# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

#### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

                              No.  1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      Thursday, November 20, 1958

Pages: 5172 to 5338

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

MALCOLM E. LOVE
**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 -- Ext. 370

XXJ 1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
      -vs-                         )          No. 1247-SD-C
                                   )
FALLBROOK PUBLIC UTILITY           )
DISTRICT, et al.,                  )
                                   )
            Defendants.            )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, November 20, 1958

APPEARANCES:

    For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                               WILLIAM E. BURBY, ESQ.,
                               Special Assistants to the
                               Attorney General,
                               Department of Justice,
                               Washington, D. C.

APPEARANCES (Continued):

| | |
|---|---|
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State of California | EDMUND G. BROWN, ESQ., Attorney-General, by ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney General, and Carl Baronkay, Esq. |
| For Defendants Fallbrook Public Utility District, et al. | F. R. SACHSE, ESQ. |

j

## I N D E X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Frank H. Cannon | 5178 | | 5210 | |
| (By Mr. Sachse) | | 5180 | | |
| (By Mr. Moskovitz) | | 5198 | | |
| (By Mr. Stahlman) | | 5200 | | |
| Joseph R. McNearny | 5217 | | | |
| (By Mr. Moskovitz) | | 5233 | | |
| (By Mr. Stahlman) | | 5235 | | |
| Walter E. Moore | 5243 | 5248 | | |
| Walter Hughes | 5252 | 5262 | 5264 | |
| (By Mr. Moskovitz) | | 5264 | | |
| Robert A. Nichols | 5266 | | 5319 | |
| (By Mr. Sachse) | | 5304 | | |
| (By Mr. Stahlman) | | 5314 | | |
| William D. Taylor | 5324 | | | |

| EXHIBITS: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| Plaintiff's Exhibit | | |
| 98-A | | 5209 |
| 92 | | 5261 |
| 73-A - Box of 1929 aerial photos | 5276 | |
| 73 - Mosaic | | 5277 |

\* \* \* \* \*

A
Z1

SAN DIEGO, CALIFORNIA, THURSDAY, NOVEMBER 20, 1958.   10 A.M.

THE CLERK:  Number three on the calendar, Case No. 1247-SD-C, United States vs. Fallbrook Public Utility District, et al.  Further court trial.

THE COURT:  In yesterday's transcript-- it is not too important-- I noticed on page 5174, line 17, Mr. Sachse made a hearsay objection and the Court overruled it, and it reads, "We will consider it material."  I said, "We still consider it immaterial."  I overruled the objection, but I was indicating that I didn't consider the matter material.  It should read, "We still consider it immaterial."

MR. VEEDER:  Your Honor, we have lodged, as part of our Exhibit 89, some photographs which are oblique aerial photographs.  They are part of the original exhibit 89.  I want everybody to know that we have made that addition to it, because it is going to be part of Col. Bowen's testimony, and if there is going to be any objection to these additional photographs I would like to know it because it will involve some changes in our schedule in Col. Bowen's testimony.

THE COURT:  Are there subdivisions of Exhibit 89, Mr. Clerk?

THE CLERK:  Yes, your Honor.  The ones that were given to me yesterday start with 89-AZ and run through 89-CF, inclusive.

5176

A

Z2

1    THE COURT:  All right, counsel will look at them at

2    their convenience.

3    MR. STAHLMAN:  Your Honor, I have a suggestion.  I don't

4    know if the Court will consider it of any importance or not.

5    In view of the fact that there are only a few of us here par-

6    ticipating in the trial and that there are a great many de-

7    fendants, I have noted, however, that from time to time various

8    defendants, some represented by counsel and some in pro per,

9    have appeared in court.  I just wondered whether it would bear

10   any significance upon the fact that sometime anyone may appear.

11   THE COURT:  I think it would be well to make a record

12   of that from time to time, and I wish you had thought about it

13   yesterday.

14   MR. STAHLMAN:  I didn't think of it last evening.

15   THE COURT:  Who was present here yesterday?

16   MR. STAHLMAN:  Well, during the past few weeks

17   there have been a number of them that I happened to recognize.

18   Yesterday, of course, Mr. Vail was here.

19   MR. VEEDER: Is Mr. Vail a pro per?

20   MR. STAHLMAN:  No, but Mr. Jack Roripaugh, whom I know

21   to be a pro per, was here the day before.

22   Is Mr. Borrell a pro per?  Alex Borrell was here.

23   MR. SACHSE:  Mr. Borrell was represented.

24   MR. STAHLMAN:  Then there was another party here.  I

25   don't know his name, but I know there have been some other

A

Z3

1  pro pers.

2  THE COURT:  I wish counsel would call my attention to

3  the fact when defendants are present.

4  Any defendant present here today?

5  MR. SACHSE:  You mean even represented defendants?

6  THE COURT:  No, it is not important if they are repre-

7  sented by counsel.

8  MR. STAHLMAN:  The point I am making, it does show that

9  some people have the privilege and that they take advantage of

10  it.

11  THE COURT:  Any defendant here today?

12  MR. STAHLMAN:  There was another gentleman here whose

13  name I do not know, but I have seen him in the area up there.

14  THE COURT:  Are you going to proceed further with Mr.

15  Cannon, Mr. Veeder?

16  MR. VEEDER:  Yes, your Honor.

17  THE COURT:  Come forward, Mr. Cannon.

18  MR. VEEDER:  Take the stand, Mr. Cannon.

19

20  FRANK H. CANNON,

21  recalled as a witness in behalf of the plaintiff, having been

22  previously sworn, testified further as follows:

23

24

25

A

Z4

DIRECT EXAMINATION (Resumed)

BY MR. VEEDER:

Q  Mr. Cannon, have you given consideration as to the effect of the reduction of the depth to which the water table may be reduced beyond which salt intrusion will take place?

MR. SACHSE:  In Ysidora Basin?

MR. VEEDER:  In Ysidora Basin.

THE WITNESS:  I have made investigations on that and I have bone into the mathematics of it and find, I believe, that it is necessary that a greater head of fresh water be maintained to prevent intrusion of the heavier salt water because of the differences in specific gravity of the two waters, and I believe that can be easily proved mathematically.

THE COURT:  You testified to that.  But the question was different.

BY MR. VEEDER:

Q  In your opinion, at what level must the water table be maintained to prevent salt water intrusion?

A  It depends on the effective depth of the salt water, and there is a mathematical relationship between those, and I believe that it will be found that for a given depth of salt water, a given static head, it is necessary that the fresh water head be 1.025 times the depth of salt water for a condition of equilibrium.  If the head falls below that, you will get salt water movement toward the pumping basin.

A

Z5

1      Q   And have you calculated the actual level at which the

2   water must be maintained from the standpoint of the number of

3   feet from ground surface?

4      A   I did for one particular spot, which would be Well

5   11-5-2N4, I believe-- it is in Ysidora Narrows, very close to

6   the Ysidora Gaging Station, and I find an effective salt water

7   head there of 186 feet.  At that point it would be necessary

8   to maintain approximately 4.86 feet of head or fresh water

9   at an elevation of 4.86 feet above mean sea level for a con-

10   dition of equilibrium.  A dropping of the fresh water head

11   below that would allow salt water to intrude the pumping

12   basin.

13      THE COURT:  In other words, so that I may understand

14   this, how many feet was it that the salt water was in that

15   well?

16      THE WITNESS:  The bottom of the water-bearing medium

17   is 186 feet below mean sea level.

18      THE COURT:  You would, therefore, under these calcula-

19   tions, have to have a basin up above in which you could keep

20   water 4.86 feet above sea level, with the saturation that

21   would take place below that.

22      THE WITNESS:  That is correct; for a condition of

23   equilibrium.

24      THE COURT:  For a condition of equilibrium.

25      THE WITNESS:  Any dropping would allow salt water to

A

Z6

1    enter the basin.

2         MR. VEEDER:  You may cross-examine.

3

4                    CROSS-EXAMINATION

5    BY MR. SACHSE:

6         Q  Mr. Cannon, right on this very first question, then

7    4.86 feet above sea level in that particular well would be

8    what distance below ground surface?

9         A  The ground surface is of a shifting character,

10   depending on the scouring of the river bed at that point.  I

11   could only answer approximately as of one condition-- the

12   condition as I have it here, it is approximately  16 feet

13   above mean sea level at that point. from 12 to 16 feet.

14        Q  Leaving off this .86 and just calling it 5 for

15   purposes of easy arithmetic, you say it is how many feet above

16   mean sea level of ground surface?

17        A  The surface of the stream is approximately 16 feet.

18        Q  Then if you had a water table in that particular well

19   11 feet below ground surface, you would feel that an equilibrium

20   was being maintained?

21        A  It would approximately balance.

22        MR. VEEDER:  Counsel, have you observed that the addi-

23   tional data has been added onto Exhibit 101 from the stand-

24   point of the calculations by Mr. Cannon as to the depth?

25        MR. SACHSE:  No, I didn't.

A

Z7

1      MR. VEEDER:  It is placed on there in accordance with

2   the directions of the Court yesterday.  I thought you didn't

3   know about it.

4   BY MR. SACHSE:

5      Q  Mr. Cannon, this condition of salt water intrusion

6   you observed first when?

7      A  In 1947 the pumping season.

8      Q  I am not quite clear whether you testified that the

9   condition of actual intrusion has continued since then, or

10  whether it is simply a condition of contamination caused by

11  past intrusion.  Do you understand my question?

12     A  We took every step possible, I believe, to prevent

13  or to stop the intrusion by ceasing pumping of those particular

14  wells which were affected greatest.

15     Q  So as of what time do you estimate that the actual

16  intrusion of additional sea water into the basin stopped?

17     A  That is difficult to say with certainty, but I

18  believe it is reasonable to assume that it stopped with the

19  wet season of 1952.

20     Q  And since then--

21     A  It could be accentuated at any time by overpumping.

22     Q  That was my next question.  And since then you have

23  maintained an equilibrium by stopping pumping in that basin;

24  is that correct?

25     A  An attempt has been made to do just that.

A

Z8

1        Q   So if you started heavy pumping again your antici-

2  pation would be that you would expect additional salt water

3  intrusion?

4        A   I would expect it, yes.

5        Q   Likewise, if you don't pump you would expect that

6  your condition of equilibrium would be maintained?

7        A   Providing the ground water level can be kept at an

8  adequate height to counteract the effect of the static head of

9  salt water.

10       THE COURT:   Well, now, all pumping has not been stopped,

11  however, in the Ysidora Basin since 1952?

12       THE WITNESS:   No, your Honor.   There is some pumping on

13  one well known as 4C, and there is irrigation pumping for the

14  benefit of the north area or Stewart Mesa area from Well 4I--

15  I could convert that number.   Presently contract documents

16  have been completed and are ready for going out to bid to dig

17  replacement wells in Lower Chappo, which would cut out all

18  pumping in the Ysidora Basin.   That is being pursued with all

19  haste.

20       MR. SACHSE:   I will show the witness Exhibit 98.

21       MR. VEEDER:   Your Honor, I had previously requested

22  that we have the right to recall witnesses on different sub-

23  jects, and I would like to have that applied to Mr. Cannon.

24       THE COURT:   He may be recalled later, if you have

25  another matter.

A

Z9

MR. SACHSE:  An exhibit has been mislaid.  I will use mine.  It is Exhibit 97.

Q  Directing your attention, Mr. Cannon, to Plaintiff's Exhibit 97, which you will recall was the topographic map prepared by Messrs. McKissick & Bell, Civil Engineers, Vista, in 1940, on which you plotted the watershed line north from the river; is that correct?

A  That is correct.

Q  And as I understand it, you plotted that watershed line solely with reference to the contours as they appear on this map?

A  That I made an effort to do, yes.

Q  In other words, you were not on the ground with a transit in 1940?

A  I did not make the map.

Q  What do you know of the conditions at the time this map was made, the physical conditions?

A  I was not there.  It is my understanding that por- tions of it were in cultivation, portions were not.

Q  In other words, you don't know, then, whether this Stewart Mesa area, through which you have drawn the watershed boundary line, had been altered by acts of man at the time the map was made?

A  I believe that leveling processes had proceeded in- land from Highway 101 and the railroad, that that had been

A

Z10

1    cropped.  Now the extent of leveling I can't testify.  I was

2    not there.

3        Q  And in which direction it had been graded you can't

4    testify?

5        A  No.  The evidence indicated that the portion between

6    the railroad, the highway and the sea had not been altered.

7        Q  Let us speak then solely regarding the portion of

8    the mesa lying easterly of the highway and the sea.  You

9    don't know whether or not the drainage in that area had been

10   changed by reason of the grading activities incident to the

11   cropping of the land?

12       A  I don't know.

13       MR. SACHSE:  Your Honor, I move to strike the exhibit.

14   It has absolutely no materiality, and there is no foundation

15   for that watershed line.

16       THE COURT:  Your motion is denied.  He has testified

17   that as between the ocean and the railroad he is certain.  He

18   has some doubt as between the railroad and the east side of

19   Stewart Mesa.

20       MR. SACHSE:  I didn't understand that.

21       Q  Did you say that you are certain that there had been

22   no action between the railroad and the ocean-- no grading?

23       A  The appearance of aerial photographs taken at that

24   time, together with the fact that the contours are so irregular

25   between the highway and the ocean, lead me to believe that that

1   has not been leveled.  I know the conditions now.

2        Q  They have not been leveled at this time?

3        A  It is not in that condition at the present time.

4        THE COURT:  It has been changed; is that right?

5        THE WITNESS:  It has been changed.

6   BY MR. SACHSE:

7        Q  With particular reference to the lagoon area, the

8   salt marsh area indicated on Exhibit 98, you testified in

9   response to a question of his Honor yesterday as to maximum

10  high tides in this area.  What was the figure you gave us?

11       A  I said that the maximum high tides were in the

12  neighborhood of 5 feet above mean sea level.

13       THE COURT:  Which exhibit are you talking about now?

14       MR. SACHSE:  Exhibit 98, your Honor.

15       Q  Your elevation datum that appears on Exhibit 98 is

16  also above mean sea level, is it not?

17       A  No, sir; the datum is mean sea level.

18       Q  In other words, the elevations, I mean, are above

19  sea level?

20       A  They are.  To the datum of mean sea level they would

21  be above.  Some elevations are minus, however.

22       Q  That is right-- below sea level?

23       A  That would indicate elevations below sea level.

24       Q  I will direct your attention particularly to the

25  elevation figures that appear on the sand dunes immediately

1    beneath the location point nine.

2        THE COURT:  What do you mean by location point nine?

3        MR. SACHSE:  Perhaps I had better ask about that.

4        Q  There is a series of numerals on a straight line

5    along the beach-- 6, 9, 12, 15, 18, 21, et cetera.  Do you

6    see the ones I refer to?  What are those numbers?

7        A  That is stationing on the base line.  For the

8    purpose of accuracy, it is generally necessary to establish

9    a base line for a survey, and that base line is-- the station-

10   ing starts at 0 plus 00.  The first order of triangulation

11   point at the side is the right-hand side of the map.

A2

12       Q  Under the flap?

13       A  Under the flap.

14       Q  So, if I want to refer to numerals along there, I

15   should call them what?

16       A  Base line station.

17       Q  Base line station?

18       A  And the 3 indicates 300 feet to the northwesterly

19   of the station side.

20       Q  Then I am directing your attention, Mr. Cannon, to

21   the elevations that appear immediately beneath the base line

22   station No. 9.  You will observe, I think, that the elevations

23   are shown as 8.5 feet and 7.5 feet?

24       A  That is right.

25       Q  What, in your opinion, would be the effect of a 6-foot

A2

Z13

1   tide with a northwest or southwest gale at that point of the

2   dunes?

3        MR. VEEDER:  I object on the grounds that it is purely

4   speculation:  What would be the effect of a high wind and a

5   high tide?  He couldn't even guess.  It is pure speculation,

6   the purest conjecture.

7        THE COURT:  Objection sustained.

8   BY MR. SACHSE:

9        Q  Have you observed, Mr. Cannon-- it is not shown on

10  this exhibit-- the mouth of the Santa Margarita River where

11  it actually hits the barrier beach during your residence in

12  Camp Pendleton?

13       A  I have, for a good many years.

14       Q  Am I correct in stating that for many extended

15  periods of time that is a dry-land barrier all the way across

16  the mouth of the river?

17       A  That is true for years of low flow.  I have seen

18  that opening of the river opened for eight or nine months of

19  the year-- in wetter seasons, however.

20       THE COURT:  Now, wait.  You say there is a dry-land

21  barrier.  Do you mean by that that fresh water does not cross

22  from the uplands and/or do you mean that salt water does not

23  come in from the ocean?

24       MR. SACHSE:  I would not attempt to state the latter,

25  your Honor, because I am quite sure that salt water goes

Z14

1    underneath and through the beach.  But what I mean is that one

2    could physically walk without getting his feet wet all the way

3    up the beach to the Santa Margarita River.

4         THE COURT:  Well, do you mean that salt water does not

5    flow over the top of it?

6         MR. SACHSE:  Yes, your Honor; not over the top, and

7    fresh water not over the top is the intent of my question.

8         Q  Now, knowing the intent of my question, Mr. Cannon,

9    do you want to change your answer?

10        A  I know that the Santa Margarita River in the

11   neighborhood of the sea is an intermittent stream.  It does

12   not constantly flow.  It is not a navigable stream and it is

13   not continually open to the ocean.  Not very many streams in

14   Southern California--

15        Q  Have you observed periods as long as a year when

16   this condition existed?

17        A  I have noted such a period, yes.

18        Q  You have noted a period in excess of a year, have

19   you not?

20        A  When no water broke through to the sea at all to

21   open the barrier beach it could be possible, yes.

22        Q  When was the last occasion that you noted water

23   breaking through the barrier beach to the sea?

24        A  Last winter.

25        Q  That would be in March or April, the big rains of

A2

Z15

1   this year?

2       A  January, I believe.

3       Q  Prior to that time for how long a time had the barrier

4  been closed, to the best of your knowledge?

5       A  I didn't keep records of that and I couldn't state

6  from memory.

7       THE COURT:  During this period when water was not

8  coming down the Santa Margarita and across the barrier to the

9  ocean, did you observe whether or not the salt water at high

10  tide crossed over the barrier into the lagoon?

11      THE WITNESS:  It can at times of high tide accompanied

12  by high waves.  The normal condition at that point-- and at

13  no time, to my knowledge, has it all been dry-- there is always

14  a lagoon inland from the barrier.  While the direct connection

15  to the sea is cut off, the lagoon is quite brackish and there

16  are times when it is not nearly as salt as the sea.  It is

17  always extremely brackish.  We have made at various times

18  salinity tests of the water in the lagoon.  It receives waste

19  drainage water from the Stewart Mesa and other farmed areas

20  in the neighborhood, and also I believe that the lagoon at

21  times stands at a level above the ground water gradient within

22  the stream above.

23

24

25

ML-X B-1 j
j3

1       THE COURT:  This examination is directed, I suppose,
2  to the question whether this lagoon area is part of the
3  watershed.

4       MR. SACHSE:  That is all I have, your Honor.  No
5  further questions.

6       THE COURT:  Is it your contention, Mr. Sachse, that
7  the watershed line runs up along the foot of a bluff?

8       MR. SACHSE:  Yes, your Honor.

9       THE COURT:  Along the 10-foot level or so?

10      MR. SACHSE:  Yes, your Honor.

11      THE COURT:  How much of an installation does the
12  Government have in this lagoon area?  How much water are
13  they using in this lagoon area?

14      MR. SACHSE:  Nothing.  That is why I think it is
15  extremely unimportant.  I think that the record ought to be
16  clear on it.  I don't think there is any agricultural use
17  in it.  I don't think you can find any irrigable land in that
18  area; so it is --

19      THE COURT:  Nor is there any appreciable use of water
20  in that area by the Government other than for activities in
21  connection with the Boat Harbor, I take it?

22      MR. SACHSE:  That I could not answer.  I don't know
23  what the Marines may or may not do in that area, but I don't
24  think you could claim it is irrigable land.

25      MR. VEEDER:  We are going to put in a great deal of

j4

1    evidence along the line of location of buildings and the

2    use of the land, your Honor.

3        THE COURT:  I know there is a use of land.  I am

4    inquiring as to whether or not there is any appreciable use

5    of water in that area.

6        MR. SACHSE:  I can't answer.

7        MR. VEEDER:  Yes, there is use of water throughout

8    the area; and there has been in the past.  And we have

9    moved some buildings up, and we are continuing to use the

10    water.

11        MR. SACHSE:  I have nothing further on this subject

12    now.

13        Q    Now, Mr. Cannon, specifically the four wells that

14    are indicated on Exhibit 101, profile, and the fifth one

15    that you drew in are all in Ysidora Basin, are they not?

16        A    They are.

17        Q    For what purpose have those wells been pumped

18    since your residence on Pendleton?

19        A    They have been pumped both for domestic and for

20    irrigation purposes.

21        Q    Now, one well only, however, was used for domestic;

22    is that not correct?  I so understood you to testify

23    yesterday.

24        A    Of the --?

25        Q    Of those five.

1  A The one that was added has also been used for

2 domestic purpose.

3  Q You mean the one you drew on?

4  A Yes.

5  Q When was that domestic use discontinued?

6  A I believe in 1948.  I could be wrong by a few

7 months.

8  Q So since 1948, the only diversions from the

9 Ysidora Basin have been for irrigation purposes, is that

10 correct?

11  A No, I would not say that.  Well 4BB was used as

12 a domestic.  That is in Ysidora Basin and has been used for

13 domestic purposes since 1948.

14  Q Is that still being used for domestic purposes?

15  A No, it is not.

16  Q When was that use discontinued?

17  A I can't recall the exact date.  That was dis-

18 continued in line with the rise in salt content of the

19 water.  I don't recall the exact date.

20  Q Can you give us within a year?

21  A It was approximately five years ago.

22  Q So then, for the past five years, am I correct in

23 saying that, the only pumping from the Ysidora Basin has

24 been for irrigation purposes?

25  A In general, approximately that time.

Q    Where on your irrigation system, as you have delineated it, does that water go?  In what area of the camp does this irrigation take place?

A    The larger portion of it goes to the Stewart Mesa area which is indicated at the top of the map.

Q    It is the area north of the river on the top of the map?

