# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:  San Diego, California

Date:   Friday, November 21, 1958

Pages:  5339 to 5445

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

– – –

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

– – –

UNITED STAT$S OF AMERICA,       )
                                )
                    Plaintiff,  )
                                )
        -vs-                    )        No. 1247-SD-C
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                    Defendants. )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, November 21, 1958

APPEARANCES:

      For the Plaintiff      WILLIAM H. VEEDER, ESQ.,
Special Assistant to the
Attorney General,
Department of Justice,
Washington, D. C.

APPEARANCES (Continued):

|  | |
|---|---|
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State of California | EDMUND G. BROWN, ESQ., Attorney-General, by ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney General. |
| For Defendants Fallbrook Public Utility District, et al. | F. R. SACHSE, ESQ. |

I N D E X

| PLAINTIFF'S WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| William D. Taylor | | | | |
| (Resumed) | 5344 | | | |
| (By Mr. Sachse) | | 5349 | | |
| (By Mr. Moskovitz) | | 5351 | | |
| | | | | |
| Allen C. Bowen | 5356 | | | |
| (By Mr. Stahlman - Voir Dire - 5420) | | | | |


EXHIBITS

| Plaintiff's Exhibit | |
|---|---|
| 94 | 5378 |
| 93 | 5378 |
| 93A | 5378 |
| 74 | 5408 |
| 77 | 5424 |
| 89-CG | 5427 |
| 89-AZ through 89-CF | 5432 |
| 89-CJ | 5432 |
| 89-A through 89-AY | 5437 |
| 120-A | |
| 120-B | |
| 120-C | |
| 120-D | 5444 |
| | |
| MORNING RECESS | 5372 |
| NOON RECESS | 5396 |

j3

5342

1  SAN DIEGO, CALIFORNIA, FRIDAY, NOVEMBER 21, 1958, 10:00 A.M.

2  ---o---

3

4  THE COURT:  Are we ready to proceed?

5  THE CLERK:  Number three:  1247-SD-C, United States

6  vs. Fallbrook for further court trial.

7  MR. VEEDER:  Will you take the stand, Mr. Taylor.

8

9  WILLIAM D. TAYLOR,

10  having been previously sworn was a witness on behalf of the

11  Plaintiff, resumed the stand and testified further, as

12  follows:-

13  THE COURT:  On the matter of your request, Mr.

14  Veeder, to put over the hearing at Fallbrook, you want, as

15  I understand, to re-examine the area to see whether or not

16  you are content to let the record stand as it is.

17  MR. VEEDER:  Right.

18  THE COURT:  Or whether you want to ask permission

19  of the Master to offer additional evidence.

20  MR. VEEDER:  That is right, your Honor.

21  THE COURT:  We are not concerned with the Vail

22  problem.  There is no problem there.  But I would rather

23  have you content with the record that is made and not have

24  some hereafters about it sometime in the future.  And with

25  the holiday season coming along I don't think any particular

1   time will be lost if this is put over until January.  I

2   talked to the Special Master, and he is willing to continue

3   the December 1st hearing to January 12th.  I understood

4   that was your request.

5         MR. VEEDER:  Right.

6         THE COURT: And the December 8th hearing at Fallbrook

7   to January 19th.

8         MR. VEEDER:  All right, your Honor.

9         MR. SACHSE:  Was it December 8th?

10        MR. VEEDER:  I thought it was December 15th.

11        MR. SACHSE:  15th, I thought.

12        THE COURT:  Oh, was it December 15th?

13        MR. SACHSE:  That is my recollection, your Honor.

14   Let me check.  That is my note that it is.

15        THE COURT:  Whatever they are.

16        MR. SACHSE:  In other words, both hearings will be

17   continued?

18        THE COURT:  Continued; and he will send out, he will

19   publish the necessary notices continuing the hearings.  And

20   I suppose he should make some arrangement for someone present

21   at the school house in case the people appear.

22        MR. SACHSE:  I understand that one or two -- this is

23   purely hearsay -- but I think that would be very wise,

24   because I understand one or two of the pro per people have

25   complaints about it, and they might show up.  So it would

be wise to try and have somebody there, at least.

MR. VEEDER:  Do you have the names of those?  We might be able to help them.

MR. SACHSE:  Well, the only one I know of, and I am sure you cannot help, and that is Mrs. Click, who thinks she owns half of the De Luz Valley and that this is a quiet title real estate action.  And she is giving the Master a pretty bad time.

MR. VEEDER:  I don't know Mrs. Click, but if we had our way, why, we would help her.

MR. SACHSE:  It is outside.  You couldn't do anything for her.  She wants a quiet title of real estate.  She doesn't understand what is going on.

DIRECT EXAMINATION (Continued)

BY MR. VEEDER:-

Q   Now, Mr. Taylor, what has been your experience in connection with the maintenance of --  Thank you, your Honor, for that courtesy.  What has been your experience in regard to the operation of basins, ground water basins, for the purpose of maintaining grass coverage on them?

A   I spent ten years with the Mountain Empire Soil Conservation District in this county where the principal conservation project was in the raising of water tables on valley bottom lands with the idea in mind of increasing

1  forage production.

2      Q    And what was the effect of that kind and type of

3  conservation practice?

4      A    Well, we found that wherever we could raise the

5  water table within a reasonable distance of the surface,

6  possibly five feet, we could maintain the meadow type

7  vegetation, which was vastly more productive than the dry

8  soil would produce without the water table.

9      Q    What kind and type of forage is there growing in

10  the Ysidora Basin, for example?

11      A    There is a great variety of vegetation on the

12  Ysidora Basin.  You did say Ysidora, did you not?

13      Q    That is right.  And above that, from the stand-

14  point of the best type of forage that could be grown there?

15      A    Ysidora Basin primarily supports a dry type

16  vegetation that is found up on the hillside.  In other words,

17  for the most part, Ysidora Basin shows no effects of a

18  water table at the present time.  There are areas within the

19  Ysidora Basin, the lower elevation areas, which do support

20  a meadow type vegetation which is extremely productive.

21      Q    And what kind of vegetation is that?  Name some

22  of the grasses.

23      A    Bermuda grass, primarily.  Bermuda grass is not

24  a native, however, it is naturalized.  And it is very

25  aggressive vegetation.

Taylor - Direct

2xIxMIA-2

Q    How would you classify that for the purpose of forage?

A    Excellent.

Q    And what, in your opinion, would be the effect of maintaining the water table at approximately five feet throughout both Ysidora, Chappo and Upper Basin?

A    Under those circumstances I feel quite confident that we would have a meadow made up of Bermuda complex of vegetation -- Bermuda grass, sweet clover, and a good many others.

Q    What would be the effect of having that kind and type of vegetative cover from the standpoint of your grazing operation within the Camp Pendleton area?

A    I would say conservatively that we could graze at least a thousand mature cattle without any cultural effort whatsoever in the bottom land itself.  That is in the basin area.  In addition to that, I believe that the basin area would provide a green field supplement during the summer season so that we could make much better utilization of the dry land hillside grazing areas.

Q    And what would that be from the standpoint of the carrying capacity of the area for the purpose of raising livestock?

A    Well, in place of grazing possibly 200, 250 head, as we do right now, I feel sure that we could graze 2000 to

1    2500 head.

2         Q    And when you say "250 head," during which period

3    are you talking about?

4         A    I am talking about the summer season now, the

5    dry season.

6         Q    What, in your opinion, would be the consumptive

7    use of water if you had a coverage of Bermuda grass and

8    similar coverage throughout the year?

9         MR. SACHSE:   I object, your Honor.  I don't believe

10   that there has been any qualification laid.  I think he

11   might qualify it.

12        MR. VEEDER:   I can qualify him.  He was qualified at

13   the Reche School beyond a question in my mind, and --

14        MR. SACHSE:   I don't recall that Mr. Taylor testified

15   at Reche School as to the consumptive uses of water.

16        Q    BY MR. VEEDER:   What has been your background --

17   I am not going to argue about it.  I will ask him some

18   questions.

19             What is your college background, Mr. Taylor?

20        A    Bachelor of Science degree in forestry with a

21   major in range management, grazing management.

22        Q    And what study did you undertake from the standpoint

23   of the utilization of water and for agricultural purposes?

24        A    None in college.

25        Q    Or subsequently?

1          A    Subsequently I spent a good many years designing

2     irrigated pastures, designing irrigation systems for those

3     irrigated pastures.

4          Q    And in that process of designing those systems,

5     what factors did you have to take into consideration from

6     the standpoint of the utilization of the water by the lands?

7          A    We first of all had to know the water requirements

8     of the pastures.

9          Q    And what would that entail?  What consideration

10    would be entailed in determining the water requirements?

11         A    Quantity of water used during a season.  We

12    worked that out ordinarily by experimentation.

13         Q    What kind or type of experiments, Mr. Taylor?

14         A    By applying various applications of water to

15    various pastures and finding out the most efficient schedule

16    of irrigation and also the most efficient quantity of

17    irrigation from the standpoint of forage production.

18         Q    From the standpoint of consumptive use, did you

19    take those factors into consideration?

20         A    That is right.

21         Q    Now, based upon your background and training and

22    your experience, what, in your opinion, would be the con-

23    sumptive use of water by Bermuda grass and similar desirable

24    coverage in the basins of the Santa Margarita River within

25    Camp Pendleton?

1          A    Conservatively I would say that optimum production

2     would be achieved with four acre-feet per acre per year.

3          MR. VEEDER:   I have no further questions.

4          MR. SACHSE:   I think I have just one or two.

6                      CROSS EXAMINATION

7     BY MR. SACHSE:-

8          Q    Mr. Taylor, I don't recall whether it was Mr.

9     McNearny or Mr. Cannon who testified yesterday on the 4.86

10    level, water level below ground surface.  Were you present

11    and heard the testimony?

12         A    Yes, I was, Mr. Sachse.

13         Q    As I understood them, they testified that the

14    pumping was to be cut off from Ysidora Basin when the level

15    fell below that point?

16         A    That is correct.

17         Q    Then, your statement that a water level of

18    approximately five feet below ground surface was adequate

19    to maintain natural forage covered, would apply also to

20    Ysidora Basin?

21         A    I am not sure I understand that question, Mr.

22    Sachse.

23         Q    Let me rephrase it, then.  You testified, speaking

24    of your studies in the Mountain Empire District, that you

25    discovered by maintaining a water level at about five feet

5350

1  below ground surface you maintain a satisfactory natural

2  forage, did you not?

3       A    That is right.

4       Q    Would that same five-foot figure apply to the

5  size and types and conditions that exist in Ysidora Basin?

6       A    That is right.

7       Q    Then, in other words, as the basin is presently

8  managed, there is no reason why it doesn't have an adequate

9  ground water?

10      A    I am afraid you misunderstand that 4.86 figure,

11 Mr. Sachse. That figure pertains to sea level. That is not

12 4.86 below the ground surface, but above sea level. Those

13 are not the same figures at all.

14      Q    What figure does that represent, then, Mr.

15 Taylor, just for my information?

16      MR. VEEDER: Wait a minute. That goes beyond the

17 scope of the direct examination.

18      Q   BY MR. SACHSE: If you know?

19      THE COURT: If he knows. Overruled.

20      THE WITNESS: The 4.86 elevation would be, if I

21 remember correctly, in the neighborhood of 11 feet below

22 the ground surface at that point, Mr. Sachse.

23

24

25

Z1

1    Q  Do you know at what level below ground surface water

2  is presently standing in shallow wells in Ysidora Basin?

3    A  No, I do not, because that is extremely variable,

4  even from day to day.

5    Q  By reason of the pumping activity?

6    A  That is right.

7    MR. SACHSE:  I have nothing else, your Honor.

8    THE COURT:  Mr. Moskovitz?

9

10                    CROSS-EXAMINATION

11  BY MR. MOSKOVITZ:

12    Q  Mr. Taylor, I believe yesterday you testified that

13  the quantity of water available to you for allocation to the

14  lessees for agricultural activities has dwindled in the past

15  years; is that correct?

16    A  That is correct.

17    Q  And when you say that, do you not mean that the

18  amount of water which has been allowed to you by the Base for

19  allocation has dwindled?

20    A  That is correct.

21    Q  You are not saying that you have any figures inde-

22  pendently of how much water could be made available for

23  agricultural use?

24    A  I believe the figures exist.  I don't have them.

25    Q  In other words, you are given a certain allocation

1    by somebody else?

2         A   That is correct.

3         Q   And then you allocate that in turn to the lessees;

4    is that correct?

5         A   That is correct.

6         Q   Just who does make the decision as to how much water

7    is allocated to you for re-allocation to the lessees?

8         A   The allocation is given to me by the Commanding

9    General.  He takes the recommendations, if he sees fit, of

10   the Base Water Control Board.

11        Q   And who composes the Base Water Control Board?

12        A   It is composed of a group of officers:  The Officer

13   in Charge of Ground Water Resources Office is on that board,

14   the Assistant Chief of Staff G4 is the senior member; other

15   members are the Public Works Officer, the Base Maintenance

16   Officer, the Supply Officer, the Public Works Officer of the

17   U. S. Naval Hospital, the Public Works Officer of the NAD,

18   Fallbrook, and possibly some others.  Those are the ones I

19   can remember, Mr. Moskovitz.

20        Q   Now, I believe you testified that the grass cover

21   which is used for grazing purposes is primarily made up of

22   annual grasses; is that correct?

23        A   To what areas are you referring?

24        Q   I thought you had reference to the Base, generally

25   speaking.  Now if there is a difference, let me know.

B

Z3

1      A  Well, the grazing resource which we utilize, for the

2  most part, is made up of annual type of Mediterranean vegeta-

3  tion; that is correct.

4      Q  And these grasses are sustained by rainfall entirely,

5  I believe you testified?

6      A  That is essentially true.

7      Q  And when the grasses dry up because the effects of

8  rainfall have ceased to grow the grasses, then your grazing

9  ceases; is that right?

10      A  For the most part, that is correct, yes.

11      Q  Now, are both hill and valley lands within the Santa

12  Margarita River watershed on Camp Pendleton used for grazing?

13      A  Yes, sir.

14      Q  What kind of grasses do you have on the valley lands?

15      A  Because of the lowered water table, we have pretty

16  much the same type of vegetation on the valley lands that we

17  have on the uplands.

18      Q  And those grasses also rely almost entirely upon

19  rainfall for their growth; is that correct?

20      A  That depends on the season.  In seasons of high

21  rainfall where we do get a higher water table those grasses

22  don't dry up as quickly as the ones up on the uplands.  And

23  of course, we do have remnants of meadow vegetation, perennial

24  grasses, which are much better in those seasons of heavy

25  rainfall and higher water table than in the dryer seasons.

B

Z4

Q  How long have you been on Camp Pendleton?

A  Ten years.

Q  Since 1942?

A  Ten years.

Q  Ten years, since 1948?

A  That is right.

Q  And in that period of time the grasses have essentially been maintained by rainfall; is that correct?

A  That is correct, plus what I just said about the perennial vegetation.

Q  Now you testified this morning that if the water table could be raised to a point not lower than five feet below ground surface, then you could develop and sustain a perennial type of pasture land; is that what you said?

