VOLUME NO. 49

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                                        Plaintiff,

vs.                                                         No.  1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                                        Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Tuesday, November 25, 1958.

Pages: 5446 to 5594

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1

IN THE UNITED STATES DISTRICT COURT

2

SOUTHERN DISTRICT OF CALIFORNIA

3

SOUTHERN DIVISION

4

- - -

5

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6

- - -

7

8    UNITED STATES OF AMERICA,      )
                                    )
9                    Plaintiff,     )
                                    )
10          vs.                     )          No. 1247-SD-C.
                                    )
11   FALLBROOK PUBLIC UTILITY       )
     DISTRICT, et al.,              )
12                                  )
                     Defendants.    )
13

14

15

REPORTERS' TRANSCRIPT OF PROCEEDINGS

16

San Diego, California

17

Tuesday, November 25, 1958

18

19

20   APPEARANCES:

21        For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                     Special Assistant to the
                                     Attorney-General,
22                                   Department of Justice,
                                     Washington, D.C.
23

24

25

5447

22

1    APPEARANCES (Continued):

2         For Defendant Vail        GEORGE E. STAHLMAN, ESQ.
          Company
3
4         For Defendant State of   EDMUND G. BROWN, ESQ.,
          California               Attorney-General, by
                                   ADOLPHUS MOSKOVITZ, ESQ.,
5                                  Deputy Attorney General.

6         For Defendants
          Fallbrook Public
7         Utility District,        F. R. SACHSE, ESQ.
          et al.
8

9                        -  -  -

10                          -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## INDEX TO WITNESSES

| For the Plaintiff: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Allen C. Bowen | 5458 | | | |
| (By Mr. Sachse) | | 5495 | | |
| (By Mr. Moskovitz) | | 5551 | | |

## EXHIBITS

| Plaintiff's Exhibit - | For Identification | In Evidence |
|---|---|---|
| 86-A | | 5489 |
| 88 | | 5490 |
| 86 | | 5492 |

* * * * *

1    SAN DIEGO, CALIFORNIA, TUESDAY, NOVEMBER 25, 1958.   10:00 A.M.

2

3        THE CLERK:  Number one on the calendar, case No.

4    1247-SD-C, United States of America vs. Fallbrook Public

5    Utility District, et al.  Further court trial.

6        MR. VEEDER:  As I understand, your Honor, tomorrow is

7    the day that we go to the field, is that correct?

8        THE COURT:  Yes.  What plans have been made?

9        MR. VEEDER:  We have arranged for transportation at

10   Camp Del Mar.  There will be a bus there.  And I have talked

11   to Mr. Krieger, who represents the Oviatts and others.  They

12   will be there.  We have transportation available.  We will

13   also have a car available to take your Honor to Camp Del Mar.

14       Our thought in that regard is to have the reporter, and

15   I would like to have the Clerk, because there are exhibits

16   that we would like to take along with us.

17       Briefly, I would outline the kind of trip we would make.

18       THE COURT:  All right.

19       MR. VEEDER:  We propose to visit the important areas,

20   that we consider important, and to have with us a blank map

21   on which there will be numbered the various spots that we have

22   observed, and there will be dictated into the record by your

23   Honor or by someone the points that we saw, to the end that

24   it just won't be a junket, if that is agreeable to your Honor.

25       THE COURT:  It seems to me that that is about the way

A

Z4

1    it should be done.  You will have a blank map and you can

2    insert a number on the area at which we have been and you can

3    dictate to the reporter general observations.

4            MR. VEEDER:  That would be my thought, your Honor.

5            THE COURT:  And have as little matter on the record as

6    possible.

7            MR. STAHLMAN:  As to time, do you have an opinion how

8    long it will take?

9            THE COURT:  Yes, that is important.

10           MR. VEEDER:  Yes.  We plan on picking your Honor up

11   and we can come to your house if you want us to at 8:30, and

12   be at Del Mar at 9:30.

13           Isn't that right, Col. Bowen?

14           COL. BOWEN:  Yes, sir.

15           MR. VEEDER:  And there we will have a bus that can take

16   us on the trip.

17           Timewise our plans will certainly consume the full day,

18   and when I say the full day I would assume that it would run

19   through certainly to 4 o'clock.  Again, I think Col. Bowen

20   knows more about it from the standpoint of time and access and

21   what will be involved.

22           THE COURT:  What do you anticipate on time?

23           COL. BOWEN:  I anticipate, your Honor, with a stop for

24   lunch, that it should run through about 4 o'clock.

25           THE COURT:  And wind up somewhere around the Santa

A

Z5

1   Margarita at 4 o'clock?

2       COL. BOWEN:  Wind up back at my office at 4 o'clock,

3   the spot where the tour would commence, so that the people

4   who have driven their cars up there will wind up at their cars.

5       THE COURT:  It is all right.  I was just hopeful that

6   we could get through earlier.  But while we are there we had

7   better see what we can see.

8       MR. VEEDER:  Does your Honor anticipate other trips,

9   for example, up through the Santa Margarita itself, the whole

10  area itself?

11      THE COURT:  Yes, I want to get up in the Fallbrook

12  area.  I have only been at Fallbrook once or twice in my life.

13  I went to this Master's hearing.  That is one of the few places

14  in Southern California I have not been over.  I have been over

15  a lot of this other area and know a lot of it very well and have

16  known it for years.  But the Santa Margarita Watershed up to

17  Temecula I have only been in once.  So some other time, if we

18  would like to do that-- we couldn't do it the same day.

19      MR. VEEDER:  No.

20      That raised the point in regard to whether you desired

21  to have court on Friday or not, and whether, if we didn't

22  complete seeing these things on Wednesday, we should arrange

23  to proceed and finish them up on Friday.

24      THE COURT:  You mean Friday also within the area of the

25  Base?

A

Z6

1    MR. VEEDER:  No, it wouldn't be within the area of the

2  Base.  I am thinking particularly of the area respecting the

3  geology in the upper watershed, concerning which the State is

4  going to put in its evidence.  I am not recommending it.  I am

5  just tendering that thought.

6    MR. MOSKOVITZ:  Your Honor, I think it would be a good

7  idea sometime in the near future to see the upper watershed

8  area, particularly in this Ground Water Unit 4.  There is a

9  very deep cut that has been made for the aqueduct, which

10  reveals a good section of the materials in this ground water

11  basin that may be covered up, if we wait too long.  I don't

12  know just what the construction schedule is there, but it is

13  exposed there and it is very interesting to look at that.  So

14  I think it would be a good idea to do that fairly soon.

15    THE COURT:  Of course, you don't expect to be here

16  Friday.

17    MR. MOSKOVITZ:  No, I do not, your Honor.

18    THE COURT:  You would want to be along when we made

19  that inspection?

20    MR. MOSKOVITZ:  I would.

21    MR. VEEDER:  I bring also to your Honor's attention

22  one additional factor.  I think, based upon conversation with

23  Mr. Sachse, that Col. Bowen will be available for cross-

24  examination very shortly in regard to matters we have covered.

25  As I understand it, wasn't that your feeling, Mr. Sachse?

1    MR. SACHSE:  My thought was this, your Honor, that it

2    might pay, because of the absence of Mr. Littleworth partic-

3    ularly, to segmentize Col. Bowen's testimony-- I discussed it

4    after court adjourned on Friday, and confine Col. Bowen's

5    testimony, if possible, to the areas below the Temecula Gorge

6    for the time being, and then perhaps let him come back on

7    later and give Mr. Littleworth and others concerned a chance

8    to come in before he goes into the upper lands.  That was my

9    point.  I have indicated to Mr. Veeder my willingness to do

10   that.

11        MR. VEEDER:  I would do that, yes, your Honor.  My own

12   view is that with a record as lengthy as this, continuity of

13   testimony is not nearly as important as it would be in another

14   kind of case.  So what we would do is run through the remain-

15   ing material we have now and then Col. Bowen could be interro-

16   gated in regard to the soils in the basin and other matters

17   he has testified to, to date.

18        THE COURT:  Mr. Stahlman.

19        MR. STAHLMAN:  Your Honor, in connection with the matter

20   Mr. Moskovitz referred to, the cut up there, I understand

21   there is no immediate plan to cover it.  We can find out and

22   be sure.  I think it will be a matter of weeks before it is

23   covered up.

24        You have been up looking at it?

25        MR. MOSKOVITZ:  Yes.

A

Z8

5454

1    THE COURT:  I don't really care whether we work Friday

2  or not.

3    MR. VEEDER:  If Mr. Moskovitz is not going to be here--

4    THE COURT:  What is the feeling of counsel?

5    MR. SACHSE:  In my little office, your Honor, I can

6  always use a day off.

7    MR. STAHLMAN:  It is immaterial to me, your Honor.

8    THE COURT:  Does anybody really want to work on Friday?

9    MR. VEEDER:  Being a bureaucrat, I almost have to say

10  that into the record.

11    THE COURT:  One day more or less isn't going to affect

12  this case, and I think with a holiday coming on I would just

13  as soon not work.  Mr. Moskovitz wants to return home for

14  Thanksgiving, and coming back down would be bad for him, and

15  he doesn't like staying away.  I will leave it up to counsel.

16    MR. SACHSE:  I would prefer not to, your Honor.

17    MR. STAHLMAN:  It is completely immaterial to me, your

18  Honor.

19    THE COURT:  We will not work Friday.  We can all use

20  the time.  I have various matters that I have had to lay

21  aside.  I will probably be working.  I can find plenty to do

22  wityout being here in the courtroom.

23    You think this will take the whole day?  There will be

24  no chance to wind this up earlier?

25    MR. VEEDER:  They checked that whole area with radar,

1   your Honor, and I would hate to have Col. Bowen go-- I think

2   we can't go much faster.

3       THE COURT:  This starting at 9:30, I don't know how you

4   gentlemen operate, but I get up at 6 or 6:30 in the morning.

5   I will be just twiddling my thumbs.

6       MR. STAHLMAN:  I go to be about that time.

7       THE COURT:  What time does the bugle blow at Pendleton?

8       COL. BOWEN:  5:30.

9       MR. VEEDER:  Well, let's be reasonable about this.

10      THE COURT:  I don't mind getting up.  I would rather

11  get up and start early and wind up earlier.

12      MR. MOSKOVITZ:  Start at 8 o'clock in the morning?

13      THE COURT:  It would suit me fine.  What's wrong with

14  8 o'clock at Del Mar?

15      COL. BOWEN:  We can do that, your Honor.

16      THE COURT:  Can you do that?

17      MR. VEEDER:  Surely.

18      THE COURT:  That is better.  That cuts an hour and a

19  half off and we ought to be through about-- what time do we

20  have lunch, at 12?

21      COL. BOWEN:  Yes, sir.

22      THE COURT:  We don't have to take all day for lunch, do

23  we?

24      COL. BOWEN:  No, sir.  We will eat in a cafeteria and

25  can get in and out fairly quick.

A

Z10

1          MR STAHLMAN:  We can take along some field rations.

2          THE COURT:  Let's try to wind up at 2:30.  We can cut

3    off the hour and a half on the latter part of the day and put

4    it on the front.

5          MR. VEEDER:  I am for that, your Honor.  I am just

6    trying to be nice about this.

7          THE COURT:  All right, let's do that.

8          MR. VEEDER:  I couldn't imagine anyone wanting to get

9    to work so early is all.  We will figure it that way.

10          THE COURT:  I was down here this morning about 7:15.

11    I don't mind getting to work if I am not whipping you gentle-

12    men.

13          MR. VEEDER:  I am up at 6 every morning, your Honor.

14    So it makes no difference.

15          THE COURT:  There will be a car of some kind bringing

16    you up from San Diego?

17          MR. VEEDER:  Yes.

18          THE COURT:  Do you want to drive your car, Mr. Luddy?

19    Does the Government pay your expense?

20          THE CLERK:  It doesn't matter.  Yes, they will pay my

21    expense.

22          THE COURT:  That is up to you.

23          MR. STAHLMAN:  Mr. Hall is going up from here.

24          MR. MOSKOVITZ:  We will have a State car.

25          THE COURT:  Mr. Luddy, you can either go up in your own

5457

A

Z11

1    car or go with Mr. Swader or work out some other arrangement.

2    I think I will probably drive up to Del Mar.

3         We will meet at your office?

4         COL. BOWEN:  Yes, your Honor.

5         MR. VEEDER:  In other words, it will not be necessary

6    to pick you up?

7         THE COURT:  It is just the other side of Oceanside?

8         COL. BOWEN:  Yes, about two miles north of Oceanside

9    on U. S. Highway 101, a left turn into the main gate of Camp

10   Del Mar, which is between the highway and the beach, and my

11   office is the second building on the inside of the gate-- it

12   is Building No. 21705.

A2   13        MR. STAHLMAN:  It might be advisable to suggest that

14   when you pass the sign that says "To Camp Pendleton"-- is

15   that correct?

16        COL. BOWEN:  Yes.

17        THE COURT:  You go almost to the river.  It is just

18   this side of the Santa Margarita River?

19        COL. BOWEN:  Yes.

20        THE COURT:  All right.  You pass all that butterfly at

21   Pendleton and go up north almost to the river.

22        Well, all right, that will be the understanding.  We

23   will assemble at Col. Bowen's office at 8 o'clock in the

24   morning.

25        MR. VEEDER:  May I proceed, your Honor?

THE COURT:  Proceed.


ALLEN C. BOWEN,

recalled as a witness in behalf of the plaintiff, having been

previously sworn, testified further as follows:


DIRECT EXAMINATION (Resumed)

BY MR. VEEDER:

Q  I hand you, Col. Bowen, Plaintiff's Exhibit 120 and

series A, B, C, and D, and ask you to state the basis upon

which you made the soil survey, the results of which are de-

picted on those exhibits.

A  The soil survey which is reflected in Plaintiff's

Exhibits 120-A, B, C, and D was made in the same fashion as that

made within the Naval Reservation at Camp Pendleton, using

vertical aerial photographs enlarged to the scale of approx-

imately four inches to the mile and using the same 1955 flight

flown by Navy Photographic Squadron 61.

The boundaries of the Pechanga Reservation are delineated

on Plaintiff's Exhibits 120-B, C, and D.  Plaintiff's Exhibit

120-B has a small separate parcel enclosed by a quadrilateral

dash-dot line indicating the reservation boundary and the words

"Pechanga Indian Reservation" are inscribed along the dash-dot

line and outside the area enclosed.  Now that separate area, the

Pechanga Reservation, appears on the left-hand portion of

1   Plaintiff's Exhibit 120-B.  On the right-hand portion of

2   Plaintiff's Exhibit 120-B is an irregular body enclosed by a

3   dash-dot line on all but the easterly boundary.  That is a

4   portion of the main body of the Pechanga Reservation and is

5   astride the Pala-Temecula Road, which appears and is named on

6   Plaintiff's Exhibit 120-B.  The easterly boundary of the

7   right-hand geometric figure is a match line which adjoins the

8   portion of the reservation mapped on Plaintiff's Exhibit 120-C.

9   Plaintiff's Exhibit 120-C shows a geometric figure which is

10  bounded on the north and south by the reservation boundary,

11  on the southern half of the westerly portion by the reserva-

12  tion boundary, and on the northerly half of the western line

13  by the matched line which adjoins the right-hand portion of

14  Plaintiff's Exhibit 120B.

15          THE COURT:  Where does it join on?

16          THE WITNESS:  The northerly portion of the west line,

17  your Honor, on Plaintiff's Exhibit 120-C adjoins the easterly

18  boundary of the right-hand portion mapped on Plaintiff's

19  Exhibit 120-B.

20          THE COURT:  This highway that goes up to Anza which

21  crosses Pechanga--

22          THE WITNESS:  This is the Pala-Temecula Highway, your

23  Honor.

24          THE COURT:  Pardon me.

25          THE WITNESS:  This is Pechanga down south and east of

1    Temecula.

2         THE COURT:  This is the highway running diagonally?

3         THE WITNESS:  A white line running diagonally on Exhibit

4    120-B from the northwest corner of the map to the center of the

5    photograph, and then it turns and goes southerly from the

6    center--

7         THE COURT:  Down the canyon to Pala?

8         THE WITNESS:  --down the canyon to Pala, yes.

9         MR. VEEDER:  Would it help you to locate it on No. 1,

10   the big base map?

11        THE COURT:  I know where it is on the big base map.

12        Then Gardner's place is in between the two reservations,

13   isn't it, in here somewhere?

14        THE WITNESS:  Yes, your Honor.  The buildings on

15   Erle Stanley Gardner's place appear on Plaintiff's Exhibit 120-B

16   just below the bend in Pechanga Creek between the two parcels

17   of the reservation where the lettering "Pechanga Creek" appears

18   on the exhibit.

19        THE COURT:  And there is no connection or continuity

20   between these two parts of the Pechanga Reservation?

21        THE WITNESS:  You are correct, your Honor.  There is no

22   physical connection.

23        THE COURT:  This property line north and east of the

24   Temecula-Pala Road is part of the Vail property?

25        THE WITNESS:  Yes, your Honor.

1    MR. STAHLMAN:  For further identification, if I may

2  ask a question, is that the property known as the Government

3  property?

4    THE WITNESS:  A portion of it, Mr. Stahlman.

5    MR. VEEDER:  Government-Vail property.

6    MR. STAHLMAN:  Yes.

7    THE COURT:  How did it get the name "Government"?

8    MR. STAHLMAN:  It was acquired from the Government

9  rather than from the Mexican grant.

10    THE WITNESS:  A portion of this is the little Temecula

11  grant, however, that appears on Plaintiff's Exhibit 120-B.

12    THE COURT:  Proceed.  You haven't talked about 120-D

13  yet, have you?

14    THE WITNESS:  No, sir.  Plaintiff's Exhibit 120-D shows

15  the remainder of the Pechanga Reservation and the westerly

16  boundary of the area mapped on Plaintiff's Exhibit 120-D joins

17  the easterly boundary of the area mappedon Plaintiff's Exhibit

18  120-C.

19    I should point out to your Honor that there are two

20  islands of private ownership within the exterior boundaries

21  of the larger portion of the Pechanga Indian Reservation.  One

22  of those appears as a 40 on Plaintiff's Exhibit 120-D, which

23  is adjacent to the westerly line of the area mapped and con-

24  tained in a dash-dot line.

25    THE COURT:  Why don't you write on there with pencil--

1    what is the name of the owner, do you know?

2    THE WITNESS:  I believe this is Mr. Moore, your Honor,

3    who testified in regard to water uses on the Naval Ammunition

4    Depot, but I am not absolutely certain about that.

5    THE COURT:  Just write on there "Private".

6    THE WITNESS:  On Plaintiff's Exhibit 120-D, with red

7    pencil, I will mark "Private"-- I need a softer pencil-- with

8    a red lumber crayon I will mark "Private."

9    THE COURT:  Put it over here on the left and run an

10   arrow to it.

11   THE WITNESS:  With pen and ink, your Honor, I will

12   print "Private" immediately to the left of the 40 acres which

13   appears in an island within the exterior boundary of the

14   Pechanga Indian Reservation on Plaintiff's Exhibit 120-D.

15   THE COURT:  Where is the other island of private owner-

16   ship?

17   THE WITNESS:  The other island, your Honor, appears on

18   Plaintiff's Exhibit 120-C.  It is a small area of approximately

19   ten acres.  It appears in the lower left-hand corner of the

20   area mapped on Plaintiff's Exhibit 120-C, and I will to the

21   left of the area map write the word "Private" in blue ink and

22   indicate with an arrow a body of privately-owned land which is

23   bounded by a dash-dot line.

24   On Plaintiff's Exhibit 120-B, your Honor, there is an

25   irregularity on the southern portion of the easterly portion

1   mapped on Plaintiff's Exhibit 120-B, which is privately-owned

2   land.  But the dash-dot line describing the exterior boundar-

3   ies of the Pechanga Indian Reservation go around it and I

4   believe it would be obvious that that would be outside the

5   reservation.

6       THE COURT:  I see you have listed, or have you, the

7   characteristics of the land in that piece?  Or are lines drawn

8   across-- Oh, they are drawn across.

9       THE WITNESS:  The symbol is placed in that area, your

10  Honor, but a line leading from the symbol to the site indi-

11  cated indicates the portion described by the symbol.

12      THE COURT:  So Plaintiff's Exhibit 120-B doesn't pur-

13  port to describe it as privately-owned land?

14      THE WITNESS:  No, your Honor.

15      THE COURT:  What about Plaintiff's Exhibit 120-C?  You

16  have symbols in that area.  Is that the same situation?

17      THE WITNESS:  No, sir.  On Plaintiff's Exhibit 120-C

18  the soil delineations go across the privately-owned land and

19  symbols that are written in and adjacent to that parcel of

20  privately-owned land apply also to the private land.  And the

21  same is true, your Honor, on the 40 acres of privately-owned

22  land appearing on Plaintiff's Exhibit 120-D.

23      THE COURT:  And all this is part of the Indian Reserva-

24  tion and the Pechanga Indian Reservation within the watershed?

