# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No.  1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**    San Diego, California

**Date:**    Tuesday, December 2, 1958.

**Pages:**  5650 to 5790

# FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By_____  Deputy

MALCOLM E. LOVE
**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | No. 1247-SD-C. |
| ) | |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, December 2, 1958

APPEARANCES:

|  |  |
|---|---|
| For the Plaintiff | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney-General, Department of Justice, Washington, D.C. |

1
2   APPEARANCES (Continued)

3        For Defendant Vail      GEORGE E. STAHLMAN, ESQ.
        Company

4        For Defendant State     EDMUND G. BROWN, ESQ.,
        of California          Attorney-General, by
5                            ADOLPHUS MOSKOVITZ, ESQ.,
                            Deputy Attorney General.
6

7        For defendants
        Fallbrook Public
        Utility District,    F. R. SACHSE, ESQ.
8        et al.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX TO WITNESSES

| For the Defendants: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Leland R. Illingworth | 5665 | | | |
| **Laurence James** | 5779 | | | |


E X H I B I T S

| Defendants' Exhibit | | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|---|
| M series | Rock samples | 5689 | |
| N series | Rock samples | 5689 | |
| O-1 to O-26 | Colored slides | 5713 | |
| California L | | | |
| Plate 1  Map | | | 5737 |
| Plate 2-A "Physiography, Coastal area" | | | 5736 |

5653

A-1 ML

SAN DIEGO, CALIFORNIA, TUESDAY, DECEMBER 2, 1958, 10:00 A.M.

---o---

THE CLERK:  Number four:  1247-SD-C, United States vs. Fallbrook for further court trial.

THE COURT:  The reporter had three places that he was uncertain about in the transcript he prepared.  I suppose no one has had a chance to look at it yet.

MR. VEEDER:  I haven't.

THE COURT:  We will pass it over.  Largely, the names of some of the schools.

MR. VEEDER:  And I have told him that I would obtain the names of those schools.  I don't know them myself.

THE COURT:  It appears on 5608, 5632; both involve schools.  And 5646 at the weather stations.  Some word is missing there.

MR. VEEDER:  We will get those and have them supplied.

THE COURT:  All right.

MR. SACHSE:  Your Honor, I have a very minor correction, I believe, in the statement you made in the transcript of November 25th, page 5534.  It is a statement you made to me.

THE COURT:  What volume is that?

MR. SACHSE:  That is Volume 49.

THE COURT:  And what line?

MR. SACHSE:  Line 12.

1   MR. STAHLMAN:  What page again, counsel?

2   MR. SACHSE:  5534.  The statement reads, as follows:

3       "I take it your point is, Mr. Sachse, that there

4   are small areas of ground that need, to say the

5   least, which are so small, so far removed from source

6   of the water, that it would be economically feasible

7   to irrigate them, even if they were, of their own

8   character, irrigable lands?"

9       I think the statement was:  "...it would not be..."

10  THE COURT:  Insert the word "not."

11  MR. MOSKOVITZ:  Your Honor, I understand today is

12  the day when the State is scheduled to present geological

13  evidence.  Before we begin, I would like to outline briefly

14  what we have in mind to see if it is in accord with your

15  desires.

16  MR. STAHLMAN:  Would you excuse me one moment on a

17  matter I think we left in the air here regarding the

18  transcript, the request by Mr. Littleworth, transferred to

19  the Court by someone, regarding the taking of the testimony

20  of some one particular witness.  And I believe your Honor

21  said he would consider whether or not that could be done.

22  THE COURT:  Did you talk to the reporter about it?

23  MR. STAHLMAN:  I didn't.

24  THE COURT:  I didn't.

25  MR. STAHLMAN:  From my position we have got to the

1  point --   In the first place, there is so much of a daily

2  that does me no good.  And it is getting quite expensive on

3  a daily basis.  I am talking about my client.  He is

4  seriously giving up the desire to have the transcript at all.

5  However, if the other arrangement is made there are some

6  witnesses whose testimony we would like.

7       THE COURT:  The rumble is that it costs a half-

8  million dollars to try this lawsuit in the State courts and

9  if the United States and Vail proceed to have a go at it

10  again here the small amount of money they are going to pay

11  for a transcript here will have little bearing to the total

12  bill.

13       MR. STAHLMAN:  Your Honor, it costs more than that.

14  That is one thing that scares me.

15       THE COURT:  Well, I see your point, and I am just

16  wondering about being pound wise and penny foolish --

17  penny wise and pound foolish, I think it is.

18       MR. STAHLMAN:  They were penny foolish and pound wise

19  before, but it didn't get them very far.  They lost both

20  the pennies and the pounds so --

21       THE COURT:  Well, I will have a talk with the reporter.

22  Whose testimony was it you wanted?

23       MR. STAHLMAN:  I have no particular one in mind at

24  this time.  It was Mr. Littleworth who suggested it.  We

25  have this situation, for instance, we have no concern at all

1   over some areas like, for instance, Fallbrook Creek.  We

2   are not concerned with what is done on Fallbrook Creek in-

3   sofar as the detailed testimony is concerned, and yet, as

4   the testimony goes in, it would become necessary to want

5   the testimony of some particular person on that date.  We

6   have to order the transcript of the whole day.  And through-

7   out this case there will be many of these areas which do

8   not affect Vail at all.

9       THE COURT:  I think it can be worked out.  I will

10  talk to the reporter.  In other words, up to now he has been

11  giving you a day's transcript if you want it?

12      MR. STAHLMAN:  Yes.

13      THE COURT:  This would be where you want a portion

14  of the day?

15      MR. STAHLMAN:  I wouldn't have thought about it except

16  Mr. Littleworth suggested it.  Now, I hate to break it down.

17  But I know there are some days when we don't need it at all.

18  I hate to get the transcript for the entire day when it is

19  only a very small part of the testimony of that day.

20      THE COURT:  I don't think this next matter ought to

21  go in the record.

22      (Discussion off the record.)

23      THE COURT:  That is off the record.

24      MR. VEEDER:  It will be on.

25      THE COURT:  All right, Mr. Moskovitz, you want to

1     make something in the nature of a brief opening statement of

2     how you are going to proceed in this matter?

3         MR. MOSKOVITZ:  Yes, and get a little guidance from

4     the Court as well.

5         As we understand it, the request was that the

6     State put in geology at this time out of order in order that

7     while the geology of the United States is still fresh, other

8     views, to the extent they are different, can be heard.  And

9     we were willing to go ahead on that basis.  Now, our geology

10    is set forth in Bulletin 57.  That is Fallbrook's AA for

11    identification, the State's L for identification.  Along with

12    other data --

13         THE COURT:  State's 12, I think.

14         MR. MOSKOVITZ:  Your Honor, the Clerk has told me

15    that we should letter our exhibits rather than number them,

16    so L is the proper one.

17         THE COURT:  All right.

18         MR. MOSKOVITZ:  The geology is gathered together with

19    the results of other phases of the investigation in the

20    Bulletin.  It would be most orderly, I think, and most helpful

21    if, at this time, we can introduce the Bulletin in evidence

22    as an official statement to the State of California and have

23    it available for reference by the witness who will testify

24    on geology for the State.  What I think would be unfortunate

25    and not, as I understand it, in line with your desires in

1   asking us to present geology now.is for the entire bulletin

2   to be thrown up to cross-examination now.  Frankly, we are

3   not prepared for that type of case now.  We are prepared for

4   geology only.  And what I would like your guidance on is

5   whether the introduction of the bulletin, or use referring to

6   it in geology, is going to result in opening up the entire

7   matter at this time.

8        THE COURT:  Doesn't your Bulletin break itself down

9   into categories so that you could offer in evidence the

10  portions of the bulletin that concern geology?

11       MR. MOSKOVITZ:  We can do it that way, your Honor,

12  if that is the way you would like to proceed.  It will be a

13  little more awkward, but I believe we can do it.  However,

14  it occurs to me that if we can get the bulletin in evidence,

15  there will be an ample opportunity later on when we present

16  Mr. Illingworth as a witness to examine him fully on all the

17  other aspects than geology which will now be presented fully.

18  And I would prefer to proceed that way, without that course

19  of procedure opening up the whole thing for cross-examination

20  now.

21       MR. VEEDER:  Well, I talked to Mr. Moskovitz on the

22  telephone on Saturday and reviewed the plans that I had

23  previously made, namely, of having Max Bookman called, and

24  also Mr. Holsinger.   Until your Honor's guidance in this

25  matter has been received, I have withheld that written statement

1   or any other statement in regard to calling those two

2   witnesses.  It is my own view, however, your Honor, that

3   there are two aspects that were to be considered, namely,

4   the geology and certainly the ground water hydrology.  I

5   don't believe that the two can be separated.  Now, I have

6   spent a little time on this bulletin, and it is quite evident

7   to me that it can be broken down on ground water, which is

8   the geology and hydrology.  And if they choose to go ahead

9   on that basis, well, it is up to your Honor.  I feel,

10  though --

11          THE COURT:  Didn't you, when you said "geology,"

12  didn't you mean also hydrology?

13          MR. MOSKOVITZ:  We meant strictly geology, your

14  Honor, to the extent that the geologists of the Department

15  of Water Resources contributed to the Bulletin.

16          MR. VEEDER:  We are not interested in just -- I daresay

17  that Mr. Stahlman was not interested when he suggested this

18  course -- we are not interested in the geology as a science;

19  we are interested as it pertains to the use of water.  And

20  without that, I believe it is entirely irrelevant.

21          MR. MOSKOVITZ:  Well, of course, your Honor, this is

22  going to be related to the issues of the case, the character-

23  istics of these rocks as water-bearing materials, but the

24  point I am making is that Mr. Illingworth, who participated

25  in it, was responsible himself largely for the hydrologic

1    conclusions which can be separated from the geology.  He

2    is not now prepared to testify on those matters.  We did not

3    believe that that was what was called for.

4         MR. VEEDER:  It is passing strange that a bulletin

5    having been written in '52, the man who wrote it isn't

6    ready to testify,  And my own feeling about it is that if

7    they want to call and stick to geology and hydrology, it

8    would be governed by your Honor's thoughts.  But if they

9    are offering more of the bulletin than that, we must inter-

10   pose objection or else have the thing thrown open to cross-

11   examination and extensive voir dire.  I would like to see

12   them try to get in as much of the bulletin as they can.  I

13   will resist it all the way.  But, in any event, to any

14   degree that it is in evidence it certainly should be subject

15   to cross-examination.

16        MR. MOSKOVITZ:  Your Honor, I think it is a problem

17   of order of proof.

18        THE COURT:  Of course, that is true.  If it went into

19   evidence somewhere along the line, there would be ample

20   opportunity to cross-examine.  How can you separate, strictly

21   speaking, the geology and the hydrology?  You were talking

22   about you were going to have testimony to the extent of

23   these alluvial basins, and that ought to go pretty rapidly.

24   There doesn't seem to be much dispute here.

25        MR. MOSKOVITZ:  That is right.

THE COURT:  But are you going to limit yourselves to that?  You are not going to talk about water underneath the ground and how it flows and --

MR. MOSKOVITZ:  No, I wouldn't say that, your Honor. But some of the things Mr. Illingworth has done, for example, he has made certain studies and investigations of percolation rates and rates of recharge into the Santa Margarita coastal basin.  And I expect to go into certain studies as to yield, safe yields.  Those are matters which we had not planned to go into at this time.  But Mr. James will certainly testify as to the water-bearing characteristics of the materials which have been discussed by the geologist for the United States.

MR. STAHLMAN:  May I ask a question?  How about contour lines?  That is one thing I am interested in.  I think it ties into the structure.

MR. VEEDER:  That is certainly part of it.

MR. STAHLMAN:  When I made the suggestion I thought it was a practical solution to, sort of our getting sights on what differences there may be relative to the testimony that Mr. Kunkel gave which went into the matters in regard to water levels and matters of that kind.

THE COURT:  What about contour lines?  Will there be testimony on that as part of your case?

MR. MOSKOVITZ:  In the preparation of the bulletin

1    there was, of course, a lot of cross-fertilization, you

2    might say, between the engineers and the geologists. It

3    so happened the drawing of contour lines portion was done by

4    the engineers consulting with the engineering geologists,

5    as they do in certain studies. In this case it happened to

6    be done by the engineers.

7        MR. VEEDER: We don't care who did it, your Honor,

8    but we do think it is impossible to separate the hydrology,

9    ground water, water contours.

10       MR. MOSKOVITZ: Perhaps it was a --

11       THE COURT: Why does the bulletin have to be offered

12   in evidence before the complete foundation is laid? You

13   gentlemen are doing the thing backwards, it seems to me.

14   You call the geologist; you have the book marked for

15   identification; you make reference to it; as it goes along

16   there is cross-examination. The bulletin can be actually

17   offered, and the objections heard much later after the

18   testimony is put on as to the hydrology part. Now, it would

19   seem to me the ordinary way would be to start out and have

20   some explanation of how this was assembled and who did it

21   and who did what part, and start out and put your geology on

22   and have some cross-examination. That is all that witness

23   knows. We are through with him. But I would think as this

24   part of the case, if not this week, next or the week after,

25   we ought to have the witnesses on the hydrology in. What we

1   want is geology and hydrology while the Government's case

2   on that point is fresh in mind.

3         MR. MOSKOVITZ:  Relating to underground water?

4         THE COURT:  Yes.

5         MR. MOSKOVITZ:  Well, we can proceed that way, your

6   Honor.

7         THE COURT:  That is the way I would prefer you

8   proceed.

9         What about Mr. Bookman and Mr. Holsinger?

10        MR. VEEDER:  Your Honor, in that connection, I simply

11  have to wait and see what develops.  I am so fully in accord

12  with what your Honor just said, namely:  that you put your

13  geologist on.  He testifies.  I assume he will identify

14  exhibits, and I assume that he will be subject to cross-

15  examination.  If he is the man who is testifying and putting

16  in the exhibits, well, then, I see no need for our calling

17  Max Bookman; because, if Mr. James did the work and he is

18  testifying, I think that is the way the lawsuit should be

19  tried.  And then let the exhibits go in.

20        THE COURT:  Well, that is what we are both talking

21  about.  Now, one of these men was sick and is to have an

22  operation.  Who is that?

23        MR. VEEDER:  Mr. Bookman.

24        MR. MOSKOVITZ:  Mr. Bookman is going to have an

25  operation in a few days,

1      THE COURT:  When?

2      MR. MOSKOVITZ:  I believe this is his last week in

3  the office.  He has to recuperate about six weeks.

4      THE COURT:  If we needed him, we could have him down

5  later this week?

6      MR. MOSKOVITZ:  The schedule he gave me showed this

7  week was pretty much full.

8      MR. VEEDER:  I will not know whether we want to call

9  him or not until after we see what the course is.

10      THE COURT:  Mr. Holsinger retires when?

11      MR. MOSKOVITZ:  January 15th is when his term expires.

12  Whether he is reappointed, there is no date.

13      THE COURT:  What difference does it make whether he

14  is retired when he is called or whether he is still in

15  office?

16      MR. MOSKOVITZ:  Well, as to whether he is a proper

17  witness or not, no difference.  As to whether I can ask him

18  to come down after he has left State service, --

19      THE COURT:  Subpoenaes run throughout the State of

20  California.

21      MR. MOSKOVITZ:  Oh, if he is subpoenaed I have nothing

22  to do with it.  I thought this was going to be an arrangement

23  whereby I would produce a witness voluntarily, which I would

24  be willing to do at your direction if he was within my reach.

25      THE COURT:  Let's proceed and see what develops here

1   and how you are going to present this.

2        MR. MOSKOVITZ:  Very well.  I would like to call Mr.

3   Illingworth as my first witness.

4

5                    LELAND R. ILLINGWORTH,

6   called as a witness on behalf of the defendants, having been

7   first duly sworn, was examined and testified as follows:-

8        THE CLERK:  State your name for the record.

9        THE WITNESS:  Leland R. Illingworth.

10

11                    DIRECT EXAMINATION

12   BY MR. MOSKOVITZ:-

13        Q    What is your address, Mr. Illingworth?

14        A    4437 Elizabeth Avenue, Sacramento.

15        Q    And what is your age?

16        A    43.

17        Q    And what is your present occupation and position?

18        A    I am an hydrolic engineer, branch of Civil

19   Engineering, employed by the California Department of Water

20   Resources, with headquarters in Sacramento.

21        Q    And what is your Civil Service rating?

22        A    Supervising Hydrolic Engineer.

23        Q    Will you please relate the summary of your

24   education?

25        A    I received my primary education in Los Angeles

1   city schools. I attended high school in Los Angeles,

2   graduating from Manual Arts High School in 1933.

3       Q   And what did you do subsequent to graduating from

4   high school?

5       A   I worked for two years and then entered the

6   University of California at Los Angeles in 1935, took the

7   two years of engineering that they had at that institution

8   at that time, and then proceeded to the University of

9   California, campus at Berkeley, where I graduated in 1939.

10      Q   And what degree did you receive?

11      A   A B.S. in Civil Engineering.

12      Q   Have you had any additional education in college

13  since then?

14      A   Yes, I have taken some graduate courses in

15  engineering; one at the University of California, Berkeley,

16  and three or four others at the University of Southern

17  California.

18      Q   How many graduate credits do you have?

19      A   Oh, approximately 15.

20      Q   After you graduated from college what job ex-

21  perience did you have?

22      A   Upon graduation I was employed by the Shell

23  Chemical Corporation in Pittsburgh, California, as a junior

24  engineer. That plant is a manufacturing plant for ammonia.

25

B
Z3

1    I worked there under a plant engineer, assisting him in the

2    manufacturing operations and preliminary layout of plant

3    additions.

4        Q  How long did that job last?

5        A  Approximately a year and a half.

6        Q  And what was your next job experience?

7        A  I returned to Los Angeles to work full time for a man

8    whom I had formerly worked part time with during my years in

9    college.

10       Q  What was the nature of that job?

11       A  This man was a manufacturer's representative.  He

12   represented about ten eastern textile machinery manufacturers

13   on the Pacific Coast, and I was his assistant.

14       Q  And what were the inclusive dates of that position?

15       A  That was from the middle of 1941 through the end of

16   1942.

17       Q  And what did you do after the end of 1942 in the way

18   of work experience?

19       A  I should say that part of this time that I worked

20   with the manufacturer's representative I was entirely on my

21   own as-- of course, this was in the early years of the war--

22   my employer was called back into the Army, as he had been a

23   West Point graduate, and for approximately a year I carried the

24   business on until wartime conditions were such that the business

25   was relatively slow and I entered the United States Navy.

1    Q  What was your activity in the United States Navy?

2    A  I was trained by the Navy as a meteorologist; the

3  Navy term is aerological officer.

4    Q  How long did you serve in the Navy in that capacity?

5    A  Three years.

6    Q  And what rank did you attain?

7    A  Lieutenant.

8    Q  What was the date of your discharge from active duty?

9    A  December, 1945.

10    Q  And what professional activity did you engage in

11  after leaving the United States Navy?

12    A  I worked for a short time as a meteorologist for a

13  commercial airline and did some work with my brother in the

14  construction industry, and then I took a civil service examina-

15  tion in the spring of 1947.

16    Q  A civil service examination with what agency?

17    A  Well, this was an examination for Junior Hydraulic

18  Engineer with the Division of Water Resources of the Depart-

19  ment of Public Works.

