# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Wednesday, December 3, 1958

**Pages:** 5791 to 5940

FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

MALCOLM LOVE
and
**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,

    Plaintiff,

  -vs-       No. 1247-SD-C.

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

    Defendants.

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, December 3, 1958

APPEARANCES:

    For the Plaintiff    WILLIAM H. VEEDER, ESQ.,
                Special Assistant to the
                Attorney-General,
                Department of Justice,
                Washington, D.C.

APPEARANCES (Continued)

| | |
|---|---|
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State of California | EDMUND G. BROWN, ESQ., Attorney-General, by ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney General. |
| For defendants Fallbrook Public Utility District, et al. | F. R. SACHSE, ESQ. |

<u>INDEX TO WITNESSES</u>

<u>For the Defendants:</u>     <u>DIRECT</u>   <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>

Laurence James

<u>EXHIBITS</u>

| <u>Defendants' Exhibit</u> | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| L-Plate 14 | 5814 | |
| "    "    2-B | | 5918 |
| "    "    6 | | 5919 |
| "    "    9-A | | 5920 |
| "    "    9-B | | 5921 |
| "    "    10-A | | 5921 |
| "    "    10-B | | 5922 |
| "    "    11-A | | 5924 |
| "    "    11-B | | 5924 |
| "    "    13-A | | 5926 |
| "    "    13-B | | 5926 |
| L-14 | | 5927 |
| L-15 | | 5927 |

1                              <u>EXHIBITS</u>

2    <u>Defendants' Exhibit</u>          <u>FOR IDEN.</u>          <u>IN EVIDENCE</u>

3      L16                                                    5927

4    L-17                                                     5928

5    L-18                                                     5928

6    L-F                                                      5929

7    L-G                                                      5930

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   SAN DIEGO, CALIFORNIA, WEDNESDAY, DECEMBER 3, 1958.   10 A. M.

2

3          (Other matters.)

4          THE CLERK:  Number three, 1247-SD-C, United States of

5   America vs. Fallbrook Public Utility District, et al.,

6          Further court trial.

7

8                     LAURENCE JAMES,

9   recalled as a witness in behalf of the defendant State of

10  California, having been previously sworn, testified further

11  as follows:

12         MR. MOSKOVITZ:  Your Honor, as an aid to using some

13  of the plates in Bulletin 57, we prepared an overlay which has

14  the sections, townships, ranges which can be placed over

15  those plates that don't have those delineated, and may we pass

16  them out now.

17         THE COURT:  All right.

18         MR. VEEDER:  We have also, your Honor-- and I am asking

19  leave to be permitted to do so-- we have taken our Plaintiff's

20  Exhibit 17 and marked on it as nearly as we can ascertain the

21  hydrographic areas as shown by the State, because we are

22  hopeful that we can keep this thing straight, the way it is

23  going, and if your Honor has no objection I would like to

24  leave that on the easel as it is.

25         THE COURT:  You may leave it there.  We will see when

1    cross-examination comes.

2         MR. SACHSE: Your Honor, before proceeding with exam-

3    ination of the witness, I want again to call your Honor's

4    attention to the fact that on the 7th of November your Honor

5    requested Mr. Veeder to produce, or if necessary for an in

6    camera inspection, the log of the Pauba well. Last Tuesday

7    this matter was again brought up. As far as I am aware, the

8    United States has done absolutely nothing. I think they are

9    consciously, purposely dragging their feet. I am extremely

10   anxious to have this report on the Pauba well available while

11   the examination and testimony on geology is taking place, and

12   I can conceive of no earthly reason-- the document is in Los

13   Angeles, it could have been obtained in 24 hours had the United

14   States desired to do so, and I want at this time for the record

15   to make a formal request that the Court direct the United

16   States to produce the document immediately.

17        MR. VEEDER: Your Honor, I have been in contact with

18   Mr. Worts, who wrote the report. I have asked him to make it

19   available to us. He has said that he will make it available

20   to us. I have also told him that I expect him to be available

21   for cross-examination by the State and by the Fallbrook Public

22   Utility District, and he will be available and the report will

23   be available then as soon as we can get it cleared. I think

24   I have told Mr. Sachse that.

25        THE COURT: What do you mean by get it cleared?  I

1   thought it was cleared.

2       MR. VEEDER:  Well, I have talked to Mr. Kunkel about it

3   and I have talked to Mr. Worts about it and they say that it

4   has to be cleared by Washington before it can be released. I

5   have done all that I can.

6       THE COURT:  What department in Washington?

7       MR. VEEDER:  U. S. Geological Survey, your Honor.  And

8   that has not been done.  However, I have asked Mr. Worts-- I

9   have done all that I can-- I have asked Mr. Worts to come down

10  here for cross-examination, and I will also--

11      THE COURT:  I want the report here and in the hands of

12  counsel long before the cross-examination.  I want them to have

13  an opportunity to study the report on the well rather than have

14  him bring it in the day he is to be cross-examined.

15      MR. VEEDER:  I will call Mr. Worts for it today, your

16  Honor.

17      THE COURT:  I think that report ought to be here Monday

18  at the latest.

19      MR. VEEDER:  All right, your Honor.

20      THE COURT:  Today is Wednesday, I don't see any reason

21  why you couldn't get it down here by Monday.

22      MR. VEEDER:  I will do that.  I will simply say that I

23  have been ordered by your Honor to produce it.

24      THE COURT:  All right, that is the order.

25      MR. SACHSE:  Thank you, your Honor.

1    DIRECT EXAMINATION (Resumed)

2  BY MR. MOSKOVITZ:

3        Q   Mr. James, when we recessed yesterday afternoon you

4  were testifying as to your experience in the investigation of

5  the Tia Juana Basin.  Now the testimony concerned the studies

6  that were made with respect to the effects from pumping of one

7  well on the level of water in other adjacent wells.  I will

8  ask you this question:  What effects did you note from the

9  pumping of wells and in the levels of other wells with respect

10 to the existence of confined aquifers?

11       MR. VEEDER:  May I inquire, is this just part of the

12 qualification, Mr. Moskovitz?

13       MR. MOSKOVITZ:  This is part of qualification.

14       THE WITNESS:  We noted that in the west end of the Tia

15 Juana Basin the pumping of the test wells had little effect on

16 the shallow wells, whereas it did have a pronounced effect on

17 other deep wells in that area.  We used this along with other

18 observations to delineate an area, a semi-pressure area in

19 the downstream end of Tia Juana Basin.

20       Q   What studies and data did you make and collect with

21 respect to the confines or boundaries of the basin?

22       A   We mapped the areal geology and we made tests of

23 the permeability of the sediments that flanked the basin on

24 the north side.  From this we concluded that these materials

25 on the north side of the basin were far less permeable than

1    the valley fill or Recent alluvium, whatever you want to call

2    it.

3        THE COURT:  Let's cut out testimony about other valleys.

4    If counsel wants to go into it on cross-examination, all

5    right.  You made studies about permeability in the Tia Juana

6    Basin?

7        THE WITNESS:  Yes, sir.

8    BY MR. MOSKOVITZ:

9        Q  Leaving the Tia Juana Basin, what other studies and

10   investigations were you engaged in, and give the dates?

11       A  I was requested to make a geological study of the

12   Antelope Valley in the Southern California area.  This in-

13   vestigation took place the latter part of 1946 and continued

14   on into the spring of 1947.  This investigation involved

15   breaking the Antelope Valley up into several subbasins.  It

16   involved delimiting an area of confined ground water within

17   the central part of the basin.  It involved constructing

18   ground water contours throughout the various subbasins that

19   we had delimited, and it involved estimating the change in

20   ground water storage that occurred within these various sub-

21   basins over the period of study that we selected.

22       Q  What were your duties and responsibilities in that

23   regard?

24       A  I was responsible for undertaking the geologic

25   studies that were made in connection with this overall water

1 supply study.

2   Q Was anyone working under your direction on that in-

3 vestigation?

4   A I was working alone on that investigation.

5   Q What additional investigations were you engaged in?

6   A I worked on a water supply study of Ventura County,

7 from which Bulletin 12 of the then Division of Water Resources

8 was written.

9   Q What were the dates of that study?

10   A I don't recall the dates exactly.  It was probably

11 started in about 1951 and ended in about 1953.  It lasted

12 for a period of about two years, possibly longer.

13   Q And what was your role in that investigation?

14   A I had technical supervision over the geological

15 work that was being performed on that investigation.

16   Q And were there any others working under your direc-

17 tion?

18   A Yes, there was one geologist working full time and

19 two others thatworked part time.

20   Q And what was the scope and what were the studies

21 undertaken in that investigation?

22   A The geological studies?

23   Q Yes.

24   A The geological studies involved collecting all of

25 the well logs in the Ventura County area which amounted to

1    on the order of 2,000. It involved complete areal geologic
2    mapping. By "complete" I mean preparing an areal geologic
3    map of the entire Ventura County. It involved delineating
4    the aquifers within Ventura County. It involved compiling
5    ground water contour maps within the county. It involved a
6    determination of underflow that took place between the various
7    basins within the county. It involved a study of the sea
8    water intrusion that was occurring along the coast in Ventura
9    County. It involved compiling estimates of change of storage
10   and of storage capacity of ground water basins within the
11   County. And it also involved preparation of a final report
12   which appears in Bulletin 12.

        Q   What part did you play in the preparation of that
13
     report?
14
        A   I assisted in the writing of that report and I had
15
16   technical supervision over the geological aspects.

17      Q   What additional investigations did you engage in?

18      A   I have engaged in a study of sea water intrusion
19   throughout the State of California. This is a study of the
20   entire coast line from the Oregon border down to the Mexican
21   boundary, in which we studied all ground water basins that
22   touched upon the coast. We delimited all the aquifers, all
23   these ground water basins. We collected water samples from
24   which chemical analyses were made. We studied the hydrology
25   of the wells in the vicinity of the coast, and we ultimately

1    delimited the extent of sea water intrusion as it existed in

2    each one of these basins at that time.

3            Q   Approximately how many basins were involved in this

4    study?

5            A   To the best of my recollection, there were about

6    thirty, I believe.

7            Q   During what period of time was this investigation

8    carried on?

9            A   The investigation was carried on between about 1953

10   and 1956 chiefly.  The report of that investigation has just

11   recently been approved and will be released shortly.

12           Q   What was your role in the investigation-- your

13   duties and responsibilities?

14           A   I was responsible for the geologic work that was

15   done from San Luis Obispo County south to the Mexican border.

16           Q   And did you have a staff working under your direction?

17           A   Yes, sir.  I had one other geologist working on that.

18           THE COURT:  Is the Ysidora Basin one of the basins that

19   you considered?

20           THE WITNESS:  The Ysidora Basin and the mouth of the

21   Santa Margarita was one of the areas we considered.  At that

22   time we were not positive that sea water intrusion was taking

23   place.  We listed it as a possible area of intrusion in our

24   studies.

25           THE COURT:  You mean that is the way your report will

1    come out?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  You are not positive yet?

4              THE WITNESS:  I haven't reviewed the recent data myself

5    on it, your Honor.

6    BY MR. MOSKOVITZ:

7              Q  Would you briefly summarize the other major investi-

8    gations that you have taken part in?

9              A  We undertook a large number of studies for the

10   Regional Water Pollution Board in the State of California.

11             We undertook an inventory of oil field wastes throughout

12   Ventura County and Orange County.

13             We had investigations for dump sites in Los Angeles

14   County, Santa Ana County, and San Diego County.  Our oilfield

15   waste investigations included inspection of many hundreds of

16   points where oil field brines were being discharged.  Our

17   objective was to determine whether these brines were being

     discharged in such place and in such manner that they would

     reach underlying ground water aquifers and pollute those bodies

     of ground water.

             THE COURT:  What is an oil field brine?

             THE WITNESS:  Your Honor, when they pump oil from these

     wells there is frequently a large portion of the fluid that is

     extracted that consists of salt water, and they separate the

     salt water from the oil and then discharge the water however

1    they can.

2    BY MR. MOSKOVITZ:

3         Q   And wat factor was significant in determining

4    whether these oil field brines that were disposed of would

5    penetrate into fresh water aquifers?

6         A   Well, the permeability of the deposits upon which

7    these brines were being ejected was the controling factor.

8         Q   And what role did you have in these many investiga-

9    tions you refer to?

10        A   Several of these investigations I undertook myself.

11   On the others I was responsible for directing and supervising

12   the geologic work that was involved.

13        Q   And over what period of time were these investigations

14   made?

15        A   I would say between 1952-- some of them are going

16   on at the present time, but I was involved mostly between 1952

17   and 1956.

18        Q   What position did you have in the Department of

19   Water Resources during this period of time?

20        A   I was in charge of the geological group in the

21   Southern California office of the Division of Water Resources.

22        Q   Subsequent to this period, what further major

23   investigations, briefly, have you been involved in?

24        A   There was an investigation of the Los Angeles River,

25   which involved a study of the aquifers underlying the river,

1   a study of the infiltration that took place from the river

2   into these aquifers, and it involved a delimination of areas

3   in which we felt recharge could take place.  We had to delimit

4   the lenses of clay that underlaid the river from the well logs

5   that were available and outline those areas where we felt

6   recharge would be most apt to take place beneath the river.

7   This study lasted for about six months.  I think it took place

8   either late in 1952 or early 1953.

9        Q  What further major studies have you engaged in?

10       A  I made a study of the feasibility of installing a

11  puddle clay cutoff wall across the mouth of the San Luis Rey

12  River for the purpose of increasing the yield of Mission Basin,

13  which lies upstream from Oceanside on the San Luis Rey River.

14       Q  What is a puddle clay cutoff wall?

15       A  A puddle clay cutoff wall is an impervious clay dike

16  which is placed in a trench for the purpose of preventing an

17  underflow.

18       Q  When was this investigation made?

19       A  That was about 1953.

20       Q  What was your responsibility in that investigation?

21       A  I was responsible for supervising the geologic work

22  that was undertaken.  There was one man under my supervision

23  at that time.

24       Q  How many other major investigations have you been

25  involved in, in your experience as a geologist?

1          A  The Feather River project and studies on the Cali-

2     fornia Water Plan, some extensive land subsidence studies in

3     the San Joaquin Valley, studies of the Bay Barrier Project,

4     and the San Joaquin Delta region.

5          I might add that in connection with the California

6     Water Plan studies we are undertaking a geologic investiga-

7     tion of 267 dam sites, several hundred miles of canal and over

8     a hundred miles of tunnel.

9          Q And what type of geological studies are involved in

10    this work?

11         A  To a large extent we explore foundations, we select

12    from the geological standpoint the best alignments for the

13    canals and tunnels.  Our exploration involves a lot of diamond

14    core drilling and churn drilling and soil sampling.  We have

15    nine drill rigs of our own in the Department of Water Resources.

16    At the present time we have six private contracts for drilling

17    going on, in addition to the use of these nine rigs.

18         Q  And what are your duties and responsibilities in

19    connection with this group of investigations?

20         A  At the present time?

21         Q  Yes.

22         A  At the present time, as chief geologist, I am

23    responsible for the technical direction and supervision of

24    all geological studies undertaken by the Department of Water

25    Resources for the Director of the Department of Water Resources.

James - Direct

1     Q   How large a staff of geologists do you have under

2   your supervision and direction?

3     A   We have 103 geologists, of which about 23 work

4   temporarily during the summer.

5     Q   And are these under your supervision and direction?

6     A   They are under my technical direction, yes.

7     Q   Since when have you been Chief Geologist for the

8   Department of Water Resources?

9     A   Since July, 1956.

10     Q   And at the present time do you have an estimate as

11   to the number of separate studies and investigations which are

12   going on under your technical supervision?

13     A   There are 28 projects going on within the Department

14   of Water Resources which presently involve geologic studies.

15     Q   What membership do you have in professional societies?

16     A   As I belong to the Geological Society of America, the

17   California Association of Engineering Geologists, the Seis-

18   mological Society of America, and the American Society of

19   Civil Engineers.

20     Q   What education and what activities have you engaged

21   in with respect to the engineering profession?

22     A   I belong to the Sacramento Chapter of the American

23   Society of Civil Engineers.  I attend their conventions, and

24   last June I was called upon to prepare a paper and present

25   that paper before the National Convention at Portland, Oregon.

James  Direct  5807

1    Q  On what subject?

2    A  The title was "An Engineering Geologists's Team

3    Approach to Study of a Conduit Location Through an Unusual

4    Subsidence Area."

5    Q  What progress have you made yourself toward becom-

6    ing a registered civil engineer?

7    A  Registered professional engineering in California

8    requires the passing of two eight-hour examinations.  I have

9    passed the first.

10    Q  What other professional papers or articles have you

11    written in addition to the various bulletins and reports for

12    the Department of Water Resources?

13    A  I prepared jointly with two other geologists a

14    portion of Bulletin 170, which is presented by the California

15    State Division of Mines.  The title of this publication is

16    "Hydrology in Ventura County"-- that is the approximate title.

17    I also prepared a paper for the Geological Society of

18    America National Convention in 1957 in Atlantic City, New

19    Jersey on a method of cost estimating tunnels from geological

20    information.

21    Q  Turning now to the investigation of the Santa

22    Margarita River Watershed, what duties and responsibilities

23    did you have in connection with that investigation?

24    A  I was responsible for the technical direction and

25    supervision of the geological studies that were undertaken on

1  that investigation, and in this respect I was under the general

2  direction of Mr. Illingworth.

3      I might add that this is a customary way within the

4  Department of Water Resources of undertaking this type of

5  study.  We use an engineering geologist team approach on most

6  of our studies, in which the engineers and geologists partici-

7  pate, have a roundtable panel type of approach to solving

8  their problems, but that in each instance it has been the

9  policy of the department to have a hydraulic engineer respons-

10  ible and in charge of the investigation and he serves to

11  coordinate the work of the other specialists and does not

12  interfere with technical problems that are strictly technically

13  geology, for example.  But he is responsible for this work and

14  he looks it over and he is the boss.

15      Q  When did your investigations of the geology of the

16  Santa Margarita River watershed begin?

17      A  I first became involved in this study in 1950 in

18  connection with the Temecula Reference, and in that respect

19  I was responsible for conducting geological studies.  I worked

20  with Mr. Illingworth at that time for only a short period on

21  this investigation, a matter of a few weeks.

22      Q  And what did you actually do during that period?

23      A  We inspected the watershed of Temecula Creek.  We

24  located points for installing gaging stations.  We located

25  some of the water wells and collected logs and talked to many

1    of the land owners in the area in regard to things that might

2    affect our investigation.

3         Q  Did you have any other geologists working under you

4    at that time?

5         A  Not at that time.

6         Q  Subsequent to that time, when the Legislature author-

7    ized the investigation of the Santa Margarita River watershed

8    in entirety, what were your duties and responsibilities?

9         A  I was responsible for conducting the geologic

10   investigation that was to be made in connection with that

11   study.

12        Q  And who worked under your technical supervision in

13   that regard?

14        A  Three geologists:  Mr. Keith Jones, Mr. John Roth,

15   and Mr. Robert C. Fox.

16        Q  Where were your headquarters at this time?

17        A  My headquarters were in Los Angeles.

18        Q  Over how long a period of time were the geologic

19   studies in the Santa Margarita River investigation conducted?

20        A  Field studies were conducted between 1952 and 1954.

21   Our office studies continued on into 1956, when the report

22   was completed.

23        Q  Specifically, what types of studies and investiga-

24   tions, data gathering, was carried on with respect to geology?

25        A  May I refer to this Bulletin 57?

1         Q   Go ahead.

2         A   In general our geologic investigation entailed,

3    first, collection of all existing information that we could

4    find in regard to the geology in the area, a study of that

5    material, a preparation of an areal geologic map, a collection

6    of well logs within the area, preparation of geologic sections--

7    and in connection with the geologic sections, at least in

8    Murrieta Valley, we constructed a peg model to assist in this

9    respect.

10         MR. SACHSE:   Constructed what?

11         THE COURT:   A peg model.

12         THE WITNESS:   A peg model.

13   BY MR. MOSKOVITZ:

14         Q   Describe what a peg model is.

15         A   A peg model is a three-dimensional model in which

16   pegs are painted graphically so that the different colors of

17   these pegs represent the thickness and type of material that

18   is penetrated.   In effect, the peg represents the well log.

19   These pegs are then inserted on a base map at the points where

the wells are located, so that you have a three-dimensional

picture of the aquifer, and this sometimes assists in locating

geologic sections and portraying the true three-dimensional

picture underground.

         Q   What other types of studies were made?

         A   We collected water samples, we located springs.

1      Q  What sort of studies did you make in so far as pump

2  tests were concerned?

3      A  We measured the specific capacities of a number of

4  wells.  We ran a transmissibility test on one pair of wells

5  in the Temecula area.

6      MR. VEEDER:  I didn't hear that last.

7      THE WITNESS:  We ran a transmissibility test on one

8  pair of wells in the vicinity of Temecula.

9      MR. VEEDER:  By the way, Mr. Moskovitz, all this data

10  that this gentleman is testifying to you are going to provide

11  us with, is that in approximately--

12      MR. MOSKOVITZ:  Well, to the best of our ability, we

13  have assembled the material that relates to his testimony.

