# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                                   Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                                   Defendants.

No.   1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:       San Diego, California

Date:        Thursday, December 4, 1958.

Pages:   5941 to 6069

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
                        DEPUTY

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1            IN THE UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3               SOUTHERN DIVISION

4                 - - -

5     HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6

7

8  UNITED STATES OF AMERICA,   )
                         )

9             Plaintiff,  )
                         )

10       vs.           )      No. 1247-SD-C.
                         )

11  FALLBROOK PUBLIC UTILITY    )
    DISTRICT, et al.,        )

12           Defendants.  )

13

14

15       REPORTERS' TRANSCRIPT OF PROCEEDINGS

16          San Diego, California

17        Thursday, December 4, 1958

18

19  APPEARANCES:

20      For the Plaintiff      WILLIAM H. VEEDER, ESQ.,
                           Special assistant to the

21                           Attorney-General,
                           Department of Justice,

22                           Washington, D. C.

23

24

25

5942

APPEARANCES (Continued)

1

2     For Defendant Vail     GEORGE E. STAHLMAN, ESQ.
Company

3

4     For Defendant State     EDMUND G. BROWN, ESQ.,
of California     Attorney-General, by
ADOLPHUS MOSKOVITZ, ESQ.,
5     Deputy Attorney General.

6     For Defendants
Fallbrook Public
7     Utility District,     F. R. SACHSE, ESQ.
et al.,

- - -

## INDEX TO WITNESSES

| DEFENDANTS' WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Laurence James | 5956 | | | |

| EXHIBITS: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| Defendant California Exhibit | | |
| L – Appendix B, Draft 1 and Draft 2 | 5994 | |
| L–Appendix F, Logs 1, 2, 3, 4. | 5995 | |
| L–Table 15-1 (Map) | 5997 | |
| L–Table 15-2 (Overlay) | 5998 | |
| M–1 | | 6031 |
| M–2 | | 6044 |
| M–3 | | 6049 |
| M–4 | | 6056 |
| M–5 | | 6058 |
| M–6 | | 6059 |
| M–7 | | 6060 |
| M–8 | | 6063 |

* * * * *

z3                                                                    3944

1    SAN DIEGO, CALIFORNIA, THURSDAY, DECEMBER 4, 1958.  10:00 A.M.

2

3            (Another matter.)

4        MR. MOSKOVITZ:  Before we begin, your Honor, I have

5    the precipitation records on which our Appendix D was based,

6    and I am handing it to Mr. Veeder for his inspection.

7        MR. VEEDER:  Thank you.  Do you have copies of the

8    several rewrites of Bulletin 57 which we originally had but

9    which we no longer have?

10       THE COURT:  What do you mean by "rewrites"?

11       MR. VEEDER:  As I understand it, first there was a

12   germ and then it grew on up and each man made a change as it

13   went down the line, and we are interested in it.

14       MR. MOSKOVITZ:  Your Honor, there are some rough

15   drafts of the text materials.  I don't see why Mr. Veeder is

16   entitled to those.  All the basic information is available.

17       THE COURT:  Do you want to spend the time of the Court

18   on that matter, Mr. Veeder?

19       MR. VEEDER:  No, I would like to spend my time on it

20   myself, your Honor.

21       THE COURT:  How many of these drafts are there?

22       MR. MOSKOVITZ:  For the Geology appendix, apparently,

23   there is a final draft, and then some notes which led up to

24   the final draft.

25       THE COURT:  See what you can find, Mr. Moskovitz, and

1    report to the Court later.

2        MR. VEEDER:  Your Honor, you had asked that we under-

3    take to prepare a map which would be indicative to you of the

4    watershed as it relates to the structures outside the water-

5    shed line.  We have done that, using the Exhibits 103 through

6    114, and then we have added, to make a complete showing, three

7    additional key maps.  Now they are here for counsel's exam-

8    ination and for your Honor's examination to the end that if

9    they are acceptable we will simply substitute them for the

10   exhibits originally so numbered showing the location.

11       THE COURT:  Why do we have to substitute them?

12       MR. VEEDER:  Well, we had them run off the watershed

13   lines and it was easier for us to do a reproduction job than

14   to have the work done in the courtroom.  It is the same thing.

15       THE COURT:  I don't know that I follow you.  You pre-

16   pared a new exhibit.  Why can't it just be given a new number?

17       MR. VEEDER:  To a very large extent it very largely

18   duplicates exactly the same thing that is already in the

19   record.  We would have a repetition.

         THE COURT:  Which ones does it duplicate?

         MR. VEEDER:  103 through 108, and then 110 through 114.

         THE COURT:  I will have to look at what you have and

     take it up later.

1        MR. VEEDER:  All right.

5        THE COURT:  These were the sewer system exhibits?

1      MR. VEEDER:  Water distribution system; yes, sir.

2      THE COURT:  And the 110 through 114?

3      MR. VEEDER:  You will find that we have added three of

4  the same kind of maps so as to show fully the watershed line

5  that has been established down at the South Mesa and also at

6  the Stuart Mesa.

7      THE COURT:  I will look at them and we will talk about

8  it later.

9      Mr. Veeder, did you work over my copy?

10     MR. VEEDER:  I did this, your Honor.  I started what

11 amounted to a continuous interlining, and then I thought that

12 perhaps your Honor would not be too smitten with the idea so

13 I have written on each paragraph "Objection - WHV" or I had it

14 written there.

15     I most certainly object to every paragraph of Bulletin

16 57.  I cannot agree to any part of it, and I would be glad to

17 point out the reasons for each objection.  It might be pain-

18 ful, but I am prepared to do it.

19     I didn't want to cut up your Honor's copy, so I took

20 the Master's copy and took a couple of slashes at it.  And, as

21 I say, I am prepared to follow whatever course you desire.  If

22 you desire me to read into the record, as to the introduction

23 to Chapter I on page 1, what my objections are, I will do that,

24 I will do that first-- I will state them.  It would probably

25 save a little time.  But they would go on throughout the entire

1    report.

2         THE COURT:  Well, let's hear your objections to the

3    first paragraph of the introduction.

4         MR. VEEDER:  May I preface it with this statement,

5    that the Bulletin is written, by and large, for the purpose

6    I have previously stated, and I didn't add that the Bulletin

7    throughout is designed, in my view, so as to effectuate what

8    California refers to as its "Water Plan"-- I think that is

9    the term it uses.  I don't believe that "Water Plan" or the

10   future development of water in California has anything to do

11   with this litigation.

12        But in any event, the first sentence says:

13              "The Santa Margarita River watershed,

14              located in the South Coastal Area of

15              California, and including portions of

16              San Diego and Riverside Counties, has a

17              semi-arid climate and potential water

18              requirements which far exceed the natural

19              supply . ."

20        One of the principal questions here involved is the

21   matter of the extent of the natural supply of water.  It is

22   our view that the part of the natural supply is contained in

23   the area marked 15A--

24        THE COURT:  I am not going to hear you on that.  The

25   statement says "potential water requirements which far exceed

A2

1    the natural supply." Do you object to that?

2         MR. VEEDER:  I object to it because, from our stand-

3    point, the question of what is the natural supply and what

4    are the demands is certainly an issue.

5         THE COURT:  It doesn't say here what the extent of

6    these requirements is or what the extent of the supply is.

7    Do you contend that the supply exceeds the water requirements?

8         MR. VEEDER:  Not in the slightest.

9         THE COURT:  Then if you don't, you must contend that

10    the water requirements exceed the supply.

11         MR. VEEDER:  I am not quite sure, your Honor, what is

12    meant.  I will say this, that Mr. Holsinger in his summary on

13    the legal aspects and the comments by the several men who

14    wrote this brochure all point to one thing with which we can-

15    not live, that there will be no further riparian development

16    absent additional storage.

17         THE COURT:  Well, it is one thing to object to that

18    statement in the report.  It is another thing to object to a

19    general statement such as appears in this first paragraph.

20         MR. VEEDER:  I do so object.

21         In regard to the balance of the overall report-- I am

22    simply pointing out the general objection that I have-- the

23    objection turns, by and large, on the whole theory and thesis

24    upon which the State undertook to issue permits to the Fall-

25    brook Public Utility District, namely, that there would be no

1  further development of the natural supply of water in the

2  Santa Margarita River without impounding, and we believe that

3  the facts as we know them now and as they are in the record

4  today deny such a contention.  We know the Querry Well has come

5  in, the Roripaugh well has come in, we know a great many other

6  wells that have come in and are coming in.  And more than

7  that, they have turned their back upon one of the most vital

8  factors in this case--

9      THE COURT:  You are arguing the case.  I asked you for

10  your objection to the first paragraph, and I will tell you

11  frankly your objection is absurd.

12      MR. VEEDER:  Well, I have to try this side of the case,

13  your Honor.

14      THE COURT:  You do, and you have a right to make your

15  record.

16      MR. VEEDER:  And I might add, your Honor, that I have

17  no willingness whatsoever to have one word of acceptance in

18  this record in regard to Bulletin 57.  I quite understand the

19  four corners on which I must try this lawsuit.  I know that

20  your Honor told me that if you overruled me on enough points

21  of law I might settle.

22      Now, the points of law are things that concern me

23  greatly, but I believe that I have recourse in regard to them

24  on appeal.  But where there is a conflict of evidence, it is

25  most clear that the finder of fact will not be upset unless

1    he is clearly erroneous, and when we have something like this

2    in the record I daresay that you could not be shown to be

3    clearly erroneous, because we have a book fraught with contr-

4    dictions, and that is the gravest factor with which we are

5    confronted.  It would be nice to be able to say, "Let it go

6    in--"

7            THE COURT:  I have heard enough platitudes.

8            MR. VEEDER:  All right, your Honor.  I object to every

9    paragraph in Bulletin 57.

10           MR. MOSKOVITZ:  Your Honor, Mr. Veeder has objected to

11   the admission of this--

12           THE COURT:  It has not been offered yet.  He is answer-

13   ing my request as to what he would object to, if and when it

14   was offered.

15           MR. MOSKOVITZ:  Yes, your Honor, and his objection, as

16   we have seen, is that he doesn't agree with it.

17           Now, I have offered theseportions of the Bulletin

18   yesterday and you said you would defer ruling until Mr.

19   Veeder made his objections this morning.

20           I re-offer the Bulletin and I do so on the grounds that

21   it is an official statement.

22           The objection that Mr. Veeder made cited the Federal

23   Rules on Civil Procedure that in all trials the testimony of

24   witnesses shall be taken orally in court, which has an excep-

25   tion unless otherwise provided by these rules, and the rules

1    provide that official documents may be admitted even though

2    they would otherwise be hearsay and they permit the admission

3    of such documents either under the rules of procedure followed

4    by Federal Courts or by rules which apply to the State courts

5    in the State in which the Federal Court is sitting.  And there

6    is authority both in the Federal Courts and in the State courts

7    that this type of official statement which is published under

8    the authority and under the direction of the Legislature of

9    the State is the kind of statement that may be admitted.

10          I can cite you cases for it, your Honor.  The very type

11   of document which we are now offering was admitted in a Federal

12   case, Williamson against Union Oil Company of California, 125

13   Fed. Supp. 570.  The volume which was offered was a printed

14   volume entitled "Geology and Ground Water Resources of Parts

15   of Lincoln, Albert and El Paso County, Colorado," written by

16   a certain employee of the Colorado Water Conservation Board

17   who had worked together with employees of the U. S. Geological

18   Survey.  In that case no witnesses were presented who would

19   testify about the document or who would be subject to cross-

20   examination.

21          Here we have the witness available and his facts and

22   his conclusions can be thoroughly tested on cross-examination.

23          There are other authorities on the same issue.  There is

24   another Federal case, Franklin vs. Skelly Oil Company, 141 Fed.

25   (2d) 564, particularly at pages 571 to 572.  This is another

1   case where an official statement, the report of a fire marshal
2   as to the cause of a fire, was involved.  The court said that
3   it would admit portions of that.  Again, this was an offer
4   without presenting the person who made the report for cross-
5   examination.

6   In both these cases I have cited the court's caution
7   against the allowance of such documents to the extent that
8   they contain conclusions and opinions which could not be
9   tested.

10  In our case the conclusions and opinions may be tested
11  by the very persons who prepared it and by any others whom
12  Mr. Veeder feels he wishes to cross-examine on it.

13  In the State court, relying upon Section 1875 of the
14  Code of Civil Procedure, which provides that courts take
15  judicial notice of public and private official acts of the
16  legislative, executive and judicial departments of the State
17  and of the United States, the California Supreme Court has held,
18  in the case of Vallejo Railroad Company vs. Reed Orchard
19  Company, 169 Cal. 145, particularly at 571, that the report
20  of the State Agricultural Society, the official's reports on
21  the agricultural resources and the interests of the State in
22  such resources, was admissible merely by introducing them in
23  evidence, even though there was no witness to testify about it
24  because it was an official statement.

25  And that is what this is.  Mr. Veeder's objections I

5953

1   don't think should be indulged any longer.  He is lengthening

2   the record, he is going to lengthen the trial, when he can

3   have all the opportunity made available in this court for cross-

4   examination and testing what has been offered.

5        MR. VEEDER:  Did you cite that as a Supreme Court case

6   of the State of California?

7        MR. MOSKOVITZ: Yes, I did.

8        MR. VEEDER:  I have checked into these authorities,

9   your Honor, a long time ago, and I have reviewed with great

10   care the laws, I think, of several states in regard to the

11   admissibility of publications.  I think the California Code

12   of Civil Procedure, Section 1918, I believe, has provision for

13   the introduction of official documents.  But I have not found,

14   and I don't believe that anyone will find, that under any

15   circumstances a document such as Bulletin 57, prepared in

16   contemplation of litigation and prepared by an adverse party

17   to that litigation while the case was in progress, was ever

18   admitted into evidence.

19        I don't believe, moreover, that counsel has found, or

20   that there will be found, a single case which supports the

21   proposition that for some two or three hundred pages, with

22   numerous tabulations and numerous plates in support of them,

23   that they would be admissible, because every plate in itself

24   is a conclusion and virtually every sentence in itself is a

25   conclusion.

1    Now, for me to undertake a page-by-page and line-by-

2  line interrogation, which I most certainly will do, seems to

3  me to be the surest way of lengthening this record.  Competent

4  counsel, with competent engineers, could put into the record

5  this entire case on direct examination and do it expeditiously

6  and do it, by and large, in a great deal shorter time than if

7  I were to say to Mr. James, "How did you arrive at this cross-

8  section" on cross-examination.  If he had said on direct exam-

9  ination, as I think he should, "Here is what we did.  Here

10 is how we did it.  And this is the reason for my conclusion,"

11 that would be a normal trial.

12    But for anyone to think, absurd though it may sound,

13 your Honor, that I would agree to try this case out of a

14 brochure, that's simply, as they say, whistling in the Dixie.

15 I wouldn't accept it, and I believe that time would be saved

16 if they put the man on the stand and subjected him first to

17 direct examination and then to cross-examination.

18    But there is no authority, I repeat, there is no author-

19 ity which I have been able to find-- and I looked, because I

20 have wanted in times past to do exactly this thing; it would

21 be so nice to be able to deal into the record 1500 conclusions--

22 I find no authority that would permit two volumes of engineer-

23 ing, geologic, hydrologic, climatologic conclusions to go into

24 the record.

25    THE COURT:  I understand, Mr. Moskovitz, that what you

1   want in the record is all of Chapter I, with the plates and

2   documents contained therein, all of Chapter II, and in Chapter

3   III from pages 107 to 140.

4        MR. MOSKOVITZ:  That is correct, your Honor, although

5   in connection with geology we are not even offering that much.

6   But this is what we have asked to have in evidence as of our

7   current expectation.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

jl

B-1 ML

1    MR. MOSKOVITZ:  For geology all we have offered are
2    about two pages in Chapter 1, a portion of Chapter 2, and
3    none of Chapter 3, and Appendix B, which is the geological
4    appendix, Volume II.

5    MR. VEEDER:  Now, are you withdrawing your request
6    to put in the soil?

7    MR. MOSKOVITZ:  I have never offered to put that in.

8    THE COURT:  He never requested it, Mr. Veeder.  140
9    was the end of the offer he made.

10   MR. VEEDER:  I just wanted to be sure.

11   THE COURT:  Well, come back to the witness stand,
12   Mr. James.

13

14               LAURENCE JAMES,

15   having been previously sworn as a witness on behalf of the
16   defendants, resumed the stand and testified further as
17   follows:-

18   MR. MOSKOVITZ:  I take it, your Honor, that you are
19   not going to rule at this time on the offer?

20   THE COURT:  I will do a little examining myself if
21   you will permit me.

22   MR. MOSKOVITZ:  Yes, certainly.

23   THE COURT:  Now, in Chapter 1 of California's Exhibit
24   1 what portion of that chapter were you responsible for,
25   Mr. James?   Was it page 13 and the first three lines on

1    page 14?

2         THE WITNESS:  Yes, your Honor.

3         THE COURT:  And did you prepare this portion I have

4    just referred to?

5         THE WITNESS:  It was prepared under my direction,

6    your Honor.

7         THE COURT:  By that you mean you had some men working

8    with you but you were directing their work and responsible

9    for the results?

10        THE WITNESS:  Yes, sir.

11        THE COURT:  You checked the results?

12        THE WITNESS:  Yes.

13        THE COURT:  Who were these men that were working with

14   you?

15        THE WITNESS:  It was Mr. Keith Jones and Mr. John

16   Roth, and Mr. Robert Fox.  Those men were not working all

17   at the same time, your Honor.  They were working at

18   different times.

