# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                     Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.

                     Defendants.

No. 1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:** San Diego, California

**Date:** Friday, December 5, 1958.

         **Pages:** 6070 to 6215

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,     )
                              )
              Plaintiff,      )
                              )
      vs.                     )          No. 1247-SD-C.
                              )
FALLBROOK PUBLIC UTILITY      )
DISTRICT, et al.,             )
                              )
              Defendants.     )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, December 5, 1958

APPEARANCES:

        For the Plaintiff       WILLIAM H. VEEDER, ESQ.,
                             Special Assistant to the
                             Attorney General,
                             Department of Justice,
                             Washington, D. C.

- - -

APPEARANCES (Continued)

| | |
|---|---|
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State of California | EDMUND G. BROWN, ESQ., Attorney-General, by ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney General. |
| For Defendants Fallbrook Public Utility District, Et al. | F. R. SACHSE, ESQ. |

- - -
-
-

6072

## INDEX TO WITNESSES

| DEFENDANTS' WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Laurence James | 6086 | 6201 | | |

| EXHIBITS: | FOR IDENTIFICATION | IN EVIDENCE |
|---|---|---|
| State's Exhibit | | |
| M-9 | | 6087 |
| M-10 | | 6089 |
| M-11 | | 6090 |
| M-12 | | 6091 |
| M-13 | | 6092 |
| M-14 | | 6095 |
| M-15 | | 6097 |
| M-16 | | 6098 |
| M-17 | | 6099 |
| O-1 to O-26, Inclusive | | 6199 |

ML A-1

SAN DIEGO, CALIFORNIA, FRIDAY, DECEMBER 5, 1958, 10:00 A.M.

---o---

THE CLERK: Number 1247-SD-C, United States vs. Fallbrook.

THE COURT: I looked over this set of maps not yet numbered which Mr. Veeder proposed to substitute for exhibits now in evidence, and I see what he has done. He has taken the same base exhibit and had put on it the watershed line. And I have no objection to having him substitute it. Has anyone else had a chance to look them over?

MR. SACHSE: I have looked them over, your Honor, and I think they will be very helpful. I told Mr. Veeder before court started that I would like, as soon as the geology is over, to have Mr. Cannon available for pretty extensive cross-examination on it at that time.

THE COURT: All right. I suggest, therefore, that they be matched up by the Clerk. There are no numbers on them now. And the exhibit numbers of the ones that are substituted for should be placed on them. And there is only one other thing that ought to be done. In most of the maps there is a portion of the river shown, and so you could tell easily what is in and outside of the watershed. There may be a few of them where there should be an arrow or something to indicate which is the watershed.

6074

1    MR. VEEDER:  Well, on that, your Honor, there are --

2  we will have that done.  And there are three additional

3  sheets which are of interest because of the change in the

4  watershed line.  And I intend in due time to call Mr. Cannon

5  in regard to the whole matter.  Mr. Sachse says that he

6  would rather not -- that he wants extensive cross-examination.

7  And it is obvious that it is, I would think, necessary.  I

8  would like to have, though, those -- I am worried about the

9  ten-day rule, and I am worried about other factors that --

10    THE COURT:  Unless somebody is concerned about the

11  ten-day rule we can go right ahead.  At any rate, these

12  that have been presented, and, according to your statement

13  you are submitting substitutes for Government's 103 to 108

14  inclusive and 110 through 114 inclusive?

15    MR. VEEDER:  Yes, sir.

16    THE COURT:  And the Clerk will match them up -- you

17  can do it after court -- and put the proper numbers on them.

18  And apparently you have a copy for me, also.

19    MR. VEEDER:  Yes, your Honor, we do.  And in regard

20  to the three additional pages, I would like to have those

21  designated.  I think it would probably be one --

22    THE COURT:  These are not pages to be substituted?

23    MR. VEEDER:  These are additional pages.

24    THE COURT:  New maps.

25    MR. VEEDER:  And I think that the way to avoid

1  difficulty would be to make it 102-A, -B, -C.

2      MR. SACHSE:  -3.

3      THE CLERK:  -3.

4      MR. VEEDER:  Well, 103 is already in.  We already have

5  103.

6      MR. SACHSE:  Don't you have a 102?

7      THE COURT:  You have a 102.

8      MR. VEEDER:  We have 102, and I would just like to

9  add it on with an A, B, C, to pick up those three additional

10  sheets.

11      THE COURT:  Well, that will be satisfactory.  It can

12  be 102-A, 102-B, and 102-C.

13      MR. VEEDER:  And those will be marked, and there are

14  copies for counsel.  I will take the balance of the copies

15  and have them down in the office.

16      THE COURT:  No changes going to be made on 102 or

17  109 or 115, 116, 117?

18      MR. VEEDER:  That is right.

19      THE COURT:  You can check later and see.

20      MR. VEEDER:  Yes, I want to be sure.

21      THE COURT:  All right.

22      THE CLERK:  Your Honor, I have a set of these.

23      THE COURT:  I want mine marked.  I want the numbers

24  on them.

25      MR. VEEDER:  We will have them marked.  We will also

1    put arrows as to the direction of the river on there.

2        THE COURT:   It may be that every one of them has

3    enough on it so you can tell.  I looked them over hurriedly.

4    I think they are all satisfactory.  If I have any problem

5    on that, I will ask for it later.

6        MR. MOSKOVITZ:   Your Honor, counsel had a little

7    discussion about the tour of the upper watershed that was

8    discussed yesterday, and Mr. Veeder has very kindly offered

9    the use of the Marine Corps bus.

10        MR. VEEDER:   Col. Bowen offered the bus to us.  Go

11   ahead.  Excuse me.

12        MR. MOSKOVITZ:   And Mr. Veeder suggests Tuesday and

13   Wednesday of next week.  I think we probably can make the

14   arrangements.  There will have to be some sort of planning

15   done for an overnight stay in that area.  But I think we

16   can probably do that today, and, with the cooperation of

17   the Vail ranch, outline a route.  I don't know just what

18   plans Mr. Veeder has as to where the trip should start from.

19        MR. VEEDER:   These aren't my plans, your Honor.  I

20   mean, it was a suggestion.  I didn't offer --

21        THE COURT:   You mean stay overnight on Tuesday night?

22        MR. VEEDER:   I hadn't thought about actually an over-

23   night stay, Mr. Moskovitz.

24        MR. MOSKOVITZ:   This is something that I guess can be

25   decided.  People can drive back Tuesday night if they want

6077

to to San Diego or their homes.

THE COURT:  Where would there be any accommodations for us?

MR. MOSKOVITZ:  That is something we would have to explore.  Perhaps there may be at Warner Springs or maybe Elsinore.  I don't know.  But if most people would rather go back to San Diego, that would make it a lot simpler for us.

MR. STAHLMAN:  I don't want to stick my neck out, but I might have a talk with Mr. Vail.  I might get ahold of him.  I talked with him yesterday.  I don't know where he will be today.  He is in different parts of the country, but there is a lodge up there.  He might say no soap; he might say okay.  I don't know.  But I will find out, because, if we are going to do it Tuesday, I don't know.  I will try to get ahold of him this noon on the long distance.  Maybe I can have some information this afternoon.  If not, there are a number of motels up in that area.

THE COURT:  Tuesday would be the 9th?  And the 10th. There is no court here on Monday because of the Judges' meeting, and probably there have been a few matters put over to Tuesday the 9th.

MR. STAHLMAN:  How many will there be on this trip? He may not have sufficient accommodations.

MR. MOSKOVITZ:  We had about 15 persons last time,

didn't we?

COL. BOWEN:  17.

MR. SACHSE:  17, you had.

MR. VEEDER:  I would think we could come back to Oceanside just as easily.

MR. STAHLMAN:  I think he might have accommodations for that number.  I will see if I can get ahold of him. He will have to make the motion.

THE COURT:  Would Wednesday and Thursday be just as good as Tuesday and Wednesday?

MR. MOSKOVITZ:  Yes.  The additional day might help.

THE COURT:  Because I have a few matters on Tuesday morning the 9th, so I think Wednesday and Thursday.

MR. STAHLMAN:  I think that is better.  We would know more about it, and we can make our plans Tuesday morning.

MR. SACHSE:  We can make our plans over the week end and confirm them in court Tuesday.

THE COURT:  All right.

MR. STAHLMAN:  That is a good suggestion, Mr. Hall. Thursday and Friday would be still better and we wouldn't have to come back.

MR. MOSKOVITZ:  No objection to that.

MR. STAHLMAN:  We will still be on the geology at that time.  This ties in with it.  The evidence might even indicate a little more logically what we should look for.

6079

THE COURT:  I want to check my calendar.  But it would be all right with me, Wednesday and Thursday or Thursday and Friday.

On the court calendar, Mr. Clerk, do you have anything?

THE CLERK:  Nothing for Wednesday, Thursday, or Friday, your Honor.

THE COURT:  Mr. Bailiff, get my desk calendar, will you, please.

We can discuss it later.

MR. STAHLMAN:  I have another matter.  Have you concluded?

MR. MOSKOVITZ:  I have some other things, but go ahead.

MR. STAHLMAN:  The suggestion that your Honor made yesterday relative to determining the difference in the capacity of the basins as contended for by the State and the Federal Government, I think the very practical suggestion -- and I was just wondering if it wouldn't be advisable while these geologists are still speaking to each other -- they couldn't get together and draw up a chart of some kind that would be of assistance to us that we can refer to, for instance, taking each basin, the usable capacity of the basin, or whatever factors that would be of benefit to us in respect to the two contentions, and then a column showing the difference.  And we could then have -- we may

6080

1  eliminate a lot of these basins, we know what we are talk-

2  ing about, and I think it would more clearly indicate to us

3  just what these differences are, if any.

4      MR. MOSKOVITZ:   Your Honor, that is what I understood

5  you requested the State to do.  We are doing it, and we have

6  no objection having the United States do the same thing.

7      THE COURT:   The difference in the suggestion is that

8  the geologists on the Government side cooperate in getting

9  some kind of a chart.  Now, you go through and get your

10 material, Mr. Moskovitz, and then talk to Mr. Kunkel and Mr.

11 -- well, Mr. Kunkel is the only geologist here now on the

12 Government's side, and see if you can get us some sort of a

13 parallel chart.  And certainly, your areals will have to be

14 grouped together to become the equivalent of what the

15 Government is talking about.  Apparently, there is not much

16 dispute on the basins in the lower Santa Margarita.  See

17 what can be done on that.

18     MR. MOSKOVITZ:   After we come up with something --

19     THE COURT:   That is a good suggestion, Mr. Stahlman.

20     MR. STAHLMAN:   Thank you.

21     MR. MOSKOVITZ:   -- we will show what we have done to

22 the Government's geologists.

23     THE COURT:   All right.

24     MR. MOSKOVITZ:   Now, your Honor, with respect to the

25 trip, shall we explore what the possibilities are of getting

accommodations up there and then report back next Tuesday? Would that be what you would want us to do?

THE COURT: Yes, you do it in any way you want to. As far as I am concerned, there is no great hardship for me to drive up there. I can come back or I can stay up there. I might even elect to stay all night with Mr. Stahlman, invite myself to his sumptuous quarters.

MR. STAHLMAN: You are certainly welcome at my place, your Honor.

THE COURT: I have many friends in the area. I can come back or go out. Anything you work out is all right. I will check my calendar. I have nothing on except on Friday night, is the annual meeting of the San Diego bar, and I plan to attend. And I want to be then, by 6:30 on Friday night.

MR. MOSKOVITZ: I would like to inquire now from Mr. Veeder as to whether he wants definitely to have Mr. Bookman here as a witness. If so, I would like to be able to get a date which I can give Mr. Bookman, tentatively, at least, for the purposes of his own schedule. He has requested that of me.

MR. VEEDER: Well, I look at it this way, your Honor: That I will know better when I finish cross-examination. And do I understand that Mr. Bookman is going into the hospital next week?

MR. MOSKOVITZ:  He is going in tomorrow and he expects
to be available sometime after the second week of January.

MR. VEEDER:  Well, if he is going into the hospital
tomorrow, I can't go to L. A., and if he is under an
anesthetic it would be taking unfair advantage.

MR. MOSKOVITZ:  If you want him we can set up a date
in January and let him have that on his calendar.

MR. VEEDER:  I think you should set up a date for him
in January.  It will probably be -- let's see; we start
back to work the 13th of January, is that right?

MR. SACHSE:  We start the 6th.

THE COURT:  The 6th.  But I understood you to say
sometime or other -- maybe it was on Thanksgiving Day --
that you had something on the first week in January.

MR. VEEDER:  Yes, I do, your Honor.

THE COURT:  The week of the 6th?

MR. VEEDER:  That is right.

THE COURT:  Where is it at?

MR. VEEDER:  Spokane.

THE COURT:  Can you complete that in a week?

MR. VEEDER:  Yes, sir, I can.

THE COURT:  So that for your convenience we couldn't
start back until the 13th of January, right?

MR. VEEDER:  Well, I hate to put it on that basis,
but it is true.  I would have a conflict.  I have an argument

1    on a case for a week.

2          THE COURT:   Then, shall we designate a day during

3    the week of the 13th or the 20th for Mr. Bookman?

4          MR. VEEDER:   Let's put it the second Tuesday after

5    we reconvene.

6          THE COURT:   We will reconvene on the 13th or the

7    20th, then?

8          MR. VEEDER:   the 20th will be good.

9          MR. MOSKOVITZ:   20th.   All right.

10         MR. SACHSE:   Mr. Veeder, that makes no change in the

11   Master's Hearing of the 12th of January?

12         MR. VEEDER:   No, if the airplanes are flying, it will

13   make no difference.

14         . MR. MOSKOVITZ:   I wonder if the United States has

15   well level measurements for the wells in Camp Pendleton for

16   1957-1958?   Are they going to be put in evidence?

17         MR. VEEDER:   I will have to inquire.   I assume we do.

18         MR. MOSKOVITZ:   We would like to have them if you do

19   have them.

20              Your Honor, yesterday after the examination on the

21   Bulletin I did not re-offer the portions of the Bulletin on

22   geology in evidence again.   I would like to do so.

23         THE COURT:   I am going to receive in evidence parts of

24   those chapters, by parts.   When you get to the place where

25   you want to offer the entire chapter, then I will hear you.

1    But this business of putting the chapters in by parts, I

2    don't approve of that.   It may be that B, Appendix B, has

3    been sufficiently completed.

4        MR. MOSKOVITZ:   I will offer Appendix B at this time,

5    your Honor.

6        MR. VEEDER:   Your Honor, you touched on the point

7    that is very important to the United States.   My view is

8    that Appendix B and the plates constitute the only conceivable

9    foundation for the statements written into Volume I of the

10   Bulletin.   And I don't see how they can be segregated or

11   separated, particularly in the light of the fact that

12   tabulation 15, apparently, has its genesis in tabulation B-3.

13   The method of arriving at the gross storage capacity and

14   the method of arriving at the usable capacity of the basins

15   were an element of probably the greatest importance.   And

16   to date I haven't been supplied by the State of California

17   with the methods utilized in arriving at those figures.   As

18   a consequence, it is impossible to properly formuate ob-

19   jections.   And certainly, it is impossible to cross-examine;

20   because, unless we have before us the actual procedures

21   utilized in arriving at those storage capacities, it just

22   can't be done.

23       THE COURT:   Now, Mr. Veeder is right.   I wouldn't

24   receive Table B-3 in evidence at this time, which is now

25   included within the Appendix B, nor the table appearing

at the bottom of page B-64, which is tied in with Table 16

in Volume I at page 81.  I have checked, however, the other

references in Appendix B, and unless I am in error the

various plates that are referred to in Appendix B are now

in evidence.

MR. MOSKOVITZ:  That is correct.

THE COURT:  Now, you can defer your offer or -- I

suppose it would be better to defer it until you have the

material for the plate on those tabulations unnumbered on

B-64 and the material in connection with Table B-3.

MR. MOSKOVITZ:  The storage capacity computation which

we are to consult with the Government's geologists on.  Very

well.  I will defer.

THE COURT:  And, of course, again, that ties in with

this job you are going to do.  If it appears as to some of

these smaller basins, you can be satisfied there is no

particular dispute.  Your material on tabulations can be

limited to the other basins that are in dispute. So I

would suggest that you defer your offer on it.

MR. MOSKOVITZ:  Very well.

LAURENCE JAMES,

having been previously sworn as a witness in behalf of the
defendants, resumed the stand and testified further as
follows:-


DIRECT EXAMINATION (Continued)

BY MR. MOSKOVITZ:-

Q   Mr. James, I hand you State's Exhibit M-9 for
identification and ask you to identify it and describe where
this sample was obtained?

A   The sample of Exhibit M-9 is a sample of older
alluvium which was taken from Long Valley Road, six-tenths
of a mile from Highway 395.

Q   Will you point it out, approximately, on Plaintiff's
Exhibit 15-A.

Do you care to look at it, your Honor?

A   The sample was obtained from this general area,
and I am referring to Exhibit 15-A.  I am pointing to the
northeast quarter of Section 1, Township 8 South, Range 3
West.

Q   And precisely where was it obtained?

A   It was obtained in a road cut on the north side
of the road.

Q   And what was the appearance of this road cut?

A   The road cut was vertical.  The material exposed

James - Direct

6087

A-4

therein is as you see here, a fine-grained sediment, moderately well cemented.

Q   And what is your opinion as to the permeability of this material?

A   That it is low.

THE COURT:  What was the answer?

THE WITNESS:  Low, your Honor.

THE COURT:  Is the sample typical of the material found in the area?

THE WITNESS:  It is typical of the material in the road cut, your Honor.

MR. VEEDER:  Well, now, if we are going to have "typical of the road cut," I think then there should be foundation as to the depths of the road cut, the -- I think there is no foundation if we are going beyond the one narrow strata from which this piece of --

THE COURT:  My question was this:  Did he pick up the piece of material that looked most impermeable to him or was this a typical piece that he picked up.  That is all I was concerned about.

THE WITNESS:  This is typical, your Honor.  We endeavored to do that at each one of these sampling points.

MR. MOSKOVITZ:  I offer State's Exhibit M-9 in evidence.

THE COURT:  M-9 received in evidence.

James O. SBC   Direct

1    Q  BY MR. MOSKOVITZ:  I hand you State's Exhibit M-10

2    for identification and ask you to identify what it is and

3    where it was obtained?

4    A    This is a sample of older alluvium obtained two

5    miles north of Highway 79 and Anza Highway Junction, from

6    the junction of those two highways.  And it was obtained

7    from a road cut.  This material, I should correct that, is

8    undifferentiated Pleistocene material.

9    MR. VEEDER:  Could we have that defined, your Honor?

10   THE COURT:  What do you mean by it?

11   Q  BY MR. MOSKOVITZ:  Define the term "undifferentiated

12   Pleistocene," if possible.

13   A    Well, those are one of the formational units that

14   we mapped which corresponds to the older continental

15   deposits as mapped by the U.S.G.S. in the easterly end of

16   the -- east of Vail reservoir.

17   Q    Would you point out in Exhibit 15 approximately

18   where this sample was obtained?

19   A    The best that I can point it out on this exhibit,

20   it was obtained in the general area here.  I am referring

21   to Exhibit 15 at a point two miles north of the junction of

22   Anza Highway with Highway 79.

23   Q    Will you describe precisely the appearance of the

24   cut from which you secured this sample?

25   A    This is moderately consolidated from cemented

1    sediment of fine and rather coarse particles which, in my

2    opinion, is relatively impermeable.

3        Q    How does the permeability of this material compare

4    with the permeability of the        exhibit offered, M-9?

5        A    I would say this was less.

6    MR. MOSKOVITZ:  I offer Exhibit M-10 in evidence.

7    THE COURT:  M-10 received in evidence.

8        Q    BY MR. MOSKOVITZ:  Mr. James, I hand you

9    California's Exhibit M-11 for identification and ask you to

10   identify it.

11       A    This is a sample of undifferentiated upper

12   Pleistocene sediments.  It was obtained from the north side

13   of Highway 79 about a mile east of Radec.  It was obtained,

14   again, from a road cut, a fairly high road cut.  Referring

15   to Exhibit No. 15 --

16   MR. MOSKOVITZ:  Would you like to see it, your Honor?

17   THE WITNESS:  -- it was obtained from this area I

18   am pointing to here which, as I stated, is approximately

19   one mile east of Radec on Highway 79.

20

21

22

23

24

25

Q   And can you describe the road cut from which this sample was obtained?

