# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.  1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Tuesday, December 9, 1958

Pages: 6216 to 6295

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

MALCOLM E. LOVE
**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

Z1
/A

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- -. -

UNITED STATES OF AMERICA,       )
                                )
                    Plaintiff,  )
                                )
        vs.                     )       No. 1247-SD-C.
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                    Defendants. )


REPORTERS' TRANSCRIPT OF PROCEEDINGS


San Diego, California

Tuesday, December 9, 1958


APPEARANCES:

        For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                 Special Assistant to the
                                 Attorney General,
                                 Department of Justice,
                                 Washington, D. C.

Z2

APPEARANCES (Continued):

| | |
|---|---|
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State of California | EDMUND G. BROWN, ESQ., Attorney-General, by ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney General. |
| For Defendants Fallbrook Public Utility District, et al., | F. R. SACHSE, ESQ. |

- - -
-
-

## INDEX TO WITNESSES

For the Defendant
 State of California:                     Cross

     Leland R. Illingworth              6241

Recalled by the Court:

     Fred Kunkel   --   6285

1    SAN DIEGO, CALIFORNIA, TUESDAY, DECEMBER 9, 1958.  10:00 A. M.

2

3        (Other matters.)

4        THE CLERK:  Number 4, 1247-SD-C, United States vs.

5    Fallbrook, et al. Further court trial.

6

7                    LAURENCE JAMES,

8    recalled as a witness in behalf of the defendant State of

9    California, having been previously sworn, testified further as

10   follows:

11       MR. STAHLMAN:  Your Honor, I would like to file a sub-

12   stitution of attorneys in the case in relation to the Vail

13   matter, substituting George Stahlman in place and stead of

14   O'Melveny & Myers and George Stahlman, as heretofore shown.

15       THE COURT:  I will approve it.  It may be filed.

16       MR. STAHLMAN: I was wondering if your Honor desires to

17   take up the matter in relation to the proposed trip that we

18   are going to make tomorrow and the next day.

19       I made some arrangements that might be of some practical

20   benefit to the trip.  I think the first thing we should decide

21   is just what the route will be.  I understand that we want to

22   go to the Naval Ammunition Depot first.  Is that correct?

23       MR. VEEDER:  No, I have no desire to go to the Ammuni-

24   tion Depot at all.

25       MR. STAHLMAN:  I would just as soon pass that up,

1  because I think we are going to have two pretty good days if

2  we go up to Murrieta Valley and also to the Vail Ranch.  In

3  fact, I have some doubts as to whether we can in two days make

4  the Murrieta Valley, the Vail Ranch and the other properties

5  east of Vail.  That in itself would be quite a trip I would

6  think.

7       Then there is the matter in relation as to how we shall

8  make this trip.  I think as far as Murrieta Valley is con-

9  cerned, practically any place we go can be accomplished by

10  riding in the bus that is provided by the Navy.  However,

11  there are places on the other ranch that I think your Honor

12  will want to see and the others interested in the case will

13  want to see that we will not be able to make in the bus.  Now

14  we have station wagons and Jeeps and we have some other auto-

15  mobiles with which we can reach some of the area that the bus

16  just couldn't go through.  I think Col. Bowen here, who is

17  familiar with Nigger Canyon and the terrain surrounding the

18  Vail Dam and the approach to the dam-- I doubt very much

19  whether a Navy bus would be able to make that.  Do you agree

20  with me, Col. Bowen?

21       COL. BOWEN:  I agree with you, Mr. Stahlman.

22       MR. STAHLMAN:  So we will have the transportation there,

23  and I will have my car there, too.

24       THE COURT:  Can you make these places with an ordinary

25  car?

1    MR. STAHLMAN:  Yes, we can make them with an automobile,

2    your Honor.

3    Now, there is the matter relative to the accommodations.

4    We will provide lunch on Wednesday and Thursday at Mr. Vail's

5    camp for all of those concerned, and we have some overnight

6    accommodations.  I don't think everybody will want to stay

7    there.  Those who can stay at the camp will be given their

8    dinner there that evening and breakfast the following morning.

9    Those of us who live in the general area there, I think-- I

10   talked to Mr. Sachse and I think it is his inclination, as

11   well as it is mine, to go to our homes, because it is not far

12   from there.  I would like to know how many there will be of

13   those who desire to stay at the ranch.  I am sure it will be

14   as pleasant there as any place that they could stay in the

15   northern part of the State.  However, as I say, we don't have

16   accommodations for everybody who will make this trip.

17   THE COURT:  I can work something out.  I had a call

18   from Mr. Gardner and he asked me to come over and have one of

19   his steaks.  I may go over there and stay with Erle.

20   MR. STAHLMAN:  Probably your Honor will be better taken

21   care of there than I would take care of you.

22   THE COURT:  Well, his literary ability exceeds yours

23   a little bit.

24   MR. STAHLMAN:  Surely, your Honor.

25   We have that part of it settled.  If I may know how

II
A2

1    many want to stay at the Vail Ranch overnight, we will make

2    arrangements for it.

3        THE COURT:  Let's go down this side of the table.  Mr.

4    Moskovitz?

5        MR. MOSKOVITZ: We had planned to stay at Fallbrook, but

6    perhaps we will take you up on your invitation.

7        MR. STAHLMAN:  Very well.

8        MR. MOSKOVITZ:  Are there enough accommocations for the

9    people on this side?

10       THE COURT:. How many do you have-- four?

11       MR. MOSKOVITZ:  Mr. Boronkay will probably be with us.

12   If this is too many, just say so, Mr. Stahlman.

13       MR. STAHLMAN:  Tell me how many there will be.

14       MR. MOSKOVITZ:  There will be five of us.

15       MR. STAHLMAN:  The Clerk, the Shorthand Reporter, and

16   the Bailiff also?

17       THE COURT:  We don't need the Bailiff, unless he wants

18   to go.  He ran out on us last time.

19       MR. STAHLMAN:  That will be seven.  Mr. Kunkel will be

20   eight.

21       You will probably go home, Col. Bowen?

22       COL. BOWEN:  Yes.

23       THE COURT:  Mr. Veeder?

24       MR. VEEDER:  I am going to Oceanside with the Colonel,

25   your Honor.

1          THE COURT: Can you take care of those?

2          MR. STAHLMAN:  Yes, your Honor.

3          THE COURT:  What time would we assemble, and where?

4          MR. STAHLMAN:  That is the next question.

5          MR. MOSKOVITZ:  Over the weekend, Mr. Illingworth has

6    laid out a tentative route.  I am not sure it is going to

7    accord with some of the suggestions of Mr. Stahlman.  That may

8    still have to be worked out.  But we had planned on assembling

9    at Mr. Sachse's office at Fallbrook and we would start from

10   there at 8 o'clock.

11         THE COURT:  Why assemble there?

12         MR. MOSKOVITZ:  It seemed to be a central place for

13   people who would come from the Murrieta area-- Mr. Littleworth's

14   people and people from the Base also.

15         MR. STAHLMAN:  We would be retracing our steps, then.

16         MR. SACHSE:  The suggestion was made by Col. Bowen on

17   the basis that we might see the Depot, because the Depot is

18   very close to my office.  If the visit to the Depot is elimin-

19   ated, there is no practical reason for meeting at my office.

20         THE COURT:  It would seem better to meet somewhere up

21   around Murrieta.

22         MR. SACHSE:  It might be, if we are not going to see

23   the Depot.

24         MR. STAHLMAN:  I would suggest that the central place

25   would be the Vail Ranch offices, which are just a mile or

1  mile and a half off of Highway 395.  That is an easy place to

2  find.  And I might indicate for anybody that is here that

3  coming up from the south going north you turn on highway 71

4  right at Temecula, turn right, and it is the second group

5  of buildings on the right.

6        THE COURT:  You take the left fork?

7        MR. STAHLMAN:  You take the left fork.

8        THE COURT:  You stay away from that Power road and

9  go as if you are going toward Warner's.

10        MR. STAHLMAN:  Yes.

11        THE COURT:  The second group of buildings on your

12  right?

13        MR. STAHLMAN:  The second group of buildings on

14  your right.  Turn right in there.  It is before you come to the

15  feed pens and the dairy over on the left.  Before you get there,

16  you turn in that camp.

17        THE COURT:  8 o'clock there-- is that satisfactory?

18        MR. MOSKOVITZ:  Yes.

19        MR. STAHLMAN:  Yes.

20        THE COURT:  Is that satisfactory?

21        MR. VEEDER:  8 o'clock?

22        THE COURT:  At the Vail Ranch Office.  Is that agree-

23  able?

24        MR. MOSKOVITZ:  Agreeable.

25        THE COURT:  What do you figure from San Diego to the

1    Vail Ranch?  An hour?

2         MR. STAHLMAN:  An hour and fifteen or twenty minutes,

3    I would say.

4         THE COURT:  From La Jolla that would be an hour, I

5    suppose?

6         MR. STAHLMAN:  Yes.  I get to my home from San Diego,

7    when I drive sensibly, in about an hour and five minutes,

8    and it is about fifteen or twenty minutes from there to the

9    Vail Ranch.

10        THE COURT: All right, 8 o'clock tomorrow morning.

11        (Another matter.)

12        MR. STAHLMAN:  I would like a little help on this

13   suggestion, because I don't feel that I know all of the

14   factors that might present the most logical route to take.

15   I think there are two general divisions into which we could

16   break the trip down:  One would be Murrieta Valley, and the

17   other would be the Vail Ranch.  Col. Bowen has been over there

18   many times.

19        Do you think that would be a logical breakdown?

20        COL. BOWEN:  Yes.

21        THE COURT:  You mean one day for one, and one day for

22   the other?

23        MR. STAHLMAN:  One day for one, and one day for the

24   other.

25        In the Murrieta Valley I presume that you would want

1    to see these points of rising water and the Roripaugh layout

2    and probably drive all the way up to the headwaters of the

3    Murrieta to see what the development is, and theremay be some

4    certain specific places you would want to view-- maybe Mr.

5    Littleworth would want to have some suggestions for some of

6    his clients up there.

7        THE COURT:  Let's see what Mr. Moskovitz and Mr.

8    Illingworth have in mind.

9        MR. MOSKOVITZ:  Your Honor, we have worked out a two-

10   day route.  It will have to be revised slightly if we are

11   going to take Mr. Stahlman's suggestion of eating at the Vail

12   Ranch at lunch both days.  But we cover the Murrieta area and

13   some of the area east of Murrieta, and then also attempt to

14   see the upper end of the basin-- that is, the Coahuila area

15   and the upper end of Temecula Creek in that one day.  We may

16   not have as much detail as some would like, and I suggest that

17   Mr. Illingworth get together with Col. Bowen and Mr. Hall and

18   Mr. Stahlman and see whether what he has worked out would do.

19       Our idea was that on the second day we would concentrate

20   on the Vail Ranch and the areas north and south of the Pauba

21   Basin.

22       THE COURT:  The first day we are going to see Temecula

23   Valley?

24       MR. MOSKOVITZ:  Murrieta Valley, and then go up around

25   by way of Hemet.  We thought we would have lunch there, and

1    then from there go up to the Coahuila Indian Reservation area

2    and see Anza Valley and Terwilliger Valley, and also attempt

3    to see the Temecula River, the upper part-- Oakgrove in that

4    area, and come down and conclude that day.

