# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

## HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

|                                        |         |                |
|----------------------------------------|---------|----------------|
| UNITED STATES OF AMERICA,              |         |                |
|                            Plaintiff,  |         |                |
| vs.                                    | }       | No.  1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT,     |         |                |
| et al.                                 |         |                |
|                            Defendants. |         |                |


## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Friday, December 12, 1958.

Pages:     6405 to 6522

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____
                              DEPUTY

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1        IN THE UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF CALIFORNIA

3            SOUTHERN DIVISION

4                - - -

5    HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                - - -

7

8    UNITED STATES OF AMERICA,    )
                                  )
9              Plaintiff,         )
                                  )
10       vs.                      )       No. 1247-SD-C.
                                  )
11   FALLBROOK PUBLIC UTILITY     )
     DISTRICT, et al.,            )
12                                )
                                  )
13             Defendants.        )

14

15        REPORTERS' TRANSCRIPT OF PROCEEDINGS

16           San Diego, California

17        Friday, December 12, 1958

18

19   APPEARANCES:

20       For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
21                                  Attorney General,
                                    Department of  Justice,
22                                  Washington, D. C.

23

24

25

1  APPEARANCES (Continued):

2      For Defendant Vail
        Company                    GEORGE E. STAHLMAN, ESQ.

3

4      For Defendant State         EDMUND G. BROWN, ESQ.,
        of California              Attorney-General, by
                                   ADOLPHUS MOSCOVITZ., ESQ.,
5                                  Deputy Attorney General, and
                                   CARL BARONKAY.

6

7      For Defendants
        Fallbrook Public
        Utility District,
8       et al.,                    F. R. SACHSE, ESQ.

9

10                    - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## INDEX TO WITNESSES

2

| For Defendant State of California: | Direct | Cross |
|---|---|---|
| Laurence James | | 6423 |

3

4

5

## E X H I B I T S

6

| Defendant State of California Exhibit - | | For Iden. | In Evid. |
|---|---|---|---|
| L 15-1 | | | 6463 |
| L 15-3 | Map | 6438 | |
| L 15-4 | Special Report 43 | 6438 | |
| L 15-5 | Tracing | 6438 | |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SAN DIEGO, CALIFORNIA, FRIDAY, DECEMBER 12, 1958.   10:00 A.M.

2

3            (Other matters.)

4            THE CLERK:   Number three:   1247-SD-C, United States

5    versus Fallbrook.

6                    FRED KUNKEL,

7    recalled as a witness in behalf of the plaintiff, having been

8    previously sworn, testified further as follows:

9            THE COURT:   All right.   Are we ready to proceed this

10   morning?

11           MR. MOSCOVITZ:   Your Honor, we still have the compari-

12   sons of ground water storage and the method of computation of

13   storage capacity to present.   Mr. James is not quite finished

14   with it, and I wanted it to be complete before we do present it.

15   We were going ahead with cross-examination last time we met.   I

16   assume that is where we are to go now.   I might have a few

17   moments, however.   There was some discussion off the record

18   during our trip which I felt there might be some  misunder-

19   standing, misapprehension about the position the State is tak-

20   ing concerning the characteristics of residuum and the effect

21   which water from residuum would have on the flow of the stream.

22   And if your Honor would permit, I would like to refer to the

23   record to clarify whatever misunderstanding might exist.   Your

24   Honor, on December 3, 1958, Volume 52 of the transcript, page

25   5939, there begins--

A1
S4

1    MR. STAHLMAN:  What is the page?

2    MR. MOSCOVITZ:  5939 and following.  There begins ex-

3  amination of Mr. James on direct by me as to the water-bearing

4  characteristics of residuum.  And if I may, I would like to

5  read what he has said there..

6    Beginning on line 19, the witness says:  "We find re-

7  siduum to be water bearing, and  this comprises residuum mater-

8  ial which  is the weathered products of the basement complex

9  and it does bear water and is a source of water supply to cer-

10  tain  areas, notably in the Fallbrook area.

11    "THE COURT:  Are you  giving these in any particular

12  order?  Do you place residuum next to younger alluvium as the

13  next best water-bearing material?"

14    This is on page 5940 now.

15    "THE WITNESS:  No, your Honor, I was giving them in the

16  order in which they appear on the legend of Plate 13B.  The

17  residuum I do not regard as the second most permeable material.

18  The second most permeable material would be the terrace depos-

19  its and old alluvium.

20    "THE COURT:  Go ahead.

21    "THE WITNESS:  The permeability of that material is

22  low.  However, the residuum is lower in permeability, in my

23  opinion.

24    "THE COURT:  You were not here and heard the testimony

25  about  residuum from the Government's experts?

1      "THE WITNESS:  I did not hear that testimony.

2      "THE COURT:  Did you read it in the transcript?

3      "THE WITNESS:  I reviewed the transcripts, yes.

4      "THE COURT:  Are you in any disagreement with the

5    statements of the Government's witnesses as to residuum?

6      "THE WITNESS:  I don't recall their testimony in de-

7    tail, but offhand I believe we are in fundamental agreement."

8          And going on to the transcript on Friday, December 5,

9    Volume 54, beginning on page 6160, on line 11, start reading

10   the testimony  there:

11      "BY MR. MOSCOVITZ:

12      "Q  Mr. James, you have previously testified your opin-

13   ion as to the permeability of residuum found in the Santa

14   Margarita watershed.  What is your opinion as to the effect of

15   pumping of ground water from residuum in the De Luz Creek water-

16   shed upon the flow of De Luz Creek?"

17        Mr. Veeder made an objection.  I will skip it for the

18   moment, your Honor, unless Mr. Veeder wants it heard.

19        Then:

20        "THE COURT:  What do you have in mind?  What are you

21   trying to prove?

22        "MR. MOSCOVITZ:  I am trying to get the witness's opin-

23   ion on this issue which is, apparently, being reopened by Mr.

24   Veeder as to the-- the transcript says 'where' and that was an

25   incorrect statement-- 'as to whether the pumping from the

residuum is going to--' and here there are some corrections to be

made-- I will read them as I think they should be corrected--

' as to whether the pumping from the residuum is going to de-

crease the water flowing into De Luz Creek and whether you have

to consider the rights to residuum when you  are adjudicating

the rights to De Luz Creek, and I thought it would be helpful

to your Honor to have this witness's opinion as to that ques-

tion.

"THE COURT:  Are you familiar with the De Luz Creek

area?

"THE WITNESS:  I have been there, your Honor.

"THE COURT:  Have you been there or have you made some

studies in the area?

"THE WITNESS:  Yes, we have.  In the course of our in-

vestigations, we have mapped the residuum.

"THE COURT:  I am now referring to the residuum as

shown upon your geologic plates that cover that area.  What is

your answer to the question?

"THE WITNESS:  I don't believe that extracting water

from that residuum would affect materially  the flow in De Luz

Creek."

There is some discussion between Court and the witness.

"THE COURT:  What are your reasons for that opinion?

"THE WITNESS:  Well, for one thing, you have a matter

of roots again.  Any water that is going down that way  would be

consumed by the vegetation and by pumping in the residuum. What little bit is able to squeeze through that residuum, you are just cutting out what would otherwise be consumed by that vegetation."

"BY MR. MOSCOVITZ:

"Q What is the effect of the permeability of the residuum itself on the amount of water which would go from it to the stream?"

The witness started to answer. Mr. Veeder made an objection. The Court then said: "What is the difference between this question and the one you just asked the witness?

"MR.MOSCOVITZ: Your Honor, I am attempting to develop this question-- this matter, I mean.

"THE COURT: The objection is overruled. Do you know what the question is?

"THE WITNESS: Yes, I do. I think in previous testimony and, in fact, in answer to the last question, I brought forth that the residuum is very low permeability and that, therefore, movement of water through it is very insignificant.

"MR. MOSCOVITZ: One further question.

"Q Would your opinion be the same with respect to residuum in other portions of the Santa Margarita River watershed?"

Mr. Veeder made an objection. The Court overruled it.

And the witness answered: "In my opinion, the same answer holds for this question as for the last one. Movement

would be very slow.

And the Court asked: "Does the depth of the residuum have anything to do with it?

"THE WITNESS: Yes, it does.

"MR. VEEDER: With the water-bearing quality?

"THE COURT: With the water-bearing quality?

"THE WITNESS: Yes, it does.

"THE COURT: What effect does it have?

"THE WITNESS: Well, the thicker it is, obviously, your Honor, the more water is going to go through it. But it is so low in permeability that where I have observed it in this water-shed, I don't think it is going to appreciably affect flow of the stream."

Now, there is a little more discussion about it in the same general tone, your Honor. And I do want to have that clarified, because this is the position of the State.

MR. VEEDER: Do I proceed, your Honor? I am not just sure of whether Mr. James is going to come back in the court-room or not.

MR. MOSCOVITZ: If this is the witness you wish to cross-examine.

MR. VEEDER: Well, I will have some cross-examination. Did your Honor have any more questions of Mr. Kunkel?

THE COURT: I forget what we were on when we adjourned.

MR. STAHLMAN: I think we had a very important situation.

THE COURT:   Oh, I recall.  I recall.

When  we adjourned on Tuesday, there was the problem of offering in evidence certain points of Bulletin 57, Exhibit 11. And objections by Mr. Veeder-- you can sit down, Mr. Kunkel.  I have been giving the matter some consideration, and  also reviewed part of the record.  Mr. Veeder stated that I took  over the examination  of Mr. Illingworth, and it is not exactly correct.  I took over the examination of Mr. James and examined Mr. James as to certain parts of it.  The examination of Mr. Illingworth was conducted by Mr. Moscovitz.  It was not done in the same way in which I examined Mr. James.

Now, the present situation before us arises when the State offered Chapter 1, offered--

MR. VEEDER:  The offer started on page, as I recall, 62, your Honor.

THE COURT:  Part of Chapter 2, beginning at page 62 and running to page 81.  And various objections were made.  I have not been inclined, as I viewed this matter in the past, to permit this bulletin in evidence on the  ground it was made as a State record pursuant to State statute.  In checking Wigmore on a number of these situations, comparable situations, and this type of report, if offered and received on that basis, would go further than I have been able to find any Court has done.  There are conclusions of the witnesses as to a large number of matters, conclusions that intimately, closely concern some of the

1    ultimate decisions that the Court has to make in this matter.

2    On the other hand, as we have been progressing with the matter,

3    I have felt that there was, I believe, no reason why  part of

4    the bulletin could not be used as the equivalent of the oral

5    testimony of the witness merely  for the purpose of saving time,

6    to receive it as the oral testimony of the witness and permit

7    the Government to  cross-examine.  Now, the big objection, of

8    course, the first objection one  sees to the introduction of

9    the bulletin, or parts of it, is the hearsay objection.  If

10    you have the witnesses available, the hearsay objection melts

11    away into thin air; because the person is available to be

12    cross-examined on the basis of his opinion set forth, on the

13    basis of where he secured the facts which he recites in his

14    report or compilation.  I have assured Mr. Veeder we will have

15    anyone here he wants to have in connection with this matter of

16    this bulletin.  On any other objection as to materiality, I

17    fail to  see why the matter is not material.  It is certainly

18    material to the issue; relevant.  Its competency is largely

19    concerned with the hearsay objection.  Mr. Veeder raises the

20    question  of the qualification of certain of the witnesses.

21    Qualification goes to the weight, according to the weight.  Mr.

22    Illingworth has worked this type of job, has made reports of

23    this sort in his State position, in the field of hydrology; and

24    any objection to his competency is not a matter that would re-

25    quire the exclusion of his opinions, but matter that goes to the

1   weight of the testimony.  On a purely mechanical basis, counsel

2   proposes to offer this report in piecemeal, in pages here and

3   pages there.  That is all right as to plates.  It may be all

4   right as to individual appendices.  But not to-- I  don't like

5   that method of splitting up the chapter.  However, there is no

6   reason why it can't be done in that fashion.

7         One other objection made by Mr. Veeder, however, is

8   well taken.  And that is even if we treated pages 62 to  78

9   as the testimony of the witness, there is a reference to a

10  large amount of material in there which has not yet been iden-

11  tified.  We know nothing about it  as far as foundation is

12  concerned.  Now, that wasn't true with Appendix B.  I checked

13  that  rather  carefully.  At least, I couldn't find any place

14  in Appendix B that wasn't properly identified and received in

15  evidence.  Accordingly, in the sense that pages 62 to 81 are

16  offered as a special  report, the objection is sustained. From

17  the standpoint of an offer as the oral testimony of the wit-

18  ness, I would  overrule the objection; except  for the techni-

19  cal objection made by  Mr. Veeder that  certain  parts in that

20  material have not yet been identified and we have no foundation

21  material for them.

22        MR. MOSCOVITZ:  Your Honor, you  may recall that when

23  we began putting in direct  testimony I indicated my apprehen-

24  sions about putting in parts, and requested your Honor-- I made

25  an attempt to do it that way.  I realized the problems.  And

start
A4

1   portions of Chapter 2 offered that do refer to matters not yet

2   in evidence, I think can best be deferred until Mr. Illingworth

3   comes on the stand with his main testimony, and identifies the

4   various portions.  As to Exhibit B, I feel there is no problem

5   whatsoever-- pardon me; Appendix B.

6          THE COURT:  Appendix B.

7          You didn't offer Appendix B on Tuesday.  We hadn't

8   reached that point.

9          MR. MOSCOVITZ:  I see.  Well, I have offered it a num-

10  ber of times, together with the other portions; and I would re-

11  offer Appendix B at this point.

12         MR. VEEDER:  I have my objections made, your Honor.  It

13  is my view, with all respect to your Honor, that there are

14  basic  and fundamental objections to all phases of the offer

15  that has been made.  I believe that it is a departure, with

16  all respect to your Honor, from the rule of law and of evidence

17  that the  testimony must be oral and it must be on the basis

18  of question and answer.  And I renew that objection in regard

19  to Appendix B.  If I understand correctly, the offer is not

20  made  as to Bulletin 57, but as the testimony of the witnesses.

21  And I assume that that is the basis upon which your Honor is

22  sitting.

23         THE COURT:  Of course, you still have the loose end in

24  Exhibit B of Table B3.

25         MR. VEEDER:  That is correct, your Honor.  And numerous

A4
S13

cross-references.

THE COURT:  What  cross - references are there that aren't in here in evidence?  Cross-references to B3, you mean?

MR. VEEDER:  The cross  references are, of course, to the written summarization that is contained in Volume 1 of Bulletin 57.  However, as I understand it, the testimony of Mr. James is incorporated in pages 62 through 81 of the bulletin, and that is presently  before the Court, as I understand it, based upon your ruling.

THE COURT:  I haven't ruled on it.

MR. VEEDER:  I thought it was admitted, 62 to  81.

MR. STAHLMAN:  No.

THE COURT:  I sustained your objection until they laid the foundation as to plates that-- the matters that  were re-ferred to that had not yet been identified.

MR. VEEDER:  Your Honor, as I understood  your ruling, and I have no complaint about it, if I understood  what your Honor  said, you sustained  the objection based upon the con-tention that this was prepared in contemplation of litigation and didn't come within the exception of the hearsay rule stemming from special statutes, but that--

THE COURT:  Well, in substance.  I didn't mention the fact it was prepared in connection with this litigation.  Of course, it obviously was.  But I sustained an objection to it, going into evidence, merely on the ground it was an official

A4
S14

1    report.   I was going to receive it, and I probably will receive

2    it in evidence as the narrative of the testimony of the witness,

3    as to his conclusions, as to what facts he has been able to de-

4    velop, and so forth.   But I sustained your objection even on

5    that view of  it until these other matters were identified.

6            MR. VEEDER:   Now, that is precisely  the point I want

7    to have clear in my  mind.   In other words, this, from 62 to

8    81, has not been  admitted  at all?

9            THE COURT:   Not yet.

10            MR. VEEDER:   And we do have, then, Appendix B  that is

11    offered?

12            THE COURT:   Offered and raising the question now, the

13    only loose ends I see in Appendix B  is Table B3 upon which

14    some work is being done, and in order to save time, and subject

15    to  that material being supplied, I am prepared to receive B,

16    Appendix B, in evidence.

17            MR. VEEDER:   I have made my objection, your Honor.

18            THE COURT:   The objection is overruled.   Appendix B in

19    Volume II of Exhibit L, which commences on page B-1, carries

20    an index for a page or two, text begins on page B-5 and runs

21    through B-67, will be received in evidence as the narrative

22    testimony of the witness James.   And counsel will be entitled

23    to  cross-examine the witness as to his opinions.   If it devel-

24    ops that some particular part was prepared by  some subordinate

25    of  James and  Mr. Veeder wants that man present, we will have

1    him present in order that he may be subjected to cross-examina-

2    tion in the sense that-- all right.

