# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— , — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:  San Diego, California

Date:  Tuesday, December 16, 1958

Pages: 6523 to 6670

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

A Z1

1          IN THE UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3                  SOUTHERN DIVISION

4                     - - -

5      HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                     - - -

7

8   UNITED STATES OF AMERICA,    )
                                 )
9                   Plaintiff,   )
                                 )
10         vs.                   )        No. 1247-SD-C.
                                 )
11   FALLBROOK PUBLIC UTILITY    )
     DISTRICT, Et al.,           )
12                               )
                   Defendants.   )
13

14

15          REPORTERS' TRANSCRIPT OF PROCEEDINGS

16

17                San Diego, California

18              Tuesday, December 16, 1958

19

20   APPEARANCES:

21          For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                     Special Assistant to the
22                                   Attorney General,
                                     Department of Justice,
23                                   Washington, D. C.

24

25

1

2   APPEARANCES (Continued):

3       For Defendant            GEORGE E. STAHLMAN, ESQ.
          Vail Company

4       For Defendant State      EDMUND G. BROWN, ESQ.,
          of California          Attorney-General, by
5                                ADOLPHUS MOSKOVITZ, ESQ.,
6                                Deputy Attorney General,

7       For Defendants
          Fallbrook Public
8         Utility District,      F. R. SACHSE, ESQ.
          et al.

9
                            - - -
10                            -
11                            -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX TO WITNESSES

| For Defendant State of California: | CROSS | REDIRECT | RECROSS |
|---|---|---|---|
| Laurence James | 6529 | | |

E X H I B I T S

| Defendant State of California Exhibit - | | For Iden. | In Evidence |
|---|---|---|---|
| P | Comparison | 6527 | |
| Q | Method of Computing | 6527 | |
| R | Method of Computing | 6527 | |
| S | Work Sheets, Rainbow Basin | 6531 | |

1    SAN DIEGO, CALIFORNIA, TUESDAY, DECEMBER 16, 1958.   10 A. M.

2

3        THE CLERK:  No. 1247-SD-C, United States of America

4    vs. Fallbrook Public Utility District, et al.   Further court

5    trial.

6

7                    LAURENCE JAMES,

8    recalled as a witness in behalf of the defendant State of

9    California, having been previously sworn, testified further

10   as follows:

11       MR. MOSKOVITZ:  Your Honor, over the weekend we have

12   completed the comparison of ground water storage capacity of

13   the State and the United States has put in evidence.  I have

14   given Mr. Veeder a copy of that; so that he can look it over,

15   with Mr. Kunkel, and indicate as to which basins or storage

16   units there is controversy over his opinion and thereby

17   indicate it to you.

18       THE COURT: Do you have a copy for me?

19       MR. MOSKOVITZ:  Yes.  Would you like to have it marked

20   for identification at this point, your Honor?

21       THE COURT:  No.

22       MR. MOSKOVITZ:  I also have two proposed exhibits

23   which show in detail how ground water storage capacity was

24   computed for two basins:  One, Murrietta, and the other Oak-

25   grove-- two different methods were used.  These go into detail

1   and show how the results were reached.  I can have those marked
2   if you like, or merely have them available.

3       THE COURT:  I suppose we had better mark them.  These
4   L exhibits are getting so complicated.  Any objection to
5   giving them another number?

6       MR. MOSKOVITZ:  No, sir.

7       THE COURT:  The next would be P, would it not?

8       THE CLERK:  Yes, your Honor.

9       MR. MOSKOVITZ:  Shall we mark this comparison first,
10  your Honor?

11      THE COURT:  All right, mark the comparison then as
12  California's Exhibit P.

13      MR. MOSKOVITZ:  Mark that P.

14      THE COURT:  The comparison of basins will be Exhibit P.
15              What would be Exhibit Q?

16      MR. MOSKOVITZ:  That would be the method of computing
17  the gross and usable storage capacity of the Murrieta Ground
18  Water Basin.

19      THE COURT:  That will be marked Q for Identification.
20              What will be R?

21      MR. MOSKOVITZ:  R would be the method of computing the
22  gross and usable storage capacity of the Oakgrove Ground Water
23  Basin.

24          (Defendant State of California's Exhibits P, Q, and R
25  were marked for Identification.)

1      MR. VEEDER:  May I have just a second to run through

2  this, your Honor.  This is the first time I have seen this.

3      Looking at California's Q for Identification, that

4  relates to Murrieta, and California's R relates to Oakgrove;

5  is that right?

6      THE COURT:  Yes.

7      MR. VEEDER:  I will proceed, your Honor, if amenable

8  to you, reserving the right to go back and study this, if I

9  may.

10      THE COURT:  All right.

11      MR. MOSKOVITZ:  Your Honor, it was my expectation to

12  ask other counsel and the Court for time to study this, if we

13  could have these three exhibits introduced for the Exhibits Q

14  and R, which are narrations, read and made part of the testimony

15  on direct examination of Mr. James.

16      THE COURT:  All right.  I will take that up after they

17  have been looked over.

18      MR. VEEDER:  Inother words-- I want to be sure-- you

19  are going to have some more direct examination with Mr. James;

20  is that correct?

21      THE COURT:  No, counsel suggested that Exhibits Q and R

22  be considered the oral testimony of the witness in this

23  connection and then subject him to cross-examination on the

24  matters contained therein.  Instead of having him go through

25  and read it, which would be one way to do it, or question him

1   in detail about it, just consider that Q and R are his testimony

2   as to methods and then subject him to cross-examination on it.

3       MR. VEEDER:  Yes, your Honor.

4       THE COURT:  But not until you have had a chance to

5   study it and until you are ready to do that.

6       MR. VEEDER:  Yes, your Honor.

7

8                 CROSS-EXAMINATION (Resumed)

9   BY MR. VEEDER:

10      Q  Now, Mr. James, on last Friday you stated that there

11  was an error in the calculations for Rainbow Valley, at page

12  6492, and that you would benefit us with your explanation as

13  to how you determined the storage capacity of that basin, in

14  view of the fact that the alluvium is only 22 feet deep, and

15  you have stated in Bulletin 57, Appendix B, that you made your

16  calculations 25 feet above the base of the alluvium.  Would

17  you explain your method of calculation at this time?

18      A  Well, I believe I explained last Friday a few of

19  the column headings, or the column heading here on maximum

20  depth of storage unit in feet was questionable.  This maximum

21  depth of storage unit in feet, as shown here for Rainbow

22  Basin, is 22 feet.  What that heading means is that the 22 feet

23  is the maximum depth or recorded depth that we have-- maximum

24  recorded depth that we have in the Rainbow area.  However, we

25  feel--

Q   Just one moment.  When you say the maximum recorded depth, is that the maximum depth of a well?

A   That is the maximum depth that we have knowledge of.

Q   From a well?

A   Yes.  And we feel that the basin in this particular instance went deeper than the depth which we had recorded.  I will check through the calculation sheets, if you wish, and find out what depth we did use in that calculation.  I will have to thumb through these to find Rainbow.  In Rainbow Valley we used a depth of 30 feet.

Q   30 feet.  In other words, you desire to change the 22, on page B-50, to 30; is that right?

A   Well, no, I wouldn't change the 22 to 30.  This column means something else here.  It is a listing, as I explained, of the recorded depths within the particular basins, and in the calculations we did not use that column.  We used 30 feet in our calculation sheet for that particular basin.

Q   I would like to have marked for identification, then, your notes on that.  I

A   I have many of them for all of these basins.  This is the particular calculation sheet.

Q   There are three sheets; is that right?

A   Yes.

MR. VEEDER:  What is the series you just started on,

1     Mr. Clerk?

2          THE COURT: Do you want a California number on this?

3          MR. VEEDER: It would seem to me-- I don't care how

4 it is identified. It is a California problem.

5          THE COURT: S for Identification.

6          THE CLERK: S-1, S-2, S-3, S-4, your Honor? There are

7 four sheets.

8          MR. VEEDER: Why don't we staple them together?

9          THE COURT: Clip them together. Call them "Work Sheets

10 on Rainbow Basin."

11          (Defendant State of California's Exhibit S was marked

12 for identification.)

13 BY MR. VEEDER:

14          Q Now, I note here that you have the statement "20

15 feet (instead of 25 feet) deducted from bottom of basin be-

16 cause this basin supplies wells of low yield. Only in less

17 depth at the basin bottom is regarded under these circum-

18 stances." What do you mean by that?

19          A Well, that is--

20          Q Now, just a moment, Mr. James.

21          MR. MOSKOVITZ: Let him answer. You have asked him a

22 question.

23          MR. VEEDER: No, I see something I didn't see before.

24          Q I see here "L. B. James, 12-15-58." What does that

25 mean?

1      A  That is a note that I attached on there.  I went

2   over the calculations that are on the foregoing two sheets

3   to familiarize myself with the method that was used in com-

4   puting the storage of this particular basin, and that note was

5   put on there to make it clear that this particular sheet of

6   paper was done by myself at the date indicated, and the work

7   that is on there is from these two sheets.  This was just to

8   clarify in my own mind that it had been done as you requested.

9      Q  In other words, this was not part of the work that

10  was done when you arrived at your conclusion; is that right?

11     A  Well, this is the work.  The work that is shown on

12  here is done in these other pages.  This is merely a summariza-

13  tion of what was done.

14     Q  I see nothing that would show what that note just

15  states.  The fact is, I see that your notes have been revised

16  quite considerably.

17     A  These were revisions that were made at the time that

18  the office studies were made for this report.

19     Q  As I say, I see nothing--

20     A  Except for this one sheet, which I have dated myself

21  here.

22     Q  I see nothing, though, to indicate on either of these

23  sheets your statement that "20 feet instead of 25 feet were

24  deducted from bottom of basin because this basin supplies wells

25  of low yield."  I see nothing on the sheet to indicate that.

1      A  Well, that is what was done.  That is the way we did

2   it, and that is the way I explain it.  Here you will notice--

3      Q  In other words, these notes, without your statement

4   dated the 15th of December, 1958, are literally without mean-

5   ing?

6      A  No, I don't agree with you.

7      MR. VEEDER:  I have handed your Honor the written

8   summarization prepared on the 15th of December, and I find

9   nothing in the rough notes, if your Honor would care to look

10  at them, that could possibly support what he has said.

11     THE WITNESS:  The calculation sheet calculating the

12  quantity of water that was deducted from the bottom of the

13  basin is not with that number of sheets, with those sheets that

14  are shown there.  The deductions from the top of the basin are

15  there, and to the deductions from the top of the basin has to

16  be added what was deducted from the bottom of the basin, and

17  20 feet was deducted from the bottom of the basin to get the

18  results shown.

19     THE COURT:  How deep is this basin?  You say 30 feet?

20     THE WITNESS:  An average of 30 feet, yes.

21     THE COURT:  So you took 30 feet off the bottom and that

22  left 10?

23     THE WITNESS:  Yes, and we took 5 off-- I forget what we

24  took off the top.

25     THE COURT:  That left 5 feet--

1          THE WITNESS:  Storage capacity.

2          THE COURT:  Is that what this means?  If it is 30 feet

3    deep, and you took 20 feet off the bottom and 5 feet off the

4    top, you calculated 5 feet of water-bearing aquifer or 5 feet

5    of aquifer?

6          THE WITNESS:  Yes, I believe that is what is shown on

7    the sheets.

8    BY MR. VEEDER:

9          Q  And that would be 5 feet--

10         A  That is for usable storage capacity.

11         Q  Just a moment.  You would go down 5 feet, then start

12   calculating your water-bearing strata, and go down 10 feet

13   and stop; is that what you did?

14         A  I would have to look at the notes when his Honor is

15   through with them. As shown in Table B-3, we figured a very

16   small usable storage capacity in that basin.  You will notice

17   the gross storage capacity is 2000 acre feet, and the usable is

18   only 335, and that is because of this relatively large percent-

19   age of deductions, including what was taken off the top and

20   what was taken off the bottom.  This is a dish-shaped proposi-

21   tion.  So when you take a certain thickness off the top and

22   a certain thickness off the bottom, there is not much left.

23         THE COURT:  These haven't marked.  Clip them together.

24         MR. MOSKOVITZ:  I think you had better clip them to-

25   gether.  They have been reshuffled.

1      MR. VEEDER: May I suggest that the summarization that

2 is written there not be made part of the exhibit. It is

3 certainly not part of his field notes.

4      THE COURT: You have asked them to be identified. They

5 are not in evidence. They are just identified as Exhibit S.

6 You may do with them what you please. You may offer them or

7 not.

8      (The Clerk staples Exhibit S together.)

9 BY MR. VEEDER:

10      Q Do I understand this correctly-- I want to be sure--

11 there is only five feet of storage capacity in the Rainbow

12 Basin, and that is to be found five feet below the surface of

13 the ground down to 10 feet in depth; is that right?

14      A May I see the calculation sheet, please.

15      (Mr. Veeder hands document to the witness.)

16      MR. MOSKOVITZ: In this question are you asking about

17 gross or usable?

18      MR. VEEDER: I am just asking it to get started.

19      THE WITNESS: There was five feet deducted from the top

20 of the basin and 20 feet deducted from the bottom, and the total

21 thickness considered was 30 feet, which means that inusable--

22 in computing the usable storage capacity there was a 5-foot

23 interval, an interval of 5 feet in thickness which was con-

24 sidered in this basin.

25

BY MR. VEEDER:

Q  And where was that five-foot interval located?

A  It was located-- the bottom of it would be 20 feet up from the bottom of the basin, and the top of it was located 5 feet down on the average from the top of the basin.

Q  So it would be a strata five feet thick between the depths of 5 and 10 feet; is that right?

A  Yes.

Q  And have you considered in your calculations the points of perforation on the wells that you found in Rainbow Valley?

A  No, we didn't consider that.  That doesn't enter into the usable storage capacity.

Q  In other words, if the wells didn't happen to be perforated there they couldn't draw any water out of them; is that right?

A  No, we don't say that or imply that in any way, shape or form.

Q  What were the factors that you took into consideration-- you say this is a saucer-like basin-- in determining the water capacity toward the edge of the basins, where of course the alluvium would be a little thinner than it would be in the middle; is that right?

A  Yes.

Q  How did you do that?  What was your formula for that?

1          A   Well, we drew an isopach map with what data we could

2     find.

3          Q   Do you have that isopach here?

4          A   Yes, that is right in the exhibit that was just

5     identified, not exhibit but--

6          MR. MOSKOVITZ:   California's S for Identification?

7          THE WITNESS:   Yes.

8     BY MR. VEEDER:

9          Q   Where is that isopach?

10         A   It is right here.  I am holding it in my hand.  It

11    is based on what little bit of subsurface data were available

12    and controlled by judgment and observations in the field.

13         Q   So you really didn't use a formula to arrive at your

14    calculation; is that right?  You used your judgment and

15    discretion; is that right?

16         A   Oh, no, we very definitely used the formula to compute

17    this storage capacity.  However, some of the factors that were

18    plugged into that formula were determined, to some extent, by

19    best geologic judgment.

20         Q   So you drew these lines on this California's S on the

21    basis of what-- well logs?

22         A   Where available, and by our judgment.

23         MR. MOSKOVITZ:   The lines you are referring to are the

24    isopachlines, Mr. Veeder?

25         MR. VEEDER:   Yes.

1        THE WITNESS:  I might add that there are-- there is

2   not very much in the way of subsurface data to go on in that

3   basin and you had to make the best of what we had.

4   BY MR. VEEDER:

5        Q   Then in regard to the column which has been marked

6   in Appendix B for Rainbow Valley, you would state then that

7   the 22 feet as shown there is an error?

8        A   No, I don't state that is an error.  You will notice

9   that the title of this Table B-3-- and I presume that is the

10  table you are referring to?

11       Q   That is right.

12       A   --says "Ground water basin characteristics," and the

13  22 feet here is the maximum or the recorded depth, the depth

14  that we had recorded for--

15       Q   Maximum depth of storage unit in feet?

16       THE COURT:  What you are doing, then, is inserting in

17  your column across the top the word "recorded" after the

18  word "maximum"; is that right?

19       THE WITNESS:  That is true.  That should cover it, your

20  Honor.  The title should be revised.

21  BY MR. VEEDER:

22       Q   Now you will revise that to read "maximum"-- why

23  don't you do it on my copy here?  I have a fresh copy for you--

24  "Maximum recorded".

25       MR. MOSKOVITZ: Can we do it on the copy of the exhibit in

1 evidence, and that will make it official.

2  MR. VEEDER:  Why don't we substitute?  I have one that

3 is cut out here and we could use that, if it would be amenable

4 to you, rather than having the whole Bulletin.  This is the

5 same thing.  I have simply cut it out of Bulletin 57.  It

6 would be easier to handle, because we have a great many ex-

7 hibits.

8  MR. MOSKOVITZ:  Your Honor, we have a lot of other

9 portions that are already in evidence from Exhibit L.

10  MR. VEEDER:  I might also add that I have here all of

11 the-- I am pointing now to the easel-- I have taken from

12 Bulletin 57 copies to the end that as the witness works we will

13 be working with actual plates .  Now it would seem to me that

14 the simple thing to do would be simply to mark these as ex-

15 hibits rather than having the Bulletin floating around all of

16 the time, and I have cut out a copy of Appendix B and stapled

17 it into a folder for ease and convenience in making changes.

18  THE COURT:  That is all right with me.  It is a matter

19 of form.  There is some duplication in the exhibits.  They

20 will never be reproduced.  They will merely go up on appeal

21 as part of the exhibits in the case.

22  MR. VEEDER:  That is correct, your Honor.  They have

23 been removed.

24  MR. MOSKOVITZ:  Can't we do it both, your Honor, and

25 mark the one that is already in the Clerk's file, and then we

1    can do it on other copies if Mr. Veeder wants these other

2    copies as well.

3        THE COURT:  That is agreeable also.

4    BY MR. VEEDER:

5        Q  Just mark it right on there, the "Maximum recorded."

6        MR. MOSKOVITZ:  I suggest this be done on all pages

7    of that Table, so that it will be uniform.

8        THE COURT:  Is this true with each of the other basins

9    now?  You have ut this word "recorded" in there.  Is that

10    going to be true of each of the other basins?

11        THE WITNESS:  To the best of my knowledge, your Honor.

12    The column was not utilized in preparing the ground water

13    storage estimates.  It is there for general information.

14        THE COURT:  If you put it in each column-- let's take

15    Pauba Basin.  You have maximum depth of storage unit in feet,

16    170 feet.

17        MR. VEEDER:  Which is an error.

18        THE COURT:  There your maximum recorded depth would be

19    at least 2500 feet, would it not?

20        THE WITNESS: For what we considered as the storage unit,

21    it would be considerably shallower in Pauba Valley.  We didn't

22    go down the several thousand feet.  We computed storage not

23    to the total depth of the sediments.  Nor did the Government.

24        MR. VEEDER:  But that is an error.

25        THE COURT:  You are talking now about changing that

1  column to read "Maximum recorded depth of storage," and I

2  understood that in Rainbow you took that from wells and went

3  down 22 feet?

4      THE WITNESS:  Yes.

5      THE COURT:  If you make this change, which your counsel

6  has suggested, in the heading of each heading along here, then

7  what are you going to do with Pauba Basin, where you have the

8  figure 170 feet?  There are many wells in the Pauba basin

9  that go down deeper than 170 feet.

10      THE WITNESS:  Yes, but where they go deeper than 170

11  feet they are below what we considered as the storage unit.

12      THE COURT:  Well, you do what you want to do.  Is that

13  what you want to do?  You want to change that column in each

14  of the headings of your exhibit Table B-3 attached to Appendix

15  B to Exhibit L?

16      THE WITNESS:  Well, to the best of my knowledge.  I

17  haven't checked each one of these over in that respect to see

18  if there are any differences.

19      THE COURT:  Is that what you want to do, Mr. Moskovitz?

20      MR. MOSKOVITZ:  Perhaps the witness ought to check each

21  one over.  I think this is correct, but let him check it over

22  and make sure before he marks it.  I think his explanation as

23  to the Pauba Basin is the correct one, that the storage unit

24  considered by the State did not go into the pressure area but

25  was limited to the free water zone as indicated, and that is

1   the maximum recorded depth of the storage unit as utilized.

2          MR. SACHSE:  Footnote b.

3          MR. MOSKOVITZ:  We will defer this and have the witness

4   check it over.

5          THE COURT:  Defer it until after the recess and check

6   it over.  Maybe you want to do that after the noon hour.

7   BY MR. VEEDER:

8          Q  Where are the well logs that you utilized in determin-

9   ing the maximum depth in Rainbow Valley was 22 feet?

10         A  Well, all of our well logs are here in the-- either

11  in this room or in the next room.

12         Q  Would you provide me with the well logs upon which

13  you relied in the Rainbow Basin?  We haven't been able to find

14  any, I don't believe.

15

16

17

18

19

20

21

22

23

24

25

THE WITNESS:   I will check what   we have.

(Pause.)

BY MR. VEEDER:

Q   Well, we can go   ahead if you   want to.

MR. MOSKOVITZ:   I think it will take   a little time   to check these.

