# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                       Plaintiff,

vs.

                                 No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                       Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:       San Diego, California

Date:       Wednesday, December 17, 1958

Pages: 6671 to 6819

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
                     DEPUTY

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1              IN THE UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF CALIFORNIA

3                     SOUTHERN DIVISION

4                          - - -

5          HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                          - - -

7

8    UNITED STATES OF AMERICA,      )
                                    )
9                   Plaintiff,      )
                                    )
10         vs.                      )        No. 1247-SD-C.
                                    )
11   FALLBROOK PUBLIC UTILITY       )
     DISTRICT, et al.,              )
12                                  )
                                    )
13                  Defendants      )

14

15           REPORTERS' TRANSCRIPT OF PROCEEDINGS

16

17                  San Diego, California

18            Wednesday, December 17, 1958

19

20   APPEARANCES:

21       For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
22                                  Attorney General,
                                    Department of Justice,
23                                  Washington, D. C.

24                                  WILLIAM BURBY, ESQ.,
                                    Special Assistant to the
25                                  Attorney General,
                                    Department of Justice,
                                    Washington, D. C.

1   APPEARANCES (Continued):

2        For Defendant              GEORGE E. STAHLMAN, ESQ.
          Vail Company
3
4        For Defendant State        EDMUND G. BROWN, ESQ.,
          of California             Attorney-General, by
5                                    ADOLPHUS MOSKOVITZ, ESQ.,
                                     Deputy Attorney General, and
6                                    CARL BORONKAY, ESQ.

7        For Defendants
          Fallbrook Public
          Utility District,         F. R. SACHSE, ESQ.
8         et al.

9

10                         -  -  -
                              -
11                            -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Z3

# INDEX TO WITNESSES

| For the Plaintiff: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| G. F. Worts, Jr. (By Mr. Sachse) | | 6676 | 6786 | |
| (By Mr. Moskovitz) | | 6758 | | |

For Defendant State
of California:

| Laurence James | | 6801 | | |

# E X H I B I T S

| Defendant Fallbrook's Exhibit | For Iden. | In Evidence |
|---|---|---|
| AB - Report on Pauba Well | 6676 | 6733 |

| Defendant Vail Exhibit | | |
|---|---|---|
| E - Receipt | 6784 | |
| F - Official well record | 6784 | |
| G - Copy of letter to N. B. Smith | 6786 | |
| H - Follow-up record | 6787 | |

| Defendant State of California Exhibit | | |
|---|---|---|
| X - Notes and calculation sheets | 6824 | |

A Z1

1   <u>SAN DIEGO, CALIFORNIA, WEDNESDAY, DECEMBER 17, 1958. 10:00 A.M.</u>

2

3       THE CLERK:  No. 1247-SD-C, United States vs. Fallbrook

4   for further court trial.

5       MR. SACHSE:  Your Honor, before we start, I think, are

6   you aware that the missing draft of 57 was located by the

7   Clerk in the collection of exhibits we have?

8       THE COURT:  Yes, yes, I know you are all honest.  We

9   won't lose any exhibits except through the Clerk's inadvertence.

10      MR. MOSKOVITZ:  Your Honor, for his sake to clarify,

11  it was not his inadvertence; it was ours.

12      THE COURT:  I am being facetious.  I have a very fine

13  Clerk.

14      MR. SACHSE:  If your Honor please, by agreement with

15  Mr. Veeder last week we arranged to recall Mr. Worts today

16  for cross-examination based on the confidential report on the

17  Pauba Well which was turned over to us last week.  And I would

18  like at this time to call Mr. Worts to the stand.

19      THE COURT:  Come forward, Mr. Worts.

20

21               G. F. WORTS, JR.,

22  recalled as a witness in behalf of the plaintiff, having been

23  previously sworn, testified further as follows:

24      MR. SACHSE:  I will want to have marked for identifica-

25  tion, your Honor, the report, and question Mr. Worts on it.

A
Z2

1    Mr. Veeder has asked that there be an understanding that this

2    original can be withdrawn, because it is our only file copy,

3    and a reproduction supplied.  And I have no objection at all.

4    But for purposes of the examination there are some things in

5    the original which I don't have available in these reproductions,

6    namely, photographs, and so on.  I would like the examination

7    be conducted on the original.

8         THE COURT:  Is it here?

9         MR. SACHSE:  It is here.  How would we like that marked?

10   There is a Fallbrook AA, which is Bulletin 57.  And I see no

11   reason for using Fallbrook AA anymore if no one objects,

12   since 57 already has an L.  We could call this--

13        MR. VEEDER:  57 doesn't have the L.

14        MR. SACHSE:  57 is California's L.

15        MR. VEEDER:  Well, the objection to 57 was sustained.

16   The only thing that is in is the testimony of Mr. James.

17        THE COURT:  He is only talking about numbers.  He is

18   talking about numbers.

19        MR. SACHSE:  My point is this:  For Identification 57

20   is California's L.  And if I subsequently seek to introduce

21   other parts of the Bulletin, I don't see why we need bother

22   with two numbers.  I could just introduce them as L-15 or L-20,

23   or whatever it may be, rather than have a Fallbrook AA and a

24   California L, both the same document.  I don't care.  Whatever

25   is the simplest for the Clerk. Leave it AA if you want and

XXX

1    assign this AB.

2         THE COURT:  Well, these exhibits will be complicated by

3    numbers.  Let's call this AB.  That is Fallbrook's next in

4    order.  This is the report on the Pauba well?

5         MR. SACHSE:  United States State Department

6    Geological Survey Report.  Here is a photostatic copy.  The

7    text is complete, your Honor, and some exhibits are complete.

8    All the ones--

9         THE COURT:  Is this a copy that I may keep?

10        MR. SACHSE:  That you may keep, yes, your Honor.

11        THE COURT:  Is there another photostatic copy to be used

12   in evidence?

13        MR. SACHSE:  Yes. We will get another one later, will

14   we not, Mr. Veeder?

15        MR. VEEDER:  We will substitute.

16

17                   FURTHER CROSS-EXAMINATION

18   BY MR. SACHSE:

19        Q  Mr. Worts, you were previously sworn in this case?

20        A  Yes.

21        Q  I will remind you you are still under oath.  And I

22   hand you the document that has been marked Fallbrook's AB

23   for Identification.  Will you tell us what it is?

24        A  It is an official Government report on the Pauba

25   Ranch exploratory well, Riverside County, California.

A Z4

Werts   Cross                                                          6677

1          MR. STAHLMAN:  Talk a little louder.

2    BY MR. SACHSE:

3          Q  What were the circumstances under which the United

4    States Geological Survey was asked to prepare this report?

5          A  We were requested by the Navy to supply technical

6    advice and supervision in the preparation of specifications

7    for the drilling of the well and to collect the data during the

8    course of drilling.

9          Q  And you did assist in the drafting of the plans and

10   specifications?

11         A  The technical clauses.

12         Q  And you did collect and evaluate data obtained when

13   the well was drilled?

14         A  Yes.

15         Q  Did you also have anything to do with the selection

16   of the site for the well?

17         A  I was consulted as were representatives of the Vail

18   Ranch, Vail Company, as to the location.

19         Q  Now, you used the pronoun "I" then.  Would you please

20   explain your personal relation to this project?

21         A  I was a technical consultant supplying advice to the

22   Navy.

23         Q  Were you the ranking member of the U.S.G.S. staff in

24   connection with this project?

25         A  Yes.

1    Q And so we can say that as far as the U.S.G.S. was

2 concerned this drilling and evaluation was under your super-

3 vision?

4    A Yes.

5    Q Did you write this report?

6    A Yes.

7    Q The title sheet or the cover says "George F. Worts,

8 and others." Are there any particular parts of this report

9 that any other person wrote of the text?

10    A Not to my recollection. The others were the men in-

11 volved, for example, who logged the well and prepared the

12 U.S.G.S. well log as shown as Table-- correction-- as Appendix

13 2.

14    MR. SACHSE: That is not in your Honor's copy. The

15 well log is not in this reproduction.

16    THE COURT: Not this?

17    MR. SACHSE: No, that is the electric well log.

18    THE COURT: All right.

19 BY MR. SACHSE:

20    Q Now, is the data contained in this report accurate

21 to the best of your knowledge?

22    A Yes.

23    Q And are the conclusions expressed in it your con-

24 clusions at the time you wrote the report?

25    A Yes.

1    Q When was it written?

2    A I am not exactly sure. It was written sometime

3 after the completion of the data collection program and prior

4 to the date on the cover, which is May, 1953. We had a span in

5 there of over a year and a half. I don't recall exactly when

6 I wrote the report. The usual procedure at that time when I

7 was in charge of the Long Beach office: I would prepare the

8 report. The draft would then go to my supervisor who was in

9 Sacramento. He would review it and return it to me. I would

10 consider his suggestions. We would retype the report and then

11 send it in to Washington for their perusal and review. If it

12 met with their satisfaction-- and this being an administrative

13 report, they don't make much effort to do any more than make

14 sure that technical conclusions seem reasonable and sound.

15 And then the report was forwarded to the Navy. And the date,

16 May, 1953, on there, was probably the date that the report was

17 approved for transmittal to the Navy after that process of

18 preparation and review.

19    Q I will direct your attention to page 5 of the report,

20 the first page of text. And I see a list of references, being,

21 apparently, various correspondence relating to this report.

22 Do you see to what I am referring?

23    A Yes, I do.

24    Q I notice that the first two references, Reference A

25 and Reference B, are not confidential but are dated in early

1   '51.  Thereafter, References C, D, and E are identified as

2   confidential.  Does reference to those dates refresh your

3   recollection as to when the report was actually written, more

4   nearly as to when it was actually written?

5         A  No.  I can explain why some of these are confidential

6   and some aren't.  At a certain stage in our work at Camp

7   Pendleton and also up on the Pauba Ranch we were advised that

8   all the work that we were doing was to be classified.  The Navy

9   advised us of this.  So that this letter-- a correction here--

10  the References A and B properly should have been shown as

11  confidential in this report, because they were post-- that is,

12  they were affected by this order that everything pertaining

13  to all the work was to be classified confidential.

14        Q  Do you recall who imposed that classification?

15        A  It came-- as I recall now, our Washington office was

16  advised, and I was advised officially in that manner.  However,

17  a man by the name of Henderson, the original man in charge of

18  the Office of Ground Water Resources at Camp Pendleton, told

19  me that it was all to be classified.  This was in 1951, be-

20  cause I remember we were carrying on our test drilling program

21  at the time.

22        Q  But you do not know exactly who put the stamp, Navy

23  tag "Confidential" on it; who issued the order?

24        A  No, I do not.

25        Q  Now, going to the report itself, you collected--

1    when I use the word "you," I mean you and your staff-- certain

2    data to assist you in evaluating this well, did you not?

3        A  Yes.

4        Q  Your drillers maintained their own log, did they?

5        A  The drillers maintained a log.

6        Q  And your staff maintained another log, did it?

7        A That is correct.

8        Q  A separate and independent log of the driller?

9        A  That is correct.

10        Q  You also took an electric log, did you not?

11        A  I did not.  That was part of the drilling contract.

12        Q  You let a contract for an electric log?

13        A  The Navy let a contract for the electric log.

14        Q  And you received an electric log?

15        A  The Public Works Office, Camp Pendleton, received it,

16    and we obtained copies.

17        Q  And that is enclosed in the report as-- Would you

18    tell me the table number, please, on it?

19        A  It is Plate 7.  The electric log, modified on the

20    left-hand side by the addition of a driller's log and a U.S.G.S.

21    log shown in graphic form along the left margin.

22        Q  What is an electric log?

23        A  Well, it is explained in the text.

24        Q  Well, tell us about it, please.

25        A  Well, I would rather refer to what it says here.  It

1    is a rather lengthy description extending page 24 to 26.

2              Q  What are the principal values you obtain from having

3    an electric log available to you when you analyze the well?

4              A  The principal values are to pick out the permeable

5    and--  in other words, in general, commonly called the sand

6    sections and the clay sections in so far as water work is

7    concerned.  Furthermore, they can be useful from the standpoint

8    of quality studies, too, quality of water.

9              Q  In other words, the electric log enables the geologist

10   to better distinguish between permeable and impermeable

11   materials?

12             A  Yes, in general.

13             Q  The electric log also indicates those strata that

14   yield water more readily than others?

15             A  Yes, in general.

16             Q  And, thus, I presume it is also a very useful device

17   to use in comparison with the drillers' log also?

18             A  Very useful.

19             Q  Do you know if any other wells in the Pauba Basin

20   or upper Santa Margarita watershed have electric logs avail-

21   able?

22             A  I do not personally know of any others.

23             THE COURT:  An electric log is the best kind of log

24   you can get on a well, is it not?

25             THE WITNESS:  When taken in conjunction with the

1 geologist's log or the log of the materials penetrated. In

2 other words, your Honor, the more data of this type that you

3 can have on a well the more you know about it and the more

4 intelligently you can proceed to make it into a producing well.

5      THE COURT:  The men who drill for oil will not drill an

6 oil well with an electric log, would then?

7      THE WITNESS:  No.  No, sir.

8 BY MR. SACHSE:

9      Q  Now, this electric log would be a useful tool to

10 any geologist, however, who was attempting to determine the

11 structures in the Pauba Valley, would it not?

12      A  A single log in itself is limiting, because the

13 common use of a group of electric logs is for correlation, if

14 correlation is possible, from one well to another.  One well

15 in itself tells you what is vertically beneath a certain point

16 on the land and can be used for certain interpretations.

17      Q  Was this electric log filed with the State of

18 California?

19      A  I do not know.

20      Q  Under the confidential classification assigned to

21 the report, as a matter of fact, the electric log was not

22 available to anybody except the person who had access to the

23 confidential report; isn't that right?

24      A  I don't know.  The Navy is the one that holds the

25 classification, not the Geological Survey.

Worts   cross

1      Q  You have these files in your office, a copy of this

2   report in your office, did you not?

3      A  You were speaking of the electric log?

4      Q  The electric log as contained in Fallbrook's AB

5   which is before you.

6      A  Yes.

7      Q  That was on file in your office, was it not?

8      A  A copy was.  The original was not.

9      Q  Was that copy available for examination by me, for

10  example, if I had chosen to go up and see it?

11     A  No.

12     Q  Was it available for examination by engineers of

13  the State of California?

14     A  Not without specific okay from the Navy.

15     Q  Was it available for use as basic data by Mr. Kunkel

16  when he made his studies?

17

18

19

20

21

22

23

24

25

1    A  Yes.

2    THE COURT:  Tell me how this works.  I think I have the

3    electric log in my hand, do I not?

4    THE WITNESS:  Yes, sir.

5    THE COURT:  There are three columns.  One says

6    "Spontaneous-Potential."  What does that mean?

7    THE WITNESS:  That is the self-potential.  The electro-

8    chemical energy produced within the formation can be measured

9    by lowering the electrodes into the ground and recording those--

10   THE COURT:  Is that shown by the line of the needle here?

11   THE WITNESS:  That is correct, your Honor.

12   THE COURT:  What is the driller's log?  That is the

13   driller's interpretation of the chart?  Or is it actually what

14   the driller saw coming up out of the well?

15   THE WITNESS:  Those two logs shown along the left side

16   have been plotted there by myself from the driller's log on the

17   left.

18   THE COURT:  That he made as the well was drilled?

19   THE WITNESS:  That he made as the well was drilled; that

20   is correct.

21   THE COURT:  And the descriptive matter on the left

22   describes the type of material that the driller says he found?

23   THE WITNESS:  That is correct.

24   THE COURT:  Then the U.S.G.S. log is made by your men

25   as they watched the well being drilled and the interpretative

1    material on the right-hand side of that in words is their

2    description?

3              THE WITNESS:  That is correct.

4              THE COURT:  So the "Spontaneous-Potential" column

5    actually only concerns this line?

6              THE WITNESS:  That is right, your Honor.

7              THE COURT:  Then the next column is "Depth of the well."

8              THE WITNESS:  That has been plotted in by myself.

9              THE COURT:  And then the next column is--

10             THE WITNESS:  A correction on the last statement, your

11   Honor.  The depth, you will observe, is in hundreds of feet,

12   showing the depth that these spontaneous-potential and resist-

13   ivity curves measured.  You will observe numbers running down

14   that depth column that shows 100, 200, 300, 400, et cetera,

15   throughout the hole.

16             THE COURT:  Each of the small dotted lines within the

17   blocks are ten feet apart?

18             THE WITNESS:  Yes.

19             THE COURT:  With a heavier line every 50 feet?

20             THE WITNESS:  That is correct, your Honor.

21             THE COURT:  And with a hundred-foot marking in this

22   depth column?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  What is the difference between the two other

25   columns that seem to be headed exactly the same?

1          THE WITNESS:  Yes, sir.  Those are resistivity curves.

2   There are three shown there.  One--

3          THE COURT:  Two of them are in one column, and one--

4          THE WITNESS:  Yes, sir.  And one, the left-hand column,

5   shows the 10-inch penetration curve and the 10-foot penetration

6   curve by the dashed line.

7          THE COURT:  The dashed line is 10 feet?

8          THE WITNESS:  Yes, sir.

9          THE COURT:  What do you mean by 10-inch and 10-foot?

10         THE WITNESS:  That means the depth out into the hole

11  away from the bore, in other words, 10 inches out, and that is

12  controlled by the spacing of the electrodes.

13         THE COURT:  In other words, this instrument could make

14  some kind of check as to the type of material ten inches away

15  from the bore, and another part of the instrument ten feet

16  away from the bore?

17         THE WITNESS:  Yes, sir.  And in the right-hand column

18  is 19 feet.  Here is the problem you run into, your Honor,

19  with permeable sands and gravels  The mud will actually move out

20  and invade the gravels.  Therefore, your 10-inch resistivity

21  reading means one thing in sands and gravels because it is

22  masked by the mud that is out in the formation.  The 10-foot

23  penetration on the resistivity curve usually is out measuring

24  the resistance beyond the--

25         MR. VEEDER:  Excuse me.  Mr. Worts, are you speaking of

1    the driller's mud when you refer to the mud that goes into the--

2        THE WITNESS:  Yes, the drilling mud in the well bore.

3        MR. VEEDER:  Excuse me. Go ahead.

4    BY MR. SACHSE:

5        Q  And the 19-foot one, generally speaking, is out

6    beyond any possible effect on the driller's mud?

7        A  Generally, the farthest out, 19 feet in this case,

8    because the hemisphere that is being measured by the electrical

9    current covers a radius of 19 feet, the distinction of the finer

10   units, thinner beds, is not as distinct as it is in the thinner--

11   not thinner-- the hemisphere of less diameter of 10 inches,

12   which measures more accurately the smaller beds.

13       THE COURT:  Is it a fair statement to say, just as a

14   layman looking over this chart, that there is more correlation

15   between the 10-foot and the 19-foot intervals than there is

16   between the 10-inch and the 10-foot?

17       THE WITNESS:  Yes, sir.  And if you are interested in

18   that type of correlation, you will notice right up in the

19   upper 100, or from 100 to 200 feet, you will notice that the

20   resistivity curves, the 10 and the 19, kick out to the right.

21   Yet the 10-inch doesn't.  And I believe that that would be

22   caused by the mud invading the shallow 10-inch one.  If the

23   drilling mud did not invade the formation, the 10-inch would

24   also give a corresponding kick-out to the right.

25       THE COURT:  The kick-outs to the right in the curve,

1   what do they mean?

2       THE WITNESS:  That means formations-- assuming the

3   water quality doesn't change in this material, it means that

4   there is more resistance, and it would mean to the geologist

5   that the materials are gravels and sands.

6   BY MR. SACHSE:

7       Q  Better water bearing?

8       A  Better water bearing.  When they kick in to the left

9   and follow along toward zero, the zero side, that means that

10  there are clays and fine-grained material-- clays, silts.

11      Q  Poorer water bearing?

12      A  Poorer water bearing materials.

13      THE COURT:  I think I understand.

14      I am sorry I interrupted you, Mr. Sachse.

15  BY MR. SACHSE:

16      Q  You answered me a moment ago, I believe, that this

17  electric log was available for reference by Mr. Kunkel in his

18  studies?

19      A  Yes.

20      Q  Now, I would like to direct your attention, Mr.

21  Worts, to your testimony of November 7th.

22      I am referring, Mr. Veeder, to transcript 4351, line 25,

23  and continuing on the next page through line 6.

