# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al, | |
| Defendants. | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Thursday, December 18, 1958

Pages:  6820 to 6960

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego, California
BElmont 4-6211  Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
        vs.                    )        No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                Defendants     )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, December 18, 1958

APPEARANCES:

        For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                 Special Assistant to the
                                 Attorney General,
                                 Department of Justice,
                                 Washington, D. C.

6821

```
 1    APPEARANCES (Continued):

 2              For Defendant              GEORGE E. STAHLMAN, ESQ.
                Vail Company
 3
                For Defendant State       EDMUND G. BROWN, ESQ.,
 4                of California           Attorney-General, by
                                          ADOLPHUS MOSKOVITZ, ESQ.,
 5                                        Deputy Attorney General,

 6              For Defendants
                Fallbrook Public
 7              Utility District,         F. R. SACHSE, ESQ.
                et al.
 8

 9                                  -  -  -

10                                     -

11                                     -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## INDEX TO WITNESSES

| For Defendant State of California: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Laurence James | 6881 | 6823 | 6950 | 6952 |

## E X H I B I T S

| Defendant State of California Exhibit - | For Iden. | In Evidence |
|---|---|---|
| Y - Table re well logs | | 6885 |
| P - Amendment to Table B-3 | | 6896 |
| P-1 Three volumes | | 6896 |
| R - Table of data | | 6900 |
| S - Work sheets on Rainbow Basin | | 6900 |
| T - Work Sheets on Tucalota | | 6901 |
| U - Work sheets on storage basins | | 6901 |
| V - Tantative computation | | |
| W - Notes on Murrieta Basin capacity | | 6901 |
| X - Notes on Santa Gertrudis Basin | | 6901 |

1    SAN DIEGO, CALIFORNIA, THURSDAY, DECEMBER 18, 1958.  10 A. M.

2

3         THE CLERK:  Number one, the case on trial, 1247-SD-C,

4    United States of America vs. Fallbrook Public Utility District,

5    et al.

6

7                    LAURENCE JAMES,

8    recalled as a witness in behalf of the defendant State of

9    California, having been previously sworn, testified further as

10   follows:

11

12                 CROSS-EXAMINATION (Resumed)

13        MR. VEEDER:  In the concluding moments yesterday, your

14   Honor was interrogating respecting the method of computing the

15   storage capacity in Santa Gertrudis.  Had your Honor finished

16   that, do you recall?

17        THE COURT:  Yes.

18   BY MR. VEEDER:

19        Q  I hand you the overlay for the 15 series of Murrieta

20   Basin.

21        Now, in checking over the area No. 11, we find that

22   there is, based upon our calculations, a mistake of just about

23   100%.  In other words, you have shown that the area is 41 acres,

24   and our calculations show that it is either 18 or 21, as closely

25   as we can calculate.  It would be a very simple matter, would

1    it not, for you to just recalculate that Area 11 right where

2    you are and see whether or not we are correct?

3          A  Well, this was calculated with a planimeter.

4          Q  Can't you just calculate that just using your ruler?

5    It is virtually a triangle, you see.

6          A  Well, I don't recall the scale.

7          Q  The scale, I believe, is--

8          A  It is not written on this Exhibit L, Table 15-2.

9          Q  The scale is on this large map, so there will be no

10   problem there.

11         THE COURT:  What exhibit is the large map?

12         MR. VEEDER:  This is L 15-1.

13         Q  Would you want to take a look and check that (handing

14   exhibit to the witness).

15         That is 31680.  That is what the scale of the map is.

16   So based on that, I believe you would be able to make the

17   determination.  It is the same as Dr. Mann's scale on his map.

18         What are you looking for?

19         A  I am looking to see if we have a graphic scale on

20   here.

21         Q  You can calculate two inches to the mile, as I under-

22   stand it.

23         MR. STAHLMAN:  May I ask what you are asking for, Mr.

24   Veeder?  Is this the entire basin or a subgroup?

25         MR. VEEDER:  It is the subgroup No. 11.

1          THE WITNESS:  Let me get my slide rule here.

2          Well, in this rough estimate I made here, I came up with

3    about 16 acres.

4    BY MR. VEEDER:

5          Q  As distinguished from 41 acres; is that right?  We

6    came up with 18.

7          A  I went through this rather hastily.

8          Q  In other words, your calculations show a disparity

9    of some 25 acres in the Area 11, disclosed on California's

10   Exhibit L, Table 15-2.

11         Now, in regard to Area No. 1 our calculations have shown

12   that the areal extent of that segment or parcel is 569.6 acres,

13   and your figures show 680.5 acres.

14         A  Which area is this?

15         Q  That would be Area No. 1.

16         A  I would like to call your attention that I believe in

17   this Area No. 1 there is a central island that is deducted.

18         Q  But that was included in our calculation.  So when you

19   say the central island you are talking about the area of older

20   alluvium; is that right?

21         A  I would have to check the map. There is an island

22   shown here and it is not marked what it is.  I presume that is

23   what it is.   That would be reasonable.

24         Q  That would make an immense difference, would it not,

25   from the standpoint, particularly in Storage Unit No. 1, which

1    has 21% specific yield and the depth from 400 to 450; so your

2    whole basic calculation would be in error, would it not, if

3    our investigation is correct?

4         A  Well, if your investigation is correct, there would

5    very definitely be an error in that subarea.  However, the 21%

6    specific yield that you refer to in regard to that subarea

7    applies only to the bottom 50 feet, and it is by far the

8    highest specific yield in that area.  I think perhaps that

9    would exaggerate the area which you are trying to point up.  I

10   am referring now to Table 2 of Exhibit Q.

11        Q  Are you stating that this is not a serious error,

12   an error of over 100 acres in your area designated as 1,

13   assuming that the error is shown to be true?

14        A  What were your figures?  What did your figures show?

15        Q  Our figures show 569.6 as against your 680.

16        THE COURT:  Does Exhibit Q involve Santa Gertrudis or

17   Murrieta?

18        MR. VEEDER:  Murrieta.

19        THE WITNESS:  This is Murrieta, your Honor.  This is

20   on Table 2, page 7, of Exhibit Q.

21        I haven't checked your percentage.  Did you say 21% is

22   what you came up with?

23   BY MR. VEEDER:

24        Q  No.

25        A  What was the percentage?

James      Cross                                           6827

1        Q   You have a percentage specific yield of the bottom

2    50 feet, which would be very important from the standpoint of

3    calculating the specific yield and the storage capacity in acre

4    feet.

5        A   Well, the way you computed this error, how much

6    percentage difference did you get in area from what we got?

7        Q   I haven't figured the percentage.

8        A   I would need that figure in order to compare what

9    significance it might have.

10       Q   If you excluded this island of older alluvium in

11   your Segment No. 1, it would even accentuate the disparity

12   between the figures that we have and the figures that you have;

13   is that not true?

14       A   What were your figures again?

15       Q   The figures 5--

16       A   Let me write them on this copy of mine here.  What

17   figure did you get?

18       Q   We have the calculation 569.6 as compared with your

19   figure of 680.5.  You have agreed that you are in error in

20   regard to area No. 11.  You have 60, we figure 18, and your

21   Table 1 shows 41.

22       A   I haven't agreed that I am in error.  My hasty

23   calculations would suggest that I was, but we haven't run this

24   out carefully.

25       Q   Now, in regard to your figures on No. 9, there is a

1    disparity between our calculation and yours of approximately

2    100.

3        MR. MOSKOVITZ:  What is the disparity?

4        MR. VEEDER:  About 100 acres.

5        MR. MOSKOVITZ:  Which way?

6        MR. VEEDER:  It appears to me that we have 100 acres

7    less than the 920 that you show.

8        THE WITNESS:  You have about 820, then?

9        MR. VEEDER:  That is right.

10        Q  Now, in areas of high specific yield that becomes

11    extremely important, does it not?

12        A  It depends upon how big the area is, what thickness

13    is being considered.

14        Q  You would say, however, that the figures which you

15    have now offered in evidence, assuming your 16 acres is correct,

16    that your offer is in error; isn't that right?

17        A  Assuming that these corrections that you have men-

18    tioned here, that your corrections are correct, one of us is

19    in error.  That is true.

20        Q  $^H$ere is a very simple one to measure.  Why don't you--

21        MR. MOSKOVITZ:  Your Honor, I want to make an objection

22    here.  It seems to me that if we are going to be comparing

23    figures this should be done accurately with a planimeter, and

24    also there must be some showing that the figures that Mr. Veeder

25    is quoting were also done by a planimeter.

1    MR. VEEDER:  They were.

2    MR. MOSKOVITZ:  And on the same base.

3    THE COURT:  The comparison is being made from the

4    witness's work sheets, not from the Government's proposed

5    basin.  They are both working from the same sheet.

6    MR. MOSKOVITZ:  Mr. Veeder, first of all, is asking the

7    witness to scale it out with a ruler.  This is not the accurate

8    way.

9    MR. VEEDER:  But a competent man can do it with a

10   ruler.  I have seen it done this morning twice and checked

11   against the planimeter reading.

12   MR. SACHSE:  The foundation should be laid.

13   THE COURT:  Is there a planimeter here in the court-

14   room?

15   MR. VEEDER:  Do you have one on your person?

16   THE WITNESS:  No.

17   MR. MOSKOVITZ:  The point is that an error will make a

18   difference.  It is obvious it will make a difference.  How

19   big a difference depends on how big an area.  And to get some

20   accurate measurements, you don't know how big the area is.

21   MR. VEEDER:  Could you have someone check these out

22   while we proceed?

23   THE WITNESS:  We don't have a planimeter, and I would

24   like to point out that even with a planimeter this is a lengthy

25   task.  There is considerable time spent in running out these

1    areas.

2        MR. VEEDER:  Take about half an hour.

3        THE COURT:  How long will it take this morning?

4        THE WITNESS: With a planimeter, your Honor?  Is that

5    your question, sir?

6        THE COURT:  Yes.

7        THE WITNESS:  To run out each one of these areas, there

8    is a little preliminary time taken in setting up the planimeter

9    and getting things going.  I would say it would take several

10   hours to run out all these areas.

11       THE COURT:  How many do you claim there are errors on?

12       MR. VEEDER:  I don't believe we have agreed on any of

13   the figures, but I know that I saw it done yesterday afternoon

14   and again this morning-- probably a half hour.

15       THE COURT:  Do you have a planimeter here?

16       MR. VEEDER:  Did you send that back?

17       MR. MOSKOVITZ:  May I ask this question, what is the

18   total disparity in the basin?

19       MR. VEEDER:  The total disparity in the basin, your

20   Honor, I would like to point out now, has nothing to do with

21   the case, for this reason, that in the area, for example No.

22   1, where you have a high specific yield, the quantity of

23   storage would be very material.  As a matter of fact, we find

24   that there are probably 200 acres difference in total, but

25   that in certain areas the errors run as high as 100%.

1    MR. MOSKOVITZ: What difference will that make in total

2    storage capacity, Mr. Veeder?

3        It seems to me that this is the heart of it. If it is

4    not material, why go into these great details?

5        THE COURT: It is certainly not material on the storage

6    capacity. But I don't think that is the purpose of the cross-

7    examination.

8        MR. VEEDER: Your Honor, from this standpoint I can

9    demonstrate, from the standpoint of storage capacity-- for

10   example, their Storage Unit No. 1 shows storage capacity in

11   acre feet 33,471.

12       THE COURT: What figure did you arrive at?

13       MR. VEEDER: If these figures are correct as we have

14   them set up, the total storage capacity would be very material,

15   because they have broken it down in 50-foot segments. The

16   point that I make, however, is that each one is materially

17   different and it simply goes to show that Exhibit Q, which was

18   offered as Mr. James's testimony, is not accurate testimony.

19       THE COURT: How long would it take you to do it without

20   a planimeter?

21       THE WITNESS: Your Honor, I don't think it could be

22   done accurately without a planimeter. There are curved

23   boundaries involved. You can't divide it up into a geometric

24   straight-sided figure.

25       MR. VEEDER: Mr. Worts was able to check out almost

1    exactly today, using the very ruler here without a planimeter,

2    the planimetered figures.  That is why we think these are right.

3         THE COURT:  If you want the witness to recheck the

4    figures, you will have to ask him to do it outside of court

5    time, and you can interrogate him later on it.

6         MR. VEEDER:  Fine.

7         THE COURT:  Which areas do you want rechecked now?

8         MR. VEEDER:  I want all eleven areas rechecked, your

9    Honor.

10        THE COURT:  In California's Q?

11        MR. VEEDER:  In California's Q, and recheck the measure-

12   ments against L, Table 15-2.

13        THE COURT:  And if errors are found in the column

14   "Areas in Acres" on Table 1, you want the computations

15   carried out as to gross storage on Table 2.

16        MR. VEEDER:  Yes.  But the basic factor is that if the

17   areal extent is in error, we don't know what wells are thrown

18   out, what wells are in, or whether your specific yields would

19   be changed.  I really think it goes to the heart of the whole

20   exhibit, it goes to the heart of all these calculations in

21   regard particularly to Appendix B, which is his testimony--

22   Which is in the record.

23        MR. SACHSE:  I have a question. Mr. Veeder said that

24   Mr. Worts did all this.  I would like at this time to have Mr.

25   Veeder produce in the courtroom Mr. Worts's work sheets on

1  which he did this planimetering, his arithmetic calculations,

2  and have Mr. Worts available so that we can check the accuracy

3  of Mr. Worts's work.  Maybe this gentleman is right, and Mr.

4  Worts is wrong.  If we are going to do this, we might as well

5  find out who is right.  If Mr. Worts did it, I would like to

6  have the pencil notations and all the preliminary work.

7         THE COURT:  No use doing more work than is necessary.

8  If the witness rechecks this and claims he is right in Q,

9  then we will follow your suggestion.  If he concedes that he

10 is in error, then he will correct his testimony by further

11 testimony in court.

12        MR. SACHSE:  My particular point was that we have a

13 little difficulty in getting notes.

14        MR. VEEDER:  What notes?

15        MR. SACHSE:  Mr. Worts yesterday, for instance, stated

16 that he didn't know where the pencil notes were that they kept

17 on the well logs.  He didn't think they were available.

18        MR. VEEDER:  I think they are down in the middle of my

19 desk now, if you want to look at them.

20        MR. SACHSE:  I am quoting his testimony.  Maybe you know

21 where they are, but he didn't.

22        THE COURT:  If Mr. Worts is the man who made the estimates

23 for you as to Exhibit Q, Mr. Veeder, tell him to save his

24 notes and he may be called upon to come in and show what his

25 calculations were.

1          MR. VEEDER:  And we will have a planimeter brought in.

2          Q  How would you define "Recent alluvium," as you have

3     used it in your testimony?

4          A  Well, Recent alluvium is the sediment that has been

5     deposited by streams in Recent geological time.

6          Q  Would you state whether, in your opinion, usable

7     ground water supplies are found principally in the Recent

8     alluvium of the valley areas?  Would that be your opinion?

9          A  Yes.

10         Q  And would you define Recent alluvium as being those

11    materials undergoing deposition and in three principal cate-

12    gories:  (1)  Alluvial fans; (2) Basin deposits, and (3)

13    Channel deposits?  Would that be your definition of Recent

14    alluvium?

15         A  I believe that is the way we defined it in Bulletin

16    57.

17         Q  Would you state whether there are any alluvial fans

18    in your calculations in connection with the storage capacity?

19         A  Whether there are any involved?

20         Q  Yes.

21         A  Why, yes.

22         Q  There are.  And where are those situated?

23         A  Well, there are parts of fans scattered in a number

24    of-- very many places throughout the Santa Margarita watershed

25    area.

B Z1

Q  And how do those fans differ from the rest of the alluvium in the valley?

A  Fan deposits are depending on the type of material from which they are derived.  When they are derived from basement complex areas, they are generally coarser, the materials are less rounded than materials that have been transported farther and deposited by the streams farther down slope.  They are heterogenous.

Q  Then, how would you distinguish an alluvial fan from basin deposits?

A  An alluvial fan is generally distinguished in the field by its shape.  It is a conical-shaped deposit with the apex near the mouth of the stream that disgorges from the hill slope.

Q  The material would not be greatly different, though, from basin deposits, would it?

A  Generally, it is depending on the source material. It is coarser in the basins.  The material has been transported farther before it has been deposited.

Q  In other words, the basin deposits are just materials that have been carried farther than the alluvial fan, is that right?

A  And they have been subject to further sorting.

Q  What do you mean by stream channel deposits?

A  Well, those are the deposits that are laid down by

1    the stream, mostly in the course of high flows.

2        Q  And then, in your statement that Recent alluvium

3    constitutes alluvial fans, basin deposits, and stream channel

4    deposits, are you including in those three categories the

5    Qtoa?

6        A  The Qtoa is differentiated from those two as a

7    separate formation.  It is differentiated from the Recent

8    alluvium.

9        Q  You would state that the sources of ground water,

10    usable ground water supplies, rather, are found principally

11    in the alluvium of valley areas?

12        A  Principally.

13        Q  And in regard to basins, such as the Pauba Basin,

14    would you say, in view of the facts which are before the

15    Court, that the principal sources of usable water are in

16    the Recent alluvium?

17        A  I believe the greatest extractions from Pauba Valley,

18    to the best of my recollection, I derived from the shallowers

19    and Recent alluvial deposits.  I might add at this point that

20    we recognize and it has been brought out in testimony that

21    there is storage of water in large amounts in the older

22    alluvial deposits which lie on either side of Pauba Valley,

23    and that we just do not know the characteristics of these

24    deposit to sufficient detail to estimate how much is stored

25    in there.  But there is plenty.  There is no quarrel there.

1        Q   Now, in regard to the areas in the Pauba Valley,

2   there the field is, to a vast extent, composed of older

3   alluvium, is it not?

4        A   In Pauba Valley itself?

5        Q   Yes.

6        A   There is considerable depths of older alluvium that

7   is underlying the Recent alluvium in that area; true.

8        Q   And to what depth do you calculate the younger

9   alluvium to be in the Pauba Valley?

10       A   Well, as I recall, in our storage capacity figures

11  we used a depth of 170 or 171 feet.

12       Q   Why did you use that figure?

13       A   That was, as I recall, the deepest logged depth to

14  the top of what we believe to be a zone of relatively low--

15  of material of relatively low permeability which tends to

16  confine the underlying water.

17       Q   So the statement then that the depth of younger

18  alluvium in Pauba Valley would be 250 feet would be in error;

19  is that it?

20       MR. MOSKOVITZ:  Where is that statement, Mr. Veeder?

21       MR. VEEDER:  I will read the statement in regard to

22  Pauba Basin.  Page 75.  The Recent alluvium I am speaking of.

23  75 of Bulletin 57, Volume I.

24            "The Recent alluvium constitutes a

25       free ground water zone tapped by relatively

shallow wells ranging in depth up to 250

feet."

THE COURT:  We were all over this.  It has all been covered by you.

MR. VEEDER:  He has changed his testimony so frequently I was going to be this morning apart, and it is not entirely repetitious, your Honor.  I have before me a--

THE COURT:  Well, go ahead.  Ask your question.

MR. VEEDER:  I have asked it, your Honor.

THE WITNESS:  I would like to repeat what was my testimony of yesterday; that this 250 feet that appears on page 75 of Bulletin 57 refers to the depth of the wells, to the best of my recollection.  It does not imply that the depths of alluvium-- is not meant to imply that the depth of the Recent alluvium is 250 feet.  The way I read that, Mr. Veeder, is that relatively shallow wells ranging in depth up to 250 feet. These pass through the Recent alluvium, and they derive their supply from the Recent alluvium.

BY MR. VEEDER:

Q  Now, you are changing the word "tapped" then to "passing through"; is that right?

A  Well, I am trying to restate that so that it can straighten us out, whatever confusion you might have in that respect.

Q  I have no confusion on it.

