# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.

Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**      San Diego, California

**Date:**       Friday, December 19, 1958

**Pages:**      6961 to 7040

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1247-SD-C. |
| ) | |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Friday, December 19, 1958

APPEARANCES:

For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
Special Assistant to the
Attorney-General,
Department of Justice,
Washington, D. C.

6962

APPEARANCES (Continued)

                For Defendant                GEORGE E. STAHLMAN, ESQ.
                 Vail Company

                For Defendant State          EDMUND G. BROWN, ESQ.,
                 of California               Attorney-General, by
                                             ADOLPHUS MOSKOVITZ, ESQ.,
                                             Deputy Attorney General; and
                                             CARL A. BORONKAY, ESQ.

                For Defendants
                 Fallbrook Public
                 Utility District,           FRANZ R. SACHSE, ESQ.
                 et al.

                              - - -
                                -
                                -

## INDEX TO WITNESSES

| For the Plaintiff: | Direct | Cross | Redirect |
|---|---|---|---|
| Henry W. Witman, Jr. | 6980 | | 7018 |
| (By Mr. Sachse) | | 7002 | |
| (By Mr. Moskovitz) | | 7015 | |
| John L. Salisbury | 7019 | | |
| (By Mr. Sachse) | | 7035 | |

## E X H I B I T S

| Plaintiff's Exhibit - | For Iden. | In Evidence |
|---|---|---|
| 125 - "Irrigation in Southern Calif." | 6891 | |
| 125-A   Page 101 from Exhibit No. 125 | 6981 | |
| 125-B   Page 90 from Exhibit No. 125 | 6981 | |
| 125-C   Pages 46 and 47 from Ex. 125 | 6982 | |

SAN DIEGO, CALIFORNIA, FRIDAY, DECEMBER 19, 1958.   10:00 A.M.


THE CLERK:  No. 1247-SD-C, United States of America vs. Fallbrook Public Utility District, et al.  Further court trial.

THE COURT:  We are going to adjourn tonight until Tuesday, the 12th of January?

MR. VEEDER:  That is my understanding, your Honor.

MR. MOSKOVITZ:  Until the 13th, your Honor.

MR. VEEDER:  Until the 13th, I think.

THE COURT:  Until the 13th of January.  You have an engagement in Spokane the week of the 5th to the 9th and 10th of January?

MR. VEEDER:  That is correct, your Honor.

THE COURT:  I don't want to burden the holiday season with a lot of work, but last night I spent a little time outlining a few matters and I thought I would go over them the first thing this morning.  Maybe the Reporter could get this portion out for you so that you could look it over before we adjourn this afternoon.

We have about completed the general evidence on geology.  My proposal is that you submit to me, upon your return or shortly thereafter, a document in the nature of a proposed or tentative finding that I might make on some of these matters.  I don't propose to make them immediately.

1    Mr. Littleworth, who is concerned in this problem, is not

2    here.   There may be other defendants who may want to put on

3    some evidence on geology.

4         But following Mr. Sachse's suggestion sometime ago, it

5    appears to me that we ought to tentatively crystallize the

6    position of the defendants and the plaintiff on some of these

7    matters.  Many of them are not really essentially in dispute.

8    We have had a lot of cross-examination here.  Mr. Veeder has,

9    for instance, cross-examined on some issues where I am satis-

10   fied he is content with the answers.  But apparently his cross-

11   examination was from the standpoint of attacking the credibil-

12   ity of the witness, which is proper and which he has a right

13   to do.  But the point is that many of these matters aren't

14   really in dispute.

15        I have listed here fourteen sort of subheads.  They

16   are not worked out too well, since I did it rather hurriedly.

17   But I want to go over them with you now one at a time.

18        Let me interject and say that when you reply to this

19   I want you to set it up with these same numbers, so that as

20   to number one I can see what the State or Fallbrook or the

21   United States has to say about item one and match them up.

22   If you scatter it all through a document, then it is very

23   difficult to match up your positions.

24        1.  Definitions.

25             Permeability.

8966

1                Transmissibility.

2                Specific yield.

3                Specific capacity of wells.

4                What is a basin or a storage unit?

5       In general terms, there oughtn't to be any dispute

6 about those matters. There may be another item or two that

7 you may want to include in there.

8       2.   The major faults:

9         (a)   Their location as to streams and basins.

10 Now, I am only concerned with the major faults. You have a

11 fault east and west of the Murrieta Valley and generally east

12 and west of Pechanga or Wolf Valley. You have another fault

13 that is significant running up through the Murrieta Hot Springs

14 area. There are probably many others, but probably those are

15 the major faults that have any impact on this case. And

16 there may be some faulting up near the Vail Dam that should be

17 taken into account. But there is no real dispute on it. I

18 don't care whether one witness relied on Mann and someone else

19 looked at Mann and made a little further research. But when

20 you look the matter over there is no general dispute as to

21 these major faults.

22        (b) Their effects:

23          (1)   They appear on either side of the

24              Murrieta and Wolf Basins.

25       Let me interject again that these are not findings, and

1    where I indicate something in the nature of a finding, if I

2    am wrong on it I can be shown to the contrary.  But this is to

3    give you something to work on.

4                    (2) They constitute a partial barrier to

5                        water from the older alluvium in the

6                        Murrieta and Wolf Basins.

7        I don't think there is any dispute on that.  No one

8    has said that they are absolute barriers.  All witnesses have

9    indicated that they impede the flow of water-- t a  partial

10   barrier.

11                   (3)  There is a partial barrier effect at the

12                        west end or lower end of the Pauba and

13                        the Santa Gertrudis Valleys or Basins.

14                        There isn't much dispute about that.

15                   (4)  These faults are responsible for the

16                        situation of rising water along the side

17                        of Murrieta Valley.

18                   (5)  The faults, together with confining or

19                        semi-confining or lenticular bodies, are

20                        the cause of the artesian wells in Pauba

21                        Valley.

22       3.  The kinds of material in the watershed.  This is

23   concerned largely with the upper part of the watershed, but it

24   concerns the entire watershed, and actually we have probably

25   only four categories that concern us:

1          (a)  The younger alluvium.

2          (b)  The older alluvium.

3          (c)  The residuum or the weathered complex.

4          (d)  The basement complex.

5      4.  The areas where these materials are located.   There

6 is no major dispute as to that.   Mr. Fox stated that the general

7 outline of them on Government's Exhibit 15, subject to minor

8 differences of opinion here and there, was substantially

9 correct.

10      5.  The permeability of these various materials:

11          (a)  As to the basement complex, we all agree that

12               it has no permeability, and that any water

13               in the complex is in faults, joints, breaks

14               et cetera.

15          (b)  The residuum or the older weathered material.

16               There is a certain amount of permeability,

17               certainly not like in the younger alluvium.

18               I am not sure how it compares with these older

19               materials.

20          (c)  The younger alluvium-- permeability is generally

21               good.

22          (d)  The older alluvium is less permeable.   There

23               has been no dispute on that.   No one has given

24               the Court any specific data that could be

25               included in a finding as to the degrees of

1    permeability, except that they are good or a

2    little less than good, or moderate.

3    6.   The capacity of these materials listed above and

4  their characteristics in connection with the storage of ground

5  water.   Again there is not much dispute that

6         (a)   In the basement complex we can say none.

7         (b)   In the younger alluvium we can say it is very

8               good.

9         (c)   In the older alluvium everyone concedes that it

10              will yield water-- not to the extent of the

11              younger, however.

12        (d)   Likewise, the residuum may or may not yield

13              water.

14   7.   A list of the basins or water storage units.   And

15 there aren't too many disputes.   The disputes that I have

16 listed are:

17        (a)   The areal extent of the Murrieta Basin.   The

18              United States has generally taken the fault

19              lines as the edges of the basin.   The State of

20              California has taken the contact between the

21              younger and the older alluvium and projected

22              it downward in a vertical manner, which gives

23              them an irregular-shaped basin and gives them

24              a basin a little over half the size of the

25              basin as shown by the United States. And yet

1     the State of California concedes that as those

2     lines are projected downward they go through

3     both the younger and the older alluvium, so

4     that older alluvium is included as part of the

5     basin unit.  Tentatively and offhand, it seems

6     to me, in view of that extreme faulting in the

7     two major faults and the dropping effect along

8     the Murrieta as compared with the uprising on

9     the Santa Rosa side, that the natural basin

10    there is probably defined by the fault lines

11    rather than by taking the contact of the younger

12    and the older alluvium and weaving an irregular

13    line and projecting it downward.  The dispute

14    there concerns some 4,400 acres as compared

15    with 7,600 or so, and it is largely on the

16    basis of which of those two lines you take.

17  (b)  Another dispute exists as to the United States'

18       proposed Ground Water Unit 4.

19  (c)  There is a minor dispute as to French Basin, and

20  (d)  Los Alamos Basin.  The Government's position is

21       that that is residuum, not a basin.  There is

22       some water there.  The State of California says

23       they are two small basins, neither one with any

24       large amount of water.  So you have those

25       disputes.

Now as to many of the smaller basins, the Government says we do not have sufficient information to make a calculation, and the State has made a calculation in certain of those smaller basins.

8.   The usable storage capacity of basins.

(a)   As to the small basins, as to which the State of California estimates and as to which the United States has no estimate, I don't see how we can go wrong if we accept the California figure. The United States says we have no estimate. They don't say there is not a basin there, because their evidence shows there is a basin; but they say we are not prepared to make an estimate on it.  But there is water in those small basins.  I don't think it is a very important point in the case.

(b)   As to the Coastal Units, there is no real dispute as to the final figure as to usable storage capacity.  It is true that there is some dispute as to how you arrived at the figures. But ultimately you are seeking the final answer, and you arrive at a similar final answer even though your methods are entirely different. We are certainly not concerned with the methods,

1        at least in the situation where the final

2        answers are as similar as they are.

3   (c)  In the Pauba Basin the ultimate figures are

4        relatively close, notwithstanding the other

5        disputes that exist.

6   (d)  As to Murrieta and Wildomar, which have been

7        separated by the State in those two areas, and

8        by the United States in Murrieta, I have al-

9        ready commented on the different approach as

10       to the areal extent of the basin between

11       California and the United States.  I will add

12       to what I have said that it is obvious that

13       the State has used the older alluvium as part

14       of their basin area, it is obvious that wells

15       go down into the older alluvium, and it is

16       very difficult to see, therefore, why the fault

17       lines aren't the best edges of the basin and

18       the basin consists of all the material within

19       the fault lines.

