# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al.

Defendants.

No.   1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       January 13, 1959.

Pages: 7041 to 7140

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ Deputy

MALCOLM E. LOVE

J O H N   S W A D E R
Official Reporter
United States District Court
325 West F Street
San Diego, California
BElmont 4-6211   Ext. 370

1        IN THE UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF CALIFORNIA

3                SOUTHERN DIVISION

4                   - - -

5      HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                   - - -

7

8  UNITED STATES OF AMERICA,       )
                                   )
9              Plaintiff,          )
                                   )
10      vs.                        )        No. 1247-SD-C.
                                   )
11  FALLBROOK PUBLIC UTILITY       )
    DISTRICT, et al.,              )
12                                 )
                                   )
13             Defendants          )

14

15         REPORTERS' TRANSCRIPT OF PROCEEDINGS

16

17              San Diego, California

18            Monday, January 13, 1959

19

20  APPEARANCES:

21      For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                 Special Assistant to the
22                               Attorney-General,
                                 Department of Justice,
23                               Washington, D.C.

24

25

APPEARANCES (Continued)

  For Defendant     GEORGE E. STAHLMAN, ESQ.
  Vail Company

  For Defendant State   STANLEY MOSK, ESQ.,
  of California     Attorney-General, by
            ADOLPHUS MOSKOVITZ, ESQ.,
            Deputy Attorney General.


  For Defendants
  Fallbrook Public    FRANZ R. SACHSE, ESQ.
  Utility District,
  et al.

- - -

## INDEX TO WITNESSES

For Defendant State
of California:

| | Direct | Cross |
|---|---|---|
| Laurence James | 7067 | 7093 |

Z3
A-1

1    SAN DIEGO, CALIFORNIA, MONDAY, JANUARY 13, 1959.   11:45 A. M.

2

3          THE COURT:  Welcome back.

4          THE CLERK:  No. 1 on the calendar, case No. 1247-SD-C,

5    United States of America vs. Fallbrook Public Utility District,

6    et al.

7          Further court trial.

8          MR. SACHSE:  Your Honor, I would like to file with the

9    Clerk--

10          THE COURT:  You have served Mr. Moskovitz, Mr. Veeder

11    and Mr. Stahlman?

12          MR. SACHSE:  Yes, and I will mail a copy to Mr. Krieger.

13          --the memorandum on geology requested by your Honor at

14    the last recess.

15          MR. MOSKOVITZ:  Your Honor, I would like to file the

16    original and one copy of a memorandum on the same subject.  I

17    have served Mr. Littleworth, Mr. Sachse, Mr. Veeder and Mr.

18    Stahlman.

19          MR. VEEDER:  Your Honor, I have given a great deal of

20    consideration to the fourteen or fifteen points that you have

21    raised, and have discussed these matters with the experts of

22    the United States, and we have concern as to whether we have

23    made ourselves clear as to the meaning of the ground water

24    storage units as shown on Plaintiff's Exhibit 17.

25          The principal matter that comes to our attention, when

1 │ your Honor's inquiries have been analyzed, relates to the

2 │ effect of findings at this time.  We certainly desire to

3 │ cooperate and to pursue the course that your Honor directs.

4 │ But we believe that the delination of the ground water storage

5 │ units, as shown on Plaintiff's Exhibit 17, haven't had the

6 │ result that we had hoped for.

7 │ Those storage units are not there to indicate, in any

8 │ sense of the word, that persons outside of those delineations

9 │ do not have rights to the use of water in the Santa Margarita

10 │ River.  A prime example would be the north half of Lancaster

11 │ Valley, as shown on Plaintiff's Exhibit 17.  We drew an arbitrary

12 │ line, as you will note, through Lancaster Valley, and I believe

13 │ that that line runs right straight through the Stardust Ranch.

14 │ We don't believe that there would be any difference, actually,

15 │ from the standpoint of the productivity of ground water and the

16 │ water-bearing stratas underlying the Lancaster Valley either on

17 │ the north or the south side of that line.  We drew that arbitrary

18 │ line to show where we believe beyond doubt that pumping would

19 │ have a direct and immediate effect upon our rights downstream.

20 │ I was alluding to our Storage Unit No. 5, in the first

21 │ instance.

22 │ I am now referring to Storage Unit No. 3.  Storage Unit

23 │ No. 3, it will be observed, draws a line westward from a part

24 │ of the Vail Company's land which is presently in cultivation

25 │ and which is certainly dependent upon the ground water of the

1    Pauba Valley.

2    We drew those arbitrary lines, as I said, for the

3    reasons of our desire to show places where we thought the

4    impact would be felt immediately.

5    Now, what I have said in regard to those ground water

6    units is applicable throughout the entire watershed.

7    We feel that there may be some confusion by reason of

8    the delineations which we made, although it is clear from the

9    record-- Mr. Kunkel's testimony-- that certainly we did not

10   intend to exclude anyone from utilizing water from the Santa

11   Margarita River Valley in the areas where they are not en-

12   compassed in a ground water storage unit.

13   That brings me to an additional question.  And it may be

14   that it is not a good idea to have anyone get too far away

15   from a lawsuit, because he may take another look at it.  In

16   the days that we have been out of court I have reviewed in my

17   mind, for the purpose of ascertaining what is the rationality

18   of this proceeding now?  And I came back with a sort of

19   startling feeling, by reason of other litigation in which I

20   happen to be.  The question arose in my mind as to whether, by

21   offering more than the bare bones of a prima facie case, we

22   haven't created a circumstance that was entirely contrary to

23   what we actually desire.

24   When we offered geology, when we offered hydrology

25   throughout the Valley, we did so for the purpose of disclosing

1   the physical features of the entire watershed, without any

2   thought of assuming the burden as to who had rights and who

3   did not have rights.  It would be completely unwarranted on

4   the part of plaintiff to undertake the responsibility of the

5   proof of the rights of the defendants.  We put in this data and

6   we offered this evidence as an assist, we thought, in the pro-

7   ceedings.  We didn't intend, nor do we intend, nor do we think

8   we have the power or authority in any way to affect the kind

9   of proof that the defendant should put on in his case.

10          But in reading over this data that has been handed to

11   us, I see references in the State's and also in Fallbrook's

12   observations that in the state of the record there is nothing

13   to show that these areas are involved in the Santa Margarita

14   River or that their use of water would have any effect upon the

15   interests of the United States.  But we believe that the

16   responsibility resides with Mr. Roripaugh to come in and show

17   that his water is derived from the Santa Margarita River system,

18   and if he fails to make that proof that we then have a decree

19   against him which would preclude him -- that we are entitled to

20   a decree against him that would preclude him from ever pumping

21   water which would have any effect upon the runoff of the Santa

22   Margarita River which would reach the United States.

23          And that is the case throughout the Valley.  We believe

24   that when the Ninth Circuit remanded this matter for trial as

25   to each right, that is precisely what it had in mind.  Not that

1    we had the burden of showing that these people did not have

2    rights or that they did have rights, but rather the only burden

3    we had was to prove our rights, and that they as defendants

4    had to come in and plead and prove theirs.

5         THE COURT:  Well, now, Mr. Veeder, let me make just one

6    comment right here.  This business of letting you go for a

7    vacation and think about this thing may have been a bad idea.

8         MR. VEEDER:  I shouldn't have said that.

9         THE COURT:  We know what the suit is.  It is a quiet

10   title suit by the Government in which it claims that it has

11   rights on the River system and it wants a decree quieting title

12   to its rights.

13        MR. VEEDER:  That is correct, your Honor.

14        THE COURT:  Now, to start with, the Government has to

15   make some general prima facie showing of what is the river

16   system.  You are asking a decree to quiet title to your rights

17   in the river.  You have to make some showing, which you have,

18   of the general river system-- the streams, some of the basins,

19   et cetera, and generally it will be the obligation of a de-

20   fendant to come in and set forth his rights.

21        Take Mr. Roripaugh and your suggestion there.  Using him

22   as an example, I am of the opinion that if Mr. Roripaugh stayed

23   away from this lawsuit, which I don't believe he is going to do,

24   and put on no evidence, I think there is sufficient evidence

25   that the Court could find that his well is from a basin which

A8

1   is part of the river system, and in the absence of any evidence

2   on his part the Court could make some proper decree that he was

3   part of the system and had correlative rights with the other

4   riparian and overlying owners on the river.  But I don't think

5   he is going to stay away.  I don't know yet what his position

6   will be.

7        I am talking now about what the record shows now.

8        The one exception to this business about the defendant

9   having to come in and put on proof of his rights is the fact

10   that you have made 6,000 people defendants, and the Court is

11   going to require you in some instances where a defendant

12   doesn't come forward to put forth what facts you have as to what

13   rights these people have.  In other words, I am not going to

14   let you bring them into this lawsuit and say they never showed

15   up and in substance default them out.  It may take us some time.

16   But if people do not come in and make their showing, then the

17   Government is going to be required to present for the assistance

18   of the Court, not acting in their behalf but merely to make as

19   complete a record as possible, what information the Government

20   has as to a certain piece of ground or as to the presence of

21   water there or whether it is part of the stream or isn't.

22        But generally I am not in disagreement with what you have

23   said.

24        MR. VEEDER:  That is the point I wanted to make, your

25   Honor.  We have certainly undertaken and have worked extremely

A2
Z9

1    hard to do what you said in regard to showing the De Luz area

2    and the other areas in which we have worked.

3            But the thing that concerned me, and I have been

4    greatly concerned in reading over these statements, that some-

5    how the idea is in the minds of California and of Fallbrook

6    that there is a responsibility for us to prove that a man up

7    here in Section 30 has or has not a right to the use of water.

8    And I don't believe that resides with us at all.  I don't

9    believe we could and I don't think that we should.

10           THE COURT:  Well, now, let us not get too deep into

11   technicalities.  I don't think there is any real misunder-

12   standing between us.

13           What other counsel want, and what the Court wants, in

14   this case, is this-- how soon we can get at it I don't know:

15   We know that there are large areas in this watershed that

16   aren't part of the river system, except for runoff.

17           MR. VEEDER:  Surface runoff.

18           THE COURT:  All the surface runoff, of course, runs

19   down the Santa Margarita River.  But we know that there are

20   large areas where, as I said facetiously, I propose to make a

21   finding that if a defendant had water he was lucky and he

22   ought to be entitled to it.

23           Incidentally, I was up through this valley on a pleasure

24   trip the other day and of course saw Mr. Stahlman and Mr. Vail

25   out at their usual activity, apparently hunting birds along

A2

Z10

1    the side of the road as I went by.  I saw them-- I didn't stop.

2        MR. STAHLMAN:  You should have stopped and got a couple

3    of ducks.

4        THE COURT:  Was it ducks that day?

5        Again, there are large areas that at the earliest moment

6    we ought to get out of this case-- the clearcut areas.

7        Now, the people who have land on the streams, the

8    people who have land on the basin, where it is going to be

9    pretty clear that they have correlative rights, that is one

10   category.  The people who have land where there is no water is

11   another category.  Then you have the in-between area:  Maybe so,

12   maybe not.

13       Well, I am content, if there is any doubt about a piece

14   of ground, let's leave it in until we can fully explore it.

15       But there is a lot of this that ought to go out.  The

16   sooner we can cut down this case and remove from this case the

17   people who should go out of the case on an interlocutory decree,

18   the better off we are going to be.

19       MR. VEEDER:  I am with you on that, your Honor.  We are

20   working on it now.  We are checking out from the standpoint of

21   the answers.  I think that is the best place to start.  We are

22   going right through the valley now in regard to every defendant.

23   We will know exactly what his status is and know exactly where

24   he stands and know exactly what we think should be done about it.

25       THE COURT:  If I understand you right, you are going

A2

Z11

1   through the answers and if a defendant says I don't claim any

2   water out of the river, I claim that I have some springs, et

3   cetera, and vagrant percolating waters, then as to that de-

4   fendant you take the position that he doesn't claim part of

5   the stream as such.

6        MR. VEEDER:  That is right.

7        THE COURT:  Then you would check that with your

8   material, and if your records show that he didn't have any

9   rights, then his claim and your position are identical and

10  you are willing to let him out.  Is that it?

11       MR. VEEDER:  Well, we would simply have an order to

12  the effect that he made no claim from the Santa Margarita

13  River, and that from the standpoint of our investigations his

14  use of water at the present time has no effect upon our rights.

15       THE COURT:  We are not going to say your investigation

16  to the present time.  What we are going to do is say that he

17  makes no claim.  There has been general evidence, of course,

18  concerning this whole watershed.  We will make an interlocutory

19  finding and judgment that any water that he has is vagrant,

20  percolating water and he is entitled to an interlocutory decree

21  that he is shut and clear and divorced from this litigation

22  and henceforth out.  I want to give him the equivalent of a

23  certificate of title; if he ever gets any water on the property,

24  he is just lucky that he has it.

25       These people in this valley have been harassed with this

1    suit.  I don't use the word "harassed" in any sense of criti-

2    cizing anybody.  But here they are part of a lawsuit, and there

3    are a number of these people who ought to have the equivalent

4    of a quiet title certificate that they are not part of this

5    river system and that if there has to be litigation in the

6    future let you and him fight about it, let the other two people

7    fight, and let this little fellow out.  Because there is lots

8    of land in that category.

9         MR. VEEDER:  I have no great disagreement on that point,

10   your Honor.  The only point I want very clear, from our stand-

11   point, is that up to this juncture in the lawsuit we haven't

12   assumed the responsibility of proving anything for the defend-

13   ants, nor have we assumed any responsibility other than-- I am

14   not talking about the Special Master's hearings.

15        THE COURT:  I understand that.  But nevertheless what

16   proof has been offered this Court can consider.

17        MR. VEEDER:  Yes, by all means.  And from our standpoint

18   in the storage areas that we have delineated we think we have

19   given at least a partial guide as to some of the more pressing

20   problems.

21        As I say, we are very anxious, though, at this juncture

22   to wind up our case in chief as soon as we can and let the

23   defendants come forward with their case.

