# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — — —

#### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:     Wednesday, January 14, 1959.

Pages:     7141 to 7280

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____
DEPUTY

MALCOLM E. LOVE
**JOHN SWADER**
Official Reporters
United States District Court
325 West F. Street
San Diego 1, California
BElmont 4-6211 Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
     vs.                        )        No. 1247-SD-C.
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
            Defendants.         )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, January 14, 1959

APPEARANCES:

        For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                 Special Assistant to the
                                 Attorney-General,
                                 Department of Justice,
                                 Washington, D. C.

APPEARANCES (Continued):

|   |   |
|---|---|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney-General, by<br>ADOLPHUS MOSKOVITZ, ESQ.,<br>Deputy Attorney General. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al. | FRANZ R. SACHSE, ESQ. |

7243

# INDEX TO WITNESSES

| For Defendant State of California: | Direct | Cross | Redirect |
|---|---|---|---|
| Laurance James | | | |
| (By Mr. Veeder) | | 7148 | |
| (By Mr. Stahlman) | | 7209 | |
| (By Mr. Sachse) | | 7236 | |
| | | | 7237 |

**For Defendant Fallbrook:**

| | Direct | | |
|---|---|---|---|
| William H. Veeder | 7250 | | |
| Allen C. Bowen | 7255 | | |

**For the Plaintiff:**

| | Direct | | |
|---|---|---|---|
| Walter Hofmann | 7265 | | |

A

Z1

SAN DIEGO, CALIFORNIA, WEDNESDAY, JANUARY 14, 1959.  10 A.M.

(Another matter.)

THE CLERK:  No. 2:  Case on trial, 1247-SD-C.

MR. SACHSE:  Your Honor, before we proceed with the
witness I would like to take a moment of your time, if I may.
A matter has come to my attention, reviewing Mr. Veeder's
remarks of yesterday I think are pertinent to the point he
made about the United States concerning the putting in case
of the defendants.  I went back to my office last night and
very hastily going through my files I find that there are 34
requests for admissions covering individual defendants which
the United States has not yet answered.  Now, 30 of those 34
requests ask the United States to admit that the property is
non-riparian and does not abut on the stream and that the
waters are vagrant, parolating.  Four, the other four requests
are involved in riparian rights in one way or another.  Many
of those requests are over six months old.  Some were made
June 7, June 24, July 6, June 20th.  The most recent was made
last September.  Now, under the Federal Rules I am of the
opinion that the United States should complete these discovery
proceedings as to these individual defendants before there is
any transfer of the burden of proof to the defendants.  It
seems to me that in a quiet title proceeding the very first
issue of obligation to be met by the plaintiff is to indicate

A

Z2

1    exactly what it is seeking the quiet title to.  And if, as I

2    believe is the case, many of these defendants are in areas

3    where the ground waters are not an issue in this proceeding,

4    I believe these individual defendants are entitled to have

5    such a reply from the United States.

6          THE COURT:  They are.  And, of course, the Court can

7    assume that the requests are admitted unless they are answered.

8    Now, give the Government some reasonable time but--

9          MR. SACHSE:  These are over six months old now.

10         THE COURT:  The Government has the facilities to get

11    additional lawyers.  Mr. Burby is of counsel here.  The

12    Department of Justice has many lawyers, and the Marine Corps

13    has lawyers.  Let's get some lawyers working on this and get

14    this done.

15         MR. VEEDER:  Your Honor, I want the record to be very

16    clear about this.  I am not sure how the circumstances which

17    prevail -- I think Commander Redd has been handling these

18    things for us.  I know he has.

19         MR. SACHSE:  Mr. Veeder, none have been received by

20    me in more than two months.

21         MR. VEEDER:  I want to make the additional point that

22    yesterday Mr. Sachse got up and made a deliberate misrepre-

23    sentation of the record.  I think he has made another one

24    today.  I don't worry a great deal about these things, but I

25    do say this, your Honor:  The United States of America has

A

Z3

1    proceeded expeditiously in these matters.  We have done all

2    that we can within reason and accuracy.  If-- May I just

3    confer with Commander Redd for a moment?

4            THE COURT:  Yes.

5            MR. VEEDER:  I understand from Commander Redd that there

6    was an agreement here with Mr. Sachse on this matter in re-

7    gard to these investigations that we are making.  And

8    certainly, your Honor's statements in regard to time that we

9    are taking, I think it stems completely from an agreement with

10   Mr. Sachse.  We will undertake--

11           THE COURT:  What was the agreement, Commander?

12           MR. VEEDER:  The agreement--

13           MR. SACHSE:  Now, wait a minute, Mr. Veeder.  I would

14   like to hear from Commander Redd, what he understands the

15   agreement was.

16           THE COURT:  Did I admit Commander Redd for the purpose

17   of this trial?

18           MR. VEEDER:  Yes.

19           THE COURT:  Commander Redd, what is the understanding

20   you had with Mr. Sachse?

21           COMMANDER REDD:  My understanding was that inasmuch as

22   the Court had ruled on the area in Fallbrook Creek there and

23   that the evidence in the area of streams from Fallbrook Creek,

24   which is between Fallbrook Creek and Rainbow watershed, that

25   the underground waters there were vagrant or percolating

A

Z4

1   waters in accordance with the testimony of Col. Bowen, that

2   they were not connected to the Santa Margarita River system,

3   that that had more or less done away with any need for answer-

4   ing those.  And it was Mr. Sachse's agreement, I thought, that

5   there was no longer any need to answer those for that area

6   there which --

7   　　　MR. SACHSE:  That is entirely correct, your Honor.  And

8   I am not referring to a single request in the Fallbrook Creek

9   watershed.  These requests are on Sandia Creek there, on the

10  drainage of the Santa Margarita River outside the Fallbrook

11  Creek watershed.  They are in the upper watershed.  They are

12  in Rainbow Valley.  Commander Redd's statement is absolutely

13  correct.  I said he could forget entirely the requests in the

14  Fallbrook Creek watershed because of the state of the record.

15  I was satisfied with that.

16  　　　THE COURT:  Let's not waste any more time.

17  　　　MR. VEEDER:  I will take care of it expeditiously.

18  　　　THE COURT:  Give Commander Redd a list of these and

19  let's find out what the situation is.

20  　　　MR. VEEDER:  I would like to have Mr. Sachse give me

21  the list, and I will pursue it myself, and I will take care

22  of it.

23  　　　THE COURT:  All right.

24  　　　MR. VEEDER:  There is an additional matter that has

25  come up, your Honor, in regard to the calling of Mr. Bookman.

On the basis of the evidence that is in the record about the

methods of preparing Bulletin 57, I think it would probably

be just a waste of time to call him.  And for that reason

I see no reason for calling him.  I will offer evidence --

I mean proceed with our case again in regard to the basis

upon which the so-called permits to Fallbrook were issued.

But I have no desire to take the time, my time or the Court's

time, with any further representatives in regard to Bulletin

57.


LAURENCE JAMES,

recalled as a witness in behalf of the defendant State of

California, having been previously sworn, testified further

as follows:


CROSS-EXAMINATION (Resumed)

BY MR. VEEDER:

    Q  In your investigations, Mr. James, did you determine

whether there was any confined water in the Murrieta Basin?

    A  The areas of confined water which we determined

and outlined are shown in appropriate plates here in Bulletin

57, and, no, we didn't outline any areas within Murrieta

Basin.

    Q  It has been your practice, has it not, to eliminate

from your calculations of storage capacity any areas which

James   Cross

A

Z6

1   overlie confined waters; isn't that right?

2       A  We didn't include them, no, in Pauba Basin, nor in

3   Santa Gertrudis.

4       Q  Why did you include them then in the Murrieta Valley?

5   What is the distinguishing element?

6       A  I don't recall offhand what we did.

7       Q  Well, you know whether there is any confinement or

8   not in the Murrieta Valley?

9       A  I would like to refer to my notes here a moment.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I believe you are probably referring to this small

2    segment northeast of Wildomar fault, as shown on Plate 10B.

3    Is that what you are driving at?

4          Q  No, I am simply asking you if you know if there is

5    any confinement in the Murrieta Valley?

6          A  There is some confinement in a small projection off

7    of Murrieta Basin.

8          Q  Would you point that out then on--

9          A  On Plate 10B (Stepping down to the map).  This area

10   here.  I am referring again to Plate 10B.

11         THE COURT:  Immediately left and west of the Santa

12   Gertrudis Basin shown on that plate?

13         THE WITNESS:  That is true, your Honor.

14         THE COURT:  In fact, it is part of the lower end of

15   Warm Springs Creek?

16         THE WITNESS:  That is true.

17   BY MR. VEEDER:

18         Q  Now, I ask you to come to United States' Exhibit

19   15-A and locate on there the Gonzales well, if you will.

20         A  Well, I am not familiar with that name.

21         Q  Well, I hand you Plaintiff's Exhibit 16-A33 and ask

22   you if you can locate that well.

23         A  This shows the number of that well to be 7 South,

24   3 West, 35P1.  It is shown here in Section 35, and the name

25   Gonzales is written by it.

B

Z5

Q   Would you look at the log that I handed you there, 16-A33, and view it from the standpoint of what is reported there and state whether, in your opinion, those statistics evidence confinement?

A   Well, it shows that the water level has risen some as the depth of the well increased.

Q   Well, what does that indicate to you?  Does that not indicate confinement?

A   It indicates that the water is--

Q   Under pressure, does it not?

A   --under some pressure, yes.

Q   Now, why then would you include the area as you have in Murrieta as part of the storage capacity and you did not include it in Pauba or in Santa Gertrudis?

A   May I have the question again, please.

Q   I will rephrase it.

What was the distinguishing element that caused you not to include Pauba, the combined areas in Pauba and Santa Gertrudis, whereas you did include them in Murrieta?

A   We don't delineate a confined ground water aquifer on the strength of one log.

Q   How many logs did you have in Santa Gertrudis that evinced confinement to you?

A   We had fairly good evidence in Santa Gertrudis of a confined ground water body.

James     Cross

7152

B

Z6

1        Q  Well, how many wells?

2        A  Well, I would have to make a little study to come

3   up with that answer, Mr. Veeder.

4        Q  Well, the fact that the Gonzales well was a pressure

5   well would indicate that there was confinement; is that not

6   right?

7        A  There is some degree of confinement.  That is not

8   uncommon in water wells.  Your own witnesses testified to that

9   previously.  Most of these wells exhibit some confinement as

10  they go down.

11       Q  I have asked you what was your criterion.  There was

12  no criterion; isn't that right?

13       A  I don't understand your question-- criterion.

B2      14       Q  Why you left the Gonzales well in the area out?

15  Isn't that right?

16       MR. MOSKOVITZ:  I object to that last question, your

17  Honor.

18       MR. VEEDER:  All right, I will withdraw it.

19       MR. MOSKOVITZ:  I think it is impossible to understand

20  it.

21  BY MR. VEEDER:

22       Q  If there was confinement in the Gonzales area for

23  one well, would it not indicate that there would be confine-

24  ment for others?

25       A  This matter of confinement, again, is a matter of

B2

Z7

1    degree.  I would like to explain.  As I said, your own testimony

2    of your own witnesses--

3         MR. VEEDER:  I object to this man reviewing our testi-

4    mony, your Honor.

5         THE COURT:  Sustained.  Just answer the question.  That

6    is argumentative, Mr. Witness.

7         THE WITNESS:  All right, sir.  I am sorry, your Honor.

8         THE COURT:  That's all right.

9         THE WITNESS:  In the Pauba area we have very marked

10   evidence of ground water confinement-- flowing wells, water

11   which flowed on the surface, artesian flow.  There was no

12   question about it whatsoever.

         In this particular area, to my knowledge we have one

14   well where there is a slight rise of water within the well as

15   it was being drilled.

16   BY MR. VEEDER:

17        Q  Did you have that knowledge when you started to

18   answer the question?

19        A  We probably-- if this is one of the wells that we

20   had a log for, we were aware of it.  This is common in wells

21   every place, that you do have a rise of water when you drill

22   them.  It is a matter of degree, again, how much they are con-

23   fined.

24        Q  From the standpoint of the availability of water,

25   why would you eliminate the areas of confined water?

B2

Z8

MR. STAHLMAN:  May I have the question?

BY MR. VEEDER:

Q  From the standpoint of the storage capacity of these
basins, why would you eliminate the areas where there is con-
finement?

A  I answered this earlier, I am sure, in earlier
testimony.  When there is confinement, the purpose of making
studies of safe yield, et cetera, where you are trying to
determine the change in storage capacity that occurs within
a basin, where water is under pressure, the change of water
level within the wells that are in those pressure aquifers do
not reflect the change of storage occurring in the sediments
within that pressur portion of the aquifer.  They reflect a
change of pressure only.  The storage change occurs at some
distant forebay which we cannot delimit.

THE COURT:  Forebay?

THE WITNESS:  Forebay area, your Honor.  That is the
area of replenishment, the area where water enters the ground
and enters the deeper aquifers.

BY MR. VEEDER:

Q  Are you stating that the pressure areas in the Pauba
Valley are in some manner unrelated to the surface runoff of
the Santa Margarita River?

A  Are unrelated?

Q  Yes.

B2

Z9

James   Cross

1    A  I didn't make that statement.

2    Q  Well, are you stating that the use of water under

3  pressure doesn't constitute a burden upon the surface runoff?

4    A  Well, the use of water under pressure, as we stated

5  earlier in our testimony all the way throughout it, that these

6  areas are in hydraulic continuity; that there is some effect

7  when you pump the pressure aquifers on the stream flow.  This

8  may be very slight, however.

9    THE COURT:  Well, let me understand this now.  I don't

10  know that I do.

11    You started out to compute some storage areas or basins.

12  What did you call them in the Exhibit L?

13    THE WITNESS:  We called them basins, your Honor.

14    THE COURT:  Basins?

15    THE WITNESS:  Yes.

16    THE COURT:  What was your purpose in delimiting the

17  basins and computing the depth of the usable storage?

18    THE WITNESS:  We were trying to outline the areas where

19  water had been used, where there was information, where we

20  could get some idea of what the storage capacity was within the

21  areas of use.

22    THE COURT:  You were trying to determine storage

23  capacity?

24    THE WITNESS:  Yes, sir.

25    THE COURT:  And then how would that help you in your

B2

z10

1   studies in Bulletin 57?  What effect would the storage capacity

2   have on your ultimate conclusions?

3        THE WITNESS:  Well, this would be something that the

4   engineers might use or have some future need for in running

5   through the hydrologic equation to determine safe yield, when

6   they make their safe yield studies.

7        THE COURT:  So you are determining storage capacity to

8   assist in determining safe yield?

9        THE WITNESS:  That is what we set it up for.  Now it

10  was not necessarily used for that in the report.

11       THE COURT:  And therefore the greater the storage

12  capacity the greater the safe yield?

13       THE WITNESS:  Well, up to a certain point.  Of course,

14  your safe yield is also limited by the amount of water that is

15  available.

16       THE COURT:  And the less the storage capacity the more

17  of a detrimental effect it would have on the safe yield,

18  generally speaking?

19       THE WITNESS:  Well, that is true, except, your Honor, I

20  might make this point, that if you have a million acre feet

21  of storage available and you find out that it is not a million--

22  it is only 500,000, and yet you have only a few thousand acre

23  feet of water available, it is not going to make any difference

24  obviously.

25       THE COURT:  So in determining these storage basins you

B2

Z11

1   did eliminate areas of confined water where you had enough

2   evidence to show you an area of confined water?

3       THE WITNESS:  That is true, your Honor.

4       THE COURT:  Mr. Veeder wants to know and I want to know

5   why you would eliminate an area of confined water when you were

6   looking at and trying to determine storage capacity in a

7   certain area?

8       THE WITNESS:  Well, the storage that is withinthat

9   confined part we could not use in the hydrologic equation.

10  This equation, your Honor, equates the overall inflow to a

11  basin, subtract the overall outflow from a basin, equals the

12  change in storage.  So when we work with that equation it is

13  the change of storage we are after.

14      THE COURT:  All right.  Now why can't you include an

15  area of confined water, such as in Pauba Valley, where it is

16  in close contact with the rest of the storage unit you have

17  laid out, why can't you use that in effecting the equation?

18      THE WITNESS:  For this reason, your Honor,  When we

19  figure our change of storage, we take the ground water level

20  of a certain date and then we may take another later ground

21  water level, a lower level, and then if it is in a confined

22  zone this change between those two dates is a change in

23  pressure.  There hasn't been any change of storage within that

24  particular portion of the well.   The change of storage has

25  occurred farther off upstream in this forebay area, which we

James        Cross                                                    7358

B3

Z12

1    are unable to delimit because we don't have sufficient infor-

2    mation.

3         THE COURT:  I follow you on that: That the change in

4    water level in the confined area would show a change in

5    pressure.  But even if you couldn't use it as part of your

6    equation, wouldn't it be valuable to you to know the area and

7    the depth of this water under confinement?  It is stored there

8    under pressure.

9         THE WITNESS:  Yes, it is stored there, your Honor.  But

10   it is also, for example, in the vicinity of Temecula Creek, it

11   is stored far out to the north and far out to the south, too--

12   that is, beyond the confines of Pauba Valley.  So that we

13   would have to then evaluate the storage capacity of this

14   whole area, which is impossible to do.  We don't have the

15   information to do it.

16        THE COURT:  When you say it is stored north and south

17   of Pauba Valley, then you mean it is stored in the older

18   alluvium on either side?

19        THE WITNESS:  That is true, yes.  We suspect that those

20   areas of confinement extend  out.  This has been brought out,

21   I am sure, in earlier testimony.

22        THE COURT:  This area of confinement, regardless of its

23   extent, is fed by rains that fall somewhere and by runoff on

24   streams that run somewhere, is it not?

25        THE WITNESS:  That is true.

B3

Z13

1       THE COURT:  You don't anticipate that it comes out of

2  the center of the earth?

3       THE WITNESS:  No, your Honor.

4       THE COURT:  And therefore the keeping up of a certain

5  amount of water in this confined area is a burden on the

6  rainfall and the stream flow somewhere in the watershed?

7       THE WITNESS:  That is true.

8       THE COURT:  Then isn't this a factor that has to be

9  taken into account in determining storage?  You may have

10  difficulty in this equation you are talking about.  But how can

11  you ignore a large area of confined water lying underneath what

12  you call a storage area?

13       THE WITNESS:  Well, we don't ignore it, your Honor.  We

14  realize it is there.  But to compute what the storage capacity

15  is within the confined area just in the immediate confines of

16  those small basins, it doesn't mean anything to us, your Honor.

17  We would have to get the whole thing, the whole unit 4, for

18  example.

19       THE COURT:  Go ahead, Mr. Veeder.

20  BY MR. VEEDER:

21       Q  For example, the Roripaugh well in your estimation,

22  then, is not a burden on the stream; is that right?

23       A  It is supplied from somewhere within that watershed.

24  But it may be supplied very slowly.  That has been our

25  contention.  It pumps from confined water.

