# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Thursday, January 15, 1959.

Pages:      7281 to 7399

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____
DEPUTY

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211    Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,              )
                                       )
                    Plaintiff,         )
                                       )
          vs.                          )        No. 1247-SD-C.
                                       )
FALLBROOK PUBLIC UTILITY               )
DISTRICT, et al.,                      )
                                       )
                    Defendants.        )


REPORTERS' TRANSCRIPT OF PROCEEDINGS


San Diego, California

Thursday, January 15, 1959.


APPEARANCES:

          For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                     Special Assistant to the
                                     Attorney-General,
                                     Department of Justice,
                                     Washington, D. C.

APPEARANCES (Continued):

     For Defendant               GEORGE E. STAHLMAN, ESQ.
     Vail Company

     For Defendant State        STANLEY MOSK, ESQ.,
     of California             Attorney-General, by
                               ADOLPHUS MOSKOVITZ, ESQ.,
                               Deputy Attorney General.

     For Defendants
     Fallbrook Public
     Utility District,        FRANZ R. SACHSE, ESQ.
     et al.

# INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD | RX |
|---|---|---|---|---|
| Walter Hofmann | | | | |
| (By Mr. Sachse) | | 7286 | | |
| (By Mr. Stahlman) | | 7307 | | 7326 |
| (By Mr. Moskovitz) | | 7314 | 7322 | |
| Allen C. Bowen | 7354 | | | |

## EXHIBITS

| Plaintiff's Exhibit - | | Iden. | Evid. |
|---|---|---|---|
| 129 | Yield of Vail Lake | 7324 | 7325 |
| 130 | Data from Master's hearing | 7327 | 7327 |
| 131 | Master Ex. M-28 | 7328 | 7328 |
| 132 | Master's Ex. M-29 | 7329 | 7329 |
| 133 | Master's Ex. M-30 | 7330 | 7330 |
| 134 | Master's Ex. M-15 | 7330 | 7330 |
| 135 | Master's Ex. M-17 | 7331 | 7331 |
| 136 | Master's Ex. M-18 | 7331 | 7331 |
| 137 | Master's Ex. M-19 | 7332 | 7332 |
| 138-A | Master's Ex. M-20 | 7332 | 7333 |
| 138-B | Master's Ex. M-21 | 7332 | 7333 |
| 138-C | Master's Ex. M-22 | 7332 | 7333 |
| 139 | Ltr. Sachse to Holsinger | 7333 | 7335 |
| 140 | Letter to Sachse | 7335 | 7335 |
| 141 | Revocable permit | 7336 | 7336 |
| 142 | Map - M-14 | 7337 | 7337 |
| 143 | Trans. Fallbrook v. Martin | 7337 | |
| 144 | "Vail Judgment" | 7338 | |
| 145 | Index to USGS quadrangle | 7343 | |
| 78P1 to 8 - Aerial Photos | | | 7374 |
| 78Q1 to 13 Aerial Photos | | | 7376 |
| 78R1 to 3 Aerial Photos | | | 7378 |
| Vail Exhibit I - Vail Lake Graphs | | 7285 | |
| Fallbrook Exhibit AC-- Runoff report | | 7292 | 7322 |
| Plaintiff's Exhibits - | | | |
| 78S1 to 15 - Aerial Photos | | | 7392 |

1    SAN DIEGO, CALIFORNIA, THURSDAY, JANUARY 15, 1959.   10:00 A. M.

2

3        THE CLERK:   The case on trial, number one on the calen-

4    dar, Case No. 1247-SD-C, United States of America vs. Fallbrook

5    Public Utility District, et al.

6        MR. SACHSE:   Mr. Hofmann, will you resume the stand,

7    please.

8        MR. STAHLMAN:   Your Honor, before we do that, checking

9    over the Vail exhibits, these matters that were requested

10   yesterday, of which your Honor desired a copy, I was quite

11   certain they were lodged with the Court.   Looking over the ex-

12   hibits I see that they are not there:   Since the building of the

13   Vail Dam, the Vail Lake graph--

14       THE COURT:   These are the Vail exhibits?

15       MR. STAHLMAN:   Yes, your Honor.

16       THE COURT:   What numbers are they?

17       MR. STAHLMAN:   They are not numbered, your Honor.   I am

18   sure I lodged them.   However, to be sure I would like to lodge

19   these.

20       THE COURT:   What records do you have, Mr. Clerk?   I show

21   up through H.

22       THE CLERK:   Through H, yes, your Honor.

23       THE COURT:   I show for identification.   I didn't see

24   copies of them.

25       MR. STAHLMAN:   We are having copies made for your Honor.

1   I have copies here to lodge as exhibits.

2          THE COURT:  How many are there?

3          MR. STAHLMAN:  There are two sheets, your Honor.  One

4   of them is for the direct-to-irrigation system, and the other

5   is direct to Pauba Basin, and they include the figures up to

6   1957-58.  They could be one exhibit, I presume.

7          THE COURT:  Are they additions to another exhibit?

8          MR. STAHLMAN:  No, your Honor; these will be original

9   exhibits.

10         THE COURT:  Let me see them.

11         MR. STAHLMAN:  And I will have copies made for your

12  Honor.  We have the master from which those were made.

13         THE COURT:  I didn't understand.  In other words, this

14  shows the amount of water released from the dam which has gone

15  into the irrigation system and the amount that has gone

16  directly into the basin.

17         MR. STAHLMAN:  That is right.

18         THE COURT:  They will be called Exhibit I for Identifica-

19  tion.

20         MR. STAHLMAN:  We are having copies made this noon.

21         MR. SACHSE:  Are you through, Mr. Stahlman?

22         MR. STAHLMAN: Yes.

23

24

25

A

Z6

WALTER HOFMANN,

recalled as a witness in behalf of the plaintiff, having been

previously sworn, testified further as follows:


CROSS-EXAMINATION

BY MR. SACHSE:

Q   Mr. Hofmann, I have put up on the board United

States's Exhibit 17, which I believe is the exhibit on which

you noted the location of the different gaging stations, is it

not?

A   Yes, sir.

Q   Directing your attention to the most upstream of all

the stations, namely, Temecula near Aguanga, that gage would

reflect all accruals to the Santa Margarita River system above

that point, would it not, all surface accruals?

MR. VEEDER:   What do you mean by "accruals"?

MR. SACHSE:   Surface flow into the river system.

Q   --would be gaged at the Temecula near Aguanga?

MR. STAHLMAN:   May I have the question, Mr. Sachse,

please?

MR. SACHSE:   Let me rephrase it.

Q   The entire portion of the Santa Margarita River

system upstream from the Aguanga gage runs off through the

gage, does it not?

A   It runs off through the stream channel at the gage;

A

Z7

A2

1    that is correct.

2        Q   So aside from diversions from the stream or percola-

3    tion into the ground, the gage should reflect the flow of the

4    stream at all points upstream from it?

5        A   It measures the quantity of runoff from the drainage

6    area above the gage.

7        Q   That is right.

8        MR. VEEDER:   Which reaches the gage, is what he is say-

9    ing.

10       THE WITNESS:   Yes.

11       MR. SACHSE:   Which reaches the gage.

12       Q   Now, have you any way of estimating-- I realize that

13   you don't have gages, but have you any way of estimating the

14   contribution to that runoff from any one of the subwatersheds

15   upstream from that gage?

16       A   It could be estimated very roughly, perhaps, depending

17   on-- Yes, it could be estimated.   Very roughly, however.

18       Q   Have you done that?

19       A   No, sir, I haven't.

20       THE COURT:   That rough estimate would be on the basis of

21   area?

22       THE WITNESS:   On the basis of area purely.   It might be

23   very, very much in error, your Honor.

24   BY MR. SACHSE:

25       Q   In other words, it would be area and precipitation

A2

z8

1    calculations?

2           A   Yes, sir.

3           Q   But you have made no such estimate?

4           A   I have made no such estimate.

5           Q   Would the same answer apply to, for example, Coahuilla

6    Creek?

7           A   Yes, it would.

8           Q   You have made no such estimates for that?

9           A   I have made no such estimates for that.

10          Q   In other words, for any of the subdrainages your

11   office has made no estimates of their respective contributions

12   to the runoff of the stream system as a whole?

13          A   No, sir.

14          Q   So if the entire runoff of Coahuilla Creek were sub-

15   tracted from the runoff of the system, you don't know how much

16   that would be?

17          A   No, sir.

18          Q   Now, moving downstream to the Murrieta Creek at

19   Temecula gage, we visited that gage on a view with his Honor

20   and it is my recollection that it is very close to the Narrows,

21   is it not?

22          A   It is approximately .4 of a mile upstream from the

23   confluence.

24          Q   There would be very little additional accrual at

25   Murrieta Creek below that gage, would there not?

A2

Z9

1        A   There would be very little change in the quantity

2   flow between that point and the mouth of the Murrieta Creek.

3        MR. STAHLMAN:   I want to hear that.   What was that

4   again?

5        MR. SACHSE:   Read it, please.

6        (The Reporter read the answer.)

7   BY MR. SACHSE:

8        Q   Now, however, looking at the gage of Temecula Creek

9   at Vail Dam, there is a substantial stretch of river between

10   that gage and the next gage downstream, Santa Margarita near

11   Temecula, is there not?

12        A   Yes, sir.

13        Q   And likewise there is one named tributary-- Pechanga

14   Creek?

15        A   Yes, sir.

16        Q   Which contributes to the stream above the Temecula

17   gage, is that right?

18        A   That is correct.

19        Q   Do you have your exhibits before you, Mr. Hofmann?

20        A   No, I do not.

21        MR. SACHSE:   May we have that set of exhibits, No. 19

22   through 26.

23        (The Clerk hands documents to the witness.)

24        THE WITNESS:   Thank you.

25

BY MR. SACHSE:

Q  First, a preliminary question.  Are these your final figures?

A  The additions that I had to do yesterday afternoon?

Q  Yes.

A  Yes, they are.

Q  In other words, I have seen similar sheets from your office previously that bear the stamp "Not final - Subject to revision," something like that?  Those are preliminary?

A  These records have been reviewed in our Washington office and are final figures, yes.

Q  Let me direct your attention, please, to Exhibit 22-- that is the Murrieta Creek at Temecula for the year 1958-- and to the column of "Total runoff for the month of April." Do you find a figure of 9,910 acre feet?

A  No, sir.

Q  Murrieta Creek at Temecula.

A  For 19--  Oh, beg your pardon.  I thought you said Exhibit 22.

THE COURT:  Is that the second one of the series?

MR. VEEDER:  He did say Exhibit 22.

MR. SACHSE:  Isn't that Exhibit 22, Murrieta Creek at Temecula?

THE COURT:  Yes, it is.

THE WITNESS:  It was misfiled.

A2

Zll

1          MR. SACHSE:  I am referring, your Honor, to the bottom

2     horizontal row where it says "Acre feet."

3          THE WITNESS:  Yes, I find the figure 9,910.

4     BY MR. SACHSE:

5          Q  That was the runoff at the Murrieta gage, which is

6     .4 of a mile upstream from the junction of Murrieta and

7     Temecula Creeks?

8          A  That is correct.

9          Q  Now, please look at Exhibit 21-- if my number is

10    right, which is the Santa Margarita River near Temecula.

11         A  Yes, sir.

12         Q  For the same month what do you show to be the runoff

13    of the whole river at Temecula?

14         A  9,460.

15         Q  In other words, the United States Geological Survey

16    finds that during the heavy rains of April in 1958 there not

17    only was no accrual to the stream out of Pechanga Creek and

18    out of Pauba Valley, but that actually the stream shrank; is

19    that right?  Is that what the figures show?

20         A  The figures show a decrease; yes, sir.

21         Q  Can you account for it?

22         MR. VEEDER:  I object to that as going beyond the scope

23    of the direct examination.

24         THE COURT:  Overruled.

25

1  BY MR. SACHSE:

2      Q  Can you account for the discrepancies, Mr. Hofmann?

3      A  I believe I explained in my earlier testimony that

4  the stream gaging is not an exact science to the extent that

5  you come out with the umpteenth decimal place.  In this instance

6  it probably reflects a difference in the rating between the

7  two sides.

8      Q  Were you in Southern California in the rains of April,

9  1958?

10     A  Yes, sir, I was.

11     Q  Do you think there was no runoff from Pechanga Creek

12  in April, 1958?

13     A  In all probability there was runoff from Pechanga.

14     Q  But it doesn't show on your gage report, does it?

15     A  No, it does not.

16     MR. SACHSE:  I have no spare of this, Mr. Veeder, but

17  you may examine it (handing document to Mr. Veeder).

18     MR. VEEDER:  What is this?

19     MR. SACHSE:  I am going to ask the witness.  That is a

20  pencil note that you may disregard.  Those are my notes.

21     MR. VEEDER:  What is this?

22     MR. SACHSE:  This is the unpublished-subject-to-revision

23  draft for the same station.

24     MR. VEEDER:  Are you going to have copies of that made?

25     MR. SACHSE:  We will as soon as we have a chance.

A2

Z13

1    Will you mark this Fallbrook's AC, please?

2    (Fallbrook's Exhibit AC was marked for Identification.)

3    THE COURT:  Have you made a comparison with earlier

4  years, Mr. Sachse?

5    MR. SACHSE:  The document I am about to offer, your

6  Honor, is the unpublished-subject-to-revision report of this

7  very station, which is drastically different from the final

8  one, and I want to know if the witness can explain it, and on

9  prior years you don't find that condition existing at all.

10    THE COURT:  Has this been marked?

11    MR. SACHSE:  That has been marked Fallbrook's AC for

12  Identification, your Honor.

13    Q  I will ask you if you will examine that document,

14  Mr. Hofmann, and tell me if that is not the unpublished report

15  subject to correction for the very same gaging station, Santa

16  Margarita River near Temecula, that we discussed a moment ago,

17  Exhibit 21?

18    A  Yes, it is.

19    Q  What difference do you find in that for the month

20  of April compared with the final?

21    A  There is a difference of approximately 2,000, a

22  little less than 2,000 acre feet.

23    Q  In other words, the unpublished report showed 2,000

24  acre feet more at the Temecula gage than the final report; is

25  that right?

A2

Z14

1       A   Approximately 1,500 acre feet; yes, sir.

2       Q   And in the case of the unpublished report this

3   peculiar discrepancy of no accrual to the river from Pechanga

4   Creek doesn't exist, does it?

5       A   That is correct.

6       Q   Can you, with that to help you, perhaps, account

7   for this phenomenon that the river got no water out of either

8   Temecula Creek or Pechanga Creek in April, 1958?

9       A   Without investigating the base data, I would have no

10  explanation.

11      Q   I wonder if you would be good enough to try to check

12  that out.  I think it is quite important.  Will you try to do

13  that for us, Mr. Hofmann?

14      THE COURT:  Let me see it.

15      THE WITNESS:  That is the unpublished, your Honor, and

16  this is the final.

17      THE COURT:  Who makes the revisions in them?

18      THE WITNESS:  Your Honor, they are reviewed in our office

19  locally, and this change was made in our office based on the

20  accumulation of measurements made throughout the year.  That

21  preliminary one that you have there was made before the water

22  year was completed and was just a preliminary computation based

23  on the previous year's rating.  The rating had not been

24  completed at that time.  It was just a preliminary study.  And

25  this final figure would be the more correct one.

A2

Z15

1      THE COURT:  Why would the daily figure vary?

2      THE WITNESS:  I don't understand.  It is a good ques-

3  tion, your Honor.  You mean between the two--

4      THE COURT:  No.  Taking October, on the first day of

5  October why should it be 2.8 second feet in the final draft and

6  2.5 on the preliminary draft?  Or taking November 1st, why

7  should it be 5.1 on the final draft and 4.0 on the preliminary

8  draft?

9      THE WITNESS:  As I have indicated, your Honor, if you

10  will recall, the stream gaging procedure is to obtain a record

11  of the stage and translate that record of stage to a record of

12  discharge by the use of a rating table or a rating curve and a

13  table based on that curve.  The preliminary record used the

14  previous year's rating table, which did not have the benefit

15  of all the measurements made throughout the 1958 water year.

16  On the basis of those measurements in the 1958 water year the

17  rating table was redrawn through those measurements-- those

18  observations, and the reason for the change in the daily

19  figures is that a different rating was used.

20      MR. SACHSE:  Are you through, your Honor?

21      THE COURT:  Yes.

22      MR. VEEDER:  Mr. Sachse you have had this preliminary

23  unpublished record marked, and I observe that the writing--

24      MR. SACHSE:  The writing may be deleted.  That is our

25  own notes.  It may be erased, if you want to.

A3

A3
2 / 6

1          THE COURT:  Erase it, Mr. Clerk-- the pencil notations.

2   BY MR. SACHSE:

3          Q  Mr. Hofmann, would you look at the same two exhibits,

4   please, Exhibits 21 and 22, for the water year 1957?

5          A  Yes, sir.

6          Q  Now, starting at the left-hand side, let's go right

7   across and compare the monthly runoff of the two gages:

8   Murrieta Creek for October, 26 acre feet--

9          THE COURT:  Well, now, wait a minute.

10         THE WITNESS:  On the bottom, your Honor.

11         MR. SACHSE:  At the very bottom, your Honor.

12         THE WITNESS:  The last line.

13         MR. SACHSE:  The last line at the bottom of the page--

14   accumulation.

15         THE COURT:  All right.  Go ahead.

16   BY MR. SACHSE:

17         Q  I note that for October, 1956, the runoff at Murrieta

18   was 26 acre feet.  On the river, however, 190.  For the next

19   month, 52 at Murrieta and 218 on the river.  And so on across,

20   without exception a larger runoff on the river than at Murrieta;

21   is that right?

22         A  Yes, sir.

23         Q  Look at the next one, if you please, back to 1956,

24   and without going through every one of them, will you please

25   examine them and tell me if you can find any one where you

A4

1    show a smaller runoff for the river gage at Temecula than you

2    do from Murrieta Creek?

