# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Tuesday, January 20, 1959

Pages: 7400 to 7534

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
Deputy

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,     )
                              )
                Plaintiff,    )
                              )
        vs.                   )       No. 1247-SD-C.
                              )
FALLBROOK PUBLIC UTILITY      )
DISTRICT, et al.,             )
                              )
                Defendants.   )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, January 20, 1959

APPEARANCES:

        For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                 Special Assistant to the
                                 Attorney-General,
                                 Department of Justice,
                                 Washington, D. C.

1    APPEARANCES (Continued)

2        For Defendant                GEORGE E. STAHLMAN, ESQ.
         Vail Company

3

4        For Defendant State         STANLEY MOSK, ESQ.,
         of California               Attorney-General, by
                                     ADOLPHUS MOSKOVITZ, ESQ.,

5                                    Deputy Attorney General;
                                         and

6                                    CARL BORONKAY, ESQ.

7        For Defendants
         Fallbrook Public
8        Utility District,           FRANZ R. SACHSE, ESQ.
         et al.,

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX TO WITNESSES

| For the Plaintiff: | Direct | Cross |
|---|---|---|
| Walter Hofmann | 7411 | |
| (By Mr. Sachse) | | 7414 |
| (By Mr. Moskovitz) | | 7420 |
| (By Mr. Stahlman | | 7421 |
| | | |
| Allen C. Bowen | 7424 | |
| | 7466 | |
| (By Mr. Sachse) | | 7445 |
| (By Mr. Stahlman) | | 7464 |
| | | |
| Lyle F. Warnock | 7497 | |
| (By Mr. Sachse) | | 7505 |

# EXHIBITS

| Plaintiff's Exhibit | Iden. | In Evid. |
|---|---|---|
| 126 | | 7437 |
| 126-A, B, C. | | 7443 |
| 124-A through N | | 7427 |
| 78-U-1 through 78-U-4 | | 7486 |
| 78-V-1 through 78-V-19 | | 7486 |

SAN DIEGO, CALIFORNIA, TUESDAY, JANUARY 20, 1959.  10:00 A.M.

THE CLERK:  1, 1247-SD-C, United States of America vs.
Fallbrook Public Utility District, et al.  Further court trial.

MR. VEEDER:  Your Honor, I would like to interrupt the
interrogation of Col. Bowen at this time for the purpose of
calling Mr. Walter Hofmann of the United States Geological
Survey in regard to Plaintiff's Exhibit 21 and the supplementary
sheet to be added to that exhibit by reason of the calculations
now made in connection with the water year 1958.  May I call
Mr. Hofmann?

MR. STAHLMAN:  Pardon me, Mr. Veeder.

Your Honor, not at this particular time, but sometime
during the day I would like to present to your Honor some
thoughts that have been provoked by reason of the 15-point
program that your Honor has made inquiry about.  I think it has
pointed up some matters, some of which it may be a little early
to consider.  However, it may be well to have them in mind, and
some of them, I think, are directly connected with the matters
which your Honor has made inquiry of.

THE COURT:  Do you want to do it now?

MR. STAHLMAN:  I could do it at this time, yes.

THE COURT:  All right.

MR. STAHLMAN:  I think that the manner in which your
Honor is conducting this trial, such as putting out these

1　questions, is very beneficial to counsel, that we may have the

2　opportunity to exchange thoughts as we proceed through this

3　case.  As I have previously indicated, I think this is a matter

4　in which we are searching for the truth-- it is not a contest

5　as to whose cherished opinions may prevail, and with that

6　thought in mind, and realizing that if we go overboard one way

7　or the other on any of these critical issues, in years to come

8　we are going to have to suffer the consequences of it.  So it

9　may be well to give some thought to some of these matters.  As

10　I have indicated, some of them, I believe, will follow by

11　reason of evidence that may be adduced in the future, and some

12　I think are directly created by some of the questions which your

13　Honor has asked.

14　　　　First, there will be matters pertaining to the Vail Dam

15　and what its benefits are and what its usefulness is and what

16　its utility may be to the Vail Company.  That is one of the

17　issues that, I think, we will have to wait until there is evi-

18　dence to support what occurs upstream that will have some

19　effect upon it, and I believe some of the matters that are

20　directly related to some of the issues upon which your Honor

21　has questioned us will have some effect upon it.  I don't think

22　it is something that could be determined this early in the case.

23　　　　However, coming to the Pauba Basin, there seems to be,

24　as I view  the evidence-- and I may be wrong in some of my

25　conclusions here; I am merely commenting upon these matters for

1  the purpose of probably getting myself in line and straight-

2  ened out more than any other thing-- there seems to be some

3  contention on the part of the Government that the storage areas,

4  such as Storage Unit No. 4, have some direct relationship with

5  the stream system; and I think one of the things that has to

6  be determined is what areas constitute the stream system, and

7  when we come to these areas in which the stream reaches porous

8  material and some of the water goes underground it then becomes

9  a question as to whether or not some of the area in the vicinity

10  may be charged by the stream.

11        Now we have these two different types of material, and

12  in attempting to reach some determination in my own mind as to

13  what the situation may be, I have found some of our cases in

14  California where the factual situations have been outlined in

15  the decisions.  They may be a guide to us as to what is the

16  character of evidence that is deficient in this case and which

17  should be supplied before we can reach some of these conclu-

18  sions.  And I have this matter in mind.

19        In the first place, it has been well established by our

20  decisions as to what constitutes a stream system.  The elements

21  which must be taken into consideration, I think, are quite well

22  defined, such as the channel, direction of flow, and whether

23  or not the waters leave the system and whether they return to

24  the system.  It is important to determine the stream system,

25  because upon that hinges the definite rights whether or not

1    certain persons may or may not be riparian to the stream.

2         Now the evidence thus far does to some extent indicate,

3    although there is some small conflict, as to what the capacity

4    of these basins may be-- speaking of all basins in general.

5    In addition to that, I think it is quite important, as has

6    been decided in other cases and I understand from a conver-

7    sation with Mr. Illingworth this morning that the State is

8    going to come up or is attempting to or is making some studies

9    in relation to what the balance of the lower basins may be.

10        MR. VEEDER:  I didn't hear that.

11        MR. STAHLMAN:  The balance.  By that I mean the balance

12   of the basin.  Probably we haven't used those terms in our

13   discussion, but they have referred to what is the safe yield

14   of that basin.

15        Now those matters that I have spoken of, such as whether

16   or not the lands adjoining the Pauba Basin may be a part of the

17   storage unit of the Pauba Basin, receive charge from the river,

18   as to whether or not the overlying land owner and the riparian

19   are to have common rights, is a very important question in this

20   case, I think.  I can see where the operation, toward which we

21   are trending in this case, as to what the pumping may be and

22   who shall do it and what quantity of water may be extracted and

23   by whom, would have a bearing upon the rights of the riparian

24   as they may be related to the overlying land owner.

25        Now it may be or may not be that there is that close

1    continuity between charge and recharge from the older to the

2    younger alluvium, that that may occur.  But I would think that

3    the evidence in the case at this point has established that.

4         And then we are confronted with the presumption that has

5    been well established in California cases that where water has

6    once left the stream system it is to be determined as being

7    vagrant and percolating water, and the presumption is that it

8    is not a part of the stream system, and that presumption of

9    course would have to be overcome by proof.

10        Then we have the determination as to whether or not the

11   older alluvium is part of the unit No. 4, or whether it is a

12   part of unit No. 1, or whether it is a part of unit No. 3, and

13   what the relationship will be.

14        For instance, I can see the possibility that the water

15   that may lie in this area here, in Unit No. 4, may, as it

16   indicates here, all flow in this direction.  If it does, by

17   reason of the definition of the stream system, it therefore

18   would not be partof the stream. And it may be that this water

19   is coming from rainfall and small canyons, et cetera, that

20   charge that.  It may flow in one direction.  It may not flow

21   in the other. There is that possibility.

22        The point I am driving at is that there is no evidence

23   yet, and if it is possible to obtain this evidence before the

24   determination of this case, if some of these engineers can

25   come up with some means or method by which it may be determined,

1   it may be helpful to us.  But what we want to find out is,

2   what is the situation?

3         There is another question:  What is the rate of percola-

4   tion?  How fast does this water travel?  If it is to be charged

5   to the stream system, to what extent would it be charged?  I

6   am speaking now of the Pauba Basin.  We have the same factors

7   here.  It would appear that from the Murrieta Basin here, by

8   reason of the barrier, what charge could come from that stream?

9   If not, is there a charge from the Pauba Basin?  What is the

10  rate?  Would wells that are placed back a distance be affected

11  to the same extent as wells which would be adjacent to the

12  flowing stream system of the area where we know that we receive

13  ready and immediate charge?

14        Then we have questions as we proceed downstream that I

15  think are questions of law that might be decided at this time

16  and could be helpful.  And some of these matters, your Honor,

17  are my deductions that are made from the trend of the evidence

18  and the questions that are asked by the various counsel,

19  pointing out what their contentions may be.

20        I would like to pause and say that it is unfortunate

21  that we have some of these seeming conflicts which seem to be

22  a contest as to whose opinions will prevail.

23        Now we get down into the area of Pendleton.  There are

24  some questions there.  They affect Vail.  Some of them may be

25  detrimental, some of them may be helpful-- I don't know.  I am

1   not approaching this with the idea in mind as to who may be

2   benefited by the conclusions which are ultimately to be drawn.

3   But in the Pendleton Basin there is a question that is already

4   raised here as to whether or not the waters in that basin should

5   be kept at such elevation as they could sustain the natural

6   growth.   Now that is a question.   I believe some comment was

7   made on that in the early Santa Margarita vs. Vail suit and

8   other cases that followed that indicated that that was a

9   question of fact that may differ in each individual case.

10        So it may be important for us to consider that are the

11  facts to make a determination as to whether or not that

12  character and kind of water usage would be a reasonable and

13  beneficial use so that that basin may receive water to that

14  extent.   I am not saying it does, I am not saying it doesn't.

15  I am saying it is a question which I think can be determined

16  in the early stage of this case.

17        Another question we have is the seeming conflict between

18  the approach of Fallbrook and the approach of the Navy as to

19  whether or not the lower basins could receive, by artificial

20  means, recharge for the repulsion of salt water intrusion or

21  water that may retard or correct that condition; as to whether

22  or not, by artificial means, the injection of water into a

23  basin in order to maintain water levels to preserve the utility

24  and the efficiency of the basin is a reasonable and beneficial

25  use of riparian waters.

4.23

Z10

1       And then the question of salt water intrusion, as to

2   what may be done in that respect.  I think we will probably

3   ultimately come to the necessity of reaching the physical

4   solutions, which the later cases are tending to indicate must

5   be done in some of these areas where there are widely dispersed

6   uses of water and many users and conditions that exist that can

7   be brought about in order to effectuate the purposes of our

8   amendment ot the Constitution.

9       Now those are some of the matters that I had in mind,

10  and they were mostly provoked by my attempt to answer your

11  Honor's suggestion that we formulate the facts so that con-

12  clusions may be drawn from them, and of course we have to have

13  some of the law that applies to it.  So I think some of these

14  legal questions should be considered at an early stage and can

15  be considered by reason of the evidence that is now in the

16  record.

17      THE COURT:  Thank you, Mr. Stahlman.

18      MR. VEEDER:  May we proceed, your Honor?

19      THE COURT:  You may proceed.

20      MR. VEEDER:  I will call Mr. Hofmann.

21      MR. SACHSE:  Your Honor, I have a very minor correction

22  of the record.  It is on page 7306 of Friday's transcript at

23  line 8:  Delete the word "that"-- this is in my question-- and

24  at the end, the last word in the sentence should be "as" rather

25  than "has."

1    THE COURT:  The correction will be made.

2    MR. SACHSE:  On line 22, and I have checked this with

3  Mr. Hofmann, the transcript gives Mr. Hofmann's answer to the

4  question as 2,540 and the answer was 22,540-- a 2 is missing.

5    THE COURT:  On the same page?

6    MR. SACHSE:  On the same page, your Honor.

7    THE COURT:  The correction will be made.

8    THE CLERK:  Walter Hofmann, heretofore sworn on October

9  17.

10

11                        WALTER HOFMANN,

12  recalled as a witness in behalf of the Plaintiff, having been

13  previously sworn, testified further as follows:

14

15                        DIRECT EXAMINATION

16  BY MR. VEEDER:

17    Q  I hand you, Mr. Hofmann, the page of tabulations

18  marked "Santa Margarita River near Temecula," supplemental

19  page to Plaintiff's Exhibit 21, and I ask you to state into the

20  record what it is.

21    A  This is the annual runoff for the Santa Margarita

22  River near Temecula, tabulated mean daily discharges as

23  corrected.

24    Q  When you state "as corrected," would you clarify that

25  into the record, Mr. Hofmann?

1      A   This tabulation is to supersede the tabulation that

2   I presented last Wednesday, I believe, as an insert to Exhibit

3   21.   There were some corrections.

4      Q   I hand you the page which you state you desire to

5   supersede and I ask you, please, to refer to the data and the

6   period that was involved and clarify the statistics shown on

7   that page.

8      MR. SACHSE:   May I interrupt a minute.   Mr. Veeder is

9   referring to this as Exhibit 21.   We have an Exhibit 21.

10   Shouldn't that be distinguished for the purpose of the record?

11   So that we will know which 21 he is talking about.

12      THE COURT:   21 is the whole exhibit.

13      MR. VEEDER:   There is no amendment to it.   It is simply

14   a supplemental page.

15      THE COURT:   This is the 1958 calculation.   We will just

16   have to mark this "Corrected" on this sheet that is being

17   offered today to distinguish it from the earlier sheet, which

18   will not have that word on it.   Does that take care of it?

19      MR. SACHSE:   That takes care of it, your Honor.

20      MR. VEEDER:   Will it be agreeable to withdraw the

21   original sheet that was filed?

22      MR. SACHSE:   We object to the withdrawal of the original

23   sheet, Mr. Veeder.

24      THE COURT:   It will remain in the record and this will

25   be the corrected sheet.

BY MR. VEEDER:

    Q  Would you proceed, Mr. Hofmann?

    A  Yes.  The corrections are on approximately--

    THE COURT:  Three months-- February, March and April.

    THE WITNESS:  February, March and April, and involve three to five days in each of those months.

BY MR. VEEDER:

    Q  Name the days and refer to the changes.

    THE WITNESS:  The changes are for February 4 from 493 to 514, on February 5 from 104 to 116, and on February 19th from 36 to 42.

    MR. STAHLMAN:  I fell off the sled here.  Is this sheet he is testifying to from a new one that you produced this morning?

    MR. VEEDER:  Yes.

    MR. STAHLMAN:  I don't have a copy.  May I have a copy?

    THE WITNESS:  The daily discharge for March 15 has been changed from-- from 14 to 17-- from 689 to 745.

    THE COURT:  What day in March?

    THE WITNESS:  March 16th, from 689 to 745, and March 17 from 50 to 55, and on March 22nd from 189 to 259, and from 38 to 41.

    THE COURT:  That is the 23rd?

    THE WITNESS:  That is March.

    THE COURT:  The 28th has been changed to 41.

A3

Z14

1        THE WITNESS:  Yes.  And on April 1, 1410 has been

2   changed to 1516, on the 2nd of April, 347 to 466, on the 3rd

3   of April, 1240 to 1360, and on the 4th of April, 191 has

4   been changed to 252.  Then on the 7th of April 876 has been

5   changed to 944 and 170 has been changed to 208.  That is all

6   the changes in the daily tabulation.

7        The monthly values have been changed.  Runoff in acre

8   feet has been changed for February from 1700 to 1770; in March

9   from 2800 to 3130; and in April from 9,460 to 10,560.

10       The other monthly computations have been changed accord-

11   ingly.

12       MR. VEEDER:  We offer the amended page in Exhibit 21.

13       MR. STAHLMAN:  May I ask some questions first, your

14   Honor.

15       THE COURT:  Yes.

16       MR. STAHLMAN:  Did you have some questions?

17

18                    CROSS-EXAMINATION

19   BY MR. SACHSE:

20       Q  Mr. Hofmann, I call your attention to March 27th;

21   didn't you change that one, too, from 61 to--

22       A  Yes, sir.  I beg your pardon.

23       Q  March 28, didn't you change that one?

24       A  Yes, that has been changed.  I didn't mark it on my

25   sheet.  I didn't run through the entire list.  March 27th has

Z15

1  been changed from 61 to 74; and March 28 has been changed from

2  85 to 100.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

B

Z1

1      Q  Now, I notice that the maximum discharge figure in the

2  extreme left-hand page -- 5,720 c.f.s., 5:30 P.M., April 1--

3  has not been changed, although your April total runoff has been

4  changed?

5      A  That is correct.

6      Q  That is correct the maximum discharge will remain

7  the same.

8      Now, has this corrected sheet been referred to

9  Washington for final approval?

10      A  The matter is being sent to Washington today, but

11  the type of revision that was necessary in this correction is

12  not one that generally Washington would change the local

13  office computation on.

14      Q  However, it has not yet been approved?

15      A  It has not yet been approved by Washington.

16      Q  What was the type of error that accounted for-- let's

17  take the 1st of April: 500 acre feet out of 1410.

18      A  That is approximately 10% change.  And the change in

19  all of these figures is due to the same condition, in that the

20  rating that was used in making the computation was improperly

21  shaped through the medium and high range.

22      MR. VEEDER:  When you state "improperly shaped," would

23  you go into the terminology a little more.

24  BY MR. SACHSE:

25      Q  Please do.  Go ahead.

1        A  If I might show it on the board, it would be a

2   little simpler, I believe.

3        MR. SACHSE:  I don't want this stuff.  It has been on

4   since before Christmas.

5        MR. VEEDER:  Unless your Honor desires to retain it.

6        THE COURT:  I don't care for that.  It may go off unless

7   somebody wants it.

8        MR. VEEDER:  Will you proceed, then, Mr. Hofmann, to

9   show what occurred.

10       THE WITNESS:  As I testified earlier, a rating curve

11  relates the gauge height or stage gauge height to the discharge

12  or Q, and it is defined by periodic current reader measurements.

13  There will be a number of measurements in the lower range

14  plotted-- this is gauge height in feet along the vertical axis

15  of the diagram, and discharging cubic feet per second along the

16  horizontal axis.  And we have a peak value and measurements in

17  here.  These measurements do not plot the same from year to

18  year.  And in shaping this rating curve then, you have measure-

19  ments through this range and a known peak up here, and then the

20  problem is to draw this rating curve from the peak to the

21  lowest stage to encompass the entire range in stage that your

22  stream encounters during the year.  And in shaping this rating

23  considerable difference can occur.  I am exaggerating this

24  slightly.  In this medium and high range this curve would give

25  you more discharge.  And by "this curve" I mean the one to the

1  right of the diagram would give you more discharge for the same

2  gauge height than this curve.  And while this spread is

3  exaggerated, this is essentially what was incorrect in the

4  original analysis for Temecula or Santa Margarita River near

5  Temecula gaging station.  But the curve was improperly shaped

6  in this range.

