# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.  1247-SD-C

---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Wednesday, January 21, 1959.

**Pages:**   7535 to 7657

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

MALCOLM E. LOVE
**JOHN SWADER**
Official Reporter
United States District Court
325 West F. Street
San Diego 1, California
BElmont 4-6211   Ext. 370

A

Z1

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,       )
                                )
                 Plaintiff,     )
                                )
         vs.                    )       No. 1247-SD-C.
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                 Defendants.    )


REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, January 21, 1959

APPEARANCES:

      For the Plaintiff      WILLIAM H. VEEDER, ESQ.,
                                Special Assistant to the
                                Attorney-General,
                                Department of Justice,
                                Washington, D.C.

APPEARANCES (Continued)

|  |  |
|---|---|
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State of California | STANLEY MOSK, ESQ., Attorney-General, by ADOLPHUS MOSKOVITZ, ESQ., Deputy Attorney General; and CARL BORONKAY, ESQ. |
| For Defendants Fallbrook Public Utility District, et al., | FRANZ R. SACHSE, ESQ. |

## INDEX TO WITNESSES

| For the Plaintiff: | Direct | Cross' |
|---|---|---|
| Frank H. Cannon | 7580 | |
| Stanley R. Stevenson | 7611 | 7641 |
| Allen C. Bowen | 7647 | |

## EXHIBITS

| Plaintiff's Exhibits | Iden. | Evid. |
|---|---|---|
| 122 and 123 | | 7588 |
| 102-A, B, C. | | 7595 |
| 127 | | 7599 |
| 147 - Water Use - Palomar District - Cleveland | | 7636 |
| 148 " " Trabuco " " | | 7637 |
| 149 " " Trabuco " " | | 7638 |
| 146 — Water Use - Palomar District - Cleveland | | 7632 |

A
Z4

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, JANUARY 21, 1959.  10:00 A.M.

2

3        MR. MOSKOVITZ:  Your Honor, before we proceed I wonder

4    if I may request Mr. Veeder to bring Mr. Hofmann back to the

5    stand.  In examining the '58 runoff figures I believe that

6    there is a discrepancy in the figures for the gage at Fallbrook

7    compared with the gage at Santa Margarita River at Temecula which

8    we corrected yesterday.  I can point out the figures that we

9    think are questionable.  We would like to have Mr. Hofmann

10   back this morning.

11       THE COURT:  Why don't you point them out and see if it

12   may be something we can explain without getting him back up

13   here.

14       MR. VEEDER:  It would have been better if you had told

15   me, Mr. Moskovitz.

16       THE COURT:  Talk with him at recess and find out,

17   communicate with him and find out.  If there are discrepancies,

18   we ought to get them straightened out.  If there is something

19   that we can readily explain, let's save some time.

20       MR. VEEDER:  That brings us to the question, your Honor,

21   in regard to time.  If I understand it, if we rest on Friday

22   there will be no proceedings on Tuesday; is that correct?

23       THE COURT:  It hasn't been decided yet.

24       MR. VEEDER:  Well, it is important from the standpoint

25   of scheduling, your Honor.

7539

A

Z5

1    MR. VEEDER:  And I see no reason why we shouldn't be

2  through by Friday.

3    THE COURT:  When is your master's hearing set?

4    MR. VEEDER:  The next hearing is the 10th of February.

5    THE COURT:  10th of February.  That is on Fallbrook

6  and De Luz Creek?

7    MR. VEEDER:  That is correct, your Honor.

8    THE COURT:  And you are to have your objections, if any,

9  ready by the 2nd?

10    MR. VEEDER:  We are going to have, as I see them now,

11  quite a number and we will have them on the 2nd.

12    THE COURT:  Well, are you prepared to tell me now whether

13  or not you are going to contest the factual record as it now

14  stands before the Master?

15    MR. VEEDER:  I think that our request will be directed

16  very largely to making them more specific and, in certain

17  instances-- I can give you an example that concerns us-- maybe

18  certain instances where we will have to have additional

19  testimony.  But it is not, in any sense, an attack on what has

20  gone on in the proceedings.  It is that we believe that they

21  should be a little more specific in some regards.  However,

22  we are shaping them up now, and we are working on them, and

23  we will have those ready.  Now, the plan is then, as I see it,

24  if we are not going ahead in this court on Tuesday, it would

25  entail-- well, we are all busy, and we simply shift our

1    schedule around to meet the situation.

2            THE COURT:  I didn't guess very good.  I set a Standard

3    Oil matter for Tuesday, February 3rd, not February 27th.

4            MR. SACHSE:  Your Honor, it might be helpful.  I

5    telephoned Mr. Krieger last night to tell him of these de-

6    velopments, and he stated that he hoped to have certain

7    engineering testimony relating to the upper watershed and his

8    people ready in two to three weeks; he thought he would have it.

9    I checked this morning at the Fallbrook Public Utility District

10    on the status of the four maps that are being prepared, and

11    one man, the only man they have got is also getting out spe-

12    cifications on a pipe line and does not guarantee them earlier

13    than the end of next week.

14            THE COURT:  It would be the end of the month?

15            MR. SACHSE:  That would be the end of the month, yes,

16    your Honor.

17            THE COURT:  You can't proceed without those maps?

18            MR. SACHSE:  I think it is pretty illogical.  They are

19    the basic maps of the district, of the water system, and they

20    would be the very thing your Honor would want to look at, the

21    very thing that Mr. Veeder would want to use in reference on

22    cross-examination.  I think it would be a waste of time to

23    attempt to go ahead without them.  And I want to repeat:  In

24    so far as I personally am concerned, I represent not only

25    Fallbrook.  But it has always been my intention in planning the

A

Z7

1      conduct of this case to attempt at the close of the United

2      States' case by various motions to obtain dismissal of in-

3      dividuals, judgments at the conclusion of the United States'

4      case for other individuals and perhaps create a condition

5      where if, for example, to be very frank if all the residuum

6      and basement complex that were ruled by your Honor to be out

7      of the case, then I would switch my order of proof and probably

8      simply file evidence of title for my individual clients who

9      are located in those areas; simply take a half a day putting

10     into the record Jones A, Smith A, and so on, the title docu-

11     ments which would clearly establish in what portions of the

12     watershed their lands are located, to create a record upon

13     which your Honor can enter a res judicata judgment that their

14     waters are not part of the stream.  That was my thinking as to

15     how I hoped to proceed.

16          THE COURT:  What is California's position?

17          MR. MOSKOVITZ:  We now have our schedule so that the

18     exhibits which are being prepared, the studies underlying them,

19     will be finished on the 6th of February; that is, they will

20     be marked for identification and a ten-day period will begin

21     then.  So that our case on hydrology will be ready to put on

22     beginning on the 6th of February, which is a Tuesday, and that

23     everything else will follow that.

24          THE COURT:  The further we proceed the more I begin to

25     wonder what California is doing in this case anyhow.  It

A

Z8

1   becomes more and more apparent to me that-- I don't know what

2   California's interest in this case is.  Certainly, the

3   lawyers for the various litigants are competent; and I take

4   it you are only in here on the basis of pro patria, or some-

5   thing like that, the common good, or to see to it that some

6   decision doesn't get entirely out of line as far as water law

7   is concerned that might embarrass the State afterwards.  Is

8   that the general theory?

9       MR. MOSKOVITZ:  That is it, your Honor.  On the (log) _law_

10  we have we were instructed at the very beginning by the

11  Legislature to appear and to--

12      THE COURT:  To appear in this case by the Legislature?

13      MR. MOSKOVITZ:  Yes, your Honor.  Yes, your Honor.  In

14  our answer there is an attachment, a resolution by the Legis-

15  lature requesting the Attorney-General to participate in this

16  case.  That was the trigger that led us to intervene ini-

17  tially.  Subsequent to that time the Legislature appropriated

18  money to make a study of the physical facts which resulted in

19  Bulletin 57.  We felt that our obligation was to the Court to

20  assist it by preparing the facts that we had gathered.  Now,

21  we have no partisan interest whatsoever except in so far as we

22  have a couple of small or a few small ownerships ourselves.

23  And that has been our effort here.  The studies we are making

24  now are to bring up to date things that were done in connection

25  with the investigation.  These studies would show the

A

Z9

1   character, analyze the character of runoff and the effect of

2   runoff upon the ground water basin on Camp Pendleton, the

3   coastal basin, and upon the runoff into the ocean under a few

4   assumptions of upstream development.  Now, this is for the

5   assistance of the Court in analyzing the importance, the

6   significance of the runoff.  I have asked myself the question,

7   too, your Honor, as to the proper (hold) of the State, and this

8   is what I have come up with.

9        THE COURT:  And though it is not directly concerned in

10   this case, I suppose that the purpose of the State's par-

11   ticipation also is to justify the decision made by the Water

12   Board, and so forth?

13        MR. MOSKOVITZ:  Well, your Honor, we don't think this

14   is involved in the case.

15        THE COURT:  I don't think so, either.  But is that in-

16   directly part of the reason for participation by the State?

17        MR. MOSKOVITZ:  I wouldn't say it is that, your Honor,

18   to justify the position.  We justify that position if and when

19   an action is brought which would require us to do so.  How-

20   ever, we do feel that for your own benefit sitting in this

21   case there are facts about the watershed, about runoff, which

22   would be of assistance.  And this is the only reason we are

23   here.  Mr. Veeder has said that we have prepared a bulletin

24   in contemplation of litigation, as though we had a partisan

25   position, a particular objective which we wanted to reach for

A

Z10

1 the benefit of the State against the United States.  And this

2 is not true.  The facts we gathered work for the benefit of

3 all, including the United States.  And perhaps our efforts to

4 be helpful are not desired.  I don't know.  But this is our

5 objective.  And it is for this reason that we are making these

6 studies and expending the money.

7     MR. SACHSE:  I would like to add, your Honor:  Fall-

8 brook does not intend to put any hydrology in.  I am perfectly

9 content with the findings of the State Water Rights Board.

10 And I do not know what Mr. Moskovitz has got, and I haven't

11 seen it, but the only hydrology that is going to be put in

12 defense in opposition of the United States, as far as I am

13 concerned, is going to be the State of California's hydrology

14 on the river.

15     THE COURT:  Mr. Veeder, let me inquire about this

16 project of having the Clerk check the answers.  I don't know

17 that I follow you on this.  Supposing A, a defendant, comes

18 in and by answer says, "I claim no rights in the stream at

19 all.  I claim no riparian rights, and I claim no rights of an

20 overlying owner in the basin, and so forth."

21     MR. VEEDER:  I would treat that as a disclaimer, and

22 that would be the end of the case with him.

23     THE COURT:  Well, in other words, you would be content

24 then that he go out on the basis of an interlocutory decree,

25 for instance?

1          MR. VEEDER:  I am very glad you brought that up, your

2     Honor.  My view on the matter is this:  Is that when we filed

3     the quiet title -- if the man had a claim on the river, by

4     all means we desired him to press it.  If he had no claim,

5     so far as we were concerned, we simply notified him of the

6     litigation and if he desired to appear, fine; if he didn't,

7     fine.  We have no claim against him whatever.  That is the

8     circumstance.  In other words, as the Supreme Court has

9     stated, in a quiet title suit there are three alternatives:

10    A man can answer and set up his claim; he can disclaim; or he

11    can default.  And my desire working with Bill her is to run

12    through each pleading; and when a man says, "I have no claim,"

13    so far as we are concerned I would ultimately file a motion

14    with your Honor bringing to your attention and say, "So far as

15    the United States of America is concerned, this man has no

16    claim, and we have no claim against him."  Now, in regard to

17    these defaulting people--

18          THE COURT:  Now, wait.  Let's stop just a minute.

19          MR. VEEDER:  All right.

20          THE COURT:  Why shouldn't he go out and not by any

21    dismissal, but go out by interlocutory decree?

22          MR. VEEDER:  I believe, your Honor, that such a judg-

23    ment would be void, because I believe there would be no

24    justiciable issue involved. I think the matter would be moot,

25    simply stated.  That is why when I find a man--

A

Z12

1    THE COURT:  Moot.  Your pleadings allege that all these

2    people have some right in the stream.

3    MR. VEEDER:  That is right.  And when he says he does

4    not have a claim--

5    THE COURT:  Does not have.

6    MR. VEEDER:  --then, there is no justiciable issue,

7    and there is no jurisdiction.  It is that simple, your Honor.

8    THE COURT:  I am not so sure.  I don't want to have a

9    situation occur where later on some of these people would be

10   dragged through another litigation.

11   MR. VEEDER:  Neither do I, your Honor.

12   THE COURT:  And, therefore, I would, if it is legally

13   possible, I would prefer that they go out with a decree that

14   they have no interest in the stream, and nobody who has an

15   interest in the stream has any claim against it.

16   MR. VEEDER:  Could I tender, though, this thought, and

17   it stems directly from what Mr. Sachse said yesterday about

18   moving for judgment.  We have, we had no way, and no one has a

19   way of reallyknowing whether a man's only claim is on basement

20   complex or where he is; so, when he comes in and pleads that

21   he has no claim at all, the issues are moot.  That is our view.

22

23

24

25

B

Z1

1        THE COURT:  Suppose he is poorly advised and he comes in,

2   possibly in pro per, and says, "I have no claim."  But actually

3   from the evidence as we see it we know he overlies a basin.  I

4   am not going to throw him out.

5        MR. VEEDER:  Rest assured, your Honor, on that.

6        THE COURT:  Then we can't take his statement.

7        MR. VEEDER:  No, we can't.

8        Now here is what is occurring.  I have delivered to Mr.

9   Luddy the list as prepared by the Marine office, and on it we

10  have answers yes or no where there has been an answer.  If there

11  is an answer, we look at it-- we run it back against the

12  geology, we run it back against the system.  If we find that a

13  man is actually overlying what we believe is a ground water

14  basin or is in a situation where he has riparian rights, we

15  want him in there.  The Marines must know the demands on the

16  stream, and we certainly have no desire to say to this man--

17        THE COURT:  All right, you put that man then in one

18  category.

19        MR. VEEDER:  He is over in one category.  And we will

20  have an analysis, from the technical standpoint, of every

21  single pleading that is in there.  Some of those pleadings

22  are just scrawled out in longhand.  Obviously, those people

23  are entitled to the benefit of all the knowledge that the

24  Marine Corps has brought together.  And I will file with your

25  Honor as rapidly as we can, and we have been on this for sixty

1  days now-- we are moving as fast as we can.  It's a tremendous

2  job.  When we find that a man has answered and said, "I have

3  no claim on the Santa Margarita River," and we find based upon

4  Col. Bowen's investigation that he probably has no interest

5  in the river,  he goes into another bin or another slot and we

6  will prepare a list of those owners.  Now there are people

7  whose lands are situated on the outer limits of some of our

8  ground water basins.  I would be very reluctant to have them go

9  out until they have appeared and testified before your Honor

10  or before the Special Master.

11          THE COURT:  All right, I am with you most of the way,

12  except as to how we handle getting them out of the case.

13          MR. VEEDER:  We are moving as fast as we can on that

14  work.  It's a tremendous job.  Commander Redd and the other men

15  out there are spending a great deal of their time on that.

16          THE COURT:  Let me ask another question.  Suppose that

17  B comes in and files one of these answers such as Mr. Krieger

18  has filed on behalf of his defendants where he claims everything--

19  he says, "We claim riparian land, we claim to be overlying

20  owners," he claims this and that.  Suppose that kind of general

21  shotgun answer is filed.  Now let's assume that he is located

22  over in the middle of this basement complex area.  Are we going

23  to have to spend a lot of time on that?

24          MR. VEEDER:  Did Mr. Krieger sign the answer?

25          THE COURT:  Let's assume that he did.

1          MR. VEEDER:  All right, I would say to Mr.Krieger-- and

2     that is one reason why we started out on the inland area and

3     put in all of our geology because we are just as interested as

4     is your Honor to delineate and define this litigation-- if Mr.

5     Krieger filed such an answer, with a counter-claim against us,

6     we would feel this way--

7          THE COURT:  He has to be heard, I realize that.

8          MR. VEEDER:  I think this, though, that again, based

9     on geography, we would separate those answers, because experience

10    we have had in the past has always indicated that there are

11    areas where a man's rights were so tenuous that you feel that

12    the decree would have no effect on him at all.

13         Now that is what we are searching for, and I think when

14    we get through we will be able to push the number away back.

15    But I think we can only go the way we are going.  Mr. Luddy

16    has an alphabetical list of all the parties.  We are giving

17    him our list.  When we get the key list, then the matter of

18    shuffling the papers is very simple.

19         I can give you an example, though, of what is concerning

20    us to some degree.  It is a technicality, but I think we can

21    straighten it out.  A man comes in, he says, "We own the land

22    in this watershed, we own overlying rights, we own the right

23    to dig wells, we own all of the surface runoff."  Then they

24    incorporate by reference all of the answer of the Fallbrook

25    Public Utility District.

THE COURT: Well, they have shot for the moon.

MR. SACHSE: That is not my people.

MR. VEEDER: No, I am not arguing with Mr. Sachse on this thing. I am pointing out our own problem.

My own view is that if we find, and I think that we will in many of these cases, we will find that this man was using discretion; he was saying, "I am going to cover every-thing." But by and large we are going to be convinced that a lot of this area is where the residuum is, where the basement complex is, there is no claim.

