# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Thursday, January 22, 1959.

Pages:     7658 to 7786

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F. Street
San Diego 1, California
BElmont 4-6211    Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,  )
                         )
        Plaintiff,   )
                         )
  vs.                 )     No. 1247-SD-C.
                         )
FALLBROOK PUBLIC UTILITY  )
DISTRICT, et al.,     )
                         )
       Defendants  )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Thursday, January 22, 1959

APPEARANCES:

      For the Plaintiff         WILLIAM H. VEEDER, ESQ.,
                                 Special Assistant to the
                                 Attorney-General,
                                 Department of Justice,
                                 Washington, D.C.

A
Z2

APPEARANCES (Continued)

| | |
|---|---|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney-General, by<br>ADOLPHUS MOSKOVITZ, ESQ.,<br>Deputy Attorney General;<br> and<br>CARL BORONKAY, ESQ. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al. | FRANZ R. SACHSE, ESQ. |

## INDEX TO WITNESSES

| For the Plaintiff | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Allen C. Bowen | 7664 7723 | | | |
| (By Mr. Sachse) | | 7756 | | |

## EXHIBITS

| Plaintiff's Exhibit - | Iden. | In Evid. |
|---|---|---|
| 150 - Tabulation | 7723 | 7728 |
| 151 - Tabulation | 7727 | 7728 |
| 128-A through H | | 7681 |
| 78 ω 1-19 | | 7675 |

7662

A
Z4

THE CLERK:  Number two, 1247-SD-C, United States of America vs. Fallbrook Public Utility District.  Further court trial.

MR. VEEDER:  I will call Col. Bowen, please.


ALLEN C. BOWEN,

recalled as a witness in behalf of the plaintiff, having been previously sworn, testified as follows:

MR. VEEDER:  I would like to have the record show that I am calling Mr. Illingworth as part of our case in chief as an adverse witness.  I would like to have him here as soon as possible.

MR. MOSKOVITZ:  Mr. Illingworth is in Los Angeles or is on his way to Los Angeles, your Honor.  I didn't realize that Mr. Veeder wanted to call him at all.

MR. VEEDER:  I didn't realize that the State was not going to go ahead with its case until just yesterday, and it is very important that I have him as an adverse witness for the purpose of interrogating him in regard to certain of these matters that have been put in issue by the State.  All he would have to do is turn around and come on back, as I see it.

MR. MOSKOVITZ:  Mr. Illingworth is going to be here at the time we put in the rest of our case in chief.  Would it

1  not be just as well to defer your examination until that time?

2  We can get him back here.  But he is working on these studies

3  that we propose to put in.

4  THE COURT:  When did he go to Los Angeles?

5  MR. MOSKOVITZ:  He left just this morning.  He is on

6  the plane right now.

7  MR. VEEDER:  I didn't know it until this morning.  I

8  asked for Mr. Illingworth when Mr. Moskovitz came into court

9  and I was advised that he had left.

10  THE COURT:  Well, you can have him sometime.  The only

11  question is whether he has to turn around and come back to-

12  morrow.

13  MR. VEEDER:  Certainly the United States can't rest,

14  under the circumstances, until he is here.

15  THE COURT:  We will probably be going here on Tuesday.

16  Do you think you can finish tomorrow?

17  MR. VEEDER:  I have reason to suppose that that would

18  probably be the case, your Honor.  Certainly I need him.

19  THE COURT:  Well, as between Friday and Tuesday it

20  wouldn't make much difference, would it?  You could have him

21  down here tomorrow?

22  MR. MOSKOVITZ:  We could, your Honor.

23  MR. SACHSE:  For whatever it is worth, your Honor, I

24  expect to have fairly lengthy detailed cross-examination of

25  Col. Bowen when he is finished with these photographs.

THE COURT:  We will see how we get along.

(A criminal matter.)

THE CLERK:  The case on trial, No. 2 - 1247-SD-C, United States of America vs. Fallbrook Public Utility District.

DIRECT EXAMINATION (Resumed)

BY MR. VEEDER:

Q  Col. Bowen, would you proceed with the marking of the exhibits of the 78-W series.

A  78W12 is the next one in the series.  The last one described yesterday was 78W11.

Plaintiff's Exhibit 78W12 is a vertical aerial photograph showing a portion of Temecula Creek and is indexed to the Vail Lake quad reduction of Plaintiff's 145.  On that Vail Lake quad reduction I will write with a red pencil "78W12" over the numerals 3-0186 which appear on the Vail Lake quad reduction of Plaintiff's 145.  78W12 shows Temecula Creek entering just below the center on the right margin and continuing--

THE COURT:  Put a check mark there where it enters.

THE WITNESS:  With a red pencil I will put a check mark where it enters the area of the photograph.  It continues in a northwesterly direction through Radec Valley and enters Nigger Valley in the upper left-hand corner of 78W12.  Long Canyon, which arises in the Cleveland National Forest and

A

Z7

1    flows northwesterly and northerly through Section 32, 8 South,

2    1 East to its confluence with Temecula Creek in Section 29,

3    8 South, 1 East is shown entering the area of 78W12 in the

4    lower right-hand corner and continuing northwesterly and

5    northerly to its confluence with Temecula Creek.

6         THE COURT:  Will you mark it as Long Canyon?  Was it

7    Long Canyon or Long Creek?

8         THE WITNESS:  Long Canyon, your Honor.  And it is not

9    to be confused with either the Long Canyon or the Long Valley

10   which are within the Vail Ranch.  I will mark "Long Canyon"

11   with a red pencil on the face of 78W12, the words appearing

12   just to the left of the stream bed in Long Canyon.  The

13   cleared area which appears in the lower left-hand quadrant

14   of 78W12 is the Devil's Hole area, which is privately-owned

15   land, surrounded largely by the Cleveland National Forest.

16        THE COURT:  What creek is that that runs through Radec?

17        THE WITNESS:  That is Arroyo Secco Creek, your Honor,

18   as indicated on the Vail Lake quad reduction of Plaintiff's

19   145.

20        THE COURT:  It runs on down and feeds into Vail Dam?

21        THE WITNESS:  Arroy Secco drains on into the Vail Lake,

22   your Honor.

23        THE COURT:  Not into the Temecula?

24        THE WITNESS:  That is correct, your Honor.  At the

25   present time it is tributary to the lake.  Arroyo Secco appears

1  entering the area of 78W12 to the left of the lower center

2  margin and flowing northerly to Devil's Hole and thence

3  northwesterly, leaving the area of 78W12 at the approximate

4  center of the left margin.

5      Plaintiff's 78W13 is a vertical aerial photograph

6  lying northerly of 78W12 and indexed to the Vail Lake quad

7  reduction of Plaintiff's 145. With a red pencil I have marked

8  "78W13" over the numerals 3-0185 which appear on the Vail

9  Lake quad reduction of Plaintiff's 145. 78W13 is southerly

10  of 78V18. 78W13 shows the Temecula Creek entering at the

11  lower right-hand corner and flowing northwesterly through

12  Radec Valley into Nigger Valley. Now this reach of Temecula

13  Creek is found in Sections 19, 30 and 29, 8 South, 1 East,

14  and Sections 13, 14 and 24, 8 South, 1 East. The State

15  Highway 79 enters the area of 78W13 on the north and the

16  intersection of Highways 79 and 71 is shown in the northerly

17  part of Radec Valley. Highway 79 continues off to the south-

18  east, leaving the area of 78W13 in the lower right-hand corner

19  Highway 71 continues westerly along the southern boundary of

20  Nigger Valley.

21      Plaintiff's 78W14 is a vertical aerial photograph which

22  lies westerly of 78W13 and is indexed to the Vail Lake quad-

23  rangle reduction of Plaintiff's 145. I have written with a

24  red pencil "78W14" over the numerals 3-0160 which appear on

25  the Vail Lake quad reduction of Plaintiff's 145. 78W14 shows

1   Temecula Creek entering Nigger Valley and flowing on to the

2   Vail Lake, which is impounded by the Vail Dam, the lake and

3   the dam both appearing in the upper left-hand quadrant of

4   78W14.   Arroyo Seco Creek is shown as it leaves Devil's Hole

5   in the lower right-hand corner of 78W14, flowing northwesterly

6   and northerly to its confluence with Vail Lake.   The confluence

7   of Arroyo Seco Creek with Vail Lake is westerly of the con-

8   fluence of Temecula Creek and Vail Lake, and the confluence

9   of Temecula Creek with Vail Lake is southerly of the confluence

10   of Wilson Creek with Vail Lake, which also appears on 78W14.

11        THE COURT:   Where does Wilson Creek come in?

12        THE WITNESS:   Wilson Creek, your Honor, enters just

13   below the upper right-hand corner and flows westerly through

14   the valley which appears at the top of 78W14 and easterly of

15   Vail Lake.   That also shows on 78V19.

16        Plaintiff's 78W15 is a vertical aerial photograph which

17   shows the Vail Lake in the lower right-hand corner and Temecula

18   Creek traveling through the Nigger Canyon reach to the outwash

19   area or the upper area of the Pauba Basin.   78W15 is indexed

20   to the Vail Lake quad reduction of Plaintiff's 145, and with a

21   red pencil I have written "78W15" over the numerals 3-0146

22   appearing in the upper left-hand corner of the Vail Lake

23   quad reduction of Plaintiff's 145.

24        MR. STAHLMAN:   Would you mind my asking a couple of

25   questions, so that I may understand it.

A

Z10

1          Col. Bowen, I notice that on these photographs that

2     you have testified to there is, first, a picture of a clock

3     showing a time thereon, which I presume is the time the photo-

4     graph was taken?

5          THE WITNESS:  The marginal information, Mr. Stahlman,

6     to which you are referring is primarily for the photographer's

7     information.  The white lettering which appears on the face

8     of the print and not on the margin gives the date, time, focal

9     length of the lens, the altitude, the meridian and the time

10    indicated there would be more nearly the time that the photo-

11    graph was taken-- 2150 Zebra, for example, Mr. Stahlman,

12    refers to using the 24-hour system, the Navy system, with

13    which you are eminently familiar.

14         MR. STAHLMAN:  Not eminently, but slightly.

15         THE WITNESS:  9:50 P.M. Greenwich Meridian, and you can

16    come back from the Greenwich Meridian the number of time zones

17    and determine the hour at which that was taken.

18         MR. STAHLMAN:  What is this marginal information here?

19    Does it have any significance?

20         THE WITNESS:  It is of significance to the photographer

21    and the laboratory man. From the standpoint of the interpreta-

22    tion of the photographs, it has no significance.

23         MR. STAHLMAN:  What is the one on the right?  Is that

24    the altitude?

25         THE WITNESS:  Altimeter; yes, sir.  The film exposure

A

Z11

1    information, et cetera, is indicated on the black margin of

2    78W14.

3         MR. STAHLMAN:  Is there any way on the photograph to

4    determine the directions as to north, east, south and west?

5         THE WITNESS:  Yes, sir.  In each instance I have placed

6    the identifying number, as 78W14, on the northern border of

7    the photograph.  I have done that consistently with all of

8    the 78 series that have been introduced.

9         MR. STAHLMAN:  Thank you.

10        THE COURT:  Northern?

11        THE WITNESS:  Yes, sir.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

B
Z1

1          THE WITNESS:  These lines of flight, your Honor, were

2   taken from north to south as is indicated on the index

3   Plaintiff's 145.  Lines of flight are indicated by a numeral,

4   and the number in that flight, the numeral before the dash is

5   the flight number, and the number following the dash in each

6   instance is the photo number in that flight.  You can observe,

7   for example, on the Vail Lake quad reduction of Plaintiff's

8   145 running along the San Bernardino Meridian is a line of

9   photographs beginning at the bottom of the Vail quad reduc-

10  tion with 3-0157.  North of that is the 3-0158.  North of that

11  is 3-0159, and so on, to 3-0162, which appears just south of

12  Wilson, or Lancaster Valley.  Therefore, it is obvious that

13  the aircraft taking that particular run was flying north.  And

14  coming back on the south on the east of that.

15          78W15 is also indexed to the Sage quad reduction of

16  Plaintiff's 145.  And I will write with a red pencil "78W15"

17  over the numerals 3-0146 appearing on the Sage quad reduction

18  of Plaintiff's 145.

19          78W16 is a vertical aerial photograph showing that

20  portion of Temecula Creek as it debouches from Nigger Canyon

21  to the plain of the Temecula or Pauba Valley and flows across

22  the Pauba Valley slightly south of westerly to the point where

23  it leaves the area of the photograph just south of the left

24  margin.  And cultivated areas, irrigated areas within the

25  valley are clearly depicted on 78W16.  The older continental

B

Z2

1  deposits north and south of the Pauba Valley show a marked

2  contrast to the areas of basement complex.

3      THE COURT:  Is this cultivated area with the lines close

4  together?

5      MR. STAHLMAN:  I might assist in asking a question.

6  Is this the highway here?

7      THE WITNESS:  Yes, sir.  State Highway 71.

8      MR. STAHLMAN:  Some areas are devoted to dry farming.

9  It might show cultivated, but I think most of those are to the

10  south of the highway.

11     THE COURT:  What are those areas with the fine lines

12  on it, Mr. Stahlman, do you know?

13     THE WITNESS:  This is the old State road, Mr. Stahlman,

14  going northerly and westerly from State 71.

15     MR. STAHLMAN:  Would you indicate where the camp is on

16  here?  Would that be--

17     THE WITNESS:  The **Mahlon** Camp?

18     MR. STAHLMAN:  Yes.  Would that be in there?

19     THE WITNESS:  That is out of the area of this photo-

20  graph.

21     MR. STAHLMAN:  Down here?

22     THE WITNESS:  Sandy's new house.

23     MR. VEEDER:  I think you had better identify **Mahlon** and

24  Sandy for the record.

25     MR. STAHLMAN:  Malin is Mr. **Mahlon** Vail, and Sandy is

B

Z3

1   the Sandy Wilkerson who is the nephew of Mr. Vail who resides

2   on the ranch.  He has an area in that area called Pear Tree.

3   You know about where that would be?  There is a road off it.

4   It is right in here, isn't it?

5         THE WITNESS:  Right in here, Mr. Stahlman.  The road

6   takes off this point and goes over to there, as I recall.

7         MR. STAHLMAN:  These definite lines, as your Honor has

8   seen and heard that looks like lines certainly baffle me.  My

9   recollection is that, I think this portion, I think that has

10   been cultivated, hillside cultivation.  But I am sure it is

11   not at the present time.  I hunted quail in that this last

12   year.

13         I might add that if that was cultivated, I believe it

14   was dry farming, as is the land across the road.

15         MR. SACHSE:  Did you give us a cross-reference to this?

16         THE WITNESS:  Not yet, Mr. Sachse.

17         MR. SACHSE:  I didn't have it.

18         THE WITNESS:  Your Honor, that looks more like areas

19   where the brush has been stripped out and winrowed or areas of

20   brush have been left standing interspresed with a cleared

21   strip.

22         MR. STAHLMAN:  I am inclined to think the Colonel is

23   right, because I recall no time in the last several years any

24   cultivation in that area.

25         Here is this last.  We might look at it.  It might give

1  a better idea.

2          Would your Honor like to look at it?

3          THE COURT:  Go ahead.

4          MR. VEEDER:  While Mr. Stahlman is reading, I would

5  like to proceed with the Colonel.

6          THE WITNESS:  I would like to complete this one, if I

7  may.

8          MR. VEEDER:  Oh, you are not through yet.  Sorry.

9          MR. SACHSE:  This isn't cross-indexed yet.

10          THE WITNESS:  78W16 is indexed to the Pechanga Quad

11  reduction of Plaintiff's 145.  With a red pencil I have marked

12  "78W16" over the numerals 3-0121 which appear in the upper

13  right-hand corner of the Pechanga quad reduction of Plain-

14  tiff's 145.

15          78W17 is a vertical aerial photograph showing Temecula

16  Creek as it flows through a portion of the Pauba or Temecula

17  Valley.  The valley is distinguished by the cultivated,

18  irrigated fields running generally east and west across the

19  central portion of 78W17.  78W17 is indexed to the Pechanga

20  quad reduction of Plaintiff's 145.  With a red pencil I have

21  marked "78W17" over the numerals "30100" as it appears on

22  Pechanga quad reduction of Plaintiff's 145.

23          78W18 is a vertical aerial photograph showing portions

24  of Temecula Valley or the Pauba Basin over which the Temecula

25  Creek flows.  In the lower left-hand corner of 78W18 is shown

1   a portion of Pechanga Creek and a portion of Wolf Valley.

2   78W18 is indexed to the Pechanga quad reduction of Plaintiff's

3   145.  And with a red pencil I have marked "78W18" over the

4   numerals 3-0086 appearing on the Pechanga quad reduction of

5   Plaintiff's 145.

6        78W19 shows the confluence of Temecula Creek with

7   Pechanga Creek, the confluence of Temecula Creek with

8   Murrieta Creek; and the upper reach of the Temecula Canyon

9   through which the Santa Margarita flows is shown in the lower

10  left-hand corner of 78W19; Santa Margarita River departing at

11  the extreme lower left-hand corner of 78W19.  U.S. 395 is

12  shown in the left-hand portion of 78W19 as is the town of

13  Temecula which appears inthe upper left-hand quadrant.  State

14  Highway 71 as it joins 395 is shown.  The Temecula-Pala Road

15  which continues southeasterly through Wolf Valley is also

16  shown.  78W19 is keyed to the Pechanga quadrangle reduction

17  of Plaintiff's 145.  With a red pencil I have written "78W19"

18  over the numerals 3-0065 which appear in the upper left-hand

19  portion of the Pechanga quad reduction of Plaintiff's 145.

20       MR. STAHLMAN:  Your Honor, I have another one of

21  Stahlman's ill-conceived suggestions for your consideration.

22  In the filing of these photographs by the Clerk I think it

23  might aid us in finding them in the future if when they are

24  filed by the Clerk, either an envelope or folder, as he would

25  file them-- I presume each one of these separate series would

be filed in a group-- and then, if that particular folder

or envelope could be marked in addition to the exhibit number

that has been assigned, just merely the name of the creek;

so if we want to find them, we won't have to go through them.

Just stick up the name of the creek.

THE COURT:  Can you do that, Mr. Clerk?

