# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                        Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                        Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:       San Diego, California

Date:       Friday, January 23, 1959.

Pages:    7787 to 7906

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 69

7787

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -


UNITED STATES OF AMERICA,       )
                                )
                Plaintiff,      )
                                )
        vs.                     )       No.1247-SD-C.
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                Defendants      )


REPORTERS' TRANSCRIPT OF PROCEEDINGS


San Diego, California

Friday, January 23, 1959


APPEARANCES:

        For the Plaintiff       WILLIAM H. VEEDER, ESQ.,
                                Special Assistant to the
                                Attorney-General,
                                Department of Justice,
                                Washington, D.C.

A
Z2

1    APPEARANCES (continued)

2        For Defendant            GEORGE E. STAHLMAN, ESQ.
         Vail Company

3

4        For Defendant State      STANLEY MOSK, ESQ.,
         of California            Attorney-General, by
                                  ADOLPHUS MOSKOVITZ, ESQ.,
5                                 Deputy Attorney-General.

6        For Defendants
         Fallbrook Public
7        Utility District,        FRANZ R. SACHSE, ESQ.
         et al.

8

9

10                          - - -

11                            -

12                            -

13

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX TO WITNESSES

| For the Plaintiff: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Allen C. Bowen | | | | |
| (By Mr. Sachse) | | 7840 | | |

## EXHIBITS

| Plaintiff's Exhibit - | Iden. | In Evid. |
|---|---|---|
| 152 - Study re Parcel 52 | 7853 | |
| State of California Exhibits | | |
| L - Appendix F, Logs 1, 2, 3 and 4 | | 7855 |

1   is no evidence, in our view, that would support a claim for

2   rights to the use of water for either appropriative or riparian

3   rights.

4         Now, we have thought of filing motions which, in sub-

5   stance, would be for judgment with the Special Master or with

6   your Honor pointing out--

7         THE COURT:  What does the Master propose to find in this

8   particular case that you are discussing?

9         MR. VEEDER:  The Master has, for example in the Garnsey

10  case, found that there are structures for the diversion and the

11  use of water, but there is no proof that we can find as to--

12        THE COURT:  What else does the Master find?  He found

13  there were structures that--

14        MR. VEEDER:  He found there were structures.  He found

15  there were some riparian lands.  He found there were some over-

16  lying rights.  But we are unable, based upon his findings, to

17  determine the quantities of water for which an actual

18  appropriative right might exist.  We have been unable to de-

19  termine--

20        THE COURT:  Did the Master find any amounts?

21        MR. VEEDER:  He didn't.

22        MR. SACHSE:  Your Honor--

23        MR. VEEDER:  Now, don't interrupt for a moment.

24        MR. SACHSE:  I am Mr. Garnsey's attorney.

25        MR. VEEDER:  The point I make, your Honor, is that the

1   SAN DIEGO, CALIFORNIA, FRIDAY, JANUARY 23, 1959.  10:00 A.M.

2

3       (Another matter.)

4       THE CLERK:  No. 2, the case on trial:  1247-SD-C,

5   United States vs. Fallbrook.

6       MR. SACHSE:  Your Honor, while the witness is opening

7   up his papers, I observe an error in the record, page 7768,

8   line 15.  Col. Bowen, when discussing the evaporation factor,

9   the figure you are given in the answer is:  "Yes, sir, that

10  figure of 73.9 times the surface area."  I think it is 3.9

11  times the surface area.

12      THE COURT:  It should be 3.9?

13      MR. SACHSE:  It should be 3.9.

14      THE COURT:  3.9.  All right.

15      MR. VEEDER:  Your Honor, we have some questions to pre-

16  sent to your Honor before proceeding a great deal farther in

17  regard to the objections which we are preparing for the Special

18  Master, and I would like direction from you, if possible, as

19  to what your views are on the method to proceed.  There are, in

20  our view, a very sizeable number of cases in the De Luz area,

21  for example, where we believe that the defendants have not

22  proved their claim.  We introduced the evidence that we were

23  directed to obtain, namely, the investigations under Col.

24  Bowen's direction.  Now, we find, for example, what we believe

25  to be a failure of proof in the case of Felix R. Garnsey.  There

A

Z6

1  situation is this:  On numerous occasions throughout these

2  findings there is nothing to show actually what the burden on

3  the stream would be once a decree is entered.  And we think

4  that that is highly important.  We think, moreover, that in

5  the Garnsey case, for example, that there is no way to determine,

6  based upon the evidence that was introduced by the defendant

7  Garnsey, to delineate and define the extent of his rights.

8  A similar situation exists, and I am not being the slightest

9  bit critical of the Special Master-- I think he made all the

10  findings that the record would support--

11      THE COURT:  Before you go to another case, let's hear

12  from Mr. Sachse on this case.

13      MR. VEEDER:  Well, all right.  That suits me.

14      MR. SACHSE:  On Garnsey, your Honor, the evidence before

15  the Court, regardless of who introduced it, is as follows:

16  There is a detailed engineering report by the Marines with the

17  amount of his land, a determination by Col. Bowen of how much

18  of it was irrigable, which Mr. Garnsey on the witness stand

19  accepted as correct.  There is evidence in the form of maps and

20  testimony as to on what streams it abuts.  There is evidence

21  which streams meet.  In one case two streams intermingle on his

22  land.  There is evidence that Mr. Garnsey holds two permits

23  of the State of California.  Permits-- they have not yet gone

24  to license-- for the diversion of winter runoff of Cottonwood

25  Creek.  Permits.  These are not in evidence.  There is a

A

Z7

1  description of works.  The Master viewed them.  There is

2  description of the lands, by testimony, of the lands on which

3  the water has been put to beneficial use.  Now, the original

4  findings by the Master did not contain a finding that any of

5  the appropriative water had been put to beneficial use.  I

6  raised that objection.  I stated, and I believe the State of

7  California did also, that the finding was incomplete in that

8  respect; that the mere finding of a permit without some finding

9  that the water has already been put to use doesn't give you any

10  more than an inchoate right.  Mr. Garnsey had been unable to

11  state the amount of water, because he didn't meter it; but he

12  had testified to the acreage that was irrigated.  And so the

13  Master amended his findings.  I am sorry I don't have that

14  amendment before me.

15      Mr. Veeder, perhaps you do.

16      MR. VEEDER:  I do.

17      MR. SACHSE:  And the general language-- if you want to

18  help me out by finding it, I would appreciate it.  The general

19  language was to the effect that there was no specific evidence

20  of the amount of water that has been put to use by Mr. Garnsey,

21  but that water has been put to use from the diversion works

22  and under the permits named in the findings.

23      Now, I am perfectly satisfied with the findings.  And

24  if Mr. Veeder wants to move for judgment at the close, for

25  judgment on the ground of the evidence, why, let him go ahead

7793

A

Z8

1    and do so.

2            MR. VEEDER:   The problem is not that simple, your

3    Honor.

4            THE COURT:   Well, if the right, if perfected under a

5    permit, under the permit becomes the measure of the right, does

6    it not?

7            MR. SACHSE:   When perfected.

8            THE COURT:   When perfected.

9            MR. VEEDER:   But it has not been perfected.

10           MR. SACHSE:   It has not been perfected, that is cor-

11   rect.

12           THE COURT:   But there is a finding going to be made

13   that water is being diverted and it is being put to a beneficial

14   use--

15           MR. SACHSE:   Under the permit.

16           THE COURT:   --under the permit.   So that when the

17   permit matures into a license, the permit and the license are

18   the measure of the right, are they not?

19           MR. VEEDER:   Well, your Honor, it goes deeper than that.

20   I am not worried about what proceeding Mr. Garnsey subsequently

21   will take.   I don't know what he will or whether he ever will

22   or not.   But the fact remains that all parties have rested in

23   this particular case.   And we have scrutinized these findings

24   closely, and we have looked to the record, because we certainly

25   don't want any more burden in this case than we have now.   In

1   fact, our burden is insuperable in some regards.  But we have

2   prepared what we think would be a format for a decree, and we

3   believe that we have set out the minimum for such a format.

4   And applying that format and the elements that we think are

5   essential so that the Marines will know how much water they

6   can reasonably anticipate, we find that-- and I took the

7   Garnsey case because counsel is here-- there is no means what-

8   ever of determining the quantity of water that will be ultimately

9   utilized or demanded or how much water is presently utilized

10  or demanded.  And we believe that--

11        THE COURT:  Does the permit specify any amount?

12        MR. SACHSE:  Yes, your Honor.  The permit is limited in

13  two respects.  There is a permit to store a certain number of

14  acre feet in toto and to divert and apply to beneficial use

15  another amount.

16        MR. VEEDER:  But you see, the permit is similar to the

17  one that was given to Fallbrook to build a dam for 35,000 acre

18  feet of storage, which is meaningless.  And the permit here is

19  of the same nature.  There is no way of telling whatever,

20  there is no cross-section of the ditches, there is no means

21  of showing the quantity of water that could ultimately be

22  delivered; nor is there any way of showing the acreage upon

23  which the water would be applied.

24        MR. SACHSE:  Mr. Veeder--

25        MR. VEEDER:  Similarly--

A2

Z10

1            MR. SACHSE:  --that, I think is not true.

2            MR. VEEDER:  I think I should be permitted to finish,

3    your Honor.

4            MR. SACHSE:  That, I think, is incorrect.

5            THE COURT:  Go ahead.

6            MR. VEEDER:  There is no way of determining the extent

7    of the overlying rights.  There is no way of determining the

8    basic factors which, in our view, had to be proved by the

9    defendants in these cases.  Now, I am anxious to bring these

10   matters to your attention now and point out that what we would

11   do in the normal case would be to file a motion on the grounds

12   that we are entitled to judgment, because there has been no

13   proof of the affirmative claim of Garnsey.  And I think that

14   that is the case.  An example, your Honor has asked about the

15   permits.  The Master went back and made an additional finding.

16   He said the defendants have diverted water for use upon certain

17   portions of that land-- we don't know what portions-- every

18   year since 1945.  "Defendants have irrigated a total of about

19   70 acres, although they have never irrigated all of said land

20   at one time.  The defendants have also stored water since said

21   permits 5505 and 8166 were issued.  But the precise period of

22   time of such storage cannot be established from the record.

23   The evidence is also insufficient to determine the precise

24   amount of water diverted and stored and/or used pursuant to the

25   provisions of the permit."

1    Now, I think that every one of those things we knew at

2  the time that the lawsuit was started.  But we believe this

3  way, your Honor:  That there has to be proof in regard to

4  Garnsey.  We believe that there has to be proof in regard to

5  Foss, and--

6    MR. SACHSE:  Foss has no appropriation.

7    MR. VEEDER:  Well, you have the riparian rights or the

8  overlying rights.  --are not proved there at all.

9    Now, our concern is this:  If we proceed from De Luz

10  Creek in the present state of the record, there being a failure,

11  in our view, in most instances, of the defendants to prove what

12  we consider to be the essential facts, ultimately, whether

13  before the Master or here, we would simply file a motion on the

14  grounds that we are entitled to judgment because they didn't

15  prove their affirm rights, their rights affirmatively

16  alleged.  So your guidance in this matter would be most --

17    THE COURT:  Let me see that sheet you are looking at.

18    MR. VEEDER:  It is extremely rough.  But is our rough

19  draft in preparation of our objections.

20    MR. SACHSE:  Your Honor, may I make an observation?  Are

21  you finished, Mr. Veeder?

22    MR. VEEDER:  No, I am not.

23    MR. SACHSE:  Go ahead, then.  When you are through--

24    MR. VEEDER:  His Honor is looking at a sheet now.

25    THE COURT:  Go ahead, finish up.

A

Z12

1    MR. VEEDER:  Now, our feeling similarly in regard to,

2    generally, the description of overlying rights is inadequate.

3    For example, there will be a description saying, or rather, a

4    finding saying that in the upper and higher lands the water

5    underlying those lands would be vagrant and percolating, but

6    in the lower lands they would be part of the De Luz Creek.  And

7    we believe that it would behoove the defendant to prove what

8    he meant by the lower lands and what he meant by the higher

9    lands.  That is not for us.  And similarly--

10    THE COURT:  Which case is this now, Foss?

11    MR. VEEDER:  That would be the Foss case.

12    MR. SACHSE:  That is a common occurrence in the find-

13    ings.  Mr. Veeder is correct.

14    MR. VEEDER:  Throughout the findings there is no way

15    of determining at this juncture the areal extent of those lands

16    which overlie a part of the stream system of the Santa

17    Margarita River; in other words, the ground water which supports

18    the surface flow of the De Luz Creek.

19    THE COURT:  What are they spoken of, as lower grounds?

20    MR. VEEDER:  Lower grounds and the higher grounds, and

21    a general description.  For example, there would be a descrip-

22    tion of around 60 acres of land or maybe 80, and we will say

23    the upper portion of this area with the water underlying is

24    vagrant and percolating but the lower portion of it is not.

25    THE COURT:  Is there any reference to maps or these--

A

Z13

1          MR. VEEDER:  No, there is not.

2          THE COURT:   --where you can identify these areas?

3          MR. VEEDER:  It is true that the United States has filed

4    maps-- Col. Bowen's soil survey and land class maps-- but there

5    is no map that would respond to the question that you asked

6    me.   There is no way of determining what is meant by the

7    Special Master in his declaration that the upper land is over-

8    lying vagrant water and the lower land is overlying that which

9    is part of the stream.

1          MR. VEEDER:  I will let Mr. Sachse use this, if he

2    desires.

3          MR. SACHSE:  I think I have seen one, but I would

4    appreciate it.

5          Now, your Honor, I am very happy that Mr. Veeder

6    brought this up.  This is an important and a serious thing

7    in the entire case.  But my interpretation of what has happened

8    at the Master's hearings is just a little different.  An

9    examination of this sheet that Mr. Veeder has handed you will

10   indicate--

11         MR. VEEDER:  May I say that this is just a rough draft.

12         MR. SACHSE:  I appreciate it.

13         --will indicate that what he is after is a present

14   quantitative allocation of the waters of the stream.

15         Now, when the Master concluded his hearings, he re-

16   quested the parties to submit suggestions as to findings, and

17   I did in the case of each of my clients, and I also submitted

18   a rather lengthy memorandum on the findings in general, and

19   the principal point I made in that memorandum was that there

20   were certain glaring lacks in the evidence offered by the

21   United States and that for this reason the findings should be

22   very drastically limited.

23         Now, the lacks in the evidence are as follows:  There

24   is no evidence whatsoever in the record as to the amount of

25   water that comes down any tributary of De Luz Creek, the amount

B

Z2

1    of water that flows past any land owner's or farmer's door.

2    The only evidence in the record is the short period of time

3    that the De Luz gage has operated at the absolute foot of

4    the watershed, which includes Roblar Creek.  So instantly we

5    were confronted with the fact that if any apportionment were

6    attempted to be made between a land owner on, let us say,

7    Fern Creek or Camps Creek, there was not the slightest evidence

8    from any source as to what water was to be apportioned-- as

9    to how much water his rights were correlative.  That is the

10   first glaring hole in the case.

11         The second one-- and I agree with Mr. Veeder absolutely

12   that Col. Bowen, who was the only technical witness, in his

13   testimony referred on numerous occasions to alluvial areas.

14   Now there are very few in De Luz Creek, and the only one of

15   any substantial size underlies the Garnsey property.  I don't

16   recall that he specifically used the word "basin."  But there

17   was no evidence, Mr. Veeder is quite correct, of the area of

18   that little alluvial plain or whatever you want to call it,

19   there was no evidence of its depth, there was no evidence of

20   the amount of water in it or how much could be safely ex-

21   tracted.

22         It was my view, and I so stated in the memorandum to

23   the Master, that on the present state of the record all that

24   he could find was that lands were or were not riparian, he

25   could catalog such appropriative rights as existed-- and I

7801

think there were three, describing how near perfection they
were and what their present right called for, he could
catalog prescriptive rights, if any, and I even objected to
his finding of irrigable acreage because I took the position
that the question of irrigable acreage is a constantly fluc-
tuating thing-- that what was irrigable twenty years ago is
surely a different question from what is irrigable today, and
since there was no possible evidence under which he could
allocate the water of the stream there was no purpose at this
time in making a finding of irrigable acreage.  He overruled
me on that.  But he apparently agreed with my other con-
tentions to the extent at least of recognizing that he had
absolutely no evidence whatsoever upon which he could determine
how much water goes past anyone's door.

Now this is of tremendous importance and I am glad that
it came up today, because I am sure your Honor has observed
in my examination of Mr. Hofmann and others that I have pointed
out in the upper watershed that we have no method whatsoever
today of knowing what water is anywhere except at the limited
gaging stations, and your Honor will recall that Mr. Hofmann
stated it would be possible to make a very rough, were his
words, estimate of the contribution of any of these individual
tributaries.  But I asked him if it had been done, and he said
it had not.

Now the significance of all this is that when this case

1    ends, it is my firm conviction that it is going to be looked

2    upon as one of the greatest fiascos in the history of the

3    Department of Justice.  Regardless of your Honor's findings

4    as to irrigable acreage, regardless of your findings as to

5    the appropriative rights, if any, of the United States, the

6    fact is going to remain that there will be no evidence what-

7    soever before your Honor as to how much water there is to

8    divide between any two riparians.

