# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Tuesday, January 27, 1959.

**Pages:**   7907 to 8040

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

MALCOLM E. LOVE
**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - - - - - -

BEFORE HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,       )
           Plaintiff,       )
      vs.                       )       No. 1247-SD-C.
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
          Defendants.       )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, January 27, 1959

APPEARANCES:

    For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                            Special Assistant to the
                            Attorney-General,
                            Department of Justice,
                            Washington, D. C.

APPEARANCES (Continued):

    For Defendant              GEORGE E. STAHLMAN, ESQ.
    Vail Company

    For Defendant State      STANLEY MOSK, ESQ.,
    of California            Attorney-General, by
                        ADOLPHUS MOSKOVITZ, ESQ.,
                        Deputy Attorney-General;
                        and
                        CARL BORONKAY, ESQ.

    For Defendants
    Fallbrook Public
    Utility District,       FRANZ R. SACHSE, ESQ.
    et al

SAN DIEGO, CALIFORNIA, TUESDAY, JANUARY 27, 1959.  10:00 A.M.

(Other matters.)

THE CLERK:  No. 2, 1247-SD-C, United States of America vs. Fallbrook Public Utility District, et al.  Further court trial.

MR. VEEDER:  Your Honor, I would like to bring up some points at this moment, and to have Mr. Luddy check with me as I move through these facts.

THE COURT:  This is as to exhibits?

MR. VEEDER:  No, your Honor.  The exhibits are checking out all right.

I am concerned, however, by the fact that Mr. Oviatt has not filed an answer-- one of the biggest operators up the river.  I have not checked through to see whether Mr. Roripaugh has filed an answer, or that Mr. Query has answered.

THE COURT:  They were both represented by Mr. Krieger, were they not?

THE CLERK:  Query has answered by another counsel, your Honor.

MR. VEEDER:  By another counsel rather than by Krieger?

THE CLERK:  Other than by Krieger.

Oviatts has answered the first complaint, but there has been nothing on the amended complaint.

THE COURT:  Under the order, that first answer was

# INDEX TO WITNESSES

| For the Plaintiff | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Allen C. Bowen | | | | |
| (By Mr. Sachse) | | 7935 | | |
| (By Mr. Moskovitz) | | 7979 | | |
| (By Mr. Stahlman) | | 8011 | | |

# EXHIBITS

| Plaintiff's Exhibit - | Iden. | In Evid. |
|---|---|---|
| 153 - Tabulation | 7946 | 7947 |
| 154 - Tabulation | 7947 | 7947 |
| Defendant State of California Exhibit | | |
| AA - Report | 8001 | |

1   sufficient, was it not?

2       MR. VEEDER:  I am not so concerned in regard to the

3   first answer.  I am concerned, however, about the issues that

4   have not been joined in regard to these three key parcels,

5   namely, the question of the effect of this upstream pumping

6   and whether, at this juncture, we shouldn't ask that an order

7   be entered requiring an answer or that the matter be on the

8   calendar for default.

9       THE COURT:  Who appeared originally for Oviatts?

10      MR. VEEDER:  You have that, Mr. Luddy.  I think his

11  name was Krueger.  I know I conferred with the man several

12  years ago up there.

13      MR. STAHLMAN:  Probably the same attorney he had in

14  that Oviatt proceeding.

15      MR. VEEDER:  The thing that precipitated many of these

16  thoughts that I have about it is that we now have this statement

17  by Mr. Krieger in regard to your fourteen questions, par-

18  ticular reference being made to Unit No. 4, which of course I

19  think is one of the key questions.

20      THE COURT:  Did Mr. Krieger file this, so that I have a

21  copy?

22      MR. VEEDER:  It was served on us.

23      MR. SACHSE:  I received mine in yesterday's mail, your

24  Honor.

25      THE CLERK:  We have never received it, your Honor.

7912

A

Z6

1    MR. VEEDER:  Did you find that, Mr. Luddy?

2    THE CLERK:  No, I didn't.

3    MR. VEEDER:  I know that Mr. Oviatt had counsel back

4    in 1951.  Since that time I have no knowledge of it.

5    We have, of course, introduced a great deal of evidence

6    about the Oakgrove area, where he is principally interested.

7    As we go down near the end of the line on the case in chief, it

8    is very apparent--

9    THE COURT:  Where does he live, and what is his full

10   name?

11   MR. STAHLMAN:  I have it here.  His full name is James

12   Oviatt.  He lives, I think, on the ranch there.  He was build-

13   ing a home there a couple of years ago, or extending his home

14   or elaborating it.

15   MR. VEEDER:  He owns that large store in Los Angeles.

16   MR. STAHLMAN:  Yes.

17   MR. VEEDER:  The James Oviatt store.

18   THE COURT:  Is he active in the management of the store,

19   or is he up on the ranch most of the time?

20   MR. STAHLMAN:  I think he is on the ranch most of the

21   time.  I know his wife is there most of the time.  He lives

22   there.

23   THE COURT:  What is his address up there?  How would

24   you locate him?

25   MR. VEEDER:  Is that Radec or Aguanga?

1    COL. BOWEN:  Aguanga.

2    THE COURT:  Who is the other one who hasn't appeared?

3 Leo Roripaugh?

4    MR. VEEDER:  I think they have appeared, your Honor.

5 I have gone on the basis, relying on Mr. Krieger's statement,

6 that he is appearing for Roripaugh, Quarry and Oviatt.  He

7 said that, as I recall, into the record.

8    THE COURT:  Have you talked to him about this?

9    MR. VEEDER:  No, I haven't.  It strikes me that he

10 should have some pleadings in here.

11    THE COURT:  I didn't understand that.  Mr. Krieger has

12 told you that he represented all three of these people?

13    MR. VEEDER:  Yes.  In fact, we went out to the

14 Roripaugh and Querry properties pursuant to his authorization

15 and conferred with these people pursuant to his authorization.

16    THE COURT:  We have answers on file for Querry?

17    MR. VEEDER:  No, your Honor.

18    THE COURT:  There was something about an answer being

19 filed by Querry?

20    MR. VEEDER:  By Holland and Prendle, wasn't it?

21    THE CLERK:  By Holland and Prendle, in Los Angeles.

22    THE COURT:  For Querry.  When was that filed?

23    MR. CLERK:  That was filed May 20, 1958.

24    THE COURT:  What about Roripaugh-- any answer?

25    THE CLERK:  For Roripaugh there was an answer filed

1    June 6th, your Honor.

2        MR. VEEDER:  Leo Roripaugh is the one that is involved.

3        THE COURT:  1958?

4        MR. STAHLMAN:  I know Jack Roripaugh has filed an

5    answer.  That is his father.

6        THE CLERK:  No answer by Leo Roripaugh, your Honor.

7        THE COURT:  This answer for Querry, filed in May, 1958,

8    then, was an answer to the amended complaint, wasn't it?

9        THE CLERK:  Yes, your Honor.

10        THE COURT:  By Holland and Prendle, you say?

11        THE CLERK:  By Holland and Prendle.

12        MR. VEEDER:  I intend to call Mr. Krieger this morning

13    or at lunch and find out how many clients he is representing

14    up there and what he is going to do about them, because we

15    have been getting one or two answers from him.

16        THE COURT:  I have seen some of Mr. Krieger's answers

17    dribbling in.  Will you call at the noon hour and let me know

18    after lunch?

19        MR. VEEDER:  Yes, your Honor.

20        THE COURT:  How long do you think you will be?

21        MR. VEEDER:  It shouldn't be very much longer, from the

22    standpoint of our case.  But it would be error on our part to

23    rest until the principal defendants have joined issue with us

24    in these matters, and apparently he is hopeful, as nearly as

25    I could tell, that this Basin No. 4 is-- I don't know how it

A

Z9

1   could be-- to be declared not part of the Santa Margarita

2   stream system.  To me it is a question of fact that certainly

3   hasn't been tried out yet.

4        THE COURT:  I have been in contact indirectly with Cal

5   Tech and several professors up there are willing to come down

6   at the expense of the institution to confer with us as to

7   whether or not any help can be given through geophysical

8   techniques to this problem.  I want you to be thinking about

9   that.  We can probably do this without charge to anyone, if

10  they thought they could be of some help.

11       MR. VEEDER:  I wonder if we should have Mr. Kunkel go

12  up there this week.  He might do some preliminary work on this,

13  because I think it is extremely important that this move along.

14       THE COURT:  This is particularly concerning the question

15  of this basin No. 4.  My inquiry was, could they tell us,

16  through the physical sciences, as to whether it was a basin,

17  and the character of it, and the depth and that sort of thing.

18  They are not too optimistic.  They would want to know more

19  about the problem.  But they are willing to confer about it

20  and are willing to come down at their own expense and talk to

21  us-- Professors Johns, Dicht, Sharp, three or four of them.

22  I made contact with them through a gentleman who has raised

23  considerable money for them, so they are very anxious and

24  happy to be of service to him.  It depends on what we want on

25  that.  We may confer with them, and it may be that they can't

1    tell us anything more than we already know.

2         MR. VEEDER:  If your Honor desires that assistance.

3    What would be the status of the case, though?  Would we wait

4    until we hear from them or how would we proceed?

5         THE COURT:  We can't do it immediately, but if you

6    decide they can help us we could later on take proof from some

7    of these experts.  We could find out.  This would be a matter

8    of physical testing.  It would not be a matter of looking at

9    the ground and giving an opinion.  They would report the

10   results of physical tests that they would make.

11        MR. STAHLMAN:  I think that question is one of the key

12   questions of this upper watershed, and I am in favor of

13   anything that can logically and reasonably give us factual

14   matter to determine what those conditions are, because I don't

15   think, in the present state of the record, that we have that

16   evidence that is required by law to determine or to tie in

17   the various basins one to the other.

18        THE COURT:  They may not be able to help us at all.

19   But the physical sciences have progressed in this matter of

20   determining the nature of materials under the earth.  In the

21   oil industry there has been very rapid progress made.  Things

22   are done today that we never thought they could do five or ten

23   years ago.

24        MR. STAHLMAN:  It is my opinion, in the present state

25   of the record, that it is going to take future experience in

A

Z11t

1   relation to those matters and possibly directed by certain

2   tests that can be made to determine what the factual situation

3   is.

4       MR. VEEDER:  Of course, I think it is time for me to

5   express myself somewhat on these matters of just good old-

6   fashioned pleadings and issues.

7       It has never occurred to me that, at this state of the

8   case, it would be possible to determine what the rights of a

9   defendant were or are who has a well like Mr. Leo Roripaugh.

10  I think he has to plead.  I think he has to show up here.

11      As I said before in regard to Mr. Sachse's requests

12  for admissions and in regard to statements that have been

13  made throughout this case, that the state of the record doesn't

14  support a determination on these ground water rights, and

15  pursuant to your request I have gone out and have pursued this

16  matter a little further than originally in connection with the

17  jurisdiction of this Court under the present state of the

18  record, it is not even doubtful, in my mind, that under Article

19  3, Section 2, of the Constitution there has to be a case in

20  controversy before your Honor has jurisdiction, and if there

21  is not a case in controversy then I would say that there is

22  only one course to take and that would be dismissal.

23      Now, in regard both to Mr. Sachse's position and in

24  regard to Mr. Krieger, in the light of the pleading status,

25  it is clear to me that there is no actual case pending, for

example, in regard to Mr. Sachse's client and the United States. He has stated that he has no claim in the Santa Margarita River and its tributaries. Under those circumstances, I would say that he simply pleaded himself out of court, and under those circumstances there would be no need of any other action than perhaps a dismissal.

Now the leading case in regard to the necessity of a joinder of justiciable issues is the Aetna Life Insurance Company vs. Haworth, 300 U.S. 227, 240 (1936). Now that case, I think, is very important, because when all is said and done this case pending before your Honor is very largely a declaratory judgment case. A quiet title suit is nothing more nor less than a declaratory judgment, in the final analysis. Now in that case the court presents the tests which, I think, are applicable here in regard to the Sachse situation. It says, "A 'controversy' in this sense (in the sense of the constitutional provisions) must be one that is appropriate for judicial determination . ." A justiciable controversy is thus distinguished from a moot question.

In other words, where Mr. Sachse comes in with his request for admissions and says, "I have no claim in the Santa Margarita River, then there is no case to be tried at all, and there is no reason for taking any more-- he has just simply pleaded himself out of court.

". . The controversy must be definite and concrete,

touching the legal relations parties having adverse legal interests . ."

Now, adverse legal interest is emphasized throughout the whole series of cases coming down from the Haworth case and proceeds from there on, because the court was analyzing the very situation that you have here.

". . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts . ."

Now, the case specifically in regard to quiet title suits-- and as I say, I think Borchard and Anderson and all the rest of those who analyze quiet title suits say they are nothing more nor less than declaratory judgments to begin with-- in the case of Ely vs. New Mexico and Arizona Railroad Company, 129 U.S. 291, 293, the question arose as to the relationship between the plaintiff and defendants in a quiet title suit.  In particular, it is important in the light of the present Federal Rules of Civil Procedure.  They analyzed there the statutes of the then Territory of Arizona, and the question was asked as to the sufficiency of the complaint and the proper procedure and course to be pursued by a defendant.  As to the complaint, it says that an allegation in ordinary concise terms of the ultimate facts that the plaintiff is the owner in fee is sufficient.  In other words, where the plaintiff

1    comes in and says that he owns some property, and then where

2    he makes the allegation that the defendant claims an adverse

3    estate or interest, the court said it is sufficient to put the

4    defendant to a disclaimer, or to allegation and proof of the

5    estate or interest which he claims.

6         In other words, where as here we come in--

7         THE COURT:  Well, don't skip over so easily.

8         MR. SACHSE:  I have done some briefing myself, your

9    Honor.

10        THE COURT:  It says that that is sufficient, meaning

11   that there is a cause stated to put the defendant to a dis-

12   claimer or to proof of what interest he has.

13        MR. VEEDER:  That is right.  And the case goes on and

14   says that an allegation that the defendant claims an adverse

15   state or interest is sufficient, without further defining it,

16   the nature of which must be known to him, and may not be known

17   to the plaintiff.

18        Under those circumstances, and based upon Mr. Sachse's

19   admissions, we came in and we alleged that there was an adverse

20   claim.  He comes back and says, "No, I am claiming nothing in

21   the Santa Margarita River or in its tributaries," which is

22   perfectly proper.  The only way that the plaintiff can get

23   people before the Court properly is to serve them, and when

24   they appear, as Mr. Sachse has appeared for himself-- I am

25   limiting it now to his, because it is the simplest case-- he

1   comes along and says, "Will you admit, based upon the de-
2   scription that I have here, that I have no claim in the Santa
3   Margarita River or its tributaries?" Now under those circum-
4   stances it is my view that in regard to Mr. Sachse's request
5   for admissions and in regard to himself and all parties that
6   he has filed these fourteen questions upon, we are of the
7   opinion that it is very simple. Now that we know the areas
8   that he is claiming, our men can go out and check out and if
9   they agree I think there is no issue at all. The fact is I
10  believe that when he filedthe request for admissions saying,
11  "Will you agree that I am not a party to this," in effect
12  saying, "I am not a claimant to any water," I think at that
13  time it became manifest that this Court had no jurisdiction
14  over him because there was nothing to litigate and there could
15  certainly be no judgment under the circumstances.
16      Now I believe that those two cases are extremely
17  important.
18      THE COURT: Well, if you have a judgment one way or the
19  other, it would be a judgment that the plaintiff take nothing
20  against the defendant. That would be the judgment.
21      MR. VEEDER: It would be, as I see it--
22      THE COURT: But it wouldn't be properly res adjudicata.
23  That is the trouble with that.
24      MR. VEEDER: I think it is a disclaimer, and I think
25  that a disclaimer of an adverse claim--

1          THE COURT:  Well, these two cases are your authorities?

2          MR. VEEDER:  I will write a brief for your Honor on it,

3     although I think this whole thing was briefed originally when

4     our first complaint was filed back in 1951.

5          In any event, your Honor, I would like very much to

6     withhold the final determination in regard to resting until

7     I do have this chance to talk to Mr. Krieger and to find out

8     what he is going to do, because those are the big claims.  I

9     don't know how many more big claims there are.

10          THE COURT:  As a practical matter, in California, under

11     the quiet title practice, the real function of the disclaimer

12     is to get out without costs.  If you disclaim they can't take

13     costs against you.  If you come in and answer, you can be

14     held for costs.  I have never had this question raised, and I

15     have done a lot of quiet title work.  As a practical matter,

16     the question whether you come in and answer or whether you

17     disclaim hinges largely on whether you want to take a chance

18     of being caught for costs.

19

20

21

22

23

24

25

Jumping back to the complaint for a moment. No. 5 of Mr. Veeder's own prayer has this language: That the court decree "The respective rights of all parties in the litigation as they relate one to another." Now, that is Mr. Veeder's prayer. It doesn't say the respective rights in the Santa Margarita River; it says the respective rights of all parties in the litigation as they relate one to another. That is No. 5 in the complaint. Now, how it can be contended, regardless for the moment of the requests for admissions, how it can be contended that there is no issue raised by those pleadings, I don't understand. On the one hand the United States says I am injuring them, I am causing salt water intrusion, and I assert a right in the river. On the other hand, I deny it. I assert I own a different kind of a water right entirely. And I agree with the Government's Prayer 5. I say: Please, your Honor, adjudicate my water rights. And Mr. Veeder says: Adjudicate the respective rights of all parties as they relate one to another. So with that state of the pleadings in each case file a request for admissions which set forth the simple facts that I own the property described in the answer; that they do not abut upon a stream; and that the waters underlying are vagrant, local percolating, and not a part of the Santa Margarita River system. And in each case I get a reply from the United States which states-- and I have all the files ready to argue this in detail. I brought them down. They

1    MR. SACHSE:  Your Honor, may I make an observation.

2  In the first place, I think that we are utterly overlooking

3  the most important thing in the whole case that Mr. Veeder

4  himself mentioned, and that is the pleadings themselves.  Now,

5  what I am saying now, I am talking about 34 separate answers

6  that I have filed and that involve 55, more or less, defend-

7  ants.

