# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Wednesday, January 28, 1959.

Pages:    8041 to 8109

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

MALCOLM E. LOVE
**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,    )
                             )
                Plaintiff,   )
                             )
        vs.                  )      No. 1247-SD-C.
                             )
FALLBROOK PUBLIC UTILITY     )
DISTRICT, et al.,            )
                             )
                Defendants.  )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California

Wednesday, January 28, 1959

APPEARANCES:

    For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                Special Assistant to the
                                Attorney-General,
                                Department of Justice,
                                Washington, D.C.

1   APPEARANCES:   (Continued)

2         For Defendant              GEORGE E. STAHLMAN, ESQ.
          Vail Company
3
          For Defendant State        STANLEY MOSK, ESQ.,
4         of California              Attorney-General, by
                                     ADOLPHUS MOSKOVITZ, ESQ.,
5                                    Deputy Attorney-General.

6         For Defendants
          Fallbrook Public
7         Utility District,          FRANZ R. SACHSE, ESQ.
          et al.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## INDEX TO WITNESSES

| For the Plaintiff: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Eliott B. Robertson | 8066 | | 8104 | |
| (By Mr. Sachse) | | 8098 | | |
| (By Mr. Moskovitz) | | 8101 | | |

## EXHIBITS

| Plaintiff's Exhibit - | Iden. | In Evidence |
|---|---|---|
| 76 - Map | | 8045 |
| 76-A | | 8049 |
| 76-B | | 8049 |
| 121 | | 8046 |
| 73 Series | | 8051 |
| 73-A and 73-B | | 8051 |
| 93-AG through 93-AK | | 8061 |
| 87 | | 8063 |
| 89-CG-1, 2, 3, 4 | | 8064 |
| 10 | | 8086 |
| 11 | | 8086 |
| 12 | | 8087 |
| 13 | | 8087 |
| 14 | | 8087 |

A

z4

SAN DIEGO, CALIFORNIA, WEDNESDAY, JANUARY 28, 1959.  10 A.M.


THE COURT:  Go ahead.

The Clerk:  No. 2, 1247-SD-C, United States vs. Fallbrook.


ALLEN C. BOWEN,

recalled as a witness in behalf of the plaintiff, having been previously sworn, testified further as follows:

MR. VEEDER:  Your Honor, I have-- I was waiting for Mr. Moskovitz and Mr. Sachse.

THE COURT:  Are you going to finish up by noon?

MR. VEEDER:  I hope so.

THE COURT:  Hope?  I may not be around this afternoon.

MR. VEEDER:  You won't be?

THE COURT:  No.  Finish up by noon or come back tomorrow morning.

MR. VEEDER:  We will quit now.

MR. STAHLMAN:  We will come back tomorrow morning.  That will be nice.

MR. VEEDER:  That will be fine.  I am halfway home.

MR. STAHLMAN:  Let's move fast.

THE COURT:  All right.  Mr. Moskovitz and Mr. Sachse are here now.

MR. VEEDER:  All right.  I have some maps which are

1    marked for identification.  They have been served on all

2    counsel.  They have been utilized but they have not been

3    offered.  I am referring to 76.

4         THE COURT:  The rancho map?

5         MR. VEEDER:  That is right.  We offer 76.

6         MR. SACHSE:  No objection from Fallbrook.

7         THE COURT:  Received in evidence.  What is this, of the

8    old Rancho as it was before the condemnation?

9         MR. VEEDER:  1939.  That was before that was irrigated

10   land.

11        THE COURT:  Received in evidence, Exhibit 76.

12        MR. VEEDER:  That is the distribution system.

13        MR. SACHSE:  This is the key to those other exhibits,

14   isn't it?

15        MR. VEEDER:  And the distribution system is on there.

16        MR. STAHLMAN:  You say this is when?  As of what?

17        MR. VEEDER:  This is as of now.

18        MR. STAHLMAN:  Yes.

19        MR. VEEDER:  Water distribution systems.  This was

20   entered originally, offered up, as I recall, in the Special

21   Master hearing.

22        MR. STAHLMAN:  Oh, the water distribution systems.

23        MR. VEEDER:  Yes.

24        Offered.

25        THE COURT:  76?

A

Z6

1        MR. VEEDER:  121.

2        THE COURT:  Oh, this is--

3        MR. STAHLMAN:  Where is 76?

4        MR. VEEDER:  That has gone in, George.

5        MR. STAHLMAN:  Well, what is it?

6        MR. VEEDER:  I want to get out of here by noon, George.

7        THE COURT:  76 is the Rancho as it was in '39 before

8   the acquisition.

9        MR. STAHLMAN:  We will get you out of here.  '39; but

10  when was it prepared?

11       MR. VEEDER:  Prepared by Col. Bowen.

12       MR. SACHSE:  It shows on the legend.

13       MR. VEEDER:  May, 1958.  The old-timers testified off

14  it.

15       MR. STAHLMAN:  I would like to ask a few questions about

16  it, if I may.

17       MR. VEEDER:  All right.

18       THE COURT:  I already admitted it in evidence while you

XXX   19  were fumbling around.  Do you want to do it as cross-examination

20  or do you want me to set aside my order?

21       MR. STAHLMAN:  I just want to understand it.

22       THE COURT:  All right.  Then, inquire.

23       MR. STAHLMAN:  It would be in the nature of what we

24  have here.  It may be important to me.  May I ask questions

25  now, your Honor?

THE COURT:  Yes.


### VOIR DIRE EXAMINATION

BY MR. STAHLMAN:

Q   Col. Bowen, this map, Plaintiff's 76, that was drawn
by the Office of Ground Water Resources, was it?

A   Yes, sir.

Q   And what was the information from which the various
conditions as to the Rancho, as shown on the map, were taken
from?  It was an older map prepared at an earlier date from
which this was taken?

A   1939 aerial photographs were used primarily as the
base for determination of irrigated and cultivated lands.

Q   It is not the reproduction of some previously-drawn
map?  It is in itself a new map created by yourself, using
such materials as you obtained from your inspection of the
lands and the aerial photographs; is that it?

A   Yes, sir.

Q   And what is it purported to depict, the condition
of the ranch as of what?

A   As of 1939, Mr. Stahlman.

Q   And you used what photographs for that purpose?

A   1939 photographs.

MR. STAHLMAN:  That is all I have, your Honor.  I just
wanted to understand that.

A

z8

1    THE COURT:  All right.

2    THE CLERK:  Is this your copy?

3    THE COURT:  What is your next one you are talking about?

4    MR. VEEDER:  I have 73-A and B.  And I am just asking

5    the Clerk.  I want to check it.  It is the 1929 flight.

6    MR. STAHLMAN:  You didn't put in that picture of Lake

7    O'Neill, 87?

8    MR. VEEDER:  No.

9    THE COURT:  73 or 73-A?

10    MR. VEEDER:  73 has been received.

11    THE COURT:  Yes.

12    MR. VEEDER:  73-A and B are the keys to it, and they

13    are now offered.  There is just nothing but the locations on

14    the--

15    THE CLERK:  It has been marked, Mr. Veeder.

16    MR. VEEDER:  It has been marked, but it hasn't been

17    admitted.  And I would like to have it admitted now, if I may,

18    please.

19    THE CLERK:  Was 121 received?

20    MR. VEEDER:  Yes.

21    THE COURT:  73, a mosaic, is in evidence.

22    MR. VEEDER:  That is right, your Honor.

23    THE COURT:  The aerial photos themselves are not.

24    MR. VEEDER:  The keys are not, and that is what I am

25    offering now.  Here.  These are part of the exhibit, your Honor.

1          THE COURT:  Yes, but when you finally wound up-- here is

2     the exhibit you have got in evidence.

3          MR. VEEDER:  That is right.  That is right, and these

4     are just a part.  And I would like to have them offered.

5          THE COURT:  How do those help with this?

6          MR. VEEDER:  They were simply prepared as part of the

7     overall exhibit.

8          THE COURT:  Yes, these key to the series of photographs.

9          MR. VEEDER:  The maps, yes, your Honor.

10          THE COURT:  Which aren't in evidence.  Do you want to

11     offer them?

12          MR. VEEDER:  I would like to have that whole set in

13     evidence, if I could.  I don't know if there is any objection

14     to it.

15          MR. STAHLMAN:  What is the whole set?  What area?

16          THE COURT:  It is the 1929 flight.

17          MR. VEEDER:  It is the 1929 flight.

18          MR. STAHLMAN:  What is it, the entire county or the

19     watershed or--

20          MR. VEEDER:  The northern half, the northern part of

21     San Diego County.

22          No objection?

23          MR. SACHSE:  I have none.

24          MR. STAHLMAN:  I don't have any.

25          THE COURT:  All right.  Received in evidence.

XXXXX

A

Z10

1      How will you identify them?  73 now is this mosaic

2  which has been made from the--

3      MR. VEEDER:  Let's put those in as seventy--

4      THE COURT:  Wait.  Wait.  Excuse me.

5      MR. VEEDER:  I would like to offer them.

6      THE COURT:  What do they look like?  Are they in the

7  book?

8      MR. VEEDER:  I have a book of them.

9      No, that is not it.

10      These are the aerials that came from San Diego, your

11  Honor.

12      MR. SACHSE:  Those are the old County Assessor's aerials?

13      MR. VEEDER:  That is right.   .

14      THE COURT:  Is that the box there?

15      MR. VEEDER:  Yes, your Honor.  That is the key that I

16  was referring to.

17      THE COURT:  By townships?

18      MR. VEEDER:  That is right.

19      THE COURT:  And this is now marked 73?

20      THE CLERK:  Yes, that is 73, and then there is a series.

21      THE COURT:  Series what?

22      THE CLERK:  Townships.

23      THE COURT:  How do you have them marked?

24      THE CLERK:  Take the first one.

25      MR. STAHLMAN:  That series of photographs, Bill, that

A2

A2

Z11

1   doesn't go into Riverside County?

