# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

                Plaintiff,

   vs.                                   No. 1247-SD-C

FALLBROOK PUBLIC UTILITY
DISTRICT, et al.,

                Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:     Tuesday, February 10, 1959

Pages:   8109A - 8109S, Inclusive

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) Plaintiff, ) | |
| ) vs. ) | No. 1247-SD-C |
| ) FALLBROOK PUBLIC UTILITY ) DISTRICT, et al., ) | |
| ) Defendants. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California

Tuesday, February 10, 1959

SAN DIEGO, CALIFORNIA, TUESDAY, FEBRUARY 10, 1959; 11:00 A.M.

- - -

(The following proceedings were had in Chambers:)

THE COURT: Mr. Stahlman says he has some charges to make about some counsel in this case, so I had the reporter come in to take it down.

MR. STAHLMAN: I will recite the facts and then you can see for yourself what the picture is.

As you know, Mr. Hall has been with the Vail Company for about forty years, he has been a trusted employee of the Vail Company, and I presume he is getting a little old and he enters into this picture. It is a question of how to tie into this thing. I will start and tell you the recent events and then we can go back.

You recall in court there was some question regarding a stipulated judgment, and we have had a number of meetings in relation to the stipulated judgment at which each time there were always Navy representatives. The important meetings that we had were one in the San Diego Hotel, in which Colonel Robertson, Colonel Bowen, Mr. Veeder, Mr. Hall, Mr. Vail and myself participated, and we started kicking this matter around.

Then we had a meeting in early December at Vail's ranch, at which time Colonel Robertson, Colonel Bowen, Mr. Hall, Mr. Vail and myself were present.

1           On the 19th of December, the day we last had our
2  hearing here in court, we had a meeting at my home. Colonel
3  Robertson had left -- he was not present. However, Colonel
4  Bowen was there, Mr. Hall was there, Mr. Veeder was there,
5  Mr. Vail was there, and I was there; and at that meeting we
6  had some discussion regarding this matter, and it was then
7  indicated by Mr. Vail that it was time for the Navy to make
8  a proposition to us, that we had already made a couple of
9  propositions, and it was then agreed at that meeting that
10 Mr. Hall and Colonel Bowen would get together and work out
11 figures in relation to the streams, so that we would know
12 what the basis was if there was an adjustment in relation
13 to the stipulated judgment.

14          Now, at the last session in court here we talked
15 about it. You made some inquiry regarding it and I said we
16 were still negotiating, and then when that question was up
17 something was said about sometime in the future. Mr. Hall
18 came to Mr. Vail and said Mr. Veeder had told him that I
19 refused to discuss the stipulated judgment with him. And I
20 went to Mr. Veeder on the 27th, which was Tuesday of last
21 week, when we were --

22     THE COURT: January 27.

23     MR. STAHLMAN: January 27. And I went to Mr. Veeder
24 and said, "Did you say to Mr. Hall that I would not discuss
25 the stipulated judgment with you?"

He said, "Absolutely no."

I said, "Did you say anything that could possibly be construed that way?

"No.

I said, "Well, Mr. Hall has that impression. He said that you told him that."

I said, "Bill, any time you want to talk about it -- any time, any place -- O.K."

Well, we had lunch together that day, on the 27th, and had lunch on the 28th.

Then when we found out Mr. Veeder had an engineer from Seattle, someplace up North anyway -- I have never met the man. He has never entered into any of these negotiations. Mr. Veeder called Mr. Hall on the 27th at the telephone at his home -- Mr. Hall had not been here for over a week prior to that time -- and said that he wanted Mr. Hall to talk with -- this is what Mr. Hall tells us -- wanted Mr. Hall to talk with this engineer -- Henderson was his name -- and just what arrangements were made, Mr. Henderson showed up that evening at the Biltmore Hotel. Mr. Hall went over to the Biltmore Hotel. And I should say that Mr. Vail had strictly instructed Mr. Hall that he was not to make any proposition to the Navy; he was to discuss this thing with Colonel Bowen -- that the proposition would have to be when we were all present.

Mr. Hall and this man sat down and they wrote out in longhand, of which I now have a copy -- we did not know this, he didn't call Mr. Vail, he didn't call me -- wrote a longhand purported compromise which is the most ridiculous, abhorrent thing. It doesn't comport with any of the ideas that we had. It gives away everything of Vail's to the Navy.