A    It is the larger portion.  Certain other smaller areas are still irrigated.  Water is divided for the State of California seed potato plots.

Q    And those are to the south of the map indicated with an arrow?

A    Adjacent to the south boundary.

Q    Do you know where those plots lie with relation to the watershed line?

A    Yes; I can determine that from the maps, from the exhibits.

Q    Can you tell us offhand?

THE COURT:  You are talking about the seed potato plots now?

MR. SACHSE:  That plot now, yes, your Honor.

THE WITNESS:  Exhibit No. 98-A embraces all of the areas used by the State.  And the watershed line as indicated on that exhibit in part passes through the area leased to the State.  Most of the --

j7

1    THE COURT:  Where is that area?  What section?

2    MR. VEEDER:  If your Honor will look on 101.

3    MR. SACHSE:  It is labelled on 101, your Honor.

4    Open arrow pointing to it, to a 240-acre parcel.

5    THE WITNESS:  I might add that the area indicated on

6    Exhibit 101 as 240 acres has been cut down and subdivided.

7    A portion of that is now used for the housing of 540 families

8    but --

9    Q  BY MR. SACHSE:  But that portion now does not

10   receive water from Ysidora Basin?

11   A  No, it does not.  And also, there is a plot

12   labelled on Exhibit No. 98-A as "North Terrace School."

13   That has been given over to the Oceanside Municipal School

14   District for elementary school purposes.  That does not

15   receive water from Ysidora Basin.  However, those areas

16   were deducted from the area indicated on Exhibit 101 as the

17   original 240 acres leased to the State Department of

18   Agriculture.

19   THE COURT:  I was trying to identify on 98-A where

20   this 240 acres was located.  I am having a little trouble

21   doing it.

22   MR. SACHSE:  Perhaps we could ask the witness roughly

23   with another color just to indicate it.

24   Q  Could you do that?

25   A  I am not acquainted with the present boundaries

1   of the lease.  It is my understanding that approximately 75

2   per cent of it, at least, is within the watershed, within

3   the Santa Margarita watershed.

4        Q   If you are not acquainted with it, we won't ask

5   you to draw it on there.

6        A   I believe there is another witness that can do

7   that.

8        Q   Now, with reference to Stewart Mesa, you delineated

9   watershed lines on Exhibit 97, as I showed a moment ago,

10   as of the state of nature.  A very substantial part of

11   Stewart Mesa is outside the watershed, is it not?

12        A   A considerable area, yes.

13        Q   And a considerable area of the irrigated land is

14   outside the watershed on Stewart Mesa, is it not?

15        A   As nature put the watershed, I believe that is

16   true.

17        Q   I think I am almost through, Mr. Cannon.  Now,

18   with particular reference to 98-A, the watershed line, as I

19   understand it, as you have indicated it, is your reconstruc-

20   tion based on numerous other exhibits here of how that line

21   existed in the state of nature prior to the grading and road

22   construction, and so on?

23        A   To the best of my ability, with the information

24   I had to work with, I believe that is correct.

25        Q   Now, you would agree certainly, would you not,

1   that the actual drainage of water in that area, the actual

2   watershed line, as a result of the works of man, is entirely

3   different?

4        A   The conditions have been altered by works of man,

5   that is true.

6        Q   In other words, as just a simple example, the

7   area immediately surrounding the Boat Basin now drains into

8   the Boat Basin, does it not?

9        A   Certain drainage has been directed that way.

10        Q   By works of man?

11        A   That is right.

12        Q   Have you made any study or delineation on the

13   map of the watershed as it presently exists subject to the

14   alteration by works of man?

15        A   No, I have not.

16        Q   Do you know whether any such study exists in

17   your office, in your Public Works Office, where such a map

18   has been prepared?

19        A   Not in our office, no.

20        Q   You don't have such a map?

21        A   No, I don't have that determination.

22        THE COURT:  What materiality would that have?

23        MR. SACHSE:  It has only this, your Honor -- I again

24   will drop this subject.  I frankly don't know, your Honor.

25   I am trying to look it up.  I know that riparian status can

be lost by evulsion.  I know that certain circumstances can
cause land to use its riparian status.  I don't know.  My
offhand impression, on the basis of logic and reasoning, is
that Mr. Veeder would be right, and that the natural water-
shed line would control.  I am not certain.  And so I think
we should be prepared to inquire into it in case it turns
out I am wrong.

THE COURT:  My offhand reaction is this:  Supposing
there was an area that is in the state of nature down here,
some fringe area, drains into the San Luis Rey, and it has
now been changed so that it drains into the Santa Margarita.
It seems the only persons who can complain about that would
be the people in the San Luis Rey.  Now, if, on the other
hand, in the state of nature it drains into Santa Margarita
and has now been changed to drain into the San Luis Rey,
the appreciable effect on the watershed, removing that
amount of drainage from it, would be so infinitesimal that
I wouldn't think we would be concerned with it.

MR. SACHSE:  I think your Honor is missing the point.
The question isn't where the water drains to from the stand-
point of the water involved.  The question is from the
standpoint of calculating irrigable lands to which riparian
rights attach.  Using your Honor's example:  If a block of
land were changed by acts of man, a block of land which had
originally been within the San Luis Rey watershed, and by

1    acts of man was pushed into the Santa Margarita watershed,

2    I do not believe that that landowner could claim additional

3    riparian rights in the Santa Margarita by reason of those

4    acts of man.  I think the state of nature would apply.  Now,

5    I am not certain as to how it works in reverse.  I know that

6    you can lose riparian rights by evulsion.  By acts of

7    nature, when the stream whips itself around, you can lose

8    your riparian status.  That is sound law.  But whether your

9    own acts could cause you to lose them, I don't know.  And

10   my tendency is to feel that the state of nature must control,

11   I am satisfied.  And I think weshould be prepared to con-

12   sider the present watershed line as well as the past ones.

            I have no further questions.


15                    CROSS EXAMINATION

16   BY MR. MOSKOVITZ:-

17        Q    I just have about two minor matters I want to

18   cover, Mr. Cannon.  I believe you testified that Well 5-A-2,

19   as shown on Exhibit 101, is the same well which under the

20   Geological Survey numbering system would be 11-5-2F2; is

21   that correct?

22        A    I may have not made the proper conversion there,

23   and my testimony in that respect may require a revision.

24        THE COURT:  I thought he said that Well 4-C-1 was

25   the equivalent of 11-5-2F2.  That is what my notes show.

1    MR. MOSKOVITZ:  Let's clarify it.  Mine do not.

2        Q   What is the correct number according to the

3    Geological Survey of the well that you have marked as

4    Well 5-A-2 on Exhibit 101?

5        A   I do not have the conversion numbers for Well

6    5-A-2.  I know the location on the -- I would have to have

7    access to one of the United States Geological Survey exhibits

8    to determine that.

9        MR. MOSKOVITZ:  I think the well logs would be a

10   useful exhibit; 16.

11       THE WITNESS:  Those wells have been known by so many

12   numbers, and I am used to another system than that used by

13   the Geological Survey.

14       MR. MOSKOVITZ:  I think we can correct the error.  I

15   just want to get it correct in the record.

16       THE COURT:  You can do that during the recess or

17   over the noon hour and tell us what the correlation is?

18       THE WITNESS:  I may have made an inadvertent but

19   honest mistake in identifying the numbers.

20       MR. MOSKOVITZ:  It would be helpful if you correct

21   the Geological Survey numbers for the five wells that now

22   show in the Ysidora Subbasin on your profile, Exhibit 101,

23   so that we will all have the right conversions.  And we will

24   do that after the recess, the noon hour.

25       THE COURT:  All right.

Q   BY MR. MOSKOVITZ:  And you testified that presently contracts have been let for the drilling of some new wells in the lower part of the Chappo Subbasin?

A   No, I did not testify that the contracts had been let.  I say, the contract documents are all ready for contract.

Q   And those wells would be used for obtaining the water that is now being obtained from the one well that is still pumping in the Ysidora Subbasin?

A   That is the intention, yes.

Q   And that water would be used, then, for the irrigation of the areas that you have already testified to are now receiving water in the area?

A   That is correct, yes.

MR. MOSKOVITZ:  I have no more questions.

MR. STAHLMAN:  I just have a few, your Honor.

CROSS EXAMINATION

BY MR. STAHLMAN:-

Q   Mr. Cannon, do you have an opinion as to whether in the state of nature there was any salt water intrusion into the Ysidora Basin?

A   I have no reason to believe that there was any appreciable salt water in the Ysidora Basin.  I have heard stories about those wells when they originally drilled that

1   some salt water was encountered at the lower depths but that

2   it cleared up immediately on pumping.

3       Q   Is it your opinion that in the state of nature

4   that the Ysidora Basin would contain fresh water, not salt

5   water?

6       A   It has been my experience, the wells I have seen

7   drilled there, that it does contain fresh water.

8       Q   Now, you stated, also, I believe, that you have

9   given consideration to various ways and means of preventing

10   the further salt water intrusion as well as to restore the

11   basin so that it may function as a fresh water delivery

12   system; is that correct?

13       A   That is true.

14       Q   And you mentioned, of course, the method of using

15   the sewage water by flooding the land.  And were there any

16   other methods considered?

17       A   Actual physical barriers were considered, and

18   reports have been made and studies have been made to

19   determine costs by such methods.

20       Q   Have there been any movements or plans towards

21   the installation of either one or the other of these methods?

22       A   No moneys have been appropriated for that purpose.

23       Q   Have you preponderated on any of the methods to

24   be used, as being the best?  What, in your opinion, would

25   be the best?

A    Are you asking for a personal opinion?

Q    Yes, as your opinion.

A    I have the opinion that because of costs involved that it would be worthwhile to try out at least the hydrolic method.

Q    That would be by use of the sewage?

A    The sewage, or a combination of sewage and other fresh water.

Q    A combination, yes.

Well, you have experienced, have you not, in the use of the sewage water, that that has also increased the saline content of the water so to, if continued over a period of time, could be beyond the limits; is that true?

A    There are indications that the quality of the water changes.

Q    If the method were used, such as you have suggested, over a period of time, in your opinion would the use of the sewage water effectively destroy the fresh water condition of the lower basin?

MR. VEEDER:  May I have that question, please.

MR. STAHLMAN:  I don't know whether I expressed it very clearly or not.

THE COURT:  Read it.

(The reporter read back the question.)

Q  BY MR. STAHLMAN:  What I have in mind is this, in

1    explaining the question:  that in the event that that system

2    was resorted to and you continued to use sewage water for

3    that purpose and it was effective, as you state, would that

4    then cause trouble again at some time in the future by

5    reason of the use of sewage water?

6         A.  I believe that is a distinct possibility.  And

7    in that respect, the method might have to be considered an

8    interim method.  However, the damage to the basin would be

9    much less than admitting sea water from the sea.

10        Q    All right, then, the final question:  Would, in

11   your opinion, some appropriate method of spreading and

12   releasing gradually in calculated amounts of fresh water,

13   eventually be able to restore this basin as a usable fresh

14   water basin, speaking of the Ysidora Basin?

15        A    I don't think there is much doubt as to that.

16   However, from my own observations it is going to take a long

17   time, because the movement of the ground water in the mediums

18   are so slow that it is quite a chore.  It will take a long

19   time.

20        Q    And, however, it would be a matter of gradation,

21   would it not?  I am not trying to put words in your mouth.

22   I don't know.  I am just assuming that as the water became

23   reduced in its saline solution, there would come a time

24   when you could start pumping again, we will say, for

25   irrigation purposes, and then the pumping would assist,

1   would it not?  In other words, you would be taking out

2   salt water to some extent and then the blending would con-

3   tinue and eventually the fresh water would come down --

4   (inaudible)?

5       A   I don't think I follow you in that statement.

6       Q   I don't blame you.

7           What I have in mind is this:  You say it would

8   take it a long period of time.  I am asking now whether, if

9   it is a situation somewhat reversed to what has occurred

10  there with the induction of an artificial means of inducing

11  fresh water under the ground, that you would then reach a

12  point where you could pump water that would, even though

13  not completely fresh water but in the condition that you

14  have pumped water for irrigation purposes, that was not

15  suitable for domestic purposes, but then the reverse situation

16  would be true; the pumping would assist the elimination of

17  the salt water and accelerate the induction of the fresh

18  water?

19      A   I don't believe that is true.

20      MR. VEEDER:  I am going to object to that as being

21  too speculative.

22      MR. STAHLMAN:  I am trying to help.  If you don't

23  want the question, okay.

24      THE COURT:  The witness has answered the question.

25  The objection is overruled.

MR. STAHLMAN:  My interest, your Honor, in asking these questions, is this:  It affects Vail, I think, because it is of Vail's interest to have a fresh water basin there and eliminate the necessity of Vail having to furnish the water for Camp Pendleton.  And I thought that, and I do believe that --

THE COURT:  I know what you are getting at.  From the testimony we have heard, down deeper in the ground, 150, 160 feet, the salt water intrusion is further upstream than it is up towards the surface.

THE WITNESS:  That is true, your Honor.

THE COURT:  What what Mr. Stahlman is getting at is: Supposing this hydrolic barrier was constructed, and it would probably be constructed down, I take it, at about the narrowest place there in the narrows.

THE WITNESS: That appears to be the easiest location.

THE COURT:  Assuming it is constructed there, and that is considerably downstream from some of the wells which have already shown contamination.

THE WITNESS:  Your Honor, I believe it is quite important that the Ysidora Basin be purged of its salt water before any barrier of any kind is constructed.

MR. SACHSE:  That is what Mr. Stahlman is getting at.

MR. STAHLMAN:  That is what I am getting at.

THE COURT:  That is what Mr. Stahlman is getting at.

B-2

1          Is there some way, either before this barrier is
2    built or after it is built, that you could eventually
3    pump out and get rid of some of this contaminated water?

4          THE WITNESS:  I think that would be a very inefficient
5    means of doing it and --

6          THE COURT:  How would you purge it?

7          THE WITNESS:  Providing you had a positive barrier,
8    and such a barrier would be very difficult to manufacture or
9    build, if you had a -- theoretically, if you had a positive
10   barrier then you could pump the salt water out from the land
11   side; but I believe the surest method would certainly be to
12   push the salt water out, even though it takes considerable
13   time, and then build your barrier.

14         THE COURT:  Well, push it out; you mean by the
15   introduction of fresh water into the basin?

16         THE WITNESS:  By allowing the ground water head to
17   develop high enough to insure positive seaward movement of
18   the water in the basin.

19         THE COURT:  Yes, but --  Now, that is going to stop
20   further intrusion into the basin, but that isn't going to
21   run this water back that is down there 150 feet that has
22   intruded up past the narrows.

23         THE WITNESS:  I believe it would reverse the flow,
24   your Honor, by maintaining a positive head on the fresh water
25   side.

1  THE COURT: Now the question specifically then is:

2 Assuming that you put in this hydrolic barrier, assume it

3 was put down in the narrows, which is downstream from some

4 of the contaminated wells, and assume this barrier was

5 operating, running efficiently as a barrier, would it be

6 possible to pump out some of that contaminated water that

7 is down in the lower part of the basin upstream from the

8 barrier on some gradual basis and eventually get rid of it?

9  THE WITNESS: I believe that such a thing would be

10 possible, but that would mean, of course, that you are

11 pumping a part of the fresh water, and you would have to use

12 a pretty fresh water in order to get dilution. You would

13 produce a drawdown cone on the landward side which would

14 draw water from the hydrolic barrier as well as from the

15 water naturally percolating down the stream.

16  THE COURT: Is there any possibility that you could

17 pump water into the lower depths of this basin and then

18 immediately upstream some distance from where you are pump-

19 ing fresh water in, pump out an equal amount of contaminated

20 water?

21  THE WITNESS: I don't believe it would work in that

22 manner, your Honor.

23  THE COURT: Is this what you are getting at?

24  MR. STAHLMAN: That is what I am getting at.

25  My point is this: I think that the Court will

1    have something to say about ways and means by which this

2    thing can be done to restore this basin to its workable

3    condition.  And I am trying to explore the different ways

4    and means by which it could be done.  And when I ask questions

5    for both the benefit of Vail and the Government, if this

6    Montana flash is going to make objection --

7          MR. VEEDER:  I move to strike that.  It hurts my

8    feelings.

9          THE COURT:  It may go out.

10          MR. STAHLMAN:  -- you are going to meet the Kansas

11    cyclone, and we are going to have some fun.

12          THE COURT:  Do we have a defendant present here in

13    the jury box now?

14          MR. STAHLMAN:  That is all.

15          THE COURT:  Someone came in.  What is your name, sir?

16          MR. MOORE:  Mine, sir, is Walter E. Moore.

17          THE COURT:  Are you appeared by an attorney in this

18    case?

19          MR. SACHSE:  That is one of Mr. Veeder's witnesses.

20          MR. VEEDER:  He is also a witness of mine.

21          THE COURT:  What about the gentleman next to him?

22          MR. HUGHES:  I am Walter Hughes.  I am from N.A.D.

23    I am here as a witness.

24          THE COURT:  All right.

25          MR. STAHLMAN:  Those are all the questions I have,

1   your Honor.

2         THE COURT:   Any further questions of Mr. Cannon?

3         MR. SACHSE:   I have nothing further.

4       MR. VEEDER:   I have a few on redirect.

5         Before I do so, your Honor, the exhibit marked

6   for identification 98-1, which is the quadrangle dated

7   1898, had not been lodged prior to the testimony of Mr.

8   Cannon.   I would like the indulgence of the Court and counsel

9   to offer it in evidence.   It was a matter that seemed

10  extremely relevant to the Exhibit 988 and 98-A.

11        MR. SACHSE:   No objection.

12        MR. MOSKOVITZ:   We don't have any objection.

13        THE COURT:   Do you people have any objection to it?

14        MR. MOSKOVITZ:   No.

15        THE COURT:   98-1 will now be identified by that

16  number, not having been previously identified, and received

17  in evidence.

18        (People's Exhibit No. 98-1 for identification was

19  received in evidence as People's Exhibit No. 98-1.)

20        MR. VEEDER:   Thank you, your Honor.

21        THE COURT:   You say that is a quadrangle from 1898?

22        MR. VEEDER:   Yes, your Honor.   I think that is right.

23  "Survey in 1891 and 1898."

24

25

REDIRECT EXAMINATION

BY MR. VEEDER:-

Q   Mr. Cannon, what, in your opinion, would be the effect upon the Ysidora Basin from the standpoint of salt water intrusion in the event that there is an appreciable reduction in the quantity of water surface supply reaching Camp Pendleton in the Santa Margarita River?

MR. SACHSE:  I am going to object.  It is beyond the scope of the cross.

MR. VEEDER:  Your Honor, we have gone into it at great length, I thought.

MR. SACHSE:  There has been not one question of surface flow of Mr. Cannon on cross-examination.

THE COURT:  Let's have the question read.

(The reporter read back the question.)

MR. STAHLMAN:  In view of my questions, that is proper redirect.

MR. VEEDER:  Certainly, and also your Honor's question.

THE COURT:  Whether it is proper or not I will permit the Government to reopen.  The objection is overruled.  You may answer.

Q   BY MR. VEEDER:  Have you the question in mind now, Mr. Cannon?

A   I believe I have.  In my opinion, appreciable reduction in the surface flow of the stream would undoubtedly

have an effect on the height of the water table in lower Ysidora. And, as I testified before, in my opinion, any reduction of that height would allow or would cause a drop in head of the fresh water above the narrows, which would allow the further intrusion of salt water.

THE COURT: Of course, the question doesn't mean anything, because it depends upon some other factors. If you didn't pump at all from the basins, it would take a lesser amount of water to keep the salt water out. If you pump it extensively, you will keep a lot more water, you will require a lot more water to keep the salt water out. So the question is just argument.

MR. VEEDER: No, your Honor, from our standpoint we are confronted, as your Honor well knows, with the problem of maintaining this military establishment, and Fallbrook is sitting up there, threatening -- I don't think it will ever build a dam, but it is threatening to build a dam --

THE COURT: Let's go ahead.

Q  BY MR. VEEDER: Now, when you use the term "domestic purposes," Mr. Cannon, what do you mean by that term in connection with the use of the water at Camp Pendleton?

A    I would construe the term "domestic purposes" --

THE COURT: What do you mean by the word "domestic" when you use it? That is what he asked you.

THE WITNESS:  I mean the use of water in the homes that are maintained there, the housing areas, and in the barracks where it is necessary for flushing toilets, drinking purposes, and cooking.

1    MR. VEEDER:  I have no further questions.

2    THE COURT:  Watering lawns?

3    THE WITNESS:  I would include that as a domestic use,

4  yes.

5    THE COURT:  Washing cars?

6    THE WITNESS:  That is extending it a little bit, but

7  it is considered a domestic use.

8    THE COURT:  The activities that would ordinarily go on

9  around a home?

10    THE WITNESS:  That is correct, your Honor.

11    MR. SACHSE:  What would you consider--

12    MR. VEEDER:  What is this now?  Are we opening this up?

13    THE COURT:  Are you through, Mr. Veeder?

14    MR. SCAHSE:  This is recross.

15    MR. VEEDER:  Yes, your Honor.

16

17              RECROSS-EXAMINATION

18  BY MR. SACHSE:

19    Q  What would you consider industrial activities such

20  as washing salt off of amphibious vehicles?

21    A  I don't know that I am qualified as an expert to

22  answer the question.

23    MR. VEEDER:  Then you can't answer it.

24  BY MR. SACHSE:

25    Q  In your classification of use, Mr. Cannon, you gave us

C

Z17

just two terms, domestic and irrigation.

MR. VEEDER: He has answered the question, your Honor.

MR. SACHSE: I would rephrase it, Mr. Veeder.

Q You gave us just two terms, domestic and irrigation. Would you say there are other uses in addition to the domestic and irrigation uses on Camp Pendleton?

MR. STAHLMAN: I don't understand the question. Do you mean that they use down there?

THE WITNESS: To answer that question, I would say that it is akin to municipal use where water uses would involve all manner of industrial uses.

BY MR. SACHSE:

Q I have particular reference to the questions that I asked you about the uses to which the water from Ysidora wells was put and you used just two descriptive terms; you used the term "domestic" and you used the term "irrigation." Now, are there other uses that you don't include within "domestic" and "irrigation"?

MR. VEEDER: If you know.

THE WITNESS: I don't know that I could give definitions of other uses.