A  I didn't say exactly that.  I believe the perennial type of vegetation would come in of its own accord without any development-- in other words, through no action on our part, it would occur.

Q  But that would require the maintenance of your water table not less than five feet or not more than five feet below the surface?

A  In that neighborhood.

MR. VEEDER:  Did you say not more or not less, Mr. Moskovitz?

MR. MOSKOVITZ:  Not more than five feet below the ground.

1    Q   If it dropped below five feet-- in other words, if

2    it were six or seven feet, that would be too low to sustain

3    the pasture; is that correct?

4    A   It is a grading process.  The forage would not be

5    as good at six feet as it would at five feet.  There is no

6    cutoff line there that you could put your finger on.

7    Q   What happens to this type of perennial pastureland

8    if the water table is lowered to a point ten feet below ground

9    surface?

10   A   It deteriorates over a period of years to the point

11   where eventually the annual type of vegetation would crowd it

12   out.

13   Q   And if it were lowered to a point 15 feet below the

14   surface?

15   A   The same thing, only more so and faster.

16   Q   Would it die out within a year?

17   A   I would say that it would be not anywhere near as

18   productive within a year.  I am speaking now-- it would lose

19   75% of its productivity within a year.

20   Q   So if the ground water basin were so operated as to

21   lower the water table to 15 feet below the ground level, the

22   usefulness of your perennial pasture would be severely limited,

23   wouldn't it?

24   A   That is correct.

25   MR. MOSKOVITZ:  That is all, your Honor.

1      MR. STAHLMAN:  No questions, your Honor.

2      MR. VEEDER:  I have no further questions, your Honor.

3      THE COURT:  Thank you, Mr. Taylor.  I will excuse you,

4  but hold yourself ready to come back if we need you.

5      THE WITNESS:  Thank you.

6      THE COURT:  Mr. Veeder, yesterday we had testimony

7  about the wells that supplied the Naval Ammunition Depot.

8  There was no identification as to their exact location.  Are

9  you prepared to do that?

10      MR. VEEDER:  Yes, we will have those located, your

11  Honor.  I intend to have Col. Bowen cover the whole area and

12  locate all the points that are important.

13      THE COURT:  All right.  Call your next witness.

14      MR. VEEDER:  Col. Bowen.

15      THE CLERK:  Allen C. Bowen heretofore sworn October

16  24th.

17

18                    ALLEN C. BOWEN,

19  heretofore sworn, called as a witness in behalf of the plain-

20  tiff, testified as follows:

21

22                  DIRECT EXAMINATION

23  BY MR. VEEDER:

24      Q  Col. Bowen, would you state into the record very

25  briefly your educational background and your professional

5357

B

Z7

experience since leaving college.

A   My educational background, Mr. Veeder, is that of a scientific nature, coupled with the study of agricultural sciences, including animal husbandry, soils and agronomy.

My experience since--

Q   Where did you attend school?

A   At the University of Utah and the Utah State Agricultural College, both situated in the State of Utah.

Q   And when did you complete that college?

A   I was graduated with a degree of Bachelor of Science in 1937 from Utah State Agricultural College.

Q   And just briefly delineate and define your professional experience since 1937.

A   Since then I have worked on soil surveys briefly for the Utah State Experiment Station, as a concrete and earth fill inspector for the Bureau of Reclamation, United States Department of Interior, as a soil surveyor for the United States Department of Agriculture Soil Conservation Service, as a Marine in the United States Marine Corps, as a soil scientist and in charge of the operation of drainage and irrigation work in the Imperial Valley of California, as Officer in Charge of the Office of Ground Water Resources at Camp Pendleton beginning in 1951, with a 17-months interruption in 1953 and 1954 when I returned to inactive duty.  During the 17-months period I was in charge of all soil conservation

B

z8

work done by the Soil Conservation Service in the Central
Coastal Counties of California, extending from San Francisco
Bay to San Luis Obispo.

Q  Would you state for the record the responsibilities
which you have at the present time on Camp Pendleton with
reference to the utilization and conservation of water within
Camp Pendleton and the other military installations there
involved?

A  I am a special staff officer to the Commanding
General, Marine Corps Base, Camp Pendleton.

Q  What responsibilities are entailed with that posi-
tion?

A  My responsibilities in that position are to advise
the Commanding General of all matters affecting the water
resources, make recommendations concerning the use and con-
servation of those resources.  In addition to that, I hold
the responsibility, as the Commandant of the Marine Corps'
representative on the West Coast for matters relating to this
particular litigation.  I have the responsibility of keeping
Headquarters of the Marine Corps advised of the same matters.

Q  What other duties have you, Colonel, on the Base
from the standpoint of operating the Office of Ground Water
Resources?

A  Well, part of the duties of the Office of Ground
Water Resources, which I am in charge of, are the gathering of

B2

Z9

Bowen    Direct

5359

1   data concerning water levels in wells, the design and assist-

2   ance in supervision of construction of water conservation and

3   storage facilities, such as channel-spreading devices, the

4   operation of the surface diversion from the Santa Margarita

5   River into Lake O'Neill and into the various spreading areas,

6   the assembling of records relating to water consumption,

7   sewage disposal and any other matters that relate to the

8   conservation and use of water on the Base and within the

9   Naval Ammunition Depot as well.

10        Q  Now what investigations have you made throughout

11   the Santa Margarita River Valley, both upon Camp Pendleton

12   and throughout the whole watershed, from the standpoint of

13   soils, land classification and land utilization?

14        A  Well, we have offered to private land owners and

15   agencies controling public lands in the watershed of the

16   Santa Margarita River our technical services to make soil

17   surveys, geologic surveys, hydrologic surveys, and to submit

18   recommendations in the form of reports and maps regarding the

19   highest and best use of these lands, the determination of

20   course of irrigable and non-irrigable lands within the parcels

21   investigated.

22        Q  What other investigations have you made from the

23   standpoint of the lands of the United States throughout the

24   watershed?

25        A  We have completed field surveys on practically all

B2

Z10

1   of the lands controlled by the United States within the water-

2   shed of the Santa Margarita River.

3       Q   And what was involved in that type of investiga-

4   tion from the standpoint of the determination of the irrigable

5   acreage?  Was that a factor that you took into consideration?

6       A   Well, that was more or less an end result of the

7   job.  I might state that we have utilized vertical aerial

8   photographs as field sheets for the purpose of plotting the

9   data recorded in the field on a field sheet or a map.  These

10  aerial photographs are taken to the field by the technical

11  personnel working out of my office and thereon, based upon

12  auger holes bored into the soil, certain simple chemical tests

13  to determine PH--

14      Q   What does "PH" stand for, Colonel?

15      A   "PH" is the measure of concentration of hydrogen

16  ion within the solution.  It is expressed with a scale of 1

17  to 14, 7 being neutral-- that is, the hydrogen and hydroxal

18  ions are in balance.  Less than 7 is an acidic condition

19  wherein there is more hydrogen ion, and greater than 7 indi-

20  cates a basic condition in which the hydroxal ion is more

21  prevalent.

22      Q   Would you proceed and state what investigations

23  you have made within the Camp Pendleton itself from the stand-

24  point of the use of the land and the potential use of that land

25  for purposes of agriculture.

1    A   We made a soil survey of that portion of the United

2    States Naval Reservation within the Santa Margarita River

3    watershed.   The survey was for the purpose of determining the

4    depth of soil, the surface texture of the soil, the permea-

5    bility of the sol, the slope within given ranges in percent,

6    the amount of accelerated erosion that has occurred, and other

7    minor factors such as susceptibility to flooding, the degree

8    of wetness, if any, salinity, and/or alkalinity of the soil.

9    All of these various findings are coded and represented on

10   the soil survey field sheets, in this instance vertical aerial

11   photographs.   The areas wherein this particular series of

12   physical factors are predominantly the same are delineated

13   on the photograph.

14        Following completion of these determinations of the

15   physical factors of the soil which I have mentioned, an

16   interpretation is made as to the land use capability classi-

17   fications of each particular soil site.

18        I might say that the soil survey which we are conducting

19   on both publicly and privately owned lands is based on a

20   national soil survey standard developed by the United States

21   Department of Agriculture, and that the land capability classes

22   to which we relate the various physical aspects of the soil

23   are as developed and described by the United States Department

24   of Agriculture, so that these surveys conform with nationally-

25   accepted standards.

BY MR. VEEDER:

Q   I hand you Plaintiff's Exhibit marked for Identification No. 93 and ask you to state into the record what that is; and I also hand you Exhibit 93A and ask you to state into the record what that is.

A   Plaintiff's Exhibit 93 for Identification is a binder enclosing photographic copies on a reduced scale of the field survey sheets utilized in making the soil surveys within the confines of the Naval Reservation and the Santa Margarita River watershed.  In addition to these photographic copies of the field sheets, a reduced scale map of the watershed is enclosed for the purpose of indexing the field sheets. Each field sheet is represented by a number, which appears in the lower right-hand corner of the sheet.  The location of any particular sheet, your Honor, can be discovered by referring to the index map wherein that number will appear in the lower right-hand corner of the area covered by the photograph.

For example, the first copy of a field sheet included in this booklet is numbered 4-0070 in the lower right-hand corner.

THE WITNESS:  By referring to the index map it is noted that 4-0070 is shown in the lower left-hand portion of the index map.  The number itself would appear or does appear in Sections 2 and 3, Township 11 South, Range 5 West. Now, the black line underneath the number on the index map 4-0070 and the horizontal black line on the right of the number indicates generally the lower **right**-hand corner of the photograph and has no connection with the roughly rectangular area delineated on the photograph.  That area delineated on the photograph is the area, portion of that photograph used in the survey.  The survey is confined as nearly as possible to the central portion of the picture in order to avoid errors due to distortion.  Distortion increases from the center of the photograph outward to the margin.  Now, these photographs have approximately a 65 per cent overlap in line of flight, and the lines of flight are in a north-south direction.  They have approximately a 25 per cent overlap between lines of flight.

Q  BY MR. VEEDER:  Now, in making the soil surveys how did you utilize those photographs, Colonel?

MR. SACHSE:  I didn't hear what you said, Mr. Veeder.

MR. VEEDER:  I said:  How did you utilize those aerials in making the soil surveys to which Plaintiff's Exhibit marked 93 pertains?

MR. SACHSE:  Mr. Veeder, could I just inquire:  Is

1    this the same set that was introduced as M-60?

2       MR. STAHLMAN: Except there is some additional in-

3    formation in it.

4       MR. VEEDER: That is correct.

5       MR. SACHSE: In other words, I should not use the

6    old Master's set? That is all I wanted to know.

7       MR. VEEDER: I think I had better have Col. Bowen --

8       MR. SACHSE: Just so I know what document. Is it

9    the one introduced in the Master's Hearing I have before me

10    now, the one that you are using?

11       MR. VEEDER: I think you had better look at it.

12       MR. SACHSE: There are so many photos.

13       THE WITNESS: Yes, sir, this is the same. The same

14    Exhibit as introduced in the Master's Hearing **at** the Reche

15    club house.

16       MR. SACHSE: Thank you.

17       THE WITNESS: A series of photographs, your Honor,

18    marked 93-A through 93-A-F for identification are approx-

19    imately the same size as the field survey sheets. The

20    scale of the field survey sheets was approximately four

21    inches to the mile. And the first thing that was done was

22    to mark out with green ink on the originals this central

23    portion of the photograph which was to be used for purpose

24    of marking the soil delineations and symbols. Since this

25    survey was confined to the watershed of the Santa Margarita

River wherever that watershed line traversed the area within the match lines, it is indicated with a dash-dot line as shown on Plaintiff's Exhibit 93-A in the lower right-hand corner.

Q   BY MR. VEEDER:   How was that watershed line determined as appears on the aerial photographs throughout the watershed with the exception of those areas covered on Plaintiff's Exhibits 98 and 98-A?

MR. SACHSE:   Excuse me.   I don't understand.   Could I have that question again?

MR. VEEDER:   Surely.   Read it, please.

(The reporter read back the question.)

MR. SACHSE:   Which one do you mean?

MR. VEEDER:   These exhibits concerning which Mr. Cannon testified and located the watershed line.

THE WITNESS:   The watershed line for the Santa Margarita watershed was located by taking U.S.G.S. topographic maps and working out on the ground the divide which separated the drainage into the Santa Margarita from drainage into other areas outside of the Santa Margarita River.

Q BY MR. VEEDER:   Who did that work?

A   I did that work.

Q   And what investigation on the land did you undertake in that connection?

A   Well, I undertook to find the high points along

the ridge by walking or riding the area out, so that I could more accurately delineate on the contour maps available to me the actual crest or divide of the watershed.

THE COURT: I don't think I understand all I should about this. Exhibit 93, now, the booklet, if you will look over here. Here is your key, and, taking the first picture shown, 4-0070.

THE WITNESS: Yes, your Honor.

THE COURT: Now, is the picture supposed to be roughly the area enclosed in that square on your key?

THE WITNESS: No, your Honor. That geometric figure on the index, which is indicated with 4-0070 in the lower right-hand corner, represents the lower right-hand corner of the photograph. And the area which is actually delineated as a match line area within 4-0070 is removed north and west of this corner of the photograph. So that it would appear in this fashion, your Honor: Sample, between 4-0070, which is marked 93-A for identification, and 4-0071, which is 93-B for identification, there is approximately a **65** per cent overlap illustrated by laying 93-A over 93-B.

THE COURT: You are talking of the entire photograph now?

THE WITNESS: Yes, sir.

THE COURT: But the squares drawn out on 93-A and 93-B, do they overlap also?

1    THE WITNESS:  No, sir.  Now, the square on 93-A,

2  for example, the bottom line of that square matches with

3  the top line of the square on 93-B.  So there is no overlap.

4  They match on those lines.  If the photograph were folded

5  and laid together, the match lines would coincide.

6    THE COURT:  Did I understand you to say that on

7  93-A, which is the same as 4-0070 --

8    THE WITNESS:  Yes, sir.

9    THE COURT:  -- that in the right-hand corner of the

10  square the broken line demonstrates the watershed?

11    THE WITNESS:  On 93-A, your Honor, the dash-dot line

12  in the lower right-hand corner of the section within the

13  match lines represent a portion of the watershed of the

14  Santa Margarita River.  That area lying north and west of

15  the dash-dot line is outside of the Santa Margarita River

16  watershed.  And the small area that contains solid lines and

17  soil symbols is inside of the watershed.

18    THE COURT:  What disturbs me is this:  Here is

19  Exhibit 93 and your key chart.  This 93-A is a picture some-

20  where in that area?

21    THE WITNESS:  Yes, sir.

22    THE COURT:  How could a watershed line be down in the

23  right-hand corner with a picture in that area?  You would

24  have to have a map clear over in an area like that to get

25  your watershed line in the right-hand corner.

1          THE WITNESS:  Yes, your Honor, because, as I stated,

2    the delineation on the index within 93 is for the whole

3    photograph.  In other words, that lower right-hand corner

4    represents the extreme lower right-hand corner of the

5    photograph and not the lower right-hand corner of the area

6    within the match line.  So, by moving --

7          THE COURT:  So that this photograph runs over --

8          THE WITNESS:  Actually, your Honor, it would be a

9    little to the right of that.  It would be about where --

10          THE COURT:  Off the record here.

11          (Discussion off the record.)