25      THE WITNESS:  No, your Honor.

1          THE COURT:   Where is the watershed?

2          THE WITNESS:   On Plaintiff's Exhibit 120-C the watershed

3     boundary of the Santa Margarita River appears as a dashed line

4     in the lower portion of the area mapped and the words "Santa

5     Margarita Watershed" were inscribed along the line to indicate

6     what that line is, and that line extends from the lower portion

7     of the westerly line on Plaintiff's Exhibit 120-C to the

8     easterly portion of the southerly line on Plaintiff's Exhibit

9     120-C.

ML B-1

1    THE WITNESS:  But on neither of the other exhibits

2    does it appear.

3    THE COURT:  Put a little "v" on either place there

4    to indicate where that watershed line is.

5    THE WITNESS:  Thank you, Mr. Stahlman, for your pen.

6    With blue ink I am indicating with a "v" outside of the

7    exterior boundaries of the area mapped the point where the

8    Santa Margarita watershed line intersects the boundary of

9    the reservation.

10   THE COURT:  Now, why have you inscribed the land

11   outside the watershed in the lower left-hand corner of 120-C?

12   THE WITNESS:  I did that as a service to the Bureau

13   of Indian Affairs, your Honor.  They wanted the soils infor-

14   mation for planning purposes, and it was easy to get them

15   at the time and save the Government the additional expense

16   of sending other personnel out there.

17   MR. VEEDER:  That is a legal question, your Honor,

18   which I am glad to explain.  The Government, when it reserved

19   water for these indians didn't necessarily limit the reser-

20   vation and water within the watershed, the point being is

21   that under the doctrine of the Winters case the quantities

22   of the water were reserved for the purpose of making these

23   lands habitable and without regard to the watershed line.

24   THE COURT:  But there are not in this case.  The land

25   outside the watershed --

Bowen - Direct                                              3486

1          MR. VEEDER:  It is entirely possible they will use

2     the water outside the watershed.

3          Did I hear "heh-heh"?

4          THE COURT:  We understand your position on 120-C

5     which demarks an area of land lying outside of Santa

6     Margarita watershed but within Pechanga reservation.  It is

7     your contention that the waters reserved to the Indians on

8     the reservation can be used anywhere in the reservation

9     whether it is within the watershed or outside the watershed?

10         MR. VEEDER:  Yes, sir.  Winters' doctrine, I am sure,

11    and the 9th Circuit has repeatedly held -- I would say there

12    are probably 20 cases that said that the reservation is for

13    the use of the Indians; and I know of no delineation or

14    demarcation other than, of course, the water must be applied

15    to a beneficial use.

16         MR. MOSKOVITZ:  Your Honor, we don't agree with that

17    legal view.  We will argue that later, I suppose.

18         THE COURT:  Yes.  That is another issue that is

19    denoted that has cropped up in the case.

20         MR. VEEDER:  Well, sir, I didn't know that it cropped

21    up.  If there was any doubt about it, I am glad that it has

22    been now clarified.

23         THE COURT:  We will say that your position has been

24    clarified.

25         Q   BY MR. VEEDER:  Now, in regard to Plaintiff's

1    Exhibit 120-A, would you refer to your testimony of last
2    Friday in regard to the location of certain of those
3    properties?

4         A    In describing Plaintiff's Exhibit 120-A, your
5    Honor, last Friday I erroneously referred to a 40 acres of
6    a public allotment to an Indian.  That 40 is not depicted
7    on this Exhibit 120-A.  Rather, the northeasterly corner of
8    the Mission Indian Reservation is indicated by a dash-dot
9    line in the lower left-hand corner of the photograph, it
10   is shown here, and the watershed of the Santa Margarita
11   river is shown by a dash line across the lower portion of
12   the photograph, Plaintiff's Exhibit 120-A, with the words
13   "Santa Margarita watershed" displayed thereon.  The area
14   up north and east of that line is within the watershed of
15   the Santa Margarita River, and the area south and west of
16   that line is outside of the watershed.

17        THE COURT:  Now, I understand that the remaining
18   portion shown within the dark lines, excluding the corner
19   in the southwest, is this Pechanga?

20        THE WITNESS:  No, your Honor, the remaining portion
21   of the area mapped on Plaintiff's Exhibit 120-A is largely
22   within the Cleveland National Forest.

23        THE COURT:  And this square cut out to the southwest
24   is Mission Reservation?

25        THE WITNESS:  Yes, sir.  It lies largely in the San

1    Luis Rey watershed, but that northeasterly corner of the

2    Mission Reservation is within the Santa Margarita watershed.

3         THE COURT:  Would you put on the map there in the

4    light-colored place "Part of the Indian Reservation," and

5    put the line over indicating where it is.

6         THE WITNESS:  Yes, your Honor.  With Mr. Stahlman's

7    pen, in blue ink, I am inscribing on Plaintiff's Exhibit

8    120-A in the lower left-hand corner the words "Part of the

9    Mission Indian Reservation."

10        THE COURT:  Is that within the pleadings of this

11   case?  Did you plead anything about the Mission Indian

12   Reservation?

13        MR. VEEDER:  As I recall, we pleaded in regard to the

14   mission Indians, and then on further investigation we found

15   that there was no water there for use, and we are not putting

16   in evidence in regard to that.  I would want to take a look

17   at that.  I think it was for that reason, your Honor.

18        THE COURT:  If I remember, there were three Indian

19   reservations:  Pechanga --

20        MR. VEEDER:  Pechanga, Ramona, and Coahuila.

21        THE COURT:  I don't remember anything about missions.

22        MR. VEEDER:  I know we made an investigation regarding

23   the mission Indians.

24        THE COURT:  There will be no issue, then, about water

25   in that little section referred to as the part of the Missi⌐n

B-2

1  Indian Reservation?

2         MR. VEEDER:  Well, of course, if there was some of

3  that reserve up there; but I don't think there is any in the

4  use for agriculture.

5         Q    Is that right, Colonel?

6         A    You are correct, Mr. Veeder.

7         THE COURT:  So that for all practical purposes we

8  can eliminate it from consideration?

9         MR. VEEDER:  At this moment, your Honor, I know of no

10 reason why it should be included.

11        THE COURT:  All right.

12        Q  BY MR. VEEDER:  Col. Bowen, have you, based upon

13 the soil surveys, classified the lands similar to the manner

14 that you pursued in connection with the lands within the

15 Naval enclave?

16        A    Yes, sir.

17        Q    Referring now to Pechanga Indian Reservation?

18        A    Yes, sir, I have.

19        Q    Would you state into the record the land classes

20 that you established predicated upon your survey?

21        A    Yes, sir.  On the Pechanga Indian Reservation that

22 portion only within the watershed of the Santa Margarita

23 River, I tabulated as follows, the areas of land by classes:

24         Class I is 55.8 acres.  Class II, 706.6 acres.

25        MR. SACHSE:  70.6?

THE WITNESS:  706.6.  Class III is 338.7 acres.
Class IV is 163.5 acres.  Class VI is 718.7 acres.  Class
VII is 1680.0 acres.  And Class VIII is 123.4 acres.

THE COURT:  Classes VI, VII and VIII are lands on
which you have not used water for irrigation; right?

THE WITNESS:  For a cultivated crop, your Honor.  But
there is still some question as to the suitability of
certain Class VI lands on the Pechanga reservation for crops,
such as avocadoes and citrus, that might warrant their
subjugation and use for irrigated lands under a non-cultiva-
tion program.

MR. VEEDER:  In that regard, we are calling another
witness, your Honor.

Now, I would like the record to show that I
talked to Mr. Krieger respecting this phase of Col. Bowen's
testimony.  He agreed that we should proceed without having
him here but requested that the reporter send to him a copy
of this phase of our case in chief, that is, the Pechanga
data.

THE COURT:  Who is requesting this be sent to Mr.
Krieger?  Is Mr. Krieger requesting it?

MR. VEEDER:  Mr. Krieger asked me to relay that to
the reporter.

THE COURT:  Now, have you completed the direct on
Pechanga?

1    MR. VEEDER:  To the extent that Col. Bowen is going

2    to testify in regard to it we will call a representative of

3    the Bureau of Indian Affairs on the remainder of it.

4        MR. STAHLMAN:  Your Honor, that brings up the

5    question:  Are we going to be permitted to order just parts

6    of the transcript?  If we are, I can save my client a con-

7    siderable expense, because I have been ordering it on those

8    days we felt the matter important.  There are a great many

9    matters in which we are not concerned on occasion.

10       THE COURT:  We will talk to the reporters about it.

11       MR. VEEDER:  I had no -- all I did was convey what

12   Mr. Krieger asked.

13       THE COURT:  All right.

14       Q  BY MR. VEEDER:  Col. Bowen, I hand you Plaintiff's

15   Exhibit marked 89-CG and ask you to state into the record

16   the action you have taken in regard to that document or that

17   map pursuant to the direction of the Court?

18       A  Your Honor, on Plaintiff's Exhibit 89-CG --

19       THE COURT:  Which was the sort of base map to be used

20   with the overlays and which was made up of portions of the

21   29 exhibit?

22       THE WITNESS:  Yes, your Honor.

23       THE COURT:  The geological sections.  What have you

24   done to it?

25       THE WITNESS:  I have inscribed thereon, your Honor, a

1    solid black line indicating the Santa Margarita watershed,

2    the boundaries of the Santa Margarita watershed, crest line.

3        THE COURT:  On the disputed area near the Coast on

4    the South Mesa and on Stewart Mesa, what date have you taken?

5    Or what?  State of nature, present condition, or what?

6        MR. VEEDER:  Natural watershed line, as depicted on

7    it.

8        THE WITNESS:  Yes, your Honor.  On the coastal areas

9    I have shown the watershed boundary as it is illustrated

10   on Plaintiff's Exhibits 97, 98, 98-A, and 99; showing it as

11   a positive state of nature.

12       THE COURT:  All right.

13       Q  BY MR. VEEDER:  Now, Col. Bowen, I hand you

14   Plaintiff's Exhibit marked **89**-BG and ask you to locate it

15   in connection with the watershed line depicted on 89-CG?

16       A    89-BG is an oblique aerial photograph which shows

17   some developments on Camp Pendleton within the watershed and

18   some without.

19       Q    And what are those areas which are situated

20   outside of the watershed?

21       A    The developments outside of the watershed, your

22   Honor, are shown on the right-hand portion of the photograph

23   immediately adjacent to the Grant line, which is shown as a

24   straight line running across the right-hand corner.

25       THE COURT:  This is the Grant line here, isn't it?

1     THE WITNESS:  Yes, sir.

2     THE COURT:  I have put an arrow indicating the

3  direction of the Grant line and have written "Grant line"

4  on it.

5     THE WITNESS:  Now, the buildings immediately to the

6  left of the Grant line, your Honor, and to the rear of the

7  cultivated area shown in the foreground between the beach

8  and the buildings shown, are the Wire Mountain housing area

9  which is built under the Wherry Housing Act, Title 8 housing.

10  The smaller area is the enlisted housing area, and the

11  larger area in the background is the officers' housing area.

12     THE COURT:  And that corresponds with the --  Is

13  this the Wire Mountain?

14     THE WITNESS:  No, your Honor.  These are not shown

15  on the map.  They were built at a later date, '52 and '53,

16  after the map was printed.  And they would appear -- the

17  enlisted housing would be in Section 14, 11 South, 5 West,

18  your Honor.  And the officers' housing shown on Plaintiff's

19  Exhibit 89-BG appears where the words "Wire Mountain" appear

20  in Section 11, Township 11 South, 5 West.

21     THE COURT:  Both on Exhibit 89-BG?  Both the officers'

22  housing and the enlisted men's housing is largely outside

23  the watershed?

24     THE WITNESS:  They are both outside the watershed,

25  your Honor.  The enlisted housing is in the foreground on

1    89-BG and the officers' housing in the background.

2    THE COURT:  Is this the officers' housing?

3    THE WITNESS:  Yes, sir.

4    THE COURT:  Is this the enlisted?

5    THE WITNESS:  Yes, sir.

6    Q  BY MR. VEEDER:  Would you state to where his Honor

7    is referring into the record, Col. Bowen?

8    A    His Honor referred to the development described

9    as being adjoining to the Grant line on the right-hand portion

10   of Plaintiff's Exhibit 89-BG.

11   Q    And the section and the township and the range?

12   A    The enlisted housing lies in the foreground on

13   89-BG and is in Section 14, 11 South, 5 West.  The officers'

14   housing is to the rear of the enlisted housing and appears

15   in Section 11, 11 South, 5 West.

16   Q    Now, I hand you Plaintiff's Exhibit marked 89-BW

17   and referring to Plaintiff's Exhibit 89-CG I ask you to

18   locate the structures disclosed on the photograph?

19   A    89-BW, your Honor, is a vertical -- I should say

20   an oblique aerial photograph which was taken from a position

21   northwest of the airfield or landing strip which appears in

22   Sections, largely in Sections 13 and 24, 10 South, 5 West.

23   The Chappo rifle range appears in the lower right-hand

24   corner, and that is the rifle range which is shown on

25   Plaintiff's Exhibit 89-CG and marked "Rifle Range" in Section

1    23, 10 South, 5 West. Camp Santa Margarita appears in the

2    left foreground, and that is situated on the terrace forma-

3    tion in Section 14, 10 South, 5 West. And the camera was

4    pointed towards the southeast when the picture was taken.

5    So that the industrial area, 22 area, appears in the right

6    center, and that is the compound, Plaintiff's Exhibit 89-BW.

7    On Plaintiff's Exhibit 89-CG, that is the area shown south

8    of the landing strip lying largely in Sections 23 and 24,

9    10 South, 5 West. The 24 area appears a little to the left

10    of center on Plaintiff's Exhibit 89-BW and is shown on

11    Plaintiff's Exhibit 89-CG to the east of Vandegrift Boulevard

12    in Section 13, 10 South, 4 West. And the main division area

13    lying outside the watershed is shown on Plaintiff's Exhibit

14    89-BW on the high ground which is centrally located with

15    regard to the vertical distance and in the left-hand portion

16    of the photograph with respect to the horizontal dimension

17    on Plaintiff's Exhibit 89-BW. And that area is the main

18    division area which lies astride Vandegrift Boulevard in that

19    reach which runs generally north and south in Plaintiff's

20    Exhibit 89-CG.

21    Q    You referred to Plaintiff's Exhibit 100 and from

22    that alluded to the so-called areas which are involved.

23    When we use the term "area," it is the location of the

24    particular installation.

25    A    Referring to Plaintiff's Exhibit 100, your Honor,

1    the administrative areas into which the camp are divided are

2    shown with dashed lines, and the number of the area is shown

3    encircled within the perimeter of the area.  So that main

4    division area depicted in the middle distance on Plaintiff's

5    Exhibit 89-BW includes portions of area 17, 16, 15, 14, 13,

6    12, and 11, and shown on Plaintiff's --

7              THE COURT:  How many of these photographs are you

8    going to do this with?

9              MR. VEEDER:  I have five remaining ones, your Honor.

10   I feel from our standpoint this way:  Going over the record

11   and based on my examination of the data that is available,

12   it is doubtful in my mind that the record is sufficiently

13   clear as to the location of the installations as they relate

14   to the watershed.  Now, we have limited --

15             THE COURT:  You could do that very easily by just

16   preparing an exhibit in which you showed the watershed lines

17   and showed the installations that lie outside of the water-

18   shed.  Because you take Exhibit 100.  It is not particularly

19   helpful to the Court because the watershed line is not shown

20   in the exhibit.

21             MR. VEEDER:  The only reason I am referring to 100

22   is, your Honor, for the purpose of having them identified,

23   the number of the area.  I will say this:  that while I

24   certainly have no desire to go beyond your Honor's wishes, I

25   don't believe that on appeal the courts will be able to

1 locate these areas in question and --

2 THE COURT: Wouldn't the easiest way to do it would

3 be to draw an exhibit and show the installations which lie

4 outside of the watershed and on the exhibit give the name

5 that applies to them, such as Enlisted Men's Area, Officers'

6 Area; and if you want to use these numbers that you use,

7 Area 17, Area 16, show that. You would have it all there in

8 one exhibit without having to search the record to find out

9 just what part of an installation was in, what part was out.

10 MR. VEEDER: And I would also like to be permitted,

11 then, to have Col. Bowen to take each of these exhibits and

12 write on the back of them. I have no desire to take the time

13 in the record on it, but I do desire to be able to identify

14 the Exhibit 89-CG with these exhibits, particularly in line

15 with other witnesses that I am going to call.

16 Now, what we would do would be write on the back

17 of these exhibits where they are located and the general

18 area where these properties are situated. The object of it

19 would be this: The United States has spent perhaps eighty

20 to a million, eighty to a hundred million dollars in

21 connection with properties situated outside of the watershed.

22 And we believe it is extremely important that the record

23 show those properties, and so that they will be easily

24 identified in the record, and thing which is not possible

25 now.

1    THE COURT:  You do as you want to, but as far as

2   being helpful to me, and I would think the appellant court

3   would be something like this:  Now take 89-BX.  Right on the

4   face of the photograph point to the mesa area here and with

5   an arrow give it its name and say, "Entirely outside the

6   watershed."  You can't very well draw a watershed line on

7   these photographs.

8    MR. VEEDER:  Correct, your Honor.

9    THE COURT:  If you could, that would be helpful.  But

10   that would be a lot easier to look at than to have the

11   witness try to describe in detail the location, such as in

12   the right-hand corner an area of buildings running horizontal

13   with the bottom of the photograph is so and so.  With simple

14   pen lines across and with some names on them the skyline of

15   the photograph, you get the same result and a lot more

16   effective.  And then if you wanted to actually show where

17   they are in and out of the watershed --    You must have an

18   up-to-date map showing all your installations --   Put a

19   watershed line in there, and you have got it right there on

20   the nose, what is inside and what is out.

21    MR. VEEDER:  I will bother your Honor in that regard.

22   I don't think that we are stuffing the record in any degree,

23   but if we are permitted to write these things onto each of

24   the exhibits out of court, that is all I ask.

25    THE COURT:  That is satisfactory with me.  I don't

1    think there is any objection.  We can have cross-examination
2    on it.  For instance, 89-CB, in the right-hand side, that
3.   is obviously the industrial area, is it not?

4            THE WITNESS:  Yes, your Honor.

5            THE COURT:  And that is within the watershed?

6            THE WITNESS:  Yes, sir.

7            THE COURT:  And this little group of housing toward
8    the center --    What did you call that?

9            THE WITNESS:  That, your Honor, on 89-CB is the
10   barracks area for housing the troops that work primarily in
11   the industrial area.

12           THE COURT:  All right.  That is what you put there,
13   and that is within the watershed?

14           THE WITNESS:  Yes, your Honor.

15           THE COURT:  Why don't you do it that way, Mr. Veeder?

16           MR. VEEDER:  Just so the record is clear --

17           THE COURT:  When you get a record that you have to
18   read where you have to have the exhibits in front of you and
19   read the script, too, --

20           MR. VEEDER:  But, your Honor, the way I write a brief
21   there would be no question.  In any event --

22           THE COURT:  I am glad I will never see your brief on
23   appeal.  I won't have to pass on your brief on appeal.

24           MR. VEEDER:  I sincerely hope not.

25               Then, if it is permissible, we will go ahead that

1    way, your Honor.

2    THE COURT:  All right.  I would like,before you get

3    through, an exhibit up to date with the installations outside

4    of the watershed, because many of our exhibits taken at

5    different times --   Take your base map, 89-CG here, of

6    course, is of a date in the past.  And there are many in-

7    stallations that don't show on that map.  I would like to see

8    an up-to-date diagram of your installations and where the

9    watershed line runs.

10    MR. VEEDER:  With all respect, your Honor, I under-

11    took to show that one day and your Honor said, "Just put

12    them all in."  I had a witness on the stand, and I had the

13    maps.  I had the locations.  I had the utility connections

14    and --

15    THE COURT:  What exhibit was it?

16    MR. VEEDER:  The start of 102 through -- 102 through

17    117.

18    THE COURT:  They all went into evidence?

19    MR. VEEDER:  Oh, yes.

20    THE COURT:  But then you have got --

21    MR. SACHSE:  They don't show the watershed line, Mr.

22    Veeder.

23    MR. VEEDER:  I said, "This map shows the watershed."

24    MR. SACHSE:  102 through 118.

25    MR. VEEDER:  I said, "This map shows the watershed."

1   You can't do everything on a single map.

2          THE COURT:  Don't you have a base map up there that
3   shows your installations?

4          MR. VEEDER:  Yes.  Yes.

5          THE COURT:  As of now?

6          MR. VEEDER:  Yes.  It is in the record.

7          THE COURT:  Which one is it?

8          MR. VEEDER:  It is Exhibit 100, which will locate the
9   various areas.  And then on the maps which are presently --

10         THE COURT:  Let's see one.

11         MR. VEEDER:  I am showing you now my copy of 103.

12         THE COURT:  100 doesn't do it.  It doesn't have a
13  watershed line in it.  103, in part, but it doesn't have a
14  watershed line.