20    Q  Of what State?

21    A  State of California.

22    Q  And what was the outcome of your taking that exam-

23  ination?

24    A  I passed the examination and was employed on about

25  the 1st of June, 1947, in the Los Angeles office of the

Division.

Q  And what were your responsibilities and duties in that position?

A  My first duty was in connection with the West Coast Basin reference, a ground water adjudication in the Superior Court of the State of California, in and for the County of Los Angeles, the West Coast Basin being a ground water basin between the Inglewood-Newport fault running roughly from Long Beach to a few miles east of Santa Monica, and the basin extending from that fault to the coast line, including the cities of Redondo, Hermosa Beach, and up nearly to Venice.

Q  What was the nature of the responsibility which the Division of Water Resources had in connection with that reference?

A  As referee the Division was called upon to develop all of the physical facts which were involved or might be involved in the solution of the water problem there, which was, namely, a problem of overdraft on the ground water basin.  They had problems of sea water intrusion, and the area had many wells, including large producing wells, primarily for industry, oil industry.

Q  What was the nature of the duties and responsibilities which you had in that investigation?

A  My first activities were locating water wells, measuring the depth to water in wells, obtaining factual data

1    with respect to the wells-- that is, the ownership, the use

2    to which the water was put, the amount of water obtained, and

3    relating this to the overall picture in drawing ground water

4    contour maps.

5         Q  Did you have any responsibility with respect to the

6    computation of ground water storage capacity and changes in

7    storage?

8         A  Not at that time.

9         Q  How long did this particular assignment continue?

10         A  I worked on the West Coast Basin Reference for

11    approximately a year, and then I was off on some other assign-

12    ments, and a few years later during the latter stages of the

13    investigation and during the preparation of the report of the

14    referee I was again back on the West Coast Basin job.

15         Q  What jobs did you do after the year of working on

16    the West Coast Basin investigation at the outset of your work

17    with the Division?

18         A  I was appointed Deputy Water Master in the Raymond

19    Basin Water Master Service Area.

20         Q  What is the Raymond Basin Water Master Service Area?

21         A  Raymond Basin is a ground water basin lying in the

22    vicinity of Pasadena, extending roughly from the Arroyo Seco

23    on the west and bounded by the foothills of the San Gabriel

24    Mountains on the north and on the south and southeast by the

25    Raymond Basin fault, a geologic fault constituting a barrier

B2

1  to ground water which extends from the City of Arcadia westerly

2  along the escarpment on which the Huntington Hotel is located.

3      Q  What was the relation of the Division of Water

4  Resources to the Raymond Basin?

5      A  The Division of Water Resources had been the referee

6  for the Superior Court of Los Angeles County in this ground

7  water basin adjudication.  The report of the referee, I believe,

8  was dated approximately 1946, and after the Court made the

9  judgment in this case the Division was appointed as referee to

10  administer the rulings of the court.

11      Q  And what were your duties and responsibilities in

12  that connection?

13      A  I was responsible for doing all those things required

14  by the court.  It breaks generally into two categories:  One,

15  to obtain information about the current production of wells,

16  to determine what that production was by each of theparties

17  to the suit, to maintain records of the extraction of ground

18  water, to maintain records-- well, the production records

19  constituted the first phase of this work.  The second phase was

20  the measurement and tabulation of all data which might be

21  required in a further redetermination of the safe yield of

22  the basin at a later date, such information as ground water

23  levels, stream flow records, et cetera.

24      Q  How long did this responsibility continue?

25      A  Approximately two years.

1        Q  Were any reports written during that period?

2        A  Yes.  We prepared annual reports of operations of

3  the Raymond Basin Water Master Service Area.

4        Q  To whom were these reports made?

5        A  To the Court and to the parties.

6        Q  What was your role in the preparation of those annual

7  reports?

8        A  I prepared the reports.

9        Q  Subsequent to this activity, what further profes-

10  sional activities did you have?

11        MR. VEEDER:  That was done in 1949, was it?

12        THE COURT:  Was this in 1949?

13        THE WITNESS:  Could I check just a moment here.  This

14  period of time that I worked in the Raymond Basin Water Master

15  Service Area extended from about June, 1948, through June,

16  1950.

17        Following that period of time there was filed a water

18  suit on the Temecula Creek.  This is known within our Division

19  as the Temecula Creek Reference, the Division having been

20  appointed referee by the court.  This is the Barbee vs. Oviatt

21  suit.  I was assigned the responsibility of field and office

22  work in connection with that reference.

23  BY MR. MOSKOVITZ:

24        Q  What were your responsibilities in the conduct of

25  that investigation?

1      A   In conjunction with others in the Department, includ-

2   ing the Engineer in Charge of the Office, Mr. Bookman, we laid

3   out the plan of attack on the problem, determined what data

4   we would gather, what would be necessary, the type of study we

5   should make, and the type of investigation we should make, and

6   then it was my responsibility to see that this was carried out

7   in the field.  We established stream gaging stations, we

8   located diversions of surface waters, we made measurements of

9   the diversions, in some cases we installed continuous recorders

10   on the larger diversions and on others we rotated the recorders

11   from place to place, we established stream gaging stations.

12      Q   What did you do in so far as wells were concerned?

13      A   We located water wells and initiated a program of

14   measurement of the depth to ground water in a group of key

15   wells.

16      Q   What was the area in which this investigation was

17   made?

18      A   The area comprised the entire watershed of Temecula

19   Creek above the confluence with the Murrieta Creek, which has

20   previously been referred to in this room.

21      Q   How long did that investigation continue?

22      A   Well, it continued over a rather long period of time,

23   but we were only actively engaged in an intensive investiga-

24   tion for a relatively few months, approximately six months,

25   since this carried us from the fall of 1950 into the early part

1    of 1951, and the present litigation of United States vs.

2    Fallbrook Public Utility District was filed in January, 1951,

3    and as a result of this filing of this action the State Court,

4    the Superior Court that is, instructed the Referee to discon-

5    tinue any additional investigation as a referee but simply to

6    continue operating those stations that we had established and

7    continuing with the key well measurement program, with one or

8    two additional items.

9        Q   In that investigation did you have any other em-

10   ployees under your supervision?

11       A   Yes, I had some engineers and geologists.

12       Q   After that investigation was suspended, what further

13   work did you do in the Department of Water Resources?

14       A   This is the period of time in which I went back to

15   the assignment on the West Coast Basin Reference.  This was in

16   the latter phases of the investigation.  We were in the process

17   of determining production from a large number of water wells.

18       Q   How many water wells were involved?

19       A   We determined the production by methods of running

20   pump tests, obtaining all historic pump tests we could, copy-

21   ing power records from the power companies and correlating

22   power consumption with production of water.  We calculated the

23   production of some 800 wells for a period of 18 years, starting

24   in 1932.

25       Q   What were your responsibilities and duties in

1    connection with that phase of the work?

2         A  I had a crew of four professional men who worked

3    under me on that particular chore.

4         Q  What was the result of that investigation?

5         A  A report was prepared for the court and submitted to

6    the court.  It formed the basis for further negotiation among

7    parties to the litigation.  This litigation, as I understand

8    it, is still active.

9         Q  When was that report made to the court?

10         A  It was dated June, 1952.

11         MR. VEEDER:  Was that the West Coast litigation?  I fell

12    off the sled back there.

13         THE WITNESS:  Yes, it is.  It is California Water

14    Service Company, et al., vs. City of Compton, et al.

15    BY MR. MOSKOVITZ:

16         Q  And that is in what court?  Do you know?

17         A  In the Superior Court of the State of California, in

18    and for the County of Los Angeles.

19         Q  What role did you play in the preparation of the re-

20    port?

21         A  I myself prepared one of the appendices of the report,

22    one which described the methods used in the calculation of

23    production from the wells.  I also worked on the ground water

24    contour maps, the problems involved in the calculation of yield

25    of the basin, underground hydrology in general, and was

1   responsible for assembling much of the data.  This was rather

2   a large report and there was quite a bit of work involved just

3   to have it assembled properly. That was one of my duties.

4          THE COURT:  Who was your immediate superior at that

5   time?

6          THE WITNESS:  Meyer Kramsky.

7          THE COURT:  What was his title in the Water Resources

8   set-up?

9          THE WITNESS:  I believe he was Senior Hydraulic Engineer

10  at that time, possibly a Supervising Hydraulic Engineer.

11         THE COURT:  All right.

12  BY MR. MOSKOVITZ:

13         Q  After that phase of this work was concluded, what

14  further experience in investigations have you had?

15         A  There was one--

16         MR. VEEDER:  I beg your pardon.  May I have the time

17  when you finished that?

18         THE WITNESS: Well, that was from about the middle of

19  1951 through June, 1952, but during that period of time I did

20  work for a few months on another job, which involved again a

21  ground water basin.  This one on the Upper San Jacinto River,

22  we called the Upper San Jacinto Reference.  This is the water-

23  shed which lies north of the Santa Margarita River watershed.

24  The boundaries of the two watersheds are in contact in the

25  vicinity of Winchester and Diamond Valley, and of course on up

1    into the mountains up in Thomas Mountain, et cetera.

2         Q   What was the nature of that reference?

3         A   This involved a dispute between the City of San

4    Jacinto and primarily a private water company and a rather

5    large number of individual water producers, owners of wells.

6         Q   What was the role of the Division of Water Resources?

7         A   The Division was appointed referee in this case, and

8    it was my duty to make the field investigation of hydrology,

9    surface and ground water hydrology, and prepare reports to the

10   court or to the parties; and in this case we were able to

11   develop sufficient data within a relatively few months so that

12   the parties were able to stipulate and we never prepared a

13   formal report to the court, that is, never a printed report--

14   there was a formal report, but just a limited number of copies

15   were prepared.

16        Q   What types of studies did you make in connection with

17   that investigation?

18        A   This included the period, the winter of 1951-52.  We

19   were afforded a good opportunity, therefore, to make some

20   measurements of the recharge of the ground water basin.

21        Q   Why was that so in the winter of 1951-52?

22        A   I believe, as has been pointed out in this court by

23   some of the testimony, that was one of the minor flood years,

24   one of the years in which water ran in the streams to a rather

25   appreciable extent.  In the San Jacinto River it was the first

1   flow that had reached the valley floor in approximately seven

2   years.  It was quite a novelty for some of the local people to

3   see water in the river.  We had many observers when we were

4   out trying to measure the water.

5       Q  And what studies and observations did you make during

6   that time?

7       A  We had crews out every time it looked like rain and

8   every time the water flowed in the river we measured percola-

9   tion into the river at various points along the San Jacinto

10  River from the mouth where the Geological Survey maintains a

11  continuous recorder situation, on down to the lower portion of

12  our investigated area.

13      Q  And what kind of results did you come up with in so

14  far as percolation was concerned?

15      A  We were able to get some reasonably good estimates

16  of recharge to the basin.

17      Q  When was that phase of your work concluded?

18      A  In the spring of 1952.

19      Q  Subsequent to that time, the middle of 1952, what

20  additional investigations have you engaged in?

21      A  Well, in the spring of 1952 the State Legislature

22  passed legislation authorizing an investigation of water

23  resources of the Santa Margarita River watershed.  This job

24  was given to the Division of Water Resources and I was assigned

25  the task of supervising the field and office work in connection

1 with that investigation.

2     Q  Under whose general direction did you work in that

3 investigation?

4     A  Under the Engineer in Charge of the Southern Cali-

5 fornia Office, Max Bookman, and his assistant, R. M.

6 Edmundston.

7     Q  Did you have a staff which worked under your direc-

8 tion in that job?

9     A  Yes, I did.  The size of the staff varied from time

10 to time, but generally we had four or five professional

11 engineers and one or two professional geologists working on the

12 job.

13     Q  And how long did that investigation last?

14     A  Field work on the job lasted approximately two years.

15 We started in July, 1952, in which month we established a field

16 office in Murrieta, California, and maintained that office un-

17 til May of 1954.  That was the end of the extensive field work

18 or intensive field work.  Following that we performed some

19 additional field work out of the Los Angeles office.  But this

20 was more of an intermittent nature, following May, 1954.

21     Q  And following the field work, what type of work was

22 done in connection with that investigation?

23     A  We recalled the men who had been in the field office

24 back to Los Angeles and those engineers who had worked on the

25 investigation out of Los Angeles from the start, we prepared

1   the data, made studies and repared a report on the investiga-

2   tion.

3       Q   And what is the report which was prepared?

4       A   This report is entitled "Santa Margarita River

5   Investigation."  It is Bulletin No. 57 of the State of Cali-

6   fornia, Department of Public Works, Division of Water Resources.

7   It is dated June, 1956.

8       Q   And that is Fallbrook's AA and the State's L for

9   Identification in this case?

10      A   That is true.  It consists of two volumes.

11      Q   What was your role in the preparation of that written

12  report?

13      A   Well, I was in charge of the investigation and

14  studies which culminated in the production of the report.

15  Essentially, I wrote the report.  Certain phases of it were

16  originally written in draft form by various engineers who

17  worked on specific problems, and I in some cases simply edited

18  those and included them in the report.  In most cases, however,

19  it meant rewriting and very extensive editing to make a

20  reasonably comprehensive document.

21      Q   What was your relationship with the geologist who

22  participated in the investigation and in the writing of the

23  report?

24      A   The geologist, as with the other professional people,

25  worked under my direct supervision.

B4

1          THE COURT:  On page XVI, in Volume 1 of the report,

2   appears this statement:  "This investigation was conducted

3   and report prepared under the direction of  Max  Bookman. . .

4   and R. M. Edmonston. . . by L. R. Illingworth," and then the

5   word "and," and then is listed Erb, Jackson, Tranbarger,

6   Leitzinger, and then it says "Assisted by" Clawson, Harrison,

7   Hood and Mullnix," and then a reference to geologic studies.

8   Is that an accurate statement of how this was worked out?

9          THE WITNESS:  Yes, it is.

10  BY MR. MOSKOVITZ:

11         Q What was your relationship, Mr. Illingworth, to Mr.

12  Bookman and Mr. Edmonston, to whom the Court just referred?

13         A  Mr. Bookman was in charge of the Southern California

14  office, and Mr. Edmonston was his direct assistant, and I was

15  one of the engineers working under their overall direction.

16         Q  And what responsibilities did they have in that office?

17         A  They were responsible for all investigations of the

18  Department of Water Resources conducted in the Southern

19  California area, which includes the area of Inyo and Mono

20  Counties, et cetera, on the east side of the Sierras, from the

21  Mono Lake southward to the Mexican Border, from the Colorado

22  River to the Pacific Ocean and up to the Tehachapi Mountains.

23         THE COURT:  Did they do any work in the field, either

24  one of them?

25         THE WITNESS:  No, sir.

Case 3:51-cv-01247-JO-SBC   Document 4551   Filed 09/24/63   PageID.26409   Page 34 of 142

1    THE COURT:  Did you discuss problems with them?

2    THE WITNESS:  Yes, sir.

3    THE COURT:  To what extent did they dictate or determine

4 the substance of the report and its conclusions?

5    THE WITNESS:  They were very active, or Mr. Bookman was

6 especially, in the initial stages of it, setting forth the

7 general objectives the type of investigation we should conduct

8 and what items we should obtain to try to resolve the problem

9 that appeared to exist at the outset.

10    THE COURT:  In other words, they laid out some work to

11 be done?

12    THE WITNESS:  That is right, in general terms.

13    THE COURT:  What participation did they have in the

14 conclusions drawn?

15    THE WITNESS:  They reviewed them.  They were certainly

16 more active in that phase of it than most of the detailed

17 investigation during the three years involved.

18    THE COURT:  They were your conclusions, though?

19    THE WITNESS:  Yes, sir.

20    THE COURT: Were there any disagreements between you on

21 any of them?

22    THE WITNESS: We had some discussions, but we had no

23 great disagreement.  Largely it was a matter of simply editing,

24 emphasizing one thing or another.

25    THE COURT:  You knew a lot more about it than either one

1  of them, did you not?

2  THE WITNESS: I believe so.

3  MR. MOSKOVITZ: Mr. Illingworth is very modest, your

4  Honor.

5  THE COURT: Go ahead.

6  BY MR. MOSKOVITZ:

7  Q  Mr. Illingworth, in your opinion, is the Bulletin,

8  State Exhibit L for Identification, the facts stated therein

9  and the conclusions stated therein and the various plans and

10  the entire matter correct and accurate in so far as you are

11  concerned?

12  MR. VEEDER: I object. There is absolutely no quali-

13  fication for such a question. The man is not qualified to

14  testify in response to the question that has been asked. It

15  has been most interesting to hear. He has had not fifteen

16  minutes experience in regard to soils, not ten minutes experience

17  in regard to geology, in fact, I don't see anything here which

18  would indicate he knew very much about the Santa Margarita River

19  Valley in view of the fact that it appears that he didn't get

20  into this matter until July of 1952. He may be a whiz. I

21  am with him if he is. But I daresay that he did not perform

22  the work for making the soil surveys. I also deny that he

23  was capable of making the geological studies or coming up with

24  the conclusions.

25  THE COURT: Wait just a minute.

5684

1        On page XVI in Volume 1, in California's Exhibit L,

2   Bulletin No. 57, following what I read, there is a statement,

3   "Geologic studies were performed under the direction of L. B.

4   James," omitting his title, "by R. C. Fox, K. E. Jones, and

5   J. N. Roth;" is that a correct statement?

6        THE WITNESS:  Yes, sir.

7        THE COURT:  And in compiling the report you largely

8   accepted the studies made by James and his assistants?

9        THE WITNESS:  I critically reviewed them to see that

10   they tied in with my knowledge of the situation and what

11   information others, such as the soil scientists and the dam

12   experts and the other engineers, had learned.

13        THE COURT:  But you relied to a large extent upon the

14   material they had gathered and the conclusions they had drawn?

15        THE WITNESS:  I did not tell them how to do their

16   geology; that is right.

17        THE COURT:  On page XVII, in the preface to the Exhibit

18   L, going right ahead appears next, "Work relative to land

19   classification and ultimate crop pattern was performed by

20   J. W. Shannon, land and water use specialist, R. N. Haley,

21   associate soil technologist;" is that a correct statement?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  And there again the particular responsibility

24   for that section of the report rested with Shannon and Haley;

25   is that right?

1    THE WITNESS:  I wouldn't say necessarily the preparation

2   of that section of the report.  Certainly the field work was

3   done by them and the tabulations were made jointly by them

4   and by my own immediate staff, and that all of the work was

5   coordinated in our office under my direct supervision.

6    THE COURT:  Then next follows, "Chapter IV, Legal

7   Considerations, was prepared under the direction of Henry

8   Holsinger. . by G. N. Craig, Senior Attorney;" is that correct?

9    THE WITNESS:  Yes, sir.  That is Chapter IV.

10    MR. MOSKOVITZ:  Your Honor, may I add that we are not

11   offering that portion of the Bulletin at all, and I did not

12   mean to have that included among the portions he is testifying

13   about.

14    MR. VEEDER:  But you asked him about his conclusions

15   in the overall book.