14      MR. VEEDER:  And it is now available to us?

15      MR. MOSKOVITZ:  It is available to you and to all other

16  parties.

17      Q  What work was done in so far as ground water basins

18  are concerned?

19      A  We delimited ground water basins within the water-

20  shed area.

21      Q  Will you define the term "ground water basin" as

22  used in work that you have performed?

23      A  For the purpose of this study, we regarded a ground

24  water basin as a body of pervious material which is underlain

25  and surrounded by a relatively less or relatively impervious

1    material.  In the watershed we disregarded small bodies of

2    alluvium which would fit this definition simply because when

3    they got too small they were not considered to be of import-

4    ance.  Also there were areas of alluvium which were underlain

5    and surrounded with less pervious older alluvium, older

6    continental deposits, for which we had very little data, and

7    for this reason we did not consider those bodies as ground

8    water basins.

9        I would like to refer to Bulletin 57, where we have a

10   definition of ground water basins.

11       MR. VEEDER:  I object to this entirely.  There is no

12   basis upon which this witness could testify from the language

13   of the report.  He didn't write it.  It has not been offered.

14   There has not been any foundation laid for it.

15       THE COURT:  I will sustain the objection as far as

16   reading from it.

17       Give us the cross-reference, however, for the record,

18   where we could later on look at it if the document should go

19   in evidence. What is the page?

20       THE WITNESS:  The page is 62 in Volum 1, Bulletin 57.

21       THE COURT:  That is Exhibit L?

22       THE WITNESS:  Exhibit L.

23       MR. VEEDER:  For Identification.

24       THE COURT:  Yes.

25

1   BY MR. MOSKOVITZ:

2          Q   What type of investigations and studies did you make

3   with respect to the existence of confined water?

B-1 ML

1      A    We examined the water well logs.  We constructed

2  geologic sections.  We studied the underground hydrology, the

3  effects of pumping deep wells on shallow wells and deep wells

4  on other wells.  We studied what information was already

5  available in regard to these things, and we studied the

6  water qualities as they existed in both shallow wells and in

7  deep wells.  We also studied the materials as they appeared

8  on the surface, surface outcropping.

9      MR. STAHLMAN:  Mr. Moskovitz, do you mind asking the

10  witness what he means by "constructed geological sections"?

11  Does he mean mapping them or --

12      Q   BY MR. MOSKOVITZ:  Would you describe the work

13  that was done with respect to geologic sections?

14      A    How they were constructed?

15      Q    And what they are.

16      A    Geologic sections --   May I refer to a plate?

17      Q    Refer to a plate for illustration.

18      A    For illustration.

19      THE COURT:  Which plate?

20      THE WITNESS:  It will be plate 14.

21      Q   BY MR. MOSKOVITZ:  State Exhibit L?

22      A    State Exhibit L.

23      THE COURT:  It will be called L-plate 14 for

24  identification.

25      THE WITNESS:  On this plate --   I refer to plate 14 --

1    are shown three geologic sections for illustration.  The

2    uppermost is designated "Section A  A', Murrieta Valley."

3    The line of this particular section is shown on plate 13b.

4         Q  BY MR. MOSKOVITZ:  That is Exhibit L-Plate 13b for

5    identification?

6         A    This line is also shown as A  A', which crosses

7    the Murrieta Valley just east of Murrieta in a northeast-

8    southwesterly direction.  The section is, in effect, shows

9    the picture as we visualize it of a slice through Murrieta

10   Basin along that line, along line A  A'.

11        MR. VEEDER:  What size picture was that?

12        THE WITNESS:  What size?

13        MR. VEEDER:  Yes.

14        MR. MOSKOVITZ:  I think the scale is on the plate,

15   Mr. Veeder.  You can ask him later.

16        THE WITNESS:  You mean in regard to scale?   The scale

17   is shown beneath the section and on its left and right-hand

18   side for vertical scale.

19        Q  BY MR. MOSKOVITZ:  Now, after these studies and

20   investigations in the field were completed, were the results

21   compiled into Bulletin 57, State's Exhibit L?

22        A    Yes, they were.

23        Q    And under whose technical direction and super-

24   vision were the results of the geological studies compiled?

25        A    Under mine.

1     Q    Would you identify and describe the portions of

2    the State's Exhibit L which contain the results of the

3    geologic investigation?

4     A    Commencing with Volume I of Exhibit L, that

5    portion of Chapter 1 which deals with geology, namely, page

6    13 --

7     Q    And terminating on what page?

8     A    And terminating near the top of page 14.

9    THE COURT:  What about it?

10    THE WITNESS:  That was undertaken under my direction,

11    your Honor.

12    THE COURT:  Did you prepare this draft?

13    THE WITNESS:  No, sir; it was prepared under my

14    direction.

15    MR. VEEDER:  May I inquire:  When you say "prepared,"

16    you mean wrote?  Was it written?

17    THE WITNESS:  I did not write it, no.  It was done

18    under my direction, however.

19    Q  BY MR. MOSKOVITZ:  And does it state correctly, to

20    your knowledge, the information which is contained therein?

21    Is that information correct?

22    A    Yes, it is.

23    MR. VEEDER:  May I inquire who wrote it?

24    THE WITNESS:  I believe that was written jointly by

25    Mr. Illingworth and Mr. Fox.

THE COURT:  What can you find in that section there
which will give you any concern, Mr. Veeder?

MR. VEEDER:  What?

THE COURT:  This particular section.

MR. VEEDER:  It is largely incorrect.

THE COURT:  Well, that interests me.  Some of it
sounded rather favorable to your position.  If it is in-
correct, why --

MR. VEEDER:  But even when it is not correct, we
can't accept it.  That is the point.  And it might be
favorable, but we think they are wrong on that particular
exhibit.

THE COURT:  If you were called under oath to
testify, would the material on page 13 and the first three
lines of 14 in Exhibit L for identification, Volume I,
would this be your testimony in substance to the geology?

THE WITNESS:  Yes, sir.

THE COURT:  Under oath?

THE WITNESS:  Yes.

MR. MOSKOVITZ:  Would you speak up.

THE WITNESS:  Yes.

Q  BY MR. MOSKOVITZ:  What subsequent portions of
this State's Exhibit L includes the geological studies and
conclusions that were made under your technical direction
and supervision?

A    Pages 62 through 78 -- I should answer that were not made entirely under my direction.  Mr. Illingworth and I both contributed to that, that section; and it was really under his direction.  However, the portion in there on geologic investigation on page 66 was mine.

THE COURT:  What part?

MR. MOSKOVITZ:  66.

MR. VEEDER:  May I have that page again, please?

THE WITNESS:  Page 66 through the top of 68.  Actually, again, this section between 62 and 78 was, as I mentioned, prepared jointly by us under the way our department operates, a team approach.

THE COURT:  Well, from 62 to 78, are you familiar with what is contained therein?

THE WITNESS:  Yes, your Honor.

THE COURT:  All right.  If you were examined in detail as to the matter that you have set forth, the matters that are set forth between 62 and 78, would this be your testimony?

THE WITNESS:  Yes, sir.

Q    BY MR. MOSKOVITZ:  Would your testimony be the same as to the material between 78 and 81 covering the Santa Margarita coastal basin?

A    Yes, it would.

THE COURT:  78 and what, 81?

1       THE WITNESS:  81, your Honor.

2       Q  BY MR. MOSKOVITZ:  Now, as to the material between

3 62 and 66, was that the portion that was prepared under the

4 joint direction of you and Mr. Illingworth?

5       A  Yes.

6       Q  Now, turning to the plates at the back of Volume

7 I of State's Exhibit L for identification, I believe it is

8 L-plate 2a, would you describe the parts of that plate,

9 contributions to that plate from the geologic studies which

10 were under your technical direction?

11       A  We located the faults that are shown on that

12 plate and also assisted in delimiting the basin boundaries.

13       Q  Are those features delimited correctly to your

14 knowledge?

15       A  Yes, they are.

16       Q  Turning to plate 2b, Exhibit L-plate 2b, would

17 you identify what portions of that plate were contributed to

18 by the geologists under your direction?

19       A  We located the faults and again assisted with

20 delineation of the basin boundaries.

21       THE COURT:  That part of it is correct according to

22 your opinion?

23       THE WITNESS:  Yes.

24       Q  BY MR. MOSKOVITZ:  Did you say basin boundaries to

25 these?

1      A   Yes.

2      THE COURT:  Basin boundaries or alluvium --

3      THE WITNESS:  Well, the boundaries of valley fill, I

4 should say.  Valley areas.

5      MR. VEEDER:  He changed that to "valleys" rather than

6 basin?

7      THE WITNESS:  Yes.  It was changed to boundaries of

8 valley areas.

9      Q  BY MR. MOSKOVITZ:  Turning to plate 6, what

10 contribution to that plate was made by the geologists under

11 your direction?

12      A  We located some of the springs that are shown on

13 this plate.

14      Q  And is that information correct to your knowledge?

15      A  Yes.

16      THE COURT:  You say "some of the springs"?

17      THE WITNESS:  Yes, your Honor.  Again, due to our

18 joint efforts on this thing between engineers and geologists

19 we located some and they located some.  I would say we

20 located most of them.

21      THE COURT:  Would it be possible if you were called

22 upon to determine which ones you did locate to make a list

23 of which ones the geologists under your direction located,

24 which ones the hydrologists located?

25      THE WITNESS:  I think we probably could by extensive

1   search of our field notes.

2        MR. VEEDER:  Will you undertake that for us?

3        THE WITNESS:  It will take considerable time.

4        MR. VEEDER:  I don't believe he can.

5        THE COURT:  Your request is denied unless it becomes

6   real issue as to where some spring is that is supposed to be

7   on one map and its existence is denied by some other witness

8   by the Government.

9        Q  BY MR. MOSKOVITZ:  Turning to plate 9a, would you

10   identify the contributions to that plate by the geologists

11   under your technical direction?

12        A   We assisted in delimiting these areas -- yellow,

13   purple and brown areas -- that are shown on this map.

14        Q   And what do these areas depict?

15        A   The yellow area depicts moderate to high permeability.

16   The purple --

17        Q   What type of material is outlined?

18        A   Recent alluvium, which is the principal source of

19   ground water within the watershed area.  The purple depicts

20   areas of low permeability, which includes older alluvium and

21   deep residuum in the Fallbrook area, areas of minor

22   ground water yield.  The brown --

23        Q   Could you explain the boundaries of the purple

24   area in the Fallbrook area?  What does that outline?

25        A   Well, that outlines areas of residuum.

1       MR. VEEDER: Now, is this testimony or is he trying

2 to identify it or making an offer? What is this, now?

3       THE COURT: Just listen a while and find out. If

4 that is an objection, it is overruled. Go ahead, Mr.

5 Witness.

6       THE WITNESS: This residuum, its boundary --

7       THE COURT: Which residuum?

8       THE WITNESS: The residuum near the Fallbrook area.

9       MR. SACHSE: That is the purple?

10       THE WITNESS: The purple, right, which has the

11 straight-line boundary on the west side, the boundary line

12 here is the boundary to the Naval reservation, Camp Pendleton.

13       Q BY MR. MOSKOVITZ: Does the residuum, in your

14 opinion, end at that boundary?

15       A No, it doesn't. But we based our mapping here on

16 the fact that there were wells east of this boundary. We

17 had information in this area so that we knew that it was

18 composed of water-yielding materials, whereas west of that

19 boundary we had no information. There were no wells drilled

20 in that area. We had to draw the boundary some place. If

21 we drew it to the west of that line, it would probably make

22 a more sensible looking boundary, but we would have no

23 justification for drawing it there. It seemed more reasonable

24 to us at the time to cut it off where the information

25 terminated.

1      Q    There is a purple area or areas depicted farther

2    south on the Naval reservation.  What type of material is

3    designated there?

4      A    That is older alluvial material, terrace deposits,

5    and older alluvial material.

6      Q    Would you describe the brown material?

7      A    The brown material is that which is generally

8    impermeable.  It comprises igneous, metamorphic, and cemented

9    sediments which are practically non-water-bearing, but from

10   which limited quantities of water sometimes obtain from

11   joints and fractures.

12     Q    From what data were these three types of areas

13   derived?

14     A    We considered the geology, the nature of the rocks,

15   the nature of the geologic formations; and we considered the

16   wells and the productivity of the wells, the yield of the

17   wells that penetrated these materials.

18     Q    Is that geology from which these areas were

19   outlined depicted on any other plates in Exhibit L?

20     A    Yes, it is depicted on plates 13a and 13b.

21     Q    Now, insofar as plate 9a is concerned and the

22   contribution which was made to it by the geologists under

23   your supervision, is it correct, in your opinion?

24     THE COURT:  This will be a good time to take a recess.

25   Before we do it, I am curious about this:  The little area

of Rainbow is shown right on the watershed line between the Santa Margarita and the San Luis Rey. And yet it is shown as an area of younger alluvial. And I would assume that immediately south of the watershed line it is younger alluvial area in the San Luis Rey watershed. How does it happen that geologically you have younger alluvial straddling, as it were, a watershed line there?

THE WITNESS: Well, this happens at several other places in this watershed, your Honor. Sometimes the alluvium is washed off of hills on either side of the valley, and so that you have a hump of alluvium which, in effect, is actually the drainage boundary.

MR. SACHSE: The same phenomena, your Honor, as observed on the next map in a number of places.

THE WITNESS: Yes, it does.

THE COURT: On 9b?

MR. SACHSE: Yes, your Honor. Up in the northwest and north.

THE WITNESS: You will notice one pronouncement up at the extreme northerly end of plate 13b, namely, Diamond Valley.

Q  BY MR. MOSKOVITZ: This is 13b or 9b you are looking at now?

A    13b.

Q    13b.

A   Here the watershed boundary is again in alluvium.

THE COURT:  All right.  We will take a short recess.

(Recess.)

1    Q  Referring to Plate 9A and the designation of areas

2    in brown as generally impermeable and the designation of the

3    area around Fallbrook as deep residuum, what is the difference

4    between residuum and the material which is denoted in brown?

5    A  Residuum is a weathered basement rock, basement

6    complex rock.  We designated where it is 15 feet thick or

7    more, where we feel it is 15 feet thick or more we regard this

8    weathered material as residuum.  Where it is less than that,

9    we don't feel that it contains an ample supply of water to be

10   worth considering.  Actually, the residuum is this weathered

11   and fractured igneous or metamorphic crystalline material which

12   does store limited amounts of water.

13   THE COURT:  But on Plate 9A you called it older alluvium

14   and deep residuum.  There is a big difference between the two,

15   is there not?

16   THE WITNESS:  Well, that is true.  I was referring to

17   the residuum, your Honor.

18   THE COURT:  Which is it?

19   THE WITNESS:  It is residuum in the Fallbrook area,

20   your Honor.

21   THE COURT:  And in the lower part of the basin down

22   west of Lake O'Neill it is what-- older alluvium?

23   THE WITNESS:  Yes, sir, and terrace deposits.

24   THE COURT:  But in the Fallbrook area it is residuum?

25   THE WITNESS:  Yes, sir, your Honor.

Case 3:51-cv-01247-JO-SBC   Document 4552   Filed 09/24/63   PageID.26556   Page 39 of 153

1        THE COURT: And that is originally then a granite that

2 is decomposed?

3        THE WITNESS: It is a granitic rock that has been

4 weathered; yes, sir.

5 BY MR. MOSKOVITZ:

6        Q What was the reason for denoting the residuum in the

7 Fallbrook area only in the purple color on Plate 9A?

8        A We had no idea what its thickness was west of the

9 Naval Reservation boundary. We did know that it was sufficiently

10 thick to yield water east of the Naval Reservation boundary

11 due to the number of wells that occur in that area and which

12 are shown on Plate 9A.

13        Q Returing to Plate 9B, what information thereon was

14 contributed to by the geologists under your technical direc-

15 tion?

16        A We assisted in the delimitation of the boundaries

17 of the yellow, purple and brown areas, as shown on that map.

18        THE COURT: Here, again, you have grouped this time

19 older alluvium with Upper Pleistocene sediments.

20 BY MR. MOSKOVITZ:

21        Q Will you explain what Upper Pleistocene sediments

22 are?

23        A Upper Pleistocene sediments are sedimentary materials

24 which were deposited during the geologic time known as Upper

25 Pleistocene Time.

1          THE COURT: Deposited how?  By alluvial action?

2          THE WITNESS:  Yes, sir, they are deposited by stream

3   action.

4          THE COURT:  Then they are older alluvium?

5          THE WITNESS:  Yes, sir.

6   BY MR. MOSKOVITZ:

7          Q  What is the difference between older alluvium and

8   Upper Pleistocene sediments, as described on Plate 9B?

9          A  We differentiated between older alluvium and Upper

10  Pleistocene deposits on this map.  Upper Pleistocene deposits

11  occurred--

12         THE COURT:  Now wait.  You didn't differentiate on

13  this map.

14         THE WITNESS:  No.  We did on the geology map.

15  BY MR. MOSKOVITZ:

16         Q  Which plate is that?

17         A  That is Plate 13B.  This differentiation was made

18  chiefly on the strength of its topographic expression.

19         Q  Would you point out on Plate 13B which are the Upper

20  Pleistocene sediments and which are the older alluvium

21  materials?

22         A  The older alluvium as mapped on Plate 13B is the

23  orange material marked Qtoa.  The orange and yellow hashered

24  material, cross-hatched material, designated Qps is the un-

25  differentiated Upper Pleistocene sediment.

James    Direct    5829

1    THE COURT: The double hatched with the orange lines on

2   a yellow base?

3    THE WITNESS: Yes, sir.

4    THE COURT: Largely lying north, south and east of the

5   Vail reservoir?

6    THE WITNESS: Yes, sir.

7    THE COURT: On Plate 13B have you shown any areas of

8   residuum?

9    THE WITNESS: Yes, your Honor.

10    THE COURT: What is the symbol for that?

11    THE WITNESS: That is a light brown color, and it is

12   marked Qr.

13   BY MR. MOSKOVITZ:

14    Q Would you point out where some of these areas appear?

15    A Yes.

16    THE COURT: I can see them now, in the Coahuila Valley,

17   north, south, east and west of the younger alluvium, and in

18   various other areas.

19    THE WITNESS: Yes, sir.

20   BY MR. MOSKOVITZ:

21    Q What has been the term used for describing the two

22   types of materials, older alluvium and Upper Pleistocene

23   sediments, heretofore in this case?

24    A They have been termed older continental deposits

25   by-- in foregoing testimony.

1          MR. VEEDER:  By whom?

2          THE WITNESS:  I didn't say by whom.

3          THE COURT:  In the testimony from the Government's side

4  of the case.

5          THE WITNESS:  Yes, sir.

6  BY MR. MOSKOVITZ:

7          Q  On Plate 9B does the purple color include any areas

8  of residuum?

9          THE COURT:  Purple?

10         MR. MOSKOVITZ:  It looks purple to me.

11         THE COURT:  The matter under metamorphic rock, you

12  mean?

13         MR. MOSKOVITZ:  No.

14         THE COURT:  What plate are you looking at?

15         MR. MOSKOVITZ:  Plate 9B, your Honor.

16         THE COURT:  9B?

17         MR. MOSKOVITZ:  Yes.  I want to bring out the difference

18  between 9A and 9B in so far as the purple color is concerned,

19  your Honor.

20         THE WITNESS: What was your question again?

21  BY MR. MOSKOVITZ:

22         Q  Whether the purple color on plate 9B includes any

23  residuum as it does on 9A?

24         A  To the best of my recollection, it does not.  As

25  stated on the legend of Plate 9A, the purple includes older

1    alluvium and deep residuum.  On Plate 9B it includes older

2    alluvium and upper Pleistocene sediments.

3        Q  Were the outlines, the boundaries of these three

4    different colors, obtained also from the same base material

5    as on 9A?

6        A  Yes.

7        THE COURT:  The outlines, the base material-- you mean

8    the base map?

9        MR. MOSKOVITZ:  I am going to identify the base

10   material, your Honor.

11       Q  What other plate in Bulletin 57 shows the detail

12   of the geologic materials from which the different colors on

13   Plate 9B was gotten?

14       A  That is Plate 13B.

15       Q  Is the data which appears on Plate 9B that you have

16   testified about that geologists contributed correct, in your

17   opinion?

18       A  Yes.

19       Q  Turning now to Plate 10A of State Exhibit L for

20   Identification--

21       THE COURT:  Did we look at that exhibit?

22       MR. MOSKOVITZ:  Yes, your Honor, we did.  That is the

23   "Lines of Equal Elevation and Ground Water, Coastal Area,

24   Spring of 1927."

25       Q  What information that appears on that plate was

1    contributed to by the geologists under your technical direc-

2    tion?

3         A  We assisted in the delimination of the ground water

4    basins.

5         Q  And on what basis, from what data did you outline

6    the ground water basins?

7         A  From the geology that is shown on Plate 13A.

8         Q  Could you describe the types of materials which were

9    included within the ground water basins shown on Plage 10A?