19        THE COURT:  Mr. Roth?

20        THE WITNESS:  Yes, sir.

21        THE COURT:  And Mr. Fox and Mr. Jones.  Do you know

22   which one of the three prepared this draft that became

23   page 13 and the top part of 14?

24        THE WITNESS:  No, I don't.  I don't recall at this

25   time.

1    THE COURT:  You are familiar with the materials

2  contained on this page?

3    THE WITNESS:  Yes, sir.

4    THE COURT:  And in your opinion is that material

5  correct?

6    THE WITNESS:  Yes, sir.

7    THE COURT:  Where conclusions are involved or

8  opinions, those are your opinions; right?

9    THE WITNESS:  Yes, sir.

10    THE COURT:  Now, in Chapter 2 --   Let me go back.

11  If you were to be interrogated by question and answer, you

12  would testify substantially as set forth on page 13 and the

13  top three lines of 14?

14    THE WITNESS:  Yes, sir.

15    THE COURT:  Now, in Chapter 2, what pages, Mr.

16  Moskovitz?

17    MR. MOSKOVITZ:  Pages 62 through 81.

18    THE COURT:  Beginning on 62 is the break line

19  "underground hydrology."   Now, who was responsible for that

20  section that runs over to 66 where the word appears "geologic

21  investigation"?  Who was responsible for 62, 63, 64, and 65?

22    THE WITNESS:  Mr. Illingworth was responsible for the

23  preparation, and I assisted.

24    THE COURT:  And you are familiar with the matters that

25  are contained therein?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  And in connection with your work in

3     geology you slop over continually, do you not, into

4     hydrology?

5          THE WITNESS:  Yes, sir.  That is part of the job.

6          THE COURT:  There is no way to draw a hard and fast

7     line between geology and hydrology?

8          THE WITNESS:  That is correct.

9          THE COURT:  You have worked in problems of hydrology

10    and geology together as part of your experience, as you have

11    related here to the court?

12         THE WITNESS:  Yes, your Honor.

13         THE COURT:  If you were interrogated by question and

14    answer, would your testimony be substantially the same as

15    set forth in pages 62, 63, 64 and 65?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  And these pages, the material on these

18    pages is correct to the best of your knowledge and informa-

19    tion?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Beginning on page 66 where the break line

22    says, "Geologic investigation," who was responsible for that

23    material on through to page 69?

24         THE WITNESS:  I was, your Honor.

25         THE COURT:  Who worked with you on that?

5960

1      THE WITNESS:  Again, we follow our general team

2  approach.  We worked with the engineers, with Mr. Illingworth.

3  And, of course, those geologists that I have named that

4  were under my direction were involved, too.

5      THE COURT:  If you were interrogated by question and

6  answer as to the matters contained on these pages referred

7  to, would your answers be as appear in these pages?

8      THE WITNESS:  Yes, your Honor.

9      THE COURT:  And to the best of your knowledge and

10  information the materials set forth are incorrect?

11      THE WITNESS:  It is correct.

12      THE COURT:  How far does this run, Mr. Moskovitz?

13  You said to page --

14      MR. SACHSE:  81, your Honor.

15      THE COURT:  81.

16          Now, directing your attention to Table 15 which

17  follows immediately after page 69 and comprises pages 70,

18  71, and 72, entitled "Ground water basin data."  Who was

19  responsible for the preparation of this data?

20      THE WITNESS:  I was, your Honor.  Under my direction.

21      THE COURT:  Under your direction.  And who worked

22  with you on it?

23      THE WITNESS:  Well, again, this was one that was

24  worked on with Mr. Illingworth and with the other geologists --

25  with the geologists under my direction.  This was another

5961

one of those joint arrangements that we worked up with the engineers.

THE COURT:  And if you were interrogated by question and answer as to matters set forth on pages 70, 71, 72, to wit, Table 15, would your answers be as set forth on those three pages?

THE WITNESS:  Yes, your Honor.

THE COURT:  And is this table and the materials contained therein correct according to your information, the best information and belief?

THE WITNESS:  Yes, sir.

THE COURT:  We have a column, "Area in acres."  Where did you obtain that information?

THE WITNESS:  Those areas were planimetered from our map of the ground water basins from which plate --   Let me refer here and get the correct number.  Plates 11-A and 11-B.  The boundaries of the basins are shown on those.

THE COURT:  You mean by planimeter, methods by which you computed the acreage?

THE WITNESS:  Yes, sir, planimeter.

MR. VEEDER:  Could I interpose this one question?  Is the map from which you planimetered these areas in the courtroom?

THE WITNESS:  I am not sure that it is, Mr. Veeder.  This was done some time ago.

1      THE COURT:  Do you have that map available?

2      THE WITNESS:  I am sure it could be made available.

3      THE COURT:  Is it the map from which you made the

4  plate or is it the same as the plate or is it a different

5  map entirely?

6      THE WITNESS:  To my recollection it is the same one

7  the plate was made from.

8      THE COURT:  Make a note to find that map.

9      MR. MOSKOVITZ:  Yes, your Honor.  We will bring it.

10     THE COURT:  Now, in working out this Table 15, you

11  had available the geologic sections?

12     THE WITNESS:  Yes, sir.

13     THE COURT:  And the elevations shown thereon?

14     THE WITNESS:  Yes, sir, we had.

15     THE COURT:  Is that what you used to get the elevations,

16  the second and third columns?

17     THE WITNESS:  I am not sure that we used the cross-

18  sections, your Honor, to get the elevations.  I don't recall

19  just exactly where we got them, but we got them from a

20  reliable source.

21     MR. VEEDER:  A reliable source?

22     THE WITNESS:  Yes.

23     THE COURT:  Elevations are shown on these geologic

24  sections, are they not?

25     THE WITNESS:  Yes, they are.

THE COURT:  This could be checked against the section maps in evidence?

THE WITNESS:  Yes.

THE COURT:  And you have columns on wells.  Where did you get that material?

THE WITNESS:  This material came from the canvass of water wells that was made throughout the Santa Margarita watershed.  This canvass was made in part by geologists and in part by engineers.

THE COURT:  The men on the staff who were working with you on this team?

THE WITNESS:  Yes, sir.

THE COURT:  The same answer would apply to the yield of the wells?

THE WITNESS:  Yes, sir.

THE COURT:  Now, your next column is "Storage capacity in acre-feet."  How was that arrived at, the areas in acres?  And what else?

THE WITNESS:  Well, there is quite a lengthy procedure involved here, your Honor.  We took each of the basins and broke them down into sub-areas; and then, after considering the well logs, the logs of the wells that are located within those sub-areas and using those logs to obtain values of specific yields, other sediments within those areas, we computed the storage that lay beneath each one of those areas

1  and then summed them up.

2      THE COURT:  I thought you had told me that specific

3  yield had nothing to do with capacity.

4      THE WITNESS:  No, sir.  I think you are referring to

5  permeability or transmissibility.  I don't recall that I

6  said that.

7      MR. SACHSE:  Your Honor's question, your Honor, was

8  as to permeability.  I anticipated you and I am viewing the

9  transcript at that point.  You asked the witness if per-

10 meability had anything to do with it.

11     THE COURT:  Does specific yield have an effect upon

12 storage capacity?

13     THE WITNESS:  Very definitely, your Honor.

14     THE COURT:  How?

15     THE WITNESS:  Specific yield is the measure of the

16 amounts, the quantities of water within the sediments that

17 will be yielded as the water is drawn.

18     MR.MOSKOVITZ:  That has been the testimony.

19     THE COURT:  What has that got to do with the capacity

20 of a basin?

21     THE WITNESS:  Well, in computing the capacity, your

22 Honor, we, in effect, measure the volume of the sediments.

23 Once we have a volume of the sediments we have to determine

24 how much water can be obtained from that volume of sediments.

25 And the specific yield is the factor that we apply to the

1  volume of sediments in order to get the water that was

2  contained therein.

3  THE COURT:  Yes, if you were going to show me a figure

4  as to how much water could be taken out of a basin, I can

5  see where specific yield would be important.  But you have

6  this column listed as "Storage capacity."  How much water

7  would stay in there?  There might be a big difference between

8  water lying in a basin and how much other water you could get

9  out.

10  THE WITNESS:  Well, your Honor, in studies of this

11  nature the term "storage capacity" is used to indicate the

12  amount of water that is stored within a basin that can be

13  extracted.  This is common practice.  We do not --

14  THE COURT:  In other words, when you talk about

15  storage capacity, you are only talking about water that can

16  be taken out?

17  THE WITNESS:  Yes, your Honor.

18  MR. STAHLMAN:  If I may, your Honor has overlooked

19  that under that column it says, "Estimated usable storage

20  capacity."

21  THE COURT:  Yes, I see the word "usable."

22  Now, you did not take any uniform number of feet

23  of aquifer?  You based it on your studies of well logs as

24  to just how much water-bearing aquifer there was in the

25  basin regardless of how deep it was?

1    THE WITNESS:  We used our judgment to some extent in

2 computing the storage capacities.

3    THE COURT:  I realize you have to do that, because

4 you haven't well logs for every acre nor every square foot

5 of ground.  But I want to point up what I think is a

6 situation.  In the Government's presentation they said they

7 were going to take a hundred feet of the water-bearing

8 aquifer, drop down below the surface to where there was

9 water-bearing aquifer.  And they took a hundred feet across

10 the border.  Then, I think some allowance may be along the

11 edges.  You didn't do it that way.  You took the entire

12 amount of water-bearing aquifer which, to your best judgment,

13 laid in the basin?

14    THE WITNESS:  Not necessarily the entire amount,

15 your Honor.  For example, in Murrieta Basin these sediments

16 we know go down to tremendous depths and at these lower

17 depths we have very little information as to the characteris-

18 tics, their characteristics, so that in this area and other

19 similar areas we arbitrarily selected a depth above which we

20 figured, we considered as gross storage capacity.  For

21 example --   Excuse me.

22    THE COURT:  Go ahead.

23    THE WITNESS:  For example, in Murrieta Basin there are

24 a number of wells that go so many hundred feet -- I can't

25 recall the exact numbers -- in depth.  And to compute what

1  the storage capacity would be below the bottom of these

2  wells would be meaningless, because we don't have any control,

3  nothing to hang our hat on, so to speak.  So we took the

4  bottom of our total or gross storage capacity unit and as

5  near the bottom of these deeper wells.

6      THE COURT:  That is shown on your geologic sections

7  A A' and K K', as I recall.

8      THE WITNESS:  We didn't show the volume of our

9  storage unit on that.  The sections are intended to show

10  the general configuration of the formations that occur

11  within these basins.

12      THE COURT:  How could we tell?  From what documents

13  in this Exhibit L for identification could we tell how you

14  made the computation in Murrieta Basin?

15      THE WITNESS:  Well, just from the text, your Honor.

16      THE COURT:  Well, where in the text?  Show me in the

17  text where.

18      MR. MOSKOVITZ:  Your Honor, of course, the text

19  consists of the appendix as well as the main volume.

20      THE COURT:  I understand.  Text or appendix.

21      MR. VEEDER:  I wonder if the witness does.

22      THE WITNESS:  There is --  I refer your Honor to

23  Bulletin 57, Volume II, of page B-65.  This is a --

24      THE COURT:  B-65?

25      THE WITNESS:  B-65, yes, sir.

THE COURT:  All right.  Let me read it.

First order:  Where is this Table B-3 located that you refer to?

MR. SACHSE:  That is B-45.

MR. VEEDER:  I think this, your Honor --

THE COURT:  I find it.  Table B-3 starts at --

MR. VEEDER:  I hope that counsel actually will not do this any more.

THE COURT:  Just a second.  --starts at page B-46, Appendix B in Volume II, page 46.  All right.

1    MR. VEEDER:  I would like the record to show, your Honor,

2    that this witness did not know where to look; that Mr.

3    Moskovitz told him first where to look, and then Mr. Sachse

4    also told him where to look.

5    MR. SACHSE:  I would like the record to show that I

6    responded to your Honor's question as to where Table B-3 was.

7    MR. VEEDER:  And the question was to the witness, and

8    that is the point I make.

9    THE WITNESS:  I am quite familiar with this material,

10   your Honor.  It just takes me a little time to find it.

11   MR. VEEDER:  I will stipulate to that.

12   MR. MOSKOVITZ:  I think the record will show that we

13   have all been thumbing and fumbling through lots of exhibits

14   in this trial.

15   THE COURT:  If you are doing it for my benefit, just

16   stop; but if you are doing it for a record on appeal, have at

17   it.

18   MR. VEEDER:  May I have the question read, your Honor.

19   (The alternate reporter, who had reported the pending

20   question, had left the courtroom.)

21   MR. VEEDER:  Where are you reading now, Mr. James?

22   THE COURT:  I am reading something here.  Wait a minute,

23   if you will.  He is not doing anything for me now.  He can

24   read where he wants to.  I am looking over some of this material.

25   Well, I have read the material on pages 65 and 66, and

1    I have looked at Table B-4 on page 67, where specific yield

2    values are shown.  I find nothing as to how you arrived at

3    your computation of 136,000 acre feet for Murrieta Valley.

4           THE WITNESS:  Your Honor, this computing of these

5    storage capacities involves a lot of office study work.  We

6    have our work forms here in this room.  There are several

7    large envelopes full of data, as well as a cardboard bound

8    book approximately three-quarters of an inch or an inch in

9    thickness.  As I say, the procedure is quite involved and all

10   of the data that were used to compile these estimates are

11   contained within these work books and envelopes.  We drew

12   sketches of isopach maps and we drew sections and we compiled

13   tables.

14          THE COURT:  They are not in Bulletin 57?

15          THE WITNESS:  No, sir, they are not.

16          THE COURT:  Well, Mr. Moskovitz, you have your work cut

17   out as far as Table 15 is concerned.  I suggest that you do the

18   following:  First, look over the presentation made by the

19   Government on various basins-- they don't like to call it a

20   basin; they call it an underground water unit.

21          MR. SACHSE:  Water storage unit.

22          THE COURT:  Water storage unit.

23          MR. VEEDER:  Exhibit 17.

24          THE COURT:  Which is a distinction without a difference.

25   Look over it and see what they have on these various

1    underground storage units, which correspond to some of yours,

2    and if there is no substantial dispute as to what they have

3    set forth, then tell me so and let's forget about it.  Where

4    there is substantial dispute, and there undoubtedly will be

5    on Murrieta Basin and the bigger basins-- incidentally, some

6    of yours are broken down into smaller segments.

7         MR. MOSKOVITZ:  Yes, sir.

8         THE COURT:  Prepare a table in which you demonstrate

9    how you arrive at this acre feet, with the supporting data,

10   so that we can understand how it was done.  The description

11   in the Bulletin tells generally how it was done, but there is

12   no factual base to base it on.

13        MR. MOSKOVITZ:  I see what you want, your Honor.

14        THE COURT:  There is no use doing it on those where

15   there is no substantial dispute.  Substantial is a matter of

16   degree, of course.  But if the estimates by the Government on

17   some of these smaller units are substantially correct, let's

18   forget about it.  Let's not clutter up the record.  But

19   certainly on Murrieta-- I haven't looked these others over--

20   I will want that.

21        MR. MOSKOVITZ:  Yes, your Honor.  I think what you will

22   find is that in most of them the boundaries vary because of

23   the different method used to arrive at the boundary.  In those

24   cases we can show that the boundary is.

25        THE COURT:  Well, I don't really care if the boundaries

1    differ.  If the Government comes up with proof that there is

2    10,000 acre feet substantially in Diamond Basin or in Diamond

3    underwater storage unit, they call it, and if you say there

4    is 9,500 in Diamond Basin, I don't care about your areas.  You

5    can be a mile apart on your areas.  Substantially you are in

6    agreement that there is about so much water in storage up

7    there in that general area.  If you think that I am going to

8    make findings of the exact limits of some of these basins, we

9    would be here forever, showing what 10-acre or 20-acre piece

10   it cut across.  There might be cases where it might be material

11   because of the ownership matter or something like that.  But

12   it is not material at this stage of the proceeding.

13        MR. MOSKOVITZ:  We will undertake to show all the

14   differences that exist.  Many of these differences are differ-

15   ences of judgment as to where to stop and where to start,

16   which themselves in our opinion are not really controling.

17        THE COURT:  All I want is something that I can under-

18   stand.  The Government said, "We took a hundred feet.  We

19   didn't care whether we thought there was alluvium down for

20   2,000 feet.  We took a hundred feet of water-bearing aquifer."

21   We took specific yields on the bases shown in their charts,

22   similar to what you have in your charts.  We apportioned the

23   amount of the material and took our area and made our computa-

24   tion.  Give me something so that I can understand how it was

25   done.

1          MR. MOSKOVITZ:  Yes, sir.

2          THE COURT:  Beginning on page 73, Mr. James, there is

3    a description of the Anza Basin; 74, Murrieta Basin; 75, Pauba

4    Basin; 78, Santa Margarita Coastal Basin, and that carries

5    us down to Table 16.  Who prepared this material?

6          THE WITNESS:  This was again a joint effort, your Honor.

7          THE COURT:  Who was responsible for it?

8          THE WITNESS:  I believe I would say I was responsible

9    for that.  Of course, you recall that all of this is ultim-

10   ately Mr. Illingworth's responsibility, but I was directly

11   responsible for preparation of these pages.