A   To the best of my recollection, this road cut was on the order of 15 to 20 feet high, sometimes fairly near to vertical, and is comprised of this material here interbedded with similar material.

Q   What is your opinion as to the permeability of this material?

A   The permeability would be low.

MR. MOSKOVITZ:  I offer California's Exhibit M-11 in evidence.

THE COURT:  Exhibit M-11 received in evidence.

(Defendant State of California Exhibit M-11 was received in evidence.)

(Another matter.)

THE CLERK:  The case on trial, No. 1247, United States vs. Fallbrook, et al.

BY MR. MOSKOVITZ:

Q   Mr. James, I hand you California's Exhibit M-12 for Identification and ask you to identify it.

A   This is a sample of undifferentiated Upper Pleistocene sediments.  It is obtained from Highway 79, 1.05 miles south of Wilson Creek, from a steep road cut which is located right on the drainage divide between Lancaster Valley and Radec.

X M11

Q   Describe the sample.

A   The sample is a fine-grained, moderately consolidated material which, in my opinion, is of low permeability.

THE COURT:  Point it out on the map.

THE WITNESS:  Right in that general area, your Honor. I am pointing to Exhibit 15.

THE COURT:  Is that south of Vail Dam?

THE WITNESS:  Your Honor, it is east of Vail Dam and just north of the community of Radec.

THE COURT:  All right.

MR. MOSKOVITZ:  I offer California's Exhibit M-12 in evidence.

THE COURT:  Exhibit M-12 received in evidence.

(Defendant State of California Exhibit M-12 was received in evidence.)

BY MR. MOSKOVITZ:

Q   Mr. James, I hand you California's Exhibit M-13 and ask you to identify it and state where it was obtained.

A   This is a sample of older alluvium obtained from Section 12, Township 8 South, Range 2 West.

Q   Would you point out approximately where that was taken from?

A   Referring to Exhibit 15-A, I am pointing in the Northeast Quarter of Section 12, of the township and range I mentioned.  This sample was obtained near, adjacent to a

1 stock reservoir on the Vail Ranch.

2 Q  Will you describe the sample?

3 A  This material is a fine-grained, moderately con-

4 solidated material.  I believe it is probably more permeable

5 than the previous sample, but its permeability would still

6 be relatively low.

7 MR. MOSKOVITZ:  I offer California's Exhibit M-13 in

8 evidence.

9 THE COURT:  Exhibit M-13 received in evidence.

10 (Defendant State of California Exhibit M-13 was

X M-13   11 received in evidence.)

12 BY MR. MOSKOVITZ:

13 Q  I hand you California's Exhibit M-14 for Identifica-

14 tion and ask you to identify it.

15 A  This is the sample of Recent alluvium from Pauba

16 Valley just below where that valley disgorges from Nigger

17 Canyon.

18 Q  Point out on Exhibit 15-A approximately where this

19 sample was secured.

20 A  This sample was obtained in this general area.  I am

21 pointing near the center of Section 5, Township 8 South, Range

22 1 West.

23 THECOURT:  Actually you are pointing to an area listed

24 on that map as younger alluvium?

25 THE WITNESS:  Yes, sir.  I described this as being

1    Recent alluvium, younger alluvium.  The material is--

2        MR. VEEDER:  May I inquire:  When you use the term

3    "Recent alluvium" it is synonymous with the term "younger

4    alluvium" as the United States has used the term; is that

5    right?

6        THE WITNESS:  That is right.

7    BY MR. MOSKOVITZ:

8        Q  Will you describe it?

9        A  This is a fine-grained, loose sand, which is moder-

10   ately permeable.  However, I would like to point out that the

11   permeability of this material, this Recent alluvium, would be

12   considerably lower than the Recent alluvium that occurs in

13   many other places in California, such as in the--

14       MR. VEEDER:  I move to strike the answer, your Honor,

15   It is not responsive to any question.  There is no question

16   presented in regard to it.  And other places in California are

17   totally irrelevant in this lawsuit, unless there is something

18   to show that they are comparable.

19       THE COURT:  That part may go out.

20       MR. VEEDER:  May I ask one more question here.

21       THE COURT:  The rest of the answer remains, that it is

22   permeable, more permeable than some of these previous exhibits

23   in the M series.

24       THE WITNESS:  Very definitely more permeable.

25       THE COURT:  But less permeable than some of the younger

1    alluvium elsewhere in this watershed?

2         THE WITNESS:  I think, yes, it is less permeable than

3    younger alluvium in many places in this watershed.

4         MR. VEEDER:  Your Honor, I think, moreoever, in view

5    of the condition of this exhibit, which appears to be mulch,

6    I think it is important whether this was taken from a field

7    or a road cut or the source of it.

8         MR. MOSKOVITZ:  I am going to ask that question.

9         Q  Describe precisely where this exhibit was obtained--

10   from a valley or a road?

11        A  Well, it was taken south of the road that leas into

12   Nigger Canyon in the flood plain area of the Pauba Creek--

13        MR. VEEDER:  Well, was it in a field?

14        THE WITNESS:  --Temecula Creek.

15        MR. VEEDER:  Was it in a field?

16        THE WITNESS:  The area had been leveled off.  But I

17   might add that this entire area near the mouth of Nigger

18   Canyon has been leveled off and  this material is representa-

19   tive, in general, in my opinion, of all this alluvium that is

20   disgorged right in here.

21        MR. VEEDER:  I object and move to strike--

22        THE COURT:  Wait until he offers it.

23        MR. MOSKOVITZ:  I offer in evidence California's Ex-

24   hibit M-14.

25        MR. VEEDER:  I object to it on the grounds that this

1    exhibit marked for identification as M-14 is taken from an

2    area which has been leveled, in process of being prepared for

3    cropping, I believe, and certainly the efforts of man in

4    regard to it have changed its texture, the whole aspects of

5    the kind and type of sample that is used here.  I have seen

6    this machinery that is used up there for leveling this land,

7    and I don't believe this could be considered to be representa-

8    tive of anything, from the standpoint of the production of

9    ground water.

10        THE COURT:  Well, whether it has been leveled or not,

11   that would now be the condition of the area at the end of

12   Nigger Canyon.  We would have to live with it.  It is not like

13   establishing a watershed line in a case where the watershed

14   line has been changed.  The objection is overruled.  The matter

15   you talked about goes to the weight.  The exhibit is received

16   in evidence.

17        (State of California Exhibit M-14 for Identification

X M-14   18   was received in evidence.)

19   BY MR. MOSKOVITZ:

20        Q  I hand you now, Mr. James, California's Exhibit M-15

21   for Identification and ask you to identify it and state where

22   this sample was obtained.

23        A  This is a sample of older alluvium obtained from

24   Section 2, Township 7 South, Range 2 West, a road cut in Los

25   Alamos Valley.

1     Q  Would you point out where that road cut is on Exhibit

2  15-A, as it appears on 15-A?

3     A  I am pointing to Exhibit 15-A to the road cut that

4  crosses Tucalota Creek near the south side of that section,

5  and the road cut is in this general area.

6     THE COURT:  What kind of material would you call this

7  exhibit?

8     THE WITNESS:  This is a consolidated sand, your Honor.

9  In my opinion, it would be of low permeability.

10     MR. VEEDER:  May I see the other sample?

11     THE COURT:  Is consolidated sand an older alluvium?

12     THE WITNESS:  Yes.  It is moderately consolidated and

13  moderately cemented.

14     THE COURT:  The area you took it from, according to

15  your plates, was what kind of ground-- residuum?

16  BY MR. MOSKOVITZ:

17     Q  Please refer to Exhibit 13-B and describe the area

18  from which this sample was taken.

19     A  Referring to Exhibit 13-B, on which the point of

20  sampling is shown to be on older alluvium as mapped on that

21  exhibit.

22     THE COURT:  The purple colored material in that exhibit,

23  then?

24     THE WITNESS:  Your Honor, it is on the orange colored

25  material.

1          THE COURT:  Pardon me.  I am looking at the wrong one.

2    All right.

3          MR. SACHSE:  Would you show me?

4          MR. MOSKOVITZ:  Point out to Mr. Sachse the place on

5    Plate 13-B where that sample was taken.

6          Q  Would you give your opinion as to the permeability

7    of that sample?

8          A  The permeability would be low.

9          MR. MOSKOVITZ:  I offer in evidence California's Exhibit

10    M-15.

11          THE COURT: Exhibit M-15 is received in evidence.

12          (Defendant State of California Exhibit M-15 was

13    received in evidence.)

14    BY MR. MOSKOVITZ:

15          Q  I hand you California's Exhibit for identification

16    M-16 and ask you to identify it and state where it was obtained.

17          A  This is a sample of older alluvium obtained from the

18    north side of Sheep Camp Spring, Section 1, Township 8 South,

19    Range 3 West.

20          Q  Will you point out where Sheep Camp Spring is lo-

21    cated on Exhibit 15-A?

22          A  I am pointing on Exhibit 15-A at the section and

23    range which I designated.

24          THE COURT:  15 would be east of Murrieta Valley in the

25    area designated as the older alluvium.

1      THE WITNESS: Yes.

2      THE COURT: And reasonably adjacent to the younger

3 alluvium?

4      THE WITNESS: That is correct.

5 BY MR. MOSKOVITZ:

6      Q Where does that spring lie in relation to the

7 Wildomar fault?

8      A It lies practically right along the Wildomar fault.

9 In fact, the Wildomar fault is, in my opinion, responsible for

10 the existence of that spring.

11      Q Would you describe the sample as to the grain size

12 and consolidation?

13      A It is moderately consolidated, poorly sorted,

14 cemented sediment of low permeability.

15      MR. VEEDER: Did you say that was from a road cut?

16      THE WITNESS: It is from the spring, from the side of

17 the spring, the embankment.

18      MR. MOSKOVITZ: I offer in evidence California's Exhibit

19 M-16, your Honor.

20      THE COURT: Exhibit M-16 received in evidence.

21      (Defendant State of California Exhibit M-16 was

22 received in evidence.)

23 BY MR. MOSKOVITZ:

24      Q I hand you California's Exhibit M-17 for Identifica-

25 tion and ask you to describe it and to indicate where it was

1   obtained.

2       A   This is a sample of older alluvium from the Northeast

3   Quarter of Section 35, Township 7 South, Range 2 West.

4       Q   Point out on Exhibit 15-A where that sample was

5   obtained.

6       A   I am pointing on Exhibit 15-A to the Northeast

7   Quarter of Section 3, Township 7 South, Range 2 West in the

8   general vicinity of the point of sampling.

9       Q   Will you describe the grain size and consolidation

10  of this material?

11      A   This is a poorly sorted sediment, moderately con-

12  solidated, with some cementation, and I would judge that it

13  would be of low permeability.

14      Q   How would its permeability compare with the finer-

15  grained materials which you have previously testified to in

16  other exhibits of the M series?

17      A   This would be more permeable than some and less than

18  some of the others.  I would have to compare it with the

19  specific sample.

20      MR. MOSKOVITZ:  I offer California's Exhibit M-17 in

21  evidence, your Honor.

22      THE COURT:  Exhibit M-17 received in evidence.

23      (Defendant State of California Exhibit M-17 was

X M-17  24  received in evidence.)

25

BY MR. MOSKOVITZ:

Q   Mr. James, you have testified to the relatively low permeability of the older continental deposits, older alluvium and differentiated Pleistocene deposits found north and south of Pauba Valley and found in the vicinity of Aguanga, Radec, and Nigger Valley.  What is the significance of the relatively low permeability of those materials?

MR. VEEDER:  I am going to object to that, one, because it is far too broad, for one reason; secondly,--

MR. MOSKOVITZ:  I haven't finished my question, Mr. Veeder.

MR. VEEDER: You said what was the significance of it, and stopped.

MR. MOSKOVITZ:  I didn't stop.  You interrupted me.

THE COURT:  Finish your question, Mr. Moskovitz.

BY MR. MOSKOVITZ:

Q   What is the significance of the relatively low permeability of that material in so far as the movement of ground water through that material is concerned?

MR. VEEDER:  I again object.  It is far too broad, for one thing.  Secondly, he has taken a series of road cuts, of materials which are not shown to be representative of the areas which are water bearing.  He has not shown that they are comparable with well logs in the area.  He has utilized a series of samples where the soils have been sun baked and

1  washed and weathered continuously, every one of them from a

2  surface area, and there is absolutely nothing to tie them to

3  the water strata concerning which the question is directed.

4  He didn't use an auger, he didn't go down a hundred feet, he

5  didn't go down 200 feet, he didn't in any way tie these samples

6  to the water-bearing characteristics of the lands to which he

7  is now testifying.

8      THE COURT:  If your question is limited to these par-

9  ticular samples, the objection is overruled.

10      MR. MOSKOVITZ:  Your Honor, I think the witness has

11  testified that in his opinion these samples would give evidence

12  of the materials in this area.

13      THE COURT:  I haven't heard him say that these samples

14  were typical of all the older alluvium in this district.  He

15  said they were uniform at the places he picked them up.  I

16  haven't heard him say that if you go over this entire area of

17  older alluvium shown on Government's Exhibit 15, this is the

18  kind of samples you would get.

19      THE WITNESS:  Your Honor,-- I beg your pardon.

20      THE COURT:  All right.

21      THE WITNESS:  I would like to state that each one of

22  these samples differs in some respects from the other, and that

23  each sample, in my opinion, represents the material that occurs

24  at that point, and the sampling points were selected, as you

25  can see, at random so as to give an overall idea of what the

1    permeability of the materials within that general region is.

2    THE COURT:  Your testimony is in the record in that

3    respect.

4    But still limit your question to these particular

5    pieces.

6    MR. VEEDER:  May I ask that it also include the fact

7    that these samples were taken from road cut levels?

8    THE COURT:  The record so shows that.

9    MR. VEEDER:  And not in the water-bearing strata.

10    THE COURT:  The record so shows that.

11    Answer the question.  The objection is overruled.

12    THE WITNESS:  Could I have the question back, please?

13    THE COURT:  Better rephrase it.

14    MR.MOSKOVITZ:  I will phrase it again.

15  BY MR. MOSKOVITZ:

16    Q  The question is, what is the significance of the

17    relatively low permeability of these materials in so far as

18    the movement of ground water is concerned?

19    THE COURT:  By "of these materials," you mean Exhibits

20    M-1 to M-17?

21    MR. MOSKOVITZ:  Yes, at this point I will ask it that

22    way.

23    MR. VEEDER:  I object.  There is absolutely no showing

24    where the water table was or that there was any water in the

25    samples or in the vicinity.

1      MR. SACHSE:  Your Honor please, I am interested in this

2   particular one, because it so happens that I have some clients

3   in this neck of the woods.  Mr. Veeder says that there is no

4   showing of any water in the area.  I submit that the testimony

5   of his witnesses and his own exhibits have been that this very

6   area shall be included in the ground water storage units, and

7   from the standpoint of my individual clients I am very inter-

8   ested in hearing the answer.

9      THE COURT:  That is not his point.  You missed his point.

10   The point is that instead of these exhibits coming from down

11   in the ground, where there was water adjacent to them or in

12   them, that they are exhibits taken from areas that have been

13   exposed to the air and the sun, and the question now is, how

14   are these as to permeability?  But I think the witness is

15   entitled to answer the question.  The objection is overruled.

16      Did I interpret your point?

17      MR. VEEDER:  That is correct, your Honor.

18      THE COURT:  He misunderstood.  He thought you said some-

19   thing about there being no water in that area.

20      Go ahead.  What is your answer?

21      THE WITNESS:  In my opinion, first, these samples would

22   be representative and would indicate or would have permeabili-

23   ties representative of the materials within the upper layers

24   of the older alluvium through which ground water would have

25   to pass in moving either to or from any of the streams in this

Case 3:51-cv-01247-JO-SBC   Document 4554   Filed 09/24/63   PageID.26834   Page 36 of 147.

6104

1    area.

2         Further, the nature of these materials would indicate

3    to me that the movement of ground water through them would be

4    slow, and in this respect I would say that wells pumping from

5    these sediments or from greather depths, if pumped long enough

6    and hard enough, could dewater some of these sediments.  The

7    effect of this dewatering or as a result of this dewatering,

8    water would move through the sediments toward the area that was

9    evacuated.

10        THE COURT:  That was being pumped?

11        THE WITNESS:  That was being pumped, yes, your Honor.

12        Now, in view of the nature of these materials, from

13   what observations we have here, whate evidence there is in this

14   area, I feel this movement would be slow.

15

16

17

18

19

20

21

22

23

24

25

THE WITNESS: If they were highly permeable, the movement would be slow. Now, the over-all effect of all of this would be, if you consider this thing over, say a period of a year --

MR. VEEDER: This goes far beyond the question, your Honor. I object to it.

THE WITNESS: The over-all effect would be that the quantity of water that would move from the stream to this evacuated area over this arbitrary period of a year would not be much. In fact, it could be, if the permeability is generally as low as it might be the case, it could be so low that the amount of percolation from the stream into these sediments would constitute only a small fraction of the flow in the stream.

MR. VEEDER: I move to strike the answer as not being responsibe and going far, far beyond any inquiry presented of this witness.

THE COURT: Overruled.

Now, you say the character of these materials, and referring to M-1 to 17, and as you described them, you said "cemented," "consolidated," and so forth; right?

THE WITNESS: Yes, your Honor.

THE COURT: Now, if they were down in the ground in an area where there was ground water -- let's not talk about permeability. Let's talk about water. In an area

1   where there was water, they would be saturated with water,

2   wouldn't they?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  They wouldn't be cemented?

5          THE WITNESS:  They can still be cemented, yes, your

6   Honor.  Well, your Honor, I would like to point out that at

7   one of the sampling points which was discussed -- I don't

8   recall the number right now, but it was the one to which

9   I referred where the materials were dipping in the cut for

10  the Metropolitan Water District -- now, at that point water

11  had accumulated, and the cut went below the water table in

12  that area.  And even at that point, in my opinion, these

13  materials were of low permeability where they were wet and

14  had been exposed to continual saturation.

15         MR. VEEDER:  That did not answer your question.

16         THE COURT:  That they would be cemented?  You take

17  any of these exhibits, M-1 to M-17 -- forget about the bag

18  of sand there, whichever one that was.  If you emersed that

19  in water and soaked it, the cementing action would be gone

20  completely, would it not?

21         THE WITNESS:  Well, the cohesion would be gone, that

22  is true.  But there is still --

23         THE COURT:  That is what I thought you meant by

24  "cementing."  What do you mean by "cementing"?

25         THE WITNESS:  Well, that is the fine materials within

1   the interstices that would impede the percolation.

2       THE COURT:  Is that what you mean by "cementing,"

3   that there are fine materials in between the larger

4   materials?  Rr do you mean this adhesion quality when you

5   describe it as being cemented?

6       THE WITNESS:  Your Honor, for example, adobe, which

7   will deteriorate upon saturation still has a clay-like

8   cement that holds the constituent parts together.  And

9   whether it is dry or whether it is saturated, it still is

10  of very low permeability.

11      Do I make myself clear?

12      THE COURT:  I understand, but I am just trying to get

13  what you meant by "cemented."  I understood you to mean

14  that the cemented quality was this adhesiveness which

15  appeared on some of these; the fact that you have to break

16  a piece off with your finger.  And you say you don't mean

17  that.  You are not talking about the fact that it is

18  hardish in characteristic.  But you are talking about the

19  fact it was little particles in between bigger particles.

20  Is that what you mean by "cemented"?

21      THE WITNESS:  That is in part, yes.

22      THE COURT:  In part.  In any part did you have in mind

23  the adhesion characteristic, the hardness of these particles?

24      THE WITNESS:  Well, the hardness doesn't enter into it

25  too much, I don't think, your Honor.  It is the materials in

1    there that impede the flow that are important.

2    THE COURT:  Let me ask you another question:  Did you

3    ever dig a well?  I don't mean boring one but dig it in the

4    ground where you get down in it and shore it up as you went

5    down?

6    THE WITNESS:  I haven't dug any that were shored, your

7    Honor.

8    THE COURT:  Have you ever been in any dug wells?

9    THE WITNESS:  Yes, your Honor.

10    THE COURT:  Supposing you took some of this material,

11    like some of these series -- let me see, about M-4, M-5

12    there.  Let's see which one I want to talk about.  I want

13    one about medium, not one of the --

14    MR. MOSKOVITZ:  Yes.  Here is one that has some fairly

15    good-sized grains, M-4.

16    THE COURT:  You got one of those reddish-colored ones?

17    The one you handed me looks like a piece of cement.  Which

18    one have you got?