5         THE COURT:  Do you have it laid out on a map?

6         MR. MOSKOVITZ:  We have it laid out on quad sheets,

7    your Honor.

8         MR. STAHLMAN:  Do you think, Mr. Moskovitz, that that

9    could be arranged?  I have already made arrangements for lunch

10   at the Ranch on Wednesday.  If we could see part of it on the

11   way up, and then cut it off and come back and have lunch, and

12   then go up and see the other end.

13        MR. MOSKOVITZ:  I am sure we could.

14        THE COURT:  Well, you gentlemen sit down and work it

15   out.  Whatever you agree upon is agreeable with me.  But we

16   will meet tomorrow morning.  Court will meet at the Vail office

17   at 8 o'clock.  That is agreed.

18        MR. STAHLMAN:  I have just one other thought, your

19   Honor.

20        THE COURT:  Old clothes are in order, I take it?

21        MR. MOSKOVITZ:  Yes, I think so.  We will be just

22   tramping over the country.

23        MR. STAHLMAN:  I think we can start at one end of the

24   Vail Ranch and either work up or work down.

25        THE COURT:  Do you have a pick or a shovel available to

1    throw into this wagon?  I suppose we can pick those up at the

2    Vail Ranch..

3        MR. MOSKOVITZ:  I assume that we can get them there,

4    can't we?

5        MR. STAHLMAN: We have a lot of shovels up there.  In

6    fact, we will be glad to provide all the shovels we might need,

7    even suggest a place where you might do some digging.

8        MR. MOSKOVITZ:  Your Honor, I have been in touch with

9    Mr. Littleworth, and he knows about this trip.  I will give

10   him the details today.  Some of his clients will be along.

11       THE COURT: What about Mr. Grover?

12       MR. MOSKOVITZ:  I will get in touch with him, too.

13       THE COURT:  Who else represents some major clients in

14   this case who isn't here?

15       MR. MOSKOVITZ:  Mr. Doherty represents clients up in

16   Diamond and Domenigoni.

17       THE COURT:  Will you get in touch with him?

18       MR. MOSKOVITZ:  I will get in touch with him too, your

19   Honor.

20       THE COURT:  Today?

21       MR. MOSKOVITZ:  Today.

22       THE COURT:  Get in touch with him at the earliest

23   possible moment to give him a chance to prepare, if they want

24   to go along.

25       MR. MOSKOVIT:  I will call them during the noon hour

1   at the latest, your Honor.

2        MR. STAHLMAN:  If we have passed that, your Honor, I

3   have another matter.

4        MR. VEEDER:  Regarding transportation, Col. Bowen has

5   to know how many are going to be there, because the size of

6   the bus that will be available is extremely important.

7        THE COURT:  I take it there will be five on the

8   California side of the case, Mr. Sachse is six, Mr. Stahlman

9   and Mr. Hall are eight, the Clerk and the Reporter are ten,

10   and I am eleven, and you and Col. Bowen make thirteen, fourteen,

11   Mr. Krieger or Mr. Littleworth--

12        MR. VEEDER:  And Mr. Cannon.

13        MR. STAHLMAN:  There will be also, I think, Mr. Vail,

14   he would like to make the trip, and it may be that we will

15   have his ranch foreman there.

16        THE COURT:  What size are these buses, Colonel?

17        COL. BOWEN:  They carry about 35 passengers, your Honor.

18        THE COURT:  What is the size below that?  The Jeeps?

19        COL. BOWEN:  Yes, sir.

20        MR. STAHLMAN:  That is the one we had the other day.

21        COL. BOWEN:  I planned on the same type of bus we had

22   the other day, but when Mr. Moskovitz mentioned some of the

23   defendants coming along--

24        THE COURT:  A 35-passenger bus will be ample.

25        Anything else?

1          MR. VEEDER:  Your Honor, in regard to going over some

2     of that rough country, the Marine Corps can supply Jeeps for

3     that purpose, and it might be better than taking the other

4     cars.  It is optional with us and I am not insisting on it in

5     any way,  It is just a thought.

6          MR. STAHLMAN: Can you supply that many Jeeps?

7          MR. VEEDER:  Colonel?

8          THE COURT:  They have thousands of them down there.

9          MR. STAHLMAN:  I know they have.

10         COL. BOWEN:  How many.

11         MR. STAHLMAN: There may be places that we would lik to

12    look at off the road ways.

13         THE COURT:  What do they hold-- four or five?

14         COL. BOWEN:  They will hold three passengers plus the

15    driver.

16         MR. STAHLMAN:  I think we can do it with our cars.

17    I am sure we can save the Government the expense of those

18    Jeeps.

19         THE COURT: Are we going to be wanting to get very far

20    off the road on some of these places?

21         MR. STAHLMAN:  It depends on who is driving.  The boys

22    who are used to driving over this ranch will take these cars

23    up hills and over places you and I wouldn't dare drive.

24         MR. VEEDER:  It was just a thought.

25         MR. STAHLMAN:  However, I think that we are going to at

1    least stick to the roads.  We are going to take our time pretty

2    well, as far as these areas are concerned that can't be driven

3    with a bus.

4            THE COURT:  All right.

5            What is the next matter?

6            MR. STAHLMAN:  Your Honor, the other day you asked me

7    a question, in reply to which I floundered around a bit.  I

8    wouldn't say how Mr. Veeder characterized my reply.

9            MR. VEEDER:  I think Mr. Stahlman is getting touchy.

10           MR. STAHLMAN:  I am very sensitive.

11           THE COURT:  The position of the Vail Ranch on the

12    alleged underwater basins northeast of the Murrieta Valley,

13    north and south of Pauba Valley.

14           MR. STAHLMAN:  I am afraid that when I get through

15    I will probably give the Court about as much information as

16    I did the other day.  However, I am going to subject myself.

17           I would like, first, to state, your Honor, that I

18    believe the Vail Company is probably one of the oldest

19    proprietary interests in water for a continuous period of time,

20    which they have lived with, than practically anybody else on

21    the stream.  There are a lot of practical concepts in relation

22    to the history and use of water on the Vail Ranch that I think

23    will be of some benefit of the Court.

24           I would like to state at the outset that we feel, in

25    the first place-- experience has taught us-- that every person

1  on the river who has an interest in riparian, appropriative

2  or prescriptive use to water should be interested in main-

3  taining the entire stream system in its highest state of

4  efficiency.

5        There are two legal questions before the Court here

6  at this time which I think should be settled.

7        Before I mention the first question, I might state

8  that we feel, in relation to this attitude toward maintaining

9  the stream system in its highest state of efficiency, that

10  it is in the interests ov Vail Company and in the interests

11  of every other person claiming rights on the river to see

12  that the basins at Camp Pendleton are maintained in their

13  highest state of efficiency.  We have some different views

14  expressed as to whether or not water from the stream could be

15  used in order to repel salt water intrusion, and there have

16  been some statements made that cast some blame as to what

17  brought about the condition.  We take the view that this is

18  not a criminal action; that there may have been mistakes by

19  many of the persons who have extracted water from the river ,

20  but that we are not going to decide this case by punishing

21  what has happened in the past.

22        So we come to what I think is one of the legal situations

23  that should be determined.  We have heard the positions

24  advocated here by Mr. Sachse that it is true that cyclical

25  storage of riparian water is not permitted.  That raises a

1    question as to whether or not the putting of water underground

2    to rehabilitate and revitalize and cure this condition that

3    exists in Camp Pendleton, as to whether or not they have a

4    right to use artificial means in putting the water underground

5    I have some views as to what I think the law should be.  It

6    is not necessary to go into them at this time.  Maybe some of

7    the others may express themselves on it.

8        Then I think there are certain practical situations

9    that will give some information to the Court as to what have

10   been the happenings and the experiences of people who have in

11   the past attempted to produce water in various areas that are

12   in controversy here.

13       It is regrettable to me that a lot of the approach to

14   this case is the result of some feelings that have been built

15   up by reason of the history of this case.  It would seem to

16   me that the object on the part of everyone-- the State and

17   the Government-- would be a searching for what is the truthful

18   situation that exists in relation to all of the factors that

19   affect the stream system and its production of water.  I strongly

20   suspect that some of the opinions that have been expressed--

21   and I don't mean only here; I have been reading some of the

22   early transcripts of the case of the proceedings which occurred

23   before Judge Weinberger-- and it appears that some of the

24   opinions are merely repellant to the fact that someone else

25   adovcated a position in the case, and I don't think that makes

1    for a healthy atmosphere in which to proceed in a case of this

2    character, which should be, I think, free from emotion,

3    .feelings and politics, and search out what is the truth.

4    Because when the final judgment is rendered in this case,

5    if we are wrong one way or the other it is going to spell

6    disaster to someone.

1          MR. STAHLMAN:   Now, I know-- and this may  be considered

2     in   the nature of some of these factors that  we can    establish,

3     that there have been, in all probability, a great many wells

4     there on which there are no logs.   And usually those wells on

5     which there are no  logs are wells in which they struck dry

6     holes.  We know that has been done in some of this area that

7     has been  declared by  some of the Government's witnesses as

8     having this  vast quantity of water in it, speaking about

9     storage unit number four.   And it is quite logical, also,

10    when a man  drills a dry  hole and he figures on selling his

11    property some day, he doesn't want it  advertised there wasn't

12    any water there.  And so  we don't have well logs.  So some of

13    the experiences, however, that the  people have had in the  area,

14    and there  are some of them up there that know some of these

15    situations, I think theirs should be considered along with

16    the other evidence.  Then, we have situations  where in that

17    same  area where we are supposed to have a  great depth of older

18    alluvium-- and there are areas in addition to  the area which

19    shows the outcropping of basement complex  as indicated upon the

20    Exhibit 15A-- that there  are places where  wells  were drilled,

21    not only one, after  reaching a little over a hundred feet and

22    running into what  was thought to be basement complex, reached

23    rock bottom, moved over and drilled a few hundred feet away and

24    run  into the same thing, a few more hundred feet and run into

25    the same situation.   And then, there  are places where we talk

1   about the lenticular structure of this underground basin.  It

2   becomes quite important as to what is the depth  of this

3   lenticular.  I know of situations where it is contended that

4   there were great depths of impervious material that was drilled

5   through before they  ever reached sand and then only  a small

6   layer of sand, maybe two  feet, and then run into this same

7   other very difficult material.  The point I am making by this

8   is that it raises some question as to whether we shouldn't be

9   very careful in estimating capacities of these basins without

10  taking into consideration all of the factors, including the

11  practical matters.  And I think we will be able to present to

12  the Court some of these practical matters.  However, I think

13  they only  probably  bear a small  relationship to the entire

14  experience of the area.  The well  people in investigating have

15  talked to a lot of these people  who have lived there for a

16  long time and find out where some of these wells were drilled

17  which were not logged and which produced no water.  So we come

18  right  back to the proposition that one of the most logical

19  expressions I heard by an appraiser I had on the witness stand

20  not too long ago  and questioned by Mr. Sachse, I believe, about

21  he didn't think if we drilled  a well in a certain canyon they

22  would produce water, and he said, "In Southern  California I

23  will not reach an opinion as to where  water is until it is

24  produced."  Now, there are also  other matters that I think

25  have a bearing upon what the conditions are in this area.  And

I am not an hydrologist or a geologist, and I am not going to express my opinion on it. But I think there are factors that should be considered. And you will see them on the trip, where there are certain areas along the fault line where the willows have been there for many, many years and are now dying. In other words, there is no question but what the water levels in these basins have been retreating. Some of it, I think, is due to the draw, and some of it is probably due to the activities of man. This is where we determine which is which. However, I believe that these factors that I have mentioned are factors that should be considered. And I would like, if it were possible, in conclusion, to say that I wish that the geologists on both sides would sort of instead of burying the hatchet in each other's backs, bury it and shake hands, try to get together and see what the factors are. I think they are both a little right. It may be that they are both a little wrong. The truth lies somewhere in between.