3        MR. MOSCOVITZ:  Your Honor, just so there will be no

4    misunderstanding:  Our offer on the basis that this is an offi-

5    cial record hasn't been withdrawn.  We do believe this is per-

6    missible on that grounds.  But we are happy with the ruling

7    that it comes in.

8        THE COURT:  You  stated the other day you were content

9    either  way when I directed to you that question.

10       MR. MOSCOVITZ:  That is right.

11       THE COURT:  Are you still of that same position?

12       MR. MOSCOVITZ:  This is the point, your Honor.  If the

13   matter becomes important on appeal, we want to be free to argue

14   that this is properly admissible as a public document.  We

15   think it  is because the witnesses are available for cross-

16   examination.  We recognize the problems in the case as they

17   exist  when you do not have the witnesses available to testify

18   as to their conclusions.  But we think they are, and on that

19   basis we think that the appendix is admissible as a public docu-

20   ment.  If it is important on appeal, we want to be able to argue

21   that.

22       THE COURT:  Don't ask me to prevent you from arguing

23   anything you want to on appeal.

24       MR. MOSCOVITZ:  I just want to make the point.

25       THE COURT:  Except where you have assured me  that you

1   are not concerned which way I rule on it so long as you get the

2   matter before me, I wouldn't think you would then argue that it

3   was error to exclude it on the other basis.

4         MR. MOSCOVITZ:  Oh, no, not error, unless for some

5   reason the other basis it  is held not to have been proper,

6   which I think it is.  All I want to make sure, it is properly

7   before you and cannot be challenged on appeal.

8         MR. STAHLMAN:  What do you mean now?

9         THE COURT:  Incidentally, in connection with this rul-

10  ing that I made and some of the work I have done, I refer you

11  to Wigmore on Evidence, 3rd Edition, Section 1385A.  Paragraph

12  1385A:  "Expert reading a  report prepared beforehand.  So long

13  as a witness is at the trial subject to cross-examination,

14  there can be no sound objection on the present principle,"--

15  This is under the hearing section-- going ahead with the quote--

16  "-- to the form of delivering his testimony.  In particular, he

17  may read a report prepared beforehand."

18

19

20

21

22

23

24

25

1    "The report's statements by themselves were indeed

2    not subjected to cross-examination at the time of their

3    composition; but they are now subject to it, and that is

4    enough.  The case is the same as though the witness should

5    give an uninterrupted oral narrative for his direct examina-

6    tion, being afterwards subjected to cross-examination.

7    Whether a witness delivers his direct testimony with or

8    without interrogation by the party calling him, is merely a

9    matter of the mode of narration, and does not affect the

10   present principle.

11   "In view of the speed, lucidity, and general satisfac-

12   tion, which is often to be obtained, especially with expert

13   witnesses, on matters of science, this form of testimony

14   should be encouraged . ."

15   MR. VEEDER:  I recall studying that a great many times,

16   your Honor, and I don't know that the cases that Professor

17   Wigmore cites support his conclusion, and we have gone into

18   this many times, and even then what Professor Wigmore states,

19   with all respect to your Honor, is not applicable here.

20   We have a Bulletin that was prepared by a variety of

21   people.  I wanted to make the statement into the record be-

22   cause I think when we start to cross-examine you will see

23   what the problem is.  There is no complete statement by an

24   expert.  Analyzing what Wigmore says there, it is that a man

25   could get on the stand and read into the record a statement in

6422

Z2

1  regard to the value of a piece of land maybe, which would be

2  one thing.  But here is a whole valley about which a man is

3  purportedly writing, and he didn't do it himself-- it was done

4  under his direction, and that is my concern.

5  THE COURT:  We will take care of your concern as to

6  any matters on which you want to go further and find out

7  which particular man drew the chart or looked at the par-

8  ticular stream or the alluvium, and gathered the material,

9  and have him present-- find out who he is and have him present.

10  MR. VEEDER:  As I understand it, Mr. James will be back

11  here.

12  MR. MOSKOVITZ:  Yes.  You can have him right now, if

13  you want.  He is working right now across the hall on the

14  compilation.

15  MR. VEEDER:  If he is available, I think we might as

16  well get to work.

17  THE COURT:  All right.

18  MR. MOSKOVITZ:  Do you want him now?  We can bring him

19  in.

20  MR. VEEDER:  Where is the big geologic map, the one

21  that was up there-- 15?

22  THE CLERK:  Where do you want it, Mr. Veeder?

23  MR. VEEDER:  Just put it up here.

24  (A map is placed on the board.)

25  THE COURT:  The trouble we had with this map before is

1    that the colors on it do not correspond with the numbers on the

2    plates that we have been using.  But if you can avoid that

3    difficulty, we may find some use for it.

4

5                         LAURENCE JAMES,

6    recalled as a witness in behalf of the defendant State of

7    California, having been previously sworn, testified further

8    as follows:

9

10                    FURTHER CROSS-EXAMINATION

11   BY MR. VEEDER:

12        Q  Have you completed your work in regard to the methods

13   of determining storage capacity of the basin?

14        A  We are still working on that.

15        Q  You are still working on that?

16        A  Yes.

17        Q  And when you say "we," is someone else working on it

18   now?

19        A  Well, no, I am working on it.

20        Q  Do you think you will have that available-- when?

21        A  Well, it will be finished in rough form today and

22   will get to the typist sometime this afternoon.

23        Q  Now, in regard to the location of faults, I note,

24   on page B-38 of Exhibit L, Appendix B, in the second paragraph,

25   the second sentence:  "Only those (referring to faults) that

1  have a topographic expression or other surficial evidence are

2  noted on the areal geology plates."  Now what do you mean by

3  that statement, Mr. James?

4      A  Well, by topographic expression" we refer to an

5  alignment of saddles in the topography, we refer to an

6  alignment of fault slivers would be another type of geological

7  feature.

8      Q  In other words, things that you observed on the

9  surface of the earth itself; is that right?

10     A  Where it says, "topographic expression," yes.  I

11 might add that we also considered ground water elevations in

12 projecting these faults.

13     Q  You say "other surficial evidence."  Now "surficial"

14 means, does it not, on the surface of the earth?

15     A  Well, it does, but as a matter of fact we did use

16 hydrologic observations in helping fix the localities of these

17 faults.

18     Q  So as a matter of fact you would say the sentence

19 which I read into the record and to which I am now making

20 reference in my interrogation is incorrect?

21     A  I think it could be reworded.

22     Q  The word "only" is not correct; isn't that right?

23     A  That is true.  You are correct.

24     MR. VEEDER:  Are you having an objection, Mr. Moskovitz,

25 or just clearing your throat?

B

Z5

1    THE COURT:  Proceed, Mr. Veeder.

2  BY MR. VEEDER:

3    Q  You want to change the word "only", then, is that

4  right?

5    MR. MOSKOVITZ:  Your Honor, I think this is getting to

6  be argumentative now.  I object on that basis.

7    THE COURT:  Overruled.

8    THE WITNESS:  It would probably be worded better that

9  surficial evidence was utilized in assisting in the location

10  of faults in this area, or something like that.  That would be

11  a better way of wording it.

12  BY MR. VEEDER:

13    Q It was not only surficial evidence and topographic

14  evidence that you used; it was other evidence?

15    A  We used everything we could get that would help fix

16  the location of these faults, including the work of prior

17  investigators.

18    Q  I hate to pursue this very much further, but the

19  word"only" is incorrect, isn't it?

20    MR. MOSKOVITZ:  That is objected to as having been

21  asked and answered, your Honor.

22    THE COURT: He so stated.  He told you how he would re-

23  word it.   Proceed.

24  BY MR. VEEDER:

25    Q  How doyou want it reworded?

1          THE COURT:  He told you already.

2          MR. VEEDER:  I would like to have him state it again,

3    your Honor.  I didn't quite follow it.

4          THE COURT:  Will you read it, Mr. Reporter.

5          (The reporter read the record as follows:  "A  It

6    would probably be worded better that surficial evidence as

7    utilized in assisting in the location of faults in this area,

8    or something like that.  That would be a better way of wording

9    it.")

10    BY MR. VEEDER:

11          Q  Is that the amendment that you desire in California's

12    Exhibit L, B-38?

13          MR. MOSKOVITZ:  I object to that, your Honor.  I don't

14    think we have to get--

15          THE COURT:  Sustained.  You have made your point.  Go

16    on.

17          MR. VEEDER:  Your Honor, this is the witness's evidence

18    that you admitted right here.

19          THE COURT:  He has told you how he would word it.  Let's

20    go ahead.  When you make a point, don't kick it around and

21    wear it out.

22          MR. VEEDER:  I am very anxious, your Honor, to make this

23    point very clear.

24          THE COURT:  You have made it clear.

25          MR. VEEDER:  That the State of California issued permits

1    to Fallbrook on the basis of this Bulletin.  They are now

2    changing it, and they are changing the basis upon which those

3    permits were issued.

4          THE COURT:  All right, proceed.

5    BY MR. VEEDER:

6          Q  Now, Mr. James, how do you locate faults?  How did

7    you locate faults?  I will change the question.

8          A  Do you have any particular fault in mind, or are

9    you just speaking of faults in general?

10         Q  I am just talking about faults in general.

11         A  This goes into a one-year course in structural

12   geology, you might say.  There are innumerable ways of

13   locating faults, and often it depends upon the particular

14   locality.  I am afraid I can't answer your question specific-

15   ally without giving you a course in structural geology.

16         Q  Would you state that when you infer a fault-- and

17   when I say "infer", what is meant by "inferring" the presence

18   of a fault?

19         A  Well, there are certain indications, certain

20   geological expressions that would lead you to suspect, that

21   can best be explained by the presence of a fault, although in

22   some instances you cannot actually observe the fault.  There

23   are features there that make you strongly suspect its existence.

24         Q  So when you indicate the presence of a fault by a

25   particular line, it could be a hundred yards one way or it

1    could be a quarter of a mile the other?  You just happen to

2    infer it from the standpoint of, "Well, it could be here, or

3    it could be some place else;" is that right?

4         A   This again depends upon the particular situation.

5    In some instances an inferred fault can be much more closely

6    located than in another case.

7         Q   Well, let us take the Willard fault, which has been

8    referred to by the United States as the Elsinore fault.  Can

9    you state with any exactitude where the Willard fault is

10   located within a quarter of a mile?  Could you say that you

11   could locate it specifically within a quarter of a mile by

12   inferring its location?

13        A   Well, parts of it could be quite definitely located--

14   they can be seen on the surface, and other parts you could not do

15   it as closely as that.

16        Q   One might locate it a half mile-- his inference might

17   be a mile or a mile and a half away from the point where

18   another man might locate it; is that right?

19        A   Well, that is getting pretty far.  I think we prob-

20   ably could do better than that.

21        Q   Well, with how much exactitude doyou think you could

22   strike it?

23        MR. MOSKOVITZ:  Your Honor, I object to this question.

24   I think he is asking for the conclusion of this witness as

25   to how other people might do their work.

1        THE COURT:  Overruled.

2        THE WITNESS:  That is a very difficult question to

3   answer, Mr. Veeder, for this reason:  In that in certain

4   parts of that fault you could locate, two geologists would be

5   in fairly close agreement, whereas in other parts there might

6   be considerable difference in opinion.

7   BY MR. VEEDER:

8        Q  Well, it would be almost fantastic for two geolo-

9   gists to infer the location of a fault at exactly the same

10  place; is that not correct?

11       A  I don't think that is true as a general statement,

12  no.  In certain areas they would locate them almost exactly

13  the same.

14       Q  By inferring them?

15       A  Yes.

16       Q  Do you think the Willard fault is one where you

17  and any other competent geologist would infer its location at

18  exactly the same place?

19       A  Parts of it.

20       Q  I am asking about the whole delineation of the

21  Willard fault.

22       A  The only way that I can see that I can answer your

23  question would be to say that parts of it two geologists, I

24  am sure, would agree very closely, whereas in other parts

25  there would be some disagreement.

B

Z10

1    Q   Now I am referring to State's Exhibit L, 15-1 --

2    MR. MOSKOVITZ:  You mean Table 15-1?

3    MR. VEEDER:  Is that what you call it?

4    MR. MOSKOVITZ:  That is what the Clerk has called it.

5    BY MR. VEEDER:

6    Q   And I am pointing to a complex series of faults

7    lying directly west of the town of Murrieta.  Can you observe

8    these?

9    A   I see them on Plate 13-B, yes.

10   Q   Would you say that those inferred faults would be

11   found by all geologists in exactly the same place?

12   A   I can't answer that.  I would have to go into the

13   field and take a look at it.  I can't remember that particular

14   area that well.

15   Q   And you didn't go into the field yourself and make

16   these delineations-- you didn't do this yourself, did you?

17   A   I did not map those myself in the field, no.

18   Q   Do you remember who did?

19   A   I think this goes back to earlier testimony wherein

20   it was stated that these features were mapped, in part, by

21   our field personnel and in part from the works of previous

22   investigators.  We considered all available sources in coming

23   up with the best answer we could.

24   Q   So you don't know who did this work of locating these

25   faults here directly west of--

k B

Z11

1       A  Well, at the particular location you are pointing to

2    on the exhibit, no, I can't recall just how that was obtained

3    specifically.

4       Q  Will you look at your notes and let me know?

5       A  I will look at the notes.  I am not sure I can find

6    anything that will refer to that specific location.  Possibly

7    it appears on some of our photographic overlays.

8       Q  And you will check those?

9       A  I will do that.

10      MR. MOSKOVITZ:  Your Honor, should there be some indi-

11   cation as to what the materiality of this is before we have

12   our witness go through all these notes?

13      THE COURT:  Unfortunately, Mr. Veeder has you in this

14   position, you see.  There is no dispute about this Elsinore

15   fault.  The Government has it on its exhibits, and the State

16   has it.  There is no dispute that there is a fault there.

17   Where it lies exactly is probably not too material.  It lies

18   at the foot of the Santa Rosa Mountains.  But Mr. Veeder is

19   entitled to cross-examine this witness on the basis of the

20   showing of his competency and the basis for his opinion, so

21   he can take a matter on which there is no real controversy

22   and examine the witness on that point.

23      MR. VEEDER:  And impeach him.

24      THE COURT:  That is his right.  I thought for a moment

25   of injecting here and saying there is no argument about this

B

Z12

James        Cross                                    6432

1    particular faulting area, but that still doesn't answer the

2    problem.

3           MR. VEEDER:  No, it doesn't, your Honor.

4           MR. MOSKOVITZ:  Does it answer the problem to attempt to

5    determine specifically who did what part of what fault?

6           MR. VEEDER:  I thought I could cross-examine each of

7    the parties who played a part in it.

8           MR. MOSKOVITZ:  Very well.  It is just a matter of

9    time.  There is nothing to hide on it.

10   BY MR. VEEDER:

11          Q  I ask you to look at California's Exhibit L, Table

12   15-1 and note the point directly east of the Pechanga Indian

13   Reservation, another complex set of faults, sort of in a barn

14   shape, but in any event, some of them are inferred but some

15   of them have been apparently mapped with precision by you.

16   Who did that work, Mr. James, or was it under your direction?

17          MR. MOSKOVITZ:  Your Honor, I want to make an objection

18   I believe Mr. Veeder should be referring to the plates which

19   are in evidence when he examines this witness.

20          THE COURT:  Well, Exhibit L, plate 13-B is the same

21   plate.

22          MR. MOSKOVITZ:  That is right.

23          THE COURT:  We will understand that his references are

24   to Plate --

25          MR. VEEDER:  I think it is easier for the witness.

B

Z13

1    Certainly it is easier for me to work from here.

2          MR. MOSKOVITZ:  As long as he can look at Plate 13-B

3    while you are looking at 15-1.

4          MR. VEEDER:  I am for that.

5          Q  Who did the work?

6          A  This work was obtained, in part, from the studies

7    of previous investigators, it was checked, and to some extent

8    original work was done by our people from aerial photographs

9    and from some work in the field.

10         Q  In other words, where it is not inferred you know

11   that it is situated exactly, of your personal knowledge?

12         A  Well, I would like to point out that our definition

13   of the dashed fault line, as appears on Plate 13-B in Bulletin

14   57, is that that line indicates a fault where it is solid,

15   where it is dashed it indicates that the fault is concealed

16   or that it is at its approximate location.  We don't exactly

17   say inferred.

18         Q  But you don't know who did that work either, do you?

19         A  To the extent to which I have previously answered

20   your question, I know that we considered the work of other

21   investigatiors and supplemented that with observations of our

22   own.