MR. VEEDER:   You provide me with   the well that is the maximum depth of 22 feet.

MOSKOVITZ:   There is in evidence the Plate 9-A which shows the wells in land Area 1953, and Appendix F which has data which   are on Plate 9-A.

MR. VEEDER:   You will let me know   which one you relied upon.

Q   Now, in referring to Footnote A: Usable storage capacity calculated between high   water table and a surface 25 feet above base of recent alluvium is inapplicable and in error, is it not, in regard to the Rainbow calculation?

A   That does not apply to the Rainbow.

Q   Would you just put a little   star right after "Rainbow" and write "inapplicable."

MR. MOSKOVITZ:   Your Honor, the witness is going through all these calculations and will be ready to indicate what   the correct footnote should be for all of them.   And I think to do it piecemeal is going   to result in confusion.

MR. VEEDER:   This is the testimony in the record, your

1   Honor.  This is his testimony, and I am cross-examining him on

2   it.

3       MR. MOSKOVITZ:  He has testified that  that footnote is

4   not accurate, and I think it might  be simpler if we do it all

5   at once.

6       THE COURT:  Make the note on  the exhibit there.

7       MR. VEEDER:  I think what you had better do is make

8   yourself a little asterisk right after the word "Rainbow" and

9   say, "Footnote A inapplicable."

10      THE WITNESS:  (Marking.)

11  BY MR. VEEDER:

12      Q  I observe, Mr. James, that in the record you testi-

13  fied that--

14      MR. MOSKOVITZ:  Where is this?

15  BY MR.  VEEDER:

16      Q   Pages 62 to-- I beg your pardon-- the geology set

17  forth in the write-up in Bulletin 1 was correct to your know-

18  ledge?

19      MR. MOSKOVITZ:  What bulletin is this?

20      MR. SACHSE:  What bulletin?

21      MR. VEEDER:  Bulletin 57, Volume 1, rather.

22      THE COURT:  What part are you referring to now, Vol-

23  ume 1?

24      MR. VEEDER:  Yes, it would be Volume 53 of the tran-

25  script, page 5958 and 5959.

Q  You testified that the bulletin was correct, to your
personal knowledge, and that if you  were interrogated that
you would testify as set forth there.  The Court, at line 13,
page 5959, says:  "If  you are interrogated by question and
answer, would your testimony  be  substantially the same as
set forth on pages  62, 63, 64 and 65 of Volume 1?"  Would you
say that at the  present time?

A  Yes.

Q  You would adhere to that?

A  Yes.

Q  Now, in regard to Tucalota Valley, at page 6493,
I think you have the same problem in regard to calculation of
the storage capaciy that you did in regard to Rainbow Valley,
did you not?  In other words, the 6494.  In other words, where
you say the maximum depth is 22 feet, actually that is not re-
flective of the facts as they  exist; is that right?

A  Let me check my notes on Tucalota.

Q  It is on page B-47.  You said maximum depth of stor-
age unit 22 feet, and you calculate 25 feet above the  base.
So you have the same error that you had in regard  to Rainbow;
is that not right?

A  In Tucalota Basin, we again used an isopach map.

Q  And do  you have that with you here so we can have
it marked?

A  Yes, it is here some place.  Here is the isopach map.

1      MR. MOSKOVITZ:  The witness just handed Mr. Veeder an

2    isopach map?

3      THE WITNESS:  Yes, of Tucalota Basin.

4      MR. VEEDER:  Now, I  would like to have this marked for

5    identification as California's T, I think.

6      THE COURT:  It may  be so marked.

7    BY MR. VEEDER:

8      Q   What were the means pursued by you in arriving at

9    the storage capacity?  Do you have those numbers here?

10     THE COURT:  This T involves a work  sheet on Tucalota?

11     THE WITNESS:  Yes, I have several work sheets, your

12   Honor.

13     THE COURT:  What  has been marked?

14     MR. VEEDER:  What he handed me I thought was all he had.

15   You have something more?

16     THE WITNESS:  The isopach map.  That is what was handed

17   Mr. Veeder.

18     THE COURT:  Well, include the work sheets.

19   BY MR. VEEDER:

20     Q  Do you have a statement as you made in Rainbow about

21   this dated December 15th?

22     A  There is a summary sheet in there.

23     MR. MOSKOVITZ:  Has this whole sheet now  been marked

24   for identification as California's Exhibit T?

25     MR. VEEDER:  If that is agreeable to your Honor.

THE COURT:  Yes, the work sheets on Tucalota Basin.

BY MR. VEEDER:

Q  What  was the deepest well  that you  found in Tucalota Valley?

A  Well, again, I will have to refer to  notes.  I have a well here, 7S1E, 7D1 and 7S1E, 7D2, also, 7S--

Q  What  are the depths of those?

A  -- 1W12H1.  I don't have the depth on these sheets. I can give the general range  from these sheets,  but  the ac-tual depth would have to be  gotten out of the other  data.

Q  What  is the general range?

A  7S1W, 12H1, is in the general range between  50 and 100 feet in depth.

Q  In other words, you could not  put  the words, "recorded maximum depth" on Tucalota because it is 22 feet; is that right?  I mean, your column in Appendix B shows 22 feet in Tucalota, and yet you have wells, you say, over 100 feet in depth; is  that right?

A  The answer is that this title, as revised, says, "Depth of storage unit," and these wells go below what we con-sidered to  be the storage, below where we considered to be the base of storage.

Q  Let me understand this:  Back here on Rainbow, we changed a maximum recorded depth of storage unit in feet?

A  Of storage unit.

1    Q  And the maximum depth of the well was 22 feet there,

2    wasn't it?  Isn't that what you testified to?

3    A  The maximum  depth  of the well  was 22 feet.

4    Q  Yes.

5    A  As I recall.  I haven't checked the log,  but  that

6    is what--

7    Q  Well, you are going to do that.

8    Now, in regard, then, to this 22 feet at Tucalota, how

9    did you arrive  at that 22 feet?  Is that the maximum depth of

10   any  well in Tucalota Valley?

11   A  It is not the maximum  depth of the well, but it is,

12   as indicated in the column here, the  maximum depth of the

13   storage unit.

14   Q   In other  words, we shouldn't have the word "re-

15   corded" in there, is that right?

16   A  No, I wouldn't say that was right.

17   Q  Should we have a different heading for each column,

18   then, for each basin?

19   A  No, I don't think so.  I think where you  are con-

20   fused on that is--

21   Q  I am confused?

22   A  -- this column does not apply-- these are not figures

23   that  were utilized in compiling the storage capacity estimates.

24   Q  Let me start again--

25   THE COURT:  What  are they in there for, then?

THE WITNESS:  They are in there--  as the title of the table implies, your Honor, it is ground water basin character-istics.  And this was just a column that was put  in.

BY MR. VEEDER:

Q  For--?

A  I think the title of that column has been revised. In our earlier draft, that has a different title on it.  Per-haps that would be enlightening.  I don't recall what that title  was.

Q  Why, then, do we change the column in regard to Rainbow and not in  regard to the Tucalota?  That is my prob-lem.

A  Well, I don't get your point;  I don't believe we did change the title of the column.  If we changed it, we changed it here at the  time we were talking about Rainbow. But I don't see that we changed it again.

Q  In other  words, on page B-50, it will be a column "Maximum  recorded depth  of storage unit in feet," but on the page in regard to Tucalota, we will have only the "Maximum depth of storage"; is that right?

A  Well, still a depth  of the storage unit.  That is where we considered our storage unit to end, at the depth.

Q  You  are perfectly willing to have the column , and your  testimony  on B-50 to read "Maximum recorded depth of storage unit," but on  page 47 it will read "Maximum depth  of

1  the storage unit in feet"; is that right?  Is that how the tes-

2  timony is to be?

3          A  Well, the way I see it--

4          MR. MOSKOVITZ:  Your Honor, I object to this.  I object

5  because Mr. Veeder is pursuing a matter which the witness has

6  testified does not concern the storage capacity at all.  It is

7  another element of basin characteristics.

8          THE COURT:  He is entitled to find out what it is.  I

9  will be frank, it is hard for me to follow what is in here.  My

10  only objection is his spending too much time on it, but if is

11  on the chart as the characteristic, what is  the  characteristic?

12  We know, in the case of Rainbow, the  witness said it was the

13  recorded depth of wells.  From that, he got the figure 22.  Now,

14  in Tucalota I don't know yet what the 22 feet is.  It is not the

15  depth of wells.  What is the 22  feet?  Can you tell me in

16  simple language?

17          MR. MOSKOVITZ:  Your Honor, we were going to check over

18  the noon hour our well on Rainbow, and I think  we had better

19  check these out and have an answer for  each one if Mr. Veeder

20  is going to go through each one.  These are matters that were

21  not regarded as being of significance in storage capacity, and

22  over the last few  days when Mr. James has checked storage

23  capacity, he did not go into this matter.  And I think that if

24  Mr. Veeder is going to make a point of it, and if your Honor

25  is interested in it, we had better check and make sure what each

1  one of them is.  And there, apparently, has been, a mislabeling,

2  at least in the--

3      THE COURT:  All right, you may do it over the noon hour,

4  and we will postpone that until  after you are finished.  That

5  may save some time.  Go  through and see what labeling you are

6  going to  put on each one of them.

7      Let me ask, generally, so I will understand generally

8  what this case is about:  What is the significance from the

9  Government's standpoint and the State of California's stand-

10  point as to the amount of storage capacity in the upper basin?

11  The comparison chart which is not yet in evidence, T,  shows,

12  as far as the coastal  area is concerned, the California fig-

13  ures for usable capacity of 24,000 acre feet; the Government's

14  figures are 26,200.  There is not much difference.  In the

15  upper valley, of course, you have this situation:  The United

16  States has not estimated storage capacity in some of these

17  smaller basins, claiming a lack of data.  We know, however, we

18  all concede there is some storage capacity.  California, on

19  the other hand, has made some estimates.  The Government has

20  made an estimate of storage in the old alluvial of 280,000 acre

21  feet.  And the  State of California has in that  area probably

22  only the Santa Gertrudis Basin, which, if I recall, was included

23  in the Government's older alluvial, ground unit four.  But if

24  you  add them all up,which  I just did here, the Government

25  shows 493,000 acre feet of storage.  To that, of course, will

1  probably have to be added, have to take into  account, there

2  will be additional storage in the smaller units that the

3  Government hasn't calculated because  we have got no figure

4  for it.  The State of California shows 385,000 acre feet of

5  storage.  What is the significance in the difference in the

6  amount of storage in the upper basin?  Mr. Veeder?

7      MR. VEEDER:  I would say, in the first place, your

8  Honor, that we have calculated in the lower part of Pauba

9  Basin, I think it is 280,000 acre feet.  We believe that that--

10      THE COURT:  That is in ground unit four?

11      MR. VEEDER:  Well, that is right.  That is the  the

12  Pauba Basin itself.

13      THE COURT:  Now, wait a minute.  I understand the

14  significance of whether there is a basin or isn't one insofar

15  as it affects the case, insofar as it affects the people who

16  own overlying  grounds.  But  what is the significance as to

17  exactly how much storage there is upstream there?

18      MR. VEEDER:  From our point of view, your Honor, it is

19  probably the most crucial single element in the case.

20      THE COURT:  Explain it to me.

21      MR. VEEDER:  Because of this:  We believe that one of

22  the prime reasons that there is no real surplus available is

23  because they are beginning to use those basins.  The reduction

24  in the quantity of water in those basins is extremely important,

25  because the only source of recharge, as Mr. James and Mr. Fox

1   have testified, the water that falls in the valley and is in

2   the surface streams.  Now, when those basins are pulled down,

3   their recharge must necessarily come from surface runoff, and

4   when that surface runoff is used to recharge the water con-

5   sumed in the upper basin, it simply does not come through  the

6   Temecula Gorge.  We live a precarious life downstream, and,

7   your Honor--

8        THE COURT:  I follow you.  What you  are saying is the

9   fact that the basins are pulled down, usable water, otherwise

10  pulled down the  stream, are used to recharge the basin.  What

11  is the significance as to whether there is a half million acre

12  feet of storage available up there or  whether there is a quar-

13  ter of a million acre feet?

14       MR. VEEDER:  Well, it is extremely--

15       THE COURT:  The significant question is the question of

16  how much  the basins are pulled down, and so forth.  How is it

17  too  important as to what the capacity of these basins are?

18       MR. VEEDER:  Because, certainly, your Honor, as we see

19  it, the ever-increasing economy up there is going to be measured

20  by the calculated available storage for use.  And the people

21  who are going in there, and the people who own these rights

22  to the use of  water are going to have that  great increment

23  available for them.  In our view, the overlying landowners will

24  have  the right to tap that water, and it may  be you will see

25  what is the difference between a quarter and a half million.

1   It is the amount of demand that will be made on the streams,

2   as far as we are concerned, and the quantity of water required

3   to recharge those basins.

4        THE COURT:  Yes, but the demand made on the streams

5   and the basins has a direct relation to the amount of water

6   needed to recharge them; but what is the relationship between

7   the storage capacity of the basins?

8        MR. VEEDER:  Well, the greater the pull-down-- the

9   greater the area that can be pulled down, the greater the re-

10  charge and demands-- the greater will be the demands for re-

11  charge.  In other words, your Honor, we are confronted right

12  now with, for example, the Roripaugh Well and these new wells

13  that are going in the Santa Gertrudis, and it is obvious to us

14  that they are being pulled down, and the extent that they can be

15  pulled down is the extent that there will be demand for recharge.

16       THE COURT:  I follow that.  Mr. Moskovitz, what can

17  you say to help me on this problem?

18       MR. MOSKOVITZ:  Your Honor, I think in many instances

19  the disparity in ground water storage calculations is of no

20  significance in this case.  As you have indicated, the key

21  question is the amount of recharge that will go into the basins

22  when they are used, and in the instances where you have tremen-

23  dous storage, whether it is 300,000 acre feet or 600,000 acre

24  feet, that will not be the controling element in determining

25  how much water will go in on recharge.  In some various small

Start
B3

1   basins, the amount of storage may make a difference; because

2   if the storage is very small, it may not be able to take as much

3   as it would otherwise.

4          THE COURT:  Pull down rapidly?

5          MR. MOSKOVITZ:  Yes.

6          THE COURT:  Is there any  argument but what the levels

7   of the water basins in the upper valley have been  pulled down

8   in recent  years?  Anybody  dispute that?

9          MR. MOSKOVITZ:  Well, in some of the  basins, the levels

10  changed very, very little.  In Murrieta, I understand, it has

11  been  very little.

12         THE COURT:  Whenever it is changed, it will be downward?

13         MR. MOSKOVITZ:  I think probably since 1927 we had the

14  last ground  water levels.  That is probably so.  It has been

15  downward.

16         THE  COURT:  Then, is there any dispute that the pres-

17  ent uses on the basins are, in the upper basins, are to an ex-

18  tent that overall the basins  are being depleted?

19         MR. MOSKOVITZ:  I don't think I would go so far as to

20  say that.  I would like to consult  with my experts.  My under-

21  standing is, though, your Honor, that this is not  true in many

22  of the basins.  In many of the basins, there has been no sig-

23  nificant change downward.  In some, there has been.  But, you

24  put your finger on the controling point:  How much recharge is

25  going to go in?

THE COURT:  The more of the water is used out of the streams and basins, the more recharge will be required.

MR. MOSKOVITZ:  To an extent, to an extent, but the way the water comes, further pulling down of storage may merely be mining the water and not necessarily causing any additional amount to be recharged into the basins.  I think this is a question that has not been touched enough upon in this case yet.  We hope to point that out.  But, in direct answer to your question, then, about the storage capacity:  I think in many cases it is not significant.

THE COURT:  It is significant, I will concede, as to people who own property over a basin or over in the source of water that is connected with the stream.  But, in the overall picture, I don't think it is significant whether it is 385,000 acre feet of usable storage, or whether it is 500,000 acre feet of usable storage in the upper basin.

MR. MOSKOVITZ:  Take this ground water storage unit number four.  The fact that the State has not computed the storage capacity there doesn't mean that the State doesn't believe there is quite a bit of storage capacity there.  There is a lot of it there.

THE COURT:  I should have pointed out when I said although the Government hadn't figured the smaller basins, we still had to concede there was capacity there; and, by the same token, although the State has not computed what the

1   Government calls ground unit basin four, you would have to con-

2   cede, and you have to concede, there is ground water storage

3   there.

4        MR. MOSKOVITZ:  And quite considerable ground  water

5   storage there.

6        THE COURT:  When you get all done, what have you got?

7   What disputes have we got, unless somebody is going to call

8   upon me to determine how many acre feet of storage there are

9   in these basins?   And how that will solve this lawsuit, I

10  don't know.  You see my quandary?  I am particularly inter-

11  ested in the amount of water used out of these areas, and how

12  it is used, and how the basins will be replenished.  But I

13  don't know that we ought to spend too much time on trying to

14  calculate how much storage capacity exactly is.  At best, it

15  is an approximation.  Any expert who would get up here and tell

16  me he can figure this out to a T, I wouldn't believe him any-

17  how.  It is an approximation based upon best judgment of the

18  man on the basis of what he can find.  And  when you  get all

19  done, I don't care who your  experts were, you would have some

20  variances.  And when you shake it all down, we all concede that

21  the storage capacities in the smaller basins, the only dis-

22  crepancy really involved is the fact that the State lists two

23  basins, the Government doesn't-- French and Los Altos-- which

24  I don't think has any particular impact on the case except as

25  to people who might own property in that area.  And the

1  Government says they have enough data to calculate a storage

2  unit in the older alluvial.  The State concedes  that there is

3  water there, but they say "we haven't got enough  data to draw

4  lines of contour to calculate the water."  I am interested in

5  getting on with this case, and I am interested  to getting down

6  to the issues that are really going to  concern us in a decision

7  of this  case.  I don't know whether  we are pointing  to the

8  mark or not.

9       MR. VEEDER:  I think we are, your Honor.  I think that

10  it may  be that you will say, well, the acre feet disparity is

11  not great.  But a course of testimony and a course of conduct

12  by the State has been adopted.  It is extremely important to

13  the United States in this regard.  I had truly thought that

14  these witnesses would be called and cross-examined-- I mean,

15  direct examination-- and that we would go ahead that way.  But,

16  no, we have an  Appendix B in the record,  And if this man, Mr.

17  James, had testified on direct examination, the numerous errors

18  that we find in Bulletin 57, we would certainly have been per-

19  mitted to cross-examine him on those.  Now, it goes a great

20  deal to the credibility of this witness.  It goes, indeed, to

21  the very heart of Bulletin 57.  It goes to the heart, these very

22  points that  we are talking about-- indicating in regard to

23  these exhibits, which I have now put on the easel-- what I have

24  been interrogating about is simply preliminary to moving in to

25  exhibits presently in the record.  We are confronted with, I

think, probably the most serious problem, certainly, that I

have ever had in the courtroom; we are confronted with your

Honor's  statement that he will not take cognizance of the per-

mits that were issued to Fallbrook and that they are not part

of this case.  Your Honor has dismissed several of our counts

in the complaint, to our great prejudice.  The data upon which

those permits were issued is data concerning which this witness

cannot testify, because he doesn't know.  Now, it is my inten-

tion, your Honor, before very long, to raise some questions of

law and ask to  be  heard as to whether or not the counts to

which I have alluded are not properly before your Honor.  Now,

I am sincerely hopeful that I will not be restricted  in cross-

examination, because I believe that the State's case is fall-

ing apart very rapidly.  I believe that their bulletin is all

that I have said that it was, facetiously, and almost costly.

And I sincerely hope that before much time has gone by that

your Honor will see why I jokingly referred to it at first,

and why I am so sincere about it now.  I hope that I will be

permitted to cross-examine in detail.

THE COURT:  I am going to permit you to cross-examine,

because by putting  this matter in in a narrative form, ob-

viously  you should have a right to cross-examine.  I am just

suggesting that you not run too long in one place.  When you

have made a point, a column of figures doesn't mean anything,

and counsel has asked permission then to go over them and see

B3
S18

1   what identification they can give to them, it is a good time to

2   stop on that and see what they come up with.  If they come up

3   with some other identifcation of the figures, why, maybe you

4   want to cross-examine; maybe you don't.  I mean, let's don't

5   run  too long in one place.   I am certainly going to let you

6   cross-examine.   I think even with extensive cross-examination,

7   we will have saved time.  The witness has been interrogated at

8   length on direct.  And then the cross-examination follows.  You

9   probably would use more time than we will use in the method we

10  are following.

11       MR. VEEDER:  I am not being in the slightest critical,

12  your Honor.  The only point I am making is that the more you

13  get into Bulletin 57, the less you  get out of it, if I may

14  say.

15       THE COURT:  We will take our morning recess.

16       (Short  recess taken.)

17

18

19

20

21

22

23

24

25

6561

1       MR. SACHSE:  Your Honor, may I make a brief statement

2   along the same line that Mr. Moskovitz and Mr. Veeder just did.