24      MR. VEEDER:  Is that Volume 43?

25      MR. SACHSE:  Volume 41.

1    Q  Answering a question from me:  "A  No, you have all

2  the basic data or are in the process of acquiring it.  By

3  basic data now, I refer to basic water levels, pumpage,

4  chemical analyses, sewage return or sewage effluents where

5  pertinent, well logs.

6       "Q  What do these reports contain then that we don't

7  have here?

8       "A  Nothing.

9       "Q  But they are classified?"

10      That statement then is not literally correct, is it?

11      A  From the sound of that, I was talking about the

12  Pendleton Basin, not the upstream basins.

13      Q  In other words, some of the material contained in

14  Fallbrook's AB was not previously made available to anyone

15  involved in this litigation other than the United States; is

16  that right?

17      A  Well, I really can't say.

18      Q  Well, it was not here in court?

19      A  I can't say that, either.  I haven't been here all

20  of the time,  Specifically, I don't know what Mr. Kunkel has

21  turned over in the way of material.

22      Q  You did not produce your copy of Fallbrook's AB for

23  use in this proceeding until directed to do so by Judge Carter;

24  is that right?

25      A  That is not basic data.  This isn't basic data.

1          Q  Please answer the question.  Did you produce your

2    copy of Fallbrook's AB until directed to do so by Judge Carter?

3          MR. VEEDER: He made the point that it is not basic data.

4          THE COURT:  The question now leaves out basic data.

5    BY MR. SACHSE:

6          Q  Did you produce this until directed to do so by his

7    Honor?

8          A  No, I didn't produce it, no.  The Navy produced it.

9    I can't produce it.  As long as the Navy puts the string

10   "Confidential" on it I cannot release it.  It is beyond my

11   power.

12         Q  You do not consider an electric well log basic data

13   of any benefit to a geologist in analyzing the structures?

14         A  I certainly do, but I don't consider that this report

15   is just a well log.

16         Q  In your evaluation of the Pauba well you also made

17   certain analyses of water temperature data, did you not?

18         A  Yes, I attempted to see what could be done with the

19   temperature data from the well and have so plotted it on Plate

20   9.

21         Q  And also I will direct your attention to a discussion

22   on page 40 of the text dealing with what you have found in your

23   water temperature analyses; am I correct?

24         A  That is an interpretation of the data, yes.

25         Q  Now, what was the particular value of making water

1    temperature analyses?

2           A   Taking the temperatures, which are the part of the

3    basic data collected prior-- well, first of all, the bottom

4    hole temperature is obtained from the electric log, the

5    temperatures during periods of free flow, the temperature

6    during pumping, the temperature from nearby flowing wells of

7    known depth were used here on pages 40 to 41, used those data

8    as a tool to get some idea at what depth the bulk of water was

9    coming from.

10          Q  Again, these temperature studies were very valuable

11   to help you in determining the more permeable areas-- zones in

12   the Pauba well, were they not?

13          A   Not the more permeable zones.   The data were interpreted

14   to determine where in the well we thought the water might be

15   coming from.

16          Q   Will you turn to page 41, please, and look at the last

17   sentence of the first paragraph.   I will read it:

18               "Accordingly, it is believed that the

19               shallower deposits are more permeable and yield

20               water more readily than the deeper deposits."

21          That is a conclusion that you drew from your temperature

22   studies, is it not?

23          A   Yes.

24          Q   Then your temperature studies were of some value in

25   assisting you in determining if zones were more permeable, were

1  they not?

2          A   That is correct.  If I might, I would like to--

3          Q   Go ahead.

4          A   --to add on that, that by shallower we are speaking

5  in relative terms of the total depth of 2150 feet, and the

6  conclusions expressed here is that possibly the upper half or

7  more, the upper thousand feet, would be more permeable than

8  the lower thousand.  That is how it appeared to us from the

9  study of the data from this one well.

10          Q   In other words, the deeper you got the more compacted

11  and less permeable?

12          A   Yes.

13          Q   Now, this plate was, I presume, drafted from--

14          MR. VEEDER:  Which plate is that?

15          MR. SACHSE:  Plate 9, showing the temperatures.

16          Q   --was, I presume, drafted from certain rough notes

17  that somebody took the temperature readings on; is that right?

18          A   Oh, sure, whatever field notes there were, yes.

19          Q   Those field notes have not been made available to

20  anyone prior to this time, have they?

21          A   I don't think they are available.

22          Q   And Plate 9 has not been made available to anyone in

23  this proceeding up to this time, has it?

24          A   Not to my knowledge.

25          Q   Now, in connection with your evaluation of this well

1    you also made some studies of water qualities, did you not?

2         A   Yes.

3         Q   What was the particular value of these analyses of

4    chemical quality of water?

5         A   The analyses are shown on page 44 in Table 4.   They

6    show some variation in the quality of the water when the well

7    is free flowing and when the well is pumping.   Those, in turn,

8    are compared with the quality in the nearby artesian well, the

9    Studley, possibly the Studley well, which would reflect the

10   quality in the upper part of the artesian system.

11        MR. VEEDER:   May I have that answer read back.   I fell

12   off the sled on that.

13        (The reporter read the last answer.)

14   BY MR. SACHSE:

15        Q   Now, then, in other words, these quality analyses

16   again enabled you to draw a conclusion as to which zones

17   yielded the bulk of water; is that correct?

18        A   I am not sure that the quality of water data proved

19   that.   I think it showed that there was a difference.

20        Q   May I direct your attention to the last sentence on

21   page 45:   "Thus, it is believed that when the Pauba well is

22   pumped the bulk of the water is supplied from deposits in the

23   upper thousand feet."   That is a conclusion drawn by you from

24   the quality variations, is it not?

25        A   Yes, it is.

1      Q  And that conclusion coincides with the conclusion you

2  drew from temperature variations, does it not?

3      A  Yes, it does.

4      Q  In other words, from your tests of temperature varia-

5  tions and quality variations you concluded that the bulk of the

6  water in the Pauba Well when pumped comes from the shallower

7  zone; is that right?

8      A  I believe that is correct.

9      THE COURT:  Well, by "shallower" you mean the upper

10  thousand feet?

11      MR. SACHSE:  By shallower I mean the upper thousand feet.

12      THE WITNESS:  Yes, sir.

13  BY MR. SACHSE:

14      Q  Now, was this data available to Mr. Kunkel in his

15  studies?

16      A  I suppose so.

17      Q  But again was it available to anybody else until it

18  came into the courtroom today?

19      A  I don't know.

20      Q  Or last week?

21      A  I don't know whether this quality material has been

22  supplied to others or not.

23      Q  Did you youyourself ever suggest that this report

24  be kept confidential?

25      A  Oh, no.  No.  I would change certain parts of it if I

1    wanted to have it published under my name.  But it is not my

2    idea that they are kept confidential.

3            Q  Do you not believe that this report would be a useful

4    and helpful tool to an interested party or an interested

5    geologist attempting to find out what the facts are?

6            A  I would think so.

7            THE COURT:  Of course, you are talking to the wrong man.

8    Many a document of the military or some of the other agencies

9    of the Government that they feel should be marked "Confidential"

10   it is stamped "Confidential."

11           MR. SACHSE:  I have had extensive experience with it in

12   my own military service, your Honor.  The point I am trying to

13   make is that Mr. Veeder has had a considerable field day

14   yesterday discussing "collusion," even using the word "corrup-

15   tion," implying that certain efforts of the State of California

16   have been dictated by Fallbrook and that California is Fall-

17   brook's "hand maiden."  I think it is rather interesting to

18   find out that here is very valuable and important data which,

19   by direction of the military, a responsible civilian agency has

20   not been able to make available for this litigiation without

21   your order.

22           THE COURT:  It is now produced.

23           MR. SACHSE:  It now is, after a month and a half of

24   foot dragging.  It was produced last week.  It was requested

25   the 7th of November.

1        THE COURT:  Well, we have it now.

2        MR. VEEDER:  Yes.

3        THE COURT:  It will be going on for some time.

4    BY MR. SACHSE:

5        Q  Have you ever discussed the effect of this report

6    with Mr. Veeder?

7        A  What does that mean?

8        MR. SACHSE:  Read the question.

9        (The reporter read the pending question.)

10       THE WITNESS:  I still repeat my question.

11   BY MR. SACHSE:

12       Q  Have you ever discussed the significance of your

13   conclusions as expressed in this report with Mr. Veeder?

14       MR. VEEDER:  Yes, he did.  I talked to him on the phone.

15       MR. SACHSE:  I want the witness to answer, Mr. Veeder.

16       THE COURT:  Mr. Veeder--

17       MR. VEEDER:  I thought counsel had to release the witness

18   before he could say.  This is a lawyer-client relationship.

19       THE WITNESS:  I have explained the technical aspects of

20   this report to Mr. Veeder.  I don't know what you mean by the

21   word "significance."

22   BY MR. SACHSE:

23       Q  The value of your conclusions, their bearing in this

24   litigation.

25       A  Well, if they have a bearing, fine.  I am not here to

1 decide whether they do or not.  This is an interpretative

2 report on what facts we collected during the drilling of this

3 well.

4        THE COURT:  You discussed with Mr. Veeder and explained

5 to him what the report meant.  The questions that he had about

6 the report you answered?

7        THE WITNESS:  Yes, sir.

8 BY MR. SACHSE:

9        Q  Do you know of your own knowledge or do you have

10 any information as to why this report was classified confi-

11 dential?

12        A  No.  In fact, the work was classified before the well

13 started to drill.

14        Q  You don't know why that was, either?

15        A  No.

16        Q  How many well logs are there in this report?

17            Withdraw that.

18            There are two logs in addition to the electric log,

19 are there not?

20        A  Yes.

21        Q  Do you know which of those two was found in the State

22 of California?

23        A  I was not aware that either of them was.

24        THE COURT:  I notice they are also marked "Confidential"--

25 16A53 and 16A54.

1          THE WITNESS:  You see, the--

2   BY MR. SACHSE:

3          Q  That direction classifying those logs confidential

4   was also received from the Navy; is that right?

5          A  Everything we did in connection with the field work

6   at the well and the preparation of the report, correspondence

7   related thereto, everything was classified as confidential.

8          Q  Even though this was on private property, on the

9   Vail Ranch?

10         A  Apparently so.  I can't speak for the reasons why

11  it is classified.

12         Q  Do you know what distribution was made of this

13  report as confidential, in its confidential status?

14         A  Yes, we have a record of it.  You see, there are ten

15  typed copies, and they have been distributed and we have a

16  record of where they are.  So does the Office of Ground Water

17  Resources.

18         Q  Where did they go?

19         A  Well, probably two went to Budocks, Bureau of Yards

20  and docks, through my Washington office.  My Washington office

21  must have at least one copy.  Sacramento office has a copy.

22  The Long Beach office has a copy.  The Office of Ground Water

23  Resources had at least one copy.  There may be copies-- the

24  District of Public Works Office here in San Diego has a copy,

25  I believe.  I think we are probably approaching pretty close to

1  ten.   Now, that is to the best of my knowledge and recollection,

2  because I don't recall exactly what the distribution was beyond

3  that.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. SACHSE:

Q   Mr. Worts, I want to direct your attention to page
10 of the report at the section entitled "Generally Ground
Water Conditions.". The first sentence, reading:  "The alluvium
and underlying Older continental deposits form a relatively
large ground water basin northeast of the Wildomar fault."

THE COURT:   What page are you reading from?

MR. SACHSE:   Page 10, the first sentence, your Honor.

Q   What is the significance of the word "underlying"
in that sentence?

A   The significance is that it is a unit older than the
younger alluvium and, therefore, it underlies it.

Q   In other words, it is the Older continental deposits
that underly the younger alluvium that you are referring to?

A   Depending on what you-- the geologist's connotation
of "underlie" means that it is older than and that the alluvium
is younger than it and rests upon it. And that would rest upon
it whenever it was in contact with it laterally, downward, in
all directions.

Q   Is it not a fact that the word "underlying" in that
sentence is intended to distinguish Older continental deposits
located in stream channels  and overlain by younger alluvium
from Older continental deposits in highland areas?

A   No.

Q   It is not?

1    A  Not in any sense.

2    MR. VEEDER:  You said, "Not in any sense"?

3    MR. SACHSE:  He said, "Not in any sense."

4    THE WITNESS:  I think the next sentence, if you would

5    read it, clarifies that.

6    BY MR. SACHSE:

7    Q  I am going to.  That is the next one we are going to

8    take up.  Now, the balance of this first paragraph reads as

9    follows:

10            "The principal source of ground water in the

11            basin is probably recharged from the Temecula

12            River upstream from the area of confined water

13            and below Nigger Canyon (east of the area not

14            shown on Plate 1) at the lower end of Nigger

15            Canyon.  The water-bearing deposits are in

16            contact with older consolidated rocks.  There

17            is minor recharge from rainfall and from

18            small tributary streams."

19    Does that statement reflect your opinion as to the

20    principal source of ground water in the basin?

21    A  I think so, in general, yes.

22    Q  In other words, the principal sourse of ground water

23    is from the Temecula River, minor recharge from rainfall, and

24    small tributary streams?

25    A  Yes.

Q   And you are in that sentence referring to Pauba
Basin, are you not?

A   I am referring to the-- well, you didn't read this
second sentence there:  "No attempt was made to determine the
lateral extent of the basin."

Q   And when you say "basin", you are referring to Pauba
Basin?

A   I am referring to the topographic expression of the--
not topographic expression; I am speaking of the lateral ex-
tent of all these water-bearing deposits.  In other words, I
didn't go all the way--  Where is an exhibit I can refer to?

THE COURT:  I understand what you mean.  You didn't go
outside; you made an attempt to delimit yourself to what the
Government speaks of as the basin No. 2, Pauba Basin, or what
the State of California calls the Pauba Basin?  You are using
"basin" in the term of where it might be without attempting to
define it?

THE WITNESS:  That is right.  As I recall, it is out in
the storage unit No. 4 of Mr. Kunkel's Exhibit--

MR. VEEDER:  Even the Government's.

THE WITNESS: Even the Government's Exhibit.

MR. VEEDER:  17

THE WITNESS:  17, is it?

MR. VEEDER:  Yes.

THE WITNESS:  Yes.

BY MR. SACHSE:

Q  But regardless—

MR. VEEDER:  Just one moment.  Just a moment.  I think your Honor referred to Unit No. 2.  I think it is No. 3 to which your Honor intended.  The $\overset{Murrietta}{\text{Pauba}}$ is No. 2.

THE COURT:  Yes, 3 is Pauba.  Pardon me.

BY MR. SACHSE:

Q  Regardless, however, of the area laterally of this basin, as you use the word in Fallbrook's AB on page 10, it is your opinion that the principal source of ground water is recharge from Temecula River upstream, and minor recharge from rainfall, and small tributary streams; is that correct?

Read your statement again.

A  Yes.  I just want not to get into an ambiguity on this, because there are other streams entering-- I know a lot more about this basin now, due to Mr. Kunke's efforts, than I did when I wrote this and was limiting myself just to the well.  This is background material for the construction of the well, setting the stage geologically and hydrologically for the well.  Obviously, the principal purpose of the report is not to completely undertake a study of the whole area merely to find out what is going on in the vicinity of the well.  And a short period it was, too, that I took looking around.

Q  But I would like an answer to my question, Mr. Worts: Your opinion as to the recharge of this basin, regardless of

1    sits area, was that its principal source is the river, minor

2    recharge from rainfall, and small tributaries?

3        A  Well, except for that "regardless of its area," the

4    basin, as defined or delimited on Exhibit 17, extends many

5    miles up to the northwest.  I can't say whether it is the

6    principal recharge up there or not.  So don't get in "regard-

7    less of its areal extent."

8        Q  I am asking what you mean when you wrote this.  You

9    must have known what you meant.  What did you mean?

10       A  That is not what you are asking me.

11       Q  I am asking you, and I will repeat the question:

12   You use the word "basin" here.  You referred to something in

13   using the word "basin."  I don't know.  That is why I say,

14   "regardless of its areal extent" I want to know.

15       A  Don't say "regardless of its areal extent," because

16   I didn't say that.

17       THE COURT:  Ask your question.  This is not a debating

18   society now.

19   BY MR. SACHSE:

20       Q  Mr. Worts, using the term "basin" to describe the

21   area you had in mind in the first paragraph on page 10, is it

22   your opinion that the principal source of recharge is the

23   Temecula River, plus minor recharge from rainfall, and small

24   tributary streams?

25       A  Yes.

1    Q  I will refer to Plate 1.  And I take it it is your

2  opinion that the older continental deposits you delineated

3  north and south of the Pauba Valley on Plate 1 do not con-

4  tribute any substantial amount of water to the Pauba Valley

5  basin?

6    A  It doesn't say that.  The report doesn't say that.

7    THE COURT:  What plage?

8    MR. SACHSE:  You have the plate, your Honor.

9    MR. VEEDER:  Plate 1.

10   MR. SACHSE:  The plate is supplied and has been repro-

11  duced.

12    Q  Let me ask you this, Mr. Worts--

13   MR. VEEDER:  Wait a minute.  Isn't there a question

14  pending?

15   MR. SACHSE:  He says, "It doesn't say so," was his

16  answer.

17    Q  Do you anywhere in this report, Fallbrook's AB, Mr.

18  Worts, suggest that the Paube Valley receives recharge from

19  the Older continental deposits to the north or the Older

20  continental deposits to the south?

21    A  Not to my recollection.

22   THE COURT:  Well, I am just reading here.

23   MR. SACHSE:  I didn't hear your Honor's observation.

24   THE COURT:  Just a minute.

25   What is the significance of your statement on the bottom

1 of page 11: "In the artesia area upward leakage of ground

2 water from the Older continental deposits"-- that would be

3 below?

4         THE WITNESS: Yes.

5         MR. VEEDER: May I inquire as to where your Honor is

6 reading?

7         THE COURT: I have answered my own question. I just read

8 it more carefully.

9         MR. SACHSE: Were you through, your Honor?

10         THE COURT: Yes.

11 BY MR. SACHSE:

12         Q I am going to direct your attention to the third

13 paragraph on page 10, Mr. Worts, reading as follows:

14         "Downstream from a point about one

15         mile above the State Highway 71 bridge the

16         Temecula River is a perennial stream. The

17         river gains in discharge downstream for a

18         distance of about four miles. The gain

19         is from effluent seepage of ground water

20         in the artesian area and is caused by slow

21         upward leakage through confining to semi-

22         confining clay and shale beds in the Older

23         continental deposits and through the

24         overlying alluvium and channel deposits."

25       What do you mean by "channel deposits."?

1        A  Well, if you wanted to map-- a geologist could map

2   the active surface of the stream as channel deposits.  They

3   essentially are a part of the alluvium.

4        Q  Recent alluvium?

5        A  Recent alluvium.

6        Q  In other words, they are the very Recent alluvium?

7        A  They are the active Recent alluvium.

8        Q  Then under this is so-called Recent alluvium which

9   may go back a good many thousand years?

10       A  Yes.

11       Q  And then under that is the Older continental?

12       A  Yes.

13       Q  Or Older alluvium?

14       A  Yes.

15       Q  Now, is that conclusion expressed in that paragraph

16  3 on page 10 your present conclusion?

17       A  Yes.

18       Q  Then, is it your opinion that the principal movement

19  of ground water in the Pauba Valley is a slow upward movement

20  of deep artesian water rather than a lateral movement from

21  Older continental deposits on either side?

22       A  Well, now, you are getting into a difficult subject.

23  I think Mr. Kunkel has explained the flow pattern.

24       Q  I don't want Mr. Kunkel's opinion; I want yours as

25  expressed to us.

1    A  That is my opinion, too.  I agree with what he said

2    in his testimony about the movement of the water down through

3    the Temecula Basin and the manner in which it discharges.

4    Q  I am asking if paragraph 3, if your opinion as ex-

5    pressed in paragraph 3, is that the gain in surface flow of

6    the stream is from effluent seepage of ground water in the

7    artesian area caused by slow upward leakage?

8    A  Yes.

9    Q  And when you say "gain," you mean increase noted in

10   the stream flow, did you not?

11   A  Yes.

12   Q  Now, I will direct your attention to page 11 of the

13   report.  It is the very last sentence, the bottom three lines

14   and continuing on at 12:  "The alluvium is recharged by

15   seepage from the Temecula River between the mouth of Nigger

16   Canyon and the area of confined water.  In the artesian area

17   upward leakage of ground water from the Older continental

18   deposits and infiltration of rainfall and irrigation water

19   have kept the alluvium fully recharged."  The last word,

20   "alluvium," third from the end of the sentence, you were

21   referring to the Recent alluvium, were you not?