1              When you originally prepared these data on which the

2       Bulletin was predicated, Mr. Fox made this statement:    "Ground

3       water occurs in several distinctive rock types within the

4       Santa Margarita Basin."

5              THE COURT:   What are you reading from now?

6              MR. VEEDER:   I am reading now from Appendix B, Draft 1.

7       "Ground water occurs in several distinct rock types within the

8       Santa Margarita Basin--region.   Almost all of the readily

9       extractable ground water is stored in the larger alluvium-

10      filled valleys, which are themselves distinctive in size,

11      shape, depth, and permeability.   The material comprising the

12      valley fill is unconsolidated to poorly consolidated water-

13      bearing alluvium of variable thickness.   The alluvium is

14      composed primarily of continental flood plain and sand

15      deposits, with some interbedded lagoonal sediments in the

16      basins which border the coast."   Now, from there you proceed

17      to say--

18             MR. MOSKOVITZ:   You are still referring to that same

19      reference?

20             MR. VEEDER:   Oh, yes.   Yes.

21             Q   From there you proceed to say that:   "Forming the

22      impermeable sides and bottoms of the ground water basin are

23      material classed herein as non-water bearing."   Now, that

24      statement, in fact, the two statements which I have read from

25      the original draft comport fully with the statements appearing

1   on pages B17 and B18.  You will notice under "Geologic Units"

2   you say:  "Almost all of the readily extractable ground water

3   is stored in the large alluvium-filled valleys," --

4         A  Which page now, Mr. Veeder?

5         Q  I am on page 17.

6         MR. MOSKOVITZ:  B17.

7         THE COURT:  You don't have to reread it.  The first

8   portion is word for word.

9         MR. VEEDER:  I didn't hear.

10        THE COURT:  You don't have to reread it.  The first

11  portion you quoted from the original draft is carried over

12  almost word for word to the bottom of B17.

13        MR. VEEDER:  That is correct.

14        THE COURT:  Where is the second line?

15        MR. VEEDER:  The second one that I read, if you will

16  turn to page 18.

17        THE WITNESS:  That is B18?

18        MR. VEEDER:  B18.  Second paragraph.

19        THE COURT:  Second paragraph.

20  BY MR. VEEDER:

21        Q  It says:  "Forming the relatively impermeable sides

22  and bases of many of the valleys are materials classed herein

23  as non-water bearing.  This group ranges from pre-Cretaceous

24  to Tertiary in age and comprises crystalline, igneous,

25  metamorphic, and volcanic rocks plus impervious or slightly

1   permeable sedimentary formations." Now, as a matter of fact,

2   when this bulletin was first prepared was it not contemplated

3   that the basins, those would be bordered and bounded by the

4   basement complex, and that there was no distinguishing

5   elements made in regard to the alluvium? You treated all of

6   the alluvium within the basins to which we have referred as

7   Recent alluvium, did you not?

8       A  No, Mr. Veeder, that is not the case. I think I

9   can point out also that the Government in the coastal areas

10  had sedimentary deposits which flanked and underlay their

11  ground water basins. They did not contemplate regarding all

12  sedimentary deposits as comprising a basin. Also in the

13  upper areas various depths were assumed on the sedimentary

14  deposits, both by the Government and by the State, in making

15  their storage capacity estimates. We did not include or did

16  we ever intend to include all sediments or all continental

17  sediments for a single basin.

18      Q  As a matter of fact, the only method pursuant to

19  which there can be reconciled the apparent differences between

20  the original draft and the appendix is to adopt the statement

21  which I just made; is it not?

22      MR. SACHSE:  I object, if the Court please. The draft

23  that he has just read jibes almost word for word with the

24  Appendix.  That is assuming a fact that is not in evidence

25  at all.

MALCOLM E. LOVE.  OFFICAL REPORTER

1      MR. MOSKOVITZ:  I have a further objection.  I think

2   this is being argumentative.  The draft obviously went through

3   changes in the course of consideration of the information.

4   I see nothing startling about this.  And the final product

5   was the best opinion of the department and the people respons-

6   ible at the time.

7      MR. VEEDER:  The point that I make, your Honor, and

8   we have taken --

9      THE COURT:  Well--

10      MR. VEEDER:  The point that I make, your Honor, is this:

11   That there are various basic and fundamental changes and

12   differences between what this witness is presently

13   testifying to and the actual language that he swears is his

14   testimony as presented in Appendix B.  And I think that if we

15   were to pursue this thing through to its logical conclusion,

16   he would have to admit that there was no difference originally

17   contemplated between the alluvium from the standpoint of the

18   younger and the older alluvium which he has termed as Recent,

19   and the alluvium which they have depicted as filling the

20   valleys.

21      THE COURT:  The objection is sustained on the

22   grounds your question is argumentative.  You are arguing now

23   about the question you previously asked and which the witness

24   answered.  Your question to which objection was made was

25   some question about the only way to reconcile this statement

B2

1    and that statement.

2    BY MR. VEEDER:

3        Q  It will be observed on page 23 of Appendix B, as

4    we have previously brought to your attention, that the

5    Recent alluvium:  ". . fills the basins to great depths . ."

6    You see that on page 23 at the bottom of the page?

7        A  Yes.

8        Q  If the Recent alluvium that you have described fills

9    the basins to great depth, where is the older alluvium

10   located beneath those great depths?

11       A  You mean just exactly where is the contact?

12       Q  No, just in general.  You can start with that.

13   MR. MOSKOVITZ:  I object to that question, your Honor.

14   I don't think it is capable of being answered.

15   THE COURT:  Sustained.  It is awfully argumentative.

16   Also, we have covered this matter of B23 already.

17   MR. VEEDER:  Your Honor, as I see it, the witness has

18   testified on page 17 and page 18 as to what constitutes

19   geologic units.

20   MR. MOSKOVITZ:  Is that B17 and B18?

21   MR. VEEDER:  That is right.  I think that in cross-

22   examination we are entitled to have him either show that the

23   statements are reconciled or to explain why there appears to

24   be a conflict between the statements he testified to as set

25   forth as his testimony on B23 and on B17.

1        THE COURT:  You can pick out particular statements and

2    do that, if you want, or you can wait and argue the matter.

3    But I will sustain the objection to the type of questions

4    you are asking.  More than that, you are not entitled to do

5    it more than once.  You went into page 23 at some length and

6    called attention to the earlier language.  And from the record

7    you can conclude, apparently, that there were some omissions

8    made out of the preliminary draft and page B23 resulted.  You

9    have specific statements that you find to be inconsistent.

10   You called them to the witness's attention.  Let's do it once

11   and be on our way.

12   BY MR. VEEDER:

13        Q  Is there in your testimony set forth in Appendix

14   B a description of the kind and types of structure which

15   constitute Pauba Basin as you have defined it?

16        A  The kind and types of structures?

17        Q  That is correct.

18        A  By that you mean geological structures?

19        Q  That is right.

20        A  Well, the only way I can see to answer that question,

21   as far as geological structure goes, there is the Wildomar

22   fault down at the extreme end of the basin.  Beyond that, I

23   can't pursue your question.  Your word "geological structures"--

24        Q  There are no structures then contained in Pauba

25   Basin, is that right, other than the Wildomar fault?

1        A  Pauba Basin is an eroded channel which has been

2   filled with alluvial materials.  That, I don't refer to as

3   a structure.

4        Q  And you say that the basin then, as you depict it,

5   is simply contained in older alluvium; is that right?

6        A  It is surrounded on the north-- it is flanked

7   on the north side by older alluvium, on the south side, and

8   is underlain by older alluvium; and on the downstream side

9   is the Wildomar fault.

10       Q  How would you define the boundaries of the Santa

11  Gertrudis Basin, then?

12       A  It has older alluvium on either side, and the

13  Wildomar fault on the downstream boundary.

14       Q  And would you state then that the description-- as

15  set forth on page B18 of the--

16       THE COURT:  Well--

17  BY MR. VEEDER:

18       Q  --valley basins would not be applicable to those

19  two basins; isn't that right?

20       MR. MOSKOVITZ:  What is the statement?

21       THE WITNESS:  I beg your pardon?

22       MR. VEEDER:  I will find it.

23       THE COURT:  Let's see if we can shorten it up.  In

24  B18 in the section entitled -- this is in Appendix B18--

25  "Geologic units" you have the broad statement that the sides

James    Cross                                              6846

and basins of the valleys are formed of materials classed as

non-water bearing.  Now, when you say "non-water bearing,"

that would exclude older alluvium and continental deposits,

would it not?

THE WITNESS:  Yes.

THE COURT:  That would be excluded.

MR. MOKOVITZ:  Your Honor, may I ask where you are

reading from?

THE COURT:  We are at the middle of B18 where Mr.

Veeder has been talking about.

THE WITNESS:  I would like to point out, your Honor,

that has "many of the basins."  The way you read that I

didn't catch that word.

THE COURT:  "Many of the valleys."

THE WITNESS:  Correct.

THE COURT:  Since you have made this statement, I take

it this would be the most common characteristic in the area?

You are not picking out the section, are you, when you say

"many of the valleys"?

THE WITNESS:  Your statement is correct.

THE COURT:  Therefore, when you say "non-water bearing,"

you exclude older continentals and older alluvium?

THE WITNESS:  True.

THE COURT:  And you, therefore, would indicate to the

casual reader, to the lawyer, to someone other than, we will

1  say, an expert geologist, that these valleys have sides of

2  igneous, metamorphic, volcanic rocks, basic complex; right?

3      THE WITNESS:  True.

4      THE COURT:  When you get to 23, your draft originally

5  talked about the Recent alluvium and the Older alluvium in

6  the valley floors, and then the language went on:  "This

7  formation fills the basins to greath depths."  When the

8  omission occurred, "in the older alluvium" went out; the

9  words "greath depths" were still left in.  So your sentence

10  reads now:  "The formation"-- B23.  You have to refer back to

11  Recent alluvium to find what is meant by "this formation"--

12  "fills the basins to great depths."  Now, the word "great"

13  could have well been left out there, could it, in the revision

14  that took place?

15      THE WITNESS:  It could have been left out.  However,

16  there are great depths of Recent alluvium in many of the

17  basins.

18      THE COURT:  Again using the word "many," is that the

19  common characteristic of basins or is that the exception in

20  the basin that has an alluvium, Recent alluvium to great depth?

21  I don't know of any basin that has been shown to have Recent

22  alluvium down more than 170 feet or so.

23      THE WITNESS:  Well, your Honor, may I point out--

24      THE COURT:  Which one?

25      THE WITNESS:  --Ysidora Basin, Chappo Basin--

MR. VEEDER:  We are talking about the Upper Basin.

THE COURT:  It is true the coastal basins might.  But even then, how deep does younger go in the coastal basins?

THE WITNESS:  200 feet, approximately, your Honor.

THE COURT:  That would be great depth?

THE WITNESS:  Yes, I would consider that as a great depth.  I think it is the way you look at it, your Honor.

MR. MOSKOVITZ:  Your Honor, I want to point out on page B18 above the place where you--

MR. VEEDER:  Your Honor, I submit that the witness should be testifying and not Mr. Moskovitz.

MR. MOSKOVITZ:  I am referring to testimony already in evidence.

THE COURT:  Go ahead, Mr. Moskovitz.

MR. MOSKOVITZ:  I just want to refer your Honor to the first full sentence on page B18 starting with the word "limited":  "Limited quantites of ground water are found in the semi-consolidated Pleistocene sediments, which flank several of the alluviated valleys and form permeable collecting areas for the sediments underlying the valleys."

Now, that refers to the kind of basins which are not confined by consolidated rock.  So both types are described here.  The first full paragraph which you read can't be read in isolation.

THE COURT:  That part in the paragraph you read from,

1    Mr. Moskovitz, isn't talking about basin, is it?

2          MR. VEEDER:  No.

3          MR. MOSKOVITZ:  The one you read from doesn't talk

4    about basin.  It talks about valleys.  And so the sentence

5    I read from--

6          THE COURT:  This is all argument, a matter of argument.

7    On B17 appears the statement which has already been commented

8    upon:  "Almost all the readily extractable water stored in

9    the larger alluvium-filled valleys . ."  Now, of course, that

10    general statement of "larger alluvium-filled valleys," would

11    cover both the older continental , older alluvium and the

12    younger alluvium; would it not?

13          THE WITNESS:  Alluvial would cover, yes.

14          THE COURT: Go ahead, Mr. Veeder.

15    BY MR. VEEDER:

16        Q  There is not any description, as I find it, in the

17    Appendix B, is there, of the kind and type of valleys to

18    which I refer-- Santa Gertrudis and Pauba?

19        A  You mean as a separate paragraph?

20        Q  Yes.

21        A  Describing each of those?

22        Q  Yes.

23        A  We included some of the more-- some of the descrip-

24    tions of some of the basins which we had more data pertaining

25    to in here.  Now, I have to refer to this to see just which

ones we did include.  I presume we included that.  Yes, I have.

MR. MOSKOVITZ:   The Pauba Basin is described on page B-59.   There is quite a lot of description of it.

THE WITNESS:   Yes.

THE COURT:   Santa Gertrudis on B-47 in the chart, and it expressly states that the Recent alluvium is underlain by older and wells supplied by both Recent and older.

BY MR. VEEDER:

Q   And the boundaries of the basins are in older alluvium; is that what you are saying?

A   Is that what I am saying where, Mr. Veeder?

Q   Well, is that your testimony now?

A   Boundaries--

MR. MOSKOVITZ:   I object, your Honor.   I think this question has been asked and answered so many times.

THE WITNESS:   I don't follow your question.

THE COURT:   I don't know that this particular question has.

Now, what are these basins?   Are the basins the younger alluvium and older?   And if so, where do you draw the line on older?

The objection is overruled.

What is your testimony as to the definition of a basin where there is involved in the basin older alluvium?

THE WITNESS:   Your Honor, where there is involved older

1   alluvium-- for example, Murrieta Basin, Pauba Basin, Pechanga

2   Basin-- we used as a surface boundary of the basin the contact

3   of the Recent alluvium.

4           THE COURT:  All right.

5           THE WITNESS:  Now, as a bottom to that basin, we

6   examined the wells that were in that particular basin, the

7   wells with logs which we felt were reliable, and on the

8   basis of those logs we fixed a base to the basin for the

9   purposes of computing the storage capacity.  This base varied

10  in the several subareas into which we divided the basin, and

11  the base was not necessarily the Recent alluvium.  It frequently

12  extended down below the Recent alluvium into the Older alluvium,

13  and the base was fixed on these well logs to which I refer.

14  Actually, your Honor, the basin encompasses a volume of

15  materials from which we know ground water is being extracted.

16          THE COURT:  Now, you have told me that the areal limita-

17  tion is the juncture of the older and the younger alluvium,

18  that the base is based upon well logs and may be in the younger

19  or in the older?

20          THE WITNESS:  That is true.

21          THE COURT:  There is no rule of thumb on that; is that

22  right?

23          THE WITNESS:  Yes.

24          THE COURT:  In no place did you use basement complex

25  as the bottom of the base?  Or did you?

1    THE WITNESS:  Yes, we did, particularly in the smaller

2    basins.

3    THE COURT:  What did you use on the sides between

4    the areal juncture of the older and the younger and the

5    bottom that you are talking about?  What did you say were the

6    sides of the basin?

7    THE WITNESS:  On some of these basins we assumed

8    vertical walls for the purpose of simplifying the calculat-

9    tion, where the basin was surrounded by older alluvial

10   materials.  For example, this was done in Murrieta Basin, it

11   was done in Pauba Basin, and it was done in some others.

12   THE COURT:  So your testimony, then, is that in

13   Murrieta and Pauba Basin, by using the vertical walls, you

14   were using certain of the older alluvium?

15   THE WITNESS:  That is true.

16   THE COURT:  Since, if you started with an areal contact

17   between the younger and the older, obviously in most cases

18   that contact wouldn't be vertical?

19   THE WITNESS:  That is true.

20   THE COURT:  You would be taking part of the older

21   alluvium, by your vertical line, as part of the base?

22   THE WITNESS:  That is true, and we went into the older

23   alluvium that underlaid the Recent alluvium, too.  I might say--

24   I think perhaps it would clarify it-- that one of the reasons

25   for making these storage computations is that in general when

1    we get into a ground water study somewhere along the line

2    the engineers become involved in studying the hydrologic

3    equation-- that is, they are trying to balance the inflow into

4    an area with the outflow.  When I speak of "inflow," I mean

5    all sources of replenishment to the basin, including rainfall,

6    stream percolation, et cetera; and "outflow" would include

7    exportation and evapo-transpiration losses and that sort of

8    thing.  And in this equation, the inflow minus the outflow

9    includes change in storage.  So one of the things we are inter-

10   ested in is solving for the changes of storage that occur

11   over a selected period of study.  Now where these changes of

12   storage occur, these occur in the areas where the wells are

13   located, providing the wells are extracting water from free

14   ground water zones and not in confined water zones.  So we

15   attempted, in delimiting many of these basins, to outline

16   areas in which these changes of storage would occur.

17        This whole Santa Margarita area is so complex-- it is

18   in hydrologic continuity with certain areas, and certain areas

19   are in hydrologic continuity with other areas-- that this

20   approach of applying the hydrologic equation to some of these

21   individual areas became exceedingly difficult.  Nevertheless,

22   we attempted to outline these basins and to set up a method of

23   computing storage by depth intervals and by subareas, so that

24   the changes could be recognized.  This is much more effective

25   in the coastal area than in the inland area.  One of our

James      Cross                                                    6864

1    plates, as your Honor will recall, relates to depth to ground

2    water with storage capacity, and this is the way we usually

3    approach those problems.

4         That's all I have to say, your Honor.

5         THE COURT:  Take a short recess.

6         (Recess.)

7         MR. SACHSE:  Your Honor, before the examination con-

8    tinues, I have two very brief corrections in yesterday's

9    transcript.  On page 6736, line 20, my question is given as

10   "It also may be an important water-bearing material," and the

11   question should read "It also may be a non-water-bearing material."

12        THE COURT:  The correction will be made.

13        MR. SACHSE:  And on page 6752, the very last line is a

14   misquotation from the previous transcript:  "The evidence

15   indicates the loss," the word should be "logs"--"the evidence

16   indicates the logs. ."

17        THE COURT:  Change the first s to a g.  The correction

18   will be made.

19        MR. SACHSE:  Thank you.

20        THE COURT:  Proceed.

21   BY MR. VEEDER:

22        Q  Do I understand you correctly in stating that you

23   simply drew lines in the younger and older alluvium and sort

24   of blocked off the basins in making your calculations; is

25   that right?

1    MR. MOSKOVITZ:  Certain basins, he said.

2    THE COURT:  Murrieta and Pauba--

3    BY MR. VEEDER:

4    Q  Murrieta, Pauba, Santa Gertrudis?

5    A  To the best of my recollection-- and Pechanga.

6    Q  And Pechanga.  Now, this statement, then, would be

7    incorrect, would it not, in regard to at least those four to

8    which you have made reference, reading from page 62 of the

9    text:

10    THE COURT:  Exhibit L, Volume I, page 62.

11    MR. VEEDER:  "Ground Water Basin -- a pervious forma-

12    tion with sides and bottom of relatively impervious material

13    in which ground water is stored. . "

14    That would not have application to those four large

15    basins; is that not correct?

16    A  Let's say it this way.  The storage was computed out

17    beyond the areas as defined in this definition you have just

18    quoted.

19    Q  Would you say that again, please?

20    A  There was--

21    MR. MOSKOVITZ:  Have the answer read, Mr. Veeder.

22    THE COURT:  Read it, Mr. Reporter.

23    (The reporter read the last answer.)

24    BY MR. VEEDER:

25    Q  In other words, the definition is inapplicable to

1   those four basins; is that right?

2        A  We define the ground water basin as set forth here

3   on page 62.  In computing storage, we included slightly larger

4   areas.