20  (e)  Pechanga-Wolf.  Again, we have the same situa-

21       tion where the United States has taken the

22       fault lines and made a more regular-shaped

23       basin.  The State of California has taken the

24       contact between the older and the younger

25       alluvium and drawn an irregular-shaped basin

1  and projected it vertically downward.  The same

2  comments on Murrieta would apply to Pechanga-

3  Wolf.

4      9. Confining waters or confined waters.  This apparently

5  concerns only Pauba and Santa Gertrudis.

6      (a)  The areas where such situations exist.

7      (b)  The agreement that there is no absolute con-

8          finement.

9      (c)  Likewise, an agreement that there is some

10          movement up and down.  It is a matter of degree.

11      (d)  Artesian wells are explained by some sort of

12          lenticular bodies or semi-confining materials.

13      (e)  It is agreed that these lenticular deposits

14          are irregular, vary in depths, but none of them

15          is of great thickness-- they are interlaced

16          but they exist.

17      (f)  It is agreed that there is no complete blanket

18          of clay or complete blanket in the nature of a

19          confining bed.

20      (g)  I think it is agreed among the experts that

21          laterally the water would probably move more

22          easily through these beds than it would vertically.

23      (h)  This confined or semi-confined zone of water is

24          recharged by streams, by rainfall, and I

25          suggest that it is recharged also, to a limited

1    extent, by vertical movement downward and to a

2    greater extent by lateral movement from the

3    older alluvium from the sides-- although it is

4    a difficult thing to pin down.

5    (i)   The effect of these confining beds on our case.

6    I can't see where it is anything but a matter

7    of academic interest about these confining beds.

8    10.   Government's Unit No. 4.  We have probably the major

9    problem here.

10   (a)   California admits that there is much storage

11   in the older alluvium.

12   (b)   It projects its basin down into the older

13   alluvium.

14   (c)   But it doesn't project its basins out laterally.

15   In other words, it takes an arbitrary line

16   down through the older and cuts it off here

17   and says here is where the basin starts and

18   here is where it ends, although the material

19   on either side of that vertical line is un-

20   doubtedly identical.

21   Now there are four basins where the pro-

22   jection is made down vertically:  Murrieta,

23   Pauba, Pechanga and Santa Gertrudis.  The other

24   basins the State and the United States generally

25   look at on the basis of the contact between the

1            older and the younger alluvium.  There is no

2            dispute there.

3   (d)   If storage exists within this older alluvium

4            within Government's Unit No. 4, the major ques-

5            tion is how rapidly the water moves-- how

6            rapidly water could be extracted from it.

7   (e)   What about the Roripaugh Well, specifically?

8            It would seem to me, from the record made thus

9            far, in the absence of some showing by Mr.

10           Littleworth, that the Roripaugh Well is

11           obviously in the Santa Gertrudis Basin.  I don't

12           think there can be much argument about the

13           Roripaugh Well.

14   (f)   Water level contours.  It has been conceded by

15           the State's witnesses that the wells shown in

16           Unit No. 4 are hydrologically connected.  What

17           is the significance of the fact that they are

18           connected?  Apparently, the State's position is

19           that although there is water in the older

20           alluvium, although the wells are hydrologically

21           connected, and although there is probably a

22           lot of water in that area, they don't have

23           enough information to say that it is a basin.

24           But when they get through making the various

25           concessions they have made, query:

1          Haven't they in substance said there was a

2     basin?

3          And what is the extent of it?

4     11.  What is the gradient or slope of the basement

5  complex under the United States's Ground Water Unit No. 4?

6  By that I mean this:  We know that down in the Murrieta the

7  oil well went down several thousand feet.  We know that in

8  the Pauba the Navy well went down 2,400 or 2,500 feet without

9  hitting basement complex.  We know that easterly of the

10 Government's proposed Unit No. 4 basement complex appears.  We

11 know there is a vertical line up through Murrieta Hot Springs.

12     Now, did this basement complex between Murrieta Hot

13 Springs and the Santa Rosa Mountains, on one or both of those

14 faults, sink down uniformly, or is there a gradient or slope

15 to that basement complex from the eastward where the basement

16 complex appears in a westerly direction, so that there is much

17 more of the older alluvium near the Murrieta and much less of

18 the older alluvium as you go further east?  Some of the well

19 logs would indicate that/several hundred feet along the
                           at a depth of

20 easterly limits of Government's proposed Ground Unit No. 4

21 that basement complex is encountered.  It is probably true

22 that the faulting that occurred on the easterly side and the
                                       not as
23 fault near Murrieta Hot Springs is/an extreme case of faulting,

24 as is the faulting along the Murrieta.  And if there is a

25 gradient westerly with the deeper areas of alluvium down in

1   the Murrieta first and next immediately east of the Murrieta

2   Valley, then if there is a basin there the major portion of it,

3   of course, is closer to Murrieta.  The Government has proposed

4   to take only 100 feet of aquifer, but this gradient of the

5   basement complex would have some bearing on how far back you

6   would run the line of such a basin.

7          At any rate, I have some points under this:

8          (a)   Whether I have enough so to find, I don't know, but

9                it seems to me that the slope must be to the

10               west.  That is the area in which the alluvium

11               came in when it was deposited.  There must have

12               been a big void there and it filled up over a

13               number of years by the action of streams

14               bringing the material down.

15         (b)   Would the use of seismographs pick up the

16               location of that basement complex?  In other

17               words, could you put a seismograph on that

18               Unit 4 area and find out where your basement

19               complex is in selected places?

20         (c)   I have already mentioned the 100 feet of

21               aquifer taken by the Government.  Where would

22               it intersect or come in contact with the

23               basement complex, if at all?

24         (d)   In view of the depth of this older alluvium,

25               as we see it in the Murrieta Valley and as we

1          see it east of the Murrieta Valley and in the

2          Pauba Valley, why isn't the taking of a hundred

3          feet of water-bearing aquifer a reasonable

4          estimate?  It doesn't seem to be unreasonable

5          where we know there are several thousand feet

6          of material in certain places and many wells

7          go down over 500 feet into/alluvium which is
                                  older

8          water-filled.  Why isn't the use of a hundred

9          feet reasonable?

10    12.  The matter of movement of water in Unit No. 4.

11         (a)  Direction.

12         (b)  Amount.

13         (c)  Speed of movement.

14         (d)  The water level contours.

15         (e)  Hydrologic connection of wells-- all tied in

16              somewhat with some of these earlier problems.

17    13.  Depletion of basins in areas of confined water.

18         (a)  They are charged by stream and rainfall,

19              generally.

20         (b)  In the Pauba and the Santa Gertrudis, if the

21              basin is depleted, I think it would be con-

22              ceded there is then a drawdown effect upon

23              older alluvium on either side of those basins.

24              How much it is, is difficult to ascertain, but

25              there certainly would be an effect.

6979

(c)   In the Wolf and Murrieta Valleys the situation
      is probably a little different.  The drawdown
      on those basins, because of the barrier effect
      of the faults, would not immediately put too
      much of a pull on the older alluvium.  But of
      course the first water over the barrier would
      be used to fill up the depleted basin.

14.   The only real geologic problem downstream is the
problem of salt water intrusion in the lower basin.

(a)   Does it exist?

(b)   How can it be combatted.

(c)   What kind of a finding and decision should the
      Court make as to salt water intrusion and how
      to handle the problem?

When you have had a chance to look these over there
may come to you other problems.  But offhand I should say that
most of our issues are encompassed in this outline.  And as
to many of these matters there is no dispute.

Proceed.

MR. VEEDER:  As I understand, Mr. Moskovitz is going
to call Mr. James; is that right?

MR. MOSKOVITZ:  No, I am not.

MR. VEEDER:  I thought you were going to have some
more examination.

MR. MOSKOVITZ:  No.

1          MR. VEEDER:  I see.

2          I will call Mr. Witman.

3

4                    HENRY W. WITMAN, JR.,

5    called as a witness in behalf of the plaintiff, being first

6    duly sworn, testified as follows:

7          THE COURT:  State your name.

8          THE WITNESS:  Henry W. Witman, Jr.

9

10                    DIRECT EXAMINATION

11         MR. VEEDER:  The Clerk is not here at this time, your

12   Honor, but I would like to have the record show that I am

13   offering to have marked for identification three parts from

14   a publication by the State of California designated "Irrigation

15   in Southern California."  About one and a half pages of that

16   material appeared in the State's Exhibit L for Identification.

17

18

19

20

21

22

23

24

25

1    MR. VEEDER:  At page 19, matter concerning which your

2    Honor has made reference.

3    THE COURT:  L, Volume I?

4    MR. VEEDER:  That is correct, your Honor.

5    THE COURT:  This the part on page 19, Volume L, page 1

6    where the quotation is made from the report of William Hamil-

7    ton Hall, the first California State Engineer, entitled:

8    "Irrigation in Southern California, dated 1888"?

9    MR. VEEDER:  That is correct.

10   THE COURT:  And that is the book you made your extracts

11   from?

12   MR. VEEDER:  Yes, your Honor, it is.  I would like--

13   THE COURT:  It may be marked for identification.  The

14   next in order is 125, is it, Mr. Clerk?

15   THE CLERK:  Yes, your Honor.

16   MR. VEEDER:  That would be 125, and the pages from

17   the book to which I have alluded would be on 101 and 102.

18   Now, there is another portion of that, your Honor,

19   portion of that book which is page 90; it relates to the

20   Fallbrook Water & Power Company.  I would have that marked

21   125-A, if it is agreeable to your Honor.

22   THE COURT:  All right; 125-A.

23   (Between the Clerk and the Court:)

24   THE COURT:  Yes, we will call the first one 125-A;

25   the pages 101 to 102.

1    MR. SACHSE:  What is the second one, then?

2    THE COURT:  The next one on 125-B will be page 90,

3  concerning Fallbrook.

4    MR. VEEDER:  And then pages 46 and 47, just a general

5  statement from that report in regard to the Temecula-Santa

6  Margarita River.

7    THE COURT:  It will be 125-C for Identification.

8    MR. VEEDER:  Now, I would like to withdraw the book,

9  because it was obtained from--

10    MR. STAHLMAN:  What is the date of the publication of

11  that, Mr. Veeder?

12    THE COURT:  1888, according to Exhibit L.

13    MR. VEEDER:  Yes, it is published in 1888.

14    MR. MOSKOVITZ:  What was that third extract?  Page 40?

15    MR. VEEDER:  46 and 47, Mr. Moskovitz.

16    MR. MOSKOVITZ:  Do you have extracts of that?

17    MR. SACHSE:  Do you have extracts of that page 40?

18    MR. VEEDER:  Yes.

19    MR. MOSKOVITZ:  Extracts also?

20    MR. VEEDER:  Yes, there are pages for counsel.

21    THE COURT:  Pages for the Court, too?

22    MR. VEEDER: Yes, your Honor.  Do you desire them now?

23            In view of the ten-day rule I will not

24  offer them until after the holiday.