24        THE COURT:  What do you mean by wind up your case in

25   chief?  What will that consist of?

A2

Z13

MR. VEEDER:  I talked to Mr. Sachse and Mr. Moskovitz

yesterday about this.  We would like as rapidly as possible to

finish up the evidence in regard to the surface phenomena that

we think are important.  Col. Bowen will testify starting today

in regard to the last aspects of the surface areas, taking our

Exhibit 78 and such aerials as we think are important and have

bearing, and tie those into the valley.  We will go ahead

after that and finish up on the Camp Pendleton area, the

Naval Ammunition Depot, and then we would like to put in the

rest of our case from the standpoint of the Coahuila Indian

Reservation, the National Forest and the Bureau of Land Manage-

ment.  We would like to put those in.

When those areas are to be heard in regard to the

people situated in the valley where the Special Master or your

Honor will take evidence--

THE COURT:  Put that over until that phase of the case?

MR. VEEDER:  I think it would be better, and going over

the matter it is clear to me that in view of our statement

that certainly we don't believe we can transfer Forest water

down to Camp Pendleton.  But so far as we are concerned, that

water is used in place, and so far as we are concerned the

sensible progression of this lawsuit would be to put our evidence

in as we go.

THE COURT:  I see no difficulty with that.  But we want

to keep our eye on when we are going to get some of these areas

A2

Z14

1  out of the case.  If I understand you right, that work can be

2  progressing, your work of going through answers and seeing

3  what you have on it--

4       MR. VEEDER:  That is progressing.

5       THE COURT: --while you are completing your case and

6  while Fallbrook and California are putting on theirs.

7       MR. VEEDER:  That is correct.  Area by area, we are

8  going through right now, and as we go through and find out the

9  status of each of these individuals we are hopeful, by the time

10  we hit a particular area, that we will be able to make a

11  statement to your Honor in regard to the status of the parties

12  and what can be done about it.  I know of no other way of

13  handling it, your Honor.  The mechanics of this matter is

14  tremendous.  We are as anxious as you are to get the people

15  out who have no claims.  But I don't want to do otherwise than

16  a businesslike job in getting rid of them.

17       THE COURT:  As part of your case did you put on proof

18  as to water duty in the Pendleton area?

19       MR. VEEDER:  We have put in a great deal of that

20  material already.  What we will do now is wind up in regard

21  to military use, inside and outside the watershed, and related

22  data.  From our standpoint, there will not be a great deal

23  more data and evidence to be introduced in the Camp Pendleton

24  area.  I don't know how long it will take.  It depends on

25  cross-examination.  But it will not be too much time.

A2

Z15

1          Frankly, it has been a tremendous burden trying to

2    conduct Special Master's hearings and hearings here, and I

3    think we will do a better and more effective job for your

4    Honor to pursue the course I have just delineated.

5          MR. SACHSE:  Your Honor, I would have most vigorous

6    objection to this last request that you seem to think there is

7    no problem about.

8          THE COURT:  Which last request?

9          MR. SACHSE:  That the proof of the United States' claimed

10   rights upstream in the watershed, in the National Forest, Indian

11   Reservation and elsewhere, should not be put on in their case

12   in chief before defendants are required to present their

13   evidence.  It seems to me obvious, since both an amendatory and

14   supplementary complaint was filed a year ago by the United

15   States which for the first time raised these extensive claimed

16   rights in the upper watershed, that those rights and their ex-

17   tent and their nature are going to absolutely vitally control

18   the position of every single defendant in the case, because

19   those rights are at the absolute top of the stream and whatever

20   right they have to stop the water affects every defendant in

21   this watershed-- appropriator, riparian or otherwise, and I

22   don't think it is proper to ask a defendant to come in and

23   attempt to prove his rights without any showing whatsoever

24   from the United States as to even the theory, even the practical

25   approach to the extent of these rights in the upper watershed.

A2

Z16

1    It would be a complete reversal of the burden of proof. We

2    are not suing the United States.  They are suing us.

3         MR. VEEDER:  Perhaps I didn't understand what Mr. Sachse

4    said to me yesterday when I proposed this.

5         MR. SACHSE:  I certainly did not agree to this, Mr.

6    Veeder, at any time.  Let's say you misunderstood me.

7         THE COURT:  Now this is another thing that we can do a

8    lot of talking about, and it is not going to take very long

9    to prove and there is probably not much dispute about it.  Let's

10    take an Indian reservation.  The Government would prove what

11    the area of it was.  They would probably put on some proof as

12    to what part of it was riparian.  The chances are, technically,

13    if it was created at one time, that it is all riparian.  They

14    would put on some proof as to what part of it was irrigable.

15    And then you have largely a question of law.  The cases seem

16    to indicate that the Indians are entitled not only to the water

17    they might use now, but all that they might reasonably use

18    in the future, and of course that would only concern the water

19    that arose on that area, and it would only concern use on that

20    area.  We don't yet have what could be a troublesome problem:

21    Providing some Indian would sell his water rights to somebody

22    else.  That would really complicate the problem.  But I don't

23    think that is in this case as yet.

24         That was involved in your case in the Northwest, was it

25    not?

A2

z17

1     MR. VEEDER:  That is correct.

2     THE COURT:  So when you get all done what do you do?
3 You find that there is so much of this ground that is
4 irrigable, and that the Indian has a right to use all the
5 water he needs now or may reasonably use in the future, and
6 that right only concerns at best the state of the water as it
7 would leave that reservation.  And they are upstream, and
8 their areas aren't so big.  It seems to me that almost by
9 stipulation you could work out the factual end of his rights.

10     MR. VEEDER:  We will go ahead, your Honor.  I thought
11 that Mr. Sachse had agreed with me yesterday on this.  If he
12 hasn't agreed with me, we will go ahead.

13     THE COURT:  All right.

14     Now, you asked for more time, Mr. Veeder, and asked
15 that the Master's hearings be continued.  I didn't make any
16 order, but I talked to the Master and the Master continued the
17 hearing.  There was one yesterday.

18     MR. VEEDER:  Yes, I was up there yesterday.  I talked
19 to him.  I have a letter from him in regard to it.  February 10th,
20 I think, is the time.  I simply want to review the findings
21 that he has proposed.

22     THE COURT:  Well, now, will you be ready at that time
23 to do that?

24     MR. VEEDER:  Yes.

25     THE COURT:  Findings are to be in on February 2nd.

A2

Z18

1        MR. VEEDER:  Yes.

2        THE COURT:  And the hearing is to be on the 10th.

3        MR. VEEDER:  That is right.  We are moving on it, your

4   Honor.  These are big problems.  I have never felt this way

5   about a lawsuit, that I would ever make a commitment if I could

6   avoid it until such time as I was sure I was protecting my

7   rights entirely, and as far as I am concerned I want to examine

8   each finding as proposed down to the last.

9        THE COURT:  Well, you have pretty much a commitment

10  now.  Maybe you haven't had up to now.  But now you have had

11  a couple of extensions.

12        MR. VEEDER:  That is right.

13        THE COURT:  And you have pretty much of a commitment to

14  have that in by the 2nd and to argue it on the 10th, if you are

15  going to do it.  I understand that you have made up your mind

16  now that you are going to object.

17        MR. VEEDER:  We are going to have objections, yes, your

18  Honor.

19        THE COURT:  Well, let's adjourn until 2 o'clock.  I have

20  a luncheon engagement.

21        (Noon recess.)

22

23

24

25

B

Z1

1    SAN DIEGO, CALIFORNIA, TUESDAY, JANUARY 13, 1959.   2:00 P. M.

2

3         (Another matter.)

4         THE CLERK:  The case on trial, 1247-SD-C, United

5    States vs. Fallbrook.

6         THE COURT:  Mr. Stahlman, were you going to submit

7    material?

8         MR. STAHLMAN:  Yes.  I would like to make a few re-

9    marks in the nature of an inquiry to the Court.  I have

10   formulated answers to these questions.  And I am just wonder-

11   ing:  Your Honor has indicated in the preference to the ques-

12   tions that it be in the nature of findings of facts.  Now, I

13   would like to inquire as to whether your Honor feels we should

14   confine ourselves at this state to merely the conclusions

15   which we have reached as a result of the evidence or whether

16   or not we may expand that to some extent.  I find it a little

17   unusual, in other words, at this stage of the case to submit

18   to what would be equivalent to findings of fact at the con-

19   clusion, realizing that conclusions of law are to be drawn

20   from those findings of fact and that we run into situations

21   where there are some legal situations which, I think, would

22   affect the conclusions.  For instance, there are certain

23   presumptions in relation to some of the matters which your

24   Honor has made inquiry of, if we were to pursue them to their

25   useful benefit, that is, to make legal conclusion from them.

7061

B

Z2

1    Also, I am wondering if your Honor feels that we have

2    reached the point in the case where we may give consideration

3    to some of the other factors that I think are, in my mind,

4    more important to reach than what might be the analysis taken

5    from the transcript of the evidence to this point, which is

6    not a difficult thing to do; merely give our respective per-

7    sonal opinions regarding what the conclusions should be.  I

8    have in mind matters such as some of the legal questions that

9    are bothering me.  I think we can reach the point where some

10   of them might be settled and could have some effect upon

11   these findings of fact.  For instance, the matter-- and your

12   Honor has made inquiry regarding the salt water intrusion.

13   There is another, I think, correlated determination to be made

14   in this case in Camp Pendleton.  That is in relation to whether

15   or not the reasonable and beneficial use of water would be

16   proper in artificially impregnating the basin so as to im-

17   prove the water level and the efficiency of the basin.  And

18   also I feel that there is a dearth of evidence in some of the

19   important situations in this case which the conclusions that,

20   in some respects that your Honor requested, that could be found

21   at this time that bear a relationship to the law of the case.

22   And also I have attempted in the reading of some of the cases

23   in California to find comparable situations, and there are

24   some cases in which there are some comparable situations in

25   geology to which we have here.  And, of course, in those cases,

B

Z3

1   having reached a conclusion of having hard situations of fact

2   and conclusions of law in the judgment thereon, there was

3   evidence in addition to that which we have here.  For instance,

4   in the basins.  There was determination as to the quantity of

5   water in these basins when they were in balance and when they

6   were not.  And there were determinations as to the rate, the

7   transmissibility of water from what would be the defined river

8   system into surrounding areas that had materials less im-

9   pervious than that which abutted upon the basement of the

10  stream itself, such as we have here.  And I find that in those

11  cases that there was more extensive evidence from which

12  certain conclusions and certain findings could be made which

13  we don't have in this case.  And so my inquiry to your Honor

14  is as to whether or not if you feel at this time, or is this

15  too early for us to point out some of those situations in the

16  answer or make comments upon the evidence in relation to

17  factors which we feel may have some effect upon the ultimate

B2    18  conclusion of the case?  There is another--

19           THE COURT:  Let me comment on that.  I think the

20  answer is certainly yes.  And I don't propose to draw findings

21  at this time.  This procedure we are following is largely to

22  make counsel crystalize their thinking about these things as

23  we go along.  Some of you may have in mind other evidence

24  you are going to introduce which may have a very definite

25  bearing on what you think the finding will ultimately be.

7063

B2

Z4

1    I don't expect you to set it all out but at least some intima-

2    tion there will be some evidence on a certain subject matter.

3    This is largely to see whether we are all thinking along like

4    terms and how close together some of our conclusions are at

5    this stage of the case.

6    MR. STAHLMAN:   That answers my question.   And that was

7    one of them, as to whether or not if we introduced into our

8    response to your Honor's query matters which may be a de-

9    parture from what the record indicates is, but it would have a

10    bearing upon what we think the evidence will eventually show.

11    THE COURT:   I would think anything that would be help-

12    ful to the Court or counsel in that respect would be proper.

13    Or counsel might all think presently a certain finding will

14    be indicated but you might know of evidence that is going to

15    be introduced , and in one paragraph you could say, "Propose

16    to offer evidence along a certain line," if you think when the

17    evidence is in the findingwould be different or it would be a

18    different finding.

19    MR. STAHLMAN:   Then, there is another question that I

20    think we are going to ultimately reach, and it may be I

21    wouldn't want to just be the one, to use the vernacular, stick

22    my neck way out at this time.   But I think your Honor is

23    going to have to give and will give some consideration to mak-

24    ing physical solutions in some of the problems of this case.

25    And we may have some suggestions that might be well to consider

B2

Z5

1   at this stage of the trial, even though we haven't reached the

2   point as yet where the physical solutions to some of these

3   problems may be advanced.

4   THE COURT:  Of course, there will be many problems, I

5   think referred to in these documents in the file. What I tried

6   to do is merely list some of the problems at this stage that

7   had already become apparent.

8   Any suggestions as to how it will be offered?

9   MR. MOSKOVITZ:  Your Honor, this morning before we

10   went to lunch I lodged with the Clerk and passed out to counsel

11   copies of California Exhibit Z, which is a narrative explana-

12   tion of the method of storage capacity of ground water basins

13   set forth in Table B-3, Appendix B, of California Exhibit L

14   were computed.  And I propose at this time to call Mr. James

15   to the stand to present this and then have him available for

16   cross-examination.  Mr. Veeder hasn't had sufficient time --

17   MR. VEEDER:  I have studied this, read it over, but

18   certainly, your Honor--  Has your Honor seen it?

19   THE COURT:  No.

20   MR. VEEDER:  I submit to your Honor that this couldn't,

21   in my view, conceivably be an exhibit.  It is a resume.  It

22   is a statement.  It might be a very, very fine thesis by an

23   eighth grader, but I submit that it is certainly not evid-

24   entiary in character.  It is a write-up.  A man sits down and

25   says, "Here is what we did."

7065

B2

z6

1    MR. MOSKOVITZ:  Your Honor, I propose that Mr. James

2    go on the stand and read this as his testimony.  This is what

3    it would be.  I prepared it in its written form for the con-

4    venience of the Court and counsel in response to requests that

5    we set forth some easily-read matter.  Just how the various

6    storage computations were made.  That is the purpose.  There

7    is objection to it.