B3

Z14

Q  And you are saying that all the older alluvium is confined water; is that what you are saying?

A  No, I am not saying that all of it is.  We just don't know enough about the older alluvium.

Q  You are stating, though, however, that pumping from the Roripaugh well is in effect utilizing the water resources of the Santa Margarita River Basin, are younot?

A  Yes.  However, it may be mining water at the present time from that area, which would be replenished over a long period of years very slowly.

Q  But you don't know that, do you?

A  No.  No, we don't know that.

Q  Now, you stated that the confined water in the Pauba Basin came from north and south of the Pauba Basin, did you not?

A  We didn't state that it did, no.

THE COURT:  He said that it extended north and south. He didn't say that the source of the water that is there under confinement came from those areas.  He said that this area of confined water extended north and south into the older alluvium.

THE WITNESS:  We suspect.

BY MR. VEEDER:

Q  In other words, the use of water from the Pauba well, for example, would tap the older alluvium north and south from Pauba Valley?

B3

Z15

A   Well, we suspect that these areas extend to the north and south of Pauba Valley.  But as I stated earlier, we can't delimit them areally.  We don't have the data to do this with.

THE COURT:  Would it be a logical conclusion that if this area of confined water extends into the older alluvium on either side of Pauba Basin, that if there were deep wells put down into the older alluvium north and south of Pauba Valley in this area of confined water that there would result an impact on the wells of the Vail Company which now pump out of that confined area?

THE WITNESS:  This is a possibility, your Honor.  But of course you have to get a good well first, and this material is of low permeability and there have been unsuccessful wells in this area.  A good well in that area could have some effect. We don't know how much.

BY MR. VEEDER:

Q   Now, when you are speaking of the forebay area of the Pauba Well, for example, would you locate that forebay area to which you made reference?

A   I have already said that we can't delimit it.  We don't have the data with which to do so.  We made a guess on one of our cross-sections here which you will recall.  I don't see it on the--

Q   Would you look at Exhibit 16 and state whether in your opinion that depicts the geological phenomena that exists

1    in the Pauba Valley?

2            A  (Witness stepping down to the map).

3            Q  The Pauba Valley is up here.

4            A  Well, on Exhibit 16 you show a geologic section

5    showing Recent alluvium underlain by older alluvium.  It shows

6    the Navy well and the Wildomar fault.  We have no quarrel with

7    the showing of those formations.  It doesn't--

8            Q  Well, now, you look at your own exhibits, then, and

9    tell us.  Can you locate yourself?

10           A  I am looking at Plate 16, Section G, G-prime.  This

11   is the section that I was referring to a moment ago, which

12   shows a line with question marks on it, which delimit this

13   confining bed.  This is one possibility of how the picture

14   might be, based on the data that are available.

15           Q  Referring to that picture, doesn't it show that

16   there is granite, doesn't it show that there is basement

17   complex enclosing, as shown on Exhibit 16, the areas of

18   confinement?

19           MR. STAHLMAN:  I don't understand the question.  Will

20   you read it, please.

21           THE COURT: Ask another question.  It couldn't show

22   confinement on all sides.

23           MR. VEEDER:  I will ask the question again.

24           Q  Does it not show the basement complex virtually at

25   the surface in the upper extremity of the Pauba Valley?

B3

Z17

A  At the mouth of Nigger Canyon?

Q  Yes.  Doesn't that show that?

A  Yes, it does.

Q  Is not the forebay then necessarily between the point of the mouth of Nigger Canyon and the point where the younger alluvium starts?

A  Not necessarily.  It may be.  We are looking at a two-dimensional picture here.  This thing extends out in a third dimension.

THE COURT:  In other words, on this cross-section the answer would be yes?

THE WITNESS:  On the cross-section, it could be.

THE COURT:  If you took a cross-section somewhere else, there might be a small canyon on one side or the other of Nigger Canyon which was pouring some limited amount of water into the forebay, which again fed this area of confined water; is that what you mean?

THE WITNESS:  That is true, your Honor.  Also, there could be rainfall penetration in certain areas.

BY MR. VEEDER:

Q  Are you stating that rainfall proceeding downward enters the area of confinement?

A  I am not saying that it does.  This is a possibility, that where it fell on a forebay area, that it could penetrate downward.

James   Cross

B4

Z18

1        Q  But you are not saying that the rainfall would enter

2   the confined area?

3        A  If it fell on a forebay area, it could.

4        Q  Suppose it fell over the area of confinement, do you

5   think the water would percolate into the confined area?

6        THE WITNESS:  No, definitely not.  Under present con-

7   ditions there is a pressure gradient in the opposite direction.

8        Q  Now, are you acquainted  with the Pauba Valley

9   sufficiently to state whether in your opinion there is a water

10  enters Pauba Valley from sources other than the surface flow

11  of the Temecula Creek?

12       A  Enters Pauba Valley, you say?

13       Q  That is right.

14       A  Are you talking about the subsurface or just into

15  the valley?

16       Q  I am talking about the surface runoff into the valley.

17       A  There are a number of little gullies that enter the

18  valley on either side.

19       Q  In your opinion do those contribute very much water?

20       A  In my opinion, I don't believe so.

21       Q  So as a matter of fact, then, the forebay area would

22  necessarily be, from the point where Temecula Creek leaves

23  Nigger Canyon and enters the Pauba Valley; is that not right?

24       MR. MOSKOVITZ:  I object to that question, your Honor.

25  That is assuming something that the witness didn't say.

B4

Z19

1    THE COURT: Well, this is cross-examination. He can

2    ask the witness if that is what he means. He said that the

3    little gullies would carry very little water. This is a

4    logical follow-up question.

5    THE WITNESS: Well, it is logical that some forebay

6    area does exist in that general area, as shown on Plate 16.

7    We figured that there was some area of recharge near the mouth

8    of Nigger Canyon, but we don't know how big it is or we don't

9    know anything about it-- there is no information.

10    THE COURT: Well, is it your opinion that the major

11    recharge to the confined area in the Pauba Basin comes from the

12    water that flows down Nigger Canyon, out of Nigger Canyon into

13    the upper part of Pauba Valley?

14    THE WITNESS: Your Honor, I honestly don't know. I

15    would suspect that that is probably the case.

16    THE COURT: Of course, when you say major part that

17    would mean, as stated, that there was more there than there

18    is altogether in all other places. Putting it another way,

19    the Temecula stream pouring out of Nigger Canyon is obviously

20    the largest single unit that could have any contribution to

21    that confined water?

22    THE WITNESS: That is true, your Honor.

23    THE COURT: Whether collectively all other things that

24    might aid in charging it were as great as the amount coming

25    out of Nigger Canyon you are in doubt about?

B4

Z20

1          THE WITNESS:  That is true, your Honor. You see, we

2    know very little about this recharge rate.  There may be water

3    that is being drawn out of there that is pulled from either

4    side of the valley and has been mined from those areas for a

5    long time and would be entering very slowly.  Perhaps a large

6    percentage of that water entered over a long period of years

7    from rainfall penetration or from runoff off adjacent slopes.

8    Perhaps it is replenishment chiefly from Temecula Creek near

9    the mouth of Nigger Canyon.  But I am not prepared to answer

10    that.  I don't know.  I don't believe anyone does.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MR. VEEDER:  May I proceed, your Honor?

Q  Now, for the record, I think we should make it clear that you have been referring to Plate 16.  That is the plate--

THE COURT:  All these plates are L, Plate so and so.

MR. VEEDER:  Yes.

THE COURT:  They are all part of L.

MR. VEEDER:  And the United States Exhibit 16 is a cross-section of the exhibit.

THE COURT:  Yes.

BY MR. VEEDER:

Q  Now, is it not true that taking water from the confined area in the Pauba Valley would necessarily reduce the surface runoff of Temecula Creek?

A  Yes, it would probably affect the surface runoff, but this effect might be very slight.

Q  When water is mined, as you have suggested, when water is mined north and south of the Pauba Valley, is not the source of recharge of that mined water the surface runoff of Temecula Creek?

A  In part, perhaps.

Q  And would it also be in part from the Santa Gertrudis Creek?  Would it not?

A  In part.

Q  So, as a matter of fact, when you are mining water

C

Z8

1   you are placing a burden on the surface runoff?

2       A  Yes, but this might be a slight effect.

3       MR. MOSKOVITZ:  Just a minute.  Let this witness

4   finish.

5       THE WITNESS:  I went on to say this effect **might be**

6   very slight.  It might be immaterial.

7   BY MR. VEEDER:

8       Q  Do you think that mixing of water can go on con-

9   tinuously without an effect on the surface runoff?

10      A  It would have some effect; but, as I said **again**,

11  this effect might be immaterial, even though it continued

12  indefinitely.

13      Q  Now, from the standpoint of the actual experience

14  in the Pauba Valley, are you aware of the effect upon the

15  surface runoff of Temecula Cree?

16      MR. STAHLMAN:  What is that question?

17  BY MR. VEEDER:

18      Q  Are you aware of the actual effect of pumping upon

19  the surface runoff of Temecula Creek?

20      MR. MOSKOVITZ:  I object to that.  Pumping where?

21      MR. STAHLMAN:  Yes.

22      MR. VEEDER:  Well, in the Pauba Valley.

23      MR. MOSKOVITZ:  From what wells?

24      MR. VEEDER:  Any wells.

25      MR. MOSKOVITZ:  I object.  That is too indefinite.

C

Z9

1   It would affect differently if it is shallow or deep.

2          THE COURT:  It is pretty broad, Mr. Veeder, because

3   you have got shallow wells and you have got deep wells.

4   BY MR. VEEDER:

5          Q   Are you aware of the effect of pumping upon the

6   water level in Windmill well?  Or are you acquainted with

7   Windmill well?

8          A   I am acquainted with Windmill well.

9          Q   Are you acquainted with the changes of the levels

10  in Windmill well in the last 25 years?

11         A   We have an hydograph.

12         Q   Are you acquainted with it?

13         A   Yes, I have seen the hydrograph.

14         Q   What does that how?

15         A   I am referring to Plate 12 in Bulletin 57 which is

16  an hydrograph of the Windmill well.  It shows the change, the

17  fluctuation of water levels in that well from approximately

18  1918 to --

19         Q   Just a moment.  I don't believe that is in evidence,

20  is it?

21         A   --1954.

22  MR. VEEDER:  Is Plate 18--

23  THE WITNESS:  Plate 12.

24  THE COURT:  12.

25  MR. VEEDER:  I don't believe that is in evidence, your

C

Z10

1    Honor.  I object to this evidence.

2         THE COURT:  Plate 12, I think it is.  Oh, you are

3    right.

4         MR. MOSKOVITZ:  12 is not.

5         MR. VEEDER:  12 is not in evidence, your Honor.

6         MR. MOSKOVITZ:  The witness can refer to it in answer-

7    ing the question.

8         THE COURT:  You asked him about it, and he started to

9    tell you about it.  Now, what do you want?

10        MR. VEEDER:  If he is going to quote from the plate,

11   why, I think that he can make statements of his own knowledge,

12   but I don't believe he can read from the plate.  He doesn't

13   know a thing about the plate himself.  He didn't prepare the

14   plate, certainly.  I asked him does he not have any personal

15   knowledge.

16        MR. SACHSE:  You asked him if he was familiar with the

17   pumping from the Windmill well, Mr. Veeder.

18        MR. VEEDER:  That is correct, absolutely.

19        MR. MOSKOVITZ:  You can be familiar with something

20   from having read about it without having done the studies

21   yourself.

22        THE COURT:  Go ahead, Mr. Witness.  What study are you

23   referring to on Plate 12?

24        THE WITNESS:  I am referring to this hydrograph in the

25   upper right-hand corner of Plate 12.  It says "Pauba Basin"

C

Z11

1    at the top of it.

2    BY MR. VEEDER:

3        Q  Now, Mr. Witness, did you prepare that plate?

4        A  No, I didit.

5        Q  Have you any knowledge, in fact, as to the data

6    used in the preparation of it?

7        A  Yes, I do.

8        Q  Did you prepare the data?

9        A  These data were obtained from water level measure-

10   ments.

11        Q  Did you prepare it?

12        A  No, I didn't prepare the plate.

13        Q  So you have no personal knowledge of this matter?

14        A  Well, I have seen the plates before.

15        Q  Do you have personal knowledge, though?

16        A  Of the plates?  Yes, I have seen it.

17        Q  Of the data upon which it was prepared?

18    THE COURT:  It was prepared under your direction?

19    THE WITNESS:  No, sir, it wasn't.

20    MR. VEEDER:  I object to his referring to it, your

21   Honor, if he doesn't have personal knowledge.  He can simply

22   say, "I don't know."

23    THE COURT:  You are withdrawing the substance of your

24   question.

25    MR. VEEDER:  No, I asked him the question did he know.

C

Z12

1   the effect of pumping upon the level of Windmill well.  If he

2   doesn't, why, no, he doesn't.

3       MR. STAHLMAN:  Aren't we kind of quibbling on this?  If

4   it is of any importance to know the level, some other evidence

5   says it is something different than what this is, it can show

6   what is his knowledge.

7       MR. VEEDER:  This is not his knowledge.

8       MR. STAHLMAN:  I understand it is a foundational ques-

9   tion in relation to other matters you are attempting to de-

10  velop.

11      THE COURT:  Well, in the sense that the witness didn't

12  prepare the plate and it wasn't prepared under his direction,

13  then Mr. Veeder's objection will be sustained.

14  BY MR. VEEDER:

15      Q  You don't know, to answer the question?

16      MR. MOSKOVITZ:  I object to that.

17      MR. SACHSE:  Don't know what?

18      THE COURT:  Sustained.

19      MR. VEEDER:  He doesn't know.  I have asked him the

20  question.

21      THE COURT:  Well, ask the question.

22  BY MR. VEEDER:

23      Q  Do you know the effect of pumping upon the levels

24  of Windmill Well, of your personal knowledge?

25      MR. STAHLMAN:  What pumping?

C

Z13

1    MR. VEEDER:  In the Pauba Valley.

2    THE COURT:  Deep or shallow wells?

3    MR. VEEDER:  Shallow.

4    THE COURT:  Reframe your question.

5    MR. VEEDER:  All right.

6    Q  Do you have any knowledge, personal knowledge of

7 the effect of pumping upon Windmill Well?  Pumping, now, I

8 will say from the shallow wells in the Pauba Valley?

9    A  Do I have any knowledge-- I am trying to repeat

10 this question--

11    Q  Do that.

12    A  --of the effect of pumping in Pauba Valley on the

13 Windmill Well?

14    THE COURT:  No, the question is--

15    MR. VEEDER:  I will start again.

16    THE COURT:  --do you have any personal knowledge of the

17 effect of pumping the shallow wells in Pauba Valley upon the

18 water levels in Windmill Well?

19    THE WITNESS:  No.

20 BY MR. VEEDER:

21    Q  And how was it that you were able to come to your

22 conclusions in regard to the effect of the utilization of

23 water from the deeper wells?

24    MR. MOSKOVITZ:  I object to that question.

25    THE COURT:  Sustained.  Unintelligible.  I don't know

C
Z14

1    what he means.

2    BY MR. VEEDER:

3        Q   Do you have any knowledge about the effect of

4    pumping of deeper wells upon the levels in Windmill Well?

5        MR. MOSKOVITZ:  Your Honor, I object.  If Mr. Veeder--

6        MR. VEEDER:  In Pauba Valley.

7        MR. MOSKOVITZ:  A more fundamental objection.  If Mr.

8    Veeder means this witness has personal knowledge in that he

9    went out and took well level readings himself, he has answered

10   he didn't do that.  But experts can have knowledge about things

11   because they have read about them, they have read reports and

12   surveys, and they have opinions based on that.  If Mr. Veeder

13   is asking that latter question, the witness can answer that,

14   if Mr. Veeder wants it.  And I object until he clarifies ex-

15   actly what he means by "knowledge."

16       MR. VEEDER:  I don't have to clarify anything, your

17   Honor.  I can ask him questions.

18       THE COURT:  If you don't want to clarify it, I will

19   sustain the objection on the ground the question is am-

20   biguous.  By "personal knowledge" I don't know whether you

21   mean has this witness ever read anything about the subject

22   matter or whether, as Mr. Moskovitz points out, has he ever

23   himself gone out and taken measurements, and so forth?

24   BY MR. VEEDER:

25       Q   Have you made any well measurements in the Pauba

C

Z15

1     Valley yourself?

2           A   Yes, I have made a few.

3           Q   Did you make any in regard to Windmill Well?

4           MR. SACHSE:   You mean did he make Windmill Well?

5           THE WITNESS:   I am not sure on that.   I might have

6     measured a few wells in that valley.

7     BY MR. VEEDER:

8           Q   Have you made any analysis based upon-- I almost

9     said your expert experience-- have you made any analysis of

10     the effect of pumping either in the shallow or in the deeper

11     alluvium of Pauba Valley upon Windmill well?

12           A   These effects--

13           Q   You can answer yes or no.

14           MR. MOSKOVITZ:   I think he can answer the question.

15           THE COURT:   Well, answer yes or no; then make an

16     explanation.   Have you made any study or analysis of the effect

17     of pumping shallow wells or the deeper wells that go into the

18     older alluvium in Pauba Valley, upon the Windmill Well?

19           THE WITNESS:   Well, I believe we did, your Honor.   We

20     made studies of all of these wells and the data that were

21     available at the time.   I don't recollect specific wells that

22     were studied at the time we delimited these pressure areas,

23     but I am sure we considered the data that was available on the

24     windmill well.

25           MR. VEEDER:   We are back on the team.   I asked him did

James  Cross                                                                                  7175

he personally.

THE WITNESS:  Personally, no,  But studies of that sort were made under my direction.

BY MR. VEEDER:

Q  And what other wells did you undertake to study in that connection in regard to the effect of pumping, either in the shallow or the deep, upon the wells in the Pauba Valley itself?

A  I can't answer that specifically.  I don't recall which ones.

Q  Did you make any studies in regard to any of the wells, either north or south of Pauba Valley, by reason of pumping, either in the shallow or the deeper alluvium?

MR. MOSKOVITZ:  I object to that question.  I don't think it is clear.

BY MR. VEEDER:

Q  Do you understand what I ask?

A  No, I don't.

Q  All right.  Now, you know where north and south are. That is the area here and here.  I am pointing to 15-A.  Now, did you make any studies north of Pauba Valley in connection with wells situated in the older alluvium to determine the effect of pumping either in the younger or older alluvium in the Pauba Valley?

MR. STAHLMAN:  That question, I don't think I understand

James   Cross                                                                7176

C

Z17

1    that.

2            THE COURT:  Well, I think I understand the question.

3    It is sort of--

4            MR. STAHLMAN:  Compound.

5            THE COURT:  --germanic.

6            MR. VEEDER:  Throw the cow over the fence some hay.

7    Well, I will start over again.

8            MR. STAHLMAN:  It might be a good idea.

C2    9            THE COURT:  The question is this:  Have you yourself,

10   first now, limited to you, made any studies of wells, water

11   levels in them, where the wells were located-- What was this,

12   north of Pauba Valley?