3        A  No, sir.

4        Q  Look at the next one back, please; the same question:

5    Do you find any instance?

6        A  No, sir.

7        Q  Well, now, would that not lead you to assume, Mr.

8    Hofmann, that there is some kind of blunder in the 1958 fig-

9    ures?

10        MR. VEEDER:  I object to the question.  If he wants it

11    checked out, check it out.

12        MR. SACHSE:  Some kind of error, if you don't like

13    "blunder."

14        MR. VEEDER:  Error or anything else, if they want the

15    records we will certainly produce them.  We will show the

16    whole background and the whole history.  I am just as anxious

17    to have any disparity corrected, if there is a disparity.

18        THE COURT:  The objection is overruled.

19    BY MR. SACHSE:

20        Q  Would it not lead you to assume that there is some

21    kind of error in those figures?

22        A  I have already indicated, Mr. Sachse, that I believe

23    there is.

24        Q  And you will check them out and supply them?

25        A  Yes, sir.

1    Q   Now, moving on downstream from the Temecula gage and

2   again referring to Exhibit 17, the next gage downstream on the

3   river is the one indicated as Santa Margarita at Fallbrook, is

4   it not?

5    A   Yes, sir.

6    Q   Above which gage the river receives surface runoff

7   from two named tributaries, Rainbow Creek and Sandia Creek; is

8   that right?

9    A   Yes, sir.

10   THE COURT: Above the gage.

11   MR.SACHSE:   Above the gage.

12   THE WITNESS:   Above the Fallbrook gage and below the

13   gage Santa Margarita River near Temecula.

14  BY MR. SACHSE:

15   Q   And of course, the river at precipitation times of

16   runoff also receives recharge from runoff of little side

17   channels and so on?

18   A   From the entire drainage between the two sides, yes.

19   Q   Again, have you any way of calculating, other than by

20   the rough runoff estimates that you mentioned, the contribution

21   to the river of either Sandia Creek or Rainbow Creek?

22   A   No, sir.

23   Q   Now, moving downstream from Fallbrook, there are no

24   more gages on the river proper until we reach Ysidora; is that

25   correct?

Z19

1   A  That is correct.

2   Q  The DeLuz Creek gage, however, would gage the

3  contribution of Roblar and De Luz Creeks to the river system?

4   A  The entire drainage above the gage.

5   Q  But there is substantial contribution to the stream

6  other than the De Luz Creek drainage between the fallbrook

7  gage and the Ysidora gage, is there not?

8   MR. VEEDER:  I object to that question.  What do you

9  mean by "substantial?"  Unless there is some definition, some

10  delineation of "substantial."

11  BY MR. SACHSE:

12   Q  Is there contribution to the stream?

13   A  There is some contribution to the stream.

14   Q  There is the Fallbrook Creek runoff, is there not?

15   A  Yes.

16   Q  And there is the runoff from the area within Camp

17  Pendleton and within the watershed below De Luz Creek, is there

18  not?

19   A  Yes, sir.

20   THE COURT:  What area are you talking about now?  Be-

21  tween the confluence with De Luz--

22   MR. SACHSE:  Below the Fallbrook gage clear to the last

23  gage on the ocean; what the accruals are to the river within

24  that area other than De Luz, which is gaged.

25   THE WITNESS:  Might I point out that the gaging station

Hofmann    Cross

A4

Z20

1  measures the contribution of the entire drainage above it as

2  it flows past that point, if that clarifies it.

3  BY MR. SACHSE:

4        Q  But there are, again, small side channels, canyons

5  and the like, within the reservation below De Luz Creek that

6  carry runoff in times of runoff, are there not?

7        A  It would depend on the degree of precipitation.  I

8  would certainly say that there were times when there would be

9  runoff in these channels, yes.

10        Q  And again you could makepossibly a very rough

11  estimate of the contribution of that area to the stream, could

12  you not?

13        A  It would be more difficult than the headwaters area,

14  probably more inaccurate.

A5

15        Q  And as perhaps one of the reasons why it would be

16  more inaccurate is the fact that within the Camp Pendleton area

17  there is extensive acreage of impermeable materials, such as

18  streets, roofs and the like?  Would that contribute to the

19  inaccuracy?

20        A  That would contribute to the inaccuracy.

21        Q  In other words, an inch of rain falling on a paved

22  street within the watershed contributes a great deal more to

23  the surface flow of the stream than an inch of rain falling on

24  the slope of Palomar Mountain, does it not?

25        A  May I have the question again, please?

Hofmann      Cross                                            7391

A5

Z21

1      MR. VEEDER:  I object on the grounds that there is no

2  proper foundation.  There are a great many different things

3  that will occurr-- temperature, evaporation.

4      THE COURT: Yes, it's pretty hard to know how this is

5  going to help us, except that there are differences.

6      MR. SACHSE:  I will withdraw that and try again, your

7  Honor.

8      Q  Mr. Hofmann, is it not a fact that the runoff from

9  any given acreage of surfaced improved dwellings and streets

10  will be substantially greater than the runoff from any given

11  acreage of brush-covered slope?

12      MR. VEEDER:  I object to that, your Honor.  There is

13  absolutely no basis for this witness to answer that.  If it

14  fell on a bunch of rocks, there wouldn't be any difference--

15      MR. SACHSE:  I didn't say a bunch of rocks.  I said

16  brush-covered slope.

17      MR. VEEDER:  I object, your Honor; there is no basis

18  whatever for this question.

19      MR. SACHSE:  If your Honor please, this man is a

20  hydrologist.

21      THE COURT:  What you mean is this:  Take a particular

22  acre of ground and if you have that same acre covered with

23  brush or if you have it paved.

24      MR. SACHSE:  That is correct.

25      THE COURT:  All right.  You don't need any evidence on

1    that.  I will take judicial notice of the fact that if it is

2    paved there will be more water run off of that than if it were

3    not paved.

4         MR. SACHSE:  But Mr. Veeder does not agree.

5         MR. VEEDER:  But, your Honor, I daresay that the water

6    falling among the brush would be consumed, and the water falling

7    on a hot pavement would be consumed.  I think this is so vague

8    that we are simply sticking a shotgun out the window and

9    pulling the trigger and hoping we will get a bird.

10        THE COURT:  Of course, you are right that if you had a

11   few drops of rain that fell on a hot pavement it would probably

12   be all evaporated.

13        MR. VEEDER:  That is right.

14        THE COURT:  But if you had a heavy rain, then you would

15   lose very little by evaporation if it fell on a pavement.

16        MR. SACHSE:  Let's ask the witness specifically.

17        Q  If we had rain such as contributed to the heavy

18   runoff of April, 1958, would you expect the runoff from the

19   improved areas of Camp Pendleton to be greater than the runoff

20   from the brush-covered slopes of Mt. Palomar?

21        MR. VEEDER:  I object, your Honor; there is no basis

22   for this response whatever.  There is a tremendous variety of

23   circumstances that exists in every one of these situations.

24        THE COURT:  I will sustain the objection, Mr. Veeder.

25   But you are not going to argue to me that this isn't correct,

1    are you?

2         MR. VEEDER:  I say by and large if water falls in San

3    Francisco a lot of it will runoff.  But I don't know, Mr.

4    Sachse doesn't know, this witness doesn't know, no one knows

5    what is going to happen to an acre foot of water falling in a

6    particular area.  We can speculate all we want.

7         THE COURT:  I will not say that we can't tell what is

8    going to happen.  We know the type of material that if falls

9    upon, we know the time of the year, we know the slope, and

10   we know all the various factors.  We could have a pretty good

11   idea of what would happen.

12        MR. VEEDER:  I simply hope that your Honor will not

13   find too harshly against us in regard to a couple of roofs and

14   a few miles of paving on Camp Pendleton.  Mr. Sachse was

15   trying to make something out of it and I was worried.

16        MR. SACHSE:  Are you through with the speech, Mr. Veeder?

17        MR. VEEDER:  Yes, momentarily.

18   BY MR. SACHSE:

19        Q  Now, Mr. Hofmann, I wish you would compare Exhibits

20   23 and 26, namely, Santa Margarita River near Fallbrook and

21   Santa Margarita River at Ysidora.

22        THE COURT:  You want a comparison of this last year?

23        MR. SACHSE:  This last year, yes, your Honor.

24        Q  Have you the figures?

25        A  Yes, I have.

A5

Z24

Q  I will direct your attention particularly to the figures for the month of March, 1958.

A  Yes, sir.

Q  I observe that the gage runoff at the Fallbrook gage was 3,720 acre feet; is that correct?

A  Yes, 3,720.

Q  And the gage runoff at Ysidora was 7,650; is that correct?

A  That is correct.

Q  Now, what factors affect, in your opinion, the difference between those two figures?  Why was the runoff to the ocean greater than the runoff at Fallbrook?

A  There was additional drainage area between the two sides.

Q  For one thing, of course, there was the De Luz Creek accrual, was there not?

A  That is correct.

Q  And for another, there was the accrual of the other drainage area within Camp Pendleton?

A  I have no way of knowing--

Q  But it existed?

A  If it existed, it is represented in these figures.

Q  And there were certain losses between Fallbrook and Ysidora, were there not?

A  Yes, sir.

A5

Z25

1      Q  What were those losses?

2      A  In general, they were percolation to the ground water,

3  evaporation, transpiration.

4      Q  How about diversions through O'Neill ditch?  Those

5  are extractions from the stream, are they not?

6      A  Yes, sir, if diversions were made at that time.

7      Q  Do you want to check your O'Neill ditch, No. 25,

8  then, for the same month?

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      A  Yes, sir.

2      Q  There were 549 acre feet diverted from the stream

3 through the O'Neill ditch for that month, is that right?

4      A  That is correct.

5      Q  So notwithstanding the diversion of 549 acre feet

6 through the O'Neill ditch and notwithstanding the evaporation

7 and percolation you have just referred to, double the amount

8 of water ~~that~~ ran into the ocean at Ysidora in March, '58, has

9 passed the Fallbrook gage?

10      MR. VEEDER:  Could I hear the question, please.

11      (The Reporter read the pending question.)

12      MR. SACHSE:  Have I got my times mixed?  Let me see.

13 I don't think so.

14      Q  March, 3720 passed Fallbrook; March, 7650 at Ysidora?

15      A  You are correct.

16      Q  I am correct?

17      A  Yes, sir.

18      Q  And looking to the next month, April, you find

19 13,000 acre feet in round figures pass Fallbrook and 22,300

20 spilled to the sea at Ysidora; is that right?

21      A 22,540.

22      Q  500.  My figures aren't clear.

23      So here we have not quite double but the same condition

24 exists, is that right?

25      A  There is more runoff at Ysidora gaging station than

B

Z2

1   the Fallbrook gaging station, yes.

2        Q   And that is true notwithstanding evaporation losses

3   en route and percolation into the undergound basin?

4        A   That is correct.

5        MR. SACHSE:   I have no further questions.

6        THE COURT:   And 11,000 in that month, 11,450 feet in

7   De Luz.

8        MR. SACHSE:   Which is within the military reservation

9   and below Fallbrook, your Honor.

10        MR. STAHLMAN:   I just have a couple of questions.

11

12                    CROSS-EXAMINATION

13   BY MR. STAHLMAN:

14        Q   Mr. Hofmann, east of Vail Dam between the gaging

15   station at Aguanga and the place where the stream empties

16   into the Vail Reservoir there are some diversions and ex-

17   tractions in that area, are there not?

18        A   To my knowledge, there are some, yes.

19        Q   And then, in so far as the figures as to what the

20   contribution to the charge of Vail Dam would be, that can be

21   determined by such method of gaging as you used at the Vail

22   Dam?

23        A   Yes, sir.

24        Q   It gives you the sum total of all the runoffs from

25   tributaries, gullies, and rainfall?

B

Z3

1        A  Yes, sir.

2        Q  Now, you spoke about the rating in connection with

3  the compilation of your figures.  What are the basic factors

4  that comprise the rating?

5        A  Are you referring to Vail, the gaging station at

6  Vail Dam, or in general?

7        A  No, I have left that now.

8        Q  Let me reframe the question.  First, I will ask you

9  a question about how do you compute the figures, such as are

10  officially tabulated on the U.S.G.S. runoff reports?

11        A  The stream gaging station consists of a water stage

12  recorder along the bank of the stream which records the stage

13  of the stream.  To relate the stage to discharge it is neces-

14  sary to establish what we term a rate of curve.  That is based

15  on current meter measurements, measurements of the discharge

16  in cubic feet per second made at intervals, of periodic

17  intervals, once weekly or once every other week, and made at

18  more frequent intervals during the times of flood.  Now, these

19  measurements of discharge are related to the gage height or

20  stage as recorded by the water stage recorder and by the gages

21  on the installation.  Then, by plotting the measured discharge

22  against the gage height or stage, a curve can be drawn through

23  the plotted points.  And from this curve the discharge for

24  the daily, mean daily gage height can be obtained.

25        Q  The rating that you speak of, does that take into

Hofmann    Cross                                    7309

B
Z4

1   consideration the contour of the area, topograph of the ditch

2   or creek at the point of the gaging station?

3        A   To a certain extent, it is reflected.  It is re-

4   flective of the control conditions for that particular gaging

5   station.  By that I mean the feature downstream in the channel

6   which governs the height of the stream at the gage for a

7   particular discharge.

8        Q   What I am trying to understand is that, for instance,

9   assuming that the gage is at a point in the stream where by

10  reason of the action of the stream the area or the contour of

11  the cross-section of the area measured is changed by the stream

12  flow, you compensate for that, do you?

13       A   Yes, on the basis of our measurements?

14       Q   Yes.

15       A   That is correct.

16       Q   Now, then, what is the process by which you obtain

17  your figures?  You yourself make your depth maximum readings

18  of these gages periodically?

19       A   Yes.

20       Q   There are also some readings that are made by Mr.

21  Green who is working for Vail at Pendleton who reads them

22  daily?

23       A   He makes discharge measurements almost daily.  I

24  don't believe he measures every day, but on the average,

25  perhaps 300, 250 to 300 days a week-- a year.

B

Z5

Q   A year, yes.

And are those figures then turned over to your department?

A   Yes, sir, they are.

Q   And what factor do they play in relation to your figures?  Do you merely check on them or do you assume those figures?

A   We use those figures in analyzing the rating for the station at which they were made.

Q   But the final computation is based upon your own readings, are they?

A   Well, the final computations are based on a study of all the data that are available.  Mr. Green's measurements and our measurements are all lumped together and are used in coming up with the final rating.

THE COURT:  What does Mr. Green measure?

THE WITNESS:  He measures the discharge, your Honor.

THE COURT:  Where?

THE WITNESS:  In cubic feet per second.  At the gaging stations of Murrieta Creek and Santa Margarita River near Temecula and--

MR. SACHSE:  Fallbrook.

THE WITNESS:  Fallbrook, I believe.

THE COURT:  You have a recorder, automatic recorder, at each one of those gaging stations, don't you?

Hofmann    Cross                                    7311

B
Z6

1          THE WITNESS:  Yes, sir.

2          THE COURT:  So you have the information from the tape

3   made by automatic recorder?

4          THE WITNESS:  Yes.

5          THE COURT:  And you have got Mr. Green's information,

6   too?

7          THE WITNESS:  Yes, and our periodic measurements in

8   addition to Mr. Green's.

9   BY MR. STAHLMAN:

10         Q  Now, Mr. Green's information that is turned over to

11  you, that is not just merely a reading off of the sheet or the

12  meter, is it?

13         A  No, sir.  It is actually a current meter measurement

14  of discharge of the stream at the instant of time that he is

15  there.  It does not necessarily apply for the entire day,

16  because you get fluctuations throughout the day.

17         Q  But he also makes computations in reaching the

18  figures which he turns over to you, does he not?

19         A  Could you explain the question a little further?  I

20  mean--

21         Q  Let me put it this way:  You have indicated that he

22  doesn't just take the meter reading and turn it over to you.

23  What in addition does he do in reaching the conclusion as to

24  the flow besides the reading of the meter?

25         A  Well, perhaps I should explain a little bit.  In

B

Z7n

1  making a current meter measurement I believe earlier in my

2  testimony I believe I indicated that the meter is placed into

3  the stream at various cross-sections throughout the stream to

4  measure the velocity at that point, and the depth at that point

5  is determined from a rod.  And then by computing the velocity

6  times the depth you come up, or rather the width times the

7  depth gives us an area, and the velocity times these subareas

8  gives you a unit of discharge for a small portion of the

9  stream.  And then, this is accumulated across the stream to

10  come up with the total discharge of the stream.  And those

11  computations are made by Mr. Green.  But his measurements are

12  checked, the computations, I should say, are checked in our

13  office.

14      Q  And have you found discrepancies between your measure-

15  ments and the figures which he has turned in to you?

16      A  Occasionally, yes.

17      Q  Have there been any substantial differences?

18      A  I would have to check into the records before

19  answering that question.

20      Q  You don't have any recollection at this time whether

21  that has occurred on occasion?

22      A  There have been differences on occasion.  And I

23  don't know what you mean by "substantial."  Where those dis-

24  crepancies have been called to our attention we have analyzed

25  the data.

Hofmann       Cross                                7313

B

Z8

Q  What would you call "a substantial"?

A  I would suppose it would depend upon what figures I was dealing with.  Presumably, in stream flow records of this type, if there is a difference of 20 to 25 percent, it would be substantial.

Q  Do you know whether there have been differences greater than 25%?

A  Not offhand.

B2

MR. STAHLMAN:  That is all we have.

MR. SACHSE:  May I inquire:  Do you have any idea, Mr. Hofmann, when this recalculation might be finished?

MR. VEEDER:  It is going to start at once.  He is going to get on the phone as soon as he is off the stand.

MR. SACHSE:  I am just curious as to what the time estimate is as to how long you think it will take to get it compiled.

THE WITNESS:  I probably could have it sometime the latter part of next week.