7       MR. VEEDER:  I have no further questions.

8       MR. SACHSE:  I am still examining, Mr. Veeder.

9       MR. VEEDER:  Well, I had made the offer.  Then you

10  raised a point.  I simply had a couple of more questions.  Go

11  ahead and examine him.

12  BY MR. SACHSE:

13       Q  When were these rating curves made of this gauge?

14  Sit down, Mr. Hofmann, please.

15       A  Which ones, Mr. Sachse?

16       Q  For the 1958.

17       A  The rating curves originally were prepared, I think,

18  in about November, October or November.

19       Q  Then, did you in making this correction actually go

20  back and change the rating curve?

21       A  Yes, sir.

22       Q  On the same data, however, that you corrected in

23  November, is that right?

24       A  Yes, sir.

25       Q  You didn't change--

A   The same data that we had collected during the water year from October 1 of 1957 to September 30, 1958.

Q   Who made the rating curve in November?

A   One of our employees.

Q   And did you check it?

A   I did not personally check it.  Another one checked it.

Q   When it went to Washington it was checked there?

A   Yes, sir.

Q   And they were satisfied?

A   Yes, sir.

Q   But now you went back and checked it over the week-end and found you made an error?

A   Not over the weekend; last Friday and yesterday, and I checked it.

Q   And you find that you made a mistake?

A   That the curve was improperly drawn, yes.

MR. SACHSE:  I have no further questions.  However, go ahead.  The offer has been made of 21.  I have no objection to, of course, corrected 21 for 1958 going in.

MR. VEEDER:  Now. let's have the record straight.  There is simply one page, '58 water year is all that is being offered at this time.

THE COURT:  It will be received.  The document with the word "Corrected" on it showing the water year from October 1st,

1957, through September 30th, 1958, as part of Exhibit 21.

MR. VEEDER:  Have any other questions?

MR. SACHSE:  I have nothing further, Mr. Veeder.

MR. STAHLMAN:  That answers my question.

MR. MOSKOVITZ:  I want to ask a question or two.


CROSS-EXAMINATION

BY MR. MOSKOVITZ:

Q  Mr. Hofmann, what led you to believe that the rating curve you are now using on which the figures in this revision were based is the correct one?

A  Personal judgment, experience.

Q  And what factors led you to believe that the other one was not correct that has been superseded?

A  The fact that there were inconsistencies in the record would be one.

Q  The inconsistencies that were pointed out by Mr. Sachse?

A  Yes, sir.

MR. MOSKOVITZ:  I have no more questions.

THE COURT:  I understand that just a slight change in this curve can make a considerable effect on the acre feet computations?

THE WITNESS:  Your Honor, the difference in the acre-feet computation is 10% between the ones originally percented

1    and these.  And if you will recall, I believe earlier in my

2    testimony I did not claim much greater accuracy for the stream

3    flow records for most of the gaging stations of the Santa

4    Margarita River than that 10%.  The physical characteristics

5    of the gaging sites are such that they do not lend themselves

6    to the type of accurate determination that you would get by,

7    say, counting the number of pennies in a jar, something of that

8    type.  That it is a matter of interpretation and judgment. And

9    the final answers for any of these records for any years would

10   be in the accuracy range of from five to ten percent.  So that

11   that is--

12       MR. STAHLMAN:  I have one question.

13

14                        CROSS-EXAMINATION

15   BY MR. STAHLMAN:

16       Q  I believe you say five or ten percent.  Is that for

17   any one station?

18       A  Well, some are better than others, Mr. Stahlman.  I

19   am just using that statement generally.  But I would say that

20   it would apply for any one station, or for any particular year

21   that theanswer could be in error by somewherein the nieghbor-

22   hood of five to ten percent.

23       Q  Are there some stations that you feel that by reason

24   of some factor they are more dependable than others?

25       A  Murrieta Creek would probably be a little more

1  dependable than Santa Margarita River near Temecula, because the

2  rating is more stable at that site.  And again, that would be

3  I am talking in this accuracy of daily figures, your Honor.

4  The monthly figures generally are in a more accurate, say,

5  from two to five percent and the annual figures are in that

6  same range, two to five percent, because the daily errors tend

7  to compensate.

8          MR. STAHLMAN:  That is all.

9          MR. VEEDER:  I have no further questions, your Honor.

10          THE COURT:  All right.  You may step down.

11          MR. VEEDER:  Call Col. Bowen, please.

12          Your Honor, at this time we would like to proceed in

13  connection with the claims of the Indians in the valley of the

14  Santa Margarita River.  We had originally hoped that we could

15  proceed on the basis of offering this evidence, the Forest

16  Service evidence and the Bureau of Land Management evidence,

17  at the time evidence was taken in the several valleys as we

18  have been doing.  My understanding is there is objection to

19  that.  We will go ahead out of order somewhat for the purpose

20  of meeting that objection to the end that we can rest our

21  entire case as soon as possible.

22          THE COURT:  You hadn't finished the description of

23  these photographs?

24          MR. VEEDER:  No, I hadn't, your Honor.  I thought

25  that--

z8

1    THE COURT:  Go on to something else at this time?

2    MR. VEEDER:  If I may interrupt that now and go ahead.

3    THE COURT:  All right.

4

5              ALLEN C. BOWEN,

6    recalled as a witness in behalf of the plaintiff, having been

7    previously sworn, testified further as follows:

8    MR. SACHSE:  Are you going to want to refer to some

9    of these photographs in connection with this examination, Mr.

10   Veeder?  You are going into Indian Reservation along Pechanga

11   Creek and Col. Bowen has not yet done Coahuilla Creek or

12   Pechanga Creek, these areas that you were producing yesterday.

13   It seems to me, with all due respect, you run your own case,

14   but it would be lots more logical if we could at least have

15   the photographs he is talking about.

16   MR. VEEDER:  I was helping a young man get to Dallas.

17   He is not so young any more.  He wants to go to Dallas, and

18   I would like to get him on the stand and off if I may.  I

19   don't believe I am giving him time if I go that way.  However,

20   if your Honor directs, I will put him on.

21   MR. SACHSE:  I am perfectly willing to try, but we may

22   want to cross-examine him further.

23   MR. STAHLMAN:  Why would anybody want to go to Dallas?

24   THE COURT:  What was that?  Let's go ahead, Mr. Veeder.

25

B2

Z9

7424

## DIRECT EXAMINATION

BY MR. VEEDER:

Q  Col. Bowen, I hand you Plaintiff's Exhibit marked 124-A through N, I believe, for Identification, and ask you to state into the record what that identification comprises.

A  Plaintiff's Exhibit 124-A through N for Identification are photographic copies of the field survey sheets used in preparation of soil survey and land classification data for the Coahuilla Indian Reservation within the Santa Margarita River watershed.

Q  Now, in regard to that soil survey, under whose direction was it conducted?

A  The soil survey was made under my direction and supervision.

Q  In regard to that survey, would you compare the methods utilized by you in performing that function with the methods pursued in connection with the soil surveys and land classifications in Camp Pendleton?

A  The methods and techniques used in the soils survey work on the Coahuilla Indian Reservation were identical with the methods and techniques used in making the soil survey of Camp Pendleton.

Q  Now, was that same procedure-- what do you have?

(Between counsel.)

--to compare the methods utilized by you in connection

B2

Z10

1    with the soil survey conducted on the Pechanga Indian Reserva-

2    tion, which is Exhibit 120-D?  Did you utilize the same methods

3    in both cases?

4         A    There are three--

5         THE COURT:  Pechanga was 120-B, C, and D?  120-A was

6    Mission?

7         MR. VEEDER:  That is correct.  And we didn't offer that,

8    as I recall.

9         THE COURT:  It was offered.

10         MR. VEEDER:  Was it offered?

11         THE COURT:  According to my record.

12         MR. SACHSE:  Mr. Veeder, can we stop you for a moment.

13    Mr. Stahlman seems to have Coahuilla; I seem to have Pechanga.

14    However, the exhibits don't seem to jibe with the exhibits.

15    So I want to know what we are following.

16         MR. MOSKOVITZ:  I have Pechanga and Ramona.

17         MR. SACHSE:  I have three Pechangas.

18         MR. STAHLMAN:  I have an extra Coahuilla.

19         MR. MOSKOVITZ:  I think you got all the Coahuillas, and

20    we have the Pechangas.

21         MR. VEEDER:  That is the disadvantage of their going

22    through my exhibits, your Honor.

23         MR. SACHSE:  You handed them to me.

24         THE COURT:  What is it supposed to be, one of each?

25         MR. VEEDER:  At this point, your Honor, we haven't even

1    approached those things to which they are making reference at

2    the present time.

3            MR. STAHLMAN:  Well, they are soil survey maps, though.

4            MR. VEEDER:  That is right; land classification maps.

5            MR. STAHLMAN:  I thought we might like to look at them

6    here and see what he is talking about.

7            THE COURT:  Would you ask the question.  The question

8    was:  Did you use the same methods in 124-A through N as to

9    Coahuilla as you did as to 120-B, C, D, Pechanga, and 120-A,

10   Mission?

11           THE WITNESS:  My answer, your Honor, is yes, we used the

12   same techniques.

13   BY MR. VEEDER:

14       Q   Did you make a soil survey of the Ramona Indian

15   Reservation?

16       A   Yes, sir.  That portion of the Ramona Indian

17   Reservation within Santa Margarita watershed.

18           THE COURT:  What exhibit number is that?  Are you

19   getting ready to offer it, too?

20           MR. VEEDER:  I am inquiring whether he made an in-

21   vestigation on that.  We have an identification over here

22   that we are going to offer later.

23       Q   Are the soil survey field sheets, the 124 series,

24   accurate to your personal knowledge, Colonel Bowen?

25       A   Yes, sir.

B2

Z12

1  MR. VEEDER: We offer in evidence the soil survey field

2 sheets, the aerial photographs marked for identification 124-A

3 through N.

4  THE COURT: Received in evidence.

5  Colonel, on the first one, 124-A, there are two large

6 rectangles shown. The one to the right and upper right has

7 north boundary, I take it, of the reservation, west boundary

8 of the reservation, and within the area have the classification

9 areas outlined in number?

10  THE WITNESS: Yes, sir.

11  THE COURT: Now, there is a rectangle immediately left

12 with no indication. What is that?

13  THE WITNESS: That rectangle, your Honor, includes

14 privately-owned land which ultimately perhaps will be used as

15 a base for soil surveys. The line delineating that rectangle

16 on the left is the match line of the photograph.

17  THE COURT: And it has no other purpose presently?

18  THE WITNESS: No, sir, no other purpose.

19  THE COURT: The same is true with 124-B?

20  THE WITNESS: Yes, sir.

21  THE COURT: This rectangle, is that one ownership or is

22 it--

23  THE WITNESS: No, sir; the rectangle on the left, the

24 smaller of the two that appears on 124-B which your Honor is

25 indicating, is simply the match lines on the photograph. In

1    other words, that portion of the photograph will be used as a

2    base for surveying the lands included within that rectangle.

3         THE COURT:  All right.  Just arbitrary allocations?

4         THE WITNESS:  Yes, your Honor.

5         THE COURT:  Certain rectangles.

6         Here, Mr. Clerk .  These run-- well, they don't seem

7    to be in order.

8         THE WITNESS:  Your Honor, I arranged them in order from

9    the northwest corner of the reservation south in vertical lines

10   of flight.  The order they are in now perhaps would be a

11   little easier to find than the order in which they are marked.

12        THE COURT:  All right.  Mark them in evidence, Mr.

13   Clerk.

14   BY MR. VEEDER:

15        Q  Now, I hand to you Plaintiff's Exhibit marked 126

16   for Identification and ask you to state into the record what is

17   depicted on that exhibit?

18        A  Plaintiff's Exhibit 126 for Identification depicts

19   the Coahuilla Indian Reservation and within the perimeter of

20   that reservation and the crest of the Santa Margarita River

21   watershed which appears in the southeast corner of the

22   reservation are delineated the lands which are susceptible to

23   irrigation.  And in addition, lands which have been irrigated are

24   delineated on this map.

25        THE COURT:  Do you have a copy of this for me?

B2

Z14

1      MR. VEEDER:  Yes, your Honor.

2      THE WITNESS:  In the upper right-hand corner of

3  Plaintiff's 126 is a location sketch to indicate the approx-

4  imate locatiom of the reservation with respect to the highway

5  net and the Santa Margarita watershed.

6      MR. STAHLMAN:  May I ask a question, your Honor?

7  You said, "Santa Margarita watershed"?

8      THE WITNESS:  Yes, sir.

9      MR. STAHLMAN:  Where?

10      THE WITNESS:  The southeast corner, Mr. Stahlman.  It

11  appeas on the last line with the words "Santa Margarita water-

12  shed" appearing on the Santa Margarita watershed side of the

13  crest.

14  BY MR. VEEDER:

15      Q  Now, based upon your investigation are those de-

16  lineations of your irrigated and irrigable acreage correct?

17      A  Yes, sir.  These delineations were prepared from the

18  soil survey field sheets and were checked by me.

19      THE COURT:  Well, looking at your symbols there, the

20  symbol shows the square with the dots in it as Class I to IV?

21      THE WITNESS:  Yes, your Honor.

22      THE COURT:  And that means irrigated in the past?

23      THE WITNESS:  No, sir.  The stippled area, Classes I

24  through IV, are the irrigable lands.  And the block below that,

25  stippled block in the legend with the dashed cross-hatching

Bowen — Direct

7439

B2

Z15

1   indicates irrigated lands. Those lands here in Section 26,

2   for example, 7 South, 3 East.

3        MR. VEEDER: Your Honor, may I look at the copies?

4        THE COURT: I am looking at the next one. The next

5   block here, when you say: "Class I to IV; irrigated in the

6   past"--

7        THE WITNESS: Yes, sir.

8        THE COURT: Where does that appear?

9        THE WITNESS: Referring your Honor to Section 6, 7

10  South, 3 East in which an irrigated block is shown in the

11  northeast quarter of that section, it is noted that a portion

12  of the irrigated area laps over into the white area which we

13  consider non-irrigable. In other words, they irrigated

14  portions of land which, according to our classification, are

15  not susceptible of irrigation. The same is true in the

16  Northwest Quarter of Section 26, 7 South, 3 East. And the

17  same is also true in the Section 14, 7 South, 3 East, and

18  Section 23, 7 South, 3 East.

19       THE COURT: Well, that is not my difficulty. I was

20  looking at the first legend. And it shows the stipple, the

21  little dots, as representing Class I to Class IV lands.

22       THE WITNESS: Yes, sir.

23       THE COURT: And that type of land is susceptible to

24  irrigation, I take it?

25       THE WITNESS: Yes, sir. That was determined from our

1    soil survey.

2    THE COURT:  And then down below there is table acreage

3    Class I to IV irrigated in the past.  This is just an acreage

4    computation?

5    THE WITNESS: Yes, sir.  There were 43 acres of Class I

6    through IV which were irrigated in the past, and there were

7    31 acres of Clas VI through VII which were irrigated in the

8    past.

9    THE COURT:  I see.  All right.

10    THE WITNESS:  The combined total of 74 acres has been

11    irrigated on this reservation within the watershed of the

12    Santa Margarita River.

13    THE COURT:  And Classes VI, VII and VIII are not

14    susceptible to irrigation according to your survey?

15    THE WITNESS:  That is correct, your Honor, in this

16    area.

17    THE COURT:  Now, you have here in this column also:

18    "Outside of watershed; 980 acres."  That is within the reserva-

19    tion but outside of the watershed?

20    THE WITNESS:  Yes, sir.  That is the southeast corner

21    which appears in part in Section 35, 7 South, 3 East, in part

22    in Sections 2, 3, and 4, 8 South, 3 East.

23    THE COURT:  In other words, this rectangle as shown

24    here is the Coahuilla Reservation in toto?

25    THE WITNESS:  Yes, your Honor.

B

Z17

1       THE COURT:  So that most of it is in the watershed and

2    this part in Section 35, Sections 2, 3, and 4, shown in the

3    lower right-hand corner, are part of the reservation but

4    outside of the watershed?

5       THE WITNESS:  That is correct, your Honor.

6       MR. VEEDER:  We offer 120--

7       MR. SACHSE:  May I inquire, your Honor?

8       THECOURT:  Yes.

9       MR. VEEDER:  That was 126.  I would like to finish the

10   offer.

11              VOIR DIRE EXAMINATION

12   BY MR. SACHSE:

13       Q  Where, Col. Bowen, are the field work sheets on

14   which you made these determinations?

15       A  Those are the soil survey field sheets, Mr. Sachse,

16   which are Plaintiff's 124-A through N.

17       Q  In other words, the Coahuilla is also included in

18   the 124-A throughN series?

19       MR. VEEDER:  Yes.

20       THE WITNESS:  That is only the Coahuilla.

21   BY MR. SACHSE:

22       Q  Only the Coahuilla.

23       Now, am I to understand that in the Coahuilla Indian

24   Reservation you simply lumped all land in Classifications I

25   through IV into a single category?

B

Z18

1          A   Into the single category of irrigable lands, yes,

2   sir.

3          Q   That is not the technique you followed, for example,

4   on Camp Pendleton, is it?

5          A   Yes, sir.

6          MR. VEEDER:  Now, just a moment.  I think that Mr.

7   Sachse is talking about land classification, and we on the

8   inquiries directed to Col. Bowen were asking in regard to

9   soil surveys.  There is a difference, Mr. Sachse.

10         MR. SACHSE:  Well, all right.  Let me go at it again.

11         Q   On what are indicated the land classifications?

12         A   On the soil survey field sheets, Mr. Sachse.

13         Q   That is Exhibit 124-A through N?

14         A   Yes, sir.  Exactly as they were shown on our exhibit

15   showing the Naval Reservation land classes.

16         Q   So you are indicating that all land then in Class

17   VI, VII, and VIII you are finding as non-irrigable; is that

18   correct?

19         A   On the Coahuilla Indian Reservation, that is correct.

20         Q   That is not the same technique that you followed

21   in your classifications on Camp Pendleton and elsewhere, is

22   it?

23         MR. VEEDER:  Nor has he ever testified to that.

24         THE WITNESS:  Yes, sir, it is the same technique.  The

25   climatic conditions are much different up here, Mr. Sachse,

B

Z19

1    than they are down on the Coast.

2    BY MR. SACHSE:

3        Q  In other words, what I want to spell out is that

4    you have found Class VI land to be irrigable in other areas,

5    have you not?

6        A  Yes, sir.  Certainly have.  We used the same technique

7    in arriving at that in the coastal area, your Honor.

8        MR. SACHSE:  I am sorry for the word "technique."

9        THE COURT:  Class VI lands in the coast area, you

10   found susceptible to irrigation?

11       THE WITNESS: Yes.

12       THE COURT:  But not Class VI lands in the Coahuilla?

13       THE WITNESS:  That is correct, sir.

14   BY MR. SACHSE:

15       Q  Perhaps I am anticipating, but where do you dis-

16   tinguish between what you refer to as coastal area where Class

17   VI land is irrigable and the inland area where it may not be?

18       A  Well, I haven't drawn a definite line, but it would

19   be somewhere a little upstream from the confluence of

20   Murrieta and Temecula Creek, together to form the Santa

21   Margarita River.

22       Q  In other words, the inland areas that we have been

23   discussing here or the inland geology as indicated on Plate

24   15A and 15, for example, you would hold Class VI land to be

25   non-irrigable?