As far as I am concerned, I would notify that man-- and I have been talking about the kind of notice that we should give him, but I think it will have to come from the Clerk's office-- we willnotify him. And I will add one more difficulty that we have. The man hasn't appeared in any of these hearings. He has filed an answer. He hasn't appeared. So we have the situation of issue but no appearance by the individual at the Reche School. He should be notified once more, in my view. He may have received a copy of the findings that were prepared by The Special Master, but at the same time I think he is entitled to be advised once more that we don't believe that he has any claims or rights in the river, and if he does we want him to appear. If he doesn't, I think then your Honor could consider an interlocutory order and say, "Based upon the data before me, I don't believe this man has an interest in the river." He

would be in a separate and distinct category.  So that five years from now our decree would not be res adjudicata against him and your Honor would have continuing jurisdiction.  You may disagree as to that approach.  But I don't believe that we should foreclose that man, but at the same time the  Marines are entitled, in my view, to have chronicled every conceivable claim against them.

THE COURT:  I am not much concerned with that man, if he has had notice to appear before the Master and if the Master has considered that area.  But let's take a man in another area, such as in the upper part of the watershed, who has filed a pro per answer, we will say, where he says, "I have springs, and I have a well, and I have the right to dig wells, and I have a claim to all of the waters that rain on my property," and he incorporates somebody else's answer, et cetera.  Now suppose as to  him it is pretty apparent, when we get down even at this stage of the case, that he hasn't any riparian rights, that he hasn't any rights overlying a basin, and that any water that exists there is vagrant, local, percolating water.  Now we know as a matter of law that he has no right to store the rainfall that falls on his property.  He probably doesn't know that.  If it is vagrant, local, percolating water he has a right to dig wells and his rights are correlative with his neighbors.  But under the facts as we see them he is not part of the stream or the stream system.  Couldn't we

1   notify that man that as far as the Government is concerned it

2   is of the view, from the state of the evidence as now pre-

3   sented, that he is not part of the stream and that the Govern-

4   ment will have no objection that an order or finding be made

5   that any water on his property is vagrant, percolating water

6   and ask him to come in for a hearing and in default of coming

7   in that is what we propose to do?

8           MR. VEEDER:  Yes.

9           THE COURT:  Can't we take that approach with some of

10   these people?

11          MR. VEEDER:  I think so.  But I had understood, for

12   example, and we are beginning to move to see if we can get

13   accommodations for the purpose, as I understand it you are

14   going to have hearings in the Temecula area before the Special

15   Master or before your Honor.

16          THE COURT:  You understand what?

17          MR. VEEDER:  Well, I understand that we are going to

18   have hearings in Temecula and perhaps in Anza, just like we

19   had at Reche School.

20          THE COURT:  Before me?

21          MR. VEEDER:  Well, before the Special Master, or your

22   Honor said you might hear some of those yourself.

23          THE COURT:  That is right, I may.  But you talked as

24   if something had been settled.

25          MR. VEEDER:  No.

THE COURT:  I anticipate that I may conduct some hearings to speed this up.  I would like to have the Master conduct some.  I don't know of any reason why, when we get to cataloging some of these rights, the Master and the Court couldn't both be operating up there.

MR. VEEDER:  All right, I am for that.  But as I say, I would be very much opposed at this juncture to throwing anybody out of the lawsuit when we are going to have hearings up at Temecula Creek.  It just doesn't add up to me, with the approach that we are taking, that we would be anticipating action in any area until we had some basic evidence in, and I don't believe that the general geology covers it.

Now we are attempting to follow an orderly procedure so that when we get into here and we find that somebody in Alabama has been served and he owns a trust interest of some kind I would like to get him out, I would like to eliminate just as many of these people who haven't appeared that we think by common sense dictation should be out.  That will take a big cut.

THE COURT:  How are you going to eliminate them?  When?  Before these hearings in the area?

MR. VEEDER:  As we progress, your Honor.  All I can say is that we are moving as rapidly as we can.

THE COURT:  I know.  But how?  By what mechanics?

MR. VEEDER:  I would file a motion with your Honor and

B

Z8

1   I would have a statement as to each of these individuals and

2   I would say here is the situation with regard to this man.  We

3   believe that he could be dismissed out of the case without

4   prejudicing anybody's interest.

5        Then there would be these people we are talking about,

6   though, and the ones with whom I am really concerned.  Here are

7   people all through here whose lands overlie what we believe are

8   part of the storage unit.  What are their rights?  It's just

9   guesswork really.  And until we know, my feeling is that they

10  are not being prejudiced until we do have this data.  When we

11  get the key list and the Clerk agrees with us, we will have

12  taken a long step forward, and then it is just a matter of

13  running through each of the answers.

14       Now we have this situation.  Many of the answers were

15  filed with us, and I think most of them were filed with the

16  Clerk-- we are not sure.  Similarly, we know that three or four

17  answers have come in to Mr. Luddy-- we are not sure whether

18  we got all of those.  But the first step is the one we are

19  taking now, and when we are through with that that will be the

20  key list from the standpoint of the disposition of parties.

21       Now it may be that from the public relations standpoint

22  it would be a pious idea to take a broad brush and eliminate a

23  lot of them.  I simply think we would be making a mistake if

24  we did it, and I think the time will come when we can go

25  through this and delete a lot of it.

MR. SACHSE:  May I inquire.  Mr. Veeder, I think, and your Honor both have missed one of the most common situations, and that is where the defendant-- these are mine, this is the way I answered for a couple of hundred of them-- has said that he is not a riparian, that he does not abut on any stream, and that the waters underlying his land are vagrant, local, percolating ground waters.  There is a tremendous bundle of those answers.

THE COURT:  In other words, he is claiming no water in the stream?

MR. SACHSE:  Absolutely none.

THE COURT:  He would go into the bin for dismissal or for judgment out of the case, whatever procedure we work out, if the Government on checking found generally from their information as to geology that this was right.

MR. SACHSE:  There is further elaboration on that, though, which deals directly with Mr. Veeder's question of where we go if he rests.  I have a list right there in the file cabinet-- well, it is more than a legal cap page double spaced of answers that Veeder has given to requests for admissions where the United States has admitted in formal answer to request for admissions that the waters are vagrant, local, percolating ground waters.

Now, it is my conception of the Federal Rules that in every one of those cases at least the moment the United States

B

Z10

1  rests its case I can say to your Honor-- because the United

2  States also admitted ownership in those cases, in the case of

3  that man I don't even have to bring in a deed-- it will be my

4  position that the record before your Honor is such that I can

5  ask for a judgment decreeing that the waters underlying that

6  man's lands are vagrant, local, percolating ground waters, on

7  the state of the United States's own admission.  And I would

8  certainly expect to do it.

9        THE COURT :  I would think that you could, unless on

10  rechecking the Government said--

11        MR. SACHSE:  They may change their mind on some of them.

12        THE COURT:-- we made an error.  We want to recheck as

13  to a parcel.  But in the absence of that, I would think that

14  those cases would be suitable.

15        Do you agree?

16        MR. VEEDER:  Well, I agree to this extent, that based

17  upon the circumstance that he has described there is no

18  controversy before this Court and I think there is no juris-

19  diction of such a circumstance as that, because there is no

20  issue and there is no joinder of issue.  And I would say that

21  we will run checks on every single party.

22        THE COURT:  Let me understand this.  In other words, in

23  the situation that Mr. Sachse indicates, your suggestion is

24  that subject to a final check to be sure you are right that

25  you would think that these people would be subject to dismissal

B

Z11

1    out of the case.

2              MR. VEEDER:  That is right.  There would be a disclaimer.

3              THE COURT:  Mr. Sachse is talking about a judgment.

4         Now we have got down to a proposition of law.

5              MR. VEEDER:  That is right.

6              THE COURT:  I prefer that they go out by judgment, if

7    there is jurisdiction to do that, and I prefer it for the

8    reason that they have been subjected to a lawsuit and if they

9    are not part of the stream then they should have the equivalent

10   of what amounts to a certificate in a title policy that they

11   are not part of this stream and that they will not be subjected

12   to litigation in the future.  I would only propose that kind

13   of judgment in these clear cases.  This middle ground situation

14   that you suggest, and I think Mr. Sachse has some that may be

15   similar, are a different problem.  But in this clear situation

16   I think they ought to go out by judgment.

17             You raise the point that there is no jurisdiction.  I

18   would like to have this researched and I would like to know.

19   If we can't do it by judgment legally, then they go out by

20   dismissal.  But if we can do it by judgment, I would prefer

21   that they go out in that manner.

22             MR. VEEDER:  To me it doesn't make any difference.  But

23   when I hear Mr. Sachse talking about judgment where there is

24   no issue joined, I simply say that there is no jurisdiction.

25             But I think that we will be able to give your Honor a

B

Z12

1    full and complete review of every party, and we will do it as

2    expeditiously and as rapidly as we can.

3         THE COURT:   I know.  But let's go back to Mr. Sachse's

4    situation.  When you rest your case, he is then going to

5    raise this problem on the number of defendants where the record

6    is in the state as he has stated it to the Court.

7         MR. VEEDER:   Yes.

8         THE COURT:   What is your position going to be on that?

9         MR. VEEDER:   If things are as he describes them, I

10   would have the Marine Corps office check them out once more,

11   and if there is an agreement that there is no issue there, I

12   simply say that what Mr. Sachse has presented to us on his

13   request for admissions has been tantamout to being a disclaimer

14   and under the circumstances they are out of the litigation.  I

15   would say they are out automatically.  I think it would be a

16   pious idea to have a statement from your Honor to that effect.

17   I don't believe that there could be a judgment under the

18   circumstances.

19        THE COURT:   Well, now, we have an issue of law joined

20   right there and let's find out what the law is on it.

21        MR. VEEDER:   Certainly, your Honor.

22        We are trying to do this in a businesslike way, and we

23   think we are doing it in a businesslike way.  We are convinced

24   that the only way to do it is the drudgery way, the way we are

25   doing it, and Mr. Luddy is working here every day on it and our

B

Z13

1    men are working on it at the Camp.

2          Of course, I fall off of the sled-- maybe I was never

3    on the sled-- from the standpoint of why when we rest this

4    phase of our litigation the circumstances change.  I don't see

5    it.  But if they do, I will be glad to argue it.

6          THE COURT:  Well, we have a further problem.  We have

7    several hundred of the offers to settle on a half-acre or

8    less.

9          MR. VEEDER:  That's right.

10         THE COURT:  Which the Government has checked and approved.

11   Now why can't they be incorporated into an interlocutory de-

12   cree?

13         MR. VEEDER:  I am not sure that there are several

14   hundred, your Honor, but I know there is a sizeable number,

15   and we will check those out and your Honor will have a full

16   list of those, too.

17         All these fall into separate categories and I don't

18   believe we can treat them other than in the categories into

19   which they fall.  And it's just a big job.  But we are pro-

20   ceeding.

21         When the Government has its case in chief in, the

22   status should not, in our view, change in the slightest.  But

23   I am willing to argue the jurisdictional point that I raised,

24   and if I am in error we can go ahead some other way.  All I

25   want to be sure of is that we are not spinning our wheels and

B
Z14

1   five years from now we will be back in litigation.  That is

2   my great concern.  I want the Marines to know that we have a

3   satisfactory decree.

4         MR. STAHLMAN:  Your Honor, I have a question that I

5   think has some bearing upon our project here.  Does Mr. Veeder

6   have an estimate as to the time when this matter may be

7   accomplished?  Secondly, can it be done progressively rather

8   than wait for the entire matter?

9         MR. VEEDER: We are going on a progressive basis.  The

10  list that we have given to Mr. Luddy are designated areas that

11  the Master is taking testimony on.

12        THE COURT:  You have started the Clerk on what-- De Luz

13  and Fallbrook?

14        MR. VEEDER:  That is correct, your Honor, and the area

15  between Fallbrook and Rainbow Creek.  So we are going just as

16  fast as we can.

17        MR. SACHSE:  I have another aspect on this thing.  Mr.

18  Veeder apparently feels that as we go to the upper watershed

19  all parties who own land in the watershed should be required

20  to appear before the Master.  That is where I part company.

21  It seems to me, again to try to paint the picture by over-

22  emphasizing it, let's assume for a minute that as to some

23  particular section here the United States' testimony is

24  absolutely specific that the ground waters are vagrant, local

25  and not part of the tream system.  If that is the case, why

B

Z15

1   should that property owner have to appear again sbefore the

2   Master?  It has been established before you that that is the

3   case and he ought to get out of the proceedings.  We should not

4   try to make him spend more money and more time.  If the waters

5   within the basement complex and the residuum are vagrant, local

6   percolating waters, I think we ought to ascertain it in this

7   Court and reduce the expense to the Government, the expense to

8   the litigants, the expense to everybody, instead of passing it

9   on for a second decision before the Master.  That is the

10  reason that I am so tremendously interested in getting these

11  fifteen questions--

12          May I interrupt myself to say that Mr. Krieger said

13  that he hoped to have his in by the end of the week.

14          But that is the reason I am so tremendously interested

15  in getting the answers to your Honor's fifteen questions, be-

16  cause I feel that your Honor could then make a finding at the

17  close of the United States's case, if someone made an approp-

18  riate motion, where you would say, "I find that all ground

19  waters located in areas of basement complex delineated on

20  Exhibit 15 are vagrant, local, percolating ground waters not

21  part of the stream system."  Then all that anybody would have

22  to do to get a judgment that would protect them, that would

23  be res adjudicata, would be to file evidence of title in this

24  Court, get it in, so then a specific decree could be entered

25  saying that he is located in such an area and the waters

B

Z16

1    underlying his ground are vagrant, local percolating and he

2    has, as your Honor has described it, what amounts to a quiet

3    title decree that would protect him against any other stream

4    claimant twenty years from now filing an action against him.

5    He would have a res adjudicata judgment from your Honor that

6    he is not a part of the stream system.   And that is what I am

7    fishing for and hoping to get for these many people.

8         MR. VEEDER:   Apparently I didn't make myself clear on

9    this, and I don't want to labor it too much, if your Honor

10   wants me to quit.

11        The only thing we ever pleaded in this case was rights

12   to the use of water in the Santa Margarita River and its

13   tributaries.   Anyone who says, "I have no claim in the Santa

14   Margarita River and its tributaries" simply can't join issue

15   with us and your Honor would have no jurisdiction, and that

16   physical feature would continue forever and I don't see how

17   the man could be ever in litigation.   It might be that he might

18   strike an aquifer or something with a well that would affect

19   the stream twenty years from now.   I don't know.

20        I simply feel that we can do a careful job of cataloging

21   and doing a good job for your Honor.   We will give you the

22   lists as fast as we can get them.

23        THE COURT:   Well, we have to do that, and I realize that

24   we will waste time if we try to move too rapidly.

25        But following Mr. Sachse's suggestion, suppose that when

B.

Z17

1  we heard everybody that wanted to be heard and there were

2  still some parties, people represented by Mr. Littleworth and

3  Mr. Krieger, and California and Vail here on the general

4  geology of the basin.  Suppose that we proposed to make a

5  finding that all the waters in the basement complex and the

6  residuum, as shown on Exhibit 15 or 15-A, whatever it is, was

7  in the present state of the record apparently vagrant,

8  percolating water and not part of the stream.  You still have

9  the problem of a defendant who might be ill-advised but who

10  might say, "No, we own land and we think we are part of the

11  stream", et cetera.  But suppose you then served a notice on

12  these people that this was a tentative finding which the Court

13  proposed to make, giving him a chance now to be heard if any

14  of them contested it, that this was the time to come in and

15  present their claim.

16      MR. VEEDER:  In thirty days.

17      THE COURT:  But if they didn't, the Court would make an

18  interlocutory finding to that effect.

19

20

21

22

23

24

25

C

Z13

THE COURT:  I am thinking out loud:  As I see the difficulty there, we can identify it here by Exhibit 15.  The fellow in the field hasn't any idea, the defendant, what Exhibit 15 is.

MR. VEEDER:  That is right.

THE COURT:  He doesn't know whether he is in the blue or the gray or the yellow or the orange area.  And I am think-ing out loud again:  If we are going to do it right, I suppose we would have take areas by sections.  And when you did that, then, you don't know whether a man's ground which stretches back into basement complex may on some finger of it overlie on the stream.

MR. VEEDER:  Precisely.

THE COURT:  In which event, his land is riparian, also it is an illusory right, because there is no water runs in that stream in the dry year except in the wintertime.  Technically, he has a riparian right.  Permit yourselves coming back on this thing.

MR. SACHSE:  I feel that the Master has been required in the findings he has filed so far to confront every situation that your Honor will, with one exceptional basis:  He does not have any areas where he can delineate or spell out a basin. But he has set out the relation of the land owner who is riparian; he has in other cases found that there were riparian streams that flowed only during and immediately after periods

C

Z14

1  of any precipitation and runoff; and I suggest--

2  THE COURT: But the Master is not cataloging the land;

3  he does the areas and the descriptions and the names of these

4  people.

5  MR. SACHSE: And I think we will have to do that with

6  everyone here.

7  THE COURT: Yes.

8  MR. VEEDER: That is what we are doing. We are doing

9  that, Mr. Sachse, at this moment.

10  MR. SACHSE: Maybe I will ask for something for me as

11  distinct from that of a pro per for a moment. Some of us are

12  here; some of these people have hired lawyers.

13  THE COURT: I don't think you have much of a problem.

14  MR. SACHSE: I don't think we should be compelled, your

15  Honor-- we have set through this thing-- I don't think we

16  should be compelled to drag on through the Master's hearing

17  forever.

18  THE COURT: I don't think you have much of a problem,

19  but as to what we can do for other people who haven't appeared,

20  it is difficult. I think that probably this is going to have

21  to be done sort of watershed by watershed.

22  MR. VEEDER: And section by section, if I might inter-

23  rupt.

24  THE COURT: And probably have a court hearing or a

25  master's hearing in which word goes out that the Court or the

C

Z15

1   Master is now going to hear Coahuilla Creek watershed down to

2   its junction with Temecula, or whatever the situation may be.