THE CLERK:  Yes.

MR. VEEDER:  We offer 78W1 through 19.

THE COURT:  Received in evidence 78W1 through 78W19.

BY MR. VEEDER:

Q   Col. Bowen, I hand you Plaintiff's Exhibit marked

128-E for Identification and ask you to state what it is.

THE COURT:  128-E?

MR. VEEDER:  Yes, your Honor.

THE COURT:  Well, now, you have a series marked A to H.

Are you going to skip on some of them?

MR. VEEDER:  No, they are all going in; but we are

putting them in in a different order than the way they were

marked originally.  They will all go in.

THE COURT:  All right.

THE WITNESS:  128-E is the point at which sewage

effluent discharge from Sewage Treatment Plant No. 1 is

discharged back into the Santa Margarita watershed.

BY MR. VEEDER:

Q   And that photograph fairly depicts the area concerning

which you made reference?

A   Yes, sir.  This is looking downstream from the point of discharge.

Q   I hand you 128-C marked for Identification and ask you to state into the record what that identification constitutes.

A   128-C is the same site as 128-E, looking in the opposite direction or upstream.  It is the point at which sewage effluent discharged from treatment plant No. 1 enters the Santa Margarita watershed.

Q   From your observation what is that white material that appears in the center of the photograph?

A   It is foam.

Q   I hand to you Plaintiff's Exhibit marked 128-B for Identification and ask you to state what it is.

MR. SACHSE:  B?

MR. VEEDER:  B.

THE WITNESS:  128-B for Identification illustrates a concrete culvert abutment and a weir structure over which is flowing sewage effluent shortly above the point where it enters Lake O'Neill.  This effluent originates at Sewage Treatment Plant No. 1.  It is discharged into the watershed as shown in Plaintiff's 128-E and C.  It travels down a natural stream channel to the point shown in 128-B.

B2

z8

BY MR. VEEDER:

Q   I hand you Plaintiff's Exhibit marked 128-G and ask you to state into the record what it is.

A   128-G is a close-up of the weir structure described on 128-B.  It is looking upstream at the weir and the fluid discharging through the weir and into the foreground of 128-G is sewage effluent originating from Treatment Plant No. 1.

Q   I hand you 128-D and ask you to state into the record what that identification is.

A   128-D depicts--

THE COURT: Oh, this last one was supposed to be a G. Here.  Yes, all right.  Now, which one are you talking about?

THE WITNESS:  D now, your Honor.

THE COURT:  D.  All right.

THE WITNESS:--depicts basically the same area as 128G from a slightly different angle looking upstream at the weir structure shortly above confluence of this sewage effluent with Lake O'Neill.

BY MR. VEEDER:

Q   I offer you 128-F for Identification and ask you to state into the record what is depicted by that identification.

THE COURT:  It is an old friend, but he can't recognize just exactly where it is.

THE WITNESS:  It looks like an old friend.

MR. VEEDER: It looks like an old friend, as a matter of

B2

Z9

1    fact.

2         MR. STAHLMAN:  Well, I don't know.  You hold it away

3    a little.

4         THE WITNESS:  This is sewage effluent discharging from

5    height, but at the moment--

6         MR. STAHLMAN:  Maybe that is Fallbrook Creek.

7         THE WITNESS:  --May I see 128-- here.

8         (Pause.)

9         THE COURT:  Well, it is on the base somewhere, Camp

10   Pendleton, is it not?

11        THE WITNESS:  Yes, sir.

12        THE COURT:  Does it make any difference particularly

13   where?

14        Colonel Robertson, I think, knows where it is.

15        MR. VEEDER:  I might as well face up to it.  I thought

16   my witness could do it.

17        MR. MOSKOVITZ:  It is practally 11.  Maybe he can do

18   it during the recess.

19        THE WITNESS:  The order in which Mr. Veeder has shown

20   these to me, this 128-F--

21        MR. STAHLMAN:  I tried to mix them up for him, but he

22   wouldn't let me.

23        THE COURT:  128-F.  Go ahead.

24

25

C

Z12

1       THE WITNESS:  128-F is the point of discharge of the

2  sewage effluent into the Santa Margarita River watershed.  It

3  is shown pouring from the pipe in the upper portion of 128F

4  and flowing toward the photographer.

5       128-H is the same point of discharge as shown in 128-E,

6  looking in the same direction toward the culvert under the

7  road.  It is the same area shown in 128-C.  It is the point

8  where sewage effluent is discharged into the Santa Margarita

9  River from Sewage Treatment Plant No. 1.

10 BY MR. VEEDER:

11      Q   And I hand you 128-A and ask you to state into the

12 record what is depicted by that exhibit.

13      A   128-A is sewage effluent flowing through the natural

14 stream channel between its point of departure from the sewage

15 treatment lagoon up near De Luz Housing and Lake O'Neill-- its

16 destination.  This is just upstream from that road crossing

17 where the weir structure is shown, the same road that we

18 stopped on when the Court viewed the premises.

19      MR. VEEDER:  I offer in evidence Plaintiff's Exhibits

20 marked for Identification 128-A through H.

21      MR. SACHSE:  I have a few questions on voir dire.  I

22 would like to know the date when they were taken, please.

23      Go ahead, Mr. Stahlman.

24

25

C

Z13

VOIR DIRE EXAMINATION

BY MR. STAHLMAN:

Q  What date were these taken, if you know?

A  These photographs were taken in December of 1958 or January, 1959.

Q  To your personal knowledge are the conditions as shown here typical of the daily condition that exists in relation to these detergents or whatever they are that are in the water?

A  There is quite a bit of variation in the manifestation of suds here, Mr. Stahlman.  Some days it is more, like on wash day.  Some days it is less.  But I would say that this condition is about average or typical.

Q  How about the flow from Fallbrook Creek?  Does that show a similar condition?  Does that cause any flow of this detergent on the Base?

A  The sewage effluent discharged into Fallbrook Creek by both the Fallbrook Sanitary District and the Naval Ammunition Depot sewage treatment plant never reaches Lake O'Neill, except during periods of rainfall, high precipitation and runoff, and immediately thereafter, and at those times it is diluted by fresh water and you seldom see this manifestation.

MR. STAHLMAN:  That is all I have.

MR. SACHSE:  I have no more questions.

THE COURT:  Exhibits 128-A through H, Inclusive, are

XXXXX

Bowen    Direct

1    received in evidence.

2           (Plaintiff's Exhibits 128-A through H, inclusive,

3    for Identification were received in evidence.)

4           THE COURT:  Take a short recess.

5           (Recess.)

6           THE COURT:  Proceed.

7    BY MR. VEEDER:

8           Q  Col. Bowen, what investigation have you made in

9    regard to the utilization of water within the confines of

10   Camp Pendleton regarding the lands overlying the ground water

11   basins within the confines of Camp Pendleton?

12          A  I assume by your question you mean total uses?

13          Q  In regard to the vegetative cover within the area.

14          MR. SACHSE:  What are, again, Mr. Veeder?

15          MR. VEEDER:  The evapo-transpiration losses, the

16   utilization of plant life, every aspect of it.

17          MR. SACHSE:  I object, your Honor.  The question is

18   too broad.  I ask that Mr. Veeder direct his question spe-

19   cifically, so we will know what the question is and can object.

20          MR. VEEDER:  I think counsel should have been listening,

21   but I will state it again.

22          Q  What investigation have you made, Col. Bowen, in

23   regard to the evapo-transpiration of water from the ground water

24   basin underlying Camp Pendleton?

25          A  Well, I have determined the nature and density of

Bowen   Direct

vegetation, measured the areas which are developed--

Q   First, how did you make your determination as to the density of the growth on the surface of the Base?

A   I used vertical aerial photographs, in combination with field surveys, and plotted the areas on U. S. Geological 7½-minute series quadrangles.

Q   And what other steps did you take in connection with the determination of the areas?

A   From those maps I determined the acreage in various types and densities of vegetation by planimetric measurement.

Q   What investigation did you make in regard to other land uses in the area, such as roads, buildings and similar uses?

A   I measured the areas that were in roads, buildings, air fields, railroads, industrial and barracks developments.

Q   And what was the total acreage that you determined to be the surface of the subterranean basins in question?

MR. SACHSE:   Just a minute.   Is this all three basins? That's what I want to understand.

MR. VEEDER:   There is only one basin.   There are three inter-connected, Chappo, Ysidora and Upper, and they are all included in my reference to basin.

THE WITNESS:   The basin surface that I determined and used in this investigation was 5,454 acres in area.

C

Z16

BY MR. VEEDER:

Q Now, would you state the extent, then, of the area that you took into consideration-- that is, along the river, and state why that areal extent is different from that testified to by Mr. Worts earlier in the trial?

A The study of natural cover on the floor of the basin which I made extended from the estuary or lagoon at the mouth of the Santa Margarita River on up to the confluence of De Luz Creek with the Santa Margarita River, whereas Mr. Worts in his evaluation of the basin explored only that portion of it from the De Luz Dam Site down to the Ysidora Gaging Station.

THE COURT: What figure did he have, by the way?

THE WITNESS: It was somewhere around 5,300, your Honor, I believe. I am not absolutely certain of that.

THE COURT: All right.

BY MR. VEEDER:

Q How many acres of land did you deduct from that total for the roads, buildings and similar land uses other than those lands which are in vegetative cover?

A Including the fresh water areas with the physical developments on the floor of the basin, I deducted 786 acres from the growth.

Q And what net acreage, then, would there be that you made your calculations upon?

A That left an area of 4,668 acres.

1    Q   Now, would you describe the kind and type of

2  vegetative cover that will be found on the areas to which your

3  investigation was directed?

4    A   The vegetation varies from arundinaceous type

5  plants, such as the reeds, sedges and tules which grow in

6  the swamp areas, to phreatophitic growth such as willows,

7  tamarisk, a few sycamore, and down through a variety of

8  brush or herbaceous type vegetation to grasses such as

9  Bermuda grass, salt grass and annual grasses.

10    Q   What have been your efforts in regard to the removal

11  of phreatophitic growth on the area to which this present

12  investigation was directed?

13    A   Camp Pendleton has a continuing program for

14  removal and control of phreatophytes, which program comes under

15  my technical direction.  It is, as I say, a continuing

16  program.  We clear some areas each year.

17    Q   Now, you have stated that there are phreatophytic

18  growth and other grown down toward the mouth of the Santa

19  Margarita River.  Why is it that that growth has not been

20  removed?

21    A   Well, much of the growth that remains, particularly

22  the willows, shrubs and brush near or in the lower portion

23  of the Santa Margarita Valley, is left there for the purpose

24  of training Marines in the arts of advancing and taking cover.

25    Q   What are your directions in connection with the

c

Z18

Bowen   Direct                                                                    7685

1    removal of growth of that nature?

2         A  Well, the directions are of such nature that I must

3    give consideration to the training needs of the Fleet Marine

4    Force, which is principally the First Marine Division.  I might

5    say that initially I had the idea that we could remove all of

6    the phreatophytes and conserve a substantial amount of water.

7    I started out on that program with the consent of the Marine

8    Corps Base Commanding General and was interrupted by the

9    Division Commanding General, who objected to the denudation of

10   the area and claimed that if such a program were completed it

11   would greatly hamper his mission of keeping the First Marine

12   Division in a state of readiness.  So we compromised with the

13   Division requirements and the directions that I new follow or

14   the guidance that I follow in continuing this program are to

15   coordinate the water-saving values of phreatophyte removal with

16   the training values of retention of cover on the valley floor.

17        Q  What were the elements that you took into considera-

18   tion in making your investigation in regard to evapo-transpira-

19   tion, in addition to the matters concerning which you have made

20   reference?

21        A  Well, we have had a climatological station, a Class A

22   weather station, as it is called, in operation on Lake O'Neill

23   since 1953, and from the records obtained at that station we

24   have determined the evaporation losses from a free water surface.

25   In addition to that, in evaluation of consumptive use by various

Bowen  Direct                                                        7686

1    types and densities of cover, I utilized consumptive use values

2    which were determined by the U. S. Department of Agriculture

3    in research activities in the San Luis Rey Basin.   These

4    research people arrived at consumptive use values for various

5    types and densities of cover, and I extrapolated the values that

6    they developed in the San Luis Rey Valley to the Santa

7    Margarita Valley.

8         Q  How would those two valleys compare, in your view, as

9    to climatological aspects?

10        A  Well, they have a very close relationship from the

11   Ocean on up to the confluence of De Luz Creek with the Santa

12   Margarita River on the one hand and the Bonsall Narrows in the

13   San Luis Rey Valley.

14        Q  Now, based upon that investigation, have you arrived

15   at a conclusion as to the waters from the Santa Margarita

16   River consumptively used by the vegetative cover in the area

17   concerning which youare now testifying?

18        A  Yes, sir.

19        Q  And would you state into the record what that con-

20   sumptive use of water is?

21        MR. SACHSE:   I object unless the qualification is made

22   as to time when the study was made, your Honor.

23   BY MR. VEEDER:

24        Q  Would you state the time at which you made this

25   investigation, Col. Bowen, starting at the earliest time when

Bowen   Direct

the matter was given consideration and down to the most

recent time?

A  The first studies on this matter that were initiated

by me were in 1951, and there have been additional studies

continued through 1952 and 1953, begun again by me in 1954,

1955, 1956, 1957 and 1958.

Q Predicated upon those studies would you state into

the record the quantity of water which, in your opinion, is

consumptively utilized from the Santa Margarita River by the

vegetative cover to which you have made reference in your

testimony?

MR. SACHSE:  I want clarification as to when he measured

this vegetative cover.  That is the date with which I am

concerned, Mr. Veeder-- not the studies; as to when he found

4,668 acres of vegetation.  The same objection.

BY MR. VEEDER:

Q  Would you go ahead and state when you made the

determination, then, Col. Bowen, as to acreage?

A  The determination as to the acreage that I have

stated into the record was made in the summer and fall of 1958.

Q  Would you proceed to state then the quantity of

water consumptively used from the Santa Margarita River by the

vegetative cover of the area to which you have made reference?

A  About 5200 acre feet annually.

Q Now, Col. Bowen, have you considered the question of

C

Z21

1  the quantity of water used for military purposes at Camp

2  Pendleton and the Naval Ammunition Depot and the United States

3  Naval Hospital, both within and outside of the watershed of

4  the Santa Margarita River?

5  　　　A  Yes, sir.

6  　　　Q  And would you state the basis upon which you made

7  that determination?

8  　　　MR. STAHLMAN:  Could I have some more information as

9  to when this was done?  What I had in mind is this, Mr. Veeder:

10 Does this question that you have asked him refer to a par-

11 ticular time, to the average, or --

12 　　　MR. VEEDER:  I am asking him for the quantity of water

13 which has been used each year.  That is what it will be

14 ultimately.  I can't ask them all at once.

15 　　　THE COURT:  You are going to elicit information year by

16 year?

17 　　　MR. VEEDER:  That is correct.

18 　　　THE COURT:  I understand that the question no pertains

19 to uses at Camp Pendleton and the Naval Hospital in and outside

20 the watershed?

21 　　　MR. VEEDER:  That is correct, your Honor.

22 　　　THE COURT:  But will exclude other uses of water made

23 elsewhere in the Camp?

24 　　　MR. VEEDER:  That is correct.  Only that derived from

25 the Santa Margarita River.

1    THE COURT:  Only water that comes from the Santa

2    Margarita River?

3    MR. VEEDER:  That is right, your Honor.

4    Q  Will you state the period of time for which those

5    studies have been made, Col. Bowen?

6    A  By studies, Mr. Veeder, I assume that you are

7    referring to the taking and keeping of records of water

8    pumped from the Santa Margarita Basin?

9    Q  That is correct.

10   A  The period of time that I have before me here is

11   1944 through 1957, inclusive.  Those are water years.

12   THE COURT:  A water year starts on October 1st?

13   THE WITNESS:  October 1st, your Honor, and ends on

14   September 30th.

15   MR. STAHLMAN:  May I ask a question on voir dire.  I

16   just want to get this in my mind.  I think this a rather

17   important thing.

18   There has been introduced in evidence, I believe,

19   Exhibit 43, the graph as to the water usage at Pendleton.  Is

20   this the evidence that relates to that?

21   MR. VEEDER:  No.

22   MR. STAHLMAN:  My recollection is that that was on the

23   calendar year basis.

24   MR. VEEDER: You are speaking of Mr. Worts's testimony?

25   MR. STAHLMAN:  Yes, the graph that he put in evidence.

MR. VEEDER:  This hasn't been related to that.

What I am asking him now is, based upon his investiga-
tion, the quantity of water used for military purposes, both
within and without the watershed for the period of record.

MR. SACHSE:  I object, your Honor,  I want more clari-
fication of "for military purposes."  I don't know whether
that includes or does not include agricultural uses.

BY MR. VEEDER:

Q   Would you state, Col. Bowen, what is meant by you
in regard to military uses in performing this function of
calculating both within and without the watershed?

A   Yes, sir.  The military usage that is referred to in
my study includes the water used for barracks and administrat-
ive purposes.  By that I mean cooking, laundry, washing
vehicles, any use of water which would be made by the military
people in the accomplishment of their mission.  It is also that
water which is used by the families of military personnel
living on the reservation and obtaining their water from the
Santa Margarita well field.  Military use excludes the water
pumped for irrigation of tenants' crops.  However, military
use does include the water that is pumped for the meager land-
scaping which is in the vicinity of the Marine barracks and
quarters.

Q   What relation does it have to this quantity of water
utilized in evapo-transpiration on the surface of the basin

1    concerning which you have just testified?

2        MR. STAHLMAN:  May I have the question?

3        MR. VEEDER:  Mr. Sachse has raised a point as to

4    military purposes, and I am simply trying to delineate and

5    inquire what relation there is, if any, between the quantity

6    of water used in evapo-transpiration on the surface of the

7    basin, concerning which you have now testified, as that relates

8    to the military uses.

9        MR. STAHLMAN:  Has he answered the first question you

10   asked him so far, as to what military use there was?

11       THE COURT:  I don't understand what you are talking

12   about.

13       MR. STAHLMAN:  I don't either.

14       THE COURT:  Are you trying to elicit an answer that

15   evapo-transpiration is a military use?