9         If you take Mr. Roripaugh-- I will discuss a case in

10   which I have no personal interest; I am not his attorney-- and

11   if you take the fact, which I would be willing to concede,

12   that his land is a part of the stream system, you still don't

13   know what the contribution of that stream system is, you still

14   don't know the capacity of that basin, you still don't know

15   how much water he has taken, you still don't know whether he

16   is taking more than his share; you would have no possible fact

17   before you upon which you could do any more than make a finding

18   that Mr. Roripaugh is a part of the stream system, that the

19   water that he diverts he has a right to share correlatively

20   with others, and that would be the sum total and extent and

21   you would have to keep continuing jurisdiction for such future

22   time as shortage was proved, injury occurred, or something of

23   the kind.

24        Now that is exactly the situation on De Luz Creek.

25        I am almost through.  I want to make one further point.

1  There is a line of cases-- I wish I had my memorandum before

2  me-- California cases, which I urged to the Master where the

3  cases that spelled out the type of finding that he was com-

4  pelled to make.  I think they are-- Mr. Moskovitz, if I am

5  wrong, please correct me if you remember-- they are the

6  Bigelow vs. Mertz, 57 C.A. 613, Strong vs. Baldwin, 154 Cal.

7  150, and a couple of others-- I will furnish the citations at

8  the recess-- in all of which the plaintiff sued for an

9  adjudication on a stream, expressly asked to have quantitative

10  allocations of water, in all of which the trial court refused

11  to make any quantitative allocation but said that we haven't

12  got evidence enough to do it, it is impossible, so we will

13  find that these people are or are not riparians who share

14  correlatively in the stream and at such later time as somebody

15  wants to bring this question up where a shortage is proved or

16  an injury is proved, at such time we are going to have to get

17  a little more evidence and then we are going to have to make

18  the quantitative allocation.

19        Now that, I conceive, with all sincerity, is the exact

20  situation existing on De Luz Creek, and looking to the future

21  of this case, it is the exact situation that is going to exist

22  on the watershed as a whole.

23        Now, Mr. Veeder complains that he doesn't know what

24  the burden of the stream of Mr. Garnsey is going to be.  I

25  submit, your Honor, that we haven't the slightest idea what the

1  burden on the stream of the United States is going to be.  We

2  have figures of future development-- we have everything under

3  the sun.  There is no conceivable basis on which your Honor

4  in this case could make a quantitative finding, on the state

5  of the record as it now exists, and I am absolutely perfectly

6  willing to go to judgment on the state of the record on the

7  Garnsey record before the Master-- I am absolutely willing.

8  But as I said, I am very happy that this thing has been

9  brought up at this time, because it is going to come up again,

10  it is going to come up in every subtributary of this water-

11  shed, and I will state in passing that this has been ex-

12  tensively discussed between counsel for other defendants.

13  While I will not attempt to speak for Mr. Krieger, I know that

14  your Honor will have the same thought presented to you as

15  regards Mr. Krieger's clients, that there is nothing what-

16  soever on which you can do any more than find the legal status

17  of their rights rather than their quantitative right.  We might

18  as well meet it right now, if there is any misunderstanding

19  between us on it.

20      I would like to hear the State.

21      MR. MOSKOVITZ:  Your Honor, I just want to add one

22  further thought.

23      THE COURT:  Are you in accord with Mr. Sachse?

24      MR. MOSKOVITZ:  I am in accord with what Mr. Sachse has

25  said, your Honor.  I want to add one further point.

1              Mr. Veeder has said that on the state of the record,

2    for Mr. Garnsey, for example, he would move for judgment

3    against Mr. Garnsey on the grounds that Mr. Garnsey has failed

4    to prove any riparian right.  I think Mr. Veeder is mistaken

5    as to what is necessary to prove a riparian right.  It is not

6    necessary to prove what quantity of water one is entitled to

7    in any particular time.  It is necessary to prove only that it

8    has the status of riparian land, it has not been severed, the

9    right has not been lost by prescription, and the owner is the

10   owner of a riparian right.  In the very nature of a riparian

11   right, it cannot be specific as to quantity.

12              Now as to appropriative rights, this is different, and

13   where you have a purely appropriative state, like many in the

14   West, you can have a decree which sets forth quantities of

15   water, diversion or application.

16              But with riparian rights you can't do it.

17              Mr. Veeder referred sometime earlier in this case to a

18   decree on the Carson River where a Federal Court proposed a

19   decree to have both riparian and appropriative rights on a

20   stream, which was interstate-- from California to Nevada.  Now

21   in that case the proposed decree does list quantities with

22   respect to appropriative rights.  But when it comes to ripar-

23   ian rights, it just says the acreage, because you can't be

24   more specific than that.

25              MR. VEEDER:  Why, of course.

1      MR. MOSKOVITZ:  And if Mr. Veeder hopes to come out of

2  this case with a specific, definite idea as to what will be

3  the burden on the stream of each and every person so that he

4  can tell specifically how much the Marines will get, I think

5  he is just barking up the wrong tree.

6      MR. VEEDER:  I think this is the most amazing mis-

7  statement I have ever heard.  I have never said, nor will I

8  ever say, that with regard to a riparian right-- and he mis-

9  quoted me-- that you could conceivably make a determination

10 as to the water that a single acre would receive.  Why?  It

11 is correlative in nature.  They are competing, one acre against

12 the other.

13     My statement is in regard to appropriative right.  My

14 statement is that there was nothing in the Garnsey record to

15 show the extent of the burden on the stream by the appropriative

16 right.  There is nothing to show the extent of the overlying

17 rights.  There is not a word in there.

18     THE COURT:  Just a moment.  Your overlying right, in

19 legal interpretation, is equivalent in its operation to a

20 riparian right, isn't it?

21     MR. VEEDER:  Right.  But there is nothing to show the

22 acreage of land which is overlying the alluvium the water-

23 bearing characteristics of which are part of the stream.

24     THE COURT:  What difference does it make how many acres

25 overlie?  Suppose a man had an 80-acre piece and two acres

B
Z9

1    overlay the stream.

2         MR. VEEDER:  It would be extremely important.

3         THE COURT:  He could use the water on the whole 80,
4    could he not?

5         MR. VEEDER:  Your Honor, in that regard, we have this
6    problem which has come out-- I am not quite sure on the
7    Garnsey case whether this is the statement or not-- where it
8    said that some of the land is overlying, but the balance of
9    the land overlies vagrant, percolating waters.

10        Now, may I go back--

11        THE COURT:  I want to follow you as you go along.

12        MR. VEEDER:  All right, your Honor.

13        THE COURT:  A man might have 80 acres.  78 acres of it
14   might have vagrant, percolating waters.

15        MR. VEEDER:  That is right.

16        THE COURT:  Two acres might overlie a basin or be
17   riparian to a stream.  He could use the stream waters on the
18   whole 80.

19        MR. VEEDER:  Right.

20        THE COURT:  Even though he also had vagrant, percolating
21   waters.

22        MR. VEEDER:  Very true.  There is no objection to that.

23        I want to clarify the proposition again, though.  In
24   regard to riparian rights, I have never said, and I will never
25   say, and there is no basis for anyone saying that I ever said,

B

Z10

1    that you can do any more than get a correlative share in the

2    stream. But in regard to appropriative rights, it is

3    essential that you show the acreage that has an appropriative

4    right, the means of diverting the water, the priority, and

5    how the water is utilized.

6        In regard to the most grievous error of Mr. Sachse's

7    thinking, your Honor could not conceivably, and I think the

8    Almighty is the only one who could, say how much water is

9    going to be available. It changes momentarily from day to

10    day, from year to year, from week to week. And when I say

11    that I think the grave error of the opposition, including the

12    State of California, is there. You cannot decree the quantity

13    of water available. You cannot say that there is or is not a

14    surplus, because you don't know. And no one knows.

15        All we are asking, and the sole and only reason for

16    a quiet title proceeding is just exactly what we have asked for

17    and what we have been talking about for a year. We are saying

18    we want to know the extent of the riparian lands. We want

19    to know the maximum quantity that could be reasonably used

20    upon that land. We want to know the prescriptive rights to

21    the full extent of those rights. We want to know the full

22    extent of the maximum use that could be used under the

23    appropriative rights. The completed appropriations and the

24    inchoate rights-- we are entitled to know that.

25        But we couldn't ask you to find, and no one in water

1    litigation ever asked to have, a quantitative allocation of

2    water.  It would be impossible.  But we can say that here is

3    a ceiling which would establish the maximum quantity that

4    could ever be used.  We could say that in regard to priorities

5    Joe Doe will get the first crack at the available appropriative

6    water, and Emil Zilch will get the next shot, and Joe Blow--

7          THE COURT:  Appropriative water?

8          MR. VEEDER:  That is right.

9          THE COURT:  You are talking about water available for

10    appropriation?

11          MR. VEEDER:  That is right.

12          So you can chronicle those rights.  But you divide

13    correlatively on the basis of the available quantity of water

14    momentarily in the stream, the acres that are entitledto

15    riparian water.

16          I would just as soon go on with the discussion with Mr.

17    Sachse until the end of time.  But your Honor, there is one

18    thing that I think should be clarified.  This Court doesn't

19    have jurisdiction, and no court has jurisdiction, and nothing

20    could ever be proved, as to the quantity of water that is going

21    to be available on a given day to divide up among the users,

22    and I think that error has permeated the thinking of the

23    opposition throughout this litigation.  It is an impossibility.

24    We want to have a definition, we want to have a specific

25    declaration as to the lands with legal entitlements to whatever

B

Z12

1   water is available, and that is all the Marines can possibly

2   hope for.

3        Now, in regard to the balance of our case, we will

4   show present use, past use, and anticipated use, before we

5   rest.

6        MR. SACHSE:  Your Honor, I am sorry I don't have the

7   Garnsey papers, but, your Honor, I would like to use Vail as

8   an example only.

9        THE COURT:  What do you say generally to Mr. Veeder's

10  statement that he doesn't contend that there can be any

11  quantitative amounts under a riparian right--

12       MR. SACHSE:  Your Honor, I am happy--

13       MR. VEEDER:  Now why don't you let the Court finish?

14       THE COURT:  --and that you don't contend that?

15       MR. SACHSE:  Your Honor, I am happy--

16       MR. VEEDER:  Why don't you let the Court finish, Mr.

17  Sachse?

18       THE COURT:  That as to appropriative, prescriptive or

19  inchoate rights in the process of maturing as prescriptive or

20  appropriative rights, that they are subject to being cataloged?

21       MR. SACHSE:  Your Hanor, I concur.  But I think we

22  can discuss it more logically with an exact--

23       MR. VEEDER:  Your Honor, you asked him a very pertinent

24  question and he interrupted you several times.

25       MR. SACHSE:  I stated that I concur with Mr. Veeder that

B

Z13

1    the riparian rights cannot be chronicled other than as being

2    correlative; that they cannot be set forth as part of any

3    basin.   That was my big point.   If you concede, I am happy.

4         As to appropriative rights or prescriptive rights, they

5    can be chronicled.

6         Now, let's look at one.   Here is a permit.   I has not

7    gone to license.
         MR. MOSKOVITZ:   Mr. Vail's permit?

8        MR. SACHSE:   Yes.   This is Mr. Vail's permit.   I don't

9    have Mr. Garnsey's permit here, and I want to use an exact

10   permit as an example.   That is the only purpose of using Vail's

11   permit.

12        This permit says:

13            "The amount of water appropriated

14             shall be limited to the amount which can

15             be beneficially used, and shall not ex-

16             ceed 40,000 acre feet per annum by stor-

17             age to be collected from about November

18             1 of each year to about April 30 of the

19             succeeding year."

20        That is the permit.   That is all it says.   Then it has

21   some time conditions as to how soon the work shall be commenced

22   and how soon all the water appropriated shall be put to bene-

23   ficial use.

24        THE COURT:   This is the permit that led to the Vail Dam?

25        MR. SACHSE:   This is the permit that gives them the

1    water to store behind the Vail Dam.

2             Now the Garnsey permit is exactly the same thing, ex-

3    cept it is for 35 acre feet or something of that kind.

4             The point I want to make is this:  Mr. Stahlman can't

5    offer evidence today-- I know he can't-- that 40,000 acre feet

6    has been put to beneficial use in any succeeding year.

7             MR. VEEDER:  Right.  That is the point I make.

8             MR. SACHSE:  Neither can Mr. Garnsey.  Mr. Garnsey can't

9    for one reason:  He has used it, but he hasn't metered it.

10   Mr. Stahlman's client has metered it, but he hasn't had the

11   water to use-- he hasn't had the 40,000 acre feet.

12            Now, when this permit is chronicled, as I conceive it,

13   the Court will say that the Vail Company is the owner of

14   Permit No. 7032 from the State of California giving them the

15   right to impound 40,000 acre feet of runoff between November

16   1st and April 30th of each year, if they can get it-- not to

17   exceed 40,000 acre feet, and what they get they can use, and

18   if those acts by Mr. Stahlman's client later--

19            THE COURT:  And that they have since the issuance of

20   the permit complied and that they have used some benefically--

21            MR. SACHSE:  That they have diligently proceeded.

22            THE COURT:  --and that it is still alive and is in the

23   process of maturing someday into a license.

24            MR. VEEDER:  May I take one shot at that, too, your

25   Honor.

MR. SACHSE:  I might point out also, your Honor, that there has been an extension of time here to complete the putting to beneficial use.  And all your Honor would find is that he has such a permit from the State, that he has a perfect right to go ahead and develop his use and try to put it to use.  But you cannot say what his burden is on the basis of this permit.

MR. STAHLMAN:  Your Honor, I might add one other thing that may throw some light on this.  Under the State laws as they now exist it is necessary that we submit to the State and file with them a record of the usages of the water each year.  We do that at the end of each calendar year.

MR. VEEDER:  Yes, your Honor, and the point that I make, and the point that I am hopeful for, is that they have an opportunity should the water be available, and they have a permit from the State to impound a maximum of 40,000 acre feet. We want to know how much water has been diverted and applied to beneficial use, and in my view of the law the extent of the perfected right at the present time, the perfected right being measured by that water that has been applied to beneficial use to the land for the purpose of irrigation.

Now they have an inchoate right for the balance, they have an inchoate right up to the full 40,000 acre feet of water. But as of the moment, as distinguished from this tree character-istic of Plate 23, although they have the right to impound 40,000 acre feet, they have never impounded more, as I recall,

B.

Z16

1    than 13,000 at any one time.

2         MR. STAHLMAN:  Approximately that.

3         MR. VEEDER:  So our view is that they have impounded

4    to that extent and that they have applied beneficially to the

5    land from that water thus stored and thus acquired a storage

6    right to the extent of whatever water they have applied bene-

7    ficially, which I think runs around 3,000 acre feet.

8         THE COURT:  It is your contention that they now have a

9    vested right to 3,000 acre feet, but an inchoate right to

10   37,000 more?

11        MR. VEEDER:  Right.  To the extent that they have

12   applied water beneficially, they have a vested, perfected and

13   completed right.

14        THE COURT:  Do you understand the law to be, then, that

15   if they had a permit for a 40,000 acre-foot dam and that the

16   winter they got it completed it filled clear to the top and

17   they thereafter used that whole 40,000 acre feet on the ground,

18   that they then had a vested right to 40,000 acre feet?

19        MR. VEEDER:  I would say they had a perfected right from

20   then on.  Then they would get a license.

21        But the point I am making, in regard to the Garnsey

22   matter, and it concerns me greatly because it is precedent

23   throughout the valley, Mr. Garnsey has a permit for X quantity

24   and he has a reservoir.  I think he has probably filled it and

25   has probably utilized it to the fullest extent.  But we don't

1    know.  And we say that Mr. Garnsey has a perfected appropriat-

2    ive right to the extent that he has diverted and applied the

3    water to beneficial use, and the findings should so reflect

4    that.  That is the principal criterion, the principal reason

5    for my bringing up this point.

6         THE COURT:  I still have a little trouble about that.

7    Suppose the findings go along, as they are now, that he has

8    applied some quantity unknown, and that he has stored some

9    quantity unknown.  He still has his inchoate right under the

10   permit for the balance.

11        MR. VEEDER:  Right.

12        THE COURT:  And sooner or later, if they get enough

13   water that he can use, he will probably perfect his entire

14   right.  Why are we concerned with such certainty as to how

15   much he has perfected at this particular moment?

16        MR. VEEDER:  For this very reason, your Honor.  I think

17   the history of the West bears this statement out, that there

18   is not a man in the world who makes a filing who doesn't make

19   a filing for probably five times what he should-- indeed, we

20   have seen it happen many times.  Now that inchoate right, if

21   you can show due diligence, stays alive.  If you fail to show

22   due diligence, it dies down to the point of the perfected,

23   completed and vested appropriative right measured by the water

24   beneficially applied.