8    ~~None~~ of the complaint filed by Mr. Veeder alleges that

9  the acts of each named defendant have caused salt water

10  intrusion and damaged the Government.  Count 25 alleges that

11  the defendants assert claims adverse to the United States; the

12  claims have clouded title of the United States; and that the

13  present exercise of the claimed rights of the defendants invade

14  the rights of the United States.

15    Now, in each of these 34 answers I did the following:

16  I generally denied each of those specific allegations of the

17  United States.  In each of those answers I then set forth a

18  separate and an affirmative defense.  In that separate and

19  affirmative defense I alleged that I was the owner of certain

20  described lands, or my client was, applying it to my own case

21  as Mr. Veeder did.  That the lands described did not abut upon

22  any stream.  That the lands overlay percolating ground waters

23  which were not a part of the Santa Margarita River system.

24  I then in my prayer asked this Court to adjudge me the owner

25  of those water rights which I have pleaded.

are in the other office now.   In each case I get a reply from

the United States which admits ownership; admits that the lands

don't abut on a stream; and admit the fact that the waters

underlying the lands are percolating and ground waters "not a

part of any surface stream or subsurface stream or subsurface

basin of the Santa Margarita River or its tributaries."

Now, if that evidence had been presented to a court

in the form of evidence rather than admissions and a plaintiff

formally rested, I can see that it is the most perfect case

in the world for saying, your Honor, there is no more

justiciable controversy here.   The Government has admitted the

rights that I asserted and for which I requested an affirmative

relief.   I have admitted that I am not attacking there, but

there is a quiet title proceeding, a streamwide adjudication.

Give me a red judicata judgment setting forth these rights,

at least, as against the United States.

Now, Mr. Veeder cited some law.   I looked up a little.

There is plenty of authority, and I confined myself to

California law quiet title as suggested by your Honor.   I

have not gone to the Federal cases.   There is ample authority

in California for the proposition that in a quiet title

proceeding the Court has the duty to render substantial

justice and make findings and enter a judgment that will

prevent unnecessary further litigation.   41 Cal. Jur. (2d)--

and there is an extensive section on that starting at page 505.

7926

B

Z4

1      Now, the leading case on proposition in California is Ridgeway

2   against Ridgeway, cited in 1949, 95 C.A.(2d) 46, at 50.

3           MR. VEEDER:  Just a moment, Franz.  95--

4           MR. SACHSE:  Cal.(2d) 46, at page 50, is the quote I

5   am about to read.  The language is as follows:

6               "In an action to quiet title even

7               though the defendant does not file a

8               cross-complaint or ask for any affirmative

9               relief, a decree declaring the defendant

10              has title and enjoining the plaintiff from

11              further setting up a claim thereto is a

12              proper form of judgment."

13      Now, that is even where I don't say anything.  If I

14   had simply filed a general denial, the Court would have had

15   this power.  But here, as I pointed out at the very outset, I

16   would like to go back to the pleadings themselves.  The plead-

17   ings themselves have got an issue between us.  Mr. Veeder's

18   pleading asks that the rights of each defendant each to the

19   other be determined.  My pleading asks that the Court adjudge

20   that these are gound waters.  Well, there is an issue.

21      Now, if we too, as to this defendant and this plaintiff

22   can stipulate then, I submit I am entitled to a judgment.  And

23   it amounts to no more than an agreement as to the facts of

24   the case.  There are many other cases that I am citing.

25      Now, I would like to take just a moment, directed more

nearly to your Honor's question about where do we go from here

and was Mr. Veeder ready to rest. And I certainly appreciate

his problem on the question of no pleadings. And I think he

is entitled to some assistance on that. But I would like to

tell you where I stand as relating to Fallbrook and these de-

fendants and what I would hope to be able to do timewise.

First, I expect tomorrow to lodge in behalf of Fallbrook

a number of exhibits which will be confined to title documents,

permits, decree and condemnation, and things of that kind. I

am trying to lodge them early, because some of them, I realize,

will involve rather careful study by the United States to

determine whether there have been severances of riparian rights,

and so on.

By Friday-- I checked this morning and the drafting of

the original maps and graphs is almost finished. And I would

hope by Friday to have them produced, copies available for

distribution to counsel, and the originals for lodging.

Now, however, I have these motions. A study of the

Federal Rules indicates that since they are motions made in

the course of trial they can be oral. But again, since in this

particular case it involves 54 or 55 defendants and 34 separate

answers, I am drafting a motion. I am not going to notice it,

because I don't know when to notice it. But I am going to have

a motion naming each of the people in whose behalf it is made

and with a memorandum attached to that so there will be in the

file something that will assist your Honor, and Mr. Luddy, at

a later time when we get around to making findings instead of

having to check our transcripts.  Furthermore, since there

are 34 answers-- and I am quite certain Mr. Veeder is not

going to want to reply without checking every one of those

answers out carefully-- and knowing the state of the pleadings,

I want to be able to give him something that he can check out.

And I can do that today.  I have that motion, not with its

complete memorandum of points yet, but I have the motion on

the defendants to whom it will apply ready.  It is undated,

because I had planned to date it when it is finished.

THE COURT:  The motion for what?

MR. SACHSE:  The motion for judgment on Rule 41b of the

Federal Rules, on the ground that there remains no further

justiciable issue at the close of the Plaintiff's case between

this plaintiff and this defendant.

MR. VEEDER:  May I inquire-- Excuse me for interrupting.

Does that include Fallbrook?

MR. SACHSE:  No, this is 34 individual answers relating

to 55 defendants, or it is 56 defendants.  Now, I will have

that ready.  I will also have a motion.  The motion itself is

extremely brief.  It is ready today in behalf of Fallbrook to

dismiss Count 21, a motion under Rule 41, that is, to dismiss

on the ground there has been no proof offered by the plaintiff.

I am drafting it.  It is not yet finished; a motion in behalf

of Fallbrook to dismiss under Rule 41, Count 22 of the complaint.  Those two are to dismiss.  Those are not motions for judgment that call for findings but straight dismissals.

Now, looking at the time, I told how close Fallbrook was to ready so that you can be sure I am not dragging my feet, I feel with all sincerity Mr. Veeder is going to want to check each one of these answers of these individual defendants.  He is going to want to check these pleadings I have generalized on.  And I feel that when the moment comes that he rests his case or says, "All right, somebody else take over," I would like to turn over these motions to him.  And if we aimed at putting Fallbrooks' case on starting with a witness in the box on the 18th of February, that would be two weeks from today,  I think we will be just about on the nose. That will give us time to argue these motions, and I think they are extremely serious; to discuss a few of the points that may be raised by objections to the Master's findings; and perhaps even more important, to discuss some of the points raised by our several answers to your Honor's fifteen questions, because Mr. Veeder's will be in by that time, too.

Now, one last word on this last matter, the fifteen questions:  Your Honor stated you have not yet seen Mr. Krieger's reply.  One thing is startling and interesting.  Your questions have produced a useful result in that there is at least one issue, and an important issue, where there is

3

298

1   absolutely no disagreement among anybody.  Mr. Krieger states

2   very flatly in his answers that he admits that ground waters

3   found in areas overlain by younger alluvium shall be regarded

4   as a part of the stream system.  Well, that would take care of

5   the Roripaugh well.  And if I had known that earlier, there

6   would be a great deal of pages of transcript that would have

7   been unnecessary.  Now, I have taken the same position.  The

8   State has taken the same position.  I am quite sure Mr. Veeder

9   isn't in any disagreement.  He is going to say it is part of

10  the stream system.  I haven't seen Mr. Stahlmans's, but I have

11  talked to him about it, and he says he agrees.  We have at

12  least found one matter that we are in accord on.

13      MR. VEEDER:  You mean we have agreed to disagree in

14  regard to those, is that right?

15      MR. SACHSE:  We have one where there is no disagreement.

16      MR. VEEDER: We are going to have litigation in regard

17  to those.

18      MR. SACHSE:  I am not following your question.  Please

19  let me finish and maybe you will understand what I am saying.

20      We have found in response to your Honor's questions

21  one issue of fact that doesn't take any more evidence; it

22  won't take any arguments; there won't be any ~~promise~~ problem to writing

23  in the findings.  Now, maybe when Mr. Veeder squarely faces

24  up to the problem posed by Question 15, we will find some more

25  areas of agreement.  And I think we owe it to ourselves, our-

selves, let alone the six or seven thousand litigants, to see

if we can't do that. I will assure you I will be ready to

roll even with the motions, everything, I think, can be

disposed of, with Fallbrook putting on its case starting

Tuesday the 10th. I think that is the day.

THE COURT: When is the Master's hearing?

MR. SACHSE: The 9th of February.

THE COURT: It is set for the 9th?

MR. SACHSE: Yes, your Honor. Or the 2nd of February

is the day for filing objections.

THE COURT: Yes. And to file your answer to the fifteen

questions?

MR. VEEDER: That is correct.

THE COURT: Are you going to have it ready by then?

MR. VEEDER: I have every reason to expect so.

MR. STAHLMAN: I might indicate my position. I just

have one page and a half that has to be done over, and Mr.

Swader says he would take over the job.

THE COURT: It would be your thought, Mr. Sachse, if

the Government rested shortly that you would file these

motions?

MR. SACHSE: I would file the motions immediately when

the Government rests. I would immediately get up, if that

happened today, and I would request your Honor to recess for

four or five days; because I don't think, in fairness to

Mr. Veeder-- and I am not being facetious--I don't think he should be asked to reply to motions that involve 34 different answers, and the words are not identical, without time to look them over.

THE COURT:  Probably argue the week of the 3rd?

MR. SACHSE:  The week of the 3rd.  That would be my thinking.

THE COURT:  And ready to go ahead on the 10th?

MR. SACHSE:  That would be my thinking, your Honor. Thatwould comply with all the rules for lodging.

THE COURT:  Are you going to be ready to rest today, Mr. Veeder?

MR. VEEDER:  I am not going to rest on the state of the record; I am going to talk to Mr. Krieger; and I am going to find out what the situation is.

Z17

1    There are points in issue that he is going to **raise**

2 in regard to these particular parcels that I would **have** to

3 know about. But my own thought on it-- and I am anxious to

4 get this show on the road-- even if we should not rest as of

5 today or tomorrow, I would like to have a date set for the

6 State and for Fallbrook to commence, because we have to plan

7 our schedule, and everyone has the same problem as I do.

8    THE COURT:  Fallbrook has indicated--

9    MR. VEEDER: Fallbrook is on the 10th; is that **right?**

10    THE COURT:  California has said that they could **start**

11 in the middle of February.

12    MR. SACHSE:  Your Honor, I want to make it clear that

13 I do not propose, without your Honor's directing me to do

14 so, to put on any evidence until I hear "Rest" out of the

15 United States.  I realize that your Honor has control of the

16 trial and of the order of proof and you can order us to put it

17 on out of order.  But I do not intend to do so.  I think it

18 would be an injustice to the defendants, and I believe if **we**

19 are required to do so it should be by direction of the Court,

20 and no misunderstanding that we are voluntarily putting on any

21 part of our case before the United States has completed its

22 case.

23    MR. VEEDER:  I am simply saying that the problem **with**

24 which we are confronted here stems, in part at least, from **the**

25 procedures that have been followed in the trial of the case.

1    I am extremely anxious to determine as soon as possible the

2    scheduling of Fallbrook and the State.  As I understand it,

3    the State says that it will be on for two weeks; is that

4    right?

5         MR. MOSKOVITZ:  A week to two weeks.

6         MR. VEEDER:  Mr. Stahlman?

7         MR. STAHLMAN:  We will follow.

8         THE COURT:  You are going to call Mr. Krieger this

9    noontime.  We will know more about these particular three

10   defendants.  But somewhere along the line you are going to

11   have to say, "This is the Government's case."

12        MR. VEEDER:  I have done that very frequently in my

13   life, your Honor, I have said "The Government rests." and

14   let the chips fall where they may.

15        THE COURT:  How long will you be today?

16        MR. VEEDER:  How long will you be on your cross-

17   examination?

18        MR. SACHSE:  I have relatively little more cross-

19   examination, except that Col. Bowen has certain material that

20   he was to bring us.

21        THE COURT:  We will take a short recess and then get

22   started on it.

23        MR. SACHSE:  Could we take a look at what he has during

24   the recess?

25        (Recess.)

1      MR. SACHSE:   Let the record show that Col. Bowen is

2  again staking the stand for cross-examination.

3

4              ALLEN C. BOWEN,

5  recalled as a witness in behalf of the People, having been

6  previously sworn, testified further as follows:

7

8              FURTHER CROSS-EXAMINATION

9  BY MR. SACHSE:

10     Q  Col. Bowen, in Friday's proceedings his Honor

11  suggested that possibly you could work out a faster method

12  of arriving at your findings as to the irrigable acreage

13  within Forest and public domain lands that had a riparian

14  status, any perennial or intermittent stream.  Have you

15  worked out such a table or formula?

16     A  Well, I have devised a method which may simplify

17  the approach to the question.

18     Q  I would like first then to consider the public

19  domain lands within the Cleveland National Forest, and I

20  would like to have you tell us which parcels of such land have

21  riparian status and how many acres in such parcels you find

22  to be irrigable?

23     MR. VEEDER:   I am going to object to that.  To begin

24  with, you have used the term "public domain," I believe, in

25  the Forest Service lands; secondly, you are asking the Colonel

1    to state what lands are riparian, which of course is a legal

2    conclusion.

3         MR. SACHSE:  On the public domain, let us clear that up.

4    I mean Bureau of Land Management lands.

5         MR. VEEDER:  Within the Forest Service?

6         MR. SACHSE:  No; Bureau of Land management outside the

7    Forest Service.

8         MR. VEEDER:  Bureau of Land Management properties?

9         MR. SACHSE:  Outside of National Forests.

10        MR. VEEDER:  Outside of National Forests.  And then

11   secondly, the only appropriate question that I could observe

12   would be the lands that are intersected by a stream that

13   abut upon the stream rather than the riparian question.

14        MR. SACHSE:  I will accept the modification.  Thank you.

15   I will rephrase the question.

16        Q  Colonel, can you tell us what lands you find among

17   the Bureau of Land Management lands outside the National

18   Forests which are traversed by or abut upon --

19        MR. VEEDER:  Or Overlie.

20        MR. SACHSE:  Not overlie yet.

21        Q  --a perennial or intermittent stream?

22        A  Yes, sir.

23        Q  Where do you want to begin?  According to how you

24   have your notes.  You start with wherever is most convenient.

25        A  May I refer to Plaintiff's Exhibit 1.

C

Z21

THE COURT:   What do you mean by Bureau of Land Management lands?

MR. VEEDER:   Those are the Tailor grazing lands, your Honor.

THE COURT:   Are those the lands in the public domain?

MR. VEEDER:   That is correct.

THE COURT:   Part of the 8,800 acres?

MR. VEEDER:   That is correct.

MR. SACHSE:   I used the term because Taylor grazing is too small.   They are not all Taylor grazing leases.   But they are all under the Bureau of Land Management's jurisdiction, as I understand it.   That is the way Mr. Veeder described it in his complaint.

MR. VEEDER:   That is right.

THE COURT:   They are lands in the public domain as contrasted with this small amount of land in the National Forest that are alleged to be irrigable.

MR. SACHSE:   That is correct.

THE COURT:   All right.

THE WITNESS:   We have designated those lands, your Honor, on Plaintiff's Exhibit 1 with a cross-hatching pattern in both directions, indicated in the legend here as "Public Domain," and using the Exhibit G of the Amendatory and supplementary complaint of the United States as an outline-- that gives a description of lands within the public domain

C

Z22

1    which are either within the Santa Margarita River watershed

2    or are traversed by the Santa Margarita River watershed line

3    and administered by the Bureau of Land Management, Department

4    of Interior-- I have selected photographs used as a base for

5    soil survey on the lands described in that Exhibit G just

6    mentioned.   From a study of those soil survey field sheets,

7    some of which are not completely checked, but which are present

8    in the Courthouse, I have made a determination as to which of

9    those lands are either overlying an alluvial plain or abut upon

10   a significant stream tributary to the Santa Margarita River

11   or its tributaries.

12        The first such parcel is--

13   BY MR. SACHSE:

14        Q  Colonel, before we take the individual parcels, may

15   I ask you a question or two about your determination.  You say

16   you have determined which of the lands overlie an alluvial

17   fill.  Is that determination based solely upon examination

18   of the photographs or upon visual observations on the ground?

19        A  In each of those instances, Mr. Sachse, I have had

20   soil surveyors on the ground making test holes with an auger

21   and other examinations in the performance of the soil survey.

22        Q  And your observations that you will give us as to

23   the character of the stream are they based also upon observations

24   that youhave made during your extensive investigations in the

25   area?

C

Z23

1    A  Yes, sir.

2    Q  Now, go ahead, please, with the very first one.

3    THE COURT:  Are these the ones that are marked in red,

4 Colonel?

5    THE WITNESS:  Yes, sir.

6    THE COURT:  Would you save some time-- well, let's find

7 out what happens.

8    MR. SACHSE:  May we say for the record to what you are

9 now referring?  You are referring to the first subdivision

10 within Exhibit G attached to Plaintiff's supplementary and

11 amendatory complaint, which is entitled "The following lands

12 in Township 6 South, Range 1 East, S.B.B.M."-- that is found

13 on page 64 of the amendatory complaint; is that right, Colonel?

14    A  Yes, sir.

15    Q  All right.  Now, go ahead.

16    A  Your Honor, on an enlarged print of vertical aerial

17 photograph 5-0141 --

18    THE COURT:  Is this in evidence?

19    THE WITNESS:  No, sir.  These are field sheets.

20    MR. SACHSE:  Your Honor, I asked him to produce the

21 field sheets.  I am not going to ask them to be introduced.

22 If the United States wants them in, they can put them in.  But

23 I want them only to refresh his recollection-- unless you want

24 them marked.

25    THE WITNESS:  This with others which I will refer to,

C

Z24

1   your Honor, are not yet completed.  As your Honor can see,

2   the entries are rough.  These are the rough field notes,

3   which will be recorded in India ink on the face of this

4   photograph in the drafting section.  They haven't been entirely

5   reviewed and checked at the moment.