2        MR. VEEDER:  No, that is just the northern part.  It

3   shows Fallbrook, 1929.

4        THE COURT:  They are now marked by the Clerk in series

5   73-1-A, 1-B, 1-C, 1-D.  Those all happen to be in Township 1.

6   And then in Township 2, they are marked series 2-A, 2-B, 2-C,

7   and so forth.  They will all be received in evidence.  And 73

8   will remain in evidence as the general mosaic.

9        Now, you have two other exhibits?

10       MR. VEEDER:  These are the keys.  We are intending to

11  use those.

12       THE COURT:  I suppose it won't be confusing since these

13  all start with 1-A, 2-A.  This will be 73-A and 73-B, then.

14  Is that satisfactory?

15       MR. VEEDER:  It suits me, your Honor.

16       THE COURT:  73-A and 73-B in evidence; and the entire

17  73 series in evidence.

18       MR. VEEDER:  The reporter's transcript of testimony

19  of Max Bookman of February 24, 1956, marked for identification

20  143 has been lodged, and we now offer it as part of our case.

21       MR. STAHLMAN:  Won't that have to be read into the

22  record?

23       MR. MOSKOVITZ:  I object to that.  I don't think that

24  is relevant.

25       MR. SACHSE:  I will join in the objection.  The record

A2

Z12

1    is part of the transcript in a separate proceeding.

2        MR. VEEDER:  The point I make, your Honor, in regard to

3    this transcript of the record:  It is extremely important to

4    us from the standpoint of the course of conduct in the issuance

5    of the permits of the Fallbrook Public Utility District.  The

6    fact is that Mr. Bookman testified as early as February 24th,

7    1956, in regard to the availability of water and in regard to

8    the investigation made by the State which ultimately resulted

9    in Bulletin 57.  I think that it is extremely pertinent

10   particularly in regard to certain of the counts of the complaint

11   as amended of the United States concerning which your Honor

12   said he did not have jurisdiction and that you would not review

13   the activities of the State Board.

14       THE COURT:  So you are offering it on the matter which

15   I said I wouldn't consider?

16       MR. VEEDER:  That is right, your Honor.

17       THE COURT:  And you are not calling him as a live

18   witness; you are just bringing in the transcript of the

19   testimony?  It can't be impeachment, because he hasn't testified

20   here.

21

22

23

24

25

1          I will sustain the objection to it, and you have a

2     record made.

3          MR. VEEDER:  All right, your Honor.

4          We also have marked for identification--

5          THE COURT:  What was that number?

6          MR. VEEDER:  That was 143.

7          THE COURT:  Before we get away from it, you started to

8     talk about 122.  Have you forgotten about that?

9          MR. VEEDER:  I think I was talking about 121.  I made

10     the offer on that.

11          THE COURT:  There is no ruling on it.  You got off onto

12     something else.  You started out with 76.

13          MR. VEEDER:  Plaintiff's 76 was offered and received.

14          THE COURT:  Then you pulled out 121 and Mr. Stahlman

15     wanted to cross-examine about 76.  So I said he could cross-

16     examine about 76.  Then we didn't hear anything more about 121.

17          MR. VEEDER:  I offered 121, your Honor.

18          THE COURT:  Is it in evidence?

19          THE CLERK:  It was offered, your Honor, but there is no

20     ruling on it.

21          MR. VEEDER:  I renew the offer on 121, your Honor.

22          THE COURT:  That is the water distribution system at

23     Pendleton?

24          MR. VEEDER:  That is right.

25          THE COURT:  Plaintiff's Exhibit 121 is received in

1   evidence.

2          (Plaintiff's Exhibit No. 121 for Identification was

3   received in evidence.)

4          MR. VEEDER:   In regard to Plaintiff's Exhibit marked

5   144, which is a certified copy of the judgment in the case of

6   Rancho Santa Margarita vs. Vail, that was entered.

7          THE COURT:   It was later reversed.   What is the value

8   of it?   Historical value?

9          MR. VEEDER:   It is part of the showing of the use of

10  water between the Rancho and Vail Company and pursuant to which

11  water was utilized by both the ranchos during the period

12  pending the appeal.

13         MR. STAHLMAN:   You are limiting it to that purpose?

14  Could you do that by a judgment instead of the reverse?

15         THE COURT:   Let me understand this.   What was the date

16  the judgment was entered in the Superior Court?

17         MR. VEEDER:   The 5th day of May, 1930, your Honor.

18         THE COURT:   And then it was reversed when?

19         MR. VEEDER:   Was it eight years.   I know it was a long

20  time.

21         MR. SACHSE:   1938 is the appellate decision.

22         THE COURT:   And you offer it as proof of how the

23  parties conducted themselves between 1930 and 1938?

24         MR. VEEDER:   For a period well in excess of the five-

25  year period.

1    Also, I am leading up to the point that Mr. Stahlman

2  and I have been discussing settlement in this matter, and as

3  a result we haven't put in all of the evidence regarding the

4  course of conduct between the United States and the Vail

5  Estate, and from our standpoint until there is ultimately a

6  determination on that phase of the litigation it is not our

7  intention to rest, your Honor.

8    MR. STAHLMAN:  Let's not put in part of it then until

9  we decide this question.

10    THE COURT:  Let's do one thing at a time.  You are

11  talking now about the judgment entered in 1930 and reversed

12  in 1938.  It might have some historical value.  I would admit it

13  for that, as part of the history of the litigation.  But now

14  you offer it to show that the parties operated under this

15  judgment for this eight-year period.

16    MR. VEEDER:  That is correct, your Honor.

17    THE COURT:  The judgment itself wouldn't show that.  If

18  you want to stipulate that after the case was decided in the

19  Superior Court and before it was reversed the parties did

20  operate in that manner, then this might be of some value.  But

21  the mere fact that there was judgment entered, you don't

22  conclude from that that this is the way the thing was handled.

23    MR. VEEDER:  It is one of the phases of the evidence in

24  the case.

25    THE COURT:  Well, you have some pending matters with the

8056

1   Vail Estate.  You say you are talking about settlement with

2   the Vail Estate.  Why not wait on that?

3        MR. VEEDER:  It suits me, your Honor.  The matter was

4   marked.

5        THE COURT:  It is difficult for me to see how a judgment

6   which was later reversed has any binding effect.

7        MR. VEEDER:  It shows a course of conduct, your Honor.

8   That's the only thing.

9        THE COURT:  Suppose I engaged in a course of conduct

10   on the basis of a judgment and the judgment was later reversed.

11   Then you come into court and say, "Now I am going to show that

12   between 1930 and 1938 you did certain things," and you are

13   going to show that in some way to bind me.  I say, "Well, wait

14   a minute, I did this pursuant to the terms of the judgment,

15   not voluntarily on my part.  There was a judgment that I do

16   these things.  Later the judgment was reversed. Are you

17   contending that my conduct done pursuant to that judgment in

18   some way estops me or binds me or indicates a limit to my rights?

19        MR. VEEDER:  It has nothing whatever to do with the

20   Vail Estate, your Honor.  It has a very strong implication, in

21   our view, in regard to the delivery of water down the valley

22   and in regard to the claims of the Fallbrook Public Utility

23   District and in regard to our claim that for a period long

24   beyond this prescriptive period the Vail Company was operating

25   and delivering water at the head of Temecula Gorge to the United

1  States of America under a claim of right.

2       THE COURT:  Well, this judgment in and of itself would

3  not prove the delivery of any water.  It might be the basis

4  of a claim of right when coupled with some other proof that water

5  was delivered.

6       MR. VEEDER:  That is exactly what I said, your Honor.

7       And here is an additional factor. All one has to do is

8  to review the statistics by the U.S.G.S. and observe the

9  quantities of water that have historically come down the

10  gorge, which in our view would certainly never be there because

11  the Vail Estate is in the position of utilizing all of the

12  water and would use all of the water if there were not a

13  judgment controling them, with all respect to Mr. Stahlman.

14       MR. STAHLMAN:  With all respect to decency, the Vails

15  in their previous operations, and what occurred at that time,

16  too, Mr. Veeder.

17       MR. VEEDER:  That is precisely the point.  Had there not

18  been a judgment there would have been no water in the river and

19  we would certainly have a prescriptive right against Fallbrook

20  and any other claimant.

21       MR. SACHSE:  Your Honor, if this is offered for the

22  purpose of a prescriptive right, I have a new objection, be-

23  cause how they could get a prescriptive right--

24       THE COURT:  Let's pass this up until such time as you

25  have settled this problem with the Vail Estate.

8958

1    MR. VEEDER:  Very good, your Honor.  I just wanted to

2  bring it to your attention.

3       I have no further questions of Col. Bowen.

4    MR. SACHSE:  I have a correction or two in the transcript,

5  your Honor.

6       At page 7923, line 8, quoting me, it reads, "None of

7  the complaint;" it should read, "Paragraph 9 of the complaint."

8       At page 7924, line 19, the word "I" should be inserted

9  right after the word "case," the second word in the line--

10  "In case I file a request. . "

11       At Page 7930, line 22, the word "promise" at the end

12  of the line should be "Problem"--"there won't be any problem;"

13  and the word "write" is "writing."

14       That's all, your Honor.

15       THE COURT:  The corrections may be made.

16       MR. SACHSE:  I am now prepared to lodge the first-- I

17  have given them to Mr. Veeder; I have not yet copies for all

18  other counsel, but I will supply them-- the first of our

19  exhibits.

20       And Mr. Luddy, I have typed a list of them here, and

21  these are the ones that are lodged herewith.  I will bring

22  you the rest later.  This is a revised list, and the old

23  numbers should be disregarded.

24       Here is a set for your Honor.  Well, you don't want them

25  yet until they are admitted.