And then Mr. Vail called Mr. Hall in -- he didn't know this until the 29th or 30th, that Mr. Hall had given some sort of copy -- and he told Mr. Hall, "Well, you sent me a copy of that thing."

Well, I know that Mr. Hall is always giving out pamphlets, and I thought that was what it was. Well, when I saw the thing I naturally hit the ceiling.

Now, Mr. Veeder had been telling Mr. Hall before this time, "You quit your job with Vail Company. I can see you get work that will be much more lucrative." This is what Mr. Hall tells us. Mr. Henderson told Mr. Hall up there, "Colonel Bowen is all packed. He is going to Okinawa. He will not be in the case." He also told Mr. Hall that he would go in business with him in an engineering firm and the two of them could make a lot more money than he was making with Vail -- words to that effect. I don't know whether I have that particular thing correct, but there was a discussion about going into business with him. As to the Okinawa thing, I heard Mr. Hall make the statement himself.

confidence in him, and to the extent that he may do things that he may think are all right but they are dangerous to have a witness on the case who thinks along those lines.

As far as any negotiations are concerned in the future, I wouldn't have one thing to do with Mr. Veeder. I will still discuss them with any representative of the Government who has not pulled such stunts as this man has pulled, and we will still discuss them with Colonel Robertson and Colonel Bowen. We have no occasion in any way to feel that Colonel Bowen and Colonel Robertson are in this thing to any extent. In fact, when this thing was done, I called Colonel Bowen and asked him whether he was going to Okinawa. I had never heard that he was going to Okinawa. It seemed ridiculous to me -- having been in court and realizing he is still on for cross-examination.

I believe where the Court, and all Courts, I think, have a policy which encourages these negotiations, they expect the lawyers to be open and above board, fair and honest with each other. When a situation like this comes into this case it has a terrific impact upon our attitude toward this case. The case has had a number of months in court. I don't think it should have an effect on the entire proceedings in the case, with which we are still ready to go along. But to negotiate with Mr. Veeder after he has called my witness and after having lunch with me the next day, if those facts are

1  true, I could not possibly --

2  THE COURT: Was there any promise, express or implied,

3  that Mr. Veeder himself might talk to Mr. Hall?

4  MR. STAHLMAN: None whatsoever. We had no objection to

5  his talking to Mr. Hall. They were down here -- Mr. Hall is

6  living here, and Mr. Veeder is down here -- naturally, they

7  are going to talk together. But for Mr. Hall to make an

8  arrangement --

9  THE COURT: Apparently, what Mr. Veeder did, in part,

10  was to put Mr. Hall together with another engineer, and the

11  two of them tried to work out some kind of compromise.

12  Mr. Veeder was not present at that.

13  MR. STAHLMAN: No. And we had never reached any stage

14  of these proceedings where any such thing as this could be

15  tendered to the Government, because I had always contended

16  that the division of water was wrong as far as Vail's were

17  concerned, that with the large riparian acreage they were

18  getting less water, that there should be some re-evaluation

19  as to the division of the water, and there had been

20  discussions. So Mr. Hall said that Mr. Veeder said to him

21  at one time, "Would Vail be satisfied with fifty-fifty?"

22  THE COURT: I don't know enough about this to make heads

23  or tails out of this.

24  Mr. Veeder was up here yesterday, and Mr. Cranston

25  was here. We were talking about laying out some Master's

1 hearings. Mr. Veeder at that time expressed assurance that
2 he was going to work something out with the Vails. And, of
3 course, misunderstandings can happen and they can grow up.
4 I don't like this idea of taking an old man and talking about
5 getting him another job and all that kind of business -- if
6 that happened. I don't know. However, it seems to me that
7 maybe you ought to go to Mr. Veeder and see if he has any
8 explanation that in any way satisfies you. Of course, your
9 feeling is that Mr. Hall has been destroyed as a witness as
10 far as your use of him is concerned, in any event. Is that
11 it?