BY MR. SACHSE:

Q Perhaps I am phrasing this poorly, Mr. Cannon.

THE COURT: Well, counsel asked a very simple question. You gave two categories; you said "domestic" and "irrigation."

C

Z18

1    Would all the uses that you know of that go on at Camp Pendle-

2    ton, in your opinion, come within either one of those?

3            MR. SACHSE:  From the Ysidora wells, your Honor.

4            THE COURT:  From the Ysidora wells.

5    BY MR. SACHSE:

6        Q   Would all the Ysidora well uses be included within

7    those two categories, either domestic or irrigation?

8        A   Yes, I think they would.  Yes.

9            MR. SACHSE:  No further questions.

10           MR. MOSKOVITZ:  I have a further question.

11

12                        RECROSS-EXAMINATION

13   BY MR. MOSKOVITZ:

14       Q   Mr. Cannon, you testified on redirect examination

15   that the reduction of surface inflow in Ysidora Subbasin would

16   reduce the levels of the ground waters and therefore would

17   affect the amount of sea water intrusion.  Is that in sub-

18   stance what you said?

19       A   In essence I believe that is what I said.

20       Q   Would it make a difference at what times the surface

21   water inflow were reduced?

22       A   I think it would make more of a difference about

23   the levels to which the ground water might drop, regardless

24   of time.

25       Q   For example, Mr. Cannon, if in time of high flow,

C

Z19

1  when there was discharge past Ysidora Gaging Station of surface

2  water into the ocean, would a reduction in those flows neces-

3  sarily affect the ground water level and necessarily affect

4  how much sea water?

5      A  I don't think that if the river bed was covered with

6  flowing water rushing out to the sea that snatching some of

7  it on the way would have an appreciable effect on the ground

8  water level, no.

9      Q  Would it have any effect?

10     A  I think I have answered it.

11     Q  You used the term "appreciable."  I am asking you,

12  would it have any effect?

13     A  I don't think you could prove an effect.

14     MR. MOSKOVITZ:  All right.

15     THE COURT:  Are you through now with this witness?

16     MR. VEEDER:  I have no further questions, your Honor.

17  I would like to have the right to recall him.

18     THE COURT:  You have that right.

19     Thank you, Mr. Cannon.  You will be available for being

20  recalled if we need you.

21     THE WITNESS:  Yes.

22     THE COURT:  You will not be required to stay in attend-

23  ance, unless Mr. Veeder so directs.

24     MR. MOSKOVITZ:  Your Honor, Mr. Cannon is going to

25  correct those well designations?

5217

C

Z20

1     THE COURT:  Yes, he is going to do that.

2         Get those designations of the wells and give them to

3  us after the recess.

4         (Recess.)

5     MR. VEEDER:  I will call Mr. McNearny.

6

7                    JOSEPH R. McNEARNY,

8  called as a witness in behalf of the plaintiff, being first

9  duly sworn, testified as follows:

10    MR. SACHSE:  Your Honor, before Mr. Veeder proceeds--

11 I hate to play the same cracked record-- Mr. Veeder has just

12 advised me during the recess that as far as he is concerned

13 this classified report on the Pauba well is unclassified, but

14 he says he hasn't got it.  I would like to get it and look at

15 it.

16    MR. VEEDER:  I will do the best I can to get it.

17    MR. SACHSE:  I think that in connection with our agree-

18 ment for exchange of information it should be available, your

19 Honor.

20    MR. VEEDER:  It will be.

21    THE COURT:  What have you done to get it?

22    MR. VEEDER:  I will have to call Mr. Worts to get it.

23 No one here has it.  I have asked the Range for it.  They don't

24 have it.

25    THE COURT:  Will you call Mr. Worts?

1      MR. VEEDER:  I will, your Honor.

2

3                      DIRECT EXAMINATION

4      MR. VEEDER:  Again, your Honor, Mr. McNearny testified

5  at the proceedings up at Reche School before the Special

6  Master.  For that reason, I think we can avoid inquiries as

7  to his qualifications and position, if counsel agree.

8      MR. STAHLMAN:  I think you ought to have something in

9  the record as to his position.

10     MR. VEEDER:  I will on that.

11     THE COURT:  Briefly.

12     MR. SACHSE:  I don't recall that he was qualified as an

13  expert, Mr. Veeder.

14     MR. VEEDER:  If you heard what I said, Mr. Sachse.  I

15  didn't even tender the idea that he was an expert.

16     THE COURT:  What did you say about it?  You said that

17  he testified at the Reche School and what?

18     MR. VEEDER:  And that his background and data, like

19  that, need not be repeated.  He is not going to testify as an

20  expert.

21     THE COURT:  What is your business or occupation?

22     THE WITNESS:  I am the civilian in charge at Camp

23  Pendleton of all the pumping and disposal setup.

24     THE COURT:  How long have you been there?

25     THE WITNESS:  Since 1942, with a short time that I went

C

Z22

1    overseas.

2         THE COURT:  Proceed.

3    BY MR. VEEDER:

4         Q  Mr. McNearny, briefly state into the record what you

5    do in the performance of your duties at Camp Pendleton,

6    alluding, if you would, to Plaintiff's Exhibit No. 101, which

7    shows, by way of illustration, the location and the schematic

8    drawing of the system for the distribution of water, or you may

9    step to the easel, if you would, and state briefly what your

10   duties are.

11        A  I have many duties other than what pertains to this--

12   is it 100?

13        Q  That is Exhibit 101 you are looking at there.

14        A  --101, regarding all of the pumping, plumbing,

15   maintenance, repair and required needs for the Camp.  But in

16   regard to the water system, I am the civilian in charge of

17   the requirements for water, working under the Maintenance

18   Officer, who is a colonel at the time.

19        Q  When you say the requirements for water, what do

20   you mean by that?

21        A  Each barracks, hospital, dispensary, rental units,

22   mess halls and quarters are tied into one water system.

23        The water system consists, at Camp Pendleton, of three

24   stages; the wells, which are located in the Margarita Basin;

25   the booster stations, which are located at various points

C

Z23

1 throughout the main area of Camp; and the reservoirs, which are

2 four, in the main area.

3     Three of the reservoirs are on the same elevations--

4 540 feet.  One reservoir, the one that takes care of the Wire

5 Mountain and 12 Area, is at an elevation of 450 feet.  All

6 boosters are on the same elevation-- 260 to 300 feet, I believe.

7     Q  How do you know where the water is delivered once

8 it is pumped from the well, Mr. McNearny?  Is there any way

9 to determine that?

10     A  With a few exceptions, there is no way of determining

11 the way the water is going to go.  Let me explain it this way,

12 by the way the water is coming.

13     The prime requirement is the individual that goes to a

14 faucet and turns the faucet on.  That is when the water starts

15 moving.  The water will be removed from the reservoirs.  I say

16 reservoirs because the three of them are tied together at the

17 same elevation.  When one reservoir goes down, they all go

18 down.  The reservoir is tied to a booster station.  Each booster

19 station has a 75,000 gallon redwood tank, which at all times,

20 when not in use, is filled.  The booster station calls on the

21 various wells.  Usually we have two wells tied to each booster

22 station through a dial system.  Now in the area, any area

23 regardless where it is, when the water is called, the water is

24 removed from the reservoir.  That immediately puts into action

25 a float switch.  The float switch will call, by pressure, to

McNearny    Direct

5221

C

Z24

1  the booster station.  With the 75,000-gallon redwood tank,

2  it will immediately start pumping the water from that tank

3  into the reservoir.  Again the booster station is controled

4  by a float switch to the well.

5          Q Is there any way of knowing, Mr. McNearny, assuming

6  that the water is called for as you have described, whether

7  the water will be used in any particular area?

8          A  No, Mr. Veeder, there isn't.

9          THE COURT:  Mr. Veeder, let's let the witness finish.

10         There is a switch, then, on the booster station and a

11  dial so that if the booster station starts in operation then

12  that starts a well pumping.

13         THE WITNESS:  That immediately starts the well to pump.

14         THE COURT:  So the wells don't pump all of the time;

15  they pump as they are activated by activity on the system?

16         THE WITNESS:  Yes, sir, that is correct.  And the prime

17  starter for the well is the reservoir to the booster to the

18  well.

19  BY MR. VEEDER:

20         Q  Now, referring to Plaintiff's Exhibit 100, I am

21  going to ask you to--

22         I had better use your 100, Mr. Clerk.

23         Does your Honor have a copy of it?

24         THE COURT: Yes, I have a copy.  Do you want it?

25         MR. VEEDER:  I have a copy, your Honor.

C

Z25

1     The Clerk's copy is what I am concerned about.  I don't

2  find it there.

3     Exhibit 100 looks this way, your Honor; it is the

4  overall map showing the location.

5     THE COURT:  Exhibit 100?  This map here?

6     MR. VEEDER:  That is the one.

7     THE COURT:  This has numbers in it.  There were a number

8  of other maps that were keyed to this Exhibit 100.

9     MR. VEEDER:  That is right, and I am just going to ask

10  Mr. McNearny to refer to it.  If you have it, we will go ahead,

11  your Honor.

12     Q  Now, from the standpoint of the delivery of water,

13  for example, down to the area marked 17 on Exhibit 100, how

14  does water reach that particular point, Mr. McNearny?

15     A  Coming away from the reservoir there is a 16-inch

16  line running through the golf course down to Vandegrift

17  Boulevard, along Vandegrift Boulevard into the 17 Area.  But

18  that water is also delivered into the 16 Area and 15 Area from

19  the same water line.

20     Q  Now, in the utilization of that system is there any

21  way of determining whether the water will or will not be

22  utilized within or without the watershed of the Santa Margarita

23  River?

24     A  You mean when the water goes into the reservoir could

25  I say where it is going to go?

C

Z26

1    Q  That is right.

2    A  In the shed or out of the shed, no, sir, there is not.

3    THE COURT:  I don't see that this is material.  If the

4    Court decides that you can't use water out of the watershed,

5    you will have to revise your system.  It is just that simple.

6    You can go ahead and make a showing here.  The mere fact that

7    you have a water system where you can't tell whether your

8    water is going to go in or out of the watershed is entirely

9    immaterial as far as I am concerned, as far as the issues of

10   this case are concerned.

11   MR. VEEDER:  Well, I would like on appear, your Honor,

12   for the purposes of appeal, I am extremely anxious to have

13   this,  I can't have them dream it.

14   THE COURT:  Let the record show that the Court doesn't

15   consider it material and that you are putting this on merely

16   in lieu of an offer of proof.

17   MR. VEEDER:  All right.  I am not arguing with your

18   Honor.  I am perfectly pleased.  I am very happy.

19   Go ahead.

20   MR. SACHSE:  If your Honor wants to save time, I heard

21   this at the Master's hearing, and I think Mr. Moskovitz did,

22   and we had no quarrel with it, and I would stipulate--

23   MR. VEEDER:  There are some phases of that as to which

24   I would like to interrogate.

25   THE COURT:  All right.  Just try not to duplicate more

1  than you have to.

2          MR. SACHSE:  Your Honor, I was going to say that I am

3  perfectly willing to stipulate on the record with Mr. Veeder

4  that as presently constructed they cannot tell whether water

5  goes in or out of the watershed.

6  BY MR. VEEDER:

7          Q  How long has the system been in that condition?

8          A  Since 1942.

9          Q  And how long have you been acquainted with the sys-

10  tem?

11          A  Since October, 1942.

12          Q  What changes, if any, have there been in regard to

13  the system as it is presently laid out, as far as you know?

14          A  No changes, only in August of 1940, the 30th of

15  August, 1940, station forces at Camp Pendleton laid an 18-inch

16  line, cast iron, from the Chappo area to the Ysidora area.

17          MR. MOSKOVITZ:  May I have the answer read.

18          MR. STAHLMAN:  Did you mean 1940?

19          THE WITNESS:  1948.  What did I say?

20          MR. STAHLMAN:  You said 1940.

21          THE WITNESS:  I am sorry.  1948.  It was August 30th

22  to October 20th when we finished the job in 1948.

23  BY MR. VEEDER:

24          Q  Now, what other responsibilities have you, Mr.

25  McNearny, in regard to the utilization of water in the Camp

McNearny  Direct 5225

C2

Z28

1   Pendleton area and the Naval Hospital area?

2       A   In the Naval Hospital area they have their own water

3   system.   The only tie-in that we have with the hospital is

4   for emergency purposes only.   The 12-inch line running from

5   our main system and tying in at a junction box at the fire

6   station at the Naval Hospital is kept closed at all times,

7   with exception of need for fire and occasionally a breakdown

8   in their water system or when their reservoirs are required to

9   be cleaned by Sanitation.

10      Q   And what about sewage disposal for the Camp Pendleton

11  area?   What are your responsibilities in connection with that?

12      A   All disposal plants come under our cognizance, and

13  the effluent from each one of the disposal plants have been

14  directed to be returned to the Margarita Basin.

15      Q   Would you step to Plaintiff's Exhibit 100 again and

16  identify the location of the sewage effluent plants which are

17  under your jurisdiction and operation?

18      A   In the 17 Area, in Block 17, there is what is known

19  as No. 2 Disposal Plant.

20      Q   What area is served by that?

21      A   The 17 Area, a portion of 16 area, a portion of 15

22  Area.

23      The effluent has been directed, not by station forces

24  but by a contract, across the hill, which would be still in

25  the 17 Block, through the golf course-- and I may add that in

C2

Z29

1    in the golf course they use the effluent for the sprinkling

2    of the golf course-- into two lagoons which, in turn, event-

3    ually by canyon and pipe is directed back into the Santa

4    Margarita River in the Ysidora area.

5         No. 1 Disposal Plant, which is located in Block 24--

6         MR. MOSKOVITZ:  What do you mean by Block 24, Mr.

7    McNearny?

8         THE WITNESS:  In this particular key map various blocks

9    have numbers, and I use that as a guide.

10        MR. VEEDER:  That's all right, go ahead.

11        THE COURT:  Block 24 is immediately north of Block 17;

12   is that right?

13        THE WITNESS:  Yes, sir.

14        MR. STAHLMAN:  16.

15        THE COURT:  I am talking about blocks now, not the

16   numbers incircles but the numbers without circles.

17        That is Disposal Plant No. 1.

18        THE WITNESS:  No. 1; yes, sir.

19        THE COURT:  Go ahead.

20        THE WITNESS:  The effluent from that disposal plant was

21   constructed by station forces in 1950, and it was directed

22   through the 14 Area into a lagoon adjacent to the De Luz Hous-

23   ing, which in turn was piped into Lake O'Neill, which eventually

24   meanders into Santa Margarita River.

25

C2

Z30

BY MR. VEEDER:

    Q  Where is the De Luz Housing in connection with this on Plaintiff's Exhibit--

    A  De Luz Housing is in Block 31 directly north of Block 24.

    Q  What are the other sewage disposal plants?

    A  There is a disposal plant on Vandegrift Boulevard in Chappo Flats.

    THE COURT:  In what block is that?

    THE WITNESS:  That would be in Block 16.

    THE COURT:  Block 16?  Vandegrift Boulevard doesn't look like it runs over that way.

    THE WITNESS:  Yes, sir.

    THE COURT:  Oh, yes, I see it.

    THE WITNESS:  That is the industrial area.  And Block 15.

    THE COURT:  What number is this disposal plant-- No. 3?

    THE WITNESS:  That is No. 3; yes, sir.

    The effluent is directed into the Santa Margarita from the four lagoons that are adjacent to the disposal plant. That was all constructed by contract, not by station forces.

BY MR. VEEDER:

    Q  What about the Camp Margarita area?  How is that served?

    A  Camp Margarita area is served from the main-- well,

McNearny-Direct                                     5268

C2

Z31

1   water or sewage?

2           Q  Both.

3           A  It is served from the same water system as the main

4   camp.  Margarita has a disposal plant unto itself.  The

5   Margarita camp, Camp Margarita, is in Block 22, which is north

6   of 15.  And that also goes from lagoons into the Santa Margar-

7   ita River, constructed by contract and not by station forces.

8           Q  What other sewage disposal plants, if any, are

9   located in the camp and reflected on Plaintiff's Exhibit 100?

10          A  The Twin Lakes Disposal Plant, which is in Block 3.

11          The disposal plant takes care of all the Wire Mountain

12  Housing, all of the trailer camp and the main gate, and of

13  December the 6th a contract will have been completed and all

14  of the effluent or sewage, raw sewage, from the Del Mar Camp

15  itself will be under pressure pumped back into the Twin Lakes

16  disposal plant.

17          THE COURT:  Is the effluent presently being returned

18  to the stream from the Twin Lakes Disposal Plant?

19          THE WITNESS:  The effluent from the Twin Lakes, yes,

20  sir, your Honor, is being injected into the Margarita River.

21          THE COURT:  Where?  Above the Ysidora Gage, or where?

22          THE WITNESS:  Below the Ysidora Gage.  When I say below,

23  I mean closer to the mouth of the Margarita.

24  BY MR. VEEDER:

25          Q  I hand you plaintiff's exhibit marked 119 for

McNearny    Direct

5229

C2

Z32

1    Identification and ask you to read into the record the name of

2    that compilation.

3         A  It is "Sewage Effluent Discharges, Plant No. 1, Acre

4    Feet Water Year."

5         You didn't mean for me to read all of the figures?

6         Q  No.  Of what is that reflective?

7         A  They reflect in acre feet the effluent from Plant

8    No. 1, Plant No. 2, Plant No. 3, Plant No. 4.  Plant No. 4 is

9    in Del Mar, No. 5 is in Del Mar, and No. 6 is in Del Mar.

10   Numbers 4, 5 and 6, as of the 6th of December, if the contractor

11   holds to his deadline, will all be under pressure back into the

12   Twin Lakes.

13        Q  And the balance of the tabulation is reflective of

14   the other sewage plants; is that correct?

15        A  Yes, that is correct.

16        Q  Under whose directions are those figures maintained?

17        A  Under my direction and my office.

18        Q  Do you know whether those tabulations are correct?

19        A  Yes, they are correct.

20        MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

21   marked 119 for Identification.

22        THE COURT:  Exhibit 119 received in evidence.

X119

23        (Plaintiff's Exhibit No. 119 for Identification was

24   received in evidence as Plaintiff's Exhibit No. 119.)

25

C2

Z33

BY MR. VEEDER:

Q Now, would you step to Plaintiff's Exhibit 101, Mr. McNearny, and bring with you a red pencil.

THE COURT: Just a minute.

Mr. Clerk, were there some exhibits lodged after No. 118? This is No. 119. The last I have shown is 118. How many more have been lodged?

THE CLERK: Numbers 119 and 120, your Honor. No. 119 was lodged on the 12th.

THE COURT: That's all, 119 and 120?

THE CLERK: Yes, your Honor.

BY MR. VEEDER:

Q Would you locate the De Luz well on Plaintiff's Exhibit No. 100?

A 101.

Q What is your acquaintance with that structure, Mr. McNearny?

A Well, the engineers drilled the well there many years ago.

Q What use is being made of that well?

A At the present time? As of two years ago we had instructions-- when I say we, the Water Section of the Base Maintenance-- had instructions to turn the well over to NAD for their operation and their sole use.

Q And when you say NAD you mean the Naval Ammunition

McNearny   Direct   5261

C2

Z34

1   Depot?

2           A   Naval Ammunition Depot, Annex Seal Beach.

3           Q   What connection has that well with the Ammunition

4   Depot at Seal Beach?

5           A   In round figures, it is five miles away from Naval

6   Ammunition Depot, and a four and six-inch line were laid

7   under my direction to NAD or Naval Ammunition Depot.

8           Q   What were the circumstances under which that con-

9   struction was undertaken?

10          A   Evidently they were out of water, because I didn't

11   know too much about it, only they directed me to lay it.

12          Q   What did you do then?

13          A   We laid the four-inch line and six-inch line and

14   started pumping water to them to put it into their--

15          Q   Take a pencil and draw a line on Exhibit 101 showing

16   the course of the pipe line that you constructed.

17

18

19

20

21

22

23

24

25

J26

D-1 ML

5232

1    THE WITNESS:  Well, we followed the river bed, which
2    was the easiest way, because we are in a hurry; and we just
3    ran right down the river bed and placed it adjacent to the
4    gallery.

5    Q   BY MR. VEEDER:  Placed what?

6    A   The end of the pipe and, in turn, pumped the
7    water into the gallery.

8    Q   How long, to your knowledge, personal knowledge,
9    has that pipe line been in operation?  When did you put it
10   in operation?

11   A   1951.

12   Q   And how long did you have any responsibilities
13   in connection with them?

14   A   Up to 1957.

15   Q   And during what period of years was that structure
16   and pump operated?

17   A   May I --

18   Q   You can refresh your memory.

19   A   At different times -- different years there were
20   different months, but as a general rule it was --

21   Q   You can state the year and the month that the
22   water was delivered.

23   A   1952, in September.  1953, from August to
24   September.  1954, from July to October.  1955, from June to
25   August.  1956, from July to November.  Then, 1957, I got the

1   records from the N.A.D.  It was from May to October.  And

2   1958, I don't know only that they are pumping.  I imagine

3   you will be able to get that from the next witness.

4          MR. VEEDER:  I have no further questions.

5          THE COURT:  Who is going to examine?

6

7                    CROSS EXAMINATION

8   BY MR. SACHSE:-

9          Q    Mr. McNearny, I am not clear where sewage plants

10   8 and 13 are.

11          A    13 is the one at Twin Lakes.  That is adjacent,

12   Margarita.

13          Q    And 8?

14          A    Camp Margarita.

15          Q    And then 4, 5, and 6 are the ones that, in the

16   past, have discharged direct to the sea but under this new

17   contract will be put back over the hill?

18          A    That is correct, Mr. Sachse.

19          THE COURT:  4, 5 and 6 are the ones we refer to as

20   Del Mar?

21          THE WITNESS:  Yes, sir.

22          Q  BY MR. SACHSE:  In the past they have discharged

23   into the ocean but now will be put into Twin Lakes?

24          A    That is correct.

25          THE COURT:  Well, to the ocean?  In the past they

1   discharged into the ocean?

2      THE WITNESS: That is correct, your Honor.

3      THE COURT: All right.

4      Q BY MR. SACHSE: Mr. McNearny, have you any

5 familiarity with the date, instruments, transactions by

6 which the United States acquired the Naval Ammunition Depot?