12          Q  BY MR. VEEDER:  You are referring back and forth

13    to 93, to 93-A, are you not?

14          THE COURT:  Back on the record.

15          MR. VEEDER:  I want you to be sure we keep the two --

16          THE COURT:  When were these photographs taken?  1955,

17    1956?

18          THE WITNESS:  These photographs, your Honor, were

19    taken in 1955, referring to Plaintiff's Exhibit 93-A.  The

20    symbols in the --

21          THE COURT:  Corner?

22          THE WITNESS:  -- in the corner of the photograph give

23    first the photograph number.  It gives the designation of

24    the squadron that took the flight, VJ61, United States Navy,

25    which is a photograph squadron located at Miramar.  The line

Bowen — Direct

1    of flight is indicated by the 4-7.  The date of this

2    particular picture is 29 March, 1955.  And the time is in-

3    dicated by the 1958 Zebra, which is in the 24-hour time

4    system.  And the approximate latitude and longitude of the

5    area is shown on the lower line.

6         THE COURT:  Now, on the next two photographs in

7    Exhibit 93, 4-0071 and 4-0072, you trace the watershed line

8    down through Stewart Mesa?

9         THE WITNESS:  Yes, your Honor.

10        THE COURT:  Is that watershed line as shown on these

11   two photographs and 93 as of '55, as of the physical con-

12   dition of the ground in '55?

13        THE WITNESS:  Yes, your Honor.

14        THE COURT:  No attempt was made to determine what

15   the state of the ground was in the state of nature in that

16   area?

17        THE WITNESS:  No, your Honor.

18        THE COURT:  In fact, I take it that probably here

19   where the watershed line reaches the Pacific on Stewart Mesa

20   is one of the few places where there has been any substantial

21   change in the terrain?  Or are there others?

22        THE WITNESS:  Well, I believe there have been rather

23   substantial changes -- minor changes, in the terrain through-

24   out that area because of the process of levelling.

25        THE COURT:  I am talking now about on eastward after

Bowen - Direct

you leave the Coast, after you leave Stewart Mesa and get up into this area of ravines and hills. There has been very little change up in there?

THE WITNESS: No, sir; there has been no change up in there in the way of grading or anything else. That network of lines that shows on up there is roads and tracks left by military vehicles and tanks. It indicates no substantial alteration to the watershed as it was prior to its acquisition by the Marines.

MR. VEEDER: Were there further questions, your Honor?

THE COURT: No, that is all the questions I had.

Q BY MR. VEEDER: Would you go ahead, then, and explain the methods that were pursued in making your soil surveys and tests that you made throughout the area, Colonel Bowen?

A Yes, Mr. Veeder. Referring to Plaintiff's Exhibit for identification 93-B, which, in the smaller additions, Plaintiff's Exhibit 93 is photographed 4-0071, it is noted that the dash-dot line indicating the watershed of the Santa Margarita River runs generally north and south through the central portion of the area within the match lines. Incidentally, your Honor, for further understanding of the way these fit together, the numbers around the match lines indicate the numbers of adjoining photographs.

THE COURT: Yes.

THE WITNESS: And as on 4-0071, or Plaintiff's Exhibit 93-B for identification, it is noted there are two numbers on the right and two numbers on the left with a small horizontal tic between them on the match line. That indicates where the match line between, say, 4-0092 and 4-0093 would intersect the north-south match line on the right of 4-0071. So, with the areas, the central portion of the photograph, included within match lines, the original of this field **sheet** was taken into the field on a board with a soil **auger** and field chemical testing equipment. The soil scientist bored holes to determine depth, texture, permeability, nature of underlying material. I carried an Abney level to determine the slope. And he plotted these solid lines, delineations, as shown on Plaintiff's Exhibit 93-B, the irregular solid line delineations which appear within the match lines and within the watershed boundary. And he sybolized with a fractional symbol within these site delineations these features which I have previously mentioned; and those features, your Honor, are keyed to the legend in Plaintiff's Exhibit 93. It is actually the second page which is entitled "Map Symbols." It is called commonly a "spider diagram" because of the appearance of the lines radiating out from the fractional symbol appearing in approximately the center of the page.

MR. VEEDER: Now, to a degree, this phase of our

1    testimony here is repetitious of what happened at the Reche

2    School.  But at the same time, when we attempt to sever it,

3    I believe that we really save time by letting the Colonel

4    go ahead with this phase of the testimony, your Honor.

5         MR. STAHLMAN:  Would this be a good time to take our

6    recess, your Honor?

7         THE COURT:  Yes.

8         MR. VEEDER:  Are we off the record now?

9         THE COURT:  Yes, we are in recess.

10         (Recess.)

D

Z13

Q  Colonel, would you proceed with your statement in regard to the soil survey and the criteria that guided you in making that survey.

A  I believe I was referring to the legend used to interpret the symbols shown on the field survey sheets.

By referring to the second page contained in Plaintiff's Exhibit 93 for Identification, entitled "Map Symbols," the relationship of the various numerals and letters contained in the fractional symbol are described.  The lines radiating from the sample fractional symbol contained in the center of the map symbol sheet lead out to the particular characteristic which it describes; and using the fractional symbol which is a codified designation of the physical factors comprising the soil and the terrain, these features are translated or interpreted into land capability classes.

THE COURT:  Is that some standard method of doing that? In other words, in the example that you are looking at, you arrive at III.  Is there a mathematical formula for doing this?

THE WITNESS:  No, it can't be reduced to a formula, because--

THE COURT:  It is a matter of judgment?

THE WITNESS:  It is a matter of judgment.  And I know in my years of experience in this type of work that the matter continues to come up for review as more information is

1    derived.  Now, there are guides which are utilized, however,

2    to assure some consistency in the classification; various

3    types of posting tables, et cetera, are used to assure a

4    consistency of interpretation throughout an area like the

5    Santa Margarita River watershed.

6    BY MR. VEEDER:

7        Q   What were your responsibilities in connection with

8    the field personnel, though, in seeking uniformity in these

9    surveys, Colonel?

10       A   Well, I was in direct charge and supervision of the

11   work, and I did some of the work and field checked and office

12   checked the rest of the work.

13       THE COURT:  So you attempted as far as possible to have

14   a uniform application of this type and method of study?

15       THE WITNESS:  Yes, sir.

16       THE COURT:  Of all the land within the Santa Margarita--

17   within the Naval Reservation?

18       THE WITNESS:  Within the Santa Margarita watershed, your

19   Honor, on both private and public lands, this same system has

20   been used.

21       THE COURT:  With the same degree of uniformity?

22       THE WITNESS:  Yes, sir.

23       THE COURT:  The exhibit we have, however, is only the

24   Naval Reservation in the watershed?

25       THE WITNESS:  That is right, your Honor.  That is Exhibit

D

Z15

93.

THE COURT:  Is this method in line with accepted modern scientific methods for making soil classifications?

THE WITNESS:  Yes, sir.

THE COURT:  And this type of symbol and this type of example shown on the second page of the sample fractional symbol is the way this is worked out?

THE WITNESS:  Yes, sir.

BY MR. VEEDER:

Q   How did you place the symbols upon your field sheets, Colonel?  Where was that done?  Was that done in the field or in the office?

A   The symbol was actually placed on the field sheets in the field on the site at the time of determination of these physical features.  However, the final symbol, as readily detected by reference to Exhibit 93, the symbols are drawn with a Leroy lettering set, and for the purposes of appearance the field sheets were turned over to a draftsman, who actually inked in with India ink the soil symbols and the soil site delineations.

Q   And under those supervision was that transfer done by the draftsman?

A   That drafting work was done under my supervision and direction.

Q   And what was the extent of your checking on it to

D

Z16

1   ascertain the accuracy of the work?

2      A   I checked it very closely and continuously.

3      I might say, your Honor, that preparatory to going to

4   the field with these photographs they are subjected to exam-

5   ination with a stereoscope in the office.  Any two adjoining

6   pictures in line of flight form a stereo pair.  As the par-

7   ticular ground image in the center of a photograph, for

8   example, your Honor, as 93B, which is 0071 and 93C which is

9   0072, both show the Stewart Mesa and the mouth of the Santa

10  Margarita River.  It is possible, by placing that stereo

11  pair under a stereoscope, which allows the viewer to see 72

12  with one eye and 71 with the other eye, it is possible to get

13  a stereo view of the ground.  In other words, the relief of

14  the ground is apparent.  Because the Stewart Mesa area, for

15  example, was taken from two slightly different angles by the

16  camera.  The center of the lens was approximately over the

17  center of the photograph, and the distance between centers

18  of photographs is approximately one mile.  The shadows vary

19  sufficiently so that by taking the stereo pair the effect of

20  relief is gained.  That is most pronounced as the country

21  becomes more rugged, of course.

22      THE COURT:  What would be the fraction of time between

23  one photograph and another on this mile?  Just a second or

24  two?

25      THE WITNESS:  Yes, sir.  It depends on the type of

D

Z17

1 aircraft used. These aircraft were a large conventional

2 engine type, as I recall, and they traveled about 250 to 300

3 miles an hour; so there would be, oh, roughly four or five

4 seconds between exposures.

5 THE COURT: I just noticed that if you look at the

6 waves breaking on the coast at the point of contact between

7 0071 and 0072, the position of the waves is not exactly alike;

8 there is an interval of time where the waves have broken.

9 THE WITNESS: Yes.

10 THE COURT: Which doesn't appear in the others.

11 When you use the stereoscope, you used them with the

12 smaller picture as shown in 93, I take it?

13 THE WITNESS: We use them with the contact prints,

14 your Honor.

15 THE COURT: From which 93 was made?

16 THE WITNESS: From which 93 was made.

17 THE COURT: And the series with the letters 93A, B,

18 C are blown up?

19 THE WITNESS: Yes, your Honor.

20 (Interruption -- Another matter.)

21 THE COURT: Have we had enough identification of this

22 document?

23 MR. VEEDER: I was going to ask the Colonel just one

24 more question, your Honor.

25 Q Just give an example, using sheet 4-0072, and apply

5378

D

Z18

1    the symbols there to that phase of Identification 93, if you

2    would, please.

3         THE COURT:  I think it has been fully explained.  Is

4    everybody here content?  Do you understand how to read these?

5    You need a magnifying glass, but it can be done.

6         MR. VEEDER:  Yes.  Well, I will just offer in evidence,

7    then, Plaintiff's Exhibit marked 93 for Identification and

8    also 93A, which is the larger photograph.

9         THE CLERK:  The whole series?

10        MR. VEEDER:  Yes, the whole series.

11        THE COURT:  Exhibit 93 will be received in evidence,

12   and the large photographs 93A through 93AF will be received in

13   evidence.

14        (Plaintiff's Exhibits 93 and 93A through AF marked

15   for identification were received in evidence as Plaintiff's

16   Exhibits 93 and 93A through AF.)

17   BY MR. VEEDER:

18        Q  Now, from the standpoing of the land classification,

19   what determinations have you made in that regard, Colonel,

20   speaking still of the area--

21        You have classified all the lands, is that correct,

22   within the Camp Pendleton area?

23        A  Yes.

24        MR. STAHLMAN:  Within the watershed.

25             MR. VEEDER:  Yes, within the watershed.

D

Z19

1    THE WITNESS:  Within the watershed and the Naval

2    Reservation.

3    BY MR. VEEDER:

4    Q  Would you state briefly into the record what is

5    meant by your land classification process?  What do you do

6    when you classify land?

7    A  Well, land may be classified for many purposes.

8    But in this particular instance a classification is made in

9    accordance with the treatment necessary to keep it productive

10   and to present the method of handling or cultivation commensur-

11   ate with safe conservation practices.

12       As I mentioned, the legend describing the land capability

13   classes is included in Plaintiff's Exhibit 93-- definitions and

14   the limitations of each of those classes.  It is generally

15   considered that Classes I through IV, for example, with

16   progressive restrictions on tillage and cultivation and

17   erosion control are cultivatable lands.  Classes I through IV

18   can be cultivated.  And generally Classes VI through VIII,

19   or V through VIII cannot be cultivated.  Class V is not shown

20   on the standard land capability classification sheet, shown

21   in Plaintiff's Exhibit 93, because no Class V lands were

22   mapped in this watershed.

23       However, I am limiting this description of land as

24   suited for cultivation.  There are techniques for subjugating

25   some sites within this watershed to crops and harvesting a

Bowen   Direct

5380

D

Z20

1   cash crop from those sites by irrigating the crops and by not

2   cultivating the crops.  So in effect it doesn't violate the

3   land capability classification in that there is no tillage or

4   cultivation practiced as a continuing phase of the operation.

5        Q What investigation did you make in regard to land

6   utilization?  Would you step to Plaintiff's Exhibit 94 on the

7   easel and explain that exhibit and under whose direction it

8   was prepared?

9        A  Plaintiff's Exhibit 94 for Identification is

10  entitled "Santa Margarita River Watershed Within Camp Pendle-

11  ton Land Utilization."

12       This map was prepared by myself, and it was prepared

13  by examining the soils as mapped on the field survey sheets,

14  Plaintiff's Exhibit 93, and determining which crops were best

15  adapted to the soil sites designated.  The crops, of course,

16  may be adapted to a variety of sites.  It will be noted by

17  referring to the field survey sheets that there are many

18  more delineations of soil sites than there are delineations

19  of crops.

20       THE COURT:  On your legend where you have listed A

21  for avocados, C for citrus and P for irrigated pasture, and

22  RC for row crops, all those items would come within your

23  land classifications I, II, III and IV, would they not?

24       THE WITNESS: · I, II, III, IV and VI, your Honor.  I

25  mentioned that VI site was not well suited to cultivation.

D

Z21

1   That limitation of cultivation is shown on the description

2   of the land use capability classes.  But it does not preclude

3   the production of a cash crop which can be harvested without

4   cultivation or without frequent or recurring tillage practices

5       THE COURT:  And your land shown under the legend G,

6   grazing land, would come under your land classification VII

7   or VIII?

8       THE WITNESS:  Yes, your Honor.

9       THE COURT:  Give me an example of your Classification

10  VI that you are talking about.

11      THE WITNESS:  The best example in this area, your

12  Honor, is land sites that are suited to avocado production.

13  The avocados require deep, well-drained soil.  They are also

14  rather sensitive to frost, and they require a site which has

15  good air drainage so that the cold air will move away from

16  them and not settle down around the trees and damage them.

17  So as typified by many acres in the Escondido, Vista, Pauma

18  Valley, I think even Valley Center now coming into it, and

19  Fallbrook, they are subjugating hill lands which have slopes,

20  say, ranging up to 35%, which, according to our interpretation

21  of our soil symbols, would normally throw them into Class VI

22  lands.  But they do have a sufficient depth of soil, they

23  are well situated with regard to frost-free conditions, and

24  avocados can be grown with continuous ground cover.  About

25  the only time that the site is ever really exposed is when the

D

Z22

1   brush is knocked down, and then they don't go in and till the

2   soil as a common practice, work up a seed bed; they go through,

3   knock down the brush, plant the trees in the basin, deliver

4   the water to the tree by a pipe and a sprinkler, and from that

5   time on out there is generally no tillage or other practice

6   except mowing, to interfere with the ground cover.  So that

7   the surface of the soil is continually protected by vegetative

8   cover.