15         MR. VEEDER:  Your Honor, it is extremely difficult,
16  and we have undertaken it once before, to put a watershed
17  line on these major installations.  And to do so is very
18  largely a matter of guesswork.  We are down where we are
19  going to put in evidence about the millions of dollars outside
20  the watershed and inside the watershed.  Now, I will do what-
21  ever your Honor directs, but our investigation has shown that
22  these maps here have no contour lines on them; and, therefore,
23  an effort to tie them to the watershed was never satisfactory,
24  at least to me.  Therefore, we prepared 89-CG which has the
25  contours on it, and by correlating it across, as we have

1    undertaken, there would be no doubt from the record as to

2    the particular facilities that are involved.  If your Honor

3    directs, why, we can undertake a task of that nature, but I

4    believe, and we have gone into this carefully, the photographs,

5    89-CG, coupled with the 102 series through -17, are the only

6    ones where it would be possible definitely to identify the

7    areas.  For example, up in the -14 area the watershed line

8    goes through the northwest corner, I believe it is, and

9    there the balance of the buildings are outside.  Now, I

10   believe that our expenditure outside the watershed there

11   would probably be 90 per cent of the cost of that particular

12   area.

13              This is my copy, your Honor, this one over here.

14              THE COURT:  I would just like to have something a lot

15   simpler to work on.  Now, you take your Exhibit 89-CG as of

16   the date that it was made and what it shows.  It shows very

17   plainly.  You can see in a glance that your industrial area

18   is in the watershed.  You can see in a glance that your

19   Camp Delmar is.  And a housing area that lies between the

20   101 and Vandegrift Boulevard.  I wouldn't see any reason why

21   a map like this couldn't have added to it these other in-

22   stallations so you could see at a glance.  Now, these in-

23   stances where the watershed lines runs through an installation,

24   it may take a little more doing.  But at least it is obvious

25   that part is in and part is out.  In other words, as far as

1  it goes, 89-CG would be a lot more useful to me than trying

2  to get out a series of exhibits 103 to 113, or whatever it

3  was, 117, and try to study those which have no watershed lines

4  on them, try to look at the photographs, go back and read a

5  record saying, "This photograph, if you will look at the

6  shaded area," so forth and so on.

7       MR. VEEDER:  I truly am a little bit afraid that --

8       THE COURT:  What?

9       MR. VEEDER:--that perhaps I shouldn't have started

10  that sentence.

11       The point that I will make is that we will under-

12  take to prepare a composite map showing what your Honor

13  desires.

14       THE COURT:  Off the record.  Then we will take a

15  recess.

16       (Discussion off the record.)

17       THE COURT:  On the record again.

18       MR. VEEDER:  We will do that, your Honor.

19       THE COURT:  What difference does it make whether the

20  Government has put $50,000 or 50,000,000 in installations

21  outside the watershed?  If you have got a right, you have got

22  it.  If you haven't, you haven't.  The type of these buildings

23  and how fine they were built or how poorly, the extent of them,

24  doesn't seem to enter into it, in my opinion, in the legal

25  proposition.  Either you have got a right to use water outside

1    there or you haven't.  You could have spent 50,000,000 or

2    500,000,000.  If you have no right, you still have no right.

3    You may have to take other remedies.  On the other hand, you

4    could have a $50.00 shack outside there outside the water-

5    shed, and if you have a right to take water to it, you could

6    take water there.  It wouldn't make any difference how fine

7    a building it was.  I don't see how the detailed testimony

8    as to the value of these buildings enters into it.

9         MR. VEEDER:  Your Honor, we will present authorities,

10    I believe, that sustain our course.

11         THE COURT:  Take a short recess.

12         (Recess.)

13

14

15

16

17

18

19

20

21

22

23

24

25

5485

C

Z19

1          THE COURT:  Proceed.

2          MR. VEEDER:  May I be permitted to withdraw those

3     photographs for the purpose of making the designations that

4     I asked, your Honor?

5          THE COURT:  You may.

6          MR. SACHSE:  Might I suggest that it might be helpful,

7     Mr. Veeder, to all of us, if it is not too much work to do it

8     on some of the others in addition to the 89 series.

9     BY MR. VEEDER:

10         Q  I hand you, Col. Bowen, Plaintiff's Exhibit No. 88

11    marked for identification and I ask you to read into the

12    record the statement contained in the title block.

13         A  Plaintiff's Exhibit 86-A for Identification--

14         Q  Plaintiff's Exhibit 86-A, that is correct, and

15    Plaintiff's Exhibit 88, if you would read into the record the

16    title block from that identification.

17         MR. MOSKOVITZ:  Is there an 86 also that you just

18    identified?

19         MR. VEEDER: Yes, there is an 86, but this is 86-A that

20    you have.

21         THE COURT:  Yes.  The one I have is 86.  Is there any

22    difference between 86-A and 86?

23         MR. SACHSE:  I don't have an 86-A.

24         MR. VEEDER:  The mark by the Clerk is 86-A, and that

25    is correct.

C

Z20

Bowen - Direct                                    5486

1         THE COURT:  Was there an 86-B?

2         MR. VEEDER:  There is a sketch, your Honor, of the area.

3         THE COURT:  The sketch is 87.

4         Do you have anything marked as 86-A, Mr. Clerk?

5         THE CLERK:  That could be 86, and then this large

6    painting is 86.

7         MR. VEEDER:  Let us change it back to 86, then, and just

8    leave it that way.

9         THE COURT:  That painting or sketch you picked up is

10   87.

11        THE CLERK:  This is 86, your Honor, this is a photo-

12   graph, and then this is 86-B, and the one the witness has now,

13   I believe, is 86-A.

14        THE COURT:  All right, then, 86-A and 86-B.

15   BY MR. VEEDER:

16        Q  Would you state into the record the title block on

17   Plaintiff's Exhibit 86-A marked for identification, Col. Bowen?

18        A  Yes, sir.  Plaintiff's Exhibit marked 86-A for

19   Identification is entitled "Santa Margarita River Diversion

20   Dam and Spreading Basin with Lake O'Neill Control Ditch System."

21        Q  Would you state into the record what identification

22   Plaintiff's 88 constitutes?

23        A  Plaintiff's Exhibit 88 for Identification is entitled

24   "Area and Capacity Curve, Lake O'Neill.  Date March, 1957."

25        Q  What is Exhibit 86-A fromthe standpoint of what is

1    depicted on 86-A, and under whose direction was that exhibit

2    prepared?

3        A  Plaintiff's Exhibit 86-A depicts the portion of the

4    Santa Margarita River channel, the diversion structure, Lake,

5    O'Neill, the O'Neill ditch, the off-channel spreading area,

6    all as determined by plane table survey made under my super-

7    vision and direction in 1957.

8        Q  And are the matters depicted on that illustration

9    correct, to your personal knowledge?

10        A  They were correct as of the date shown on the title

11    block, Mr. Veeder-- 15 November, 1957.

12        MR. VEEDER:  We offer in evidence--

13        THE COURT:  First, what are these areas up above with

14    the little dash lines to the side of them?

15        THE WITNESS:  Those are levees, your Honor, referring

16    to Plaintiff's Exhibit 86-A for Identification, the off-

17    channel spreading system shown lying east of the Santa

18    Margarita River, which is at the top of the map, and west of

19    the hospital area which is shown by the road network lying

20    west of Lake O'Neill shown at the bottom of the map is an

21    off channel.

22        THE COURT:  East of Lake O'Neill?

23        THE WITNESS:  The hospital area, your Honor, lies west

24    of Lake O'Neill.  North is at the right hand.

25        THE COURT:  Pardon me.

1      THE WITNESS:  That area shown with the hachures marked

2  the "Levees", which includes the off-channel spreading areas,

3  your Honor, to which water is diverted and placed underground,

4  and the Levee system continues off to the upper left-hand

5  corner of the map east of the Santa Margarita River.

6      MR. SACHSE:  May I inquire another question or two about

7  what this is.

8      Col. Bowen, at the extreme left-hand side of Lake

9  O'Neill it says "Gaging Station."  Is that gaging station tied

10  in in any way to the ones that have been previously testified

11  to here?

12      THE WITNESS:  No, sir.  That is a staff gage maintained

13  there to determine the level of water in the lake.

14      MR. SACHSE:  Where is the gage that is referred to as

15  the O'Neill Diversion Gage in our earlier testimony?  I don't

16  find that on this exhibit.

17      A   That gaging station, Mr. Sachse, is located on the

18  right-hand side of the map, referring to Plaintiff's Exhibit

19  86-A for Identification, and marked "Parshall Flume."  You

20  will note two Parshall Flumes, and the downstream or left one

21  of the two is the station used for gaging the diversion at

22  O'Neill ditch.

23      MR. SACHSE:  That is all.

24      MR. VEEDER:  We renew the offer, your Honor.

25      THE COURT:  Received in evidence.

Bowen    Direct

Z23

X86-A

1        (Plaintiff's Exhibit 86-A was received in evidence.)

2     BY MR. VEEDER:

3        Q   Now, would you explain into the record the facts

4     depicted upon Plaintiff's Exhibit marked 88 for Identification.

5        A   Yes, sir.   On Plaintiff's Exhibit 88 for Identifica-

6     tion the left-hand side indicates both the gage height and

7     the elevation in feet above mean sea level, and this refers to

8     the gaging station on Lake O'Neill near the outlet structure

9     on the left-hand corner of Lake O'Neill as it appears on

10    Plaintiff's Exhibit 86-A for Identification.   The figures

11    across the top of the area capacity curve, Plaintiff's Exhibit

12    88 for Identification, indicate the area of the lake and the

13    figures across the bottom of Plaintiff's Exhibit 88 for Iden-

14    tification indicate the capacity in acre feet.   So for any

15    given gage height, for example, take gage height 13, which

16    would appear in the upper left-hand corner of Plaintiff's

17    Exhibit 88, go across to the curve marked "Area curve," which

18    is the first curve encountered going in a horizontal direction

19    to the right of the gage height 13, and then traveling vertically

20    from the point of the intersection of the 13 horizontal line

21    with the area curve, the area can be read as 123 acres on the

22    upper scale.   Conversely, for capacity, travel on gage height

23    13 horizontally across to the capacity curve, which is labeled

24    such and is the right-hand portion of the curve in the upper

25    portion of Plaintiff's Exhibit 88, to the intersection of the

gage height line 13 with the capacity curve, and then drop vertically down and read 1170 acre feet. So given either the capacity, the area or the gage height, it is possible to determine any of the other factors from this chart, that being Plaintiff's Exhibit 88.

BY MR. VEEDER:

Q  And is the plaintiff's exhibit marked 88 for Identification accurate, to your personal knowledge, Col. Bowen?

A  Yes, sir.  This curve was based on surveys made in 1957 under my supervision and direction.

MR. VEEDER:  We offer in evidence Plaintiff's Exhibit 88 marked for Identification, your Honor.

THE COURT:  It is received in evidence.

(Plaintiff's Exhibit No. 88 was received in evidence.)

BY MR. VEEDER:

Q  From the standpoint of the capacity, what did your investigation reveal in regard to Lake O'Neill as related to the time when the structure was completed to its present size?

MR. SACHSE:  I didn't hear the latterpart of the question.

MR. VEEDER:  As relates to the size of the structure as it was originally constructed.

MR. SACHSE:  I object on the ground there is no foundation that Col. Bowen knows anything about the original structure of Lake O'Neill.

MR. VEEDER:  I will change the question.

Q  From your observation, what was the condition of the Lake O'Neill from the standpoint of its capacity, based upon the height of the dam and the crest of the spillway as it is now constructed?

A  I don't believe I follow you, Mr. Veeder.

THE COURT:  What is the present capacity of Lake O'Neill?

MR. VEEDER:  As it relates to height of the crest of the spillway and the height of the dam?  I can't ask a leading question.

THE WITNESS:  The maximum capacity of Lake O'Neill at the present time is revealed by referring to Plaintiff's Exhibit 88.  The upper left-hand corner shows spillway crest, being gage height 13.70.  And traveling across to the intersection of that point with the capacity curve and dropping down vertically it is noted that the present capacity up to the spillway level is a little over 1210 acre feet.

BY MR. VEEDER:

Q  I hand you plaintiff's exhibit marked 86 for identification and ask you to state into the record what is depicted on that exhibit.

THE COURT:  Plaintiff's Exhibit 86 or 86B?

MR. VEEDER:  This is Plaintiff's 86, your Honor.

THE WITNESS:  Plaintiff's Exhibit 86 is a photographic

C2

Z26

X86

view of Lake O'Neill, shown in the right middle distance of the photograph, the hospital shown a little to the right of center of the photograph, the off-channel spreading area shown to the left of the hospital-- that would be left of center in the photograph, the Santa Margarita River is marked by the trees and the break in topography running generally horizontally across the photograph, to the rear of the off-channel spreading area and the hospital.

MR. VEEDER: We offer in evidence plaintiff's exhibit marked 86 for Identification, your Honor.

THE COURT: Plaintiff's Exhibit 86, the photograph, received in evidence.

(Plaintiff's Exhibit No. 86 was received in evidence.)

BY MR. VEEDER:

Q Will you state into the record the method of operating the O'Neill diversion ditch and Lake O'Neill since you have assumed your responsibilities at Camp Pendleton, Col. Bowen?

A Water is discharged from Lake O'Neill in the fall of the year through the control gate shown on Plaintiff's Exhibit 86-A, and on the southerly abutment of the Lake O'Neill Dam. That control gate is further marked by elevation shown 108.2 on Plaintiff's Exhibit 86-A. That gate is manually operated and can be so controled as to regulate the volume of discharge from the lake. Normally water is released from the lake in fairly small amounts to assist in its return to and

1    recharging the ground water basin, both of the upper sub-

2    basin and of the Chappo subbasin.

3        THE COURT:  Where does it go after it is released from

4    that gate?

5        THE WITNESS:  After it is released from that gate, your

6    Honor, it goes down the drainage ditch marked on Plaintiff's

7    Exhibit 86-A as the Lake O'Neill control ditch, which is a

8    dash-three-dot line running off to the southwest to its con-

9    fluence with the Santa Margarita River in the extreme upper

10   left-hand corner or just off the upper left-hand corner of

11   Plaintiff's Exhibit 86-A.

12       THE COURT:  It does not go to the spreading grounds

13   from that release point?

14       THE WITNESS:  No, sir, not to the off-channel spreading

15   area, your Honor, as shown on this map.  We do have our

16   channel spreading structures further downstream, however.

17   BY MR. VEEDER:

18       Q  Would you state the sources of water for Lake O'Neill,

19   Col. Bowen?

20       A  The primary source of water for refilling Lake

21   O'Neill is surface runoff in the Santa Margarita River.

22       Q  During what period of the year is that usually taken,

23   Colonel, since your arrival there?

24       A  Well, the only period of the year when surface water

25   is available is during the winter season, generally considered

1    to run from November through March of each year; but the

2    surface runoff rarely gets down to our point of diversion

3    until January or February.

4          THE COURT:  I don't understand that.  Surface water

5    doesn't get down to your point of diversion until January or

6    February?

7          THE WITNESS:  That is correct, sir, in my period of

8    experience with this operation.

9          THE COURT:  You haven't had rains that were heavy

10   enough to bring surface water down until that late in the

11   season?

12         THE WITNESS:  That is right, your Honor.  The early

13   rains are largely soaked into the ground, and have resulted

14   in no or little runoff.

15   BY MR. VEEDER:

16         Q What are your other sources of water for Lake O'Neill,

17   Col. Bowen?

18         A  Well, the Fallbrook Creek, which arises up in the

19   vicinity of the town of Fallbrook-- as a matter of fact, the

20   town of Fallbrook is in the upper watershed of Fallbrook Creek--

21   that drainage area drains directly into Lake O'Neill, and

22   there is some drainage from other small adjacent upland areas,

23   and in addition to that there is sewage effluent discharged

24   into Lake O'Neill from Sewage Treatment Plant No. 2.

25         Q  What utilization is made of Lake O'Neill?

C2

Z29

1      A   Well, Lake O'Neill is the only sizeable body of

2   still water available for training the Marine Engineers in

3   building of bridges over water surfaces.   So we have a Bridge

4   Platoon which is stationed on this point of land which pro-

5   jects out into the lake at the bottom of Plaintiff's Exhibit

6   86-A.   Their temporary bridge building equipment is stockpiled

7   there and they receive training in bridging these arms of the

8   lake.

9      Q   What other uses are made of Lake O'Neill, Col.

10  Bowen?

11     A   Recreational uses are made of the lake. Between the

12  Atchison, Topeka & Santa Fe Railroad line, shown in the lower

13  left-hand corner of Plaintiff's Exhibit 86-A, and the margin

14  of Lake O'Neill, there is a recreational area devoted to

15  recreational use by Marines, sailors and their dependents and

16  guests.   There are small boats available at that point for

17  use on the lake.   There is also fresh-water fishing in the lake.

18     MR. VEEDER:   You may cross-examine.

19

20                       CROSS-EXAMINATION

21  BY MR. SACHSE:

22     Q   While we have this exhibit before us, Col. Bowen,

23  I want to ask you about the operation of Lake O'Neill and the

24  ditch bringing the water into it.   When the surface flow of

25  the Santa Margarita River is first high enough to provide a

Bowen                    Cross                         5496

C2

Z30

1    head behind your control dam, who decides when you open the

2    O'Neill diversion?

3         A   The decision is, by and large, mine, Mr. Sachse.

4         Q   And having made it, I presume that you open the

5    control gate that shows at the extreme right of Exhibit 86-A

6    at the dam; is that correct?

7         A   Yes, sir.

8         Q   And what is the firstParshall flume indicated

9    proceeding down channel?

10        A   The first Parshall flume proceeding down channel on

11   O'Neill ditch, as shown on Plaintiff's Exhibit 86-A, is a five-

12   foot Parshall flume which was just completed, I believe it was,

13   in the fall of 1957.

14        THE COURT:   What is a Parshall flume?  Is it named after

15   the man?

16        THE WITNESS:   That is named after the man who designed

17   it, your Honor, a hydraulic engineer in Colorado named

18   Parshall.

19        THE COURT:   Is it an open flume?

20        THE WITNESS:   Yes, sir.  It has the principles of the

21   Venturi tube.  It has a constriction in the flume and it

22   gives a hydraulic jump to the water which makes it possible

23   to make a more accurate measurement of water flowing through

24   it.

25   BY MR. SACHSE:

          Q   Is that first Parshall flume used to make any

Bowen     Cross                                                                5497

C2

Z31

1    measurements of ditch flow?

2        A   Yes, sir.  I made measurements of stream flow in that

3    upper Parshall flume last winter.

4        Q   And you say it was put in the fall of last year?

5        A   Yes, sir.

6        Q   Are those measurements simply Marine measurements or

7    are they connected with the official U.S.G.S. measurements of

8    the diversion?

9        A   Those measurements are for our own records and have

10   no connection with the official U.S.G.S. records.

11       Q   And those official U.S.G.S. records are based on a

12   second flume downstream; is that correct?

13       A   Yes, sir.

14       Q   Going back to the first one immediately below, I

15   see the control gate.  What does that control?

16       A   The ranch built some flood control structures at this

17   point long before the Government acquired the property.  Those

18   flood control structures show up on the 1929 photographs,

19   which are in evidence, or at least that mosaic plaintiff's

20   exhibit which is in evidence, and actually we made use of some

21   of those old levees to enclose these off-channel spreading

22   basins, particularly that westerly leveee shown there on the

23   same line as the control gate you are speaking about, and the

24   control gate was put in there as part of the flood control

25   system.  Stop logs can be dropped in that in the event the

1  river reaches flood stage to keep it from washing on down and

2  making an end run, so to speak, around the flood control levees.

3      Q  The division box immediately downstream ties into a

4  72-inch culvert.  Is that a means of diverting water into the

5  spreading basins?

6      A  Yes, sir.

7      Q  In other words, it is entirely possible to divert

8  water from the Santa Margarita River into the spreading basin

9  before it reaches the O'Neill Lake gage; is that correct?

10     A  Yes, sir.

11     Q  Is it ever done?

12     A  Yes, sir.

13     Q  So the O'Neill ditch gage figures that have been

14  introduced in evidence in this proceeding, then, are not

15  accurate as to the water diverted from the river?

16     A  They don't reflect all of the surface water diverted

17  at the dam here, Mr. Sachse.

18     Q  Do you have any way of knowing or estimating how

19  much additional water was diverted from the river through the

20  O'Neill diversion that does not show up on the U.S.G.S. figures?

21     A  I have estimates, Mr. Sachse.  We don't have a

22  recorder on the upper Parshall flume, and the estimates are

23  based on periodic measurements of the gages on that flume.

24     Q  Now, having assumed that that division box is open,

25  I have just referred to, on the 72-inch culvert, it would be

C2

Z33

Bowen   Cross

1    possible to divert water to fill all of the indicated spreading

2    basins on the right half of the map without the water being

3    gaged, would it not?

4         MR. VEEDER:  You mean measured?

5         THE WITNESS:  Yes, sir.  Any water diverted into the

6    off-channel spreading area is diverted before it reaches the

7    recorder on the lower flume.