16    MR. MOSKOVITZ:  I am omitting that.

17    THE COURT:  What portions are you omitting?

18    MR. MOSKOVITZ:  Your Honor, actually at this time we

19   are not offering anything about legal considerations, as will

20   be seen by the letter which I wrote to Mr. Veeder.  We are

21   offering certain specified portions of the Bulletin at this

22   time, or whenever the offer will be made in evidence, and they

23   do not include--

24    I think I gave you a copy of that letter when I first

25   gave it to the Court.

1          THE COURT:  Well, as lodged you had only two pages of

2     Chapter I and all of Chapter II in Volume 1, but you have

3     broadened that out.

4          MR. MOSKOVITZ:  Yes, I will read it if you like.

5          THE COURT:  Read it into the record.

6          MR. MOSKOVITZ:  It is Chapter I--

7          THE COURT:  All of Chapter I?

8          MR. MOSKOVITZ:  Yes, your Honor.

9          THE COURT: What else?

10          MR. MOSKOVITZ: Chapter II, and the portions of Chapter

11     III between pages 107 and 140.

12          THE COURT:  Yes.

13          MR. MOSKOVITZ:  Then Plates 1 through 21b, inclusive.

14          THE COURT:  Yes.

15          MR. MOSKOVITZ:  Plate 23, and then Appendices B, D

16     through H, inclusive.

17          THE COURT:  This time you are including G, which you

18     did not have in before; is that right?

19          MR. MOSKOVITZ:  That is correct, your Honor.

20          THE COURT: What does G concern?

21          MR. MOSKOVITZ:  G concerns measurements of depths to

22     ground water, a compilation.

23          THE COURT:  B, D, E, F, G, H?

24          MR. MOSKOVITZ:  Yes, your Honor.

25          Your Honor, I would like to ask a few more questions.

1   I will withdraw the last one and ask a few more questions

2   which will indicate a little further the method by which the

3   investigation was carried on and the time that was spent and

4   what was done.

5        THE COURT:  I will reserve ruling on Mr. Veeder's

6   objection. Go ahead.

7        BY MR. MOSKOVITZ:

8        Q   Before I get to that, Mr. Illingworth, what member-

9   ship do you have in professional and honorary organizations?

10       A   I am a member of the American Society of Civil

11  Engineers, I am a member of Tau Beta Pi, an engineering

12  honorary fraternity, and a member of Chi Epsilon, an honorary

13  civil engineering fraternity.

14       Q   I would like to complete the summary of your pro-

15  fessional experience.  After completing the report of the Santa

16  Margarita River investigation, what further experience did you

17  have?

18       A   For approximately a year from June of 1955 through a

19  portion of September, 1956, I was--

20       MR. VEEDER:  Pardon me.  May I have that 1955 date,

21  please?

22       THE WITNESS: Approximately June.

23       --I worked as the Assistant to the Engineer in Charge

24  of the Water Quality Section in the Los Angeles Office of the

25  Division of Water Resources.

BY MR. MOSKOVITZ:

Q  And what duties and responsibilities did you have in that position?

A  I assisted him in laying out investigations, the work required on investigations of water quality, and I worked with the men performing various investigations within that section and reviewed the reports and edited the reports that were prepared by the Water Quality Section during that period of time.

THE COURT:  It is time for a recess.  We will take a short one.

(Recess.)

Illingworth - Direct

C-1 ML

1        MR. MOSKOVITZ:  Your Honor, the last week end Mr.
2   Fox, Mr. Illingworth, Mr. James and I had a field trip in
3   the Upper Basin area, and we have a number of exhibits,
4   samples of rocks which Mr. James is going to identify.

5        MR. STAHLMAN:  Keep your voice up, Adolph.

6        MR. MOSKOVITZ:  Pardon me.  Which Mr. James is going
7   to identify and refer to.  We have them labelled.  I have
8   asked the Clerk to mark them for identification, and they
9   are on the front table here.

10        THE COURT:  They will be what series?  M on?

11        THE CLERK:  M, yes.

12        THE COURT:  Called M on.

13        THE CLERK:  I was going to mark them M-1, M-2, -3,
14   and so forth.

15        MR. MOSKOVITZ:  Then, N, because we have actually
16   two sets of them.

17        THE COURT:  M and N series.  All right.

18        MR. VEEDER:  Are these gentlemen still going to be
19   on the stand on the 12th?

20        THE COURT:  What are the differences between the M
21   series and the N series?

22        MR. MOSKOVITZ:  The M series --

23        THE COURT:  Which, the M?

24        MR. MOSKOVITZ:  The M series are rocks which were
    picked up in the field in the Upper Basin.  The N series, in
25

1    these jars are specimens of materials which have been tested

2    for permeability.  They have not been picked up in this

3    area, but they are illustrative of certain features.

4              THE COURT:  All right.

5              MR. MOSKOVITZ:  With respect to these materials,

6    your Honor, during the testimony of Mr. Hall there was the

7    introduction of a specimen, and there was no ten-day advance

8    notice of that.  Now, I am --

9              THE COURT:  We will see how far you get along, and

10   you are going with your case until the 19th, I take it, of

11   December, probably.

12             MR. MOSKOVITZ:  I hope it is not quite that long.  In

13   any event, here they are for the parties to look at.

14             THE COURT:  They may be lodged.

15             MR. VEEDER:  Will we get copies?

16             MR. MOSKOVITZ:  I don't believe that we have enough

17   specimens to give each person a piece.

18             THE COURT:  We will take that up later, too.  If you

19   find there is something you want a part of, we might be

20   able to give you a small portion out of the bag, Mr. Veeder.

21   Go ahead.

22             Q  BY MR. MOSKOVITZ:  I believe when we took the

23   recess you were testifying about your experience as an

24   assistant in the Water Quality Section.  What types of

25   investigations were made in that section during that period

1   and what responsibilities and duties did you have in connec-

2   tion with it?

3        A   The Department, or Division of Water Resources

4   at that time had generally two types of duties in the Water

5   Quality Section.  Certain statutory functions, such as

6   sustained programs of water quality sampling, stream sampling

7   program, and a periodic well sampling program were continuing

8   functions.  Then, we performed engineering investigations in

9   connection with water quality for other State agencies.  One

10  type of agency of the various State Water Pollution Control

11  Boards.  We made numerous investigations for such agencies.

12       Q   And what was the objective of that type of in-

13  vestigation?

14       A   The objective, generally, was to solve a problem

15  which involved water quality, either existing or potential

16  problem of pollution of waters by some activity of man, in

17  general.

18       Q   Were any investigations made during the period of

19  time when you were in a position of assisting in that section,

20  any investigations made in the Santa Margarita watershed?

21       A   I recall one such investigation.  There was an

22  implement plant located in the town of Murrieta which dis-

23  charged a waste containing a high percentage of chrome.  This

24  very rapidly contaminated some wells, and this was reported.

25  One of the men got sick from drinking the water.  And this was

1    reported to the Water Pollution Control Board.  We were asked

2    to make an investigation of the circumstances involved in

3    that discharge.

4            MR. VEEDER:  May I inquire as to --   Excuse me.

5            MR. MOSKOVITZ:  Go right ahead.

6            MR. VEEDER:  Where was that location?

7            THE WITNESS:  In the town of Murrieta.

8            MR. VEEDER:  In the town of Murrieta itself?

9            THE WITNESS:  Yes, very close to the center.

10           Q   BY MR. MOSKOVITZ:  And was the report made, an

11   investigation report made of that problem?

12           A   Yes, it was.

13           Q   And what part did you play in that investigation

14   and report?

15           A   Primarily in the -- well, discussion of the

16   problem because of my previous acquaintance with the area,

17   and also in the preparation, review of the report that was

18   made to the Water Pollution Control Board.

19           Q   What attention, if any, was paid to that problem

20   in Bulletin 57, State's Exhibit L for identification?

21           A   It was discussed as one of the water quality

22   problems existent in the watershed.

23           Q   Subsequent to this period what further responsibili-

24   ties did you have in the Department of Water Resources?

25           A   In September of 1956, I transferred to the

1    office of the then Department of Water Resources, and I

2    have been there employed since that time.  My duty at that

3    time, and continuing to the present with the exception of

4    time spent in San Diego, has been involved in an inventory

5    of water resources and requirements of the State.  This is

6    a state-wide investigation in which our present activities

7    are concentrated mostly in the northern portion of the State,

8    and we are gradually working, watershed by watershed, down

9    through the State, determining in detail water supply, water

10   requirements, present and future, and the extent that the

11   local water supply or the local water requirements can be

12   supplied by local water supplies and whether or not, and in

13   what amounts water might be available for export from areas

14   of surplus to areas of deficiency.  This is a problem in

15   which it is directly related to the problem on which the

16   State Legislature has been concerned for some years.

17        Q    And do you have a staff working under your direc-

18   tion in that investigation?

19        A    Yes, I do, approximately ten professional

20   engineers directly under my supervision plus clerical help.

21        Q    Keep your voice up, please.

22        A    And an additional force of approximately ten to

23   fifteen -- it varies from time to time -- of people who work

24   in other sections who, you might say, are working on some-

25   what of a sub-contract basis with us.  We lay out the work,

1    set the requirements, continually review the work that they

2    are doing, and administer the program and cordinate it with

3    other work that my immediate staff is engaged in.  An example

4    of such work would be specialists in the stream flow measure-

5    ment, diversion measurements, classification of lands, and

6    mapping of present land use.

7         Q    Are you a registered engineer in the State of

8    California?

9         A    Yes, I am.

10        Q    Since when have you been registered?

11        A    1949.

12        Q    Now, when did you first have occasion to do work

13   of an engineering nature in the Santa Margarita River

14   watershed?

15        A    My first contract was in 1948.  It was a contract

16   as a result of a request by the United States Navy in

17   connection with water problems involved on Camp Pendleton.

18        Q    And how long a period of time did you spend in

19   the watershed at that time?

20        A    I do not recall exactly, but I made three or four

21   trips to the area contacting the Public Works officer at

22   the base.

23        Q    And what types of inspection or tours did you

24   make in the area?

25        A    I made a tour of the base with the Public Works

officer or someone assigned to that office.  We inspected the location of wells for the production of water for both irrigation and camp use and the areas where the water was used.  By inspection, we observed the ground water basins, the Ysidora Subbasin, the Chappo Subbasin, and the Upper Subbasin, and obtained the measurements of depths to ground water in wells and measurements of sewage treatment plant effluent.  This investigation was simply a gathering of data that Camp Pendleton had obtained, and we analyzed this data, plus the data that was available from the UnitedStates Geological Survey stream gaging stations.

1          THE COURT:  Did you write a report in connection with

2   that?

3          THE WITNESS:  Simply office reports to my superiors.

4          MR. VEEDER:  Did I understand that you simply obtained

5   the material that had been gathered by the Public Works

6   Officer; is that right?

7          THE WITNESS:  To the best of my knowledge at the moment

8   that is right.  I may have measured a few wells at that time.

9   I am not sure.

10         THE COURT: Well, he said he did three things:  He took

11  material that had been gathered, he inspected the area, and

12  he relied upon information from the U. S. Geological Service.

13         THE WITNESS:  That is correct.

14         THE COURT:  You say you made office reports to your

15  superiors?

16         THE WITNESS:  Yes, memoranda.

17         THE COURT:  Are those still in existence?

18         THE WITNESS:  Yes, sir, I believe so.

19         THE COURT:  What subjects were you reporting on?

20         THE WITNESS:  Well, the nature of the problem that

21  existed at that time.  This was at the time, I think, Mr.

22  Cannon testified here that they first became aware of the sea

23  water intrusion, of salt water intrusion.

24         THE COURT:  One problem was salt water intrusion?

25         THE WITNESS:  Yes, sir.

1    THE COURT:  What other problem was involved?

2    THE WITNESS: I think that was it.

3    THE COURT:  As part of that, which wells could be

4 pumped?

5    THE WITNESS:  Well, we didn't discuss this particular

6 thing, although we recognized and I recall that in one of my

7 reports we pointed out that the pattern of pumping had a lot

8 to do with the situation as existed in the Ysidora Subbasin.

9    THE COURT:  Did you find salt water intrusion at that

10 time in 1948?

11    THE WITNESS:  We could not conclude from the data that

12 was available at that time or from any studies that we were

13 able to make with that data that there was sea water intrusion,

14 although the records of depths to water indicated that sea

15 water intrusion was a possibility.

16    THE COURT:  When you say you could not find, this is

17 again one of these problems where on the basis of engineering

18 principles the data was not sufficient to draw a firm conclusion,

19 although there were indications that this was the situation;

20 is that what you mean?

21    THE WITNESS:  Well, there simply had not been much

22 investigation made.  This is a little different, I think.  This

23 is a case where very little investigation had been made.

24 Perhaps data could be developed.  In fact, one of the state-

25 ments, I believe, we made in the memoranda, that it would take

1    a great deal of investigation to determine exactly what the

2    situation was, and that we did not have funds, I believe, was

3    the conclusion by my superiors--

4    BY MR. MOSKOVITZ:

5        Q   What was the date of this investigation?

6        A   This was in 1948, I believe, in the fall.

7        Q   What was the reason that the Division of Water

8    Resources was called down to Camp Pendleton at that time?

9        MR. VEEDER:  I object.  There is nothing to show that

10   this witness would know the reason it was called down.

11       THE COURT:  Reframe it.

12   BY MR. MOSKOVITZ:

13       Q   What was the objective of this investigation?

14       A   The objective was to find out the nature of the

15   problem that confronted the officials of the Camp.

16       MR. VEEDER:  What problem?  What are you talking about?

17       THE WITNESS: I just mentioned that they were concerned

18   over salt water intrusion.

19       MR. VEEDER:  And that was the problem?

20       THE COURT:  Do you want to strike it out, Mr. Veeder?

21       MR. VEEDER:  No, I am anxious to hear it.

22       MR. MOSKOVITZ:  I have asked the witness to develop it,

23   but apparently you had some objection.

24       MR. VEEDER:  No, I wanted to be sure.

25       THE COURT:  Go ahead.

BY MR. MOSKOVITZ:

Q  When was your next occasion to investigate and make studies in the Santa Margarita River watershed?

A  This was in connection with the Temecula Creek Reference in the fall of 1950.

THE COURT:  You have covered that?

THE WITNESS:  Yes.

MR. MOSKOVITZ:  Yes.

Q  And how much time was spent during that phase of the investigation of the Santa Margarita River?

THE COURT:  You mean the Barbey-Oviatt phase?

MR. MOSKOVITZ:  Yes, the Barbey-Oviatt phase.

Q  How much time did you spend?

THE COURT:  By this witness?

MR. MOSKOVITZ:  No, I am asking about the investigation by the Division of Water Resources.

MR. VEEDER:  That is objected to on the grounds that it would be hearsay, your Honor.

THE COURT:  If he knows, he may answer.

MR. MOSKOVITZ:  This witness testified that he was in charge of it.

THE COURT:  The objection is overruled.

THE WITNESS:  I worked directly in the field for about six months, and then for the following-- well, from that time, that is, from the spring of 1951 until the start of the

1    investigation on the Santa Margarita, we maintained the

2    records, as I previously mentioned, and the maintenance of

3    these records required one to two man days a week, and the man

4    or men who were assigned to this work were directly under my

5    supervision, so that I was associated with it for another, well,

6    somewhat over a year, although I did not spend an extensive

7    amount of time on it.  We were simply keeping records at that

8    time.

9    BY MR. MOSKOVITZ:

10        Q   How much time did you personally spend in that in-

11   vestigation, the Barbey vs. Oviatt Temecula Creek Reference

12   investigatioi?

13        A   At that time, the times I have been referring to,

14   that is, up through June, 1952, I spent about six months time.

15   Then following that, in 1956, we prepared a report of the

16   referee and I spent additional time at that time in the prepar-

17   ation of the report.

18        Q   Under whose supervision was the report prepared?

19        A   Under my supervision.

20        Q   And how much time did you personally spend in the

21   preparation of that report?

22        A   I would say roughly about six months.

23        Q   How much time was devoted by others than yourself

24   in the preparation of that report?

25        MR. VEEDER:  Under his direction?

1    Mr. McMr. MOSKOVITZ:  Under his direction.

2         THE WITNESS: Are you referring to clerical help or

3    engineering help?

4    BY MR. MOSKOVITZ:

5         Q  Professional assistance.

6         A  Professional help?  Not very much time was spent

7    by professional help.  In other words, this particular report,

8    by its very nature and by directions of the court, was one

9    that included no studies of its own.  We had started this

10   investigation, as I mentioned, we worked on it about six months,

11   and it was curtailed because of the filing of the present suit

12   in the Federal Court.  We simply maintained records for a

13   period of time, and then all during the time of the Santa

14   Margarita investigation, during the time it was conducted, we

15   continued to maintain these records that we had started for

16   the reference.  Then in the spring of 1956, approximately that

17   time, we were ordered by the court to prepare a report on the

18   investigation.  They specifically mentioned that we should

19   include any data that we had gathered from other investigations

20   which were applicable or pertinent to that reference.  There-

21   fore, the report of the referee on the Temecula Creek reference

22   includes much data that was gathered in the Santa Margarita

23   River investigation, but it includes no additional studies

24   that were not made for the Santa Margarita.

25         THE COURT:  You mean it includes some of the matters

1  you gathered in connection with the work on Bulletin No. 57?

2       THE WITNESS:  Yes, we were requested to do this by the

3  court.

4       THE COURT:  All right.

5  BY MR. MOSKOVITZ:

6       Q  In connection with the Santa Margarita River investi-

7  gation itself that culminated in Bulletin 57, what were the

8  objectives of that investigation?

9       A  The objectives were to develop data which would be

10  useful for planning purposes, as statewide water resources

11  planning, and to develop the kind of data that would be useful

12  in water rights adjudications.  We realized that one of the

13  reasons that the State Legislature authorized the investigation

14  was to develop data which would be useful in such a determina-

15  tion as the Court has before it.

16       MR. VEEDER:  As this Court has before it?

17       THE WITNESS:  Yes.

18       THE COURT:  Let me ask another question or two.

19  Bookman, Edmonston, James and these other engineers listed on

20  page XVI were all civil service employees?

21       THE WITNESS:  Yes, we all are-- or were.

22       THE COURT:  Is Harvey O. Banks, State Engineer, a civil

23  service employee?

24       THE WITNESS:  He was until the Department of Water

25  Resources was formed, and he is now an appointive officer

1    appointed by the Governor.

2         THE COURT:  When did that change take place?

3         THE WITNESS:  In June or July of 1956.

4    BY MR. MOSKOVITZ:

5         Q  At the time this report was made what was his posi-

6    tion?

7         A  This report is dated June, 1956, and it was under

8    Mr. Banks--

9         THE COURT:  He was then a civil service employee?

10        THE WITNESS:  Yes, sir.

11        THE COURT:  And the Assistant State Engineer, William

12   L. Berry, was then a civil service employee?

13        THE WITNESS:  That is right, your Honor, and he still is.

14        THE COURT:  The Director of Public Works at that time,

15   Frank B. Durkee, was an appointee of the Governor, without

16   civil service?

17        THE WITNESS:  Yes, sir.

18        THE COURT:  What is the hierarchy here beyond Bookman?

19   From whom did Bookman take directions at the time this report

20   was prepared?  To whom was he responsible-- the State Engineer?

21        THE WITNESS:  Mr. Berry and the State Engineer, Mr. Banks.

22        THE COURT:  And did Mr. Edmonston have contacts directly

23   with the State Engineer and the Assistant State Engineer, or

24   did he go and operate entirely through Mr. Bookman as his

25   superior?