10        A  We included the Resent Alluvium.

11        Q  Was any other information on Plate 10A obtained from

12   the studies of the geologists, was any assistance given with

13   respect to the ground water contours shown thereon?

14        A  Yes, we were consulted to see if the contours-- we

15   worked as a team, again, as we do on these matters, in prepar-

16   ing ground water contour map.

17        Q  Is the information on Plage 10A to which the

18   geologists contributed correct, in your opinion?

19        A  Yes.

20        Q  Now, turning to Plate 10B, what information depicted

21   there was contributed to by the geologists under your technical

22   direction?

23        A  We assisted in the delimitation of the ground water

24   basins, and we assisted in the delimiting the areas of appar-

25   ent confined water, as shown on this plate, and we were

James      Direct                                    5833

1  consulted in the construction of the ground water contours

2  that are shown on that map.

3       Q  Calling your attention to the basin which is denoted

4  "French Basin" on this Plate 10B, what type of materials are

5  included within that basin?

6       A  In the basin we included Recent alluvial material

7  and as I recall there are some areas of older alluvium shown.

8       Q  On what basis, what was the explanation for includ-

9  ing within the French Basin an area of older alluvium?

10      A  In this particular area there are a number of pro-

11 ducing water wells that are supplied from that material.

12      Q  And what significance does that have in the outlin-

13 ing of the ground water basin?

14      A  Well, in areas where we knew that the Recent

15 alluvium contributed water or was a good aquifer--

16      Q  Recent alluvium?

17      A  The older alluvium.

18        --we included it within the ground water basin.

19      Q  And is there a plate in Exhibit L which indicates

20 the existence of wells which you referred to in so delimiting

21 French Basin?

22      A  Yes, there is.  That is Plate--

23      Q  Would that be Plate 9B?

24      A  Yes.

25      THE COURT:  You say now that on Plate 10B where you

1    show French Basin that it was an area, according to my notes,

2    of Recent alluvium and older alluvium and that there were

3    wells there?

4         THE WITNESS:  Yes, sir.

5         THE COURT:  On Plate 13B-- and it is difficult to tell

6    just where this basin lies, but trying to locate it, it would

7    appear to me that a large part of it is what you would call

8    residuum on Plate 13B.

9         THE WITNESS: Residuum, your Honor, is excluded from the

10   basin, and the Qtoa older alluvium and recent alluvium com-

11   prises the ground water basin.

12        THE COURT:  I see.

13   BY MR. MOSKOVITZ:

14        Q   Now, with respect to the other ground water basins

15   delimited on Plate 10B, what other materials do they comprise?

16        A   They are mostly comprised solely of Recent alluvium,

17   although, as I recall, in Los Alimos Basin we also had some

18   older alluvium included for the same reason that we included

19   it in French Basin.

20        Q   And what plate in State Exhibit L do you refer to to

21   determine the types of materials that are included within the

22   basins in Plate 10B?

23        A   That is Plate 13B.

24        Q   Now, is the information on Plate 10B which the

25   geologists under your technical supervision contributed

1    correct, in your opinion?

2         A  Yes.

3         Q  Turning now to Plate 11A, what is the nature of the

4    contribution which the geologists under your technical super-

5    vision made there?

6         THE COURT:  Which plate?

7         MR. MOSKOVITZ:  Plate 11A, your Honor, "Lines of Equal

8    Elevation, Ground Water, Coastal Area, Fall of 1953."

9         THE WITNESS:  We assisted in delimiting again the ground

10   water basin boundaries, and we were consulted at the time the

11   ground water contours were drawn.

12   BY MR. MOSKOVITZ:

13        Q  And are the ground water basin boundaries on Plate

14   11A the same as those on Plate 10A?

15        A  Yes.

16        Q  And is the information there on Plate 11A correct,

17   in your opinion-- the information contributed to by the

18   geologists?

19        A  Yes.

20        Q  Turning now to Plate 11B, what information therein

21   was contributed to by the geologists under your direct

22   technical supervision?

23        A  We assisted or were consulted in the drawing of the

24   ground water contours and we delimited the basin boundaries

25   and we assisted in delimitation of the apparent areas of

1    confined water as shown on that plate.

2         MR. VEEDER:  Are you on 11?

3         MR. MOSKOVITZ:  11B.

4         Q  Are the ground water basin boundaries on Plate 11B

5    the same as in Plate 10B?

6         A  Yes.

7         Q  On the basis of what type of information did you--

8    by you I mean the geologists under your technical supervision--

9    determine where the apparent areas of confined water which are

10   shown on Plates 10B and 11B should be drawn?

11        A  We considered the well logs in those regions.  We

12   considered the quality of water in deep and shallow wells,

13   and we considered the reactions of pumping of deep wells on

14   shallow wells and on other deep wells.  We considered, in

15   other words, the well hydrology.

16        Q  What is meant by an "area of confined water"?

17        A  This is an area beneath which the deeper waters are

18   retained under pressure beneath a horizon or beneath a layer

19   which is, in effect, relatively impermeable or of low perm-

20   eability.

21        MR. VEEDER:  May I have that read back.

22        THE COURT:  Yes, read it.

23        (The reporter read the last answer as follows: "A  This

24   is an area beneath which the deeper waters are retained under

25   pressure beneath a horizon or beneath a layer which is, in

1    effect, relatively impermeable or of low permeability.")

2        THE COURT:  Is this a continuous layer, or is this a

3    series of lenses?

4        THE WITNESS:  It is generally a series of lenses, but

5    when considered as a group the overall body is of low

6    permeability.

7        THE COURT:  What about the confining of it on the

8    sides?  Your diagram in Plate 11B would indicate that it is

9    confined laterally.  Because you can't illustrate, I take it,

10   on a flat map the confinement on the vertical. But your map

11   indicates a confinement laterally.  Do you mean by plate 11B

12   that the water in the confined area in Pauba Basin is con-

13   fined laterally?

14       THE WITNESS:  No, we don't, your Honor.  We do think

15   that there is some restriction to flow in the lateral direc-

16   tion.  But in describing these confined bodies we are referring

17   to vertical confinement.

18   BY MR. MOSKOVITZ:

19       Q  What is the nature, in your opinion, of the restric-

20   tion of flow that you just testified to in answer to the

21   Court's question-- the restriction to lateral flow?

22       A  We believe, or I believe, that the older--

23   MR. VEEDER:  Has this been changed from "I" to "we"?

24   THE WITNESS:  Changed from "we" to "I", Mr. Veeder.

25   MR. VEEDER:  Well, I wanted to know when the team broke

James   Direct                                                              5838

1   up.  Go ahead.

2          THE WITNESS:  I believe that this older alluvial material

3   is considerably less permeable than is the Recent alluvial

4   material.  In my opinion, it is of relatively low permeability

5   when considered as the entire body, and I base this opinion on

6   the fact, on field inspection of the material as it occurs in

7   the field, on the fact that we have observed in the field that

8   a number of reservoirs have been constructed upon this material--

9   the fact that they hold water suggests that it does not transmit

10  water easily, on the fact that there is a confining effect--

11  that there are pressure wells in the area would indicate that

12  there are zones or regions of low permeability, the fact that

13  in shallow wells we have a different quality of water than

14  in deep wells would indicate that there is not an intermingling

15  of these waters.  On these things, it is my feeling that al-

16  though we do not know a good deal about this area, there is a

17  paucity of information--

18  BY MR. MOSKOVITZ:

19          Q  By this area, what area are you referring to?

20          A  I am speaking of the area of older alluvium north

21  and south of Pauba Valley.  It is my feeling that these

22  materials are generally of low permeability.

23  THE COURT:  Assume a hypothetical case-- it is an impossibility,

24  but let's assume that there was no inflow upstream into Pauba

25  Valley from the River and that the Pauba Valley was pumped

1  away down.  Would water drain into the Pauba Valley from the

2  older alluvium on either side?

3      THE WITNESS:  I believe it would drain in, your Honor.

4  I believe that movement might be quite slow.

5      THE COURT:  Well, it would be difficult to approximate

6  how fast it would drain in, I take it?

7      THE WITNESS:  That is true.  We don't have the informa-

8  tion.

9      THE COURT:  But it would drain in, wouldn't it?

10      THE WITNESS:  I believe it would, yes, sir.  I feel

11  that this material is permeable, but in my opinion it is of

12  low permeability.

13      THE COURT:  Suppose that water was pumped in the wells

14  that were inserted into the older alluvium on either side of

15  Pauba Valley and they were over-pumped so that you pumped the

16  wells all down. After you quit pumping, would there be a

17  movement of water from Pauba Basin into the older alluvium?

18      THE WITNESS:  I believe there would be, your Honor.

19  However, I think this movement, from what I see now, would be

20  quite slow.

21  BY MR. MOSKOVITZ:

22      Q  Have you any order of magnitude of years or any

23  order of magnitude of quantity that you can testify to at this

24  time?

25      MR. VEEDER: There is absolutely no foundation for this

1   question up to this point, I am sure.

2          MR. STAHLMAN:  He is getting ready to say no anyway.

3          THE COURT:  Have you made any studies as to how rapidly

4   or slowly water moves from one type of material to another?

5          THE WITNESS:  Not in this area, your Honor.  We don't

6   have the wells that would be needed for that type of study.

7          THE COURT:  Then you couldn't answer this question?

8          THE WITNESS:  No.  I would have to answer it that we do

9   not know quantitatively at this time how fast this movement

10  might take place.

11  BY MR. MOSKOVITZ:

12         Q  What kind of information would be needed before one

13  could answer such a question as to the magnitude of the effect

14  of pumping in the area of the older alluvium, as the Court

15  described, on the flow of water in Pauba Valley?

16         A  This type of situation is very hard to answer

17  quantitatively.  I don't believe you could get a positive

18  answer to this thing, except through-- until the lands were

19  developed and the water level was pulled down.  Then you would

20  begin to see what was going to happen.  Until then you can

21  only make studies that give some indication as to what might

22  happen.

23         Q  And the information which you have available to you

24  now, what does that information indicate to you as to the

25  effect of such pumping?

1          MR. VEEDER:  He says he doesn't have any information

2      on which he can arrive at a conclusion.  He has already said

3      that.  It is repetitious, your Honor.  I object to it.

4          MR. MOSKOVITZ:  I don't believe he has.

5          THE COURT:  I am of the same impression.

6          The objection is overruled.  Let's see if he does have

7      any information or opinion.

8          THE WITNESS:  Well, my observations-- let me get the

9      question again, please.

10         THE COURT:  Read it.

11         (The reporter read the pending question as follows:

12     "Q  And the information which you have available to you now,

13     what does that information indicate to you as to the effect of

14     such pumping?")

15         MR. VEEDER:  I still have my objection, your Honor.

16         THE WITNESS:  Well, we can't, as I said, we can't

17     answer positively what might happen. But from what I know, the

18     nature of the older alluvial deposits, particularly the shallow

19     older alluvial deposits as they appear, as they outcrop on the

20     sides of the valley, and these observations of the confining

21     effects of ground water that occur within this older alluvial

22     material, these differences in water quality between shallow

23     and deep wells, would indicate to me that movement of water

24     through the material would be slow and that therefore it is

25     likely that stream flow could continue through this valley in

spite of heavy pumping on either side of the Temecula Creek.

James - Direct

D-1 ML

1   Q  BY MR. MOSKOVITZ:  Now, is the information --

2   THE COURT:  First, that means absolutely nothing to

3   me:  Stream flow could continue notwithstanding heavy pumping

4   on the other side.  I could imagine a good stream of water

5   flowing through a valley exceedingly heavy pumping on either

6   side that took most of it, but finally there was some stream

7   flow that went through the valley, which would be what you

8   said; stream flow could continue notwithstanding heavy

9   pumping on either side.

10   THE WITNESS:  Well, your Honor, unfortunately we

11   don't have the information that we can give you a quantitative

12   analysis.

13   THE COURT:  If you don't know, say so.  In other

14   words, pumping would or would not affect stream flow?

15   THE WITNESS:  I think it would affect it, but --

16   THE COURT:  You don't know how much?

17   THE WITNESS:  I do not know how much, your Honor.

18   THE COURT:  All right.

19   Q  BY MR. MOSKOVITZ:  Now, is the information which

20   was contributed to by the geologists on plate 11b under your

21   technical direction correct to your knowledge?

22   A  Yes.

23   Q  Turning now to plate 13a; how was this plate

24   prepared?

25   A  In preparing this plate we made use of all of the

1    existing geological maps that were available at the time.

2    We then, by use of aerial photos, checked the contacts that

3    are shown on here, checked those contacts that were most

4    important from a water supply standpoint; and we entered

5    the Naval reservation for a short period of time and checked

6    it further in the field.

7         Q    Under whose direction and supervision was this

8    areal geology map on plate 13a prepared?

9         A    Under mine.

10        Q    And is it correct, in your opinion?

11        A    Yes.

12        Q    Turning now to plate 13b; was this plate prepared

13   in the same way as plate 13a?

14        A    Yes, it was.

15        Q    Under whose technical supervision and direction

16   was it prepared?

17        A    Under mine.

18        Q    And is it correct, in your opinion?

19        A    Yes, sir.

20        Q    Would you explain some of the marks which appear

21   on it as shown by the legend, at the bottom of the legend,

22   the remarks as to fault lines and sections?

23        A    A solid black line indicates a fault.  Where that

24   line is dashed it indicates that the line of faulting was

25   not -- is approximate or it indicates that it is concealed

1   beneath other materials which cover the fault line.  The

2   finer, heavy line with a capital letter on one end and a

3   capital letter followed by a prime mark on the other end

4   indicates the lines of geologic sections, that is, the lines

5   of the sections that appear on the subsequent plates:  Plate

6   14 and 15 and 16 and 17.

7       Q   Turning now to Plate 14; what type of information

8   did the geologists under your supervision have in drawing

9   the apparent section at depth as shown on Plate 14?

10      A   We utilized the logs of wells, and we utilized

11  the geology, surface geology.

12      Q   Now, was Plate 14 prepared under your technical

13  supervision and direction?

14      A   Yes.

15      Q   Is it correct, to your knowledge?

16      A   Yes.

17      Q   Turning to Plate 15; was it prepared from the

18  same data and also under your technical supervision and

19  direction?

20      A   Yes.

21      Q   On both Plates 14 and 15 there are vertical

22  heavy lines with arrows on either side.  What do those lines

23  and arrows indicate?

24      A   Those lines indicate faults.  The arrows indicate

25  the relative motion that has taken place on either side of

1    the fault.

2         THE COURT:  In Exhibit 15, for instance, you have a

3    type of material which you call "undifferentiated upper

4    Pleistocene sediments, Qps."  That is much the same as older

5    alluvial or older continental deposits?

6         THE WITNESS:  Yes, your Honor.  It is differentiated

7    from the older continental deposits chiefly on the way it

8    appears topographically.  It is dissected largely into

9    badlands topography and appears somewhat more consolidated;

10   so we divided it on that basis.

11        THE COURT:  It would be a water-bearing material?

12        THE WITNESS:  There is water within it, yes; but the

13   permeability is quite low.  There are a few windmills and

14   small wells that will yield a meager supply.

15        Q   BY MR. MOSKOVITZ:  Now, on Plate 15 in Section E E'

16   there is a contact line between Qps and Kat in which there

17   are question marks spotted through the line.  Would you

18   explain what that means?

19        A   The questioned line means that we don't know

20   exactly where that contact lies.  We know that there is a

21   contact between these two formations at some depth.

22        Q   Is Plate 15 correct to your knowledge?

23        A   Yes.

24        Q   Turning to Plate 16; what data were utilized in

25   the preparation of the sections which appear on that plate?

A   We used the logs of the wells that are shown graphically on that plate.  We used, considered the quality of water which is obtained from the zone of unconfined water, as shown on that plate.

Q   Which plate are you referring to now?

A   I am referring to Plate 16.

Q   I mean, which section are you referring to?

A   I am referring to Section G G', Pauba Valley, along Highway 71.  We considered again the influence of pumping deep wells upon the water levels in shallow wells and on other deep wells.

Q   Would you explain the jagged line with a question mark in it at the right side of Section G G' outlining the confining bed designation?

A   Well, the jagged line indicates that we have questionable information as to where it should be drawn. We feel there is a confining bed in that area, and just what becomes of it we don't know.  This is what we think might happen.

Q   What information in the logs of the wells shown graphically on Section G G' indicate the existence and location of the confining bed which is graphically shown?

A   Well, the thickness of clay, mud, mud and clay, shown as black in several of the wells and also the existence of mixtures of sand and clay that occur within that bed, as

1 shown, suggest that this zone of low permeability exists.

2 THE COURT: You don't have the Pauba well on here,

3 do you?

4 THE WITNESS: I don't believe we have. It was, I

5 think, remote from this particular section. Either that or

6 we did not have a log for it.

7 MR. SACHSE: It wouldn't be on this line of section.

8 THE COURT: It should be pretty close to G G'

9 section, shouldn't it? I wouldn't say it would be right on

10 it, but it would be very close to that line of section,

11 wouldn't it?

12 THE WITNESS: I don't recall the reason offhand why

13 we don't show that well on there, your Honor. It must be

14 that we didn't have any information.

15 Q BY MR. MOSKOVITZ: Now, turning to Section H H'

16 on Plate 16, what does that show?

17 A That is another line of section running through

18 Pauba Valley as shown on the geology map, Plate 13B. You

19 will notice, H H' is shown on that map, and this section is

20 across the valley in that area. It shows again the thickness

21 of clay and mud and clay that serves, helps confine or

22 confines the ground water at depths under pressure.

23 Q In your opinion, what is the explanation for the

24 phenomenon that you have described: the water from the

25 deeper wells shows pressure characteristics whereas the

James - Direct                                                    5848

1    water from the shallow wells in Pauba Valley does not?

2          A    We have an enlargement of this Section G G'.

3    Perhaps I could demonstrate a little better using it.

4          MR. MOSKOVITZ:  May we just put it up for illustrative

5    purposes?

6          MR. SACHSE:  Your Honor, may I ask a question?   I

7    think I see something here.  Referring to the two cross

8    sections, G G' and H H', am I correct, Mr. James, that the

9    H H' section coincides with the fourth well from the left

10   on the other side, on the G G'?  Reading the well letters,

11   and so on, it seems to me that it does.  The same well is

12   shown on both cross sections, is that right?

13         MR. VEEDER:  The designation is identical.

14         MR. SACHSE:  I want to be sure I am interpreting this

15   correctly, Mr. Veeder.

16         THE WITNESS:  Well, you will note, Mr. Sachse, that

17   these wells are projected.  Perhaps bring this out at this

18   time:  There is a number which follows the well number on

19   the line of section which says, in the case of Section H H':

20   "There is a 1400 feet west," which means that the well has

21   to be moved 1400 feet to be on the line of section.

22         MR. SACHSE:  That answers it exactly.

23         THE COURT:  Well, if you use this, it will probably

24   wind up being an exhibit.  Put it up.

25         MR. MOSKOVITZ:  That is all right.

1        THE COURT:  It will be L-Plate 16A.

2        MR. MOSKOVITZ:  Shall we have the Clerk mark that

3   first?

4        THE COURT:  He can mark it later.

5        MR. MOSKOVITZ:  All right.

6        MR. STAHLMAN:  May I ask whether or not in the

7   investigation of these wells, whether they recognize some

8   of them by the names we have been heretofore using?  If

9   they have, I think as early as possible where the names of

10  the wells are known to the witness we ought to indicate

11  them so we can get them by name, some of them that are

12  important.

13       MR. MOSKOVITZ:  I think it is a good idea, too, where

14  the witness is able, to correlate those names.

15       THE COURT:  What has been now marked as L-Plate 16A

16  is the same as L-Plate 16 except enlarged; right?

17       THE WITNESS:  That is true.

18           In answer to your question as to how this confin-

19  ing bed retains the water at depth under pressure, assuming

20  for the moment that this questioned line that we have in

21  here is the true picture, water could enter the sands at

22  this point -- and I am pointing to the right end of Section

23  G G' -- and percolate downward beneath in this zone of

24  confined water.  Now, assuming that this is filled to some

25  point up near the surface with ground water --

1      Q   BY MR. MOSKOVITZ:  You are drawing a line with a

2  pencil at the right end of Section G G'.  Would you mark

3  that as "Water level."

4      A   Well, this is water level at this point.

5      MR. VEEDER:  That is "Assumed water level."

6      MR. MOSKOVITZ:  That is assumed water level for the

7  purpose of this illustration.

8      THE WITNESS:  Now, assuming again for illustration

9  that there is no movement through this confining bed, that

10  the Wildomar Fault, as shown here, is an impermeable barrier,

11  that this water within this zone is static, then the water

12  in these deep wells --

13      Q   BY MR. MOSKOVITZ:  By "these deep wells," which

14  ones are you referring to?

15      A   8-S/2-W/15Cl, or any other deep wells in that

16  area.  8 South slant 2 West cash 15Cl; 8 South slant 2 West-

17  16Al.  The water would rise in these wells to this level.