12         MR. VEEDER:  Could I ask one question?  When he says

13   that he is responsible, does that mean that he did the in-

14   vestigation and that he wrote the report, or that he only

15   wrote the report based on the investigation by others?  Could

16   I have an answer to that question, sir?

17         THE WITNESS:  I directed the preparation of these pages.

18         MR. VEEDER:  I have asked the Court for a ruling.

19         THE COURT:  Your motion is overruled.

20   You directed the preparation of these pages?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Did you write them yourself?

23         THE WITNESS:  No, sir.

24         THE COURT:  And who wrote them, if you know?

25         THE WITNESS:  Your Honor, I believe that was Mr. Fox.

1          THE COURT:  It was worked on by a team also that looked

2     over that material?

3          THE WITNESS:  That is true.  Most all of this material

4     was shuffled around among the team.

5          THE COURT:  Is the material set forth therein accurate,

6     to the best of your information and belief?

7          THE WITNESS:  Yes, sir.

8          THE COURT:  And those matters that are matters of

9     opinion that are set forth therein, would they be your opinion

10    if you were interrogated about them?

11         THE WITNESS:  Yes.

12         THE COURT:  If you were interrogated by question and

13    answer on materials on pages 73 to 81 down to where Table 16

14    begins, would you so testify as shown in these pages?

15         THE WITNESS:  Yes, sir.

16         MR. VEEDER:  What was the last page to which your Honor

17    made reference?

18         THE COURT:  Page 81, just before the table starts.

19         Now Table 16 is a table based on water well yields;

20    is that right?

21         THE WITNESS:  Yes, sir.

22         THE COURT:  And you list in the first column the sub-

23    basins, and then next the number of wells tested.  Do you know

24    what wells they were that you tested?

25         THE WITNESS:  I believe this, to the best of my

1  recollection, I believe these are tests that we got either

2  from the G.S. or the Navy.

3  THE COURT:  Do you have anything in the Bulletin that

4  shows which were the two wells in the upper-- there are three

5  wells shown there in the Upper Basin-- which were those three

6  wells?

7  THE WITNESS:  Well, all of the wells are listed in the

8  Bulletin, of course, your Honor, but I am not sure that we could

9  point those out.

10  THE COURT:  Which are the three wells?

11  THE WITNESS:  I couldn't tell you offhand.

12  THE COURT:  You couldn't be cross-examined, then.   If

13  you couldn't tell us what the three wells were, no one would

14  be able to cross-examine to see whether you were right about

15  the figures set forth there or not, could they?

16  THE WITNESS:  I am sure that this information could be

17  obtained from our office studies and notes, and possibly it

18  appears somewhere here in the Bulletin.

19  THE COURT:  Well, see if the material appears in the

20  Bulletin.  If not, Mr. Moskovitz, prepare a new Table 16 that

21  gives us this data.

22  I take it your next column on Table 16, after the number

23  of wells, this was a pumping record of some kind?

24  THE WITNESS:  Yes.  To the best of my recollection,

25  your Honor, this material was all obtained from outside sources.

1        I don't believe we obtained this ourselves.

2            MR. VEEDER:  I didn't hear that last.

3            THE WITNESS:  I don't believe we ran these tests myself,

4    to the best of my recollection.  However, the source would be

5    on file.

6            THE COURT:  I am not concerned about who ran the test

7    in any kind of study.  You have to rely on work that other

8    people have done and you have to start with the premise that

9    they are probably correct until they are proven wrong.  You

10   gathered all that material together.  But I am interested in

11   which particular ones and where the source material is upon

12   which the table was based.

13           MR. MOSKOVITZ:  We will get that source material.  We

14   have it.

15           THE COURT:  That is all in Chapter II that you had in

16   mind from this witness; is that right?

17           MR. MOSKOVITZ:  That is all.

18           THE COURT:  Turning to Appendix B, Mr. James, do you

19   know who prepared this appendix?

20           THE WITNESS:  Yes, sir; it was prepared under my direc-

21   tion.

22           THE COURT:  It runs from page B-1 to B-67.  Who worked

23   with you on it?

24           THE WITNESS:  Mr. Fox prepared-- did most of the actual

25   writing, your Honor.

1    THE COURT: And it was again a team project where the

2 matter was discussed with various people of this geologic

3 team?

4    THE WITNESS: That is correct.

5    THE COURT: Are you familiar with the maters contained

6 therein?

7    THE WITNESS: Yes, sir.

8    THE COURT: Is it generally correct, according to your

9 best information and belief?

10    THE WITNESS: Yes, sir.

11    THE COURT: If you were interrogated by question and

12 answer as to that material, would these pages be in substance

13 your testimony?

14    THE WITNESS: Yes, sir.

15    THE COURT: I notice now that there is first set forth

16 some acknowledgements, which appears on B-5, and there is a

17 reference to 400 well logs. Do you have a summary somewhere

18 of which were those well logs?

19    THE WITNESS: We have those well logs, your Honor, only

20 they are not included in the Bulletin.

21    THE COURT: They are available, though?

22    THE WITNESS: Yes, they are. They are in Appendix F,

23 I believe it is, your Honor. Let me check the index.

24    MR. VEEDER: That is, the references; not the well logs?

25    THE WITNESS: Not the well logs; the well logs are not.

1    THE COURT:  Are these wells shown in Appendix F, are

2  there 400 of them shown there, or are these the 400, or are

3  there more than 400 and you took 400 out of the total number

4  of wells?

5    THE WITNESS:  Just a minute.  I will check that.  I

6  don't know how many wells there are listed in Table F, your

7  Honor, but the well logs, the wells that we used are included

8  in that table.

9    THE COURT:  Well, there are 70-some-odd pages, and

10  there are about 20 to a page.  It looks me like there are

11  about 1400, roughly speaking, wells shown.  The 400 that you

12  were talking about on Page B-5 are within those?

13    THE WITNESS:  Yes, they are.

14    THE COURT:  Mr. Moskovitz, do you have a document

15  showing which were these wells?

16    MR. MOSKOVITZ:  Yes, your Honor.  In one of the tables

17  here in Appendix F it explains what other data is available

18  than the specific data listed here, and I believe--

19    MR. VEEDER:  I would like to have the witness testify,

20  your Honor.

21    MR. MOSKOVITZ:  The Court asked me a question.

22    THE COURT:  Just a minute.  The objection is overruled.

23    MR. VEEDER:  I want to make a specific objection.  I

24  am going to object, specifically, that though the witness is

25  being interrogated by the Court, counsel is continually pointing

1    out the points and places of interest in the Bulletin and

2    thus assisting the witness to testify.

3              THE COURT:  My question was directed to Mr. Moskovitz.

4    What table are you referring to, Mr. Moskovitz?

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D-1 ML

1      MR. MOSKOVITZ:  If you look in Appendix F and run

2  across the page to, well, take, for example, page F-3.  I

3  think perhaps we had better go to F-4.  And if you run down

4  that page to Well 6, 1 West, 26Pl, and then across the page

5  under the heading "Other data available," it indicates,

6  "Water level log."  I believe that throughout there are those

7  cases which would lead you to examine the log compilations

8  which we do have in the courtroom.

9      THE COURT:  All right.  I am interested now in which

10  are the 400, approximately 400 well logs which were relied

11  upon.

12      MR. MOSKOVITZ:  We will check on that, although I

13  think that those notations would give you that information.

14      THE COURT:  You think that whenever a well log is

15  shown in Appendix F that those are the wells, that they total

16  about 400, and those are the wells?

17      MR. MOSKOVITZ:  I will have to check on that, your

18  Honor.

19      MR. VEEDER:  I renew my objection on the ground the

20  court is interrogating counsel and not the witness.  And I

21  submit, your Honor, that we have departed from --  No, no,

22  this is not funny to me, your Honor.  We have departed from

23  the rules of court to the point where I can not permit it

24  to go further without further objection.

25      THE COURT:  Objection overruled.

1    MR. VEEDER:  I didn't object to your Honor's leading

2    questions of this witness.  I let them go.  But you took

3    over.  You interrogated.  Now, we have a situation where

4    the witness can't testify but Mr. Moskovitz, with some

5    assistance from somebody else, testifies.

6         THE COURT:  Objection is overruled.

7         THE WITNESS:  Your Honor, may I make a comment in

8    this regard?

9         THE COURT:  Yes.

10        MR. VEEDER:  I object to the witness' commenting.

11        MR. MOSKOVITZ:  I think the witness has a right to

12   comment.  You are commenting all the time.

13        THE COURT:  When I want to hear from either of you,

14   I will call upon you.  Objection overruled.

15        What do you want to say, Mr. James?

16        THE WITNESS:  I just wanted to point out that in this

17   right-hand column on Table F that all of those wells that

18   it is so indicated have well logs.  That does not necessarily

19   mean that those logs were used in compiling the storage

20   capacities.  They were considered, your Honor.  In some

21   cases where a log was not felt to be reliable, some of those

22   were rejected.

23        THE COURT:  Where are the well logs?  Are they avail-

24   able?

25        MR. MOSKOVITZ:  Yes, they are, your Honor.  They are

1    right across the hall.

2         THE COURT:  400 of them?

3         MR. MOSKOVITZ:  The 400 are included among them.

4    We have them all across the hall.  We can identify them.

5         THE COURT:  I think these 400 well logs should be

6    identified, segregated into a separate file, if they are

7    the ones that were relied upon as indicated in B-5.

8         MR. MOSKOVITZ:  We will do that, and we will present

9    them here and put them in evidence, if that is your desire,

10   your Honor.

11        THE COURT:  Next thing you have is B-6, "Related

12   investigations and reports."  And I take it there you gathered

13   together what literature you could find generally on the

14   subject, is that right?

15        THE WITNESS:  Yes, sir.

16        MR. MOSKOVITZ:  Well, they are actually right here on

17   the table, your Honor.

18        THE COURT:  Next is called "Scope of geologic in-

19   vestigation."  That refers particularly to the scope of the

20   investigation?

21        THE WITNESS:  Yes.

22        THE COURT:  And on page B-10 then you say:  "The

23   results are presented in the following sections of that

24   appendix."  Then, there are listed Sections 2 to 8.  2:

25   "Physiography."  3:  "Geologic units."  4:  "Structures."

5:  "Geologic history."  6:  "Parents of ground water."
7:  "Ground water basins."  8:  "Procedure for estimating
underground storage capacity."  Then, these sections follow
in order.  Then, you come to Table B-1.  Now, who was
responsible for preparation of Table B-1?

THE WITNESS:  This table was prepared under my
direction, your Honor.

THE COURT:  Who worked on it?

THE WITNESS:  Mr. Fox, and, to some extent, Mr. Roth.

THE COURT:  And where did you get the information as
to the general character of the rock in these different
places?

THE WITNESS:  This was compiled by our geologist by
examining the materials in the field and in the course of
their geologic mapping, in the course of their other studies
in the watershed area.

THE COURT:  And your geologic age system series is a
matter of understanding geology and knowing where to classify
this particular kind of material?

THE WITNESS:  That is true, your Honor.

THE COURT:  "Geologic unit," what do you mean by that?

THE WITNESS:  Well, that classes it as to formation,
I think.

THE COURT:  Alluvium, residuum, so forth?

THE WITNESS:  Yes, sir.

D-2

1    THE COURT:  Next, is a symbol that is applied to that
2    type of material in the various plates?

3    THE WITNESS:  That is right.

4    THE COURT:  Now, the last column says, "Water-bearing
5    characteristics."  What is the source of your opinion there?

6    THE WITNESS:  Well, again we used the results of our
7    examinations of these formations in the field and the con-
8    sideration of the number and type of use in the wells which
9    penetrated them and general results of pump tests on these
10   wells.

11   THE COURT:  And that is largely a matter, then, of
12   opinion, is it not?

13   THE WITNESS:  Yes, it is.

14   THE COURT:  If you were interrogated about Table B-1
15   by question and answer, would you testify in substance to
16   what appears therein?

17   THE WITNESS:  Yes, sir.

18   THE COURT:  Is it correct to the best of your infor-
19   mation and belief?

20   THE WITNESS:  Yes, sir.

21   THE COURT:  And the opinions that appear there as
22   distinguished from the factual matters would be the opinions
23   that you would offer if you were questioned by the Court?

24   THE WITNESS:  Yes, sir.

25   THE COURT:  Or by counsel.

j20

5989

1    And the report goes on describing various matters,

2  terrace --

3    MR. VEEDER:  May I have that last statement?  Will you

4  read the last statement.

5    THE COURT:  The report goes on describing terrace

6  deposits, marine deposits, various of the systems.

7    MR. VEEDER:  Well, it is the report, your Honor,

8  isn't it?

9    THE COURT:  What?

10   MR. VEEDER:  You said, "the Court goes on."

11   THE COURT:  The report.  The report goes on.  Describ-

12  ing various systems, formations, locations or some of the

13  material.  That takes us up to B-39.  Now, as to the material

14  between B-1 and B-39, we have already asked you about the

15  Table B-1.  If you were interrogated as to the matter con-

16  tained therein by question and answer, would you testify as

17  set forth therein?

18   THE WITNESS:  Yes, sir.

19   THE COURT:  And is the matter contained therein accurate

20  to the best of your knowledge and belief?

21   THE WITNESS:  Yes, sir.

22   THE COURT:  And where matter of opinions are stated,

23  are those opinions which you would give in testimony if you

24  were interrogated about them?

25   THE WITNESS:  Yes, sir.

1     MR. VEEDER:  Did he say who prepared this?  Who

2  prepared B-2?

3     THE COURT:  We haven't come to B-2 yet.  Just now

4  coming to B-2.

5     Q   Now, Table B-2:  "Major faults and associated

6  features in Santa Margarita watershed and adjacent areas."

7  Who prepared the chart on the faults?

8     THE WITNESS:  It was prepared under my direction, your

9  Honor.

10     THE COURT:  Do you know who worked on them?

11     THE WITNESS:  Mr. Robert Fox, your Honor.

12     THE COURT:  Again, was this a team matter that was

13  discussed and worked over by the hydrologic-geologic team?

14     THE WITNESS:  Yes.  It was left more the responsibility

15  of the geologists than our other plates.  It was checked,

16  however, by our engineering group.

17     THE COURT:  And did you check it over?

18     THE WITNESS:  Yes, sir.

19     THE COURT:  And in your opinion is it correct?

20     THE WITNESS:  Yes, sir.

21     THE COURT:  Now, the chart shows the name of the fault,

22  the location, the trend and degrees, the movement, the depth.

23  Then appears a column:  "Barrier effect to ground water

24  movements."  That is a matter of opinion, is it?

25     THE WITNESS:  Yes, it is, substantiated by certain

1   observations that we made in the field.

2          THE COURT:  I notice that as to all the faults, with

3   the exception of one, the note appears, "Not apparent."  In

4   other words, no barrier effects of ground water movement.

5   In the case of Murrieta Basin, the statement is:  "Ground

6   water movement impeded and a ground water cascade produced.

7   Line of springs at northeast edge of Murrieta Valley is the

8   result.  Did you inspect that area in Murrieta Valley?

9          THE WITNESS:  Yes, I have.

10          THE COURT:  You have seen the springs?

11          THE WITNESS:  Yes, I have.

12          THE COURT:  You have seen the formation there, what

13   is upon the ground?

14          THE WITNESS:  Yes, sir.

15          THE COURT:  It is your opinion that there is not a

16   barrier but there is an impeding of this movement, is that

17   right?

18          THE WITNESS:  It is my opinion that there is not a

19   wholly impermeable barrier.

20          THE COURT:  In other words, that water passes through

21   this fault to a certain extent?

22          THE WITNESS:  That is a possibility, your Honor.  We

23   can't say for sure just exactly what happens underground.

24          THE COURT:  And this conclusion as to Murrieta, as to

25   the Wildomar Fault at the Murrieta Basin, this is your best

1    judgment as to the geology?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Now, you have next a column:  "Age of

4    faulting."  I take it that is a matter of geologic knowledge

5    of formations, and so forth, estimating the knowledge?

6          THE WITNESS:  This is true.

7          THE COURT:  The age, I mean?

8          THE WITNESS:  Of the age, which time the fault movement

9    was taking place.

10         THE COURT:  And then, finally, there is listed:

11   "The evidence of faulting."  And these are the things, I

12   take it, upon which you, in part, based your judgment?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  Fault evidences.

15         I would like to request Mr. Veeder over the noon

16   hour to give some consideration to the notation as to the

17   Wildomar Fault.  The conclusions stated on Table B-2, if I

18   recall, are pretty much in line with the testimony of the

19   Government witnesses.

20         MR. VEEDER:  I will check.

21         THE COURT:  And if it is, let's waste no more time on

22   it.  All the other faults are listed as having no apparent

23   barrier to water.  As I recall, the Government testimony was

24   that this fault line was not an impervious barrier, that it

25   did impede to a certain extent, that it was difficult to

1   tell how much water passed through it; and probably some did

2   but that some went over the top.  If that is true, then we

3   have got no issue on that.

4        MR. VEEDER:  I was wondering when the witness first

5   inspected the faults.  Was it in November, 1958?

6        THE WITNESS:  It was in 1950, Mr. Veeder.

7        THE COURT:  Did you see it again on a trip in 1958?

8        THE WITNESS:  Yes, your Honor.

9        THE COURT:  2:00 o'clock.

10        (Whereupon a recess was had at 12:00 o'clock noon until

11   2:00 o'clock p.m. of the same day.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SAN DIEGO, CALIFORNIA, THURSDAY, DECEMBER 4, 1958.  2:00 P.M.