19    MR. MOSKOVITZ:  M-10, your Honor.

20    THE COURT:  All right.  M-10.

21    Now, assume that you have an area of ground, half

22    an acre, we will say, 30 feet has this kind of material.

23    Assume it is saturated with water and you dig a well, one

24    that you can get down in.  You might have to board up as

25    you went down.  You probably would.  And would some water

1  seep, do you think, out of this into your pit?

2      THE WITNESS:  Very definitely some would seep.

3      THE COURT:  And it would probably be a little bit

4  colored with material, wouldn't it?

5      THE WITNESS:  Yes, sir.

6      THE COURT:  As this would seep out little by little

7  wouldn't channels be formed in that material?

8      THE WITNESS:  No, your Honor.  I can't agree with

9  that.

10     THE COURT:  New channels?

11     THE WITNESS:  No.  I can't agree with that, either.

12  There is a filtering effect where the smaller particles that

13  are included in there plug up the openings; and it gradually

14  tends to seal off, much as in an oil well, looking at it in

15  reverse, where the mud cannot go out into the interstices

16  of the sand.

17     THE COURT:  To the contrary, doesn't a certain amount

18  of the smaller particles tend to fill out with the water,

19  color the water, and some of the sediments flow out with

20  the water?

21     THE WITNESS:  That is true.  This is a situation that

22  is analogous with developing a well, an ordinary drilled

23  water well, where you understand you have slots in the

24  casing and when you first start to develop that well the

25  fine particles come in through those slots and into the well

1    until such time as coarser particles become locked together

2    around the periphery of the thing and the fines can no

3    longer get through, as you call them.

4        MR. VEEDER:  I fell off the sled back there.

5        THE COURT:  The longer you would pump out of this

6    well, wouldn't there be a tendency to more and more effect

7    small channels through which water would seep in through

8    the material into this subhole you created?

9        THE WITNESS:  No, sir.  I think you reach a point

10   where this no longer becomes effective.  This is what well

11   drillers do not want to encounter.  You undoubtedly heard

12   of the expression of a well "standing up," with the sands

13   coming in and the well pumping sand.  They want these

14   interstices to become plugged with the finer, to be inter-

15   locked so that the fine material does not come through and

16   no more channels are formed.  Otherwise, their well would

17   eventually fill up or they would be pumping sand.  This

18   does have a natural tendency.  What I am trying to say,

19   your Honor:  To stop, you will get some sands that come in

20   first into a well, but eventually this ceases, except in

21   extreme cases where the well has been abandoned.

22       THE COURT:  Go ahead.  It is time for a recess, I

23   guess.

24       MR. MOSKOVITZ:  Yes:

25       (Recess.)

C-3

1    Q  BY MR. MOSKOVITZ:  In your opinion, Mr. James,

2  what is the effect on the nature of older continental

3  deposits at depths when they are saturated because they are

4  below the water table?

5    MR. VEEDER:  I am going to object to that.  We have a

6  tremendous area, a tremendous valley in here with a

7  tremendous number of circumstances.  We have a vaster idea

8  of soils.  We have a lenticular situation concerning which

9  all have testified.  Now, I think we must be specific on

10  this, because a generalized statement is absolutely mean-

11  ingless.

12    THE COURT:  Except that the question of getting the

13  records for it is going to be one of the issues in this case,

14  permeability of the older alluvial, the older continental

15  deposits.

16    MR. SACHSE:  If Mr. Veeder wants to stipulate that

17  there is a tremendous variety of products in that orange

18  material and that permeability varies from one extreme to

19  the other throughout, why, I would be the happiest man in

20  the world to accept that.

21    MR. VEEDER:  As far as we are concerned, your Honor,

22  we have said there are lenses throughout this area that

23  produce greater quantities of water than other lenses.  But

24  we also say that, for example, the Roripaugh well which is

25  all in the older alluvium is a tremendous producer; and the

1    point being that wells like that are drilled right into this

2    very area without regard to the kind and type of lenses

3    that they intersect.

4         THE COURT:  Does Mr. Littleworth know -- I suppose

5    he did -- that the State was putting on some of their

6    testimony on geology and hydrology?

7         MR. MOSKOVITZ:  Yes, your Honor, I told him; and he

8    is following it in transcripts.

9         THE COURT:  Rephrase your question and limit it to

10   types of materials, such as we have seen here.

11        MR. MOSKOVITZ:  Yes, your Honor, I will.

12        THE COURT:  In the Exhibit M-1 to -17.

13        Assume that in an area of older alluvial there

14   were in depth materials such as Exhibits --

15        MR. MOSKOVITZ:  This is Exhibit M-6, your Honor.

16        THE COURT:  -- M-6, but fully saturated with water

17   within a water table.  What is the rest of your question?

18        MR. MOSKOVITZ:  What would be the effect of that

19   saturation upon the nature of the material?

20        MR. VEEDER:  I am going to object until there is

21   another factor put in there.  How deep the lenses are are

22   extremely important.  In other words, he says some of these

23   are relatively permeable.

24        THE COURT:  The question I gave him was:  Where this

25   type of material appears in depth.  And he is talking now

1    about a strata of this material.  If you want to call it

2    a lens, all right; such as Exhibit M-7.

3            MR. VEEDER:  Strata of all these varieties 1 through

4    17?

5            THE COURT:  No.  7, wasn't it?

6            MR. MOSKOVITZ:  M-6 is the one example I have given

7    him now.

8            THE COURT:  M-6.  Overruled.

9            THE WITNESS:  This material at depth and when

10   thoroughly saturated below the water table would, in my

11   opinion, remain very, be very low in permeability; and the

12   water would move through it most slowly, very slowly.  I

13   might add that the material, when it is buried and at

14   depth, it cannot fall apart as it does in these demonstrations

15   we have witnessed here in emersing them in the water;

16   because they are retained and held together by the overlying

17   and surrounding materials.  They cannot fall apart.  They

18   remain consolidated and compacted, and the water would pass

19   through them most slowly.

20           Q  BY MR. MOSKOVITZ:  Mr. James, referring to Plate

21   11-B in State's Exhibit L for identification, actually

22   Plate 11-B in evidence, will you explain the reasons why

23   no ground water basin was drawn to include the area of

24   older continental deposits lying northwest and southeast of

25   Pauba Basin?

James - Direct

1     A   We realized from the onset of our investigation

2  -- and our legend on Plate 13-B of that same exhibit will

3  bear out -- that the materials in the area to which you

4  refer do contain water; that there is probably quite a bit

5  of storage in that area.  However, there are very few data

6  available.  There are comparatively -- or there are very

7  few well logs, even less well logs, fewer well logs, than

8  there are wells in that area.  The logs are of pretty old

9  wells in some cases.  They are scattered.  And referring to,

10  I might refer to plate, or well location plate --

11     Q   What plate is that?

12     A   Plate 9-B is the plate to which I refer.  Now,

13  within the purple area on that map -- I am referring again

14  to Plate 9-B -- there are very few wells with logs which

15  penetrate these older materials to which you refer.  In

16  fact, it is on the order of something like 25.  Most of

17  these wells are concentrated relatively close to the margins

18  of the contact between the recent alluvium and the older

19  continental deposits.

20

21

22

23

24

25

1  For this reason, we felt there was not sufficient data in that

2  area to evaluate it--

3      THE COURT:  As a matter of fact, on your Plate 9B, as

4  of 1953 you don't even have the Roripaugh well, do you?

5      THE WITNESS:  No, sir.  That was before that well was

6  drilled, to the best of my knowledge.

7      THE COURT:  Have you inspected the well log of that

8  well?

9      THE WITNESS:  No, your Honor.  I have read the testimony

10  that the various witnesses have given in regard to it, and I

11  have inspected the well itself in the field; but I have not

12  had opportunity to examine--

13      THE COURT:  Is it your opinion that that well, with the

14  exception of the very upper part of it, is into the older

15  continental deposits?

16      THE WITNESS:  Yes, your Honor, it is.

17      THE COURT: And that the water produced from it is from

18  the older continental deposits?

19      THE WITNESS:  Yes, I believe it is.

20      THE COURT:  And it is a good well?

21      THE WITNESS:  It is a good well, yes, your Honor.

22      THE COURT:  What do you say as to that?

23      THE WITNESS:  Well, I say this, your Honor.  I think

24  there is on the order of 125 wells that we show on our Plate

25  9B-- I can't remember exactly, but it is somewhat on that

1  order-- that have been drilled into this purple area in

2  general, and I refer to the area from--

3      THE COURT: North and south of Pauba Valley?

4      THE WITNESS: Yes, sir.

5      THE COURT: And east of Murrieta Valley you are talk-

6  ing about?

7      THE WITNESS: That is true. And of this great number

8  of wells there is a relatively small handful which are good

9  producers.

10      MR. VEEDER: May I inquire, were those 125 domestic

11  wells?

12      THE WITNESS: On the order of 125, somewhere in that

13  magnitude.

14      MR. VEEDER: But they were domestic wells, were they

15  not?

16      THE WITNESS: I can't recall offhand. Some were

17  domestic, and some were probably smaller irrigation wells.

18      THE COURT: Isn't it true that most of the wells that

19  have been heretofore drilled in this area of the older

20  continental deposits were drilled not to secure large quantities

21  of water but were drilled as cattle wells, windmill wells, a

22  well for a house and outbuilding; isn't that true?

23      THE WITNESS: Yes--

24      THE COURT: Very few of those wells were put down with

25  large size casings or to any great depth?

THE WITNESS:  Yes, your Honor.  But I haven't made a
complete study from a numerical standpoint.  But I do note
two wells on our Exhibit 9B, one of which was drilled to a
depth of 590 feet and is not used.  I refer to Well 7 South,
3 West, D2.

MR. VEEDER:  Where would that be on Exhibit 15-A?

THE COURT:  2 West?

THE WITNESS:  3 West, D2.

THE COURT:  What section?

THE WITNESS:  Section 23.

THE COURT:  23D2, then?

THE WITNESS:  Yes, sir, that is right.

MR. VEEDER:  You don't have a number on that?

MR. MOSKOVITZ:  That is the number.

MR. VEEDER:  That is the number?

THE WITNESS:  Yes.

MR. VEEDER:  And it is not on 15-A?

THE COURT:  What section again?

THE WITNESS: Section-- I have written all over this--
Section 23, your Honor.

MR. MOSKOVITZ:  Your Honor, it is west of Murrieta Hot
Springs.

MR. VEEDER:  West of Murrieta Hot Springs?

THE COURT:  I see it.  How far did that well go down?

THE WITNESS:  590 feet, your Honor.

1        THE COURT:  And how big a casing?

2        THE WITNESS:  I would have to refer to the notes on

3  that.

4        THE COURT:  What did you find out about the well?

5        THE WITNESS:  It is no longer  used.  It is not used.

6        THE COURT:  Do you know why it is not used?

7        THE WITNESS:  No, sir, I don't.  But if they had ob-

8  tained a good well there, it stands to reason that there would

9  have been other ones in there.

10       MR. VEEDER:  I move to strike the answer, your Honor.

11       THE COURT:  It may go out.

12       Whose well is it?  On whose property?  Do you know that?

13       THE WITNESS:  Yes, I could check and refer to Appendix

14  F.

15       THE COURT:  What page?  On Page F-27, the Davis well

16  you are talking about?

17       THE WITNESS:  Your Honor, that should be 23D-1 instead

18  of D-2.  You will notice it is the well that belongs to Dr.

19  Nathaniel Davis.

20       MR. VEEDER:  Is there a log on that well?

21       THE WITNESS:  Yes, there is.

22       MR. VEEDER:  Is it in evidence?  We can't find it, if it

23  is.

24       MR. MOSKOVITZ:  If it is not in evidence-- it would be

25  in the State logs that have been put in for identification.

1    THE WITNESS:  In answer to your question, your Honor,

2  that was an eight-inch casing.

3    MR. VEEDER:  You say an eight-inch casing?

4    THE WITNESS:  Eight.

5    THE COURT: Apparently it was replaced by D-2 right next

6  to it, is that right?  Or do you know?

7    THE WITNESS:  I don't know, your Honor.

8    We don't have a depth on 23B-2.  But 23D-2 only has a

9  two-horsepower electric motor, so it couldn't supply much

10  water.

11    In further answer--

12    MR. VEEDER:  I move to strike that answer, too, your

13  Honor.

14    THE COURT:  It may go out.

15    MR. MOSKOVITZ:  What answer was that?  May I have it

16  read?

17    (The Reporter read the last part of the answer as

18  follows:  "A  But 23D-2 only has a two-horsepower electric

19  motor, so it couldn't supply much water."

20    MR. MOSKOVITZ: What part has gone out?

21    THE COURT:  The whole thing.  The size of the motor

22  and pump on a well isn't in itself evidence of what kind of

23  well it is.  A man might have a piece of arid ground and all

24  he wanted was enough water for a house.  He wouldn't put a

25  40-horsepower pump on it.  It may well be true, but it doesn't

1   follow.

2          THE WITNESS:  I have two other deep wells in this

3   general area, if your Honor is interested in referring to

4   them, about the same status as the one I just mentioned.

5          THE COURT: What are they?

6          THE WITNESS:  There is 7 South, 3 West, 9Q1.  That

7   well, your Honor is 735 feet deep.  It has been abandoned.

8          THE COURT:  Is there a log on it?

9          THE WITNESS:  Yes there is, your Honor.

10         MR. VEEDER: What is the number of that again?

11         THE WITNESS:  7 South, 3 West, 9Q1.

12         And then there is another one--

13         THE COURT:  Wait a minute.

14         MR. VEEDER:  Was that an oil well?

15         THE COURT:  It is not shown.

16         MR. STAHLMAN:  It is on the top of page F-20.

17         MR. VEEDER:  That is an oil well.

18         MR. STAHLMAN:  Jackie Coogan's, evidently.

19         THE COURT:  Was that an oil well?

20         THE WITNESS:  I have nothing in the records here to

21   indicate that it is an oil well.

22         THE COURT: Do you know anything about the well?

23         THE WITNESS:  Only what is in the table here, your

24   Honor.

25         THE COURT: What do you mean?  What appears on F-20?

1        THE WITNESS:  Yes.

2        THE COURT:  What does that tell us?  It tells us that

3   it is the Jackie Coogan well, 735 feet deep, not used,

4   abandoned.  Is that all you have on that well?

5        THE WITNESS:  We have a log on it, your Honor.

6        MR. VEEDER:  16A-15, your Honor, is the exhibit number.

7   It is an oil well.

8        THE COURT: ' Do you know whether there was water in the

9   well at any time, or whether there was any attempt ever to

10  get water out of the well?

11       THE WITNESS:  No, sir.

12       THE COURT:  What do you cite it to me for?  For what

13  purpose?

14       THE WITNESS:  Well, I was trying, in passing, to mention

15  a few of these deeper wells that had been drilled for which we

16  had no record of any water being encountered.  As I say, we

17  haven't made a detailed study of these things to see how many

18  other deep wells there might be which did not yield water.

19  But I mentioned this in passing.

20       THE COURT:  Do you have another well?

21       THE WITNESS:  Yes, your Honor, there is another well

22  here, and that is 7 South, 3 West, 7, it is either R-1 or R-2.

23       MR. VEEDER:  Is that in evidence?

24       MR. STAHLMAN:  7R2 is the deeper.

25       THE WITNESS:  7R2 is the deeper.

1      MR. STAHLMAN:  449 feet, at page F-19.

2      MR. VEEDER:  16A-14 is the exhibit number, your Honor.

3      THE COURT:  Does anybody find the number of the well

4  log on 23D-2?

5      MR. VEEDER:  I haven't, your Honor.

6      THE WITNESS:  Your Honor, I will have to retract that

7  last well, because it--

8      THE COURT:  23D-1 it should be.  What was the well log

9  on it?  Well, I have two things pending here.  What do you

10  want to do about this last well?

11      THE WITNESS:  Well, I indicated this as being one that

12  was drilled in the older alluvium, and it is not.  I made a

13  mistake.  It is one that was drilled in the Recent alluvium.

14      THE COURT: All right.

15      MR. VEEDER:  Your Honor, that is strictly a conclusion.

16  I object to it.

17      THE COURT:  Overruled.  You can cross-examine him.  If

18  you can show it was in the older alluvium, all right.  It is

19  apparently right down in the heart of Murrieta Valley.

20      MR. VEEDER:  It appears to be 449 feet deep.

21      THE COURT:  In the area of younger alluvium.

22      MR. VEEDER:  Well, the depth of the well is the import-

23  ant thing, your Honor, as I see it.

24      THE COURT:  What was the well log number on 23D1?

25      MR. MOSKOVITZ:  I found that well log, your Honor.

1          THE COURT:  Which one?

2          MR. MOSKOVITZ:  23D1, the one you have been asking

3  about-- 7 South, 3 West, 23D1.  It is one of the well logs

4  that the State has in Exhibit--

5          MR. VEEDER:  It is marked for identification.

6          MR. MOSKOVITZ:  --California's L Appendix Log 4.  That

7  is one of the logs which appears in that volume.  It has no

8  separate number.

9          THE COURT:  According to the log, apparently at over

10  500 feet they hit hot water, 112 degrees.  What is the last

11  entry on the thing?

12          MR. VEEDER:  590, hot salt water, pale green rock.

13          THE COURT: Do you know anything about that well?

14          THE WITNESS:  I haven't looked at the record lately,

15  your Honor, except that statement that you make there would

16  indicate to me that--

17          MR. VEEDER:  There we go again.

18          THE WITNESS:  --that it was not a very good well.

19          MR. VEEDER:  I move to strike the answer, your Honor.

20          THE WITNESS:  If they hit salt water--

21          THE COURT:  The motion to strike is denied.

22          It indicates something else to me.  It indicates to me

23  that in this particular area there must be some sort of nearness

24  to material underneath that heated the water or channels that

25  lead the water down into areas where it would get heated.

1          MR. MOSKOVITZ:  It was hot and salt, your Honor,

2  which indicates that it is not very good water for irrigation.

3          MR. VEEDER:  I move to strike counsel's conclusion.

4          THE COURT:  It is not evidence, Mr. Veeder.

5          MR. VEEDER:  I'll say.

6          THE COURT:  That is true.  But if it drew water out

7  of the basin, something else had to happen to the water.  In

8  other words, it is an exceptional well.  It is not the kind

9  of well we are looking at to prove anything.

10          Suppose it was hot salty water at 590 feet, what is

11  your theory, Mr. James, as to how it cot salty and hot?

12          THE WITNESS:  This would be a theory indeed, your Honor.

13  I would suspect that probably the well was drawing water that

14  was rising from a buried fault in that area at considerable

15  depth.  Hot water in this area is generally associated with

16  salting.

17          THE COURT:  In other words, it came out of a fracture

18  or a joint where the water came from such depth that it had the

19  effect of being heated by the hot material below?

20          THE WITNESS: Yes, sir.

21          THE COURT:  Then that doesn't help us very much in

22  talking about the basin here, does it?

23          THE WITNESS:  Except that it does show that here is

24  one well out of the very few that have been drilled to depth

25  that did prove to be apparently unsuccessful, from the log.  I

1    think, going a little further on this thing, that all of this

2    does point up there are very meagre data in this area.  My

3    feeling is that we don't really know what the situation is

4    in regard to successful deep wells.  There have been wells

5    drilled, a very few, which have been successful, and there

6    have been a lot of other wells drilled that do not yield a lot

7    of water, and until we know or have more information--

8         MR. VEEDER:  I move to strike the latter part of his

9    statement, your Honor.

10        THE COURT:  Motion denied.

11        THE WITNESS:  Until we have more information--

12        MR. VEEDER:  Your Honor, may I be heard for a moment

13   on this.  Here he is talking about a lot of deep wells that

14   have been drilled that aren't productive.  That is contrary

15   to the record, and there is not a thing in the world to support

16   his statement.

17        THE COURT:  You can bring that out on cross-examination.

18   Motion denied.  Overruled.

19        Finish your statement.

20        THE WITNESS:  Well, it is in regard to the scarcity of

21   this data in this area that we feel there is not sufficient

22   information to consider it as a ground water basin, your Honor.

23   We don't have enough well logs to make a meaningful estimate

24   of the storage capacity of all these materials in this area.

25   Nor do we have enough wells, by the same reasoning, with water

James   Direct

1   level measurements to draw, in my opinion, ground water con-

2   tours.