(Another matter.)

THE COURT: Let us proceed with Fallbrook.

MR. VEEDER: May I proceed, your Honor?

THE COURT: Yes.

MR. VEEDER: Your Honor, the situation, as I observe it at the present time, is this: The offer of the pages marked in Bulletin 57 --

1    THE COURT:  State's Exhibit L.

2    MR. VEEDER:  -- State's Exhibit for identification L

3  was deferred.  Similarly, the offer in regard to the appendix

4  was deferred.  With  the record in that status, I think that

5  there will  be no further cross examination until we find out

6  what will  be done in regard to those pages which  were desig-

7  nated and which  were certainly part of, an important part of

8  any  interrogation that would  be made.

9    THE COURT:  Let's find out.  What have you done on these

10  studies, on these tables I asked you  to look into, Mr. Mosco-

11  vitz?

12    MR. MOSCOVITZ:  Over the weekend, Mr. James has com-

13  pared the  ground water storage capacity  of our basins with

14  the storage units of the United States, and  he has a compari-

15  son which is worked into a table.  He has not yet talked with

16  Mr. Kunkel about it.  And until he does so, I assume that your

17  Honor doesn't want that information presented to the Court in

18  evidence.

19    THE COURT:  I was hopeful that some consultation might

20  further this along.  Do you have copies of this statement?

21    THE WITNESS:  No, sir.  It is in longhand form at this

22  moment, your Honor.

23    MR. MOSCOVITZ:  The computations, your Honor, are--

24    MR. VEEDER:  Could I have references to table when we

25  are talking about these computations so I will  be sure I am

1    following?

2            THE COURT:  This is Table 15B3, I think.

3            THE WITNESS:  That is right.

4            MR. MOSCOVITZ:  I believe that is correct.  Table 15

5    and Chapter 2 and Table B3 in Appendix B.  The computations are

6    quite complex  because of the manner in which the  various

7    basins were divided into units and then within each unit in

8    depth intervals.  And it is not an easy thing to  lay them

9    forth  in a way that they  can  be easily  reviewed  by lay

10   people.  Mr. James has made a comparison of results of the

11   areas at depth intervals.  He has not completed the full  com-

12   putation, which would  take quite a  few pages to do.  But we

13   can  compare what we have with what the Government has by con-

14   sulting with Mr. Kunkel, or it can  be testified to by Mr.

15   James right now.

16           THE COURT:  Let's let them talk about it.  Advise Mr.

17   Kunkel of what progress he has made and how he is proceeding,

18   and  see where you  are with that.

19           MR. MOSCOVITZ:  We can do that at the first opportunity.

20           THE COURT:  What else will you have to  put on, then?

21           MR. MOSCOVITZ:  The only other items that I think we

22   still have been  requested to put in are the  data on the pump

23   tests.  It is Table, I believe it  was--

24           THE WITNESS:  B4.

25           MR. MOSCOVITZ:  -- 16.  Just a moment.  I will  get the

B1
S6

start
B2

1    number.  It is Table 16 on page 81 of Volume 1.  Securing the

2    well numbers and the dates of the wells which  are summarized

3    in Table 16.  Those are the yields of wells in the Santa

4    Margarita coastal  basin.  Those were secured from well logs

5    which were furnished by the United States Navy, and Mr. Fox is

6    still working on that.  In addition, we are--

7         MR. VEEDER:  I didn't quite understand your last state-

8    ment.  Those are pumping tests which  were secured from well

9    logs?

10        MR. MOSCOVITZ:  Yes, they are pumping tests that  are

11   reported on well logs.  And we are going through and getting

12   them out for the Court.  Those were not independently conducted

13   by the State.  They were information gathered from sources on

14   the Camp Pendleton.  The final test that we are still engaged

15   in is isolating the well logs that the State has which have not

16   yet been  put in the evidence.  Mr. Fox is engaged in that.  I

17   believe that covers the supplementary  information which you

18   have asked us to furnish.

19        THE COURT:  You propose to offer some evidence as to

20   these other appendices that you  want to offer?

21        MR. MOSCOVITZ:  Yes, your Honor.  Those will be offered

22   when Mr.  Illingworth  testifies.

23        THE COURT:  Oh, I  see, later on.

24        MR. MOSCOVITZ:  Which will  be a later date.

25        THE COURT:  In other words, you are limiting yourself

now to geology?

MR. MOSCOVITZ:  That is correct, your Honor.

MR. VEEDER:  And ground water hydrology.

MR. MOSCOVITZ:  Well, there will  be some testimony on ground  water hydrology, which Mr. Illingworth will  give later on; not at this time.

THE COURT:  Are you prepared to go forward, Mr. Veeder?

MR. VEEDER:  No, sir.  Until we find out what the status is going to be in regard to those parts of Chapter 2--

THE COURT:  I don't mean go forward with your cross.  I certainly  will abide by your  request to find out whether or not these documents go in evidence, and if they go  in evidence, then, you may cross.  But I mean, while this job is being com- pleted, which hasn't  been done, and until the offer in evidence is renewed, are you prepared to go forward with Colonel Bowen this morning?

MR. VEEDER:  No, no,  I am not,  your Honor.  No.  As I understood it--

THE COURT:  You  gentlemen talk it over a while.  Take a short  recess.

(Short recess taken.)

LELAND R. ILLINGWORTH,

recalled as a witness in behalf of the defendant State of California, having been previously sworn, testified further as follows:

THE COURT:  Proceed.

CROSS-EXAMINATION (Resumed)

BY MR. VEEDER:

Q   Mr. Illingworth, the geologic studies were conducted under your direction; is that correct?

A   Yes.

Q   And as a consequence you have your familiarity with all of the physical aspects and the terminology used in the preparation of the plates and maps which were entered in evidence while you were on the stand; is that right?

A   I have some general familiarity with all of the geologic aspects of those plates, yes.

Q   Now, would you state into the record what is meant by you in regard to the term "permeability"?  What does that mean to you?

A   Permeability is the ability of a geologic formation to transmit water.

Q   And what does "transmissibility" mean to you?

A   Transmissibility, as has been testified here, is the summation in a vertical direction through a geologic formation or aquifer for the depth of that aquifer that is penetrated by a given well.

Q   From the standpoint of the yield of the well, the real test is not permeability, but rather the real test in regard to the capacity of the well to yield is transmissibility? Isn't that correct?

1          A   That is true.

2          Q   And you have, as I recall, referred to the various

3    phases of permeability, you have called certain strata "highly

4    permeable;" isn't that right?

5          A   I don't know as we said certain strata. Certain

6    geologic units are more or less permeable.

7          Q   And you have used the term "moderately permeable;"

8    isn't that right?

9          A   That is one of the terms used to define--

10          Q   What would you mean, just from the practical stand-

11    point, by "an aquifer or a strata is moderately permeable"?

12    What would you mean by that?

13          A   It would mean that you could obtain moderately good

14    producing wells.

15          Q   And speaking of irrigation wells, what would you say

16    would be a good producing well?  I am speaking now of an

17    irrigation well.  Would you say that 1300 gallons per minute

18    would be a good producing well?

19          A   Yes, that is a good producing well.

20          Q   And you would say then that a well drilled that would

21    produce 1300 gallons a minute is at least drilled in moderately

22    permeable stratas or aquifers; is that right?

23          A   Well--

24          MR. MOSKOVITZ:  Your Honor, I object.  I think there

25    is an element that has to be added to that, and that is what

6244

1  the depth of the strata is that is intersected.  Permeability

2  doesn't take into account the full length.  That is trans-

3  missibility.

4      MR. VEEDER: Your Honor, in this regard, he has said

5  that a well that produces 1300 gallons a minute is a good

6  well, and he has also said that water-bearing strata that is

7  moderately permeable should produce good wells.  I think he

8  has already touched on it.

9      THE COURT:  Objection overruled.  This is cross-examin-

10  ation.

11      THE WITNESS:  The terms, the relative terms of the

12  relative permeabilities are just that, they are relative, and

13  they are general terms, and we are not saying that in any one

14  of these classifications that we have delineated on our maps

15  that every square foot of that area has a given specific

16  permeability.  It has a general characteristic for the entire

17  formation, and this is true when we are speaking of low

18  permeability or moderate or high.

19  BY MR. VEEDER:

20      Q  You would say that highly permeable strata would

21  result in very good wells; isn't that right?

22      A  If you have enough depth.  You can have a highly

23  permeable formation that is ten feet deep and you are not

24  going to get much of a well out of it.

25      Q  Assuming that it was a hundred feet deep, you would

1  say that you had reason to believe-- still speaking of

2  irrigation wells-- that you would get good irrigation wells

3  in a strata of that kind; isn't that right?

4       A  Not necessarily;  a hundred feet is not a very

5  great depth.

6       Q  What depth do you think is requisite to result in a

7  good producing well?

8       A  I don't think this is the kind of question that can

9  be specifically answered.  It depends on many other conditions.

10       Q  Well, we know there is a well about 171 feet deep

11  in the Pauba Valley, used for irrigation.  Are you acquainted

12  with that well?

13       A  I am sure I can't identify it by the single measure-

14  ment of the depth.

15       Q  You could, though, if I showed it to you on one

16  of the plates that you prepared; is that right?

17       A  If you point it out to me and locate it, or give me

18  the number or some other clue, perhaps I would be acquainted

19  with it.

20       Q  You would say then that a strata of highly permeable

21  water-bearing material of sufficient depth would produce good

22  wells, wouldn't you?

23       A  Would you repeat that question, please?

24       (The Reporter read the last question.)

25       MR. MOSKOVITZ:  Your Honor, I think the term "sufficient

1  depth" is somewhat--

2      MR. VEEDER:  I am working toward what is sufficient

3  depth.  I am going to ask him the next question as to what he

4  thinks is sufficient depth.

5      THE WITNESS:  To your first question, I think yes.  But

6  to give you a specific value of what is sufficient in any one

7  case, I wouldn't be prepared to do.

8  BY MR. VEEDER:

9      Q  All right.  Now, would you state for the record what

10  you mean by "low permeability."?  What do you mean by that?

11      A  As defined on our Plates 9A and 9B?

12      Q  Well, there are several places that it is used on

13  your plates.  What do you mean by "low permeability"?