23         Q  And when you put your straight lines on there, you

24   were saying, "We know that that is the exact place where it

25   is located"?

1      A   Well, where the dashed lines are, that indicates the

2   approximate location or concealment.

3      Q   Now, in regard to all of the other marks on here,

4   the fault across the Anza Valley, did you personally investi-

5   gate that?

6      A   I personally reviewed some of the observations which

7   led to the establishment of that fault.

8      Q   When you say you "reviewed", what do you mean?

9      A   There were water level measurements made in the

10  field, which helped control the location of that fault.  I

11  did not make those-- well, let me change that.  I did not make

12  all of those measurements.  I measured some of those wells

13  myself.

14     Q   Now, in regard to the other faults which appear on

15  here, you say that you know they are right, from your personal

16  knowledge?

17     A   I would say that my testimony in regard to earlier

18  testimony applied here also.

19     MR. VEEDER:  I would like to your Honor by the use of

20  a light table that, by and large, Plate 13B is nothing more

21  nor less than a plagiarization from another man's work, and

22  that man is not here for cross-examination and is not employed

23  by the State.  I think that we will show by the use of the

24  light table that they simply copied the work of John Mann,

25  and are now offering--

1     THE COURT:  Who is John Mann?

2     MR. VEEDER:  John Mann wrote a thesis, he drew some

3  pictures, and we will show that, even though the State claims

4  they did the work, there is a complete identity even as to

5  the inferred lines.

6     THE COURT:  Is this Mr. J. F. Mann?

7     MR. VEEDER:  Well, here is the map.  I will see if

8  he is J. F. or not.

9     MR. MOSKOVITZ:  I think we ought to have a foundation

10  for what this is, your Honor.

11     MR. VEEDER:  I am laying it.

12     THE COURT:  J. F. Mann is given credit on B-7 in

13  regard to a paper called "Late Cenazoic Geology of a Portion

14  of the Elsinore Fault Zone, Southern California," University

15  of Southern California Thesis 1951.

16     MR. VEEDER:  We will put the map 15-1 --

17     THE COURT:  Just a moment.

18     MR. SACHSE:  Sait a minute, Mr. Veeder.  What is this?

19  If you want to lay a foundation for what this paper is--

20     MR. VEEDER:  This is the map prepared--

21     MR. SACHSE:  I want a foundation from the man who did

22  it, Mr. Veeder; not you.  I would like the man who made the

23  map.

24     MR. VEEDER:  Well, I think the State has got to call

25  Mr. Mann, because John Mann prepared the thesis for his

1    doctorate--

2         THE COURT:  Now, wait.  Let's see the document.  Do

3    you have the thesis there?

4         (Mr. Veeder handing document to the Court.)

5         THE COURT:  Well, there is nothing to show that this

6    document is the same document that is referred to in B-7 of

7    Appendix B.

8         MR. VEEDER:  I would like to have your Honor, if you

9    would--

10        MR. SACHSE:  I have an objection pending.  I don't know

11   who drew this sheet of paper.  I don't know where it came

12   from.  I haven't the slighest idea what it is.  I object to

13   its use without a foundation for this tracing before us.  It

14   is not even the document that is before your Honor.

15        MR. VEEDER:  If your Honor will give me the map from

16   which this tracing is made, I will show the source of it.

17        MR. SACHSE:  I don't want it shown.  I want a witness,

18   Mr. Veeder.  You have been making quite a point on this.

19        THE COURT:  Just a minute, all of you.  Let's cut the

20   argument out.  We are not getting anywhere here.

21        There has been handed up a document with a printed

22   report "State Department of Natural Resources, Special Report

23   43, October, 1955, by John F. Mann, Jr."  Can this be marked

24   for identification--

25        MR. VEEDER: You see, your Honor,--

1     MR. SACHSE:  What was the date, your Honor?

2     THE COURT:  October, 1955.

3     MR. MOSKOVITZ:  1955?

4     MR. SACHSE:  Obviously, it could not have been

5  plagiarized.  This was written before.

6     MR. VEEDER:  Your Honor, may I offer one thought.  I

7  would like to proceed with this cross-examination and interro-

8  gate the witness as to the source of the data that he used

9  in locating the faults as they appear here.  He can say

10 whether or not the map which I have placed before your Honor

11 up there is or is not the map that he used in locating these

12 faults, and if he says no--

13    THE COURT:  Let us get a few things marked.  This

14 bulletin-- what do you want to call it -- Special Report 43

15 will be--

16    MR. VEEDER:  I am not offering that, your Honor.

17    THE COURT:  --will be called 15-2.

18    The map which you laid on my desk will be 15-3.

19    Those numbers are available, aren't they, Mr. Clerk?

20    MR. MOSKOVITZ:  There is a 15-2 already, I think, that

21 overlay, your Honor.

22    THE CLERK:  L-15-1 and 15-2 are both used, your Honor.

23    THE COURT:  How far does that 15 series go?

24    THE CLERK:  Just to 2, your honor.

25    THE COURT:  Then make the map that Mr. Veeder has

1    produced L 15-3.

2         MR. STAHLMAN:  Are you going to take a recess this

3    morning, your Honor?

4         THE COURT:  Just a minute.

5         And the publication Special Report 43 will be L 15-4.

6         The tracing that Mr. Veeder has--

7         MR. VEEDER:  The tracing was simply something that I

8    prepared to see how the lines were delineated.

9         THE COURT:  Mark it L 15-5.

10        (California's Exhibits L 15-3, L 15-4, and L 15-5 were

11   marked for identification.)

12        THE COURT:  Take a short recess.

13        THE CLERK:  Shouldn't these be all Table 15-4?

14        THE COURT:  It doesn't have to be Table, just L 15.

15        MR. VEEDER:  Are we in recess, your Honor?

16        THE COURT:  Yes.

17        (Recess.)

18        THE COURT:  To proceed with the matter of attack on

19   cross-examination, counsel can pull out any document without

20   laying a foundation for it and say to the witness, "What is

21   this?", et cetera. So let's proceed.

22        MR. MOSKOVITZ:  Let us have it identified by examining

23   the witness or by examining someone else.

24        THE COURT:  The record shows that counsel has placed

25   over a light Exhibit L, Table 15-1 for Identification, which

1    is the larger map from which the plate in evidence L 13-B was

2    made, except the colors are different.

3          MR. MOSKOVITZ:  That is right.

4          THE COURT:  And he has placed over Exhibit L, Table

5    15-1, which is over a light, another document which has

6    been marked L 15-3.

7          MR. VEEDER:  And that map is designated "Geologic Map

8    of the Temecula Region, Riverside, California, Geology of

9    John F. Mann, Jr., 1949."

10         THE COURT:  He is reading from the face of L 15-3.

11         Go ahead.

12   BY MR. VEEDER:

13         Q  Now, Mr. James, I am showing you the fault complex

14   which lies immediately west of Murrieta, as shown on L 15-1

15   for Identification and for Identification L 15-3 and ask you

16   to state whether the fault complex on the two maps does not

17   appear to you to be identical.

18         A  You are referring to this particular area here,

19   pointing to the area north of Mesa De Burro?

20         Q  That is right, and the complex which you can observe

21   marked "Willard fault," and then directly west of the word

22   "Murrieta" from Murrieta Creek, and also directly west of the

23   town of Murrieta; that complex is so located?

24         A  Why, yes, they are.

25         Q  They are identical, are they not?

1      A   They are in close agreement.  We, as I stated earlier,

2  checked our work with previous investigators, checked the work

3  of previous investigators, and where we found it to be accurate

4  in our opinion we utilized it.  I might say, with respect to

5  this paper, Dr. Mann is a personal friend of mine--

6      Q   Don't go any further.

7      THE COURT:  Just a minute.  The witness may make an

8  explanation.

9      Go ahead.

10      THE WITNESS: He is, in my opinion, an excellent

11  geologist, and I have high regard for his work.

12  BY MR. VEEDER:

13      Q   And you simply, then, on your map here, which is

14  marked L Table 15-1, you simply took the work of Mr. Mann and/

15  or Dr. Mann, as the case may be, and placed it on the map

16  which has been designated L Table 15-1; is that right?

17      A   We considered his work in drawing these particular

18  faults as shown here.

19      THE COURT:  The question was, did you take his work

20  and carry it over onto your exhibit?

21      THE WITNESS:  After checking it, your Honor, determining

22  that it was correct to our satisfaction.

23  BY MR. VEEDER:

24      Q   When you say you "checked"--

25      MR. MOSKOVITZ:  Just a moment.  Let the witness finish.

    THE COURT:  Go ahead.

THE WITNESS:  We utilize it, as in the case of other

previous investigators, we utilized their work when it appeared

reliable and was, in our opinion, correct.

BY MR. VEEDER:

Q  Are you swearing that you went upon the ground and

checked out these lines and they  are absolutely identical with

the lines that appear on 15-3?

A  No, Mr. Veeder.  I have already  testified that I

did not get out in the field and look at these particular areas

myself.

Q  In other words, these were simply taken from Dr.

Mann's map and placed on here?  And you think that Dr. Mann

was an accurate workman and, therefore, you accepted them as

being correct;  is that right?  Answer the question yes or no.

A  Just--

Q  Answer yes  or no.

A  May I have the  question again?

THE COURT:  Read it.  And if you can answer it yes or

no, do so.  If you can.  And then make any explanation you want

to make.

THE WITNESS:  Well, there are several answers to that,

as I see it.  There is, do I think Dr. Mann is a capable work-

man, or do I--

MR. VEEDER:  I will change the question.

Q  Did you take the fault pattern to which we are now

1  referring from Dr. Mann's map and place it onto Table 15-1?

2  That is a yes-or-no answer.

3         MR. MOSCOVITZ:  Or it could be a qualified answer.

4         THE WITNESS:  I will qualify it this way, the same thing

5  I said before:  We checked his work.  We looked it over.  It

6  looked acceptable to us.  We put it on the map.  I would like

7  to quote from--

8         MR. VEEDER:  Now, just a moment.

9         THE COURT:  Wait a minute.  Go ahead, Mr. Witness.

10        THE WITNESS:  I would like to quote from Bulletin No.

11  57, page B-9, just exactly  how we did this type of thing, if

12  I might.  I am referring to--

13        MR. MOSCOVITZ:  That is Exhibit L, Appendix B?

14        THE WITNESS:  Yes.

15        MR. VEEDER:  Your Honor, I am going to object.

16        THE WITNESS:  Page 59.

17        MR. VEEDER:  I am going to object.  This is not re-

18  sponsive to the question I have asked.

19        THE COURT:  The witness has a right to make his explan-

20  ation.  Read it, Mr. Witness.

21        THE WITNESS:  I am quoting from the third paragraph near

22  the middle of page B-9.  In fact, I will start with the second

23  paragraph:  "The geology of the Santa Margarita  watershed is

24  depicted on areal  geology maps, Plates 13A and B.  Since this

25  portion  of the Santa Margarita River investigation was primarily

1 a study of geology as related to water resources, and, more

2 particularly, to  the ground water supply, geologic structure

3 of the non-water bearing rocks was not intensively investigated.

4 Work in this regard generally extended to field checking of the

5 results of previous investigations.  However, those faults and

6 fault zones which  appeared to have a direct bearing on the

7 occurrence and movement of ground  water were given a more thor-

8 ough study."

9 BY MR. VEEDER:

10        Q  Now, will you answer the question?  You have ans-

11 wered the question.  You have simply said that you took this

12 from Mann and placed it on the map.

13        THE COURT:  Go ahead.

14        THE WITNESS:  I didn't say that, simply, no.  I said

15 that we considered his work and where we found it to be re-

16 liable, in our opinion, we used that to assist us.

17        THE COURT:  And you said you specifically used this

18 investigation by Mann?

19        THE WITNESS:  We did use Mann's investigation, yes,

20 your Honor, in every way.

21 BY MR. VEEDER:

22        Q  And you put it on the map?  You simply took his work

23 and put it upon this map, this thing to which I am referring

24 now, this fault area?

25        MR. MOSCOVITZ:  Your Honor, I want  to  point this out:

1      That what has been placed on Exhibit L-15-3 has not been iden-

2      tified  as being the work that the State referred to.  There

3      has been no identification of it.  So I think when Mr. Veeder

4      says  that "You took Mann's work, and this is what you took,"

5      that hasn't been  established.  This may or may not  be the

6      same.  I just don't know whether it is.

7              THE COURT:  Overruled.  There is no argument about that.

8              Mr. Witness, you have seen this map before, haven't

9      you?

10             THE WITNESS:  Yes, sir, very definitely.

11             THE COURT:  Is this the work you  are talking about,

12     some of Mann's work you have been talking about?

13             THE WITNESS:  Yes, John Mann.

14             MR. VEEDER:  Referring to L-15-3.

15             THE COURT:  All right.

16             THE WITNESS:  Yes, this is the work.

17             MR. VEEDER:  He has answered the question.

18             THE COURT:  Ask another question.

19     BY  MR. VEEDER:

20             Q  As I understand it, though-- this witness is a little

21     hard to keep up with.  Now, referring to the fault contact which

22     appears--

23             THE COURT:  South and west of Vail Lake.

24             MR. VEEDER:  Yes, it would be south and  west of Vail

25     Lake, and--

C1
S21

1      THE COURT:  Southeast of Temecula or Pauba Basin.

2      MR. VEEDER:  That is right.

3      Q  Now, referring again to the State's Exhibit 15-1 --

4      THE COURT:  L.

5      MR. VEEDER:  L-15-1.

6      THE COURT:  L-15-1, and to the Mann map, L-15-3.

7  BY MR. VEEDER:

8      Q  Would you state whether the lines which  are drawn

9  on-- would you get your hand out of the way, Mr. Moscovitz, for

10 just a moment-- whether or not the lines  which are drawn, and

11 not inferred, but are the direct and solid lines, do they ap-

12 pear identical to you on Table 15-1 and 15-3?

13     MR. MOSCOVITZ:  Would you move your finger just a little

14 bit, Mr. Veeder, to expose that portion there?

15 BY MR. VEEDER:

16     Q  Speaking only now of the lines which are solid lines?

17     MR. MOSCOVITZ:  Would you point  to the ones you have

18 referred to?

19     MR. VEEDER:  Yes, I have just pointed to them.

20     Q  Are they not identical?

21     A  Those three lines, yes, they coincide.

22     Q  Did you copy those, take them directly from Dr.

23 Mann's map and place them onto Table 15-1?

24     A  We didn't take them directly.  We considered them

25 first, and, when we agreed with them, we put them on.

C1
S22

Q And when you say, "You agreed with them," what do you mean?

A Well, we found them to-- found their location to be agreeable to our own geological knowledge of the area.

Q Did you check these lines, these lines which are not inferred but are direct, did you check them yourself in the field to know they are right?

A I did not check personally these lines that are shown on here. However, this region, as well as the entire region of the Santa Margarita watershed, was checked against the previous investigational work, was checked against aerial photos and previous investigators' work was checked among the different investigators.

Q Now, I hand to you an overlay taken from the data that you gave to the United States as your field work, and ask you whether or not-- the fact is, I think this should be marked, your Honor.

THE COURT: 15-4.

MR. VEEDER: Four.

THE CLERK: 15-4? We have a 15-4.

THE COURT: All right. 15-6.

BY MR. VEEDER:

Q Now, I ask you if you are familiar with the identification marked L-15-6?

A I see it on this overlay, yes.

C1
S23

THE COURT:  What is this thing he has handed you, 15-L-6?

THE WITNESS:  Your Honor, this looks like one of the overlays for one of our  aerial photos on which  we mapped the geology in the Santa Margarita watershed.

BY MR. VEEDER:

Q  Would you say that overlay is representative of the fault complex concerning which you have just been testifying to from-- it won't fit-- from 15-1?

A  This doesn't fit.

Q  That is  right.  Now, is it not correct, then, that the State apparently undertook to locate the same fault complex, and then when it checked the Mann fault complex, it adopted the Mann and disregarded its own work; isn't that correct?

A  No, that is not correct.

MR. MOSCOVITZ:  Just a moment.  Have we had this L-15-6 identified as to where it was placed on the overlay?

MR. VEEDER:  I asked him.

THE COURT:  Well, no.

MR. MOSCOVITZ:  No, you didn't ask him that.

THE COURT:  It has been placed on the same fault complex we have been talking about lying south of Vail Lake and south and  east of Pauba Valley.

MR. MOSCOVITZ:  Have we established this was the place where it was on the  aerial photographs?  Maybe it was.  I don't

6448

1  know.

2          MR. VEEDER:  If you want to have some argument.  Let's

3  have this marked L-15-6, an aerial photograph  taken from the

4  data given to us.