3       Speaking now only of my client Fallbrook only as an

4   appropriator and not of Fallbrook as a riparian proprietor

5   which has a few limited acres of riparian land, I believe

6   that this question of storage capacity upstream is completely

7   immaterial to the case of Fallbrook.  The reason is this--

8   I have said it many times before and I repeat it again for the

9   record-- as an appropriator Fallbrook takes subject to the

10  hazards of upstream development.

11      To use a more concrete example than Fallbrook, the

12  Vail dam is also an appropriation, and I presume that theo-

13  retically if every basin upstream from the Vail dam were

14  sucked down to nothing there might come a day when there would

15  be no water behind the Vail dam.  There is an existing

16  appropriation.  But that doesn't mean that Vail could stop

17  this upstream development as an appropriator.

18      Fallbrook can't stop upstream development.  If we

19  could prove, if it were unanimously agreed that all of the

20  upstream overlying owners were mining the water and were

21  ruining their basins, as an appropriator we cannot complain.

22  Perhaps the United States as a riparian could, or certainly the

23  United States as a riparian could.  But as an appropriator we

24  couldn't.  As an appropriator we take subject to all of the

25  hazards of upstream development.

1           A very concrete example exists in the case of our pres-

2    ent permit on the San Luis Ray.  23 years ago the State gave

3    us a permit to pump water from the basin.  The State found that

4    there was at that time a surplus.  That pumping is now enjoined.

5    There is no more surplus, under the findings that are now in

6    effect, and until the basin rises to a certain level we can't

7    take out of that basin.

8           Exactly the same condition will exist on a surface flow

9    appropriation, such as we are pressing on this River.

10          Now so much for Fallbrook.  We can't so anything about

11   it if they do mine the water.

12          THE COURT:  Let me add to whatyou have just said.  Let

13   us assume that the basins are pulled down upstream.  When flood

14   waters come, there is going to be more of the flood waters used

15   to fill up the basin and there is going to be less water

16   available to appropriate-- assuming that you have that right.

17          MR. SACHSE: And conceivably, as I say, it could reach

18   a stage where there would be zero to appropriate.  That could

19   well happen.

20          But the point that I think we are inclined perhaps to

21   overlook, to look ahead, your Honor, and say to yourself,

22   "What am I going to do about this? What can I do?"  Assuming

23   that you are convinced that the future devebpment of these

24   areas is going to be such ultimately that there will not be

25   enough, there may no longer be a surplus, what can we do about

1   it?  Can you today tell a land owner to stop pumping unless

2   he has injured his neighbor?  I don't think you can.  I don't

3   believe you have that power.

4       THE COURT:  I don't have any right to make them stop

5   pumping to make water available to Fallbrook.

6       MR. SACHSE:  No.  But I question that you have a right

7   to make him stop pumping until his pumping injures another

8   riparian or another overlying owner.

9       In other words, you can't start to ration water now

10  before there is a need for it.  You can't start to ration it

11  on the assumption that 20 years from now you are going to have

12  to ration it.

13      On the state of the record-- of course, the case is

14  far from over, but on the state of the record we have no proof

15  of any deficiency.  We have no proof of any injury.  And how

16  today, or when this is finished, are you going to say-- again

17  take a concrete example of Mr. Roripaugh-- to pump X acre feet

18  is all right, to pump Y acre feet is excessive?  Until the

19  crisis arises, until the injury occurs, you can't stop it.

20      To say just one word further on Mr. Veeder's constant

21  point of the Water Rights Board having granted us permits on

22  the assumption that there would be no further upstream de-

23  velopment.  I don't believe for one moment that that is true.

24  The Water Rights Board is as well aware as I am, as is stated

25  here, that we take subject to the risks of upstream development.

1   The Water Rights Board could perfectly legally and intelligently

2   have granted us the permits on the simple basis that some water

3   is running into the Pacific, and if we think, as a public

4   taxing agency, that we can economically and usefully capture

5   that, there is today then a surplus, and we have to weigh in

6   our minds and take into consideration the possibility that that

7   surplus may someday in the future disappear.  But as of today

8   Fallbrook can't complain, Fallbrook can't say a word if

9   Roripaugh pumps the basin dry or, for that matter, if Vail

10  does, or for that matter if anybody in Upper Oakgrove or

11  Aguanga Valley does.  They are overlying land owners and they

12  have an absolute right to take it, as far as we are concerned.

13  Possibly the United States as a riparian, if it feels that the

14  Vail pumping or that the Roripaugh pumping is excessive, can

15  complain.

16      But I don't think that the United States has yet told

17  us that they are making such complaint and that they specific-

18  ally want to try to restrict these upstream pumpings at this

19  time.  That is what we are going to be up against when this

20  case is finally submitted to you.  Do they ask us to do something

21  today or not?

22      THE COURT:  Mr. Veeder, let me ask you this.  Suppose

23  when we get through trying this case-- this is all suppositious,

24  we haven't heard the case-- and the Court hears the extent of

25  the riparian land in the upper basin, the land that could be

1   irrigated if there was sufficient water, land that is riparian--

2   take the Vail estate, take some of those plateaus, some of them

3   at least may be high enough to grow citrus, I don't know, but

4   some of them certainly couldn't because it is too cold in that

5   valley-- but all of the land in the Vail estate that could

6   be irrigated and other land that is riparian and the Court adds

7   up and finds that there is more riparian land that can be

8   irrigated than there is available water.  We will just assume

9   that.

10          MR. VEEDER:  I think you will.

11          MR. SACHSE:  I think you will, too.  No question about

12   it.

13          THE COURT:  And then assuming that we straightened out

14   all the matters on the riparian owners so that no one is

15   getting more than his share-- let's assume that.  Is there

16   any reason why, if a flood comes down and charges these basins

17   and goes roaring down this river, that an appropriator can't

18   come in and take some of that water and stor it?  Maybe there

19   will not be any.  There may be a series of dry years.  You may

20   build a dam that will have a dry bottom for a long time.  But

21   is there any reason, until such time as these riparians exer-

22   cise their rights, that somebody can't take the water that

23   slides by in flood time?

24          MR. VEEDER:  Your Honor, in the firstplace, I think the

25   response entails a review of the kind and type of lawsuit this

1   is, namely, a quiet title proceeding in which the United

2   States has asked to have declared and determined the rights

3   upstream.  We are talking about spending a quarter of a

4   billion dollars and I don't blame the Marines and the Navy for

5   wanting to know what their rights are.

6          THE COURT:  I understand.  That is perfectly proper.

7   That is the purpose of this suit, to adjudicate what the

8   rights of the United States are.  And so we adjudicate them,

9   we find what your riparian rights are and the extent of your

10   riparian ground, we find the extent of your appropriative

11   rights and prescriptive rights, if such exist, and we catalog

12   them.  Is there anything wrong with then saying that water

13   which comes down that stream at flood time is subject to a

14   permit issued by the State of California?

15          MR. VEEDER:  Your Honor, in that regard I have failed so

16   utterly to explain my position.  Chronicle the rights, set

17   them up A, B, C, or 1, 2, 3, I don't care, and if the Vails

18   and the United States and Roripaugh and Querry and Oviatt and

19   a thousand others receive the quantities of water to which

20   they are entitled at a given moment, then the next in order

21   of priority is certainly entitled to take it.  I live by that.

22          THE COURT:  That is all that Fallbrook has been asking

23   ever since this lawsuit started.

24          MR. VEEDER:  That is all I have ever said.

25          THE COURT:  All that Fallbrook has been asking is the

1  right to take flood waters that come down the stream or

2  riparian waters which upper riparians do not use.

3      MR. VEEDER:  Then it is not riparian water.

4      THE COURT:  Until such time as upper riparians use it.

5  And they concede that this permit they have is a permit which

6  is subject to all these vested rights.  They concede also, as

7  a practical matter-- I have heard Mr. Sachse say it here--

8  that all they anticipate they will get will be some flood

9  waters.

10      MR. VEEDER:  Sometimes.

11      THE COURT:  Sometime, maybe.  And if they build a dam

12  they may have to fill it with Colorado River water and use it

13  for that purpose.  But once in a while there might be a good

14  wet year where they could catch some water.

15      More than that, they probably anticipate that there

16  may be some riparian water which is unused-- I don't know

17  strong that anticipation is, but certainly what they do with

18  it can't affect any riparian owner.

19      MR. VEEDER:  Your Honor, since 1951 when an innocuous

20  little suit was filed by an innocuous little man, we have had

21  the same problem.  All I have ever said was that we would like

22  to have our rights adjudicated.  That is all I am here for.  I

23  have no other single purpose.  I daresay that when we get

24  through--

25      THE COURT:  Why are we so concerned about this permit?

1   Suppose the State gave them a permit. Maybe the State labored

2   and brought forth a mouse. Maybe it thought it brought forth

3   a mountain, but it brought forth a mouse. Let us assume for

4   argument that everything is as bad as you say it is. This

5   permit they have can't affect anybody's vested rights. Maybe

6   they will get something under it, maybe they will not. If

7   they want to spend money on a dam, it is their business.

8   Certainly the rights of the United States are going to be

9   protected as to any dam across that river. They are not

10   going to be allowed to interfere with the Governments riparian

11   rights, which are substantial. So why do we get so excited

12   about this permit?

13        MR. VEEDER:  I will tell you why, your Honor. The

14   permit was predicated upon Bulletin 57, and Bulletin 57 was

15   spawned in a political era that you say couldn't exist but it

16   did exist, and the State of California issued the right to

17   build a dam above the United States and declared that there

18   as a surplus. In fact, the testimony in there reveals--

19        THE COURT:  It is not binding on me whether they think

20   there is a surplus there or not.

21        MR. VEEDER:  But it is certainly making it very diffi-

22   cult on the United States. And more than that, at the very

23   time that this Court had directed us to convene for the pur-

24   pose of a pre-trial conference, at which California's

25   representative was presiding, California came in and held a

1  hearing, under circumstances that were as incredible as the

2  circumstances under which the Bulletin was written.

3      I say this, that the whole element of the issuance

4  of the permit to Fallbrook and the declaration that the permit

5  that the United States Navy had filed would be thrown out, I

6  say that those very elements called for a full trial and called

7  for a very sound reason to attack the permit, and I will spend

8  my life at it, for this reason:  It smacked of corruption,

9  and that is the only word I can use.

10      And I will say this, that when we are through-- I

11  haven't forgot the "Dear Franz, Dear Henry" exchange at all--

12  we say this, that in this courtroom Bulletin 57 is disinte-

13  grating, we are saying in this courtroom that Fallbrook's

14  permit is disintegrating with it.

15      THE COURT:  Well, look, Mr. Veeder, let's not fight

16  straw men.  Suppose you or I had been sitting on a water rights

17  board and Rainbow came in and applied for a permit, Fallbrook

18  applied for a permit, the United States applied for a permit

19  to take some surplus water, and at the time of the hearing

20  the United States came in and refused to proceed-- raised some

21  jurisdictional question.  If you don't want to participate,

22  that is the business of the United States.  And so you hold a

23  hearing and you say that the board says that there is some

24  surplus water.  Really the only people who can be hurt by the

25  action of that water rights board are the people who rely upon

1   their finding of a supposed surplus and spend money to build a

2   dam.

3       MR. VEEDER:  But the United States--

4       THE COURT:  No, the United States can't be hurt.

5       MR. VEEDER:  Oh, yes.

6       THE COURT:  The only people who could be hurt would be

7   some person who took the findings of the Board as gospel and

8   said, "We are going to get some water and spend some money,"

9   and then it turned out there wasn't any and they might have a

10  real complaint about this quasi-legislative board that misled

11  them.  But how the United States or how any riparian could be

12  concerned I don't know.  Any riparian could stay away from that

13  hearing.

14      And the United States, of course, had an application

15  in there that was junior, but had an application in.  I assume

16  that being junior, it couldn't succeed anyhow.

17      MR. MOSKOVITZ:  That is not so, your Honor.  Fallbrook

18  was junior to Santa Margarita.

19      THE COURT:  Anyhow, the United States didn't participate.

20  What could the board do if they thought there was a surplus

21  but give somebody a permit?  Who can complain?  The fellow who

22  spends some money and gets hurt because he thinks there is

23  some surplus is the only one who can be hurt.

24      MR. VEEDER:  Your Honor, the United States can and will

25  be hurt very seriously.  We know that.  We don't live in a

1    vacuum.  I have spent my life in this work and I know that if

2    Fallbrook builds a dam the taxpayers will be robbed of their

3    water, as night follows day.  Let's face it.

4         I know more, that the acts of the State of California,

5    a party to this litigation by voluntary intervention, prove to

6    me-- and I will never live long enough to be proved incorrect.

7    that there was collusion between Fallbrook and the State,

8    and that collusion is proceeding today in this courtroom.

9         MR. MOSKOVITZ:  Mr. Veeder has used some pretty strong

10   words, your Honor.

11        THE COURT:  Yes.

12        MR. MOSKOVITZ:  I think it is about time for him to

13   be told to be a little more discrete in the way he accuses

14   people of corruption.  I resent it personally, and I know that

15   the people of the State of California resent it.

16        THE COURT:  I suggest that you terminate accusations

17   and if you have any proof, present it.  I would like to look

18   back upon my relationship with you and what I have known of

19   you as a first-class water lawyer and not a bull fighter who

20   went around fighting straw bulls.  That is the way I would

21   like to think about you in the future.  It seems to me that

22   you have built up a terrific straw bull here that can't hurt

23   you, except of course in this question as to the Government's

24   right to take unappropriated water.  There is no doubt but

25   that there is an impact between Fallbrook's permit and the

1   Government's claimed right to take unappropriated water. But

2   that is a question of law and I have ruled on it and I think

3   I am right and I don't think you have that right. So if you

4   haven't the right you were not hurt by what the Board did. That

5   is the only impact that Fallbrook's activities could have on

6   you, and that doesn't grow out of the fact that they granted

7   a permit. I didn't decide that the United States had no right

8   to take unappropriated water because the Water Rights Board

9   had granted Fallbrook a permit. I decided it on the basis,

10  as I read the law, that the Congress of the United States had

11  never told the $^N$avy Department expressly that they could take

12  this water, and that you don't have a right merely on the sayso

13  of the Solicitor General or of counsel or of an executive

14  officer of the United States to say, "We are going to take that

15  appropriative water." I didn't base that decision on the

16  fact that the Water Rights Board had acted. It wouldn't mean

17  anything to me what the Water Rights Board had done. If I

18  had decided that the Government had a right to take that water,

19  then anything that the Water Rights Board had done would

20  fall by the wayside.

21      That is the only impact that Fallbrook's activities can

22  have on the Government.

23      MR. VEEDER: Your Honor, if I truly could accept it I

24  would be the first to do so and I would go quietly home so

25  that you would not remember me as fighting a straw bull. But

1   I believe that that critter is quite lively and I am not going

2   to turn my back on him at all.  When I get through I am going

3   to ask your Honor to rule that the Fallbrook Public Utility

4   District was powerless to appropriate rights to the use of

5   water for the purpose of irrigation.  I believe that is before

6   you.  I think it is a question that, in my view,--

7        THE COURT:  That may be before me.  We will get to that

8   eventually.  It might be before me on the theory that any dam

9   on the River would require expense to guarantee the Government's

10  riparian rights.  It would be a possible source of friction to

11  the Government's right, and therefore if there was no power

12  to build a dam the erecting of the structure, even though the

13  flow of riparian water could be regulated, might be such an

14  activity that it should not go forward.  But that is another

15  point entirely.

16       MR. VEEDER:  May I add one more point there.

17       THE COURT:  And again I don't see why--

18       MR. VEEDER:  In the heat of things we attempted to bring

19  to your Honor's attention a very important factor in regard

20  to this case.  It being a quiet title proceeding and a proceed-

21  ing to remove clouds from the title, the question arises in

22  regard to every single right on the stream:  What was the

23  claimant's power to acquire a right?  So immediately irrespect-

24  ive of what the State of California did in connection with

25  its permit, granting a permit to Fallbrook, there arises here

6574

c z34

1   for adjudication, what is the right of the Fallbrook Public

2   Utility District, which is claiming a right which the National

3   Government declares clouds its title-- and it does cloud its

4   title, the very claim clouds the title-- and therefore there

5   is squarely before your Honor the question of the ultra vires

6   act, in our view, of the Fallbrook Public Utility District

7   claiming as a municipal corporation the right to take water for

8   purposes of irrigation.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     MR. VEEDER:  The important thing I would like to bring

2     to your Honor's attention is this:  Everyone says, "Well, there

3     is some surplus water there."  But is there surplus as long as

4     our basins are imperiled by salt water intrusion?

5         THE COURT:  I wouldn't be concerned about that.  It

6     may  well be when their rights are cataloged, there will be no

7     surplus water available except at flood time.  And at flood

8     time, you would be the first to concede that substantial amounts

9     of  water shouldn't run to the  sea.

10        MR. VEEDER:  I will declare that right off.

11        THE COURT:  You may have the right to have your allu-

12    vial plain  covered  by water, but some arrangement has to be

13    made, either by agreement or otherwise, to see that substan-

14    tial amounts don't run to the sea.  It may well be that Fall-

15    brook is taking water in dry seasons that  the United States,

16    as a riparian, has the first right to that water, and there is

17    no surplus for Fallbrook except flood time.  But Mr. Sachse very

18    religiously stated early in this case actually what Fallbrook

19    expected to get out of this litigation was the right to impound

20    some  ground water if, as, and when there were any.

21        MR. VEEDER:  I might add one more arrow, if I may.

22    Fallbrook is today, and has been, taking direct flow rights and

23    using them, in our view, for purposes ultra vires.  They are

24    invading our rights.

25        THE COURT:  Those are issues in this case we will have

D1
S20

1   to decide.  I am not saying that there aren't some issues of

2   that sort that have to be determined.  And  as long as they

3   have to be determined--

4          MR. VEEDER:  Well, your Honor has inquired as to my

5   fighting this straw El Toro, and I have to say--

6          THE COURT:  I am talking about this straw bull in the

7   upper basin, the sizes of the basins, and how much potential

8   storage capacity, and so forth.  It looks to me as if it is

9   something we ought to move on along as rapidly as we could,

10  and get to these matters that are  more pertinent.

11         MR. VEEDER:  I am in complete accord.  I think this:

12  That as we progress through  Bulletin 57-- and avoiding the

13  knit-picking, if possible, but nevertheless, it is important

14  to me-- I think I have found in there probably a thousand mis-

15  takes, not less than that, some minor and some major, but by

16  and large, it is the genesis upon which a permit that I think

17  is  very detrimental to the United States was issued.

18         THE COURT:  All right.  Let's proceed.

19  BY  MR.  VEEDER:

20         Q  You were going to tell  us  about Tucalota Creek

21  and how you arrived at the depth, the maximum depth, as you call

22  it, in that valley, as depicted on page 47.  We have a 22 there.

23  And the column says, "Maximum depth of storage unit in feet."

24  You have revised the column in regard to Rainbow.  Now, what

25  will you do  in regard to Tucalota?

1      A  Well, I have looked at some of the well logs, or at

2  the well logs of Tucalota Basin during the recess, and I find

3  here that the log 7S1E7D1 shows a depth to gray granite of 22

4  feet.  There are other logs in that basin, but this is the

5  one which we feel reliably depicts the contour of the basement

6  complex rock.  Now, we do not think that this one point sets

7  the maximum depth to which permeable materials extend.  It does

8  depict at that one point.

9      Q  It is not the maximum depth of the storage unit in

10  feet, in other words, is that right?

11      A  It is the maximum recorded depth, the maximum re-

12  liable recorded depth,  we feel, of bedrock in that area.

13      Q  Isn't it true you found some that are over 100 feet?

14      A  We found some that are over 100 feet deep, but we

15  don't place reliance on those logs.  However, we did use, in

16  calculating our storage capacity, a depth greater than 22 feet,

17  because we do feel the basin extends to greater depths at other

18  points than this log.

19      Q  In other words, this 22 is in error, is that right?

20      A  No, I don't say  the 22 is in error.  I say it is

21  recorded here 22 feet, and that is the deepest-- that is the

22  recorded depth to bedrock that we feel  is reliable at that

23  point, at the point of this log.

24      Q  So then, you will change this, as I see it, from

25  maximum depth  at the point of the well 22 feet, is that right?

A  I don't understand you.

Q  It is not reflective of what is true when you have here-- this is your testimony, remember:  "Maximum depth of storage unit in feet, 22 feet."  And that is not the figure that you use in calculating your storage capacity, isn't that right?

A  Well, I have already stated in the testimony that we did not use the figures in that column to compute storage capacity.

Q  So the figure is  meaningless, is that right?

A  I wouldn't say it is meaningless.  It shows a maximum recorded depth to the base of the material.  That is what it says in the column.

Q  All right.  Then you write  "Recorded" in right here, "Maximum recorded depth."

A  Well, I believe that was written in, wasn't it?

Q  No.  No, not on Tucalota.

A  Well, it was written in the column head.  Do you want it written under "Tucalota," too?

Q  Friend, you are over here under--

MR. MOSKOVITZ:  Your Honor, I don't see why we have to keep writing in different things.  We are going to  review this and indicate what the column headings should be for all of these.