22   A  Yes.

23   Q  In other words, the upward movement of confined water

24   and infiltration of rainfall and irrigation water have kept

25   the Recent alluvium in the Pauba Valley fully recharged?

A   Below the point of rising water, yes.

Q   Below the point of rising water?

A   Yes.

Q   Now, Mr. Worts, I wish you would look at page 9, please.  The third sentence of the second paragraph reads: "The Wildomar fault forms an effective barrier to ground water movement in the Older continental deposits upstream in the Temecula River Basin."  Is that your present opinion?

A   Yes, it is.  But I have a suspicion that we don't interpret the words "effective barrier" in that same manner.

Q   That is what I am going to ask you right now.  What do you mean by "effective barrier to ground water movement"?

A   Well, sufficiently effective to bring or cause a great deal of the water moving through, moving southwestward through the Older continental deposits to rise on the upstream, up gradient side of the fault and discharge over the fault. I do not mean to imply that the barrier is a steel plate.

Q   I want to direct your attention to the fact that the last three words in the sentence refer to the Temecula River Basin.

A   Yes.

Q   Now, directing your attention again to Plate 1.

A   Yes.

Q   I am speaking now of the barrier effect of the Wildomar fault in the Temecula Basin, disregarding the Older

1   continental for a moment.  What do you feel is the barrier

2   effect of the fault in that basin?

3           A  It acts as a relatively impermeable dam, subsurface

4   dam, across the lower end of that basin.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  You have used the word "Temecula River

2      Basin" there in the same sense as referring to the Pauba Basin?

3              THE WITNESS:  I assume so, your Honor.  It is the area

4      of Older--

5              THE COURT:  Eastward of the Wildomar Fault?

6              THE WITNESS:  Yes, sir.

7      BY MR. SACHSE:

8              Q  Now, the remainder of that paragraph, Mr. Worts,

9      "The difference in head in the four flowing artesian wells,

10     500 to 550 feet in depth--

11             A  Pardon me.  I don't see where you are.

12             Q  Page 9, the remainder of the second paragraph.  I

13     read you the first sentence already.

14             "The difference in head of the four flowing wells--"

15             Have you got it?

16             A  Yes.

17             Q  --" on the alluvial plane of the Temecula River

18     upstream from the fault, and water levels in non-flowing

19     wells downstream from the fault is evidence supporting this

20     conclusion.  These wells indicate confined water conditions

21     for a distance of at least two and a half miles upstream from

22     the fault."

23             What do you mean by "confined water conditions"?

24             A  It means that there are enough lenticular bodies of

25     clay to produce flowing artesian condition in the lower portion

1     of the Temecula River or Pauba Basin.

2          Q  In other words, if I understand this paragraph

3     correctly, you feel that the Wildomar fault confines water,

4     helps confine water to the west?

5          THE COURT:  To the west?

6          MR. SACHSE:  To the west, downstream to the west of the

7     Pauba Basin.

8          Q  And that there are lenticular clay structures

9     horizontally on top of the water that help confine it; is

10    that it?

11         MR. VEEDER:  To the west?

12         THE COURT:  To the west?

13         MR. SACHSE:  To the west.

14         THE COURT:  You mean the Wildomar fault operates on

15    waters to the east?

16         MR. SACHSE:  The Wildomar fault operates on waters to

17    the east.  The Wildomar fault lies to the west of the confined

18    area.

19         THE COURT:  All right, go ahead.

20         MR. SACHSE:  Let me start all over again.

21         Q  Mr. Worts, looking at your Plate 1, you have indi-

22    cated the approximate boundary of an artesian area on the

23    plate?

24         A  Correct; artesian flow, yes.

25         Q  Now, could we generally say, for ease in discussion,

1  that when you say "artesian area" or "confined water area" you

2  are talking about the same ting?

3      A  Yes..

4      Q  The westerly boundary of your confined water area,

5  then, in Pauba Basin is the Wildomar fault, is it not?

6      A  Yes.

7      Q  Now, there must also be some kind of a horizontal

8  ceiling, is there not?  Now is that the lenticular clay struc-

9  tures you just referred to?

10      A  Yes.

11      Q  In other words, the water in this confined water area

12  is confined on the west by the Wildomar fault, on the top by

13  lenticular clay structures?

14      A  Let us say it is dammed up on the west by the Wildomar

15  fault, not a completely impervious structure.  It is similarly

16  capped-- not capped but the water-bearing section contains

17  sufficient number of clay lenses to cause a vertical restric-

18  tion on its movement.  So that you do have it hemmed in on the

19  top and on the west end.  But as is evidenced from the gain in

20  flow, the whole system is leaking out the water and discharging

21  it down across the fault and probably through the fault, just

22  like it is leaking upward through the clay lenses.

23      Q  In other words, that is the same thing you referred

24  to on page 10 in the third paragraph:  "Slow upward leakage

25  through semi-confining clay and shale beds"?

1    A  Yes.

2    THE COURT:  Is this a good place to stop for the

3 recess?

4    MR. SACHSE:  Yes, your Honor.

5    (Recess.)

6 BY MR. SACHSE:

7    Q  Mr. Worts, again directing your attention to Plate

8 1 of the exhibit, reviewing quickly what we did just before

9 the recess, I understand you to say that your use of the term

10 "artesian area" on Plate 1 is approximately the same meaning

11 as "area of confinement" or of confined water?

12    A  Well, not exactly.  If you look at the legend, the

13 legend spells it out.  The artesian area here means this is

14 the area within which you would get flowing wells.

15    Q  Is that not also the area which you have referred to

16 in your text as having a horizontal layer of confining and

17 semi-confining clay and shale beds?

18    MR. VEEDER:  Where are you reading now?

19    MR. SACHSE:  Page 10, the third paragraph, the second

20 paragraph the same language is used.

21    Q  In the second paragraph you say "confining clay

22 beds," and in the third paragraph you say "confining and

23 semi-confining clay and shale beds."

24    A  Yes, as they affect these flowing wells in the valley.

25 However, it is obvious that the confining beds would extend

1    off north and south of the basin beyond the area delimited

2    here as where flowing wells occur.  For example--

3        Q  Go ahead.

4        A  Referring to Exhibit 15-A, we have flowing-- at the

5    time of preparation of that report, the river was gaining from

6    above Highway 71 bridge crossing, flowing from there, gaining

7    stream as water was increasing in discharge all the way down

8    the valley.

9        MR. VEEDER:  Could we have the section numbers, please.

10       THE WITNESS:  Well, it is the Temecula River Valley.

11   The flow, as I recall, started in Section 11, 8 South, 2 West

12   and flowed with increasing quantity downstream to the Wildomar

13   fault.

14       Now maybe this would help explain what my concept is.

15   If we went to the north of Pauba Valley, between Pauba Valley--

16       MR. VEEDER:  Just a minute, please.  I am interested

17   now, please, Mr. Worts--

18       THE WITNESS:  I have to explain this.  You are asking me

19   about--

20       MR. SACHSE:  Just a minute.  I don't mind your doing

21   that.

22       Q  First, I am trying to get straight your concept of

23   the confinement within the valley itself.  I want to understand

24   this one thing, when you use the words "confining and semi-

25   confining clay and shale beds" you are referring to a horizontal

1    confinement within the valley; is that right?

2        A   No, not within the valley.   That is why I was going

3    ahead and explain what I had in mind.

4        Q   All right, go ahead.

5        A   If you took a monstrous ditch digger of some kind

6    and constructed a deep trench between Long Canyon and Pauba

7    Valley and running parallel to them, say starting up in

8    Section 3 and traversing southwest toward the Wildomar fault,

9    if you dug that trench down as deep as the surface of the

10   stream bed approximately in Temecula Valley, you would have

11   rising water for the same reasons in the bed of that trench.

12   In other words, throughout this whole area you would have

13   this rising water.   But the topography-- this is high land

14   north of the valley.   Therefore, the water doesn't rise up to

15   the land surface because it is not under sufficient pressure

16   to do so.   However, the seeps and springs that I have observed

17   along the front indicate that this condition exists throughout

18   the whole area to the northeast of the Wildomar fault.

19       Q   Now again, if you please, back to the valley itself.

20   The pressure effect that is observed in the half dozen artesian

21   wells is caused, as I understand your text, by the barrier

22   effect of the Wildomar fault and the confining and semi-

23   confining clay beds immediately overlying it; the water under-

24   neath them is at pressure, is that right?

25       A   Yes.

Worts    Cross

1          Q  Now, I want to direct your attention to Plage 16

2  of California's Exhibit L.  That is here on the board, if you

3  will take a look at it.

4          A  I am not familiar with any of these exhibits.

5          Q  Well, this, as you can see, is a--

6          THE COURT:  You mean that you didn't study Bulletin 57

7  in connection with this investigation of the valley?

8          THE WITNESS:  Your Honor, the study was made in 1951 and

9  1952, and I don't think Bulletin 57 was around at the time.

10         THE COURT:  All right.

11 BY MR. SACHSE:

12         Q  Have you ever read Bulletin 57?

13         A  I have skimmed through it.

14         Q  Well, I think you are a good geologist.

15         A  Thank you.

16         Q  Just take a look at this Plate 16, please, Mr. Worts.

17 This, as you can see, is a cross-section of Pauba Valley along

18 Highway 71.  You have seen many such diagrams before, have you

19 not?

20         A  Yes, I have seen a lot of diagrams.

21         Q  I want to direct your attention to the fact that the

22 valley fill in this diagram is depicted as showing a zone

23 of unconfined water, then a confining bed-- I am using the

24 words from the exhibit-- and then a zone of confined water.

25 Do you follow it on the exhibit?

1           A  I see that it says that.

2           Q  Now, does that agree or disagree, in substance, with

3     the conclusions that you expressed in your report?

4           THE COURT:  To the extent that it goes.

5           MR. SACHSE:  To the extent that it goes, yes, your

6     Honor.

7           MR. VEEDER:  What is meant by that, your Honor, "to the

8     extent that it goes"?

9           THE COURT:  Well, by "to the extent that it goes" I

10    mean exactly this:  As I read the report on the Pauba well,

11    they talk about, "confined water."  They don't talk about

12    "unconfined water," but the same thing.  However, the report

13    on the Pauba well talks about a seepage upward or a movement

14    upward, which isn't shown on this chart.  But as far as the

15    confining bed and the zone of confined water and an area to the

16    eastward in Pauba Valley where the recharge occurs, that is all

17    shown on Plate 16.

18          MR. VEEDER:  But that doesn't fully comport with what

19    Mr. Worts has written.

20          MR. SACHSE:  Let me ask Mr. Worts a question, if I may,

21    specifically.

22          Q  Mr. Worts, I will direct your attention to page 11

23    of your text, the second paragraph, the first sentence:

24                "Based on the above rough estimate,

25           the area of artesian flow extends upstream

1        on the surface of the alluvium plane a

2        distance of at least three miles above the

3        Wildomar fault and in the river channel

4        about four miles above the fault."

5    Now that was your conclusion?

6    A  Yes.

7    Q  If you care to take a scale, would you care to

8  scale off here the distance between the Wildomar fault and the

9  point where the State of California says they don't knod of a

10  confinement in existence.  See if that does or does not

11  comport with your conclusions as to the extent lengthwise of

12  the artesian zone.

13    A  Well, the artesian zone has nothing-- I won't say it

14  has nothing to do-- it is not what I am saying here.  I am

15  saying that the area of artesian flow, that is, the area

16  within which you will obtain flowing wells-- I am not saying

17  that is the extent of confining materials at all.

18    Q  All I am asking you is, does your delineation of the

19  extent to which you would expect to find artesian wells

20  cover the same area, generally speaking, that the State has

21  indicated on Plate 16 solely in an east-and-west direction?

22  I am not asking you about north and south.  Solely from the

23  Wildomar fault upstream.  Are your conclusions not the same?

24    MR. VEEDER:  I object, your Honor.  This is going

25  beyond any cross-examination that was agreed to.  I told

1  counsel that I would be very pleased to have Mr. Worts here

2  along with his report.

3    THE COURT:  Overruled.

4    MR. VEEDER:  He hasn't studied the California--

5    MR. SACHSE:  I realize you have overruled this--

6    THE COURT:  I overruled his objection.  Why argue it?

7    The Plate 16 at the bottom has a scale in thousands

8  of feet, and the extent of the so-called confining bed is

9  shown to be at an area about 35 or 36 thousand feet.  However,

10  the measurement is made not from the Wildomar fault; it is

11  made from the line of the basement complex further to the

12  west.  So you would have to subtract--

13    MR. SACHSE:  You can measure from the 8000 line on the

14  Wildomar fault upstream to the 35,000 indication.

15    THE WITNESS:  The trouble is, your Honor, we are comparing

16  apples and bananas here.

17    THE COURT:  Whether you are or not, he has asked you

18  a question whether that areal extent is about the same as your

19  three to four miles.

20    MR. SACHSE:  That lengthwise extent only.  I haven't

21  asked you about north and south yet; just east and west, Mr.

22  Worts.

23    THE WITNESS:  You are asking me to compare an area of

24  artesian flow with an area of-- what do you call it here--

25  an area of confining bed?  You can't compare the two.

1    THE COURT: That isn't what he is asking you. He wants

2    to Court to draw that conclusion. But he isn't asking you

3    that question. He is asking you the simple question, where

4    you talk about the area of artesian flow as being distant

5    eastward from the Wildomar fault and the channel about four

6    miles, whether that distance you show there on page 11 is

7    approximately the same distance shown on Plate 16?

8    THE WITNESS: For something else.

9    THE COURT: For something else. He has a right to ask

10   that, whether you think it is apples and bananas or not.

11   THE WITNESS: I misunderstood him. I thought he was

12   trying to compare the same thing, which he isn't at all.

13   Four miles is 21,000 feet, roughly. The Wildomar fault

14   is shown at 8,000. Adding 21,000 onto that would read up to

15   29,000, which would fall at about the same place near Well

16   8S, 2W, 11J4, in that vicinity. That would be the upstream

17   limit of where the stream started to flow.

18   THE COURT: Which well again?

19   THE WITNESS: Adding 21,000 to 8,000--

20   THE COURT: Which well number did you refer to? That

21   is what I am asking.

22   THE WITNESS: I am trying to get back to it again.

23   MR. MOSKOVITZ: I think it was 11J4.

24   THE WITNESS: It would be somewhere between Wells 8S, 2W,

25   11L1 and 11J4.

1          THE COURT:  All right.

2   BY MR. SACHSE:

3          Q  Now, Mr. Worts, if you want to come up to the thing

4   you have been trying to answer, apparently, now what confining

5   areas or semi-confining clay and shale beds, or whatever there

6   may be, did you find to exist either north or south of the

7   Pauba Valley?

8          A  I didn't find any.  But I know by geologic principles

9   that they can't suddenly stop.

10         Q  Then your plate 1-- and I am directing your attention

11  to the approximate boundary of the artesian area-- is not,

12  in any sense, supposed to indicate-- will you look at Plate 1,

13  please-- that you might not, for example, get an artesian

14  well in Section 8?

15         A  A flowing artesian well?

16         Q  Yes.

17         A  You can't get a flowing artesian well there because

18  the topography is so high.  In other words, you go up on a

19  mesa of maybe-- I don't know what the relative altitude is.

20         THE COURT:  Well, you have answered the question.

21         Go ahead.

22  BY MR. SACHSE:

23         Q  Now, I will direct your attention to the fact that

24  on this Plate 1 you show fringe areas of younger alluvium,

25  for instance, in Section 17 you show a little side channel,

1  in Section 10 you show another side channel, in Sections 16

2  and 21, which you have excluded from your artesian area. Do

3  you follow me?

4       A  Yes.

5       MR. VEEDER:  When you say "fringe" you are referring to

6  those areas delineated on 16 to 21; is that right?

7       MR. SACHSE:  Yes.

8       MR. VEEDER:  And 15 and 10?

9       MR. SACHSE:  I have lost you now, Mr. Veeder.

10      Let me ask the question again.

11      THE COURT:  He is referring to the yellow areas north

12  and south of the Pauba Valley, but which are not enclosed

13  within the areas shown as the area of artesian water.

14      MR. SACHSE:  That is correct.

15      Q  Now then, do I take it that your testimony is that

16  you would expect to find artesian flow in the younger alluvial

17  area lying in Sections 17 and 16?

18      A  You would find artesian flow-- this means a flowing

19  well-- up that alluvial slope to the point where the water in

20  the well would rise.  If it would rise-- that is, that dashed

21  line across there is an indefinite boundary which I at the

22  time drew in as the height to which water would rise right to

23  the surface of the alluvium.  North of that line I surmise that

24  the altitude, the topography was such, rising to the north, that

25  the water in the well would not rise far enough to flow.  South

1  of that line I presume that there would be enough head to cause

2  a well there to flow.

3      Q  You were not on our tour of the Pauba Valley, Mr

4  Worts, but have you read Mr. Kunkel's testimony and reviewed it

5  in this case?

6      A  No, I have not.

7      Q  I will tell you that both on the tour and in his

8  testimony it has been pointed out to us on several occasions

9  that the line of contact between the younger and the older

10  alluvium on either side of Pauba Valley is at the break in the

11  hills, where the hills start to go up is the older alluvium,

12  and the flat is the younger alluvium.  Now, assuming that--

13      A  Well, let's not assume that.

14      Q  I am going to ask you to assume that.

15      THE COURT:  He has a right to ask you to assume it.

16  BY MR. SACHSE:

17      Q  Assuming that, what barrier would exist to cause you

18  to exclude the younger alluvium, in Sections 17 and 16, from

19  the artesian area?

20      A  What barrier?

21      MR. VEEDER:  He has already answered that.

22  BY MR. SACHSE:

23      Q  What barrier would exist to cause you, on your Plate

24  1, to exclude that younger alluvium from the artesian area?

25      THE COURT:  Objection overruled.

1    THE WITNESS:  I don't know how the word "barrier" got

2 in here, but there isn't any barrier there.

3 BY MR. SACHSE:

4    Q  Let us use the word "confining" or "semi-confining

5 layer" would exist.

6    A  Merely the topography controls the position of that

7 line.

8    Q  So if that line is drawn on a point where the ground

9 level is the same on both sides, then there is something wrong

10 with your plate; is that right?

11    A  Yes.

12    THE COURT:  Apparently all geologists are reluctant to

13 admit that they made any kind or error or mistake.  It seems

14 to be a common characteristic.

15    MR. VEEDER:  That is because it is such an exact science,

16 your Honor.

17 BY MR. SACHSE:

18    Q  I would like now to direct your attention to page 7

19 of the report, Mr. Worts, particularly the last five lines, in

20 which you were discussing the location of the Pauba well:

21        "Hydrologically, the proximity of the

22        well to the fault was expected to have a

23        detrimental effect on the pumping level, in-

24        asmuch as the drawdown would be increased

25        when the pumping cone of depression reached

1          the fault, which acts as a barrier to ground

2          water movement."

3     Is that still your conclusion?

4     A  Yes.

5     Q  In other words, you felt that when a cone of depres-

6 sion reached the fault on the west, it didn't go through it but

7 it tended to stop and the cone would extend further to the

8 east; is that right?

9     A  Not wholly correct.

10    Q  Tell me where I am wrong, then.

11    A  Whether or not it would stop against the fault would

12 depend on the degree of leakage through it.  But it is suffi-

13 ciently-- it has relatively low permeability.  Therefore, the

14 effect would be in a pumping test of only 70 hours or so to

15 truncate the cone as it expanded out and hit the Wildomar fault.

16 It is quite likely that there was some contribution or a

17 reverse flow through the fault, but that couldn't be measured.

18 It would be relatively small.

19    Q  When you say "truncate the cone" you mean it would

20 give you a lopsided cone, shorter on the Wildomar fault side

21 and longer on the upstream side?

22    A  Yes.

23    THE COURT:  Or on the sides?

24    MR. SACHSE:  Or on the sides, yes.

25    THE WITNESS:  Yes.

BY MR. SACHSE:

Q   Is that correct?

A   Yes.

Q   Now, turn to page 8, please, the second sentence:

"The faults and geologic formations

shown are largely from work by Mann (1949)

and by Waring (1919);"

Is that correct?

A   Largely.

Q   Do you know anything improper in a geologist's using the works or studies of a geologist who did the job earlier?

A   Not in a reconnaissance type of geologic map, as shown on Plate 1, no.

Q   In fact, you customarily seek to look to all of the earlier sources, don't you?

A   We look at it.  If it is a detailed study, we go over it carefully.  In this case I just used what data were available, plus my own field inspection, to prepare Plate 1.