5        Q  Then you are stating that the storage areas which

6   you calculated do not correspond with the definition of ground

7   water basins; is that right?  They are larger?

8        MR. MOSKOVITZ:  I object, your Honor.  I think the ques-

9   tions are getting repetitious and argumentative.

10       THE COURT:  This is some of the most pertinent cross-

11   examination we have had.  I mean this question is right on the

12   nose.  The objection is overruled.

13       MR. VEEDER:  Read the question, Mr. Reporter.

14       THE COURT:  Some of it is a little far-fetched.  But

15   this is a good question.

16       Read the question.

17       (The reporter read the pending question.)

18       THE WITNESS:  They are somewhat larger to simplify the

19   calculations.  The areal boundaries are as defined in this

20   definition.  In some instances the walls were drawn down

21   vertically from those areal boundaries to simplify calculations,

22   and because we do not have sufficient data with accuracy to

23   delimit the base of these basins in those particular instances.

24   BY MR. VEEDER:

25       Q  Now, where in the report, in your testimony, either

1    in Appendix B, do you state that that method has been pursued?

2        A  Well, our description of the methods used in com-

3    puting storage capacity, or the limitations of the basins, et

4    cetera, are contained in Table B-3 and in descriptions of the

5    basins, of a few basins themselves, from B-54 to B-63, and

6    then the procedure for estimating ground water storage

7    capacity is discussed in general on page B-65 through B-67.

8        Q  Now, you no place, however, in your testimony,

9    Appendix B, state what you have just stated now as a method

10   of determining the confines of the basin from the standpoint

11   of storage capacity; is that not true?

12       MR. MOSKOVITZ:  Your Honor, this was brought out before,

13   and for that purpose we prepared California's Exhibit Q, which

14   states exactly what the witness has been stating.  There it is.

15   I think Mr. Veeder is going into matters which were already

16   covered.

17       THE COURT:  Overruled.

18       THE WITNESS: To the best of my recollection, there

19   isn't any statement in the text that says that we used vertical

20   walls to the basins where we did use them.

21   BY MR. VEEDER:

22       Q  As a matter of fact, if you read the first sentence

23   in the first full paragraph on B-45, you will find that your

24   definition of the boundaries of the basins is opposed to what

25   you have just testified to; is that right?

1    A  Well, these are the boundaries that are shown on the

2  plates of the Bulletin, and the boundaries that were used in

3  computing the storage capacity.

4    THE COURT:  The statement counsel is referring to is:

5  "Boundaries of basins are generally continuous ridges of

6  basement complex either exposed at the surface or underlying

7  several feet of residual cover. ."

8    MR. MOSKOVITZ:  Your Honor, this is also matter that

9  has been gone into.

10    THE COURT:  It has been covered.  We have already been

11  over this.

12    MR. VEEDER:  Not in regard to the method he just

13  described to your Honor as to what they did on storage

14  capacity.

15    THE COURT:  He has answered the question.  He told you

16  that he has not, in so many words, stated that in the bulletin.

17    Indirectly, I notice it is probably stated in connection

18  with Pechanga, on B-50.  Inferentially, you get it.  "The

19  basin occupies a down-dropped block between the Wildomar fault

20  on the northeast and the Willard fault zone on the southwest. ."

21    But go ahead.  What is your next question?

22  BY MR. VEEDER:

23    Q  Now, you have stated that there is hydrologic

24  continuity in the area marked on Plate 16G, G-prime between

25  the unconfined water and the zone of confined water.

1    MR. MOSKOVITZ:  Do you have a transcript reference,

2    Mr. Veeder?

3    MR. VEEDER:  I simply remember when he said it.

4    THE COURT:  Have you so stated?

5    THE WITNESS:  Yes, sir, and that it is a matter of

6    degree; that the hydraulic continuity is, we feel, very slight.

7    BY MR. VEEDER:

8    Q  Now, here is your definition, then, of "confined

9    ground water," on page 63 of Volume I of Exhibit L:

10    "Confined Ground Water -- A body of

11    ground water immediately overlain by

12    materials sufficiently impervious to sever

13    free hydrologic connection with overlying

14    water, . . "

15    Now, you have stated that there is hydrologic continuity

16    in Pauba Basin between the confined and the unconfined water;

17    therefore, your definition which I have just read would be

18    inapplicable; is that not correct?

19    A  No, I don't believe that statement of yours is

20    correct.  You will notice in the definition of "confined ground

21    water" it says "free hydrologic connection," and I don't

22    believe I have described "free hydrologic connection."

23    THE COURT:  Yes, but you used the word "sever."

24    "Sever" means "to cut off."  It doesn't mean to "impede."  What

25    do you think about the word "sever"?

THE WITNESS:  Well, your Honor my way of looking at this definition, the way it means to me is that it greatly impedes the flow between the two.  That is the way I visualize a confined ground water or an aquifer, as we call it, the low permeable material that lies between the two.

THE COURT:  If you were writing it again, instead of using the word "sever" you would probably use other words;

THE WITNESS:  After this session, yes, sir.

THE COURT:  What would you say?  "Seriously impede"?

THE WITNESS: Yes.

THE COURT:  Or "impair"?

THE WITNESS:  "Seriously impede," I think, would be a good selection.

MR. VEEDER:  But you would certainly say that "sever" is incorrect?

THE WITNESS:  Yes, in view of his Honor's definition, I would.

MR. MOSKOVITZ:  Your Honor, a word is a word is a word. There are different ways of looking at words.

THE COURT:  Well, what does "sever" mean to you?  This is a small matter, but what does "sever" mean to you?

MR. MOSKOVITZ:  "To sever free hydrologic continuity" doesn't mean that there would be no hydrologic continuity at all; there would no longer be "free hydrologic continuity."

MR. SACHSE:  That is the way I read it, your Honor.

1     MR. MOSKOVITZ:  Your Honor, this is an important point

2  because Mr. Veeder is making it important, not because it really

3  is.  Certainly, when a number of people read something and

4  some of them say, "This sounds a little funny to me"-- the

5  more people who read it, the more criticism you can get.  If a

6  lot of people read this draft, there would be changes,

7  obviously.  I don't think that that means that the words that

8  were used are inapplicable or incorrect, necessarily.  There

9  could be better words used.

10     MR. VEEDER:  The witness has agreed.

11     THE COURT:  I don't want to be in the position of

12  twisting your arm, Mr. Witness, and merely because I make a

13  suggestion have you accede to it.  But this is a study in

14  semantics.  The subject is "hydrologic connection."

15     MR. MOSKOVITZ:  Free hydrologic connection.

16     THE COURT:  No; "free" is an adjective.

17     MR. MOSKOVITZ:  Very well, but that modifies it.

18     THE COURT:  The subject is hydrologic connection, and

19  then it is modified by calling it "free hydrologic connection,"

20  and then you say you "sever" this, you cut it off-- clip it

21  off.  It is a matter of semantics.

22     THE WITNESS:  Your Honor, I would like to say that it

23  was not meant, in this definition, to imply that there would

24  be absolutely no movement of water between these two ground

25  water bodies.

BY MR. VEEDER:

Q   At page B-25 you state that the residuum is a hundred feet and that--

THE COURT:   Where are you reading?

MR. VEEDER:   Go up to where it says "residuum, Qr" and the sixth line below that.

THE COURT:   Yes.

MR. VEEDER:   Then at the final line the statement is made, "In the Fallbrook area, however, many wells tap the residuum and it constitutes an important source of domestic and irrigation water. ."

Now, how many of those wells did you investigate?

MR. SACHSE:   If the Court please, I am going to object. This is a misstatement of the text.   It is not in evidence. Mr. Veeder's first words to the witness were, "You state on B-25 that the residuum in the Fallbrook area is a hundred feet."   That is not the statement.   The statement is, "The depth to which such weathering has progressed varies con- siderably, extending from only a few inches . . to more than a hundred feet . ."   Don't believe--

THE COURT:   Well, let's read it all.   " . .a few inches below the surface in many areas to more than a hundred feet at points near Fallbrook. . "

MR. SACHSE:   At points.   That residdum at Fallbrook is a hundred feet deep is an incorrect statement.

1    THE COURT:  The question will be modified with the

2  correct quotation.

3    Now, the question relates to the last sentence, be-

4  ginning on page B-25.

5    MR. VEEDER:  Your Honor, in view of Mr. Sachse's shout-

6  ing, I will read a little more in this connection-- I am read-

7  ing now the second sentence: --

8    THE COURT:  In the middle of the page.

9  BY MR. VEEDER:

10   Q  ". . Only those areas in which depth of weathering

11  appeared to exceed 15 feet are shown on this plate.  Where

12  weathering appeared shallower the parent rock formation is

13  indicated.  The 15-foot depth criterion was selected for the

14  following reasons:  First, it was considered that where

15  weathering extended to a depth of less than 15 feet, the

16  ground water storage capacity of the weathered materials was

17  negligible; second, it was felt that a thickness of at least

18  15 feet would be required before an appreciable quantity of water

19  could be produced from wells; . ."

20    Now, you undertook that investigation yourself, Mr.

21  James, did you?

22   A  It was done under my direction.

23   Q  But you didn't go on the land yourself?

24   A  I have been on the land, yes, but I did not do all

25  of the study involved.

1    Q   Now, it is stated, "In the Fallbrook area, however,

2    many wells tap the residuum and it constitutes an important

3    source of domestic and irrigation water. . "

4    What was the kind and type of investigation that you

5    made in that regard?

6    A   Our geologists went into the field in that area,

7    they collected the logs of wells, they located these wells on

8    their field sheets and they discusses with various ranchers

9    the performance of their wells, the investigated the method

10   in which these wells were drilled or dug, and they obtained

11   data as to the yield of the wells.

12   Q   Now, do you have those data available for examinat-

13   tion?

14   A   Well, most of these date to which I refer are in

15   Bulletin 57.

16   Q   Do you have the notes?

17   A   The logs are not there, however.   They are available.

18   Q   Would you make those available to me?

19   A   They are.

20   Q   They are all in the record now?

21   A   They are available.   I don't recall that they are

22   all filed as exhibits.

23   MR. MOSKOVITZ:   All the logs, I believe, that were

24   used are in exhibits for identification at least here.

25   MR. SACHSE:   Your Honor, I think I can make this a

1  little easier for Mr. Veeder.

2      MR. VEEDER: When Mr. Sachse starts to make anything

3  easier for me I am very suspicious.

4      MR. MOSKOVITZ: No dug well needs to be logged, and

5  when there are dug wells throughout the Fallbrook area you

6  will not find a log anywhere, Mr. Veeder-- such as my well.

7      THE COURT: I wonder what we are going to spend some

8  time on this particular item for, because in view of Mr.

9  Veeder's repeated remarks about the Bulletin I wouldn't think

10  that he is going to rely upon this particular paragraph as a

11  basis of proof. Nor do I think that Mr. Sachse, notwithstand-

12  ing all his interest in the Bulletin, is going to give me a

13  big argument that I should make findings based on this par-

14  ticular paragraph. So why are we spending a lot of time on

15  it?

16      MR. VEEDER: Your Honor, I am confronted with this

17  problem, that the Bulletin-- I don't mean the Bulletin, the

18  Bulletin is not in evidence; I mean Mr. James's testimony--

19  Mr. James has made some statements, the correctness of which

20  are extremely important, and I think it is entirely proper on

21  cross-examination, particularly when this is nothing but his

22  own testimony, to find out how come?

23      THE COURT: All right, in view of the fact that I let

24  this go in as his oral testimony, you may cross-examine. But

25  let us be practical about it. I will be very much surprised

1    if you cite me any part of his testimony in support of your

2    proposed findings.  But proceed with your cross-examination.

3    MR. VEEDER:  I wouldn't cite his testimony in support

4    of the Lord's Prayer, frankly.

5    THE COURT:  Proceed with your cross-examination.

6    MR. VEEDER:  Will you find the logs that you have?

7    Are they here?

8    MR. MOSKOVITZ:  You can find them, if they are there.

9    THE WITNESS:  All our logs are there, Mr. Veeder.

10    BY MR. VEEDER:

11    Q  Now, those would be drilled wells; is that correct?

12    A  Some are dug.  Just what the relative ratio of dug

13    wells to drilled wells is, I couldn't tell you.  There are a

14    number of dug wells in that area.

15    Q  Did you make logs on those?  Did you obtain logs on

16    the dug wells?

17    A  We obtained logs where they were available, where

18    we could get them.  If they were available, we got them.

19    Q  And how much of an investigation did you make in

20    regard to the irrigation of land from these wells?

21    A  Well, now, I made no investigation myself.  That

22    was done by other members of our staff, other than geologists.

23    Q  In other words, you do not know how the water is

24    used in that area; is that right?

25    A  Well, of course, we observed on our own where it was

1    being used for irrigation or domestic.  But we made no irriga-

2    tion studies such as you mention.

3           Q   Now, do you have your Table 3 before you there, Mr.

4    James?

5           THE COURT:  Table 3 from the Bulletin?

6           MR. VEEDER:  That is right.

7           THE COURT:  On what page does it appear-- B-3?

8           MR. VEEDER:  That is right.  That appears on B--

9           THE COURT:  All right, you are talking about B-3.

10          MR. VEEDER:  That is B-46.

11          THE COURT:  Yes.

12   BY MR. VEEDER:

13          Q   Now, starting in on Nigger Basin, on page B-49, it

14   is observed that you state that the wells in that area are

15   supplied by ground water in the Recent alluvium.  But on page

16   71 of Volume I of Exhibit L, the reference is made to the

17   water-bearing formations as Recent alluvium underlaid by un-

18   differentiated upper Pleistocene sediments.  Now, which of

19   those statements is correct?

20          A   It says the same thing in both tables, where I am

21   looking, Mr. Veeder.  Wait a minute.  I am referring now to

22   Table B-3.  It says, "Recent alluvium underlain by undiffer-

23   entiated upper Pleistocene sediments."  Now referring to the

24   other table on page 71--

25          THE COURT:  Yes, but you said the basin fill is composed

1    of, and then you said the wells are supplied by ground water

2    in the Recent alluvium.  That is what Mr. Veeder is referring

3    to, that you limited the wells to the Recent alluvium.

4         THE WITNESS:  Well, I think they are largely supplied

5    from that source, your Honor.

6         THE COURT:  Go ahead.

7    BY MR. VEEDER:

8         Q  It is incorrect, then, to say, on page 71, that the

9    water-bearing formations to which you are alluding are part--

10   the undifferentiated Pleistocene sediments; is that right?

11        MR. MOSKOVITZ:  May I have the question again, please?

12        MR. VEEDER:  I will rephrase it.

13        Q  Inother words, your statement on page 71 that the

14   water-bearing formations, with which you are concerned in

15   connection with this basin, are both Recent alluvium and the

16   undifferentiated upper Pleistocene; is that right?

17        A  You say that statement is incorrect?  Is that it?

18        Q  Is that not incorrect?

19        A  There may be some water supply from the undiffer-

20   entiated upper Pleistocene deposits from deep wells.  I can't

21   say for sure.

22        Q  You don't know, then, whether your statement is

23   correct that wells are supplied by ground water in Recent

24   alluvium; is that right?

25        A  They are very definitely supplied by ground water

1   from the Recent alluvium.  There may be some additional supply

2   from underlying deposits.

3       Q  So as a matter of fact your statement in regard to

4   ground water basin characteristics in regard to Nigger Canyon

5   may or may not be correct; is that right?

6       A  No, I didn't say that.  It says, "Wells are supplied

7   by ground water in the Recent alluvium," and I believe they

8   are.  However,--

9       Q  Would that not exclude the supplying of water from

10  undifferentiated upper Pleistocene sediments?

11      A  No.

12      MR. MOSKOVITZ:  I object to that as being argumentative,

13  your Honor.

14      THE COURT:  He has answered the question.  He said no.

15  The objection is overruled.

16      Go on to some other matter, Mr. Veeder.

17  BY MR. VEEDER:

18      Q  Now, on page B-48 you have the similar situation

19  where you say that in the Lower Lancaster Valley the wells are

20  supplied by Recent alluvium, but on your Table 15 you indicate

21  that the water-bearing formations are the Recent alluvium and

22  the undifferentiated upper Pleistocene sediments; is that right?

23      THE COURT:  That is what he states.

24      If the same other questions asked you by Mr. Veeder as

25  to Nigger Canyon were asked as to Upper Lancaster, would your

1    answers be the same?

2            THE WITNESS:  Yes, it would, your Honor.

3    BY MR. VEEDER:

4            Q  In other words, there are variations in that; is

5    that right?

6            MR. MOSKOVITZ:  That is not what he said.

7            THE COURT:  Go on to some other matter, Mr. Veeder.

8    BY MR. VEEDER:

9            Q  Why then would you make such a differentiation?

10   Why would you differentiate, in regard to Santa Gertrudis

11   Valley, when you have the same situation where you say both--

12           A  To what are you referring now, Mr. Veeder?

13           Q  You say, "The basin fill is Recent alluvium underlain

14   by Older alluvium."

15           A  You are referring to what?

16           MR. MOSKOVITZ:  What page?

17           THE COURT:  B-47.

18           MR. VEEDER:  On Page B-47.

19           THE WITNESS:  What was your question again?

20   BY MR. VEEDER:

21           Q  Well, tell me, why is it that you did not distinguish

22   and show that fact up in regard to the Lower Lancaster, Upper

23   Lancaster and Aguanga Valley, when you did in certain other

24   of the valleys?

25           A  Well, I don't know, except at the time it didn't

1  seem important.

2       Q  You mean Bulletin 57 didn't seem important?

3       A  No; the differentiation that you point out here

4  didn't, and doesn't, seem important.

5       Q  Now, in connection with the Lower Lancaster Valley

6  I see the maximum depth storage unit in feet you have 362.

7  Are you aware there is a well 588 feet deep, I believe,

8  drilled by the Oviatts?

9       MR. SACHSE:  At what time?  Prior to this report, Mr.

10  Veeder?

11       MR. VEEDER:  No; it is subsequent to this report.

12       MR. SACHSE:  Then you are asking him if he knows it is

13  there now?

14       MR. VEEDER:  Yes.

15       THE WITNESS:  Personally, I am not aware of it, no.

16  BY MR. VEEDER:

17       Q  You are not?  In each instance, then-- I want to be

18  sure I understand this Table B-3 -- in each instance where

19  you have used Footnote a, for example, in connection with your

20  State's Q, you desire to have Footnote a made inapplicable

21  where water is actually drawn from the older alluvium; is that

22  right?

23

24

25

James    Cross                                          6871

1          A  Well, I would say Footnote a might state that

2     usable storage capacity was calculated between historic high

3     water table and a surface 25 feet above the base of the

4     deepest subarea that was used in calculating the storage

5     capacity.  This is along the line we were talking yesterday

6     afternoon.

7          Q  And you desire now to amend Footnote a to be in

8     accordance with your statement just made, is that right?

9          MR. MOSKOVITZ:  May I make an explanation, your Honor?

10         THE COURT:  Just a minute.

11         MR. MOSKOVITZ:  It will help save some time, I think.

12         THE COURT:  All right.

13         MR. MOSKOVITZ:  That footnote a is not correct.

14         MR. VEEDER:  I am told now.

15         MR. MOSKOVITZ:  It is misleading.  We mentioned this

16    before.

17         THE COURT:  He has asked the witness the question if

18    he wants to amend it.

19         MR. MOSKOVITZ:  That is what I am coming to now, your

20    Honor.  We propose to have the witness submit a short explan-

21    ation in writing as to the method by which the usable storage

22    capacity was computed in the case of each of these basins.

23    The footnote is misleading.  And we will propose how we should

24    dispose of those footnotes and how the method of calculating

25    gross and usable will be understood.  And if that--

THE COURT:  You will do that when we adjourn after the holidays?