25    THE COURT:  All right.

Wittman - Direct

MR. VEEDER:  I have put on the board Plaintiff's
Exhibit No. 76.  I would like to call to your Honor's atten-
tion the fact that the map that I have placed on the easel was
lodged originally as Plaintiff's Exhibit No. 76.  However,
there has been a revision in the map originally lodged by
changes of the water line to conform with that which has been
established.  Now, I don't know whether that has violated the
ten-day rule or not.  If there is objection, why I will just--

THE COURT:  Any objection?  Mr. Veeder, in substance,
is substituting another map or a changed map for the one
originally lodged.  Of course, the word "established" means
established to his satisfaction.

MR. VEEDER:  Well, I am sure that--

THE COURT:  There may be no dispute about it. We will
see later.  Do you have a copy of the new exhibit?

MR. VEEDER:  Yes.

THE COURT:  May this new one be substituted for the
old 76?

MR. VEEDER:  I would like to do that if it would be
amenable to your Honor.

THE COURT:  Any objection?

MR. SACHSE:  Yes, your Honor.  They both have the same
date, May, 1958.  They have got two entirely different water-
shed lines.  And I cannot consent to that substitution under
that--

1    THE COURT:  The only thing you can object to is the

2  application of the ten-day rule to offer it in evidence.

3  If counsel will go ahead and--

4    MR. SACHSE:  Oh, I beg your pardon.  You mean just

5  substitute for the purposes of identification?

6    THE COURT:  That is right.

7    MR. SACHSE:  No, I don't care.

8    THE COURT:  They may be substituted.

9    MR. SACHSE:  When the offer time comes there will be

10  objection.

11    MR. VEEDER:  Do you have a copy of that, counsel?

12    MR. SACHSE:  I have the old one.

13    MR. VEEDER:  May we proceed, your Honor?

14    THE COURT:  You may proceed.

15  BY MR. VEEDER:

16    Q  Mr. Witman, would you state your present residence?

17    A  1935 South Pacific, Oceanside, California.

18    Q  And how old are you, Mr. Witman?

19    A  Sixty-five.

20    Q  Would you state into the record when you first

21  became acquainted with the Rancho Santa Margarita?  When did

22  you first become acquainted with the Rancho Santa Margarita?

23    A October, 1920.

24    Q  And would you state into the record the circumstances

25  under which you became acquainted with the Rancho?

1    A  Well, I became a tenant on Rancho Santa Margarita

2    lands in the fall of 1920.

3    Q  And how long were you on the rancho as a tenant to

4    start with?

5    A  As a tenant until July, 1922.  I became an employee

6    of the ranch.

7    Q  And what were your responsibilities at that time

8    in connection with the Rancho Santa Margarita?

9    A  I was foreman of the activities in the south end

10   of the property.

11   Q  And when you say the south end, you mean?  What do

12   you mean by that, Mr. Witman?

13   A  The Santa Margarita watershed.

14   Q  (Pointing).

15   A  Right there.

16   Q  Yes; and would you state what your responsibilities

17   were in connection with the Rancho?  What did you do?

18   A  At that time I had charge of the farming activities,

19   and we commenced to feed cattle at that time.

20   Q  And what were the sources, if any, of the water used

21   on the Rancho?

22   A  From the Lake O'Neill and some wells in the basins.

23   Q  And what were the waters used for by the Rancho?

24   A  Irrigation of the valley lands.

25   Q  And would you state how the waters were diverted from

1  the Santa Margarita River for use by the Rancho?

2        MR. SACHSE:  I object, if the Court please.  It is

3  entirely immaterial how the diversions were made for the

4  irrigation of valley lands within the watershed of the Santa

5  Margarita River by a riparian owner, such as a proper riparian

6  use, and cannot possibly create any adverse appropriative use

7  or prescriptive use under your Honor's pre-trial ruling.

8        THE COURT:  It is probably true, but it may be admis-

9  sible for other purposes.  Objection overruled.

10  BY MR. VEEDER:

11        Q  Will you proceed to describe the method of--

12        A  We just erected a little surface diversion in the

13  stream bed.

14        Q  And how did you erect that surface diversion?

15        A  With scrapers, teams, and fresno scrapers.

16        Q  What was the objective of building the dam across

17  the--

18        A  To divert the surface flow of the river into Lake

19  O'Neill.

20        Q  And how was the water conducted from the Santa

21  Margarita River into Lake O'Neill?

22        A  Through a ditch.

23        Q  And do you recall the length of the ditch, Mr.

24  Witman?

25        A  Oh, approximately a mile to a mile and a half.

1    MR. SACHSE:  May I have a continuing objection, your

2    Honor?  I can conceive of no other purpose for this testimony

3    unless it is intended to establish either a claimed pre-

4    scriptive or appropriative right.  But it is absolutely im-

5    material.  There is no conveivable basis for it.

6    THE COURT:  You may have a continuing objection.  The

7    objection is overruled.

8    BY MR. VEEDER:

9        Q  When the water was conducted into Lake O'Neill,

10   how was it utilized?

11       A  Well, it was released during the summer months for

12   irrigation of lower lands.

13       Q  And could you state the time of year when the dam

14   was constructed across the Santa Margarita?

15       A  It varied.  It depended upon the amount of rainfall

16   we had during the preceding winter and spring.  Usually from

17   April 15th to June the 1st.

18       Q  And what are the dates when you--

19       A  We put the dam in and diverted the water into the

20   lake.

21   THE COURT:  You mean you put the dam in--

22   THE WITNESS:  Each spring.

23   THE COURT:  --in April?

24   THE WITNESS:  Yes.

25   THE COURT:  And then used the dam to divert water on

Witman   Direct                                                    6988

1    through to the 1st of June?

2         THE WITNESS:  Used the dam all-- until the following

3    winter.  We used the dam, but we put it in at varying periods,

4    depending on the river flow.

5         THE COURT:  Varying periods between April and June?

6         THE WITNESS:  Yes, sir.

7    BY MR. VEEDER:

8         Q  How would the dates of construction of the dam

9    relate to the winter runoff?

10        A  Well, when we have had heavy spring rains there was

11   too much surface water to be able to put a dam in there.  We

12   just made it out of soft sand there from the river surface.

13   It would wash away faster than you would put it in.

14        Q  After the water had been diverted into the lake,

15   what were the means utilized for the delivery of the water to

16   the lands for irrigation?

17        A  When I came to the ranch, there was a system of

18   ditches from the O'Neill Lake down the valley; and it was

19   distributed to the valley lands.

20        Q  And state generally, if you would, where those lands

21   were situated which were irrigated from Lake O'Neill, if you

22   would, please?

23        A  Well, directly below the Ranch House and in the

24   valley south of the Santa Fe tracks called Chappo Flats.

25        Q  How many years have you been a farmer, Mr. Witman?

MALCOLM E. LOVE, OFFICAL REPORTER

Witman - Direct                                                    6989

A  Since 1911.

Q  During that period what experience did you have in connection with the estimates of acreages?

A  Well, I had charge of all the leasing on the ranch after 1926.

Q  And what would your responsibilities entail from the standpoint of acreages?

A  Oh, we had probably fifty tenants with acreages to be either measured or estimated each fall for the computation of these leases; some on a crop and some on a cash rent.

Q  Based upon your experience, would you state into the record the number of acres of land which were irrigated by means of water stored in Lake O'Neill at the time that you went to the Rancho?

MR. SACHSE:  That is 1920, then, Mr. Veeder?

MR. VEEDER:  That is correct.

Q  Can you give us an estimate?

A  At the time I went to the rancho I-- At the time I went there as a tenant in 1920, I don't believe there were over 300 acres irrigated.

Q  Would you state how many acres of land were irrigated from Lake O'Neill after you had been put in charge of the operations?

A  Well, we built feed pens and commenced feeding cattle for commercial purposes in 1922, and our irrigated acreage

Case 3:51-cv-01247-JO-SBC   Document 4562   Filed 09/24/63   PageID.27733   Page 31 of 81

1  for feeds increased then.  And we had an average from the

2  period 1922 to when the Marines took over the property in '42

3  of, I would roughly say, 500 acres of alfalfa and about three

4  to four hundred acres of fallowed land used either for

5  vegetables or a crop that would clean the ground up in

6  preparation of alfalfa; about 800 acres of irrigated lands.

7        Q  Below Lake O'Neill?

8        A  Below Lake O'Neill, yes, sir.

9        Q  And served by Lake O'Neill?

10       A  By Lake O'Neill; gravity.

11       Q  Now, what other lands were irrigated on the Rancho

12  Santa Margarita within the watershed of the Santa Margarita

13  River?

14       A  Well, there were some areas across on the west side

15  of the river called Thompson Canyon that was first in sugar

16  beets and then later in alfalfa.

17       Q  Can you locate on Plaintiff's Exhibit marked for

18  Identification 76 where that Thompson Canyon property would

19  be situated?  If you want to approach the easel, why, you

20  may do so.

21       Have you oriented yourself?

22       A  I don't think it is outlined, but it is right in

23  here.

24       Q  And you are pointing to Section--

25       A  Section 14.

1    Q   And where would that be located in connection

2    with the Chappo Flats areas then?

3    A   That would be northwest on the opposite side of the

4    river.

5    Q   What other lands--

6    THE COURT:   How many acres were irrigated there in

7    Thompson?

8    THE WITNESS:   Originally when I came to the ranch,

9    about 70 acres.  But we increased that in, oh, along about

10   1930.  And I think it was about 160.

11   BY MR. VEEDER:

12   Q   And what was the source of the water that you--

13   A   That was from wells along the edge of the river.

14   Q   What other areas, Mr. Witman, were irrigated within

15   the Rancho Santa Margarita and within the watershed of the

16   Santa Margarita River besides those in Thompson Canyon and

17   Chappo Flats?

18   A   Well, we had a small piece where the Naval Hospital

19   is there, between the lake and the river.  There was about,

20   oh, 80 acres where the Navy Hospital is; and then we had--

21   Q   What was the source of the water for that 80 acres?

22   A   That was pumped out of either the river or the

23   lake, wherever it was handy.  It had to be lifted by pump.

24   Q   And do you recall when that land was brought into

25   cultivation?  Was that--

A  Into irrigation, I would say 1935.

THE COURT:  How many acres were there?

THE WITNESS:  About 150 or 60 acres.

THE COURT:  That were irrigated?

THE WITNESS:  Yes, sir.

MR. SACHSE:  Wait a minute.  He said, "80," I thought.
Which is the correct figure?  My note says 80.  Am I mis-
taken?

THE COURT:  No.  That is what he said.