8    THE COURT:  What is wrong with that procedure of using

9    this as the witness's sworn testimony and a few preliminary

10   questions as to what his testimony would be and let you cross-

11   examine him?  You don't have to do it today.  You can study

12   up on it.

13   MR. VEEDER:  I would just like to have the trial go

14   ahead normally.  I would like to have him get on there with

15   direct examination and cross-examine him.  Go ahead any way

16   he wants to; suits me; but I certainly object to this as an

17   exhibit.  I don't believe that it is an exhibit.  I believe

18   that the requirement is that the proceedings go ahead on oral

19   testimony by question and answer.  I believe that that is the

20   rule, and I certainly object to this canned testimony that

21   is being profered here to seek to salvage Bulletin 57.  Now,

22   I have made my objection.  If he wants to call the man, why,

23   let him go ahead and we will cross-examine.

24   THE COURT:  I can't see how you are hurt, Mr. Veeder.

25   You want to save some time in this case.  Why should we sit

B2

Z7

1   when they prepared the material for you, when you can have all

2   the time you want to study it over, why shouldn't we use it

3   as his sworn testimony and let you go from there on?  He is

4   available for cross-examination.  You are in better position

5   than you would be by question and answer.

6      MR. VEEDER:  Well, I have my objection.  I don't believe

7   it is proper trial procedure.  I think it is completely in

8   error.  I think that the time that we waste on this silly,

9   silly Appendix B proves it.  But I am willing to go ahead.

10   And as long as the record shows that I have objected to this

11   procedure-- Are they just going to put him up and say, "Would

12   you say this?"  Then I cross-examine on this Exhibit Z?  Is

13   that the procedure?

14      THECOURT:  That is the proposal.

15      MR. VEEDER:  I object.

16      MR. MOSKOVITZ:  Your Honor, I propose to have Mr.

17   James read this aloud.  I would ask him the question:  "Would

18   you explain how the gross and usable storage capacities were

19   computed for each of the basins which are set forth in Plate

20   Table B-3?"  And this would be his testimony.  This is how it

21   was done.

22      THE COURT:  The objection is overruled, Mr. Veeder.

23   Do you want this to proceed now or do you have something else

24   you want to do?

25      MR. VEEDER:  Surely.  Go ahead.

James   Direct

7067

B2

Z8

1    THE COURT:  Call your witness.

2    MR. MOSKOVITZ:  Mr. James.

3    THE COURT:  Mr. James has already been sworn.  Ask him

4    the preliminary question and let's get started.

5

6                    LAURENCE JAMES,

7    recalled as a witness in behalf of the defendant State of

8    California, having been previously sworn, testified further

9    as follows:

10

11               FURTHER DIRECT EXAMINATION

12   BY MR. MOSKOVITZ:

13        Q   Mr. James, would you explain the manner in which

14   the gross and usable storage capacities are set forth in

15   Table B-3 of Appendix B, California Exhibit L were computed?

16        THE COURT:  Answer that yes or no.  Can you do it?

17        THE WITNESS:  Yes, sir.

18        THE COURT:  Have you prepared a document where you

19   have written out in detail this explanation?

20        THE WITNESS:  Yes, your Honor.

21        THE COURT:  And that is California Exhibit Z for

22   Identification?

23        THE WITNESS:  Yes, your Honor.

24        THE COURT:  And then your answer to Mr. Moskovitz'

25   question in detail as to the method, would Exhibit Z be your

B2

Z9

1    answer as to the methods used?

2             THE WITNESS:  Yes, your Honor.

3    BY MR. MOSKOVITZ:

4             Q  Would you refer to Table A which is attached as

5    part of California Exhibit Z for Identification and would you

6    explain the information which appears on Table A?

7             A  The information on this table is described more

8    fully in a text that precedes the first seven pages of Exhibit

9    Z.  In this table we have attempted to break down the various

10   basins that appear in Table B-3 into three categories for the

11   purpose of simplifying the explanation as to how storage

12   capacity, both usable and gross, was compiled by the State.

13   As explained in the text, there are some features in each of

14   these basins that are unique to that particular basin.  And

15   for this reason these categories are rather general.  However,

16   this should show how it was done and what limits were adopted

17   for computing both gross and usable storage capacity.

18

19

20

21

22

23

24

25

C

Z19

1    MR. VEEDER:  Did I hear you say "should"-- "should

2 show"?

3    THE WITNESS:  It will show.

4    MR. VEEDER:  How about "does"?

5 BY MR. MOSKOVITZ:

6    Q  Could you relate the different categories of basins

7 which appear in Table A to the portions of the textual part

8 of California's Exhibit Z where they are described?

9    A  These categories are described on page 3 of Exhibit

10 Z.  Do I understand that you would like me to read these

11 descriptions of categories?

12    Q  The brief descriptions of categories, so that they

13 can be related to the different basins which are listed in

14 Table A.

15    A  In Category 1 there is included alluvium-filled

16 basins which are largely underlain and surrounded by basement

17 complex.

18    Category 2 includes those alluvium-filled basins which

19 are largely underlain and surrounded by older tertiary

20 sedimentary deposits of relatively low permeability.

21    In Category 3 are included basins largely underlain and

22 surrounded by older alluvium or undifferentiated Upper

23 Pleistocene sediments of relatively low permeability.  Cate-

24 gory 3 we broke down into two subdivisions:  Subdivision A,

25 which includes basins with vertical walls, and which vertical

James   Direct                                    7070

C

Z20

1    walls were assumed, and a Cagetory B, which includes basins

2    the walls and floors of which were delimited from isopach maps.

3           Q  Does each of the basins which are listed on the left-

4    hand side of Table A fall within those categories you have just

5    described?

6           A  Yes, they do.

7           Q  And are each of the basins which are listed in Table

8    B-3, for which storage, both gross and usable, are indicated--

9    do each of those appear on Table A?

10          A  Yes.

11          Q  And will you describe the information which is

12   summarized under the column headed "Method of delimiting walls

13   and floors of basins in Table A"?

14          A  This column simply sets forth some clarifying in-

15   formation to further describe just how the walls and floors of

16   the particular basins were delimited.

17          Q  Please refer to Table B-3 in Appendix B of Exhibit L

18   and to the footnotes which appear at the conclusion of that

19   table.  That would be on--

20          MR. VEEDER:  B-50.

21          THE WITNESS:  I am referring to page B-50.

22          THE COURT:  Is this Volume I or II?

23          MR. MOSKOVITZ: Volume II.

24          THE WITNESS: Volume II, yes, your Honor.

25

James    Direct                                                    7071

Z21

BY MR. MOSKOVITZ:

Q  What is the relationship between California's Exhibit Z and the footnotes on the bottom of page B-50?

A  The limits that were utilized in setting usable storage capacity are described within the text of Exhibit Z.

Q  What is the relationship to the footnotes on page B-50?  Are those footnotes to be taken as correct?

A  No, this would substitute for the footnotes that appear on that table.

Q  Exhibit Z would substitute for the footnotes at the bottom of page B-50?

A  That is right.

MR. MOSKOVITZ:  I offer in evidence California's Exhibit Z.

MR. VEEDER:  I would like to have some questions on that, your Honor.

THE COURT:  Yes.


VOIR DIRE EXAMINATION

BY MR. VEEDER:

Q  Did you do this work yourself, Mr. James, as set forth on Exhibit Z?

A  Yes, I did all of this work.

Q  That is, when you say you did all of the work, you are referring only to the editorializing; is that right?

C

7:22

A   No; I wrote this exhibit.

Q   That is what I mean.  You wrote it.  And where did you get the data that went into the preparation of this Exhibit Z?

A   These data were obtained from Bulletin 57 and from our office calculation sheets which were submitted in evidence earlier.

Q   And you went to Bulletin 57 to get the data which you set forth here; is that correct?

A   Bulletin 57 was considred in preparing this exhibit Z.  However, that breakdown of basins into categories was something that was done for thefirst time in preparing the exhibit for the purpose of clarifying--

Q   I didn't follow what you said right there.  Would you say that again?

MR. MOSKOVITZ:  Could youhave the reporter read it, or let him finish it?

MR. VEEDER:  I would like to have the reporter read it.

(The reporter read the last answer.)

THE WITNESS:  I might add, that was for the purpose of clarifying the method of estimating the storage capacities of these basins.

BY MR. VEEDER:

Q   In other words, you took additional data in the preparation of this?

James    Direct

C

Z23

1     A  No additional data.  All the data that are included

2   herein, and I refer to Exhibit Z, are included either in

3   Bulletin 57 or in the calculation sheets which have been

4   submitted in evidence.

5     Q  Is there any data in Bulletin 57 that is not included

6   in your calculation sheets?

7     A  Well, there are all sorts of information in Bulletin

8   57 that aren't included in this.  Or do you mean in Table--

9        MR. VEEDER:  That is just what I meant.

10        I object, your Honor, on that ground; that here again

11   we have offered in evidence canned testimony which is of such

12   character that we can't possibly cross-examine on it.  For

13   example, we know that California had to raid the transcripts

14   of cases to get data to put into Bulletin 57.  We know there

15   is a vast amount of statements throughout Bulletin 57 that

16   were taken from sources other than this witness's knowledge

17   and this witness's personal investigations.  The net result

18   of it is that we have here before us Bulletin 57, which was

19   prepared in contemplation of this litigation.  We have before

20   us the statements originally made in Appendix B, which were so

21   faulty that California itself admitted they had to shore it

22   up.  And now we come in with an explanation compounding an

23   explanation of an explanation and it is offered in evidence,

24   and I submit that there is no conceivable rule that would

25   permit this kind and type of data to be offered in evidence.

C

Z24

1    THE COURT:  Well, now, if you don't want it offered in

2    evidence, I am willing to let it be incorporated in the

3    transcript and copy it in as the witness's testimony.  But

4    other than that, your objection is overruled.  Which way do

5    you want to handle it?

6    MR. VEEDER:  Let it go into the record as-- let him read

7    it into the record, any way he wants to.

8    THE COURT:  Why should we sit here and have him read it?

9    MR. VEEDER:  Let it go in any way you want, as long as

10   my objections are clear.

11   THE COURT:  The reporter will be instructed to copy the

12   contents of Exhibit Z into the record as the testimony of this

13   witness on direct.

14   This is what you would swear to?

15   THE WITNESS:  Yes.

16   THE COURT:  Now you may cross-examine on this.  An

17   expert witness may base his opinions on all sorts of literature.

18   What would you think about an expert witness who didn't consult

19   the literature in the field before he testified?  A mathe-

20   matician would go back to the Greeks.  A geologist would lean

21   on anyone who had made study and research.  There may be

22   material and ideas that come from other places.  You can cross-

23   examine.  If you want to question the correctness of some of

24   the witness's opinions or supporting data, you have full range

25   to cross-examine.  You are no worse off.  In fact, you are better

James    Direct

C

Z25

1   off than if he sat here and read this or by question and answer

2   we spent a day or half a day putting this matter into the

3   record, and you would have the same right to cross-examine that

4   you have now.  So the objection is overruled.  You may cross-

5   examine him.

6          MR. VEEDER:  I shall, your Honor.

7          (California Exhibit Z for Identification is copied in

8   words and figures as follows:)

9

10              Methods by which Storage Capacity of the Ground

11                   Water Basins in the Watershed of

12              Santa Margarita River, California, as set

13                   forth in State Exhibit L, Appendix B,

14                      Table B-3, were computed

15

16          The Santa Margarita River watershed comprises

17   large areas of basement complex within which are

18   pocketed sedimentary formations of varied areal

19   extent and thickness.  Of these sedimentary

20   formations, those of Quaternary age as depicted

21   on State Exhibit L, Plates 13A and 13B contain

22   most of the suable ground water, and the Recent

23   alluvium produces the greatest supply.

24          In the west half of the Inland Area, as

25   depicted on State Exhibit L, Plages 9B and 13B,

C

Z26

1          a comparatively large area of older alluvium

2          exists which surrounds and underlies valleys

3          of Recent alluvium.  Development of ground water

4          in this region has occurred mostly within the

5          Recent alluvial areas as indicated by the

6          distribution of water wells shown on State

7          Exhibit L, Plate 9B.  On the other hand there

8          has been comparatively little exploitation from

9          the large expanse of older alluvium.  The older

10         alluvium is highly lenticular and judging from

11         observations of surface deposits, its physical

12         characteristics vary from one locality to the

13         next.  Because of these variable conditions the

14         few available well logs provide insufficient

15         information with which to prepare a reasonably

16         accurate estimate of the storage capacity of the

17         entire body of older alluvium.  For these reasons,

18         California's calculations of ground water storage

19         capacity in this region were restricted to the

20         ground water basins delimited within the areas of

21         Recent alluvium where data were more abundant.  Older

22         alluvium immediately underlying and surrounding the

23         deposits of Recent alluvium was included within

24         these ground water basins wherever sufficient well

25         logs were available to permit a reasonable evaluation

C

Z27

1    of the waterbearing properties of these adjoining
2    and subjacent sediments.  It was reasoned that the
3    storage within the ground water basins so delimited
4    constituted the bulk of the storage presently
5    being utilized, and that evaluation of the storage
6    capacity of the entire body of older alluvium
7    would be meaningless inasmuch as the storage
8    within that body was not being appreciably
9    utilized and inasmuch as there were not sufficient
10   data available to prepare a reasonably accurate
11   estimate.
12       Elsewhere in the Inland Area and in Rainbow
13   Valley  are numerous deposits of Recent alluvium
14   which are surrounded and underlain largely by
15   basement complex and which are someti es inter-
16   connected by alluvial channels.  Where these
17   deposits were of appreciable size, and where
18   sufficient data were available to permit a
19   reasonably accurate estimate of storage capacity,
20   they are designated ground water basins.
21       The Santa Margarita Coastal Basin consists of
22   Recent alluvium largely flanked and underlain
23   by older Tertiary sediments of low permeability
24   which form the floors and walls of this basin.
25   Alluvial channels interconnect adjoining subbasins

1    of this basin and also connect Ysidora subbasin

2    with the ocean.