13           MR. VEEDER:  Pauba Valley.

14           THE COURT:  -- north of Pauba Valley-- what the effect

15   upon those wells and water levels thereof would be if wells

16   were pumped in the shallow portion of Pauba Valley itself or

17   in the wells that went down to the deeper portion in the older

18   alluvium of Pauba Valley?

19           THE WITNESS:  No, we didn't make any pump test.

20           THE COURT:  I asked you if you did, and your answer is

21   no?  Your answer is also that the team didn't do it?

22           THE WITNESS:  I don't believe we did any of those,

23   your Honor.

24           THECOURT:  The same answer would be given if the ques-

25   tion was about wells south of Pauba Valley?

C2

Z18

1    THE WITNESS:  Yes, it would.

2  BY MR. VEEDER:

3    Q  So how would you conclude then that the effect of

4  pumping either north or south of the Pauba Valley would have

5  little or no effect upon the stream flow?

6    A  We didn't make that conclusion, Mr. Veeder. We said

7  we didn't know what the effect of such pumping might be.

8    Q  Now, in regard to your calculations of 136,000

9  acre feet of storage in Murrieta Valley, you had to take into

10  consideration as one of the principal factors in making that

11  computation, did you not, the areal extent of the Murrieta

12  Valley; isn't that true?

13    A  That is true.

14    Q  So that Exhibit L 15-2 has been stricken from the

15  standpoint of the areal extent of the Murrieta Valley, you

16  would be totally lacking one of the principal ingredients for

17  arriving at your conclusions of 136,000 acre feet of storage,

18  would you not?

19    A  We have the areas tabulated that were utilized in

20  preparing that estimate.

21    THE COURT:  Mr. Veeder, is it your contention that

22  there is not 136,000 acre feet of storage in the Murrieta

23  Basin?

24    MR. VEEDER:  It is my contention, your Honor, and it

25  is extremely important because of your request that we sit

C2

Z19

1    down with California and consider these fifteen propositions

2    that you advanced and see if there is not a ground for agree-

3    ment with California.  It is our position that the material

4    that California has offered and Appendix B is not evidentiary

5    in character.  We believe that the very foundation of Appendix

6    B has collapsed entirely. We believe that--

7        THE COURT:  In other words, in answering my question

8    all this cross-examination is largely devoted for the purpose

9    of impeachment of the witness and of Exhibit L, parts of it,

10   so forth?

11       MR. VEEDER:  Well, not entirely.

12       THE COURT:  It is not directed at trying to assist me

13   in finding out how much water there is in storage there?

14       MR. VEEDER:  Yes, your Honor, it is.

15       THE COURT:  Because the United States' figures for

16   Murrieta Basin were 84,000 acre feet.

17       MR. VEEDER:  That is right.

18       THE COURT:  And it is the Government's contention, as

19   I understand, all along that there is more water in storage

20   in this upper valley than California concedes the valley as a

21   whole.

22       MR. VEEDER:  Yes.

23       THE COURT:  Why should we get so excited about the

24   fact that--

25       MR. VEEDER:  Your Honor, I very seldom get excited.

C2

Z20

1    THE COURT:  -- the State of California said there is

2    136,000 acre feet of storage in Murrieta when the United States

3    only estimates 84,000 storage feet in the Murrieta Basin?

4    MR. VEEDER:  It is not the objective, your Honor, in

5    my view, of doing anything here but getting the most specific

6    facts to your Honor possible.  And we have taken the position--

7    Do you have 18?  --We have taken the position that our in-

8    vestigations have been scientifically pursued.  We believe

9    that they are evidentiary in character. We believe, however,

10   based upon the admissions most recently made by Mr. James that

11   their conclusions are not evidentiary in character.  Now, we

12   are anxious to present to your Honor our conclusions and we

13   will tender to the extent possible our proposed findings.

14   But we cannot do it on the basis, in my view, which would

15   ascribe to or attribute to Appendix B any evidentiary elements,

16   for the reason that to do so would be to give them unwarranted

17   credence.  Now, in regard to each one of these studies and

18   each one of these basins-- and I went through them this

19   morning-- I have no desire to cross-examine this witness a

20   great deal more-- I went through them this morning, and I

21   looked at the material that was utilized.  And I daresay that

22   no one can conceivably understand what was done.  I have

23   looked for the isopachs to which they made reference in their

24   Exhibit Z, and H have found some weird drawings, but they are

25   not isopachs, by and large.  And in addition, throughout those

C2

Z21

1  notes there are references to sources and other elements

2  which defy any method of calculation.  That is one of the

3  reasons why I have pursued Mr. James for the last few hours

4  with a thought in mind of demonstrating that this material,

5  in a highly important case, simply can't be relied upon.

6       I observe it is 11 o'clock, your Honor.

7       THE COURT:  Yes, take a short recess.

8       (Recess.)

7181

D

Z21

1     (After the recess.)

2     (Another matter.)

3     THE CLERK:  The case on trial, No. 1247-SD-C, United

4  States of America vs. Fallbrook Public Utility District, et

5  al.

6

7                    LAURENCE JAMES

8  recalled as a witness in behalf of the defendant State of

9  California, having been previously sworn, testified further

10  as follows:

11

12                CROSS-EXAMINATION (Resumed)

13  BY MR. VEEDER:

14     Q   Now, in which of the categories on page 3 of Exhibit

15  Z does Aguanga Valley fall in your revision of Appendix B?

16     A   That is shown on Table A of Exhibit Z as falling

17  into Category 3A.

18     Q   May I see how you arrived at that conclusion, sir?

19  That is on your table?

20     A   Yes, Table A.

21     Q   Your Table A shows Aguanga Valley in 3A?

22     A   Yes.

23     Q   Now, the 3A contemplates, does it not, the prepara-

24  tion of an isopach?

25     A   3A?

James    Cross

Q  I beg your pardon.  The 3A contemplates a basin with vertical walls assumed?

A  That is true.

Q  What was the basis for your conclusion that there were vertical walls on the Aguanga Valley?

A  We assumed there were vertical walls in this instance because that would appear to give us-- with the data we have available this seemed like the best way to do it.  This was the most accurate way.

Q  Was it on the basis of well studies that you made that assumption?

A  We considered the wells, we considered the areal geology, the faults that were in the area.  That is what we considered.

Q  And those are the only elements which you took into consideration?

A  The wells and the areal geology, yes.

Q  I have your report on Aguanga Valley and somebody wrote in there "According to Dr. Mann, main part of Aguanga Valley is graben"--

MR. MOSKOVITZ:  Is that an exhibit, Mr. Veeder?

MR. VEEDER:  Yes.

MR. MOSKOVITZ:  What is the number of that exhibit?

MR. VEEDER:  Well, what is the number of it?

California's P-1B.

D

Z23

Q  Reading from California's Exhibit P-1B:

"According to Dr. Mann, main part of Aguanga Valley is a graben with straight or nearly straight sides. Therefore, take Area No. 1 as straight-sided and as to depth of deepest well."

Now is that what you used to make your determination?

A  We considered Dr. Mann's work.

Q  So in addition to your areal investigation and in addition to your depth of well, you recall now that you took into consideration that Dr. Mann had made such a determination; is that right?

A  We didn't make our-- we considered the areal geology, and Dr. Mann had done the areal geology in that area and we considered his work in preparing our geology map.  This had been brought out before in the testimony.  We very definitely considered geologic structure in pursuing our estimates.

Q  Now, in regard to the calculations of vertical sides, did you take into consideration the situation that prevails in Aguanga Valley from the standpoint of--

A  What situation?

Q  --from the standpoint of the areas which surround it?

MR. MOSKOVITZ: I object, your Honor.  I think that is a very ambiguous and indefinite question.

THE COURT:  Overruled.

D

Z24

BY MR. VEEDER:

1

2      Q  Will you come here to 13B?

3      A  I have a copy of that right here.

4      Q  All right.  Now, based upon the geologic formations,

5  as they are shown there, you assume that it is sound geologic

6  conclusion to say that there would be vertical sides?

7      A  It says we assume vertical sides, and there is a

8  very marked fault on the southwest side of Aguanga Valley and

9  there are faults shown on the northeast side, too.

10      Q  What about the other side?  Is there any reason to

11  assume those would be straight up and down vertical sides?

12      A  There is basement complex on the east end, which is

13  probably not vertical, and on the west end there are--

14      Q  Where it is probably not vertical there was no basis

15  for such an assumption; isn't that right?

16      A  Well, that is the way we did it.  We assumed it had

17  vertical walls.

18      Q  Even though you knew the basement complex was not

19  vertical?

20      A  We didn't know what the angle of the basement complex

21  was.

22      Q  But you knew it was not vertical?

23      A  It could have been vertical as well as anything else.

24      THE COURT:  What plate are you referring to?

25      THE WITNESS:  13B, your Honor.

D

Z25

1          MR. VEEDER:  Referring to Plate 13B, your Honor.

2          Q  Absent a fault, would you expect the basement com-

3 plex to be vertical?

4          A  No, frankly I wouldn't.  But I don't know what it

5 would be.

6          Q  So not knowing, you decided it was vertical?

7          A  We decided that was a logical way of approaching it,

8 true.

9          Q  Now, in making your calculations-- if you would

10 approach 13B.  You have 13B before you?

11         A  Yes, I do.

12         Q  What was the determinative factor that caused you to

13 set up a No. 2 area there?  Isn't that what you have (showing

14 document to withess)?

15         A  Yes, there are two subareas in that basin.

16         Q  Why did you set those up?

17         A  Well, as discussed in earlier testimony, we divided

18 basins into subareas because we thought that would improve the

19 accuracy of the estimate.  We considered such things as the

20 well logs that were available, the surface geology, breaking

21 those basins down.

22         Q  Now, in regard to your calculations on Burnt Valley--

23         MR. MOSKOVITZ:  I object, your Honor.  This goes into a

24 basin for which we came up with no storage capacity in Appendix

25 B.  It is beyond the scope of the direct examination.

MR. VEEDER:  This data here.  What is this?

MR. MOSKOVITZ:  Your Honor, there are data included among the rough notes for basins on which preliminary work was done and no final storage capacity was computed because of the judgment that there was insufficient data or it was not appropriate.

THE COURT:  Why waste time on that, Mr. Veeder?

MR. VEEDER:  All right.

THE COURT:  Because the Government itself took the position that there were certain of these basins that they knew there was water but they didn't have enough data to calculate the amount of storage.

BY MR. VEEDER:

Q  Now, in every instance, then, when you made your calculations which are reflected in Appendix B and also I and Q and B and Z, I think, were you able to distinguish between the older and the younger alluvium?  When you made your calculations upon which you placed your calculations as to storage, were you able to distinguish between the younger and the older alluvium?

A  We have answered this a number of times, Mr. Veeder. In the wells that pass through the Recent alluvium, we are often not able to distinguish where those enter the older alluvium.

Q  In other words, there was no way for you to know

D

Z27

1  which was the older and which was the younger alluvium; is
2  that right?

3      MR. MOSKOVITZ:  I object to this question on the ground
4  that it has been asked and answered many times, your Honor.

5      MR. VEEDER: I am going to the first paragraph of his
6  write-up on Z, your Honor, and I am asking the questions from
7  there.

8      THE COURT:  Overruled.

9  BY MR. VEEDER:

10     Q  Now, go ahead and state, will you, the basis upon
11 which you concluded as follows:

12     I will withdraw the original question.

13     I am reading the second sentence on the first page:

14     "Of these sedimentary formations, those of Quaternary
15 age, as depicted on State's Exhibit L, Plates 13A and B, con-
16 tain most of the usable ground water and the Recent alluvium
17 produces the greatest supply."

18     How, in view of your statement that you could not
19 distinguish between the two, could you reach such a conclusion?

20     A  Well, for one thing, we don't know the depth of the
21 Recent alluvium in all of the coastal-- Santa Margarita coastal
22 ground water basins.

23     Q  I will limit my question to the inland area.

24     MR. MOSKOVITZ:  This sentence is not about the inland
25 area; it is about the whole Santa Margarita watershed.

BY MR. VEEDER:

Q   I will limit my question to the inland areas.  How did you know, on the inland areas, that most of the usable ground water-- I will start again:  "Of these sedimentary formations, those of Quaternary age, as depicted on State's Exhibit L, Plates 13A and B, contain most of the usable ground water and the Recent alluvium produces the greatest supply."  How did you know that, in view of the fact that you have stated that you can't distinguish between the younger and the older alluvium?

A   I didn't make that statement about the coastal area.  This statement includes the Santa Margarita watershed.  Now in the inland areas, we do know that the Recent alluvium is considerably more permeable.

Q   How do you know that?

A   By observing it.

Q   Did you run any tests?

A   There were tests of specific capacities of wells, pumping tests, et cetera, that were considered throughout the study of the watershed.

Q   At what level did you determine that the younger alluvium became older alluvium?

A   I have answered that question, that in some areas we can't tell from the logs of wells.

Q   In what areas can you tell from the well logs?

D

Z29

1          A  Well, for example, in Pauba Basin we have delimited

2     what we feel to be the base of the Recent alluvium.

3          Q  How did you make that determination?  What were the

4     factors that made that determination possible?

5          A  Well, our knowledge of geology, our mapping of the

6     surface areas, and what information we can get from the well

7     logs.

8          Q  And what were the factors from the well logs that

9     showed where the older alluvium began and the younger alluvium

10    left off?  We are still talking of the well logs.

11         A  It is just the inspection of the log.  I don't know

12    how to answer your question.  Recent alluvium is different in

13    appearance from the older alluvium.

14         Q  In what regard?

15         A  On the surface where you can see it.  It is less

16    cemented.  There is, in general, less clay than the Recent

17    alluvium.  It is less consolidated.

18         Q  Let's go back to the well logs and you tell us how

19    you can distinguish between the older and the younger alluvium?

20         A  I don't know that I can.

21         Q  You can't?

22         A  There may be some instances where you could.

23         Q  All right.  Then how did you come up with this very

24    important conclusion-- I will read it again:  "Of these

25    sedimentary formations, those of Quaternary age, as depicted

D

Z30

1    on State's Exhibit L, Plates 13A and B, contain most of the

2    usable ground water and the Recent alluvium produces the

3    greatest supply"?  How can you support that conclusion?

4         A  Well, we support it by our geologic findings.

5         Q  What are those findings?

6         A  Our geologic map, sections we have constructed-- in

7    fact, there is no argument at all between the Government and

8    the State in the coastal area that the basins are filled with

9    Recent alluvium.

10         Q  You don't know your self, though, the difference

11    between Recent and older alluvium?

12         A  I certainly do.

13         Q  How did you distinguish?

14         A  By looking at it.

15         MR. MOSKOVITZ:  I object, your Honor.  This is getting

16    very repetitious.

17         MR. VEEDER:  Your Honor, I simply submit that this is

18    this man's testimony.  I recommended that we conduct the trial

19    a different way, but I was overruled.  Now, this man has

20    written here as his conclusion something that he simply can't

21    sustain.  Now I asked him a very simple question, because it

22    is extremely important, from the standpoint of our request that

23    we stipulate and make some determination and findings.  We have

24    said that the principal source of water--

25         THE COURT:  Wait a minute.  Let's not get off the track.

1    I don't anticipate that you are going to be able to stipulate.

2    I asked you to propose findings of what you thought the evi-

3    dence showed and I was going to lay them down side by side

4    and later on we might discuss how far apart we are.  But let's

5    go ahead.  True, I laid out this method of examination, and

6    you may cross-examine him.  Actually, on the basis you are on

7    now, counsel can try this case as they want to.  But what

8    interests me is something entirely different from what you are

9    talking about.

10    MR. VEEDER:  Well, I would like to know, your Honor,

11    and I will proceed that way.

12    THE COURT:  What interests me is this.  The Government,

13    in laying out their basin, as shown on Exhibit 17, trying to

14    do this very roughly, apparently took into account rather

15    seriously the fault lines, and when they got through with the

16    basin which the Government calls 5-- that would be the equival-

17    ent of parts of five different basins shown by the State--

18    Government's 5 would include part of Nigger Basin, Radec Basin,

19    Aguanga Basin, Upper Lancaster and Lower Lancaster.  And the

20    Government's basin, for instance, around Radec, although there

21    was younger alluvium in that Radec area, because of fault

22    lines apparently and the location of the basement complex,

23    actually excluded some of that area from their basin.  Like-

24    wise, in the Lancaster Valley, what would be on the State's

25    Upper Lancaster Valley, the Government basin follows the fault

D

Z32

1    line that runs through an area of younger alluvium, and the

2    Government excludes from its basin some of the younger alluvium

3    and takes the edge of the basin as a fault line.

4         The State of California, on the other hand, has used

5    the areas of younger alluvium without as much consideration,

6    apparently, to the fault lines as the Government has.

7         As a result, parts of what the State of California says

8    are in basins are excluded by the Government, and the major

9    other difference is that the Government then takes the older

10   alluvium lying in between the fault lines and projects the

11   basin as containing the center material which the State of

12   California excludes, that material lying midway between the

13   various of the five basins.

14        There is apparently a very basic difference of approach.

15   The United States has taken largely the fault lines.  The State

16   of California has taken largely the areas of younger alluvium.

17        But you go ahead then.  I will give you full range to

18   cross-examine.

19        MR. VEEDER:  Your Honor, you are certainly entitled to an

20   explanation because of the time it is taking, and I am not

21   happy about the time myself.  I would like to get our case in

22   chief in and be through.  The point that I make is that

23   throughout all the graphs of Appendix B, Appendix B itself, the

24   revisions of Appendix B and the methods of calculating storage

25   invariably have the statement made by Mr. James or someone that

they have made a determination that the Recent alluvium is the greatest source of water supply.

I think that it is essential that we make the determination or else have him say that he just didn't know.

So I will ask him once more:

E

Z22

1      BY MR. VEEDER:

2          Q   Whether you agree with this statement that because

3      of the difficulty of differentiating Recent and older alluvium

4      from studies of logs of wells the walls of those basins are

5      arbitrarily considered to be vertical, an assumption that was

6      further justified in several instances by the facts that

7      vertical faults closely parallel the boundaries?  Now, you

8      are stating on page 5, bottom of the page, the last sentence:

9      That because of the difficulty in differentiating between the

10     Recent and older alluvium you simply took an arbitrary method

11     of measuring the storage capacity; isn't that right?

12         A   No, I wouldn't say we took an arbitrary method.

13         Q   Well, you simply took a method of extending walls

14     vertical downward without differentiating between the Recent

15     and older alluvium; isn't that right?

16         A   At depths we did not distinguish between the Recent

17     and older alluvium; that is true.

18         Q   Then how, on the basis of that conclusion, could you

19     state:  "That most of the usable ground water and the"-- I

20     will start again because your sentence is strange-- "of these

21     sedimentary formations, those of Quaternary age, as depicted

22     on State's L, Plates 13A and B, contain most of the usable

23     ground water and the Recent alluvium produces the greatest

24     supply"?  How do you know that?