MR. SACHSE:  Thank you.

THE WITNESS:  I am not certain there will be a re-calculation.

MR. SACHSE:  If there is.

THE WITNESS:  I am going to look into the explanation.

MR. VEEDER:  We will state for the record now:  I think that we will call your Los Angeles office, isn't that right,

Hofmann   Cross                                               7314

B2

Z9

1    today and see if there isn't something.  I want to get this

2    straight as soon as we can.

3         THE WITNESS:  With, of course, permission if I get

4    off the stand today I was going back and look into the matter

5    myself rather than call someone else.

6         MR. VEEDER:  We will move as fast as we can on it.  I

7    don't know that there is an error.  If there is, we certainly

8    want to have the record show that.

9

10                        CROSS-EXAMINATION

11   BY MR. MOSKOVITZ:

12        Q  Mr. Hofmann, yesterday you gave some testimony about

13   yield from Vail Reservoir since it has been in operation?

14        A  Yes, sir.

15        Q  And I believe you testified that you were preparing

16   a tabulation showing--

17        A  Yes.

18        Q  --the yield from the time the gates were closed

19   through this last water year?

20        A  Yes, sir.

21        Q  And you would have that ready for an exhibit?

22        A  Yes, sir.

23        Q  Is that ready?

24        A  No, sir.

25        Q  I have here a typewritten sheet of paper which I

B2

Z10

1   believe was prepared by you?

2        A  Yes, sir.

3        Q  Are those preliminary figures relating to yield

4   that you testified about?

5        A  They are for the first nine years of record, yes.

6        Q  And what you are working on now will add the results

7   of the last water year?

8        A  That is correct.

9        Q  And then make a new calculation of average?

10       A  Yes, sir.

11       Q  Based on last year?

12       A  I think I gave the figures for it, but the typing

13  hasn't been completed.

14       Q  What did you mean by the term "yield" in that testi-

15  mony about Vail Reservoir?

16       A  It is the quantity of water available for use out

17  of Vail Reservoir, based on the records of runoff.

18       Q  And it is the quantity of water that is available as

19  a result of runoff during the period covered?

20       A  Yes, sir.

21       Q  Now, have you ever heard of the term "safe yield"?

22       A  Yes, sir, I have heard of it.

23       Q  And what does that term mean?

24       A  Offhand, it would mean the average annual yield that

25  could be used over a long period of time from a reservoir unit

B2

Z11

1  you are considering.

2      Q  Now, is what you testified to yield a safe yield?

3      A  No, sir.

4      Q  And what is the difference between what you testified

5  to and a safe yield?

6      A  Well, the safe yield for that period would have been

7  considerably less because for the first three or four years

8  the runoff into the reservoir was considerably less than the

9  average of 3,000 acre feet that I gave for the ten-year period.

10      Q  You say the say the safe yield for that period.

11  Have you ever made a safe yield study?

12      A  No, sir.

13      Q  Have you ever run across safe yield studies in your

14  work?

15      A  In the literature, yes.

16      Q  In making a safe yield study, would you use a period

17  as short as ten years?

18      MR. VEEDER:  I object to this, your Honor.  This is

19  beyond any direct examination whatever.

20      THE COURT:  Sustained.

21  BY MR. MOSKOVITZ:

22      Q  You are familiar with the records of runoff at Vail

23  Reservoir, are you not?

24      A  Yes, sir.

25      Q  And how far back do those records go?

1      A  I believe 1924.  But I would check it, if I may.

2   January, 1923 to date.

3      Q  And from those records it is possible to determine

4   what the yield, average annual yield would have been for that

5   period, just as you did so for the period since the Vail

6   Reservoir was put in operation; is that not correct?

.7     A  You would be able to compute the average annual

8   runoff, but there it might not necessarily represent the same

9   figure because of the evaporation losses if you had a

10   reservoir in place at that time.

11      Q  You could compute what the evaporation losses would

12   have been had there been a reservoir during that period, could

13   you not?

14      A  I could not compute them.  An approximation could

15   perhaps be made.

16      Q  Now, on the basis of your knowledge of the runoff

17   records for the period of record, is the period since the gates

18   were closed at Vail Dam representative of the full period of

19   record?

20      MR. VEEDER:  I object to that.  It is beyond the scope

21   of the direct examination.

22      THE COURT:  Read it.

23      (The reporter read the pending question.)

24      MR. MOSKOVITZ:  Your Honor, this witness has put in a

25   compilation of average for a certain period.  He also has

1    introduced the records for the full period. I just want a

2    comparison to know what the import is of the average which has

3    been testified to yesterday.

4         MR. VEEDER:  Then, he should ask that kind of question.

5    He is asking whether this is representative or not of a

6    particular period of time. It is very difficult and very

7    scientific and far beyond anything that has been gone into

8    from the standpoint of the direct examination.

9         THE COURT:  Some of these matters are self-evident from

10   the record. I will sustain your objection. Reframe your

11   question. Pardon me if I go to sleep on some of these matters

12   that you gentlemen persist in going into. I will do my best

13   to stay awake.

14        MR. STAHLMAN:  Move over. I want to lie down also.

15        (Laughter.)

16   BY MR. MOSKOVITZ:

17        Q  Do you know what the average runoff past the Vail

18   Reservoir station has been since the period of record, average

19   annual runoff?

20        A  Past the Vail Reservoir station?

21        Q  Yes.

22        A  That would be then for the period prior to the

23   closure of the Vail reservoir.

24        Q  From the whole period of record up to date?

25        A  The runoff past the Vail Reservoir station since the

B2

Z14

1     closure of the gates is different than the runoff at the in-

2     flow as computed at Vail Reservoir, because the runoff past

3     the dam is only the release from the reservoir; so that the--

4          Q   I will reframe the question then.  The runoff into

5     the Vail Reservoir site through the whole period of record?

6          A   The average for that?

7          Q   Yes.

8          A   I believe that is in one of the exhibits introduced

9     earlier.

10         Q   You happen to know what it is?

11         A   I don't know the number offhand.  It is the monthly

12    tabulation of runoff for the various gaging stations, the

13    average that is given in that.

14         Q   I will ask you this question, then:  Isn't it true

15    the period since Vail Reservoir was closed-- was put in opera-

16    tion is a very dry period?

17         A   Yes, sir.

18         Q   And that the average annual yield that you have

19    calculated is far lower than you would secure if you took the

20    entire period of record?

21         MR. STAHLMAN:  Just a moment.  Has he calculated the

22    annual yield?

23         THE WITNESS:  No.

24         MR. STAHLMAN:  I don't think he has.

25         MR. MOSKOVITZ:  He said he has testified to annual

B2

Z15

Hofmann - Cross

1  yield.

2          Let's have the question answered.

3          THE WITNESS:  Is there a question?

4          (The Reporter read the pending question.)

5          MR. VEEDER:  I object to that.

6          MR. STAHLMAN:  I don't understand the question.

7          THE COURT:  The objection is sustained.

8          Have you calculated any annual yield?

9          THE WITNESS:  No, sir.  The yield of the Vail

10  Reservoir for the ten-year period that has been in place.  I

11  have made no further claim than that, as based on the actual

12  record.

13          MR. MOSKOVITZ:  Your Honor, I don't understand.  I have

14  asked him whether that figure is not far lower than you would

15  get if you took the whole period of record.

16          MR. VEEDER:  And I have objected to it on the ground it

17  is beyond the scope of the direct examination.  If Mr.

18  Moskovitz wants to do some multiplication and dividing, let

19  him do it.

20          THE COURT:  It is obvious, isn't it?  It is proper cross-

21  examination, but is there any argument about it?

22          MR. MOSKOVITZ:  I just want the witness's testimony as

23  an expert if this is a fact, so that we can evaluate the

24  import of the average which is given us for the period since

25  the gates were closed.  It is not a typical period.

1    THE COURT:  Can you answer it?

2    THE WITNESS:  Yes, sir.

3    THE COURT:  Overrule the objection.  Answer the ques-

4  tion.

5    THE WITNESS:  May I have the question again, please.

6    (The Reporter read the pending question as follows:

7  "And that the average annual yield that you have calculated

8  is far lower than you would secure if you took the entire

9  period of record?")

10    A  It is lower, yes.

11    MR. MOSKOVITZ:  All right.  That is all.

12    THE COURT:  Take a short recess.

13    (Recess.)

C

Z26

MR. SACHSE:  Your Honor, looking at my notes, I find that I did not offer Fallbrook's Exhibit AC.  I would like to offer it at this time.

MR. VEEDER:  Which is Exhibit AC?

MR. SACHSE:  The preliminary draft of the sheet on 21.

THE COURT:  Fallbrook's Exhibit AC is received in evidence for comparison purposes, for what use can be made of it.

MR. VEEDER:  May I proceed, your Honor?

THE COURT:  Yes.


REDIRECT EXAMINATION

BY MR. VEEDER:

Q  Mr. Hofmann, would you state how the runoff from De Luz Creek for the water year 1958 compares with the average runoff as you have considered it for the period of record?

MR. SACHSE:  Of De Luz Creek?

MR. VEEDER:  Of De Luz Creek, yes.

THE WITNESS:  The average for the six years of record prior to 1958 was a little over 3,000 acre feet-- 3,270, to be exact, and for 1958 was approximately six times that-- 20,810 acre feet.

Q  What was the minimum during that period of record from De Luz Creek?

A  In the 1957 water year there were only 65 acre feet

1   ran off from the DeLuz Creek watershed.

2        Q  What consideration did you give to the sewage effluent

3   contributions from Camp Pendleton and from Fallbrook in making

4   your response to the inquiry as to the quantities of water

5   passing Ysidora?

6        A  I did not give it any consideration.  The quantity

7   of water passing Ysidora is the flow past that point and would

8   be affected by sewage recharge upstream from that point.

9        MR. VEEDER:  I have no further questions.

10        Mr. Hofmann, you will check immediately, though, on the

11   1958 record.

12        And we will recall Mr. Hofmann, your Honor, for the

13   purpose.

14        THE COURT:  Are you through with the witness now?

15        MR. VEEDER:  No, I am going to have this exhibit marked.

16   It will be Plaintiff's 129.

17        THE CLERK:  Exhibit 129.  That is one exhibit?

18        MR. VEEDER:  Just one exhibit.

19        THE COURT:  There have been some marked I haven't heard

20   about.  What happened between 125 and 129?

21        MR. VEEDER:  There have been exhibits that have been

22   lodged but have not as yet been offered, your Honor.

23        THE COURT:  What are they?

24        THE CLERK:  Exhibit 126 is the map showing the Coahuilla

25   Indian Reservation, land susceptible of irrigation; Exhibit 127

1    is the master shore station development area location map;

2    and Exhibit 128 are a series of photographs, 128-A through

3    128-H.

4                THE COURT:   And this is Exhibit 129?

5                THE CLERK:   This would be 129.

6                THE COURT:   What is Exhibit 129 for Identification?

7                MR. VEEDER:   Exhibit 129 for Identification is the

8    yield of Vail Lake, your Honor.

9                (Plaintiff's Exhibit No. 129 was marked for identifica-

10   tion.)

11   BY MR. VEEDER:

12        Q   Mr. Hofmann, I hand you Plaintiff's exhibit marked

13   129 for identification and ask you to state into the record

14   what it is.

15        A   It is a computation of the yield of Vail Lake for

16   the ten-year period 1948 through 1958.

17        Q   And who prepared it?

18        A   I prepared it.

19        Q   And what was the source of the data that you used?

20        A   The record of the runoff and evaporation as published

21   by the Geological Survey.

22        Q   Is it in your opinion correct?

23        A   Yes, sir.

24        MR. VEEDER:   I offer in evidence Plaintiff's Exhibit

25   marked 129 for Identification.

1        THE COURT:  If there is no objection, I will receive it.

2   It has not been lodged the required length of time.  If there

3   is no objection it will be received in evidence.

4        (Plaintiff's Exhibit No. 129 for Identification was

5   received in evidence.)

6        MR. VEEDER:  This is, of course, subject to the addi-

7   tional testimony by this witness in regard to the record that

8   has been offered in evidence. He is going to testify in regard

9   to the official publication of the U. S. Geological Survey

10  for the year 1958.  You desire that, is that not right, Mr.

11  Sachse?

12       MR. SACHSE:  Yes.

13       MR. VEEDER:  And have you asked for the basic data?

14       MR. SACHSE: No, I am not going to bother Mr. Hofmann

15  for the basic data.

16       THE COURT:  Do you have Exhibit 129, Mr. Clerk?

17       THE CLERK:  Yes.

18       THE COURT:  Is this my copy?

19       THE CLERK:  That is your copy, your Honor.

20       MR. VEEDER:  I have no further questions.

21       MR. STAHLMAN:  I have one question in connection with

22  Exhibit 129.

23

24

25

C

Z30

RECROSS-EXAMINATION

BY MR. STAHLMAN:

Q   Mr. Hofmann, the column of runoff at Vail Dam, is that equivalent to releases?

A   No, sir, it is not.

Q   What is the difference?

A   That is the computed inflow to Vail Reservoir.

MR. STAHLMAN:   That is all.

MR. SACHSE:   You are going to get us some more copies of this?

MR. VEEDER:   Yes, it is going to be reproduced and distributed.

May the witness be excused, your Honor?

THE COURT:   He may be excused.   But if we need him back--

MR. VEEDER:   I mean temporarily.   We are going to call him back ourselves.

THE COURT:   You may be excused.

MR. VEEDER:   Your Honor, at this time I desire to offer in evidence data from the Master's hearing over which your Honor presided, I think it was on May 23rd.   The exhibits are marked in the Master's hearing M-16, which are the papers of incorporation of the Fallbrook Public Utility District. That would be marked for identification as Plaintiff's Exhibit 130.

THE COURT:   Is there any objection to receiving them in

C

Z31

1  evidence?

2          MR. SACHSE:  No objection, your Honor.

3          MR. VEEDER:  I will make the offer now, then.

4          THE COURT:  Exhibit 130 received in evidence.

5          (Plaintiff's Exhibit No. 130 for Identification was

6  received in evidence.)

7          MR. VEEDER:  We desire to have marked as Plaintiff's

8  Exhibit for Identification No. 131 the Master's Exhibit M-28,

9  which was the notice of application to appropriate water by

10 the Fallbrook Irrigation District.

11         MR. SACHSE:  Let's see that.

12         For the record, I object that it is immaterial.  This

13 is a defunct organization.  This application has never been

14 acted on and has no part in these proceedings.  It is immaterial

15 and irrelevant, not tending to prove or disprove any issue in

16 the case.

17         THE COURT:  Is this the previous irrigation district?

18         MR. VEEDER:  That was the irrigation district which was

19 established for the purpose of distributing water for irriga-

20 tion in the Fallbrook area.

21         MR. SACHSE:  It is a defunct organization-- defunct

22 since 1935.  It is a cancelled application.

23         THE COURT:  The point is not whether it is in existence

24 now.  The point, as I understand it, is that it went back

25 to the time when it was a live organization.

Hofmann - Recross

7328

C

Z32

1      MR. VEEDER:  That is correct, your Honor.

2      THE COURT:  The objection is overruled.

3      MR. SACHSE:  Your Honor, in case there is any misunder-

4  standing -- I am not going to quarrel with your Honor's ruling,

5  but this agency has no connection, directly or indirectly,

6  with any party to this litigation.

7      THE COURT:  I understand.  That is not Mr. Veeder's

8  point.

9      MR. VEEDER:  That is correct, your Honor.  We are

10  simply showing that an entity was created to distribute water

11  for the purpose of irrigation and was functioning at one time

12  during the same time that the Fallbrook Public Utility District

13  was in business.

14      I offer in evidence Plaintiff's Exhibit 131 for Iden-

15  tification.

16      THE COURT:  Plaintiff's 131 received in evidence.

17  I don't know that it proves anything, but there is no founda-

18  tional problem.

19      (Plaintiff's Exhibit No. 131 for Identification was

20  received in evidence.)

21      MR. VEEDER:  The next offer is the exhibit from the

22  Master's hearing which is marked M-29, which is a permit that

23  was issued to the Fallbrook Irrigation district by the State

24  of California.

25      THE COURT:  Exhibit 132.

1        MR. SACHSE:  Same objection; irrelevant and immaterial,
2   your Honor.

3        THE COURT:  This was the permit to this organization
4   which is now defunct, the Fallbrook Irrigation District?

5        MR. VEEDER:  Yes, your Honor, to build a dam.

6        MR. SACHSE:  No, it is not a dam permit.  It was a
7   permit to appropriate water.

8        MR. VEEDER:  A permit to appropriate 35,000 acre feet
9   of water to be collected between January 1 and December 31 of
10  each year.

11       MR. SACHSE:  It is not a dam permit.  They come from a
12  different department.

13       THE COURT:  It will be received in evidence for what it
14  is worth as Plaintiff's Exhibit 132.

15       (Plaintiff's Exhibit No. 132 for Identification was
16  received in evidence.)

17       MR. VEEDER:  Next is a statement to the State of
18  California from the Fallbrook Irrigation District, stating
19  that the Fallbrook Irrigation District is going to take no
20  further action in regard to the permit which is marked and
21  offered and received in evidence as Exhibit 132.

22       MR. SACHSE:  The same objection, your Honor.  It is
23  simply the document now that conclusively proves that all other
24  documents have no relation to the case.

25       THE COURT:  What was the Master's number on this?

c

z34

Hofmann   Redirect

1          MR. VEEDER:  M-30.

2          THE COURT:  It will be received in evidence for what it

3    is worth as Exhibit 133.

4          MR. SACHSE:  The objection is overruled, I take it?

5          THE COURT:  Yes, the objection is overruled.

6          (Plaintiff's Exhibit No. 133 for Identification was

7    received in evidence.)

8          MR. VEEDER:  Next I desire to have marked for iden-

9    tification as Plaintiff's Exhibit No. 134 from the Master's

10   hearing Exhibit M-15, application to the State of California

11   of the Fallbrook Public Utility District No. 11587.