B

Z20

MR. VEEDER:  Now, your Honor, this is cross-examination.

MR. SACHSE:  This is voir dire.  I am trying to find out what the exhibit means.  It is different from any I have seen before.

MR. VEEDER:  It is cross-examination, your Honor.

THE COURT:  Overruled, Mr. Veeder.  Let's go ahead. What difference does it make?

THE WITNESS:  What plates did you refer to?  What exhibits, Mr. Sachse?

BY MR. SACHSE:

Q   15 and 15-A.  In other words, the large exhibits that show inland geology.  This is the small one, 15.

A   No, I testified, Mr. Sachse, that the demarcation between areas which might grow subtropical fruits is some- where upstream from the confluence of Murrieta and Temecula Creek.  So that line would certainly not delete all of the areas shown on Plaintiff's Exhibit 15A.

Q   Could you be any more definite with your "somewhere upstream"?  A mile or twenty?

A   Well, I haven't made enough detail surveys in there. I know that we found some areas on the Pechanga Indian Reservation, for example, which, in my opinion, are adapted to the growth of avocados.  There are undoubtedly some of the Vail lands which are adaptable to that.

Q   Now, just one or two other questions about what the

B

Z21

1    exhibit indicates.  The black specks are wells, are they?

2         A  Yes, sir.

3         Q  And where did you get your data as to where the wells

4    were located?

5         A  From the field survey.

6         Q  Conducted by whom?

7         A  Conducted by soil surveyors under my direction and

8    supervision.

9         Q  Did they check out each of these wells as to its

10   location?

11        A  Yes, sir.

12        Q  And now, the springs, where did you obtain informa-

13   tion as to the location of the springs?

14        A  From the same source.

15        Q  And how did you calculate the acreages indicated in

16   the table of acreage?

17        A  We planimetered the areas of the land classes as

18   shown on the soil survey field sheets, Plaintiff's Exhibit

19   124-A through N.

20        Q  In other words, you planimetered the individual

21   large-scale photographs rather than the exhibit itself?

22        A  Yes, sir.

23        MR. SACHSE:  That is all for voir dire, your Honor.

24        MR. VEEDER:  We offer the Plaintiff's Exhibit marked

25   126.

B

Z22

1     MR. SACHSE:  I am not going to object to its offering,

2     your Honor, but I want to point out the first I saw of it

3     was at about 10:15 this morning.

4     MR. VEEDER:  Well, it has been lodged here for a long

5     time.  I don't know the date, but it has been well past the

6     ten-day period.

7     THE COURT:  Received in evidence.

8     MR. VEEDER:  Now, your Honor, in regard to the next

9     exhibits which I am going to have marked for identification

10    the ten-day period has not elapsed on them.  They are,

11    however, presently lodged with the Court and while the Colonel

12    is on the stand I would like to have him identify them for that

13    purpose.

14    THE COURT:  What are they, 126-A, B, and C?

15    MR. VEEDER:  That is correct, your Honor.  They relate

16    to the Pechanga Indian Reservation, the Ramona Indian

17    Reservation, and to a 40-acre trust allotment.

18    MR. STAHLMAN:  40-acre trust allotment?

19    MR. VEEDER:  Don't you have a copy?  I think you have

20    found it.

21    THE COURT:  What is meant by a trust allotment?

22    MR. VEEDER:  Trust allotment is a tract of land, your

23    Honor, that was public domain which was withdrawn and placed

24    in trust for an Indian.  Withdrawn by the Secretary of the

25    Interior for that purpose.

B

Z23

1    THE COURT:  Placed in trust for a perticular Indian?

2    MR. VEEDER:  Well, it was in trust originally for a

3    particular Indian.  That Indian has now expired and his heirs

4    are the parties in interest.  However, the land is still held

5    by the National Government and is still in trust for those

6    Indians.

7    THE COURT:  All right.  126-A for Identification is

8    Ramona Reservation.

9    MR. VEEDER:  Now, how is that?  That should be marked

10   Pechanga, your Honor.

11   THE COURT:  126-A?

12   MR. VEEDER:  Yes.  I don't know how it got that.

13   THE COURT:  It is marked Ramona here.  Do you want to

14   change it?

15   MR. VEEDER:  I would like to, your Honor.

16   MR. STAHLMAN:  Which one do you have now?

17   MR. VEEDER:  Which one do you have there?

18   THE WITNESS:  126-A is the Pechanga Indian Reservation.

19   THE COURT:  And 126-B is Ramona; right?

20   MR. VEEDER:  That is right, your Honor.

21   THE COURT:  And 126-C is the 40-acre trust; right?

22   MR. VEEDER:  Yes, your Honor, that is correct.

23

24

25

B

Z24

## FURTHER DIRECT EXAMINATION

BY MR. VEEDER:

Q   Now, in regard to the identification marked 126-A would you state under whose direction that identification was prepared, Colonel?

A   126-A is compiled from the soil survey sheets which were made under my direction and supervision.  The soil survey was made under my direction and supervision.  126-A was based upon that soil survey.

Q   And that soil survey is Exhibit 120-B, C, and D; is that correct?

A   Yes, sir.  This map, 126-A, was checked by myself.

Q   Now, in regard to the Ramona Indian Reservation, I refer to Plaintiff's Exhibit marked for Identification 126-B, and I ask you to state into the record what is represented by that identification.

A   126-B for Identification is a map of the Ramona Indian Reservation showing the land classification within that portion of the reservation inside the Santa Margarita watershed.

Q   What are the sources of data upon which that identification is predicated?

A   126-B is based upon the soil survey made under my direction and supervision.

THE COURT:  We don't have a photograph of that, though,

B

Z25

1  do we?

2          MR. VEEDER:  We do not, your Honor.

3          THE COURT:  All right.

4  BY MR. VEEDER:

5          Q  Now, was that soil survey conducted in the same manner

6  as the other soil surveys were conducted in the Santa Margarita

7  watershed?

8          A  Yes, sir.

9          Q  And to your personal knowledge was that an accurate

10  survey?

11          A  Yes, sir.

12          Q  And would you state into the record, first, in

13  regard to the Pechanga Indian Reservation, the number of acres

14  which you found to be within the reservation as a whole?

15          A  The total acreage within the Pechanga Indian Reser-

16  vation as a whole, both within and without the Santa Margarita

17  River, is 4,125 acres.

18          Q  And of that total what did you find to be irrigable?

19          A  We didn't classify the irrigable lands in the por-

20  tion of the Pechanga Reservation lying outside the watershed.

21  Of the portion lying inside the watershed we found a total

22  of 1,694 acres.

23          Q  How many?

24          A  1,694 acres to be irrigable.

25

THE COURT:  That is the total of the Class I to Class IV land and also the Class VI land?

THE WITNESS:  A portion of the Class VI land, your Honor.

MR. SACHSE:  May I have that figure again, Colonel, the total irrigable?

THE WITNESS:  1,694, referring to Plaintiff's Exhibit 126-A for Identification.  That would show in the table of acreage in the right-hand portion and would be the sum of the Classes I through IV and the Class VI, which is considered suitable for subtropical fruits.

(Recess.)

MR. VEEDER:  Your Honor, could Mr. Hofmann be excused?

THE COURT:  You may be excused subject to call.

BY MR. VEEDER:

Q  Col. Bowen, I hand you Plaintiff's Exhibit marked for Identification 126-C and I ask you to state in the record what is depicted on that identification.

A  Plaintiff's Exhibit 126-C for Identification depicts the land classification on 40 acres of public domain, trust allotment, being more particularly the Northeast Quarter of the Northwest Quarter of Section 3, 9 South, 1 East.

Q  What was the source of the data that was relied upon for the preparation of that identification?

A  Soil surveys prepared under my direction and

C

Z17

1  supervision.

2          Q  And is that identification a correct reflection of

3  the soil survey that you made upon that property?

4          A  Yes, sir.

5          Q  And would you state into the record whether you

6  proceeded in the soil survey and land classification in regard

7  to this 40 acres of land in the same manner that you did in

8  regard to the other soil surveys concerning which you have

9  testified?

10          A  Yes.

11          MR. STAHLMAN:  Mr. Veeder, may I ask, is that 40 acres

12  shown on Exhibit 126-C in Pechanga Reservation?

13          MR. VEEDER:  No, it is not.  As a matter of fact, it

14  lays sufficiently close to Cleveland National Forest so that

15  when the soil survey was made there this survey was included

16  and made part of it.

17          Q  Now would you proceed and state into the record the

18  number of acres of irrigable land that you found in that 40-

19  acre tract?

20          A  21 acres.

21          MR. VEEDER:  Your Honor, I will reserve the offer of

22  these.

23          THE COURT:  Unless somebody objects, is there any

24  difficulty in getting them in now?

25          MR. VEEDER:  I will make the offer then, your Honor, of

Bowen   Direct

7443

Z18

1    Plaintiff's Exhibits 126-A, B, and C.

2         THE COURT:  All right, Plaintiff's Exhibit 126-A,

3    Plaintiff's Exhibit 126-B and Plaintiff's Exhibit 126-C are

4    received in evidence.

5         (Plaintiff's Exhibits 126-A, 126-B and 126-C were

6    received in evidence.)

7         MR. VEEDER:  I have no further questions.

8         THE COURT:  Where is the Mission Reservation?

9         MR. VEEDER:  Your Honor, in regard to the Mission

10   Indian lands--

11        First, would you answer the question?

12        THE COURT:  You had an exhibit 120-A, which showed

13   something about Mission lands.  Where are they located?

14        MR. VEEDER:  We will show you on Plaintiff's Exhibit

15   1, your Honor.  However, our investigation disclosed that there

16   was no water used in that area, so there was no need of intro-

17   ducing evidence in connection with it.

18        THE COURT:  There is no claim of any irrigable land,

19   then?

20        MR. VEEDER:  That is correct.

21        THE WITNESS:  The Mission Indian Reservation, your

22   Honor, lies largely in the San Luis Rey watershed.  One corner

23   of it is shown in Plaintiff's Exhibit 1, lying just north of

24   the watershed boundary and west of the Range 1 West, 1 East

25   boundary.

C

Z19

1        THE COURT:  All right, then, no claim is made for

2   any irrigable land in that?

3        MR. VEEDER:  That is correct.

4        THE COURT:  Is that Indian Reservation set up in your

5   pleadings?

6        MR. VEEDER:  Yes, it was, your Honor.  But we have in-

7   vestigated and we have found that there was no land there that

8   was susceptible of irrigation.

9        THE COURT:  So we actually have Ramona, Pechanga,

10  Coahuilla and this 40-acre tract?

11       MR. VEEDER:  Yes, your Honor.

12       THE COURT:  This 40-acre trust piece set forth in your

13  pleadings?

14       MR. VEEDER:  I think it was.  I would want to check, but

15  I am quite certain it was.

16       MR. STAHLMAN:  The Mission Reservation referred to on the

17  map is designated by a No. 2 on that map?

18       THE WITNESS:  Yes, there where the horizontal hatching

19  indicates Indian reservation.

20       MR. VEEDER:  I have no further questions, your Honor

21  Honor.

22       THE COURT:  Does anyone want to examine?

23       MR. SACHSE:  Yes, your Honor.

24

25

C

Z20

CROSS-EXAMINATION

BY MR. SACHSE:

Q   Col. Bowen, I notice that Plaintiff's Exhibit 126-B is dated August 23, 1958, that Plaintiff's Exhibit 126-C is dated August 26, 1958, and that Plaintiff's Exhibit 126-A is dated November 21, 1958.   Are those the dates when the study was made or when the map was made?

A   Those are the dates when the map was made, Mr. Sachse.

Q   When was the study made?

A   Field work was done just prior to the dates shown on the map.

Q   Did your office supply to Mr. Veeder the information used in answering Fallbrook's interrogatories on the Indian Reservations?   The interrogatories were dated May 31, 1958.

A   Yes, sir. we supplied the technical information and Mr. Veeder incorporated it in his answers to your interrogatories.

Q   Then if there are any inconsistencies between the answers contained in the interrogatories, which were sworn to by Mr. Veeder, and the testimony which you have just given, which of these is correct?

A   The testimony I have just given, Mr. Sachse, is based on detailed soil survey and is more correct than the earlier information, which was based on reconnaisance survey.

C

Z21

Q   I am speaking now of specific information, such as population, acreage under agricultural development, number of wells, number of springs, number of reservoirs, et cetera.  You gave us that information in the interrogatories signed by Mr. Veeder, dated May 31.

Do you want to examine this original, Mr. Veeder?

MR. VEEDER:  No.  I am going to call another witness here to testify in regard to the population matters, Mr. Sachse.

MR. SACHSE:  I want to examine the witness who gave you the information to which you swore in this.

MR. VEEDER:  You have the gentleman on the stand.  He is under oath.  He is a Marine.

BY MR. SACHSE:

Q   Then if there are any discrepancies between the information contained in the answers to Fallbrook's interrogatories, let us say, as to acreage under agricultural development, and the testimony you have just given us, which are we to accept?

A   By all means, accept the testimony I have just given, Mr. Sachse.

Q   What agricultural development exists in the Coahuilla Indian Reservation other than the irrigated lands you indicated as Parcels A, F, D, et cetera?

A   The rest of the area is used primarily for stock raising.

C

Z22

1     Q  There is no agricultural development as such, is

2  there?

3     A  I am not quite sure what you mean by agricultural

4  development.

5     Q  There are no crops of any kind, are there?

6     THE COURT:  He has answered it that there are no agri-

7  cultural crops other than grazing, if you want to call that an

8  agricultural crop.

9     THE WITNESS:  There are, your Honor, some dry land crops

10  grown on portions of the reservation.

11  BY MR. SACHSE:

12     Q  Do you know how many acres are dry farmed?

13     A  No, sir.

14     MR. VEEDER:  I submit that that goes beyond the scope

15  of the examination, your Honor.

16     MR. SACHSE:  Mr. Veeder, if I can find some inconsistencies,

17  I conceive I am at liberty to bring them out.

18     Q  Col. Bowen, in the United States's answers to

19  Fallbrook's interrogatory, the interrogatory requested, "Please

20  supply the following information with regard to each of the

21  Indian Reservations referred to in those counts: (b) Present

22  agricultural development, including crops and acreages."  The

23  United States answered to that:  For the Coahuilla Indian

24  Reservation, 6229 acres, followed by an asterisk which says:

25  The figures set forth in this response are being further checked

C

Z23

1    and if there are variances you will be advised.  I gather that

2    is in error.  There are not 6,229 acres of crops in the Coahuilla

3    Indian Reservation, are there?

4        A  I believe, Mr. Sachse, that that information for

5    population, et cetera, came from the Bureau of Indian Affairs.

6        Q  Well, then, you didn't give it to Mr. Veeder.  You

7    just told me you gave him the information.

8        A  You asked me if I furnished the technical information

9    on which the answers to irrigable acreage were based, and my

10   answer to that was yes.

11       MR. SACHSE:  Your Honor, I am at a loss.  We raised the

12   same question a long time ago on my motion for a new answer

13   on the interrogatories.

14       THE COURT:  The answer to the interrogatory you are

15   calling attention to calls attention to the fact that if there

16   is additional or more specific information you will be advised.

17   Now the witness has said that the map of the soil survey is the

18   equivalent of this additional information.

19       MR. SACHSE:  Your Honor doesn't follow my concern.

20   Away back before this case went to trial I made a motion on

21   interrogatories requesting that someone other than Mr. Veeder

22   be instructed to sign them, I think your Honor will recall,

23   because obviously I can't call the attorney to the stand and

24   ask him questions about every one of the things if somebody

25   else had given him the facts.  Now I want to know who gave him

C

Z24

Bowen      Cross

74449

1   the facts.  Mr. Veeder signed the interrogatory.  Mr. Veeder

2   is not a witness.  Now I believe we have a right to know where

3   he got this information, which may have completely misled us

4   in the preparation of our case.

5        THE COURT:  I don't think you have been misled, as far

6   as the reservations are concerned.

7        MR. SACHSE:  There is a substantial difference between

8   6,000 acres and 74 acres.

9        THE COURT:  It is not to your detriment.  If there is

10  less land that is susceptible of irrigation or of being

11  irrigated in the reservation than you thought there was,

12  Fallbrook is better off, as near as I can understand the issues.

13       MR. SACHSE:  He says that there is 12,000 acres suscept-

14  ible of irrigation, present agricultural development 6,000

15  present, on the map 74.  There is more than 100% error.  Mr.

16  Veeder has had a field day for weeks here nitpicking errors of

17  a few percent.  Here we have one in excess of 100%.  I would

18  like to know who made it.

19       THE COURT:  Ask the witness.

20       MR. SACHSE:  I asked him.

21       Q  Do you know who gave the information that there were

22  6,229 acres of agricultural development crops on Coahuilla

23  Indian Reservation?

24       A  At the moment, Mr. Sachse, I can't recall.  I know

25  that the Indian Service provided some information, we provided

JOHN SWADER, OFFICIAL REPORTER

1    some.  I think ours was largely confined to soils.

2         Q  Well, Col. Bowen, based on your investigation, then,

3    do you think there is anything like 6,229 acres of crops on

4    the Coahuilla Indian Reservation?

5         A  If you take in the dry-farmed crops, there probably

6    are.

7         Q  Who gave you the total of wells on the reservation

8    that you gave Mr. Veeder for his answer to the interrogatory?

9         A  I think that came from the Bureau of Indian Affairs,

10   Mr. Sachse.  We didn't go up and make an inventory of wells in

11   the spring.

12        Q  But have you made an inventory for the purposes of

13   Exhibit 126?

14        A  Yes, sir.

15        Q  So that wells indicated here are going to be right,

16   and if there is any discrepancy on the interrogatories Mr.

17   Veeder's statement is in error; is that right?

18        A  Yes, sir, I would say that the maps now placed in

19   evidence here are the most accurate.

20        Q  How about the springs-- where did you get that data?

21        A  That data was derived from an investigation in the

22   field at the time of making the soil survey.

23        Q  By thatyou mean the springs that are shown on Exhibit

24   126?

25        A  Yes, sir.

Q  In Mr. Veeder's answer to my interrogatory, sworn to by Mr. Veeder, he states that there are 26 springs on the reservation used for domestic and stock use.  If that figure disagrees with the total delineated on Plaintiff's Exhibit 26, which is right?

A  Well, I don't know exactly where the information about 26 springs came from, Mr. Sachse.  I believe it was information furnished to Mr. Veeder by the Bureau of Indian Affairs.

Q  Are all the springs which you have indicated on Exhibit 126 presently developed and devoted to domestic and stock use, or are some simply undeveloped springs?

A  It is my recollection that most of these are or have been utilized for domestic and stock watering use.

Q  Would you be able to answer me about any particular one if I indicated it to you on the section?

A  No, sir.

Q  You are not able to tell me which ones, then, may or may not be devoted to domestic use?

A  No, sir.

Q  I see one reservoir indicated on Exhibit 126 and then I see a little thing almost like a lake up in Section 14.  Is that also a reservoir, up above the irrigated tract F?  Do you see what I am referring to-- near a well?

A  Yes, sir.  I believe there is a small reservoir there.