3   And we have it marked out.  We have a map there that people

4   can see what we are talking about.  And then we say that

5   from the evidence to date the general feeling of the Court is

6   that the land in the basement complex, if it doesn't cross

7   over a stream or basin, has only vagrant, percolating water

8   and is not part of the water system.  And we propose to take

9   them out of the case.  But we still then would have to identify

10  the name of this owner and his legal description to make him

11  properly part of the judgment.

12      MR. SACHSE:  That is right.  And that is exactly-- of

13  course, the simplest example is Fallbrook Creek watershed.

14  The findings are only two pages long.  The findings are that

15  Fallbrook is vagrant, local percolating.  But the exhibit

16  which listed parcels is like a telephone book.  The Government

17  had a mountainous job in putting all those descriptions in.

18  It is done now.  Every single ownership of the Fallbrook

19  watershed is covered by that finding.  Every single parcel is

20  described.  And I think ultimately that should be done for the

21  entire watershed, I agree.

22      MR. VEEDER:  You just don't waive a wand, though, Mr.

23  Sachse, and get that kind of an exhibit.

24      THE COURT:  It is a lot of hard work.  While we are

25  talking about this matter, the Master, of course, as soon as he

C

Z16

1   concludes these hearings up at De Luz and Fallbrook, would like

2   to proceed with further hearings.  And what is your view on

3   that?

4          MR. STAHLMAN:  Your Honor, may I say a word at this

5   time?  I have no direct concern with some of these matters,

6   but I do know the history of this case; and there are matters

7   that are significant to a good many of the litigants in the

8   case.  The public relations, of course, is something that

9   from time to time becomes more important.  Bad public relations

10  are detrimental to the effectiveness of many things, as

11  witness John Foster Dulles.  Good relations are desired.  Now,

12  public relations should never be sacrificed, of course, in the

13  determination of rights in the judicial proceedings.  However--

14         MR. VEEDER:  Didn't you say that just backwards, George?

15         MR. STAHLMAN:  What was that?

16         MR. VEEDER:  Didn't you say that backwards?  I don't

17  intend to interrupt.

18         MR. STAHLMAN:  The desire to establish good public

19  relations should never be sacrificed for proper judicial

20  determination in the case.  In other words, that should not

21  be the objective that is in mind.

22         THE COURT:  You still said it backwards.

23         MR. STAHLMAN:  Did I?

24         MR. VEEDER:  Yes, and we are suffering, George.

25         THE COURT:  Go ahead.  I know what you are talking about.

7568

C

Z17

MR. STAHLMAN:  Well, I am kind of a backward country boy, anyway.  I will probably do a lot of things backwards before the case is over; just so I get the stall.

MR. VEEDER:  I am going to count my change whenever he starts talking that way.  Go ahead.

MR. STAHLMAN:  It would seem to me that if it could be accomplished, the getting some of them out of the case before you proceed into some of these other watersheds, you are going to have a much healthier situation and a situation which will more expeditiously bring about the determination of the rights in those other areas.

THE COURT:  We are in the position to do so on two creeks now, De Luz and Fallbrook, as soon as objections are heard and we get over that.

MR. STAHLMAN:  That is what I had in mind.  If those could be done before you proceed into other areas, I think it would be a healthy thing for the case.

MR. SACHSE:  There is one other aspect, your Honor: The news will go like a prairie fire.

MR. STAHLMAN:  That is what I have in mind.

MR. SACHSE:  If it is ever stated by the United States, which apparently Mr. Veeder doesn't want it, but if it were ever stated that all of the blue on the map in Judge Carter's court can get out of this case, you would get plenty of them come pouring in with one attorney or another to find out if

C2

7569

C

Z18

they are on that blue.  It would go like a prairie fire.  If

a determination is ever made that certain areas of this place,

regardless of ownerships, are out, the people will pour in,

most of them to prove their title to land in those areas.

MR. VEEDER:  They will pour in just the way they have

been pouring into the Reche School, by and large.

THE COURT:  Trickling in, you mean?

MR. VEEDER:  One at a time, I mean.  We have a herd one

at a time.

MR. SACHSE:  The news hasn't been out, Bill.

MR. VEEDER:  I have simply outlined to your Honor the

plan of those of us who ultimately-- it is like grandfathers

are more sure of the how of raising the child than the father,

and because he doesn't have responsibility.  I happen to have

some responsibility in this matter.  We are doing the best we

know how.  We have outlined to you what we are doing.  We

will notify your Honor as soon as we can complete one phase of

it.  And I sincerely petition your Honor to be patient with us

as you have been in these matters.

THE COURT:  Tentatively, what area would you expect the

Master to start on next?  To finish up in a downstream area

like Sandia?

MR. VEEDER:  Well, I think that Sandia and Rainbow,

or Rainbow and Sandia.

MR. SACHSE:  The proposal was Rainbow, wasn't it, Mr.

C

Z19

1   Veeder?

2   　　　MR. VEEDER:  That is right.

3   　　　THE COURT:  Would be next in order?

4   　　　MR. VEEDER:  Would be next in order, definitely.

5   　　　THE COURT:  Rather than to send him up into the Temecula?

6   　　　MR. VEEDER:  That would be our thought.  That is where

7   our work is directed now.

8   　　　THE COURT:  You are more ready in those areas?

9   　　　MR. VEEDER:  We are working every day getting ready on

10  the Rainbow area now.

11  　　　MR. SACHSE:  And I believe, didn't Col. Bowen state

12  that you were practically finished with the other little

13  watershed that is shown on that exhibit below the Narrows?

14  Aren't you, Colonel?

15  　　　MR. VEEDER:  I think that is right.

16  　　　MR. SACHSE:  They are all practically done.

17  　　　MR. VEEDER:  But it is just a matter of going through

18  each piece of land filling out who has interests?

19  　　　MR. STAHLMAN:  There is this other situation in

20  scheduling these areas, and that is that as far as we are

21  concerned, the Vail Company, why, it may be that we would have

22  interests in several of those areas up there.  So that if

23  your Honor were hearing matters in some area and the Master

24  in others, we may have some difficulty there.  However, if

25  during the time of the hearing on Rainbow, in which we have

C

Z20

1   no interest, and on Sandia, in which we do have an interest,

2   but not so far as all the other people on the stream are

3   concerned.  We are only going to take a position in that

4   stream that we will put out evidence on relative to our

5   particular rights, as we did on De Luz Creek.  Then, if both

6   of you are hearing cases, why we could--

7        THE COURT:  I don't see that you have got any problem.

8   This land that the Vail Estate owns up in the Santa Rosa--

9        MR. STAHLMAN:  No, no, not up there. We have not there,

10  your Honor.  That is just what I mean.  Sandia, that is the

11  land in Santa Rosa and on--

12       THE COURT:  Well, that is all down below the confluence

13  of the Temecula and the Murrieta?

14       MR. STAHLMAN:  Right.

15       THE COURT:  I don't see you have any problem there.

16       MR. STAHLMAN:  We are not concerned.  I never even

17  attended the hearing before the Master except for a few days

18  to see how things were going on at De Luz and found out it

19  wasn't worth our time to spend the time there.  When Col.

20  Bowen got through with his geology and study of water use up

21  there, we put in that evidence, and that is all we have on

22  that.

23       MR. VEEDER:  Mr. Moskovitz, could you give me the

24  citation which directed the intervention of California into

25  this case?

C

Z31

1        MR. MOSKOVITZ:  If you will look at the answer of the

2   State, I believe it is--

3        MR. VEEDER:  The original answer?

4        MR. MOSKOVITZ:  In the answer.  It is an attachment to

5   the answer.  It is a resolution of the Legislature which

6   requested the Governor and the Attorney-General to take all

7   action, all possible action, to oppose the claims of the

8   United States on the basis of--

9        MR. VEEDER:  The word "oppose" is extremely important,

10  your Honor.

11       THE COURT:  Oppose the claims of the United States?

12       MR. MOSKOVITZ:  Let me read you the-- I don't know how

13  to get the language, your Honor.  It was based upon the

14  complaint originally filed which caused so much concern in this

15  part of the State.

16       THE COURT:  Probably based upon the editorials that

17  came as an interpretation of the complaint.

18       MR. VEEDER:  That is right.

19       MR. MOSKOVITZ:  I am sure it was based upon the fact

20  that throughout this litigation the United States has asserted

21  claims to the use of water which are different and higher than

22  claims of which anyone else can assert.  This has never yet

23  ceased, the kinds of claims which your Honor has held cannot

24  be asserted.

25       MR. VEEDER:  I would like to have the citation.

C

Z32

THE COURT: He will get it for you.

MR. MOSKOVITZ: I have told you where it is. I will bring the citation out after the recess.

THE COURT: It is almost time for a recess. What witness do we start with?

MR. STAHLMAN: I have one correction in the statement which I made at page 7407, Tuesday, January the 20th.

THE COURT: What line?

MR. STAHLMAN: It starts on the last line on page 7406 wherein it is stated: "Now it may be or may not be that there is that close continuity between charge and recharge from the older to the younger alluvium, that that"-- one "that" should go out. That is incidental, however -- "may occur. But I would think that the evidence in the case at this point has"-- and the word "not" should be in there-- "not established that."

THE COURT: Insert the word "not" on line 3?

MR. STAHLMAN: Right.

THE COURT: All right.

Now, we haven't concluded as to what we will do next Tuesday in the event the Government finishes by Friday. You have plenty of work to do, don't you, Mr. Veeder?

MR. VEEDER: Yes, sir.

THE COURT: How long a gap would it be? When could we pick up again? You said your maps would be ready by the end of the month?

C

Z33

1    MR. SACHSE:  I can go ahead with Fallbrook, certainly,

2   I am sure, I would think by the formal starting time in

3   February.  That would be the 3rd. No, that wouldn't be the

4   3rd.  We would lodge them then.

5        THE COURT:  Tuesday the 3rd?

6        MR. SACHSE:  If I could get my exhibits in by the 30th,

7   I would-- although I don't think any of them are particularly

8   controversial-- they are just maps-- but allowing at least a

9   week, say, Tuesday the 10th I could be in full blast.  However,

10  I still had in mind, as I say, your Honor, when Mr. Veeder

11  says, "Rest," I want to get in the record that this is rest,

12  and I will have motions before I do anything with Fallbrook,

13  a lot for my people.

14       MR. VEEDER:  Would it help you any if I didn't rest;

15  just sort of terminated?

16       MR. STAHLMAN:  We would have it to do all over again.

17       MR. SACHSE:  So I think you could say safely that if--

18  Mr. Veeder's deadline, as I understand, for the 15 questions

19  and for the objections to the Master is the 2nd.

20       MR. VEEDER:  There is a dealine on the 15 points?

21       THE COURT: You asked time on that, and I gave you the

22  same time that we got on the Master's hearing which, I think,

23  was the 2nd, wasn't it?

24       MR. SACHSE:  I would suggest, to be very specific on

25  how best to proceed, if those are served and counsel have them

C

Z34

available for the week of the 2nd, they are going to be the basis undoubtedly of some of these motions, and we ought to reconvene the 10th, the week of the 9th, the 10th, we would be here on the 10th.  And I think we could probably kill a couple of days with some motions, and I am ready to go then immediately afterwards.

MR. VEEDER:  When will he be ready to go, then, the 10th?

MR. SACHSE:  The week of the 10th.  Mr. Veeder, I am not going to tell me in what order to put on my case.  If I feel I have motions to present first, I am going to do it.

THE COURT:  I understood you would be ready to put on evidence the week of the 3rd of February.

MR. SACHSE:  I probably will be able to put on evidence, but, your Honor, as I stated a moment ago, I definitely will have motions; if nothing else, motions based on these 20 or 30 answers that Mr. Veeder has given me.  I have them in the record.  Those I am going to do first before I do anything.

THE COURT:  Some of those could be taken care of next week if you rest at the end of this week.

MR. SACHSE:  I am ready to go ahead with any of that at any time.

THE COURT:  Well, let's continue on and see whether he rests, and before the week is over maybe we will know more about what we are going to do.

C

Z35

1    MR. SACHSE:  All right. I think it is a good idea.

2    MR. STAHLMAN:  Whether he is going to rest or he is

3    just restless.

4    THE COURT:  We will take our morning recess.  What

5    witness are you going to call after recess, Mr. Veeder?

6    MR. VEEDER:  Mr. Cannon.

7    THE COURT:  Mr. Cannon?

8    MR. VEEDER:  Yes.

9    MR. SACHSE: Col. Bowen hasn't finished with the

10   watershed yet?

11   MR. VEEDER: No.  We will give him a vacation.

12   MR. STAHLMAN:  All-purpose witness.

13   THE COURT:  Who is going to get me some law on this

14   question of alleged lack of jurisdiction or presence of

15   jurisdiction to take some of these defendants out by inter-

16   locutory decree?

17

18

19

20

21

22

23

24

25

Z18

1      MR. VEEDER:  I will undertake some of that, your Honor.

2      MR. MOSKOVITZ:  We will undertake that, too, your Honor.

3      MR. SACHSE:  I will see what I can do.  But the issue,

4  it seems to me, is very obvious.  The United States has

5  alleged that we are diverting water and causing salt water

6  intrusion.

7      THE COURT:  Let's find out what the law is.  There is

8  a lot of quiet title law in the State of California.  We ought

9  to be able to find out very readily what kind of situation it

10  is-- whether there would have to be a dismissal or a decree.

11      MR. VEEDER:  I would recommend that they look at the

12  Constitution, to begin with.

13      THE COURT:  Why?

14      MR. VEEDER:  That is the only source of power for this

15  Court.  If there is no justiciable issue, there is no juris-

16  diction, and if they don't claim anything against us-- well, I

17  will argue it later.

18      THE COURT:  Take a short recess.

19      (Recess.)

20      MR. MOSKOVITZ:  Your Honor, some inquiry was raised

21  before the recess as to the resolution of the Legislature with

22  respect to the intervention of the State of California, and I

23  would like to cite it and quote from it.  It is California

24  Statutes of 1951, Chapter 190.  It is Assembly Concurrent

25  Resolution No. 96 relative to the water rights to the Santa

Margarita-Temecula River System.

"Whereas, the United States has entered suit in a Federal Court in San Diego, California, to establish the doctrine that it holds 'paramount title as sovereign' to all water, surface and subsurface, in the Santa Margarita—Temecula river system; and

"Whereas, the upholding of this doctrine would result in the destruction of the private rights of hundreds of farmers and small land owners of the Fallbrook area named as defendants in this suit who will have their farms destroyed and thus lose their homes and savings; now, therefore, be it

"Resolved by the Assembly of the State of California, the Senate thereof concurring, that the Governor of the State of California and the Attorney-General of the State of California are respectfully requested to take all needful and legal action promptly and vigorously to oppose the action of the United States to establish its claim of right to the waters in the Santa Margarita-Temecula River system, to the court of last resort, if necessary; and be it further

        "Resolved, that the Chief Clerk of the

        Assembly is requested to transmit a copy

        of this resolution to the Governor and the

        Attorney-General of this State."

    Your Honor, thereafter there were conversations between the Attorney-General of the State and the Attorney-General of the United States, and a letter was sent by DeWitt Vanich, Assistant Attorney-General, in which he stated that the United States invited the intervention of the State of California in the proceeding for the purpose of carrying out the desire of the Legislature that paramount rights not be established on behalf of the United States.

    Throughout the first trial we sat in, in order to see to it that the law was properly understood and followed. We took an appeal and we felt that the Court in the first trial improperly understood and applied the law. Since the second trial we have done the same thing. We have participated throughout the pre-trials, as your Honor knows. We felt that we had a further obligation because of the money that had been spent by the Department of Water Resources in gathering the facts. It is for your assistance.

    MR. VEEDER:  In Bulletin 57.

    MR. MOSKOVITZ:  In Bulletin 57.

    Some years have elapsed since Bulletin 57 was published. We are attempting to bring up to date some of the hydrologic

1    studies, again for your Honor's assistance.

2         THE COURT:  All right, let's go ahead.

3         MR. VEEDER: I will call Mr. Cannon, please.  Mr.

4    Cannon has been previously sworn.

5         THE COURT:  Yes, he has been sworn.

6         THE CLERK:  On November 19th.

7

8              FRANK H. CANNON,

9    recalled as a witness in behalf of the plaintiff, having

10   been previously sworn, testified further as follows:

11        MR. VEEDER:  May I have Plaintiff's Exhibit marked

12   122 for Identification.

13        THE COURT:  May I have a copy of it?

14        MR. VEEDER:  Yes, your Honor.

15

16              DIRECT EXAMINATION

17   BY MR. VEEDER:

18        Q  I hand you Plaintiff's Exhibit marked 122 for

19   Identification and ask you to state into the record what it is.

20        A  Plaintiff's Exhibit 122 is a drawing identified as

21   "Public Works Drawing 858CP."  It represents water level

22   measurements from the ocean to the Ysidora pumping basin on

23   Camp Pendleton.  These measurements date from 1949 to 1950.

24        Q  Who made the measurements?

25        A  The measurements were made under my supervision by

Cannon   Direct

D

Z22

1    the Survey Section of the Public Works Office.

2        Q   And what was the objective, Mr. Cannon?

3        A   The objective was to determine changes in water

4    levels in our lower pumping basin.

5        Q   And how would you designate that basin normally?

6        A   The Ysidora Pumping Basin.

7        Q   Now go ahead.

8        A   When evidence of salt water intrusion first came in

9    1947 by the increase in the percentage of chlorides, it was

10   suspected that the water levels of the Ysidora Basin were

11   lowering to the point where the gradient from the sea may

12   have been reversed and flowed in there.   To better enable us

13   to make that determination, we put in observation wells from

14   the Ysidora Basin down toward the sea.

15       Q   When you say you put in observation wells, what did

16   you do in that regard?