16       MR. VEEDER:  No, your Honor.  Mr. Sachse raised a question,

17   very proper in my view, and I am asking him whether, when he

18   made his calculation, that includes evapo-transpiration, con-

19   cerning which he testified.

20       THE COURT:  Do these figures include or exclude evapo-

21   transpiration, to which you have heretofore testified?

22       THE WITNESS:  The figures I am about to give exclude

23   evapo-transpiration, your Honor.  They are only water actually

24   pumped from wells and measured by meters at those wells.

25

C

Z25

Bowen   Direct                                                              7692

BY MR. VEEDER:

Q   In regard to the year 1944, will you state into the record the quantity of water used for military purposes, both within and without the watershed of the Santa Margarita River?

MR. SACHSE:   I object, for the record, that this is again back to the old story of attempting to establish the extent of the water right by the extent of a use; and it is further complicated by the injection of uses outside the watershed, your Honor.

THE COURT:   Are you going to prepare a chart on this eventually, or are you just going to give it orally?

MR. VEEDER:   He is going to give it orally, your Honor.

THE COURT:   The objection is overruled.   We will find out the facts.   Do you intend to break this down by some estimate as to in and outside the watershed?

MR. VEEDER:   Yes, your Honor.

THE COURT:   You are starting out now asking for both.

MR. VEEDER:   I am asking him to state the quantity of water used within the watershed in 1944 and the quantity of water used in 1944 outside the watershed.

THE COURT:   I thought your first question called for both together.

MR. SACHSE:   I withdraw the objection, if that is the question.

MR. STAHLMAN:   Why don't you make a chart on this?

C

Z26

1    THE COURT:  If we want one, he can make it later.  The

2   objection is overruled.  Let's go ahead.

3    The question is, separately state in and outside the

4   watershed for 1944.

5    THE WITNESS:  I don't quite understand the question.

6   Is it the combined pumpage, Mr. Veeder?

7   BY MR. VEEDER:

8    Q  Would you state the total quantity of water utilized,

9   and then state the quantity of water used withinthe watershed

10   and then the quantity of water used outside the watershed?

11    MR. STAHLMAN:  In 1944?

12    THE COURT:  This is the third different question you

13   have asked.

14    MR. VEEDER:  Your Honor, as objections are raised I

15   am simply trying to help.

16    MR. STAHLMAN:  We are trying to help you.

17    MR. VEEDER:  The day that I need any help, Mr. Stahlman,

18   I will call for you.

19    THE COURT:  Colonel, can yougive us these figures, or

20   do you have them broken down in some other way?

21    THE WITNESS:  Your Honor, I have two tables before me,

22   one of which shows the water pumped from the Santa Margarita

23   River for use at Camp Pendleton and the U. S. Navy Hospital,

24   and I have another table which shows the water pumped for use

25   within the Naval Ammunition Depot.

1    The amount of water pumped for use by Camp Pendleton

2  and the Navy Hospital combined in 1944 was 3,490 acre feet,

3  and for the Ammunition Depot in water year 1944 it was 130

4  acre feet, for a total for the three military establishments

5  of 3,620 acre feet.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D

Z10

BY MR. VEEDER:

Q   That is the total now.  Will you state the quantity
of water used for military purposes within the watershed of
the Santa Margarita River from the Santa Margarita River?

A   The amount of water used in the water year 1944
within the watershed of the Santa Margarita River for military
purposes was 1,840 acre feet.

Q   And then, will you state the quantity of water used
outside?

A   The quantity of water used outside the watershed of
the Santa Margarita River but pumped from the Santa Margarita
well field in the water year 1944 was 1,780 acre acre feet.

Q   Now, would you proceed--

THE COURT:  Now, the witness is having to make calcula-
tions as we go along.  Can't we get this prepared in the form
of a chart rather than take it orally?

MR. VEEDER:  Your Honor, there is a variation as we go
along here, and I would prefer to put it in by oral testimony
in the manner in which we are proceeding.

THE COURT:  What is the variation?

MR. VEEDER:  The quantities of water that are used as
we go down the line are dependent upon the number of personnel
and the number of troops, and I was going to interrogate him
along that line as we proceeded.  Now, it is up to your Honor.
If you would rather have us make up a tabulation, we can do it.

D

Z11

Bowen Direct

7696

1   But our view from the practical standpoint of getting into the

2   record the data that we think are important, it be handled in

3   this manner.

4           MR. STAHLMAN:  Each one of us is going to have to make

5   a chart in order to understand this.

6           THE COURT:  The witness is having to make calculations

7   as he goes along.  He doesn't have it in the form you are

8   asking for it right now.

9           MR. SACHSE:  Your Honor, we have a set of exhibits that

10  I haven't heard withdrawn.  They are lodged.  I got them right

11  in front of me.  They are 80, 81, 82, 83, 84, 85.  80 is water

12  used for military purposes from the Santa Margarita River.  It

13  is on water years.  And it is inside the watershed and out-

14  side the watershed.  And the figures are not exactly the same

15  now.  If Mr. Veeder wants to change the figures in these

16  exhibits, I haven't any objection.  I don't see why the exhibit

17  which has been prepared so long ago and was lodged and dis-

18  tributed last year, it is that or something like that, can't

19  be used.

20          MR. VEEDER:  The matter is very simple, your Honor.  We

21  have changed the watershed line.  It is that simple.

22          THE COURT:  You don't propose to use Exhibits, then, 80,

23  81, 82, 83, 84, 85?

24          MR. VEEDER:  That is right.

25          THE COURT:  You don't propose to use any of them?

1          MR. VEEDER:  That is correct, your Honor.  We are with-

2  drawing them.  The watershed line has been changed now, and

3  it makes a difference in the quantity of water utilized.

4          MR. STAHLMAN:  Not the total but in and out?

5          MR. SACHSE:  Yes, inand out.

6          MR. VEEDER:  What is used within or without.  And it is

7  extremely important to us to have that matter established.

8          MR. SACHSE:  How about the totals?  They seem to be

9  different, too, Mr. Veeder, for the one year you have given

10  me.  Well, that is cross-examination, anyway.

11  BY MR. VEEDER:

12          Q  Now, would you proceed--

13          THE COURT:  Just a minute.  Colonel, how big a job

14  would it be to prepare some kind of a table onthis?

15          THE WITNESS:  It wouldn't be a very difficult job,

16  your Honor, to prepare a table.

17          THE COURT:  Mr. Stahlman says that counsel will

18  probably have to do it.  Your charts that you have presently

19  here are broken down first as to a list of water consumption

20  at the Naval Ammunition Depot; right?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Now, that Depot is in or outside the water-

23  shed?

24          THE WITNESS:  Partly within and partly without, your

25  Honor.  But all of the water uses within the Naval Ammunition

D

Z13

1   Depot are within the watershed.

2   THE COURT:  I see.  So you have those figures from year

3   to year, from '44 on to '58?

4   THE WITNESS:  Yes, sir.

5   THE COURT:  You have another list of figures from '44

6   to '57. Again, this is a water year now?

7   THE WITNESS: Yes, sir.

8   THE COURT:  And this is for Camp Pendleton and the

9   Navy Hospital?

10   THE WITNESS:  U. S. Navy Hospital.

11   THE COURT:  And that is broken down as to inside the

12   watershed line and outside the watershed line?

13   THE WITNESS:  Yes, sir.

14   THE COURT:  And you have been figuring out along the

15   side a computation or have already figured out a computation

16   of the total?

17   THE WITNESS::  Yes, sir.

18   THE COURT:  Of the in and outs?

19   THE WITNESS:  Yes, sir.  That is the total.

20   THE COURT:  To that total would be added then the

21   Naval Ammunition Depot?

22   THE WITNESS:  Yes, sir.

23   THE COURT:  Why don't you have the girl run a set of

24   these off.

25   MR. VEEDER:  If your Honor wants that we do it that way.

D

Z14

1    MR. STAHLMAN: It would be simpler, Bill. Not only

2 that, you may have some other attorneys that would be inter-

3 ested in this situation and would cross-examine.

4    MR. VEEDER: I keep forgetting George didn't buy a

5 daily transcript.

6    MR. STAHLMAN: Oh, you haven't forgotten it. If you

7 have, I will remind you.

8    THE COURT: See what you can do over the noon hour.

9    THE WITNESS: Yes, sir.

10    THE COURT: Prepare some copies.

11    What is the next matter you are going into?

12    MR. VEEDER: We will proceed on that same basis, then,

13 your Honor, if your Honor desires it done that way in regard

14 to irrigation uses. That was the next aspect that I was going

15 to interrogate about.

16    THE COURT: You also have exhibits on that score that

17 you are withdrawing?

18    MR. SACHSE: They are in that same series I mentioned,

19 your Honor.

20    THE COURT: Same series.

21    MR. VEEDER: The changes that were made by reason of

22 the change of the watershed line, and we have simply proceeded

23 on the basis that it was simpler to interrogate than it was

24 to revise all of the exhibits.

25    THE COURT: He just has two sheets there. The girl

D

Z15

1  could type up in fifteen minutes the material we have been

2  talking about up to now.  I haven't seen what he has got on

3  the irrigation.

4  BY MR. VEEDER:

5      Q  Would you proceed to state as to whether you have

6  made investigations as to the quantity of water utilized for

7  purposes of irrigation within and outside of the watershed of

8  the Santa Margarita River for purposes of irrigation?

9      A  Yes, sir.  I have made a tabulation of those.

10     THE COURT:  And also there is one sheet.

11  BY MR. VEEDER:

12     Q  And for what period of time have you made that

13  determination?

14     A  Water year 1942 through water year 1958, inclusive.

15     MR. VEEDER:  Now, if your Honor desires that we have that

16  put in tabular form and marked for exhibit, we will.

17     THE COURT:  All right.  Do it that way.

18     I noticed in this earlier tabulation that you showed

19  me a minute ago you only go through '57 on water used for

20  military purposes in Camp Pendleton and the Navy Hospital.

21     THE WITNESS:  Yes, sir.

22     THE COURT:  You don't have the '58 figures available

23  yet?

24     THE WITNESS:  I can get the '58 figures in very little

25  time, your Honor.

D

Z16

1          THE COURT:  I see.  All right.

2          MR. VEEDER:  We will do that, your Honor, if that is

3     your desire.

4          THE COURT:  I think it would be a lot easier to see

5     and study, cross-examine on, and use.

6          MR. STAHLMAN:  It will save time.

7     BY MR. VEEDER:

8          Q  Have you made an investigation, Colonel, in regard

9     to the acreages of land within the Naval Reservation from the

10    standpoint of land capability classes?  Now, that relates to

11    your Exhibit 93, as I recall.

12         A  Yes, sir.  I have made a land classification of

13    that area of the Naval Reservation lying within the watershed

14    of the Santa Margarita River.

15         Q  Do you have that tabulation with you now?

16         A  Yes, sir.

17         MR. VEEDER:  We would like to have marked for the

18    purpose of adding to Plaintiff's Exhibit 93-- May I have 93,

19    Mr. Luddy.

20         THE COURT:  93 was photos, 93-A to 93AF.  Is that

21    what you are talking about?

22         MR. VEEDER:  Just a moment.  It is this small--

23         THE CLERK:  You have the copy already.

24    BY MR. VEEDER:

25         Q  Now, I hand 93 to you, Colonel, and ask you to state

D

z17

1    what the substituion is that will be made in connection with

2    the Exhibit 93?

3         A   It appears in Plaintiff's Exhibit 93, the third page

4    in the exhibit, a sheet entitled "Tabulation" with the further

5    information that this is a tabulation of land capability

6    classification of United States Naval Reservation within the

7    Santa Margarita River watershed.  Following that there are

8    two columns:  One entitled "Land Class," under which appear

9    Roman numerals I, II, III, IV, VI, VII, and VIII.  A second

10   column is headed "Acreage," and under that, in that column,

11   appear figures which purport to show the acreage of land

12   classes indicated by numeral in the left-hand column.

13        Q And what are the changes that were made from the

14   aggregate standpoint, Colonel?

15        A   The changes made in the aggregate reduce the sum

16   of Land Class I through VI from 20,424, as shown on the

17   tabulation originally with Plaintiff's 93, to the sum of

18   19,200, as shown on the tabulation sheet dated 24 November 58.

19   There is also a difference in the sum of Class VII and VIII

20   land on the tabulation in Plaintiff's 93.  VII and VIII lands

21   are shown the total 17,465 acres.  And on the 24 November 58

22   tabulation they are shown the total 19,352.

23        MR. SACHSE:  That was the non-irrigable, VII and VIII?

24        THE WITNESS:  Yes, sir.

25        MR. SACHSE:  19,452?

D

Z18

THE WITNESS: 19,352, Mr. Sachse.

MR. SACHSE: Thank you.

THE WITNESS: On the 24 November 58. The total acreage as shown on the tabulation in Plaintiff's 93 is 38,031. That is 38,031. On the amended tabulation dated 24 November 58 the total acreage is shown to be 38,694.

THE COURT: I don't know. I have a note in this exhibit that on November 25th, '58, Col. Bowen in his testimony corrected the figure of 20,424 to be 18,947.

MR. SACHSE: I have the same note, your Honor.

THE COURT: Now, that is the day after. That is, November 25, '58. This new tabulation is dated November 24th, '58, the day before the correction.

BY MR. VEEDER:

Q Now, would you state into the record the reason for the revision that you have made in that, Col. Bowen?

A Well, the reason for the revision shown in the tabulation dated 24 November 58 is that some of the areas were incorrectly plotted as to land class on the overlay from which the measurements were made by planimetric means.

Q Is this figure that you are now referring to accurate in your own opinion?

A I would like to clarify his Honor's question, if I might. That figure which he read, 18,947, was given by me, but it did not refer to this tabulation. It referred to a

D

Z19

1    table entitled "Applied duty of water" and indicates the

2    sum of the lands which were irrigable.  It is noted, your

3    Honor, that that is somewhat less than the 19,200 by reason

4    of the fact that not all of the Class VI lands were considered

5    susceptible of practical and profitable irrigation, and some

6    odd corners were lopped off, so the total irrigable acreage

7    there appears differently than the subtotal of the sum of lands

8    Class I through VI as shown on the 24 November, '58.

9        THE COURT:  Where was this table that you say this

10   correction should have concerned, in this exhibit?

11       THE WITNESS:  It is not in Exhibit 93, your Honor.

12   That was another schedule which I prepared.

13       MR. VEEDER:  That is another phase of the testimony,

14   your Honor.

15       THE COURT:  Well, it is unimportant.  I have it noted

16   on this tabulation.  You are substituting, therefore, this

17   new tabulation for the old?

18       MR. VEEDER:  Which we now offer, your Honor.

19       THE COURT:  In Exhibit 93?

20       MR. MOSKOVITZ:  Do you have copies?

21       MR. VEEDER:  Was there some inquiry about it?

22       MR. MOSKOVITZ:  Yes.  Do you have copies of the new

23   tabulation?

24       MR. VEEDER:  Oh, yes, yes.

25       MR. MOSKOVITZ:  Where?

D

Z20

1    MR. VEEDER:  They will be given to you now.

2    Do you have extra copies, Colonel?

3    THE COURT:  Unless there is objection, this page which

4    is page 3 in Exhibit 93 will be substituted.

5    MR. VEEDER:  Your Honor.

6    THE COURT:  I have a copy.

7    MR. STAHLMAN:  Did your Honor say "substitute it" or

8    "supplement it"?

9    THE COURT:  Supplement it.  We will not tear anything

10   out of the old exhibit; we will supplement it by putting a

11   replacement sheet in.

12   This exhibit that you handed me, Mr. Stahlman, is Vail

13   I or Vail 1?

14   MR. STAHLMAN:  It is Vail I.

15   MR. VEEDER:  Which is that, now?

16   MR. STAHLMAN:  Well, that is one that has been lodged,

17   and his Honor asked the other day for a copy.  You kindly

18   prepared some very bad copies for me, and I handed one to the

19   Judge so he could have it among his exhibits.  But if it is

20   too bad, I will go have some made that will look a little

21   better.

22   MR. VEEDER:  I don't want you to be cluttering up our

23   exhibits is all.

24   Q  Col. Bowen, have you made a calculation as to the

25   total water requirement of the lands which you have determined

1  to be irrigable within the watershed of the Santa Margarita

2  River?

3          MR. SACHSE:  I will object, if your Honor please,

4  without some further elaboration as to what they are irrigable

5  for.

6          MR. VEEDER:  I have simply asked if he had some cal-

7  culations.

8          THE COURT:  Your question is too broad.  You mean lands

9  of the United States that are within the watershed of the

10  Santa Margarita?  Is that what you mean?

11          MR. VEEDER:  It is a preliminary question.

12          THE COURT:  What?

13          MR. VEEDER:  I was simply asking a preliminary question,

14  but I will ask him another.

15          THE COURT:  All right.

16  BY MR. VEEDER:

17          Q  Did you make an investigation and a determination

18  of the water requirements of the total irrigable lands owned

19  by the United States of America and situated within the water-

20  shed of the Santa Margarita River?

21          A  Yes, sir.

22          Q  And what was the basis upon which you made that

23  determination, Col. Bowen?

24          A  Based upon detailed soil surveys of the Federally

25  owned or controlled properties within the watershed of the

D

Z22

1    Santa Margarita River.

2          Q  And what were the kinds and types of crops that you

3    took into consideration when you made this determination?

4          A  I took into consideration everything from sub-

5    tropical fruits which are adapted to the milder coastal

6    climates to truck crops, row crops, general field crops,

7    corn, potatoes, sugar beets, grain, alfalfa, irrigated

8    pasture.

9          MR. STAHLMAN:  This is preliminary, because you have

10   gone into this before, this particular phase of it?

11         MR. VEEDER:  Yes, sir.

12         THE COURT:  Do you have an exhibit on this?

13         MR. VEEDER:  I wasn't going to give an exhibit on it,

14   your Honor.  If you want me to write up a tabulation, I

15   will.

16         Q  From the standpoint of row crops, Col. Bowen, how

17   many acres of row crops did you determine could be raised on

18   this 18,950 acres of irrigable land?

19         MR. SACHSE:  If the Court please, I will object.  It

20   is irrelevant, immaterial, and has no relation whatsoever to

21   a water right.