25        Now, in my view, there is nothing in the findings to

B

Z18

1    which I am making reference which would permit this kind and

2    type of finding by your Honor and ultimate decree.  I think

3    there should be a showing of the maximum irrigable land and

4    the maximum quantity under the permit of Mr. Garnsey.  Then I

5    think a line should show that as of the date when your Honor

6    enters the decree, let us say in 1975, that he has diverted

7    and applied beneficially X quantity of water.  Now at least

8    we would know downstream that from a date in 1930 down to a

9    date in 1975 that he at least had not perfected more than X

10   quantity of water or rights to that X quantity of water.  I

11   think it is extremely important.

12        I am not saying anything about the Vail rights, but I

13   will be amazed if the time ever comes when that reservoir

14   fills up-- I would be very much amazed.  But I think it is

15   absolutely imperative--

16        THE COURT:  What do you mean, you would be amazed?

17        MR. VEEDER:  Because I don't believe there is that kind

18   of water in the stream.

19        THE COURT:  If we ever get some good rains, it would

20   fill that reservoir and go over the top.

21        MR. VEEDER:  Well, I'm with you all the way on that,

22   your Honor-- I pray for rain.  But not until after the State

23   puts in its case.  But we want to be very sure--

24        MR. STAHLMAN:  We are praying for rain, too, your Honor.

25        MR. VEEDER:  The statistics look so bad now.  If they

1   could only just get a little water in the ocean.  But in any

2   event, our view is this, that as of a given time we should

3   know as of the date--

C

Z14

THE COURT:  In other words, we should be as certain as we can about what has been done under this permit--

MR. VEEDER:  Up to now.

THE COURT:  --as of the time we feel something has been decided by approval of the Master's Findings or a decree, and so forth.  That is the point.

MR. VEEDER:  That is correct, your Honor.  And I think that every one of these findings-- and it is just a problem--

THE COURT:  "Every one of them".  How many appropriative rights are involved?

MR. SACHSE:  Three, your Honor, on De Luz.

MR. VEEDER:  I am not limiting it to appropriative rights.  My objection goes to the fact that there isn't sufficient specificity-- I don't like the word, but there it is-- to show the extent of the land overlying water-bearing material which is part of the stream.  I don't think that it is sufficiently clear, and for us--

THE COURT:  Now, there are three appropriative rights when this problem arises.  How many instances are there where there is question of upper and lower ground without adequate description?

MR. SACHSE:  Probably a good many.

MR. VEEDER:  I have been through it and--

THE COURT:  What can be done to correct that?

MR. VEEDER:  I have been talking money this morning

C
Z15

1    and the Marines are about fresh out.  But I think that it is a

2    problem that might be worked out.  Now, the State has got a

3    lot of personnel.  The State might help us a little on these

4    matters.  They are here, and we have often wondered why.  If

5    we could get some help in regard to the locations of some of

6    these properties that are overlying and also in regard to some

7    of these acreages that have been irrigated and the size the

8    cross-sections of the ditches and the present size of the

9    reservoirs.  In other words, I have no stomach whatever for

10   leaving the De Luz area without its being buttoned up, to to

11   speak.  I would like to see when we leave there precedence

12   for future hearings up the valley.  And I think now is the

13   time to kick the ball around as we get near the end of the road

14   ourselves on our case in chief, so that come February 2-- I

15   would rather not argue this matter before Mr. Sachse's

16   clients at Fallbrook.  I would rather argue it here, because

17   I think he has failed to prove his case.  But if needs be, I

18   will.  I argued it with him one time, and he became very

19   vehement up in Reche School about it.  I think it is very

20   important, though, that these matters be clarified and be

21   defined with as much exactitude as possible.  And I don't

22   believe the findings at this moment are as exact as could be.

23        MR. SACHSE:  May I make a comment on this question of

24   the indefinite descriptions, indefinite delineation of the

25   break between vagrant ground water and part of the stream?  The

C

Z16

1   only testimony on the subject, again, was that of Col. Bowen.

2   And it is quite correct, Mr. Veeder is quite correct, that as

3   to many parcels Col. Bowen was specific that such and such a

4   section, it is vagrant local.  But as to other parcels, the

5   Colonel's reply would be to the general effect that it is very

6   difficult to say at what point the ground waters underlying

7   this ground may contribute substantially and be a part of the

8   stream and where they don't.  And Mr. Veeder's statement is,

9   I think, substantially correct; that the Master has many times

10  described it as the higher land or the land in the west half

11  of the section or the west portion of the section, and so on.

12  But, first, your Honor, the point that you yourself brought

13  up to Mr. Veeder is present in every one of these cases.

14          MR. VEEDER: Which point is that now?

15          MR. SACHSE:  The point that his Honor brought up to

16  you:  That what is the difference?  If this man-- there can

17  be about three conditions exist:  The whole thing can be over-

18  lying, vagrant local waters and also riparian to a stream that

19  flows only during and after precipitation and runoff.  Well,

20  O.K.  That is an easy one.  Because the riparian can't use

21  the limited precipitation, anyway.  So all he has got is

22  ground water.

23          The second one is that part of the land is riparian to

24  the stream or that the land is riparian to the stream, I should

25  say, and that the gound waters under part are part of the stream,



1   and the ground waters under the rest are vagrant local.  It

2   doesn't make a bit of difference.  He can still take his

3   riparian share of the stream water and put it anywhere he

4   wants on that tract, if it is a riparian tract, as your Honor

5   pointed out.

6        THE COURT:  The real question there is:  How many acres

7   are irrigable and what is the duty?

8        MR. SACHSE:  That is the only question.

9        And the third possibility, that Mr. Veeder makes so much

10  of, the basins.  And I would be very happy-- let's get the

11  exhibit.  It would be most interesting, because we have 67 to

12  show you the size of this thing he is talking about; one land

13  owner is affected by basin.  This is almost like Vail.  Garnsey

14  is the only man over this little tiny dribble of alluvium that

15  youfind in the De Luz Valley.  I don't know why such a problem

16  over that.

17       THE COURT:  Go ahead.  Follow through.  He is the only

18  man over it; therefore, he can use it on all the land that--

19       MR. SACHSE:  So what?  Let him use it anywhere in his

20  property.  Furthermore, Garnsey is also a riparian.  So Mr.

21  Veeder is confronted with this peculiar situation-- perhaps

22  not peculiar.  It is identical with Vail, where he has got a

23  riparian right and also an appropriative right.

24       THE COURT:  What difference does it make, then, Mr.

25  Veeder?

C

Z18

1    MR. VEEDER:  It makes a great deal.  Now, we are

2    getting this omlette scrambled a little bit here.  It makes a

3    great deal of difference in regard to the appropriative rights.

4    That is very important; whether appropriative water is being

5    used, what is the extent of the appropriative right.

6        THE COURT:  We have already agreed the appropriative

7    rights we should try to pin down as tightly as we can.

8        MR. VEEDER:  Yes.

9        THE COURT:  Now you are talking about riparian

10   overlying.  We are talking about the findings of upper and

11   lower grounds.  What difference does it make?

12       MR. VEEDER:  Well, it does make this difference, your

13   Honor.  What is the full extent of the burden he can place

14   on the stream?  What is he going to do?  What are the acreages?

15       THE COURT:  The burden is measured by the irrigable

16   acres and the water duty for those acres, if his ground is

17   riparian.

18       MR. VEEDER:  May I read this, your Honor?  I think this

19   is the point.

20       MR. STAHLMAN:  I would like to pose a question, too,

21   that I am at sea on.  Go ahead, Mr. Veeder.  I am sorry.

22       MR. VEEDER:  "A large portion of this parcel overlies

23   alluvium"--

24       THE COURT:  What are you talking about?

25       MR. VEEDER:  I am reading from the Garnsey.

C

Z19

1        THE COURT:  What, Garnsey?

2        MR. VEEDER:  Yes.

3        MR. MOSKOVITZ:  Give the page, please, so we can follow.

4        MR. VEEDER:  31.  I think it is Finding 27.

5              "A large portion of this parcel overlies

6        alluvium ground water basins, which basins

7        are part of the subsurface flow of De Luz

8        Creek in the east and East Fork of De Luz

9        Creek, but neither the areas nor the

10        boundaries nor the depths of these ground

11        water basins"--

12        THE COURT:  Go slower, if you want me to understand you.

13        MR. VEEDER:  Excuse me.  I will give it to you, your

14   Honor.  Now, this is just one--

15        THE COURT:  Let me read it.

16        MR. VEEDER:  It is the bottom paragraph, your Honor.

17        THE COURT:  Well, now, elsewhere has he found that all

18   this ground is riparian?

19        MR. VEEDER:  I don't recall the precise finding on that,

20   your Honor.  And he has quite a sizeable piece of land.  But

21   the fact remains-- and it is unfortunate that we are getting

22   into this riparian question, with Garnsey in particular.  We

23   have the situation with others.  Garnsey is unique, because he

24   has a variety of rights.  But in regard to these other over-

25   lying owners--

C

Z20m

MR. SACHSE:  Which ones?  Name me one, Mr. Veeder.

MR. VEEDER:  I think Foss is one of them.  Matthews is another.

MR. SACHSE:  He is not an overlying owner.

MR. VEEDER:  I will check them out.  And I will file specific objections to them.  And we will be specific in regard to each parcel.  I simply brought up these glaring ones where it is important for us to have clearly defined areas which have not, in our view, been proved by the defendants.

MR. MOSKOVITZ:  Your Honor--

THE COURT:  Go ahead, Mr. Moskovitz.

MR. MOSKOVITZ:  May I make an observation?  In each of the cases I think Mr. Veeder has referred to the Master referred to the areas, the underground areas, that were part of the stream as being the alluvial areas as distinguished from the other areas.  Now, the State made the same objection to the Master findings that Mr. Veeder is raising here in our written objections, that we felt there was some deficiency in exactitude in describing these areas, and raised it to the Master.  And he said, "I am sorry, I just don't have anything more specific."  He described it as alluvium.  He said, "In the future if the problem arises we can get more evidence on it at that time."  Well, that sounded reasonable to us.  It is not necessary right now to be that specific.  Of course, this finding will only be part of what you have before you when you

C

Z21

1   decide the case.  And you will also have the benefit of the

2   geology that has been presented before you.  That geology does

3   go into a delineation of alluvial areas as contrasted with the

4   other types of materials that are on the surface in the De Luz

5   watershed.  And perhaps, using that together with his findings

6   you can be a little more specific when the final decree is

7   entered.

8        MR. VEEDER:  Well, the point, I think Mr. Moskovitz

9   has placed it back to back to what I have said:  I say we are

10  now confronted with the situation before the Court, branch of

11  the Court, agent of the Court, Special Master, where on the

12  state of the record I think there has been a failure of proof.

13  I am not sure how to correct it.  I do know, though, that the

14  objections that we are going to make strike precisely and

15  fully at the claims that have been made in the pleadings.  And

16  my original inquiry was:  What, in your view, is the best way

17  to proceed?  Should we proceed by motion on these things and

18  say that there was a failure of Garnsey to prove up his claim?

19  Or should we hold these things in abeyance until there has been

20  further investigation?  I have no desire to go into a wheel

21  spinning routine here.  I would like very much to follow

22  through along the lines that we have attempted here; and where

23  there is a failure of proof by Mr. Sachse in his case, or

24  anyone else, simply point out where they have failed to prove

25  their claims and say we believe that additional evidence is

C

Z22

required.  Now, our desire is not a judgment against these people by reason of their failure to prove their claims.  Our desire is to know as closely as possible the maximum demand and the impact upon the Naval enclave.  That is all we desire.

THE COURT:  Well, you couldn't get a judgment.  Supposing a defendant came in and made a very poor showing, very unsatisfactory.  But it became apparent that he had some smidgen of a riparian right.  You can't get a judgment against him.  Because he has got a riparian right there and a judgment against him, would he take nothing?  It would be subject to reversal.

MR. VEEDER:  Your Honor, I wouldn't say "take nothing." I would say that the judgment might very well prevent him from taking what we believe he should be entitled to.  Sure, he has a smidgen of a right.  He has a smidgen of a right, but he has more right than the record shows.  That is my view. And I think that the problem is one confronting all of us: What do we do now?

THE COURT:  All right, Mr. Moskovitz.

MR. MOSKOVITZ:  Your Honor, I think again, Mr. Veeder is trying to reverse the burden of proof.  If these people come in and prove that they own land adjoining a stream located in a certain spot, this gives them the right to share in the water flow.  Now, if Mr. Veeder feels they are taking more than their share, he has got to show it; they don't have

C

Z23

1    the burden, in my view, of coming in and showing what the

2    boundaries are between the various kinds of materials.  He

3    has got to show that they are taking more than their share

4    and they are impinging upon him, not the other way around.

5         MR. STAHLMAN:  Your Honor, may I ask one question that

6    I think remained unanswered.  There was so much talking going

7    on.  It is regarding these appropriative rights.  They are

8    indexed in Appendix K.  That is all of those that have been

9    filed with the Water Resources Board up to the year of 1952.

10   They are chronicled there by dates.

11        MR. SACHSE:  They have been changed since '52.

12        MR. STAHLMAN:  That is the entire watershed?

13        MR. VEEDER:  That is simply the filing without.

14        THE COURT:  Let's take a short recess.

15        (Recess.)

16

17

18

19

20

21

22

23

24

25

D

Z20

1    MR. SACHSE:  Your Honor, I misstated a citation-- I

2  had the wrong case.  I would like to correct it.  I referred

3  to two cases:  Strong vs. Baldwin, 154 Cal. 450, was correct;

4  but the other one should have been Bigelow vs. Mertz, 57 C.A.

5  613.

6    THE COURT:  When did you cite these cases?

7    MR. SACHSE:  I mentioned them to your Honor in the

8  record as authority for this principle of no determination of

9  the ultimate burden by riparians on a stream.

10    THE COURT:  I didn't remember that you cited some

11  cases.

12    MR. SACHSE:  I cited them, your Honor.  The reporter

13  has them.  But I didn't give the citations.

14    THE COURT:  Let me have the citations again.

15    MR. SACHSE:  Bigelow vs. Mertz, 57 Cal. App. 613, and

16  Strong vs. Baldwin, 154 Cal. 450.

17    MR. STAHLMAN:  If you said 450, it should be 150.

18    MR. VEEDER:  From what are you citing?

19    MR. SACHSE:  I was looking them up in the table of

20  cases.

21    THE COURT:  The inquiry raised by Mr. Veeder as to what

22  we should do about this, are you prepared to have me answer

23  your inquiry?

24    MR. VEEDER:  Yes, your Honor.

25    MR. STAHLMAN:  Your Honor, there is one understanding

7829

D

Z21

1    that I have in relation to the appropriative rights that may

2    be of some assistance, if I am correct.

3         In relation to appropriative rights, the first in time

4    is first in right, and as Mr. Veeder said, people file for

5    quantities of water that are sometimes out of all proportion

6    to even what they can use.  And the thing that might confuse

7    us a little here, we are dealing in rivers here in Southern

8    California where we have a dearth of water where there is

9    not a sufficient quantity of water to fulfill some of their

10   appropriations.  When you read some of the cases like in the

11   San Joaquin Valley where tremendous quantities of water have

12   been appropriated, this becomes apparent.

13        It was formerly the law that the lack of use of an

14   appropriator for a period of five years would destroy the

15   right to use, and the law now I think is three years.  So you

16   see that if a person could put to beneficial use that quantity

17   of water for which they filed application and the water was

18   available, they could put that quantity of water to use up

19   to the amount that is limited by the amount of the appropria-

20   tion.  However, if they did not during that time when the

21   water was available put that quantity of water to use, then

22   they would be restricted in their right to the quantity

23   actually put to use in the now three-year period and previously

24   the five-year period.

25        For instance, if a person had previously used the

D

Z22

1   quantity of water that was available, and then in the last

2   three years had cut back and used a lesser quantity, then

3   their right as of the present time would be established by

4   only that amount which they used in the last three years.

5       Is that your understanding, gentlemen?

6       MR. MOSKOVITZ:  Just one modification.  The five-year

7   period applies to non-statutory appropriations.

8       MR. STAHLMAN:  Yes, that's right.  In basins, for

9   instance, they are not part of the stream system, like the

10  Pasadena vs. Alhambra case, appropriations are made there

11  without the necessity of filing an application.  It is only

12  on a stream system.  That is correct.

13      MR. SACHSE:  Your Honor, I have only one observation,

14  if your Honor is going to rule, and no one else has mentioned

15  it.  I am a little at a loss by Mr. Veeder's constant referral

16  to failure of the defendant to prove, because any ABC water

17  law is that the presumption-- I am sure counsel will agree

18  with me-- that the presumption in California is that water

19  is not a part of the stream, and if it is the contention of

20  the United States that Mr. Foss or any of these people where

21  Mr. Veeder points out the indefinite boundary between vagrant

22  waters and stream waters, the presumption would be that they

23  are taking vagrant waters, in the absence of any proof that

24  the water is a part of the stream system.

25      THE COURT:  I have heard that statement several times.

D

Z23

1  Is there any authority for that statement except dictum in one

2  case?

3      MR. SACHSE:  Yes, your Honor, the best kind of authority

4  in the world, because the case went up on an instruction to a

5  jury, so it is spelled out.