6        But this aerial photograph enlargement of vertical

7   aerial photograph 5-0141 contains a portion of the Bureau

8   of Land Management lands that are in Section 36, Township 6

9   South, Range 1 East.  The BLM interest is particularly in

10  the Southeast Quarter of the Southwest Quarter, the East Half

11  of the East Half of the Southeast Quarter, and the East Half

12  of the Southeast Quarter of the Northeast Quarter.  The soil

13  survey field notes indicate that within the Southeast Quarter

14  of the Southwest Quarter of this section there are Class II

15  and III lands which adjoin the stream or the drainage trending

16  southerly in the area known as Redd Valley.  Reed Valley

17  appears upon Plaintiff's Exhibit 15.  The stream draining

18  Reed Valley is intermittent in character.

19  BY MR. SACHSE:

20       Q  By that do you mean flowing only during and after

21  periods of precipitation and runoff?

22       A  Yes, sir.

23       Q  How many acres of total acreage of irrigable land

24  did you find in that block of Bureau of Land Management Lands?

25       A  There are 31 acres of irrigable land in that

7941

C

Z25

1    particular section 36, 6 South, 1 East.

2         THE COURT:  Does the Government own all of Section 36?

3         THE WITNESS:  No, sir.  It owns only the portions that

4    I described, namely, the Southeast Quarter of the Southwest

5    Quarter, the East Half of the East Half of the Southeast Quarter,

6    and the East Half of the Southeast Quarter of the Northeast

7    Quarter.  That is the same description as appears in Exhibit

8    G of the Amendatory and Supplementary Complaint.

9         THE COURT:  Of those three different areas within that

10   section, leaving out the question now of irrigable ground,

11   are all three of those portions of the sections on a stream

12   or over alluvium?

13        THE WITNESS:  No, sir.  Only the 40-acre parcel, which

14   is the Southeast Quarter of the Southwest Quarter of Section

15   36, Range 6 South, 1 East.

16   BY MR. SACHSE:

17        Q  That is the only portion of that that abuts upon a

18   stream?

19        A  Yes, sir.

20        THE COURT:  And it is only a portion of that 40 acres

21   that is irrigable?

22        THE WITNESS:  Yes, sir.

23   BY MR. SACHSE:

24        Q  How much is irrigable in that 40?

25        A  Your Honor, my present breakdown only shows the

1    irrigable land within the section and doesn't break it down

2    to where there are separate parcels within the section, as

3    exists in this instance.

4             THE COURT:  I don't think we are prepared to go

5    through these sheets at this time.

6             MR. SACHSE:  I don't either, your Honor.

7             THE COURT:  First, the work hasn't been completed.

8    They are rough notes.  They are going to be put in, in India

9    ink.  Secondly, there is no sense of making calculations of

10   the ground that might be irrigable where it is not in a

11   section or a portion of a section which abuts on a stream or

12   lies over an alluvial wash.

13            MR. SACHSE:  I am willing to drop this examination,

14   again with the understanding that the United States will as

15   soon as possible advise us when they have it done.

16            Calculate out those sections, and by section I don't

17   mean 640 acres-- those areas of Forest and Bureau of Land

18   Management lands which abut upon or are traversed by a stream,

19   the character of the stream, and the irrigable areage within

20   each of those parcels, and also the alluvium or ground water

21   status of those parcels.

22            THE COURT:  I think we can save a lot of time if the

23   Colonel would prepare it in the form of an exhibit.  He has

24   already gone through and picked out from Exhibit G to the

25   amendatory complaint the general description of where this

C

Z27

1   land might appear.  There is further work to be done.  I

2   think the Colonel could well prepare an exhibit on this which

3   would describe and key it to these particular maps and then

4   let the exhibit be inspected by counsel and you probably

5   would have very little cross-examination on it.  The Colonel

6   could pick out and describe the particular areas and demark

7   them on these sheets and key his summary of the matter right

8   to these exhibits that you can use as an exhibit.  Then we

9   will all know what it is.  And if after inspection somebody

10  wants to cross-examine, all right.  The chances are, I would

11  guess, that the Colonel is familiar enough with this type of

12  work that there would probably be very little cross-examination.

13        MR. VEEDER: We will do that, your Honor.

14        MR. SACHSE:  That will be very satisfactory.

15        THE COURT:  Do you have in mind what I want, Colonel?

16        THE WITNESS:  Yes, sir, I understand perfectly.

17        THE COURT:  Almost a narrative statement, but tie it

18  in with the picture and with your exhibit, setting forth the

19  particular description and probably marking them on the page

20  so we will know which ones come withinthat category.

21        THE WITNESS:  Yes, sir.

22        THE COURT:  All right.

23  BY MR. SACHSE:

24        Q  Colonel, I also asked you to prepare a breakdown

25  of the irrigable acreages and water duties for the Government's

7944

C

Z28

1   lands within the Naval Ammunition Depot as distinct from those

2   within the rest of Camp Pendleton.   Have you done that?

3          A   Yes, sir.

4          Q   Is that in tabular or exhibit form that we can look

5   at?

6          A   I have prepared a tabulation, one showing the land

7   utilization acreage for the Naval Ammunition Depot by sections

8   and by crops.   The tabulation appears on two pages.   The second

9   tabulation is the irrigable acreage and applied water duty

10  in acre feet per year for the Naval Ammunition Depot in which

11  the acreage of crops adapted in particular sections is noted,

12  the applied duty of water is indicated, and summed up on page

13  2 of the water duty tabulation.

14         Q   First, please, the totals.   What do you find to be

15  the total acreage of irrigable land which is within the Naval

16  Ammunition Depot?

17         A   The total acreage of irrigable land within the

18  Naval Ammunition Depot, part of the Naval enclave of Camp

19  Pendleton-- that is, the total irrigable acreage within the

20  Santa Margarita watershed--

21         Q   Yes.

22         A   --is 4858 acres.

23         Q   And as I understand it, you have broken that acreage

24  down into several types of crops that you found most suitable

25  and applied the appropriate water duty to each crop and have

C

Z29

1      thus come up with a total water duty for that irrigable acreage;

2      is that right?

3              A  Yes.

4              Q  What is that total?

5              A  The total of applied water duty for the irrigable

6      acreage within the Santa Margarita River watershed portion

7      of the Naval Ammunition Depot is 12,380 acre feet per annum.

8              MR. SACHSE:  May I ask, do you intend to introduce

9      these tabulations, Mr. Veeder?  If you don't, I would like to.

10             MR. VEEDER:  I will have them marked.

11             MR. SACHSE:  Could you have a copy made?

12             MR. VEEDER:  Yes.

13             THE COURT:  You don't have copies yet?

14             THE WITNESS:  No, sir.

15             MR. SACHSE:  If it goes in evidence and the copies are

16     distributed, that will terminate the cross-examination, your

17     Honor.

18             THE COURT:  These are copies?  Where is the original?

19             THE WITNESS:  The original is either here or at Camp

20     Pendleton, your Honor.  I am not certain at the moment.  I

21     could have the original here in very short order, your Honor.

22             THECOURT:  What shall we do?  Mark these as Government's

23     exhibits and then have copies?

24             MR. VEEDER:  It would suit me, your Honor.  We could

25     have that marked.

C

Z30

1      Mr. Clerk, would you mark that as Government's Exhibit

2  153.

3      THE COURT:  Which one would be Exhibit 153?  There are

4  two different exhibits there.

5      MR. VEEDER:  This is the irrigable land.

6      THE COURT:  Let the Colonel see them.

7      MR. VEEDER:  (Handing document to the witness)  NAD

8  irrigable land and duty of water.

9      THE WITNESS:  I think the first one, your Honor, should

10  be the Schedule A.

11      THE COURT:  Let's have the other one.

12      Describe A.  What you call now A will become Exhibit 153.

13  Tell us what it is.

14      THE WITNESS:  That is a tabulation, your Honor, entitled

15  "Naval Ammunition Depot (abbreviated to N.A.D.) Land Utiliza-

16  tion Acreage," and it is comprised of two pages, the first

17  page giving the irrigable acreage within the Township 9 South,

18  Range 4 West, the second page giving the irrigable acreage

19  within Township 10 South, Range 4 West, and also the totals

20  for the entire area of the Depot within the Santa Margarita

21  River watershed.

22      THE COURT:  It will be marked Plaintiff's Exhibit 153 for

23  Identification.

24      Any objection to receiving it in evidence?

25      MR. SACHSE:  No objection, your Honor.

1      THE COURT:  It is received in evidence.

2      Describe the next one for us, Plaintiff's Exhibit 154.

3      THE WITNESS:  Plaintiff's Exhibit 154, your Honor, is

4  a tabulation on two pages, which is entitled "Naval Ammunition

5  Depot (abbreviated N.A.D.) Irrigable Acreage and Water Duty

6  Acre Feet Per Annum."  The first page shows the tabulation

7  of crops and applied duties within Township 9 South, Range 4

8  West.  The second page shows the same information in Town-

9  ship 10 South, range 4 West, as well as the totals for both

10  pages.

11      THE COURT:  Is it offered in evidence?

12      MR. VEEDER:  That is right, your Honor.

13      MR. SACHSE:  No objection.

14      THE COURT:  Received in evidence as Government's

15  Exhibit 154.

16      (Plaintiff's Exhibits 154 and 153 were marked for

17  identification and received in evidence.)

18      THE COURT:  You will make copies and supply us with

19  them?

20      THE WITNESS:  Yes, sir.

21  BY MR. SACHSE:

22      Q  Colonel, I had one other question that I left with

23  you Friday, and that was, could you supply us with the water

24  deliveries from Camp Pendleton to the Naval Ammunition Depot

25  during the times that the supply from their gallery was

C

Z32

1    inadequate?

2         A  Yes, sir.

3         Q  Is that in any tabular form, or would you like to

4    read it into the record?

5         A  Do you want it by month or just the annual total?

6         Q  Annual total would be sufficient for my purpose,

7    unless somebody wants more.

8         THE COURT:  What is this?

9         MR. SACHSE:  These are deliveries to the Naval

10   Ammunition Depot from the De Luz well on Camp Pendleton.

11        Q  When do they commence?

12        A  They commence in 1952, Mr. Sachse.

13        Q  What month?

14        A September.

15        Q  And could you give us the balance of the 1952

16   calendar year?

17        A  Yes, sir.  The totals I have are by water years,

18   but I can give you--

19        Q  Do it by water years.  In other words, it will be

20   from September, 1952, through--

21        A  The first year will be water year 1951-52.  So

22   September will be the last month of the water year.

23        Q  Yes.

24        A  I might describe this well for the record more

25   particularly.  It has been referred to as the De Luz well.

C

Z33

1    Using the Cadastral Grid Index-- that is 9/4-29L1-- as I have

2    previously testified, it is located at the confluence of De

3    Luz Creek and the Santa Margarita River within the exterior

4    boundaries of Camp Pendleton.

5        MR. VEEDER:  This is all testified to by Mr. McNurtry,

6    called earlier.  So we can hear this back to his testimony.

7        THE COURT:  Go ahead.

8        THE WITNESS:  Water year 1951-52, 2 acre feet pumped

9    from the De Luz well for Naval Ammunition Depot.

10   BY MR. SACHSE:

11       Q  1952-53, please?

12       A  1952-53, 22 acre reet.

13       Q  1953-54, please.

14       A  1953-54, 10 acre feet.

15       Q  The next year, please?

16       A  1954-55, 10 acre feet.

17          1955-56, .34 acre feet.

18       Q  .34?

19       A  .34; yes, sir.

20       Q  Anything else?

21       A  1956-57, 16 acre feet.

22          And 1957-58, 17 acre feet.

23          And in October, 1958, which is the beginning of

24   water year 1958-59, 11 acre feet were pumped.

25       THE COURT:  You have rounded off the decimals to give

us even acre feet?

THE WITNESS:  Yes, sir.

THE COURT:  I can see from the chart you were using.

THE WITNESS:  Yes, sir.

MR. SACHSE:  Thank you, Colonel.

Now, I have a few more questions on military use in Camp Pendleton, Colonel.

Q  In answering Mr. Veeder's question and my voir dire question, I understand that in testifying as to the amount of water used for military purposes you excluded the agricultural uses on Stuart Mesa and South Coast Mesa?

A  Yes, sir.

Q  And do I understand that you excluded the evaporation loss from Lake O'Neill?

A  Yes, sir.  The figures I gave for military use was water actually pumped from wells for those military purposes I described.

Q  Those waters are used for general barracks purposes, are they not?

A  Yes, sir; Marine housekeeping, and of course for the family units that are resident on Camp Pendleton.

Q  They are used for fire protection?

A  Yes, sir.

Q  Sewer system?

A  Yes, sir.  A sewer system wouldn't operate without

1    water.

2    Q  I just want to spell out the types of uses, Colonel.

3    A  Yes, sir.

4    Q  That's all I am after.  Do you have schools on Camp

5    Pendleton?

6    A  Yes, sir; we have two schools presently in operation

7    on Camp Pendleton.

8    THE COURT:  You make it sound like a city.

9    MR. VEEDER:  Yes, he is working real hard on this

10   municipal pitch, your Honor.

11   BY MR. SACHSE:

12   Q  Do you have stores on Camp Pendleton-- post exchanges?

13   A  There are several kinds of stores.  Do you mean

14   military stores or where one can buy merchandise?

15   Q  Where one can purchase merchandise.

16   A  Yes, sir.

17   Q  The equivalent of a super-market?

18   A  Yes, sir.  Our Commissary Officer takes great pride in

19   his super-market.

20   THE COURT:  A service station where you can get water

21   for radiators?

22   THE WITNESS:  Yes, sir.

23   BY MR. SACHSE:

24   Q  Toyland?

25   A  Yes, sir.

C

Z36

1    THE COURT:  Toyland?

2    MR. SACHSE: Toyland.

3    THE COURT:  What is that?

4    MR. SACHSE:  Where they sell toys to children.

5    Q  Hardware store?

6    A  Yes, sir.

7    Q  Drug stores and notions?

8    MR. VEEDER:  Mr. Sachse, you are going to run this

9  into the ground.  We will agree that we have a tremendous

10  military establishment out there and that we provide all the

11  needs of all the personnel and that they all use water.  That

12  is a military use, your Honor.  Mr. Sachse would like to get

13  this funny little town of Fallbrook into the same category as

14  Camp Pendleton.  He can't.  Because it is a military use to

15  support and take care of all these people.

16    MR. SACHSE:  I haven't heard any objection yet.

17    THE COURT:  No, I haven't.  Go ahead, Mr. Sachse.

18    MR. VEEDER:  I just wanted to blanket him before he

19  started.

20  BY MR. SACHSE:

21    Q  You have a facility where you rent rooms to guests,

22  do you not, analogous to a hotel?

23    A  Yes, sir.

24    Q  You have drug stores and notion counters, don't you?

25    A  Yes, sir.

C.

Z37

1          Q   Hospitals and dispensaries?

2          A   Yes, sir.

3          Q   You have recreational facilities such as boating,

4   fishing, picnic grounds?

5          MR. VEEDER:   Horseback riding.

6          THE WITNESS:   Yes, sir.

7   BY MR. SACHSE:

8          Q   Athletic fields?

9          MR. VEEDER:   Golf courses.

10          THE WITNESS:   Yes, sir.

11          MR. SACHSE:   Your Honor, I request that Mr. Veeder

12   be instructed to keep still until I finish my examination.

13          MR. VEEDER:   I am doing all I can for the man.

14          THE COURT:   All right, we will save time, Mr. Veeder,

15   if you will let Mr. Sachse complete his examination.  He is

16   counsel for Fallbrook.

17   BY MR. SACHSE:

18          Q   Motion pictures?

19          A   Yes, sir.

20          Q   Laundry?

21          A   Yes, sir.

22          Q   Dry-cleaning establishment?

23          A   Yes, sir.

24          Q   Lawns and gardens?

25          A   Yes, sir.

Q   Residences occupied by non-military personnel?

A   Yes, sir.

D
Z11

1    Q   The answer was yes, was it not?

2    A   Yes, sir.

3    Q   Residences occupied by military personnel and their

4    dependents?

5    A   Yes, sir.

6    Q   Industrial activities employing commuters, civilian

7    commuters?

8    A   Yes, sir.

9    Q   Can you think of any facilities, Col. Bowen,

10   available to a resident of Fallbrook or Escondido, let us say,

11   which is not also available to a resident of Camp Pendleton?

12   THE COURT:   I think of one:   Attorneys at law with

13   offices.

14   BY MR. SACHSE:

15   Q   All right.   You provide a legal aid service, do you

16   not, for your personnel on Camp Pendleton under the terms of

17   the Uniform Code of Military Justice; is that not a fact,

18   Colonel?

19   A   Yes, sir; I believe that is a fact.

20   Q   Can you think of any facility that is available to

21   a resident of Fallbrook or Escondido which is not also avail-

22   able to a resident of Camp Pendleton?

23   A   Yes, sir.

24   THE COURT:   One thing is evident.

25   MR. VEEDER:   Wait a minute, your Honor.   The Colonel

D

Z12

1   just came up with one.

2           THE COURT:  I am thinking of the same one.

3           MR. SACHSE:  I haven't asked the Colonel.

4           MR. STAHLMAN:  Which one is this?

5           THE WITNESS:  Well, one that occurs to me at the moment

6   is the sale of automobiles, Mr. Sachse, and large appliances.

7   The Marine Corps exchanges no longer can handle items that are

8   over a certain value.  And for those large items we go out-

9   side the Fallbrook or Escondido area.

10  BY MR. SACHSE:

11          Q  So you couldn't sell me a tractor if I were eligible

12  to get onto Camp Pendleton, either?

13          Can you think of any services or facilities that

14  are available--

15          MR. VEEDER:  I am going to object to this, your Honor.

16  The witness is not qualified to be able to, nor should he be

17  asked to think of all the nefarious things that go on in

18  Fallbrook and try to apply them to Camp Pendleton.  We know

19  the point that he is making.

20          THE COURT:  We have got enough, but I think a couple

21  more: for instance, in Escondido there are card parlors where

22  you can go in and play certain kinds of card games.

23  BY MR. SACHSE:

24          Q  You have clubs on Camp Pendleton, do you not,

25  Colonel, officers and enlisted men's clubs?

MALCOLM E. LOVE, OFFICAL REPORTER

D

Z13

1    THE COURT:  I am not talking about clubs.  I mean

2  actual card parlors where there is a game in progress and

3  the parlor takes a certain percentage of the game, card games.