1    That's all, your Honor.

2        THE COURT:  Plaintiff's Exhibit 152 is not in evidence,

3  a list of the 8,000 acres in the public domain; but in view

4  of Plaintiff's 153 and 154 do we need it?

5        MR. VEEDER: Your Honor, there is an additional fact

6  that is involved.  Col. Bowen and his staff are now pursuing

7  that 152 further.

8        THE COURT:  All right.

9        MR. VEEDER:  And I would like to leave that open for

10 ultimate deposition.

11       THE COURT:  It may be left open.

12       Plaintiff's 125-A is in evidence, but not 125-B or C.

13       MR. VEEDER:  I don't care whether those are offered

14 or not, your Honor.

15       THE COURT:  Plaintiff's 95 is not in evidence.

16       MR. VEEDER:  95, your Honor, we are not offering at this

17 time.

18       THE COURT:  Plaintiff's 90 and 91 are not in evidence.

19       MR. VEEDER:  Plaintiff's 95 relates to the duty of water?

20       THE COURT:  Yes.

21       MR. VEEDER:  That will be withdrawn.

22       Plaintiff's 91 relates to the Cleveland National Forest.

23 That is being withdrawn.

24       Plaintiff's 90 I may offer later, your Honor, but I

25 want to check that further.

B

Z8

1    THE COURT:  All right.

2    MR. VEEDER:  I have this Plaintiff's 88 on my list.

3    THE COURT:  Plaintiff's 88 is not in evidence.

4    Is that what your records show, Mr. Clerk?

5    THE CLERK:  Yes, your Honor.

6    THE COURT:  Plaintiff's 87 is not in evidence. That is

7    a sketch of Lake O'Neill.

8    MR. VEEDER:  That is not going in, your Honor.

9    THE COURT:  That will be withdrawn.

10   MR. VEEDER:  We have these tabulations of water inside

11   and outside the watershed.

12   THE COURT:  What numbers are you talking about?

13   MR. VEEDER:  I am referring to Plaintiff's 84 and 85.

14   Those have been superseded.

15   THE COURT:  You have already told me that you withdraw

16   Plaintiff's 80, 81, 82, 83, 84 and 85.

17   MR. VEEDER:  That is right, and I am getting them

18   physically out now.

19   THE COURT:  All right.

20   MR. VEEDER:  If that is agreeable with everyone.

21   THE COURT:  Plaintiff's 93.

22   MR. VEEDER:  That is these aerials in the box; is that

23   right?

24   THE CLERK:  Plaintiff's 93-AG through 93-AK.

25   THE COURT:  Plaintiff's 93 is in evidence-- 93-A through

1   93-AF.

2       THE CLERK:  That is correct.  Then Plaintiff's 93-AG

3   through Plaintiff's 93-AK were added later.  They were merely

4   marked for identification.

5       MR. VEEDER:  I offer those now, your Honor.  Those are

6   the soil surveys.

7       THE COURT:  Is there any objection to Plaintiff's 93-AG

8   through Plaintiff's 93-AK?

9       MR. SACHSE:  I have no objection.

10      THE COURT:  All right, Plaintiff's 93-AG through 93-AK

11  are received in evidence.

12      (Plaintiff's Exhibits 93-AG through 93-AK were received

13  in evidence.)

14      THE COURT:  Now, what about this 78 series, where you

15  picked out portions of it?

16      MR. VEEDER:  I would like to leave those lodged, if I

17  may, your Honor, because as the case progresses it is entirely

18  possible there will be individual owners who will be interested

19  in having them put into evidence.

20      MR. SACHSE:  I agree, your Honor.  I think it would be

21  helpful to leave them lodged and not offer them until the

22  problem arises.

23      THE COURT:  All right.

24      That fairly well cleans up my list, except 10 through

25  14.

1      MR. VEEDER:  Col. Robertson is going to be on the stand

2 in regard to those, your Honor.

3      MR. STAHLMAN:  Plaintiff's 87.

4      MR. VEEDER: Mr. Stahlman, why don't you put in 87 your-

5 self?

6      MR. SACHSE:  May I inquire-- I have no further questions

7 of Col. Bowen-- did you say you are through with Col. Bowen?

8      MR. VEEDER: Yes, I have no further questions.

9      THE COURT:  What about Plaintiff's 87?  Mr. Veeder said

10 he is not going to offer it.

11      MR. VEEDER:  I will just leave it lodged.

12      MR. STAHLMAN:  Has your Honor seen it?

13      THE COURT:  Not in detail.

14      MR. STAHLMAN:  I think we shouldn't be too mundane with

15 a work of art that might have some merit.

16      MR. VEEDER:  I hope that Mahlin Vail pays him a very

17 high fee for his efforts.

18      THE COURT:  Is this the work of some Marine?

19      MR. SACHSE:  I want a foundation laid.  Bring the

20 artist down.

21      MR. STAHLMAN:  It was put up in great style.  I was

22 sure that nobody was going to steal a look at it unless they

23 put forth some effort.  (Mr. Stahlman exhibiting the exhibit.)

24      THE COURT:  A very beautiful picture.  It would be a

25 great help to me in deciding this case, I am sure.

1      MR. VEEDER:  Well, we offer Plaintiff's 87.

2      MR. STAHLMAN:  Now I am satisfied.  No objection.

3      THE COURT:  May the record show the remark was

4  facetious.  Do you offer it?

5      MR. VEEDER:  Yes, your Honor.

6      THE COURT: Plaintiff's 87 received in evidence.  Do

7  you want the photograph with it?

8      MR. VEEDER:  The photograph is already in, your Honor.

9      THE COURT:  What is the photograph?

10      MR. VEEDER:  The photograph of Lake O'Neill.

11      THE COURT:  That is 86.

12      (Plaintiff's Exhibit No. 87 for Identification was

13  received in evidence.)

14      MR. VEEDER:  Your Honor, we have this series of

15  Plaintiff's 89-CG-1, 89-CG-2, 89-CG-3, 89-CG-4-- here they are--

16  which we took on the trip through Pendleton.  I will offer

17  those.

18      THE COURT:  To complete the record?

19      MR. VEEDER:  Yes, your Honor.

20      THE COURT:  My record shows that we stopped with G,

21  Mr. Clerk.

22      THE CLERK:  89-CG-1, 89-CG-2, 89-CG-3 and 89-CG-4.

23      THE COURT:  Yes.

24      MR. VEEDER:  There were other people who worked on

25  those exhibits other than I, but I am offering them.

8064

THE COURT:  How many are there?

THE CLERK:  Four.

THE COURT:  Those were the maps marked on the trip?

MR. VEEDER:  Yes.

THE COURT:  That was the trip at Pendleton?

COL. BOWEN:  Yes, sir.

THE COURT:  What about the ones we marked on the trip up to Temecula?

MR. VEEDER:  Are you going to offer those?

MR. MOSKOVITZ:  I think we might as well have them in evidence.

MR. VEEDER:  It suits me.

What were the numbers assigned to those, Mr. Luddy, on the Temecula trip or the State trip?  I don't have a designation on that.

MR. MOSKOVITZ: It seems to me that we marked them on the 29 series themselves, didn't we?  We didn't give them a separate number.

MR. VEEDER:  If they are on the 29 series, they are already in.

MR. SACHSE:  I think he used the original exhibits.

THE COURT:  89-CG-1, 2, 3 and 4 will be in evidence.

(Plaintiff's Exhibits No. 89-CG-1, 2, 3, and 4 for Identification were received in evidence.)

THE COURT:  It seems to me that on the Temecula trip

8065

B

Z13

1    we used the exhibits themselves.  They will show.

2         MR. VEEDER:  I have nothing further, your Honor.

3         MR. SACHSE:  I have one question, to clarify the record.

4         Col. Bowen, I don't imagine that you have that study

5    of the irrigable lands and their location, the tabulation,

6    prepared yet-- over night.  That is the one we referred to

7    yesterday.

8         I would simply like the record to show, your Honor,

9    that that will be forthcoming, and that we can reserve

10   additional cross-examination on that, if necessary, after the

11   tabulations are prepared.

12        I have no questions at this time, with that understand-

13   ing.

14        MR. STAHLMAN:  Did you paint Exhibit 87, Colonel?

15        COL. BOWEN:  No, sir.

16        THE COURT:  All right, Col. Bowen, you may step down.

17   We will have you back again when we need you.

18        THE WITNESS:  Aye, aye, sir.

19        MR. VEEDER:  I think the Colonel will probably be back,

20   your Honor.

21        Call Col. Robertson.

22

23

24

25

1                    ELIOTT B. ROBERTSON,

2    called as a witness in behalf of the plaintiff, being first

3    duly sworn, testified as follows:

4              THE CLERK:  Would you state your name, please?

5              THE WITNESS:  Eliott B. Robertson.

6

7                      DIRECT EXAMINATION

8    BY MR. VEEDER:

9          Q  Will you state your age, Colonel?

10         A  Forty-two.

11         Q  Where do you reside?

12         A  Waldorf-Maryland.

13         Q  Would you state your official capacity in the

14   Government, as to your rank in the Marine Corps?

15         A  Colonel.

16         Q  How long have you been in the Marines?

17         A  Nearly twenty years.

18         Q  And will you briefly state into the record your

19   educational background?

20         A  I was educated in the public schools at Bethesda,

21   Maryland, graduating from high school in 1934.  I stayed out

22   of school a year and worked at the construction trade, as I

23   have all my life.  I went to the University of Maryland,
                                    Bachelor's
24   getting the Civil Engineer/Degree in 1939.

25         Q  Subsequent to your graduation from the University

of Maryland, would you briefly state your experience.

A   I was in the Army as a Reserve Officer for a short time, a matter of weeks.   Then I took a regular commission in the Marine Corps and have been a Marine officer ever since.