12 MR. STAHLMAN: Yes. We have gone all over this.

13 THE COURT: Doesn't he have some factual information
14 that would be useful in the case?

15 MR. STAHLMAN: Well, here was the first intimation we
16 had, when Mr. Veeder wanted to put Mr. Hall on the stand, and
17 Mr. Vail happened to be sitting in the courtroom, and Mr.
18 Hall testified that he was in charge of all this survey that
19 was made, in relation to the old suit, and that evening
20 Malin Vail said to me, "George, I can't understand his
21 testifying to that, because I don't think he was in charge.
22 My brother was handling the matter at the time," that Mr.
23 Vail was laid up with an illness. But he says, "My under-
24 standing is that Mr. Hall was not in charge of that work."
25 THE COURT: Well, do you think Mr. Veeder is responsible

for that overstatement on his part, if it is an overstatement?

MR. STAHLMAN: I don't know.

THE COURT: Or is this a situation where, in part, you have become a little unhappy with the prospects of using Mr. Hall and what has happened in Mr. Veeder's activities has added fuel to the fire and you can't use him and have to get another engineer?

MR. STAHLMAN: I think this all came about since Mr. Hall has been living in San Diego. I don't know how much talk he has had with Mr. Veeder. Whether Mr. Veeder has had any conversation on that situation or not, I can't say.

But I saw that if we put a witness on the stand as an expert to establish our irrigable acreage under a settlement that was worked out, that he would have to be in charge of that work to qualify and give that testimony. So Mr. Vail and myself then went up and hunted up Mr. Coit, who drew the maps and made the study, and we found Mr. Coit, and although he said he had heard of Mr. Hall and Mr. Hall was around there he had had no contact with Mr. Hall; that all of his reports when he made his study were made with a man named Jones. So we have Mr. Coit, now, who made the survey, as a witness. That is the first information that I had that Mr. Hall was not qualified to give those surveys, and that is an essential part of our case.

THE COURT: Is there much dispute about your irrigable

acreage?

MR. STAHLMAN: They have been gone over by Colonel Bowen.

THE COURT: Why wouldn't Mr. Hall be qualified to testify to irrigable acreage, by his own observation, without relying on Coit's notes?

MR. STAHLMAN: It is quite a study to go over that many acres and determine the water duty here and there. You have to have maps and surveys. When those maps were drawn and surveys made they went out with a transit and blocked this land out.

THE COURT: We had a little flurry on those Coit notes already, didn't we?

MR. STAHLMAN: Yes.

THE COURT: Mr. Veeder has already intimated that they didn't show anything, he didn't think, as I got the impression.

MR. STAHLMAN: Colonel Bowen has been over them. They used Mr. Hall at the first trial. The Government put him on and established Vail's irrigable acreage. We are not worried about establishing the irrigable acreage.

THE COURT: I get the impression that you were unhappy with Mr. Hall from the fact that Mr. Veeder put him on the stand and asked him that question about being in charge.

MR. STAHLMAN: No, it didn't bother me at that time, really, Judge. I told Mr. Vail that if there is some

question as to whether Mr. Hall was in charge of those surveys, we had better get the man who made the surveys. I still felt there was other data. Mr. Hall has been measuring wells and keeping records of the releases from the dam and filed all of our figures with the State in relation to the dam and all those things. There has been nothing, so far as those matters are concerned, that is not O.K. and that we couldn't use Mr. Hall for.

THE COURT: It boils down, first, to the fact that he put Mr. Hall in contact with this engineer Henderson unbeknownst to you.

MR. STAHLMAN: Yes.

THE COURT: However, I can't see how you would be prejudiced there. Any conversation between Mr. Hall and Mr. Henderson which looked toward a settlement wouldn't be admissible on direct or cross. As to whether that destroyed your confidence in Mr. Hall or not, that is another thing. On the other hand, the contention that Mr. Veeder and Mr. Henderson, as I understand you to say, that Mr. Henderson sort of promised him a job of some kind --

MR. STAHLMAN: Mr. Veeder, first.

THE COURT: Mr. Veeder, too?