7      A No.

8      MR. VEEDER: Wait a minute.

9      THE COURT: You say plant 8 is at the Margarita area?

10      THE WITNESS: Yes, your Honor, Camp Margarita.

11      THE COURT: All right.

12      Q BY MR. SACHSE: Directing your attention to the

13 sewage discharge figures again for the U.S. N.A.D. plant,

14 the last sheet on your tabulation.

15      A If you will recall, Mr. Sachse, I did not put

16 U. S. N.A.D. down. I did not have anything to do with the

17 tabulation of this particular --

18      Q These figures that appear on the last sheet of

19 119 are not your figures?

20      A They are not my figures, that is correct.

21      Q Have you any general familiarity with them? I

22 have covered two simple questions here.

23      A None whatsoever.

24      MR. SACHSE: I have no further questions, your Honor.

25

CROSS EXAMINATION

BY MR. MOSKOVITZ:-

Q   Mr. McNearny, you stated that this temporary pipe line constructed in 1951, from Well 28-Z-11 --

A   That is the De Luz.

Q   De Luz well to the Naval Ammunition Depot was under your direction or supervision from the time it was constructed until 1957?

A   That is correct, sir.

Q   And under whose supervision is it today?

A   N.A.D., the Naval Ammunition Depot Annex, Seal Beach, California.

Q   And that line is still in existence, to your knowledge?

A   That is correct, yes.

Q   Now, you testified that water was delivered from that well through the pipe line to the Naval Ammunition Depot during certain periods that you testified to in the years 1952 through 1957?

A   That is correct, sir.

Q   Do you know what quantities were delivered?

A   Yes.

Q   Will you tell us what those quantities were?

THE COURT:   What do you have, a summary year by year?

THE WITNESS:   Yes, your Honor.

THE COURT: Okay.

THE WITNESS: 1952: 650,000 gallons were delivered. 1953: 7,241,300 gallons. 1954: 4,389,200 gallons. 1955: 3,299,000. 1956: 140,000. 1957, N.A.D. took over, and I have the figures here but I was not the one recording.

THE COURT: What figures do you have?

THE WITNESS: I have in 1957: 12,675,000. In 1958: 6,750,000 gallons. Those two last tabulations were not on my recording.

THE COURT: They were given to you by someone from the N.A.D.?

THE WITNESS: From the Ground Water Resources.

THE COURT: Office?

THE WITNESS: Yes, the office, their recording office, who, in turn, I assume got it from N.A.D.

THE COURT: What is the significance, Mr. Moskovitz? What are you interested in in connection with the water going in that direction?

MR. MOSKOVITZ: Your Honor, I think there were separate acquisitions of the two areas, and I am not sure that the -- I suspect that the rights that Camp Pendleton would have as riparian owners may not be usable in connection with the Naval Ammunition Depot; and, therefore, that uses of water from pumping in Camp Pendleton would not be appropriate under riparian rights but may on the Naval

Ammunition Depot.

MR. SACHSE:  That is absolutely correct, your Honor.
The exhibits Mr. Veeder has lodged already -- I won't say
lodged, introduced by stipulation, will show clearly that
the Naval Ammunition Depot is a separate acquisition at
a separate time and has a separate set of rights.  They are
not a lump set of rights with the rest of Camp Pendleton.

MR. VEEDER:  Is there any question about it?

THE COURT:  Does the Naval Ammunition Depot come down
to the river?  Does it have any --

MR. SACHSE:  The Naval Ammunition Depot has rights
in the river, but the situation that exists in these figures,
as I understand it, is that the periods indicated by Mr.
McNearny, the Naval Ammunition Depot gets water not from its
riparian land or its riparian rights but it goes downstream
and takes it from somebody else's; and I don't know that
that can be used to either augment the claimed rights of the
depot or the claimed rights of Camp Pendleton.  It is going
to be a legal qustion that will be argued later on but --

MR. VEEDER:  I even doubt it is a legal question.

MR. SACHSE:  But the fact is very clear that there
are two separate acquisitions.  They happen to be owned by
the same agency, yes, the United States of America; but
that doesn't mean that their rights are pooled.  The fact

1    that Fallbrook happens to own a great many individual parcels

2    of lands that are purchased on the river means that it can

3    pool all of those in creating a riparian right.  A right is

4    attached to the individual parcel.

5         MR. VEEDER:  I think Mr. Sachse speaks very well

6    for Mr. Moskovitz.

7         THE COURT:  Do you have any further questions?

8         MR. MOSKOVITZ:  Yes.

9         Q    Mr. McNearny, do you have any knowledge as to

10   why the deliveries were made, as you testified, from that

11   well to the Naval Ammunition Depot?

12        A    Only that it was very definitely a dry season,

13   because we laid the line in the river bed, a dry river.

14        MR. MOSKOVITZ:  I have no question.

15        MR. STAHLMAN:  I just have one question.

16

17                    CROSS EXAMINATION

18   BY MR. STAHLMAN:-

19        Q    You put the line up there because the cable was

20   out of the water, is that correct?

21        A    That is what I assume, because my officer in

22   charge, the Colonel, indicated as such; and that was the

23   reason we had to lay the line.

24        Q    Do you know the reason why they went out of the

25   water?

1        ·A    It was a very dry season that year.

2        MR. STAHLMAN:  Go ahead.  I am through.  That is all.

3   I thought he might answer better answers.

4        MR. VEEDER:  He knows that Fallbrook is stealing the

5   water, but he didn't go up there and see them steal it at

6   that point.

7        MR. SACHSE:  I ask that be stricken, the testimony

8   of Mr. Veeder.

9        THE COURT:  It may go out.

10        MR. VEEDER:  I have no further questions.

11        THE COURT:  Well, the Naval Ammunition Depot is

12   riparian and goes down to the river on its northerly side,

13   doesn't it?

14        MR. VEEDER:  The Ammunition Depot?

15        MR. SACHSE:  That is correct, your Honor.

16        THE COURT:  Northwesterly side.

17        MR. VEEDER:  That is correct.  It was the first

18   acquisition by the United States along that area.  It abuts

19   the full length, as I recall, of the river.

20        MR. STAHLMAN:  I presume they were operating on a

21   correlative basis.

22        MR. VEEDER:  Yes.  I think it is going to be interest-

23   ing to see the United States share correlatively with the

24   Naval Ammunition Depot itself.

25        THE COURT:  This De Luz well, do you have the section

1   where it is located?  It is located, I take it, below the

2   De Luz damsite.  Is it in the Upper Basin, so called?

3        THE WITNESS:  It is in the Upper, yes.

4        MR. SACHSE:  It is not in --

5        THE COURT:  Upper subbasin?

6        THE WITNESS:  I believe it is the Upper Basin.  It

7   would be in Upper Subbasin.

8        THE COURT:  What is the number on it in a series that

9   we have been using here?

10        MR. VEEDER:  And I will get the conversion on that,

11   your Honor.  I don't have it on 101.  And I will have it

12   for you after the noon hour.  But I would like to have Mr.

13   McNearny draw the red line on the upper illustration of 101

14   to show the course of the pipe line up to the N.A.D.

15        THE COURT:  You are starting --

16        THE WITNESS:  I am drawing a red line indicating the --

17        Q  BY MR. VEEDER:  Course.

18        A   -- course of the river bottom, because that is

19   the way the pipe line ran.

20        THE COURT:  Starting with the location of the well?

21        THE WITNESS:  Starting with the location at Well

22   28-2-11, the De Luz, which is in Block 29 of 101.

23        THE COURT:  You have got a section number there,

24   haven't you?

25        THE WITNESS:  Well, that is (marking).  As I stated

1   before, I followed the river bed.  If that is correct, that

2   is exactly the way the pipe is laying.

3        Q  BY MR. VEEDER:  Do you know whether it is presently

4   in place, Mr. McNearny?

5        THE COURT:  Well, --   Answer the question.

6        THE WITNESS:  What was that?

7        Q  BY MR. VEEDER:  Is it presently in place, to your

8   personal knowledge?

9        A   Yes, it is.

10       THE COURT:  Do I understand this well as shown on

11  Exhibit 101 by the number, 2-8-2-11, Well De Luz?

12       MR. VEEDER:  That is right.

13       THE COURT:  That is in Section 29.

14       MR. VEEDER:  That is correct.

15       THE COURT:  And that is above De Luz damsite?

16       MR. VEEDER:  That is right.

17       THE COURT:  And, therefore, it is not in the Upper

18  Subbasin.

19       MR. VEEDER:  Not as designated by Mr. Worts.  But

20  it does go into the alluvium there.  That is what the witness

21  was saying.  I don't believe he was aware of where the

22  delineation by Mr. Worts of the Upper Basin was.

23       THE COURT:  It must be the well as shown on some of

24  the other maps as range or township --

25       MR. VEEDER:  It is 9 South, 4 West.

1    THE COURT:  -- 9 South, 4 West.

2    MR. VEEDER:  Section 29.

3    THE COURT:  L-1, it must be.

4    MR. VEEDER:  That is right.

5    THE COURT:  Check that for us.

6    MR. VEEDER:  We will have that for you, your Honor,

7  right after lunch.

8    THE COURT:  All right.

9    THE WITNESS:  It is 9-4-29L1.

10    MR. VEEDER:  I have no further questions, your Honor.

11    MR. SACHSE:  I have nothing.

12    MR. VEEDER:  It is right on the nose.

13    MR. STAHLMAN:  12:00 o'clock.  There it is.

14    MR. SACHSE:  We surely timed that one nicely.

15    THE COURT:  Adjourn until 2:00 o'clock.

16    (Whereupon a recess was had at 12:00 o'clock noon until

17  2:00 o'clock p.m. of the same day.)

18

19

20

21

22

23

24

25

E

Z35

SAN DIEGO, CALIFORNIA, THURSDAY, NOVEMBER 20, 1958.  2:00 P.M.

1

2

3        MR. VEEDER:  I had asked all the questions of Mr.

4    McNearny.  I don't know whether there are any more.

5        THE COURT:  Any further cross-examination?

6        MR. SACHSE:  No further cross-examination, your Honor.

7        THE COURT:  Thank you, Mr. McNearny.  We will excuse

8    you subject to being recalled if we need you.

9        THE WITNESS:  Yes, sir.

10        MR. VEEDER:  I will call Walter E. Moore.

11

12                    WALTER E. MOORE,

13    called as a witness in behalf of the plaintiff, being first

14    duly sworn, testified as follows:

15        THE CLERK:  State your name, please.

16        THE WITNESS:  Walter E. Moore.

17

18                    DIRECT EXAMINATION

19    BY MR. VEEDER:

20        Q  What is your age, Mr. Moore?

21        A  My age is 46.

22        Q  And where do you reside?

23        A  I reside in-- well, you might call it the town of

24    Temecula, although I am five miles south of town.

25        Q  What is your present position, Mr. Moore?

Moore - Direct

E

Z36

1   A  I am leading man in utilities on the Naval Ammunition

2   Depot at Fallbrook.

3   Q  How long have you been working for the United

4   States?

5   A  Well, I served in the Navy six years and have worked

6   for civil service since 1948.

7   Q  By the way, are you a defendant in this litigation?

8   A  I am.

9   Q  We are suing our own people now?

10  A  That is correct.

11  Q  What is your present position, Mr. Moore?  What do

12  you do?

13  A  In my present position I supervise the men who

14  maintain and operate the utilities at the depot.

15  Q  And what utilities are under your direction?

16  A  The water, sewer, the propane gas, telephone and the

17  electric power.

18  Q  And what are the sources of water for the United

19  States Naval Ammunition Depot?

20  A  The sources of water for the Depot are the-- the

21  primary source is the Santa Margarita River, which we call

22  the River Well No. 1, and the No. 1 Well.

23  Q  What do you mean by the No. 1 well?

24  A  The No. 1 Well is located in the lower left-hand

25  portion of the map pinned on the bulletin board there.

E

Z37

MR. VEEDER: Your Honor, I haven't offered that yet. I am going to have another witness to offer that.

Q Is that well within the Naval Ammunition Depot, Mr. Moore?

A That is in the Naval Ammunition Depot.

Q And what connection, if any, does it have with the Santa Margarita River?

A Well, it is on a tributary of the Santa Margarita River.

Q What are the uses to which water is being placed up there on the Naval Ammunition Depot at the present time?

A Well, it is for domestic purposes and for fire fighting.

Q How many people are presently employed and work during the day on the United States Naval Ammunition Depot?

A Do you mean by that civilians?

Q Well, civilians, yes.

A Civilians-- there are approximately 110.

Q And of the military personnel, how many are there, if you know?

A Roughly I would say about 120.

Q So in all how many are employed there?

A 230.

Q What about permanent residents-- are there permanent residents in that area?

E

Z38

1    A   There are.   There are nine officers' quarters, each

2    one for the most part of the year occupied by an officer and

3    his family, we will say, and 32 defense housing unit apartments.

4        Q   And what is the source of water for those places?

5        A   The source of water for those is primarily the

6    Santa Margarita River.

7        Q   From the standpoint of fire protection, what are the

8    demands as established for the Naval Ammunition Depot?

9        A   The fire engineer, the fire protective engineer, I

10   believe they call him, of the Eleventh Naval District, in his

11   report, is of the opinion that the demand should be 2500

12   gallons per minute for a period of four hours.

13       Q   What are the facilities available for the procure-

14   ment and distribution of water on the United States Naval

15   Ammunition Depot?

16       A   Well, it would first be what we call our River Well,

17   which derives its water from a gallery running across the

18   Santa Margarita River, and from that well it is pumped into

19   what we call a desanding tank of about 10,000 gallons.

20       THE COURT:   Let me interrupt.   You say a river well

21   located in the Santa Margarita River?

22       THE WITNESS:   That is correct.

23       THE COURT:   I thought you said previously the river

24   well was within the confines of the Ammunition Depot?

25       MR. VEEDER:   I believe he said No. 1 well, your Honor.

5247

E

Z39

1    THE WITNESS:  They both are, aren't they, sir?

2    MR. VEEDER:  I am going to have further and more de-

3    tailed explanation of this identification which is hanging on

4    the easel, your Honor.

5    THE COURT:  You get water from two wells?

6    THE WITNESS:  That is correct, your Honor.

7    THE COURT:  We will look into it later, where the two

8    wells are.

9    MR. VEEDER:  Yes, your Honor, I have a witness who was

10   there when it happened.

11   THE COURT:  I interrupted you.  Water comes from the

12   gallery and goes into a desanding tank?

13   THE WITNESS:  A desanding tank.  In other words, it is

14   a settling tank.

15   THE COURT:  All right.

16   THE WITNESS:  And from there it goes to an adjacent

17   10,000-gallon tank for reserve for what we call the booster

18   pump, which takes the water and pumps it up into a million-

19   gallon tank.

20   BY MR. VEEDER:

21       Q   And from there where is the water taken?

22       A   From the million-gallon tank it is boosted up by a

23   pump into a 100,000-gallon tank, which is a tank set on a

24   tripod, and the 100,000-gallon tank is located on an elevation

25   somewhere in the neighborhood of 800 feet above sea level,

E

Z40

1  and the tank base is 101 feet above the ground level.

2      Q  Now, you have referred to sewage.  What disposition

3  is made of the sewage effluent from the Naval Ammunition

4  Depot?

5      A  We have a sewer system which collects all of the

6  sewage from all of the facilities on the Depot; not all of

7  them, but the greater portion of the facilities on the Depot,

8  and it is brought down to a sewage disposal plant.

9      Q  And where is that sewage effluent released from there?

10     A  The effluent from the sewage disposal plant is run

11 into the Fallbrook Creek.

12     THE COURT: On the Depot or off the Depot?

13     THE WITNESS:  On the Depot, your Honor.

14     MR. VEEDER:  I have no further questions, your Honor.

15     MR. SACHSE:  I have a couple of questions, your Honor.

16

17                     CROSS-EXAMINATION

18 BY MR. SACHSE:

19     Q  Mr. Moore, in describing the available sources of

20 water you named the two wells.  Is there a connection to the

21 Fallbrook Public Utility District on the Depot?

22     A  There is; yes, sir.

23     Q  What is that connection?

24     A  That connection runs more or less east on the map

25 from-- well, a little south of east from the 100,000-gallon

E

Z41

1    tank.

2         Q  And that is an 8-inch pipe; is that correct?

3         A  That is an 8-inch pipe; yes, sir.

4         Q  Has that ever been used, to your knowledge, in the

5    past?

6         A  To my personal knowledge, no.

7         Q  It has not been used.  Are you aware of its use

8    during periods when the 100,000-gallon tank has been cleaned?

9         MR. VEEDER:  I object to that.  The witness says that he

10   doesn't know.

11        MR. SACHSE:  I can refresh his recollection, or attempt

12   to, I believe.

13        Q  During cleaning operations of the 100,000-gallon

14   tank, are you aware that this has been used?

15        MR. VEEDER:  I object.

16        THE COURT:  Overruled.

17        THE WITNESS:  At the time that the 100,000-- if I am

18   correct, sir, since I came in January, 1956, the tank has not

19   been cleaned.

20   BY MR. SACHSE:

21        Q  Then you can speak only from 1956?

22        A  That is right.

23        MR. SACHSE:  I have no further questions, your Honor.

24        THE COURT:  Mr. Moskovitz.

25

CROSS-EXAMINATION

BY MR. MOSKOVITZ:

    Q  What is this tributary to the Santa Margarita River you said this Well No. 1 was on?

    A  It is a tributary to a tributary, I would state.

    THE COURT:  Do you know the name of it?

    THE WITNESS:  There is no name.  It is more or less a drainage area which eventually drains into Lake O'Neill on Camp Pendleton.

BY MR. MOSKOVITZ:

    Q  Is it a tributary to Fallbrook Creek?

    A  It is a tributary of Fallbrook Creek.

    Q  And this is a well that is drilled into the bed of that tributary; is that what it is?

    A  Well, it is located, I would say, about a hundred yards to the north of the bed of this tributary or to the north of this stream.

    Q  Do you know the depth of well No.1?

    A  Yes I do.  I measured it myself along in about March of this year, and it was 75 feet 6 inches.

    Q  Did you say that was the primary source of water?

    A  No, I did not.

    MR. VEEDER:  No, he didn't.

BY MR. MOSKOVITZ:

    Q  The primary source is this river well that you

E

Z43

1  mentioned?

2          A   That is correct.

3          THE COURT:  What does this well pump, this one that is

4  75 feet deep?

5          THE WITNESS:  It was designed to pump 350 gallons.  Here

6  again I am only speaking of what I have learned.  It was de-

7  signed to pump 350 gallons a minute.

8          THE COURT:  Do you know whether it pumps that or not?

9          THE WITNESS:  I would say, from my own personal ex-

10  perience, it pumps 250 gallons a minute.

11  BY MR. MOSKOVITZ:

12          Q   Has it been used since you have been on the Base?

13          A   Yes, it has.

14          Q   Is it in continuous use?

15          A   No, it is not.

16          MR. MOSKOVITZ:  I don't have any more questions, your

17  Honor.

18          MR. VEEDER:  I have no questions.  Thank you, Mr. Moore.

19          THE WITNESS:  You are welcome.

20          MR. VEEDER:  Do you have, Mr. Stahlman?

21          MR. STAHLMAN:  No.

22          THE COURT:  You are excused, but subject to call if

23  we need you, Mr. Moore.

24          THE WITNESS:  Thank you, your Honor.

25          MR. VEEDER:  Mr. Walter Hughes.

E

Z44

1                    WALTER HUGHES,

2    called as a witness in behalf of the plaintiff, being first

3    duly sworn, testified as follows:

4            THE CLERK:  State your name, please.

5            THE WITNESS:  Walter Hughes.

6

7                    DIRECT EXAMINATION

8    BY MR. VEEDER:

9            Q   How old are you, Mr. Hughes?

10           A   Sixty-three.

11           Q   Where do you live?

12           A   I live three miles south of Fallbrook.

13           Q   That is in California?

14           A   California.

15           Q   Where are you presently employed, Mr. Hughes?

16           A   At the Naval Ammunition Depot at Fallbrook.

17           Q   How long have you been employed there?

18           A   Oh, approximately twelve years.

19           Q   And when did you first come to work at the U.S.

20   Naval Ammunition Depot?

21           A   January, 1942.

22           Q   And have you been there continuously since that date?

23           A   No, I have not.  I worked there until 1946, and then

24   I thought I had it made and was on my own, and in 1950 I came

25   back to work there.

E

Z45

1      MR. STAHLMAN:  He bought an avocado ranch.

2      MR. VEEDER:  You were waiting for the Fallbrook Dam?

3      THE WITNESS:  Mr. Stahlman understands.

4      THE COURT:  Are you a defendant in this case, too?

5      THE WITNESS:  No, I have never been served.  I am in

6  the San Luis Rey slope.

7      MR. STAHLMAN:  I am back working again also.

8      MR. VEEDER:  If you two have finished the repartee, I

9  would like to go ahead.  This Kansas approach is killing me,

10  your Honor.

11      Q  Now, Mr. Hughes, would you step to Plaintiff's

12  Exhibit marked No. 92.

13      THE COURT:  Do you have a copy of it, Mr. Clerk?

14      (Mr. Veeder hands document to the Court.)

15      MR. VEEDER:  I will get you a copy of that.

16      Q  And I ask you to read into the record from the title

17  block on that illustration the statements contained on it--

18  right here.

19      A  "Water Distribution System, U. S. Naval Ammunition

20  Depot, Fallbrook, California."

21      Q  Were you employed by the United States at the time

22  that that system was constructed as shown on the illustra-

23  tion?

24      A  Yes, I was.

25      Q  And would you describe the gallery from which the

E

Z46

1    water is pumped from the Santa Margarita River?

2        A   Yes.

3        MR. SACHSE:   Your Honor, I object; there is no founda-

4    tion.   I don't know what this gentleman's job is yet.   I would

5    like to know a few things about him.   All I know is that he

6    works on the Depot.

7    BY MR. VEEDER:

8        Q   Will you describe your responsibilities?

9        A   Yes.   My duties are to keep this water system oper-

10   ating, pump all the water and keep track of it, and keep a

11   head pressure and look for leaks and so on and so forth.

12       Q   What do you do from the standpoint of repair work?

13       A   Well, if I have time I repair a leak myself.   If I

14   don't, I turn it over to the plumber.