9         THE COURT:  Then is ground VI area within Exhibit 94?

10        THE WITNESS:  Yes, your Honor.  Most of these Class VI

11  lands would be included in the areas shown suited to avocados,

12  some citrus.  On Plaintiff's Exhibit 94 the avocado area is

13  colored in light green.  It is noted that the largest block

14  of it is in the United States Naval Ammunition Depot, which

15  is adjacent to Fallbrook, and a lesser block of avocado land

16  is west of Lake O'Neill, which appears in the center of the

17  map, and then some other smaller areas also suited for

18  avocados.  The citrus sites on Plaintiff's Exhibit 94 are

19  colored in orange.

20  BY MR. VEEDER:

21       Q  What were the elements that were taken into con-

22  sideration in arriving at that conclusion?  What fact of

23  land phenomena?

24       A  Well, citrus are a little more tolerant of lower

25  temperature-- I should say they can stand somewhat lower

Bowen    Direct

5383

D

Z23

1   temperatures than avocados.  They can stand a little tighter

2   soil, a little finer soil than avocados.  They are not as

3   sensitive to water remaining in the root zone.  Basically,

4   they can be cultivated on slopes-- I should say they can be

5   grown on slopes in a non-cultivated fashion, typical of the

6   avocado.  But the reason for selecting the citrus for these

7   sites shown in orange on Plaintiff's Exhibit 94, instead of

8   avocados, is that they are basically a little poorer soil

9   drainage and a little more frost hazard than on some of these

10  higher sites.

11      Q  Would you proceed to explain the rest of the legend

12  and explain why the designation was ascribed?

13      A  The irrigated pasture, symbolized by the letter P

14  and on Plaintiff's Exhibit 94 colored in brown, occupy areas

15  where there is even greater frost hazard, such as along De

16  Luz Creek, where there is flood hazard or a wetness factor

17  such as along the Santa Margarita River below the confluence

18  of De Luz Creek with the Santa Margarita River, on down

19  through the hospital area to the upper border of Chappo Flats.

20  And the remaining area included within the irrigable lands

21  is devoted to row crop, shown with the symbol RC and colored

22  yellow on Plaintiff's Exhibit 94 for Identification.  The row

23  crop land occupies primarily the land classified as I, II and

24  III.  It is the leveler sites, the valley floor, as shown

25  in the Chappo and Ysidora Basins, and the frostless areas of

D

Z24

1    level land in the coastal terraces, such as the portion of

2    Stewart Mesa and South Coast Mesa, which are shown in the

3    lower left-hand corner of Plaintiff's Exhibit 94 adjacent

4    to the confluence of the Santa Margarita River with the

5    Pacific Coast.

E-1

1      THE WITNESS:  The areas shown in the magenta color

2   with the G symbol is grazing land.  That is non-irrigated

3   land; Class VII and VIII land, which is comprised largely

4   of rough, mountainous land, shallow soils, many rock out-

5   crops, and so forth.  And also the coarse alluvial material

6   which is in the channel of the Santa Margarita River as it

7   flows through the lower Santa Margarita River basin.  Those

8   lands are not suited to irrigation, not well-suited to

9   production of cash crops but do have value for native forage

10  grazing.

11      Q  BY MR. VEEDER:  Now, is that map accurate, to

12  your knowledge, personal knowledge, Colonel?

13      A   Yes, sir.  With the addition of the Stewart --

14  or South Coast Mesa area which is represented on Plaintiff's

15  Exhibit 98-A and 99.

16      THE COURT:  By that you mean 98-A and 99 show a

17  larger portion of South Coast Mesa within the watershed than

18  does your Exhibit 94?

19      THE WITNESS:  Yes, your Honor.

20      MR. VEEDER:  That is correct, your Honor.

21      THE WITNESS:  If we are to take the natural watershed

22  boundary as illustrated on 98 and 98-A and 99, that would

23  include additional lands on the South Coast Mesa.

24      Q  BY MR. VEEDER:  Similarly, what about the Stewart

25  Mesa?

A    it makes very little difference on the Stewart
Mesa.   I am still checking that out, Mr. Veeder, but I think
the change on Stewart Mesa is very small.

THE COURT:   Now, there was a map in here that was
based on 1940 contours when Mr. Cannon was on the stand.
What exhibit number?

MR. VEEDER:   That is correct.   I think that was 97,
your Honor.

THE COURT:   How does this 94 check out with 97 on
Stewart Mesa?

THE WITNESS:   Very closely, your Honor.   I am still
having my people check that out on the Stewart Mesa up there.
I have a figure of how much acreage is affected on the south
coast, but I will not know until Monday just what effect
the watershed line as shown on Plaintiff's Exhibit 97 would
have on the watershed line as shown on Plaintiff's Exhibit
94 for identification.

MR. STAHLMAN:   May I ask a question?

THE COURT:   Let me finish.

MR. STAHLMAN:   Have you finished?

THE COURT:   What?

MR. STAHLMAN:   Has he finished?

THE COURT:   Let me finish.

MR. STAHLMAN:   Oh, I am sorry, your Honor.

THE COURT:   We also had testimony here from Mr.

1    Nichols. You were here when he testified?

2         THE WITNESS: Yes, sir.

3         THE COURT: In which he referred to the Exhibit 75-9

4    and demonstrated where the water had run to his knowledge

5    at one flood time. Now, if any watershed line was fixed

6    on the basis of his testimony, it would depart considerably

7    from your Exhibit 94, would it not?

8         THE WITNESS: Yes, sir.

9         MR. VEEDER: We are checking the whole thing out,

10   your Honor, from the standpoint of complete analysis and

11   examination as to what we believe is proper and appropriate.

12        THE COURT: And what are the two exhibits now on

13   South Mesa that you mentioned? 98-A --

14        MR. VEEDER: 98 and 98-A.

15        THE WITNESS: 98, 98-A, 99, your Honor.

16        MR. VEEDER: 99, which does not show the watershed

17   line, however. The 99 is a basis upon which Mr. Cannon

18   based his --

19        THE COURT: Are you checking that out further?

20        MR. VEEDER: We are checking the whole thing out,

21   your Honor, and also we are checking out the data of both

22   Mr. Cannon and Mr. Nichols. And we would ask leave that

23   when determination has been made by the technical personnel

24   that we would be permitted at least to put down the lines

25   which we think are appropriate; and we will designate them

1  to the end that it will be very clear as to what we are

2  relying upon.

3  THE COURT:  How long have you known about this

4  witness, this Mr. Cannon?

5  MR. VEEDER:  I have known about Mr. Cannon for about

6  ten years.  But I find the longer I talk to Mr. Cannon the

7  more I become acquainted with things he knew that he didn't

8  tell me about.  I might as well face it.  And I had no idea,

9  and I want the record to be very clear on that, that I did

10  not know until one day I happened to be in his office and

11  he brought out some of these matters here, and Col. Bowen

12  didn't know about it.  And I don't know but what -- anyway,

13  we looked at them.

14  THE COURT:  I tried a patent case one time where it

15  involved a patent for lengthening women's dresses.  And

16  extensive depositions had been taken in New York, and there

17  had been a complete search of the garment industry, and proof

18  was put on.  During the trial, as it is done here, I commented.

19  I didn't think anything had been shown in the prior art that

20  invalidated this woman's patent.  Overnight -- this happened

21  in an afternoon -- overnight the lawyer went over to Wild

22  Heights, and he came in with a tailor who testified that he

23  had come from the Old Country and that this method shown

24  by the patent was well-known and used for years.  And on

25  the basis of a barbed wire case in the Supreme Court I

1    disregarded his testimony and held the patent good.  Now,

2    this isn't a patent case.  But barbed wire case, you know --

3    you probably don't know because you don't practice patents --

4    held on this matter of digging up witnesses to recall things

5    that happened years ago, the Court should view that

6    testimony with scrutiny.  And what had happened in the

7    barbed wire case, when the patents came before the Court,

8    witnesses were dug up who said, "Why, yes, 20 years ago I

9    went to a county fair and I saw an exhibit of barbed wire.

10   And this is nothing new to this thing.  I have seen these

11   exhibits at fairs, and traveling salesmen have come along

12   and showed me this."

13        MR. VEEDER:  Well, your Honor, I am quite used to

14   barbed wire one way or another, and it runs through my hands

15   frequently, but I pay no attention to it.

16        THE COURT:  We will try to find out what the facts

17   are.

18        MR. VEEDER:  I am glad to explain the circumstances.

19   I relied upon Col. Bowen through the whole matter for

20   preparation.  He was as surprised as I was to find this data.

21   I have offered it, and I am delighted the way it turns out.

22        THE COURT:  Mr. Stahlman, did you have something you

23   wanted to say?

24        MR. STAHLMAN:  Merely this question seems important.

25   I think it was one of the most consuming questions of the

1    long, protracted Vail trial, the matter of the Stewart Mesa.

2    And then the Supreme Court opinion had a great deal to say

3    about it.  And there was a tremendous amount of testimony.

4    I am hoping we can avoid that by use of the sensible, proper

5    contour maps that were in existence then and have a

6    realization of what has gone on before and simplify this.

7    Otherwise, we may get into a hassle here that -- well, I

8    hope there won't be. Nothing like that has ever happened

9    before, and I don't think it should be, but it could be a

10   rather involved controversial thing.  I will be happy to

11   know as early as conveniently possible what Col. Bowen's

12   findings are in relation to the watershed line of Stewart

13   Mesa as it existed in nature.

14       MR. SACHSE:  I have only one thought, your Honor:

15   I agree with Mr. Stahlman.  A great many exhibits have been

16   lodged, Mr. Veeder, which -- looking now at 81, 85 --   Are

17   you going to change all those?

18       MR. STAHLMAN:  I don't know whether we need this on

19   the record or not.  I don't want to interrupt you, either.

20       MR. SACHSE:  I have only this point:  Here are five

21   exhibits setting forth water uses within and without the

22   natural watershed.  They have given us these and said this is

23   their basis.  Now, if they are going to change the natural

24   watershed, presumably every one of these figures is wrong.

25   We will cross that bridge when we get there.

1    MR. VEEDER:  I will be perfectly candid.  I simply

2    face up to it.  I would like the bulletin entered in.  If

3    we are going to make the changes, we are going to fight for

4    them.

5         MR. STAHLMAN:  I might just point out, your Honor:

6    that in the decision of the Rancho Santa Margarita vs. Vail,

7    many pages were devoted to the analysis of this very

8    situation:  If it is possible to set a beach barrier theory

9    that was proposed.  I am talking now about the Supreme Court.

10   And it directed that if the case were tried over again, it

11   would be done on a sensible basis.

12        THE COURT:  What was the sensible basis?

13        MR. STAHLMAN:  Well, that is that it would be in

14   relation -- in the first place, there were various theories

15   in that case which were proposed in relation to what con-

16   stituted the water line in nature.  The theory of the Ranch

17   Santa Margarita at that time was that they would go back

18   into the geological past as it existed in a certain way,

19   and the Court explains how to bring that up to date and how

20   that is a reasonable times under the natural conditions that

21   are created as of the present day and to establish the line.

22   And then, it was admitted by both sides that the water

23   flowed towards the ocean in certain places, and, of course,

24   if it went into the ocean it is not draining back into the

25   Santa Margarita and wouldn't be riparian to the Santa

Margarita.  And the theory upon the part of the Rancho was
that it hit this beach barrier, had run back down so it hit
the stream bed, forthwith into the ocean.  Therefore, it
would be riparian.  There was great conflict and a great
hassle.  I think the case points out what is the simple
method that distinguishes between other cases in California
where there were, beach pile-ups and so forth, of driftwood
that came down the river; and I think that by taking the
contour maps that existed prior to the time of the change
by cultivation and readily -- not readily -- it is a flat
surface.  It is a little difficult but a person with ex-
perience of Col. Bowen, I think, can readily determine
what that --

MR. VEEDER:  We offer in evidence Plaintiff's
Exhibit marked 94 for identification.

THE COURT:  94 received in evidence.

Q  BY MR. VEEDER:  Col. Bowen, in your studies have
you taken into consideration the duty of water for the
several types of crops to which you have made reference on
the land utilization map which is Plaintiff's Exhibit 94?

A  Yes, sir.

Q  And for the record would you state what you mean
by the term "duty of water"?

(Whereupon the document above referred to was marked
Plaintiff's Exhibit 94 and received in evidence.)

1    A    Duty of water is a term used to describe the

2    number of acres that can be irrigated by units of flow,

3    say a cubic foot per second, continuous flow.

4    Q    And how have you applied the criterion to these

5    lands as depicted on the land utilization map?

6    A    I have taken from the experience of local farmers

7    in San Diego and Riverside County as gathered and weighed by

8    various agencies, such as the United States Soil Conserva-

9    tion Service, the California Extension Service, and so forth,

10   the amount of water required to properly produce these crops

11   indicated on Plaintiff's Exhibit 94 for a year's time and

12   have multiplied that figure times the acreage of those crops

13   to come up with an annual requirement for the entire area

14   of the Naval reservation within the Santa Margarita watershed.

15   Q    What was your determination as to the duty of

16   water for --

17   THE COURT:   Do you have one for me?

18   MR. VEEDER:   No, I am just referring to this.

19   Q    The duty of water for row crops as determined by

20   you for this area?

21   MR. SACHSE:   Is this question directed, Mr. Veeder,

22   to the total area?   I mean, the total row crop areas?

23   MR. VEEDER:   No, it is just the duty.

24   THE COURT:   Give me a copy of 95.

25   MR. SACHSE:   Just the what?

1          MR. VEEDER:  Just the duty of water to raise, the

2     quantity of water required for one acre of land to raise,

3     for example, row crops.

4          THE WITNESS:  Four acre-feet per year.

5          THE CLERK:  Mr. Veeder, the Court would like a copy.

6          THE COURT:  Four acre-feet per year per acre?

7          THE WITNESS:  Per acre, yes, sir.

8          THE COURT:  How much for avocadoes?

9          THE WITNESS:  About two and thirty-five hundredths

10    acre-feet per acre per year, your Honor.

11         THE COURT:  And citrus?

12         THE WITNESS:  About one and eight-six hundredths

13    acre-feet per acre per year.

14         Q  BY MR. VEEDER:  And in regard to irrigated pasture,

15    what have you determined that to be?

16         A    Three and eighty-three hundredths of acre-feet

17    of water per acre per year.

18         Q    When you state that duty of water, is that the

19    diversion duty or is that the field duty of water?

20         A    Now, these figures which I have just related

21    represent the field duty or the water that must be delivered

22    to the field to successfully grow those crops in this area.

23         Q    What is embraced in field duty in your terminology,

24    Colonel?

25         A    Well, field duty includes the consumptive use of

1    the water which --

2        Q    When you say "consumptive use," what do you mean?

3        A    Consumptive use is the sum of the evaporation,

4    transpiration losses as the term evapotranspiration is

5    commonly used in combining those **losses**. Those in many

6    areas, the evapotranspiration **or** consumptive use represents

7    the bulk of the water applied.  However, in some other

8    areas, such as the Imperial Valley of California, it is

9    necessary to apply an excess of water over and above that

10   required by the plant and evaporated from the soil in order

11   to continue carrying the soluble salts on out of the soil.