8    BY MR. SACHSE:

9         Q  Is that true of the whole area?  I don't notice any

10   outlet culvert from the right-hand block of levees.  Do you

11   follow me?  Are they connected to the left-hand group, in

12   other words?  Having spilled water through the 72-inch, the

13   spreading area to the extreme right, it could flow from that

14   through a 24-inch into the area next to it; is that correct?

15        A  Three 24-inch culverts.

16        Q  Then it could flow through a 30 into the area next

17   to that?

18        A  Yes.

19        Q  Is there a culvert line indicated or means by which

20   it gets out of that area ever indicated?

21        A  There is a culvert.  As of the date of this survey

22   it was not installed as of this time.

23        Q  I wonder if you could indicate whereabouts it is on

24   the exhibit.

25

D-1 ML

1      THE WITNESS:  With a red pencil on Plaintiff's Exhibit

2   86-A I am indicating the approximate location of a culvert

3   in the third spreading basin from the inlet or division box.

4   And I am not absolutely certain of the size of that culvert,

5   but I believe it is also one 36-inch culvert, Mr. Sachse.

6      Q   BY MR. SACHSE:  Now, having spilled through that

7   culvert which you have indicated, where would the water go?

8      A   The water continues flowing on down the spreading

9   area being intercepted by other levees which are below it.

10      Q   In other words, Col. Bowen, this Exhibit 86-A,

11   of course, does not show ground contours?

12      A   No, sir.

13      Q   Is there high ground between this spreading area

14   and the river, higher ground?

15      A   No, sir.  The general slope of the valley floor

16   at this point is southerly from the spreading basins, the

17   upper three spreading basins.

18      Q   But having spilled through the 36-inch culvert

19   you just drew, the water would not find its way directly to

20   the Santa Margarita River to the west but would work its way

21   down through the more southerly spreading basins; is that

22   right?

23      A   Yes, sir.

24      Q   You stated a moment ago that you have estimates

25   of the amount of water actually diverted from the Santa

Margarita River; am I correct?

A     Into the **off**-channel spreading area?

Q     Yes, as distinct from the water gaged at the O'Neill gage.  You said you had such estimates?

A     Yes, sir.

Q     I wonder if you could produce those for us, Col. Bowen, for as long a period of time as you have them?

A     My estimate is only for the gross period of stream flow.  We began this **off**-channel spreading system in water year '56-'57.  And during that period of runoff in that year approximately 900 acre-feet were discharged into the **off**-channel spreading area.  And during the runoff period of '57-'58, approximately 2400 acre-feet of water were discharged from the O'Neill ditch into the **off**-channel spreading area.

Q     Would those figures you have just given us be discharges before the water had reached the O'Neill ditch gage?

A     No, they are discharges made into the **off**-channel spreading area and the division box which is upstream from the recorder, stream gage recorder on O'Neill ditch.

Q     In other words, to determine the total diversions by you from the Santa Margarita River at the O'Neill ditch diversion, it would be necessary to total the figures you have just given me -- 900 acre-feet in '56-'57 and 2400 in '57-'58 -- with the U.S.G.S. figures for discharge into Lake

O'Neill; is that right?

A    Yes, sir.  You would add those to the recorded figures made by U.S.G.S. in order to get the total diversion.

Q    From the stream?

A    From the stream.

Q    Now, you stated, I believe, if my notes are correct, that this system of levees continues on off the map to the left for a short distance before they finally end, is that right?

A    No, sir.  In response to his Honor's question I pointed out that the outlet **ditch** carrying discharge from Lake O'Neill joins the Santa Margarita River on that dash-three-dot alignment just off of the upper left-hand corner of the Plaintiff's Exhibit 86-A.

Q    But then, this Exhibit 86-A does indicate all of the spreading basins located off-channel in this general area?

A    Yes, sir.

Q    Now, you stated that there are other on-channel spreading works downstream.  I believe I have observed some of those in company with you.  They are, generally speaking, low-**ea**rth dams running across the whole flood channel of the river, is that right?

A    Yes, sir.

Q    And they trap winter water and hold it there until

1  it spills over the top and goes on down to the next one?

2      A    Yes, sir.  We have an earthen spillway around

3  each of them so we hope the water doesn't spill over the top.

4      Q    When you get a really good rain it takes a lot

5  sometimes?

6      A    Yes, sir.

7      Q    Have you any calculation of the number of surface

8  acres in the spreading areas delineated on 86-A when they are

9  all full of water?

10     A    There has been some additional construction since

11 Plaintiff's Exhibit 86-A was prepared.  The area of the

12 three basins shown, the three upper **off**-channel basins shown

13 on 86-A, is approximately 30 acres.

14     THE COURT:  The question was:  When they are full.

15 Have you ever seen them all full of water?

16     THE WITNESS:  Yes, sir.  I have seen those three

17 basins, three upper basins on 86-A, all full of water.

18     Q  BY MR. SACHSE:  What about the other area; have you

19 any estimate of that?

20     A    You mean the remainder of the area which shows

21 levee construction, Mr. Sachse, on 86-A?  The remaining

22 surface area of the spreading basins **off**-channel --

23     THE COURT:  Well, the balance aren't basins.  The

24 right-hand side of the picture, there are basins shown; but

25 the left-hand side, they are dams with openings in them which

1    impede water and divert its flow, but they are not basins.

2         Q   BY MR. SACHSE:   Is it not a fact, Col. Bowen, that

3    the structures to the left-hand side of Exhibit 86-A also

4    serve to impound water because of the natural contour of

5    the land; although they are not completely enclosed, water

6    does pile up behind them, does it not?

7         A   Yes, sir.  That was my design when I laid this

8    out, to have those levees approximately on the contour.

9         Q   Now, when they are filled, what is the total

10   surface area flooded?

11        A   Well, the ultimate design for off-channel spread-

12   ing structures in this area is about the only figure I

13   could give, Mr. Sachse, because these on-contour or approximate

14   contour levees shown in the left-hand portion of 86-A have

15   never been filled yet.

16        MR. VEEDER:  If you don't know the answer, Colonel,

17   I would simply observe so.

18        MR. SACHSE:  I didn't hear what you said.

19        MR. VEEDER:  I simply say --  He says he doesn't

20   know the answer.

21        MR. SACHSE:  He doesn't know the answer.

22        Q   Could you tell me, then, what, if they are all

23   filled, your designer capacity called for as the surface

24   area?

25        A   Designed to cover an area of about 150 acres.

1    Q    That would include the 30 or 150?

2    A    Yes, sir.

3    Q    The total would be 150?

4    A    Yes, sir.

5    Q    Did you calculate in your basin design how many

6  acre-feet, assuming they were all filled, would be impounded

7  in the structures?

8    A    You mean on the surface, Mr. Sachse?

9    Q    Acre-feet considering the depth of the structures

10 and assuming to fill them up, how many acre-feet of water?

11   A    Would be impounded on the surface of the valley,

12 on the floor of the valley ground?

13   Q    Yes; disregarding percolation for a moment.

14   A    I haven't made those calculations, because my

15 original design was for generally on-contour levees, low

16 elevation, which would keep the water levels very low.  But

17 subsequent modifications brought about the construction of

18 rather substantial levees and enclosed basins which would

19 impound, oh, several feet of water.  It would vary, say,

20 from five or six  feet in the lower corner of each basin to

21 perhaps two or three in the upper corner of the basin.

22   Q    You have no estimate you care to make, then, of

23 capacity?

24   A    No, sir.

25   Q    During the past winter you testified that 2400

1   acre-feet, approximately, according to your estimate, would

2   have diverted through the division box into the spreading

3   basins.  Now, that is over the whole winter, I assume?

4        A   Yes, sir, that is for the season.

5        Q   And yet at no time last winter were all of these

6   basins filled, at no single time?

7        A   Oh, the three basins were filled, Mr. Sachse.

8        Q   I mean, the whole off-channel spreading operation;

9   at no time during the last winter was the whole thing filled?

10       A   No, sir.

11       Q   So during the last winter is it your estimate

12  that you succeeded in putting underground in these off-

13  channel spreading works, how much water?

14       A   Well, we put underground everything we diverted

15  into them, Mr. Sachse.

16       Q   Minus a slight evaporation loss, I suppose?

17       A   Yes, sir.

18       Q   I think I have just one more question which might

19  be good before lunch.

20            Is there any other division box or control gate

21  by which you can put water into the spreading works from

22  Lake O'Neill?

23       A   No, sir.

24       Q   In other words, all the water that goes into the

25  spreading works has to be taken from the O'Neill ditch before

1    it reaches Lake O'Neill?

2         A    Yes, sir.

3         Q    And the O'Neill discharge through the control

4    ditch or the spillway ditch goes straight to the Santa

5    Margarita River?

6         A    That which doesn't percolate into the alluvium.

7         Q    Through the control ditch itself?

8         A    Yes, sir.

9    MR. SACHSE:   Could we recess now, then, your Honor?

10   THE COURT:   Yes.   Recess until 2:00 o'clock.

11        (Whereupon a recess was had at 12:00 o'clock noon

12   until 2:00 o'clock p.m. of the same day.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   SAN DIEGO, CALIFORNIA, TUESDAY, NOVEMBER 25, 1958.   2:00 P. M.

2

3          (Other matters.)

4          THE CLERK:   The case on trial, 1-1247-SD-C, United

5   States vs. Fallbrook.

6

7                    ALLEN C. BOWEN,

8   recalled as a witness in behalf of the plaintiff, having been

9   previously sworn, testified as follows:

10

11                 CROSS-EXAMINATION (Resumed)

12  BY MR. SACHSE:

13         Q  Col. Bowen, before the noon recess you gave me two

14  figures of your estimates of water diverted into the storage

15  basins, 900 acre feet in 1956-57, and 2400 acre feet in 1957-58.

16  Are those years calendar years, or were you using the water

17  year period also?

18         THE COURT:   What were the figures?   Was that before the

19  recess?

20         MR. SACHSE:   Yes, your Honor.

21         Q  Correct me if I am wrong, Colonel.   Did you not

22  estimate that during 1956-57, 900 acre feet were diverted into

23  this off-channel surface storage that did not pass through the

24  O'Neill gage?

25         A  That was the amount diverted into the off-channel

Bowen      Cross

spreading area, Mr. Sachse, in the water year 1956-57.

Q   The water year 1956-57?

A   Yes.

Q   And the second figure was for the water year 1957-58, 2400 acre feet?

A   Yes, sir.

Q   And both those figures did not pass through the O'Neill ditch gage?

A   That is correct.

Q   Just one or two more questions about Lake O'Neill. Exhibit 86-A does not show the confluence of Fallbrook Creek drainage with the lake.  At what part of the lake does that come in?

THE COURT:  Just a moment.

(An interruption while the Court takes up a criminal matter.)

THE WITNESS:  Mr. Sachse, in response to your question, by referring to, for example, Plaintiff's Exhibit 94, it is noted that Fallbrook Creek depicted on that exhibit enters Lake O'Neill near the northerly end approximately in the center of Section 5, 10 South, 4 West.  On Plaintiff's Exhibit 86-A that confluence would be approximately on the right-hand portion of the lake, that portion in the lower right-hand corner of 86-A, or the northerly portion of the lake near the intersection of the hospital boundary shown on 86-A with the

Bowen      Cross      5510

E

Z36

1    perimeter of Lake O'Neill.

2        Q   The discharge from Sewage Plant 2, does that drain

3    down Fallbrook Creek?

4        A   No, sir.

5        Q   But Fallbrook Creek also receives the discharge

6    from the NAD sewage plant, does it not?

7        A   Yes, sir.

8        Q   You know, do you not, that it also receives the

9    discharge from the Fallbrook Sanitary District sewage plant?

10       A   Yes, sir.

11       Q   You testified on direct examination that there were

12   other spreading areas downstream on the Santa Margarita River,

13   all of them, however, being what you referred to as in-channel

14   as distinct from off-channel?  What is the distinction between

15   the spreading areas such as are depicted on 86-A off-channel

16   and the ones that you referred to as in-channel spreading areas?

17       A   Well, the off-channel spreading areas, as depicted

18   on Plaintiff's Exhibit 86-A, are situated on lands adjoining

19   to but not including the river channel and water must be

20   diverted from the channel into this off-channel spreading area.

21   Whereas, the on-channel spreading structures further down-

22   stream on the Santa Margarita River are earthen dams or dikes

23   which cross the actual channel of the river and impound water

24   within that channel.

25       Q   How many such structures are there in the river at

1    the present time?

2         A   You mean actually operative, Mr. Sachse, or--

3         Q   I don't think there is any water behind them, but

4    how many physical structures are there across the river

5    waiting for the water to come down?

6         A   We originally put seven in there, but I don't believe

7    all of them have been restored from some damage that occurred

8    this last winter.

9         Q   Let me show you the photograph to which I refer,

10   Colonel.   It is Exhibit 93-- beg your pardon.

11        MR. VEEDER:   That is a 1955 flight?

12        MR. SACHSE:   Yes (handing document to the witness).

13        Q   I will direct your attention to the photograph,

14   Plaintiff's Exhibit 93-L, and immediately upstream from the

15   southern match line on the photograph I see a shallow horse-

16   shoe shaped structure with sort of a comb effect on it, a

17   heavy black line with little teeth on it; is that a spreading

18   structure?

19        A   Yes.

20        MR. SACHSE:   Let me indicate it, your Honor.

21        THE WITNESS:   That is one of the on-channel spreading

22   structures, one indicated by this symbol indicating a low

23   dam on Plaintiff's Exhibit 93-L.

24   BY MR. SACHSE:

25        Q   On that photograph taken in March, 1955, can you

E

Z38

Bowen    Cross

1   identify any water impounded behind it from the colors or

2   shading?

3        A  Yes, sir.  Your Honor, the area in darker gray

4   adjoining the easterly abutment of the spreading structure and

5   irregular in character upstream lying below the soil symbol

6   and land classification symbol number VIII is water surface.

7        Q  Are there any more such structures shown on this

8   particular photograph?

9        A  Yes, sir.  Below the match lines there are structures

10  shown on the photograph but not symbolized with the dam symbol.

11       Q  I will direct your attention to Exhibit 93-M.  I

12  believe I see two or three more such structures.  Will you

13  point them out?

14       A  Yes, sir, your Honor.  On Plaintiff's Exhibit 93-M,

15  just below the top match line, is a symbol crossing the river

16  channel indicating earth dam.  That is one of our channel

17  spreading structures.

18       THE COURT:  Is there water behind it, too?

19       THE WITNESS:  Yes, sir, there is water behind it, your

20  Honor.

21       Similarly, on downstream about two-thirds of the way

22  below the top match line is another symbol indicating an earth

23  dam, which is one of our on-channel spreading structures, and

24  it appears as though there may be a small amount of water

25  behind that dam.  And then immediately above the southern match

E

Z39

Bowen   Cross   5513

1   line on Plaintiff's Exhibit 93-M is a V-shaped symbol, which

2   also indicates an earth-filled dam and the area upstream from

3   that dam appears to be devoid of water.  This one north of

4   the match line area on 93-M is the spreading structure symbol-

5   ized on Plaintiff's Exhibit 93-L.

6        MR. VEEDER:  Concerning which you have previously

7   testified.

8        THE WITNESS:  Concerning which I previously testified.

9        THE COURT:  What about downstream?

10        THE WITNESS:  Yes, sir, there are.

11        MR. SACHSE:  The next photograph will show those, your

12   Honor.  Can we go to the next photograph, 93-N.

13        Q  The next photograph downstream from M, is it not?

14        A  Yes.

15        Q  Point out, continue on downstream and show us the

16   spreading structures.

17        A  On Exhibit 93-N it has a symbol indicating an earth-

18   filled structure astride the river approximately an inch and a

19   half below the top match line below the word "Margarita" along

20   the stream.

21        THE COURT:  That is the second one you are talking about

22   now?

23        THE WITNESS:  Yes, sir.  There is another symbol

24   indicating an on-channel spreading structure, and that is the

25   furthest downstream, your Honor.

5514

E

Z40

BY MR. SACHSE:

Q   Would you examine, please, 93-R.  I indicate to you a structure, the top one-third of the match line portion of the photograph across the bed of the stream, just below the word "River;" do you see the one to which I refer?

A   Yes, sir.

Q   What is that?

A   That is the O'Neill diversion dam, your Honor, which is indicated on Plaintiff's Exhibit 86-A in the right-hand portion of the map and designated "Diversion Dam."

Q   And behind that likewise, Colonel, does the darker shading in the photograph indicate water impounded at that time?

A   Yes, sir.

Q   And all these photos were in March of 1955?

A   I believe that is correct.

Q   Colonel, is there any systematic numbering system of those structures upstream or downstream which are used in referring to them?

A   Yes, sir.  I have numbered them 1 through 7, beginning downstream.  No. 7 is now used as a road over to the Chappo Flats rifle range, and I didn't call that one to his Honor's attention.

THE COURT:  A minute ago you said there had been seven structures across the stream, but I was under the impression

1    that those seven were downstream from the map Exhibit 86-A.

2    That is not correct, then?  There are seven structures alto-

3    gether on the stream, both upstream and downstream?

4            THE WITNESS:  There are eight, your Honor, if the

5    O'Neill diversion dam is counted as a spreading structure.

6    I didn't include that as an on-channel spreading structure,

7    but it does serve in that capacity and could be called that.

8    BY MR. SACHSE:

9        Q  But all of the others are downstream from the O'Neill

10   ditch diversion?

11       A  Yes, sir.

12       Q  Do you know the surface area of those several struc-

13   tures?

14           MR. VEEDER:  Surface area of the several structures?

15           MR. SACHSE:  Thank you, Mr. Veeder.

16       Q  Do you know the surface area that can be flooded

17   behind the several structures?

18       A  If I may refer to my notes, your Honor.

19       Q  If it would help you, Col. Bowen, I will direct your

20   attention to Exhibit M-DE from the Master's hearing, at which

21   you made certain calculations.  I don't know whether they

22   exactly meet my question.

23       A  Yes, sir, I have observed the exhibit.

24       Q  Are those figures on M-DE correct?

25       A  Yes, sir, they are approximately correct.

E2

Z42

1    Q  They do not include the O'Neill creek diversion.

2  What would be the surface acreage for that?  I beg your pardon.

3  I see it is differently here, is that correct?

4    A  Yes, sir.

5    THE COURT:  You were referring on this exhibit before

6  the Master M-DE to a figure "Off-channel spreading basin 37

7  acres"?

8    MR. SACHSE:  Yes, that is one figure.  Perhaps we had

9  better do them as we go along.

10    THE COURT:  I see them here.  Spreading dams 1 through

11  6.

12    MR. SACHSE:  And the second figure from the top is the

13  O'Neill ditch diversion.

14    THE COURT:  Is that figure for O'Neill ditch diversion

15  the acres covered by the ditch or is it the acres that water

16  would cover lying behind the O'Neill dam?

17    THE WITNESS:  That figure is 17 acres, your Honor,

18  indicates the area upstream from the dam that would be covered

19  by water at spillway level.

20    THE COURT:  Is that true also with spreading dams 1, 2,

21  3, 4, 5 and 6?

22    THE WITNESS:  Yes, sir.

23    THE COURT:  One, 1 acre; two, 6 acres; three, 19 acres;

24  four, 2 acres; five, 8 acres; and six, 9 acres?

25    THE WITNESS:  Yes, sir.

E2

Z43

1    MR. SACHSE:  Perhaps I should inquire now, your Honor,

2  as to what your desire is and Mr. Veeder's may be, for the

3  record, when we choose to refer again to these maps as exhibits.

4  Shall we use the same numbers?  I am going to have other

5  questions of Col. Bowen and probably of other witnesses on

6  this same exhibit.

7    THE COURT:  You can incorporate it by reference.

8    MR. SACHSE:  I think it is in the record already.  But

9  I am curious whether we need any additional designation.  I

10  am assuming that testimony before the Master is before his

11  Honor.

12    THE COURT:  You don't need any additional designation.

13  It is Master's Exhibit number so and so.

14    MR. SACHSE:  Leave it the way it is?

15    THE COURT:  Yes.

16    MR. VEEDER:  As I understand it, these matters before

17  the Master are still subject to review before your Honor.  So

18  I wouldn't go so far as to say they are presently in the

19  record.

20    MR. SACHSE:  They are in the record regardless of how

21  much they may be subject to review, Mr. Veeder.  At least that

22  is my understanding.

23    MR. VEEDER:  That is not mine.

24    MR. SACHSE:  May I get that straight, your Honor.  If

25  they are not in the record, I want it in.

E2

Z44

1    MR. VEEDER:  I think the Special Master's proceeding

2  is something separate from this hearing.  That's the point.