1    THE WITNESS: I would say that--

2    THE COURT: If you know.

3    THE WITNESS: Well, yes, he did operate through Mr.

4   Bookman, although in many cases he would be Mr. Bookman's

5   representative in negotiations with them.

6    THE COURT: What part does the Director of Public Works

7   play in this matter? Do you know anything about this at all?

8    THE WITNESS: He would have had very little to do with

9   this particular investigation.

10    THE COURT: Did you ever have any conferences with him

11   about the matter?

12    THE WITNESS: No, sir.

13    THE COURT: Mr. Holsinger at this time is listed here

14   as Principal Attorney. In 1956 was he a civil service employee?

15    THE WITNESS: Yes, sir.

16    THE COURT: It was after that that he was appointed to

17   the State Water Board?

18    THE WITNESS: The State Water Rights Board was formed

19   at the same time the Department of Water Resources was formed.

20    THE COURT: Did you have any conferences at all with

21   Mr. Durkee at the time you were working on this report?

22    THE WITNESS: No, I did not.

23    THE COURT: Do you know whether Bookman or Edmonston

24   did?

25    THE WITNESS: I don't know that they did.

1          THE COURT:  The State Engineer's office, from the State

2   Engineer on down, did you gentlemen operate some separate

3   unit up there outside the Department of Public Works, or were

4   you in that same building?

5          THE WITNESS:  We were in the same building.  Our head-

6   quarters, in fact, the Department's headquarters are still in

7   the same building temporarily.

8          THE COURT:  But you had really your own unit?

9          THE WITNESS:  Yes, sir.

10  BY MR. MOSKOVITZ:

11         Q  To your knowledge, what review did the Bulletin

12  receive in the hierarchy which was above you?

13         A  Did you say what review?

14         Q  What review?

15         MR. VEEDER:  To his personal knowledge?

16         MR. MOSKOVITZ:  Yes, to his personal knowledge.

17         THE WITNESS:  It was reviewed, as I previously men-

18  tioned, at various times.  That is, the type of work we were

19  doing was reviewed periodically by Mr. Bookman and Mr.

20  Edmonston, and when it was finished they reviewed it again.

21  They did not review all aspects of it from a critical technical

22  standpoint at all stages.

23         THE COURT:  I want to ask you a frank question and I

24  want a frank answer.  Were you given pretty much a free hand

25  in this, or was somebody at your elbow when you were writing

1    this report and working at this?

2          THE WITNESS:  No, sir; I was given a free hand.

3          THE COURT:  You can say with a good conscience that you

4    were given a free hand in preparing this report and drawing the

5    conclusions you did?

6          THE WITNESS:  Yes, I was.  I did request and receive a

7    review by Mr. George Gleason, whose name appears on XVII.  He

8    reviewed and edited--

9          THE COURT:  You say you requested, or he requested?

10         THE WITNESS:  Well, I requested that we get all these

11   matters reviewed by--

12         THE COURT:  He was a civil service employee?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  And he was of equal rank as far as the civil

15   service standing was concerned with Edmonston?

16         THE WITNESS:  Yes.

17         THE COURT:  And he was also subordinate to Bookman?

18         THE WITNESS:  Yes, and he had extensive experience in

19   this type of investigation, and he did critically review and

20   edit the report, and I worked directly with him during this

21   period.

22         THE COURT:  You know what I mean by being given a free

23   hand?

24         THE WITNESS:  I believe I do.

25         THE COURT:  And allowed to work and draw your own con-

1    clusions, without somebody indicating to you what they wanted

2    found?

3              THE WITNESS:  That is right.

4              THE COURT:  Or the slant the report should take?

5              THE WITNESS:  No, we talked about the overall objectives

6    that we had to solve, the objectives of the investigation, the

7    problems we had to solve and the general manner in which we

8    would do it.  But what the answers were going to be depended

9    upon the facts we developed.

10             THE COURT:  I ask these questions because I am not

11   without a little experience in how state government operates.

12   Mr. Sachse at one time was Deputy Director of Public Works

13   when I was Director of Motor Vehicles.  I had the experience

14   of having to issue an order that one of my assistants not

15   communicate directly with the Governor without my consent,

16   which is an unusual order to have to make to somebody that

17   worked for you, that you know he was going to go directly to

18   the Governor about matters that concerned the Department.

19             I also had reports submitted to me with which I was not

20   happy.  I had submitted to me, as Director of Motor Vehicles,

21   purchase orders for automobiles with a very detailed report

22   of what kind of automobile they wanted to buy-- the length of

23   it, the horsepower-- it took a page to describe, and when I

24   got through studying it I discovered that it was slanted so

25   that when you signed the order you could only buy a certain

1 kind of Buick. If you would make the chassis a half inch longer

2 or vary the horsepower one unit, then maybe two or three more

3 people could bid. But as written, very fine specifications,

4 as written you got down with a slide rule only one kind of car

5 could bid on it. And when I inquired on that situation I got

6 the frank answer, "Well, that is the kind of car we wanted."

7 "Well," I said, "if that is what you want, tell me what you

8 want. Don't give me a two-page report, which I read over and

9 it looks like it is a competitive proposition, when actually

10 you tailor made the thing so that you get a certain result."

11        So I am not without a little experience on how some of

12 these things operate, and I ask you that question whether you

13 can tell me, in good conscience, you had been given a free hand

14 in this.

15        THE WITNESS:  Yes, sir, and these are my conclusions

16 that are incorporated in the report.

17 BY MR. MOSKOVITZ:

18        Q  Mr. Illingworth, I believe you already testified

19 about the inclusive dates of this investigation.  How many

20 man hours, months or man years were spent under your super-

21 vision and also by you included within that total on the

22 investigation in the Santa Margarita River and the preparation

23 of the report Bulletin 57?

24        MR. STAHLMAN:  Do you mean also on the Oviatt deal,

25 or just this?

1          MR. MOSKOVITZ:  I am limiting it now to this investiga-

2   tion, exclusive of the Oviatt.

3          THE WITNESS:  This is difficult to be exact on this.

4   I would say between 20 and 25 man years.  22 is the nearest I

5   can get to it.

6          THE COURT:  How many years is a man year?  You mean a

7   man working--

8          THE WITNESS:  A full year.

9          THE COURT:  --a full year?

10          THE WITNESS:  Yes; not 365 days, but--

11          THE COURT:  This is a matter that could probably be

12   gone into on cross-examination.

13          MR. MOSKOVITZ:  I thought I would like to develop it

14   myself to point out the--

15          THE COURT:  Let's go back to the question that Mr.

16   Veeder asked and on which I deferred ruling.

17          With reference to the parts of the report of the Santa

18   Margarita River investigation which Mr. Moskovitz has speci-

19   fied:  All of Chapter I, All of Chapter II, pages 107 to 140

20   of Chapter III, Plates 1 through 21b, inclusive, and 23, and

21   Appendices B, D, E, F, G, H, the question was, is this report

22   and these matters accurate to the best of your knowledge?  To

23   which Mr. Veeder objected.

24          Do you now renew that objection?

25          MR. VEEDER:  I do.  I multiply it by five.  The point I

1  make--

2      THE COURT:  I am prepared to rule on it.

3      There was a time when there wasn't law schools and young

4  lawyers had to come into court and watch older lawyers, whom

5  they admired and who were men of experience in the practice,

6  and that is the way they learned their law, and to a certain

7  extent today that still goes on.  Mr. Moskovitz is a young

8  lawyer.  He has heard about your experience, Mr. Veeder.  As

9  to all of the exhibits which you offered in evidence you always

10  asked the same question: "To the best of your knowledge, is this

11  exhibit correctly and accurately prepared?"  The witness always

12  said yes.  The witness is not going to say-- you are not going

13  to try to offer an exhibit which the witness didn't think was

14  accurate.  So Mr. Moskovitz has asked the same question, and

15  I take it largely because he admires and respects your ability.

16      MR. VEEDER:  Oh, I am sure of that.

17      THE COURT:  Do you renew your objection?

18      MR. VEEDER:  May I add something more?

19      THE COURT:  Make them short, because there is a judge's

20  luncheon today for three retiring judges.  What other objec-

21  tion do you have to that question?

22      MR. VEEDER:  I simply say that this man is not qualified,

23  obviously.

24      THE COURT:  The exhibit is not now offered yet.  The

25  question is, to the best of your knowledge is this report, the

1  part of it that is going to be eventually offered, accurate

2  and correct?

3  　　　MR. VEEDER:  But there is no foundation whatever for

4  this man to testify that to his knowledge the soil surveys

5  are accurate, for example.

6  　　　THE COURT:  Well, he may have greater or less informa-

7  tion, but suppose that he had been told that a certain section

8  of this report that someone else had worked on had come to him

9  and said, "Here, I have thrown this together.  Just between

10  you and me this is all wrong, it has been hastily prepared,

11  and it is no good. But I have to get rid of it and get it off

12  my desk and here it is."  The witness could say, "yes, all

13  except this one part.  This one part I couldn't vouch for

14  because I had information that led me to believe that it was

15  not accurate."

16  　　　MR. VEEDER:  If, under oath, the witness wants to answer

17  that question, let him.  But in no sense is this an offering

18  of anything; is that right?

19  　　　THE COURT:  It has not been offered yet.

20  　　　MR. MOSKOVITZ:  I am not offering it at this time.

21  　　　MR. VEEDER:  All right.

22  　　　THE COURT:  Your objection is overruled.

23  　　　You may answer the question.

24  　　　THE WITNESS:  With the exception of minor typographical

25  errors and that sort of thing, which I am sure turn up in most

Illingworth - Direct                                    5712

1    any kind of document, it is correct.

2          THE COURT:  We will take a recess until 2 o'clock.  We

3    have a luncheon on today for three judges of this County who

4    are retiring.  2 o'clock.

5          (Noon recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

rE-1 ML

1    SAN DIEGO, CALIFORNIA, TUESDAY, DECEMBER 2, 1958, 2:00 P.M.

2                          ---o---

3

4           (Other matters.)

5           THE CLERK:  1247-SD-C, United States vs. Fallbrook

6    for further court trial.

7           MR. MOSKOVITZ:  Your Honor, on this inspection tour

8    that you mentioned this morning certain colored slides were

9    taken, and I would like to have them marked for identifica-

10   tion at this time.

11          THE COURT: Give it the O series; O-1, -2, -3, and so

12   forth.  How many are there?

13          MR. MOSKOVITZ:  They go up to 26.

14          THE COURT:  All right, proceed.

15

16                LELAND R. ILLINGWORTH,

17   having been previously sworn, resumed the stand and

18   testified further, as follows:-

19

20                DIRECT EXAMINATION (Continued)

21   BY MR. MOSKOVITZ:-

22          Q   Mr. Illingworth, prior to the investigation

23   which was made of the entire Santa Margarita watershed

24   pursuant to legislative authorization did you have occasion

25   to consider the facts of pumping upstream in the Santa

1  Margarita watershed on the intrusion of sea water into the

2  lower Santa Margarita coastal basin?

3      MR. VEEDER:  I am going to object to that.  There has

4  been no showing this man is qualified in any regard as a

5  geologist, not a word about it.  Certainly, there is nothing

6  to show that he has any information at this juncture as to

7  what the pumps might do, where the pumps are located, or any

8  other factors essential to qualify this man as a geologist

9  or even as a hydrologist.

10     THE COURT:  Overruled.

11     THE WITNESS:  In connection with the visits that I

12 have previously mentioned wherein I visited Camp Pendleton

13 I made some studies to determine the effect of upstream

14 diversions on the ground water basin of Camp Pendleton.

15     Q  BY MR. MOSKOVITZ:  Which visits are you now

16 testifying about?

17     A  Those in 1948, in the fall of 1948.

18     THE COURT:  When you were requested to do this by

19 the Marine Corps?

20     THE WITNESS:  Yes, that is right.  The reason, of

21 course, that the Division of Water Resources was contacted

22 in this connection was that the Division is the State agency

23 responsible for receiving applications to appropriate water,

24 and this request was in connection with the pumping by

25 Fallbrook Public Utility District at this diversion of the

1  Santa Margarita River, which is, of course, upstream from

2  Camp Pendleton.  So I did consider this in the studies that

3  we made in connection with these visits and this study or

4  this request.

5  Q  BY MR. MOSKOVITZ:  Now, turning to the Santa

6  Margarita investigation as authorized by the Legislature,

7  would you describe what the investigation consisted of?

8  A  Well, first of all, this investigation was a team

9  effort.  I was in charge of directing it and coordinating

10  all of the people involved on it.  This included geologists,

11  water quality specialists, land and soil analysts --

12  MR. VEEDER:  Your Honor, I would like to interrupt

13  this for just a moment because I didn't hear correctly,

14  apparently.  Did I understand this witness to testify that

15  the Marine Corps had requested that the Division of Water

16  Resources undertake this investigation?

17  THE COURT:  I said to him, "This is when you went to

18  the base at the request of the Marine Corps."  Now, did the

19  request come from the Marine Corps or --

20  MR. VEEDER:  To make the investigation.

21  THE COURT:  -- someone from Pendleton?  Do you know

22  whom the request came from?

23  THE WITNESS:  I would not know who wrote the letter.

24  However, I believe I know that it was the Navy Department.

25  MR. VEEDER:  Asked for an investigation?

1　　　　THE WITNESS:　Or the Department of the Navy.　Asked

2　us to, they requested us, and I have not reviewed the

3　specific request.　I do not have --

4　　　　Q　BY MR. MOSKOVITZ:　Of your own knowledge, what

5　do you know about your occasion for going down there?

6　　　　A　They requested the Department of Water Resources --

7　　　　MR. VEEDER:　Now, wait a minute.　Does he know this

8　of his own knowledge?

9　　　　THE WITNESS:　Yes, I know that the United States

10　Department of the Navy made the request of the Division of

11　Water Resources to consider the effect of the diversion of

12　Fallbrook under a permit which was granted by the Division

13　of Water Resources on conditions of the ground water basin

14　of Camp Pendleton.

15　　　　MR. VEEDER:　I object, then, on the grounds this is

16　not the best evidence, and I ask that these letters and

17　the exchange correspondence be introduced as the best

18　evidence.

19　　　　THE COURT:　As far as his representation of the

20　contents of the letter, it is hearsay.　But the general

21　statement that the letter was received from the Navy Depart-

22　ment may remain in, and he will be instructed to try to find

23　the letter.

24　　　　MR. MOSKOVITZ:　Your Honor, this is for the purpose

25　of establishing his background of knowledge of the Santa

E-2

Margarita River watershed. We are not introducing this for the purpose of establishing any facts as a result of that investigation.

THE COURT: You don't care whether he went in there at the request of the Navy or not?

MR. MOSKOVITZ: Well, no, your Honor. We want to get the background so that you know why he went back there. But I don't see why the letter is of --

MR. VEEDER: It is the best evidence.

THE COURT: It is an immaterial point. If you want to pursue it, I will direct him to bring it in. What do I care? I have an idea some letter was written; otherwise, I doubted if he came down and knocked at the gate and said, "I am just down here now to stick my nose in your affairs down there." I have no doubt some letter was written. What was written in the letter isn't going to decide the issues of this lawsuit.

MR. VEEDER: It would be very important, your Honor. I think that I understand, I think I know the exchange of correspondence that was involved; and I don't know that this witness is aware of what was written. I don't believe that he is aware of what was written in return to the Government. And I think --

THE COURT: Let the record stand presently. We will strike everything out except the general statement of the

1    witness that he appeared there pursuant to some correspondence.

2        MR. VEEDER:  Thank you, your Honor.

3        THE COURT:  Let him produce the correspondence.

4        MR. VEEDER:  Thank you, your Honor.

5        MR. MOSKOVITZ:  I didn't hear your last remark.

6        THE COURT:  And then I said, "Let him produce the

7    correspondence."

8        MR. MOSKOVITZ:  Very well.

9        THE COURT:  This just wastes time.  You people are

10   complaining about the size of this record.  What difference

11   does it make?  Let's find out what he did, what he knows.

12       MR. VEEDER:  I have no objection to what he did or

13   what he knows.

14       THE COURT:  If you think this lawsuit is going to

15   turn on the wording of that letter or any part of it you and

16   I have different ideas about it.  Let's go ahead.

17       Q  BY MR. MOSKOVITZ:  I believe when Mr. Veeder made

18   his objection you were testifying about what the investigation

19   consisted of.  Would you continue?

20       MR. STAHLMAN:  This is the Santa Margarita investiga-

21   tion?

22       MR. MOSKOVITZ:  This is the Santa Margarita investiga-

23   tion that culminated in Bulletin 57.

24       THE WITNESS:  I was saying that this was a team

25   effort which I directed, coordinated.  It is certain that

1    we were all headed in the right direction; that our informa-

2    tion dovetailed; that we had more or less round table type

3    of discussions at various times.  We pooled our understand-

4    ing, and we think that this resulted in a better investiga-

5    tion than we would have had otherwise.

6        Q  BY MR. MOSKOVITZ:  What type of data was gathered?

7        A  We gathered a great deal of data, and we included

8    a lot of it in the bulletin; the reason being that, as I

9    previously mentioned, we wanted to make data available for

10   water rights litigation which was already in progress.

11   Another of the objectives, of course, was to develop general

12   hydrologic information for planning purposes on a statewide

13   basis.

1          The types of things that we collected-- and I say we

2    collected data-- we actually made measurements in the field,

3    we contacted agencies and individuals in the field, collected

4    all past data that we could that they had gathered.  Such in-

5    formation included precipitation records.  We established three

6    continuous recorders within the watershed during our field

7    investigation, we put out numerous other rain gauges--

8    relatively few, we collected records from a large number of

9    rainfall stations, we located water wells, obtained the logs

10   of water wells, measured depths to water in water wells.  We

11   measured 40 key wells on a monthly basis and a considerable

12   number of other wells twice a year in the fall and again in

13   the spring.

14          Q  By a considerable number, how many wells do you have

15   reference to?

16          A  I don't know exactly.  It would be in the hundreds.

17          Q  What type of studies did you make with reference to

18   water quality?

19          A  We obtained a large number-- again this would be in

20   the hundreds-- of water samples, had them analyzed for mineral

21   constituents in a chemical laboratory and utilized that.  The

22   results of those analyses are included in one of the appendices.

23          Q  Would you identify the portions of the Bulletin

24   where this information is gathered together?

25          A  The water quality data is included in Appendix H,

Case 3:51-cv-01247-JO-SBC   Document 4561   Filed 09/24/63   PageID.26448   Page 73 of 142

1   Records of Mineral Analyses.

2      Q   And what other portions of the Bulletin gathered

3   together the basic data that you testified was gathered?

4      A   Well, the precipitation data is Appendix D, entitled

5   "Precipitation Records."   We made a large number of measurements

6   of stream runoff, we established seven stream gauging stations,

7   which operated during the period of our field investigation,

8   we made miscellaneous spot measurements in other places.

9      THE COURT:   Stream Discharge is in Appendix E.

10      THE WITNESS:   Yes.

11      These do not include any of the published records.   We

12   did not repeat published records, but in the appendices we

13   attempted to publish all the data which had not been previously

14   published.   So therefore the Geological Survey records of stream

15   runoff are not included in this report.

16      We located the points of rising water throughout the

17   watershed.