18      Q   By "this level," what level are you referring to?

19      A   The level of this line that I have projected

20  from the right end of Section G G' through the uppermost

21  point in the confining bed as extended horizontally in a

22  southwest direction.  In other words, the water in this zone

23  of confinement would seek this level.  Now, since there is

24  some movement of this water -- possibly some through the

25  fault, some out laterally -- this pressure does not attain

James — Direct 5051

1  this height.  But it does reach some other level.

2  Q  Would you draw another line where --

3  THE COURT:  Well, in other words, that is how you

4  explain the artesian wells?

5  THE WITNESS:  Yes, your Honor.

6  THE COURT:  Tell me after lunch what difference does

7  it make to this case whether there is an absolute confining

8  bed or a partial confining bed or lenses or a layer?  What

9  difference does it make to the lawsuit?  We hear a lot about

10  this.  I want to know.

11  MR. MOSKOVITZ:  Let me ask the witness one question.

12  It may clarify it.

13  Q  What is the significance of the existence of

14  a confining bed, such as is indicated on Section GG' to

15  the movement of water from one area to another?

16  A  It impedes the vertical movement of water from

17  the stream into the underlying zone or from the zone upward.

18  THE COURT:  That is, under your testimony, in the

19  area where you think it lies does not -- it does not exist

20  at the upper east end of Pauba Valley?  You don't contend

21  that, do you?  The water dumps out of Vail Lake and into

22  the stream?

23  THE WITNESS:  This, of course, is the extreme upperly

24  eastern end of Pauba Valley.

25  THE COURT:  That is up near Vail Dam or it is --

1          THE WITNESS:  No, sir.  It is near the mouth of

2     Nigger Canyon where this gorge is.

3          THE COURT:  It is downstream from Vail Dam.

4          THE WITNESS:  Yes, your Honor.

5          Q   BY MR. MOSKOVITZ:  What is the situation with

6     respect to the permeability of materials there, in your

7     opinion?

8          MR. VEEDER:  "There," where?  Where do you mean?

9          MR. MOSKOVITZ:  At the outlet of Nigger Canyon to

10    which the witness just referred.

11         THE WITNESS:  In that area there is recent alluvium

12    deposited.  Recent alluvium is relatively permeable in

13    comparison to the other sedimentary deposits in the Santa

14    Margarita watershed.  However, the recent alluvium near the

15    point where Nigger Valley empties out onto Pauba Basin

16    consists of comparatively fine material.  The recent alluvium

17    in this area is not to be confused permeabilitywise with

18    recent alluvium that occurs in other areas in Southern

19    California, such as, let's say, Pacoima Canyon and Tahunga

20    Canyon, or San Gabriel Wash where you have these large

21    cobbles and boulders and coarse gravels and coarse sands.

22    This material is less permeable.  True, it is permeable, but

23    it will not transmit water as fast as it will in these other

24    places.

25         THE COURT:  After lunch, Mr. Moskovitz, you or the

1   witness tell me what difference does it make to this lawsuit

2   about this confining bed.  If it doesn't make a lot of

3   difference, we will shorten it up and not talk about it any

4   more.

5        MR. MOSKOVITZ:  Yes, sir.

6        THE COURT:  Take a recess until 2:00 o'clock.

7        (Whereupon a recess was had at 12:00 o'clock noon

8   until 2:00 o'clock p.m. of the same day.)

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, DECEMBER 3, 1958.    2:00 P.M.

2

3         (Other matters.)

4         THE CLERK:  Case No. 1247-SD-C, United States of

5    America vs. Fallbrook Public Utility District, et al.  Further

6    court trial.

7         MR. MOSKOVITZ: Before lunch, your Honor, you asked for

8    an explanation as to the importance of the testimony about

9    the confining bed in Pauba Basin.

10        This case, of course, is an adjudication of the rights

11   to the water in the Santa Margarita River and its tributaries.

12   Now the issue to which the confining bed relates and so much

13   of the testimony about the nature of the older continental

14   deposits is, in what areas is the ground water so closely

15   connected to the stream that the rights to use such ground

16   waters have to be adjudicated along with the rights to the

17   stream?

18        THE COURT:  What has that got to do with the confining

19   bed?  I know that issue is in the case.  But what has that got

20   to do with the confining bed?

21        MR. MOSKOVITZ:  The confining bed is one of the reasons

22   why the pumping or extraction of water from the older contin-

23   ental deposits on both sides of Pauba Valley may not have such

24   an effect on the flow of the stream that the rights to use

25   such waters have to be adjudicated in this proceeding.  Now

1   the question is one of magnitude of effect.  We all know that

2   water pumped from areas of basement complex might, in some

3   measure, reduce the amount of water which gets to the river.

4   But the magnitude is so small that, for practical purposes,

5   it is not deemed necessary to adjudicate those rights.

6       THE COURT:  You mean that you have proof that is going

7   to show that?

8       MR. MOSKOVITZ:  As to basement complex, your Honor?

9       THE COURT:  No.  The water from the older alluvium

10  being of such a minimal amount that there is no practical

11  effect.  This witness hasn't said that.

12      MR. MOSKOVITZ:  No, your Honor.  This is the point.  As

13  of now the evidence is such that you cannot conclude that it

14  will or will not have that type of effect, the material effect

15  which will make it necessary to adjudicate those rights.  What

16  this witness has is evidence which indicates that the effect

17  may be quite little.  He is not prepared to say that it will

18  be immaterial. But one of the evidences that indicates that

19  it may be small is the confining bed.  This is one of the

20  factors which would slow down the travel of underground water.

21      Now the position of the State, your Honor, is not that

22  the evidence is such that you can find at this time that pump-

23  ing from the older continental deposits will not have material

24  effect and therefore there should be a finding that those

25  areas are out of the lawsuit.  However, we feel that there must

1    be positive evidence the other way before you can find that

2    pumping will have such effect, and therefore that the rights

3    to those waters should be considered at this time.  Now the

4    evidence that we are putting in at this point is to show the

5    indications that there may be very slow travel of water.

6          Now I don't know if this answers your question, your

7    Honor, but this is the direction in which we are going and we

8    hope it is of some assistance to you.

9          If I might go just a little further as to why the con-

10   fining bed is material.  In order to have water to travel

11   from the Temecula River to the materials from which pumps in

12   the older continental deposits will take their water, it must

13   go laterally from the river, from the stream channel itself

14   and laterally out to those areas where the pumping is taking

15   place, or it must go down and then laterally.  But it must

16   pass underground in some way.  Now the question is what type

17   of material lies between the river and the older continental

18   deposits in which these wells at sometime in the future may be

19   drilled?  And this is the kind of evidence which we are attempt-

20   ing to put in.

21         THE COURT:  Of course, it would seem to me to be

22   axiomatic that the more of a pull-down-- let us assume a

23   confining layer-- the more of a pull-down on the water beneath

24   the confining area, the more water would be received at the

25   east end of Pauba Valley when it was available in the stream,

1    and if there was no pumping out of the confining area and the
2    basin was full, then of course it couldn't take any more and
3    there would be more water in the stream.  I mean, there is an
4    interplay there.  I don't care how you dress it up.  I can't
5    see that it makes a lot of difference.  Do you follow me?

6        MR. MOSKOVITZ:  Your point, as I get it, is that the
7    fact that there is a confining bed in part of the valley
8    doesn't make any difference if there is no confinement at the
9    upper end.  Is that the point, your Honor?

10       THE COURT:  Well, that is where the water comes from,
11   the upper end.

12       MR. MOSKOVITZ:  Of course, your Honor, the amount of
13   area through which the percolation can occur will certainly
14   affect how much percolation will occur.  If there were no
15   confining bed at all and there could be percolation throughout
16   the entire length of Pauba Valley, certainly more water would
17   penetrate than under the conditions as they exist.

18       Now, also the fact that there may be a relatively small
19   area through which percolation of any rapid rate could occur
20   will affect the amount of water, and we have some opinion
21   evidence as to the amount of percolation that could occur in
22   the area at the eastern end of Pauba Valley.

23       But all these factors will influence the total amount
24   and the rate at which the water will percolate from the river
25   to areas where there may be pumping in the older continental

1  deposits.

2      THE COURT:  All right.

3      What is your position on this, Mr. Burby?

4      MR. BURBY:  Well, your Honor, I think the position of

5  the United States Government in this case is the fact that there

6  is considerable water that comes from these particular areas,

7  and that it is necessary to have the full flow of the stream

8  in order to keep it properly supplied, and I agree with your

9  statement that it seems quite a simple proposition to say that

10  the more water is drawn from the stream the more flow there

11  will be from these particular deposits.

12      MR. VEEDER:  Could I take a shot at it, your Honor?

13      THE COURT:  Yes, I will let you take a shot at it.

14      MR. VEEDER:  Not that my colleague, Bill Burby, didn't

15  do very well.

16      THE COURT:  You have another idea.

17      MR. VEEDER:  Well, I have a consistent idea in regard

18  to the testimony that has been going on here.

19      We interrogated Mr. Fox, if your Honor will recall.  He

20  stated that the water moved laterally.  And this witness has

21  stated that water moves laterally from the area.  Both have

22  indicated that there is no real confinement between--

23      THE COURT:  Laterally.

24      MR. VEEDER:  --the Pauba Basin and the continental

25  deposits on both north and south of the Pauba Valley.

1          Now, I thought what your Honor was inquiring about when

2     you asked the effect of the confining bed was not upon the

3     lateral effect necessarily, but on the effect of the Vail

4     claims and interest in this litigation, and whether this water

5     in the so-called confined zone, which we deny exists, should

6     be adjudicated-- whether it would be important.  Well, it is

7     obvious that it is important.  These wells here-- we disagree

8     with the logs as shown-- I am pointing to 15A--

9          THE COURT:  Well, confining bed or not, it is in the

10    stream bed.

11         MR. VEEDER: Well, yes.

12         THE COURT:  Mr. Moskovitz concedes that.

13         MR. VEEDER:  And it has to be adjudicated.  And how

14    could it be otherwise?

15         So the question, as we see it, whether this is a con-

16    fining bed or not has nothing to do with the adjudication,

17    and certainly it has nothing whatever to do with the areas--

18    I am now referring to 15A-- and 15A, as you move on up the

19    valley, in the contours 1100 and 1050, it is just as obvious

20    to us that there is water there, that it has been exploited,

21    and that it will be exploited.

22         THE COURT:  All right, I have your position.  Let us

23    go ahead.

24

25

LAURENCE JAMES,

recalled as a witness in behalf of the defendant State of
California, having been previously sworn, testified further
as follows:

DIRECT EXAMINATION (Resumed)

BY MR. MOSKOVITZ:

 Q  I believe you were describing Plate No. 16 and
referring to California's L, Plate 16A on the easel when this
legal discussion ensued.  To conclude this point, what is your
opinion as to whether the higher levels of water in deep wells,
higher in comparison with the level of water in shallow wells--

 MR. STAHLMAN:  I can't hear you,  Keep your voice up.

 MR. MOSKOVITZ:  I will repeat it.

 Q  What is your opinion as to whether the higher level
of water in deeper wells in Pauba Valley, as compared to the
shallow wells in Pauba Valley, can be caused by any other
reason than confinement or the existence of relatively less
permeable materials between the water that the deeper wells
tap and the water that the shallow wells tap?

 A  I believe there must be a confining effect there.
I can see no other way to explain the artesian flow that
occurs from some of those wells.

 THE COURT:  Is it a common phenomenon where you have
shallow wells and deep wells nearby each other that the water

James Direct 5861

1    level in the deep well will be higher than in the shallow well?

2    THE WITNESS: Yes, your Honor, where there is confining

3    effect, where there are fine-grained deposits involved.

4    THE COURT: Isn't it common experience even when you

5    have no confining bed but have a variation of lenses of

6    different types of materials, various degrees of permeability?

7    THE WITNESS: Not where you have a homogeneous or

8    isotropic media; you could not have any confining effect, in

9    my opinion, your Honor.

10    THE COURT: All right.

11    BY MR. MOSKOVITZ:

12    Q Referring to Plate No. 17, what does it depict and

13    how was that plate prepared?

14    A Plate No. 17 contains two geologic sections, the

15    uppermost being Section KK prime through Murrieta Valley.

16    The line of this section is shown on Plate 13B. Section LL

17    prime on the lower half of this plate is another graphic

18    geologic section through Santa Margarita Valley. Its align-

19    ment is also shown on Plate 13B.

20    Q Is that shown on 13B or 13A?

21    A 13A. I beg your pardon.

22    Q And under whose direction and supervision was this

23    plate prepared?

24    A This plate was prepared under my direction and

25    supervision.

1          Q  And is it correct in so far as your opinion is con-

2     cerned?

3          A  Yes.

4          Q  Turning to Plate 18, will you describe what appears

5     thereon and how that plate was prepared?

6          A  Plate 18 is entitled "Relationship between ground

7     water storage capacity and depth to ground water in Santa

8     Margarita Coastal Plain."  This plate, as the title implies,

9     shows the storage capacity in thousands of acre feet for

10    various depths to ground water within the three subbasins,

11    namely, Ysidora, Upper Subbasin and Chappo Subbasin, and a

12    fourth curve which is the total of the three subbasins-- in

13    other words, the composite curve, the fourth curve, shows the

14    total storage capacity as compared with the average depth to

15    ground water.

16          THE COURT:  How does this work?  Let's take the Ysidora

17    line.  The left-hand figures are depths to ground water in

18    feet?

19          THE WITNESS:  Yes, sir.

20          THE COURT:  That 90 up there isn't 90 feet to ground

21    water?  The bottom is the ground water figure, isn't it?

22    Five feet to ground water?

23          THE WITNESS:  No, sir.  When the depth to ground water

24    is 90 feet, there is 5,000 acre feet of storage capacity.

25          MR. VEEDER:  He has it just backward.

E2

1      MR. MOSKOVITZ: Just a moment. Let the witness explain.

2      THE COURT: When has it been 90 feet to ground water in

3  Ysidora Basin?

4      THE WITNESS: This is assuming that it is drawn down to

5  90 feet, your Honor. It has not been drawn down that far

6  historically.

7      THE COURT: Well, then, if it is 20 feet to ground

8  water in Ysidora Basin, what have you got?

9      MR. STAHLMAN: What figure did your Honor use?

10     THE COURT: 20 feet, the figure on the left.

11     You would have only 3,000 acre feet of storage?

12     MR. SACHSE: Of storage capacity, your Honor.

13     THE WITNESS: Of storage capacity; yes, sir.

14     THE COURT: You mean this is left over unfilled; is

15  that what you are talking about?

16     THE WITNESS: That is right.

17     MR. STAHLMAN: That is empty storage capacity.

18     THE WITNESS: In other words, when the average depth

19  to ground water in feet is zero-- when the basin is completely

20  filled, there is zero storage capacity left. There is no

21  more room to put in any more water.

22     MR. MOSKOVITZ: Is that clear now, your Honor?

23     THE COURT: Yes.

24     Was the Government's chart worked on the other basis,

25  where ground water was how many feet there was in storage?

1    MR. VEEDER: As I recall, your Honor, we had just the

2    reverse on the thing. I think this chart is reversed. I

3    think he has his line run the wrong way.

4    MR. SACHSE: The Government's chart, to answer your

5    Honor's question, was just the reverse-- how much water is in

6    storage. This chart is how much storage capacity is there,

7    how much is empty and how much is full.

8    MR. VEEDER: I think Mr. Stahlman summed it up correctly--

9    how much is empty.

10    THE COURT: Well, then, take the maximum figure in

11    Ysidora Basin of 180 feet to ground water, if you could imagine

12    that. The capacity available then in the Ysidora Basin would

13    be about 12½ thousand acre feet?

14    THE WITNESS: On that order, your Honor.

15    THE COURT: Of course, that doesn't mean anything

16    either, because if you pump the Ysidora Basin down to 180 feet,

17    from the evidence I have heard so far, you would fill up with

18    salt water; so you wouldn't have any 12,000 acre feet capacity.

19    THE WITNESS: That is true, your Honor. These curves

20    are physical data that we got together that our engineers

21    could use for whatever condition they might imagine. For ex-

22    ample, it is possible that someday they might want to construct

23    an impermeable barrier, for example, across the Narrows at

24    Ysidora Basin, in which case they could draw the water table

25    down to considerable depth below sea level without causing

1    sea water intrusion.  Under those conditions they could use the

2    upper parts of that curve.

3        THE COURT:  Have you made any computations or checked

4    the Government's computations as to storage areas in Ysidora,

5    the upper subbasin and Chappo Subbasin?

6        THE WITNESS:  Personally, I have not made such studies,

7    your Honor, but some of those working on this investigation

8    have, and it is my understanding that those studies have been

9    made.

10       THE COURT: Somewhere along the line I am going to ask

11   you gentlemen to tell me how much departure there is between

12   the proof you are putting on and the proof the Government is

13   putting on.

14       MR. MOSKOVITZ:  Yes, I can ask some questions which

15   will certainly show that with respect to the Santa Margarita

16   Coastal Basin.

17       THE COURT:  All right.

18   BY MR. MOSKOVITZ:

19       Q  Mr. James, in this Bulletin 57, State Exhibit L, are

20   there computations with respect to storage capacity of the

21   Santa Margarita Coastal Basin?

22       A  Yes, there are.

23       Q  Where do these appear?

24       MR. MOSKOVITZ:  Your Honor, I was just about to get to

25   the geological appendix in Volume II where this basic informa-

1   tion appears at this time.

2          THE COURT:  You don't have to do it out of order.  You

3   can do it any way you want to.  Proceed.

4          THE WITNESS:  These are tabulated in Bulletin No. 57,

5   Volume II, on page B-50.  That is a part of the Table B3,

6   entitled "Ground Water Basin Characteristics."  At the bottom

7   of this table you will notice there are two columns on the

8   right-hand side of that table in which are indicated the gross

9   storage capacity and usable storage capacity of Upper Basin,

10  Chappo Basin and Ysidora Basin, and also the totals for those

11  basins.

12         THE COURT:  Do you know how those figures compare with

13  the Government's figures?

14         MR. MOSKOVITZ:  Yes; very closely, your Honor.  There

15  are minor differences there.

16         THE COURT:  All right.

17  BY MR. MOSKOVITZ:

18     Q   Now, in so far as Appendix B is concerned, how was

19  this appendix prepared?

20     A   Appendix B was prepared under my technical direction.

21     Q   And who wrote it, if you know?

22     A   Mr. Robert Fox and-- Mr. Robert Fox wrote that under

23  my direction.

24         THE COURT:  This is Appendix B starting at--

25         THE WITNESS:  Page B-5, your Honor.

1      THE COURT:  Using the index 2, it starts at B-1 --

2      THE WITNESS:  B-1.

3      THE COURT:  -- and runs through the B series to B-67;

4  is that right?

5      THE WITNESS:  Yes, sir.

6      THE COURT:  You checked over the work that Mr. Fox did?

7      THE WITNESS:  Yes.

8      THE COURT:  Did he do it under your direction?

9      THE WITNESS:  Yes, your Honor.

10     THE COURT:  Is it correct according to the best of your

11  knowledge and your opinion?

12     THE WITNESS:  Yes, sir.

13  BY MR. MOSKOVITZ:

14     Q  Now, going through Appendix B, would you briefly

15  describe what is gathered together and explained in that

16  appendix?

17     A  The appendix describes the scope of the geologic

18  investigation, it describes the physiography of the watershed

19  area, it describes the geologic units, the sedimentary rocks

20  that occur of the Quaternary system and of the Tertiary

21  system, it describes the igneous rocks, it describes the

22  metamorphic rocks.

23     Q  What is contained in this Appendix with respect to

24  the general water-bearing quality of the types of geologic

25  units that are summarized, found in the Santa Margarita

1    watershed?

2         A   In Table B-1 --

3         Q   Appearing on what page?

4         A   --appearing on Page B-19, this table is entitled

5    "Generalized Stratigraphy of the Santa Margarita River Water-

6    shed."

7         THE COURT: Stratigraphy?

8    BY MR. MOSKOVITZ:

9         Q   What does that mean-- stratigraphy?

10        A   That is a study or description of the formations

11   that occur within a watershed area.

12        There are columns in which the age of the various

13   formations is set forth, the title of the geologic unit, its

14   symbol as shown on the geologic maps, Plate 13A and 13B, a

15   description of the general character of the formation, and a

16   right-hand column in which the water-bearing characteristics

17   of those materials are briefly set forth.

18   BY MR. MOSKOVITZ:

19        Q   And what are the general water-bearing character-

20   istics of the types of materials which are found in the Santa

21   Margarita watershed?

22        MR. VEEDER:  May I have the question?

23        (The reporter read the question as follows:  "Q  And

24   what are the general water-bearing characteristics of the

25   types of materials which are found in the Santa Margarita

1    watershed?")

2        THE COURT:  They are set forth in the column on the

3    right; is that what you mean?

4        MR. MOSKOVITZ:  Yes.

5        THE COURT:  Is that right?

6        THE WITNESS:  Yes.

7        THE COURT:  In this section that we have just been

8    referring to, Appendix B, you have gathered together here as

9    much factual material as you could from the geology standpoint?

10        THE WITNESS:  Yes, your Honor.

11        THE COURT:  I notice a section of acknowledgements

12    where various other papers have been referred to in the

13    preparation of this appendix?