2

3                         LAURENCE JAMES,

4    recalled as a witness in behalf of the defendant State of

5    California, having been previously sworn, testified further

6    as follows:

7         MR. MOSKOVITZ:  Your Honor, this morning you asked for

8    certain data. We have been able to get hold of some of it at

9    least and present it at this time.

10        THE COURT:  What data is that?

11        MR. MOSKOVITZ:  Your Honor asked me to check into rough

12   drafts of the Geology Appendix, and I have about three rough

13   drafts here in various stages of the preparation of the Geology

14   Appendix.

15        THE COURT:  We will mark them for identification.

16   They concern Exhibit L, don't they?

17        MR. MOSKOVITZ:  They concern Exhibit L, Appendix B.

18        THE COURT:  Appendix B.

19        MR. MOSKOVITZ:  Yes.  I haven't yet undertaken to find

20   out whether there are rough drafts available of the other

21   portions of the Bulletin.  But this is the Geology.

22        THE COURT:  Is there any order-- which is the first,

23   second and third?

24        MR. MOSKOVITZ:  There is one sheet which contains two

25   earlier drafts, and then the black book contains a later draft,

1    apparently one of the last.  They go in this order (indicating.)

2            THE COURT:  They are actually two documents?

3        MR. MOSKOVITZ:  Yes, your Honor.

4            THE COURT:  One has two drafts in it?

5        MR. MOSKOVITZ:  Yes.

6            THE COURT:  We will have to take an arbitrary number.

7    We will call it L Appendix B, D-1 and D-2, meaning draft 1 and

8    draft 2, marked for identification.

9            THE CLERK:  D-1 or Draft 1?

10           THE COURT:  Draft 1 and Draft 2 would be better, if

11   you can put it in that way.

12           (Documents marked Defendant California Exhibits

13   L Appendix B, Draft 1 and Draft 2 for Identification.)

14       MR. MOSKOVITZ:  As to the well logs, somewhere around

15   400 well logs that are referred to in Bulletin 57, Appendix

16   B-5, these are records of the Department of Water Resources,

17   of which we do not have copies, and if all of these are to be

18   put in evidence or marked I would like to have opportunity to

19   substitute copies. Most of these are copies of the same well

20   logs which are already in evidence by the Government.

21           THE COURT:  How big a job would it be to check and see

22   what well logs are in those volumes that are not in the exhibits

23   already in the record?  It would be just a clerical job,

24   wouldn't it?

25           MR. MOSKOVITZ:  It would be just a clerical job of

1    checking the numbers, yes.

2        THE COURT:  For the time being we will mark-- four

3    volumes, are there?

4        MR. MOSKOVITZ:  Yes, your Honor.

5        THE COURT:  --for identification.  Since they concern

6    well logs, let's call them L Appendix F, Logs 1, 2, 3, and 4.

7        MR. MOSKOVITZ:  Very well.

8        (Documents marked Defendant California Exhibit L

9    Appendix F, Logs 1, 2, 3, and 4 for Identification.)

10       MR. MOSKOVITZ:  Then may I have the opportunity to

11   withdraw them in order to compare them?

12       THE COURT:  You may.  And after you have ascertained

13   what logs are in those four volumes that are not already in

14   the record, you could limit yourself to supplying copies of

15   those new logs and withdraw the exhibit.

16       Is that satisfactory, Mr. Veeder?

17       MR. VEEDER:  Yes, your Honor.

18       MR. MOSKOVITZ:  Very well.

19       THE COURT:  So that will be for identification L Appendix

20   F, Logs 1, 2, 3 and 4.

21       MR. MOSKOVITZ:  Your Honor, you also asked for the map

22   on which the area of Murrieta Basin was planimetered, and I

23   have here and will ask the witness some questions, if you like,

24   but I have here the large scale geological areal map and the

25   overlay for Murrieta which was actually used to do the

1      planimetering.

2           THE COURT: To what document did that refer in Exhibit

3      F for Identification?

4           MR. MOSKOVITZ: This would refer to--

5           MR. VEEDER: That is Table 15.

6           MR. MOSKOVITZ: First of all, it would refer to Plates

7      10B and 11B, which were the plates showing the ground water

8      storage basins in the upper portion of the--

9           THE COURT: It also particularly concerned Table 15.

10      MR. MOSKOVITZ: Yes. Let me check the number.

11      MR. SACHSE: 15.

12      MR. MOSKOVITZ: Yes.

13           THE COURT: And did Table 15 appear in Appendix B?

14      MR. SACHSE: That is in Volume I.

15           MR. MOSKOVITZ: There is also a table in Appendix B

16      which refers to the area of the basin, and that is Table B-3.

17      That would be on page B-47. Page B-47 is where the Murrieta

18      Basin is analyzed.

19           MR. VEEDER: Murrieta Basin is simply a single example

20      of a great many others.

21           THE COURT: Well, we have to be arbitrary about this.

22      We will call it L -- Is there only the one series of tables in

23      the report?

24      MR. MOSKOVITZ: Yes, one series of tables throughout.

25           THE COURT: There is no duplication of table numbers?

1          MR. MOSKOVITZ:  Except when you get to the appendices.

2     Isn't that right?

3          THE COURT:  No, the tables in the Appendix have a letter

4     on them.

5          MR. MOSKOVITZ:  That's right.

6          THE COURT:  So we will call it L Table 15-1, which is

7     a map used to planimeter the Murrieta Basin.

8          (Defendant California Exhibit L, Table 15-1 (Map) marked

9     for Identification.)

10          MR. MOSKOVITZ:  Now, your Honor, we have furnished

11     this for illustrative purposes.  This is the one overlay,

12     although the map pertains to the whole watershed.

13          THE COURT:  Was the map also used to planimeter other

14     basins?

15          MR. MOSKOVITZ:  Yes.

16          THE COURT:  All the basins, in fact?

17          MR. MOSKOVITZ:  Yes.

18          THE COURT:  Table 15 concerns all the basins, doesn't

19     it?

20          MR. MOSKOVITZ:  Yes.

21          MR. VEEDER:  As does Table B-3.

22          THE COURT:  Yes.  Well, we have tied it into Table 15,

23     and it may be used any way you want to use it.  That is satis-

24     factory?

25          MR. MOSKOVITZ:  Yes.

1    THE COURT:  It may be marked for identification as L

2  Table 15-1

3    MR. MOSKOVITZ:  The overlay is loose.  It is not clipped

4  to the map.  Shall we give it a number?

5    THE COURT:  If you want to mark the overlay separately

6  it would be -2.

7    (Defendant California Exhibit L, Table 15-2 (Overlay)

8  marked for Identification.)

9    THE COURT:  Does that conclude the matter?

10    MR. MOSKOVITZ:  That concludes everything we have been

11  able to get now.  There were a couple of other tasks which you

12  asked us to do, which will take more time.

13    THE COURT:  Mr. Witness, in Appendix B to Exhibit L,

14  page B-17, it is stated, "Almost all the readily extractable

15  ground water is stored in the larger alluvium-filled valleys

16  which are in themselves distinctive in size, shape, depth and

17  permeability."  First of all, by the use of the word "alluvium"

18  there, I take it you mean younger and older alluvium?

19    THE WITNESS:  Yes, sir.

20    THE COURT:  And that is a generally correct statement,

21  is it?

22    THE WITNESS:  Yes, your Honor.

23    THE COURT:  On B-18 it is stated:  "Limited quantities

24  of ground water are found in the semi-consolidated Pleistocene

25  sediments which flank several of the alluviated valleys and

1   form permeable collecting areas for the sediments underlying

2   the valleys."

3       Now, by the words "semi-consolidated Pleistocene sedi-

4   ments," referring to Table B-1, what do you refer to?  They

5   are all within this quarternary system, I suppose?

6       THE WITNESS:  Yes, they are, your Honor.

7       THE COURT:  And what do they fall within-- the un-

8   differentiated upper Pleistocene sediments, marine deposits?

9       THE WITNESS:  Yes, sir, and the older alluvium.

10      THE COURT:  And the marine deposits marked Qm marine?

11      THE WITNESS:  No, the marine deposits are less perm-

12  eable.

13      THE COURT:  The marine and terrace deposits are not in-

14  cluded in that description?

15      THE WITNESS:  No, sir.

16      THE COURT:  And you said terrace and older alluvium?

17      THE WITNESS:  Yes.

18      THE COURT:  So actually, then, referring to Table B-1

19  in Appendix B to Exhibit L, you actually refer to the third and

20  fourth categories that you have listed there?

21      THE WITNESS:  Yes, sir.

22      THE COURT:  Peistocene to Recent and Upper Pleistocene?

23      THE WITNESS:  Yes.

24      THE COURT:  Is that right?

25      THE WITNESS:  Yes, your Honor.

1          THE COURT:  An inspection of Table B-1-- check me if I

2  am in error-- shows that there is no appreciable amount of

3  water in any of the systems except the quaternary system?

4          THE WITNESS:  That is right, your Honor.

5          THE COURT:  The only possible exception might be what--

6  La Jolla, with the Del Mar?

7          THE WITNESS:  The La Jolla formation in general con-

8  tains a salty water which is not usable.

9          THE COURT:  So we can eliminate the La Jolla unit from

10  consideration, then?

11          THE WITNESS:  In my opinion, yes, sir.

12          THE COURT:  As being any substantial source of ground

13  water?

14          THE WITNESS:  Yes, your Honor.

15          THE COURT:  And then as we go down the scale, in the

16  igneous rocks there is no appreciable amount of ground water,

17  it would appear, only in fissures, cracks and exceptional

18  places?

19          THE WITNESS:  That is correct.

20          THE COURT:  And the same would be true with the

21  metamorphic rocks?

22          THE WITNESS:  That is correct.

23          THE COURT:  We have completed our discussion of Table

24  B-2 at Page B-40.

25          Starting in at page B-41 there is a section called

1  "Geologic History," It runs over to page 44. Who prepared

2  this section?

3      THE WITNESS: This section was prepared under my direc-

4  tion, your Honor.

5      THE COURT: Who did most of the work on it?

6      THE WITNESS: Robert Fox.

7      THE COURT: And was it a team enterprise as the others

8  were?

9      THE WITNESS: Yes.

10     THE COURT: And are the matters stated in this portion

11  I referred to correct, according to your best information and

12  belief?

13     THE WITNESS: Yes.

14     MR. VEEDER: Your Honor, may I call your Honor's atten-

15  tion that No. 5, Geologic History, starts on B-41 and is

16  concluded on B-42, designation 6.

17     THE COURT: Pardon me, yes. I will limit my questions,

18  then, to that portion.

19     If you were examined under oath and questioned about

20  the subject matters referred to herein, would your answers

21  be the same as appears on B-41 and B-42?

22     THE WITNESS: Yes, sir.

23     THE COURT: And where matters of opinion are stated,

24  these would be your opinions?

25     THE WITNESS: Yes, sir.

1          THE COURT:  The next section is entitled "6  Occurrence

2    of Ground Water," which begins at B-42 and runs to B-44.  If

3    these same questions were asked you about that material, would

4    your answers be the same?

5          THE WITNESS:  Yes, sir.

6          THE COURT:  This again was Fox's work?

7          THE WITNESS:  Yes, your Honor.

8          In that respect, I might say that several of these

9    parts have been written, as for example started by Mr. Fox

10   and then they would be passed on to someone else and they

11   would perhaps insert a few comments and then it would move on

12   to another party, and in this manner it is rather difficult to

13   say sometimes just who wrote the whole thing.  But I would

14   say the bulk of this was actually written by Fox under my

15   direction.

16         THE COURT:  And at least an initial draft of it was

17   written by Fox?

18         THE WITNESS:  Yes.

19         THE COURT:  Before further revisions.

20         Plate 6 I admitted into evidence, did I not?

21         MR. MOSKOVITZ:  Yes, that is my understanding.

22         MR. VEEDER:  May I inquire, because it is not clear from

23   the notes that I made this morning, as to when Mr. Fox-- I

24   beg your pardon-- Mr. James is to provide the data referred to

25   on page 5884 of the transcript, lines 19 through 22, where

1      Mr. James was to give us the calculations on Murrieta.   "We

2      can over night give you a calculation on Murrieta as a sample

3      of how this was done, referring to the various elements we

4      have taken into account to arrive at that figure, that 136,000,"

5      I don't intend to interrupt your Honor, but--

6             THE COURT:  We went into that same thing again today

7      also in connection with Table 15, as I recall.

8             MR. VEEDER:  Yes.

9             THE COURT:  And I supplemented my remarks there by

10     asking Mr. Moskovitz to have prepared a breakdown of how this

11     calculation was made on Murrieta, and secondly to check the

12     other smaller basins, and if there was no substantial conflict

13     report to me, and if there was I want the same thing done for

14     the other basins.

15            MR. MOSKOVITZ:  We have already begun doing that, your

16     Honor.

17            THE COURT:  All right.

18            Now, referring to what is called "Section 7, Ground

19     Water Basins," part of Appendix B, beginning at Page 44 and

20     running down through Page 64, who originally prepared this

21     section?

22            THE WITNESS:  Well, this was prepared as a result of a

23     team approach, your Honor.  It was originally compiled into

24     text form by Mr. Robert Fox under my direction.

25            THE COURT:  And the team treatment given it?

1    THE WITNESS: Yes, your Honor.

2    THE COURT: And reviewed by you?

3    THE WITNESS: Yes, your Honor.

4    THE COURT: If you were called upon to testify in
5    detail as to matters set forth in that part of the exhibit,
6    would you testify as set forth in this section?

7    THE WITNESS: Yes.

8    THE COURT: Is the section correct, to the best of your
9    information and belief?

10    THE WITNESS: Yes.

11    THE COURT: And matters of opinion set forth in there
12    would be your opinion on matters therein contained?

13    THE WITNESS: Yes, sir.

14    THE COURT: Referring to the table at the bottom part
15    of page 64, it seems to be a similar table to the one we were
16    looking at earlier. Do you have a reference to that other
17    table, Mr. Moskovitz?

18    MR. MOSKOVITZ: Yes. That is Table 16 on page 81 of
19    Volum I.

20    THE COURT: Part of it at least is similar to that
21    table, is it not? Certainly the reference to the Upper Basin
22    is identical, is it not?

23    THE WITNESS: Yes, sir.

24    THE COURT: Now, my same comment that--

25    What is it, Table 18?

Case 3:51-cv-01247-JO-SBC   Document 4553   Filed 09/24/63   PageID.26733   Page 63 of 128

1       MR. MOSKOVITZ:  Table 18, page 81, your Honor.

2       THE COURT:  --would apply to this.  I think you should

3 give us a description of the wells tested in the different

4 basins and the source of the information for the yield of the

5 wells.

6       THE WITNESS:  We have started to do that, your Honor.

7       MR. VEEDER: Could we have the dates when those tests

8 were made?

9       THE WITNESS:   Yes.  If the date is indicated on the

10 text, we will have it for you.

11      THE COURT:  Table B-3, beginning at B-46, is in many

12 respects similar to another table that we discussed.

13      MR. MOSKOVITZ:  Table 15 in Volume 1 on page 70?

14      THE COURT:  Yes.  And my remarks as to Table 15 would

15 be applicable to Table B-3.

16      MR. VEEDER:  That is, in regard to basic data?

17      THE COURT:  Basic data.

18

19

20

21

22

23

24

25

F-1 ML

1    MR. MOSKOVITZ:  Your Honor, the basic --

2    THE COURT:  We have reference to whether there is any

3    dispute in some of these smaller ground water units or basins.

4    MR. MOSKOVITZ:  Yes, with respect to storage capacity

5    of these basins.

6    MR. VEEDER:  Could I tender a thought in that regard,

7    your Honor?  It is quite possible that there will not be a

8    great disparity, but we do believe that the conclusions that

9    are drawn from this data is what is basically and fundamentally

10   important.  The conclusion expressed by the State of

11   California, namely, that there is no more development upstream

12   to be expected by reason of the shortage of water is really

13   the crux of this matter.  These basic data are important, and

14   we desire to interrogate on them extensively to show --

15   THE COURT:  I can accommodate you right now, and if you

16   will point out where that conclusion is drawn in the report,

17   I will strike it out and require oral testimony on it.

18   MR. VEEDER:  All right.

19   THE COURT:  If that is the particular thing that is

20   bothering you.

21   MR. VEEDER:  Oh, it is just one of the things, your

22   Honor.

23   THE COURT:  I note already from notes I made on Table

24   B-3 that Mr. Moskovitz states that the lower basins in the

25   Santa Margarita coastal area, which the State called hydrographic

1    unit No. 6, are in capacity very close to the Government

2    figures.

3         MR. MOSKOVITZ: That is right, your Honor.  I think

4    Mr. Veeder is right, that on most of this basic data there

5    is no dispute.  It is a question of difference in the way it

6    was approached; the conclusions, there is some variance.

7         MR. VEEDER: Well, I didn't say that there is not a

8    great disparity between the basic data.  That is very

9    important.  I don't agree with what Mr. Moskovitz said.

10        THE COURT:  Overruled.

11        MR. MOSKOVITZ:  I like to be agreeable when I can.

12        MR. VEEDER:  Well, it is the safe --

13        THE COURT:  Now, there is one other section in

14   Appendix B called:  "Procedure for estimating ground water

15   storage capacity."  And who prepared this section, Mr.

16   Witness?

17        THE WITNESS:  This section was prepared under my

18   direction, your Honor.  Again, it is a team approach proposi-

19   tion.

20        THE COURT:  Is the matter set forth therein correct,

21   in your opinion, to the best of your knowledge and informa-

22   tion?