3          THE COURT:  Did you hear the testimony of the Govern-

4   ment with reference to the depth to ground water in various

5   of the wells up in the area of the older alluvium east of

6   Murrieta Valley and north of Pauba Valley?

7          THE WITNESS:  I have read some of that testimony, your

8   Honor.

9          MR. MOSKOVITZ:  Your Honor, these are the wells that

10   are spotted on Exhibit 15A.

11          THE COURT:  Yes.

12          And do you attach any significance to the fact that

13   wells in reasonable proximity one to another up in that area--

14   and by reasonable I mean with some of them even a mile or two

15   apart-- have water levels about the same?

16          THE WITNESS:  Your Honor, that is my point.  I don't

17   think there are, in my opinion, enough water level elevations

18   in that area to draw meaningful contours.  I will conced that

19   water moves generally from northeast to southwest, but the

20   way I regard it when you draw ground water contours you are

21   stating that the water flows at right angles, the direction is

22   at right angles to the contour line, and in my observation

23   there are certain structures, which I mentioned yesterday when

24   I was talking about the deep clay beds-- granted there is a

25   scarcity of knowledge of that area, but there are these things

6127

1    that suggest to me that there could be irregularities in the

2    direction of flow in that region.

3            THE COURT:  Yes, but do you attach any significance--

4    let me show you 15-A.  Let's just take an area out here that

5    appears north and south of the parallel between 7 South and

6    8 South in 2 West.  Here is a well in Section 34, 2 South,

7    Range 4 West:  Depth to water, 115 feet.  You drop down here

8    a good half mile away into Section 3, 8 South, 2 West, and

9    here is a well-- these are my figures on them-- this is K-1:

10   Depth to water, 1140 feet.

11           MR. MOSKOVITZ:  Isn't it level to water above sea

12   level?

13           THE COURT:  Above sea level, yes.

14           You move across, then, into Section 2, 8 South, 2 West,

15   Well J-1, 1147.

16           You come down into Section 11, 8 South, 2 West and we

17   have H1 at 1144, we have J2 at 1138, we have R1 at 1140, we

18   have P2 at 1128, we have P1 at 1125.  Here is a group of wells--

19   I haven't checked this one over here-- here is a group of

20   wells, over which I can practically put my hand on this map.

21           Do you attach any significance to the fact that the

22   depth to water from sea level seems to bear some relationship

23   one to the other in that area?

24           THE WITNESS:  Very definitely it does in that area,

25   your Honor.  However, if you will note the area further to the

1  north and further to the northeast and some of this area to the

2  west of the general region you mentioned, there is much less

3  control.

4          THE COURT:  Let's go further.

5          THE WITNESS:  Particularly south of Pauba Valley.

6          THE COURT:  I am just talking about north of it now.

7  Let's take Section 27, 7 South, 2 West.  Here is a well R-1,

8  1151.  In Section 26, 7 South, 2 West, here is a well nearby

9  1153.  Now both wells are drilled in younger alluvium where

10  they start, but I have no doubt that because of the shallow-

11  ness of that younger alluvium those wells go into the older

12  alluvium.  Does that have any significance?

13          THE WITNESS:  Those points would control the contour,

14  but how do we know what happens, say, out here in this area to

15  the northwest?  Perhaps this contour would swing down like

16  that.

17          THE COURT:  Well, we don't know.  But we go up to

18  section 21 in 7 South, 2 West and here is a well E1, a wind-

19  mill well, and we see 1180.

20          THE WITNESS:  That is true.  So you have control at this

21  point, and at this point here, your Honor.

22          MR. MOSKOVITZ:  Would you like to note for the record the

23  numbers of those wells?

24          THE COURT:  He was talking about Section 21, E1 and

25  Section 27R2.

1    Well, I realize that there are areas where no wells

2 apparently at all have been drilled.  But do you attach any

3 significance to the fact that here in an area there seems

4 to be some relationship to the depth, or the height above sea

5 level at which water stands in these wells?

6    THE WITNESS:  Well, yes.  They are tied together.  But

7 my feeling is that with the amount of information that is

8 available, your Honor, were we preparing a contour map, or

9 were we considering preparing a contour map rather than making

10 a map, we would make a statement in our report, say, that in

11 general the movement of water is in this direction.

12    THE COURT:  Indicating from--

13    THE WITNESS:  In the direction from northeast to

14 southwest, and that we do not feel that there are sufficient

15 data to draw a contour map, which implies that the direction

16 of water in any particular area is fixed.

17    THE COURT:  Well, let's forget now about how you are

18 going to draw contour.  Just talk about these wells for a

19 minute.  Where you find two or three wells within a mile or

20 so of each other that have a depth to water above sea level

21 that seems to be fairly close, doesn't that imply to you that

22 there must be some movement of water one way or the other

23 between them which causes those wells to stay at a certain

24 level?

25    THE WITNESS:  Well, very definitely, I agree with you,

1  your Honor, that there is a movement of water through that

2  area.

3      THE COURT:  Now, if there is a movement of water, isn't

4  it pretty apparent which way the movement is-- 34N1, 1115

5  feet; 26N1, 1153; 24F1, 1,433?

6      THE WITNESS:  That is true, your Honor.

7      THE COURT:  Do you have much doubt that the water is

8  going from northeast direction to the southwest instead of the

9  reverse?

10      THE WITNESS:  That is true.  And I think I stated that

11  earlier in the record.  However, my feeling is that that

12  movement should be described just as your Honor has described

13  it in words; that we cannot imply a specific direction in any

14  general area, which is done when contours are constructed.

15      THE COURT:  Wouldn't we have an entirely different

16  situation if, for instance, we discovered that in Section 34,

17  well N-1 depth to water here was, we will say-- sea level of

18  water, we will say, was 800 feet, and coming up a mile away

19  and found 1200 feet, and moving over another mile we found it

20  700 feet, and moving over another mile and you find it 1400

21  feet-- in other words, no particular order in the levels--

22  you might well decide that here was a series of pockets

23  independently holding water without any particular relationship

24  one to the other.  Is that right?

25      THE WITNESS:  That is right.  The situation you depict,

Case 3:51-cv-01247-JO-SBC   Document 4554   Filed 09/24/63   PageID.26861   Page 63 of 147

1    your Honor, would be very unusual in any sedimentary formation.

2         THE COURT:  And it would indicate that probably there

3    was not a basin, there were merely pockets or relatively

4    small basins that had water levels, none of which had a

5    relationship one to the other?

6         THE WITNESS:  Very true.

7         THE COURT:  Would you go so far as to say the wells

8    you have been talking about show some relationship one to the

9    other?

10        THE WITNESS:  Very definitely.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 3:51-cv-01247-JO-SBC   Document 4554   Filed 09/24/63   PageID.26862   Page 64 of 147

6132

E-1 ML

1    THE WITNESS:  Very definitely.  My point has been

2  that the material in this general area appears to be

3  generally of low permeability and that we do not feel we

4  have sufficient data to draw ground water, meaningful

5  ground water contours.  You can draw ground water contours

6  with no data at all or with very meager data, but to draw

7  meaningful ones I feel you should have more.  And also we

8  do not have enough data to compile a meaningful estimate

9  of storage capacity in that area.  That is the point I am

10  trying to make here.

11    THE COURT:  Whenever you draw a ground water contour,

12  it is an approximation, isn't it?

13    THE WITNESS:  Yes.  But here again it is up to a

14  matter of judgment, when you have enough points to accurately

15  control these contours and show the directions of flow.

16    THE COURT:  Does the fact that this entire area in

17  orange on 15-A is conceded by you to be what we call older

18  alluvial or the continental deposits, also have a significance

19  in the relationship of these wells one to the other?

20    THE WITNESS:  I don't exactly follow, but I think they

21  all -- there is no argument but what they are all connected

22  hydrolically.  This water is all in one body.

23    THE COURT:  That is what I am getting at.  In other

24  words, if, instead of this area shown on 15-A in the orange,

25  instead of its being older continental or older alluvial, if

1    it was residuum or igneous or metamorphic rock, and you had

2    drilled wells at different places and had found well levels

3    the same, you might have considerable doubt whether there

4    was any hydrolic connection between the water, would you

5    not?

6    THE WITNESS:  True.

7    THE COURT:  Because you would be getting water there

8    only out of fractures or joints or unusual situations; you

9    wouldn't expect to find a basin in the igneous or meta-

10   morphic rock; right?

11   THE WITNESS:  True.  Your Honor, our feeling is that --

12   MR. VEEDER:  Now, I am going to object if this is

13   just a statement without any inquiry presented.

14   THE COURT:  Overruled.  I want to hear what the

15   witness says.

16   THE WITNESS:  I say, my feeling is --

17   THE COURT:  By "feeling," you mean your opinion?

18   THE WITNESS:  My opinion, yes, your Honor. --there was

19   more drilling in this area with more ground water control,

20   ground water elevation control, with more logs, which

21   would depict the situation in there with more successful

22   deep wells.  The data might then be available.  From these

23   data we might conclude that this whole thing was a ground

24   water basin.  At this point we are very reluctant.  We

25   don't --

1          THE COURT:  Your point is if we had more information,

2   we could be more certain as to what is under there?

3          THE WITNESS:  That is true, your Honor.

4          THE COURT:  If we had a well in every 40-acre part of

5   every section, we could do a lot better job, couldn't we?

6          THE WITNESS:  That goes without saying.

7          THE COURT:  Or we could make some cuts two or three

8   hundred feet deep across here if that were possible, look

9   it all over, we would know what we are about?

10         THE WITNESS:  That would be the case.

11         THE COURT:  But since we have to take what we have

12  got, which is the old American method, what do we do?  Just

13  say, "Well, here are some wells hydrolically connected.

14  There is a relationship in the water levels.  They are in

15  an area of older alluvial, the kind of a place where you

16  would expect a water basin.  There seems to be a relation-

17  ship southeast to southwest.  But since we don't know all

18  that we would like to know about it, then we just ignore

19  it."  Is that what we do?

20         THE WITNESS:  Well, no, sir.  I would say we did not

21  ignore it.  We examined the data that were available and

22  came up with the conclusions that we have made in our

23  Bulletin 57.

24         THE COURT:  Where do those conclusions appear?  I

25  would like to read them.

THE WITNESS:  There are no specific conclusions in that regard.  It is throughout the text matter, textual matter.

MR. VEEDER:  And that is a point that is of extreme importance to us, your Honor, because the conclusions -- and that is why piecemealing us to death with 57 is so excruciatingly painful to me, is because we are in this position of having these conclusions set up in a variety of statistics in the Bulletin; and, if we are infiltrated with the Bulletin, pretty soon we will find that these conclusions which they say they cannot support are nevertheless going to be supported.

THE COURT:  I have heard all you say, and I don't even know what particular conclusion you are talking about.  I asked the witness if it was set forth specifically in the Bulletin.  He said, "No."

THE WITNESS:  Well, your Honor, let me refer to page B-62 in Appendix 2 of the Bulletin.

MR. MOSKOVITZ:  Appendix B.

THE WITNESS:  Appendix B, yes, sir, on page B-62.

MR. MOSKOVITZ:  In Volume II?

THE WITNESS:  The second paragraph on that page.

MR. VEEDER:  I am going to object to his reading it.

THE COURT:  Just a minute, Mr. Veeder.  We will take our noon recess.

1    MR. MOSKOVITZ:  I will ask the question after recess.

2    MR. STAHLMAN:  I think we are right at a very crucial

3    point in this case here, as far as I am concerned.

4    MR. VEEDER:  I believe we will all say amen to that.

5    MR. SACHSE:  I will agree.  We ended on an agreeable

6    note.

7    MR. STAHLMAN:  If we are going to draw a check on the

8    bank, we have got to know how much is in there.

9    THE COURT:  It may be we are not actually, when you

10   set this all down, too far apart.  I don't think we are too

11   far apart on the factual situation.  There is not much

12   dispute but what the well logs show and what wells there are.

13   If there is a dispute it is probably what conclusions we

14   should draw.

15   MR. STAHLMAN:  That is it.

16   THE COURT:  Be thinking about this:  If the State of

17   California is going to ask me to draw a conclusion -- I am

18   anticipating what Mr. Veeder's position apparently is --

19   if the State of California is going to ask me to draw a

20   conclusion that upon the basis of the evidence shown there

21   is no possibility of further agricultural development in

22   needs of the water in areas shown as orange and east of

23   Murrieta and north of Pauba Valley, I certainly am not going

24   to draw that conclusion.  We can stop right now and put your

25   mind to rest on it.

E-2

1      MR. MOSKOVITZ:  Your Honor, I thought I made it clear

2  many times.  That is certainly not our position.  Our

3  position is not that there will be no further development.

4  Our position is that on the state of the present known facts

5  you cannot conclude how much development there will be nor

6  how much that development will affect the flow of the stream.

7  That is as far as we go.  Withhold judgment and see what

8  happens when the development occurs.

9      MR. VEEDER:  And now, the point I make is that their

10  D897, their decision giving Fallbrook permits, is contrary

11  to what Mr. Moskovitz just said.

12      THE COURT:  Not necessarily.  Wait a minute.  We are

13  not going to go into that.  But here is why it isn't true:

14  If this land we are talking about had riparian rights and

15  is entitled to water, nothing that the Water Board could do

16  should rob them of it; and they have the rights.

17      MR. SACHSE:  They are upstream, too, Mr. Veeder.

18      THE COURT:  Sit on them for 50 years and they still

19  have the right; and, if Fallbrook wanted to go ahead and

20  build a dam and thought that there was surplus water and

21  that nobody was every going to develop this area, maybe

22  Fallbrook gets some water.  The time might well come when

23  you never get a drop, never get a drop.

24      MR. VEEDER:  They take ours, and then we would have

25  to fight.

MR. SACHSE:  Then you would enjoin us properly when we take yours, Mr. Veeder; properly.

MR. VEEDER:  No, your Honor, the whole -- you touched on the crux of it.  You touched on the crux of it right there.  The State of California issued permits on the basis of Bulletin 57, and now they say they don't have the facts to support it.

THE COURT:  We are not going to try what the State Water Rights Board did; but, on the other hand, I am going to try what rights there exist on this stream.  And where I find that rights exist on this stream, any action of the State Water Board is ineffective as affecting these vested rights.  Now, if there are water rights that exist that are not being used -- I suppose other riparians first of all should use them; and, if other riparians couldn't use them, then I suppose eventually appropriators could temporarily use them.  Is that right?

MR. SACHSE:  That is right, your Honor.

THE COURT:  An appropriator can't come in until all riparians have made a reasonable use of water.

MR. VEEDER:  I am perfectly willing, your Honor, to concede in theory some of the propositions which your Honor has advanced.  But I believe in actualities, and we live in a harsh world of actualities.  I observe it is the noon hour, your Honor, and --

THE COURT:  It is the noon hour.  But I would wager:

Here we can't decide these things.  We haven't got all the

evidence in.  I have got your positions.  You are not too

far apart on the facts.  You are not too far apart on the

facts that exist here.  It is the inferences that you want

me to draw and it is the legal conclusions thereafter.  I

would wager that if we would take the time out to make

somebody put their findings of fact and conclusions of law

in this area that we are talking aboutthat we wouldn't be

too far apart right now.  I wager we wouldn't be too far

apart.  I don't know whether you can try cases that way.

We might save a lot of time.  This goes back to Mr. Sachse's

suggestion that we --

           MR. SACHSE:  I suggested that, your Honor.

           THE COURT:  -- from time to time we find out how

close together we are on these things.  The Court makes a

finding that this was alluvial over continental; it was a

type of area where you would expect to find a basin.  That

there were wells, some that produced large amounts of water.

There were various smaller wells that produce it.  There is

an hydrolic relationship between many of the wells.  That

certain of the experts were hesitant to take positions be-

cause of a lack of information.  That the information is not as

complete as it might be elsewhere.  That there is permeability

in this area but of lesser degree than in the younger

alluvial.  I don't think anybody would kick at any of

E-3

1   these findings.  I don't think you would.  I don't think

2   Mr. Moskovitz would.

3        MR. MOSKOVITZ:  No, sir.

4        MR. VEEDER:  No.

5        MR. MOSKOVITZ:  The problem would then come as to

6   what should be done with the people who overly the areas.

7        MR. SACHSE:  That is the significant thing, your

8   Honor.  Sooner or later in this case your Honor is going to

9   have to say that that spot in the map, the effect of this

10  man's diversions are so minor that I should not consider

11  them at this time.  That spot exists somewhere on the map,

12  I am sure, even by Mr. Veeder's contentions.  Now, where is

13  it?  How broad those spots are, how much area they comprise,

14  is a very difficult problem you have.  And the basic pre-

15  sumption of California law, as far as I have always under-

16  stood it, is that in the absence of proof to the contrary

17  water shall be considered not a part of a stream system;

18  and in California, as you well know, a presumption is itself

19  evidence.  A presumption shall not be overthrown without

20  evidence to the contrary.  And the problem, as I see it, is

21  in the older alluvium.  Everything you have said I would

22  agree to.  Everything you said from the bench just now I

23  would agree to.  The problem would be:  Is that state of

24  proof sufficient to satisfy you in the face of a presumption

25  that all of the diverters from that area must be wrapped

1    into a decision adjudicating the rights of the stream?  Now,

2    that is the sticker that is going to confront you.

3        MR. VEEDER:  We take the completely contrary position,

4    however, that simply because there is not proof that a man

5    has rights to the use of the water and, complete proof,

6    that a man has rights to the use of water in the Santa

7    Margarita River, that he should automatically be cut away

8    and given no rights in this stream.  And that is the big

9    point.

10       THE COURT:  Is it possible now -- let's throw this

11   out:  In some of these areas I wouldn't have much of a

12   problem, I will tell you very frankly right now, in making

13   a decision.  Is it possible that we could take certain

14   areas and deliberately not make an adjudication one way or

15   the other?

16       MR. SACHSE:  I think you are going to have to keep

17   this case open, your Honor, and you are going to have to

18   state --

19       THE COURT:  Let me follow this out:  Supposing we

20   could take part of this area and say we have enough to go on,

21   in certain areas here where we find this map.  Some of them

22   we find that they are not part of the system, and others we

23   find they are.  But there are other areas, maybe certain of

24   these places, where there hasn't been a well within two or

25   three miles of it.  And we, therefore, do not at this time

1    adjudicate where there is water there that is part of the

2    stream or that there is vague or percolating water.  The

3    very fact that there is no well in the area, no diversion

4    going on, no one is hurt.  Just an unknown quantity.  Some-

5    body cuts the cake and finds out what happens in that area.

6         MR. VEEDER:  My view, of course, is this:  that in

7    regard to the man who owns a piece of property in this

8    general area where the witness has now testified that there

9    is hydrolic interconnection, in his opinion I would say that

10   under the rule of Katz vs. Walkinshaw,  in the State of

11   California that man has an interest and his rights and

12   interests should be protected by a decree stating that

13   rights could not be gained against him by prescription or

14   that he could not be deprived of his water if and when he

15   wanted to use it.  Now, that is our position.

16        MR. SACHSE:  Well, he has got a right, your Honor, as

17   an overlying landowner.  If you simply make no finding as

18   to the status of the part of the stream, he can take all the

19   water he wants, and until somebody does something different.

20   Mr. Veeder is making a straw man here.  The man has a right.

21   Simply because you don't find him a part of the stream

22   system doesn't destroy his water rights.  He has a right to

23   extract water from under his land.

24        THE COURT:  Now, here is another question, though,

25   aside from law, et al., just from the way these people wind up.

I am not so sure whether a man is helped or hurt by a finding one way or the other here.

MR. MOSKOVITZ:  Your Honor, I think perhaps this is where Mr. Littleworth and Mr. Krieger should come in, because they represent a lot of people in this area.  And their position, as I understand it, has been that they do not feel that there should be such a finding at this time. That would be in the interest of their clients.  Perhaps we should ask them to come in and express their findings on this point.

MR. VEEDER:  Our view is the whole object is to protect these people in their future development and also that we will know what rights could be reasonably be expected to be exercised in this area.  And so far as we are concerned, the proceeding would be completely abortive if we didn't delineate the areas and if we didn't declare that these people have rights to the use of water in the Santa Margarita River and can reasonably anticipate that in the future they will exercise --

MR. SACHSE:  In the Santa Margarita River?  You go that far?

MR. VEEDER:  I think if there is an hydrolic interconnection of the tributaries to the streams or the pumping of the Roripaugh well has an effect on the surface runoff, it certainly has an effect on us.