14      MR. MOSKOVITZ:  Perhaps you could identify the plates,

15  Mr. Veeder.

16      MR. VEEDER: All right.  Plates 9A and 9B have used the

17  term "low permeability."

18      (An interruption.)

19      MR. VEEDER:  Would you read the last question, Mr.

20  Reporter?

21      (The Reporter read the pending question as follows:

22  "Q  What do you mean by low permeability?

23      "MR. MOSKOVITZ:  Perhaps you could identify the plates,

24  Mr. Veeder.

25      "MR. VEEDER:  All right.  Plates 9A and 9B have used

1    the term 'low permeability.'")

2       THE WITNESS: Well, as stated, these are relative

3    terms. Low permeability is the term assigned to the formations

4    which yield relatively low yields to wells. This is in the

5    nature of generally less than a few hundred gallons a minute.

6    The wells are typically windmill wells and this domestic type

7    of wells. Occasionally there is an irrigation well.

8    BY MR. VEEDER:

9       Q Again, where you use the term "low permeability" the

10    matter of transmissibility is the controling factor; is that

11    not correct?

12       A Transmissibility is the factor which governs any

13    well.

14       Q Yes. In other words, when we say that an area is an

15    area of low permeability, we certainly are not saying that a

16    well properly drilled with proper perforations, by reason of

17    this phenomenon transmissibility, will not be a good well.

18    Isn't that right?

19       MR. MOSKOVITZ: May I have the question read?

20       MR. VEEDER: I will rephrase it.

21       Q In other words, where you have designated areas of

22    low permeability, you do not mean that good wells cannot be

23    obtained in that area by reason of the phenomena of trans-

24    missibility?

25       A I don't know that I understand that question fully.

MR. VEEDER:  I will break it down.  This is important.

Q  When you say an area is one of low permeability, it does not follow that you could not get good wells in it; isn't that correct?

A  I think I have already said that these are general terms and that there are exceptions to the general rule in these areas.  The general rule inthis area of purple on Plates 9A and 9B is described as low permeability.  However, we know that there are some wells in there that are relatively good producers.

Q  And the factor of transmissibility is the controling factor even in the areas of low permeability; isn't that right?

A  The transmissibility as measured at a given well is the factor that measures the ability of the formations to yield water to the well.

Q  So as a matter of fact the matter of low permeability, as designated by you on the several plates that you have, should not rule out an area as a prospective ground water source; isn't that correct?

A  Well, we certainly said-- we have not said that it was not a source.

Q  Yes.  Now, we have gone through high permeability, moderate permeability, low permeability, and the next phase is the impervious character, is it not, of the basement complex?  Isn't that right?  Isn't the next gradation, from the standpoint

1   of water yield, lands of relatively impervious quality?

2       A   That is true.   Referring back to Plates 9A and 9B,

3   the brown area is described as being generally impermeable,

4   and this largely consists of the basement complex.

BY MR. VEEDER:

Q And you say the lands that are impermeable are actually impervious; isn't that correct?

A Well, when you say impervious, it sounds like you are referring to the surface characteristics. Is that what you mean?

Q No. His Honor interrogated Mr. Kunkel along these lines. Assuming that you had a block, a fault which created a barrier, a basement complex, is not that basement complex relatively impervious? I think those are substantially the terms that he used. And isn't that true that the basement complex is relatively impervious?

A I believe this to be true: It is relatively impermeable. It transmits water slowly.

Q You use the terms interchangeably, impervious and impermeable, is that right?

A I am not a trained geologist, Mr. Veeder. If you want the technical definitions, I suggest that you talk with the people that specialize in this particular matter who worked under my direction in this case.

Q Are we correct, then, in saying that there are impermeable areas in the Santa Margarita River Valley, that there are areas of low permeability, moderate and high; isn't that right?

A You said Santa Margarita Valley?

1    Q  I mean the watershed.

2    A  Do you mean the entire watershed?

3    Q  Yes.

4    A  Mr. Reporter,  would you  read that question, then,

5  please?

6       (The  reporter read back the question.)

7    A  Yes, within the watershed there are areas that are

8  generally impermeable, those with low permeability, and those

9  with moderate or high  permeability.

10    Q  In referring to-- before going further, how would

11  you define a ground water basin in the Santa Margarita River

12  Valley or any other valley?  What is your definition of a ground

13  water basin?

14    A  Well, there could  be many definitions of ground

15  water basins.

16    Q  What is the one that you have used in preparing

17  your plates?

18    A  A ground water basin is, as we used it in this re-

19  port, is an area or a volume of  relatively-- correction-- of

20  a pervious nature which would yield water to wells, which is

21  surrounded on the bottoms and sides by some relatively imper-

22  meable materials.

23    Q  Impermeable or impervious?

24    A  Yes.  I am not  saying they are impervious or im-

25  permeable.  I say they  are relatively so with respect to the

1  main body of the formation that we are considering, the fill of

2  the basin.

3       Q  Now, if you will take-- this is California's  Exhibit

4  10B.

5       MR. MOSCOVITZ:  Exhibit L, Plate 10B?

6       MR. VEEDER:  Yes.

7       THE WITNESS:  Yes.

8  BY MR. VEEDER:

9       Q  -- and look  at the-- well, I think the Pauba Basin.

10  We may pick on the Vail Company a little more.  That is a good

11  example.  You have  delineated the lines of the Pauba Basin,

12  and it is designated in a block there as Pauba Basin.  The

13  legend says:  "Ground water basin boundary."  Do you  see that?

14       A  Yes, sir.

15       Q  As you have prepared that plate, you  are stating

16  that the recent alluvium is contained in a basin surrounded by

17  relatively  impervious material, is that correct?

18       A  On this plate we have defined the boundary of a

19  basin as being the contacts between what our geologist con-

20  sidered recent alluvium and the older alluvium adjacent to it

21  to the northwest and to the southeast.

22       Q  And you  are saying, then, that the confines of

23  Pauba Basin are delineated by an area which is relatively im-

24  pervious; is that not correct?

25       A  You are  saying-- yes, the material that is adjacent

1    to that basin which is defined as being the recent alluvium is

2    surrounded or is adjacent to materials of less permeable nature.

3         Q  No.  No.  You have said that it is contained and by

4    strata or materials which are relatively impervious?

5         MR. SACHSE:  I will object, if the Court please.  The

6    witness has not used the statement "impervious" yet.  He has

7    very carefully used "impermeable, relatively impermeable."  The

8    question  has been asked and answered a half a dozen  times.

9         MR.  VEEDER:  He has used the term "impervious" within

10   the last very few questions.  And it is highly important to us

11   that we be permitted to--

12        THE COURT:  My recollection of the record, and you

13   would have to check me, was when Mr. Veeder was asking him to

14   define what he meant by basin, he  said it was an  area of

15   material that was of relatively high permeability surrounded on

16   the bottoms and on the sides by an  area of relatively-- I

17   think he  said impermeable and impervious material.

18        MR. VEEDER:  That is right.  That is  exactly what he

19   said.

20        THE COURT:  If he didn't say it, then Mr. Veeder asked

21   him a question where he used both words.  But I don't know the

22   difference between-- do you make a distinction  between imper-

23   meable and impervious?

24        THE WITNESS:  No, sir.  I have the same problem.

25        THE COURT:  You use them interchangeably?

1  THE WITNESS: Well, I have been here, but I would rather

2  stick with the word "impermeable." I may find that my geologist

3  would  advise me there is a technical difference.

4  THE COURT: As far as you have been using them, though,

5  they mean the  same to you?

6  THE WITNESS: Yes, sir. I  really--

7  THE COURT: They mean the same to me.

8  THE WITNESS:  -- should have said "impermeable," in

9  some  cases.

10  THE COURT: Until somebody instructs me otherwise.

11  BY MR. VEEDER:

12  Q  In other words, you would say that on the sides and

13  the bottom of Pauba Basin there is some kind and type of mater-

14  ial that is relatively impervious, isn't that right?

15  A  Impermeable.  I would prefer to use that word.

16  Q  You use them interchangeably.  I will use "imper-

17  vious," and you use "impermeable."

18  Now, we are going to have quite a lot on this point,

19  your Honor.

20  MR. MOSCOVITZ: May I ask, Mr. Veeder, do you  feel

21  there is a distinction between these two terms?  If so, I don't

22  want my witness to  be led into a trap.

23  (Remark off the record.)

24  THE COURT: What do you understand by the  two terms,

25  Mr. Veeder?

1    MR. VEEDER:  I would  say that a relatively impervious

2    strata  would  be a strata which has less, certainly a markedly

3    less degree of permeability than an  area of low permeability.

4    I would say that a good example of relatively impervious mater-

5    ial would  be basement complex.  I think that is correct.

6       THE COURT:  You  are using the term, therefore, "imper-

7    vious" as a material with less permeability than what you would

8    call low permeability?

9       MR. VEEDER:  A great deal less.

10      THE COURT:  On a scale you would start with high per-

11   meability--

12      MR. VEEDER:  Moderate.

13      THE COURT:  -- moderate permeability--

14      MR. VEEDER:  Low.

15      THE COURT:  -- low permeability;  then relatively im-

16   pervious would be down at the bottom of the scale.  Is that

17   about it?

18      MR. VEEDER:  Yes, I think that is probably right.

19      THE WITNESS:  Mr. Veeder, if that is the--

20      MR. VEEDER:  Now, no.

21      THE COURT:  Just a minute.

22      MR. VEEDER:  I don't--

23      THE COURT:  The witness has a right to explain an ans-

24   wer, and that is apparently what he is going to do.  So just

25   sit still.

1          MR. VEEDER:  I am going to object to it, because I

2    don't want the witness making explanations in the record.  And

3    I think it is very, very bad from the standpoint of cross-

4    examination.

5          THE COURT:  Whether you want it or not, it is a rule

6    that the witness may explain an answer.  Did you have some-

7    thing you wanted to say, Mr. Illingworth?

8          THE WITNESS:  Yes, sir.  If this is the definition of

9    "impervious" that Mr. Veeder is using, then I would like to

10   have that word stricken out of my testimony and substitute

11   the word "impermeable" in all cases, because I put no such

12   difference between the two terms as you have described.

13   BY MR. VEEDER:

14         Q  Have you ever used the term "impervious"?

15         A  Certainly.

16         Q  And what did it mean when you used the term "imper-

17   vious"?

18         A  When I said something is impervious, I mean simply

19   that, that it would transmit no water, for instance.

20         Q  Thank you.

21         A  When I used "relatively impervious," I mean some-

22   thing entirely different.

23         Q  What do you mean when you say "relatively imper-

24   vious"?

25         A  Less than impervious.

Q  All right.  But--

A  Compared with-- it always has to be relative to something else; compared with something else.

Q  Would you describe, then, the materials which contain the recent alluvium in the Pauba Valley which you have said are relatively impermeable?

A  I don't think I said that the materials in Pauba Valley were relatively impermeable.  I said that the materials adjacent to the recent alluvium in Pauba Valley were relatively impermeable with respect to the valley fill; the recent alluvium in Pauba Valley.