5          MR. STAHLMAN:  Seven.

6          THE CLERK:  Seven.

7          MR. VEEDER:  That will be seven.  From the State of

8  California.

9          Q  Do you recognize L-15-7?  If you do recognize it,

10  state into the record what  it depicts.

11         A  Well, this appears to be a photograph of the Santa

12  Margarita watershed.  I can't--

13         Q  Of the  Santa Margarita watershed?

14         A  Well, a part of it.  I can't  say for sure.  It

15  could also be of a number of other places.  But I assume that

16  it is.

17         Q  Would you  be able to,  from your personal knowledge

18  as  a geologist, identify whether that particular photograph

19  relates to the same fault complex concerning which you are tes-

20  tifying to on L-15-1?

21         A  This would take a little bit of study.

22         Q  Well, take a little bit of study.

23         Mr. James, would you state into the record the symboli-

24  zation and the cross-references of your overlays and your aerial

25  photographs that you used in preparing this map?

1    Do you know that system?

2         A   I don't remember offhand exactly how we did orient

3    these.   There is a number on the photograph and a number on the

4    overlay which correspond.   In this particular instance, the

5    photo here is shown to be 155/8 and the overlay is also desig-

6    nated 155/8.

7         Q   But you don't know  the system that was used?

8         A   Well, it is an indexing system for aerial photos.

9    It was utilized here.   This particular indexing system was one

10   that was adopted by the Marine Corps, I believe, when they flew

11   the photos, to the best of my recollection.

12        Q   But you don't know yourself?

13        A   What do you mean I don't know?   I am trying to ex-

14   plain to you.   I mean, just what is it specifically you are

15   trying to get?   Isn't this what you want:   How these are cata-

16   loged?

17        Q   I will withdraw my original observation.   Can you

18   locate the terrain depicted on L-15-7 from your personal know-

19   ledge?

20        A   I am having some difficulty here getting this thing

21   oriented.

22        THE COURT:   Let me help you.

23        MR. VEEDER:   Your Honor, I am seeking to impeach this

24   man, and I hope your Honor won't hold him up.

25        THE COURT:   I won't hold him up.   But I call your

C2
S26

1    attention to some alluvial here and some alluvial here.

2          THE WITNESS:  This corresponds.

3          MR. VEEDER:  And your Honor has pointed to  the alluv-

4    ium in the Pechanga Indian Reservation and has assisted the

5    witness in locating himself by a definite question.

6          THE COURT:  By a what?

7          MR. VEEDER:  By a very definite question.  I am compli-

8    menting your Honor.

9          Q  Now, do you know where your-- Mr. Witness, have you

10   been able to find yourself?

11         A  Yes.

12         Q  With the assistance of the Court, you have now lo-

13   cated--

14         A  I think I could find myself.

15         MR. MOSCOVITZ:  I think that is uncalled for, your

16   Honor.

17   BY MR. VEEDER:

18         Q  Now, are you able to find the fault complex on the

19   aerial photograph which has been marked L-15-7?

20         A  I wouldn't attempt to set on here and locate a com-

21   plex such as this on just the photo.  I would take this map out

22   into the field and work with it there.

23         Q  Did you do that?

24         A  I didn't do this, no, but those who worked under my

25   direction--

1        Q  Who did?

2        A  -- did this mapping.  There was Mr. Fox and Mr. Roth

3    and Mr. Jones that did this work.

4        Q  Now, they did the work?  They went out into the field

5    and checked it themselves, is that right?

6        A  They took the photos into the field, yes.

7        Q  How does it occur, then, that the fault complex

8    concerning which you are now testifying comports and is exact-

9    ly the same as the complex depicted by Mann and is not the same

10   as the one by the State of California?  How does it happen you

11   adopted the Mann and not your own?

12       A  Well, it would be my opinion that those who did the

13   work out in the field took  this out and did some mapping on

14   it, went back in, checked it with Mr. Mann's work, went  back

15   out and found  out that they thought his work was perhaps

16   better in detail.

17       Q  But you don't know, do you?

18       A  No, I can't answer that definitely.

19       MR. VEEDER:  I move to strike all that he said.

20       THE COURT:  Overruled.

21       THE WITNESS:  I would like to say that Mr. Mann spent

22   considerable  time  in  this non-water bearing, these basement

23   complex areas that we didn't think was worth the effort, for a

24   water study  to put in this much time.  We, therefore, recog-

25   nizing the ability, accepted his work in these areas.

C2
S28

BY MR. VEEDER:

Q  Are you stating that the Dripping Springs area and the areas which constitute part of this complex are not important  from the standpoint of this investigation?

MR. MOSCOVITZ:  Your Honor, I want to point out that when Mr. Veeder asked the comparisons of the lines, he wasn't pointing to the Dripping Springs area.  He was pointing to  · another area which is marked--

THE COURT:  Also to get on with our case:  In the comparison made, there was a Mann map and the L-15-3 and the--

MR. VEEDER:  Observe those lines.

THE COURT:  I observe certain of the lines are identical.  I observe other lines that are not identical.  I refer to solid lines off to the right and above indicating faults that don't correspond with the lines below.

MR. VEEDER:  Your Honor, I would like to conduct the cross-examination  along that line.

THE COURT:  I merely wanted the record to show what I have observed.  Secondly, there is no issue as to these faults as far as they affect water.  The witness's statement in the record shows, and the table  referred to once before, there is only one fault that has any effect upon the water.  And why are we going to spend a lot of time on this unless you are doing it entirely from the standpoint of  attacking the credibility of the witness?  On this Table B-2 at page B-40 is a column:

1  "Barrier effect to ground water movement." And all the faults

2  there listed, and I take it they are the major ones, have the

3  words, "None apparent," with the exception of a comment on the

4  Murrieta Basin on the Wildomar Fault. And I don't see any dis-

5  pute between the Government's geology and the State's geology

6  in respect to that fault.

7      MR. VEEDER: Your Honor, I am attacking the credibility

8  of this witness. I am also attacking the credibility of the

9  evidence that you have admitted in here, the textual write-up

10  of L-Appendix B. In other words, this witness admits that a

11  great deal of this work, they simply lifted off of Mann's work.

12      MR. MOSCOVITZ: I don't think that is an accurate

13  statement.

14

15

16

17

18

19

20

21

22

23

24

25

James   Cross

6454

1    THE COURT:  Mr. Veeder, you can say that they lifted

2    it.  In any scientific research, the researcher relies upon

3    what has been done in the past.  This is elemental.  Appendix

4    B lists Mann, the same Mann, with an article with a little

5    different name, as one of the source.  This matter of

6    plagiarism in scientific matters is much the same as in

7    literary matters.  People borrow from the experience of the

8    past.  That is the way human knowledge has been accumulated.

9    I don't consider it any grievous sin to take studies and

10   materials made by other people, as long as you give credit for

11   what has been done.

12       MR. VEEDER:  They haven't given credit, your Honor,

13   and that is the precise point I am making,  These plates were

14   put in by Mr. Illingworth as being correct to his personal

15   knowledge.  Then when we tried to grab him, he ran, and we

16   came up with James.  Now, I have a few more questions I would

17   like to ask.

18       THE COURT:  Go ahead with your questions.

19       MR. VEEDER:  And this, your Honor, directly involves

20   the movement of ground water, this involves the Aguanga Basin.

21       Q  Now, I will have you take a look at the faults--

22   if I am not being harsh when I use the term-- L 15-1 and L 15-3

23   of the Aguanga area, and I ask you if those are not identical,

24   again looking at the lines as drawn and depicted by James

25   after Mann.

1       A  Yes, those are close to one another.

2       Q  They are identical?

3       MR. MOSKOVITZ:  Is this one of those that refers to

4 the movement of ground water?

5       MR. VEEDER:  Yes, it is.  The Aguanga Basin is very

6 important.

7       THE COURT:  Are those faults important in the movement

8 of ground water?

9       MR. VEEDER:  Yes, they are.  Our star-- I called

10 him the "Tiger" yesterday-- testified at length in regard

11 to the movement of water in the Aguanga Basin, and that is

12 extremely important from the standpoint of the production of

13 water above Vail Dam.  So the movement up there is of great

14 importance, your Honor.

15       We also have this complex here in the Radec area,

16 which, I believe your Honor will observe, was also another

17 example of fine plagiarization.  The Radec Valley is an

18 important valley from the standpoint of production of ground

19 water.

20       THE COURT:  You have the laboring oar to show me that

21 those faults have anything to do with the movement of ground

22 water-- faults through the complex.

23       MR. VEEDER:  That is precisely the point, your Honor.

24 We have basins which are depicted on exhibits which are before

25 this Court, the numerous plates which have been offered,

1    showing basins enclosed by basement complex and they are

2    important from the standpoint of the movement of water.

3           THE COURT:  Go ahead and ask your questions, Mr. Veeder.

4           MR. VEEDER:  Before I do that, I am going to ask that

5    Mr. Mann be called as a witness by the State.

6           MR. MOSKOVITZ:  I think there is no earthly reason to

7    do so.

8           THE COURT: The request is denied.  If you want Mr.

9    Mann here, get a subpoena for him.

10          The witness has admitted that he has leaned on Mann's

11   work in this matter.  He said that he found Mann's work

12   accurate and borrowed from it, which is proper.

13          MR. VEEDER:  Well, it is the purest kind of hearsay,

14   your Honor, and I move to strike these exhibits that have been

15   offered, particularly the Plate 13B, on the grounds that it

16   is the purest hearsay.

17          THE COURT:  Denied.

18          If any issue arises as to one of these particular faults

19   that have any bearing on the movement of water, we will cross

20   the bridge at that time.  I think you are building up a straw

21   man here, in so far as any of these faults have anything to

22   do with the movement of water.  Your own witnesses aren't

23   in dispute as to the existence of the major faults.

24          MR. VEEDER:  In regard to this Aguanga situation, there

25   is certainly a vast difference between what Mr. Kunkel has

1    testified to and the testimony of Dr. Mann.

2            THE COURT:  Proceed.

3            Take the witness stand, Mr. James.

4            (The witness resumes his seat on the witness stand.)

5    BY MR. VEEDER:

6            Q  In regard, then, to the location of the geology,

7    the faults in particular, it is principally then the work

8    of Mann which appears on the exhibit Plate 13B?

9            Don't shut that off (referring to the light table).

10           MR. SACHSE:  Let it cool off.

11           THE WITNESS:  Would you repeat the question?

12           THE COURT:  Read the question, Mr. Reporter.

13           (The reporter read the pending question.)

14           THE WITNESS:  The answer to that is no.

15   BY MR. VEEDER:

16           Q  In regard to the faults?

17           A  You said, in your first statement, as I got it,

18   you asked in regard to the faults and the geology, if I got

19   your statement correct; and as far as the faults go, we

20   utilized his work after satisfying ourselves that it was

21   accurate.

22           Q  In otherwords, you are stating into the record under

23   oath that you checked out all these faults that appear on

24   here and you know them personally to be accurate?

25           A  Those under my direction looked over all of this

1    mapping that we have presented here on our exhibit.

2        Q   What, in your opinion, then, is the effect of the

3   fault that you have drawn up through Terwilliger Valley upon

4   the availability of ground water for use in that area?

5        A   By Terwilliger Valley you mean Anza?

6        Q   Well, Anza is the term that you have used.   What

7   is the effect of that fault upon the movement and sources of

8   ground water?

9        A   The fault acts as a, in my opinion, a partial barrier

10   to movement of water across it, as evidenced by a drop in the

11   level of water in wells that are located on either side of

12   the fault.

13        Q   And you feel, then, that there is less or more water

14   available by reason of it?

15        MR. MOSKOVITZ:   Less or more available where?

16        MR. VEEDER:   In the Terwilliger Valley.

17        MR. SACHSE:   Above or below the fault?

18        THE COURT:   Make your question more clear, Mr. Veeder.

19   The objection is sustained.   You say more or less water

20   available where?

21        MR. VEEDER:   In the Terwilliger Valley.

22        THE COURT:   Which side?

23        MR. VEEDER:   The whole valley.   Can't we start with a

24   general question?

25        THE COURT:   Reframe your question.

BY MR. VEEDER:

Q   What is the effect upon the availability and the use of ground water in Terwilliger Valley by reason of the fault that you have depicted on L Table 15-1?

A   I am referring to Plate 11B here in Bulletin 57, on which this fault is shown and on which also are shown the ground water contours for the inland area as determined in the fall of 1953.

Q   I am asking you to testify in regard to another exhibit, Mr. Witness-- L 15-1.

THE COURT:   Just a minute.   The witness has a right, in answering your question, to refer to any exhibit he wants to.

Proceed.   Your question is, what is the effect of the fault on ground water?

Go ahead, Mr. James.

THE WITNESS:   On the exhibit to which I referred, it is shown that there is a barrier effect, this fault acts as a barrier north of the highway designated as Coahuila Highway on that Plate, and that south of that area there is no appreciable barrier effect to the movement of water, at least as indicated by these contours-- the contours cross the fault.

MR. VEEDER:   I observe, your Honor, that it is noon.

THE COURT:   All right, adjourn until 2 o'clock.

(Noon recess.)

1  <u>SAN DIEGO, CALIFORNIA, FRIDAY, DECEMBER 12, 1958.  2:00 P. M.</u>

2

3       (Another matter.)

4       THE CLERK:  Number three on the calendar, 1247-SD-C,

5  United States vs. Fallbrook Public Utility District, et al.

6  Further court trial.

7

8                  LAURENCE JAMES,

9  recalled as a witness in behalf of the defendant State of

10  California, having been previously sworn, testified further

11  as follows:

12

13                  CROSS-EXAMINATION (Resumed)

14  BY MR. VEEDER:

15       Q  One more series of questions, Mr. James, in regard

16  to the use of the work by Mr. Mann or Dr. Mann, whatever his

17  name is.  You also used his work to locate, did you not, both

18  the Willard fault and the Wildomar fault?

19       A  We considered it.

20       Q  And actually they are virtually the same on both

21  L 15-3 and L 15-1; isn't that correct?

22       A  (The witness stepping down from the stand.)

23       Q  You locate it, if you want to.

24       A  It doesn't look virtually the same to me.  Here is

25  a difference here.

1          Q  Let us get this pulled around so that we have it

2      exactly in place.

3          A  It doesn't look the same to me.

4          THE COURT:  I suppose what you are getting at is this--

5      BY MR. VEEDER:

6          Q  It does run right virtually on the same lines.  I

7      am again referring to L 15-1 and L 15-3..

8          A  Well, the fault does run there.  The fact that he

9      shows it there and we show it there, too, it is expected.

10          Q  Do you think it is expected that you would each

11      infer the same place?

12          A  Yes.

13          Q  The map on which Mann did his work is of the same

14      scale as the 15-1, isn't it?

15          MR. MOSKOVITZ:  You are referring to Exhibit L 15-3?

16          MR. VEEDER:  Yes.

17          MR. MOSKOVITZ:  And Exhibit L 15-1?

18      BY MR. VEEDER:

19          Q  Isn't that the same scale?

20          A  That is a common scale.

21          Q  Is it presently in use, for instance, by the United

22      States Geological Survey?  Isn't that the base from which you

23      took it?

24          MR. MOSKOVITZ: Which question are you asking, Mr.

25      Veeder, whether it is in use or whether--

BY MR. VEEDER:

Q  Well, is this the scale that is used by the United States Geological Survey?  Do you know?

A  The United States Geological Survey at the present time uses one to 24,000.

Q  And what is this?

A  I don't recall offhand what it says on it.  I don't see on the legend.  It is not indicated.

Q  Well, it is indicated on the Mann map, which is L 15-3, as being --

A  If you are implying that we adopted the scale for our geology map, selected that scale because it was the same scale as Dr. Mann's map, you are incorrect.  That is not the reason.

THE COURT:  Let the record show that the drawings are not identical, Mr. Veeder to the contrary.

MR. VEEDER:  I haven't said they are identical, your Honor.

THE COURT:  That the south side of the Elsinore fault on the line lying near the confluence of the Temecula and Murrieta are not identical; that across the Temecula Valley L Table 15-1 proceeds about a quarter of an inch diverging from the line shown on L 15-3; that the Elsinore fault, as shown on L 15-3, is drawn in a southeasterly direction only to the Santa Rosa Mountains, while on L 15-1 the projected

1  fault extends through the--

2         MR. VEEDER:  It is inferred a little further, is it

3  not?

4         THE COURT:  --it is inferred clear through the Santa

5  Rosa Mountains almost to Temecula Canyon.

6         MR. VEEDER:  And being inferred throughout, your Honor.

7         THE COURT:  And that on 15-1 it is also inferred from

8  Temecula Canyon in an easterly and southerly direction to a

9  place diverging by three-eighths of an inch from where it is

10  shown on L 15-3.  I am calling attention to this one here.