THE COURT:  Yes.  We will pass it up.

start
D2

1      MR. VEEDER:  You are going to revise it?  You  are go-

2  ing to revise this column head?

3      MR. MOSKOVITZ:  We are going to review it.

4      THE WITNESS:  We  are going to revise one of these

5  other pages.  It is the same column.

6      THE COURT:  Go on to something else.  He is going to

7  look it over at noon and see on that very question.

8      What depth  of aquifer did you take in  Tucalota Basin?

9      THE WITNESS:  I'll have to refer to our notes.  I be-

10  lieve the-- someone has them.

11      THE COURT:  Is that T?

12      THE WITNESS:  It was between 50 and 100 feet.  The en-

13  tire depth is not recorded on these sheets, your Honor.

14      THE COURT:  You mean it varied between 50 and 100 feet?

15      THE WITNESS:  Yes.

16      THE COURT:  Fifty feet in some places, 100 in others;

17  is that it?  Or are you talking about an aquifer--

18      THE WITNESS:  Your Honor, we drew an isopach map on

19  that  area which extended-- the deepest point we have in that

20  basin is a 68 feet that we used to-- we thought controled bed-

21  rock contact.  Then it extended somewhat beyond that depth.  I

22  can't get the--

23      THE COURT:  You say the deepest point was 68, and then

24  it extended beyond that depth?

25      THE WITNESS:  That was a point on a log where we thought

1   might represent the bottom of the, our best interpretation of

2   the log.  We felt that was the contact at that particular point.

3   And then, due to the topography surrounding the basin, we fig-

4   ured it probably went down a bit beyond that 68 feet.

5        THE COURT:  Let me see that isopach map, Exhibit B.

6        THE WITNESS:  The deepest part would be in, of course,

7   the center of the innermost contour.

8        THE COURT:  You figured it  was 25 feet  to the water

9   table; right?

10       THE WITNESS:  Yes.

11       THE  COURT:  And then you cut off the bottom 25 feet?

12       THE WITNESS:  I believe so, your Honor.  That would

13   appear on the sheet to which you are referring.

14       THE COURT:  Go ahead.

15  BY MR. VEEDER:

16       Q  And, of course, the Footnote A would have no appli-

17  cation to Tucalota; isn't that right?

18       A  Just a minute, please.  I want  to get this material

19  straightened about.  Well, the usable storage capacity was

20  computed, as the judge just remarked, between the record high

21  water table and a point 25 feet above the bottom of  the basin.

22  And since this basin is comprised of recent alluvium, I would

23  say  that Footnote A did apply.

24       Q  And about the 22 feet?

25       A  What about it, Mr. Veeder?

1      MR. MOSKOVITZ:  What is the question?

2  BY MR. VEEDER:

3      Q  What about the 22 feet, then, to which you have

4  made reference?

5      THE COURT:  All right.  Let's go on to something else.

6  You have already been over that.

7      Mr. Witness, when you were previously examined about

8  the Tucalota Basin, my notes show that you said the Footnote A

9  was in error at that time.

10     MR. VEEDER:  That is correct.

11     THE COURT:  And apparently, at that time, you weren't

12  sure what the 22 feet item was and you said that the Footnote

13  A was in error.

14     THE WITNESS:  Well, I wasn't sure, your Honor, nor have

15  we gone over that column completely yet; which we intend to do

16  this noon hour.

17     THE COURT:  So Footnote A is not in error,then; the

18  usable storage capacity was calculated from historic high water

19  table, which was 25 feet from below the ground--

20     THE WITNESS:  Yes.

21     THE COURT:  -- and a surface 25 feet above the base of

22  recent alluvium?

23     THE WITNESS:  That is true in the bottom 25-- let me--

24     THE COURT:  All right, now.  When this basin was cal-

25  culated or sketched on your isopach, there would be parts that

1  would be deeper than others, would there not.  You said some-

2  thing over 68 feet for the deepest part?

3       THE WITNESS:  Yes.

4       THE COURT:  Now, would this 25  feet that you subtracted

5  be 25 feet up from the bottom at all levels so that where you

6  have listed there, I think, a note of about 45 feet, you have

7  that on the isopach, you think?

8       THE WITNESS:  Yes, we have a point 45 feet, your Honor.

9       THE COURT:  You take 25 feet off of that,  and that

10  would leave  20 feet, and you take 20  feet from the top, you

11  wouldn't have any aquifer, water-bearing aquifer.

12       THE  WITNESS:  Well, your Honor, the way we did this,

13  we divided the isopach  map up into two  subareas.  We divided

14  each of these basins into a number of subareas in order to com-

15  pute the storage within each.

16       THE COURT:  All right.

17       THE WITNESS:  What I am starting to say is that we

18  subtracted the bottommost 25 feet from the deepest of those

19  subareas.

20       THE COURT:  Then you didn't take the 25 feet off of the

21  other subareas?

22       THE WITNESS:  No, sir, just the one.

23       THE COURT:  That is what I wanted  to know.  Then, this

24  Footnote A, that the surface is 25 feet above the base of recent

25  alluvium, isn't correct?

1          THE WITNESS:  Well, it is above the base of the recent

2    alluvium.

3          THE COURT:  In the deepest area?

4          THE WITNESS:  In the deepest subarea, yes, sir.

5          THE COURT:  So that if there were a sort of pit in the

6    bottom of this basin, you took 25 feet off of there?

7          THE WITNESS:  That's correct.

8          THE COURT:  And the sides of the basin, you didn't take

9    25 feet off there?

10         THE WITNESS:  No, sir.

11         THE COURT:  It is time for a recess.  It is the noon

12   hour.  We will adjourn until two o'clock.

13         (Whereupon, at 12:05 o'clock p.m., a recess was had

14   until 2:00 o'clock p.m. of  the same  day.)

15

16

17

18

19

20

21

22

23

24

25

1      SAN DIEGO, CALIFORNIA, TUESDAY, DECEMBER 16, 1958.  2:00 P.M.

2

3                    LAURENCE JAMES,

4      recalled as a witness in behalf of the defendant State of

5      California, having been previously sworn, testified further

6      as follows:

7

8                    CROSS-EXAMINATION (Resumed)

9      BY MR. VEEDER:

10          Q  Did you locate the wells upon which you relied in

11     Tucalota Creek Basin?  We are unable to identify them from

12     these notes, as nearly as we can tell.

13          A  No, I haven't gotten those.  I worked on another

14     matter during the noon hour.

15          THE COURT:  Put it over until tomorrow morning.

16          MR. MOSKOVITZ:  Let me be sure I understand.  What was

17     this question?

18          MR. VEEDER:  I am inquiring about the wells upon which

19     he relied in arriving at the storage capacity in Tucalota.

20          MR. MOSKOVITZ:  You mean in computing the specific

21     yield?

22          MR. VEEDER:  Yes.

23          Q  Now, as a matter of fact, if you were to draw a

24     cross-section of Tucalota, you would have protruding, would

25     you not, a 22-foot area of basement complex in there?

1      A   You are referring to that column again?

2      Q   Yes.

3      A   Which we said we did not use for computing the

4   storage capacity?

5      Q   That is right.  But you said that you used some

6   other wells and did not use this 22 feet, this well that was

7   22 feet in depth; therefore, your cross-section would show a

8   sort of mound 22 feet high, wouldn't it, right in the middle

9   of the storage capacity?

10      THE COURT:  You don't mean 22 feet high?  You mean 22

11   feet from the surface?

12      MR. VEEDER:  That is right.

13      Q   Well, it would be almost 22 feet high, because you

14   are figuring from 45 feet, aren't you?

15      A   While we are talking here, I have here the logs

16   that we used in computing that, if you would like those numbers.

17      Q   I will get them, yes-- I say I will get them, because

18   I want to check them out.  You don't need to take the time to

19   read them.

20      Now, what kind of cross-section--

21      THE COURT:  The logs to which you refer appear in

22   Exhibit S for Identification or T for Identification?

23      MR. VEEDER:  Here is T, your Honor.  I don't know.

24      Would you check those?

25      THE COURT:  What were you reading from?  Mr. Veeder cut

1    you off and said he would check them out.

2          THE WITNESS:  I am reading from our computations, your

3    Honor, our calculation sheets.

4          THE COURT:  Were those marked T for Tucalota Basin?

5          THE WITNESS: The actual calculations are marked T, but

6    in addition to those-- the logs are not contained in T, your

7    Honor-- there is another calculation sheet here that I am

8    referring to.  It is called "Well group computation for

9    specific yield."  This is a standard form that we use for this

10   type of work, and these logs are listed on that sheet.

11         THE COURT:  With reference to the basin they are in?

12         THE WITNESS:  Yes, sir; Tucalota Basin.

13         THE COURT:  And this is the sheet just for Tucalota

14   Basin?

15         THE WITNESS:  Yes, sir.

16         MR. MOSKOVITZ:  Show the Court what you are referring

17   to here.

18         MR. VEEDER:  Has that been marked for identification?

19         MR. MOSKOVITZ:  No, it has not.

20         THE WITNESS:  You see here, your Honor, Tucalota Basin

21   computations, and these are the logs, and there is a second

22   sheet here similar, only with a third log.

23         MR. VEEDER:  I would suggest that they be marked for

24   identification now before we go any further.

25         THE COURT:  Is this book all of well logs?

1          THE WITNESS:  Yes, sir, these are all well logs in the

2     Santa Margarita Valley, plus some calculations in regard to the

3     coastal area.

4          THE COURT:  We will mark the entire book for identi-

5     fication, because each sheet is numbered but I don't know

6     whether they are in series or not.

7          THE WITNESS:  They are in alphabetical order.  Basins

8     are in alphabetical order.

9          THE COURT:  And the sheets numbered within the basin?

10         THE WITNESS:  Yes, sir.

11         THE COURT:  In the right-hand corner of each sheet is a

12    basin.  Looking toward the back of the book:  Reid Valley,

13    sheet 7, Santa Gertrudis Sheet 10 is the next one, Santa

14    Gertrudis 10A, Santa Gertrudis 10B, Tucalota Sheet A with the

15    word "Superseded" written on it, Tucalota Sheet 8A, Tucalota

16    Sheet 8B.  They don't seem to run numerically in order.

17         THE WITNESS:  Your Honor, we had those originally in

18    a different order, and then they have been reorganized and

19    they are now in order according to basin.

20         THE COURT:  What I am thinking about, rather than tear

21    the book apart, if we can mark the book in some way and just

22    refer to the page in the book, wouldn't that be much better?

23         MR. MOSKOVITZ:  Yes, your Honor.  These of course are

24    all the original work papers and we hope they are not going

25    to be lost to the State.

E2

1    THE COURT:  They will not be lost.

2    MR. VEEDER:  It is passing, strange that they weren't

3 available for cross-examination.

4    THE COURT:  They are being made available for cross-

5 examination.

6    MR. VEEDER:  I had rather desired to prepare from these.

7    MR. MOSKOVITZ:  We were asked to do certain work for

8 the Court, and these were utilized in doing that work.  They

9 are certainly available.

10    THE COURT:  Well, what we will have to do will be to

11 have the Clerk go through and number each page.  I notice that

12 there are about five pages to start, and then there is a

13 section called "Ysidora Basin," a section called "Chappo

14 Basin," a section called "Upper Basin," and then the final

15 section is called "Pauba Valley," and apparently in Pauba

16 Valley you have Tucalota and all these others thrown together.

17    THE WITNESS:  No, they shouldn't be that way.

18    MR. MOSKOVITZ:  Your Honor, are you referring to the

19 tab Pauba Basin and then the other composits following that?

20    THE WITNESS:  Each basin was folded together as a

21 group, and then went on alphabetically to the next group folded

22 together.  That is the way it was intended to be.  I see that

23 one is folded over two others.

24    THE COURT:  Probably a mistake?

25    THE WITNESS:  Yes.

1          THE COURT:  Do you know of any other way to do this

2    than to have the pages numbered?

3          MR. MOSKOVITZ:  I suppose that would be the most

4    orderly way.

5          THE COURT:  When we come to a group, fold them together

6    and give them one number, or what?

7          THE WITNESS:  That is the way they are intended to be

8    included in the binder.  That is the way we bind them.

9          THE COURT:  This sheet seems to be the first page?

10          THE WITNESS:  That was in the front, yes, your Honor.

11          THE COURT:  Mark it U for Identification.  And Mr.

12    Clerk, put something on this to get this back.  And then start

13    out down in the right-hand corner and number each page con-

14    secutively, and when you come to a group folded together--

15    let's see where they are-- just number the outside page.  When

16    we have to identify them we will break them down at that time.

17    Here is a group folded together.  Just number this corner,

18    number each of these corners.

19          U for Identification.

20          This is work sheets on storage basins; is that right?

21          THE WITNESS:  Yes.

22          (Defendant State of California's Exhibit U for Identi-

23    fication.)

24    BY MR. VEEDER:

25          Q  In that U for Identification we will find the logs

Iden
U

1 utilized by you to determine specific yields; is that right?

2     A  That is true. The actual drillers' logs are in these

3 binders.

4     MR. MOSKOVITZ: Let's identify what you are referring

5 to. Those are California's Exhibit L, Appendix F, Logs 2, 3

6 and 4.

7     THE COURT: What are these? Have they been marked?

8     MR. MOSKOVITZ: Those were marked sometime ago, your

9 Honor. Those are three books of well logs.

10     THE COURT: I see.

11 BY MR. VEEDER:

12     Q  I want to be sure I understand the course we must

13 pursue to find out how you did this. You first go-- You tell

14 us how you did it, sir.

15     A  All right. First, we delimited the boundaries to

16 the basin, in this example here Tucalota Basin. We next-- Well,

17 in the course of our field examination we had collected

18 certain well logs in regard to that basin. These logs were

19 placed in Exhibit L, Logs 2, 3 and 4.

20     THE COURT: L, Appendix F?

21     THE WITNESS: L, Appendix F, yes, your Honor.

22     THE COURT: Log 1, Log 2, Log 3, and Log 4?

23     THE WITNESS: That is right.

24     We next plotted on a sheet the locations of the wells

25 with logs in the basin, within the basin as drawn. We then,

1   on examining the logs, divided these basins into subareas so

2   that we could get the best representation, and the logs which

3   best represent the conditions within the basin itself.

4   BY MR. VEEDER:

5       Q With regard to Tucalota, how many wells did you use?

6       A  How many wells?

7       Q  Yes.

8       THE COURT:  You will probably have to wait until the

9   Clerk finishes marking Exhibit U, Mr. Veeder.

10  BY MR. VEEDER:

11      Q  Go ahead.

12      A  We then divided each of the subareas into depth

13  zones, in most cases into 50-foot intervals.  We took the

14  basic data logs here in L, Appendix F and divided the materials

15  on those logs into 50-foot intervals and the 50-foot intervals

16  are recorded in the book which the Clerk has at this time.

17      MR. MOSKOVITZ:  Exhibit U for Identification.

18      THE WITNESS:  Next, we went through the logs by zones

19  and computed a weighted average specific yield for each depth

20  zone within each subarea.

21  BY MR. VEEDER:

22      Q  May I interrupt.  When you say "weighted", what do

23  you mean by "weighted"?

24      A  We took a weighted average.  We considered the

25  specific yield in each well within the zone.  But then we had

1  a number of wells, so we had to get the average specific yield

2  within the zone, however many wells there happened to be in the

3  particular subarea.  It was a matter of averaging up the

4  specific yields within the subarea.  We then planimetered the

5  areas within each subarea and within each depth zone.  The

6  areas that we obtained in this manner we multiplied the

7  thickness of the zone, which was in most instances 50 feet,

8  and multiplied the product so obtained again by the weighted

9  average specific yield which was determined in-- I can't

10  remember the exhibit number again.

11          THE COURT:  That last one, the book?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  U.

14          THE WITNESS:  And this gave us the storage capacity

15  within the particular depth zone within the particular sub-

16  area.  Now, the total storage of the basin was then taken as

17  the sum of all these integral parts.

18          MR. MOSKOVITZ:  I might point out, your Honor, that

19  California's Exhibits Q and R, which I passed out this morning,

20  summarize these steps for two basins and give the calculations

21  as examples for Murrieta and for Oakgrove.

22  BY MR. VEEDER:

23          Q  Are you through as to how you arrived at your--

24          A  Yes.

25          Q  You are.  Did you use the procedure for estimating

1    ground water storage capacity as set forth on B-65?

2        THE COURT: B-65 of Appendix B?

3        MR. VEEDER:  That is correct, sir.

4        THE COURT:  What paragraph are you referring to?

5        MR. VEEDER:  Well, it is a whole series there and I

6    couldn't follow him when he was speaking there-- I couldn't

7    follow from this.

8        THE WITNESS:  Yes, this is the method that we used.

9    BY MR. VEEDER:

10        Q  And what differentiation did you make between the

11    alluvial deposits?  Did you use the same for Recent alluvium

12    and older alluvium and the other soils and rock that you

13    encountered?

14        A  We took the material as it appeared on the logs and

15    assigned to each sedimentary type that appeared on the log a

16    specific yield value.

17        Q  So you didn't differentiate between Recent and older

18    at all?

19        A  We differentiated by the type of sediment. We didn't

20    differentiate by age.  We differentiated by the type of

21    sediment that appeared on the log.

22        Q  Now, in regard to the material that you utilized,

23    for example on Tucalota Valley, did you deduct from the storage

24    capacity this area which appears to be 22 feet below the

25    surface, or how did you handle such a circumstance as that?

1        MR. MOSKOVITZ:  Your Honor, I object to that question.

2        THE COURT:  Objection overruled.

3        THE WITNESS:  In Tucalota Valley--

4        THE COURT:  Just a minute.  Did you give a reason for

5   your objection?

6        MR. MOSKOVITZ:  Yes, I was about to give a reason, your

7   Honor.  Mr. Veeder has been told many times that the 22 feet,

8   that figure appearing in the column as to maximum depth, was

9   not involved in the calculations at all.  He is assuming

10  something that has already been--

11       THE COURT:  It may not have been involved in the

12  calculations, but the witness testified that that figure was

13  put in because that was the depth to gray granite in the

14  particular well; is that right?

15       MR. MOSKOVITZ:  Yes.

16       MR. VEEDER:  And it was the only reliable depth that

17  they had.

18       THE COURT: Well, I assume that gray granite is basement

19  complex.  And if there was gray granite 22 feet below the

20  surface, then somewhere there was gray granite 22 feet down.

21       MR. VEEDER:  And it would have to be deducted from the

22  storage capacity.

23       THE COURT:  Overruled.

24  BY MR. VEEDER:

25       Q  How much did you deduct from the storage capacity,

1   in light of that 22 feet whatever it is that was found in the

2   alluvial deposits?

3        A  Well, the 22 feet was used as a point on the isopach

4   map to control the configuration--

5        Q  May I see that.

6        A  -- the configuration of the bottom of the basin.

7        THE COURT:  This is part of Exhibit T for Identification.

8   BY MR. VEEDER:

9        Q  And where is the 22 feet?

10       A  Well, it is not shown on here, but it was used to

11   control it.

12       Q  And when you say to control it, will you please tell

13   me what you mean by that?

14       A  Well, on this isopach map there shows a sketch of the

15   limits of the basin as considered in the storage estimates.

16   You will note here that the basin is divided into two subareas,

17   1 and 2, and then using the best geologic data we had, both

18   surface and subsurface, we drew a depth contour.  By the way,

19   here is the 22 feet.  It is shown right here in pencil.  You

20   don't see it too clear.  Right at this point.  Do you see it?

21       Q  Yes.  But is it in the storage basin?

22       A  Very definitely it is shown in the storage basin,

23   in subarea No. 1.

24       Q  Go ahead.

25       THE COURT:  You drew one of your lines on your isopach

1    through this point marked 22 feet?

2         THE WITNESS:  Yes, it was used to control it.  Now, we

3    then went to work in the manner I described and computed the

4    storage within both subareas and added those two storages

5    together to get the gross storage, and then we knocked off so

6    much storage on the top and so much on the bottom.  If you can

7    show me that, I can tell you just how much.

8    BY MR. VEEDER:

9         Q  How much did you knock off?

10        A  We knocked off the upper 25 feet--

11        Q  Above the 22?

12        A  No, above-- the bottom 25 feet in the deepest sub-

13   area, we knocked off that 25 feet, and then we--  No, we knocked

14   off the top 25 feet and we knocked off the bottom 25 feet,

15   and that was a total deduction of 808.5 acre feet, which we

16   deducted from our gross storage capacity of 1390 acre feet to

17   give a usable storage capacity of 585, approximately.

18        Q  If I remember, you had 68 feet depth at one point

19   and you deducted 25 feet from that; is that right?

20        A  We deducted 25 feet--

21        THE COURT:  From the deepest area in the basin?

22        THE WITNESS:  Yes, your Honor.

23   BY MR. VEEDER:

24        Q  That would leave 43 feet from the surface, wouldn't

25   it?