Q   On the same page, under the subhead "(1) Basement complex, which includes granitic intrusive rocks and metamorphic rocks of pre-Tertiary age, essentially non-water bearing;" is that your opinion?

A   Yes.

Q   And continuing down the same paragraph, subhead "(2) Older continental deposits, which include the pre-terrace

1   continental deposits of Pleistocene to probable Pliocene age,

2   and terrace deposits of probable Pleistocene age, composed of

3   gravel, sand, silt, and clay and, where saturated, are largely

4   water bearing;" that is still your present opinion?

5          A  Yes.

6          Q  What is the significance of the phrase "where

7   saturated"?

8          A  If it is unsaturated you can't get any water out of

9   it.

10         Q  Is there any way that the symbol used in geologic

11  mapping Qtoa distinguishes between saturated and unsaturated

12  materials?

13         A  No.

14         Q  So from the mere fact that someone told you, for

15  example, that an entire area was older alluvium Qtoa, you

16  would not draw the conclusion that that particular body of

17  older alluvium was or was not water bearing?

18         THE COURT:  You mean merely from the fact that it is

19  older alluvium you would not conclude that it is water bearing?

20         MR. SACHSE:  Exactly.

21         Q  That factor alone would not determine whether or not

22  it is or is not water bearing?

23         A  That is true.

24         THE COURT:  Is this supposed to be doing me some good,

25  Mr. Sachse?

           MR. SACHSE:  I hope it is, your Honor.

BY MR. SACHSE:

Q  With particular reference to Plate 15-A.

THE COURT:  Do I have that?

MR. SACHSE: Exhibit 15-A.  It is on the board.  I want it only for a moment.  Your Honor undoubtedly observed it. No detail.

15-A, Mr. Veeder.

THE COURT: Government's 15-A?

MR. SACHSE:  Government's 15-A.

Q  Parts of the Qtoal delineated on there may not be saturated?

A  Definitely.

THE COURT:  Does that help?  Because obviously the little hillocks of Qtoal, protruding in the valley, obviously have no water.  We are not talking about those now, are we? You are talking about something else?

MR. SACHSE:  Maybe it is a good time to make a little argument, your Honor.  What I am trying to point out is the point that I have pressed as vigorously as I can here, and that is we don't know enough about any of this stuff to attempt to regulate or control the water uses in it.  With your permission, though, I will go ahead a little further.

THE COURT: There are areas where we don't know as much about it as we do in other areas.  You will concede that.

MR. SACHSE:  I will concede that.

1       THE COURT:  And there are some areas we know consider-

2   able about, then?

3       MR. SACHSE:  We have considerable information.

4       THE COURT:  And it is an old experience of mankind that

5   a dog barks at you and then bites you, when you pass by the

6   next time you draw an inference that when he barks at you he

7   might bite you again.  So we draw inferences.  We find certain

8   things in certain areas and draw an inference of probably.

9   Something similar exists in another set of similar facts.

10  BY MR. SACHSE:

11      Q  Mr. Worts, page 9, please, the last paragraph,

12  first sentence:  "The alluvium in river channels deposits

13  extend beneath the Pechanga and Murrieta Creek planes and the

14  Temecula River plane.  Preliminary examination indicates these

15  deposits are about 100 feet thick."  Is that your present

16  conclusion?

17      A  I don't have much more to base it on than I did then.

18      Q  That is the best conclusion you have?

19      A  On that order.

20      THE COURT:  Since we have this extensive cross-

21  examination, can't we put this exhibit in evidence as the

22  testimony of the witness in the same way in which we have done

23  with other documents?

24      MR. SACHSE:  I am going to offer it in evidence, your

25  Honor.

1          THE COURT:  As a narration of his testimony if he was

2    interrogated on all the matters in connection with the Pauba

3    Well data.

4          MR. SACHSE:  I would be very, very happy to have it

5    done on that basis.  But I do not expect to carry on quite so

6    extensive cross as Mr. Veeder did.

7          THE COURT:  I am not trying to cut you off.  I am just

8    saying let's give this the same treatment as we gave Appendix

9    B.

10          MR. SACHSE:  At this time I am going to offer it

11    anyway, whether it goes in as his testimony or not.  I will

12    offer it, and I will submit there is another basis for its

13    admission; in that it is a report prepared at the request of

14    a litigant here, United States Navy, and is admissible as an

15    admission if on no other basis.  And I will now offer it.

16          MR. VEEDER:  I am going to object on the grounds that

17    it is improper to offer documentary evidence on cross-examina-

18    tion; that by so doing it deprives me of the right of cross-

19    examination.  I think the rule of law is very clear on that.

20          MR. SACHSE:  I still haven't heard that one.

21          MR. VEEDER:  Well, I think that you will find that to

22    be the law.  And I object to it on that ground.

23          THE COURT:  Overruled.

24          MR. SACHSE:  I suggest, your Honor--

25          THE COURT:  Overruled.  The document has been used

1    for cross-examination, and I will treat it also in the same

2    manner as we treated Appendix B as the oral testimony of the

3    witness Worts. I do not know how Mr. Veeder would expect to

4    cross-examine his own witness; however, he will have ample

5    latitude if he wants to question Mr. Worts on the matter. If

6    he is taken by surprise, he can even cross-examine his own

7    witness.

8    MR. VEEDER: I have been taken by surprise, your Honor.

9    THE COURT: At any rate, the Exhibit AB will be con-

10   sidered as the oral testimony of the witness Worts reduced to

11   writing, and it will be received in evidence, as I understand

12   it.

13   All right. Do I understand you to infer there is some-

14   thing about this Pauba well report that you don't like?

15   MR. VEEDER: I simply have to state, your Honor, that

16   from the standpoint of the offers in evidence that have been

17   made there are elements in here--

18   THE COURT: Where is Mr. Luddy?

19   MR. VEEDER: -- that will entail some further con-

20   sideration.

21   THE COURT: Let the record show, however, I am not

22   receiving it in evidence in any sense as an admission against

23   interests. There is considerable doubt as to application of

24   that rule against any body politic. We are not going to pass

25   on that.

1          MR. SACHSE:  As long as it is in, that is all I care

2      about.

3          THE COURT:  Go ahead, Mr. Sachse.

4          MR. SACHSE:  I thought you wanted to wait for Mr.

5      Luddy.

6          THE COURT:  We will tell him when he comes back.

7          (To the Clerk)  Fallbrook's Exhibit AB received in

8      evidence with certain limitations.

9      BY MR. SACHSE:

10         Q  I want to direct your attention now to page 23, Mr.

11     Worts, the second paragraph, and, let's see, the sentence that

12     starts on the fourth line of the second paragraph:

13             "Based on these samples, on comparative

14             drilling rates, and on number of new"--

15         THE COURT:  Wait a minute.

16     BY MR. SACHSE:

17         Q  "--bits worn out during drilling"--

18         THE COURT: Wait a minute.

19         MR. SACHSE:  Page 23, second paragraph, on the fourth

20     line of the paragraph.

21         THE COURT:  All right.  Start over again.

22     BY MR. SACHSE:

23         Q         "Based on these samples, on comparative

24             drilling rates, and on number of new bits

25             worn out during drilling, it is judged that

1          many of the materials below about 1500

2          feet logged as sand were sandstone."

3      Is that still your opinion?

4      A  Yes, sir.

5      Q  On the same page, the last sentence of the first

6  paragraph:

7          "Because no sandstone pieces or

8          bits of shale, as such, were seen to pass

9          over the shaker table, the materials were

10         classed as sand or clay by the survey;

11         although it was suspected or known that

12         in the deeper parts of the hole the materials

13         penetrated were fairly well consolidated."

14     By that do you mean that the drilling process had so

15  broken up the heart of the material that you couldn't say

16  specifically that it was stone but that it looked like sand?

17     A  That is generally true.  If you will read the first

18  sentence of the second paragraph, our most definite informa-

19  tion on the type of materials encountered when they became

20  consolidated were the pieces of sandstone that actually got

21  jammed in the bit and came up when they made a roundtrip to

22  change bits.

23     Q  And those, of course, would be intact?

24     A  Those would be intact.  Here you have a-- I think

25  that Plate 3-A you can see the type of machinery that is down

1   in the bottom of the hole in the form of that bit with those
2   gear | tooth/tube | cutters, which would grind up the sand to a point where
3   when it came to the top of the hole it couldn't be identified
4   as sandstone, as such.  It was pretty well ground up.

5         Q  Now, what I want to get straight is:  In your U.S.G.S.
6   log how are those materials described, as sand or as sandstone?

7         A  As I recall-- I could look and see-- I believe they
8   are logged as sand.

9         Q  That is my understanding, too; but I wish you would
10   check when you have a moment.

11         Do you consider standstone as a permeable material,
12   highly permeable?

13         A  Which do you mean?

14         Q  Highly permeable?

15         A  Not usually highly permeable.

16         Q  Do you consider it as a good water-bearing material?

17         A  It can be, depending on the type of cement and
18   whether the cement fills all of the interspaces between the
19   grains that form the sandstone.

20         Q  It also may be an important water-bearing material,
21   can it not?

22         A  It can be.

23         Q  So the delineation on the U.S.G.S. log of areas
24   marked sand, in your opinion, many of those areas are sand-
25   stone?

1    A  In the deeper part of the hole, yes.

2    Q  Now, at several different places in this report
3 you have made comparisons between the shallower deposits and
4 the deeper deposits.  For example, I will refer you to one
5 at page 41 in connection with the temperature study, the last
6 sentence of the first paragraph:  "Accordingly, it is believed
7 that the shallower deposits are more permeable and yield water
8 more readily than the deeper deposits."  Have you any distance,
9 yardstick you can give us to distinguish what you mean by
10 shallower and deeper?

11    A  As I explained before, we have a hole here of 2100
12 feet deep.  The upper 108 feet is cemented off by the con-
13 ductor pipe.  So we are dealing with a section between about
14 108 feet and about 2150 feet.  By the upper part and shallower
15 part I am speaking of maybe the upper thousand; the deeper
16 part would be, say, the lower thousand.

17    Q  Now, I direct your attention to the sentence immed-
18 iately preceding the one I just read you.

19    A  Yes.

20    Q  "The average depth of the zone indicated is about
21 750 feet below land surface."  Now, is that the shallower zone
22 you are talking about?

23    A  That would be in the shallower zone, yes.

24    Q  In other words, the shallower zone is 750 feet
25 below land surface?

Worts  Cross                                                                                    6738

A   There is no distinct zone.  It is just the shallower part of the well.

Q   And the closest figure then you can give us to a depth measurement in the well, as distinguishing shallower and deeper zones, would be this 750-foot figure?

A   No, it is just a general figure.

Q   Now, on page 21, please, the last paragraph.  I am not going to read the whole thing.  It is a little lengthy.  Would you take just a minute and read it yourself, Mr. Worts.

A   Yes.

Q   What is the significance, in your opinion, of commencing the perforations in this well 114 feet lower down than you suggested they start?

MR. VEEDER:  I object to that-- (inaudible.)

MR. SACHSE:  I will withdraw it and start over.  I think it is unclear.

Q   I will direct your attention to the third sentence. You say, "It was suggested that perforated casing be placed at depth of one twenty-four hundred"-- and then you continue. Do you see the language?

A   Yes.

Q   In other words, you suggested that perforated casing start at 120 feet, did you?

A   Yes, apparently so.

Q   Going to the last sentence:  "However, the Pauba

1  Ranch owners intervened and financial arrangements were agreed

2  upon to perforate the casing continuously from 234 to 2147."

3  Now, the difference between 120 and 234 is 114 feet, is it

4  not?

5  A  Yes.

6  Q  Now, what is the significance, in your opinion, of

7  starting these perforations 114 feet farther down than you

8  recommended?

9  A  I don't know.

10  Q  What effect would it have on where the water comes

11  from?

12  A  It might tend to prevent water coming in in that

13  uppermost 114 feet you mentioned.  However, this is a gravel-

14  packed well, which means that outside the casing even in zones

15  where the well isn't perforated it has a continuous--

16  Q  Column of water in the gravel?

17  A  --in the gravel between the well casing and the

18  outside of the ream bore; so that the water coming in can,

19  if the well is properly cleaned and the gravel is cleaned

20  up, water can seep through those gravels and get down to the

21  nearest perforations.

22  THE COURT:  What was your purpose in suggesting the

23  perforations only at intervals?

24  THE WITNESS:  Save a little money.  And for my opinion,

25  to come up with the same results in the pumping and pump

1   discharge and drawdown.  I think I have a total of 1500 feet,

2   but I further suggested that they-- a total of 1530 feet of

3   perforations-- but I went ahead to suggest that they use

4   alternate blank and perforated casing throughout those intervals,

5   which would have decreased the total perforations to something

6   like 750 feet for this well.  It was my opinion that you would

7   have gotten essentially, virtually the same yield and draw-

8   down with that many perforations as you would with 1900 feet;

9   because 1900 feet of perforations of the size and type used

10  in this well give you a collective space of 217 square feet

11  or something, as I recall it, about the size of a wall of a

12  room, which, I thought, was unnecessary for the amount of

13  water that we were going to get out of the well.

14          THE COURT:  There is no lack of perforations in the

15  well?

16          THE WITNESS:  There certainly isn't, your Honor.

17  BY MR. SACHSE:

18          Q  The point that I am again trying to get back to is

19  this effect of having the first perforations 114 feet lower.

20  Would I be correct in saying that it would tend to reduce the

21  proportion of the water derived from the shallower zones?

22          A  Yes, it would have that effect, of decreasing some-

23  what the amount of water coming in that 114 feet that was not

24  perforated.

25          THE COURT:  How big is this gravel pack?

1    THE WITNESS:  Well, your Honor, there is 283 tons of

2 gravel in the hole, and it is about 12-inch casing and a 24-

3 inch ream; so there is 12, 24, six-inch-thick pack all the way

4 around the 12-inch casing.

5 BY MR. SACHSE:

6    Q  Now, your test pumping analyses, your temprature

7 analyses, electric log analyses, and chemical analyses, all

8 indicated that when pumped, the bulk of the water came from

9 the shallower zone; is that not correct?

10    A  That was the interpretation of the data.

11    THE COURT:  By "shallower," though, you didn't refer

12 to the couple of hundred of the surface?

13    MR. SACHSE:  No, we are again referring to 750 or

14 1,000, whichever figure you show--

15    THE WITNESS:  Let's say the upper half of the well.

16 If you read that, it is:  "Whose average depth is 750 feet."

17 BY MR. SACHSE:

18    Q  All your conclusions were that when pumped, these

19 shallower areas, shallower zones, produce the bulk of the

20 water; is that right?

21    A  Yes.

22    Q  Now if an additional 114 feet had been perforated in

23 this shallower area, the discrepancy would have been even

24 greater, would it not?

25    MR. VEEDER:  I object.  It is pure conjecture on his

1    part.  There is not a thing in the world to show.

2         THE COURT:  Overruled.

3         THE WITNESS: As I said, it would probably increase the

4    yield a little.  To what extent--

5    BY MR. SACHSE:

6         Q  Would you have taken more water from the shallower

7    zone then in proportion?

8         A  That would depend on several things:  First, how

9    open the gravel is opposite those zones where the well, this

10   114 feet were where the well is not perforated.  If the gravel

11   is clean, you will get a contribution from that 114-foot

12   section you mentioned.  Another consideration is that when you

13   pump the well down, during that period of pumping you would have

14   leakage from these beds that weren't perforated downward into

15   the well, into the cone of drawdown, anyway.  So I can't

16   evaluate the degree of that change.

17        Q  I don't ask you to evaluate the degree.  All I am

18   saying is that if you had an extra 114 feet perforated in the

19   shallow zone you, as an expert, would expect to get a little

20   more water out of the shallow zone when you pump, wouldn't you?

21        A  It is possible.

22        THE COURT:  More in the sense of one bucketful, more

23   in 24 hours, or on up; right?

24        THE WITNESS:  Yes, sir.

25        MR. SACHSE:  Your honor, it is 12, and I am not

E2

1    through, but fairly close to through, I think.  And if we

2    could recess now to let me review what I have, it will go

3    faster.

4        THE COURT:  We can do that.  2 o'clock.

5        (Noon recess.)

E₂Z37                    Worts    Cross                                    8744

SAN DIEGO, CALIFORNIA, WEDNESDAY, DECEMBER 17, 1958.  2:00 P.M.


THE COURT:  Proceed.


                    G. F. WORTS, JR.,

recalled as a witness in behalf of the plaintiff, having been

previously sworn, testified further as follows:


                    FURTHER CROSS-EXAMINATION

BY MR. SACHSE:

    Q  Mr. Worts, will you refer, please, to page 46 of

Fallbrook's AB and Pauba Well report, and particularly, the

very last line on the page:  "Within this depth"-- referring

to a depth of 2150 feet just above-- "an aggregate of about

1000 feet of the deposits are water yielding."  Is that your

conclusion as to the facts of the Pauba Well when it was

drilled?

    A  That was my conclusion based on the E log, electric

log.

    Q  Now that would imply necessarily the converse, that

about 1150 feet were non-water yielding; right?

    A  Not necessarily.

    Q  Then, you didn't mean that 1000 feet were water

yielding?

    A  They are the ones that supply the bulk of the water

1   to the well.  There will be various amounts of water coming

2   out-- lesser amounts out of the remaining materials.

3        Q  How would you care to change that to reflect the

4   facts as you believe them to be?

5        A  I would leave it just as it is.

6        Q  You would state that an aggregate of 1000 feet are

7   water yielding, not the bulk of water yielding, but water

8   yielding; is that right?

9        A  Yes, those would be the beds that supply most of the

10   water to the well.

11        Q  The other 1150 feet would not be a solid, continuous

12   trunk of 1150 feet depth, would it?

13        A  Certainly not.

14        Q  Now, within the total depth of the well you also

15   would agree, would you not, that a certain portion at the very

16   top is water yielding from younger alluvial, a certain depth?

17        A  To the Pauba Well?

18        Q  Yes.

19        A  That upper 108 feet is cemented off.

20        Q  I am speaking now of the structures through which

21   it was drilled.  The structures are water yielding.  They are

22   the younger alluvium, are they not?

23        A  They are the younger alluvium.

24        Q  Of younger alluvium, as you stated in the very first

25   part of your-- en page 8-- is largely water bearing?

1          A   Yes, I will stay with that on the basis of the

2     U.S.G.S. log, Appendix 2.

3          THE COURT: Appendix 2 to Exhibit Fallbrook's AB?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  All right.

6     BY MR. SACHSE:

7          Q   So this thousand foot of water-yielding deposits

8     includes or does not include the top 200 feet?

9          A   To the best of my recollection, it would include--

10    I am speaking in this report of the well-- and it would in-

11    clude the zone from 108 at the bottom of the conductor, to the

12    best of my recollection, to the 2150 feet.

13         Q   In other words, throughout that 2,042 feet the

14    1000 feet would be broken up into various strata?

15         A   Yes.

16         Q   The 1000 feet of water-yielding material?

17         A   Yes.

18         Q   Would you consider it a correct statement to say

19    that there is no confinement, either vertical or horizontal,

20    in the Pauba Basin?

21         A   For my benefit, what is your definition of "con-

22    finement"?

23         Q   We will use the same definition you did in confin-

24    ing or partially confining clay beds.

25         THE COURT:  What page?

1  MR. SACHSE: Let's see. It is stated twice on page

2  10. The second paragraph, second line, you use the phrase

3  "confining clay beds." And in the third paragraph next to the

4  last line you use "confining to semi-confining clay and shale

5  beds." I am treating those both the same.

6  Q Would you say it is a correct statement to say that

7  there is no confinement, either lateral or vertical or

8  horizontal, within the Pauba Basin?

9  A There are lenticular deposits, alternating clay and

10  sand, shown on the electric log from the 108 to the bottom of

11  the well. Those interbedded lenses of clay form confinement

12  within the whole depth zone penetrated. The deeper you drill

13  the well, in my opinion, the higher the head you will get.

14  Q Then, if I understand you correctly, you would

15  disagree with the statement that there is no confinement

16  horizontally?

17  A I am speaking vertically.

18  Q All right, vertically. There is no horizontal con-

19  finement across the vertical hole? You would disagree with

20  that?

21  A How is that again?

22  Q You would disagree with the statement that there

23  are no horizontal confining areas?

24  A I am afraid I don't understand the question.

25  THE COURT: Here is what counsel is getting at. I

1    don't remember who the witness was but probably some witness

2    for the Government said there were no confining bed or beds

3    in this basin.  And he is asking whether you agree or disagree

4    with that statement.