MR. MOSKOVITZ:  I hope that we can get it-- we might be able to get it by tomorrow, your Honor.  I don't know.  We are still working on the explanation.

THE COURT:  All right.  Do you want to go ahead and answer the question.

THE WITNESS:  I would like to have it restated.

THE COURT:  Go ahead, Mr. Veeder.

MR. VEEDER:  When will this be made available to us?

MR. MOSKOVITZ:  Just as soon as it is completed.

THE COURT:  He said possibly tomorrow; maybe after the holidays.  Proceed.

BY MR. VEEDER:

Q  And would you say that Footnote b:  "Storate capacity calculated in free ground water zone only"; is that correct in regard to Santa Gertrudis Valley?

A  It is computed in what we consider to be the free ground water zone in our estimates as we went into that yesterday, just how we considered Santa Gertrudis Valley. We divided it into two subareas, one of which was 50 feet deep and one of which was of greater depth.  This, too, will be covered in the memorandum to which Mr. Moskovitz has referred.

Q  You are going to change both Footnote a and b,

1    then; is that right?

2          A  We are going to, as Mr. Moskovitz explained, write

3    further explanation as to how gross storage capacity and usable

4    storage capacity were computed with reference to each of the

5    specific basins that were involved.

6          Q  Further, in connection with your Exhibit B, as I

7    understand--

8          THE COURT:  Appendix B?

9    BY MR. VEEDER:

10          Q  --Appendix B, and also Table B-3 you desire to

11    change, do you not, the data set forth under the column

12    "Relative permeability"; is that right?

13          A  No, I don't recollect any statement being made to

14    that effect.

15          Q  In other words, you are willing to state that the

16    storage unit of which Murrieta, for example, is comprised, as

17    shown on Q, is moderately permeable?

18          A  The Recent alluvium in that area is moderately

19    permeable, yes.

20          Q  And how about the older alluvium?

21          A  That, I cannot-- I do not know.

22          Q  In other words--

23          THE COURT:  Wait.  Wait.  You are breaking it down.

24    The table says:  "Ground water basin characteristics."  Your

25    word "moderate", therefore, applies to the sum total of the

1    material in the basin that is water bearing in part of the

2    storage unit.  Now, you have answered that the younger is

3    moderate.  Then, do I understand that as compared to the

4    sum total "moderate" is not correct?

5         THE WITNESS:  Well, it is the younger alluvium that we

6    know more about, your Honor.  It is shallow.  It is on the

7    surface where we can see it.  And the majority of the wells

8    are supplied from it.  The underlying materials, as has been

9    the testimony before, we don't know too much about.  We do

10   know the wells go into it.  Just what its permeability is,

11   I cannot testify.

12        THE COURT:  Well, you have the permeability of-- at

13   least, you have figures as to yield as to the deeper areas

14   in that basin in your Exhibit Q.

15        THE WITNESS:  We have a measure of the specific yield,

16   your Honor, which is a measure of the amount of water that it

17   contains and will yield to a well; but it is not the measure

18   of permeability.

19        MR. VEEDER:  Well, your Honor, they have the depth to

20   450 feet in Unit 1, 300 feet in Unit 2, 150 feet in Unit 3,

21   the same in 4, 300 feet in Unit 5, 306--

22        THE COURT:  I understand that.  But you have a figure

23   on Table 2, I believe, in Exhibit California's Q where you

24   split these depths up into areas and you give us a percentage

25   figure as to specific yield?

1      THE WITNESS:  Yes, sir.

2      THE COURT:  Doesn't that have a relationship to permeabil-

3  ity?

4      THE WITNESS:  No, sir.

5      THE COURT:  None at all?

6      THE WITNESS:  Not in my opinion, your Honor.

7      THE COURT:  None whatsoever?

8      THE WITNESS:  No.  They measure two different quantities.

9  It is like comparing apples and bananas, as I think was the

10  statement that was used yesterday.

11      THE COURT:  What is your formula for specific yield?

12      THE WITNESS: Specific yield is defined as the quantity

13  of water that a given volume of sediment will yield.  It is

14  expressed as a percentage:  The volume of water that will be

15  yielded divided by the volume of the sediment.  It is a

16  volume, volumetric measurement; and a specific yield itself

17  is a percentage.  Permeability, on the other hand, your

18  Honor, measures the rate at which water will pass through a

19  sedimentary material.

20      MR. VEEDER:  I think that we are entitled to an answer,

21  your Honor.  He has a column "Relative Permeability Moderate

22  at a Depth of 520 feet."  It is either correct or it is in-

23  correct.

24      THE COURT:  He has answered:  That word concerns the

25  younger alluvial; he doesn't know enough about the older.  Go

1    ahead.

2    BY MR. VEEDER:

3        Q  Would you submit to us a statement to be added to

4    Table B stating that the word "moderate" applies only to the

5    younger alluvium?

6        MR. MOSKOVITZ:  May I have that question again, the

7    first part?

8        MR. VEEDER:  I just asked him if he would correct the

9    bulletin so it would be right.

10        MR. MOSKOVITZ:  He has given testimony.  I don't think

11    there is any need for us to rewrite the bulletin.

12        THE COURT:  Nothing need be submitted on that proceed-

13    ing.  The record will show.  It speaks for itself.

14    BY MR. VEEDER:

15        Q  You say the similar circumstance relates to Los

16    Alamos Valley where you say you have a moderate permeability?

17    Does that relate to the older alluvium?  I am looking at B-46.

18        A  Los Alamos?

19        Q  That is right.

20        A  In Los Alamos Valley I have a moderate permeability

21    which, to the best of my recollection, refers to Recent

22    alluvium.

23        THE COURT:  Well, your statement says:  "The basin

24    fill comprises Recent and slightly dissected older alluvium."

25        MR. VEEDER:  "Wells obtain supplies from both. . "

James   Cross                                                        6877

THE WITNESS:  Well, the average of the two, I guess, is what is meant there is moderate.

BY MR. VEEDER:

Q  Would you give us your statistics upon which you arrived at that conclusion?

A  Well, we have--

Q  I mean your notes.

A  All right.  Refer to Well 7S, 2-- I can't tell whether that is 2 East or 2 West; but the section is 2R1.  There is 243 gallons a minute with 17-foot drawdown from a well that is 60 feet deep.

Q  And you determine it is moderate to permeable in that area, is that right?

A  That helps arrive at that opinion.  Also inspection of the materials on the surface adds weight, or added weight to this decision.

Q  In French Valley, you are willing to state that the Older alluvium is moderately permeable, is that right?  I am referring now to B-46.

A  I am not willing to state that the older alluvium is moderately permeable, no.

Q  You state:  "Wells supplied by both Recent and older alluvium, with Recent alluvium yielding larges supplies."  Now, does that moderate apply to the older and younger alluvium both?

1      A  Well, it applies to a general opinion of the basin,

2   that the permeability is moderate and most of the water

3   supplied from the Recent material.

4      Q  How did you make the determination that most of the

5   water was supplied from the Recent material?  How deep is the

6   Recent alluvium there?

7      A  I can't tell you that offhand.

8      Q  Do youhave statistics in your --

9      A  I imagine this was made from an inspection of the

10  well logs in that area and a--

11     Q  You don't know?

12     A  At this moment, I can't recall that particular item.

13     Q  Would youmake the notes available to us?

14     A  Our well logs are in the exhibits, Mr. Veeder.

15     Q  And you have nothing else upon which to make your

16  determination that the permeability is moderate?

17     A  I mentioned visual inspection enters into this sort

18  of thing.

19     Q  Did you visually inspect the older alluvium?

20     A  Geologists under my direction did.  I have seen it.

21     Q And they think that the older alluvium is moderately

22  permeable?

23     A  I didn't say that.

24     THE COURT:  How much longer are you going to be, Mr.

25  Veeder?

1        MR. VEEDER:  I don't know, your Honor.  I think this:

2    That this Table B is shot so full with errors and contradic-

3    tions and holes that the matter should be followed through,

4    in particular, your Honor, in regard to these statements that

5    the permeability of these alluvia is moderate; because these

6    wells to which I am now referring are in the areas of a very

7    thin mantle of Recent alluvium, and they are situated, by and

8    large, in the area which we have designated on 15-A as the

9    older alluvium.

10       THE COURT:  Well, not French Valley and Los Alamos.

11   They are in the area that you called the older weathered

12   complex, and they are in the gray area on your 15-A.

13       MR. VEEDER:  Those two are, yes, your Honor.  And it

14   is very important to us that this witness is saying, that even

15   the residuum--

16       MR. MOSKOVITZ:  He is not saying it.

17       MR. VEEDER:  --that even the residuum-- that is what

18   it appears to us to be-- is moderately permeable.

19       MR. SACHSE:  I am a little at a loss--

20       THE COURT:  I am, too.

21       MR. SACHSE:  Does Mr. Veeder want to introduce this--

22       THE COURT:  Maybe we can get it straightened out after

23   lunch.  2 o'clock.

24       (Noon recess.)

25

SAN DIEGO, CALIFORNIA, THURSDAY, DECEMBER 18, 1958.  2:00 P.M.

MR. MOSKOVITZ:  Your Honor, I have asked the Clerk to mark for identification California's Exhibit Y.  I have given copies to counsel.

It is a table showing the pumping tests of wells in the Santa Margarita coastal basin, which supports the data shown in Table 16, Volume I, on page 81, and a similar table that appears on page B-64 in Appendix B of Volume II of State's Exhibit L.

MR. VEEDER:  Page 81 hasn't been offered.  Isn't that right?

MR. MOSKOVITZ:  Well--

THE COURT:  To refresh your recollection, these two tables were similar.  One appeared in Exhibit L, Volume I, page 81, and the other appeared in Appendix B at page 64, and the tables did not list the numbers of the wells that were shown.  Mr. Moskovitz was requested to supplement them. Neither table, as I recall, was in evidence.  In Appendix B, I think, we excepted that table, and as I recall, I don't think any of Volume-- you will have to refresh my recollection, Mr. Moskovitz.

MR. MOSKOVITZ:  I don't think any of the text of Volume I has yet been admitted, your Honor.

THE COURT:  But that is what the tables are, Mr.

1    Veeder.

2           MR. VEEDER:  May I have just a moment to look at this.

3           MR. MOSKOVITZ:  I expect that you will want some time

4    to look it over.  I am just passing them out now.

5           MR. VEEDER:  Have these been offered?

6           MR. MOSKOVITZ:  No.  I will offer them on redirect.

7           MR. VEEDER:  You are going to offer them on redirect?

8           MR. MOSKOVITZ:  I want to ask the witness how these

9    were secured.  If you want to let me ask some questions, I

10   will do that.

11          MR. VEEDER:  Why don't you ask some questions now, if

12   you are going to--

13          MR. MOSKOVITZ:  All right.

14   I would like to put that in evidence, together with

15   some other exhibits we have prepared and circulated.  I can do

16   that at this point.

17          THE COURT:  All right.

18

19                        LAURENCE JAMES,

20   recalled as a witness in behalf of the defendant State of

21   California, having been previously sworn, testified further

22   as follows:

23                   DIRECT EXAMINATION (Resumed)

24   BY MR. MOSKOVITZ:

25          Q  Mr. James, referring first to California's Exhibit Y,

1  which has just been passed out, who prepared this table?

2      A  This table was prepared by geologists under my

3  direction.

4      Q  And where was the information which appears on

5  California's Exhibit Y secured?

6      A  It was secured off the well logs that we collected

7  in the course of our geological studies.

8      Q  And are those the well logs which are marked

9  California's Exhibit L, Appendix F, Logs 1, 2, 3, and 4?

10     A  Yes, they are.

11     Q  Specifically, log 1; is that correct?

12     A  That is true.

13     Q  Now, on the California's Exhibit Y there is a

14  column headed "Test date."  Where was that information secured

15  from?

16     A  Well, that was the date that was put on the log,

17  and to the best of my knowledge that was the time during

18  which the test was run.  I didn't specify exactly that that

19  was the test date, but it was the date that appeared on that

20  document.

21     Q  Now, there are a number of figures in the columns

22  headed "Discharge GPM" and "Drawdown feet," at which a star

23  appears and the footnote says, "As reported on log."  What

24  does that indicate?

25     A  Where those stars are shown, those particular words

1  were taken word for word off the log.  The reason for doing

2  this was that -- for example, I am looking at Well 10S, 4W,

3  18E1, they give a start 900 gallons per minute and a finish

4  of 1800 gallons per minute, a drawdown of 58 feet.  That is

5  just the way it appeared on the log and we copied it that way.

6         Q  Calling yourattention to the figures for Well 19S,

7  4W, 7J2, the second well listed, comparing the specific

8  capacity reported there with the specific capacity reported

9  on page B-64 of Appendix B, what is the explanation of the

10 figure 3.1 as compared with 3.8?

11        A  Well, I think that was probably--

12        MR. VEEDER:  Which column is that in now?

13        MR. MOSKOVITZ:  This is in the last column, specific

14 capacity GPM.

15        THE COURT:  Of Californi's Exhibit Y.

16        THE WITNESS:  The figure 3.8 that is shown on page

17 B-64 was probably intended to be 3.08 and was put down as 3.8

18 instead of 3.1.  As shown on Exhibit Y, 3.1 is the number

19 that appears on the log for that well.

20        THE COURT:  The formula for specific capacity, gallons

21 per minute per foot of drawdown, is the dividing of the feet

22 of drawdown into the discharge of gallons per minute; is that

23 right?

24        THE WITNESS:  That is true.

25        THE COURT:  That is a recognized formula?

1       THE WITNESS:  Yes, it is.

2       THE COURT:  Then you speak of the well as having a

3  specific capacity?

4       THE WITNESS:  That is true.

5       THE COURT:  In other words, that first well listed,

6  you would say, in water language, that that well has a

7  specific capacity of 7?

8       THE WITNESS:  That is true.

9       THE COURT:  In other words, the bigger the figure the

10  better well it is?

11       THE WITNESS:  That is true, except that the depth of

12  the well is involved.

13       THE COURT:  It is not involved in the formula, is it?

14       THE WITNESS:  No, but it is involved in determining

15  the permeability of the materials or the transmissibility.

16  Obviously, if you have a well 1000 feet deep and it delivers

17  100 gallons per minute and pulls the water level down, say,

18  five feet, the material is less permeable than would be the

19  case if you had a well only 15 or 20 feet that showed the

20  same characteristics.

21       THE COURT:  What you are trying to say, or what you are

22  saying is that although specific capacity is some indication

23  of how good a well is, the figure on specific capacity has to

24  also be looked at in connection with the depth of the well?

25       THE WITNESS:  That is true.

1    THE COURT:  How much material is traversed, and there-

2  fore the yield of the material in the well?

3    THE WITNESS:  That is true.  Sometimes they will

4  divide the figure by the depth of the well and come up with

5  what is called a "formation factor."

6    MR. MOSKOVITZ:  I would like to offer California's

7  Exhibit Y in evidence.

8    THE COURT:  Exhibit Y received in evidence.

9    MR. VEEDER:  Now, your Honor, that was a little rapid,

10  if I may say so.

11    THE COURT:  If you have an objection--

12    MR. VEEDER:  I wanted some voir dire on this, if I

13  may, because our people have never seen these figures before.

14  I am just talking now to the geologists about these.

15    THE COURT:  They have the same figures that appear on

16  page 64.

17    MR. VEEDER:  That is precisely the point, your Honor.

18    THE COURT:  With a little more specificity.

19    MR. VEEDER:  For the first time we have been able to

20  identify them, and it is obvious that some of these-- I think

21  the first two wells are no longer in existence, and--

22    THE COURT:  Would that be any reason why they couldn't

23  be shown on a chart, for whatever value they shed upon the

24  characteristics of the basin?

25    MR. VEEDER:  But when you start showing the characteristics

1   of a basin, as the State is attempting here, the matter of

2   hearsay becomes extremely important, and it is obvious that

3   the State didn't make the tests in 1942.

4          THE COURT:  This has been identified as being based

5   upon the well logs.  The well logs are here to look at.  Do

6   you want us to throw out all these well logs which both sides

7   have been using, which we all know are, to greater or less

8   degree, of some value to us?  Do you want us to throw them

9   all out?  There is only one well log here that I know of that

10  has been made under any supervision of any kind, and that is

11  the Pauba well.

12         MR. VEEDER:  Your Honor, in regard to a matter such as

13  this--

14         THE COURT:  You have relied on well logs,  Your water

15  contours in Basin 4 are based on the same kind of well logs.

16  Well logs are before us in other exhibits.

17         MR. VEEDER:  Your Honor, I have avoided assiduously

18  up to this point interrogating this witness in regard to Mr.

19  James's testimony as set forth in Appendix B in regard to the

20  lands within the Naval enclave.  I don't believe there is any

21  issue there, to begin with.  But the State certainly-- I

22  think the State is here-- I don't know why the State is here,

23  but certainly it shouldn't be here, in my view.

24         THE COURT:  Are you making an objection?  I have made

25  a ruling, but if you want to make an objection to the introduction

1      of this document, object to it.

2      MR. VEEDER:  I am going to object on the grounds (1)

3      that we don't have the slightest idea where much of this data

4      came from, and (2) certainly in regard to pumping tests and

5      specific capacity per foot of drawdown in regard to wells back

6      in-- what are they-- 1927, 1926, wells on a Naval enclave

7      which is now in operation, it is very, very important to us

8      that the hearsay rule be applied.  I don't believe these are

9      reflective of anything in regard to the productivity of our

10     basins, or that it is properly offered.

11     THE COURT:  Do I understand, Mr. Witness, that the

12     material on this exhibit California's Y, with the exception

13     of the computations on the right-hand side, came from well

14     logs of the wells indicated?

15     THE WITNESS:  That is true, your Honor.

16     THE COURT:  The well logs are here before the Court in

17     certain of the exhibits?

18     THE WITNESS: That is correct.

19     THE COURT:  The objection is overruled on the ground

20     you first made, on the ground that you don't know where it

21     came from, and your objection is overruled with reference to

22     the dates of the wells in that that goes entirely to the weight.

23     Obviously, what happened in 1927 is not as close to the

24     problem as the situation is currently.  But for what weight it

25     has in learning about this coastal basin-- it has weight.  The

1    objection is overruled.

2    BY MR. MOSKOVITZ:

3        Q   Mr. James, I hand you California's Exhibit P for

4    Identification and ask you to identify it, please.

5        A   This California's P is a comparison of data utilized

6    by the State of California, State's Exhibit L, Appendix B,

7    Table B-3, and the United States's--

8        THE COURT:  Let' stop now just a minute.  Does the

9    record show that all of Appendix B-3 is in evidence?

10       MR. MOSKOVITZ:  No, your Honor, I think you clarified

11   the ruling you made when you first admittedAppendix B and said

12   that table B-3 was not in evidence until all substantiating

13   material came in, and we are putting that material in.

14       THE COURT:  All right.

15       MR. VEEDER:  Well, now, just a moment.  I have a great

16   deal more.  I realize that this Footnote a is another part of

17   Table 3.

18       THE COURT:  Let's take that up when we get to it.  We

19   are talking now about California's Exhibit P.

20       Proceed, Mr. Moskovitz.

21       THE WITNESS:  Well, in this table are set forth the

22   basins which the State computed storage capacities for.

23   BY MR. MOSKOVITZ:

24       Q   And also the storage units for which the United

25   States computed storage capacity?

1      A   That is true.   There is a comparison of the area

2   in acres, as measured by the State and by the United States,

3   a column entitled "Depth considered for gross storage in

4   feet," which is cross-referenced by Footnotes to symbols on

5   the last two pages, there is another column in which specific

6   yield values are so compared, there is a column entitled

7   "California's method of estimating gross storage capacity,"

8   another column in which the gross and usable storage capacities

9   as determined by California are set forth, and a column in

10   which the capacities as determined by the U.S. are set forth.