Do you mean 80 or 160?  That is between where the
Naval Hospital is and the river.

THE WITNESS:  No, it was about 160 acres farmed, I
guess, and about half irrigated.

BY MR. VEEDER:

Q  You would say about 80?

A  I would have to correct that, yes.

Q  Now, to what crops were those lands--

A  That was vegetables.

Q  Vegetables.

A  The irrigated portion was vegetables.

MR. SACHSE:  I think this is irrelevant, your Honor.
The crops are irrelevant to any water right.

THE COURT:  What is that?

MR. SACHSE:  Crops certainly are irrelevant to any
water right.

1          THE COURT: Go ahead.  Overruled.

2          MR. VEEDER:  I get used to this--

3          THE COURT:  I don't think it is very material, I will

4     agree.  But it will save time to let him ask it.  Go ahead.

5     BY MR. VEEDER:

6          Q  What other lands--

7          A  The lower Ysidora Valley.

8          Q  And where were those lands generally situated, Mr.

9     Witman?

10          A  Well, they were down in this area here.

11          Q  You pointed to Sections-- well, that was Section

12     35, 36, Section 2, is that right, in--

13          A  I can't see the numbers or the sections from here.

14     That is the Ysidora Valley or the lands, and they are in

15     Section 2, 35, 36, and 1.

16          Q  What other lands were there irrigated, Mr. Witman,

17     during your period on the Rancho Santa Margarita?

18          THE COURT:  What was the acreage irrigated in Ysidora

19     Valley?

20     BY MR. VEEDER:

21          Q  Would you state then during your time the lands

22     that you irrigated there?

23          A  500 acres.

24          THE COURT:  When did this start?

25          THE WITNESS:  Well, that was under irrigation, the

1    majority of the 500 acres was under irrigation when I came

2    to the ranch, when I first saw it.

3    BY MR. VEEDER:

4         Q   That was in 1920?

5         A   Yes, sir.

6         Q   And what was the source of the water for those

7    lands?

8         A   Well.

9         Q   And would you state what crops were being raised

10   on those lands at the time that you went to the rancho, if

11   you recall?

12        A   Beans at the time I went to the rancho.

13        Q   And what other crops, if you remember?

14        A   Later, vegetables.

15        Q   When you state "vegetables," how long an irrigation

16   season would be involved under those circumstances?

17        A   Four or five months during the summer.

18        Q   What other properties were irrigated on the Rancho

19   Santa Margarita during the period that you were on the rancho?

20        A   In the coastal lands adjacent to the river.

21        Q   And when you say "coastal lands," what do you mean

22   by that?

23        A   The Stuart Mesa and South Coast Mesa.

24        Q   Could I ask you to approach the Plaintiff's Exhibit

25   marked for Identification 76 and just generally refer to the

1   sections in Stuart and South Mesa which are depicted there as

2   being irrigated?

3        A  We have Sections 4 and 5, 9, 16, 15.  That gets

4   most of it.  There is a little bit in 14.

5        Q  What were the crops which were being raised on

6   Chappo Flats when you came to the rancho?

7        A  Beans, the year I came to the ranch.

8        THE COURT:  Before we skip Stuart and South Mesa, when

9   you first came there in 1920, lands were being irrigated also?

10        THE WITNESS:  No, that was all dry farming.

11        THE COURT:  Dry farming?

12        THE WITNESS:  Yes, sir.

13        THE COURT:  When did the irrigation start on South

14   Coast and Stuart Mesa?

15        THE WITNESS:  1937, I believe, at Stuart, and 1938 at

16   South Coast.

17   BY MR. VEEDER:

18        Q  And what were your responsibilities in connection

19   with bringing those lands into irrigation, Mr. Witman?

20        A  I had charge of putting in both those irrigation

21   systems, leasing the land.  I was general manager at the

22   ranch at that time.

23        Q  And would you state the acreage that was brought

24   under irrigation on the Stuart Mesa?

25        A  Approximately 1,100.

1    MR. SACHSE:  Excuse me.  What was the figure?

2    THE WITNESS:  1,100; Stuart.

3    BY MR. VEEDER:

4    Q  And what about the acreage on South Mesa?

5    A  Approximately 600.

6    Q  Into what crops was that acreage planted on both

7    the Stuart and South Mesa?

8    A  There was 100 acres of lemons and the rest was

9    vegetables.

10    Q  And what would be the period that water would be

11    realized on Stuart and South Mesa for raising the, well, the

12    lemons and also the vegetables?

13    MR. MOSKOVITZ:  When you say "would be," you mean

14    actually?

15    BY MR. VEEDER:

16    Q  What would be the irrigation season for the

17    vegetables which were raised on Stuart and South Mesa?

18    MR. SACHSE:  You mean what was the irrigation season

19    of the vegetables, Mr. Veeder?  Or what might it be?  Your

20    question is: "What would it be?"

21    THE COURT:  He means what was the irrigation season.

22    MR. VEEDER:  I will reframe it.

23    Q  What was the irrigation season for raising vegetables

24    in Stuart and South Mesa?

25    A  Of course, the main irrigation season was from May

MALCOLM E. LOVE, OFFICAL REPORTER

1    until November.  But it was land that was subject to winter

2    crops, and years like this where we had no rain, we irrigated

3    clear up until the rains came in December and January and--

4    whenever the rains came.  And, of course, the citrus needed

5    water until it rained; so--

6         Q  How was Lake O'Neill operated during this period

7    from the standpoint of releases of water stored in behind the

8    dam which created that reservoir?

9         A  Well, as it was stored in the reservoir, and as

10   we had a valve that released the water, and we turned it on

11   as we needed it during the summer months.

12        Q  Now, would you state the maximum acreage in alfalfa

13   that was irrigated from Lake O'Neill during your stay there?

14        MR. MOSKOVITZ:  You mean any one time?

15        MR. VEEDER:  Yes.  Yes.

16        THE WITNESS:  Probably 500 acres.

17   BY MR. VEEDER:

18        Q  And do you recall what year that that maximum of

19   500 acres of alfalfa was irrigated?

20        A  I would say it was a period of 1925 or '26 to

21   probably 1941.

22        MR. VEEDER:  Your Honor, I observe that it is time

23   for a recess.

24        THE COURT:  All right.  Take a short recess.

25        (Recess.)

B3

1  BY MR. VEEDER:

2      Q  Just one more question, Mr. Witman.  Would you state

3  into the record the number of cuttings of alfalfa you took

4  off of these lands that you managed down there on the Chappo

5  Flats?  How many cuttings of alfalfa?

6      MR. SACHSE:  I object.  It is immaterial.

7      THE COURT:  Overruled.

8      MR. STAHLMAN:  You mean a season?

9      MR. VEEDER:  Yes.

10     THE WITNESS:  About five cuttings during the season.

11  BY MR. VEEDER:

12     Q  And do you recall the number of tons to the acre

13  that you would take off there?

14     MR. SACHSE:  Same objection, your Honor.

15     THE COURT:  Overruled.

16  BY MR. VEEDER:

17     Q  If you remember?

18     A  Oh, approximately five ton.

19     Q  To the acre?

20     A  Yes, sir.  About a ton to the acre each cutting.

21     MR. VEEDER:  I have no further questions.

22     MR. SACHSE:  Now, your Honor, if your Honor please,

23  we are in a stage in the evidence where I think the record

24  is becoming very important.  And at this time I am going

25  to move to strike the testimony of this witness.  And I

1   would like to express briefly my thinking upon it.

2        THE COURT:  Now, we can save a lot of time, Mr.

3   Sachse.  You are going to object on this ground of pre-

4   scription and appropriation, and so forth.  But what was done

5   in 1920, in so far as this witness has testified to it, might

6   fit on with the testimony of earlier periods and, therefore,

7   of evidentiary value.  Now, as to matters that started after

8   1920 and in the '30's, it might still have an evidentiary

9   value as to the water duties of the land or how much land

10  could be used for irrigation, and so forth.  And if the

11  evidence is admissible on any score, it goes into the record.

12       MR. SACHSE: The point I am trying to make at the

13  moment is this, your Honor, with specific reference to Lake

14  O'Neill:  I would like to inquire of Mr. Veeder-- I believe

15  it is proper inquiry, because I object to the immateriality

16  of the testimony-- If this testimony is offered for purposes

17  of appropriative, showing and exercising an appropriation.

18  That is one thing.  It may be material.  If, on the other

19  hand, it is offered for purposes of showing a riparian use,

20  it might be material.  But if it is for riparian use, then

21  it is immaterial as to the appropriation issue in this case.

22  And if it is an appropriation, it is utterly immaterial to the

23  riparian factors involved in this case.  And it is something,

24  I believe, that the defendants have a right to know.  So I

25  am objecting that the whole thing is immaterial.  I am well

1    aware of how Mr. Veeder can skip from theory to theory; and

2    I would like to know what the theory of his testimony is at

3    this time.

4              THE COURT:: Mr. Veeder?

5              MR. VEEDER:  Are you directing me to advise counsel?

6              THE COURT:  Yes; he is inquiring what your theory is,

7    what your purpose is here.  What purpose you are offering it

8    for.

9              MR. VEEDER:  Simply to prove the diversion application

10   of water to beneficial use.  What else?  I hear these objec-

11   tions, and I am utterly amazed, because for this reason, your

12   Honor:  The point I make, if I may, is that the use of water,

13   in this litigation, perhaps is the most material single ele-

14   ment in the case.  And certainly from the standpoint of the

15   methods of diverting and impounding the water subsequent to

16   the releasing it for purposes of irrigation, it occurs to me,

17   is probably the most material aspect of the claims of the

18   United States.

19             THE COURT:  Well, you haven't answered us specifically.

20   But, let's save some time.  First of all, I told Mr. Veeder

21   that he may make his record, and he can do it by offer of

22   proof or by witnesses.  Now, in the sense that he wants to

23   make a record that the Government can appropriate water to

24   a beneficial use after '14 or '23, he is making a record.

25             MR. SACHSE:  Very well, your Honor.

7001

THE COURT:  To the extent that it pertains to appro-
priation, it is obviously material.  To the extent that it
pertains to what ground is irrigable, water duties, it is
material.  To the extent that it seeks to prove a prescriptive
right, the Court will not consider it.  But it goes into the
record if it is admissible for any purpose.

MR. SACHSE:  Very well, your Honor.  I have made my
point for the record.

MR. VEEDER:  I never understand some of these ques-
tions that are presented to me.  The point I make: How could
I answer otherwise than I did, your Honor?  You asked me--

THE COURT:  You answered very simply that you offer it
for all purposes.

MR. VEEDER:  That is exactly what I said.

THE COURT:  If it is admissible for any purpose, it
goes in the record.