3        Because of physical differences in the several

4    kinds of ground water basins found in the Santa

5    Margarita watershed, it was not feasible to

6    employ a standardized method of estimating

7    their storage capacities.  Many basins possessed

8    peculiarities which necessitated individual con-

9    sideration; however, for the purpose of describing

10   in general the methods used to estimate storage

11   capacities appearing in State Exhibit L,

12   Appendix B, Table B-3, basins within Santa

13   Margarita watershed may be considered as com-

14   prising three categories as follows:

15        Category 1.  Alluvium filled basins

16        largely underlain and surrounded by base-

17        ment complex.

18        Category 2.  Alluvium filled basins

19        largely underlain and surrounded by older

20        Tertiary deposits of relatively low

21        permeability.

22        Category 3.  Basins largely underlain

23        and surrounded by older alluvium or un-

24        differentiated upper Pleistocene sediments

25        of relatively low permeability.

James    Direct

7079

(A) Basins with vertical walls assumed.

(B) Basins, the walls and floors of which

were delimited from isopach maps.

The ground water basins within the Santa Margarita

River watershed which were delimited in State Exhibit

L, Appendix B, Table B-3, and Plates 11A and 11B,

are classified into appropriate category in

Table A, attached.

## Method of estimating storage capacities of ground water basins

### in Category 1

Gross Storage Capacity

Gross storage capacity was considered to be

the amount of extractable water which could be

stored within the entire body of alluvium.

Where sufficient well logs were available the

volumes of alluvium were obtained from isopach

maps constructed to depict the configuration of

the walls and floors of these basins.  The

procedure for estimating gross storage capacity

then followed in general the steps outlined in

State Exhibit R.

Where fewer well logs were available it was

necessary to place greater reliance upon

interpretation of surface geology in estimating

the volumes of alluvium.  Where very few well logs
were available the surface area of the basin was
multiplied by an average depth to basement complex
as estimated from these logs.  This product was
in turn multiplied by the estimated average
specific yield to obtain gross storage capacity.

### Usable Storage Capacity

The capacity of sediments lying above historic
high water table and the capacity of the bottom-
most 25 feet of the deepest subarea of the basin
were deducted from gross storage capacity to
obtain usable storage capacity.  The procedure
for estimating usable storage capacity followed
in general the steps outlined in State Exhibit R.

### Method of Estimating Storage Capacities of Ground
### Water Basins in Category 2

### Gross Storage Capacity

Gross storage capacity was considered to be the
amount of extractable water which could be stored
within the entire body of alluvium.  Storage
capacity was computed generally in the manner
described in California's Exhibit R except that
the isopach maps were drawn on the upper surface

of the subjacent tertiary deposits instead of
on the basement complex.  Also forty foot depth
zones were used in lieu of fifty foot zones.

## Usable Storage Capacity

Usable storage capacity was calculated as being
the storage capacity in the interval between (1) 10
feet below ground surface and (2) mean sea level
but not more than 100 feet below ground surface.

## Method of Estimating Storage Capacities of Ground
### Water Basins in Category 3

### Category 3A
### Gross Storage Capacity

Because of the difficulty in determining the depth
of Recent alluvium from the logs of the wells
drilled in basins within this category, the
bottoms of these basins were established from the
deepest wells with reliable logs.  The bottom of
each subarea was considered to be a horizontal
plane passing through the fifty-foot depth
interval nearest to the deepest reliable logged
depth. Therefore, the bottom of each basin was not a
smooth continuous surface but rather a ste-like
arrangement of horizontal planes.  Because of the

James   Direct

difficulty in differentiating Recent and older alluvium from study of the logs of wells, the walls of these basins were arbitrarily considered to be vertical, an assumption that was further justified in several instances by the fact that vertical faults closely paralleled the boundaries. The areal boundaries of basins were assumed to follow the line of contact between Recent and older alluvium.

Where zones of free water were known to overlie zones of confined water, storage capacity was computed in the free water zones only.  In these instances it was reasoned that the free ground water was drawn directly out of storage within the basin whereas draft on the confined water was reflected by drawdown in distant undefined "forebay" areas which were not amenable to study.

In general, estimates of gross storage capacity were computed in the manner described in California's Exhibit Q.


Usable Storage Capacity

The capacity of sediments lying above historic high water table and the capacity of the bottommost

James    Direct

25 feet of the deepest subarea of the basin were

deducted from gross storage capacity to obtain

usable storage capacity.  The procedure followed

in general that outlined in California's Exhibit Q.

## Category 3B

### Gross and Usable Storage Capacity

Ground water basins in this category are in

some instances partially flanked by basement

complex, but mostly they are bounded and under-

lain by older continental deposits, the thickness

and water transmitting properties of which are

largely unknown.  These basins include Recent

alluvial deposits, and where producing water

wells penetrate the older continental deposits

which surround and underlie Recent alluvium, the

productive parts of these older deposits have

also been included within the ground water basins.

Thus the basins as delimited by isopach maps include

permeable and water-bearing deposits for which

sufficient data are available with which to compile

reasonably accurate estimates of storage capacity.

The configurations of the walls and floors of

these basins were fixed largely from study of

water wells, their distribution, depths, yield,

and the logs describing the materials they
penetrated.

Estimates of gross and usable storage capacity
followed in general the procedure outlined in
State Exhibit R; except that as heretofore
mentioned the isopach maps were drawn so as to
include those sediments for which information
was available instead of being drawn to depict
a bedrock surface.


TABLE A

Classification of Ground Water Basins

Within Santa Margarita River Watershed


| Basin | Category* | Method of Delimiting Walls And Floors of Basin |
|-------|-----------|-------------------------------------------------|
| Diamond | 1 | (a) |
| Domenigoni | 1 | (a) |
| French | 1-(f) | (a) |
| Los Alamos | 1-(f) | (a) |
| Murrieta | 3A | (b) |
| Santa Gertrudis | 3B-(e) | (a) |
| Tucalota | 1 | (a) |
| Wildomar | 3A | (b) |
| Anza | 1 | (a) |

James    Direct

7085

C

Z35

| | | | |
|---|---|---|---|
| Lower Coahuilla | 1 | | (c) |
| Lower Lancaster | 3B | | (a) |
| Upper Coahuilla | 1 | | (c) |
| Upper Lancaster | 3B | | (a) |
| Aguanga | 3A | | (b) |
| Dodge | 1 | | (a) |
| Lower Culp | 1 | | (a) |
| Nigger | 3A | | (c) |
| Oakgrove | 1 | | (a) |
| Radec | 3B | | (a) |
| Pauba | 3A-(e) | | (b) |
| Pechanga | 3A | | (b) |
| Rainbow | 1-(d) | | (c) |
| Upper | 2 | | (a) |
| Chappo | 2 | | (a) |
| Ysidora | 2 | | (a) |

*   See page 3.

(a) Isopach map.

(b) Vertical walls assumed; depth to basin floor
    differed for each subarea and was determined
    from the logs of water wells located within
    each specific subarea.

(c) Average depth estimated from few existing
    well logs.

1   Vertical walls assumed.  Storage capacity

2   obtained by multiplying average depth X

3   estimated specific yield X surface areas in

4   acres.

5  (d) The capacity of sediments lying above historic

6   high water table and the capacity of the

7   bottommost 20 feet of the deepest portion

8   of the basin were deducted from gross storage

9   capacity to obtain usable storage capacity.

10  (e) Sediments within zone of confined water were

11   not considered in estimating storage capacity.

12  (f) Areal boundaries of ground water basin encompass

13   some older alluvium.

14

15  BY MR. MOSKOVITZ:

16  Q  Mr. James, was an effort made to check the calcula-

17  tions as to the acreages of the subareas contained in Murrieta

18  Basin by you or under your direction?

19  A  Yes, under my direction, the Murrieta Basin and

20  subareas, as depicted on California's Exhibit L, Table 15-2,

21  was checked.

22  THE COURT:  What is California's Exhibit L, Table 15-2?

23  THE WITNESS:  Your Honor, that is the tracing of the

24  Murrieta Ground Water Basin in which various area that were

25  used for computing storage capacity are delineated.

James   Direct

C2

Z37

1          MR. MOSKOVITZ:  You recall last time, your Honor,

2   there was a question about the areas.

3          THE COURT:  Yes.

4   BY MR. MOSKOVITZ:

5          Q  What were the results of the planimetering of those

6   subareas?

7          A  In re-planimetering those subareas, we came up with

8   essentially the same areas that the Government obtained in

9   their planimeter job.  We realize now that this Exhibit

10   California's L, Table 15-2 was not the tracing that was util-

11   ized in determining the areas that are set forth in Table B3--

12   utilized in computing the storage capacities that are set

13   forth in Table B3.  Your Honor, we don't know where that

14   original tracing might be.  This was a tracing that was

15   constructed in the course of the computations and it was in-

16   cluded in our computation sheets, but it is not the one that

17   was finally used.

18          THE COURT:  Then this is useless to us-- that is,

19   California's L, Table 15-2?

20          THE WITNESS: Well, your Honor, except that it does

21   show that it was broken down into eleven subareas, and that

22   the areas are approximately of the configurations shown on

23   this sketch.  But it is not the one.  There are some differences

24   in area which we don't feel are very great.  It is approximately

25   the same.  But the one that was finally planimetered was

James    Direct

C2

738

1    different.

2         MR. VEEDER:  I move to strike California's Exhibit L,

3    Table 15-2 on the basis of the witness's statement, your

4    Honor.

5         THE COURT:  I think the motion should be granted.

6         MR. MOSKOVITZ:  I have no objection, your Honor.

7         THE COURT:  It will be stricken.

8    What did you planimeter in order to come to the con-

9    clusion that the Government's figures on planimetering are

10   correct?

11        THE WITNESS:  We planimetered this exhibit which was

12   just stricken, California's Exhibit L, Table 15-2-- We re-

13   planimetered that, and our re-planimetering confirmed their--

14        THE COURT:  Planimetering of the same exhibit?

15        THE WITNESS:  Yes, sir.

16   BY MR. MOSKOVITZ:

17        Q  Could you explain what led you to the conclusion

18   that California's Exhibit L, Table 15-2 was not the one

19   which was used in calculating the storage capacity?

20        MR. VEEDER:  I object; the question is incompetent,

21   irrelevant and immaterial.  It has not a thing in the world to

22   do with this case.  The exhibit is stricken.

23        THE COURT:  Well, it might explain the mistake that he

24   made.  Overruled.

25        THE WITNESS:  For one thing, the boundaries shown on

C-2
Z39

1    Exhibit California's L, Table 15-2 are not the same as those

2    shown in Bulletin 57, Plate 11B, which are the basin boundaries

3    as finally adopted by the State.

4         Secondly, because of the fact that the re-planimetering

5    showed that the areas set forth in our computation sheets

6    didn't agree.

7    BY MR. MOSKOVITZ:

8         Q   In what respects were the boundaries on California's

9    Exhibit L, Plate 11B of the Murrieta Basin different from--

10        THE COURT:  He says it is inaccurate.  I will object

11   to that myself and sustain the objection.

12        MR. MOSKOVITZ:  Very well.

13        MR. VEEDER:  Your Honor, now we move up a step further.

14   I am referring to  Exhibit L, 15-1, this big garish map, and

15   L 15-2, when it is laid over the Murrieta Valley, will show

16   that they are identical.  Now he admits that L 15-2, the

17   overlay, is meaningless, and I respectfully submit-- If your

18   Honor would care to put the overlay on this you will find that

19   it is true-- I respectfully submit that L 15-1 should join

20   L 15-2 in limbo or wherever they go, because they are in-

21   accurate.

22        MR. MOSKOVITZ:  Your Honor, by questions I wanted to

23   develop the differences, and I can do so, if you are inter-

24   ested in it.

25        THE COURT:  Why should we be concerned-- let's forget

1    about Mr. Veeder's objection for the minute-- why should we be

2    concerned with what the differences are, if this is inaccur-

3    ate and you want the map out?  Let's forget about it.

4          MR. MOSKOVITZ:  I am willing to do so.

5          THE COURT:  Now, is it correct, as Mr. Veeder states,

6    that this overlay, California's Exhibit L, Table 15-2, is

7    identical to the materials shown on California's L, Table 15-1,

8    the  map?

9          MR. MOSKOVITZ:  Well, this is the explanation, your

10   Honor.  The overlay fits on the delineation of the recent

11   alluvium which appears on 15-1, but the difference is that

12   some of the arms of Recent alluvium which extend from the main

13   part of the basin were cut off at various points on Table 15-2.

14   Now it is where you cut off those arms that you get a differ-

15   ence in the area.  My witness tells me that therin probably

16   lies the difference between the results in Table B-3 and 15-2--

17   if I make myself plain.  I can show you on the exhibit.

18         MR. VEEDER:  Why not have the witness testify to that?

19         MR. MOSKOVITZ:  I began to do so, but his Honor stopped

20   me.

21         THE COURT:  All right, go ahead.

22         MR. MOSKOVITZ:  With testimony, your Honor?

23         Q  Will you explain what the differences were between

24   the extent of the Murrieta Basin as it appears in Plate 11B

25   of Exhibit L and that which appears on Exhibit L 15-2?

James          Direct                                                    7091

C2
Z41

1          THE COURT:  What are you comparing now?

2          THE WITNESS:  Plate 11B, your Honor, with California's

3     Exhibit L, Table 15-2.

4          On Plate 11B you will note that just west of Santa

5     Gertrudis Basin there is a small arm of alluvium which extends

6     north and northeast of the Wildomar fault-- it is shown within

7     the basin boundaries, whereas on Exhibit 15-2 it is not shown.

8     Continuing westerly, there is another small arm.

9          MR. VEEDER:  Excuse me.  I am trying to follow you as

10    you go.

11         THE WITNESS:  Your Honor, I referred first to this.

12    You are pointing to it, Mr. Veeder.  This particular arm is

13    not included on 15-2, and there are also other irregularities

14    going around the basins which differ in shape from Table 11B.