25         A   Because the Recent alluvium is more permeable.

1    For that reason, more water will pass through it into a well

2    that passes, that penetrates it.

3            Q  How do you know that?

4            A  How do you know it is more permeable?

5            Q  How do you know, taking a well now in the Murrieta

6    Valley, how do you know where that well passes into the older

7    alluvium?

8            A  We don't know exactly where it does.

9            Q  Have you any way of estimating where it does?

10           A  Well, we have-- you exercise some judgment in pre-

11   paring our cross-sections.

12           Q  What was a guide for exercising that judgment?

13           A  Well, we considered the wells whether perforated,

14   what we could get from the logs-- I have been through this

15   before-- the areal geology; these things were all considered.

16   And it is our feeling that the greatest supply is obtained

17   from the Recent alluvium.  I might also say in Pauba Valley--

18   I am not prepared to quote any figures here-- but I believe

19   that the greatest supply that is produced from wells in that

20   are comes from the shallower wells above the confined zone,

21   Recent alluvium.

22           THE COURT:  Now let me ask some questions.  You look

23   over here.  This is the Government's 17, which you are

24   familiar with, and shows Basin No. 5.  Are you familiar with

25   that area?  Here is Vail Dam.

7196

E

Z24

1    THE WITNESS: Yes, your Honor.

2    THE COURT: Counsel have their copies of maps you can

3    look at. I just set my own copy here.

4    MR. STAHLMAN: Which is that, your Honor?

5    THE COURT: Government's 17.

6    MR. STAHLMAN: Oh, 17, yes.

7    THE COURT: Here is your Plate L, 10B showing the five

8    basins-- Upper Lancaster, Lower Lancaster, Aguanga, Radec,

9    and Nigger. And I have also before me Government's 15

10   showing the characteristics of some of the materials here. It

11   is apparent, is it not, that the Government has taken as part

12   of the basin area between what you show as Upper, Lower

13   Lancaster and Nigger?

14   THE WITNESS: That is true.

15   THE COURT: And between what you show as Upper Lan-

16   caster and Radec?

17   THE WITNESS: Yes, your Honor.

18   THE COURT: Between what you show as Upper Lancaster

19   and Aguanga?

20   THE WITNESS: That is correct.

21   THE COURT: And this middle area the Government has

22   taken is the older alluvial?

23   THE WITNESS: That is correct.

24   THE COURT: Is it your opinion that older alluvial

25   lying in that area-- and I think it is shown in your L 13B--

E

Z25

1      THE WITNESS:  Undifferentiated Upper Pleistocene

2   deposits, your Honor.

3      THE COURT:  That would be the equivalent of older

4   alluvial, would it not?

5      THE WITNESS:  That is correct.

6      THE COURT:  Is it your opinion that that is not water

7   bearing?

8      THE WITNESS:  I feel that it is only very slightly

9   water bearing from the data, the information that is available.

10  There are a few windmills in there.  You recall, your Honor,

11  when we made the trip from Radec to the north we went by one

12  of the handful of wells that are in that, or two of the handfuls

13  of wells that are in that area.  These are windmills of very

14  low yield.

15     THE COURT:  Are there any deep wells in that area?

16     THE WITNESS:  I am trying to recall.  It is a well known

17  as the Castaic, is the one that we looked at.  And I don't

18  remember; I believe it is 100 or 200 feet deep; something like

19  that.

20     THE COURT:  Well, looking at your L, Plate 13B, you

21  show various fault lines in this area, do you not?

22     THE WITNESS:  Yes, sir.

23     THE COURT:  You show a fault line 13B running east and

24  west.  It is hard to describe it here as -- well it would be

25  running right through what is referred to as the Upper Lancaster

E

Z26

1    Valley?

2         THE WITNESS:  That is true.

3         THE COURT:  Right?

4         THE WITNESS:  Yes, your Honor.

5         THE COURT:  Now, in your basin that you have laid

6    out as the Upper Lancaster Basin, you have got that right

7    astraddle of that fault line, have you not?

8         THE WITNESS:  Yes, sir.

9         THE COURT:  You have got a basin on either side of

10   that fault line?

11        THE WITNESS:  That is true.  However, I will point out

12   that this fault is dashed through here, which means that it

13   is buried in that area.

14        THE COURT:  And when you get down to Radec, you show

15   fault lines, a couple of them, running in a direction from the

16   northwest to the southeast and widening up on their north-

17   westerly end right up in this Radec area; right?

18        THE WITNESS:  Yes; yes, your Honor.

19        THE COURT:  And can you tell from your Radec Basin

20   whether that lies astride of the fault line 2 as you marked it

21   out on 10B?

22        THE WITNESS:  The fault line on that Radec, your Honor,

23   is-- there may be some that are buried beneath the alluvium

24   in there, but there is none through Radec Basin in that.

25        THE COURT:  It is difficult to tell from the comparison

E

Z27

1    where your Aguanga Basin is located, but I take it that it is

2    all northerly of that major fault line shown?

3              THE WITNESS:  Yes, sir.  I might point out that this

4    is basement complex here.

5              THE COURT:  Yes, I understand that.  All right.

6    BY MR. VEEDER:

7              Q  Now, assuming, based upon the evidence in the record,

8    that there was a well drilled 588 feet deep in that area--

9              THE COURT:  What area?

10             MR. VEEDER:  To which you have just referred, the

11   Radec area-- I beg your pardon-- between the Upper and Lower

12   Lancaster Valley.

13             THE COURT:  Between the Upper and Lower?

14             MR. VEEDER:  That is right.

15             Q  --which produced water at 90 feet and went to a

16   depth of 588 feet, would that make any difference in the

17   conclusions you have expressed in regard to the availability

18   of ground water in the area?

19             MR. MOSKOVITZ:  Mr. Veeder, would you identify that?

20             THE WITNESS:  Not necessarily.

21             MR. MOSKOVITZ:  Excuse me.  Could you identify the well

22   by number or by name?

23             MR. VEEDER:  The well is on the Oviatt property, and

24   Mr. Kunkel testified with regard to it earlier.

25             THE WITNESS:  Perhaps I have got the location.

E

Z28

1    MR. VEEDER: Between the Upper and Lower Lancaster

2    Valley.

3    THE WITNESS: Between Upper and Lower Lancaster Valley.

4    MR. SACHSE: Let's find out where it is.

5    MR. VEEDER: Come here. I will show you where it is.

6    THE COURT: Let's identify it by section numbers and

7    see where we are. 8 South, 1 East.

8    MR. VEEDER: Where P-1 is situated,, your Honor, is

9    where you will find it.

10    THE COURT: Can we identify it by section number?

11    MR. VEEDER: I don't have the sections on this, but I

12    can get it for you.

13    MR. MOSKOVITZ: There are sections there.

14    MR. SACHSE: There are sections there.

15    MR. VEEDER: It is 8 South, 1 East, 7P3.

16    THE COURT: It is in Section 7.

17    MR. VEEDER: That is right.

18    THE COURT: P.

19    THE WITNESS: P-3.

20    THE COURT: Well, P means on the very southwest side

21    of the section.

22    THE WITNESS: Your question again, Mr. Veeder?

23    MR. VEEDER: Would you read the question?

24    I will rephrase it. It will probably take you some

25    time.

E

Z29

1    Q   Assuming there was a well dug in the area to which

2   I have just referred which went to a depth of 588 feet,

3   struck no water until a depth of 90 feet, with a flowing well,

4   when completed and was pumped tested out 300 gallons per

5   minute, would that make any difference in your conclusions in

6   regard to the availability of water in the older deposits?

7    A   Not necessarily.  You could be getting water from

8   a fault in that area.  I might point out that there is another

9   fairly deep well just to the east of there, a recent well in

10   Upper Lancaster Valley which produces considerable water at

11   some depth.  However, that water is at a temperature, some 80

12   degrees, indicating that it probably comes from a fault.

13    Q   When you say "some depth," what do you mean?

14    A   I don't recall right now. Several hundred feet,

15   I believe.

16    Q   And is that not then indicative that the older

17   deposits are water bearing in that area?

18    A   Not necessarily.  You frequently get water from

19   salts in basement complex.  I shouldn't say "frequently," but

20   in some instances; notably one up in Anza Valley which was

21   drilled for Mr. Pursche, collared in basement complex, which

22   is a very prolific producer of water.

23    THE COURT:  We will refer to the well identified in

24   Section 7, 8 South, 1 East.  There doesn't seem to be much

25   dispute between the parties there.  It is within the basin as

E

Z30

1    outlined by the United States.  It is within the basin as

2    outlined by the State of California, according to my cal-

3    culations, that particular area.

4            We will take our adjournment until 2 o'clock.

5            (Recess at 12:00 Noon until 2:00 P.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F
Z34

SAN DIEGO, CALIFORNIA, WEDNESDAY, JANUARY 14, 1959.  2:00 P.M.

THE COURT:  Mr. Moskovitz very timidly inquired whether or not we are going to have court on Friday, because he has a very important matter in Sacramento, and I told him I was very happy to accede to his request since he couldn't be here on Friday.  I propose to adjourn on Thursday evening after court and take up again the following Tuesday.

All right.

LAURENCE JAMES,

recalled as a witness in behalf of the defendant State of California, having been previously sworn, testified further as follows:

CROSS-EXAMINATION (Resumed)

BY MR. VEEDER:

Q  Mr. James, have you considered the general descriptions set up in your Table 3 of Appendix B in the light of your California's Exhibit Z?

A  I didn't get the first part of your question.

Q  Have you compared your general descriptions of the valleys as set forth in Table 3 of Appendix B with your undertaking so-called California's Exhibit Z?

THE COURT:  Which we referred to as an exhibit, but

F

Z35

1    which actually was read as part of the record, so that we
2    understand each other.
3            MR. VEEDER:  Yes.
4            THE COURT:  All right.
5    BY MR. VEEDER:
6            Q  Have you compared them?
7            A  Yes, we considered them.
8            Q  Now, in arriving at your conclusions expressed as
9    to the sources of water from the younger and the older
10   alluvium, will you look at your Exhibit L, plate 17 and locate
11   yourself on that plate and state into the record the basis
12   upon which you concluded the line of demarcation between Qal
13   and Qtoa as shown on that exhibit?
14           A  I am looking at Section K, K-prime.  First, I am
15   looking at Well 7S, 3W, 21P1, which appears about in the
16   middle of that section, and the line of the base of the
17   alluvium is drawn on the top of a fairly thick clay layer in
18   that particular well.
19           Going further eastward, there is Well 7S, 3W, 27Q2,
20   in which also there is a little clay there.
21           These were probably considered in drawing a line.
22           Q  Did you consider those in drawing the line?
23           A  I imagine they were considered, yes.
24           Q  Well, did you?
25           A  What?

James    Cross

7205

F

Z36

Q   Did you?  Did you draw the line?

A   No, I didn't actually draw the line, no.

Q   Well, did you determine where the line would be?

A   This work was done under my direction, Mr. Veeder.

Q   And you determined that that was the point, then, where the older and the younger alluvium was separated; is that right?

A   We didn't determine that that was the precise point. This was in our judgment where we thought it lay.

Q   Well, now, in other words, when you drew the line you didn't have difficulty, is that right, in differentiating between the younger and the older alluvium?

A   I didn't say that.

Q   How could you arrive at such a definite line as you have depicted there?

MR. MOSKOVITZ:  I object; I think this is argumentative, your Honor.

THE COURT:  Overruled.  I have difficulty in knowing how he could draw a line between the older and the younger alluvium when you have only well logs.

BY MR. VEEDER:

Q   How did you draw the line?

A   Well, I started to explain that those were two of the points that we figured was the place to put it.

Going further to the west, here is Well 6S, 4W, 35P2.

We have a very substantial clay layer there.

Between those two points the line is--

Q  Where are you now?

A  At the extreme northwest end of the section.  I am looking at Well 6S, 4W, 35P2.

Q  Is that in Murrieta Valley?  Does thatextend to Wildomar?  I am trying to locate ourselves here now.

A  It is northwest of the hump of older alluvium, if you are looking at the map.

Q  How does that relate to the Wildomar fault, then?

A  Here is the well.

Q  Where is Wildomar?  Is that north from there?  Or where is it?

A  It is out to the northwest.

Q  Are you stating that this whole K, K-prime is Murrieta Valley?

A  Murrieta Valley.

Q  And there is nothing shown on Wildomar at all?

THE COURT:  Well, Murrieta Valley, and you talk about Wildomar Basin.  Let's not get mixed up.  Wildomar Basin is in the Murrieta Valley.

THE WITNESS:  Here is the line of Section shown on Plate 13B, K, K-prime.

BY MR. VEEDER:

Q  In other words, it does extend--

James Cross

7207

F

Z38

A  Yes, it does.

Q  --to what you call Wildomar Basin?

A  Yes, it extends to Wildomar Basin.

Q  So your reference is then to the Wildomar Basin?

A  Well, there was one reference there.

Q  Now, in regard to your statements, then, that you made those delineations, I observe in the write-up in Bulletin 57, Volume I, that the Recent alluvium is from 100 to 125 feet. Is that your conclusion now?

MR. MOSKOVITZ: Where are you reading from now?

MR. VEEDER:  Page 74, the third or fourth line.

THE WITNESS:  Page 74, what line?  Oh, the third or fourth line.

BY MR. VEEDER:

Q  Page 74, the fourth line:  "The basin area is limited by the extent of Recent alluvium, which is bounded on the northeast and southwest by older alluvium and is generally 100 to 125 feet in depth."

A  Well, that was our guess as to the general depth.

Q  It was a guess?

A  Well, drawn in our judgment.

Q  Now, you vary that statement by your statement on page 5 where you say it is difficult to differentiate, so you didn't make any differentiation in determining your storage capacity; isn't that right?

F

Z39

1     A  We didn't in making the storage capacity; th

2     correct.

3     Q  So as a matter of fact you really have no crit

4     for differentiating between the older and the Recent alluv

5     isn't that right?

6     A  We didn't do it for computing the storage capaciti

7     Q  Then why is it important at all to distinguish

8     between the Recent and the older alluvium?

9     A  Well, because in general the older alluvium is less

10    permeable.  We know less about it.  It is highly lenticular.

11    It contains more clays. Where you see it on the surface you

12    can recognize the fact that it is a different formation.

13    Q  But you didn't differentiate when you calculated your

14    storage capacity?

15    A  On the surface we did, yes; but in the wells we

16    didn't.

17    MR. VEEDER:  Now, your Honor, I would like to have

18    this witness subject to recall, because we have undertaken

19    to check back Table A of Exhibit Z against the general de-

20    scriptions set forth in Table 3 of Appendix B and we are unable

21    to reconcile it.  We have not had the opportunity to run a

22    planimeter of this witness's designation of the Wildomar

23    Basin, a thing that we will undertake.  I will stop the cross-

24    examination now if your Honor will permit me to call him back

25    when we make these checks.

1    THE COURT:  You may call him back, in view of my under-

2    standing with you on cross-examination.  However, this matter

3    of comparing descriptions in what you call Exhibit Z with

4    descriptions in Table B-3 in the appendix in Bulletin 57 is

5    largely a matter of argument.

6    MR. VEEDER:  I thought so too when we started, but the

7    more I get into this maze--

8    THE COURT:  All right, you may have permission to recall

9    him.

10    MR. VEEDER:  Thank you, your Honor.  I have no further

11    questions.

12    THE COURT:  Anybody have any questions of this witness?

13    MR. STAHLMAN:  I have, your Honor.

14

15                        CROSS-EXAMINATION

16    BY MR. STAHLMAN:

17    Q  Does the rate of percolation bear a relationship to

18    the permeability of the material through which it percolates?

19    A  Yes, it does.

20    Q  And what other factors affect the rate of percolation?

21    A  The hydraulic gradient to the materials and the area

22    through which the water is percolating.

23    Q  Then you would say, would you, that the rate of

24    percolation, generally speaking, through such material as you

25    have observed as older alluvium would be at a slower rate than

F
Z41

1   that in the younger alluvium?

2       A  Very definitely.

3       Q  With a given gradient.  Now, you made no studies to

4   determine the rate of percolation, have you?

5       A  No.

6       Q  That has been done, however, in studies in other

7   rivers and basins, has it not?

8       A  Yes, it has.

9       Q  What is the objective of determining the rate of

10  percolation?

11      A  Well, it would be to determine the rate of recharge

12  to a particular aquifer or group of aquifers, or to determine

13  the loss from a stream bed, decrease in stream flow as a

14  result of perhaps pumping or lowering of the water table in

15  the vicinity of a stream.

16      Q  Studies have been made on rivers in this State where

17  there were younger alluvia in the stream bed and older alluvium

18  bordering upon the younger alluvium into which water was

19  determined to have percolated to charge the older alluvium or

20  the more impervious material?

F2

21      A  May I have that question back, please?

22      Q  I believe I can ask it better.  There have been

23  studies made to determine what the degree of recharge would be

24  into impervious material, that is, more impervious material

25  when it was adjacent to more pervious material in the stream

1  bed, have there not?

2      A  Yes, there have been percolation measurements made

3  in various type stream channels and surrounding terrain.

4      Q  Are you familiar with some of those?  I don't want

5  you to go into them, but generally that they have been done

6  on rivers in this State and that there have been determinations

7  of the quantity of water which would percolate into the more

8  pervious material and its relationship to the flow of the

9  stream?

10      MR. VEEDER:  May I have the question read, please?

11      (The Reporter read the pending question.)

12

13      THE WITNESS:  Well, there have been studies made.  I

14  can't cite any specific example right now where I could quote

15  you any figures.

16  BY MR. STAHLMAN:

17      Q  Well, the studies such as that would demonstrate

18  the degree of charge and recharge of the older material which

19  would bound upon younger alluvium, would it not?

20      A  That is true.

21      Q  Let's see if I understand what your conclusions are

22  in relation to the Pauba Basin.  You recognize that the younger

23  alluvium is a permeable material which readily transmits water

24  in the area in which that material exists?

25      A  That is right.  It is the most permeable material in

F

Z43

1    the area.

2         Q  What is your opinion as to the degree of permeability

3    in the Pauba area between the younger and the older alluvium?

4    Do you have an opinion in that respect?

5         A  Do you mean, are you comparing permeability of the

6    two formations?

7         Q  Yes.

8         A  In generall-- I can put it only in relative terms--

9    that the older alluvium--

10        MR. VEEDER:  I object to this; the question simply was,

11   did he have an opinion.

12        THE COURT: Answer the question.

13        THE WITNESS:  Yes.

14        THE COURT:  What is your opinion?

15        THE WITNESS:  My opinion is that the older alluvium is

16   much less permeable, in general.

17   BY MR. STAHLMAN:

18        Q  When you say "much less," can you pin it down in any

19   other respect?  Do you have any opinion as to whether it is

20   5% or 50%?

21        A  I can't give you a specific answer.

22        Q  You can't?

23        A  No.  It would vary, Mr. Stahlman, from place to

24   place, depending on the percentage of clays that were present.