12         THE COURT:  That will be Plaintiff's Exhibit 134.

13         MR. VEEDER:  I offer it in evidence, your Honor.

14         MR. SACHSE:  I object, your Honor.  This application has

15   gone to permit, as is shown in our pre-trial stipulation of

16   fact, and your Honor's pretrial opinion has stated that you

17   did not intend to go behind the permits heretofore granted by

18   the Water Rights Board, and therefore any matter that preceded

19   granting of the permit is irrelevant and immaterial.

20         THE COURT:  I see no harm in receiving it in evidence.

21   The objection is overruled.

22         (Plaintiff's Exhibit No. 134 was marked for identifica-

23   tion and received in evidence.)

24         MR. VEEDER:  Next is Exhibit M-17, application of

25   Fallbrook Public Utility District, Application 11586.  That

Hofmann - Redirect

7321

C

Z35

1    will be Exhibit 135.

2          (Plaintiff's Exhibit No. 135 was marked for Identifica-

3    tion.)

4          MR. SACHSE:  Same objection, your Honor.

5          THE COURT:  This also went to permit?

6          MR. SACHSE:  Yes, your Honor.

7          THE COURT:  Overruled.  Exhibit 135 for Identification

8    is received in evidence.

9          (Plaintiff's Exhibit No. 135 for Identification was

10   received in evidence as Plaintiff's Exhibit No. 135.)

11         MR. VEEDER:  The next exhibit from the Master's hearing,

12   marked M-18, would be Plaintiff's 136, application from the

13   Fallbrook Public Utility District No. 12178.

14         MR. SACHSE:  That also has gone to permit and I make the

15   same objection, your Honor, and it is so indicated on our pre-

16   trial stipulation and order.

17         THE COURT:  The objection is overruled.  Plaintiff's

18   Exhibit 136 will be received in evidence.

19         (Plaintiff's Exhibit No. 136 for Identification was

20   received in evidence.)

21         MR. VEEDER:  Exhibit 137 marked for Identification was

22   M-19 in the Master's hearing.  It is application 12179.

23         MR. SACHSE:  That also has gone to permit and it is so

24   indicated in the pre-trial stipulation of facts.  The same

25   objection.

Z36

1    THE COURT:  The objection is overruled.  Received in

2  evidence as Exhibit 137.

3    (Plaintiff's Exhibit No. 137 was received in evidence.)

4    MR. VEEDER:  We have marked for identification three

5  exhibits from the Special Master's hearing which were numbered

6  respectively M-20, M-21 and M-22.  They are the application

7  of the United States Navy Department as amended, Application

8  No. 12576.

9    THE COURT:  Which is which?

10    MR. VEEDER:  The original was M-20, the amendment was

11  M-21, and then there is an exchange of correspondence by

12  Gene Irskine, that correspondence being dated July 13, 1949--

13  that is M-22.  I would like to have those either given

14  separate numbers or give it the No. 138-A and B.  I would like

15  to have it numbered that way, if I may.

16    THE COURT:  138-A, B, and C to correspond with 20, 21

17  and 22.

18    MR. VEEDER:  All right.

19    MR. SACHSE:  Plaintiff's 138, then is the original,

20  Mr. Veeder?

21    MR. VEEDER:  That is correct.

22    MR. SACHSE:  And 138-B is the first amendment, and C is

23  the second?

24    MR. VEEDER:  That is right.

25    THE COURT:  You just want them marked for identification?

C

Z38

1    MR. VEEDER:  I am offering them.

2    MR. SACHSE:  No objection.

3    THE COURT:  Is there any objection to receiving them in

4  evidence?

5    MR. SACHSE:  I have no objection to your receiving them,

6  your Honor.

7    THE COURT:  They will be received in evidence.  They

8  are facts.  What materiality they have--

9    MR. VEEDER:  Your Honor, I will be glad to argue the

10  materiality.

11    THE COURT:  I don't know whether I will let you or not.

12  If I want argument ontheir materiality, I will let you know.

13  I am not conducting a Water Rights Board hearing to decide

14  whether your permit is going to be granted or not.

15    (Plaintiff's Exhibits No. 138,-A, B, and C, marked

16  for identification and received in evidence.)

17    THE COURT:  What is the next one?

18    MR. VEEDER:  The next one is the "Dear Franz, Dear Henry"

19  exchange, marked M-26 before the Master's hearing.  That is the

20  letter signed Franz R. Sachse, an undated letter, to Henry

21  Holsinger.  That would be Exhibit 139.

22    I offer in evidence Plaintiff's Exhibit marked for

23  identification 139.

24    MR. SACHSE:  No objection.

25    THE COURT:  What materiality has that?  I have no

7334

C

239

1   objection to having it in the record and having it marked.

2   But what has that to do with the case?

3        MR. VEEDER:  Your Honor, I take this position, that not

4   only has the United States of America a better right to the

5   use of water, but these bits and odds and ends of filings by

6   the Fallbrook Public Utility District simply cloud our title

7   to the rights to the use of water, and the State of California

8   was simply in error when it granted permits to the District.

9   Now I have raised the point of ultra vires, and I certainly

10  think--

11       THE COURT:  Does that have something to do with ultra

12  vires?

13       MR. VEEDER:  Yes, your Honor.

14       THE COURT:  This exhibit?

15       MR. VEEDER:  Yes.

16       THE COURT:  How?

17       MR. VEEDER:  There is no question that some honest men

18  were running the District at one time and they proceeded on

19  this basis that they had a municipality and that they could

20  appropriate rights to the use of water for municipal purposes.

21       THE COURT:  But what has this letter got to do with all

22  of that?

23       MR. VEEDER:  It simply shows that originally they

24  started with a project which would bring municipal water to an

25  area that needed perhaps municipalwater, and I think these

Z40

1    facts will show that these gentlemen came in a little bit

2    later and they attempted to pervert the law and the incorpora-

3    tion papers of the Fallbrook Public Utility District to get

4    water for irrigation is very important.

5         THE COURT:  Received in evidence as Plaintiff's 139.

6         (Plaintiff's Exhibit No. 139 for Identification was

7    received in evidence.)

8         MR. VEEDER:  M-27 is also a letter to "Dear Franz" from

9    the State Engineer.  That will be Exhibit 140 for Identifica-

10   tion.

11        THE COURT:  Exhibit 140 for Identification.

12        MR. SACHSE:  This is a reply to M-26.

13        THE COURT:  M-26.

14        MR. SACHSE:  You referred to an exchange, Mr. Veeder.

15   I thought they were both in the one exhibit.

16        THE COURT:  Exhibit 139 was the Sachse letter.

17        MR. VEEDER:  That was to "Dear Henry."

18        MR. SACHSE:  That's right.  The second one is the reply.

19        MR. VEEDER:  This one is coming back and saying your

20   1,500 feet on Sandia--Anyway, there it is.

21        THE COURT:  Plaintiff's 140 received in evidence.

22        (Plaintiff's Exhibit No. 140 for Identification was

23   received in evidence.)

24        MR. VEEDER:  The next that I would like to have marked

25   would be Plaintiff's 141, which would be the   revocable

permit from the Rancho Santa Margarita to the Fallbrook Public

Utility District.

MR. SACHSE:  No objection.

MR. VEEDER:  That will be Exhibit 141 for Identification.

THE COURT:  What number did it have before the Master?

MR. VEEDER:  I don't recall that that was marked before

the Master.

THE COURT:  All right.  This is the   revocable permit

from the Rancho Santa Margarita to the Fallbrook Public Utility

District?

MR. VEEDER:  That is correct, your Honor.

THE COURT:  It is received in evidence.

(Plaintiff's Exhibit No. 141 for Identification was

received in evidence.)

MR. VEEDER:  I would also like to have marked as Exhibit

142 the exhibit before the Master which was M-14.  It was a

map that Mr. Bookman made rather extensive markings upon--

locations and similar points in regard to the Fallbrook

applications to appropriate water for, I assume, municipal

purposes.

THE COURT:  Do you offer Exhibit No. 142?

MR. VEEDER:  Yes, I offer Plaintiff's 142.

THE COURT:  A map of what?

MR. VEEDER:  A map of the watershed of the Santa

Margarita River as used in the--

C

Z42

1    THE COURT:  What about the markings made on it?  What

2  can we make out of those-- anything?

3    MR. VEEDER:  Yes.  It will be observed that Mr. Bookman

4  testified in regard to the locations of 12178 and 12179

5  applications, and also the location as to De Luz Creek and

6  various other points, which he himself marked based upon his

7  official capacity, as I recall, and based upon the action that

8  California had taken in preparation of Bulletin 57 and also

9  in regard to the activities before the State Water Rights

10  Board.

11    MR. MOSKOVITZ:  Did you say that he marked these on

12  the basis of his official activities in connection with the

13  granting of permits?

14    MR. VEEDER:  On the basis of his activities as the

15  representative of the State of California, I think.  He said

16  at that time that he prepared Bulletin 57.  And also in regard

17  to actions that were taken before the State Water Rights Board.

18    THE COURT:  If there is no objection, Plaintiff's 142

19  will be received in evidence.

20    (Plaintiff's Exhibit No. 142 for Identification was

21  received in evidence.)

22    MR. VEEDER:  I will have marked for identification as

23  Exhibit 143 the Reporter's Transcript in the condemnation

24  proceeding in the Fallbrook Public Utility District vs. Gene

25  E. Martin, in the Superior Court of the State of California,

C

Z43

1  in and for the County of San Diego, before Judge Sherry.  That

2  has not been deposited the full ten days, but I would like to

3  have reserved for it a number, which would be 143, and I

4  will offer it.

5          THE COURT:  Reporter's Transcript of what?

6          MR. VEEDER:  The condemnation proceeding.

7          THE COURT:  It is not all of the condemnation proceed-

8  ing?

9          MR. VEEDER:  Max Bookman's testimony, and it is marked

10 on the outside of the exhibit, your Honor.

11         MR. SACHSE:  This has not been offered, though.

12         MR. VEEDER:  I will offer it, if the ten-day period

13 doesn't make any difference.

14         MR. MOSKOVITZ:  It does make a difference.  I would

15 like to read that.

16         MR. VEEDER:  I think you should.

17         THE COURT:  It will be marked for Identification as

18 Exhibit 143.

19         (Plaintiff'e Exhibit No. 143 was marked for Identifica-

20 tion.)

21         MR. VEEDER: We would also like to have marked at this

22 time the judgment in the case in the Superior Court of the

23 State of California, in and for the County of San Diego, Rancho

24 Santa Margarita vs. Marguerite R. Vail, et al.  Again, I will

25 reserve a number-- 144.

7339

C

Z44

1    THE COURT:  This is the copy of the Vail Judgement, so-

2  called?

3    MR. VEEDER:  It is not the stipulated judgment.  It is

4  the judgment that was in effect prior to the stipulation.

5    THE COURT:  It is the prior judgment?  Is this the one

6  that was reversed?

7    MR. VEEDER:  That is right, it is the one under which

8  they operated for I don't know how many years.

9    MR. STAHLMAN:  Your are just lodging it?

10    MR. VEEDER:  I am just lodging it.  There is no offer.

11    THE COURT:  All right.

12    MR. STAHLMAN: Do you have an extra copy of that?  I

13  think we have it.

14    MR. VEEDER:  I will call Col. Bowen.

15    MR. SACHSE:  Before you call the witness--

16    Your Honor, this just raises a question in my mind:

17  Should we, if we wish to refer in subsequent argument to your

18  Honor to any other of the Master's exhibits, is it necessary

19  that we renumber all of these with you?  I have no express

20  exhibit in mind at this moment, but Mr. Veeder's action here

21  raises a question.  I have assumed that all of this is in

22  evidence before your Honor, and if subsequently there are

23  arguments before you on the Master's findings or anything

24  of the kind are we not able to refer to the M series of exhibits

25  without renumbering them?

C

Z45

1    MR. VEEDER:  My own thought on that, your Honor, is that

2    it simply makes a more concise record.

3    MR. SACHSE:  I personally would not like to renumber

4    them, because I don't think there is any real point in my

5    using them.  I think there would be very few that I would

6    want to use.  But at the moment I have no idea what Mr. Veeder's

7    objections may or might not be to the Master's findings and

8    undoubtedly if there are such objections they will come before

9    your Honor and there will be occasions to refer to exhibits

10   now bearing only an M. number and I would like to be clear in

11   my mind that I can do so.

12   THE COURT:  It is pretty hard to answer this in detail.

13   I don't see any real problem.  If the report of the Master

14   is before me as to whether his proposed findings should be

15   accepted, adopted and approved, then obviously the transcript

16   of the proceedings and the exhibits are before me.  Now whether

17   out of context some exhibit was before the Master which is not

18   being presented or argued about in connection with the approval

19   of what the Master did is desired to be relied upon by counsel,

20   I don't know offhand.  It seems to me probably the better

21   practice would be to re-offer it.  But certainly as to the

22   matters that come up from the Master the record that he made,

23   the exhibits that he had, are then before me at the time I

24   go over his findings.  But whether out of context you can

25   go back and say that there is in evidence before the Master

C

Z46

1   exhibit so-and-so, if I approve his findings and he left the

2   exhibit in it is probably part of the record in the case.  But

3   in that instance probably the better practice is to re-offer

4   them.

5        That is all I can tell you on that.

6        MR. SACHSE:  That answers my question.

1      MR. VEEDER:  Would you take the stand for a minute,

2  please?

3      THE CLERK:  Col. Allen C. Bowen heretofore sworn

4  October 24th.

5

6              ALLEN C. BOWEN,

7  recalled as a witness in behalf of the plaintiff, having

8  been previously sworn, testified further as follows:

9

10     MR. VEEDER: I would like to have marked for identi-

11  fication Plaintiff's Exhibit 145 which was M-12 in the

12  Master's proceedings.

13     THE COURT:  What is it?

14     MR. VEEDER:  It is simply the index, your Honor, to

15  the United States geological quadrangles which have already

16  been entered.  I think that they are the Exhibit 29 series.

17  And for the purpose of introducing aerial photographs from the

18  exhibit, it is 78.  We will tie those aerial photographs into

19  these quadrangles.

20     Is there objection to this?

21     MR. SACHSE:  No.

22     MR. VEEDER:  I offer 145.

23     THE COURT:  145 received in evidence.

24     You say there is an index to quadrangles.  Is it also

25  quadrangles in there?

D

Z18

1      MR. VEEDER:  No.

2      THE WITNESS:  There are no quadrangles.

3      MR. VEEDER:  Yes, there are.  I beg your pardon.

4      THE WITNESS:  There are.  All these quadrangles are

5  reductions of U.S.G.S. topographic quadrangles with the aerial

6  photographs indexed to them.

7      THE COURT:  This series that you are tying to will be

8  Exhibit 78?

9      MR. VEEDER:  It will tie to Plaintiff's Exhibit 78

10 which when originally marked for identification, your Honor,

11 it was pointed out that the whole area had been flown and the

12 photographs taken.  What we have done is to make a selection

13 of the stream system throughout the Santa Margarita River

14 Valley, tied them to the quadrangles, and will cross-reference

15 them by testimony into the 29 series.  That is what it will

16 amount to.

17     MR. STAHLMAN:  Mr. Veeder, for my information, there

18 have been several sets of aerial photographs referred to.  Is

19 this the one that came from the County Auditor of San Diego?

20     MR. VEEDER:  No, this is the 1959 flight.

21     THE COURT:  '55 flight.

22     MR. VEEDER:  '55 flight; I beg your pardon, your Honor.

23     THE COURT:  '39 flight would come from the Assessor.

24     MR. VEEDER:  That is correct, your Honor.

25     THE COURT:  This is the '55 flight.  There was also a

D

Z19

1    '38 flight which is already in evidence.

2              MR. VEEDER:  That is correct.

3              THE COURT:  That is 75, Mr. Stahlman.  And 73 was the

4    '29 flight.  That came from the Assessor.  That is not in

5    evidence yet.  75 is the '38 flight, and 78 is the '55 flight.

6              MR. VEEDER:  Your Honor, in regard to marking these

7    exhibits, we have set them up on this basis of exhibit 78,

8    and then we have divided them up into stream systems which

9    would be, for example, Murrieta, all these aerials which show

10   the entire course of the stream.  I wanted Col. Bowen to

11   identify them into the record from the standpoint of sections,

12   townships, and ranges as part of our evidence in regard to the

13   general physical features of the Santa Margarita River water-

14   shed.  It ties also to the geology that has already been

15   offered.

16             THE COURT:  What are you going to have the Colonel do,

17   mark them or--

18             MR. VEEDER:  Here is what I have in mind:  Your Honor

19   has raised the point in regard to many of these photographs.

20   The question came up at the time that they were identified,

21   the 1955 flight.  My thought at that time was that the whole

22   flight would go in.  You desired at that time, as I recall,

23   to have the aerials in some way identified with legal sub-

24   divisions and identified too with certain areas so that they

25   could be more readily applied to the other data that is in the

1 record.  Now, we have gone through and the Colonel is prepared

2 to identify each of the photographs from the standpoint of

3 their location in the valley by sections, townships, and

4 ranges.  And by tying them to the 29 series it will be possible,

5 and it is important from my standpoint to be able to identify

6 these various areas concerning which the testimony has already

7 gone in on the geology.

8          THE COURT:  Now by stream systems you start out--

9          MR. VEEDER:  That is correct, your Honor.

10          THE COURT:  --and you follow a stream, upstream or

11 downstream or how do you do it?

12          MR. VEEDER:  Well, you bring it down from the head-

13 waters of the Murrieta, headwaters of Coahuill, headwaters

14 of the Temecula.  Now, I don't care how your Honor desires

15 to have it done.