Q  Then I see right up on the section line between 26

C

Z27

Bowen     Cross

7452

1    and 23 a symbol with the printing "Reservoir,"

2         A   Yes, sir.

3         Q   What is the capacity of that reservoir?

4         A   I don't know at the present moment, Mr. Sachse.

5         Q   Are there any other reservoirs on the reservation?

6         A   There are other small reservoirs, primarily for

7    stock watering purposes.

8         Q   Do you know who gave Mr. Veeder the answer which he

9    swore to in response to interrogatories that there is one

10   62,000-gallon and seven smaller reservoirs on the reservation?

11        MR. VEEDER:  Just a moment.

12        THE WITNESS:  I believe the Bureau of Indian Affairs--

13        MR. VEEDER:  I think it would save time.  I obtained

14   a reported survey, your Honor, of these several Indian

15   reservations from the Bureau of Indian Affairs.  They showed

16   data in there, it being an official publication given to me.

17   I made reponse under oath predicated upon that data.  I have

18   no way of knowing whether it was right or wrong.

19        THE COURT:  You mean you relied upon this in much the

20   same way that California relied upon the statements made by

21   Dr. Mann?

22        MR. SACHSE:  Exactly.

23        MR. VEEDER:  I didn't hear what your Honor said.

24        THE COURT:  You relied upon this study or report in

25   much the same manner that the State of California relied upon

C

Z28

1    the studies made by Dr. Mann as to faults?

2        MR. VEEDER:  Your Honor, I imagine I am just as good a

3    geologist as is Mr. James.  If you want to make the analogy,

4    fine.  I simply took the data that was handed to me by this

5    Bureau of Indian Affairs.  I think they thought it was right,

6    and I responded to it.

7        THE COURT:  Let's go ahead.

8        MR. VEEDER:  That is the source of it.

9    BY MR. SACHSE:

10       Q  Have your attempted in your study, Col. Bowen, on

11   Plaintiff's 126 to indicate all the reservoirs?

12       A  No, sir.

13       THE COURT:  How do all these wells that are shown here

14   on Plaintiff's Exhibit 126 on the Coahuilla Reservation happen

15   to be up there?

16       THE WITNESS:  Primarily for stock watering purposes,

17   your Honor.

18       THE COURT:  The Indians run a good bit of stock up there,

19   do they?

20       THE WITNESS:  Yes, sir.  They also lease some of their

21   grazing area to surrounding cattlemen for grazing.

22   BY MR. SACHSE:

23       Q  Have you checked all of those wells to determine

24   whether they are presently operative?

25       A  No, sir.

C

Z29

Q  It is quite possible then, is it not, that a great number of them are in fact abandoned; they are old well sites with no present pump facilities of any kind on them?

A  I believe most of these have windmills on them, Mr. Sachse.

Q  Are there any dams on the Coahuilla Indian Reservation?

A  Well, there are no dams of significance there.

Q  Did you supply Mr. Veeder with the answer that he swore to in answer to my interrogatory that there is a four acre-foot dam on the Coahuilla Indian Reservation?  And if so, where is it?

A  No, sir, I did not supply him that information.

Q  Do you know where it is?

A  No, sir, I don't.

Q  In your soil survey and analysis you had no occasion to notice any dam impounding four acre feet?

A  I personally don't recollect such a dam, Mr. Sachse.

Q  Did you check out the crops that are being grown on these irrigated areas indicated on Exhibit 126 in November, 1948, when you made the study?

MR. VEEDER:  As I said, I was going to call another witness.

MR. SACHSE:  I am asking this witness.

MR. VEEDER:  It is beyond the scope of the examination.

C

Z30

1          THE WITNESS:  You are referring now to Plaintiff's

2  Exhibit 126?

3  BY MR. SACHSE:

4          Q  Yes.  You have indicated certain parcels of land as

5  presently irrigated, have you not?

6          A  May I refer you, Mr. Sachse, to the Plaintiff's

7  Exhibit 126, Table of Acreage, under which it states that 43

8  acres of Class I to IV land were irrigated in the past and

9  31 acres of Class VI through VII land were irrigated in the

10 past.  Therefore, I made no allegation to any presently

11 irrigated acreage.

12         Q  Exactly.  Now, is there anything presently irrigated

13 on the Coahuilla Indian Reservation?

14         A  Well, if at all, it is in a very desultory fashion.

15         Q  And when you say irrigated in the past, what past

16 are you talking about?

17         A  Prior to the date of this survey.

18         Q  Can you be any more definite?  Did all the irrigation

19 stop in November, 1958?

20         A  No, sir.  I think the Bureau of Indian Affairs people

21 can probably give you a little more information on the operation

22 of these reservations than I can.

23         Q  In other words, when you indicated the land that was

24 irrigated in the past, you got that information from somebody

25 else, didn't you?

C

Z31

1          A   No; there are indications of irrigation on there.

2          Q   If there are indications of irrigation, you can tell

3   me how recent those indications are?

4          MR. VEEDER:   I object to this as being purely specu-

5   lative, your Honor.

6          THE COURT:   Overruled.

7          Mr. Sachse, you are as bad as Mr. Veeder now.

8          MR. SACHSE:   I intend to be for a little while, your

9   Honor.

10          THE COURT:   If you want to run his course on cross-

11   examination, go ahead.   I gave you some compliments awhile

12   back.   I may have to take them back.   I complimented him on

13   his cross-examination, you remember.

14          MR. VEEDER:   Do you know what he did?   He lost his

15   lawsuit by it.   He gave us all the water after the high water

16   season, and I want to thank you very much.

17          THE COURT:   We will talk about that.

18          MR. VEEDER:   I never dreamed he would be so foolish.

19          THE COURT:   Go ahead.

20   BY MR. SACHSE:

21          Q   If you observed signs of irrigation, I presume you

22   can conclude how recent those signs were, Col. Bowen?   How

23   recent were they?

24          A   Well, the operation of these people up there is

25   rather faulty, Mr. Sachse, and some of these springs that have

C

Z32

1    been developed in the past for irrigation are discharging

2    water out onto the land.  You can say that perhaps that was

3    by design.  I talked with one of the Indians that live up

4    there.  I don't know whether they go out and divert the course

5    of the water from time to time to irrigate another tree or

6    another patch of land.

7          Q  Just for curiosity, Colonel, is this the Indian

8    Reservation that ran the Marines off, that we saw in the paper?

9          A  I assume you are being facetious, Mr. Sachse.

10         Q  There was a story in the paper about it.

11         MR. VEEDER:  I object to this as being beyond the scope

12   of the direct examination.

13         MR. SACHSE:  Yes.

14         THE COURT:  Sustained.

15   BY MR. SACHSE:

16         Q  Now, of a total of 321 acres in Ramona, do I under-

17   stand from the soil legend that you find 104 susceptible of

18   irrigation?

19         A  That is a correct understanding, Mr. Sachse.

20         Q  What is the present agricultural development on the

21   Ramona Indian Reservation?

22         A  None.

23         Q  So when Mr. Veeder said that the present agricultural

24   development was 60 acres, you think he was in error in giving

25   me that answer?

C

Z33

1        MR. VEEDER:  Wait a minute. Agricultural development

2   entails stock raising.

3        MR. SACHSE:  The witness has said there was none.

4        THE WITNESS:  Well, Mr. Sachse, I assume when you say

5   development you are not speaking of grazing.

6   BY MR. SACHSE:

7        Q  What is the population presently of the Ramona Indian

8   Reservation?  There isn't any, is there?

9        MR. VEEDER:  There are two questions there.

10       MR. SACHSE:  I will withdraw the first question.

11       Q  As a matter of fact, there are no Indians on the

12   Ramona Indian Reservation; isn't that a fact?

13       A  At times Frank Hamilton pitches a tent up there,

14   particularly during deer hunting season, and extracts a toll

15   from white hunters who think they can go into the Thomas

16   Mountain area, and other than that tepee which is there from

17   time to time I know of no permanent residence.

18       Q  How about springs?  It is rather difficult to read

19   the exhibit, but I see one spring on Class II land in the

20   lower right-hand corner of the exhibit.  Is that the only one

21   you found?

22       A  That is the only important one that was there.

23       Q  Then if Mr. Veeder states that there are two in his

24   answer to my interrogatory, he again was wrong; is that right?

25       A  Well, there might be other springs.  We got that

information from the Indian Service and they may have detected

a spring there which we don't show.  You are speaking here

of the whole reservation.

Q  Look at the Pechanga, please, Exhibit 126-A.  First,

a question regarding the Class VI land.  If I understood your

testimony, you stated that the irrigable land shown in the

total column of your table of acreages of 126-A was the total

of 1135 and 559; is that right?

A  Yes, sir.

Q  Look at the Pechanga, please, Exhibit 126-A.  First,

a question regarding the Class VI land.  If I understood your

testimony, you stated that the irrigable land shown in the total

column of your table of acreages of 126-A was the total of 1135

and 559; is that right?

A  Yes, sir.

Q  Does that 559 represent all the Class VI land that

is shown on the exhibit?

A  That 559 does not represent the total of the Class

VI lands which are delineated on Plaintiff's Exhibit 120-B, C,

and D.

Q  You haven't answered my question, Colonel.  Does the

559 represent the total Class VI land delineated on Exhibit

126-A?

A  Yes, sir.

Q  In other words, you left parts of Class VI land off

C
Z36

1  of this exhibit if you felt they were not irrigable; is that

2  right?

3       A  If I felt they were not adapted to subtropical fruits,

4  yes, sir.

5       Q  And then they would go in this "No class" heading,

6  which you didn't classify at all; is that right?

7       A  That "No class" may be misleading.  The entire area

8  was classified and the "No class" includes the Class VI land,

9  which is not considered susceptible of development for sub-

10  tropical fruits, all of the Class VII land, and all of the

11  Class VIII land.

12       Q  I notice that on the Pechanga map you do not purport

13  to make any showing as to what lands have been irrigated in

14  the past, whereas you did make such showing on Coahuilla.  Why

15  the distinction?

16       A  The distinction is that there were lands that were

17  irrigated in the past on the Coahuilla Reservation, and no

18  indication of any lands which were irrigated in the past on the

19  Pechanga Reservation.

20       Q  In other words, we are to take the fact that none is

21  shown to indicate that during your investigation you found no

22  indication of past irrigation on Pechanga?

23       A  Yes, sir.

24       Q  What agricultural development is there on Pechanga?

25       A  Well, very little.  There has been some dry farming

1  in there.  But there again the land does not show evidence of

2  being used as intensively as it could be.

3       Q  Then whoever gave Mr. Veeder the information which

4  he swore to in his answer to our interrogatory that there are

5  2,000 acres of present agricultural development on the Pechanga

6  Reservation was in error; is that right?

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          A   They must have gotten that from the Bureau of

2     Indian Affairs, Mr. Sachse.

3          Q   That 2,000 acres represents nearly 50% of the total

4     reservation, doesn't it?

5          A   Yes, sir.

6          Q   You saw no indication of any such agricultural

7     development, did you?

8          A   None other than the evidence of some dry farming, as

9     I stated.

10         Q   Now, I count nine wells indicated on 126A,  Can you

11    tell us whether or not those wells are all operative?

12         A   No, sir.

13         Q   I will invite your attention to the fact in the

14    sworn answer to my interrogation, Mr. Veeder says:   "There

15    are four wells windmill on the reservation."  So it is quite

16    possible he is right and only four of those wells work, is that

17    correct?

18         A   Did the answer say there were four operating wells,

19    Mr. Sachse?

20         Q   It says:  "4 wells windmill."

21         MR. VEEDER:   What was the question, Mr. Sachse?

22    BY MR. SACHSE:

23         Q   The present water development-- wells, dams,

24    reservoirs.  Your answer:  "The present water developments:

25    (a) Wells 4 windmills; (b) Springs"-- and so forth is your

D

Z27

1    answer.

2        MR. VEEDER:  If you are interested in seeing this

3    report from which those data came, I will make it available

4    to you.

5        MR. SACHSE:  I don't think the witness has answered my

6    question.  I asked him:  "Is it possible that the statement

7    of four wells is more nearly correct than yours."

8        MR. VEEDER:  I object to this question.  How could he

9    analyze the subject?  How can he tell whether I was right or

10   wrong?

11       THE COURT:  Sustained.  Let's go ahead.  We are just

12   wasting time and spending money on transcript.

13       MR. SACHSE:  It is such a joy when we find infallible

14   little pink bear making a few mistakes, your Honor.  Maybe we

15   do overdo it but--

16       THE COURT:  Let's go ahead.

17       (Discussion off the record.)

18   BY MR. SACHSE:

19       Q  Col. Bowen, I presume your answer would be the same

20   in regard to irrigable acreage in all these Indian reservations

21   that you gave us on Camp Pendleton, namely, that by finding

22   acreage as irrigable you do not intend to make any implication

23   that there is water available to irrigate it?

24       A  That is correct.

25       Q  And in determining acreage to be irrigable, did you

MALCOLM E. LOVE, OFFICAL REPORTER

D

Z28

1    consider the cost of applying water to the land?

2         A  Well, now, I didn't make any calculations directly

3    on these reservations, Mr. Sachse, but there are adjacent

4    areas comparable in location, elevation, and so forth, which

5    are being irrigated and by inference I would draw that these

6    are susceptible of profitable and practical irrigation.

7         MR. SACHSE:  I think that is all, your Honor.

8         MR. STAHLMAN:  I have just one or two questions.

9

10                        CROSS-EXAMINATION

11   BY MR. STAHLMAN:

12        Q  Referring to 126-A, what is this square box that

13   invades the land classified here?

14        A  Referring, Mr. Stahlman, to Plaintiff's Exhibit 120-C--

15        THE COURT:  120?

16        THE WITNESS:  120-D, may I have, please; B, C, and D.

17        THE COURT:  It is a privately-owned piece of ground

18   right in the middle?

19        THE WITNESS:  Yes, sir.  It was so indicated on that

20   exhibit.

21   BY MR. STAHLMAN:

22        Q  Was that the aerial photograph that showed that?

23        A  Yes, sir.

24        Q  Yes; I recall now.

25        A  The same istrue, Mr. Stahlman, of the little

1    quadrilateral in Section 34.

2         Q   I recall now, yes.   Thanks very much.

3         Now then, do you know at this time the present

4    irrigated land on Pechanga?

5         A   I have already testified, Mr. Stahlman, that I

6    know of none.

7         Q   None.   And you have also said Ramona, none.

8         You say Coahuilla.   How much on Coahuilla?

9         A   That is shown on Plaintiff's 126.   You mean presently?

10        Q   Presently, yes.

11        A   Well--

12        MR. VEEDER:   Now, just one moment.   You are speaking

13   of artificial irrigation?

14        MR. STAHLMAN:   Yes.   Yes, I mean as where water is

15   applied to the land, such as--

16        MR. VEEDER:   As distinguished from subirrigation?

17        MR. STAHLMAN:   Right.

18        THE WITNESS:   To respond to Mr. Sachse, it is difficult

19   to tell whether it is presently being irrigated or not.

20   These people are not what you would call farmers.

21   BY MR. STAHLMAN:

22        Q   You couldn't say there is a certain number of acres

23   that are being presently irrigated by some form of farming?

24        A   Certainly does not exceed that acreage shown on

25   Plaintiff's 126.

1    Q  By "that acreage" you mean the--

2    A  Combined total of 74 acres.

3    Q  74 acres?

4    A  Yes, sir.

5    MR. STAHLMAN:  That is all I have.

6    MR. MOSKOVITZ:  I have no questions, your Honor.

7    THE COURT:  Mr. Burby?

8    MR. BURBY:  I have no questions, your Honor.

9    MR. STAHLMAN:  Any answers?

10   THE COURT:  That concludes that part of it.

11   MR. VEEDER:  I would like to finish up, if I may, with

12   these aerials that we started in on.  We went a little faster

13   than I thought so far, and Mr. Warnock will be able to make

14   Dallas.  Anyway, we will get through with this while we are

15   at it.

16   THE COURT: What series is this now?

17   MR. VEEDER:  120--

18   THE CLERK:  This is series 78.

19   MR. VEEDER:  I beg your pardon.  And what was the last

20   one, Bill?

21   THE CLERK:  That was 78T7.

22

23                    FURTHER DIRECT EXAMINATION

24   BY MR. VEEDER:

25       Q  I hand you, Col. Bowen, this list 78U and ask you

D

Z31

1    to refer to the exhibit and to correlate it--

2          THE COURT:  What stream will it be now?

3          MR. VEEDER:  I didn't hear your Honor.

4          THE WITNESS:  This is Pechanga Creek, your Honor.

5          THE COURT:  Pechanga.

6    BY MR. VEEDER:

7          Q  --and I ask you to correlate it, if you would,

8    please, with Plaintiff's Exhibit 145.

9          Let the record show the Colonel is now wearing glasses.

10         A  I strained my eyes so badly Thursday I had to go

11   out and buy some.

12         Q  Would you proceed, Colonel.

13         A  Yes, sir.

14         THE COURT:  I hand you-- oh, you have a grease pencil

15   already.

16         THE WITNESS:  Yes, your Honor.

17   BY MR. VEEDER:

18         Q  You also have the other pencil there to write on

19   145?

20         A  May I have the exhibit number, please?

21         THE COURT:  78U1 to 78U whatever there are, four or

22   five of them.

23         THE WITNESS:  78U1 is a vertical aerial photograph

24   showing a portion of Pechanga Creek indicated in the lower

25   half of the photograph running from east to west as an

1    irregular white and braided line, that being the course of the

2    stream.  It is indexed to the Pechanga quadrangle reduction

3    of Plaintiff's 145.  And on that reduction I will write

4    "78U1" in red over the numerals 3-0098.  Now, this 78U1 shows

5    a portion of Pechanga Creek which flows through Sections 25,

6    26, 27, 34, 35, and 36, 8 South, 2 West.

7        Q  Now, would you put your initials there, please.

8    78U2, is that right?

9        A  Yes, sir.  78U2.  And in each instance I should

10   point out I am placing the exhibit number in red on the

11   northern border of the photograph.  78U2 is a vertical aerial

12   photograph which shows Pechanga Creek entering at right

13   center and ploying across the photograph to approximately

14   the center of the photograph where it turns in and flows in

15   a northwesterly direction to the upper left-hand corner of the

16   photograph.  The cultivated valley which is shown northerly

17   of Pechanga Creek is primarily within the Vail Ranch property.

18   The Temecula-Pala Highway is shown running diagonally from the

19   upper left-hand corner to about the center of the photograph

20   and then running southerly, leaving the photograph at about

21   to the right of center of the bottom line.

22       Q  Mark "Highway" on there.

23       THE COURT:  Mark the-- it has no number, does it?

24       THE WITNESS:  Not to my knowledge, your Honor.  It is

25   commonly called the Pala-Temecula highway.

D

Z33

1    And with a red pencil I have inscribed on the Pala-

2    Temecula Highway "Pala-Temec Hwy."

3    THE COURT:  Where does this road go running off to the

4    left-hand corner?