17       A   Those observation wells were merely pipes-- sometimes

18   a hole would be bulldozed out and a pipe installed down where

19   water levels could be measured from the top of the pipe.   They

20   were right down in the bottom of the Santa Margarita River,

21   and the locations are noted on the plan section of the map

22   near the top.   The locations of the observation wells are

23   repeated on the profile section of the river at the bottom,

24   and the tabulations to the left of the sheet at the bottom,

25   legend 1949 to 1950, represent actual measurements at the dates

1   indicated in the tabular columns.

2        Q   And when were those measurements made?  Would you

3   take just the first year and the last?

4        A   1949 to 1950.

5        Q   What were the results of those investigations, Mr.

6   Cannon?

7        A   Those investigations indicated that there was a

8   lowering of the water level due to the pumping in the Ysidora

9   Basin, and as indicated on the profile lines it indicated a

10  gradient from the sea toward the land.  You notice the mean

11  sea level line is extended throughout the basin, labled on the

12  left-hand side of the sheet as "Sea level."  If that line is

13  followed over to the right, the comparative levels at the

14  various points can be indicated and determined.  And certain

15  selected readings on certain selected dates have been plotted.

16  All of them are not plotted because the map would be too

17  confusing if they were all plotted.  But certain elevations--

18  in fact, the worst conditions are not plotted because the

19  worst conditions occurred in the fall of 1951.  They do not

20  appear on here.  This information was information which was

21  obtained through our efforts at Camp Pendleton before the

22  Ground Water Branch of the Geological Survey came into the

23  picture.

24        Q   Now I hand to you Plaintiff's Exhibit marked for

25  Identification 123.

Cannon    Direct

THE COURT:  Do you have a copy of it?

MR. VEEDER:  I have a copy for your Honor.

Q  Of what is the Exhibit 123 reflective?

A  Plaintiff's Exhibit 123 is a chart upon which is plotted the changing chlorides content of certain wells in the Ysidora pumping basin.

Q  Under whose direction were those prepared?

A  They were prepared personally by me from chlorides determinations by the testing laboratories in the Eleventh Naval District.

Q  Would you explain the two or three lines that appear on that graph, which is Plaintiff's Exhibit 123 for Identification.

A  For instance, under the legend, it will be noted that line labeled 4 at intervals along its extent represents the change in chlorides content of Well 5A2.  Well 5A2 will be noted on the plan section of Exhibit 122 right above the name "Margarita."  That is the well very close in the river bed on the north side which was observed on a field trip.  It is an abandoned well at present.  But starting in 1947 it will be noted that Well No. 4 had a chlorides content of -- the first reading was 175 parts per million.

THE COURT:  You mean the well has the 4 symbols, but the well named 5A2?

THE WITNESS:  That is correct, your Honor.  As of March,

D
Z25

1  1948, the chlorides content was approximately 165, and it

2  will be noted from that point on there was a steady rise in

3  the chlorides content of the water, indicating salt which came

4  from the ocean-- a dilution of the natural fresh water of the

5  basin.  That rise in chlorides content, it will be noted,

6  continued until July, 1949, when it reached the value of 250

7  parts per million, as indicated on the scale at the left of the

8  chart.  That 250 parts per million was taken as an index of

9  usable potable water, as recommended by the U. S. Public Health

10  Service drinking water standards, and accordingly we con-

11  sidered the usefulness of that well for provision of potable

12  water had ceased.  So we quit pumping at that time.  That

13  particular well was not pumped at all until November, 1950,

14  when pumping was started again, and it will be noted that the

15  rise thereafter was more rapid than it was before.  In fact,

16  it rose to 300 parts per million by April, 1951, when pumping

17  was ceased again, and it has not been pumped since then.  The

18  well was lost to all intents and purposes.

19        THE COURT:  Where is the well 4C?  Is that the same as

20  observation well 4?

21        THE WITNESS:  No, sir, your Honor.  Well 4C is almost

22  off the limits of the map directly below the name "Margarita."

23  You will notice it on the margin of the map.  The well there

24  was pointed out on the field trip as being behind the booster

25  station which is at the lower end of Ysidora.  It is opposite

D

Z26

1   5A2, but southerly therefrom.  There is another well 4Cl which

2   has another number-- 22WW2.  But that well was the first one.

3          THE COURT:  4C.

4          THE WITNESS:  4C was the very first one to show up the

5   effects of chloride.  Now that was a very old well.

6          THE COURT:  What about 4Cl?

7          THE WITNESS:  4Cl is not listed on this.  It was a

8   shallower well.  It is in the same geologic formation as Well

9   4C.  The logs are quite similar down to the depth of 4Cl, which

10   is approximately 140 to 150 feet, something like that.  But the

11   well 4C goes down to about 190 feet-- 192 feet, I believe.

12   The well logs are similar up to the depth of the shallower well,

13   but the perforations are at different points.  The perforations

14   in Well 4Cl are at a higher location than those in 4C, which

15   may account for the rapid rise in the salt content because of

16   the more porous nature of the aquifer at that depth.

17   BY MR. VEEDER:

18          Q  And what was the course of that aquifer?

19          A  I don't get the question.

20          Q  You say the aquifer was of a different porous

21   character; is that right?

22          A  It is characteristic of all these wells which, I

23   believe, evidence has been submitted on before, that the upper

24   portions in the Ysidora basin are comparatively tight.  It

25   contains water, but the water cannot be extracted therefrom.

D

Z27

1 But these wells go down to a coarser medium where water can be

2 extracted with safety.

3     Q Based upon your observation, would you state whether

4 in your opinion the aquifer extends out to the Pacific Ocean

5 or--

6     MR. SACHSE:  That is objected to; no proper foundation

7 by this witness.

8     THE COURT:  Sustained.

9 BY MR. VEEDER:

10     Q  What investigation did you make during this period

11 from the standpoint of salt water intrusion?

12     A  We kept the weekly records of all the wells in Lower

13 Chappo, or in Lower Ysidora Basin, and those records were

14 turned over to the Ground Water Branch of the Geological

15 Survey when they came into the picture and were asked to study

16 our problem.  In that connection I might say--

17     Q  Would you trace the course of the test wells that

18 you had located?  Would you state where they were along the

19 course of the Santa Margarita?

20     THE COURT:  They would show on this map.

21     THE WITNESS:  The test wells are indicated on Exhibit

22 122.

23 BY MR. VEEDER:

24     Q  Which is the one closest to the ocean?

25     A  The closest one to the ocean is observation well No.

1 l, which is located a little over a hundred feet upstream from

2 the cable crossing which is used for stream measurements. I

3 believe the cable crossing was pointed out to the Court on

4 the field trip. That is approximately half a mile below the

5 Ysidora Gaging Station.

6   Q  And how far is it from where you find the salt water

7 from the Pacific Ocean?

8   THE COURT:  You mean salt water standing on the surface?

9   MR. VEEDER:  Yes, that is right, on the surface.

10   THE WITNESS:  At times the lagoon extends almost up to

11 observation well No. 1.

12 BY MR. VEEDER:

13   Q  When you say the lagoon, what do you mean by that?

14   A  The lagoon is the water at the mouth of the Santa

15 Margarita which has been trapped by the closing off of the

16 mouth by the barrier beach or sand pit.

17   Q  What would be the source of that water that was

18 trapped?

19   A  That is a little difficult to say in one word, be-

20 cause at the time it was first closed off the water would be

21 fresh from the Santa Margarita River. There are times when

22 that is a tidal area where salt water from the ocean comes in

23 directly and leaves with the low tide. When it is finally

24 closed off no one can know just what the state of the water

25 was at the time of the closure.

D

Z29

1    Q  How many observations sid you make overall, Mr.

2  Cannon, in this period concerning which these two exhibits,

3  Exhibits 122 and 123, pertain?

4    A  Some hundreds of observations were made.  I have a

5  list in my hand here, but it only takes in four years of the

6  observations.  There have been many, many observations.  We

7  took them weekly.

8    Q  What, in your opinion, is the source of the chloride

9  that entered the aquifer to which you have made reference?

10   A  I believe the evidence is convincing that it is

11  from the ocean, it is from dilution from the ocean, because

12  the static head of the water in the ocean is higher than that

13  at the pumping basin, as indicated by the water level measure-

14  ments.

15   MR. VEEDER:  I offer in evidence Exhibits 122 and 123,

16  your Honor.

17   THE COURT:  Exhibits 122 and 123 are received in

18  evidence.

19   (Plaintiff's Exhibits 122 and 123 for identification

20  were received in evidence.)

XXXX

21   MR. VEEDER:  Mr. Clerk, will you get Exhibits 102, 103,

22  104, 105, 106, 107, 110, 111, 112, 114.

23   THE COURT:  They are all in evidence.

24   MR. VEEDER:  Your Honor, these are exhibits which will

25  show the watershed line, as requested by your Honor at the time

Cannon   Direct

7589

D

Z30

1    the original exhibits were offered, and we will simply make

2    substitutions based on the location of the watershed line.

3         THE COURT:   There has been one substitution made already

4    in this set of exhibits.

5         MR. VEEDER:   They have been lodged, your Honor.   They

6    have never been in evidence, the ones to which I am making

7    reference.

8         THE COURT:   Maybe they weren't in evidence.   I thought

9    that was all taken care of.   Wasn't it?

10        THE CLERK:   Those are all in evidence, yes, your Honor.

11        MR. VEEDER:   With watershed lines on them?

12        Your Honor, if they have been admitted on that basis,

13   I am happy.   But I am quite convinced that--

14        THE COURT:   Well, I have Exhibit 103 in front of me.

15        MR. VEEDER:   I would like to have the witness look at

16   these, because I want to be very sure that when we make the

17   substitutions we make them correctly (handing document to the

18   witness).   I would like to have the witness compare these,

19   because there have been two series that have been up before your

20   Honor for review.

21        THE COURT:   Does it have a date on it?

22        THE WITNESS:   Exhibit No. 103, that His Honor has, is

23   identical to the exhibit that I have at this time, and it is

24   the 103 with the watershed added.

25        THE COURT:   As I recall, we first received this series

7590

D

Z31

1  of exhibits in evidence and then there was a substitution made

2  and I thought the record was clear that we substituted the new

3  exhibits with the same number, the only change being the in-

4  sertion of the watershed line.

5       MR. VEEDER:  And the new watershed line.

6       THE COURT:  I don't know that a watershed line appeared

7  on the old exhibits.

8       MR. VEEDER:  They did not originally appear, your Honor.

9       THE COURT:  So a watershed line was put in.

10      MR. VEEDER:  If there is no objection, I am very happy.

11      THE COURT:  If there is no objection--

12      MR. MOSKOVITZ:  There is no objection.

13      THE COURT:  Identify for the record which exhibits these

14  are, so that we will be sure we are right.  Do you have a list

15  of them?

16      MR. VEEDER:  Yes, we do, your Honor.  I would like to

17  call attention to this fact, that there are three new exhibits.

18      THE COURT:  Exhibits 102-A, 102-B, and 102-C?

19      MR. VEEDER:  Exhibits 102-A, B, and C.

20      THE COURT:  Before we get to that, let's go through this

21  list that you first mentioned.  What were the numbers again?

22      MR. VEEDER:  Exhibit 103 --

23      THE COURT:  Earlier you started with Exhibit 102.

24      MR. VEEDER:  The reason I referred to Exhibit 102 is

25  that we are adding some new exhibits to that number.

D

Z32

1        Exhibit 103 is the one to which I would like to make

2    reference now, if I could.

3        THE COURT:  All right, Exhibits 103, 104--

4        MR. VEEDER:  Now, Mr. Witness, will you follow through

5    on these to be sure that you have the correct form.

6        THE WITNESS:  If I may say so, 102 has no change on it

7    at all.

8        THE COURT:  Let us skip Exhibit 102 for the time being.

9    Start with 103.  Which are the ones where you put the water-

10   shed line in?

11       THE WITNESS:  Exhibits 103, 104, 105, 106, 107, 108,

12   110, 111, 112, and 114.  There are ten sheets on that.

13       THE COURT:  Not Exhibit 113 also?

14       THE WITNESS:  10 that were changed, and three new ones

15   were added.

16       THE COURT:  The new exhibits with the watershed line on

17   them will be received in evidence under the same numbers

18   substituted for the old exhibits without the watershed line.

19   Counsel can later check with the Clerk to be sure that he has

20   the copy of the exhibits with the watershed line on them.  But

21   I think we had this all taken care of.

22       MR. VEEDER:  There had not been a specific offer, and I

23   made the offer and your Honor has admitted them, so there is

24   no question about them not being in evidence.

25       THE COURT:  All right.  Check to be sure that the Clerk

D

Z33

1    has the right exhibits with the watershed line on them.

2              MR. VEEDER:  I will do that, your Honor.

3              (New Exhibits 103, 104, 105, 106, 107, 108, 110, 111,

4    112 and 114 were received in evidence.)

5              THE COURT:  What about this Exhibit 102?

# E

Z36

1        THE WITNESS:  Exhibits with the proposed numbers 102,

2   102-A, 102-B, and 102-C consist of sheets 1, 5, and 9, as

3   indicated on the key map, which was Exhibit 100.  And the

4   reason they were added was to bring the watershed line clear

5   down to the sea.  Sheets 1, 5, and 9.

6        THE COURT:  Are they substituted?

7        THE WITNESS:  They are not.

8        MR. VEEDER:  These are additional, your Honor.

9        THE WITNESS:  They are additional sheets.

10       THE COURT:  To 102?

11       THE WITNESS:  They were not included in the original

12   labeling.  One of them, for instance, Sheet No. 9, indicates

13   a portion of the Stuart Mesa, and No. 5 is a portion of the

14   Stuart Mesa which was not included in the original draft in

15   order to trace the watershed line down to the sea.

16       MR. VEEDER:  If your Honor will observe, and I would

17   like to have the Clerk, if he would, note now, it appears that

18   102-A, B, and C have not been admitted in evidence.

19       THE COURT:  They have not been.  That is true.  Do you

20   offer them?

21       MR. VEEDER:  I will make the offer now, your Honor,

22       MR. SACHSE:  Are there copies of them available?

23       MR. VEEDER:  Yes, there are.  They are down in the

24   office, and they are waiting for you.  I will get some.  They

25   have been there for a long time, if you want them.

E

Z37

1    MR. STAHLMAN: Bill, what number did you offer?

2    MR. VEEDER: 102-A, B, and C, which have just been

3    offered.

4    THE COURT: 102-- if no objection, 102-A, B, C will

5    be received in evidence.

6    MR. VEEDER: Thank you, your Honor.

7    127, Mr. Luddy. Bill, will you give that to the Court,

8    please.

9    Q   Mr. Cannon, I hand you the Plaintiff's Exhibit

10   marked for Identification 127 and ask you to state into the

11   record what is depicted on that identification.

12   A   Plaintiff's Exhibit marked for Identification No.

13   127 is a representation of all of the lands on the Marine

14   Corps Base and expressed as an area allocation map. It is a

15   portion of a study which took us approximately three years

16   under an architect-engineer contract to develop a master plan

17   for--

18   Q   For land utilization?

19   A   --for land utilization on Camp Pendleton to meet

20   the established mission of the military base.

21   Q   Now, you refer specifically to an area which is

22   marked "Camp Christianson" and ask you what that represents

23   from the standpoint of the land utilization of the property?

24   MR. SACHSE: What was the name of the camp?

25   THE WITNESS: Christianson. Camp Christianson, it will

E

Z38

1   be noted as just above and to the left of the bottom of the

2   map, is an area distinguished by vertical hatching, vertical

3   lines hatching labeled "Weapons Training Facility." That is

4   the area upon which the proposed new replacement for Camp

5   Matthews is to go. The planning is complete.

6        MR. SACHSE: I will object and move to strike, your

7   Honor. Any proposed expansion of Camp Pendleton is absolutely

8   immaterial, irrelevant, and can have nothing whatsoever to

9   do with our water rights. The water rights have no relation-

10  ship to what the proposed expansion may or may not be.

11       THE COURT: Overruled. Get it in the record.

12  BY MR. VEEDER:

13       Q  What other developments are depicted?

14       A  It will be noted that the watershed line traverses

15  that area. Part is within and part without the watershed.

16       Q  From the standpoint of housing of personnel, what

17  additional areas appear to be subject to the plan?

18       A  It will be noted that the family housing area is

19  distinguished by a diamond hatching device, and at the right

20  of the boundary adjacent to the area known as the "Division

21  Area" that has been designated for family housing. That is

22  the area surrounding 17 Area, east of 14 Area, and down

23  toward the golf course. But that entire area has been desig-

24  nated for housing purposes. But, of course, it must be

25  understood that some of it is rather rough terrain, and it

1    all could not be used for housing.

2         MR. SACHSE:  I make the same objection and move to

3    strike on the further ground it is all outside the watershed.

4         THE COURT:  The record will so show.  Your objection

5    is overruled, however.

6    BY MR. VEEDER:

7         Q  And in regard to the dark areas that are depicted

8    on this Identifcation 127, would you briefly explain those?

9         A  The dark shaded areas are presently built up and

10   in use.  Those are existing camp areas.

11        THE COURT:  I see.  I see a Cannon.  Named after you,

12   Mr. Cannon?

13        THE WITNESS:  No, sir.  Camp Cannon was named after a

14   Congressional Medal of Honor winner who was a Marine flyer.

15   It has no relation to me.  These, by the way, are proposed

16   names.  They are not presently in use except in connection

17   with the official master plan.

18   BY MR. VEEDER:

19        Q  Could I ask you to refer to Camp Mason and explain

20   what is represented there?

21        A  Proposed Camp Mason will be occupied by what is

22   known as the 2nd Infantry Training Regiment.  That is the

23   regiment which is presently at Camp Pendleton now up in what

24   is labeled on this map as Camp Moreland.  But that is the

25   group which receives the graduates from boot camp.