22         THE COURT:  Where is the testimony about 18,947?  I

23   called his attention to my note.  But I don't know.  What

24   tabulation did that correct?  That figure doesn't appear in

25   the new tabulation.

D

Z23

Bowen — Direct                                      7708

1    BY MR. VEEDER:

2         Q  Col. Bowen, would you go ahead and state then the

3    basis upon which you made the calculation from the standpoint

4    of the total irrigable acreage that, based upon your investiga-

5    tions, could be irrigated from the Santa Margarita River

6    within the watershed, the title to which is in the United

7    States of America?

8         THE COURT:  Your question is broad enough to cover

9    the national forests and the Indian lands.  You are not talk-

10   ing about those?

11        MR. VEEDER: I am talking about Camp Pendleton, your

12   Honor.

13        THE COURT:  All right.  You didn't say so, but that is

14   what you mean.  We understand you.

15        Your chart that you put into Exhibit 93, Mr. Witness,

16   has a total of 19,200 acres.  Is that Classes I to VI?  Is

17   that your irrigable land?

18        THE WITNESS: No, sir, it is not.  The irrigable land

19   is the 18,947 which I gave your Honor on the 25th of November.

20        THE COURT:  What is the discrepancy between that and

21   19,200?

22        MR. VEEDER:  Well, your Honor, he explained--

23        THE WITNESS:  There is no discrepancy, your Honor.  I

24   simply felt, it was my opinion, that a portion of the Class VI

25   lands which are properly classified to VI were not susceptible

D

Z24

1   of practical and profitable irrigation.  The only way that

2   they can be irrigated, your Honor, is under conditions and

3   under management which will allow the production of a high

4   valued crop with no cultivation.  The sites in Class VI or the

5   sites classified as VI are generally on moderately steep

6   slopes, ofttimes with medium to shallow soils, highly

7   susceptible to erosion if the vegetative cover is removed.

8   And great care must be exercised in the management of those

9   sites in order to prevent their complete and utter deteriora-

10  tion.

11          THE COURT:  All right.

12          THE WITNESS:  In this area, your Honor, the avocado

13  and other subtropical fruits have been found adapted to certain

14  soil sites that provide good internal drainage, that is,

15  water drainage within the soil.  Free air drainage across

16  the surface, so that the frost hazard is minimized. And they

17  are so managed that by piping water to each tree and building

18  a basin around the tree, they can be irrigated without running

19  water across the surface.  The vegetative cover of grass can

20  be left without cultivation to protect the soil and keep it

21  in place.  Now, where all of those qualifications did not

22  prevail with the Class VI lands on the Naval Reservation, I

23  considered them not suitable for irrigation and, therefore,

24  I came up with a lesser figure of 18,947.

25          THE COURT:  All right, take a recess.  2 o'clock.

            (Noon recess.)

E

Z28

SAN DIEGO, CALIFORNIA, THURSDAY, JANUARY 22, 1959.   2:00 P.M.

 

    (Another matter.)

    MR. MOSKOVITZ:  Your Honor, I have a couple of corrections to make in yesterday's transcript.  At page 7542, line 9, the last word in that line should be "law" instead of "log".

    On page 7543, line 7, the word "hold" should be "role."

    MR. VEEDER:  Your Honor, I have asked that Mr. Illingworth be here in the morning, and it is not a request that was lightly made by me, in any sense.  Based upon statements into the record made by Mr. Moskovitz, apparently there are going to be changes in some of the exhibits that have been lodged with the Court since the inception of the case.  I am referring in particular to Plate 23 of Bulletin 57.  That plate, from our view, was a key to a great deal of our thinking, preparation and approach to this lawsuit.  I think that it is essential that we call the witness as an adverse witness as part of our case in chief to understand or to attempt to understand what changes could possibly be made and to understand, if possible, the reason for the changes at this date.

    THE COURT:  How would any changes in that plate have anything to do with the Government's case in chief?  If they want to make some changes before the plate is offered, they should have that right, and you can cross-examine.  But how does that become part of your case in chief?

E

Z29

1    MR. VEEDER:  It certainly is very important, from our

2    standpoint, particularly in the calculation of our water uses

3    within the basin and our inventory of the water that we believe

4    is essential for the survival of Camp Pendleton.

5        THE COURT:  What is essential?  That you rely upon

6    their plate?

7        MR. VEEDER:  No, I am not relying upon their plate,

8    but I certainly have a right, your Honor, and the only reason

9    for a pre-trial conference and a pre-trial order and the

10   lodging of exhibits is for us to understand what is contemplated

11   in this lawsuit.  Now we are confronted with a situation-- and

12   your Honor is entitled to an explanation for my request-- I

13   had intended simply to go ahead and when the witnesses were

14   called to interrogate them.  I might also add that I had thought

15   that at one time the State would put in their case in regard

16   to hydrology at the same time that the put in their geology.

17   Now I find there is going to be a continuance until the middle

18   of February, with expected changes in all these documents,

19   the basic material upon which the issues are formulated.

20       I don't know how long the interrogation would be, but

21   I certainly think that we are entitled to know, in our case in

22   chief, as to the proposals and the changes and the thinking

23   that has come about.  I don't intend to rest, in the light of

24   the statement that Mr. Moskovitz has made, until we have had an

25   opportunity further to consider the approach that is being

7712

E

Z30

1    taken.  I don't see  how I dare.

2         I would like to go ahead with Col. Bowen and wind up

3    as rapidly as we can.  We have been moving rapidly on our

4    case in chief.  In the last two weeks we have moved far down

5    the road.

6         I am certainly interested in knowing, particularly in

7    view of the fact that Fallbrook's permits were predicated

8    upon Bulletin 57, the changes that are contemplated, and I

9    think I am entitled to know it.

10        MR. MOSKOVITZ:  Your Honor, I think Mr. Veeder has

11   things backwards.  He is not entitled to know what the de-

12   fendants' case is before he rests.  The plaintiff puts in his

13   case, and the defendant puts in his case, and then the plain-

14   tiff has rebuttal.  When our case comes on Mr. Veeder will

15   know just what alterations to bring the exhibit up to date

16   have been made.

17        I have no objection to bringing Mr. Illingworth back,

18   if Mr. Veeder wants him for his case in chief.

19        MR. VEEDER:  That's right.

20        MR. MOSKOVITZ:  I do have an objection, your Honor, to

21   bringing him tomorrow, when Mr. Veeder's witness will probably

22   not be through then, just as a matter of convenience to Mr.

23   Illingworth.  He went up to Los Angeles this morning.  I see

24   no reason to interrupt Col. Bowen's testimony to bring Mr.

25   Illingworth down.  I can't see any reason for bringing him down

E

Z31

1    tomorrow.

2            MR. VEEDER:  I expect to be through with Col. Bowen

3    very shortly this afternoon.

4            THE COURT:  There is going to be some cross-examination.

5    Mr. Sachse has already told you that he will have considerable

6    cross-examination of Col. Bowen.

7            MR. VEEDER:  I would lik, however, at this point to

8    bring to the Court's attention, not that I need to bring it

9    to your Honor's attention, but also to Mr. Moskovitz's

10   attention, the spirit and the intendment of Rule 16.  He says

11   that I am not entitled to know what the case is going to be.

12           THE COURT:  Oh, well, the purpose of pre-trial is that

13   you know generally.  But here is a problem where some change

14   is going to be made, apparently, in the figures on water

15   available, et cetera, which is part of the State's case.  It

16   is not part of your case.  You are not going to be hurt.  This

17   case ins't going to be decided next week.  There is plenty

18   of time.  Now if the data is going to be available in the

19   middle of February, that will be soon enough to find out.  I

20   don't see how it affects your case at all.

21           MR. VEEDER:  Your Honor, I will not rest until I find

22   out the changes that are being made.

23           THE COURT:  I don't care whether you rest or not.  When

24   you get through we will go on with somebody else.  You can

25   say whether you rest or not.  It doesn't make any difference.

E

Z32

1  But we saw wood here as long as we can.

2  MR. VEEDER:  I will saw wood just as long as I can,

3  your Honor.  But as I said, my own feeling is that we are

4  entitled to know.  We have had these things lodged.  This

5  thing was written in 1951, 2, 3.

6  THE COURT:  What type of change is to be made?  The

7  amounts of the figures?

8  MR. MOSKOVITZ:  Your Honor, we are going to take into

9  account the years that have intervened since then, and certain

10  of the figures that were used in calculating inflow to the

11  coastal basin were based on estimates, because they are not

12  runoff figures going back through the full period that was

13  considered.  We are considering a different approach to the

14  making of these estimates of runoff.  Our effort is to have

15  this as reasonable and as sound a basis for the studies as we

16  can have at this time, and with conditions changing we feel

17  we may have a better way of estimating some of these figures.

18  That is what they are undergoing right now.

19  MR. VEEDER: Certainly there has been no change since

20  April 10 when they issued the permits to Fallbrook.

21  MR. MOSKOVITZ:  I think that is irrelevant.

22  THE COURT:  Would you want to interrogate Mr. Illingworth

23  on something else besides this plate that you mentioned?

24  MR. VEEDER:  I would interrogate him in regard to Plate

25  23 and to the whole write-up that they have on hydrology.  In

E

Z33

1    their exhibit they have designated the pages for Mr. Illing-

2    worth's testimony in the letter of November 10th, and they

3    have specified the pages concerning which Mr. Illingworth

4    will testify and they have indicated these plates which were

5    part of their case.

6        Now their calculations here are shown in regard to the

7    methods of determining the runoff and the availability of

8    water, the fact that there was a determination that there was

9    a surplus of water, the very essence of their case, and indeed

10   Fallbrook's case, is summed up in Mr. Illingworth's testimony,

11   particularly the plates that are referred to on the second

12   page of Mr. Moskovitz's letter of November 10, 1958.

13       THE COURT:  I will direct him to be here Tuesday

14   morning, not tomorrow morning, and if this work has been

15   completed-- first of all, you may interrogated him on the

16   portions of the Bulletin 57 which are intended for consider-

17   ation by the State.  I don't know whether any of those portions

18   that you talk about are in evidence as his testimony.

19       MR. VEEDER:  They are marked, your Honor.

20       THE COURT:  They are identified.  If he has completed

21   any of the work on these matters, you may interrogate him on

22   those.  But if he hasn't, that is the end of it, until he has

23   completed it.

24       MR. MOSKOVITZ:  Your Honor, I wanted to make this point,

25   that I think Mr. Veeder is going to attempt to shake up the

E

Z34

1   case that we propose to put in by asking questions about

2   portions of it before the entire presentation is ready, and I

3   object to that.  It seems to me that we should have this trial

4   proceed in an orderly way and let the direct examination go

5   in first and then the cross-examination.  Mr. Veeder will

6   have the opportunity to do so.

7       THE COURT:  He is calling this witness, I understood,

8   as--

9       MR. VEEDER:  As an adverse witness.

10      THE COURT:  As what?

11      MR. VEEDER:  As an adverse witness.

12      MR. MOSKOVITZ:  It seems to me that this is just another

13  way of saying that he is going to be cross-examining him.

14  Your Honor has already asked Mr. Sachse to withhold examination

15  of Col. Bowen on matters relating to the residuum and the

16  basement complex until Mr. Veeder has completed a study now

17  underway and has put in the results of that study, for orderly

18  consideration of the evidence.  It seems to me this is the same

19  sort of situation.

20      THE COURT:  You mean you haven't made your final decisions

21  as to what position the witness is going to take on some of

22  these matters?

23      MR. MOSKOVITZ:  I am saying that these studies are still

24  underway and the results are not out, and we feel that the

25  entire presentation should come in when it is completed.

E

Z35

1      MR. STAHLMAN:  May I ask what the nature of them are?

2      MR. MOSKOVITZ:  I have no objection to telling you

3  what the nature of them is.  These are studies of safe yield

4  on the coastal ground water basin and of outflow to the ocean

5  on the basis of different assumptions concerning flow to the

6  basin and they would be based, of course, on records, with

7  corrections as appropriate, to show the significance of flow

8  and development.

9      MR. VEEDER:  Are these changes subsequent to the issuance

10  of the permits to Fallbrook of April 10, 1958?

11      MR. MOSKOVITZ:  These are studies, Mr. Veeder.  They

12  have nothing to do with the issuance of the permit to the

13  Fallbrook Public Utility District.

14      MR. VEEDER:  Your Honor has ruled as I desired him to.

15  I just want the man here.

16      THE COURT:  Well, it depends.  Now, if they are making

17  studies and the witness isn't prepared to take a position on

18  certain matters at this time, I am not going to let you bring

19  him down here and waste a lot of time.

20      MR. VEEDER:  All right.

21      THE COURT:  Now, if there are particular matters in

22  Bulletin 57-- what pages are you talking about?

23      MR. VEEDER:  The references are easily identified.  If

24  your Honor has a copy of Mr. Moskovitz's letter, the letter

25  of November 10 refers to Mr. Illingworth's testimony, pages82

1    to 106.

2            THE COURT:  This is Volume I?

3            MR. VEEDER:  That is correct.

4            THE COURT:  Pages 82 to 106?

5            MR. VEEDER:  And Chapter 3, which is apparently the

6    real heart of California's attack on the United States,

7    starting at page 107.  Now that is Water Utilization, Water

8    Requirements, et cetera.  It goes on through the study of the

9    Vail Reservoir, the Vail uses, contemplation of all diversion,

10   and the essence of their calculations appears on Plate 23.  I

11   think that is probably the last plate in Volume I.

12           Now it is extremely important, from the position of the

13   United States, that we be advised and forewarned as to what the

14   course is going to be.  We have, for practical purposes,

15   released the U.S.G.S. personnel, outside of Mr. Kunkel, and

16   they of course have reviewed these matters and we have dis-

17   cussed them with them, and if there are going to be changes

18   that is why I am interested in knowing so that we can properly

19   prepare.

20           THE COURT:  I understand there are going to be changes.

21   Is that right?

22           MR. MOSKOVITZ:  Yes, there are, your Honor, and we will

23   have an exhibit which summarizes the results, one or more,

24   which will be lodged in accordance with the ruling.

25           THE COURT:  Lodged by when?

E

Z37

1    MR. MOSKOVITZ:  The date we propose would be the 6th,

2  and therefore we would be ready to go on, if the schedule

3  allows, on the 16th.

4    MR. VEEDER:  I would be glad to waive the ten-day

5  period, if we can get some information as to what we can

6  reasonably anticipate.

7    MR. MOSKOVITZ:  I don't think it is going to be helpful

8  to you, Mr. Veeder, or to the Court or any of us if we give

9  you the information before the studies are completed.

10    THE COURT:  Let's find out about this.  Suppose Mr.

11  Veeder waives the ten-day period, will you be able to start

12  on or about the 6th of February?

13    MR. MOSKOVITZ:  The 6th is a Friday.  We would be able

14  to start, I imagine, on the following Tuesday.  But then Mr.

15  Veeder may not have the time he needs.  In other words, I

16  don't want to give him something until it is finished.

17    THE COURT:  Assuming that you have it filed about the

18  6th, will you be ready to start the next Tuesday, if he waives

19  the ten-day period?

20    MR. MOSKOVITZ:  Yes, your Honor.

21    MR. VEEDER:  Is this going to be some more of the

22  canned testimony?  Are you going to write it up or are you

23  going to interrogate him?

24    MR. MOSKOVITZ:  We are going to have the bulletin to

25  refer to for various data that is collected there, and then

1   we will have testimony, with exhibits, which will summarize

2   these studies and other matters we want to cover.

3          MR. VEEDER:  You haven't answered the question.  Is it

4   going to be oral question testimony, or is it going to be

5   canned, like you put in Mr. James's testimony?

6          MR. MOSKOVITZ:  There will be oral questions and answers,

7   and there will be certain portions we will refer to for the

8   purpose of speeding up the taking of the testimony.

9          THE COURT:  You mean certain portions of the old

10  Bulletin?

11         MR. MOSKOVITZ:  Yes.

12         THE COURT:  The other testimony will be oral?

13         MR. MOSKOVITZ:  Yes.

14         THE COURT:  Do you want Mr. Illingworth here for any-

15  thing besides the matter of examination on those chapters

16  that you mentioned?

17         MR. VEEDER:  Yes, on the pages he has made reference to,

18  and also to the related plates, Plate 23 being simply a

19  composite.

20         THE COURT:  I will set aside my order and I will not

21  direct him to be here until the study is completed.

22         MR. VEEDER:  I want to make an objection to your Honor's

23  ruling.

24         THE COURT:  Object right now.

25         MR. VEEDER:  I have just now.

E

Z39

1    THE COURT:  All right, the objection is overruled.  I

2 don't know what kind of objection it is.

3    MR. VEEDER:  Well, I have a right, under the pre-trial

4 order, your Honor, to know when they are going to shift around

5 and change their whole course.

6    THE COURT:  You have, and he has now informed you that

7 they are studying this matter and that by February 6th they

8 will have their supplemental exhibits and will be in a position

9 to proceed.

10    MR. VEEDER:  And will that be limited-- may I inquire a

11 bit further on this-- will the changes be limited simply to

12 runoff and to safe annual yield?  Now don't suffer so much,

13 Mr. Moskovitz.

14    MR. MOSKOVITZ:  Well, these things are being done by

15 these technical people.  I am not sure of all the details.  I

16 am giving you the general subject matter that is to be covered.

17    THE COURT:  All right.

18    MR. MOSKOVITZ:  I can't go further.  You objected when

19 we tried to pin you down as to what you were going to do next.

20 I am trying to be helpful, but I don't want to mislead you or

21 anyone else.  I have told you generally, and this is what we

22 are doing.

23    THE COURT:  Proceed.

24    MR. STAHLMAN:  I have one thing, your Honor.  I don't

25 want you to assume, from my prolonged silence, that I don't have

1     an interest in one phase of this discussion.  I have no

2     interest in when Mr. Illingworth gets here or when Mr. Veeder

3     wants to put him on.  But I do have the same thought in mind

4     that I had when I made the suggestion regarding the geology

5     and the hydrology being put in, as I suggested previously,

6     so that we may have an understanding as to what it is and as

7     to when it comes in.  I just want it understood that I think

8     it should be in before we put on our case.