6      THE COURT:  That is the case I am talking about.

7      MR. SACHSE:  Los Angeles vs. Pomeroy.

8      THE COURT:  That is the only authority?

9      MR. SACHSE:  No, there is much additional authority.

10  I am not prepared to give it to you now.

11      THE COURT:  Do you concede that that is the law, Mr.

12  Veeder?

13      MR. VEEDER:  Well, I will not concede it, your Honor.

14      THE COURT:  You think it is but you will not concede

15  it?  Is that what your tone of voice means?

16      MR. VEEDER: No.  I would rather not be psychoanalyzed on

17  that, your Honor.  My view is that we are greatly concerned

18  to see that these people have their rights protected, and at

19  the same time that we know what our rights are, and I think

20  we can be more specific than we have been.  I understand the

21  burden of proof as well as anyone, I believe.

22      THE COURT:  All right, let's go on with the matter.

23      MR. VEEDER:  All right.

24      THE COURT:  Number one, the present matter before the

25  Master is for a determination by the Master as to what findings

he is going to make.  They are not yet presented to me.  That

has to be done later on.  I think, therefore, that the Master

should rule on these matters, and I think you should call

attention to the specific particulars in which you think

findings are deficient, and why, and give the Master a chance

to see what he wants to do with them, and present it and argue

it before the Master.  And it is only after the Master has

approved or disapproved and made findings that the matter

eventually comes before me.  I think the Master should have a

crack at this and the matter should be called to his atten-

tion.

You have certain fundamental principles.  This is a

quiet title suit.  The plaintiff in a quiet title suit has to

rely on the strength of his own title and not the weakness of

a defendant.  That is Hornbook law in California.

MR. VEEDER:  Right.

THE COURT:  And if there is a deficienty in proof on

a defendant's right, that is something ordinarily that a

plaintiff can take advantage of.  The plaintiff, in quieting

title to waters, must show what the waters are.  So that

ordinarily the laboring oar here is in the hands of the

plaintiff.

Now, it would be generally my view that we should have

findings that are as specific as possible. and particularly in

the case of these appropriative rights.  It seems to me that

1  we should have more specificity.

2      In the case of the riparian rights and the basin rights,

3  I am not yet convinced that it makes a lot of difference.  You

4  might be able to spell out one particular case where it would,

5  but in the categories that Mr. Sachse relates it doesn't make

6  a lot of difference.

7      You have 80 acres.  We will say two acres are riparian,

8  and the other 78 acres have vagrant, percolating waters.  The

9  fellow is entitled to his vagrant, percolating water.  He is

10  also entitled, because of his two acres that are riparian, to

11  use riparian water, if it is there, over the whole 80.  So

12  actually the number of irrigable acres, the type of use he can

13  make and the water duty for that use, are the ultimate measure

14  of the right.

15      MR. VEEDER:  I agree, in general.

16      THE COURT:  Now, there may be particular cases where we

17  should try to cut off the upper and lower lands, so-called,

18  and be more particular.  But in many of these cases, because

19  of the nature of the man's right, it will not make a lot of

20  difference.

21      MR. STAHLMAN:  It may make a difference.

22      THE COURT:  How?

23      MR. STAHLMAN:  Suppose he sells off part of that land,

24  severs it, and somebody else puts a well back on the other part.

25      THE COURT:  You run into problems there.  That is true.

D

Z26

1    MR. VEEDER:  We have some real problems on these things,

2  your Honor, and I will follow your direction, and that is what

3  we will do.

4    MR. STAHLMAN:  To answer one question that Mr. Sachse

5  raised about the presumption, there are three cases, I think,

6  under this that--

7    MR. VEEDER:  That is less than Hornbook.

8    MR. STAHLMAN:  It might be less than Hornbook, but it

9  might be good to read some of the cases.

10    THE COURT:  What is that-- Hutchins's book?

11    MR. VEEDER:  This is Hutchins' "The California Law of

12  Water Rights," at page 427:

13         "Ground waters are presumed to be

14         percolating. -- the question of the exist-

15         ence of percolating water in land is merely

16         a question of fact (Hooker vs. Los Angeles,

17         188 U.S. 314, 317).  But if it is known

18         that ground waters exist, but not known

19         that they are flowing in a defined and

20         known channel, 'the presumption is that

21         they are not part of a stream or watercourse

22         nor flowing in a definite channel.' (Los

23         Angeles vs. Pomeroy, 124 Cal. 597, Hanson

24         vs. McCue, 42 Cal. 303, 308; Baldwin 155

25         Cal. 280).  The burden of proving that

D

Z27

1          ground waters are part of a definite

2          underground stream, therefore, is on

3          the party who asserts the existence of

4          such a stream."

5     THE COURT:  Here are your findings, if you want them,

6  Mr. Veeder.

7     MR. VEEDER:  Your Honor, there is one more bit of house-

8  keeping I would like to clear up before we get to the good

9  Colonel up there, and I would like to have Mr. Sachse follow

10  through on these, because there has been quite a show made on

11  the matter of admissions.

12     MR. SACHSE:  Have you got a copy for me, so that I can

13  follow it?

14     MR. VEEDER:  Yes.

15     Now, these are the clients on whose behalf requests

16  for admissions have been filed on property in the Fallbrook

17  Creek area on which preliminary findings have been made.  Mr.

18  Sachse has agreed that there is no longer any need for

19  answering the requests for admissions:  Dolores Costello

20  Barrymore Lyle W. Doore, Horace W. Hanson, Frances H. Johnson,

21  and John M. Walker.

22     MR. SACHSE:  May I take them as we go along?  I believe

23  you are correct, Mr. Veeder, with one exception, I think, in

24  that first five.  I did state, as you know, that this was a

25  hasty compilation.  I think the Colonel is mistaken;

D

Z28

1   Barrymore is not on Fallbrook Creek.  I know exactly where

2   she lives.  Just check that one again.  The others, I think,

3   are correct.

4        MR. VEEDER:  The following parties own property in the

5   areas south of the Santa Margarita River and below Rainbow

6   Creek on which testimony as to the nature of the land has been

7   presented at the Master's hearings, and Mr. Sachse has agreed

8   that there is no longer any need to answer the requests for

9   admissions:  Chester Cassel, Leighton L. Harrison, and Geneva

10  B. Nicholas.

11       MR. SACHSE:  I concede that you are correct on all

12  three of those.

13       MR. VEEDER:  The following requests for admissions

14  contain a technical legal question involving severance of

15  riparian rights by conveyance of property abutting on the

16  Santa Margarita River to the Fallbrook Public Utility District

17  for a reservoir site:

18       MR. SACHSE:  There have been no answers to such simple

19  questions as to whether the land does or does not abut on the

20  Santa Margarita River, and I would like to have them.

21       MR. VEEDER:  I will give you the names of those:  John M.

22  Hornbeck, Ray G. Peters, and Walter G. Peterson.

23       The following requests for admissions will require

24  extensive surveys and engineering studies in order to answer

25  the questions which actually amount to legal conclusions.

D
Z29

1    These studies are being made as fast as our limited staff can

2    make them, while executing their other duties in preparation

3    of evidence for this case.   There is quite an extensive list

4    there.

5         But that is the situation in regard to this matter of

6    admissions, and I will say that the United States has done

7    what it can, and is doing it as rapidly as it can.

8         I will not read into the record these names concerning

9    which we don't have the information, but to the extent that

10   Col. Bowen and Col. Robertson have personnel available we are

11   moving as rapidly as we can and we are doing all we can.

12        Someday I will chronicle the responsibilities that we

13   have in this lawsuit, and they are very large and very ex-

14   tensive, and we are doing all we can.   There is nothing more

15   that we can do in regard to these technical studies than send

16   men out to make investigations.   I truly don't believe they are

17   prejudicing Mr. Sachse in the least.   But we are going as

18   rapidly as we can, your Honor, and we will try to get them for

19   him as soon as possible.

20        THE COURT:   Do you want this document filed?   Do you

21   have a copy of it, or are you content to let the matter ride

22   as it is now?

23        MR. SACHSE:   I have a copy of it, your Honor.   I am not

24   content to this extent.   I can compare some of these quickly.

25   I have some of these that are as old as June 6th.

D

Z30

1      MR. VEEDER:  Where are those?

2      MR. SACHSE:  Tule Valley Land & Cattle Company, June

3  6th.

4      Let's go down the line and I will give you all of

5  these.

6      MR. VEEDER:  Just a minute.  The Tule Land & Cattle

7  Company is far up the valley, is it not?  Where would that be?

8      MR. SACHSE:  That is way up in the upper watershed.

9  It is the head one on my oldest.

10      Buckley, the first one on your list, was filed the 10th

11  of July.

12      Burlingham, Quinn, et cetera, were filed the 10th

13  of July.

14      Chess was filed the 30th of June.

15      MR. VEEDER:  Those are all in the upper watershed?

16      MR. SACHSE:  No, they are not.  Burlingham is.  Chess

17  is Rainbow.

18      Crabtree, Knight, Hostetter, Stanley, Perry, Speed,

19  et cetera, were filed --

20      MR. VEEDER:  Where are those?

21      MR. SACHSE:  In the Rainbow area.  I have not the filing

22  date for them.

23      THE COURT:  Do you think the progress of the work

24  ought to be from the lower basin on up?  That any matters in

25  De Luz, Sandia, Rainbow area should be completed first?

1    MR. SACHSE:  I would be very happy if he would give

2    them to me.  But he hasn't.

3    MR. VEEDER:  We are trying to stay ahead of the Master,

4    your Honor, and keep up with the work the Master desires us to

5    do.

6    MR. SACHSE:  I have found one more.  As I say, this is

7    a hasty search that I made previously, and I don't see it

8    on Mr. Veeder's list.  Perhaps it was not on my original one.

9    But I wish you would check it.  In Rainbow, Roy Costello I

10   have no answer to, and that was filed on the 10th of June.

11   That is in Rainbow.

12   Arno Ehrig was filed the 20th of June.

13   MR. VEEDER:  If you will give us those--

14   MR. SACHSE:  No, you have Arno Ehrig.  The only one I

15   find offhand that you don't have is Roy Costello.

16   MR. VEEDER:  Your Honor, I would apologize if I didn't

17   know that the Marines are working day and night to get these

18   things done.  I am doing the best I can.  I don't think Mr.

19   Sachse has been prejudiced in the slightest.  He has a right

20   to have them, and I don't believe this Court will ever demand

21   that we do the impossible.

22   THE COURT:  Let's go ahead.

23   MR. SACHSE:  Does that finish up our morning's house-

24   keeping?  Do you have anything else, Mr. Veeder?

25   MR. VEEDER:  No, go ahead.

ALLEN C. BOWEN,

recalled as a witness in behalf of the Plaintiff, having been

previously sworn, testified further as follows:


CROSS-EXAMINATION (Resumed)

BY MR. SACHSE:

Q  Colonel, I would like to direct your attention now

to United States's Exhibit No. 1.  I observe that there are

public domain lands located in the De Luz Creek-Roblar Creek

watershed; is that correct?

A  That is correct, sir.

Q  Now, were any of the public domain lands which you

found to be irrigable located in that watershed?  And please

refer to your field notes, if you have to do so.

A  Some of them were; yes, sir.

Q  Can you tell us where they are located, and how

many acres?

A  In Township 8 South, 4 West, as illustrated on

Plaintiff's Exhibit 1, there are certain public domain lands

which are situated in both De Luz and Sandia Creek, and cross-

hatched diagonally in both directions on Plaintiff's Exhibit 1.

I also have copies of engineering reports prepared on these

parcels of public domain lands within the De Luz Creek water-

shed.  For example, De Luz Parcel No. 52 indicates that there

are 80 acres of public domain land, being the West Half of the

1  Southeast Quarter of Section 32, Township 8 South, Range 4

2  West.  The land classification table indicates that of that 80

3  acres 9.6 acres are Class VI and the remainder is Class VII.

4  It goes on to state that the soil on Land Class VI is best

5  adapted for the raising of forestry.  However, on this parcel

6  of land, only the Class VI portion with 8% slopes, approximately

7  3.6 acres, is considered suitable for irrigation.

8    Q  Can we stop with that parcel for a moment before you

9  go to another?

10    A  Yes, sir.

11    Q  The entire parcel is located in the West Half of

12  the Southeast Quarter of Section 32; is that right?

13    A  Yes, sir.

14    Q  Does that entire parcel abut upon a perennial stream?

E

Z24

A   No, sir.

THE COURT:   Let me interrupt a minute.   The Government's proof, as I remember, just consisted of this:   Proof that there was 40,000 acres of ground of the public domain and that 8,800 were irrigable with no specification of where the irrigable land was or whereabouts it was in the public domain.

MR. SACHSE:   That is my recollection, too, your Honor.

THE COURT:   Now, on the basis of that, there is nothing to worry about.   Of course, if you go along and proceed to identify each of these parcels, then, we will have to make findings on it.

MR. SACHSE:   Your Honor, I seriously debated the question on the way down, whether I wouldn't be better off, to myself, whether I wouldn't be better off just to do nothing. But knowing how Mr. Veeder has skipped from theory to theory and back again, I still expect to hear Mr. Veeder, when all this argument is over, say that all of this is a burden on the stream.   Now, I am convinced that very, very little is a burden on the stream.

THE COURT:   I don't think he thinks it is much of a burden on the stream.   The forest land turned out to be about 260 acres or so, and the public domain land, it hasn't been described, but I take it it is up in the upper vastness of the mountains, along the ridges and whatnot.   It couldn't be much of a burden.   And even if some of it was irrigable--

E

Z25

1      MR. SACHSE:  Is that an exhibit, Mr. Veeder?

2      MR. VEEDER:  No.  His Honor is talking.

3      THE COURT:  What?

4      MR. SACHSE:  Is that an exhibit?

5      MR. VEEDER:  Yes, it will be.

6      MR. SACHSE:  May I have a copy?

7      THE COURT:  And this is an exhibit that is going to

8  be put in?

9      MR. VEEDER:  There is the tabulation Mr. Sachse was

10  talking about, where it is located.

11      MR. SACHSE:  Are you planning to put this in?  Are you

12  planning to put this in evidence, Mr. Veeder?

13      MR. VEEDER:  I didn't hear.

14      MR. SACHSE:  Are you planning to put this in?

15      MR. VEEDER:  It depends a great deal on your cross-

16  examination, Mr. Sachse.

17      MR. MOSKOVITZ:  Why don't you ask Mr. Veeder what his

18  theory is about these lands?

19      THE COURT:  What is your theory about these lands?

20      MR. VEEDER:  I think Col. Bowen has testified in re-

21  gard to the irrigable acreage.  And I think the location of

22  them is shown on the map.  And I think that the aerials that

23  we have put in cover a great deal of the-- we showed all the

24  stream systems.  Now, there is a tabulation right there.

25      THE COURT:  What proof have you got as to where this

1    8,864 acres are located?

2            MR. VEEDER:  Right there, your Honor.  You are looking

3    right at it.

4            THE COURT:  This is an afterthought.  It has never

5    been lodged.

6            MR. VEEDER:  Well, it is not quite an afterthought,

7    your Honor.  We have 8,400 acres, I think.  What was it,

8    Colonel?

9            THE WITNESS:  8,864 acres of irrigable land in public

10   domain within the Santa Margarita watershed.

11           MR. STAHLMAN:  May I ask what your contention is, what

12   type of land it is, what relation it bears to the stream

13   system?

14           MR. SACHSE:  That is what I want to know.

15           MR. VEEDER:  I thought that was your cross-examination,

16   Mr. Sachse.  Proceed.

17           MR. SACHSE:  We are trying to save time as his Honor

18   suggested.  What is your contention?

19           THE COURT:  What are your contentions?  You state them,

20   Mr. Veeder.

21           If we had to go through this parcel by parcel, you

22   could spend--

23           MR. VEEDER:  That is right.

24           THE COURT:  --a month here just going through this

25   document here.  What is your general contention going to be

E

Z27

1    about this?

2        MR. VEEDER:  We believe this:  That in regard to these

3    lands that are situated within the watershed and which are

4    irrigable that they are entitled to participate in an avail-

5    able supply of water.

6        MR. SACHSE:  What water?

7        THE COURT:  What water?

8        MR. SACHSE:  Water in the stream, or vagrant water?

9        THE COURT:  If some of this land was down where there

10   was some water, that is one thing.  But I will wager that

11   some of this land, a good bit of it, is right up on the ridges.

12   There is no water available except by what rainfall hits it.

13   What water is it going to participate in?

14       MR. VEEDER:  I might add, I just received this tabula-

15   tion this morning, your Honor.  So let's face up to it.

16       MR. SACHSE:  I think I had better go ahead.  I don't

17   know of any other way to do it, your Honor.  Mr. Veeder won't

18   answer your question.

19       THE COURT:  Wait.  A lot of this land is up pretty

20   high, isn't it, Colonel?

21       THE WITNESS:  Most of it, your Honor, is in the rougher

22   portions of the watershed.

23       THE COURT:  Up high along the ridges and the hogbacks,

24   and so forth?

25       THE WITNESS:  Well, I would say most of it.  There are

1   some streams, for example, this Section 36, 8 South, 5 West,

2   which is part of the public domain land, lands as the head-

3   waters of Fern Creek; and there is a very fine spring on Fern

4   Creek.

5        MR. SACHSE:  It is straight up and down, isn't it,

6   Colonel?

7        THE WITNESS:  There is a very fine spring that rises

8   in Section 36.