4  BY MR. SACHSE:

5       Q  Have you ever encountered a similar situation to

6  that described by his Honor in barracks on the military

7  reservation?

8       MR. VEEDER:  I am going to object.  It is going too

9  far now.

10       THE WITNESS:  No, sir.  His Honor is mentioning those

11  legal card games.

12       MR. VEEDER:  I think that we are perfectly willing

13  to agree as to the kind and type of facilities and uses of

14  water on Camp Pendleton, that they are the things that are

15  required for a military base.

16       MR. SACHSE:  You can relax, Mr. Veeder.  I am satisfied

17  now.

18       Q  Now, I have just one or two more questions, Colonel.

19  Mr. Luddy, can I have 67, 69, and 70, please.

20       I want to just finish the section on the watershed that

21  you described on your aerial photograph series, 78 series

22  below the Narrows.

23       THE CLERK:  67, 69, 70?

24       MR. SACHSE:  Yes, please.

25       THE COURT:  We have got a counsel in attendance here

D

Z14

1  who is interested in that.

2      MR. SACHSE:  Yes, I observe him in the back of the

3  courtroom, your Honor.

4      THE COURT:  You should make yourself known here if

5  you have appeared in this case.  Your name is Lincoln?

6      MR. LINCOLN:  I am here, your Honor.

7      THE COURT:  And your name is what?

8      MR. LINCOLN:  Lincoln.

9      THE COURT:  What is your full name?

10      MR. LINCOLN:  Walter Gould Lincoln.

11      THE COURT:  Let the record show he is in attendance

12  today and has been for several days past.  You may be seated.

13  We are just now to a part of the case that might concern you,

14  and I think the record should show your presence.

15      MR. STAHLMAN:  I think Mr. Lincoln ought to come up

16  here and sit with us.

17      THE COURT:  You are welcome to have a seat up at the

18  table, Mr. Lincoln.

19      MR. VEEDER:  We can have him right across here.

20      THE COURT:  It is already bought and paid for by these

21  counsel.

22  BY MR. SACHSE:

23      Q  I am handing you 78T series, Colonel.  Is that the

24  one that has the appropriate photographs in it for that section

25  of the river below the gorge?

D

Z15

1      A   Yes, sir.

2      Q   Directing your attention to photograph-- well, I am

3  not sure which one it is-- 78T2, perhaps.   That shows Stone

4  Creek?

5      A   Yes, sir.

6      Q   Can you locate Stone Creek for us on United States

7  Exhibit 70?

8      A   Stone Creek appears on Plaintiff's Exhibit No. 70,

9  although not so labeled, as arising in Sections 35 and 36,

10  Township 8 South, Range 3 West, plying westerly through

11  Section 34, 8 South, 3 West; thence southwesterly through

12  Sections 3 and 4, 9 South, 3 West, to its confluence with the

13  Santa Margarita River, which is in the Northeast Quarter of

14  Section 4, Township 9 South, Range 3 West.

15      Q   Are you familiar with the characteristics of surface

16  flow of that stream, Colonel?

17      A   Yes, sir.

18      Q   How would you describe it?

19      A   Intermittent.

20      Q   Flowing only during and after periods of heavy

21  precipitation and runoff?

22      A   Yes, sir.

23      Q   You also are familiar with the geologic structures

24  and formations in that area, are you not?

25      A   Yes.

1          MR. VEEDER:  I object.  It goes beyond the scope of the

2   direct examination.

3          THE COURT:  If he is familiar, he may answer.

4   BY MR. SACHSE:

5          Q  In fact, Government's Exhibit 70 indicates it was

6   prepared under your supervision, was it not?

7          A  Yes, sir.

8          Q  Then am I correct in stating that with the ex-

9   ception of a narrow strip of alluvium in Section 34, 8 South,

10  3 West, which continues through Sections 3 and 4, 9 South,

11  3 West, the entire stream flows through basement complex or

12  residuum?

13         THE COURT:  Stone Canyon you are talking about?

14         MR. SACHSE:  Stone Creek, yes, sir.

15         THE COURT: Stone Creek.  All right.

16         THE WITNESS:  Yes, sir.  The stream drains the water-

17  shed comprised of basement complex or residuum, as shown on

18  Plaintiff's Exhibit 70, with the exception of the small finger

19  of alluvium you have described.

20  BY MR. SACHSE:

21         Q  And what is your opinion of the character of the

22  ground waters found in that stream system other than under-

23  lying the finger of alluvium?

24         A  It is my opinion that those ground waters, if any,

25  are vagrant, percolating, not a part of any defined stream

D

Z17

basin or subbasin.

Q  Moving on downstream, Colonel, the next tributary of the river is indicated by name on 70 as Rainbow Creek. That is its correct delination, is it not?

A  Yes, sir.

Q  I observe that Rainbow Creek has a rather substantial little valley or basin of alluvium, in fact, two of them, in its upper reaches, and two very small fingers of alluvium in its lower reaches; is my description correct?

A  Yes, sir.

Q  With the exception of those fingers of alluvium and alluvial basins I have just described, how do you characterize the ground waters in Rainbow Creek drainage?

MR. VEEDER:  Now, just a moment.  I want to be sure we have this straight.  To what areas are you referring the Colonel?

MR. SACHSE:  Rainbow Creek drainage.

THE COURT:  Drainage of Rainbow Creek except this--

MR. VEEDER:  These two areas here marked Qal?

THE COURT:  Upstream, the large area, and one not quite so large, and two somewhat small ones downstream.

THE WITNESS:  It might be helpful if I give the sections in which these alluvial filled valleys appear in part as shown on Plaintiff's Exhibit 70.  Rainbow Creek rises in the mountainous area contained partly in Sections 4, 5 and 6, 9

D

Z18

1  South, 2 West, and partly in Sections 30, 31 and 32, 8 South,

2  2 West; draining westerly and southerly to confluence of

3  Rainbow Creek with the Santa Margarita River in Section 8, 9

4  South, 3 West.  The valleys over which Rainbow Creek or

5  tributaries to the creek flow, valleys which contain alluvium

6  over which the creek flows when it flows, are contained in

7  part in Sections 30 and 31, 8 South, 2 West, Section 36, 8

8  South, 3 West, and Sections 6 and 7, 9 South, 2 West; Section

9  1, 11, and 12, 9 South, 3 West.  Now, those are the principal

10  alluvial valleys, and then the minor fingers of alluvium

11  referred to by Mr. Sachse along the lower reach of Rainbow

12  Creek lie in part in Sections 8, 9 and 10, 9 South, 3 West.

13  BY MR. SACHSE:

14      Q  Colonel, in describing those alluvial areas you have

15  reference to Government's Exhibit 70?  Did you not?

16      A  Yes, sir.

17      Q  And the areas delineated in yellow as alluvium,

18  Qal, on Government's Exhibit 70 are the same areas you just

19  described?

20      A  Yes, sir.

21      Q  Now, aside from those areas of alluvium how do you

22  characterize the ground waters within that drainage?

23      MR. VEEDER:  I renew my objection.  It goes beyond the

24  scope of the direct examination.

25      THE COURT:  Overruled.

D

Z18

1    THE WITNESS:  In my opinion that, aside from those

2  areas containing alluvium within the watershed of Rainbow

3  Creek, as shown on Plaintiff's Exhibit 70, ground waters are

4  vagrant, percolating, not a part of any stream system or basin

5  or subbasin.

6  BY MR. SACHSE:

7    Q  Colonel, I didn't ask you about the surface

8  characteristics of Rainbow Creek.  What are they?

9    A  Intermittent.

10    Q  Flowing principally during and after periods of

11  precipitation and runoff?

12    A  Yes, sir.

13    Q  Now, Colonel, there are--

14    THE COURT:  This is a good place to stop?

15    MR. SACHSE:  Yes, your Honor, although it is very

16  little more.  I can either finish it now or do it right after

17  lunch.

18    THE COURT:  Do it right after lunch.  I have a luncheon

19  engagement.  Take a recess until 2 o'clock.

20    (Noon recess.)

21

22

23

24

25

E
Z39

SAN DIEGO, CALIFORNIA, TUESDAY, JANUARY 27, 1959.  2:00 P.M.

(Another matter.)

THE CLERK:  No. 2, case on trial, 1247-SD-C, United States of America vs. Fallbrook Public Utility District, et al.

MR. STAHLMAN:  Your Honor, I will hand you the Vail Company's responses to the fifteen points.  That is the original.  Here is your Honor's copy.

THE COURT:  All right.

File it, Mr. Clerk.


ALLEN C. BOWEN,

recalled as a witness in behalf of the plaintiff, having been previously sworn, testified further as follows:


CROSS-EXAMINATION (Resumed)

BY MR. SACHSE:

Q  Col. Bowen, we had finished covering Rainbow Creek drainage as delineated on Government's Exhibit 70.

I now wish to direct your attentionn to the drainage area shown on Exhibit 70 as lying northerly and easterly of the confluence of Rainbow Creek and the Santa Margarita River. Do you see the drainage area to which I refer?

A  Yes, sir.

Q   Perhaps you could locate the section for us on which the confluence takes place.

THE COURT:   Wasn't that the area that the first creek ran into?

MR. SACHSE:   That was the area that the first creek ran into, but I am covering the entire drainage area now, your Honor.

THE WITNESS:   The confluence of Rainbow Creek with the Santa Margarita River is in the Northeast Quarter of Section 8, Township 9 South, Range 3 West.

BY MR. SACHSE:

Q   And Exhibit 70 does delineate the subdrainage area lying northerly and easterly of that point, does it not?

A   Yes.

Q   We have already discussed the Stone Creek drainage which lies in that area?

A   Yes.

Q   I will eliminate the Stone Creek drainage area from these questions.

I observe that the only areas of alluvium shown in that section of the drainage on Exhibit 70 is a strip of alluvium lying along the bed of the Santa Margarita River interrupted at various points where the stream flows over basement complex.   Does that conform to your observations of the stream?

A   Yes, sir, with the exception of that finger of

1    alluvium on Stone Creek which you have referred to.

2         Q  Can you describe the character of the river itself

3    in that reach of the stream?

4         MR. VEEDER:  Speaking of the main river?

5         MR. SACHSE:  Speaking of the main river, the Santa

6    Margarita River, yes.

7         THE WITNESS:  The reach of the stream of the Santa

8    Margarita flowing from the confluence of Murrieta Creek and

9    Temecula Creek down to the confluence of Rainbow Creek with

10   the Santa Margarita River is that of a perennial stream.

11   BY MR. SACHSE:

12        Q  I observe in the same section shown on Exhibit 70

13   a great many intermittent stream symbols.  Are you familiar

14   with the character of surface runoff of those streams?

15        A  Yes, sir.

16        Q  Can you tell us what they are?

17        A  Those streams indicated by the intermittent symbols

18   as shown on Plaintiff's Exhibit 70 in the drainage of the Santa

19   Margarita between the confluence of Murrieta Creek and Temecula

20   Creek and down to the confluence of Rainbow Creek with the

21   Santa Margarita River are intermittent in character.  The only

22   perennial stream in that reach is the Santa Margarita River

23   itself.

24        Q  And the intermittent streams youhave just referred

25   to would be such as flow only during and after periods of

E

Z42

1    precipitation and runoff?

2        A  Yes.

3        Q  How would you characterize the ground waters under-

4    lying those intermittent streams?

5        A  I would characterize the ground waters underlying

6    those intermittent streams just referred to as being vagrant,

7    percolating and not part of any defined stream basin or sub-

8    basin.

9        Q  But you would characterize, as I understand it, the

10   ground waters underlying areas of younger alluvium shown in

11   that section of the watershed as part of a stream system; is

12   that correct?

13       A  Yes, sir.

14       Q  Moving to the next subdrainage area--

15       THE COURT:  Mr. Lincoln, Mr. Sachse just made your case

16   now.  I understand your clients own land on either side of

17   the Santa Margarita?

18       MR. LINCOLN:  Yes, your Honor.

19       THE COURT:  The upper reaches thereof, below the

20   confluence of the Murrieta Creek and the Temecula Creek.  What

21   is your client's name?

22       MR. LINCOLN:  Really, we are ten trustees under the

23   Will of Morrie Schlaus, deceased, in Riverside County, and we

24   carry on our business and have the title of the property in

25   the name of the trustees jointly.

1          THE COURT:  You have made an appearance for them?

2          MR. LINCOLN:  Yes, your Honor, I have; I filed an

3    answer sometime ago.

4          THE COURT:  How many acres along the stream are owned

5    there, approximately?

6          MR. LINCOLN:  Approximately between 1500 and 1800

7    acres, which we respectfully consider are riparian to the

8    stream.

9          THE COURT: All acquired at one time?

10          MR. LINCOLN:  No, your Honor, they were not. They

11   were acquired at various times by Morrie Schlaus, beginning

12   with the year of about 1922.  Some portionsof it were

13   acquired by him and his friends directly from the Federal

14   Government, and other portions were acquired by him by

15   purchase from settlers who had been there for thirty or

16   forty years prior to his purchase.

17          THE COURT:  You probably will have to come in at some-

18   time and get into the specific titles and produce your deeds

19   or evidence of title and the date of acquisition, so we may

20   determine whether all or part of this land is riparian.

21          MR. LINCOLN:  Yes, your Honor, I am prepared to do that.

22          THE COURT:  All right.

23          MR. VEEDER:  I would like to bring your Honor's atten-

24   tion to the fact that the stipulated judgment of December,

25   1940 embraces these lands.

1      THE COURT:  You were a party to this judgment?

2      MR. LINCOLN:  We were parties to the original judgment,

3  your Honor, but we did not appeal from the original judgment.

4  The only portion of the judgment which describes any rights

5  which we may have had pertains solely to Stone Creek, from

6  which we were given five inches of water.

7      THE COURT:  You were parties to the original judgment,

8  but after the reversal you did not enter into the stipulation

9  of the new judgment?

10     MR. LINCOLN:  That is correct, your Honor.

11     THE COURT:  But by virtue of the stipulation of other

12  parties, you were accorded, as it were, five inches in Stone

13  Creek?

14     MR. LINCOLN:  That is as I understand it, your Honor.

15     THE COURT:  We will have to check this all out later.

16  Thank you very much.

17     MR. VEEDER:  I wanted to have this in the record,

18  however, because I wanted to be sure that these matters are

19  not ignored.

20     MR. STAHLMAN:  There is also another piece of property.

21  I don't know who the original owner was, but I think the present

22  owner is Henderson.  That is in the same position; is that

23  correct?

24     THE COURT:  Well, we will have to check it out later.

25     MR. LINCOLN:  Thank you, your Honor.

E
Z45

1   BY MR. SACHSE:

2       Q  Col. Bowen, I will direct your attention to the next

3   subdrainage area shown on Plaintiff's Exhibit 70, which lies

4   easterly of the Sandia Creek drainage delineated on Exhibit

5   69; am I correct?

6       MR. VEEDER:  Would you point that out, please?

7       THE WITNESS:  Yes, sir.  That is the minor subdrainage

8   that flows directly into the Santa Margarita River, arising

9   partly in Sections 31 and 32, 8 South, 3 West, and flowing

10  southerly through portions of Sections 5, 6, 7 and 8, 9 South,

11  3 West.

12  BY MR. SACHSE:

13      Q  I observe that the only area of younger alluvium

14  shown in that subdrainage is the younger alluvium along the

15  thread of the Santa Margarita River; is that correct?

16      A  Yes, sir.

17      Q  And would you describe the Santa Margarita River in

18  that reach the same as you did above-- that is, a perennial

19  stream?

20      A  Yes, sir.

21      Q  Would your testimony be that the ground waters within

22  the younger alluvium are a part of the stream?

23      A  Yes, sir.

24      Q  Will you characterize the type of flow of the inter-

25  mittent streams shown in that section of the watershed?

A   The intermittent streams shown in that section of the watershed just described flow only during and immediately after periods of high precipitation and runoff.

Q   And how would you characterize the ground waters in that section of the watershed?

A   The ground waters in the basement complex and residuum, excluding the Recent alluvium along the Santa Margarita River, are in my opinion vagrant, percolating, not part of the stream system.

Q   Now, moving immediately south of that section of the drainage, I observe intermittent streams flowing northward into the Santa Margarita River.  Will you identify that section for us, please, by section and range?

A   Yes, sir.  That is southerly of the Santa Margarita River.  The intermittent streams, minor tributaries, flow northerly from Sections 17 and 18 to the confluence with the Santa Margarita River in Sections 7 and 8, all in 9 South, 3 West.

Q   And again would you characterize those streams as being intermittent, flowing only during and after periods of precipitation and runoff?

A   Yes, sir.

Q   I am eliminating the Santa Margarita River from my characterization.

A   Yes, sir.

E.

Z47

1    Q   And you would characterize the ground waters in that

2    area as vagrant, local, percolating, not a part of the stream

3    system?

4        A   Yes, sir.   I believe I have so characterized them

5    already before the Master.

6        Q   Your testimony before the Master also covered that

7    section of the drainage--

8        MR. VEEDER:   That is objected to as being beyond the

9    scope of the direct examination here.   Certainly what went on

10   before the Master--

11       MR. SACHSE:   I want to clarify what he has and what he

12   has not, if I may.

13       MR. VEEDER:   I don't believe it is proper cross-

14   examination.

15       MR. SACHSE:   I will ask him to go through it.

16       Q   I will direct your attention to the section of the

17   drainage lying southerly of the Santa Margarita River and

18   immediately westerly of the section you have just described,

19   but stopping at the Naval Reservation grant line-- do you see

20   the section to which I refer?

21       A   Yes, sir.

22       Q   How do you characterize the ground waters in that

23   section, eliminating the river and the younger alluvium from

24   consideration?

25       MR. VEEDER:   I renew my objection, your Honor; it goes

1    beyond the scope of the direct examination.

2         THE COURT:  If the witness knows.

3         THE WITNESS:  The stream flow is intermittent.

4    BY MR. SACHSE:

5         Q And the ground waters?

6         A  The ground waters, excepting the Recent alluvium

7    shown only along the Santa Margarita River in that reach, are

8    vagrant, percolating, and not part of the stream system.