The first year, commencing in the summer of 1939 was in Basic School, a school through which all young officers go. Then I went to sea for a year.   Then I returned to the United States and was stationed first in the Infantry and then in an Engineer Company at Camp Elliott.

In the fall of 1941 we went to Pearl Harbor with an Engineer Battalion and built Camp Catten.   I was there an engineer company commander, in sole charge of building about one-third of the camp, around 250 to 300 buildings and all appurtenances.

In May, 1942, we returned to San Diego, and shortly thereafter I was transferred to Washington, where I spent something over two years in the design, procurement and supply of combat engineer equipment.

MR. SACHSE:   Excuse me.   That was from when in 1942?

THE WITNESS:   July of 1942, for 28 months.

BY MR. VEEDER:

Q   And what division or office were you assigned to in Washington when you went to Washington?

A   For about two-thirds of the year I was assistant to the Officer in Charge of the Engineer Supply Division, and the

1    remainder of the time I was the Officer in Charge.

2        Q   And thereafter would you state what your experience

3    was?

4        A   I then went to Guadalcanal, where I was the First

5    Battalion commander and organized the Sixth Engineer Battalion

6    of the Sixth Marine Division.  There, in addition to training

7    and preparing ourselves as a new unit for combat, we were

8    charged with all the housekeeping functions of the Division,

9    such as road and bridge building, water supply, all things of

10   an engineer and maintenance nature.

11       Q   From there what was your experience, Colonel?

12       A   We embarked from Guadalcanal for Okinawa, where we

13   engaged in combat.

14       Q   When did you return to the United States from there,

15   and why?

16       A   I was wounded on Okinawa to the extent finally that

17   I had to be evacuated and came back to the States in June

18   of 1945 and spent about nine months in various hospitals.

19       Q   Thereafter what was your experience in the Marine

20   Corps?

21       A   I was transferred from the hospital to Headquarters

22   Marine Corps, where from February of 1946 until February of

23   1951 I was the Assistant Officer in Charge of our utilities

24   and public works section of the Supply Department, which

25   section was charged with the planning, construction, operation

B

Z17

1  and maintenance of the Marine Corps establishments worldwide.

2        From 1951 until July of 1957, I continued as Officer

3  in Charge of that and some other activities which were joined

4  with it, with the title Director of Services Division.  The

5  additional factors we brought in were such matters as work

6  management, property accounting, and all forms of transportation

                                        freight and
7  services, such as rail/passenger, sea and air transportation.

8        Q  And what other function did you have, if any, during

9  that period?

10        A  As collateral duty I was for many years the recorder

11  of the Marine Corps Station Development Board, which was a

12  board of usually nine senior general officers at Headquarters,

13  whose duties were to review all construction and development

14  plans for Marine Corps stations and make recommendations to

15  the Commandant of the Marine Corps for his personal determina-

16  tion.  As Recorder I kept the records straight and was charged

17  normally by the senior member with personal inspection of all

18  the problems brought before the Board and technical recommenda-

19  tions to the Board.

20        Q  Based upon your career in the Marine Corps, would

21  you state when you first became acquainted with Camp Pendleton?

22        A  I first went to Camp Pendleton in July of 1943 in

23  connection with the supply of engineer equipment.

24        Q  And at that time did you become acquainted with the

25  physical development on Camp Pendleton, such as the housing

B

Z18

1     A  I received the usual Cook's Tour of a newcomer and

2  looked the place over fairly thoroughly in the course of about

3  a week.

4     Q  Between the time when you first went there and the

5  present time, have you become acquainted with the operations

6  of the Camp, particularly in regard to the utilization of water?

7     A  I have.

8     Q  Have you given consideration to the plans for the

9  development of Camp Pendleton to fullfil its mission?

10     A  I have on many occasions beginning in 1946.

11     Q  Would you briefly state what is the mission of the

12  Marine Corps as one of the fighting elements of the Armed

13  Forces?

14     MR. SACHSE:  I object, if the Court please; water right

15  is not determined upon the standing in the community of the

16  owner. The right is no greater and no less.  The right of the

17  United States would be no greater if this were a penitentiary

18  instead of a Marine Base.  It is absolutely improper to

19  introduce any evidence as to the mission of the Marine Corps.

20  It is the very point that was discussed at great length in the

21  Circuit Court of Appeals decision.

22     THE COURT:  I am inclined to agree with Mr. Sachse.

23  But the only question now is, how is the easiest way to let

24  you make your record?  By offer of proof, or by question and

25  answer?  Which will be the fastest?

B

219

1    MR. VEEDER:  I think the Colonel can make it faster

2  than I can, because I will probably get into quite a speech.

3        But the point I make, your Honor, is that I believe

4  the mission of the Marine Corps is highly important in this

5  litigation.  There is a preliminary question leading up to the

6  function of Camp Pendleton as part of our overall national

7  defense.

8        THE COURT:  Indirectly, of course, what the military

9  did with the Base might have some bearing on the question of

10  whether a military use is a riparian use.  But as far as

11  enlarging the rights of the United States, I agree entirely

12  with Mr. Sachse.

13        MR. VEEDER:  Without arguing with your Honor about it,

14  I think there is sufficient evidence in the record now, your

15  Honor, to show that the Fallbrook Public Utility District

16  and the State of California had full knowledge and complete

17  knowledge that the United States was greatly in need of water,

18  and that in complete disregard of those needs the State under-

19  took to grant a permit, indeed to grant several permits, and

20  that the Fallbrook Public Utility District,with full knowledge

21  of the demands for water downstream, undertook to purloin some

22  of that water.

23        Now our view is this, that it is essential for the

24  record to disclose the great public use that is being made of

25  this water and the invasion of those rights by the Fallbrook

B

Z20

1   Utility District and, as I said, its handmaiden the State of

2   California. So with that in mind, I think that it is essential.

3   I think it is extremely relevant.

4          THE COURT: Let's see what you can do with an offer

5   of proof. I will sustain the objection presently and let's

6   see what you can do with an offer of proof now.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JOHN SWADER, OFFICIAL REPORTER

C

Z13

1    MR. VEEDER:  It would be the purpose of the United

2    States to--

3        THE COURT:  Prove by this witness who is now sworn

4    and is on the witness stand.

5        MR. VEEDER:  Thank you, your Honor.  That the Marine

6    Corps is one of the highly important elements in the defense

7    of our country.  That the United States and all of you is in

8    great peril at the present time.  That it is absolutely

9    essential that there be maintained the Marine Corps and that

10   adequate facilities for the training of the Marines be

11   provided.  That Camp Pendleton is one of the very, very

12   essential establishments for our national defense and that

13   without it the West Coast would be seriously depleted from

14   the standpoint of defending this part of the country.  More-

15   over, we would show that the Marine Corps trains men as the

16   first unit.  In the event of war the Marines are the first to

17   take off, and they have to be prepared, and they have to have

18   an adequate place to be trained and prepared for their mission.

19       THE COURT:  And that Pendleton is one of the places

20   where they are so prepared.

21       MR. VEEDER:  And Pendleton is the key place, is the

22   key place for that training.

23       THE COURT:  All right.

24       MR. VEEDER:  Now--

25       THE COURT:  Let's break this up as we go along.  Is

C

Z14

1   that a good stopping place for the time being?  I mean, for

2   objections?

3          MR. VEEDER:  I would just as soon have an objection

4   now.

5          MR. SACHSE:  I want to object onthe same grounds, your

6   Honor, that the rights of the United States can be neither

7   expanded nor contracted.  Whether this is a Marine Base or

8   penitentiary, it is immaterial and irrelevant, the purposes

9   for which the property is operated.

10          THE COURT:  The objection is sustained.

11          I agree with what you said about the Marines, and I

12   don't relish being in a position to have to say that what you

13   offer is immaterial.  But the Government is not helpless.  If

14   the Government finds it hasn't enough water when it gets

15   through quieting title to its water claims, it has the power

16   of eminent domain.  It can do with this Marine Base what it

17   wants to do.  Mr. Sachse is dead right, that the needs of the

18   Government or the criticalness or the importance of this base

19   to our military defense cannot enlarge the claims of the United

20   States.

21          MR. VEEDER:  I will agree with your Honor--

22          THE COURT: In this suit.  It may be very pertinent in

23   an eminent domain proceeding, but in this suit it is imma-

24   terial.

25          MR. VEEDER:  But your Honor, may I respond to what you

Robertson - Direct                                          8075

1  have just said?  Apart from the offer of proof that I am in

2  the process of making, to me it is incredible, it is absolutely

3  incredible, that the Fallbrook Public Utility District which

4  was diverting water pursuant to a gratuitous, revocable license,

5  knowing full well that the Marines were then using water and

6  had been using water for four or five years, went ahead and

7  undertook the initiation of rights to the use of water which

8  invaded the interests of the United States; and I think--

9          MR. SACHSE:  Let the record indicate--

10         MR. VEEDER:  Let me finish.  The point that I make, your

11  Honor, is this:  Your Honor may be absolutely correct, if

12  Fallbrook had had a right in the first instance, to say, "Well,

13  if you want that right, go and get it by eminent domain."

14  I am with you all the way on that.  But I deny that equity and

15  good conscience and, indeed, the law, even the law as promul-

16  gated by-- I won't say it.  Well, I am trying to be nice the

17  last few hours-- The point I am trying to make, your Honor,

18  is this:  That here we have a calculated invasion.  And your

19  Honor says, "Well, if you want the water that they have robbed

20  you of, go and condemn it."  And I submit that the law does

21  not contemplate such a thing.

22         THE COURT:  I am not talking about specific water.  I

23  said if the water to which you had rights was not sufficient,

24  you could acquire additional rights by condemnation.  We will

25  cross bridges as we get to them.  But presently, the objection

C
Z16

1    to the offer of proof is sustained.