MR. STAHLMAN: Here is the statement he made. Before this all happened -- I get this from conversation that Mr. Hall had with Mr. Vail -- that before this thing happened --

1   MR. STAHLMAN: Yes.

2   THE COURT: In a way, I have encouraged -- I have talked
3   about these engineers sitting down and talking.

4   MR. STAHLMAN: Right.

5   THE COURT: I am not too concerned about that. It is
6   kind of strange that we never hear about Henderson, and he
7   sits down and talks with Henderson. That is kind of strange.
8   I would be more concerned about the things that Mr. Henderson
9   said to him, or that Mr. Veeder said to him, maybe softening
10  him up about getting him a job and that sort of thing.
11  I don't really put too much significance on the fact that he
12  sat down and talked to Henderson, because I have encouraged
13  these engineers to talk on these things.

14  MR. STAHLMAN: But if Mr. Veeder is going to call my man,
15  when I am with him all day long two days, and tell him he is
16  up in Los Angeles and make an appointment for him to meet a
17  man named Henderson to talk with him, I think he should tell
18  me about it. He is a complete stranger. He has never
19  entered into any of these negotiations before.

20  THE COURT: Can you keep your temper? Why don't you
21  jump Mr. Veeder about that and see what he has to say?
22  I don't know. Maybe he could throw some light on that.
23  My immediate reaction to the whole thing is that I am sorry
24  for Mr. Hall. I like him very much.

25  MR. STAHLMAN: I am, too. All the Vails are. This has

1  been a terrific thing. He has been like a member of the
2  family. Just three weeks ago   Malin Vail went out --
3  he admired a Hi-Fi set that his nephew had in his home --
4  and Malin bought a more expensive one and gave it to the old
5  man.

6  THE COURT: This memo he gave to Mr. Henderson, is there
7  something terribly wrong about that?

8  MR. STAHLMAN: It gives away the Vail Dam to the Navy.

9  THE COURT: What do you mean?

10 MR. STAHLMAN: There is no benefit to the Vail Dam except
11 to store one-third of the water behind it, and the other two-
12 thirds goes to the Navy.

13 THE COURT: What is your present division on the
14 stipulated judgment?

15 MR. STAHLMAN: There is a question. That is one of the
16 points we bring up, that we can't determine from that
17 stipulated judgment what the division is.

18 THE COURT: What does the Government claim?

19 MR. STAHLMAN: It says two-thirds to Pendleton and one-
20 third to Vail. That is the division of the water made.
21 Vail builds a dam and gets a permit for surplus water.
22 The question is, does two-thirds of that surplus water go
23 to the Navy? According to this thing, it does. We contend
24 it does not. That is a separate permit. Of course, there are
25 other things about the stipulated judgment that will come up

1  be done.  I was pretty mad and I was going to bring this
2  thing out in open court.

3  THE COURT:  You feel better now that you have some of it
4  off your chest.

5  MR. STAHLMAN:  Yes, I do.  The matter concerned me much
6  and I have given it a lot of thought.

7  THE COURT:  Well, some of it I don't like, particularly
8  things like this talk about jobs and all that.  I am not too
9  concerned about him putting Mr. Hall and the other engineer
10 in touch with each other.  But I am not going to let anything
11 come out on that that will prejudice anybody.  I felt all
12 along that these engineers, thrown together, could solve this
13 case.

14 MR. STAHLMAN:  Why didn't he send Colonel Bowen up there,
15 or Colonel Robertson or somebody, who had been in the case?
16 I wouldn't have thought anything about it at all.  But to
17 work in a stranger to me -- I think Mr. Hall met him sometime
18 in 1951.  He was down here on some phase of the case.  But he
19 had never been in the negotiations in this case.

20 THE COURT:  Why don't you jump him and see what he has
21 to say about it?

22 MR. STAHLMAN:  I will try.

23 THE COURT:  If you can keep your temper, you can find
24 out something.  If you get mad, you will not find out
25 anything.

1   MR. STAHLMAN: O.K.

2   THE COURT: Thank you for calling it to my attention.
3   We will see what we do later on.

- - -

# C E R T I F I C A T E

I hereby certify that I am a duly appointed, qualified and acting official court reporter of the United States District Court for the Southern District of California.

I further certify that the foregoing is a true and correct transcript of the proceedings had in the above-entitled cause on the date specified herein, and that my said transcript is a true and correct transcription of my stenographic notes.

Dated this 21st day of May, A.D., 1963.

*John Swader*
Official Reporter