15       Q   What were your responsibilities with the system

16   depicted on Plaintiff's Exhibit marked 92 when the gallery in

17   the Santa Margarita River was constructed?

18       A   At the time the gallery was being built?

19       Q   Yes.

20       A   At that time the civil service employees-- they didn't

21   have enough of the camp completed, and we were mainly put there

22   to familiarize ourselves with what was going on and to keep

23   track of what was being done.

24       Q   What did you observe in connection with construction

25   of the gallery from the standpoint of the kind and type of

Hughes  Direct   4547

5255

1   construction that went into it and the kind and type of

2   facilities that were used in building that gallery?

3        A  Well, when they first started to lay this gallery

4   across the river, there was quite a water flow there and they

5   had a hard time being able to work.  They finally diverted the

6   water to one side of the river and then as they blasted out

7   this was put down some 20--

8        Q  Blasted out what?

9        A  Blasted out of the river bed.  They got down to hard

10   rock at approximately 18 feet, and then they dug out such a

11   big hole there and the water kept filling in, even though it

12   was diverted to the side of the river, that they had to put a

13   battery of suction pumps there to keep it pumped out so that

14   they could lay the tube in the gallery.

15        Q  And when you say the tube, what do you mean by that?

16        A  Well, there is an 18-inch concrete tube that lays

17   across approximately two-thirds of the way across the river.

18   This has some holes in it that lets the water come into the

19   tube and then that comes across to the bank of the river

20   where out pumping station is.

21        Q  What else went into the construction of this gallery

22   that you observed besides this tube that you have described?

23        A  After they got the tube laid down in the rock where

24   they blasted it out, they built the framework up around it

25   of wood and filled in with small rock first and then large

E

Z48

1    rock until it was finally built up level.

2         Q   Level with what?

3         A   Level with the bed of the stream at that time.

4         Q   And then what other facilities were placed into this

5    gallery as you have observed it?

6         A   The gallery went across to a concrete well that is

7    commonly referred to-- it is actually a tube sunk down to this

8    level.

9         Q   To the level of what, now?

10        A   To the level of the tube that lays across the river,

11   a total height of some 40 feet.

12        Q   And what was the purpose for which that installation

13   was completed?

14        A   That was to allow the water coming from the river to

15   get into the tube and flow across and build up the river bed

16   level in the tube for pumping out.

17        Q   How is the water taken from the well to which you

18   have made reference?  What kind of system is utilized for that

19   purpose?

20        A   Of lifting it?

21        Q   Yes.

22        A   Well, there is a small turbine pump that picks

23   it out of the tube and dumps it first into the desanding tank.

24        Q   Referring to Plaintiff's Exhibit marked 92 for

25   Identification, would you allude to the structures that you

E

Z49

1  have just mentioned and point them out to the Court on this

2  exhibit?

3  A  Yes.  This is a continuation of where the river plan

4  is.  Here it is in detail.

5  THE COURT:  Where does it hook on?

6  MR. VEEDER:  Point to it.

7  THE WITNESS:  This is a continuation of this road where

8  it goes on.

9  BY MR. VEEDER:

10  Q  When you say this, would you please be a little more

11  specific?  Would you say "River Well"?

12  THE COURT:  Up in the top part of the diagram there is

13  a small sketch unconnected called "River well."

14  THE WITNESS:  Yes, your Honor.

15  THE COURT:  Where does that fit in?

16  THE WITNESS:  That is a continuation of this road.  It

17  is just a short distance.  This road goes down and makes a

18  turnaround.

19  THE COURT:  Where does this other sketch down in the

20  left-hand side come in?

21  THE WITNESS:  And this is the detail of what this

22  represents at the river.

23  BY MR. VEEDER:

24  Q  And what are the facilities in question?

25  A  The facilities are the well that has been referred

1    to and a suction pump to pick the water up and put it into the

2    desanding tank.  It overflows into the makeup tank, and a pump

3    there that picks it up from there and puts it all the way on

4    top of the hill.

5         Q  And what is located on top of the hill, Mr. Hughes?

6         A  On the top of the hill is a storage place, commonly

7    referred to as the million-gallon reservoir.

8         Q  And what is the utilization made of that million-

9    gallon tank, Mr. Hughes?

10         A  That is where some water is put so it is available

11   to be picked up from there and keep the 100,000-gallon filled.

12         Q  And where is the 100,000-gallon tank located on

13   Plaintiff's Exhibit marked 92 for Identification?

14         A  The 100,000-gallon tank is on across on to the next

15   highest elevation that we have probably on the base in the

16   neighborhood, and then the elevated tank is set on top of

17   that hill approximately a hundred feet higher than the top

18   of the hill.

19         Q  From there where is the water distributed, Mr. Hughes?

20         A  From there the water through gravity and the head

21   pressure spreads to all parts of the system.

22         Q  And how is the pressure maintained throughout the

23   system, Mr. Hughes?

24         A  The pressure is matintained through a float system,

25   primarily speaking, and when the level drops in the 100,000-

E

Z51

1    gallon tank it calls over electrically to the booster pump at

2    the million-gallon and it immediately picks it up and fills

3    it back up in the 100,000 to the full level.

4        Q  What have been your responsibilities in connection

5    with the procurement of water from the De Luz Well?

6        THE COURT:  The De Luz Well?  What well is that?

7        MR. VEEDER:  That is on Exhibit 110, concerning which

8    Mr. McNearny testified this morning, your Honor.

9        THE COURT:  Was it called the De Luz Well this morning?

10   Or was it in the bed of the Santa Margarita?

11       MR. VEEDER:  Well, your Honor, we have referred to it

12   as the De Luz Well.

13       THE COURT:  All right.

14       MR. VEEDER:  And it is shown on Exhibit 101 as the

15   De Luz Well.

16       THE WITNESS:  We have a little minor dam just to hold a

17   little head of water across this gallery at the river, and

18   as our season goes along and gets into the hot weather the

19   water table drops and drops and finally we don't have any

20   water left there, and then at that time we have to go down to

21   the De Luz Well and start it up and pump water back up to our

22   gallery.

23       Q  How is that water delivered into the gallery?

24       A  That is delivered through a pipe line that goes

25   some five-odd miles down the river bed to the De Luz Well.

E3

E2

Z52

Q  What use, if any, was made of that system in the year 1957?  Do you recall?

A  In 1957 I think we ran it approximately 30 days.

Q  And what use was made of it last year, if any?

A  Last year it was just about the same time, although we were able to start it just a little bit later.

MR. SACHSE:  By last year, Mr. Veeder, you mean this past summer season?

MR. VEEDER:  1958.

Q  Have you used the schematic illustrations on Plaintiff's Exhibit marked 92 for Identification?  Have you located the buildings?

A  Yes.

Q  And are those located, to your personal knowledge, in the correct places?

A  Yes, they are.

MR. VEEDER:  We offer Plaintiff's Exhibit marked 92 in evidence, your Honor.

THE COURT:  Where is Well No. 1?  There is a diagram down here on the left-hand side of the page unconnected that says "Well No. 1."  Where does it fit in?

THE WITNESS:  Yes, your Honor.  That lies right here on the map just below the transfer depot.

THE COURT:  This little diagram on the left, then, called "Well No. 1" is a blow-up in more detail of what

E3

Z53

1    appears over there on the map itself?

2        THE WITNESS:  Yes, your Honor, that is a detail of what

3    we have there.

4        THE COURT:  And that well is located on the Naval

5    Ammunition Depot?

6        THE WITNESS:  That is on the Naval Ammunition Depot.

7        THE COURT:  And this river well is located in the bed

8    of the Santa Margarita River?

9        THE WITNESS:  Well, it is also on the Depot.

10        THE COURT:  On the Depot.

11        THE WITNESS:  Yes.  The Depot comprises to the center

12    of the river bed, I understand.

13        THE COURT:  Does your gallery run clear across the

14    river bed or only to the center?

15        THE WITNESS:  No, it does not.  It runs just beyond the

16    center.

17        THE COURT:  Is this Exhibit 92, Mr. Veeder?

18        MR. VEEDER:  Yes.

19        THE COURT:  Exhibit 92 received in evidence.

20        (Plaintiff's Exhibit No. 92 for Identification was

21    received in evidence as Plaintiff's Exhibit No. 92.)

X92

22        MR. VEEDER:  Your Honor, we had lodged and had marked

23    for identification an Exhibit 92A, which we used as 101 when

24    Mr. Cannon was testifying.  We will withdraw 92A, if your

25    Honor will permit.

THE COURT:  Exhibit 101 you had listed heretofore as an exhibit in order.  Is the 101 you used the same one you had heretofore?

MR. VEEDER:  It is exactly the same, your Honor, but there is no need of duplicating them.  Both of them reflect--

THE COURT:  I don't have any 92A listed.

THE CLERK:  There were two parts, your Honor: 92A and B. This Exhibit 92 was originally marked 92B.

MR. VEEDER:  When we put in 101.

THE COURT:  All right, then, Exhibit 92A may be withdrawn.

MR. VEEDER:  I have no further questions, your Honor.

THE COURT:  You may cross-examine.


CROSS-EXAMINATION

BY MR. SACHSE:

Q  Mr. Hughes, you are familiar with this entire water system as it is delineated on Exhibit 92?

A  Yes, I am.

Q  Are you familiar with the eight-inch connection with the Fallbrook Public Utility District system that is shown in the upper right of the map?

A  In the upper right--

MR. VEEDER:  In the upper right of what?

THE WITNESS:  Yes.

E3

Z55

1          MR. SACHSE:  Upper right-hand side of the map.

2      I didn't hear your answer.

3      A  I said yes, I am.

4      Q  During your familiarity with the operation of the

5  water system, have you known of any water deliveries through

6  that connection?

F-1 ML

THE WITNESS:  Yes, we used some water through that at one time.

MR. SACHSE:  I have no further questions.

REDIRECT EXAMINATION

BY MR. VEEDER:-

Q  How long ago was that, Mr. Hughes, that you used water from the --

A  I can't record the year.  It was away back; '43 or '44, somewhere in there.

MR. VEEDER:  I have no further questions.

RECROSS-EXAMINATION

BY MR. MOSKOVITZ:-

Q  Mr. Hughes, I take it that the sketch on the left-hand side of this Exhibit No. 92, above the line marked "N-439,000," is the detail sketch of your river well, is that right?

THE COURT:  That is the one he is referring to.

THE WITNESS:  Right.

Q  BY MR. MOSKOVITZ:  Where is the gallery you described indicated on that sketch?

A  Just beyond the rectangular last cable, the building there, which says, "18-inch RC."

THE COURT:  What does "RC" mean?  Reinforced concrete?

1    THE WITNESS:  Reinforced concrete.

2    THE COURT:  And that 18-inch reinforced concrete is

3    the pipe that lays across half of the bed of the Santa

4    Margarita River?

5    THE WITNESS:  Yes, your Honor.

6    Q  BY MR. MOSKOVITZ:  And then, from that 18-inch

7    reinforced concrete pipe you have two lines:  One goes to

8    a descending tank and the other goes off in a downward

9    direction.  What is that second line?

10    A  The second line -- there are two pumps in that

11    well.  One is hooked to the electric pump, and the other is

12    hooked to a gasoline pump.  That is our standby pump.  In

13    case of electrical trouble we start up the gas engine, and

14    through the other pump forces up to the million gallons.

15    Q  So that the pipe that goes down is the one that

16    is hooked up to the gasoline pump?

17    A  Yes, that is the line to the gasoline pump.  It

18    hooks in.  They both hook into the same line going up the

19    hill.

20    Q  Then, the line at the bottom of that sketch that

21    says "18-inch CLCCS" is the one that goes up to the top of

22    the hill?

23    A  That is the line that goes up the ridge to the --

24    (inaudible).

25    MR. VEEDER:  Would you state that again, please, Mr.

1     Hughes?  The reporter didn't get it.

2          THE WITNESS:  That is the line that goes up the hill

3     to the million-gallon -- (inaudible).

4          THE COURT:  Million-gallon tank.

5          MR. MOSKOVITZ:  I have no other questions.

6          THE COURT:  Mr. Stahlman?

7          MR. STAHLMAN:  No questions.

8          MR. VEEDER:  I have no questions.  Thank you, Mr.

9     Hughes.

10         THE COURT:  Thank you, Mr. Hughes.

11         MR. VEEDER:  Call Robert Nichols.

12         THE COURT:  This is your sketch, you said, Mr. Veeder?

13         MR. VEEDER:  Yes, it is.

14         THE COURT:  All right.  Hand it back to him.

15         MR. VEEDER:  I will get your Honor another copy.

16

17              ROBERT A. NICHOLS,

18    called as a witness on behalf of the Plaintiff, having been

19    first duly sworn, was examined and testified as follows:-

20         THE CLERK:  Please be seated.

21         MR. VEEDER:  If it would be helpful to your Honor to

22    locate any of these features on Plaintiff's Exhibit 92, the

23    U.S.G.S. Quadrangles 29-F and -G may be of some assistance to

24    you for purposes of location.

25         THE COURT:  Do you have extra copies of them?

1     MR. VEEDER:  Well, your Honor has copies of these.

2     THE COURT:  Oh, I haven't been given copies of those.

3     MR. VEEDER:  29-F and -G?

4     THE COURT:  No, I have only been given three copies.

5     MR. VEEDER:  All right, your Honor.

6     THE COURT:  I have been given 29-K and 29-J and 29-O.

7     MR. VEEDER:  We will get them at once for your Honor.

8     THE COURT:  Let's see the ones you have.

9     MR. VEEDER:  Those are in evidence.

10    THE CLERK:  Would you state your name.

11    THE WITNESS:  Robert A. Nichols.

12

13                    DIRECT EXAMINATION

14    BY MR. VEEDER:-

15        Q   How old are you, Mr. Nichols?

16        A   46.

17        Q   And where do you live?

18        A   On South Pacific Street in the City of Oceanside.

19        Q   What is your present employment?

20        A   Under contract to the 11th Naval District and the
21    Marine Corps through the Bureau of Yards and Docks.  I
22    operate the water systems and supply water to the farmers in
23    the areas known as South Coast Mesa and Stewart Mesa.

24        Q   And would you briefly state your educational
25    background?  Where did you attend elementary school?

Nichols - Direct

1   A   In Fresno and Santa Maria, both in California.

2   Q   And where did you attend high school?

3   A   Santa Maria.

4   Q   Now, would you state your college work and the

5   degrees, if any, that you have?

6   A   I went to the Santa Maria Junior College and

7   graduated and attended the University of California for two

8   years.  I now hold a B.A.

9   Q   And what other employment do you have at the

10  present time than that to which you just made reference?

11  A   I teach in the Oceanside Libby School System,

12  specifically 7th and 8th grade at Jefferson Junior High

13  School.

14  Q   How long have you been employed there?

15  A   Two years under contract; substituted for four

16  years.

17  Q   Would you state your acquaintance with Camp

18  Pendleton and the agricultural operations that are conducted

19  there?  When did you first become acquainted with that area?

20  A   I first became acquainted with that area specifically

21  in 1938 when my father started growing flowers there.  He

22  came to the ranch in, I believe, July of 1938, and put up

23  his buildings and started planting and using water in

24  approximately August, 1938.

25  Q   And what kind and type of crops were raised there

Nichols - Direct

1   by your father, if you remember?

2      A   My father was strictly a gladioli grower at the

3   time.

4      Q   And how long did he operate in that area?

5      A   We operated -- I say "we" because I joined him

6   in November when I closed our planting in Santa Barbara

7   County.   We operated there until 1943, and then we moved to

8   another area of the camp.

9      THE COURT:   When you say "operated there," --

10      THE WITNESS:   At Stewart Mesa, your Honor.   I am

11   sorry.

12      THE COURT:   Well, Stewart Mesa.   Are you going to tell

13   us what part of the Stewart Mesa?

14      Q   BY MR. VEEDER:   Would you go on and state the area

15   on Stewart Mesa where your father was operating?

16      A   The area is exactly in the middle between the

17   roads known as the South Road and the North Road.

18      Q   Would you come down to Plaintiff's Exhibit marked

19   75, in particular, page 75-9, and locate it, if you would,

20   for the Court, the area to which you have just made reference?

21      A   This is a rather difficult question, because I

22   didn't come down until Thanksgiving Day, and at that time

23   considerable changes had been made in the map that is shown

24   here.

25      Q   Just generally can you identify the area?

j43

Nichols - Direct                                                    9270

1      A   I would say that it was approximately 800 feet
2  from this North Road to the location of my father's area.

3      Q   When you say "the North Road," you are pointing
4  to what, Mr. Nichols?

5      A   The road that enters between the section house
6  and the packing sheds on Stewart and continues to the top
7  of the hill.   Here is the section house, and these are the
8  packing sheds.

9      THE COURT:   How many acres?

10     THE WITNESS:   We had 80 acres at the time, your
11  Honor.

12     THE COURT:   Does anybody have a colored pencil here?

13     MR. SACHSE:   Yes, your Honor.

14     MR. VEEDER:   Here.

15     THE COURT:   Put a cross in approximately where the --

16     THE WITNESS:   (Marking.)

17     THE COURT:   Now, you put the cross clear up towards
18  the --

19     THE WITNESS:   About 800 feet from here, and I would
20  guess we were about three times as far down to this South
21  Road, which is a continuation to this one at the present
22  time (indicating).

23     THE COURT:   And it was that far east?

24     THE WITNESS:   No.   There is now a division road that
25  I missed here in the middle.   And our property was to the

1    west here; 80 acres approximately like that.  This crosses.

2           THE COURT:  Put your initials beside that "X."

3           THE WITNESS:  (Marking.)

4           MR. SACHSE:  May I inquire:  Is that supposed to be

5    the rough outline?

6           THE WITNESS:  That is approximate outline.  There were

7    80 acres there; 79 and a fraction, to be exact.

8           THE COURT:  What is the purpose of this testimony,

9    Mr. Veeder?

10          MR. VEEDER:  What is the purpose of it?

11          THE COURT:  Yes.

12          MR. VEEDER:  General background in regard to

13   utilization of water, your Honor.

14          THE COURT:  In regard to what?

15          MR. VEEDER:  The utilization of water, from the Santa

16   Margarita River, that is.

17          THE COURT:  Well, the record will show it is outside

18   the watershed as sketched by your own witness.

19          MR. VEEDER:  I am going to call this witness down

20   here, and we are going to change the watershed line, your

21   Honor.  I think that he can move it north a little bit.

22          MR. SACHSE:  I will object for the record on the

23   grounds as stated by your Honor; it is outside the watershed;

24   irrelevant and immaterial; not tending to prove any issue

25   in this case.

1    THE COURT:  The Court rules it is immaterial so far,

2  but may remain in the record as part of your showing.

3  Proceed.

4    MR. VEEDER:  Your Honor, I would like to have this

5  record show that I am delivering to the clerk of the court

6  the mosaic that you asked be constructed from the 1929

7  aerials -- Mr. Clerk, if you will help me here a moment --

8  that has been marked 73 for identification.

9    THE COURT:  This would be, then, 73?  Do you have

10  any more in this series?

11    MR. VEEDER:  There is quite a series of them.  I

12  don't know how Mr. Luddy has them prepared at the present

13  time.

14    THE CLERK:  According to the different flights.

15    THE COURT:  There is quite a series of the 73 prints?

16    MR. VEEDER:  That is correct.

17    THE COURT:  How have you got them listed, Mr. Luddy?

18    THE CLERK:  Your Honor, by flights.  For example,

19  this is 73-1-A, -B, -C.

20    THE COURT:  -1-B.  The record will show that the

21  clerk has indexed or stamped Exhibit 73 in the following

22  manner:  Folder called TEWP --  What is that?

23    MR. VEEDER:  Township, I would assume.

24    THE COURT:  Township.

25    THE CLERK:  See, that would be Township 1, and each

envelope is numbered A.  In other words, that will be TW or T-73-1A, -1B, -1C, and -1D.

THE COURT:  All right.

THE CLERK:  And the next township is 2, and it is 73-2AB, and so on.

THE COURT:  Now, I notice there is written on these envelopes -- for instance, Exhibit 73-1D there is written on the envelope a number, put on by someone else, 1D1 to 6. All the way through have your exhibit numbers followed these other numbers?

THE CLERK:  Just this number here, your Honor.

THE COURT:  The township.

THE CLERK:  Yes, sir.

THE COURT:  And where there was a D written, you have used a D?

THE CLERK:  Yes, sir.

THE COURT:  So it would be 73-1, indicating township, and the envelopes are A, B, C, D?

THE CLERK:  Yes, your Honor, that is correct.

THE COURT:  All right.  Do you offer the 73 in evidence?

MR. VEEDER:  Yes, we do, your Honor.

MR. MOSKOVITZ:  I object, your Honor.  I don't think that this 1929 mosaic is at all relevant.  I can't see what purpose it will serve at this time.  If it is for the purpose

of showing water uses or attempting to delineate land

irrigated in 1929 within the watershed, it is not relevant,

because uses at that time have no relationship to riparian

rights.  If it is for the purpose of showing water uses

outside the watershed, well, then, it is immaterial on the

basis that the evidence just given of water uses outside

the watershed is immaterial.  I can't see what purpose it

will serve.

MR. SACHSE:  I will join in the objection, your

Honor.

THE COURT:  You can't prove everything with one

document.  Supposing it showed the use of water in 1929

outside the watershed and supposing it was part of a series

of proof that this has gone on for fifty years.  Would it

be immaterial?

MR. MOSKOVITZ:  If there is evidence which shows a

continuous use of a certain amount of water through the years

going back before 1913, then this may be evidence of an

appropriation outside the watershed.  If it is within the

watershed, that would not be enough to show an appropriation,

because it would be within a riparian right.

THE COURT:  If it was within the watershed, it would

show, would it not, that the ground was suitable for irriga-

tion and tillage?

MR. MOSKOVITZ:  Well, for that limited purpose,

1　　although --

2　　　　　THE COURT:　I am not going to be misled about the

3　documents.　Your objection is overruled.　And 73 --　You

4　have offered 73, all the --

5　　　　　MR. VEEDER:　I have offered the whole thing, your

6　Honor.

7　　　　　THE COURT:　Including the mosaic.

8　　　　　73 will be received in evidence.　It will be

9　understood they are just what they purport to be, aerial

10　photographs of 1929.

wtdrawn
P 5276

11　　　(Plaintiff's Exhibit No. 73 for identification was

12　received in evidence as Plaintiff's Exhibit No. 73.)