12   And that amount varies from place to place and with the

13   soil, varies between soil.

14       Q    What additional water would be required to

15   deliver the water from the point of diversion to the field

16   or to the place of use, in your opinion?

17       A    Well, there are inevitably losses incurred between

18   the point of diversion and the place of use.  Those losses

19   sometimes are referred to as administrative losses.  They

20   may represent evaporation losses and seepage losses from

21   canals, breaks in pipes, leaks in pipes, and so forth.  And

22   also, they are sometimes called project losses, and, hence,

23   a combination of the project losses and the field duty is

24   often spoken of as project duty.

25           THE COURT:  You take a ten per cent figure for those?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  That seems pretty high.  I could go along

3    with you on canals and ditches.  But where you have got

4    water piped to an area, isn't that a pretty high figure?

5          THE WITNESS:  Losses on canals and ditches will run

6    a lot of times far in excess of that, particularly where

7    they are earth lined, your Honor.

8          THE COURT:  So this figure is a sort of general

9    combination? that is, you are taking into account ditches,

10   canals, pipes, and so forth?

11         THE WITNESS:  Yes, your Honor.

12         THE COURT:  Is this an accepted figure in this field

13   of science, ten per cent?

14         THE WITNESS:  It is acceptable for planning purposes,

15   your Honor.

16         THE COURT:  12:00 o'clock.  Adjourn until 2:00.

17         (Whereupon a recess was had at 12:00 o'clock noon

18   until 2:00 o'clock p.m. ofthe same day.)

19

20

21

22

23

24

25

5397

1    THE COURT:  Mr. Veeder, how are we on our schedule with

2  reference to your timing on this case?

3    MR. VEEDER:  We are running ahead considerably, your

4  Honor.

5    THE COURT:  Ahead of schedule?

6    MR. VEEDER:  Yes, sir.

7    THE COURT:  Next week will be the last week you will

8  be putting on proof, and then the State of California will

9  start in on December 2nd?

10    MR. VEEDER:  That is right.

11    THE COURT:  What proof generally will you put on next

12  week?

13    MR. VEEDER:  I had intended that Col. Bowen will be

14  on the greater share of the time, which will be soils,

15  topography, general data of that character.

16    THE COURT:  All over the watershed?

17    MR. VEEDER:  Yes, your Honor.  We are going to try to

18  get in just as much as we can right now on our uses on the

19  Camp, your Honor.

20    THE COURT:  We will go this afternoon probably without

21  recess until 3:30 and I will let you out at 3:30.  I have a

22  meeting with Judge Weinberger.

23    MR. VEEDER:  All right, sir.

24

25

5398

F

Z26

ALLEN C. BOWEN,

recalled as a witness in behalf of the plaintiff, having been

previously sworn, testified further as follows:

DIRECT EXAMINATION (Resumed)

MR. VEEDER:  Mr. Luddy, I was in process of offering

Exhibit 94, as I recall, when we recessed.

THE CLERK:  Exhibit 94 has been received in evidence.

THE COURT:  Exhibit 94 has been received.

BY MR. VEEDER:

Q  I hand you, Col. Bowen, Plaintiff's Exhibit 74

marked for Identification, and I ask you to state what is

contained on that tabulation.

A  The title of this tabulation on Plaintiff's Exhibit

74 for Identification is "Rancho Santa Margarita y Las Flores

areas irrigated from Santa Margarita River from vertical

aerial photographs 1929."

Q  Now, I hand you Plaintiff's Exhibit 73 and ask you

to correlate the data appearing on Identification 74 and state

how you arrived at that acreag.  First, state what Exhibit 73

is, for the record.

A  Plaintiff's Exhibit 73 is a mosaic of the lower

portion of the Santa Margarita River Valley, prepared from

vertical aerial photographs made in 1929.  This mosaic was

prepared in my office under my direction and supervision.

F

Z27

1      Q   How did you arrive at the irrigated acreage which

2  has been tabulated on Identification 74?

3      A   I arrived at the acreage tabulated on Plaintiff's

4  Exhibit for Identification 74 by planimetering the areas

5  which show as irrigated areas on the individual aerial photo-

6  graphs, which were used to compile Plaintiff's Exhibit 73.

7      THE COURT:  How can you say that a certain area is

8  irrigated or non-irrigated from looking at that map?

9      THE WITNESS:  Your Honor, the determination of the

10  area irrigatedwas made by stereoscopic study of the individual

11  aerial photographs and the diversions, head ditches, borders

12  and/or furrows are apparent.  Also, from inspection of the

13  photographs compiled in the mosaic, Plaintiff's Exhibit 73,

14  the lands that are irrigated show up in the cropping pattern,

15  such as that in the Ysidora Basin, located on Plaintiff's

16  Exhibit 73 to the left of the compass rose indicating north,

17  the patchwork of fields in white, black and varying shades of

18  gray indicating various stages of crop development or culture.

19      THE COURT:  Just show me generally the Ysidora Basin

20  outline, if you can, with your finger.  I think I see where

21  it is there.

22      MR. VEEDER:  I will get you a red pencil.

23      THE WITNESS:  The Ysidora Basin, your Honor, is bounded

24  generally by the river channel, which is shown by the white

25  and gray area, running north and south through the mosaic,

Bowen   Direct   5400

F

Z28

1    and by the hill lands which have the dark shadow to the south,

2    completing an arc to the east and north, and returning back

3    to the river, crossing the railroad which appears as a line

4    comprised of arcs and tangents to the arcs traversing the

5    mosaic generally from north to south to the lower two-thirds,

6    and then out through the northeast through the upper portion

7    of the mosaic.

8    BY MR. VEEDER:

9        Q   When you say the upper portion of the mosaic, what

10   area in general do you have reference to from the standpoint

11   of the basin?

12       A   The upper portion of this mosaic is called the

13   Chappo Basin portion of the upper basin, and Lake O'Neill,

14   your Honor.  Lake O'Neill, for example, is the dark area

15   which appears in the upper portion of Plaintiff's Exhibit 73.

16   The straight line indicates the Lake O'Neill dam, and then the

17   water surface is shown by an area which is dark in the northern

18   portion and has some reflection from the sun and also has a

19   lighter area in the southern part of the lake.

20       THE COURT:  To the left of it is the upper basin?

21       THE WITNESS:  To the left of the Lake O'Neill is a

22   white area, which are the sands and gravels of the upper

23   basin, your Honor.

24       THE COURT:  Where is Thompson Canyon, which is shown

25   on Exhibit 74?

1    THE WITNESS:  Thompson Canyon, your Honor, is across

2    the Santa Margarita River from the Chappo Flat.  Chappo Flat

3    occupies generally the central portion of the mosaic, Plain-

4    tiff's Exhibit 73.  It is shown as a gray, predominantly gray,

5    with some differences in tones, with lines running in a

6    northeast-southwest direction through the Chappo Flats area

7    lying on both sides of the railroad previously described.

8        Now, looking across the stream channel which is marked

9    by the white and gray areas is the area known as Thompson

10   Canyon.  It is a small tributary to the Santa Margarita River

11   flowing from the northwesterly direction to the confluence

12   with the river and the headwaters of Thompson Canyon are

13   marked by the gullied area shown in the upper left-hand

14   corner of the mosaic.

15       THE COURT:  Why don't you take the red pencil and

16   outline roughly the irrigated portion of the Tompson Canyon

17   and write "Thompson Canyon" on it.  Can you do that?

18       THE WITNESS:  Yes, sir.

19       MR. VEEDER:  Would it be permissible to work down here

20   on the table, your Honor?

21       THE COURT:  Yes.

22       MR. VEEDER:  We have most of our exhibits down here.

23   We can work there better anyway.

24       MR. STAHLMAN:  Your Honor, I have a suggestion that

25   would be of help to myself at least.  Looking over a great

F

Z30

1    many of these maps and photographs of the areas, this area

2    shown by the mosaic is sort of a critical area in the case.

3    I wonder if it would be well if you went up and took a look

4    at it.

5           MR. VEEDER:  You mean a field trip, Mr. Stahlman?

6           MR. STAHLMAN:  Yes.

7           THE COURT:  Yes, I would like to do that.

8           MR. STAHLMAN:  For this reason, I have found out many

9    times in this type of court testimony and exhibits that you

10   get an entirely different concept if you go out to see it,

11   and it clarifies it a great deal and you have a better under-

12   standing of what we are talking about.

13          MR. VEEDER:  Would you have a thought about making

14   that inspection trip on Friday of next week?

15          MR. STAHLMAN:  I would think most any time, Mr. Veeder.

16          MR. VEEDER:  Mr. Moskovitz will not be here Friday.

17   Would Wednesday be all right?  We have to do some planning,

18   if we want to do it.  Would Wednesday be all right?

19          MR. MOSKOVITZ:  Wednesday would be fine.

20          MR. VEEDER:  We are going in to show aerials and

21   oblique photographs today, and I think it would be as pro-

22   pitious a time as any sometime next week.

23          MR. SACHSE:  Mr. Veeder, would that be principally to

24   view the Pendleton area?

25          MR. STAHLMAN:  I think that is all you could ever do

1    in one day.

2         MR. VEEDER:  I don't believe you could do more than

3    that in one day.  That's for sure.

4         But I would like to be able to get these photographs

5    into evidence and have them so that we can make reference to

6    them as we proceed.

7         MR. STAHLMAN:  I don't mean to hold up anything in

8    court.  I just think we have reached a point in the case

9    where we ought to do that.

10        THE COURT:  Let's think about it and tentatively plan

11   it for Wednesday.  We can talk about it later.

12   BY MR. VEEDER:

13        Q  Would you proceed with that, Colonel?

14        A  Your Honor, with a red pencil I am placing on

15   Plaintiff's Exhibit 73 a red line-- with a carmen line, your

16   Honor, No. 1945 Dixon colored pencil--

17        Q  I think you can use carmen rather than red.

18        A  --I am placing a line around the area in Thompson

19   Canyon which was irrigated at the time.

20        Q  Which time is that now?

21        A  1929.  The information is taken by inspection of the

22   1929 vertical aerial photograph.

23        Q  Would you proceed?

24        A  With the same pencil, your Honor, and again on

25   Plaintiff's 73, I am now drawing a carmen line around the

1    irrigated acreage in the Chappo Basin.

2         Q  I am going to ask you to write "Thompson Canyon"

3    or "Thp" or something like that.

4         MR. STAHLMAN:  Your Honor, it seems to me, with all

5    these pencils here, we can make a better mark than that.  You

6    can hardly see it.  In a couple of days you will not see it

7    at all.

8         MR. VEEDER:  Go ahead.

9         THE WITNESS:  I will write "Thompson Canyon" within the

10   first area delineated.

11        I will write "Chappo" within the larger area delineated,

12   lying generally east of the Thompson Canyon area.

13        And the Ysidora area I will delineate with a red

14   carpenter's crayon, that portion which is irrigated according

15   to the 1929 aerial photograph, and I will write within that

16   line delineated in red "Ysidora".

17        This is all with reference to Plaintiff's Exhibit 73.

18   BY MR. VEEDER:

19        Q  Now, would you state whether there is disclosed on

20   the aerial the source from which the water is delivered to

21   Chappo Basin from Lake O'Neill?

22        A  Yes, sir.  The 1929 photographs reveal a ditch or

23   canal extending from the south end of the O'Neill dam,

24   following generally along the margin of the valley to the

25   old Ranch House.

F

Z33

1      Q   Will you mark an X where the old Ranch House is

2   situated, Colonel?

3      A   The old Ranch House's location is in the vicinity

4   of the red X marked on Plaintiff's Exhibit 73, that X lying

5   at the upper end of the Chappo field previously delineated,

6   and from the Ranch House there is evidence of irrigation

7   ditches which traverse the Chappo field below the Ranch House

8   on either side of the Santa Fe Railroad spur.

9      MR. STAHLMAN:   Where is the spur on there?

10      THE WITNESS:   This is the railroad, Mr. Stahlman.   It

11   is made up of a series of arcs and tangents traversing as I

12   have previously described the mosaic from its junction with

13   the main line of the Santa Fe Railway near the bottom of the

14   Exhibit 73, generally north to Chappo, and thence northeasterly

15   to the vicinity of Lake O'Neill.

16      THE COURT:   Where did the water come from that was

17   used on Thompson Canyon?

18      THE WITNESS:   The water on Thompson Canyon, your

19   Honor, apparently came from wells.   There is no evidence

20   on the photograph of surface diversions from the Santa

21   Margarita River.

22      MR. VEEDER:   We are going to call witnesses, your

23   Honor.

24      THE COURT:   And the water in Ysidora?

25      THE WITNESS:   That also, your Honor, apparently came

F

Z34

1    from wells, as there is no evidence of surface diversion,

2    although there is evidence of ditches and preparation of the

3    land for receipt of irrigation water.

4         MR. VEEDER:  We have witnesses to call for that

5    purpose, your Honor, and to explain the source and means for

6    diverting and supplying the water.

7         Q  Would you refer on the aerial, Col. Bowen, to the

8    point of diversion from the Santa Margarita River at the point

9    where the water is diverted down to Lake O'Neill, and state

10   what is disclosed there.

11        A  Yes, sir.  The diversion structure on the Santa

12   Margarita River above Lake O'Neill, still commonly called

13   the O'Neill diversion, appears northwest of the cultivated

14   field which borders Lake O'Neill on the west and north, and

15   is shown on Plaintiff's Exhibit 73 in the upper right portion

16   of the mosaic as a light gray, light to dark gray area, that

17   being an irregular cultivated field.

18        THE COURT:  Was this diversion some sort of dam?

19        THE WITNESS:  Yes, sir.  The diversion is just what

20   might be called a sand dam or sand dike of temporary nature.

21        THE COURT:  Put a red line across and put a D there.

22        THE WITNESS:  I will mark a red line across the

23   diversion--

24        THE COURT:  Put it in the white area where we can see.

25        THE WITNESS:  I am putting a D in the field to the

JOHN SWADER, OFFICIAL REPORTER

F

Z35

Bowen    Direct                                              5407

1    east of the diversion, with an arrow indicating the location

2    of the diversion structure.

3          THE COURT:  How did the water run, by ditch, into

4    O'Neill?

5          THE WITNESS:  From that diversion, your Honor, the

6    water ran by gravity into a ditch which follows the toe of

7    the mesa-- the top of the mesa or terrace is the cultivated

8    field, and the ditch followed the toe of the mesa and is

9    apparent on this mosaic on down to the northerly abutment

10   of the dam containing Lake O'Neill, at which point it entered

11   Lake O'Neill through a gate of some sort.  The type of gate

12   is not apparent from this picture.

13         MR. STAHLMAN:  Where is the hospital?

14         THE WITNESS:  The hospital is in this area where the

15   cultivated field is, lying east and north of Lake O'Neill,

16   where the letter D appears on Exhibit 73.

17   BY MR. VEEDER:

18         Q  Is that west and north did you say?  I didn't get

19   the location.