3         MR. SACHSE:  They are in the record, however.

4         MR. VEEDER:  They are in the Master's record.

5         MR. SACHSE:  Your Honor, I will offer M-DE.

6         THE COURT:  I read the figures into the record for you.

7         MR. VEEDER:  I don't know what he wants.

8         MR. SACHSE:  I will ask that it be marked for identifi-

9  cation for further cross-examination.  I think this is

10  ridiculous.  This material has been introduced in evidence and

11  I believe we have a perfect right to use it to examine the

12  Government's witnesses.

13         MR. VEEDER:  I haven't said that you can't.

14         MR. SACHSE: And he can rebut it.

15         MR. VEEDER:  I said so far as I am concerned those

16  matters that were before the Master are not presently in the

17  record here.  I have made no objection to your cross-examina-

18  tion.

19         THE COURT:  Can't we just let the record show that

20  Exhibit M-DE before the Special Master is now before this

21  Court for consideration?

22         MR. VEEDER: I have no objection.  He is examining from

23  it.

24         THE COURT:  Go ahead.

25

E2

Z45

BY MR. SACHSE:

 Q Who prepared Exhibit M-DE, Col. Bowen?

 A That was prepared by my office, Mr. Sachse.

 Q Are you familiar offhand with the runoff figures for Ysidora, Fallbrook and De Luz Creek gages for March, 1955?

 MR. VEEDER: I object on the ground that it is beyond the scope of the direct examination. We carefully avoided this phase of the evidence with Col. Bowen and I object to his pursuing this any further.

 MR. SACHSE: If your Honor please, over my previous strenuous objections, the Government has introduced a lot of photographs which I contend contain a great deal of irrelevant material. Some of the material that I think is extremely irrelevant is the fact that there happens to be water impounded behind the structures in one of the driest runoff months.

 MR. VEEDER: That is sewage effluent. What do you suppose it was?

 MR. SACHSE: I will be happy to ask Col. Bowen if it is sewage effluent.

 MR. VEEDER: I object on the grounds that I am going to recall Col. Bowen to go into this whole phase of the matter in another aspect of the case. We deliberately limited this matter to the scope of the direct examination down to this time with this witness.

 THE COURT: Mr. Sachse, can't you let us conclude these

1    other matters and go into this later?

2        MR. SACHSE:  Yes, I can do that, your Honor.

3        THE COURT:  All right.

4        MR. SACHSE:  I will go into some other questions.

5        Q  Col. Bowen, now I am going to direct your attention

6    to Exhibit 94 and some questions about that.  First, generally

7    speaking, as I understand it, all of the Class VII and VIII

8    land as so classed on your soil classification photographs

9    has been generally lumped as grazing land; is that correct?

10       A  Yes, sir.

11       MR. VEEDER:  Are you including this only on Camp

12   Pendleton?

13       MR. SACHSE:  94.

14       MR. VEEDER:  Not in Pechanga?

15       MR. SACHSE:  Just the 94 exhibit.

16       Q  All of the VII and VIII land you classed as grazing?

17       A  Yes, sir.

18       Q  And the VI land, is that entirely classed as

19   irrigable or only part as irrigable?

20       A  On Camp Pendleton it is entirely classed as irrigable,

21   Mr. Sachse.

22       Q  So we can generalize, then, that Classes I through

23   VI on Camp Pendleton you have found irrigable and suitable for

24   one irrigated crop or another, and VII and VIII you found non-

25   irrigable?

Z47

1    A  Yes, sir.

2    Q  Now, the land classifications as set forth in your

3  Exhibit 93, particularly the spider chart, it refers to them

4  as land capability classes, am I not correct?  Exhibit 93

5  uses the word "Land capability classifications" for the

6  Roman numeral designations.

7    A  Yes, sir, the Roman numeral designation indicates

8  the land use capability classification.

9    Q  Exhibit 94, however, has the title "Land Utilization."

10  You do not mean to imply that Exhibit 94 indicates the uses

11  to which this land is being put on Camp Pendleton, doyou?

12    A  No, sir.

13    Q  How does the land utilization title tie into the land

14  capability reference to the Roman numeral land classifica-

15  tion?

16    A  The land capabilities, Mr. Sachse, in company with

17  the soils information and the fractional symbol, were utilized

18  in developing this plan for land use on the Naval Reservation.

19    Q  And in determining the acreages that are set forth

20  in the tabulation from one of the early pages of 93, how did

21  you determine those acreages, Col. Bowen?

22    MR. VEEDER:  I object again; this is beyond the scope

23  of the direct examination.

24    MR. SACHSE:  On this?

25    MR. VEEDER:  Just a moment.  I have attempted to

E2

z48

1    restrict references to the acreages and also the uses of water

2    by reason of the change in the watershed line.  I have no

3    objection if you are simply checking out those matters of

4    classification.

5          MR. SACHSE:  I am only talking at the moment about

6    classification.

7          MR. VEEDER:  If you are going to limit it to that, there

8    is no objection.

9    BY MR. SACHSE:

10         Q  How did you determine the acreage for the land

11   classifications?

12         A  The land classes were transferred to the U. S.

13   Geological Survey 7½-minute series topographic maps and the

14   areas were planimetered.

15

16

17

18

19

20

21

22

23

24

25

F-1 ML

1      Q   BY MR. SACHSE:   So, for example, taking Class I

2  land, 459 acres, how would you --   I will withdraw that.

3  Does that represent any particular one of the utilization

4  classes you have set forth on 94?

5      A   No, sir.

6      Q   It represents a combination of several of them?

7      A   Yes, sir.

8      Q   And perhaps some would be eliminated?

9      A   Not the Class I.   No, sir; all the Class I is

10  found to be irrigable land.

11      Q   If you were to planimeter -- I am trying to find

12  out what has happened; what you have done, Col. Bowen -- if

13  you were to planimeter the AC, P and RC classes on this map,

14  Exhibit 94, would you come up with the same figure total for

15  irrigable acreage that you show on this total, that you show

16  in Exhibit 93?

17      A   Plaintiff's Exhibit 93?

18      Q   Yes.

19      A   No, sir.

20      Q   What would the difference be?

21      A   It would be somewhat less in area than that shown

22  in Plaintiff's Exhibit 93.

23      Q   In other words, 93 would give you a greater

24  irrigable acreage than shows on 94?

25      A   The tabulation presently enclosed in Plaintiff's

1    Exhibit 93 discloses a greater area of irrigable land than

2    the sum of those areas depicted on Plaintiff's Exhibit 94

3    as shown as adapted for production of irrigated crops.

4         Q    Why is that true?  Where would the difference

5    occur?

6         A    Well, the difference occurred primarily in an

7    error in computation in the preparation of this tabulation

8    in Plaintiff's Exhibit 93.

9         Q    Then, which one is correct?  93 is correct or

10   94 is correct?

11        A    94 is more nearly correct.

12        THE COURT:  Then, do I understand your answer to be

13   that they should check out?

14        THE WITNESS:  Yes, sir.  There should be a close

15   agreement between the total irrigable acreage as shown on

16   the tabulation of land classes and the land utilized for

17   production of irrigated crops, as shown on Plaintiff's

18   Exhibit 94.

19        THE COURT:  Well, now, the tabulation lists land that,

20   in your opinion, is irrigable, could be irrigated?

21        THE WITNESS:  Yes, sir.  The tabulation in Plaintiff's

22   93.

23        THE COURT:  93.  And 94 shows what is actually being

24   irrigated?

25        THE WITNESS:  No, sir.  94 shows the uses to which

1    those irrigable lands could be put if the property were

2    developed fully as an agricultural enterprise.

3            THE COURT:  Now, you say there is an error in com-

4    putation in 93?

5            THE WITNESS:  Yes, sir.

6            THE COURT:  Can that be corrected?

7            THE WITNESS:  Yes, sir.

8            MR. VEEDER:  We intend to make a complete revision,

9    your Honor.

10           THE COURT:  All right.

11           MR. VEEDER:  If I may just momentarily explain:  The

12   problem, if your Honor will recall, when we put in our

13   Exhibits 98, 99, and 98-A, there was an enlargement of the

14   areas within the watershed and there have been some

15   differentiations made; and we are going to recall Col.

16   Bowen for the purpose of covering the whole phase of it.

17           Q  BY MR. SACHSE:  Col. Bowen, considering only, then,

18   the classification as it now appears in tabulation in

19   Exhibit 93, when you use the definition "irrigable," do you

20   mean that it is susceptible of practical or profitable

21   irrigation?

22           A   Yes, sir.

23           Q   Do you then consider what the highest and best

24   use to which it might be put is?

25           A   Yes, sir.

F-2

1    Q   Did you make any adjustment in your acreage

2    figures, for example, by reason of the existence of paved

3    U.S. 101 running roughly north and south across the middle

4    of the area delineated on 94 as being suitable for row crops?

5    A   No, sir, I made no adjustment by Highway 101.

6    Q   Did you make any adjustment for any paved roads

7    anywhere in the military reservation?

8    A   No, sir.

9    Q   You would not consider them susceptible of

10   practical and profitable irrigation today, would you?

11   A   No, sir, not with the road there.

12   Q   How about the railroads; did you make any adjust-

13   ment for them?

14   A   No, sir.

15   Q   How about buildings, roof space, floor space;

16   did you make any adjustment for that?

17   A   No, sir.

18   Q   Directing your attention to the area on Exhibit

19   94 immediately westerly of Lake O'Neill marked "U. S. Naval

20   Hospital," the whole area is indicated as suitable either

21   for row crops or permanent pasture.  You are familiar with

22   the present condition of that area, are you not?

23   A   Yes, sir.

24   Q   It is all either in lawns, buildings, or streets,

25   is it not, flower gardens?

A    Would you be a little more specific about the area, Mr. Sachse?

Q    The Naval Hospital area?

A    Where the Naval Hospital area is, it is in lawns, buildings or streets.

Q    So far as lands within the reservation that are susceptible to practical and profitable irrigation today, that area would have to be eliminated, would it not?

A    Yes, sir.  I didn't consider the land in the condition or use to which it is put today in preparation of 94.

Q    And so to avoid doing all these things one by one, let me make a few more general questions:  Throughout the United States Naval Ammunition Depot you have large areas of land indicated as suitable for avocadoes.  Actually, those lands contain concrete ammunition bunkers, do they not, some of them?

A    Yes, sir, there are --

MR. VEEDER:  Your Honor, we will agree completely and save a little time here.  We agree completely that from the standpoint of the soil survey and land class Col. Bowen certainly was not undertaking a study as of the present military use.  But we do think it is highly important to show the agricultural potential here, and we believe it is in keeping with the law of California to grants of riparian

1    rights.   We will agree to everything that has been touched

2    upon from the standpoint of -- the areas down the Chappo,

3    certainly goes to the industrial area.

4           THE COURT:  This exhibit of the Master, D-E, contain-

5    ing some 1587 acres, this is largely along the line that Mr.

6    Sachse is talking about.

7           MR. SACHSE:  Yes, your Honor, but --

8           THE COURT:  Land which is now occupied for some other

9    purpose besides farming.

10          MR. VEEDER:  Well, that is true.

11          THE COURT:  Right?

12          MR. SACHSE:  That is addressed to you, Col. Bowen,

13   by his Honor.

14          THE WITNESS:  Oh; yes, sir.

15          Q  BY MR. SACHSE:  Except, Col. Bowen, am I not

16   correct in saying that Exhibit M-D-E, when you prepared it

17   at my request was limited to what we described as basic

18   lands on the floor of the valley and does not include

19   ammunition depot structures, does not include structures in

20   the higher elevations on either side of the valley floor?

21          A   That is correct, Mr. Sachse.  And I should further

22   clarify my response to your Honor's question.  There are, I

23   believe, such things itemized there as the hayfield in Ysidora

24   which do occupy lands susceptible of practical and profitable

25   farming.

1          THE COURT:   What is the law?   Here is an airplane strip,

2    surfaced and unsurfaced, 180 acres altogether.   Now, is there

3    any doubt but what, if they decide to rip up to the concrete

4    and plant the crops, it could be planted?

5          MR. SACHSE:   There is absolutely no doubt, if the

6    concrete is ripped up -- rather than say "if," I would say

7    "when the concrete is ripped up," the riparian owner of that

8    land could take riparian water and put it to proper riparian

9    use and water his lands.   However, there is also, in my

10   opinion, no doubt whatsoever as to the law that when it is

11   not available and is not being used for riparian purposes,

12   it is available to appropriation, by appropriative.

13         MR. VEEDER:   Is there any doubt?   I mean our --

14         MR. SACHSE:   So we are extremely concerned about the

15   exhibits that are going into evidence here implying that the

16   present right --

17         THE COURT:   You say "available to appropriation."

18   You don't use the term correctly.

19         MR. SACHSE:   I use the term literally as a word of

20   art, as available for appropriation, subject to the vested

21   rights of the riparian to recapture it at such time as he

22   again desires to put it to proper riparian use.

23         MR. VEEDER:   I don't follow the source here at all,

24   your Honor.   We are willing to agree to this whole approach:

25   that certainly where you have a concrete strip, that is not

going to be irrigated at this time. If it is torn up, it will be.

MR. SACHSE: Then, I suggest a great deal of time could be saved if the United States would put in a few exhibits showing what exactly they are claiming as to water rights instead of this abstract hokus-pokus predicated upon an irrigable acreage that doesn't exist. Whether it is a military reservation or not, it doesn't exist. The U. S. 101 and the Santa Fe Railroad right of ways, they can't tear up if they wanted to. They are running straight across the middle of the row crop area.

MR. VEEDER: I have attempted to point out we will recall Col. Bowen for the purpose of going into fully the questions of utilization of water. Now, there is no --

THE COURT: I understand your position to be, therefore, that if there is, we will say, 1500 or 2000 acres covered by roads and dams and lakes and railroads and highways, then that there is riparian water that would otherwise be available to those 1500 or 2000 acres that are available for appropriation upstream?

MR. VEEDER: Well, now, your Honor, I would say that from the standpoint of the Vail Company, for example, who shares correlatively -- and I am speaking to the jury now -- they would come in ahead of these 1950 interlopers. We certainly say that what rights we have are, riparian rights

1   we have are held correlatively; and the mere fact that we

2   have an airplane strip down there doesn't mean that Mr.

3   Sachse should incorporate some more land and sell it as

4   avocadoes.  We believe that certainly the day may come when

5   the -- I won't say it.  This is getting close to Thanksgiving.

6   The point we make is that certainly momentarily we are not

7   applying riparian water onto the airport.  But we are

8   certainly claiming a riparian right for that land, and other

9   riparians will enjoy that water, but not some appropriator.

10       THE COURT:  I have your point.  Let's go ahead.

11       MR. SACHSE:  May I have 95, Mr. Luddy.  I don't think

12   it is in evidence.  It has just been marked.  Is it in yet?

13       Q   I hand you Plaintiff's 95 for identification,

14   Col. Bowen.  That exhibit is entitled "Applied Duty of Water;

15   Santa Margarita watershed within Camp Pendleton, California;

16   Irrigation requirements acre-feet."  And it is signed, or

17   dated at the bottom --

18       MR. VEEDER:  What is the number of that?

19       MR. SACHSE:  95.

20       Q -- "Office of Ground Water Resources, October, 1958."

21       MR. VEEDER:  I object to this.  It goes beyond the

22   scope of the direct examination.  We have not offered this.

23   It has not been offered.  I am going to call Col. Bowen back

24   on this.  It is not an exhibit in the record.

25       MR. SACHSE:  I have a perfect right to cross-examine

F-4

1    on an exhibit for identification that was prepared by this

2    very gentleman and deals with this very subject.

3            THE COURT: Are you going to change your exhibit before

4    it is offered?

5            MR. VEEDER:  I propose to call Col. Bowen on this

6    whole thing, and it is entirely possible this exhibit will

7    never be offered.

8            THE COURT:  We will postpone it until we hear the

9    direct on it.

10           Q   BY MR. SACHSE:  Now, in considering the irrigability

11   of land, Colonel, do you consider the economic factors in-

12   volved at the present time, to be specific, the accessibility

13   to land, for example, to water?

14           MR. VEEDER:  Now, would you be specific?  What land

15   to what water, Mr. Sachse?

16           MR. SACHSE:  The land within the military reservation

17   as indicated on Exhibit 94.

18           Q   Do you consider, in determining its irrigability,

19   whether it has a readily available water supply or do you not

20   consider that factor?

21           A   Yes, sir.  Applying the answer to the lands

22   within the Naval reservation as depicted on Plaintiff's

23   Exhibit 94, I considered the availability of water.

24           Q   Did you consider, then, that there was water

25   available for all of the -- what is it, 20,000-odd acres

indicated on Exhibit 93?

A    Not all at one time, Mr. Sachse.

Q    But you did consider that water could be made available to any part of the lands depicted on 94 if the owner so desired?

A    Yes, sir.

Q    Did you consider, for example, the availability of the electric power in some of the rather remote corners of the military reservation?

A    Well, electric power isn't the only means of power or the only power available, Mr. Sachse.

Q    In other words, you did not consider that factor; you assume it could be pumped one way or the other?

A    Yes, sir.

Q    Did you consider the cost of providing water transmission lines to remote and small areas of land?

MR. VEEDER:  I object to this.  It goes beyond the scope of the direct examination.

THE COURT:  Overruled.

THE WITNESS:  I didn't work out a detailed cost estimate on piping water to every portion shown as irrigable, Mr. Sachse.

Q  BY MR. SACHSE:  Would we not, then, be correct, Colonel, in saying that you simply took for granted that any parcel of land, the physical characteristics of which were

such that it could profitably grow any crop, you have

treated as irrigable?

    A    Yes, sir.

    Q    You didn't consider anything beyond the physical

characteristics of the land itself?

    A    I considered that water was available, Mr. Sachse.

    Q    But not to it all at once?

    A    Yes, sir.

    THE COURT:  I take it your point is, Mr. Sachse, that

there are small areas of ground that need, to say the least,

which are so small, so far removed from source of the water,

that it would/be economically feasible to irrigate them, even

if they were, of their own character, irrigable lands?

    MR. SACHSE:  Correct, your Honor.  I think the matter

is of greater importance as we get upstream.  Perhaps not so

acute here, but it will be unquestionably true of large

areas in Government lands in the more remote sections of the

watershed.

    MR. VEEDER:  I think we can get much closer than that.

Some of that billygoat land that Fallbrook has incorporated

into his district is going to be extremely interesting.  I

don't see how they are going to get water up there, economically,

that is.  I am glad he opened it up.

    MR. SACHSE:  Would you like me to go a little further

with it and withdraw a few of those objections?

1    MR. VEEDER:  Let's try it again, then.  You get your

2    friend Yackey up, we will go all the way.

3    THE COURT:  Let's save some time.  If you cross-examined

4    extensively, all you would have currently is the fact that

5    there is a factor.  You wouldn't have any figures for me or

6    any way to prove whether it was or was not economically

7    feasible; because this witness said he made no economic

8    studies of that sort.

9    MR. SACHSE:  That is right.

10   THE COURT:  So where do we get?

11   MR. SACHSE:  That is all the record shows so far.

G

z49

BY MR. SACHSE:

    Q  Now, Col. Bowen--

May I have Exhibit 71, please, Mr. Clerk.

    MR. VEEDER:  Exhibit 71 has not been offered in evidence, your Honor.

    MR. SACHSE:  Your Honor, I am a little at a loss.

    MR. VEEDER:  All right, I will withdraw Exhibit 71.

    MR. SACHSE:  Exhibit 71 is--

    MR. VEEDER:  Withdrawn.

    MR. SACHSE:  --physically in the record.

    MR. VEEDER:  Not any longer.  It has just been withdrawn.

    THE COURT:  The point is, Mr. Sachse, that Mr. Veeder has not examined the Colonel in chief about certain matters, and particularly matters that concern the area of the watershed downstream, and we were trying to see what we could do on the matter he did cover.  You will have ample opportunity to go into that.  The Government has stated that they are going to make further study on that and supply more data.  That would be the appropriate time to do it.

    MR. SACHSE:  Under the circumstances, I would prefer to defer my entire cross-examination until he finally makes up his mind what he is going to do.  I know he jumps around on questions of law, but I have not expected him to jump around on questions of fact when they are supplied by his own technical

G

Z50

1 staff.  I have no further questions, and I would like to

2 reserve full cross-examination until the witness has had his

3 direct.

4        THE COURT:  You may.

5        Mr. Moskovitz?  Mr. Stahlman?

6        MR. STAHLMAN:  On this last point, do I understand

7 that in relation to the watershed boundaries that affected the

8 South Mesa and the Stuart Mesa, that those are matters to be

9 gone into further on cross-examination?

10        THE COURT:  Yes.

11        MR. VEEDER:  As far as I am concerned, Exhibits 98-A

12 and 99 are in.  That is the watershed line as we have estab-

13 lished it, and we are living with it, and we are there to stay.

14 My objection is that he was bringing out an exhibit which was

15 not offered.  The Colonel is ready, willing, anxious and I am

16 sure able to testify in regard to the natural watershed line

17 as now established in the record.

18        MR. STAHLMAN:  Then may I have Exhibit 89-CJ.

19        MR. SACHSE:  I am very interested in this.

20        MR. STAHLMAN:  Do you want to continue further?

21        THE COURT:  You called one witness and put one line in

22 and you called another witness and put another line in.  I am

23 talking about the word "established" and its connotation.  I

24 don't know whether it has been established.  At best we have

25 a conflict in the evidence presented on your side of the case.