18      THE COURT:   That is in Appendix E.

19      THE WITNESS:   Well, the measurements that we made below

20   points of rising water are included in previously referred to

21   Appendix E, but one of the plates depicts the points of rising

22   water.   This is Plate 6.

23   BY MR. MOSKOVITZ:

24      Q   What type of information did you gather with respect

25   to diversions and extractions of water?

Case 3:51-cv-01247-JO-SBC   Document 4351   Filed 09/24/63   PageID.26449   Page 74 of 142

1      A   We located the diversions. We measured most of the

2 diversions. Some it was not possible to have measured directly.

3 We made estimates of the diversion of water primarily on the

4 basis of acres of irrigated crops.

5      Q   Is that information compiled in the Bulletin?

6      A   Yes, it is. It is in Water Utilization section of

7 Chapter III.

8      THE COURT: What about the well log data? Did you

9 gather all that you could find on that, or was some omitted and--

10      THE WITNESS: We gathered all that we could find. The

11 well logs themselves have not been reproduced in this Bulletin.

12 We do have a record, however, in this previously referred to

13 report of the referee of the Temecula Creek reference for those

14 well logs within the Temecula Creek watershed. They are re-

15 produced in that Bulletin.

16      THE COURT: This data that is contained in your well log

17 material, Appendix F, some of that material come from well logs?

18      THE WITNESS: Yes, sir.

19      THE COURT: Some from observation on the ground?

20      THE WITNESS: Yes.

21 BY MR. MOSKOVITZ:

22      Q   For purposes of the investigation, was the watershed

23 divided up into portions or units?

24      A   Yes, for convenience in reporting the data, we

25 divided it up into six what we call hydrographic units.

1        Q   Were those described and indicated in the Bulletin?

2        A   They are depicted on Plate 6.

3        THE COURT:  There is also a table of them on page 22

4   of California's Exhibit L, Volume 1.

5        MR. VEEDER:  Either one or the other is in error, your

6   Honor.

7        THE WITNESS:  That is true.  I would like to point that

8   out, if I may.

9        MR. MOSKOVITZ:  Yes.

10       THE COURT:  Yes.

11       THE WITNESS:  On page 22, the description under 2 for

12  Temecula Creek, which is described as Temecula Creek drainage

13  above Vail reservoir, the description itself applies to Unit 3,

14  and that is all.  The other data, the 157 square miles, for

15  instance, is for Unit 2.  The descriptions only are out of

16  place.

17       THE COURT:  What should the description for 2 be?

18       THE WITNESS:  Lancaster-Coahuila Creek drainage area

19  above Vail reservoir.

20       THE COURT:  You mean those two have been interchanged?

21       THE WITNESS:  Yes, sir.

22       THE COURT:  Just the descriptions?

23       THE WITNESS:  That is right.

24       THE COURT:  So that the description under 3 should be

25  up in 2, and the description in 2 should be down under 3?

Illingworth   Direct                                          5724

1        THE WITNESS:  That is correct.

2        THE COURT:  Other than that they are correct?

3        THE WITNESS:  Yes, sir.

4        Now, these hydrographic units are shown on Plate 6.

5   The hydrographic unit 1 is the Murrieta Creek drainage above

6   the confluence of Murrieta Creek and Temecula Creek at the

7   head of Temecula Canyon.  Unit 4--

8        MR. VEEDER:  I don't know of any question that is pending,

9   your Honor.

10        MR. MOSKOVITZ:  There is a question pending.  I asked

11   as to the hydrographic areas.

12        THE COURT:  The objection of Mr. Veeder is overruled.

13        Plate 6 demarks these various units as you set them

14   forth on page 22?

15        THE WITNESS:  Yes, sir.

16        Should I proceed with the description of them, or is

17   this self-evident?

18        MR. MOSKOVITZ:  I would like you to describe the units

19   briefly, unless the Court feels it is superfluous.  But I

20   think it would be helpful to outline them for the record.

21        THE COURT:  All right, let's have it.

22        THE WITNESS:  Unit 4 is the Temecula Creek drainage

23   from the confluence with Murrieta Creek up to Vail Dam.

24        Units 2 and 3 constitute the remainder of the Temecula

25   Creek drainage.  Unit 2 being the Lancaster-Coahuila Creek,

1    also known as Wilson Creek above Vail Dam, and Unit 3 is the

2    upper portion of Temecula Creek above the Vail reservoir, the

3    Vail Dam.

4    BY MR. MOSKOVITZ:

5         Q  Now, turning to Plate 1 of the Bulletin, will you

6    describe that briefly as to the information which is contained

7    therein?

8         A  That is a map of the State of California.  The plate

9    title is "Location of Santa Margarita River Watershed."  It

10   shows in red the area of the Santa Margarita River watershed

11   and the western Riverside and northwestern San Diego Counties.

12        Q  Under whose direction and supervision was that plate

13   prepared?

14        A  Under my direction and supervision.

15        Q  And is it correct, to your knowledge?

16        A  Yes, it is.

17        Q  Referring to Plate 2a, will you describe what appears

18   on that plate?

19        MR. STAHLMAN:  May I ask a question.  What is the form

20   this is going to take?  Are you going to introduce these in-

21   dividually as we come to them, or are you just going to have

22   them testified to, as he has testified to Plate 1 and then

23   eventually say all of them in?  How are they to be introduced?

24        I have some concern, your Honor, by reason of the fact

25   that in connection with the investigation of the Oviatt case

1    where there is some overlapping into the matters pertaining to

2    this case, there have been filed some written objections.  I

3    feel that I must give some consideration to that.

4         Also, we have some slight concern with some of the other

5    plates in connection with this matter.  I want to have the

6    opportunity to cross-examine the people who made the investi-

7    gation as to where the matter was obtained upon which the

8    plates were made.  I refer specifically to the irrigable acreage

9    of the Pauba Basin, which is on Plate 21, Unit 4.

10        How are these to be offered in evidence?

11        MR. VEEDER:  Plate 21b it is.

12        MR. MOSKOVITZ:  Your Honor, my plan was to identify the

13   plates which will relate to the geologic testimony, have them

14   identified by Mr. Illingworth because of the part that he

15   played in their preparation, and then have them identified by

16   Mr. James to the extent that he participated in their prepara-

17   tion, and then have them introduced in evidence at that time.

18        MR. VEEDER:  I desire at this time to have the record

19   clear in regard to basic objections which I have, and I see no

20   better time than now to bring this about.

21        THE COURT:  What kind of basic objection can you have

22   when counsel is trying to lay a foundation?  He doesn't even

23   offer the material until after foundation is laid.

24        MR. VEEDER:  I know, but I would rather have it in the

25   record now, because I am not quite sure if he knows where he

1    is going.

2           In the transcript of September 22nd, 1958, before your

3    Honor, Mr. Moskovitz says:

4                "Mr. Bookman was in charge of the prepara-

5                 tion of this Bulletin 57.  This investigation

6                 was conducted and report prepared under the

7                 direction of Mr. Bookman.  There is no

8                 dispute about that.  There was a profes-

9                 sional staff that he, Mr. Bookman, directed.

10                He, Mr. Bookman, outlined the work they were

11                to do, and they did the work."

12           THE COURT:  The testimony today is consistent with that.

13           MR. VEEDER:  Your Honor, of course, can weigh the

14    evidence as he chooses, but I simply say that efforts to identify

15    with this witness these matters are contrary to statements that

16    Mr. Moskovitz has already made.

17           MR. MOSKOVITZ:  Your Honor--

18           MR. VEEDER:  I have the floor, your Honor.

19           MR. MOSKOVITZ:  Just a moment.  I don't think this is

20    proper, your Honor.  This doesn't go to the questions I am

21    asking Mr. Illingworth at this time.  This is entirely another

22    matter.  This is the wrong time to bring it up.

23           THE COURT:  That is what I have indicated.

24           Is this an objection?

25           MR. VEEDER:  It is an objection, your Honor, on the

1    grounds that there was agreement to produce Mr. Bookman for

2    the purpose of introducing Bulletin 57, and Mr. Moskovitz

3    agreed to it.

4        MR. MOSKOVITZ:   There was never any such agreement on

5    my part.

6        MR. VEEDER:   May I go ahead?

7        MR. MOSKOVITZ:   I was very specific in saying that Mr.

8    Illingworth will be the one to testify.

9        MR. VEEDER:   No, I am reading from the transcript in

10   this very case and I refer to the pages of the transcript,

11   they start on page 2146, lines 3 and 4.  He goes on at great

12   length in regard to the vast ability of Mr. Bookman and all the

13   work that he did, and then he says, "We plan to have a witness

14   who would testify to this Bulletin was prepared and the informa-

15   tion upon which it was based.  He, the witness, can be cross-

16   examined as to the conclusions," and he went on at great

17   length, because I was objecting, your Honor--

18       THE COURT:   But that was not Mr. Bookman he was talking

     about then.

19       MR. VEEDER:   I didn't know that up until this.

20       THE COURT:   Don't misstate the record.

21       MR. VEEDER:   I am not misstating the record, your Honor.

22   I am quoting from the record.

23       THE COURT:   I am not intimating that you have been

24   doing it purposely.  But you have been talking about Bookman,

1   and then you go into having a witness present, which would

2   sound as if it was Mr. Bookman.

3          MR. VEEDER:  I believe it was Mr. Bookman.

4          THE COURT:  That was not the understanding, as I under-

5   stood it.

6          MR. VEEDER:  I simply say that I have never misstated

7   the record to anyone in my life, and I am not starting it now.

8          THE COURT:  I don't accuse you of doing it directly.

9          MR. VEEDER:  But I am stating this, that the transcript

10  of September 22nd, 1958, certainly showed that Mr. Bookman was

11  the man, and if there was any doubt that Mr. Bobkman was going

12  to be called--

13         THE COURT:  If you want Mr. Bookman down before the

14  exhibit is offered in evidence, we will have him down here.

15  But I can prophesy what you are going to find about it.  He was

16  in charge of it, he assigned the work, and he did what any good

17  superior would do-- he had some people do the work, and he takes

18  the credit for the report if it is a good one and he takes the

19  blame if it is a bad one.  But somebody else did the work.  You

20  have men with you who know how this operates.  This is the

21  old assignment of level of authority.

22         If you want him down, we will have him.  But I prophesy

23  that it would be a dry run.  But if you would like to have him

24  here, we will direct him to come down.

25         MR. VEEDER:  I simply say this, in all sincerity, your

1    Honor, that I think I have studied this Bulletin as closely as

2    anyone here, including Mr. Moskovitz, and I will say that I

3    hate to see an underling undertake to identify these exhibits

4    because I think I am going to have to object to almost every

5    one that he talks about.

6            THE COURT:  If Mr. Bookman had been called and he was

7    asked the question that qualified him and said, "You were in

8    charge of this investigation"-- Where is this page?

9            MR. MOSKOVITZ:  Roman XVI, your Honor.

10           THE COURT:  Page Roman XVI.

11    "You were in charge of it?

12    "Yes.

13    "You were responsible for this matter?

14    "Yes."

15           Et cetera.

16    "Was this report prepared under your direction?

17    "Yes, sir.  Mr. Edmonston assisted me and Mr. Illing-

18    worth did the work."

19           When you got through with that kind of foundation and

20    it had been offered in evidence, you would stand up and say,

21    "Well, wait a minute now.  We want the men who did the work."

22           MR. VEEDER:  Yes, irrespective of what they try and do,

23    I am going to insist that they produce the bodies that did this

24    work.  Rest assured, your Honor.

25           THE COURT:  So he started in and produced the men who

1   did the work.  They started in with Mr. Illingworth, I under-

2   stand that they will have Mr. James, they will probably have

3   Mr. Shannon or Mr. Haley.

4       MR. MOSKOVITZ:  If we put that part of it in.  We

5   haven't offered it yet, your Honor.

6       THE COURT:  If there is any question comes up and it

7   appears that some of these subordinates under Mr. Illingworth's

8   direction, it may be pertinent that we have them here.  But

9   Mr. Moskovitz is apparently trying to lay a foundation in the

10  best legal style.

11      MR. STAHLMAN:  Your Honor, I am sorry that my inquiry

12  provoked this rather heated little set to here.  I didn't know

13  that Mr. Veeder was going to grab the mythical ball and run

14  with it.  I am not as emotional about this Bulletin 57 as

15  probably he is. And I just wonder what the procedure is going

16  to be, because there are a number of bulletins that I wanted

17  to have an understanding of it, and I think it probably should

18  occur in some cases before they are introduced in evidence.

19  I just wondered how Mr. Moskovitz was proceeding, whether he

20  was going to introduce one at a time and later on make a mo-

21  tion to introduce all of those, or whether he is going to offer

22  the whole Bulletin.

23      MR. MOSKOVITZ:  Your Honor, as I pointed out before we

24  started--

25      THE COURT:  Well, let's split it up into categories--

1    it is still the same exhibit, and you offer your Chapter I,

2    your Chapter II, and that part of Chapter III, and you offer

3    the plates, and you offer the appendices you have listed,

4    and then Mr. Stahlman will have a chance to object to any

5    particular one that he wants to.

6        MR. MOSKOVITZ:   Certainly.

7        MR. STAHLMAN:   As an example, had he offered Plate 1 I

8    would have no objection to it; that merely shows an area, and

9    there are a lot of them that I don't think I have any quarrel

10   with or am concerned with.

11       MR. VEEDER:   I think you can get that from any road map.

12       THE COURT:   I take it you have no objection to Plate 1?

13       MR. VEEDER:   I think we all concede that California is

14   on the West Coast.   But beyond that I make no concession.

15       MR. MOSKOVITZ:   Your Honor, I would like to clarify the

16   point as to the necessity of Mr. Bookman's being here as a part

17   of the foundation for introducing the Bulletin or portions

18   thereof.   It seems to me that if Mr. Veeder wants to impeach

19   the testimony of Mr. Illingworth as to how the Bulletin was

20   prepared and who was in charge of it, he can call Mr. Bookman

21   himself thereafter.   But it seems to me that if Mr. Illingworth

22   testifies and lays the proper foundation, the Bulletin can be

23   introduced after his testimony when the offer is made.

24       THE COURT:   You have no objection, do you, to having

25   Mr. Bookman down here as part of this foundation?

1    Mr. MOSKOVITZ:  No, I don't, your Honor.  It is a

2  question of the order, and it seems to me that this would

3  really delay the consideration of the material that we were

4  asked to put on at this time, which is geology, and if we are

5  going to get into these questions right now at this time of

6  what Mr. Veeder thinks is an inconsistency in who prepared it,

7  it seems to me we are long delaying geology.  However, if this

8  is your desire, we will produce him.

9    THE COURT:  All right, let's produce him.

10    MR. MOSKOVITZ:  At what time, your Honor?

11    THE COURT:  Can you have him here later this week?

12    MR. MOSKOVITZ:  I rather doubt it, your Honor.  I have

13  his schedule for this week in my notes.

14    THE COURT:  What is he doing this week?

15    MR. MOSKOVITZ:  May I have just a few moments to check

16  the letter I have from him.

17    THE COURT:  Yes.

18

19

20

21

22

23

24

25

G-1 ML

1    MR. MOSKOVITZ: The communcation Mr. Bookman sent me

2  when I told him there might be a possibility of his being

3  here was that he was being tied up the dates of the 1st,

4  3rd, 4th, and 5th of December, without telling me what his

5  precise appointments were those days; and that he was going

6  to enter the hospital on the 8th and would be --

7    THE COURT: I don't really care when he comes, but

8  if Mr. Veeder insists that he wants to interrogate him, then,

9  I will not hear any motion to submit this in evidence until

10  after he can be interrogated. We will leave it to him.

11  If what he is doing on the 2nd, 3rd, and -- 3rd, 4th and 5th

12  are more important than coming down here, then we will have

13  to wait until he can come down.

14    MR. MOSKOVITZ: Well, that need not delay the

15  testimony. We can refer to the bulletin, because --

16    THE COURT: It need not delay the testimony.

17    MR. MOSKOVITZ: -- we can offer it later.

18    THE COURT: Proceed to lay your foundation.

19    And if no one has any objection to a particular

20  plate, let's have it over with and out of the way.

21    MR. MOSKOVITZ: I am willing, your Honor, then, to

22  offer these as we go along. I will offer in evidence plate

23  No. 1 at this time.

24    THE COURT: Any objection to plate No. 1?

25    MR. VEEDER: Well, now, is it plate No. 1? Is it just

a map?  Is it part of the bulletin that is being offered or is it just a map of California?  If it is only a map of California, fine.  If it is part of the bulletin, I certainly object to it.

THE COURT:  Why?

MR. VEEDER:  Because there is no part of the bulletin that I think can be qualified for evidence.  Now, this trying to get the facts of this thing into the court is something to which I certainly strenuously --

THE COURT:  Why spend any time with an objection to plate 1, which is merely a red spot on the California map showing generally where the watershed is located?

MR. VEEDER:  As long as it is not part of the bulletin, I have no objection to it.

MR. MOSKOVITZ:  Well, it is part of the bulletin, your Honor.

MR. VEEDER:  Tear the page out and put it in.

THE COURT:  What difference does it make?  If it goes into evidence, it goes in for what it is worth on the four corners of the plate.

MR. VEEDER:  On the four corners of the plate, fine, so long as it is not part of the bulletin.

THE COURT:  Later on the rest of the bulletin goes in, then it is part of the bulletin.

MR. VEEDER:  Just let him tear out the page, and let's

1　put it in.　And that is the way I think it should be done.

2　　　　MR. MOSKOVITZ:　But, your Honor, in light of Mr.

3　Veeder's objection and your desire to have Mr. Bookman here

4　before we offer it, it seems to me we can tear this thing

5　apart if we offer it piecemeal.

6　　　　MR. VEEDER:　Why not?　I think that is the way to do

7　it.

8　　　　MR. MOSKOVITZ:　Because this bulletin is a unit, and

9　the plates go together.

10　　　　MR. VEEDER:　That is what I am objecting to.

11　　　　MR. MOSKOVITZ:　They explain each other.

12　　　　MR. STAHLMAN:　It might simplify it by putting it in

13　piecemeal.

14　　　　MR. VEEDER:　That is right, because the thing I am

15　objecting to right now is the write-ups to which these things

16　pertain.　I am not being unreasonable.

17　　　　THE COURT:　We will save a lot of time.　The plate 1

18　received in evidence.　It will be marked by the Clerk as

19　California L-plate 1.　That is what it will be called.

20　　　　MR. VEEDER:　And it will not be a part of the bulletin

21　at all?

22　　　　THE COURT:　It makes no difference to me how you want

23　to argue it.　You can argue it is not part of the bulletin.

24　Later on if more of it is in, somebody else can argue to me

25　those parts that are in are part of the bulletin.　I am not

1   going to waste time on that.

2          MR. VEEDER:  Fine.

3          THE COURT:  As far as you are concerned it is not

4   part of the bulletin.  As far as Mr. Moskovitz is concerned

5   it came out of the bulletin and is part of the bulletin.

6   But so far only plate 1 is in evidence.

7          MR. VEEDER:  Over my objection.

8          THE COURT:  All right.

9          Q  BY MR. MOSKOVITZ:  Now, Mr. Illingworth, would you

10   identify and describe plate 2-A?