14        THE WITNESS:  That is right, your Honor.  We always make

15    use of any work that has been done before.

16        THE COURT:  And if you were to testify at length as to

17    matters set forth in Appendix B, would Appendix B be in sub-

18    stance your testimony?

19        THE WITNESS:  I didn't understand that.

20        THE COURT: Suppose you were asked questions for a week

21    around here about the matters contained in Appendix B.  Is the

22    material in Appendix B what you would testify to under oath?

23        THE WITNESS:  Yes, your Honor.

24        THE COURT:  And you would be willing to be cross-

25    examined on the basis of the material in Appendix B?

1          THE WITNESS:  Yes.

2          THE COURT:  Where matters of opinion are set forth,

3    they are your opinion?

4          THE WITNESS:  Yes, your Honor.

5          THE COURT:  Where matters of fact are set forth, they

6    are either things that you have observed or that you have

7    borrowed from other studies that have been made?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Isn't that sufficient foundation for B to

10   permit cross-examination on any matter in Appendix B?

11         MR. VEEDER:  That is for your Honor to rule upon.

12         THE COURT:  That is about what I am going to rule.

13         MR. VEEDER:  I would just as soon get at him now as

14   any time.

15         THE COURT:  I don't mean when you are going to cross-

16   examine him.  But I mean we could spend a week here and we

17   could wind up by his telling us everything that he has in

18   Appendix B.  And what I would propose to do would be to permit

19   cross-examination on these matters.  And it is obvious from

20   reading it that many of these are matters of opinion, other

21   matters are matters that could be observed, other matters are

22   matters that could come from other studies that have been

23   made.

24         MR. VEEDER:  Well, I would, of course, interpose the

25   additional objection, your Honor, that the rules and the law

James   Direct

1   is very specific that the testimony must be oral and by exam-

2   ination, and that from my view the cross-examiner is put at a

3   very definite --

4           THE COURT:  Disadvantage?

5           MR. VEEDER:  --disadvantage.

6           THE COURT:  Why?  You have the advantage of having it

7   down in black and white printed, even better than a transcript.

8   You have it right there to study.  You have no doubt as to

9   what he would say.  There it is.

10          MR. VEEDER:  Of course, I would much rather impeach a

11  man by his written statements after he has made his errors

12  into the record, and frankly I truly believe that this is

13  nothing more nor less than written testimony, and I don't

14  believe that, for example, I will allude to the Chapters I, II

15  and III-- one of the prime objections which I am going to

16  interpose when they are offered is that it is violative of the

17  principle that evidence cannot be written and that you cannot

18  tender written evidence and that the evidence adduced in the

19  Federal Court certainly has to be oral.

20          THE COURT:  That is true.  But very often counsel are

21  cooperative enough that you can use what is called "canned

22  testimony".  It is a very common phenomenon in the Federal

23  Courts to have counsel who are cooperative and who say, "Yes,

24  we see what the man would testify.  We are willing to proceed

25  on the basis that that is his testimony and cross-examine him."

1          MR. VEEDER: Yes, and I think there are circumstances

2    where counsel will be cooperative.  But in regard, your Honor,

3    to this kind and type of litigation and this kind and type of

4    evidence, there is a point beyond which even I cannot be

5    cooperative, the soul of kindness that heaven knows I am.

6          THE COURT: The soul of cooperation that you are.  That

7    is what you meant to say.

8          MR. VEEDER: Yes, your Honor, we can go on the record

9    with that.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F-1 ML

1    MR. VEEDER:  I have always said that gentlemen can

2    disagree without being disagreeable.  And that is my approach

3    to this thing.  I am not being disagreeable, but I simply

4    think these questions should be asked.

5    THE COURT:  Well, I am going to do it, I think, one

6    of two ways.  I am either going to do it, with your approval,

7    by using as much of this opinion matter as in substance the

8    testimony of the witness with your right to cross-examine;

9    or if you have objections to these chapters and the appendices

10   or -- I am thinking now particularly of B, which is a

11   different kind of appendices than some of the others -- ask

12   you to go through and mark off matters which you say are

13   opinion rather than the gathering of facts.

14   MR. VEEDER:  I have done that, by and large.

15   THE COURT:  And then we would take that up page by

16   page.

17   MR. VEEDER:  If your Honor would permit a little voir

18   dire along the proposition of this Appendix B, for example,

19   you might think that my position in regard to cooperativeness

20   was necessarily well taken.  And I feel this way:  that if

21   voir dire doesn't point that up, why, your Honor's conclusions

22   may be right; although I can't accept it.  My own view is

23   that we have, in my view, found repeated errors, conflicts

24   of conclusions.  And I simply couldn't agree to let it go in

25   without interrogation.

1      THE COURT:  We are right at Appendix B now.  Let's

2  have a little voir dire on B and see what you have in mind.

3      MR. MOSKOVITZ:  Your Honor, I might point this out --

4      THE COURT:  You have concluded on B, haven't you?

5      MR. MOSKOVITZ:  Well, your Honor, we can go into a

6  further explanation.  We can have the witness read it through-

7  out if he wants it on oral.

8      THE COURT:  Do you mind pausing briefly at this time

9  and see what Mr. Veeder has in mind with voir dire?

10      MR. MOSKOVITZ:  I will pause briefly, although I may

11  want to touch upon some points --

12      THE COURT:  Yes.

13      MR. MOSKOVITZ:  -- in Appendix B which should be

14  emphasized.  I will defer now and let Mr. Veeder have his go.

15      MR. VEEDER:  Well, that is very nice.

16

17              VOIR DIRE EXAMINATION

18  BY MR. VEEDER:-

19      Q    The matters concerning which --

20      THE COURT:  This is voir dire, I take it?

21      MR. VEEDER:  Yes.  As I say, I am sort of running the

22  gauntlet here.

23      THE COURT:  And it is sort of directed, as it were,

24  Mr. Veeder, to see how far we can get along to preserving

25  your record at the same getting what should properly be before

the Court in with a minimal of time and effort?

MR. VEEDER:  Right.  Right.  We have to take that approach, and I am for it.

THE COURT:  Do you have a copy of the exhibit before you?

THE WITNESS:  Yes, your Honor.

THE COURT:  All right.

Q  BY MR. VEEDER:  Referring to Table B of --

A  That is B-1, Mr. Veeder?

Q  That is Table -- it will be B3, page B46 of Appendix B.  Now, I observe that your footnote A states: "Usable storage capacity calculated between historic high water table and a surface 25 feet above the base of recent alluvium."

MR. MOSKOVITZ:  What page does that appear on, Mr. Veeder?

THE COURT:  Where do you see a footnote of that character?

MR. VEEDER:  It is on B-50.

MR. STAHLMAN:  B-50.

THE COURT:  What?

MR. VEEDER:  B-50.

Q  Now, how did you arrive at your conclusion in regard to Murrieta Valley, for example, that the -- or how could you calculate, rather, 25 feet above the base of the

1   recent alluvium in Murrieta Valley?

2   MR. SACHSE:  I will object, if the Court please.  This

3   is not voir dire.  This is cross-examination.  I have an

4   interest in keeping the record short myself, even though

5   this isn't my record.

6   THE COURT:  Overruled.  Let's see what we get on

7   this.

8   MR. VEEDER:  I simply asked how he arrived at it.

9   I think that is perfectly legitimate from the standpoint of

10   voir dire.

11   THE WITNESS:  As I recall, the 25 feet above the

12   base of the recent alluvium is 25 feet above the base, the

13   line that is taken as base of the recent alluvium, as shown

14   on Plate 17, to the best of my recollection.

15   Q   BY MR. VEEDER:  And the depth of the storage unit,

16   then, that you refer to, is 520; is that not correct, again

17   referring to Murrieta?

18   A    520 feet is the maximum depth of the storage unit

19   in feet.  This is the depth of the maximum well, or the

20   maximum depth as shown at the deepest point.

21   Q    Then, are you saying that the depth of the recent

22   alluvium is 500 or 495 feet or 520?  Or what is it?

23   MR. MOSKOVITZ:  If your Honor please, I do think this

24   is developing into cross-examination.

25   THE COURT:  Overruled.  Let's find out.

1    THE WITNESS:  The 520 would be the deepest figure

2  that we used, as I recall.

3    Q  BY MR. VEEDER:  Well, is that recent alluvium?

4    A  As I recall, yes.

5    Q  And the recent alluvium, then, is 520 feet in

6  Murrieta Valley.

7    THE COURT:  Now, let me ask:  Did you take a depth,

8  then, of 520 feet to calculate the storage in Murrieta

9  Valley?  Or have you taken some other depth?

10    THE WITNESS:  We took, as I recall, the total depth

11  of the recent alluvium, as best we could determine it.  It

12  is a rather difficult thing to determine.  It is rather

13  difficult to pick off where one recent alluvium ends and the

14  older alluvium begins.

15    THE COURT:  In other words, in order to arrive at the

16  figures you have of storage capacity of 146,000 or 136,000,

17  depending on the growth or usable factor, you took the areal

18  surface, 4400 acres, times 520 feet in depth?

19    THE WITNESS:  No, we didn't; because the sides of the

20  basin taper in.  The 520 is just the deepest point, and the

21  sloping sides of the basin were taken into consideration in

22  computing the storage capacity.  And this has quite an effect

23  on it.

24    THE COURT:  After you had sloped the sides down, then

25  the rest of the basin you took at 520 feet deep?

F-2

James - Direct

1   THE WITNESS:  No, the 520 just marked the depth of

2   the very deepest point, and we computed the -- actually, we

3   drew up in our work sheets sections from which the volume

4   of the materials involved were computed.  And in drawing up

5   these sections, why, we used our best judgment in determining

6   the slopes of the basement floor.  The 520, your Honor, is

7   just a figure to indicate the depth at one of the deeper

8   wells.

9   THE COURT:  What did the Government take, 200 feet?

10  MR. VEEDER:  I think we took 100.

11  MR. STAHLMAN:  100.

12  MR. VEEDER:  100 through the whole area.

13  THE COURT:  100 of water-bearing materials?

14  MR. VEEDER:  That is right.

15  MR. MOSKOVITZ:  Your Honor, the work sheets are in

16  the courtroom and are readily available.  They can be

17  referred to to have specific, detailed answers to these

18  questions.

19  THE COURT:  Go ahead, Mr. Veeder.

20  Q  BY MR. VEEDER:  Now, referring to Plate 17, there

21  is no well that is 520 feet deep; you realize that?

22  A  On page 17, you are talking about?

23  Q  On plate.

24  A  Plate 17 only shows wells in the vicinity of the

line of that Section K K'.

25

James O - Direct

1  Q   Do you didn't obtain your well from Plate 17 as
2  you stated; isn't that right?

3  MR. SACHSE:   I object.   The witness did not so state
4  he obtained the well from Plate 17.

5  MR. VEEDER:   He said he referred to Plate 17, I
6  believe.

7  THE WITNESS:   I referred to Plate 17 to show what
8  geologic units were involved.

9  MR. VEEDER:   Well, to stick with voir dire.

10  Q   Now, I will refer to Table 15, which is page 70.

11  THE COURT:   B 70?

12  MR. VEEDER:   No, the 70 of the write-up in Volume I.

13  MR. STAHLMAN:   What page is that?

14  MR. SACHSE:   Page 70, Volume I.

15  MR. VEEDER:   Page 70.

16  Q   Table 15, I refer again to Murrieta, which is in
17  the left-hand column, I observe that you state the estimated
18  storage capacity is 136,000 and that the water-bearing
19  formations or recent alluvium underlain by older alluvium.
20  Now, does that 520 feet depth of the well penetrate older
21  alluvium and younger alluvium or only recent alluvium?

22  A   I don't believe I understand your question.

23  THE COURT:   Well, I think I know what he means.   I
24  notice that your usable storage capacity for Murrieta Basin
25  is 136,000, the same as shown on usable storage capacity on

page B 47.  On B 47, however, you show maximum depth of

storage unit in feet, 520 feet.  On this one you have a --

you don't have any depth shown, but you say, under "Water-

bearing formations:"  "Recent alluvium underlain by older

alluvium."  Now, counsel wants to know whether your basin,

as you have calculated, takes into account both recent

alluvium and older alluvium.

MR. VEEDER:  And if it is not a conflict between that

column and Footnote A on page 50 in regard to Murrieta.

MR. MOSKOVITZ:  If the Court please, your Honor, the

question is indefinite; because it doesn't distinguish

between gross capacity and usable storage capacity as set

forth in Table A-3.

THE COURT:  Overruled.  Both calculations have a

heading:  "Usable storage capacity, 136,000."

MR. MOSKOVITZ:  No, your Honor, what I am referring

to is that on Table B-3 on page B 47 there is gross storage

capacity in acre-feet of 146,000.  There is no letter A

after that.  The letter A appears under the term "Usable

storage capacity."

MR. VEEDER:  I am sticking with "usable storage

capacity" under 136,000.

THE COURT:  Objection overruled.

What about this recent alluvium underlain by

older?

James - Direct

1         Answer my question first.  Did your basin take

2    into account both of those materials?

3         THE WITNESS:  To the best of my recollection, in that

4    basin we included just the recent alluvium.

5         THE COURT:  And your maximum depth of the well of

6    520 feet only went through the recent alluvium?

7         THE WITNESS:  Well, I would have to check the logs

8    of that particular well to know where we stand in that

9    respect.  We are getting into details.  I haven't worked

10   on this for some six years.

11        Q  BY MR. VEEDER:  You say you can't answer the

12   question?

13        A   I can't give you --

14        MR. MOSKOVITZ:  He said he can't answer it without

15   checking his notes further.

16        Q  BY MR. VEEDER:  What formula did you utilize in

17   determining, as you purport to have done in regard to

18   Murrieta, what formula was adopted and what figures were

19   used to come up with the 136,000 acre-feet of usable storage

20   capacity?  I observe again on page B 47 of the exhibit --

21   I beg your pardon; Table B --

22        MR. MOSKOVITZ:  Table B-3, you mean.

23        Q  BY MR. VEEDER:  B-3; you have service areas of

24   4400 feet and you have 520 feet depth.  Then, you have

25   relative permeability, "Moderate."

F-3

1    Now, how did you reach the 136,000 acre-feet?

2    A    Well, as indicated in Footnote A we considered a

3    volume of sediments lying between the historic high water

4    table and the surface which was 25 feet above the base of

5    the recent alluvium.  In general, that volume was multiplied

6    by the average specific yield for the materials that are

7    contained within that volume to obtain the storage capacity.

8    Q    What do you mean by "relative permeability,"

9    then?

10    A    Well, you are talking about the third column from

11    the right now?

12    Q    Yes.

13    A    Well, the relative permeability compares in this

14    column the permeabilities of the materials within Murrieta

15    Basin as compared with the permeabilities in the other

16    ground water basins throughout the watershed.

17    Q    So you determined with this 520-foot well the

18    specific yield, is that right, of the whole area, of the

19    whole Murrieta Valley?

20    A    No.

21    MR. MOSKOVITZ:  That wasn't his testimony.

22    MR. VEEDER:  I am inquiring.

23    THE WITNESS:  No, we didn't.  We have a standard

24    procedure for going through these things in which we consider

25    all of the well logs that are available in arriving at the

specific yields to be used.  Furthermore, we break these basins down into sub-areas, so that we get a representative distribution of wells; so we can weight our specific yields accordingly.  Just how many areas we broke this down into, this particular basin, I don't recall at this time, but --

Q   BY MR. VEEDER:  But you are stating then, that based upon the data which is in Bulletin 57 of Volumes I and II, it would be impossible for us to know the correctness of your figure, 136,000 acre-feet?  In other words, we would have to go outside the Bulletin to find that, is that right?

MR. MOSKOVITZ:  I object to that question.  I don't think it is clear in its significance.

THE COURT:  Well, have it read.

MR. VEEDER:  I will state it again.

THE COURT:  Overruled.  I understand.  Have it read if you want it, Mr. Moskovitz.

MR. MOSKOVITZ:  Yes; I would like to have it read.

(The reporter read back the question.)

THE COURT:  You may answer.

THE WITNESS:  Our calculation sheets are not included.

Q   BY MR. VEEDER:  Then, you would have to go outside of the Bulletin?

A   You would have to go out to get the calculation sheets.  However, the general method of obtaining this is

described within the Bulletin.

Q   But in regard to the 136,000 acre-feet of storage you would have to go outside of the Bulletin?

A   You cannot check our calculation in this --

Q   In the Bulletin?

A   In the Bulletin.

THE COURT:  You have all the elements in the Bulletin from which the calculation could be made?

THE WITNESS:  All the elements, your Honor, with exception, I believe, of just the well logs, which were too voluminous to include.

THE COURT:  Let me ask this; you have got me confused now.  In determining the storage capacity in a basin, what has permeability got to do with it?

THE WITNESS:  The permeability is here for general information other than storage capacity.

THE COURT:  Well, it has nothing to do with storage capacity, does it?

THE WITNESS:  No, sir, it doesn't.  You will notice the title of the table is:  "Ground water basin character-istics."  This is a characteristic that deals with something other than ground water storage.

THE COURT:  So, in other words, storage capacity is one characteristic and permeability is another?

THE WITNESS:  Yes, your Honor.

1          THE COURT:  But permeability has nothing to do with

2    how much water is stored?

3          THE WITNESS:  That is true.

4          Q  BY MR. VEEDER:  And so when we go back to Table 15

5    with 136,000 acre-feet, which is shown as estimated usable

6    storage capacity, that is on page 70, there is no way of

7    knowing how you arrived at that figure based upon data within

8    the Bulletin?

9          A    Well, we have a --

10         MR. MOSKOVITZ:  I think that question has been asked

11   and answered.

12         THE COURT:  It has been asked and answered.

13         MR. VEEDER:  All right.

14         THE COURT:  He has told you all the elements are here

15   except the well logs; and, if I recall rightly, we have most

16   of the well logs we have gathered up already in evidence.

17         MR. VEEDER:  Then, I would like to have him explain

18   into the record how he came up with 136,000 acre-feet.

19         THE COURT:  Well, he can, overnight, give you a cal-

20   culation in the Murrieta, as a sample of how this is done,

21   referring to the various elements we have taken into account

22   to arrive at that figure.

23         MR. VEEDER:  All right.

24         THE COURT:  We are certainly not going to do this for

25   each one of these items.

1          MR. VEEDER:  No.

2          THE COURT:  What is the difference -- it is apparent

3   -- between these figures shown in the ground water basins

4   here and the Government's showing?

5          MR. VEEDER:  They are very material in our view for

6   several reasons.

7          THE COURT:  First of all, of course, the Government

8   has calculated on the basis of 100 feet of water-bearing

9   strata.

10          MR. VEEDER:  That is right.

11          THE COURT:  And these are calculated on deeper amounts

12   in some cases.  But is there any other appreciable difference?

13          MR. STAHLMAN:  The areas are not the same.

14          MR. VEEDER:  Some of the factors of most importance

15   to us, as your Honor will observe, if I may take down this --

16          THE COURT:  Well, I understand the area of older

17   alluvial lying east of Murrieta Valley is, south of Pauba

18   Basin, is the relation; I understand that.  But what about

19   the other basins?

20          MR. VEEDER:  Well, the other basins, for example, your

21   Honor, our Unit 5 here is very important.

22          THE COURT:  Unit 5 is not shown there on 16, on

23   Exhibit L-Plate 16A for identification as a basin.  It is

called an hydrologic unit, but it is not entirely a basin.

24          MR. VEEDER:  You asked me the question, your Honor.

25

1    These have been divided into a series of basins, and we, of

2    course, take extreme issue in regard to the course and the

3    data that they have used.  We say that this area, for

4    example, 4, the continental alluvium which -- I beg your

5    pardon -- that embraces both the Murrieta Valley down to our

6    Area 1, is just as important and just as much of a water-

7    bearing area as a basin, as this witness has undertaken to

8    define them.  And we believe that the pulling down of the

9    water table in the continental alluvium in No. 4 --

10         THE COURT:  I understand that issue.  That is a major

11   issue in this case.  What about the other basins shown?

12         MR. VEEDER:  The other basins shown?

13         THE COURT:  Yes, these exhibits here.

14         MR. STAHLMAN:  Your Honor means in the Bulletin, do

15   you not?

16         MR. VEEDER:  Oh, in the Bulletin.  Well, yes, they

17   are --

18         THE COURT:  Basins shown on Exhibit for identification

19   Plate 11-B which shows this is ground level; but it shows

20   the areas of the basins also:  the basins of the Anza Valley,

21   Upper Coahuila, Lower Coahuila, Lancaster, Tecolete, Diamond

22   Valley.  Have any calculations been made to see whether

23   there is any issue on any of those basins?

24         MR. VEEDER:  Oh, yes.

25         MR. SACHSE:  Comparison of 18, Government's 18, has

F-4

their calculations.

MR. VEEDER:  Oh, yes, your Honor.  11-B, for example,
we necessarily take a complete issue with that.  We believe
that it is wrong, and we believe that this witness has
already contradicted it.  For example, if your Honor will
observe -- Pauba Valley is a good example.  There is a
delineation of ground water basin boundaries, and then there
are apparent areas of contained water.  We say, of course,
that that is not contained water; that there is no basis for
concluding that it is contained water.