23        THE WITNESS:  Yes, sir.

24        THE COURT:  If you were called upon to testify, would

25   you testify as set forth on pages B-65 and B-66?

THE WITNESS:  Yes, sir.

THE COURT:  And the opinions stated therein are opinions which you would give upon testimony if you were asked for your opinion?

THE WITNESS:  Yes, sir.

THE COURT:  Table B-4 which we refer to is arbitrary, I mean arbitrary in the sense that you have selected a certain value of yield for different types of materials; right?

THE WITNESS:  Yes, sir.

THE COURT:  And I notice your yield runs from one to twenty-eight?

THE WITNESS:  That is correct.

THE COURT:  Is this a standard spread of yield for the different types of rock materials?

THE WITNESS:  Your Honor, these yield values are based on extensive laboratory tests that were made by the Division of Water Resources at the time of their south coastal basin investigation.  It terminated in 1934.  And it is common practice in our Division to use these laboratory results, making them applicable to other studies.

THE COURT:  In other words, this is your practice, to use a  spread  from one to what?  What is your maximum?

THE WITNESS:  To 28.  Sometimes to 30.

THE COURT:  In other words, the spread is from about

6009

1 to 30?

THE WITNESS:  Yes, sir.  1 to 28 in this investigation.

THE COURT:  Now, is this type of spread that you use also used by other scientific groups in the field of geology and hydrology?

THE WITNESS:  Yes, it is, your Honor.  Bulletin 45, which, as I mentioned, was a result of our south coastal basin studies is used extensively by many other organizations doing this type of work.

THE COURT:  And this assignment of values is based basically on Bulletin 45?

THE WITNESS:  Yes, sir.

THE COURT:  And where you list the type of material, I take it, this is the same situation that occurred when the Government presented their case:  you take a well log and try to figure out as best you can whether the driller meant clay when he said clay?

THE WITNESS:  That is true, sir.

THE COURT:  And attempt to group the material in one of the types shown on the left-hand column?

THE WITNESS:  That is true, your Honor.  In this central column here entitled "Description of material," it lists the unusual descriptions that occur on the many well logs that we utilized in making this study; and it also shows which one of the types that are shown on the left-hand

1  column of these descriptions that occurred on the log, how

2  they were used.

3      THE COURT:  So that the columns, description of

4  material, are, in substance, quotations from the type of thing

5  you find in well logs?

6      THE WITNESS:  They were taken off of the well logs in

7  the Santa Margarita River watershed.

8      THE COURT:  And according to your best judgment as a

9  geology engineer the group shown under the type of clay you

10  classified them together and called them clay and then

11  assigned the specific yield, which would be indicated by

12  Bulletin 45?

13      THE WITNESS:  Yes, sir.

14      THE COURT:  And this table is accurate to the best of

15  your knowledge and belief?

16      THE WITNESS:  Yes, sir.

17      THE COURT:  And this is the table which you used in

18  estimating the storage capacities of the basins?

19      THE WITNESS:  That is correct.

20      THE COURT:  So that we know that you based it upon

21  areal perimeter, upon this table, and on well logs.  We still

22  want further information as to what depth or the other

23  factors that went into making up the area of the basin?

24      THE WITNESS:  Yes, sir.

25      THE COURT:  Is that all the material that this witness

1    is concerned with?

2          MR. MOSKOVITZ:  All the material in State's Exhibit

3    L, yes, your Honor, in addition to the plates and the

4    appendices already received in evidence.

5          THE COURT:  There are two appendices received in

6    evidence so far:  F and G.

7          MR. MOSKOVITZ:  The depth to ground water in wells

8    and the water well data, that is correct.

9          THE COURT:  Where does this conclusion that has

10   bothered you so much, Mr. Veeder, appear?

11         MR. VEEDER:  The conclusion in regard -- about the

12   availability of water?

13         THE COURT:  About the development upstream.

14         MR. VEEDER:  Well, I think that is the very first

15   paragraph on page 1, your Honor, that we discussed this

16   morning.  You will observe that the very introduction of the

17   write-ups pertain to the statement that the readily avail-

18   able water has so limited agricultural endeavor that only

19   about six per cent of the total irrigable land in the water-

20   shed is presently irrigated.

21         THE COURT:  That doesn't bear on this other point you

22   make.  That talks about the present.  You told me you ob-

23   jected to some conclusion about the future development.

24         MR. VEEDER:  I think that the whole thesis and theme

25   of this bulletin is that upstream development --

THE COURT:  Mr. Luddy, Volume I must still be on my
desk.  Will you get it, please.

MR. VEEDER:  -- the whole thesis and theme of this
bulletin has been presented here, and by this witness, that
there would be no more ground water development of any
appreciable size because they doubted that the water could
be extracted from the older alluvium, particularly the areas
designated on our bulletin -- bulletin! -- on our Exhibit
15-A.  Now, I think that that is already in the record by
this witness.  And I think that --

THE COURT:  Where?

MR. VEEDER:  I believe yesterday he testified that
in his view this older alluvium was not an area which would
yield water to any appreciable extent.  Now, we disagree
with that.  We believe that it is entirely in error.  And we
believe, moreover --

THE COURT:  I don't think that is what he testified to
to start with.  I think his testimony was that there was a
permeability there, was less than elsewhere in the younger
alluvial, that they had water there and they didn't have
sufficient data to draw a conclusion.  Wasn't that the sub-
stance of it?

THE WITNESS:  That is correct, your Honor.

THE COURT:  That is his testimony.

MR. VEEDER:  Would you read that back to me, please,

1   Mr. Reporter.

2          (The reporter read back that portion of the record.)

3          MR. VEEDER:   In other words, as I understand it, the

4   State is simply saying, "We don't know whether there is or

5   is not water available in the older alluvium; we do not know

6   whether, if it is pumped down, it will affect surface runoff;

7   we do not have any data upon which to express conclusions in

8   regard to the older alluvium as disclosed on Plaintiff's

9   Exhibit 15-A," is that correct?

10          MR. MOSKOVITZ:   Your Honor, it seems to me --

11          MR. VEEDER:   Now, I asked a question.

12          THE COURT:   Just a minute.   If you are asking me,

13   just wait a minute.

14          MR. MOSKOVITZ:   May I make this comment:   It seems to

15   me Mr. Veeder can ask this very kind of question on cross-

16   examination and explore fully what is the position of the

17   State.   We haven't finished even our direct on that.

18          THE COURT:   I agree, Mr. Moskovitz.   Objection is

19   overruled.

20          MR. VEEDER:   It wasn't an objection.

21          THE COURT:   Well, if it is an objection, it is over-

22   ruled.   If it is a question to me, I let the record stand as

23   it is.   If it is a question of the witness, you can do it on

24   cross-examination.   But I merely repeat that the witness'

25   testimony so far has not gone to the extent that you intimate.

1          Now, what do you propose to do?  You have other

2  witnesses to identify some of the other appendices and other

3  parts of Chapters 1 and 2?

4          MR. MOSKOVITZ:  At this time I had planned to go ahead

5  and ask some more questions of Mr. James as to the remaining

6  portions of Exhibit L.  I hadn't planned to offer them until

7  the witnesses who would testify --

8          THE COURT:  I thought you had completed Mr. James on

9  Exhibit L.  Do you have other matters in Exhibit L you want

10 to interrogate him on?

11          MR. MOSKOVITZ:  I have matters which are not just in

12 Exhibit L itself but some opinions and conclusions and some

13 materials he has picked up in the field with explanations,

14 from photographs, experiments, which would help to put light

15 on some of these issues.

16          THE COURT:  All right.  Proceed.

17          Q  BY MR. MOSKOVITZ:  First of all, Mr. James, have

18 you made a comparison between the geologic units as mapped

19 in Exhibit L and the geologic units as mapped in the Government

20 exhibits?

21          Your Honor, I thought that it might be helpful to

22 you if I pointed out the differences that exist.

23          THE COURT:  Very definitely.  If you didn't do it, I

24 was going to ask it be done.

25          MR. MOSKOVITZ:  I will ask it.

j34

69115

Q First, let's have his answer to this question: Have you made the comparison?

A Yes, I have made such a comparison.

MR. MOSKOVITZ: I think we can perhaps start with Exhibit 15 of the Government's which covers the Upper Basin and have the differences --

MR. VEEDER: 15-A?

MR. MOSKOVITZ: I would like 15, which covers the whole Upper Basin. 15-A is only a portion of the exhibit.

Is that in here?

Q Now, with what plate in Exhibit L would you be comparing the geologic mapping that appears on Exhibit 15?

A Plate 13-B.

Q In 13-B there appears a large number of geologic units indicated by the different colors in the legend. Is there some way of comparing those and relating those large number of units to the four units which appear on Exhibit 15?

A I will try to point this out on this exhibit, if I may.

Q Will you please do so?

A First, I will point to the easterly end of Exhibit 15 and which is shown Terwilliger Valley and Coahuila Valley. On Exhibit 15 there is alluvium and basement complex indicated. Now, the State in its mapping differentiated

part of this basement complex into residuum.

May I have a pencil.  I will outline, in general, the differences.

I can point out.

MR. MOSKOVITZ:  He can just point them out.  I don't think it is necessary to mark them on there.

THE WITNESS:  Your Honor, this general area from this point -- and I point to near the intersection about one mile south of Township 6 line in the easterly end of the basin due north of Coahuila Valley about three miles -- commencing from that point and extending down south to a point below Coahuila, about one mile below Coahuila Valley, hence eastward to the easterly basin boundary, and thence northeasterly to the fault here -- which, I presume, is the San Jacinto Fault -- and thence generally along that fault to the north boundary of the basin, and thence westerly to point of beginning.  In that general area.  The State has shown that, the basement complex to have weathered to residuum.

THE COURT:  It is your opinion that there is any substantial amount of water in that residual?

THE WITNESS:  No, sir, not a great deal.

MR. MOSKOVITZ:  Your Honor, many of these differences we do not believe are significant from a water-bearing point of view, but, if you would like, we could point them out.

1    THE COURT:  I can see these things.  Of what significance

2  are they?  Why should we waste time?

3    MR. MOSKOVITZ:  We will have the witness do it himself;

4  just summarize briefly what the differences are and limit

5  himself to explaining the differences which do have water

6  movement and water-bearing significance.

7    THE COURT:  What are your comments about the alluvial

8   basin  you show which you called -- Terwilliger?

9    MR. MOSKOVITZ:  We call it Anza.

10    THE WITNESS: Anza, we call it.

11    THE COURT:  How does that compare with the one on

12  Government's 15?

13    THE WITNESS:  That compares fairly favorably, your

14  Honor.

15    THE COURT:  You have an orange-colored material

16  marked Qtoa as terrace deposits.  That same area on the

17  Government's exhibit is shown as younger alluvial, or it is

18  shown as alluvial.

19    THE WITNESS:  That is true.  There are some differences.

20  There are a number of differences on the two maps which we

21  could tabulate.  It would be by sections, which would

22  require a lot of tabulation.  As far as I am concerned, in

23  general we agree, with the exception of the alluvium in a

24  few areas of older alluvium -- recent alluvium, older

25  alluvium and residuum; there are a few differences there.

1   In brief, I think this is a result of our doing a more

2   detailed mapping study in this upper watershed area.

3       Q   BY MR. MOSKOVITZ:  Could you point out the

4   differences that exist in the area on Exhibit 15 in the

5   vicinity of  Auld   Valley and French Valley which is mapped

6   on Exhibit 15 as weathered basement complex, and that area

7   as mapped on Plate 13-B of Exhibit L?

8       A   In that area that you mention we show a few square

9   miles in this general region here -- and I point to the

10  south side of  Auld   Valley, in general.  We mapped some --

11      THE COURT:  Green-colored material on Exhibit 15.

12      THE WITNESS:  Right.  We mapped some older alluvium

13  in that area, whereas the G.S. shows it all as gray; BCW.

14      MR. VEEDER:  It would be better to use 15-A on that.

15  We have it more detailed on 15-A, rather than on 15.

16      MR. MOSKOVITZ:  Is there a difference, Mr. Veeder?

17      MR. VEEDER:  No, I don't believe there is a difference,

18  but I think the references are more easily accomplished.

19  Certainly, it is a larger scale.

20      THE COURT:  Take the area which is shown in the

21  orange-colored material on Exhibit 15 east of Murrieta

22  Valley, south of the Pauba Valley, that large area of

23  orange-colored material which, in the Government's case,

24  was shown as older alluvial or -- Is that also called

25  continental?

1    MR. MOSKOVITZ:  Older continental deposits.

2    THE WITNESS:  Older continental deposits, your Honor.

3    THE COURT:  Now, you have almost the same identical

4    area shown in your Plate 13-B with also a bright orange

5    color with the symbol Qtoa.   Any substantial difference

6    between the designations made by the Government and made

7    by the State of California?

8    THE WITNESS:  Not in my opinion, your Honor, in that

9    area.

10   THE COURT:  Take the area around the Vail reservoir.

11   It would be north of Vail reservoir, south and west of it,

12   east of it, and another section of the orange-colored

13   material that runs to the northwest -- I can't see the name

14   of that valley.

15   MR. VEEDER:  Northeast.

16   MR. MOSKOVITZ:  Northeast, you mean, your Honor.

17   THE COURT:  Yes, northeast.  There where you are

18   pointing.

19   THE WITNESS:  That is Lancaster.

20   THE COURT:  Lancaster Valley.  Now, you have almost

21   the same area as shown on Exhibit 15, marked on the State

22   of California's Exhibit L Plate 13-B with the orange cross-

23   hatch on yellow background and with the symbol O --

24   THE WITNESS:  Qps, your Honor.

25   MR. MOSKOVITZ:  Qps.

1    THE COURT:  Oh, Qps.  Any substantial difference
2    there between the State of California and the United States
3    in their showing?

4    THE WITNESS:  The only difference, your Honor, is that
5    we differentiated the Qps from the Qtoa in our mapping.

6    THE COURT:  What is the difference, in your opinion,
7    between the material of the two areas?

8    THE WITNESS:  These materials are quite similar.
9    Their topographic expression is somewhat different in the
10   easterly area which you mentioned, and they are perhaps
11   somewhat more consolidated.  They are quite similar.

12   MR. MOSKOVITZ:  Your Honor, one of the exhibits we
13   marked this afternoon is a large-scaled map of the 13-B.
14   Would it be convenient to put that up on one of the easels
15   here?

16   THE COURT:  Yes.

17   Are the materials sufficiently alike that you
18   would not take offense with the Government's characterization
19   of those materials as shown on Exhibit 15?

20   THE WITNESS:  I wouldn't take offense, your Honor.

21   THE COURT:  In other words, that would be within the
22   realm of geologic opinion, within the realm of variation of
23   experts who have given geologic opinions?

24   THE WITNESS:  That is my opinion.

25   THE COURT:  What other differences, substantial

differences are there between the geologic mapping on Government's 15 and California's L - 13-B?

THE WITNESS:  On California's 13-B we have mapped in somewhat greater detail the faults along the southwest side of Murrieta Valley, and we also have mapped a few additional faults on the northeast side of that valley.  There are a number of sections within this general area -- and I refer to the area north of Vail Dam and slightly to the northeast of Vail Dam -- where the State has mapped residuum, and in which the Exhibit 15, the material is shown as unweathered basement complex.

THE COURT:  The only difference geologically between the two is the extent of weathering, is that right?

THE WITNESS:  That is correct, your Honor.

THE COURT:  Basement complex, when it is weathered, becomes residuum?

THE WITNESS:  That is correct.

MR. MOSKOVITZ:  Your Honor, it has been pointed out to me that the coloring on this large-scale map does vary from the coloring in Exhibit 13-B, and it may be confusing to work back and forth.  So perhaps I will withdraw the suggestion that we refer to it.

THE COURT:  I think we can work from the plates we have before us.

MR. MOSKOVITZ:  Yes.

THE COURT:  Go ahead, Mr. Moskovitz.

Q  BY MR. MOSKOVITZ:  Are there any other substantial areas of difference between the mapping on Exhibit 15 and in Exhibit Plate 13-B?

A  I believe there are a lot of smaller details which --

Q  Are they of any significance, in your opinion?

A  Not in my opinion.

Q  Let us move into Plaintiff's Exhibit number -- let's see what number this is.

MR. VEEDER:  37.

Q  BY MR. MOSKOVITZ:  -- 37, which is the areal geology of the portion of the Santa Margarita River within Camp Pendleton and related military establishments.

THE COURT:  What is the number again?

MR. MOSKOVITZ:  Exhibit 37.

Q  With what plate in Exhibit L would you compare the geological units that appear on Exhibit 37?

A  Plate 13-A.

Q  And in your opinion are there any substantial differences in the mapping of the geological units between Plate 13-A, the portion of 13-A, which compares with the Plaintiff's Exhibit No. 37?

A  I would say other than some differences in the mapping of the residuum there are no significant differences.

THE COURT:  What is this difference about the residuum?

THE WITNESS:  This difference, your Honor, lies in the vicinity of Lake O'Neill, in the blue area shown east of O'Neill and north and farther over to the west; in that area the State maps this material as residuum.

1          THE COURT:  And you map it as?

2          THE WITNESS:  And that is what we map it as.

3          THE COURT:  And the United States maps it as basement

4  complex?

5          THE WITNESS:  Yes, your Honor.

6          THE COURT: There is a difference between the watershed

7  line shown adjacent to the ocean--

8          THE WITNESS:  I was limiting my testimony here to the

9  geology, your Honor.