1   MR. MOSKOVITZ:  Your Honor, I think this is one

2   fallacy:  That it follows from hydrolic connection that there

3   will be a material effect on the stream from the pumping of

4   the ground water.  And that doesn't follow.  There is

5   probably hydrolic connection when a drop of water is taken

6   out of a fissure.  Theoretically Mr. Kunkel said this.

7   Theoretically it will come down and eventually it will get

8   out to sea.  But that is not the point.  Not a drop of water;

9   it is whether it will be material.  And we don't know that

10  yet.

11      MR. VEEDER:  The mere fact that we don't know precisely

12  all these elements, in my view, doesn't in any way alleviate

13  the concern that the United States has in regard to its

14  relationship with the Vail Company and the rights that we

15  are claiming.

16      MR. MOSKOVITZ:  That is a different question.

17      THE COURT:  2:00 o'clock.

18      (Whereupon a recess was had at 12:20 o'clock p.m.,

19  until 2:00 o'clock p.m. of the same day.)

20

21

22

23

24

25

1    SAN DIEGO, CALIFORNIA, FRIDAY, DECEMBER 5, 1958.  2:00 P. M.

2

3         THE COURT:  Mr. Stahlman told me that he had some slides

4    here.

5         MR. STAHLMAN:  Does anybody have any objection to the

6    Judge looking at them?

7         MR. MOSKOVITZ:  No.

8         MR. SACHSE:  No.

9         (Off the record, Mr. Stahlman shows slides to the

10   Court.)

11

12              LAURENCE JAMES,

13   recalled as a witness in behalf of the defendant State of

14   California, having been previously sworn, testified as follows:

15

16         DIRECT EXAMINATION (Resumed)

17   BY MR. MOSKOVITZ:

18         Q  Mr. James, what studies were made in the Santa

19   Margarita River investigation with respect to the location

20   of geologic faults and the effect which they might have had

21   in impeding the flow of ground water?

22         A  In the course of our geologic mapping, we located

23   the prominent faults within the area, and we also took notes

24   of any of these that had a significant effect upon the

25   movement of ground water.  Of all the faults that we examined

1 in the course of our investigation, the Wildomar fault was

2 found to have the most significant effect upon the movement

3 of ground water. This particular fault, it was observed that

4 springs were located along the trace.

5 THE COURT: This fault is located on the east side of

6 MurrietaValley?

7 THE WITNESS: That is true.

8 MR. VEEDER: Your Honor had inquired as to whether there

9 was general agreement with the State in regard to the barrier

10 effect of the Wildomar fault-- I mean whether our scientists

11 would be in general agreement. I think that if there is a

12 disagreement it is only as to degree. I think that there is

13 substantial agreement.

14 THE COURT: Yes.

15 Your chart or table that I looked at yesterday indicated

16 that none of the other faults had any effect upon the movement

17 of water?

18 THE WITNESS: Well, there is--

19 THE COURT: You just now said that the only appreciable

20 interference was the Wildomar fault.

21 MR. MOSKOVITZ: Let me ask this question:

22 Q Does the table that the Court was just referring to--

23 is that Table B-2 in Appendix B?

24 A Yes, it is.

25 Q That would be on page B-40 in Volume II. Does that

1  table list all the faults which were mapped in the geologic

2  investigation of the Santa Margarita River watershed by the

3  Division of Water Resources?

4      A  By no means.  There were a great many faults.

5      THE COURT:  These were the major faults; is that right?

6      THE WITNESS:  These were the big ones, yes.

7  BY MR. MOSKOVITZ:

8      Q  Of the other faults that were mapped, as appears on

9  Plates 13A and 13B, did you note whether any of those other

10 faults had an effect of impeding the movement of ground water?

11     A  Yes.  There was one fault up in the Anza area.

12     Q  Could you locate that by reference to any of the

13 plates in the back of Volume I?

14     A  I think it is probably shown as well as any place

15 on Plate 11B.  That is the "Lines of Equal Elevation of Ground

16 Water."

17     Q  For what area and what date?

18     A  That is for the inland area, fall of 1953.

19     Here you will note where it says "Anza Basin" in the

20 upper right-hand corner of this map.

21     Q  By "this map" you mean Exhibit L, Plate 11B?

22     A  Plate 11B.

23     There is a fault shown traversing the basin in a north-

24 west-southeast direction.  This fault was noted to affect the

25 movement of gound water.  There is mention of this in the text.

1       Q  Could you identify the place?

2       A  Well, for one place, on page--

3       MR. VEEDER:  Just a moment.  Are you going to be

4  testifying from the text here?  Is that the idea?  This has

5  not been offered yet, has it?

6       MR. MOSKOVITZ:  I am having the witness locate the

7  place where this is discussed in Exhibit L for Identification.

8       THE COURT:  The objection is overruled.

9       Locate the place and then decide whether you testify

10  or read.  Where is it?

11      THE WITNESS:  Page 73 of Volume 1, your Honor.

12  BY MR. MOSKOVITZ:

13      Q  Does it also appear--

14      A  Yes, it also appears in Volume II near the top of

15  page B-55, starting with the second line from the top and

16  continuing to the end of that paragraph.

17      THE COURT:  In your investigation made in this Anza

18  Valley and basin, is the alluvium on one side of that fault

19  deeper than on the other side?

20      THE WITNESS:  We don't really know just how the depths

21  of alluvium compare on either side of the fault, your Honor.

22  But there is a difference in water level elevation, as measured

23  in wells on either side.

24      THE COURT:  Read the answer, please.

25      (The reporter read the last answer as follows:  "A  We

1    don't really know just how the depths of alluvium compare on

2    either side of the fault, your Honor.  But there is a differ-

3    ence in water level elevation as measured in wells on either

4    side.")

5        (An interruption - the Court steps momentarily off the

6    bench.)

7        THE COURT:  I just had a call from Judge Harrison that

8    the Judge's meeting scheduled for Monday the 8th will not be

9    held.  That means that we could work Monday afternoon, if we

10   wanted to.  I have only a few matters in the morning.

11       THE CLERK:  A very few, your Honor.

12       MR. MOSKOVITZ:  There is some problem of plane reserva-

13   tions at the last minute, your Honor.

14       THE COURT:  Well, I have other things to do.  If you

15   don't want to work Monday afternoon we will start Tuesday

16   morning.

17       MR. MOSKOVITZ:  I would prefer it, your Honor.

18       THE COURT:  All right.

19       MR. VEEDER:  You have decided that we will not work on

20   Monday afternoon.

21   BY MR. MOSKOVITZ:

22       Q  Does the fault that you referred to in Anza Valley

23   appear in any of the geologic cross-sections?

24       THE WITNESS:  Yes, it appears on Plate 14, which is

25   entitled "Geologic sections A, A-prime, B, B-prime, C, C-prime,

1   dated 1954.  The lowermost geologic section on that plate,

2   entitled "Section C, C-prime, Anza Valley."  The fault closest

3   to the left-hand side of this section depicts the one which we

4   have been talking about.  I might note that this fault should

5   extend up through the Qal.

6          MR. VEEDER:  Are you revising the plate?

7          THE WITNESS:  There has been an omission on that plate,

8   yes, and I would like to call it to the general attention

9   here that that line should have been extended up through the

10  alluvium.

11         MR. MOSKOVITZ:  May we put that line through the Recent

12  alluvium on the exhibit, your Honor?

13         THE COURT:  Put it in with pen.

14         Which side of the fault is the water level highest?

15         THE WITNESS:  Your Honor, it is highest on the north-

16  east side.  This is shown on the plate of ground water contours,

17  Plate 11B.  This difference in water levels was noted in that

18  region along the fault on the north side of the Coahuila

19  highway, as shown on Plate 11B.

20  BY MR. MOSKOVITZ:

21         Q  Mr. James, what is the reason why a fault such as

22  the one depicted in Anza Valley would cause the disparity in

23  water levels that is depicted on Plate 11B?

24         A  There are several reasons why this can happen.  When

25  movement occurs along the fault there is a tendency, in some

1   instances, to grind up the materials right in the plane of the

2   movement.  These materials, when they are ground, increase--

3   well, they become less permeable, and this tends to create a

4   barrier to the movement of gound water.  Another reason, in

5   some instances you will have an offsetting along the fault in

6   which permeable zones on one side of the fault will be brought

7   up and adjacent to permeable zones on the other side, so that

8   it seals off the movement through the permeable zone.  Also,

9   sometimes a completely impervious body will be brought into

10  contact with the permeable beds just through the offsetting

11  along the fault.

12      Q  What in your opinion is the explanation for the imped-

13  ing effect which the Wildomar fault has on the movement of

14  ground water from the northeast to the southwest?

15      A  Well, I feel that it acts as a barrier, which very

16  significantly influences or impedes the flow of water.

17      Q  And what has that fault done, in your opinion, to

18  result in that impeding effect?  Which of the explanations which

19  you have given for the effects of faulting applies to the

20  Wildomar fault?

21      MR. VEEDER:  May I have that question read, please?

22      (The reporter read the pending question as follows:

23  "Q And what has that fault done, in your opinion, to result

24  in that impeding effect?  Which of the explanations which you

25  have given for the effects of faulting applies to the Wildomar

    fault?")

1          MR. VEEDER:  I don't understand it.

2          MR. MOSKOVITZ:  Your Honor, this witness gave a few

3    of the effects of faulting which results in the impeding of

4    flow of ground water, and I want to have him tie those into

5    the Wildomar Fault.

6          THE COURT:  I understand.

7          MR. MOSKOVITZ:  You may answer the question, Mr. James.

8          MR. VEEDER:  What is the witness doing?  Is he reading

9    from Bulletin 57?

10         MR. MOSKOVITZ:  He is referring to Bulletin 57.

11         THE WITNESS:  I am looking at Bulletin 57.

12         MR. VEEDER:  For the purpose of refreshing your memory?

13         THE WITNESS: For the purpose of reading what it says.

14         MR. VEEDER:  I object to it.

15         THE WITNESS:  Well, I can answer this.

16         THE COURT:  Well, then, answer it.  Don't read from the

17   Bulletin.

18         THE WITNESS:  Well, offhand I am not sure just which

19   one of those effects is the most important along the Wildomar

20   fault.  I think probably of the three possible effects that I

21   have mentioned all of them are involved to some extent.  We

22   know that the barrier effect does exist there.  I don't believe

23   there is any argument about that.

24   BY MR. MOSKOVITZ:

25         Q  Mr. James, from the fact that a ground water basin

1   has been delineated, such as the ground water basins delineated

2   on Plates 11A and 11B-- I will limit that to Plate 11B in the

3   upper watershed-- from the fact that a ground water basin has

4   been delineated, can it be necessarily concluded that pumping

5   of ground water in that ground water basin will have a

6   material effect on the flow of the Santa Margarita River

7   downstream?

8          MR. VEEDER:  I object to that question entirely.  First,

9   it is not comprehensible, because there are several different

10   kinds of basins shown.  Secondly, there is certainly no

11   agreement that the basins, as depicted on Plate 11B, are

12   properly described as basins.  There is no proof that the

13   physical features of the basins comport with the definition

14   that this witness undertook to ascribe to the basins.  Now

15   the generalized question is certainly objectionable under the

16   circumstances.

17          THE COURT:  I will have to have the question read.

18          (The reporter read the pending question as follows:

19   "Q  Mr. James, from the fact that a ground water basin has

20   been delineated, such as the ground water basins delineated

21   on Plates 11A and 11B-- I will limit that to Plate 11B in the

22   upper watershed-- from the fact that a ground water basin has

23   been delineated, can it be necessarily concluded that pumping

24   of ground water in that ground water basin will have a

25   material effect on the flow of the Santa Margarita River

1  downstream?")

2  THE COURT:  The objection is overruled.

3  THE WITNESS:  It is my opinion that in many instances

4  it will not significantly affect, or will not affect the flow

5  of water downstream, for this reason:  As an example, since

6  I have got Plate 11B open--

7  THE COURT:  This is all very general.  This was Mr.

8  Veeder's objection, in part.  The Court recalls that in

9  certain of this area there is testimony that the basement

10  complex comes clear to the surface and that any water that

11  passes from one of these upper basins to a lower basin would

12  have to practically pass over the top of the basement complex

13  and not through the alluvium.  That is true, is it not?

14  THE WITNESS: That is true, your Honor.  I was going to

15  go a little further on that.

16  THE COURT:  But that is not true in all cases.  Some

17  of the areas of alluvium are connected with continuous alluvial

18  matter clear to another ground water basin, are they not?

19  THE WITNESS:  That is true.  But in these instances--

20  THE COURT:  In which instances?

21  THE WITNESS:  In the latter instances that you just

22  mentioned, your Honor, it frequently happens that water that

23  would be pumped from such basins would merely detract from

24  what would otherwise feed the phreatophytes or vegetation down-

25  stream.

1          MR. VEEDER:  I object to this.  This witness is not

2    qualified to testify on that phase of it at all.

3          THE COURT:  Overruled.

4          Let me give you an example.  Let us suppose we had a

5    basin upsteam on the Temecula-- I don't suppose I could find

6    the particular one I have in mind here.

7          MR. VEEDER:  Coahuila Basin is a good example.

G-1 ML

1      THE COURT:  This is Coahuila Basin.  Let's take

2  Coahuila Basin.  And I don't think there is much dispute in

3  the geology of the Government and the State of California

4  that between Coahuila Basin and Wilson Valley, which is an

5  alluvial area below that, there is a strip in there where

6  the channel of the stream passes over the basement complex.

7  You want to check that to be sure?

8      MR. MOSKOVITZ:  May I ask if you are referring to

9  Exhibit 15 in this?

10      THE COURT:  I am looking at 15, yes.

11         Do you follow me?

12      THE WITNESS:  Yes, I do.

13      THE COURT:  Is that true?

14      THE WITNESS:  Yes, it is.

15      THE COURT:  You, therefore, would say that Coahuila

16  Basin, the water in Coahuila Basin, if we want to call it

17  that for the purpose of this question, would have no effect

18  on the flow of the stream in the Santa Margarita; is that

19  your statement?

20      THE WITNESS:  I don't believe it would have a significant

21  effect, your Honor.  A lot of the water that migrates down

22  that stream would be otherwise consumed by the pheatophytes.

23      THE COURT:  Let's go ahead, then.  Supposing that

24  wells are put in the Coahuila Basin and the basin in the dry

25  season of the year has been pumped almost completely dry,

James — Direct                                                    6157

1   and the rains come down in the late part of the year or early

2   part of the following year and the basin is practically dry.

3   The first thing that would happen would be that the basin

4   would fill up with water, wouldn't it, and then what was

5   left over would flow under?

6       MR. VEEDER:  Did you get the answer?  The reporter did

7   not get the answer to that question.

8       THE WITNESS:  I said, "Right."

9       THE COURT:  Then what was after after the basin was

10  filled would flow down the, over the basement complex and

11  into some place lower down on the watershed; right?

12      THE WITNESS:  Right.

13      THE COURT:  On the other hand, let's suppose Coahuila

14  Basin is not pumped at all and remains practically full.

15  When the rains come, water would pass directly over it, run

16  past the basement complex and down into the lower part of

17  the watershed?

18      THE WITNESS:  Correct.

19      THE COURT:  Then, how can you say that this little

20  natural reservoir, this little basin upstream can have no

21  effect on the stream below?

22      THE WITNESS:  Your Honor, it is probably more a matter

23  of degree.  But it has been noted elsewhere in other studies

24  that by pulling the reservoir down you can, in some instances,

25  pull the water level down below the roots of some of these

1    pheatophytes, and they will die out; and the water that they

2    would have consumed is, therefore, salvaged.

3        THE COURT:  You lost me completely.  I don't know what

4    that has got to do with what we are talking about.  Start

5    over again.

6        THE WITNESS:  Well, what I am trying to say is that

7    the natural vegetation, say, in the basin itself, there is

8    a certain amount of, let's say, cattails and toolies, and

9    that sort of thing, that consume a, pretty high consumers

10   of water.  They have a high consumptive use.

11       THE COURT:  Yes.

12       THE WITNESS:  The water level is pulled down, and uses

13   made of this water.  It is put to some beneficial use.

14   These cattails die out, because the water is pulled below

15   their root zone.

16       THE COURT:  Yes.  So, therefore, you are assuming they

17   died oompletely and for all time; the basin is a more usable

18   basin thereafter because there is no drawdown on it by the

19   phreatophytes?

20       THE WITNESS:  This is my feeling, your Honor.

21       THE COURT:  Isn't it true that in those instances

22   where the cattails and the phreatophytes die out there is

23   still enough life in the roots that as soon as some water

24   comes down, up they come?

25       THE WITNESS:  Well, this takes time, of course.  There

1    are also trees, too, that are involved in this sort of

2    thing.

3        THE COURT:  Then, would you recommend that basins be

4    pumped down so that all the phreatophytes would die and,

5    therefore, have more space in the basin for water?

6        THE WITNESS:  I think you could make better use of

7    the water.  That is my own particular feeling.

8        THE COURT:  Some of these basins in the more arid

9    part, the upper part of this watershed have very few phre-

10   atophytes in there.

11       THE WITNESS:  If that is true, then, this wouldn't

12   apply in such instances.

13       MR. VEEDER:  I do want a motion to strike the answer

14   as certainly not being responsive to the question.  The

15   question was simply this and very clearly:  Assuming that

16   the basin was pumped down and pulled down and the stream

17   ran across it, what would be the effect upon the stream

18   flow?  Now, that was the question.

19       THE COURT:  I will deny your motion, and I will treat

20   that as my question.  And he may answer it.

21       THE WITNESS:  What is this, again?

22       THE COURT:  Read the question.

23       (The reporter read back the question.)

24       THE COURT:  All right.

25       THE WITNESS:  Obviously, the water would flow into

1   the basin and help contribute to filling it up. But we are

2   not making any regulatory use or any use of the basin if we

3   do that.

4        MR. VEEDER:  I move to strike the last part of his

5   statement.

6        THE WITNESS:  Making a reservoir and leaving it full.

7        THE COURT:  Denied.  But to the extent that the water

8   was used to fill the basin there would be less water in the

9   watershed below?

10       THE WITNESS:  No argument.

11       Q   BY MR. MOSKOVITZ:  Mr. James, you have previously

12  testified your opinion as to the permeability of residuum

13  found in the Santa Margarita River watershed.  What is your

14  opinion as to the effect of pumping of ground water from

15  residuum in the De Luz Creek watershed upon the flow of

16  De Luz Creek?

17       MR. VEEDER:  I object to that.  There is absolutely

18  no foundation.  It is the most general question that could

19  be asked in this whole trial.  The relationship -- there

20  are innumerable tributaries.  The main stem runs over alluvium.

21  Sometimes it runs across residuum.  And we have to have a

22  specified area.  Are you talking about the Garnsey(phonetic)area?

23  Is he talking about some other area?  I think it must be

24  specified.

25       THE COURT:  What do you have in mind?  What are you

G-2

trying to prove?

MR. MOSKOVITZ: I am trying to get this witness' opinion on this issue, which is, apparently, being reopened by Mr. Veeder, as to where the pumping from the residuum is going to deep water De Luz Creek and whether you have to consider the rights to residuum when you are adjudicating the rights of De Luz Creek. And I thought it would be helpful to your Honor to have this witness' opinion as to that question.

THE COURT: Are you familiar with the De Luz Creek area?

THE WITNESS: I have been there, your Honor.

THE COURT: Have you been there or have you made some studies in the area?

THE WITNESS: Yes, we have. In the course of our investigations we have mapped the residuum.

THE COURT: I am now referring to the residuum as shown upon your geologic plates that cover that area. What is your answer to the question?

THE WITNESS: I don't believe that extracting water from that residuum would affect materially the flow in De Luz Creek.

THE COURT: What are your reasons for that opinion?

THE WITNESS: Well, for one thing, you have a matter of roots again. Any water that is going down that way

1  would be consumed by the vegetation and by pumping in the

2  residuum.  What little bit is able to squeeze through that

3  residuum, you are just cutting out what would otherwise be

4  consumed by that vegetation.

5      Q  BY MR. MOSKOVITZ:  What is the effect of the

6  permeability of the residuum itself on the amount of water

7  which would go from it to the stream?

8      A   Well, I think --

9      MR. VEEDER:  Your Honor, I am going to renew my

10  objections.  This falling back on phreatophytes to show that

11  the residuum is not permeable is fantastic.  I almost said

12  "observe."  But I didn't mean to be really quite so harsh.

13  The point I make is that he is not responding to the question.

14  He says that if there was a drawdown, it would kill the

15  phreatophytes.  Nobody likes phreatophytes.  Therefore, it

16  doesn't matter, as nearly as I can tell.