Q  Would you describe that material?

MR. MOSCOVITZ:  Which material?  Is that in Pauba Valley or--

MR. VEEDER:  The material in which the recent alluvium is contained.

Q  What was it like?

A  You mean the recent alluvium?  Not-- you say within which--

Q  The basin, the outside, the container of the recent alluvium; what is that like?

A  Describe the older alluvium, then, in fact?

Q  No.  No.  You say that the ground water basins are contained in relatively impermeable material.  Now, would you describe that relatively impermeable material?

1   MR. MOSCOVITZ: In connection with Pauba Basin, is that

2 correct?

3   MR. VEEDER: Yes.

4   THE WITNESS: It has been  described as older alluvium

5 by the geologists, and that is the way I would describe it.

6 BY MR. VEEDER:

7   Q And you would then say that-- well, how do you dis-

8 tinguish, then, between the younger and older alluvium?

9   A I did not make the  detailed studies which would

10 distinguish these, Mr. Veeder.

11   Q Didn't you draw the outlines of the ground water

12 basin?

13   A Certainly on the basis of the evidence that was, and

14 the studies that were made by the geologists.

15   Q And you assume, then, that these basins are-- this

16 recent alluvium is contained in some kind of a material that

17 can be readily distinguished; is that right?

18   A I don't know how readily they distinguished it. I

19 probably wouldn't  be able to  readily distinguish it.

20   Q In other words--

21   THE COURT: We will adjourn until two o'clock.

22   (Whereupon, a recess was had at 12:00 o'clock noon

23 until 2:00 o'clock p.m., of the same day.)

24

25

SAN DIEGO, CALIFORNIA, TUESDAY, DECEMBER 9, 1958.  2:00 P. M.


(Other matters.)

THE CLERK:  Number four, 1247-SD-C, United States vs.

Fallbrook, et al.  Further court trial.


LELAND R. ILLINGWORTH,

recalled as a witness in behalf of the defendant State of

California, having been previously sworn, testified further

as follows:


CROSS-EXAMINATION (Resumed)

BY MR. VEEDER:

Q  Mr. Illingworth, did I understand you to say that

you merely took the data given to you by the geologists and

that you simply drew in the boundaries of the ground water

basins?

A  We drew the ground water basins as shown on State

L, Plate 10B for Pauba Basin along the contact line between

the older alluvium and the Recent alluvium as shown on State

L, Plate 13B.

Q  Will you answer the question?

MR. MOSKOVITZ:  The question has been answered, your

Honor.

MR. VEEDER:  Your Honor, the question has not been

1      answered. I asked him whether he simply drew the lines on

2      the basis of the data that was given to him by the geologists.

3          THE COURT: Can you answer the question yes or no.

4          THE WITNESS: That is the way we drew the lines.  I

5      wouldn't say that that is simply all we did, certainly.

6      BY MR. VEEDER:

7          Q  Can you answer it yes or no first?  Can you answer

8      whether you did or did not draw the lines based upon the data

9      handed to you by the geologists?

10         A  Yes, we used the geologists' information.

11         Q  And it was upon the information given to you by the

12     geologists, then, that you drew these lines?

13         MR. MOSKOVITZ:  I think the question has been asked and

14     answered, your Honor.

15         MR. VEEDER:  Your Honor--

16         THE COURT:  Sustained.  He said that he did.

17     BY MR. VEEDER:

18         Q  Was that the only information that you had?

19         A  No.

20         Q  What other information did you have?

21         MR. MOSKOVITZ: For drawing the ground water basins

22     boundaries?

23         MR. VEEDER:  Yes.

24         THE WITNESS:  We have much information concerning the

25     stream flows, well production, location of wells, logs of wells--

1  MR. VEEDER: Just a moment.

2  Q What did stream flow have to do with drawing the

3 lines of ground water basin at Pauba?

4  A The stream flow and its relationship to production

5 of the wells was important in considering the nature of the

6 materials and whether there was what one would call or define

7 as a ground water basin.

8  Q In other words, the stream flow indicated to you

9 where the lines of this relatively impervious strata which

10 embraces the younger alluvium delineates the Pauba Basin; is

11 that right?

12  A Certainly not.

13  Q Then what did stream flow have to do with it?

14  MR. MOSKOVITZ: I think that has been asked and

15 answered, your Honor.

16  THE COURT: Overruled.

17  THE WITNESS: /Just one of the factors that we considered

18 in determining whether this was an area which could properly

19 be called a ground water basin, under our definition of ground

20 water basin as we have previously testified.

21 BY MR. VEEDER:

22  Q As used in Bulletin 57?

23  A Yes.

24  Q In other words, the stream flow demarked, in your

25 opinion, the ground water basin; is that right?

1    MR. SACHSE:  Your Honor, that has been asked and

2  answered.

3    MR. VEEDER:  No it was not, your Honor.

4    THE WITNESS:  My answer is no.

5    THE COURT:  Overruled, Mr. Sachse.

6  BY MR. VEEDER:

7    Q  What other factors did you take into consideration,

8  in addition to the stream flow, in determining the delimits

9  of the Pauba Basin?

10    A  In addition to those that I just mentioned?

11    Q  No; in addition to stream flow?

12    MR. MOSKOVITZ:  Your Honor, I don't think the witness

13  said the stream flow was used to determine the boundaries.  He

14  said they were not.

15    THE COURT:  You read the record tomorrow.  He made a

16  very broad general statement.

17    THE WITNESS: Could I have the question again, please?

18    (The reporter read the pending question as follows:

19  "Q  What other factors did you take into consideration in

20  addition to the stream flow in determining the delimits of the

21  Pauba Basin?

22    "A  In addition to those that I just mentioned?

23    "Q  No, in addition to stream flow.")

24    THE WITNESS:  Well, I think I said a couple of times

25  that we didn't use the stream flow measurements to delimit the

1  basin boundaries or to delineate the basin boundaries. This

2  was done on the basis of geologic mapping of the edge of the

3  Recent alluvium, the contact between the Recent alluvium and

4  the older alluvium.

5  BY MR. VEEDER:

6      Q  Then you want to change what you previously said?

7      MR. MOSKOVITZ:  Your Honor--

8      THE WITNESS:  I don't believe so.  I think it has been

9  consistent.

10  BY MR. VEEDER:

11      Q  The record will show what you said.

12      A  Yes.

13      Q  Now, you said that in addition to the data that the

14  geologists gave to you, you took into consideration some other

15  factors in delimiting the Pauba Basin as shown on Plate 10B,

16  and would you state what those things are?

17      A  Once we had determined that there was a proper ground

18  water basin, proper to delineate this ground water basin,

19  under the definition that we had adopted, the boundary was

20  delineated along the line of contact between the Recent

21  alluvium and the older alluvium, the Recent alluvium being

22  in Pauba Valley, the older alluvium being adjacent to on the

23  northwest and adjacent to on the northeast of the Recent

24  alluvium of Pauba Valley.

25      Q  Then it was only the geologic data supplied to you

Case 3:51-cv-01247-JO-SBC   Document 4555   Filed 09/24/63   PageID.26995   Page 50 of 82

1    that you used in delimiting the Pauba Basin; is that right?

2         A  In delineating the Pauba Basin we used the geologic

3    information, that is true.

4         Q  And that was given to you by Mr. James; is that

5    right?

6         A By Mr. James and his crew of geologists.

7         Q  So the only data that you used was the data from

8    them?

9         A The only data that we used to delineate the boundary

10   was that data.  But we used other information to establish

11   that there was a ground water basin.

12         Q  What other information did you use to establish

13   that there was a ground water basin?

14         A  The existence of various wells, production from the

15   wells.

16         Q  Now, did you, on the basis of your personal informa-

17   tion on the production of the wells, delineate the basin?

18         A  I think we just have been through this a couple of

19   times.  We delineate the basin--

20         Q  Will you answer the question?

21         A  --on the basis of geologic contact and the delinea-

22   tion of that line as shown on Plate 13B.

23         Q  Now, what did the wells indicate to you from the

24   standpoint of the north and south boundaries of the Pauba

25   Basin?  What did they show to you?

1     A  The logs of the wells?

2     Q  No, no; the wells themselves.

3     A  Nothing.  You can't look at a well and determine

4 where the boundaries of the basin are, I am sure.

5     Q  All right.  Then what factors did you consider?

6     MR. SACHSE:  Your Honor, that has been asked and

7 answered four times.

8     THE COURT:  We have been all over this.  Go on to some-

9 thing else.

10    MR. VEEDER:  No, your Honor, I am--  All right.  I want

11 to say this, that I am operating under a great handicap be-

12 cause of the present status of the record.  But I will try

13 and elicit from these witnesses what I can.

14     Q  Now, you viewed the well logs to determine the north

15 and south lines of the Pauba Basin; is that right?

16    MR. MOSKOVITZ:  I think that has been asked and answered,

17 your Honor.

18    THE COURT:  It is the same question you had just before.

19    MR. VEEDER:  No, your Honor.

20    THE COURT:  It is the one we had just before.

21 BY MR. VEEDER:

22     Q  What would the well log show you in regard to the

23 north and south boundary lines of the Pauba Basin as you have

24 delineated them?

25    MR. MOSKOVITZ:  I think that has been asked and answered.

1    MR. VEEDER:  No, it has not been.

2    THE COURT:  Let's get this straightened out.  You first

3    examined him as to how he fixed the perimeter of the basin.

4    MR. VEEDER:  That is right.

5    THE COURT:  Then you asked him a general question,

6    something to do with the nature of the extent of the basin,

7    and you got an answer about wells.

8    MR. VEEDER:  No, your Honor, I am still on the question

9    of delimiting the basins.

10    THE COURT:  He has answered you three or four times

11    that he used the geologic information as to the place of

12    meeting between the older and the younger alluvium in the

13    delineation of the basin.

14    MR. VEEDER:  I would just as soon have your interpreta-

15    tion of what he said, your Honor.

16    Q  Now is that all?  Is that the only fact?

17    THE WITNESS:  That is all we used to delineate the

18    boundary here.

19    THE COURT:  That is the way I understood the record.

20    BY MR. VEEDER:

21    Q  How did you determine that the boundaries of the

22    basin constitute the line of a relatively impermeable material?

23    A  I didn't personally make such a determination.  This

24    is a geologic matter which was investigated by the geologists.

25    Q  Who made that determination?

1    A  Mr. James and his crew of geologists.

2    Q  In other words, you simply did the drafting job when

3  you drew in the lines of the Pauba Basin?  Is that right?

4    A  Well, I didn't draw these lines, Mr. Veeder, if you

5  are talking about 13B; they were drawn by a draftsman.

6    Q  I am not talking about 13B.  I am talking about 10B,

7  which was introduced in evidence on the basis of your testi-

8  mony.

9    A  I am sorry-- 10B.

10    MR. MOSKOVITZ:  I think that was the testimony of both

11  geologists.

12    MR. VEEDER:  No, that is not correct.

13    THE COURT:  Let us go ahead.  Was Exhibit 11, Plate 10B,

14  drawn under your direction, or did you actually draw the

15  lines of the basin?