11         MR. VEEDER:  Yes, and those inferences are simply

12  little dashes that any office boy could put on.

13         Now, I offer in evidence L 15-3.  I don't know whether

14  L 15-1 has been received.  I offer both those in evidence.

15         THE COURT:  L Table 15-1, the large map from which

16  Plate 13B was made, will be received in evidence.

17         And L 15-3, which is Dr. Mann's map, will be received

18  in evidence.

19         (Defendant State of California's Exhibit L Table 15-1

20  and L Table 15-3 were received in evidence.)

21  BY MR. VEEDER:

22         Q  Now, did you, in the preparation of any of the

23  other plates which have been offered in evidence, utilize

24  substantially or in their entirety any other drawings from

25  Dr. Mann's work?  Do you recall?

1    A  We considered his work.

2    Q  I am referring in particular to Plate 14, which

3 would be California's Exhibit L-14-- I believe that is the

4 designation that has been given to it.

5    A  We considered his work.

6    Q  And referring now to the cross-section A, A-prime

7 on California's Exhibit L-14, would you state whether you

8 were guided in the preparation of that plate by the work of

9 Dr. Mann?

10    A  Let me state that the particular location of this

11 geologic section was selected because the only well in the

12 entire Murrieta Basin that penetrates bedrock lies on this

13 line of section.  I am referring the the Bernard well, Well

14 No. 7S, 3W, 21H1.

15    Q  Will you answer the question?  Did you or did you

16 not utilize Dr. Mann's material in preparing the cross-section

17 A, A-prime on California's Exhibit L-14?

18    MR. MOSKOVITZ:  I think that question was asked and

19 answered, your Honor.

20    THE COURT:  The objection is overruled.

21    THE WITNESS:  It depends upon--

22    MR. VEEDER:  It can be answered yes or no.

23    MR. MOSKOVITZ:  Just a moment.  He can explain his

24 answer.

25    THE COURT:  He has to answer it before he can explain

1    it, Mr. Moskovitz.

2           MR. MOSKOVITZ:  Does he have to give a yes or no

3    answer?

4           THE COURT:  He has to try to answer the question.

5           The question is, did you utilize Dr. Mann's work in

6    preparing Exhibit L-14?

7           THE WITNESS:  Yes, we utilized it and we considered

8    it and we used our own knowledge of the areal geology and

9    subsurface geology of the area also in compiling this section.

10   BY MR. VEEDER:

11          Q  And you would say it is almost a Chinese copy,

12   isn't it?

13          A  No, I wouldn't say so.

14          Q  You would say that it is almost an identical copy,

15   is it not?

16          THE COURT:  Chinese copy of what?

17          MR. VEEDER:  I am referring to Dr. Mann's cross-

18   section taken from the report which your Honor, I think, has

19   there.

20          THE COURT:  From L 15-4.

21          MR. MOSKOVITZ:  May I see this a moment, please.

22          (The Court hands a document to Mr. Moskovitz.)

23          MR. MOSKOVITZ:  Mr. Veeder, was this in the pocket part?

24          MR. VEEDER:  Yes.  You had better identify the exhibit

25   to which you are referring.

1        THE COURT:  By "this", he refers to the cross-section

2    of Murrieta Valley, and by the pocket part he refers to L

3    15-4.

4        MR. MOSKOVITZ:  I suggest that Mr. Veeder could

5    identify it first.  He just handed something to the witness

6    without even indicating where it came from.

7        THE COURT:  The objection is overruled.  He may ask

8    the witness if this is what he relied upon.  The question

9    pending is what-- something about a Chinese copy?

10       MR. VEEDER:  Yes.

11       Q  Isn't this copy to which I am now referring, taken

12   from the pocket of Exhibit L 15-4, referring to A, A-prime,

13   virtually identical with Plate A, A-prime of the Murrieta

14   Valley?

15       A  To my knowledge it is not virtually identical.  It

16   is a section drawn along the same line on the surface for the

17   reason which I stated earlier.

18       Q  Along the same line as what, now?

19       A  Along approximately the same line as-- the two

20   sections are drawn along approximately the same line.  The

21   reason they were so drawn, or the reason ours was drawn

22   along that line was because of this one controling well which

23   I mentioned earlier, the Bernard well, the only one which

24   reaches the basement in Murrieta Valley.  I would be surprised

25   if they were not strongly similar-- in fact, then I would

James    Cross    6467

1    be alarmed.  You will note on the easterly end, the right-

2    hand end of A, A-prime on Plate 14 of our exhibit, there is

3    a marked difference.

4        Q  And what is that difference?

5        A  We show on our exhibit, Plate 14, Bonsall tonalite,

6    mapped on the northeasterly end of the section.

7        Q  How did you arrive at that?

8        A  This was taken from our mapping, from our field work.

9        Q  And from your surface investigation you were able to

10   draw the depth that you show there on the cross-section?

11       A  I don't understand your question.  We have Bonsall

12   tonalite shown on the section.  We have a contact--

13       Q  How do you know that it reaches all the way down

14   to the bottom of the cross-section?  What proof did you have

15   of that?

16       A  Because of the occurrence of the rock known as

17   tonalite.  It is an intrusive rock which will extend to con-

18   siderable depth.  It can extend down 20, 30 miles.

19       Q  Do you know that it extends as deep as shown on

20   A, A-prime?

21       A  We haven't been down there to look at it, no.  Our

22   contacts are shown with question marks.

23       Q  You don't know?

24

25

1  BY MR. VEEDER:

2        Q  In regard to the areas which have been depicted on

3  Plaintiff's Exhibit 15A as older alluvium and which will appear

4  on the A A' of California's Exhibit L-14, how did you know the

5  depth of the older alluvium as depicted there?

6        A  We don't know exactly--

7        Q  You don't.

8        A  -- what it is, nor does anybody else.

9        Q  In other words, you have no basis for knowing the

10  depth of the older alluvium as depicted on that exhibit?

11        A  We have it at the Bernard No. 2 well.

12        Q  The older alluvium?

13        A  The older alluvium.

14        Q  And you infer your conclusion from the Bernard well

15  over east of Highway 395, is that correct?

16        A   In drawing the bottom.

17        Q  Would you answer the question?

18        MR. MOSCOVITZ:  Your Honor, I think he is badgering the

19  witness.  The witness is trying to answer.

20        THE COURT:  Let him answer the question.

21        MR. VEEDER:  Yes.

22        THE WITNESS:  Repeat it.

23        MR. VEEDER:  Read the question.

24        (The reporter read back the question.)

25        THE COURT:  I don't even understand what it means.

THE WITNESS:  I don't either, your Honor.

THE COURT:  Ask it again, Mr. Veeder.

BY MR. VEEDER:

Q  You have shown Bernard well, and then you show--

THE COURT:  That is 2-N-2H-1 -- 21H-1?

THE WITNESS:  Yes, your Honor.

THE COURT:  All right.

BY MR. VEEDER:

Q  Then you show older alluvium continues on across--

A  Now, where are you talking now where I show the older alluvium?

Q  I am looking at this exhibit, young man.

A  It refers on all sides of this well, Mr. Veeder, and I want to get your questions straight, sir.

THE COURT:  He is referring to the older alluvium extending eastward from Well 21H-1 easterly across Highway 395 for another distance to where it joins the area of more solid material.

THE WITNESS:  Your question was?

BY MR. VEEDER:

Q  Why did you make that inference from the Bernard well?

A  We know from examination of these faults.  We have reason to know which way  they have moved, which way one side moved relative to the other.  Now, the block on the northeast

E1
S32

side of the Bernard well, we know moved upward relatively to

the block in which the Bernard well is located.  Just how far

that displacement was, what the distance was, we don't know.

But we do know that it moved in that direction, and we know that

the contact between the formation shown as Tsrb and Tmz on this

section is somewhere in that area.

Q  But you have no idea about the depth of the older

alluvium there, do you?

A  We don't know exactly, no.  We know it is somewhere

within that range.

Q  Why do you know it is within that range?

A  Because we know that fault moved in the direction

that it moved.

Q  And you know that this Tmz was flattened out the

way it is shown there, there are no irregularities in the Tmz?

A  No, we don't know that.

Q  You have just drawn that in schematically, is that

right?

A  That is true.

Q  So what was the basis upon which you arrived at

that conclusion, then?

MR. MOSCOVITZ:  I think that question has been asked

and answered.

THE COURT:  Overruled.

THE WITNESS:  Let me answer that this way:  We know the

1    contact is there, which I have told you.  We do not know what

2    the shape or what the configuration is of that contact.  We do

3    not know exactly where it is.  But we do know one thing:  We

4    know it is there, and we know it is about where it is located

5    in the Bernard well.  And, therefore, we are following the old

6    American custom; we are putting it down as best we can to give

7    the general idea of what the picture is.

8            Q  Is that an old American custom?

9            A  Well, that is my understanding.

10           Q  In regard to the contours of the basement complex

11   underlying the older alluvium, you have absolutely no informa-

12   tion, have you?

13           A  We have the Bernard well.

14           Q  I am speaking now of the area between the Wildomar

15   Fault and this extremity that you show in older alluvium.

16           A  Well, you are speaking strictly along this line of

17   section?  I am referring to section A A'.

18           Q  Oh, yes, A A' on Exhibit 14.

19           A  And your question is again?

20           Q  How do you know the configuration of the contour of

21   the basement complex which is underlying the older alluvium?

22           MR. MOSCOVITZ:  I think the witness has already answered

23   he doesn't know exactly what it is.

24           THE COURT:  Overruled.

25           THE WITNESS:  I will answer that, that I don't know the

1    exact configuration of the surface.

2    BY MR. VEEDER:

3         Q  Why do show that the older alluvium is shallower in

4    the area between the two faults which appear-- oh, well, the

5    number 30 is virtually in between the two of them on section

6    A A'.  How did you know the difference in the levels there of

7    the older alluvium?

8         A  We do not know  the exact level, but we do know again

9    the relative movement of the faults which  would place that

10   particular block above the block that lies to the southwest.

11        Q  So you have really no knowledge whatever as to the

12   gradient of the basement complex underlying the older alluvium;

13   isn't that correct?  In the area to which I have just made ref-

14   erence?

15        A  I don't understand just what you mean by "gradient."

16        Q  You  don't know which  way the basement complex

17   slants or that it is leveled, do you?

18        A  We know that we  are reasonably sure that it is not

19   level for the reason I tried to explain, that the movement along

20   these faults,  the way these fault blocks have raised.

21        Q  Now, I observe that on your A A' that you have de-

22   picted a strata of what you have marked as Qal.

23        MR. MOSCOVITZ:  In what area?

24   BY MR. VEEDER:

25        Q  Where you show Murrieta Creek.  Again looking at A A'

1    on  Plaintiff's Exhibit 14.  Do you see that?

2         A  Yes.

3         Q  How do you know that that is a fact?

4         A  The depth of that material, we infer, as best we

5    can, from our observations of  well logs within the basin with-

6    in that vicinity.

7         Q  Would you  state whether that depth is 520 feet?  Is

8    it?

9         A  I can't state offhand.  I don't believe it is.

10        Q  You don't believe it is.

11        If you will take the ground water, the Plate B-3 and

12   look on page B-47--

13        THE COURT:  Referring to Appendix B, now?

14        MR. VEEDER:  Yes, your Honor.

15        THE COURT:  All right.

16   BY MR. VEEDER:

17        Q  You will find in the column under heading of "Maxi-

18   mum depth to storage unit in feet, 520"-- now, is that 520 feet

19   of recent alluvium or is it not?

20        A  I have looked over this recently, and the best I can

21   tell, that is a mistake in our table here--

22        Q   In other words--

23        A  -- that--

24        Q  -- what would  be correct-- Mr. Moscovitz, quit sig-

25   naling the witness.

1        MR. MOSCOVITZ:  I am not signaling the witness.  I

2    think you interrupted him before he finished his answer.

3    BY MR. VEEDER:

4        Q  You  say that the 520 is an error?

5        A  Yes, according to my note here.

6        Q  And what is the correct figure, then?

7        A  I have a well here that is 449 feet, but I don't

8    have a notation here as to what it would  be, the depth of the

9    alluvium, if that  was your question.

10        Q  Now, I  refer to footnote A following the "136,000

11    acre feet usable storage capacity," and footnote A says:

12    "Usable  storage capacity  calculated between historic high

13    water table and a surface 25 feet above the base of Recent

14    alluvium"; and the word "recent" is capitalized.  Now, which

15    is correct, the 449 feet or the 520?

16        A  Well, this involves going into--

17        Q  Could you answer?

18        A  I can't answer that offhand.

19        Q  You don't know.  How would you--

20        A  We have these worked up in our calculation sheets.

21        Q  How would you arrive at a level 25  feet above  the

22    base of  recent alluvium?  What kind and type of  calculation

23    would you engage in to make such a determination?

24        A  In many of our basins--

25        Q  I am speaking of the Murrieta Basin.

E2
S37

1    A  There has to be a certain amount of storage left in

2    the bottom of a basin in order to get a movement of water from

3    the materials into the well.  In other words, you can't pull a

4    well clear on down, because there has to be some left in the

5    bottom in order to create a cone of depression so the water will

6    flow  from sediments into the well.  That was the reasoning in

7    selecting that figure.

8        Q  How did you arrive  at the 25 feet  above the base

9    of  the  recent alluvium in Murrieta Valley, I asked you?

10       A  Well, the 25 feet is a figure which  we felt, we

11   feel, is sufficient to  allow water to move from the material

12   into the well.

13       Q  And  what is  the depth  of the  recent alluvium in

14   Murrieta Valley?

15       A  This is in our, the way we computed this is in our

16   computation sheets.  I can't give you this right here offhand.

17       THE COURT:  Referring to your Plate L-14 in evidence,

18   the Qal in Murrieta,  referring to the Murrieta segment  there--

19       THE WITNESS:  Yes, sir.

20       THE COURT:  -- evidences a younger alluvium; right?

21       THE WITNESS:  That is true.

22       THE COURT:  This is drawn  to scale, is it?

23       THE WITNESS:  Approximately.  This--

24       THE COURT:   If that is drawn to scale, taking the

25   scale on the left-hand side, the depth of the  recent alluvial

1    can't be more than 75 feet, a hundred feet at the outside?

2           THE WITNESS:  At that point, yes.

3           THE COURT:  Right?

4           THE WITNESS:  Yes, sir.

5           THE COURT:  How do you square that with this you are

6    talking about on Table B-3 in Appendix B of a 520 figure feet,

7    or, if that is in error, of 450 figure  feet, something like

8    that?

9           THE WITNESS:  In this particular basin, your Honor, we

10   actually took into consideration some storage within the older

11   alluvium.  We did this because we  had wells that penetrated

12   that older alluvium; and, although  we didn't know how much

13   water was being supplied by that older alluvium, we knew that

14   the wells entered it, and we considered it.  We actually used

15   as a bottom of our storage unit a base which was predicated upon

16   the depths of the deepest logged wells within the  basin.

17          THE COURT:  You say  in Table B-3:  "Wells supplied by

18   both recent and older alluvium."

19          THE WITNESS:  That is true.

20          THE COURT:  So  in figuring your Murrieta storage  basin,

21   you took the  rather thin area here of  recent alluvium  and

22   also a good portion  of the older alluvium?

23          THE WITNESS:  That is true, your Honor.

24   BY MR. VEEDER:

25          Q  In other words, your footnote A is in error in regard

E2
S39

1    to Murrieta Valley, is that right, on page B-50?

2              A   It depends on just how you look at it.

3              Q   Let's look at it the way it is written.

4              THE COURT:   It is in error, is it not?

5              THE WITNESS:   Yes.

6              THE COURT:   This footnote A refers to Murrieta Basin,

7    and that is where the footnote appears, among other places.

8    You say:   "25 feet above the base of recent alluvium."

9              THE WITNESS:   Actually, for the purpose of compiling

10   this estimate, we figured the deepest logged wells as being in

11   recent alluvium, so to  speak.   That is, as exceedingly diffi-

12   cult as it is to  differentiate between recent and older allu-

13   vium, we recognized that when we--

14             THE COURT:   You say, when you took them as  being in

15   recent alluvium, you mean you considered the well log knowing

16   that the well went through the recent alluvium into the older

17   alluvium?

18             THE WITNESS:   Yes, we did.   We used it  because that

19   seemed like the sensible thing to do.

20   BY MR. VEEDER:

21             Q   So it is in error, then, to  say that footnote A

22   has application to Murrieta Valley?