1    THE COURT:  No, you misunderstand--

2    MR. VEEDER:  Maybe I didn't understand it.

3    THE COURT:  He had a point 68 feet, but that was only
4  one point on his isopach.

5    MR. VEEDER:  That is right.

6    THE COURT:  He had another point that went considerably
7  below that to almost a hundred feet, although he didn't give
8  an exact figure.  Then I asked him about when he knocked off
9  this 25 feet off the bottom whether he knocked off 25 feet
10  following the configurations of the basin or the lowest 25
11  feet, and he said they knocked off the lowest 25 feet.  In
12  other words, the 25 feet in that part of the basin where it was
13  deepest.  Therefore, assuming it was a hundred feet in that
14  area, they knocked it off so that it went down to 75 feet.
15  By the time they got over to the 68-foot level they didn't
16  knock off any thing.  But the time they got to the 50-foot
17  level they didn't knock off anything.  Do you follow me?  That
18  is what he says he did.  Let's not--

19    MR. VEEDER:  No, I will not labor it any more.

20    THE COURT:  ---make it any more confusing than possible.

21    MR. VEEDER:  I am searching for the truth, your Honor.

22    Q  You will give us these computations, will you not?
23  In other words, we will be able to get it all out of this
24  material here, your location of this well?

25    A  Yes, you can have this back, as a matter of fact now,

1    if you want it.

2            MR. MOSKOVITZ:  By "this" you mean--

3            THE WITNESS:  California's T.

4    BY MR. VEEDER:

5            Q  Now, in regard to the Murrieta Basin, if we may

6    digress momentarily to the basin, the statement which I will

7    read to you is as follows: --

8            MR. MOSKOVITZ:  Where are you reading from?

9            MR. VEEDER:  Page 74.

10            THE COURT:  Of the text?

11            MR. VEEDER:  Yes, your Honor.

12            THE COURT:  In Volume I?

13            MR. VEEDER:  In Volume 1.

14            ". . The basin area is limited by the extent of

15                    Recent alluvium, which is bounded on the

16                    northeast and southwest by older alluvium

17                    and is generally 100 to 125 feet in depth. ."

18            Is that a correct description of the basin, in light of

19    your most recent offering, which I believe has been numbered

20    California's Q?

21            A  Well for the purpose of calculating storage capacity

22    in that basin, we computed the storage to greater depths than

23    that.

24            Q  In other words, your description of Murrieta Basin

25    doesn't comport with California's Q; is that right?

1        MR. MOSKOVITZ:  This talks about areal extent.

2        MR. VEEDER:  Let the witness answer.

3        THE COURT:  Of course, this textual material, pages 62

4   to 81 of Volume 1 of Exhibit L, is not yet in evidence.

5        MR. VEEDER:  That is correct, but I think--

6        THE COURT:  You may cross-examine.

7        MR. VEEDER:  On cross-examination we can inquire.

8        THE COURT:  That is right.

9        Is there a difference, Mr. Witness, between what you

10   have written on page-- or what you have written under your

11   direction on page 74 and what you have now in Q for Identi-

12   fication?

13        THE WITNESS:  Well, the basin area is limited by the

14   extent of the Recent alluvium in this computation that we

15   have here.

16

17

18

19

20

21

22

23

24

25

F1
S28

MR. MOSKOVITZ:  By 'here," you are referring to?

THE WITNESS:  I am referring to Exhibit Q.  And the recent alluvium is generally on the order of 100 to 125 feet in depth.  However, our storage computations did go to greater depth than that.  I think we mentioned the other day that we did assume that some storage came from the older alluvium in Murrieta Basin.

BY MR. VEEDER:

Q  In other words, you are stating, then, that the quote that I just read to you as to the description of Murrieta Basin is different than the storage capacity which you have now benefited us with in California's Q?

A  We computed storage to somewhat greater depths, as I recall.

Q  And it is different, is it not?

A  Well, the statement here says it is generally 100 to 125 feet in depth, referring to the recent alluvium. To the best of my knowledge, that is still correct.

THE COURT:  What counsel is talking about is this statement:  "The basin area"-- now, of course, I am interjecting-- you could use area in the extent of aereal area, but, as you read further, it is obvious you don't mean that-- "is limited by the extent of recent alluvium which is bounded on the northeast and southwest by older alluvium which is generally 100 to 125 feet in depth.  This formation is underlain by older alluvium."

1    So you, in substance, have said the basin area is bounded on

2    the sides and the bottom by older alluvial.  And counsel is

3    pointing out, therefore, that your statement as to  the basin

4    here is as limited, but that in your Exhibit B-3 attached to

5    Appendix  B you use a 520-foot figure, and in Q you-- I haven't

6    read it carefully-- but apparently you go down below 100 feet.

7    And you testified  the other day that 100 is part of the older

8    alluvium underneath the younger as part of the basin.  Now,

9    counsel is pointing out that inconsistency and asking if you

10   have any  explanation for it.

11            THE WITNESS:  No other than we did go deeper than the

12   125 feet in computing our storage.  We definitely went deeper

13   than that.

14   BY MR. VEEDER:

15            Q  Did you go down to 520 feet, as shown on page B-47

16   of Appendix B?

17            A  I think that was brought forth in the testimony the

18   other day, that we did not go that deep, that we went--

19            Q  I am referring to California's Q.  Did you, or did

20   you not, in California's Q go down to  520 feet?

21            A  No, we did not go down to 520  feet in Q.

22            Q  How deep did you go?

23            A  Our deepest subarea was 450 feet.

24            Q  Now, you said 449 feet also on Friday as distinguished

25   from 520.

A   I think 449 was the depth of the well, and we ex-
trapolated that another foot.  We felt justified in doing that.

Q   Now, on page 62, you state--

THE COURT:  Of the text?

MR. VEEDER:  Of Bulletin 57.

THE COURT:  Exhibit L, Volume 1.

MR. VEEDER:  That is right.

Q   You describe a ground water basin as a "pervious
formation with sides and bottom of relatively impervious mater-
ial in which ground  water is stored."  Now, that, surely, is
not applicable to Murrieta storage capacity  described in
California's Q; isn't that right?

A   Well, we do feel that the flanking and materials that
underlie at depth-- it  has been brought forth in the  testimony
before-- are less permeable.

Q   Are they relatively impervious?

A   Well, relative to the recent alluvium, we feel it
is less pervious.

Q   You say it is impervious?

MR. MOSKOVITZ:  He didn't say  that.

THE WITNESS:  I didn't say it was impervious.

BY MR. VEEDER:

Q   You say it was relatively impervious?

A   Well, that is a matter of degree, again.

Q   What is the degree of relative impervious?  What do

1   you mean by that?

2       A   I mean that it is less pervious than the  material

3   which it surrounds.

4       Q   Then we continue:  In this report,"valleys filled

5   with recent alluvium are generally considered to constitute  the

6   basins although it is recognized that such  bodies of recent

7   alluvium, when surrounded by less pervious but still water-bearing

8   older formations, could be termed subbasins of a larger basin

9   comprising both materials."

10          THE COURT:  Are you reading page 62?

11          MR. VEEDER:  I am still  at 62.

12          THE COURT:  Exhibit L for identification, Volume 1,

13   page 62.

14          MR. VEEDER:  That is correct.

15       Q   What do you mean by that?

16       A   Well, now, I have lost you here.  Which sentence

17   are you reading?

18          THE COURT:  It is the last paragraph, and it is the

19   second full sentence starting out about eight lines from the

20   bottom:  "In this report, valleys filled * * *."

21          THE WITNESS:  I found it.  I don't understand just what

22   you want explained.

23   BY MR. VEEDER:

24       Q   How does that comport with what you say in regard

25   to the basins?

A   It says in here:  "The bodies of older, less permeable formations, are not generally treated as ground water basins herein because of the relatively small development of water from such material and the consequent lack of physical and hydrologic data."  Now, in some areas, we have more hydrologic data and physical data.

Q   Would you say that would be applicable to Murrieta Valley?

A   Beneath  the alluvium, the recent  alluvium in Murrieta Valley, we consider that to be the case, and we took those  deeper sediments into consideration in computing our storage capacities.

Q   And in making that computation, did you use specific yield for each of those depths?

MR. MOSKOVITZ:  Each of what depths?

MR.  VEEDER:  You have your step  number five:  "Logs of wells within each subarea"--

MR. SACHSE:  We are back to Q, now, Mr. Veeder?

MR. VEEDER:  Yes,  we are on Q.

MR. MOSKOVITZ:  What page are you  referring to, Mr. Veeder?

MR.  VEEDER:  On the first page.

THE WITNESS:  I would like to hear that again.

MR. VEEDER:  Well, I will ask it again.

Q   Did you designate specific yield for each one of

1    those depths that you have outlined there?

2        A  I think you will find that answered on Exhibit Q,

3    page 7, Table 2, where there is a specific yield value given

4    for each depth interval within each subarea.  Now, these

5    weighted  average specific yield values were, again, taken from

6    the computation sheets which  are set forth in, I believe, it is

7    State's Exhibit U.

8        Q  Oh, we will find those in U?

9        A  Very definitely.

10       MR. MOSKOVITZ:  Your Honor, if there is going to be

11   cross-examination on Q, I would like to offer it in evidence.

12   Mr. Veeder is, apparently, ready to cross-examine on it.

13       THE  COURT:  Let me look it over sufficiently.

14       MR. VEEDER:  I am just inquiring if he wants it in

15   evidence as this witness's testimony.  Are you making an offer?

16       MR. MOSKOVITZ:  Yes, I am.

17       THE COURT:  Q will be received as the narrative account--

18       MR. VEEDER:  And, of course, your Honor, I would like

19   to have all  the objections I made to the original Appendix B

20   applicable to it.

21       THE COURT:  I  forget what they were.  You had better

22   state them again.

23       MR. VEEDER:  I have stated them originally:  That there

24   was no proper foundation for Appendix B at all; that this wit-

25   ness has proved, in my view, that he didn't do the work and

1   doesn't know the correctness of the data set forth.  I have ob-

2   jected on the ground that it is not oral testimony; that the

3   testimony can only properly be elicited on direct examination

4   with questions and answers being presented; that the data,

5   particularly now, the data about which this material has been

6   based has not been made available, so far as I know, so far as

7   any examination is possible  to  ascertain how they arrived at

8   these figures.  Now, those are the objections that  I made.  If

9   I understand, your Honor has ruled that Appendix B is simply

10  admitted as this witness's testimony, and that this Q would be

11  on the same basis; is that right?

12       THE COURT:  Your objection is overruled, and Q will be

13  received in evidence as the narrative account ·of the testimony

14  of the witness if he were asked the questions by  question and

15  answer.  It shows also  computations  that he has made and how

16  he made them.

17       I want to ask you about  Table 2.  I notice a very

18  interesting thing.  In your subareas or well groups-- and by

19  well groups, you took  a group of wells, or a certain subarea

20  in the basin?

21       THE WITNESS:  That is true.

22       THE  COURT:  Now, of the eleven groups listed, the

23  first group were the deepest wells; right?

24       THE WITNESS:  Yes, your Honor.

25       THE COURT:  And the first group, then, would, by the

1  depth interval shown on Table 2, would be the deepest part of

2  the Murrieta Basin that you used to calculate the storage?

3      THE WITNESS: Yes, your Honor. There are also groups--

4  subarea nine has deep wells, too, you will note.

5      THE COURT: Nine? Yes, I notice nine. Let's look at

6  group one. Now, your depth intervals, ought to 50, and 50 to

7  100, those would be in the younger alluvial?

8      MR. VEEDER: I didn't hear those, your Honor.

9      THE COURT: The depth intervals, looking at his Table

10  2 at page 7 of Q for identification, ought to 50 feet, 50 to

11  100 feet, would be in the younger alluvial; right?

12      THE WITNESS: Yes.

13      THE COURT: 100 to 150 might be possibly in the

14  younger and possibly in the older alluvial?

15      THE WITNESS: That is true.

16      THE COURT: Now, you get down to 350 to 400, and 400 to

17  450, that is definitely in the older alluvial?

18      THE WITNESS: Yes, your Honor.

19      THE COURT: And yet those have the largest specific

20  yield of any of the depth intervals in the chart?

21      THE WITNESS: That is very true, your Honor.

22      THE COURT: 350 to 400 is .174 and 400 to 450 is .211?

23      THE WITNESS: Yes. There might very well be a large

24  lens in that area, your Honor. You will note in subarea A

25  that--

F1
S36

MR. SACHSE:   Subarea which?

THE COURT:   Subarea A?

THE WITNESS:   Subarea nine; I beg your pardon.   That at those depths the specific yields are comparatively much lower.

THE COURT:   Yes.  But in ten I notice that from 150 down  to 250  feet holds up pretty well  as to specific yield, doesn't it?

THE WITNESS:   That is true.

THE  COURT:  And in group six, 150  to 300 feet, would average out better than the younger alluvial; right?

THE WITNESS   That is true.

THE COURT:  If the older alluvial beneath the younger alluvial is part of a storage unit, why isn't the older allu- vial on either side of the Murrieta Basin down  in those depths also capable of yielding water into that basin?

THE WITNESS:  Your Honor, I think it is capable of yielding water.  The problem is that we just don't know about it.  I think this has been brought out before.  We don't have the data in some of these areas, and we don't know its permea- bilities; and it is an unknown that we may know more about at some later date.  We did not include it in anything because we did not have sufficient information to make what we thought was a meaningful estimate.

THE COURT:  All right.  Go ahead, Mr. Veeder.

BY MR. VEEDER:

Q   I would inquire also  as to where the-- you have a map showing each one of these  areas, have you, Mr. James?  I am speaking now of the-- did you  map the area?

MR. MOSKOVITZ:  Which areas are you talking  about, Mr. Veeder?

MR. VEEDER:  Subareas, or well groups one, two, and three.

Q   How will we locate those?

A   Those are on a transparent overlay that was sub-mitted sometime back as an exhibit, and I don't recall the designation of that exhibit.

Q   Would that be State's Exhibit L?

A   I believe--

MR. MOSKOVITZ:  California's Exhibit L, Table 15-2.

THE WITNESS:  Yes.

MR. MOSKOVITZ:  Would  this be the one?

THE WITNESS:  I am pretty  sure that  those subareas are delineated  on that.  On here you will notice numbers 1, 2,3, 4, 5, 6, so forth.

MR. MOSKOVITZ:  By "here," the  witness has referred to Exhibit L, Table 15-2.

MR. VEEDER:  And this has  not  been offered yet?

THE COURT:  No.  L, Table 15-1; the map used to per-imeter the area which was received  in evidence on December 12th.

1   But the overlay is not.  Would you like the overlay in evidence?

2         MR. VEEDER:  It is  entirely  up to California.

3         MR. MOSKOVITZ:  No, we have no particular reason for

4   putting it in evidence.  If you want to use it in  cross-

5   examination, go ahead.

6         MR. VEEDER:   Then, I would  certainly move to  strike

7   California's Q, because there is no way of possibly knowing

8   where, without foundation material, as to where these matters

9   will  be found.

10         THE COURT:  Oh, yes, Mr.  Veeder.  Exhibit Q gives us

11   the names of the wells in various areas, if I recall, if you

12   will turn to table one.  You take subarea one and you have

13   the area in acres and the depth that they finally went to in

14   estimating the basin,  and the areas as to the wells.  And

15   they  are in Seven Township  South, Three West.  So when you

16   start out you know what sections-- Section 17, Section 7, Sec-

17   tion 18.

18         In fact, I am interested to know just where that area

19   is myself.

20         MR. VEEDER:  Could  the witness locate us?

21         THE COURT:  You don't have a big map with  section

22   numbers on it here, do you?

23         THE WITNESS:  No, sir.  Actually, was it Exhibit L,

24   Table 15-2 you were curious to  know where it fits into the

25   picture, or--

1      THE COURT:  No, this particular, wells in this part of

2  the basin, in subarea one, Murrieta, shown on your  Table 1,

3  page 6, Exhibit Q for identification, where you list five well

4  logs.

5      THE WITNESS:  Those wells are shown on Plate 9-B.

6      THE COURT:  Nine-B.

7      MR. SACHSE:  Of Bulletin 57, yes, your Honor.

8      THE COURT:  All right, we will look at 9-B.

9      Does that plate give a section number?  Yes, 7 South,

10  3 West, to start with.

11      MR. VEEDER:  7 South, 3 West.  And your  section is

12  17; is that right?

13      THE COURT:  Three sections listed.  There is one in

14  Section  17, three wells in Section 7, and one well in Sec-

15  tion 18.  Section 7 seems to be the second tier down in the

16  left-hand section, and--

17      MR. VEEDER:  Now, is that well located in the--

18      THE WITNESS:  Your Honor, you  will note there is an

19  inset on the right-hand side of that plate which shows loca-

20  tion of wells in the Murrieta.

21      THE COURT:  More detail.

22      MR. MOSKOVITZ:  Your Honor, I suspect there may  be

23  a typographical error when Section 7 is indicated.

24      MR. VEEDER:  That is in the low permeability  area.

25      MR. MOSKOVITZ:  I think it probably should be "17"

1     instead of "7."

2          THE COURT:  Seventeen is listed, too, and seven would

3     be the section right above eighteen in the tier.  I may not be.

4     Let's see what wells you list.  You list 17E1.

5          MR. SACHSE:  That is right.  Mr. Veeder is looking  at

6     the wrong  section.

7          THE COURT:  There seems to be no  E1 in seven, so that

8     may be an error.  That first one might be-- oh, it is 17, par-

9     don me.  17E1.

10         THE WITNESS:  It is.

11         THE COURT:  And  you  list 7L1.  There seems to  be no

12     L1 listed.

13         THE WITNESS:  I imagine that is close--

14         MR. SACHSE:  Yes, your Honor, there is L1 in seven, if

15     you look on the larger, on the other map.  It is not on the

16     inset.

17         THE COURT:  Yes, there is an L1 listed there, on the

18     big map, not on the inset.  R1 is listed.  R2 is listed.  And

19     then in Section 18, A3.

20         THE WITNESS:  There is an A3.  It is 416' deep, your

21     Honor.  It is shown on the inset.

22         THE COURT:  Not shown on the big map?

23         MR.  SACHSE:  A3 is on the inset map.

24         THE  COURT:  Shown on the--

25         MR. MOSCOVITZ:  That is shown on the inset.

1        THE COURT:  Yes, shown on the  inset.

2        In other words,  this particular area would be de-

3    scribed as lying north and west of the town of Murrieta?  This

4    particular subgroup, subarea, or well  group one?

5        THE WITNESS:  That is true, your Honor.  You will note

6    from the overlay  that it is at this westerly  edge of the basin,

7    as outlined on that overlay, Exhibit L, Table 15-2.

8        THE COURT:  Well, unless there is some objection, I

9    am going to receive this overlay in evidence for whatever it

10   is worth.  It has been  referred to here.  L, Table 15-2, the

11   overlay, is received in evidence.

12       MR. VEEDER:  I would like to have all  my objections

13   applicable that I have already made, your Honor, if I may.

14       THE COURT:  They will be applicable to that one,  Mr.

15   Veeder.

16       MR. VEEDER:  I didn't hear.

17       THE COURT:  They may be applicable.  Then, it will be

18   overruled as to that exhibit.

19       MR. VEEDER:  They may be what?

20       COLONEL BOWEN:  They  are applicable but overruled.

21       MR.  VEEDER:  Oh, yes.

22       THE COURT:  Your prayer was granted in  part.  They re-

23   main applicable.  Your prayer  was denied in part in that your

24   objections  were overruled.

25

BY MR. VEEDER:

Q  Could you locate for me the areas in Section 35, Township 7 South, 3 West?  I would like to have you join me down here, if you would, Mr. Witness.

THE COURT:  What  was your township and range, first?

MR. VEEDER:  Seven South, Three West, your Honor.  I am down in number nine.

MR. MOSKOVITZ:  Subarea number nine?

MR. VEEDER:  That is right.

THE WITNESS:  What do you want now?

BY MR. VEEDER:

Q  I would like to have you locate me, locate these so we will see where they  are.

THE COURT:  Section 35.

THE WITNESS:  What did you want me to do on that?

BY MR. VEEDER:

Q  In other words, in Sections--  I guess they are all in 35.

THE COURT:  Yes.  That section, of course, will appear, from  the map, that it lies between Temecula and Murrieta and is generally south  and east about two and a half, three miles, from Murrieta.  And is right  at the area where the Santa Ger- trudis intrudes into the Murrieta Basin.

MR. MOSKOVITZ:  The witness has located those three wells for you, Mr. Veeder?

F1
S43

6615

BY MR. VEEDER:

Q  You find that their depth is 450 feet.  Is that the greatest depth?

A  That is the depth that we use, greatest depth of that subarea number nine.

Q  In making your calculations, did you take into consideration the specific yields in those areas, and are those also in the--

A  By "those areas," you are referring to subarea nine?

Q  That is right.

A  Yes, those appear on Table 2, page 8.  That is Exhibit Q, again.

Q  In regard to these areas, then, which are at great depth, you would say that those wells which you utilized are not in the recent alluvium, would you not?  I mean, the--

A  No.