5              THE WITNESS:  The best way I can answer that is refer

6    to the electric log.  That is Plate 7 in Exhibit AB?

7              MR. SACHSE:  Yes.

8              THE COURT: Fallbrook's AB.

9              THE WITNESS:  You will look at either the resistivity

10   curves on the right-hand side of Plate 7 or the self-

11   potential curves on the left side.  You will observe on the

12   basis of what I described the meaning of these curves, that

13   when the resistivity curves swing out to the right it indicates

14   sand; when they swing in, it indicates fine-grained material.

15   If you will observe the character of those curves, you will

16   observe that they swing back and forth, back and forth, all

17   the way down to a depth of 2150 feet, approximately, before

18   there is any real change in that character.  In other words,

19   there is no confining bed, as such, anywhere.  But together,

20   collectively, these individual lenses of clay that are shown

21   by the swing in of the E log, resistivity curves, to the left

22   toward zero, are an indication of where the clays are.

23   BY MR. SACHSE:

24        Q  You say there are no confining beds anywhere?

25        A  I didn't say that.  I said there is no single

1 confining bed that I can identify on this electric log.  But

2 the individual, or collectively, the lenses of clay depicted

3 throughout the whole vertical section of the electric log are

4 what produce the confinement.

5      MR. VEEDER:  Your Honor, I think this is settling

6 down to an argument between counsel and the witness on the

7 matter of whether there is a confining bed or is not a

8 confining bed.  The witness has said that there are lenses

9 that do create some confinement.  Now, I think that we have

10 labored this thing about as far as we can, haven't we?

11      MR. SACHSE:  I would like to ask a specific question

12 then in relation to a specific statement.

13      THE COURT:  Go ahead.

14 BY MR. SACHSE:

15      Q  Will you please look at page 10, Mr. Worts, second

16 paragraph:

17           "Movement of ground water is generally

18           southwestward through gently southwest

19           dipping water-bearing deposits beneath

20           confining clay beds."

21 Now, do you choose to change that language?  If so,

22 please change it.

23      A  No, sir.  I stick right with that plural term of

24 "beds."

25      Q  Then, we will go down to the next paragraph, third

line of the next paragraph:

> "The gain is from effluent seepage
> of ground water in the artesian area and
> is caused by slow upward leakage through
> confining to semi-confining clay and
> shale beds."

Now, you will agree then there are confining and semi-confining clay and shale beds?

A   Yes.

THE COURT:  There is no dispute on this problem.

MR. SACHSE:  I would like to read the--

THE COURT:  The Government's showing and the State's showing is that there are lenticular bodies of clay and gravel and sand that run throughout this basin.  And the electric log here demonstrates clearly how they run.  The interesting thing about it is that most of them are so shallow until you get down to 2100 feet.  This is in line with the testimony of the State's witnesses.  The only real dispute is the dispute, which we have encountered heretofore, and that is the lateral extent of the basin and whether proposed Storage Unit 4 is a basin.  There is no dispute about the effect of the Wildomar fault.  No dispute about the fact that these artesian wells come up from below because of this interlacing of these lenticular beds.  No witness has claimed there was a solid impervious, absolute confining layer clear across this valley,

1   not even the State's witnesses.

2       MR. SACHSE:  I agree, but there have been witnesses

3   who said there has been no confinement, and that is what I

4   want to bring out.

5       THE COURT:  "Confining" is a relative term.

6       Now, Mr. Witness, I notice on page 10 you say "leaking

7   through confining," instead of "confining clay and shale beds."

8   In other words, your word "confining" there is not an absolute?

9   There can be leaking through in confining beds; right?

10      THE WITNESS:  Yes, sir.

11      THE COURT:  In other words, you define a confining bed

12  as one which, we will say, put it this way, tends to confine

13  but does not absolutely confine?

14      THE WITNESS:  That is right.  In the state of nature,

15  dealing in these alluvial basins all over California, I have

16  yet to find a clay bed or beds that is watertight.

17      THE COURT:  I don't see any dispute except the issue

18  which we have been faced with all along as to the extent of

19  the basin and whether there is lateral extent beyond the

20  younger alluvial.

21      MR. SACHSE:  Your Honor, we have gone at great length

22  yesterday on crossed i's and dotted t's that didn't match in

23  two drafts of a report.  Now, if I have crossed i's and dotted

24  t's that do not match between Government witnesses, I would

25  like the privilege of calling it to your Honor's attention.

1          THE COURT: You may. You may.

2   BY MR. SACHSE:

3          Q  Mr. Worts, I am going to read you a question by Mr.

4   Veeder.

5                  "Q  Alluding"--

6          MR. VEEDER:  To whom?

7          MR. SACHSE:  To Mr. Kunkel.

8          MR. VEEDER:  Well, that is important.

9   BY MR. SACHSE:

10         Q       "Alluding to the area on Exhibit 16-1

11              which is the cross-section of the Pauba

12              Valley, where the cross-section of the Pauba

13              Valley is noted, would you state what

14              evidence of confinement, if any, you have

15              observed in connection with those ground

16              waters?"

17         Now, I am going to ask you that identical question.

18   Will you please answer what evidence of confinement, if any,

19   have you observed in connection with the ground waters in the

20   Pauba Valley?

21         A  Well, the flowing wells would be evidence.

22         Q  Now, the answer.  The question was re-read.  Mr.

23   Veeder says, "Either lateral or vertical," in elaboration of

24   the question.

25         Answer:  "The evidence indicates the loss, the

1  hydraulic principles that must be involved indicate that the

2  area is not confined."

3      Do you agree with that answer?  Just yes or no, please,

4  and explain it later if you want to.

5      MR. VEEDER: He can given an explanation.

6      MR. SACHSE:  He can, but I would like the yes or no

7  followed by the explanation.

8      THE COURT:  He said he may.  He is asking now if he

9  agrees with the answer.

10     THE WITNESS:  I would say it is confined to the extent

11  that I have defined it.

12     MR. SACHSE:  All right.  That answer satisfies me.  If

13  you want to explain, go ahead.

14     THE WITNESS:  In terms of these numerous lenses--

15  It is a progressive thing, Mr. Sachse.  I would expect this:

16  When you drill a well in the alluvium of the Pauba Valley, I

17  would expect, when it got through the upper hundred feet or

18  so, I would get a slight flow.  This is down toward the

19  Wildomar fault.  As I went deeper and crossed through more

20  clay lenses, more stratification, I would expect to get higher

21  and higher head in the well.

22  BY MR. SACHSE:

23     Q  Mr. Worts, what was Mr. Kunkel's relation, if any,

24  to the Pauba Well study?

25     A  Exhibit AB?

Worts   Cross   6754

Q   Yes.

A   I don't know whether Mr. Kunkel was connected with the operations at all at that time.   I can't truthfully state whether he saw the well during the period of construction.

Q   What is your relation to the studies conducted by Mr. Kunkel in the last six months in connection with the Santa Margarita River watershed?

A   Well, as supervisor operating from Sacramento, reviewing the material that he prepared.

Q   And your transfer to Sacramento was fairly recently? You told us, but I forget.

A   No, my transfer from Long Beach to Sacramento was in 1955.   I have recently been transferred from Sacramento to Menlo Park.

Q   In other words, all of Mr. Kunkel's upper Santa Margarita Valley studies were made under your supervision from Sacramento?

A   Yes.

Q   And through an intermediate supervisor in Los Angeles?

A   No.

Q   Or Long Beach?

A   No; Mr. Kunkel is a supervisor.

Q   He is the head man in Long Beach.

Now, what review have you given to Mr. Kunkel's

1   conclusions and exhibits?

2        A  Well, I have gone over the exhibits to see whether I

3   concur with his presentation.  We have discussed at times--

4   When we were all down here together we have discussed the

5   work up there and the exhibits.

6        Q  Have you seen all the exhibits before they were

7   offered?

8        A  I believe so.

9        Q  Does Mr. Kunkel ever--

10       A  I am not positive on that.

11       Q  You say you are not positive?

12       A  I am not positive.  I don't think I looked over the

13  well logs, for example, that Mr. Kunkel turned in as a part

14  of an exhibit, for example.

15       Q  Did he discuss with you his conclusions as to the

16  existence or non-existence of confining beds in the Pauba

17  Basin?

18       A  Yes.

19       Q  Did he express to you the conclusion that he could

20  find no evidence of confinement in the Pauba Basin?

21       A  We discussed the manner in which the artesian

22  system operated and agreed that there are flowing wells and

23  that the lenticularity of the deposits is what is producing the

24  artesian condition in the Pauba Valley.  I think we are agreed

25  on that.  Whether he wants to alter the term "confinement" or

1    whether I am using the term "confinement" in a slightly

2    different sense than he did, I don't know.

3         Q  Mr. Worts, why was this extensive and expensive

4    test undertaken by the Navy on private property?

5         MR. VEEDER:  I object to that.

6    BY MR. SACHSE:

7         Q  If you know?

8         MR. VEEDER:  I have an objection.  I don't believe it

9    is within the scope of this examination.  I don't believe it

10   is proper cross-examination:  Why was this expensive thing

11   undertaken?  I object.

12        MR. SACHSE:  Strike the word "expensive."

13        Q  Why was the examination undertaken?

14        MR. VEEDER:  I don't believe that this witness has

15   specified that he knows.  I don't believe it is proper exam-

16   ination.

17        MR. SACHSE:  I have asked him.

18        THE COURT:  If he knows, he may answer.  The objection

19   is overruled.

20        THE WITNESS:  I don't know too much about it.

21   BY MR. SACHSE:

22        Q  Well, you had correspondence.  Why, as far as you

23   were aware, was this test undertaken?

24        A  I don't really know.

25

1    Q   You have no opinion at all?

2    A   Well, I have an opinion that they wanted to test the

3   materials up there to find out what type of supply wells could

4   be obtained.  Just in what manner that related to the operations

5   of the military, I cannot give you an answer.

6    Q   I direct your attention to page 6 of the report, the

7   last paragraph:

8            "In Reference C the geological survey

9            advised against drilling the well as a

10           supplemental source of water supply for

11           Camp Joseph H. Pendleton, which is about

12           20 miles downstream from the well.  The

13           Geological Survey also indicated that the

14           so-called Chappo and Upper Basins of the

15           lower Santa Margarita River Valley were

16           adequate to meet water supply require-

17           ments at a rate at least equal to the

18           1951 demands and that additional wells,

19           if needed, should be drilled in those

20           basins rather than on the Pauba Ranch."

21    You wrote that, didn't you?

22    A   I sure did.

23    Q   Does that refresh your recollection as to the purpose

24   of this study?

25    A   No.

Wents    Cross

1          Q  It doesn't?

2          A  No.

3          Q  But this was your recommendation?

4          A  Yes.

5          Q  That the Upper and Chappo Basins on Camp Pendleton--

6    those are the two you are referring to?

7          A  Yes.

8          Q  That the Upper and Chappo Basins could meet Camp

9    Pendleton's water supply requirements at a rate at least equal

10   to the 1951 demands?

11         A  That is right.  That was a rate of about 5500 acre

12   feet a year in that one year.

13         MR. SACHSE:  I have no further questions.

14         This has been offered, has it not--  This went in?

15         THE COURT:  It has been offered and was received.

16         MR. SACHSE:  It was received in evidence?

17         THE COURT:  I ruled on that.

18         MR. MOSKOVITZ:  I have some cross-examination.

19         MR. VEEDER:  Go ahead.

20         THE COURT:  Mr. Sachse, do you feel that you have

21   impeached this witness?  Are you going to argue that you have

22   impeached him?

23         MR. SACHSE:  I don't feel that I have impeached this

24   witness at all, your Honor.  I am very happy with this witness.

25         MR. VEEDER:  He is as happy as a clam at high tide.

1          THE COURT:  I am just being facetious.  Because if you

2     were, I was going to ask you what reliance you would put on that

3     last paragraph.

4          MR. SACHSE:  I think this is one of the outstanding

5     witnesses that anybody has been able to present.

6          THE COURT:  Mr. Veeder agrees.

7          MR. VEEDER:  Why, all my boys are fine.

8          THE COURT:  Proceed, Mr. Moskovitz.

9

10                        CROSS-EXAMINATION

11    BY MR. MOSKOVITZ:

12          Q  I want to find out a few things about the way in

13    which the water above and below the area of the confining clay

14    beds acts.  First of all, a few definitions.  Referring you

15    to page 9 of Fallbrook's AB, the third sentence in the second

16    paragraph:

17                   "These wells indicate confined water

18                conditions for a distance of at least two

19                and a half miles upstream from the fault. ."

20          THE COURT:  Are you reading from page 9, Mr. Moskovitz?

21          MR. MOSKOVITZ:  Yes, your Honor, page 9, the second

22    paragraph, the third sentence.

23          THE COURT:  All right.

24    BY MR. MOSKOVITZ:

25          Q  What is meant by "confined water conditions?"

1          A  It is getting very repetitious, but that the

2    lenticular bodies of clay and interbedded sand, together with

3    the occurrence and movement of ground water in the skeleton

4    of the ground water system, are such as to produce flowing

5    wells mentioned in the upper part of paragraph 2.

6          Q  What is meant by "artesian area"?

7          A  Well, it is the area in which wells have artesian

8    flow.

9          Q  Is that the same area where you find confined water

10   conditions?

11         A  You would find confined water conditions extending

12   over a much, much greater area.

13         Q  The confined water conditions, then, extend further

14   upstream in Pauba Basin than the artesian area would extend?

15         A  It would extend further upstream, and it would ex-

16   tend away out laterally several miles or more on either side,

17   in my opinion.

18         Q  You have also used the term "confining clay beds."

19   What relationship would exist between the extent of the con-

20   fining clay beds, the areal extent, and the areal extent of the

21   confined water conditions?

22         A  They would be pretty much synonymous.

23         Q  In other words, you find confined water conditions

24   throughout the area where there would be confining clay beds?

25         A  Yes.

Worts   cross                                                6760

1          Q   Now on page 9, the sentence I read to you, "These

2    wells indicate confined water conditions for at least two

3    and a half miles upstream from the fault."  I want to compare

4    that with page 11, where you state, in the second paragraph:

5    "Based on the above rough estimate, the area of artesian flow

6    extends upstream in the surface on the surface of the alluvial

7    plane for a distance of at least three miles above Wildomar

8    fault and in the river channel about four miles above the

9    fault."

10         A   I am sorry, I didn't see what page you referred to.

11         Q   Page 11, the second paragraph, the first sentence.

12         A   Yes.  What was the question?

13         Q   The question is, how does the figure of at least two

14   and a half miles for confined water conditions compare with

15   the at least three miles for the area of artesian flow and

16   four miles of that area up the river channel?

17         A   I believe that on page 9 the extent of the area of

18   artesian flow is indicated by the areal distribution of the

19   flowing wells.  On page 11 I have projected the *pressure* ~~surface~~

20   gradient from the Pauba well upstream through these flowing

21   wells to see where it would intersect the land surface upstream

22   from the flowing well that is furthest upstream, and where that

23   would intersect the land surface would at that time, in my

24   opinion, have been the approximate upstream extent of flowing

25   wells.  If you wanted to drill a well there you would probably

encounter *a flowing* one.

1      Q  And then there would be some greater distance upstream

2  over which there would be confining clay beds?

3      A  Yes.

4      Q  Now, looking at this area in a cross-section, at

5  what depth--

6      A  Across the valley or up and down the valley?

7      Q  No, down the thread of the valley.  At what depth

8  below ground level would you find the confining clay beds?

9      A  You mean, where do you first run into enough confining

10  beds to cause a flowing well to result?

11      Q  Yes.

12      A  I don't know.  In other words, the test on the Pauba

13  well was not conclusive in that respect because it was a rotary

14  drilled well full of mud.  So the well never did flow until

15  the mud was cleaned out.  We never did drill what you might call

16  a cable tool well, which would be a hole drilled without mud

17  in the hole and the well would start to flow at some depth

18  down there.  I couldn't say exactly how deep you would have to

19  go.  It would probably depend, for one thing, on what part of

20  the basin you were in.  I would think that at the downstream

21  end of the basin, toward or near the Wildomar fault, you might

22  expect to run into flowing wells at a shallower depth than

23  you would further up the valley.

24      Q  Let me call your attention to the paragraph beginnig

25  at the bottom of page 11 and continuing to page 12.  You say,

1    "Shallow wells 100 to 200 feet in depth drilled in the artesian

2    area upstream from the Wildomar fault would be principally

3    water-bearing sands and gravels in the alluvium."  I presume

4    that means Recent alluvium, doesn't it?

5         A  I don't know whether it does or not.  I think it does.

6         Q  Well, referring you to page 8, where you describe,

7    in the first paragraph, the categories of rocks, is it not

8    true that the term "alluvium" there is distinguished from

9    older continental deposits?

10        A  Yes.  But taken as a whole, I have also stated some

11   place else that the younger alluvium was on the order of a

12   hundred feet thick.  So I am not sure whether I was restricting

13   this wholly to the younger alluvium or not.

14        Q  Let's continue reading and see if this is correct:

15   "The alluvium is recharged by seepage from the Temecula River

16   between the mouth of Nigger Canyon and the area of confined

17   water.  In the artesian area upward leakage of ground water

18   from the older continental deposits and infiltration of rainfall

19   and irrigation water had kept the alluvium fully recharged."

20   Would that not refer to the Recent alluvium?

21        A  By and large, that is what is meant there, except the

22   depth of 200 feet stated in the opening sentence leads me to

23   believe that I may have been thinking about maybe some of

24   the upper part of the older alluvium.  I don't recall what my

25   thoughts were at the time.  But the latter part on page 12, I

1    think I am talking about the younger alluvium.

2         Q  Continuing, "Because of water table conditions in

3    the alluvium, water levels in the shallow wells are below

4    land surface and of course the wells do not flow." What do you

5    mean by "water table conditions in the alluvium?"

6         A  It would be unconfined water, largely.

7         Q  Inother words, there is a zone of unconfined water

8    in Pauba Basin?

9         A  I don't know. We probably went around and took one

10   shot of measurements in preparation for the work for the Pauba

11   well-- drilling of the Pauba Well, and the water levels in

12   what few wells there are-- apparently the main well I had to

13   use to base that on was an unnamed well on Plate 1 in Section

14   20 right down in the river bed, shown in the alluvium, that

15   apparently was not a flowing well.  That may be what is known

16   as the Cantarini well.  I am not sure.

17        Q  I am not sure I had an answer.  You said that the

18   water table conditions in the alluvium refers to unconfined

19   water, and I asked you, is there a zone of unconfined water?

20        A  Well, when you throw the word "zone" in, it indicates

21   to me some type of definite segmentation that can be identified

22   as such, above which you don't get flowing wells and below

23   which you do.  I don't know enough about the valley to state

24   whether that would be as well defined as this word "zone" that

25   you are using would imply.

1      Q  When you referred, in the beginning of that para-

2  graph, to shallow wells 100 to 200 feet in depth, and then at

3  the end you say, "Because of water table conditions in the

4  alluvium the water levels in the shallow wells are below land

5  surface and of course the wells do not flow"--

6      A  Yes.

7      Q  Would it not follow that the shallow wells tap un-

8  confined water and therefore they do not flow?

9      A  Yes.

10     Q  Now, referring you to page 10, the third paragraph,

11  the last sentence of the third paragraph--

12     A  Beg your pardon?

13     Q  Page 10, the third paragraph.  I will read that

14  paragraph to you:  "Downstream from a point about one mile

15  above the State highway 71 bridge the Temecula River is a

16  perennial stream.  The river gains in discharge downstream

17  for a distance of about four miles."  First of all, let me

18  ask you this:  At the point where the Temecula River becomes a

19  perennial stream, the point where the water begins to show

20  on the surface, where does that water come from?

21     A  It is discharged directly out of the younger alluvium

22  there.

23     Q  And is that because the water table intersects land

24  surface?

25     A  Yes.

Q  As you go downstream the river gains, as you have pointed out, the river gains in discharge downstream for a distance of about four miles?

A  Yes.

Q  Does any of that gain come from the water in the zone of unconfined water or come from unconfined water in the Recent alluvium?

MR. VEEDER:  Wait a minute.  You have two questions there.  First, you use "zone of unconfined water" and then you drop the word "zone."  What do you mean?

MR. MOSKOVITZ:  I will reframe it.

Q  Does any of the gain as you proceed downstream--

THE COURT: Downstream from where?

BY MR. MOSKOVITZ:

Q  -- downstream from the point where the river first becomes apparent on the surface, does any of that gain come from the water in the Recent alluvium that is not confined?