11   The finalcolumn lists the number of subareas into which the

12   State divided each of these respective basins.

13      Q   Will you go through the figures given for Diamond

14   Valley and explain the reference to the explanatory notes that

15   are contained in that particular basin's analysis?

16      A   In Diamond Valley the area as utilized by the

17   State was 2600 acres; that by the U.S. was 900 acres.

18      The depth considered for gross storage in feet by

19   California was referred to Footnote m.   I read Footnote m:

20   "Storage capacity was computed for 50-foot depth zones within

21   each subarea of the basin, 40-foot depth zones in Santa

22   Margarita coastal basin, the total depth of each subarea

23   determined from isopach map."   The U.S. depth is shown as 30

24   feet.

25      Specific yields reference is made to Footnote g under

1     the State. Here it says, "Because of lack of reliable well

2     logs in Diamond Basin, specific yield values estimate for

3     Domenigoni Valley were applied in the storage capacity estimates

4     for Diamond Basin, these values being considered the best

5     approximations obtainable."

6           Then under California's method of estimating gross

7     storage capacity there is reference to Footnote c, which

8     states, "Gross storage capacity computed as follows: 1. Basin

9     divided into one or more subareas and each subarea into depth

10     zones. 2. Storage capacity for each depth zone within each

11     subarea computed by multiplying the area of the zone times

12     the depth of the zone, times the specific yield of the zone,

13     3. Gross storage capacity of each subarea in the basin com-

14     puted by adding the capacities of all zones in that subarea,

15     4. Gross storage capacity of the basin computed by adding

16     gross storage capacities of all subareas in the basin."

17

18

19

20

21

22

23

24

25

1      Under "Storage capacity-acre feet", California's gross

2 capacity, 37,400 acre feet.  Usable storage capacity,

3 California's, 26,800.  Under United States, Footnote a, which

4 states:  "No estimate."  And the final column, "Number of

5 California subareas," 2.

6      THE COURT:  This was done in like manner with the other

7 basins or storage units?

8      THE WITNESS:  That is correct, your Honor.

9      THE COURT:  And if you were to testify by question and

10 answer, you would testify as set forth in detail in the

11 California's P?

12      THE WITNESS:  Yes, sir.

13      MR. MOSKOVITZ:  I will offer California's Exhibit P

14 in evidence, your Honor.

15      MR. VEEDER:  Is this proposed to be an amendment to

16 each of the items set forth on Table B-3?  Is that what this

17 is?

18      MR. MOSKOVITZ:  This was done at the Court's request

19 to get a comparison.

20      THE COURT:  Correct.  I suggested that I wanted to see

21 what the variance or discrepancy was between the basins, and

22 this was done at my request.  In any sense that it modifies

23 Table B-3, we will consider it is so modified.

24      MR. MOSKOVITZ:  Yes.

25      THE COURT:  The only really good comparison that came

F Z26          James    Direct                                    6892

1    out of it, as far as result was concerned, was in the Pauba

2    Basin where the figures aren't too far apart-- 1400 acre feet--

3    and in the coastal basins where there is a discrepancy in the

4    estimates by the two opponent sides.

5         MR. MOSKOVITZ:  And as it was mentioned this morning,

6    we are still working on an explanation of the manner by

7    which the usable storage capacity in each basin was computed

8    so we will have a complete picture of the steps we have gone

9    through for the basins.  That is not yet ready.  P was received,

10   was it not, your Honor?

11        THE COURT:  I am waiting for Mr. Veeder here.  Do you

12   have any objection?

13        MR. VEEDER:  I would like to ask the witness in regard

14   to calculations that have been made.

15        Q  For example, you have French Valley.  You refer to

16   M.  And how did you divide up French Valley into 50-foot

17   zones?  What figures did you use?

18        A  Well, I will have to check to see exactly what we

19   did with French Valley.  But we divided it up into three sub-

20   areas.  And in those basins where the depth exceeded 50 feet

21   we used  a zero to 50-foot depth zone and any number of depth

22   zones in multiples of 50 feet to which depths to basin might

23   extend.

24        Q  Do you have your notes with you here?

25        A  Yes, I do.

1      Q  And when were these notes made?

2      A  These were made in the course of the investigation

3  several years ago.  I can't tell you offhand just when.

4      THE COURT:  Is this file the notes on all these basins?

5      THE WITNESS:  Sir, we have, yes, three envelopes here

6  full of notes on every basin in which we worked.

7      MR. MOSKOVITZ:  Some of them, your Honor, have already

8  been marked.

9      THE COURT:  Some were already marked.

10      And were isopachs made on each one?

11      THE WITNESS:  Not on all of them.  On many of them,

12  your Honor.

13      THE COURT:  And those isopachs that exist are in these

14  notes?

15      THE WITNESS:  Yes, they are.

16      THE COURT:  Then, why shouldn't all the notes be marked

17  as an exhibit?

18      MR. VEEDER:  I think they should be, your Honor, and

19  I would like--

20      THE COURT:  Because this chart again by the Footnote m

21  which concerns a number of these basins says:  "Total depth

22  determined from isopach maps."  Without the isopach map no

23  one would be able to tell how you arrive at this figure.

24      MR. MOSKOVITZ:  In this exhibit that we are still working

25  on, your Honor, we contemplated indicating that in each event.

1    We can mark these notes for identification also.

2           THE COURT:  We will call this file of notes, what is

3    left of them, including those that have already been taken

4    out, as California's P-1, notes on the basins.  Mark it for

5    identification.

6           MR. MOSKOVITZ:  May we go through them and take out

7    those that apply to the basin for which storage capacity was

8    calculated indicated in this bulletin.  There are some

9    miscellaneous notes, too.

10          THE COURT:  There is no use keeping the notes on areas

11   which you may have investigated but decided were not basins.

12          MR. MOSKOVITZ:  Then we also have the privilege of

13   withdrawing them so we can make this further exhibit?

14          THE COURT:  You may withdraw it at any time.

15          THE CLERK:  Three volumes, your Honor.

16          THE COURT:  Three volumes.

17          THE CLERK:  A, B, C?

18          THE COURT:  Just A, B, C.

19          THE WITNESS:  There is another group on the coastal

20   area studies.  They are probably back on the table or in the

21   other room.

22          MR. VEEDER:  There will be no offer made then until we

23   have had a chance to check these, is that right?

24          THE COURT:  It doesn't follow.  You can check them,

25   You can cross-examine.

1      MR. VEEDER:  Your Honor, we are finding that this

2   overlay, for example, on Murrieta was clearly in error, and

3   we are having it planimetered now.  I don't know.  Well, your

4   Honor has ruled, I guess.

5      THE COURT:  All right.  Now, I haven't ruled yet.  I

6   am waiting for you if you have any objection.

7      MR. VEEDER:  I certainly object.  There is no foundation

8   whatever for this and absolutely no way of ascertaining from

9   the means or the methods utilized in computing the storage

10   capacities; and certainly there is no way of knowing the figures

11   or factors that were utilized by California in the preparation

12   of these things.

13      THE COURT: Coupled with P-1 there is, Mr. Veeder.  Do

14   you offer P-1 also?

15      MR. MOSKOVITZ:  These are all these notes.

16      THE COURT:  Yes.  You have the volume of the coastal

17   notes, too?

18      MR. FOX:  I am looking for them.

19      THE COURT:  How many?

20      MR. FOX:  I will get them at the recess.

21      THE COURT:  One envelope or more?

22      MR. FOX:  They are in a book of storage computations.

23      MR. MOSKOVITZ:  I will have to check, your Honor, to

24   make sure.  But there is a book or an envelope, that probably

25   is being used by Mr. Illingworth.  I will bring those in.

James   Direct   6896

THE COURT:  Subject to having them also made a part of P-1 with additional volume numbers, the objection will be overruled and P and P-1 received in evidence; P-1 consisting of three volumes, A, B, and C.

THE WITNESS:  Your Honor, there is the extra notebook.

THE COURT:  We will mark it when you bring it down here.

THE CLERK:  Your Honor, that should be P-1-D, then?

THE COURT:  The notebook?

THE CLERK:  Yes, sir.

THE COURT:  If there is one volume, it will be D.  If there is more than one it will be D, E, E, F, whatever it is.

MR. MOSKOVITZ:  Your Honor, California's Exhibit Q is already received in evidence without any oral explanation by the witness.  I think it is probably self-explanatory unless there are some questions to be asked on it.  That is the method of computing gross and usable storage capacity for Murrieta ground water basin.

THE COURT:  I don't show it has been received.  I show it marked.  Do you have it down received, Q?

THE CLERK:  Yes, your Honor.  It was on December the 16th.

THE COURT:  All right.

BY MR. MOSKOVITZ:

Q  Mr. James, I hand you California's Exhibit R for

1   Identification and ask you to describe it and explain what it

2   contains?

3          A   This is a method of computing gross and usable

4   storage capacity of Oakgrove Ground Water Basin.  You want

5   me to go through it?

6          THE COURT:  Mr. Witness, if you were interrogated by

7   question and answer, this would be your testimony?

8          THE WITNESS:  Yes, sir.

9          THE COURT: You have laid out the steps on gross storage

10  and youhave laid out the steps on usable storage and made

11  your computations.  You have a Table 1 and a Table 2 similar

12  to the Table 1 and 2 in Q; right?

13         THE WITNESS:  That is true.

14  BY MR. MOSKOVITZ:

15         Q   Would you compare the tables in the two exhibits,

16  Q and R, Mr. James?

17         A   Table 1 in Q is entitled "Data utilized in computing

18  gross storage capacity of Murrieta Ground Water Basin."

19  Table 1 in R is entitled "Computation of gross storage

20  capacities of subareas within Oakgrove Basin."

21         Q   Is there a table in Exhibit Q which corresponds to

22  Table 1 that you just referred to in California's R?

23         A   Not exactly.  In Table 1 in R the areas are--

24  which appear on Table 1 in Q will appear.  Some of the columns

25  are included in the same table.  And also in Table 1 in

1   Exhibit Q there is set forth a list of the well logs utilized

2   in estimating specific yield values.  This table does not

3   appear in R.

4        Q  Do you have those well logs available so that we can

5   refer to them?

6        A  Yes.

7        THE COURT:  Well logs are in the exhibits already

8   marked?

9        THE WITNESS:  Yes, sir.

10       MR. VEEDER:  I am looking for R.  Do you have an extra

11  copy of R?

12       MR. MOSKOVITZ:  I will see if we do.  I will have to

13  go in the other room and get it.

14       MR. STAHLMAN:  Here is one you can use.

15       MR. VEEDER:  Thanks.

16       MR. MOSKOVITZ:  Your Honor, I offer California's

17  Exhibit R in evidence.

18       MR. VEEDER:  Now, I would like to ask a few questions.

19

20                    VOIR DIRE EXAMINATION

21  BY MR. VEEDER:

22       Q  Now, in regard to the Table B of Appendix B--

23       MR. MOSKOVITZ:  Table what?

24       MR. VEEDER:  Table B, B-3 of Appendix B.

25       Q  Does this calculate the sources of the water?  I

1  know that Oak Grove is declared to have-- "Basin fill is

2  composed of Recent alluvium which is underlain by igneous

3  rock. Most of the water is supplied by wells in Recent

4  alluvium. Small amounts are obtained from the underlying

5  bedrock." Did you take into consideration the water from the

6  underlying bedrock?

7       A  No.

8       MR. MOSKOVITZ:  In computing?

9       THE WITNESS:  You mean did I take into consideration

10 in this California's Exhibit R?

11 BY MR. VEEDER:

12      Q  In computing the gross and usable storage capacity?

13      A  No, we didn't take it into consideration.

14      Q  You have no designation of relative permeability

15 in B-3?  Did you make any permeability tests?

16      MR. MOSKOVITZ:  Your Honor, does this relate to the

17 offer of Exhibit R or is this further cross-examination?  I

18 object.  I think it is not voir dire on the Exhibit R.

19      THE COURT:  Exhibit R has nothing as to usable

20 capacity.  It is only gross.

21      MR. MOSKOVITZ:  I believe it goes into usable, too,

22 your Honor.  If you will look at the text there is an explana-

23 tion of it.

24      MR. STAHLMAN:  Page 3.

25      THE WITNESS:  On the bottom of page 2, your Honor.

THE COURT:  But no computations were made as to usable storage here; is there?

MR. MOSKOVITZ:  I believe there were, your Honor.

THE WITNESS:  May I see your copy, your Honor?  Page 3.

THE COURT:  I will take it back.  Yes, there was.

As to your question, Mr. Veeder calls this voir dire. Any further question, Mr. Veeder?

MR. VEEDER: No.  No, I will cross-examine him.

THE COURT:  R received in evidence.

FURTHER DIRECT EXAMINATION

BY MR. MOSKOVITZ:

Q  Mr. James, what was the purpose of estimating or showing the method of computing gross and usable storage capacity for Murrieta and Oakgrove Basins, particularly in Exhibits Q and R?

A  These are two of the basins which are shown in California's P to have different storage capacities as computed by California and the U.S. That is why these two were chosen.  Then, also for the reason that Murrieta set forth an example of computing a basin in which we assume vertical walls, whereas Oakgrove Basin is one where an isopach map was utilized.

THE COURT:  Let's get into the record these work sheets on Rainbow Basin also which was supporting data.  That

1  is S for Identification.

2          MR. MOSKOVITZ:  Very well.

3          THE COURT:  Any objection?  Received in evidence.

4          MR. VEEDER:  No, I don't have any objection.

5          THE COURT:  T, the work sheets on Tucalota, received

6  in evidence.  And then U is a book with work sheets on

7  storage basins.  Received in evidence.  W-- skipping V for a

8  minute-- was notes on Murrieta Basin capacity.  W.received in

9  evidence.  And X were notes on Santa Gertrudis Basin capacity.

10 Received in evidence.  Now, V was a tentative computation made

11 by California in its work sheets on a possible basin in the

12 older alluvial in the area somewhat similar to the Government's

13 Storage Unit 4.  Do you want those in evidence?  The State

14 has claimed no basin for that area.  Therefore, there are

15 not supporting data for the basin the State contends for.

16 However, you referred to the notes in your cross-examination,

17 Mr. Veeder.  You want V in evidence?

18         MR. VEEDER:  May I see V.  I had better take a look at

19 it if--

20         THE COURT:  Work sheets where they came up with a

21 figure of about 4,900,000 acre feet; then, apparently, decided

22 not to consider it a basin on the grounds they didn't have

23 sufficient data.  That is about the way I understand it.

24         MR. VEEDER:  Where is the original of this?  Have you

25 found it?

1    MR. MOSKOVITZ:  We have found the rough notes from

2    which this was photostated.

3    THE COURT:  They will be available for Mr. Veeder for

4    comparison?

5    MR. MOSKOVITZ:  Yes.

6    THE COURT:  If there is any discrepancy, you use the

7    originals instead of photostats.

8    MR. VEEDER:  Your Honor, who did the work on these

9    notes?  There was a general denial of--

10   MR. MOSKOVITZ:  Your Honor, no one is present with

11   me now who can recognize whose handwriting it is.  Somebody

12   on the staff of the Division of Water Resources working under

13   Mr. James' general direction must have done it.  We don't know

14   any further than that.

15   MR. VEEDER:  I have no objection.  They might as well

16   put everything else in.

17   THE COURT:  V received in evidence for what it is

18   worth.  Some unknown person, as part of the staff of the

19   California unit, made some computations one time; apparently

20   looked 4,900,000 acre feet of storage in the older alluvial;

21   then somebody rejected it.  Be received in evidence.

22   I think at this time you might as well ofer table B-3

23   subject to the cross-examination that has gone on.  The

24   corrections have been made.

25   MR. MOSKOVITZ:  Very well, your Honor.  I have offered

it many times, but I will offer it again.

MR. VEEDER:  I thought it was in evidence, your Honor.

THE COURT:  There was some little doubt about it, and so I said it would not be considered in evidence.

MR. VEEDER:  I think it was in evidence.

THE COURT:  B-3, I think probably you are right.  It went in as part of the appendix, but just to be sure, Table B-3, which was a part of Appendix B, will be considered as now being in evidence subject to the cross-examination on the statement of the witness as to various matters contained thereon.

1          MR. MOSKOVITZ:  Now that we have gotten these in

2     evidence, your Honor, I am willing to let Mr. Veeder proceed

3     again with his cross-examination.

4          MR VEEDER:  That's very inviting.

5          MR. MOSKOVITZ:  I try to cooperate.

6

7                    FURTHER CROSS-EXAMINATION

8     BY MR. VEEDER:

9          Q  Mr. James, have you had an opportunity to check out

10    your acreages shown on California's Q?

11         A  That is the overlay?

12         Q  Yes.

13         A  No, I haven't.

14         MR. VEEDER:  And he will be available, I assume, for

15    cross-examination when we get these odds and ends that consti-

16    tute California's case?

17         MR.MOSKOVITZ:  He will be made available when required

18    for further examination.

19    BY MR. VEEDER:

20         Q  Mr. James, how many changes have been made to your

21    personal knowledge in the determination of the storage capacity

22    of these basins concerning which you have been testifying?  Do

23    you have any idea?

24         MR. MOSKOVITZ:  I object, your Honor.  I think that is

25    a very indefinite question.

1    THE COURT:  Sustained.  The record will speak for it-

2    self.

3    MR. VEEDER:  Well, your Honor, I would like to be

4    heard for even a moment on that.  I simply asked him how many

5    times they had made determinations and then rejected them and

6    then started again.

7    THE COURT:  I misunderstood the question.  I thought

8    you were summarizing how many different instances you had asked

9    Mr. James to make corrections in some of the material here.

10    MR. VEEDER:  No.  I am just trying to find out how many

11    times they have changed these things, because I find that

12    there have been several methods described in the basic data

13    they have handed us, and I really don't know where to start

14    on this new material, I guess you would call it, that has

15    shown up.

16    MR. MOSKOVITZ:  Your Honor, I object.  I think there is

17    a certain point beyond which we needn't go in dredging up the

18    notes and the tentative drafts and the rough drafts and the

19    changes they went through.  How can he compute how many times

20    he changed a note or changed an idea how to proceed in the

21    course of coming up with the final report?  Ask a lawyer how

22    many times he changes a draft when he was writing a brief--

23    THE COURT:  I will sustain your objection.  But the

24    cross-examination is pertinent as to parts of this Bulletin.

25    He is entitled to know how you made certain computations.  It

James    Cross                                                    6906

1    is one thing to present in evidence an isopach map, as the

2    Government did, and say from this map we prepared our storage

3    capacity computations and here is Exhibit 18 in 1943 as to how

4    we computed storage. You can look at the two exhibits and you

5    can see.

6         It is another thing to prepare a document-- you don't

7    even say in the document that you used isopach maps, and later

8    on in explaining it you tell us that you used isopach maps.

9    Then you find the isopach maps are in some notes, and we keep

10   running down and trying to find out where are the basic factors

11   that were used to get an estimate.

12        So the cross-examination, I think, is pertinent.

13        MR. MOSKOVITZ:  I am not objecting to that portion, your

14   Honor.  But when you go back to preliminary drafts of material

15   that were not final--

16        THE COURT:  The objection to the particular question

17   is sustained.

18        MR. VEEDER:  Your Honor, I simply can't ascertain from

19   anything that I have whether these are new computations or

20   whether they actually followed the procedure that appears to

21   have been set forth in this pink draft which has been marked.

22        THE COURT:  Which is just what it purports to be, a

23   rough draft.  What they are relying upon are the other matters

24   that have been received in evidence.

25        BY  MR. VEEDER:

         Q  What method did you use in computing the storage

1    capacity for Ysidora Basin?

2         A  At first we divided Ysidora Basin into a number of

3    subareas.

4         Q  What was the criterion for the division of it into

5    several areas?

6         A  That was done on the basis of the areal distribution

7    of the well logs.  We tried to so divide the basin so that

8    each separate little group of well logs would mostly clearly

9    represent the conditions underneath that particular subarea.