MR. VEEDER:  For the diversion application of water
for beneficial use.  This is water litigation; I thought we
understood that.

THE COURT:  Well, diversion for beneficial use.  The
Court may consider, if the rights antedate '14 or '23, if
they are diversions after '14 or '23, the Court is going to
rule unless later convinced that I have made a mistake, you
don't acquire rights that way.  But you have made your record.

MR. VEEDER:  So that you have covered the point.  Your

1    Honor directed me to make a statement.  I want to be sure I

2    covered it.

3

4                         CROSS-EXAMINATION

5    BY MR. SACHSE:

6        Q  Mr. Witman, what records, if any, do you have to

7    help you fix these dates that you have given us in your

8    testimony?

9        A  None, Mr. Sachse.

10       Q  So are you quite certain as to, for instance, the

11   date that irrigation started on Stuart Mesa in 1937?  Or could

12   you be a year or two off?

13       A  No, I am sure of the construction of the irrigation

14   project was during '37.  Now, whether the actual irrigation

15   was in the fall of '37 or the spring of '38, I am not defin-

16   itely sure.  But we worked, we put the irrigation project in

17   and commenced pumping water in '37, I am sure.

18       Q  How about the South Coast operation?

19       A  It too was the year following; the year following.

20       Q  In other words, the construction started in '38?

21       A  '38 and '39.

22       Q  Whether you had water in '38 or '39, you are not

23   certain?

24       A  We had water in '39, I am certain, yes, sir.

25       Q  By '39 you are certain?

B Z23

A   Yes, sir.

Q   Now, you gave Mr. Veeder the figure of 1,100 acres irrigated on Stuart Mesa, is that correct?

A   Yes, sir.

Q   Was that entire 1,100 acres irrigated in 1938?

A   Well, I can't definitely say that, no, sir.

Q   In your opinion, was it all irrigated the first year you had the system in operation or did your system expand gradually?

A   No, I think the 1,100 acres was all irrigated in the fall of '38.

Q   How about the 600 on South Mesa?  Was that --

A   No, that expanded.

Q   How much was irrigated the very first season on South Mesa?

A   My guess would be about 200, 250 acres.

Q   And when did the full irrigation of 600 acres occur on South Mesa?

A   Probably around '40 or '41 when the strawberries went up there.

Q   Just before the Government took the property over?

A   That is right, sir.

Q   Prior to '37 on Stuart Mesa and '38 on South Coast Mesa, the entire area was dry farming, you say?

A   Dry farming and pasture, yes, sir.

xxx

1    Q   And pasture?

2    A   Yes.

3    Q   In other words, no water was imported to it?

4    A   No, sir.

5    Q   Now, you stated that 500 acres were irrigated in the

6    Ysidora Valley, but my notes don't show that I noted any date

7    as to when that 500 took place?

8    MR. VEEDER:   You are speaking of Chappo now?

9    MR. SACHSE:   No, Ysisora.

10    MR. VEEDER:   Oh, Ysidora.

11    THE WITNESS:   Well, I think, I am sure, Mr. Sachse,

12    that it was 500 acres irrigated at alternate times during the

13    year, of all the years I was on the ranch from '22 to '42.

14    Now, we diverted crops and we fallowed some of it.   But it

15    was 500 acres under pipe line and wells.

16    BY MR. SACHSE:

17    Q   And the maximum in any one year would be 500?

18    A   That would be my guess, yes, sir.

19    Q   Some years it would be as little as how much?

20    A   It would be 400, or something like that, 350, 400,

21    depending on the crops and the amount of rainfall.

22    Q   On the Naval Hospital site, did I understand you

23    correctly to say that about 160 acres were farmed and about

24    half of that was irrigated?

25    A   Yes, sir.

Q  This O'Neill ditch diversion, as I understood you, you threw up a sand earth dam as soon as the heavy runoff stopped in the spring of the year?

A  Yes, sir.

Q  The reason you didn't do it sooner, I guess, was the heavy runoff would wash it out; is that it?

A  That is right.

Q  And you left that low sand dam in existence until the first rain took it out, is that right?

A  That is right.

Q  So you did not divert through the O'Neill ditch diversion during the wet season?

A  No, sir.

Q  And you took this water through the O'Neill ditch into O'Neill Lake, is that right?

A  Yes, sir.

Q  And from the lake to irrigation?

A  Yes, sir.

Q  You didn't take it right from the river to irrigation?  Or did you?

A  No.  No, through the lake.

Q  And from the lake did it go anywhere else, or did it go directly to irrigation of crops?

A  No, it went directly to irrigation.

Q  And the lands principally irrigated were those

1    immediately below the ranch house and on Chappo Flats, is that

2    correct?

3           A   That is right, sir.

4           Q   When you first went there, there was not over 300

5    acres?

6           A   I don't believe so.

7    MR. VEEDER:  This is again Chappo Flats now, Mr. Sachse?

8    MR. SACHSE:  Total.

9           Q   Below the ranch house and Chappo Flats; am I correct?

10          A   That first year, yes, sir.

11          Q   First year.

12              Did you give your estimates, calculations of the

13   amount of land irrigated and the storage of the system of

14   irrigation to Mr. Veeder prior to May of this year?

15          MR. VEEDER:  Maybe I can help you on that.

16          THE WITNESS:  I don't think I ever saw Mr. Veeder

17   prior to May of this year, to my best recollection.

18   BY MR. SACHSE:

19          Q   Did you supply data to, let us say, Col. Bowen or

20   anyone in the Division of Ground Water Resources as to the

21   amount of land under irrigation and the method of irrigation

22   before May of this year?

23          A   Possibly, yes.  I was a witness in Los Angeles

24   before Judge Yankwich.  I have forgotten whether I was

25   asked about the number of acres under irrigation or not.

1    MR. SACHSE: Could we have off the record here for a

2    minute.

3        MR. VEEDER:  We are off the record?

4        THE COURT:  Yes.

5        (Discussion off the record.)

6        MR. VEEDER:  Franz, this is the copy I mailed you.

7        MR. SACHSE:  Yes, it has got your signature on it.

8        MR. VEEDER:  Well, I haven't seen it.  That is all. I

9    don't even know what you have there at the point.  But go

10   ahead.

11   BY MR. SACHSE:

12       Q  Is it true, Mr. Witman, that prior to the acquisi-

13   tion of Camp Pendleton by the United States water stored in

14   Lake O'Neill was used for the direct irrigation of crops?

15       A  Yes.

16       MR. VEEDER:  May I inquire as to--

17       MR. SACHSE:  The answer of the United States--

18       MR. VEEDER: I am not worried about the answer.

19       MR. SACHSE:  The United States denies that fact.

20       THE COURT:  Denies that water from O'Neill was--

21       MR. SACHSE:  That is the fact, your Honor.

22       THE COURT:  Well, it is obviously a mistake.

23       MR. SACHSE:  I don't know what he is trying to prove.

24       MR. VEEDER:  I am inclined to doubt--

25       MR. SACHSE:  You are inclined to doubt that you deny

1    it?

2    MR. VEEDER:  I think I would like to take a look.

3    Well, go ahead with the examination.  I will check out the

4    interrogatories.  I have a hunch that there is a mistake by

5    Mr. Sachse.

6    THE COURT:  Well, we need a new lieutenant or a new

7    commander down at the Camp Pendleton.

8    MR. VEEDER:  I didn't hear.

9    THE COURT:  We will probably need a new lieutenant

10   or a new commander in the Legal Department at Pendleton.

11   COL. BOWEN:  Again?

12   BY MR. SACHSE:

13   Q  Are you familiar at all, Mr. Witman, with the

14   operation of Lake O'Neill now?

15   A  No, sir.

16   MR. VEEDER: Could I have the number of that interrogatory?

17   MR. SACHSE:  You can.  It is your response to Fallbrook's

18   request for admission No. 7.  Your answers are dated June the

19   4th, 1958.

20   MR. VEEDER:  Request for admission--

21   MR. SACHSE:  No. 7.

22   MR. VEEDER:  --No. 7.

23   MR. SACHSE: Dated June 4th, 1958.

24   Q  Have you kept or do you have any knowledge as to

25   the actual amount of water diverted for irrigation of any of

1    the crops you have described?

2        A   No.

3        MR. VEEDER:  I object.  It goes beyond the scope of

4    the Direct Examination.

5        THE COURT:  He has already answered the question.  Go

6    ahead.

7    BY MR. SACHSE:

8        Q   Do you have any connection with the present

9    agricultural operations within Camp Pendleton, the leased

10    lands that the United States leases for agricultural purposes?

11        A   I am a tenant on leased lands of the rancho.

12        Q   You are?

13        A   Yes, sir.

14        Q   Where?

15        A   South Coast; lemon orchard.

16        Q   And have you been such continuously?

17        A   Since 1943, yes.

18    Q Since the Government took over?

19        A   Since 1943, I believe.

20        Q   And have you had any other leases?

21        A   No, sir.

22        Q   Other than the lemons?

23        A   I beg your pardon.  I had a permit to run some

24    livestock on the ranch two or three years; 1945 and '6, I

25    believe.

1    Q  Would you give me, please, your best estimate of

2  the total acreage that was irrigated in Chappo Flats in 1929?

3    A  Well, I can't tell you how much was irrigated in

4  1929.  The irrigation system covered the entire valley from

5  the time I first saw it.

6    THE COURT:  The entire valley at Chappo Flats?

7    THE WITNESS:  Yes, sir.

8  BY MR. SACHSE:

9    Q  Well, you testified earlier--

10   A  In Chappo Flats?  I beg your pardon.  Chappo Flats.

11  I thought you meant Ysidora.  I beg your pardon, Mr. Sachse.

12   Q  No, Chappo.  How much was irrigated in Chappo Flats

13  in '29?

14   A  I still can't definitely say in '29.  I don't

15  remember.

16   Q  You testified in response to Mr. Veeder's question

17  that the average up to 1942 for Chappo Flats, in the area

18  below the ranch house, which I treated as the same--

19   A  Yes, that is right.

20   Q  --was 500 acres of alfalfa and 300 acres of valley

21  lands in vegetables, and so on?

22   A  That is right, fallowed, 800 total, yes, sir.

23   Q  How much, do you know, if you know, was irrigated

24  in '29?  Or do you know?

25   MR. VEEDER:  He said he didn't know.

1          THE WITNESS:  I don't know.  I know the irrigation

2     system was in, and the wells were all there.

3     BY MR. SACHSE:

4          Q  And could you tell us how much of Thompson Canyon

5     was irrigated in that year?

6          MR. VEEDER:  Which year now, Mr. Sachse?

7          MR. SACHSE:  '29.

8          THE WITNESS:  In 1929, about 70 acres.  It was before

9     it was expanded, so I think that was about the size of it.