15         THE COURT:  Was Plate 11B made from the large  map

16    California's L, Table 15-1?

17         THE WITNESS:  Yes, that map-- 15-1 I am referring to--

18    was made based on aerial photograph mapping, as was this

19    Plate 11B.

20         THE COURT:  That isn't what I asked you.  I asked you

21    if Plate 11B was made from the big map, L Table 15-1.

22         THE WITNESS:  To the best of my recollection, it was

23    traced from that map.

24         MR. VEEDER:  The evidence so shows, your Honor.  At

25    least that was the testimony originally, that this map 15-1

C3

C3

Z42

1   was the source of, I think it was, 13B and 11B.

2          MR. MOSKOVITZ:  I believe that is correct, your Honor.

3          MR. VEEDER: And that it was predicated upon that.

4          THE COURT:  (Stepping down and examining the map)  It

5   is pretty obvious that Plate 13B was made from or was very

6   similar to California's L, Table 15-1.  But Plate 11B has

7   still some chopping off of alluvial areas.

8   BY MR. MOSKOVITZ:

9          Q  Mr. James, would you explain what was done in

10   delineating the Recent alluvium or the basin boundaries on

11   Plate 11B in deriving it from Plate 13B and Table 15-1?

12          MR. VEEDER: Are you saying Table 15-1?

13          MR. MOSKOVITZ:  This is called Table 15-1.

14          THE WITNESS:  The boundaries of the Recent alluvium

15   were first delineated and then some of the arms which were

16   either shallow or for which there were not well information

17   available were chopped off and the basin was rounded off to

18   exclude some of the areas that were not believed to be sig-

19   nificant.

20          MR. MOSKOVITZ:  I don't have any further questions,

21   your Honor.

22

23                    CROSS-EXAMINATION

24   BY MR. VEEDER:

25          Q  Now, in arriving at the areal extent of the Murrieta

C3

Z43

1  Basin, which is depicted on the Exhibit or the Appendix B,

2  what was the criterion that you used to eliminate these so-

3  called arms that made the difference?  How did you make a

4  determination on that?

5        A  This was largely a matter of judgment where the arms

6  were slender, believed to be shallow, or where there were

7  little data available to disclose the nature of the materials

8  that were included within the arms.  These were all things

9  that were considered in arriving at the boundaries.

10       Q  Did you do that in regard to the Wildomar Basin,

11  the areal extent of it?

12       A  I don't remember just what we lopped off in that

13  case.  But we considered these things.  The Government did the

14  same thing in their coastal areas-- coastal basins.

15

16

17

18

19

20

21

22

23

24

25

D

Z10

James   Cross

BY MR. VEEDER:

Q   What was your criterion making that determination up in Wildomar?   The fact that the Government did it some place else?

A   No, as I say, it is largely a matter of judgment.

Q   From the standpoint of storage capacity what does that mean, in your opinion?

MR. MOSKOVITZ:   I object to that question.   I think it is a little vague.

MR. VEEDER:   All right.   I will rephrase it.

Q   Now, in connection with Appendix B you have shown 4400 acres as the areal extent of Murrieta.   I am referring to your Bulletin 57.   Based upon your revisions, what is the areal extent now of the--

MR. MOSKOVITZ:   Based upon what revisions?   I think he is assuming something not in evidence.

MR. VEEDER: Well, he has come up with some--

Q   What is the area of extent of the Murrieta Basin based upon your present calculation?

A   The area is 4,400 acres, was the area that we determined in our studies.   We made no revised estimates of area.   We have not redrawn the basin.

Q   You have no overlay or any map to show the source of that acreage, is that right?

A   We don't have the exact overlay that was used to

D

Z11

1    obtain that figure. But if we were to redo Exhibit L-1, why,

2    we would come up with approximately the same.

3        Q  You mean 15-1?

4        A  15-1.

5        Q  Would you show me so that we can planimeter those

6    areas in 15-1, precisely the ones that were eliminated or

7    brought in, or whatever you did to come up with your 4,400

8    acres?

9        A  I can show you precisely-- I can show you approx-

10   imately after some study. This would require study of the

11   logs, study of the terrain.

12       Q  But you don't know now?

13       A  If you expect me to go on and delimit precisely the

14   boundaries we used, no, Mr. Veeder, I can't do that now.

15       Q  When will you be able to do that?

16       A  That is up to the Court.

17       MR. VEEDER:  I think it is essential that it be done,

18   your Honor. Here we are. Here we are with--

19       THE COURT:  You want an overlay made from California L,

20   Table 15-1 showing on the overlay the area that was used for

21   computation of 4,400 acre feet?

22       MR. VEEDER:  Not necessarily so, your Honor. If he--

23       THE COURT:  That would show you then what parts he had

24   eliminated. By overlay, that would be the easiest way to do

25   it.

D

Z12

1  MR. VEEDER:  Whatever way is desired.  It would occur

2  to me that we can run an overlay ourselves very rapidly if

3  he would show us the areas which the arms or legs, or whatever

4  is involved, if he would just show us those limbs.

5  MR. MOSKOVITZ:  Well, if Mr. Veeder will look at Plate

6  11B, he will see it.

7  MR. VEEDER:  If you think you can planimeter that and

8  come up with any acreage, you are wrong.  What we would like

9  to have done, because I desire to move to strike a great deal

10  of this material if it is not shown to be correct, I would

11  like to have Mr. James show me how they arrived at the 4,400

12  acres.  And I think we should indicate the areal surfaces that

13  were involved when he came up with 4,400 acres.

14  THE WITNESS:  These areal surfaces are shown to a

15  small scale on Plate 11B, and this area as shown on 11B was

16  broken down into subareas as set forth in California's Exhibit

17  Q and were planimetered--

18  BY MR. VEEDER:

19  Q  Which is Q now?

20  A  --each subarea was planimetered, and the sum of those

21  subareas was taken to be the total area of the basin.

22  Q  You can't indicate to us then on 15-1 that to which

23  you are referring, is that right?

24  A  I would refer you to 11B.  That shows you what I

25  can tell you.

D

Z13

Q   In your view as an expert, do you think we can planimeter those areas from 11B and get 4,400 acres?  Is that your view?

A   It would be better to blow it up.

Q   I have thought of doing that with 57.  But if you would just help us a little.  If you would just delineate for us.  If you want to make an overlay, as his Honor suggested, and then show us the areas that you use, we would be most happy.

A   As I stated before, we can give you approximately on a large scale the boundaries of the basin.

THE COURT:  All right.  Large-scale map is California L, Table 15-1.  Make an overlay and let the overlay show what part of the area of the Murrieta Basin shown there you used to arrive at your 4,400 acre feet.

THE WITNESS:  We would be happy to do that, your Honor. May we do that tonight?

THE COURT:  Yes.

MR. VEEDER:  You will do that tonight?

THE WITNESS:  I am not sure we have a planimeter here, as far as the areas go, but we can--

THE COURT:  What?

MR. ILLINGWORTH: We don't have a projector here in San Diego that we can use.

MR. VEEDER:  Do we have to blow up 15-1?  It is as blown

James   Cross

7098

D

Z14

1   as anything I have ever seen.

2         THE COURT:  He is not talking about something to blow

3   that map up.  You are talking about the planimeter.

4         THE WITNESS:  Planimeter for actually running the areas

5   off, your Honor.

6         MR. VEEDER:  We will get him a planimeter.

7         MR. ILLINGWORTH:  We need more than a planimeter.

8         THE WITNESS:  I might say at this point, your Honor:

9   In my opinion, to draw a hairline boundary around any ground

10  water basin, such as Murrieta Basin, to try to planimeter it

11  and come up with an area in two or three or four, or any

12  number of instances, that is within ten percent of the orig-

13  inal area, is working beyond the accuracy of any type of

14  study of this nature.  That if any two people-- the Govern-

15  ment, the State, or any geologist in other organizations or

16  within those organizations-- came up with anything that was

17  identical, why, it would be hard to understand.  This type

18  of work is not presumed to be of that accuracy.

19  BY MR. VEEDER:

20        Q  In that regard, I would like to call your attention

21  to the second gasp that you came up with Mr. James.  You

22  showed us--

23        THE COURT:  What exhibit?

24        MR. VEEDER:  On Table 1.  I think it is Q.  You said

25  your number one area was 680.5 of an acre.  Now, that is

James   Cross

D

Z15

1    pretty accurate, isn't it?

2        A   This is a copy of our office calculation sheets,

3    and that is the way they come off of the calculator.   The

4    final figures that are published are rounded off.   This is a

5    copy of a calculation sheet, and it is reproduced as it was

6    shown on the calculation sheet.

7        Q   So you would say that your Exhibit Q was as inaccurate

8    as your 15-2 that was stricken, is that right?

9        MR. MOSKOVITZ:   I object to that question, your Honor.

10   I think that is argumentative.

11       THE COURT: Sustained.

12       Referring to Exhibit Q, Table 1, where in the record

13   can we find where these subareas are?   Table 1 says:   "Sub-

14   areas or well groups."   Then, you have certain acreage.   Now,

15   where can we find to check as to where subarea 1 is so we can

16   see whether we agreed with your figure of 680 acres?

17       THE WITNESS:   Your Honor, those subareas are shown

18   roughly on California's Exhibit L, Table 15-2, but--

19       MR. VEEDER:   Which was stricken.

20       THE WITNESS:   --there were some revisions in the final

21   drawing of the tracing that was utilized to get the exact

22   areas.   And we do not have that map any longer.

23       THE COURT:   Now, we have nothing in the record to

24   support these subareas?

25       THE WITNESS:   Your Honor, we can't check them exactly,

1    no, sir.

2           MR. VEEDER:  I move to strike Q.

3           MR. MOSKOVITZ:  Well, your Honor, I object to that

4    motion.  I think we have testimony.

5           MR. VEEDER:  I don't blame you.

6           MR. MOSKOVOTZ: We have testimony as to how this was

7    done.

8           THE COURT:  That is right. But you have here something--

9    Let me say this:  The further I go with Bulletin 57 the more

10   I am inclined to agree with Mr. Veeder. We have here a nice

11   looking table, and it says:  "Subarea or well group No. 1."

12   And it tells us some well logs, how deep, and all that, how

13   many acres.  But we have got no way of telling where that

14   area of that subarea is.

15          MR. MOSKOVITZ:  Your Honor, the witness has testified

16   that the location, or relative location, and the general

17   outlines of the subareas are on an exhibit which has now been

18   stricken.  But it is on an exhibit which we can put back in

19   evidence if it is of necessity--

20          THE COURT:  Let me see the exhibit.

21          MR. MOSKOVITZ:  --of necessity in getting the informa-

22   tion properly before your Honor.  The point is:  The precise

23   acreage is not an important thing at all in this case.

24          THE COURT:  It may not be.  But for the purpose of

25   cross-examination, counsel have a right to check to see whether

D

Z17

1   there was more than a 10% error that the witness says would

2   exist.  680 acres, 10% error would be 68 acres.

3        MR. MOSKOVITZ:  You had it, Mr. Clerk, 15-2.

4        THE CLERK:  No.  I guess Mr. Veeder has it.

5        MR. MOSKOVITZ:  You gave it to Mr. Veeder.

6        THE CLERK:  There it is.  It is hanging over the

7   edge of the witness's chair.

8        MR. VEEDER:  Who had it?

9        MR. MOSKOVITZ:  It is on the witness stand.

10        MR. VEEDER:  Mr. James had it.

11        THE WITNESS:  Over the edge of my chair.

12        MR. VEEDER:  We can pull the table over here, your

13   Honor.

14        THE WITNESS:  The basin included-- it is in larger

15   as depicted on Plate 11B of Bulletin 57.  The basin included

16   some of the regular areas outside of the boundaries shown on

17   the basin.

18        THE COURT:  What are these numbers?

19        THE WITNESS:  Your Honor, those are the numbers of the

20   subareas that occur in Table 1 of Exhibit --

21        THE COURT:  Was this all 9 here?

22        THE WITNESS:  Yes.  I suspect what happened:  That

23   each time they ran the planimeter down they got it down in a

24   number of the subareas, subtracted the number of times they

25   ran a planimeter around the area.

D

Z18

1      THE COURT:  Is that a 6?

2      THE WITNESS:  Yes, your Honor.

3      THE COURT:  5, 4, 3, 2, 1.  What is this?

4      THE WITNESS:  That is No. 8, your Honor.

5      MR. VEEDER:  Have there been any changes made on that

6  since it was offered in evidence?

7      THE WITNESS:  No.

8      MR. MOSKOVITZ:  There are no changes made.

9      MR. VEEDER:  No marks?

10      THE WITNESS:  In retracing this, these lines in here

11  heavied up somewhat so they could see through them.  But they

12  have not been altered.

13      THE COURT:  Is there a number here?

14      THE WITNESS:  There is an 11, your Honor.

15      THE COURT:  Is there a 10?

16      MR. VEEDER:  Yes.

17      THE WITNESS:  Here it is.

18      MR. MOSKOVITZ:  Your Honor, it might help if the

19  witness would testify he has the information as to the differ-

20  ences between the area totals which appear in Exhibit Q,

21  California Exhibit Q, and those which the United States came

22  up with.

23      MR. VEEDER:  We are on cross-examination now.

24      MR. MOSKOVITZ:  I think his Honor asked a question

25  as to the differences, how big they were, what percentage

1    they were.

2          MR. VEEDER:  That is right.

3          Q  As a matter of fact, is it not true that your Table

4    1 on Q is incorrect?

5          A  I don't believe it is incorrect.

6          Q  Are you testifying now that area 1 is 680.5 acres?

7          A  Yes.

8          Q  Is that right?

9          A  Area 1 that was planimetered on our work sheet that

10   was utilized for this purpose, it is my belief that it was

11   680 acres.  The .5 is not significant.

12         Q  How about 6?  Is 6 in Table 1 accurate?

13         A  6 in Table 1 was accurate on the sheet from which

14   it was planimetered.