25        Q  You were unable to determine from such studies as you

F

Z44

1    have made as to whether or not the flow of water through the

2    Temecula Creek through the Pauba Basin would in any practical

3    degree recharge the older alluvium that bounds it to the north

4    and south; is that correct?

5         MR. VEEDER:  Let me have the question again.

6         THE COURT:  Read it.

7         (The reporter read the pending question.)

8         MR. VEEDER:  He said that he made no studies and that

9    there are no studies made.  So I object if he attempts to

10   answer.

11        THE COURT:  He didn't say exactly that.  He made no

12   specific studies that you asked him about of wells and levels

13   on the effect of pumping.  The objection is overruled.

14        MR. STAHLMAN:  Do you have the question in mind now?

15        THE WITNESS:  I would like to have it repeated to make

16   sure I have it correctly.

17        MR. STAHLMAN:  Would you read it, please?

18        (The reporter read the pending question.)

19        THE WITNESS:  We have made no measurements, no studies

20   that would indicate to what degree transfer of water might

21   take place.

22   BY MR. STAHLMAN:

23        Q  Do you have any opinion as to whether or not there

24   would be any recharge into the older alluvium from the flow

25   of the Temecula stream?

F
Z45

1      A   Yes.

2      Q   What is that opinion?

3      A   I believe that there would be some recharge, but

4   that with the data that are available we are unable to tell

5   whether that would materially-- be of material amount or

6   quantity.

7      Q   Would there be a difference in the quantity of

8   recharge, assuming there is a recharge into the older alluvium

9   from the stream flow of Temecula Creek in quantity, depending

10   upon the distance from the source of charge?

11      A   Are you talking about pumping?

12      Q   I am talking now simply about the ability to charge

13   from the stream, assuming, of course, that the area had voids

14   and was susceptible of charge.

15      A   As I understand your question, it is--

16      Q   Let me put it to you this way and see if I am

17   correct in the assumption that I make;  Assuming that there

18   was, I believe, the greatest description we have had as to

19   how this charge between the older and the younger alluvium

20   would be was by bleeding-- does that mean anything to you?

21   That the water would bleed through?

22      A   That is not a term that we have used.

23      Q   Well, your opinion would be that the rate of charge

24   into the older alluvium would be very small; is that correct?

25      A   It could be small.  We don't know enough about it.

F

Z46

Q   Have there been areas that you have made studies of in which you have determined the rate of charge into the older alluvium?

MR. VEEDER:   I object to this until we find out the areas.   Is this limited to Pauba Basin?

MR. STAHLMAN:   No, this is just a general question.

THE COURT:   Overruled.

MR. STAHLMAN:   I mean any place in any of your studies?

THE WITNESS:   No, I have never made any percolation measurements.

BY MR. STAHLMAN:

Q   Your Department has, however, have they not?

A   They have made a number of measurements into different types of materials.   Whether one would fall into older alluvium or not, into that exact category--

Q   You are not familiar, then, with any studies your department have made with relation to any basins that have similar situation what we have here in Pauba such as the younger alluvium which is surrounded by a less permeable material?

A   I am trying to recall.   I don't think I have had anything to do with any studies where there was Recent alluvium surrounded or flanked  by older alluvium.

Q   Well, we will put it this way:   Studies that were made wherein the water traversed a highly permeable material which was surrounded by materials of less permeablity?

James   Cross   4564   7216

1          A  That is Tijuana Basin, is one that comes to my

2    mind.  The north side of Tijuana Basin we have a formation

3    which is similar in character to the older alluvium, and there

4    are some similarities.  And we made detailed hydrologic study

5    in that area.

6          Q  Did you make the study on the Lodi Basin?

7          A  No, I was not involved in that.

8          Q  Well, was your department?  Do you know anything

9    about them?  What I am trying to find out, is there--  I will

10   ask you this question:  What, in your opinion, would be

11   necessary in the way of making the tests to determine the

12   degree of or the ability to recharge the older alluvium in

13   this case from the stream system?

14         A  It would be very difficult to set up any representative

15   conditions for such a test.  Actually, the only way you really

16   get an answer to this type of problem is when, for example,

17   speaking say of Pauba Valley, if ground water levels were

18   actually drawn down and you had some way of observing the

19   effects.

20         Q  You mean by a lot of wells?

21         A  That is true; by an actual field scale demonstration.

22         Q  You have had no familiarity with some of these areas

23   where there have been the less permeable material surrounding

24   the stream system in which the degree of recharge and the

25   quantity of recharge into the older material has been determined?

G

Z32

1     A  Not quantitywise, no.  We have, as I mentioned

2  before, the Tijuana Valley, I was engaged in that, where we

3  did observe time lags and that general rise of water level in

4  the older material.

5     Q  Do you know those types of studies have been made

6  on some of the rivers of this State?

7     A  Yes, there have been studies made.

8     Q  Now then, then to clinch that particular phase,

9  then there is no manner at this time by which you could reach

10  a conclusion, in your opinion, that there was recharge into

11  the older alluvium from the stream system, the Temecula Creek

12  I am talking about in Pauba Basin in the older alluvium?

13     MR. MOSKOVITZ:  Could I have that question?  Could I

14  have that question read, please?

15     THE COURT:  Read it.

16     (The reporter read the pending question.)

17     THE WITNESS:  We know that from the observation on the

18  surface of the types of materials, what we see in the logs,

19  at least we suspect there is recharge.  In my judgment there

20  would be some.  How much, how rapid, these are things that we

21  cannot establish.

22  BY MR. VEEDER:

23     Q  Now then, when you speak of the usable capacity of

24  a basin, what do you mean by that?

25     A  Usable capacity is usually-- it refers to the amount

G

Z33

of water that can be extracted from a basin.  For example,
let me start out first by saying in gross storage capacity we
mean the total amount of extractable water or total amount of
water that the sediments would yield within the basin.  How-
ever, there are certain limitations as to how much of that water
can be extracted.  First, there must be some water in the
bottom of the well, in the bottom of the basin, so that the
water can flow into the well.  In other words, you can't ex-
tract the last drop of water, obviously.  On the other hand,
near the surface of the basin there are irregularities in the
topography, and there are certain thickness that drains quite
rapidly.  And it is, for all practical purposes, the storage
in that top layer.  It is not usable.  So we deduct those
bottom portions and top portions.

    Q  Then, there are no other factors concerned in your
use of the term "usable storage capacity" other than what you
mentioned?  In other words, you are not considering the
efficiency of the basin or whether it is in balance or a
relationship to charge?  It is just that much could be taken
out if the water were in there, is that correct?

    A  Yes, that is our feeling.

    Q  Have you made any studies to determine the rela-
tionship, historical relationship, between the charge of any
of these basins to determine whether or not there is a point
of in balance?

G

z34

1          A   There have been some studies made in this investi-

2    gation.  However, those were not under my direction.

3          MR. STAHLMAN:  May I ask, Adolph, were you going to

4    have evidence on those matters?

5          MR. MOSKOVITZ:  We are going to have testimony by Mr.

6    Illingworth and some evidence on studies other than in Pauba

7    Basin, at least those that we are now working on.

8          MR. STAHLMAN:  Well, I will not then burden this

9    witness with that matter if you have another witness for it.

10         THE COURT:  Let me inquire.

11         MR. STAHLMAN:  Yes.

12         THE COURT:  The Vail Dam was put into operation--

13         MR. STAHLMAN:  '49.

14         THE COURT:  '49.

15         MR. STAHLMAN:  Yes.

16         THE COURT:  And following its operation there was a

17   regulated flow of water down to Nigger Canyon?

18         MR. STAHLMAN:  Right.

19         THE COURT:  Regularly all year round?

20         MR. STAHLMAN:  Yes.  It wasn't a constant flow all

21   year around; it depended upon the operations of the ranch and

22   circumstances and conditions.  It is not just a steady flow.

23         THE COURT:  But there was water that flowed down in the

24   summer?

25         MR. STAHLMAN:  Oh, yes.

MALCOLM E. LOVE, OFFICAL REPORTER

G

Z35

1    THE COURT:  Where prior thereto for many years there

2    probably was no water?

3    MR. STAHLMAN:  Right.  The point of rising water was

4    much farther downstream.

5    MR. MOSKOVITZ:  Your Honor, not all the time, as I

6    understand it.

7    MR. STAHLMAN: What not all the time?

8    THE COURT:  Not necessarily all the time, but there was

9    water certain times during the summer was allowed to flow down

10   from the dam.

11   MR. STAHLMAN:  Your Honor will refer to--  We have

12   lodged with the Court-- I think this has been lodged.  I am

13   sure it has-- the Vail Lake draft.  And that is indicated in

14   acre feet, months, and the amount of water released.

15   THE COURT:  I don't know that I have got a copy of any

16   of your exhibits.  Will you make copies for me?

17   MR. STAHLMAN:  Yes.

18   THE COURT:  I won't bother you now.  I am just in-

19   quiring.  Now, there is also information on the Windmill Well.

20   MR. STAHLMAN: Right.

21   THE COURT:  Down below the spreading ground at the

22   mouth of Nigger Canyon.  And I get the impression from the

23   exhibit which the witness desired to refer to, and Mr. Veeder

24   didn't permit him to this morning, that there was some fluc-

25   tuations shown in the Windmill Well that had some relationship

G

Z36

1    to the increase to the Vail Dam.

2            MR. STAHLMAN:  Had some increase to what?

3            THE COURT:  Had some relationship--

4            MR. STAHLMAN:  Yes.

5            THE COURT:  --to putting the Vail Dam into operation.

6    A query:  Has any study been made as to the water levels in

7    any of the wells on either side of Pauba Valley after the

8    Vail Dam was placed into operation?

9            MR. STAHLMAN: Well, your Honor, I don't know whether

10   there is any studies, but we have data on certain measurements.

11           THE COURT:  What I am thinking about is this:  I don't

12   know what it will lead to.  But assume that putting into

13   operation of Vail Dam, which changed the cycling flow of the

14   river had certain effects on the windmill well.  It might be

15   interesting to know what, if any, effects were visible in some

16   of the wells off in the older alluvium.

17           MR. STAHLMAN:  I have had that same thought.  The fact

18   of the matter, I have asked Mr. Hall if it could be possible

19   to determine whether or not those old test wells that have

20   been testified to here that were drilled along the northern

21   boundary, if those could not be measured at this time.  It

22   might give some determination.

23           THE COURT:  Yes.

24           MR. STAHLMAN:  But we, in the practical operation, have

25   always considered the Windmill Well as the measuring well, and

G

Z37
Z38

1   most all measurements have been made for that well.  However,

2   I think that your Honor has given me a thought.  I don't know

3   whether at this late date it will be of much benefit, but we

4   might be able to learn something regarding that.  You recall

5   these old test wells that were put down to the north of the

6   Pauba Basin have not been utilized for years.  Some of them,

7   I don't think you could even make a test on them.  Some of

8   them you may.

9       THE COURT:  I forget which exhibit, Government exhibit,

10  was identified, one exhibit which was a series of well levels

11  on it.  Which one was that?

12      MR. VEEDER:  Contours, your Honor?

13      THE COURT:  Yes, and well levels.

14      MR. VEEDER:  15-A.

15      MR. STAHLMAN:  Right here is the one, I think.  Is

16  this the one your Honor has reference to?  And the wells--

17      THE COURT:  No, 15A is not-- Oh, yes.

18      MR. VEEDER:  It has got the contours on it, your Honor.

19      THE COURT:  It was 15A.

20      MR. STAHLMAN:  Your Honor will recall these wells here

21  that are indicated as, taking Section 6 down to 8, Range 1,

22  starting in there, there is a well B1.  Going right down the

23  side there is a well B2.  K1.  Wells with a line through them,

24  I think that is the designation they are not in use.  There

25  was a series of test wells that were put down years ago.

G

Z39

1    THE COURT:  That is what I am thinking about.  Some of
2  those wells are listed on the map as abandoned wells.  But
3  water levels were obtained in them at certain times.

4    MR. STAHLMAN:  There was, yes.

5    THE COURT:  Because on the basis of the Government's
6  15-A certain contours were drawn, and I remember some discussion
7  about the relationship between these levels.  I don't know
8  what the dates of these water levels were.

9    MR. STAHLMAN:  Those wells were put in-- and I don't
10  think they have been measured for a good many years.  I think
11  they were put in around 1905 or thereabouts.

12    MR. VEEDER:  The test wells are 27.

13    MR. STAHLMAN: '27.

14    THE COURT:  Are what, Exhibit 27?

15    MR. VEEDER:  They were drilled in '27, your Honor.

16    MR. MOSKOVITZ:  Your Honor, you made an inquiry a
17  moment ago as to the releases from Vail Dam. There is an
18  exhibit that shows that if you want to refer to it.  It is
19  Exhibit 20.

20    MR. STAHLMAN: Following your Honor's thought with the
21  query, I would like to state the position that I have in
22  relation to this matter.  We are truly somewhat perplexed
23  and realize the significance and magnitude of the determina-
24  tion as to whether or not there is a recharge into these
25  areas in which there has been some development and will be

James   Cross

1  some more undoubtedly, and what the relationship will be to

2  the--

3       MR. VEEDER:  Here is Exhibit 20, your Honor.

4       MR. STAHLMAN: And that is what I am searching for:  If

5  there is some proposal of what may be done within economic

6  limits to determine these questions.

7       THE COURT:  15-A says that, at the bottom:  "Geology,

8  location of select wells and water level contours for October,

9  '58.  Now, contours then were drawn in by Mr. Kunkel for

10  October of '58.  However, somewhere along the line while we

11  were considering this I picked up the elevation of waters on

12  certain of these wells and wrote them on this map.  And I

13  don't remember what date those water levels were, but it was

14  at the time when I asked whether or not there wasn't some

15  relationship to these water levels shown in the older alluvial

16  and the younger alluvial because of the way in which these

17  water levels seemed to have on the map some relationship one

18  to the other.  I don't know when those water levels were taken.

19       MR. STAHLMAN:  One was in '53.  That was on Exhibit 15.

20  And wasn't that taken in '53?  Wasn't that the first?

21       MR. KUNKEL:  I believe it was.

22       MR. STAHLMAN:  '53 and 15-A was in '58.

23       MR. VEEDER: Well, Schrode well is what your Honor has

24  inquired about.  That well has dropped about 25 feet since

25  1927.

THE COURT: Let's not spend any more time on it now.
What I am thinking about here was a definite change in the
regime of Temecula Creek when the Vail Dam went into opera-
tion. I assume that prior to that time there was a lot of
water came down in flood time.

MR. STAHLMAN: No, your Honor. Since the Vail Dam has
been in operation there has only been two years in which
there was any heavy rainfall. We have been going through a
period of drouth. And I don't think the small amount of water
that -- fact of the matter, there were years in which there
was practically no water that would have gone down that creek.

THE COURT: In the wintertime?

MR. STAHLMAN: Yes. There have been some very, very
dry winters there.

THE WITNESS: We have rainfall.

MR. SACHSE: Here is the charts.

THE COURT: What I think happened was that prior to the
construction of Vail Dam, when you would have your storms in
the valley, there must have been water that flowed down the
Temecula past the dam site.

MR. STAHLMAN: Yes.

THE COURT: In large quantities.

MR. STAHLMAN: Yes. There was in years when we had
rainfall.

THE COURT: Then, following the construction of the

G2

z42

1   dam when there was flood water, it was impounded, and instead

2   of water coming down cyclically in the winter and none in the

3   summer, after the construction of the dam, there has been

4   more of a planned release so that water was released very

5   often in the summer down that creek to maintain the flow at

6   the mouth of the Santa Margarita.

7        MR. STAHLMAN:  Now, may I make an explanation that I

8   think may throw some light on what your Honor is thinking about.

9   We know that the studies as to the history of what the dam

10  would produce according to the State Engineer, and this has

11  been testified to in several cases, that the Vail Dam, it was

12  built as a result of the studies that there would be in

13  addition to the ability to impound what waters flowed at that

14  place an overflow of 6,000 acre feet per year.  Now, that is

15  the historical trend that would have occurred if we hadn't

16  had this dry period, and the rainfall.

17       THE COURT:  You mean the dam would have filled up and

18  there would have been 6,000 acre feet flow over the top?

19       MR. STAHLMAN:  6,000 acre feet per year, per year.

20       MR. SACHSE:  I think I have to object to this.  This

21  is testimony now?

22       THE COURT:  No, it is not testimony.

23       MR. STAHLMAN:  No.

24       THE COURT:  I understand that there is a difference

25  between a statement by counsel and testimony.

G2

Z43

1    MR. SACHSE:  We have right before us in Government's

2    Exhibit 20 the exact runoff figures below Vail Dam.  It shows

3    that starting in November, 1949--

4    MR. STAHLMAN:  I wish I could make a statement to the

5    Court without interruption from counsel.  I try to respect

6    other counsel without interrupting.

7    THE COURT:  Go ahead, Mr. Stahlman.

8    MR. STAHLMAN:  Since the dam has been built the maximum

9    amount of water that was ever stored behind the dam in '52

10   was 14,000 acre feet.  And the last rain that we had last

11   year we never received over 11,000 acre feet in the dam.  So

12   you see if we attempt to obtain study or reach conclusions as

13   a result of the study of these water levels in relation to

14   Vail Dam we did not have during, unfortunately, the period

15   of time in which this dam was constructed a realistic picture.

16   MR. SACHSE:  That is very true.

17   MR. VEEDER:  I move to strike counsel's statement as

18   realistic, because what we have, what we can expect in the

19   future.

20   THE COURT:  The motion is denied.  It is not evidence,

21   gentlemen.  You know that.

22   MR. VEEDER:  I was moving to strike Mr. Sachse's

23   statement, because he is trying to build a dam down there

24   without any water.

25   MR. STAHLMAN:  The Court is thinking about something

G2

Z44

1   that I have some concern about.  And if there is some way in

2   which we can determine--

3        THE COURT:  That started me thinking about this was

4   this exhibit that is not in evidence, Plate 12.  It refers to

5   Well 8S, 2W, 12HI, which, I think, was supposed to be the

6   Windmill well.  Now, whether this chart was accurate or not

7   is another matter, but there are water levels on the Windmill

8   well.  And if this chart has any merit at all, there was an

9   obvious change occurred in the area of the Windmill well after

10  the Vail Dam went into operation.

11       MR. STAHLMAN:  Yes.  And there was certainly a change in

12  the weather at that time also.  I mean, we started in at that

13  time with-- the rain charts will show that simultaneously--

14  if there is anything that was badly timed it was building of

15  the Vail Dam.  Nobody knows it better than Vail.

16       MR. VEEDER:  Having the driest year in the years,

17  aren't we, right now?

18       MR. STAHLMAN:  We have a dam full of air.

19       MR. MOSKOVITZ:  Just like our courtroom.

20       THE COURT:  Well, you know what I am thinking about.

21       MR. STAHLMAN:  Yes.

22       THE COURT:  Find something out about it.

23       MR. STAHLMAN:  If that is true, your Honor, if there

24  had been released down that river which could have shown a

25  response in these wells, that may be something we could hang

James   Cross   7229

G2

Z45

1    our hat to.  What I am thinking about is when we come to the

2    legal significance of this evidence.