16          THE COURT:  What--

17          MR. STAHLMAN:  What does it add to our--

18          MR. VEEDER:  It adds this:  That it will be possible

19 to locate under the present circumstances by sections, town-

20 ships, and ranges the areas concerning which the evidence has

21 presently gone in, from the standpoint of geology, from the

22 standpoint of the location of the stream systems, and gives an

23 aerial, a pictorial identification of the stream system as

24 shown on the United States Geological Survey quadrangles.

25          MR. STAHLMAN:  It is cumulative of the evidence already

D

Z21

1    in.

2           MR. VEEDER:  No, it is not cumulative.  It is pictorial.

3    It shows pictures.

4           THE COURT:  Then, the witness will merely testify that

5    a certain picture here is within a certain area?

6           MR. VEEDER:  Within sections, townships, and ranges.

7    And he will give the sections to which they pertain.

8           THE COURT:  Is he going to mark it on here?  It is

9    going to be very difficult to make anything out of that in the

10   record.

11          MR. VEEDER:  The point I was making in regard to the

12   index that we have is this:  By each one of these identifica-

13   tions it is possible to show the section, township and range

14   to which each one of those pictures pertain.  And here is what

15   I hope to do:  I would have it marked Exhibit 78-A, B, C, and

16   D for Murrieta; E, F, and G for Temecula, and right on

17   through; so that it would not be necessary to go through the

18   entire 1959 flight for the purpose of locating and having an

19   aerial photograph of each area to which our evidence as up

20   to this point has been directed.  I don't believe it is

21   cumulative at all, your Honor.  I think it is something in

22   addition for the purpose of identification.  And we don't have

23   pictures of the whole watershed.  Now, I assume-- I don't

24   know what kind of case the defendants are going to put in or

25   what kind of case the State will put in-- but there is no

D

Z22

1   overall aerial flight in evidence, and I assume there will not
2   be other than these locations.
3       THE COURT:  The '38 flight is in evidence.
4       MR. VEEDER:  Well, that doesn't relate to the whole
5   watershed, your Honor.
6       THE COURT:  It doesn't, huh?
7       MR. VEEDER:  Neither does the '29 flight.
8       THE COURT:  Does the '55 flight relate to the whole
9   watershed?
10      MR. VEEDER:  It covers the whole watershed, and these
11  pictures we have simply picked out.  And I personally desire
12  to have them identified from the standpoint of sections, town-
13  ships, and ranges.
14      THE COURT:  I notice, I have in front of me the Murrieta
15  group, and they are marked Murrieta 1, 2, 3, 4, 5, 6, 7, and
16  8.  Now, what did you say these would be, No. 78-A, B, C?
17      MR. VEEDER:  That is correct.
18      THE CLERK:  Excuse me.  We have a 78 series A, through
19  O now.
20      MR. VEEDER:  Well, then, let's make it--
21      THE COURT:  What did you say?
22      THE CLERK:  78 series runs from A through O.
23      MR. VEEDER:  Well, may I explain that to the Clerk?
24      THE COURT:  For what?  In here and here?
25      THE CLERK:  Yes.

D

Z23

1      MR. VEEDER:  You see, your Honor, there are a large

2  number of these aerial photographs that we have previously

3  shown you, that necessarily duplicate certain specified parts

4  of the valley because of the method in which the flight was

5  made.  We have gone through and have selected those pictures

6  out of the 78 series to the end that we can pinpoint and

7  specify the particular areas within each drainage system

8  showing full length of Murrieta, full length of Temecula,

9  the full length of the Santa Gertrudis, the full length of

10  Aguanga.  In other words, there are duplications in here

11  necessarily.  Each flight may show something individually

12  itself.  Now, these pictures that we have picked out are

13  selective out of the whole group, and I would not offer in

14  evidence, unless your Honor desired, anything more than the

15  pictures that we have there.  It will cut down the number of

16  aerial photographs very materially for 1955 flight.

17      THE COURT:  How will we identify them?

18      MR. VEEDER:  They will be identified by tying them

19  strictly to the United States Geological Survey maps.

20      THE COURT:  How will we number them?

21      MR. VEEDER:  My own thought on this, what I being Mr.

22  Luddy's attention to, we do have marked for identification 78-A,

23  B, C, and D.  I don't believe that we would offer anything

24  more.

25      THE COURT:  Well, that is 79-A, B, C, and D.

7349

D

Z24

1    MR. VEEDER:  79-A, B, and C.

2    THE COURT:  That is something else again.  That is

3    gaging stations.

4    MR. VEEDER:  Well, 78-A through O.

5    THE COURT:  78-A through O has been marked for iden-

6    tification.

7    MR. STAHLMAN:  78-P-1--

8    MR. VEEDER:  It can go right on.  I don't care how it

9    is done, your Honor.

10   MR. STAHLMAN:  One group or one creek would be P, then

11   Q, R, and you can go to Z.

12   MR. VEEDER:  I think that the State has already pre-

13   empted Z.  I don't know what it is, but there it is.

14   MR. STAHLMAN:  It is still available.

15   THE COURT:  Of course, the way they are presently

16   marked, they are only identified by groups.

17   MR. VEEDER:  That is correct, your Honor.  There would

18   be no reason why we couldn't mark them any way it would be

19   most convenient.

20   THE COURT:  How could these be identified, Mr. Clerk?

21   Supposing these got mixed up; how could they be put back in

22   order here?  This is 201 to 218.  Is that what it says?

23   THE CLERK:  Yes.  I believe they are marked on the

24   photographs.  This was a system, I think, Mr. Veeder and I

25   worked out just to mark them for identification rather than

MALCOLM E. LOVE, OFFICAL REPORTER

D

Z25

1  mark each picture at the time theywere lodged.

2  THE COURT:  Well, I am going to a Rotary luncheon

3  this noon.  You can figure out something on it.  As far as

4  being any use, a mosaic putting them together would be of

5  far more use than doing it this way.

6  MR. VEEDER:  Your Honor, the President has a budget

7  of 77 billion this year, and I haven't the courage to ask

8  him to raise the debt limit.  That was our problem really

9  when we tried to put them together from the standpoint of the

10  mosaic.  It would take-- well, let the Colonel tell you how

11  many man hours.  I don't know.  But these, in our view, will

12  give you the principal locations throughout the valley tied

13  to section, township, and range.

14  THE COURT:  If the black edges were cut off, of course,

15  you can lay one over the other as you go along.

16  MR. VEEDER:  May I explain how we use them ourselves?

17  THE COURT:  It would be more difficult to do with the

18  black edges on them.

19  MR. VEEDER:  After lunch I will have the Colonel show

20  how we worked on this thing to the end that you can identify

21  them.

22  THE COURT:  2 o'clock.

23  (Noon recess.)

24

25

7351

D2

Z26

SAN DIEGO, CALIFORNIA, THURSDAY, JANUARY 15, 1959.   2:00 P.M.

MR. SACHSE:   Mr. Veeder and your Honor, I have been going over these that you offered, and it appears that 130 is either incomplete or perhaps there is something in it you don't want.  The first sheet of 130 is a letter to Mr. Veeder from the Lt. John McCoffey, Office of Ground Water Resources at Camp Pendleton, which refers to enclosures of the articles of incorporation of Fallbrook and also information dealing with the so-called "secret Marine unit".  Now, there are no papers here dealing with any secret Marine units, and I am very curious whether Mr. Veeder's exhibit is incomplete or whether he wants to withdraw the top sheet.

MR. VEEDER:   No.  No, I thought it was  highly humorous, and I left it in there.  And I know it will give Mr. Sachse an opportunity to talk.  No, that was in the Special Master's exhibit.  It was attached to the matter when it came in, and I left it there.

MR. SACHSE:   Then, I would like to ask Mr. Veeder to complete the exhibit.  I don't see what the secret Marine unit has to do with the articles of incorporation of Fallbrook.

MR. STAHLMAN:   It might be the Lost Battalion.

MR. VEEDER:   The Secret Marine Unit is sitting in the witness stand right there.

THE COURT:   Let's take the sheet off.  It talks about

MALCOLM E. LOVE. OFFICAL REPORTER

Case 3:51-cv-01247-JO-SBC   Document 4565   Filed 09/24/63   PageID.28099   Page 73 of 120.

7352

D2

Z27

1    "Included are articles occurring in the San Diego Evening

2    Tribune and Los Angeles Times".

3         MR. VEEDER:  That is right.

4         THE COURT:  They are not in here.

5         MR. VEEDER:  The whole thing was attached together,

6    your Honor.

7         THE COURT:  May the front sheet be taken off?

8         MR. VEEDER:  Oh, surely.

9         MR. SACHSE: Do you object if it comes off, Mr. Stahlman?

10   I don't.

11        MR. STAHLMAN:  I don't know.  This is a serious matter.

12        THECOURT:  Mark it for identification.  Leave it in as

13   130-A for Identification, but the exhibit will no longer have

14   it in.

15        MR. VEEDER:  At the time I thought it was humorous,

16   your Honor.

17        THE COURT:  130, however, yes, it was offered.

18        MR. VEEDER:  It is in, yes.

19        THE COURT:  So mark the sheet I pulled off as 130-A

20   for Identification.

21        MR. VEEDER:  Has your Honor given directions as to

22   how he desires to have these aerials offered in evidence?

23   I had intended to have each one marked as they were identified,

24   as they related to the quadrangles, and also they have refer-

25   ence to the surface diversions throughout the Santa Margarita

D2

Z28

1  River Valley and have the Colonel identify the exhibit as it

2  related to quadrangles, as it related to surface diversions.

3  Now, if your Honor doesn't want to take time for that, what-

4  ever your Honor directs.  To me it would be helpful in a year

5  from now when we are working on it.  I don't know whether it

6  would be helpful to your Honor or not.

7  THE COURT:  If you can ever find what you are looking

8  for, it might be helpful.  I don't see any reason why all the

9  pictures can't go into evidence, the whole watershed.

10  MR. VEEDER:  I offer all of 78, then, your Honor.

11  THE COURT:  But you want to lay out particular parts

12  of the stream.  I thought probably the thing to do would be

13  to let you try one stream and see how it works out, see what

14  comes of it.  The Murrieta.  You have the Murrieta ready?

15  MR. VEEDER:  Yes, I have it.

16  THE COURT:  Let's see what you do with it.

17  MR. VEEDER:  And I would like to proceed with it.  And

18  I would have these marked in view of the fact that it went

19  down to O, it would be 78P.  If you will just mark on this

20  top one.

21

22

23

24

25

Bowen    Direct

D2

Z29

7354

ALLEN C. BOWEN,

recalled as a witness in behalf of the plaintiff, having

been previously sworn, testified further as follows:

DIRECT EXAMINATION

BY MR. VEEDER:

    Q  Col. Bowen--

    THE COURT:  What will the first one be?

    MR. VEEDER:  78-P.

    THE COURT: All right.

BY MR. VEEDER:

    Q  Col. Bowen, I ask you to view Plaintiff's Exhibit

marked 78-P for Identification and ask you to state what it

is and to identify it on the Plaintiff's Exhibit 145, if you

would, please?

    A  Yes, sir.  Plaintiff's Exhibit marked 78P for

Identification-- first, may I ask a question, Mr. Veeder?

    Q  This is Murrieta.

    A  It is my understanding you wanted to start with the

uppermost photograph in the watershed; and what township?

    Q  Whatever order you have arranged them in.

    A  They have been disarranged.  The second one in the

series is on Murrieta.

    THE COURT:  Well, rearrange them, and let's get new

letters assigned.  We will start with the letter P.  78-P

Bowen   Direct

D2

Z30

1    will be the first one you use, and go on down:  P, Q, R, S, T,

2    U, V.

3         MR. VEEDER:  They have been marked, your Honor.

4         MR. STAHLMAN:  May I make a suggestion.  It probably

5    won't be any good.  If you have a series here and you want to

6    keep the series differentiated, couldn't one series be 78P1,

7    2, 3, 4, and as many photographs as there are, and the next

8    series be 78Q1, 2, 3, 4?

9         MR. VEEDER:  However you want it marked.  It makes no

10   difference to us.

11        MR. STAHLMAN:  If you are going to refer back to them

12   at any time, you would know what series the photograph was.

13        THE COURT:  It has got to be better.  I think 78P;

14   then, the series will be 1, 2, 3, 4.  Will that be agreeable?

15   BY MR. VEEDER:

16        Q  They are now in the proper order?

17        A  Yes, sir.

18        MR. SACHSE:  Then 78P would be Murrieta Creek?

19        THE WITNESS:  Yes.

20        MR. VEEDER:  Murrieta Creek, 78P, whatever it is, 1,

21   2, 3, 4.

22        Go ahead.

23        THE COURT:  Have you got them marked in order?  The

24   Colonel can mark them and get them in the right order.  There

25   is no magic in having the Clerk do it.

Bowen   Direct                                                           7356

D2

Z31

1          MR. VEEDER: They are in the right order now.

2          THE COURT:  All right.

3          THE WITNESS:  78Pl for Identification is a vertical

4   aerial photograph, No. 4-0128.  It appears on the sheet

5   marked "Wildomar Quadrangle" in Plaintiff's Exhibit 145 for

6   Identification in the upper right-hand corner.  The town

7   of Wildomar appears in the lower right-hand corner of the

8   photograph.  The Elsinore fault system traverses the photo-

9   graph from the upper left to the lower right portion of the

10  photograph.  The Murrieta Valley occupies the area northeast of

11  the Santa Rosa Scarp.

12         THE COURT: Do I understand, this printed sheet, that

13  is part of the exhibit-- what is the number of it?

14         THE WITNESS:  145, your Honor.

15         MR. VEEDER:  145.

16         THE COURT:  --was made from these photographs?

17         THE WITNESS:  Your Honor, the photographs were indexed

18  on these topographic quadrangles, and then the quadrangles

19  were photographically reduced in scale for inclusion.

20         THE COURT:  So you have each photograph marked off on

21  Exhibit 145?

22         THE WITNESS:  145, your Honor.

23         THE COURT:  Showing where it goes?

24         THE WITNESS:  Yes, sir.  The lower right-hand corner

25  of the photograph.

DW2

Z32

1    MR. VEEDER:  There is one additional factor, however.

2 From the standpoint of selecting those in relation to the

3 thread of the stream we had to have some more specific

4 identification subjected to this.

5    THE COURT:  What do you mean?  These numbers that appear

6 are the same numbers in the photograph, aren't they?

7    THE WITNESS:  Yes, sir.

8    MR. VEEDER:  He is identifying them from the standpoint

9 of sections and townships and ranges so they tie down more

10 specifically than the large group that is in Exhibit 78.

11 I will show you what I am talking about, your Honor, on that.

12    THE COURT:  Go ahead.  Yes, I know what you are talking

13 about.  I haven't heard anything yet about section, township

14 and range.

15    THE WITNESS:  I could, your Honor, to make this index

16 more helpful mark the exhibit number that appears on the

17 photograph in the vicinity of the photograph number which

18 appears in Plaintiff's Exhibit 145.

19    THE COURT:  Do that.

20    THE WITNESS:  I will mark with a red pencil "78P1"

21 over the numerals 4-0128 appearing on the Wildomar quadrangle,

22 reduction included in Plaintiff's Exhibit 145.  Much of this

23 area is not sectionalized, your Honor, but a portion of it

24 does include sectionalized areas and portions, for example of

25 Sections 26 and 27, 6 South, 4 West appear on Plaintiff's

1    Exhibit 78P1 for Identification.

2    BY MR. VEEDER:

3        Q   Now, would you refer to the next photograph,

4    Colonel, and just proceed on through.   And if your Honor

5    feels that this is not going to be helpful, why, we are per-

6    fectly willing to proceed with another phase of the testimony.

7        A   78P2 is a vertical aerial photograph which is

8    indexed on the Wildomar quadrangle of Plaintiff's Exhibit 145.

9    And I will mark "78P2" over the number 4-0171 which appears

10   on the Wildomar quadrangle reduction contained in Plaintiff's

11   145.   That continues on downstream in Murrieta Valley.   The

12   townsite of Wildomar appears in the upper left quadrant of

13   Plaintiff's Exhibit 78P2, and the valley stems diagonally

14   from the upper left to the lower right corner of the photograph.

15   I am speaking of upper in each instance as north and lower as

16   south.   I have indicated on the photograph with an arrow and

17   the letter N the direction of north.

18       Q   I had you 78P3 and ask you to identify it on 145,

19   if you would, please.

20       A   Plaintiff's Exhibit 78P3 for Identification is

21   indexed on the Murrieta quadrangle reduction contained in

22   Plaintiff's 145.   And I will mark "78P3" in red over the

23   numerals 3-0007 which appear near the town of Murrieta on

24   the Murrieta quadrangle reduction contained in Plaintiff's

25   145.   The town of Murrieta appears in the lower right-hand

Bower — Direct   1399

D2

Z34

1   corner of Plaintiff's 78P3.  The thread of the stream,

2   Murrieta Creek, appears as a dry sandy wash running diagonally

3   across 78P3 from the upper left to the lower right-hand

4   margin of the photograph.

5        Q   I hand you Plaintiff's 78P4 and ask you to identify

6   it on 145.

7        A   Plaintiff's 78P4 is immediately south of-- is an

8   aerial photograph depicting an area immediately south of 78P3.

9   And I will write with a red pencil "78P4" over the numerals

10   3-0008 which appear on the Murrieta quadrangle of Plaintiff's

11   145.

12        Q   Would you identify the course of the stream on the

13   aerial photograph?

14        A   The course of the stream here is shown as running

15   diagonally from the upper left to the central right margin

16   of the photograph.

17        Q   As it relates to the town?

18        A   78P4, the town of Murrieta appears to be right of

19   center of the photograph on 78P4.  The Mesa de Burro of the

20   Santa Rosa Grant appears in part in the lower left-hand corner

21   of 78P4.

22        Q   I hand you 78P5 and ask you to identify it on

23   Plaintiff's Exhibit 145, referring to the physical phenomena

24   that appear on that aerial.