5    THE WITNESS:  The road running off the left-hand corner,

6    your Honor, is a fire truck trail which leads ultimately over

7    to Rainbow Valley.  It also leads to a prison camp which is

8    shown as a little white island in the lower left-hand corner

9    of the 78U2.  California State Division of Forestry maintains

10   this camp and utilizes prisoners in forest work-- making fire

11   breaks, road trails, and, when the need arises, fighting

12   fires.

13   Now, 78U2 is keyed to the Pechanga quad reduction of

14   Plaintiff's 145.  And with a red pencil I will inscribe

15   "78U2" over the numerals 3-0088 which appear on Pechanga quad

16   reduction.

17   THE COURT:  Allright.  12 o'clock.  Take a recess

18   until 2.

19   (Noon recess.)

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, TUESDAY, JANUARY 20, 1959.  2:00 P. M.


ALLEN C. BOWEN,

recalled as a witness in behalf of the plaintiff, having been

previously sworn, testified further as follows:


DIRECT EXAMINATION (Resumed)

BY MR. VEEDER:

Q  Colonel, would you proceed with the designation

of the various areas as they relate to the Pechanga Valley?

A  Yes, sir.

Q  78U-2; is that right?

A  Yes, sir.

Your Honor, I didn't designate the sections,

portions of which are traversed by the Pechanga Creek as it

appears on Plaintiff's Exhibit 78-U-2.  The portions of

sections so traversed are 27, 28, 29, 8 South, 2 West.

MR. SACHSE:  Could you tell us approximately what

part of that is in the Indian Reservation and what is not, on

U-2?

A  Yes, sir.  The Pechanga Indian Reservation contains

that portion of Pechanga Creek which extends into the Section

28, 8 South, 2 West.  The easterly portion of the Pechanga

reservation extends across the Pala-Temecula Road, including

the curve near the center of the photograph where the direction

E

Z39

1  of the road changes from a northwest-southeast to a generally

2  north-south direction, and the fence line containing that

3  portion of the reservation appears on the photograph as an

4  east-west line and it lies northerly of the--

5  THE COURT:  Can you put it in roughly in red, or would

6  that be a big job?

7  MR. SACHSE:  Would this help you?

8  THE WITNESS:  Yes, sir, I might get it in roughly,

9  with the exception of this little ten-acre piece which appears

10  on Plaintiff's Exhibit 126-A, and I might be able to get that.

11  With a red grease pencil I will draw a line not exactly

12  on the boundary but enclosing the boundary of the Indian

13  Reservation.

14  MR. VEEDER:  You are still referring to Plaintiff's

15  Exhibit 78-U-2?

16  THE WITNESS:  On Plaintiff's Exhibit 78-U-2; yes, sir.

17  THE COURT:  There is a littlepiece of it down here.

18  THE WITNESS:  Yes, sir, the Kelsey tract.

19  THE COURT:  Borders on the road?

20  THE WITNESS:  It borders on the Pala-Temecula road.

21  THE COURT:  It is this piece here, I think, isn't it?

22  MR. VEEDER:  I believe your soil survey will help you

23  on that, Colonel.

24  THE WITNESS:  Thank you very much.

25  The Judge was right, yes, sir.

E

Z40

1          The second area on the 78-U-2 which is completely

2     encircled with a red line is the so-called Kelsey tract of

3     the Pechanga Indian Reservation.

4          MR. VEEDER:  Would you proceed, Colonel?

5          THE WITNESS:  Plaintiff's Exhibit 78 - U-3 is a

6     vertial areial photograph which is indexed to the Pechanga

7     quad of Plaintiff's Exhibit 145.  With a red pencil I will

8     mark on that quad reduction "78-U-3" over the numerals 3-0087.

9     78-U-3 shows essentially the same portion of Pechanga Creek

10    as is shown on 78-U-2, except that it extends Pechanga Creek

11    a little farther north about to the point where it intersects

12    the old Highway 395, which is just visible on the left center

13    margin of 78U3.  The valley which is traversing the upper

14    portion of 78U3 is the Temecula Valley, sometimes called the

15    Pauba Valley of the Vail Ranch.

16         Plaintiff's Exhibit 78U4 is a vertical aerial photograph

17    which is indexed to the Pechanga quad of Plaintiff's 145, and

18    I will write "78U4" on that quad reduction over the numerals

19    3-0064.  78U4 shows the confluence of Pechanga Creek with

20    Temecula Creek which appears about the center of the photograph,

21    and to the right of U. S. Highway 395 which traverses 78U4 from

22    north to south I will write "U.S. 395" in red on 78U4 to

23    indicate that highway alignment.  The San Diego Aqueduct appears

24    on 78U4 to the right of U.S. 395 and running in a north-south

25    direction, and I will mark "Aqu." in keeping with the

k E

Z41

symbolization for aqueduct in other of the 78 series.  In

addition to the confluence of Pechanga and Temecula Creeks on

78U4 there also appears the confluence of Murrieta and

Temecula Creeks together forming the Santa Margarita River.

The confluence of Murrieta and Temecula Creeks appears on 78U4

just above the numeral 5 as part of 395..

MR. VEEDER:  Next would be 78V, the Coahuilla area.

THE WITNESS:  This is V?

MR. VEEDER:  That is right, 78V.

THE WITNESS:  Plaintiff's Exhibit 78V1 is the first in

the series of Coahuilla Creek, a vertical aerial photograph

indexed to sheet No. 4 of Plaintiff's Exhibit 145, and I will

write "78V1" over the numerals 6-0042 which appear in the

upper right-hand corner of Sheet No. 4 on Plaintiff's Exhibit

145.  78V1 shows a portion of Terwilliger Valley, both within

and without the watershed of the Santa Margarita River.  The

portion within the watershed includes the cultivated area in

the upper right-hand corner of 78V1.  The watershed line comes

fairly close to the Farmstead area, which I will encircle with

a red pencil on 78V1.  That watershed boundary appears on the

soil survey sheets, Plaintiff's Exhibit-- and that is the

Coahuilla Reservation, your Honor-- 124 series, I believe.

THE COURT:  124-A to N?

THE WITNESS:  Yes, sir.

MR. SACHSE:  Could you tell us what sections this

1     headwater is in?

2          THE WITNESS:  Neither this sheet nor the picture are

3     sectionalized, but if I may have the 124 series I will be

4     pleased to tell you-- 124-M, I believe.

5          (Mr. Veeder hands documents to the witness.)

6          THE WITNESS:  As marked in evidence, it is Plaintiff's

7     124-E.  124-E is an enlargment of 78V1, with the addition of

8     soil survey symbols and soil site delineations included on it.

9     On 124-E the watershed line appears as a dashed line labeled

10    "Santa Margarita River watershed," and the sections which

11    show on 78V1, as indicated on 124-E, are Sections 2 and 3,

12    8 South, 3 West.

13         Plaintiff's Exhibit 78V2 is a vertical aerial photograph

14    which is indexed to sheet No. 3 of Plaintiff's 145, and with a

15    red pencil I will mark 78V2 over the numerals 6-0041 which

16    appear in the lower right-hand corner of sheet No. 3 of

17    Plaintiff's 145.  The drainage course of Coahuilla Creek and

18    its tributaries through Terwilliger Valley appear in Sections 2

19    and 3, 8 South, 3 West and Sections 33, 34 and 35, 26, 27 and

20    28, 7 South, 3 West.  The valley is generally shown by the

21    cleared area which extends diagonally from the upper left-hand

22    corner of 78V2 to the lower right-hand corner of 78V2.

23         MR. SACHSE:  Is that the Farmstead you pointed out on

24    78V1?

25         THE WITNESS:  Yes, sir; also depicted in the lower

E

z43

1   right-hand corner of 78V1.

2           THE COURT:  What do you call it-- farmstead?

3           THE WITNESS:  Probably in California they call that a

4   rancho.

5           MR. VEEDER:  Where are we now?

6           THE WITNESS:  On the Coahuilla Indian Reservation.

7           Plaintiff's Exhibit 78V3 is a vertical aerial photograph

8   lying immediately north of 78V2 and indexed to sheet No. 3

9   of Plaintiff's 145.  I will write with red pencil on Sheet

10  No. 3 of Plaintiff's 145 in red the inscription "78V3" over the

11  numerals 6-0040.  The portion of the Coahuilla Creek drainage

12  area, that is, the water courses through which the water runs

13  from time to time, appears on 78V3 as running through portions

14  of Sections 26, 27, 28, 34 and 35, 7 South, 3 East.  The area

15  which appears in the central left-hand portion of 78V3 as a

16  mottled area is an intermittent lake bed.

17          Plaintiff's 78V4 is a vertical aerial photograph which

18  is indexed to sheet No. 4, Plaintiff's 145, and with a red

19  pencil I will mark "78V4" over the numerals 5-0081 in the

20  upper right-hand corner of Sheet No. 4 of Plaintiff's 145.

21  Plaintiff's 78V4 shows a tributary of Coahuilla Creek running

22  northerly in the left-half of 78V4, draining the area shown

23  on Sheet No. 4 of Plaintiff's 145 as Durasno Valley.  That

24  area of Durasno Valley is shown as a cultivated area in the

25  lower central portion of 78V4 and that cultivated area is

    outside the Coahuilla Indian Reservation.

A   Durasno Valley extends northerly through Sections 5 and 6, 8 South, 3 East, and 30, 31, and 32, 7 South, 3 East.

MR. STALHMAN:  What valley is that?

THE WITNESS:  Durasno.  I will point to sheet No. 3 of Plaintiff's 145, Mr. Stahlman, in Sections 5, 8 South, 3 East, and 31, 8 South, three East.

78V5, the vertical aerial photograph which shows the dry lake bed, also shown on 78V3 appearing on 78V5 in the upper right-hand corner, Coahuilla Creek leaves the area of that dry bed and runs south of west through the upper half of 78V5.  With a redpencil, and referring to Sheet No. 3 of Plaintiff's 145, I will write 78V5 over the numerals 5-0082 appearing at the bottom of sheet 3, Plaintiff's 145.

A portion of Coahuilla Creek shown on 78V5 traverses Sections 28 and 29 and 30, 7 South, 3 East, and Durasno Valley drains, and the stream draining Durasno Valley has its confluence with Coahuilla Creek within Section 31, 7 South, 3 East; and that is shown on the 78V5 above the center of the left margin.

MR. SACHSE:  What is the figure there, Colonel?

THE WITNESS:  5-0082.

MR. SACHSE:  And that is on 5, is it not, V5?

THE WITNESS:  78V5, yes, sir.

78V6  lies north of 78V5.  And with a red pencil I will write "78V6" over the numerals 5-0083 as they appear on

F

Z35

1    Sheet No. 3 of Plaintiff's 145.

2         78V6 shows essentially the same reach of Coahuilla

3    Creek as shown on 78V5.  It does show cultivated areas in the

4    upper left-hand corner of 78V6 which lie-- upper right-hand

5    corner, thank you, sir-- of 78V6, and those cultivated areas

6    lie largely but not wholly outside the Coahuilla Indian

7    Reservation.

8         78V7 is a vertical aerial photograph indexed in sheet

9    No. 3 of Plaintiff's 145.  And I will inscribe with a red

10   pencil on sheet No. 3 "78V7" over the numerals 5-0127.

11   Coahuilla Creek appears in the upper right-hand corner of 78V7,

12   through a short portion of its reach lying largely within

13   Section 30, 7 South, 3 East, and Section 25, 7 South, 2 East.

14        78V8 is a vertical aerial photograph appearing just

15   north of 78V7.  And with a red pencil I will mark 78V8 on

16   sheet No. 3, Plaintiff's 145, over the numerals 5-0128.

17        78V8 shows about the same reach of Coahuilla Creek as

18   appears on 78V7.  And now the image of Coahuilla Creek appears

19   running generally from east to west across the central portion

20   of 78V8.  And 78V8 shows the location of the cemetery and the

21   crossroads marked "Coahuilla" on sheet 3 of Plaintiff's 145.

22        Now, this crossroads appears in Sections 23 and 26, 7

23   South, 2 East.  I will encircle with a red pencil on the face

24   of 78V8 the crossroads of Coahuilla and write "Coah" in red

25   on "78V8" to indicate the signifance of the red circle.

1    78V9 is a vertical aerial photograph which is indexed

2 to sheet No. 4, Plaintiff's 145. And I will mark in red

3 "78V9" over the numerals 5-0167, which appear on Sheet No. 4

4 of Plaintiff's 145.

5    78V9 is also indexed on the Aguanga quad reduction

6 which appears in Plaintiff's 145. And I will mark "78V9"

7 over the numerals 5-0167 which appear in that Aguanga Quad

8 reduction.

9    Plaintiff's 78V9 shows in the extreme upper left-hand

10 corner a little of the valley through which Coahuilla Creek

11 flows.

12    78V10 is a vertical aerial photograph indexed through

13 sheet No. 4, Plaintiff's 145. And I will write "78V10" in

14 red as it appears over the numerals 5-0168 as it appears on

15 sheet 4 of Plaintiff's 145. Also 78V10 is indexed to sheet

16 No. 2 of Plaintiff's 145. And I will write "78V10" over the

17 numerals 5-0168 as they appear in the lower right-hand corner

18 of sheet 2, Plaintiff's 145.

19    78V10 lies north of 78V9 and shows clearly the thread

20 of the stream of Coahuilla Creek as it enters the photograph

21 in the upper right-hand corner and meanders across the upper

22 portion of the photograph ploying in an easterly-westerly

23 direction to a point where it leaves 78V10 on the left margin

24 above center.

25    MR. SACHSE: Will you give us the sections, Colonel?

F

Z37

1          THE WITNESS:  Yes, sir.  The road which appears traversing

2   diagonally across the upper left-hand corner of 78V10 is the

3   unnumbered road which goes from Aguanga to Palms to Pines

4   Highway.  The section through which this reach of Coahuilla

5   Creek which appears on 78V10 flows are Sections 27, 7 South,

6   2 East, and Section 28, 7 South, 2 East.

7          78V11 lies immediately north of the 78V10 and is

8   indexed as sheet No. 2 of Plaintiff's 145.  I will mark in

9   red "78V11" over the numerals 5-0169 as they appear in the

10   lower right-hand corner of Sheet 2, Plaintiff's 145.

11          78V11 is also indexed on Sheet No. 3 of Plaintiff's

12   145.  I will mark with a red pencil "78V11" over the numerals

13   5-0169 appearing on the lower left-hand corner of Sheet No.

14   3, Plaintiff's 145.

15

16

17

18

19

20

21

22

23

24

25

1     I note also that 78V10 is indexed to sheet 3, and I

2  will add "78V10" over the numerals 5-0168 as they appear in the

3  lower left-hand corner of Sheet 3 of Plaintiff's 145.

4     Plaintiff's Exhibit 78V11 shows essentially the same

5  reach of stream of Coahuilla Creek that appears on 78V10,

6  except that the image of the creek is moved downward on 78V11

7  so that it traverses the exhibit generally from an east to west

8  direction.  78V11 also shows the Coahuilla crossroad in the

9  upper right-hand quadrant.

10     Plaintiff's Exhibit 78V12 is a vertical aerial photo-

11  graph which is indexed to sheet 2 of Plaintiff's 145, and I

12  will write "78V12 over the numerals 5-0170 appearing on sheet

13  2 of Plaintiff's 145, and also appearing on Sheet 3 of

14  Plaintiff's 145 I will write "78V12" over the numerals 5-0170.

15  78V12 shows the Coahuilla crossroads and an important tributary

16  of Coahuilla Creek running from north to south, having its

17  confluence with Coahuilla Creek near the crossroads of

18  Coahuilla.  It appears on 78V12 paralleling the right-hand

19  margin.

20     That north-south tributary which appears on Plaintiff's

21  78V12 traverses portions of Sections 23 and 26, 7 South, 2 East.

22     Plaintiff's Exhibit 78V13 is a vertical aerial photo-

23  graph which is indexed to the Aguanga quad reduction of

24  Plaintiff's 145, and I will write "78V13" over the numerals

25  6-0013 appearing in the upper right-hand corner of the Aguanga

Bowen   Direct

7481

1    quad reduction of Plaintiff's 145.  Coahuilla Creek is shown

2    on Plaintiff's 78V13 traversing in an east-west direction the

3    upper portion of the photograph.  78V13 shows where the

4    creek leaves the Coahuilla Valley and enters a canyon reach.

5    The canyon reach is shown as the valley ends in the upper

6    left-hand corner of 78V13.

7         MR. SACHSE:  Could you give us the sections on 13,

8    please?

9         THE WITNESS:  Referring to Plaintiff's Exhibit 78V13,

10    Coahuilla Creek is shown in portions of Sections 31, 32 and

11    33, 7 South, Range 2 East.

12         Plaintiff's Exhibit 78V14 shows essentially the same

13    reach of Coahuilla Creek, excepting that it shows the Coahuilla

14    Valley in the center of the photograph and the stream con-

15    tinuing on through a canyon reach as it leaves the valley to

16    the left of center, the stream draining then on down in a

17    southwest direction.  78V14 is keyed to sheet 2 of Plaintiff's

18    145, and I will write "78V14" over the numerals 6-0012

19    appearing in the lower right-hand corner of sheet 2 of

20    Plaitiff's 145.

21         Plaintiff's Exhibit 78V15 depicts Coahuilla Creek

22    flowing southerly and westerly or southwesterly from the valley

23    which appears in the upper right-hand corner of 78V15, and it

24    flows through a canyon reach continuously from leaving that

25    valley clear across the photograph 78V15.  78V15 is keyed to

Bowen    Direct

7482

1  Sheet 2 of Plaintiff's 145, and I will write "78V15" over the

2  numerals 5-0146 appearing on sheet 2 and appearing also on

3  the Aguanga quad reduction of Plaintiff's 145.

4        Plaintiff's Exhibit 78V16 is an aerial photograph

5  showing a portion of Coahuilla Creek.  It is indexed on the

6  Aguanga quad reduction of Plaintiff's 145, and I will write

7  in red "78V16" over the numerals 5-0036 appearing in the

8  upper left-hand corner of the Aguanga quad reduction of

9  Plaintiff's 145.  Wilson creek is shown on 78V16 entering the

10  area of the photograph in the upper right-hand corner and

11  flowing southerly to its confluence with Coahuilla Creek to

12  the right of center of 78V16.  Together then the streams

13  continue flowing in a southwesterly direction to the point where

14  they enter Wilson Valley, a small portion of which is shown

15  in the lower left-hand corner of 78V16.

16        Plaintiff's Exhibit 78V17 is a vertical aerial photo-

17  graph of a portion of Coahuilla-Wilson Creek drainage.  It is

18  indexed on Aguanga quad reduction of Plaintiff's 145, and I

19  will write in red "78V17" over the numerals 5-0104 appearing in

20  the upper left-hand corner of the Aguanga quad reduction.

21  78V17 is also indexed to the Vail Lake quad reduction of

22  Plaintiff's 145, and I will write "78V17" over the numerals

23  5-0104 appearing in the upper right-hand corner of the Vail

24  Lake quad reduction.  78V17 shows Lancaster Valley in the lower

25  left-hand corner of the photograph, which appears as a cultivated

1    area, adjoined both to the north and south by very irregular

2    terrain, typical badlands topography, which is designated

3    "Temecula Arkose" described by our geologist, I think, as

4    older continental deposits.

5    MR. VEEDER:  By which geologist-- the United States

6    geologist?