1    Q   What was your responsibility in connection with this?

2    A   I supervised the contract which prepared this and

3    worked with them over the three years in checking their

4    partial submissions, and all that, approval, and so forth.

5    Q   And is it correct to your personal knowledge from

6    the standpoint of the plans and design?

7    A   This is the official map, and it has been approved

8    by the Commanding General and is now on file with the Chief

9    of Naval Operations with headquarters in Washington.

10   MR. VEEDER:   We offer in evidence Plaintiff's Exhibit

11   marked 127.

12   MR. SACHSE:   Could I have voir dire for a moment, your

13   Honor?

14

15                    VOIR DIRE EXAMINATION

16   BY MR. SACHSE:

17   Q   What is this date, Mr. Cannon, October 23rd, I

18   guess it is, 1958, that is the date of the approval of the

19   Commanding General?

20   A   That is the date of approval of the Commanding

21   General.

22   Q   And the date that I see over to the left, date of

23   compilation, 1 January, is the date of the actual preparation,

24   then?

25   A   That was the date of submittal by the architect-

E

Z31

engineer contractor, Porter, Urquhart, McCreary and O'Brien.

Q   Who put the watershed lines on?

A   I put the watershed lines on personally myself.

Q   And when was that done?

A   That was done in 1958.

Q   The Commanding General approved this watershed line?

A   You are bringing up a technicality.  I don't know whether the Commanding General, it is up to him to approve the watershed line or not.

Q   Did the Commanding General see the watershed, is what I am getting at, or is this something added to the watershed line, something you added to another exhibit?

A   That was something that was added to this.  This was not an exhibit.  This has not been an exhibit before.

THE COURT:  The point is this:  When the Commanding General put his -- what are the initials there?

MR. SACHSE:  Ridgley.

THE WITNESS:  Major-General Ridgley.

THE COURT:  When he put the "Ridgley" on there, were the watershed lines then on the map?

THE WITNESS:  They were not on the map at that time.

MR. SACHSE:  That is all I have, your Honor, on voir dire.

MR. VEEDER:  I renew the offer.

THE WITNESS:  They were added for information  purposes.

1          THE COURT:  All right.  127 received in evidence.

2    BY MR. VEEDER:

3          Q  Mr. Cannon, what were your responsibilities, just

4    very briefly, at the time that the Camp Pendleton was con-

5    structed in 1942?

6          A  I was in charge of the design and construction at

7    that time as Navy Supervising Engineer.

8          Q  What were your responsibilities in regard to the

9    expenditures that were made for the construction?

10         A  I actually supervised the design and construction

11   at that time.  I didn't handle the money.  I don't know what

12   you mean by that.

13         Q  Under whose direction were the cost records main-

14   tained?

15         A  The cost records were maintained by the Navy

16   auditor.  For administrative purposes, I supervised some of

17   those, the personnel; but the cost records were not directly

18   under my supervision.  They were under the Navy auditor.

19         Q  Was the record of the costs maintained in your

20   office, Mr. Cannon?

21         A  They have been since the completion of the contract.

22   I have the original records.

23         Q  Have you determined the expenditures that were made

24   in constructing Camp Pendleton outside of the watershed of the

25   Santa Margarita River?

E

Z33

1    A  I have.  I have personally done that.

2    Q  And would you state what those expenditures were?

3    MR. SACHSE:  I object, if the Court please.  It is

4    absolutely immaterial and irrelevant.  If anything is

5    irrelevant it is how much somebody spends on some of this

6    property.  It has nothing to do with the extent of the water

7    rights.

8    MR. VEEDER:  Your Honor, from the standpoint-- this is

9    a court of equity, to begin with, and it is certainly highly

10   important that the Fallbrook Public Utility District went down

11   and filed a piece of paper.  And that is all it did; filed

12   a piece of paper with the State of California.  It had full

13   and complete knowledge that the National Government some four

14   or five years before that piece of paper was filed had made

15   these tremendous expenditures.  It is in the form of black-

16   mail, of course, that they have undertaken this thing.  Our

17   view is that it is highly relevant, extremely important, that

18   they could put in peril and in jeopardy this vast development

19   that was made by the United States of America while the

20   Fallbrook Public Utility District was receiving water under a

21   gratuitous, revocable license that they went down, filed a

22   piece of paper, and the State of California issued permits on

23   it.  It is a remarkable thing.  Now, I think it is extremely

24   important that your Honor have before him the facts that the

25   United States of America in an effort to defend itself spent

E

Z34

1   $15,000,000 outside of the watershed.

2   THE COURT:  I am going to let it into the record and

3   overrule the objection.  But I will tell you frankly I don't

4   think it is material.  But I want you to have your record made.

5   MR. VEEDER:  Thank you, your Honor.

6   THE COURT:  If the United States wants to spend that

7   kind of money, they are armed with the power of eminent domain.

8   And if they have made a mistake and spent money on lands where

9   they had no business spending it, they can condemn and acquire

10  water to supply that land.  But I don't think the fact that

11  they spent money outside the watershed, whether they spent a

12  dollar or 100 million dollars, affects the measure of their

13  rights.

14  MR. VEEDER:  I think it is highly important, your

15  Honor, and I thank you for the ruling.

16  MR. SACHSE:  I will make a further objection that there

17  is no adequate foundation for this witness to testify.

18  MR. VEEDER:  It has already been admitted, Mr. Sachse.

19  Q  Would you state the amount of money that was expended

20  outside of the watershed?

21  MR. SACHSE:  I object.  There is no foundation.  And

22  hearsay.

23  THE COURT:  I understand you.  You have what kind of

24  records there?

25  THE WITNESS:  I have compiled these from the original

E

Z35

1    records from the cost accounting department.

2         MR. SACHSE:  Object.  It is hearsay, then.

3         THE WITNESS:  It was a matter of separation using the

4    watershed line as a boundary.

5         THE COURT:  And where are those original records?

6         THE WITNESS:  Those original records are in my office

7    at Camp Pendleton.

8         THE COURT:  You could produce them for inspection?

9         THE WITNESS:  I could produce them if necessary.

10        THE COURT:  If Mr. Sachse wanted to see them?

11        THE WITNESS:  Yes, your Honor, I could.

12        THE COURT:  And this is a compilation whereby you have

13   segregated those items of expenditures that were made outside

14   the watershed?

15        THE WITNESS:  That is correct.

16        THE COURT:  On the basis of the watershed line as shown

17   on Exhibit 103, and so forth?

18        THE WITNESS:  They were originally compiled not with

19   that separation.  The separation was necessary.

20        THE COURT:  Presently they are segregated on that basis?

21        THE WITNESS:  They are segregated on that basis, yes.

22        THE COURT:  All right.  The objection is overruled.

23   You may ask the original records be brought in, Mr. Sachse,

24   if you think it is material.

25

E

Z36

BY MR. VEEDER:

Q   And those are the areas that are served by the Santa Margarita River outside of the watershed, is that correct?

A   The listing I have, the original cost in 1943 of the buildings, structures and utilities outside of the watershed but obtaining the water supply from the Santa Margarita Basins, that figure is $15,250,891.

Q   Now, have you considered the cost of replacement of those structures based upon the present going rate for construction?

A   I have.  The cost of the--

MR. SACHSE:  I will object, if the Court please.  This is getting even more fantastic.

THE COURT:  What materiality is that?

MR. VEEDER:  Your Honor, I think your Honor precipitated this phase of it.  You said, well, rather early in the proceedings that the thing to do would be spin the camp around and bring these buildings within the watershed of the Santa Margarita River.  And I have been very concerned that someone, your Honor, would think that that would be possible under the circumstances.  That is another reason why we put in 127, from the standpoint of land utilization where there simply is not an area which would be available to bring these structures within the watershed to a very large degree. Secondly, if we had to tear up, as your Honor seems to intimate

E

Z37

1    in his earlier observation, that we had to tear up the whole

2    area, I think it is highly important.

3            THE COURT:  I meant no inference that you could

4    physically pick up any of these buildings and move them over

5    into the watershed.

6            MR. VEEDER:  Or reconstruct them.

7            THE COURT:  I did express a little interest in areas

8    that were available for certain of your activities that seem

9    to be within the watershed and not out of it which had not

10   been utilized.  But I am going to sustain the objection as

11   to anything about replacement costs.

12           MR. VEEDER:  I will make an offer of proof, then, your

13   Honor.

14           THE COURT:  Go ahead.

15           MR. VEEDER:  We would show by this witness that the

16   costs to replace these facilities as of the going rate, as

17   of today, would be--

18           THE COURT:  To replace them within the watershed, is

19   that it?

20           MR. VEEDER:  Well, the cost of the same facilities in

21   1958.

22           THE COURT:  Well, regardless of where they were sit-

23   uated?

24           MR. VEEDER: Wherever, yes.  It would be $39,494,807.69.

25   That 69 cents is very important.  Now, those arrived at by--

E

Z38

1    MR. SACHSE:  Wait a minute.  I am going to object to

2  your offer of proof on the ground there is no foundation that

3  this witness is qualified to testify to construction costs.

4    MR. VEEDER:  I made my offer of proof, your Honor.

5    THE COURT:  The objection is sustained on the latter

6  ground and upon the ground it is not material.  Both grounds.

7    MR. VEEDER:  Well, I hear the whistle blow, your Honor.

8    THE COURT:  Yes.  It is 12 o'clock.

9    MR. STAHLMAN:  Your Honor just blew the whistle.

10    MR. VEEDER:  Only on one small facet.  We will call

11  this witness back after lunch.

12    THE COURT:  2 P.M.

13    (Noon recess.)

14

15

16

17

18

19

20

21

22

23

24

25

F

Z34

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, JANUARY 21, 1959.   2:00 P.M.

2

3          (Other matters.)

4          THE CLERK:  The case on trial, number 2, 1247-SD-C,

5    United States of America vs. Fallbrook Public Utility District.

6          MR. VEEDER:  I will call Mr. Cannon, please.

7

8                     FRANK H. CANNON,

9    recalled as a witness in behalf of the plaintiff, having been

10   previously sworn, testified further as follows:

11         MR. VEEDER:  Respecting the reference made this morning

12   to the records of the United States Geological Survey, Mr.

13   Hofmann states that the figures are correct and that he

14   doesn't believe that a change would be necessary or proper.

15   He is, however, available to talk further to Mr. Illingworth,

16   if the State's engineer desires to talk to him.

17         MR. MOSKOVITZ: We will discuss this with him further

18   and after we will indicate whether we feel he should be

19   brought back to the stand.

20         THE COURT:  All right.

21   BY MR. VEEDER:

22         Q  Mr. Cannon, what are your responsibilities in regard

23   to the calculation of costs of construction in connection

24   with your present position?

25         A  In my present position as chief engineer and design

F

Z35

1    director, we are constantly engaged in the estimation of costs

2    of proposed work.  That is a very important part of my duties

3    at Camp Pendleton in connection with proposed work and work--

4         Q  When you say "proposed work," you are referring to

5    what kind of work?

6         A  Construction work involving structures, utilities,

7    buildings and such.

8         Q  For how many years have you been performing those

9    functions for the National Government?

10        A  Slightly less than seventeen years.

11        Q  Now, what is the criterion that you presently utilize

12   in relating the costs of construction, for example, as of 1942

13   with the present costs of construction?

14        A  One of the best known cost indexes, I would say

15   universally used in the United States, is known as the

16   Engineering News Record Cost Index.  This particular index

17   is based on the construction costs using the year 1940 as 100

18   and relating the constantly rising costs to that index.

19        Q  Would you give an example of the relationship

20   between that 100 figure as designated for 1940 with relation

21   to the year 1958, for example.

22        A  Well, for instance, the construction costs in 1940,

23   taken at 100, the 1958 costs are 316 in relation to that.

24        Q  Predicated upon that criteria, have you given

25   consideration as to the costs of replacement as of present

F

Z36

1    costs in connection with those structures and facilities

2    located outside the watershed of the Santa Margarita River

3    but which are dependent upon water from that source?

4        MR. SACHSE:  I object to that on the grounds that it is

5    irrelevant and immaterial; not tending to prove any issue in the

6    case.

7        THE COURT:  I will sustain the objection on the grounds

8    of materiality.  Make your offer of proof what the witness

9    would testify to.

10        MR. VEEDER:  I will make the offer of proof, which

11    would show, predicated upon the facts which have been elicited,

12    that the then cost of the buildings constructed in 1943 was

13    $15,250,891; that in the year 1958 the cost of replacement would

14    be $39,494,807.59.

15        THE COURT:  Do you object to the offer of proof on the

16    same ground?

17        MR. SACHSE:  On the same grounds of materiality.

18        THE COURT:  Sustained.

19        MR. VEEDER:  I have no further questions.

20        MR. SACHSE:  I have just a few.

21

22                    CROSS-EXAMINATION

23    BY MR. SACHSE:

24        Q  Mr. Cannon, your Exhibit 123 ends with the year 1951.

25    Have you kept similar analyses since that date?

1        A  Yes, we have.

2        Q  How do those figures compare with the salt water

3   contamination shown on Exhibit 123?

4        A  I believe those were in evidence.

5        MR. VEEDER:  They are in evidence presently, Mr. Sachse.

6        THE WITNESS:  They were put there by the Surface Water

7   Branch of the United States Geological Survey.

8   BY MR. SACHSE:

9        Q  Well, am I not correct in stating that the ground

10   water gradient in Ysidora Basin has been restored to a seaward

11   direction?

12        A  That is true.  By ceasing all pumping within that

13   area, within the lower area, and moving upstream, coupled

14   principally with the replenishment that came with the runoff

15   of 1952, the seaward gradient has been maintained, and we are

16   attempting to maintain it.

17        Q  So the seaward gradient has been maintained since

18   after the 1952 runoff?

19        A  It has.  But the restoration of the quality of the

20   water is much slower.

21        Q  I understand.  And I previously asked Mr. Worts, and

22   I will ask you the same question:  It is quite possible, is it

23   not, that there be salt water contamination in a basin without

24   there being present actual intrusion of salt water?

25        A  The salt water contamination can persist.

F

Z38

1 Q That is the point I am making; by reason of prior

2 intrusion, even though the intrusion has stopped?

3 A That is true.

4 MR. SACHSE: That is all, your Honor.

5 THE COURT: Mr. Moskovitz?

6 MR. MOSKOVITZ: I have no questions.

7 THE COURT: Mr. Stahlman?

8 MR. STAHLMAN: I have no questions.

9

10     REDIRECT EXAMINATION

11 BY MR. VEEDER:

12 Q What in your opinion would be the effect of a

13 decrease of the quantity of water in the basin or further

14 pumping in that area, Mr. Cannon, upon further salt water

15 intrusion?

16 A I don't think I got the question precisely. Would

17 you word it again?

18 MR. VEEDER: Would you read it, please?

19 (The reporter read the pending question.)

20 THE WITNESS: Pumping, under conditions of low runoff,

21 would undoubtedly bring about a repeat of the former conditions.

22 MR. VEEDER: I have no further questions.

23 MR. SACHSE: I have no questions.

24 MR. VEEDER: You are excused as far as I am concerned.

25 THE COURT: You are excused. If we need you we will

1  call you back.  You are excused, but remain available for call.

2      THE WITNESS:  Yes, sir.

3      MR. VEEDER:  I will call Mr. Stanley R. Stevenson.

4

5                 STANLEY R. STEVENSON,

6  called as a witness in behalf of the Plaintiff, being first

7  duly sworn, testified as follows:

8      THE CLERK:  Would you state your name, please?

9      THE WITNESS:  Stanley Stevenson.

10

11                 DIRECT EXAMINATION

12  BY MR. VEEDER:

13      Q  How old are you, Mr. Stevenson?

14      A  Forty-three.

15      Q  And where do you reside?

16      A  In San Diego.

17      Q  And would you give your address, please?

18      A  4019 Narragansett Street.

19      Q  And would you state your education, referring first

20  to your elementary work and your later college work.

21      A  I attended Bakersfield High School for two years and

22  then Reedley High School, Reedley Junior College.  I graduated

23  with a degree in Forestry in 1938 from the University of

24  California.

25      Q  Would you state briefly the kind and type of

employment you have had during your period of college?

A  During the summer months, which is about the only times I worked during the time I was going to college, I worked for the United States Forest Service either in maintenance of trails, telephone lines, or in fire suppression and prevention capacity.

Q  What were those years, Mr. Stevenson?

A  Well, I had worked in a similar capacity prior to that while I was going to high school, for that matter, on Sequoia National Forest.

Q  When were you in college and when did you graduate?

A  I started at the Reedley Junior College in the fall of 1933 and was there for two years.  I transferred to the University of California in 1935-- actually in the summer of 1935.  That is one summer that I didn't work, because they have a course of summer school in Plumas County that you have to attend.  So I didn't work that year.  Then I attended the University of California until 1938-- with one exception: I should probably mention that I went to Fresno State for a semester in 1936, I guess it was-- 1936.  Then I went back to the University of California.

Q  Subsequent to your graduation what was your employment?

A  I worked for the United States Forest Service on Sequoia forest in trail maintenance, erosion control of meadows, fire prevention-- at that time they called them a fire guard;

1    actually it was in fire prevention and fire suppression duties--

2    as a fire control assistant for a district ranger in 1938.  I

3    guess that was the summer I was graduated.

4        Q  And then would you just briefly refer to your other

5    employment and describe it, subsequent to that time.