9               THE COURT:  You mean California's geology?

10              MR. STAHLMAN:  Yes.

1      MR. VEEDER:  Now, your Honor has asked that we make a

2  tabulation of the quantities of water which were utilized for

3  military purposes inside of the natural watershed line of the

4  Santa Margarita within the Naval enclave and without the Naval

5  enclave, I mean, and without the watershed.

6

7                    ALLEN C. BOWEN,

8  recalled as a witness in behalf of the plaintiff, having been

9  previously sworn, testified further as follows:

10

11                FURTHER DIRECT EXAMINATION

12  BY MR. VEEDER:

13      Q  And I ask Col. Bowen now if you have prepared a

14  tabulation showing the water used for military purposes from

15  the Santa Margarita River, both inside and outside of the

16  watershed within Camp Pendleton?

17      A  I have.

18      MR. VEEDER:  And I would like to have that marked for

19  identification, your Honor.

20      THE COURT:  It would be 150, Mr. Clerk?

21      THE CLERK:  Yes, your Honor.

22      THE COURT:  By the word "Camp Pendleton," now do you

23  include the Naval Hospital, too?

24      THE WITNESS:  Sir, on this--

25      MR. VEEDER:  You mean within the Naval enclave, your

F

Z26

1    Honor?

2         THE WITNESS:  In the one I have combined Camp Pendleton,

3    the U. S. Naval Hospital, and the Naval Ammunition Depot.

4         THE COURT:  This is really within the enclave, then, is

5    it?

6         THE WITNESS:  Yes, sir.

7         MR. SACHSE:  Now, your Honor, if I had realized that

8    this was going to be, I could have mentioned it earlier and

9    perhaps saved time.  I think we are getting into a rather

10   serious objection.  There is no question from the record

11   presently before you; it can't be contradicted; it is

12   documentary evidence introduced by the United States itself

13   that the Naval Ammuntion Depot is a separate acquisition by

14   the United States prior to the acquisition of the remainder

15   of Camp Pendleton.  Now, there is no question-- I am conceding

16   frankly that they are both riparian tracts.  But it is ABC

17   Hornbrook water law that the mere acquisition by a single

18   owner of two adjoining riparian tracts separately does not

19   enable him thereafter to pool the water rights of the two

20   tracts.  A severance was accomplished when the Rancho Santa

21   Margarita/sold the United States the Naval Ammunition Depot.
                     River

22        MR. VEEDER:  The Santa Margarita River?

23        MR. SACHSE:  The Santa Margarita sold the United States

24   the Naval Ammunition Depot.  And the Naval Ammunition Depot

25   has a riparian right.  There is no argument about it.  But that

F

Z27

1  right at that time became severed from the rest of the rights

2  of the Rancho Santa Margarita.  Then, the Rancho Santa

3  Margarita sold the rest of it to the United States for Camp

4  Pendleton, and those riparian rights are severed.  And it is

5  entirely improper if this is intended to be any evidence

6  whatsoever of their right.  It is entirely improper to pool

7  the two rights.  If it is not intended to in some way con-

8  tribute to proof of their right, then, it is, of course, I

9  think absolutely material.  And we are going to have to face

10  this issue sooner or later.  I think we ought to thresh it out

11  now.

12      THE COURT:  You can find out on cross-examination.  You

13  can have him bring in another list.  Let's go ahead with what

14  we have got here now.

15      MR. VEEDER:  I would like to-- Mr. Sachse has touched

16  on a point that we might as well just make one observation about.

17  The Naval Ammunition Depot abuts upon the Santa Margarita

18  River.  And it may be a matter of title that he is raising.

19  But certainly, the question of the use of water and the

20  beneficial use of it is material, and I can't imagine anything

21  more material.

22      THE COURT:  Well, you have heard his objection.  You

23  know what he is talking about.

24      MR. VEEDER:  I am not sure, your Honor.

25      THE COURT:  His contention is that the ammunition depot

F

Z28

1  has certain riparian rights.  The rest of the camp has

2  certain riparian rights.  But you can't pool them and say

3  that so and so makes so and so and that is our total rights.

4  That is his point, and he wants you to segregate the uses that

5  you made on the Naval Ammunition Depot.  And you have those

6  figures separately?

7      MR. VEEDER:  That is right.

8      THE COURT:  And you give them to us.

9      MR. SACHSE:  I will do it by cross, your Honor.

10      THE COURT:  Do you have a copy of this Exhibit 150?

11      MR. VEEDER:  Yes.

12      Q  I would like to have you straighten this one point

13  out, Colonel, in the right-hand column.  Will you state into

14  the record.

15      A  Plaintiff's Exhibit 150 for Identification comprises

16  three columns, four columns, actually:  The first showing

17  the water year; the second showing the acre-feet used inside

18  the natural watershed line; the third showing the acre-feet

19  of water used outside the natural watershed line; and the

20  fourth column being the total on the original copy of Plain-

21  tiff's 150 for Identification.  I have changed the 5 to a 6;

22  an arithmetical error was made in this tabulation.

23      THE COURT:  That is the first total on the right-hand

24  column?

25      THE WITNESS:  Yes, sir.  That now reads 3,620 instead

F

Z29

1   of 3,520.  It is the sum of the two preceding columns.

2         THE COURT:  Is this copy for me?

3         MR. VEEDER:  I have a copy for you coming up now, your

4   Honor.

5         Q  Now, in regard to the water used for irrigation

6   purposes, would you state whether you have prepared an exhibit

7   for the water utilized within and without the watershed of the

8   Santa Margarita River for purposes of irrigation?

9         A  Yes, sir, I have.

10         Q  And that is within the Naval enclave, is that

11   correct?

12         A  Yes, sir.

13         THE COURT:  Mark this 151.  You have a copy of that

14   150 for me?

15         MR. VEEDER:  Yes, your Honor.  It is coming up.  Mr.

16   Burby has gone down to get it for you.

17         MR. STAHLMAN:  You can have this one, and I will take

18   the one when it comes in.

19   BY MR. VEEDER:

20         Q  Will you state whether you have made the determinations

21   that are shown on Plaintiff's Exhibit 151 and whether this is

22   accurate to your personal knowledge?

23         A  I have, and they are.

24         MR. VEEDER:  I offer in evidence Plaintiff's Exhibits

25   marked 150 and 151.

F

Z30

THE COURT: Received in evidence; but with the understanding that we will have somewhere, by cross or by supplemental exhibit, a breakdown showing the uses for the Ammuntion Depot.

BY MR. VEEDER:

Q   Now, Col. Bowen, would you approach Plaintiff's Exhibit marked 94 and state into the record-- first, read into the record the title block of that exhibit.

A   Plaintiff's Exhibit 94 is entitled "The Santa Margarita River Watershed Within Camp Pendleton; Land Utilization."

Q   And have you made a determination, Col. Bowen, from the standpoint of the duty of water required for the kind and type of crops that you believe may be grown upon the lands depicted on Plaintiff's Exhibit marked 94?

A   I have.

Q   And would you state into the record the number of crops that you have determined could reasonably be raised, row crops, that could be reasonably raised on the land in question?

MR. STAHLMAN:  You mean the number of acres?

MR. VEEDER:  That is right; the number of acres.

MR. STAHLMAN:  Or the number of crops?

MR. VEEDER:  Number of acres of row crops in that area.

THE WITNESS:  Yes, I have.

F

Z31

BY MR. VEEDER:

Q  And would you state that into the record, please.

A  The area of the Naval enclave within the Santa
Margarita River which is suited to the culture of row crops
is indicated on Plaintiff's Exhibit 94 with the yellow color.
I would like to call to your Honor's attention that the color
scheme on Plaintiff's Exhibit 94 has no relation to the color
chart in Plaintiff's Exhibit 93, which gives colors illustrat-
ing or designating the various classes of land.  This is
completely unrelated to that exhibit from the standpoint of
color.

The area designated on Plaintiff's 94 as RC, an
abbreviation for row crops, and colored in yellow, totals
6,502 acres.

Q  And how many crops a year of row crops could be
reasonably raised in that area, based upon your investigation,
Colonel?

A  At least two.  In some instances, three.

Q  And have you made an estimate as to what would be a
reasonable water duty for the row crops, based upon a two-crop
year?

A  I have.

Q  And would you state into the record what you have
determined that water duty to be, the applied duty of water?

A  The applied duty of water for the row crop land in

F

Z32

1    the coastal area is four feet per acre per year.

2        Q  And what would be the aggregate then predicated

3    upon your estimate?

4        A  Well, that would be the area times the depth of

5    water, which would be 26,008 acre feet of water per year for

6    the full utilization of the land designated as row crop on

7    Plaintiff's 94.

8        Q  From the standpoint of the raising of citrus, have

9    you made a determination as to the number of acres of land

10   that could be reasonably cropped with citrus?  Have you made

11   that determination?

12       A  I have.

13       Q  And would you state into the record the number of

14   acres that you have designated as the kind and type of land

15   which could reasonably be used for citrus?

16       A  The citrus lands are indicated on Plaintiff's Exhibit

17   94 with the letter C and the color orange; and the acreage of

18   those lands so designated are 2,140.

19       Q  And have you considered the applied duty of water

20   which would be requisite per acre for the raising of citrus?

21       A  I have.

22       Q  Upon the lands in question?

23       A  Yes, sir.

24       Q  And would you state into the record what you have

25   determined that applied duty of water to be?

F

Z33

A  The rate of application for citrus is 1.86 feet per acre for a total of 3,980 acre feet of water required for the area colored orange on Plaintiff's 94.

Q  From the standpoint of avocados, have you made a similar investigation as you made in regard to citrus and row crops from the standpoint of acres that could be reasonably utilized for growth of avocados?

A  Yes, sir.

Q  And would you state into the record the number of acres that you determined would fall into that category?

A  The avocado land is shown on Plaintiff's Exhibit 94 with the letter A and the green color, light green.  The acreage of that avocado land is 7,246.

Q  And what would be your opinion as to the reasonable applied duty of water for avocados?

A  2.35 feet per acre per year.

Q  And what would be, in your opinion, the quantity of water reasonably required annually for that purpose?

A  That would be 17,028 acre feet of water annually to irrigate the avocado land that is shown on Plaintiff's Exhibit 94.

Q  And have you made a determination as to the number of acres of land that could be reasonably utilized for purposes of irrigated pasture within the area set forth on the Exhibit 94?

F

Z34

1   A   I have.

2   Q   And would you state into the record the number of

3   acres that you have determined would fall into that category?

4   A   3,059 acres of irrigated pasture are shown on

5   Plaintiff's Exhibit 94, with the letter P and the light brown

6   color.

7   MR. STAHLMAN:  May I check that figure?  3,059, was it?

8   THE WITNESS:  3,059, yes, sir.

9   BY MR. VEEDER:

10   Q   And what would be your opinion as to the applied

11   duty of water for the irrigated pasture?

12   A   It would be 3.83 feet per acre per year.

13   Q   For an aggregate for the year of how much?

14   A   11,716 acre feet of water would be required each

15   year for the irrigated pasture land delineated on Plaintiff's

16   Exhibit 94.

17   Q   From the standpoint of the total number of acre feet

18   that you believe could be reasonably utilized upon these lands

19   for the purposes concerning which you have now testified,

20   will you state the aggregate of each year?

21   A   Well, the total irrigable acreage is 18,947, as

22   delineated on Plaintiff's Exhibit 94, that being the sum of

23   the crops requiring irrigation.  And the total amount of water

24   required for those crops for the year if completely subjugated

25   would be 58,732 acre feet of water per year.

F

Z35

Q   For the record, would you state what you have meant when you used the term "applied duty of water"?

A   The term "applied duty of water" means the amount of water actually delivered to the irrigated field.

Q   Have you given consideration to the method of calculating and computing a reasonable diversion duty for the kinds and types of crops and acreages to which you have made reference?

THE COURT:  Diversion duty?  What do you mean, loss in transporting the water to the place of irrigation?

MR. VEEDER:  That is correct, your Honor.  We could call it project duty.  It would be simpler.

Q   Have you made that determination, Colonel?

A   Yes, sir.

Q   And would you state into the record what, in your opinion, would be the diversion or project duty to irrigate the acreages concerning which you have just testified which are set forth, the lands which appear upon the exhibit marked 94?

A   I have used 10% of the applied duty as the amount of water loss between the point of diversion and the place of use.

Q   And in your opinion, is that a reasonable calculation in the light of present methods of irrigation?

A   Yes, sir.

Z36

THE COURT:  What does that mean?  That would increase your figure of 58,000 acre feet by 10%?

THE WITNESS:  Yes, sir, to arrive at the project duty.

THE COURT:  You take 10% of 58,000 as a project duty?

THE WITNESS:  No, sir.  10% of 58,000 added to 58,000, the sum of that is then the project duty.  That is the total amount of water diverted in order to deliver 58,000 acre feet of water to the field.

THE COURT:  All right.

MR. VEEDER:  Does your Honor have further questions?

THE COURT:  It makes 64,605 acre feet; right?

THE WITNESS:  I haven't checked that out, your Honor.  Did your Honor say 64,605?

THE COURT:  Right.

THE WITNESS:  Yes, sir, I have checked that figure.  That would be the project duty.

THE COURT:  Then, the project duty was not as I stated it and to which Mr. Veeder aquiesced as being the loss.  The project duty is the gross amount of water required to take water to a place and put it on the field and, therefore, includes a total of the amount lost during the diversion process and plus the water put on the fields?

THE WITNESS:  Yes, sir.

MR. VEEDER:  That is correct, your Honor.

THE COURT:  All right.

Z37

BY MR. VEEDER:

Q   Col. Bowen, would you state into the record a description of the facilities that constitute the diversion dam, the O'Neill ditch, and Lake O'Neill?  What are the--

MR. SACHSE:  I will object.  It has been asked and answered.  It has been cross-examined on; and we have an exhibit in the record and lengthy testimony on this very question.

MR. VEEDER:  I am simply making some preliminary inquiries, your Honor.  I think that it may be as Mr. Sachse says.  It may be that there are references to these structures. However, I am trying now to, and I undertake--

THE COURT:  All right, overruled.  Go ahead.

BY MR. VEEDER:

Q   Would you describe those structures, Col. Bowen?

A   As they presently exist, Mr. Veeder?

Q   The present ditch from Santa Margarita River down to the Lake O'Neill.

A   The present O'Neill diversion on the Santa Margarita River consists of a rock weir, which the Court saw under construction during the view of the premises at Camp Pendleton. The crest of this weir runs completely across the Santa Margarita river bed, stream bed, just below the Hospital Well. The crest of the weir is four feet above natural stream bed elevation, and it serves to divert surface flow from the

1    Santa Margarita River into the O'Neill ditch system.  The

2    water flows through an earth-lined ditch, and through the

3    various structures which the Court has seen:  The flood

4    control gate-- or, firstly, the inlet gate structure, control

5    gate structure, the five-foot Parshall    flume, the flood

6    control gate which was part of the old ranch flood protection

7    system, the diversion box from which water can be allowed

8    to continue on down to the lake or be diverted into the off-

9    channel spreading basins or both, the three-foot Parshall

10   Flume which is the station at which the O'Neill ditch record

11   of stream flow is taken, through various culverts until it

12   reaches the downstream division box at which point the water

13   may be discharged into Lake O'Neill or discharged below the

14   spillway section of Lake O'Neill.  Lake O'Neill itself is a

15   fresh water pond of about 135 acres in area, and the outlet

16   structure which the Court has seen is at the opposite end

17   of the dam impounding Lake O'Neill from the inlet structure.

18       Q  Have you considered the aerial photographs which

19   are the 75 series which depict the irrigation system which

20   was in existence in 1938?

21       A  Yes, sir.

22       Q  And could you just briefly describe the system as

23   it appeared from those aerial photographs?

24       A  An earth-lined canal originating at the Lake O'Neill

25   outlet structure followed the edge of the Santa Margarita

F

Z39

1    Valley down to the old Ranch House, at which point it divided
2    and part continued on along the margin of the valley to the
3    Chappo fields which are now the 22 area, industrial and
4    barracks area.  The other branch which divided or split off
5    at the ranch house went over to what is called the alfalfa
6    field, which is the area presently occupied, in part at
7    least, by the air field.

8         Q  Now, have you considered the description of that
9    irrigation system as appearing on the aerial series, Exhibit
10   75, with the description as set forth in the record by the
11   testimony of Mr. Salisbury and Mr. Whitman who testified on
12   the 19th of December?

13        MR. SACHSE:  If the Court please, I don't want to
14   clutter the record up-- I am going to object-- but as the
15   entire 75 series went in I made a series of objections which
16   your Honor overruled in that use in 1935 can have no conveivable
17   bearing on any issue in this case since the appropriation
18   cutoff date that your Honor gave us and which was in the
19   watershed proper riparian activity anyway.  It has been asked
20   and answered.

21        THE COURT:  Unless it shows a continuation of the use
22   that existed from some earlier time.

23        MR. VEEDER:  If you need an explanation-- I am simply
24   trying to show that the system was the same in 1911 as shown
25   on the photograph.

F

Z40

1 THE COURT:  Overruled.

2 MR. MOSKOVITZ:  Your Honor, I object because this is

3 asking this witness to interpret testimony in the record.  That

4 is for your Honor to do.

5 MR. SACHSE:  I didn't get the last question.  If Mr.

6 Veeder is going to ask this witness to say how the photographs

7 in '38 compared with what Mr. Salisbury described, I think that

8 is completely outside the realm of the witness.  And it is a

9 determination for the Court to make, not him.

10 MR. VEEDER:  Well, your Honor, it is certainly true

11 that a witness, an expert witness, can be present-- and

12 certainly I was very careful to see that Col. Bowen was here

13 present while the system in 1911 was being described.

14 THE COURT:  Whatever assistance it is to the Court, I

15 will hear him.  Overrule the objection.

16 MR. VEEDER:  I didn't hear what your Honor said.

17 THE COURT:  Whatever assistance it is to the Court,

18 I will hear the expert witness on his views on it.

19 Did you make a comparison?

20 THE WITNESS:  May I have the question again?

21 MR. VEEDER:  Would you go back and read the question,

22 please.

23 (The reporter read the pending question.)

24 MR. VEEDER:  Is there an objection?

25 MR. STAHLMAN:  I don't think it is a proper question.

F.