9        MR. SACHSE:  Answer that:  It goes straight up and

10  down?

11       THE WITNESS:  I will be glad to answer that, sir, when

12  I answer his Honor.  There is this spring, but, as Mr. Sachse

13  interrupted me, it is very steep, precipitous.

14       THE COURT:  The kind of ground you could lean up

15  against if you couldn't walk over it?

16       Couldn't you go through here and segregate a few little

17  bits that might be of any real significance to you?

18       MR. VEEDER:  Well, your Honor, the proposition, as

19  we encountered it, and I will be perfectly candid with your

20  Honor--

21       THE COURT:  You have got an obligation to--

22       MR. VEEDER:  I certainly do.

23       THE COURT:  --the agency, but you can't make a silk

24  purse out of a sow's ear.  If you have got a bunch of ground

25  laying up on a hogback with no stream available, so what?

E

Z29

1    What water is there?

2    MR. VEEDER:  Your Honor, in regard to the lands that

3    are here involved, these lands are usually the kind that are

4    leased for grazing purposes.  Now, a spring on a place to

5    which you have just referred would be very, very important

6    from the standpoint of a livestock economy.

7    MR. SACHSE:  May I get something straight?  These are,

8    as I understand, irrigable lands, not grazing lands.

9    MR. VEEDER:  The point that I make--

10    THE COURT:  Go ahead, Mr. Veeder.

11    MR. VEEDER:  The point that I make-- Mr. Sachse is so

12    rude-- I wish to go on, your Honor, and add that these lands

13    are important from the standpoint of a grazing economy; and

14    the waters that are on them are important; and the fact that

15    the lands happen to be irrigable and good grazing land at the

16    same time.  There is no coincidence there.  It is quite the

17    usual, in fact.  The point that I desire to make, though:  I

18    had no wishes to pursue the course that I was forced to pursue

19    in this matter.  Mr. Sachse had a full and complete agreement

20    with me and with Col. Bowen that when the Master got into

21    these areas, we would put in this evidence.  He backed out

22    on the agreement.  Therefore, I took a cut across, clear

23    across.  I had to do it.  I had no alternative.  Now, we have

24    a tabulation here which I think is reflective of the acreages

25    and the areas, the irrigable lands; and from the data that is

1   now in the record, the 29 series in particular, it is entirely

2   possible to locate every parcel of land and know where they

3   are and know the streams, the intermittent streams.  Some of

4   these lands overlie ground water basins.  Now, they are

5   important.  And that is our situation, your Honor.  We have

6   no desire to burden the record with anything more than we have

7   had to.

8         THE COURT:  What kind of findings would you want to

9   make eventually as to this 8,000 acres?

10        MR. VEEDER:  Well, right here.  Here is the Bureau of

11  Land Management lands.  Here are the lands, the township and

12  range where they are located, and the location of the property

13  by section.  And you have here 16.3 acres of a No. VI land in

14  31 and then over here in 35 we have 17.8 acres of land in

15  land Classification III.  So you have a situation with a

16  complete tabulation.

17        THE COURT:  We are talking about water duty and burden

18  on a stream.  Where is this--

19        MR. VEEDER:  That is in.  I asked him that $64 question

20  yesterday.  I said, "Now, what would be the reasonable duty

21  of water for those lands in the upper areas?"  And he said,

22  "4.2."  And that covered the whole area.

23        MR. SACHSE:  That is your story.  Your Honor, he is

24  taking the position that the 4.2 is a burden on the stream,

25  and we are going to have to prove somehow or other a great

E

Z31

1    deal of it isn't.

2         THE COURT:  Unless the facts show there is some way

3    water could be obtained for this land--

4         MR. VEEDER:  Your Honor, in that regard, these lands

5    that you are looking at there, and which your Exhibit 29 will

6    reflect the locations of it, you will find intermittent

7    streams.  You will find throughout the areas, very simple

8    to locate, where the lands if they are in private ownership

9    would be considered a riparian.  So we have no problem from

10   the standpoint of locating the lands.

11        MR. STAHLMAN:  May I make a suggestion?

12        THE COURT:  Some of the land, yes.  But I wager if he

13   took the time, the major portion of this land would have no

14   water rights at all except what water fell on it.

15        MR. STAHLMAN:  Your Honor, where we have large blocks

16   of land that are not in individual ownerships, is it necessary,

17   as long as there undoubtedly will be an open end decree in

18   the case, to make those refined determinations at this time?

19   I was thinking the other day when we were talking about the

20   anticipated development of certain forest land.  Whether or

21   not they will ever be developed that way becomes a question.

22   And could the findings be based upon what somebody anticipates

23   doing in the future would seem-- I can't see any reason why

24   where there are these large blocks of land the open end decree

25   couldn't just at some later date determine that.

E

Z32

Bowen    Cross    7850

1    MR. VEEDER:  May I point out in that regard, your Honor,

2    if I may speak on that point:  These lands, many of them, are

3    held in leave status.  You see, the lands by and large are

4    closed to homesteading, and they are part of the lands where

5    people go and run livestock; and where the water there, it is

6    very important.  And there is no real way of segregating or

7    defining or determining exactly which lands at any given time

8    are utilized in water.

9    MR. STAHLMAN:  Have you ever tried to chase a cow

10   through those hills up there?

11   THE COURT:  Now, wait.  I follow you on this matter.

12   The fact that springs are available in this ground-- much of

13   this is probably Taylor grazing land--

14   MR. VEEDER:  That is right.  It is under that ad-

15   ministration.

16   THE COURT: -- the springs would make it useful.  But

17   what contentions are you going to make as to these irrigable

18   lands being burdens on the stream?

19   MR. VEEDER:  I think that they constitute a potential

20   burden on the stream, your Honor.

21   MR. STAHLMAN:  It should be left open to future

22   determination.

23   THE COURT:  What do you mean "potential burden"?

24   MR. VEEDER:  It is entirely possible that those lands,

25   all we are saying is, here is the maximum quantity that would

E

Z33

1    be reasonably applied, assuming the waters are diverted and

2    applied.  It is just exactly like your riparian lands,

3    concerning which Mr. Sachse was talking this morning.  Our

4    view is the same.  He says this, and I think he has some merit

5    to his contention, that the riparian land is here.  A man has

6    the right to use whatever waters are available to him as a

7    riparian owner.  Now, I don't believe these lands fall into a

8    great deal different category.

9         MR. SACHSE:  They aren't riparian.  This last parcel

10   I just questioned Col. Bowen about is not riparian.  That is the

11   point I am trying to get at.  Your Honor, that is the high

12   hopes I had when prior to Christmas I suggested the fifteenth

13   question be added to your fourteen, that we be asked to

14   delineate the areas, each of us, that we thought could go out

15   of the lawsuit.  If Mr. Veeder would honestly face up to that

16   problem, if he would honestly face up to it and tell me, for

17   example, that he concedes, as his own witnesses testified, that

18   the basement complex and the residuum should go out, then we

19   will stop all this foolishness.  But as long as Mr. Veeder

20   persists in a statement he just made to your Honor, that

21   every one of these acreages are a potential burden on the stream,

22   then I conceive it is my duty, as much as I hate to spend

23   the money and the time, to go ahead and find out and prove his

24   is wrong.

25        THE COURT:  There ought to be some simpler way.

E

Z34

1    MR. SACHSE:  There certainly should.

2    THE COURT:  Now, certain of these lands may be riparian.

3    And those that are, I have no objection to a finding that

4    they might be a potential burden on the stream.  They have

5    certain rights.  But certain of these lands, much of them are

6    in the basement complex; and there is no impact on the stream

7    except that they are part of the drainage system, and springs

8    that are there are not part of the stream.  They pertain to the

9    land; would be useful to the land.  I have no objection to

10   making those findings.  I don't want to make a finding that

11   there are 8,000 acres of land here in the National Forest that

12   may be a potential burden on the stream when we know there

13   isn't.

14   MR. VEEDER:  Let me make a run through that, your

15   Honor, and I think we can come up with a long list you desire

16   by Tuesday morning.

17   THE COURT:  Can't you pick out those particular parts

18   that should be spotted and designated?

19   MR. VEEDER:  We will try.

20   THE COURT:  And the rest of them are vagrant, percolating

21   water.  If there is a spring on it for Taylor gazing purposes,

22   the fellow is lucky.  That is all it amounts to.

23   MR. VEEDER:  We are fully in accord with your Honor,

24   and we will undertake that course.

25   THE COURT:  Where does this thing come from here,

Bowen   Cross   7853

E

Z35

1    Parcel 52?

2         MR. SACHSE:  That is one of the Colonel's individual

3    studies.  I will give you back mine.

4         THE COURT:  All right.  You want to identify that

5    document that we have been talking about?

6         MR. VEEDER:  Yes, your Honor.  That will be 52, would

7    it not?

8         THE COURT:  52?  You mean 152?

9         THE CLERK:  That is right; 152.

10        MR. VEEDER:  And we will do as we said we would, your

11   Honor.

12        THE COURT:  All right.

13        MR. SACHSE:  Well, your Honor, I have got a stack of

14   notes that were prepared specifically and directly to this

15   line of questions.  It is about two minutes to 12.  Can we

16   recess so I won't be fumbling, and do them when I come back?

17        THE COURT:  These questions you are going to ask now--

18        MR. SACHSE:  I will defer them.

19        THE COURT:  --you defer them?

20        MR. SACHSE:  We will recess now, then?

21        THE COURT:  We will recess now.  You want to stop at

22   4 this afternoon, I understand?

23        MR. MOSKOVITZ:  Yes.

24        THE COURT:  2 o'clock.

25        (Noon recess.)

1    SAN DIEGO, CALIFORNIA, FRIDAY, JANUARY 23, 1959.  2:00 P. M.

2

3        THE CLERK:  The case on trial, No. 2, 1247-SD-C,

4    United States of America vs. Fallbrook Public Utility District,

5    et al.

6        MR. MOSKOVITZ:  Your Honor, you may recall that some-

7    time ago we were preparing copies of well logs that the State

8    had that are not already in evidence, and these are to be

9    substituted for the well logs No. 2, 3 and 4 that were marked

10   for identification.  I have these now.

11       THE COURT:  To be substitued for what?

12       MR. MOSKOVITZ:  For State's Exhibits--

13       THE CLERK:  L, Appendix F, logs 2, 3 and 4.

14       MR. MOSKOVITZ:  State's Exhibit L, Appendix F, Log 2,

15   State's Exhibit L, Appendix F, Log 3, and State's Exhibit L,

16   Appendix F, Log 4.  Those are marked for identification only

17   as of this time and we were going to defer admitting them into

18   evidence until the copies were made and could be substituted.

19       THE COURT:  Those are pretty cumbersome numbers.  Do

20   you want to use the same numbers?

21       MR. MOSKOVITZ:  I don't think it makes any difference,

22   your Honor.  They are marked that way on the folder.

23       THE COURT:  All right, this is for California's Exhibit

24   L, Appendix F, Logs 2, 3 and 4.

25       MR. MOSKOVITZ:  Then there is a Log 1.  Has that been

F

Z35

1    put in evidence?

2          THE CLERK:  No.

3          MR. MOSKOVITZ:  I suggest that we put Log 1 in evidence

4    also.  So it will be Logs 1, 2, 3 and 4 in Evidence now.

5          THE COURT:  Any objection?  All right, State's Exhibit

6    L, Appendix F, Logs 1, 2, 3 and 4 received in evidence.

7          (State's Exhibit L, Appendix F, Logs 1, 2, 3 and 4

8    were received in evidence.)

9

10                    ALLEN C. BOWEN,

11   recalled as a witness in behalf of the plaintiff, having been

12   previously sworn, testified further as follows:

13

14                 CROSS-EXAMINATION (Resumed)

15   BY MR. SACHSE:

16        Q  Col. Bowen, I am now going to start some inquiry

17   regarding your testimony on the 78-W series of aerial photo-

18   graphs dealing with Temecula Creek.  Do you have them avail-

19   able?

20        A  I don't have them before me, Mr. Sachse.

21        MR. SACHSE:  I understand that Col. Bowen and Mr.

22   Veeder are going to attempt by Tuesday to have this break-

23   down on the public lands and forests, so I am dropping that at

24   this time.

25        THE COURT:  All right.

F

Z36

1          (Mr. Veeder hands documents to the witness.)

2          MR. SACHSE:   Do you have the 78 series before you now?

3          THE WITNESS:   I have the index only, Mr. Sachse,

4    Plaintiff's 145, before me.   The photographs I do not yet have.

5          (Mr. Veeder hands documents to the witness.)

6    BY MR. SACHSE:

7          Q   In describing the headwaters of Temecula Creek, and

8    referring to Plaintiff's Exhibit 15, I observe that your

9    description began at the very edge of the watershed in Dodge

10   Valley; am I correct?

11         A   Yes, sir.

12         Q   Am I to understand that you are in disagreement,

13   then, with the testimony of Mr. Kunkel--

14         At page 2336 of the record, Mr. Veeder.

15         --who says, "The Temecula Creek as such in this

16   area (Dodge Valley) has no well-defined bed or bank"?

17         A   Well, it is apparent from examination of 78W1 that

18   at least through a portion of Dodge Valley there is a well-

19   defined bed.

20         Q   Let me go a step further.   Mr. Veeder then inquired:

21   "What do you mean by this area, Mr. Kunkel?"

22   Mr. Kunkel says:

23   "I mean the area which lies in Sections 26 and 27, 9

24   South, 2 East, has no well-defined bed and bank."

25         A   That was 26 and 27?

Z37

1    Q  9 South, 2 East.

2    MR. VEEDER:  You are on Sections 26 and 27; is that

3  right, Mr. Sachse?

4    MR. SACHSE:  That is as the transcript reads, Mr.

5  Veeder; Sections 26 and 27, 9 South, 2 East.

6    Q  The testimony continues that it begins to be well-

7  defined in the Northwest Quarter of 27.

8    A  Well, there is a--

9    MR. VEEDER:  Just a moment.  I think the question of

10  "well defined"--

11    THE COURT:  He didn't ask a question.  He just read the

12  transcript to him about being well defined.  Oh, you are

13  referring to the earlier question.  Pardon me.

14    MR. VEEDER:  "Well defined" is quite a vague term.  I

15  have no objection to the Colonel answering the question, but

16  it seems to me that there may not be a disparity between what

17  the two of them are saying because there has been no defini-

18  tion of the term in question.

19    THE WITNESS:  It is apparent, Mr. Sachse, from an

20  examination of Plaintiff's Exhibit 78W1 and the identification

21  of the thread of the stream of Temecula Creek as it appears

22  in Sections 26 and 27, as shown on the Palomar Observatory

23  quad reduction of Plaintiff's 145-- I should give the township

24  on that; that would be 26 and 27, 9 South, 2 East-- by relation

25  of the two exhibits, 78W1 and that Palomar Observatory quad

1    reduction of Plaintiff's 145, that there is a well-defined

2    channel which appears originating on the northerly slope of

3    Aguanga Mountain northerly of the Halfway Truck Trail which

4    I described on identification of 78W1.

5        THE COURT:  What is this going to have to do with the

6    lawsuit?

7        MR. SACHSE:  I would like to get the answer completed

8    now, your Honor.

9        THE WITNESS:  The channel is apparent flowing northward

10    from Aguanga Mountain to a point to the right of center of

11    78W1 and thence northwesterly to the upper left-hand corner

12    of 78W1, where the stream channel leaves the area of the

13    photograph.

14        MR. SACHSE:  The significance, as far as I am concerned,

15    your Honor-- and I want it understood that I am not arguing

16    with the Colonel at all--

17        THE COURT:  Just impeachment?

18        MR. SACHSE:  No, your Honor.  I feel there are some very

19    serious holes in the evidence that have to be introduced.  We

20    don't know what the stream is yet.  We don't know where the

21    stream begins and ends.  And I have clients up there.  This is

22    not impeachment, not in any sense of the word.

23        Q  Now, Colonel, a preliminary question.  In testifying

24    to the character of these water courses, are you testifying

25    only from the aerial photographs in the 78 series and from the

Bowen    Cross                                                    7859

1  quads, or do you have any personal familiarity with these
2  water courses?
3      A  Well, I have personal familiarity with these water
4  courses from point to point, Mr. Sachse.  I haven't actually
5  walked down the entire bed of the stream.
6      Q  Are you familiar with Dodge Valley?
7      A  Yes, sir; I have been in Dodge Valley many times.
8      Q  Are you familiar with the course of the Temecula
9  Creek in Dodge Valley?
10     A  Yes, sir.  It is obviously apparent on Plaintiff's
11 Exhibit 78W1.  As I say, I haven't been at every point of the
12 stream as it is displayed on 78W1.
13     Q  Then can you or can you not tell us where, in your
14 opinion, Temecula Creek actually starts as a stream, not
15 simply an area traversed by water flowing during and immediately
16 after periods of heavy precipitation and runoff but as a
17 defined stream channel?
18     MR. VEEDER:  Could I have that again?  I don't follow it.
19     (The reporter read the pending question.)
20     MR. VEEDER:  I think it is entirely possible to have a
21 bed and bank and well-defined stream, irrespective of the
22 period in which the water may run.  It may run on only one day.
23     MR. SACHSE:  I certainly concur.  That was not my
24 question.
25     I will rephrase it, Colonel.