9         Q  And any ground waters found in the younger alluvium

10   you would consider to be part of the stream system?

11        A  Yes, sir.

12        Q  Immediately north of that section is a very small

13   area above, northerly of the military Navy reserve grant line

14   lying in Sections 10, 11, 12, 1, 2 and 3, Township 9 South,

15   Range 4 West-- do you observe the area I refer to?

16        A  Yes, sir.

17        Q Would you characterize the streams in that section

18   of the watershed as intermittent, flowing only during and

19   after periods of precipitation and runoff?

20        A  With the exception of the Santa Margarita River, yes,

21   sir.

22        Q  With that exception.  And would you characterize

23   the ground waters, with the exception of those underlying

24   younger alluvium, as vagrant, local, percolating, not a part

25   of the stream system?

E
Z49

A   Yes, sir.

Q Directing your attention to Exhibit 69, Colonel, being a detailed map of the Sandia Creek watershed--

THE COURT:   What about this area in Sections 13 and part of 12, lying south of the river and outside of Pendleton and the Naval Depot?   You haven't had any testimony about that. Do you see what I am referring to?   Section 13, a portion of 12, and a small corner of 24.

MR. SACHSE:   That was the area which I just intended to refer to.

Q   Colonel, would you include that area?

THE COURT:   You talked about Sections 1, 2, 3, 10, 11 and 12 north of the river.

MR. SACHSE:   Thank you, your Honor.

Q   I will direct your attention to the areas indicated by his Honor, lying in Sections 12, 13 and 24, Township 9 South, Range 4 West--

THE COURT:   A little bit in 7 and 18 there, too.

MR. SACHSE:   Yes.

Q   --and a very small part in 7 and 18.   How would you characterize the ground waters in those areas?

A   Excepting for the Recent alluvium, the ground waters would be vagrant, percolating, not part of the stream system.

Q   I see only one intermittent symbol in that area. Would you characterize that as flowing only during and after

E

Z50

1    periods of precipitation and runoff?

2         A  Yes, sir.

3         Q  I direct your attention to Government's Exhibit 69,

4    being a geologic map of the Sandia Creek watershed.  You are

5    familiar with that watershed, are you not?

6         A  Yes, sir.

7         Q  I observe that the map indicates points of rising

8    water and extent of stream flow as of the date of the map.

9    Does that conform to your observations?

10        A  Yes, sir.

11        Q  How would you characterize Sandia Creek from its

12   headwaters to its confluence with the Santa Margarita River,

13   whether it is perennial or intermittent?

14        A  That is an intermittent stream.

15        Q  Directing your attention to the areas of younger

16   alluvium shown on Exhibit 69, is it your opinion that the

17   ground waters in those areas are a part of Sandia Creek?

18        A  Yes, sir.

19        Q  What is your opinion as to the character of the

20   ground waters in areas of the Sandia Creek watershed other

21   than those overlain by younger alluvium?

22        A  Vagrant, percolating, not part of the stream system.

23        Q  How would you characterize the numerous watercourses

24   indicated by intermittent stream symbols on Exhibit 69?

25        A  They are intermittent in character.

E

Z51

7976

1          Q  Flowing only during and after periods of precipitation

2     and runoff?

3          A  Yes, sir, with the exception of the stream flow

4     that varies with the precipitation.

5          MR. SACHSE:  Thank you, Colonel.  I may have one more

6     question or two before I am through.

7977

Z19

BY MR. SACHSE:

Q   The changes you have made for us from time to time in calculations of irrigable acreage on the military reservation and in calculations of water use within and without the watershed, those changes have been occasioned by changes in the watershed line itself, have they not?

A   With the one exception, Mr. Sachse, the change made in that tabulation originally enclosed with the reduced scale photo copies of field survey sheets.

Q   You testified in that case that there had been an error made in the planimetering, I believe?

A   Yes, sir.

Q   Do you know how many changes in the watershed line have taken place since you started to work on this case?

A   Approximately.

Q   How many?

A   Well, one time we adopted the present watershed line. Then, we adopted a natural watershed line, which is the basis for most of these plates that the plaintiff has in evidence on the scale of 1 to 24,000, showing the portion of the natural enclave within the Santa Margarita River.  And then, there was the natural watershed line based on the plane table surveys and Kelch plotting surveys that are Plaintiff's Exhibits 97, 98 and 99, I believe.

Q   And do you include in that latter the changes that

F

Z20

1   were made on the northerly boundary of the watershed in Stuart

2   Mesa as well as the southerly boundary?

3          A  Yes, sir.

4          Q  And it is your opinion that the boundary you are

5   presently using is the most accurate for the purposes of this

6   trial?

7          A  Yes, sir.

8          MR. SACHSE:  I have no further questions.

9          MR. VEEDER:  Your Honor, may I interrupt just a moment.

10  You had asked me to contact Mr. Krieger.

11         THE COURT:  Yes.

12         MR. VEEDER:  I have done that.  And he says that he

13  will not be able to file answers prior to this coming Monday;

14  that possibly he will not have it accomplished, have those

15  pleadings prepared and the filings accomplished by then.  He

16  assured me he would be in contact with me.

17         THE COURT:  Is he going to appear for those three

18  defendants?

19         MR. VEEDER:  Yes, your Honor, he is.

20         THE COURT: Query, Leo Roripaugh and the Oviatts?

21         MR. VEEDER:  That is what he said.  And he said that the

22  filings that he was preparing and working on were extremely

23  complex and that he had had problems in connection with the

24  preparation of his pleadings.  It presents a serious problem to

25  us, of course, from the standpoint of the status of the issues

1    with those large and important defendants.

2         Also I have been talking with Mr. Luddy about the status

3    of Mr. Dennis's clients.  I think there are roughly 25 that I

4    just simply don't know what the situation is in regard to them.

5    Now, I didn't call Mr. Dennis.  If you desire me to do so, I

6    will, but--

7         MR. SACHSE:  I have been trying to call Mr. Dennis

8    for two weeks and haven't been able to get him, Mr. Veeder.

9         MR. STAHLMAN:  How about Sawday?

10        MR. VEEDER: Do you represent the Raulsons?

11        MR. SACHSE:  Yes.

12        MR. VEEDER:  Well, that is the circumstance with which

13   we are confronted, your Honor.

14        THE COURT:  Go ahead.

15

16                        CROSS-EXAMINATION

17   BY MR. MOSKOVITZ:

18        Q  As I understand your testimony on direct examination

19   relating to the use by natural vegetation over the ground water

20   basin on Camp Pendleton--

21        MR. VEEDER:  That is within the watershed?

22   BY MR. MOSKOVITZ:

23        Q  --within the watershed of the Santa Margarita River,

24   you computed a total area, total surface area, of 5,454 acres?

25        A  Yes, sir.

1    Q   And from that total area you deducted 786 acres

2    as comprising areas on which there were roads, buildings,

3    water surfaces, presumably on which there was no natural

4    vegetation growing; is that correct?

5    A   Well, there is natural vegetation growing on some

6    of those areas that I subtracted, Mr. Moskovitz, such as the

7    Chappo Rifle Range, the Pistol Range, and so forth.  But I

8    credited those with no consumptive use of ground water.

9    Q   The result was that you had 4,668 acres in vegetation

10   which you believe is, in part at least, being supplied from

11   ground water in the basin?

12   A   Yes, sir.

13   Q   Now, at the master's hearing on June 4, 1958, this

14   is Volume 6 of the transcript, Master's hearing, page 727,

15   you testified that the surface area of the subterranean basin

16   was about 4,500 acres.  Is that an equivalent figure but just

17   more rough than the figure of 4,668 acres?

18   A   I don't believe I testified that the area of the

19   basin was 4,500 acres, Mr. Moskovitz.

20   Q   What was your--

21   A   The area of the basin in natural vegetation was

22   4,500 acres.  And in that respect it is equivalent to or

23   similar to the 4,668 acres concerning which I have testified

24   at this time.

25   Q   And the 4,668 acres is just a more detailed and

F

Z23

1   specific figure?  Is that the difference between that and

2   4,500?

3         A  Well, that, and there is variation from year to year.

4   As I testified, this 4,668 acres is based on observations made

5   in 1958.  I further testified that we have a continuing program

6   of phreatophyte control, so the situation varies from year

7   to year.

8         Q  The 4,668 acres is what you computed was a natural

9   vegetation in the summer of 1958?

10        A  Yes, sir.

11        THE COURT:  Well, how does the State's figure differ

12   from this?

13        MR. MOSKOVITZ:  We have no figure, your Honor.  I want

14   to find out some details about these figures.

15        THE COURT: All right.  Go ahead.

16   BY MR. MOSKOVITZ:

17        Q  Now, this figure of 4668 takes into account the

18   phreatophytes which you, in your program of controling and

19   eradicating phreatophytes, have destroyed; is that right?

20        A  Well, unfortunately, we are never able to completely

21   destroy them.  We remove them or reduce their growth, and the

22   next year we have all or part of it to do over again.  It

23   does take into consideration some of the areas where we have a

24   continuing program of phreatophyte removal, and some of the

25   areas, such as the off-channel spreading basins, where we

pursue a vigorous control of vegetation, they are not included in that 4,668 acres.

Q  You apparently used the 4668 acres as the base for computing the annual use of water by natural vegetation from the basins; didn't you?

A  Yes, sir.  By native vegetation, of course.

Q  By native vegetation.

MR. VEEDER:  I didn't hear that, Colonel.

THE WITNESS:  I say, by native vegetation.

BY MR. MOSKOVITZ:

Q  Now, when you engage in this program of control by destroying phreatophytes, does that affect the amount of water which is consumed by natural vegetation?

A  Oh, yes, it will reduce it.

Q  Then, if you merely multiply 4668 acres by a certain factor of use, that would not take into account areas in which phreatophytes were destroyed in your control program, would it?

A  No, I didn't use a uniform constant for the 4,668 acres.

Q  What computations did you make in translating the 4668 acres to the total water use, annual water use, which you estimated, as I believe, 5,200 acre feet?

A  Well, I determined the areas that were in different types and densities of cover.  And for each of those subareas I used a consumptive use factor and multiplied the acreage of

1   the subarea by those consumptive use factors to arrive at a

2   total consumptive use in acre feet per year.  And the sum of

3   those gave me the 5,200 acres.

4        Q  Now, what were the different types of subareas that

5   you used?

6        A  I determined the area that was in swamp and tules.

7        Q  What was the factor of consumptive use for that type

8   of vegetation?

9        A  For that I used 4 feet per acre per year.

10       Q  From the ground water basin?

11       A  Yes, sir.

12       Q  Did you consider that any portion of the needs of

13   that type of vegetation would be supplied from precipitation?

14       A  Yes.  I excluded the precipitation from these con-

15   sumptive use factors that I used.

16       Q  What precipitation factor did you take into con-

17   sideration?

18       A  1.16 feet per year.

19       Q  Then, I take it that swamp and tules would use 5.16

20   acre feet per acre per year; is that correct?

21       A  Well, actually they would use six to eight feet per

22   acre per year.  An area of hydrophytes which occupy these swamp

23   areas will transpire a greater quantity of water than would be

24   evaporated from a comparable fresh water surface.

25       Q  How did you reach a figure of 4 acre feet per year

1    for that type of material?

2         MR. VEEDER:  For that type of what?

3         MR. STAHLMAN:  Vegetation.

4         MR. MOSKOVITZ:  Pardon me.

5         Q  For that type of vegetation?

6         A  Well, from our evaporation studies on Lake O'Neill

7    we arrived at an average annual evaporation of 3.9 feet per

8    acre per year.  And I simply rounded that off to 4 for the

9    swamp and tules.

10        Q  In other words, the 4 is the evaporation from the

11   water surfaces which are exposed in that area rather than the

12   consumptive use by the vegetation growing there, is that

13   correct?

14        A  No, it is a conservative estimate of the consumptive

15   use by evapo-transpiration, both evaporation and transpiration,

16   from those surfaces.

17        Q  How many acres did you assume were in that category?

18        A  314 acres.

19        Q  And what was the next type of vegetation that you

20   considered?

21        A  I determined the area that was covered by a heavy

22   density of brush.

23        Q  And how many acres was that?

24        A  144 acres.

25        Q  And what consumptive use did you assign to that type

of vegetation?

A   Excluding rainfall, 3.04 feet per acre per year.

Q   And where did you secure that figure?

A   Well, I secured the figures of consumptive use from studies made by the U. S. Department of Agriculture research people in the San Luis Rey Valley immediately to the south.

Q   And was this figure of 3.04 acre feet per year excluding rainfall, the figure they used?

A   Yes, sir.

Q   Are you familiar with Appendix C to California Exhibit L, Volume II?

A   No, sir.

Q   Now, am I correct that you then considered that a total of 4.20 acre feet per year would be used by heavy brush of which 1.16 was contributed by rainfall?

A   Yes, sir.

MR. VEEDER:  May I interrupt for just one moment here. Counsel made reference-- I am simply desiring to have this identified-- to Appendix C?  Is that right?

MR. MOSKOVITZ:  That is right.

MR. VEEDER:  Well, now, I want to be very sure that I understand.  Are you intending to offer in evidence this report by Blaney?

MR. MOSKOVIT:  No, I am just asking Col. Bowen if he is familiar with it.

F

Z28

MR. VEEDER:  It is interesting from this standpoint: That if it is not marked for identification it shouldn't be referred to as such.

MR. MOSKOVITZ:  I think I can ask the Colonel--

MR. VEEDER:  You referred to it as an exhibit, as an identified exhibit.

MR.MOSKOVITZ:  No, I didn't.

MR. VEEDER:  I think he did.  You said, "Exhibit L, Appendix C."  Now, it makes a great deal of difference to us if you are going to offer in evidence the soil survey purportedly made by Mr. Blaney.  If it is not part of the identification that you marked, well, all right.

MR. STAHLMAN:  What is this thing?

MR. MOSKOVITZ:  It hasn't been identified, and it is not being offered.

MR. VEEDER:  And it hasn't been marked.

THE COURT:  It has been marked.  The Exhibit L is the whole business.  It has been marked for identification.  There is no reason why an attorney can't refer to a document marked for identification.  He may decide he never laid a sufficient foundation to offer it in evidence.  He may change his mind. If anybody wants to look at it, it is there.

MR. VEEDER:  I have no objection to his looking at it. I simply objected to his reference to it as an exhibit marked for identification which has not been done by the State, your

F

Z29

F2

1    Honor.   The State has not marked this for identification.

2        THE COURT:  Well, that is true, the State hasn't.

3    Fallbrook has marked the whole exhibit.  The State has not.

4    The State has marked only parts of it.

5        MR. VEEDER:  If that is what he is alluding to, that

6    is all right.

7        THE COURT:  The State marked parts.

8        MR. VEEDER:  Mr. Moskovitz answered the question while

9    I am here, so that is all right.  It is not identified as an

10   exhibit.

11   BY MR. MOSKOVITZ:

12       Q   Is there a printed or published report of the

13   studies on which you relied?

14       A   Well, I have a copy of a report which I reviewed in

15   arriving at these factors, Mr. Moskovitz:  It is a mimeographed

16   report.

17       Q  May I see it?

18       A   I will give you the reference.  It is entitled:

19   "Utilization of the Waters of Lower San Luis Rey Valley, San

20   Diego County, California."  And it is dated April, 1945.

21   Prepared by the U. S. Department of Agriculture.

22       Q   This is the report on which you relied in arriving

23   at your consumptive use?

24       A   Yes, I took this report into consideration in

25   arriving at these consumptive use factors.

1        THE COURT:  Keep your voice up.

2        MR. MOSKOVITZ:  May I see it, please?  I will look at

3    this during the recess.

4        Q  Now, what other type of vegetation did you consider

5    in reaching your conclusions?

6        A  I considered the areas that were in grass, primarily

7    the perennial grasses, such as Bermuda and salt grass.

8        Q  And how many acres did you have of those types of

9    vegetation?

10        A  934.

11        Q  And what consumptive use figure did you use in

12    estimating water consumption from the ground water basin?

13        A  1.24 feet.

14        THE COURT:  The native grasses, is that right?

15        THE WITNESS:  Primarily perennial grasses, your Honor,

16    such as Bermuda and salt grass.

17    BY MR. MOSKOVITZ:

18        Q  And this was in addition to the use from precipita-

19    tion?

20        A  That was as you so stated, Mr. Moskovitz.

21        Q  In other words, more thanhalf of the total con-

22    sumptive use annually by the perennial type grasses comes

23    from ground water when they are located over the basin?

24        A  If the ground water is available, it does, yes, sir.

25        Q  Now, what other type of vegetation did you consider?

F

Z31

A   I considered the areas that were, and delineated in the areas that were in a medium density brush.

Q   How many acres do you have of that?

A   758.

Q   And what consumptive use figure from ground water do you use?

A   1.04 feet.

Q   In using the last two figures-- 1.24 acre feet per acre annually for perennial grasses and 1.04 acre feet per acre annually for medium brush-- what authority did you rely upon?

A   Well, I took into consideration that mimeographed publication which you possessed yourself of, Mr. Moskovitz.

Q   By taking that into consideration didyou modify the figures there?

A   Well, the figures are out of that publication, but the consumptive use figures I took are the average between the Mission Basin and the Bonsall Narrows figures which I considered more typical of the Santa Margarita Valley.

Q   And what other types of vegetation did you consider?

A   I delineated the area that was in a combination of brush and grass.

Q   How many acres did you find of that type vegetation?

A   1,171 acres.

Q   And what consumptive use figure did you use?

F

Z32

1      A  1.04.

2      Q  And that was also secured from the study by the

3  Department of Agriculture in the San Luis Rey watershed?

4      A  I relied upon that as a source of information, yes,

5  sir.

6      Q  Did you modify the information?

7      Mr. VEEDER:  I object to the term "modify."  He says

8  he took it into consideration.  It is not a matter of

9  applying the figure of --

10     THE COURT:  Well, what he means is: Did he use the

11  identical figure, or did he consider other things?  Did he

12  arrive at some figure different from that shown in the report?

13     MR. VEEDER:  Just so the term is understood.

14     THE WITNESS:  Well, there again, it is an average of

15  those two situations which I previously mentioned.