2        Now, do you have more in this offer of proof?

3        MR. VEEDER:  Well--

4        MR. SACHSE:  I would like the record to indicate, your

5    Honor, I am making the objection in behalf of W. C. Fevers,

6    riparian owner of the Stardust Ranch.

7        THE COURT:  As well as the Fallbrook Public Utility

8    District?

9        MR. SACHSE:  Yes, your Honor.

10       THE COURT:  In whose behalf are you objecting?

11       MR. SACHSE:  Both.  The Public Utility District and

12   the riparian owner.

13       THE COURT:  The record will so show.  And the record is

14   sustained.

15       Do you have any further offer of proof with this

16   witness?

17       MR. VEEDER:  Yes, in regard to needs of Camp Pendleton.

18   I haven't asked the question.  I think it would be a pious

19   idea to throw the question in.

20       Q Would you state into the record, Col. Robertson, the

21   mission of the Camp Pendleton as it relates to the overall

22   mission of the Marine Corps?

23       A  Camp Pendleton furnishes logistic support for the

24   combat elements of the Marine Corps stationed on the West

25   Coast, Fleet Marine Force, and also furnishes individual

C

Z17

1    training of individuals who are being prepared for transfer

2    to the Fleet Marine Forces overseas and to other supporting

3    establishments in the United States.  The Fleet Marine Force

4    is a part of the Fleet and is an amphibious joint air-ground

5    task force.  Camp Pendleton is companion station to El Toro

6    which is an air station.  Camp Pendleton provides the major

7    part of the maneuver grounds for the organizational training

8    of the Fleet Marine Forces stationed on the West Coast,

9    consisting of a Marine Air Wing from El Toro and its satellites,

10   and the Marine Division plus some reinforcements called Force

11   Troops.  Camp Pendleton is the site for this amphibious train-

12   ing, which is our primary mission.

13        Q When personnel have been trained at Camp Pendleton,

14   where are they sent from there, Colonel, for service?

15        MR. SACHSE:  I object.  It is immaterial.  It is

16   inconsequential.  I didn't object to the preceding question,

17   but I think it is of historical interest, the military use

18   question, but--

19        THE COURT:  Well , it is general background.  Overruled.

20        THE WITNESS:  The recruit comes from the Recruit Depot

21   at San Diego up to Camp Pendleton and is there further trained

22   as an individual until he is an accomplished rifleman.  From

23   there he is either transferred into the Fleet Marine Force

24   unit at Camp Pendleton, into a combat organization, or further

25   transferred up to El Toro for integration into an air combat

C

Z18

unit, or sent overseas as a replacement to a combat unit, or

sent to support establishments, such as the Marine Corps

Supply Center at Barstow or to the protection detachments at

Navy Yards, such as Mare Island, Bremerton, Pearl Harbor.

Part of the training he gets at Camp Pendleton is engaged in

with its satellites:  The cold weather center and mountain

training center at Bridgeport, California, and the desert

training and long-range and high-altitude weapons at Twenty-Nine

Palms, California.

BY MR. VEEDER:

    Q  Would you be a little more specific in this, your

reference to the satellite feature of Camp Pendleton?  Why

does that circumstance exist?

    MR. SACHSE:  If the Court please, I will object to any

reference to the satellites, and I move to strike the refer-

ences to Bridgeport and Twenty-Nine Palms.  They have ab-

solutely no right in the waters of the Santa Margarita River.

And the fact that Pendleton has one or a hundred satellites

does not in the slightest increase its water right.

    MR. VEEDER:  That is precisely the point I want him to

bring up, your Honor.  Here we have a situation where Camp

Pendleton is a key, not only for the personnel that are

trained immediately upon the beaches of Camp Pendleton or in

the areas, the combat areas, but throughout the whole area of

California.  The Camp Pendleton base is a key base, of the

1    essential character which the Colonel has described; namely,

2    people are sent from there to other places to be trained

3    further and to come back ultimately to Camp Pendleton, in some

4    instances.

5         THE COURT:  May we consider this as an offer of proof

6    as to what this witness would now testify to under oath, what

7    you have just stated?

8         MR. VEEDER:  Well, I would want the Colonel to say

9    whether he agrees with what I have just said.  He may not

10   completely agree with what I have just said with regard to the

11   utilization of Camp Pendleton as a satellite.  I want to be

12   sure of that.

13        THE WITNESS:  Yes, I agree.  Camp Pendleton performs

14   one other function.

15        THE COURT:  Now, wait.

16        MR. SACHSE:  Let's save time, your Honor, and let him

17   answer, if you will recognize my right to motion to move to

18   strike instead of going through a cumbersome order of proof.

19   I think it might save time.

20        THE COURT:  I am just trying to do what will save the

21   most time; be the quickest.  Go ahead.

22        MR. SACHSE:  I think striking would be the easiest.

23        THE COURT:  You agree with what Mr. Veeder stated

24   except you want to add something?

25        THE WITNESS: As to individuals' training, yes.  We also

C

Z20

1   send complete organizations from Camp Pendleton up to Twenty-

2   Nine Palms and mountain areas for further training.  Camp

3   Pendleton is also the host for joint amphibious maneuvers with

4   the other services.  For example, very shortly now there will

5   be a maneuver involving both the Navy and Marine Corps, an

6   amphibious operation at Camp Pendleton.  From time to time we

7   also train Army units or furnish our training facilities there

8   for Army units.  And combined with these amphibious maneuvers,

9   of course, is our air-ground coordinated efforts, the air

10   troops from El Toro and their aircraft joining maneuvers also.

11        MR. SACHSE:  I move to strike, your Honor, on the

12   grounds it is all irrelevant and immaterial.

13        MR. VEEDER:  I would like to respond to that, your

14   Honor.  Again, we come back to the point--

15        THE COURT:  I know your position.  It is the same as

16   you have been stating it?

17        MR. VEEDER:  Yes, but I think there is an additional

18   factor that is becoming increasingly important as this evidence

19   goes in.  If we were here proving up an agricultural use, an

20   agricultural need, I daresay that there would be no reason why

21   we shouldn't go ahead and outline the areas that would utilize

22   water and outline the present use, the use that would be

23   required had we not been prevented from the full development

24   and the ultimate use of water on full mobilization.  In other

25   words, it is passing strange, in my view, that the Marines are

C

Z21

1  more limited in the proof of their rights than the Stardust

2  Ranch would be which, I assume, will someday come in and

3  undertake to prove the ranch, what they raise, what they would

4  like to raise, and their ultimate uses of water.  Now, why is

5  Camp Pendleton any different than a ranch or any place else?

6  Certainly, if we didn't put in this evidence, we would be in

7  a position of failing to prove the beneficial use, needs, and

8  the rights to the use of water.

9      MR. SACHSE: My response will be very brief, your Honor.

10  My objection is principally to the fact that this entails, this

11  testimony of the Colonel, involves operations outside the water-

12  shed of the Santa Margarita River. He is generalizing on Camp

13  Pendleton and on its beaches and on Bridgeport and on Twenty-

14  Nine Palms, none of which can have the slightest relationship

15  to the water rights of the United States.

16      THE COURT:  In the sense that it is an offer to prove,

17  right or wrong, the potential uses the Government might make

18  of the Base itself within the watershed and the uses the

19  Government might make of the Base in connection with the use

20  of the water from the watershed, such as being the host for

21  joint operations with Army and Navy and so forth, I will

22  overrule the objection and permit it in.  I don't think that

23  the Government's rights can be limited by its need.  And if

24  you wanted to expand this theory you could expand it indefin-

25  itely.  The Government could spell out demands that far exceeded

C

Z22

1    any rights that they acquired from the Santa Margarita.  And

2    with a key Marine Base in an area with the satellite bases

3    relying on it, operating in conjunction with it, you could

4    expand the uses of the Base so that the military use you

5    showed on the base would be ten times in amount of use of

6    water, any riparian right or other right that you had acquired,

7    that the Government had acquired, when they bought the Santa

8    Margarita.  In that sense, I don't think it is competent.

9    But in a trial without a jury the Circuit Court assumes a

10   court picks out those things that were material and disregarded

11   those that were immaterial.

12        MR. VEEDER:  I would just like to respons momentarily

13   to what your Honor has just said.  It goes back, of course,

14   to the good old days of the floral wreath, and so forth, but,

15   in any event, we have never taken the position that we could

16   expand our rights by reason of our needs, beyond our vested

17   rights.  We do say, though, that in regard to an interloper--

18   and I am being kind-- in regard to Fallbrook-- that the matter

19   of the reasonableness of the riparian right is not involved.

20   Here is a Johnny-come-lately, pistol in hand, and we have our

21   riparian rights that we say we can expand in regard to such

22   an appropriator.  In regard to a riparian owner, we hold those

23   rights correlative.  But certainly, if the satellites to

24   which the Colonel has testified would make a demand for

25   increased water within the watershed, and we say that the

1  military use is a riparian use, we say that those rights

2  could be expanded to their full potential.

3       THE COURT:  In part, that is the reason for my ruling.

4  There may be some grain of material here.  In other words,

5  let us assume the Government has certain rights, riparian

6  rights on this base, and then let us assume that the Court

7  finds that a military use is a proper riparian use.  That,

8  apparently, is conceded.  The real question in dispute is

9  the reasonableness of the use and the extent of the use.

10  Assume that the Court finds that the military use is a

11  reasonable use and riparian use.  Then, the question comes:

12  What is the extent of this right by the Government?  Now, all

13  I pointed out is this:  That although you might, for argument's

14  sake, take care of 50,000 men-- I am just picking the figure

15  out of the blue-- by what riparian rights you had, you couldn't

16  move a million men in there and say we are going to take all

17  the water for this million men by virtue of our riparian

18  rights.

19       MR. VEEDER:  As against Fallbrook.  Yes, we could as

20  against these appropriators, your Honor.