13　　　　　MR. SACHSE:　May I ask a question?

14　　　　　THE COURT:　And it may be that, to a large extent,

15　they will be immaterial.　There may be certain matters that

16　we will draw some value from.　I can't tell you right now.

17　　　　　MR. SACHSE:　May I inquire for just a moment, your

18　Honor:　Mr. Veeder, when we first looked at the large box

19　of the originals before the mosaic was made, it appeared to

20　me that it covered a large area.　Have you deleted some of

21　the --

22　　　　　MR. VEEDER:　The Court asked us to draw the mosaic

23　from the standpoint of water used within Camp Pendelton.

24　That is what that is.

25　　　　　MR. SACHSE:　In other words, what about the original

documents?  Have the photos --

MR. VEEDER:  They are there.

MR. SACHSE:  Well, are they being offered?

MR. VEEDER:  The whole thing.

MR. SACHSE:  Then, your Honor, that is the point I am getting at.  This mosaic is conceivably proper for the reason your Honor just stated, but if there are a great many additional photos in here, not in the mosaic, that cover stuff outside here, not in the watershed completely, then those are irrelevant and immaterial.

THE COURT:  Do we need the whole box, 73?

MR. VEEDER:  Your Honor, we are going to have witnesses to testify in regard to various phases of this, of the flight that was made throughout the watershed.  There may be parts of it concerning which there will be no evidence introduced.  I would throw those at that time.  But we do have --

THE COURT:  Let's leave it marked for identification, then, and as we use them we will mark them.

MR. VEEDER:  I would like to have the mosaic --

THE COURT:  All right, the mosaic will be received in evidence, 73-A, and I will set aside the order receiving in evidence Exhibit 73.  73-A.

You have other mosaics of this sort, Mr. Veeder?

MR. VEEDER:  No, your Honor, not of this kind.

1    THE COURT:  Then, why not call this mosaic 73, because
2    the 73 series all have subdivision series on them.  Whenever
3    we pull any of them out, we will have a subdivision already
4    shown.

5    MR. VEEDER:  It suits me.

6    THE COURT:  All right.  The mosaic will be called
7    Exhibit 73 and will be in evidence.  Do you have a small
8    copy of it?

9    (Plaintiff's Exhibit No. 73 was admitted in evidence.)

10    MR. VEEDER:  Let the record show that I just took
11    that away from Mr. Stahlman.

12    Q    Mr. Nichols, would you return to Plaintiff's
13    Exhibit marked 75-9 for the purpose of further interrogation.
14    Now, when you first observed that land in 1938,
15    Mr. Nichols, what was its condition from the standpoint --
16    I am pointing now to the lands in Stewart Mesa which are
17    delineated by purple line.  What was the condition of that
18    land when you first observed it?

19    THE COURT:  Well, there is no showing that he ever
20    saw anything except the 80 acres.  Tell us, first, Mr.
21    Nichols, how much of that area in the red line which has
22    been identified as Stewart Mesa did you view then in 1938?

23    THE WITNESS:  When my father and I were looking for
24    land on which to grow flowers, we covered practically all
25    of Stewart Mesa on foot; not on the west side, the west side

1    of the highway, but on the east side where they had already

2    started constructing the pipe lines.

3           THE COURT:  Was 101 in at that time?

4           THE WITNESS:  101 was in.  Not that type of road, but

5    it was still there.

6           THE COURT:  So you looked over the area east of 101?

7           THE WITNESS:  East.

8           THE COURT:  Within the red line?

9           THE WITNESS:  Within the red line.

10          THE COURT:  Go ahead.

11          Q  BY MR. VEEDER:  Now, what was the condition of

12   that land when --  Was it rough land when you observed it?

13          A   It was rough land.  It is very much like the type

14   of land that is seen along the Coast between there and San --

15   (inaudible).  It is the type of land that can be commonly

16   observed anywhere along the Coast up toward San Onofre.  It

17   is commonly called "Hog Wallow" land, because it has high

18   spots and low spots in it.

19          Q   What kind and type of level did you observe in

20   connection with the presentation of that area for agricultural

21   purposes?

22          A   I didn't see any of the levelling actually going

23   on because actually I was in Las Olivas with our other

24   planters.  I made visits down.  And at that time I saw what

25   I have always called the land leveler.  It is a machine on

1  small wheels that a man rides.  It is pulled by a tractor,

2  and he scrapes dirt from the high spots and dumps it in the

3  low spots.

4       Q    From the standpoint of your observation, how

5  extensive was the land-levelling that you observed on the

6  lands concerning which you are now testifying, namely, the

7  areas east of 101 to the purple line?

8       THE COURT:  On Exhibit 75-9.

9       Q  BY MR. VEEDER:  On Exhibit 75-9.

10      A    The levelling on much of the land that was

11  taken up by Biggs Bros., which is the area east of where

12  my father was, and on our piece, the levelling was rather

13  minimal, because in both cases we were using sprinklers; and

14  it wasn't necessary that we be able to irrigate.  The other

15  areas were done with slightly larger equipment.  But the

16  largest tractor that I recall seeing there was about a D-4.

17      Q    Would you state whether or not, based upon your

18  observations, the general contour of the land was changed by

19  that type of development?

20      MR. STAHLMAN:  In what way?  What does the question

21  mean?  May I have the question, please.

22      (The reporter read back the question.)

23      MR. VEEDER:  You understand what I ask?

24      MR. STAHLMAN:  I don't know.  "General contour."

25      THE WITNESS:  Well, general contour is quite a large

term.

MR. VEEDER: All right.

Q    From the standpoint of the gradient of the land in that area would you state?

A    Well, I believe that all I can state is that the --

MR. STAHLMAN: Just a moment.

THE COURT: Just a minute.

MR. STAHLMAN: I have an objection to that. I don't think the witness is qualified to say whether a gradient is changed or reach a conclusion as to whether or not the watershed is altered.

THE COURT: Did you see the land before they started doing any of this grading?

THE WITNESS: I did, sir, yes.

THE COURT: And no grading at all had been done?

THE WITNESS: Yes. It was just barren.

THE COURT: All right. Did you observe that land at any time when rain was falling to see how water ran?

THE WITNESS: No, sir, I did not.

THE COURT: You wouldn't know how water ran off of it, then?

THE WITNESS: I saw it during flood stages after that, but preceding that I did not see it, no, sir.

THE COURT: Well, you saw it in flood stages after -- what do you mean -- after what?

1    THE WITNESS:  After we had -- after it -- the surface

2    had been levelled enough to enable the farmers to plant.

3    Q  BY MR. VEEDER:  Can you state the course in which

4    you observed the water to run at that time?

5    MR. SACHSE:  I will object.  That is immaterial.

6    THE COURT:  Overruled.

7    THE WITNESS:  Our ranch house or sheds were approx-

8    imately in the middle of this piece.

9    Q  BY MR. VEEDER:  When you say "this piece" --

10    A    I have marked with an X and my initials in the

11    center of the plot.

12    THE COURT:  On Exhibit 75-9.

13    THE WITNESS:  During the course of the flood -- I

14    believe that was in '39.  I cannot pin it exactly.  I believe

15    it is in the winter of '39, '40 we had excessive rain.  And

16    one morning after quite a few showers water broke from what

17    is now called Parcel 12, in here, followed --

18    Q    You mark 12 so we will know where.

19    A    Could I refer for a number to Mr. Taylor on that

20    to be sure it follows the right path?  Is that 12, Mr. Taylor?

21    THE COURT:  Put "12" in there.

22    THE WITNESS:  It came from 12 across the corner of

23    Biggs Bros.' field here.

24    Q  BY MR. VEEDER:  Would you draw the line where you

25    observed it to go.

J55

Nichols - Direct

5982

1    A    It broke down across our place here, came to the

2  railroad track.  Mr. Taylor, would you please --

3        MR. VEEDER:  No, you can't ask him.

4        MR. STAHLMAN:  May I ask a question at this time?

5        THE WITNESS:  May I say something, your Honor?  I can

6  only keep my knowledge in my roads.  This road is the main

7  road at the present time.  I have it to the right of the

8  main road, and it should be below here, and that would

9  make --

10        THE COURT:  Wait a minute.  Your X is wrong, then?

11        THE WITNESS:  This X is wrong.

12        THE COURT:  You recall that you mentioned the road in

13  here?

14        THE WITNESS:  Yes, there is a road in there, sir,

15  but that is a plain dirt road.  This is the main road that

16  ran through the middle there.  We are below that road from

17  there to the river, as I stated, only a piece, but much too

18  long to cover.

19        THE COURT:  Well, cross a red line through what you have

20  marked and put your arrows in -- .

21        THE WITNESS:  This is area 12, but the water came down --

22        THE COURT:  First, put where your 80 acres are.

23        THE WITNESS:  Right here, sir.

24        THE COURT:  And put where the farmhouse is, and the

25  name.

1    THE WITNESS:  It was right in there, sir.

2    MR. SACHSE:  Could you ask that the boundary be

3 indicated?

4    THE WITNESS:  The boundary, approximately (marking).

5    THE COURT:  All right, now.  Where did the water

6 come?

7    THE WITNESS:  The water came out of this piece, 12,

8 here, across the corner.  I remember it because they had

9 the potatoes in here, and they washed out and were down here,

10 came right across there, right across our field and hit the

11 railroad at approximately that point where it followed south.

12 We had gladiolas growing here (inaudible) down into the

13 Santa Margarita River.

14    MR. VEEDER:  Say that again.

15    THE WITNESS:  The water followed across our field --

16    MR. STAHLMAN:  Just a moment, your Honor.

17    THE COURT:  Let him finish his answer.  Let's get the

18 record straight.

19    THE WITNESS:  -- down the railroad track and into

20 the Santa Margarita River here where we had the gladiolas

21 growing the following summer.

22    THE COURT:  Do you mean by that that gladiolas came up

23 from gladiolas which had been washed --

24    THE WITNESS:  Washed from here apparently down there,

25 because there is no other way to have gladiolas growing on

1    the edge of the river.

2            MR. VEEDER:  Put your initials on the red line, Mr.

3    Nichols.

4            THE COURT:  Put an arrow showing the direction and

5    run a line crossing out this other business that you have

6    got in before, other red line, crossing out the "12."

7            THE WITNESS:  The "12" is still that same area.

8            THE COURT:  All right.

9            MR. STAHLMAN:  May I ask a question of Mr. Veeder?

10           THE COURT:  Yes, sir.

11           MR. STAHLMAN:  Bill, didn't you, at Reche Schoolhouse

12    have a map made prior to the time of the grading which was

13    a survey which showed the contour line by which it was

14    determined, where it could be determined where the watershed

15    line was?

16        MR. VEEDER:  Here is a map right here.

17           MR. STAHLMAN:  Is that the same one you had only

18    larger?  You had a larger map there.

19           MR. VEEDER:  You want to check it?  These are the maps.

20           MR. STAHLMAN:  I think it would be more reliable to

21    determine this --

22           MR. VEEDER:  Well, your Honor, as far as I am concerned,

23    I would like to go ahead and finish with this examination.

24           THE COURT:  May I inquire:  This map here was --

25           MR. VEEDER:  97.

1    THE COURT:  What was the date of those contours?

2    MR. VEEDER:  1940.

3    THE WITNESS:  1940.

4    MR. STAHLMAN:  My question was he didn't have a map

5    prior in time to that that showed --

6    MR. VEEDER:  I would like very much to check it out.

7    THE COURT:  He says he will check it out and let us

8    know.  Now, go ahead with the witness, Mr. Veeder.

9    MR. VEEDER:  Your Honor, in regard to page 75-9 I

10   will order from Salt Lake another page, with your Honor's

11   permission.  I will have to, because this one is confusing

12   the way it is marked now.

13   THE COURT:  Leave it just the way it is.  Leave it

14   just as it is.

15   MR. VEEDER:  If that is all right.

16   MR. SACHSE:  If your Honor please, perhaps I am

17   premature, but Exhibit --   What is the number of it?

18   MR. MOSKOVITZ:  97.

19   MR. SACHSE:  -- 97, the express testimony from Mr.

20   Cannon was that this represented, the contours on this land

21   represented this property in a state of nature --

22   MR. VEEDER:  No.

23   MR. SACHSE:  -- as of 1940, under my cross-examination.

24   This would indicate that somebody is completely wacky, and we

25   had better find out who.

1          THE COURT:  It often happens in lawsuits you have

2     conflicting testimony.  Let's proceed.  Go ahead with your

3     examination.

4          Q  BY MR. VEEDER:  Mr. Nichols, how long have you

5     operated in the area known as Stewart Mesa as a rancher?

6          A    As a rancher?

7          Q    Yes.

8          A    Until 1943, and then we moved opposite the main

9     gate.

10         Q    And when you say, "opposite the main gate," what

11    do you mean?

12         A    The main gate entrance to Camp Pendleton.

13         THE COURT:  Can the witness take the seat back here?

14         MR. VEEDER:  Yes.  Yes, you can sit down.

15         Q    During that period what kind and type of crops

16    did you raise, Mr. Nichols, in this area?

17         THE COURT:  What area?

18         THE WITNESS:  We raised gladioli entirely.

19         MR. SACHSE:  Just a minute, please.

20         Q  BY MR. VEEDER:  In the Stewart Mesa?

21         THE COURT:  He has talked about two areas, Mr. Veeder.

22    He has talked about being down on the main gate, and he has

23    been talking about Stewart Mesa.  "This area," doesn't mean

24    anything.

25         Q  BY MR. VEEDER:  In the Stewart Mesa area, first,

1  Mr. Nichols, would you state the kind and type of crops that
2  have been raised there?
3      MR. SACHSE:  I will object, if the Court please.  It
4  is immaterial.  The kind and type have nothing to do with
5  it.  If this land is irrigable, that is that.  If it is
6  within the watershed, water duty is of no matter, because
7  in riparian rights they can exercise it.  If it is without
8  the watershed, water duty is immaterial, because your Honor
9  has already ruled that no prescriptive rights can be acquired
10  and that no appropriative right can be acquired except by
11  compliance with the law since '23; so it is entirely
12  immaterial what kind of crops they raised.
13      THE COURT:  You mean that the water duty is identical
14  all through the watershed?
15      MR. SACHSE:  No, your Honor.  I am saying that the
16  question of water duty is, in this case, immaterial; because,
17  if it is within the watershed, as a riparian, he has a
18  right to use the water on irrigable land, whatever the duty
19  may be.  And if it is outside the watershed, he can't have
20  any rights.
21      THE COURT:  Let's forget about outside.  Why isn't
22  the type of crops within the watershed material?
23      MR. SACHSE:  Because a riparian can use his land for
24  any crop.  It doesn't matter whether he chooses to raise the
25  crop with the heaviest draft on the water or the crop with

1   the least.  This is an exercise of the riparian right.  Let

2   him take all the water he wants for the land.

3        MR. VEEDER:  Will the State stipulate to that?  Will

4   Mr. Stahlman stipulate to that?

5        THE COURT:  Wait a minute.  Of course, he can't take

6   all the water he wants.  He gets a correlative right to

7   water.  And I haven't looked into this, but I would imagine

8   it would be correlative rights to water on a reasonable

9   basis, and it would have something to do with the kind of

10   crops he was using.

11        MR. SACHSE:  If your Honor please, I would have to

12   disagree.  We submitted some pretty extensive legal memorandums

13   to Mr. Cranston on the point.

14        THE COURT:  We will pass it up until I have a chance

15   to look at them.  I want to look into that.

16        MR. SACHSE:  The point is that if an apportionment

17   -- and there are many cases -- if an apportionment were to

18   be made on anything as nebulous as the type of crop, it

19   would have to change every year, season, perhaps two or

20   three times a season.  The Court would have to reapportion

21   water.  So the apportionment is necessarily made on irrigable

22   acreage, not on the kind of crops that may or may not be

23   grown at a particular period of time.

24        THE COURT:  Your position is that all irrigable land-

25   owners within the Santa Margarita who are riparian have

1    correlative rights to water regardless of what kind of crop

2    they might want to use?

3         MR. SACHSE:  Yes, your Honor.  The apportionment, if

4    it is made -- at some time an apportionment must be made --

5    the apportionment shall be made on the basis of irrigable

6    acreage, not upon the basis of the particular crop that may

7    or may not be grown on the land.

8         MR. VEEDER:  Mr. Sachse just doesn't understand water

9    law.  That is his problem.  There is not going to be any

10   apportionment, your Honor, as I see it.  I think the

11   question of availability of water may be important.  But

12   from your standpoint we don't expect your Honor to say, "This

13   quantity of water can be used here, and that quantity there."

14   What does he think?

15        THE COURT:  All right.  Go ahead.  I am going to over-

16   rule the objection here, what the testimony is as to the use

17   that was made --

18

19

20

21

22

23

24

25

G

252

1    MR. SACHSE:  Then I respectfully would like to inquire

2  what the purpose of this is.

3    THE COURT:  What is the purpose, Mr. Veeder?

4    MR. VEEDER:  The object, as I see it, your Honor, I

5  don't know of a better way of proving the value of the land

6  from the standpoint of the production of agricultural crops

7  and need for water than to show the kind and type of crops

8  that have been raised there.  It would be an anomaly, it would

9  seem to me-- of course, I said that if they would stipulate,

10  it is fine-- but I think that we have to show, in my own view,

11  and I would certainly move for judgment if anyone failed to

12  do so, that water was diverted and applied to beneficial use

13  and application to crops of the various kinds and types.  Now

14  this will go far in showing that this area in here is cropped

15  twelve months a year and that it can be, and that if there is

16  water available it will be.

17    MR. SACHSE:  Mr. Veeder asked for a stipulation, I am

18  perfectly willing to stipulate-- I don't know what the State

19  will say-- that the Stewart Mesa is irrigable, every foot of

20  it.  That doesn't stipulate whether it is within or without

21  the watershed and doesn't stipulate what rights they may have

22  on it.  But I will certainly stipulate that it is irrigable

23  land.

24    MR. STAHLMAN:  That isn't the only test.  The highest

25  and best use is the test.

THE COURT:  Let us proceed.  The objection is over-
ruled.

Tell us briefly.

BY MR. VEEDER:

Q  What are the kinds and types of crops that have been
raised on there on Stewart Mesa in the period that you were
operating there?

A  We grew gladiolus.  There were other types of
flowers grown there.

Q  In what period of the year did you grow those
gladiolus?

A  We grew only in the wintertime.

Q  And when you say wintertime--

A  The planting commenced in August and stopped in
approximately March.

THE COURT:  The planting stopped, or the harvest
stopped?

THE WITNESS:  The planting stopped, your Honor, and we
harvested past May 30th.

BY MR. VEEDER:

Q  And what other kind and type of crops did you
observe growing in 1938 through 1943 on Stewart Mesa?

A  There were potatoes.

Q  And what time of the year were those raised?

A  Those were raised as a very early spring crop.

Q   And when you say early spring crop, what time of year was that?

A   I know they were in the ground in November.

THE COURT:   You mean in the ground, you mean they had been planted?

THE WITNESS:   They had been planted and were growing and were up.

BY MR. VEEDER:

Q   In the month of November?

A   In the month of November.

Q   And when generally were they harvested down there?

A   That I couldn't say, sir.

Q   What other kinds and types of crops did you observe growing on Stewart Mesa in 1938 through 1943 in the entire area that has been delineated on Plaintiff's Exhibit marked 75-9?

THE COURT:   Within the red line as Stewart Mesa.

MR. VEEDER:   Yes.   I believe that is a purple line, your Honor.

THE COURT:   Purple line, all right.

THE WITNESS:   Those days were experimental days.   The farmers tried almost every type of crop that had been grown in Southern California to see if the Mesa was suitable for it. There were peas, strawberries, cabbage, the aforementioned potatoes, lima beans, many types of flowers.

BY MR. VEEDER:

Q   What month of the year were those crops grown down there?

A   The growing there is a continual process.  You can find almost any of those in any given months during the year.

Q   When you say a continual process, you mean the year around?

A   Year around, planting and harvesting, on the Mesa.

Q   Subsequent to 1943 where did you conduct your operations, you and your father?

A   From 1938 to 1943 on Stewart Mesa.

Q   And subsequent to that time where did you farm?

A   Our base of operations was Santa Maria.  We were there from 1926 until 1937.

THE COURT:  He is asking you about after 1943.

THE WITNESS:  Excuse me.  In 1943, 1944 and 1945 we were in the area known as the Triangle opposite the main gate. I know of no other designation of that area.

BY MR. VEEDER:

Q   Which side of the river would that be?

A   That is south of the river.

Q   And what kind and types of crops did you raise there?

A   We grew gladiolus and stocks.

Q   And to what is the triangle presently planted?  Do

1   you know?

2          A   It is vacant at the present time.

3          THE COURT:   Take a recess.   Find some map and show me

4   where the triangle is on the map.

5          (Recess)

6          MR. VEEDER:   Your Honor asked where the triangle was.

7   I would like to have the witness point it out to you.

8          THE COURT:   What map are you going to use?

9          MR. VEEDER:   I shall use for that purpose Exhibit 98A,

10  your Honor.

11         Q   See if you can delineate it and state into the

12  record where the triangle is situated and the crops you raised

13  there.

14         A   This triangle is situated south of the overpass on

15  Highway 101.

16         THE COURT:   Where is the overpass?

17         THE WITNESS:   Right here, your Honor.   It is approx-

18  imately half a mile north of the San Luis Rey Bridge.

19         THE COURT:   Well, let me come down.   I can't make any

20  heads or tails of it, as I see it.

21         THE WITNESS:   This is the triangle here, your Honor,

22  bounded by the railroad on one side, Highway 101 on the other,

23  and the south boundary of the Santa Margarita Ranch at that

24  time on the other.

25         THE COURT:   For the record, then, it is bounded on the

G.

Z61

1   west by the railroad--

2          THE WITNESS:  Right.

3          THE COURT:  --on the south by the boundary of the ranch,

4   and on the east by Highway 101.

5          THE WITNESS:  Highway 101.

6          THE COURT:  Going up to the overpass.

7          THE WITNESS:  At that time there was no overpass.  It

8   has been put in since then.