20         A  I said the terrace on which the hospital lies is the

21   cultivated field now lying west and north of Lake O'Neill.

22         Q  Referring to Plaintiff's Exhibit marked 74 for

23   Identification I ask you to state whether in your opinion

24   that reflects the correct data?

25         A  Yes, sir, it does.

Bowen          Direct

5408

F

Z36

X74

F3

1   MR. VEEDER:   I offer in evidence Exhibit 74, your

2   Honor.

3   THE COURT:   Exhibit 74 received in evidence.

4   (Plaintiff's Exhibit 74 for Identification was

5   received in evidence as Plaintiff's Exhibit 74.)

6   MR. SACHSE:   I object, your Honor.   I am extremely

7   curious as to the materiality of Exhibit 74.   Every inch of

8   this land is apparently inside the watershed.   Any water use

9   on it for irrigation purposes would be a proper riparian use

10   by a riparian.   They can prove no prescriptive right, no

11   appropriative right, and it could have no conceivable bearing

12   on the extent of their rights because the riparian rights

13   as such of the United States are not gained by use or loss by

14   disuse.   So the use they may have made on the riparian land

15   in 1929 has absolutely no materiality.

16   THE COURT:   It have some materiality from time to time.

17   Although much of what you say is probably correct, I see no

18   objection to putting it in.   We will probably have testimony

19   from people who go back a lot farther than 1929, is my guess.

20   MR. VEEDER:   That is correct, your Honor.

21   THE COURT:   Exhibit 74 received in evidence.   The

22   objection is overruled.

23   BY MR. VEEDER:

24   Q   Now, I ask you, Col. Bowen, if you will step to

25   Plaintiff's Exhibit 75 and locate in that exhibit, which is

F3

Z37

Bowen   Direct

5409

a series of aerials from 1938, the areas to which you have
made reference in your testimony respecting the 1929 aerials
and areas which are shown to have been irrigated in 1929.

A   Yes, sir.  Referring to Plaintiff's Exhibit 75-7
in the upper right-hand corner, partly containing the numeri-
cal designation of the photograph, appears a portion of the
Ysidora field which is delineated on Plaintiff's Exhibit 73
as an area irrigated in 1938.  If your Honor pleases, I will
delineate that area--

THE COURT:  This is the same area now that appears in
1938 as appears in 1929?

THE WITNESS:  Yes, sir, it is essentially the same
area.  It appears only in part on 75-7.  It appears more in
75-8, and the remainder of it appears on 75-13 in the upper
left corner.  That is the Ysidora Valley.

THE COURT:  You are working backwards from 75-13?

THE WITNESS:  Yes, sir, your Honor.  I will indicate
with a red line the area which, according to the 1938 vertical
aerial photographs, indicates irrigation.

THE COURT:  That is 75-13.

MR. VEEDER:  I would like to offer it.

THE COURT:  It is already in evidence.

MR. SACHSE:  It is in subject to my motion to strike.

THE COURT:  The next one you had was 75-8.

THE WITNESS:  75-8.  There is some duplication of

Z38

1   areas between 75-13 and 7-8, but for purposes of continuity

2   I will delineate on 75-8 the area portion of Ysidora Valley

3   which is indicated as irrigated by the photograph, using a

4   red carpenter's crayon.  I will make a break on the ravine

5   on the easterly portion.

6          THE COURT:  Will those two cover it?

7          THE WITNESS:  Those cover the Ysidora Valley, your

8   Honor.

9          THE COURT:  Write "Ysidora" on 75-8.

10          THE WITNESS:  I am writing "Ysidora" with a carmen

11   pencil on both 75-8 and 75-13.

12          THE COURT:  Did you study these negatives with the

13   stereoscope set-up also?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  And it is your opinion from your study,

16   then, that this land shown in the red showed irrigation uses

17   in 1938?

18          THE WITNESS:  Yes, sir.

19          MR. SACHSE:  Your Honor, may I have the same motion

20   to strike on the ground that it is immaterial and can have

21   no bearing on the riparian rights of the plaintiff and can have

22   no bearing on the prescriptive rights under your Honor's pre-

23   trial ruling and it can have no bearing on the appropriative

24   rights under your Honor's pre-trial ruling.

25          THE COURT:  As far as it goes, it is overruled.  Here

1    is testimony in 1929 and 1938.  Suppose you have testimony in

2    1908.

3         MR. SACHSE:  I am assuming that we are not going to

4    get it, so I am moving to strike as we go along.

5         THE COURT:  We will cross those bridges when we get to

6    them.  Motion denied without prejudice.

7         MR. SACHSE:  We will renew it, your Honor.

8         MR. VEEDER:  Now, I would like to have him go ahead on

9    Ckappo Basin.

10        THE WITNESS:  There are some differences in the area

11   delineated Ysidora on Plaintiff's Exhibit 73 and Plaintiff's

12   Exhibit 75-8 and -13.  For example, on 75-13 there is a field

13   northerly of the main Ysidora irrigated area which gives

14   evidence of being irrigated in 1938 and not in 1929.

15        THE COURT:  So you have drawn your line on 75-13 to

16   show the same general area as 1929 and have omitted the field

17   which you say showed irrigation in 1938?

18        THE WITNESS:  Yes, sir.

19   BY MR. VEEDER:

20        Q  Will you proceed to put that on with the orange

21   pencil for 1938, please.

22        A  On 75-13 I will place with an orange pencil a

23   field north of the Ysidora Valley which gives appearance

24   of being irrigated in 1938.

25        Q  Will you proceed to the Chappo Basin area and make

F3

F4

the same delineation, Colonel.

A  Your Honor, a portion of the Chappo field appears on 75-13.  Before we leave that, it duplicates in part the Chappo area shown on 75-53.

THE COURT:  Does -53 show it all on--

THE WITNESS:  No, your Honor, -53 does not show it all. It shows just the southerly end.

The Chappo field is indicated on Plaintiff's Exhibit 75-13 in the right-hand portion of the vertical aerial photograph with a series of horizontal lines running up and down on the photograph, and those lines are a combination drainage and irrigation delivery system.  And with a red carpenter's crayon I will indicate on the right-hand side of Plaintiff's Exhibit 75-13 that portion of the Chappo field which appears on the photograph as being irrigated in 1938.

G-1

1      THE COURT:  Write "Chappo" on there.

2      THE WITNESS:  And with a carmine pencil I will write

3  on 75-13 the word "Chappo."

4      THE COURT:  Now, as far as this area goes in 38,

5  does it appear somewhere under the area in 29?

6      THE WITNESS:  Now, there is a little more area

7  delineated in 38, your Honor, than in 39.

8      MR. VEEDER:  Than in 29.

9      THE WITNESS:  Than in 29; thank you.  Particularly

10  the southern portion of Chappo field, which, in 38, picture

11  gives the appearance of being irrigated; on 29, picture

12  does not give that appearance, your Honor.

13      MR. VEEDER:  You want that drawn on the map, your

14  Honor?

15      THE COURT:  Put that part in orange.

16      MR. VEEDER:  In orange.

17      THE WITNESS:  Mine generally followed this orange

18  line which I am inscribing on the Chappo Field delineated

19  on 75-13.

20      THE COURT:  Make the area in orange.  And Chappo Basin

21  in 75-13 was, apparently, irrigated in 38 but not in 29?

22      THE WITNESS:  Yes, sir.

23      THE COURT:  Yes.  Put your red line on 75-53.  75-53

24  is Chappo.  First, make it correspond with that part that

25  is the same as 29 in red.

1  THE WITNESS:  (Marking.)  It conformed.  The area

2  Chappo Basin shown on 75-53 as irrigated in 1938 conforms

3  fairly closely, your Honor, with that same area shown on

4  Plaintiff's Exhibit 73 as being irrigated in 29.

5  THE COURT:  All right.  Outline it in red and write

6  "Chappo" on it.

7  THE WITNESS:  There may be some minor differences,

8  but very small.  (Marking.)  Now, delineated on Plaintiff's

9  Exhibit 75-13, the area of Chappo Basin, 75-53, the area of

10  Chappo Basin which appears to have been irrigated in 1938,

11  with a carmine pencil I will write the word "Chappo" within

12  that red-line delineation.

13  MR. SACHSE:  May I have the same motion to strike,

14  your Honor?  Additional ground that there is no foundation

15  laid of any showing of a claimed appropriative, prescriptive

16  right prior to 1929 -- (inaudible.)

17  THE COURT:  Motion granted without prejudice.

18  Now, was there an area in Chappo Basin here that

19  was irrigated in '29 and not irrigated in '38?

20  THE WITNESS:  Now, your Honor, in the southeasterly

21  portion of Chappo I have on Plaintiff's Exhibit 73 extended

22  the line more easterly than I have on Plaintiff's Exhibit

23  75-53.  That area I would have to inspect stereoptically

24  before I would be absolutely certain of the line on Plaintiff's

25  Exhibit 73 in that portion.

G-2

1     MR. VEEDER:  I believe the witness we will call will
2  straighten out that, your Honor.
3     THE COURT:  All right.
4  BY MR. VEEDER:
5     Q  Now, the Thompson Canyon area, you haven't touched
6  on that.
7     A  Now, the Thompson Canyon area, your Honor, depicted
8  on Plaintiff's Exhibit 75-15 and the area, a portion of it
9  which gives the appearance of having been irrigated --
10     THE COURT:  In '38?
11     THE WITNESS:  In '38.  Delineated with a red pencil.
12     THE COURT:  Write "Thompson Canyon" above that.
13     THE WITNESS:  Above that I will write with a carmine
14  pencil "Thompson Canyon."
15     THE COURT:  Number '38 map -- that is Exhibit 75-15 --
16  what are these features, trees, in the red area?
17     THE WITNESS:  No, your Honor, that appears to be a
18  hay crop.
19     MR. VEEDER:  A windrow?
20     THE WITNESS:  Windrow and cocks, probably with an
21  hayrake.
22     THE COURT:  Does that correspond closely to the area
23  shown in 1929?
24     THE WITNESS:  It is fairly close, your Honor, with
25

1   the exception of this portion that runs a little farther up-

2   stream in Thompson Canyon.  The rest of it conforms rather

3   closely to the area depicted on Plaintiff's Exhibit 73.

4        MR. SACHSE:  I make the same motion to strike.  It is

5   not material.

6        THE COURT:  Denied without prejudice.

7        MR. VEEDER:  We are going to Plaintiff's Exhibit 77.

8        Q  I hand you Plaintiff's Exhibit marked 77 for identi-

9   fication and ask you to state what is revealed on that

10  tabulation?

11       A  Plaintiff's Exhibit 77 for identification is a

12  tabulation with a heading:  "Total Acreage Irrigated from the

13  Santa Margarita River - 1939."

14       MR. VEEDER:  Now, in this regard, your Honor, we have

15  three sets of aerials already in the record, and we hesitated

16  bringing in another set.

17       Q  Would you state the source of this data, Colonel?

18       A  The data used as a source for this tabulation,

19  your Honor, is an aerial photographic compilation that was

20  made jointly by the San Diego County Assessor's Office and

21  the Rancho Santa Margarita Corporation in 1939 for the

22  purpose of establishing a more exact assessment of the ranch.

23       MR. VEEDER:  Your Honor, I realize that there is a

24  factor of hearsay involved in this in view of the fact that

25

1    we haven't present the aerials.  If there is --

2         THE COURT:  You have the aerials available, have you?

3         MR. VEEDER:  They are available, your Honor.

4         THE COURT:  And the negatives can be pulled out, if

5    necessary, and inspected?

6         MR. VEEDER:  That is correct, your Honor.

7         THE COURT:  On any particular part in the same way as

8    the other has been conducted?

9         MR. VEEDER:  That is true, your Honor.

10        THE COURT:  Any objection?

11        MR. SACHSE:  I won't object to foundation, your Honor.

12   I have exactly the same objection to materiality and rele-

13   vancy; but foundation, it is okey with me.

14        THE COURT:  We will leave it on that basis.  If we

15   are interested in a particular area, we can get the aerial

16   out.  And we could even use the stereoscopic slide, I take it.

17        THE WITNESS:  Now, this particular set, your Honor --

18        MR. STAHLMAN:  May I get something straight in my

19   mind?  You are talking now about the photographs from which

20   the mosaic was made?

21        MR. VEEDER:  No, this is --

22        THE COURT:  This is a flight in '39.

23        MR. STAHLMAN:  '39, oh.

24        THE COURT:  This is another flight.

25

1          MR. VEEDER:  The County has in its possession.  And

2    it is available.  We didn't bring it in.

3          MR. STAHLMAN:  Then, may I ask this question:  I

4    thought that '29 pictures were in evidence.

5    BY MR. VEEDER:

6          Q   Would you explain that, Colonel Bowen?

7          A   The 1929 photographs which, I believe, are now in

8    evidence as Plaintiff's Exhibit 73 are filed in the County

9    Assessor's Office, the negatives are filed there; have been

10   for many years.  The actual prints which are in evidence are

11   from the County Assessor's files.

12         THE COURT:  73 is not in evidence yet.  The mosaic is

13   in evidence, and I said we would put in such of the aerials

14   as we needed.  73 is the mosiac, and 73 with a number series

15   following it are the photos.  They are not in evidence?

16         THE CLERK:  That is correct, your Honor.

17         MR. VEEDER:  That is right.

18         THE COURT:  That '29, that came from the Assessor's

19   Office?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Then, the next flight was '38, and that

22   was a Naval flight?

23         MR. VEEDER:  That is our 75.

24         THE WITNESS:  No, '38, your Honor, was made by the

25

old Agricultural Adjustment Administration in the course of

their business for the purpose of --

THE COURT:  Was that made by Navy fliers?

THE WITNESS:  No, sir; that was made for the U. S. Department of Agriculture by contract.

THE COURT:  I see.

THE WITNESS:  In connection with the Department of Agriculture's crop subsidization program.

THE COURT:  All right.

BY MR. VEEDER:

Q  '39 now is what?

THE COURT:  '39 we are talking about.  That is the end of the Assessor's?

THE WITNESS:  '39, your Honor, is a bound volume containing mosaics.  Each page of photographs --

THE COURT:  Which one are you talking about now?

THE WITNESS:  '39, your Honor.

THE COURT:  The '39 flight?

THE WITNESS:  The '39 flight, which was used as a basis for 77.  I do not have in my custody the individual prints.  But I do have a series of mosaics which depict the area and which were used jointly by the Ranch and the County Assessor to find the value of the property.

MR. STAHLMAN:  Well now, is '39 here in court?

THE WITNESS: No, sir.

MR. STAHLMAN: This Exhibit 77 was made from '39, is that it?

THE WITNESS: Yes, sir.

MR. VEEDER: It is available for examination; isn't that?

THE WITNESS: Yes, sir; it is in my office.

THE COURT: Then, the final flight was the '55 flight, and that was made by the Navy?

MR. VEEDER: That is correct.

THE WITNESS: Yes, sir. We made one in '51, which is not in evidence, and then we made the one in '55, which is, your Honor.

THE COURT: '55 is not yet in evidence.

MR. VEEDER: '55 has not yet been offered.

THE COURT: It is Exhibit 78.

MR. STAHLMAN: May I ask a question on voir dire, your Honor?