Bowen        Cross                                        5538

G

Z51

1          MR. VEEDER:  No, your Honor, the position taken by the

2     United States in this regard, and we were very careful in

3     regard to the watershed line on the land utilization map, the

4     United States now stands and will stand throughout the trial

5     on the basis of the watershed line which was established on

6     Exhibits 98, 98-A--

7          THE COURT:  I understand your statement.  But I under-

8     stand the word "established" as meaning that you have offered

9     some proof on it?

10          MR. VEEDER:  Yes.  I think your Honor is the one who

11     will do the establishing.

12          MR. SACHSE:  How about Exhibit CG?  Is that in evidence?

13     May we cross-examine on that?

14          MR. VEEDER:  Yes, CG is in.

15          MR. SACHSE:  Col. Bowen drew the line on it.

16          MR. VEEDER:  Yes, and he drew the line exactly from 98-A.

17          MR. STAHLMAN:  Did you wish to cross-examine further on

18     that?

19          THE COURT:  You stated this morning that you would have

20     some further proof on this matter of the watershed lines on

21     Stuart Mesa and South Mesa, and I understood that the subject

22     of cross-examination was not to be gone into.

23          MR. VEEDER:  I beg your pardon, your Honor, in this

24     regard.  What we were talking about was our calculations in

25     regard to irrigated and irrigable acreages and the quantities

G

Z52

Bowen          Cross          5539

1    of water used within and without the watershed, which is a

2    matter of further study.  But from the standpoint of location

3    of the watershed lines, as shown on our exhibits presently in

4    the record, that is, 98 and 98-A, there is no question but

5    that you can go ahead and cross-examine untilyou are--

6            MR. STAHLMAN:  Blue in the face?

7            MR. VEEDER:  And you probably will.

8            MR. STAHLMAN:  May I have Exhibit 89-CG, then.

9            Q  Directing your attention, Col. Bowen, to the water-

10   shed line as shown in its relationship to that area referred to

11   as Stuart Mesa, how did you determine that?

12           A  That was determined, Mr. Stahlman, by examining

13   Plaintiff's Exhibit 97, I believe it is.

14           MR. VEEDER:  That is the McKissick-- 97.

15           MR. SACHSE:  That is the one that is six feet long.

16           MR. VEEDER:  That shore line map.

17           MR. SACHSE:  Yes.

18           THE COURT:  Mr. Veeder, let us get your position straight

19   here.  You had a witness on the witness stand by the name of

20   Nichols, whose father was engaged in some growing on the Mesa,

21   and according to his testimony the watershed line on the Stuart

22   Mesa would not be the same as that shown on Exhibit 97; and

23   you are content now to stand on Exhibit 97 and the other ex-

24   hibits prepared therefrom and not upon the testimony of Mr.

25   Nichols? .

G

Z53

1    MR. VEEDER:  That is correct, your Honor.  Mr. Nichols

2    testified in regard to an area further north, and we checked

3    that out yesterday and went into the matter with Col. Bowen

4    and he pointed out that that water, in his opinion, had it been

5    permitted to go ahead in the state of nature, would have

6    flowed off into the Pacific Ocean, which would have precluded

7    it from being part of the Santa Margarita River watershed.

8    THE COURT:  So we can forget about Nichols' testimony

9    about that?

10   MR. VEEDER:  Let us not forget about it, but we are not

11   standing on that as a watershed line.  We are standing now,

12   you might even call it, the Cannon line.  But in any event,

13   on 97 and 98 and 98-A -- those are the lines upon which we are

14   standing, and they are all embraced now upon Col. Bowen's

15   exhibit, which is 89-CG.

16   MR. STAHLMAN:  Are you finished?

17   MR. VEEDER:  I am finished, unless his Honor interrogates

18   further, at which time I will respond.

19   BY MR. STAHLMAN:

20   Q  You are familiar with the line as established by Mr.

21   Cannon Exhibit 97, are you not?

22   A  Yes, sir.

23   Q  And the line as you established it on Exhibit 89-CG,

24   did you do that independently of any establishment of the line

25   Mr. Cannon made?

G

Z54

A  No, Mr. Stahlman. Exhibit 89-CG, to refresh your memory, was introduced in evidence on Friday of last week without the watershed line on it, and his Honor requested me to place the watershed line on it, and for the portion of the Stuart Mesa I referred to Plaintiff's Exhibit 97.

Q  So you merely took the line such as was on Exhibit 97 and used that as the line on Exhibit 89-CG?

A  Yes, sir.

Q  You did not make an independent calculation or investigation as to where the contour lines existed so as to establish the watershed line?

A  Yes, sir, I reviewed the contour lines on Plaintiff's Exhibit 97 myself.

Q  Did you make any calculation as to the acreage of Stuart Mesa?

MR. VEEDER:  Your Honor, I think that goes beyond the scope of the examination.  That was the point I was making. But go ahead.

THE WITNESS:  Yes, sir.

BY MR. STAHLMAN:

Q  And do you have a figure as to the total area of Stuart Mesa in acres?

A  I believe I do, Mr. Stahlman.  I will refer to my notes, if I may.

THE COURT:  You mean the total area in and out of the

G

Z55

1    watershed?

2         MR. STAHLMAN:  Yes, in and out of the watershed, your

3    Honor.  That is a preliminary question.

4         THE COURT:  Did you make me a copy of this Exhibit 89-CG?

5         MR. VEEDER:  We will have one made for your Honor.  We

6    haven't yet.

7         THE WITNESS:  Would you repeat the question, please?

8         MR. STAHLMAN:  Read it, please.

9         (The reporter read the pending question as follows:

10   "Q  And do you have a figure as to the total area of the

11   Stuart Mesa in acres, in and out of the watershed?")

12        THE WITNESS:  The total area of the Stuart Mesa, Mr.

13   Stahlman, is 1158 acres.

14   BY MR. STAHLMAN:

15        Q  And have you calculated now that the line as you

16   have placed it on Exhibit 89-CG, as to how many acres are in-

17   side the watershed and how many are out?

18        A  Yes, sir.

19        Q  Will you give us those figures?

20        A  362 acres of Stuart Mesa are within the Santa Margarita

21   River watershed, as depicted on Plaintiff's Exhibit 89-CG, and

22   796 acres of the Stuart Mesa are outside the Santa Margarita

23   River Watershed as depicted on Plaintiff's Exhibit 89-CG.

24        Q  By the way, did you testify in the previous hearing

25   in front of Judge Yankowich in relation to the Stuart Mesa?

G

Z56

A   Yes, sir.

Q   And was there an exhibit in that case that estab-
lished a line indicating the watershed?

A   Yes, sir.  We have copies of field soil surveys.

Q   Do you know whether or not those departed from what
we have here?

A   Yes, sir.

Q   What was the difference?

A   I could tell you more closely, Mr. Stahlman-- the
departure from the line as depicted on Plaintiff's Exhibit 93
in this current action?

Q   Exhibit 93 in this case.

A   Yes, sir.

THE CLERK:  Here is the 93 series, Mr. Stahlman.

THE WITNESS:  That series that the Clerk has, Mr.
Stahlman.

THE COURT:  Well, it was 93-A to 93-AF. Was there also
a 193?

THE CLERK:  Yes, your Honor.

THE COURT:  A key?

THE CLERK:  No, it is a small book of aerial photographs,
as I recall.

MR. VEEDER:  Mr. Sachse has that.

THE COURT:  Yes, I have my copy of it here.

MR. VEEDER:  Did you return the copy?

G

Z57

1      MR. SACHSE:  I didn't use the Court's.  I used my own.

2      MR. VEEDER:  I gave you the exhibit.

3      THE COURT:  This is 93-- mine.

4      MR. VEEDER:  You have it.  All right.

5      THE WITNESS:  I have the Clerk's copy of 93.

6      MR. VEEDER: We reserve the right to make changes on the

7   exhibits, from the standpoint of the location of the watershed

8   line.  We requested the privilege and you said we could have

9   it, your Honor.

10      THE COURT:  That is correct.

11      MR. SACHSE:  Does that mean that we have a new water-

12   shed line now again?

13      MR. VEEDER:  Well, no.

14      THE WITNESS:  Referring more particularly, Mr. Stahlman,

15   to Plaintiff's Exhibit 93-B and 93-C, which together depict

16   the watershed line of the Santa Margarita River across Stuart

17   Mesa--

18      THE COURT:  What about it?  That is the line as shown

19   in the first trial?

20      THE WITNESS:  Approximately, your Honor.

21      THE COURT:  Where does the line now some, according to

22   your Exhibit 97?

23      MR. STAHLMAN:  Exhibit 89-CG, I think, shows it better.

24      THE WITNESS:  It is shown on Exhibit 89-CG, your Honor.

25   The line runs from the beach in a northeasterly direction near

G

Z58

the road, which shows also on Plaintiff's Exhibit 93-C running

in a northeast-southwest direction, but northerly of the

watershed line as depicted on 93-C.

BY MR. STAHLMAN:

Q   Now then, do I understand that this photograph that

you have just referred to, Exhibit 93-D and 93-C, were the

lines as they were established in the previous trial?

A   No, sir; Exhibit 93-B, B as in Baker, and 93-C

represent the line basically as we had it on the exhibit pre-

sented in 1952.   There may be some slight differences, but

very small ones.

Q   And how was that line at that time determined from--

A   I made a plane table survey, Mr. Stahlman, of the

area at the time.

Q   What did you use, what map, as the basis for your

calculation?

A   The best published map that I had available at that

time was the 7½-minute series U.S. Geological Survey.

Q   And this map as shown in Exhibit 97, was that in

existence at the time?

A   It was undoubtedly in existence, Mr. Stahlman,  It

has a date of 1940.

Q   And what is the reason for using this map at this

time?

MR. VEEDER:   I object to that; that is not proper cross-

G
Z59

1  examination.

2  BY MR. STAHLMAN:

3  Q  Let me ask you this question:  Did you determine

4  that there was some error in the previous calculation?

5  A  The previous calculations show the watershed line

6  as it exists today, Mr. Stahlman.

7  Q  You have not previously plotted the watershed line

8  of Stuart Mesa from data that would show its existence in the

9  state of nature?

10  A  No, sir.

11  Q  And that was not done at the first trial, then?

12  A  No, sir.

13  Q  What was the difference in the acreage in and out

14  of the watershed as you had plotted it on the first time that

15  you plotted the watershed for the first trial?

16  A  The difference in acreage, Mr. Stahlman, between the

17  watershed line of the Santa Margarita River depicted on

18  Plaintiff's Exhibit 93-B and 93-C and that plotted on Plain-

19  tiff's Exhibit 97 is 138 acres.

20  MR. VEEDER:  Did you say 138?

21  THE WITNESS:  138.

22  THE COURT:  Let me see that.

23  BY MR. STAHLMAN:

24  Q  That would be at that time it was 138 acres that was

25  in the watershed; is that correct?

1          THE COURT:  No.  The present figure, he has 138 acres

2    more in the watershed than the figure at the first trial?

3          THE WITNESS:  Yes, sir.

4          MR. VEEDER:  That is, on Stuart Mesa.

5          THE WITNESS:  On Stuart Mesa.

6    BY MR. STAHLMAN:

7          Q  Now, the water in Lake O'Neill that is diverted out

8    of the lake, is any of that used directly for irrigation?  Or

9    is it all put underground?

10          A  You mean at the present time, Mr. Stahlman?

11          Q  Yes.

12          A  It is put underground.

13          Q  Has it been any different, to your knowledge, in

14    the manner in which it was done?

15          THE COURT:  Different from when?

16    BY MR. STAHLMAN:

17          Q  At any time that you know of, was it ever released

18    for purposes of irrigation?

19          A  You mean within the period that I have been at

20    Camp Pendleton?

21          Q  Yes, to your knowledge.

22          A  No, sir.

23          Q  Now then, I believe your calculations show, Col. Bowen,

24    that there are-- I will ask you:  What is the total irrigable

25    acreage in the Santa Margarita River watershed, as it is shown

G

Z61

1   on Map 94?

2        MR. VEEDER:  You mean within the enclave?

3        MR. STAHLMAN:  Within the enclave, yes.

4        THE WITNESS:  The total of the area shown on Plaintiff's

5   Exhibit 94 as being adapted to production of irrigated crops

6   is 18,847 acres.

7        MR. VEEDER:  May I make an inquiry here now?

8        MR. STAHLMAN:  Yes.

9        MR. VEEDER:  Is Mr. Stahlman directing his inquiry to

10  Exhibits 98-A and 98, the watershed as shown on those two

11  exhibits, or are you limiting it now to 94?

12       THE COURT:  You see, Exhibit 94, Mr. Stahlman, probably

13  has to be corrected.

14       MR. STAHLMAN:  Yes, I understand.

15       THE COURT:  The watershed line on Exhibit 89-CG runs

16  almost at right angles to the coast.

17       MR. STAHLMAN:  Yes.

18       THE COURT:  If you look at Exhibit 94, it does not run

19  at right angles.  So there will have to be some correction

20  made there.

21       Is that right, Colonel?

22       THE WITNESS:  I should clarify my previous testimony,

23  your Honor.  The figure that I gave includes those areas on

24  the coast not shown on Plaintiff's Exhibit 94.

25       THE COURT:  18,900, was it?

G

Z62

1    THE WITNESS:  18,947 acres, your Honor.

2    MR. STAHLMAN:  That is the complete total, whether there

3    is any correction or not to it; is that right?

4    THE COURT:  That is the total with the correction.

5    MR. STAHLMAN:  With the correction, yes.

6    THE WITNESS:  That is the total irrigable land within

7    the Naval Reservation and within the Santa Margarita River

8    watershed.

9    MR. VEEDER:  We have been using the term "natural

10   watershed," and that might help you distinguish it.  If that

11   will assist your Honor.

12   BY MR. STAHLMAN:

13   Q  Have you made a revision of the amount of irrigable

14   acreage within the enclave and within the watershed since the

15   first trial before Judge Yankowich?

16   A  Yes, sir.

17   Q  You did, however, testify, did you not, before Judge

18   Yankowich, as to the irrigable acreage that was in the enclave

19   within the watershed of the Santa Margarita?

20   A  Yes, sir.

21   Q  And was that after a study you had made?

22   A  Yes, sir.

23   Q  What was the irrigable acreage at that time?

24   A  I don't recall, Mr. Stahlman.

25   Q  Would it refresh your memory--

G

Z63

1        MR. VEEDER:  It can be found in 110 Federal Supplement,

2  Mr. Stahlman.

3        MR. STAHLMAN:  I have it.

4        Q  First, let me ask you this:  The acreage that you

5  have given here is the acreage both within the Ammunition

6  Depot and Camp Pendleton, is it not?

7        A  Yes, sir, and the U. S. Naval Hospital.

8        (Recess.)

THE COURT:  This will be a good time for a recess.

MR. STAHLMAN:  It would be.  There is a little difference here.  I think I can pick it right up.

(Recess.)

Q   BY MR. STAHLMAN:  Then, as I understand your testimony at this time, Colonel, is that of the total acres irrigable within the watershed, that is, **susceptible of profitable** irrigation, is 18,947; is that correct?

A   Yes, sir.

Q   And the 20,000 figure that appears in the Exhibit 73 is in error?

A   Yes, sir.

THE COURT:  In Exhibit 73?

MR. SACHSE:  93.

MR. STAHLMAN:  93, yes.

That is this table.

THE COURT:  Yes.

MR. STAHLMAN:  Those are all the questions I have.


CROSS-EXAMINATION

BY MR. MOSKOVITZ:-

Q   Col. Bowen, pursuing this matter of the error that appears in the Exhibit 93 as to total irrigable acreage, what was the nature of the error?  Was it really arithmetic addition?

1    A    Well, it was primarily an error in planimetering

2  the acreages of various classes.

3    Q    When you made your planimeter calculations which

4  resulted in a 20,424-acre figure, did you planimeter the

5  quad sheets or the aerial photographs?

6    A    I think that first figure was based on the plan-

7  imetering of the aerial photographs.

8    Q    And then, the figure you just gave is based upon

9  planimetering the irrigable areas on the quad sheets?

10    A    Yes, sir.  The land classes were transferred to

11  the seven and a half-minute series, U. S. Geological Survey

12  topographic map, and planimetered again.

13    Q    And does the different base upon which these two

14  calculations or planimetering were made explain the

15  difference in the figures?

16    A    Primarily, yes, sir.

17    Q    In the first trial I believe the figure for a

18  total irrigable acreage which was testified to was 18,710.1

19  acres.  Is that approximately correct?

20    A    That sounds approximately correct.  It is in the

21  record.

22    MR. STAHLMAN:  701.

23    MR. MOSKOVITZ:  701.

24    Q    What is the explanation of the difference between

25  that figure and the 1000 given?  Is it the difference of the

1    location of the watershed line near the coast?

2         A    Yes, sir; that is part of it.

3         Q    What other differences?

4         A    Well, actually, I came up with a smaller figure

5    of irrigable land exclusive of the coastal land taken in

6    under the natural watershed boundaries, as shown on Plaintiff's

7    Exhibits 97, 98, and 98-A.  So you can't simply subtract

8    the difference between the natural watershed and the present

9    watershed and add it to the 18,701 and come up with this

10   figure I gave Mr. Stahlman.  The sum of those would be

11   somewhat greater than 18,947.  So we lost some and gained

12   some, Mr. Moskovitz.

13        Q    When did you first learn that the watershed line,

14   as depicted on your Exhibit 94, for example, was not a

15   correct line?

16        MR. VEEDER:  Now, I object to that on this ground:

17   the watershed line as depicted on 94 is the watershed line

18   at the present time.  Now, we changed it to the natural

19   watershed line.  I don't believe that there is an error.

20   That is how it stands.

21        MR. MOSKOVITZ:  I will withdraw that question.

22        Q    When did you first become aware of the existence

23   of 97?

24        A    Just a couple of days prior to its introduction

25   in evidence here in this proceeding.

1    Q    Do you know when Mr. Cannon first discovered its

2  existence?

3    A    No, sir.

4    Q    Directing your attention to the various on-channel

5  and off-channel storage areas that you have for spreading

6  water, when were these spreading areas first constructed and

7  operated?

8    A    Which spreading areas are you referring to, Mr.

9  Moskovitz?

10    Q    I am referring to all of them.  They were first

11  constructed and operated on different dates.  Would you

12  please tell us what they are?

13    A    I am a bit hazy on the construction of the on-

14  channel spreading devices.  Some of those, I believe, were

15  in existence prior to 1951, when I joined the Office of

16  Ground Water Resources.  And I cannot state accurately at

17  this moment which ones were in existence at the time and

18  which ones were constructed later.  However, as regards the

19  off-channel spreading area, that is my own conception and,

20  basically, my own design; and I can tell you, Mr. Moskovitz,

21  that the **off**-channel spreading area, as shown on Plaintiff's

22  Exhibit 86-A --

23    THE COURT:  86-B.

24    THE WITNESS:  86-A, your Honor.

25    THE COURT:  All right.  Go ahead.

j46  Bowen — Cross                                                    5556

THE WITNESS:  Was constructed beginning in the summer of 1955.

Q  BY MR. MOSKOVITZ:  And by the winter of 1955, 1956, were all these areas depicted on Exhibit 86-A completed?

A  No, sir.

Q  When were they all completed?

A  By the fall of 1956.

Q  Fall of 1956.  Then, they were all in existence during the water year '57-'58?

A  Yes, sir.  This layout of off-channel spreading basins as shown on Plaintiff's Exhibit 86-A were in existence for the water year '57-'58 and in operation during the period of runoff of that water year.

Q  When did they first have water diverted into them in the water year '56-'57?

A  I would have to refer to the stream gaging records on that to make certain, Mr. Moskovitz.

Q  Would you also have to refer to those records to determine when storage was first made in the water **year**, '57-'58?

A  No, sir.  That is more recent, and I can give an approximate date there.

Q  I would like to have these fairly accurately.  If you can get them, it would be better.

A  To be accurate I would have to refer to the gaging records.

H-2

1    Q   Would you please do that and, if you can, indicate

2    by days, if you have those records, how much water was put

3    in storage on this off --

4    MR. VEEDER:  I object to this.  There is no water

5    ever put in any storage.  It was spread on the basins and

6    went underground.  The use of the word "storage" is objected

7    to.

8    THE COURT:  Let me hear the question read.  The Clerk

9    was talking to me.

10    (The reporter read back the question.)

11    MR. MOSKOVITZ:  The word "storage" is not necessary.

12    I just --

13    THE COURT:  Which water was diverted out of --

14    MR. MOSKOVITZ:  Yes, by days during the two years

15    when water was diverted into these off-stream spreading

16    basins.

17    THE COURT:  Do you have a record by days, or months,

18    or weeks?  How do you have it?

19    THE WITNESS:  I might be able to construct it down to

20    months, your Honor.  I would have to refer to my office

21    records before I can tell how definitive I could be in regard

22    to the diversion of water into the off-channel spreading

23    area.