11          A    Plate 2-A is entitled:  "Physiography, Coastal

12   Area."  It depicts in the yellow color the valley areas.

13   And shown thereon in a dash line are, or solid and dash

14   line, geologic faults, the major faults.  Incidentally, the

15   significance of coastal area is that this is the portion of

16   the Santa Margarita River watershed on the coastal side of

17   the divide that meanders across the Santa Rosa plateau,

18   identified here on the map in part as Mesa de Colorado and

19   Mesa De Burro.  It is this meandering line which intersects

20   the Santa Margarita River at the confluence of Murrieta

21   and Temecula Creeks.  The portion inland from that line,

22   portion of the watershed inland from that line is called the

23   inland area.

24          Q    Now, in the delineation of the faults and the

25   valley areas depicted on plate 2-A what information or data

Illingworth - Direct

1   were used?

2       A   Well, the valley areas are simply determined

3   from inspection of the topographic maps.  The geologic

4   faults were those major faults that were determined in the

5   geologic investigation.

6       Q   Under whose technical direction was the geological

7   investigation made?

8       A   That was done under the technical direction of

9   Lawrence James.

10      Q   And under whose general direction was this plate

11  prepared?

12      A   Under my general direction.

13  MR. MOSKOVITZ:  May I, your Honor, I am not going to

14  offer this at this time because Mr. James participated in

15  gathering the data used for it.

16  THE COURT:  All right.

17  MR. MOSKOVITZ:  And that will be offered at a later

18  date.

19  MR. STAHLMAN:  I also would like to make this inquiry:

20  Are these maps as shown here -- I think here is another, as

21  far as I am personally concerned, is a map of which there is

22  no great consequence to it.  When we get into some of these

23  other maps -- the maps in this bulletin are so small.  Weren't

24  there prepared some sizeable maps?  That when we get into

25  matters that we may be concerned with, such as irrigable

1    acreage and those things, we would have some of the larger

2    maps, if any there are, as evidence, as exhibits in this

3    case, and we can work from something that is not going to

4    require a microscope to see it?  These are reduced to such

5    a small size that I think it is impractical to make a

6    determination of some of the important evidence that might

7    come out of them.

8    MR. MOSKOVITZ:  Your Honor, for the purposes that we

9    are offering the various portions of the bulletin we feel

10    that these plates are usable.  They are convenient because

11    everyone can have a copy before him.  And at the present

12    time I don't know just what the availability, if any, is of

13    the originals from which these plates were prepared.

14    THE COURT:  We will cross those bridges later.  You

15    are not offering 2-A at this time?  Go ahead.

16    MR. MOSKOVITZ:  No, your Honor.

17    Q    Now, would you identify and briefly describe what

18    appears on plate 2-B?

19    A    Well, plate 2-B depicts, for the inland area,

20    the same type of information as shown on 2-A for the coastal

21    area.  I should say that with respect to both plates the

22    hasher marks are intended to indicate the type of terrain.

23    Where they are most dense you have mountainous terrain and

24    where there are none -- such as the yellow-colored areas --

25    the lands are flat-lying, and the intermediate concentration

1  of hasher marks indicates rolling lands.  This plate was
2  simply designed to give a general over-all picture of the
3  relationship between mountains to valley areaas and the
4  general picture of faulting in the area and the relationship
5  of these features to streams.

6      Q   On what basis did you delineate the watershed
7  boundary appearing on plates 2-A and 2-B?

8      A   These lines were determined from detailed in-
9  spection of topographic maps and the field surveys, where
10  necessary.  In addition to our own field surveys we utilized
11  those that were made by the Office of Ground Water Resources
12  at Camp Pendleton, particularly for those areas in Rainbow
13  and in the coastal areas in the vicinity of South Coast Mesa
14  and Stuart Mesa, those boundaries which were determined by
15  the Office of Ground Water Resources for the first trial of
16  this case.

17      Q   Now, when did you receive the information from the
18  Office of Ground Water Resources as to the watershed boundary?

19      A   I don't know the exact date.  Sometime during our
20  investigation; between July of '52 and June of '54.

21      Q   Under whose direction and supervision was plate
22  2-B prepared?

23      A   Under my direction.

24      THE COURT:  You did the work on it.  Who was
25  responsible for the material that went into it under you?

1        THE WITNESS:  Under me, the faults were the

2   responsibility of the geologist working under the technical

3   direction of Mr. James.  The remainder of it, to the best of

4   my knowledge, I prepared myself.

5        MR. VEEDER:  Your Honor, I would like to bring to

6   your Honor's attention from page 6 of Bulletin 57 the state-

7   ment:  "Much of the data presented herein" --

8        MR. MOSKOVITZ:  Your Honor, it seems to me Mr. Veeder

9   is taking --

10        THE COURT:  Let's hear him out.

11        MR. VEEDER:  Well, I just hate to hear a man say what

12   he is saying.  It says:  "Much of the data presented herein

13   * * * is included in this report, either in the analyses

14   presented or the basic data."  Now, that was taken from the

15   Rancho Santa Margarita vs. Vail.  In other words, if your

16   Honor will look at page 6 it will be seen that the bulletin

17   itself says that the data they used in this matter was taken

18   from that.

19        MR. SACHSE:  I am lost, Mr. Veeder.  Would you mind

20   telling me where you are?  I can't find any of this language.

21        MR. STAHLMAN:  Page 6.

22        MR. SACHSE:  Page 6 where?

23        MR. VEEDER:  Of the book.

24        MR. SACHSE:  You have not read any sentence completely,

25   so I am lost.  Tell me where you start, please.  "Much of the

1　data from the Southern California area investigation and

2　continuing investigation" --

3　　　MR. STAHLMAN:　He is down below here.

4　　　MR. VEEDER:　Here you go:　"Hydrologic and geologic

5　data concerning the Santa Margarita River system generally

6　for the period 1920 through 1927" --

7　　　MR. MOSKOVITZ:　"Generally for the period 1920 through

8　1927."

9　　　MR. VEEDER:　--"were obtained and presented in

10　evidence in Rancho Santa Margarita vs. Vail, et al.　Much

11　of the information presented therein pertinent to the present

12　investigation was made available by the Vail Company and

13　is included in this report either in the analyses presented

14　or in the basic data."

15　　　THE COURT:　This is a matter for cross-examination.

16　You can find out at that time what part of the material he

17　is talking about.

18　　　MR. VEEDER:　I submit, your Honor, that the only way

19　I know how to get the evidence of another case into the

20　record is certainly not this way.　And the point that I make

21　is that this book which this gentleman says he wrote is

22　nothing but a country editor's re-write of the record of

23　three different lawsuits, by and large, and we are now

24　watching the fancy of -- a man says, "It was prepared under

25　my direction."　And I daresay he wasn't of voting age when

this case was tried. Now, I submit that many of the things
that I said that almost cost me some money about the
bulletin are deep in my heart, and the more that I read
about this bulletin the more convinced I am that materials
such as this -- I am now referring to plate --    What is it?
2-B.

MR. MOSKOVITZ:  Your Honor --

THE COURT:  Just a minute.

MR. VEEDER:  Plate 2-B purports to show, for example,
faults, fault lines.  Now, it is very interesting but we
are being asked to let this progress on the basis of data,
and we know that it can't be true, some of these things that
are being said.  But I will also interpose another objection
on the ground not only that this is the purest kind of
hearsay that this is being touched upon.  We are confronted
now at this late date in the trial where everyone is
familiar with references, for example, on plate 2-B.  We
have all worked with Terwilliger Valley since the first
evidence was introduced.  Now we find that Terwilliger Valley
is substantially Anza Valley.

MR. SACHSE:  I might submit, your Honor, we have
worked with a boundary of a watershed line submitted by the
United States that has been changed sixteen times in the
course of the United States' own case.  A change of names
doesn't bother me much.

Illingworth - Direct

1          MR. VEEDER:  We also have an example of one large

2     valley area which is not even designated dam or valley.

3     We then find that another large area is not marked at all.

4     Now, we can confound this confusion as we go through each

5     exhibit, your Honor.

6          THE COURT:  You are doing your best.  Just keep it

7     up.

8          MR. VEEDER:  I am doing my best to keep this --

9          THE COURT:  What difference does it make?  If one

10    side wants to give one name to it and one another, I am not

11    going to be confused.

12         MR. VEEDER:  I think the record is, your Honor.

13         THE COURT:  You mean to say that if --   Let's take

14    a simple matter:  If one side of this litigation, one party,

15    wanted to call a valley by a certain name and used it, that

16    another party that came along would be required to use the

17    same terminology?

18         MR. VEEDER:  But we agreed in the stipulated agreed

19    facts that the United States Geological Survey terminology

20    designations be applicable.

21         THE COURT:  In the sense there is an agreement in the

22    agreed set of facts then probably these exhibits should

23    have another name put in them to comply with the stipulation.

24         MR. VEEDER:  I think there should.

25         THE COURT:  And this, we can take care of it later.

1      MR. VEEDER:  In other words, then, I understand they

2  will change these to comply with the stipulated agreement?

3      MR. MOSKOVITZ:  Your Honor, I don't think we have to

4  change the names on these exhibits.  It was brought out in

5  cross-examination of Mr. Kunkel that they had a few names.

6      THE COURT:  Any objection to using the names on these

7  exhibits that you used in the pretrial stipulation?

8      MR. VEEDER:  Just consistency's sake.

9      MR. MOSKOVITZ:  Oh, no.  If he puts the name in in

10  ink.  We are not going to reprint.

11      THE COURT:  That is all I am talking about.

12      MR. VEEDER:  That is all I am talking about.

13      MR. MOSKOVITZ:  No objection.

14      THE COURT:  Now, if this is an objection, Mr. Veeder,

15  it is overruled.  Let's go ahead.  Much that you are talking

16  about is a matter for cross-examination.

17      Did you have something you wanted to say, Mr.

18  Illingworth?

19      THE WITNESS:  I could explain how these names were

20  arrived at and it might clarify the record.

21      THE COURT:  It isn't important.  It isn't important.

22  The point is that if we have a stipulation whereby a certain

23  valley was given a certain name, we will instruct somebody

24  to take a pen and ink and write in here a name that we used.

25  It doesn't vitiate the exhibit.

1          THE WITNESS:  No, sir.

2          Q   BY MR. MOSKOVITZ:  Turning now to plate 6, would

3    you please identify and briefly describe that plate?

4          A    Plate 6 has been previously referred to in connec-

5    tion with the designation of the hydrographic units.  It is,

6    in addition to showing the hydrographic units, it delineates

7    by width of red line the magnitude of summer flow as

8    represented by 1953 conditions of the perennial streams.

9    There are three widths of line indicated.  The northwest

10   line is from one-hundredths to half a cubic foot per second.

11   The intermediate width line, from a half to four-second feet,

12   and the wider one from four to six.  Also shown on the map

13   are the location of springs which we located during investi-

14   gation.  By black triangular star the stream gaging stations

15   that were in existence at the time of the investigation.

16

17

18

19

20

21

22

23

24

25

1          There are mileage indicators on the streams, indicating

2     the stream miles upstream from the Pacific Ocean. These are

3     useful in designating the location of water sampling points.

4     And also we show the boundaries of water service organizations,

5     including the Naval Reservation of Camp Pendleton, the Naval

6     Ammunition Depot, and including the Naval Hospital, the Fall-

7     brook Public Utility District, the Rainbow Municipal Water

8     District, Vail Company holdings, and also the boundary of the

9     South Elsinore Mutual Water Company. These boundaries, of

10    course, as other things in this Bulletin are as of the date

11    of the bulletin or the date shown on the plates and may not

12    necessarily be absolutely correct today.

13         Q  And is the watershed boundary the same as the water-

14    shed boundary delinated on Plates 2a and 2b?

15         A  Yes, it is.

16         Q  Under whose direction and supervision was this

17    plate prepared?

18         A  Mine.

19         Q  Was any of the information which is delineated here

20    gathered by the geologists under the technical supervision of

21    Mr. James?

22         A  Yes.  A rather large number of the springs were

23    located by the geologists.

24         Q  Turning next to Plate 9a, would you identify and

25    describe that plate-- what appears thereon?

1          A  Plate 9a is entitled "Location of Wells, Coastal

2    Area."  It indicates the location of water wells, test holes,

3    abandoned wells and foundation test holes for which we had

4    information.

5          Q  And what is the numbering system which is used in

6    the location of wells?

7          A  The numbering system is one used in the Department

8    of Water Resources.  It is also used by the U. S. Geological

9    Survey and has been previously referred to in this litigation.

10   It is based on the township, range and section designation,

11   with a lettering A through R, eliminating the letters I and O,

12   for 40-acre tracts within each section.

13         Q  What other information is depicted on Plate 9a?

14         A  We show in general the water-bearing characteristics

15   of the materials within the watershed in Plate 9a, the coastal

16   area.  By color designation we show in yellow those deposits

17   that have moderate to high permeability; by purple those with

18   relatively low permeability, and by brown those areas which

19   are generally impermeable.

20         Q  Is the watershed boundary the same as the watershed

21   boundary on Plate 2a?

22         A  Yes, it is.

23         Q  And what information is shown here with respect to the

24   hydrographic units?

25         A  The boundaries of the hydrographic units are shown and

1   the shaded number in the oval indicates the number of the

2   hydrographic unit.  In this plate Units 5 and 6 are shown.

3          Q  What information is depicted on this plate with

4   respect to section lines?

5          A  The township, range and section lines depicted on

6   this plate are those shown on the U. S. Geological Survey

7   Quadrangles, the latest available for all those areas wherein

8   sections have been surveyed.  Now on the land grants we have

9   projected section lines.

10         THE COURT:  By dotted lines?

11         THE WITNESS:  Yes.  We have two designations, or three,

12   actually:  The long dashes are those from the GS quadrangles,

13   the dotted lines are those where-- let's see, I don't believe

14   there are any shown on this plate.

15         THE COURT:  Dotted lines?

16         THE WITNESS:  Dotted lines.

17         THE COURT:  Yes, up in the Santa Rosa.

18         THE WITNESS:  Those are really short dashes.  There

19   is a third designation that appears on Plate 9b1 that we

20   haven't looked at yet.

21         THE COURT:  It seems to me that the short dashes are

22   shown down in the Naval Depot.

23         THE WITNESS:  Well--

24         THE COURT:  Maybe not.

25         THE WITNESS:  Those are longer than the others.  It

1   is a little difficult to distinguish.  But the significance

2   here, we have two things, we have the short dash lines on the

3   land grants, and the long dash lines south of that.

4          THE COURT:  Well, you have some solid lines.

5          THE WITNESS:  Those are township and range lines only,

6   and those we have shown solid in all cases, even when projected,

7   for ease in following.

8          The method by which these projected lines were delin-

9   eated was to start with the actual surveyed lines and throw

10  the error into the northern tier of sections, in the same manner

11  that a surveyor would do it were he to sectionize those lands

12  to the best of his ability without spending an undue amount

13  of time on this.  But this is the explanation for the fact

14  that the sections 1 through 6, for instance, are very narrow

15  sections.  All of the error is thrown into that top tier.  The

16  rest of them are generally one mile in dimension each direction.

17  BY MR. MOSKOVITZ:

18         Q  On the basis of what information were the delineations

19  with the colors of the water-bearing characteristics of under-

20  ground formations determined?

21         A  Would you read that, please?

22         (The reporter read the pending question.)

23         A  This is based on the geologic studies conducted

24  during the investigation and is based on the geologic information

25  developed by the geologists.

1      THE COURT:  By that you mean Mr. James and his staff?

2      THE WITNESS:  Yes, your Honor.

3      MR. STAHLMAN:  Might we have a recess, your Honor.  It's

4  twenty after three.

5      THE COURT:  Yes, take a short recess.

6      (Recess.)

7      THE COURT:  Proceed.

8      MR. MOSKOVITZ:  Your Honor, before the recess, Mr.

9  Veeder madequite a point of trying to show inconsistency in

10  the names of valleys, and for the record I think, your Honor,

11  we should point out what the pretrial stipulation of facts

12  does say about Terwilliger Valley.  On Page 6, starting at

13  line 1 of the Pretrial Stipulation as to facts, it states as

14  follows:

15          "Coahuila Creek, an intermittent

16           stream, has its origin on the southwest

17           slope of the San Jacinto Mountains south-

18           east of Thomas Mountain.  From its source

19           it proceeds south and west for a distance

20           of approximately thirteen and three-

21           quarters miles, passing through the

22           Terwilliger Valley, also known asAnza

23           Valley, to the lower end of the Coahuila

24           Valley."

25  I have looked through the stipulation and there is no

1  reference anywhere there to Culp or Damron Valley whatsoever.

2  I think Mr. Veeder is throwing up another smoke screen as he

3  usually does.

4        MR. VEEDER:  No, no, no.

5        THE COURT:  Proceed.

6        MR. VEEDER:  No.

7        THE COURT:  In view of the fact that the stipulation

8  alternately uses the name Anza or Terwilliger Valley, no

9  correction or addition need be made on Plate 2b.

10        MR. VEEDER:  How about Dameron Valley, your Honor?

11  There is no designation at all on that.

12        THE COURT:  Well, does the stipulation say anything

13  about it?

14        MR. VEEDER:  But there is certainly a Dameron Valley,

15  and we have a lot of testimony about it.

16        THE COURT:  You may have testimony about it, but that

17  is another thing, to require additions to a stipulation.  I

18  don't see any harm in doing it, but there is no need that it

19  be done.

20  BY MR. MOSKOVITZ:

21        Q  Mr. Illingworth, going back for a moment to Plate 6,

22  is that plate accurate to your knowledge, in so far as the

23  information that was supplied or gathered under your direction

24  and supervision?

25        A  Yes, it is.

1    THE COURT:  Did someone else participate in Plate 6?

2 Was there geology that came from James's department on Plate 6?

3    THE WITNESS:  I have previously mentioned that the

4 geologists located a number of the springs that are designated

5 thereon.

6    MR. VEEDER:  May I inquire who designated the water

7 service organizations, for example, including the United States

8 of America's land and the Naval Reservation, as being in a

9 water service organization, similarly the Vail Company as

10 being in a water service organization?

11    MR. MOSKOVITZ:  Your Honor--

12    THE COURT:  That is a matter for cross-examination,

13 Mr. Veeder.  Proceed, Mr. Moskovitz.

14 BY MR. MOSKOVITZ:

15    Q  Turning to Plate 9b, would you identify that and

16 describe what appears on it?

17    MR. VEEDER:  Now, before you leave Plate 9a, I am not

18 sure how we are doing this, because I don't know where voir

19 dire starts and where it stops.  But I ask you to review first

20 the low permeability, if your Honor will look where the town

21 of Fallbrook is situated.  Now--

22    THE COURT:  I noticed it.  I expect when it is probably

23 offered Mr. Sachse will have an objection.

24    MR. VEEDER:  I know, but I was going to ask whether this

25 is fence line geology or how they arrive at a perfectly straight

1 line to cut off the valley.  Now I have—

2 MR. SACHSE:  Your Honor, Mr. Veeder made a great point,

3 as your Honor will well recall, at the last court session

4 when I attempted on a half a dozen occasions to interrogate

5 Col. Bowen regarding exhibits which had not yet been offered,

6 and your Honor sustained him on each occasion and stated that

7 the time for cross-examination was after the exhibit was

8 offered in evidence, and I submit that the same situation

9 exists here-- this exhibit is not offered.