THE COURT:  I am not talking about Pauba Valley or
Murrieta Valley.  I am talking about these other small
basins.  Are there issues about those?

MR. VEEDER:  Oh, yes.  In Aguanga Valley, Aguanga
Basin, we say that there is no confinement of the character
that is shown there.

THE COURT:  There is no confinement shown there.  That
was brought out yesterday.  That is sand and stream.  I asked
the witness myself about that, so you --

MR. VEEDER:  I think this, your Honor:  When you have
these lines that are demarked around the basin, as shown
there, that is purporting to be confinement in regard to
the deposits in which the younger alluvium is deposited.
There has to be lateral contributions into these basins, your
Honor, and that is true, for example, up and down the

1     Murrieta. If you look at the Murrieta Basin, there is a

2     prime example. They have a very, very constricted area,

3     whereas, if your Honor will look on our Exhibit 15-A you

4     will observe that it is very extensive and that we have

5     brought the basin all the way down; whereas they have

6     limited it very, very materially.

7         MR. MOSKOVITZ: No basin is shown on 15-A, Mr. Veeder.

8         MR. SACHSE: There is no basin delineated on 15-A,

9     Mr. Veeder.

10        MR. VEEDER: I am showing you the younger alluvium

11     as depicted on our Exhibit 15-A. If I used the term basin,

12     I should have said that that is the younger alluvium shown

13     in yellow through which the stream flows.

14        MR. SACHSE: I suggest, then, you compare it to the

15     delineation of younger alluvium in Bulletin 57 and not to

16     something that it doesn't even compare with.

17        MR. VEEDER: That is the primary thing that concerns

18     us, your Honor: There have been these very, very limited

19     definitions of basins. We deny that they are thus limited.

20     We say that the Murrieta younger alluvium --

21        THE COURT: Well, now, let's stop right now. You

22     have exhibits in here. You have Exhibit 17, what you call

23     ground water storage units.

24        MR. VEEDER: Yes.

25        THE COURT: You don't call them basins.

1        MR. VEEDER:  Why, no.  No.

2        THE COURT:  I don't know what you mean unless it has

3   the same meaning.

4        MR. VEEDER:  Oh, no.

5        THE COURT:  Ground water storage unit?

6        MR. VEEDER:  Your Honor, look, this whole area, this

7   whole area is a ground water storage unit.  It is not a

8   basin.  It is not a basin.  But, nevertheless, it is an

9   extremely important water-bearing area.

10        THE COURT:  Well, you say it is a ground water storage

11   unit.  You made a calculation of what its capacity was, and

12   yet you say it differs from an underground basin.

13        MR. VEEDER:  I truly think it does, and I think

14   geologically it is different.

15        THE COURT:  You introduced in evidence Exhibit 17

16   where you show what you call a ground water storage unit in

17   Dodge Valley.

18        MR. VEEDER:  Yes.

19        THE COURT:  Which doesn't look too different from the

20   one shown on 11-B.  There may be some variation.

21        MR. VEEDER:  Very small.

22        THE COURT:  You show a ground water storage unit in

23   Exhibit 17 in Oak Grove Valley.

24        MR. VEEDER:  Right.

25        THE COURT:  The big difference between the two is that

1    the State of California has extended their basin up in the

2    alluvial area to the west and to the north a little farther

3    than you have.  You show a ground water basin in what you

4    call a ground water storage unit in Coahuila -- well, the

5    shape of it is a good bit different.  There it has apparently

6    been broadened out to cover almost the area of the younger

7    alluvium.

8         MR. VEEDER:  Now, do you desire me to go ahead with

9    these other points I would like to bring out as to why we

10   can't accede to the request that these matters go into

11   evidence as written testimony?

12        THE COURT:  Well, I will hear you about it.

13        MR. VEEDER:  Now, we can show repeated errors, in our

14   view, in regard to Table B and Table 15 and which I would,

15   of course, do on cross-examination.

16        MR. MOSKOVITZ:  Your Honor, why don't we do it on

17   cross-examination, then?

18        MR. VEEDER:  I am doing what your Honor directed me

19   to do, as I recall.

20        THE COURT:  Let's hear him out.  The mere fact that

21   you disagree with what an expert may say doesn't mean that

22   the testimony is not admissible.

23        MR. VEEDER:  No, your Honor.

24        THE COURT:  We are in a field largely of opinion

25   testimony.  We have a few things we can anchor to.  We can

j46  James - Direct Case 3:51-cv-01247-JO-SBC Document 4552 Filed 09/24/63 PageID.26621 Page 104 of 691

153

1 anchor to well logs. We can anchor to rainfall studies. We

2 can anchor to water runoff. We anchor to well levels. We

3 have a few things to anchor to; physical characteristics

4 of the ground. And then we go, after we leave these matters,

5 we go into the area of opinion. Now, the mere fact you

6 disagree with the witness or think his opinion is erroneous

7 doesn't mean that his opinion isn't admissible.

8   MR. VEEDER: I quite agree with that, your Honor,

9 and the rule of law that I respectfully stated to your Honor

10 was this: I think that it should be oral rather than written

11 testimony. And I truthfully have never seen an instance

12 where a bulletin of this character was ever offered in

13 evidence. I don't see how it could be. But, in any event,

14 I will go on and interrogate this man a little further.

15   Q If you will turn to page B-38 -- these are just

16 high spots, your Honor.

17   MR. SACHSE: Mr. Veeder, I didn't hear that.

18   MR. VEEDER: What?

19   MR. SACHSE: The page number, I didn't hear it.

20   MR. VEEDER: B-38.

21   Q BY MR. VEEDER: "4," under the heading of "Structure,"

22 the second paragraph:

23     "Faults are numerous in the area but the mag-

24     nitude of several of them is unknown, and the

      majority are masked by the broad alluvial plains."

25

F-5

Quotes from here on:

"Only those that have a topographic expression or other surficial evidence are noted on the areal geology plates."

Now, if you will view Plate 13-B you will find innumerable references to faults, dash lines indicating concealment or approximate location. Now, the Willard Fault which -- another reason why I objected to these plates is that we always had the Elsinore Fault up to now -- is dashed in there. You will observe that. I think it is --

THE COURT: This statement of text says, "or other surficial evidence."

MR. VEEDER: Yes, and surficial evidence, your Honor, I --

THE COURT: Is there any dispute that there has been that kind of evidence? Every geologist who has appeared here has said there was a fault there.

MR. VEEDER: Well, but, the point I am making --

THE COURT: He said there was a fault, because he has gone out and looked at the character of the terrain on the south side and on the north side, and he could see the basic complex. He could see the evidence of slipping and practically straight lines are along there. So there is evidence of a fault.

MR. VEEDER: Yes, but you see, your Honor, there are

1    a great many of these faults that he has depicted on here

2    that cannot be seen, that there is no way of knowing that

3    they are there and are of extreme importance.  For example,

4    in Terwilliger Valley he shows on one plate a fault but on

5    another plate in regard to the --   Get me that one.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  You mean that he doesn't show the fault on

2    another plate?

3    MR. VEEDER:  Yes, your Honor.

4    THE COURT:  If that is an objection, it is overruled

5    right now.  Let us waste no more time on that.  You can point

6    that out on cross-examination.  But that doesn't mean that his

7    plates are inadmissible.

8    MR. VEEDER:  I am not saying that.  But your Honor has

9    asked me whether I would be willing to let these go in and

10    cross-examine from them, and I say no because there are

11    innumerable errors in addition--

12    THE COURT:  All right, let's go back.  You say these

13    things.  Now there have been foundations laid for a series of

14    these plates.

15    MR. VEEDER:  That is right.

16    THE COURT:  And I will hear you on your objection. But

17    if you want to read my mind, I will save you some trouble.  I

18    will probably admit them in evidence.  We are down to a

19    question of really talking about the text.  How are we going

20    to handle the text of these materials-- Chapters I, II and III,

21    and Appendix B, for instance?  How are we going to handle that?

22    MR. VEEDER:  I renew my objection.

23    THE COURT:  Nothing is offered yet, so you don't have

24    to make an objection.  I am asking you how you want to handle

25    it.

1      MR. VEEDER:  I simply cannot, in my own view, agree to

2  assume the full responsibility of permitting into evidence these

3  write-ups, which, in my view, your Honor, are a composite of

4  the writings by several people, some of whom I have said, such

5  as Mr. Illingworth-- I deny that he is a competent geologist,

6  with all due respect to him.

7      I also have before me a series of instances in which

8  every bit of this data, every bit of it, was offered in evidence--

9  by whom?  By Max Bookman as the man who says, "I did it."  Now

10  the reason why that is extremely important to me is that the

11  permits which were issued to the Fallbrook Public Utility

12  District, under very dim circumstances, were predicated en-

13  tirely upon Max Bookman's testimony,  And he went into the wild

14  blue yonder, I assure you.  But it was he who said he did all

15  these things.  It was he who reviewed all these things.  And

16  now we have Mr. Illingworth who says, "I reviewed them all."

17  Now we have Mr. James, who says, "I reviewed them."  Then Mr.

18  Fox says, "I wrote them."  So if I sound a little perplexed, I

19  am.  Because we are in the heart of this lawsuit now.  How

20  could permits be issued to Fallbrook under the circumstances?

21      MR. MOSKOVITZ:  Your Honor has thrown out that heart

22  right out of the lawsuit a long time ago.

23      THE COURT:  You are trying that in the wrong court.

24      MR. VEEDER:  I am getting ready to try it in the Ninth

25  Circuit, your Honor.  And the point I make to your Honor is

1  that I could not, under any circumstances, in the light of

2  what I considere to be a nefarious act on the part of these

3  people in the issuance of these permits, permit Bulletin 57

4  to go into the record without direct examination and without

5  full and complete cross-examination.

6          THE COURT:  You are going to have that.

7          MR. VEEDER:  For I want to hear in particular Mr.

8  James on direct examination on many of these things, because

9  I don't believe that he did them.  And it may be that the way

10  to win friends and influence people would be momentarily to

11  forget about the laws and the requirements in regard to

12  evidence. But I can't do it, your Honor.  And I would like to

13  very much.  But I don't see how it can be done.

14          THE COURT:  I want to hear from somebody else.  You are

15  running around in circles now.

16          From your standpoint, Mr. Moskovitz, aside from the

17  plates, the compilations which are in appendices, what is your

18  theory of these chapters, which are really largely opinion

19  matter-- what is your theory of their admissibility?  Do you

20  think that somebody can write a book while a lawsuit is pending

21  and set down their opinions and then offer them in evidence as

22  his opinion?

23          MR. MOSKOVITZ:  Your Honor, the reason why the State

24  is participating in the trial of this case this time, which we

25  did not do in the first trial of the case, is that a large sum

1    of money, $175,000, was spent of money of the people of the

2    State of California to gather together facts which would be

3    of assistance to all parties in the litigation.  This is the

4    sort of thing we would do in a court reference procedure.  We

5    got this material together.  It took a lot of time.  We think

6    it is valuable information for all, including the Court, and

7    we believe that we owe it to the people to present it to the

8    Court for the Court's consideration, and that is why we have

9    offered these portions of the Bulletin that we think are

10   relevant.

11        THE COURT:  You mean that is why you are going to offer

12   them.  You haven't offered anything yet.  You have offered

13   one plate.  Pardon me.

14        MR. MOSKOVITZ:  Yes, your Honor.  That is why we are

15   going to offer it.  That is why I have been laying the founda-

16   tion for it.  The material is here.  It was gathered by the

17   staff--

18        THE COURT:  I am not talking about materials.  I am

19   not talking about the appendices and the materials.  They are

20   the source materials.

21        I am talking now about the matters contained in

22   Chapters I, II and III and in Appendix B-9 largely-- let's say

23   B-9.

24        MR. MOSKOVITZ:  Your Honor, the textual material con-

25   tains a lot of facts.  It contains conclusions and opinions,

1      but it contains a lot of facts, too, and they all go together.

2              THE COURT:  But the factual matters have been pulled

3      largely out of the appendices or plates attached thereto.

4              MR. MOSKOVITZ:  Well, I think the plates and appendices

5      supplement them, but they don't include all the facts or

6      necessary conclusions.  If you go through the textual material

7      in Appendix B and in the Chapters in Volume I, you will find

8      much factual material which was pulled together in an organ-

9      ized way, which we think is an easy way to grasp it and from

10     which it would be easy to cross-examine.

11             If this is the way the trial will go, we can have this

12     put in by oral testimony.  But I can't see that it would add

13     anything, except to the length of the record.  But there is

14     factual material that should be before the Court that appears

15     in the text as well as in the plates.

16             MR. VEEDER:  I would like to make one observation in

17     that regard, your Honor.  The element that has great bearing

18     upon my view in regard to the admissibility of this data are

19     the sources of it.  The gentleman very honestly states that

20     most of this work that he did, at least, was done in the

21     office.  They had the transcript of the record, they had the

22     exhibits, from the Rancho Santa Margarita vs. Vail.  And from

23     there, I daresay, the reason for this picture, L Plate 16-A,

24     16-A violates Mother Nature in a manner that no one could even

25     believe.

1      THE COURT:  Well, let's get back on the track.
       MR. VEEDER:
2          The reason why they did it and the reason why they

3   made this error, in my view, is that they misinterpreted the

4   record in the case of Rancho Santa Margarita vs. Vail. And

5   they were not their own conclusions. They simply sat down and

6   read it, and that is the thought they came up with.

7      THE COURT:  The evidence shows that your exhibits were

8   worked on the same manner.  None of your evidence would have

9   been able to proceed without taking into account the literature

10  on the subject of geology and hydrology, studies that had been

11  made in the area, information obtained from Mr. Hall and from

12  the Vail Ranch, information collected by the Water Resources

13  unit at Camp Pendleton, as any good scientist would do it in

14  making a study-- he collects all the available material he can

15  get.

16      MR. VEEDER:  Right.

17      THE COURT:  And then he draws conclusions which are

18  matters of opinion.  He may be in error, and on cross-examination

19  you may expose what a poor opinion he drew or how weak his

20  opinion is, how unsupported by facts or logic.  But his opinion

21  is admissible.

22      Now, we are just confronted with a practical matter.

23  Do you want to build a big record up here?

24      MR. VEEDER:  No, I don't.

25      THE COURT:  And spend hours with this witness on direct

1    examination while Mr. Moskovitz gets all this opinion and

2    factual matter into the record?  Or do you want to shorten it

3    up in some way, preserving your right to cross-examine and to

4    tear him limb from limb, expose him from the minute you start

5    your cross-examination until you conclude, and save some time?

6         MR. VEEDER:  I don't believe, your Honor, that it would

7    save a moment of time.  I truly believe that if I had called

8    in Mr. Worts and Mr. Kunkel and had them write me a letter and

9    I came in here and I said, "It was written by these gentlemen--

10   and we know that they are fine fellows-- and I have some ex-

11   hibits that they prepared.  Now you fellows go ahead and cross-

12   examine," I wouldn't have gotten -- I know what would have

13   happened.  The point I make--

14        THE COURT:  Let us not speculate, because you didn't do

15   it.  But there have been many cases where I have tried cases

16   where you take a written statement of an expert and you save

17   time by using that as his testimony on direct examination and

18   you let somebody then cross-examine.

19        MR. VEEDER:  But here is a valley, your Honor.  You are

20   asking me to agree to hundreds of pages of write-up--

21        THE COURT:  Not to agree.

22        MR. VEEDER:  --with numerous tabulations.

23        THE COURT:  We will cross the bridge on the tabulations

24   and the various plates.  They will be identified.  They will be

25   in evidence.  I don't think there is any concern about that.

1      MR. MOSKOVITZ:  Talking about hundreds of pages of

2  things, we have two boxes of United States exhibits that have

3  been put in.  We are confronted with those, too.

4      MR. VEEDER:  They are very good ones, too.

5      MR. MOSKOVITZ:  So are ours.

6      MR. STAHLMAN:  Somebody wrote a play about this.

7      THE COURT:  Well, we will take a recess.

8      (Recess.)

9      THE COURT:  I want you all to give some consideration

10  to this matter tonight.  Bear in mind the old Chinese proverb,

11  which I will not repeat.  This can be done the hard way.

12  Counsel can take each chart, each exhibit, call the men who

13  worked on it, if necessary, lay a foundation, and we can have

14  a long record, and when we get done we will not have any more

15  for you to work on than we have now.  Because you may have

16  available to you anybody that it develops has any knowledge

17  of this.  In your cross-examination if you find that Mr. James,

18  being in charge of the geology, used Mr. Fox to do a certain

19  bit of work, you can have Fox here-- he is here.  But if you

20  find that they used Mr. XYZ and you want him present, we will

21  direct that he be brought here if he is still in the employ of

22  the State-- if he is not we will issue a subpoena for him.  We

23  can pull in any background material that you need.

24      When you put your exhibits on you were in the same

25  position exactly as is Mr. Moskovitz.  You had charts that were

1   built up on a lot of material that was not here in court.  You

2   wanted to know where the material was and it was brought in--

3   well logs and various data, and anything we could find that

4   was used in the preparation of these charts.  So what is going

5   on here is no different than what went on when you presented

6   your evidence.  You had no more foundation in the record for

7   a lot of your charts than is present here.  So there is no

8   discrimination against you.  In fact, I thought that you were

9   treated very fairly by counsel as you proceeded with your ex-

10   hibits.  They went in with a minimum of discussion.  When some-

11   body discovered that you had drawn or had somebody draw the

12   chart on the basis of some data which had come out of the

13   Department of Water Resources, if it was available we asked

14   you to bring it in.  And when you used some figures from Mr.

15   Hall or the Vail Ranch, if we could get them we had them brought

16   in here-- supporting data.

17        So there are various ways that we can do it.  We can do

18   it the hard way and have the witness interrogated at length

19   on various of the factual matters and various of the conclu-

20   sions.  That is one way.

21        Secondly, we can inquire of the witness as to whether

22   this, in substance, is his testimony, and permit you free cross-

23   examination.

24        Thirdly, we can require you to go through and make a

25   note by line and paragraph of the parts to which you object

1  and the parts to which you don't object.  In other words, you

2  can't object to all of this.  There must be something to which

3  you don't object.  And then find out what additional background

4  or foundation we will need for the parts where you have objec-

5  tion.  And we can also, if you want to pick out matters of

6  conclusions, we can have the witness interrogated in chief

7  as to whether these are his conclusions, by question and

8  answer, and then when the exhibit finally goes in that part

9  about which you had interrogated in chief will be the record

10  and will be stricken from the exhibit as it goes into the

11  record.  You get the same result when you get all done in any

12  of the methods that we use.

13  MR. STAHLMAN:  I will explain the Chinese proverb to Mr.

14  Veeder tonight.

15  MR. VEEDER:  I am young and I am very easily swayed and

16  maybe this Chinese deal will get me over the fence, your

17  Honor.  But at the moment I am still where I was.

18  And I will read, if I may, your Honor, from this

19  Bulletin.

20  THE COURT:  What are you reading from?

21  MR. VEEDER:  I am reading from 188.

22  THE COURT:  What volume?

23  MR. VEEDER:  Volume I.

24  THE COURT:  Page 188?

25  MR. VEEDER:  Yes.

1          There is no rancor when I say this--

2          THE COURT:  Page 188 is not going to be offered by the

3    State of California.

4          MR. VEEDER:  But it says in one short sentence --

5          MR. SACHSE:  It is not going to be offered.

6          MR. VEEDER:  It is written by Mr. Holzinger.

7          MR. MOSKOVITZ:  This is legal considerations.

8          MR. VEEDER:  Let me read it.  It is very interesting.

9          THE COURT:  Go ahead.

10         MR. VEEDER:  He goes through all these matters that Max

11   Bookman prepared, and then he says:  ". . . Because of limita-

12   tion imposed by difficulties in obtaining wells of sufficient

13   yield for irrigation purposes, further large-scale ground

14   water development appears to be improbable in the 'inland

15   area'.  With a proper pattern . ."

16         THE COURT:  Page 188?

17         MR. VEEDER:  Page 188, the second sentence in the first

18   full paragraph.

19         Now Mr. Holzinger is the one who granted the permits.

20         MR. MOSKOVITZ:  Mr. Holzinger is not the one who granted

21   the permit.  The permit was granted by a three-man Water Rights

22   Board, of which he was a member.

23         MR. VEEDER:  There were only two who granted the permit,

24   and he was the only one who heard the testimony.

25         The point I make, your Honor, and I sincerely believe

1    that Bulletin 57 was written for and on behalf of the Fallbrook

2    Public Utility District, I believe that it was designed

3    basically and fundamentally to support their position, and so

4    long as I believe it and nothing is shown to the contrary, I

5    certainly could never agree, never agree, to permit them to

6    put in what I think is a biased and a slanted brochure.

7        THE COURT:  Do you object to that particular sentence

8    that you read?  That particular sentence that you read-- no

9    one has talked about offering it-- doesn't seem to be contrary

10   to the Government's position.