10          THE COURT:  Yes.

11  BY MR. MOSKOVITZ:

12          Q  Calling your attention to Plaintiff's Exhibit 70,

13  which shows the geology of a portion of the Santa Margarita

14  River watershed below Temecula-- it includes the Fallbrook

15  area and also shows Lake O'Neill to the south-- referring to the

16  mapping of the area in the vicinity of Lake O'Neill to the

17  south, have you made any comparison between that and the

18  mapping of that same area on Plaintiff's Exhibit 37?

19          A  On Plaintiff's Exhibit 37, as I previously testified,

20  they show basement complex unweathered in this vicinity of

21  Lake O'Neill, whereas on Exhibit No. 70 in that same region

22  residuum is shown, and except to the north of Lake O'Neill

23  they show a layer of terrace material which I presume is over-

24  lying residuum.

25          Q  Have you made any comparison between the geology

1    shown on Plaintiff's Exhibit 70 and Plate 13A of Exhibit L?

2        A  Yes, I have, and the two exhibits you mentioned are

3    in good agreement.

4        Q  Does this also refer to the mapping of the residuum

5    north of Lake O'Neill?

6        A  Yes, it does.

7        Q  Now, turing to Plaintiff's Exhibit 67, which is a

8    geological map of the De Luz Creek watershed, have you made

9    a comparison between the areas mapped there and Plate 13A of

10   Exhibit L?

11       A  Yes, I have, and these two exhibits appear to be

12   in reasonable agreement.

13       THE COURT:  Plaintiff's Exhibit 67 is being compared

14   with what?

15       THE WITNESS:  Plate 13A, your Honor.

16   BY MR. MOSKOVITZ:

17       Q  Referring to Plaintiff's Exhibit 69, which is the

18   Sandia Creek watershed geology, have you made a comparison

19   between that exhibit and State Exhibit L, Plate 13A?

20       A  Yes, I have, and these appear to be in reasonable

     agreement.

         THE COURT:  You have one more.  You have De Luz.

         MR. MOSKOVITZ: We just did that, your Honor.

         THE COURT:  Exhibit 69?

         MR. MOSKOVITZ:  Yes, your Honor.

1      MR. SACHSE:  No, 67.  It is underneath.

2      MR. MOSKOVITZ:  67 is De Luz.

3      THE COURT:  They have one more-- 69.  Which one do you

4   have in front of you now?

5      MR. MOSKOVITZ:  69 is the one we just covered, which

6   is Sandia.  67, De Luz, has been covered, and 70 we referred

7   to previously.

8      THE COURT: All right.

9   BY MR. MOSKOVITZ:

10     Q   Now, in your investigations in the Santa Margarita

11   River watershed, did you have occasion to pick up specimens of

12   rocks and make an inspection of them for purposes of coming

13   to opinions as to their permeability?

14     A   Yes, I have.

15     Q   And in what area were those specimens obtained?

16     MR. VEEDER:  Are you reading from your notes, Mr. James,

17   at the present time?

18     THE WITNESS:  I am not reading from them.  I am thumbing

19   through them.

20     MR. MOSKOVITZ:  I think perhaps we should take off the

21   exhibits of the lower basin (removing exhibits from the board.)

22     Q   Mr. James, would you come to the easel and referring

23   to Exhibits 15A and 15, whichever is the more convenient one

24   to refer to, point out the general area where the inspection

25   tour was made and give the dates of this tour.

1          A  The dates of the tour were November 22nd, 23rd and

2   24th, 1958.

3          Q  I hand you now California's Exhibit M-1 for Iden-

4   tification and ask you to identify what that exhibit is.

5          A  This is a sample of older alluvium Qtoa which was

6   taken 100 feet east of the bridge on Highway 71 where the

7   bridge crosses Temecula Creek.  It was taken in the Northeast

8   Quarter of Section 14, Township 8 South, Range 2 West.

9          MR. VEEDER:  On 15-A?

10         THE WITNESS:  I am referring to Exhibit 15-A.

11  BY MR. MOSKOVITZ:

12         Q  And where was this exhibit taken from precisely?

13         A  It was taken from the road cut where the highway

14  enters the older alluvium about a hundred feet east from the

15  end of the bridge.  This material is a consolidated sandstone

16  that is moderately well cemented, and in my opinion it is

17  relatively--

18         MR. VEEDER:  I object.  There is no question pending.

19         MR. MOSKOVITZ:  I would like to have his opinion as to

20  its permeability.

21         THE WITNESS:  It is relatively impermeable.

22         THE COURT:  Are you objecting, Mr. Veeder?

23         MR. VEEDER:  Yes, I was, your Honor.  I don't like these

24  speeches.  I want to have it by question and answer.

25         THE COURT:  Make your objection.

G2

1    MR. VEEDER:  I did.

2    THE COURT:  What was it?

3    MR. VEEDER:  I objected that he was going ahead and

4  expressing an opinion without being asked a question.

5  BY MR. MOSKOVITZ:

6    Q  What evidences in this sample Exhibit M-1 have

7  caused you to come to the conclusion that it is of low

8  permeability?

9    A  Chiefly the manner in which it is cemented, and

10  the fact that it is a relatively fine-grained material.  This

11  is the material that flanks the Pauba Basin in that area.

12    THE COURT:  Can we put a piece of that in water?

13    MR. MOSKOVITZ:  Yes, your Honor.

14    THE WITNESS:  You may if you want.

15    MR. MOSKOVITZ: We are going to have some other ex-

16  periments with water later on, your Honor.

17    THE COURT:  Bring me an ash tray with a little bit of

18  water in it.

19    MR. MOSKOVITZ:  We are going to have the water permea-

20  bility test.

21    THE COURT:  Here is some water right up on my bench

22  here.

23    MR. VEEDER:  This is from Pauba, did you say?

24    MR. MOSKOVITZ:  Your Honor, later on we are going to

25  have some other experiments on the relationship between how a

1    sample acts when water is put on it and its permeability, and

2    I think this will tell you quite well.

3         THE COURT:  All right.  Who has a piece of this?

4         MR. VEEDER:  Just reach in the bag.

5         THE COURT:  Break a piece off?

6         MR. MOSKOVITZ:  Here is a fairly good-sized piece, if

7    you want to try it.

8              MR. VEEDER:  Is it the same?

9    BY MR. MOSKOVITZ:

10        Q  Are these two pieces from the same place, Mr. James?

11        THE WITNESS:  Yes, they are.

12        THE COURT:  I am taking a portion of California's

13   Exhibit M-1, which appears to be identical to the bigger

14   portion remaining in the bag, and I am putting it in water.

15        MR. VEEDER:  Highly permeable.

16        THE COURT:  The piece of rock was approximately two

17   inches square at the base and sort of a pyramid style about

18   two inches high.

19        MR. VEEDER:  May I inquire, this was from a road cut?

20        THE WITNESS:  Yes.

21        THE COURT:  At the end of one minute the bottom portion

22   is apparently dissolved, the water has seeped up partway into

23   the upper portion of it.

24   BY MR. MOSKOVITZ:

25        Q  In your opinion, Mr. James, is the experiment which

1    has just been performed by the Court a reliable indication

2    of the permeability of the material?

3         THE WITNESS:  In my opinion, it is not.  I have had

4    considerable experience on my own of judging the permeability

5    of material.  In fact, we have taken some samples, geologists

6    under my direction, in the Sacramento area.

7         MR. VEEDER:  I object on the grounds that this is

8    irrelevant and immaterial, not tending to prove any issue, if

9    he doesn't show the materials are the same.

10        THE COURT:  Overruled.

11        THE WITNESS:  And these materials, at my direction, have

12   been subjected to a similar, or I should say a controlled

13   laboratory experiment in which they were immersed and the times

14   for disintegration were noted.  The permeabilities of the

15   samples were measured in the laboratory.  They were determined

16   to be quite low.  In fact, several of the materials which we

17   experimented with are materials which will be used to construct

18   the impermeable core of the Oroville Dam when it is built.

19   Another of the materials experimented with is from the founda-

20   tion of the Mammoth Pool Dam, which is now being constructed

21   by the Southern California Edison Company on the San Joaquin

22   River.  And there were experiments run on some additional

23   samples, and we do have those samples here today and we would

24   be glad to demonstrate.

25        MR. MOSKOVITZ:  Your Honor, at this point I would like

X M-1

1    to offer Defendant's Exhibit M-1 in evidence.

2         THE COURT:  Defendant's M-1 received.

3         (Defendant's Exhibit M-1 for Identification was received

4    in evidence.)

5         MR. SACHSE:  Is that the one you just did the experiment

6    with?

7         MR. MOSKOVITZ:  That is the one on which the experiment

8    was just made.

9    BY MR. MOSKOVITZ:

10        Q  Do you have a report of the permeability of the

11   material that you have just referred to from various dam cores,

12   et cetera?

13        A  Yes, I do.

14        THE COURT: What is your foundation to show the similarity

15   between these matters and the report you are going to give us

16   on this?

17        MR. MOSKOVITZ:  Your Honor, these experiments will show

18   that materials that test low for permeability, when placed in

19   water, fall apart, which is evidence that the fact that

20   material falls apart in water has no relationship whatsoever

21   to what its permeability will be.  And the reason we have this

22   material in Plaintiff's Exhibit M series for Identification

23   is that those were tested in a scientific laboratory with

24   accepted methods to determine permeability, and we will show

25   that the experiment of putting these portions of samples in

1  water doesn't show anything. They will fall apart. Yet they

2  are of established very low permeability.

3      THE COURT: There is a non sequitur there somewhere.

4  Assume that whether it dissolved might bear on the experiment.

5  The fact that you have certain kinds of material maybe which

6  you don't offer to show are similar to materials in this

7  watershed, and the fact that you offer to show that they do

8  fall apart and dissolve when put into water and that they

9  have little permeability still leaves wide open the question

10  of what they are composed, and if they are not similar to the

11  materials here many things could happen. I am no chemist or

12  geologist, but you just take two factors: (1) That they are

13  tested and have low permeability; and (2) That they dissolve

14  in water. The third factor is unknown: What are they composed

15  of?

16      MR. MOSKOVITZ: We can show what they are composed of,

17  your Honor. But the purpose of the exhibits which we are

18  now about to offer and have experiments performed on is not

19  to prove what the permeability of the older continental

20  deposits is, but to prove that you cannot test that permeability

21  by immersing samples in water. That is not a test, because

22  materials proved to be low in permeability fall apart as readily

23  or more readily than the sample you have just seen, M-1. That

24  is the purpose.

25      THE COURT: How many of these experiments do you want

1      MR. MOSKOVITZ:  We can put one on for illustrative

2  purposes, your Honor.

3      MR. VEEDER:  Until there is some foundation, I will

4  object.

5      MR. MOSKOVITZ:  We will establish the foundation where

6  the sample was obtained.

7      THE COURT:  We will take a recess.  Set up the ex-

8  periment.

9      MR. MOSKOVITZ:  Very well, your Honor.

10      (Recess.)

11  BY MR. MOSKOVITZ:

12      Q  Mr. James, I hand you California's Exhibit M-2 for

13  Identification and ask you to identify what that is.

14      A  This is a sample of material from the Mammoth Pool

15  Dam Site on the San Juaquin River in California.  The sample

16  was collected by geologists under my direction for the purpose

17  of conducting a controled experiment to determine what the

18  effect of immersion in water might relate that to permeability.

19      MR. VEEDER:  May I hear that last part?

20      (The reporter read the last part of the answer.)

21  BY MR. MOSKOVITZ:

22      Q  Now, who requested the test to be performed?

23      A  I did.

24      Q  And by whom was it performed?

25      A  It was performed in the Soils Laboratory of the

1    California Department of Water Resources.

2        THE COURT: That piece is gone.

3        THE WITNESS: We have another one.

4        MR. MOSKOVITZ: Fortunately, we have one morepiece.

5        THE COURT: There are some little pieces there.

6        MR. MOSKOVITZ: We will treasure this one.

7        Q Was this test performed in the ordinary course of

8 the usual procedure of the Department of Water Resources?

9        A Yes, it was. Our regular procedure is for our

10 geologists or engineers to request that soil tests be run in

11 our laboratory. The tests are then run by the soil mechanics

12 technician.

13        Q What type of test or tests were run on this par-

14 ticular sample?

15        A Well, the standard test for permeability, in accord-

16 ance with the American Society of Testing Materials' specifica-

17 tions was run on this material. Also, there were some other

18 properties of the soil determined: Its void ratio, its dry

19 density, its mechanical analysis was also run.

20        Q And was a report rendered to you on these properties?

21        A Yes.

22        Q Would you relate what the results were as to the

23 permeability of this sample?

24        MR. VEEDER: I object on the grounds that it is the

25 purest kind of hearsay, your Honor.

1    MR. MOSKOVITZ:  Your Honor, this test was made in the

2    ordinary course of the Department of Water Resources.  That is

3    how they always do it.

4    THE COURT:  Were you there?

5    THE WITNESS:  No, sir.

6    THE COURT:  Do you have the written report?

7    THE WITNESS:  Yes, I do.

8    THE COURT:  What is wrong with letting him use the

9    written report?

10   MR. VEEDER:  I desire to have the man who made the test

11   here.

12   MR. MOSKOVITZ:  I think this is a well-accepted excep-

13   tion.  I have some cases on this.

14   MR. VEEDER:  It makes no difference to me whether it

15   is well-accepted or not.  If the man who made the test is not

16   here, it is hearsay, and we object to it accordingly.  I have

17   other objections, but thefirst one is hearsay, basically.

18   MR. MOSKOVITZ:  If you want to hear it, your Honor.

19   THE COURT:  What is your case?

20   MR. MOSKOVITZ:  Your Honor, I cite the case of Moran

21   vs. Pittsburgh Des Moines Steel Company, District Court of

22   Pennsylvania, 1949.  The citation is 86 Fed. Supp. 255, at 276.

23   This was a wrongful death action and involved in this case was

24   a tank which was blown up and some tests had been performed

25   sometime before on the steel from which the tank had been

Case 3:51-cv-01247-JO-SBC   Document 4553   Filed 09/24/63   PageID.26764   Page 94 of 128

1    constructed.

2           THE COURT: Who was called as a witness?

3           MR. MOSKOVITZ:  A witness was called who had not con-

4    ducted any tests-- his name was Jacobson, and the question

5    was whether his explanation of certain reports made available

6    to him by other agencies relative to technical and scientific

7    investigations which they had made on the steel, whether his

8    testimony as to that was admissible, and the court said they

9    were admissible, and this is a quotation-- I don't have the

10   quotation here now, but I can secure it.  But the court held

11   that under--

12          MR. VEEDER:  We have the volume downstairs.

13          MR. MOSKOVITZ:   --Section 1732 of 28 U. S. Code that

14   this was admissible as a business record.  It was a memorandum

15   made in the ordinary course of the business of this testing

16   agency and was admissible to prove that the test was made and

17   that the results were as reported in the report.

18          THE COURT:  That was in the regular course of business.

19   It was not made as a test for evidence at the trial.

20          MR. MOSKOVITZ:  This is the regular course of business

21   of this particular laboratory to make tests of materials which

22   are submitted to it by other units within the Department of

23   Water Resources.

24          THE COURT:  When was this test made?

25

BY MR. MOSKOVITZ:

     Q  When was this test made?

     A  It was made on the 28th of November, 1958.

     THE COURT:  Was it made in connection with the trial of this lawsuit, or was it made in connection with the building of the dam you are talking about?

     THE WITNESS:  This particular test, your Honor, was made in connection with the trial of this lawsuit, at my direction.

     MR. MOSKOVITZ:  It was made by established scientific procedures.

     THE COURT:  What other cases do you have?

     MR. MOSKOVITZ:  This is the case I have at this time, your Honor.

     THE COURT:  It seems to me that if you are relying on the regular course of business, it is not in the regular course of business to make tests for the trial of a lawsuit.

     Let us take another situation.  Suppose they were going to build a dam and five years ago they made tests of the materials and the State agency had put the report in their file and you bring the report down to this lawsuit as being something done in the regular course of business-- in building the dam the test was made.  Or a steel company makes steel plate and as it puts the plates out it has a routine to make tests on it and the tests are filed away.  When it comes up later on, here is a report on the matter made in the regular course of

1   business.

2          But it is not in the regular course of business to make

3   tests for the purpose of demonstration in a lawsuit and then

4   have the witness come in and give hearsay information as to

5   the results of that test.

6          MR. MOSKOVITZ:  I don't want to argue with your Honor.

7          THE COURT:  I will sustain the objection without

8   prejudice.  You can look into it and raise the question again,

9   if you feel like it.  But that is my present view.

10         MR. MOSKOVITZ:  We can bring the people down who made

11  the tests, if that is going to be necessary.

12         THE COURT:  Can't you accomplish the same thing by

13  expert testimony?  Can't you call a witness who is an expert

14  in this field and let him testify to the matter?

15         MR. MOSKOVITZ:  The only thing we have to establish

16  now, it seems to me, for the purpose of the demonstration, is

17  what the permeability of that material has been tested to be.

18  That is what I would like to get into the record, and then we

19  can perform an experiment and see what happened to it.  The

20  matter was tested for permeability.  We have the results of

21  that test.

22         THE COURT:  But you have a witness here who didn't

23  participate in the test.  Someone has handed him the matter.

24  He is not available for cross-examination.  And you come in

25  under an exception, as it were, to the hearsay rule, under

1    records in the regular course of business.

2        MR. MOSKOVITZ:  Your Honor, it seems to me that it is

3    in the regular course of business for this particular labora-

4    tory to make tests at the request of other units in the

5    department.  The same kind of test is made whenever they ask

6    for information as to permeability.