17      THE COURT:  What is the difference between this

18  question and the one you just asked the witness?

19      MR. MOSKOVITZ:  Your Honor, I am attempting to

20  develop this question -- this matter, I mean.

21      THE COURT:  Objection is overruled.  You know what the

22  question is?

23      THE WITNESS:  Yes, I do.  I think in previous testimony

24  and, in fact, in answer to the last question, I brought

25  forth that the residuum is very low permeability and that,

1    therefore, movement of water through it is very insignificant.

2        MR. MOSKOVITZ:  One further question.

3        Q    Would your opinion be the same with respect to

4    residuum in other portions of the Santa Margarita River

5    watershed?

6        MR. VEEDER:  I am going to object to that question as

7    being so general that even this witness, I would think,

8    would be afraid to answer it.  An additional factor:  that

9    unless there is a specification of the depth of the

10   residuum I don't believe that it makes a bit of sense to

11   ask such a question.  Depth of residuum certainly is im-

12   portant in regard to the water-using characteristics of it

13   and from the standpoint of burden upon the stream, the

14   factors which are entailed:  how close is the residuum to

15   the stream.  What is the interconnection.  What kind of

16   wells are used.  But, particularly, the depth of the residuum

17   is extremely poor.

18       THE COURT:  Overruled.  You may answer the question,

19   if you can.

20       THE WITNESS:  In my opinion, the same answer holds

21   for this question as for the last one.  Movement would be

22   very slow.

23       THE COURT:  Does the depth of the residuum have any-

24   thing to do with it?

25       THE WITNESS:  Yes, it does.

1    MR. VEEDER:  With the water-bearing quality.

2    THE COURT:  With the water-bearing quality?

3    THE WITNESS:  Yes, it does.

4    THE COURT:  What effect does it have?

5    THE WITNESS:  Well, the thicker it is, obviously,

6 your Honor, the more water is going to go through it.  But

7 it is so low in permeability that where I have observed it

8 in this watershed, I don't think it is going to appreciably

9 affect flow of the stream.

10    THE COURT:  Supposing, just take a hypothetical case,

11 you have a little basin filled with alluvial and on the

12 downstream lip of it extending for a mile or two there was

13 residuum.  When the basin overflowed, the water would flow

14 up to the residuum, would it not?

15    THE WITNESS: Very slowly, yes, sir.

16    THE COURT:  Supposing this basin up above the

17 residuum was being fed by rains in the wintertime.  Would

18 you say then that the residuum had no bearing on whether the

19 water flowing through it was part of the stream or not?

20    THE WITNESS:  In the particular instance that your

21 Honor brings forth where the stream would be running right

22 over residuum, I can see where it --

23    THE COURT:  Or through it.

24    THE WITNESS:  -- or through it, I could see where it

25 could have some slight effect.

1    THE COURT:  That is why I asked.  You generalize and

2    say that residuum without reference to area or place there

3    is --

4    MR. VEEDER:  Or the kind of pumping --   Excuse me,

5    your Honor.

6    THE COURT:  -- could have no effect.  Isn't your

7    statement too broad?

8    MR. MOSKOVITZ:  He didn't say no effect, your Honor.

9    THE COURT:  Well, very slight.

10    MR. MOSKOVITZ:  That is the testimony he just gave:

11    "very slight."

12    MR. SACHSE:  May I inquire:  Has your Honor read the

13    Master's testimony, by the Master on this issue?

14    THE COURT: . Part of it, but --

15    MR. SACHSE:  I would like to --

16    MR. VEEDER:  I object to this phase of it, your

17    Honor.

18    MR. SACHSE:  This is testimony in the record, Mr.

19    Veeder.  It is testimony by a United States witness.

20    MR. VEEDER:  I object to this course and --

21    THE COURT:  Overruled.  Let's see what Mr. Sachse has

22    in mind.  It was probably Col. Bowen's testimony.

23    MR. SACHSE:  Col. Bowen's testimony:  "On the strength

24    of the studies made in Fallbrook of these gently rolling

25    hills which comprise the major part of the upland portion

of the Fallbrook area is comprised of deeply weathered residuum. And generally throughout the residuum it is my opinion that the ground waters are vagrant, percolating, not a part of any refined channel, hence, not a part of the Fallbrook Creek, and, hence, the Santa Margarita River system." Then there follows two volumes in which Mr. Veeder attempts to get his witness to change his story but doesn't succeed.

THE COURT: That part may go out, the reference to two volumes and the --

MR. VEEDER: And also the fact I tried to get him to change his story. I never tried to get Col. Bowen to change anything.

THE COURT: Mr. Sachse's characterization of what happened may go out. The record speaks for itself.

MR. MOSKOVITZ: Your Honor, that concludes the question and answer portion of this examination. We have some slides which I thought you might be interested in looking at. It might be a nice way to finish up the week. We have it set up in accordance with your agreement.

MR. VEEDER: You mean we are going to finish up the week on slides?

MR. MOSKOVITZ: The witness took these slides. I will have him testify, and he will explain them.

G-4

1    THE COURT: All right. Just one moment.

2    MR. VEEDER: Where does he want to set up?

3    MR. MOSKOVITZ: I think his Honor still has a question

4 or two. He is studying something.

5    (Discussion off the record.)

6    THE COURT: I had a question I wanted to ask Mr.

7 Stahlman. And you may answer it or you may think about it.

8 I was just running on 15-A, on which I had a little more

9 detail than I had on 15, a tentative line of the Vail ranch.

10 And I note that the Vail line recedes from Point McCorner

11 on the south side of the Murrieta Valley -- probably in

12 Section 3, Township 8 South, 3 West -- in a northeasterly

13 direction to a point of about midway in Section 19, Town-

14 ship 5 South, Range 2 West; and then proceeds at right-angles

15 in a southeasterly direction to about the middle of the

16 northwest quarter of Section 38 and meanders around. But

17 the net result being that a large part of this orange-colored

18 material -- which the Government characterizes as older

19 alluvial or older continental material and which the

20 Government says lies in the basin, the underground unit

21 called No. 4 -- I have traced, as you will see, with a red

22 pencil, approximately the outline in the upper basin. A

23 large portion of that, particularly in the southeasterly end

24 of it, lies within the Vail estate. And I haven't heard

25 from the Vail estate as to what their position is in this

1    matter.   And I wondered if sometime along the line you

2    wanted to tell me what your position is on this.

3         MR. STAHLMAN:  I think we should, yes.  I thought --

4         THE COURT:   A little louder.

5         MR. STAHLMAN:  Yes, your Honor, I think that it might

6    be logical to follow naturally after the Government and the

7    State, and then you might like to hear our point of view.

8         THE COURT:  You know what your position is now, or

9    are you going to contend that this area within the Vail,

10    estate, which I have just described lying east of the

11    Murrieta and lying north of Pauba Valley and south of Pauba

12    Valley, is within the water storage unit?

13        MR. STAHLMAN:  Your Honor, I had some preliminary

14    discussions with --

15        THE COURT:  You don't have to answer now, you know.

16        MR. STAHLMAN:  I would be perfectly willing to tell

17    you that we are in contact with a geologist that may throw

18    some light on this, too.  I have had some preliminary

19    discussions with him.

20        (Discussion off the record.)

21        MR. STAHLMAN:  We have not formulated completely the

22    views until we have determined what is the position of the

23    State and the Federal Government.  I could tell your Honor

24    what I think about it at the present time.  Naturally, as a

25    result of listening to this evidence and some of these

1    discussions, I have reached some, if I may say, preliminary

2    opinions on what the situation is there. And I think,

3    however, we are confronted with what is going to be the big

4    question in this case, and that is: What is the degree of

5    continuity? That is, the continuity. I believe there is

6    continuity there between the older and the newer alluvium.

7    But there is some difference of opinion in our ranks to

8    just how this may be effected, as to what the difference is

9    between lenticular materials in relation to what may be the

10   vertical transmissibility, the rate, as related to the

11   waters that may come in from the side. Now, I am not the

12   geologist. I might put a little material under a micro-

13   scope, but I don't have the knowledge to state what our

14   conclusions will be. But we are thinking about it. When

15   the State has concluded, if your Honor is ready at that time

16   to hear from us, we will be ready.

17       MR. VEEDER: Did he say anything, your Honor, is what

18   I want to know.

19       MR. STAHLMAN: Not much.

20       (Laughter.)

21       MR. STAHLMAN: I think, however, I will continue.

22   I may go a little further in this voyage and say a little

23   less: that I think that some of the practical experiences

24   over the years of the Vail Company in relation to water

25   curves in connection with the use of water, the extraction

1    the pumping of water, may throw a great deal of light on

2    the question; and we expect to present some evidence of

3    that character.

4        THE COURT:  All right.

5        MR. STAHLMAN:  Did I say anything then?

6        MR. VEEDER:  Thank you.

7        THE COURT:  Now, these slides have been marked what

8    series?

9        MR. MOSKOVITZ:  The slides are the O series, your

10   Honor, and they go from O-1 through-26.

11       Q    Mr. James, would you state who took the slides

12   which are in Exhibit O-1 through -26?

13       A    I did.

14       Q    And when were these slides taken?

15       A    They were taken over a period of November 22nd,

16   23rd, and 24th, 1958.

17       Q    And what area were they taken?

18       A    Most of them were taken in the inland area of the

19   Temecula Creek watershed.  A few were in the lower area,

20   coastal area; and I think there is one or two there that we

21   took of the residuum which, for a matter of interest, these

22   were taken down in the San Luis Rey watershed.

23

24

25

1    BY MR. MOSKOVITZ:

2         Q  Would you identify the slides as we go along by

3    number and where they were taken and what they depict?

4         A  This slide was taken--

5         Q  This is State's Exhibit O-1 for Identification.

6         A  This was taken at a road cut on the north side of

7    the highway which runs through the Pauba Valley toward Radec.

8    The point you are looking at is about 100 feet east of the

9    bridge across Temecula Creek.  That is the embankment of the

10   road.  It shows older alluvial sediments.  It shows the site

11   of Sample No. 3-- that would be Exhibit M-3.  There is a

12   geology pick there just below the white layer of older

13   alluvium and against the orange, for scale.  The material

14   you see at the bottom of the slide is the permeable gravel--

15   I mean, it is not natural gravel.  It is the shoulder of the

16   road.

17        THE COURT:  What about the little area-- it looks like

18   about four inches in thickness-- above the gravel from the

19   road and running in a parallel line, about four or five inches

20   thick?

21        THE WITNESS:  I think, your Honor, that some material

22   has slid off here in this general region of the photo and that

23   probably a blade or some other highway equipment has come along

24   and cut this little scar at the very bottom and cut off this

25   material that sloughed down on here.  That is my impression.

1        THE COURT: All right, go ahead.

2        THE WITNESS:  That material is moderately well cemented

3    and appears quite impermeable.

4        MR. VEEDER:  Is that in regard, now, to the whole area

5    that you say is cemented?

6        THE WITNESS:  All of this material is moderately

7    cemented, the upper part.  This, incidentally, is dipping out

8    toward Pauba Valley at some point off the slide here-- it

9    becomes obscured.  This is the more impermeable, but both of

10   these are low in permeability.

11       THE COURT:  The whiter is the more impermeable?

12       THE WITNESS:  The less permeable.

13       This is a cut on the south side of Temecula Creek.  It

14   has been cut back by the stream.  Mr. Moskovitz is there for

15   scale.  The picture is taken of the southeast bank of the

16   Temecula Creek.  That would be the left bank looking downstream.

17   That is about one-half mile downstream from the bridge, from

18   the site of the last photo.

19   BY MR. MOSKOVITZ:

20       Q   And this is Exhibit O-2 for Identification.

21       THE COURT:  This bridge is the bridge down near the

22   junction of Highways 78 and 395?

23       THE WITNESS:  No, sir, it is at the east end of Pauba

24   Valley.

25       THE COURT:  At the east end of Pauba Valley?

1          THE WITNESS:  Yes, sir.  This, again, is the older

2     alluvial material.

3     BY MR. MOSKOVITZ:

4          Q  And that is Exhibit O-2 for Identification?

5          A  Yes, and sample 2 was taken at this point-- Exhibit

6     M-2.

7          Q  This is Exhibit O-3 for Identification, Mr. James?

8          A  That is correct.  This picture was taken from the

9     same point that the last picture was taken, but it is looking

10    downstream.  This is again the left bank of the stream.

11         Q  On what side of the stream would that be?

12         A  That would be on the left side looking downstream.

13         Q  In what direction would that be?

14         A  Southerly.  There are a couple of individuals there

15    for scale.

16         THE COURT:  I don't see any individuals.

17         THE WITNESS:  Well, they are rather difficult to see.

18    This is a white shirt right here.  I believe that is Mr.

19    Illingworth.

20         THE COURT:  All right.

21         THE WITNESS:  You will note the vertical cliffs there.

22    BY MR. MOSKOVITZ:

23         Q  This is Exhibit O-4 for Identification; is that

24    correct?

25         A  Yes.

1    Q  What is depicted on this slide?

2    A  This is an excavation feature part of the Metro-

3  politan Water District's new line, and this particular struc-

4  ture is located on the north side of Pechanga Creek.

5    Q  Describe the material that is exposed.

6    A  This is fine-grained sediments.  You can see the

7  vertical cut here.  They are not shown in the picture, but

8  just below the cut goes through the water table and the water

9  is puddled at the bottom.  This darker color here is, in

10  effect, moisture that has accumulated there in the sediment.

11  This is a fine sediment.  It is not as impermeable as a-- it

12  is more impermeable, let me word it that way, than most of

13  the samples that have been exhibited here.  It is, however,

14  in the older alluvium.

15    MR. VEEDER:  That is, of your M series; is that what

16  you are speaking of?

17    THE WITNESS:  That is correct.

18    MR. STAHLMAN:  Before you go further, may I ask a

19  question on this.  Do you know whether or not this was in a

20  portion of the Pauba Basin on Pechanga Creek?

21    THE WITNESS:  No, this is southwest of Wolf Valley.

22  BY MR. MOSKOVITZ:

23    Q  Could you point that out on Exhibit 15A?

24    A  It is where the aqueduct crosses.  It is in this

25  general area.  I am pointing to Exhibit 15 where the pipe line

1    goes across there.

2            THE COURT:  Is it in the younger alluvium, then?

3            THE WITNESS:  No, it is in the older alluvium.

4            MR. VEEDER:  What is the section, township and range,

5    please?

6            THE WITNESS:  It is near the southwest corner of Section

7    27, Township 8 South, Range 2 West.

8            MR. STAHLMAN:  I have another question while we are

9    on this exhibit.  What was the significance that you attached

10   to the water level of the materials that were moist?

11           THE WITNESS:  I was just pointing it out.  I was not

12   making any point on it.  That is an explanation for what

13   brownish core you see at the bottom of the slide.

14           MR. VEEDER:  How deep is the cut?

15           MR. STAHLMAN:  I was coming to that.  Do you know

16   whether or not this was in an area that had been dewatered?

17           THE WITNESS:  That would be just south of this.  They

18   had to dewater it in the bed of Pechanga Creek.  They had a

19   number of well points in there and had dewatered it.

20           MR. VEEDER: And what is the depth here of the cut?

21           THE WITNESS:  I have nothing in my notes as to the

22   depth, Mr. Veeder.

23           MR. VEEDER:  Than I object to this as being incompetent,

24   irrelevant and immaterial, your Honor.

25           THE COURT: Before I rule on it, give us an approximate

1    depth.  I take it that the picture was taken by someone stand-

2    ing on top of the cut?

3         THE WITNESS: That is true.  That is Mr. Illingworth

4    standing there.

5         THE COURT:  No, the person who took the picture, was he

6    standing on the surface of the ground or was he down in the

7    cut?

8    BY MR. MOSKOVITZ:

9         Q  Where were you when this picture was taken?

10        A  I was standing right near the top of the cut.  I

11   think my head would be above the level of the ground.  I was

12   partially down in the cut.

13        THE COURT:  What was the approximate depth of that cut?

14        THE WITNESS:  To the best of my recollection, I would

15   say 15 feet.

16        THE COURT:  All right.  Overruled, Mr. Veeder.

17        MR. MOSKOVITZ:  I was going to wait until all of these

18   had been shown to offer them together, your Honor.

19        THE COURT:  All right.

20   BY MR. MOSKOVITZ:

21        Q  The next one is Exhibit O-5 for Identification.

22        A  This is a road cut in the older alluvium on the south

23   side of Pechanga Creek, Township 8 South, Range 2 West, Section

24   26.  I am referring to Exhibit 15-A.  That sample was taken in

25   this general area right here.  I am pointing to Section 26 in

1    the older alluvium.  These are cemented sands and they are

2    interbedded with silt stones.

3         Q  Would you point out the cement sands and silt stones

4    with your pointer?

5         A  All right. They are underlying the conglomerates

6    (indicating).

7         Q  In the lower part of the picture?

8         A  In the lower part of the picture I am pointing to.

9         Q  What is the material above those cemented sands?

10        A  That is an old stream channel that at sometime in

11   the distant past had trended through that area, refilled this

12   cut area in here and has become consolidated.  It is what we

13   call in geological terms an "unconformity."  I don't attribute

14   any significance to that from our standpoint.  It is of

15   academic interest.

16        Q  Now go to Exhibit O-6 for Identification.

17        A  This is another road cut on the south side of

18   Pechanga Creek in Township 8 South, Range 2 West, Section 26.

19        Q  Will you locate it on Exhibit 15-A?

20        A  Yes.  It is on the south side in this general area

21   here.  There is a road that goes up the canyon here, which is

22   not shown.  It is again in older alluvium-- cemented sands

23   that are interbedded with silt stone.  Now the darker colored

24   material that you see there-- the one which-- I believe that

25   is a geology pick or something there for scale.

1     Q  Would you point to it with your pointer?

2     A  (Indicating.)  These are very fine-grained materials,

3  silty and of very low permeability.  The other materials are

4  of greater permeability, but even so would not transmit water--

5  would transmit but very little water.

6     THE COURT:  Let the record show that all of Section

7  26 and the three quarters of Section 27, namely, the northeast

8  quarter, the southeast quarter and the southwest quarter, are

9  all generally outside the boundary of the water basin as

10  depicted on the Government's exhibits.

11     MR. VEEDER:  That is Exhibit 17, your Honor.

12     THE COURT:  Exhibit 17.  I have it marked in on my

13  Exhibit 15-A.

14     THE WITNESS: Sample No. 4, I might add, was obtained at

15  this point.  That was the Exhibit M-4.

16  BY MR. MOSKOVITZ:

17     Q  Let us turn to Exhibit O-7 for Identification.

18     A  This is the same cut that was shown in the previous

19  slide.  Here you can see the silt stones.  They stand out a

20  little more spectacularly.

21     MR. SACHSE:  What do you call it-- silk?

22     THE WITNESS:  Silt.

23  BY MR. MOSKOVITZ:

24     Q  Would you please point them out with  our pointer on

25  the slide?

1        A   The light brown material is the silts, and inter-

2   bedded are moderately cemented sandstones.

3        Q   And what color are the interbedded moderately

4   cemented standstones?

5        A   They are buff-colored.

6        Q   And they are lighter than the other material?

7        A   Yes, they are.  They are the lighter of the two.

8        THE COURT:  This also is in Section 26?

9        THE WITNESS:  Yes, sir, it is.  The same spot as the

10   last slide.

11        THE COURT:  They are north of Pechanga Creek?

12        THE WITNESS:  It is the south side, your Honor.

13        THE COURT:  What road is this?  Where does this road

14   go?

15        THE WITNESS:  It is the road that goes up Pechanga

16   Creek and goes into the Indian Reservation, your Honor.

17        THE COURT:  All right.

18   BY MR. MOSKOVITZ:

19        Q   Turn to Exhibit O-8 for Identification.

20        A   This is a reservoir on the Vail property, located in

21   Section 20, Township 8 South, Range 2 West.

22        Q   Would you point that place out on Exhibit 15-A?

23        MR. STAHLMAN:  For the record, so that it may be

24   identified further, we may indicate that the Cantarini place.

25        MR. MOSKOVITZ:  Reservoir.

1          MR. STAHLMAN:  Yes.

2          MR. VEEDER:  Could I have the identification number,

3     before you go any further?

4          THE COURT:  Township 8 South, Range 2 West, Section 20.

5     BY MR. MOSKOVITZ:

6          Q   This is Exhibit O-8 for Identification.

7          A   Again in the background you see the hill in the

8     immediate background is of the older alluvial material, as is

9     the hill in the foreground. There is a small dam on the right

10    that has been constructed there.  I believe that is all on

11    this one.