16    THE WITNESS:  It was drawn under my direction.

17    THE COURT:  All right, go on from there, Mr. Veeder.

18  BY MR. VEEDER:

19    Q  It was under your direction that these determinations

20  were made; is that right?

21    A  Yes.

22    Q  And you say you are not a geologist?

23    A  I am not a geologist.

24    Q  Now, turning to Exhibit L, Plate 16, who made the

25  determination as to the line which separates-- I am referring

1    to G and G-prime-- who made the determination as to where

2    the zone of unconfined water would be located on G, G-prime?

3         THE COURT:  I don't see any zone of unconfined water.

4    Reframe your question.

5         MR. MOSKOVITZ:  I think there is one, your Honor.

6         MR. VEEDER: There is one there, your Honor.

7         MR. MOSKOVITZ:  The top zone.

8         THE COURT:  Pardon me.  I will take it back.

9    BY MR. VEEDER:

10        Q  Who made that determination?

11        A  Are you referring to the line between the zone of

12   unconfined water and the confining bed?

13        Q  Yes.

14        A  This was done by the geologists working under Mr.

15   James's direction.

16        Q  And not under your direction?

17        A  Under Mr. James's technical direction.

18        THE COURT:  He said, "And not under your direction"?

19   You were in overall charge of this project?

20        THE WITNESS:  Yes, I was.

21        THE COURT:  So then Mr. James was working under your

22   direction generally?

23        THE WITNESS:  That is true.

24   BY MR. VEEDER:

25        Q  When you say under your general direction, what do

1   you mean?

2        A   I mean that I was responsible for the entire job,

3   and in that capacity I had a number of people working for me,

4   among whom were the geologists who worked under the technical

5   direction of Mr. James.

6        Q   So both in regard to the exterior boundaries of

7   the Pauba Basin and also this area of zone of unconfined water

8   he was simply working for you but not carrying out your in-

9   structions; is that right?

10       A   If you mean by that that I told him what findings

11   he should come up with, the answer is yes, I believe-- unless

12   I misconstrued the question.

13       Q   In other words, when he is working under your direc-

14   tion it is comparable to a man simply reporting to a boss from

15   the standpoint of time and that he is on the job on Monday

16   morning; isn't that right?

17       A   No; we conferred on this all the way through.

18       Q   And did you make the determinations on any of these

19   geologic questions?

20       MR. MOSKOVITZ:   Could you be more specific, Mr. Veeder?

21   Which geologic questions?

22       MR. VEEDER:   I will just ask the general question to

23   begin with.

24       MR. MOSKOVITZ:   I object.   I think it is a little

25   indefinite as to what is meant by geologic questions.

1          THE COURT:  Overruled.

2          MR. VEEDER: Would you read the question, please.

3          (The reporter read the pending question as follows:

4    "Q  And did you make the determinations on any of these

5    geologic questions?")

6          THE WITNESS:  No, I didn't make the determinations.

7    BY MR. VEEDER:

8          Q  You did not?

9          A  That is correct.

10         Q  In other words, you simply undertook the drafting

11   job of these plates which were offered in evidence; is that

12   right?

13         A  No, that is not true.

14   MR. MOSKOVITZ:  I object as to plates.  Are you talking

15   about the sections?

16   BY MR. VEEDER:

17         Q  Well, let's take Plate 16.  What did you do, from

18   the geologic standpoint, in connection with that Plate 16G,

19   G-prime?

20         A  Well, from a geologic standpoint is a pretty broad

21   question.  If you want to know what I had to do with this

22   plate, I can explain that.

23         Q  I am asking about the geologic aspects of it at the

24   present time.

25         THE COURT:  Well, what did you do?  Did you actually

1   draft it in your own hand, or was it drafted by a draftsman in

2   your project and under your supervision?

3        THE WITNESS:  Well, the rough draft of it was prepared

4   by the geologists working under Mr. James.  But before it was

5   prepared as a plate by draftsmen, it was reviewed by me.  I

6   checked to see whether it appeared reasonable, whether it

7   appeared to be in accord with other determinations that were

8   made, whether the well logs shown thereon were the number

9   of feet, for instance, off the section line that they say they

10  are, whether the well numbers were correct, whether the well

11  depths were as shown in the well logs, et cetera.  I reviewed

12  from a mechanical standpoint what is shown thereon.  I did not

13  say that they had interpreted the well log improperly.  This

14  was a geologic interpretation which the geologists made.

15  BY MR. VEEDER:

16       Q And that was the extent of your responsibility, then,

17  was the mechanical features of it?

18       A  On this particular plate, that is true.

19       Q  Was it only the mechanical features, then, that you

20  undertook in regard to the Plate 10B when you located the

21  boundaries of Pauba Basin?  It was only mechanical there; is

22  that right?

23       A  Plate 10B?  I don't think that is a proper statement

24  of the nature of our work.  I think that it is more properly

25  stated that we discussed these matters together.  The delineation

Illingworth      Cross                                    6271

1   of a basin was made.  I questioned the geologists about it to

2   find out why they did it, and if they had sufficient reasons,

3   good reasons, that appeared reasonable to me.  We went ahead

4   and delinated the way they had it shown.  If they were not

5   reasonable, we reviewed it further.

6        Q  It was based on their statement to you, though; that

7   was really what guided you?

8        A  They made the basic geologic investigation, that is

9   true.

10        Q  And they told you what the matters were and you

11   accepted that; is that right?

12        A  I just said I didn't accept everything.  We reviewed

13   it, and if we didn't agree or it didn't seem reasonable to us,

14   we went back and either tried to obtain some further information

15   or study it further.

16        THE COURT:  I don't have any problem, Mr. Veeder, on

17   problems of this sort.  Maybe you do.  But I don't.  If a man

18   is given the responsibility to assemble a report, it doesn't

19   mean that he has to be an expert draftsman; it doesn' mean

20   that he has to be a geologist; it doesn't mean that he has to

21   know every science involved in the report.  First of all, he

22   has an overall administrative responsibility to get the job

23   done.  He has the responsibility to see that the work is being

24   done accurately, that it reflects the best judgment of the

25   technicians in the particular fields they are working in.  Maybe

1  you never have, but I have been responsible for briefs that

2  were prepared much the same way.  I had an assistant prepare

3  a section of a brief.  When I was practicing law as United

4  States Attorney I looked the brief over.  I was responsible

5  for the brief.  If I was asked if I was responsible for the

6  brief, "Yes."  I didn't write it.  My name was on every brief

7  filed, but I didn't write them all.  And those briefs were

8  some assistant worked with me, he may have worked on one

9  section and I worked on another.  I checked with him as to

10  how thorough his research had been.  I read the thing over

11  from the standpoint of whether it made sense from my general

12  knowledge of the subject matter, into which he had gone in

13  detail, and I was generally responsible for it.

14      I don't have any problem understanding the situation.

15  This man doesn't claim to be a geologist.

16      MR. VEEDER:  And he is not.

17      THE COURT:  He claims to be a hydrologist.

18      MR. VEEDER:  All right.

19      THE COURT:  But he was given the overall responsibility,

20  and it happened that the geologists reported to him.

21      MR. VEEDER:  The only point that I desire to bring out,

22  and I think it is very clear now, that all these plates were

23  admitted into evidence over my objection on the grounds that

24  there was no proper foundation.  I think it is evident now

25  that I was correct in my objection, because this man, when he

1   testified, purported to be a geologist, and that is what the

2   record will show.

3          THE COURT:  No, he testified that plates were made

4   under this direction.  He didn't testify that he drew any

5   plate.

6          You didn't call any witness in who did the actual

7   drafting on any of your charts.  We are trying to get along

8   with this case.  You called in some men who were responsible

9   for the charts.  They had draftsmen working for them.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. VEEDER:  Let's  see, your Honor, I am not raising

2   the question about whether they  have draftsmen  or not, or

3   whether the case is moving along or not.  My concern is  that

4   your Honor undertook the  examination of Mr. James on direct

5   examination.  And based upon that examination, the state of

6   the record is as follows:  "If you  were under oath, would you

7   testify as to what appears on the pages in the write-up of

8   Bulletin 57?"

9      THE COURT:  Geologic part of it, yes.

10     MR. VEEDER:  "And would you  testify as written up on

11  Appendix B?"  Now, here, we have truthfully the split  person-

12  ality, and I was sure we would wind up this way, with Mr.

13  Illingworth avoiding  responsibility by saying he doesn't know

14  anything more than the  draftmen's end of it.  And we now have

15  a situation where the .record--

16     THE COURT:  No, we have a situation where you  were told

17  by both-- by  Mr. Moscovitz-- and if  you weren't content with

18  that, you  were told by the sworn testimony of Mr. James, and,

19  I think, by Mr. Illingworth-- what parts of this record Mr.

20  James was responsible for in the  geology.  Mr. James, in turn,

21  told  you who the people were who worked with him on the various

22  projects, and who he, in turn, relied upon for some of the work;

23  because he didn't do it all.  And you have been  assured.  You

24  have Mr. James here for cross-examination.  You have Mr. Fox,

25  and you  can have the other two  men if you  want them.  In other

1    words, you can cross-examine on the geology of this situation

2    anybody who worked on this project, if you want to.  Now, no

3    man can do a job this size all by himself. It has to be done

4    on some team basis.

5         MR. VEEDER:  I know that.

6         THE COURT:  What better opportunity can we give you

7    for cross-examination than to have the record show who did the

8    work and then let you cross-examine as far down the line as you

9    want to go, including the draftsmen who put the final ink on

10   the sheet, if you want to do that?  So far, we haven't had in-

11   quiry as to who the draftsmen were.  If you want that, we

12   will have that, too.

13        MR. VEEDER:  Fine.  Fine.  I think it is probably

14   desirable. Now, the point that I make, then, is that I would

15   like to have Mr. James subject to recall, this gentleman, be-

16   cause I know these bugs are going to run.  I would like to re-

17   call Mr. James to the stand in place of Mr. Illingworth.

18        MR. MOSCOVITZ:  At this time?

19        MR. VEEDER:  Right now.

20        THE COURT:  Step down, Mr. Illingworth.

21        MR. VEEDER:  But I reserve the right to call this fellow

22   back.

23        THE COURT:  Step down, Mr. Illingworth.  Mr. James.

24   come forward.

25        MR. MOSCOVITZ:  I will go out and get Mr. James.

1    THE COURT:  Here is Mr. James right here.

2    MR. SACHSE:  Here he is, Adolph.

3    MR. JAMES:  My notes are in the next room.  May I get

4    them, your Honor?

5    THE COURT:  Notes on what?

6    MR. JAMES:  My copy of the Bulletin 57.

7    THE COURT:  All right, you may.

8    MR. VEEDER:  And in regard, now, to Appendix B, are we

9    in a position so that is to be offered now?

10   MR. MOSCOVITZ:  No, not if he wants to have a complete

11   analysis of the ground water storage computations.  Mr. James,

12   I believe, is still working.  You might ask him.

13   MR. VEEDER:  He has been sitting in the courtroom.  I

14   thought, under the circumstances, he must be through.

15   MR. MOSCOVITZ:  We are going to try to reproduce what

16   he does, in any event.

17   Mr. James, have you completed your work on the ground

18   water storage?