23             A   Insofar as stating strictly 25  feet above the base

24   of recent alluvium, that--

25             Q   In other words, in regard to both the number 520 as

MALCOLM E. LOVE, OFFICAL REPORTER

1    a maximum depth, and in regard to the 25 feet  above the base

2    of recent alluvium, both of your statements are incorrect so far

3    as they pertain to Murrieta Creek?

4         A  Well, in regard to the 520 feet at the present time,

5    I am unable  to find a log of a well that goes that deep, to

6    520.  Now, it may be that we had that thing at the time this

7    table was compiled, but I can't find it now.  That is the  case.

8         Q  Certainly, the 520 would have no application-- it

9    would certainly eliminate the use of footnote A if the well was

10   520 feet deep; isn't that right?

11        A  If you regard this recent alluvium-- I don't know

12   how to answer that question, Mr. Veeder.

13        Q  Because you don't know how you arrived at the cal-

14   culations, do you?

15        A  No, that is not true.

16        Q  Then, how did you arrive at them?

17        A  As a matter of fact, at the judge's instructions,

18   we are going over this estimate and compiling a calculation to

19   show how it was done.  I am in the process of doing that.

20        MR. MOSCOVITZ:  Your Honor, that is coming in and will

21   be in detail, and I think for cross-examination.

22        THE WITNESS:  I think it will explain many of these

23   things.

24   BY MR. VEEDER:

25        Q  The only method by which you could explain what you

1    have on page B-47 is by going outside of Appendix B, is that

2    correct?

3        A  Well, we go outside insofar  as we utilize the cal-

4    culation sheets that  were put together to fill this table.

5        Q  In other words, you go outside of the Appendix B?

6        MR. MOSCOVITZ:  I think this is argumentative, isn't

7    it, your Honor?

8        THE COURT:  Overruled.

9    BY MR. VEEDER:

10       Q  You go outside of Appendix B to arrive at this fig-

11   ure, don't you?

12       A  Our calculation sheets are not included in Appendix

13   B.

14       Q  Nor are the data upon which you are making your

15   smoke-filled room calculations in the Appendix B; isn't that

16   right?

17       THE COURT:  Let's ask a lawyer-like question.  Strike

18   the question out.  Ask another one.

19   BY MR. VEEDER:

20       Q  Is it true that you must go beyond Appendix B to

21   procure data upon which to make calculations in regard to the

22   usable storage capacity in acre  feet?

23       A  That is true.

24       THE COURT:  Let me ask this question:  I understand you

25   to say that the younger alluvial in Murrieta is a thin layer.

E2
S42

1   MR. VEEDER:  I think he said 75 feet, your Honor.

2   THE WITNESS:  We don't know just how thick, your Honor.

3   THE COURT:  Your plate fourteen shows it to be--

4   THE WITNESS:  That is our best estimate.

5   THE COURT:  It is your best judgment?

6   THE WITNESS:  Yes.

7   THE COURT:  But in figuring the storage capacity of the

8   Murrieta Basin you use not only  the younger alluvial, but you

9   used the older alluvial that underlay it?

10  THE WITNESS:  That portion of the older alluvium that

11  was penetrated by wells.

12  THE COURT:  Is that older alluvial that underlies the

13  Murrieta Valley, in your opinion, the same as the older alluv-

14  ial that lies east of Murrieta Valley in the area shown as

15  older continental on Government's 15?

16  THE WITNESS:  It is the same formation, to the  best

17  of my knowledge, your Honor, but whether it is the same, has

18  the same physical characteristics, I doubt; because this is a

19  very heterogeneous formation that varies from place to place.

20  THE COURT:  Wouldn't your  best judgment be that the

21  older alluvial under the Murrieta Valley was probably the same

22  kind of  older alluvial that appeared on the surface east of

23  the Murrieta Valley?

24  MR. VEEDER:  East of the Wildomar Fault.

25  THE COURT:  Well, east of Murrieta Valley.

THE WITNESS:  It is the same formation.

THE COURT:  Wouldn't your judgment be that at the time this younger alluvial was laid in the Murrieta Valley, the older alluvial spread across there and there was a low place in Murrieta Valley where the younger alluvial filled in?

THE WITNESS:  Well, the point--

THE COURT:  Isn't that true?

THE WITNESS:  Please ask that again.

THE COURT:  Go back to the time when the younger alluvial began to fill up in the Murrieta Valley.  At that time, the bottom  and the sides and the extension to  the east of Murrieta Valley was all older alluvium?

THE WITNESS:  True.

THE COURT:  And this was deposited in the Murrieta Valley on top  of the older?

THE WITNESS:  Yes.

THE COURT:  Wouldn't you be inclined to think, therefore, that the older alluvial underlying the younger in the Murrieta Valley  was of the same character as the older alluvial shown up on the higher ground to  the east of Murrieta Valley?

THE WITNESS:  No, your Honor, for this reason:  My answer to that is-- I just don't know  because of the difference, the differences in this material as we proceed in a lateral direction.

THE COURT:  Well, is the older alluvial, in your opinion,

E2
S44

1   less permeable than the younger alluvial?

2        THE WITNESS:  Yes, sir.

3        THE COURT:  How do you square your position that the

4   older alluvial under the younger in the Murrieta Valley is part

5   of the water storage unit, and yet the older alluvial lying on

6   a higher elevation to the east of the Murrieta Valley is too

7   impermeable  to be a water basin?

8        THE WITNESS:  Well, we know--  actually, it is from what

9   we-- actually, data we have available,  we know  where these

10  wells penetrated in the Marrieta Basin that there is some water

11  obtained from those wells.  However, we do not know what pro-

12  portion of the yield of each one of those  wells is from the

13  recent alluvium and what proportion comes from the deeper

14  lenses in the deeper material.  But, since the wells do pene-

15  trate it, they  are perforated in it, we felt it was the wise

16  thing to do  to include it in our storage unit.

17       THE COURT:  In Murrieta Valley?

18       THE WITNESS:  In Murrieta Valley, yes, sir.  The other

19  areas,  we don't know enough about them.

20       THE COURT:  All right.

21  BY MR. VEEDER:

22       Q  And you are talking about your new calculation; you

23  are not talking about the exhibit that is now in evidence?

24       A  There are no new calculations.  What we are compil-

25  ing is an explanation of the calculations.  There are many, many

1  calculations.  We have many envelopes and books full of calcu-

2  lations.  And, according to the Court's instruction,  we are

3  setting forth how these were utilized, how they went about

4  storage testimony.

5      MR. VEEDER:  I want the record to show that I asked

6  that this material be made available to me, and it has not been

7  made available.

8      THE COURT:  Just take it easy.  They will be made avail-

9  able when the work is completed.

10 BY MR. VEEDER:

11     Q  Would you take your ruler and measure on Exhibit 14,

12 using the scale, advise us the depth of that which you have

13 designated as recent alluvium?

14     MR. MOSCOVITZ:  The witness doesn't have a ruler with

15 him, your Honor.

16     MR. VEEDER:  Well, I will tell you:  I will bet we can

17 find one.

18     THE COURT:  I have one.

19     THE WITNESS:  I can scale it off with a piece of paper.

20     (Witness handed ruler.)

21     THE WITNESS:  Now, there are several-- two places here.

22 BY MR. VEEDER:

23     Q  I am looking at Murrieta Creek.

24     A  Murrieta Creek, all right.

25     Q  What is the scale?

1          A   This is a ten scale I am using here.

2          Q   And what is the scale on the map; I mean, on the

3   diagram?

4          A   The scale on the diagram is approximately-- let me

5   select a  better scale-- approximately three-quarters of an

6   inch equals a thousand feet.  I am not trying to be facetious,

7   but I think this is like trying to measure the diagram of a

8   potato with a caliper.

9          Q   It is not even funny.  Let the record show an ex-

10  tremely long pause.

11         A   It is rather difficult to measure when it is on the

12  scale it is.

1    It is on the order of a hundred feet, as near as I can

2  get it.

3    Q  You stated to the Court that it was 75.  Which is

4  correct?

5    MR. MOSKOVITZ:  I don't think he said it was 75.  You

6  suggested that it was 75.

7    THE COURT:  I so recall.  I just estimated 75 or 100,

8  according to the scale.  I was the one that asked him for an

9  approximation.

10    Scaling it out, you would say it was closer to 100?

11    THE WITNESS:  That is what I get.

12    THE COURT:  Of the younger alluvium?

13    THE WITNESS:  Yes.

14    THE COURT:  Shown on Plate 14.

15  BY MR. VEEDER:

16    Q  How did you arrive at the shape of the Qal shown

17  on Plate 14, which you originally designated as 520 feet in

18  Appendix B and which you now say is approximately 100?

19    MR. MOSKOVITZ:  I think he is misstating the record,

20  your Honor.

21    THE COURT:  Well, he is coming pretty close to stating

22  the record, but I will sustain the objection to the question.

23  Let us not make your questions argumentative.  Just ask your

24  questions.

25

BY MR. VEEDER:

    Q  How did you arrive at the shape of the Recent alluvium which is depicted on California's Plate 14?

    A  Used our best judgment.

    Q  It is to scale, is it not?

    A  The scale is shown on the side of the section and we used our best judgment in drawing what we thought would be a reasonable configuration of the base of the Recent alluvium.

    Q  You had no well logs that would show such a configuration?

    A  We utilized well logs where they were available.

    Q  But did you have well logs to make this configuration?

    A  On this particular section, this section doesn't show the well logs of wells or the wells in that area.

    Q  Well, then, how did you arrive at the configuration?

    A  We took--

    MR. MOSKOVITZ:  I think that question has been asked and answered, your Honor.

    THE COURT:  Overruled.

    THE WITNESS:  We considered the well logs that were available, the location of those wells, our best judgment as to where the base of the alluvium would appear on those wells--

    Q  Had the wells been drilled?

1     A   Sir?

2         MR. MOSKOVITZ:  Would you please let the witness

3   finish his answer.

4         THE COURT:  Please don't interrupt facetiously, Mr.

5   Veeder.

6         Go ahead, Mr. Witness.

7         THE WITNESS:  And then we used our best judgment and

8   this information to arrive at a bottom of the Recent alluvium.

9   BY MR. VEEDER:

10        Q   So as a matter of fact, you arrived at this con-

11  figuration by using wells which are not shown on Plate 14; is

12  that correct?

13        A   That is correct.

14        Q   Now, which were those wells that you used in making

15  this configuration?

16        A   I can't tell you offhand.

17        Q   Well, will you give us the notes?  You must have

18  something to show how you arrived at that configuration.

19        A   Well, these wells are shown on a-- all the wells

20  are shown on our well log plate, which is contained in

21  Bulletin 57, Plate 9B, and we took those that had well logs

22  in that vicinity and considered them.

23        Q   Well, now, would you give me a list of those?

24        A   This is standard geological practice.

25        Q   Would you give me a list of those wells that you

1    used in arriving at that configuration?

2         MR. MOSKOVITZ:  Your Honor, I think he told him which

3    wells were used.

4         THE COURT:  Sustained.  I understand what the witness'

5    is stating, and I think you do.

6         MR. VEEDER:  No, I truly don't, your Honor.

7         THE COURT:  He studied these well logs throughout the

8    Murrieta Valley.  He has the well logs on Plate 9B.  Then he

9    came up with a conclusion.  These geologic opinions are

10   approximations.  He came up with the opinion that this veneer

11   of younger alluvium was rather thin and he so showed it on

12   Plate L-14.

13        MR. VEEDER:  And he showed it in scale.

14        THE COURT:  He might not have found a well that went

15   right through the particular cross-section that he was draw-

16   ing.  If you found well logs in existence showing this younger

17   alluvium being rather shallow, you conclude that therefore it

18   is shallow elsewhere along the Murrieta Valley.

19        Let's go ahead.  Let's get to something else a little

20   more material.

21        MR. VEEDER:  Your Honor, this to me is extremely

22   material.  I look at this matter of cross-examining under

23   canned testimony as being extremely difficult, and particularly

24   with the circumstances.

25        THE COURT:  Well, when you make your point proceed to

1      another one.  I think I am following your cross-examination.

2      Let us not beat each one of these to death.  You have already

3      developed the fact that he has used older alluvium to figure

4      a base for Murrieta Valley.  Let us go on to something else.

5      You contend, don't you, that the veneer of younger alluvium

6      in Murrieta is raltively thin?

7               MR. VEEDER:  Do I?

8               THE COURT:  Yes.  That is the United States's position,

9      is it not?

10              MR. VEEDER:  Yes.

11              THE COURT:  All right.

12              MR. VEEDER:  But I am also contending that California

13     could never issue permits based upon Bulletin 57.  That is

14     the primary thing I am shooting at.

15              MR. MOSKOVITZ:  Your Honor, then I move to strike all

16     this cross-examination, because it is irrelevant to this

17     case.

18              MR. SACHSE:  I am inclined to agree.

19              THE COURT:  If you are going to stand on that--

20              MR. VEEDER:  It is just one of the things, your Honor.

21              THE COURT:  Just one of the things?

22              MR. VEEDER:  Yes.

23              May I have the plate at which your Honor is looking?

24              THE COURT:  Yes.  Go ahead.

25              MR. SACHSE:  Is there one other thing in addition to the

James Cross

1    permits?

2          MR. VEEDER:  I am impeaching this witness, too.

3          Q  Now, did you not take from Dr. Mann's cross-section

4    the depth of Recent alluvium rather than well logs?

5          A  No.

6          Q  Isn't it identical with Plate 14?

7          A  If it is, I can't see that it is.

8          Q  You used the same cross-section, however, did you

9    not?

10         A  We used the same line of section, yes, for the

11   reason I stated.

12         Q  Now, how do you distinguish between the younger and

13   the older alluvium at the point where you have marked the

14   Recent alluvium on cross-section A, A-prime.  How did you

15   arrive at that?

16         MR. MOSKOVITZ:  Is this Murrieta Valley?

17         THE COURT:  Yes, Plate 14.

18         MR. MOSKOVITZ:  There is another Recent alluvium shown

19   there.

20         THE COURT:  You are talking about Murrieta Valley?

21         MR. VEEDER:  Yes, A, A-prime is right there.

22         MR. MOSKOVITZ:  For the record, A, A-prime also shows

23   recent alluvium in another place.

24         MR. VEEDER:  I am talking about Murrieta Springs.

25         THE WITNESS:  To the best of my knowledge, I have

1    answered this already.  I will repeat it.  That is, that we

2    utilized and considered well logs, surface geology--

3    BY MR. VEEDER:

4        Q  Now, using those well logs, how did you determine

5    which is Recent and which is older alluvium?  That is the

6    question.

7        A  Well, as I stated into the record before, this is a

8    very difficult thing to resolve.  We just used the best of

9    our judgment about where it appeared to be more permeable,

10   where it appeared likely on the log that this contact occurred

11   there, we drew it in.

12       Q  But you really have no knowledge, do you, as to where

13   to draw that line by reason of viewing the well logs?

14       A  Well, only our best judgment and geologic interpre-

15   tation.

16       Q  Now, if the Recent alluvium-- did you say a hundred

17   feet deep?

18       A  That is what I got roughly with the scale.

19       Q  And then you calculated 25 feet above that depth

20   to estimate your storage capacity; isn't that right?

21       A  Well, no, I think I explained to his Honor here just

22   a minute ago that in Murrieta Basin we utilized as a base of

23   our storage unit a base which was taken from the deepest logged

24   wells in that basin.

25           THE COURT:  Which went into the older alluvium?

1    THE WITNESS:  Yes, your Honor.

2  BY MR. VEEDER:

3    Q  And then there was 25 feet above that depth that you

4  used to make your calculation?

5    A  That is true.

6    Q  So basically therefore California's Appendix B in

7  regard to Murrieta Valley is in error?

8    A  Are you saying that Appendix B is in error, or just

9  what?

10    Q  The part relating to Murrieta Valley, as set forth

11  in California's Appendix B, Table 3--

12    THE COURT:  That has been covered.  He conceded that

13  there are two errors in Table B-3.  Let us go on to something

14  else.

15  BY MR. VEEDER:

16    Q  Now, turn to page B-50 and look at Rainbow ground

17  water basin.  Are you there?

18    A  Yes.

19    Q  Now, you say that you made your calculations on the

20  basis of usable storage capacity calculated between the historic

21  high water table and the surface 25 feet above base of Recent

22  alluvium.  In other words, as I see it, you were calculating

23  the storage capacity well above the ground; is that not right?

24    A  No, we didn't calculate storage capacity above the

25  ground.

1      Q  How did you calculate it, if you went 25 feet above

2  the base and the alluvium was only 22 feet deep?

3      A  I would have to review how we calculated it.  I

4  don't know what the discrepancy is here offhand.

5      Q  Well, is it or is it not in error the way you have

6  shown that?