Q  And they enter the--

A  They enter-- well, I will wait for your question.

Q  They go beyond what you would call the recent alluvium, is that right?

A  Very probably.

Q  Well, do you know?

A  I suspect.  I don't know exactly where the contact is between the two, but I would suspect it is there.

Q  In referring to page B-23 of State's L--

1    THE COURT:  Appendix B?

2    MR. VEEDER:  Yes, your Honor.

3    Q  I find this statement:  "Recent alluvium covers

4    almost all of the valley floor in the Santa Margarita region"--

5    THE COURT:  Valley floors.

6    BY MR. VEEDER:

7    Q  -- "floors in the Santa Margarita region, as shown

8    on the geologic maps.  The formation fills the basins to great

9    depths, and contains  most of the readily-extractable ground

10   water."

11   Now, when you say there that the recent alluvium fills

12   the Murrieta Basin to great depth, just what do you mean by

13   "great depth"?

14   A  Well, a great depth, I think, would be anything over

15   100 feet.

16   Q  And you are saying, then, that the recent alluvium

17   goes beyond and below the 100 to 125 feet, which I read to you

18   most recently, and which is set forth  on page 74 of identifi-

19   cation L?

20   A  What  was that?  What am I saying  again?

21   THE COURT:  I will sustain the objection to it.  Don't

22   beat your point to death.  You have made your point.  I don't

23   know what more you can ask for.  He has admitted that these

24   calculations show that the younger alluvial goes to 100 to 125

25   feet.  He has listed two areas that go down to 450 feet.  Both

1  areas have layers of higher permeability or higher yield--

2  　　　　MR. MOSKOVITZ:  Specific yield.

3  　　　　THE COURT:  -- specific yield than some of the upper

4  areas.  And he has been interrogated as to why, if that is true

5  underneath the alluvial, why isn't it true on the sides.  I

6  don't know what more you can get.

7  　　　　MR. VEEDER:  But, your Honor, the important thing so

8  far as I am concerned is that this witness has stated under

9  oath that this is a true statement, that: "Recent alluvium

10  covers almost all the valley floors in the Santa Margarita

11  region, as shown on the geologic maps.  The formation fills

12  the basins to great depths * * * ."  Now, that is clearly an

13  error or else his California's Exhibit Q is clearly in error.

14  And if there is to be an amendment, a change, in the write-up

15  in B-23, I think I should know it.

16  　　　　MR. MOSKOVITZ:  Not at all-- excuse me.

17  　　　　MR. VEEDER:  This is the witness's testimony.

18  　　　　THE COURT:  This, of course, is a general statement,

19  Mr. Veeder, starting out with a description of the Quaternary

20  System.  It is a general description.  And then, following this,

21  of course, there are specific descriptions of the basins in

22  Appendix B.

23  　　　　MR. VEEDER:  Right, your Honor, and I desire to pursue

24  this.

25  　　　　THE COURT:  And the specific always controls over the

1    general.  You know that.

2         MR. VEEDER:  Well--

3         THE COURT:  Again, let's be realistic about this.  You

4    could question what he means by great depth.  It looks to me

5    as if it a rather broad statement, not particularly when ap-

6    plied to Murrieta or Pauba, but when applied to Anza, Dominica,

7    and some of these smaller basins.  Great depth doesn't look

8    like the right  term to use.  But suppose you did cross-

9    examine, it isn't going to do me any good, and it is not going

10   to do you any good on appeal in the Circuit.  You are just

11   costing counsel money to write up the transcript.  And you

12   made your point, and--

13        MR. VEEDER:  I would like to pursue it, though, your

14   Honor.

15        THE COURT:  You don't want to mentally catch it, but

16   shake it to death.

17        MR. VEEDER:  I do, and I am going to destroy it.

18        Q  Now, referring to Plate 14, which is California's

19   L-14, you will observe, will you not, an  area designated Qal?

20   What does Qal mean to you?

21        A  That is recent alluvium.

22        MR. MOSKOVITZ:  Which  section are you referring to,

23   Mr. Veeder?

24        THE COURT:  L-14.

25        MR. VEEDER:  A A', Murrieta Valley.

BY MR. VEEDER:

Q   Now, you observe on page B-57, you state under oath: "The basin"-- meaning the Murrieta-- " which  is filled chiefly with recent alluvium, is adjointed by areas of older alluvium on the northeast and southwest." Now, which is cor- rect, the picture, Plate 14, or your  statement written into B-57, where you say it is chiefly  filled with recent allu- vium?

A   Well, I think they are both  correct.

Q   What is Qal?

A   I just answered that; recent alluvium.

Q   And you say that this is chiefly--

MR. MOSKOVITZ:  Your Honor, there is no basin delin- eated.

MR. SACHSE:  There is no basin delineated on AA.

MR. VEEDER:  Look at Qal.

THE COURT:  Well, the basin isn't delineated, but there are distances in feet, so you could see about where the 400-foot level would come across.  About half way between zero and one thousand.

MR. VEEDER:  Your Honor, he also measured this himself with a ruler on Friday, and it was 100 feet.

THE COURT:  Yes.

Mr. Witness, referring to B-57, from developments in this detailed cross-examination, wouldn't you say that statement

1   is a little too broad?

2        THE WITNESS:  Yes, probably so, your Honor.

3        THE COURT:  All right.

4        MR. MOSKOVITZ:  Your Honor, I think the section makes

5   a difference, too, where the section  is, too.

6        MR. SACHSE:  Mr. Veeder has on the blackboard Plate 13-B

7   which shows exactly where this section was drawn, and it is on

8   the narrowest part of Murrieta.  It is on the narrowest part of

9   Murrieta Valley.

10        THE COURT:   13-B?

11        MR. SACHSE:  13-B, yes, your Honor, shows the line of

12   section.  He is a wizard at creating issues where none exist.

13   A A'.

14        MR. VEEDER:  If I had to depend on Bulletin 57, I would

15   be very concerned now.

16        THE COURT:  According to this witness's exhibit, it is

17   across a narrow portion of the younger alluvial, but it isn't

18   across a narrow portion of the Murrieta Valley.

19        MR. SACHSE:  No, it crosses the narrowest portion of

20   the younger alluvium.

21        THE COURT:  The statement that Mr. Veeder is talking

22   about-- that is the trouble why we waste all the time about

23   this-- B-57 doesn't talk about section A A'; it talks about the

24   Murrieta Basin.  And it says the Murrieta Basin is filled

25   chiefly with younger alluvial.  And I have asked him if he

1    didn't think that was too broad a statement, and he admitted it

2    is too broad.

3    BY MR. VEEDER:

4         Q   In regard to the terminology that you have used in

5    looking for your pink book--

6         A   This early draft, is that what you are referring to?

7    This?

8         MR. MOSKOVITZ:  What is the number of that, Mr. Veeder?

9         MR. VEEDER:   That is L, Appendix B, draft one.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Q  In regard to the areas which you have designated as

2     terrace and older alluvium, how would you describe those

3     properties?

4          MR. MOSKOVITZ:  I object to that.  I don't understand

5     the question.

6          THE WITNESS:  I don't understand it.

7          THE COURT:  I don't either.

8          MR. VEEDER:  You don't understand?  Terrace and older

9     alluvium, your Honor--

10         THE COURT: Reframe your question.

11         MR. VEEDER:  All right.

12         Q  How would you describe the lands and the geology

13    which you have designated as terrace and older alluvium?

14         MR. MOSKOVITZ:  I still object, your Honor.  I can't

15    understand that question.  What kind of properties?  And if

16    you have reference to a particular place in Exhibit L, I

17    wish you would point it out and point out the place in this

18    earlier draft that you have reference to.

19         THE COURT:  How would you describe them as to what?

20    The color of them?  The water-bearing quality?

21         MR. VEEDER:  Yes, your Honor.

22         THE COURT:  The location of them?

23         MR. VEEDER:  That is right, each one of those things.

24    I have just asked the general question.

25         THE COURT:  Well, it is too general, then. What part of

1    the watershed are you talking about?

2           MR. VEEDER: All right.

3           Q   Would you describe, from the standpoint of permea-

4    bility, the lands which are referred to in Appendix B as

5    terrace and older alluvium?

6           MR. MOSKOVITZ:  Where?

7           THE COURT:  Limit it to a certain area.

8           MR. VEEDER:  Well, look on B-26.

9           MR. MOSKOVITZ:  You are asking about permeability.

10   Where on that page is permeability referred to?

11          THE COURT:  First of all, Mr. Witness, on page B-26 you

12   group the terrace and older alluvium together with the symbol

13   Qtoa?

14          THE WITNESS:  That is correct.

15          THE COURT:  Therefore, when we speak of older alluvium

16   we are speaking either of terrace or older alluvium, strictly

17   speaking?

18          THE WITNESS:  That is correct.

19   BY MR. VEEDER:

20          Q   In other words, you have three of them together; is

21   that right-- terrace and older alluvium?

22          A   We have mapped them as the same unit, yes.

23          Q   Yes.  Now, in your Exhibit B, draft 1, you say this:

24   "Recent alluvium"--

25          THE COURT: What page?

1      MR. VEEDER:  Well, your Honor, I will put a number on

2  it.  It doesn't seem to have a number.

3      Q  You say this, "Recent alluvium covers almost almost

4  of the valley floors in the Santa Margarita region, as shown

5  on the geologic maps . . "  Then there is in parentheses the

6  statement:  "(Omit)."  ". . The depth to which deposits of

7  recent age extend is not known, but this depth is not important

8  to this study, as the character. . " and then there is an

9  interlineation above it "water-bearing characteristics"--

10      MR. MOSKOVITZ:  Question mark.

11      MR. VEEDER:  --"of the underlying Pleistocene fill is

12  similar to that of the Recent age.  The characteristics of

13  all the quaternary alluvium fill will, therefore, be discussed

14  in this section. ."

15      THE COURT:  Let me see that.

16      MR. VEEDER:  The point that I make, your Honor, is that

17  the error here is that they put Qtoa underlying the younger

18  alluvium and they didn't intend to.

19      THE COURT:  Just a minute.

20      MR. MOSKOVITZ:  Come again?

21      MR. VEEDER:  And that is exactly what occurred.

22      THE COURT:  Just a minute.  I am trying to read something,

23  if you please.

24      Have you finished your cross-examination on this?

25      MR. VEEDER:  No, your Honor.

1    THE COURT:  On this particular paragraph?

2    MR. VEEDER:  You asked me to wait, your Honor.

3    THE COURT:  I am asking you now, are you through on

4  this particular paragraph?

5    MR. VEEDER:  No.

6    THE COURT:  All right, go ahead.

7  BY MR. VEEDER:

8    Q  Is it not true that the original investigation treated

9  the valley fills here as Recent alluvium and that the Qtoa

10  was the older alluvium and the terrace, but that your original

11  calculations in the basins that you dealt with didn't distinguish

12  between the Recent and older alluvium?

13    MR. MOSKOVITZ:  I object to that question.  I think it

14  is compound, and I don't think the witness can give an answer

15  to it, your Honor.

16    THE COURT:  Read it, Mr. Reporter.

17    (The reporter read the pending question.)

18    MR. VEEDER:  I will restate the question.

19    Q  Is it not true that as originally written you treated

20  the whole area, the whole fill of the basins as Recent

21  alluvium and made your calculations on the basis that the

22  valleys-- Murrieta Valley, for example, was filled with Recent

23  alluvium, thus explaining your statement that the formation

24  fills the basins to great depth-- and I am quoting from B-23;

25  isn't that what occurred?

1          A  No,--

2          MR. MOSKOVITZ:  I object to the question again, your

3  Honor.  It is very compound.

4          THE COURT:  Well, it is pretty compound, but I think

5  I know what he is talking about and I think the witness does.

6  Overruled.

7          THE WITNESS:  Before we made our calculations we had

8  our areal geology map upon which was delimited the Recent

9  alluvium and the older alluvium.

10 BY MR. VEEDER:

11         Q  Areally speaking?

12         A  Areally, correct.

13         Q  Now, in regard to the depth of the alluvium, you

14 stated, "The recent alluvium--"

15         MR. MOSKOVITZ:  What are you referring to now?

16         MR. VEEDER:  Appendix B-23, your Honor.

17         Q  You say, "The Recent alluvium . . fills the basin

18 to great depth."  So it would make sense to say that you did

19 not intend to have referred to in the plate showing A, A-prime

20 the Qtoa?

21         MR. MOSKOVITZ: I object to that.  I can't understand

22 it.

23         THE WITNESS:  The way we did our estimates, Mr. Veeder--

24 I think this will answer your question, although I thought I

25 had explained already-- was that we outlined the alluvial

1   areas first, set the basin's boundaries areally.  Then we

2   considered the wells that were located within those areas and

3   the bottom of our storage unit, so to speak, was governed by

4   the logs of these wells.

5       THE COURT:  Well, let me put the question more spe-

6   cifically.

7       Here is what Mr. Veeder has in mind.  I will read you

8   from the same page in Exhibit L, Appendix B, draft 1.  Following

9   what he read previously appears this statement:  "Quaternary

10  alluvium fills the basins to great depth and contains most

11  of the readily extractable ground water."  B-23, toward the

12  bottom of the page, under the heading "Recent Alluvium" reads:

13  "Formation fills the basins to great depth and contains most

14  of the readily extractable ground water."  There is a big

15  difference between those two statements, isn't there, because

16  quaternary alluvium would include both older and younger

17  alluvium?  Is that right?

18      THE WITNESS:  That is true; it would.

19      THE COURT:  So in the original draft the report read

20  that the "quaternary alluvium filled the basins to great

21  depth and contained most of the readily extractable ground

22  water."  When the draft finally came out it was changed so

23  that this sentence appeared in a paragraph under "Recent

24  alluvium" and now reads, "Recent alluvium covers most of the

25  valley floors . .  The formation fills the basins to great

1    depths and contains most of the readily extractable ground

2    water."

3            Now, the key question is, how did that change come

4    about?  It is a very minor change in phraseology between the

5    preliminary report and the final report.  How did that change

6    come about?

7            THE WITNESS:  Your Honor, in my opinion, Recent

8    alluvium was implied at first when they said quaternary.  In

9    speaking of older alluvium we wouldn't have used it with

10   reference to--

11           THE COURT:  Mr. Witness, I can't follow you on that.

12   Your original draft starts out talking about Recent alluvium.

13   It says, "coveredmost of the valley floors."  It says, "The

14   depth to which depths of recent alluvium extend is not known.

15   The depth is not important to this study.  As the character

16   of the underlying Peistocene fill--

17           That is the old alluvium?

18           THE WITNESS:  Yes, sir.

19           THE COURT:  "--is similar to that of the Recent.  The

20   characteristics of the Quaternary alluvium fill, therefore,

21   will be discussed in this section."

22           So as originally drafted they were all thrown together,

23   and then followed the statement I just read.  Now, as redrafted

24   your statement now reads that the younger alluvium contained

25   most of the readily extractable ground water.  As far as I am

1  concerned, I see a big difference between the two statements.

2  Whether there is a difference or not, how did the change come

3  about?

4       MR. VEEDER:  May I tender a thought before proceeding,

5  your Honor.  On Page B-26 of Appendix B, you will find, under

6  the heading "Terraces and Older Alluvium Qtoa," and you will

7  also find it in the volume to which your Honor is now making

8  reference, which is draft 1-- they were separated and segregated

9  very definitely.

10      THE WITNESS:  Your Honor, in my opinion, the Qtoa, as

11  described in this page B-26 to which Mr. Veeder refers, is,

12  as stated on that paragraph, somewhat more indurated and Qtoa

13  also contains a higher percentage of residual clay, both of

14  these, which would tend to show that it has a lesser permea-

15  bility, and this is probably-- I don't recall the exact reason,

16  but this probably may have something to do with why that was

17  changed.  That we did recognize that there was a difference

18  between the two, and the earlier draft was changed.

19      THE COURT:  The Quaternary system includes Recent

20  alluvium, Older alluvium, residuum, terraces?

21      THE WITNESS:  That is true, your Honor.

22      THE COURT:  Do you know whose handwriting this is on

23  this omission, or whose the interlineations are?

24      THE WITNESS:  No, sir, I don't.  Now this handwriting

25  here looks like mine.

1          THE COURT: "Water-bearing characteristics," that looks

2     like your handwriting?

3          THE WITNESS:  Yes, I believe it is.

4          THE COURT:  And the word "age" looks like yours?

5          THE WITNESS:  That looks like mine.

6          THE COURT:  The pencil printed "omit"?

7          THE WITNESS:  That is not my handwriting.  I don't know

8     whose that might be.

9          MR. MOSKOVITZ:  This a really interesting lesson in

10    exploration as to how drafts of documents are written.  They

11    go through a number of stages, your Honor.

12         MR. VEEDER:  I am glad that he thinks it is funny, your

13    Honor.

14         THE COURT:  It happens to pertain pretty directly to

15    what is so far one of the few major issues in this case, the

16    extent of the water basin in the older alluvium.

17         MR. MOSKOVITZ:  I think the final product, of course,

18    is the one.

19         THE COURT:  The final product is the witness's present

20    opinion.  The Court is just curious about what looked to me

21    like a change of position between drafts.

22         MR. VEEDER:  And a complete change, your Honor, when

23    you consider Qtoa filling the basins.

24         I observe that it is recess time.

25         THE COURT:  Yes, take a short recess.

1        (Recess.)

2        THE COURT:  The Clerk asked me about where the two

3   drafts were.

4        MR. VEEDER: You have the one before you that I was

5   using, your Honor.

6        MR. MOSKOVITZ:  Your Honor, I didn't get another one.

7        THE COURT:  I did have it before me, but it is not

8   here now.

9        THE WITNESS:  Here it is, your Honor.

10        THE COURT:  All right.  Last Friday Mr. Veeder wanted

11   to use the drafts.

12        MR. MOSKOVITZ:  Yes.

13        THE COURT:  Mr. Veeder said he was working on one, and

14   I said to let him keep the one he has.  Apparently you had the

15   other one.

16        MR. MOSKOVITZ:  I don't believe I did, your Honor.  I

17   will check.

18        THE COURT: Do you have only the one draft, Mr. Veeder?

19        MR. VEEDER:  That is all I have, and I would like to have

20   the other one, because I think we can probably unravel this

21   sock a little further.

22        MR. MOSKOVITZ:  I didn't have it with me when I answered

23   that question, your Honor, and when I got back I looked at the

24   one Mr. Veeder had.

25        THE COURT:  It will turn up, I am sure.  I don't think

1  it is up here.  One was a pink-colored one, and what did the

2  other one look like?

3      THE CLERK:  It had a black cover on it, your Honor,

4  like this.

5      THE COURT:  Proceed.

6  BY MR. VEEDER:

7      Q  Referring to Appendix B, page 23, I allude to the

8  paragraph under Quaternary System-- you have numbers 1, 2, and

9  3 there.  Number 1 is a Recent Alluvium Qal, your next is the

10  residuum Qr (Recent), and then your terraces and older

11  alluvium Qtoa.  Now, in your original draft, if I correctly

12  interpreted the part that we reviewed here, you did not dis-

13  tinguish between the Qal, which is the younger alluvium, and

14  the other material which underlaid it, because you stated that

15  it cannot be distinguished and it makes no difference in regard

16  to their water-bearing characteristics; isn't that what you said?

17      MR. MOSKOVITZ:  I object to this question on this basis--

18  I want to explain it a bit.  Mr. Veeder is referring to "your

19  earlier draft."  Now there is an earlier draft.  The persons

20  in the Division of Water Resources at that time prepared these.

21  These were prepared by people under Mr. James's direction.

22  Those earlier drafts were submitted for review and approval.

23  Mr. James' testimony is on the draft which he approved.  The

24  earlier ones do not represent his testimony or his views, ex-

25  cept to the extent that they correspond with what he has put

1  in as his testimony.  Now we all know that within a group of

2  people working on a problem before this final decision there

3  can be differences of view.  This is not impeachment of this

4  witness to show that there were differences of view within the

5  organization.

6       THE COURT: I understand what you have said.  I haven't

7  heard the witness say it.

8       MR. MOSKOVITZ:  Very well.

9       THE COURT:  I asked him if he knew who wrote the ord

10  "Omit", and how that section happened to come out, and he

11  didn't know-- at least he gave me no explanation for it.  If

12  he had reviewed the earlier drafts and had taken the section

13  out, then what you say might make some sense to me.

14       MR. MOSKOVITZ:  I think he was merely referring to the

15  handwriting that said "Omit."  I don't think he was saying

16  that--

17       THE COURT:  Well, do you know how that portion came out

18  that is marked "Omit"?

19       THE WITNESS:  I don't recall right now exactly how that

20  came out, except that in the normal course of the way we write

21  these things there are many changes that occur and we get

22  together and discuss these things and the drafts go around the

23  circuit to various people that are involved and these changes

24  do occur.

25       THE COURT:  Do you remember any discussion with any of

G3 Z63                    James    Cross                              6634

1    the members of your staff about water-bearing characteristics

2    and the older alluvium and the fact that in one of the drafts

3    you were throwing the younger and the older together as being

4    the principal source of ground water?