A  I imagine some of it does.

Q  Wouldn't that be a very important source of the gain as you go downstream?

A  When you say "important," in what respect?

Q  Terms of amount.

A  Terms of amount?  It would depend wholly-- let's review what goes on here.  We have on Plate 1 the China Garden well indicated, and we have other wells in this Temecula Valley.

1    They grow, or they grew at the time I was in there, a good deal

2    of alfalfa, so they were irrigating. Well, when you irrigate

3    crops some of the water not consumed by the plant is going to

4    seep down below the root zone and return to ground water.

5    So you have contribution from that source.

6           During a year of high rainfall you would get recharge

7    from the rainfall, if it is of sufficient magnitude, that would

8    also contribute to this system.

9           You also have the upward leakage through the alluvium

10   from below that is contributing to the supply in the younger

11   alluvium.

12          All these are a part of what constitutes the increase

13   or gain in the system-- not in the system, in the river bed as

14   you go downstream.

15          Q Well, then, in the third sentence of that paragraph,

16   where you say "The gain is from effluent seepage of ground

17   water in the artesian area and is caused by slow upward leakage

18   through confining--"

19          MR. VEEDER: I am sorry, Mr. Moskovitz. Could you

20   tell me where you are?

21          MR. MOSKOVITZ: Yes. I am sorry. Page 10, third

22   paragraph, third sentence.

23          Q I will read the sentence and ask the question:   "The

24   gain is from effluent seepage of ground water in the artesian

25   area and is caused by slow upward leakage through confining

and semin-confining shale and clay beds and the older contin-
ental deposits and through the overlying alluvium and channel
deposits." When you said that, that did not cover all of the
sources of the river gain, did it?

A  No, sir, it didn't.

Q  Now, in terms of amount, do you have any opinion as
to whether the return irrigation water and the water that is
found in the free ground water area contributes more than the
upward leakage from the older continental deposits?

A  I really don't know.  It is obvious that it would vary
during the year, depending on what was going on in the basin.
Take a series of dry years, for example, in which there was
very little rainfall.  Well, in those years you can discount
any contribution from that source, in my opinion. During the
summer they may be irrigating heavily the alfalfa and in that
time of year you might expect to get a contribution from that
source.  In the winter-- I don't know exactly how they handle
their irrigation practice up there, but I might expect less
return from that source.  I think it would vary during the year.
I think their irrigation methods would have to be considered
in analyzing the relative amounts from irrigation return water
and rising water from below.

Q  Would studies of the quality of the water in Temecula
River as compared with the quality of the water secured from
various depths below help you to determine where the water was

1 coming from?

2      A  If there was enough difference in the analyses so

3 that you could draw conclusions, I would say that is a possible

4 approach.  I am not saying that it would be diagnostic.  I am

5 saying it is worth a study to find out whether that would show

6 anything.

7      Q  Assume that studies of water quality showed that the

8 water in Temecula Creek below the point where it rose to the

9 channel, the water in Temecula Creek had similar quality to

10 water found in the Recent alluvium underneath but that it

11 differed markedly from the quality of the water extracted from

12 the pressure wells, what conclusion would you draw then as to

13 the source?

14      A  You have a nice problem there, because here you have

15 the alluvium that we are considering as a unit here in which

16 you are supplying an increment of return irrigation water from

17 above.  You have return -- I will not call it return-- you

18 have rising water from depth coming up into the lower part of

19 the alluvium.  So that conceivably you might expect to find

20 the types of water in the upper part of the alluvium to be

21 similar to the irrigation water that is being returned.  Where-

22 as, in the lower part of the alluvium you might expect to find

23 a water that is similar to the water that is rising from

24 depth.  But the actual water in the stream might never be

25 represented by a blend of the two.

Worts    Cross                                                                   6769

1    Q  You say it might never be represented?

2    A  It might never be represented by a blend of the two.

3    Q  Even though there was water contributed from the

4  deeper zones?

5    A  Yes.  Because if you cut off the contribution from

6  the deeper zones, you might not have any flowing water in the

7  stream.  You see, you have water being forced up from below.

8  That naturally is going to push the water above it higher

9  up, which will cause it to flow, and the waters on top are

10  from rainfall and irrigation return.

11    Q  And would you never have any sign, in sofar as

12  quality is concerned, from that fact that water was being

13  pushed up?

14    A  I didn't say that.  I don't know.  It would depend

15  on what the analyses showed when you took them.

16    Q  So assume that the analyses never showed that there

17  was-- the analyses only showed that the quality of the water

18  flowing in the stream was markedly different from the quality

19  of the water which was found in the deeper wells.

20    A  That still wouldn't preclude the water in the deeper

21  zones from shoving up from beneath, despite their own pressure

22  head differential between that and the shallow, and causing

23  the upper waters to intersect the land surface and start to

24  flow.

25    Q  And where would these upper waters come from that

1   would continue to flow out?

2        A   It would depend on the magnitude of the return

3   irrigation water.  If there were no irrigation practiced, the

4   waters would represent a blend between that in the younger

5   alluvium, if that can be distinctive, moving down the valley,

6   together with the waters rising from beneath.  The analysis

7   of this problem would take/test wells various depths to deter-
    ⌒chemical samples from⌒

8   mine if there is a change vertically in the younger alluvium

9   and if there is any significant differences whether or not

10  they can be related to the sources of the waters.

11       Q   Do you know where the Pauba Ranch, at what depth the

12  Pauba Ranch secures the water it uses for irrigation?

13       A   In what wells?

14       Q   Generally throughout Pauba Basin, the ones that are

15  used for irrigation?

16       A   Maybe you had better tell me which ones are, because

17  I am not-- I think the China Garden well, at the time of my

18  reconnaissance, the flow from it was used to irrigate some

19  alfalfa.

20       Q   Are you not aware that the great bulk of water that

21  is used for irrigation purposes in Pauba Valley comes from the

22  shallow wells?

23       A   I know there are some-- for example, up in Section

24  12, I have a double circle; there must be an irrigation well

25  up there.  This is on Plate 1, Exhibit AB.  I couldn't tell you

1    how deep that -- I don't know the depth of those wells,

2    truthfully, up there.  So I can't tell you where the bulk of the

3    supply does come from.  I was under the impression in 1951,

4    in making a tour up through this area, that the China Garden

5    well was being turned onto the nearby alfalfa-- in fact, I

6    walked out there and watched it.  They were actively using it

7    for irrigation.  I don't recall whether I tried to estimate the

8    flow of the well at the time or not.  But I went out to look

9    at it.

10        Q  Assume that the greater bulk of the water that is

11    used for irrigation comes from the shallow wells and that the

12    quality of the water that is found in the stream blow the

13    point of rising water and the quality of water that is in the

14    Recent alluvium are the same, but that the quality of the

15    water in the deeper wells, the pressure wells, is different.

16    Could you then make any conclusion as to the magnitude of the

17    contribution from the deeper zones to the stream flow?

18        A  No.

19        Q  Now on page 8, where you list the types of geologic

20    units or rocks, the first paragraph, No. (2), you list older

21    continental deposits, which include the pre-terrace continental

22    deposits of the Pleistocene and probably pleiocene age and

23    terrace deposits of probably Pleistocene Age.  Is it the

24    usual practice to lump both pre-terrace deposits and terrace

25    deposits as one geologic type?

1         A   It is up to the discretion of the-- well, I had

2   better put it this way.   In a detailed study, such as we made

3   on Camp Pendleton itself, Exhibit 37, we identified the terrace

4   deposits and showed them by the symbol Qt.   In an area as

5   large as this upstream valley, where you have a ground water

6   basin that covers it looks like a couple hundred square miles

7   and you have the older continental deposits and terrace

8   deposits, it would be up to the discretion and maybe the time,

9   maybe even to the interest of the geologist, whether he broke

10   those out, if they could be so identified.

11         Q   Then there is nothing wrong with lumping those two

12   together in a geologic study?

13         A   No.

1      Q  Now, turning to the portion of the Fallbrook's

2   Exhibit AB relating to the well log, beginning on page 22,

3   how would you say the drilling methods and the keeping of the

4   log, accuracy of the keeping of the log, in the Pauba well

5   compared with log keeping generally in drilling of water

6   wells?

7      A  That is a tough one to answer.  You get such a

8   variety of conditions.  You have such a variety in techniques

9   of drillers.  You have a variety in the size and capacity

10  of drilling rigs, difference in diameter of hole.  Many

11  considerations.  Even the viscosity of the mud.  The sampling

12  equipment that is provided by the contractor.  It is a very

13  difficult question to answer on a comparative basis.

14     Q  Would you say that the accuracy at least was as

15  good as is generally the case?

16     A  Whose log?

17     Q  The driller's log.

18     A  I can't say anything about drillers' logs because--

19     Q  How about the U.S.G.S. log?

20     A  I think it is a pretty good log.

21     Q  In the second paragraph, page 22, you state that:

22  "The log of the Geological Survey was based on the materials

23  passing over shaker table that separated the drilling mud

24  from the cuttings."  Now, are you saying that all the cuttings

25  were separated from the drilling mud?

1    A  No, not precisely.  You get into silts and soft clays.

2    They will become a part of the drilling mud, and you can't

3    separate everything out.  Once in a while you are fortunate.

4    I might add this:  If you have a fishtail bit on, which is like

5    a paddle standing on end that is being spun by the drill rod,

6    that will usually, if the rig is big enough and the driller is

7    letting enough pressure down on it, it will pull loose lumps

8    of clay, for example, so that clay might very well come across

9    your screen shaker table looking like a bunch of mothballs,

10   only whatever color the formation is.

11   Q  Then, you couldn't tell from examination of the

12   material passing over the shaker table whether your cuttings

13   did or did not contain fine-grained material at the level

14   where they were taken?

15   A  Dependent on, as I mentioned, the type of bit

16   principally that they were using.  One of the most difficult--

17   clay is usually easy to pick up, because it does tend to come

18   up in small balls.

19   Q  Assume you came up with a sandy material.  Would you

20   know whether or not there had been fine-grained materials in

21   the interspaces by examining the cuttings?

22   A  Color.  Color changes are a big assistance there.  If

23   the drilling mud is of gray, for example, and if you run into

24   a reddish, an iron-stained sand that has filled with, oh,

25   maybe has some clay, that you mentioned, or fines, you are

1    very apt to get a color change which would indicate to you

2    that something was contributing to the coloration; and, there-

3    fore, what was coming across your shaker table alone couldn't

4    be used solely as a guide.  When you are logging a well, you

5    do more than just watch what is coming across the shaker

6    table.  You watch for color, the hardness of drilling, whether

7    or not the drill pipe is clattering during drilling.  After

8    you get to working with a rig for awhile, you can begin to

9    tell what some of these indications are indicative of.

10        Q  Is it not a fact that you couldn't be very sure

11   about what you took up?

12        A  No, I wouldn't make a dogmatic statement like that,

13   no.

14        Q  Didn't you say near the bottom of page 22:  "Conse-

15   quently, it is exceedingly difficult to obtain an accurate log

16   of the materials penetrated"?

17        A  Yes, it is difficult.  Try it sometime.

18        Q  Then, there are difficulties in saying that the log

19   that you have truly reflected the material you went through?

20        A  I said I thought it was a pretty good log.  I didn't

21   say it was an excellent log.  I said it was a pretty good log,

22   particularly in the difficulty you run into in the deeper part

23   of the hole, is the-- I explain in here, too, that the deeper

24   you go getting down around 2000 feet we had a time lag of--

25   by "time lag" I mean the time the bit is spinning.  You are

1    looking at the bit-- not the bit; you are looking at the drill

2    pipe.  And here it is spinning.  And you look at  your watch,

3    and it is 3 o'clock.  You are going to have to wait until

4    two minutes before 4 before the churning that was going on at

5    that time, at 3 o'clock, is going to appear there at the

6    surface.  Almost an hour delay.  So when I say it is difficult,

7    I mean it is difficult.  And to determine the time lag,

8    whenever they break off to add another stand of drill pipe,

9    we will drop in anything from colored glass beads to cats, to

10   shredded paper; and we will watch for those to return through the

11   mud column and out over the discharge table to compute how long

12   a time lag we have on our hands. There is a lot of technique

13   to doing a good job of logging the well.

14        Q  Because of the fact that the drilling mud could

15   absorb the fine-grained materials, you could not be sure that

16   the cuttings that you had showed what the amount of fine-

17   grained materials really was, where the deposits were found

18   at depth; isn't that correct?

19        A  It is very difficult to determine.

20        Q  Were any cores taken during the drilling of this

21   well?

22        A  Not to my recollection.

23        Q  You mentioned that the driller's bit would show

24   pieces of materials when the bit was taken up from time to time?

25        A  In the deeper part of the hole.

Q    And how often was this done?

A    They came up to change bits, I couldn't state how often.  The Plate 3, one of the photographs, shows why they had to come up.  The reamer in this case, the teeth are worn completely off.  In fact, the bits have jammed.  The wall cutters have jammed here, and the bit was just, you might say, skidding and not making much progress in reaming at all.  So when they came up with this big bit, and even with the pilot hole earlier, every once in a while a piece of the sandstone would jam in the bit and we would pry it out and take a look at it.

Q    Then, it was only on occasions when you did bring the bit up that you were able to determine for certain that you were going through consolidated materials, is that right?  Otherwise, it looked like sand as you took it up from the --

A    Yes.  I explained that earlier in my testimony today.

Q    On page 23, the second paragraph, the third sentence.

A    Wait a minute.  All right.

Q    You say:  "Based on these samples on comparative drilling rates and on a number of new bits worn out during drilling, it is judged that many of the materials below about 1500 feet logged had sand with sandstone and below 2150 the coarser elements were almost definitely sandstone rather than sand."  Now, could this also have been true in the materials above 1500 feet?

A   No, I don't think so. It would get progressively more cemented, more compacted. It is under greater weight. It is a progressively older geologic age as you go deeper. In my opinion, it is a progressive condition, and it became noticeable to me, at the depth indicated on page 23 there, that below 1500--I think I was familiar enough and recollected the drilling operations that below that depth there was quite a bit of sandstone, in my opinion, and above that depth there was progressively less.

Q   Turning to page 40, the first paragraph, you say that: "Considering the depths and number of perforations and thickness of water-bearing materials the above-determined specific capacity is relatively low." You are referring to the capacities on page 39, I assume. What do you mean by "Relatively low"?

A   Just relatively low.

Q   Compared to what?

A   Compared to relatively high. It is just relatively low in comparison to something that yields water in much greater quantities per foot of thickness, let's say.

Q   Would you say, generally speaking, that, therefore, it was a relatively poor well?

A   No. No. No, I don't consider a 2,000 gallon a minute well a poor well anywhere. But considering the thickness, 2,000 feet of thickness to accomplish that yield, I would say

Wortts   Cross   6779

1    would mean that the specific capacity when considered against

2    the depth of the well, the 2,000 feet or 1,900 feet of

3    perforations, at least, would be relatively low.

4        Q  When you say that the permeablility of the materials,

5    generally speaking, was relatively low?

6        A  The average?  Yes, the average permeability, too,

7    probably would be relatively low.  However, the transmissi-

8    bility of the ability of that 2,000 feet to yield water,

9    there is not much doubt about it when you look at 2300 gallons

10   per minute with the discharge of that test pump.

11       Q  If you had 2000 feet of clay, you might have good

12   transmissibility, too, might you not?

13       A  No.  If you want a good comparison, take the younger

14   alluvium in Upper Basin on Camp Pendleton.  Say in Upper Basin

15   it is a little over a hundred feet thick.  It will yield

16   2,000 gallons a minute with a nine-foot drawdown.  So there is

17   comparison for you, if you are searching for one.

18       Q  So that the material penetrated by the Pauba well

19   was considerably less permeable than the material penetrated

20   in Upper Basin?

21       A  If we use the term "average," yes.  I can't state--

22   Some of those, you will notice that in the Appendix 2 of

23   Exhibit AB there are some beds logged as sand and gravel

24   here and there in the log.  Now, it just maybe that 1500--

25   and this is just pulling it out of the air-- it may be that

1   1500 gallons of that 2300 was coming from maybe two or three

2   hundred feet of the best water-bearing material in the section

3   anywhere distributed down through the section.

4        Q  And in between you would have materials of quite low

5   permeability?

6        A  Well, they might be supplying the other 800 gallons

7   a minute; so they are supplying water.

8        THE COURT:  You say, "Appendix 2."  You mean Table 2?

9        THE WITNESS:  I am sorry, your Honor.  Let me see what.

10  Oh, I was referring to the U.S.G.S. log.  Is that not Appendix 2?

11        MR. SACHSE:  You don't have that in your reproduction,

12  your Honor.  No, the U.S.G.S. log was not reproduced.

13        THE COURT: I have the amount of the well logs?

14        MR. SACHSE:  You have the amount of the well logs.

15        THE COURT:  16A53, 16A54.

16        THE WITNESS:  If you wish to get a rapid look at where

17  some of the more permeable materials might be, you can observe

18  on Plate 7, the electric log, on the left-hand side where I

19  have shown diagrammatically the types of materials penetrated.

20  If you make a fast eyeball scan down through there you can see

21  where the sands and gravel, the coarser materials, are situ-

22  ated.  Those may very well be the zones supplying the bulk of

23  the water of the 2300.  I can't begin to tell you where and

24  how, because you will notice one of the very last conclusions

25  in this report is to-- we suggested that they test this well

1    further to find out where the water is coming from in the well,

2    which can be done with packers and control pumping and flow

3    meters.  You could find out where the bulk of the water in

4    this well is coming from if anybody really wanted to pin it

5    down.

6    BY MR. MOSKOVITZ:

7         Q  And you really need more data before you knew just

8    where the relatively permeable strata were and where the

9    relatively impermeable strata were?

10        A  That is above and beyond the interpretations I made

11   of the temperature changes during pumping and above and beyond

12   the data shown by the chemical analyses.

13        Q  And what would be the rate of movement of water in

14   the strata which have the relatively low permeability?

15        A  No idea.  No idea what the rate of movement would

16   be.  It would depend on the hydraulic gradient through it.  It

17   would depend on the permeability.  It would depend on--

18   another factor is porosity.

19        Q  Rate of movement?

20        A  Yes.  Velocity is equal to permeability times the

21   hydraulic gradient divided by the porocity.  I think that is

22   most of the equation.

23        Q  I am in no position to challenge it.

24        Now, your description of the specific capacity on

25   page 40 and your description again on page 47 indicates that

1  you have a relatively low specific capacity and relatively

2  small value of specific capacity for the materials considered

3  as a whole; is that not correct?

4      A  Yes.

5      Q  And that since more of the water comes from certain

6  strata of higher permeability, then the permeability of the

7  remaining strata would be quite low, would it not?

8      A  Well, I think we have been belaboring this.  I don't

9  know exactly how-- we have every-- I won't say "every"-- we

10  have many combinations of materials down there, as depicted

11  either in Appendix 2 or on the electric log graphically. I

12  propose that if you want to find out more exactly where the

13  zones in which the water are supplied, magnitude, you would

14  have to put packers in and test.  But even packers put in a

15  gravel-packed well, you can't do too well, because there is

16  no way to seal off the adjacent beds because they can

17  contribute through the gravel pack. But that would be the

18  closest you could come to finding where most of the water is

19  coming from.  You could, for example, place a packer halfway

20  down the well and pump and observe the drawdown and discharge.

21  You could then put a packer on the pump column and stick the

22  intake down below that point and pump and observe the discharge

23  and drawdown and get a measure of the relative contributions

24  from the upper and lower halves of the well.

25      MR. MOSKOVITZ:  I have no more cross-examination.

1           MR. VEEDER:  May we have a recess, now, your Honor?

2   It might save some time in the long run.

3           MR. STAHLMAN:  I am so groggy I don't think I could

4   ask a question.

5           THE COURT:  Take a short recess.

6           (Recess.)

1     MR. STAHLMAN:  Your Honor, I have just a couple of

2 questions that will be in the nature of marking some exhibits

3 that we might want to use later.

4     May I have this receipt from the County of Riverside,

5 dated June 15, 1951, receipt No. 1405, marked as Vail's Exhibit

6 E for Identification?

7     THE COURT:  What does it concern?

8     MR. STAHLMAN:  It is a receipt, your Honor, from the

9 County of Riverside: "Received from Vail Company (Van Noy

10 Drilling Company), address Temecula, California," and it is

11 a receipt for one dollar for the location of the proposed well

12 SW$\frac{1}{4}$ of SW$\frac{1}{4}$ of Section 17,--

13     THE COURT:  Which is the Vail well, the Pauba well.

14     MR. STAHLMAN:  Which is the Pauba well, yes.

15     THE COURT:  It may be marked for identification.

16     MR. STAHLMAN:  Is that not correct-- the description

17 shown on that receipt is for the Pauba well?