10        For example, I think you can clearly see that if you

11   have an elongated basin, with ten wells with logs, and one

12   end of that grouped closely together and two or three wells

13   spread out toward the other end of the basin, that a mere

14   average of all the wells in the basin to obtain a specific

15   yield will not be as clear as if you make the well logs in

16   one end of the basin representative of that end of the basin

17   and then break the basin up into parts so that the other logs

18   that are distributed throughout will represent that fraction

19   of the basin.

20        THE COURT:  What is the purpose of this cross-examina-

21   tion?  The estimates of usable capacity of the Ysidora Basin,

22   as shown by both the State of California and the United States,

23   is 1200 acre feet.

24        MR. VEEDER:  That is right.  And this witness has said

25   that he doesn't know whether there is a threat of salt water

1    intrusion or not, and I was going to ask  him whether he took

2    into consideration the necessity for maintaining a fresh

3    water barrier.

4         THE COURT:  You may question on some of those matters.

5    But there is no sense in questioning on the 1200 result,

6    which is identical in both computations.

7         MR. VEEDER:  Well, I will do what your Honor directs.

8         THE COURT:  Get me a reason.  Why?

9         MR. VEEDER:  I was asking a preliminary question, your

10   Honor.

11        THE COURT:  Toward what?  Preliminary to going into

12   the salt water question?

13        MR. VEEDER:  Yes, that is what I was going to do.

14   This witness has said that he doesn't know whether there is

15   saltwater intrusion or not, and I wanted to know whether he

16   had a factor in there in regard to maintaining a fresh water

17   barrier.

18        THE COURT:  You may cross-examine on that.

19        MR. SACHSE:  May I point out that the usable capacity

20   calculated by both California and the United States are

21   identical, the gross calculated by California is even bigger.

22        MR. VEEDER:  If he wants to kill some time, fine, let

23   him kill it.

24        THE COURT:  Mr. Veeder has just claimed that he is

25   talking about capacity.  Now he wants to cross-examine, he says,

1  on salt water intrusion, barrier, et cetera, and this is a

2  preliminary question to that line of questioning.

3      MR. SACHSE:  Then I would object on the ground that it

4  is not proper cross-examination.  I don't believe this witness

5  said anything about that.

6      MR. VEEDER:  The Court examined him, himself, on the

7  question of salt water intrusion.

8      MR. SACHSE:  I would like to have a reference, unless

9  the Court recalls it.  I don't, frankly.

10      MR. VEEDER:  Of course.  Your Honor asked if he had

11  made any salt water intrusion studies on the West Coast, and

12  he said yes, he had gone from Portland, Oregon, to Tijuana.

13  But he doubted if there was any salt water intrusion in the

14  Santa Margarita Basin, as I remember.

15      THE WITNESS:  I didn't make that statement, your Honor.

16  BY MR. VEEDER:

17      Q  You said you didn't know, I think, didn't you?

18      THE COURT:  What did you say?

19      THE WITNESS:  I said, your Honor, to the best of my

20  recollection, that we were aware that there was potential salt

21  water intrusion-- this is what I know, anyway-- in the Santa

22  Margarita River area.  However, I had not received the most

23  recent data and was not aware that that intrusion has actually

24  taken place.

25      THE COURT:  In other words, you limited it to the fact

1    that there was a potential intrusion?

2          THE WITNESS:  I was aware of that and was fully aware

3    that it might have taken place.

4          MR. MOSKOVITZ:  Your Honor, sometimes professional

5    technical people, when they use the word "know," use it

6    differently than lawyers do.  They mean something they know

7    by their own knowledge rather than information that is bandied

8    about.

9          THE COURT:  Proceed, Mr. Veeder.

10   BY MR. VEEDER:

11         Q  In calculating the quantity of water that you said

12   is usable in the Ysidora Basin, did you take into consideration

13   the possibility of salt water intrusion?

14         A  Yes, we did.  I think I went over that at the time

15   that his Honor asked the question to which you referred earlier.

16   We did take that into consideration.

17         Q  And in your view has there been any salt water in-

18   trusion up to now?

19         MR. MOSKOVITZ:  I think that has been answered, your

20   Honor.

21         THE COURT:  Overruled.

22         THE WITNESS:  As I stated before, we are aware of the

23   imminence of salt water intrusion.

24   BY MR. VEEDER:

25         Q  Imminence?

1          A  Well, the fact that it is potential, that the con-

2     ditions existed which would bring about salt water intrusion;

3     but that at the time of my last observations of that area I

4     had not seen the data which would conclusively show that it

5     had occurred.

6          THE COURT:  In this areal extent of the Ysidora Basin

7     in which you give 1100 acres, you leave a blank, indicating

8     that the Government on Exhibit 18 and 43, whichever one is

9     pertinent, did not give an areal extent.  Did you include in

10    your areal extent of the Ysidora Basin that part of the lower

11    part of the basin from the Narrows or slightly east thereof

12    down to the lagoon area of brackish water?  Did you include

13    that as part of the Ysidora Basin?

14         THE WITNESS:  No, we excluded the area downstream from

15    Ysidora Narrows.

16         THE COURT:  You went clear to Ysidora Narrows with your

17    basin, then?

18         THE WITNESS:  Yes, as I recollect.

19         THE COURT:  Do you have your isopach on the Ysidora

20    Basin here?  That is that book you were talking about, isn't

21    it?  Did you make an isopach?

22         THE WITNESS:  The data that was used in computing that

23    storage capacity is in that book, your Honor. Whether the

24    isopach itself is in there I am not sure.

25         THE COURT:  Go ahead, Mr. Veeder.

G Z57                          James    Cross                                6912

BY MR. VEEDER:

Q  Do you have the notes here for Ysidora, did you say?  Or don't you?

A  Yes, the computation sheets are here.

Q  And they have been marked in evidence; is that right?

A  Yes, they have.

MR. MOSKOVITZ:  Those, I think, are the ones we didn't have at the time we marked them.  Isn't that right?

THE WITNESS:  Those were the ones that were in the other room.  Someone went in and got them, I thought.

THE COURT:  They were assigned the letter DP-1, Volume D-- if, as, and when found.

THE WITNESS:  I saw them this morning.

BY MR. VEEDER:

Q  Well, to what depth do you think it is safe to pump the Ysidora Basin?

A  You mean under present conditions?  Or do you mean under conditions where they might have installed an impermeable barrier?

Q  Well, I mean under present conditions.

A  I needed to know that to answer the question.

Q  Well, there is no impermeable barrier there, is there?

A  No.  But if there were, and there could very well be one installed, then the answer to your question would be

1    different.

2         In our calculations we used sea level.

3         Q  And how much of a drawdown would that permit on the

4    basis of existing water levels?  Do you know?

5         A  No, I don't know offhand.

6         Q  And did you take into consideration, when you made

7    your calculations, that several of the wells have already been

8    contaminated and closed down by reason of salt water intrusion?

9         A  No,  As I said, at the time we made these estimates,

10   there had been no sea water intrusion.

11        Q  When did you make these estimates?

12        A  I would have to refer to the notes.  It was, oh,

13   '53 or '54, something on that order.  There are dates on the

14   calculation sheets.

15        Q  And there had been no salt water intrusion at that

16   time?

17        A  Not to my knowledge.

18        Q  Why did you take it into consideration at all, then?

19   MR. MOSKOVITZ:  Why did you take what into consideration?

20   MR. VEEDER:  The salt water intrusion.

21   THE WITNESS:  Well, that was because here was a basin

22   which was interconnected with the sea by permeable sediments;

23   that if that ground water basin were drawn down and a reverse

24   hydraulic gradient from the sea landward were developed, then

25   the requisites for sea water intrusion would be present and

1   sea water intrusion, we felt, would ultimately occur.

2       Q   Now, in connection with making your calculations on

3   Wildomar, Murrieta, Pauba and Pechanga, in which you used

4   vertical sides, would you describe the areas where you made

5   those artifical delineations of a basin?

6       A   How do you mean? Describe the shape of the basin,

7   do you mean?  I don't--

8       Q   Do you treat it as a storage area, or do you treat

9   it as a basin?  What is your technical terminology for such a

10  circumstance?

11      A   Well, this is the volume of sediments which contain

12  a certain amount of extractable ground water, and we computed

13  the amount of extractable ground water within this volume of

14  basin as defined.

15      Q   Without any regard to anything but arbitrarily

16  assigned lines of demarcation; is that correct?

17      A   No, that is not correct.  Our surface contacts

18  were mapped in the field.

19      Q   Well, you don't see what I mean.  You just simply

20  took an arbitrary cutdown on each side of the basin?

21      A   We took vertical walls, if that is what you mean.

22      Q   Without regard to any physical phenomena; is that

23  right?

24      A   Well, I wouldn't say that. We used the contact between

25  the Recent alluvium and the surface and projected that contact

1   vertically.

2          Q   You projected it vertically?

3          A   Downward.

4          Q   Without regard to the possibility, or the probability

5   that you were including basement complex?

6          A   No, I don't think-- we didn't figure on including

7   any basement complex.

8          Q   Do you think your lines run straight down on all of

9   these basins to whatever depth you assigned them?

10          THE COURT:   What lines?

11          MR. VEEDER:   The vertical lines they have assigned.

12          MR. MOSKOVITZ:   Which basins?

13          MR. VEEDER:   The four I have made reference to.

14          THE COURT:   Wait.   You say do you think your lines,

15   and then you say the lines you have assigned run down.

16   Obviously, he has assigned vertical lines.

17          MR. VEEDER:   That is right.

18          THE COURT:   Do you mean that the contact between the

19   older and the younger run down in a vertical area?

20          MR. VEEDER:   Yes.

21          THE COURT:   Or the contact between the alluvium--

22          MR. VEEDER:   I will take both of them, your Honor.

23          Q   Do you think that in every instance the vertical

24   line, or that there is a vertical line where the younger and

25   the older alluvium have their contact?

1          MR. MOSKOVITZ:  I object, your Honor.  I think this

2     question has been asked and answered.  It was gone into before

3     lunch.

4          MR. VEEDER:  No.

5          THE COURT:  Part of it may have been.  It was never

6     asked this way.  Overruled.

7          THE WITNESS:  No, I don't think those contacts extend

8     vertically.  However, it is as good an assumption as we can

9     make for the purpose of an estimate.

10    BY MR. VEEDER:

11         Q  In other words, it is quite possible that when you

12    assign these storage capacity values that you took in basement

13    complex?

14         A  No, I didn't say that.  I think-- I know we took in

15    older alluvium, in some instances.

16         Q  But you don't know that you could assign a straight

17    vertical line straight down from the contact of the older

18    and the younger alluvium and not take in the basement complex;

19    is that right?

20         MR. MOSKOVITZ:  I would like to have that read.

21         (The reporter read the pending question.)

22         MR. MOSKOVITZ:  I object to the question, your Honor.

23         THE COURT: Overruled.

24    BY MR. VEEDER:

25         Q  What about Pechanga?

BGZ62

1     A   What about it?

2     Q   Well, do you think in the Pechanga Valley, you
3   know that the vertical lines you have assigned for your storage
4   capacity would not intersect basement complex?

5     A   I don't believe our vertical lines intersect basement
6   complex in the depths at which we operated.

7     Q   What gives you that idea?  Have you wells there to
8   show that?

9     A   There are not many wells in Pechanga Basin.

10    Q   So you are simply assuming that situation; isn't
11  that right?

12    A   Well, I wouldn't say assumption.  There is judgment
13  involved in all these things.  Where you don't have the data
14  you have to utilize your best judgment and what you can
15  perceive from surface observation.

16    Q   Well, now, you have maximum depth of storage unit
17  500 feet.  Do you know that depth of the storage unit goes
18  down vertically through the whole area, goes down vertically
19  500 feet, without the possibility of intersecting basement
20  complex?

21    A   That doesn't necessarily refer to the whole area,
22  in the first place, Mr. Veeder.  The bottom of these basins
23  is taken as the base of the lowest subarea which is determined
24  from well logs.  I would have to check the calculation sheets
25  to see how large an area that might be and where it might be

1    that it extended down to its greatest depth.

2          Q   Did you make any field notes in the preparation of

3    your determination?

4          A   We made a geologic map.

5          Q   Which one?

6          A   Plate 13-B.

7          Q   Plate 13-B.   And that shows you the depth, does it,

8    of the alluvium throughout the area that you state has storage

9    capacity?

10         A   It does not show the depth, no.

11         Q   So you have simply assumed that; is that right?

12         A   No.   Again I repeat, it is not an assumption.   We

13    utilize our judgment in these matters and our knowledge of

14    geology and geologic conditions as they appear on the land

15    surface, coupled with what observations, what records we have

16    of wells that show the conditions at depth.

17         Q   And you are going to correct the page B-50 of

18    Appendix B-3 in regard to Pechanga Valley to straighten out

19    and to clarify your Footnote A in regard to usable storage

20    capacity; is that right?

21         A   There are a few paragraphs that are going to be

22    written in connectionwith the methods to supplement the

23    explanation of the methods for computing the usable and gross

24    storage capacity for all of the basins, which will apply here

25    as well.

James        Cross                                                    6919

1          Q  Would you step to the blackboard and draw a picture

2     of how you calculated the storage capacity for Wolf or

3     Pechanga Valley?  I would like to see how you did that.

4          MR. MOSKOVITZ:  May we have the field notes P-1.  I

5     think the witness should have his field notes to refer to.

6          (The clerk hands document to the witness.)

7     BY MR. VEEDER:

8          Q  By the way, how did you determine that the alluvium,

9     both Recent and older alluvium, in Pechanga Valley were of

10    low permeability?  Did you have any permeability tests made?

11         A  To my recollection, I don't believe there were

12    permeability tests in Pechanga Valley.

13         Q  How did you arrive at the permeability, then, of

14    these older and younger alluvia?

15         A  At this time I imagine we --

16         Q  You don't know?  You imagine?

17         A  I am stating that in all of these instances we looked

18    at the materials on the surface and took this into considera-

19    tion, and furthermore in Pechanga Basin there may be some--

20         Q  But you don't know?

21         A  Well, I don't recollect at this moment.  These

22    things would be available.

23         I will try to draw from memory a picture, a rough

24    outline of Pechanga.

25         It is an elongated valley. It runs in a northwest-

1   southeast direction.

2        Q  Now we are looking down on it-- it is aerial?

3        A  That is true.

4        Q  Will you give us a cross-section while you are

5   about it?

6        A  North would be right about in here.

7   This basin was divided into three subareas.

8        Q  What was the criterion that guided you in making

9   that separation?

10        MR. SACHSE:  That has been asked and answered and gone

11   into at great length.

12        THE COURT:  On Pechanga?

13        MR. SACHSE:  No.

14        THE COURT:  Overruled.

15        THE WITNESS:  Well, in all these instances we utilized

16   the logs of wells that were available individing the basin

17   up into subareas.

18   BY MR. VEEDER:

19        Q  Did you planimeter the areal surface in the same

20   manner that you planimetered the Murrieta surface?

21        A  Yes.  The notes here in regard to Planimetering are

22   on the first page of these calculations.

23        Q  And you have the overlay that you used?  Is that

24   right?

25        A  I don't find the overlay attached to these notes,

1    and I can't tell you right now where it is.

2             Q   Did you take it off of 15-1 the big map?

3             A   I imagine that that was the case.

4             Q   You don't know, though?

5             A   I believe it was taken off that map.

6             MR. MOSKOVITZ:   Mr. Veeder, is the witness still to

7    draw it in the manner he did this?

8             MR. VEEDER:   Yes.

9             MR. SACHSE:   Then I suggest that you let him do it.

10            THE COURT:   Permit the witness to make the drawing

11   you asked him to make.

12            THE WITNESS:   Well, the area was divided into three

13   subareas-- 1, 2 and 3, diagrammatically.

14            There were wells in each of those three areas.   Each

15   group was divided into depth zones.

16            Now group 1 was divided into zero to 50-foot zone, and

17   a 50 to 100 feet-- when I say "group" we refer to them as

18   groups or as subareas.   This is all called "Subarea" to make

19   it consistent with the previous testimony.

20

21

22

23

24

25

1        Now, this 50-foot depth-- I am going to run out of

2  space here-- the specific yield was determined for each of

3  these depth intervals, and in the case of group 1 or subarea

4  1 the specific yield of the first, zero to 50 interval, was

5  determined to be .171.  This was determined on our calculation

6  sheets, computation sheets, for specific yield in the manner

7  that is described and set forth in our South Coastal Basin

8  investigation and described more fully in Bulletin 45 of the

9  Division of Water Resources.  This was multiplied times the

10  planimetered area which was determined to be 999 acres.  And

11  again, this multiplied by 50, which is the depth of the zero

12  to 50-foot interval.

13  BY MR. VEEDER:

14        Q  And the specific yield is high in that instance?

15        A  The specific yield is .171.  That is a moderate

16  specific yield.  This storage was computed to be 8,550 acre

17  feet.  We next moved to the 50 to 100-foot interval.  Again,

18  since the sides were taken as vertical--

19        Q  Would you draw the vertical sides as you calculated

20  them.  You took them down into 100-foot depth, is that right,

21  in the No. 1 area?

22        A  In the No. 1 area.  Here again, we had a 999 area

23  because of these vertical sides.  However, in this instance

24  the specific yield was determined to be .188.  Again, since

25  this is a 50 to 100-foot interval it was multiplied by 50

1   feet.  I am sorry we didn't have more previous planning.  These

2   columns don't line up.  But I will bring them together and

3   total them later, unless you are just interested in the method.

4        Q  Yes, we are interested in the method.

5        A  This totaled 9,400 acre feet; this being the storage

6   capacity within the 50 to 100-foot interval in subarea 1.

7   So, therefore, the total storage for group or subarea 1 is

8   the summation of 8,550 and 9,400-- call it subarea.  That was

9   17,950; this being the total of these two again.

10       THE COURT:  It is time for a recess now.  Do you want

11   this carried on out for the other two subares, Mr. Veeder?

12       MR. VEEDER:  What I would like to know is how you get

13   the specific yield of the other two areas, 2 and 3.

14       THE WITNESS:  I could give you that right now in a

15   moment if you would like to have it.

16       THE COURT:  Very well.

17       THE WITNESS:  In group subarea 2 in the zero to 50-foot

18   interval the specific yield was .08.  In the--

19   BY MR. VEEDER:

20       Q  .08.  Would you write those down, then.

21       A  I will repeat these.

22       THE COURT:  You can finish it during the recess,

23   specific yields of the subareas.

24       (Recess.)

25

BY MR. VEEDER:

Q   How did you calculate your areal extent on that, did you say?

A   That was done by planimetering the three areas.

Q   And you don't know the source?  Did you say you did or did not know the source?

A   Yes; it was an overlay that was made, which I don't have attached to these notes.  That was planimetered.

Q   Will you provide us with that?

A   I am not sure that I can find it.  As I say, it is not attached here.  I don't know where it is.

THE COURT:  It was an overlay taken off of L 15-1, the big map?

THE WITNESS:  Your Honor, I think so.  It has been a long time.  And I think that was the map that was used.

BY MR. VEEDER:

Q   But you don't know?

A   I am not positive.

Q   So we have no way of knowing then the areal extent of Pechanga?

A   You can planimeter it on any one of the maps.

Q   That you might have used?

THE COURT:  All right, if you are interested, Mr. Veeder, have one of your experts make the calculations from the map.  If you find there is a discrepancy, we will take it

1   up later.

2   BY MR. VEEDER:

3       Q   Now, in regard to the side that you calculated here,

4   you determined that went down 500 feet, did you?