10    BY MR. SACHSE:

11         Q  Do you know what the capacity of the O'Neill ditch

12    in cubic feet per second or miner's inches was during the

13    time you saw it in operation?

14         MR. VEEDER:  I object.  It goes beyond the scope of

15    the direct examination.

16         THE COURT:  Sustained.

17    BY MR. SACHSE:

18         Q  Do you know the height of the O'Neill Lake Dam

19    during this time?

20         MR. VEEDER:  I object.  It goes beyond the scope of

21    the direct examination.

22         MR. SACHSE:  If your Honor please, I think the United

23    States has offered this for some purpose.  Mr. Veeder hasn't

24    told us what.  I am guessing.  If it can be within appropria-

25    tion--

1          THE COURT:  You talk about the table and the height

2     which will require a technical answer, such as capacity.  The

3     objection will be overruled.

4          You know how high the water was in the O'Neill Dam?

5     What the height of the dam was, I mean?

6          MR. SACHSE:  I will withdraw the question and rephrase

7     it and adopt your Honor's.  It is more suitable.

8          Q  Do you know what the elevation of water was in

9     O'Neill Lake during the period you saw this operation?

10         MR. VEEDER:  I object to that.  Mr. Witman, just hold

11    it.  At what time of year?

12         MR. SACHSE:  At maximum.

13         MR. VEEDER:  Maximum storage in the reservoir; is that

14    what you are talking about?

15         MR. SACHSE:  Yes.

16         MR. VEEDER:  Well, I certainly will object to that.

17    There has been absolutely no evidence in regard to this, not

18    a mention of the storage capacity of that reservoir, or the

19    number of acre feet impounded at the maximum impoundment.

20         MR. SACHSE:  Your Honor, is this--

21         THE COURT:  Overruled.  Let's find out what he knows.

22         THE WITNESS:  Well, I had charge-- we put in a new

23    release gate and release pipes along 1931 or '2.  And to my

24    best recollection, we had a staff gauge alongside of the

25    release gate. The staff gauge would record up to 12 feet.

BY MR. SACHSE:

Q   Do you know what the acreage covered by O'Neill Lake was, the maximum acreage?

MR. VEEDER:   Submerged, that is?

BY MR. SACHSE:

Q   That is covered by the lake, submerged land?

A   Only the figures that were given to me by a hydrographer which I have memory, 1,300 acre feet of capacity, after we raised it a few feet.  I had charge of raising the dam a few feet when I first came to the ranch.

Q   And when was that?

A   In 1922.  That is one of the first things--

Q   You said you raised the gauge in 1931?

A   We put in a new spillway later on, a spillway and release gates in '31 and '2.

Q   When was this figure of 1300 acre feet--

A   That was after the new one was put in.

Q   After '31, in other words?

A   Yes, sir.  That was supposedly--

Q   So you have no figure then as to its capacity prior to 1931?

A   No, sir.

Q   During your connection with the Rancho, was the water in Lake O'Neill used for any purpose other than irrigation?

1          A   Livestock could drink out of the ditch between the

2   lake and, that is about all, and the ranch house.

3          Q   Was the diversion dam in the river always at the

4   same place?

5          A   Within a hundred feet.

6          Q   And the ditch did remain in existence?   The ditch

7   would not wash out?

8          A   No, sir.

9          Q   You had some flume, did you not?

10         A   Just at the lower end.

11         Q   Just at the lower end?

12         A   Yes.

13         Q   You have answered this already, I believe, but so--

14   MR. VEEDER:   I object, then.   It is repetitious.

15   MR. SACHSE:   I don't know.   My notes are not clear.

16         Q   Did you not state that you have no record of the

17   amount of water used?

18         A   I have no records.

19         Q   Yes?

20         A   I have none.

21   MR. SACHSE:   That is all, your Honor.

22   MR. VEEDER:   I have one question.

23   THE COURT:   Mr. Stahlman, do you have any questions?

24   MR. VEEDER:   Excuse me.

25   THE COURT:   Mr. Moskovitz?

CROSS-EXAMINATION

BY MR. MOSKOVITZ:

Q   Do you know how much land was irrigated for any particular year between 1920, when you first came to the ranch, and when the Marines took over in 1941, for any particular area?

A   Definitely, no.

Q   Then, what you know is generally the maximum area that was irrigated in each of these areas?

A   Under the irrigation systems.

Q   In other words, the maximum that could be irrigated from the system which had been installed?

A   Existed, yes, sir.

Q   And the amount irrigated in any particular year could have been less than that maximum?

A   That is right.

Q   And in your recollection the amount was less in many of the years, is that correct, less than the maximum that could have been irrigated in each year?

A   A little less, yes, sir, at times.

Q   Do you have any recollection of what the minimum amounts irrigated were in any of these areas in any year?

A   The only thing, I do know that the activities in the irrigation was at its lowest point when I came to the ranch to work in 1922; because we had no cattle feeding, and we had

1   no use right at that particular place for alfalfa for grains,

2   except for our livestock.  We didn't feed, didn't have any

3   concentrated feed yards.

4          Q  And your answer is you have no recollection?

5          A  No, sir, no definite recollection.

6          Q  I think yousaid as to Chappo--

7          A  It increased each year.

8          Q  I beg your pardon?

9          A  It increased each year.

10         Q  It increased each year?

11         A  Yes.

12         Q  The maximum, take the Chappo Flats area of how much

13  annually?

14         A  Oh, Chappo Flats, I imagine around 300 acres on

15  that side of the tract, Chappo Flats.

16         Q  And does that include the other area near the ranch

17  house?

18         A  No.  The Ysidora area was about 500 acres, in that

19  entire area.

20         Q  I am talking now about the area just below the

21  ranch house.

22         A  There were 500 acres in those fields, as I remember

23  it.

24         Q  And 300 in the Chappo Flats area?

25         A  300 across west-- or south of the Santa Fe tracks

1    in Chappo Flats, yes, sir.

2            Q  And that was the maximum?

3            A  Yes, sir, as far as I can remember.

4            Q  Is your recollection clear now or is this something

5    that is pretty hard to remember?

6            A  Well, I haven't had any connection with the property

7    since 1942, to answer your question.

8            Q  You haven't thought about it over these years, have

9    you?

10           A  Except I have lived in the immediate area.

11           Q  Now, in the Ysidora Valley area, I believe you

12   testified there was a maximum of 500 acres irrigated; is that

13   correct?

14           A  I think so, yes, sir.

15           Q  And in some years there was less than that irrigated?

16           A  That is right.

17           Q  How much less?

18           A  Oh, maybe 100, 150 acres.  I can't tell exactly.

19   I don't have any records at all.  The records were all kept

20   in the ranch offices.  They were not in my hands.

21           MR. MOSKOVITZ:  That is all.

22           MR. STAHLMAN:  I have one question, Mr. Witman:  Were

23   you a witness in the trial of the Rancho Santa Margarita vs.

24   Vail?

25           THE WITNESS:  Yes, sir.

1          MR. STAHLMAN:  Then, your Honor, I have no questions

2     at this time.  However, I would want to review one or two

3     phases of his testimony with the previous record.  There may

4     or may not be a necessity of asking any questions.  If I may

5     reserve the right.

6          THE COURT:  What date was that case tried?  What year?

7          MR. HALL:  '25 to '28.

8          MR. STAHLMAN:  '25 to '28.

9          THE COURT:  Redirect, Mr. Veeder?

10         MR. VEEDER:  Yes, I have one question.

11

12                    REDIRECT EXAMINATION

13    BY MR. VEEDER:

14         Q  Do you recall the acreage that was in irrigation

15    on the Ysidora Basin in 1920 when you went to the rancho?

16         A  All I know is the wells were there and the ditches and

17    water systems.

18         Q  And what was the maximum acreage that was irrigated

19    there, oh, say in 1922, on the Ysidora Basin?

20         A  Any particular year, Mr. Veeder, I can't remember

21    the year.

22         Q  What was the maximum that you have ever  seen

23    irrigated there?

24         A  About 500 acres.

25         MR. VEEDER: I have no further questions.

1              That will be all, I think, Mr. Witman.

2              THE COURT:  Step down,  You will be excused.

3              MR. VEEDER:  I will call Mr. Salisbury.

4

5                       JOHN L. SALISBURY,

6    called as a witness in behalf of the plaintiff, being first

7    duly sworn, testified as follows:

8              MR. VEEDER:  Your Honor, before proceeding with this

9    witness, it may be that we will have to recall Mr. Witman

10   when I review the interrogatories to which Mr. Sachse made

11   reference.  I haven't had the opportunity--

12             THE COURT:  Well, you will be temporarily excused, Mr.

13   Witman, and that is you may go but you will be subject to

14   being called back to testify if we need you.

15             MR. WITMAN:  Thank you, sir.

16             MR. VEEDER:  Would you sit down, Mr. Salisbury.

17             THE COURT:  State your name, please.

18             THE WITNESS:  John L. Salisbury.

19

20                       DIRECT EXAMINATION

21   BY MR. VEEDER:

22             Q  Where do you live, Mr. Salisbury?

23             A  San Clemente.

24             Q  And would you state your age, Mr. Salisbury?

25             A  Sixty-seven.

Case 3:51-cv-01247-JO-SBC   Document 4562   Filed 09/24/63   PageID.27763   Page 61 of 81

1      Q  When did you first become acquainted with the

2  Rancho Santa Margarita?

3      A  In October of 1911.

4      Q  And would you state the circumstances under which

5  you went to the rancho in 1911?

6      A  I was working for a man by the name of Kanawyer and

7  my brother who were partners; and they came there and leased

8  land; and I came there with them to work.

9      Q  And what work did you do?

10      A  Common ranch work.

11      MR. SACHSE:  I didn't hear that; I am sorry.

12      THE COURT:  Common ranch work.

13  BY MR. VEEDER:

14      Q  Do you recall the irrigation system which was in

15  existence on the Rancho Santa Margarita when you went there

16  in 1911?

17      A  Well, the only system they had was the water from

18  the lake at that time.

19      Q  And when you say the "lake", which lake do you mean?

20      A  O'Neill Lake.

21      Q  And you recall at that time the methods of diverting

22  and delivering water into Lake O'Neill?

23      A  Yes, they had a ditch from the river down which,

24  probably a mile or-- to the river and throw a little levee

25  into the river with scrapers, teams.

Q  And when would they do that, Mr. Salisbury?

A  Well, after the heavy rains were over.  It would probably be along from in April on next month or so.

Q  And what use would they make of the water that was diverted and impounded in Lake O'Neill?

A  Well, they irrigated these fields just below the ranch house.