15         Q  Do you have 770.7 acres?  It is really 734, isn't

16   it?

17         A  734 was a figure that we came up with a second time

18   when we checked it, but that--

19         Q  In other words, the 7--

20         MR. MOSKOVITZ:  Please let the witness finish the

21   answer.  I don't think he has finished.

22         THE COURT:  Had you finished your answer?

23         THE WITNESS:  No, your Honor.  I was going to point

24   out:  For example, the Government when they went into sub-

25   area 1--

D

Z20

1          MR. VEEDER:  I object to this statement.

2          THE COURT:  Let him make his explanation and we will

3    see what it is.

4          THE WITNESS:  On the different trials they came up

5    with 569 acres for one and 579 acres for the second.  This

6    same discrepancy in planimetering occurs through practically

7    every one of their trials on each one of these subareas, and

8    this is no reflection on the accuracy of this work.  This is

9    the way things happen.  When you planimeter, you are working

10   to some extent outside the accuracy of the planimeter.  In

11   regard to your question, Mr. Veeder, I think it was subarea

12   No. 6; am I correct?

13   BY MR. VEEDER:

14        Q  Yes.

15        A  We came out with 770, is what is shown in the table.

16   And 734 was the answer that we came up with a second time.

17        Q  So you will not say that 770 and .7 acrea is

18   accurate; isn't that right?

19        A  I believe it is within the accuracy of the instru-

20   mental work.

21        Q  In regard to No. 11, it shows 41 acres on Table 1.

22   What do your figures shown on rechecking?

23        A  Our figures show 24.4.

24        Q  So you were 100% off there, is that right?

25        A  No, I wouldn't say that, because this 41 is the area

D

Z21

1    that we obtained for some area, or subgroup 11 on the sheets

2    that we first planimetered, which we don't have now.

3        THE COURT:  Where did you get your recheck figures

4    from, the stricken exhibit?

5        THE WITNESS:  Yes, your Honor.  That was the exhibit

6    which has just been stricken.

7    BY MR. VEEDER:

8        Q  Now, in regard to area No. 9, is 920.1 acre accurate

9    for that?

10       A  To the best of my knowledge.

11       Q  Our figures show 817.60 as distinguished from

12   920.1?

13       A  Well, I believe this difference is due to the fact

14   that the subareas are, on the exhibit which you have plan-

15   imetered, not the same as those originally planimetered.

16   For example, the boundary between subarea 7 and subarea 9,

17   if it was shifted just slightly, could make that difference.

18       Q  In other words, this is not right?

19       A  What I am trying to say is if you take subarea 7

20   and subarea 9 and add those two figures together, you get

21   1,315 acres.  If you do that on Exhibit California L, Table

22   15-2, you get 1316 acres, a difference of only one acre.

23       MR. VEEDER:  I move to strike the answer as not being

24   responsive, your Honor.

25       THE COURT:  Overruled.

D

Z22

1      You can take your time, Mr. Witness, but I think you

2   had better get us a substitute exhibit which shows the areas

3   on which you based Table 1, Exhibit Q.

4         MR. VEEDER:  I move to strike Exhibit Q, your Honor,

5   and request that it be under consideration until they show up

6   with this exhibit.

7         THE COURT:  I will deny it without prejudice to renew

8   at this time.

9         THE WITNESS:  Your Honor, I would like to point out

10   that in reconstructing this we are not going to come up with

11   the same areas for each of these subareas, because it is going

12   to be impossible to get exactly the same subarea boundary.

13         MR. VEEDER:  I renew my motion to strike Exhibit Q on

14   the basis of what the witness just said.

15         MR. MOSKOVITZ:  Well, your Honor, again I want to make

16   this point:  That the precise figures are not the significant

17   point.  Now, Mr. Veeder has cross-examined, and he has shown

18   that there can be different results secured from different

19   planimetering.  He has made that point, if it is a point at

20   all.  But the witness has testified as to the manner in which

21   the work was done.  And the fact that some of the calculation

22   sheets and the original working papers are not available

23   doesn't make the exhibit irrelevant or make it improper as

24   evidence.  When Mr. Worts was on the stand, he was asked for

25   some of his calculation sheets.  He said he didn't have them.

1   He didn't save them.  As a matter of fact, I think there is

2   far more detail that has been made available than ordinarily

3   is required.  And I don't see that there is any reason for

4   striking the exhibit.

5       MR. VEEDER:  He has said that it is inaccurate, and

6   that is sufficient reason, your Honor.  And I renew my motion.

7       MR. MOSKOVITZ:  He didn't say it was inaccurate.

8       MR. VEEDER:  He said, "We will come up with different

9   figures."

10      THE COURT:  Yes, he has explained that in running a

11  planimeter the variation could vary by 10%.  I wouldn't be

12  surprised if your own witnesses wouldn't tell you the same

13  thing if they were on the witness stand.  What I am concerned

14  with is some identification of these subareas, general iden-

15  tification of where they are located.

16      MR. MOSKOVITZ:  Your Honor, the witness has tesified

17  that on Exhibit L, Table 15-2, they are shown in their general

18  location to each other; and that the planimetering shows that

19  the actual acreage is very close to the ones that appear on

20  Exhibit Q.  Now, if that is necessary in order to make Exhibit

21  Q admissible, we can re-introduce Table 15-2 to show the

22  location of the various subareas.  I think Mr. Veeder is

23  really picking nits here.  I don't see that this has any real

24  relation to an issue in the case, the precise acreage of the

25  area that was included as Murreita Basin, precise acreage.

D

Z24

1    And I don't see that that is important at all.

2         MR. VEEDER:  The only thing I say, your Honor, is this

3    is awfully blase scientific reporting.  And if it is nit picking

4    to simply show that the thing that was offered as a State

5    report and a bulletin and sworn to by this witness, if it is

6    nit picking when he says, "I know that it is in error," is

7    what he said--

8         MR. MOSKOVITZ:  Well, he didn't say that.  He didn't

9    say that.

10        MR. VEEDER:  If that is nit picking-- that is what he

11   said.

12        THE COURT:  That is your characterization, generally.

13        MR. VEEDER:  I think it is a good characterization,

14   your Honor.  But the point I make, your Honor, is that we have

15   here, and it is extremely important, for, as I said, Mr. Max

16   Bookman and Mr. Holsinger relied entirely upon what I referred

17   to, and I won't repeat it, Bulletin 57, and we show that it is

18   simply a compilation of inaccuracies.  And the point I make

19   is that one of these things, every single item, every single

20   item in Appendix B was sworn to by this witness.  He says,

21   "I know it is accurate."  Now, he says, "I know it is not

22   accurate."

23        MR. MOSKOVITZ:  That is not true, and I think Mr.

24   Veeder should be instructed to stay within the record.  He has

25   not said it is inaccurate.

E

Z44

1          THE COURT:  Well, you are both overstating it.  The

2   witness has not as to every single item, but as to certain

3   items admitted that the description in the footnote was not

4   accurate and that it could have been better described.  There

5   are various admissions of that sort.  That all goes to the

6   weight of the witness's testimony.  He has not admitted that

7   everything was in error, and the truth lies somewhere between

8   the statements of both counsel in the matter.

9          The motion to strike the Exhibit Q, Table 1 thereof, or

10  whatever the motion is, is denied.  I will permit the stricken

11  exhibit to remain in evidence solely for the purpose of showing

12  the general location of these subareas.  It does show that--

13  the lines across the basin.  It may not have demarked the

14  limits with some of the arms of the younger alluvium chopped

15  off, but it shows the general area, the subareas or well groups

16  shown on Table 1 of Exhibit Q.

17         MR. VEEDER: Do I understand that the witness is going

18  to come up with these other data that I have asked for?

19         THE COURT:  What other data did you ask for?

20         MR. VEEDER:  I have asked that we find out how they

21  arrived at these points.

22         THE COURT:  Arrived at these areas?

23         MR. VEEDER:  Yes, your Honor.

24         THE COURT:  He has said that he couldn't reconstruct

25  it accurately.

1        MR. MOSKOVITZ:  He has testified that the results are

2    accurate.

3        THE COURT:  I understand it would be physically impos-

4    sible to show us the exact areas which you rely upon for these

5    groups?

6        THE WITNESS:  The exact areas, that is correct, your

7    Honor.  They are shown, as I have testified earier, on the

8    Exhibit 15-2, approximately.

9        THE COURT:  Was it 15-2 that the Government had the

10   Planimeters run on?

11       MR. VEEDER:  Yes, sir.

12       THE COURT:  And in each instance the Government's

13   figure came up with a smaller area?

14       MR. VEEDER:  No.  In some instances it appeared that

15   the acreages were virtually accurate.  Our objection and the

16   reason why I want to object to your Honor's even leaving this

17   exhibit in the record at all is this fact, that the areal ex-

18   tent is but one aspect of the evidentiary features of the offer,

19   for this reason, the specific yield of certain of these areas

20   is very much different. So the net result is that you have

21   here an inaccuracy in the areal extent which, when considered

22   in the light of the specific yields, becomes extremely import-

23   ant.  In other words, you could have a 10% inaccuracy in regard

24   to one area which might not make too much difference, but if

25   you have an area of a high specific yield then the storage

E

z46

1    capacity is thrown much further out of line than it would be

2    in another instance where the inaccuracy might be much

3    sharper.

4    What has occurred is that their inaccuracies cut clear

5    across the whole aspect and feature of this exhibit.  It goes

6    to the very heart of the matter because when you analyze

7    what they have undertaken to do as a scientific feature, it

8    will be noted, turning to page 4 of Exhibit Q, that the

9    storage capacities are determined on a number of factors and

10   that the specific yield and indeed the total storage capacity

11   turns entirely upon the accuracy and the delineation of these

12   things.  So we now have a situation where the areal extent is

13   known to be inaccurate, as testified to.  So what is the actual

14   storage capacity as would be recomputed on the basis of these

15   inaccuracies?  That is why, your Honor, I renew my motion in

16   regard to Exhibit Q.

17   THE COURT:  Let's keep the record straight.  You over-

18   state it each time.  The witness told us first that the Exhibit

19   L, Table 15-2, the overlay, was inaccurate in that arms of the

20   younger alluvium had been chopped off and it did not include

21   the full extent of the younger alluvium and he used that to

22   explain the discrepancies you pointed out between your plan-

23   imeter and California's planimeter.  When the overlay, Table

24   L, 15-1, was laid on the map, it was apparent that the overlay

25   was an overlay from that map and that it did eliminate certain

E

Z47

1    arms from the younger alluvium.  In the sense that the overlay

2    has cut off certain arms, it is true that it is inaccurate,

3    in that it doesn't go the full distance on some of the areas

4    of the younger alluvium.

5         The witness further told you that in computing by

6    planimeter areal extent, that a 10% error was not unexpected,

7    and that therefore this is as close as you could get in this

8    type of work.  That doesn't necessarily mean it is in error.

9    It means that it is an approximation, it can't be an exact

10   measurement, and the mere fact that on the computation made,

11   as shown on Table 1 of Exhibit Q, some of the errors come out

12   .5 or .7, it is merely the result of the computations that he

13   made, the figures were rounded out, and as he pointed out

14   they have a total here of 4,415.6 acres and the contention

15   of the State is that it is 4,400.  They just rounded off the

16   15 acres.

17        MR. VEEDER: But the point that I make, your Honor, is

18   that you have this situation, and it strikes at the basis of

19   the whole estimation-- I am not going to say "computation"

20   any more-- you have a series of depth intervals.

21        THE COURT:  I understand that the amount of storage is

22   a mathematical computation where you multiply figures, and your

23   point is that if you have a figure that is off to start with

24   and you do some multiplication your result is off even more

25   than the original figure.

E

748

1      MR. VEEDER:  That is right.

2      THE COURT:  That is your contention.

3      MR. VEEDER:  That is correct.

4      THE COURT:  Now if it is true-- and this would be a

5  matter of evidence, if you want to put it on-- if it is true

6  that planimeters are of that nature, that is one thing.  If

7  there is evidence that the Court believes that planimeters can

8  be made so accurate that you don't have to allow for that error,

9  that is another thing.  But it goes to the weight of the

10  witness's testimony.

11      MR. VEEDER:  But, your Honor, I think the record would

12  show, and I believe the witness would never testify, that the

13  inaccuracy would be a hundred percent, as it is on 11.  I

14  don't think it would ever be possible to get an inaccuracy of

15  a hundred acres, as it appears on 9.  And when we strike some-

16  thing like that, where you have variable depths, where you have--

17  and another point that I will get into on cross-examination:

18  How did they arrive at these vertical sides?  That is why I

19  believe that the whole concept of this phase of the testimony

20  is so completely in error.  There is a point beyond which you

21  don't take away weight any more; you take away the evidentiary

22  aspects of it, and I think we just passed the point of no

23  return on that. Because I defy anyone, even Mr. James, to

24  calculate now the total storage capacity.

25      MR. MOSKOVITZ:  Your Honor, may I tender a thought that

E

Z49

1    will show how unimportant this whole inquiry by Mr. Veeder is.

2    We can have the witness recalculate storage capacity on the

3    basis of the planimeter figures that Mr. Veeder's experts came

4    up with from overlay Table 15-2 and show the small discrepancy

5    percentagewise between those recalculated storage capacities

6    and the ones that are in the Bulletin.  It is an inconsequential

7    point in so far as the issues of this case are concerned, if

8    that is what he is pursuing now.

9         MR. VEEDER:  I am simply pursuing the fact that they

10    are inaccurate.

11         THE COURT:  Well, the overlay will be in evidence for

12    the limited purpose of identifying the general areas that they

13    used for the computation of Table 1 of Exhibit Q.

14         Take a short recess.

15         (Recess.)

16    BY MR. VEEDER:

17         Q  Now, in making your calculations in regard to the

18    Wildomar Basin, did you find your overlay that was used for

19    that purpose?

20         A  I would have to check our calculation sheets, which

21    are on exhibit.  Those are the calculations that are in the

22    envelopes.