3            MR. VEEDER:  What evidence?

4            MR. STAHLMAN:  As to whether or not it has been estab-

5    lished that there is a charge into the older alluvium from

6    the stream system.

7            MR. VEEDER:  Oh, I thought you were talking about --

8            THE COURT:  Go ahead, Mr. Stahlman.  I interrupted you.

9            MR. STAHLMAN:  All right.

10           Q  Now, you spoke about mining water.  Do you have an

11   opinion as to the character, kind or the manner in which the

12   waters were deposited in the older alluvium, for instance at

13   the depth of 2500 feet in the Pauba Basin?

14           MR. VEEDER:  I am going to object on the ground this

15   man is not qualified.

16           THE COURT:  Overruled.

17           THE WITNESS:  These waters, regardless of the depth,

18   in my opinion, entered sediments as percolating rainfall

19   penetration, and some from the seepage from the streams and

20   tributaries, and so forth, over a long period of years.

21   BY MR. STAHLMAN:

22           Q  When you say "a long period of years," what does

23   that mean to you?

24           A  Well, undoubtedly some of the waters were included

25   about the time that these materials were laid down; something

G2

Z46

1    less perhaps than a million years.

2         Q   About the Quaternary period?

3         THE COURT:   You were interrupted.   What?   How long

4    ago?

5         THE WITNESS:   Oh, something on the order of, oh, a

6    little less than a million years, perhaps.   This water does

7    move, and it is replaced.   But the first waters were introduced

8    many years ago.

9         THE COURT:   You are not intimating any of that water

10   of a million years ago is still there in the ground, are you?

11        MR. STAHLMAN:   I think so.   Don't you?

12        MR. VEEDER:   I move to strike counsel's statement.

13   BY MR. STAHLMAN:

14        Q   Well, do you?

15        A   A million years is a long time.   I think probably

16   it is pretty well flushed out.

17        Q   Do you think that the older continental deposits

18   were laid down, how long ago?

19        A   I couldn't tell you in years.   The way we classify

20   those are by the geologic ages, and we classified them Upper

21   Pleistocene, which is--

22        Q   Upper Pleistocene?

23        A   That is geologically speaking a relatively --

24        Q   Well, your Recent period is--

25        THE COURT:   Let's let him finish.   There must be some

G2

Z47

1   age period for that general Upper Pleistocene period, isn't

2   there?   Age length?

3       THE WITNESS:  The Recent generally starts about, oh,

4   ten to twenty thousand years ago, is the general feeling on

5   it.  So that the Upper Pleistocene would be below that and

6   would extend from ten to twenty thousand years.  I guess the

7   Pleistocene is somewhere on the order of a million years in

8   length.  We are not used to talking of these things in terms

9   of years.

10      THE COURT:  So from 20,000 years ago up to a million

11  years ago, is that Upper Pleistocene?

12      THE WITNESS:  That is Pleistocene, and the Upper

13  Pleistocene--

14      MR. VEEDER:  I like things exact.

15      THE COURT:  What was that?  All that was of no conse-

16  quence, Mr. Witness.

17      The Upper Pleistocene is what part of the Pleistocene?

18      THE WITNESS:  Well, it is the most recent part, your

19  Honor.  It is deposited more recently than the lower.

20  BY MR. STAHLMAN:

21      Q  Those two make up the what you call it, the Quaternary?

22      A  The Recent Pleistocene constitutes the Qaternary.

23      Q  Quaternary, yes.

24      Well, then, these, when you talk about mining waters,

25  what do you mean?

G

Z48

1    A  That is not a very technical term, but it is a term

2  that implies that water is being extracted from a basin and

3  not being replenished or at least being replenished very much

4  slower than it is extracted over a long period of time.

5    Q  You extract beyond the ability of the source to

6  supply--

7    A  That is correct.

8    Q  -- the amount extracted?

9      Now, this continental deposit when it was taken down

10  carried waters into the lower basin with it because it is in

11  the basin which it constructed at that time, did it not?

12    A  It carried waters with it, you say?

13    Q  Yes.

14    A  Well, the waters carried sediments.

15    Q  The waters carried the sediments and, of course, the

16  waters remained in some of those lower places since that

17  period of time, have they not?

18    A  They were present since the time of deposition, but

19  they do move, and they are flushed out. We have a term for

20  trapped water, which are called connate waters.

21    Q  Connate waters or fossilitic waters?

22    A  That is synonymous.

23    Q  Do you consider any of these waters of that character?

24    A  No, I don't have any reason for suspecting that they

25  are connate. Connate waters are frequently very highly

G

Z49

1    mineralized, since, due to this long stay within the sediments,

2    they do dissolve certain minerals.  That, to my knowledge, the

3    waters in this area are not highly mineralized; although there

4    are connate waters that are fresh.  But I have no reason for

5    thinking this.

6        Q  You are talking about determining the level of the

7    newer alluvium.  What is the criteria by which you determine

8    the depth?

9        A  We, of course, look at it on the surface.  Get some

10   indication from the slopes of the hills on either side.  We

11   exercise our judgment, you might say.

12       Q  Do you subscribe to the history, as has been out-

13   lined here, that at one time this was a river which had its

14   outlet up through Elsinore into the Santa Ana River?

15       MR. SACHSE:  Would you identify the exhibit, please,

16   Mr. Stahlman?

17       MR. STAHLMAN:  Exhibit 16 is what we are looking at.

18   But I am talking now about the general conditions of the

19   Santa Margarita and Temecula Rivers.

20       THE WITNESS:  Yes, that seems a reasonable explanation

21   that--

22   BY MR. STAHLMAN:

23       Q  And then, at some particular period of time by

24   reason of the fact that a gradient was changed here at the

25   outlet at Temecula Gorge, it flowed the other way; is that

James      Cross                                                 7234

G

Z50

1    right?

2              A   Yes, we had what is known as stream capture, stream

3    piracy occurred at sometime in the past.

4              Q   And prior to the time that the river changed its

5    course do you have an opinion as to whether or not any of the

6    younger alluvium was laid down?

7              A   Offhand, no.   At the moment I don't recall of any

8    reason, think of any reason.

9              Q   In the Pauba Basin have you determined the depth

10   of the alluvium at any time to be lower than the elevation

11   at which the water flows out of the Pauba Basin and through

12   the Temecula Gorge?

13             THE COURT:   By "alluvial" do you mean the younger?

14             MR. STAHLMAN:   The younger alluvium.

15             THE WITNESS:   I have to check the elevation of the

16   lip of the gorge and then the depth of the alluvium farther

17   upstream.

18   BY MR. STAHLMAN:

19             Q   Assuming this map here, 16, Government's Exhibit is--

20   You subscribe to the general depth of the younger alluvium

21   as is shown on Exhibit 16?

22             A   In general, they show about 130 feet, I think, on

23   theirs, and we showed about 170 on ours.   This is a point that

24   we didn't discuss this morning, the fact that the Government

25   does show 130 feet of alluvium in the Pauba Valley.

G

Z51

Q You recognize the fact, however, that as is shown on the exhibit, that the depth starts in from a zero quantity at the point of overflow at the fault and then gradually increases until upstream, that is to the east, until it reaches a point on the map as Well 8/2-1 2H1 projected, and from that point on it then recedes again to a period of zero up in the basement complex? Do you see that on the map?

A Yes.

Q In your opinion, is that about the way that new alluvium is laid down?

A That appears reasonable, as far as we can tell.

Q Do you then have an opinion as to whether or not it was laid down after the piracy of the river?

A This whole situation is somewhat complicated by the fact that there has been recent movement along a number of these faults, for example, the Wildomar fault and the Willard fault. These things affect deposition and the times of deposition, and it is hard to unravel those things. In other words, I am saying I can't give you a firm answer to your question.

Q And you have no opinion as to whether or not the younger alluvium in the Pauba Basin is lain down after the river changed its course?

A I haven't given it any study, Mr. Stahlman.

Q Would it have any significance to you in determining

G

Z52

the depth of the older and the younger alluvium?

      A  Significance in what respect?

      Q  As to what the depth would be.

      A  Offhand, I don't see any significance.

MR. STAHLMAN:  That is all.

MR. SACHSE:  I have just about one or two, your Honor.


                    CROSS-EXAMINATION

BY MR. SACHSE:

      Q  Mr. James, I will direct your attention to Exhibit 15-A of the United States.  That exhibit also shows ground level contours, surface contours-- in other words, they are rather dim lines-- does it not?

      A  Yes, it does.

      Q  Am I correct in stating that the fingers of younger alluvium show, extending northeastward from Murrieta Valley, are, in fact, valley areas, are they not?

      A  Yes, they are.

      Q  Being such, they would naturally receive the greatest proportion of the surface runoff, would they not?

      A  Yes, the water from the adjoining lands would concentrate in those valleys.

      Q  Would necessarily drain to the valleys and there would be a greater concentration of surface water in periods of precipitation in the areas of younger alluvium than there

G

Z53

1   would be in the non-valley areas of older alluvium?

2        A   That is correct.

3        Q   And likewise, you have expressed the opinion that

4   the younger alluvium itself is more permeable on the surface

5   than the older alluvium on the surface?

6        A   That is my opinion.

7        Q   So the surface runoff in those valleys would naturally

8   percolate through the younger alluvium more rapidly in the

9   valleys than it would through the older alluvium on the

10  hilltops, is that right?

11       A   That is my feeling.

12       Q   Would you not then expect it to be entirely natural

13  that areas of older alluvium that underlay surface younger

14  alluvium receive much more rapid recharge than surface areas

15  of older alluvium?

16       A   There would be more water in that vicinity, true.

17       Q   More water to accomplish a recharge?

18       A   Correct.

19       MR. SACHSE:   I have nothing further.

20

21                    REDIRECT EXAMINATION

22  BY MR. MOSKOVITZ:

23       Q   Mr. James, yesterday you were examined concerning

24  the surface area of Murrieta Basin as set forth in Table B-3

25  of Appendix B and also in Exhibit Q, State's Exhibit Q, as

compared with the surface are which can be planimetered from

State's Exhibit L, Table 15-2, the overlay.

MR. VEEDER:  Now, I object to that.  It is not a

correct statement.  It can't be planimetered.  He said it

couldn't.  He said he didn't have the right overlay and,

therefore, it couldn't be planimetered.  That is exactly what

he said.

THE COURT:  Overruled.  He is referring the witness to

something.  He hasn't even asked the witness yet.  He is

directing the witness's attention to a matter.  Go ahead.

BY MR. MOSKOVITZ:

Q  And you referred also yesterday to acreages which

could be planimetered from the overlay, Exhibit L, Table 15-2?

THE COURT:  Speak up.

THE WITNESS:  Yes.

BY MR. MOSKOVITZ:

Q  Now, have you compared the total acreage which is

indicated from Murrieta Basin on the surface in Exhibit Q and

Table B-3 with the total area which is derived from planimeter-

ing the overlay, Exhibit L, Table 15-2?

A  Yes, I have that comparison.

Q  Would you give the comparison, the total acreage

between those two?

A  Figure given in State's Exhibit Q is 4,415.

Q  Acres?

G

Z55

1      A  Acres, yes.  And that determined for Exhibit L 15-2,

2  was 4,227.

3      Q  And what is the percentage difference between those

4  two figures?

5      A  Well, there is a difference of 188 acres and a

6  percentage difference of 4.3 is approximately.

7      Q  4.3%?

8      A  Percent, yes.

9      Q  Did you calculate what the storage capacity would be

10  in Murrieta Basin, using the planimetered acreages which would

11  be derived from the overlay, Exhibit L, Table 15-2?

12      A  Yes.

13      Q  And how did you make those computations?

14      A  First off, we planimetered the exhibit L, 15-2 our-

15  selves.  We checked the results of that planimetering with

16  results that were given us by the Government, Mr. Bohn.  And

17  there were two sets of figures given us by the Government which

18  differed slightly for each other, that is, for the areas of

19  the subareas of Murrieta Basin.  Both of these were fairly

20  well in agreement with our figure.  However, for the purpose

21  of making a comparison, why, we took the figure of area that

22  the Government had which was the farthest from our figure.

23      Q  Which figure?

24      A  Our figure of area.

25      Q  From what exhibit?

A  From Exhibit, from the one that occurs in Table B-3 of Bulletin 57.  We then, with this figure, these figures which were farthest from ours, followed the procedure set forth in State's Exhibit Q and computed both gross and usable storage capacity based on those figures and folowing that procedure.

Q  What gross storage capacity did you come up with in making that computation, computation of the basis of the planimetered area from the overlay Exhibit L, Table 15-2?

A  I came up with 137,000 acre feet as compared to 146,000 acre feet as set forth in Table B-3.

Q  And what is the percentage difference in the gross storage capacity between those two figures?

A  6.2%.

Q  Which one is the lower of the two?

A  California's-- the one in Table B-3 was the larger of the two.  The one taken from L 15-2 was the smaller.

Q  And did you make a computation of usable storage capacity of Murrieta Basin using the planimetered area from the overlay, Exhibit L, Plate Table 15-2?

A  Yes, we did.  And the result of that showed 120,000 acre feet of usable storage capacity as compared with 136,000 acre feet in usable storage capacity, the latter figure being that from Table B-3.

Q   And what is the percentage of difference between those two figures?

A   There was 5.9% difference.  Again, the figure appearing in Table B-3 being the larger of the two.

Q   Mr. James, I want to direct your attention to Exhibit L, Table 15-1, which is the large areal geology map.

Now, yesterday, at Mr. Veeder's request, you drew two lines in pencil, with your initials near them, on the younger alluvium depicted in the area between the town of Murrieta and the town of Wildomar.  What did you mean to indicate by those two lines?

A   Those were my thought as to the general location of the boundaries of the Wildomar Basin in those particular areas. They were not specific boundaries, but just in general where we had them.

Q   Did you mean, in drawing those lines, that they could be utilized in making a planimeter of the area for purposes of showing area in making gross and usable storage computations?

MR. VEEDER:  I object to the question, your Honor.  It is not for him to ask what the man meant.  The man testified here to the locations.  Whether or not he had a reservation in his mind is beyond the scope of the examination.

THE COURT:  Sustained.  He was asked by me to put in the demarcation of what he considered the end of the Wildomar Basin and the beginning of the Murrieta Basin.  That is one

H

Z48

1 line.  The other line he drew was showing the arm that was

2 lopped off when they were computing the Wildomar Basin.

3     MR. MOSKOVITZ:  Your Honor, I didn't want the impression

4 to be left that by using those lines someone could planimeter

5 and come up with a figure which he felt was the accurate area.

6 If there is no misapprehension as to that, that is all right.

7 But I thought such an understanding was left.

8     MR. VEEDER:  It was left, and we are proceeding on it,

9 your Honor.

10     THE COURT:  Ask him.

11     MR. MOSKOVITZ:  I asked him that very question.

12     THE COURT:  You didn't ask him that way.

13     MR. MOSKOVITZ:  All right.

14     THE COURT:  Would it be possible to planimeter Wildomar

15 Basin on the basis of those lines that you drew?

16     THE WITNESS:  No, you couldn't come up with anything

17 that would compare with the boundaries of the original basin.

18     THE COURT:  Why not?

19     MR. MOSKOVITZ:  Perhaps you can observe the lines, your

20 Honor, how broad they are.

21     MR. VEEDER: Mr. James put them on there.

22     MR. MOSKOVITZ:  That is the point.  You can't just

23 free-handedly draw a line and--

24     THE COURT:  Why not?  Why couldn't you planimeter that

25 basin that you showed me as Wildomar Basin?

1    THE WITNESS:  You could planimeter it, your Honor, but

2 you have no assurance that those were exactly the same lines

3 that were used before.  There is some latitude used when you

4 draw basin boundaries.  I couldn't pretend to come up to this

5 map and just lop off a line in there that would fall precisely

6 on the line that was used for the first planimetering.

7    MR. VEEDER:  I submit that that is just exactly what

8 he did, your Honor.  He stepped up at our request and, without

9 equivocation, he said, "I will draw the line."

10    MR. MOSKOVITZ: This is really misstating the evidence.

11    MR. STAHLMAN:  This isn't my fight, your Honor, but I

12 remember the testimony.

13    THE COURT:  I do, too.  Take a short recess.

14    (Recess.)

15    MR. MOSKOVITZ:  I have no more questions on redirect

16 examination, your Honor.

17    MR. VEEDER:  I have a question or two in regard to the

18 location of the Wildomar Basin, then.

19

20                    RECROSS-EXAMINATION

21 BY MR. VEEDER:

22    Q  If you have backed away from your statement as to

23 where the basin was located, can you tell us how we would find

24 out-- not that we would expect you to know, but how would we

25 find out the area that you utilized?

H

Z50

1          A   I think this has been explained, Mr. Veeder.   First,

2     I would like to say that I don't feel I backed away on that.

3     I showed you approximately the boundaries in those two areas,

4     but I didn't give you boundaries which would give you the

5     same planimetered area that was utilized in preparing the

6     estimates that appear on Table B-3.   The overlay that was used

7     to obtain the area of the Wildomar Basin, we no longer have

8     that.   We can't find it.   I can't give you the precise boundar-

9     ies for planimetering purposes.

10          Q   For any purpose?

11          A   I can give you the general idea of where they are.

12          Q   And you think we can planimeter the general idea?

13          A   No, I just told you I couldn't give you the precise

14     boundaries for planimetering.

15          Q   Then how can you justify the figures that you have

16     set forth in your Appendix B and also in Volume I of the

17     Bulletin?

18          MR. MOSKOVITZ:   I object.   I think that is an argumentative

19     question.   The basic information has been given.

20          THE COURT:   Overruled.

21          THE WITNESS: We have given the areas of the subareas that

22     were utilized, the areas that make up the basin.   Those are

23     in our computation sheets.   The size of the thing in general

24     is known to you.

25          THE COURT:   He doesn't have the tracing, That's all.

H

Z51

1    Let's go on to something else.

2    BY MR. VEEDER:

3        Q   Now, you testified that "The Upper Pleistocene epoch

4    was characterized by the deposition of the Pauba formation,

5    faulting, and by headward erosion by the Santa Margarita

6    River resulting in the eventual capture of Murrieta and

7    Temecula Creeks and the change of drainage direction to the

8    present southwesterly course through Temecula Canyon."

9        MR. MOSKOVITZ:  Where are you reading from, Mr. Veeder?

10       MR. VEEDER:  Appendix B, page B-42.

11       Q   Now, when Mr. Stahlman was cross-examining you, you

12   stated that you didn't know.  Now, have you forgotten that

13   you had written that?  Or how did you know, if you knew when

14   you wrote--

15       A   What did I say?

16       MR. MOSKOVITZ:  I object to this question, your Honor.

17   I think Mr. Veeder has misstated the evidence.

18       THE COURT:  I didn't hear the last part of the question.

19   What was it?

20       MR. VEEDER:  The point of it is, your Honor-- it is

21   very simple-- he testified that he didn't know when the Santa

22   Margarita River pirated the Temecula River, but in his testimony

23   on B-42 he says that it took place in the Upper Pleistocene

24   epoch.