25        A   Plaintiff's 78P5 for Identification is a vertical

D2

Z35

1  aerial photograph which is indexed Murrieta quadrangle re-

2  duction in Plaintiff's 145.  I will mark with a red pencil

3  "78P5" over the numerals 3-035 which appear on the Murrieta

4  quadrangle reduction, Plaintiff's 145.  Murrieta Creek stream

5  bed is shown from the upper left to the lower right-hand

6  corner of the photograph running diagonally across the phot-

7  ograph.  The confluence of Santa Gertrudis Creek and Murrieta

8  Creek is shown to the right of center of Plaintiff's Exhibit

9  78P5.  Santa Gertrudis Creek entering from the upper right

10  corner of 78P5 to the point of confluence previously de-

11  scribed.

12       Q  Didn't you say "Temecula Creek," Colonel?

13       A  Santa Gertrudis Creek.

14       MR. SACHSE:  The first reference, Colonel.

15  BY MR. VEEDER:

16       Q  Murrieta?

17       A  Murrieta Creek, yes, sir.  This is a confluence of

18  Murrieta Creek and Santa Gertrudis Creek on 78P5.

19       Q  And could you locate the Roripaugh surface diversion

20  on that area, at least identify it into the record as to--

21       A  The Leo Roripaugh surface diversion is located in

22  7 South, 3 West, 35-E.  That is the same numbering system to

23  identify the sixteenth of a section in which wells have

24  already been located.  That is a spring tributary to Murrieta

25  Creek used for irrigation, and there is an earth dam structure

D3

D3

Z36

1  there.

2       Q  Now, you proceed with your-- Excuse me.

3       THE COURT:  Can it be identified on the map while you

4  are at it, first on Exhibit 145 in the proper sheet, and then

5  the picture?

6       THE WITNESS:  Inasmuch as this area is not sectional-

7  ized on the map, your Honor, and I haven't run a projection

8  across it, I would not at this moment care to make an iden-

9  tification on the photograph to this particular earth dam

10  and spring.

11  BY MR. VEEDER:

12       Q  Would you locate it on later then, Colonel, and

13  mark it 145?

14       A  Yes, sir.

15       Q  Will you proceed with 78P6.

16       A  78P6 is indexed on the Murrieta quadrangle reduction

17  in Plaintiff's 145.  In the lower right-hand corner I will

18  inscribe "78P6".

19       THE COURT:  P6.

20       THE WITNESS:  P6 over the numerals 3-0052 appearing on

21  the Murrieta quadrangle reduction of Plaintiff's 145.

22  BY MR. VEEDER:

23       Q  Will you identify the physical phenomena which appear

24  on the areal?

25       A  If I may see Plaintiff's 78P5, your Honor.  I

Bowen   Direct

7362

D#3

Z36

1    overlooked the confluence of Warm Springs Creek with Murrieta

2    Creek.   That appears, I believe I described, to the right of

3    center on Plaintiff's 78P5.   There is Warm Springs Creek.

4    And Santa Gertrudis Creek appears downstream in the lower

5    right-hand quadrant of 78P5.   It shows better-- the confluence

6    of both Warm Springs Creek and Santa Gertrudis Creek are

7    shown more clearly on 78P6.   And the Roripaugh diversion

8    referred to appears on the photograph--

9        Q   P6?

10       A   --78P6 near the Roripaugh house.   And I will circle

11   on P6 the pond with red pencil.

12       THE COURT:   What do you mean "the diversion"?   What is

13   it, a pond?   Reservoir?

14       THE WITNESS:   No, a spring, your Honor, which dis-

15   charges into a pond restrained by an earth-filled dam.

16       MR. SACHSE:   Where we stopped at on the trip.

17       THE COURT:   Is this 395 here?   And this is the old

18   road here?

19       THE WITNESS:   Yes, your Honor.

20   BY MR. VEEDER:

21       Q   Would you describe a little more specifically so

22   that--

23       THE COURT:   Let's put "395" on here so we know where we

24   are.

25       THE WITNESS:   All right.   U.S. Highway --

Bowen    Direct

7363

D3

Z37

1    THE COURT:  Well, bear down a little bit.  I can't--

2    MR. VEEDER:  Can we borrow this, Bill?

3    THE COURT:  Bill has got a red pencil.

4    MR. VEEDER:  This will do it, your Honor.

5    THE COURT:  Grease pencil.

6    MR. VEEDER:  It might be a good idea when he comes to

7    each one of those 395's, he can just put that on there.

8    THE WITNESS:  U.S. 395 is inscribed in red along the

9    alignment of the highway as it appears on 78P6.

10    THE COURT:  Put your circle around the diversion so

11    we can see it.

12    THE WITNESS:  Circle the diversion with a red pencil.

13    I will mark, that is California 71, in red on Plaintiff's 78P6.

14    BY MR. VEEDER:

15    Q  I hand you 78P7 and ask you to identify it as it

16    relates to Plaintiff's Exhibit 145 and state the quadrangle

17    to which it pertains, Colonel.

18    A  78P7 is a vertical aerial photograph which is

19    indexed to Temecula quadrangle reduction contained in Plain-

20    tiff's 145.  It appears in the upper right-hand corner of

21    that quadrangle.  And I will mark "78P7" over the numerals

22    3-0053, appearing on the Temecula quadrangle reduction of

23    Plaintiff's 145.  78P7 shows the town of Temecula in the

24    lower right-hand corner; Murrieta Creek entering the photo-

25    graph in the upper left-hand corner and continuing diagonally

D3

Z38

7364

1    across the photograph to the Murrieta Creek.  This is

2    Murrieta Creek diagonally across the photograph to the lower

3    right-hand corner.

4         Q  I think you should mark 395 on that just to the end

5    that we have that for further identification.

6         A  With a red pencil I will mark "395" on Plaintiff's

7    78P7 to indicate the highway.

8         THE COURT:  All right.

9         THE WITNESS:  And I will write the town of Temecula

10   in red, the word "Temecula" near the townsite.  Here, just

11   south of the townsite.

12   BY MR. VEEDER:

13        Q  I hand you 78P8 and ask you to identify it on

14   Plaintiff's Exhibit 145.

15        A  Plaintiff's 78P8, the vertical aerial photograph

16   which is indexed on Temecula quadrangle reduction of Plain-

17   tiff's 145.  It appears just south of 78P7.  And I will, with

18   a red pencil, mark "78P8" over the numerals 3-0054 which

19   appear on the Temecula quad reduction of Plaintiff's 145.

20   Now, the photograph 78P8 shows the confluence of Murrieta

21   Creek entering from the north with Temecula Creek which

22   enters from the east.  The confluence appears to the west of

23   Highway 395, which I will identify in red pencil on 78P8

24   with a number 395."  I will circle the confluence of Temecula

25   and Murrieta Creeks, at which point the stream is known as

Bowen     Direct

D3

Z39

7365

1   the Santa Margarita River, which continues to flow southwesterly

2   through a well-defined gorge as shown on Plaintiff's 78P8.

3       MR. STAHLMAN:  May I ask what this is here, if you

4   know?

5       THE WITNESS:  May I see 78P7, please.

6       MR. STAHLMAN:  A road, is it?

7       THE WITNESS: That is a small, unnamed tributary which

8   drains into Long Canyon.  It is shown as an irregular,

9   elongated white area under right-hand portion of Plaintiff's

10  78P7 and the upper right-hand corner of Plaintiff's 78P8.

11      MR. VEEDER:  If you desire it be the procedure, your

12  Honor, we can have these marked as Q.  We are now in Tucalota

13  Creek.  I beg your pardon; this is Diamond Valley.

14      THE COURT:  78P8 completed Murrieta?

15      MR. VEEDER:  That is correct, your Honor.  I was going

16  to make a blanket offer whenever we got whatever direction

17  you give to us in regard to how you desire to proceed.

18      MR. STAHLMAN: Could it be done with a notation in the

19  record?  Could it be done off the record and put in?

20      MR. VEEDER:  The only thought I had in regard to it,

21  your Honor, was from the standpoint of method of identification.

22  The Colonel and I have been through this twice now in an

23  effort to line up these aerials as they relate to the physical

24  phenomena.  We have had trouble each time now from the stand-

25  point of identifying them.

Bowen   Direct

7386

Dm3

Z50

1          MR. SACHSE:  Could I ask a question?  Mr. Veeder, do

2     these sets of photos cover then all of these tributaries?

3     You mentioned Tucalota and Diamond.

4          MR. VEEDER:  That is right.

5          MR. SACHSE:  And would you have later on Coahuilla

6     and--

7          MR. VEEDER:  We will go down each one of them, and each

8     aerial photograph will be tied to the U.S.G.S. records with

9     a number to the end that if someone wants to locate a

10    particular area from an aerial we will have this index.  You

11    will have a reference to each of the surface diversions as

12    we proceed.

13         MR. SACHSE: All right.  I am frank to say I think it is

14    important.  But I am inclined to agree with Mr. Stahlman.

15    Would it be possible for us to just let the Colonel mark them

16    all in and then as individual might want to cross-examine

17    go into more detail on them?

18         THE COURT:  For instance now, we start out with the

19    next one.  It is Tucalota.

20         MR. VEEDER: Diamond.  I started in on Tucalota.  It

21    is Diamond Valley.

22         THE COURT:  Diamond Valley.  That would be 78Q?

23         MR. VEEDER:  That is correct.

24         THE COURT:  The Q series, and the Colonel could be

25    instructed to number these photographs in the right order on

D3

Z-51

1   from 78Q1 through how far they ran, to insert the number of

2   the photograph on the pages in Exhibit 145 as he has done.

3   And later on you could call our attention to the diversions.

4   There is only one or so in each tributary.

5        MR. SACHSE:  What I had in mind was if I had an

6   individual client, that is why I feel this is important, I

7   could readily take 145 here, not readily, but I could take

8   145 and find out roughly where he is.  And if the Colonel

9   would make the same kind of marks on it, I could then cross-

10  examine the Colonel as to the kind of stream it was at that

11  point.  Otherwise, I wouldn't bother with it unless I was

12  interested.

13       MR. STAHLMAN:  May I ask another question?  This sheet

14  you have been referring to here, is that a key to the differ-

15  ent tributaries?

16       THE COURT:  No, just a description of diversions, of

17  just a few diversions he has here.

18       THE WITNESS:  I have here, Mr. Stahlman, a description

19  of the principal surface diversions for the watershed.

20       MR. STAHLMAN:  In other words, these are the ones you

21  intended to put in?

22       MR. MOSKOVITZ:  I have another suggestion:  On the

23  aerial photographs would it help to place on there the quad

24  sheet on which you find these areas so that they can relate

25  both ways?

D3

252
Z42

1          MR. SACHSE:  Your Honor, I will say this:  I was in-

2     clined to think Mr. Veeder maybe was going into too much

3     detail here for the record; but, considering that I have

4     individual clients up here, I don't know but what it might

5     not save time to have Col. Bowen briefly describe what each

6     one of these sets are and let's get it in.

7          THE COURT:  All right.

8          MR. VEEDER:  That has been our experience on two

9     occasions, your Honor.

10          THE COURT:  Start out with 79.

11          MR. VEEDER:  78.

12          THE COURT:  Pardon me; 78Q1, and so forth.  This is

13     Diamond Valley, I understand?

14          MR. VEEDER:  Correct.

15          THE COURT:  Are these in the right order?

16          MR. VEEDER:  I will have the Colonel look at them.

17     They were in the right order when I brought them to the

18     courtroom.

19          THE COURT:  They are marked right down here on the

20     bottom, aren't they, Colonel?

21          THE WITNESS:  Yes, sir.  I marked those.

22          THE COURT:  1, 2, 3?

23          THE WITNESS:  Yes.

24          THE COURT:  Will you start to mark them, Mr. Clerk.

25          MR. VEEDER:  I thought the Colonel could mark it as he

Bowen        Direct

7369

D3

Z43

went along.  Whatever you say, your Honor.

THE COURT:  Yes, he can mark it as he goes along.

MR. STAHLMAN:  This is Warm Springs Creek, is it?

THE WITNESS:  Yes, sir.

E.

Z47

1        MR. VEEDER:  Will you proceed as you have.

2        THE COURT:  This is Diamond Valley we are starting with?

3        MR. STAHLMAN:  Warm Springs Creek, I think, is the

4   series.

5        THE WITNESS: All of this drainage ultimately goes into

6   Warm Springs Creek and thence to Murrieta Creek.

7   BY MR. VEEDER:

8        Q  This is 78Q1, Colonel.  Will you please identify it

9   and mark it on the quadrangle.

10       A  78Q1 for Identification is a vertical aerial photo-

11   graph showing a portion of Diamond Valley within the Santa

12   Margarita River watershed.  It appears in the lower left-hand

13   corner of 78Q1.  78Q1 is indexed on the Hemet quadrangle

14   reduction which appears in Plaintiff's 145, and with a red

15   pencil I will mark "78Q1" over the numeral 3-0137 which appears

16   on the Hemet quadrangle reduction of Plaintiff's 145.  The

17   portion of Diamond Valley which appears on 78Q1 comprises parts

18   of Sections 32 and 33, 5 South, 1 West and Parts of Sections

19   4 and 5, 6 South, 1 West.

20       Q  Would you mark 78Q2 and locate it on the quadrangle?

21       A  78Q2 is a vertical aerial photograph lying south of

22   78Q1 and showing essentially the same area of Diamond Valley.

23   It was included because with 78Q1 it makes a stereo pair.  With

24   a red pencil on the Hemet quadrangle reduction of Plaintiff's

25   145 I will mark "78Q2" over the numerals 3-0138 which appear

E

z48

1   on the Hemet quadrangle reduction of Plaintiff's 145.  It shows

2   portions of Sections 9, 10, 3, 4 and 5, 6 South, 1 West.

3        Q  Will you mark for identification 78Q3, still in

4   Diamond valley, and identify it as it relates to Exhibit 145.

5        A  Plaintiff's Exhibit 78Q3 is indexed to Plaintiff's

6   Exhibit 145 on the Winchester quadrangle reduction.  With a

7   red pencil I will write "78Q3" over the numerals 3-0131 which

8   appear on the Winchester quadrangle reduction of Plaintiff's

9   145.  The portion of Diamond Valley shown on Plaintiff's Ex-

10  hibit 78Q3 embraces parts of Sections 31 and 32, 5 South, 1

11  West, 5 and 6, 6 South 1 West, the upper portion of Domenigoni

12  contained in Section 1, 6 South, 2 West.

13       78Q4 is indexed to the Winchester quadrangle reduction

14  of Plaintiff's 145.  With a red pencil I will mark on that

15  reduction "78Q4" over the numerals 3-019.  78Q4 shows a

16  portion of Domenigoni Valley laying in Sections 1, 2, 3, 10,

17  11 and 12, 6 South, 2 West.

18       Q  Will you mark 78Q5.

19       A  78Q5 is a vertical aerial photograph indexed to the

20  Winchester quadrangle reduction of Plaintiff's Exhibit 145.

21  With a red pencil I will mark "78Q5" over the numerals 3-0078

22  appearing on the Winchester quadrangle reduction of Plaintiff's

23  Exhibit 145.  On 78Q5 the thread of the stream draining into

24  Warm Springs Creek lying in part in sections 9, 10, 16 and

25  17, 6 South, 2 West.

1          Q   Will you please mark 78Q6.

2          A   78Q6 is indexed on the Winchester quadrangle Plain-

3    tiff's 145.  With a red pencil I will mark "78Q6" over the

4    numerals 3-0074 which appear on the Winchester quadrangle

5    reduction of Plaintiff's 145.  78Q6 shows a portion of the

6    stream in part in Sections 16 and 17, 6 South, 2 West.  That

7    portion is shown in the lower right-hand corner of the photo-

8    graph 78Q6.

9          78Q7 is a vertical aerial photograph just to the south

10   of 78Q6, and it shows the stream channel draining from Diamond

11   to Domenigoni to Warm Springs Creek, lying in part in Sections

12   16, 17, 18 and 19, 6 South, 2 West.  The stream channel

13   appears on 78Q7 diagonally across the lower right-hand corner

14   of the photograph, and I will inscribe with a red pencil on

15   the Winchester quadrangle reduction of Plaintiff's 145 "78Q7"

16   over the numerals 3-0073 appearing in the lower left-hand

17   corner of the Winchester quadrangle reduction.

18         Q   Mark 78Q8 now.

19         A   78Q8 is indexed to the Romo land quadrangle reduction

20   in Plaintiff's 145.  I will mark "78Q8" over the numerals

21   3-0047 appearing in the lower right-hand corner of the Romo

22   land quadrangle reduction of Plaintiff's 145.

23         Q   78Q9.

24         A   I might add that a portion of 78Q8 is also indexed to

25   the Murrieta quadrangle, and I will write "78Q8" over the

1 numerals 3-0047 appearing in the upper right-hand corner of the

2 Murrieta Quadrangle reduction in Plaintiff's 145.

3      78Q9 is indexed to the Murrieta quadrangle reduction

4 in Plaintiff's 145 and lies immediately south of 78Q8, and

5 with a red pencil I will mark "78Q9" over the numerals 3-0048

6 appearing on the Murrieta quadrangle reduction of Plaintiff's

7 145.  Plaintiff's 78Q9 shows the formation marked or known

8 as hogback, which appears as a rough dark area in the right-

9 hand portion of the photograph 78Q9 and Warm Springs Creek

10 traverses 78Q9 from the upper right to the lower center

11 portion of the photograph.

12      MR. VEEDER:  Is there going to be any objection to

13 these aerials?

14      MR. SACHSE:  Not from me.

15      MR. MOSKOVITZ:  No.

16      MR. VEEDER:  Why not let Mr. Luddy mark them admitted

17 as they go along?  Is that all right, your Honor?  If there

18 is no objection, we make the offer.

19      THE COURT:  Have you completed them?

20      MR. VEEDER:  We are moving along through these various

21 ones and he is marking them for identification as we go along,

22 you see.