7    THE WITNESS:  Our geologist.

8    Coahuilla-Wilson Creek enters the valley in the lower

9    left quadrant of 78V17 and continues to flow westerly across

10   the valley to the point where it leaves the area of the photo-

11   graph.

12   MR. VEEDER:  Colonel, would you point out the Stardust

13   and Oviatt properties, if you can locate them, on 78V17.

14   THE WITNESS:  As I recall, the State Highway 79 traverses

15   Plaintiff's 78V17 in a northerly-southerly direction, and I

16   will write along the alignment of that road "State Highway"

17   (Abbreviated) 79.

18   THE COURT:  Where do you see the highway?  Here?

19   THE WITNESS:  The highway, your Honor, is this gray line

20   which appears entering the photograph in the lower margin

21   and continuing on across the valley and along the alignment

22   generally where I have placed on 78V17 the State Highway

23   designation to a point where it leaves the upper margin near

24   the plot at the top of the margin.  It runs throughthat badlands

25   topography and it is rather difficult to pick up on this scale.

Z48

1          As I recall, the Stardust Ranch occupies generally the

2    portion of Lancaster Valley and others-- I don't have the

3    boundaries before me-- to the right of State Highway 79, and

4    the portion of Oviatt property in the valley to the left.

5          THE COURT:  Where is this map on--

6          THE WITNESS:  78V17, your Honor, appears--

7          THE COURT:  Is this the highway?

8          THE WITNESS:  Yes, sir.  The highway is symbolized on

9    the Aguanga quad reduction of Plaintiff's 145.  This levee

10   system, your Honor, in the Lancaster Valley which shows on the

11   quadrangle also shows on the photograph and may help to orient

12   your Honor.  It would be this east-west straight line of

13   section of the creek as it appears in the center of 78V17.

14         Mr. Stahlman was pointing to State Highway 71 which

15   traverses in part the Vail Ranch.

16         Plaintiff's 78V18 is indexed to the Aguanga quad

17   reduction, and I will inscribe "78V18" with a red pencil

18   over the numerals 3-0184 which appear in the upper right-hand

19   corner of the Vail Lake quad reduction of Plaintiff's 145.

20   78V18 shows the Coahuilla-Wilson Creek continuing on down to

21   Lancaster Valley west of the area shown in 78V17.

22         MR. SACHSE:  May I see 17, your Honor?

23         Is this taken from a lot higher elevation or something,

24   Colonel?

25         THE WITNESS:  78V17 and 18 are taken from the same

elevation. 78V18 is a very poor print of the negative. These are some prints and run off in haste and they don't always give the most desirable image.

Plaintiff's 78V19 is distinguishable by the image of the Vail Reservoir appearing to the left of center and the Vail Dam containing that reservoir is depicted from a vertical observation point. The Coahuilla-Lancaster Creek enters the reservoir area from the right central margin of the photograph on down to its confluence with the reservoir. The stream entering the area shown on 78V19 from the lower left-hand corner is Temecula Creek as it flows mainly through Nigger Valley. 78V19 is indexed to the Vail Lake quad reduction of Plaintiff's 145. I will write with a red pencil "78V19" over the numerals 3-0161 appearing on the Vail Lake quad reduction of Plaintiff's 145.

That completes the Coahuilla Creek series.

MR. VEEDER: I would like to interrupt Col. Bowen now and call Mr. Warnock as a witness, if I may, your Honor.

THE COURT: Do you want to get in evidence the U series?

MR. VEEDER: U and V, your Honor.

THE COURT: 78U1 to 78U4.

MR. VEEDER: We make the offer.

THE COURT: Plaintiff's 78U1 to Plaintiff's 78U4 will be received in evidence. That is Pechanga Creek.

And you offer the 78V series?

1          MR. VEEDER:  Yes, your Honor, we do.

2          THE COURT:  Plaintiff's 78V-1 to Plaintiff's 78V19,

3    inclusive, arereceived in evidence.

4          (Plaintiff's Exhibit 78U1 to 78U4, inclusive were

5    received in evidence.  Plaintiff's Exhibits 78V-1 to 78V-19,

6    inclusive, were received in evidence.)

7          THE COURT:  Do you want to take a recess now before you

8    call this witness?

9          MR. VEEDER:  That will be satisfactory, your Honor.

10         THE COURT:  All right.

11         (Recess.)

H

Z38

1      MR. VEEDER:  Call Mr. Warnock, please.

2

3                    LYLE F. WARNOCK,

4      called as a witness in behalf of the People, being first duly

5      sworn, testified as follows:

6           THE CLERK:  Please be seated.

7           MR. SACHSE:  Your Honor, before we start with the

8      witness, Mr. Veeder just told counsel, all of us here, that

9      he expects to rest Friday.  Now, if he is facetious, that is

10     one thing.  If he is serious, I think in fairness to your

11     Honor and to all of us-- we have had a very hasty discussion

12     about it here-- we ought to take a minute to take up what is

13     going to go next.  Now, speaking for myself--

14          MR. VEEDER:  I will clear it up.  Now, bringing

15     witnesses in is a little difficult sometimes, I think, though,

16     that all my witnesses will be here.  I am hopeful, very

17     hopeful, to rest by Friday.  I have one witness that has to

18     go to a conference.  I think he will be back in time.  If he

19     is, or if I can get him on before, I am hopeful to rest Friday.

20          MR. SACHSE:  Well, the problem is, as I see it, and

21     that confronts me-- Friday is the 23rd-- Now, I feel very

22     strongly that no defendant in this case should be required

23     to put on any evidence until we know to what the United States

24     seeks to quiet title.  We don't know.  The United States has

25     neither answered your Honor's fifteen questions nor has it yet

H

Z39

1   filed anything indicating its approval or disapproval of the

2   Master's findings.  I am not prepared-- I will speak very

3   frankly-- I am not prepared to go ahead with any defense of

4   any kind until those questions are answered.  And I don't

5   think I should be required to do so.

6       MR. VEEDER:  I can expound very rapidly to both of

7   the statements that have just been made.  Certainly, there

8   is no reason in regard to these fifteen questions.  We are

9   preparing an answer to them and will give full and complete

10  answers.  But there is no reason for not proceeding by reason

11  of those factors in regard to the Master's hearings.  Those

12  hearings--

13      THE COURT:  That is not important.  But direct your-

14  self to the other inquiry:  What is the United States seeking

15  a quiet title to?  This is a suit to quiet title, to the

16  rights of the United States on the stream.

17      MR. VEEDER:  In my view, it is not even doubtful.  the

18  United States of America is quieting a title, seeking a quiet

19  title to the rights to the use of water for Camp Pendleton,

20  which was measured and which we have pleaded to the full ex-

21  tent of 23,000 acre feet.  We have also pleaded in there that

22  your claims for just the ordinary use on the camp will run

23  upwards to 13,000 acre feet.  That is what we are seeking to

24  quiet, our title.

25      THE COURT:  We are not talking about quantity.  I am

H
Z40

1   talking about the reaches of the streams.  Should I require a

2   man who owns property over in this basement complex area to

3   put on any proof at all?

4        MR. VEEDER:  My own view on that, your Honor, is that

5   I think that he probably would decide to, but why shouldn't he?

6   We have put in our case.  Now, we have certainly made more than

7   a prima facie case.

8        THE COURT:  Whether you put it in or not, shouldn't you

9   be required to say what the reaches of the stream are and

10  whether a particular land is involved in this litigation or

11  not?

12       MR. VEEDER:  Yes, we have.  We have.  We believe that

13  anyone claiming water in the Santa Margarita River through any

14  of these reaches concerning which we have just put in the

15  evidence of, that Col. Bowen has just been testifying to,

16  anyone who claims water in there should, by all means, come

17  in and prove up his rights.  Now, in regard to all of these

18  areas through here, if they don't claim water, why, that is

19  up to them.

20       THE COURT:  You mean that if no one comes in and claims

21  any rights to use water, that I am going to give the United

22  States a decree quieting title to any water that might be on

23  that land?  If you think so, you are wrong.

24       MR. VEEDER:  Which brings us to the point, your Honor,

25  that--

H

Z41

1    THE COURT:  Plaintiff has to recover on the strength

2    of his own title and not on the weakness of the defendants.

3    MR. VEEDER:  That is right.  And we have certainly

4    shown the strength of our title, your Honor.  We own, as I

5    have shown.  We proved.

6    THE COURT:  You have shown some water rights and some

7    reaches of the stream, but what are we going to do about some

8    of these people who have property remote from any of these

9    stream beds?  I am going to enter a decree quieting title

10    against them merely because they don't come in and put some

11    proof on?

12    MR. VEEDER:  Here is the thing that we are doing right

13    now:  I have been working with Mr. Luddy, the Clerk, and we

14    are making what we call a key list right now of parties, of

15    counsel.  It appears to me, as we come to the point where we

16    are getting ready to rest, my concern is this:  That I think

17    there may be substitution counsel, some other acts like that,

18    and I want your Honor's direction in that connection.  But

19    from our point of view, the United States has put in its case.

20    And I think that the matter as set up from the stand--

21    THE COURT:  No one is criticizing the fact you put in

22    some kind of a case.  But the question is:  How about chopping

23    down some of your broad claims and cutting the case down at

24    this stage to some size that it ought to be, rather than to

25    leave it up in the air.

H

Z42

MR. VEEDER:  I don't believe-- one, I don't think the case is up in the air. Secondly, your Honor, I want to point out this:  That the Fallbrook Public Utility District certainly should be prepared to go ahead with its case now.  If it isn't now after eight years, it never will be.  Secondly, the State of California prepared its Bulletin 57, so-called, for this litigation commencing in 1951 and '52.  Now, I say this: That it occurs to me that if Fallbrook and the State of California are not now ready to go to trial, that is the most amazing thing I ever heard of.

THE COURT:  Wait.  Mr. Sachse represents other people besides Fallbrook.

MR. VEEDER:  Well, surely he does.

THE COURT:  He is not talking about Fallbrook.  He is talking about some other people he represents up in the Temecula and in the lower part of the watershed, if I understand his position.

MR. SACHSE:  That is correct, your Honor.

I would like to show you specifically and exactly what I mean.

MR. VEEDER:  (Inaudible.)

THE COURT:  What?

MR. VEEDER:  I say Mr. Sachse is not prepared to go to trial so he blames me.

THE COURT:  Oh, no.

H

Z43

1      MR. VEEDER:  Which is ridiculous.

2      THE COURT:  I know what he is talking about.  He is not

3  talking about his representation of Fallbrook; he is talking

4  about some other people he represents up in this valley.

5      MR. VEEDER:  Is he ready for Fallbrook, then?

6      THE COURT:  And whether or not he should be required

7  to proceed in any way is the question.

8      MR. VEEDER:  Your Honor,--

9      THE COURT:  Go ahead, Mr. Sachse.

10      MR. VEEDER:  I made a specific inquiry.

11      THE COURT:  Just a minute.

12      MR. SACHSE: I represent a client who is in Section 9

13  under the overlay right here.  There is no stream under any

14  stretch of the imagination from anybody's testimony through

15  his land.  It is clearly basement complex.  I represent

16  another client who owns a large chunk of land in Section 22,

17  23, 24, 25, 26, and 27; again, clearly basement complex; and

18  so on.  I could spot this all over the map.  Now, it is my

19  intention, for the purpose of simplifying this case, that

20  when the United States has rested and when we know or when I

21  think I know what they claim is in or out of this case, the

22  first thing I intend to do was to take some of those individual

23  defendants, tender evidence of title and rest their case;

24  because, surely, there is going to be no rebuttal to that,

25  unless the United States wants to contest their title.  I was

1  going to rest their case and thereafter ask your Honor for an

2  affirmative judgment.  Mr. Paul Hernley who owns this land in

3  9 in the basement complex is the owner of vagrant, local,

4  percolating ground waters underneath his ground.  And similarly,

5  that was my procedure to try to get rid of these people,

6  partly for my own convenience as well as the Court's.  I would

7  like to chop a lot of these people out of here.

8      MR. VEEDER:  Your Honor, I made an inquiry:  Is

9  Fallbrook Public Utility District ready to go to trial?  I

10  think that is the important question.

11      MR. SACHSE:  I will answer your question that it is

12  not.

13      MR. VEEDER:  That is all I wanted to know.

14      MR. SACHSE:  I have our engineer, the only one we

15  have, Mr. Veeder, working presently on exhibits.  The minute

16  they are finished, which shouldn't be more than a week or ten

17  days or two weeks, I am ready.  I am that close to ready.  The

18  exhibits are not prepared.  I don't have the facilities of the

19  United States Marine Corps, the Indian Service, the Navy

20  Department, the Justice Department, and a U. S. Geologicals

21  Survey to help me prepare my exhibits.

22      MR. VEEDER:  Is California ready to go ahead?

23      MR. SACHSE:  Now, furthermore, I believe that as

24  representing individual clients we have a state of the record

25  for the Court at this moment where his Honor can direct that

H

Z45

1   certain facts be deemed admitted and certain people eliminated
2   from this proceeding, because the United States has not yet
3   answered questions of admission filed according to the Federal
4   Rules over six months ago.  And if you think I am going ahead
5   with Fallbrook's case or anybody else's without making a few
6   motions on that situation, why, you have got another think
7   coming.  I would like to hear what some of the other counsel
8   have to say.

9          MR. VEEDER:  I have heard this about the admissions.

10         THE COURT:  I don't care how many times you have heard
11  it.  We are talking about requests for admissions, and you
12  haven't got them in.  Now, you are talking about resting your
13  case.  We are trying to work out something in an orderly
14  manner to get rid of some of these defendants who don't belong
15  in the case, probably never did belong to it, and you want to
16  divert the question into whether Fallbrook is ready to go ahead
17  with this case.

18         MR. VEEDER:  I have no desire to divert anything.  The
19  point I am trying to make, your Honor, is this:  I will give
20  a report, and I will show how Mr. Sachse has misrepresented
21  to you in regard to these admissions.  Now, the next thing I
22  will say is this:  The United States of America has proceeded
23  down a long and rugged course preparing cases for people as
24  we went along.  We are glad to do it.  Now, we are down to a
25  point:  Who is striking at the heart of the Marine Corps?

X H

Z46

1   Well, it is a bunch of speculators.  It is the Fallbrook

2   Public Utility District.  And I submit that I am not going to

3   have dust thrown in my eyes in regard to somebody in the

4   basement complex when the Fallbrook Public Utility District

5   and the State of California admit that they are not ready to

6   go to trial.  And that is all they are doing.  It is the

7   biggest red herring that I ever saw in my life--

8        THE COURT:  Now, Mr. Veeder.  I haven't heard from Mr.

9   Moskovitz.  Are you prepared to go ahead?

10       MR. MOSKOVITZ:  Your Honor, there are some studies

11  underway now that are not yet ready.  In looking at the

12  schedule of the trial, I didn't anticipate Mr. Veeder would

13  rest at this pdnt.  I had also, looking at the schedule, it

14  was my understanding that we would come at the tail end of

15  those appearing here as set forth in the order on ground

16  rules, and that is the manner in which our schedule has

17  been prepared.

18       MR. STAHLMAN:  Probably change that.  It will be

19  Fallbrook, State and Vail, and then the minute they are through

20  I will probably be ready.

21       MR. MOSKOVITZ:  I am not avoiding going on, your Honor.

22  I can tell you now that the way our studies are going we will

23  be ready in the middle of February.  This gives us the ten

24  days before that to have the exhibits onfile.

25       MR. STAHLMAN:  I do think, however, that if Mr. Veeder

H

Z47

1    rests on Friday, if there are going to be some of these people

2    obviously out of the case, probably that would be the time

3    to do it.

4         MR. VEEDER:  Well, I would like to call Mr. James on

5    Tuesday if you are not-- you see, we have gone through this

6    other material on Bulletin 57.

7         THE COURT:  Call Mr. James on Tuesday?

8         MR. VEEDER:  Well, I would just as soon wind up 57

9    from the standpoint of geology.  But from our standpoint, our

10   case in chief is going to be through very soon.  And I don't

11   care whether Mr. James shows up in their case in chief or

12   later.  But I submit, your Honor, right now that from our

13   standpoint we are progressing on a list, working with Mr.

14   Luddy, but I see no reason in the world--

15        THE COURT:  What is the significance of this list that

16   you are working with Mr. Luddy on?

17        MR. VEEDER:  I am extremely anxious, your Honor, to

18   see how many of the people have actually answered, how many

19   have actually pleaded, how many have pleaded rights and whether

20   or not-- I don't believe that we can just walk in and say these

21   people are in and these people are out; because many of them

22   have pleaded claims in the river.  And when the Marines get

23   through with this, I want them to have a good decree.

24

25

1    Nor did I know that anything was going to stir up a ruckus now

2    when I stated I was intending to rest very shortly.

3         The thing that concerns me very greatly is the schedul-

4    ing of all of us, if Fallbrook is not ready to go ahead and

5    if the State is not ready to go ahead.  It is going to make

6    some real difference in the scheduling of myself personally

7    for the next year.

8         I would like to go ahead with Mr. Warnock, if I could,

9    and wind up his testimony so that he can leave.

10        THE COURT:  All right, let's go ahead with Mr. Warnock.

11

12                    LYLE F. WARNOCK,

13   called as a witness in behalf of the Plaintiff, being duly

14   sworn, testified as follows:

15        THE CLERK:  Would you state your name?

16        THE WITNESS:  My name is Lyle F. Warnock.

17

18                    DIRECT EXAMINATION

19   BY MR. VEEDER:

20        Q  Would you state your age, Mr. Warnock.

21        A  Fifty years.

22        Q  And where do you reside Mr. Warnock?

23        A  In Sacramento, California.

24        Q  What is your present appointment with the Bureau

25   of Indian Affairs?

A   Engineer.

Q   And would you state briefly what the duties are that are entailed in that position?

A   My position is such that I am in charge of road construction and maintenance, irrigation construction and maintenance, and soil conservation and drainage work.

Q   And what area does that embrace?

A   Throughout the State of California, except for those reservations on the Colorado River which are under the Phoenix Area Office.

Q   What educational background have you, Mr. Warnock?

A   I am a graduate civil engineer from Purdue University.

Q   And how long have you been an engineer?

A   Since 1930.

Q   Would you state your acquaintance with the Coahuilla, Pechanga and Ramona reservations?

A   I am acquainted with these reservations with respect to the work which is under my jurisdiction--that is, roads, irrigation, and soil conservation and drainage work.

Q   Now, in regard to the Coahuilla Indian Reservation, what were the surveys that you may in connection with that reservation?

A   In conjuction with the Office of Ground Water Resources of Camp Pendleton, under Lt. Col. Bowen, the Bureau of Indian Affairs made surveys in the field and mapped the areas by soil

classification and also those areas which have been irrigated in the past.

Q  And what investigation on the lands did you make in connection with the properties which are irrigated, Mr. Warnock?

A  We determined the source of the water, the condition of existing facilities and whether or not there are any crops growing at the present time.

Q  And would you refer to Plaintiff's Exhibit 126 and based on your investigation allude to the area marked A on Plaintiff's 126 and state the source of water that you have yourself there personally observed?