6        A  In the fall of 1938 I was released from the Forest

7    Service because the fire season had ended and obtained employ-

8    ment with a road construction company in eastern Fresno County,

9    still within the boundaries of the Sequoia National Forest,

10   until the spring of 1939.  Then I went to work for the United

11   States Forest Service again as a timber sale officer on the

12   Sequoia National Forest at the headwaters of the Kern River,

13   and worked through that summer and into the fall, when again

14   there was no more work because of the seasonal nature of that

15   particular job.  I obtained a  job with Morrison-Knudson at

16   Camp Roberts during the construction phase, in the fire

17   department.  The next spring I started again with the Forest

18   Service on this same timber sale, representing the Government

19   in the sale of timber, until the fall of 1943, when I was

20   promoted to District Ranger at Mendocino National Forest

21   and transferred to the Mendocino National Forest, where I

22   remained for three years as district manager until the spring

23   of 1946.  And I came to San Diego to the Cleveland National

24   Forest as fire control officer on the staff of the Forest

25   Supervisor-- in this building, in fact, where the office was

F

Z42

1    at that time.

2        Q  When did you first become acquainted with the

3    Cleveland National Forest, Mr. Stevenson?

4        A  In the spring of 1946.

5        Q  And what have been your responsibilities since that

6    time?

7        A  I was Fire Control Officer on this Cleveland National

8    Forest for nearly five years, and was transferred from here

9    to the Stanislaus National Forest in the spring of 1951.

10       Q  And thereafter what have been your responsibilities?

11       A  On the Stanislaus National Forest I was a staff

12   officer on the staff of the Forest Supervisor at Sonora, in

13   charge of timber management, with duties forest-wide-- pre-

14   paring, selling and administering National Forest timber sales,

15   until the spring of 1955, when I was transferred to a similar

16   job on the Six Rivers National Forest on the headwaters of

17   Eureka.

18       Q  After that what did you do?

19       A  In the spring, I think it was in February of 1957,

20   I was transferred back to the Cleveland National Forest in

21   charge of forest administration, of all activities, and have

22   been here since.

23       Q  Would you state what your responsibilities are at the

24   present moment?

25       A  I am Forest Supervisor of this National Forest, with

1  primary duties of administration and protection of the National

2  Forest lands and the National Forest resources on those lands.

3      Q  Would you state briefly into the record the objective

4  of the National Forest Service, particularly with reference

5  to the administration of the Cleveland National Forest?

6      A  The Cleveland National Forest stretches in four

7  separate blocks, from just north of the Mexican boundary to

8  just south of the Santa Ana River on the north end, comprising

9  some approximately 350,000 acres of National Forest land, on

10  which there is a nominal amount of timber from which we make

11  no commercial sales, and I would say as far as National Forests

12  are concerned an average amount of grazing or forage for which

13  permits are issued to people who own cattle and their cattle

14  are grazed for a fee for specified periods on National Forest

15  lands.

16     Q  What are the other uses that are made of the National

17  Forest?

18     A  Our primary objective is the management and protection

19  of the watersheds that fall within the National Forest and the

20  development and administration of recreation and recreational

21  facilities and opportunities offered on National Forest land.

22  Those two are probably the largest in the Southern California

23  forests including this one.

24     Q  From the standpoint of maintenance of wildlife, have

25  you any responsibilities in that connection?

Stevenson - Direct

F

Z44

1          A   The maintenance and improvement of the habitat of

2     the wildlife is also my responsibility.

3          Q   What in your view is one of the greatest threats on

4     Cleveland National Forest from the standpoint of maintenance

5     of the watershed?

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stevenson - Direct

1     A   Well, the greatest threat to the watersheds on the

2   Cleveland National Forest is the destruction through fire,

3   primarily, and in minor degrees the disruption or the, or

4   disturbance of the soil that would, in turn, move into stream

5   channels, load stream channels, and ultimately reach reservoirs

6   that were built to trap the water.

7     Q   What plans, if any, are there for the future de-

8   velopment of forest areas with particular reference to

9   Cleveland National Forest for future use and future recrea-

10  tional purposes?

11    A   We are now in the process of making an inventory

12  to determine the recreation use, present recreation use, and

13  the future recreation use of National Forest lands in the

14  Cleveland Forest as a part of the nationwide inventory of

15  recreation uses on National Forest land and are developing

16  under the nationwide program of operation outdoors recreation

17  resources in the forest.

18    Q   Now, what are some of the water uses that are made

19  on the National Forest with particular reference to Cleveland

20  National Forest?

21    A   Well, the use by the traveling public in our

22  recreation facilities, camp grounds, picnic grounds, wayside

23  stops, and so forth, is one of the heavier uses.  The use we

24  make of water in fighting fires, of course, is a heavy one,

25  depending on the presence or absence of fires.  The use that

Stevenson - Direct

7618

G

Z40

1  wildlife makes of the water in living on National Forest

2  lands.  The use our people make, and I use "our" in our

3  protection forces and administration forces, of water on

4  National Forest land.  Most of our facilities and our per-

5  sonnel either live on or immediately adjacent to National

6  Forest lands.

7      Q  Would you describe the wells or similar facilties

8  that are located in the Cleveland National Forest and locate

9  them by legal subdivision and if they have a name ascribed

10 to them, why, would you give the name?

11     THE COURT:  You mean within the watershed of the Santa

12 Margarita?

13     MR. VEEDER:  That is correct, your Honor, within the

14 watershed of the Santa Margarita.

15     THE WITNESS:  May I use--

16 BY MR. VEEDER:

17     Q  You can use your notes if you want to.  I am speaking

18 of wells now.

19     A  Oh, wells.  There are three within the Santa

20 Margarita watershed and at our Oakgrove station.

21     Q  Would you give the legal subdivision of that?

22     A  Southeast Quarter of the Southeast Quarter of

23 Section 17, Township 9 South, Range 2 East, San Bernardino

24 Base and Meridian.  The well at Oakgrove is a drilled well

25 eight inches in diameter, 62 feet deep.

G

z41

Q  And have you estimated the need from that well for--

A  Yes.

Q  By the way, what is the principal use of that well at the present time?

A  It is domestic and recreational.  There is a camp-ground across the road that is fed by this well.

Q  And what are the needs from that well, if you have that?

A  We estimated 325,000 gallons a year.

Q  And what plans, if any,have you for future development of that area?

A  We plan additional barracks and campground enlarge-ment and estimate an additional 100,000 gallons would be needed from that source.

Q  Would you refer to such other wells as are located there.

A  We have a well at Dripping Springs in the Northeast Quarter of the Northeast quarter, Section 22, Township 8 South, Range 1 West, San Bernardino Meridian.

Q  Would you describe that well, please.

A  That is eight inches in diameter and 73 feet deep. Its estimated needs are-- that we now have, 50,000 gallons a year, and we believe we will need an additional 50,000 gallons with increase in the camp grounds, with increases in the residences for personnel that they plan to put there.  There

Stevenson Direct

Z42

1    is another one at Dripping Springs in our camp ground.  That

2    is a dug well-- oh, pardon me-- it is in the Northeast

3    Quarter, Northeast Quarter of Section 22, Range 8 South, 1

4    West.

5            THE COURT:  Which well?

6            THE WITNESS:  This is another one that is in our

7    public camp ground.

8            THE COURT:  I know.  What description you gave per-

9    tains to both and--

10           THE WITNESS:  This is the dug one, sir.

11           THE COURT:  Did you give a description for the--

12           THE WITNESS:  Yes.  This is dug five feet in diameter

13   and 28 feet deep.  And our present needs are 50,000 gallons

14   a year, and we anticipate an additional 50,000 gallons by

15   1965.

16   BY MR. VEEDER:

17           Q  Now, what are the other sources of water that the

18   United States Forest Service is utilizing on the National

19   Forest?  That would include springs and other sources.

20           A  This is present use of water on National Forest

21   lands?  There is one we call Sourdough Springs in Southwest

22   Quarter of the Northeast Quarter of Section 25, Township 9

23   South, Range 1 East.

24           Q  Have you made calculations as to the need for water

25   from that spring?

A   Yes; 10,000 gallons per year on that one.  And we anticipate that we would have an additional-- pardon me-- yearly use of 25,600 gallons-- 680 gallons in the future.

THE COURT:  What is this, recreational activities?

THE WITNESS:  This will be primarily recreation, sir, yes.

THE COURT:  Presently--

THE WITNESS:  No, that is planned use.

THE COURT:  What is the 10,000?

THE WITNESS:  We have a water development there for livestock and wildlife that uses about 10,000 gallons a year. After we put in some recreation developments, a small area of six camp ground units, we will need about 25,680 gallons.

Q   Now, what are the other sources of water on the Cleveland National Forest concerning which you have data?

A   Well, Eagle Creek Springs which is in the Southeast Quarter, Southeast Quarter of Section 14, Township 9 South, Range 1 West.  We estimate we will need 2100 gallons a year-- I mean we are using 2100 gallons a year and will need in the future for fire, wildlife, and recreation, 8,500 gallons a year.

Q   Would you proceed to describe the other, Aguanga.

A   There is an Aguanga Mountain Spring that has been developed, Southwest Quarter, Northwest Quarter of Section 19, Township 9 South, Range 2 East, in which we are using some

G

Z44

1    10,000 gallons a year. Our plans and anticipated use for

2    fire and wildlife are some 1,600 gallons-- pardon me, 10,600

3    gallons per year.

4        Q  And would you describe your next source of water.

5        A  We have one called Crosby. It is in the Northeast

6    Quarter of Southeast Quarter of Section 10, Township 9 South,

7    Range 1 West; in which we have a yearly consumption of 4,700

8    gallons per year and anticipating an additional 5,300 gallons

9    per year.

10        THE COURT:  It will make 10,000?

11        THE WITNESS:  Right.

12   BY MR. VEEDER:

13        Q  And would you describe your next source.

14        A  Long Canyon Springs, Southeast Quarter, Northwest

15   Quarter of Section 16, Township 9 South, Range 1 East. We

16   have estimated needs or present needs of 10,000 gallons a

17   year and anticipate an additional 600 gallons per year,

18   primarily for wildlife.

19        Q  And would you proceed from there and describe the

20   other springs.

21        A  Cusca Valley Spring in the Southwest Quarter,

22   Southwest Quarter of Section 17, Township 9 South, Range 1

23   East, presently needing 10,000 gallons a year and anticipate a

24   need, primarily for fire, of 42,800 additional gallons. We

25   have one at-- That is a surface catchment.

G
Z45

1      Q  When you say "a surface catchment," what do you mean
2  by that, Mr. Stevenson?
3      A  We found through the use of the old cistern principle
4  of putting aprons or building an apron on generally ridges
5  above the road we can catch the precipitation and drain it
6  into a container or a tank or, in some instances now, we are
7  building underground vaults, storing the water there until
8  needed, primarily for fire, as a source of water in fire
9  suppression.  And that is what we have called here a surface
10  catchment.  There is no stream or spring development.  It is
11  using the cistern principle of filling a tank for later use.
12      Q  You have plans for future development of that
13  particular catchment?
14      A  It is in place, and we anticipate increasing it.
15  It is now-- I don't think I gave the-- that is in the South-
16  west Quarter of the Northeast Quarter of Section 4, Township
17  10 South, Range 2 East.  We are now using 2,300 gallons a year,
18  and we anticipate an additional 7,700 gallons per year.
19      Q  Would you just briefly refer to-- which other ones
20  now are in place?
21      THE COURT:  The catchment basins?
22      THE WITNESS:  These are catchment basins.
23      MR. VEEDER:  Yes.
24      THE WITNESS:  We have one in the Northeast Quarter of
25  the Southwest Quarter of Section 30, Township 9 South, Range

G

z46

1  2 East. That is primarily developed-- this is a small one,

2  600 gallons. Now, here again, I had better explain this.

3  These are primarily to develop for wildlife. They are what

4  we call a quail guzzler and trap water on the cistern principle

5  on an apron, either on concrete or macadam type surface, drain

6  it into an underground reservoir with an incline; that is, the

7  water recedes. The birds and small animals can follow the

8  water down and back up above there. There are four of those.

9  And I gave the location of two of them. One of them, I guess.

10 There is another one in the Northeast Quarter of the Southeast

11 Quarter of Section 25, 9 South and 1 East. There is one in

12 the Northeast Quarter of the Northeast Quarter of Section 31,

13 9 South, Range 2 East. There is one in the Southwest Quarter

14 of the Northeast Quarter of Section 4, Township 10 South,

15 Range 2 East. All these are about 600 gallons a year use,

16 and they will remain that. There isn't much chance of in-

17 creasing their capacity.

18      THE COURT: I take it we can stipulate that all the

19 water for quail guzzlers is properly usable and expended.

20 There is no disagreement on that?

21      MR. STAHLMAN: I think it is a very necessary and

22 beneficial use.

23      THE COURT: Any disagreement on that?

24      MR. SACHSE: We are willing to stipulate.

25      THE COURT: I don't know whether the river can stand

G

Z47

1    the strain, though, of their future development of--

2         MR. SACHSE:  It is kind of rough on the Marines to

3    have all that quail up there and no water.

4         THE COURT:  --10,000-gallon projects.  I don't know

5    whether the river can stand the strain of that, though.

6         MR. VEEDER:  Mr. Stevenson, they kick me all around this

7    way all the time.  Don't let them kid you.  You need quail.

8    You need water for quail.

9         MR. STAHLMAN:  I am wondering if your Honor would

10   consent to requesting the Government to furnish us a map as

11   to where these quail watering places are located.

12        MR. VEEDER:  That is exactly why it is put in orally.

13        THE COURT:  Together with the quail's population in the

14   area and whether it is open or closed areas.

15        MR. VEEDER:  It will be important, your Honor.  I am

16   glad everyone is willing to stipulate, because I have 50 of

17   these here.

18        THE COURT:  Quail guzzlers?

19        MR. VEEDER: Yes.

20        THE WITNESS:  Those are fire.  And the overflow of some

21   of them-- they come from a live source-- are being developed

22   for wildlife.

23        THE COURT:  Mr. Witness, we would go crazy in this

24   lawsuit if we didn't have a little fun once in a while.

25        THE WITNESS:  Yes.

7626

G

Z48

1        THE COURT:  It gets to be a pretty dry and tedious

2   thing.

3        You have a list of these that you can put in without--

4        MR. VEEDER:  Yes, I do, your Honor.  I would like to

5   have the witness explain, though, the plans for future de-

6   velopment that have been formulated.

7        Q  Mr. Stevenson?

8        MR. STAHLMAN:  May I ask this question of the witness:

9   Are all of these quail guzzlers 600 gallons or are there some

10  larger than that?

11       MR. VEEDER:  We have some bigger quail, Mr. Stahlman.

12       THE COURT:  Go ahead, Mr. Witness.

13  BY MR. VEEDER:

14       Q  I would like to have the witness explain the de-

15  velopment that is contemplated and that has been approved by

16  the Department of Agriculture.  Would you just go ahead and

17  state in there what kind and type of development that you

18  plan for the Cleveland National Forest?

19       A  The water developments that we have planned are,

20  in large part, surface catchments for the catching of water

21  that we will store underground in tanks of 10,000 gallon

22  capacity.  Generally they are 10,000 gallons.

23       Q  What is the primary object of that?

24       A  Primarily for fire. And the wildlife will get very

25  little use from them, because we store the water until fall,

G

Z49

Stevenson    Direct                                                 7627

1    and then they would be drained and filled again during the

2    winter.

3           Q  What are your plans from the standpoint of location

4    of those structures?

5           A  Well, our objective is to try to get enough of those

6    so that there will be one of them about every half hour travel

7    time in mountainous areas from a fire to a source of water

8    and back to the fire again.  So far we have had no real

9    substitute for water in fire suppression, although we have

10    had additives to it.  In the presence of a fire, in suppressing

11    even forest fires, is very important.

12           THE COURT:  These 10,000 gallon tanks would only be

13    good to put out an insipient fire; they wouldn't be much

14    help after a fire got underway, would they?

15           THE WITNESS:  Well, there are about, let's see, our

16    tankers, at most, carry about 300 gallons.  So we would have a

17    number of fills there from each one of those.  And in the

18    event the fire got large, say, as the recent Stuart fire where

19    we burned thousands of acres, then, of course, it is used

20    only along the perimeter of it instead of suppressing the

21    whole fire.

22           MR. VEEDER: If there is an agreement as to the--

23    There are 50 of these developments that are contemplated,

24    your Honor.  If there is agreement on those, why--

25           THE COURT:  50 each with a 10,000-gallon capacity?

MALCOLM E. LOVE, OFFICAL REPORTER

G

Z50

MR. VEEDER:  Some of them are larger.

THE WITNESS:  Some of them are larger.  Now, those are catchments.

MR. VEEDER:  Those are catchments.

Q  Refer to the larger ones, the reservoirs.

A  There are some--

Q  Go ahead.

A  There are some ten or eleven springs or streams that have a tank and a wildlife, well, open basin in connection with it where the water source would be diverted into the tank and the overflow run into a wildlife watering trough. And then the water would be stored in the tank until it is used for fire.  And, of course, if it wasn't used, the water would run from the source into the tank, into the wildlife drinker and then on into the natural channel again.  And we have some ten, eleven or twelve of those within this 50.

THE COURT:  Proposed?

THE WITNESS:  Yes.  We have been making about three or four or five of these a year, so this is our plan for the next, well, it looks like until '68.

THE COURT:  We have a column on the right-hand side of this document, document called "Water Use Inventory" showing these 50 proposals.  The column on the right says "Water Rights Status" and then at the head it says "None initiated" and then ditto marks all the way down.

G

Z51

1    THE WITNESS:  That is right; on the planned uses.

2    THE COURT:  Planned uses of this water you propose to

3 initiate your rights under State law; is that what you pro-

4 pose?

5    THE WITNESS:  Yes.

6    MR. VEEDER:  Now, that is a legal question.

7    MR. SACHSE:  It was coming on cross, Mr. Veeder, if

8 the Judge hadn't asked it.