Z41

1   Certainly, I don't know whether he knows what Salisbury

2   testified to or not.  It is speculative, indefinite, un-

3   certain.

4        THE COURT:  So far, the question only asks him whether

5   he considered what he saw in these pictures with the testimony

6   of these witnesses.

7   BY MR. VEEDER:

8        Q  Have  you done that, Col. Bowen?

9        A  Well, the witnesses, as I recall, didn't describe

10  the irrigation system with a great deal of specificity, but

11  in so far as they did, I have considered it.

12       Q  And how did the system described by them relate to

13  the system that you have observed on your Exhibit 75 series?

14

15

16

17

18

19

20

21

22

23

24

25

G
A 1

1          MR. SACHSE:  I will object.  The witness has just

2    stated that the previous witnesses didn't have any degree

3    of specifity and that there was not anything to the complaint.

4    He has very honestly answered that question.

5          THE COURT:  He didn't go that far.  Let's find out

6    what his opinion is.  It is only opinion testimony. Overruled.

7          What is your view on it?

8          THE WITNESS:  Well, their general testimony and de-

9    scription of the operation would indicate that it was basic-

10   ally, perhaps with some minor modification, about the same

11   during the period that they saw it in operation as it was

12   when the Exhibit 75 aerial photographs were made, speaking

13   of the means of obtaining water from the river now and

14   delivering it to the field.

15   BY MR. VEEDER:

16        Q  Now, assuming, Col. Bowen, that there was in cul-

17   tivation in 1911, 150 acres of alfalfa, and assuming that

18   they had 5 cuttings of alfalfa with approximately 1 ton to

19   the acre, have you an opinion as to the quantity of water

20   that would be required to raise a crop of the character

21   described as of 1911?

22        A  Yes.  The quantity of water required for alfalfa

23   in 1911 would be essentially the same as that required for

24   alfalfa in 1935 or even today.

25        Q  And what is your opinion as to the quantity of

1   water that would be required, utilizing the system that was

2   described, what quantity of water, in your opinion,  would

3   be required to raise alfalfa in the amounts to which reference

4   has been made?

5       A   In my opinion, it would be about 3 feet per acre.

6       Q   Would you state whether that is the applied duty

7   or whether that is the diversion duty?

8       A   That is the applied duty.

9       Q   And based upon your investigation and knowledge of

10   the area through the O'Neil Ditch presently runs, and based

11   upon your hearing of the testimony of Mr. Salsibury and Mr.

12   Whitman in regard to the O'Neil Ditch, have you given consid-

13   eration as to what would be reasonable transmission losses

14   between the point of diversion from the Santa Margarita River

15   down to Lake O'Neil?

16       A   Yes, sir, I have.

17       Q   And what do you think would be the reasonable loss

18   in a structure of that character down to the Lake O'Neil?

19       A   I would say there be a 20% loss in that reach of

20   the ditch--very sandy, highly permeable.

21       Q   And have you given consideration as to what would

22   be the evaporation loss for each acre of the impounded water

23   in Lake O'Neil?

24       MR. SACHSE:   That is objected to, your Honor.  It has

25   been asked and answered just this morning.  He has given the

1    figure as a part of and included within his figure for the

2    consumptive use on the valley floor.  He stated that he speci-

3    fically included the evaporation from the surface.

4             THE COURT:  Overruled.  Let's hear it again.

5             MR. VEEDER:  I'll ask the question again.

6        Q   Have you given consideration to what would be the

7    reasonable evaporation losses from Lake O'Neil?

8        A   Yes, sir.

9        Q   And what in your opinion would that be?

10       A   About 500 acre feet per year.

11       Q   Now, predicated upon the applied duty of water, the

12   evaporation losses and the losses in transmission from Santa

13   Margarita River down to Lake O'Neil, have you arrived at an

14   opinion as to the water that would be required to irrigate

15   150 acres of alfalfa in 1911?

16       A   Yes sir, I have.

17       Q   And would you state into the record what your con-

18   clusions are in regard to that?

19       A   I testified that in my opinion about 20% of the

20   water diverted from the Santa Margarita River was lost in

21   transit between the point of diversion and the point of de-

22   livery to Lake O'Neil.  For the reach of the canal system

23   from the outlet in Lake O'Neil to the area where alfalfa was

24   grown below the ranch house, an additional transmission loss

25   would obtain--and that is a very porous, highly permeable

G

A 4

1    area through which that ditch ran, and we have been able to

2    contain almost the entire volume of Lake O'Neil within the

3    area above the ranch house--in my opinion, there would be an

4    additional 30% loss in transit.  Combined losses at the ditch

5    would be 50%, which would mean that 6 acre feet of water would

6    have to be diverted from the river without considering the

7    seepage loss and evaporation loss from Lake O'Neil--

8        Q  And what would you consider that to be?

9        A  --in order to supply 3 acre feet at the field.  I

10   would say that would be 900 acre.  And then with the 500 acre

11   feet evaporation loss, it would be 1400 acre feet.  There is

12   about a 300 acre foot seepage loss from Lake O'Neil each year.

13   That would bring it up to about 2,700 acre feet.

14       MR. SACHSE:  I just want to be sure I understand.  This

15   is 2,700 acre feet to irrigate 150 acres of alfalfa?  Is that

16   what this adds up to, Col. Bowen.

17       THE WITNESS: Yes, sir.

18       THE COURT:  I got lost in the figures, but maybe we

19   can figure them out later.  First of all, it was 150 acres of

20   alfalfa or 115?

21       MR. VEEDER: 150.

22       THE WITNESS: One hundred and fifty was the question,

23   your Honor.

24       THE COURT:  Originally you said about 3 acre feet of

25   water a year to irrigate an acre?

G
A   5

THE WITNESS:  Yes, sir.

THE COURT:  So that would be 450 acre feet?

THE WITNESS:  Yes, sir.

THE COURT:  And you say it will take 6 acre feet to make up for the losses?

THE WITNESS:  The losses in the ditch section only, your Honor.

THE COURT:  That is, the ditch section from the stream to Lake O'Neil and from Lake O'Neil to the field?

THE WITNESS: Yes, sir.

THE COURT:  So that would mean you would have to take 6 acre feet out, and that would be 900 acre feet?

THE WITNESS:  Yes, sir.

THE COURT:  Then you estimated 500 acre feet evaporation loss at Lake O'Neil?

THE WITNESS:  Yes, sir.  That is based on our climato-logical data.

THE COURT:  That brought you up to 1,400 acre feet.

THE WITNESS:  Yes, sir.

THE COURT:  You said there would be a seepage loss at Lake O'Neil of 300 acre feet a year?

THE WITNESS:  Yes, sir.

THE COURT:  That would be added to the 1,400 acre feet?

THE WITNESS:  Yes, sir.

THE COURT:  That would make 1,700 acre feet.

A 6

1      THE WITNESS:  Yes, sir.

2      THE COURT:  I thought you said 2,700?

3      THE WITNESS:  I did, your Honor.  It is 1,700.

4      MR. SACHSE:  Oh, it is 1,700?

5      THE WITNESS:  Yes, sir.

6      MR. VEEDER:  What did he say?

7      MR. SACHSE:  He said 2,700.

8      THE COURT:  That's where I got lost.

9      THE WITNESS:  I added it wrong.

10      MR. VEEDER:  I would just as soon have cross-examination

11   when we get around to it.

12      MR. STAHLMAN:  You got 900 transmission loss, 500 evap-

13   oration loss, 300 seepage; that is 1,700.

14      THE COURT:  The 900 is not transmission loss, the 900

15   is to irrigate and transmission.  Half of that is transmission

16   loss, and the other half, 450, is water on the field.  And you

17   add 500, and you add 300.

18      MR. VEEDER:  May I proceed?

19      THE COURT:  Yes.

20      THE WITNESS:  I don't know where that thousand crept

21   in.

22      THE COURT:  That's a big difference.

23      THE WITNESS:  Yes, sir.

24      THE COURT:  Is this a good place for recess?

25      MR. VEEDER:  I would just as soon have a recess, your

Honor.

THE COURT:  Mr. Moskovitz, it is not in evidence, but just to give me a little encouragement here.  This Plat 23, studying it over here, do I understand this plat to show that there is 25,000 acre feet of water available at the mouth of the Santa Margarita River?

MR. MOSKOVITZ:  Not every year, your Honor.  This is over a long period of time.

THE COURT:  Is this an average?

MR. MOSKOVITZ:  As an average.

THE COURT:  Twenty five thousand acre feet?

MR. MOSKOVITZ:  That is right; over a long period of time.

MR. SACHSE:  Average waste into the ocean has been historically 25,000 acre feet.

THE COURT:  Over what period of time?

MR. MOSKOVITZ:  I think the period of time of this study was 1898 to --

MR. VEEDER:  This will kill you, your Honor.

MR. STAHLMAN:  Wait until you see how that is figured. You haven't heard anything yet.

THE COURT:  You have your work cut out for you.  I never noticed that figure until today when I got to studying this over.

MR. MOSKOVITZ:  Have you seen some of the figures of outflow to the ocean in some of the big years?  It's tremendous.

G

A 8

1       MR. SACHSE: I's an average.

2       MR. VEEDER: That's why I want Mr. Illingworth.

3       THE COURT: An average doesn't mean a thing. If there

4 is a big year, you have a lot of water out there. But what

5 about the years when none flows out at all?

6       MR. MOSKOVITZ: Exactly. It is just an average. You

7 see, for storage purposes, it is important.

8       MR. VEEDER: That's why I want Mr. Illingworth.

9       THE COURT: Take a short recess.

10      (Recess).

11      THE COURT: Proceed.

12 BY MR. VEEDER:

13      Q  Now Col. Bowen, assuming that in 1911 there was

14 raised on the Rancho Santa Margarita an area served through

15 the irrigation system which you have described, and assuming

16 that water was delivered from Lake O'Neil to the acreage

17 concerning to which you have testified,  would you state what

18 would be a reasonable duty of water for the raising of sugar

19 beets?

20      A  About 1½ acre feet of water applied per acre of

21 sugar beets.

22      MR. VEEDER: I see that Mr. Sachse has left. Do you

23 want me to wait until he gets back?

24      THE COURT: No, go ahead.

25

BY MR. VEEDER:

Q   Assuming that there were 200 acres of sugar beets irrigated from the source in question, what do you think would be a reasonable quantity of water to be utilized for the purpose of raising the 200 acres of sugar beets?

A   In order to deliver 1½ acre feet of water per acre per year through the transmission system beginning at the diversion at the river to the sugar beet field, the transmission losses in the ditch would be as I have previously testified, 50%, which would require the diversion of 3 acre feet of water at the river to meet the requirement of 1½ acre feet of water at the field,; so that three times 200 would be 600 acre feet of water in order to meet that demand of 1½ acre feet of water for 200 acres of sugar beets.

Q   Now, assuming that there raised in the area in question 200 acres of lima beans, would you state what would be the reasonable duty of water for lima beans in this area, the water being diverted and utilized through the system which has been described as the diversion from Santa Margarita River, the Lake O'Neil and the system down to Chappo Flats?

A   The reasonable requirements for lima beans in the Santa Margarita River area, would be about ½ an acre foot per acre per year, and using the same transmission losses from the point of diversion on the river to the bean field, namely, 50%-- I point out that I am excluding on both the sugar beets and the

1   lima bean calculation the Lake O'Neil losses;  they were

2   already fully covered in the alfalfa field computation--but

3   with the 50% loss in the ditch portion of the irrigation

4   system from the point of diversion to the field, it would

5   require a diversion of about 200 acre feet of water in order

6   to deliver 100 acre feet of water to supply the demands of

7   the 200-acre lima bean field.

8         THE COURT:  Is this 200 acres alternately to the

9   sugar beets, or is it the contention that there was 200 acres

10  of sugar beets and 200 acres of lima beans?

11         MR. VEEDER:  It is our contention, and I think the

12  evidence will support us,  that the aggregate acreage irri-

13  gated in 1911 in Chappo Flats through the Lake O'Neil system

14  was between 550 and 600 acres of land; that that was the

15  total irrigated acreage at that time on the area in question.

16         Q  Now Colonel, assuming that the same crops were

17  raised on the Ysidora area, would the applied duty of water

18  be the same down there on the crops which were raised as

19  would be the applied duty of water on Chappo Flats ?

20         A  Yes, sir.

21         Q  Have you considered the statements contained in

22  Plaintiff's exhibit marked 125A in regard to the uses of water

23  in 1886?

24         I don't know whether your Honor has a copy of that.

25         THE COURT:  I did have.

1      THE WITNESS:  Yes, sir.  Plaintiff's Exhibit 125A

2  indicates the acreages of various crops that were irrigated

3  from the O'Neil diversion system.

4      Q  And how many acres of crop were in alfalfa as shown

5  by that?

6      A  Plaintiff's Exhibit 125-A states that about 300

7  acres were in alfalfa.

8      Q  Would you apply the same criteria for the irrigation

9  of that acreage as you have applied to the 150 acres referred

10  to by Mr. Salisbury as being in alfalfa in 1911.

11      A  Yes, sir.  I would.

12      Q  And what would you calculate the diversion to be

13  from the Santa Margarita River through Lake O'Neil to irrigate

14  the 300 acres of alfalfa?

15      A  Well, in this instance, starting with 300 acres of

16  alfalfa, with the 50% transmission loss through the ditch

17  reach of the irrigation system, it would require a diversion

18  of 6 acre feet from the river, not counting the lake seepage

19  and evaporation losses, in order to supply a demand of 3 acre

20  feet per acre at the alfalfa field.  Six times 300 is 1,800

21  feet of water diverted at the river, excepting the Lake O'Neil

22  losses, would supply the 3 acre feet demand at the field.

23  Adding the same evaporation loss of 500 acre feet per year,

24  from Lake O'Neil and the same seepage loss of 300 acre feet

25  per acre per year from Lake O'Neil,  we would have a total of

G

A 12

1    2,600 acre feet per year to supply the demand to 300 acres of

2    alfalfa mentioned in Plaintiff's Exhibit 125A.

3         Q  Now Col. Bowen, have you made a determination,

4    based upon soil surveys and investigations, as to the number

5    acres of land in the public domain within the Santa Margarita

6    River watershed?

7         A  Yes sir, I have.

8         Q  And what were the results of that investigation?

9         A  Within the watershed of the Santa Margarita River

10   I found that of 40,931 acres of public domain land 8,864 acres

11   were irrigable.

12        MR. SACHSE:  I object, your Honor, and move to strike

13   that answer.  It is not responsive to the question.  The

14   question was whether he made an investigation.  The answer,

15   I presume, would be yes.  If he is going to give this answer,

16   I want some foundation.

17        THE COURT:  All right, the answer will be that he

18   made the investigation.  The other answer will go out.

19        First, how many acres of public domain land did you

20   find within the watershed--40,931?

21        THE WITNESS:  Yes, sir.

22   BY MR. VEEDER:

23        Q  Did you make a soil survey of those lands, Col. Bowen?

24        A  Yes, sir.  I made a detailed soil survey of these

25   public domain lands, using the vertical aerial photographs

1    for a base and using the same methods and techniques of de-

2    termining land-capability classes as used on other public and

3    private lands within the Santa Margarita River watershed.

4         Q   Based upon that investigation, have you determined

5    the number of acres of irrigable land within the 40,931 acres?

6         A   Yes, sir.

7         Q   And would you state into the record what that aggre-

8    gate number of irrigable acres amounts to?

9         A   That is 8,864 acres.

10        Q   Did you make a soil survey in regard to the lands

11   within the National Forest?

12        A   Those portions of National Forest within the Santa

13   Margarita River watershed, yes sir.

14        MR. VEEDER:  Your Honor, we wish to make a point here

15   before proceeding further.  In our original complaint--and

16   your Honor is entitled to an explanation on this--we set forth

17   a very sizeable acreage of irrigable land in the National Forest,

18   and when we checked out the titles we were proceeding on the

19   basis of data supplied to us, we found that to a very large

20   extent the irrigable lands had passed into private ownership,

21   and as a result we are making a material reduction in the

22   claimed irrigable acreage within the National Forest.

23        THE COURT:  You have just given some figures on public

24   domain land.  What is that--taylor grazing land?

25        MR. VEEDER:  That is correct.  Those are lands that

1    are that are under the administration of the Bureau of Land

2    Management, and those are pleaded.

3            THE COURT:  Apart from National Forest?

4            MR. VEEDER:  Yes, your Honor.  We have broken down the

5    irrigable acreage in the National Forest separate and apart

6    from these others.

7            MR. SACHSE:  Your Honor, I didn't realize that Mr.

8    Veeder was through with the public domain.  I am going to

9    move to strike the evidence on the grounds that there is no

10   showing that any part of this public domain land is part of

11   the stream system of the Santa Margarita River.  In fact,

12   we can infer from most of the testimony so far to date--I

13   grant that it is an inference--that it is all going to be in

14   the basement complex.  There is no showing that it is riperian,

15   and the amount of irrigable acreage is absolutely immaterial,

16   without further foundation.

17           THE COURT:  It probably is, but to the extent that it

18   might prove something someday, it is admissable. Overruled.

19   BY MR. VEEDER:

20           Q  Will you state into the record the number of acres

21   of irrigable land that you found within the Palomar District

22   of the Cleveland National Forest?

23           A  One hundred forty seven acres of irrigable land

24   within the Santa Margarita portion of the Palomar District of

25   the Cleveland National Forest.

G

A 15

1    Q   This was of course, within the watershed of the

2  Santa Margarita River.  Within the Trabuco District of the

3  Cleveland National Forest, how many acres of land did you find

4  that were irrigable there?

5    A   I found 9 acres of irrigable land within that portion

6  of the Trabuco Division of the Cleveland National Forest which

7  lies within the Santa Margarita watershed.

8    Q   And would you state the number of acres that you

9  found in the San Bernardino National Forest lying within the

10  Santa Margarita River watershed that you determined to be

11  irrigable in character?

12    A   One hundred thirteen acres.

13    Q   Based upon your investigation, Col. Bowen, of the

14  area within the Santa Margarita River watershed, have you

15  determined what would be a reasonable water duty for the rais-

16  ing of irrigated pasture throughout the watershed in question?