F-
Z40

1          Q  At what point in Dodge Valley do you think a well-

2  defined stream channel appears to begin for Temecula Creek,

3  regardless of when it may have water in it?

4          A  As I have testified, Mr. Sachse, Temecula Creek

5  appears on 78W1 as a well-defined stream channel on the

6  northerly slopes of Aguanga Mountain.

7          Q  What is the section, please?

8          A  Sections 2 and 3, 10 South, 2 East, and in those

9  two sections Temecula Creek is entrenched in a deeply-incised

10  canyon which drains the northerly slope of Aguanga Mountain.

11          Q  Do you have knowledge as to the character of flow

12  in the channel in that area you have just described?

13          MR. VEEDER:  During which time?

14          MR. SACHSE:  Any time.

15          THE WITNESS:  The character of flow through that reach

16  of the stream, Mr. Sachse, is intermittent.

17  BY MR. SACHSE:

18          Q  By "intermittent" do you mean only during and

19  immediately after periods of heavy precipitation and runoff?

20          A  Yes, sir.

21          Q  Now, may I direct your attention for a moment to

22  Exhibit 15, and youwill observe that the exhibit indicates

23  "Spring and extent of stream flow October-December, 1957" by a

24  red dot and then a red line following.  That symbol is used

25  throughout the exhibit.  The first surface flow indicated in

F

Z41

1    October-December, 1957, for Temecula Creek appears in Section

2    17, 8 South, 2 east.

3            A  Isn't that 9 South, Mr. Sachse?

4            Q  Beg your pardon, 9 South.  Does that conform to your

5    observation of the stream?

6            A  I haven't checked those observations of Mr. Kunkel's,

7    as shown on Plaintiff's Exhibit 15.

8            Q  So then you would be unable to express an opinion as

9    to the character of the stream between Dodge Valley and the

10   point shown on Exhibit 15 as rising water?

11           A  I could express an opinion, Mr. Sachse.

12           Q  What is your opinion as to the character of the

13   stream between Dodge Valley and that point of rising water in

14   Oakgrove Valley?

15           MR. VEEDER:  What do you mean by the character of the

16   stream?

17           MR. SACHSE:  Character of its flow, Mr. Veeder.  I think

18   the witness understands the question.

19           MR. VEEDER:  I am interested in knowing myself, and

20   when you say "character of the flow" do you mean intermittent

21   or what do you mean?

22           MR. SACHSE:  I mean at what seasons of the year and

23   under what circumstances does the witness believe it flows.

24           Q  Do you understand the question, Colonel?

25           A  Yes, sir.

1    Q  Would you answer it, please?

2    A  It is my opinion that Temecula Creek is an inter-

3  mittent stream from its headwaters to that point of rising

4  water which you indicated in Oakgrove Valley, referring to

5  Plaintiff's Exhibit 15.

6    Q  And by intermittent, again, do you mean that it

7  will flow only during and immediately after periods of pre-

8  cipitation and runoff on the surface?

9    A  Yes, sir.

10    Q  I observe, however, that Exhibit 15 indicates this

11  entire area is younger alluvium.  I presume that you also

12  then would express the opinion that it is likely that there is

13  ground water in those areas of younger alluvium that may be

14  a part of the stream?

15    A  That is my opinion; yes, sir.

16    Q  Now, over to Chihuahua Valley, please.  You did not

17  trace that stream for us in your testimony, although you

18  pointed out on Exhibit 78W3 and 78W4 its confluence with

19  Temecula Creek.  Are you familiar with the character of that

20  stream from its headwaters to its confluence?

21    A  I have made spot checks along the stream, Mr. Sachse.

22  I haven't traversed Chihuahua Creek from its origin to its

23  confluence with Temecula Creek.

24    Q  Have you an opinion as to the character of Chihuahua

25  Creek?

F
243

A   Yes, sir.

Q   What is that opinion?

A   In my opinion, Chihuahua Creek, a tributary to Temecula Creek, is an intermittent stream.

Q   Flowing only during and after periods of heavy precipitation and runoff?

A   Yes, sir.

Q   Proceeding on down from the rising water on Oakgrove Valley, and paraphrasing Mr. Kunkel's testimony, he testified that the water was on the surface in some places and disappeared and rose again and he showed several points of rising water. Does that conform to your observation?

A   As I have previously stated, Mr. Sachse, I haven't checked out Mr. Kunkel's work as plotted on Plaintiff's Exhibit 15, but Mr. Kunkel is a very reliable worker and I have no hesitation in accepting his observations and plots.

Q   I am accepting them, too, Colonel, so don't feel badly about it.  Now, the next tributary I want to discuss is the next one downstream, Tule Creek.  On your Exhibit 78W8 and 78W9 you describe its confluence with Temecula Creek, but again you don't describe Tule Creek itself for us.

THE COURT:  Where does Tule Creek come in?

MR. SACHSE:  Tule Creek enters the main stream in Section--

THE COURT:  Put your finger on it.

7864

F

Z44

1          MR. SACHSE:  Right here-- 34.

2          THE WITNESS:  As shown on the Aguanga quad reduction

3     of Plaintiff's 145, the confluence of Tule Creek with

4     Temecula Creek is in the Northeast Quarter of Section 34,

5     8 South, 1 East.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. SACHSE:

Q   Are you familiar with Tule Creek from personal observation?

A   I am not too familiar with Tule Creek, since much of that is in large private holdings that we have not until recently had access to.  But I am familiar generally with the lower reach of the creek as it approaches its confluence with Temecula Creek.

Q   Would you approach Exhibit 15 for just a moment so you will have the overlay.  Mr. Kunkel describes this stream, as follows:  You want the page reference, Mr. Veeder?   Page 2389.

> "The headwaters of Tule Creek are
> in Section 20, Township 8 South, Range
> 2 East.  The stream or the drainage of
> the area is generally westward into
> Sections 24 and 23 . . "

Does that conform to your opinion?

A   Yes, sir.

Q   Now, then, what is the character of the Tule Creek drainage easterly of Section 20?

A   Section 20, 8 South, 2 East?

Q   Yes.

THE COURT:  Easterly of 20?

MR. SACHSE:   Easterly of 20.

1

2      Q   Is there any well-defined stream in that area?

3      A   It might be more helpful, Mr. Sachse, if we had the

4  29 series exhibits.

5      THE COURT:   I have got them right in front of me.

6      THE WITNESS:   --which are a larger scale.

7      THE COURT:   It shows it is running easterly quite a--

8  here is 8 South, 2 East.   There is 20.

9      MR. SACHSE:   No, that is 9 South, 2 East we are talking

10  about, your Honor.

11      THE WITNESS:   No, sir, it is 8 South.

12      THE COURT:   8 South, 2 East.

13      MR. SACHSE:   That is the headwaters, yes.   I beg your

14  pardon.

15      THE COURT:   20 you are talking about?

16      THE WITNESS:   Referring to that drainage portion

17  easterly of Section 20, 8 South, 2 East.   And Plaintiff's

18  Exhibit 29-V indicates stream channel and Tule Valley lying

19  in Sections 21 and 22, 8 South, 2 East.

20  BY MR. SACHSE:

21      Q   Then, you think Mr. Kunkel is wrong in saying the

22  headwaters are in Section 20?

23      A   If that is what he said.

24      Q   I read you the transcript section.   You think that

25  statement was in error?

G

Z38

1    A   Yes, sir.   The headwaters would be easterly of

2   Section 20, 8 South, 2 East.

3    Q   Then, your statement a moment ago that you were in

4   agreement with his statement was also in error; is that right?

5    MR. VEEDER:   Well, now, the point I make your Honor,

6   is that I don't believe that Col. Bowen intends to sit in

7   judgment on what Mr. Kunkel said.

8    THE COURT:   No, this doesn't advance the matter.   Let's

9   find out what the facts are.

10   BY MR. SACHSE:

11    Q   All right.   Col. Bowen--

12    A   Now, the reference that you made, Mr. Sachse, was

13   to Plaintiff's Exhibit 15.   And on that I indicated I was in

14   agreement that that showed the Tule Creek originating in

15   Section 20.

16    Q   Let me read you again Mr. Kunkel's testimony:

17        "The headwaters of Tule Creek are

18        in Section 20, Township 8 South, Range 2

19        East.   The stream or the drainage of the

20        area is generally westward into Sections

21        24 and 23, 8 South, 1 East."

22   Do you agree with that or don't you?

23    A   Well, I certainly don't agree that the headwaters

24   of Tule Creek are in Section 20, 8 South, 2 East, when it is

25   obvious that from examination of Plaintiff's Exhibit 29 -V

G

Z39

1   that the intermittent stream symbol continues through Sections

2   21, 22 and I believe Section 23, 8 South, 2 East.

3        Q  You refer to the intermittent stream system.  Are

4   you familiar with the streams in those reaches?

5        A  No, sir.

6        Q  So you cannot express an opinion as to the character

7   of its surface flow?

8        A  Well, since I haven't seen it at that point, my

9   opinion might not have much value.

10       Q  Do you have an opinion?

11       A  Yes, sir, I have an opinion.

12       Q  What is your opinion?

13       A  My opinion is that Tule Creek is an intermittent

14   stream.

15       Q  That it flows only during and immediately after

16   periods of heavy precipitation and runoff?

17       A  Yes, sir; excepting spring flow that may be

18   manifested through the valley.  Tule Valley might possibly

19   have some alluvial fill in there which--

20       Q  Do you find any indicated on--

21       A  It is not indicated on the Plaintiff's 15.

22       MR. SACHSE:  That is the wrong one, Mr. Veeder.  That

23   is not Tule Valley.

24       Q  Is there any indicated on 15?

25       A  No; but I don't believe that Plaintiff's 15 is a

G

Z40

1    large enough scale to indicate all of the alluvium, Recent

2    alluvium, that might be found up there, Mr. Sachse.

3        Q  The only evidence we have before us at this time,

4    Col. Bowen, evidence which you characterized a few moments

5    ago as very reliable, does that evidence, namely Exhibit 15,

6    exhibit any areas of alluvium easterly of the Range 1 East-2

7    East range line?

8        A  Just the very little tip, Mr. Sachse, that appears

9    in Section 19, 8 South, 2 East.

10       Q  And continuing then along the course through 20, 21,

11   22, and 23, you find no indication of any alluvium, do you?

12       A  8 South, 2 East?

13       Q  Yes.

14       A  No, I find no indication of alluvium plotted on

15   Plaintiff's 15.

16       Q  Now then, will you characterize any ground waters

17   that might be found in that area?

18       A  I don't have enough information to base an opinion

19   in regard to the ground waters in that area.  I certainly am

20   not going to make any opinion on the basis of Plaintiff's 15.

21       Q  You have no confidence in Mr. Kunkel's delineation

22   of basement complex?

23       A  I have the greatest confidence in Mr. Kunkel's work,

24   Mr. Sachse, but much of that area up in there you might say

25   was done on a reconnaisance basis by Mr. Kunkel.  He concentrated,

1    as I understand it, on the principal water sources.  I am not

2    willing to accept from a map on the scale of 1 to 62,500 that

3    there is no alluvium in Tule Valley.  It may well be none, but

4    I would like to--

5            Q  If the delineation--

6            MR. VEEDER:  Let him finish, Franz.  Let him finish.

7            MR. SACHSE:  I thought he was finished.

8            THE WITNESS:  I would like to have the opportunity to

9    make more detailed studies, as it has been my intent to do,

10   in connection with these subwatershed hearings.

11   BY MR. SACHSE:

12           Q  If Exhibit 15 is correct and the entire area is

13   properly delineated as basement complex, what is your opinion

14   as to the character of the ground water?

15           A  Well, without reference to exhibit numbers--

16           MR. VEEDER:  Now, this goes beyond the scope of the

17   direct examination.  We didn't qualify the Colonel in regard

18   to ground water in this area.  We were simply delineating the

19   surface runoff.  It is extending the direct examination in that

20   area, your Honor.

21           MR. SACHSE:  If your Honor please, this witness is

22   testifying to stream systems, and a part of the stream system

23   is the underground flow.  We all concede it.  There isn't the

24   slightest argument about it.

25           MR. VEEDER:  But he didn't testify on this phase of the

G

Z42

examination.

MR. SACHSE:  And I want to know if there is a stream system, just what this witness has testified to as to the stream system.

MR. VEEDER:  I renew my objection.

THE COURT:  Sustained.  The witness was not examined in these areas of underground water.  He was examined with regard to the aireal photographs, the channels shown in the photographs, and so forth.

MR. SACHSE:  Then, am I to understand by your Honor's ruling we cannot--

THE COURT:  The witness has also said he wants to make a more detailed study of these partidular areas, smaller watersheds, when we get into those areas.  He has obviously indicated he is not prepared to testify about these under-ground problems.

MR. SACHSE:  He may not be on Tule Creek.  So I will not repeatedly ask further questions that are in conflice with your Honor's ruling.  Will you advise me:  Am I to understand that I am not to be permitted to inquire of this witness as to whether or not he thinks an underground stream exists where he has delineated these streams?

MR. VEEDER:  I submit, your Honor, there are areas in which he could, and there are areas where he couldn't.

MR. SACHSE:  All right, then, we will keep on going.

G

Z43

1          THE COURT:  I take it he knows more about some of these

2     areas than others.

3          MR. SACHSE:  Agreed.

4          THE COURT:  He said this is an area that he has not been

5     in as much as in others, and he has asked time to make a

6     further study.  When we get into other areas where he is

7     familiar with them--

8          MR. SACHSE:  Very well, your Honor.

9          Q  Let's go up to Terwilliger Valley, then, Col.

10    Bowen.  Have you a familiarity with the stream system in that

11    valley on Coahuilla Creek?

12         A  Yes.

13         Q  You do?

14         A  I am familiar with the stream system in that area.

15         Q  I observe that Exhibit 15 indicates many points of

16    rising water in Coahuilla Valley and some surface flow, but

17    no rising water anywhere easterly of that.  Does that conform

18    to your observation?

19         MR. VEEDER:  Easterly of what, now?

20         MR. SACHSE:  Easterly of Coahuilla Valley.  Of the

21    points of rising water I have just described.  Let's do it by

22    section.

23         Q  I observe that Exhibit 15 shows points of rising

24    water on Coahuilla Creek in Sections 23 and 26, 7 South, 2

25    East and no points of rising water further east than that.

Bowen        cross

G

Z44

1    Does that conform to your observation?

2          A   Now, with the exception of a little minor spring

3    flow upstream from that, I would say it conforms with my

4    observation.

5          Q   Then, how would you characterize the flow, surface

6    flow, of CoahuillaCreek easterly from Sections 23 and 26, 7

7    South, 2 East?

8          A   I would characterize the stream flow of that portion

9    of Coahuilla Creek as intermittent.

10         THE COURT:   What sections were you talking about?

11         MR. SACHSE:   Easterly of Sections 23 and 26, 7 South,

12   2 East.

13         Q   Intermittent, flowing only during and immediately

14   after periods of heavy precipitation and runoff?

15         A   Yes, sir.

16         Q   Do you have any opinion as to the character of the

17   subsurface stream that may exist in those areas?

18         A   Yes, sir; in that area of alluvium shown on Plate

19   15.

20         MR. MOSKOVITZ:   You mean Exhibit 15.

21         THE WITNESS:   Yes.   Thank you, Mr. Moskovitz.   Plain-

22   tiff's Exhibit 15, the area of alluvium designated as

23   Terwilliger Valley, I would say that ground waters contained

24   in that alluvium do support the surface stream when there is

25   one.   They are contained in a defined ground water basin.

G

Z45

Bowen     Cross

BY MR. SACHSE:

Q   Moving westerly from Coahuilla Creek, after leaving Coahuilla Valley, the testimony of Mr. Kunkel was to the effect that after leaving Coahuilla Valley the creek was deeply incised in Basement Complex.  Does that agree with your observations of the stream?

A   After leaving Coahuilla Valley?

Q   And flowing westerly, yes; westerly and southerly.

A   Yes, sir.  That is in accord with my observation.

Q   So through those sections of Coahuilla Creek, I take it, it would be your opinion that the entire flow of the stream is a surface flow; is that correct?

A   No, that would be more specifically a portion of Coahuilla Creek which flows through Section 36, 7 South, 1 East, and Sections 1, and the east half of 2, 8 South, 1 East.

Q   Those are the sections to which I refer?

A   Yes, sir.

Q   It would be your opinion that the flow of Coahuilla Creek in those areas is only a surface flow, is that right?

A   Yes, sir.

Q   Ground waters in areas removed from the stream would or would not be a part of the stream system?

MR. VEEDER:  I object to that as being too general. There are areas in there concerning which Mr. Kunkel testified that there was water emanating from the basement complex,

Bowen    Cross                                                    7875

the very area concerning which he testified.

MR. SACHSE:  All right.  I am asking the Colonel what his opinion,is.  Do you mind if he answers it, Mr. Veeder, rather than you?

MR. VEEDER:  I thought I did very well.

THE WITNESS:  You are referring to the areas north and south--

BY MR. SACHSE:

Q  North and south.