16     THE COURT:  Mission Valley and Bonsall Narrows?

17     THE WITNESS:  Yes, sir.

18     THE COURT:  All these figures are in addition to

19  rainfall that would fall in the area?

20     THE WITNESS:  Yes, sir.

21  BY MR. MOSKOVITZ:

22     Q  What other types of vegetation did you consider?

23     A  Light density brush.

24     Q  How many acres?

25     A  1,347.

F

Z33

1      Q  And what consumptive use factor did you use?

2      A  .24 feet.

3      Q  .24?

4      A  Yes, sir.

5      Q  Was that also based on an average between Mission

6  Basin and Bonsall Narrows secured from the study in San Luis

7  Rey watershed?

8      A  Yes, sir; as I recall, it was.

9      Q  Any further types of vegetation considered?

10     A  I think that totals the sum of 4,668 acres, Mr.

11  Moskovitz.

12     Q  In what category did annual grasses fall?

13     A  Well, the annual grasses are scattered through these

14  areas here.  They are probably more evident in the are termed

15  light density brush.

16     Q  I take it that by multiplying the acreage by the

17  factor of consumptive use per acre that you gave and totaling

18  it all up we would come up with 5,200 acre feet annually;

19  is that correct?

20

21

22

23

24

25

1    A  We would come out with exactly 5,181 acre feet per

2    year.

3    Q  Which is rounded off to 5,200?

4    A  Yes, sir.

5    Q  Does it make a difference where the water table is?

6    A  Oh, yes sir.

7    Q  As to how much water is used?

8    A  Indeed.

9    Q  Where did you assume the water table would be when

10   you made your calculations?

11   A  Well, following the runoff last February, March,

12   April, the basin was quite well recharged and I considered

13   the surface of the ground-water plane to be at or near a

14   maximum figure for the basin.

15   Q  In other words, the consumptive use that you calcu-

16   lated is as high as it would ever be?

17   A  Oh, no sir.

18   Q  And why not?

19   THE COURT:  He figured a high water table.  If you have

20   a low water table, you would have a greater consumptive use;

21   is that right?

22   THE WITNESS:  No, sir.  The character and density of

23   the brush is the most significant varible in this formula, if

24   I may call it such.  In other words, if we were to maintain

25   a high water table in the basin for a period of years, without

any  control over the nature and character of the vegetation,

the growth would be much more vigorous, the coverage would

be denser and consumption would be vastly increased.

BY MR. MOSKOVITZ:

Q  Let's take it this way.  Suppose you had the same

acreages as you have given me of the various types of vege-

tation and the water table were lowered one foot, would you

have this same consumptive use annually of 5,200 acre feet

rounded off, or would you have something less?

A  Well, I doubt that one foot lowering--of course,

there would be slight effect with each increment of one foot

that the ground-water plane were lowered.

Q  Well, take 5 feet lower.  Would that make a differ-

ence in the consumptive use?

A  Oh yes.

Q  Would it be less or more?

A  It would generally be less.

Q  Would it ever be more, assuming the same acreages

of the various types of vegetation?

MR. VEEDER:  Would it ever be more than when?

MR. MOSKOVITZ:  Than it was 5 feet higher.

THE WITNESS:  Well, it would be almost impossible to

maintain the same character and density of vegetation with a

ground-water plane maintained at an elevation near the land

surface.

BY MR. MOSKOVITZ:

Q  Isn't it true that as you lower the ground-water basin, the level of water in the ground-water basin, there will be less consumptive use by vegetation?

A  You would successively kill off or reduce the growth of the plants in relation to their root depth.  The shallow-rooted plants would suffer most from the one-foot lowering of the water table that you mentioned, and there are plants growing in this area which might continue to survive with a twenty-foot lowering of the water table.

Q  Do annual grasses secure any part of their consumptive use of water from the ground water directly?

A  If it is available, in my opinion they do.

Q  Isn't it true that if you have ground water within reach of roots of plants, that the tule type plants and the willow type plants will take over and will crowd out annual type grasses?

A  To some degree.  That is why we have phreatophyte control program in continuing effect.

Q  So that if you have an area where there are annual grasses growing, this indicates that there is very little usage of ground water in the basin, doesn't it?

MR. VEEDER:  I object to that.  There is absolutely no basis for such a hypothesis.  It is vague.

THE COURT:  Sustained.

BY MR. MOSKOVITZ:

Q  If the water table were high, you would have phreatophyte type growth, wouldn't you?

MR. VEEDER:  I object again. There is no basis for that statement, and no basis for that hypothesis whatever. He has pointed out that tules and hydrophytes survive when the water table is extremely high and when the water is virtually at the surface.  The presence of perennial grasses is entirely a different situation, and that has been described.

I think he should reframe his question, if he wants to pursue this any further, because there is certainly a variety of situations on that basin surface.

THE COURT: Read the question please:

( The reporter read the pending question ).

MR. VEEDER:  What does he mean by "high" is the first thing?

THE COURT:  The trouble is that the question is so indefinite.  In other words, you say if the water table is high.  We will suppose there had been 20 dry years, the plant life had almost died away, and suddenly you had some rains and the water table came clear up but it hadn't had enough time for growth to come back.  How could you answer the question until you knew how the long the water table had been in that shape?  The mere fact that overnight the water table came up wouldn't overnight give you grass and brush,

G

A 5

1    if you had a semi-desert before.

2         MR. MOSKOVITZ:  That is true, your Honor.

3         THE COURT:  You have too many variables.

4         MR. MOSKOVITZ:  I will rephrase the question.

5         Q  Isn't it true that by the very nature of grass

6    and brush as contrasted with phreatophyte type vegetation,

7    by the very nature of grass and brush they draw little, if

8    any, water from the free ground water?

9         MR. VEEDER:  I again object to that.  I think phrea-

10   tophyte can be brush or a bush or a tree.  I think we have

11   got to be a little specific in asking this witness these

12   questions.

13        MR. MOSKOVITZ:  I think the witness can answer this

14   question.

15        THE COURT:  I don't know what a phreatophyte is,

16   whether it embraces all of those or not.  Let's find out.

17   BY MR. MOSKOVITZ:

18        Q  How do you define phreatophytes?

19        A  I define phreatophytes, Mr. Moskovitz, as plants

20   which draw a large part of their water supply from the phreatic

21   zone of the ground water.  The phreatic zone is that capillary

22   zone which is immediately above the free ground water zone.

23        Q  And do perennial grasses draw their water supply

24   from the phreatic zone?

25        A  They may.  It depends on where the phreatic zone is

1     in relation to their root system.

2        Q  How about annual grasses?

3        A  They may also, if the phreatic zone puts the water

4     up there available for their use.

5        THE COURT:  What are you trying to prove?  Maybe there

6     is no disagreement about what you are trying to prove.  Or

7     are you trying to prove anything?

8        MR. MOSKOVITZ:  Your Honor, I am trying to show that

9     the amount of annual consumption that the Colonel computed is

10    based upon a high water table at the very top, the maximum.

11    It is based upon use by the kind of heavy-using water-loving

12    plants that are usually called phreatophytes, and that when

13    you have grasses growing in an area there is very little use

14    from free ground water at all.

15       THE COURT:  He has been talking about the basin area,

16    hasn't he?

17       MR. MOSKOVITZ:  Yes, your Honor.

18       THE COURT:  He is not talking about the brush-covered

19    hills.

20       MR. MOSKOVITZ:  That is right.

21       THE COURT:  And in a natural state, an ideal state,

22    the ground water level would be high in this basin, would it

23    not?

24       MR. MOSKOVITZ:  Well, it goes up and down even naturally.

25       THE COURT:  It goes up and down depending on how much

water the Government pumps, depending on how much water Fallbrook pumps, depending on how much water is released upstream.

MR. MOSKOVITZ:  And how much water nature supplies.

THE COURT:  Yes.

MR. VEEDER:  I think nature supplies it all.  I'll stipulate to that.

MR. MOSKOVITZ:  It goes up and down, and the figure that we have here of 5,200 acre feet is based upon the maximum level, according to the Colonel's own testimony.

THE COURT:  If that is what you are trying to prove, let's ask one general question.  Let's take another extreme. Supposing, Colonel, instead of making the estimate as of the time after the ground-water  basin had been fairly well filled up by rains, you had made an estimate in a period following a number of dry years plus heavy pumping in the basin.

THE WITNESS:  1951, your Honor, would be a good year to select for this purpose.

THE COURT:  Your estimate would be less?

THE WITNESS:  Yes, sir.

THE COURT:  Is that what you want to prove?

MR. MOSKOVITZ:  Yes, your Honor.  Now let's find out how much less, if we can do so.

THE COURT:  Is it going to be the State's contention that the Government's rights are going to measured by 1951,

A   8

1   and that their contentions as to rights to the use of water

2   are going to measured by dry years with a low water level in

3   these basins?  Or is it the State's contention that the

4   Government has the right to have water in these basins at

5   some reasonably high level?

6        MR. MOSKOVITZ:  If the United States is going to be

7   using this ground-water basin to supply needs of the Base,

8   your Honor, it is going to have to draw the ground water

9   down in certain years and not keep it up to the maximum at

10  all times.  That means that with the ground-water basin

11  lower in certain years the amount of consumption by natural

12  vegetation will be lower and you wouldn't have to assume

13  5,200 acre feet consumptive use annually by native vegetation.

14       MR. VEEDER: Your Honor, we fighting for our right to

15  the use of water.  The objective here is to attain the great-

16  est quantity of water that we can beneficially utilize.  This

17  Bermuda grass, for example, that has a deep root zone, 750

18  acres at the present time, and probably a great deal more if

19  we hadn't been interfered with by Fallbrook and others up-

20  stream.

21       The point I make is that we are entitled to have sub-

22  stantial natural coverage on the entire basin.  We have a

23  legal right to it, and there has been interference with it.

24  It has nothing to do with when the basin is pulled down a

25  good many feet.  We have the right to demand that that water

1    reach us.

2           THE COURT:  All right.  If that is an objection, it is

3    overruled.

4           Let's see if the Colonel has any estimates for 1951.

5           MR. MOSKOVITZ:  I'll ask the question.

6           Q  What would the natural use from the ground-water

7    basin by natural vegetation have been in 1951?

8           MR. VEEDER:  Again I object, your Honor.

9           THE COURT:  If he doesn't know, all he has to say is,

10   "I never computed it."  But if he did compute it, then Mr.

11   Moskovitz is entitled to have it.  I don't know whether he

12   has computed it.

13          THE WITNESS:  I didn't compute it then, but I believe

14   it was less than for 1958, Mr. Moskovitz.

15   BY MR. MOSKOVITZ:

16          Q  Do you have any estimate as to how much less it

17   would have been?

18          A  No, sir.

19          THE COURT:  Take a short recess.

20          (Recess).

21          MR. MOSKOVITZ:  Your Honor, I would like to have this

22   report entitled "Utilization of the Waters of Lower San Luis

23   Rey Valley, San Diego County, California," which Colonel Bowen

24   gave me as the reference that he used, marked for indentification.

25          MR. VEEDER:  I would like to have designated the parts

1    the Pala-Rincon subunits of the San Luis Rey basin.

2         Then again referring to Table 39, following page 90,

3    I guess it would by 91, of California's Exhibit AA, this

4    Table 39 is entitled "Annual Consumptive Use (Including

5    Precipitation) As Estimated By The Integration Method In

6    San Luis Rey Watershed Escondido Canal Intake To Pacific

7    Ocean San Diego County California.)  Table 39 shows the

8    location as to sub-basins, divides the basins into valley

9    floor and hillside and tributary lands, gives the consumptive

10   use of the irrigated lands, dry farmed lands, lands in native

11   vegetation, miscellaneous and the total.  Those, of course,

12   sum up the work which is explained in the narrative portion

13   of the report.

14        Q  Did you consider the discussion beginning on page

15   70 and going on through page 72, including a graph entitled

16   "Relation Between Consumptive Use By Native Vegetation And

17   Distance of Water Table Below Ground Surface"?

18        A  Yes, sir.  That graph, to which you just referred,

19   is Figure 15, following page 71 of the report.  Yes, I con-

20   sidered  the sections 70, 71, 72 of the report.

21        Q  On page 71, in the second full paragraph, it is

22   stated, in part:

23        "Where the water-table depth is more than 12 feet,

24   the vegetation depends wholly or very largely on rainfall

25   which has been stored in the soil.  Blaney and Taylor found

A · 12

1    that in a native-vegetated area with a soil consisting of

2    sand of variable texture to a depth of 12 feet or more, the

3    major root activity existed in the zone extending from the

4    ground surface to a depth of 11 feet.   The consumptive use

5    consisted entirely of rainfall and amounted to as much as

6    14 inches in one year without penetration below the root-zone.

7    Point 'C' on Figure 15 was therefore set at 14 inches of

8    consumptive use with a water table at 12 feet.   The consumptive

9    use for areas with water tables at greater depths than 12

10   feet would be the same and consist entirely of rainfall.   In

11   years of excessive precipitation there would be contribution

12   to the ground water, and in years of low precipitation the

13   consumptive use could not exceed the rainfall..."

14        Did you take that into consideration in making your

15   study?

16        A  Yes, sir.

17        Q  Am I correct in my understanding that this means

18   that if the water table drops below 12 feet there would be

19   no consumption of ground water by native vegetation?

20        MR. VEEDER:   I object to that, your Honor, unless

21   there is some showing that the situation that Counsel has

22   alluded to is comparable to the Santa Margarita basin, and

23   moreover he has testified in regard to several different areas

24   within the basin.

25        THE COURT:   That objection is overruled.   But the

1    question merely calls for this witness's conclusion of what

2    is in the book that has just been read.  You say am I correct

3    in my conclusion that this is what it says?  The Colonel says

4    that he took this into account.  That doesn't necessarily

5    mean that the Colonel accepted every line of it as being

6    gospel.  He said he took it into account.  Now your last

7    question was whether you understood it right.  It has just

8    been read.  So I'll sustain the objection to that.

9    BY MR. MOSKOVITZ:

10          Q  Do you agree with the statements I have just read?

11          MR. VEEDER:  Again I would like to say this, that the

12   cross-examination at this point is completely without meaning

13   unless there is something to show that this is comparable,

14   your Honor.

15          THE COURT:  That is very true.  But this might be a

16   preliminary question.

17          MR. VEEDER:  I have that as an objection, your Honor.

18          THE COURT:  Overruled.

19          THE WITNESS:  Do I agree with what, Mr. Moskovitz?

20          MR. MOSKOVITZ:  With the statements I just read to

21   the effect that when the water table drops below 12 feet under

22   the surface of the ground there is no consumption by native

23   vegetation of ground water.

24          MR. VEEDER:  It depends.  That is not a correct state-

25   ment, I believe.

A  14

1        THE COURT:  It talked about 12 feet of sand, as I

2   heard it.

3        MR. VEEDER:  That is right.  It says 12 feet of sand,

4   and also there has to be some delineation and indication of

5   the kind and type of vegetation that is involved.  This is

6   just the wild blue yonder, your Honor, unless we get something

7   to show that these areas are comparable.  I think the Colonel

8   should read everything.  I don't want him to be a Mr. James,

9   though--I don't want any analogy.

10       THE WITNESS:  No, sir, I don't agree entirely with

11   the assumption made in the first part of that paragraph.

12   BY MR. MOSKOVITZ:

13       Q  Would you indicate what your view is as to the

14   level of ground water below which native vegetation would

15   not draw water from the ground water?

16       MR. VEEDER:  Before you answer the question, would

17   kindly designate the first part of the paragraph to which

18   you were alluding?

19       THE WITNESS:  Reading from the second paragraph be-

20   ginning on page 71 of California's Exhibit AA and in the third

21   sentence of the second full paragraph of page 71 it states:

22   "This third point 'C' was determined on the assumption that

23   valley vegetation draws little if any water from the ground

24   water when the water table is at a depth of 12 feet or more..."

25   I say I don't agree with that assumption.

BY MR. MOSKOVITZ:

Q  At what depth do you believe valley vegetation draws little if any water from the ground waters?

MR. VEEDER:  Again I object; there is no foundation. It is pure speculation.  It depends on the kind and type of vegetation.  It has to be designated and reference has to be made to it.

THE COURT:  Overruled.

THE WITNESS:  First, that assumption states water table at 12 feet, Mr. Moskovitz, and I am assuming by that that they mean the surface of the water under gravity influence, whereas the phreatic zone or the capillary zone above that water table would be somewhat substantially above 12 feet below ground surface.

BY MR. MOSKOVITZ:

Q  Let me call your attention to the first sentence in the text on page 70 of California's Exhibit AA; it states:

"Brush, trees and grasses on the valley floor account for considerable water loss.  Areas throughout the valley are covered with growths consisting of native trees intermingled with grasses and underbrush.  The density of these growths varies according to the available water supply.  In areas underlain by a high water table, the growths are dense, but as the terrain rises toward the hills and distance to the water table increase, vegetation becomes less dense and changes

G

A 16

1   to a species having roots developed for obtaining water from

2   greater depths..."

3        Does this describe the basin area that you--

4        A  I think that paraphrases very well what I stated

5   to his Honor.

6        Q  And this describes the area that you studied in

7   the Santa Margarita Basin, does it not?

8        THE COURT:  What do you mean?  Would this description

9   apply to the area in the Santa Margarita?

10       MR. MOSKOVITZ:  Yes, would this description apply to

11   the area in the Santa Margarita?

12       THE WITNESS:  Yes, sir.

13   BY MR. MOSKOVITZ:

14       Q  Calling your attention to Figure 15, which follows

15   page 71 of State's Exhibit AA, do you agree with the informa-

16   tion which is contained in that figure?

17       A  Your question is redundant, Mr. Moskovitz.  That

18   figure is drawn from the assumption on page 71, which I have

19   already stated I am in disagreement with.

20       Q  Do you have an estimate as to the depth of the

21   ground water--

22       MR. VEEDER:  In what part of the valley?

23       MR. MOSKOVITZ:  I am talking now about the Santa

24   Margarita Basin, the coastal basin.

25       Q  What depth of ground water would the native vegetation

1    cease to draw water from the ground water?