21       THE COURT:  The record is in such a shape that I can

22  pick and choose on this matter.  I see the criminal case

23  has come in.  How much more do you have of this witness?

24       MR. VEEDER:  Not very much, your Honor.  I am moving

25  as fast as we can.  I have got some exhibits I want to

1    introduce, and we will move right along.

2    MR. SACHSE:  May I offer this suggestion, your Honor?

3    I want to make this as short as I can.  But I am forced to

4    cross-examine with this last answer.  I am not just going to

5    let this record stand where the Circuit Court of Appeals or

6    the Supreme Court can assume that Bridgeport is in the water-

7    shed or Twenty-Nine Palms is in the watershed or that every

8    amphibious training is carried on within the watershed, be-

9    cause they aren't.  I am just offering this in kindness to

10    Mr. Veeder.  If he wants to save time, maybe we should better

11    have the Colonel as he goes along spell out which of these

12    are in and which of these are out of the watershed; otherwise,

13    I am going to cross-examine.

14    MR. VEEDER:  I am sure the Colonel will do that.  We

15    don't want Mr. Sachse's cross-examination if we can help it.

16    THE COURT:  We will suspend just a minute.  If we can

17    get through here in a few minutes, why, we will.  Otherwise,

18    we will go over until tomorrow morning.

19    Call the criminal matter.

20    (Another matter.)

21    THE COURT:  All right.  Let's go ahead with the

22    Fallbrook Matter.

23    May it be stipulated, gentlemen, that all of these

24    places that the Colonel mentioned of other installations are

25    outside the watershed except the Naval Ammunition Depot and

C

Z25

1  the Naval Hospital and that part of Pendleton which we know is

2  in the watershed by virtue of the maps?

3  BY MR. VEEDER:

4      Q  Is that correct, Colonel?

5      A  That is correct.

6      MR. VEEDER:  I will stipulate to that.

7      MR. SACHSE:  All right.  The Colonel has testified to

8  it.  That is enough.

9      THE COURT:  Do you have any further questions, Mr.

10  Veeder?

11      MR. VEEDER:  I am going to put in some of the exhibits

12  that I have here.

13      Q  And before I ask any further questions I hand you,

14  Colonel, a document marked for identification Plaintiff's

15  Exhibit No. 10 and ask you to just state briefly into the

16  record what that is.

17      A  These are copies of the records at Headquarters

18  Marine Corps showing the designation of Camp Pendleton as a

19  permanent establishment on the 21st of September, 1944.

20  And its designation is "Isolated for housing purposes on

21  30 October, 1951"; both determinations by the Secretary of

22  the Navy.

23      MR. SACHSE:  Your Honor, I would object to this document

24  on the ground that much contained in it-- is this 10?

25      MR. VEEDER:  10.

Robertson   Direct

8086

1    MR. SACHSE:  --much contained in it is self-serving.

2  However, I will stipulate that Camp Pendleton is a permanent

3  base.  There is a lot in here about boat basins and about how

4  essential it is, and so on, at least comparing it to my 10.

5    THE COURT:  The objection is overruled.  We will pick

6  out what is material and what is immaterial.

7    MR. VEEDER:  Does your Honor care to look at it?

8    THE COURT:  Yes.  What is your next one, Mr. Veeder?

9    MR. VEEDER:  No. 11.

10    Q  Will you state into the record what Plaintiff's

11  Exhibit marked for Identification No. 11 is, Colonel?

12    A  This is certified copy of the Secretary of the

13  Navy's certificate to Federal Housing Administration covering

14  the construction of 562 houses, which later becomes De Luz

15  Homes.  And it contains, as required by law before the construc-

16  tion could go forward, the certification of the Secretary of

17  the Navy at that time that the military installation is

18  deemed to be a permanent part of the Department of the Navy,

19  there is no present intention to substantially curtail the

20  activities, and that the houses would be kept full.

21    MR. VEEDER:  We offer Plaintiff's 11.

22    MR. SACHSE:  No objection.

23    THE COURT:  Received in evidence, 11.

24  BY MR. VEEDER:

25    Q  I hand you Plaintiff's Exhibit marked 12 for

C

Z27

1    Identification and ask you to state into the record what it is.

2         MR. SACHSE:  Is this 12, Mr. Veeder?

3         MR. VEEDER:  12 it is.

4         THE WITNESS:  This is a similar Secretary of the Navy

5    certificate covering the first half of Wire Mountain Homes.

6    The certificate is identical to that covered by the previous

7    exhibit except for the different houses.

8         MR. VEEDER:  We offer 12, your Honor.

9         THE COURT:  Received in evidence.

10   BY MR. VEEDER:

11        Q  I hand you Plaintiff's Exhibit marked 13 for

12   Identification and ask you to state into the record, Col.

13   Robertson, what it is.

14        A  This is a similar Secretary of the Navy certificate.

15   It covers the last half of Wire Mountain homes and is dated

16   the 24th of June, 1953.

17        MR. VEEDER:  We offer 13, your Honor.

18        THE COURT:  13 received in evidence.

19        MR. VEEDER:  Now, 14, your Honor, is a copy of the

20   stipulated judgment.  While it was part of the pleadings I

21   am offering it, I am offering a copy of it, as part of the

22   record in the case.

23        MR. SACHSE:  No objection.

24        THE COURT:  14 received in evidence.

25        MR. STAHLMAN:  That is the stipulated judgment?

Robertson - Direct

1      MR. VEEDER:  That is the stipulated judgment, yes, sir.

2      THE COURT:  Let me see the judgment.

3  BY MR. VEEDER:

4      Q  Now, Col. Robertson, would you state the size of the

5  Marine Corps under the present legal authorization?

6      MR. SACHSE:  Object-- immaterial-- on the same grounds

7  previously stated.  The size of it.

8      THE COURT:  More of this same kind of business we have

9  been talking about?

10     MR. VEEDER:  I just want to have this final part into

11  the record--

12     THE COURT:  Go ahead.

13     MR. VEEDER:  --with regard to the authorization of the

14  Marine Corps.

15     THE WITNESS:  The Marine Corps strength has been fixed

16  by law at three Marine Air Wings and three Marine Divisions.

17  Our physical establishment or permanent establishment is based

18  on that floor.

19  BY MR. VEEDER:

20     Q  Based upon your experience in the Marine Corps,

21  what has been the effect upon the population of a camp, such

22  as Camp Pendleton, when there has been a reduction in personnel?

23     A  My experience is varied in the past.  At times Camp

24  Pendleton has gone down and other stations have gone down.

25  However, with the introduction of this new law just mentioned,

C

Z29

1  fixing the military strength of the Marine Corps, we have an

2  entirely different situation and a different set of plans.  In

3  order to maintain the three Marine divisions we have to have

4  three Marine division training camps; similarly, three air

5  wings training establishments.  So we would never visualize

6  Camp Pendleton being reduced again.  Instead our planning now

7  is that we will reduce overhead figures first and then close

8  camps.  An illustration is a current situation we have on the

9  East Coast where in a large camp or a large complex of camps

10  on a reduction of personnel we closed up a whole camp and

11  concentrated the troops from that camp into the larger camp,

12  thus lowering an overall overhead.  We have under consideration

13  now as an economy move closing another camp.  That would move

14  several thousand men to Camp Pendleton.  Then, looking at

15  Camp Pendleton alone, we would apply the same theory that we

16  would first close up an outlying camp, reduce expense and

17  overhead, and concentrate in the heart of the camp as much

18  of the population as that part of the camp would house.

19  Practically applied, it would mean that the camps in the

20  outlying watershed would close, and if we were to reduce any

21  significant amount in the Marine Corps as a whole, we would

22  maintain that Marine division largely in the main camp area

23  down in the area of the Santa Margarita River watershed.

24

25

Case 3:51-cv-01247-JO-SBC   Document 4571   Filed 09/24/63   PageID.28843   Page 51 of 69

D

Z21

1    Q  Colonel, would you state into the record the

2    determination as to the number of gallons per day for each

3    individual who would be billeted or who would reside on Camp

4    Pendleton?

5    MR. SACHSE:  Military or civilian, or are they both

6    the same, Mr. Veeder?

7    BY MR. VEEDER:

8    Q  Would you distinguish, if there is a difference,

9    between civilian and military personnel?

10    A  In our planning figures and our experience, we have

11    not tried to, nor are we able to distinguish between an

12    individual in uniform and one out of uniform as to his require-

13    ments.

14    Based on our overall studies and experience, applied

15    to this climate, we have a planning factor and a requirement

16    for 200 gallons per person per day on the average throughout

17    the year.  Now there will be sometimes of the year, such as

18    August, when it may be a little higher, and in January a little

19    lower.  The overall factor works out to 200 gallons per man per

20    day.  .

21    Q  Now, Colonel, I hand to you the answer to Fallbrook

22    Public Utility District's Interrogatory No. 12-A and ask you

23    to state whether the figures set forth there as the average

24    number of military personnel stationed at Camp Pendleton is

25    correct.

D

Z22

1          A  The averages are correct, from the record.  I have

2  made some spot checks, checking peaks, and have found that in

3  late 1944 we had a peak of 56,000 men, compared to the average

4  for that year of 45,000 given in the interrogatory.

5          THE COURT:  What was that peak?

6          THE WITNESS:  56,000, your Honor.

7          THE COURT:  In August, 1944?

8          THE WITNESS:  In late 1944, in the fall, sir.

9          In 1952, on the 1st of October, a head count revealed

10  49,123 people, against an average that year of 34,000.

11  BY MR. VEEDER:

12          Q  Would you state into the record the signifcance of

13  those two peak periods from the standpoint of operation of the

14  camp and the planning at the camp?

15          A  From the standpoint of planning at the camp and the

16  operation of essential services, you have to have, when

17  applied to water, a water system that will conduct enough

18  water to supply that many men and a source of water adequate to

19  serve that many people in any given time.