9          THE COURT:  Where is the main gate that you talk about?

10         THE WITNESS:  The main gate is right opposite here.

11         THE COURT:  It is that butterfly--

12         THE WITNESS:  The main gate was situated right here.

13         THE COURT:  To the east of 101.

14         THE WITNESS:  Yes.

15         THE COURT:  About how many acres were there in that

16   triangle?

17         THE WITNESS:  23, sir.

18   BY MR. VEEDER:

19         Q  What were the sources of water--

20         MR. SACHSE:  Just a minute.  There was a question

21   pending, I believe, wasn't there, about the kind of crops?

22   I want to object to that.  You asked him to locate the triangle

23   and state the kind of crops.  I don't believe the witness has

24   answered about crops.  I want to object to any testimony about

25   crops, your Honor.  This property is clearly within the

1   watershed.   Mr. Veeder has stated that he is not doing this

2   for purposes of any apportionment or allocation of water, and

3   if it is not for that purpose, it has no materiality whatso-

4   ever.

5          THE COURT:   Well, it takes less time and less space in

6   the record to have the answer than the objection.  The object-

7   tion is overruled.

8          Let's find out what kind of crops are down there.

9          THE WITNESS:   Our basic crops were gladiolus and stocks,

10  although we did grow some tomatoes.

11  BY MR. VEEDER:

12         Q What have been your responsibilities in regard to the

13  operation of the water system for the delivery of irrigation

14  water in the Stewart and South Mesas?

15         A  In 1942 I was employed by Haddock Engineers in the

16  capacity that might be called a line rider.

17         Q  What was that?

18         A  I merely checked over the system to see if there

19  were any breaks or leaks.  If there were, I reported them to

20  Haddock Engineers.

21         Q  And the system was the irrigation system; is that

22  right?

23         A  The irrigation system.

24         Q  And subsequent to 1942 what were your responsibili-

25  ties?

A   In September, 1943, I was given a contract by the Eleventh Naval District for the operation, maintenance and upkeep of the entire water system for irrigation water for Stewart Mesa and South Coast Mesa.

Q   And in performing those functions what did you do?

A   Pumped the water.

Q   And from what source did you pump the water?

A   At the time I received my original contract we were pumping from two wells in the Ysidora Basin.  One of them was designated 5A2, the other was designated 5A5.

Q   During that period who utilized the water on Stewart and South Mesas?

A   Do you wish the names, or--

Q   Wel, no.

A   The persons using that water or utilizing that water were the lessees that farmed those areas.

THE COURT:  The lessees from the Government?

THE WITNESS:  The lessees from the Government.

BY MR. VEEDER:

Q   What were the periods of years during which you delivered this water each year?  What was the period?  A 12-months period?

A   It is a 12-month period, and we have shifted our period of measuring water from January 1 to December 31 to the dates of April to April 1, and I believe for one year we used

G

Z64

1   the year from July 1 to July 1 for measuring our water.

2      Q   Now, during the period in question what were the

3   results, if any, of the appearance of salt water contamination

4   in the Ysidora Basin upon your operation?

5      THE COURT:   By the period in question you mean from

6   1942 on?

7      MR. VEEDER:   From 1942 on, yes.

8      THE WITNESS:   When I was operating under my first

9   contract, Well 5A2 was our principal source of water, with

10  5A5 cutting in if Well 5A2 could not handle the load or the

11  demand.   It became obvious that we were increasing in salt

12  content.

13     Q   How did that become obvious to you?

14     A   There are methods of testing water for salinity,

15  and we— I should not say we-- the Marines in their test had

16  a plot made of the increase and decreas in salinity in the

17  various wells.

18     MR. MOSKOVITZ:   I object to that, your Honor, on the

19  ground that it is hearsay.

20     MR. SACHSE:   It is hearsay and mere repetition of what

21  we have already received from the direct source, your Honor.

22     THE COURT:   As far as he has gone no harm is done.   He

23  merely tells us something we already know.   The objection is

24  sustained.

25     Go ahead.

5299

BY MR. VEEDER:

Q   When the presence of salt water contamination appeared, what effect did that have upon your operation, Mr. Nichols?

A   It became necessary to shut down Well 5A2 and to do all of our pumping from Well 5A5.

Q   Now, what is the present source of the water that you are using on the Stewart and South Mesa?

A   As the time went on and we continued to draw water from 5A6, a profile was made of the underground water levels and it was found that we were endangering the entire lower end of the basin by continuing to pump from Well 5A6.

THE COURT:   You haven't mentioned 5A6 until just now. You said 5A5 was the well you used after the first one got salty.

THE WITNESS:   Your Honor, when Well 5A5, the casing collapsed, we drilled right alongside it for another casing as a replacement well, which is 5A6, and after calling it 5A6 for the last several years I slipped into calling it the number it now bears.

MR. SACHSE:   Your Honor please, I object on the further ground that this is hearsay.  Unless this witness lays a foundation, I object to the statement that they were endangering the whole basin.  I think this is repetition.  He is doing nothing but repeating what he heard from somebody else.

G

Z66

1    THE COURT:  Objection sustained.  I will strike out the

2    statement.  It was not responsive to a question anyhow.

3    The question asked, as I recall it, was, where is the

4    present source of water for Stewart Mesa and South Mesa?

5    BY MR. VEEDER:

6    Q   What is the present source of water?

7    A   The present source of water for Stewart Mesa is what

8    is designated as Well 4I.  It is approximately 3700 airline

9    feet upstream from the well site of 5A5 or 5A6 as it is now

10   known.  That was connected in 1949 and is now our main source

11   of supply.  It is used entirely unless we have a break in that

12   line and must switch back to 5A5-5A6 area for water supply

13   until we can repair our line up to 4I.

14   THE COURT:  What is the present source of water for

15   South Mesa?

16   THE WITNESS:  Well 4Cl on the other side of the river.

17   THE COURT:  Neither of these systems for these two

18   mesas is connected with the water system at Camp Pendleton?

19   THE WITNESS:  No, sir, they are not.

20   THE COURT:  I got the impression that one of the exhibits

21   showed a line running up to Stewart Mesa.

22   MR. VEEDER:  I don't believe it is in existence now,

23   your Honor.

24   Q   I hand you plaintiff's exhibit marked for identifica-

25   tion 82 and ask you to state into the record what that

1   tabulation represents.

2       A  This tabulates the water used for irrigation from the

3   Santa Margarita River and reports figures from meter readings

4   of water delivered to Stewart Mesa and South Coast Mesa.

5       Q  And under whose direction are those tabulations

6   maintained?

7       A  Those tabulations are maintained by the Marine Corps.

8   Under whose direction I do not know.

9       Q  Do you know whether that tabulation is correct from

10   the standpoint of the quantity of water that has been pumped

11   and utilized?

12       A  The exact figures I can't guarantee, although I can

13   guarantee that the meters work.

14       Q  From the standpoint of the quantities of water that

15   have been utilized down through the years, how does the quantity

16   that you are presently receiving compare with the maximum

17   quantity that you have delivered during previous years?

18       MR. SACHSE:  I object, if the Court please.  The witness

19   just said that he didn't read the meters and can't vouch for

20   the figures exactly.  So how can he answer that?

21       THE COURT:  Sustained.

22   BY MR. VEEDER:

23       Q  Have you compared the quantities of water presently

24   being delivered with the quantities of water that you have

25   in the past delivered, Mr. Nichols?

5302

G2

Z68

1   A   I have done that through my own personal records.

2   Q   How do those figures compare?

3   A   We show a--

4   MR. MOSKOVITZ:   I object, your Honor; there is no

5   foundation as to the type of personal records he kept.

6   BY MR. VEEDER:

7   Q   Would you state what kind of personal records you

8   keep, Mr. Nichols?

9   A   In the course of my operation it is necessary that

10   I meter the water, that I send bills to each farmer, that I

11   collect for these bills and pay the money that is acquired to

12   the Eleventh Naval District or the Treasurer of the United

13   States, as it should be put.   These records are audited and

14   checked monthly as well as on a three-months report basis.

15   Q   How does the quantity of water which you are

16   presently delivering during the year 1958 compare with the

17   maximum quantity of water based upon your personal knowledge

18   and your personal records, compared with the maximum quantity

19   that was at any time ever delivered?

20   MR. MOSKOVITZ:   I object, your Honor.   There has been

21   no showing how this man got the information as to how much water

22   was delivered.

23   THE COURT:   From meters?   He said from the meters.   He

24   said they are maintained by him, that he himself maintained them

25   and checked them.

G2

Z69

1      MR. MOSKOVITZ:  I don't believe he said that yet.

2      THE WITNESS:  I believe I mentioned in the record that

3  I meter all water to the farmers.

4      MR. VEEDER:  That is what he said.

5      THE COURT:  Objection overruled.

6      MR. VEEDER:  You should pay attention.

7      THE COURT: Mr. Veeder, let us go ahead with the case.

8      MR. VEEDER:  Would you answer the question?

9      Would you go back and read the question that was

10  objected to, Mr. Reporter?

11      (The reporter read the pending question as follows:

12  "Q  How does the quantity of water which you are presently

13  delivering during the year 1958 compare with the maximum

14  quantity of water, based upon your personal knowledge and

15  your personal records, compare with the maximum quantity that

16  was ever at any time delivered?")

17      THE WITNESS:  We are now furnishing, when we are

18  allowed our full ration, approximately a thousand acre feet

19  less than we have in times in the past.

20      THE COURT:  A thousand acre feet what?

21      THE WITNESS:  Per year.

22  BY MR. VEEDER:

23      Q What has been the result of that reduction, to your

24  personal knowledge?

25      A  To my personal knowledge, the farmers are raising

G2

Z70

1   one crop on approximately half of the acreage that they lease

2   in order to protect their water.

3       THE COURT:  Raising one crop on half the acreage?  You

4   mean they left half the acreage lie fallow for one year?

5       THE WITNESS:  They lease approximately twice what they

6   expect to plant in any one year in order to insure an adequate

7   supply of water for what they do grow.

8       MR. VEEDER: I have no further questions, your Honor.

9       THE COURT:  Where did you get the figures on Exhibit 82?

10      THE WITNESS:  These figures are compiled by the Ground

11  Water Resources on Camp Pendleton.

12      MR. VEEDER:  I haven't offered it yet, your Honor.  I

13  am going to call Col. Bowen to offer it.

14      THE COURT:  Of course, another thing we have to find

15  out is, where is this so-called natural watershed line?

16      MR. VEEDER:  That is correct, your Honor, and I am

17  going to call Col. Bowen for that purpose.

18      THE COURT:  You may cross-examine.

19

20                    CROSS-EXAMINATION

21  BY MR. SACHSE:

22      Q  Mr. Nichols, you drew some lines-- I don't think

23  you will have to come down to look at this-- you indicated on

24  Exhibit 75-9 the location of your first farming operation on

25  the mesa.  I understood you to say that at the time you and

Nichols          Cross                    5395

G2

Z71

1   your father moved in there that land was what you class as

2   hog wallow land?

3       A  Approximately, yes, sir.

4       Q  I think you used that term.

5       A  That is the term.

6       Q  By that you mean extreme dips and--

7       A  Rolling land that had to have the top few inches

8   removed in order to make a seed bed.

9       Q  You are pretty familiar with farming operations, are

10  you not?

11      A  In the field of gladidus and flowers I am, quite

12  familiar.

13      Q  Would you say at the time you observed that part of

14  Stewart Mesa which lies easterly of the railroad, when you saw

15  that in 1942 did that land give the appearance of having been

16  cultivated prior to that time?

17      A  Prior to 1942?  Yes, sir.

18      Q  Prior to your first observation of it?

19      THE COURT: 1938.

20      THE WITNESS:  1938 was my first observation.

21  BY MR. SACHSE:

22      Q  Did it give evidence of having been cultivated prior

23  to that?

24      A  On that point I don't feel that I could answer with

25  any assurance.

JOHN SWADER, OFFICIAL REPORTER

1      Q  Have you any opinion?

2      MR. VEEDER:  I object to this.  He says that he can't

3  answer that.

4      THE WITNESS:  I don't have any opinion on that at all.

5      THE COURT:  Mr. Nichols, as you drive along Highway 101

6  north after you leave the area of Stewart Mesa you come onto

7  an area where on either side of the highway the surface is

8  very uneven, covered with grass, and there is a series of

9  little humps and little basins.  Is that the type of area?

10      THE WITNESS:  That is the type of hog wallow.  But as

11  you got closer to the Santa Margarita River there was not the

12  tremendous difference between the low spots and the high spots.

13  There was a more level area.

14      THE COURT:  In other words, the depressions and the

15  bumps weren't accentuated as much as they were further north?

16      THE WITNESS:  No, sir.

17      THE COURT:  All right.

18  BY MR. SACHSE:

19      Q  Mr. Nichols, do you have any knowledge whether or

20  not that portion of Stewart Mesa lying easterly of the road

21  and the railroad had been irrigated prior to 1938?

22      A  I have no knowledge of that area at all prior to

23  1938.

24      Q  At the time you entered upon it in 1938 was there

25  any irrigation system there?

1    A  In June, yes.  When we were down earlier in the year

2  I couldn't say.  There were evidences that there either was

3  or was going to be very soon, because there was an area cut

4  through there that had been prepared either to put a line in

5  shortly thereafter or it was already in the ground.  I couldn't

6  say, sir.

7    Q  In other words, it is your impression that in 1938

8  an irrigation system was installed sometime?

9    A  I know it was installed, sir, because we used water

10  out of it in August.

11    Q  When you drew your arrows on Exhibit 75-9 to indi-

12  cate the direction of the flood flow-- I believe you said in

13  1939; is that right?

14    A  I believe that was the year, yes.

15    Q  --you stopped your arrows at the railroad and you

16  then indicated that the drainage continued southerly along

17  the railroad and the highway right of way; is that correct?

18    A  That is correct.

19    Q  Do you have any knowledge what the nature of that

20  terrain was prior to the construction of the railroad and the

21  highway?

22    A  No, sir, I haven't.

23    Q  Doyou have any knowledge as to the nature of the

24  terrain seaward from the railroad and the highway prior to 1938?

25    A  No, sir.

1    Q  You referred to taking certain wells out of produc-

2  tion after salt water intrusion.  Did I understand you

3  correctly that the determination as to the fact of such salt

4  water intrusion was made by someone other than you?

5    A  That was made by someone other than me, because I

6  do not have facilities for doing that testing.

7    Q  In other words, you were told that the salt content

8  was up and the well should go out?

9    A  I was told and I was shown a graph of the variation

10  of the salt water content of the well.

11    Q  I am not quite clear on one thing, Mr. Nichols.  Did

12  you have the authority or means to take the well out of

13  production, or did someone else do it?

14    A  No, sir.

15    Q  And you thereafter just metered a different well?

16    A That was taken out by a welder that I hired and my-

17  self.  We cut a 10-foot piece of pipe out of the pipe line so

18  that it is impossible to use that well for water.

19    Q  In other words, you youself took it out of production

20  on instructions from the Navy or Marine officials?

21    A  That is right.

22    Q  And the decision as to when to take it out was

23  not your decision, however?

24    A  The decision is under my control in that I felt that

25  the test showed the salt water content was getting to a point

G2

Z75

1  where it would be deleterious to the crops if we continued

2  to pump from that well.

3      Q  Then it has been your determination on when pumping

4  started and when pumping stopped in Ysidora Basin?

5      A  It has not been my determination, because we have

6  not had to stop with 5A2.  We just quit.  It is done.

7      Q  Was it your determination to determine to discontinue

8  the other pumping from the other wells in the Basin?

9      A  It was not entirely my determination.  It was

10  based on material that was furnished me by the Department that

11  had that under their control on the base.

12      Q  Either I don't make myself clear or --

13      THE COURT:  Who makes the decision?

14  BY MR. SACHSE:

15      Q  Who decides to take it out?

16      A  They say at a given time, "We will stop pumping."

17      Q  Who says?

18      A  The Ground Water Resources, I believe it is.  Mr.

19  Taylor calls me and says, "Our salt water content is beyond

20  the point which is supposed to be safe for our basin.  Will

21  you please shut down?"

22      Q  So then you simply carry out the instructions that

23  they give you?

24      A  I carry out the instructions, except that I prefer

25  to use well 4I.  It is a much better well than the other one.

G2

Z76

It is a much better well and cheaper to pump than 5A6. So in that area I determine that I am going to pump up the river because it is cheaper and more efficient.

H-1 ML

Q   BY MR. SACHSE:  Now, I am not sure which well number you stated, but in your testimony a moment ago you stated you had been using a particular well almost continuously except if it broke or if there was temporary --

A   If there is a breakdown in the line, yes, sir.

Q   What well is that?

A   That is Well 4-I, according to our designation. It is the one that is fartherest inland from the ocean that we have at the time.

Q   Has that situation ever existed that it broke down?

A   It has.

Q   When that happened what did you do?

A   Went down and shut off a double valve system that cuts off the line from Well 4-I and opened the line from Well 5-A-6, walked down and closed the switch, and Well 5-A-6 begins to operate.

Q   And Well 5-A-6 is closer to the ocean than 4-I?

A   Yes, it is.   It is.

Q   So, without any approval from any higher authority you have the right, if you so desire, to go down and turn on a pump closer seaward than the one you are supposed to be pumping out of?

A   I have a letter from the 11th Naval District stating that at such times as it is impossible to deliver

1    water from 4-I, I can turn on Well 5-A-6.

2        Q    I wonder if you could produce that letter?

3        A    Well, not right now, sir.

4        Q    Could you get it and turn it over to Mr. Veeder

5    for use later?

6        A    It is possible.

7        Q    Do you have any opinion as to which of the two

8    wells, 4-I or 4-A-6 has the greater deleterious  effect on

9    the basin if it is pumped?  That is, it is more likely to

10   cause salt water intrusion?

11       A    Strictly as an opinion, the one that is in the

12   narrower part of the basin would have more effect on a

13   static head of water than one that was in the larger area.

14       Q    That is 4-A-6; right?

15       A    That is 5-A-6.

16       Q    5-A-6.

17       A    That is why it is purely an emergency pump.

18       Q    Could you tell us at this time how much during

19   the past six years, seven years that 4-A-6 has been pumped?

20       A    As to definite time, no.

21       Q    Do you have any record that would tell that?

22       A    Yes, I have records that show the amount of water

23   that was pumped. .However, I do not list my pumpings per

24   pump, as they all go into the same reservoir.

25       Q    What I am trying to get at, Mr. Nichols -- I

1   realize this is not your exhibit, but I am just telling you

2   this so you will understand my question.   Exhibit 101 lists

3   a number of wells in the lower Ysidora as not pumped.   Now,

4   as a matter of fact, then some of those wells are pumped

5   occasionally if there is a breakdown; is that right?

6          A    That I cannot say.   I have one well that is

7   pumped occasionally and I have one well that cannot be

8   pumped under any circumstances.

9          Q    Which well is that?

10         A    Well 5A2.

11         Q    That one you can't pump at all?

12         A    That one I cannot pump.   It is disconnected

13  electrically, and there is a 10-foot section of  pipe out.

14         Q    And did you not name one other well that you

15  could possibly use in emergency is 4I --

16         A    No, sir.

17         Q    You just have the one emergency well, then?

18         A    I have one emergency well.

19         Q    Now, does that same well serve the south mesa?

20         A    No, sir.

21         Q    South mesa lemon groves?

22         A    No, it does not.

23         Q    And which well serves them?

24         A    I believe the designation is 4C1.

25         Q    Have you ever had any salt water problem on 4C1?

A     Until last January I did not operate 4C1.   The
Marine Corps operated it and furnished me water at Twin
Lakes.

Q     So you have no knowledge about it?

A     I have no knowledge.

MR. SACHSE: I think that is all, your Honor.

THE COURT:  Mr. Moskovitz?

MR. MOSKOVITZ:  I have no questions.

MR. STAHLMAN:  I have just a few, your Honor.


                    CROSS EXAMINATION

BY MR. STAHLMAN:-

Q     You stated that when the water reached a certain
point you get information and you wouldn't use it, is that
right?

A     That is correct.

Q     Then, as a practical farmer did you have any ob-
servations that showed up either in the soil or in the crop
to indicate that the condition of the water changed?

A     Possibly I don't understand that question.   Are
you referring to deleterious conditions on the ground?

Q     Soil.  It is true, is it not, that a high saline
solution can eventually, it may reach a point where it may
be determined by observation on the ground?

A     That is true.  Yes, it can be determined.

Q    Do you know what the observations are, the con-
ditions that you see?

A    Due to the desire of protecting the basin and the
farmers, we have shut down, I believe, at a point that is
considerably below where we would get the action.

Q    Before there was any observation?

A    Before there could be any damage.

Q    When you say "shut down," did you just discontinue
the use of water altogether or take it from a different
source?

A    We took it from a source farther up the river.

Q    Did you continue throughout this period of time
generally to grow the same type and kind of crops on the
land when you were having this water difficulty?

A    The crops now are quite limited -- to tomatoes,
cabbage, beans, and this year for the first time in two
years there is a small block of about 20 acres of celery.

Q    And the limitation that you placed on that crop,
what, in your opinion, is the reason for it?

A    Last year due to the fact that the water dropped
to the 5-foot level, through considerable juggling of
irrigation schedules, we endeavored to spread three acre-feet
of water a day, which was approximately what we had.

Q    In other words --   Pardon me.  Go ahead.  Go
ahead.  I think --

1        A   We tried to spread three acre-feet over about

2   1100 acres of farm land.  It was quite a job.

3        MR. SACHSE:  Mr. Stahlman, could I interrupt to ask

4   what he means by the 5-foot level he said the water dropped?

5        THE WITNESS:  I believe that the five-foot level was

6   introduced by Mr. McNearny in the lower well.  I believe he

7   said 4.8.  We called it 5 feet for easier figuring.

8        Q   BY MR. STAHLMAN:  Was that as a result of the

9   lack of the quantity or the condition of the quality that

10  caused you to do that?

11       A   Well, that was lack of quantity and directly to

12  the quality through that.

13       Q   You say you growed gladiolas for some time.  You

14  don't continuously grow gladiolas on any one part of land,

15  do you?

16       A   That is correct.

17       Q   It is a limited number of crops?

18       A   It is a limited number of crops, because it is

19  necessary to keep your strains pure, and you can't get them

20  all out of the ground and get a mixture.

21       Q   And how about the condition of the soil; does that

22  affect that?