THE COURT: Yes.

VOIR DIRE EXAMINATION

BY MR. STAHLMAN:

Q   You prepared from the 1939 flight this Exhibit 77 showing irrigable acreage as you studied from that flight, is that correct?

A  This is irrigated acreage, Mr. Stahlman?

Q  Yes, irrigated acreage?

A  Yes, sir.

Q  Now, in the '38 flight did you made a similar compilation such as shown on 77?

A  No, sir.

Q  Why?

A  It didn't occur to me, I guess, Mr. Stahlman.

Q  Was it because there was any great difference or anything?

A  No, sir; there was no ulterior motive in mind.

MR. VEEDER:  What was the principal difference, Colonel, and please state into the record the principal difference between the 1938 and the 1939 flights with particular reference to Stuart and South Mesa?

THE WITNESS:  Well, the 1938 flights show the Stuart and South Coast Mesa irrigation systems either under construction or just recently completed.  And the 1939 flights were made after that irrigation system had been completed and the costal acreage subjugated to irrigation.

BY MR. STAHLMAN:

Q  And the acreage, such as is shown on the Exhibit 77, are -- take Stuart Mesa, for instance -- that is acreage that is without regard to whether it is in or out of the watershed; is that correct?

1      A  That is correct, sir.  Just as the title of Exhibit

2  '77 for identification says:  "This is the acreage irrigated

3  from the River without regard to its relation to the watershed

4  line."

5      MR. VEEDER:  We make the offer, your Honor.

6      MR. SACHSE:  Your Honor, I again enter the same

7  objection but with a slight modification now.  Mr. Stahlman

8  has just very clearly brought it out that the Stuart Mesa

9  irrigation, all of it, took place since 1938; so there is no

10  remote possibility of establishing an appropriative right to

11  the use of water on Stuart Mesa.  So the Stuart Mesa portion,

12  at least, should be stricken.  And I contend the rest of it

13  is immaterial for the reasons stated on my previous motion.

14      THE COURT:  I am inclined to agree that South Coast

15  Mesa and Stuart Mesa will be without the issues of this case.

16  But I am going to permit, as I said, Mr. Veeder to make his

17  record and make it by an offer of proof or by exhibits in

18  this manner.  And I am inclined to overrule your objection.

19      Mr. Stahlman?

20      MR. STAHLMAN:  Your Honor, I may be premature in what

21  I am about to suggest, but I think there is going to come a

22  time in the case where we will want to be informed as to what

23  the principles are as it affects these various areas.  That is,

24  a principle in relation to the application of the law as we

25

understand it.  In other words, we have these questions as to

military use and agricultural use, and we, in the history of

the case, know that one time there was that question of

substitute use.  I think there should come a time in the case,

and we are rapidly approaching that situation, where we

should have a declaration from the plaintiff as to what they

rely upon in the theory -- because we are going to come to

the question very shortly as to irrigable acreage, and

military use, and so forth.

THE COURT:  That is supplementary, too, and very

similar to Mr. Sachse's suggestion that we formulate some of

these issues and find out positions of the parties and how

far we are apart in the evidence on some of the issues and

what issues of law remain in this case.  But I see no harm in

letting this entire exhibit come in.

MR. STAHLMAN:  My point is that I had to reach a

certain density sometime, progressing to some of these com-

plications, and I would like to have it made simple for me

so I understand and know what the issues are.  We are not out

here for going into some batting practice that is not going

to be hitting the ball.

THE COURT:  I am with you, Mr. Stahlman.  That is a

disability that I suffer under also.  The objection is over-

ruled.  77 received in evidence with the notation in the

record that some of it I don't consider material.  I don't

consider the South Coast Mesa and the Stuart Mesa, insofar as

it is outside the watershed, to have any bearing in this case.

But Mr. Veeder is entitled to making his record as he goes

along.

(Plaintiff's Exhibit 77 was received in evidence.)

MR. VEEDER:  Thank you, your Honor.

It is a good record.

DIRECT EXAMINATION (CON'T.)

BY MR. VEEDER:

Q  Now, would you join me down here once more, Colonel

Bowen, and we will encroach upon Mr. Stahlman's sand box, and

I will have you locate some of the principal military

establishments on the quadrangles that have been brought

together for the purpose of location or orientation.

THE COURT:  This 89-CG, has that been marked heretofor?

CG?

MR. VEEDER:  That was deposited some time ago, your

Honor.  Marked for identification.

THE COURT:  All right.

BY MR. VEEDER:

Q  Colonel Bowen, I asked you previously to state and

describe into the record what 89-CG is and also to state into

the record the overlay and the designation on that.

1  A May I have that index of U. S. G. S. topographical

2 quadrangles, Mr. Clerk?

3  MR. VEEDER: That will be with the '29 series, Bill.

4  THE CLERK: '29 series?

5  THE COURT: What year were these quadrangles made,

6 89-CG?

7  THE WITNESS: That is just a part of several quad-

8 rangles, your Honor, which I had pasted together for

9 convenience. Referring to Plaintiff's Exhibit 29 and more

10 particularly to the key --

11  MR. VEEDER: I don't believe that key is part of the

12 exhibit. Perhaps it should be, your Honor.

13  THE WITNESS: Plaintiff's Exhibit 89-CG is comprised

14 in part, a part of Plaintiff's Exhibit 29 --

15  THE COURT: 29-B, isn't it?

16  THE WITNESS: -- 29-B and C, your Honor; 29-G and -H;

17 and portion of 29-F, -K, and -L, your Honor.

18 BY MR. VEEDER:

19  Q Generally speaking, what is depicted by 89-CG marked

20 for identification, Colonel Bowen?

21  A Generally, with the exception of the De Luz area

22 it shows the Santa Margarita Valley as it relates to the Naval

23 reservation, and it shows the main division area which lies

24 largely on San Luis Rey watershed. It shows the Naval

25

Ammunition Depot.

THE COURT:  What do you mean "main division area that lies in the San Luis Rey watershed"?

THE WITNESS:  Your Honor, referring to 89-CG for identification, these symbols indicating roads, and buildings which lie south and east of Lake O'Neill, in that area, are what we call the main division area; and the bulk of that area and this housing area which is near the Old Grant Line lie in the San Luis Rey watershed.

THE COURT:  You mean lie on either side of -- what is this street here?

MR. STAHLMAN:  Mission Road.

THE WITNESS:  This is called Vandegrift Boulevard, your Honor.  It runs from -- Vandegrift Boulevard runs from the junction of 101 near the Grant, Southern Grant Line, Oceanside, up the Santa Margarita River Valley.  It swings up the hill south of Lake O'Neill and then runs in a southerly direction again  to the Grant Line north and slightly east of the Mission San Luis Rey.

THE COURT:  Then, the areas we are talking about lie on either side of Vandegrift, that part of the Vandegrift that is on the east side of the map?

THE WITNESS:  Yes, your Honor.

THE COURT:  And within the Grant area?

1    THE WITNESS:  Yes, sir.

2    THE COURT:  Go ahead.

3    MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

4    marked 89-CG.

5    THE COURT:  Received in evidence.

6    (Plaintiff's Exhibit 89-CG received in evidence.)

7    MR. STAHLMAN:  I missed one point.  What year was this?

8    THE WITNESS:  These are the same as those.

9    THE COURT:  '29.

10   THE WITNESS:  '29 series, Mr. Stahlman.  They are

11   regular portions of the standard published U. S. G. S. $7\frac{1}{2}$

12   minute series.

13   BY MR. VEEDER:

14       Q  Now, Colonel Bowen, I hand to you Plaintiff's

15   Exhibit marked for identification 89-AZ and ask you to state

16   what it is and to locate the area by use of the overlay.

17       A  May I have the overlay, please, Mr. Veeder.

18   THE COURT:  What is this first one you are talking

19   about?  89 what?

20   THE WITNESS:  This map, your Honor, is 89-CG.

21   THE COURT:  The next one you are talking about?

22   MR. VEEDER:  The overlay is 89-CJ.

23   THE WITNESS:  I would like to progress to the overlay,

24   your Honor.  Mr. Veeder went directly to one of the oblique

25   aerial photographs which are keyed to the map by use of an

overlay.  89-CJ is a photo index sheet, one of three.  It

could be oriented to coincide with the map 89-CG by the coast

line, Boat Basin, Morro Hill.

     THE COURT:  Where is Morro Hill?

     THE WITNESS:  Morro Hill is/ the southeast corner of

the Grant Line, your Honor, and/ southeast of Lake O'Neill.  Now, shown on

Plaintiff's Exhibit 89-CJ and the other two sheets of this

index series are some irregular polygons which indicate

approximately the area depicted in the oblique aerial photo-

graphs.  For example, Plaintiff's Exhibit 89-AZ, has our

index Number 5 in red in the lower right-hand corner, also in

white on the right-hand margin.  That may be related to the

numeral V which appears in the lower left-hand corner.

Appears, as a matter of fact, several times within an

irregular polygon in the lower left-hand corner of Plaintiff's

Exhibit 89-CJ.  Now, the straight line from the southwest

would indicate generally the location of the bottom of the

photograph.  It is noted that the Boat Basin shown on CG and

outlined on 89-CJ appears in the lower right corner of

Plaintiff's Exhibit 89-AZ.  The South Coast lemon grove is

shown by the eucalyptus windbreak which is the dark area in

the right center of 89-AZ.  The Stuart Mesa area is shown

from the left portion of 89-AZ.  Camp Del Mar area is the

buildings which lie in the vicinity of the Boat Basin,

previously identified.  The Wherry housing area appears in

the left center -- or right center, I should say, of the

photograph.  It is of interest to note that Mount San Gorgonio

appears in the background.  Mount San Jacinto appears in the

background.

THE COURT:  How do you use these?  In other words,

you look at the overlay and you know about where -- except

the photo itself is bigger than the area shown in the overlays.

THE WITNESS:  The scale of the photograph is bigger,

your Honor, than the scale of the map or the overlay.  The

map and overlay combination is merely an index so that you

can -- any particular area of the Camp that is covered by

this series of obliques that your Honor was interested in,

you could go to the number.  For example --

MR. VEEDER:  89-BA.

H

Z41

1          THE WITNESS:  Take 89-BA, which has our index No. 7 in

2     the lower right-hand corner, and refer to No. 7 on the 89-CJ.

3          THE COURT:  There is the lemon grove.

4          THE WITNESS:  There is the lemon grove, which appears

5     on 89-CG as the orchard symbol in a triangular area between

6     Highway 101 and the Fallbrook spur of the Santa Fe.

7          THE COURT:  Then behind is the Ysidora Narrows?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  And the Ysidora Basin.

10          THE WITNESS:  Yes, sir.

11          MR. STAHLMAN:  In making the overlay No. 5-- let me

12     see No. 5, if I may-- you talked about Stewart Mesa being on

13     No. 5, and yet as you show here on the overlay there is no

14     part there.  Oh, it goes up here, I see-- a projection.

15          THE COURT:  What do they say about the faults?

16          MR. STAHLMAN:  You have projected an imaginary line.

17          THE COURT:  Were these photographs smaller and have been

18     blown up?

19          THE WITNESS:  No, sir.  These are contact prints from

20     the actual negative, your Honor.  These photographs were taken

21     by VJ61 Navy Photographic Squadron at Miramar within the past

22     month, and they use high-speed cameras and high-speed aircraft

23     and they make negatives exactly the size of these Exhibits 89-

24     AZ on through.

25          MR. VEEDER:  The importance of them, as far as we are

Bowen      Direct

H

Z42

1   concerned, is that they have a detailed showing of the struc-

2   ture.

3        THE COURT:  On what date were the photographs made?

4        THE WITNESS:  They were made within the month, your

5   Honor.

6        THE COURT:  This year?

7        THE WITNESS:  This year.  I requested the photography

8   about six weeks ago.  Of course, I don't know the exact date,

9   because there were some technical difficulties and some storms

10  that intervened.  However, they were all made within approx-

11  imately the past month, the month of October-November, 1958.

12       THE COURT:  This series of photographs start at 89-AZ,

13  is that right?

14       THE WITNESS:  Yes, your Honor.

15       THE COURT:  And then that being the last letter it

16  jumps next to 89-BA and then BD, BC, through BZ, and then

17  starts CA through CF; is that right?

18       THE WITNESS:  Yes, your Honor.

19       MR. VEEDER:  I would like to proceed and have the

20  Colonel identify the areas of the camp.

21       THE COURT:  That would be a waste of time as far as

22  the record is concerned.  You wouldn't have much of a record

23  on it.  And I would like at my leisure to sit down with those

24  overlays and --

25       MR. VEEDER:  All right, we make an offer of 89-AZ

H

Z43

1    through 89-CF.

2          THE COURT:  89-AZ through 89-CF.

3          MR. SACHSE:  I have the same objection, your Honor.

4          THE COURT:  Overruled.  They are received in evidence.

5          MR. VEEDER:  When he says the same objection--

6          MR. SACHSE:  I will state it for the record.  They

7    are incompetent, irrelevant and immaterial, and do not tend

8    to prove or disprove any issue in the case.

9          THE COURT:  Overruled.  They are received in evidence.

10         (Plaintiff's Exhibits 89-AZ through 89-CF were received

11   in evidence.)

12         THE COURT:  Do you offer also the overlay 89-CJ?

13         MR. VEEDER:  Yes, I do, your Honor.

14         THE COURT:  Exhibit 89-CJ is received in evidence.

15         MR. SACHSE:  I have no objection to 89-CB.

16         THE COURT:  CG, you mean?

17         MR. SACHSE:  CG or CJ.

18         MR. VEEDER:  And Exhibit 89-CH is another overlay.

19         (Plaintiff's Exhibit 89-CJ was received in evidence.)

20         Q   What is the use of this 89-CH, Colonel?

21         A   The uses of 89-CH and 89-CI are identical to that

22   described for 89-CJ.

23         THE COURT:  For the same map, or a different one?

24         THE WITNESS:  For the same map, your Honor.  For example,

25   89-CI only indexes three oblique photographs.  It can be oriented

H

Z44

1    to 89-CG by the outline of the landing strip, the black line

2    in the lower right-hand corner.  And photographs index number

3    32A, 37A and 41A would show the area from the landing strip

4    through the main division area which I earlier mentioned, that

5    being Vandegrift Boulevard.

6         THE COURT:  What does the last overlay CH do?

7         THE WITNESS:  CH, your Honor, is similar to CJ, ex-

8    cept that the photographic run was taken downstream instead of

9    upstream.

10        MR. STAHLMAN:  I have a question-- maybe it should be

11   on voir dire, but just to straighten out some thinking on this,

12   if I may ask it.  I notice that this series of photographs

13   89-AZ, et cetera, are numbered by you, but they are not in

14   consecutive order.  In other words, there are different numbers,

15   and some are missing.  What is the reason for that?

16        THE WITNESS:  The reason for that, Mr. Stahlman, was to

17   avoid duplication.  There were a great number of other photo-

18   graphs in this series which showed approximately the same

19   area as these pictures offered in evidence.  An inclusion of

20   all of them would have simply extended, say, one picture

21   another quarter of a mile from the preceding picture.