24    MR. MOSKOVITZ:  To the extent that you can be

25    definitive, we would like to have those figures.

1      MR. VEEDER:  When do you want them, Mr. Moskovitz?

2      MR. MOSKOVITZ:  As soon as he can get them.

3      THE COURT:  We won't have them this afternoon.

4      MR. MOSKOVITZ:  No, I didn't expect you would.

5      Q    Now, during the time that these off-stream spread-

6 ing basins have been in existence, have any of them ever

7 been washed out?

8      A    Any of the which, Mr. Moskovitz?  I didn't under-

9 stand your question.

10      Q    My question is whether during the time since the

11 off-stream spreading basins have been constructed, had any

12 of them, any of the levees been washed out, or have they all

13 been in repair since then?

14      A    There have been minor washouts of the levee

15 system, primarily at the culvert section, as depicted on

16 Plaintiff's 86-A.

17      Q    Had the washouts affected the amounts of water

18 that could be held in them for spreading purposes?

19      A    Well, certainly, for the period of time that there

20 was a breach or partial breach in the levee system the

21 amount of water which could be contained in each of the

22 basins was diminished; but the water that flowed out of them

23 spread out over the lower portion of the spreading area and

24 went into the alluvial material, which is very coarse in

25 this area.

1    Q   Did all the water which was diverted during these

2    last two water years into these off-stream spreading basins

3    go into the underground, or was some of it returned to the

4    Santa Margarita River?

5    A   Was your question with regard to water diverted

6    into these off-channel spreading basins?

7    Q   Yes.

8    A   All of the water that was diverted into the off-

9    channel spreading basins since they have been in operation

10    have percolated into the alluvial fill, except for minor

11    losses, evaporation, and that, that might occur.

12    Q   In your opinion, has the operation of these

13    off-channel spreading basins resulted in more water going

14    into the underground than would have percolated had you not

15    used them?

16    MR. VEEDER:   I object to this on the grounds there is

17    no showing as to the quantity of water that would or would

18    not have gone underground.   There is no way of knowing.

19    THE COURT:   Well, if the witness can answer, all right.

20    Overruled.

21    THE WITNESS:   It is my opinion that spreading water

22    in this off-channel site has induced a greater recharge of

23    the alluvial basin.

24    Q   BY MR. MOSKOVITZ:   Than would have occurred had

25    there been no such spreading ground?

1       A    Yes, sir.

2       Q    Do you have any estimate or opinion as to how

3   much more water in these two water years, when you did use

4   these off-stream spreading basins, how much more water

5   percolated than would have percolated without them?

6       A    Oh, that would be limited to the quantities that

7   I gave in response to Mr. Sachse's question, Mr. Moskovitz.

8       Q    In other words, it is your opinion that in 1956 -

9   '57, 900 acre-feet percolated which would otherwise not have

10  percolated?

11      A    No, sir, that is not my opinion.  Because that

12  was a dry year, and that water would have undoubtedly

13  percolated into the stream channel.

14      Q    So 1956-'57, it is your opinion that the use of

15  these off-stream spreading basins did not result in the

16  percolation of any more water than would have gone in in

17  their absence?

18      A    That is correct.

19

20

21

22

23

24

25

5561

I

Z64

Bowen  Cross

1      Q  In 1957-58 you testified at 2400 acre feet was

2   diverted into the spreading basins.  In your opinion how much

3   of that, what portion of that would not have percolated into

4   the underground had there not been these spreading basins and

5   diversions to them?

6          MR. VEEDER:  That is objected to as calling for pure

7   speculation, your Honor.

8          MR. MOSKOVITZ:  If this witness has an opinion, it is

9   important.

10          THE COURT:  If he gives one, it is only going to be

11   little or much or more or less.  It is not going to be in any

12   acre feet or anything.

13          MR. MOSKOVITZ:  Well, he may have an acre foot estimate.

14          THE COURT:  Overruled.

15          THE WITNESS:  The winter of 1957-58 is a little more

16   difficult to analyze, Mr. Moskovitz, since there were periods

17   during the runoff season when there was surface stream flow

18   through the entire reach of the Naval Reservation on the

19   Santa Margarita.

20   BY MR. MOSKOVITZ:

21          Q  Does that mean that you can make no estimate as

22   to how much more water percolated than would have if these

23   off-stream basins had not been in existence?

24          A  As to how much, no.  But more water undoubtedly

25   would percolate because a larger area of the alluvial valley

I

Z65

1    was wetted by virtue of diverting water into this off-channel

2    spreading system.

3         Q  Were you present when Mr. Worts testified with

4    respect to the amount of recharge that occurred in the Santa

5    Margarita coastal basin in 1953?

6         MR. VEEDER:  I am going to object to that.  I don't

7    believe he testified to the quantity of water that went

8    underground.  Is that what you are asking?

9         MR. MOSKOVITZ:  Mr. Worts had an exhibit on it, as to

10   how much percolated in 1952-53.

11        MR. VEEDER:  The exact quantity that went underground?

12        MR.MOSKOVITZ:  That is what it says-- the amount of

13   recharge.

14        MR. VEEDER:  What is the exhibit number?

15        MR. MOSKOVITZ:  I think it was Exhibit 49.

16        MR. VEEDER:  What was the year concerning which you are

17   inquiring?

18        MR. MOSKOVITZ:  1935-53.

19        Q  Showing you Exhibit 49, were you present whenMr.

20   Worts described and explained this exhibit?

21        A  I don't recall being present, Mr. Moskovitz.  I have

22   been in and out of court and have heard fractions of the testi-

23   mony by various witnesses, but as to whether I was there when

24   he spoke about this matter you bring to my attention or not I

25   don't know.

I

Z66

Q   In 1952-53 were there any devices in operation for ponding the flow of the Santa Margarita River to induce more percolation?

A   Yes, sir, there were on-channel spreading structures in existence in 1952-53.

Q   Do you have the figures, or can you get the figures as to how much was impounded by those structures?

A   No, sir.

Q   Do you have figures for any of the years since those on-stream devices or spreading areas were in existence as to how much was impounded by them?

A   No, sir.

Q   Have you an opinion as to the extent to which those on-stream spreading areas caused the percolation of more water than would have percolated in their absence?

A   Yes, sir.

Q   What is your opinion?

A   My opinion is that they have aided in the recharge of the ground water basin in the lower Santa Margarita Valley.

Q   And is it your opinion that they did so each year since they were in operation?

A   No, sir.

Q   In what years do you believe?

A   Those years when surface stream flow failed to reach them they did nothing to further the recharge of the

5564

ground water basin.

Q   And in what years would surface stream flow not reach them?

A   I think that is in the stream flow U.S.G.S. stream gaging records, Mr. Moskovitz, those periods of zero flow in Ysidora, more specifically.

Q   You would assume that when there was zero flow at Ysidora that no surface water reached any of the on-stream spreading basins?

A   Very limited amounts of surface water, if any.

Q   And in those years, if any did reach those areas, those amounts of water probably would have percolated even if there had not been the on-stream spreading?

MR. VEEDER:   And when you say "percolated," you mean going into the ground water basin?

MR. MOSKOVITZ:   Going into the underground.

MR. VEEDER:   Into the basin?

THE WITNESS:   I don't know whether they would have or not, Mr. Moskovitz.   I don't know what quantities of water you are alluding to.

MR. VEEDER:   That is the point.   Are you talking about 1952-53 now?

MR. MOSKOVITZ:   No, I am talking about the years since those on-stream spreading areas have been in operation.

Q   What years, in your opinion, specifically more water

I

Z68

1      was induced into the underground than would have gone in if

2      those basins had not been in operation?

3           A  Well, certainly we have to-- the work on those years

4      when surface water reached the spreading structures--

5           THE COURT:  Well, isn't it axiomatic that in those years

6      in which there was a heavier flood flow and probably a flow

7      out of water at Ysidora Narrows and into the ocean, that those

8      were years in which these spreading devices were most effect-

9      tive?  Isn't that axiomatic?

10          MR. MOSKOVITZ:  I think it is axiomatic--

11          THE COURT:  Certainly if no water got down, then they

12     weren't effective at all.

13          MR. MOSKOVITZ:  That is right.

14          THE COURT:  Therefore, you put at one end of the scale

15     the years when water never reached them.  At the other end

16     of the scale you put the years when there was a tremendous

17     flood that came down into the whole valley and the spreading

18     device certainly had some effect.  Whether you can draw any

19     line in between is a question.  A medium flow coming down might

20     have passed on and ran out at the ocean but for the device

21     which slowed it down and therefore none went out into the ocean.

22     You might have a maximum benefit in some years that didn't have

23     a heavy flood.  How could we get at this, except just matters

24     of sort of common knowledge and common sense?

25          MR. MOSKOVITZ:  There might be some questions as to

1  whether the water might not have percolated in any event even

2  in the heavy years.

3    MR. SACHSE:  Your Honor, I attempted -- I hope that

4  Mr. Moskovitz can continue-- I attempted to start on this and

5  Mr. Veeder objected and stopped me.  Now, the stream flow,

6  as shown on Exhibit 6, was zero at Ysidora for 12 months of

7  the year 1955, and the aerial photos right before your Honor

8  that we looked at that I was cross-examining Col. Bowen, show

9  water impounded behind all except one of these structures.

10  So there is a situation when you had absolute zero discharge

11  for the entire water year and yet we did have water impounded,

12  and the exhibits are there.  I was endeavoring to cross-

13  examine on them when Mr. Veeder raised some objections, which

14  your Honor sustained.  Now if we can get into it this way, I

15  have no pride of ownership, I don't care who does it, but I

16  think it is extremely material testimony.

17    MR. VEEDER:  The point that I was making when I objected

18  to the course that was being adopted by Mr. Sachse was simply

19  this.  We hadn't gone into the matter of stream flow measure-

20  ments and we hadn't touched upon those very factors.  Now here

21  is a line of questioning that, in my view, is taking a differ-

22  ent course.  I don't know what Mr. Sachse had in mind, but I

23  do know that from the standpoint of Col. Bowen's testimony he

24  didn't talk about measured quantities of water.  He did talk

25  about off-channel spreading areas.

Bowen    Cross    4549                                    5567

THE COURT: Let us not waste a lot of time on it. Number one, can we agree, Col. Bowen, that in the years that the waters never got down as far as the devices, that they had no effect whatsoever?

THE WITNESS: Yes, sir.

THE COURT: In the years when the water got down as far as the devices and backed up behind them and none ran out into the ocean, as may have been the case in the water year 1955, they were rather effective?

THE WITNESS: Yes, sir.

MR. VEEDER: I was wishing that my witness wouldn't answer that question quite so rapidly.

THE COURT: Well, it is right in the pictures.

MR. VEEDER: Well, your Honor, I think it is true that the Santa Margarita River within the enclave occasionally is a gaining stream. In other words, there is ground water that comes to the surface and it is entirely possibel that the water that was observed behind those structures was not water that would have been available to run down to the ocean. That is what he was generally talking about. Also, we have been putting sewage effluent in there. Now there are several reasons why that water was there. Certainly during the year 1955 there was no water available that would have gone on through. Now that is our position in regard to the quantities of water that appeared in the photographs.

I

Z71

1    MR. SACHSE:  Is that your position or the witness's

2    position?

3    MR. VEEDER:  I am hopeful that the witness will adopt

4    it.

5    THE COURT:  How many of these dams across was the

6    water behind them affected by sewage effluent?

7    THE WITNESS:  In 1955, your Honor, that was all sewage

8    effluent, to my best recollection.

9    THE COURT:  In each of the dams?

10   THE WITNESS:  Yes, sir.  I think there were two there,

11   with the exception, your Honor, of the Lake O'Neill diversion,

12   which is the eighth structure upstream where water is diverted

13   through the O'Neill ditch.  That was surface runoff from the

14   river.  But as far as the spreading dam No. 6 and spreading

15   dam No. 5, which  I believe are the only ones that show a

16   free water surface behind the structure, that was sewage

17   effluent discharged from Sewage Treatment Plant No. 3.

18   THE COURT:  Is there any dispute about the right of the

19   Government to return its sewage effluent into spreading

20   basins?

21   MR.MOSKOVITZ:  No, not on my part.

22   MR. SACHSE:  No dispute.

23   THE COURT:  Or to do anything it wants with it?

24   MR. SACHSE:  No dispute.

25   MR. MOSKOVITZ:  No dispute as to any water that comes

I

Z72

1 onto the Naval Reservation.

2      MR. SACHSE:  Do anything they want.

3      THE COURT:  As to what?

4      MR. MOSKOVITZ:  As to any water that comes on to the

5 Naval Reservation, once it gets there, whether it is from stream

6 flow or from sewage return.

7      MR. VEEDER:  Well, then, why are you cross-examining?

8      THE COURT:  It is your position, then, and Mr. Sachse's

9 too-- let us get this straight-- that once the Navy has a right

10 to have certain water flow onto the reservation, from then on

11 they can do as they please with it?

12      MR. MOSKOVITZ:  No, your Honor. The question is, what

13 water do they have the right to insist upon?

14      THE COURT:  But such water as they have a right to in-

15 sist upon, that they have a right to insist it shall flow into

16 the reservation, once it gets on the reservation it is your

17 position that they can do anything they want with it?

18      MR. MOSKOVITZ:  Your Honor, the trouble is that this

19 reverses the process as to what water they can insist upon.

20 They can insist upon water for certain uses.  If water gets

21 down naturally because other people don't take it out and it

22 would go out to the ocean, they can spread it, if they like.

23 But they can't insist that somebody release water to them so

24 that they can spread it.  I think that is a big difference.

25      MR. VEEDER:  Then we spent a whole day for nothing, because

I

Z873

certainly nobody upstream -- Fallbrook has but a dream and
it doesn't hold much water.  Water comes down to us.  The
Colonel very wisely husbanded that water that got to us.  We
insist that we certainly have the right, when De Luz water
comes down, when Fallbrook doesn't steal everything, and when
it gets down to us, we have a right to handle it as we choose.
The State has no police power over it.  Now if they agree on
this proposition, what are we talking about?

THE COURT:  Well, now, let us take one step at a time.
First, sewage effluent-- there is no dispute about the fact
that the Government can take that sewage effluent and put it
back into the ground and spread it in basins, store it in
reservoirs, move it outside the watershed; is that correct?

MR. MOSKOVITZ:  I have no doubt that as to water which
is on the base, they can do that, yes.

THE COURT:  Now as to whater-- let us assume that the
Government has a right to have X feet of water flow onto the
reservation by reason of its riparian rights.

MR. MOSKOVITZ:  I am afraid I can't make that assumption
to start with, your Honor.  That is the question.  It doesn't
have a right to X quantity of water as a riparian.

THE COURT:  Well, X is a correlative figure.  That is
why I used X.

MR. MOSKOVITZ:  For use as a riparian, that is, as it
comes naturally and within the watershed; that is what the

I

Z74

1  right is for.

2      THE COURT:  Then it is your contention that that amount

3  of water, X, the Government may only use for riparian purposes

4  within the watershed.

5      MR. MOSKOVITZ:  No.  The point is that it cannot require

6  other people to release the water to it for purposes that are

7  outside its riparian right.

8      MR. SACHSE:  May I take a whack at it, your Honor.  Once

9  any water gets there, the Government can do anything it wants

10  with it-- nobody can stop it-- not only because of the

11  sovereignty of the United States, the police power, but the

12  same would be true were it a private owner.  He is the last

13  one on the stream and there is no one below him to be hurt,

14  so he can do anything with the water he wants.  But the

15  Government cannot have a right even to X acre feet, if all it

16  is going to do with it is store it, spread it, because we

17  contend that that is not a proper riparian use.  If all it is

18  going to do is spread the water, it has no right.  Anybody

19  upstream can take it.  If it is going to irrigate with it, it

20  can insist that water come down to it for irrigation.  After

21  it gets there, if it cheats and starts spreading, nobody can

22  stop them; but people can then refuse to release water for

23  such purpose.  That is the distinction.  It is a physical

24  question of their power to do with as they please with the

25  water once it arrives there, and the right to say to anyone

I

Z75

1    upstream, be it appropriator or the Vail Estate or anyone else,

2    the water has to come down-- that is the distinction.

3         MR. VEEDER:  I believe the Vail estate is represented

4    by Mr. Stahlman.

5         The point, your Honor, in regard to this phase we are

6    talking about now-- and I am glad to hear them talk about it--

7    all we are saying is that when water comes down to us, we take

8    very good care of it and husband it.

9         THE COURT:  I have made mental note of the fact that

10   Fallbrook seems to be very hard up for water, but they have

11   turned their effluent loose and make no use of it.  The

12   Government, on the other hand, makes good use of their sewage

13   effluent.  I have made a mental note of that as we went along.

14        MR. MOSKOVITZ:  Your Honor, if the testimony we have

15   had so far about what the Government does with the water once

16   it gets there has any relevance in this lawsuit at all, its

17   relevance is to prove what its rights are.  Now, it proves

18   what its rights are by showing that what it is doing is within

19   its rights.  If we show that what it is doing is outside the

20   water right, then it cannot insist that people release water

21   to make that type of use.

22        THE COURT:  I understand.

23        MR. MOSKOVITZ:  And that is why the cross-examination

24   as to how they are doing it and whether it results in their

25   getting more water for use than they would if they let the

I

Z76

1   water percolate naturally.

2          MR. VEEDER:  Is the State taking the position that we

3   should let the water run down into the ocean and waste?

4          MR. MOSKOVITZ:  Not at all.

5          THE COURT:  I think I understand the position.  In

6   other words, by showing that you have spreading grounds on

7   the stream, artificial dams, you can't thereby increase the

8   amount of water which you would otherwise be entitled to. But

9   by the same token the use of your spreading grounds is certainly

10  a sensible and reasonable use of water which you are entitled to

11  have come down the river.

12         MR. VEEDER:  May I add one additional point in that

13  regard, your Honor.

14         THE COURT:  Isn't that right?

15         MR. MOSKOVITZ:  Well, I would alter it slightly, your

16  Honor.  That if it is a sensible use of water, it is within

17  their power to make that use of water which gets to them.

18         THE COURT:  But they can't use the evidence as to the

19  spreading grounds or the artificial dams to increase the

20  measure of their rights.

21         MR. MOSKOVITZ:  That is correct.

22         MR. VEEDER:  Your Honor, I would like to put in an

23  observation there.  There is now showing as to what quantity of

24  water would or would not have gone underground had we not

25  spread the water.  But we do know that by the activities of

Col. Bowen and his staff and the Marine Corps water has been

diverted and permitted to go across the coarser alluvium in

the upper end of the valley and recharge the upper end of the

valley where we are now pumping and the greatest burden is

placed.  In my view as a riparian, we certainly have the

right to do that, and it is certainly part of the administra-

tion of the rights to the use of water to which we are entitled

as a riparian.  If they can come up with some showing as to

the quantity of water that they would say would have gone into

the ocean, I am extremely interested in it.  We don't know

what that would be. But we do know that we put the water where

we needed it and we believe we have a riparian right to it.

MR. SACHSE:  That is stated as an issue, your Honor.

You very clearly state it, although in your opinion you re-

gretted the form in which you posed the question originally.

It is still there in the issues as to whether the artificial

spreading practices are proper exercise of the riparian right.

I believe it is an issue before this Court. Whether it is of

fact or of law I don't know.  I think it is largely a matter

of law, frankly.  I think the factual question is pretty well

taken care of by the physical situation of the United States

being the last user on the stream.  Nobody can stop them

anyway.

THE COURT:  Well, you have a pretty complicated problem,

and you have artificial rules of law that say this is so and

5575

I

Z78

1   this is so and they don't all make sense.  For instance, there

2   is a series of cases that indicate that a riparian owner has

3   a right to have flood waters run across his land in their

4   natural course, and academically we could all say, "Probably

5   correct, if you could limit the water just enough to run

6   across his land."  On the other hand, here comes a riparian

7   who says, "Well, that is a wasteful thing to do, because you

8   let the flood waters run across your land and some of them

9   get away from you.  So I am going to put in some little

10  impediments along the stream to slow this water down and

11  make use of it," et cetera.  Then of course you run into the

12  rule of law that you can't have artificial storage of water

13  as an exercise of a riparian right.  So you have a lot of

14  inconsistencies here when you try to work this thing out.

15      MR. VEEDER:  That is right.  Peabody vs. Vallejo and

16  the other cases say that the riparian has a right to have the

17  stream run down under water pressure to force the water

18  underground.  We are simply giving nature a lift.

19      MR. SACHSE:  For the record, that is an absolute mis-

20  statement of Peabody vs. Vallejo.  The Peabody case is the

21  principal case that said that he did not have the right to

22  insist on the flood waters going into Suisun Bay.  That is

23  the leading case in California on the principle that he doesn't.

24  Mr. Veeder.

25      MR. VEEDER:  I imagine that I have read it more often

than you, Mr. Sachse.

THE COURT:  Well, let's go ahead.