10 THE COURT:  When you gentlemen have gotten along I

11 have permitted some inquiry in the nature of voir dire and

12 have not been too formal about it, but since you don't seem

13 to be getting along postpone it until cross-examination, Mr.

14 Veeder.

15 MR. VEEDER:  All right, sir.

16 BY MR. MOSKOVITZ:

17 Q  Mr. Illingworth, will you go ahead and identify

18 Plate 9b and describe what appears on it.

19 A  Plate 9b is entitled "Location of Wells Inland Area."

20 It shows the same type of information as I have testified to,

21 as is shown on Plate 9a.  I might say that here we do have

22 some of these dotted lines for section lines, and they are in

23 areas where we didn't have the final geological survey maps

24 available at the time this map was prepared.  We had only the

25 preliminary copies of the Geological Survey quadrangles.  The

1  preliminary copies did not contain names, that is, place names,

2  nor did they contain or include section lines.  These section

3  lines are based on a rather extensive study of aerial photo-

4  graphs and original maps of the Federal Land Office and any

5  other data that we could get to indicate where the section

6  lines were in the field and where they should be on this map.

7  We so delineated them wherever we felt they were reasonably

8  close to the proper section lines.

9       You will notice that in the Cleveland National Forest,

10  in Range 1 East, Township 9 South, there are some blank areas.

11  I believe that area had never been surveyed-- has never been

12  surveyed.  The area north of that in the same range but Town-

13  ship 7 South, there are some blank areas again with no section

14  lines shown.  This is an area that was surveyed, but we could

15  find no clues as to where the lines should be.  Nothing showed

16  up on the aerial photographs, no fence lines in there, and

17  just nothing to go on to even estimate where the position should

18  be.  This was eliminated or omitted.

19       THE COURT:  As to the areas of permeability again, you

20  relied upon the geologists, Mr. James and his assistants?

21       THE WITNESS:  Yes, your Honor.

22  BY MR. MOSKOVITZ:

23       Q  And as to the other information depicted thereon,

24  that was all gathered under your supervision and was based

25  upon the information that you felt was correct?

1      A  That is true.

2      Q  And are Plates 9a and 9b correct as to such informa-

3  tion in so far as you know?

4      A  Yes, they are.

5      Q  Turning to Plate 10a, would you identify that plate

6  and describe what appears thereon?

7      A  Plate 10a is entitled "Lines of Equal Elevation of

8  Ground Water, Coastal Area, Spring, 1927."  The plate depicts

9  certain ground water basins and shown thereon are the ground

10  water contours for spring, 1927.

11      Q  Is the watershed line the same as on Plate 2a?

12      A  It is.

13      THE COURT:  You have used the same watershed in all the

14  plates where it is involved, have you?

15      THE WITNESS:  Yes.

16      THE COURT:  1 to 23, inclusive?

17      THE WITNESS:  Yes, sir, wherever it is shown.

18  BY MR. MOSKOVITZ:

19      Q  On what basis were the boundaries of the ground water

20  basins delineated?

21      A  On the basis of the geologic investigation conducted

22  under the direction of Mr. James.

23      Q  On what basis were the lines of equal elevation of

24  ground water delineated?

25      A  On the basis of all the water well data that we could

1   obtain for this period, namely, spring, 1927.

2      Q   And under whose direction and supervision was that

3   data gathered and were these lines of equal elevation of ground

4   water drawn?

5      A   The data was gathered under my direction, but the

6   people working under my direction did not make the measurements

7   on which these are based.   This information was obtained from

8   the Vail Company through the Vail Company engineer, Mr. H. M.

9   Hall.

10      Q   For the year for which the ground water levels are

11   depicted on that plate?

12      A   That is correct, yes.

13      Q   And who drew the lines of equal elevation of ground

14   water which appear on this plate?

15      A   I don't believe I could state the man's name who

16   drew the lines.   This was done under my direct supervision,

17   however.

18      THE COURT:   What part did James have in Exhibit 10a--

19   James and his staff?

20      THE WITNESS:   The delineation of the ground water basin

21   boundaries.

22      THE COURT:   I see.

23      MR. VEEDER:   I didn't quite catch that.   There was some

24   unidentified person who drew the lines.   Is that right, on the

25   ground water basin?

1    MR. MOSKOVITZ:  Your Honor--

2    THE COURT:  Just a minute.

3    MR. VEEDER:  I am just inquiring, searching for facts.

4    THE COURT:  His answer was that someone on his staff,

5    under his direction; that presently he didn't know whether he

6    could name which particular man did it.

7    BY MR. MOSKOVITZ:

8    Q  Under whose direction and supervision was Plate 10a

9    drawn and prepared?

10    A  Under my direction and supervision.

11    Q  And is it correct, to your knowledge?

12    A  Yes, it is.

13    THE COURT:  All right, are you through with Plate 10a?

14    MR. MOSKOVITZ:  Yes, your Honor.

15    THE COURT:  Your answers as to plate 10b would be the

16    same, then-- merely the lines of equal elevation to the inland

17    area?

18    THE WITNESS:  That is true, and you will notice that

19    the many of the ground water basins show no ground water

20    contours.  There simply was not any data available for that

21    particular period of time.  Such a basin would be the Anza

22    Basin.

23    BY MR. MOSKOVITZ:

24    Q  And was the information as to the well levels for

25    Plate 10b secured from Mr. Hall?

1          A  Yes, it was.

2          Q  Turning now to Plate 11a--

3          MR. VEEDER:  May I inquire,  They have a big box down

4   here with some little spots on it, referring to 10b, lines

5   of equal elevation, etcetera.  It says "Apparent Areas of

6   Confined Water."  Who did that?

7   BY MR. MOSKOVITZ:

8          Q  On the basis of what data were the apparent areas

9   of confined water delineated on Plate 10b?

10         A  On the basis of the measurements of wells that were

11  obtained from Mr. Hall.

12         THE COURT:  You are talking now about the so-called

13  basin, are you?

14         THE WITNESS:  Well, he is speaking of this apparent

15  area of confined water that is shown shaded on Plate 10b in

16  Pauba Valley, for instance.

17         THE COURT:  I see.  I didn't see the shading.  It

18  appears in the Santa Gertrudis Basin and the Pauba Basin.

19         THE WITNESS:  Yes, and some other small areas in the

20  vicinity of Santa Gertrudis.

21  BY MR. MOSKOVITZ:

22         Q  Would you explain what is meant by that expression

23  "Apparent Areas of Confined Water"?

24         MR. VEEDER:  I object on the ground that this man is

25  not a qualified geologist.

THE COURT:  Overruled.

THE WITNESS: These are areas where it was apparent that it was confined water; that is, there were artesian wells located within these areas wherein the water stood at a considerably higher elevation than it did in the shallower wells located in the same general vicinity.  That is, in the case of Paube Valley all wells were located within Pauba Basin.  The same thing was true in Santa Gertrudis Basin.

THE COURT:  Trying to trace this symbolism, for instance, in the Nigger Basin, there are some dots.  Is that supposed to be part of the stream or is that area of confined water?

THE WITNESS:  That is part of the stream.  That is a sand symbol as shown on the topographic maps.  It is not intended to be the same thing.

THE COURT:  The same would be true as to the symbol in the Aguanga Basin?

THE WITNESS:  That is true, yes.

BY MR. MOSKOVITZ:

Q  What is the distinction between the ground water levels which are indicated in Pauba Basin in solid numbers and those which are indicated in the dotted numbers?

A  Well, the dotted numbers refer to the dashed contours, which are the contours for the pressure area.  The solid lines and the solid numbers refer to the free water table as determined

1  from the shallower wells.

2  BY MR. MOSKOVITZ:

3      Q   What were the depths of the wells from which the

4  ground water contours shown in solid lines were taken?

5      MR. VEEDER:  I renew my objection to all of this.  Mr.

6  Illingworth simply has not been qualified as a geologist, your

7  Honor.  I renew all my objections to any testimony that he

8  bases upon geology.

9      MR. MOSKOVITZ:  Your Honor, not only geologists are

10  qualified to interpret well level data.  This man is qualified

11  by--

12      THE COURT:  This man has worked for the State.  He has

13  been put upon jobs of this sort.  He has been educated in

14  civil engineering.  That doesn't mean that he is not qualified.

15  It goes to the weight of his testimony.  He has had experience

16  in these fields.  He has worked in these matters.  It is

17  entirely a matter of the weight.  It is not a matter of compe-

18  tence.  The objection is overruled.

19      THE WITNESS:  Could I have the question, please?

20      (The reporter read the pending question.)

21      MR. MOSKOVITZ:  In a general way?

22      MR. VEEDER:  How could you have depths in a general way?

23      THE COURT:  I take it, Mr. Veeder, that he is asking

24  whether they were wells over a hundred feet or 150 feet deep.

25  Let us find out what his answer is first.  The objection is

overruled, if it is an objection.

I - ML

1    THE WITNESS: They were the wells that -- it is

2 difficult for me to answer this, because we are talking about

3 a plate that depicts wells in the spring of 1927. I would

4 have to check to find out what the depths of those wells

5 were. Now, if they referred to some other period of time,

6 I could be more definite.

7    Q   BY MR. MOSKOVITZ: Generally speaking?

8    A   Or I can refer to my notes, if you wish.

9    THE COURT: You refer to your notes overnight, and

10 the question can be answered, that question, tomorrow morning.

11 Go ahead, Mr. Moskovitz.

12    THE WITNESS: I can perhaps answer it sufficiently

13 at this time by saying that they are the generally shallower

14 wells. Certainly nothing over 300 feet. The deeper wells,

15 the artesian wells were in the vicinity of four to five

16 hundred feet deep.

17    MR. VEEDER: Your testimony is, then, that they were

18 300 feet?

19    THE WITNESS: No, it isn't. I said they were not over

20 300 feet.

21    MR. MOSKOVITZ: I submit that --

22    THE COURT: Go ahead, Mr. Moskovitz. It is difficult,

23 but proceed.

24    Q   BY MR. MOSKOVITZ: What information on plates 10-A

25 and 10-B were obtained from the geologists under the supervision

of Mr. James?

A    They assisted in the delineation of these apparent areas of confined water.  This was a subject of discussion among us, as to the delineation of those areas.

THE COURT:  And also in the basins.

THE WITNESS:  Oh, yes, yes.

THE COURT:  All right.

THE WITNESS:  The basins were designated by the geologists, that is true.

Q    BY MR. MOSKOVITZ:  Now, are plates 10-A and 10-B correct in what they depict, to your knowledge?

A    Yes, they are.

Q    Now, turning to plate 11-A.  Would you identify that plate and describe what appears thereon?

A    May I make one statement again with respect to plate 10-B?

Q    Go right ahead.

A    The confined water contours shown in Pauba Valley are for March of 1926 rather than spring, 1927.

Q    What is the reason for that?

A    There were no data available for the spring of 1927, but, in my opinion, the pressure levels for March of 1926 depict  reasonably accurately the situation that would exist in spring of 1927.

Q    Would you turn to plate 11-A.

1    A    Since they did not change rapidly from year to

2  year.

3         Plate 11-A depicts the same information as shown

4  on plate 10-A with respect to the coastal area, but the

5  ground water contours are shown for the fall of 1953.

6         Q    And what information did you base the delineation

7  of the ground water levels upon?

8         A    This was based on measurement of depths to ground

9  water by people working under my supervision and from measure-

10  ments made by the Office of Ground Water Resources and the

11  United States Geological Survey on Camp Pendleton.

12         Q    Would your testimony be the same as to the

13  participation in the preparation of this plate by Mr. James

14  as with respect to plates 10-A and 10-B?

15         A    Yes.

16         Q    Is plate 11-A correct to your knowledge?

17         A    Yes, it is.

18         Q    Turning now to plate 11-B, would you identify and

19  describe what appears thereon?

20         A    Plate 11-B is entitled:  "Lines of equal elevation

21  of ground water, inland area, fall, 1953."

22         Q    Does it show the same type of information for the

23  inland area as is shown in 1953, as is shown for the inland

24  area in 1927 on plate 10-B?

25         A    In general, it does.  It contains, however,

ground water contours in many more basins than were shown on plate 10-B.

Q   And what data do you have on which you based the drawing of these ground water contours?

A   The depths to water in wells.  And in the case of the artesian wells, the head of pressure that was measured at a pressure gage at the artesian wells.

Q   Are the depths to water in wells collected and found anywhere in Bulletin 57?

A   Yes, they are.  The records are shown in one of the appendices.

THE COURT:  Appendix on water well data?

THE WITNESS:  No, sir.  That simply summarizes the data on the wells themselves.

THE COURT:  G, depth to ground water?

THE WITNESS:  Yes, sir.

Q   BY MR. MOSKOVITZ:  And are the water level contours, the lines of equalization of ground water, which are depicted on plates 10-A, 10-B, 11-A, and 11-B, based upon the data which appear in that appendix?

A   Yes, sir, it is.  It is also based on some additional information in the case of the Camp Pendleton ground water basin for 1927.  We had measurements at wells which are no longer in existence.  However, we had the location, the map location, of wells; and those data were

1   utilized in construction of the ground water contours, since

2   we couldn't identify the exact location by township, range

3   and section number. To the best of my knowledge, those wells

4   are not included in Appendix G.

5      THE COURT: When you prepared 11-A, which was the

6   coastal area, did you use Appendix G also to the extent that

7   it supplied information?

8      THE WITNESS: All the data that were used on plate

9   11-A for the fall of 1953, is included in Appendix G.

10      THE COURT: Except this information that came from

11   Pendleton?

12      THE WITNESS: That was for 1927.

13      THE COURT: Oh.

14      THE WITNESS: All of the Pendleton measurements that

15   we obtained for the fall of '53, and during the period of

16   our investigation, are included in Appendix G.

17      THE COURT: Well, G was used for both 11 and 11-A?

18      THE WITNESS: Yes, sir.

19      MR. MOSKOVITZ: You mean 11-A and 11-B.

20      THE COURT: 11-A and 11-B.

21      Q BY MR. MOSKOVITZ: And G was used for 10-B also,

22   was it not?

23      A Yes.

24      THE COURT: What about 10-A? Oh, no. He has told us

25   about 10-A. That is where --

Q  BY MR. MOSKOVITZ:  As to 10-A, would you explain whether the appendix on water level measurements supplied all the information on which 10-A was based?

A    That is the one we have referred to on Camp Pendleton, and I said that all of the data on which the ground water contours were based on 10-A were not included in Appendix G, to the best of my knowledge.

Q    Some of it is?

A    Oh, yes.  The majority of it is.

Q    Now, are plates 11-A and 11-B correct, to your knowledge?

A    With one grave exception here.  I see "Lower Culp Valley" is spelled C-u-p.

Q    What is the correct spelling?

A    It was intended to be C-u-l-p.

MR. VEEDER:  That is Dameron Valley.

THE WITNESS:  That is shown on the new edition of the Geological Survey map, the final edition, as Dameron Valley.

Q  BY MR. MOSKOVITZ:  Turning now to plate 13-A. Would you identify that plate?

A    13-A is entitled:  "Areal Geology, Coastal Area."

Q    What date?

A    1954.

Q    Under whose direction and supervision was that

1   plate prepared?

2       A    That plate was prepared under my general supervi-

3   sion and under the direct supervision of Lawrence James.

4       Q    What professional group collected the data and

5   prepared the information which appears thereon?

6       A    The group of geologists working on the Santa

7   Margarita River investigation.

8       Q    And what was your role in the preparation of the

9   plate in question?

10      A    The base map was prepared under my direction.

11  The delineation of the geologic data from the aerial

12  photographs to the plate was critically reviewed by me, and

13  the general accuracy of the information was reviewed by me.

14      Q    Is plate 13-A correct to your knowledge?

15      A    Yes, it is.

16      Q    Referring to plate 13-B, would you identify that

17  plate?

18      A    13-B is entitled:  "Areal Geology, Inland Area,

19  1954."

20      Q    Would your testimony be the same as to the prepar-

21  ation and the responsibility for this plate as for plate

22  13-A?

23      A    Yes.

24      Q    And is it correct, to your knowledge?

25      A    Yes, it is.

1     Q   Now, turning to plate 14, would you identify that

2  plate?

3     A   Plate 14 is entitled: "Geologic Sections A,

4  A', B, B', and C, C', 1954."

5     Q   Under whose direction and supervision was this

6  plate prepared?

7     A   This plate was prepared under my general super-

8  vision; under the direct supervision of Lawrence James, and

9  who supervised the geologic group.

10     Q   This, then, is a plate which the geologists

11  essentially were responsible for?

12     A   That is correct.

13     Q   And would your testimony be the same as to plate

14  15?

15     A   Yes.

16     Q   Would you please identify that plate?

17     A   It is entitled "Geologic Sections D, D', E, E',

18  and F, F', 1954."

19     Q   As to plates 14 and 15, where are these Sections

20  D, D', E, E', and F, F', and so forth, shown so you can see

21  through what areas they run?

22     A   They are shown on plates 13-A and 13-B. A, A'

23  through K, K', are shown on plates 13-B and L, L' is shown on

24  13-A.

25     MR. VEEDER: I would like to know what scale or --

1    Excuse me, your Honor.

2            THE COURT:  We haven't gotten to L, L' yet, have we?

3            THE WITNESS:  No, I am afraid I don't --

4            THE COURT:  The A, B, C, D, E, F sections are all in

5    13?

6            THE WITNESS:  13-B.

7            THE COURT:  13-B.

8            MR. VEEDER:  On what scale were those drawn?

9            THE WITNESS:  The scales that are indicated on the

10   plates.

11           Q   BY MR. MOSKOVITZ:  Turning now to plates 16 and 17.

12   Would your testimony be the same as to those plates as your

13   testimony on plates 14 and 15?

14           A   Yes.  16 is entitled:  "Geologic Sections G, G',

15   H, H', and J, J', 1954."

16           Q   Where are those sections shown on the 13 series

17   of plates?

18           A   They are shown on 13-B.  Plate 17 is entitled:

19   "Geologic Sections K, K', and L, L', in 1954."  K, K', the

20   line of section, K, K', is shown on 13-B, and the line of

21   Section L, L', is shown on 13-A.  Plates 16 and 17 differ

22   from 14 and 15 in that they are drawn from graphic well logs.

23           Q   Turning now to plate 18 --

24           THE COURT:  Well, now, the geology on 16 and 17 came

25   from Mr. James and his staff?

THE WITNESS: Yes, it did.

THE COURT: 16, 17, and the data from well logs, who assembled that, put that in, Mr. James?

THE WITNESS: Yes, sir.

Q BY MR. MOSKOVITZ: Turning to plate 18, would you identify that plate and describe what is in it?

A Plate 18 is entitled: "Relationship between ground water storage capacity and depth to ground water in Santa Margarita coastal basin."

Q Under whose direction and supervision was that plate prepared?

A Under Mr. James' supervision.

Q This was another plate that the geologists were responsible for?

A That is correct.

THE COURT: 19 is on the same sheet?

MR. MOSKOVITZ: Yes, your Honor, but that is not being offered at this time. It doesn't pertain to the geology.

MR. VEEDER: 19 is not part, then, of Mr. Illingworth's testimony, is that right?

MR. MOSKOVITZ: Not at this time.

MR. VEEDER: Not at this time.