11       MR. VEEDER:  The whole idea of the State of California,

12   the whole idea of Holzinger and all the rest of them has been

13   this:  There will be no further development upstream.  There-

14   fore, there may be some water available for Fallbrook.  Now I

15   believe that the whole sum and substance of Bulletin 57 was

16   what I have stated.  I haven't a doubt in my mind that it was

17   written for that sole and only purpose.

18       THE COURT:  Well, let us assume for argument that you

19   might be right on that.  Let us assume that only for argument.

20   That doesn't mean that everything in the Bulletin might be

21   wrong.  That part that you are talking about hasn't been offered.

22   I am going to request, since you have raised this point and

23   since you don't seem very deeply stricken with my suggestion,

24   that--

25       MR. VEEDER:  I will consider what your Honor asked.

1          THE COURT:  I suggest that you start in with Chapter I,

2  which is going to be offered here, and put in red parentheses

3  with a line on the side those things that you object to.

4          MR. VEEDER:  Yes, sir.

5          THE COURT:  And we will go through it page by page.

6          It starts out:

7              "The Santa Margarita River watershed,

8              located in the South Coastal Area of

9              California and including portions of San

10             Diego and Riverside Counties, has a semi-

11             arid climate and potential water require-

12             ments which far exceed the natural supply. ."

13         I doubt very much if you are going to object to that.

14         MR. VEEDER:  I think we have already written that into

15  a pre-trial atreement.

16         THE COURT:  I am talking particularly about "requirements

17  which far exceed the natural supply."

18             "The need for water has resulted in much litiga-

19             tion over water rights in the area in spite of the

20             relatively small water use.. "

21         I suppose you can agree to that.

22             "The general shortage of readily

23             available water has so limited agricultural

24             endeavor . . "

25         Now, you go through and pick out these things.

1          Over on page 2 are related reports.  Skip that because

2     I would consider that a scientist was not doing a job unless

3     he listed a bibliography or some of the sources that he con-

4     sulted.

5          MR. VEEDER:  May I just tender a thought.  If your

6     Honor will look at page 3 and run down to about the middle

7     of the page, the sources of data that were used in the prepara-

8     tion of this Bulletin, "Rancho Santa Margarita vs. Vail.

9     Miscellaneous exhibits and information made available by H. M.

10    Hall."

11         THE COURT:  Is there anything wrong with that?

12         MR. VEEDER:  Yes, from our standpoint.  I don't believe

13    that a scientist should draw a figure such as L 16-A for

14    Identification based upon the reading of a transcript of an-

15    other case.  I don't believe that it is proper.  I don't

16    believe that it is possible.

17         THE COURT:  If you show that on cross-examination, you

18    may weaken very seriously the effect of Plate 16A.  But he

19    wouldn't be a scientist unless he consulted all the available

20    material.  It doesn't have to be in a library because you

21    consult it.  If we know what the exhibits were, they are subject

22    to cross-examination.  I am not going to spend a lot of time on

23    that.  The author has frankly shown what sources he relied

24    upon.  You can cross-examine and see how much these sources had

25    to do with the part involved.

1          Of course, I will be very much surprised if, when we

2     get over to page 19, you want to strike the recitation there

3     toward the bottom of the page, ". . . If the extent of the

4     appropriation"-- talking about O'Neill Lake and ditch-- "is

5     to be judged by the capacity of the flumes, its volume must

6     exceed 1000 inches.  In August," which would be a dry month,

7     "the flume was carrying nearly all the water of the stream,

8     and its flow measures 140 miner's inches."  I will be surprised

9     very much if you want to strike that.

10          MR. VEEDER:  I have a live program for that.  The

11     witnesses weren't around in 1883, but they were here pretty

12     early.

13          THE COURT:  You will surprise me if you had someone back

14     as far as 1888 who could offer that kind of testimony.

15          But I will hear what you want to object to.  You show

16     me what you object to.

17          Then you take Chapter II and show me what you object to

18     in that.

19          And after I have found out what you object to, then we

20     will find out what you object to, then we will find out where

21     we have to spend time and where we don't.

22          Now, the State of California so far has proposed to

23     offer only through about page 140, as I recall.

24          MR. MOSKOVITZ:  Yes, your Honor.

25          THE COURT: And that takes you through the chart, the

1    Table 31, and to a section called "Probable Ultimate Pattern

2    of Land Use," which starts at page 141.  They have shown no

3    indication to offer anything more inVolume I except some

4    plates on which we have been working.  And in Volume II they

5    have told you what they offer.

6         Now, in Volume II, D, Precipitation Records, I will be

7    surprised if you object to them. They have been collected as

8    any scientist would.  He collected all the data he could get

9    which would bear on the subject:  Stream and spring discharge--

10   of course, I take it that these will be identified before they

11   are offered-- water well data, the depth to water, mineral ana

12   alyses.

13        MR. MOSKOVITZ:  Where is your Honor presently?

14        THE COURT:  I am talking about the various appendices

15   in Volume II.

16        The only one that has any serious amount of test in it

17   that is proposed to be offered is the one on geology, and that

18   one you can go through and show me what parts of it you want

19   to make an issue of.

20        MR. VEEDER:  I can give you examples of things that

21   concern me.

22        THE COURT: At page B-23, you probably won't object to

23   the statement, "The sedimentary rocks considered in this

24   investigation have been subdivided into two age groups:  Namely,

25   the Quaternary and the Tertiary systems."  I don't think you

5910

G2  7

1      are going to object to that.

2            You tell me things that you object to and then we will

3      know how far apart we are in working this matter out.

4            MR. VEEDER:  I will say this, that I have gone through,

5      I think, word for word and line for line Bulletin 57 with the

6      idea that if we could agree to it, it might save some time.  I

7      have no faith in the basis upon which it was written-- none.

8      I have no agreement with the general disorganization of it.

9      I find that the geology-- you would have thought they had a

10     handful of older alluvium the way they threw the geology

11     through two volumes, and then they come up with the question

12     of the export of water and you would have thought they had a

13     water pistol the way they handled it.  All you have to do is to

14     run through here and find it.

15           THE COURT:  You are objecting, apparently, to some

16     ultimate conclusions that were drawn.  I am perfectly willing

17     to strike out some of the ultimate conclusions, and if there

18     are those to be offered let them be offered orally.  But let's

19     save as much time as we can.

20           Now, I mentioned the Chinese proverb.  There is one that

21     says that a picture is worth a thousand words, and then off

22     the record I will state that is not the one I am talking about.

23           MR. STAHLMAN:  I think I know the one your Honor means.

24           THE COURT:  I hope I have cleared that up.

25           MR. VEEDER:  Your Honor, I don't claim a great deal of

G3

1  acumen, but I do believe that I understand what your Honor is

2  getting at.  And with all respect to your Honor, for whom I

3  have the highest regard, I do have the responsibility of

4  representing the United States.

5  THE COURT:  Well, don't fall into the habit of falling

6  dead in the courtroom just because somebody offers some

7  evidence that you don't like.  You have some very important

8  points in this case.  Now don't weight me down and get me so

9  confused that I can't keep my eye on some of the points in the

10 case that you might want me to be bright-eyed and bushy-tailed

11 about.

12 MR. VEEDER:  I take some pride in being able to summar-

13 ize what I want your Honor to consider.  So I am not worried

14 about that.

15 I do feel that the Bulletin is superficial, and I

16 cannot, in my own view-- I will do what your Honor directed.

17 I will go through and I will outline the parts that are odor-

18 iferous to me.

19 THE COURT: All right, you do that

20 MR. VEEDER:  And it will be almost solid red.  But we

21 will do it.

22 MR. STAHLMAN:  Are you going to use a paint brush or a

23 pencil?

24 A VOICE:  A spray gun.

25 THE COURT:  Well, let's proceed.

H-1 ML

1    THE COURT:  Well, let's proceed.

2    MR. VEEDER:  They have some more work to do on this

3 thing.

4    THE COURT:  Oh, yes.

5    MR. VEEDER:  They are not going to waltz up with this

6 whole thing now.

7    THE COURT:  Oh, no, they have some work to do.  When

8 are you going to report to me on it?

9    MR. VEEDER:  Tomorrow morning at 10:00 o'clock.

10    THE COURT:  All right.  Good.

11    MR. VEEDER:  Say, I have put the arm on Mr. Moskovitz

12 here for some more volumes.  Did you have some more?

13    MR. MOSKOVITZ:  Mr. Illingworth is going to get those

14 volumes where they are kept in the Los Angeles or Sacramento

15 office.  He says he probably will have them available by

16 next Tuesday.  We just don't have them here in San Diego.

17    MR. VEEDER:  Well, I made a study of my copy trying

18 to --

19    THE COURT:  Do you have a copy, one copy we can give

20 him so he can do this marking?

21    MR. MOSKOVITZ:  Just a moment.

22    THE COURT:  I would like you to hand it to me so I

23 can look it over after he has marked it up.

24    MR. VEEDER:  I would rather hate to -- the Chinese

25 proverb might jump clear out.

1    MR. MOSKOVITZ:  Right this moment --

2    MR. ILLINGWORTH:  I can get some tonight or tomorrow.

3    MR. MOSKOVITZ:  We will bring them here tomorrow

4  morning, then.  Is that all right?  We don't have --

5    THE COURT:  Mr. Veeder told me he would report

6  tomorrow morning.  That means he will report Friday morning,

7  then, I suppose.

8    MR. VEEDER:  All right, Friday morning.

9    MR. MOSKOVITZ:  You mean you don't have any you can --

10    MR. VEEDER:  I haven't.  I will tell you what I have

11  done.

12    THE COURT:  He has one copy, and he has torn it apart

13  in a notebook.

14    MR. VEEDER:  That is right.

15    MR. STAHLMAN:  Loan him your copy, Adolph.

16    MR. MOSKOVITZ:  Mine is all marked up.  I would rather

17  not.

18    MR. VEEDER:  Make it Friday morning.  Make it Friday

19  morning.  That will be better anyway.

20    THE COURT:  Take my copy.  I will lend you my copy.

21  I don't have any particular notes in mine.  I have torn

22  some plates out of it but --

23    MR. MOSKOVITZ:  Your Honor, if you will give me a

24  moment.  Let me look in my file cabinet.  Maybe we have one.

25    THE COURT:  You don't want him to have my copy?  Well --

1    MR. VEEDER:  That is right.

2    MR. SACHSE:  I would love to let him have mine, but

3    it has too many marks already.

4    MR. VEEDER:  We just go right straight through

5    tomorrow and I will point out the things that I think are

6    bad?

7    THE COURT:  Go through, start with Chapter 1, 2, and

8    3, and you have got Appendix B in particular that have

9    texts.  Take and put in brackets and lines on the sides

10   the parts that you think are conclusions or that you don't

11   want to handle in the way in which I have suggested.  We

12   will see how much we have got in there.  I expect you to be

13   discriminating.  I don't expect you to run a red line through

14   the fact that the Santa Margarita Valley lies in Southern

15   California.

16   MR. STAHLMAN:  That wasn't in a part of what Mr.

17   Moskovitz offered, as I get it.

18   MR. SACHSE:  Yes, it is in Chapter 1.

19   THE COURT:  Did you find it?

20   MR. MOSKOVITZ:  I didn't find it in the cabinet here.

21   It may be in our office.  Right now I can't say.

22   MR. STAHLMAN:  62 to 68; 78 and 81.  Wanted the whole

23   thing, as I got it.

24   THE COURT:  I have used some red pencil in here, so

25   you had better use a blue pencil, Mr. Veeder.  Here you are.

H-2

1   Everything in there but some plates that I have torn out.

2              Go ahead, Mr. Moskovitz.

3        MR. MOSKOVITZ:  Your Honor, at this point in the

4   examination of Mr. James I believe that we have sufficiently

5   identified, qualified, laid the foundation for the geologic

6   materials in Bulletin 57 that we plan to offer in evidence.

7        THE COURT:  You have not done all of the exhibits

8   but you have certain of them.

9        MR. MOSKOVITZ:  Those are the ones which I plan to

10  offer, and I will now offer in evidence the following

11  portions of State's Exhibit L for identification.

12       THE COURT:  Exhibit Plate 1 is already in evidence.

13       MR. MOSKOVITZ:  Yes.  And now I offer Chapter 1,

14  pages 13 to 14.

15       THE COURT:  I am not going to rule on that, because

16  that is what we have asked Mr. Veeder to work on.

17       MR. MOSKOVITZ:  Yes, your Honor.  I want, for the

18  record, to indicate the parts I want to offer of this

19  bulletin for geology.  Now, the ruling can be deferred, as

20  I expect you will.

21       THE COURT:  Well, all right.  Tell me what parts you

22  are going to offer of Chapter 1.

23       MR. MOSKOVITZ:  For geology, Chapter 1, pages 13 and

24  14.

25       THE COURT:  Just a minute.

1    MR. VEEDER:   Your Honor, you want your volumes up

2    there?

3         THE COURT:   Yes, let me have them up here.

4              Is that out of here already?   Did you?

5         MR. SACHSE:   You said all of 14, Adolph?

6         MR. MOSKOVITZ:   No, beginning on page 13 and going

7    through the first three lines on page 14.

8         THE COURT:   Yes, all right.

9         MR. MOSKOVITZ:   Then, in Chapter 2, page 52 through

10   page 81.   Then of the plates --

11        MR. VEEDER:   Still in geology?

12        MR. MOSKOVITZ:   That is on geology, underground

13   hydrology.

14        THE COURT:   Through the table on 81?

15        MR. MOSKOVITZ:   Yes, your Honor.

16        MR. VEEDER:   Underground hydrology?

17        MR. MOSKOVITZ:   That is correct.

18        THE COURT:   Go ahead.

19        MR. MOSKOVITZ:   Then, among the plates, Plate 2-A.

20        THE COURT:   Do you offer 2-A now?

21        MR. MOSKOVITZ:   Yes, I offer 2-A now.

22        THE COURT:   Well, I don't hear any objection.   2-A --

23        MR. VEEDER:   I thought that what he was going to do

24   was list these things and then make an offer as he goes

25   along.   I want some voir dire on each of these, if I may.

1    THE COURT:  We will see about that.  I will not rule

2   on the parts of the chapters that he has offered in evidence,

3   but I am ready to rule on some of these plates.

4    MR. MOSKOVITZ:  I have now offered Plate 2-A.

5    THE COURT:  2-A has been offered.

6    MR. VEEDER:  Well, I object to it on the grounds

7   there is no proper foundation for it.  And I would like to

8   ask a few questions, if I may.

9    THE COURT:  Overruled.  You may do it on cross.

10  2-A received in evidence.

11    MR. MOSKOVITZ:  I offer Plate 2-B.

12    THE COURT:  That is physiography of the inland area?

13    MR. MOSKOVITZ:  Yes, your Honor.

14    THE COURT:  Very general terms.  Same objection?

15    MR. MOSKOVITZ:  You want to see it?

16    THE COURT:  You want to look at these?  Stand up here

17  where you can see mine as you go along.

18    MR. VEEDER:  Well, I would like to interrogate in

19  regard to each one of these, your Honor.  I, of course,

20  object.  There is no proper foundation.

21    THE COURT:  Interrogate about what?

22    MR. VEEDER:  How he made these up.  I think there are

23  contradictions in what he has already said in regard --

24    THE COURT:  You can show that in cross.  Contradictions

25  wouldn't keep it from going into evidence.

1    MR. VEEDER:  Also the source of the data that he used.

2    THE COURT:  You can find out.  Objection overruled.

3  2-B received in evidence.

4    MR. MOSKOVITZ:  I offer Plate 6 in evidence.  That is

5  the plate that is entitled:  "Hydrographic map, 1953."

6    MR. VEEDER:  Now, here is a good example, your Honor,

7  where we have this split personality here of Illingworth-

8  James.  I think there is a matter here that should be in-

9  terrogated on respecting the plate with regard to rising

10  water, in regard to the quantity of water in the stream.  It

11  will be noted that the heavier line shows 46 second feet,

12  summer flow, 1953.  What was the source of the information?

13  How was it arrived at?  Who showed him that data?  You will

14  see that this kind and type of exhibit, 6, is a composite

15  of many, many, many things.

16    THE COURT:  May I remind you that when you offered

17  your exhibits you offered them in evidence before you had

18  even finished describing them or laying the foundation of

19  them, and counsel accommodated you, let them go into evidence,

20  and then cross-examined.  You had the witness read the title

21  page and then you, maybe one or two questions, you offered

22  them in evidence.  Your objection is overruled.  You may

23  cross-examine.

24    MR. STAHLMAN:  Your Honor, there is one situation that

25  I do think would come under the voir dire and that is to

understanding the exhibit.

THE COURT:  Can that be covered on cross?

MR. STAHLMAN:  Oh, I can cover it on cross, yes. Cover it on cross.

THE COURT:  This particular exhibit, in a way it appears to me that arbitrarily certain units have been laid out as a basis for this study.  I suppose that different people could lay out different kinds of units.  At least, there is a logic in what they have done.  You might say that there is one unit from the junction of the Murrieta and the Temecula with the rest of that particular watershed.  They split it up into three parts.

MR. STAHLMAN:  The thing I am concerned about on that is, what is a "water service unit" that is designated there? Water service unit?

MR. SACHSE:  Water service organization.

MR. VEEDER:  What service organization serving the United States of America.

MR. STAHLMAN:  Water service organization.  I just wonder what is meant.

THE COURT:  It can be cleared up very easily.

MR. STAHLMAN:  Okay.

THE COURT:  On cross-examination.

Exhibit Plate 6 received in evidence.

MR. MOSKOVITZ:  I offer in evidence next Plate 9-A.

1    THE COURT:   9-A.

2    MR. MOSKOVITZ:   "Location of wells, coastal area,

3  1953."

4    THE COURT:   Received in evidence.

5    MR. VEEDER:   I want a continuing objection to all of

6  these, your Honor.

7    THE COURT:   Make your objections as you go along.

8    MR. VEEDER:   I make an objection.   There is no proper

9  foundation for defendants' Exhibit 9-A, no showing of the

10  source of information or how they arrive at it.

11    THE COURT:   Overruled.   9-A received in evidence.

12    MR. MOSKOVITZ:   I offer next Plate 9-B, title:

13  "Location of wells, inland area, 1953."

14    MR. VEEDER:   I make the objection that there is no

15  proper foundation for Plate 9-B.

16    THE COURT:   What kind of foundation?

17    MR. VEEDER:   Well, your Honor, if your Honor will

18  observe, the legend in this exhibit does this:   It throws

19  out all of the land for practical purposes in the upstream

20  area for purposes of irrigation by the simple broad sweep

21  that all the areas in brown are generally impermeable.   That

22  is also true in regard to the areas particularly on

23  Defendants' Exhibit 9-A in the De Luz area.   Now, you will

24  note that the Vail Company --   and here is another thing

25  that concerns us in regard to the Special Master's hearings --

H-3

5921

1   the Vail Company has got about 10,000 acres of irrigable

2   land up there concerning which we have knowledge.

3       THE COURT:   This exhibit doesn't purport to show

4   anything about irrigable land.

5       MR. VEEDER:   It says, "generally impermeable."

6       THE COURT:   It is directed, first of all, to locations

7   of wells.   And it does also include the younger alluvial and

8   some of the residuum, and it has some charts on permeability.

9   But it doesn't have anything to do about what is irrigable

10  and what isn't.

11      MR. VEEDER:   But, your Honor, we all know this area

12  by and large is going to live on wells.   And if this goes

13  in showing generally impermeable, there will be no wells dug

14  whatever.   There will be no possibility of getting ground

15  water.   And we believe that that is one of the crucial parts

16  of this lawsuit.

17      MR. SACHSE:   I submit that is not the foundation part

18  of it, your Honor.

19      THE COURT:   Overruled.   9-B received in evidence.

20      MR. MOSKOVITZ:   I offer next Plate 10-A in evidence.

21  Plate 10-A is entitled:   "Lines of equal elevation of ground

22  water, coastal area, spring, 1927."

23      MR. VEEDER:   And I renew my objection with no proper

24  foundation for that map.

25      THE COURT:   Overruled.   10-A received in evidence.

MR. MOSKOVITZ:   I offer next Plate 10-B entitled: "Lines of equal elevation of ground water, inland area, spring, 1927."

MR. VEEDER:   There is no proper foundation for either 10-A or 10-B.   There is no showing of the sources of data. There is no showing how the determinations were made in regard to the specific factors covered in the legend.   For example, faults on both of these, 10-A and 10-B, the lines of equal elevation, there is no showing how those are arrived at and there are no data concerning which I have any information, upon which those factors could be relied. The fact is, there is nothing to support, so far as we are concerned, any of the data in the legend on either 10-A or 10-B.

THE COURT:   The exhibit is not put in to show fault lines.   But for your information I see only one fault line, and it is apparently the Wildomar Fault.   And there is not much dispute about it.

MR. VEEDER:   It doesn't run the way it ran there, in our view.

THE COURT:   It looks to me as if it does.   You can point out how it doesn't.   Overruled.   10-A received in evidence.

MR. MOSKOVITZ:   Is that 11-A, your Honor?

MR. SACHSE:   10-B.

THE COURT:  10-B.