7        Might I make this suggestion.  To admit this evidence

8    subject to a motion to strike if we do not produce the witness

9    who can testify to the way the test was made and the results

10   of the test.

11       THE COURT:  No, the objection is sustained.  You can

12   look into it further.  The objection is sustained without

13   prejudice.  I don't think it is admissible.  It is not in the

14   regular course of business to make tests for a lawsuit and

15   then bring in some third party to tell about the results of

16   the test.

17       MR. MOSKOVITZ: Very well.

18       THE COURT:  What you are trying to prove is definitely

19   kind of a side issue here.

20       MR. MOSKOVITZ:  Yes.

21       THE COURT:  It is material that is admittedly not the

22   material in this area, testing it for permeability, and then

23   showing that it would dissolve in water.  There is still a

24   non sequitur there, as far as I am concerned.

25       MR. MOSKOVITZ:  Your Honor, the reason we did this was

1  because of what appeared to be your feeling that the experi-

2  ment which had been conducted by Mr. Hall and which you now

3  conducted on this sample M-1 was significant.  We don't think

4  it is significant.  If that is conceded, that this is no way

5  to measure permeability, then the experiments we wanted to

6  offer are of no--

7  THE COURT:  Nobody said that it measured permeability.

8  All it indicated to me was that when you put it in water it

9  dissolved.

10  MR. MOSKOVITZ:  If that's all, if no further conclusions

11  are drawn from it--

12  THE COURT:  I don't know whether that is permeability

13  or not.

14  What would you call this material that you brought

15  down here that I put in that water?

16  THE WITNESS:  That you put in?

17  THE COURT:  Residuum?

18  THE WITNESS:  No, that is older alluvium.

19  THE COURT:  Is residuum as permeable as older alluvium,

20  or less?

21  THE WITNESS:  In general, residuum is less permeable.

22  MR. SACHSE:  Your Honor, I have no direct interest in

23  this as far as my clients are concerned, but it seems to me

24  that if we are really interested in this it wouldn't be hard

25  to send Mr. James, Mr. Kunkel and Mr. Hall up to Pauba Valley

1  somewhere where the map clearly shows it to be older alluvium

2  and let the three of them get together on a sample and let's

3  send the thing to the State of Arizona testing laboratory or

4  some other place by agreement and see what the results are.

5  　　　　THE COURT:  Another thing, if you are going to go to the

6  bother to make tests, let us have permeability tests on the

7  material involved here and not run permeability tests used on

8  some dam somewhere else.

9  　　　　MR. SACHSE:  I understand that there are acceptable

10  scales of permeability.

11  　　　　THE COURT:  It is obviously permeable.  It is a question

12  of the degree of permeability.

13  　　　　MR. VEEDER:  I would like to add, your Honor, that

14  there are a hundred different elements that go into the avail-

15  ability of water, that is what we are talking about, and

16  transmissibility is probably more important than permeability,

17  and I think the Roripaugh well and the Querry well prove that.

18  So from our standpoint this is one element, one factor.  But

19  by and large the availability of the water in the area to

20  which we have reference, namely, that on Exhibit 15-A, there

21  are just hundreds of elements that go into it, and this is just

22  one of the many factors.

23  　　　　THE COURT:  The witness tells me that residuum is less

24  permeable athan older alluvium.

25  　　　　Is that right?

1      THE WITNESS:  That is right, in general.

2      THE COURT:  Tell me, what is your view of the differ-

3  ence between permeability and transmissibility?

4      THE WITNESS:  Well, transmissibility is the amount of

5  water that is delivered through a column which extends

6  through some length of the aquifer.  The usual units are a

7  column a foot in width extending through the entire thickness

8  of the aquifer.  Whereas, permeability is the amount of water

9  that is transmitted through only one square foot.  So that in

10  effect transmissibility is the sum of the permeability units

11  for the thickness.

12      THE COURT:  Permeability concerns how water moves

13  through material?

14      THE WITNESS:  That is true, your Honor.

15      THE COURT:  I don't know, I irrigate some trees in

16  residuum.  If you dig down far enough you will find granite.

17  And if how fast it sinks down is any element of permeability,

18  it goes down awful fast.

19      MR. MOSKOVITZ:  Your Honor, the evidence in the Master's

20  hearing, the finding of the Master is that the water moves so

21  slowly through residuum that that water is not to be considered

22  a part of the stream, that it has low permeability, and I

23  believe there has been testimony on both sides that the

24  residuum has low permeability.  In other words, these tests

25  or observations that laymen make are often misleading as to the

1    true characteristics.

2         THE COURT:  I will keep an open mind on it.

3         MR. MOSKOVITZ:  Yes, your Honor.  Well I will have to

4    move on to another point, if we can't perform this experiment.

5         Q  Mr. James, did you secure any other samples than

6    sample M-1, which has already been introduced in evidence?

7         A  Yes.

8         THE COURT:  Here is some more of this particular sample

9    that broke.  You might put that in the jar.

10        MR. VEEDER:  We might use that in Rank Vs. Krug-- that

11   is from San Joaquin Valley.

12   BY MR. MOSKOVITZ:

13        Q  Would you refer to Exhibit M-2 for Identification

14   and state where it was obtained?

15        A  Sample M-2 is older alluvium, which comes--

16        MR. STAHLMAN:  I made a note here that that last one

17   was--

18        THE COURT:  That was N-2.

19        MR. STAHLMAN:  N for north.

20        THE COURT:  I sustained the objection to that one.

21        THE WITNESS:  This sample was obtained about one-half

22   mile downstream from the first sample, Sample M-1.

23        THE COURT:  Picked off along the bank of the older

24   alluvium?

25        THE WITNESS:  Yes, it was taken from a steep cut in the

1  south bank of the Temecula Creek in this general area in here.

2  BY MR. MOSKOVITZ:

3      Q  Would you describe where that appears by section

4  on the Exhibit 15-A?

5      A  In the Northwest Quarter of Section 14, Township 8

6  South, Range 2 West.

7      Q  And what was the appearance of the bank from which

8  this sample was taken?

9      A  The bank stood vertically for a height of 25 or 30

10  feet at least, and the material is consolidated sand that is

11  moderately well cemented and in my opinion is of low permea-

12  bility.

13      MR. MOSKOVITZ:  Have you seen it, your Honor?

14      THE COURT:  Yes.

15      What scale would you put that in?  You have a scale of

16  1 to 30.

17      MR. MOSKOVITZ:  Your Honor, that scale is specific

18  yield, not permeability.

19      THE COURT: All right.

20      MR. MOSKOVITZ:  I offer Exhibit M-2 in evidence.

21      THE COURT:  Exhibit M-2 received in evidence.

22      (Defendant State of California Exhibit M-2 was received

23  in evidence.)

24      THE COURT:  What scale would you put it in as to specific

25  yield?

1      MR. VEEDER:  I object to this, your Honor, because there

2  is nothing whatever to show that this witness has any testimony

3  whatever concerning this kind and type of deposit.

4      THE COURT:  There is evidence in the record that he has

5  made studies of well logs and material taken from wells, and

6  he has prepared a chart in which a certain scale of 1 to 28

7  has been assigned to materials from well logs.

8      If you found this kind of material out of a well log,

9  what unit would you assign to it for specific yield?

10     THE WITNESS:  I would say it would probably be less

11  than 10, somewhere between 5 and 10.  But I would like to

12  point out that when this material comes out of a well it is

13  severely chopped up in the drilling process, so that when it

14  comes out of the well you don't really know the degree of

15  cementation that it was in, in its original state.

16     MR. VEEDER:  Then I move to strike the exhibit on the

17  grounds that the witness has already pointed out that it is

18  totally without meaning.

19     THE COURT:  It has been offered not in connection with

20  the question I asked.  It was offered in connection with

21  where he found it in the area.  The objection is overruled.

22     You say from 1 to 10, or from 5 to 10?

23     THE WITNESS:  Between 5 and 10 somewhere, your Honor.

24     MR. MOSKOVITZ:  May I ask the witness another question,

25  which may enlighten you on this particular point.

1    Q  Mr. James, what relationship, in your opinion,

2  exists between permeability and specific yield of materials?

3    A  These are two different units that are intended to

4  measure entirely different properties.  Permeability is a

5  measurement of the ease with which water will pass through a

6  sediment, whereas specific yield is a measurement of the

7  quantity of water that will be released by gravity through

8  or out of the particular material in question, and there is

9  no true relationship between these.

10    Q  Do you have any knowledge as to the kinds of rela-

11  tionships which are found or the kinds of permeabilities

12  which are found in materials which have the same specific

13  yield?

14    A  Yes, there have been a number of tests made of

15  sedimentary materials, at which time the permeabilities and

16  specific yields were both measured, and there are a number of

17  these tests in which it is shown that materials of the same

18  specific yield have widely varying permeabilities.

19    Q  What is the range of the variation in permeabilities

20  of materials which have the same specific yield?

21    A  Well, I have seen ranges up to 20 times.

22    Q  What are these tests that you have referred to?

23  Can you identify who made them and when?

24    A  Well, in connection with land subsidence studies in

25  the San Joaquin Valley, the U.S.G.S. has run standard permeabil-

ity and specific yield tests on certain specimens taken from

1    that area, and in some of these instances the permeabilities

2    of samples of the same specific yield have varied quite widely.

3    The Bureau of Reclamation in connection with some of

4    their studies in the Friant-Kern area, some of these tests

5    have also revealed similar results-- that is, differences in

6    permeability of substances that have the same specific yield.

7    Q  Mr. James, will you identify California's Exhibit

8    M-3 for Identification and point out where it was obtained?

9    A  This is a sample of older alluvium from the south

10   side of Pauba Valley.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H-1 ML

1    THE WITNESS:  This is in the vicinity, in the same

2    road cut in which the first sample, M-1, was located, but

3    on the other side of the road.  It shows a lighter-colored

4    facies that occurs within the older alluvium which --

5        THE COURT:  Well, you handed me one.  Now you are

6    looking at another one.

7        Q  BY MR. MOSKOVITZ:  Will you explain, Mr. James,

8    what the difference is between these two?

9        THE COURT:  Are these from the same exhibit?

10       MR. MOSKOVITZ:  Yes, your Honor; taken from the

11   same place.

12       THE COURT:  All right.

13       MR. MOSKOVITZ:  One above the other.

14       Q   Would you describe what the significance is of

15   the difference in these two materials?

16       A   Well, the lighter material where this sample was

17   taken was found to be overlying the dark-colored material,

18   and it is a lens of different material that occurs in the

19   older alluvium.  It is one of the lenses, and it, too, is,

20   in my opinion --

21       MR. VEEDER:  I am going to object to his opinion --

22       THE WITNESS:  -- of low permeability.

23       MR. VEEDER:  -- because there was no request for an

24   opinion.  There was no foundation for it.

25       THE COURT:  Overruled.

MR. VEEDER:  And I don't like this witness making speeches.

THE COURT:  Let's save time.  Overruled.

Q  BY MR. MOSKOVITZ:  And what was the appearance of the bank from which these materials were taken?

A   The bank was vertical.

Q   And what is the import of the fact that the bank was vertical?

A   Well, the fact it is vertical just fortifies the observation that it is moderately well cemented, that there is a strong cohesion in there which indicates that the material is relatively impermeable.

MR. MOSKOVITZ:  We offer for exhibit, M-3.

THE COURT:  M-3 received in evidence.

Q  BY MR. MOSKOVITZ:  Now, would you describe Exhibit M-4 for identification and start where you secured the sample?

A   M-4 is again older alluvium.  It was obtained from Section 26, Township 8 South, Range 2 West.

Q   Point that out on the map.

A   Yes, I will do that.  It was obtained from this general locality here, from a steep road cut, in the road that goes up Pechanga Canyon.

Q   Would you describe this sample and the differences, if any, that you note between that sample and the previous

1   exhibit, M-3, and M-2?

2   A   Well, this particular sample, the main difference

3   is in the color.  It is moderately cemented, again, and, in

4   my opinion, relatively impermeable.

5   THE COURT:  I don't know how much this is going to

6   mean to me when you say, "It is relatively impermeable."

7   Is there any scale to determine permeability?

8   THE WITNESS:  Yes, there are, your Honor.

9   THE COURT:  Something is more impermeable than some-

10  thing else; but what kind of scale?  Do you have any

11  scientific scale in this respect?

12  THE WITNESS:  Yes, we do.  I would, to answer your

13  question, though, say that, in my opinion, that the ground

14  water would pass through that very slowly, through that

15  material.

16  THE COURT:  Well, "very slowly."  How do you contrast

17  that or gauge it, the statement of passing through -- not

18  slow but fast but moderate or passing through rapidly?

19  How do you gauge that?  What does it mean?  What does

20  "slowly" mean?  An hour to travel a foot or a day to travel

21  a foot or -- ?

22  THE WITNESS:  Well, there, again, you are confronted

23  with a problem of what the hydrolic gradient is.  If you

24  have a steep hydrolic gradient, it is going to pass faster

25  than it would with a low hydrolic gradient.  You have to

1   specify what gradient you are talking about.  But I would

2   say just, in general, that wells that were perforated, the

3   material of that type would yield little water.  They would

4   not yield an irrigation well, for example.  Now, I am speak-

5   ing about the type of material in that sample.

6        THE COURT:  Let's see where we are.  Let's take the

7   material in M-4 for identification.  If it came up in a

8   well log, it was brought up as a core of a well and a

9   driller saw it, he would call it sand, wouldn't he?

10        THE WITNESS:  Yes, sir.

11        THE COURT:  He would call it sand, and sand, you

12   would say, was rather permeable?

13        THE WITNESS:  Yes.

14        THE COURT:  But because you find it on a dry bank

15   where it is exposed to the sun you tell me it is relatively

16   impermeable?

17        THE WITNESS:  That is true, your Honor.

18        THE COURT:  Now, let's take the second situation.

19   Here you find it on a dry bank exposed to the sun, hardened

20   up.  It is brittle.  It breaks at the touch.  If it was in

21   a basin where there was water in conjunction with it, it

22   would be saturated with water or we wouldn't be talking

23   about it as a water-bearing  material, would we?

24        THE WITNESS:  That is true.

25        THE COURT:  Now, its condition when saturated with

1    water can't be anything like its condition when it is

2    taken off the side of a bank exposed to the sun, dried out

3    and hardened?

4         THE WITNESS:  Well, your Honor, I have a different

5    view on that myself.

6         Q   BY MR. MOSKOVITZ:  Will you please give us your

7    view?

8         THE COURT:  I gave you two examples.  Now, tell me

9    first about the well driller.  He pulls it up in his bucket

10   or his core; it has been broken up.  He calls it sand.

11        THE WITNESS:  And he is sometimes fooled in this

12   respect.  And he will perforate his well on the strength of

13   his log in that type of material, and his well will not be

14   a success.  And often under this type of condition he will

15   sink his well and place a gravel envelope about the well

16   and then drive his source of supply through lenses of

17   permeable material that may be interspersed in this particular

18   type of material.  But in my opinion he will not get a

19   significant supply of water out of this type of rock.  And

20   I base that opinion on having logged a large number of water

21   wells and test holes.

22        THE COURT:  How can you tell --

23        MR. VEEDER:  In the Santa Margarita?

24        THE WITNESS:  I have not logged the wells in the Santa

25   Margarita, Mr. Veeder, but I have logged a number of wells

1    in comparable areas.

2         THE COURT:  How can you tell when this type of

3    material would come up on a core drill whether the material

4    is there consolidated, where it came from, or whether it is

5    there broken up and loose?

6         THE WITNESS:  Well, your Honor, when you speak of a

7    core drill, do you mean a drill that takes an actual core

8    of the material?

9         THE COURT:  On these well logs, how does the matter

10   come up?  I suppose it comes up with core, doesn't it, out

11   of a well?

12        THE WITNESS:  Well, it is usually ground up in a

13   water well, your Honor.

14        MR. MOSKOVITZ:  Your Honor, I think it would be

15   helpful if we would describe --

16        THE COURT:  Ground up.  How can you tell whether it was

17   ground up below, where it came from, or whether it was

18   consolidated down there and merely got ground up in the

19   process of being drilled out?

20        THE WITNESS:  Your Honor, you can't tell unless you

21   take the core of the material.

22        Q   BY MR. MOSKOVITZ:  Would you describe the difference

23   between the core drilling and rotary drilling?

24        A   Well, core drilling is one type, of course, of

25   rotary drilling.  The process is the drilling goes down

1  vertically, spinning very rapidly, and the materials at

2  the bottom in the ordinary rotary drilling are ground up

3  by the bit and floated to the surface by mud which is in-

4  jected down the center of the drill stem; and the mud brings

5  up the materials around the outside.  The materials are

6  thoroughly ground under those circumstances.  Now, in

7  core drilling a core barrel, as we call it, which is a tube-

8  like arrangement, as the well drills the core is taken in

9  the central tube in the center of the end of the drill stem,

10  and then, when this is retracted, the barrel is broken open

11  and you see the material just as it was or close to its

12  condition in the earth.

13  THE COURT:  Now, another thing:  These samples were

14  taken from the side of a bank where the sun had hit the

15  matter for many months and many years.  Do you anticipate

16  that any of the material that lay underground in the older

17  alluvium will be in the same condition as this sample is?

18  THE WITNESS:  Well, your Honor, some of these samples,

19  I would like to point out, were taken from road cuts, places

20  where there have been excavations in the not-too-distant

21  past.