12         Q   Exhibit O-9 for Identification.  What does this

13    picture show?

14         A   This is the same reservoir taken from the other

15    side.

16         Q   What is the significance of Exhibit O-8 and Exhibit

17    O-9 for Identification which depict this reservoir?

18         A   Well, the fact that you are able to build a reservoir

19    here and that it doesn't leak-- I don't know what construction

20    methods were utilized in building this reservoir, but I did

21    note while I was there that there was water at a level where

22    it was overlapping the older alluvial materials, and that

23    would indicate to me that there couldn't be serious leakage

24    through that older alluvial material.

25         MR. VEEDER:  Do you want us to reserve our objections

1  to the end when they are offered, your Honor?

2      MR. STAHLMAN:  What was that?

3      MR. VEEDER:  My view about it, your Honor-- these

4  pictures are going along-- the mere fact that a dam and a

5  reservoir is silted up, undoubtedly this is an old structure.

6  It is obvious to look at the growth around it.  It is apparent

7  that there are deposits in there.  They tend to seal and will

8  indeed seal the reservoir.  I believe that is true.  And I

9  think unless there is a showing that a sealing had not taken

10 place, this certainly--

11     THE COURT:  Well, this is a matter for cross-examination.

12     MR. SACHSE:  I think it is a matter for Mr. Veeder to

13 testify to.

14     THE COURT:  What you say in general is true.  In some

15 of these reservoirs that have stood for some time you will

16 find, when they dry out, actual cakes of clay at the bottom.

17     MR. VEEDER:  And there is compaction in the impounding

18 structure.

19     THE COURT:  But that is a matter for cross-examination.

20 Go ahead.

21     THE WITNESS:  I think, your Honor, one point that I

22 might mention here is that you don't find reservoirs of this

23 type, without very difficult construction problems, you don't

24 find them built on pervious materials that are obvious pervious,

25 such as these coarse alluvial gravels, in the Pecoima Wash,

1    and that sort of place.  It does indicate to me that there is

2    impervious material there, relatively so.

3    BY MR. MOSKOVITZ:

4         Q  Exhibit O-10 for Identification.  Will you describe

5    this exhibit?

6         A  This is the point where sample or Exhibit M-5 was

7    obtained.  We are standing near the left abutment of the

8    dam of Vail that was shown in the preceding last two slides.

9    The material that is being cut there is the older alluvial

10   material.

11        Q  Let us go to Exhibit O-11 for Identification.

12        A  Here we are obtaining sample Exhibit M-6.  This is

13   older alluvial material.  On the left-hand side is the

14   Cantarini pumping well, designated New 28 Well, for one.

15        Q  Where was this?

16        A  This is on the south side of Temecula Creek not far

17   from where the Wildomar fault crosses the creek.

18        Q  Will you point that out on Exhibit 15-A?

19        A  Yes.  In this general vicinity right here-- Township

20   8 South, Range 2 West, Section 20.  The well designation is

21   B-4.

22        Q  Turn next to Exhibit O-12 for Identification.  Where

23   was this slide taken?

24        A  I can't see my notes.

25        THE COURT:  I will turn the light on, and then I will

1    turn it off.

2         THE WITNESS:  This picture was taken at an excavation

3    for the Metropolitan Water District pipe line on the north

4    side of Pauba Valley.  It is alternating beds of cemented

5    sands and clay.  There is one small bed there that Mr. Illing-

6    worth is pointing to that is dipping to the north about 50

7    degrees.  This dip prevails, in fact, from his finger point

8    down to the lower right-hand corner of the slide is one large

9    continuous bed of clay.  This darker material that you see

10   in the slide to the left of that line are consolidated sands.

11   This is significant in this location because a bed of clay

12   material dipping such as that is dipping would certainly

13   practically cut off any underflow of water.  I mean there could

14   be no significant underflow of water horizontally through a

15   bed such as that.

16        MR. VEEDER:  At the point where the clay is situated;

17   is that right?

18        THE WITNESS:  Well, water in my opinion wouldn't move

19   very fast through any of that, but it certainly wouldn't get

20   anywhere through that clay bed.

21   BY MR. MOSKOVITZ:

22        Q  May I have the next slide.  This is Exhibit O-13 for

23   Identification.

24        A  This is a view looking toward the west from the

25   highway that leads from Aguanga to Anza.  It shows the

1    undifferentiated Pleistocene deposits on the left.  That is

2    badlands topography that we are looking at.  In the distance

3    just right of the center is Vail's concrete dam.  This was

4    taken with a telephoto lens.  The material on the left are the

5    continental deposits that lie between Lancaster Valley and

6    Radec Basin.

7        Q  Will you point out on Exhibit 15 the area which that

8    picture shows and the direction in which the picture was taken?

9        A  The picture was taken from this point-- I am pointing

10   to the easterlymost extremity of the Qtoal as mapped on Exhibit

11   15.  The picture was taken from that point looking toward the

12   west, and we are looking over this region of older sediments.

13       THE COURT:  Apparently taken about in line between

14   Sections 14 and 23, Township 8 South, 1 East?

15       THE WITNESS:  That is true; that general area.

16   BY MR. MOSKOVITZ:

17       Q  Let us move on to Exhibit O-14 for Identification.

18   What does this exhibit show?

19       A  Undifferentiated Pleistocene deposits in a road cut

20   on the highway one mile east of Radec.

21       Q  Point out on Exhibit 15 approximately where that

22   picture was taken.

23       A  I am pointing to exhibit 15 to a point on the Qtoal

24   about one mile from Radec on the highway that leads from Radec

25   to Warner Springs.

1          MR. SACHSE:  May I ask a question?  Is the surface

2     topography here the same badlands stuff that we saw in the last

3     photograph?

4          THE WITNESS:  That is true.  Your are looking right

5     at the material that comprises the badlands topography.

6     BY MR. MOSKOVITZ:

7          Q  And how was this material mapped on Exhibit 15?

8          A  It is mapped as Qtoal older continental deposits.

9          Q  And what is the difference between the lighter-

10     colored material at the top of the cut and the darker material

11     at the bottom?

12          A  The darker material at the bottom is finer grained.

13     It is well consolidated, of very low permeability.  The upper-

14     most material is more permeable.  This is sample 11 that is

15     being taken here.

16          THE COURT:  M-11?

17          THE WITNESS:  Yes, sir.

18          MR. MOSKOVITZ:  Exhibit M-11.

19          Q  Let us move on to Exhibit O-15 for Identification.

20     Identify this and state where this slide was taken?

21          A  This was taken on the highway that leads from Radec

22     to Sage-- Highway 79.  The picture is taken at the top of the

23     drainage divide between Lancaster Valley and Radec Basin.  It

24     is about 1.05 miles south of the bridge that crosses Wilson

25     Creek on this highway.

1      Q  Would you point out on Exhibit 15 where that slide

2  was taken?

3      A  I am pointing on Exhibit 15 to a point in the Qtoal

4  about a mile north of Radec.

5      Q  What is the nature of the material which is shown

6  in this steep cut?

7      A  Well, as I said, this is the material that we have

8  in sample M-12.

9      Q  Exhibit M-12?

10     A  Exhibit M-12.  It is of low permeability.

11     Q  Next to Exhibit O-16 for Identification.  Where was

12  this slide taken?

13     A  This slide was taken on the north side of Lancaster

14  Valley, Township 8 South, Range 2 East in Section 8.

15     THE COURT:  8 South, 2 East or 1 East?

16     THE WITNESS:  8 South, 2 East.

17  BY MR. MOSKOVITZ:

18     Q  Would you locate it on Exhibit 15?

19     THE COURT:  Where you are pointing there is 1 East.  If

20  it is 1 East it is over in the basement complex.

21     THE WITNESS:  It is 8 South, 1 East, then, your Honor.

22  BY MR. STAHLMAN:  May I ask whose property that is on?

23     THE WITNESS:  I am unable to tell you.  It is right

24  near a new well that was drilled by Ralph Anderson, if that

25  helps you any.

BY MR. MOSKOVITZ:

Q   And what is the significance of the reservoir in this material?

A   Well, here again it indicates that this material certainly wouldn't transmit water very rapidly or they would have been hesitant about constructing a reservoir of this size, in my opinion.

MR. STAHLMAN:   What was that opinion?

THE WITNESS:   This again suggests that a reservoir being constructed with abutments made out of this for walls in this older continental deposit suggests that the material is of low permeability, and it also appears to be of low permeability.

THE COURT:   This is in Section 8?

THE WITNESS:   Yes, your Honor.

THE COURT:   8 South, 1 East?

THE WITNESS:   Yes.

THE COURT:   This likewise is out of an area which the Government claims was any kind of a basin according to Exhibit 17.

MR. SACHSE:   Is that on the Stardust Ranch, do you recall, Mr. James?

THE WITNESS:   It is west and slightly north of the Stardust Ranch.

MR. SACHSE:   This is not the Stardust Ranch reservoir?

1          THE WITNESS:  I couldn't answer that, Mr. Sachse.  I

2     don't know who owns it.

3     BY MR. MOSKOVITZ:

4          Q   Turn next to Exhibit O-17 for Identification.

5          A   This is a stock reservoir on the Vail Ranch in

6     Township 8 South, Range 2 West in Section 12.

7          Q   Point out the location of that on Exhibit 15, or

8     perhaps Exhibit 15A will show it more clearly.

9          THE COURT: Section 12?

10          THE WITNESS:  Yes, your Honor.

11          THE COURT:  Most of that is in the younger alluvium?

12          THE WITNESS:  Well, it is off this little projection

13     of older alluvium that extends down into Section 12 in the

14     Northeast Quarter of that section, your Honor.

15          MR. STAHLMAN:  I think, your Honor, that that would be

16     the JK.

17          May I ask another question for identification?  Is that

18     particular reservoir in two sections?  Do you know?

19          THE WITNESS:  I couldn't tell you offhand.

20          MR. STAHLMAN:  A division in between?

21          THE WITNESS:  This is the easterly side of the reservoir.

22     The road comes around in the foreground and then swings off

23     going away.

24          MR. STAHLMAN:  That description would fit a couple of

25     reservoirs.

1        THE WITNESS:  Did you see the location on the map?

2   Does that help you?  It is right on that (indicating).

3        MR. STAHLMAN:  My best opinion is that it is the JK.

4   There are several reservoirs in that area.

5   BY MR. MOSKOVITZ:

6        Q  What is the nature of the material which is exposed

7   in the bank?

8        A  These are consolidated sediments.  Sample M-13 was

9   obtained at this point. They are moderately cemented.

10        Q  How was this material mapped on Exhibit 15-A?

11        A  It was mapped as older alluvium on our map, and on

12   theirs as Qtoal.

13        Q  Let us go to Exhibit O-18 for Identification.  Where

14   was this slide taken?

15        A  This is looking east into the mouth of Nigger Canyon

16   downstream from the Vail concrete dam.  I can point to it on

17   Exhibit 15.  It is this area in Section 5, the Southeast

18   Quarter of Section 5, Township 8 South, Range 1 West.

19        MR. VEEDER:  May I ask a question?  Is this not the

20   area in which you obtained the very fine soil that is, I think,

21   your Exhibit M--

22        THE WITNESS:  14.

23        MR. VEEDER:  --14?

24   BY MR. MOSKOVITZ:

25        Q  This is the place where sample M-14 was secured?

1      A That is true.

2      Q  Next to Exhibit O-19 for Identification.  Where was
3  this slide taken?

4      A  This was a small reservoir located in Long Valley.
5  This reservoir is setting on the materials mapped as Recent
6  alluvium.  It is right near the Wildomar fault.  The Wildomar
7  Fault passes right through this general area looking right
8  through the photo.

9      Q Would you please locate that place on Exhibit 15-A?

10     THE COURT:  It is on the Vail property, then?

11     MR. HALL:  No.

12     MR. STAHLMAN:  I don't think so.  I don't recognize it.

13     MR. VEEDER:  Is that the Cantarini camp?

14     THE WITNESS:  I said in this general area here.

15     THE COURT:  He said Long Valley.

16     MR. HALL:  Long Canyon then.

17     THE COURT:  That is on Vail's property, isn't it?

18  BY MR. MOSKOVITZ:

19     Q  It is on the Long Canyon, isn't it?

20     A  Yes.

21     THE COURT:  That is on the Vail property, isn't it?

22     MR. STAHLMAN:  Yes.  -- If it is there.

23     THE COURT:  In what section is that?

24     THE WITNESS:  It would be Section 1, Township 8 South,
25  Range 3 West.

BY MR. MOSKOVITZ:

    Q  And what does this slide depict?  What is the significance of this slide?

    A  Well, it again depicts the older alluvial materials in the background in the general vicinity of the Wildomar fault.  I guess that is about all.

    Q  I think you misspoke.  Did you call this Recent alluvium or older alluvium?

    A  That is Recent alluvium in that area.

    MR. VEEDER: What is the source of the water?

    THE WITNESS:  I couldn't tell you offhand.  I think probably that is associated with one of the springs that lies along the trace of the Wildomar fault.

BY MR. MOSKOVITZ:

    Q  Exhibit 0-20 for Identification is next.

    A  This is a picture of the Metropolitan Water District pipe line excavation.  The construction equipment that you see in the background, the orange dragline, is in the stream bed of the Santa Gertrudis Creek.

    Q  Would you point out on Exhibit 15-A where that slide was taken?

    A  It is in this general area.

    Q  What section is it?

    A  That is Section 20, Township 7 South, Range 2 West.

    THE COURT:  The line cuts right across Santa Gertrudis

1    Valley there?

2         THE WITNESS:  Yes.  The line shown on the map here is

3    the old line, which is some distance to the west.

4    BY MR. MOSKOVITZ:

5         Q  Could you show on the slide where Santa Gertrudis

6    Valley is?

7         A  Santa Gertrudis Valley is where the equipment is

8    standing right here.

9         Q  And what is the direction in which Santa Gertrudis

10   Valley runs?

11        A  We are looking toward the north and the Santa

12   Gertrudis Valley runs at right angles, the way we are looking.

13        It is of interest here to note that there is a high

14   content of clay in the lower flood plain area of Santa

15   Gertrudis Creek.  I think you can see it in the picture.  It

16   is darker color.  This is the contact between the sandstone

17   materials.

18        Q  Is that where the color changes?

19        A  It is where the color changes.

20        One explanation of this phenomenon is that in the past

21   in the course of its meandering back and forth across its

22   flood plain the waters have seeped down from the bottom of

23   Santa Gertrudis Creek and have weathered the underlying

24   materials so  that the felspars and other minerals that deter-

25   iorate have changed to clays, leaving a more impermeable part

1  beneath that flood plain than what is found here further to

2  the south.

3       Q  What is the nature of the material exposed in the

4  cut in the foreground of the picture?

5       A  It is a moderately consolidated sandstone. There is

6  some structure in this.  You can see there is a slight dip to

7  the south.  It is not too apparent in the picture.

8       Q  What is the material mapped as on Exhibit 15-A?

9       A  That is older alluvium.

10      Q  Next to Exhibit O-21 for Identification.

11      A  This is another picture.  It shows the structure a

12  little more pronounced.

13      Q  Is that in the sameplace?

14      A  That is the same place.  You can see the dip here

15  to the south of the clay material interbedded with sandstone.

16  Here again is the darker weathered material that is in the

17  flood plain of Santa Gertrudis Creek.

18      Q  And that material is also older continental deposits?

19      A  Yes, it is.

20      Q  Exhibit O-22 for Identification.  Where was that

21  picture taken?

22      A  This was taken from the samepoint that the last

23  few slides were shown from.  This is again Santa Gertrudis

24  Creek, the channel near where the equipment is standing.  The

25  clays underlying the flood plain are apparent.

1      Q  What color do they appear?

2      A  They appear brown, rather dark brown.

3      Q  Exhibit O-23 for Identification next.  Would you

4  describe that exhibit.

5      A  Another picture from approximately the same location

6  looking at Santa Gertrudis Creek at the pipe line cut.  the

7  darker material appearing in the picture there in the fore-

8  ground.

9      Q  What do the piles of material that seem somewhat

10  looser at the top of the trench indicate?

11      A  Well, that is a material that has been excavated in

12  the course of digging the cut here.  That is the spoils.  It

13  is piled up.  You can see here, I believe, where in excavating

14  it they have gone through clay material and then through sandy

15  material and then clay material.  You get a rough idea of

16  what was gone through by looking at the pile.

17      Q  Next, Exhibit O-24 for Identification.  Where was

18  this slide taken?

19      A  This slide was actually taken about a quarter of a

20  mile east of Fallbrook in a cut in the highway that leads from

21  Fallbrook over to Highway U. S. 395. That is residuum that you

22  see.

23      THE COURT:  Outside of the watershed?

24      THE WITNESS:  No, sir.  This particular one is inside.

25      MR. VEEDER:  This is residuum?

1    THE WITNESS:  Yes.  You can see the cracks in it which

2   transmit some water, but in general the material is of very low

3   permeability.

4    THE COURT: Weathering has gone on in the entire area

5   shown in the photograph?

6    THE WITNESS:  It has gone on, yes, your Honor, but it

7   has been more pronounced on the upper horizons.  Down here the

8   cracks are in somewhat fresher rock and the weathering is

9   continuing along those fissures.

10    MR. STAHLMAN:  May I ask what highway that was on?

11    THE WITNESS:  It is on the highway that goes from

12   Fallbrook to 395.

13    MR. STAHLMAN:  There are several highways.

14    MR. MOSKOVITZ:  This is the main one, isn't it?

15    THE WITNESS:  The main one, yes.

16    MR. SACHSE:  Was it in the watershed?

17    MR. MOSKOVITZ:  It was partly in the watershed and then

18   goes out of the watershed.

19    MR. SACHSE:  That is Mission Road.

20    THE WITNESS:  This is not far from the drive marked

21   KNob Hill.

22    MR. SACHSE: That is it.

23    MR. VEEDER:  I think it is irrelevant and immaterial

24   unless there is some location where it was located.

25    THE COURT:  The witness stated that it is near--

1      MR. SACHSE:  Nob Hill.  It is in the watershed.

2      If you don't care to stipulate, Mr. Veeder--

3      THE COURT:  Overruled.

4      Do you speak of that as residuum?

5      THE WITNESS:  Yes, sir, I do.

6      THE COURT: Even the area at the bottom that has only

7   cracks in it and seems to be very well consolidated?

8      THE WITNESS:  That is very true.  Where it is cracked

9   like that-- this matter of mapping residuum, I am sure you

10   will understand, is a rather difficult procedure, because it

11   is a gradational sort of thing.

12      THE COURT: Where do you draw a line between Basement

13   Complex and residuum?

14      THE WITNESS:  Where it is obviously solid, free of

15   cracks, and where there is-- It is a matter of judgment ,

16   largely.

17      THE COURT: Go ahead.

18   BY MR. MOSKOVITZ:

19      Q  Now let us turn to Exhibit O-25 for Identification.

20      A  This slide is out of the watershed.

21      MR. VEEDER:  I object to it, then, as being incompetent,

22   irrelevant and immaterial, not tending to prove any issue.

23      THE COURT:  Overruled.

24   BY MR. MOSKOVITZ:

25      Q  Is the material which is shown in this slide in the

1    cut typical of the material which is found in the Fallbrook

2    area within the watershed?

3         A  Yes, it is.

4         Q  Would you describe what it shows?

5         A  The reason this picture was taken was that it

6    provided a convenient place where you could see the residuum

7    material in the cut, you could see how the avocado trees are

8    growing in it at the same time, and back by that house there

9    is a small well which yields a very limited supply of water

10   from that material.  It is of extremely low permeability.

11   To try to get a picture that would show some of the dikes of

12   igneous material that they are cutting through the residuum.

13   This shows up the igneous texture.

14        Q  Now, next to Exhibit O-26 for Identification.  Where

15   was this slide taken?

16        A  This is also out of the watershed.

17        Q  And what road is this on?

18        A  This is on the same highway to which we were referring

19   before, the one that leads from Fallbrook to Highway U. S.

20   395.  The picture was taken about .3 of a mile west of the

21   intersection of that highway with U.S. 395.

22        Q And how far was this picture taken from the previous

23   one, Exhibit O-25 for Identification?

24        A  Oh, approximately, to the best of my recollection,

25   maybe one-tenth of a mile to the east, maybe a quarter of a

1    mile to the east.