19   MR. JAMES:  No, I haven't.

20              LAURENCE JAMES

21   recalled as a witness in behalf of defendant State of Califor-

22   nia, and having been previously sworn, testified further as

23   follows:

24

25

FURTHER CROSS-EXAMINATION

BY MR. VEEDER:

Q   Now, in regard to the pages of the write-up on  the most  recent designation in regard to geology, namely, page 62, which  my record shows Mr. Illingworth wrote--

THE COURT:  Mr. who?

MR. VEEDER:  Mr. Illingworth.

MR. SACHSE:  Is this 62 or 60B, Mr. Veeder?

MR. VEEDER:  I am  speaking of 62 of Volume 1.

MR. SACHSE:  That is hydrology.

MR. MOSCOVITZ:  Underground hydrology.

MR. VEEDER:  Well, underground hydrology.

Q   Written by  Mr. Illingworth, is  that right?

MR. MOSCOVITZ:  Why don't you put Mr. Illingworth  on the  stand and ask  him  about  that?  Why did you put Mr. James on the stand and  start  asking about something that Mr. Illingworth did?

THE COURT:  Mr. James was interrogated specifically as to-- I would have to check this as to 62, but as to 66, the geologic investigation.

MR. VEEDER:  My  notes show this:  That Mr.  Illingworth wrote underground hydrology on 62, 63, 64, 65.  That Mr. James wrote geologic investigation on 66 down to the end, down to "well  drilling methods" -- no, wait a minute.  Apparently, Mr. James wrote 68, 69, 70, 71, 72, 73, 74, 75, 76, and 77, 78,

1    and 79, 80 and 81, down to the top of page 82.  Is that right?

2           MR. SACHSE:  What is the purpose of all this?

3           MR. MOSCOVITZ:  Ask the witness.  The witness is right

4    here.

5    BY MR. VEEDER:

6           Q  Did you write that?

7           A  That was written under my direction.

8           Q  And Mr. Illingworth didn't he write anything?

start
F2    9           THE COURT:  Well, now, you mentioned  two groups.  Are

10   you talking of-- you  said written under your direction.

11          MR. VEEDER:  I am talking about--

12          THE COURT:  Wait a minute.  When you said, "Written

13   under your direction," are you talking about pages 66 to the

14   bottom of 81, middle of 81?

15          THE WITNESS:  Yes, your Honor.

16          THE COURT:  What about pages 62 to 65, inclusive?

17          THE WITNESS:  Those are written under my direction, too.

18   65 is really the-- 64 and 65 were the responsibility of Mr.

19   Illingworth, but-- in fact, all of them were his responsibility;

20   but  they  were written under my direction as part of the team.

21          MR. VEEDER:  Now, may I inquire from counsel:  I believe

22   the pages to which I have just referred, 62 through 81, are

23   those going to be offered?

24          MR. MOSCOVITZ:  Those, that is one of the portions be-

25   ing offered in connection with the geological testimony, that

is right.  It requires, as your Honor has well pointed out, the

foundation and the qualification  of both  Mr. Illingworth and

Mr.  James  for  a number of these portions because this  was a

team effort.  And in order to make plain that here are the

people responsible, I put them both  on.  And  you  can cer-

tainly find out as to any specific portion who can  testify to

what.

MR. VEEDER:  All right.

Now, before I proceed with the cross-examination, I

think that these  offers should be made in regard to pages 62

through 81.

MR. MOSCOVITZ:  I would be very happy to.  I have

offered them  a number of times.  I will offer them in evidence

right now again.

THE COURT:  Well, that is one thing which could be

placed in piecemeal.  It is another thing to put  the text in

piecemeal.  Is that  what you want to do?  Is that  what you

want done?

MR. MOSCOVITZ:  Are you addressing it  to me, your

Honor?

THE COURT:  Yes.

MR. MOSCOVITZ:  Yes.  Well, my  plan was to offer at

the  time of the geologic testimony, that is, at this time all

the  textual material and the plates  which  related to geology.

Now, if your Honor directs, I can hold that until the  rest of

1  it is qualified at a later date.  But  I am happy to offer them

2  right now.

3      THE COURT:  First, this group includes the type of

4  Table 15--

5      MR. MOSCOVITZ:  That is correct.

6      THE COURT:  -- that you have  been talking about?

7      MR. MOSCOVITZ:  That is right.  If you  want to defer

8  that, why--

9      THE COURT:  And I don't propose to  receive them in

10 evidence as exhibits in the ordinary  sense of the word.  I

11 propose to receive them in  evidence pursuant to the questions

12 asked the witness as being a witness's testimony if he had been

13 interrogated about this matter; not as a report.

14     MR. MOSCOVITZ:  I see.

15     THE COURT:  As a written  summary of the witness's

16 testimony.

17     MR. MOSCOVITZ:  Our position is that it would be ad-

18 missible as a report, too; but  we have no objection to  an-

19 other theory.  But if Mr. Veeder is asking that it be  put in--

20     MR.  VEEDER:  I am not asking that it be put in.  I

21 say, how can I cross-examine if I don't know what your evidence

22 is?

23     MR. MOSCOVITZ:  Well, you know what it is.  I am cooper-

24 ative.

25     MR. VEEDER:  If it is now offered, if page 62 through 81

1  is offered, I interpose the objection on the grounds that the

2  evidence was prepared in contemplation of litigation by a

3  party to the proceeding; that it cannot be qualified under any

4  statute which would permit a State report to be admitted in

5  evidence; that it was prepared by the State of California not

6  as an unbiased report but as a report to attain an end that it

7  obviously desired. A further objection is made that there is

8  no proper foundation for it; that Mr. Illingworth, who wrote

9  part of this, has now testified that he is not a geologist, and

10 the responsibility has been assumed by Mr. Illingworth and

11 stated by Mr. James on page 62 to 65, at least. Also, there

12 are references throughout this phase of the write-up to

13 matters which are not offered in evidence and for which there

14 has been no identification. For example, on page 82, just

15 briefly to refer to them, we find that Plate 19, no offer has

16 been made and no identification.

17      MR. MOSCOVITZ: What page was that, Mr. Veeder?

18      MR. VEEDER: Page 80.

19      THE COURT: You said 82.

20      MR. VEEDER: Page 80. You find a reference to Plate

21 19. You will find a reference to Plate 20. Throughout this

22 phase of the offer, there is a vast amount of material concern-

23 ing which I am unaware of any proper foundation. But on the

24 basis of, I will submit-- if I may just have a moment here. I

25 am trying to follow this. I see repeated references to Plate

F2
S25

1   No. 12. For example: I will get the pages for your Honor on

2   that. Plate No. 12 is alluded to on page 77. No offer; no

3   identification of that plate. It has been alluded to and

4   incorporated into the writing. Of course, Table 15, as I

5   understand it, will be later cleared up.

1          Now, on Table-- I had another reference here of

2    material that hasn't been identified.

3          However, I believe that on that basis, your Honor,

4    certainly this phase of the write-up there is no proper

5    foundation for. We have an offer here, numerous plates

6    referred to, a vast amount of detail-- for example, the

7    hydrography, et cetera, that is alluded to is not before your

8    Honor. I don't see how the offer can be made. I certainly

9    can't see how we can have anything but trouble in cross-

10   examination.

11         MR. SACHSE:  If that is the objection, your Honor, I

12   would like to get clear for the record for myself, the only

13   objection I have heard, in the legal sense of the word "objec-

14   tion" is an objection of no foundation. I have heard a long

15   speech, but I have heard no objection on any other basis than

16   that of no foundation, and I think that it is clearly

17   established that there is a foundation. If he has other objec-

18   tions, for the record, if this case will be appealed, I would

19   like to know what they are in the legal sense of the term

20   "objection."

21         MR. VEEDER:  I am old-fashioned. I desire to have his

22   Honor rule. I am not going to argue with Mr. Sachse about

23   these matters. I have made myself clear.

24         THE COURT:  I am very unhappy about the whole situation.

25         MR. MOSKOVITZ:  May I make a statement, your Honor.

1          THE COURT: First of all, I am very unhappy that Mr.

2    Veeder feels like taking up the time of the Court on a matter

3    which is largely background material, from page 62 through

4    page 81. I don't know where you can find any material in

5    there, with the exception of the two pages which we talked

6    about, that is much more than background material. If Mr.

7    Veeder wants to object, of course, that is his right.

8          Secondly, I am unhappy because I have serious question

9    about this matter of reports, in so far as drawing con-

10   clusions, being prepared after litigation is commenced and

11   then offered at the trial of an action. Even though they are

12   prepared pursuant to some State statute, it bothers me. I

13   haven't had a chance to research that law. But this case has

14   been pending since 1951, and then the State, a party to the

15   proceeding, prepares a report and because it says it prepared

16   the report it offers the report originally on the basis

17   without any foundation-- this is the report we prepared and

18   want it in evidence. Now it is true that we have had a little

19   more foundation than that.

20         I was hopeful that we could let this textual matter go

21   in, in the interest of saving time, as only in substance the

22   testimony of the witness, and let Mr. Veeder then cross-examine

23   as to matters that he found objectionable in this textual

24   matter. But apparently he doesn't want to do it that way.

25         It is true that this textual matter does refer to some

1    matters that aren't in evidence.  I don't think it is true

2    of Appendix B-- I checked it very carefully, and those exhibits

3    are in evidence referred to in B. This one refers to others.

4         But I have a hunch that if we wanted to take the time

5    we could call the Government's geologists, the witness, and

6    we could read these paragraphs over to him paragraph by para-

7    graph and probably qualify most of this report.

8         Mr. Kunkel, you have been sworn as a witness, haven't

9    you?

10         THE WITNESS:  Yes.

11         THE COURT: Come up here.

12         Step down, Mr. Illingworth.

13

14              FRED KUNKEL,

15    recalled as a witness in behalf of the plaintiff, having been

16    previously sworn, testified further as follows:

17         THE COURT: Do you have a copy of Bulletin 57 before

18    you?

19         THE WITNESS:  I have my copy, your Honor.

20         THE COURT: Starting in at the top of page 62:

21              "Underground Hydrology.  The valley

22              and mesa lands"-- strike out "as previously

23              indicated"-- "comprise less than one-fourth

24              of the area of the Santa Margarita River

25              watershed."

1   Is that true?

2   MR. VEEDER:  Your Honor, I realize that I will incur

3   your wrath, but I have to make an objection as to this course

4   of interrogation because it is interrupting the State's case

5   in chief, and I object to it on the grounds that--

6   THE COURT:  That ground is overruled.

7   What is your next ground?

8   MR. VEEDER:  I object to it on the additional ground

9   that your Honor is taking over the trial of the case, for

10   practical purposes.

11   THE COURT:  All right, you are overruled on that ground,

12   for the reason that we are wasting a lot of time, and I am

13   going to demonstrate how silly some of your objections are.

14   MR. VEEDER:  Your Honor, I realize-- I have prayed for

15   patience this morning and I will be patient.

16   THE COURT:  All right. Any further objections?

17   MR. VEEDER:  No, your Honor.

18   THE COURT:  Is that a correct statement generally,

19   Mr. Kunkel?

20   THE WITNESS:  I do not know in that I have made no

21   estimates along those lines whatsoever.