7      A  Well, there is something that doesn't agree here.

8  (A pause.)  Are you waiting for something?

9      Q  Yes.  I said, is that not in error?

10      MR. MOSKOVITZ:  The witness answered the question.  He

11  said there is something that doesn't agree here.

12      MR. VEEDER:  That is an understatment.

13      THE COURT:  Ask another question.

14  BY MR. VEEDER:

15      Q  It is in error, is it not?

16      MR. MOSKOVITZ:  Your Honor, how many times does the

17  same question have to be answered?

18      MR. VEEDER:  I think until he answers it.

19      THE COURT:  Overruled.

20  BY MR. VEEDER:

21      Q  It is in error, is it not?

22      A  There is something here that at the moment, anyway,

23  I can't reconcile.

24      MR. VEEDER:  I ask that he be directed to answer the

25  question, your Honor.

1          THE COURT:   In equivalent, he has answered it properly.

2    Go ahead.

3    BY MR. VEEDER:

4          Q   Now, in regard to Tucalota Valley Basin, on page

5    B-47, again you have the maximum depth of the storage unit

6    designated 22 feet and you also have your calculations start-

7    ing 25 feet above the base of the alluvium.   Is that or is

8    that not an error?

9          A   Well, apparently this footnote does not apply to

10   that instance.

11         Q   Well, then, it is an error, is it not?

12         A   Yes.

13         Q   Now, in regard to your determination that Diamond

14   Valley has a high permeability, as shown in column 3, Table

15   B-3, what were the factors that you took into consideration.

16         A   To the best of my recollection, in Diamond Valley

17   we just compared the physical appearance of the materials in

18   that valley with the physical appearance of it in other

19   valleys.

20         Q   You simply viewed the surface and came up with that

21   conclusion; is that right?

22         A   That is my recollection on this particular one.   I

23   would have to check over the logs, too, and see just what--

24         Q   Would you check those over and let me know how you

25   arrived at that?

1          A   All right.

2          Q   Now, in regard to your calculation relative to

3   Upper Coahuila, you will observe that you have a maximum

4   depth of the storage unit in feet showing nothing.  This is

5   on page B-48.  You have relative permeability showing nothing.

6   But you come up with 4840 acre feet of storage.  Now how did

7   you do that?

8          A   Well, permeability and storage capacity measure two

9   different things.

10         Q   Well, you didn't have the factors in regard to

11  Upper Coahuila that you had in regard to the others, and yet

12  you were able to arrive at a calculation predicated upon

13  Footnote A, which says "Usable storage capacity calculated

14  between historic high water table and a surface 25 feet

15  above base of Recent alluvium."  So you didn't have any depth

16  at all.  You applied Footnote A and you came up with 4840 acre

17  feet.  How did you do that?

18         MR. MOSKOVITZ:   I think he misstates something.  Footnote

19  a refers to usable storage capacity calculations and not gross.

20  So 4840 is not the figure.

21         THE COURT:   Well, if that is any consolation to you,

22  Mr. Moskovitz, let us save some time.

23         Footnote a is again in error, is it not, since you

24  don't have any depth for the storage unit shown?  The use of

25  Footnote a is in error?

1    THE WITNESS:  What we did in this case, your Honor,

2 actually we projected, as I recall, the sides of the basin,

3 where they were exposed on the surface they had a slope where

4 they went into the basin, and we projected those constantly

5 at depth until they intersected both sides of the basin, and

6 then used the depth to that intersection as the depth of the

7 basin.

8    THE COURT:  Then you didn't use 25 feet above that?

9    THE WITNESS:  We used 25 feet above that depth to come

10 up with what we had, to the best of my recollection.

11 BY MR. VEEDER:

12    Q  Will you produce those notes for us?

13    A  We have all those calculations, yes.  They are avail-

14 able.

15    Q  And you will agree that that is an error, will you

16 not?

17    A  No, I didn't agree to any error on that one.  What

18 was the error you are talking about here?

19    Q  How could you arrive at a calculation without having

20 the depth?

21    A  I thought I explained how we did arrive at a depth.

22    THE COURT:  He has.  He said he took the slopes.  It

23 is not shown on the chart, but that is what he says he did.

24 BY MR. VEEDER:

25    Q  And you would have to go outside of Appendix B to

1    make that determination?

2            A  Yes.

3            Q  Now, in regard to your statement that you used the

4    historic high water table, what do you mean by "the historic

5    high water table"?  I am referring to Footnote a.

6            A  That is the highest ground water level of record,

7    or what we assume is the highest standing of the ground water

8    table.

9            Q  As shown by what?

10           A  Well, as determined from the measured water level

11   measurements.

12           Q  And in each instance where you made your calculation

13   you used that figure?

14           A  Yes.

15           Q  And what wells did you use?  Will you give us a

16   designation of those wells?

17           MR. MOSKOVITZ:  For what basin?

18           MR. VEEDER:  For all of the basins.

19           THE WITNESS: Well, we have those again in our calcula-

20   tion sheets.

21   BY MR. VEEDER:

22           Q  And they will be available here for cross-examination?

23           A  Yes.  Our calculation sheets are here.

24           THE COURT:  Well, this is what you are working on.

25   You are working over your calculation sheets and showing how

1   you arrived at these figures and submitting your work sheets

2   and materials to back up these calculations?

3          THE WITNESS:  Yes, your Honor.  I am writing a little

4   explanation as to how this procedure was followed.

5   BY MR. VEEDER:

6          Q  Now, in regard to--

7          MR. MOSKOVITZ:  May we have a recess now, your Honor?

8          THE COURT:  Yes, if you want a recess now.

9          MR. MOSKOVITZ:  It is the usual time.

10         THE COURT:  Take a short recess.  We are stopping early

11  today anyhow, Mr. Moskovitz?

12         (Recess.)

13         MR. MOSKOVITZ:  Your Honor, about a week or two ago we

14  gave to Mr. Veeder earlier drafts of this geology appendix.

15  We would like to look at them over the weekend.  I have

16  requested Mr. Veeder to return them to us for that purpose and

17  he has refused to do so voluntarily and suggested that I

18  mention it to you.

19         MR. VEEDER:  I really need it myself to prepare the

20  cross-examination.  But I will be certainly guided by your

21  Honor's direction.

22         THE COURT:  Do you need both drafts?

23         MR. VEEDER:  I have only one draft, your Honor.  The

24  only thing I have is this pink deal.

25         MR. MOSKOVITZ:  There were two exhibits, one containing

1    out shafts they have containing one.

2    MR. VEEDER:

3    and you

4    other have them Monday evening?

5    MR. VEEDER: Monday, Exhibit B, draft 1. That is the

6    one I have been making notes in regard

7    to it. THE COURT: course, I really feel that I

8    need it to prepare the cross-examination.

9    BY MR. VEEDER: What about the second draft?

10    French

11    Valley Wells supplied

12    by both and older alluvium, with Recent alluvium

13    yielding

14    you made isn't it.

15    

16    will that distinguish between the older and

17    the Recent to look at all three of

18    them, the

19    the older alluvium deprive him of the chance to prepare.

20    make years, you

21    would still permeability tests.

22    there are certain errors

23    that appear in inspection, exercising geologic judgement of

24    drafting make made in the placing

25    of the footnote, inspection of the surface and find

1  two drafts, and one containing one.

2  　　　MR. VEEDER:  The one that I am presently using is--

3  　　　THE COURT:  It is marked L Appendix B, B-1, and the

4  other is marked L Appendix B, B-2.

5  　　　MR. VEEDER:  This L Appendix B, draft 1.  That is the

6  one I have been using and I have been making notes in regard

7  to it.  If it is essential-- of course, I really feel that I

8  need it to prepare the cross-examination.

9  　　　THE COURT:  What about the second draft?

10  　　　MR. MOSKOVITZ:  I don't know where it is now.

11  　　　THE COURT:  The Clerk has it here.

12  　　　THE CLERK:  I don't know.

13  　　　THE COURT:  Mr. Sachse is looking at it right now.

14  　　　MR. SACHSE:  No, this isn't it.

15  　　　THE COURT:  It has been marked.  It is here somewhere.

16  Will that serve your purpose?

17  　　　MR. MOSKOVITZ:  We would like to look at all three of

18  them, the two that Mr. Veeder has, and the other one.  I

19  don't want to deprive him of the chance to prepare.

20  　　　MR. VEEDER:  I can't see why, after ten years, you

21  would still need it.

22  　　　MR. MOSKOVITZ:  Your Honor, there are certain errors

23  that appear in the final draft.  I think in the course of

24  drafting there may have been a mistake made in the placing

25  of the footnote.  We would like to track these down and find

1    out where they are.

2          THE COURT:  Mr. Veeder may have them over the weekend

3    and you can pick them up Tuesday here and look them over.

4          MR. MOSKOVITZ: Could we have them Monday evening?

5          THE COURT:  Monday evening.

6          MR. VEEDER: By all means.

7          THE COURT:  Monday evening.

8          Proceed.

9    BY MR. VEEDER:

10          Q  Now, referring again to Table B-3, under French

11    Valley you have this statement written:  " . . Wells supplied

12    by both Recent and older alluvium, with Recent alluvium

13    yielding largest supplies."  What was the basis upon which

14    you made that calculation?

15          A  I believe that is probably a matter of judgment.

16          Q  And how did you distinguish between the older and

17    the Recent alluvium in French Valley?

18          A  Well, the Recent alluvium is more permeable than

19    the older alluvium.

20          Q  Did you make some permeability tests?

21          A  No, no permeability tests.

22          Q  How do you know that?

23          A  By inspection, exercising geologic judgment.

24          Q  What was your inspection?

25          A  Well, inspection of the surface exposures of the

1    material, both materials, Recent and older.

2        Q   In French Valley?

3        A   Yes.

4        Q   And you viewed the exposures of the Recent and

5    older alluvium and construed them to indicate that the Recent

6    alluvium would yield the largest supply; is that right?

7        A   I believe that is probably the way we did it.

8        Q   You don't know?

9        A   I don't recall just exactly the situation in French

10   Ground Water Basin, but this would appear to me to be the way.

11   This is the way we go about doing these things.

12       Q   You would say, though, that you don't really recollect

13   how you did it?

14       A   In French Valley offhand I don't recollect just

15   exactly what we did.

16       Q   Your statement is, then, you don't know that they

17   are right?

18       A   I wouldn't say that.

19       Q   Well, you don't remember what you did; is that not

20   correct?

21       A   I have a good idea what we did, and that is what I

22   told you.

23       Q   But you don't remember?

24       MR. MOSKOVITZ:  Your Honor, this is repetitious.

25       THE COURT:  Sustained.

1      Go ahead.

2  BY MR. VEEDER:

3      Q  Now, in regard to Los Alamos, you say: ". . The

4  basin fill comprises Recent and slightly dissected older

5  alluvium. . " What do you mean by "slightly dissected older

6  alluvium"?

7      A  That means that it has been eroded to some slight

8  extent by Recent streams.

9      Q  And what wasthe proof of that that you had when you

10 arrived at that conclusion?

11     A  That would be visual inspection.

12     Q  And you visually inspected it yourself?

13     A  This was done by geologists under my inspection.

14     Q  But you didn't see it yourself?

15     A  I have been through Los Alamos Valley, yes. I have

16 seen that area.

17     Q  But did you make this observation?

18     A  I didn't make this particular note. I looked the

19 area over and I am willing to agree with it.

20     Q  Now, you say, "Wells obtain supplies from both, but

21 Recent alluvium yields larger amounts." How do you know that?

22     A  Well, that is because the Recent alluvium is the

23 more permeable.

24     Q  And what permeability tests did you make?

25     A  We may have some specific capacity measurements in

1    that area.  I can't recollect offhand.

2            Q  Would you produce them, if you do?

3            A  If we have them, we will make them available.

4            Q  Now, in regard to your calculations-- By the way,

5    are those going to be available this afternoon?  Are they

6    available now?

7            A  Are you referring to storage capacity calculations?

8            Q  Yes.

9            A  No, we hadn't planned to make them available this

10   afternoon.

11           Q  Now, in connection with the Santa Gertrudis Valley,

12   " . . The basin fill is Recent alluvium underlain by older

13   alluvium. ."  Did you give any consideration to the Roripaugh

14   well after it was dug?

15           A  This report was prepared before the Roripaugh well

16   was completed, or at least before we had any information.

17           Q  Now, in connection with that calculation at Santa

18   Gertrudis, you say, "Storage capacity calculated in free

19   ground water zone only."  Do you see that?

20           A  I am looking for it.

21           THE COURT:  You mean footnote b?

22           MR. VEEDER:  Yes.

23           THE COURT:  What is meant by "Free ground water zone

24   only"?

25           THE WITNESS:  Well, free ground water zone, your Honor,

1  is a zone within which the water in unconfined, in which there

2  is a water table.

3       THE COURT:  How does it differ from the storage unit

4  in Murrieta Valley?  Is that a free ground water zone?

5       THE WITNESS:  Yes, we computed the storage in--

6       THE COURT: Well, what is the significance of the

7  footnote "free ground water zone only"?

8       THE WITNESS:  What we are getting across there is that

9  we did not-- some of these basins can be under pressure, the

10  water within the aquifers can be under pressure at high water

11  level, but when the water level is drawn down below the base

12  of the confining materials, then that water that was formerly

13  pressure becomes free ground water and you could compute the

14  storage capacity in those deeper aquifers.  In this case we

15  didn't do that.  We just computed the shallower storage.

16       THE COURT: Read that answer again.

17       (The reporter read the answer as follows:  "A  What

18  we are getting across there is that we did not-- some of

19  these basins can be under pressure, the water within the

20  aquifers can be under pressure at high water level, but when

21  the water level is drawn down below the base of the confining

22  materials, then that water that was formerly pressure becomes

23  free ground water and you could compute the storage capacity

24  in those deeper aquifers.  In this case we didn't do that.

25  We just computed the shallower storage.")

1        MR. VEEDER:  I don't know what he said, frankly.

2        THE COURT:  Well, read what you have said here about

3    the description of the Santa Gertrudis Basin and see if that

4    adds any light.

5        THE WITNESS:  Do you want that read aloud, your Honor?

6        THE COURT:  Just read it into the record.

7        THE WITNESS:  "General description."  I am referring

8    to Santa Gertrudis's description as it appears on page B-47.

9    "The basin is surrounded by yields of older alluvium except

10   on the southwest where Santa Gertrudis Valley merges with

11   Murrieta Valley.  The Wildomar fault crosses the mouth of

12   the valley and, although it is not visible, it is a barrier

13   to ground water movement forming a zone of artesian pressure

14   upstream from the fault.  The basin fill is Recent alluvium

15   underlain by older alluvium.  Well are supplied both by

16   Recent and older alluvium.  The basin is drained by Santa

17   Gertrudis Creek, which flows southwesterly to Murrieta Creek.

18   In the portion of the basin which overlies the pressure zone,

19   ground water storage was calculated for the upper 50 feet"--

20   this should read "only" instead of "away"-- "storage in the

21   remainder of the basin was calculated to the maximum depth as

22   indicated by well logs."

23       THE COURT:  Where is this pressure zone that you are

24   talking about?  Down close to the place where the basin joins

25   the Murrieta?

James      cross                                              6506

1              THE WITNESS:  Yes, just upstream from the fault.

2              THE COURT:  Well, in making your computations you

3    will show us what area you took for that zone?

4              THE WITNESS:  Your Honor, that is in our calculations.

5              MR. MOSKOVITZ:  Your Honor, the calculations that we

6    are making are not detailed for every basin, as I understood

7    it.  You wanted us to compare where there is a difference, point

8    out where the differences were in storage capacity.  We are

9    making calculations for two basins to indicate the two differ-

10   ent methods.  If we have calculations detailed for each of

11   the basins, this is a very large job.  We can do so if it is

12   necessary. But we are not going to be bringing in one on

13   Santa Gertrudis--

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  The first thing I want you to do is to

2 talk to Mr. Kunkel, your men talk to Mr. Kumkel, and find out

3 which basins there was any real question about.  Have you done

4 that yet?  There is no use spending time if-- I don't care how

5 you arrived at it-- if the two of you arrived at a generally

6 equivalent figure as to a basin.  You can use two different

7 methods.  If your ultimate answer is about the same, why should

8 we waste any time on it, then?  We are concerned next with

9 those basins in which there is a major discrepancy or difference

10 between your results.  We are concerned also by your method.

11 First, this, I hadn't noticed it before.  In this basin here

12 is another factor thrown in:  Where is this area of confinement?