5        THE WITNESS:  No, I don't remember any discussion in

6    regard to this particular statement that is made here.  But I

7    do know that we are all agreed, and as far as I know the

8    testimony that has been submitted here has been all agreed that

9    there is a difference between the Recent and the Older alluvium

10   and that the Older alluvium is less permeable-- that there is a

11   distinction between the two.  I don't recollect anything in

12   regard to this statement that that was something that was not

13   regarded important at the time.

14       THE COURT:  Proceed.

15   BY MR. VEEDER:

16       Q  Now, in making the calculations that you have made

17   on California's Exhibit Q, how did you distinguish between the

18   Qal and the Qtoa, if at all?

19       A  We distinguished between them on the areal geology

20   maps between the two formations, the Qtoa and the Qal on our

21   areal map in the course of the geologic mapping, in the course

22   of preparing map Plate 13B.  In the wells, as I have testified

23   before, we selected the depths to which we would compute the

24   storage by examination of the logs and consider the hydrologic

25   or hydraulic characteristics.

Q  Well, did you just delineate a block down here of a certain depth through the valley, or was it perpendicular sides?

A  Yes, in the case of Murrieta Basin we used perpendicular sides in computing our storage.

Q  And you made no differentiation in the write-up, as I observe it, between the--

THE COURT:  The write-up on Q, you mean?

MR. VEEDER:  On Q.

Q  -- as between the older and the younger alluvium, which would be consistent with the statement made and which is marked "Omit" in the Exhibit 1, Draft 1?

MR. MOSKOVITZ:  I object to that question.  I think that is incomprehensible, your Honor.

THE WITNESS:  I don't understand.

THE COURT:  Sustained.

BY MR. VEEDER:

Q  In other words, the way you calculated the storage capacity, as shown on California's Q, would be consistent with the omitted language set forth on Exhibit L, Appendix B, draft 1?

A  No, I don't believe that is the case, because we did, as I have mentioned, we mapped the Recent alluvium on the surface, and the contact between the Recent and the Older alluvium, as we mapped it, was used as the boundary to the

Murrieta Basin.

Q  That is, the surface now?

A  That is true.

Q  And in regard to the subsurface, what distinguishing element is there between the younger and the older alluvium?

MR. MOSKOVITZ:  Your Honor, I object to that question. It has been asked and answered many times.

MR. VEEDER:  Not in regard to California's Q.

THE COURT:  I don't know that it is specifically here. I don't know whether it is framed properly. I will sustain your objection to the question on the ground that it is not clear.

In making your computations of the storage capacity of what you call the Murrieta Basin, aside from the areal extent of the younger alluvium, you made no distinction between the younger and the older alluvium but relied entirely on what you found in well logs?

THE WITNESS:  That is true, your Honor.

THE COURT:  Does that answer the question?

BY MR. VEEDER:

Q  And that is consistent with the original draft 1; isn't that right?

THE COURT:  He has already answered that question. I have my own view about it, but he has given an answer. I will sustain the objection to re-asking the question.

BY MR. VEEDER:

    Q  Now, in regard to terrace and older alluvium Qtoa,
that geologic formation comprises, does it not, the greater
share of the storage unit 4 on Plaintiff's Exhibit 17?  Isn't
that right?  Do you recall that?

    A  I have seen that, but I don't recall.

    MR. VEEDER:  Could we have Plaintiff's Exhibit 17,
please.

    Q  If you will step here, I will have you view the
Storage Unit No. 4 and ask you to state where Qtoa is found in
Unit 4 in the area north of Unit No. 3 on Pauba Valley, which
is known as Pauba Valley?

    A  Well, as shown on this map--

    THE COURT:  No, he doesn't want what the map shows.  His
question is, in your opinion, from the study you have made and
that your staff has made, is the material in Unit 4 north of
Pauba Valley older alluvium or terrace deposits, generally
speaking?

    MR. MOSKOVITZ:  Your Honor, I understood Mr. Veeder's
question as to how it was mapped there.

    THE COURT:  No.  We know how it is mapped there.

    THE WITNESS:  Yes, it is mostly older alluvium.

BY MR. VEEDER:

    Q  And would you say that that material, the Qtoa there,
is identical with the Qtoa which constitutes the chief source

1  of water in the Murrieta Basin, which is shown on California's

2  Plate 17K, K-prime?

3        MR. MOSKOVITZ:  I object to that question, your Honor.

4  It assumes something that Mr. Veeder may argue for as to the

5  chief source of water, but I don't think it should be in the

6  question.

7        THE COURT: All right, I will sustain the objection.

8        Is that older alluvium which you have identified on

9  Plaintiff's Exhibit 17 similar to the older alluvium which was

10  a substantial source of water-bearing material in your desig-

11  nation on Murrieta Basin?

12        THE WITNESS:  I can't answer that, your Honor, for this

13  reason, because where the older alluvium underlies Murrieta

14  Basin there are numerous wells in it-- we know something about

15  it.  In Unit No. 4 there is very little information available

16  and we don't know.

17        THE COURT:  Wasn't this older alluvium all laid down

18  at about the same time?

19        THE WITNESS:  Yes, your Honor, but there are lots of

20  formations geographically speaking that are laid down at the

21  same time that are very dissimilar in physical characteristics.

22  The fact that they are laid down at the same age doesn't mean

23  to me or to any geologist that they are similar physically

24  speaking.

25        THE COURT:  Well, the word "similar" and the word

1    "Identical" have different meanings to you, do they not?

2         THE WITNESS:  Oh, yes.

3    BY MR. VEEDER:

4         Q  How would they be distinguished based upon the

5    information that you have, then?

6         A  The older alluvium is--

7         Q  I am speaking now of the older alluvium which under-

8    lies the Murrieta Basin and that which constitutes Unit No. 4

9    on Plaintiff's Exhibit 17.

10        A  What is your question again?

11        Q  How would you distinguish them?  You have some

12   information-- for example, you have the Pauba well.

13        A  Well, I would distinguish them in that the material

14   that I have seen in this general area-- I am referring to

15   Unit No. 4-- on the surface where you can observe it appears

16   to be of low permeability.  It is generally a reddish color.

17   It contains fine-grained lenses and it contains some lenses

18   of permeable material.  But I can't-- I don't a hundred percent

19   understand your question.

20

21

22

23

24

25

1        THE COURT:  Well, now, going ahead with the question:

2   The knowledge you have of the older aluvial underneath the

3   Murrieta basin comes from well logs?

4        THE WITNESS:  That is true.

5        THE COURT:  You examined those well logs, have you

6   not?

7        THE WITNESS:  Yes.

8        THE COURT:  And you have drawn these conclusions.

9   Any comparison between what you saw in those materials and

10  what you know about the older alluvial in ground unit 4, as

11  shown on Exhibit 17?

12       THE WITNESS:  Well, my opinion, your Honor, is that,

13  in general, the materials that I see in unit number 4, they

14  are less permeable than those underlying Murrieta basin.

15  BY MR. VEEDER:

16       Q  Did you ever make a comparison of the two, a well

17  log in unit number 4 and a well log in the older alluvium in

18  the Murrieta basin?

19       A  On the well log basis I probably have somewhere;

20  but I don't recollect.  I have looked at the logs of both.

21  This has been sometime back, Mr. Veeder, that would be involved

22  in this, and I don't know.

23       Q  Did you make a comparison to your recollection?

24       A  I have looked at logs from both areas, but I

25  don't recollect what the --

1    Q  You don't recollect the comparison, is that right?

2    A  I don't recollect what the results of such a
3  comparison might have been if it were made.  I just don't know
4  what was done in that respect.

5    Q  Did you ever make any studies of any kind, actual
6  studies, investigations, other than the surface observation
7  that you have made to distinguish the older alluvium within
8  Murrieta basin and that in unit number 4?

9    A  Between the two?

10   Q  That is right.

11   A  No, I have made no study of that.

12   Q  In regard to the studies which you made, how would
13  you distinguish between terraces, the terraces deposits, and
14  the older alluvium?  What would be the distinguishing elements
15  in your mind?

16   A  Well, the terraces would be more of a topographic
17  feature.  It is the way they appear on, their shape, and the
18  way they appear on the surface with relation to existing streams.

19   Q  So you would distinguish the two of them, wouldn't
20  you?

21   A  It can be done, yes.

22   Q  Can you distinguish the two?

23   A  Yes; unless they are terraces so thoroughly
24  dissected.  There comes a point when it becomes difficult to
25  distinguish them.

1      Q   In your write-up on Page B-26, in your testimony

2 you say this, in regard to terraces in older alluvium Qtoa:

3 "During the course of this investigation the terraces would

4 found to be widespread and dissected, and the boundary between

5 older alluvium and terrace deposits was so difficult to dis-

6 tinguish that the general designation Qtoa was used." In other

7 words, you just wrapped them into a parcel; is that right?

8      A   That is true. We considered them as one unit.

9      Q   And in regard to the statements that you have made

10 you would declare that the older alluvium is not much of a

11 water producer; isn't that right?

12      A   I think that the statement that I made in regard

13 to the older alluvium was that we don't know too much about it.

14 There is a lot of it that remains to be explored; but that,

15 in general, there is evidence of a lower permeability, certainly

16 than what you would find in the recent alluvium and --

17      Q   Now, respecting the older alluvium you say this:

18 "Wells tapping materials of this unit" --

19      A   Where is this, Mr. Veeder?

20      Q   Reading from Page B-26.

21      THE COURT: Of the Appendix, the last line.

22 BY MR. VEEDER:

23      Q   "Wells tapping materials of this unit have low

24 yields and are limited to domestic use." Now, are there not a

25 great many irrigation wells that tap this Qtoa?

1        A   I think the statement is a generalized statement;

2   that, in general, wells tapping materials of this unit are of

3   low yield.

4        Q   In regard to the final then, we will let you --

5   I won't say it.  This is not a general statement:  ". . . are

6   limited to domestic use."  That is an error, is it not?

7        MR. MOSKOVITZ:  I think this question has been

8   answered it is a general statement.

9        MR. VEEDER:  That is your observation.

10        THE COURT:  He said it is a general statement.

11   Counsel is now asking him if it is an error.

12   BY MR. VEEDER:

13        Q   ". . . and are limited to domestic use," is

14   certainly not general.

15        A   Well, I think if you regard it as a general state-

16   ment, it is true.  But if we are going to split hairs on it,

17   then they are not limited entirely to domestic use.

18        Q   In other words, this is in error?

19        A   Depending on how you look at it.

20        MR. MOSKOVITZ:  This has been asked and answered,

21   your Honor.

22        THE COURT:  Well, how do you square that sentence

23   with your computations on Exhibit Q for identification, where

24   you show that you have taken into account an area down as deep

25   as 450 feet, where you show on Table 2 a high yield from some

1    of the lower areas?

2         MR. MOSKOVITZ:  Your Honor, that is specific yield,

3    not necessarily the amount of water that comes out.

4         THE WITNESS:  Referring to the yield of a well, your

5    Honor, we generally mean the number of gallons per minute that

6    it will produce, that it will yield.

7         MR. VEEDER:  It is controlled by the size of the

8    pump and not specific yield.

9         THE COURT:  Specific yield definitely has a relation-

10   ship to whether a unit has a low yield, doesn't it?

11        THE WITNESS: Are you asking me, your Honor?

12        THE COURT:  Yes.

13        THE WITNESS:  It is a characteristic of the forma-

14   tion which indicates how much water that formation will give up.

15   It does not indicate how rapidly a well can extract water from

16   it.

17        THE COURT:  What did you mean:  "Wells tapping

18   materials of this unit have low yields"?

19        THE WITNESS:  By that sentence, your Honor, we mean

20   that, in general, they do not have a high discharge; that their

21   yield in gallons per minute is generally low, although there

22   may be considerable storage within these materials.  A specific

23   yield may be high.  It may contain a lot of extractable water;

24   but, in general, you cannot pump it out rapidly.

25        THE COURT:  If I was reading this, "have low yields,"

1   I wouldn't think you were talking about how much pumps discharged

2   out of a well.

3          THE WITNESS: That is the way we --

4          THE COURT: If you are going to say that, I think

5   you would have said these wells pumped.

6          MR. MOSKOVITZ: These wells have low yields, your

7   Honor.

8          MR. SACHSE: The wells have low yields, your Honor,

9   not the material.

10          MR. VEEDER: Now, your Honor, they have --

11          THE COURT: Go ahead, Mr. Veeder.

12          MR. VEEDER: Well, I will go ahead, your Honor.

13          Q In regard then to the --

14          THE COURT: Haven't we kicked this around enough?

15   Are we going to wear it out? Before you get through, of course,

16   the witness may come up with something that will destroy all

17   the cross-examination you have engaged in.

18          MR. VEEDER: Oh, no, no. If he could -- I am searching

19   for the truth, your Honor -- I would be the most delighted.

20   He can't. We know it.

21          THE COURT: The Court will ignore your comments. Go

22   ahead and ask your questions.

23   BY MR. VEEDER:

24          Q Now, in regard to your compilations, did you now

25   at one time make a comparison in regard to depths in the older

1 and the younger alluvium?

2         MR. MOSKOVITZ:  I object to that question.

3 BY MR. VEEDER:

4         Q  I hand you a photostat or, at least, a reproduction

5 of some notes that you Californians took away from me and you

6 haven't returned.  I have asked you if you will bring me the

7 original of those.

8         MR. MOSKOVITZ:  Just a minute, Mr. Veeder.  What are

9 you referring to?

10         MR. VEEDER:  I gave it to the witness.  If you can

11 get the original, I will be pleased.  I would like to have the

12 Court look at it.

13         THE WITNESS:  I don't recognize it myself.  Let me

14 read it over a little more carefully here.  This could be

15 something of ours, but I don't recognize it.  In fact, I don't

16 really know what it is.

17         MR. VEEDER:  If you look at it, you will find it is

18 a comparison in regard to the yields.

19         MR. SACHSE:  I am going to object unless somebody

20 tells me what this is.  It has no mark of any kind.  And,

21 frankly, I don't know.

22         THE COURT:  Let me see it.

23         MR. SACHSE:  His Honor wants to see it.

24         MR. VEEDER:  Have it marked as a California exhibit.

25 I told you it was given to me as part of the material that was

1   used in preparing Bulletin 57.  As I remember, they calculated

2   five million acre feet of storage in unit number 4.  You will

3   note on the last page.

4           THE COURT:  Well, all you have is a photostatic copy.

5   Who handed you the material?

6           MR. VEEDER:  Mr. Moskovitz when he delivered this

7   material here to me.

8           THE COURT:  What material are you referring to?

9           MR. VEEDER:  The material that we have been getting

10  piece-meal from California, which they say is a genesis of

11  Bulletin 57.  I have been unable to find that since it was

12  first given to me.  But it is the basis upon which they

13  calculated the storage capacity of the older alluvium.

14          THE WITNESS:  Your Honor, maybe I can speed this up

15  a bit.  We did make some -- I don't recognize the writing you

16  have there -- but we did make some early estimates of the

17  storage capacity of that general vicinity of unit 4 of the

18  Government's, and we did not include those in our report because

19  we did not feel we had sufficient data to make a meaningful

20  estimate.

21          THE COURT:  Did you come up with a total storage

22  capacity of about 4,900,000 acre feet?

23          THE WITNESS:  I can't remember what we came up with.

24  We came up with a high storage capacity; I can recall that.

25          THE COURT:  Do you recognize the handwriting on this

1   photostatic copy?

2              THE WITNESS:  No, sir, I didn't; although it may be

3   ours.

4              THE COURT:  Have you looked it over?

5              THE WITNESS:  I glanced at it, but I didn't recognize

6   the handwriting.  It might have been done by someone that

7   worked for us a long time ago.  I just couldn't say.

8              THE COURT:  Mark it for identification.

9              MR. VEEDER:  California's S, T, U, V.

10             THE CLERK:  V, I believe.

11             THE COURT:  California's V.  Show it to Mr. Illing-

12  worth and Mr. Fox.  See if somebody recognizes the handwriting

13  on it.  Let's see if we can identify it.

14             MR. VEEDER:  As I remember, Mr. Moskovitz came and

15  took that from us, and we have never seen the original since.

16             MR. MOSKOVITZ:  Your Honor, we took back the material

17  showed the basin calculations in order to work up Exhibits P,

18  Q, and R.

19             THE COURT:  I understand.  We are now trying to find

20  out what this material is.

21             Mr. Fox, you have been sworn as a witness.  Have you

22  ever seen the original of that?

23             MR. FOX:  I have seen it, yes, sir.

24             THE COURT:  Is it part of the California work papers?

25             MR. FOX:  Well, they were just part of the notes that

1   we turned in; and I can't even find that exhibit that we are

2   looking for now.

3           THE COURT:  Do you know whose handwriting it is?

4           MR. FOX:  It is not mine.  It was probably one of

5   the geologists that was working with us.

6           THE COURT:  Mr. Illingworth, do you recognize the

7   handwriting?

8           MR. ILLINGWORTH:  No, I don't.

9           MR. FOX:  I know we did it.

10          THE COURT:  Have you ever seen it before, Mr.

11  Illingworth, the original of those sheets?

12          MR. ILLINGWORTH:  I don't think so.  I am trying to

13  visualize what kind of paper this was on.  I guess it was yellow

14  scratch paper.

15          MR. VEEDER:  It was.

16          THE COURT:  Have you ever seen the original of those

17  sheets, Mr. James?

18          THE WITNESS:  I can't recollect of those sheets.  We

19  made, as I mentioned, some calculations in that area, and I

20  had seen those sheets.  And I don't know if they are the same.

21          THE COURT:  We will proceed.  I think we have enough

22  foundation to know what we are talking about.

23          MR. VEEDER:  I would like to interrogate in regard

24  to this thing.

25          MR. ILLINGWORTH:  If we knew what it came from,

6850

1    maybe it would be helpful.

2    MR. VEEDER:  Mr. Moskovitz gave us this material.

3    It was this -- these are handwritten pages on a yellow sheet

4    of paper, or several sheets, and we reproduced them.  We have

5    not had it returned to us.  We are anxious.

6    MR. MOSKOVITZ:  Your Honor, these sheets, we had

7    included the work sheets and storage computation and then the

8    two books of drafts.  One book is here; the other book,

9    apparently, has not been located lately.  Maybe that is where

10    it came from.

11    THE COURT:  Go ahead.  The witness has already told

12    you, though --

13    MR. VEEDER:  He has no knowledge whatever about it.

14    THE COURT:  Those particular sheets, Exhibit V, but

15    that there was a computation made and he doesn't know whether

16    it was 4,900,000; but it was a large number of acre feet.  Up

17    in the midlands, I suppose?

18    THE WITNESS:  I can't recollect, your Honor, except

19    that it was large.  And it has been some time since I have

20    seen that.

21    THE COURT:  What is "large"?  What do you mean?

22    A hundred acre feet, a thousand acre feet, a million acre feet?

23    THE WITNESS:  Probably in hundred thousands, any way.

24    Maybe more.

25    MR. VEEDER:  I will proceed, your Honor.

1          THE COURT:  You recall any conference at which you

2    and your staff discussed this matter of the computations made

3    of unit similar to the Government's 4 in which you said you

4    objected to that as a storage unit?

5          THE WITNESS:  I can remember talking it over myself

6    with people.  I don't remember exactly what was said, except

7    that decided not to use it because we didn't think we had

8    sufficient information to make a good estimate.  And I know

9    that was the reason, your Honor.

10   BY MR. VEEDER:

11         Q  Why, Mr. James, are you able to make calculations

12   in regard to Tucalota Valley where you have but, I think, two

13   wells and you will come up with a very definite acre-foot

14   production but you are incapable of these areas of the Qtoa

15   to which I have been referring?  You are unable to come up

16   with even an estimate for those areas?

17

18

19

20

21

22

23

24

25

1      A   I think it has been brought out in testimony, both

2   mine and the testimony of others, that this older alluvium

3   is extremely heterogenous and varies on physical character-

4   istics from point to point and is, therefore, not amenable to

5   an accurate estimation.   I mean, you can't extrapolate your

6   findings over a large area.   Whereas, in the smaller basins

7   it approaches a more homogenous mass, and I think on the

8   strength of that we were justified in estimating more pre-

9   cisely what the characteristics were of the smaller units.

10      THE COURT:   Well, I think we are wasting a lot of time

11   here.

12      Were you here and heard the Government's testimony as

13   to how the Government estimated Storage Unit No. 4?

14      THE WITNESS:   I did not hear that.   I reviewed the

15   testimony, your Honor.

16      THE COURT:   You know, do you not, that the older

17   alluvium goes down at least 23 or 2500 feet in the area of the

18   Pauba well?

19      THE WITNESS:   At that location, yes.

20      THE COURT:   You know that it goes down 2500 feet in the

21   oil well in Murrieta Valley?

22      THE WITNESS:   I do.

23      THE COURT:   And if there is water-bearing material in the

24   alluvium at 450 feet, the material is water-soaked at 2500

25   also, is it not?

1          THE WITNESS:  I don't know too much about that depth,

2     but there are fluids in it, no doubt.