18     THE WITNESS:  It is close.  The way the Pauba well is

19 plotted on Plate 1 of Defendant's Exhibit AB looks like it

20 might be in the Northwest Quarter of the Southwest Quarter.

21     MR. STAHLMAN:  Well, the date June 5, 1951, as indicated

22 upon Vail's E for Identification, was prior to the date of

23 the commencement of the drilling, was it not?

24     THE COURT:  Somebody can testify, or later stipulate.

25     MR. STAHLMAN:  Yes, we will, your Honor.

8785

1    THE COURT:  Deliver it to the Clerk.

2    MR. STAHLMAN:  I would like to have marked for iden-

3    tification as Vail's Exhibit F "Official Well Record, Vail

4    Company, address Temecula, name of the driller, Van Noy Drilling

5    Company, Incorporated," and the indication thereon is "Work

6    started June 20, 1951, completed about August, 1951, ranch

7    manager"-- we know who signed it.

8    THE COURT:  Call it "Well record."

9    MR. STAHLMAN:  Yes, your Honor, and the depth of the

10   well is indicated hereon.

11   THE COURT:  Mark it Vail's F for Identification.  That

12   is sufficient to tell us what it is.

13   MR. STAHLMAN:  Now, I would like to have marked as

14   the next exhibit, Vail's Exhibit G for Identification, a copy

15   of a letter addressed to Mr. N. B. Smith, Chief Engineer,

16   Riverside County Flood Control and Water Conservation District,

17   dated April 1, 1952, and the signature copied thereon of

18   Louis L. Roripaugh.

19   THE COURT:  Mark it G for Identification.

20   MR. STAHLMAN:  Now I have a document here, your Honor,

21   which I would like to have marked.  However, we will need it

22   to put in our next records.  It is a follow-up record which

23   was filed with the State with relation to this same matter at

24   the time when the State law first went into effect, which was

25   sometime after the drilling of the well.

1      THE COURT:  Give it to the Clerk.  Let him duplicate

2 it and hand you back the original.

3      MR. STAHLMAN:  May it be marked as the next in order.

4      THE COURT:  Exhibit H.

5      Write over the original, Mr. Clerk.  What type of

6 document is this?  Give us the name of it.

7      MR. STAHLMAN:  It is the "First notice of ground water

8 extractions," and unfortunately the copy is not dated.  How-

9 ever, it does refer to the date of the calendar year from 1951

10 to 1956.

11      THE COURT:  It will be marked H.

12      MR. STAHLMAN:  We will have testimony later to explain

13 it.

14      THE COURT:  Any objection to using copies in place of

15 the originals?

16      MR. SACHSE:  No.

17      THE COURT:  All right.

18      MR. STAHLMAN:  That's all I have, your Honor.

19      (Defendant Vail Company Exhibits E, F, G, and H were

20 marked for Identification.)

21

22                    REDIRECT EXAMINATION

23 BY MR. VEEDER:

24      Q  Mr. Worts, when you testified that there was water

25 available to meet the requirements for 1951 within Chappo and

1    Upper Basin within the Naval enclave, did you make that

2    statement in contemplation of a dam being built across the

3    Santa Margarita River by the Fallbrook Public Utility District?

4         A   No.

5         Q   Then what did you mean at that time?

6         A   I meant conditions as they were at that time in 1951.

7         Q   And extraction by the Fallbrook Public Utility

8    District of 8000 acre feet a year, or the depletion of 8000

9    acre feet a year would certainly have changed your opinion in

10   regard to what you expressed in the Pauba report, which is

11   Defendant's Exhibit AB; isn't that right?

12        A   Yes, it would have changed the opinion.

13        Q   And you could not have come up with the opinion that

14   you expressed if the Fallbrook Public Utility District was in

15   fact retaining any appreciable quantity of water above the

16   Naval enclave; isn't that right?

17        MR. SACHSE:  I wish you wouldn't lead quite so much, Mr.

18   Veeder.  He is your witness.

19        MR. VEEDER:  I have a right to cross-examine.

20        THE WITNESS: Could  I have the question read, please?

21        (The reporter read the pending question.)

22        MR. SACHSE:  I object on the ground that it is a leading

23   question.  This is redirect examination.

24        THE COURT:  Overruled.

25        MR. VEEDER:  It is not redirect examination.  You opened

1    the blue sky above with this Pauba report.

2        MR. SACHSE:  May I get a ruling, then, your Honor.  Is

3    this or is this not redirect?

4        THE COURT:  It is redirect.  But I overruled the

5    objection.

6        Did the witness answer the question?

7        THE WITNESS:  I think it would havehad an effect on my

8    opinion.

9    BY MR. VEEDER:

10       Q   Then youwouldn't have expressed the opinion that

11   you expressed, would you, if that situation had prevailed?

12       MR. SACHSE:  Same objection, your Honor-- leading ques-

13   tion.

14       THE COURT:  Overruled.

15       THE WITNESS:  That is right.

16   BY MR. VEEDER:

17       Q   Now, in regard to the phenomenon of upward percola-

18   tion of ground water in the Pauba Basin, would you describe

19   into the record what you meant by that statement?

20       A   Well, again, it is the upward--

21       Q   If you want to point to Plaintiff's Exhibit 16, you

22   may do so, for purposes of illustration.

23       A   Well, as I testified with regard to the types of

24   material penetrated by the Pauba well, the upward circulation,

25   upward discharge of ground water from the deposit shown as

1  Qtoal on Plaintiff's Exhibit 16 would be upward through the

2  lenticular deposits of clay and into the alluvium shown on that

3  exhibit.   There would also be, in my opinion, some movement

4  through the fault zone shown as the Wildomar fault.

5       THE COURT:  This has all been covered.  You fellows must

6  think I have the intelligence of a ten-year-old.  You think

7  you have to beat me over the head with all this business. It

8  has been covered time and time again.  This afternoon there

9  is practically a complete blank here.

10      MR. VEEDER:  Your Honor, I agree that most of it has

11 been kicked around quite thoroughly.

12      THE COURT:  You don't have a jury here.

13      MR. VEEDER:  The only point I make, your Honor, is that

14 we are confronted with some exhibits here that have been

15 entered by California, and I have to meet them.

16      Q  Now, from the standpoint of your examination of the

17 Pauba log  and the other data that you have investigated in

18 connection with that well, did you find that there existed a

19 thick layer of confining clay that would create a zone of

20 confined water and a zone of unconfined water?

21      A  No.  In drilling the Pauba well such phenomena

22 weren't encountered as zones.  I think I previously testified

23 that I found no specific zones as such.

24      MR. VEEDER:  I have no further questions.

25      THE COURT:  I want to ask a question.

1    Your report, Fallbrook's AB in Evidence, speaks of

2  the lenticular lenses that occur, and speaks of the confining

3  effect it would have on water moving in a vertical direction,

4  up or down, although it would move through there.

5    THE WITNESS:  Yes, sir.

6    THE COURT:  Assume that those lenticular bodies extend

7  across from the older alluvium under the basin into the older

8  alluvium on the sides of the basin.  Would or would not water

9  move with less effort laterally because of the lenticular

10  structures than it would move vertically?  Or do these

11  lenticular lenses lapping, as they apparently do in places also

12  form as much a confining structure to lateral movement as they

13  do to up or down movement?

14    THE WITNESS:  This lenticular character of the older

15  alluvium, in my opinion, is no different under the Pauba Valley,

16  shown in yellow, than it is under the adjacent upland areas

17  shown as Qtoal.  In other words, there is no reason why they

18  shouldn't be the same.  Therefore, the movement--if this is

19  what your question meant-- movement parallel to the bedding is

20  going to be much, much more easy, permeability is much higher--

21  not through the clay lenses, but through the interconnected

22  sand lenses, much better in a horizontal direction, in all

23  directions, under the basin, next to the basin, out all over

24  that area, as it is any place vertically.

25    THE COURT:  I was not thinking so much of the movement

1    in a particular lens.  There is no argument that if you had a

2    coarse sand lens that within that lens itself movement would

3    be easy up or down or horizontally.  But I am thinking of

4    this composite of lenses.  We saw them on the trip we took

5    through the valley, where you would see a lens of sand and it

6    would terminate, you would see a lense of clay, and these lenses

7    have beginning and ends.

8          THE WITNESS:  Yes.

9          THE COURT:  They are not indefinite in size.  And the

10   picture I get, hearing all the witnesses here, is one with

11   which I don't think there is much dispute, that in this older

12   alluvium there is a series of these lenticular lenses of

13   different types of materials.  From the well log shown in

14   Fallbrook's AB it is apparent that none of them is very thick

15   in size-- five or ten feet might be the ordinary size that you

16   would expect.  And so you get a conglomerate here of a series

17   of these layers.  Here is sand, over here is clay, here is some

18   other type of material.  I think Mr. Kunkel or one of the early

19   witnesses drew some pictures on the blackboard showing how those

20   lay.

21         Now, I am trying to compare how water would move

22   vertically down or up as compared with how water would move

23   horizontally in that kind of structure, not within the particular

24   lens but through this composite of lenses.  Do you follow me?

25         THE WITNESS:  Yes, sir, I do.

1      THE COURT:  What is your view on that?

2      THE WITNESS:  My view is that water would be able to

3   move much more readily horizontally through these-- not through,

4   along the grain of the bedding, so to speak, than vertically

5   across the grain.

6      THE COURT:  Any questions, Mr. Sachse?  Mr. Moskovitz?

7      MR. MOSKOVITZ:  I have just one.

8      Q   Suppose these lenticular bodies of clay were folded

9   so that they were no longer horizontal.  What effect would

10   that have on the movement of ground water?

11      A   That would produce a complete change.  It would

12   depend how, where, and what the rest of the conditions were

13   that you are postulating, just what would happen.  Take in the

14   vicinity of a fault like the Wildomar Fault.  There must be

15   considerable disruption of the beds adjacent to a fault such

16   as that.  If the beds were tilted up vertically, for example,

17   that would restrict your horizontal direction of movement in

18   the vicinity of the fault zone.

19      THE COURT:  Mr. Moskovitz is referring to an area, I

20   would estimate, within a mile of the Wildomar fault, east of

21   the Wildomar fault, within that limit.

22      MR. MOSKOVITZ:  Yes, your Honor.

23      THE COURT:  In which there was observed a tilting of

24   some of the beds, both of sand and gravel material and of clay,

25   on about a 45-degree angle.

1          THE WITNESS:  That would affect the movement of ground

2     water.

3     BY MR. MOSKOVITZ:

4          Q  Where the horizontal beds of sand, more permeable

5     materials, pinch out and are adjacent to horizontal lenses of

6     less permeable material, then the movement of water would have

7     to go vertically up or down to continue into some other area

8     of more permeable material, would it not?

9          A  If that were the way it occurred, it would.  But I

10    don't think-- when you look at an outcrop, you see one cross-

11    sectional view where you may see a sand lens come down and

12    taper off maybe into silts or something else.  But suppose

13    you went back into the hill at which you were looking and

14    burrowed back into that sand in some other direction, you might

15    find that the sand graded off into another sand bed in the

16    distance some place at the same general horizon.  That is why,

17    in my opinion, the water can move so much more freely laterally

18    than it can vertically.  These aren't isolated sand lenses or

19    isolated clay lenses.  They are inter-connected-- very devious.

20         Visualize a stream coming down through a valley.  It

21    may meander and deposit a stream of gravel after a heavy storm.

22    Next you may get a flash runoff from a burned area and you

23    may get a layer of mud laid down on top of it.  You take a

24    shovel and dig down there and here you find a gravel bed that

25    extends 16 feet and then terminates against something else.

1    But if you follow it right up to the gravel bed you may find

2    that it runs as a sort of continuous interconnected chain back

3    through there.

4           THE COURT:  That is how these were laid down.

5           THE WITNESS:  Yes, sir.

6           THE COURT:  Layer by layer.

7           THE WITNESS:  Yes, sir. So that they tend to fan out,

8    interfinger, interweave.  Maybe at some point you could follow

9    a fairly continuous line of coarse material all the way up

10   through.  It is possible.  In other places you might run into

11   clay all the way up through.  That is possible, too.  But the

12   overall composite effect is a much better ability to move

13   horizontally through this system than to move vertically,

14   because the direction in which it was laid down is essentially

15   the horizontal, a slight inclined plane.

16   BY MR. MOSKOVITZ:

17          Q  For recharge to get to these deeper older continental

18   deposits there would have to be vertical movement of water from

19   the surface at some point, would there not?

20          A  Yes.  Now, if you take the upstream portion of this

21   Pauba Valley downstream from Nigger Canyon-- I have personally

22   observed those deposits, in the younger alluvium, I am speaking--

23   they may very well be pretty coarse-grained materials all the

24   way down to the contact with the underlying older alluvium and

25   adjacent older alluvium.  I can't say that for a fact, but

1    that would be to me a good assumption.

2            THE COURT:  Particularly because they occur at the mouth

3    of Nigger Canyon and the heavier materials tend to deposit at

4    the mouth and the siltier ones would be carried on further

5    down into the valley.

6            THE WITNESS: That is true, your Honor.  The gradients

7    up there are steeper, and the carrying power of the stream

8    decreases as the gradient decreases.

9            So the question of recharge.  If these deposits are

10   dewatered following a period of dry years in which you have

11   drawn down water-- let's take a look at Exhibit 16 (stepping

12   down.)  Let us assume there has been a long drouth and that

13   there has been a period of heavy pumpage from all these wells

14   in the Pauba Basin.  In my opinion, the drawing down of the

15   head here by a large amount of pumping will cause a slow downward

16   leakage of the water in the younger alluvium and move downward

17   into the zone perforated by the pumped well.  This will create

18   a large intake area for the stream during the period when there

19   is runoff.

20           In other words, as of the time I made my study, there

21   was rising water some four miles upstream.  You could have run

22   all kinds of water down the valley and you could have gotten

23   much recharge from the stream in that area of rising water.

24   But if you dewatered the younger alluvium, say down here to

25   100 feet, just for a round number, and had dewatered the older

1   deposits under the valley and adjacent to the valley, you

2   create an enormous reservoir into which this runoff can go to

3   fill u that basin, and then of course the amount of water that

4   will move out laterally from the alluvium into the adjacent

5   older deposits will be dependent directly on the hydraulic

6   gradient created and permeability and the magnitude of the

7   dewatering out laterally.

8   BY MR. MOSKOVITZ:

9       Q  For the water to get down to the various lenses of

10  more permeable materials in depth, it would have to go

11  through these lenses of lower permeability that you testified

12  to?

13      A  It would have the same difficulty, in my opinion,

14  getting down as it does getting up.  But here is the thing--

15      THE COURT:  Go through or go around?

16      THE WITNESS:  Yes.

17      THE COURT:  By "through" do you mean going right through

18  a clay lens, or do you mean going around it to more permeable

19  material?

20      THE WITNESS:  There will be some movement through the

21  clay lens, your Honor, and the bulk of it will follow the

22  easiest course, the course of the highest permeability, which

23  will probably be around it.

24  BY MR. MOSKOVITZ:

25      Q  As you say, the leakage down would have the same

1   impediments as the leakage up now has under present conditions?

2   A   Yes.   But here is the difference.   The hydraulic

3   gradient-- let us say the head in the older alluvium was pulled

4   down a hundred feet and you completely resaturated the younger

5   alluvium.   Then you have a tremendous head, a driving force,

6   which would drive more water down possibly than you are *now*

7   getting up.   Because now the only difference is about-- well,

8   at the time the Pauba well was drilled there was about 20 or

9   25 feet differential, I don't know what, between the head in

10   the younger alluvium and the rise of water in the Pauba well.

11   Now it is directly proportional.   If you have a hundred feet

12   of head that would be four times as much water you would drive

13   in as you would under 25 feet of head.

14   Q   But you agree that how much water would go, what the

15   rate of movement would be, is something that you cannot now

16   tell?

17   A   Yes.   On the basis of setting up an example like I

18   did, if it is 25 feet of difference now, in the opposite

19   direction, that is, the lower is 25 feet is higher, you get

20   X ~~rate~~ *amount* /of movement upward.   If you have your younger alluvium

21   saturated and your older alluvium pulled down to a hundred feet,

22   then in my opinion you would get approximately 4X, four times

23   as much water moving downward as you would at the time of 1951

24   have moving upward. That is rough.

25   But here is an interesting thing, speaking about

1  dewatering.  The fact that these contours, although I think

2  that Mr. Kunkel has explained--

3           MR. VEEDER:  You are now referring to 15-A?

4           THE WITNESS:  15-A.  The shape of these contours indi-

5  cates that there is water as of 1958 moving from the older

6  deposits in toward this basin.  That is what they show.  Here

7  are the arrows that indicate the movement.  If you get a large

8  slug of recharge and build a mound up here, the water level

9  up here will rise, possibly.  I have forgotten how much they

10 are down, possibly a hundred feet-- let's say a hundred feet.

11 That will raise the level in the younger alluvium a hundred

12 feet above what it is right here.  In turn, water will move

13 out there because there is a hole.  It would have to.  It would

14 have to move toward a point of lower head.  It will also have

15 to move down the valley.  But it will recharge the whole system.

16          MR. VEEDER:  From the surface stream?

17          THE WITNESS:  Well, the surface stream via the younger

18 alluvium and then out into the overall system.  The whole thing

19 is always trying to reach a state of balance.

20          MR. STAHLMAN:  May I ask a question.

21          Q  Do you know what fossil waters are, or--

22          A  Connate waters, fossil waters?

23          Q  Connate waters, yes.  Do you believe any portion of

24 the lower depths of this basin are impregnated with that type

25 of water?

NOTES   Records

1        MR. VEEDER:  Speaking of the Pauba Basin as referred

2   to?

3        MR. STAHLMAN:  Yes.

4        THE WITNESS:  I don't think so.  The chemical analyses

5   obtained from the well sample the full section, penetrate 2150

6   feet.  In other words, when the well is pumped, I have indicated

7   that the bulk of the water is coming probably out of the upper

8   part of the well.  Yet there is contribution from the lower

9   part of the well, too.  I think if there were, let us say, high

10  chloride water and real brine of some kind, like you encounter

11  in well fields, if there was that type of water down there,

12  which would be stagnant, say old marine water, if it were

13  possible to have that situation here, I am sure it would have

14  shown by a substantial increase in the quality of water, coming

15  out of the hole.

16  BY MR. STAHLMAN:

17       Q  Will you explain what you mean by "connate water"?

18       A  Well, that term is subject maybe to some disagreement

19  among the men that use it, but generally it is water that was

20  trapped in the formation at the time it was deposited, although

21  it may have migrated.  That is the problem. Generally, it

22  represents fossil water that in some way or other was related

23  to the deposition of the deposits and the--

24       Q  And has remained there ever since?

25       A  Yes, although it may migrate around as structural

1    changes take place.

2         Q  The point I am getting at is, do you feel that a

3    factor of that kind of water enters into some of the waters

4    in the lower strata of this basin?

5         A  No, I don't think so, because the resistivity curve

6    on the electric log would have shown that quite clearly.  But

7    it didn't.  In my opinion, it does not show any-- well, there

8    may be connate waters down there of a sort, but at least they

9    are not of bad quality.  That is, there was not sufficient

10   quality differential.

11        Q  But you can have connate waters that are not of that

12   quality?

13        A  Yes.  But in my opinion the whole system is circulat-

14   ing.  Some of the movement down there may be a foot a year,

15   maybe less-- I have no way of knowing.

16        MR. STAHLMAN:  That is all.

17        MR. VEEDER:  I have no further questions.

18        THE COURT:  Thank you, Mr. Worts.  Again you will be

19   excused; you are subject to call, but we are through with you

20   at this time.

21        THE WITNESS:  All right, sir.

22        MR. VEEDER:  I assume that Mr. James may join us.  We

23   were interrupted.

24        THE COURT: Come forward, Mr. James.

25        MR. MOSKOVITZ:  He wants to get his notes.

1    MR. VEEDER:  Are you ready to proceed, Mr. James?

2    THE COURT:  Yes.

3    MR. VEEDER:  I was asking Mr. James, "Are you ready to

4    go?"