5       A   500 feet was the depth as determined by wells of

6   subarea No. 3.  This basin, incidentally, is on the southwest

7   side, is flanked by faults of the Willard fault zone and on

8   the northeast side by Wildomar fault.  In fact, it is--

9       Q   Your lateral sides went through the Wildomar fault,

10  is that right?

11      THE COURT:  "Went through the Wildomar fault."  You mean

12  followed down the line of the fault?

13      MR. VEEDER:  Did it go through or across?  I am trying

14  to figure out where the Wildomar fault is on there.

15      THE WITNESS:  Referring to 13B, here is the Wildomar

16  fault extending along the northeast side of Pechanga Basin.

17  BY MR. VEEDER:

18      Q   And that constitutes one side of your storage area?

19      A   The fault as shown on the map does not extend the

20  full length of the basin, but it controls a good part of the

21  northeast side of the basin.

22      Q   And you calculated right straight down 500 feet on

23  that, is that right?

24      A   We calculated 500 feet down within subarea 3 in

25  Pechanga Basin.

James    Cross    6926

1    THE COURT:  That is the area nearest the mouth of the

2    Santa Margarita, the start of the Santa Margarita?

3    THE WITNESS:  Your Honor, I am not sure of that; be-

4    cause that would appear on that overlay which is not available.

5    This diagram I drew on the wall is diagrammatic to that extent.

6    It shows that there are three subareas.

7    THE COURT:  Well, from your knowledge of the basin

8    wouldn't the deeper alluvium and the deeper wells be down near

9    where the Santa Margarita starts and up at the east end of the

10   basin?

11   THE WITNESS: That is a very logical conclusion, your

12   Honor.

13   BY MR. VEEDER:

14   Q  Was that the conclusion you adopted?

15   A  I am reticent to give you an exact answer, because,

16   as I say, the overlay is not here.

17   Q  Then, you are stating that the data which you have

18   in evidence as your testimony are doubtful, the correctness

19   of it is doubtful in your own mind; is that right?

20   A  No, I am not stating that it is doubtful.  I am

21   stating that the particular overlay which existed there at one

22   time is not right now available.  That doesn't lead me to

23   question the veracity of the findings.

24   Q  Would it cause you to doubt the correctness of it

25   if I gave you a planimeter and asked you now to measure this

overlay for the Murrieta Valley?

Because we have no reason to believe, your Honor, that any of these should be right in the light of what we now know.

THE COURT:  If that is going to be done, it will be done after court and report in the morning.

MR. MOSKOVITZ:  Your Honor, because of the question raised this morning, we are going to go back and make another study of the area.

THE COURT:  Well, here is the instrument.

MR. MOSKOVITZ:  Yes, here is the instrument.  But we don't know whether this particular overlay might not have shrunk, been distorted in some way.  If we are going to do it again, we are going to do it with the best data available and come up with the best we can.

THE COURT:  Allright.  Willyou have it tomorrow morning?

MR. MOSKOVITZ:  No, I don't believe we will have it tomorrow morning.  We will have it when we return.  I want to make sure that it is done as carefully as it can be done.

THE COURT:  All right.

MR. MOSKOVITZ:  I think it was done carefully the first time, and I want to make sure it is done carefully this time before I check it.

THE COURT:  What is this word?

MR. MOSKOVITZ:  Planimeter.

1       THE COURT:  Planimeter all these basins?

2  MR. MOSKOVITZ:  No, no, Murrieta is the one about which--

3       THE COURT:  Can't that be done this evening?

4       MR. VEEDER:  It takes about an hour.

5       MR. MOSKOVITZ:  Your Honor, we don't want to just use

6  this overlay which has been tossed around and folded and

7  perhaps distorted.  I don't know.  Our experts say there are

8  more accurate ways to check this.  And I don't know how long

9  it is going to take them to do that.  They may want to do it

10  from the quad sheets, and they may need a place to work where--

11  they don't have the equipment, and so forth.

12       THE COURT:  All right.

13       MR. VEEDER:  Will you also provide us with your overlays

14  for the Wildomar Basin, Pauba Basin, and Pechanga.

15       THE WITNESS:  The overlays that we have and isopach

16  maps are all in the exhibit which was submitted earlier along

17  with the computation sheets for storage capacity.

18       THE COURT:  Those have been marked, Mr. Veeder.

19       Did you find the book for the Lower Basin, Mr. Fox?

20       MR. FOX:  It was in evidence.

21       MR. MOSKOVITZ:  Your Honor, this had already been put

22  in evidence as California's Exhibit U.

23       THE COURT:  U?

24       MR. MOSKOVITZ:  Yes, your Honor.

25       THE COURT:  All right.

H Z45

1    MR. VEEDER:  In other words, as I understand it, we

2   will be given the overlay for the Wildomar Basin; is that

3   right?

4    MR. MOSKOVITZ:  If we have it.  If we can find it.

5   Now, we can't give you something we don't have.

6    MR. VEEDER:  Your Honor, I am going to move to strike

7   Appendix--

8    MR. MOSKOVITZ:  Your Honor--

9    MR. VEEDER: Wait until I am finished.  --Appendix B,

10  because the data that has been supplied simply does not

11  support.

12    THE COURT:  It goes to the weight, Mr. Veeder.  Your

13  motion is denied.

14    MR. VEEDER:  Then, go ahead with redirect.  I reserve

15  the right to further cross-examination when we have had an

16  opportunity to check our lists, whatever it is that they have

17  turned in.

18    THE COURT:  What is the Government's map where you

19  estimated the basin on Wolf Valley?  You have an isopach on

20  Wolf Valley?

21    MR. VEEDER:  On 17?  I have forgotten.

22    THE COURT:  No isopach shown on 17.  Do you have an

23  isopach on 17?

24    MR. VEEDER:  I will look whether Pechanga was included

25  or not, your Honor.

1          THE COURT:  There was an isopach on the lower basin,

2     but was there an isopach on the upper basin?

3          MR. SACHSE:  No, there is no such exhibit in evidence

4     yet, your Honor.

5          MR. VEEDER:  As the "Tiger" tells me, we used vertical

6     sides, and we allowed for-- we made storage units as dis-

7     tinguished from any attempts that these people have tried to

8     come up with basins outlined, as they have attempted.

9          THE COURT:  Well, what is the difference?  You call it

10    a storage unit; they call it a basin.  You use vertical sides.

11    What is the difference?

12         MR. VEEDER:  Well, your Honor, if they want to tie it

13    down to a particular basin and come up with a particular

14    write-up, that is fine.

15         THE COURT: Ask the question.  What is the difference

16    whether you call it a basin or a storage unit where you lay

17    out on an areal map a certain perimeter and say, "This is a

18    storage unit?"  What is the difference fromsomebody else

19    who is saying, take a certain areal perimeter, and saying,

20    "This is a basin"?  What is the difference?

21         MR. VEEDER:  There is only one real difference, your

22    Honor, and that is that we came forth with a specific manner

23    in attempting to do it.  Now, they come along and offer in

24.   evidence their Appendix B which purports to say, and this man

25    under oath told your Honor, "This is my evidence, and I swear

1      it is true."

2            THE COURT:  All right.  If they made a mistake--

3            MR. VEEDER:  It was a big one, your Honor.

4            THE COURT:  -- theywould have supplied more material.

5      Did you have an isopach map on the Pechanga Basin?

6            MR. VEEDER:  No, no, we didn't, your Honor.

7            THE COURT:  So all you had on Pechanga or Wolf Valley

8      was Exhibit 18 where you had an areal extent; you took

9      vertical sides; you took a hundred feet?

10           MR. VEEDER:  That is right.

11           THE COURT:  And you took a specific yield as 12.

12           MR. VEEDER:  That is right.

13           THE COURT:  And any other supporting data was just

14     general data that could be found in the well logs?

15           MR. VEEDER:  That is right, your Honor.  And what we

16     did was this--

17           THE COURT:  If there is going to be any exhibits

18     stricken, what is sauce for the goose will be sauce for the

19     gander.  So let's be careful about motions to strike.  Now,

20     on the coastal basins you did have an isopach.

21           MR. VEEDER:  That is right, your Honor.  The point that

22     I make, your Honor, is that they have come forward with a

23     bulletin, Appendix B, and under oath this man says, "These

24     are all correct and proper and true;" and I simply say they

25     are not.  And I think that we have proved conclusively that

1    they are not.  And I simply say that from the evidentiary

2    standpoint there is no foundation.  Your Honor has overruled

3    the objection; but the fact remains--

4         THE COURT:  There is just as much foundation, Mr. Veeder,

5    as there was for Mr. Kunkel to say it is his opinion to say

6    that there were so many thousand feet of storage in Wolf

7    Valley based upon three factors-- areal extent, thickness

8    of the zone, and specific yield.  That is his opinion.  Now,

9    what has happened here is that the witness, by having been

10   a party to a bulletin, has put forth a lot of the material

11   in the bulletin, some of the statements are very broad, some

12   of the statements represent inconsistencies.  But again, he

13   gives his professional opinion that there is so much of the

14   storage unit.  You might say one is too little and the other

15   is too much, as far as foundation is concerned.  But eventually,

16   you would have the opinion of each witness.

17        MR. VEEDER:  Your Honor, there is only one real and

18   basic objection that is interposed.  They come forward and

19   tried the lawsuit by putting a witness on the stand and

20   interrogating him, fine.  But they didn't.  They come along

21   with innumerable pages; time saving.  A man swears they are

22   right.  And under the laws of the court I have the right to

23   cross-examine to show that he is wrong.

24        THE COURT:  Well, then they are in the unfortunate

25   position that you may or may not have impeached the witness

1   or destroyed the weight to be given to his testimony. But it

2   doesn't go out for that reason.

3        MR. VEEDER: Your Honor, when they come in and say

4   that this is the areal extent, and I have people come in

5   and show-- this is the fifth time this has been checked. They

6   want to be sure. Maybe it was the fourth or fifth-- they

7   show repeated mistakes.

8        MR. MOSKOVITZ: I suggest he put some witnesses on

9   if he is going to keep referring to repeated mistakes.

10       THE COURT: I would wager that if somebody had taken

11  a planimeter to your areal extent, here and there some little

12  error might have been found. I don't expect that any of these

13  experts are perfect in their computations.

14       MR. VEEDER: Well, an error--

15       THE COURT: Apparently, nobody planimetered some of the

16  maps that you have submitted.

17       MR. MOSKOVITZ: We didn't want to pick-knit the way he

18  did,your Honor. We didn't think it was that material.

19       MR. VEEDER: Nor did you know how. That is your

20  problem. The thing I am saying, your Honor, is this: That

21  where there is a hundred percent error, this man being under

22  oath and all, I think it is very important, for it goes to the

23  evidentiary character of it; not the weight, it goes to the

24  matter of admissibility.

25       THE COURT: I have ruled on that, so go on to something

1    else.

2            MR. VEEDER:  I have turned them over, subject to always

3    being recalled when I get through reading these notes.

4            MR. SACHSE:  Are you through cross-examination?

5            MR. VEEDER:  Yes; I said it sometime ago.

6            MR. SACHSE:  I have a very brief cross, if your Honor

7    please.

8

9                          CROSS-EXAMINATION

10   BY MR. SACHSE:

11           Q  Mr. James, how long have you known me?

12           A  Since--

13           MR. VEEDER:  I object.  That goes beyond the scope

14   of the examination.

15           THE COURT:  Preliminary question.  Overruled.

16           THE WITNESS: Since I first came to this Court in the

17   middle of November.

18   BY MR. SACHSE:

19           Q  Have I, to your knowledge, or anyone representing

20   Fallbrook Public Utility District, ever attempted or suggested

21   in any way what your geological findings in Bulletin 57 should

22   have been?

23           A  No, no one.  Very definitely no one has ever tried to

24   influence me in this respect.

25           Q  Has anyone from any authority, State of California

or otherwise, attempted to dictate to you your findings or

conclusions in this Bulletin?

    A  This has never happened in my work with the Depart-

ment of Water Resources or any place else.

    Q  Now, I want to ask you a couple of questions about

the depths of residuum in the Fallbrook area.  And do you

have a copy of L before you, Bulletin 57?

    A  Yes, I do.

1          Q  I will direct your attention-- And for the record,

2    I should identify this as Appendix F, which has been received

3    in evidence; it is the well log data-- and I am referring

4    to page F-67.  Now,I will point out to you, Mr. James, that--

5    May I have Exhibit L, Plate 9A, please, Mr. Clerk.

6          THE WITNESS:  Here is one, Mr. Sachse.

7          MR. SACHSE:  Have you got one before you?

8          Q  Am I correct in stating, Mr. James, that the well

9    log data appearing on page F-67, all located in Township 9

10   South, 3 West, and9 South, 4 West, is all within the Fall-

11   brook area?

12         MR. VEEDER:  I object to the question as being leading,

13   your Honor.

14         MR. SACHSE: This is cross-examination, if you please.

15         THE COURT:  Overruled.

16   BY MR. SACHSE:

17         Q  Am I correct?

18         THE WITNESS:  You are correct.

19         MR. VEEDER:  He is their witness.  May I just get the

20   party lines lined up here, your Honor.  Is Fallbrook cross-

21   examining now?  Or isn't this man Fallbrook's witness?

22         THE COURT:  The remark will be stricken from the

23   record, Mr. Veeder.  You know that he was called as a witness

24   for the State of California.

25         Proceed, Mr. Sachse.

BY MR. SACHSE:

    Q  Starting with the first well shown on page F-67, indicated as 9 South, 3 West, 18K1, owner Martin, what do you find to be the depth of that well?

    A  75 feet.

    Q  The next column shows casing diameter 60 inches. Does that 60 inches indicate anything to you as to the kind of well it might be?

    A  That would be a dug well.

    Q  In other words, it is five feet across, isn't it?

    A  Yes.

    Q  What kind of pumping equipment is on it?

    A  The pumping equipment is not shown.

    Q  To shorten this, go down your casing diameters column, please, for all these wells and see if you do not agree that most of them, from the casing diameter, would appear to be dug wells rather than drilled wells-- all the wells on page F-67.

    A  Well, I see the diameters range from 60 inches to the smallest of 36 inches on that page, and my opinion, from looking at those diameters, would be that those were dug.

    Q  What is the greatest depth of any well you find indicated on that page?

    A  I see a depth of 91 feet in 9S, 4W, 24P3.

    Q  That is the Frank Pacelli well indicated as being

1   dug in 1931?

2        A  That is correct.

3        Q  It has a three-horsepower electric motor on it?

4        A Correct.

5        Q  If you turn to the next page, do you agree that

6   the first five wells shown are in the Fallbrook area, the

7   remainder being in that area being all Navy wells?

8        A  I will have to check.  That is correct.

9        Q  I see one well there with a 350-foot depth.  Do you

10  observe that well?

11       A  Yes, I do.

12       Q  Rogers.  I also note in the other data available

13  column that you have a log for that well?

14       A  Correct.

15       Q  I hand you California's L, Appendix F, Log 2, and

16  ask you to locate that well log, if you can, and tell us what

17  character of material that well was put through?

18       A  I am reading from the log of well 9S, 4W, 25E3.

19  It shows zero to 40 feet soft granite, 40 to 200 feet, very

20  hard granite, and then in parentheses after that it says

21  blue granite, 200 to 300 feet granite softened, and then 300

22  to 350 is coarse sediment.

23       MR. VEEDER:  Coarse sediment?

24       THE WITNESS: That is what shows in the log.

25       MR. VEEDER:  Sediment under--

BY MR. SACHSE:

Q   How many feet of granite do you find logged in that well, disregarding the sediment?

A   There is 160 feet of very hard granite, and then it says another hundred feet below that of granite softened.

Q   What conclusion would you draw, when you read all of that, as to reliability of this statement "coarse sediments"?

Withdraw that for just a moment, please.  There is a preliminary question I should have asked.

I note the casing diameter is eight inches.  You would conclude from that that that is a drilled well, would you not?

A   That is true.

Q   In other words, the well log reflects what the driller saw come up in a rotary drill?

A   Well, it shows what came up in the drill.  It could be a rotary or a cable tool.

Q   All right.  Now, have you any opinion as to the reliability of the last comment you read from the well log?

MR. VEEDER:  I object to this, your Honor.  What is he trying to do, impeach his own material here?

THE COURT:  Mr. Veeder, your own witnesses have said that they took well logs and that they used their judgment in interpreting the material they found.  Your expert Mr. Kunkel did that.  Other witnesses have done it.  It is common

1    practice.  The objection is overruled.

2    BY MR. SACHSE:

3         Q  You can answer the question, Mr. James.

4         A  That kind of situation could occur only under very

5    rare, unusual conditions, such as if you had a thrust fault

6    where granite was thrust over sediments.  There is no such

7    structure in that area, to my knowledge.  I would assume

8    that that portion of the log which says "coarse sediments"

9    is erroneously logged.

10        Q  If you go back to the preceding page I notice you

11   have one other log in the Fallbrook area, a log for well 9

12   South, 4 West, 24H1, Atchison, Topeka & Santa Fe Railway, May,

13   1917.  Do you find that log?

14        A  Yes, I do.

15        MR. SACHSE:  May I call your Honor's attention-- Mr.

16   Veeder, you may be interested.

17        MR. VEEDER:  Thank you.

18        MR. SACHSE:  This is very interesting, because this is

19   not a conventional well log.  It is a railroad blueprint

20   showing not only the location but also the graphic log that

21   the railroad drew when they dug the well.

22        Q  Will you read the log and tell us what that well

23   log indicates?

24        MR. VEEDER:  I object to that on the ground that the

25   exhibit speaks for itself.

1   THE COURT:  Overruled. First of all, it is not yet

2 in evidence-- it has been marked for identification; secondly,

3 there is no reason why the witness can't read what the well

4 log says.

5   THE WITNESS:  I am looking at a graphic log designated

6 9 South, 4 West, 24H1.

7   MR. VEEDER:  This is not in evidence yet?

8   MR. SACHSE:  It is marked for identification.

9   MR. VEEDER:  Shouldn't it be admitted, then, if he

10 is going to read from it, your Honor?

11   THE COURT:  Yes.

12   MR. MOSKOVITZ:  Your Honor, if you recall--

13   THE COURT:  I understand they were marked and you

14 were going to put them in evidence.

15   MR. MOSKOVITZ:  We were going to cull out those that

16 had not yet been put in evidence by the United States and

17 make copies, and that is in progress now.

18   THE COURT: That has not been done yet?

19   MR. MOSKOVITZ:  In part it has been done, but there

20 are some that still have not been reproduced, and when they

21 are we will put all those in evidence that are not yet in

22 evidence. So I suggest that --

23   THE COURT:  That we hold up on it?

24   MR. MOSKOVITZ:  Yes, your Honor.

25   THE COURT: All right.

BY MR. SACHSE:

Q  What does the log show as to materials encountered as the well was dug?

A  Zero to 2 feet subsoil, 2 to 10 feet-- that is 8 feet total-- all sand, 10 to 20 feet all sand and boulders, and from 20 to 27 feet decomposed granite.

Q  27 feet is the bottom of the well?

A  That is correct.

Q  Now, directing your attention again to this page and a half of well data in the Fallbrook area, do you find anything in this data to indicate a depth of residuum greater than the 91 feet indicated on the single well 24P3, Frank Pachelli?

A  No, I don't.

MR. SACHSE:  That is all.

MR. STAHLMAN:  I have a couple of questions.

THE COURT:  Mr. Stahlman.


CROSS-EXAMINATION

BY MR. STAHLMAN:

Q  In determining the areal extent of the Pechanga Basin, you used the large map--

THE COURT:  L Table 15-1 in Evidence.

BY MR. STAHLMAN:

Q  -- L Table 15-1?

James    Cross                                                    6943

1        A  (Witness stepping down)  Your question was, did we

2   use that map for determining areas?