Q  And how was the water in 1911 diverted from Lake O'Neill and delivered to the fields, do you recall?

A  Just the way as I spoke.

THE COURT:  By ditch?

THE WITNESS:  By ditch, yes, sir.

BY MR. VEEDER:

Q  For what period of time, if you recall, generally was water diverted each year into Lake O'Neill?

A  What time?

Q  What period of time?  You said they would divert in the spring.  How late would they be--

A  As long as there was water in the river.

Q  And can you recall generally how long a time that was?

A  Well, I don't think there would ever be any water there by the first of October.

Q  But prior to that time--

A  Yes.

Q  --you would be diverting and impounding water; is that correct?

A That is right.

THE COURT:  Would it go on past October 1st if there was no rain?

THE WITNESS:  The river would be dry.

MR. SACHSE:  I didn't hear the answer.

THE WITNESS:  The river would be dry.

BY MR. VEEDER:

Q  How long have you been a farmer, Mr. Salisbury?

A  Well, I was raised on a ranch.  It is practically all I have ever done.

Q And what has been your experience in estimating acreages for crops?

A  Well, lots of crops you hire hand labor, and they work by the acre, and you have to measure the land to figure out what you pay the worker.

Q  And what were your responsibilities in that connection?  What would you do?

A  No, how early back do you refer to?

Q  I am talking about to, well, as far back as you ever estimated any acres?

A  Well, in those days I was just working on a ranch. I didn't do that kind of work.

Q  What were the crops that were being raised on this

1  irrigated land when you went there, do you recall?

2      A  There was alfalfa and sugar beets and lima beans.

3      Q  After 1911, what did you do in regard to the

4  raising of crops on the irrigated lands of the Rancho Santa

5  Margarita?

6      A  I was there from '11 until '14 working for these

7  people, my brother and his partner.

8      Q  Do you recall the number of acres of land which

9  were in alfalfa in 1911 when you went--

10     MR. MOSKOVITZ:  I object, your Honor.  I don't think

11  there has been any foundation for this witness's giving an

12  opinion.  In 1911, he said at that time he was only a farm

13  laborer.

14     MR. VEEDER:  Well, he can certainly recall, your Honor.

15     MR. MOSKOVITZ:  His experience in estimating acreage

16  came much later.

17     THE COURT:  Well, is his memory any value to him?  You

18  have never seen an automobile.  Then later on you saw one.

19  Wouldn't you be able to go back and identify what you had

20  seen?

21     MR. MOSKOVITZ:  That is not quite the same thing, your

22  Honor.

23     THE COURT:  How long a time over the period of your

24  life have you farmed?  Most of your life?

25     THE WITNESS:  Yes.

1      THE COURT:  And you had various-sized farms, have you?

2      THE WITNESS:  Not that I owned--

3      THE COURT:  Leased?

4      THE WITNESS:  --but worked for people.  And I have

5 owned small places.

6      THE COURT:  And you worked pieces?

7      THE WITNESS:  Which?

8      THE COURT:  Worked various pieces of ground?

9      THE WITNESS:  Yes, sir.

10     THE COURT:  You leased pieces of ground?

11     THE WITNESS:  Well, later on, yes.

12     THE COURT:  Do you know, looking at--

13     THE WITNESS:  In fact, this same land we are talking

14 about, I leased all of that and farmed it at one time.

15     THE COURT:  This same land we are talking about, south

16 of the highway?

17     THE WITNESS:  We are talking about below the alfalfa

18 fields and part of the Chappo Flats.

19     THE COURT:  You are familiar with that land, then?

20     The objection is overruled.

21     MR. VEEDER:  The witness shook his head in assent.

22 May I have the record show that?

23     THE COURT:  The record will so show.  The objection is

24 overruled.

25     How many acres would you say were in alfalfa when you

7025

1   went there in 1911?

2          THE WITNESS:  Well, in 1911, I would say there was

3   probably 150 acres.

4          THE COURT:  How many acres in sugar beets?

5          THE WITNESS:  Probably 200 acres.  200 of lima beans.

6          MR. VEEDER:  Are you through, your Honor?  May I

7   proceed?

8          THE COURT:  Yes.

9   BY MR. VEEDER:

10         Q  After 1911, what were the crops that were raised on

11  these lands-- I am saying from 1911 to 1914-- if you recall?

12         A  Approximately the same, same thing.

13         Q  When you are raising alfalfa, what is the rotation

14  that is required in the production of that crop?

15         A  Well, about every three years you have to rotate,

16  take your alfalfa crop out, put in other crops for a couple

17  of years; transfer it around.

18         Q  Is that an established farming practice, to your

19  knowledge?

20         MR. SACHSE:  Would you try to keep your voice up,

21  please, Mr. Salisbury.

22         THE WITNESS:  I can't hear myself talk so--

23         THE COURT:  Move back farther, Mr. Veeder, and he will

24  speak louder.

25         Just keep your voice up so the attorneys can hear.

BY MR. VEEDER:

     Q  Now, is that a customary practice, to rotate alfalfa with other crops?

     A  Yes, sir.

     Q  When you came to the Rancho Santa Margarita in 1911, what were the other lands, if any, which were under irrigation?

     A  At what time?

     Q  When you came there in 1911.

     A  Well, there wasn't any other lands being irrigated at that time.

     THE COURT:  It is a good place to stop for a noon recess.

     MR. VEEDER:  All right.  Mr. Salisbury, we will be back at 2 o'clock.

     THE COURT:  2 o'clock.  Court will be adjourned until that time.

     (Noon recess.)

1    SAN DIEGO, CALIFORNIA, FRIDAY, DECEMBER 19, 1958.   2:00 P. M.

2

3         THE COURT:  All of you have this partial transcript.

4    Do any of you want to comment on this now?

5         MR. SACHSE:  I would like to make a suggestion of a

6    No.15, your Honor.  It seems to me that a lot of this ties in

7    directly to the question of what areas in the watershed might

8    be eliminated from further consideration in so far as ground

9    water only is concerned.  I realize that even in basement

10   complex we may find riparian rights to surface flow of a

11   stream across it.  I would suggest that we could all, your

12   Honor and each of us, if we would, indicate what areas we

13   feel can be eliminated, geographically only, from further

14   consideration as to ground water only.  Not as to surface

15   water; we don't have enough evidence to discuss surface

16   water, I think.

17        THE COURT:  What do you think of that suggestion?

18        In other words, you are not commenting on streams or

19   riparian rights.  We are concerned only with ground water.

20        MR. VEEDER:  It should start the statement off with

21   that, shouldn't it?  That this relates solely to ground water

22   and has no relation to surface runoff.

23        THE COURT:  Right.

24        All right, put that down as No. 15.  And it would have

25   to be done largely by section number and area.  We realize

1　that if you marked out a certain section or half of a section

2　and a person had a piece of ground which was riparian to a

3　stream up in there, we are not concerned with the riparian

4　problem.  Obviously, if his land stretched for 20 miles and

5　was riparian, he would have some rights.  But we are not

6　talking about that.  We are talking about just the ground

7　water.  So make it clear that we are talking about ground

8　water as distinguished from stream runoff, riparian rights,

9　basins, and things of that sort.

10　　　　MR. VEEDER:  I would like to tender, your Honor, a

11　thought that has concerned us, and we are undertaking to do

12　something about it now.  It is obvious that there are rights

13　to the use of ground water, at least in our view, which are

14　outside the subbasins which we have.  In other words, I

15　believe that on interrogation Mr. Kunkel would state that

16　there are ground waters outside the delineation that he has

17　set up and the ground waters are an important source of water

18　to the overlying lands.

19　　　　THE COURT:  This fits right in with what we are talking

20　about, and those areas could be marked out and described.  It

21　fits right in with what we are talking about.

22　　　　MR. VEEDER:  The point I am making is that I favor,

23　if we can, tying these things down.  But I don't believe that

24　I know enough now to delineate where the rights might be.

25　　　　THE COURT:  Not all of them.  I would expect that there

1    will be these areas-- maybe yes, maybe no-- where you wouldn't

2    want to take a position.  But there are some areas, I have no

3    doubt, as to which you could take a position right now from

4    what you know about it.

5         MR. VEEDER:  Well, we are working along that line our-

6    selves.

7         What language does your Honor suggest, then, in regard

8    to No. 15?

9         THE COURT:  Areas in which a party is willing to

10   concede that-- excepting from consideration riparian rights,

11   stream flow, runoff-- there is no appreciable ground water

12   feeding or supplying the streams.  Would that do it?

13        MR. MOSKOVITZ:  I guess you want the effect both ways:

14   No appreciable ground water feeding the streams or being

15   fed from the stream.

16        THE COURT:  I suppose it would be the same.

17        MR. MOSKOVITZ:  I think tied in with this is the issue

18   I thought should be discussed, and that is whether the

19   delineation of a basin is conclusive on whether the areas

20   should be in or out.  What is the significance of the delinea-

21   tion of a basin on this issue?

22        THE COURT:  Well, is that open to dispute?  If we find

23   that there is a basin, an underground storage unit, then

24   doesn't the owner have overlying rights?  Wouldn't you treat

25   it in the same way in which you would treat riparian rights?

1      MR. MOSKOVITZ:  He certainly has overlying rights, your

2 Honor.

3      THE COURT:  And if there is a basin, isn't what goes

4 on in that basin, therefore, of significance to the rest of

5 the stream?

6      MR.MOSKOVITZ:  That is where the question comes in.

7      THE COURT:  Well, is there any doubt in your mind about

8 it?

9      MR. MOSKOVITZ:  I believe there are some small basins

10 that the State has outlined which are so situated that--

11 Well, I will not say they will have no effect on the stream;

12 the effect might be so small that you could just toss it out.

13      THE COURT:  Well, as a practical matter, on the

14 doctrine of deminimus, yes.  But you take a basin that holds

15 any appreciable amount of water, if it is depleted, the first

16 water that comes down the stream will be used to fill up that

17 basin and will not run down the stream.  Isn't that axiomatic?

18      MR. MOSKOVITZ:  Well, depending upon the situation

19 and size.  I think you might have different answers.

20      THE COURT:  Well, we have a section under basins here.

21 If you have any situations like that that you want to talk

22 about, you put them in under that section.

23      Any other comments on this?

24      MR. VEEDER: Your Honor, we have also this situation,

25 where the State has a great deal more data to put in, in

1    support of its Appendix B, and that raises a problem, as I

2    see it, from my standpoint, as to exactly what course to

3    pursue.  I will follow your Honor's direction.

4         THE COURT:  You can do this, Mr. Veeder, from your

5    standpoint.  You can say, "Assuming that there is no further

6    evidence on these issues. ."  That is a pretty broad assumption,

7    because other people may be heard from.