23         (The Clerk hands documents to the witness.)

24         THE WITNESS:  I don't have the sketch for Wildomar

25    Basin.  As I recall, I think both Wildomar and Murrieta were

E

Z50

1  on the same sketch, the basins being adjoining.

2  BY MR. VEEDER:

3      Q  Were they both on L 15-2?

4      (Mr. Moskovitz hands document to the witness.)

5      THE WITNESS:  No, this L 15 shows just Murrieta.

6  BY MR. VEEDER:

7      Q  So you are stating in the record that the way you

8  arrived at the Murrieta and the Wildomar areal extent was by

9  taking a single sketch, a single overlay; is that right?

10     A  Well, as I said, I am not sure whether there was a

11 separate one or one, but if it was shown on one sheet they

12 were planimetered separately.

13     Q  As a matter of fact, you don't recall how you arrived

14 at the Wildomar areal calculation; is that right?

15     A  Except that they were planimetered, divided into

16 subareas, and the subareas were planimetered.

17     Q  But you can't find them?

18     A  No, I don't find the sketch.

19     Q  Would you look for them?

20     A  It is not with our calculation sheets, Mr. Veeder.

21     Q  You might have them at home or something?

22     A  No.

23     Q  You don't have them?

24     A  No.  Perhaps you misunderstood.  I answered that I

25 don't have it, no.

Q   And you know of no way to find them?

A   No, I don't.

Q   So you haven't the basic data for the Wildomar Basin; is that correct?

A   I have that in my hand, yes.   In addition to that, there are the well logs, which are also on file, and the composite logs, which are also on exhibit.

MR. MOSKOVITZ:   Identify the exhibit which contains the basic data that you just referred to on Wildomar.

THE WITNESS:   This is California's Exhibit B-1A.

There is the envelope, your Honor.

BY MR. VEEDER:

Q   Would you step, then, to L Table 15-1 and show us? In this Wildomar area do you recall how you divided it up to make your calculations?

A   Wildomar Basin is shown on Plate 11B of Bulletin 57.

Q   Is it not also shown on Table 15-1?

A   Yes, it is.

Q   And how did you divide it up to arrive at the storage capacity?

A   May I refer to my notes that you have.

Wildomar Basin was divided into two subareas.   The first subarea was divided into 50-foot intervals to a depth of 300 feet, and group 2 was divided into 50-foot depth intervals to a depth of 250 feet.   These areas were planimetered

E-

Z52

1   and the weighted average specific yields were computed for

2   each subarea and each depth interval similar to the manner

3   described in California's Exhibit Q.

4           Q   And the planimetering was on the scale of Exhibit L,

5   table 15-2?  Is it on that scale that you planimetered?

6           A   To the best of my recollection.

7           Q   In other words, if we were to planimeter the

8   Wildomar area as shown on L, Table 15-1 we would come up with

9   the acreages upon which you relied?

10          MR. MOSKOVITZ:  Just a moment.  15-1 doesn't show the

11  basin.

12          MR. VEEDER:  Well, now, doesn't it?

13          THE WITNESS:  The basin is not delimited on there-- the

14  basin that was utilized for storage calculation purposes.  It

15  is similar, again to Murrieta Basin.  The basin is better

16  delimited on the Plate 11B.

17  BY MR. VEEDER:

18          Q   Are you stating that we can planimeter it from the

19  Plate and get the areal extent?

20          A   It shows again the approximate configuration of the

21  basin.  It shows the configuration of the basin to a small

22  scale.

23          Q   Would you answer the question?  Can we planimeter it

24  or not?

25          MR. MOSKOVITZ:  Planimeter what?

E

Z53

1      MR. VEEDER:  The plate to which you made reference, and

2  get an accurate acreage?

3      MR. MOSKOVITZ:  Which plate is that?

4      MR. VEEDER:  Plate 11B.

5      THE WITNESS:  You get an approximate acreage, yes.  You

6  wouldn't come up with the exact area that was used in the

7  calculation, but you would come up with approximately the same.

8  BY MR. VEEDER:

9      Q  Now, if we were to put the overlay from the Murrieta

10  onto the map L 15-1, the balance of the area which is shown

11  in yellow and marked "Wildomar" would constitute the storage

12  area of the Wildomar Basin, would it not?

13      A  The balance of the storage area is best shown on

14  Plate 11B, and there may be some irregularities in that.

15      THE COURT:  Show me first where the Wildomar Basin is

16  supposed to end and the Murrieta Basin begins.

17      THE WITNESS:  May I refer to 11B, your Honor.

18      THE COURT:  Yes.

19      THE WITNESS:  The end of the basin would be, pointing

20  right at this point where the constriction is.

21      THE COURT:  Here?

22      THE WITNESS:  Yes, your Honor.

23      THE COURT:  On Plate 11B just above a water level shown

24  as 1140, toward the west end of the word "Temecula."

25

E

Z54

BY MR. VEEDER:

Q   Could I ask you to mark on the Exhibit L, Table 15-2 where we should start planimetering to get the areal extent of the Wildomar Basin?

THE COURT:  The point you showed me was approximately there.

MR. VEEDER: We will let you take the map home.

THE WITNESS:  This map wasn't designed, Mr. Veeder, to show the basin boundaries.

MR. VEEDER:  Well, you are the expert.  You mark it on there.

THE WITNESS:  I will not try to give you the very--

MR. VEEDER: We want to know what the planimeter point is.

THE WITNESS:  I would suggest that you use this point that I have drawn.

MR. VEEDER:  Will you put your initials right there on L, Table 15-1.

THE COURT:  Let me inquire as to this arm of alluvium that runs in a southwesterly direction.  That is not, so far as 11B is concerned, considered a part of the basin?

THE WITNESS:  I think part of it, is your Honor.  On 11B you can see this little projection extending up to the southwest.

MR. VEEDER:  Would you mark that for us then, too, so

E

Z55

1    that we will have that?

2           THE WITNESS:  I can do it approximately (marking).

3    BY MR. VEEDER:

4           Q  Now, before we leave, in calculating your Murrieta

5    Basin area did you include this Qtoa?  I am referring now to

6    the area--

7           A  Are you referring to this area?

8           Q  You can see there is a Qtoa area, a rather large

9    one.

10          THE WITNESS:  To the best of my recollection, we ex-

11   cluded that.

12          Q  You did not include that Qtoa?

13          A  No.

14          Q  How would you distinguish the Qtoa there inthat

15   island in the area No. 1 from the sediments which underlie

16   what you have designated as younger alluvium?

17          A  We differentiated that in the course of our field

18   mapping.  Older alluvium, as has been brought out in earlier

19   testimony, is different than the Recent alluvium in appearance

20   and in permeability.

21          Q  Why did you eliminate it from the standpoint of

22   water-bearing area?

23          A  We have gone into this before, I believe, Mr. Veeder.

24   We did not include the Older alluvium where it appeared on the

25   surface withinour basins, with one or two exceptions.

E

Z56

Q   Are you of the opinion that the Qtoa which surfaces at that point in the Murrieta Basin differs in any way from the Qtoa which underlies the younger alluvium?

A   We feel it is the same formation.

Q   Then why did you eliminate it?

MR. MOSKOVITZ:  Your Honor, I think this question has been asked and answered a lot of times in the course of cross-examination.

MR. VEEDER:  It has never been touched on before your Honor.

THE COURT:  This particular island has never been referred to.

THE WITNESS:  We left it out to be consistent with our delineation of these basins.  We did not include the older alluvium because we felt it to be less permeable, because we did not have sufficient information regarding its character-istics to compile what we thought to be a reasonable estimate of storage capacity.

BY MR. VEEDER:

Q   On page 5 of Exhibit Z you make this statement: "Because of the difficulty in differentiating Recent and older alluvium from study of the logs of wells, the walls of these basins are arbitrarily considered to be vertical, and assumption that was further justified in several instances by the fact that vertical faults closely parallel the boundary."  Now are

1     you stating that because you observed something on the surface

2     you made a differentiation, but from under the gound you could

3     make no differentiation; so you included what you called the

4     older alluvium?

THE WITNESS: Well, the boundary to this basin, except

6     on the surface, we don't regard as a physical barrier or

7     physical boundary.  It is a ground water basin boundary that

8     is based on an areal delimitation.

9           MR. VEEDER: Would you read the answer, please.  First,

10    read the question, and then read the answer, please.

11          (The Reporter read the last question and answer.)

12          MR. VEEDER:  I move to strike the answer because it has

13    not the slightest thing to do with the inquiry I presented.

14          MR. MOSKOVITZ:  I object to the question, your Honor.

15    I don't think it was comprehensible.

16          THE COURT:  Overruled.  Ask another question.

17

18

19

20

21

22

23

24

25

James    Cross                                                7123

F

Z25

BY MR. VEEDER:

Q; Why is it that you would use in your calculations the older alluvium which was underground and would eliminate it from your calculations when you found it on the surface?

A  We used it underground where it was penetrated by wells for which we had logs, where we knew water was being exploited from it, where we knew its characteristics and could evaluate them.

Q And what were the characteristics of the older alluvium that you evaluated?

A  Those that were set forth in the logs.  From those we made a determination or estimate of specific yield which was the particular factor.

Q  Are you stating that you differentiated between the older and younger alluvium in making these calculations?

A  No, I didn't say that, Mr. Veeder.

Q  You did not?

A  No, not in the logs.

Q  From the standpoint of specific yields, did you make any differentiation between the younger and older alluvium?

A  No, we determined or estimated specific yield purely from the materials as shown on the well logs.

Q  In regard to the extension of the vertical walls, as shown in your Z at page 3, is it not true that in certain of those areas you would necessarily, if you had vertical

1   walls, include the basement complex in your calculation?

2          A   We didn't include the basement complex where there

3   was evidence that it existed.

4          Q   How could you determine, for example, that in

5   referring to L, Table 15-1--  Will you come here-- where you

6   would extend your lines, for example, in the area shown as

7   No. 1?  Can you locate yourself?  Do you want me to help you

8   get oriented on the map here?

9          A   Now, what was your question?  Here is Area 1.

10         Q   How would you extend your vertical walls, your

11   vertical sides, and make your calculations when you have an

12   island of Qtoa right in the middle of it?

13         A   We assumed vertical walls for the purpose of

14   estimates.  That was the best we could do with the data we

15   had available.  We did not have information which would justify

16   any further refinement.

17         Q   And you then simply proceeded to make arbitrary

18   lines on the calculations, is that right?

19         MR. MOSKOVITZ:  I object to that question.  I think it

20   is vague.

21         THE COURT:  Overruled.

22         THE WITNESS:  No, I don't think they were arbitrary,

23   Mr. Veeder.  On the surface they depict, they delimit the

24   areas of Recent alluvium.  That is what we used.  We pojected

25   them downward.  I think possibly one thing I might mention

F

Z27

1   is that in regard to ground water basins, to my knowledge,

2   there is no definition of a ground water basin included in

3   the scientific literature. The boundaries of basins are

4   not necessarily physical boundaries. There are boundaries

5   that are utilized for the purpose of the study that is in

6   question. Some places we have political boundaries. In the

7   case of our Tijuana investigation we have the Mexican Border,

8   which was purely a political boundary, as a basin boundary.

9   There are sometimes county boundaries. There are sometimes

10  boundaries that delimit areas for which there are data avail-

11  able with which you can use for a particular study.

12  BY MR. VEEDER:

13      Q  So when you didn't include the Qtoa in your sub-

14  division No. 1, it was because there were no data available

15  to utilize in making the calculations, is that right, well

16  logs, for example?

17      A  There may have been some well logs there, but we

18  felt this was as good an estimate we could make with the data

19  we had available.

20      Q  And would you join me here at Plate 9B and would

21  you locate the upper inset in 9B as relates to your Unit No. 1?

22      A  Well, the upper unit inset is shown here on the

23  westerly end of Plate 9B.

24      Q  Let's just locate it. Does it not show that there

25  are wells in the area that you excluded as Qtoa?

F

Z28

1 A There are some wells in there, yes.

2 Q And why, then, would you eliminate--

3 MR. MOSKOVITZ: Your Honor, this question has been

4 asked and answered a number of times as to why he eliminated

5 them.

6 THE COURT: Overruled.

7 BY MR. VEEDER:

8 Q There are a good number of wells in there. You

9 mean to say that there is no water in the Qtoa if there are

10 wells there?

11 A No, I didn't make that statement.

12 Q Would you change your views if you knew that there

13 was a well situated in that area 190 feet deep that was using

14 a 30-horsepower pump?

15 A The fact that a well has a 30-horsepower pump

16 doesn't necessarily mean much to me. Do you know what its

17 discharge was?

18 Q No. You are the expert.

19 Now, in regard to the wells that are immediately

20 adjacent to that island of Qtoa, are you stating that they

21 drew no water from that older alluvium?

22 A No.

23 Q In the bulletin in the Appendix B you have stated

24 that the Recent alluvium is at great depth in the ground

25 water basins.

F

Z29

1   MR. MOSKOVITZ: What is the reference, Mr. Veeder?

2   MR. VEEDER:  Page B-23.  The Recent alluvium, the

3 formation fills the basins to great depth and contains most

4 of the readily extractable ground water."

5   Q  Now, in your revision of Bulletin 57, California's

6 Exhibit Z--

7   THE COURT:  That is not exactly a revision.  It has

8 been copied into the record as his sworn testimony.  You can

9 refer to Z if you want to.  We will know what you are talking

10 about.

11   MR. VEEDER:  Strike the question.

12   Q  You have stated in Appendix B, Page 23, that the

13 Recent alluvium fills these basins at great depth.  Now, are

14 you stating that all of the water or the greater share of the

15 water is extracted from the Recent alluvium in the Murrieta

16 Valley?

17   MR. SACHSE:  I will object.  That is compound.  All

18 the water or the greater share.  That can't be answered.