25       THE COURT:  There is nothing inconsistent in what he

     said.  The objection is sustained.  An epoch is a long period

of time.

MR. VEEDER:  He said he didn't know when it took place.

MR. MOSKOVITZ:  That is not what he said.  He said he didn't know whether the Recent alluvium--

THE COURT:  The objection is sustained.  Let's go on to something else.

BY MR. VEEDER:

Q  Would it not make a difference in regard to the characteristics of the younger alluvium as to when the pirating took place, Mr. James?

A  The pirating would have some effect on the deposition of the Recent alluvium, but there are also other factors that would affect its deposition as well.

Q  Do you think that the fact that it took place during the Pleistocene period would not have resulted in the alluvium being laid in in a straight line rather than in the swaled and swayed lines that are shown on both the Government's exhibit and on--

A  Well, in regard to the first part of your question, if it were deposited in Pleistocene time it wouldn't be Recent.

Q  Then how can you explain the fact that the depth of the so-called younger alluvium is so much shallower at the lip where Temecula Creek flows into the Temecula Canyon?

A  It is much shallower than what, Mr. Veeder?

Q  Than the deeper areas of the younger alluvium in the

H

Z53

1   Pauba Valley? Or did you know that that situation existed?

2        A  Well, we have sections that depict what happened.

3   This can be explained in several ways.  I don't know exactly

4   what happened.  There are many complexities in the geologic

5   processes.  For example, movements along any of those faults,

6   a raise of the lip of the Temecula Gorge by uplift along Willard

7   fault would affect the depth of alluvium in that area.  Also,

8   I suspect that movements on the Wildomar fault could have some

9   effect.  Just what happened we don't know.

10       Q  Did you intend, when you testified that there has

11  been a change in the gross and in the usable storage capacity,

12  to amend your testimony in regard to Appendix B, Table 3?

13       MR. MOSKOVITZ:  I object, your Honor.  That assumes that

14  he testified that it has been changed.

15       THE COURT:  Sustained.

16       MR. VEEDER:  He said there has been a difference, your

17  Honor.

18       THE COURT:  All the testimony that Mr. Moskovitz brought

19  out was this, that if you took the overlay about which there

20  has been some argument that you got a figure that was within

21  four to 6.2% of what you got as shown in B-3.  All these matters

22  are approximations.  The Government's case is an approximation.

23  The Government says they are going to take 100 feet of water-

24  bearing aquifer.  It would be just as easy to say we are going

25  to take 80 feet, it would be just as easy to say we are going

H
254

1   to take 120 feet.  No one can tell whether the sides go down

2   vertically or go down at a slant.  We would ordinarily suppose

3   where you have a fault line the chances are that you have

4   probably a more perpendicular wall to a basin than if you

5   haven't a fault line.  But these are all approximations.

6   MR. VEEDER:  I have no further questions, your Honor.

7   THE COURT:  You don't expect me to think that your

8   witnesses are going to be able to judge the water in these

9   basins down here to a quarter of a gallon, do you?

10   MR. VEEDER:  No, your Honor.

11   THE COURT:  Or even a few thousand acre feet?

12   MR. VEEDER:  But they did their own work, your Honor.

13   That is very important.

14   I have no further questions.

15   I will call Mr. Hofmann.

16   MR. MOSKOVITZ:  I wonder if Mr. James can be excused,

17   and also, your Honor, if he is subject to recall, if he can

18   have notice of a week or so.  He is very busy on a number of

19   other projects and it would be convenient to him if there could

20   be advance notice of a week.

21   THE COURT:  We will try to give him a week's notice.

22   That should be enough.

23   MR. MOSKOVITZ:  Yes.

24   THE COURT:  You will be subject to recall and you will

25   be temporarily excused.

THE WITNESS:  Thank you, your Honor.

MR. MOSKOVITZ:  One other matter comes to mind with respect to the State's witnesses.  At one time Mr. Veeder said that he wanted to call Mr. Holsinger.  I wanted to tell you Mr. Holsinger's present status.  He has been reappointed as Chairman of the Water Rights Board and he is expected to serve until his compulsory retirement age is reached in July.

MR. SACHSE:  Mr. Veeder started to call a witness, and I certainly don't want to interrupt him.  But I have a very limited amount of evidence I would like to offer dealing with this upper watershed and the questions of what ground waters are or are not part of the stream.  Perhaps it is not particularly important when it is done, but we have been doing all this and if you want to do it now I would like to go ahead with it.  It is entirely up to Mr. Veeder and your Honor.

MR. VEEDER:  What witnesses were you going to call?

MR. SACHSE:  You and Col. Bowen.

THE COURT:  What witness were you going to call, Mr. Veeder?

MR. VEEDER:  I was going to call Mr. Walter Hofmann back here  and fill in a few odds and ends in regard to water.

MR. SACHSE:  I would like to call Mr. Veeder purely for one or two preliminary questions-- I have to get them some way, and then I would like to call Col. Bowen.

MR. VEEDER:  In regard to ground water?

1    MR. SACHSE:  Just a couple of preliminary questions.

2    THE COURT:  What does your witness concern?

3    MR. VEEDER: We would bring to date the hydrology, for

4    one thing, the 1958 runoff records, and we would also put

5    in some testimony in regard to the Vail Reservoir during its

6    history of operation.

7    MR. SACHSE:  I am directly concerned with the geology.

8    MR. VEEDER:  I am perfectly willing-- what am I saying?

9    THE COURT:  What are you willing?

10    MR. VEEDER:  I don't care what he does.  If he wants to

11    call Col. Bowen--

12    MR. SACHSE:  If I may proceed, I would like to call Mr.

13    Veeder.

14    THE COURT:  All right.

15    MR. VEEDER:  I never thought I would be a witness.

16    THE COURT:  Take the witness stand.

17

18                    WILLIAM H. VEEDER,

19    called as a witness in behalf of the defendant Fallbrook Public

20    Utility District, being first duly sworn, testified as

21    follows:

22

23                    DIRECT EXAMINATION

24    BY MR. SACHSE:

25    Q  Mr. Veeder, for the record, you are the counsel in

H

Z57

1  charge of these proceedings for the United States, are you

2  not?

3      A  I think that asks for a legal conclusion, your

4  Honor.  Yes, I am.

5      Q  In the last eight months you and the attorneys under

6  your supervision in this case have executed or entered into a

7  number of replies to requests for admissions made by me; that is

8  correct, is it not?  I have a great number of the originals

9  here in the file, if you want to refresh your recollection,

10  Mr. Veeder.

11      A  I would like to if I could.

12      MR. STAHLMAN:  Let the record show a long silence.

13      THE WITNESS:  I want the record to show a long silence,

14  because I don't remember what the man is talking about.

15  BY MR. SACHSE:

16      Q  Do you not recall receiving numerous requests for

17  admission from my office?

18      A  I think that they came to the Office of Ground Water

19  Resources.  I am sure they did.  Maybe they came to me, Mr.

20  Sachse.

21      Q  If you care to examine any of these slips-- I am

22  handing the witness now Volume 13 of the record in this case--

23  I think each one of them will be a reply to one of my requests

24  for admission.

25      A  The ones I am looking at, Mr. Sachse, I don't know

that I signed any of them.

Q   Were those signed by attorneys on your staff?

THE COURT:   Acting under your general direction as being in charge of this case?

THE WITNESS:   Well, I would like to look at each one of them.  I really would.  I think there were some signed under my direction, but I would like to examine them.

THE COURT:   Are you running the prosecution of this action, or is some Marine officer or Colonel, or Captain Powell over here running it?

THE WITNESS:   I might blame it on him at that.  No, your Honor, I am in charge.

THE COURT:   Such errors that may have occurred or corrections that you may have to make in legal documents that are filed you have to be responsible for?

THE WITNESS:   Yes, your Honor.

MR. SACHSE:   Just about one more question.

Q   Now, I presume that you set up some sort of procedure--

Withdraw that.

In some of these answers, for example--

A   It's sort of silly, isn't it?  He could have asked me this out of court.  I have no objection.

Q   I would like to have it in the record.  For example, in the answer in the case of Tom Turner I find a statement that these ground waters are not a part of any surface or subsurface

H

Z59

1    stream or subsurface basin of the Santa Margarita River or its

2    tributaries.  My question is, did you set up any procedure or

3    system whereby you obtained geologic and engineering informa-

4    tion to enable you to make that statement?

5        A   I observed the matter that you presented to me was

6    signed by David Miller, I believe, and the circumstance under

7    which David Miller signed that I have no knowledge about.

8        THE COURT:  Haven't you set up some sort of control?

9        THE WITNESS:  Of course we have.

10       THE COURT:  So that you know which areas are involved

11   where you answer to requests for admissions that the water is

12   vagrant percolating water or is not part of the stream or its

13   basin?

14       THE WITNESS:  The matters, your Honor, have always been

15   under the immediate direction of Lt.-Col. Bowen, and there is

16   no doubt that we do have a procedure for checking these matters

17   out. If an error has been made, I would like to know what Mr.

18   Sachse is talking about and we might straighten it out.

19

20

21

22

23

24

25

1          THE COURT:  I don't think he is talking about any

2   error.

3          MR. SACHSE:  I am not looking for an error.  I want

4   to know what system, if you would be kind enough to tell me,

5   to whom you referred these requests, whom you asked to make

6   the engineering or geological study that enabled you to answer

7   the question.

8          THE WITNESS:  The Office of Ground Water Resources at

9   Camp Pendleton.

10          MR. SACHSE:  That is all I want to know.

11          Q  And those answers, then, were based upon information

12   supplied to you by personnel of the Office of Ground Water

13   Resources; isn't that correct?

14          A  Well, we will put it this way.  The matters were part

15   of the litigation and they were handled in that manner.  They

16   went to the Office of Ground Water Resources.  Anything that

17   was done I am responsible for.  I will assume the responsi-

18   bility.

19          Q  You then, of course, have no direct personal knowl-

20   edge as to what personnel of the Office of Ground Water

21   Resources made any particular study?

22          A  None other than under the Colonel's direction.

23          MR. SACHSE:  That's all I want to know.

24          THE COURT:  In other words, you don't know of your own

25   knowledge, but you could probably look through the records

1  and find out who checked up on a particular piece of property?

2      THE WITNESS:  There is not the slightest doubt of that.

3      THE COURT:  All right.

4      MR. SACHSE:  I have no further questions of Mr. Veeder.

5      I would like to call Colonel Bowen.

6      THE COURT:  Anybody have any questions of Mr. Veeder?

7      THE COURT:  Let the record show that this was one of

8  the shortest, most direct witnesses in his answers that we have

9  had to date.  The record will not show the inflection used

10  upon the words "most direct in his answers."

11      THE CLERK:  Allen C. Bowen heretofore sworn.

12

13                    ALLEN C. BOWEN,

14  Heretofore called and sworn, recalled as a witness in behalf

15  of defendant Fallbrook, having been previously sworn, testified

16  as follows:

17

18                  DIRECT EXAMINATION

19  BY MR. SACHSE:  You are the same Col. Bowen who testified

20  earlier in this case?

21      A  Yes, sir.

22      Q  And you are the officer in charge of the Office of

23  Ground Water Resources at Camp Pendleton, are you not?

24      A  Yes, sir.

25      Q  And you have conducted, under your supervision,

1 numerous studies of individual parcels of land in order to

2 determine whether in your opinion the ground waters underlying

3 them were vagrant local percolating and not part of the stream?

4     A  Yes, sir.

5     Q  Some of those investigations were conducted covering

6 properties regarding which requests for admission had been made?

7     A  Yes, sir.

8     Q  You made somewhat similar investigations in certain

9 cases for what you termed engineering reports for individual

10 parcels of land where you classified the soil and so on, did

11 you not?

12     A  Yes, sir.

13     Q  And with particular reference to Exhibits 67, 69 and

14 70, being respectively De Luz Creek watershed geology, Sandia

15 Creek watershed geology and geology of a portion of the Santa

16 Margarita River below Temecula,  all 3 of those geological

17 studies were made under your supervision, were they not?

18     A  Yes, sir.

19     Q  And I believe the geologist who did the work is a

20 Lt. Walker; is that correct?

21     A  That is correct.

22     Q  And did Lt. Walker also work on some of the individual

23 parcel studies have just referred to?

24     A  Yes, sir.

25     MR. VEEDER:  Let the record show that the witness can't

see any of the exhibits.

MR. SACHSE:  We haven't asked him about the exhibits yet.

THE COURT:  How about taking down this big California map.

BY MR. SACHSE:

Q  Each of Exhibit 69, 67 and 70 were approved by you, were they not?

A  Yes, sir.

Q  In the course of making these individual studies of individual parcels, in determining whether or not the ground waters were part of the river system, did you consider your geologic studies?

A  Yes, sir.

Q  Am I not correct in stating that in every case of lands within the Fallbrook Creek watershed, as shown on Exhibit 70, in which you made a study of an individual parcel, you found that the ground waters underlying such parcel were va-grant local percolating, not a part of the stream system?

MR. VEEDER:  I object to this question on the grounds, your Honor, that there is presently an investigation going forward.  We are checking these matters out further.  We are presently preparing statements for the Special Master in this matter.  I think Mr. Sachse is trying to cut a pattern which I think is very improper trial practice and I think it is very

1    improper at this time when we have asked for a continuance

2    down to February 2nd to cover this very point concerning which

3    the interrogation is being directed.

4        MR. SACHSE:  If Mr. Veeder wants to reverse the stand

5    of his witnesses later, of course I can't prevent him.  But

6    I have a right to know, I believe, your Honor, from this wit-

7    ness what his present opinion is.

8        THE COURT:  There is an old expression that another

9    piece off a cut loaf isn't going to do any harm.  The Colonel

10   is already on record to the same effect as the question now

11   asked.  It works both ways.  What good it does Mr. Sachse to

12   get another statement out of him at this stage I can't under-

13   stand.  And how more difficult it would be for the Colonel to

14   have to back up if he testified twice instead of once, I don't

15   understand.  I am inclined to think that Mr. Veeder's objection

16   has some merit in the sense that let us not stir this matter

17   up any more than it is presently.  Let's find first what

18   position the government is going to take.

19       MR. SACHSE:  If your Honor  please, I'll take it then

20   that Mr. Veeder's objection to my question regarding the

21   Fallbrook Creek watershed is sustained.  I then will propose

22   to ask Col. Bowen certain questions as to the results of his

23   geologic investigations on Sandia Creek watershed and on other

24   portions of the watershed delineated on Exhibit 70, to which

25   he has not yet testified, and I submit that that is an entirely

H 4

A 6

1  proper procedure.  He has been used by the United States itself

2  as an expert, and I believe I have a right to those opinions

3  at this time.

4          THE COURT:  Let's see, De Luz and Sandia?

5          MR. SACHSE:  Sandia, De Luz and other portions of

6  Exhibit 70 other than Fallbrook Creek.

7          THE COURT:  Fallbrook Creek and De Luz have been heard

8  by the Master?

9          MR. SACHSE:  That is right your Honor.

10          THE COURT:  Sandia has not?

11          MR. SACHSE:  And the remainder of Exhibit 70 has not.

12          THE COURT:  Do you have any objection to those areas

13  other than that?

14          MR. VEEDER:  De Luz and Fallbrook?  Well, I have no

15  objection.

16          THE COURT:  It is a matter that I want to get into for

17  the reasons I stated when we came back here on the 13th, on a

18  lot of these areas.  But if you are not prepared to get into

19  it at an early date--

20          MR. VEEDER:  We are not prepared now to cover these

21  points, because, your Honor, I have said into the record and

22  I repeat it now that from our standpoint we would like very

23  much to be extremely short.  I know what Mr. Sachse is shooting

24  at.  There is not a doubt in my mind.  But before we make any

25  dismissals of any parties from this lawsuit, I want to screen

them, I want to know that we are right, and I want to have

Col. Bowen's full consideration of each individual tract and

have advise me as to their dismissal.  I am not being critical

of anyone other than Mr. Sachse, and I want the record to show

that I desire most firmly to accomplish this lawsuit in a

lawyer-like manner, but I don't believe it can be done when

Mr. Sachse calls in the politicians and we have a big blowup.

That is where we are heading.

MR. SACHSE:  Your Honor, if this objection is sustained,

I intend to make an offer of proof.  I have called Col. Bowen

not as an adverse witness.  I am perfectly willing to accept

the testimony of Col. Bowen as the Government's own expert and

I want his testimony in this record and I think it is   abso-

lutely vital that it go in.  I am not concerned with Mr. Veeder's

dismissals.  I am concerned with your Honor's findings on what

waters are part of this stream, and I believe that your Honor

has a right to the benefit of his testimony and not simply to

Mr. Veeder's dismissals.

THE COURT: I agree with you.  I am interested in dis-

missals either.  If people go out of this case, they are going

to go out with an adjudication, I think, in the ordinary situ-

ation.  But it is a matter of the order of proof in this matter,

and we have not yet embarked upon the areas outside of where the

Master heard evidence on De Luz and Fallbrook Creek.

MR. SACHSE:  Your Honor, we have accepted testimony on

1    geology for the purpose of assisting you in these interlocutory

2    findings.  Here is geologic testimony.  If your Honor chooses

3    to rule, I definitely want to make an offer of proof.

4         THE COURT: It is a matter of the Court's discretion on

5    the order of proof.  I would prefer to get into these areas

6    at a time when we go into it specifically as to particular

7    people.  Any interlocutory decree we make has to be made in the

8    names of people who own property in those areas, and not in this

9    manner.

10        MR. SACHSE:  Your Honor, I conceive it to be valuable

11   evidence if any expert, whether it be the United States's ex-

12   pert or my expert.

13        THE COURT:  It is a matter of timing on the matter,

14   and if I know anything about Col. Bowen, his testimony would

15   be the same 30 days from now as it would be here at 4 o'clock

16   on Jan. 14th.

17        MR. SACHSE:  I am absolutely confident of that.

18        THE COURT:  So I am not concerned about that.

19        MR. SACHSE:  But I am also pretty well convinced that

20   Col. Bowen is not going to be the witness who is going to be

21   called by the United States to testify on these things, and he

22   has been now, and now I would like to get his opinion.

23        THE COURT:  He is going to be available.  I don't think

24   he is going to be sent to China.

25        MR. VEEDER:  If anybody sends him to China, it will be

1    over my dead body.  We can't operate without him.

2         THE COURT:  The objection is sustained.  It is merely

3    a matter of timing here when we are going to go into this.

4    I'm as anxious to go into it as you are, Mr. Sachse, at the

5    earliest moment.  On the other hand, I want Mr. Veeder to

6    cooperate with us when we do and not be in the situation of

7    trying to find fault with what we do.  I have been crowding

8    all along to see if we couldn't take areas and eliminate them

9    from this case, and I am thinking about this blue area shown

10   on these 3 exhibits.