23      THE COURT:  Have you completed the series 78P1 to

24 78P8?

25      MR. VEEDER:  That is correct.

E

Z51

1        THE COURT:   Are those offered in evidence-- that is,

2   Murrieta Creek?

3        MR. VEEDER:   That is right.

4        THE COURT:   They will be received in evidence.

5        (Plaintiff's Exhibits 78-P-1 to 78-P-8, inclusive for

6   Identification were received in evidence)

7        THE WITNESS:   78Q10 is a vertical aerial photograph

8   which is indexed to the Murrieta quadrangle reduction of

9   Plaintiff's 145.   It lies immediately south of 78Q9.   With a

10  redpencil I will mark "78Q10" over the numerals 3-0049 appear-

11  ing on the Murrieta quadrangle reduction of Plaintiff's 145.

12  Inasmuch as U.S. Highway 395 shows in the left-hand portion

13  of 78Q10, I will write the numerals "395" on 78Q10, with a

14  red pencil, along the alignment of the highway.   Warm Springs

15  Creek traverses 78Q10 from the right central portion of the

16  photograph to the lower central portion of the photograph.

17        78Q10 is the last exhibit to which I referred.

18  BY MR. VEEDER:

19        Q   78Q11?

20        A   78Q11 is indexed to the Murrieta Quadrangle reduction

21  in Plaintiff's 145, and I will write with a red pencil "78Q11"

22  over the numerals 3-0050 appearing on the Murrieta quadrangle

23  reduction of Plaintiff's 145.   Plaintiff's 78Q11 shows the

24  Murrieta Hot Springs resort community.   It shows Highway 395

25  running generally from north to south in the left-hand portion

E52

1    of the photograph.  With a red pencil I will write "395" on

2    78Q11.

3         Q  Will you now mark 78Q12?

4         A  78Q12 is indexed to the Murrieta quadrangle

5    reduction of Plaintiff's 145, and with a red pencil I will

6    mark "78Q12" over the numerals 3-0037 which appear on the

7    Murrieta quadrangle reduction of Plaintiff's 145.  Warm Springs

8    Creek is in the extreme lower right-hand corner of 78Q12.

9    Highway 395 appears running generally from north to south in

10   the right-hand portion of 78Q12, and I will write with a red

11   pencil "395" on 78Q12.  The town of Murrieta appears in the

12   lower left-hand corner of 78Q12.

13        Q  78Q13.

14        A  78Q13 is a vertical aerial photograph indexed to

15   the Murrieta quadrangle reduction of Plaintiff's 145.  With a

16   red pencil on that reduction I will write "78Q13" over the

17   numerals 3-0036.  The confluence of Warm Springs Creek and

18   Murrieta Creek appears in the lower right-hand portion of 78Q13.

19   Murrieta Creek is shown on 78Q13 running generally from the

20   northwest to the southeast.  Warm Springs Creek enters the

21   photograph 78Q13 on the right center margin and flows south-

22   westerly to its confluence with Murrieta Creek.  Highway 395

23   appears on 78Q13, and with a red pencil I will write "395"

24   along the alignment of that highway as it appears on 78Q13.

25        Q  Colonel, I hand you the Santa Gertrudis series, which

Bowen   Direct

E

Z53

XXXX

1  would be R.

2          THE COURT:  How far does that series go?

3          MR. VEEDER:  It goes from 1 through 13.

4          I make the offer of 78Q1 through 78Q13.

5          THE COURT:  78Q1 through 78Q13 are received in evidence.

6          (Plaintiff's Exhibits 78Q1 through 78Q13 for Identi-

7  fication were received in evidence.)

8          THE COURT:  The next series will be 78R.  And what

9  creek?

10          MR. VEEDER:  Santa Gertrudis.

11          THE WITNESS:  This is 78R1, which is a vertical aerial

12  photograph indexed to the Bachelor Mountain quadrangle re-

13  duction of Plaintiff's 145, and with a red pencil on that

14  reduction I will mark "78R1" over the numerals 3-0103.  This

15  78R1 depicts a portion of the Pauba grant in the lower portion

16  of the photograph.  It depicts Santa Gertrudis creek that

17  flows in part in the sections 13 and 14, 7 South, 2 West.

18          MR. SACHSE:  May I interrupt for a moment.

19          Would it not be helpful, when we get to some of these

20  streams, to have the Colonel indicate on the photograph as

21  marked the headwaters?  In other words, the sections are not

22  on the photograph, but can he draw a straight line or something?

23          MR. VEEDER:  I will have him do that.

24          MR. SACHSE:  On the one he just referred to in Sections

25  13 and 14, if he could make a mark as to the approximate

1    headwaters.

2    THE WITNESS:  78R2 is a vertical aerial photograph

3    indexed to the Bachelor Mountain quadrangle reduction of

4    Plaintiff's 145.  With a red pencil on that reduction I will

5    mark "78R2" over the numerals 3-0083.  78R2 shows Santa

6    Gertrudis Creek running generally from east to west in the

7    southerly portion of the photograph.

8    THE COURT:  This creek here?

9    THE WITNESS:  Yes, your Honor, this wavy white line is

10   the stream bed of Santa Gertrudis Creek.

11   The San Diego Aqueduct appears on 78R2 running generally

12   from north to south on the left-hand portion or westerly

13   portion of the photograph.

14   BY MR. VEEDER:

15   Q  Would you mark that "Aqu."

16   THE WITNESS:  "Aqu." is marked on the base of 78R2 to

17   indicate the alignment of the San Diego Aqueduct.

18   Q  Does that appear on 78R1, Colonel?

19   A  No, sir.

20   Q  Now, will you proceed and mark 78R3.

21   A  78R3 is a vertical aerial photograph indexed to the

22   Bachelor Mountain quadrangle reduction of Plaintiff's 145.

23   With a red pencil I will mark "78R3" over the numerals 3-0068.

24   78R3 shows a portion of Santa Gertrudis Creek entering from

25   the easterly margin of the photograph and flowing generally

E

Z55

1    westerly to southwesterly, leaving the photograph in the lower

2    left-hand corner.

3         Plaintiff's Exhibit 78P5 showed the confluence of

4    Santa Gertrudis Creek with Murrieta Creek.  That appeared in

5    the Murrieta series.

6         Q  Would you mark the aqueduct on 78R3?

7         A  The San Diego Aqueduct appears on 78R3 running

8    generally from north to south, slightly to the right of

9    center, and with a red pencil I will mark "Aqu" along the

10   alignment of the Aqueduct.

11        MR. VEEDER:  We offer in evidence 78R1 through 78R3.

12        THE COURT:  Exhibits 78R1 to 78R3, Santa Gertrudis,

13   received in evidence.

14        (Plaintiff's Exhibits 78R1 to 78R3, inclusive, for

15   Identification were received in evidence.)

16        MR. SACHSE: What is the next stream system?

17        MR. VEEDER:  The headwaters of Tucalota Creek down

18   through to the confluence.  That will be the S series, your

19   Honor.

20        THE COURT:  Did you say this is Tucalota?

21        MR. VEEDER:  Tucalota where it joins with Santa

22   Gertrudis.

23        MR. SACHSE:  You are starting at the top, though are

24   you not?

25        MR. VEEDER:  That is right, starting at the headwaters.

E

Z56

1    THE WITNESS:  78S1 is a vertical aerial photograph

2  showing the upper headwaters of Tucalota Creek drainage.  It

3  is indexed on the Sage quadrangle of Plaintiff's 145, and with

4  a red pencil I will mark "78S1" over the numerals 5-0097 which

5  appear in the upper right-hand corner of the Sage quadrangle

6  reduction of Plaintiff's 145.  78S1 shows the upper end of

7  Weber Valley in the lower right-hand corner of the photograph

8  and shows the Willow Canyon area running generally from east

9  to west across the central portion of the photograph.  The

10  sections 27, 28, 29, 32, 33 and 34, 6 South, 1 East--

11    THE COURT:  1 East or 1 West?

12    THE WITNESS:  1 East, your Honor.

13    --are depicted on 78S1.

14    78S2 is a vertical aerial photograph lying south of

15  78S1 indexed to the Sage quad reduction of Plaintiff's 145,

16  and with a red pencil I will mark "78S2" over the numerals

17  5-0098 appearing on the Sage quad reduction of Plaintiff's 145.

18  Most of Weber Valley is shown in the lower right-hand quad-

19  rangle of 78S2.  It appears as a cultivated area amidst a

20  very irregular brush-covered terrain which is darker in

21  character.  78S2 extends the drainage of Tucalota Creek into

22  Sections 4, 8 and 9, 7 South, 1 East.

23    78S3 is indexed to the Sage quad reduction of Plain-

24  tiff's 145, and I will mark with a red pencil on that reduction

25  "78S3" over the numerals 3-0179.  78S3 extends the drainage of

E

Z57

1  Tucalota Creek through Sections 7, 8 and 9, 7 South, 1 East,

2  which appears at the lower right-hand corner of 78S3.

3        78S4 is a vertical aerial photograph indexed to the Sage

4  quad reduction of Plaintiff's 145 and lies immediately south

5  of 78S3, and with a red pencil I will mark "78S4" over the

6  numerals 3-0180 appearing on the Sage quad reduction of

7  Plaintiff's 145.  78S3 shows the so-called town of Sage in

8  the left central portion of the photograph.  State Highway 79

9  appears running generally north and south in the left-hand

10  portion of 78S4.

11        THE COURT:  Mark Highway 79 and mark Sage.

12        THE WITNESS:  I will mark with a red pencil on 78S4

13  "St. 79" ("St." for State), and with a red pencil I will mark

14  the town of Sage on Plaintiff's 78S4.

15        MR. SACHSE:  May I inquire-- I am getting lost-- could

16  you outline, please, with your pencil the boundaries of that

17  picture?

18        THE WITNESS:  Well, the picture, Mr. Sachse, would ex-

19  tend from the right-hand corner where the numeral 3-0180 is

20  shown on the Sage quad reduction of Plaintiff's 145 over to

21  Section 14, 7 South, 1 West, and northerly to Sections 31 and

22  32, 6 South, 1 East.

23        THE COURT:  It goes clear up to this right here (Indicat-

24  ing)?

25        THE WITNESS:  Yes, sir.  That is what I indicated--

E

Z58

1  31-32.

2        78S4, Mr. Sachse, to help orient you, shows also a

3  portion of the Willow Canyon, which is shown on the U.S.G.S.

4  topographic quadrangle.  Willow Canyon is shown in the upper

5  portion of 78S4.

6        78S5 is indexed to the Sage quadrangle reduction of

7  Plaintiff's 145, and with a red pencil I will mark "78S5"

8  over the numerals 3-0166 appearing on the Sage quad reduction

9  of Plaintiff's 145.  78S5 shows the community of Sage in the

10  lower right-hand portion of the photograph.  With a red pencil

11  I will inscribe on 78S5 the word "Sage" to the left of the

12  community and "State 79" appears running northerly and

13  southerly in the right-hand portion of 78S5.

14        THE COURT:  The stream actually runs east and west

15  here, and what looks like almost a ridge is actually the

16  stream running across this way, is it not?

17        THE WITNESS:  The stream, your Honor, leaves the area

18  depicted on 78S5 in the right-hand portion of the southerly

19  margin and will be shown on the next photograph.

20        THE COURT:  Look at 78S4.

21        THE WITNESS:  Yes, sir.

22        THE COURT:  It doesn't leave this picture, does it?  I

23  am looking at the big map up here as we go along.

24        THE WITNESS:  You are right, your Honor.

25        THE COURT:  The stream runs easterly.  In other words,

E

Z59

1 what looks like a ridge here as we first looked at it is

2 actually the stream bed running along this way?

3      THE WITNESS:  Yes, sir.  It makes almost a right-angle

4 turn southwest of the town of Sage and flows in a north-

5 westerly direction.

6      THE COURT:  Do you want to mark that on there in red

7 some way so that we can spot it.  It's very deceiving.

8      THE WITNESS:  In order to avoid obscuring any of the

9 detail on the photograph, your Honor, I will put a small red

10 arrow on the left margin of 78S4 where Tucalota Creek leaves the

11 area of the photograph.

12      THE COURT:  Put a little break line or something there,

13 so that we can pick it up there, or an arrow to it.

14      THE WITNESS:  All right, your Honor, I will put a dashed

15 line along the Tucalota stream channel on 78S4.  The same

16 appears on 78S5 and I was incorrect in saying that the Tucalota

17 stream leaves the area of the photograph 78S5.  It turns and

18 runs northwesterly to west on 78S5 in the lower right-hand

19 corner of the photograph.

20      THE COURT:  Where does it pick up again?  Is this part

21 of the stream bed-- this alluvium in here?

22      THE WITNESS:  Yes, sir.  I can show this corner of the

23 road more clearly on the next exhibit, your Honor.

24      78S6 also shows the town of Sage and Tucalota Creek and

25 a portion of the Pauba Grant.  It is indexed to the Sage quad

Bowen   Direct                                                        7383

E

Z60

1    reduction of Plaintiff's 145, and with a red pencil on that

2    reduction I will write "78S6" over the numerals 3-0165 appear-

3    ing on the Sage quad reduction of Plaintiff's 145.  In the

4    left center of the photograph 78S6, your Honor, is an acute

5    angle in the road which is very near the northeasterly corner

6    of the Pauba Grant right within the Tucalota Valley, and the

7    Tucalota Creek flowing through the canyon which it reaches

8    from the town of Sage.  Sage appears in the right center of

9    78S6.  The creek flows through a canyon until it reaches

10   Tucalota Valley, which is partly within and partly without the

11   Pauba grant.  Near the town of Sage is a suface diversion on

12   Tucalota Creek which consists of an earth dam 150 feet long.

13   It is in 7South 1 West, 12-H, which identifies the sixteenth

14   of the section in which it lies.

15        THE COURT:  Say that again.

16        THE WITNESS:  7 South, 1 West, Section 12H.

17        MR. SACHSE:  Do you know who that is, Colonel?

18        THE WITNESS:  Johnson.  That is where the Shetland

19   ponies are raised that we saw when we drove through that area.

20        THE COURT:  Who represents Johnson?

21        Will you mark the diversion on it when you see it on

22   the map?

23        THE WITNESS:  It is in the vicinity of the town of Sage,

24   your Honor.  I can't at the moment make it out on the photo-

25   graph.

E

Z61

1      THE COURT:  Is it across the bed of the Tucalota?

2      THE WITNESS:  I am not certain, your Honor, whether it

3 goes clear across the stream bed or whether it is off to the

4 side.  At the moment my notes don't indicate that it does or

5 does not cross the stream bed of Tucalota Creek.

6      78S7 is a vertical aerial photograph which is indexed

7 to the Sage quad reduction of Plaintiff's 145.  With a red

8 pencil on that reduction I will write "78S7" over the numerals

9 3-0142.  Tucalota Valley appears in the lower portion of 78S7,

10 the creek flowing from east to west.  The same distinguishing

11 road bend which is near the northeast corner of the Pauba Grant

12 appears also on 78S7.

13      78S8 is a vertical aerial photograph indexed to the

14 Sage quadrangle, Plaintiff's 145.  It lies immediately south

15 of 78S7.  With a red pencil on that reduction of Plaintiff's

16 145 I will write "78S8" over the numerals 3-0143.  It shows the

17 Tucalota Valley running from east to west about centrally

18 located on 78S8.  Also, 78S8 shows Glen Oak Valley in the

19 lower portion of the photograph.

20      THE COURT:  On this one why don't you write somewhere

21 down there "Glen Oak Valley" and then write "Tucalota" so that

22 we will not be mixed up?  It shows both of them.

23      THE WITNESS:  Yes, sir.  On Plaintiff's 78S8 I have

24 written the word "Tucalota" over Tucalota Valley, and I have

25 written the words "Glen Oak" under the Glen Oak Valley.

1       THE WITNESS:  78S9 is a vertical aerial photograph

2   indexed on the Bachelor Mountain quadrangle of Plaintiff's 145,

3   and with a red pencil I will write "78S9" over the numerals

4   3-0126 appearing on the Bachelor Mountain quadrangle reduction

5   of Plaintiff's 145.  78S9 shows Tucalota Creek flowing

6   generally from east to west across the central portion of the

7   photograph.  The right-hand portion of 78S9 is in a canyon.

8   About the center of the photograph it enters a valley area

9   which is cleared and cultivated to some extent, and shown on

10  78S9.

11      Auld Valley will appear on a later photograph, Mr.

12  Hall, if that is satisfactory.

13      MR. HALL:  Absolutely.

14      THE WITNESS:  78S10 is a vertical aerial photograph

15  indexed to the Bachelor Mountain quadrangle reduction of

16  Plaintiff's 145.  It lies immediately north of 78S9, and with

17  a red pencil I will write 78S10 over the numerals 3-0127

18  appearing on the Bachelor Mountain quadrangle reduction of

19  Plaintiff's 145.  78S10 shows the valley area lying largely

20  in Section 1, 7 South, 2 West, through which Tucalota Creek

21  flows.

22      Of interest to Mr. Sachse, I believe, that also 78S10

23  shows Rawson Canyon, which is tributary to Tucalota Creek,

24  and the confluence of the drainage from Rawson Canyon and

25  Tucalota Creek is shown in the lower central portion of 78S10.

E_
Z63

THE COURT:  Rawson Canyon coming in from the north?

THE WITNESS:  Yes, sir, Rawson Canyon comes in from the north.

THE COURT:  Mark it "Rawson Canyon" there, because on Exhibit 15 when it was identified that was merely identified as an unknown tributary of Tucalota Creek.

THE WITNESS:  Yes, sir.

THE COURT:  There is also another tributary of Tucalota Creek, a very small one, that comes in from the east, flowing almost directly west.  Is that shown?  In here?

THE WITNESS:  Yes, sir.

THE COURT:  It is unnamed on Exhibit 15.

E. 9

A 1

THE WITNESS:  Yes, sir.  I know of no name for it.