A  The water for Area A arises in the reservoir which is shown on the map, it is a spring, and at one time irrigated the entire Area A, which consists of about 35 acres.

Q  You said a reservoir?

A  Yes.

Q  Did you observe the surface area of that reservoir?

A  Yes.

Q  And about how many acre feet do you think that reservoir would have impounded?

A  That reservoir would have impounded about 1 acre foot of water.

Q  Is that reservoir presently in use, Mr. Warnock?

A  No, sir

Q  Would you refer to the area marked D and describe it

from the standpoint of irrigated acreage and the source of water
that you have found to be situated there?

A   Area D consists of about 20 acres that is located in
Section 6, Township 8 South, Range 3 West.   The water arises
from springs near the west quarter corner of Section 5 and is
conveyed to the area by a concrete pipeline 6 inches in diameter.

Q   And what crops are raised down in that area that you
have just described?

A   This area contains quite a few fruit trees at the
present time--apples, pears and peaches.

Q   And what was the irrigated area down there, Mr.
Warnock?

A   Twenty acres.

Q   Would you refer to the area marked F and describe
the source of water and the kind and type of structure utilized
for the delivery of that water?

A   Area F is an area of about 16 acres located in Section
14, Township 7, South Range 2 West.   The water for this area
arises in springs and flows into an earthen reservoir, and from
there it flows through a 6-inch pipe to the area.

Q   Did you state the number of acres which had been
irrigated in that area?

A   Sixteen acres.

Q   Now the last area, which is marked E on Plaintiff's
126, will you describe the source of the water in that area

1    which has been irrigated from that source?

2         A   Area E is a 30-acre tract located in Section 23, Town-

3    ship 7, South Range 2 East.

4         Q   What investigation did you make, Mr. Warnock, from

5    the standpoint of the areas which are subirrigated on the

6    Coahuilla Indian Reservation?

7         A   During the soil surveys, the survey crews mapped those

8    areas which indicated subirrigation, and on the exhibits of the

9    Coahuilla Reservation such symbols are used to indicate those

10   particular areas.

11        Q   How many acres of land did you find that were sub-

12   irrigated in that area?

13        A   About 1,215 acres.

14        MR. SACHSE:   Is that indicated on this map?

15        THE COURT:   Where did you say these symbols indicate this?

16        THE WITNESS:   On Exhibits 124-A through N.

17        MR. VEEDER:   It is the soil survey maps, your Honor.

18        Q   And what are the areas that you determined to be sub-

19   irrigated?

20        A   It is Plaintiff's 124, your Honor, A through N.

21        THE COURT:   How are they marked? Take an example here--

22   what are you looking at--124-B.

23   BY MR. VEEDER:

24        Q   What are the designations which would show the lands

25   which are subirrigated?

H   6
A   6

1          THE WITNESS:  There will be a W1, W2 and W3 in the

2    classification symbol.

3          Q  What does that mean from the standpoint of soil surveys?

4          A  W1 means that the surface vegetation is fed by ground

5    water where it is approximately 6 feet deep, W 2 means that the

6    surface vegetation is fed by ground water where the surface of

7    the ground is damp, and W3 indicates that there is water standing

8    on the ground.

9          Here is a W1, there is a W1, there is a W1.

10         THE COURT:  You are referring to Exhibit 124K.

11         THE WITNESS:  Here is a W3.

12   BY MR. VEEDER:

13         Q  Where in conjuction with the main stem of the Cahuilla

14   Creek are those areas generally found, Mr. Warnock?

15         A  Generally along both sides of the thread of the stream

16   and the drainage streams coming into Coahuilla Creek.

17         MR. VEEDER:  Do you have further inquiry on that, your

18   Honor?

19         THE COURT:  No.

20         MR. STAHLMAN:  I wonder if I may straighten something

21   out here.

22         W1 is vegetation which is fed from water that is within

23   6 feet of the surface?

24         THE WITNESS:  About 6 feet deep.

25         MR. STAHLMAN:  Within the upper 6 feet?

THE WITNESS:  Yes.

MR. STAHLMAN:  W2 is vegetation where the ground is damp?

THE WITNESS:  Yes.

MR. STAHLMAN:  And W3 is the standing water?

THE WITNESS:  Where there is standing water.

Q  What are the uses of water that you have observed and investigated in connection with the Pechanga Indian Reservation, Mr. Warnock?

A  There is a spring which arises in the westerly part of the reservation, from which there is a 2-inch pipe flowing down and the water from that spring is used by the people on the Pechanga Reservation for domestic purposes.

Q  What are the means for the delivery of that water?

A  A 2-inch pipe leading from the spring down to the location of where the houses are and then into the smaller pipe-lines to the individual houses.

Q  Could you refer to that spring on Exhibit 126A?

A  The spring arises just west of the center of Section 36, Township 8, South Range 2 West.

Q  And how many wells are there located on the Pechanga Reservation?

A  There are 6 wells which are in operating, or could be placed in operation.  Then there are 3 other wells which cannot be placed into operation.

H 8

A 8

1          Q   Have you made an investigation as to the number of

2     wells on the Coahuilla Indian Reservation that are presently

3     in use?

4          THE COURT:  Before you answer that, let's go back.   I

5     see only 5 and 3, or 8. You say there are 9 altogether?

6          THE WITNESS:  There are 4 on the Kelsey Tract.

7          THE COURT:  I see.  Which are the 6 that are in operation?

8          THE WITNESS:  They are not all in operation, your Honor.

9     They could be placed into operation.  The 5 in Area A of the

10    Pechanga Reservation and the 1 near the center of the Kelsey

11    Tract--well, it is northeast of the center of the Kelsey Tract.

12         THE COURT:  That is 6.  They are the ones that could be

13    placed in operation?

14         THE WITNESS:  Yes, and some of them are in operation.

15         THE COURT:  What about the other 3?

16         THE WITNESS:  They could not be placed in operation.

17         THE COURT:  Dry holes?

18         THE WITNESS:  Dry holes.

19         THE COURT:  Now you are going to Coahuilla?

20    MR. VEEDER:  Yes.

21         Q   How many wells have you investigated on the Coahuilla

22    Reservation, Mr. Warnock?

23         A   Fourteen wells.

24         Q   Are those presently in use?

25         A   Some of them are and some of them are not.  Some of

them have windmills and were used for stock watering purposes.

Q  Generally what use is made of those wells?

A  Stock watering purposes.

Q  In regard to the 40-acre public domain trust allotment, would you state what your investigation revealed in connection with the water resources as situated on that parcel of land?

A  There 2 springs which arise on this 40-acre parcel. One of them flows into a relatively large earthen reservoir, and the other one flows inside of a concrete pipe that is probably 5 feet in diameter and stood on one end and from that i flows onto the ground.

Q  What use is made of that water that is diverted and impounded?

A  The one spring which flows into the earthen reservoir, that water is used for irrigation.  The spring which flows into this concrete pipe which stands on end, the water is used for domestic purposes and it too is used for irrigation.

THE COURT:  Where is the reservoir.  On the 40 acres, or off of it?

THE WITNESS:  It is right adjacent to the spring.

THE COURT:  On the 40 acres?

THE WITNESS:  On the 40 acres.

BY MR. VEEDER:

Q  What did your investigation show as to the number of Indians inhabiting the Coahuilla Indian Reservation at the

1    present time?

2          A  On this piece of land on the 26th day of July there

3    were 8 people living there.

4          MR. SACHSE:  Was that Coahuilla?

5          MR. VEEDER:  I am talking about the Coahuilla.

6          THE WITNESS:  Excuse me, what was the question again?

7    BY MR. VEEDER:

8          Q  How many inhabited the Coahuilla Indian Reservation

9    at the time of your investigation?

10          A  About 35 people now live on the Coahuilla Reservation.

11          Q  And how many inhabit the Pechanga Reservation?

12          A  There are about 25 people living on the Pechanga

13    Indian Reservation at this time.

14          Q  In regard to the 40-acre tract to which you just made

15    reference?

16          A  There were 8 people living there last July when we

17    visited that site.

18          THE COURT:  Eight Indians?

19          THE WITNESS: Yes.

20          THE COURT:  All these people are Indians or part Indian?

21          THE WITNESS: Yes.

22          MR. VEEDER:  I have do further questions.

23

24                         CROSS EXAMINATION

25    BY MR. SACHSE:

H  11

A 11

1      Q  Mr. Warnock, did you supply any information to Mr.

2  Veeder regarding population of the Indians on the reservations

3  in May 1958?

4      MR. VEEDER: No, he did'nt.

5      THE COURT:  Just a minute.  Let the witness answer the

6  question.

7      MR. VEEDER:  All right.

8      THE WITNESS:  No, sir.

9  BY MR. SACHSE:

10     Q  Do you know what it was in May of last year?

11     A  No, sir.

12     Q  Do you know whether or not the population on the

13  reservations has increased or decreased substantially since

14  May of last year?

15     A  No, sir.

16     Q  You don't know then whether 35 Indians on Coahuilla

17  represents a decline of more than half since last May or not?

18     A  No, sir.

19     Q  You stated in connection with the Coahuilla Reservation

20  that you investigated 14 wells and some are in use.  How many are

21  in use?

22     A  Mr. Sachse, right now I don't recall exactly how many

23  were in use.  Some of them were equipped with windmills and some

24  of them had gasoline engines and engines were off, maybe tempor-

25  arily or otherwise, I don't recall.

A   In the Pechanga Reservation you distinguished between wells that were operated, or could be operated and dry holes. Could make the same distinction in Coahuilla for us?

A   Well, these wells could be operated.

Q   All the Coahuilla wells could be operated?

A   Yes.

Q   In answer to a question of Mr. Veeder's regarding subirrigated land, you referred to the symbol in the land classification equation W1, W2, W3 and W4; isn't that right?

A   Not W4.

Q   Just the first three?

A   Yes.

Q   Are you familiar with the use of those land classification symbols and what they stand for?

A   Not in their entirety.

Q   Are you familiar with the specific significance of the W1, W2 and W3 symbols as used by the Agriculture Department in its land classification?

A   Not in its entirety, either.

Q   Am I not correct in stating that the symbols are intended to indicate soil wetness: W1 slightly wet, W2 moderately wet, and W3 very wet?  Am I not correct in so stating?

A   Correct as to what Mr. Sachse?

Q   That the symbols you refer to, W1, W2 and W3, indicate respectively: W1 slightly wet, W2 moderately wet and W3 very wet?

1    A  We did not use those definitions in this particular

2  classification.

3    Q  Who wrote your soil classification fractional symbols

4  on the 124 Series?

5    A  Those were adopted under the Office of Ground Water

6  Resources of the Marine Corp.

7    Q  In other words, you did'nt do that?

8    A  You mean adopt the symbols?

9    Q  Yes.

10    A  No, sir.

11    Q  You did not characterize any of the parcels then by

12  algebraic symbols?

13    A  No, sir, I did not.

14    Q  And you don't pretend to know what the symbol means,

15  do you?

16    A  Not in their entirety.

17    Q  Why do you tell us that W2 indicates subirrigated

18  land, if you don't know what it means?

19    A  W1, W2 and W3, as I define it, is the definition which

20  we used in determining these wetted areas on the Coahuilla Indian

21  Reservation.

22    Q  Wetted areas?

23    A  That is right.

24    Q  But you didn't make the classification?

25    A  No, sir.

1          Q   It was made under Col. Bowen's supervision?

2          A   That is right, with Bureau of Indian Affairs employees

3    and his employees.

4          Q   And if I were to tell you that Col. Bowen has previous-

5    ly testified on land classification in this case that the W symbols

6    are wetness symbols indicating lack of suitability of soils for

7    cultivation, would that change your conclusion any as to the

8    suitability of those lands for irrigation?

9          MR. VEEDER:   Just a moment.

10         THE COURT:   Did you say "lack of suitability"?

11         MR. SACHSE:   Lack of suitability.   It is a  wetness

12   symbol and has been so testified to by the United States' own

13   witnesses.

14         THE COURT:   Do you have an objection Mr. Veeder?

15         MR. VEEDER:   Yes I do, your Honor.

16         THE COURT:   What is it?

17         MR. VEEDER:   It is hard to make when he is talking.

18         The point is, your Honor, that this witness has stated--

19   Mr. Sachse didn't state correctly what he said--this witness

20   testified that there are 1,200 acres of land that are subirrigated

21   in the area.   He didn't say a word a about their cultivatable

22   character at this time.   He simply talked about subirrigation.

23   Mr. Sachse misstated the record.

24         THE COURT:   I got the impression, when he said subirrigated,

25   that they were therefore suitable for agricultural purposes.

1          MR. VEEDER:  They are suitable for grazing.

2          THE COURT:  The objection is overruled.

3          You may answer the question.

4          THE WITNESS:  I don't understand your question, Mr. Sachse.

5   BY MR. SACHSE:

6          Q  Are familiar with the fact that in soil classifications

7   certain areas of land are found to be so wet or swampy that they

8   are classified as not suitable for cultivation?  Are you familiar

9   with that generally?

10          A  Yes.

11          Q  Is it not a fact that the W symbols are used to indicate

12   the degree of wetness of soil in its classification?

13          A  Yes.

14          Q  How far down in the degree of wetness, in your know-

15   ledge, W1 or W2 or W3, does the land become unsuitable for culti-

16   vation?

17          A  I don't know.

18          Q  So you don't know how much of this so-called sub-

19   irrigated land is suitable for raising any crops?

20          A  The W1, W2, W3 symbol as used on the Coahuilla Reservation

21   soil survey, was used as I defined a while ago.

22          Q  Could you quickly, Mr. Warnock, go through the 124

23   Series and locate for me  any particular area, just any one on

24   any photograph that bears that symbol?

25          A  Yes, sir.  Here's one.  Here's a W3.  Here's a W1.

1        Q  Now, in describing the agricultural development on

2   the Coahuilla Reservation, and with particular reference to the

3   parcel shown as D on Exhibit 126, you said it was planted to

4   fruit trees?

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J

z48

1     A  Yes, there are fruit trees there today.

2     Q  How many?

3     A  There were 40 apple trees, and I don't recall the

4  number, I didn't count the number of peach and pear trees.

5     Q  But the 20 acres is not an orchard, is it?

6     A  Not entirely.

7     Q  How many acres are there in orchard?

8     A  Oh, probably three to five acres.

9     Q  And what is the rest of it, grazing?

10     A  The rest of it is grazing.  There are no other crops

11  growing there today.

12     Q  Now, with particular reference to 30, Parcel A of

13  35 acres.  You stated it was 35 acres irrigated at one time.

14  When was that?

15     A  In viewing the old records, it appears that sometime

16  in the 1930's is when that was last irrigated.  I don't

17  know the exact time, though.

18     Q  And again, you don't know from the old records how

19  much the population of this reservation may have decreased

20  since then?

21     A  No, sir.

22     Q  All right.  Let's look at Parcel E, three acres.

23  When was that last cultivated?

24     A  I don't know.

25     Q  How do you determine that it ever was irrigated?

1          A   From the old record and from the evidence of the works

2    which are still there.

3          Q   What do the old records tell you about it?

4          A   Well, the old record states that it was built 1914

5    and '15, but I have no date when it was last irrigated.

6          Q   How about F?

7          A   The same is true with F.

8          Q   What does the old record tell you about when that

9    was last used?

10         A   I found no information indicating when it was last

11   used.

12         Q   What exactly did you find on Tract F then that makes

13   you suspect it was previously irrigated?

14         A   Because of constructed works there.

15         Q   By "works" what do you mean, Mr. Warnock?

16         A   By the reservoir and the pipe lines.

17         Q   What kind of pipe line was that?

18         A   Concrete pipe line.

19         Q   Do you know how many head of cattle the Indians are

20   running, the Indians themselves now, are running on Coahuilla

21   Indian Reservation at the present time?

22         A   No, sir.

23         Q   Do you know how many head of cattle are being run

24   on the reservation?

25         A   No, sir.

1      Q  Do you know how many head of cattle these Indians

2  have ever run on the reservation?

3      A  No, sir.

4      Q  Do you know how many head of any livestock have

5  ever been run on the reservation?

6      A  No, sir.

7      THE COURT: Did you ever hear of these reservations

8  before you came down to work with Mr. Veeder?

9      THE WITNESS:  Yes, sir.

10     THECOURT:  Not very active reservations, are they?

11     THE WITNESS:  The Coahuilla Reservation is quite

12  active from cattle grazing.

13     MR. VEEDER:  It gets so active sometimes we have

14  trouble.

15  BY MR. SACHSE:

16     Q  It has a population, however, at the present time

17  of 35, is that right?

18     A  That is what I understand.

19     Q  Where did you get that information?

20     A  We asked an Indian last Sunday when we discussed and

21  counted the, to the best of his ability, the number of people

22  living there.

23     Q  You don't have any records of your own to tell you

24  how many people are there under the Bureau of Indian Affairs?

25  You have to ask an Indian?

A   We have no reasons for such records.

THE COURT: What about a roll?  Don't you have a roll?

THE WITNESS:  There is no roll, completed roll on any of these bands of Indians.

THE COURT:  Are you sure of that?

THE WITNESS:  That is right.  The only way we can have a completed roll, your Honor, would be for Congress or for the Indians themselves to set a date that there will be no en- rollment after such and such a time.

THE COURT:  Well, then, you have no way of knowing who the Indians are that have rights to these lands or rights to live there?

THE WITNESS:  That is right.

THE COURT:  No way of knowing at all?

THE WITNESS:  No.

THE COURT:  You can't be that bad.  But how would you know if some Indian came in or somebody came in and said, "I am an Indian and I have a right to use lands here and live here"?

THE WITNESS:  Well, generally speaking, why, the Indians themselves who are there know whether or not there would be a foreigner choose to invade the property.

THE COURT:  I thought there was always some tentative roll, even though the roll weren't closed.  Because sometime back I had visitors, some people who claimed to be Indians,

J

Z52

1  not from these reservations but from another reservation in

2  this County, and they were complaining that they were now

3  permitting quarter breeds and eighth breeds and whatnot to be

4  listed on the rolls, and so forth, and that there was a big

5  row going on and they wanted to get some advice, which I

6  couldn't give them except to probably see a lawyer about it.

7       THE WITNESS:  Well, if the Indian groups themselves

8  will establish certain rules and regulations for enrollment

9  purposes and which would then be promulgated as regulations

10  by the Secretary, a roll could be maintained and kept, but--

11  either that or by Congress saying at such and such a time

12  there shall not be any-- the roll of the Pechanga Indians or

13  the Coahuilla Indians shall close, and then the Secretary

14  will adopt certain rules and regulations for determing who

15  would be eligible for that roll.

16       THE COURT:  Well, presently, as near as you know, the

17  Department of Interior, Bureau of Indian Affairs, has no

18  records of who the Indians might be who claim any rights in

19  either of these reservations or in the trust lands?

20       THE WITNESS: We have a partial record, but it is not

21  complete.  It is a carryover of census records which the

22  Bureau has made in years past; and then by trying to keep

23  track of the deaths and births since that time, why, that

24  record is extended.  But that record is not complete in itself.

25  We are sure of that.

J

Z53

THE COURT:  All right.

BY MR. SACHSE:

Q  Now, on the Pechanga, you state there are presently a population of 25.  Where did you obtain that figure?