9    THE COURT: I was just asking the witness a question.

10    MR. VEEDER:  Well, I believe it is a legal question,

11 your Honor, if the Forest--

12    THE COURT:  I am not passing on whether he has to or

13 not.  I am asking whether he proposes.  Is that what you

14 propose to do, initiate these rights under State law?

15    THE WITNESS:  We applied for water under State law,

16 yes.

17    THE COURT:  Now, I notice several of these are of

18 considerable size.  One at Long Canyon would be 132,000

19 gallons, following recreational use for 40 people; right?

20    THE WITNESS:  Yes.

21    THE COURT:  One at Cottonwood Creek, 56,800 gallons,

22 recreational use for 16 people; and one at Sawyer's Springs

23 for 85,200 gallons, recreational use for 24 people.  And

24 several of them listed in acre feet.  One unnamed spring is

25 Roadside Cut No. 36, 113,600 gallons; and a similar one, No.

G

Z52

1    50, 113,600 gallons.

2         MR. STAHLMAN:  Your Honor, you said gallons.  Is that

3    the capacity of it or is that the amount per year?

4         THE COURT:  Well, I don't know.  You have two figures

5    in there, No. 50.  You have 10,000 gallons, and then 113,600

6    gallons.

7         THE WITNESS:  Fire is the 10,000 gallons which he

8    read.  Follow along with the top word.

9         THE COURT:  And the recreation--

10        THE WITNESS: And the recreation would be that.

11        THE COURT:  Is that capacity or is that use?

12        THE WITNESS:  The way we estimated those needs was to

13   determine the, first of all, for recreational plans, how many

14   units we had, and then determine the number of days of man

15   use we would have and figure about 40 gallons a man day.

16        THE COURT:  This is the amount of water you would

17   anticipate you would use?

18        THE WITNESS:  Right.

19        THE COURT:  The maximum amount?

20        THE WITNESS:  Yes.

21        THE COURT:  In the case of fire--

22        THE WITNESS:  It may or may not be used.

23        THE COURT:  --those are capacities?

24        THE WITNESS:  Yes.

25        THE COURT:  10,000--

G

Z53

1      THE WITNESS:  It would be stored, and then if it

2   wasn't used during the summer, the valve opens, and it would

3   go into other streams.

4      THE COURT:  If it was used, you would attempt to fill

5   that tank as soon as you could?

6      THE WITNESS:  No, probably not, sir.  Once the area is

7   burned, there would be no reason to fill it again until

8   winter, and then winter storms would do that.

9      THE COURT:  Well, look the list over, gentlemen, at the

10   recess and see if we can't just put it in as proposed uses.

11      Take a short recess.

12      (Recess.)

13

14

15

16

17

18

19

20

21

22

23

24

25

7632

MR. VEEDER:  You have no objection to this?

MR. SACHSE:  No objection.

MR. MOSKOVITZ:  We suggest that these be put in evidence as exhibits and they will all be there and can be referred to.  We have no objection to doing it that way.

MR. VEEDER:  I have hestitated, in regard to the diversions off of the Forest lands by private individuals, to use the tabulation which we have for the reason that it is reflective of acreages concerning which we have no knowledge and quantities concerning which we have no knowledge.  I believe the individuals will probably want to put in their own facts on that matter.

MR. SACHSE:  There is one there, who is my client, who will put them in.  But I can't speak for the rest.

THE COURT:  First, the other exhibits that we were talking about, the survey of uses of water--

MR. VEEDER:  As I understand there is no objection to that.

MR. MOSKOVITZ:  No objection to that exhibit.

THE COURT:  That will be Exhibit 146, received in evidence.

(Plaintiff's 146 received.)

MR. VEEDER:  In regard to the present uses, concerning which Mr. Stevenson has testified from the standpoint of the uses of the United States, we already have those in.  But there

are these individual uses which are similarly tabulated.

THE COURT:  Apparently the witness couldn't testify to it either.

MR. VEEDER:  That is the problem, your Honor.

THE COURT:  Why don't we mark it for identification? If somebody later on wants to identify part of it or to use it, all right.  What do you want to do with it?  I don't care.

MR. VEEDER:  I would just as soon have the exhibit admitted to the extent of the names of the springs from which diversions are made and the points of diversions.  Beyond that, your Honor, we simply don't have the data, and I don't know where it would come from.

THE COURT:  This document will be marked Exhibit 147 for identification.

Mr. Witness, I take it that this is a list of diversions, proposed diversions of water to be used off of the  National Forest?

THE WITNESS:  No, sir.  I am assuming that this long one is the one you talked about a moment ago.

THE COURT:  That is in evidence.

MR. VEEDER:  That is already in.

THE WITNESS:  I see.

THE COURT:  The one with 24 items.

THE WITNESS:  Yes.  From 12 on down are those diversions by private parties of water on National Forest lands to be used

1        somewhere else.

2                 THE COURT:  Off of the Forest?

3                 THE WITNESS:  I think all of them are off of the Forest.

4                 THE COURT:  The first 11, however, are to be used by

5        the United States.

6                 THE WITNESS:  Right.  In addition to those 11, there

7        are 3 more that are wells that don't show on that, that we

8        talked about.

9                 THE COURT:  What is the difference between these first

10       11 on Exhibit 147 and the fifth one shown on Exhibit 146?

11                THE WITNESS:  These are presently in use--are developed

12       and are presently in use.

13                THE COURT:  Which are these? The first 11?

14                THE WITNESS:  The first 11 are presently in use.  And

15       over on the right-hand side of the page there are the same

16       11 with the anticipated additional use.

17                THE COURT:  All right.  As far as the first 11 shown on

18       Exhibit 147, the only difference between them and the 50 items

19       shown on Exhibit 146 is that those 50 items on Exhibit 146 are

20       all contemplated for use?

21                THE WITNESS:  Right.

22                THE COURT:  While this first 11 on Exhibit 147, show

23       a present use plus an enlarged contemplated use?

24                THE WITNESS:  Yes.

25                THE COURT:  Do items 12 to 24 show a present use by

H

A 4

1    private owners as well as a contemplated use?

2         THE WITNESS:  We do not know what the present use is.

3    This was taken from copies of the water license or permit that

4    we had of record.  We didn't know what their use of the water

5    was--how much there was.

6         MR. VEEDER:  And those are defendants in the litigation

7    and I assume they will testify themselves in regard to whatever

8    their uses are.

9         THE COURT:  Then can we limit the exhibit as to items

10   12 to 24 as to the name of the spring, or un-named spring, if

11   that may be the case, the column of water source, the column

12   of the legal description--section, township and range, the

13   column as to land owner, which is the United States all the

14   way through, and the balance of the material as far as name of

15   user, water rights status, with certain numbers in here, water

16   amounts, place of use, use period, consumption, date first

17   used, planned future use, etc.--all of that material from the

18   name of the user, including the name of the user, on across,

19   will be limited to this, that this is the information that the

20   Forest Service now has in their files and they don't vouch for

21   it, they merely compiled the information the presently have.

22        THE WITNESS:  That is right.

23        MR. VEEDER:  We certainly can't offer it because we

24   don't know the correctness of it.

25        MR. SACHSE:  That is very satisfactory.

1        THE COURT:  Exhibit 147 will be received in evidence

2   for the uses as indicated.  I am going to mark on the bottom

3   section in red."Limited to compilation of information in the

4   files of the Forest Service."  Is that satisfactory?

5        MR. SACHSE:  Yes, your Honor.

6        ( Plaintiff's Exhibit 147 received in evidence as

7   indicated.)

8        MR. VEEDER:  If we are going to pursue this course,

9   it is entirely satisfactory with me, your Honor.  We now have

10   similar data as the two last exhibits for the Trabuco Division

11   of the Cleveland National Forest.

12        THE COURT:  What division were these first two?

13        THE WITNESS:  Palomar Ranger District.

14        THE COURT:  Exhibits 146 and 147 are the Palomar Division?

15        THE WITNESS:  Palomar Ranger Districe is the name of

16   that area.

17   BY MR. VEEDER:

18        Q  Mr. Stevenson, would you state into the record the

19   data that you have in regard to the Trabuco Division of the

20   Cleveland National Forest?

21        A  We prepared an inventory for the Trabuco District

22   of the Cleveland Forest that falls within the Santa Margarita

23   watershed, of those special uses granted to private people to

24   build structures on  National Forest lands in the course of

25   taking water from National Forest land to some other location,

1   and there are 3 of those.

2        MR. VEEDER:  I would like to have that marked, then,

3   your Honor, and we will substitute that page and have a better

4   appearing exhibit.

5        THE COURT:  Mark it Exhibit 148, and again this will be

6   limited now to a cataloging of the information in the files of

7   the National Forest Service as to names of users, application

8   numbers and the various types of information, merely a cata-

9   loging of the information in their files.

10       MR. VEEDER: May I have that marked then, your Honor.

11       THE COURT:  With that understanding, it will be marked

12   Exhibit 148 and received in evidence.

13       ( Plaintiff's Exhibit 148 received as indicated.)

14       MR. VEEDER:  I have another one, the same material,

15   only in regard to future development.

16       THE WITNESS:  Planned use for the same area.

17       MR. VEEDER:  May I have that marked 149, your Honor.

18   Counsel has seen both these exhibits.  I will substitute the

19   pages, however, if it is agreeable.

20       THE COURT:  Exhibit 149 will be the planned use in the

21   future, and this concerns entirely the United States.

22       THE WITNESS:  Right.  I

23       THE COURT: I want to make sure of that.

24       THE WITNESS:  Yes.

25       THE COURT:  So that Exhibit 149 actually corresponds to

1   Exhibit 146?

2          THE WITNESS:   Right.

3          THE COURT:   This is the Trabuco District of the Cleveland

4   National Forest.   It will be received in evidence as showing

5   the planned uses of the United States for the future.   Exhibit

6   149 is received in evidence.

7          (Plaintiff's 149 is received in evidence.)

8          MR. VEEDER:   And if it is agreeable, your Honor, just

9   from the standpoint of the record, I will substitute pages.

10          THE COURT:   All right, get me a copy, too, while you

11   are at it.

12          MR. VEEDER:   Yes I will, your Honor.

13          Q   Would you state into the record, Mr. Stevenson, the

14   importance of the development that you have undertaken and are

15   contemplating in regard to fire protection in the National Forest?

16          A   For that area that is within the--?

17          Q   Palomar and Trabuco both.

18          A   We have around the perimeter of the hills comprising

19   the National Forest within this watershed, fire protection

20   forces  equipped with fire fighting trucks and tools--

21          Q   My question is, the importance of these developments

22   that we are talking about now, these fifty different--

23          A   Oh, pardon me.   The water developments are a tool in

24   the suppression of fires that occur within the area in which

25   the tanks, or water vaults, are located as one of the facilities

H

A 8

1    that help us suppress fires once they occur.  With the personnel

2    we have stationed in strategic locations throughout the water-

3    shed, the prime function of our service in the protection and

4    management of watersheds is the maintenance of a cover and

5    stabilization of the soil within the watershed, and these water

6    developments will be instrumental in suppressing fires within

7    that area.  We are beginning now to use more and more helicopters,

8    for instance, to put people on a fire once it occurs within

9    these areas, because there aren't roads in a number of instances

10   where we anticipate making these water developments.  With the

11   use of vac-pack pumps, hoses, etc., they can use the water then

12   without going very far for it, of course.  These are anticipated

13   to be within about half a mile apart throughout the National

14   Forest and therefore within this area.

15        We have through the last four years, been developing

16   a plan for pre-suppression of a fire that would occur within

17   each watershed area--what we call fire replanting.  We try to

18   determine what is needed and what can be done to suppress a

19   fire once it starts before the fire starts and mark the location

20   of various key strategic ridges on the ground, the length of

21   the ridge, the type of equipment it would take to prepare a

22   fire line down the ridges once a fire occurs, to where that

23   ridge will be a key in suppressing the fire, and along those

24   main key ridges is the location of these proposed fire water

25   developments.

H

A   9

1        MR. VEEDER:  I have no further questions your Honor.

2        MR. SACHSE:  I have no questions.

3        MR. MOSKOVITZ:  I have no questions.

4        MR. STAHLMAN:  Are there totals on these as to what

5   the total use of water is?

6        THE WITNESS:  We made estimates of the total for--

7   let's see, the plan for future water use for these fifty that

8   were referred to previously--

9        THE COURT:  That is Exhibit 146.

10        MR. STAHLMAN:  Are there totals on the exhibit?

11        THE COURT:  Did you total them up?

12        THE WITNESS:  Yes.  I don't think it is on there.

13   The total is 18,169,000 gallons or about 56 acre feet.  On

14   the ones that are in place, plus the wells,--

15        THE COURT:  Let me interrupt you a minute.  This

16   planned future use, the fifty, you say that would be in the

17   Palomar area only?  Not in Trabuco?

18        THE WITNESS:  Not in Trabuco.

19        THE COURT:  All right, this is Palomar.  Now the present

20   uses--

21        THE WITNESS:  The present uses within the Palomar District

22   are estimated as--now that will include the 11 that we had

23   talked about.  I wish I knew that exhibit number.  That was

24   Exhibit 147, was it?

25        THE COURT:  Yes, that is on Exhibit 147.

1        THE WITNESS:   There were 11 items there, plus the three

2   wells that I mentioned earlier, a total of 476,500 gallons a

3   year.   That would be a little over an acre foot, wouldn't it.

4   There is about 326,000 gallons per acre foot.

5        THE COURT:   All right.

6        THE WITNESS:   The planned future use on the same water

7   developments would be an additional 290,580 gallons per year,

8   or about an additional acre foot.

9

10                      CROSS EXAMINATION

11   BY MR. STAHLMAN:

12        Q   Have you totaled the amount of water taken off by

13   private individuals?   Is that a substantial amount.

14        MR. VEEDER:   We don't have that information.

15        THE WITNESS:   I don't know what that is.

16        THE COURT:   What about Trabuco? These were all Palomar.

17        THE WITNESS:   I didn't add it up, sir.   It would have

18   to be added under " Yearly Consumption" it indicates one for

19   each item, but I didn't add it.   There are seven of them.

20        THE COURT:   All right.

21        Anything further?

22        MR. VEEDER:   I have no further questions.

23   BY MR. STAHLMAN:

24        Q   These persons who divert water off the National

25   Forest, do they receive some sort of permit from the Government,

1    in addition to the permit from the State?

2        A  We issue a special permit for their use of National

3    Forest land on which to build and maintain a structure and

4    a conduit or facility to take the water from that point to

5    another point.

6        Q  Is there any limitation to that as to time?   In

7    other words, can they continue to do that from there on out?

8        A  As long as they live within the terms of the special

9    use agreement, or we need the land for a higher use, they can

10   use the land for any number of years.

11       Q  How about if you need the water?

12       MR. VEEDER:  I object; that is a legal conclusion and

13   is beyond the scope of the direct examination.

14   BY MR. STAHLMAN:

15       Q  Is there anything in the permit to the effect that

16   if you need the water--

17       MR. VEEDER:  It is not in evidence.  I think the best

18   evidence would be the permit.

19       MR. STAHLMAN:  All right, let it go.

20       THE COURT:  What is the practice of the Agency?

21       MR. STAHLMAN:  That is what I was getting at, your

22   Honor.

23       MR. VEEDER:  Your Honor, I can say what the practice

24   is.  The practice varies throughout the country.

25       THE COURT:  I realize that the practice varies.  But

1    I will give a specific problem.  We will say that the

2    Government says they are short of water downstream, Fallbrook

3    claims that they want to appropriate some unappropriated

4    flood waters that would otherwise go to waste, and so up in

5    the National Forest in this particular area where there are

6    a lot of springs and wells,  some individual who  some land

7    outside the Forest makes application and wants to appropriate

8    a couple of acre feet of water and take it off the National

9    Forest onto private land, and we will say that this water

10    otherwise would go down some channel and finally get into the

11    stream and feed the Santa Margarita.  What does the Government

12    do then?

MR. VEEDER:  The permit, your Honor, is limited to the
use of the land and the building of the structure and the
placement of the structure.  It doesn't relate to the right
to the use of water.

MR. STAHLMAN:  That is obtained from the State, then,
is it?

MR. SACHSE:  That is obtained from the State.

MR. VEEDER:  And it depends on what state you are in
and a great many other things.

MR. SACHSE:  In California it would be obtained from
the State of California.

THE COURT:  Yes, but I take it that this permit to use
Government land is permissive.  A person could get a permit

1  from the State to use water, but if the Federal Government

2  said "Well, you got a permit from the State, but we are sorry,

3  we are not going to give you access across our land," they

4  couldn't take the water, could they?

5      MR. SACHSE:  You are stating it backwards, your Honor.

6  The first thing that you have to file on your application

7  for water is that you have the right to the proposed point of

8  diversion and that you have access, and you couldn't even

9  file your application with the State, in this hypothetical

10  case, unless you first obtained the use permit from the Federal

11  Government.  Once having obtained the use permit, then you

12  could file your application with the State.  That is the actual

13  mechanical procedure.

14      I have one of things myself up in Mono County.

15      MR. STAHLMAN:  The amount of water at this time doesn't

16  appear to be substantial, but in the future, what would the

17  situation be?

18      MR. VEEDER:  It becomes increasingly important.

19      THE COURT:  You can use your imagination.  You go to

20  the Federal Government and you say, " I want access to go

21  across Government land and I want to put in a little dam up

22  there."  The Government gives you permission, through the

23  Forestry Department, to stick a little dam in and put a pipe

24  across.  Then you go to the State and say, " I have access and

25  I want a permit to take this water."  You multiply this a few

H
A 14

1    times--

2         MR. SACHSE:  Then you are going through the State

3    appropriative procedures and notices will be given downstream

4    and if they think there is a shortage somebody will complain.