17    A   Yes, sir.

18    Q   And would you state into the record what that is?

19    A   The applied duty for irrigated pasture is 3.83 acre

20  feet per acre per year.  With the 10% loss from the point of

21  diversion to the point of use, the project duty would be 4.2

22  acre feet per acre per year of irrigated pasture.

23    THE COURT:  Of course, that still leaves the gap that

24  Mr. Sachse mentioned.  Assuming that some of this land is

25  irrigable, where are you going to get the water? Of course,

1    you might irrigate that 9 acre feet there.  But where are you

2    going to get the water for the 8,864 acres?

3    BY MR. VEEDER:

4        Q  Referring to the Exhibit 1, would you state into

5    the record, Col. Bowen, as to whether all these lands are

6    within the watershed of the Santa Margarita River?  I am re-

7    ferring now to the public domain lands.

8        MR. SACHSE:  He has already so testified.

9        THE WITNESS:  Yes, sir, they are.

10   BY MR. VEEDER:

11       Q  And is that true in regard all the National Forest

12   land?

13       A  Yes, sir.

14       MR. VEEDER:  May I have a momentary recess, your Honor,

15   Maybe I can turn Col. Bowen over for cross-examination.

16       THE COURT:  Yes.  Call me when you are ready.

17

18

19

20

21

22

23

24

25

**I H**

**Z42**

1          MR. VEEDER:  You may cross-examine.

2

3                         CROSS-EXAMINATION

4      BY MR. SACHSE:

5          Q  Col. Bowen, in relation to these National Forests

6      and public domain lands have you plotted these irrigable

7      acreages on any map or work sheet?

8          A  Yes, sir.  I thought I had testified that we had

9      used the aerial photographs as a base, Mr. Sachse.

10         Q  I mean, have you actually plotted so that we could

11     readily see the location of the irrigable lands?

12         A  Yes, sir.  They are on the field sheets, but--

13         MR. VEEDER:  The aerial field sheets.

14         THE WITNESS:  --the field sheets are in my drafting

15     room at the (inaudible).

16     BY MR. SACHSE:

17         Q  Will you produce them, please?

18         A  Yes, sir.  I intended to produce them when they

19     were completed.

20         Q  Now, first, let's take just the nine acres in the

21     Trabuco District.  I presume its approximate location would

22     show on the De Luz Creek watershed geologic map, wouldn't it?

23         A  If I am not mistaken, Mr. Sachse, that particular

24     portion of the Cleveland Forest has been lodged.

25         Q  Has been what?

Bowen    Cross                                                    7757

Z43

1          MR. VEEDER:  Lodged.

2          THE WITNESS:  It is lodged as an exhibit.  It has been

3     in there for weeks.

4     BY MR. SACHSE:

5          Q  What I am trying to get at-- perhaps you can tell me

6     the best way to do it.  I want to know if you could with any

7     of these parcels show me on the map that is readily available

8     here where it is located?

9          A Oh, yes, sir.  Where that particular segment is

10    located?

11         Q  Yes.

12         A  Indeed.  Referring to Plaintiff's Exhibit 1, Mr.

13    Sachse, which is buried beneath the map of (inaudible).

14         THE COURT:  That Trabuco photo, I think, is 90 or 91.

15         MR. SACHSE:  I am not so much interested in the photo

16    at the moment as in the map, your Honor.

17         MR. VEEDER:  Do I understand, Mr. Sachse, that you

18    asked us to produce the field sheets?

19         MR. SACHSE:  Yes.

20         THE WITNESS:  Referring to Plaintiff's Exhibit No. 1,

21    Mr. Sachse, the Trabuco District, or that portion of the

22    Cleveland National Forest within the watershed of the Santa

23    Margarita River, is indicated by wavy diagonal cross-hatching

24    in the De Luz watershed, bounded on in part by the Santa

25    Margarita crest line and in part by sections lines.  If I

MALCOLM E. LOVE, OFFICAL REPORTER

1  could have that map that acetate township plat, I will give

2  the sections.

3       MR. SACHSE:  You didn't give it back to me.

4       THE WITNESS:  I am sorry.  I kept it over here, Mr.

5  Sachse.

6       That would be a portion of the Trabuco unit within the

7  De Luz watershed and hence the Santa Margarita watershed.

8  The parts of Sections 14, 23, 26, and 27, 8 South, 5 West.

9       THE COURT:  That is up near the crest of the watershed

10  line, is it?

11       THE WITNESS:  Yes, sir.

12       THE COURT:  The top of De Luz Creek?

13       THE WITNESS:  That is right, your Honor.

14       And there is another small portion of the Trabuco unit,

15  Cleveland National Forest, just west of Wildomar, west of

16  Wildomar in part the Santa Rosa grant line and in part the

17  sections lines.  There is not enough control to give that

18  section.  However, in that portion up in Township 6 South,

19  7 South, Range 4 West within the watershed we found no

20  irrigable land.

21  BY MR. SACHSE:

22      Q  Do you know from your own offhand recollection in

23  which of the sections in the area first mentioned your nine

24  acres were located?

25      A  I believe it was in the vicinity of the Sky Ranch,

H

Z45

1    Mr. Sachse, but I could refer to the exhibit that is lodged

2    to answer your question more specifically.

3        Q   That is close enough.

4            That land is not, according to Plaintiff's Exhibit 1,

5    does not abut upon any stream, does it?

6        A   No, sir.  There is no stream shown on Plaintiff's

7    Exhibit 1.  But that one, of course, does not show all of the

8    streams.

9        Q   Exhibit 1 does show the major streams of the De Luz

10   Creek watershed, does it not?

11       A   Well, it doesn't show Fern Creek or Camps Creek,

12   Mr. Sachse, which probably are as major as some of the others

13   shown.

14       Q   Do you know of your own knowledge whether that land

15   abuts upon a perennial stream?

16       A   Yes, sir, I know.

17       Q   What is the perennial stream?

18       A   Sir?

19       Q   What is the perennial stream?

20       A   You asked me if I knew of my own knowledge--

21       Q   Does it abut on a perennial stream?

22       A   --and my answer was yes, I do know of my own knowledge.

23   And it does not abut upon a perennial stream.

24       Q   You can resume your seat.  The only watercourses

25   running through it are watercourses that flow during and

H

Z46

1   immediately after periods of heavy precipitation and runoff;

2   is that not correct?

3        A   Yes, sir.

4        Q   And in your opinion, the ground waters underlying

5   that type of material, as you testified at the Master's hear-

6   ing, are vagrant, local and percolating ground waters; are

7   they not?

8        A   The ground water underlying that portion of the

9   Trabuco unit of the Cleveland National Forest, Mr. Sachse, are

10  of that character, namely, vagrant, percolating, not a part

11  of any defined stream or basin or subbasin.

12       Q   So when you gave us a 10% project loss from the

13  source of project of the water for that nine acre-feet, what

14  was the source of production of the water?

15       MR. VEEDER:  For what nine acre-feet, now?

16       MR. SACHSE:  The nine acres-- pardon me-- Trabuco

17  Forest.

18       MR. VEEDER:  Let's get this straight.

19       THE WITNESS:  Where was the project loss computed

20  from?  Well, from assumed well that might be drilled up there,

21  Mr. Sachse, or from surface storage reservoirs that might be

22  constructed on the site.

23       MR. SACHSE:  Now, your Honor, I am going to move to

24  strike the testimony regarding the nine acres in Trabuco,

25  because it is obvious from the testimony of the witness that

H

z47

1    it is not riparian land and that the ground waters underlying

2    it are vagrant, local and percolating, and they are not part

3    of this litigation.

4         THE COURT:  No, let's leave the evidence in.  It will

5    be a basis of a finding for the fact that nothing that happens

6    to that nine acres could be any burden on the stream.

7         MR. SACHSE:  Very well, your Honor.

8         Q  How about the Palomar District, Cleveland National

9    Forest, of 147 acres that you found to be irrigable?  Can you

10   tell me whether any part of that 147 acres abuts upon a

11   perennial stream?

12        A  The 147 acres within the Palomar unit, Cleveland

13   National Forest, which lies within the Santa Margarita water-

14   shed fringes these areas of private ownership, such as the

15   Devil's Hole area through which the Arroyo Seco flows, as

16   indicated on Plaintiff's Exhibit 1, the irregular white areas

17   astride the Riverside-San Diego County line, and also astride

18   the San Bernardino Meridian.  That white area is privately-

19   owned land.  The white area in the vicinity of Palomar Mountain,

20   more explicitly shown to the west of Palomar Mountain as

21   appears on Plaintiff's Exhibit 1, is privately owned.  And

22   the 147 acres are small fringe areas surrounding those areas

23   of privately-owned land.

24        Q  Then, I take it that you don't know whether or not

25   any of them abuts upon a perennial stream, any of the 147

H

z48

H

1    acres abuts upon a perennial stream?

2         A   At the moment, without my field sheets, Mr. Sachse,

3    I couldn't answer your question.

4         Q   I will direct your attention now to Plaintiff's 15.

5    And locating that same general area on 15, I am under the

6    impression that it would be largely basement complex; am I

7    correct?

8         A   You mean the--

9         Q   The irrigable lands you found would be largely

10   basement complex land?

11        A   It would be overlying--

12        Q   Overlying basement complex?

13        MR. VEEDER:  Now, just a moment.  Every bit of land in

14   the inland area is overlying basement complex.

15        MR. SACHSE:  All right.  Let me rephrase it.

16        Q   I am under the impression from your testimony that

17   the 147 acres to which you have testified are located in the

18   areas shown on Exhibit 15 as Basement complex.  Is that correct?

19        A   There may be a portion of that Devil's Hole area

20   which is shown on Plaintiff's Exhibit 15 as in part younger

21   and part older alluvium which may underlie some of that 147

22   acres, Mr. Sachse.  Without my field sheets before me, I

23   couldn't answer your question.

24        Q   You are going to get those for us tomorrow?

25        A   Yes, sir.  Not tomorrow, Mr. Sachse.

H

Z49

1      Q  Pardon me.  When?  Aren't we in session tomorrow?

2      A  When the drafting job is completed on them, Mr.

3 Sachse.  I will give you copies of them at that time.

4      Q  Don't you have any rough notes we can work from

5 here on some of this detailed cross-examination, Colonel,

6 without waiting for the drafting?

7      A  I have the field survey sheets, Mr. Sachse; yes,

8 sir.

9      MR. VEEDER:  Do you want those, Mr. Sachse?

10      MR. SACHSE:  Yes, I would like them for purposes of

11 cross-examination.

12      MR. VEEDER:  We will have them for you tomorrow.

13 BY MR. SACHSE:

14      Q  Now, in so far as any part of this 147 acres is

15 located on lands indicated on Exhibit 15 as basement complex,

16 am I correct in stating it would be your opinion that the

17 ground water would be vagrant, local percolating, not a part

18 of the Santa Margarita system?

19      A  I think, Mr. Sachse, since I will have the field

20 sheets here tomorrow it would be better for you and I both if

21 we defer that until then.

22      Q  All right.  And you would prefer then that we defer

23 also any discussion of San Bernardino area and the public

24 domain area until we get the field sheets?

25      A  We can have the field sheets in here.

H

Z50

Q  You want to resume your seat, then, Colonel.  I won't need you on the map much more.

Now, with relation to Lake O'Neill you testified in your water use calculations to an estimated evaporation loss of 500 acre feet per year?

A  Yes, sir.

Q  How did you arrive at that figure?

A  As I testified, Mr. Sachse, we have a Class A weather station located on the shore of Lake O'Neill out on the bridge point.  I pointed that out to you and the Court at the time his Honor viewed the premises.  That station has been in operation since 1953.  And the 3.9 acre-foot evaporation loss was determined as the average loss from the records obtained at that station.

Q  So that the 3.9 acre-foot is per surface acre of water, is that correct?

A  Yes, sir.

Q  How did you arrive at the surface acres of water in Lake O'Neill in 1911 to enable you to come up with a 500-acre-foot annual evaporation loss?

A  Well, I assumed that the lake was probably, based on the testimony of the witnesses, maintained at a state nearly full.

Q  Can you point out to me any testimony in the record, Col. Bowen, in which they stated that Lake O'Neill

1   was maintained nearly full?

2       A  No, sir.  They stated that water was diverted con-

3   tinuously from the time when they constructed the diversion

4   with ground fresnos until the high flow--

5       Q  Washed the dam out?

6       A  --washed the dam out.

7       Q  And which would be roughly, let us say, seven or

8   eight months at the most of the year, would it not?

9       A  Well, it varies.  You can examine the records of

10  diversion from 1931, when the gage was first put on Lake

11  O'Neill, and I assume that the operations of the ranch at that

12  time were somewhat comparable to those in 1911.

13      Q  Well, you have assumed that they were.  But you

14  don't know, do you?

15      A  I wasn't born in 1911, Mr. Sachse.

16      Q  And you have found no records that can tell you the

17  acreage of Lake O'Neill in the period, let us say, 1883?

18      MR. VEEDER:  I object to that.  That is a misleading

19  statement.

20      THE WITNESS:  May I see 125-A, please.  125-A, Mr.

21  Sachse, describes the reservoir.  It says:  "Main ditch three-

22  quarters of a mile in length terminates in the reservoir

23  covering 160 acres built in 1883 by throwing up an embankment

24  of earth across a flat side valley.  This dam is about 12

25  feet high, 1340 feet long," and so forth.  "And it is provided

H

Z52

1   with an outlet near the south end"; which is the place of the

2   present outlet.

3        Q  Do you find anything in that exhibit or anywhere

4   else the data upon which you relied that indicates the surface

5   areal extent of the water in Lake O'Neill at any year from

6   1883 down to '31?

7        MR. VEEDER:  He just read--

8        THE WITNESS:  I just read it from 125-A, Mr. Sachse.

9   BY MR. SACHSE:

10       Q  Do you contend that 125-A states that all year around

11  Lake O'Neill had a 160-acre surface area?  Is that the way

12  you interpret that statement?

13       A  No, sir.  It is the statement of the occurrence at

14  the time the man viewed it.

15       THE COURT:  How many acres are now covered by Lake

16  O'Neill?

17       THE WITNESS:  About 138, your Honor.

18       THE COURT: And how long is the embankment or dam which

19  constitutes the lake in fee?

20       THE WITNESS:  It is very close to this figure given in

21  125-A, your Honor.

22       THE COURT:  11,340 feet?

23       THE WITNESS:  Yes, sir.

24       THE COURT:  How high is the embankment presently?

25       THE WITNESS:  Well, the present embankment is

1    approximately 15 feet high, your Honor.

2         MR. SACHSE:  Were you through, your Honor?

3         THE COURT:  Yes.

4    BY MR. SACHSE:

5         Q  You are aware from the testimony of the two gentlemen

6    whose names I forget from the Rancho--

7         A  Mr. Salisbury and Mr. Whitman.

8         Q  Yes. --that they testified that the ditch operated

9    during the low season, during the low water season, being put

10   in after the floods stopped and going out with the first

11   flood?

12        A  Yes, sir.

13        Q  Would you concede that the ditch then under their

14   operation was not in operation for the wet period of the

15   year?

16        A  Well, not-- I wouldn't concede that entirely, Mr.

17   Sachse, because Plaintiff's Exhibit 60 indicates some years

18   when, apparently, water flowed through the ditch each month

19   of the year beginning in 1931.  And there is no reason to

20   assume that if it did it in '31 that it didn't do it '11 or

21   '86.  For example, the first year--

22        MR. VEEDER:  You said '11 or '86.  You mean 1911 or

23   1886?

24        THE WITNESS:  Yes, sir.  Plaintiff's Exhibit 60, first

25   year of record on O'Neill ditch shows water flowing through that

1    ditch every month of the year.  And then it varies.  In 1933,

2    there are only two months that have zero and (inaudible).

3        Q  Did you adjust your evaporation figures in any way

4    by reason of the fact that at times on certain years there were

5    no diversions to Lake O'Neill?

6        A  My evaporation figure, Mr. Sachse, of 500 acre-feet

7    per year is assuming that approximately 130 acres of fresh

8    water surface exists there.

9        Q  At all times?

10       A  (Witness nods.)

11       Q  At all times.

12           And if less than 130 acres of surface areas existed

13   at any time, obviously the evaporation figure would have to

14   be reduced, would it not?

15       A  Yes, sir.  That figure of ~~73.9~~ 3.9 times the surface

16   area.

17       Q  Now, how about the seepage figure from Lake O'Neill?

18   Was that also calculated on a flooded area basis?

19       A  That was calculated, Mr. Sachse, on the basis of

20   inflow and outflow, present observations on the sewage effluent

21   dischargedinto the lake and the leve of the water surface in

22   the lake.  That water surface can fluctuate about five or

23   six feet from maximum stage.  It can drop about five or six

24   feet from maximum stage without any great alteration in the

25   surface area of the pond.

Bowen - Cross

H

Z55

1    Q  I am not quite sure I understand how you calculated.

2    You mean that your own studies while the Marines have

3    controlled the lake have enabled you to estimate or calculate

4    the seepage loss, is that it?

5    A  Yes, sir.

6    Q  And you applied that figure backwards to the time

7    of the O'Neill operations?

8    A  Yes, sir.  I have no reason to believe that the

9    seepage loss would be any much different.  It might even have

10    been more when the--

11    Q  Does that also depend on--

12    MR. VEEDER: Now, just a moment.  He hasn't finished his

13    answer.

14    BY MR. SACHSE:

15    Q  Have you finished?

16    A  I simply wanted to say it probably was even more

17    in the early years of the lake than it is now.

18    Q  Does seepage loss vary also with the amount of the

19    water impounded, under your present studies?

20    A  Well, seepage loss is directly correlated with the

21    wetted area which doesn't change too much.

22    Q  So, in other words, if at any time the lake were

23    extremely low, the seepage losses would be extremely less?

24    A  Well, if you pulled it down to, say, 200 acre feet

25    in storage, then actually the wetted area would be substantially

H

Z56

1   reduced for that period of time.  The seepage loss would be

2   less.

3       Q  How does the operation of the O'Neill ditch and

4   diversion today compare with the operation of the O'Neill

5   ditch and diversion prior to the advent of the Marine Corps?