A  --in that particular reach of the Coahuilla Creek just described, Mr. Sachse?

Q  Yes, sir.

A  I would like to refer to the aerial photographs, the 78V series, which shows the course of Coahuilla Creek.

Q  Trying 78-V-13, and 14, 15?

A  Yes, sir.  78-V-15 shows the canyon reach of Coahuilla Creek very clearly, to which we have been referring, namely, that reach downstream from Coahuilla Valley through the basement complex.  And the basement complex, the creek flows through a narrow canyon in the basement complex.  And with reference to 78-V-15 and 78-V-16 which continues the canyon reach of the stream on to its confluence with Wilson Creek, it would be my opinion that the areas north and south of that canyon reach are underlain by vagrant, percolating waters not a part of the stream system.

G

Z47

THE COURT:  If there is water there?

THE WITNESS:  If there is water, yes, sir; if any.

BY MR. SACHSE:

Q   To run quickly over the rest of Coahuilla from that point on, namely, from the SouthwestQarter of Section 2, Township 8 South, Range 1 East, the stream flows through an alluvial area in Wilson Valley; is that correct?

A   Yes, sir, with the exception of one--

Q   --very small piece of basement complex.

A   --small piece that flows across basement complex in Section 9, South, half of Section 9, 8 South, 1 East.

Q   During the course of your direct examination on this 78 series you referred on two or three occasions to Temecula arkose?

A   Yes, sir.

Q   Is that included in this general area?

A   The Temecula arkose is indicated in this general area by the symbol on Plaintiff's Exhibit 15 as Qtoal.

Q   In Sections, please?

A   At least in part in Sections 3, 4, and 9, and 10, 8 South, 1 East; lying north and west of the confluence of Wilson Creek and Coahuilla Creek.

Q   Do you have any opinion as to the character of the ground waters in the Temecula arkose you have just described?

MR. VEEDER:  I object to this.  It goes beyond the

scope of the direct examination.

MR. SACHSE:  Your Honor, this is a section of the stream the witness says he is thoroughly familiar with, and he has testified to the surface flow.

MR. VEEDER:  He has never testified in regard to the ground water.  No questions were asked with regard to it. And Mr. Kunkel was the witness who testified in that regard.

MR. SACHSE:  I submit if we are discussing--

THE COURT:  If the witness knows, if he thinks he made enough investigation to testify, he may answer; otherwise, he is not familiar.

THE WITNESS:  I have made no study of the ground water in these older continental deposits, Mr. Sachse.

BY MR. SACHSE:

Q  Do you have an opinion regarding the ground water in the Temecula arkose you have just described?

MR. VEEDER:  I renew my objection.  There is nothing whatever in the direct examination, and the witness just stated he made no study.

THE COURT:  Sustained.

BY MR. SACHSE:

Q  Now, Colonel, I want to jump over to the other end of the watershed.

MR. VEEDER:  What is your page number now?

MR. SACHSE:  That is the 78P series where I believe

G

Z49

1    you started out in Diamond and Domenigoni Valley.

2            Q  Am I correct?

3            A  The 78P series starts out in--

4            Q  I beg your paron; 78Q is the one I am interested in:

5    Diamond and Domenigoni, the upper reaches of Warm Springs Creek.

6            A  That was Q, Mr. Sachse?

7            Q  Yes.

8            A  Yes, sir, I have the 78Q series before me.

9            Q  Are you familiar with that reach of the watershed?

10           A  Yes, sir.

11           Q  From personal observation?

12           A  Yes, sir.

13           Q  Can you describe for us the character of the surface

14   flow of the stream through Diamond and Domenigoni Valley?

15           A  Yes, sir.

16           Q  What is it?

17           A  Intermittent.

18           Q  Flowing only and during after periods of heavy

19   precipitation and runoff?

20           A  Yes, sir.

21           Q  And for how long a stretch or reach does that

22   condition continue?

23           A  Well, with reference to Plaintiff's Exhibit 15 there

24   is no evidence of rising water on Warm Springs Creek until it

25   reaches   Section 14, 7 South, 3 West.  It is several miles

G

Z50

7879

below Diamond Valley.

Q  It would be your opinion that the stream should be characterized as intermittent, flowing only during and immediately after periods of precipitation and runoff northerly of Section 14; is that right?

A  Yes, sir.

Q  Now, may I direct your attention to that particular stretch of Warm Springs Creek which flows along the edge of the area shown as weathered basement complex through Sections 25 and 36, 6 South, 3 West, and Sections 1, 12, and 11, 7 South, 3 West.  Do you see the stretch of the stream to which I refer?

A  Yes, sir.  I observed that reach of the stream on Plaintiff's Exhibit 15.

Q  Are you familiar with that reach?

A  Yes, sir; in general.

Q  If you want to, please refer to your aerial photographs, also.  Is that a canyon reach of the stream?

A  No, sir.  The relief in the Murrieta drainage area is, by and large, fairly slight excepting the Tucalota headwaters.

Q  Now, I observe that on 15 that stream is shown as bordered almost its entire length by a very narrow strip of alluvium, younger alluvium?

A  Yes, sir.

7880

B

251

1    Q   And that on to the west Exhibit 15 delineates base-

2    ment complex, to the east Exhibit 15 delineates a weathered

3    basement complex.  Does that conform to your observations?

4        A   Yes, sir.  I am in essential agreement with that.

5        Q   How would you describe the character of the ground

6    waters in the area of weathered basement complex immediately

7    east of that stretch of Warm Springs Creek?

8        MR. VEEDER:  I am going to object, your Honor.  This

9    goes beyond the scope of the direct examination.  This witness

10   has not testified in regard to ground water at any time.

11       THE COURT:  If the witness knows.  He has identified the

12   map and told us about the stream channels, and all.  If the

13   witness doesn't know, he can so state.

14       THE WITNESS:  May I have the reporter read that ques-

15   tion, please.

16       (The Reporter read the pending question.)

17       THE WITNESS:  By that, I presume, Mr. Sachse, meaning

18   immediately east of the alluvium?

19   BY MR. SACHSE:

20       Q   Of the younger alluvium, the strip of younger

21   alluvium containing Warm Springs Creek?

22       A   It is my opinion that the ground waters in that

23   weathered basement complex are, subject to more detailed

24   surveys and investigations, vagrant, percolating and not a

25   part of the stream system.  And by more detailed investigations,

B

Z52

1   I mean again that the scale of this map is only one square inch

2   to the--

3        MR. VEEDER:  When you say "this map," Colonel, you

4   are referring to?

5        THE WITNESS:  Plaintiff's Exhibit No. 15.

6        MR. SACHSE:  15.

7        THE WITNESS: Whereas, most of our investigations on

8   these privately-owned lands are done on a scale that is area-

9   wise 16 times this scale.  And I wouldn't want to preclude

10  the possibility in plotting some Recent alluvium on stream

11  channels that traverse that area of weathered basement complex

12  which appears on Plaintiff's Exhibit 15 and to which I have

13  just testified to.

14  BY MR. SACHSE:

15       Q  In other words, as I understand you, your present

16  opinion would be that it is vagrant, local, but you want to

17  reserve the right of a more detailed examination to change

18  that opinion if the need arises?

19       A  Yes, sir.

20       Q  Now, on Exhibit 15 is an intermittent stream symbol

21  shown running down through French Valley.  I don't know its

22  name.  Does it have a name, Colonel, so we can refer to it?

23       A  Well, as far as I know, it is called French Creek,

24  Mr. Sachse.  And it would probably be convenient to so desig-

25  nate it.

Z53

Q   I observe that that intermittent stream flows through Sections 26 and 32, Township 6, South 2 West, and Sections 6--

A   You said 26 and 32, Mr. Sachse.

Q   28, 29, and 32, 6 South, 2 West, and 7 South, 2 West, at which point it enters an area indicated as younger alluvium?

A   Within Section 6?

Q   Within Section 6, yes.

A   Yes, sir.

Q   Are you familiar with that stream?

A   Not in detail, Mr. Sachse.

Q   Are you familiar with the character of its surface runoff?

A   Geneally.

H

Am 1

1    Q  How would you characterize it?

2    A  I would characterize it as intermittent in nature.

3    Q  Running only during and immediately after periods

4 of precipitation and runoff?

5    A  Yes, sir.

6    Q  How would you characterize the groung waters under-

7 lying that reach of the stream we have just described within

8 the weathered basement complex?

9    MR. VEEDER:  I renew my objection on the grounds that

10 it is beyond the scope of the direct examination.  The witness

11 has not testified in any regard on these subjects.

12    THE COURT:  If the witness knows, he may answer.

13    THE WITNESS:  I have not made detailed soil surveys

14 up there or detailed investigations of any kind, Mr. Sachse,

15 and in as much as there is a stream channel it might well be

16 that on maps of larger scale and with closer investigation

17 we might find some Recent alluvium along that stream which

18 might contain some water.

19    Q  But in the absence of such such finding, what would

20 your opinion be?

21    MR. VEEDER:  I object to this.  This is purely conjec-

22 ture.

23    THE COURT:  Sustained.

24    Colonel, you are talking now about what--Tucalota?

25    MR. SACHSE:  French Valley Creek, your Honor.

1        THE COURT:  Let's take a little recess.

2        (Recess).

3   BY MR. SACHSE:

4        Q  Before the recess, Col. Bowen, I started to inquire

5   about Tucalota Creek and I observed that at its head waters,

6   in its upper reaches, as shown on Exhibit 15 it has three well-

7   defined tributaries, and let's take the most northerly or

8   westerly first.  Are you familiar with that stretch of the

9   stream?

10       A  I believe that is what I referred to as Rawson Canyon

11   when I was describing the course of Tucalota Creek.

12       THE COURT:  Rawson Canyon is from the north to the

13   south and the westerly direction?

14       THE WITNESS:  Yes, sir, and it flows, as shown on

15   Plaintiff's Exhibit 15, through Sections 18, 19, 30 and 31,

16   6 South 1 West.

17   BY MR. SACHSE:

18       Q  Are you familiar with that stretch of the stream?

19       A  No, sir.  That is    on the Rawson property, and

20   I was negotiating with Mr. Swing the opportunity to examine

21   that property at the time that Tommy Rawson died, and I believe

22   now you have given or required consent for us to go on the

23   property.  But we haven't been there yet.

24       Q  Would your answer be the same as to the next tribu-

25   tary down, which is also largely on the Rawson property?

1          A  Yes, sir.

2          Q  Moving down to the most southerly tributary of

3     Tucalota Creek, that is not entirely on the Rawson property.

4     Are you familiar with that stream?

5          A  Generally, yes sir.

6          THE COURT:   Is that the one that starts up around

7     Willow Canyon?

8          THE WITNESS: Yes, Willow Canyon, and at Weber Valley

9     the alluviul-filled valley which appears east of Willow Canyon,

10    originating in--that is the alluviul section originates in

11    Section 33, 6 South 1 East, and continues on down through

12    Sections 4, 6, 7 and 8, 7 South 1 East.

13         Q  You say you are familiar with that stretch of stream?

14         A  In general, Mr. Sachse, only.  I have not inspected

15    that stream in detail throughout its reach.

16         Q  Would you be able to testify as to its surface flow

17    characteristics?

18         A  Yes, sir.

19         Q  What are they"

20         A  Intermittent.

21         Q  Flowing only during and after precipitation and

22    runoff?

23         A  Yes, sir.

24         Q  Are you able to testify regarding the subsurface

25    characteristics of the stream?

1    MR. VEEDER:   I renew my objection that this witness

2  has not testified--

3    MR. SACHSE:   I am just asking him if he is able to

4    THE COURT:   If you know.

5    THE WITNESS:   I haven't made detailed surveys up in

6  that area, Mr. Sachse, and as indicated on Plaintiff's Exhibit

7  15, Weber Valley, for example, and Willow Canyon do have

8  alluviul fill and that the area around Sage has alluviul fill

9  and from the point below Sage where the Tucalota Creek enters

10  a canyon reach, the canyon reach being between the valley in

11  the vicinity of Sage and the Tucalota Valley which begins in

12  Section 11, 7 South 1 East, where again Tucalota Valley--

13    Q  7 South 1 East?

14    A  1 West, yes sir.

15    Q  Go ahead.

16    A  That is Section 11, 7 South Range 1 West, where

17  Tucalota Valley, again an alluvium-filled valley, appears and

18  is shown on Plaintiff's Exhibit 15.

19    Q  But you are not able to express any opinion, then,

20  as to the reaches between the alluviul-filled valleys on that

21  stretch of Tucalota Creek as delineated on Exhibit 15?

22    A  Well, in the canyon reach as indicated by examination

23  of photographs--I will refer to a particular exhibit, if I may.

24    THE COURT:   78S8?

25    THE WITNESS:   Actually, 78S6 shows in its entirety the

H
A 5

1   canyon reach of Tucalota Creek between the Sage Valley and

2   the Tucalota Valley.

3   BY MR. SACHSE:

4       Q  Do you say that you can express an opinion as to

5   the character of the subsurface flow and ground waters in that

6   reach?

7       A  Yes, sir.  It has been my observation there that

8   there is little, if any alluvium in the canyon reach, and any

9   water which flowed through there must flow as a surface stream.

10      Q  How about the underground waters?

11      MR. VEEDER:  I thought he answered that.  Any water

12  goes through, has to go through the surface stream.  Isn't

13  that what he said?

14  BY MR. SACHSE:  May I assume that any underground waters, in

15  your opinion, are vagrant, local and percolating waters?

16      MR. VEEDER:  Are you asking me?

17      MR. SACHSE:  No, I am asking Col. Bowen.

18      THE WITNESS:  Yes, sir.  That is basement complex and

19  any water that would be obtained in that would be in fractures,

20  fissures, and would be, in my opinion, vagrant percolating

21  water.

22  BY MR. SACHSE:

23      Q  Perhaps you can find the appropriate photograph.

24  Referring to the next stream, which goes through basement

25  complex and which flows through Sections 8 and 6, 7 South 1

1   West--that is immediately west of Tucalota Valley, are you

2   familiar with that stretch?

3      THE COURT: About 78S9.

4      THE WITNESS: Yes, sir. That is where Tucalota Creek

5   flows or passes through the Tucalota Hills. That is illus-

6   trated on Plaintiff's Exhibit 78S9, which shows the little

7   valley in Section 8, 7 South 1 West, from which valley

8   Tucalota Creek pierces the Tucalota Hills, flowing in a

9   northwesterly direction, partly in Sections 5, 6, and 8, 7

10   South 1 West. In Section 5, 7 South 1 West, Tucalota Creek

11   enters the upper end of Auld Valley.

12      Q Are you familiar with that stretch of the stream?

13      A I haven't walked through that canyon reach, but I

14   have traversed the roads that are above and below it.

15      Q Do you have an opinion as to the character of the

16   surface flow there?

17      A Yes, sir. It is intermittent in character.

18      Q Flowing only during and after precipitation and

19   runoff?

20      A Yes, sir.

21      Q Do you have an opinion as to the character of the

22   underground, if any, in that reach of the stream?

23      A The underground waters in the reach of Tucalota

24   Creek, in the canyon reach through the Tucalota Hills, to

25   but not including Auld Valley, it is my opinion that there

is no significant underground flow;  that the waters through that reach, if any, would be vagrant, percolating and not part of the stream system.

Q   That is all for the 78 Series, Col. Bowen, as far as I am concerned.

Q   Now, I asked you yesterday if you could prepare a breakdown of your Exhibit 150, which showed water used for military purposes inside and outside the watershed line between water used on the Naval Ammunition Depot inside and outside and on Camp Pendleton inside and outside.  Have you been able to do that?

A   Yes, sir.  I have a tabulation in my possession here, showing the water pumped annually for use on the Naval Ammunition Depot.

Q   And the entire water use of the Depot is within the watershed, is it not?

A   Yes, sir, within the watershed of the Santa Margarita River.

Q   Just so I am quite sure I understand what you are going to give us, if you give us the annual pumpage for the Depot we would simply have to deduct that from the second column on Exhibit 150 to determine the use for Pendleton inside the watershed line, isn't that right?

1      MR. VEEDER:  Would you read the heading of the second

2 column?

3      MR. SACHSE:  Let me rephrase the question.

4      Q  If you will give us the pumpage for the Naval

5 Ammunition Depot and we deduct that pumpage from the column

6 on Exhibit 150 headed "Inside Natural Watershed Line Acre

7 Feet," the result would give us the pumpage for Camp Pendleton

8 inside the watershed, would it not?

9      A  That is correct.

10      MR. VEEDER:  The exhibit you are referring to is Exhibit

11 150?

12      MR. SACHSE: Yes.

13      THE WITNESS:  Also, Mr. Sachse, the amount that would

14 be pumped for NAD would be substracted for the total column.

15      Q  From the total figure.  Will you read, then, slowly

16 by years so that they will be in the record, please, the Naval

17 Ammunition Depot pumpage?  Is that what this is?

18      A  Yes, sir, this is pumpage in acre-feet for water

19 years beginning in 1944.