2         MR. VEEDER:   I object to that again, your Honor.

3    What vegetation is he alluding to?

4         MR. MOSKOVITZ:   I am alluding to the same type of

5    vegetation which is discussed on page 70 and following of

6    California's Exhibit AA--brush, trees and grasses on the

7    valley floor.

8         THE COURT:   Overruled.

9         THE WITNESS:   Each of those types of plants, Mr.

10   Moskovitz, has a different demand on the ground-water basin,

11   and what that report indicates is that those different types

12   of cover will vary in area and density, depending upon the

13   proximity of ground water to the surface of the ground.

14   BY MR. MOSKOVITZ:

15        Q   You didn't answer the question.  Are you saying

16   that you can't answer the question?

17        A   I can't answer your question, Mr. Moskovitz, because

18   as far as I know, it has no answer.

19        Q   Colonel, could you scale off the depths on the

20   water level profile which are shown for various dates on

21   Plaintiff's Exhibit 38 for the Santa Margarita coastal basin?

22        MR. VEEDER:   For what year?

23        MR. MOSKOVITZ:   For the years indicated on this exhibit,

24   which are March 1932, March 1952, November 1951 and October 1957.

25        Indicate the depths below ground surface of these water

1    level profiles.

2           THE WITNESS:  If I had a scale I could, Mr. Moskovitz.

3           MR. MOSKOVITZ:  Could you use the scale I am handing

4    you?

5           THE WITNESS:  A very crude device, Mr. Moskovitz,

6    namely, a Tidewater Oil Company celluloid calendar with a

7    3-inch scale on one side, it being divided into 16ths of an

8    inch, is that correct?

9           MR. MOSKOVITZ:  Is there another scale?

10          MR. SACHSE:  Maybe this is a little better.

11          MR. MOSKOVITZ:  Here is another scale.  Take your

12   choice.

13          MR. SACHSE:  At least that is from an engineering

14   supply house.

15          THE WITNESS:  Mr. Sachse has provided a 6-inch scale.

16   The inch is divided into 16ths.  They are probably about

17   comparable in accuracy.

18          Now that I am equipped with a scale, Mr. Moskovitz--

19   BY MR. MOSKOVITZ:

20          Q  Would you scale off the depth from ground surface--

21   let's take the point where Well 10/5-23G1 is indicated--the

22   depth from ground surface to the October 1957 water level?

23          A  I don't see the symbol indicating the water level

24   profile for--March of 1952?

25

8010

Q  October, 1957, is the date.

A  Oh, October, 1957.  I am referring to Plaintiff's Exhibit 38.  Well 10/5/23G1 indicates the depth to ground water on October, 1957, at an estimated 11/32nds of an inch, which, referring to the marginal scale on Plaintiff's Exhibit 38, gives us little opportunity to interpret that on the vertical scale of the map.  The vertical scale is broken down into 50-foot units, approximately one inch being equal to 50 feet, and there is no subdivision of the 50 feet.  A half inch of course would be 25 feet.  11/32nds-- I could compute that, I presume.

Q Go ahead, if you will.

8011

**A**  If my calculations are correct, that is about 14 feet.

**Q**  No, I think it is a little more than 14 feet.

MR. VEEDER:  I object.  He is arguing with the witness.

BY MR. MOSKOVITZ:

**Q**  Isn't it close to eighteen feet?

**A**  17.6 feet, Mr. Moskovitz?

**Q**  That is rounded off, 18 feet?

**A**  Close to the unit of 18 feet, yes, sir.

**Q**  Now, March, 1952, was just after the heavy runoff of the 1951-1952 year, wasn't it?

**A**  Well, I believe we were still getting runoff in March of '52, Mr. Moskovitz.

**Q**  Could you scale off the level to the water level profile for March, 1952, at the same well?

**A**  Referring to Plaintiff's Exhibit 38 and Well 10-5-23G1, it measures approximately 3/32nds, which would be 4.8 rounded off to 5 feet below ground surface for March of '52.

MR. MOSKOVITZ:  I have no more questions.

MR. STAHLMAN:  I have just a few.


CROSS-EXAMINATION

BY MR. STAHLMAN:

**Q**  Col. Bowen, water duty as you figured in relation to Camp Pendleton, I believe you stated you gave some

1　consideration to this bulletin which covers the lower San Luis

2　Rey Basin, is that correct?

3　　　　A　Yes, sir.　You are referring to California's AA for

4　Identification?

5　　　　Q　Yes, the one the Judge is reading.

6　　　　A　Yes, sir.

7　　　　Q　Did you also give consideration to the water duties

8　in other localities that are involved in the watershed at

9　Santa Margarita?

10　　　　MR. SACHSE:　On native vegetation, you mean, Mr.

11　Stahlman?

12　　　　MR. STAHLMAN:　Water duties.

13　　　　Q　It is just a general question.　You have given

14　consideration to the water duty in other areas than that of the

15　Lower Santa Margarita Valley, have you not?

16　　　　A　Oh, yes, sir.

17　　　　Q　And have you found any material difference in the

18　water duty of the same type and kind of vegetation in, say,

19　the upper reaches of the Santa Margarita than you would in the

20　lower?

21　　　　A　Well, they would be basically the same, Mr. Stahlman.

22　There are differences in temperature and--

23　　　　Q　Humidity?

24　　　　A　--humidity, and so forth. But, in part those are

25　offset by differences in length of growing season between the

1   upper and the lower portion of the watershed.

2        Q   By that do you mean that the growing season is longer

3   in the upper or in the lower?

4        A   Generally in the lower it is longer.

5        Q   It is longer?

6        A   For example, on the coast we have practically 365

7   days of frost-free weather.

8        Q   I see.   Now, in relation to your evapo-transpiration

9   losses, you say at Lake O'Neill your factor is 3.9; is that it?

10       A   Yes, sir; 3.9 feet is the average annual evaporation

11   loss as determined from our climatological observations at

12   Lake O'Neill.

13       Q   What is it at the Vail Lake?

14       A   It is somewhat higher than that; but without re-

15   freshing my memory by referring to the climatological data I

16   wouldn't want to attempt to give you the exact figure, Mr.

17   Stahlman.

18       Q   Well, so far as any use, material use, loss, by reason

19   of phreatophyte absorption or transpiration comparatively

20   speaking between the two it would be greater in the northern

21   reaches than it would be in the south, would it not?

22       A   Just generally, on the Vail Lake, as I recall,

23   evaporation loss is in the neighborhood of five feet per year.

24       Q   That then would also indicate that evapo-transpiration

25   losses of phreatophytes in the upper reaches would be greater

H

Z37

1    than they would in the Pendleton area, would it not?

2         A   Yes, sir.  This exhibit, California's AA, indicates

3    an increase in consumptive use in the San Luis Rey Valley as

4    one goes upstream.  And the same, in my opinion, is true in

5    the Santa Margarita watershed.

6         Q   In making a determination of your riparian acres in

7    Pendleton that are susceptible of reasonable beneficial

8    irrigation, you determined that there were in all-- what was

9    that, eighteen thousand and some acres that were riparian to

10   the river?

11        A   That is irrigable land.

12        Q   Irrigable land, yes.

13        A   There was a total of 18,847 acres of land within the

14   Naval Enclave are irrigable.

15        Q   Yes, all right.  In the Naval enclave; that includes

16   the Naval Ammunition Depot?

17        A   Yes, sir.

18        Q   Now, assuming that there was a determination a number

19   of years ago in the neighborhood of twelve thousand and some

20   irrigable acres.  Do you have an opinion as to why the increase

21   of as much as 6,000 acres would occur?

22        A   Yes, sir, I have an opinion.

23        Q   Would you give us that opinion, please?

24        A   Mr. Stahlman, it is my opinion that the determination

25   of your irrigable acreage for presentation in the suit Rancho

1     Santa Margarita vs. Vail, was based on surveys made by the

2     Bureau of Chemistry and Soils of that area.  Those surveys

3     were made-- incidentally, that bureau is now defunct.  It was

4     at that time a part of the U. S. Department of Agriculture.

5     But the survey was made on the scale of one inch equals one

6     mile, a very small scale.  It is comparable to our Plaintiff's

7     Exhibit 15, for example.  It is impossible to show a great deal

8     of detail where one square inch represents 640 acres.  That

9     is partly, in my opinion, the reason why they failed to

10     delineate areas of land as irrigable.  There are other factors,

11     such as the improved method of growing crops on lands which at

12     one time would be considered non-irrigable.  I believe I

13     have explained to the Court before about the techniques adopted

14     by the successful avocado growers of growing avocados on

15     comparatively steep slopes without tilling or disturbing the

16     soil and by delivering the water in pipes and applying it in

17     a basin around the trees allows irrigation of lands which years

18     ago would not have been considered suitable for irrigation.

19     And the combination of those factors undoubtedly explains the

20     reason why today we are able to find considerably more

21     irrigable acreage on that same area.

22        Q  And is your opinion that the same principles would

23     apply to the redetermination of the irrigable acreage in

24     property such as the Vail property?

25        MR. VEEDER:  That goes beyond the scope of the examination,

H

Z39

1   your Honor.

2          MR. STAHLMAN:  He has made surveys in all these places.

3   I think whether this is standard or whether it only applies

4   to only one party in the case--

5          THE COURT:  If he knows.  He has been over a lot of

6   this district, and some parts of it he wants to go over in

7   more detail.  If he knows.

8          THE WITNESS:  I have studied the survey made on the

9   Vail Ranch with the permission of the Vail Company in 1952,

10  including July 4th of 1952.  I, over a period of days, made

11  rather an intensive check of that soil survey that was intro-

12  duced to show the irrigable acreage on the Vail property.

13  BY MR. STAHLMAN:

14         Q  Referring to the one made by Professor Coit?

15         A  Yes, sir.  The Coit survey was done in consider-

16  ably more detail than the Bureau of Chemistry and Soil

17  survey that I alluded to on the Rancho Santa Margarita.  So

18  there may be differences, Mr. Stahlman.  I think it would be

19  well worth an examination to see.

20         Q  The Coit survey, as you observed it, did that seem

21  to be realistic to you in relation to methods that you

22  employed?

23         A  It was realistic.  Of course, the Coit Survey is

24  faulty, in my opinion, in that no soil survey map as such was

25  produced.  There is a map which is alleged to be a soil survey

1   map showing blocks and lots.  The technique, as I deduce it,

2   was to send survey teams out--

3          Q   Pardon me.

4          THE COURT:  Let him finish.

5          MR. STAHLMAN:  He is talking about what he deduced that

6   came out of this.  I want to ask him a question.

7          Q   Did you ever talk to Professor  Goit as to how he

8   made the survey?

9          A   No, sir.

10         MR. VEEDER:  I thought he was answering the question,

11  your Honor.

12         MR. STAHLMAN:  Well, go ahead if you have got something

13  more to say.  I am not bashful.

14         MR. VEEDER:  I will stipulate to that.

15         THE WITNESS:  You asked me my opinion of the survey,

16  Mr. Stahlman.

17         THE COURT:  Go ahead.  I want to hear the rest of the

18  answer.  What was this thing about blocks, tracts, lots?

19         THE WITNESS:  The survey teams went out and surveyed

20  over blocks and lots and marked the corners of the blocks and

21  lots with flags.  And  Goit and his team went into each of

22  these lots, and they described the number of acres within each

23  lot, the area of the lot determined by survey methods.  And

24  they stated that X acres of land were Class A, Y acres were

25  class B, Alpha acres were class C, and Beta Acres were class D.

Z41

1   And Classes A, B, C and D were defined as to their suitability

2   and adaptability to crops.  So it is possible by going through

3   the report to read how many acres of each class, A, B, C and

4   D, are within each lot, within each block of the survey.  But

5   because of the fact that these sites, these classes were not

6   indicated--

7           THE COURT:  By "classes" you mean the lots and tracts?

8           THE WITNESS:  Well, of course, the lot corners and

9   the block corners are long since lost.  I am speaking of these

10  classes  Coit used; A, B, C, and D.  And he described them.

11  But he didn't draw a line indicating what portion of the lot

12  was Class A or B or C or D.  So it is only possible to re-

13  construct that by going in and orienting oneself with the

14  topography on these lots.  The map is a contour map of that

15  portion of the Vail property.  Orient oneself with regard

16  to the property-- the roads, the fence lines, and so forth,

17  and make a visual inspection.  Whereas the survey would have

18  been much more useful to the Vail Company had Coit actually

19  delineated the sites as we do on our survey.

20  BY MR. STAHLMAN:

21          Q  And if that had been done, you think there probably

22  would have been an increase in the number of irrigable acreage

23  of the Vail lands, do you not?

24          A  If that were done today, you mean?

25          Q  Yes.

A   It could well be.

Q   Yes.

A   Yes, sir.

Q   Now, did you know that  Coit has also made a survey of the Rancho Santa Margarita?

A   I have heard that he did, but I am not familiar with that, Mr. Stahlman.

Q At or about the same time as the Vail?

A   Of course,  Coit is not an edaphologist; he is an hortoculturist.

THE COURT:  He isno what?

THE WITNESS:  Edaphologist, your Honor.

BY MR. STAHLMAN:

Q   What is that?

A   Soil scientist, if you please.

Q   Soil scientist?

A    Coit makes no profession to being a soil scientist or edaphologist.  He specializes in planting and developing and managing subtropical fruits.

Q   How long would it take you to make a survey of the Vail using the same system you used at Santa Margarita to determine the irrigable acreage according to your system?

MR. VEEDER:  I object.

MR. STAHLMAN:  You were doing it for everybody else, and we are the highest taxpayers.  They ought to do it for us.

MALCOLM E. LOVE.  OFFICAL REPORTER

1          THE COURT:  Overruled.

2          (Laughter.)

3          MR. STAHLMAN:  I don't think there is any quarrel about

4  it.  I am just asking how long would it take.

5          MR. VEEDER:  Now, I do object, your Honor.

6          THE COURT:  He has an estimate.

7          MR. VEEDER:  Well, but your Honor, we are sweating

8  blood for about 500 small parcel tract owners, and one of our

9  great problems in this here litigation, if I might add, is

10  doing work for all the other defendants.

11          THE COURT:  I know, but the answer may well solve the

12  problem.

13          MR. STAHLMAN:  Surely.

14          THE COURT:  If he tells us it takes so long I wouldn't

15  even be here on the bench when he gets it finished.

16          THE WITNESS:  What area, Mr. Stahlman?

17  BY MR. STAHLMAN:

18          Q  Irrigable acreage.

19          THE COURT:  Of the whole Vail Ranch?

20          MR. STAHLMAN:  Yes, irrigable acreage.

21          MR. VEEDER:  Santa Rosa and all?

22  BY MR. STAHLMAN:

23          Q  Well, take the Pauba first.

24          A  Can you give me an idea of how many square miles

25  are in the Pauba?

1   Q Give you an idea.  Don't you know?  You know that

2   ranch better than I do.

3        THE COURT:  How many squaremiles in the Pauba?

4        MR. STAHLMAN:  I don't know.

5        THE COURT:  How many acres?

6        MR. STAHLMAN:  The total acres in the Pauba?  Oh, there

7   are around thirty-- let's see-- around forty-some thousand.

8   I guess 42,000.

9        MR. VEEDER:  To whom is the question addressed, to the

10  witness or Mr. Stahlman?

11       MR. STAHLMAN:  I am only guessing, your Honor.

12       He seems to have the figures there.

13       THE WITNESS:  I do have some figures here.

14       MR. STAHLMAN:  I can tell you the records that I have.

15       THE WITNESS:  Mr. Stahlman, the total acreage of the

16  Pauba Ranch, as I have it, is 33,128.

17  BY MR. STAHLMAN:

18       Q  And the Temecula and the Little Temecula?  If you

19  made such a survey as you made upon these Forest lands by

20  taking your aerial photographs, how long would it take?

21       A  That 33,000 acres on the Pauba Ranch?

22       Q  Yes.

23       A  Oh, approximately 100 man days.

24       THE COURT:  Oh, 100 man days?

25       THE WITNESS:  Yes, sir.

H
Z45

MR. STAHLMAN:  100 man days.

THE COURT:  I thought you were going to figure about an acre a day and say 33,000 days.

MR. STAHLMAN:  Ten men, ten days; five men, twenty days.

MR. VEEDER:  Are we talking about Santa Rosa only now?

THE COURT:  We are talking about Pauba only.  Pauba.

MR. STAHLMAN:  Pauba.  The other two are comparatively minor-- Temecula and Little Temecula.  Santa Rosa wouldn't be essential.  There is not enough land there riparian, except the creeks.

THE WITNESS:  Mr. Stahlman, I might tell you we have already done a substantial portion of the Santa Rosa, that was in the watershed of the De Luz Creek and that was in the watershed of Sandia Creek.  The report hasn't been completed.

BY MR. STAHLMAN:

Q  The rest of it you could do in 100 man days?

A  That was just of the Pauba Ranch.  Then, if we are to undertake that portion of the Temecula and Little Temecula withinthe Vail--

THE COURT:  How many acres are there?

THE WITNESS:  I am trying to find that, your Honor.

MR. STAHLMAN:  I think the two together would be about twenty-some thousand.  I am just guessing.

THE COURT:  Well, assume it.  Let's assume for argument

H

Z46

20,000 acres more.

BY MR. STAHLMAN:

Q  Yes, assume that.

A  Assume 20,000 acres more.  That would be about 70 man days additional.  Let us say a total of 170 man days.

THE COURT:  The Vail Ranch and the United States has been getting along pretty well together just as Fallbrook and the State of California.  Why don't you fellows work out some arrangement between you here and get this all done with some quid pro quo?

MR. STAHLMAN:  I am agreeable to it.

THE COURT:  What?

MR.STAHLMAN:  Mr. Veeder, you want everybody in the case to be treated alike, don't you?

THE COURT:  I say with some quid pro quo.  You know, there are a few things Mr. Veeder might want and if the two of you worked out your problems, why this might be accomplished right easily.

MR. STAHLMAN:  Your Honor knows what Mr. Veeder wants. I am going to open my veins right here and bleed to death. That will be the easiest way out.

(Laughter.)

MR. VEEDER:  It is on a stipulated judgment.  Why shouldn't you?

MR. STAHLMAN:  That may be the question if you don't

H

Z47

1  start talking sense.