20          There is one other significant number that I would like

21  to give.  These averages in the interrogatories go through

22  1957.  We have not worked out an average for the calendar

23  year 1958, but on the 19th of May, 1958, a head count revealed

24  42,872 persons there effectively, and I know of no real

25  significant variation from that strength to today.  There have

1    been fluctuations. For example, during the intervening period

2    since last May there have been over 6,000 reservists intro-

3    duced into Camp Pendleton for summer training.  But when one

4    realizes that most of them are there for two weeks, some of

5    them are there for six weeks, I calculated on a man week basis

6    and came out with a little over 250 man years, accounting for

7    a momentary peak, probably on the order of 2500, and a gross

8    additional personnel of a little over 6,000.

9         Q  That would be in addition to the figure you last

10   gave?

11        A  In addition to the regular resident population.

12        Q  Now, would you allude to Interrogatory 12-B-- I am

13   still referring to Fallbrook's interrogatories, and referring

14   to the period from 1953 through 1957, would you state whether

15   those figures are accurate, based upon your own investigation?

16        A  From 1953 through 1957, yes, and I--

17        THE COURT:  This concerns dependents of military per-

18   sonnel?

19        THE WITNESS:  Yes.

20        MR. VEEDER:  That is correct, your Honor.

21        THE WITNESS:  There is no significant difference in

22   1958 from 1957.  I have no precise figure for 1958, but the

23   number of houses and families are the same.

24   BY MR. VEEDER:

25        Q  Colonel, did you check out those figures from 1942

down to 1952?

1          I am still alluding to the number of dependents of

2     military personnel housed on Camp Pendleton.

3          A   I checked them against the records of Headquarters

4     Marine Corps, and found the figures shown in the interroga-

5     tories for those years to be generally lower than the records

6     of Headquarters Marine Corps, which I consider to be accurate.

7          Q   Would you state into the record just briefly for

8     each year the figure that you consider to be accurate?

9          Mr. Sachse, do you have a copy of these?

10         MR. SACHSE:   Yes.

11         THE WITNESS:   First, prefacing these detailed figures,

12    we have an estimate of 80 dependents per year on the Naval

13    Ammunition Depot for each of these years-- no specific figure

14    for NAD.   The figures I will now give, in addition to that 80,

15    are the recorded figures for Camp Pendleton and the Naval

16    Hospital, not segregated.

17         THE COURT:   In other words, you are going to give us

18    some figures, and to these figures we would add 80?

19         THE WITNESS:   Each year, sir.

20         THE COURT:   Each year.

21         THE WITNESS:   For the Naval Ammunition Depot.

22    For 1943 the figure should be 185.

23         THE COURT:   Instead of 60.

24         MR. SACHSE:   What item number?

25         MR. VEEDER:   12-B.

1        THE WITNESS:  Page 4 of the interrogatory.

2        THE COURT:  That would be in place of 60; is that right?

3        THE WITNESS:  In place of 60, show 185.

4        1944 and 1945 in place of the figures 98 and 602 should

5   be shown an average of 1785 for each year.

6        MR. SACHSE:  I am lost.  This is what years now?

7        THE WITNESS:  1944 and 1945 should each show 1785.

8        I might say, I have rounded these numbers off in averag-

9   ing them out.

10   BY MR. VEEDER:

11        Q   Would you go ahead and read them into the record,

12   Colonel?

13        A        1946            2175

14                 1957            2175

15                 1948            2200

16                 1949            2440

17                 1950            2500

18                 1951            2500

19                 1952            2350

20        Q   Does that include all of the persons during those

21   years and at the present time who are dependent upon Santa

22   Margarita River water at Camp Pendleton?

23        A   It does not.

24        Q   And what additional personnel are there involved?

25        A   These two interrogatories are directed to military

D

Z26

1    personnel and their dependents.

2         I might add that these dependent figures I just gave

3    are for all dependents housed on Camp Pendleton.  We have no

4    way of segregating the particular class of dependent.

5         THE COURT:  So they are military and non-military?

6         THE WITNESS:  Through the years few civilian families

7    have been there.

8         In addition to the families resident, we have civil

9    service, we have Post Exchange employees and other non-

10   appropriated fund Government activities employees, for whom

11   we take one-third credit when we figure effective population.

12   BY MR. VEEDER:

13        Q  And have you a total of that personnel, Colonel?

14        A  I have made no attempt to project those numbers

15   backward.  I have a current figure.

16        Q  Would you give those , please?

17        A  Based on our current budget situation--

18        Q  That is, 1959?

19        A  ♙budget year 1959, had we been able to develop

20   this establishment as we had planned and expected to, we would

21   have on board the Naval Ammunition Depot a total of 285

22   persons effectively; the Naval Hospital would have effectively

23   2400 personnel; Camp Pendleton would have effectively 54,000

24   personnel, plus 5,000 personnel which we would have placed

25   in the replacement rifle range facility for Camp Matthews.

D

Z27

1  That construction was planned for last year, and money was

2  withheld because of this litigation.

3          Q  Considering the current mission of Camp Pendleton,

4  what are its present needs for water, assuming that the de-

5  velopment could have been undertaken?

6          MR. SACHSE:  I am sorry, I don't understand the question.

7  Would you read it, please?

8          (The Reporter read the pending question.)

9          MR. SACHSE:  That is incomprehensible:  What are its

10  present needs, assuming a development could have been under-

11  taken?  I don't know what development.

12  BY MR. VEEDER:

13          Q  Colonel, would you state what is meant by the current

14  mission of Camp Pendleton, from the standpoint of water

15  utilization?

16          A  Camp Pendleton has been told how many people they

17  should plan and design for, and in turn we have devised con-

18  struction plans and would have gone ahead with them except

19  for this litigation, and under those plans we would have

20  currently on board 62,068 people, adding up the figures I

21  just gave for the individual establishments.  Multiplying

22  that by 200 gallons per person per day you get roughly 12.4

23  million gallons per day for the whole camp's needs, or a little

24  over 38 acre feet per day, which amounts to 13,910 acre feet

25  per year.

Q  How much of that water would be utilized from the Santa Margarita River?

A  10,850 acre feet per year.

THE COURT:  By that you mean 10,850 acre feet would come from the Santa Margarita River and the rest would come from other tributaries on the base?

THE WITNESS:  It would come from other watersheds on the Base.

BY MR. VEEDER:

Q  Have you given consideration to the quantities of water that would be required at Camp Pendleton and the other establishments, in the event of full mobilization, Colonel?

MR. SACHSE:  That is objected to as being immaterial, your Honor; on the same detailed grounds previously  stated.

THE COURT:  If full mobilization is a measure of the Government's right, the objection is good.  But if you can find any facts from this that would show that the amount of people were within a right which the Government had, it might be admissible.  Overruled.

MR. VEEDER:  Do you have the question, Colonel?

THE WITNESS:  Our effective population under mobilization conditions for the three establishments would be 106,500. Using again our 200 gallon per day per capita figure and the conversion factor arithmetically we come up with a water requirement of 23,900 acre feet per year required for the

D

Z30

1        Q  With particular reference to your answer to

2   Fallbrook's Interrogatory 12-H, which is a tabulation of water

3   diverted outside of Santa Margarita River watershed, do you

4   desire to make any changes in those figures?  I will remind

5   you that that is water for all purposes -- agricultural,

6   military, et cetera.

7        A  I have no knowledge on which to change or to comment

8   on those figures.

9        Q  They are satisfactory as far as you are concerned?

10       A  I have no knowledge on which to base a comment.  I

11   did not investigate it.

12       Q  Then would your answer be the same as to the

13   agricultural figures on 12-G?

14       A  That is correct.

15       Q  With reference to Government's Exhibits 11, 12 and

16   13, dealing with the De Luz Homes and the two Wire Mountain

17   Homes units, those have all been constructed, have they not?

18       A  They have.

19       Q  Can you account for, or is there an explanation for

20   the rather substantial percentage of changes made in the answers

21   to Interrogatory 12-B from 60 in 1943 to more than triple, 1944

22   increased 17 times?

23       A  I cannot rationalize how the other party, who is no

24   longer with us, got these figures that he submitted, except

25   that he may have made an approximation or a guess to satisfy

1 the interrogatory of what part of the total dependents were

2 military.  I can't find what part were military.  I have

3 given the total number of dependents housed on the reservation.

4   THE COURT:  Your figures include military and non-

5 military, and the figures in the interrogatory are mostly

6 military.

7   THE WITNESS:  My figures include dependents of both

8 types; no uniform personnel.

9   THE COURT:  I meant dependents.

10   You mentioned the other party.  Who is supposed to have

11 prepared these answers?

12   MR. VEEDER:  I signed them, your Honor.

13   THE WITNESS:  Lt. Miller did the spade work, and how he

14 did it I haven't been able to fathom. I can only assume that

15 he tried to make an honest estimate on this breakdown that was

16 asked of him.

17   MR. VEEDER:  I might add that I talked to him in Dallas

18 last night, where he is now.

19   THE COURT:  Anything further?

20   MR. SACHSE:  I have nothing further, your Honor.

21   MR. MOSKOVITZ:  I have a couple of questions.

22 I have two matters that I want to cover.

23

24

25

D

Z32

CROSS-EXAMINATION

BY MR. MOSKOVITZ:

Q   In estimating 200 gallons per day per person for use, is this the amount that would have to be delivered or the amount that would be actually consumptively used?

A   That is the amount that we would put into our water system.

Q   What percentage of that would be consumed?

A   As far as fresh water is concerned, all of it.

Q   Would there be return flow through the sewage?

A   There would be flow from sewage plants.  But we don't propose to build the economy of Camp Pendleton on sewage.