23       A   To a certain extent, I imagine, but with the new

24  treatments it is not so much of a problem.

25       Q   This flash flood, as you have stated, that you

1   saw the water run up from the north end of Stewart Mesa

2   towards the south and then down near to the railroad and

3   washed your bulbs down -- in connection with that observa-

4   tion, do you know at which time the roadway was graded along

5   which that water ran, how long prior to the time that you

6   observed it?

7       A   I don't believe I understand which road block.

8   Which road was it, sir?

9       Q   You stated that you knew the road, as shown on

10  the aerial photograph --

11      THE COURT:  Are you talking about the road along

12  where 101 is now and the railroad?

13      MR. STAHLMAN:  Yes.

14      THE COURT:  All right.

15      MR. STAHLMAN:  On the aerial photograph 75-9.

16      Q   You say that the road, now, as shown on this

17  aerial photograph, was in the same place but was a different

18  type and kind of road at that time?

19      A   There were more roads in, sir, that I was trying

20  to locate myself from.

21      THE COURT:  Counsel is talking about the highway.

22      Q   BY MR. STAHLMAN:  The highway.

23      A   The highway?

24      Q   Yes.

25      A   It was a three-lane highway, sir, but it was there

right where it is now, just not as wide.

    Q   And was there any grading work done when the roadway was changed to its present condition?

    A   Purely on the shoulder, sir.

    Q   You remember that vividly, do you not?  You recollect that?

    A   Yes, because we had to cross it every day coming out of the ranch.

    Q   And how about prior thereto?  Do you know what grading was done prior?

    A   I have no idea what grading was done before that.

    Q   Had you ever seen the land prior to 1938?

    A   I had driven by it, but I had not noticed what was there at all.

    Q   At the time you first saw the land, were there parts of it in cultivation?

    A   By "cultivation," do you mean for hay, a dry crop like that?

    Q   Yes; any farm machinery had run over it?

    A   I assume from the ground on the west side that it had had something planted in it.  I didn't know what, because it --

    Q   You wouldn't say as to the other ground?

    A   No, as to the other ground I did see -- (inaudible).

    Q   Did you have any conscious intent at any time to

1     determine where the line of the watershed of the Santa

2     Margarita River was?

3         A   No, sir.

4         Q   At any time you were making those observations

5     it was not with the idea in mind of the line of the water-

6     shed is one place or another?

7         A   No, sir.  We were interested in enough acreage

8     to grow our gladiolas with water on them.

9         Q   I know, but you have given us some information

10     here about where the watershed was.  You never checked up on

11     any of the old topog maps to determine --

12         A   No.

13         Q   -- what the gradients were?

14         A   No, sir.  All I know was that winter it came

15     right across our fields, and then I drove tractor (inaudible).

16         Q   That was after the farm machinery --

17         A   That was after the farm machinery had been in

18     there.

19         MR. STAHLMAN:  That is all, your Honor.

20         MR. VEEDER:  Anyone have any further questions?

21         THE COURT:  All right, thank you.

22         MR. VEEDER:  I have a couple of questions.

23

24                    REDIRECT EXAMINATION

25     BY MR. VEEDER:-

        Q   What was the basis upon which you arrived at

1  your opinion, Mr. Nichols, in connection with the presence

2  of salt water intrusion?

3      A    That was based on a drawdown plate that was

4  prepared by the Public Works Office and a plate that they

5  prepared that showed the rise and fall of salinity in the

6  nefarious wells.

7      Q    And what was the number of that plate, do you

8  recall?

9      A    I believe I have it in here with the rest of my

10  material, my telephone numbers out there.  The Public Works

11  drawing 858 showed underground contour of the water table.

12      MR. STAHLMAN:  Just a moment.  If this becomes

13  important, I think it is a third degree hearsay.  No founda-

14  tion laid.  Not the best evidence.

15      MR. VEEDER:  Your Honor, the matter was opened up

16  by Mr. Sachse's request as to this man's opinion, and he

17  certainly has the right to respond.

18      MR. STAHLMAN:  I don't think he has the right to

19  respond.

20      THE COURT:  All right.  The witness may identify any

21  document he makes an opinion on.  Objection is overruled.

22  Have you finished identifying it, Mr. Witness?

23      THE WITNESS:  It was based on two:  One was No. 858,

24  Public Works drawing.  The other one was L143CP.

25      Q  BY MR. VEEDER:  And what did the plate or the

1    drawing 858 reveal so that·you arrived at the opinion that

2    you expressed?

3        MR. SACHSE:   Now, that is three times hearsay.

4        THE COURT:   Sustained.

5        MR. SACHSE:   It is not the best evidence.

6        MR. STAHLMAN:   I will make a motion to strike --

7        THE COURT:   We can bring your plates in and have

8    them identified, but you are asking for hearsay now.

9        Q   BY MR. VEEDER:   Are those plates available?

10        MR. STAHLMAN:   Your Honor, may I move to strike his

11    opinion.

12        MR. VEEDER:   No.   This was asked on cross-examination,

13    your Honor.

14        MR. STAHLMAN:   Wait a minute.   May I have a ruling

15    from the Court instead of the Montana Flash?

16        THE COURT:   What opinion do you want to strike?

17        MR. STAHLMAN:   The opinion that he gave.

18        MR. VEEDER:   Well, if Mr. Sachse asks a question,

19    your Honor --

20        THE COURT:   Overruled.   Let's go ahead.

21        Q   BY MR. VEEDER:   Plate 858, is that available, do

22    you know, Mr. Nichols?

23        A   I know that there is one copy of it in existence.

24    Beyond that I couldn't say, sir.

25        THE COURT:   Who has that copy?

THE WITNESS:   I believe Mr. Cannon has it.   I saw it in his office.

Q   BY MR. VEEDER:   And what was the other document to which you alluded?

A   L143CP.

Q   And where is that document?

A   I believe the same source has that, because it was prepared by the same office.

Q   Can you make those documents available to me? Are they in your custody or in Mr. Cannon's?

A   They are not in my custody, no, sir.

Q   In Mr. Cannon's custody?

A   In Mr. Cannon's custody.

Q   Now, what do you mean by the five-foot level?

A   That is referring to the height of water above mean sea level in the test wells at the Ysidora Narrows.

Q   And who makes that determination, if you know?

A   Who measures it?

Q   Yes.

A   That is done by the Ground Water Resources on Camp Pendleton.

Q   And when you are advised that the water is below that five-foot level, what action are you required to take?

A   I am required to shut down all pumping until such time as it passes the five-foot level on its way out.

MR. VEEDER:  I have no further questions.

THE COURT:  All pumping, you mean, from the lower Ysidora Basin?

THE WITNESS:  All pumping from the lower Ysidora Basin must cease until we get back into the five-foot level.

THE COURT:  But you then may pump from the upper well?

THE WITNESS:  No, sir.  That has to be shut down as well.  The entire pumping area is shut down.

THE COURT:  All right.

MR. STAHLMAN:  I have one other situation here.  You have shown the witness, for identification, 82.  Does this have anything to do with this exhibit, or will there be another witness?

MR. VEEDER:  I didn't inquire at all.

MR. STAHLMAN:  Okay.

THE COURT:  Mr. Veeder says it will be identified by another witness.

Any further questions?

MR. VEEDER:  I have no further questions.

MR. SACHSE:  Nothing further.

MR. VEEDER:  I desire, however, as I stated, to recall Mr. Cannon in connection with this 858.

MR. STAHLMAN:  Exhibit what?

MR. VEEDER:  In connection with Mr. Sachse's question.

THE COURT:  Mr. Nichols, you will be excused but not

from the subpoena.  If we need you, we will call you back
again.

THE WITNESS:  Thank you, sir.

MR. VEEDER:  Call Mr. Taylor.


WILLIAM D. TAYLOR,

called as a witness on behalf of the Plaintiff, having been
first duly sworn, was examined and testified as follows:-

THE CLERK:  Please be seated.

MR. VEEDER:  Now, again, your Honor, this witness
has previously testified -- he testified at the hearing up
at Reche School.  We will cut it short as possible, his
examination.

THE CLERK:  Would you state your name, please.

THE WITNESS:  Taylor, William D.

THE CLERK:  William D. Taylor?

THE WITNESS:  Right.


DIRECT EXAMINATION

BY MR. VEEDER:-

Q    And what is your responsibility, Mr. Taylor, at
Camp Pendleton?

A    I am responsible for land management planning at
Camp Pendleton with a view to land conservation, soil
conservation.

THE COURT:  Are you a Civil Service employee?

THE WITNESS:  Yes, sir.

THE COURT:  Do you have a classification?

THE WITNESS:  Yes, sir.

THE COURT:  What is it?

THE WITNESS:  GS-9, or did you mean my Civil Service title?

THE COURT:  Well, your Civil Service title, I meant.

THE WITNESS:  Soil Conservationist.

Q   BY MR. VEEDER:  What is your educational background?

A   I have a degree in -- a B.S. in Forestry from the University of Idaho.

Q   How long have you been employed at Camp Pendleton?

A   Ten years and five days.

Q   And in performing your functions what are the factors that you take into consideration in the utilization of the land at Camp Pendleton for agricultural purposes?

A   We take into consideration the capability of the land to support various agricultural enterprises.

Q   For example, the areas on the Stewart Mesa, what are your responsibilities in connection with that area?

A   My primary responsibility is to insure that the land is not damaged.

THE COURT:  Do you have charge of leasing it?

1      THE WITNESS:  I recommend leasing, your Honor.  The

2 actual process of leasing is carried out by the Bureau of

3 Yards and Docks through the Public Works Office in the 11th

4 Naval District here in San Diego.

5      THE COURT:  Do you recommend the leasing?  Is it

6 your recommendation that all the land of Stewart Mesa be

7 leased for farming?

8      THE WITNESS:  All of the land that is leased is

9 leased under my recommendation, your Honor.  Certain of the

10 lands on Stewart Mesa are not under lease at the present

11 time.  That, too, is a result of my recommendation.

12      Q  BY MR. VEEDER:  What are the guides that result

13 in your recommendation for a piece of land being leased?

14      MR. MOSKOVITZ:  Your Honor, I object to the materiality

15 of the question.

16      THE COURT:  Overruled.

17      THE WITNESS:  You said what are the guides, Mr.

18 Veeder?

19      Q  BY MR. VEEDER:  Yes.  Why do you lease one piece of

20 land and not another on the Stewart Mesa?

21      A  Well, we only have a certain amount of water to

22 operate with in the Stewart Mesa area.  And throughout the

23 past ten years that water has dwindled somewhat.  And in

24 order to keep a farmer in business you must give him enough

25 water to operate on.  And it is my feeling that by reducing

1   the acreage somewhat we would be giving the remaining
2   farmers a little more water to operate on.

3       Q   In regard to South Mesa what are the lands that
4   are in production in that area?

5       A   We have two leases in the South Mesa.  One is
6   the State of California lease, one hundred sixty-three acres.
7   The other is the South Mesa lemon grove, 65 acres.  That is
8   all.

9       THE COURT:  Who decides whether this land on Stewart
10  Mesa and South Mesa just be allowed to stand there without
11  being farmed or that it be leased to farming?

12      THE WITNESS:  The Commanding General at Camp Pendleton
13  makes all the decisions for the camp, your Honor.

14      THE COURT:  You make recommendations to him --

15      THE WITNESS:  Yes, sir, that is right.

16      THE COURT:  -- as to whether it will be leased?

17      Why should either Stewart Mesa or South Mesa be
18  farmed?  What recommendations do you make?  What reasons do
19  you give that they should be leased to farm?

20      THE WITNESS:  The reasons for farming any land --

21      MR. VEEDER:  Your Honor, may I have an objection to
22  that question?  The decision or the determination or  the
23  discretion as to the leasing or the failure to lease the
24  lands certainly does not reside with this witness, as stated,
25  and the inquiry as to whether they should or should not be

leased, I daresay, your Honor, is a matter of discretion in the executive branch of the Government.

THE COURT: Well, probably it is a matter of discretion, but I have asked him what reasons or arguments he gives the General in connection with his recommendation why a certain, why property should be leased or not leased. So I will overrule your objection and hear what he has to say.

I

Z77

5329

1    MR. VEEDER:  With all respect to your Honor, I think

2  the question has been changed some.

3    THE COURT:  I didn't mean to change it.

4    In other words, I am not asking him why the General

5  decides, but I am asking him--  I will ask the question again:

6    In connection with whether lands should be leased--

7  let us take Stewart Mesa-- or allowed to remain fallow,

8  whether any land should be leased or remain fallow, what

9  arguments, what reasons do you give in your recommendations

10  to the General why it should be leased, if you give reasons

11  and arguments?

12    THE WITNESS:  The basic reason for leasing any land at

13  Camp Pendleton is to make the best possible utilization of a

14  natural resource.  That is a philosophy that has been handed

15  down to me through the top echelons of the Navy Department.

16  That is Navy Department policy.

17    THE COURT:  You mean to get the revenue from it?

18    THE WITNESS:  To make the best utilization of our

19  natural resources, your Honor.

20    THE COURT:  Well, this ground doesn't deteriorate if

21  it is not farmed, does it?

22    MR. VEEDER:  I renew all my objections, your Honor, to

23  the questions.

24    THE COURT:  What is wrong with that question?  What

25  objection do you have?  Would ground deteriorate if it is

1  not farmed?

2        MR. VEEDER:  I truly believe, your Honor, that your

3  Honor is opening up an area of a great deal of importance, with

4  all respect to your Honor.  Certainly this bunch of specu-

5  lators over here--

6        THE COURT: Now, Mr. Veeder--

7        MR. VEEDER: Have--

8        THE COURT:  Just a minute.  Just direct yourself to

9  legal arguments.  Let us have less and less of the epithets

10  and wisecracks.

11        MR. VEEDER:  The importance to me as a lawyer represnt-

12  ing the United States of America is this.  It is that the

13  Fallbrook Public Utility District, through its agents, the

14  others in that area, who have been seeking to deprive the

15  National Government of its rights to the use of water, have

16  repeatedly asserted that the National Government should not

17  lease its lands for purposes of agriculture.

18        I have personally taken the position, and I believe

19  that my Department has taken the position, that it is a matter

20  of executive discretion whether or not those lands are leased

21  and whether it is proper to lease them.  We stand firmly

22  against the idea that these lands, which are some of the most

23  productive lands on this continent, should be taken out of

24  production and that the water should be turned over to someone

25  else who, in our view, has no right to that water.

1       The competition for that water is extremely hot.  We

2 don't live in a vacuum.  We are constantly attacked by these

3 people.  And the very element upon which your Honor has

4 touched is one of the sorest points in the litigation.  They

5 say, "You can use your water for military purposes"-- I don't

6 even believe they admit that-- but in any event, they say that

7 we should not use water for agricultural purposes.  And it is,

8 as I say, a field of inquiry that is sharply contested.

9       We, ourselves, believe, your Honor, that it is highly

10 appropriate for the United States of America to utilize this

11 water for agricultural purposes, and that it is not a question

12 of law at all but it is a question that the military officers

13 in charge should determine.

14       And in all respect-- and when I when I hear my compeers

15 smile a little bit at an objection-- I necessarily have to

16 make a record, irrespective of who asks the question, your

17 Honor, and I believe that it is beyond the scope of this case,

18 I think it is beyond the scope of the pleading, I think it is

19 beyond the scope of the issues, and certainly it is beyond the

20 scope of the direct examination.

21       THE COURT:  Well, you may be right.  I was curious and

22 I was thinking about something else.  I was not thinking about

23 a situation where the Government would be required to abandon

24 the use of water under a riparian right in order that an

25 appropriator might come in and take water which you contend was

Nichols - Cross

5332

I

Z80

1    being improperly used by a riparian owner.

2         I was thinking more about the situation of Ysidora

3    Basin and the alleged shortage of water at the Base and how

4    decisions to continue irrigating ground jibed with an alleged

5    deficit.

6         But that doesn't get me anywhere.  I will sustain your

7    objection to my question.  Go ahead.

8         Who is questioning now?

9         MR. VEEDER:  I was, your Honor.

10        THE COURT:  Areyou still on direct?

11        MR. VEEDER:  Yes, your Honor.

12        Q   From the standpoint of other agricultural operations

13   on Camp Pendleton, would you state what those are aside from

14   the areas at Stewart and South Mesas?

15        A   I plan and conduct the grazing operations on the base.

16        Q   Would you limit it to within the watershed?

17        A   Well, I plan and operate or direct the grazing opera-

18   tions within the Santa Margarita Watershed on the Base.

19        Q   And how many head of stock do you usually run in the

20   area to which you have made reference?

21        THE COURT:  Within the watershed.

22        MR. VEEDER: Yes.

23        Q   If you have that knowledge.

24        A   Well, during the grazing season we normally run

25   about 4,000 head of sheep--

I

281

1    Q  And which is the grazing season, Mr. Taylor?

2    A  Pardon me.  I was not finished.

3    Q  Go ahead, then.

4    A  All right.  And as many as 2,000 head of cattle.

5    THE COURT:  Are there times when all these sheep and

6  all these cattle are grazed within the watershed?

7    THE WITNESS:  Yes, your Honor.

8    THE COURT:  And at other times they are grazed outside

9  the watershed?

10    THE WITNESS:  That is right, sir.

11  BY MR. VEEDER:

12    Q  Generally what is the grazing season in that area?

13    A  The normal grazing season runs from about the 1st

14  of December until the 1st of June-- in other words, the rainy

15  season.

16    Q  And what areas are included in that grazing opera-

17  tion, from the standpoint of the Camp Pendleton and the United

18  States Naval Ammunition Depot?

19    A  I have no cognizance of the grazing in the Naval

20  Ammunition Depot.  On Camp Pendleton I am instructed to graze

21  as many livestock throughout the Base as is possible without

22  conflict with the military operations.

23    Q  And what is the guide in regard to the carrying

24  capacity of the area in question?  What guides you in the number

25  of stock you run in that area?

A   Well, of course, one of the primary guides is the military activity that is going on.  The livestock population must always be adjusted to be reconciled with the military activity.  Then secondarily the grazing capacity, of course, is very important.

Q   And have you made a determination as to what the carrying capacity of Camp Pendleton, of the area that is leased-- what is the carrying capacity of that area?

A   The carrying capacity within the Santa Margarita watershed, I wouldn't hesitate to say that we could run as many as 4,000 mature cattle there, were we to take the other activities away and were we to have plenty of water to operate with.

Q   What kind of grass cover in the natural state have you found within the watershed in the Santa Margarita River Valley?

A   Primarily we have so-called Mediterranean annuals. They are annual plants that were introduced here by the Spaniards in the early days that came from the Mediterranean countries.

Q   What do those include?

A   It is the wild oats, bur clover type of vegetation, filaree and a number of the annual plants.

Q   What kind of range management do you practice there from the standpoint of reseeding or fertilizing the area in

I

Z83

1    question?

2        A   We do not-- Mr. Veeder, we are running primarily a

3    military camp, and of course we don't stress the improvement

4    of the range as such for the reason that it is a miltary

5    reservation.

6        Q   Now, during this period that you have been operating

7    there, what are the sources of water that are utilized for

8    the raising of the natural forage on the basin?

9        A   Rainfall.  Nothing else.

10        Q   From the standpoint of the feeding of the stock that

11    are grazed in that area, do you raise any hay or any similar

12    operation?

13        A   We do have some small hay operations carried on by

14    the Base itself for the Special Services horses.  That is the

15    recreation horses that are owned by the Special Services Office

16    of the Marine Corps.  Otherwise, there is no farming operation

17    in connection with the grazing.  In other words, the tenant

18    livestock people don't do any farming in connection with their

19    operation.

20        THE COURT:  Are these cattle run by the Base itself, or

21    are they run by lessees of the ground?

22        THE WITNESS:  They are run by licensees, your Honor,

23    a license being somewhat less strong than a lease.

24    BY MR. VEEDER:

25        Q   What are the circumstances under which these licenses

I

Z84

1 are granted?

2     A  They are granted on the basis of a prior request.

3 We maintain a chronological list of applicants. When a vacancy

4 occurs we choose the top man on the list, provided he is willing

5 and able to--

6     Q  What is the basis on which these lands are leased

7 down in the Stewart and South Mesa?

8     A  Those are leased on a one-year lease plus four-year

9 renewal option, and the leases are arranged by public bid.

10     Q  What are the arrangements that are made for the

11 delivery of water to those lessees?  How much water do you

12 allow the lessee in his operation?

13     A  I think first I should point out that every lease

14 that we have at Camp Pendleton contains a clause which guarantees

15 no water to any farmer.  The lease says the Government may in

16 its discretion curtail or discontinue the use of water by the

17 lessee.  In all instances that clause is included.

18     Q  What has been your practice--

19     THE COURT:  Let's go ahead.  Even though that clause is

20 there, what is held out as being ordinarily available for this

21 tenant?

22     THE WITNESS:  The water which we do allow these farmers

23 to use is rationed.  The Commanding General gives me a water

24 ration by basins-- we are talking here, of course, about the

25 Santa Margarita Basin-- the Commanding General tells me how

I

Z85

1   much water we can have for the whole basin, and I inturn

2   allocate the water to the individual lessees strictly on the

3   basis of the acreage they have under lease.

4        THE COURT:  Have you made any computations as to how

5   many acre feet a year have been used by these lessees, as an

6   average, say in 1957?

7        MR. SACHSE:  Per acre, you mean, Your Honor?

8        THE COURT:  Per acre.

9        THE WITNESS:  The per-acre use, your Honor, has run

10  in the neighborhood of 1.3 acre feet per acre for the last two

11  or three years.

12       THE COURT:  And that is because the lessee has been

13  taking more land than he intended to farm and doubling up the

14  water that he had and using a part of the land farmed; is that

15  right?

16       THE WITNESS:  It has not worked exactly that way.  The

17  lessee in the past has had more water, and when the water has

18  been taken away from him he has seen fit to continue his lease

19  of the larger amount of land.

20       THE COURT:  This average of 1.3 is based upon all of

21  the land leased?

22       THE WITNESS:  That is right, sir.

23       THE COURT:  And not upon the amount farmed?

24       THE WITNESS:  That is right.

25       THE COURT:  It's 4:30.  Adjourn until 10 o'clock

1   tomorrow morning.

2        (Adjournment until Friday, November 21, 1958, at 10

3   o'clock A.M.)