22        MR. STAHLMAN:  Very well.  That's all I want to know.

23        THE WITNESS:  These pictures give the complete cover-

24   age.

25        THE COURT:  Where are the pictures, though, that had

H

Z45

1    such numbers as have been shown on overlay 89-CH as to 19B--

2    are they in this series?

3        THE WITNESS:  Yes, your Honor-- 19B, 3B, 7B, et cetera,

4    your Honor.

5        THE COURT:  All right.  What is this other series of

6    photographs?

7        MR. VEEDER:  89-A through 89-AY, your Honor.  It shows

8    the complete development of the agricultural area and also

9    the military areas.

10        THE COURT:  These were also taken in 1958?

11        THE WITNESS:  Yes, sir.

12        THE COURT:  Within the month?

13        THE WITNESS:  No, sir.  Those were taken about a month

14    earlier than the 89 exhibit series.

15        THE COURT:  These are 89.

16        THE WITNESS:  The 89-AZ through CF, your Honor, post-

17    dated the 89-A through AY series.

18        MR. VEEDER:  Mr. Luddy just brought to my attention

19    that there is no reference in the record to 89-CJ-- what was

20    it?

21        THE CLERK:  H, I, and J.

22        MR. VEEDER:  I think those were included in the offer,

23    and they are offered as part of the 89 series.

24        THE COURT:  You mean you don't have a record of them?

25        THE CLERK:  No, I don't, your Honor.

Bowen   Direct

H

Z46

1      THE COURT:  Exhibit 89-CJ is an overlay upstream from

2    the mouth of the river, and 89-CH is an overlay taken down-

3    stream on the river, and 89-CI is another overlay of a smaller

4    portion of the center.  Do you offer 89-CH and 89-CI as well?

5      MR. VEEDER:  That is correct, your Honor, those are

6    all offered.  That is part of the offer on the 89 series.

7      THE COURT:  All right.

8      Where did this 89 series start?  89-A to 89-AY, I

9    suppose, was the start of it.

10      MR. VEEDER:  That is correct.  89-CG is actually the

11    base for the purpose of location, your Honor.

12      THE COURT:  I understand.  But where did we go from--

13    we went to 89-CF, and so CG came next.  I see, there is a

14    sequence among all of them.

15      Do you offer these photographs 89-A through 89-AY?

16      MR. VEEDER:  Yes, your Honor.

17      MR. SACHSE:  May I inquire as to the purpose again?

18    I don't see any materiality.

19      MR. VEEDER:  Your Honor, I have certainly the belief

20    that there is probably no more persuasive element in this

21    litigation than the fact that the United States of America

22    has expended hundreds of millions of dollars, and we are

23    showing them--

24      THE COURT:  If you are going to offer them on that

25    basis, I might reject them.  If you are offering them on the

H-2

Z-47

1    general basis of showing a good bit of the land and area

2    within the watershed, I will probably receive them even if

3    they show other things.

4         MR. VEEDER:  Your Honor, I think that it is highly

5    important that I have it in the record that these pictures

6    disclose tremendous installation, it shows the great importance

7    of it, it shows the uses of water and locations where the

8    water will be used, and my next series of questions will be

9    directed to Col. Bowen as to where these various installations

10   are located, for example, the 17 Area, and for the record it

11   is absolutely essential, in our view, that if for no other

12   reason this is a case in equity and certainly I think the

13   Court should have all the data before it.

14        THE COURT: I will overrule the objection and I will

15   admit the series 89-A through AY in evidence.  They are re-

16   ceived in evidence for a number of purposes, generally to

17   show areas within the watershed, to show installations within

18   the watershed which may be of assistance later on to the Court

19   in determining the question of the reasonableness of a military

20   use.  To the extent that they show installations outside the

21   watershed, the pictures will be in evidence, of course, but

22   the Court is presently of the frame of mind that the fact that

23   the Government has built installations outside the watershed

24   does not increase its rights on the river.  But you have them

25   in the record and you will have a record to do with what you

H2

Z48

1  want on appeal.

2       MR. VEEDER:  I certainly intend to appeal, your Honor,

3  if that is the basis upon which your Honor is going to rule.

4       THE COURT:  I am giving you my present view.  I am

5  going to receive them in evidence and I am telling you the

6  particular things about them that I think are material and

7  things that I think presently will be immaterial.

8       MR. VEEDER:  Fine.

9       (Plaintiff's Exhibits 89-A through 89-AY were received

X89-A-AY  10  in evidence.)

11  BY MR. VEEDER:

12       Q  Now, Col. Bowen, on the basis of the data that has

13  been offered here in the 89 series, I will hand you the

14  Exhibit 89-CG and request you to refer to those installations

15  which are located outside the watershed of the Santa Margarita

16  River and to state the use that is made of those installa-

17  tions.

18       THE COURT:  Well, now, as I recall, the watershed

19  line runs through the middle of some of them.

20       MR. VEEDER:  That is correct.

21       THE COURT:  Are you going to be able to put this water-

22  shed line on with some accuracy on this exhibit, or are you

23  going to estimate it only, or what?

24       THE WITNESS:  Your Honor, these topographic quadrangles

25  are part of the basis for our watershed line as depicted on

H3

Z49

1   these many exhibits that have been put in on the portion of

2   the Santa Margarita River within the watershed, and with the

3   exception of those changes on the coastal area there, can be

4   plotted with a great deal of accuracy on this 7½-minute

5   series.

6       THE COURT:  Fine.

7         MR. SACHSE:  Excuse me.  Is the watershed line

8   plotted on that?

9       THE COURT:  He says that it can be plotted.

10      MR. SACHSE:  Is that the question, Mr. Veeder?

11      MR. VEEDER:  Have it read.

12      MR. SACHSE:  That he describe outside the watershed--

13  that was the scope of it.

14      THE COURT:  The question is, the installations outside

15  the watershed and the uses of water made in connection with

16  it.

17      Is that it?

18      MR. VEEDER:  And where the watershed line intersects

19  an installation, I will ask him to depict the areas both in

20  and outside the watershed.

21      MR. SACHSE:  I will object.  It is a compound question.

22  To the areas outside the watershed I have an objection on the

23  same grounds previously stated, and Mr. Veeder is throwing us

24  a double-barreled question that allows him to get some im-

25  material matter in with perfectly material.

H3

Z50

1    THE COURT:  Don't you want me to know what part of an

2    installation shown on a map is outside the watershed?

3        MR. SACHSE:  Definitely.

4        MR.STAHLMAN:  I want it in there, and I want it in

5    there where the water is being used.

6        THE COURT:  That is what they propose to tell me, as

7    I understand the question.  Objection overruled.

8        MR. SACHSE:  What I really want is one question at a

9    time.

10       THE COURT:  Show us first the installations outside the

11   watershed, and in doing so I suppose you had better take a blue

12   or green pencil because of the red roads on Exhibit 89-CG

13   and plot out the watershed line.

14       MR. STAHLMAN:  Don't we have an exhibit here that

15   shows the watershed and shows the installations designated

16   by areas that are outside the watershed?

17       THE COURT:  Don't we have one, Mr. Veeder?

18       MR. VEEDER:  No, your Honor.

19       MR. SACHSE:  Mr. Veeder has lodged-- No, they don't

20   go high enough on that.  They don't cover the whole thing.

21       MR. STAHLMAN:  There was a map prepared.  This would

22   take a long time.

23       MR. VEEDER:  It will not take very long.  I believe

24   all he has to do is simply observe them and proceed.

25       MR. STAHLMAN:  I know, but we have boundary lines of

H8

Z51

1 areas, et cetera.  I think to sit down and draw that in there

2 would be important for us to know.

3 THE COURT:  Well, we will take that up the first thing

4 Tuesday morning.  If you want to go to something else now

5 you may.  But over the weekend the Colonel will put in with a

6 colored pencil the watershed line and when he starts to

7 testify we will save a lot of time.

8 Can you do that?

9 THE WITNESS:  May I put it in with an India ink dashed

10 symbol which will be more permanent?

11 THE COURT:  You can put it in with anything except

12 chalk, just so it won't come off.

13 THE WITNESS:  Yes, sir.

14 THE COURT:  And you may withdraw the exhibit for the

15 purpose of putting it in.

16 Do you have something else that you want to go on for

17 another ten minutes?

18 MR. VEEDER:  Well, yes, there is a great deal to be

19 done, your Honor.

20 Q  Referring to Plaintiff's Exhibit marked 120-A

21 through -D for Identification, I will ask you, Col. Bowen,

22 if you will state into the record, of what is that exhibit

23 comprised?

24 A  Exhibits 120-A, -B, -C, and -D are photographic

25 copy enlargements of vertical aerial photographs made in the

H3

Z52

1    1955 series.  These are copies of the field survey sheets that

2    were used for the purpose of recording soil survey informa-

3    tion on the Pechanga Indian Reservation, which is located on

4    Pechanga Creek tributary to the Temecula River.

5         THE COURT:  Do all four of them concern Pechanga?

6         THE WITNESS:  No, your Honor.  Exhibit 120-A concerns

7    a separate 40-acre allotment which is not connected with

8    Pechanga, which is on the northerly slope of Mt. Palomar.

9         THE COURT:  But 120-B, -C and -D concern Pechanga?

10        THE WITNESS:  120-B, C, and D, your Honor, concern

11   Pechanga; yes, sir.

12        THE COURT:  You say 120-A concerns an allotment.  What

13   do you mean by "allotment"?  An Indian allotment?

14        THE WITNESS:  Yes, sir, an Indian allotment.

15        THE COURT:  To a Pechanga Indian?

16        MR. VEEDER:  Well, at least to an Indian, your Honor.

17        THE COURT:  All right, an Indian allotment.

18        THE WITNESS:  I would say to a mission Indian, your

19   Honor.  I believe all these Indians are grouped as the Mission

20   Indians.

21   BY MR. VEEDER:

22        Q  Would you proceed and state what is depicted on that,

23   with particular reference to the--

24        MR. STAHLMAN:  First, may I have the date on which

25   they were taken?

H3

Z53

1   BY MR. VEEDER:

2        Q  Will you give the date when that was taken?

3        THE WITNESS:  I have already mentioned, Mr. Stahlman,

4   that the aerial photographs used as a basis are our 1955

5   flight which was taken of the entire watershed.  The field

6   work which is recorded on these aerial photographs was made

7   in the summer of 1958.

8        MR. VEEDER:  Now, in that regard, Mr. Stahlman, and

9   if the Court please, Exhibit 78 is the full set of aerial

10  photographs from which these exhibits have been prepared.

11       THE COURT:  Let's not put it in evidence, and let's

12  have it available to use if we need it.

13       MR. VEEDER:  That is what I am doing.

14       MR. STAHLMAN:  May I ask a question, to save time on

15  these?  What is the purpose of these?  To show the land

16  classifications?

17       MR. VEEDER:  Soil surveys.

18       MR. STAHLMAN:  Soil survey of the Government Indian

19  Reservation lands?

20       MR. VEEDER:  That is correct.

21       MR. STAHLMAN:  None of this is Vail's?

22       MR. VEEDER:  Well, no, I think you might have a little

23  Vail sticking in on the corner there.  But we are not claiming

24  that.  It is not a bad idea, though.

25       MR. STAHLMAN:  These are not for the purpose of showing

H3

Z54

1    any soil surveys on Vail, is that correct?

2         MR. VEEDER:  Would you answer the question, Col. Bowen.

3         THE WITNESS:  The answer, Mr. Stahlman, is in the

4    negative.  These show only the results or findings of the

5    soil survey within the exterior boundaries of the Pechanga

6    Indian Reservation.  As you know, Mr. Stahlman, as shown on

7    Exhibit 120-B for Identification, there is a small quadri-

8    lateral enclosing the Kelsey tract which is located in the

9    left portion of Exhibit 120-B and the dash-dot line which

10   surrounds that quadrilateral designates Indian land only.

11   It is adjacent to Vail land.

12        THE COURT:  Which one are you talking about now?

13        THE WITNESS:  Exhibit 120-B, your Honor.  And the

14   separate quadrilateral which is circumscribed with a dash-dot

15   line and entitled "Pechanga Indian Reservation," that is a

16   small portion of the reservation called the Kelsey tract.  Then

17   the remainder of the reservation is included in part on

18   each of the three exhibits 120-B, C and D.

19        THE COURT:  To the extent that 120-B, C and D show

20   anything other than Indian Reservation land, no notations as

21   to soil areas have been made on them?  This is limited now

22   entirely to the Indian reservations?

23        THE WITNESS:  That is correct, your Honor.

24        THE COURT:  With that understanding, is there any

25   objection?

H3

Z55

1    MR. STAHLMAN:  Yes, your Honor, I have no objection.

2    MR. VEEDER:  Did you say you had an objection?

3    MR. STAHLMAN:  I merely wanted to understand the

4    photographs.

5    THE COURT:  Do you offer them in evidence?

6    MR. VEEDER:  Yes, your Honor.

7    THE COURT:  Exhibits 120-A, 120-B, 120-C, and 120-D

8    are received in evidence.

9    (Plaintiff's Exhibits 120-A, 120-B, 120-C, and 120-D

XXXX    10    were received in evidence.)

11    MR. VEEDER:  Your Honor, I observe that it is about

12    one minute to go.  If it is all the same, I would like to

13    terminate.

14    THE COURT:  All right.  Adjourn until 10 o'clock

15    Tuesday morning, November 25th.

16    Mr. Luddy, so that you and I will be correct here, I

17    have on my list only an 89, but actuall that 89 is broken

18    up into all these matters.

19    THE CLERK:  Yes, your Honor.

20    THE COURT:  So we have first 89-A through 89-AY.

21    THE CLERK:  Yes.

22    THE COURT:  And that is in evidence.

23    THE CLERK:  Yes.

24    THE COURT:  Then we have 89-AZ through 89-CF, and that

25    is in evidence.

H3

Z56

1      THE CLERK:  Yes, your Honor.

2      THE COURT:  Then we have 89-CG, the base map.

3      THE CLERK:  Yes.

4      THE COURT:  Then we have 89-CH, 89-CI and 89-CJ, the

5  overlays, all in evidence.

6      THE CLERK:  That is correct.

7      MR. VEEDER:  In regard to the report on the Pauba Well,

8  I have talked to the U. S. Geological Survey.  They have it

9  in their possession.  They are editing it.  They will make it

10  available as rapidly and as readily as possible.  I cannot

11  do more.  I have tried.  I explained that it was extremely

12  difficult for me.  That is the situation.  We are going

13  forward just as rapidly as we can, your Honor, and we will

14  let Mr. Sachse know.

15      MR. SACHSE:  Do you have to have an edited report?

16      MR. VEEDER:  I don't have to have an edited report,

17  but I certainly can't make the U.S.G.S. do something it

18  doesn't desire to and it is proceeding rapidly.

19      MR. SACHSE:  I of course can't object until I see

20  what I get, and I might ask you to bring Mr. Worts down

21  again so I can ask him what the editing consisted of.

22      MR. VEEDER:  I have not the slightest idea of what it

23  amounts to or why.  I am just telling you.

24      THE COURT:  All right, we will be in recess until

25  Tuesday morning at 10 o'clock.

(Adjournment until November 25, 1958, at 10 A.M.)