MR. VEEDER:  An additional point that I make, your Honor, we desire to inject now that the question has been opened up.  We are confronted with the matter of salt water intrusion, and we are confronted with the need most scientifically to meet that situation, and if we are able in exercise of our riparian right to get that water underground at a point where it will be most munificent and moving out the salt water, I believe it is part of our legal right to do that.

The point I am trying to make, your Honor, is that it would be most unusual if by getting the water underground a little higher up that we can't get more benefit from the standpoint of salt water intrusion.  I think the law may be an ass in some regards, but I don't believe it is that big a one.

MR. SACHSE:  I would suggest that if they stopped the irrigation of Stuart Mesa from pumps at Ysidora, that your own witnesses have testified caused the salt water intrusion, excessive pumping from Ysidora, if you would stop pumping water out of the watershed, you wouldn't have any need for the artificial recharging practices.

THE COURT: Go ahead.  We will argue that later.

J-1 ML

1    Col. Bowen, since the on-channel storage dams have

2  been constructed, do you know of any that have washed out?

3    A    Yes, sir.

4    Q    When did they wash out?

5    A    Well, most recently some of them washed out this

6  past winter; 1958.  March and April of 1958, to be more

7  exact.

8    Q    You had a total of seven before that, is that

9  correct?

10    A    Not counting the O'Neill diversion.

11    Q    Not counting the O'Neill diversion.

12    A    And counting what we now call the Rifle Range

13  Road which originally was designed and built as the seventh

14  on-channel spreading structure.

15    Q    How many of those that you have mentioned washed

16  out during the last year?

17    A    Well, there were some -- by "washed out," now,

18  would you be more specific what you mean by a "washout"?

19    Q    How many were no longer effective in storing the

20  water?

21    MR. VEEDER:  I object to the use of the word "storage."

22  There is nothing to show that water was stored.

23    Q  BY MR. MOSKOVITZ:  Go ahead.

24    MR. VEEDER:  I have an objection.  I don't believe

25  that there is anything here to show that water was stored.

1    THE COURT: Stored temporarily. Overruled. Overruled.

2    MR. VEEDER: Why can't we say "spread," your Honor.

3    THE COURT: Overruled.

4    MR. STAHLMAN: Impounded?

5    MR. VEEDER: No. No.

6    THE COURT: Go ahead.

7    THE WITNESS: Well, I would say that they were all

8 effective in retarding the flow of water. It is a little

9 difficult to analyze. There were probably about two in

10 there which may have been rendered totally ineffective, and

11 the remainder, to a greater or less degree, had some effect

12 in retarding the flow of surface water.

13    Q   BY MR. MOSKOVITZ: Do you know what dates the two

14 that you said had little or no effect lost their effectiveness

15 and no longer held back water?

16    A   As I recall, it was about the 16th of March.

17 Again, I would have to refresh my memory. I believe the

18 15th of March it started to rain, and we had rain with

19 occasional showers of some intensity. It raised the stream

20 to kind of a freshet-sized proportion, and it ran on down the

21 river and caused some damage to these on-channel spreading

22 structures.

23    Q   What was the date during this past year, '57-'58,

24 when water was first impounded behind these on-channel

25 structures?

Bowen - Cross

1    MR. VEEDER:  Again, I object to the use of the word

2    "impounded" or "stored."

3    THE COURT:  Overruled.

4    By "water" do you mean water other than sewage

5    effluent?

6    MR. MOSKOVITZ:  I will ask it that way.

7    Q    Water other than sewage effluent?

8    A    Your question applied to calendar year 1958?

9    Q    The water year '57-'58?

10   A    Water year of '57-'58.  I don't believe any

11   surface stream flow of any significance reached those on-

12   channel spreading structures until the middle of March,

     1958.

13

14   Q    And how long was water impounded behind these --

15   MR. VEEDER:  I want a continuing objection to the use

16   of the word "stored" or "impounded."  There is not a thing

17   in the world to show that either was.

18   THE COURT:  Overruled.  It is obvious what the

19   question means:  maybe only impounded momentarily.  "Store"

20   doesn't indicate for any particular period of time.  The

21   general word --

22   MR. VEEDER:  Based upon your Honor's interpretation,

23   fine.  But I would like a continuing objection.

24   THE COURT:  You may have it.

25   THE WITNESS:  There was water behind at least some of

1   these on-channel spreading structures other than sewage

2   effluent, oh, well, into May or June.  I don't know when the

3   sewage effluent completely replaced the surface stream flow

4   that was held behind, say,   on channel dam No. 6.

5        Q   BY MR. MOSKOVITZ:   Then, you say for a period of

6   two to three months surface stream flow was held back behind

7   the on-channel spreading structures?

8        A   Behind what?

9        MR. VEEDEN:   Now, just a moment.  I don't believe

10  there is a matter of flow at that time.

11       THE COURT:   He is asking the question.  Overruled.

12       MR. VEEDER:   Now, he said down three or four months.

13  Isn't that what the --   May I have the question?

14       THE COURT:   Read it.

15       (The reporter read back the question.)

16       THE WITNESS:   I am not absolutely certain that there

17  was continuous surface stream flow into the -- or in the

18  stream channel for that length of time.  It was an inter-

19  mittent flow, if I recall, Mr. Moskovitz.  Again, I would

20  have to check the U.S.G.S. stream gaging records for '57-'58.

21       Q   BY MR. MOSKOVITZ:   In exhibit, Master's Hearing

22  M-DE you have given the acreages of the spreading dams.  I

23  assume those are the on-channel spreading dams that you have

24  just been testifying about?

25       A   Now, these acreages on Plaintiff's Exhibit M-DE

J55    Bowen - Cross
Case 3:51-cv-01247-JO-SBC   Document 4549   Filed 09/24/63   PageID.26306   Page 136 of 581
149

1   entitled "Spreading dams," with the acreage on the right-

2   hand margin, that area is approximately the area above the

3   dam which could be flooded by water if water were there.

4       THE COURT:  And if the dam didn't wash out, is what

5   you mean?

6       THE WITNESS:  And if the dam didn't wash out, yes,

7   your Honor.

8       Q  BY MR. MOSKOVITZ:  Do you have any opinion as to

9   how long-- let's take spreading dam No. 6 which has an area

10  of nine acres --  how long water behind that dam, up to the

11  top of the dam so that you had nine acres flooded, how long

12  that water would stay behind the dam before it seeped into

13  the underground?

14      MR. VEEDER:  I am going to object to that.  It is

15  purely speculative.

16      THE COURT:  It is impossible.  You are talking about

17  what water?  Water is there because it is flowing down.  Do

18  you mean by that, how long before there would be no longer

19  any water behind the dam?  That would mean your flow would

20  have to cease?

21      MR. MOSKOVITZ:  Yes.

22      MR. VEEDER:  Your Honor, moreover, what was the level

23  of the basin at the time?

24      THE COURT:  Another thing, I don't know why I should

25  spend a lot of time on these structures on the stream, in

1   view of the fact that the Government is putting back the

2   effluent into the stream.   There are figures here in acre-feet

3   of how much water they are putting back in the stream by

4   return of their sewage effluent.  Unless you could convince

5   me some way that in the small amount of water that might,

6   in addition, go into the subbasin because of these obstructions

7   in the stream was more than what they put back for a sewer

8   effluent, I would try to find some way to eliminate this

9   thing; cross one off against the other.  Here the Government

10   is returning water to the stream that wouldn't be there.

11      MR. SACHSE:  I don't think that last statement of

12   your Honor is correct

13      THE COURT:  Whether it is correct or not, I tell you

14   as a practical matter, I am not going to spend a lot of time

15   on a few little minor obstructions in the stream when the

16   Government meanwhile is putting back water into the stream

17   that would never be there except for --

18      MR. SACHSE:  I am speaking of the effluent.  Every

19   riparian puts back water.  The Vail Estate puts back under

20   the estimate given here by Mr. Buffman (phonetic), I think

21   about 40 per cent of what they use.

22      THE COURT:  There is no obligation under riparian

23   law that he put it back.

24      MR. SACHSE:  He puts it back in natural return flow.

25   And return flow from his irrigation, the return of sewage

1    effluent, the return of water that runs out of a domestic

2    septic tank in Fallbrook, and it comes back to the stream

3    flow, is exactly the same natural return that is -- as a

4    natural duty performed by every riparian who does not export

5    the water.  The only way that this sewage effluent would ever

6    be lost to the river would be if the United States did an

7    improper thing with it, took it out of the watershed.  As

8    long as the water is used within the watershed, as is the

9    duty of a riparian, a percentage goes back.  Now, granted,

10   the percentage of return is greater if it is concentrated

11   from domestic sources, if it is shower baths and bathing

12   water and so on, because the higher percentage, I think, of

13   the total does come back.  But even the irrigator is putting

14   back in one-third to forty per cent of the water he uses.

15   And that is one of the reasons why basic water law would not

16   permit Mr. Vail, for example, to take the water out of the

17   watershed; because then the return flow is once and forever

18   lost.  So the United States is doing nothing noble here or

19   in excess of its right.  It is doing what its right expects

20   it to do.  It is doing good husbandry, yes.

21       THE COURT:  Except it is doing it in the most efficient

22   way by putting in some obstructions across the river so that

23   this effluent is surely returned to the basin.

24       MR. SACHSE:  Well, I will concede that they are

25   exercising very good water husbandry.  But I get concerned

1  when this thing twists around so that we assume that water
2  they are putting in out of their sewage system is something
3  that they didn't have to do anyway.  They do.

4       THE COURT:  You just conceded to me a few minutes
5  ago that they could take this effluent and use it outside
6  of the basin?

7       MR. SACHSE:  I didn't, no, your Honor.  I never
8  conceded that.

9       THE COURT:  Use the water, sewer effluent.  Mr.
10 Moskovitz did, too.  You want to back up on that?

11      MR. SACHSE:  Your Honor, I said that they had the
12 physical power to do anything they wanted with any water
13 down there.  I never conceded they had a right to export any
14 water anywhere.  They don't.  They have the physical power
15 to do so, but they have no right.  The right is to use the
16 water within the watershed  and when they were exporting --

17      THE COURT:  I thought we had passed that.  I think the
18 record will show that both you gentlemen conceded the
19 Government could do as they pleased with the sewer effluent;
20 we could forget about it.

21      MR. VEEDER:  And your Honor, I want to add one other
22 thing, too:  I want to make it very clear, your Honor, there
23 is absolutely no obligation on the part of the United States
24 to reuse on a military camp the water that it once uses.
25 There is no obligation, and I submit that Mr. Sachse, in his

1  flights of ideas today, has gone clear into the blue yonder

2  again.  There is no conceivable reason why a military in-

3  stallation should be forced to use sewage effluent, and it

4  is certainly not part of the riparian obligation to re-use

5  this sewage effluent.  And I want to add one other thing:

6  that the discussion here is not predicated upon fact.  A

7  riparian owner is entirely capable, as long as it has been ben-

8  eficially used, to consume every drop of water to which he

9  is entitled so that none comes back.  And I point to the fact

10  that in regard to using sprinklers, which is becoming an

11  increased practice, that the quantity of water returning to

12  the stream when you are using sprinklers is far less than by

13  surface diversion.  And the day is going to come in this

14  valley when the quantities of water returned after they are

15  used will be greatly diminished because more people are using

16  more riparian land and applying more water to it by the

17  method that I made reference to.  So we can't accept these

18  broad strokes that Mr. Sachse has been painting today.

19        THE COURT:  Mr. Moskovitz?

20        MR. MOSKOVITZ:  Your Honor, I think it is very

21  important to distinguish between the power of the United

22  States to act within the confines of the enclave without

23  restriction by anybody and the water rights it has.  The

24  Circuit Court made the distinction very plain.

25        THE COURT:  I am aware of that.

1   MR. MOSKOVITZ:  So when I said, and if I can correctly

2   construe Mr. Sachse when he said that the Government can do

3   whatever it wants with the water that is on the enclave, we

4   were talking about the first problem, the problem of the

5   power of the Government to act free from restrictions by the

6   People.  But that doesn't mean that they have the right to

7   insist upon delivery of water to make such uses.

8   THE COURT:  Do you contend that in establishing the

9   correlative rights between the Government and riparians

10  upstream and determining whether there is any water that

11  Fallbrook could appropriate, that you would subtract from

12  the Government, share of the effluent, sewer effluent, that

13  you, therefore, would make the Government take into account

14  its sewer effluent in order to give it appropriative right

15  to take the water out of the stream?

16  MR. MOSKOVITZ:  I think probably not.

17  THE COURT:  All right.

18  MR. MOSKOVITZ:  I think probably not.  But there is

19  one further point I want to make, your Honor, and that is

20  the fact that the Government does put back the sewage effluent

21  in the basin.  It doesn't mean that it thereby has the right

22  as a riparian to spread water which comes down the stream as

23  surface runoff.

24  THE COURT:  The main thing that I am thinking about,

25  and I started out on it:  it seems to me this is such a small

1    item, such a small item, that we spend a lot of time on it,

2    and you are developing it into a big issue.  And I merely

3    pointed out the Government has been operating in an efficient

4    manner putting the effluent back where it will do the most

5    good.  And I would like to just wash my hands of it.

6         MR. VEEDER:  Of the effluent?

7         THE COURT:  Here are a few little impediments in the

8    stream that may on certain occasions cause a little more

9    water to go into the basin.  And let's assume that they are

10   in the nature of dams, and, therefore, are not in the

11   exercise of the riparian right.  Nevertheless, they help in

12   the efficient operation of the return of the sewer effluent.

13   And probably the amount of acre-feet involved is so small

14   that it isn't going to make a lot of difference in this

15   picture.  But if you gentlemen think it does, why, then,

16   we will have to squeeze the lemon dry and find out, if we

17   can, how much this affects the stream.

18        MR. MOSKOVITZ:  That has been the purpose of this

19   examination, to find out how significant this is.  If it is

20   significant, I think it should be taken into account.

21        THE COURT:  Well, I haven't heard the witness give any

22   figures in acre-feet, and I don't know how anybody can.

23        MR. SACHSE:  He gave us 2500 and 900 for the two years'

24   spreading on the off-channel structures, your Honor.  Twice.

25   He repeated them.  And that is substantial acre-feet from the

river.

THE COURT:  Well, supposing the Government turned around and let that amount of water go down the stream instead of diverting to the O'Neall ditch?  Do you think it would flow out in Ysidora?

MR. SACHSE:  In some years, yes, your Honor.

MR. VEEDER:  Suppose we didn't put sewage effluent underground.  There are so many "supposes" on this thing. There is no doubt that in a year when there is some higher runoff that we pay a tremendous price for husbanding the sewage effluent, because it is simply filling up the basin to a point where it cannot be receptive of an acre-foot of fresh water.  And I don't think we should be penalized for it.

MR. MOSKOVITZ:  I would like to have Exhibit 77.

1    Q  Col. Bowen, I believe you testified, in answer to

2  a question by Mr. Stahlman, that the total acreage of Stuart

3  Mesa was 1158 acres. Is that your present calculation?

4    A  Let me see if my notes agree with yours, Mr.

5  Moskovitz. Yes, sir, 1158 acres was the area I gave in

6  response to Mr. Stahlman's question regarding the acreage of

7  Stuart Mesa.

8    Q  And that includes the areas both inside and outside

9  the watershed; isn't that correct?

10    A  Yes, sir.

11    Q  I show you Exhibit 77, which indicates that in 1939

12  1214 acres were irrigated on Stuart Mesa.

13    A  Yes, sir.

14    Q  Is there some discrepancy between these two figures?

15    A  The figure on Plaintiff's Exhibit 77 is planimetered

16  from aerial photographs which intrinsically have some errors,

17  and the figure that  I gave in response to Mr. Stahlman's

18  question was planimetered from the $7\frac{1}{2}$-minute series U. S.

19  Geological Survey topographic map.

20    Q  And the latter figure is the accurate one; is that

21  correct?

22    A  I would consider the latter figure to be the most

23  accurate; yes, sir.

24    Q  Will this require revision of other figures which

25  appear on Exhibit 77? Were those also taken from the topographic

K

Z81

A   These were all taken from aerial photographs, Mr. Moskovitz, on Plaintiff's Exhibit 77.

Q   So they would have an error because of that fact?

A   Well, they may or may not-- it would depend.  A reevaluation or an evaluation would be made in comparison with the 7½-minute series topographic map.

Q   In calculating the amount of land which was irrigated in 1929, was that calculated from the aerial photographs?

A   Yes, sir.  That is the only way I had available to me to make any determination.

Q   And those figures might also have an error by reason of that fact?

A   There are differences in the scale of the aerial photograph within the photograph which led to some error in mensuration on the photograph, Mr. Moskovitz.

Q   This is the same kind of error that explains the difference between the 20,000-odd acres which you have indicated as riparian acreage on Exhibit 93 and the 18,000 acres which you have calculated now is irrigable acreage within the watershed?

A   It is similar, Mr. Moskovitz.

THE COURT:  Have you notified the counsel that you have lodged these additional exhibits?

MR. VEEDER:  Which ones are those, your Honor?

THE COURT:  Exhibits 122, 123, and the aerial series

K

Z82

1  124-A2 through 10.

2      MR. VEEDER:  May I see them.  I want to be sure what

3  you are speaking of, your Honor.

4      THE COURT:  The Clerk tells me they were lodged today.

5      THE CLERK:  Yes, your Honor.

6      MR. VEEDER:  Yes.

7      THE COURT:  Did you give copies of these to counsel?

8      MR. VEEDER:  They are available, yes.

9      MR. SACHSE:  Which ones are they?

10     THE COURT:  Unless you tell them, they don't know that

11 you have lodged the exhibits.

12     MR. VEEDER:  The point is that we make up a list of

13 them, your Honor, and they will be distributed, of course.

14 In regard to the aerials, that is what I want to be sure to

15 look at.  The aerial photographs for the Coahuilla Indian

16 Reservation, for example, we will not distribute copies of

17 those.  If they want to see them, they can, but I don't think

18 we should be required to make up all the copies.  We will

19 give them a complete list of those aerials that have been lodged.

20     THE COURT:  I just inquired.

21     MR. VEEDER:  Yes, your Honor.

22     MR. MOSKOVITZ:  I have no further questions, your Honor.

23     THE COURT: It is 4:30.  We have an appointment tomorrow

24 morning at 8 o'clock at Col. Bowen's office at Camp Del Mar.

25     THE WITNESS:  Yes, sir.

K

Z83

1    THE COURT:  This didn't upset your plans too badly to

2    have this thing arranged for 8 o'clock?

3    THE WITNESS:  No, sir; the arrangements have been

4    completed, your Honor.

5    THE COURT:  I expect you gentlemen to be there at that

6    time.  The Clerk and the reporter will be there.

7    MR. VEEDER:  I would like to be able to designate the

8    exhibits that we will take out, but I want to take a look

9    at them to see if I can't reduce the number, and I will tell

10   the Clerk about it.  Is that all right?

11   THE COURT:  All right.  Don't take any more than you

12   have to.

13   MR. SACHSE:  There is no need to take out sets.  There

14   is no reason why we can't all look at the same ones?

15   MR. VEEDER:  I am for that.

16   THE COURT:  I am not going to take mine.

17   Here is the Master's exhibit, and here is the exhibit

18   that belongs to you.  Keep that exhibit with the Master's

19   exhibit, but by reference it is an exhibit in this case.  Is

20   that understood?

21   MR. MOSKOVITZ:  You mean Exhibit M-DE?

22   THE COURT:  Yes.

23   MR. VEEDER:  That is admitted.

24   MR. MOSKOVITZ:  Your Honor, before we adjourn I want to

25   find out--

1    Mr. Veeder, in making your corrections as to the

2    irrigable acreage inside and outside the watershed, are you

3    also going to make corrections for the fact that previously

4    the acreages have been adopted from the aerial photographs?

5    MR. VEEDER:  I have an expert here with whom I am

6    consulting every moment, and when he guides me I shall follow

7    him. As of the moment he has not broken the trail yet.

8    MR. SACHSE:  I have one question, Mr. Veeder-- that

9    cracked phonograph record-- the State of California's geologist

10   would like to have available the confidential log on the Pauba

11   well.

12   MR. VEEDER:  I have done all I can, Mr. Sachse.

13   THE COURT:  What do you hear from Mr. Worts?

14   MR. VEEDER:  The matter is to be edited, your Honor,

15   and I simply can't get it.

16   THE COURT:  What did he tell you as to when the editing

17   would be done?

18   MR. VEEDER:  It has to be reviewed in Washington, as I

19   understand it, and I will have the witnesses available for

20   cross-examination and they can certainly when it is available.

21   THE COURT:  It may just mean delaying the matter, be-

22   cause if there is examination of some of these witnesses who

23   have come in they may have to come back again to be interrogated

24   on the Pauba well.

25   MR. VEEDER:  Yes, your Honor.  I am trying on that.

5594

K

Z85

1          THE COURT:  See if you can get a hurry-up on this.

2          MR. VEEDER:  All right, sir.  I will try.

3          THE COURT:  8 o'clock tomorrow morning.

4          (Adjournment until Wednesday, November 26, 1958, at

5    8 A.M., at Camp Del Mar.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25