Q BY MR. MOSKOVITZ: Now, turning to the Volume II of the Bulletin 57. Would you identify Appendix B?

A    Appendix B is entitled:  "Geology."

Q    And what page does that appendix start on?

A    On page B-1.

Q    And under whose supervision and direction was that appendix prepared?

A    It was prepared under the direct supervision of Mr. James and under my general supervision.

Q    This is one of the parts of the bulletin that was under the technical direction of Mr. James?

A    That is true.

Q    Now, turning to plate Appendix D, would you identify that and indicate where it may be found in Volume II of State's Exhibit L for identification?

A    Appendix D is entitled:  "Precipitation Records," and commences on page D-1.

THE COURT:  Who compiled it?

THE WITNESS:  Engineers working under my supervision.

MR. MOSKOVITZ:  This is one of the appendices that is not particularly relevant in the geological testimony, and it will not be offered.  I don't want to offer it now, lay the foundation for it at this time.  I was in error.

MR. VEEDER:  You are not talking about precipitation, then?

MR. MOSKOVITZ:  We are not going to be referring to specific precipitation records in the geologic testimony and,

1　therefore, are not offering the data on precipitation at

2　this time.

3　　　Q　Now, would you please turn to Appendix F and point

4　out where it begins in the exhibit.

5　　　A　Appendix F is entitled "Water well data" and

6　commences on page F-1.

7　　　Q　And what information is included in that

8　appendix?

1  Shown for each hydrographic unit and for wells adjacent to the

2  Santa Margarita River watershed, closely adjacent, that is, are

3  shown the well numbers, the State number and any other number,

4  if the well had been given another number, the owner of the

5  well, the date the well was drilled, the depth of the well, the

6  diameter of the casing in inches, the pumping equipment that

7  was installed at the time of our inspection, the use at the

8  time of our inspection, and under the column "Other data

9  available" are listed such information as we were able to

10  obtain and include in the appendices, such as water level

11  information, water analyses.

12      Q  By "water analyses" what do you mean?

13      A  Water analyses are chemical analyses of waters

14  obtained from the well.

15      Another item that is included in that column is

16  availability of a water well log.

17      Under "Remarks" are pertinent comments.

18      Q  What data was utilized in compiling Appendix F?

19      A  We obtained the information from any reliable source

20  that we could locate.

21      THE COURT:  Was this your responsibility?

22      THE WITNESS:  Obtaining this data?  Yes, sir.

23      THE COURT:  And assembling it, et cetera?

24      THE WITNESS:  Yes, sir.

25  BY MR. MOSKOVITZ:

      Q  This was done under your technical supervision as

1  well as overall supervision?

2       A  Yes, it was.  Well, certain of this information is

3  geological information.  For instance, geologists collected

4  the well logs-- namely to the extent that it says that a well

5  log is available, that information was obtained by the

6  geologist; and some of this information, the descriptionof

7  the well, the owner of the well and depth of the well was

8  obtained by the geologists.  We cooperate pretty well in our

9  department, the geologists and the engineers, and sometimes a

10 well is located by a geologist and he obtains the information,

11 and sometimes it is an engineer.  All of that information is

12 here.

13       Q  Does Appendix F contain any geologic conclusions?

14       MR. VEEDER:  I object to that question.  What do you

15 mean by "geologic conclusions"?  A water level could be a

16 geologic conclusion.  Is that what you are talking about now?

17       MR. MOSKOVITZ:  Your Honor--

18       THE COURT:  Reframe your question.  I don't know exactly

19 what you mean.  You are referring to a specific part of the

20 Appendices?

21       MR. MOSKOVITZ:  I am referring to the entire Appendix,

22 as to whether this Appendix F required the professional opinion

23 of a geologist in assembling the appendix itself.

24       THE WITNESS:  No, this is a basic data appendix.

25

BY MR. MOSKOVITZ:

    Q And under whose supervision was this appendix gathered together?

    A   Under my supervision.

    Q  Is this one of the parts of the investigation which was under the technical supervision of Mr. James?

    A   No.

    Q  Is it correct, to your knowledge?

    A  Yes, it is.

    I should point out, however, that the answer to that is not complete. I remember I changed one of Vail Company wells here on the advice of Mr. Hall, who had originally given me the data If we want to correct that, maybe this is the time to do it.

    Q  Go ahead.

    A  On Page F56, near the bottom fourth of the page, is a well 8 South, 2 West, 20B4. That should be 20C1. It is also known as the Caterpillar Pump.

    THE COURT: Go ahead.

    THE WITNESS: Did we correct this one?

    THE COURT: I have already got marks indicating that those two wells, 20B4 and 20B3, were merely interchanged by number. Now you say the Caterpillar Well, should be called 20C1?

    THE WITNESS: Yes, it was 20B4 and 20C1 that should have

1    been interchanged, so 20B4 should be called 20C1. Caterpillar

2    pump is correct, Vail Company is the owner, drilled January,

3    1953. I now have the depth from Mr. Hall; that is 120 feet.

4    16-inch diameter casing. The description under pumping

5    equipment should be Caterpillar Diesel, 50 horsepower.

6         THE COURT: Instead of 25?

7         THE WITNESS: Horsepower electric. That applies to the

8    well listed just down below. That applies to the New 28. The

9    New 28 is listed here as 20C1, and that should be 20B4.

10   BY MR. MOSKOVITZ:

11        Q  Are there any other corrections that should be made

12   in this Appendix that you know of now?

13        THE WITNESS: Not that I know of.

14        Q  Turning now to Appendix G, would you identify it and

15   point out where it is found in Volume 2?

16        A  Appendix G is entitled "Records of depths to ground

17   water in wells in and adjacent to Santa Margarita River Water-

18   shed." It starts on page G1.

19        Q  And what information appears in that appendix?

20        A  It includes the depth to ground water in all wells

21   for which measurements were available. We attempted to include

22   all of the historic well level information that was available,

23   as well as our own measurements and any measurements that were

24   made currently, including those made by the U. S. Geological

25   Survey and the Office of Ground Water Resources. The attempt

1    was to assemble in one place all of the data that we could.

2    And this applies to the other appendices listed in Volume 2 as

3    well.

4         Q   Is there any indication as to the source of the

5    information that appears in Appendix G?

6         A   Would you read that, please?

7         Q   I will reframe it for you. Does Appendix G indicate

8    where the well levels which are collected were secured?

9         A   Yes.  I believe without exception we indicate when

10   the measurement was made by other than us-- Yes, as indicated

11   on page G2, "Measurements made by the Division of Water

12   Resources unless otherwise indicated."

13        Q   Under whose supervision and direction was this

14   appendix collected together and prepared?

15        A   Under my direction and supervision.

16        Q   Is it correct, to your knowledge?

17        A   Yes, it is, with possible typographical errors.  I

18   am sure that with so many words and numbers there are some,

19   although we certainly spared no horses in proof reading it.

20        MR. VEEDER:  Horses?

21        THE WITNESS:  Figuratively.

22        MR. MOSKOVITZ:  You may cross-examine.

23        MR. VEEDER:  Your Honor, I would like some direction

24   from your Honor in regard to the course that is being under-

25   taken.  As I understand it, we have part of the data used for

1   identification here stemming from this witness.  Then we will

2   have another witness who will compound the action.  Now I

3   think the only proper way to cross-examine under the circum-

4   stances would be after the offers have been made, the exhibits

5   offered, and then call the two boys back together and work them

6   one at a time, of course.  I am not about to walk into this

7   bear trap.  So let us get Mr. James up here and then when we

8   get around to this trying to get this stuff in the record I

9   will cross-examine both of them. But I don't want to cross-

10  examine this man now.  It wouldn't be fair to him, and certainly

11  it is not fair to me.

12         THE COURT:  Well, the matter of cross-examination is

13  within the Court's discretion.  I could require you to go

14  ahead and cross-examine.

15         MR. VEEDER:  That is why I asked your Honor's direction.

16         THE COURT:  I will let you postpone it until we proceed

17  further.  Call your next witness.

18         You may step down temporarily, Mr. Illingworth.

19         MR. MOSKOVITZ:  Mr. James.

20

21                    LAURENCE JAMES,

22  called as a witness in behalf of the defendant State of

23  California, being first duly sworn, testified as follows:

24         THE CLERK:  Would you state your name, please?

25         THE WITNESS:  Laurence James.

Laurence James   Direct

3780

DIRECT EXAMINATION

BY MR. MOSKOVITZ:

      Q  What is your address, Mr. James?

      A  4425 Glen Oak Court, Sacramento 21, California.

      Q  What is your age?

      A  Forty-three.

      Q  What is your present occupation and position?

      A  I am Chief Geologist with the State of California, Department of Water Resources.

      Q  Where is your office?

      A  Sacramento, California.

      Q  Will you state for the record what your educational background has been?

      A  I attended grade school in La Crescenta, California. I attended high school in Glendale, California.  I went to Glendale Junior College--

      Q  When did you graduate from high school?

      A  February, 1935.  I went to Glendale Junior College in that same month, February, 1935.  I attended junior college for a year and a half.  I transferred then to Stanford University, which I attended for four years.  I graduated from Stanford with an A.B. in Geology, and was credited with a year and a half of graduate work in mining engineering.  I left Stanford University in the spring of 1940.

      Q  Since then have you had any further education?

1      A   Yes, I have.   I have taken courses with the University

2   Extension at the University of Southern California, that is, in

3   night school, and in this respect I have taken courses in

4   geology, in civil engineering and in soil mechanics.

5      Q   How many credits do you now have in graduate work?

6      A   I couldn't say exactly.   A number of my credits are

7   in quarter units, some are in semester units.   It would be

8   pretty close to two years.

9      Q   After you left school, graduated from the university,

10  what was your professional experience-- job experience?

11     A   In July, 1940, I worked for the Phelps-Dodge Corpora-

12  tion in Jerome, Arizona, as a miner.   In December, 1940, I

13  went to work as a mining geologist for Consolidated Copper

14  Mines in Kimberly, Nevada.   In this capacity I served as a

15  petrographer,   A petrographer is one who studies rocks.   In

16  this instance, both by petrographic microscope and by a visual

17  inspection of hand specimens.   I also kept the logs of both

18  churn drills and diamond drills which were operated by the

19  mining company at that time for exploratory purposes.   I

20  assisted in the preparation of areal geology maps for the

21  mine and assisted in the appraisal of mining properties in

22  which the mine was interested.

23     Q   How long did that job continue?

24     A   I stayed with that job almost exactly a year, leaving

25  in December, 1941.

1    At that time I went to work for the Anaconda Copper

2    Company in Butte, Montana, as a mining engineer.

3    Q What were your responsibilities and duties in that

4    position?

5    A I served chiefly as an underground surveyor, sur-

6    veying the excavations in mine workings of several mines which

7    were owned by the Anaconda Company.  I also checked on the

8    progress of contracts for underground excacation and support

9    that were being done for the Anaconda Copper Company by

10    private contractors.

11    Q And how long did you continue in that position?

12    A I stayed with the Anaconda Copper Company for about

13    four months, at which time I volunteered in the United States

14    Navy.  And while I was waiting for my commission to be approved,

15    which took longer than I expected, I took a short job with the

16    U. S. Army Corps of Engineers as a civil engineering aid, at

17    which time we checked specifications for certain contracts

18    that they had.  We checked the work that was being done on the

19    contracts against the specifications.

20    Q What type of contracts were these?

21    A These contracts included contracts for drilling water

22    wells and also contracts for the construction of military

23    housing projects.

24    Q What was the date of your entrance into active duty

25    in the Navy?

1        A.  June 15, 1942.

2        Q  What type of assignment were you given in the Navy?

3        A  I was chiefly attached to amphibious forces in the

4    European Theatre of operation.

5        Q  And what was your specific position and responsibility?

6        A  About half the time I was engineering officer on an

7    LST, and the rest of the time as executive officer on an LST.

8        Q  And how long did you remain on active duty?

9        A  Four and a half years.

10       Q  What was the date of your discharge from active duty?

11       A  It was in September, 1946.

12       Q  What rank had you attained?

13       A  I attained the rank of Lieutenant-Commander at that

14   time.

15       Q  Upon leaving active duty with the Navy, what was your

16   job experience?

17       A  I went to work for the California Division of Water

18   Resources as a Junior Geologist.  My first assignment was--

19       Q  What was that date, specifically, when you went to

20   work for them?

21       A  That was in September, 1946.

22       Q  Will you describe what your position was and what

23   your duties were?

24       A  My first position was as a Junior Geologist working

25   on the West Coast Basin investigation.

1          Q  What office were you attached to?

2          A  Los Angeles office at that time.  And in this

3    connection I assisted in preparing an areal geologic map of the

4    West Coast Basin.

5          Q  Is this the same basin that Mr. Illingworth testified

6    about?

7          A  Yes, it is.  Mr. Illingworth and I worked together

8    on that investigation.  In addition to assisting with the

9    areal geologic mapping, we located water wells, collected

10   water well logs, we prepared geologic sections, measured the

11   permeabilities and transmissibilities of various aquifers.

12         THE COURT:  You say "we".  Are you talking about Mr.

13   Illingworth and you, or your staff?

14         THE WITNESS:  No, sir.  There was another geologist

15   that worked with me on that job, your Honor.

16         THE COURT:  All right.

17         THE WITNESS: We delimited the aquifers beneath the

18   West Coast Basin, made estimates of their thickness and areal

19   extent.  We made estimates of the quantities of underflow that

20   replenished the West Coast Basin.  We studied the sea water

21   intrusion which was occurring into that basin, and finally we

22   prepared a report covering our findings.

23   BY MR. MOSKOVITZ:

24         Q  Did you participate in the preparation of that

25   report and the writing of that report?

1          A  Yes, I did.

2          THE COURT:  Who was in charge of this study?  Who was

3     your immediate superior?

4          THE WITNESS:  Mr. Ray Richter, an assistant geologist,

5     was my immediate supervisor at that time.

6          THE COURT:  Was he in charge of the project?

7          THE WITNESS:  No, sir.  Mr. George Gleason was in

8     charge of the project for a time, and then after a while Mr.

9     Meyer Kramsky was placed in immediate charge of the project.

10    BY MR. MOSKOVITZ:

11         Q  What was Mr. Gleason's professional specialty?

12         A  He was a hydraulic engineer.

13         Q  How long did this investigation of the West Coast

14    Basin in which you were involved last?

15         A  I was involved in it actively for about one year,

16    and thereafter off and on for I would say perhaps two years.

17         Q  Subsequent to the work on the West Coast Basin, what

18    other assignments did you have?

19         A  I was assigned to geologic studies on the Tia Juana

20    Basin reference, that is, Tia Juana Basin in California-- and

21    this is the litigation of Marvin Allen, Et al., vs. the

22    California Water & Telephone Company; and on this particular

23    job--

24         Q  What was the responsibility of the Division of

25    Water Resources on this job?

1          A   The Division of Water Resources was to investigate

2     the physical facts regarding the water supplies in the Tia

3     Juana Basin and report thereon.

4          Q   For whom?

5          A   For the Superior Court in San Diego.

6          Q   And what were your duties and responsibilities in

7     connection with that investigation?

8          A   I was in charge of geologic investigation for that

9     particular study.

10         Q   Did anyone work under your supervision?

11         A   From time to time, yes, I had one geologist and up

12    to three hydraulic enginers under my supervision.   The

13    engineers, I might add, were only temporary as required to

14    perform certain tasks.

15         THE COURT:   You said you were in charge of the geology

16    of the survey.   Were you in charge of the entire project?

17         THE WITNESS:   No, sir.   That, again, was under the

18    direction of Mr. George Gleason, hydraulic engineer.   But I

19    did have--

20         THE COURT:   I am not speaking of who your superior was.

21    I am talking about who was actually in charge of the job.

22    That was Mr. Gleason?

23         THE WITNESS:   Yes, sir.

24         THE COURT:   All right.

25

BY MR. MOSKOVITZ:

Q   What activities and what types of studies did you make in the geology studies?

A   We delimited the basin boundaries, we collected well logs, mapped the areal geology, we prepared geologic sections, drew contours at various intervals of the ground water levels, we delimited a semi-pressure area in the basin, we compiled estimates of the underflow and into and out of the basin, we performed transmissibility tests and tests to determine the permeability and transmissibility of the aquifers, both by so-called equilibrium methods and non-equilibrium methods.

Q   Will you describe those methods?

A   Well, the equilibrium method is one in which a well is pumped.  Its discharge is measured.  It is pumped for a sufficient time that it will draw the water level down in an adjacent well, as far as they are going to go, and at that time the water levels in the adjacent well or wells are measured and from certain standard formulas one can compute the transmissibility of the aquifers.

On the other hand, the non-equilibrium method employs other formulas whereby you can arrive at the transmissibility by pumping one well and measuring its discharge and noting the drawdown in adjacent wells after a certain time or in adjacent wells at varying distances from the pumped well.

THE COURT:  I don't get the distinction.  In each

1   instance you checked on ajacent wells.

2          THE WITNESS:  The distinction, your Honor, is that in

3   one instance you pump the discharging well until stable

4   conditions of water level are reached in the adjacent wells.

5   In the other method, the non-equilibrium method, you pump the

6   pumped well and take the measurements in adjacent wells before

7   stability is reached, and it applies two different types of

8   formulas.

9          THE COURT:  Before stability is reached, you mean at

10  various levels as they draw down?

11         THE WITNESS:  Yes, sir, before the water levels in the

12  observed wells have reached their maximum drawdown.

13         THE COURT:  You have a series of readings, then, as

14  the well goes down?

15         THE WITNESS:  Yes.

16         THE COURT:  While in the equilibrium method you take

17  only what you would call the equilibrium of the maximum

18  drawdown of the adjacent wells?

19         THE WITNESS: That is correct.  Of course, you have to

20  make a number of measurements in the observed wells to determine

21  when this equilibrium condition has been reached.

22         THE COURT: All right.

23  BY MR. MOSKOVITZ:

24         Q  What kind of studies did you make with respect to

25  the source and movement of ground water in that area?

1    A   As I have already testified, we constructed ground

2  water contours from the measurements that we made of water

3  levels in these wells, and from these contours we were able

4  to predict the movements of the water.  As far as the occurrence

5  of ground water goes, we constructed geologic sections through

6  the valley, delimiting the pressure aquifers and zones of free

7  water, and showed all of this on our cross-sections and on our

8  maps.

9    Q.  What type of data did you have from which you con-

10  cluded that there was semi-confinement or semi-pressure?

11    A   We had well logs which indicated the type of

12  materials which were penetrated.  We had the chemical analyses

13  of water samples which were obtained from both deep and

14  shallow wells, and there was a distinction in the chemical

15  character of these two.  We had installed automatic water

16  stage recorders on deep and shallow wells and noted the

17  effects of pumping wells on both deep and shallow aquifers--

18  that is to say, we would pump a deep aquifer and note the

19  effect on the well penetrating a shallow aquifer and also

20  the effect on another ajacent deep well.

21    MR. STAHLMAN:  May I ask if there is a time element

22  involved in that?

23    MR. VEEDER:  You mean today?

24    MR. STAHLMAN:  I just wanted to get around to the

25  subject of time.

1          THE COURT:  Have you worked enough today?

2          10 o'clock tomorrow morning.

3          (Adjournment until Wednesday, December 3, 1958, at 10

4    A.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25