MR. MOSKOVITZ:  10-B, pardon me.

1    MR. MOSKOVITZ:  I offer next Plate 11A, which is en-

2    titled "Lines of Equal Elevation of Ground Water Coastal Area

3    Fall of 1953."

4    MR. VEEDER:  I have objections to both 11A and 11B of

5    the same kind and character that I interposed to 10A and 10B.

6    I assume that they differ only in years, isn't that right--

7    1927 and 1953?

8    MR. MOSKOVITZ:  Yes.

9    THE COURT:  11B?

10   MR. MOSKOVITZ:  I haven't yet offered 11B, your Honor.

11   THE COURT:  The objection is overruled as to 11A.  It

12   is received in evidence.

13   (Defendant State of California Exhibit L-Plate 11A

X L-11A   14   was received in evidence.)

15   MR. MOSKOVITZ:  I offer now Plate 11B, entitled "Lines

16   of Equal Elevation of Ground Water Inland Area Fall of 1953."

17   MR. VEEDER:  I want the same objections that I made

X L-11B   18   to Plate 11A to be applicable to Plate 11B.

19   THE COURT:  Overruled.  Plate 11B received in evidence.

20   (Defendant State of California Exhibit L-Plate 11B

21   was received in evidence.)

22   MR. MOSKOVITZ:  I offer next Plate 13A, entitled "Areal

23   Geology of Coastal Area, 1954."

24   MR. VEEDER: We object on the grounds that there is no

25   proper foundation laid for this.  We object on the ground that

1    there is no showing upon which the delineations were made or

2    who made the investigation, who undertook the geology.

3         THE COURT:  Mr. Veeder, there is no substantial differ-

4    ence between the facts shown on this exhibit and those shown

5    by the Government.  That in itself would be a basis for

6    receiving it in evidence.

7         MR. VEEDER:  I would like also to add the objection

8    that it does not show the watershed line in the place we think

9    it is situated.

10        THE COURT:  It is not offered to show a watershed line.

11        MR. VEEDER:  The watershed line is on it.

12        THE COURT:  The watershed line is on there, but that

13   doesn't mean that it is controling as to the watershed line.

14   It is offered to show generally areal geology, and I can't tell

15   without the section lines whether the watershed line corresponds

16   with yours or not. There can't be a lot of difference in it.

17        MR. MOSKOVITZ:  I think the only difference, your Honor,

18   would be down at the coast line where this watershed line was

19   secured from the aerial photographs of the watershed line as it

20   now exists by activities of man and by consultation with the

21   Camp Pendleton Office of Ground Water Resources, which helped

22   to supply the data on which this particular portion of the

23   watershed line is based.

24        THE COURT:  The objection is overruled.  Plate 13A is

25   received in evidence.

X L-13A

1      (Defendant State of California Exhibit L-Plate 13A was

2  received in evidence.)

3      MR. MOSKOVITZ:  I next offer Plate 13B, entitled "Areal

4  Geology, Insland Area, 1954."

5      MR. VEEDER:  I object on the grounds that there is no

6  proper foundation for this.  There is nothing whatever to show

7  the basis upon which the conclusions were arrived at which are

8  set forth in that exhibit by whoever prepared it. It is full

9  of conclusions.  The whole exhibit is shot through with con-

10  clusions in regard to the kinds and types of soils.

11      THE COURT:  That is all of these are-- opinion.  That is

12  what your witnesses gave us on the same kind of map-- their

13  opinion.  Do you contend that your witnesses' opinions were

14  gospel and that somebody else's opinions are heresy?

15      MR. VEEDER:  I sincerly hope that your Honor doesn't

16  desire an answer to that.

17      THE COURT:  Overruled.  Plate 13B is received in

18  evidence.

X L-13B

19      (State Exhibit L-Plate 13B was received in evidence.)

20      MR. MOSKOVITZ:  I next offer Plate No. 14, entitled

21  "Geologic Sections A, A-prime, B, B-prime, and C, C-prime,

22  1954."

23      MR. VEEDER: Again, we object to this on the grounds

24  that there is no foundation for it.  There is nothing to show

25  how these conclusions were arrived at.  I think if we went out

1    and bought a copy of Dr. Mann's thesis we would find the same

2    thing verbatim.  There is no foundation for it.  It is objected

3    to.

4         THE COURT:  Overruled.  Plate No. 14 is received in

5    evidence.

6         (Defendant State of California Exhibit L-Plate 14 was

X L-14    7    received in evidence.)

8         MR. MOSKOVITZ:  I offer next Plate 15, which is entitled

9    "Geological Sections D, D-prime, E, E-prime, F, F-prim, 1954."

10        MR. VEEDER:  I have the same objection as heretofore

11   stated to Plate No. 14.

12        THE COURT:  Plate No. 15 received in evidence.

13        MR. VEEDER:  You overruled the objection?

14        THE COURT:  Overruled.

X L-15    15        (Defendant State of California Exhibit L-Plate 15 was

16   received in evidence.)

17        MR. MOSKOVITZ:  I offer next Plate No. 16, entitled

18   "Geologic Sections, G, G-prime, H, H-prime, and J, J-prime 1954.

19        MR. VEEDER:  I offer the same objection I had to Plates

20   No. 14 and 15 in regard to this geologic process.

21        THE COURT:  Overruled.  It is received in evidence.

X L-16    22        (Defendant State of California Exhibit L-Plate 16 was

23   received in evidence.)

24        MR. MOSKOVITZ:  I next offer Plate No. 17, entitled

25   "Geologic Sections K, K-prime and L, L-prime, 1954."

1    MR. VEEDER:  Same objection as to 14, 15 and 16.

2    THE COURT:  Overruled.  Received in evidence.

X L-17    3    (Defendant State of California Exhibit L-Plate 17 was

4    received in evidence.)

5    MR. MOSKOVITZ:  I next offer Plate No. 18, entitled

6    "Relationship Between Ground Water Storage Capacity and Depths

7    to Ground Water in Santa Margarita Coastal Basin."

8    MR. VEEDER:  I object to that on the grounds that it

9    is incompetent, irrelevant and immaterial and not tending to

10    prove any issue in the case.  There is absolutely no founda-

11    tion whatever for it.  There is no basis for the expression of

12    opinions that are disclosed on it.  As I have said before, it

13    looked to me like it was made backward.  I object to Plate No.

14    18.

15    THE COURT:  Overruled.  Received in evidence.

X L-18    16    (Defendant State of California Exhibit L-Plate 18 was

17    received in evidence.)

18    MR. MOSKOVITZ:  I offer next Appendix B, in Volume II.

19    THE COURT:  That I am not going to rule on.  That is

20    the one Mr. Veeder is going to look over.

21    MR. MOSKOVITZ:  Very well.

22    I would like to offer Appendix F in Volume II.

23    MR. VEEDER:  Would you hold that for just one moment

24    until I see--

25    MR. STAHLMAN:  That is the water level data.

1    MR. VEEDER:   That data is already in evidence, is it

2  not?

3    MR. MOSKOVITZ:   I hadn't offered it in evidence.

4    MR. VEEDER:   I think that we put that in, didn't we--

5  the United States?

6    MR. MOSKOVITZ:   You put our Appendix F in evidence?

7    MR. VEEDER:   No, I think the data is in.

8    THE COURT:   You may have the data, but this is organized

9  possibly a little differently.   Appendix F has been offered.

10  If it is cumulative, it does no harm.   It is organized in some

11  method so that we can get at it.

12    MR. VEEDER:   In regard to this Appendix F, we would

13  like to obtain all of the logs that the State of California

14  apparently has, particularly in the Terwilliger Valley area.

15    THE COURT:   We will do the same thing we did for you.

16  We will ask them to bring in any other additional well logs

17  that they have that may be helpful in this matter.   Tell Mr.

18  Moskovitz specifically what you want and see what they have.

19    MR. MOSKOVITZ: We have already made them available.

20    THE COURT:   Appendix F received in evidence.

X L-F   21    (State of California Exhibit L-Appendix F was received

22  in evidence.)

23    MR. MOSKOVITZ:   I offer next Appendix G, entitled "Rec-

24  ords of Depths to Ground Water in Wells in and adjacent to

25  Santa Margarita River Watershed."

L-G

1    THE COURT:  If there is no objection to that, it will be

2  received in evidence.

3        (Defendant State of California Exhibit L-Appendix G,

4  was received in evidence.)

5        MR. MOSKOVITZ:  I offer next Appendix H.

6        THE COURT:  There has been no testimony on that.

7        MR. MOSKOVITZ:  Pardon me.  There has been no testimony

8  on that.

9        THE COURT:  There has been no testimony on Appendix H.

10        MR. MOSKOVITZ:  That completes the offer, your Honor.

11        THE COURT:  You have some testimony on Appendix D

12  Precipitation.  Is there any objection to the precipitation

13  records, Mr. Veeder?

14        MR. VEEDER:  These are data that are simply reports?

15        MR. STAHLMAN:  Reports of rainfall gathered somewhere,

16  somehow.

17        THE COURT:  And not previously published, so D-1 says;

18  so also Table D-2 says.

19        MR. VEEDER:  I would like to have the basic data from

20  which those tabulations were made, and I haven't had them, and

21  I would like to withhold-- it may be that they are acceptable,

22  if we can get the basic data.  Is this it here?

23        MR. WILLINGWORTH:  You are thumbing through it in the

24  Bulletin.  That is basic data.

25        MR. VEEDER:  Basic data, young man, means your notes, and

1    I would like to see them before I am asked to rule upon it.

2           MR. MOSKOVITZ:  You are not asked to rule upon it.

3           THE COURT:  I will postpone ruling on that.

4           All right.

5    BY MR. MOSKOVITZ:

6           Q  Mr. James, since the completion of the publication

7    of Bulletin 57, which is State Exhibit L, have you made any

8    further investigations of geology in the Santa Margarita

9    Watershed?

10          A  Yes, I have.  On November 22nd, 23rd and 24th I made

11   an inspection of the watershed area.

12          MR. STAHLMAN: What year?

13          THE WITNESS:  1958.

14   BY MR. MOSKOVITZ:

15          Q  What did that inspection consist of?

16          THE WITNESS:  On that inspection I examined various

17   areas throughout the watershed.  We paid particular attention,

18   or I paid particular attention to the older alluvium deposits,

19   that is, undifferentiated Pleistocene deposits-- older alluvium.

20   Photographs and colored slides were made of various parts of

21   the upper watershed area and samples were taken of older alluvial

22   deposits and of the Recent alluvium.

23          Q  On the basis of the investigation which was made

24   under your direction of the Santa Margarita River, which

25   culminated in Bulletin 57, State Exhibit L, and your investigation

1    since then, what opinions do you have as to the water-bearing

2    and water-yielding characteristics of the types of materials

3    which are found in the watershed?

4        MR. VEEDER:  I object to this, your Honor.  This is the

5    widest kind of question.  Bulletin 57 is not in evidence.

6    There is no basis.  This man has expressed no opinion in regard

7    to the water-bearing characteristics of this valley.

8        THE COURT: He is now being asked.

9        MR. VEEDER:  No, he says based upon your investigation

10   and predicated upon what is set forth in Bulletin 57.

11       THE COURT:  No, that isn't the way it was worded.  Read

12   it.

13       It is too broad, because you are asking everything at

14   one time.  You might as well start over.

15       MR. MOSKOVITZ:  I will start over, your Honor.

16       Q  What is your opinion as a result of the investigations

17   which have been made under your direction?

18       THE COURT:  That is the same problem.

19       You worked on this study which culminated in Bulletin 57?

20       THE WITNESS:  Yes.

21       THE COURT:  And then in November you went up again and

22   looked it over and took colored slides and took samples?

23       THE WITNESS:  Yes.

24       THE COURT:  Do you have an opinion-- answer this question

25   yes or no-- as to the water-bearing qualities of various types

1    of material that you found in that area in the watershed of the

2    Santa Margarita?

3         THE WITNESS:  I do, your Honor.

4         THE COURT:  First, how many different kinds of materials

5    are involved?

6         THE WITNESS: The Recent Alluvium is the best--

7         THE COURT:  What are you going to talk about-- Recent

8    alluvium, older alluvium, or the older continental deposits?

9         THE WITNESS: All of those, your Honor.

10        THE COURT:  Residuum?

11        THE WITNESS: And the residuum, too.

12        MR. VEEDER:  Could it be possible to have defined what

13   he is talking about as Recent alluvium?

14        THE COURT:  Yes.

15        What do you mean by Recent alluvium?

16        THE WITNESS: Recent alluvium is material which is at the

17   present time being deposited by a stream, that is, streams

18   which are depositing or laying down this material.

19        THE COURT:  Well, it is more than the stuff that is now

20   being deposited; it is matters that have been deposited in

21   recent times; is that right?

22        THE WITNESS:  That is right.

23        THE COURT:  For instance, on your Plate 2B, the yellow

24   areas generally would be matters of Recent alluvium?

25        THE WITNESS:  Yes, sir.

1          MR. VEEDER:  I would like to hear the inquiry and then

2     the answer to that.  That the yellow areas on 2B constitutes

3     Recent alluvium; is that right?

4          THE COURT:  That is what I asked him.

5          MR. VEEDER:  And he said yes?

6          THE WITNESS:  In general, yes.

7     BY MR. MOSKOVITZ:

8          Q  Are the areas of Recent alluvium delineated with

9     greater specificity on any other plates?

10         A  Yes; on Plates 13A and 13B.

11         Q  What are the water-bearing and water-yielding

12    characteristics of that material?

13         THE COURT: Wait just a minute.

14         How are they designated on Plates 13A and 13B?  I don't

15    find any single category which says Recent alluvium.

16         MR. VEEDER:  There isn't any.

17         THE WITNESS:  The yellow colored areas on Plates 13A

18    and 13B, which are marked Qal, comprise Recent alluvium,

19    which consists of gravel, sand, silt and clay.  It is generally

20    unconsolidated and occurs as valley fill and beach deposits.

21         THE COURT:  All right.

22    BY MR. MOSKOVITZ:

23         Q  You will notice on the side of the first two blocks

24    under the legend there is a bracket and the word "Recent" is

25    written.

1          A   I was reading from the legend on Plate 13B, your

2     Honor.

3          Q   What are the water-bearing and water-yielding

4     characteristics of that type of material?

5          MR. VEEDER:  Have we decided what Recent alluvium is,

6     as defined?

7          THE COURT:  He has defined it, and I think he has de-

8     fined it much as your witnesses defined it.

9          THE WITNESS:  What was the question again, please?

10    BY MR. MOSKOVITZ:

11         Q   What are the water-bearing and water-yielding

12    characteristics of that type of material?

13         MR. VEEDER:  I object to that as being far too general.

14    There are Recent alluvium, as this witness erroneously I think,

15    but nevertheless has pointed out today.  He says the alluvium

16    at the upper end of Pauba Valley is very fine but not very

17    permeable.  There are other kinds and types of Recent alluvium

18    that have a different permeability.  Therefore, I object unless

19    there is a designation as to the valleys to which the man is

20    testifying.

21         MR. MOSKOVITZ:  Your Honor, it seems to me that this

22    general question can be answered and more detail supplied.

23         THE COURT:  Yes, answer generally.

24         THE WITNESS:  May I read from Table B-1 of Volume II of

25    Bulletin No. 57, page B-19.

1    MR. VEEDER: I object to that, your Honor.

2    MR. MOSKOVITZ: There is no reason why the witness

3 can't refer to the notes.

4    MR. VEEDER: There is nothing wrong with referring to the

5 notes; but I am opposed to his reading from something that

6 isn't in evidence, that's for sure.

7    MR. MOSKOVITZ: He can read it and adopt it as his own

8 testimony. There is no rule of law that says that he can't

9 do that.

10    MR. VEEDER: I would rather have his Honor rule on that.

11    MR. MOSKOVITZ: I am making an argument.

12    THE COURT: You can refer to anything to refresh your

13 recollection. But you are now testifying. So proceed. Don't

14 read this from some exhibit, unless you are giving this as

15 your testimony. What is your answer?

16    THE WITNESS: In describing the Recent alluvium, the

17 description as used, the definition as used--

18    THE COURT: Can't you give us a description without

19 looking at the book?

20    THE WITNESS: Your Honor, I thought I had given a

21 description. I was trying to dig out some additional informa-

22 tion for Mr. Veeder.

23    MR. VEEDER: Don't worry about me, young man.

24    THE WITNESS: Well, you asked for it, so I was trying

25 to satisfy your question.

1          MR. VEEDER:  I think if we were to look at the very

2     thing to which he--

3          THE COURT:  Just a moment.  The question is, generally

4     speaking what are the water-bearing characteristics--

5          MR. MOSKOVITZ:  Water-bearing and water-yielding

6     characteristics of Recent alluvium?

7          THE WITNESS:  Recent alluvium is the most permeable

8     sedimentary formation within the watershed area and--

9          THE COURT:  Are you talking now about this particular

10    watershed?

11         THE WITNESS:  Of the Santa Margarita River.

12         MR. VEEDER:  He already has in his offering here--

13    well, all right, I will withhold it.

14         THE WITNESS:  It is the chief source of ground water in

15    this same watershed area-- Santa Margarita River.

16         THE COURT:  And does Recent alluvium vary from valley

17    to valley, to some degree?

18         THE WITNESS:  Yes, it does, your Honor.  It varies in

19    permeability, it varies in its composition.  In some areas it

20    is composed of coarser material than in others.

21    BY MR. MOSKOVITZ:

22         Q  Do you have any examples of that difference in the

23    Santa Margarita River watershed?

24         A  Yes.

25         Q  Can you state those examples?

1       A  The Recent alluvium that occurs in the lower water-

2   shed area is, in my opinion--

3       THE COURT:  What you would call the coastal area?

4       THE WITNESS:  Yes, sir.

5       --is coarser and more permeable than that that is found

6   in Pauba Valley, for example.  That which is found in Aguanga

7   Valley, for example, is more permeable than that which is

8   found in Pauba Valley.

9   BY MR. MOSKOVITZ:

10       Q  And what is the reason for the differences in

11   permeability that exist within the class of Recent alluvium?

12       A  Well, this is in part due to the source materials

13   of which the alluvium is comprised.  In some areas it is

14   derived from the weathering of finer-grained sediments than in

15   others.  It is also in part due to the gradients of the stream.

16       Q  And what would the material which is composed of

17   weathering of finer-grained sediments have in the way of

18   permeability compared to the material composed of the coarser

19   grained sediments?

20       A  It would have a lower permeability.

21       Q  Where do you find the areas of Recent alluvium in

22   so far as the ground water basins which are outlined on Plates

23   10A, 10B and 11A and 11B are found?

24       A  Well the Recent alluvium comprises these ground water

25   basins.  It is found within the ground water basin boundaries.

1        THE COURT:  Your ground water basins have generally been

2   drawn as covering the entire area of the Recent alluvium?

3        THE WITNESS:  There are certain small shallow bodies

4   of Recent alluvium that have been omitted from the ground water

5   basin.  By our definition of ground water basin we include all

6   pervious material in the definition that is enclosed within

7   the relatively impervious material.  Where these bodies have

8   been small we haven't regarded them to be important and haven't

9   considered them as ground water basins.

10  BY MR. MOSKOVITZ:

11       Q  What other types of materials are found that are

12  water-bearing in any degree in the Santa Margarita River water-

13  shed?

14       MR. VEEDER:  I object on the grounds that it is far, far

15  too broad a question.

16       THE COURT:  He is talking about general classes of

17  materials, Mr. Veeder.  Overruled.

18       What is the next classification of material?

19       THE WITNESS: We find residuum to be water bearing, and

20  this comprises residuum material which is the weathered products

21  of the Basement Complex and it does bear water and is a source

22  of water supply to certain areas, notably in the Fallbrook

23  area.

24       THE COURT:  Are you giving these in any particular order?

25  Do you place residuum next to younger alluvium as the next

Case 3:51-cv-01247-JO-SBC   Document 4552   Filed 09/24/63   PageID.26670   Page 153 of 153

1   best water-bearing material?

2   　　　THE WITNESS:  No, your Honor, I was giving them in the

3   order in which they appear on the legend of Plate 13B.  The

4   residuum I do not regard as the second most permeable material.

5   The second most permeable material would be the terrace

6   deposits and older alluvium.

7   　　　THE COURT:  Go ahead.

8   　　　THE WITNESS:  The permeability of that material is

9   low.  However, the residuum is lower in permeability, in my

10  opinion.

11  　　　THE COURT:  You were not here and heard the testimony

12  about residuum from the Governments experts?

13  　　　THE WITNESS:  I did not hear that testimony.

14  　　　THE COURT:  Did you read it in the transcript?

15  　　　THE WITNESS:  I reviewed the transcripts, yes.

16  　　　THE COURT: Are you in any disagreement with the state-

17  ments of the Government's witnesses as to residuum?

18  　　　THE WITNESS:  I don't recall their testimony in detail,

19  but offhand I believe we are in fundamental agreement.

20  　　　THE COURT:  It is 4:30.  10 o'clock tomorrow morning.

21  　　　(Adjournment until Thursday, December 4, 1958, at 10

22  o'clock A.M.)

23

24

25