22  THE COURT:  Yes, road cuts, but they had been taken

23  from the exposed face of the road cut.  And you dug in three

24  or four feet away from this action of the sun or any distance

25  underground or into a cut to determine how this material

1  appears when it lies in there away from the sun?

2  THE WITNESS:  Your Honor, I am confident that if you

3  dug into these banks several feet, you would find the same

4  condition in the sand.

5  THE COURT:  I am not so confident.  I have done my

6  bit of chores on the soil, and it is a very common charac-

7  teristic to find that surfaces exposed to the sun will be

8  much harder, and, once you break through that even three or

9  four inches you very often get into a very soft, loose

10  material.

11  THE WITNESS:  That is true, your Honor.  I was referring

12  to where you cut into a road bank, where you were down some

13  distance below the surface.

14  THE COURT:  Fresh cuts.  Fresh cuts, yes.  But none

15  of these are taken from fresh cuts on the road bank, were

16  they?

17  THE WITNESS:  No, sir, they weren't.  But I am con-

18  vinced that if you were to go up there with a pick and dig

19  back a few feet where these samples were taken, that you

20  would get similar materials in this particular area.

21  THE COURT:  If it becomes an issue, I would like to

22  do that.  I would like to go up some place where there is

23  one of these cuts that has been exposed to the sun for a

24  year or two; and I would like to, either me or somebody

25  else, dig back and see if the material that comes out four

6056

1    or five, six feet farther back protected from the sun is of

2    the same firmness as these clod samples produced here.  I

3    don't think they will be.

4         THE WITNESS:  I would be very happy to accompany your

5    Honor.

6         MR. MOSKOVITZ:  I think perhaps we could take a field

7    trip up there, your Honor.  We can do just that, along with

8    picking up all kinds of other samples.

9         MR. SACHSE:  It gets tougher and tougher to be a lawyer.

10   Pretty soon we will be swinging a pick.

11        THE COURT:  This trip we will insist upon some "bams"

12   along, however, to serve lemonade and tea.  It will be hot

13   up there in the valley.  All right.  Let's go ahead.

14             You offer 4?

15        MR. MOSKOVITZ:  Yes, your Honor, I offer 4 in evidence.

16        THE COURT:  4 received in evidence.

17        Q  BY MR. MOSKOVITZ:  Will you identify California's

18   Exhibit M-5 and state where it came from?

19        A    This sample was obtained from Township 8 South,

20   Range 2 West, Section 20.  It was taken from the left abut-

21   ment of a small reservoir owned by the Vail Company in this

22   general area here -- and I point to the northeast quarter

23   of Section 20 in the Township and range which I specified.

24   It is again a specimen of older alluvium.  It is somewhat

25   coarser than the previous samples to which I have testified.

Q   What would be its permeability relative to the previous sample?

A   In my opinion, its permeability would probably be somewhat higher than in the previous samples.  It is of interest, because this material comprises the sides of this reservoir to which I testified of Mr. Vail's.  And, at least, from observing the reservoir there is apparently no leakage.

THE COURT:  It was taken from the outside walls of the reservoir or from the inside walls of contact with the water?

THE WITNESS:  It is taken from the inside walls just above the present level of the water in the reservoir; and, it, in my opinion, represents the material that is below the level of water in that reservoir.

THE COURT:  Mr. Veeder?

MR. VEEDER:  How about compaction?  How about all these other elements that go into this matter?  If he is going to offer this kind of evidence, I think there should be more foundation.  Certainly, anyone with any experience in building reservoirs knows that there was compaction of this material and a core was built and then the earth placed around it and on top of it.

MR. SACHSE:  Are you testifying that that so happened, Mr. Veeder?

j53

6058

1    MR. VEEDER:  I simply say --   Yes, yes, I am.  I

2    know the Vail reservoir.

3    MR. SACHSE:  I want to ask to have Mr. Veeder sworn

4    and tell us where this reservoir is and the circumstances

5    under which it was built, your Honor.

6    THE COURT:  Let's go ahead.

7    You offer 5 in evidence?

8    MR. MOSKOVITZ:  Yes, your Honor, I offer 5 in evidence.

9    I want to ask another question about it, M-5.

10   THE COURT:  Received in evidence.

11   Q  BY MR. MOSKOVITZ:  Was this taken from the Vail

12   reservoir behind the so-called Vail Dam?

13   A   No, this is another small reservoir in the

14   Section 20, as I indicated.

15   Q   I hand you California's Exhibit M-6 for identifica-

16   tion and ask you to identify this exhibit?

17   MR. VEEDER:  From which reservoir is this taken, now?

18   Q  BY MR. MOSKOVITZ:  And state where the sample was

19   taken.

20   A   This sample is again older alluvium from Section,

21   same section, Section 20, Township 8 South, Range 2 West.

22   This sample was taken from the bank cut in the hill just

23   south of the Cantarini well, which is designated in the

24   vicinity -- on Exhibit 15-A designated as Cantarini pit.

25   It is in that general vicinity from a cut.  Again, this

H-3

material is, in my opinion, of very low permeability.

THE COURT:  From an area exposed to the sun?

THE WITNESS:  Yes, your Honor.

THE COURT:  Did you ever work on a farm, Mr. James?

THE WITNESS:  No, sir, I haven't had that pleasure.

THE COURT:  Offer 6 in evidence?

MR. MOSKOVITZ:  I offer M-6 in evidence.

THE COURT:  Received in evidence.

Q   BY MR. MOSKOVITZ:  Would you identify California's Exhibit M-7 and state where that sample was taken from?

A   This sample -- I don't have a section on here. Excuse me a minute.  I would like to refer to my notes.

MR. VEEDER:  I hope Mr. Vail never hears about this, or he will find he doesn't have any wells at all out there. It is going to break his heart; no water.

THE WITNESS:  I don't have a township and range number for this particular sample.

MR. VEEDER:  I object to it, then, as not properly identified.

MR. MOSKOVITZ:  Just a moment.  He is going to identify it.

THE WITNESS:  The sample was taken from the excavation for the Metropolitan Water District pipe line which is presently being laid on the north side of Pauba Valley in the older alluvium.  It is either near the west line of

Section 17 or near the east line of Section 18, in that general area, on the north side of the Pauba Valley. That is Township 8 South, Range 2 West; and, as I mentioned, either Section 17 or 18.

MR. VEEDER: I object. No identification, your Honor.

THE COURT: Overruled.

You know: Was this piece lying in the sun on an open cut?

THE WITNESS: Your Honor, this was taken off the wall of the excavation. Just how long that excavation had been there, I don't know. It would be a matter of months at the most, I believe. It had been freshly excavated. They were in the process of laying the pipe.

THE COURT: Well, that ditch has been cut up there for months. I cross by there quite often.

THE WITNESS: I am not sure just how long it has been cut, your Honor, but that was where it came from.

THE COURT: Offer it in evidence?

MR. MOSKOVITZ: Yes, I offer that in evidence as an exhibit.

THE COURT: Exhibit M-7 received in evidence.

MR. VEEDER: Is he going to express his opinion as to permeability? I will --

Q  BY MR. MOSKOVITZ: What is your opinion as to the

1  permeability of this sample?

2      A   I believe this particular sample here is somewhat

3  more permeable than the other which we have been looking at.

4  I might say that in this general area these sands, such as

5  shown here, are interbedded with clay material, a very low

6  permeability.  And it is of particular interest, I believe,

7  because these --

8      MR. VEEDER:  Now, I am going to object to this unless

9  he has got some of the clay here and we are going to show it.

10      THE COURT:  Overruled. Go ahead.

11          What were you going to say, Mr. Witness?

12      THE WITNESS:  These clay materials have a steep dip.

13  They are dipping about 50 degrees to the north.  There are

14  a number of these lenses.  They vary from one to fifteen

15  feet in width.  And I think this observation is significant

16  for this reason:  that when you have structure, such as

17  this, geologic structure, where impermeable beds are dipping

18  at an angle, this very greatly impedes the horizontal

19  percolation of water.

20      THE COURT:  You know to what extent lenses dip to

21  that angle throughout that area of the older alluvium?

22      THE WITNESS:  No, sir, I don't; except that farther

23  north in that same excavation where the excavation crosses

24  Santa Gertrudus Valley there is also some dip there in the

25  opposite direction.  This indicates to me that there could

1   well be other dipping structures in that material.

2        MR. VEEDER:  I want an objection to this whole line

3   of speech, your Honor, and because there is no foundation

4   whatever for what he is saying.

5        THE COURT:  Objection is overruled.  I take it it is

6   a motion to strike?

7        MR. VEEDER:  Oh, yes, I will make a motion to strike.

8   And also it will save a lot of time, because I want a

9   continuing objection to these speeches where he goes into

10  the wild blue yonder and says, "I observe this and that

11  and I am sure that this and that exists," although there is

12  no foundation for what he is saying.

13       THE COURT:  Overruled.  Motion to strike denied.

14       Q   BY MR. MOSKOVITZ:  Mr. James, in your opinion, or

15  do you have an opinion as to the effect which exposure to

16  the sun would have on the degree of cementation and compac-

17  tion of materials which are exposed?

18       A   Well, in my opinion, it certainly wouldn't affect

19  the cementation; and, where a soil material is lying flat

20  on the surface -- I can agree when it has become saturated

21  and is baked out it would certainly become impermeable or

22  become much less permeable.

23       MR. VEEDER:  So when it rains on it and the sun shines

24  on it.

25       Q   BY MR. MOSKOVITZ:  What is your opinion as to the

1   effects of the sun and elements on a vertical bank with

2   respect to its cementation?

3       A   In my opinion, I don't think that this would

4   change the cementation or compaction significantly.

5       Q   I show you California's Exhibit M-8 for identi-

6   fication and ask you to identify it and describe where this

7   sample came from?

8       A   This is older alluvium.  The sample is taken from

9   Township 7 South, Range 2 West, Section 26.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  That is almost an adobe.

2    THE WITNESS:  It was taken in Section 26 in this

3 general locality in here, as indicated.

4 BY MR. MOSKOVITZ:

5    Q  Near what valley is that?

6    A  That is near Santa Gertrudis Creek, one arm of the

7 creek.

8    Q  From your notes can you tell where this material

9 was picked up specifically?

10    A  It is taken a quarter mile east of Well 7S2, W26 N2,

11 near the farm house in that locality.

12    Q  And what is your opinion as to the permeability of

13 this material?

14    A  It is very low.

15    MR. SACHSE:  What was the range and section again?

16    MR. MOSKOVITZ:  I offer California's Exhibit M-8 in

17 evidence.

18    THE COURT:  Exhibit M-8 received in evidence.

19    (Defendant State of California Exhibit M-8 was received

20 in evidence.)

21    THE COURT:  Is there any standard scale of permeability

22 other than low, moderate or high?

23    THE WITNESS:  Yes, there is, your Honor.  When tests

24 are made in the laboratory they have standard units of

25 permeability which are used, but we don't offer those in field

X M-8

1    results.

2         THE COURT:   Apparently there is going to be a big issue

3    between the United States and the State of California as to

4    the permeability of the older alluvium in what the Government

5    calls Basin 4.

6         MR. MOSKOVITZ:   Your Honor, our position is that these

7    samples indicate that there are areas of very low permeability.

8    What they are throughout the depth you don't know until you

9    get information. There are very few wells, as you see,

10   Plaintiff's Exhibit 15-A.

11        THE COURT:   Let me finish.

12        And if there is going to be a major issue on this

13   matter, I am going to hire my own expert and make somebody

14   here pay for him.

15        MR. STAHLMAN:   Don't charge it to Vails.

16        THE COURT:   Who will make an examination and report to

17   me on it.

18        MR. SACHSE:   That is why I suggested, respectfully--

19   I have no direct interest in this area, representing Fallbrook.

20   But I think a lot of time could be saved if Mr. Hall, Mr. James

21   and Mr. Kunkel could get together and agree on a laboratory

22   and send it to them and find out how it rates on this permea-

23   bility scale.  But I get very little response from the United

24   States.   I guess they want to send it to the laboratories that

25   produce the results that they tell them to.

1        MR. VEEDER:  I move to strike that as being an unkind

2    remark.

3        MR. STAHLMAN: When all the evidence is in, there will

4    be some practical matters here that may throw some light on

5    this.  Whether it will be sufficient to answer the question

6    your Honor had in mind or not I don't know.  But just in

7    passing I am just wondering if they have made the tests and

8    determined permeability, what is the purpose of it if it is

9    not eventually to be used when it is important enough to come

10   up in a lawsuit?

11       THE COURT:  Are you offering this M-series of exhibits

12   as being typical of that whole area, or as being horrible

13   examples, or as being what exist in sporadic areas?  What is

14   your purpose here?

15       MR. MOSKOVITZ:  We didn't pick these out to show

16   horrible examples, your Honor. We have some samples, as you

17   saw, which were quite sandy, and the material varies con-

18   siderably.  We attempted to pick up samples throughout the

19   area we passed.  We attempted to cover the entire area.

20       Our purpose, your Honor, is not to predict that no

21   material quantities of water can be extracted from that area,

22   because we know there are permeable lenses at depth; but to

23   show that there is enough material which we can find of low

24   permeability that you cannot predict that the effect will be

25   great until you have a lot more evidence and probably experience

1    by people developing wells, pumping and seeing what happens,

2    and what we ask is that this matter not be determined now on

3    the basis of the case which the United States has put on.  We

4    don't think that they have proved what will happen.  They have

5    proved what might happen.  And we are attempting to show that

6    this very well may not happen and that what we should do is

7    wait and see.  And that is the purpose of showing you typical

8    samples.

9         I think that you will be much more impressed when you

10   go out in the field and see the area.  We have many more in

11   other spots that we havn't yet covered to demonstrate that

12   these are taken from a cross-section of the whole area, not

13   just in one place where we happened to find something that

14   looked bad.

15        MR. VEEDER:  Of course, your Honor, we have taken the

16   position that the whole issue very largely that is here in-

17   volved in this phase of the litigation is that wells can be

18   and have been drilled and these people who drilled them get

19   good quantities of water from them, and that it is only

20   reasonable to assume that a man who owns a piece of land of

21   the kind and type to which we refer has a right to the use

22   of water and will undoubtedly exercise that right to the use

23   of water.  Now that is the only issue here.  This is a quiet

24   title suit and we have named these people and we are assuming

25   that they are going to come in.  I can't envision a man coming

1   in and saying, "I own a section of land up here, but I am saying

2   there is no water there.  So I want out of this lawsuit."

3   Well, if he gets out of the lawsuit, then he has no right

4   whatever to claim from the Santa Margarita River, I would

5   assume.

6           This is one of the strangest things that ever occurred

7   in my view.  Here is the United States putting in proof that

8   it is reasonably expected that John Jones, who owns a piece

9   of land up here, will dig a well and he or his successor in

10  interest will use water, and if he does there will be an effect

11  upon the stream. That is all we are talking about.  And we

12  insist that these people have rights to the use of water in

13  the stream.  Now that is our point.  And I think the only

14  thing which concerns your Honor is that these people be pro-

15  tected in their right ultimately to develop what we think are

16  water-yielding, water-bearing strata.  That is the onlything.

17  But I think it is mighty strange that the State is proceeding

18  against these people.

19          MR. MOSKOVITZ:  Your Honor, of course the State is not

20  proceeding against these people.  The question is, is their ex-

21  traction of water going to have the kind of effect on the

22  flow of the stream upon which the United States and other

23  claimants to the use of water from the stream rely?  It is

24  that kind of effect that makes it necessary that their rights

25  be correlated with the rights of those who claim from the

1    stream.  Now we know that if the effect is very small the law

2    is that you do not correlate their rights.  Now that is the

3    issue:  How big will the effect be?  And the rate of movement

4    of water is important in that regard.  If it moves slowly,

5    the amount of effect will be small, and it may be so small that

6    it is not necessary to --

7          THE COURT:  I haven't made up my mind yet.  I am trying

8    to be open-minded.  I will hear more testimony tomorrow.

9          Maybe next week we ought to get up and see this cut and

10   look over some of this area.

11         MR. MOSKOVITZ:  I think that would be a splendid idea.

12         THE COURT: What do you think?

13         MR. VEEDER:  It suits me, your Honor.

14         MR. SACHSE:  That is a pretty big area and will take a

15   little more planning to try to work out where to go and how

16   to do it.

17         THE COURT:  You gentlemen discuss it and we will talk

18   more about it tomorrow.

19         MR. STAHLMAN:  It is a very big area.

20         MR. SACHSE:  We couldn't do it in one day.  We ought

21   to decide which part you want to see.  If you want to see the

22   Murrieta area, that is one thing.  If you want to see the

23   Temecula area, that is another.  If you want to get up into

24   the basement complex area, that is still another thing.

25         THE COURT:  Well, there is not much dispute about this

1    basement complex.  The critical area in this case so far, as

2    far as issues emerging, is the area east of the Murrieta Valley,

3    north of Pauba Valley and south of Pauba Valley.

4          MR. MOSKOVITZ:  There is another smaller area which

5    has been included in Ground Storage Unit 5.  There are these

6    materials here which have been included in such area, and

7    their relative permeability has the same questionability as

8    in the area north and south of Pauba.

9          MR. VEEDER: The same questionability?

10          MR. MOSKOVITZ:  The permeability is under the same

11    question as to how significant pumping from that area would

12    be on the flow of the stream.  I want to point that out.  So

13    I think we should visit that, too.

14          THE COURT:  Adjourn until 10 o'clock tomorrow morning.

15          (Adjournment until Friday, December 5, 1958, at 10

16    o'clock A.M.)

17

18

19

20

21

22

23

24

25