2        Q   Which picture is easterly, this one or 0-25?

3        A   This is easterly.   One-tenth of a mile to the west

4    there is again a small well which is producing water from this

5    material.   Here you can see the dikes which indicate that this

6    is igneous basement rock, and it is of interest to note that

7    some minor supplies of water can be obtained from this type

8    of material today.

9        THE COURT:   How do you know water is being obtained

10   from that material or from some fracture or fault?

11       THE WITNESS:   Well, it is probably-- fractures are

12   contributing to it, your Honor, but the material is weathered,

13   too, and is undoubtedly a source of some of the water.

14   BY MR. MOSKOVITZ:

15       Q   Can you estimate the height of the road cut which is

16   exposed?

17       A   I would guess that road cut is about 15 feet high.

18   That was taken with a telephoto lens from the other side of the

19   canyon.   There is a terrace on top here of conglomeritic

20   material.

21       MR. VEEDER:   As distinguished from residuum?

22       THE WITNESS:   Yes, this is sedimentary material here on

23   top.

24   BY MR. MOSKOVITZ:

25       Q   You are referring to the darker colored bed which

1     occurs near the top of the road cut near the center of the

2     picture?

3         A   That is true.

4         Q   Now, the next slide is an extra, just for purposes

5     of showing the beautiful fall colors.

6         A   That is in De Luz Creek in the alluvium.

7         THE COURT:   Just to please your artistic temperament.

8         MR. MOSKOVITZ:   Yes, your Honor, with the lovely day

9     we have to close with something esthetic.

10         THE WITNESS:   That is another telephoto shot.

11         MR. MOSKOVITZ:   Your Honor, I offer in evidence Exhibits

12     O-1 to O-26.

13         THE COURT:   They are received in evidence.

14         (Defendant State of California Exhibits O-1 to O-26,

15     inclusive, were received in evidence.)

16         MR. MOSKOVITZ:   Your Honor, I expect to call Mr. James

17     back in order to present the material of the comparison of the

18     sizes and storage capacities of the various ground water basins

19     next week, but at this time I have no further examination.

20         THE COURT:   Are you finished with Mr. Illingworth on

21     Bulletin 57?

22         MR. MOSKOVITZ:   No, your Honor.   I expect to call Mr.

23     Illingworth back to the stand at a later date to present

24     hydrology, there will be some additional exhibits, and in

25     connection with his testimony we will offer in evidence the

1   portions of Bulletin 57, State Exhibit L, which pertain to the

2   work that he was primarily responsible for on hydrology.  But

3   I am not prepared at this time to put him on for that purpose.

4           You may cross-examine.

5           MR. VEEDER:  Is this a 4 o'clock day, your Honor?

6           THE COURT:  Yes.

7           MR. VEEDER:  Well, let us not put up the machine, if

8   I am going to start cross-examining.

9           THE COURT:  You mean you are going to cross-examine

10  on the photographs?

11          MR. VEEDER:  Yes, your Honor.

12          THE COURT:  Can you do it without the machine?

13          MR. VEEDER:  It might be that it would be helpful to

14  have the machine, your Honor.

15          THE COURT:  The reporter can't write in the dark very

16  well.

17          MR. MOSKOVITZ:  It is a quarter of 4, your Honor.  I

18  wonder if it might be better to start afresh on another day.

19          THE COURT:  It is satisfactory with me.  We didn't take

20  our recess and it is a quarter of 4 anyhow.  Does anybody want

21  to continue and work more this afternoon?

22          MR. STAHLMAN:  Just me.

23          MR. VEEDER:  I will bow to the demands, your Honor.

24          THE COURT:  What cross-examination do you have on these

25  photographs?

1          MR. VEEDER:  Well, I am certainly going to interrogate

2     him in regard to the inferences that the mere fact that soil

3     will impound water doesn't prove that it is impermeable in

4     any sense of the word, and there are other things that I would

5     like to touch upon.

6          THE COURT: Can't you do that without the machine?  We

7     all saw it.  While it is fresh in your mind I thought maybe

8     in fifteen minutes you could take care of that part of the

9     cross-examination.  I just wondered.

10         MR. VEEDER:  I was going to go into some detail.  I

11    would just as soon not have the machine-- I don't care.

12         THE COURT:  If you need it, we can have it.  Do you

13    think you can complete that in fifteen minutes?

14         MR. VEEDER:  No, but I would be glad to start.  I don't

15    want to be the one to hold this thing up.

16         THE COURT:  Well, let's go for a little while.  I think

17    you can probably do it in fifteen minutes.  You will be

18    surprised.

19

20                         CROSS-EXAMINATION

21    BY MR. VEEDER:

22         Q  Mr. James, what experience did you ever have in

23    building earthen structures for the impoundment of water?

24         A  Well, in connection with the investigation for the

25    California Water Plan.

1        Q Comparable to the structures that were shown here

2   in the pictures, the "O" series?

3        MR. MOSKOVITZ:  Comparable in what way?

4        MR. VEEDER:  In size, structure, object for which they

5   were constructed.

6        MR. MOSKOVITZ:  I think this is a little indefinite.

7   Do you mean only--

8        THE COURT:  Overruled.  He is talking about these

9   storage reservoirs you saw in the pictures.  It is clear what

10  he means.  Overruled.

11       What experience have you had in constructing them?

12       THE WITNESS:  I have looked at a large number of

13  similar structures.

14       MR. VEEDER:  Answer the question, please.

15       THE COURT:  He asked you what experience you had in

16  constructing them.  If you had any, tell us so.

17       THE WITNESS:  No constructing, your Honor.

18       THE COURT:  That was the question.

19  BY MR. VEEDER:

20       Q  Did you ever have any experience in planning?

21       A  No, I haven't.

22       Q  Did you ever have any experience from the standpoint

23  of operating one of them?

24       A  No.

25       Q  Did you ever have any experience in digging a ditch

1    lateral to conduct water for the purposes of irrigation?

2          MR. MOSKOVITZ:  I object to that, your Honor.  I

3    don't see the relevance of that.

4          THE COURT:  Overruled.

5          THE WITNESS:  No.  But I have had quite a bit of ex-

6    perience in geological investigations in connection with

7    planning these types of structures, both canals, small

8    reservoirs and dams.

9    BY MR. VEEDER:

10         Q  Now, in regard to the operation of a dam which is

11   maybe impounding two or three acre feet, what would be the

12   effect of diverting water into one of those structures, say,

13   for a period of ten years, from the standpoint of deposition

14   of silt throughout the bottom of the structure?

15         MR. SACHSE:  I object to that, if the Court please; no

16   adequate information, vague and indefinite, depends entirely

17   on the kind of structure of the dam and the material on which

18   it is built, and where the water comes from as to the deposi-

19   tion of silt.  The question can't be answered because it is

20   vague and uncertain.

21         THE COURT:  Well, there is merit to what you say, Mr.

22   Sachse, but the objection is overruled.  Let's see what the

23   witness says.

24         MR. MOSKOVITZ:  May I have that question again-- the

25   exact wording.

1          THE COURT:  Read it.

2          (The Reporter read the pending question as follows:

3    "Q  Now, in regard to the operation of a dam which is maybe

4    impounding two or three acre feet, what would be the effect

5    of diverting water into one of those structures, say, for a

6    period of ten years, from the standpoint of deposition of

7    silt throughout the bottom of the structure?")

8          MR. SACHSE:  Your Honor, I will renew the objection.

9    "Diverting" doesn't indicate whether it is by pump or by

10   stream diversion, whether there is water running in and

11   bringing dirt right along with it--

12         THE COURT:  All right.  Let's save some time.

13         Isn't it true that most of these structures that we

14   saw that held water, most of them-- possibly not the last

15   one-- were structures that caught water during rainfall?

16         MR. SACHSE:  No, your Honor.

17         MR. VEEDER:  Now, I object to Mr. Sachse testifying.

18         MR. SACHSE:  Well, his Honor asked me a question.  I am

19   giving him my best answer.

20         MR. VEEDER:  How does he know?

21         MR. SACHSE:  I have been there.

22         MR. VEEDER:  Well, then may I cross-examine Mr. Sachse?

23         THE COURT:  Then break your question down.  Take one

24   situation where the water comes in by rainfall, another place

25   where it is brought in by a ditch to the terrain, another one

1    where it is piped in.

2           Can you answer the question in those three categories,

3    for instance?

4           THE WITNESS:  Yes, I can, your Honor.

5           THE COURT:  All right.

6           THE WITNESS:  Waters fed into reservoirs of that type

7    do and can carry silt.  It depends on how the reservoir is

8    filled.  And the effect--

9           MR. VEEDER:  Now just a moment.

10          MR. MOSKOVITZ:  Just a moment.  Let the witness finish

11   his answer.

12          MR. VEEDER:  It depends on how the reservoir is filled--

13          THE COURT:  Mr. Veeder, let him finish his answer, and

14   then ask him another question.

15          THE WITNESS:  It depends on how it is filled, how rapidly

16   the water is poured into it, whether there is any sediment

17   suspended in the water as it comes in.  There is a variable

18   range of effects that could occur here.

19   BY MR. VEEDER:

20          Q  Have you ever observed the delivery of water into

21   reservoirs of this character?

22          MR. SACHSE:  I object, your Honor.  "Reservoirs of this

23   character" means nothing.  If Mr. Veeder wants to ask him about

24   delivery of water into one of these reservoirs, your Honor, I

25   think it would be pertinent.  Now it is my understanding-- we

1    could very readily straighten this out with Mr. Hall-- that

2    every single one of these reservoirs is pumped into.  Mr.

3    Veeder is setting up a bunch of straw men here that have no

4    relationship whatsoever to the exhibits we have just seen, and

5    he knows it.  He has seen them all.

6            THE COURT:  Overruled.  Let's hear what the witness has

7    to say.

8            MR. MOSKOVITZ:  May I have the question, your Honor.

9            THE COURT: Read it.

10           (The Reporter read the pending question as follows:

11   "Q  Have you ever observed the delivery of water into reser-

12   voirs of this character?")

13           MR. VEEDER:  The character that you have just shown in

14   the pictures here.

15           THE COURT:  That you have inspected and took pictures

16   of?

17           THE WITNESS:  Yes, I have.

18   BY MR. VEEDER:

19           Q  Would it make a difference as to the silt deposition

20   if there were surface diversions into them?

21           MR. MOSKOVITZ:  That is objected to as being indefinite,

22   your Honor-- the difference between what and what?

23           MR. VEEDER:  Would it make any difference as to the

24   amount of silt whether they are pumped into or--

25           THE COURT:  Overruled.

1          MR. MOSKOVITZ:  I wanted the other alternative, your

2     Honor.

3          Pumped into or streams, are those the two alternatives?

4          THE COURT:  Well, here we are talking about a few little

5     reservoirs up here.  We don't know yet for sure whether they

6     are fed by drainage from the rainfall, or whether they are

7     fed by pipe, or by cement flume, or whether the waters come

8     from a ditch, and I would hazard a guess that if you had a

9     dirt reservoir-- I would just hazard a guess-- if you had a

10    dirt reservoir and had your water piped in and you could drop

11    it into a cement basin or something so that it would overflow

12    very gently and wouldn't wash the bottom as it came in, some-

13    thing that you probably wouldn't find in the average reservoir,

14    that over a period of ten years you would find silt deposited

15    in the bottom of this reservoir.

16         MR. VEEDER: Thank you very much, your Honor.

17         THE COURT:  I am just hazarding a guess.

18         MR. VEEDER:  I was being beset.

19         THE COURT:  You go out in dry weather and look at them

20    and what do you see? The silt has broken up and caked and there

21    it lays across the bottom.

22         MR. MOSKOVITZ:  I want to explain the objection that I

23    made, your Honor.  The objection was not captious.  The ques-

24    tion was, what difference would it make if one thing happened.

25    You have to compare two things.

1          THE COURT:  I know you didn't make the objection

2     captiously.  I didn't mean to infer that.

3          Do you know how these reservoirs were fed?

4          THE WITNESS:  No, your Honor.  I might add that in the

5     course of our waste water--

6          MR. VEEDER:  This should be important.

7          THE WITNESS:  -- while brine disposal studies in Ventura

8     and Orange Counties and Los Angeles County, that we have

9     examined several hundred of these types of reservoirs of this

10    size for just this purpose of seeing whether there is a

11    possibility of brine seeping from them and polluting the

12    ground water beneath.  That is my background in work of this

13    type.

14         MR. STAHLMAN:  In the interests of saving time, it

15    might be interesting to note that we will show that there was

16    mechanical means used in the construction, too.

17         MR. VEEDER: There was compaction.

18         MR. STAHLMAN:  That compacted the bottom, and if some-

19    body did it with old-fashioned methods-- there are chemical

20    treatments by which some of them were done, and some of them

21    were on the alluvial base where it doesn't make any difference

22    if you did get seepage, it drains back in.

23         MR. VEEDER:  That is precisely what I was going to lead

24    up to.  This showing of a couple of reservoirs to show that

25    the water-bearing strata are not permeable was, in my view, a

1    stupid approach.

2         Q  Now, did you take into consideration how these

3    reservoirs were constructed when you arrived at your conclu-

4    sion, as expressed, that it proved that the older alluvium

5    was low in permeability?

6         MR. MOSKOVITZ:  I think this misstates what the witness

7    said.  He didn't say it proved it, your Honor, He cited it as

8    some evidence.

9         THE COURT:  Then we will have the question amended.

10        MR. VEEDER:  Amend the question.

11        THE COURT:  As being some evidence of impermeability.

12        THE WITNESS:  I believe I mentioned in earlier testimony

13   that I did not know how those reservoirs were constructed.

14   BY MR. VEEDER:

15        Q  So as a matter of fact, if they were areas-- we are

16   referring to the impounding embankment now-- the impounding

17   embankment is usually constructed with compacted material; is

18   that not true?

19        A  Well, I can't say usually.  In a lot of instances

20   they aren't.

21        Q  Could you envision a dam that does not have an

22   impervious core built into it?

23        MR. MOSKOVITZ:  This calls for a great deal of specul-

24   ation as to what kinds of dams, built by what kinds of people.

25        MR. VEEDER:  Talking about the dams that we were looking

     at.

1        THE WITNESS:  There are dams that are built without

2    impervious cores in them.

3    BY MR. VEEDER:

4        Q  Well, did you take into consideration the fact that

5    these dams--

6        Your Honor, we will offer to prove, in regard to their

7    construction--

8        THE COURT:  Just ask your question, Mr. Veeder.

9    BY MR. VEEDER:

10       Q  Assuming that these dams were constructed with

11   compacted material as the core, would that have any effect

12   upon your opinion as to the permeability of the soils concern-

13   ing which you have been testifying?

14       A  As I understand your question, you are talking about

15   the core of the dam.

16       Q  Yes.

17       A  You mean the fact that you can use that material to

18   make an impermeable core?  Is that your question?

19       Q  No.  You have expressed an opinion that these

20   structures impounded water.  Therefore, in your opinion, that

21   evidenced a low permeability.  Now would the fact that there

22   was a compacted core in the dame have any effect upon your

23   opinion as expressed?

24       A  Well, it would have effect on my opinion in this way.

25   You can take the material-- and someone will be able to advise

1    me on this, I suspect-- the material that was used in building

2    that dam was taken out of the reservoir, and if you can compact

3    it and make an impermeable core for a dam out of it, that would

4    indicate to me that it is of low permeability.  The fact that

5    you can do this with a core.  This is one of the problems we

6    run into in selecting materials to build earth dams.  We often

7    have to search hundreds of square miles back in the Sierras to

8    find material of low permeability with which we can build the

9    central impervious core for an earth dam.

10        Q  Are you testifying to this Court that the fact that

11   a compacted core is built in this dam evidences that the

12   water-bearing strata in the areas marked in orange on Exhibit

13   15-A are low in permeability?

14        A  I am saying that the materials that they used to

15   construct the core of the dam, these materials being, I

16   presume, obtained from the reservoir area and from the older

17   alluvium, those materials that comprise that core are of low

18   permeability.  That is my opinion.

19        Q  Have you ever seen a core built on younger alluvium?

20   You said you had no experience in these matters?

21        A  I didn't say that.

22        Q  If there was a chemical used--

23        MR. MOSKOVITZ:  Just a moment.  Is that question with-

24   drawn now?

25        MR. VEEDER:  Yes.

1      Q   Assuming that chemicals were used for the purpose

2  of sealing these structures, would that have any effect upon

3  your conclusions in regard to the permeability of the older

4  alluvium?

5      A   Chemicals would obviously reduce the permeability.

6  But even when you are using chemicals you try to get the most

7  impermeable material you can to cut down on the cost of

8  chemicals that are used in that type of construction.

9      Q   Have you ever used chemicals in the construction

10 of a dam?

11     A   No, sir, I haven't.  I have read about it.

12     Q   In regard to the Cantarini well, which I believe was

13 on your M-16 and from which you showed older alluvium in the

14 vicinity, did you consider the quantity of water that the

15 Cantarini well produces?

16     A   Did I consider it in what, Mr. Veeder?

17     Q   Well, did you take into consideration the fact that

18 though you were demonstrating what you said was an impermeable

19 or relatively low permeability structure, nevertheless you

20 were taking that out near a well which was a good water

21 producer-- did you think of that?

22     A   Yes, I did think of that, Mr. Veeder.  But the

23 material that I took in that sample, I do not say is repre-

24 sentative of what is away down below somewhere that that well

25 has penetrated.

1     Q  So the fact that--

2     MR. MOSKOVITZ:  Let the witness finish his answer.

3     THE COURT:  Have you finished your answer?

4     THE WITNESS:  I think so.

5     MR. VEEDER:  I wish that Mr. Moskovitz wouldn't get so

6 hysterical.

7     MR. MOSKOVITZ:  Well, it's 4 o'clock.  That is why I

8 am perhaps a little "nasty."

9     MR. VEEDER: I have been worried about this witness,

10 too, but not that badly.

11     Q  In other words, the fact that you are able to take

12 a pick and dig out some impermeable material at the top of

13 the well doesn't prove that there is not a very permeable

14 strata into which the well has been drilled; is that correct?

15     A  I have never denied that there are permeable lenses

16 of unknown extent interfingering gravel.  Our sample is

17 representative of the materials near the surface in that area

18 of the older alluvium.

19     Q  And has no relationship whatever to what is down at

20 the bottom of the well?

21     A  I wouldn't say it has no relationship to it, no.

22     THE COURT:  We will adjourn until 10 o'clock Tuesday

23 morning.

24     MR. VEEDER:  Is the field trip on Tuesday, your Honor?

25     THE COURT:  No, it is not on Tuesday.  It is either

1    Wednesday and Thursday, or Thursday and Friday.

2         MR. VEEDER:  It makes a big difference to me from the

3    standpoint of scheduling witnesses.

4         THE COURT:  Set it up either way you want.  It will

5    not be Tuesday because I have matters that I may not be able

6    to take care of on Monday.  It will be either Wednesday and

7    Thursday or Thursday and Friday, and I have no choice.  Any-

8    thing you work out is all right with me.

9         MR. VEEDER:  My point was to inquire how much longer

10   Mr. James is going to be on the stand next week on Direct.

11        MR. MOSKOVITZ: It will not be much longer, because it

12   will be to explain the storage capacity comparisons, although

13   we may not be able to get to it.

14        THE COURT:  He is through on geology except for this

15   Table 15, probably, that you asked him to work on.

16        MR. MOSKOVITZ:  I understand that you wanted him to

17   show that to the U. S. geologists before he comes back on the

18   stand.

19        THE COURT:  I hope that you can get together on some

20   of it, yes.  He can be down here on Monday and so can Mr.

21   Kunkel.

22        MR. MOSKOVITZ:  We have some problems again with plane

23   reservations, your Honor.  We hope to get together with the

24   United States on Tuesday, if we may.

25        THE COURT:  All right.

1          Do you want me to fix whether it will be on Wednesday

2    or Thursday-- the field trip?

3          MR. VEEDER:  I would very much prefer if we could de-

4    cide now whether it is on Wednesday and Thursday, for this

5    reason, that I will have to begin scheduling witnesses myself

6    on direct.

7          THE COURT:  Make it Wednesday and Thursday and it will

8    not interfere with Mr. Moskovitz's getting home on Friday.

9          MR. MOSKOVITZ:  Thank you, your Honor.

10          MR. VEEDER:  Fine.

11          THE COURT:  Wednesday and Thursday.

12          (Adjournment until Tuesday, December 9, 1958, at 10

13    o'clock A.M.)

14

15

16

17

18

19

20

21

22

23

24

25