22   THE COURT:  You made a study of this watershed, didn't

23   you?

24   THE WITNESS:  Yes, I did.

25   THE COURT:  You mean you don't know how much of it

1     comprises valley and mesa lands?

2         MR. VEEDER: Could I have your reference, your Honor,

3     from where you are reading now?

4         THE COURT: The very first line on page 62.

5         MR. VEEDER: The witness has answered the question.

6         THE WITNESS: I have studied the areas indicated on

7     Exhibit 15. By "valley and mesa lands" what is meant? Is

8     that the area colored orange and yellow?

9         THE COURT: Well, does "valley and mesa land" have any

10     technical meaning? Or does it mean just what it says, land

11     that lines in valleys and land that lies in little mesas?

12         MR. VEEDER: May I--

13         THE COURT: May you what?

14         MR. VEEDER: Your Honor, the matter of valley and mesa,

15     to begin with, I daresay any of us know that a mesa can be,

16     as I have viewed them down through the years, simply an area

17     composed entirely of basement complex. Isn't it possible

18     that a mesa would be only basement complex, just a broad flat

19     area?

20         THE COURT: Well,,let's take the next one.

21             "However, numerous bodies of ground

22             water exist in such areas"-- that would

23             be valley and mesa lands-- "and water

24             supplies in the Santa Margarita watershed

25             are regulated to some degree by storage

1            in these underground reservoirs."

2     Is that a correct statement?

3     THE WITNESS:  If we could strike--

4     MR. VEEDER:  Until we know what "valley and mesa lands"

5 are, I don't see how he could answer it, your Honor.

6     THE WITNESS:  I was going to suggest that we could

7 strike the words "in such areas" and say "numerous bodies of

8 ground water exist in the upper part of the Santa Margarita

9 watershed," I would say that is generally a correct statement.

10     THE COURT:  Let us take the next one.

11     "Usable ground water supplies are found principally

12     in the recent alluvium of valley areas, but water

13     is also extracted from older sedimentary forma-

14     tions on hill and mesa lands and to a less extent

15     from fractured rock."

16     Is that a correct statement?

17     THE WITNESS:  May I make a statement for the record?

18 that It is obvious that I have been called to testify to the accuracy

19 of the State's report, and as a representative of the Geological

20 Survey I am very reluctant to do so.  However, in reply to

21 your direct question, I am in disagreement with that statement,

22 your Honor.

23     THE COURT:  How are you in disagreement with it?

24     THE WITNESS: "Usable ground water supplies are found

25 principally in Recent alluvium of the valley areas."  In my

1    opinion, the principal supply of ground water in the upper part

2    of the Santa Margarita River area occurs in the older alluvium

3    deposits.

4         THE COURT:  By "principal" do you mean quantitatively--

5    in quantity?

6         THE WITNESS:  I mean in quantity, yes, sir.

7         THE COURT:  Let's take the next one:

8              "The sources of replenishment of

9              these ground water reservoirs are deep

10             percolation originating in stream flow,

11             precipitation, irrigation water and sewage

12             and surface transfer water from one ground

13             water body to another."

14        Is that a correct statement?

15        THE WITNESS: There is a sleeper, in my opinion, on

16   this subsurface transfer of water from one ground water body

17   to another.  Until the author of Bulletin 57 and myself have

18   come to some agreement as to terminology as to what constitutes

19   a ground water body, I cannot answer your question.

20        MR. VEEDER:  Similarly, I don't believe that the term

21   "sewage" can be viewed as a source of replenishment.  We are

22   talking about fresh water in this lawsuit.  And return flow

23   from irrigation, your Honor, is in the same category.

24        THE WITNESS:  May I volunteer a statement, your Honor?

25        THE COURT:  Yes, sir.

1          THE WITNESS:  In my opinion, and this is very difficult

2     to bear out, I recognize, because all the geologists-- myself,

3     Mr. James, Mr. Fox-- have testified that it is virtually

4     an impossibility to recognize the contact of the younger and

5     the older alluvium in vertical section. We all agree that we

6     can recognize the younger and the older alluvial deposits on

7     the surface.  The thickness of the younger alluvial deposits

8     is critical.  In my opinion, the younger alluvial deposits

9     are thin-- and by "thin" I mean generally less than a hundred

10    feet thick.  In many areas, in probably the major part of the

11    area, the younger and the Recent alluvium, in my opinion, is

12    probably 30 feet or less in thickness.  In many places it is

13    five or six feet in thickness.  The quantity of saturated

14    younger alluvium in the upper part of the watershed is

15    relatively small, and the bulk of the wells that are drilled

16    on the alluvial plane which starts in younger alluvium because

17    that is the place where it is shallowest to ground water.  That

18    is the place where normally there would be the first development

19    of ground water, because there is *the least depth to water.)* less lip.  Wells are drilled

20    into the younger alluvium, but they are drilled through the

21    younger alluvium, and in the majority of the wells the principal

22    source of ground water is from the underlying older alluvial

23    deposits rather than the Recent alluvium.

24          THE COURT:  Take a short recess.

25          (Recess.)

1    (Off the record discussion.)

2    MR. SACHSE:  We have in the record in this proceeding

3    already approximately a hundred exhibits.  Just grab any  one

4    of them at random.  We have the United States exhibits.  They

5    contain-- I am referring now to Exhibit M-81.

6    MR. VEEDER:  Let's just stop.

7    THE COURT:  Just a moment.  Just a minute.

8    MR.  SACHSE:  It is an engineering  report prepared by

9    the  United States, Office of Ground Water Recources, Marine

10    Base, Camp Pendleton.  It has an introduction, description,

11    legal description, geology, soil textures, conclusions as to

12    land classification, engineering conclusions, conclusions to

13    irrigation requirements, permanent pasture.  Signed by

14    Lieutenant Colonel Bowen.  Tabulation of authorities, and

15    sources, a map, and a geologic overlay.  I have picked one  at

16    random.  Some of them have two  or three overlays.  Others con-

17    tain more material.  Now, I realize that this is nothing more

18    than a precedent, if you want to call  it that, in this  very

19    proceeding.  There are a pile of them.  I don't know how many,

20    but close to a hundred where this exact device has been used

21    by the United States; the witness has been subjected to cross-

22    examination on his own report.  I have done  it myself, and

23    other defendants have done  it.  Now, I want to call  it to

24    your  attention in case you want to know it is there.  That is

25    all I have.

1           MR. VEEDER:  That is a misstatement  in the record by

2    Mr. Sachse.

3           MR.  SACHSE:  What is the misstatement?

4           MR.  VEEDER:  Those reports are tendered in the  rec-

5    ord before the Special Master, prepared on behalf of private

6    individuals by  the United States of America.  They are not

7    exhibits of the United States of America.  They  are--

8           MR.  SACHSE:  I beg  your pardon, Mr. Veeder.  Look at

9    them.

10          MR.  VEEDER:  You just wait until I am through.  I

11   realize how  desperate you  are in regard to Bulletin 57.  The

12   point I make is that those were prepared at the  request of the

13   small users.

14          THE COURT:  Let me  see it.

15          MR.  VEEDER:   They  are not offered by the United

16   States of America as testimony  on behalf of the United States

17   of America.  And there is no resemblance whatever between those

18   reports and Bulletin 57.

19          MR. SACHSE:  The record speaks for itself.

20          MR. VEEDER:  If they  are going to be  treated that  way,

21   I move to  strike the whole  bunch of them now, because it is

22   absolutely contrary to the  basis upon  which they were pre-

23   sented and upon  the basis of which they were offered.

24          THE  COURT:  Mr. Sachse?

25          MR. SACHSE:  Well, the record is entirely clear.  The

1  clerk's stamp  is on them.  The clerk's number.  As to whether

2  or not each individual defendant consented to  the preparation

3  of this  report, I will  agree with Mr. Veeder, the defendants

4  did.  But the point is, the canned testimony  was used.  Now,

5  granted in each case the defendant here agreed-- the United

6  States is, apparently, not agreeing-- simply points out to you

7  this device of  canned testimony, to  use your own words, has

8  been used in this very  proceeding without any  great injury

9  to anyone.

10      MR. VEEDER:  How do you  know that we haven't been  in-

11  jured by it in the  twist you are giving it now?

12      THE COURT:  You can't shame Mr. Veeder with the sin

13  of inconsistency.  He is, apparently, insusceptible of being

14  influenced by  that matter.  And if these went into evidence

15  without objection, that isn't going to determine this issue.

16      MR. MOSCOVITZ:  Your Honor, would you like to have some

17  authorities by counsel on this?

18      THE  COURT:  You gave me two or three.

19      MR. MOSCOVITZ:  These were collected very quickly.  If

20  you  want  a more/extensive memorandum, I will be happy to start

21  working on them.

22      THE COURT:  Do some work tonight on it.

23      MR. MOSCOVITZ:  Very  well.  I don't feel there is any

24  prejudice.

25      THE COURT:  I have a couple of pretty good  briefs that

1   were written in a fire case, the Pechuma fire case.  It was

2   a tort claims case in this court.  And after the fire in which

3   the various people lost their lives, a tort claims action was

4   commenced.  The Government made an investigation and had a fire

5   report.  The defendants in that case wanted to offer the fire

6   report against the Government.  This, of course, had the ele-

7   ments of being an admission against interest, but you have

8   further problems when you are trying to offer that sort of

9   thing against the United States.  The thing was rather exten-

10  sively briefed.  I read them over and came to the conclusion

11  that it wasn't an easy problem.  And while I was still work-

12  ing on the pre-trial, after pre-trial and before trial, they

13  settled the case.  The Government disposed of the claims.  But

14  I have had my law clerk dig out these two briefs that were

15  prepared on those to use, the fire report.  One of your cita-

16  tions you gave me, I got it down inaccurately.  142 Fed. 2nd,

17  I couldn't find the page.

18          MR. MOSCOVITZ:  I will get it for you right now.

19          THE COURT:  I read the Christensen decision, and it can

20  best be summarized by saying, "Maybe yes; maybe no; but don't

21  quote me."  Not much help.  Of course, the thing has to be used

22  in the aspect of having available the people who claim they were

23  responsible for the reports.

24          MR. MOSCOVITZ:  I think that is important.

25          THE COURT:  All this talk about being robbed of the

1  right of cross-examination, it goes out the window.  However,

2  you have the other situation of parties to a litigation, true,

3  pursuant to State statute, preparing the  report and asking

4  that the whole report go in, the original offer was even with-

5  out foundation for it, on  the ground it  was done under a

6  State statute.

7      What is your citation on  142?

8      MR. MOSCOVITZ:  It is 141 F. 2d 564.

9      THE COURT:  141.

10      MR. MOSCOVITZ:  Yes.

11      THE COURT:  Well, see you  tomorrow morning at eight

12  o'clock.  If you get some  time tonight,  all right, to do

13  some work on it.

14      (Adjournment at 3:30 o'clock p.m., until 8:00 o'clock

15  a.m., Wednesday, December 10, 1958.)

16

17

18

19

20

21

22

23

24

25