13    MR. MOSCOVITZ:  Your Honor, these differences occur be-

14 cause of differences in boundaries.  For example, Santa Ger-

15 trudis is not separately listed as a ground water storage unit

16 by the United States.  It is included within a much larger unit,

17 part of which we don't include.  Now, if that is the difference,

18 and we have calculated, show the details of the storage calcu-

19 lations, this is some additional work which we have not yet

20 undertaken.  And I think we want to be clear about that.  We

21 are showing Murrieta because that is one your Honor raised the

22 question about.  But not on each and every one of them.

23    THE COURT:  Let's see what you have done on the first

24 of the  week when we readjourn.

25    MR. MOSCOVITZ:  All right.

1          THE COURT:  Go ahead.

2          THE WITNESS:  Your Honor, for this confined area in

3   Santa Gertrudis Basin, this is outlined on Plate 11-B, for your

4   information.

5          THE COURT:  11-B?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  It would be roughly about 60% of the basin,

8   would it not, shown on your--

9          THE WITNESS:  Yes.

10         THE COURT:  That is just a rough guess?

11         THE WITNESS:  That is correct.  You recall that the

12   well driller we talked to had some ideas along that line, too.

13         THE COURT:  Now, in your calculations that--

14         MR. VEEDER:  Which well driller was that?

15         THE WITNESS:  Remember, we stopped and watched a well

16   that was being drilled on our trip?

17         MR. VEEDER:  Not in Santa Gertrudis.

18         THE WITNESS:  The first day.

19         MR. MOSCOVITZ:  That was in Santa Gertrudis, wasn't it?

20         THE COURT:  The well  was going down in Santa Gertrudis.

21         MR. VEEDER:  What was his name?

22         THE WITNESS:  It is in the record.  I don't recall.

23         THE COURT:  It is the Ramsays' property.  Married to the

24   Roripaugh girl.

25         Now, Mr. Witness, in your Santa Gertrudis basin, in your

1 calculations of storage capacity, have you also used the older

2 alluvial as well as the younger in arriving at your figures?

3 THE WITNESS:  My recollection, I believe, we did, your

4 Honor.  Now, that, I could  pull  out of our computation sheets.

5 THE COURT:  If you did, have you used an area of low

6 permeability as part of your water basin?  Right?

7 THE WITNESS:  If we did, we used a part that was pene-

8 trated by wells.

9 THE COURT:  I didn't ask you that.

10 THE WITNESS:  I would have to check.

11 THE COURT:  I asked you whether you used material of

12 low permeability when you used the older alluvial?

13 THE WITNESS:  Yes.  Generally, that is correct.

14 THE COURT:  In other words, you would say that older

15 alluvial that underlies the Santa Gertrudis, the younger allu-

16 vial in Santa Gertrudis is different from the older alluvial

17 lying farther upland and not covered by older alluvial?

18 THE WITNESS:  I would say it was probably similar, in

19 general.

20 THE COURT:  Go ahead, Mr. Veeder.

21 MR. VEEDER:  All right.

22 Q  It is  stated from the portion that you read that the

23 Wildomar Fault, and I quote:  "Crosses the mouth of the valley,

24 and although is not visible, it is a barrier to ground water

25 movement forming a zone of artesian pressure upstream from the

1    fault."  Now, do you mean that it is an inpenetrable barrier

2    by that term?

3         A  I mean that it impedes the flow of ground water; not

4    necessarily impenetrable.

5         Q  Do you have an opinion as to whether it is imper-

6    vious or not?

7         A  I think probably there is some leakage.

8         Q  How would you make your calculations, then, in re-

9    gard to the storage capacity calculated in free ground water

10   zone only when you use a 314 foot maximum?  What kind of for-

11   mation did you use in making your calculations?  Did it have

12   straight sides and straight across the bottom, or how was that?

13        A  In some of these basins, we used--

14        Q  I am speaking now of Santa Gertrudis.

15        A  I am trying to answer that question, Mr. Veeder.

16   For Santa Gertrudis, without looking at our calculation sheets,

17   I couldn't tell you.

18        Q  Then you don't know?

19        A  I know with reference to what we did.  I know, re-

20   ferring to our calculations, I would know.  There are some--

21   quite a number of basins in here, and I can't remember just

22   offhand exactly what  was done in the case of each one of them.

23        THE COURT:  Isn't there an inconsistency between your

24   footnote B and the last part of your description?  You say in

25   the last part of your description:  "In the portion of the basin

1  which overlies the pressure zone, ground water storage was cal-

2  culated for the upper 50 feet only" -- making the correction

3  indicated-- "Storage in the remainder of the basin was calcu-

4  lated at a maximum depth as indicated by well logs."  Then your

5  footnote B says:  "Storage capacity calculated in free ground

6  water zone only."  By that, do I understand you have taken only

7  the zone above the pressure area where it existed and then where

8  it did not exist, taking the  maximum depth as indicated in

9  the well logs?

10       THE WITNESS:  Well, your Honor, as pointed out earlier,

11  these footnotes, there is some discrepancy there, and I am sure

12  that our calculations are in good order; but, apparently, when

13  this report was put together, these footnotes were not properly

14  used.

15       THE COURT:  You have taken a maximum depth  of 314 feet.

16  You have taken older alluvial as well as younger, have you not,

17  calculating that basin?

18       THE WITNESS:  That is a figure that appears in this

19  column, and I am not sure the column has exactly the right title

20  on it, but--

21       MR. VEEDER:  Now, wait a minute.  I didn't hear that.

22  Maximum depth of storage unit in feet may be an improper desig-

23  nation?

24       THE WITNESS:  I am not sure about that.  I am not sure

25  how  we calculated this one without looking at our calculation

1    sheets.  This would have to be checked.

2    BY MR. VEEDER:

3         Q  Are you stating, then, that the recent alluvium is

4    314 feet deep?

5         A  No, I am not  stating that.

6         Q  In other words, you think there is an error in that

7    column?

8         A  I don't know.

9         MR. MOSCOVITZ:  The column  doesn't say the  recent

10   alluvium.  It is that depth.

11   BY MR. VEEDER:

12        Q  Would the free ground water, as you use the term,

13   be all in the younger alluvium?

14        A  Well, I don't know.  Whether it is recent alluvium

15   or older alluvium doesn't determine whether there is free ground

16   water or confined ground water.

17        THE COURT:  When I admitted Appendix B in evidence, did

18   I make clear that Table B-3 was not included?

19        MR. VEEDER:  No, sir.

20        MR. MOSCOVITZ:  What you said, your Honor, it was ad-

21   mitted subject to our bringing in the compilations; and this is

22   what  we  are going to  do.

23        THE COURT:  I didn't say what I intended.

24        MR. MOSCOVITZ:  I see.

25        THE COURT:  I didn't intend  to admit Table B-3 until

you produced this further material.

MR. MOSCOVITZ: This material will be brought in with whatever degree of detail that you desire.

MR. VEEDER: May I proceed?

THE COURT: Proceed.

BY MR. VEEDER:

Q How would you calculate, then, if you didn't know the depth of the younger alluvium that you had only used the 50 feet to which you made reference?

A This calculation of storage in Santa Gertrudis Basin is set forth in our calculation sheet.

Q And you are going to produce those?

A We are going to produce those. Now, whether this particular one has an isopach map or whether we made other assumptions in the calculations, I would have to refer to our calculations before I could know.

Q In calculating and in determining that there is a confining bed, what were the factors that you took into consideration in arriving at that conclusion?

A We took into consideration the fact that the ground water was under pressure in that area. The logs of wells.

Q And would you take your ruler and, turning to Plate J J' on California's Plate 16, and calculate the depth between the water table of 1953 and the surface of what you have designated as the confining bed?

1    A   Where was this you wanted to measure it again, now?

2    Q   Just measure the depth.  I am trying to see how you

3    arrive at your 50 feet.  You see where you have water table in

4    1953?

5    A   Yes.

6    Q   And then you have, apparently, the surface of your

7    confining bed.  What is the depth of that area?

8    A   You want the depth to the bottom of the Qal as shown

9    there, or the distance between the--

10   Q   That is right.  Can you start over in an area, your

11   well, it would be the second one from the right; that is this

12   here.

13   A   You mean 7 South, 3 West, 24--

14   Q   That is right.

15   A   -- Q2?

16   Q   That is a Q?  Q2?

17   A   I believe it is.

18   Q   That well is 200 feet deep, is it not?

19   A   No, it shows total depth  of 314.

20   Q   "200 feet s.e."  What does that mean?

21   A   Well, that means that it was projected 200 feet

22   southeast to fall on the line of section.

23   Q   How deep  at  that point at that well  is the free

24   ground water strata?

25   A   You mean, as I take it, the depth from the surface to

1    the   water table?

2         Q   Whatever figure you used in arriving at this 50 feet,

3    you used to calculate your storage unit.  Do you follow me on

4    this now?

5         A   No, I don't follow you on that.

6         Q   You make the statement in your write-up about Santa

7    Gertrudis:  "In the portion of the basin which overlies the

8    pressure zone, ground water storage was calculated for the upper

9    50 feet."  You said:  "Only," I guess.

10        A   Yes.

11        Q   "Storage in the remainder of the basin was calcu-

12   lated to the maximum depth  as indicated by well logs."  Now,

13   how would you  make your determination in regard to that 50

14   feet?  Was it from the ground surface or from the water table

15   of the fall of '53?

16        A   I would have to check the calculation sheets on that,

17   Mr. Veeder.

18        Q   In other words, you don't know now?

19        A   Offhand, no.

20        Q   And from the standpoint of making your calculations,

21   if you will look at your Plate J J--

22        THE COURT:  You mean Section J J?

23        MR. VEEDER:  That is right.  Section J J on page 16.

24        THE COURT:  L-16.

25

BY MR. VEEDER:

Q  How would you calculate the free water area? How did you calculate the free water area in that portion of the basin?

MR. MOSCOVITZ:  Wasn't this the same question that was just asked?

MR. VEEDER:  No, no.  I am talking about an entirely different area over here where you have 7S, 3W, 35P2.

Q  You  see that well?

MR. MOSCOVITZ:  35P2?

MR. VEEDER:  Yes.

Q  Why would you use a 50-foot depth there in calculating storage?

MR. MOSCOVITZ:  Well, that is not Santa Gertrudis, is it?

THE COURT:  I don't see 35P2.

THE WITNESS:  I don't, either.

THE COURT:  Are you looking at the same--

MR. VEEDER:  I am looking at J J--

MR. MOSCOVITZ:  That is Murrieta Valley, not Santa Gertrudis  It is not a confining zone.

THE COURT:  Mr. Veeder, you must read the chart.  That portion of that J J appearing left of the Wildomar Fault is in the Santa Gertrudis Valley, is in the Murrieta Valley; and the Santa Gertrudis only comes down to  about the Wildomar Fault.

BY MR. VEEDER:

Q   And you cut off your storage basin, then, entirely at the Wildomar Fault, is that right?

A   That is true.

Q   Did you use part of this which is marked in the Murrieta Valley in making your calculations for storage in the Murrieta Valley?

A   In Murrieta Valley?

Q   Yes.

A   Well, I would have to check our well computation sheets to see if that particular well were used.  I would sus-pect that it was used, yes.

Q   How deep did you think the alluvium is there, the recent alluvium, in that particular point?

MR. MOSCOVITZ:   Is this in Murrieta now you are speak-ing of?

MR. VEEDER:   Yes.  I am pointing to  the well I have been talking about.

THE WITNESS:   Well, judging roughly from looking at that  section, it would be on the order of a hundred feet, was the depth that we used.

BY MR. VEEDER:

Q   In making your calculations on Murrieta Valley, was your line a straight line when you arrived at your depth of your storage basin for Murrieta Valley?  Or how did you calculate it?

1          A   As I explained a little earlier, we fixed the base

2   of our   storage units or basin, or the parts for which we com-

3   puted storage, from the logs of the deepest wells.  Actually,

4   if I am going to go into this, it is going to take a little

5   time.  We had to break the basin down.  We broke it down into

6   eleven sub-areas.   And this subdivision was based on the dis-

7   tribution of the wells with the well logs where we had a-- we

8   took into consideration the pattern of this distribution, so

9   that we would get a representative evaluation of the specific

10  yield within each one of those particular subbasins.  Now, in

11  determining the bottom or the basement of each subarea, we

12  utilized the logs of the deepest wells in each one of these

13  subareas.  The bottom of each one of these subareas was taken

14  to be a horizontal plane which went through the bottom of the

15  deepest log.  So that, in effect, they had a bunch of blocks,

16  as it were, eleven of them.

17         Q   They had a bunch, did you say?

18         A   We had a group of blocks within which, rather sub-

19  areas within which we computed the storage.

20         Q   Now, I observe on your Plate 17 a line of Qal.  Now,

21  we start with-- are you with me, friend?

22         A   Yes.

23         THE COURT:  Which section are you looking at, Murrieta?

24         MR. VEEDER:  Starting at the J J'.

25         Q   You have your well, it is 21P1.  Do you see that,

1  7 South, 3 West?

2      A  Yes.

3      Q  The bottom of the Qal drops quite sharply and pro-

4  ceeds over to Well 7 South, 3 West, 35PQ, the one to which I

5  just made reference in regard to Santa Gertrudis.

H Z57

6      Now, it appears from there that you have an upward

7  gradient in your K, K-prime, and how could alluvium be

8  deposited in such manner?

9      A  Well, this--

10      Q  Wouldn't your water have to run uphill?

11      A  No, because these-- this does not go right down

12  to the profile of the stream.  The stream may wind in and

13  out across this line.

14      Q  Well, you see what I am saying?  You have a very,

15  very shallow point at the fault.  You see where I am point-

16  ing?

17      A  Yes.

18      THE COURT:  Extreme right.

19      MR. VEEDER:  Extreme right.

20      Q  --which is up gradient from the depth of the younger

21  alluvium.  How could alluvium be deposited in such a manner?

22      A  Well, I don't see any great problem there.  You

23  have alluvium that is washed in from either side from the--

24      Q  Just a moment.

25      MR. MOSKOVITZ:  Let the witness finish his answer

1    before you interrupt, Mr. Veeder.

2            THE COURT:  Let him finish. Go ahead.

3            THE WITNESS:  -- and you have alluvium that is de-

4    posited by the stream.

5    BY MR. VEEDER:

6            Q   Are you saying that the alluvium that is in the

7    Murrieta Valley was washed in from the sides?

8            A   Some of it was.

9            Q   And along the line between the two wells-- I am

10   now referring to 35P2 and to-- what is that, 12?

11           A   I can't make it out.

12           Q   --12 and 11.  Are you saying that the phenomenon

13   that is shown on that K, K-prime, the area to which I have

14   made reference, that the alluvium was washed in from the

15   sides that made such a configuration?

16           A   Well, some of the alluvium was brought in from the

17   sides, yes.

18           Q   Are there any streams in between there that would

19   bring in deposits?

20           A   Well, there is--

21           Q   Between Santa Gertrudis and that point?

22           A   There are the hillsides on either side of the valley.

23           Q   You are saying, then, that this is washed, just

24   coming down without regard to any streams; is that right?

25           A   I am not saying that is what it all is, but there

1    is certainly contribution from those two sides.

2         Q  And that is how you would then explain what would

3    appear to be a reverse gradient in your K, K-prime; isn't that

4    right?  Or is that right?

5         A  No, because here is another point here.  This

6    basement line or line of contact between the Qal and the

7    Qtoa is shown just along one line of section.  Now what

8    happens on either side of this line of section, this point

9    may be lower.

10        Q  In other words, you are saying that K, K-prime

11   doesn't truly depict the physical phenomenon that exists

12   there; is that right?

13        A  No, I am not saying that.

14        MR. MOSKOVITZ:  Your Honor, the hour of 4 o'clock has

15   arrived.  Is that when we adjourn?

16        THE COURT:  Yes.

17        How much longer will you be with this witness, Mr.

18   Veeder?

19        MR. VEEDER: Well, I will certainly cut it as short as

20   I can, your Honor, depending upon his responsiveness.  I

21   truly can't calculate, your Honor.

22        I might add that Mr. Sachse has asked me to have

23   present for cross-examination Mr. Worts, who will be here

24   Wednesday morning at 10 o'clock.

25        MR. SACHSE:  Yes.

1          I don't think we ever stated for the record, and I

2     should have, that Mr. Veeder did produce last Tuesday that

3     confidential report, and it is now available and Mr. Worts is

4     coming down for cross-examination on that next Wednesday.

5          THE COURT:  What is available?

6          MR. SACHSE:  This confidential report on the Pauba

7     well.  We have arranged next Wednesday to cross-examine Mr.

8     Worts on it.

9          THE COURT:  All right.  10 o'clock Tuesday morning.

10         (Adjournment until Tuesday, Cecember 16, 1958, at 10

11    o'clock A.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25