3          THE COURT:  Then you know also that there are wells

4     lying east of the Murrita Basin that go down three, four or

5     five hundred feet into the water-bearing aquifer?

6          THE WITNESS:  I know of those, yes.

7          THE COURT: The Government took a hundred feet across

8     that basin.  They didn't take 2500 feet of water-bearing material.

9     They took a hundred feet after excluding surface area-- I

10    forget.  Can you remind me?  Well, a hundred feet below water

11    level, I think that was it-- below the water table.

12         MR. VEEDER:  This is Exhibit 18, your Honor (handing

13    document to the Court).

14         THE COURT:  Thickness of uppermost water zone in

15    November, 1953.  They took a hundred feet.  Wouldn't you say

16    that that was a conservative estimate?

17         THE WITNESS:  Yes, your Honor.  I have no quarrel with

18    that estimate.  Nor, to my recollection, have I ever testified

19    that there was not considerable storage out in that area.  The

20    only thing I have talked about has been permeability of the

21    materials that comprise that area.

22         THE COURT:  Well, then, aside from the question of how

23    much water you would be able to pump, that is, the question of

24    permeability, wouldn't you think that item 4 on Government's

25    18, the older alluvial area where they took a hundred feet

1    across the board, was a conservative estimate?

2           THE WITNESS:  For storage.

3           THE COURT:  For storage.

4           THE WITNESS:  Yes, sir.

5           THE COURT:  Then the only question we have is how much

6    water they could pump out of that?

7           THE WITNESS:  And the question of recharge, your Honor.

8    This is the important factor, as I see it.  It is how fast can

9    that area be recharged from the streams, and I think there is a

10   question when we talk about recharge.  There is some question

11   as to how fast that basin may be replenished.

12          THE COURT:  Well, given sufficient water in the streams

13   and by rainfall, it would eventually be recharged, if pumped

14   down, would it not?

15          THE WITNESS:  Yes, it would eventually be recharged.

16   But I am referring to its effect, the effect of that pumping

17   on stream flow.

18          THE COURT:  What is the significance, then, of how fast

19   it would be recharged?

20          THE WITNESS:  The significance, as I see it, is the effect

21   that pumping might have on the flow of the streams that pass

22   through that area, and as I see it, if we want to look at this

23   thing in the stream, you could have a concrete-lined channel,

24   for example, going down Temecula Creek, in which case no matter

25   how far the ground water was pumped down in Zone 4 it certainly

1    wouldn't affect the flow in the stream.  Of course, you don't

2    have a concrete-lined channel.  But you can compare that to

3    impermeable sediments that may lie on either side and below

4    the channel are relatively impermeable sediments.  The effect

5    would be analogous.

6         THE COURT:  Well, the less the recharge, other things

7    being equal, the more water would go down the stream by the

8    stream flow?

9         THE WITNESS:  That is correct, your Honor.

10        THE COURT:  Then what difference does it make how fast it

11   recharges?  Does it make any difference in this case?

12        MR. VEEDER:  Your Honor, I want to say this--

13        MR. MOSKOVITZ:  This is the key question, your Honor.

14        THE COURT:  Is that the key question?

15        MR. MOSKOVITZ:  This is the key question.

16        THE COURT:  Well, tell me what difference it makes.

17        MR. MOSKOVITZ: I will tell you.  Your Honor, assume

18   that the recharge is at such a rate that during a year 100

19   feet gets from the stream to the place where the wells are

20   pumping north and east of the stream,-- I am talking about

21   Temecula Creek.  Then the stream will be diminished by a hundred

22   feet during that year.  That may be immaterial when you compare

23   it to the total annual flow of that stream. So the rate of

24   recharge is very important.

25        THE COURT:  I get everything but the therefore.

1      MR. MOSKOVITZ:  Perhaps I can try once again.

2      THE COURT:  Let me try first and show me where I am

3  wrong.

4      MR. MOSKOVITZ:  All right.

5      THE COURT:  Here are basins of various kinds and there

6  is pumping going on in the various basins.  We have a dispute

7  as to how fast the recharge rate is in the particular water

8  units.  We don't know. It may be slow, it may be rapid.  What

9  doesn't go down and recharge runs off as surface water.

10      MR. MOSKOVITZ:  That is correct.

11      THE COURT:  Then it runs downstream.

12      MR. MOSKOVITZ:  Yes.

13      THE COURT:  Now, if the basin had been pumped down,

14  there will be some amount of water from the springs and from

15  the stream flows that will recharge that basin.

16      MR. MOSKOVITZ: And the rate will determine how much it

17  will recharge it each year and thereby detract from the streams.

18      THE COURT:  All right.  Now, the stream flows on down.

19  Nothing we can do is going to change how fast that basin

20  recharges.  And so it flows on down.  There is water in the

21  stream that can be used below.  The riparian owners have first

22  claim on it.  What difference does it make to the lawsuit?

23      MR. MOSKOVITZ:  Here is the point, your Honor.  If there

24  is little recharge from the stream due to the pumping in an

25  area north and east of Pauba Basin, then it may not be necessary

1    or proper, under our controling law, to adjudicate those

2    rights because the amount of the effect that their pumping has

3    on the stream is immaterial when you compare it to the total

4    amount.

5         THE COURT:  I will concede that it has a bearing on

6    whether those people are overlying owners, and their rights

7    are correlative with other overlying owners and riparians.

8         MR. MOSKOVITZ:  Yes.

9         THE COURT:  There is that significance. What other sig-

10   nificance does it have?

11        MR. MOSKOVITZ:  Well, this is the significance, your

12   Honor, as to whether the areas which overlie this material

13   should be in this suit the same as those who take water from

14   the stream and depend on the stream.

15        THE COURT:  That is the only significance?

16        MR. MOSKOVITZ:  This is the significance, yes, your

17   Honor.

18        THE COURT:  That is the only significance?

19        MR. MOSKOVITZ:  As it affects the United States and

20   its claims in this case, this is the significance.  It is a

21   question as to--

22        THE COURT:  Correlative rights between the United States

23   and those land owners.

24        MR. MOSKOVITZ:  That is right.  And whether we can say

25   now that the pumping by these people is going to have such an

1  effect that they should be included in the adudication at

2  this time.

3       THE COURT:  Many of these people these bigger land

4  owners, to start with, are riparians.  They start right in

5  on the Murrieta and they run up a ways.  So first of all we

6  can say, without dispute, that their rights are correlative,

7  can't we?

8       MR. MOSKOVITZ:  That is correct.

9       THE COURT:  Then what have we got left?  We have a few,

10  very few who aren't riparian, and even those are riparian--

11  take Mr. Ceas's property.  He lies right over a stream.  He

12  is riparian to a tributary of the Santa Margarita.

13       MR. MOSKOVITZ:  Your Honor, to the extent that he is

14  riparian to the river and his riparian rights are involved,

15  certainly they must be included.  But we note from the Master's

16  hearings there were people who were riparian to a stream and

17  also overlay land which was residuum, let us say in De Luz,

18  and whose effect on a stream, if water was pumped, would be

19  so small that as to that portion of the ownership they were

20  not included in the adjudication.  And this is the issue here.

21       THE COURT:  In other words, we are just concerned with

22  correlative rights.  This is the only effect.  It hasn't any-

23  thing to do with any other question in the case.

24       MR. MOSKOVITZ:  That is correct, your Honor, as far as I

25  can see right now.  I don't want to mislead you.  But this is

1    the issue that we have been arguing and have written briefs on.

2         THE COURT: Do you agree, Mr. Veeder?

3         MR. VEEDER:  No.

4         THE COURT:  What other issues does it affect, Mr.

5    Veeder?

6         MR. VEEDER:  Well, your Honor, I believe you will state

7    that Mr. Roripaugh's well is in the older alluvium, that it is

8    a good well, that it has pumped 1300 gallons a minute and has

9    been rated as such.  If anyone says that that well will not

10   have effect on the stream flow-- well, he would have to have

11   written Bulletin 57, I assume.

12        The point I make is that each one of these wells is a

13   burden upon the stream, and every well in the future that is

14   drilled will be a burden upon the stream, because the sole

15   source of recharge is the runoff.

16        THE COURT:  You are talking about the same thing that

17   Mr. Moskovitz is talking about.  You are just saying it a

18   little differently.

19        MR. VEEDER:  Well, I am going to state that I believe

20   that a man who is pumping water in Unit No. 4 derives his

21   water from exactly the same place that the United States of

22   America does, namely, the precipitation and the surface

23   runoff, and I can't distinguish, and I will never be able to

24   accept , on the basis certainly of the data in Bulletin 57, the

25   concept that a man who has a well isn't taking surplus water

1 just as much as a man who has a surface diversion.  Because the

2 water has to come from some place, and it may be that the

3 velocity of the water would be such that only 10% of the

4 withdrawn area, of the draw-down area, would be recharged;

5 but in a ten-year period that would be a considerable quantity

6 of water, based upon the long-term yield of the stream.  And

7 that is the problem.

8          THE COURT:  That is really what I was getting at when

9 I started this inquiry.  The rate of recharge doesn't seem to

10 me to make a lot of difference.  The question is material

11 as to whether they are in a basin.

12          But Mr. Moskovitz, what does the rate of recharge --

13 suppose the basin fills up in one year or fills up in ten

14 years.  It is a burden on the stream, if it is recharged from

15 the stream, isn't it?

16          MR. MOSKOVITZ:  Your Honor, let's take an extreme ex-

17 ample.  Let's take a situation in which you would have a

18 ground water area, the materials are relatively impermeable,

19 water can be extracted from those materials, and let us say

20 that in a period of ten years a total of 10,000 acre feet

21 had been pumped, and then pumping stops, and there is 10,000

22 acre feet capacity that has been left open, and then it takes

23 a hundred years for that 10,000 acre feet to seep back in.

24          THE COURT:  Well, now, you are taking an extreme case.

25          MR. MOSKOVITZ:  You are right.  I am taking an extreme

1   case to make the point that the rate or recharge is important.

2   THE COURT:  Well, to reduce it to an absurdity, and of

3   course it becomes diminimus--

4   MR. MOSKOVITZ: That is the point.

5   THE COURT:  --but are you contending that Unit 4 is in

6   a situation like that where it would take a hundred years

7   to put in 10,000 acre feet?

8   MR. MOSKOVITZ:  What I am saying, your Honor, what our

9   position is, is that we don't know as to that entire area

10  what the effect will be, how great the degree, how fast the

11  recharge.  The rate of recharge is something that we will find

12  out by experience, and we cannot conclude now that the rate

13  of recharge will be such that there will be the kind of burden

14  on the stream that makes it necessary to adjudicate those

15  rights to pump those waters.  Now, the residuum is a good

16  example--

17  THE COURT:  Well, let's forget the residuum.  We are

18  talking about basins now.

19  MR. MOSKOVITZ:  Well, the materials are different, but

20  they are different in degree again, and rate of recharge is

21  the significant point as to both kinds of materials.  That is

22  why we have been talking about rate of recharge.

23  I hope the point has been made.

24  THE COURT:  Go ahead.

25

BY MR. VEEDER:

Q   Now, in regard to your calculations on Pauba, I note the statement, on Page 75 of Bulletin 57 marked L for Identification, the final paragraph in regard to Pauba Basin:

"The Recent alluvium constitutes a free ground water zone tapped by relatively shallow wells ranging in depth up to 250 feet. . "

In your Table B-3 in regard to Pauba Basin I note that you have the maximum depth of storage at 170 feet.  I further observe , in regard to your Plate No. 16G, G-prime, that you have one well which is 171 feet.  In your write-up in regard to the Pauba Basin you say the wells average about 170.  That on page B-60.  Do we pay our money and take our choice, or which is right?

THE COURT:  Page 60 of Volume I?

MR. VEEDER:  Page B-60, Appendix B.

THE WITNESS:  I got lost in your comparisons.

MR. VEEDER:  You should study your Bulletin.

THE COURT:  Allright, Mr. Veeder, let's go ahead. Three references have been made.

MR. VEEDER:  That is right.

THE COURT:  B-60.

BY MR. VEEDER:

Q   B-60, in the second paragraph, it says, "The averages

1    of the wells are about 170 . ."

2          MR. MOSKOVITZ:  What are you comparing that with, Mr.

3    Veeder?

4    BY MR. VEEDER:

5          Q  The deepest well, as shown on Plate B-16, is 171.

6    In the write-up, which is for Identification L, at page 75,

7    the statement is made that the wells are in depth to 250 feet.

8    Now, which is correct?

9          A  Well, as I read this sentence on page 75, it says,

10   "The recent alluvium constitutes a free ground water zone

11   tapped by relatively shallow wells ranging in depth up to 250

12   feet," and that sentence refers to the wells, not to the depth

13   of the alluvium.

14         Q  If you will stop right there and take a look at

15   Plate 16, you will observe that there is no well that comports

16   with the figure to which you just made reference.

17         A  Well, I might point out that that plate doesn't depict

18   all the wells in the basin. It depicts the wells in the

19   vicinity of the line of that cross-section.

20         Q  Then how do you square it with your statement that the

21   maximum depth is 170, as shown on Table B, page B-49?

22         A  We are talking about about page B-49?

23         THE COURT:  That is Table B-3.

24         MR. VEEDER:  That is right, B-49.

25         MR. MOSKOVITZ:  You are talking about the figure 170

1    under the--

2         MR. VEEDERI:    Maximum depth of storage unit in feet.

3         MR. MOSKOVITZ:   --maximum depth of storage unit in feet.

4         THE WITNESS:  I don't see what your point is there.

5         THE COURT:  Well, particularly what do you mean by the

6    statement "Maximum depth of storage in feet," shown on Table

7    B-3 at page B-49, showing 170 feet?

8         THE WITNESS:  Well, that was the maximum depth of the

9    storage volume that we computed in Pauba Basin.  The deepest

10   part of that volume of material that we computed storage for

11   in the Pauba Valley or Pauba Basin was 170 feet.

12        THE COURT:  In other words, referring to Exhibit Plate

13   16, you took that zone of unconfined water.  That is what you

14   computed, is it?

15        THE WITNESS:  That is right.

16        THE COURT:  And therefore the one well that went 170

17   feet was the deepest well shown in that zone?

18        THE WITNESS:  That is true.

19        THE COURT:  And you ignored entirely what you called

20   the confining bed?

21        THE WITNESS:  That is correct.

22        THE COURT:  And ignoring entirely the zone of confined

23   water shown on Plate 16?

24        THE WITNESS:  That is correct.

25        THE COURT:  And ignored the deep artesian wells that

1    were coming out of that basin?

2           THE WITNESS:  That is true.  We computed no storage in

3    the artesian sediments.

4    BY MR. VEEDER:

5           Q  Which of the wells is 250 feet, then?

6           THE WITNESS:  I imagine, from this statement, that there

7    are some wells that are supplied chiefly from the unconfined

8    sediments that do go down to a depth of 250.  Whether they

9    are shown on this section or not--

10          Q  Here you have a line showing zone of unconfined

11   water, you have a wriggle in it to bring in your 171.

12          A  Right.

13          Q  If that were the case, how could you have a well

14   in there that was 250 feet deep?

15          MR. MOSKOVITZ:  Your Honor, I think that question has

16   been asked and answered.  He answered that there are wells that

17   go deeper but which draw their water from the upper zone.

18          THE WITNESS:  I thought that is what I said.

19          THE COURT:  Well, I have a little doubt about page 75.

20   "The Redent alluvium constitutes a free water zone," and I

21   take it that free water zone is the same as shown on plate 16

22   as unconfined water.  Don't you think so?

23          MR. MOSKOVITZ:  Yes.

24          THE WITNESS:  True.

25          THE COURT:  ". . free water zone tapped by relatively

1   shallow wells ranging in depth up to 250 feet."  Now, it says

2   "Wells up to 250 feet."  Plate 16 on the cross-section shows

3   the deepest well as 171.  And the witness has testified that

4   in computing the Pauba Basin he took as a maximum depth 171

5   feet.  So although there were admittedly wells that went 250

6   feet in the free water zone, the unconfined water zone, he

7   only took 170 feet.

      MR. MOSKOVITZ:  Your Honor, I don't believe that state-

9   ment says that the wells which go up to 250 feet are in their

10   full depth in the zone of unconfined water.

11       THE WITNESS:  That's the point.

12       MR. MOSKOVITZ:  Take for example on the cross-section,

13   your Honor--

14       MR. VEEDER:  If Mr. Moskovitz were under oath I would

15   feel better.

16       MR. MOSKOVITZ:  I am sorry.

17       THE COURT:  Well, we will ask the witness what he means.

18   But it says "The Recent alluvium constitutes a free ground

19   water zone"-- here is a zone-- "tapped by relatively shallow

20   wells ranging in depth up to 250 feet."  Now, if he didn't mean

21   that this zone was tapped by wells that went to 250 feet, then

22   he didn't know how to write English.  If you think that state-

23   ment means that it was tapped by shallow wells and that some

24   of these wells then went down deeper beyond the free water

25   zone, that isn't what he said.

1        Let me ask the witness what he meant by it.

2        MR. MOSKOVITZ:  Yes.

3        THE WITNESS:  As I recall, what is meant by this is

4   that the depth of the unconfined water is 170 feet.  But for

5   example, someone in drilling a well, to tap that material,

6   could go beyond that 170 feet and go into clays and perhaps

7   be in clays for 80 feet down to 250 feet and then decide that

8   there was no water to be gained at that depth, and they come

9   back and that particular well would be supplied from 170 feet

10  on up to the surface.  The wells would be 250 feet deep, and

11  yet they would be supplied only by the unconfined water which

12  was at shallower depth.

13  BY MR. VEEDER:

14       Q  ". . . tapped by wells ranging in depth to 250 feet

15  . ."

16       THE COURT:  Well, he has given you his explanation,

17  Mr. Veeder.

18       Let me ask this question.  You knew there was a zone of

19  confined water?

20       THE WITNESS:  Yes, your Honor.

21       THE COURT:  You knew that artesian wells were flowing

22  out of that zone?

23       THE WITNESS:  That is true.

24       THE COURT:  You knew that they had substantial flows,

25  that they were used extensively on the Vail Ranch?

1       THE WITNESS:  Yes, your Honor.

2       THE COURT:  And you knew that the water coming out of

3  Nigger Canyon, before the building of Vail Dam, flowed over an

4  alluvial plane at the east end of Pauba Valley.  Did you think

5  that any of the water that previously had come down from Nigger

6  Canyon before the construction of the dam fed that zone of

7  confined water?

8       THE WITNESS:  I suspect that it did supply it, your

9  Honor.

10      THE COURT:  You suspect?  Where else could it have come

11 from?

12      THE WITNESS:  Well, some of it comes from there, too.

13 I am convinced of that.  Some of it could come from rainfall,

14 too.

15      THE COURT:  Rainfall and water from Nigger Canyon the

16 small tributaries that might lead into it?

17      THE WITNESS:  Yes, sir.

18      THE COURT:  Now, the dam was built and water no longer

19 flows over this ground.  What did you think would happen after

20 these artesian wells ceased to flow and were finally pumped out

21 and the zone of confined water was pumped down?  Didn't you

22 consider that that was depleting a basin?

23      THE WITNESS:  Your Honor, the point is that the storage

24 change would occur up near the upstream end, not down in the

25 artesian aquifer, because in the Artesian aquifer the changes

1    in water level merely reflect a change in pressure.  So that

2    we are reluctant to compute a storage capacity within those

3    pressure acquifers.  This is normal procedure.

4        THE COURT:  Did you give any consideration to what

5    would happen, after the Vail Dam was constructed and the water

6    down below was pumped out until ultimately there wasn't any?

7        THE WITNESS: We didn't compute any storage in that lower

8    material, no.

9        MR. SACHSE:  Your Honor, may I point out, neither did

10   the United States.  The United States's Exhibit 18 uses a

11   hundred feet, so does the State of California, both of them,

12   in their storage capacity.

13       THE COURT:  I am just asking the witness as to what

14   would happen when the Vail Company had pumped out the artesian

15   wells.  No more water is coming down at flood time by Vail Dam--

16   at least none has run over the top.  What would happen when

17   the confined water was pumped out of that basin?

18       THE WITNESS:  You would have water drawn from those

19   artesian aquifers.  They would then become free ground water

20   aquifers and you would have a change in storage, if the thing

21   was carried out that far.

22       THE COURT:  And if Vail Company ran out of water in this

23   confined zone, then Vail Company would have a greater demand

24   upon do-called unconfined water, wouldn't it?

25       THE WITNESS:  Don't you mean just the opposite?  You mean

1  if they ran out on the unconfined then they would have a

2  greater demand on the confined?

3       THE COURT:  No, I am talking about the reverse of it.

4       THE WITNESS:  Well, your Honor, when they pump down the

5  confined zone, we feel there is a very slow lowering of the

6  water in the unconfined zone; it would move down through this

7  zone of relatively low permeability and dry that zone up, too.

8       THE COURT:  All right, 10 o'clock tomorrow morning.

9       (Adjournment until Wednesday, December 17, 1958, at

10  10 o'clock A.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25