5    THE WITNESS:  Yes.

6                    CROSS-EXAMINATION (CON'T.)

7    BY MR. VEEDER:

8    Q  Now, on Page B-62 of California's Exhibit L --

9    THE COURT:  Volume I?

10   MR. VEEDER:  B-62 is an appendix, your Honor.

11   THE WITNESS:  Volume II.

12   THE COURT:  What?

13   MR. VEEDER:  It would be Volume II.

14   Q  This statement is made:  "The older alluvium which

15   flanks Pauba Basin on the northwest and southeast consists of

16   interfingering lenses of sediments.  Some of these lenses are

17   known to be moderately permeable, since they supply deep

18   windmill wells located on the hills on either side of the basin.

19   In fact, these lenses constitute conduits through which ground

20   water may either escape from or enter the basin, depending

21   upon the direction of the ground water slope existing at any

22   particular time."  Now, that, of course, is your testimony;

23   is it not?

24   A  That is true.

25   Q  If you will refer to Plate 10-B and to 11-B, you

1    will observe that there are lines which disclose ground water

2    basin boundaries.  You see those?

3         A  Yes.

4         Q  Those boundaries are of what character from the

5    standpoint of the transmissibility of water from Pauba Basin

6    into the older alluvium surrounding it?

7         A  Those are boundaries of the recent alluvial material

8    which we feel is more permeable than the surrounding older

9    alluvial material.  Does that answer your question?

10        Q  In other words, you would say that certainly the

11   waters are not laterally confined, isn't that right, based

12   upon your testimony which I just read to you?

13        A  They are not totally confined, no.

14        Q  Flow freely more or less in and out of the basin,

15   isn't that right?

16        MR. MOSKOVITZ:  Could I have that question, please?

17        THE COURT:  Read it.

18        (The reporter read back the question.)

19        THE WITNESS:  Freely, I don't think is the adjective

20   that I would apply in that case.  The testimony has been

21   brought out by several parties here previously that the permea-

22   bility of these older alluvial deposits is less and generally

23   considered to be relatively low.  And for that reason, I

24   wouldn't say that it flowed freely.

25

BY MR. VEEDER:

Q  You would say then that the boundaries of the basin are really not where you could tell them with a great deal of certainty; isn't that right?  You couldn't tell where the older alluvium and the younger alluvium blend one into the other, could you?

A  We have a pretty good idea.  In contacts of that type where slopes of sedimentary material are adjoining recent alluvial material, there is some overlapping.  But this is very limited.  We drew the basin boundaries for the most part on the break in topography and where the recent alluvium, it was apparent that it was recent alluvium, where we would distinguish it from the older material.

Q  And referring to Page B-45, you state this: "Boundaries of basins are generally continuous ridges of basement complex either exposed at the surface or underlying several feet of residual cover.  Several boundaries are formed by faults which act as barriers to the movement of subsurface water.  In other cases, alluvial highs have formed surface drainage boundaries between basins.  And in such situations the surface divides have been utilized in limiting the basin boundaries."  In other words, your picture of the Pauba Basin does not fit the description that I have just read to you from Page B-45; isn't that right?

A  Well, that is a general statement on B-45.  It says,

"Boundaries of basin are generally continuous ridges. . ."

THE COURT:  Basement complex is what you are talking about.

THE WITNESS:  On basement complex, yes, sir.

THE COURT:  In your Pauba Basin you don't delineate your boundary by basement complex?

THE WITNESS:  No, sir; that is correct.

BY MR. VEEDER:

Q  What do you delineate it by?  There is no reference to that.  Apparently there is a restriction there.  You don't have anything applicable to Pauba Basin; isn't that right?

A  Well, in Pauba Basin we used the recent alluvium.

Q  Would you answer the question.

A  Would you repeat it.

Q  There is nothing in the quotation that I gave you from B-45 that would include the Pauba Basin; isn't that right?

A  There is nothing in that particular paragraph.  I think probably there is something else in here that will cover that situation.

Q  I will not argue with you.

If you would step down here to the Exhibit, Plate 11-B, I will ask you to consider the various levels, various lines of equal elevation, and ask you whether those diagrams show that there is leakage throughout the Pauba Basin?  You will observe that it starts, you have got a line of 1200, it begins

at 1200, and by the time it gets to the end of the basin it is down to 1080. What does that evidence to you?

A These lines evidence to me that we have two, so to speak, zones of water; that the ground water at a shallow depth stands at a different elevation than the ground water that is tapped beneath this relatively impermeable material that lies at depth.

Q Is it not true that if there had been the zone of confinement, which is depicted on Plate 16, that this figure "1200" would have remained 1200 the full length of the Pauba Valley?

A What you are getting at, if I understand your question, is: Does this fact indicate that there is some leakage some place, either through the fault, some leakage laterally or some leakage up through the confining bed, if it weren't for such leakage you would have a static head then?

Q Right.

A True.

Q And where, in your opinion, does that leakage take place?

A I think probably that leakage occurs, to some extent, in all three of the possibilities that I mentioned.

Q In other words, you are of the opinion that there is water passing up through what is delineated on Plate 16 -- there is water passing up through the confining bed as testified

to by Mr. Worts; isn't that right?

A   There is probably some.  However, that movement may be slight.

Q   But there is, nevertheless, hydrological connection between what you have put here as unconfined water and the zone of confined water; isn't that right?

A   Probably so.

Q   And there is also leakage out through the sides; is that not correct?

A   There again, there is probably some.

Q   And there is also water passing through the fault zone; isn't that true?

A   Some.

Q   So you cannot properly say that there is a zone of confined water?  It is purely a relative statement; isn't it?

A   If you mean one hundred per cent confined, that there is no movement of the water in any direction from beneath that confining bed, then what you are saying is correct.

Q   And that is quite correctly shown when you see a loss of head from 1200 to 1080 in a relatively short distance in the Pauba Basin; isn't that right?

A   I don't understand your question.

Q   Just a moment here.  You said it was a static head and would be 1200.  But you looze coming down from 1200 to 1080 in the --

THE COURT:  Where do you see that "1200"?  On that 11-B?

MR. VEEDER:  Yes, your Honor, or 10-B.

THE COURT:  11.

MR. VEEDER:  Look at 10-B, and you will see the elevation 1200, 1090, 1080, 1070, 1060, dropping all the way down the valley.

THE COURT:  Yes.

MR. VEEDER:  Showing your reduction.

THE WITNESS:  This reduction in head does not necessarily indicate the fact that it is a very large reduction, does not necessarily indicate that the leakage is great; because there are other factors that control leakage, such as the permeability, the general permeability of the sediments.  You can have a very slight leakage and a very low permeability factor.

BY MR. VEEDER:

Q  But you are saying that this zone of confinement is a purely relative matter?

A  There is some leakage.

Q  Where are your notes which were the product of your determining the areal extent of Murrieta Basin?  I have looked for them, and I have been unable to find them.

A  The areal extent of Murrieta Basin was delimited on this overlay which you have handed me, which is California's Exhibit L, Table 15-2.

Q  Now, you must have used some means of measuring

L8
James Groves
6808

1      those areas?

2            A   These areas were traced from the large scale geo-

3      logic map which is also an exhibit in this case.

4            Q   Did you not measure the area so that you could

5      come up with the table appearing on Page 6 of California's Q?

6            A   Yes; I see what you mean.   Those areas were planim-

7      etered.

8            Q   And do you have the notes from your planimetering?

9            A   Yes, I believe I do.   You would like to see them?

10           Q   Oh, yes.   Yes.   Who did the planimetering?

11           A   That, I can't answer.   It was one of the geologists

12     working under my direction.   This all refers to the areal

13     measurements.   There is a planimeter factor shown here of .91.

14           MR. MOSKOVITZ:   You are referring to your notes?

15           THE WITNESS:   I am referring to my notes, yes.   Here

16     is the planimeter reading for Group 1, Groups 1 through Group

17     11, and the readings that were taken off the planimeter.

18     Those planimeter readings are here shown to be multiplied by

19     the planimeter factor to come up with the area of each respective

20     group.

21     BY MR. VEEDER:

22           Q   Now, in regard to your Area No. 11 --

23           MR. MOSKOVITZ:   What exhibit are you referring to,

24     Mr. Veeder?

25           MR. VEEDER:   I am referring to L, Table 15-2.

Q  What was the factor that you used there?

A  Well, the planimeter factor was .911.

Q  And you showed up 41 acres, isthat right?

A  Forty-one acres are shown on this sheet.

THE COURT:  What exhibit are you referring to now?

MR. VEEDER:  15-2, L. L, Table 15-2, your Honor.

THE COURT:  That is an overlay.

MR. VEEDER:  That is right.

THE COURT:  Is that the overlay there? .

MR. VEEDER:  That is right.

THE COURT:  Okay.  Go ahead.

MR. VEEDER:  I would like to have these marked, your Honor, if I may.

THE COURT:  What did we mark the other notes?

MR. VEEDER:  The last was T, wasn't it?

THE CLERK:  V.

MR. VEEDER:  V; I beg your pardon.

MR. MOSKOVITZ:  V.

THE CLERK:  This will be W, your Honor.

THE COURT:  It is W.  Notes re Murrieta storage unit? Is that it?

MR. VEEDER:  That is right.  Well, I guess it will be --

THE COURT:  Murrieta Basin?

MR. VEEDER:  Yes.  He has it "Gross storage capacity of Murrieta Basin."

Q   Now, in arriving at your specific yields for those areas, did you make any differentiation at all in regard to the material which was found in the well logs on the basis of the younger or the older alluvium?

A   I believe I answered that question yesterday:  That we differentiated our specific yields in accordance to what was shown on the well log.

THE COURT:  And not whether it was specifically upper or lower -- younger or older alluvium?

THE WITNESS:  That is correct, your Honor.

BY MR. VEEDER:

Q   So, as a matter of fact, then, on your Table B-3 your designation of "Relative Permeability" would have no -- and you have designated it as being moderate -- would really have no bearing whatever upon your determination of the storage capacity?

A   Now, let me see if I understand what you are talking about.  The relative permeability column in Table B-3?

Q   That is right.

A   As regards Murrieta Basin?

Q   That is right.

A   And the question is relative permeability did not enter into our storage capacity estimates?   That is correct.

Q   In other words, we can proceed then on the basis that in regard to Table B-3, the column "Relative Permeability"

1    has no meaning; is that right?

2         A  No, I didn't say that.

3         THE COURT:  What counsel means is:  Does it have any

4    meaning in connection with the last two columns -- "Gross

5    Capacity" and "Useable Capacity"?

6         THE WITNESS:  No, your Honor.  It is simply a ground

7    water basin characteristic and applies to the title of the page.

8         THE COURT:  All right.

9    BY MR. VEEDER:

10        Q  Are you saying then that the older alluvium is

11   moderately permeable by reason of that statement?

12        A  I don't see that it says that older alluvium is

13   moderately permeable.

14        Q  You say on the Table 3 that the wells are supplied

15   by both recent and older alluvium and the relative permeability

16   is moderate; isn't that correct?

17        A  Yes; but it doesn't say to what extent the older

18   alluvium is supplying the water to wells in that basin.

19        Q  Assuming that the younger alluvium is 100 feet deep

20   and you are using wells 450 feet deep, you would necessarily be

21   saying then that the older alluvium is moderately permeable,

22   would you not?

23        A  That is not what is meant by this column.  What is

24   meant by this column is that the recent alluvium in that area

25   is moderately permeable.  That is what it means.

MR. VEEDER:  Well, your Honor, I think we had better ask them to rewrite Table 3 completely, because it is completely without meaning.

THE COURT:  Your suggestion is overruled.  Proceed.

MR. VEEDER:  Well --

THE COURT:  You make your point in your record.  You don't have to worry it to death and have somebody write down, "I made a (inaudible) statement at this particular place."

MR. SACHSE:  Fifty times on the blackboard.

MR. VEEDER:  Your Honor, I make no bones about it.  I am attacking Fallbrook's permits.

MR. SACHSE:  If this is attacking Fallbrook's permits, again, for the record, I am going to move to strike; because it has been disposed of on a pre-trial order, your Honor.

THE COURT:  That is right.  Go ahead, Mr. Veeder, in your cross-examination.  We are not talking about the permits.

BY MR. VEEDER:

Q  Now, respecting the Table 15 over here -- it would be on Page 70 of Volume I -- I see that you again indicate the sources of water are both recent and --

THE COURT:  From Murrieta Basin you are talking about?

MR. VEEDER:  That is correct.

Q  -- recent and older alluvium.  And that is also true in regard to the Santa Gertrudis Basin; isn't that true?

A  Yes.  Yes, you are asking me if this column "Water-

L13

Jones   Cross   4560   6813

1    bearing Formation" says that?  That is true.

2         Q  That is right.

3         Now, from the standpoint of the water, your means of

4    determining the storage capacity in Santa Gertrudis, you state

5    that your --

6         THE COURT:  What are you referring to now?  States where?

7         MR. VEEDER:  I am referring to E-3 on Page B-47.

8         Q  -- that the water storage capacity is calculated

9    entirely within the free water zone; isn't that true?

10        THE COURT:  Are you talking about Santa Gertrudis?

11        MR. VEEDER:  Yes.

12        THE WITNESS:  Are you reading now from the general

13   description?

14        MR. VEEDER:  That is right.

15        THE COURT:  He is referring to Footnote B?

16        MR. VEEDER:  That is right.

17        THE COURT:  Make your question more specific.  Footnote

18   B appearing after your figure in acre feet of 6,460; and

19   Footnote B appears which says:  "Storage capacity calculated

20   in free ground water zone only."  Is that what you did?

21        THE WITNESS:  Yes, your Honor.  What we did in that

22   basin is we divided it into two subareas.  One of these subareas

23   overlay the confining zone, which we felt reasonable existed

24   in that area.  And storage capacity in that particular zone

25   was, therefore, computed to a depth, I believe, of 50 feet,

     to the best of my recollection.

6814

James    Cross

1    However,  the other subarea in that basin, No. 2, lay upstream

2    of the confining area, and it therefore was computed to greater

3    depth.

4         Q  In other words, the reference to footnote b is an

5    error on that page?

6         A  No, I don't think so.  We computed free ground water

7    change-- that is what it says-- in that basin.

8         Q  Do you have those notes there, Mr. James?

9         A  I am handing you the notes, calculation sheets for

10   storage capacity in Santa Gertrudis Basin.

11        THE COURT:  Mark it California's X for Identification.

12        (Documents marked Defendant State of California's

13   Exhibit X for Identification.)

14        THE COURT:  Maybe you told me yesterday or the day be-

15   fore, but I am still having some trouble.  In calculating

16   the basin in Santa Gertrudis, why didn't you want to calculate

17   any area in the so-called confined zone?

18        THE WITNESS:  Your Honor, I think it can be--

19        THE COURT:  Well, let's see if I understand what you did.

20   In the confined zone you went down only 50 feet?

21        THE WITNESS:  We didn't compute any storage in the

22   confined zone, your Honor.

23        THE COURT:  I mean, in the area above the confined zone

24   you went down 50 feet?

25        THE WITNESS:  Yes, to the best of my knowledge.

1    THE COURT:  And then eastward where you didn't think

2    there was a confined zone you went down to the depth of the

3    older or younger alluvium?

4    A   Yes, we went down to a depth controled by the well

5    logs in that area.

6    THE COURT:  So that you therefore computed the basin

7    on the east side of the Santa Gertrudis Basin at much greater

8    depth than on the western side, which underlies what you call

9    a confined zone; is that right?

10   A   Yes.

11   THE COURT:  You know there is water there because you

12   say so; you say the wells drilled into both the older and

13   younger alluvium, is that right?

14   THE WITNESS:  That is true.

15   THE COURT:  Why didn't you take into account any of the

16   area in the confined zone?

17   THE WITNESS:  Your Honor, we have to draw these limits

18   at some place.  True, you could draw water out from the sides

19   of these basins as delimited.  It comes to a point where you

20   don't have any control.  You don't have any control on specific

21   yield, you don't have any control as to depth.  So that there

22   has to be some limits drawn some place, and we drew these in

23   to the best of our judgment, what we thought represented a

24   reasonable unit, so to speak.

25   THE COURT:  Well, you knew that water was coming out

1    of this confined zone by wells, did you not?

2    THE WITNESS:  Yes.  But there was no change of storage

3    in that confined zone.

4    THE COURT:  There was no change in storage?

5    THE WITNESS:  What I mean to say, your Honor, is that

6    when you draw water out of a confined zone the change in

7    storage, the water itself is actually the change in water

8    level that represents that change in storage is occurring in

9    a free ground water zone.  The change in water level that

10    you measure in the confined zone is merely a change of pressure.

11    THE COURT:  Well, if I understand what you mean, you

12    mean that if you draw water out of this confined zone that is

13    being replaced by water from the free zone?

14    THE WITNESS:  That is true.

15    THE COURT:  So therefore you don't take into account

16    this confined zone as part of the basin?

17    THE WITNESS:  As part of the storage for the storage

18    change.

19    THE COURT:  Well if you had a bucket and you took water

20    out of the bottom, that water would be replaced by the water

21    in the bucket, wouldn't it?

22    THE WITNESS:  That is true.

23    THE COURT:  So why isn't the bucket then the basin?

24    What difference does it make if it is a confined zone and you

25    therefore cut it off and say, "We are not going to talk about

1  that as part of the storage"?  I am not trying to embarrass

2  you.  I am trying to understand what your thinking was in

3  saying that we are not going to consider this confined zone.

4          THE WITNESS:  Well, your Honor, before you could utilize

5  the storage in that confined zone, you would have to dewater

6  perhaps an area that extends out equivalent to Storage Units

7  4 and 5 and several others as depicted by the Government.  We

8  don't feel that we can evaluate that.  We can evaluate only

9  the immediate usable storage in these basins that we have

10  delimited.

11          THE COURT:  If what you say is true, that this confined

12  zone is fed from the sides, and before you could ever exhaust

13  it you would dewater a big area, then you have told me about

14  an immense storage unit--

15          THE WITNESS:  Your Honor, we have no quarrel with the

16  fact that there is a tremendous amount of storage out in that

17  older continental deposits or older alluvium.  We can't evaluate

18  it.  We have to try to evaluate the units that we do have the

19  data that we can work with.

20          THE COURT:  But I am trying specifically to find what

21  your particular reason was for not considering any part of

22  the depth of this aquifer in the confined zone, particularly

23  within the limits that you call the Santa Gertrudis Basin.

24          THE WITNESS: Well, we just don't think that you can

25  evaluate it, your Honor.  We didn't feel that we could, that

1    we could get the storage, that it would be meaningless if

2    we tried to assign a storage valuation or to compute storage

3    for those deeper aquifers in that area.

4        THE COURT:  Well, maybe when I read over what you have

5    said I will have a little more light on it.  I am still in

6    the dark.  I still don't understand.

7        How deep did you go eastward in the Santa Gertrudis

8    until you got beyond the area which you considered was the

9    confined zone?

10        THE WITNESS:  I would have to check the notes that were

11   given to the counsel for that.

12        MR. MOSKOVITZ: Exhibit X.

13        THE CLERK:  Don't you have Exhibit X?

14        THE WITNESS:  No, I don't think so.  I guess Mr. Veeder

15   has it.

16        MR. MOSKOVITZ:  Mr. Veeder has it (handing document to

17   the witness).

18        THE WITNESS:  Our lowest zone was 350 feet in depth in

19   that subarea.

20        THE COURT:  And that is the eastern part of the area?

21        THE WITNESS:  Yes.

22        THE COURT:  You went down 350 feet?

23        THE WITNESS:  Yes, in that area.

24        THE COURT:  And over the area which you show on your

25   exhibit as the confined area you took only 50 feet of aquifer?

James    cross

1        THE WITNESS:  Yes.

2        THE COURT:  In other words, you went down from the

3   surface to material that had no water until you hit the water-

4   bearing strata?

5        THE WITNESS:  Yes.

6        THE COURT:  Then you took 50 feet of aquifer?

7        THE WITNESS:  Actually, in computing the gross storage,

8   we took it from the ground surface, and in computing the

9   usable storage we took into consideration the water-bearing.

10        THE COURT:  The 50 feet you talk about in B-3, is it

11   from the surface or from the water level?

12        THE WITNESS:  It is from the surface, your Honor, in

13   computing gross storage capacity of that aquifer.

14        THE COURT:  So actually then you would have something

15   less than 50 feet of aquifer over the confined zone?

16        THE WITNESS:  Right.

17        THE COURT:  It is 4:30.  Adjourn until 10 o'clock to-

18   morrow morning.

19        (Adjournment until Thursday, December 18, 1958, at

20   10:00 o'clock A.m.)

21

22

23

24

25