3        Q  Yes.

4        A  As I testified earlier, the overlay that we did this

5   work on I cannot find at the present time.  It was perhaps

6   done on this.  It might have been done on something other,

7   Mr. Stahlman.

8        Q  With reference to the map, however, the same

9   exhibit which I have just referred to, your coloring indicating

10  the younger alluvium adjoins that referred to as the Temecula

11  River on that particular exhibit-- Pechanga; isn't that right?

12       A  That is true.  You are referring to this in the

13  vicinity of Wildomar fault?

14       Q  Yes.  Do you recall where the demarcation was for

15  the boundary between what we have been referring to as the

16  Pauba Basin and which is indicated on here as Temecula and

17  the Pechanga Basin?

18       A  To the best of my recollection, the boundary is the

19  Wildomar fault.

20       Q  That would be the boundary to the northeast, wouldn't

21  it?

22       A  That is true.

23       Q  And how about then to the north?

24       A  To the north is the boundary between the older

25  alluvium and the Recent alluvium.

1      Q  Now then, in determining your area No. 3, what wells

2  did you use?  Can you tell us that?

3      A  I will have to refer to my notes.

4      Q  Will it take time or can you give them --

5      A  I think I can give it to you shortly here.

6      I would like one of those envelopes, Mr. Clerk.  Just

7  which one I don't know.

8      (The Clerk helps the witness to locate the document.)

9      THE WITNESS:  I am reading from Exhibit U, the well

10  group computation sheet on Pechanga Basin:  "The wells utilized

11  were 8S, 2W--

12  BY MR. STAHLMAN:

13      Q  That is the Ludie well, isn't it?

14      A  No, I can't recollect.

15      MR. VEEDER:  8S, 2W?

16      THE WITNESS:  ". . 8S, 2W, 18N2, 8S, 2W, 18R1, 8S,

17  2W, 19J1."

18      MR. MOSKOVITZ:  May I ask which subarea this is for?

19      MR. STAHLMAN:  I will ask the witness.

20      Q  Is this for one of the subareas-- No. 1, was it?

21      A  These three wells were for group designation 1.

22      Q  You give it as 3 up here.  Let me ask you at this

23  time:  Did you use 28C1?  That is in No. 1 subarea, is it not?

24      MR. MOSKOVITZ:  Mr. Stahlman, if you are looking at

25  the schematic diagram to see which one is which, I don't

1      think the witness identified them as being the ones.

2             THE WITNESS:  I can give them to you by the groups.

3      BY MR. STAHLMAN:

4             Q  Those three you have given me, are those supposed

5      to be in subarea 1?

6             A  They are in the true subarea 1, and as I testified

7      earlier we are not sure just how they are actually located,

8      because--

9             THE COURT:  What section are they in?

10            THE WITNESS: They are in Section 18, as indicated by

11     the well number.

12            THE COURT:  In 2 West?

13            THE WITNESS:  7 South, 2 West, 18, and there are N-1

14     R-1, and J-1.

15            THE COURT:  Theycouldn't be in 7 South, couldthey?

16     They would have to be in 8 South, 2 West.  Do you have them

17     listed as 7 South?

18            THE WITNESS:  That is what they show here.

19            I beg your pardon.  It is 8.

20            MR. STAHLMAN:  That's different.

21            THE COURT:  8 South, 2 West?

22            THE WITNESS:  Yes, that is correct.

23            THE COURT:  They are in Section 18?

24            THE WITNESS:  Yes, your Honor.

25            THE COURT:  All in that particular area?

1       THE WITNESS:  In that subarea the two of them are in

2   18, and the last one is in 19-- 19J1.

3       THE COURT:  That is the area of the Wolf or Pechanga

4   Basin, the subarea nearest the start of the Santa Margarita

5   River?

6       MR. VEEDER:  Isn't that just the reverse, then, of your

7   picture over here?

8       MR. STAHLMAN:  No, I don't think so.

9       THE COURT:  No, the picture is right.  North is the

10  top of the page.  That is subarea 1.

11  BY MR. STAHLMAN:

12      Q Did you use C-1?

13      A  Mr. Stahlman, there are two other groups which I

14  haven't read to you yet.

15      THE COURT:  In subarea 2 what wells did you use?

16      THE WITNESS:  In subarea 2 we used one well, 8 South,

17  2 West, 28K1, I read that.  Will someone check me.

18      THE COURT:  28K1?

19      THE WITNESS:  Yes, your Honor, and that is all in

20  subarea 2.

21      Now, in subarea 3 there are four wells:  8 South,

22  2 West, 29B1, 8 South, 2 West, 29C1, 8 South, 2 West, 29F1,

23  8 South, 2 West, 29J1.

24      THE COURT:  Then your map of your three areas on the

25  blackboard is not correct, because your area 1, according

1  to the section, is up to the northwest where the basin would

2  lead into the Santa Margarita River. But what you have just

3  read from Basin 3 is along the southwest side of the basin,

4  while what you read as area 2 in Section 28 would be further

5  east.

6  　　　　MR. MOSKOVITZ:  Your Honor, he said this was not meant

7  to be accurate.

8  　　　　THE WITNESS:  It is purely for showing how the method

9  was--

10  　　　　THE COURT:  Do you have the subbasin areas marked

11  anywhere?

12  　　　　THE WITNESS:  Your Honor, I don't-- they are on the

13  overlay and I do not know where that is, what has become of it,

14  BY MR. STAHLMAN:

15  　　　　Q  You don't have sufficient familiarity with these

16  wells to know any of them by name, do you?

17  　　　　A  I don't, Mr. Stahlman.

18  　　　　Q  When you determined the depth that you would take

19  for the storage unit 3-- you call it subarea 3-- did you

20  have wells in that area to the depth of 500 feet?

21  　　　　A  I have a log here shown, which is 8S, 2W, 29C1--

22  I believe I gave you that number already-- which appears on

23  this composite log that shows a depth of 500 feet.  This is

24  not the basic log.

25  　　　　THE COURT:  This is in area--

1          THE WITNESS:  In Area 3, your Honor.  I can check that

2   against the log in this other exhibit here.

3   BY MR. STAHLMAN:

4          Q   Going back to subarea 1, you selected 18N2, 18R1

5   and 19J1; is that right?

6          A   That is correct.

7          Q   Now, there is a well known as Historical Well in

8   there, 28C1, in that same area--

9          THE COURT:  28?

10          MR. STAHLMAN:  8 South, 2 West, 28C1.

11          THE COURT:  That is in area No. 2?

12          MR. VEEDER: That is K1, too, is it?

13          THE COURT:  Yes, K1 and C1 are both in Section 28.

14   It is down in the northeasterly part of the Pechanga Basin.

15   BY MR. STAHLMAN:

16          Q   However, the only well you took, then, in 2 would

17   be 28K1; is that correct?

18          A   That is correct.

19          Q   And you didn't use this well 28C1?

20          A   No, not in these computations.

21          Q   Can you tell us the basis upon which you selected

22   the wells that you would use in any of these subareas?

23          A   Our general procedure is to collect all the logs that

24   we can get and check them over and from the appearance of

25   the log, the way the material appears, if it looks reasonable

1  geologically, we then adopt the well and use it in our

2  computation.

3      THE COURT:  Is this material on the blackboard going

4  to be wanted by anyone?

5      MR. VEEDER:  We have it, your Honor.

6      THE COURT:  What do you mean, you have it?

7      MR. VEEDER:  Copied it.

8      MR. MOSKOVITZ:  You what?

9      THE COURT:  Do you want it in the record?

10      MR. VEEDER:  No, I don't care.  I will use it on

11  redirect.

12      MR. STAHLMAN:  I have just one other question here:

13      Q  Directing your attention to Plate 6 of the Bulletin,

14  I notice that you have a designation here of "Water Service

15  Organization."  What does that mean?

16      A  I can tell you what it says on the legend, and this

17  particular part of this exhibit I didn't have anything to do

18  with preparing.

19      Q  You have no familiarity, then, with why the legend

20  "Service Organization" encompasses the entire Vail Ranch?

21      A  No, I can't answer that question.

22      MR. MOSKOVITZ:  I think Mr. Illingworth can answer that

23  question.

24      MR. STAHLMAN:  That is all right.  That is all we have.

25

REDIRECT EXAMINATION

BY MR. MOSKOVITZ:

Q Mr. James, in answer to a question by the Court you stated that specific yield and permeability are not related. Do you have any specific data on which you base that opinion?

A Well, there have been a number of tests run at various times by various organizations in which measurements of specific yield were made on samples and at the same time permeabilities were measured. I have jotted down a few here.

Q Would you identify who made the studies and what the results of these studies were specifically?

A Well, first there is a partial report compiled by W. N. Lawless and W. H. Lohman of tests run April 24th, 1958.

Q Who are those people? Whom are they connected with?

A I believe they are connected with the United States Geological Survey, Denver office. I refer to a sample which they ran in connection with subsidence studies in the San Joaquin Valley. The sample number is 57 Cal 71. There was a specific yield of 30.5 shown for this sample and a permeability of 39.

MR. VEEDER: I am going to object to this. This is strictly the purest kind of hearsay. We don't have any kind of idea --

MR. MOSKOVITZ: It is, your Honor, but I think it is well established that an expert can refer to hearsay in

1   explaining the basis for his opinions.

2        THE COURT: He can refer to it on direct by merely say-

3   ing he relied upon such a text and such an authority. On

4   cross he may be interrogated as to what is in it. But he

5   can on direct do it that way, if you want to be strict about

6   the rules. Just give us a citation of the authorities which

7   you say have made studies in this matter and you may also give

8   us your opinion on the problem involved.

9        THE WITNESS: Well, the United States Geological Survey

10   for one, and the United States Bureau of Reclamation for

11   another.

12        THE COURT: You have a citation of the Bureau of

13   Reclamation studies?

14        THE WITNESS: The Bureau of Reclamation study was from

15   tests that they conducted in connection with their studies of

16   the Friant-Kearney area in California.

17        THE COURT: Does it have an official title, bulletin

18   number or something?

19        THE WITNESS: Well, the title is just unpublished

20   tests by the Bureau of Reclamation in connection with this

21   particular study which I mentioned. They are results which were

22   made available to the Department of Water Resources.

23        THE COURT: Do you have an opinion in the matter your-

24   self?

25        THE WITNESS: Yes, I do. I do not believe that

1    specific yield and permeability-- I believe that they are two

2    different units measuring two different quantities; that two

3    materials of the same specific yield can vary widely in

4    permeability.  I have seen test results where they have varied

5    as much as 20 times, your Honor.

6         THE COURT:  My question to you earlier was:  Is there

7    any relationship?  And your answer is no?

8         THE WITNESS:  That is true.  They are two different

9    quantities.

10   BY MR. MOSKOVITZ:

11        Q   Mr. Stahlman asked you whether in computing storage

12   capacity in the Pechanga-Wolf Valley Basin you took into

13   account a well 8 South, 2 West, 28C1?

14        MR. STAHLMAN:  Save your time.  I understand there is

15   no log on it.

16        MR. MOSKOVITZ:  That is all I wanted to develop; there

17   is no log on that well.

18        I have no further redirect, your Honor.

19        MR. VEEDER:  May I have a few more questions here in

20   regard to your Wildomar Basin.

21

22                         RECROSS-EXAMINATION

23   BY MR. VEEDER:

24        Q   Did you say you did or did not have an overlay that

25   would be available for use?

A   I cannot locate the overlay.  It is not in the computation sheets, Mr. Veeder. Where it is, I do not know.

Q   And that is true of Pechanga?  And that is true of Pauba, is that right?

A   It is true.  Yes, that is true of those two cases.

Q   Assuming that the California's Q was in error in the following respects, would you state-- and I will ask you first:  What in your opinion would be the effect of a disparity in subarea-- now, I am referring to Table 1-- of 100 acres? In other words, 680 acres is shown in Unit 1.  And assuming that the areal extent was, in fact, 579.  Would that, in your opinion, materially alter the conclusions to which you have testified as set forth in Q, particularly in regard to gross storage capacity which appears on Table 3?

A   It would affect the answers, yes.

Q   And the mistake of 100 acres would be very material, would it not, where you have a depth of 450 feet?

A   It depends on what you mean by "very material."  It would have an effect, true.

Q   What would you think of the accuracy or the reliability as a scientist when there is such a disparity?

A   Well--

MR. MOSKOVITZ:  You mean if there were such a disparity?

MR. SACHSE:  If there were such a disparity.

MR. VEEDER:  That is right.  This is all in--

THE WITNESS:  It would affect the answer.  It would make the storage capacity as shown on Table 2 smaller.

BY MR. VEEDER:

Q  Was there any area which you utilized which would be designated as older alluvium?

MR. SACHSE:  I don't understand that question.

BY MR. VEEDER:

Q  Within your storage unit?

THE COURT:  I don't understand it, either.  Do you mean where the areal-- an areal map?

MR. VEEDER:  Surface was older alluvium.

THE COURT:  And included within the storage unit?

MR. VEEDER:  Yes.

MR. MOSKOVITZ:  Are you talking about Murrieta Basin now?

MR. VEEDER:  Yes.

MR. MOSKOVITZ:  Still Murrieta?

THE WITNESS:  To my knowledge, the surface areas we included were Recent alluvium in that basin.  We, however, have gone into older alluvium as we went down.

BY MR. VEEDER:

Q  Would you believe that an error of 20 acres in your Unit No. 11, assuming such an error existed, would materially affect the storage capacity of that Unit No. 11 in view of the fact that it was only 41 acres?

1      MR. MOSKOVITZ:  Your Honor, I am going to object.  He

2  used the word "material," I think it is a question of

3  judgment and degree.  If he wants to know what the difference

4  would be and--

5      MR. VEEDER:  All right.

6      Q  What would be the difference if-- Thank you-- if

7  the areal extent of Unit No. 11 turned out to be 20.8 as

8  distinguished from 41?  Will you figure that for us?

9      A  Well, it would make a difference of a very small

10  fraction inthe total gross storage capacity of Murrieta Basin.

11      Q  In regard to the total gross storage capacity the

12  variance in the capacity of one unit which has a high

13  specific yield would be much more material-- Strike that.  It

14  would be very material in the areas of high specific yield,

15  would it not, to have such an error of such magnitude as I

16  have described?

17      MR. MOSKOVITZ:  What is the--

18  BY MR. VEEDER:

19      Q  For example, Unit No. 11, that is about the highest

20  specific yield that you have, is it not, 24, from 50 to 100?

21      A  It appears to be the highest value.

22      Q  In other words, an error almost 100% would be quite

23  serious there, would it not?

24      A  However, I might point out that the unit, the subarea

25  11, is the smallest by far or at least the smallest of the

1    subareas considered; and that in an area of that size, compara-

2    tive size, an error in specific yield would be commensurately--

3    an area in storage capacity would be commensurately decreased

4    because of a small area, although the specific yield was high.

5         Q  It would be entirely possible, would it not, though,

6    when you have such an area of that magnitude, you might not

7    even have wells in the unit; is that not correct?

8         A  I don't understand your question, Mr. Veeder.

9         Q  You had to have something on which to calculate

10   your specific yield in Unit No. 11, did you not?

11        A  That is true.

12        Q  And is it not possible-- would you come down here

13   and take a look.  See if you can locate No. 11 for me on

14   State's Plate 9B.

15        A  I can't locate it on there, Mr. Veeder.  It is not

16   shown on that map.  You are talking about the subarea 11?

17        Q  Yes.  Are there numerous wells in that area?

18        A  I would have to refer to--

19        Q  Do you know?

20        A  --to the overlay to see where it is.  In subarea

21   11-- I am referring to Exhibit U under Murrieta Basin, subarea,

22   group designation 11-- there is shown one well that was

23   utilized in this computation; and that is Well 8 South, 3W,

24   13R1.

25        Q  And that is located--  Now, in regard to the wells

in Unit No. 1 it would be entirely possible that some of those would be eliminated, is that not right, if you reduce the areal extent by 100 acres?

A   No, I don't think there would be, Mr. Veeder.

Q   Would you check that for us?

MR. MOSKOVITZ:   I don't think it necessary to check. He gave his answer:   It would not eliminate any wells.

BY MR. VEEDER:

Q   How do you know it would not eliminate any wells? Where is a hundred acres reduced, do you know?

A   Possibly because it was caled off another sheet other than the one that is shown here.   I don't know if it were.   It could be a different scale.   The sheet could have shrunk in size, could be distorted, in which case the wells would still be inside the subarea.

Q   In other words, you are stating in to the record that you do not know that this overlay is the one that was utilized in determining the surface area of Murrieta Basin? Is that right?

A   I believe that it was used.   But, as I testified before, this was a long time ago that this work was done, and I am not positive.

Q   Will you check again, though, to determine whether, in your opinion, the overlay was used and tell us in the morning.

A   I will check.

Q   Do you think you will be able to ascertain the fact?

A   Well, that I can't answer for you now.

Q   I will read off these numbers to you, and I think you might want to check them out.  The first number is--

THE COURT:  Are these well numbers?

MR. VEEDER:  This is the areal extent as we have found it to be.

MR. SACHSE:  As who, Mr. Veeder?

MR. VEEDER:  The Marine Corps.  It will give him something to work toward.  This is in evidence.

MR. SACHSE:  I think we ought to know what the Marines took it from or else we have nothing to compare it with.

MR. VEEDER:  This is what was offered in evidence. It is in evidence.

THE COURT: Refer to what you mean by "this."

MR. VEEDER:  I am referring to L Table 15-2.

THE COURT:  All right. And that is where you made your computation?

MR. VEEDER:  That is right.

THE COURT:  Now, you can't have it in the morning, because they told us already that they wanted to check this out, and we would have to wait until the recess to give us this information.  But you can give him the areas that you have in mind.  I suggest you give them to him after court.

1   MR. VEEDER:  All right.

2   THE COURT:  What will be the program for tomorrow?

3   MR. VEEDER:  We are going to have some-- Do you have

4   anymore of your--

5   THE COURT:  Geology?

6   MR. MOSKOVITZ:  On geology, we want to bring in this

7   explanation I mentioned before so that--

8   THE COURT:  We will have it ready tomorrow?

9   MR. MOSKOVITZ:  We will have Mr. James working on it

10  tonight.

11  THE COURT:  All right.

12  MR. MOSKOVITZ:  We will see.  I don't know if it will

13  be in tomorrow.

14  MR. VEEDER:  Footnote 2, is that it?  Or a, is that it?

15  MR. MOSKOVITZ:  This is going to be an explanation

16  of the method by which usable storage capacity was calculated

17  and gross storage capacity.

18  THE COURT:  Do we have any other evidence on geology?

19  Any other witness?

20  MR. MOSKOVITZ:  No.

21  THE COURT:  This completes the general geology picture?

22  MR. MOSKOVITZ:  Yes, your Honor.

23  THE COURT:  You have further evidence on geology?  Or

24  are we going to some other subject matter?

25  MR. VEEDER:  Well, I thought tomorrow we would go

1    ahead on some other subject matter.

2           THE COURT:  Then, the United States is practically

3    through with its geology, too, then, I take it?

4           MR. VEEDER:  Which geology is that, your Honor?

5           THE COURT: General geology of the watershed?

6           MR. VEEDER:  Yes.

7           MR. MOSKOVITZ: We will never be through with this

8    geology.

9           THE COURT:  Does Fallbrook have any evidence on--

10          MR. SACHSE:  Fallbrook has no geologic evidence, your

11   Honor.  We are satisfied by that offered by the United States

12   to date.

13          THE COURT: Does Vail have any evidence pertaining to

14   what might be called geology, as such?  I am not limiting

15   you if some witness later on--

16          MR. STAHLMAN:  I will tell you frankly I do want to

17   talk to Mr. Vail about that matter.  I don't know whether we

18   can add anything to the confusion that already exists here

19   in regard to geology.

20          MR. MOSKOVITZ:  You can try.

21          THE COURT:  All right.  We will adjourn until 10

22   o'clock tomorrow morning.

23          (Adjournment until Friday, December 19, 1958, at

24   10 o'clock A.M.)

25