8         From the State's standpoint, the State can say, "On

9    this matter we have other evidence we haven't yet presented

10   which keeps us from taking a position on this," or "We propose

11   to show so and so, and when we do here is what we think will

12   follow."

13        MR. MOSKOVITZ:  Your Honor, on Appendix B the material

14   we are going to present is not very great.  It is going to

15   be how usable storage capacity was included in each of the

16   basins.

17        THE COURT:  Well, the rest of it is stream runoff,

18   rainfall, things which don't concern this problem.

19        MR. MOSKOVITZ:  That is right.

20        THE COURT:  So I don't think you have too much of a

21   problem there, Mr. Veeder.  But you can protect yourself with

22   that phrase:  In the absence of other evidence you think the

23   record now shows so and so.

24        Isn't it true, gentlemen, that there is a very large

25   area of agreement, when you sift this record down?

1          MR. SACHSE:  Definitely.

2          THE COURT:  Isn't there, Mr. Veeder?

3          MR. VEEDER:  Well, your Honor, I have always been

4     afraid to paint with a broad brush.

5          THE COURT:  All right.

6          Any other comments?

7          Do you want to submit this on your return on the 13th?

8     Is that going to crowd you?

9          MR. VEEDER:  Yes, your Honor, but I understand.

10          MR. SACHSE:  I had the benefit of a word with your

11     Honor that the other gentlemen didn't, and if we are not to

12     be asked to index this and make it an argument, which I

13     understood from our conversation outside that you wanted

14     simply our position and then later on we could argue it.

15          THE COURT:  I want it in the language as if it were a

16     finding, the general conclusion that the Court would ultimately

17     draw.  If you want to index it yourself and have available

18     your citations, that is another thing.  I may call on you for

19     those things later.  But presently see how you would phrase

20     this.  I don't think you are going to be very far apart on a

21     lot of it.

22          You have some assistants, Mr. Veeder, that you can put

23     to work on this while you are gone and have a draft ready.

24          MR. VEEDER:  The work is always done, your Honor.  We

25     may steal a few hours from the night, but it will be done.

1      THE COURT:  Let's proceed.

2      MR. VEEDER:  Mr. Salisbury, will you take the stand,

3  please.

4

5                JOHN L. SALISBURY,

6  recalled as a witness in behalf of the plaintiff, having been

7  previously sworn, testified further as follows:

8

9                DIRECT EXAMINATION (Resumed)

10  BY MR. VEEDER:

11      Q  You had a period of approximately four years.  Then

12  you left the Rancho; is that correct?

13      A  Yes, sir.

14      Q  Would you state that period of time, please, sir?

15  What was the time you first arrived there and when you left

16  the first time?

17      A  I first came there in October, 1911, and I went

18  away about that same time in 1914.

19      Q  And when did you return to the Rancho Santa Margar-

20  ita?

21      A  1918.

22      Q  In 1918?

23      A  Yes, sir.

24      Q  What period of time did you remain on the Rancho

25  after 1918?  How long were you there?

1     A  Until 1942.

2     Q  And during that time what were your responsibilities?

3     A  Well, in 1918 I was still working with my brother.

4  In 1919 we leased this land that we have been talking about,

5  the alfalfa field, and I farmed it for seven years.

6     Q  In Chappo?

7     THE COURT:  It is in Chappo Basin?

8     THE WITNESS:  In Chappo, and these fields below the

9  ranch house.

10  BY MR. VEEDER:

11     Q  And when you say the fields below the ranch house,

12  which fields do you mean by that, Mr. Salisbury?

13     A  That alfalfa field is immediately below the ranch

14  house.

15     THE COURT:  Lying south of the river?

16     THE WITNESS:  Yes, sir.

17  BY MR. VEEDER:

18     Q  Now, in computing your acreage that you observed

19  when you arrived there in 1911, did you include the lands

20  that you say were below the ranch house in making your total

21  acreages?

22     A  Yes.

23     Q  Now, what was the total acreage that you observed

24  in 1918 when you returned within the Ysidora Basin?  Which

25  lands were then irrigated from the Santa Margarita River?

1        A  Not any.

2        Q  There were none in 1918.  And when were those lands

3  brought into irrigation, if you recall?

4        A  Those wells were put in starting in 1911 and 1912

5  and '13.

6        Q  And what acreage was irrigated then in Ysidora,

7  if you recall?

8        A  In 1911?  Or when do you refer to?

9        Q  1911 through 1914.

10       A  Well, probably five, six hundred acres.

11       Q  And what were the crops that were raised on those

12  lands?

13       A  Sugar beets and lima beans.

14       Q  And what was the maximum acreage, if you recall,

15  on both Ysidora and Chappo that you observed in the period

16  from 1911 through 1914?

17       A  Probably thirteen, fourteen hundred acres.

18       MR. VEEDER:  I have no further questions.

19       MR. SACHSE:  I think I have only one or two.

20

21                    CROSS-EXAMINATION

22  BY MR. SACHSE:

23       Q  Mr. Salisbury, on the operation of the O'Neill

24  ditch, did you hear Mr. Witman's testimony about it?

25       A  I believe so.

1          Q  Then am I correct in stating that the O'Neill

2     diversion would be put into operation in the early spring

3     of each year after the high water had ended?

4          A  Yes, sir.

5          Q  And it would be continued either until surface flow

6     stopped or until a flood came along and washed the dam out;

7     is that right?

8          A  That is right.

9          Q And generally speaking, if I understood your testimony,

10    by about the 1st of October the river would be dry?

11         A  Practically.

12         Q  And then if it was a very wet year when the first

13    rain came the dam would go out anyway?

14         A  Yes, sir.

15         Q  And there would be no winter diversions?

16         A  No, sir.

17    MR. SACHSE:  That is all, your Honor.

18

19                      CROSS-EXAMINATION

20    BY MR. MOSKOVITZ:

21         Q  Did I understand you correctly to say that in 1918

22    when you returned to the ranch there was no irrigation in

23    Ysidora Basin?

24         A  Oh, yes, in 1918 there was.

25    THE COURT:  Well, you said there was none.  You

C Z30                    Salisbury   Cross                    7037

1    were asked, when you got back there in 1918 how many acres

2    were being irrigated?

3            THE WITNESS:  From the Lake I said none.

4            MR. VEEDER:  At Ysidora.

5            THE COURT:  None from the lake.

6            THE WITNESS:  None ever was from the lake.

7            MR. VEEDER:  At Ysidora is the point.

8            THE COURT:  But the wells which had been put in, in

9    1911, 1912 and 1913, were being used to irrigate Ysidor?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  And how many acres were being irrigated at

12   Ysidora?

13           THE WITNESS:  Oh, five, six hundred acres.

14   BY MR. MOSKOVITZ:

15           Q   Then you testified that about 550 acres altogether

16   were being irrigated near the ranch house and in Chappo?

17           A   At what time?

18           Q   In 1911.

19           A   That is right.

20           Q   And that increased?

21           A   With wells.

22           THE COURT:  Do I understand then that about-- what was

23   it, 550 or 600, was irrigated from O'Neill?

24           THE WITNESS:  Yes, sir.

25           THE COURT:  And then with the advent of the wells this

Salisbury — Cross    7038

1   pushed it up to over 1,300 acres?

2       THE WITNESS: That is right.

3       MR. MOSKOVITZ: I have no further questions.

4

5               CROSS-EXAMINATION

6 BY MR. STAHLMAN:

7       Q Mr. Salisbury, you were not a witness in the case of

8 Santa Margarita vs. Vail, were you?

9       A No, sir.

10       MR. STAHLMAN: That is all I have.

11       MR. VEEDER: I have no further questions.

12       Thank you, Mr. Salisbury.

13       THE COURT: Thank you. You may be excused. If we

14 want you back we will call you.

15       THE WITNESS: Thank you.

16       MR. STAHLMAN: We are all hoping that you are going

17 to adjourn very early today, your Honor.

18       THE COURT: I will adjourn at any time you say.

19       Do you want to call another witness or do you want to

20 adjourn?

21       MR. STAHLMAN: Well, your Honor, Mr. Veeder is a little

22 timid. So I will appear as amicus curiae in his behalf.

23       THE COURT: In other words, if we proceed now you would

24 have to call Col. Bowen and go back to other matters?

25       MR. VEEDER: That is correct. We would open up a new

1    area.  It might not be Col. Bowen but it might be somebody

2    else.

3            THE COURT:  You have no other witnesses here except

4    Col. Bowen?

5            MR. VEEDER:  I have, but it would open up a new series

6    of matters.

7            THE COURT:  I am willing to recess.

8            I wish you all a Merry Christmas and Happy New Year.

9            VARIOUS COUNSEL:  Same to you, your Honor.

10           THE COURT:  All right, gentlemen, see what you can

11   get for me on these points that we outlined in the nature of

12   proposed findings.  I am not going to make them immediately.

13   We have to hear from Mr. Littleworth and Vail and other

14   people.  I am not pressing it from the standpoint of what you

15   think some isolated bit of evidence shows, but what you think

16   the record shows.  You are doing this for my benefit.  Go at

17   this from the standpoint of what you think the record shows

18   and the kind of finding that we can make.  I don't think you

19   are going to find too big an area of disagreement.  And if we

20   get this matched up and find that on many of these points

21   there is not too much dispute, we can, if nothing else, at

22   least sit back and know just where the issues are that are

23   going to have to be met and argue it out.  I think it will be

24   helpful.  It will clear the air a little bit.

25           Again, I wish you all a Happy Christmas and a nice New

1    Year.   If I have been curt with any of you--

2              MR. VEEDER:   It came from your heart.

3              THE COURT:   Actually, a judge always has to keep

4    reminding himself that what he says, he says as a judge, and

5    not as an individual and that a lawyer puts a lot more weight

6    on it than the judge intended that he put on it.   And I don't

7    really intend to be discourteous to lawyers.   I know your

8    problems.   I have tried cases myself.   I know that the burden

9    of organizing and presenting a case is much more difficult

10   than the burden of deciding it. And if I have been harsh with

11   any of you, as the Christmas season approaches, I humbly

12   apologize and say that I think you are all very fine people

13   and I like you personally, even though I don't agree with you

14   sometimes.

15             MR. STAHLMAN:   Very well, all is forgiven.

16             MR. MOSKOVITZ:   I was going to say to the contrary,

17   sitting here for two and a half months I think you show a

18   lot of patience with a lot of very boring material at times.

19             THE COURT:   Parts of it was very interesting.   I learned

20   a lot.   I hope to learn a lot more.

21             Adjourn until January 13th, at 10 A.M.

22             (Adjournment until Tuesday, January 13, 1959, at 10

23   o'clock A.M.)

24

25