19   MR. VEEDER:  I will revise it.

20   THE COURT:  All right.

21 BY MR. VEEDER:

22   Q  Are you stating that the water that is pumped in the

23 Murrieta Basin is largely from the Recent alluvium?

24   A  I feel that probably a large share of the water

25 pumped from Murrieta water basin comes from the Recent alluvium,

Ex F

Z30

1  although--

2      Q  How do you distinguish between the Recent and older

3  alluvium?

4      MR. MOSKOVITZ:  Just a minute.

5      THE COURT:  Have you finished your answer?

6      THE WITNESS:  I was about to say, as previously testi-

7  fied, we don't know from the logs just what the depth of the

8  Recent alluvium is in that area exactly.  As was stated earlier

9  and in Exhibit Z it is difficult to differentiate on logs the

10  recent alluvium from the older alluvium, underlying older

11  alluvium.

12  BY MR. VEEDER:

13      Q  Why is that?

14      A  That is in part due to what occurs in the process

15  of drilling a well.  The materials which may be compacted,

16  consolidated, partially cemented are thoroughly ground up in

17  the process of drilling; so that when they come to the surface,

18  it is difficult to tell just what their physical character was

19  before they were removed by the driller.

20      Q  You think that there is any basic difference between

21  the younger and older alluvium, the younger or Recent alluvium

22  and the older alluvium?  Is there any real difference?

23      A  Yes.

24      Q  In appearance?

25      A  On the surface, yes.

F

Z31

Q   No, in the well log?

A   Oh, in the well log.  This, as we have mentioned before, is difficult to differentiate.

Q   Now, would you locate for me on Plate 14 a cross-section at which A, A-prime, the point in the valley where A, A-prime is located?

MR. MOSKOVITZ: Where do you want it located, Mr. Veeder, on Plate 14?

MR. VEEDER:  I want him to give me a location as to where A, A-prime is located.

THE WITNESS:  I am referring now to Plate 13B, and A, A-prime is shown as a northeast-southwest trending line of section which passes close to the town of Murrieta.

BY MR. VEEDER:

Q   And that is situated immediately-- the line traverses the very narrowest area of the younger alluvium in the Murrieta Valley, does it not?

A   It passes through a constriction in the Recent Alluvium,

Q   The most narrow?

A   Yes, it appears to be the narrowest point.

Q   Now, referring back to the A, A-prime, would you state whether A, A-prime is representative of the younger alluvium, the areas of younger alluvium found in the Murrieta Basin as depicted by you on your L Table 15-1?

7130

F

Z32

1        MR. MOSKOVITZ:  I object to that question.  I think it

2  is vague and ambiguous.  I don't understand it.

3        THE COURT:  Read it.

4        (The reporter read the pending question.)

5        MR. VEEDER:  I will rephrase it.

6        Q  Would you state whether A, A-prime, as shown on

7  Plate 14, is a cross-section of an area which is truly repre-

8  sentative of the extent of the younger alluvium found in the

9  Murrieta Basin as depicted by you?

10       A  Section A, A-prime is a diagrammatic type of section

11  which is drawn to show in general the geology across the line

12  of section, A, A-prime, as best as we can visualize it from

13  the data, both subsurface data and surface observations that

14  are available.  We do not say that the contacts shown on that

15  section occur exactly where they are shown on that section.

16  This is believed to be a presentation of the picture in

17  general.

18       Q  Picture of what in general?

19       A  Picture of a section through Murrieta Basin along

20  the line A, A-prime as shown on--

21       Q  You certainly would not say it was representative of

22  the areas where your areal extent is much larger than that

23  shown on A, A-prime?

24       A  No.  No, it is shown-- the section is drawn through

25  one of the constricted areas.

F

Z33

Q   Now, what are the changes that you have made in the footnotes on B-3 of Appendix B?   What are the results of the changes which you have made by reason of exhibits?   How does that differ?

MR. MOSKOVITZ:   I object to that question.   I think that is vague.

MR. SACHSE:   I don't understand it.   I would like to have it read.

BY MR. VEEDER:

Q   What changes have you made in footnotes A, B, and C, which appear at page B-50 of Appendix B?   Can you briefly state that?

A   Well, we placed Murrieta Basin in Exhibit Z into Category 3A, as set forth on Exhibit B.

Q   Now, just a moment.   What is that now?

A   Category 3A, which is described on page 3 of Exhibit Z as "The basins largely underlain and surrounded by older alluvium or undifferentiated upper Pleistocene sediments of relatively low permeability."   And the "A" indicates that vertical walls were assumed to the basin.

Q   So, as a matter of fact, your references then to Murrieta Basin which you have shown in your Appendix A as being "Usable storage capacity calculated between historic high water table and a surface 25 feet above base of recent alluvium," that footnote is no longer applicable to Murrieta

F

Z34

Basin; is that right?

A   Well, the reason for compiling this Exhibit--

Q   Would you answer the question:  Is it or is it not? You can say yes or no.

A   Exhibit Z is substituted for-- was compiled to explain these footnotes, in answer to that.

THE COURT:  As to Murrieta?

THE WITNESS:  Yes, sir.  It explained Table B-3, footnotes appearing therein.

THE COURT:  All basins?

THE WITNESS:  Yes, your Honor.  We had another exhibit Q, you will recall, which went into some detail on the method of computing storage capacity of Murrieta Basin.  This is more generalized.

MR. VEEDER:  All I am searching for is how to make these calculations, your Honor.  If I am taking a little time, I am sorry.  But I just don't see what he has done.

THE WITNESS:  Well, Mr. Veeder, it is explained in detail in Exhibit Q, if that will help you, for Murrieta Basin.

BY MR. VEEDER:

Q   Would you answer the question yes or no now.  Are you stating that Footnote A is no longer applicable to the Murrieta Basin referred to on page B-57 of Table 3 of Appendix B?

MR. MOSKOVITZ: What page was that, Mr. Veeder?  I

F

Z35

1    believe you gave the wrong page.  It is page B-50.

2         MR. VEEDER:  I am referring now to the Murrieta Basin

3    which appears on B-57.

4         THE COURT:  B-47.

5         MR. VEEDER:  B-47.  I am referring to Footnote A on

6    B-50.

7         Q  And I am asking you whether Footnote A is no longer

8    applicable to Murrieta Basin?

9         A  Well, that is true.

10        Q  It is no longer applicable?

11        A  We are using exhibit Z instead.

12        Q  So wherever Footnote A is referred to in regard to

13   Murrieta, we turn to Z, is that right?

14        A  Yes.

15        Q  And we also turn to Q, do we not?

16        A  Well, for a more detailed explanation of how the

17   storage was computed.

18        Q  Now, in regard to the maximum depth of storage unit

19   in feet which appears at Page B-47, we no longer rely upon

20   the 520, which is shown there for Murriet, but now we go to

21   Q, Exhibit Q, Table 2; is that what we do?

22        A  You go to this Exhibit Q and it will explain to you

23   what the base was that was used for Murrieta Basin. And in

24   the Murrieta there were two subareas of equal depth that were

25   utilized, as explained in Exhibit Q.

F

Z35

Q   So we no longer look to the 520 at all?

A   The 520 figure was not utilized in computing the storage capacity.

Q   And so it doesn't mean anything in computing storage capacity?

A   Not for storage capacity.

Q   What does the 520 mean?

A   Well, it was a figure put in here for just general information purposes.

Q   In regard to the matter under "Relative permeability," what does that mean now?

A   That compares the permeabilities of the materials among the various basins as to their general degree of permeability.

Q   So it really has nothing to do with the calculations, does it?

A   No, sir; to do with storage capacity, no.

G
A 1

Q  Now, your 146,000 gross storage capacity in acre feet would be materially changed, or at least it would be changed, would it not, in view of the fact that there is a difference in your 4400 acres of areal extent? Isn't that true?

A  No.

MR. MOSKOVITZ:  I object, your Honor, it is misstating again the witness' testimony.

MR. VEEDER:  I simply asked.

THE COURT:  Sustained.  If you want to ask the question, re-phrase.

BY MR. VEEDER:

Q  How did you arrive at the 146,000 gross storage capacity in acre feet, which is depicted on Table 3 of Appendix B?

A  That is set forth in some detail in California's Exhibit Q, Mr. Veeder.

Q  In other words, we go to Exhibit Q to find 146,000; isn't that right?

A  Well, that shows the computations, how it was derived.

Q  And for the usable storage capacity, what is our source now? Did you have 146,00 acre feet storage.  Where do we find that?

A  It is also set forth in California's Exhibit Q. There is a section commencing on Page 3 of that exhibit, in

1        which the methods are set forth.

2            Q  So now to find that we go to Exhibit Q and to

3        Exhibit Z, is that right, actually to find your storage?

4            A  Well, Exhibit Q is an exhibit which is designed

5        specifically to show the method of computing both gross and

6        usable storage capacity in Murrieta Basin.  Exhibit Z is a

7        more generalized exhibit which shows the methods that were

8        used for the remaining basins in Table B3.

9            Q  Now, in regard to Wildomar Basin, where do we go

10       to find the calculations which are set forth on Table 3 of

11       Appendix B?

12           A  The calculations are in Exhibit California's P-1A

13       for Wildomar Basin.  The general method is described in

14       Exhibit Z.

15           Q  So as a matter of fact, on the basis of the record

16       we have no means of determining the accuracy of the statements

17       contained in Table 3 of Appendix B; is that right?

18           A.  What statement are you referring to, Mr. Veeder?

19           Q  I am referring to the general description and to

20       the gross storage capacity and to the usable storage capacity

21       of the Wildomar Basin, as set forth on page B-47.

22           A  Well, we have defined for you in general the method

23       that was used in computing that storage capacity.  We have the

24       well logs from which the specific yields were obtained.  We

25       have the well group computations from which the weighted aver-

1     age specific yields of the areas were obtained. We do not

2     have the sheet which shows explicitly the subareas and the

3     areas of those subareas that were employed. But we do have

4     the answer that we obtained.

5         Q For that reason, then, footnote (a) as to Wildomar

6     Basin would have no application, would it?

7         A Again, we are suggesting that you refer to Exhibit

8     Z for the method that was utilized, or the limits that were

9     utilized in fixing usable storage capacity.

10        Q In other words, there is nothing in the record that

11     would assist us in making the actual determination based upon

12    footnote (a), is that right, so far as relates to Wildomar?

13        MR. MOSKOVITZ: I object to that question. I don't

14    think it is comprehensible.

15        THE COURT: If I understand, he means that we can

16    ignore footnote (a) as far as Wildomar is concerned.

17        THE WITNESS: That is correct.

18    BY MR. VEEDER:

19        Q And we should, should we not?

20        A Yes. Refer to Exhibit Z.

21        Q Wouldn't that be true respecting all of the footnote

22    references in Appendix B, Table 3? You throw all of those out

23    entirely; isn't that right?

24        A No. Footnote (b), I believe, is applicable.

25        Q Where?

G
A 4

1    A  If I recall, it is in Pauba Basin and Santa Gertrudis.

2    Q  You will *would* say that footnote (a) has no application

3    whatever anyplace?

4    A  You will recall that this Exhibit Z was made to

5    explain how the calculations were made.  It is to be used in

6    lieu of footnote (a).

7    Q  So footnote (a) has no application anyplace?

8    A  No, I wouldn't say that.  It is applicable in some

9    of these which are filled entirely with Recent alluvium.

10   Q  How will we know that from the record that we have

11   before us?

12   A  Well, you know that from Exhibit Z.  That is why

13   it was compiled.

14   Q  Where does Exhibit Z say that, though?

15   A  Well, Exhibit Z, under category 1, describes allu-

16   vium filled basins largely underlain and surrounded by basement

17   complex.  So those are basins which are filled with Recent

18   alluvium and underlain and surrounded by basement complex.

19   Q  When we go back, though, to these basins that are

20   only 22 feet deep, what do we do?

21   A  Suggest you use Exhibit Z.

22   Q  Is Exhibit Z the thing to look to, then, when the

23   basin is shallower than the 25 foot depth referred to in

24   footnote (a)?

25   A  I didn't understand your question.

Q  I don't understand your exhibit.  The point I make
is that when we have a situation where the depth of the
alluvium is 22 feet, and you advise us that we should calcu-
late it on the basis of 25 feet, which would put us 3 feet
above the ground then--

MR. MOSKOVITZ:  Could you give a specific example of
that?

MR. VEEDER: Yes.

MR. MOSKOVITZ:  Which one are you referring to?

MR. VEEDER:  Well, we have some dandies here for you.
We have Rainbow Valley.  We calculate our storage 3 feet above
the ground there.

THE COURT:  Actually, in my notes it was 7 feet.  The
chart shows 22 feet maximum depth, and my notes show that he
used 30 feet.

MR. MOSKOVITZ:  Your honor, this is an example of Mr.
Veeder continually misstating what was said before.

THE COURT:  I know, but according to my notes it was
7 feet.

MR. MOSKOVITZ:  The witness said many times that that
particular column was not used in storage calculations. This
was information that was placed in the Table, but it was not
used for these calculations.  Yet Mr. Veeder persists in saying
that it was.

MR. VEEDER:  But he just told you to go to Z.

G

A 6

1        Q  So as a matter of fact, these 22 foot things and

2   the 7 feet above ground, we are to turn to Z to make our cal-

3   culations?

4        A  That sets forth the general procedure.

5        Q  Now, in regard to footnote (c), what applicability

6   does footnote (c) have in view of Exhibit Z  and Exhibit Q,

7   with the tabulations set forth? It has no application?

8        THE COURT:  Well, let's save some time.  Footnote (c)

9   applies only to the basins down in the Santa Margarita.  There

10  was only 100 feet below ground surface there.

11  BY MR. VEEDER:

12       Q  Is that right, then--footnote (c) has some applica-

13  tion?

14       A  Yes.

15       Q  And you haven't changed that?

16       A  No.

17       MR. VEEDER:  I see that it is 4:30, your Honor,.

18       THE COURT: Alright, adjourn until 10 o'clock tomorrow

19  morning.

20       (Adjournment until Wednesday, January 14th, 1959 at

21  10 a.m.)

22

23

24

25