11        MR. VEEDER:  I will say that I am just anxious as you

12   are, and my directions are along that line, your Honor.  I

13   simply know the errors that can be made if my elbow is bumped

14   at this time.

15        MR. SACHSE:  Very well.

16        Q  Col. Bowen, you stated that in your determinations

17   you did consider geology.  You stated that a moment ago.

18        A  In preparing these reports for individual properties,

19   yes, sir.

20        Q Yes.  Do you consider that there is any difference in

21   the water-bearing properties of the residuum in the Fallbrook

22   Creek watershed, or the residuum shown in the Sandia Creek

23   watershed?

24        MR. VEEDER:  I renew my objection, your Honor.  The

25   objection has already been sustained to that very proposition.

H 5

A 10

1       MR. SACHSE:  I beg your pardon.  I asked him his opinion

2   as to ground water.  Now I am asking his opinion as to geologic

3   material shown on the maps.

4       THE COURT:  I think it is a proper question.  But let's

5   not use this to do something by subterfuge which we have agreed

6   that we are not going to do.  The objection is overruled.

7       You may answer.

8   BY MR. SACHSE:

9       Q  Is there any fundamental difference between the

10   residuum indicated in the Fallbrook Creek watershed on Exhibit

11   70 and the residuum, for example, indicated in the Sandia Creek

12   watershed on Exhibit 69?

13       A  Other than minor differences of depth, there are no

14   significant differences.

15       Q  I'll ask you the same question.  Is there any differ-

16   ence between the residuum indicated in the Fallbrook Creek

17   watershed on Exhibit 70 and any other areas of residuum indi-

18   cated on the same exhibit?

19       MR. VEEDER:  I would like to have the question read.

20       THE COURT:  Read it.

21       ( The Reporter read the pending question.)

22       MR. VEEDER:  I renew my original objection, your Honor.

23       THE COURT:  Overruled.

24       THE WITNESS:  That's all with reference to the residuum

25   that is delineated on the plaintiff's Exhibit 70?

H 5

All

BY MR. SACHSE:

Q  Yes.

A  Basically, it is all the same character.

THE COURT:  Except the matter of depth?

THE WITNESS:  Yes sir.

BY MR. SACHSE:

Q  Is there any fundamental difference between the areas of basement complex shown on any of the 3 exhibits, Exhibits 69, 67 or 70?

MR. VEEDER:  I object to that, your Honor.  I want to hear that question again, too.  What does it mean? Any fundamental difference between basement complex--

MR. SACHSE:  As indicated on the 3 exhibits.

Is it objected to?

MR. VEEDER: No, I have no objection.

THE WITNESS:  From the standpoint of its water-bearing characteristics, there is no fundamental difference.  Mineralogically there are differences.

BY MR. SACHSE:

Q  And I don't believe I asked you the question regarding De Luz.  Is there any fundamental difference between the residuum shown on Exhibit 67 and the residuum found in the Fallbrook Creek watershed as delineated on Exhibit 70?

A  No, fundamental difference other than the differences in depth.

H 5

A 12

1        MR. VEEDER:  I would like to have a continuing objection

2    to all of this, your Honor.

3        THE COURT:  Overruled.

4        MR. SACHSE:  I have no further questions, your Honor.

5        MR. VEEDER:  I have no questions.

6        MR. SACHSE:  Thank you Colonel.

7        THE COURT:  All right.

8        MR. VEEDER:  While he is there I might as well use

9    him.  Well, I had better call Mr. Hofmann.

10       THE COURT:  Step down Colonel.

11       THE CLERK:  Walter Hofmann sworn on October 17th.

12

13                    WALTER HOFMANN,

14   called as a witness in behalf of the defendant, having been

15   previously sworn, testified as follows:

16                    FURTHER CROSS EXAMINATION

17   BY MR. VEEDER:

18       Q  Mr. Hofmann, you have the records for the water year

19   1958 for the Santa Margarita River watershed drainage area?

20       A  Yes I do.

21       MR. SACHSE:  Are there copies available for us?

22       THE WITNESS:  I have a set of 5 copies here, and I

23   think there are additional ones there.

24       MR. VEEDER:  Copies will be available.

25       MR. SACHSE:  Could you hold it just a minute.  Wait

1    until I get my exhibit.

2        ( A pause.)

3    BY MR. VEEDER:

4        Q   These are copies to be added to Exhibits No. 19,

5    20, 21, 22, 23, 24, 25 and 26; is that not right?

6        A   That is correct. They are in numerical sequence. No.

7    19 is on top.

8        THE COURT:  Are they marked?

9        THE WITNESS:  Only by the station name, your Honor.  I

10   can give you the numbers quite readily and put them on there,

11   if you so desire.

12       THE COURT:  This again is what?

13       THE WITNESS:  This is the runoff for the gauging stations

14   in the Santa Margarita River drainage for the water year ending

15   September 30, 1958.

16       MR. VEEDER: We would simply add those sheets to the

17   exhibits as presently marked, if that is agreeable with your

18   Honor.

19       THE COURT:  Yes, they may be added to the exhibits as

20   presently marked.

21       These start with 19?

22       MR. VEEDER:  They start with 19.

23       MR. SACHSE:  They aren't in that exact order.  I think

24   you had better make it clear, Mr. Hofmann.  The first one isn't

25   19.  The first one is 26.

1      THE WITNESS:  Perhaps on your copy.  The copy I have is

2  in order.  But the names of the individual stations are at the

3  top of the sheet, and it is just a matter of putting them into

4  proper sequence.

5  BY MR. VEEDER:

6      Q   The data appearing on those sheets to be added to

7  Exhibits 19, 20, 21, 22, 23, 24 and 25, are they accurate to

8  your personal knowledge?

9      A   Yes they are.

10      THE COURT:  Well, 26 also, Santa Margarita at Ysidora.

11      THE WITNESS: That is in there too, your Honor.

12      MR. VEEDER:  We would like, your Honor, at this time to

13  offer those sheets to be added to the exhibits to which I just

14  made reference.

15      THE COURT:  They will be added to the exhibits as indi-

16  cated.

17      MR. VEEDER:  Now your Honor, in the course of the

18  examination of this witness a question was asked as to whether

19  he had made a study as to the runoff of the Temecula Creek as

20  related to the waters impounded at Vail Dam.  It appears at

21  page 3727.

22

23

24

25

1          MR. VEEDER:  The question was asked whether Mr. Hofmann

2   had studied the history of the runoff of the Temecula Creek

3   as it related the waters impounded in Vail Dam since the time

4   of the closure of that structure.  At that time your Honor

5   made this observation; that it would be unnecessary to pursue

6   the subject because you were acquainted with it.  With leave

7   of your Honor I would like to put into the record at this

8   time while Mr. Hofmann is here the results of his studies in

9   that connection if it would be all right with your Honor.

10          THE COURT:  You may do so.

11   BY MR. VEEDER:

12          Q  Have you undertaken an investigation in regard to

13   the runoff of the Temecula Creek as it related to waters

14   impounded in the Vail Reservoir?

15          A  Yes, I have.

16          Q  And what period of time did that investigation

17   relate?

18          A  From the closure of Vail Dam in November of 1948

19   through September 30, 1958, the close of the 1958 water year.

20          Q  What did your investigation disclose from the stand-

21   point of the smallest quantity of water that entered the Vail

22   Reservoir in any water year?

23          MR. STAHLMAN:  Is this something that is on these

24   sheets which you have just handed to us?

25          MR. VEEDER:  No, it is not.

MR. STAHLMAN: It is not.

MR. VEEDER: Those sheets, Mr. Stahlman, simply bring to date the runoff records previously introduced into evidence.

MR. STAHLMAN: You speak of runoffs. That is synonymous with releases, isn't it?

MR. VEEDER: No, runoff is the natural runoff from precipitation in the valley.

MR. STAHLMAN: Oh. You are talking about that. That is different.

MR. SACHSE: I am confused now. Would you restate it, what you are saying; in the Vail Dam or out. I am sorry, Mr. Veeder.

MR. VEEDER: It has been a hard day.

Q Would you state the smallest quantity of runoff that entered the Vail Reservoir in any year since the closure of that structure?

A According to the record collected by the Geological Survey the water year 1956-57 had a runoff of 925 acre feet, which is the smallest quantity since the closure the dam.

MR. STAHLMAN: That was the year of--

THE WITNESS: 1956-57.

BY MR. VEEDER:

Q And what was the year of the highest runoff?

A The highest runoff was in '51-52, where the runoff was 12,560.

Q  And would you state what the average quantity of water that has been impounded each year has been, based upon your studies?

A  The ten-year average from the closure of the dam through 1958 was 4,210 acre feet rounded off to the nearest ten acre feet.

Q  Did you take into consideration the evaporation losses from the reservoir in your studies?

A  On the assumption that the yield of Vail Reservoir would-- or on the conclusion that the yield from Vail Reservoir would be the runoff into the reservoir minus the evaporation from the water surface, I did take that into consideration.

Q  And when you took into consideration the evaporation losses, what was the average that your computation disclosed?

THE COURT:  Average of what?

MR. VEEDER:  The average in acre feet which was available in Vail Reservoir.

THE WITNESS:  If I may phrase it, the average annual evaporation from the surface of the Vail reservoir--

BY MR. VEEDER:

Q  That is correct.

A  --was 1,210 acre feet subtracted.

Q  Go ahead.  Pardon me.

A  Subtracting that from the runoff, as previously given, of 4210 acre feet, gives the yield of Vail Reservoir

I

Z60

1  for that ten-year period.  The average annual yield was 3,000

2  acre feet.

3      MR. VEEDER:  I have no further questions.

4      MR. STAHLMAN:  Do you have questions, Mr. Sachse?

5      MR. SACHSE:  I have some.

6      May I ask Mr. Veeder: · Did the witness-- he seemed to

7  be working off a tabulation.  If we could have that, it would

8  make it a lot easier.

9      MR. VEEDER:  I would just as soon have it marked.

10     MR. SACHSE:  If it is in tabular form.

11     THE WITNESS:  If I may, the tabulation was originally

12  made on October 13th and included only the nine years from

13  the closure through 1957 water year.  In pencil I have added,

14  on my copy I have added the latest record, copies of which

15  were just furnished to you; so the tabulation is not in the

16  form that it could be introduced into the record.  But I can

17  have it retyped.

18     MR. VEEDER:  Or you can read it into the record now

19  if you want to.

20     MR. SACHSE:  I was just thinking I would like to have

21  one to work with.

22     THE COURT:  Prepare us a tabulation, which you can do,

23  and it can be used as an exhibit.

24     MR. VEEDER:  You have a copy of everything but your--

25     THE WITNESS:  Well, even my last page, on that pencil

7272

I

Z61

1    copy, if I can copy that.

2        THE COURT:  You don't have to do it now.

3        MR. VEEDER:  All right.  I will give Mr. Sachse a

4    copy of this if he wants to work with it, though.

5        MR. SACHSE:  Well, thank you.  I am looking at these

6    first.

7

8                    CROSS-EXAMINATION

9    BY MR. SACHSE:

10       Q  Mr. Hofmann, I want to be certain that I--

11       THE COURT:  Are you through, Mr. Veeder?

12       MR. VEEDER:  Yes, sir.

13   BY MR. SACHSE:

14       Q  I want to be certain I understand these exhibits.

15   I am looking now, the first one on my pile is No. 24.

16       A  Yes, sir.

17       Q  That is the De Luz Creek gage near Fallbrook?

18       A  Yes, sir.

19       Q  That is the gage that is actually on De Luz Creek,

20   is it not?

21       A  Yes, sir.

22       Q  As I read these figures, the gaged runoff of De Luz

23   Creek for February, 1958, was how many acre feet?

24       A  1,060.

25       Q  And the gaged runoff for the month of March, 1958,

I

Z62

1    for De Luz Creek was 7,810?

2         A   That is correct.

3         Q   And for April of 1958, it was 11,450?

4         A   That is correct.

5         Q   And for May, 447?

6         MR. VEEDER:   Exhibit speaks for itself.

7    BY MR. SACHSE:

8         Q   It drops down?

9         A   Yes, that is correct.

10        Q   Now, the figures immediately above those where you

11   give the acre foot-- you see the one I am referring to?   It

12   says:   "533.9."   And then below that:   "3935.8."

13        A   Yes.

14        Q   Those are second feet figures, are they?

15        A   Those are second foot days.

16        Q   Second foot days?

17        A   Yes.

18        MR. STAHLMAN:  What was that, second foot days?

19        THE WITNESS:   Yes, second foot days.

20   BY MR. SACHSE:

21        Q   And the individual figures that appear in the

22   column one after each date show the second foot runoff per

23   day.   Is that right?

24        A   The column headed "Mean" on the left shows the mean

25   daily c.f.s.

I

Z63

THE COURT:  He is talking about columns of figures.

BY MR. SACHSE:

Q  I am talking about the column, say, under April.

A  Oh, I see.  I beg your pardon.  I didn't notice that these figures--

Q  These figures day by day are what?

A  C.f.s.

Q  Second foot figures?

A  Yes, the means.  Runoff of a day.

Q  And, of course, those are means for a day and reflect sometimes extremly higher and sometimes extremely lower flows, particularly in periods of a rain, don't they?

A  Well, never extremely lower flows.  Sometimes the instantaneous discharge is higher than the daily figure by quite an amount.  For example, on April 1, the enstantaneous figure was 2,800, whereas the daily is 920.

Q  That is the next question I was going to ask you. Do you have available the highest instantaneous readings for any of these stations for that April storm of 1958?

A  If you will look on the left-hand margin of the exhibit, there is typed in the maximum instantaneous value for those stations.

MR. STAHLMAN:  Which ones are you on now?

MR. MOSKOVITZ:  It doesn't show on our copy.

THE WITNESS:  It is true of all the exhibits that on the

left-hand edge there is typed the maximum discharge during the period of record.

MR. MOSKOVITZ: It didn't reproduce on our copy.

THE WITNESS: I beg your pardon.

BY MR. SACHSE:

Q So that should appear on each of these exhibits, is that correct?

A That is correct.

THE COURT: Did the records previously supplied run through January? Is that why this starts in February?

THE WITNESS: No, sir. There was no flow prior to the time that-- If you will notice at the bottom of the page, your Honor, that there is indicated no flow in the tabulation.

MR. STAHLMAN: Which one are you on now?

THE COURT: DeLuz near Fallbrook.

MR. SACHSE: No. 24.

THE COURT: There was no flow during December of January?

THE WITNESS: That is correct, your Honor.

THE COURT: We shouldn't feel so bad this year. Maybe we are going to get some rain yet.

MR. STAHLMAN: Let's hope.

BY MR. SACHSE:

Q Now, may I direct your attention to the Vail Dam, No. 20. I don't think I understand those. Please correct me if I am in error as I go across here as to what this means. The

immediate left-hand column is, of course, the months.  Then,

gage height.  That is the height of the water level gage in

the lake?

    A   That is correct.

    Q   And the next colum then "556," after the month of

September would be the total acre feet in storage at that

month?

    A   That is correct, the volume in storage.

    Q   And you read it when, on the last day?

    A   That is correct.  The footnote at the bottom of

the page indicates.

    Q   I see.  The next column shows whether the contents

went up or down?

    A   Correct.

    Q   What is the draft?

    A   That is the quantity released from Vail Reservoir.

    Q   Released how?

    A   Downstream through the gates.

    Q   Through the gates, through the dam?

    A   Through the gates below the dam, that is correct,

into the stream.

    Q   That, however, may or may not be released into the

Vail irrigation system?

    A   That is correct.  This is a measure of the release

from the dam and no indication made as to whether it is into

I

Z66

1    the irrigation system or on down the channel.  The irrigation

2    pipe, I think, is a quarter of a mile or so on downstream from

3    the dam.

4         Q The runoff in the last column, how did you obtain

5    that figure?

6         A  Runoff is the change of contents in the reservoir

7    plus the draft, plus the evaporation.

8         Q  Looking at the month of October, it is the plus 22

9    plus 24 feet of evaporation to give you the 46?

10        A  That is correct.

11        Q  Then, there are no stream gaging stations upstream

12   from Vail which you have used in calculating runoff?

13        A  Yes, we have a gaging station called Temecula Creek

14   near Aguanga.

15        Q  Do you use that in calculating the runoff to Vail?

16        A  No.

17   THE COURT:  Let's figure runoff then as merely the total

18   of what is released out of reservoir plus evaporation?

19   THE WITNESS:  Plus the change in storage, your Honor.

20   THE COURT:  Plus the change in storage.

21   THE WITNESS:  That is correct.  Using the algebraic

22   signs indicated as negative change.

23   BY MR. SACHSE:

24        Q  If you will observe now your 19, Mr. Hofmann, please,

25   and compare it with 20.

I

Z67

A   Yes, sir.

Q   If I am reading 19 correctly, it would appear that in December, 1957, you gaged 106 acre feet of runoff?

A   That is correct.

Q   Temecula Creek near Aguanga?

A   That is correct.

Q   And yet you only gage 90 acre feet into Vail Dam, is that correct?

A   That is correct.

Q   How do you account for that?

A   There may be losses into the alluvium between the gage, recharged to ground water bodies.

MR. STAHLMAN:   Which one is that?

MR. SACHSE:   No. 19.   I am comparing 19 and 20.

Q   Well, is there not also stream flow to the Vail Dam down Coahuilla Creek, Wilson Valley, and Lancaster Valley, which is not measured by the Aguanga Gage?

A   If there is stream flow in those stream systems, it is not measured by the Aguanga Gage.

Q   And at any time in which there is runoff in Wilson Creek, that is not measured by the Aguanga gage?

A   That is correct.

Q   Still comparing 19 and 20, I observe that for April the Aguanga Gage showed 5,190 acre feet of runoff and for the same month the Vail Dam showed 6,704, a larger amount?

I

68

A   That is correct.

Q   Now, you would, I presume, account for the increase by runoff for Wilson Creek or other streams not measured at the Aguanga gage, is that right?

A   That is correct.

Q   Again, to this draft of the dam showing zero October, November, December, January, February, March, April of '57 and '58.  That means that no water was taken out of the lake during that period at all?

A   No water was released from the reservoir, that is correct.

Q   In other words, none was released either for irrigation or for stream recharge?

A   That is correct.

Q   And when releases begin to show, you have no way of knowing how much is irrigation and how much might be released directly into the stream channel?

A   We have no way of knowing.

MR. SACHSE:  Your Honor, I don't want to just mark time here without really knowing what I am doing, and I would like to examine these a little more.  Maybe somebody has some more questions, if they don't mind.  It is getting near time for recess.  I think I am through, but I would like to review this.

THE COURT:  You will be back tomorrow?

THE WITNESS:  I can be, yes, your Honor.

MR. STAHLMAN:  I would like to defer my examination until tomorrow, until I talk to Mr. Hall about this.

THE COURT:  All right.  We will take an adjournment then until 10 o'clock tomorrow morning.

(Adjournment at 4:45 P.M. until Thursday, January 15, 1959, at 10 A.M.)