With a red pencil on 78S10 I have written the words "Rawson Canyon" to the left of the alignment of the drainage in that canyon.

78S11 is a vertical aerial photograph indexed to Bachelor Mountain quadrangle reduction of Plaintiff's 145, and with a red pencil I will write "78S11" over the numerals 3-0105 appearing on the Bachelor Mountain quadrangle reduction of Plaintiff's 145.  Tucalota Creek appears on 78S11 running from east to west, south of center.  Auld Valley is shown in the Westerly half of the Tucalota Valley depicted on 78S11. I will write in red on 78S11 the words "Auld Valley" underneath the general area of the valley, and with an arrow indicate the location that is northerly of the lettering on 78S11.

THE COURT:  Do I understand that Tucalota Creek flows through Auld Valley at this particular place?

THE WITNESS: Yes, your Honor.

MR. MOSKOVITZ:  Is that one that is also known as Los Alamos?

THE WITNESS:  It could be, Mr. Moskovitz.  I am more familiar with Auld Valley term.  Alamos School is located in that area, so I would assume that Los Alamos may be a local name.

78S12 is a vertical aerial photograph indexed to the Bachelor Mountain quadrangle reduction of Plaintiff's 145, and

E 3

A 2

1   with a red pencil I will write "78S12" over the numerals

2   3-0081 appearing on the Bachelor Mountain quadrangle reduction

3   of Plaintiff's 145.

4       May I have 78S11, please, your Honor.

5       On 78S12, Tucalota Creek is shown flowing westerly and

6   southerly in the lower right-hand corner of the photograph.

7       THE COURT:  Mark right underneath "Tucalota Creek,"

8   so we will know where it is.

9       THE WITNESS:  With red pencil I will write on 78S12

10  in the lower right-hand corner beneath the creek itself the

11  words "Tucalota Cr.," abbreviating creek "Cr.".

12      THE COURT:  What is the highway running cater-corner?

13      THE WITNESS:  That highway on 78S12 running diagonally

14  through the upper left-hand corner of the photograph, is now

15  known as Winchester Road.

16      French Valley is the valley which lies parallel to and

17  easterly of Winchester Road.  I will write "Winchester Rd.,"

18  abbreviating "Road" as "Rd." on 78S12.

19      THE COURT:  Where is Winchester Road on the map?  Way

20  up in the corner?

21      THE WITNESS:  Yes, your Honor.  On the Bachelor Mountain

22  quadrangle reduction of Plaintiff's 145, Winchester Road is

23  shown in the upper left-hand corner.

24      I have already mentioned French Valley, Mr. Veeder, as

25  paralleling Winchester Road and lying Easterly of it.  I will

E   3

A   3

1   write easterly of French Valley in red pencil on Plaintiff's

2   78S12, the words "French Valley" and indicate with an arrow

3   the approximate location of that valley.

4       Plaintiff's 78S13 is a vertical aerial photograph indexed

5   on the Bachelor Mountain quadrangle of Plaintiff's 145, and

6   with red pencil on that reduction I will write "78S13" over

7   the numerals 3-0070.  78S13 is also indexed to the Murrieta

8   quadrangle reduction of Plaintiff's 145, and on that reduction

9   I will write "78S13" in the right-hand margin over the numerals

10   3-0070.

11       THE COURT:  That area (indicating) is in this one here?

12       THE WITNESS:  No, your Honor.  Your Honor pointed to

13   Warm Springs Creek, which appears in the Westerly portion of

14   78S13, westerly of Winchester Road, which traverses 78S13 from

15   the upper right-hand corner to the left central portion of the

16   photograph.  The distinctive bend in Winchester Road, which

17   appears approximately in the center of 78S13, can be identified

18   by the road symbol on the Murrieta quadrangle which appears

19   partly in Sections 6 and 7, 7 South 2 West.

20       THE COURT:  Where is the Tucalota Creek on this picture?

21       THE WITNESS:  Tucalota Creek, your Honor, is in the

22   lower right-hand corner of 78S13, entering along the lower

23   right margin and leaving the photograph on the central part

24   of the lower margin.

25       MR. VEEDER:  Mark it "Tuc. Cr."

E   3

A   4

THE WITNESS:  On 78S13 I will indicate "Tuc. Cr." in the lower right-hand corner of the exhibit, indicating Tucalota Creek.

There also appears on 78S13, the San Diego Aqueduct running from north to south.  I will indicate with "Aqu." along the alignment of the aqueduct.

On 78S13 I will indicate Winchester Road with "Win. Rd."-- all in red.

THE COURT: On Exhibit 145 Tucalota Creek, then, is crossing down through here; is that right?

THE WITNESS:  On Murrieta quadrangle of Plaintiff's 145, your Honor, Tucalota Creek enters the quadrangle.

THE COURT:  That is what you told me was Warm Springs, just a minute ago.

THE WITNESS:  I said that Warm Springs, Sir, was the creek which your Honor pointed out on 78S13, lying westerly of Winchester Road, and Tucalota Creek appears entering Section 18, that portion of Section 18, 7 South 2 West, which appears on the Murrieta quadrangle of Plaintiff's 145.

THE COURT:  All right.

THE WITNESS:  78S14 is a vertical aerial photograph which is indexed to the Bachelor Mountain quadrangle reduction of Plaintiff's 145, and with a red pencil I will mark "78S14" above the numerals 3-0069 which appear on the Bachelor Mountain quadrangle reduction of Plaintiff's 145, and also appears on the

1   Murrieta quadrangle reduction of Plaintiff's 145.  I will mark

2   "78S14" in the right-hand margin of the Murrieta quadrangle

3   reduction above the numerals 3-0069.

4        Plaintiff's 78S14, your Honor, shows the Winchester Road-

5   San Diego Aqueduct alignment and Tucalota Creek entering the

6   area of 78S14 about the center of the right-hand margin, flowing

7   diagonally in a Southwesterly direction and leaving the area of

8   the photograph on the left of center.  With a red pencil on

9   78S14, I will indicate "Winchester Road" (abbreviation) and the

10  "San Diego Aqueduct" (abbreviation) and "Tucalota Creek"

11  (abbreviation).

12       78S15 is a vertical aerial photograph indexed to the

13  Murrieta quadrangle of reduction of Plaintiff's 145, and with

14  a red pencil I will write "78S15" over the numerals 3-0051

15  appearing on the Murrieta quadrangle reduction of Plaintiff's

16  145. 78S15 shows confluence of Tucalota Creek and Santa Gertrudis

17  Creek in the lower right-hand quadrangle of the photograph.

18  Tucalota Creek flows in from the northeast, and Santa Gertrudis

19  Creek flowing from the east.  78S15 also shows the resort

20  community of Murrieta Hot Springs, and it shows Warm Springs

21  Creek flowing generally from northeast to southwest, westerly

22  of the Tucalota-Santa Gertrudis system.  A portion of Murrieta

23  Creek is shown on 78S15 flowing from northwest to southeast, in

24  the lower left-hand of 78S15.  I will indicate "395" on 78S15 to

25  indicate Highway 395.

MR. VEEDER:  We offer 78S1 to 78S15, inclusive, in evidence.

THE COURT:  All right.  Where are the rest of them?

MR. VEEDER:  I have given them to the Clerk already.

THE COURT:  They are received in evidence.

(Plaintiff's Exhibits 78S1 to 78S15, Inclusive, were received in evidence.)

MR. VEEDER:  This is the 78T Series, Santa Margarita.

THE COURT:  78T1.  What valley is this now?

MR. VEEDER:  This is known as the Santa Margarita River Valley.  It is an intermittent stream.

THE COURT:  This is from the gorge on down?

MR. VEEDER:  Yes, your Honor, from the confluence of the Murrieta and Temecula.

THE WITNESS:  The confluence of Murrieta Creek and Temecula Creek, which together form the Santa Margarita River, was shown on Plaintiff's Exhibit 78P8, and the upper portion of the Temecula Creek is also shown on 78P8.

78T1 shows a portion of the Santa Margarita-Temecula Canyon--the Temecula Canyon of the Santa Margarita River, more properly stated -- in the lower    right-corner of the photograph. 78T1 is a vertical aerial photograph indexed on the Temecula quadrangle of Plaintiff's 145.  With red pencil I will write "78T1" over the numerals 3-0032, appearing on the Temecula quadrangle reduction of Plaintiff's 145.  The confluence of

E   4
A   7

1   Temecula and Murrieta is not shown on 78T1.  78T1 shows only

2   a portion of the canyon reach of the Santa Margarita River.

3   I can identify it in part by Sections, it is that portion which

4   flows through Sections 26 and 27, 8 South 3 West.

5       78T2 is a vertical aerial photograph indexed on the

6   Temecula quadrangle reduction of Plaintiff's 145, and with a

7   red pencil on that reduction I will write "78T2" over the

8   numerals 3-0031 on the Temecula quadrangle reduction of Plaintiff's

9   145.  78T2 shows a portion of the Temecula Canyon reach of the

10  Santa Margarita River.  The portion of the canyon shown lies

11  partly in Sections 26,27, 33 and 34 of 8 South 3 West, and

12  partly in Section 4, 9 South 3 West.

13      That creek, Mr. Sachse, which is tributary to the Santa

14  Margarita River,  draining generally from east to west, appear-

15  ing in the lower right-hand corner of 78T2, is Stone Creek.

16      MR. VEEDER:  Why don't you mark "Stone Creek" on there?

17      THE WITNESS:  On 78T2 I will write "Stone Cr." ( creek

18  abbreviated) in red, in the drainage area of that creek tribu-

19  tary to the Santa Margarita River.

20      Incidentally, the County line between San Diego and

21  Riverside counties, traverses 78T2 from east to west in an

22  easterly-westerly direction.

23      78T3 is a vertical aerial photograph indexed to the

24  Temecula quadrangle reduction of the Plaintiff's 145, and with

25  a red pencil I will write "78T3" over the numerals 3-0013.

E 4

A 8

1   78T3 shows a portion of the canyon reach of the Santa Margarita

2   River flowing generally through Sections 4,5,6,7 of 9 South,

3   and 3 West, and portions shown in Section 12, 9 South, 4 West.

4   The Santa Margarita flows in the canyon, which is in the Southerly

5   portion of 78T3.  Both of the Sandia and the Rainbow confluences

6   with the Santa Margarita, are shown on 78T3.  Sandia Creek flows

7   from north to south through left-hand portion of 78T3 to its

8   confluence with the Santa Margarita River in the Northwest

9   quarter of Section 7, 9 South, 3 West.

10   BY MR. VEEDER:

11      Q  Would you mark it on that?

12      A  I will circle the confluence of Sandia Creek and

13   the Temecula River with a red pencil on 78T3 and write "Sandia

14   Con." ( "Confluence" abbreviated) in the lower left-hand corner

15   on 78T3.

16      Q  Could I ask you to put "Cr." following "Sandia."

17      A  "Sandia Cr."  ("creek" abbreviated).

18      Q  And make that "Conf.," if you would.

19      A  "Conf." on 78T3 is the abbreviation for "confluence",

20   at the request of Mr. Veeder.

21      The confluence of Rainbow Creek with the Santa Margarita

22   River also appears on 78T3 in the lower right-hand corner.  I

23   will circle that with red and write below it "Rainbow Cr."

24   ("creek" abbreviated) and obove it "Conf." for "Confluence".

25      THE COURT:  Where is Rainbow coming?

E   4

A 9

THE WITNESS:  Rainbow, your Honor, comes in from the lower right-hand corner and flows in this portion of its course northwesterly along the road.  The road is shown in there.  It flows northwesterly through this portion of its reach, through this reach of the system to the confluence with the Santa Margarita River.  It shows more clearly, your Honor, on 78T4, which is a vertical aerial photograph indexed to the Temecula quadrangle reduction of Plaintiff's 145, and I will write with red pencil on that reduction "78T4" over the numerals 3-0014.  The canyon reach of the Santa Margarita River is shown generally through the central portion of the photograph from east to west.  Rainbow Creek confluence  is shown in the right-hand portion of the photograph.  I will circle that on 78T4.  Sandia confluence is shown to the left of center on 78T4, and I will circle that with a red pencil.  The town of Fallbrook, or a portion of it, your Honor, appears in the lower portion of 78T4.  The approximate position of the Santa Margarita grant line appears in the lower left-hand corner of 78T4.

MR. VEEDER:  I think, Colonel, it would be a good idea to mark on there Rainbow and Sandia again on 78T4, if you would please.

THE WITNESS:  All right.  "Sandia Cr." ("creek" abbreviated) confluence to the left of the circle on 78T4, indicating that confluence, and I will write "Rainbow Cr. Conf."

E -4

A 10

1    ("creek " and "confluence" abbreviated) to the right of the

2    red circle on 78T4, indicating the location of that confluence.

3         MR. HALL:   The Fallbrook dam site?

4         THE WITNESS:   It appears on 78T4.

5         MR. VEEDER:   Do you want the dam site on there, your

6    Honor,?

7         THE COURT:   Where is it?

8         THE WITNESS:   Just below the confluence of Sandia Creek

9    and the Santa Margarita River, your Honor, at the narrowest

10   portion of the valley, which is shown there.

11        THE COURT:   Well, it is time for Mr. Moskovitz to go.

12        MR. MOSKOVITZ::   I don't mind, your Honor, if Col.

13   Bowen and Mr. Veeder want to continue with this.

14        THE COURT:   How much more do have on this?

15        MR. VEEDER:   We have only 5 more on this, and then we

16   will be through on the Santa Margarita.

17        MR. MOSKOVITZ:   If you don't mind, I think I will leave.

18        THE COURT:   You will be excused.

19        ( Mr. Moskovitz leaves at this point.)

20        THE WITNESS:   78T5 is a vertical aerial photograph

21   indexed on the Temecula quadrangle reduction of Plaintiff's

22   145, and on that reduction with a red pencil I will mark "78T5"

23   over the numerals 4-0162 on the Temecula quadrangle reduction

24   of the Plaintiff's 145.  The Santa Margarita River canyon reach

25   is shown traversing generally from east to west, or south of

E 4

A 11

1   west through the center portion of 78T5.  78T5 shows, as did

2   78T4, the grant line which is now boundary of Camp Pendleton

3   and the Naval Ammunition Depot, westerly of which the Santa

4   Margarita River is within the Naval Reservation.  78T5 shows

5   a portion of the town of Fallbrook in the lower right-hand

6   corner and a portion of the ammunition storage igloos in the

7   lower central portion of the photograph.  The location of the

8   Naval Ammunition Depot river diversion is shown on 78T5.

9        MR. SACHSE:  Can you see it?

10       THE WITNESS:  Yes, sir.

11       MR. SACHSE:  Could I ask you to mark it, please.

12       THE WITNESS:  With a red pencil on 78T5 I will encircle

13   the NAD's diversion on the Santa Margarita River.  I will write

14   "NAD" in red on 78T5 to the right of the circle showing the

15   river diversion.

16       The gauging station, Mr. Hall, would be just upstream

17   from the ford on the Fallbrook-De Luz Road--that is, the ford

18   crossing the Santa Margarita River, which ford does appear on

19   78T5.

20       THE COURT:  In all these pictures, the high places look

21   low and the low places look high.  Is that the way they are

22   supposed to appear?

23       THE WITNESS:  That is an optical illusion, your Honor.

24   Ofttimes you can correct it if you orient the picture so that

25   the source of light falls from the same direction as the sun

1    shone on the landscape at the time the photograph was taken.

2    78T6 is a vertical aerial photograph which is indexed

3    to the Moro Hill quadrangle reduction of Plaintiff's 145,

4    and with a red pencil I will write "78T6" over the numerals

5    4-0139 as it appears on the Moro Hill quadrangle reduction

6    of Plaintiff's 145.  78T6 shows an additional portion of the

7    NAD's storage area.  It shows the Santa Margarita River flow-

8    ing through the canyon reach from the upper right-hand corner

9    of the photograph 78T6, southwesterly, where it departs from

10   78T6 in the lower left-hand corner.  De Luz Creek draining

11   from the north is shown in the left-hand portion of 78T6.  The

12   confluence with the Santa Margarita River is shown in the lower

13   left-hand corner.  I will encircle the confluence of De Luz

14   Creek and the Santa Margarita River on 78T6 in red, and write

15   below that circle, "De Luz Creek Conf." (for "Confluence").

16   Incidentally, the NAD diversion is also shown on 78T6 in the

17   upper right-hand corner of the picture.

18   78T7 shows a portion of the Santa Margarita River be-

19   low the confluence with De Luz Creek.  78T7 is indexed to the

20   Moro Hill quadrangle reduction of Plaintiff's 145, and with a

21   red pencil I will mark "78T7" over the numerals 4-0111 as they

22   appear on the Moro Hill quadrangle reduction of Plaintiff's

23   145.  78T7 shows the confluence of De Luz Creek and the Santa

24   Margarita River.  It shows the river for approximately a mile

25   below that confluence.

A 13

1          That is the last photograph in this series.

2          MR. VEEDER:  Now we have the soil survey maps, your

3    Honor, which are Plaintiff's Exhibit 93, which show in detail

4    from the point where the Colonel just stopped.

5          THE COURT:  From De Luz, on down the river?

6          MR. VEEDER: Yes, your Honor, the balance are on Exhibit

7    93.

8          MR. SACHSE:  Do you contemplate, with this same series,

9    finishing up the upper tributary?

10         MR. VEEDER: Yes.

11         THE COURT:  What is the last number?

12         THE WITNESS:  78T7.

13         MR. VEEDER:  Which we now offer in evidence, your Honor.

14         THE COURT:  78T1 to 78T7, are received in evidence.

15         ( Plaintiff's Exhibits 78T1 to 78T7, inclusive, are

16    received in evidence.)

17         THE COURT: We will adjourn until Tuesday, January 20th,

18    1959, at 10 o'clock a.m.

19         ( Adjournment until 10 a.m. on Tuesday, January 20, 1959.)

20

21

22

23

24

25