A  We obtained that from an Indian on the reservation.

Q  I am very much intrigued, Mr. Warnock, by the fact that in May, 1958, Mr. Veeder in a sworn answer stated that there were 212 Indians living on Pechanga.  You know whether or not 187 Indians have died or moved away since May of last year from that reservation?

A  I am certain that there has not.  But let me say this:  That there are other people who belong to the Pechanga group and who do nnot live on the reservation.

Q  Well, this inquiry stated:  Who live on the reservation.

MR. VEEDER: I have explained to Mr. Sachse where that data came from.

MR. SACHSE:  It is the most accurate I have seen, Mr. Veeder.

MR. STAHLMAN:  What is the bulletin number, Bill?

MR. VEEDER:  I have been hurt enough today without being flagged at by this Bulletin 57.  The records were given to me by the Bureau of Indian Affairs, Department of Interior, about the time that I gave these statements.  I think that the evidence of those  data came from investigation that they had

1   made, and they put out a report on it.  So far as I am concerned

2   those are the data that were handed to me, and I put my name

3   on it.  I made no apologies about it.

4        THE COURT:  I know.  Apparently, it wasn't very

5   accurate report.

6        MR. VEEDER:  I would say the whole thing is-- from my

7   standpoint I wanted your Honor to see the picture, and it why

8   I called Mr. Warnock.  I think it is entirely incompetent and

9   irrelevant and immaterial from the standpoint of this litiga-

10  tion whether there is one or no Indians on there; that we are

11  seeking a quiet title to rights of the use of the water.  And

12  I daresy that your Honor doesn't live on his place--

13       THE COURT:  You have to show there were some Indians

14  that had some rights on the reservation.

15       MR. VEEDER:  Oh, yes.  Yes, and we have.

16       THE COURT:  By any chance, are appropriations for

17  Bureau of Indian Affairs based upon the number of Indians

18  alleged to live on these reservations?

19       MR. VEEDER:  I wouldn't know your Honor.

20       MR. SACHSE:  Dor your Honor mean a congressional

21  appropriation.

22       THE COURT:  Do you know, Mr. Warnock?

23       MR. VEEDER:  He means an appropriation by Congress;

24  do, re, me, I am sure.

25       THE WITNESS:  I am sure they are not related.

J

Z55

1    THE COURT:  Not related?

2    THE WITNESS:  No, sir.

3    THE COURT:  Number of Indians purportedly living on

4    reservations?

5    THE WITNESS:  No, sir.

6    MR. VEEDER:  Well, this has, as I say, so far as we

7    are concerned, the question of ownership of the lands and the

8    rights to the use of water.

9    THE COURT:  Oh, yes.  It is just as immaterial as a

10   lot of the cross-examination that you engaged in, but this

11   happens to be the converse of the situation here; exposing by

12   cross-examination the utter hearsay basis of your information.

13   You go up and ask a buck Indian on the reservation how many

14   people live here.  Your witness comes in and testifies 25

15   Indians live on the reservation.

16   MR. STAHLMAN:  He didn't know even whether he could

17   count.

18   MR. VEEDER:  The point is this man didn't get up here

19   and say, "I am Mr. James who knows all about geology."

20   THE COURT:  All right.  Go ahead, Mr. Sachse.

21   BY MR. SACHSE:

22   Q  Now, still on Pechanga, referring to the six wells

23   that are operated or could be operated, how did you determine

24   whether they could be operated?

25   A  Well, the casings appeared to be in fair shape.  And

1    we did not put a test pump on to see, but the wells have not

2    been filled in.

3         Q  Did you drop a line down to find out how much water

4    was in them?

5         A  No.

6         Q  You didn't determine whether they were bone dry or

7    not?

8         A  Oh, yes, there was water in them.

9         Q  How do you know?

10        A  Some of them you could see the water.

11        Q  But you didn't measure the depths?

12        A  No, sir.

13        Q  You don't know whether it was just a skim of water

14   that would reflect to show you that when you looked down in

15   or whether there was a hundred feet?

16        A  That is right.

17        Q  You know how deep--

18   THE COURT:  What difference does it make?  As long as

19   there are any Indians that have any rights in these reserva-

20   tions, the law says the Indians are entitled to all the water

21   they presently need or may reasonably need in the future.

22   MR. VEEDER:  Thank you, your Honor.

23   MR. SACHSE:  If they can get it there.

24   THE COURT:  I know, but what difference does it make?

25   MR. SACHSE:  These Indian reservations, Pechanga in

J

Z57

1   particular, are surrounded by other property and other

2   property lies between them.  I think it gives us a little

3   information maybe on ground water if this gentleman knows the

4   answers. I don't think he knows them.

5       THE COURT:  Until such time, of course, as there is

6   some Indian or Indians want to use this water, I take it other

7   people can use it?

8       MR. VEEDER: That is right.  When they want it, why,

9   Fallbrook's false dam will just have that much less water

10   that it could catch if it were there.

11      MR. SACHSE:  We don't figure on taking it out of wells

12   in Pechanga.

13      MR. VEEDER:  You don't figure on taking any.

14  BY MR. SACHSE:

15      Q  Still on Pechanga, you referred to the spring which

16  you located in Section 36 as being piped to domestic use?

17      A  Yes, sir.

18      Q  Is that the only domestic supply at the present time

19  for the reservation?

20      A  Yes, it is.

21      Q  And what are these other wells doing or what are

22  they for?

23      A  They could be used for domestic purposes.  One is

24  used for the old school house but it is not now being used.

25      THE COURT:  Aren't some of those little places up in

J

Z58

1  Pechanga, dont they have their own wells right by the house?

2  THE WITNESS:  There is only one, your Honor, that has

3  its own well; and that is the one near the Southwest corner of

4  Section 27.  Right here.

5  THECOURT:  That must be the one we saw as we drove in.

6  MR. STAHLMAN:  Right off the highway.

7  THE COURT:  As we drove in off the left there seems to

8  be a new place there.

9  THE WITNESS:  That is right.

10  THE COURT:  That was operating?

11  THE WITNESS:  That is a good well.

12  THE COURT:  Other than that they all get their water

13  from the spring up here?

14  THE WITNESS:  From this spring, and this pipe line that

15  comes down.  And then, there are pipe lines to the houses.

16  THE COURT:  I see.

17  BY MR. SACHSE:

18  Q  And what are these other wells, then?  What are the

19  two in Section 34, for instance?  Are they used for anything

20  now?

21  A  No, sir.

22  Q  How about the one in Section 26?

23  A  It isn't used.

24  Q  How about the one in 35?

25  A  It is not used.

J

Z59

Q   And how about the four in the Kelsey tract?

A   They are not used.

THE COURT:   What did you call that tract?

MR. VEEDER:   Kelsey, K-e-l-s-e-y.

THE COURT:   Kelsey.   Is that a part of the reservation?

MR. VEEDER:   That is right.

THE COURT:   Located to the west?

MR. VEEDER:   That is correct, your Honor.

BY MR. SACHSE:

Q   Do you have any knowledge as to what agricultural use has ever been made on the Pechanga reservation?

MR. VEEDER:   Are you talking about irrigation now?

MR. SACHSE:   Yes, irrigation.

THE WITNESS:   Will you please state your question again?

BY MR. SACHSE:

Q   Do you have any knowledge as to what lands have been irrigated in the past on the Pechanga reservation?

A   To my knowledge, none.

Q   Now, would that apply also to surface diversions from the stream?   Do you know whether there have been any surface diversions at any time ever made from the Pechanga Creek for use on the reservation?

A   I know of none.   And in reviewing the old records, I found no reference to any.

Q   Now, the Ramona Indian Reservation has no people

1   living on it today, as I understand it?

2       A  That is correct.

3       Q  Do you know how long since anybody has lived there?

4       A  No, sir.

5       Q  Your old records don't tell you that?

6       A  No, sir.

7       Q  How old are your records that no one has lived

8   there?

9       A  Well, our records don't, haven't-- records I reviewed

10  hadn't even said that there were nobody living there.  The

11  Ramona tract was bought for a family or obtained for a family--

12  I am not sure that it was purchased as-- but it was set up

13  as a reservation, oh, let's see-- I don't have a date that

14  that reservation was established-- but when it was established,

15  it was for a family living there at that time.

16      MR. STAHLMAN:  Ramona?

17      THE WITNESS:  That is the Ramona.

18      MR. STAHLMAN:  That is probably Ramona and Allesandro.

19

20

21

22

23

24

25

1   Q   You don't know how big the family was?

2   A   No, sir.

3   Q   You don't know whether any of them are alive today?

4   MR. VEEDER:   I'll take back everything I asked Mr. James.

5   THE COURT:   The Government makes no claim for any water

6   on Ramona?

7   MR. SACHSE:   That is right.

8   MR. VEEDER:   We show irrigable land.   We show there is

9   a stream.

10   THE COURT:   On Ramona?

11   MR. SACHSE:   Yes, they show 104 acres of irrigable on

12   Ramona.

13   MR. VEEDER:   That is right.   It is part of the watershed

14   of the Santa Margarita.

15   THE COURT:   Oh, it is the Mission that you make no claim

16   on.

17   MR. VEEDER:   That is right, your Honor.   That evidence

18   is already in.   This witness didn't testify in regard to Ramona.

19   MR. SACHSE:   I have nothing further.

20   MR. STAHLMAN:   I have a few questions.

21                          CROSS EXAMINATION

22   BY MR. STAHLMAN:

23   Q   This Indian question intrigues me.

24   MR. VEEDER:   You can talk to him after court, if that's

25   all it is.

1      MR. STAHLMAN:  Well, I might do that, too.  I might ask

2  a question here that might interest you.

3      THE COURT:  I would wager that your client knows more

4  about these Indians than does the witness.

5      MR. STAHLMAN:  I am sure he does.  I am trying to catch

6  up a little.  I want to know what the trend of population is

7  up there.

8      MR. VEEDER:  That is objected to as being beyond the

9  scope of the direct examination; incompetent, irrelevant and

10  immaterial; not tending to prove any issue.

11      THE COURT:  That should be Mr. Stahlman's objection,

12  not yours.

13  BY MR. STAHLMAN:

14      Q  This W1, W2 and W3, does that pertain to the general

15  condition of the land, or to any particular time of the year

16  when it is raining or when the sun is shining? When do you

17  determine that?

18      A  That was determined last summer.

19      Q  Last summer?

20      A  Yes.

21      Q  When?

22      A  In July.

23      Q  Do you know whether that condition prevails throughout

24  the year?

25      A  It has prevailed each time I have been on the

1    reservation, and that has been at various times, at different

2    times of the year.

3         Q  In other words, you said the 1,200 some acres that

4    falls into the W3 Classification, is that correct?

5         A  That is right.

6         Q  And the area in which water is actually standing on

7    the surface, do you know how many acres there is of that?

8         A  There were 34 acres.

9         Q  And the number of acres on which the ground was

10   damp?

11        A  Three hundred fifty three acres.

12        Q  And the balance of course, is that which you deter-

13   mined to be to the depth of 6 feet?

14        A  That is right; 828 acres.

15        Q  How did you determine this matter? By vegetation,

16   or by some tests or--

17        A  By vegetation and by augers.

18        Q  You used augers?

19        A  Yes.

20        Q  And that was in July?

21   MR. VEEDER:  Real good grazing land up there.

22   MR. STAHLMAN:  It really surprises me.

23   MR. VEEDER:  Its good.

24   MR. STAHLMAN:  That's all I have.

25   MR. MOSKOVITZ:  I have one or two questions.

CROSS EXAMINATION

BY MR. MOSKOVITZ:

Q  Are there any plans by the Bureau of Indian Affairs

for water use projects on any of the reservations about which

you testified?

A  MR. VEEDER:  I object to that as being beyond the

scope of the direct examination.  We haven't touched on that

question at all.  It is not relevant to the case.  We are try-

ing to prove up our rights in that area.

THE COURT:  Overruled.  It is probably beyond the scope

of the direct examination.

If you know.

THE WITNESS:  There are no definite plans formulated

as of the present time.

THE COURT:  Let me ask a question.  Does the Government,

the Bureau of Indian Affairs, have a right to shift Indians

around to one reservation to another? Suppose that a group of

Navajos down in New Mexico that weren't happy--of course, they

have oil now and they will probably all stay--but could the

Government take a thousand Navajos and send them up to one of

these reservations?

THE WITNESS: I doubt that, your Honor.

MR. STAHLMAN:  Your Honor, they did it.

THE COURT:  They did it in the past, I know that.

MR. VEEDER:  Andrew Jackson chased them out of the State

of North Carolina.

K
A   21

1          MR. STAHLMAN:  Right now there is big fight on in the

2  Valley because they were moved from Warners Hot Springs down

3  to Pala and they are still discontent.

4          MR. VEEDER:  That is hearsay.

5          MR. STAHLMAN:  They have an attorney and they are

6  fighting about the fact that they were moved down there.

7          THE COURT:  I am not talking about moving anybody out.

8  I am talking whether other Indian groups could be moved in on

9  this reservation.

10          THE WITNESS:  I doubt that.

11          THE COURT: You have never had a situation like this come

12  up?

13          THE WITNESS:  Of an Indian from another band moving

14  onto another reservation?

15          THE COURT:  Indians of another band being permitted to

16  move on.  Suppose that a group of Indians had a very poor

17  reservation--and the Government, from my observation in this

18  County, gave the Indians in most cases some very beautiful

19  land, but in most cases other than that it was not much to

20  talk about.  They have some of the most beautiful sections

21  in San Diego County.  But suppose a group of Indians like the

22  Pala Indians were not happy and they liked the looks of this

23  Pechanga Reservation.  Could they petition the Bureau of Indian

24  Affairs and be permitted to move in there and develop some of

25  that ground?

K

A 22

1    THE WITNESS:  I doubt it, your Honor, because the

2  Pechanga Reservation has been patented by a trust patent to

3  the Pechanga Band.

4    THE COURT:  All right.

5    THE WITNESS:  We do have moving from one reservation to

6  another where there is an individual who may be a son or a

7  daughter of one parent from one reservation and one parent from

8  another.

9    THE COURT:  We have that very situation here.  An Indian

10  contacted me whose mother belonged to one of the bands and his

11  father belonged to the other.  He would be entitled, I take it,

12  to operate under either reservation?

13    THE WITNESS:  Under either, but not under both.

14    THE COURT:  Mr. Sachse?

15    MR. SACHSE:  I have nothing further.

16    MR. MOSKOVITZ: I have another question.

17    Q  When these reservations were first created, were they

18  created for a specific group of Indians, each reservation for a

19  specific group?

20    MR. VEEDER:  I object;  that is asking for a legal

21  conclusion.

22    THE COURT:  If the witness knows, and can give us some

23  help on it.  Probably you can find out from the statutes.

24

25    THE WITNESS:  Most of the reservations in Southern

1  California were created for particular bands of the Mission

2  Indians, and the Indians of Southern California as a whole,

3  were called Mission Indians, and in practically all cases the

4  reservation was deeded to the Indian Band by name by the

5  issuance of a trust patent.

6  BY MR. MOSKOVITZ:

7      Q  Is this true in each of the three reservations you

8  have testified about?

9      A  Yes.

10     THE COURT:  The title is in the United States.  This

11  isn't a situation like at Palm Springs where the Indians were

12  permitted to have the title to the ground in their own names.

13     MR. VEEDER:  That is a legal question, but your Honor,

14  that is the situation.  Legal title resides in the United States

15  of America as Trustee for all these bands of Indians, and the

16  United States owns the title to those lands.  They have been

17  withdrawn and reserved  for these particular tribes.  In writ-

18  ing the brief on these matters we will cover all these factors,

19  your Honor.

20     MR. STAHLMAN:  What happens to a reservation assuming

21  that the Indians dies out?

22     THE WITNESS:  I assume--

23     MR. VEEDER:  Now, just a minute.

24     THE COURT:  It is a legal question, probably.  Can you

25  tell us Mr. Veeder?

K

A 24

1        MR. VEEDER:  It truly is.

2        Well, I have had some experience in regard to these

3    matters and I think it is a matter of executive and administra-

4    tive determination as to what is done with the land.  It is

5    entirely within the power of Congress.  If it decides to revoke

6    these withdrawals, it may do so.  But I don't believe that any

7    executive branch of the Government can do it arbitrarily.

8        I have no further questions.

9        MR. MOSKOVITZ:  I have one further question, your Honor.

10       Q  You have no present knowledge of how many Indians

11   that there are that belong to the tribes for which these three

12   reservations were established initially, do you?

13       A  No accurate information.

14       MR. SACHSE:  I have a question that perhaps I should

15   have asked originally--just one more, if I may, your Honor.

16       Q  Mr. Warnock, at a Congressional hearing before the

17   House Interior and Insular Affairs Committee--

18       MR. VEEDER:  I object to this.

19       MR. SACHSE:  Let me finish.

20       MR. VEEDER:  I know what you are going to say.

21   BY MR. SACHSE:

22       Q  At a hearing before the House Interior and Insular

23   Affairs Committee last April or May, Mr. Elmer Bennett, who

24   was then solicitor for the Department of the Interior, stated,

25   "Most of these Indians work in defense plants in San Diego."

1   Is that correct?  Or don't you know?

2       MR. VEEDER:  The witness doesn't know.

3       THE COURT:  Let the witness answer Mr. Veeder.

4       THE WITNESS:  I don't know whether most of them do.

5       MR. VEEDER:  That's enough.

6       MR. VEEDER:  Neither did Mr. Bennett.

7       I have questions.

8       MR. STAHLMAN:  I have one other question.

9       Q  This condition that you found relative to the

10  moisture content in this soil--W1,W2 and W3, do you know

11  whether that is a condition that prevailed just last year that

12  followed a rather heavy rain comparatively speaking, or does

13  it exist there year after year?

14      A  Well, indications are that exists there year after

15  year, from the growth of the vegetation.

16      MR. STAHLMAN:  That's all.

17      MR. VEEDER:  I have no questions.

18      THE COURT:  Thank you, Mr. Warnock.

19      MR. VEEDER:  I will call Mr. Cannon.

20      THE COURT:  Well, it's 4:25.  How much time do you want

21  with Mr. Cannon?

22      MR. VEEDER:  Well, it will take a couple of hours.

23      THE COURT:  All right, we will do that tomorrow morning

24  at 10 o'clock.

25      MR. SACHSE:  I will undertake to be able to give Mr.

1   Veeder some kind of positive as to how soon those exhibits

2   that are being worked on at Fallbrook will be ready and then

3   we will have the ten-day problem.  But I will try to have the

4   answer.

5        MR. VEEDER:  I am not worrying about the ten-day problem.

6        MR. SACHSE:  All right, maybe we can go ahead faster.

7        MR. VEEDER:  It depends somewhat on what you are going

8   to show up with.  By and large, I am not worried about it.

9        MR. STAHLMAN:  Your Honor, these answers are ready, with

10  the exception that I have had a little stenographic trouble.

11  I had to depend upon public stenographers.

12       THE COURT:  All right.  Ten o'clock tomorrow morning.

13       (Adjournment until Wednesday, January 21, 1959 at

14  10 o'clock a. m.)

15

16

17

18

19

20

21

22

23

24

25