5         THE COURT:  Notice is given downstream?

6         MR. SACHSE:  Yes.  Maybe Mr. Moskovitz ought to speak

7    for the State.

8         MR. VEEDER:  Why?

9         MR. STAHLMAN:  I think we can get it in now that Mr.

10   Veeder has sort of pulled his tail feathers down.

11        Q  Are these permits revocable?

12        THE COURT:  Permits given by the Forestry Service

13   for the access?

14        MR. STAHLMAN:  Yes.

15        THE WITNESS:  As I mentioned a moment ago, if we found

16   that the permitee was not living up to the terms of his permit

17   and/or there was a higher use for the land involved, they

18   would be revocable.

19        MR. VEEDER:  They are revocable under those circumstances.

20        MR. STAHLMAN:  Is there a published rule on that? Where

21   do you get your source of authority to operate under that?

22        THE COURT:  Regulations of the Forest Service?

23        MR. VEEDER:  I can get you the citation.

24        MR. STAHLMAN:  Do you know, or don't you know?

25        MR. VEEDER:  If you want me to get you the citation of

H

A 15

1    those, I can, your Honor.  I can give you the basic Congressional

2    Authorization, and also the rules and regulations that have been

3    promulgated and published in the Federal Registrar.

4         MR. STAHLMAN:  Are they revocable?

5         MR. VEEDER:  Yes.

6         MR. SACHSE:  I will stipulate that they are revocable.

7         THE COURT:  Get the citations and put them into the

8    record.

9         MR. VEEDER:  I will, your Honor.

10        I have no further questions.

11        THE COURT:  Thank you, Mr. Stevenson.

12        MR VEEDER:  I will call Col. Bowen.

13        I would like to finish up on these aerial photographs,

14   if I may.

15        THE COURT:  How many more do we have?

16        MR. VEEDER:  Just about done, your Honor.  We are

17   down to W now.

18        THE COURT:  What streams do we still have to follow

19   down?

20        COL. BOWEN:  Temecula Creek, I believe, is the only

21   one remaining, your Honor.

22        THE COURT:  That is going to be 78W.

23        MR. VEEDER:  Yes, your Honor.

24

25

H
A 16

1                         ALLEN C. BOWEN,

2      recalled as a witness in behalf of the people having been

3      previously sworn, testified further as follows:

4

5                    FURTHER DIRECT EXAMINATION

6      BY MR. VEEDER:

7           Q  Would you proceed now, Colonel, marking them  W1

8      on through, using the 78 series.

9           A  Plaintiff's 78W1 is a vertical aerial photograph

10     indexed to sheet No. 5 of Plaintiff's 145, and with a red

11     pencil I will mark "78W1" over the numerals 5-0159 which on

12     sheet No. 5 of Plaintiff's 145.  78W1 is also indexed to the

13     Palomar Observatory quadrangle reduction in Plaintiff's 145,

14     and I will write "78W1" over the numerals 5-0159 which appear

15     on the Palomar Observatory quadrangle reduction.  78W1 shows

16     the head waters of Temecula Creek from the watershed boundary

17     crossing the State Highway 79, which appears traversing the

18     upper right-hand quadrant of 78W1, and with a red pencil I

19     will mark "St ( for State ) 79" to the right of the highway

20     alignment as it is shown on Plaintiff's Exhibit 78W1.

21                THE COURT:  The head waters of the Temecula?

22                THE WITNESS:  Yes, your Honor.

23                THE COURT:  What is the sheet in front of you?

24                THE WITNESS:  Sheet No. 5 of Plaintiff's 145, your

25     Honor.

H  2
A  17

1        THE COURT:  Where are the head waters shown there?

2        THE WITNESS:  The head waters begin north of the fire

3    truck trail shown on sheet No. 5 of Plaintiff's 145, labeled

4    Halfway Truck Trail.  The Halfway Truck Trail shows also on

5    78W1 extending southwesterly from State Highway 79 in the

6    lower right-hand quadrant of Plaintiff's Exhibit 78W1.  It

7    extends straight for a distance of a little less than a mile

8    and then becomes very winding as it climbs the mountain to

9    the top of the ridge.

10        MR. STAHLMAN:  May I ask this question to get oriented,

11   please.  Referring to this map now, Government's Exhibit 17,

12   is that at this point or at this point?

13        MR. SACHSE:  Is it Dodge Valley, or Chihuahua Valley?

14        THE WITNESS:  Halfway Truck Trail is in the Dodge Valley.

15        MR. SACHSE:  Could you give us the sections of these

16   head waters, please, Colonel.

17        THE WITNESS:  I will refer to Plaintiff's Exhibit No.

18   17, and if I may borrow that acetate plat, Scale 1 to 62,500,

19   Dodge Valley lies in part in Sections 21,22,26,27, 35 and 36,

20   Township 9 South Range 2 East.

21

22

23

24

25

A    The headwaters of Temecula Creek are shown draining northward from Aguanga Mountain, which appears in the lower left-hand corner of 78W-1, collecting in the channel of the creek which runs to the northwest from the intersection of the halfway truck trail with State Highway 79, as shown on Plaintiff's 78W1; the course of Temecula Creek continues on leaving the area photographed on 78W1 in the upper left-hand corner.   The exhibit identification in each instance will be placed on the north edge of the photograph.   78W2 is a vertical aerial photograph showing a portion of the Temecula Creek stream channel.   It is indexed to the Palomar Observatory quadrangle reduction contained in Plaintiff's 145.   And with a redpencil I will write "78W2" over the numerals 6-0021 which appear on the Palomar quad reduction of Plaintiff's 145. A portion of Temecula Creek, which is shown on 78W2, lies generally in Sections 21, 22, 27, 28, and 34, 9 South, Range 2 East.   Temecula Creek is shown on 78W2 entering the area of the photograph on the right center margin and continuing on northwesterly, leaving the area of the photograph to the left of center of the upper boundary of the photograph.

MR. MOSKOVITZ:   As you go along, will you identify these valleys and the streams?

THE WITNESS:   I would be happy to do that, Mr. Moskovitz.

Dodge Valley is shown in the right center portion of

1    78W2. And just before the stream leaves the area of the

2    photograph on 78W2 it passed there a portion of Oakgrove

3    Valley which is contained in Sections, 16, 17, 20, and 21,

4    9 South, 2 East.

5         THE COURT:  Write on there "Dodge Valley" and "Oak-

6    grove."

7         THE WITNESS:  With a red crayon on 78W2 I will write

8    "Oakgrove Valley," abbreviating "Valley," "V-a-l."  And below

9    Dodge Valley I will write with a red crayon "Dodge Valley,"

10   indicating that area on 78W2.  The mountainous area occupying

11   the bulk of 78W2, the dark, irregular area, is the northerly

12   slope of Aguanga Mountain.  Most of it is in the Cleveland

13   National Forest.  And I might point out the State Highway 79

14   traverses this photograph in part in the northeasterly portion

15   or the upper right-hand quadrant.  I will write "State 79,"

16   abbreviating "State," "S-t" on the face of 78W2.  In addition

17   to that, the Oakgrove fire truck trail, which leads to the

18   top of the Palomar Ridge, is shown as a very irregular white

19   line trending southerly and then westerly from Oakgrove Valley,

20   as shown on 78W2.  78W3 is a vertical aerial photograph showing

21   the area partly included in 78W2 and extending it on northerly

22   from 78W2.  78W3 is indexed to the Aguanga quad reduction

23   of Plaintiff's 145.  And I will write with a red pencil

24   "78W3" over the numerals 6-0020 which appear on the Aguanga

25   quad reduction.  78W3 is also indexed to the Palomar

Bowen   Direct

I

Z56

1  Observatory quadrangle, and I will write in red "78W3" over

2  the numerals 6-0020, which appear on the Palomar Observatory

3  quad reduction.

4      Now, 78W3 shows Oakgrove Valley, shows more of Oak-

5  grove Valley than is shown on 78W2.  And I will write "Oak-

6  grove Valley" indicating the location of that valley.

7  Temecula Creek enters the area photographed in 78W3 in the

8  lower right-hand corner and continues diagonally across the

9  area of the photograph, leaving just below the upper left-

10  hand corner.  Similarly, State Highway 79 traverses 78W3, and

11  I have written "S-t" for "State" 79 northerly of the align-

12  ment of that highway.  The Oakgrove fire truck trail is also

13  displayed on 78W3 as it was on 78W2.  Chihuahua Creek is

14  shown entering the area of the photograph 78W3 at the upper

15  right-hand corner and continuing easterly across the photograph

16  to its confluence with Temecula Creek in Section 18, 9 South,

17  2 East.  A portion of Temecula Creek which is shown on 78W3

18  is in part in Sections 16, 17, 18, 20, 21, and 22, 9 South,

19  2 East.

20      78W4 lies north of 78W3.  It is indexed to the Aguaga

21  quad reduction of Plaintiff's 145.  And on that quad reduc-

22  tion with a red pencil I will mark "78W4" over the numerals

23  6-0019 which appear in the lower right-hand corner of the

24  Aguanga quad reduction of Plaintiff's 145.  78W4 shows Oak-

25  grove Valley essentially as it is revealed on 78W3 and extends

Bowen    Direct

1  Temecula Creek just slightly northwest of that reach shown on

2  78W3.  Also, 78W4 shows the confluence of Chihuahua Creek with

3  Temecula Creek, and it shows State Highway 79 trending

4  across the southerly portion of the area depicted.

5      78W5 is a vertical aerial photograph which shows a

6  portion of Temecula Creek entering the area of the photograph

7  below the center of the right margin and continuing in a

8  diagonal northwesterly direction, leaving the area of 78W5 to

9  the right of the upper left-hand corner.  The portion of

10  Temecula Creek shown on 78W5 is contained in part in Sections

11  7, and 18, 9 South, 2 East.  The irregular white line shown

12  through the mountainous area in the lower and left-hand

13  portion of the photograph are fire truck trails and fire-

14  breaks, primarily in the Cleveland National Forest.  I believe

15  I believe I forgot to key 78W5 to the Plaintiff's 145, your

16  Honor.  78W5 is indexed to the Aguanga quad reduction of

17  Plaintiff's 145, and I will write "78W5" over the numerals

18  5-0152, which appear on the Aguanga quad reduction of

19  Plaintiff's 145.

20      MR. MOSKOVITZ:  Is Dameron Valley shown on Exhibit

21  78W5?

22      THE WITNESS:  That clearing, Mr. Moskovitz, which

23  shows in the upper central portion of 78W5 is the southerly

24  portion of Dameron Valley, yes, sir; and Oakgrove Valley, a

25  portion of it, shows on the right central portion of 78W5.

I

Z57

1    78W6 is a vertical aerial photograph lying north of

2    78W5.  It is indexed the Aguanga quad reduction of Plain's

3    145.  And with a red pencil I will write "78W6" over the

4    numerals 5-0151 which appear on the Aguanga quad reduction

5    of Plaintif's 145.  78W6 shows that reach of Temecula Creek

6    flowing above upstream and downstream from Dameron Valley.

7    Dameron Valley is the cleared area located in the approximate

8    center of 78W6.  The portion of Temecula Creek shown on 78W6

9    extends through, in part, that is, through Sections 35, 8 south

10   and 1 East; Sections 1, 2, 12, 7, 17 and 18, 9 South.  May I

11   go back and delete 17 and 18.  Sections 1, 2, and 12, 9 South,

12   1 East; and 17 and 18, 9 South, 2 East.  State Highway 79

13   traverses 78W6 from the lower right-hand corner to the upper

14   left-hand corner.  With a red pencil on 78W6, to the right

15   of Dameron Valley, I will inscribe--

16        MR. VEEDER:  Don't abbreviate too closely now.

17        THE WITNESS:  Not by a dam site.

18        Dameron Valley, "V-a-l" abbreviated, as I previously

19   stated, a cleared area in the center portion of 78W6 is

20   Dameron Valley.

21        78W7 is a vertical aerial photograph lying north of

22   78W6.  It is indexed to the Aguanga quad reduction of Plain-

23   tiff's 145.  And with a red pencil on that reduction I will

24   inscribe "78W7" over the numerals 5-0150.  78W7 shows Dameron

25   Valley in the lower central portion of the photograph with the

I

Z58

1    stream draining Culp Valley entering the area of 78W7 below

2    the upper right-hand corner, continuing westerly to a point

3    near the upper center where it makes a right-angle turn and

4    continues southerly to the confluence with Temecula Creek in

5    Dameron Valley.  The portion of Temecula Creek which is

6    shown on 78W7 is generally contained within Sections 1, 2,

7    and 12, 9 South, 1 East, and Section 35, 8 South, 1 East.

8    State Highway 79 is shown diagonally across the lower left-

9    hand quadrant of 78W7.

10        78W8 is a vertical photograph which is indexed to the

11   Aguanga quadrangle reduction of Plaintiff's 145.  With a red

12   pencil I have written "78W8" over the numerals 5-0032 appearing

13   on the Aguanga quad reduction of Plaintif's 145.  78W8 shows

14   a portion of Temecula Creek leaving Dameron Valley then flowing

15   through a canyon reach into Aguanga Valley.  Aguanga Valley

16   is shown in the upper left-hand quadrant of 78W8.

17   BY MR. VEEDER:

18        Q  Would you mark that on there, Colonel.

19        A  Below Aguanga Valley on 78W8 with a red crayon I

20   will write the word "Aguanga Valley," abbreviating "Valley"

21   "V-a-l."  The State Highway 79 and the Coahuilla Road junction

22   with that highway are shown on 78W8.  Easterly of the Coahuilla

23   Road, which proceedes northerly from its juncture with State

24   Highway 79, is a cleared area, valley section of Tule Creek.

25   A confluence of Tule Creek and Temecula Creek are shown on

I

Z59

Bowen   Direct                                                              7655

1  Plaintiff's 78W8.  I portion of Temecula Creek which is shown

2  on 78W8 traverses generally Sections 1 and 2, 9 South, 1 East,

3  30, 27, 34 and 35, 8 South, 1 East.

4      78W9 is a vertical aerial photograph lying north of

5  78W8, indexed to the Aguanga quad reduction of Plaintif's 145.

6  With a red pencil I have written "78W9" over the numbers

7  5-0033 which appear on the Aguanga quad reduction of

8  Plaintiff's 145.  78W9 also shows Aguanga Valley.  It shows

9  Tule Creek in greater clarity entering the area of the photo-

10  graph south of the upper right-hand corner, flowing westerly

11  to a point to the right of the vertical center line of the

12  photograph and thence flowing southerly to confluence with

13  Temecula Creek in Aguanga Valley; both State Highway 79,

14  which appears in the lower half of 78W9, and a portion of the

15  Coahuilla Road from its junction with State 79 and Aguanga

16  Valley northerly to the right of the upper center of 78W9.

17  Here again, a distinctive badlands topography.  The Temecula

18  arkose is shown in the upper left-hand quadrant of 78W9.

19      78W10 is a vertical aerial photograph which is indexed

20  the Aguanga quad reduction of Plaintiff's 145.  And with a red

21  pencil I have written "78W10" over the numerals 5-0107 which

22  appear on the Aguanga quad reduction of Plaintiff's 145.

23  78W10 is also indexed to the Vail Lake quad reduction of

24  Plaintiff's 145.  And with a red pencil I have written "78W10"

25  over the numerals 5-0107 as they appear on the Vail Lake

quad reduction of Plaintiff's 145.

J
A 18

78W10 shows Aguanga Valley in part.  In the back center of the photograph Temecula Creek flowing through Aguanga Valley and leaving it to continue northwesterly to Radec Valley, which is the small portion of the cleared area appearing in the upper left-hand corner of 78W10.  The irregular white line in the lower left-hand corner of 78W10 is a fire truck trail shown on the Vail Lake quad as the Cutca Valley Truck Trail.  The apparent contours which are adjacent to the Cutca Valley Truck Trail are browse trails cut by the wildlife people to allow deer to wander through and graze the area. These are on National Forest lands, your Honor.

THE COURT:  What creek is this?

THE WITNESS:  That is Long Canyon, your Honor.

THE COURT:  Coming in from the south?

THE WITNESS:  Yes, sir.

THE COURT:  South and southwest?

THE WITNESS:  Yes, sir.

THE COURT:  This is Temecula up above?

THE WITNESS:  Yes, sir.

78W11 is indexed to the Vail Lake quad reduction of Plaintiff's 145, and I will write "78W11" over the numerals 5-0106 as they appear on the Vail Lake quadrangle reduction of Plaintiff's 145.  It is also indexed to the Aguanga quad reduction, and I will write "78W11" over the numerals 5-0106 as they appear on the Aguanga quad reduction of Plaintiff's 145.

1    78W11 shows a portion of Aguanga Valley in the lower right-

2    hand corner, Temecula Creek leaving Aguanga Valley flowing

3    northwesterly through a canyon reach to its entry into Radec

4    Valley, which is shown in the left central portion of 78W11

5    and to the right of Radec Valley.  On 78W11, with a red pencil

6    I will write the words "Radec Val" (for valley).  The con-

7    fluence of Long Canyon with Temecula Creek is shown also on

8    78W11, the Long Canyon drainage coming from the south in the

9    lower left-hand corner of 78W11.

10    MR. STAHLMAN:  You might be a little mixed up here

11    sometimes.  You referred to some of these as Long Valley.

12    This is Long Canyon, is it?

13    THE WITNESS:  In every instance I meant Long Canyon,

14    if I said Long Valley.  This is not the Vail Long Canyon.

15    THE COURT:  We can't finish it tonight.  Adjourn

16    until 10 o'clock tomorrow morning.

17    ( Adjournment until Thursday, January 22, 1959 at

18    10 a.m.)

19

20

21

22

23

24

25