6       A  Vastly different, Mr. Sachse.

7       Q  Tell us the differences, please.

8       A  The significant difference is that we have no summer

9   flow to divert at this time, so the only surface stream flow

10  that we can divert from the Santa Margarita River is during

11  the winter season or the period of high runoff.  And that is

12  a much more difficult task, as you are, I am sure, well aware.

13      Q  In other words, the diversion is an entirely

14  different time of the year; that is one difference, is it?

15      A  Yes, sir.  There is some overlap, of course.  As I

16  pointed out on the record of stream flow in O'Neill ditch

17  there are periods when water was diverted every month of the

18  year by the ranch, and there would be overlaps in those

19  instances.  But primarily, our problem is much different

20  because, as I say, we have a dry stream bed in the summertime.

21      Q  Let's compare the purposes for which the diversion

22  is made by the Marine Corps with the purposes under the

23  Rancho.

24      MR. VEEDER:  No, is that a question or a statement?

25      MR. SACHSE: Yes.  Can he compare them?

H

Z57

1    THE WITNESS:  Well, certainly, there are two different

2  types of management now.  Now, we have a military establish-

3  ment and prior to the occupancy of the property by the United

4  States it was a large cattle ranch.

5  BY MR. SACHSE:

6    Q  The purposes were for irrigation, as you have

7  just testified, under the O'Neills, were they not?

8    A  For irrigation and stock watering, I believe.

9    Q  And do the Marines use Lake O'Neill for direct

10  irrigation of crops now?

11    A  No, sir.

12    Q  What do they use it for?

13    A  Lake O'Neill is used for training the Marine Bridge

14  Company, which is a part of the 7th Engineers, Fleet Marine

15  Force, First Marine Division, Fleet Marine Force.  They have a

16  calm water surface that they can utilize in constructing both

17  fixed and floating type bridges.  The lake is used for

18  recreational purposes.  There is a recreational area, which the

19  Court saw when he viewed the premises.  It has a dock and

20  small craft.  Now, there are fish in the lake.  People, Marines,

21  their dependents and guests, can boat and fish the lake.  Now,

22  the lake undoubtedly as esthetic value in there.  It is a pretty,

23  stinking mud hole when it is dry, Mr. Sachse.

24    Q  What about the place of use?  The water that is now

25  diverted from Santa Margarita River through the ditch is used

at O'Neill Lake; that is the purpose of it, isn't it?

A   Yes, sir.   And it is also released from the lake along toward the end of the summer season to--

Q   Recharge the underground?

A   Ground water basin, yes, sir.

Q   And the use of the water under the O'Neills was at a different location, was it not, the ultimate use?

A   Well, yes, I would say so.   The ultimate use there was in the alfalfa field and the Chappo field.

Q   In calculating the total amount of water required to irrigate the 150-acre alfalfa field in 1911, you totaled the applied use, the project loss, the evaporation and the seepage.   You don't mean to imply that that total was consumed from the water supply of the basin, do you?

A   Oh, no, sir.   Again, referring to the period of record on the Santa Margarita River, there is indication that even though the entire flow of the river, according to the testimony of Mr. Salisbury and Mr. Whitman, was diverted through O'Neill Ditch during the irrigation season, there is still recorded stream flow at the Ysidora station, which would indicate that that source was returned flow from irrigation-- (inaudible.)

Q   In other words, would I not be correct in saying that the 450-acre-feet per year loss that you described seepage into the ditches was actually returnof the water to the

underground?

A   Oh, yes, sir, indeed.   That is a common phrase. Seepage loss doesn't indicate that it is gone and you can't count it.

Q   And the same thing would be true of 300 acre-feet seepage loss from Lake O'Neill, would it not?

A   Yes, sir.   That went back to the basin.

Q   And it would be true of a part of the 450 acre-feet applied to the alfalfa, would it not?

A   Indeed, sir.

THE COURT:   Are you trying to prove that the Government has acquired a vested right to let water seep back into the underground?   Is that the burden you are assuming, Mr. Sachse?

MR. SACHSE:   I am very sorry if your Honor has mis-understood my objective that seriously.   I am trying to prove that when Mr. Veeder gets up here and starts to argue they have established a use to so many acre-feet-- and he has done nothing of the kind.

THE COURT:   Well, but I mean, if the evidence is susceptible of both interpretations-- one that historically this water has been allowed to seep from the reservoir and the ditches back into the stream charging the underground; that is something I hadn't thought about.   Maybe there is a--

MR. SACHSE:   Maybe I have made myself some trouble.

MR. VEEDER:   I think you have.   Without thee, Franz,

1  what would I do?

2  BY MR. SACHSE:

3      Q  Now, Colonel, with--

4      MR. VEEDER:  To change the subject.

5      MR. SACHSE:  No, not quite yet.

6      Q  With regard to the sugar beets and lima beans, the

7  same statement would be true, that the seepage loss, whatever

8  it was, is actually restored to the underground; right?

9      A  Yes, sir.

10     MR. VEEDER:  Is really what?

11     MR. SACHSE:  Restored to the underground.

12  Can you tell me, Mr. Veeder, what was the number of the

13  exhibit you used recently?  Can you help me with the number

14  of the exhibit that has the projected plans with Camp Christianson

15  and Camp So and So on it?

16     MR. VEEDER:  That is 127.

17     MR. SACHSE:  127. Can I have it?

18     THE WITNESS:  Mr. Sachse, in explanation of my answer

19  to your last question, I wouldn't want you to believe that

20  all of that water had run into the underground.  There was

21  some small transpiration evaporation, evapo-transpiration

22  losses in the seepage.

23  BY MR. SACHSE:

24     Q  Some evaporation, of course, from the ditch surface,

25  too?

H

Z61

1          MR. VEEDER:  It is a part of the appropriative right.

2     What difference does it make?

1       Q   Now, directing your attention to Exhibit 127, you

2   testified that you found 3,059 acres of land in the reservations

3   suitable for irrigated pasture; am I correct?

4       A   3,059, yes sir, that is correct.

5       Q   Generally speaking, and roughly, where on Exhibit

6   127 would that land be located?

7       A   That land is more readily located on Plaintiff's

8   Exhibit 94. It is delineated on there.

9       Q   I appreciate that. You can tell us generally where

10  it is, can't you?  May we break out Exhibit 94.

11      MR. VEEDER:  Let's have them both.

12      THE WITNESS:  I can tell you generally where it is.

13      MR. SACHSE:  Here it is (putting map up on the board).

14      THE COURT:  It is the brown area, isn't it?

15      THE WITNESS:  It is the brown areas, your Honor, which

16  are principally located along De Luz Creek, the upper basin

17  area of the Santa Margarita River, the border along the west

18  side of the Santa Margarita from, oh, the lower end of Chappo

19  Basin on down as far as Newton Lake, and also in (we call it)

20  Effluent Canyon, a tributary of the Ysidora Valley down which

21  the sewage effluent from Plant No. 2 is discharged.

22      Q   Some of that area is the Marine Corp airfield, is

23  it not?

24      A   No, sir.  The Marine Corp airfield is in the yellow

25  area marked "Row Crops" occupying Chappo Basin.

Case 3:51-cv-01247-JO-SBC   Document 4568   Filed 09/24/63   PageID.28527   Page 120 of 129

I

A 18

Q  We will come to that in a minute.  How about Camp Daley; is that in it?

A  It would be in this area below the hospital, the largest portion of the area shown as irrigated pasture on Plaintiff's Exhibit 94, which is dodified in the legend as "Industrial Area" just below the hospital and east of the Santa Margarita River as shown on Plaintiff's 127.

Q  Well then did you intend--let's take just that industrial area--did you intend in your testimony to imply that in its present condition the industrial area was suitable for use as irrigated pasture with an applied water duty of 3.83 acre feet a year?

A  Certainly not, Mr. Sachse.

Q  Now, the Marine airfield, you just testified, was in the Row Crop area?

A  Yes, sir.

Q  You didn't mean to imply, did you, that the area of the Marine Corp airfield was suitable in its present condition for raising row crops with a water duty of 4 acre feet per year, did you?

A  Certainly not.

THE COURT:  Did you take the airfield out when you took the covered area and buildings out?  You mentioned at one time the elimination of buildings.

MR. SACHSE:  That was the question I was about to ask,

I

A 19

1   your Honor.

2        THE WITNESS:  That was in connection with the determ-

3   ination of water used by the natural vegetation on the surface

4   of the basin.  I did take that out.

5        THE COURT:  But you didn't take it out in your compu-

6   tations of row crops?

7        THE WITNESS:  Your Honor, this study here simply shows

8   how the land could be placed to highest use if it were devoted

9   to an agricultural enterprise.  Certainly the Marines are not

10  going to go into the farming business.  But as I understand

11  it, the common denominator for a determination of correlative

12  rights is the agricultural use, and that is what Plaintiff's

13  94 illustrates.

14       MR. VEEDER:  That is in keeping with Article 1V of the

15  Constitution of the State of California.

16  BY MR. SACHSE:

17       Q  The 400-odd acres of roofs, buildings, streets,

18  ecetera, which you deducted from your basin area in the

19  phreatophyte calculation, you did not deduct from your irri-

20  gable acreage calculations; is that right?

21       A  That is correct.

22       Q  Now, if you were to do that, you would have to in

23  fact deduct much more than 786 acres, would you not?

24       A  If I were to do that, Mr. Sachse,  I would be under-

25  taking a completely different type of study than the one that

is illustrated by Plaintiff's 94.

Q   That is correct.   But if you undertook such a study you would find a great deal more than 786 acres of roads, roofs, pavement, dwellings, within the entire water-shed?

MR. VEEDER:   I object, your Honor.

THE WITNESS:   Certainly.

MR. VEEDER:   This goes beyond the direct examination.

THE COURT:   Overruled.

Why is that true?   Why would you find it?

THE WITNESS:   Well, what Mr. Sachse is referring to, your Honor, is that in this consumption by natural vegetation I confined that to the surface of the valley.

THE COURT:   The basin.

THE WITNESS:   The basin surface, the valley floor. Whereas, as Mr. Sachse is developing, there are roads, buildings, paved areas which are on the hill lands within the colored areas shown on Plaintiff's Exhibit 94.

MR. STAHLMAN:   Pardon my interruption. Do you mind Mr. Sachse?

MR. SACHSE:   No. Go ahead.

MR. STAHLMAN:   Mr. Veeder made some reference to some constitutional provision in relation to the determination of water duty on farm land even though it may be used for military purposes.   Is that the point?   What is the citation?

1        MR. VEEDER:   I'll be glad to give it to you.

2        MR. STAHLMAN:   The point is this.   I think we are at

3   a critical thing and I merely asked for understanding.

4        MR. VEEDER:   I'll be glad to state it.

5        MR. STAHLMAN:   Just give me the Section first.

6        MR. VEEDER:   As I recall, it was the 1928 Amendment

7   to the Constitution of California, it is Article 1V, which

8   provides the use to which the lands may reasonably be applied.

9   And certainly we have a riparian right to that quantity of

10  water.

11       MR. SACHSE:   The use to which the land may reasonably

12  be applied?   Find me the language.

13       MR. VEEDER:   No, I said the reasonable potential use.

14       MR. STAHLMAN:   What I am concerned about is, is that

15  going to be the contention as to the limit and the gauge as

16  to the water duty as being an agricultural duty?   In other

17  words, is there going to be a substitute use?

18       MR. VEEDER:   No. The substitute use is a misnomer.

19  The right of the riparian owner is to the quantity of water

20  that could be reasonably applied to the land.

21       MR. STAHLMAN:   Then if it should be determined in this

22  case that the military use is a reasonable beneficial  use,

23  how are we to determine the water duty in relation to military

24  use?   Or does it conflict?   Or can these two situations be

25  reconciled?

1      MR. VEEDER:   I will be glad to straighten that out

2  now.

3          It is not a question of any conflict at all.  It is

4  reasonable to assume that this riparian land, should it ever

5  revert to private ownership or go into agricultural purposes,

6  would be entitled to the appurtenant riparian right.

7          MR. STAHLMAN:  I follow that.

8          MR. VEEDER:  And the maximum demand that could be

9  reasonably applied, in the event of such a transfer of owner-

10  ship, would be that deman.

11          MR. STAHLMAN: Yes, I understand that.

12          MR. VEEDER:  So the fact that we are presently using

13  water for one purpose--for example Fallbrook isn't using any

14  water.  They are just claiming a lot.  Now their riparian

15  land which they bought for a dam site, which will never be

16  built, that has a potential riparian right to the extent that

17  it is riparian, even though they plan on flooding it, if they

18  can get some water.  It is the exactly the same thing here.

19  We do have a reasonable right, and I'm not going to deprive

20  Mr. Fallbrook here of the right to claim a reasonable quantity

21  of water for this spacious of theirs when they sell that land,

22  not being able to build their dam.

23          MR. STAHLMAN:  We are getting.  I am sorry I brought

24  it up.

25          THE COURT:  You talk it over.  Of course, it is a

1   problem that will have to be argued out, and it is one that

2   hasn't been decided and I haven't really indicated any opinion

3   on it.

4        But I wanted to go into something else.

5        MR. STAHLMAN:  Very well.

6        MR. SACHSE:  I wanted to ask a few questions of Col.

7   Bowen in the moment that remains, because he may have to get

8   the information.

9        Q  Col. Bowen, I intend to ask you tomorrow to spell

10  out the percentage of the water uses you gave us on 150 and

11  151 as between the Naval Ammunition Depot and Camp Pendleton.

12  Would please have whatever documents you will need for that?

13       A  You would like to have the pumpage for the Naval

14  Ammunition Depot?

15       Q  Yes.  In other words, I would like to be able to

16  put a column in myself on 150 and 151, breaking down the

17  amount inside the watershed and outside for the Naval Ammunition

18  Depot and for Pendleton.

19       A  I can give you that right now.

20       MR. SACHSE:  I didn't mean to interrupt your Honor,

21  but I wanted to ask for that.

22       THE COURT:  Anything else?

23       MR. SACHSE:  That's all I wanted to ask him for.

24       THE COURT:  Mr. Clerk, have you got a list of exhibits?

25  Mr. Veeder is getting ready to rest tomorrow.

I

A 24

1    MR. VEEDER:  Just as soon as we can, yes.

2    THE COURT:  I might make a note of what my records

3  show here.  I show not in evidence Exhigits No. 10,11,13,14.

4    MR. VEEDER:  Col. Robertson will testify and those

5  will go in.

6    THE COURT:  Not in evidence Exhibits 16E, a profile

7  that Mr. Fox made some marks on concerning Pauba Basin--

8  probably not necessary.

9    MR. VEEDER:  I thought we would withold that, your

10  Honor.

11    MR. STAHLMAN:  Exhibit 87.

12    MR. SACHSE:  Exhibits 71 and 72.

13    THE COURT:  Exhibits 71 and 72 have been withdrawn.

14  Plaintiff's Exhibits 73 Series, 1929 aerial flights, is not

15  in evidence.

16    THE CLERK:  That is correct your Honor.

17    THE COURT:  Plaintiff's 76 is not in evidence--rainfall

18  map of 1939.

19    Plaintiff's 78--we have put in the photographs on the

20  streams, but we do not have in evidence the balance of the

21  photographs.

22    MR. VEEDER:  I would like to have just a brief statement

23  on that, your Honor.

24    THE COURT:  We will do it tomorrow.  I am just telling

25  you what my records show.

I

A 25

1    MR. VEEDER:   I have made the same inventory of our

2    exhibits.

3    THE COURT:   Plaintiff's Exhibits 80 to 85, inclusive,

4    apparently are withdrawn.

5    Plaintiff's 87, a sketch of Lake O'Neil, is not in

6    evidence.

7    MR. STAHLMAN: No objection to that going in evidence.

8    THE COURT:   Plaintiff's 89 is in evidence.

9    MR. STAHLMAN:   We have no objection to Plaintiff's

10   87 going in.

11   THE COURT:   Plaintiff's 89 is in evidence.

12   THE CLERK:   Plaintiff's 89 is a series in evidence.

13   THE COURT:   Plaintiff's 90 and 91 are not in evidence.

14   Plaintiff's 95 is not in evidence.

15   Plaintiff's 125A, 125B and 125C are not in evidence.

16   In view of the references to Plaintiff's 125A today, I am

17   going to receive in evidence 125A.   Any objection?

18   MR. VEEDER:   You admitted that originally, your Honor.

19   THE CLERK:   No.

20   THE COURT:   I don't think it has ever been admitted in

21   evidence.   What do your records show?

22   THE CLERK:   It was not in evidence, your Honor.

23   THE COURT:   Plaintiff's 125A is received in evidence.

24   Plaintiff's 125B and C are not in evidence.

25   Plaintiff's 121 is not in evidence.

1    Is that right, Mr. Clerk?

2    THE CLERK:   I am trying to locate it.

3    THE COURT:   Plaintiff's 130A is only for indentification.

4    It was a sheet torn from Plaintiff's 130.

5    Plaintiff's 143 and 144 are not in evidence.

6    MR. VEEDER:   Those have been logged and they will be

7    offered.

8    THE COURT:   That is about what my records show.

9    MR. VEEDER:   That is about what we have, your Honor.

10   We ran an inventory on them this morning.

11   THE COURT:   Ten o'clock  tomorrow morning.

12   I understand  that you want to adjourn at 4 o'clock

13   tomorrow, Mr. Moskovitz?

14   MR. MOSKOVITZ:   Yes, please.

15   THE COURT:   If not sooner?

16   MR. MOSKOVITZ?  Yes.

17   THE COURT:   Ten o'clock tomorrow morning.

18   MR. VEEDER:   Your Honor, before we adjourn, do I

19   understand that if I call my last witness tomorrow, we don't

20   know what is going to happen on Tuesday? Is that right?

21   MR. SACHSE:   I am going to come down with a file of

22   files and I will not have written motions, I will advise you

23   orally what they are, and I will submit a written motion if

24   it is needed later.

25   THE COURT:   We will undoubtedly have proceedings on

1    Tuesday whether you have a witness that goes that far or not.

2    Whether we will have anything for the rest of the week, we

3    will have to decide later.  And I take it that we will have

4    more cross-examination?

5         MR. SACHSE:  Oh, yes, we will have a good deal of

6    cross-examination.

7         THE COURT:  Ten o'clock tomorrow morning.

8         (Adjournment until Friday, January 23, 1959 at

9    10 a.m.).

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25