20      A  Go ahead.

21      A  In 1944 it was 130 acre feet.

22      In 1945 it was 180 acre feet.

23      In 1946 it was 140 acre feet.

24      In 1947 it was 110 acre feet.

25      In 1948 it was an even 100 acre feet.

1          In  1949 it was 90 acre feet.

2          In 1950 it was 60 acre feet.

3          In 1951 it was 70 acre feet.

4          In 1952 it was 70 acre feet.

5          In 1953 it was 70 acre feet.

6          In 1954 it was 50 acre feet.

7          In 1955 it was 50 acre feet.

8          In 1956 it was 60  acre feet.

9          In 1957 it was 60 acre feet.

10          And I believe that is the limit of Plaintiff's Exhibit

11    150.  But his Honor did ask me to bring that down through

12    water-year 1957-1958, and I am prepared to do so, your Honor.

13          MR. SACHSE:  Will you give us that figure then.

14          THE COURT:  Give us first the gross figure there for

15    inside the watershed line, and then the Naval Ammunition Depot

16    figure right on across.

17          THE WITNESS:  Yes, sir.  The first figure I will give

18    will, of course, to be consistent with Plaintiff's Exhibit

19    150, will include the Naval Ammunition Depot pumpage for

20    1957-58.

21          THE COURT:  All right.

22          THE WITNESS:  And that will 2,460 acre feet within

23    the watershed, of which 70 acre feet was pumped by the Naval

24    Ammunition Depot; the volume of water pumped for use outside

25    the watershed line is 2,390 acre feet; and the total 4,850

1   acre feet.

2   BY MR. SACHSE:

3       Q   Now, Col. Bowen, I recollect, from the testimony

4   of some witness in the case--I can't recall who--there were

5   certain periods of time during which some of the Naval Ammunition

6   Depot requirements were met by pumping from your so-called De

7   Luz well or one of the upper wells on the reservation itself?

8       A   Yes, sir.

9       Q   Are you familiar with that?

10      A   Yes, sir.

11      Q   What years were those?

12      A   That pipeline transmitting water from the De Luz

13  well, which is at the confluence of De Luz Creek with Santa

14  Margarita River, was constructed in 1952, and immediately

15  following the completion of the laying of that line, water

16  was delivered through it from the De Luz well to the Naval

17  Ammunition Depot infiltration gallery.

18      Q   Continuously from that date?

19      A   No, sir.   That was the first instance.

20      MR. VEEDER: It is only during the time that Fallbrook

21  has taken our water; isn't that right?

22      THE WITNESS: Only pumped during those months when

23  there was no flow at the Naval Ammunition Depot point of

24  diversion, and I believe some water has been pumped contin-

25  uously for varying periods of time during the summer season

1    since 1952.

2    BY MR. SACHSE:

3        Q   That water is not metered, or is it metered?

4        A   That is metered; yes sir.

5        Q   I don't think there is any great urgency about

6    this, but if you could, at your convenience, give us the

7    figures of the amounts delivered Depot, I would appreciate

8    it, because I am trying to find out what the Depot use is

9    from the De Luz well, I am trying to find out what the total

10   Depot use has been, and that should be added to it.

11       A   Yes, sir.

12       Q   Because this does not reflect the total use; am

13   I correct?

14       A   The De Luz well would be reported there in the Camp

15   Pendleton column.

16       Q   It would be included in Pendleton, not in the Naval

17   Ammunition Depot?

18       A   Yes, sir.

19       Q   Now, Col. Bowen, you testified regarding the irriga-

20   tion requirements of the Naval Reservation, assuming the full

21   development of all the irrigable acreage.  Can you breakdown

22   that requirement between the irrigable acreage found at the

23   Naval Ammunition Depot, as shown on your Exhibit 94, and the

24   irrigable acreage found at Camp Pendleton?

25       A   Yes, sir.  I have a breakdown of the irrigable

1    acreage tabulated in accordance with the various segments of

2    the reservation.

3        Q  And have you worked the calculation out to include

4    water duty for the Naval Ammunition Depot as distinct from

5    the rest of the Camp?

6        A  I don't have that completed tabulation before me

7    here, but it would be a very small task.

8        Q  If you could do that over the weekend, please, I

9    would like to know the apportionment of your irrigable acreage

10   and your calculated maximum water demand between the Naval

11   Ammunition Depot and the rest of the reservation.  I have no

12   purpose in asking you to separate the hospital, you understand,

13       A  Yes, sir.

I

Z54

1          THE COURT:  In other words, this is the breakdown of

2   the 18,947 acres, and the total of 65,605 acre feet?

3          MR. SACHSE:  That is right, your Honor.

4          Q  Between the Naval Ammunition Depot and the remainder

5   of Camp Pendleton?

6          A  Yes, sir.

7          Q  If you will do that, I will appreciate it.

8          Now, Col. Bowen, in connection with your research

9   into the water uses by the Rancho Santa Margarita prior to its

10  acquisition by the United States, did you ever read the case

11  of Rancho Santa Margarita vs. Vail?

12         MR. VEEDER:  I object to this.

13         MR. SACHSE:  It is a preliminary question.

14         MR. VEEDER:  The question has no bearing on the litiga-

15  tion.  It goes beyond the scope of the direct examination.

16         THE COURT:  How can we tell?  Overruled.

17         MR. STAHLMAN:  What is the question again?

18         MR. VEEDER:  Has he ever read--

19         MR. STAHLMAN:  Oh, the case of Santa Margarita vs.

20  Vail.

21  BY MR. SACHSE:

22         Q  Have you ever done so, Colonel?

23         THE COURT:  Overruled.

24         THE WITNESS:  Your question was in connection with

25  my research on water use of the ranch?

I

255

BY MR. SACHSE:

    Q  Yes.

    A  Specifically?  No, I didn't review that record.

    MR. STAHLMAN:  What do you mean, the decision?

    THE WITNESS: Specifically with the object of research-
ing water used by the lands.

    MR. VEEDER:  Just a moment.  Which decision?

    MR. SACHSE:  The decision of the California Supreme
Court.

    MR. VEEDER:  In 11 Cal(2d)?

    MR. SACHSE:  11 Cal.(2d), what is it?  501?  Something
like that.  11 Cal.(2d), 501, Rancho Santa Margarita vs. Vail.

    Q Did you read that decision?

    A  The decision?

    Q  Yes.

    A  I may have glanced at the decision sometime in the
past, but I have never read it orally.

    Q  Then whatever may or may not be said that decision
in no way influenced your conclusions as to the amount of
irrigable acreage on the military reservation?

    A  No, sir.  The determination was made entirely based
upon my own work.

    THE COURT:  I am just curious: Was the Colonel pretty
close to the figures in the Supreme Court?

    MR. VEEDER:  6,000 above, isn't it?

I

Z56

1    MR. SACHSE:  The Colonel is 6,000 higher than the trial

2  court found to be irrigable on the Rancho Santa Margarita.

3  50% higher.

4    THE COURT:  That is about 10%, isn't it?

5    MR. SACHSE:  50%.  The Colonel finds 18,000; they found

6  twelve.

7    MR. VEEDER:  He looked closer.

8    THE COURT:  You mean as to irrigable acres?

9    MR. SACHSE:  Irrigable acres on the ranch.

10    THE COURT:  Well, since those times more and more land

11  becomes irrigable as you plant avocados on mountainsides.

12    MR. SACHSE:  Very true.  That is one reason, your

13  Honor, why I have so vigorously opposed findings as to

14  irrigable acreage.  Until there is time for an apportionment

15  and irrigable acreage finding seems a rather fruitless act.

16    THE COURT:  You think the time will come when they will

17  grow avocados in basement complex and in the rocks?

18    MR. SACHSE:  I just got back from a trip, to answer

19  your Honor's question, to Guatemala where corn fields,

20  irrigated corn fields, are grown on cliffs that, as you

21  described to Col. Bowen, if you walk up against them sometimes

22  it is easier to just lean against them.  And I am thinking

23  that time may come in the United States.

24    MR. VEEDER:  We are not going to resurvey the area on

25  the basis of anything in Guatemala.

I

Z57

1        MR. SACHSE:  I prefer you don't resurvey it.  I prefer

2   we wait for the problem.

3        THE COURT:  Well, progress will catch up with us.

4   The time will come when they will make all the water we need

5   out of the ocean.  We will have plenty of water.  So all the

6   desert lands can be cultivated.  By that time science will

7   have progressed so they can make foods synthetically, and you

8   won't need the water to irrigate all the grounds.

9        MR. STAHLMAN:  I am surely going to miss all these nice

10  lunch sessions when you just take a pill.

11       THE COURT:  So progress will catch up with us.

12       MR. STAHLMAN:  We can go right back to work, and we

13  won't have to take a recess.  We can just take a pill and go

14  right on working.

15       I still hope they don't develop to the point where we

16  don't have to have something to wash them down with.

17  BY MR. SACHSE:

18       Q  Col. Bowen, in your testimony yesterday regarding

19  the agricultural development of the Rancho prior to its

20  acquisition by the Marines, you referred only to the testimony

21  of Mr. Witman and the other gentleman-- What is his name?

22       MR. VEEDER:  Salisbury.

23       THE WITNESS:  Salisbury.

24  BY MR. SACHSE:

25       Q  -- Salisbury and to the exhibit.

1        A   Plaintiff's Exhibit 125-A.

2        Q   Did you conduct any other research of any kind into

3   the extent of the agricultural development and how it varied

4   year by year, or may have varied year by year?

5        MR. VEEDER:  Did you change that to "may have"?

6        MR. SACHSE:  Yes.

7        Q   How it may have varied year to year.

8        A   You mean prior to the acquisition of the property

9   by the Marines?

10        Q   Prior to the acquisition of the property by the

11   Marines.

12        A   Yes, sir.

13        Q   You do?

14        A   Yes.

15        Q   What other material did you research?

16        A   I researched the aerial photographs taken prior to the

17   acquisition of the property by the United States, and I have

18   already testified in regard to them.

19        Q   Can I interrupt you on them for a moment.  They don't

20   help you in determining how they may have changed year by year

21   because you only have one set, don't you?

22        A   We have the 1929 set.  We prepared a mosaic of the

23   Santa Margarita Valley.  And I believe that is in evidence.

24   We have the 1935 set, the 75 series  I am not sure which one

25   of those are in evidence, but there is coverage of the valley

I

Z59

1    there. Then, we have a 1939 mosaic or group of mosaics which

2    is not in evidence but from which--

3        Q But which you considered?

4        A Which I did consider, yes, sir.

5        Q Did you consider any other written or printed

6    material of any kind on the prior development of the Rancho?

7        A Well, I have tried to find as much on the development

8    of the Rancho as possible.

9        Q Did you ever read the complaint sworn to by the

10   Rancho Santa Margarita in its action against Vail?

11       A No, sir.

12       Q Then, you have no information as to whether or not the

13   owners of the Rancho Santa Margarita at the time of their

14   lawsuit with the Vails did or did not assert appropriative

15   rights to the use of water?

16       A No, I don't know what their assertions were, Mr.

17   Sachse.

18       MR. SACHSE: Mr. Veeder, can you tell me offhand the

19   number of your exhibit which contains application 12576 to the

20   United States Navy?

21       MR. VEEDER: That should be about 130-some. Be about

22   139, Bill, 138, somewhere in there.

23       THE CLERK: What number was it?

24       THE COURT: This is the application of the--

25       MR. SACHSE: United States Navy.

I

Z60

1      THE CLERK:  138.

2      MR. VEEDER:  138-A.

3      THE COURT:  A, B, and C.

4  BY MR. SACHSE:

5      Q  I will hand you, Col. Bowen, Government's Exhibit

6  138-A and ask you to examine it and tell me if you have ever

7  seen it before?

8      A  While I am examining this, Mr. Clerk, could I have

9  one of the prints out of the Plaintiff's Exhibit 75 series,

10  please.

11      THE COURT:  You know which print you want?

12      THE WITNESS:  Any one, your Honor.

13      THE CLERK:  You said 75.  That is the big volume.

14      THE WITNESS:  Is there one print loose?  May I approach

15  them and examine them,  your Honor?

16      THE COURT:  Surely.

17      THE WITNESS:  I think I testified to the date, and I

18  believe I have incorrectly stated it.

19  BY MR. SACHSE:

20      Q  The date of your flight, you mean?

21

22

23

24

25

J

A 13

1          THE WITNESS:  I believe, your Honor, I said that I

2    utilized aerial photographs flown in 1935, and the correct

3    date should be 1938.

4          MR. VEEDER:  The question was--

5          MR. SACHSE:  Has he ever seen that document before?

6          THE WITNESS:  Yes, I have seen the document, Mr. Sachse.

7    BY MR. SACHSE:

8          Q  In your consideration of possible appropriative

9    uses by the Rancho Santa Margarita prior to the acquisition of

10    the Rancho by the Marines, did you ever give any consideration

11    to this document?

12          A  No, sir.

13          Q  Let me direct your attention to Item 13, found on

14    page 2 of Plaintiff's Exhibit 138A, the last two sentences or

15    matters contained therein, reading as follows: "The land to

16    be irrigated has no water right or source of water supply other

17    than that herein applied for.  The nature and amount of the

18    additional supply referred to is"--thus far I am quoting from

19    the form, and thereafter a typed answer as follows: "Riparian

20    rights defined by Superior Court judgment Santa Margarita

21    versus Vail.  Ground water pumping which may be curtailed by

22    proposed upstream conservation dam."  Have you ever particularly

23    noticed that language before?

24          A  No, sir.

25          Q  Does that language or does it not, indicate to you

1    that at the time that document was filed any appropriative

2    right to the use of water was vested in the applicant?

3         MR. VEEDER:   I object, your Honor.   He is not to

4    psychoanalyze what happened 12 years ago, and to make a legal

5    conclusion.

6         MR. SACHSE:   I am asking what that indicates to him.

7         THE COURT:   Sustained.

8         MR. SACHSE:   Your Honor is of the opinion, which I believe

9    you expressed previously--

10        MR. VEEDER:   I move to strike that out.

11        MR. VEEDER:   I am asking his Honor a question.   That

12   the question of admissions against interests, where Government

13   agencies are involved, is a very difficult and tricky problem.

14        THE COURT:   That is right.   It is very tenuous.   You

15   have to show me some authority where you can estop the Government

16   because employee goes out and makes a statement or signs a

17   document.

18        MR. VEEDER:   332US19.

19        THE COURT:   What is the name of the case?

20        MR. VEEDER:   California versus United States, or United

21   States versus California, where the tidelands were involved.

22   BY MR. SACHSE:

23        A   Col. Bowen, have you ever had occasion to read any

24   of the protests filed by the United States against the appli-

25   cations to appropriate water of the Fallbrook Public Utility

District?

MR. VEEDER:  I renew the objection that I made, your Honor, that it has nothing whatever to do with it.  Maybe he didn't maybe he did.  What difference does it make?

THE COURT:  Overruled. See whether he did.

THE WITNESS: I have glanced at them, Mr. Sachse.

BY MR. SACHSE:

Q  Have you ever observed whether in those protests the United States asserted any appropriative rights to the use of water?

MR. VEEDER:  I object on the grounds that it has nothing whatever to do with it.

MR. SACHSE:  I just asked him whether he observed it.

THE COURT:  Overruled.

THE WITNESS:  I glanced at them, and they are not clear enough before me at the moment.

BY MR. SACHSE:

Q  We will get them later.  Have you ever observed any of the protests that the United States filed to the applications of the Santa Margarita Mutual Water Company to appropriate water from the Santa Margarita River?

A  I have glanced at them.

Q  Have you noticed whether or not in those applications the United States ever asserted any ownership in the appropriative rights to water?

J

A 16

1          A  I have no recollection of what the assertions of

2     the United States were.

3          Q  Have you ever observed the protests of the United

4     States to the first filing of the Vail Company to appropriate

5     water?

6          A  Yes, sir, just casually.

7          Q  Have you noticed whether in that protest they asser-

8     ted any appropriative rights to the waters of the river?

9          A  I have no recollection.

10          MR. VEEDER:  Three minutes to go, Franz.

11          THE COURT:  You are wasting time now, Mr. Sachse.

12          MR. SACHSE:  All of this is going to go into the

13     evidence later, your Honor.  The documents may not be conclu-

14     sive, but I submit that they have weight.

15          THE COURT:  Well, will you be back here again Tuesday

16     morning?

17          MR. SACHSE: Yes, your Honor.

18          THE COURT:  Tuesday morning at ten o'clock?

19          MR. STAHLMAN:  What does this look like next week?

20          THE COURT:  Are you going to have more cross-examination

21     of the Colonel?

22          MR. SACHSE:  I am almost done.

23          MR. STAHLMAN: Has is it been decided that it will go

24     over?

25          THE COURT:  Mr. Sachse has some motions and matters

1   that he wants to present.  We will be here Tuesday anyhow,

2   I guess.

3         MR. SACHSE: We'll be here Tuesday.

4         MR. VEEDER:  I have one more witness your Honor.

5         MR. SACHSE:  Mr. Veeder has Col. Robertson.

6         MR. VEEDER:  Col. Robertson.

7         MR. MOSKOVITZ:  The anchor man.

8         MR. SACHSE:  I think we are very likely to finish the

9   week.

10         THE COURT:  Ten o'clock Tuesday.

11        (Adjournment until Tuesday, January 27th, 1959 at

12   10 o'clock a.m.).