2      MR. VEEDER:  I have been abused.

3  BY MR. STAHLMAN:

4      Q  Let's see what that would entail, then.  You say

5  another 70 man hours?

6      A  Man days, Mr. Stahlman.

7      Q  Man days, I mean.

8      A  It would be a total of about 170 man days.

9      Q  It wouldn't be such a big job.  You have done bigger

10  ones in this case, haven't you?

11      A  Oh, yes, sir.  Our own, for example, is--

12      Q  And you have had the experience and material is

13  lined up now so that--

14      MR. VEEDER:  Fallbrook just pointed out that the

15  budget is 77 billion, and we don't--

16      MR. STAHLMAN:  Only 77 billion?

17      MR. VEEDER:  That is right, so--

18      MR. SACHSE:  You can get an awful lot of man days for

19  a billion.

20      (Discussion off record.)

21      THE COURT:  Who doesn't like the stipulated judgment?

22      MR. VEEDER:  I am for it, your Honor.

23      MR. STAHLMAN:  I don't like it.

24      THE COURT:  You don't like it?

25

MR. STAHLMAN:  No, you bet not.

MR. VEEDER: Well, it is a good strong document.

(Laughter.)

THE COURT:  Let's go ahead with this witness and get through with it.

MR. STAHLMAN:  Well, in view of this question regarding the stipulated judgment, I would-- no use getting into a lot of cross-examination.  It may not be necessary.  And I would just as soon defer any examination I have if and when the stipulated judgment is being considered by the Court.  It may not come up before the Court and, on the other hand, it may.  I think we will know very shortly.

1    MR. VEEDER:  Your Honor, I think the matter is before

2    the Court now.  Certainly it is part of the record in this

3    case.  It was part of the pleadings.

4    MR. STAHLMAN:  I am talking about the matter of expung-

5    ing the stipulated judgment.  Do you say that is before the

6    Court now, Mr. Veeder?

7    MR. VEEDER:  Expunging it?

8    MR. STAHLMAN:  Yes, inconnection with the affirmative

9    defense which we have in the Vail answer.  That is what I am

10   talking about.

11   THE COURT:  Let us postpone any matter you have in

12   connection with that until we reach it.

13   MR. STAHLMAN:  That is what I thought, yes.

14   MR. VEEDER:  Well, we are at this phase of thd case,

15   your Honor, and it is a very important phase, and as long as the

16   matter is up I would just as soon discuss it for the moment.

17   THE COURT:  I thought you gentlemen were still negotiat-

18   ing it.

19   MR. STAHLMAN:  That is what I thought, your Honor.

20   THE COURT:  Why crowd the matter if it is the subject of

21   negotiation?

22   MR. VEEDER:  Your Honor, it has been so long since I

23   have finished a sentence, but I would just like to have that

24   privilege.

25   MR. STAHLMAN:  It has not been long since you started

1    one, though.

2        MR. VEEDER:  That is right.  I start a sentence, and

3    Mr. Moskovitz or you or somebody else finishes it.

4        THE COURT:  All right, let's hear what you have to say.

5        MR. VEEDER:  I started to say that the matter of the

6    delivery of the water to the United States under the stipulated

7    judgment is very much before the Court now.  The quantities

8    of water that we receive and have received for a good many

9    years, the prescriptive right of the United States to receive

10   water as against Fallbrook and the others by reason of the

11   delivery of water under the stipulated judgment is here and

12   we believe is a matter ready for consideration.

13        That is the statement I was going to make.

14        MR. STAHLMAN:  It may be that that is for consideration.

15   But I don't think that reaches the point we have.

16        MR. VEEDER:  But that was the simple statement I was

17   going to make when you interrupted me.

18        THE COURT:  Mr. Stahlman, you may postpone any matter

19   that in any way concerns the stipulated judgment until such

20   time as we get into that.

21        MR. STAHLMAN:  Very well, I will defer any further

22   examination.

23        MR. VEEDER:  You have no further questions?

24        MR. STAHLMAN:  No.

25        THE COURT:  Is that all?

MR. STAHLMAN:  That's all, your Honor.

MR. VEEDER:  I have some redirect examination, your Honor.


REDIRECT EXAMINATION

BY MR. VEEDER:

Q Colonel, have you had occasion to consider the present size of the diversion ditch for Lake O'Neill, that is, the ditch that takes the water out of the Santa Margarita River, as described by the State Engineer in United States' Exhibit 125-A, and the size of that diversion ditch as it presently exists?

MR. STAHLMAN:  Is that that bulletin?

MR. VEEDER:  Yes, that is that excerpt.

THE WITNESS:  Yes, I have drawn a comparison.

BY MR. VEEDER:

Q  And based upon your knowledge of the system as it presently exists and that as described in--

THE COURT:  1883, 1888-- which is the date?

MR. VEEDER:  I wanted to get that date.  It was 1886, your Honor.

Q  Have you compared the size of the structures as described in Plaintiff's Exhibit 125-A and as it exists at the present time?

A  Yes, sir.

I

256

1      Q   And would you state into the record the results of

2   that comparison?

3      A   May I see the exhibit, please, Mr. Veeder.

4      (Mr. Veeder hands document to the witness.)

5      A   Plaintiff's 125-A states that the capacity of the

6   flumes must exceed 1,000 inches.  1,000 Southern California

7   miner's inches is 20 cubic feet per second, and the present

8   capacity of the lower reach of the ditch, namely, that reach

9   which has the ability to carry water into Lake O'Neill, is

10  approximately 22, 23 cubic feet per second maximum flow.

11     Q   So how do they compare?

12     A   Very closely.

13     Q   You were interrogated in regard to the vegetative

14  cover of the Santa Margarita River Basin within the watershed

15  of the Santa Margarita and Camp Pendleton.  Would you state

16  whether in your opinion the vegetative cover in a state of

17  nature would be greater than the vegetative cover as it exists

18  under present water uses by the Marines?

19     THE COURT:  Vegetative cover where?

20     MR. VEEDER:  Within the Santa Margarita River Basin.

21     THE COURT:  On the basin land?

22     MR. VEEDER:  That is right, the surface of the basin

23  within the enclave.

24     MR. SACHSE:  I object to that as being immaterial, your

25  Honor.  Obviously, you can't have both a state of nature and a

Z57

1    state of development.  It is absolutely impossible.

2        MR. VEEDER:  The point I make in that regard, your

3    Honor, California has opened up a very important phase of this

4    case.  It is our view that when we acquire the property we

5    succeeded to the right to have maintained on that entire

6    surface of the basin vegetative cover, and we believe there

7    is a vested legal right to that quantity of water from the

8    users upstream.  It is true that we might make other uses of

9    some of the riparian water, but I still believe that we have a

10   right to demand water be released down to us for the purpose

11   of maintaining coverage that would have been there in the state

12   of nature.

13       MR. SACHSE:  I will make the further objection, your

14   Honor, that it is too indefinite and uncertain.  It requires

15   the assumption of facts which are not in evidence and in regard

16   to which there is no showing that the Colonel has any

17   knowledge sufficient to enable him to answer the question as

18   to the state of nature requirement.

19       THE COURT:  You have asked him if he made a study.

20       MR. VEEDER:  Yes, I asked him if he had considered it.

21       THE COURT:  Overruled.  I don't know what facts he has

22   yet.

23   BY MR. VEEDER:

24       Q  What would be the condition of the vegetative cover

25   of the Santa Margarita River Basins within the enclave in a

state of nature?

MR. SACHSE:  I object to that because there is no foundation, your Honor.  The condition of the vegetative cover in a state of nature is absolutely immaterial to the proceedings of this case.

MR. VEEDER:  Your Honor, Mr. Moskovitz opened up the whole field of the question of what would exist if you had a high water table, a low water table, before development and after development.  He had the Colonel up here measuring the water levels.  It strikes me that the whole issue has been opened up.  We know when there has been encroachment upstream it has reduced the quantity of water that would normally enter the basin.  I think it is highly important.

THE COURT:  I will sustain the objection until you lay out what kind of study the Colonel made and what he knows, what the basis is for his opinion.  Maybe he has sufficient basis, maybe he hasn't.

BY MR. VEEDER:

Q Colonel, have you ever observed groundwater basins where they were in what you would describe as a state of nature, where the diversions upstream had not reduced the quantity of water reaching a ground water basin?

A  They are becoming very few in number, Mr. Veeder.

Q  Have you ever observed such a basin?

MR. STAHLMAN:  May I ask where this examination is

going, Mr. Veeder?  I don't quite see the purpose.  Is it

your contention that the basin on Pendleton is entitled to be

completely full, regardless of what anyone else on the stream

does?

MR. VEEDER:  I think it is a legal right in the owner

of lands of the character that exist at Camp Pendleton to

have water come down and reach those lands and maintain the

vegetative cover of the character that would be there in the

state of nature.

MR. STAHLMAN:  You mean by that that if there is suffi-

cient water available to those having the same kind and

character of rights?

MR. VEEDER:  That is correct.

MR. STAHLMAN: All right.

THE COURT:  What he may have observed elsewhere may or

may not be too important here.  Your answer is, that those are

very rare.  Have you seen vegetative cover in a state of

nature in some of the basins in Southern California?

THE WITNESS:  I don't believe he limited it to Southern

California, your Honor.

MR. VEEDER:  I didn't limit it to Southern California,

because I don't believe the Colonel is that old.

THE COURT:  It is pretty remote if you get outside

this area.

Where have you seen them?

THE WITNESS:  About the only places, your Honor, I can think of at the moment are wilderness areas in the Uinta Mountains in northeastern Utah, the Salmon River primitive area, the Selway area up in the Bitterroots of northern Idaho.

MR. VEEDER:  And Montana.

THE COURT:  What information do you have that there is any similarity between the vegetative cover in those areas and the original vegetative cover in a state of nature in the Santa Margarita basins or in the San Luis Rey Basin?

THE WITNESS:  There is no comparison, your Honor.

THE COURT:  All right.

MR. VEEDER:  The point I am making on that, though, is the fact that in a state of nature you do have a grass cover.

THE COURT:  Well, you can't testify.

What information do you have, Colonel, as to what the vegetative cover may have been on the basins of the lower Santa Margarita River in a state of nature?

THE WITNESS:  I don't have any information, your Honor.  There have been a lot of plants introduced by the Spaniards and others here, and I have not made a study of plants indigenous to this part of Southern, California.

BY MR. VEEDER:

Q  Colonel, what in your opinion would be the effect of the lowering of the ground water table in the area to which we are referring from eight feet to ten feet below that

I

Z61

8034

1   in 1958 upon the Bermuda grass concerning which you testified

2   as being on the face of the Santa Margarita River Basin within

3   the Naval enclave?

4        MR. SACHSE:  For how long a period?

5        MR. VEEDER:  Permanently.

6        THE WITNESS:  You said from eight to ten feet, Mr.

7   Veeder.  Do you mean the zone from eight to ten feet below

8   the 1958 water plane elevation?

9   BY MR. VEEDER:

10       Q   That is correct.

11       A   Or the spread of eight to ten feet below the 1958

12  water plane elevation?

13       Q   Eight to ten feet below the water plane elevation

14  of 1958.

15       A   If the water plane elevation were lowered eight feet

16  below that of 1958, the Bermuda grass would be destroyed if

17  it were lowered and remained lowered.

18       Q   I said permanently.  If it remained permanently, it

19  would be destroyed?

20       A   Yes, there would be no supply of water for it to

21  draw on.

22       Q   And what would be the effect of a similar reduction

23  of ground water table in regard to the other ground concerning

24  which you have testified?

25       A   The grasses are primarily the shallower rooted crops.

8035

Z62

1  Other of the plants, herbaceous plants, are deeper rooted, but

2  vary.  For example, one of our commonly cultivated crops,

3  namely, alfalfa, is a well-known phreatophyte.  It is a

4  succulent or herbaceous in character and will extends roots

5  under certain conditions 14 to 20 feet below the ground surface.

6      Q  But you didn't testify to the existence of any of

7  those, did you?

8      A  Well, there is a variety of plant cover over the

9  basin, and I simply say that the shallower rooted plants would

10  be adversely affected sooner by lowering the ground water

11  elevation than would the deeper rooted plants.  There are some

12  plants that have a capacity actually to follow the water table

13  down as it is lowered to rather considerable depth.

14      Q  Are any such plants presently growing on the surface

15  of the basins concerning which you are now testifying?

16      A  Oh, yes, all those plants classed as phreatophytes,

17  willows, tamarisks.

18      Q  What about the grasses?

19      A  I said the grasses are shallower rooted and would be

20  adversely affected first by any considerable lowering of the

21  ground water plane elevation permanently.  Cover would change.

22  The principal effect on grasses would be to change the nature

23  of the grasses from the perennials to the annuals.

24      Q  What would be the effect of a comparable lowering

25  of the water table to which I have just alluded upon the areas

1    which you have referred to as being brush of light density?

2         A  The density of the brush is indicative of a greater

3    depth to the water table, and further lowering of the water

4    table for a substantial period of time would reduce even

5    further the density of that cover.

6         Q  And what would the effect of that be upon the

7    availability of forage which presently exists in that area?

8         A  By substituting annuals for perennials, the period

9    in which forage could be grazed would be shortened.

10        Q  What would be your opinion in regard to the areas

11   which you have designated as the brush of medium density?

12        A  Lowering of the water plane would thin out the

13   density, probably move into light density area.  The elevation

14   of the water plane, as I have testified, may be quite directly

15   correlated to the density and character of the growth of the

16   native vegetation on the surface.

17        Q  Now, Colonel, when you were interrogated in regard

18   to a soil survey on the Pauba Ranch-- have you any plans at the

19   present time to undertake such work?

20        A  Mr. Stahlman has spoken to me in the past.  I don't

21   know why he discussed it on cross-examination.  I have no

22   well-formed plans to undertake the survey.

23        Q  Have you the personnel to handle it at the present

24   time?

25        MR. STAHLMAN:  You mean now or before the case is over?

1    THE COURT:   This matter doesn't need to be in the

2  record.  It is a matter that can be carried on by negotiation

3  between counsel.

4    MR. VEEDER:  Would this be a good place to quit now,

5  your Honor?  I think I can save some time on redirect exam-

6  ination.

7    THE COURT:  Yes. But aren't you about through on

8  redirect?

9    MR. VEEDER:  Yes, I am.  But I didn't want to turn the

10  man loose until I made one last check.

11    THE COURT:   All right, you may turn him loose tomorrow

12  morning.

13    What about tomorrow morning?  You have one more witness

14  we are waiting for.

15    MR. VEEDER:  I have one more witness, but I have a

16  problem in regard to this pleading situation.  I don't want

17  to drag this out any longer.  I would just as soon rest very

18  shortly.

19    THE COURT:  You can rest subject to getting these

20  pleadings in.  That is the way lawyers always protect them-

21  selves.  They say, "your Honor, we are through.  We rest subject

22  to . ."  That is the way California lawyers do, Mr. Veeder.

23  Mr. Stahlman has heard this many times.

24    MR. VEEDER:  I don't want to be cut in half about the

25  middle of some afternoon.

1    THE COURT:  There is no need for you to just go

2 through the motions up here to kill time while you find out

3 about the pleadings.  Finish up what you are going to do and

4 rest subject to getting these pleadings in on the part of Mr.

5 Krieger.

6    MR. VEEDER:  All right.

7    THE COURT:  How long will you be with Col. Robertson?

8    MR. VEEDER:  I don't think very long.

9    THE COURT:  Can we adjourn about noon tomorrow?

10    MR. STAHLMAN:  If we do, when will we adjourn to?

11    THE COURT:  We would adjourn probably until Mr. Sachse

12 would file these motions, and we will adjourn to about February

13 3rd, I guess, when we will come back and hear some of these

14 motions.

15    MR. VEEDER:  Are they set now for the 3rd, your Honor?

16 I thought you said they were set for the 10th.

17    MR. SACHSE:  I haven't filed them yet.  I propose, Mr.

18 Veeder, that when you rest, I have one of them ready, another

19 one almost ready, and the third one won't be ready for a day

20 or two.  I propose simply to hand over to you rather than

21 making a verbal motion, particularly the one involving the 35

22 defendants.  I simply suggested to his Honor that we take them

23 up on the 3rd.  I know we would finish them.  And I will be

24 ready to roll with Fallbrook's witnesses on the 10th on

25 Fallbrook's trial.

1      MR. VEEDER:  Why don't we have them on the 10th rather

2  than coming back on the 3rd?

3      MR. SACHSE:  It is all right with me.

4      THE COURT:  We could.  But the point is that we are

5  about ready to wind up this stage of the case and let's do it

6  by noon tomorrow.  Then we can go over to the 10th or to the

7  3rd.  I don't care.  We can go over to the 10th.  I have some

8  things that I ought to do.

9      MR. SACHSE:  If your Honor wants it for the 10th, it

10  is all right with me.  I will be happy.

11      MR. STAHLMAN:  How long will your motions take?

12      MR. SACHSE:  That is a difficult problem.  To argue

13  the first motion, at least, would take a very short time in

14  argument.  However, it involves, as I say, 35 different answers.

15  The language in each answer isn't identical.  The basic plead-

16  ings in each answer are the same.  I am quite sure that Mr.

17  Veeder would have different reactions to some of these answers

18  than he has to others.  I think I can argue one answer and

19  let the thing go.

20      THE COURT:  We can argue them pretty promptly after

21  you have had a chance to study them over.

22      MR. SACHSE:  I can give that one to Mr. Veeder right

23  now on the answers.

24      MR. STAHLMAN:  If we go on the 10th on those and start

25  several days of argument, we will lose time.

1          THE COURT:  We could set the argument the latter part

2   of the week of the 3rd, the 5th and the 6th, Thursday and

3   Friday.

4          MR. SACHSE:  Any day after the 3rd is all right with

5   me, your Honor.

6          THE COURT:  Think it over until tomorrow morning. I

7   hope we get through by noon tomorrow.  We are running too

8   long in one place now.

9          MR. STAHLMAN:  It suits me.  Here is another case I am

10  working on.

11         MR. VEEDER:  I think we all have other things to do.

12         THE COURT:  All right, 10 o'clock tomorrow morning.

13         (Adjournment until Wednesday, January 28, 1959, at 10

14  A.M.)

15

16

17

18

19

20

21

22

23

24

25