Q   What plans have you made as to the source of water under full mobilization, where you state you would need 20,800 acre feet from the Santa Margarita River?

A   As far as plans are concerned, we are studying ways and means of further exploiting our basins without sea water intrusion.  We have found no place where an underground barrier has been built to these depths effectively and economically. We are exploring nationwide at this time, and to some extent internationally with a Frenchman, how best to go about building a mechanical barrier underground within a price we can afford to pay for the result.  Eighteen months effort have not given us an answer.

The other possibility is to use this sewage effluent of

1   which you spoke to build up a hydraulic barrier in Ysidora

2   Narrows so that we can, through using injection wells and so

3   on, effectively exploit further those lower basins.

4         Now, how long this mobilization is going to last no one

5   knows, but saying /we entered into a mobilization period of, say,

6   two years of maximum mobilization, obviously if we were in

7   combat our troops would move on out to some degree and we

8   wouldn't conti nue to amass larger populations.  We feeel that

9   our basins could surely take care of us for two years, and of

10   course in an emergency we would use sewage if we had to.

11         We also have hopes of importation of water.  But we

12   haven't found any that we can get on the basis of a firm

13   supply.

14         We also have great hopes for sea water conversion.  We

15   can't count on it.  No one has made it economical and practical

16   yet.

17         Q  But your plans for securing 20,800 feet annually

18   from the Santa Margarita River are based upon pumping it from

19   your ground water basins?

20         A  It is based on the best use of those basins.  We

21   hope to be able to put in some kind of regulating structure

22   to help exploit those basins.

23         Q  You have testified that you would need 10,850 acre

24   feet annually from the Santa Margarita River today if the

25   present authorized mission of Camp Pendleton were to be carried

1  out; is that correct?

2      A  That is right.

3      Q  Where did you plan to secure that quantity of water?

4      A  From the Santa Margarita River.

5      Q  From pumping from the ground water basins?

6      A  From the basin system.

7      Q  And is it your opinion that you could pump that

8  quantity of water over an extended period of time?

9      A  If we get the aid of some kind of barrier.  Probably

10  the first thing we would do would be to put in a hydraulic

11  barrier-- probably the first thing we would do would be to

12  put in a hydraulic barrier and some more regulation at the upper

13  end of the basin--  Yes.

14      Q  Then utilizing 10,850 acre feet annually from the

15  ground water basin at Camp Pendleton would also require putting

16  in a barrier of some type?

17      A  We think that is the only safe way to operate,

18  recognizing that we have some very dry years.

19      MR. VEEDER:  Did you say "some"?  Or "many"?

20      THE WITNESS:  I said "some."

21  BY MR. MOSKOVITZ:

22      Q  Have you made studies which indicate the amount of

23  water you could safely pump each year without causing sea water

24  intrusion?

25      A  That is a very broad question. But assuming proper

Case 3:51-cv-01247-JO-SBC   Document 4571   Filed 09/24/63   PageID.28856   Page 64 of 69

1    recharge we will get that much water.

2        MR. MOSKOVITZ:  That is all, your Honor.

3        MR. STAHLMAN:  Colonel, do you intend to be back here

4    later on in the trial?

5        THE WITNESS:  If I have to.

6        MR. STAHLMAN:  I don't have any cross-examination at

7    this time.  In the event we get into this other question,

8    it may be that I would have.  You will be available later on?

9        THE WITNESS:  I will be back.

10        MR. VEEDER:  By this other question you mean the Vail

11    Estate?

12        MR. STAHLMAN:  Yes.

13        MR. SACHSE:  Your Honor, I assume that all these

14    witnesses, if an emergency arises, are subject to recall?

15        THE COURT:  That is right.

16        Is there anything more?

17        MR. STAHLMAN:  I have nothing at this time, then.

18

19                    REDIRECT EXAMINATION

20    BY MR. VEEDER:

21        Q  Have you given consideration, Colonel, to the effect

22    of the return of sewage effluent upon the basins which underlie

23    Camp Pendleton?

24        A  I have undertaken to explore all the literature on

25    the subject and have studied reports that I can find, most of

D

Z36

1  which are published in current literature, not in standard

2  texts, and largely in the Journal of the American Water Works

3  Association.

4       Q  And what has been disclosed by those studies that

5  you have made?

6       MR. SACHSE:  I object to that question, your Honor.

7       If you want to ask him his opinion based on his research.

8  But he can't tell us what the journals disclose.

9       MR. VEEDER:  All right.

10      Q Would you state your opinion, based upon your

11  investigation, as to the effect of the return of sewage

12  effluent, boron, et cetera, into the basin?

13      A  In my opinion, there are two real problems.  I feel

14  that the bacteriological problem can be handily solved; at

15  greater expense than we now go for sewage treatment, but it

16  can be solved.

17      The two problems that appear to be insoluble with

18  present standard sewage treatment equipment is the boron

19  contamination, which as it accumulates from recycling through

20  a basin of this kind, would eventually get to the degree where

21  it will be harmful to first one type of plant and then to

22  another.

23      And the other problem is the sudsing or foaming problem.

24  These papers which I have read, pictures I have looked at,

25  in the Middle West, for example, where they tried to recycle

1    the sewage; they were finally getting soap suds through the

2    household spigot for drinking purposes.  On Long Island they

3    had similar experience.  We certainly don't want to contaminate

4    our basin to that extent, to either kill our foliage or finally

5    to put through a non-potable product into our system.

6         MR. VEEDER:  I have no further questions at this time,

7    your Honor.

8         MR. SACHSE:  I have nothing further.

9         THE COURT:  All right.

10        Shall we adjourn?

11        MR. STAHLMAN:  When are we adjourning to?

12        MR. SACHSE:  That is what I want to bring up.

13        THE COURT:  Tuesday the 10th, I understand.

14        MR. VEEDER:  That was my understanding.

15        MR. SACHSE:  That is satisfactory with me, either the

16   10th or the 3rd.  I would prefer the 10th.  It gives me more

17   time.

18        THE COURT:  The 10th.  Meanwhile you will file your

19   other motions and notice them for hearing?

20        MR. SACHSE:  Frankly, I had not intended to notice it,

21   your Honor, because as I read the Rules these are speaking

22   motions which are made during trial.

23        THE COURT:  They do not need to be noticed, then.

24        MR. SACHSE:  Your Honor, I do have here, and I am pre-

25   pared to give to Mr. Veeder and to your Honor a copy, on two

D

Z38

1    of them.  The third is not yet completed.

2        THE COURT:  I understand that the Government has

3    completed its case, subject to straightening out the pleading

4    matter with Mr. Krieger and subject to matters involving their

5    contest with the Vails.

6        MR. VEEDER:  And subject to the additional matter in

7    regard to the public lands.

8        THE COURT:  Which were being given in more detailed

9    fashion?

10        MR. VEEDER:  That is correct.

11        THE COURT:  All right.

12        MR. VEEDER:  I have no alternative but to refrain

13    from resting in all regards.

14        THE COURT:  Well, you rest subject to those limitations?

15        MR. STAHLMAN:  He is not resting.  He is just reclining

16    a little.

17        MR. VEEDER:  I am just reclining, with those limitations.

18        THE COURT:  Subject to those limitations, which are very

19    minor matters, all three of them.

20        MR. VEEDER:  We have put in our case in chief to a large

21    degree, but I--

22

23

24

25

1    I simply cannot, your Honor, rest without seeing these

2    other pleadings, and also there is an additional factor to

3    which your Honor did not refer, the fact that after-- I won't

4    say it that way.  -- The State and Fallbrook are both going to

5    lodge additional exhibits and additional elements in this

6    case.  I don't know what the effect might be.

7        THE COURT:  That won't affect your case in chief.

8        MR. VEEDER:  Your Honor, I have been in the business

9    sufficiently long to know that it might make a difference in

10   my life.

11       THE COURT:  Let's not be concerned.  Nobody is going

12   to be taken advantage of. We don't try cases any more under

13   the old method:  Plaintiff says, "I rest."  And then the

14   defendant gets up and says, "Ah-ha, here is a weak spot in

15   your case.  I will let you go."  We don't try cases that way

16   any more.  So let's not be so  cagey about talking about

17   resting.  You finished your case with the exception of problems

18   that may be concerned with you and the Vail Estate, subject

19   to the pleading problem which you and Mr. Krieger have been

20   discussing as to three defendants, subject to the more

21   detailed breakdown of the public lands which Col. Bowen is

22   working on; right?

23       MR. VEEDER:  And subject to the possibility of surprise

24   from California coming up--

25       THE COURT:  All right, with a right to reopen if you

1    are caught by surprise in any of these elements.

2           MR. VEEDER:  Right.  Right, your Honor.  Thank you,

3    sir.

4           MR. MOSKOVITZ:  You can always have the right on

5    rebuttal to come in.

6           MR. VEEDER:  Thank you, Mr. Moskovitz.  But I am old-

7    fashioned in many respects.

8           THE COURT:  That is the way they used to do it, Mr.

9    Veeder.  That is not the way we do it any more.

10          MR. VEEDER:  Well, I am glad to hear it, your Honor.

11          THE COURT:  We are seeking for the truth.  This isn't a

12   game.  It is not a question of seeing who can unhorse the

13   other man and cut him down.  It is an inquiry into what are the

14   facts and what are the laws.

15          MR. VEEDER:  I will go home feeling much relieved,

16   your Honor.

17          THE COURT:  Are you going to Washington?

18          MR. VEEDER:  Yes, momentarily.  I will be back.

19          THE COURT:  Tuesday, February the 2nd.

20          THE CLERK:  The 10th.

21          MR. VEEDER:  The 2nd?

22          THE COURT:  The 10th.

23          MR. VEEDER:  The 10th.  At 10 o'clock?

24          THE COURT:  10 o'clock.

25          (Adjournment until February 10, 1959, at 10 A.M.)