# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:        Wednesday, February 11, 1959.

Pages: 8110 to 8248

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ Deputy

MALCOLM E. LOVE
**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1247-SD-C. |
| ) | |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al., ) | |
| ) | |
| Defendants ) | |

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California
Wednesday, February 11, 1959

APPEARANCES:

    For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                Special Assistant to the
                                Attorney-General,
                                Department of Justice,
                                Washington, D.C.
                                and
                                CHARLES W. SALTER, ESQ.

A
Z2

APPEARANCES:   (Continued)

For Defendant                    GEORGE E. STAHLMAN, ESQ.
Vail Company

For Defendant State              STANLEY MOSK, ESQ.,
of California                    Attorney-General, by
                                ADOLPHUS MOSKOVITZ, ESQ.,
                                Deputy Attorney-General, and
                                FREDERICK G. GIRARD, ESQ.

For Defendants
Fallbrook Public
Utility District,                FRANZ R. SACHSE, ESQ.
et al.

For Defendants                   EMMETT DOHERTY, ESQ.
Searle and Garbani

For Defendant                    MESSRS. LUCE, FORWARD, KUNZEL
Sawday Ranch                    & SCRIPPS, by
                                ROBERT McGINNIS, ESQ.

For Defendant                    MESSRS. BEST, BEST & KRIEGER,
Oviatt                          By JAMES H. KRIEGER, ESQ.

                                WALTER GOULD LINCOLN, ESQ.

San Diego, California, Wednesday, February 11, 1959.   10 A. M.

MR. VEEDER:   Your Honor, I would like at this time to move the admittance in the case of the United States of America vs. Fallbrook Public Utility District of Charles W. Salter. He is a lieutenant in the Navy and he has been admitted to practice in the Court of Appeals for the State of New York. I personally vouch for his integrity and for his ability as a lawyer.

THE COURT:   The motion is granted to permit him to appear and participate in this case only.   I will not admit him generally to the Bar of this Court.   I don't think he wants it to go that far.

I am happy to have you, Lieutenant.

LT. SALTER:   Thank you.

THE COURT:   See you around from time to time.

Mr. Moskovitz.

MR. MOSKOVITZ:   Your Honor, since this is the time for moving for the admission of attorneys, I would like to move the admission of Mr. Frederick G. Girard, Deputy Attorney-General of the State of California, who is a member in good standing of the Bar of the State of California and also a member of the Bar of the Ninth Circuit Court of Appeals.   I vouch for his good moral character.

THE COURT:   Are you moving for his admission to the Bar

1    of the District Court of Southern California?

2         MR. MOSKOVITZ:  Yes, your Honor.

3         THE COURT:  Then he will have to pay a fee and fill

4    out a card.

5         The motion will be granted.  We will be happy to have

6    him admitted to the Bar of our Court.

7         Mr. Clerk, you may administer the oath.

8         The Clerk will administer the oath to you, Mr. Girard,

9    if you will arise.

10        THE CLERK:  You do solemnly swear that you will support

11   the Constitution of the United States, that you will bear true

12   faith and allegiance to the Government of the United States,

13   that you will maintain the respect due to the courts of

14   justice and to the judicial officers, and that you will demean

15   yourself as an attorney, proctor, advocate, solicitor and

16   counsel of this Court uprightly.  So help you God.

17        MR. GIRARD:  I do.

18        MR. SACHSE:  Your Honor please, I understand the way we

19   left matters at the time of our recess the next order of

20   business is my own.  Do you object if I present the motions

21   from here?

22        THE COURT:  No, you may present them from anywhere you

23   want to, Mr. Sachse.

24        MR. SACHSE:  Your Honor, it is my intention first to

25   bring up my motion for judgment under Rule 41b on behalf of

certain named defendants.  Before specifically discussing the motion itself or any of the 35 individual pleadings that are involved, I would like to make a few general observations.

Since the Court recessed ten days ago, the United States has filed three different documents which have a direct bearing on this motion, as well as on the entire future conduct of the case.  These documents and their significance, as I see them, are as follows:

First, in its reply to your Honor's fifteen questions, specifically to Question 15-- and I am reading from line 30 on page 12 of the United States's reply and continuing on at page 13-- is the following language:

> "Basically and fundamentally there
> resides with each land owner the right to
> assert in this litigation his claims re-
> specting ground waters.  Every owner is
> guaranteed by the Constitution the right
> to come forward to prove whatever his claims
> may be."

One of the prime reasons which caused this Court to proceed with hearings before the Special Master was to permit all owners who claimed rights to appear with a minimum expenditure of time and money and have their rights adjudicated.

The second document that concerns these motions is the exceptions of the United States to the Master's findings

on the De Luz Creek watershed.  Now a careful rule of those

exceptions does not disclose that the United States objected

to the following finding (quoting from page 4, lines 10 to

13 of the Master's Proposed Findings):

> "The following parcels of property,
>
> the exact legal descriptions of which
>
> are set forth in said Exhibit A attached
>
> hereto, are not riparian to any stream or
>
> creek within De Luz Creek watershed.  The
>
> water, if any, underlying any and all of
>
> said parcels is vagrant, percolating and
>
> not a part of the surface or subsurface
>
> flow of any stream or creek within the
>
> boundaries of De Luz Creek watershed."

The United States further did not object to that por-

tion of the conclusion of law of the Master found on page 62,

lines 7 to 11, which reads:

> "Any judgment rendered in this action
>
> should expressly clear each of said parcels
>
> from any cloud cast upon the title or water
>
> rights of such parcel by the filing of this
>
> action or the recording of the lis pendens
>
> herein."

Similarly, the United States did not object to the

express finding of the Master in connection with the Fallbrook

1  Creek watershed that all of the ground waters within that

2  watershed were vagrant, local and percolating waters.

3      Now the significance of all this, in the light of the

4  motions--

5      THE COURT:  May I interrupt?

6      MR. SACHSE:  Yes, your Honor.

7      THE COURT:  I have you right to the place where you

8  are going now to give me your argument.  You have made a

9  predicate for it.

10      I think there is a misunderstanding where you gentle-

11  men in your briefing and in your arguments are missing the

12  mark.

13      As I understand the Government's position and your

14  position, these 41 people are, well, we will not say out of

15  the case, but these 41 people, it is conceded, have no water

16  that is part of the stream or the stream system.  And so we

17  are down to a question of mechanics; what are we going to do

18  with them?

19      Mr. Veeder says that the Government is entitled to a

20  judgment that they have no right in the stream system, and you

21  have asked for a dismissal.  Mr. Veeder in substance sort of

22  opposes it.  You claim that they are entitled to a judgment

23  that their rights to ground and percolating waters be quieted

24  against the claims of the Government.

25      I think we have got the thing sort of in a hassle.  I

A

Z9

1    don't think there is any real problem about it.  And Mr.

2    Veeder has cited quiet title law, all of which is correct.

3         But let's reduce this to, instead of a stream system,

4    let's reduce it to two parcels of ground, just a little simple

5    situation where there are two 40-acre pieces of ground and

6    instead of talking about a stream system the Government owns

7    one parcel and some other defendant owns the other, and the

8    Government is claiming rights to this particular parcel and

9    claiming that the owner of the other parcel is asserting some

10   rights against the Government.  The man who owns the other

11   parcel comes in and says, "I don't claim any rights in your

12   40 acres, but I am claiming certain rights in mine."  Now

13   that's all we have.

14        Now Mr. Veeder is correct in his position that the

15   Government is entitled to a judgment that these 41 defendants

16   have no right in this stream system--

17        MR. SACHSE:  I so concede, your Honor.

18        THE COURT:  --and no right in the basin, et cetera.  On

19   the other hand, these 41 defendants having been brought into

20   this action are also entitled to a judgment that the Govern-

21   ment has no right to the water under their property.

22        MR. SACHSE:  That is the purpose of this motion, your

23   Honor.

24        THE COURT:  That is all that is involved.

25        Mr. Veeder's authorities are correct.  The Government

1  is entitled to a decree that these 41 people particularly have

2  no rights in the stream system which is the subject of the

3  quiet title action.  But because of the breadth of the alle-

4  gations, as you have pointed out in the complaint, where the

5  Government says that all these defendants who in part caused

6  the salt water intrusion, that they all assert some interest,

7  et cetera, and in view of the law that you don't need in a

8  quiet title action to come in and cross-claim these people are

9  entitled to a decree which will say, among other things, that

10  the Government has no right in their 40.

11       Aren't we all agreed on that?

12       MR. VEEDER: Your Honor, are you addressing me at the

13  moment?

14       THE COURT: I am addressing you particularly, Mr. Veeder.

15       MR. VEEDER:  Fine.  I think your Honor has analyzed the

16  matter absolutely correctly up to one point.

17       THE COURT:  Up to where I am going to let them have a

18  decree against the Government.

19       MR. VEEDER:  Yes.  And the point of it is that I am

20  very happy to get judgment against Mr. Sachse's clients saying

21  they have no interest in the Santa Margarita River.

22       THE COURT:  These 41.

23       MR. VEEDER:  That is right.  They are done and God

24  bless them and that is the end of it.

25       Now the point that I do raise in regard to the proposition

A

Z11

1     that a judgment should be entered against the United States

2     that it doesn't claim any rights and that they are not inter-

3     fering with any rights, is that I believe it is simply a matter

4     of semantics.   There is no question that the law in the State

5     of California is that when a man disclaims, as Mr. Sachse's

6     client disclaimed, we are entitled to judgment, an I think

7     that the judgment should reflect, if I may respectfully sug-

8     gest it, that the United States has judgment and that these

9     people make no claims or in any way interfere with the rights

10    of the United States, and I think we are over the fence.

11        THE COURT:   That is only part of it.   Now that takes

12    care of your end of the litigation.   What are you going to do

13    about these 41 people who have been brought into a piece of

14    litigation, who had to hire lawyers, these 41 have, and who

15    now say, "Look, we don't want the United States or anybody

16    else in this watershed claiming that we are part of this

17    stream."

18        MR. VEEDER:   And I am for that, and I think the way we

19    could do that, if I could tender a further thought, is that we

20    would describe the property of these defendants and say that

21    the water underlying those properties are not part of the stream

22    and that the United States has no right, title or interest in

23    those properties.

24        THE COURT:   Good.

25        MR. SACHSE: Your Honor, we are settled.

THE COURT:  We are settled.

MR. SACHSE:  It is done.  May I then ask your Honor to grant these motions on the basis of the admissions on file. Mr. Veeder has admitted--

THE COURT:  Let's not go too fast.

MR. VEEDER:  No, I don't want Mr. Sachse to go over-board on this, your Honor.

THE COURT:  There is another problem, and that is this: This matter of costs.  Now it was not my intention, if I could prevent it, to assess costs against the small property owners in this litigation.  If you go out of here on any kind of disclaimer, under the law no costs can be assessed against you. Of course, if you have something more than a disclaimer, then there is a possibility that you are going to have to bear some costs.  Has anybody given any consideration to that?

MR. SACHSE:  Yes, your Honor.

MR. VEEDER:  From our standpoint, your Honor, we certainly-- I am speaking from my own standpoint, and  I think from the Department's-- we certainly have no desire for costs, and I don't think we are entitled to costs under the circum-stances.  As I understand, Congressman Utt has introduced a bill to pay off Franz here, but I don't know how far they will get.  But I don't believe costs can be assessed against the United States, under the laws that exist today.  Whether Franz has enough political pull to get this other thing, I don't

1  know.  But I think the situation as it exists now is that

2  costs couldn't be assessed against us, and I am certainly not

3  asking costs against his client.

4      THE COURT:  We are talking about these 41.  Are you

5  talking about some of the major defendants also?

6      MR. VEEDER: Oh, no, no, not that much.  I think sufficient

7  to the day is the evil thereof.  Mr. Vail is right back of me.

8  I don't know about costs.

9      THE COURT:  There is no problem with these 41.

10     MR. VEEDER:  No problem.

11     THE COURT:  And I take it that would set the pattern

12 for a lot of other small owners in the area.

13     MR. VEEDER:  I would think so, yes, your Honor.

14     MR. SACHSE:  Now, your Honor--

15     THE COURT:  Well, now, wait, Mr. Sachse.

16     MR. SACHSE:  It is devastating when you prepare an

17 argument and all of a sudden you don't have to argue.  It's

18 wonderful.

19     THE COURT:  I know, but the trouble is that both of

20 you got squared away with a bunch of law on this problem and

21 you are both right; but you didn't analyze what you had in the

22 case.

23     Let's go a step further.  This is an action which in-

24 volves all the parties to this watershed, and although the

25 Government might be content to say that you are not a part of

A.

Z14

1    this stream or this basin, somebody else in the watershed might

2    have a different idea.

3           MR. SACHSE: Conceded.

4           THE COURT:  I think all we can do in that respect is

5    this, to indicate that the Court is going to rule in line with

6    what we have just said here that your clients are not part of

7    the stream and make no claim in it; that the Government's

8    rights, such as they are, on the stream be quieted as against

9    your defendants, and that your clients' rights to whatever

10   water they have be quieted against the Government and against

11   all other parties who contend they are part of the stream, and

12   then eventually sometime along the line to serve a notice, to

13   be served on all other defendants in this action, that a hearing

14   will be held and unless some other defendant comes in and

15   presents some evidence or makes some contentions that would

16   change the Court's tentative view that the Court would then

17   after that hearing enter findings and an interlocutory judg-

18   ment as to these people, probably serve the proposed findings

19   and the proposed interlocutory judgment upon all of the people

20   in the watershed and set the thing up in such a way that no

21   adjudication would be made as to your correlative rights with

22   your neighbors but to heal up any question about your being

23   part of the stream.

24          Now, I have no idea that anybody in the watershed is

25   going to raise that question, but I think to get a valid and

A

Z15

1   binding judgment everybody has to be notified, because we have

2   segmented this trial, we have told people that we are going

3   to hear parts of it now and parts later, and sometime they

4   have to be told that this is the day, if you have any further

5   evidence to put on or any contentions to make this is the day,

6   and if you don't show up at this time then we are going to

7   enter this kind of interlocutory judgment in favor of 41

8   people.  At the same time we can probably send out a notice in

9   the same service, because this is a big job, a proposed inter-

10   locutory judgment on the half-acre pieces, and maybe a lot of

11   other areas in this watershed.  Because this is a big job of

12   making service, which I take it can be done by mail on all

13   defendants who have appeared, pro per or by attorney.  But it

14   is still a big job.

15        MR. SACHSE:  Your Honor, I certainly have no objection

16   to the procedure you have just discussed.  But may I point out

17   that Rule 41b expressly provides that if the Court renders

18   judgment on the merits against the plaintiff on a motion such

19   as this, that the Court shall make findings as provided in

20   Rule 52a.  Then Rule 52a says that you shall make findings of

21   fact, conclusions of law and a judgment.  I don't read Rule

22   52a to read that you have to make these findings, conclusions

23   of law and judgment all simultaneously.  The way I read it is

24   that in a case such as this, a large complex one where, as you

25   point out, there might conceivably be assertions made against

1   my client by other defendants, it seems to me that the

2   appropriate way to handle it would be to make findings that

3   based on the admissions of the plaintiff on file and the

4   pleadings of the defendants, these defendants have no right

5   in the Santa Margarita River, the ground waters underlying

6   their property are vagrant, local, percolating and not part

7   of the stream, the United States has no right in those ground

8   waters, and makes such a finding and judgment.  Of course, this

9   case is going to wait until everything is washed up, because

10  the Circuit has told us that we must wait.  But frankly I

11  think the interlocutory judgment is perhaps one unnecessary

12  piece of paper, under the Federal Rules themselves.  That all

13  you would have to do would be to find in accordance with the

14  pleadings and admissions on file the facts as agreed by Mr.

15  Veeder and me just now before your Honor.  And these 41, or 48,

16  or whatever they are, are, for all practical purposes, out of

17  the litigation until somebody comes in and objects to those

18  findings.

19      MR. VEEDER:  Mr. Sachse refuses to let things be.  Now

20  when he starts talking about the admissions, he raises a

21  jurisdictional question.  He disclaimed.  He came in and dis-

22  claimed and we are entitled to judgment.  Now he comes along

23  and says that by reason of our admissions he wants to have

24  findings against us.  Your Honor, I submit, does not have

25  jurisdiction to do that, because there is no justiciable issue.

1   Why he doesn't let these things go I don't know.

2          MR. SACHSE:   Your Honor, I thought we had it settled.

3   May I argue the motion, your Honor?  Mr. Veeder is welching

4   on what he said a moment ago.

5          THE COURT:  Well, I have settled it in my mind.  I

6   don't agree with Mr. Veeder's talk about there being no

7   justiciable issue.  I am willing to find and enter a judgment

8   that the rights be quieted against these 41 defendants.  By

9   the same token I propose to make findings that whatever water

10  on their property there is is vagrant, local, percolating

11  water and their rights to that water are quieted as against

12  the plaintiff in this action.

13         MR. SACHSE:   Does Mr. Veeder object to such a finding?

14         THE COURT:  I understood that you didn't object to that.

15         MR. VEEDER:  Well, I simply say, your Honor, that what

16  you had said in the first place was a hundred percent correct.

17  Now we come along into this a matter where a disclaimer was

18  made.  Mr. Sachse says that we made admissions.  Well, we said

19  it was a disclaimer in the first instance.  Now it settles

20  down to a technicality pure and simple.  I say this, and I

21  believe the cases support me, that when Mr. Sachse disclaimed

22  any interest the party was over.

23         THE COURT:  If he disclaimed any interest in your water

24  system--

25         MR. VEEDER:  That's right.

1      THE COURT: --the party is over as to that.  But the

2  allegations of your complaint were broad enough to throw a

3  cloud upon the title to the property that his clients owned,

4  and therefore without a cross-complaint he is entitled to

5  a decree quieting his title against your claims.  It's just

6  that simple.

7      MR. VEEDER:  Your Honor, I will raise one more point.

8      THE COURT:  Whether you are in agreement or not, that

9  is what I am going to rule.

10      MR. VEEDER:  The only point I want to be very sure on--

11  I am very pleased to get judgment against Mr. Sachse, but the

12  point I make, and I raise this because it could be important,

13  if Mr. Sachse is asserting an affirmative claim against the

14  United States other than in regard to waters that are part of

15  the Santa Margarita River and its tributaries, he immediately

16  runs into the question of the immunity of the National

17  Government from suit under the circumstances, and I think he

18  raises a very grave and a very jurisdictional question.  I

19  think we can work it out.  I think it is purely a matter of

20  semantics.  But I want to be very careful.

21      THE COURT:  Well, Mr. Veeder, the Government can't come

22  in and bring a quiet title suit on the watershed of the Santa

23  Margarita River and make 6,000 defendants parties to the

24  action and when the chips are down and some of the defendants

25  have water that is not part of the stream say, "We haven't

A

Z19

1    waived immunity." You are not hurt. You have opened the

2    door. You have made claim to all of the water in the entire

3    watershed.

4         MR. VEEDER:  No.

5         THE COURT:  You have said that every piece of ground

6    and every defendant was part of the stream and the watershed,

7    or they wouldn't have been in here.

8         MR. VEEDER:  I think the pleadings are very simple,

9    your Honor-- Santa Margarita and its tributaries. And when we

10   go one step beyond that, there we get into an entirely different

11   matter, and that is why I would like to let the thing be the

12   way you set it in the first instance.

13        THE COURT:  All right, it might be a matter of semantics.

14   But if it gets beyond the matter of semantics, I am going to

15   rule and enter this kind of decree. The only thing I am

16   concerned with is whether to do it piecemeal or to take Mr.

17   Sachse's suggestion and maybe make findings and then await a

18   judgment.

19        The difficulty I have with your suggestion, Mr. Sachse,

20   is how do we take care of other people who have been assured

21   that this case is being segmented, that they will have a chance

22   to be heard? If we give them a notice that the Court on a

23   certain day is going finally to close the door on certain

24   matters and submit to them findings and proposed judgments on

25   certain segments of the case, then they will know. If they

A

Z20

1    want to object, they can come in and object.

2        MR. SACHSE:  I think that has to be done, your Honor.

3        THE COURT:  But if I make findings first and say I have

4    made these findings, what do we do then?

5        MR. SACHSE:  Oh, I didn't mean to imply that notice

6    shouldn't be given, your Honor.  The only difference between

7    my suggestion and yours, as I conceive it, is that I said

8    leave out the interlocutory judgment piece of paper.  But the

9    rest of the procedure would be exactly the same.  I don't see

10   that the interlocutory judgment adds anything to my rights or

11   helps my clients in any way.  The important thing would be a

12   finding that the water underlying our lands are vagrant, local

13   percolating and that the United States has no rights in those

14   waters, nor does any other riparian claimant have any right in

15   those waters.  That finding would be made.  That finding would

16   be noticed exactly the same way that the Master, for example,

17   noticed similar findings for Fallbrook Creek watershed and for

18   De Luz Creek watershed.  All I am saying is that I think you

19   are asking for one additional piece of paper that was unneces-

20   sary.

21       Now I am a little concerned at what has transpired here

22   this morning.  I thought when we started out, as I said

23   facetiously but laughing on the square, that I was ready to

24   argue the motion, and it seemed that Mr. Veeder agreed. Now

25   it seems that he disagrees.

1        I have a motion, your Honor.  And under the rules of

2   this Court I have a right to have it heard.  And it has been

3   set.  Now, if Mr. Veeder ~~disagrees~~, I certainly am not going

4   to belabor a dead horse.  But your Honor has indicated what

5   your views are on it.  But I do intend to sit down with the

6   formal request that the motions be granted in the case of

7   these particular defendants.  And I want to point out one

8   thing further in this connection:  That there is nothing

9   mysterious about these.  If your Honor will recollect, over

10   a year ago during the pre-trial hearings when we had many

11   discussions here as to the simplest and easiest way to get rid

12   of defendants without offending against due process, I have

13   repeatedly suggested that the easiest mechanics were through

14   the device of requests for admissions under the Federal Rules.

15   Now, here we have got 35 of them, every single issue presented

16   by the pleadings.  And those 35 different answers are admitted

17   or disposed of by the admissions on file.  And I concede that

18   each one of those pleadings or each one of those answering

19   defendants are entitled to a--

20        THE COURT:  Have you got the Rules there, Mr. Clerk?

21        THE CLERK:  Federal Rules?

22        THE COURT:  Yes.

23        THE CLERK:  Federal Rules, no, I haven't.

24        MR. SACHSE:  --are entitled to a judgment dismissing

25   them under 41b.

B

Z2

1    THE COURT:  Let me get 41b.

2    MR. SACHSE:  Here is 41b, your Honor.

3    THE COURT:  All right.  Of course, Mr. Sachse, the

4    trouble is--

5    MR. VEEDER:  He doesn't know enough to let good enough

6    alone.  That is his problem.

7    MR. SACHSE:  Mr. Veeder, will you let me try my lawsuit.

8    I am satisfied I can do it.

9    THE COURT:  Just a minute.  All right, both of you now.

10    41b:  "For failure of the plaintiff to prosecute or

11    comply with these rules"-- and so forth.  That is not import-

12    ant.  "After the plaintiff has completed the presentation of

13    his evidence the defendant, without waiving his right to

14    offer evidence, may move for dismissal on the ground that upon

15    the law and facts the plaintiff has shown no right to relase."

16    MR. SACHSE:  That is the motion, your Honor.

17    THE COURT:  That is what you are talking about.  But

18    that isn't your motion.  If that was your motion, there is

19    no doubt about it, it would be granted.  But that only takes

20    care of half of it.  That takes care of the part that the

21    Government has shown; that it is not entitled to claim any

22    right in your property; and that, therefore, the action should

23    be dismissed as to your defendants.  Your motion comes in and

24    says, line 6, page 2:  ". . moves the Court for judgment

25    quieting their title to the ground waters underlying their

B

Z3

1    land."

2         MR. SACHSE:  You haven't finished reading 41b.  If you

3    continue down, you will find if my motion is so granted, you

4    will make findings and enter judgment under 52a.

5         THE COURT:  "If the court renders judgment on the

6    merits against the plaintiff, the court shall make findings

7    as provided in 52a unless the court in his order for dismissal

8    otherwise specifies a dismissal under that subdivision and any

9    dismissal not provided for in this rule-- and so forth--

10   operates and adjudicates upon the merits."

11        MR. SACHSE:  But 52a expressly calls for findings on

12   the issues raised by the pleadings.

13        THE COURT:  But your motion under this rule was upon

14   the ground that upon the facts and the law the plaintiff has

15   shown no right to release.  Now, actually what you are doing

16   is calling this a motion under 41b based on that and asking

17   for findings.  But you are also insubstance making what amounts

18   to a motion for summary judgment that the Court also quiet

19   title to the ground waters underlying your clients' land.

20        MR. SACHSE:  I think that is correct, and there is

21   lengthy discussion in the annotations of the relationship of

22   this motion to motions for summary judgment.

23        THE COURT:  Motions to dismiss can be converted into

24   motions for summary judgment where they rely upon other matters

25   other than would come strictly under 41B.

B

Z4

1    MR. SACHSE:  In this case the other matters, of course,

2  are always in the pleadings of the case.  There are no affi-

3  davits, as is customary in many summary judgment motions.

4  This is made solely upon the state of the record as it now

5  exists.  No additions to the record as is usual in most summary

6  judgements.

7    THE COURT:  I don't know that it makes any difference

8  what you call your motion, but you don't even actually say in

9  your motion that upon the facts and the law the plaintiff has

10  shown no cause for release.  You say you move the Court for

11  judgment quieting title to the ground waters underlying their

12  lands, the 41 defendants.  Now, I don't mean that--

13    MR. SACHSE:  Your Honor, my principal and primary

14  concern:  These 41 defendants are just 41, even in my own

15  case, out 150 or out of 175.  These are test cases, if you

16  choose.  They are guinea pigs.  Sooner or later all of us in

17  this courtroom are going to have to face the issue of how we

18  are going to dispose of these people.  It is not a charity to

19  the United States  It is not a charity to them.  It is not

20  just to this Court or to other litigants to keep this thing

21  dragging on, to keep bodies cluttering up the record, to

22  introduce volumes of transcript when it is absolutely unnec-

23  essary to do so.

24    THE COURT:  I agree.

25    MR. SACHSE:  Sooner or later we have got to face up to

B

Z5

1    it.  And if I can have a moment on that issue, it ties into

2    this.

3         THE COURT:  This all goes back now to when you told

4    me you had a motion here you wanted to argue and you wanted

5    your motion granted.  This is the prelude to all these remarks?

6         MR. SACHSE:  I will submit the motion.

7         THE COURT:  You are entitled to some relief.  But I am

8    pointing out that you called it a motion to dismiss.  It is

9    actually more like a motion for summary judgment.  I would

10   be inclined to grant it.  But let's understand what I am

11   granting.

12        MR. SACHSE:  Your Honor, if I have through ignorance

13   or unfamiliarity with Federal Rules mispleaded my motion, I

14   am sorry.  I tried to do it right.  I am perfectly willing to

15   file another one, notice it ten days from now, if that is what

16   the Court or Mr. Veeder desires.  What I am after is simply

17   this, and there is no argument whatsoever upon it, upon the

18   facts there, there in writing, I want a judgment, inter-

19   locutory, if you please, or findings, if we use my device.

20   I want findings:  That each of these people owns the land,

21   as set forth in their answer, that is admitted by the United

22   States.  That these lands are not riparian to the Santa

23   Margarita River.  That they are not a part of the surface or

24   subsurface flow of that stream or any basin.  That is the

25   admission of the United States; they are not.  That the ground

B

Z6

1    waters, if any, underlying their lands are not vagrant,

2    percolating, local; not a part of the stream system.  Then,

3    I am perfectly willing that Mr. Veeder's title be quieted

4    against any claims they may assert to the waters of the Santa

5    Margarita River.  And I say, as the exact converse of it, the

6    title of these parties should be quieted against claims of

7    the United States to the ground waters underlying their lands.

8    Now, that is what I want.  If my motion is ineptly drawn, I will

9    redraw it.  But I think we have got to face up to this, be-

10   cause it is going to happen right straight down the line.  Your

11   is going to have before you in less than two weeks, in all

12   probability, a set of proposed findings of the Master.  And

13   Mr. Cranston told us he was not going to change that finding--

14   in fact, Mr. Veeder didn't object to it-- which says that all

15   of the gound waters in the Fallbrook Creek watershed are

16   vagrant, local, percolating.  Now, I assure you, your Honor,

17   that I, having a couple of hundred clients in that area, am

18   going to figure out some kind of motion on the basis of those

19   findings, or rather I am going to press your Honor to consider

20   those findings and adopt them as the Court's findings; because

21   I think your Honor owes it to some 2,000 defendants in that

22   watershed to put their minds at ease and get them out of this

23   lawsuit without waiting until the indefinite future to do so.

24        MR. VEEDER:  Are you through?

25        MR. SACHSE:  I will submit my motion.

B

Z7

XB2

1    Yes.

2    MR. VEEDER:  Your Honor, I had hoped that Mr. Sachse

3  would leave things alone, but he didn't.  He pleaded himself

4  out of court.  And that is his problem.  He pleaded himself

5  out of court by coming in and asserting that he had no right,

6  title or claim or interest in the Santa Margarita River or its

7  watershed.  And when he did that, he was through.  His request

8  for admissions-- I call your Honor's attention to what we ad-

9  vised him about in regard to his request for admissions.  We

10  told him at that time that he had pleaded a disclaimer and

11  that he was out of business in regard to these clients, which

12  is true.  He was through.  This asks for a summary judgment

13  when he says he has no claim in the Santa Margarita River and

14  its tributaries.  It is beyond the pale of understanding so far

15  as I am concerned.  We are perfectly willing when a man comes

16  in and files an answer and says he has no claim, then he is out.

17  Now, that is our position, and that is the law of California.

18    THE COURT:  That is not all of it.  That is not all of

19  it.  He is out as to that part of it, but that is not all of

20  it.  His answers say they own certain lands, and his answers

21  assert they have certain rights to that land.

22    MR. VEEDER:  Fine.

23    THE COURT:  And by your suit you have clouded the

24  title to their land.  This is not an idle statement.  There

25  is no doubt in my mind-- I have heard it time and time again--

1  title companies have to tell these people when they transfer

2  land in this valley that lis pendens is on file and you have

3  to abide the action of the District Court involving title to

4  your land, and all the title company can say is subject to

5  case number, as in Case No. 1247.  Now, somebody who knew

6  something about water law might buy property and take a chance,

7  Somebody who didn't would be frightened off.

8      MR. VEEDER:  I have no problem there, your Honor.  If

9  that is the circumstance.  Of course, I truly believe that

10  they are stretching a point.  But that is beside the point.

11  But I would like to go back--

12      THE COURT:  Well, stretching a point.  That is all a

13  title company can do is to say in their report, "Here is an

14  action filed with a lis pendens involving your property."

15      MR. VEEDER:  All right.  All I say, though, your Honor,

16  in regard to the issue that is here, he pleaded himself out

17  of court, and he is through.  Now, I want to go back a little

18  bit and read his answer.  As long as we are getting into this

19  problem, which I thought had been settled, we will review

20  his answer.  And he didn't plead correctly or properly or

21  set up a counterclaim.  Now, that is what he should have done.

22  He didn't do that.  So we are down now to the problem of what

23  kind of judgment could be entered.

24      THE COURT:  I will permit him to amend if there is any

25  problem on that.

B

Z9

1    What does his prayer say?  Do you have his answer

2  there?

3    MR. VEEDER:  Yes, his answer is here.

4    THE COURT:  Let me look at it.

5    MR. VEEDER:  Of course, the prayer is not part of the

6  pleadings.

7    MR. SACHSE:  It is an affirmative defense, Mr. Veeder.

8    MR. VEEDER:  The prayer is not part of the pleadings,

9  your Honor, and so far as I am concerned--

10    THE COURT:  Let me read it.  Just a minute.

11    MR. SACHSE:  Mr. Veeder, which answer is the one you

12  gave us?

13    THE COURT:  Mr. Veeder, the answer and the prayer

14  comport with established California practice in quiet title

15  proceedings.  I have handled quiet title actions myself when

16  I practiced law, and that is exactly what you do.  I am not

17  going to spend any more time on this.

18    MR. VEEDER:  It suits me, your Honor.  The only thing

19  I say is this, is that from ourstandpoint as the judgment

20  is entered, as I have asked it, let it go.  We will save Mr.

21  Sachse's face if we have to.

22    THE COURT:  Here is what we will do:  We will treat

23  Mr. Sachse's motion as a motion that the plaintiff's have

24  shown no case, as it were, as to his client's land and that,

25  conversely, on the state of the record as it now stands with

B

Z10

1    the admissions that the 41 defendants are entitled to have

2    a decree, that they are the owners of the land; that they are

3    not riparian to a stream, the stream or basin; and that any

4    waters on their lands are vagrant, percolating waters, not

5    part of the river system; and that the United States and other

6    riparian owners have no claims as riparians to this water,

7    leaving open the question of their correlative rights with

8    their neighbors.  Now, I would propose to draw a tentative set

9    of findings on this subject, on this matter, subject only to

10   the rights of other riparians who might want to be heard on

11   this question after suitable notice to them in the manner in

12   which we have discussed.

13        MR. VEEDER:  Your Honor, you left out the most important

14   thing; that the United States of America is entitled to a

15   judgment against them.

16        THE COURT:  That is right.  I know.  There is no

17   dispute about that.  The United States is entitled to a judg-

18   ment quieting its title to whatever rights it has in the stream

19   system of the Santa Margarita against these 41 defendants.

20        MR. SACHSE:  Now, I offer one very minor suggestion,

21   your Honor.  I do not believe, in all fairness, that your Honor

22   could enter a judgment saying the "owner of the land".  I

23   think you should say "the apparent owner."  We kicked this

24   around before the Master.  I think this is a question of

25   quieting title of water rights to a parcel of property, but

8140

1    I do not believe your Honor has sufficient before you to quiet

2    the title of any one of these people as against all persons.

3    Someone might come in and claim my man doesn't own the land.

4    In other words, quieting the title of a piece of property is

5    to a water right rather than --

6         THE COURT:  It would only be good against those people

7    who were served.  I will concede to your request on that.

8         Do you have objection to this use of "apparent owner"?

9         MR. VEEDER:  Well, so far as I see it, your Honor, I

10   think that we can describe-- and you raised a point that is

11   of interest to me.  I hadn't known about this matter that the

12   title company had been raising.  I think the thing to do, if

13   that is the case, is to describe in one of your Honor's

14   findings the property that is involved and say that the

15   judgment runs to the property as distinguished from the owner.

16   Then, this matter you raised would be taken care of in regard

17   to that particular parcel of land and the judgment clear.  That

18   is as distinguished from the ownership of the property itself.

19   It would be simply a description of the property.

20        MR. SACHSE:  I think it is purely a mechanical matter.

21        THE COURT:  That is just the same as you have been

22   talking about using the name of the defendant as the apparent

23   owner.

24        MR. VEEDER:  That would be all right as long as we

25   describe the land.

B

Z12

1          THE COURT:  We have to describe the land.

2          MR. VEEDER:  That is what I am saying.  It would run

3    to the land, not to the owner.  That would be here for all

4    time.

5          THE COURT:  Does anybody have any objection to that

6    procedure?

7          Mr. Krieger?

8          MR. KRIEGER:  No.  I would like to make a comment at

9    this point, though, your Honor.  I just wonder if this whole

10   concept can't be pushed a step further.  You earlier suggested

11   the idea of interlocutory decree that might be entered.  It

12   seems to me that the Government's case to this point makes

13   no effort at all to prove any water rights beyond those lines

14   drawn on Exhibit 15 and 15-A by Mr. Kunkel.  And this same

15   procedure we are talking about now might well be accomplished

16   in the form of an interlocutory decree to reach all those

17   lands, literally thousands and thousands of acres, to prevent--

18         THE COURT:  You haven't been around here.  We want to

19   do something like that someday, but we have got to be able to

20   describe the lands.  We have got to be able to catalog the

21   apparent owners of those lands.  And we have got to be able

22   to get something definite enough to show some other court on

23   some other date what lands and what people were involved in

24   this litigation.

25         MR. KRIEGER:  I understand, your Honor.  And we have

8142

B

Z13

1  kept abreast of this through the transcript of the proceedings.

2  And the reason I make the suggestion is, in our own case with

3  some of the defendants that we represent, we know exactly

4  where they lie with respect to Mr. Kunkel's lines on 15-A.

5  It seems to me that the Government having run a title report

6  on all of these lands knows pretty well which defendants lie

7  inside or outside of that line, of those lines, and it wouldn't

8  be very difficult, at least it hasn't been at all difficult

9  for us, to ascertain which of our people lie outside that

10 line.  And while there have not been many of them at this

11 time we would have no difficulty in giving exact descriptions

12 and including this in a proposed interlocutory decree, if

13 that is the Court's wish.

14     MR. VEEDER:  Mr. Krieger, did you receive from us our

15 response to fifteen points?

16     MR. KRIEGER:  Yes.

17     THE COURT:  The mechanics of this matter would be, I

18 take it, a proposed set of findings which the Court would--

19 I am thinking out loud-- approve subject to this one limita-

20 tion?

21     MR. VEEDER:  You are speaking now of Mr. Sachse's 41

22 clients?

23     THE COURT:  Yes.  What would I do, approve them and

24 say subject to a hearing at which all the parties to this

25 action shall be notified and if no objection is made or if

1   upon the completion of testimony and argument at that hearing,

2   the Court is not otherwise advised, the findings will become

3   the findings of the Court as to these particular parties in

4   these particular parcels?

5          MR. VEEDER:   Could I refer your Honor to Rule 54b.  I

6   think that was amended in '46.  I believe that that contemplates

7   judgments in multiple claims, and I think it may give you an

8   outline as to-- it says:   "When more than one claim for

9   relief is presented in an action whether as a claim, counter-

10   claim, cross-claim, or third-party claim, the court may

11   directly enter a final judgment on one or more of them, unless

12   in all of the claims, only upon an expressed determination

13   that there is no just reason for the delay and upon expressed

14   direction for the entry of judgment and"--

15          THE COURT:   Mr. Veeder, the cases under that section

16   raise some very difficult problems, and the circuits are not

17   in agreement.  And I would like to stay as far away from that

18   section as I could in this litigation.

19          MR. VEEDER:   The point I make on it, though, your

20   Honor:  You are talking about entering a decree that would

21   not have complete finality.

22          THE COURT:   I don't think there are multiple claims,

23   first of all, under the cases.

24          MR. VEEDER:   I think they are, your Honor.  Would you

25   want a brief on that?

8144

B
ZM#15

1    THE COURT:  You want to read the cases so I can--

2    MR. VEEDER:  I tell you, I have a case in the Tenth

3  Circuit at the moment on it; and that is the reason why I

4  would--

5    THE COURT:  The Circuit has said, "Enter one judgment."

6  And I take it they mean one final judgment.  I don't think

7  they would object to interlocutory judgment.

8    MR. VEEDER:  That is what I am talking about.  This

9  is an interlocutory judgment, and it is not final until you

10  say there is a good reason for any finality.

11    MR. SACHSE:  I would like to assist the Court and Mr.

12  Veeder on that point.  I don't want a final judgment.  I

13  realize the problems that are here.  I know the due process

14  questions we have got before us.  It isn't that vital that there

15  be a piece of paper once and for all clearing these people

16  from the lis pendens.  What is vital is, in my mind, that  there

17  be this finding made.

18    THE COURT:  All right.  Prepare the findings.

19    MR. SACHSE:  I will do so, your Honor.

20    THE COURT:  How long do you want to prepare them?

21    MR. SACHSE:  We are going to be in court the rest of

22  this week.  I would like ten days.

23    THE COURT:  Ten days.  All right.  Serve them on all

24  counsel who have appeared here and draw up some format along

25  the line I suggest indicating that everybody in this lawsuit

B

Z16

1    can have a chance to shoot at them.

2         MR. SACHSE:  May I tender another thought in that

3    connection.  I want to do exactly that.  If necessary, I

4    want to have your Honor direct the United States to send out

5    notice on these 35 answers.  I think it is silly to do that.

6    I think it is a waste of money.  I am a taxpayer myself.  I

7    don't see any reason to burden the United States with noticing

8    6,000 people for just 35 answers.  And I have very great

9    sympathy with Mr. Krieger's suggestion.  I think we are at

10   the stage of the proceedings where certainly within two to

11   three weeks time the identical situation is going to be

12   present for over a thousand to two thousand defendants, the

13   only difference being instead of admissions on file it is

14   going to be findings based upon the Government's own testimony

15   and no defense testimony.  And that block might just as well

16   be noticed at the same time.  We might just as well face it.

17   And finally, Mr. Krieger's suggestion that we go on the next

18   step and see if we can't pull in the basement complex,

19   residuum.

20        THE COURT:  We will not send out the 41 all by them-

21   selves.  But get your findings in.  Let's have a look at them.

22        MR. VEEDER:  Time will be saved if Mr. Sachse and I

23   work together on the findings and the form of judgment.

24        THE COURT:  Yes.  Form of judgment?  I am not going to

25   sign the judgment.  If you want to submit an interlocutory

B

Z17

1    decree--

2           MR. VEEDER:  That is what I mean.

3           THE COURT:  --that is all right.  Mr. Sachse says he

4    doesn't want one.

5           MR. SACHSE:  I would be happy to have it.  I think it

6    is an unnecessary piece of paper.

7           MR. VEEDER:  I will work it out.

8           THE COURT:  Now, Mr. Krieger, let's take care of your

9    problem.

10          MR. SACHSE:  That takes care of my first motion, your

11   Honor.

12          THE COURT:  On your problem, Mr. Krieger, when Fall-

13   brook has completed its case and the State of California has

14   put its case on, and Vail, none of which are going to take

15   very long-- Fallbrook has estimated a week; California

16   estimated ten days to two weeks?

17          MR. MOSKOVITZ:  Yes, your Honor.

18          THE COURT:  Vail a week?

19          MR. STAHLMAN:  About a week, your Honor.

20          THE COURT:  Then, we are going to be ready to move into

21   this area of Murrieta and the Pauba Basin.  That is the only

22   area in this district where there is any major disput so far,

23   and I think then is the time to raise this question to

24   catalog the ownerships of the land involved and to get into

25   it.  And rather than do it piecemeal I would prefer to wait

B

Z18

1   until we have heard from most of the people in that area.

2        MR. KRIEGER:  That is perfectly agreeable with us.

3   Our evidence is being prepared right now, your Honor, and

4   we will be ready to go whenever the other defendants are

5   finished.  I understand we are last.  At that time, of course,

6   we will take issue with Mr. Kunkel's line as he has drawn it.

7   And our efforts will be to bring thatline much down, much

8   nearer the river bed than he has drawn it.  The reason I made

9   the suggestion I did just now was assuming that that line is

10  the Government's case, I was thinking momentarily of getting

11  all those thousands of acres to the north and the northeast

12  out of the lawsuit so we wouldn't have to be concerned with

13  them.  They wouldn't have to come to the Master's hearing or

14  do anything else.  It is a question of really saving time and

15  money for the real defendants.

16       THE COURT:  Mr. Veeder has been working with the Clerk

17  and cataloging the answers and the names of the parties.

18  They have done quite a job on that.  How near completion is

19  that?

20       MR. VEEDER:  It is moving along.  We will have it as

21  rapidly as we can.  I dnn't know.  Bill, have you finished

22  up your whole list?

23       THE CLERK: As far as the attorneys are concerned, I

24  have.  Some of the pro pers I have not completed.

25       MR. VEEDER:  We have a problem.  And I think Mr.

B

Z19

1  Sachse and I discussed this yesterday, and I hoped that Mr.

2  Dennis would be here this morning.  This matter of pleadings

3  has become very, very serious from our standpoint.  Now, as

4  I understand it, there is going to be an association with

5  Mr. Sachse and Mr. Swing so that those clients will be all

6  represented, is that right, by Mr. Sachse?

7  MR. SACHSE:  Yes, your Honor.  I told Mr. Swing during

8  the recess of your Honor's and Mr. Veeder's concern over the

9  pleadings, and he undertook to draft a document which would

10  list every one of his clients and simply associate me of

11  record in it so I could speak for him and there would be no

12  question of jurisdiction and presence at the hearings, and so

13  on.  As far as Mr. Dennis is concerned, I raised the same

14  question to Mr. Dennis when I saw him last week, and he told

15  me he would do the same thing.  Now, how promptly he plans

16  on moving, I don't know.

17  THE COURT:  What is your problem that you are concerned

18  with on this?

19  MR. VEEDER:  I think there are some of these parties

20  that have original answers they haven't filed in regard to

21  the latter complaints.

22  THE COURT:  The Oviatts?

23  MR. VEEDER:  I think the Oviatts are taken care of.

24  MR. KRIEGER:  I think we are all complete, all the

25  defendants we represent are complete.  Isn't that right, Mr.

B

Z20

B84

1   Veeder?

2         MR. VEEDER:  I believe that is correct.

3         THE COURT:  Mr. Clerk, did you get the names of all

4   counsel here this morning?

5         THE CLERK:  Yes, your Honor, I have it.

6         THE COURT:  And you see Mr. McGinnis.

7         MR. McGINNIS:  Right.

8         THE COURT:  For a change.  Now, representing whom?

9         MR. McGINNIS:  The Sawday Ranch.

10        THE COURT:  Sawday Ranch.  And?

11        MR. DOHERTY:  Mr. Doherty of Searle & Garbani.

12        THE COURT:  Yes.

13        MR. DOHERTY:  I would like to make an inquiry later

14   about my situation.

15        THE COURT:  Now, Mr. Krieger, let me give you something

16   to think about.  This is tentative, but I would like to have

17   you know what I am thinking about.  That is the way I like

18   to try cases.  When I was practicing law, I would rather have

19   a judge to do that than to sit up and try to look wise and

20   you try to get at what he is thinking about.  Here we have a

21   dispute on this so-called Murrieta Basin.  Obviously, there

22   is a certain area where the land is, even under the Government's

23   claim, outside of the basin.  And there is obviously some of

24   it which is within the basin.  Even under the defendant's

25   contention as we get closer down the river.  And we have a

B

Z21

1    dispute as to how far that basin goes.  Now, of course, the

2    Court could do one thing.  The Court could say, "A.  Certain

3    land is obviously outside of the basin.  B.  Certain land is

4    clearly within the basin.  And certain land the Court is in

5    doubt about.  It doesn't have enough information to decide

6    either way and, therefore, postpones this to some later date

7    when there is more information available."  That seems to be

8    California's position of what the Court should do.  Now,

9    another thing the Court could do could be this:  Say that

10   certain land is clearly outside the basin and certain other

11   land is in the basin, practically maybe as large as the

12   Government contends for it.  Now, what I am trying to figure

13   out is how anybody is badly hurt if that should happen.

14   Let's follow along.  Assume this:  Assume the Court says this

15   basin is just like the Government says it is, a big basin,

16   a part of the stream.  So here is Mr. X up there.  He has

17   got 80 acres of land.  He has never developed a well on it.

18   Later on, he develops a well.  He gets a windmill well.  He

19   gets a little bit of water.  Waters some stock; water a house.

20   Nobody is going to interfere with his windmill well.  In fact,

21   it may have been found to be over a basin.  Either the Court

22   was wrong or he didn't go far enough down to hit the water

23   or he hit a place where he didn't, because of an irregular

24   bottom of the basin, hit enough water to make any difference

25   to him.  Let's assume now he gets a big well.  He gets a well

1   like the Roripaugh well down in the Santa Gertrudis.  If he

2   gets that kind of well, gets a basin of water, gets a big stream

3   of water, it is only fair that his rights be correlative with

4   other people on the river.  So how is he hurt?  How is he hurt

5   except he is still subject to the litigation that might try

6   to determine relative rights of the riparians up the river and

7   the overlying owners.  If I adopted the State's proposition,

8   there is an area, a sort of no man's land, he is subject to

9   potential litigation to have the whole thing decided sometime

10  in the future, and he is not out of the lawsuit.  The only

11  people that are out of a lawsuit are those to whom we can say,

12  as we said to Mr. Sachse, as to Mr. Sachse's clients, it is

13  obvious this man has land which is not riparian; it is not

14  overlying any basin; and any water he has got, he is just lucky

15  to have it.  It belongs to him subject only to the rights to

16  his neighbors.  Now, even the State of California doesn't say

17  that there is no basin there.  The State of California said

18  we concede that there was water there; we don't know enough

19  about its rate of flow; we don't know enough about the basin,

20  about the area.  We concede there is water there.  So that on

21  the present state of the record unless you should dig up some

22  very fine evidence and have a terrific impact upon this Court,

23  it will be very difficult for me to find that a lot of that

24  land was not part of the stream system.  You follow me?  You

25  might say that I might take the middle ground, but I am

B

Z23

1  going to be very careful about ground that I say is not part

2  of the stream system and in the basin.

3        MR. KRIEGER:  May I answer your suggestion for a

4  moment?  There are two principal objections we have to keeping

5  many of our defendants in this lawsuit.  The first one is

6  that we don't share the view that Mr. Veeder has repeatedly

7  recited, that it is a blessing to be in this lawsuit.  We

8  think that the continuing jurisdiction of this Court imposes

9  a great burden on any defendant except the very big ones who

10  can afford to come in whenever there is a shortage of water

11  and take a reduction, as I think the United States can.  But

12  our people cannot do that.  They are not economically suited

13  to that sort of constant rehashing of this question.  Now, the

14  second problem that--

15        THE COURT:  Let me answer that.  If they are a riparian

16  owner or an owner overlying the basin, do you know any other

17  alternative?

18        MR. KRIEGER:  Yes; not to keep them in the lawsuit

19  at all, on the ground that they do not in their extractions

20  take water from this basin.  Now, that gets to my second point.

21        THE COURT:  You mean you are talking now about a man

22  who is riparian or who is an overlying owner overlying the

23  basin?

24        MR. KRIEGER:  I am thinking of this-- Let me illustrate

25  it, if I may, your Honor, because it is much easier for me to

1   speak with a diagram, if I may.  If we have a situation

2   something like this:  This is the river, and this is the river

3   bed.  Now, if a person has this parcel of land that cuts across

4   the whole stream, it seems to me that if this is one of my

5   clients, he should be given the opportunity in this land that

6   I have marked A and B to pump whatever water he wants for his

7   own uses as an overlying land owner without respect to this

8   stream, if we can demonstrate that the water that percolates

9   on this land is not a material part of the stream system.

10  This is the whole case of the defendants.  And we will attempt

11  to do this when the time comes through rather extensive well

12  tests that we have made, pumping tests, which so far haven't

13  been introduced in this case.  We will try to show that these

14  lands that have been included, to use Mr. Veeder's line, just

15  blanketed in, under this line, do not contribute to the waters

16  of these tributaries to the Santa Margarita River.  Another

17  reason that I think this is so important, your Honor, is that

18  as you increase the number of lands in this watershed that

19  can be said to be irrigable, for example, if you have a

20  denominator which is something in excess of 400,000 acres

21  right now and a yield of the river of some 30,000 acre feet

22  a year, you aren't going to have very much water to give to

23  anybody.  On the other hand, as this denominator is reduced

24  so that the lands that are truly riparian are the only lands

25  that remain within a judgment of this Court, you are going to

1  have more water for fewer acres and the people on the outside

2  of this river bed are going to be able to pursue their own

3  water developments as and when they please, and they are not

4  going to have to come back into court every time there is

5  an increase user on the stream system, and everybody says, "We

6  are using too much water.  We have all got to cut down."  So

7  for those two reasons we are profoundly interested in getting

8  as much land as we can out of this lawsuit, possibly with a

9  view of limiting the lands, if we can, just to the river it-

10  self and to the river bed, or we could call it the younger

11  alluvium, as has been pointed out in Mr. Kunkel's testimony.

12  This is the theory we are operating on for the defendants in

13  the Murrieta River.

14          THE COURT:  You represent Mr. Roripaugh?

15          MR. KRIEGER:  Yes.

16          THE COURT:  Are you going to contend that the Roripaugh

17  well is vagrant, taps vagrant, percolating water that is not

18  part of the river system?

19          MR. KRIEGER:  No.  It so happens, this is an interesting

20  thing, that every well I think that has been introduced in

21  evidence so far happens to lie right smack in the middle of the

22  river bed.  The Roripaugh well lies within the river bed, lies

23  right in the middle of Santa Gertrudis.  What we are talking

24  about are these large acres of land out here, literally thousands

25  of acres of lands that once they are included in this denominator,

1  they become subject to the continuing jurisdiction of this

2  Court.  And one final point is this:  That if I were an owner

3  of land up here in this area and I knew that I were under this

4  court order, my land was a part of the decree, but there was

5  no judgment against me at the time except to say that I was

6  part of the stream system, if I knew the proportion was some-

7  thing like this and Camp Pendleton was downstream with its

8  unlimited financial resources to put the waters of the river

9  to use, I would say, "Well, I am not going to develop this

10  land.  I can't afford to do it, because if I do, next year

11  there is going to be an overdraft on this river.  I am going

12  to be limited.  I can't afford to put any money into the

13  development of my land, because I am under this constant threat

14  of the Court's cutting me down."  So it has a profound effect

15  on the growth of this agricultural area that lies just out-

16  side the stream bed.

17      THE COURT:  All of what you say is true, except I can't

18  find that that parcel has vagrant, percolating waters, unless

19  there is evidence to support that finding.

20      MR. KRIEGER:  That is exactly what we intend to intro-

21  duce.  When our case is presented, we will show, I think, the

22  lands that are productive of water, the lands that are not

23  productive of water.  And they won't agree, I believe, with

24  the theory of th geologists in all particulars.

25      MR. VEEDER:  I wonder if that data could be made

B

Z27.

1  available to us.

2  MR. VEEDER:  Well, under the ten-day rule it will be,

3  and it will take some time to do it.

4  THE COURT:  If you have it available beforehand, don't

5  cut the other counsel down to the minimum ten days.  Let's

6  get any material that you have filed as soon as you can.

7  MR. KRIEGER:  We certainly will have it.  And, in-

8  cidentally, for convenience, I would like to clear this now

9  with Mr. Veeder.  I would like to sketch some of our exhibits

10  on your 15, if we can get it, on some of your blank 15's so

11  we will have the same tie lines.

12  MR. VEEDER:  Are you speaking of 15 or 17?  17 is the

13  one with the basins delineated.

14  MR. KRIEGER:  It will be on 17, then, either 15 or 17.

15  Would that be agreeable with you, Mr. Veeder?

16  MR. VEEDER:  Surely.  Fine.  And they are available.

17  MR. KRIEGER:  I will get them downstairs and as soon

18  as we have them ready we will certainly submit them.

19  MR. VEEDER:  Mr.Kunkel is doing additional work at the

20  present time, and any data that are available to us would be

21  helpful.

22  THE COURT:  We will take a short recess.

23  (Recess.)

24

25

1      MR. MOSKOVITZ:  Your Honor, I would like to announce

2  for the record that California has lodged Exhibits AB through

3  AN with the Clerk, and copies have been furnished to some of

4  the counsel, and we will furnish copies to others who are here

5  for the first time today.

6      MR. VEEDER:  Mr. Moskovitz, in that connection may I

7  inquire as to the exhibits which are part of Bulletin 57 that

8  you are going to rely upon?  As I understand it, you are

9  going to have exhibits in addition to the ones you have just

10  tendered?

11      MR. MOSKOVITZ:  That is right.

12      MR. VEEDER:  Which are part of the Bulletin, and if we

13  could have a designation of them then we would know the ones

14  upon which you are going to rely.

15      MR. MOSKOVITZ:  We will give you a list of those, Mr.

16  Veeder.

17      MR. VEEDER:  Thank you.

18      MR. SACHSE:  On that exhibit matter, also, your Honor,

19  Fallbrook Public Utility District has lodged Exhibits A through

20  V-1 and AA, AB and AC.  The designations W, X, Y and Z are

21  not assigned.

22      I would like to call the court's attention and that of

23  all counsel, in case there is any confusion, that I submitted

24  a revised list as of January 26, 1959, with new numbers.  The

25  list that is attached to the original stipulation on issues has

1  numbers which are incorrectly designated.  I supplied my list

2  to the Court, to the Clerk, to Mr. Veeder, et cetera.

3      They have been lodged, and I believe I have distributed

4  copies to everybody.  If I haven't, I have them here.

5      MR. STAHLMAN:  Your Honor, there was one other question

6  that Mr. Krieger touched upon and I would like to get his

7  views, and that is the Oviatt suit that lies in the State court,

8  of which Vail is a part and Mr. Krieger's clients, and which

9  has not been tried.  There has been an investigation made on

10  it by the Department of Water Resources of the State.  I had

11  made a request in the answer filed by Vail Company, inasmuch

12  as all of the issues involved in that trial were competent in

13  this case, there should be some way or means by which that

14  case could be brought into this Court.

15      I checked the files yesterday.  I think there are about

16  fifteen lawyers that represented different people in that

17  suit.

18      My query here is, first, to find out what Mr. Krieger's

19  attitude is in relation to it, and then what mechanics we

20  might utilize if the case is to be brought here before your

21  Honor.  There is no use having a case in two courts involving

22  the same properties.

23      MR. KRIEGER:  Your Honor, I am not counsel in that

24  case for Mr. Oviatt, so I would have no way of speaking for

25  him now.  I think you will have to talk with his counsel, if

c

Z23

1    we are to transfer that case.

2           THE COURT:   Is Vail a party to that suit?

3           MR. STAHLMAN:   Yes, your Honor.

4           THE COURT:   Who is the plaintiff?

5           MR. STAHLMAN:   The plaintiff is Barbee, and Oviatt is

6    a defendant, and there were a number of other intervenors--

7    Vail intervened.

8           THE COURT:   These are neighboring owners on one of the

9    tributaries?

10          MR. STAHLMAN:   It is all in that one particular area,

11   which is from Vail to the east on Temecula Creek.

12          THE COURT:   Why shouldn't I let some State court settle

13   that dispute between those parties?

14          MR. KRIEGER:   It is in the State court.  But I think

15   the feeling has been that the same matters are embraced in

16   this case that will be decided there, and there is a possi-

17   bility that the judgment in this matter will perhaps auto-

18   matically clear that case.  But as far as jurisdiction or power

19   goes, I have no authority to speak for Mr. Oviatt.

20          MR. STAHLMAN:   Mr. Swing's office represents Barbee,

21   according to the record, Mr. Sachse.  Are you familiar with

22   that?

23          MR. SACHSE:   I have never had a thing to do with that

24   case, Mr. Stahlman.  I don't know anything about it.  I will be

25   glad to inquire and try to find out for you.  But I have no

8160

1    direct connection with it.

2          Your Honor, I think perhaps I can shorten some of the

3    rest of this motion material.  I have two additional motions,

4    one of them to dismiss Count 21 of the complaint, that being

5    the count dealing with prescriptive rights asserted by the

6    United States.  I observe that in Mr. Veeder's reply to that

7    motion he states that there will be additional evidence on

8    the issue of prescriptive rights and specifically refers to

9    the material that is to be introduced relating to uses on the

10   public lands and to the United States's relationship with the

11   Vail Company.

12         Frankly, I don't quite see how those things could bear

13   on prescriptive rights, but I am perfectly willing to concede

14   that if there is additional evidence to be offered that might

15   bear on the prescriptive rights that the motion is premature,

16   and I would therefore suggest that the motion to dismiss

17   Count 21--

18         THE COURT:  Is there any objection to putting it off

19   calendar?

20         MR. SACHSE:  Just putting it off calendar to resubmit

21   at such time as Mr. Veeder has completed any evidence bearing

22   on the prescriptive issue.

23         THE COURT:  California' motion likewise?

24         MR. MOSKOVITZ:  Yes, your Honor.

25         THE COURT:  All right, off calendar.  It may be reset

1  upon notice or by agreement.

2       MR. SACHSE:  Now the motion on Count 22, however, I

3  do not find that anything in Mr. Veeder's objections implies

4  that there is any additional evidence on the issue of

5  appropriative rights.  If there is such evidence and he wants

6  to say so now, I will consent to putting that off.  But I

7  would prefer to argue it, if we are through with hearing

8  evidence on the appropriative rights of the United States at

9  Camp Pendleton.

10      MR. VEEDER:  I believe, your Honor, that the same thing

11 applies both to prescriptive and appropriative rights.  Until

12 such time as all the evidence is completed, it is premature.

13      THE COURT:  It may go off calendar.  It is not going to

14 serve any useful purpose by crowding some of these matters on

15 for decision that underlie the major part of the case that do

16 not affect some particular defendant.  Any objection to letting

17 it go off calendar likewise?

18      MR. MOSKOVITZ:  I have no objection, your Honor.

19      THE COURT:  All right, off calendar.  It may be reset

20 upon notice.

21      MR. SACHSE:  Now I have alerted all my witnesses for

22 tomorrow, your Honor.  I can introduce certain documentary

23 evidence and clean up a little "garbage" today that I don't

24 need witnesses for.  But I would like to make an opening

25 statement as to the order of Fallbrook's proof and what we

intend to offer in evidence.

However, before I do that I think it might be appropriate to ask if any other counsel here have anything else on the general issues rather than on Fallbrook, if anybody wants to bring up any other question.

THE COURT:  Anyone have any matters that they want to discuss?

MR. STAHLMAN:  I have had some discussions with Mr. Krieger here, your Honor, in relation to the matter that he discussed with your Honor, and in my answer to the fifteen points I have touched upon our view in relation to that, and I think there are other factors that enter into this question as to whether or not the area that may surround an obvious storage unit of a stream system is or is not part of the system. I think I pointed out in this fifteen-point program our thinking and the reasons for it, and the difference between the evidence in this case and inother California cases which have been able to go far enough to determine that some of these areas involving wells were as much as a mile from the stream system were a part of the stream system-- evidence in addition to that which we have here, and I pointed out the legal presumption that exists in relation to whether or not waters are part of the stream system.

However, I think that the matter could be better explored and maybe better judgment used in relation to those uses after

C

Z27

1    we have had some of these pump tests that Mr. Krieger has

2    talked about and some of the experiences we have had in our

3    pumping on the Vail Ranch. I just can't make up my mind that

4    it is. And I see that in relation to the severance of

5    property that might exist in the future where there might be

6    some conditions that would affect the rights of the parties,

7    who may be subsequent owners of the property that may be

8    subsequently sold off, and also I have a little trepidation

9    regarding the conditions that might exist in relation to what

10   claims could be made by people who were outside upon the stream

11   system as keeping this case continually alive and litigation

12   that would ensue therefrom. I have heard Mr. Krieger for the

13   first time this morning. I will talk to him out of court

14   about it, and I think we should explore this a little further.

15   I think the suggestion your Honor made should have a little

16   more thought.

17          THE COURT: All right, Mr. Sachse, you may make your

18   opening statement.

19          MR. SACHSE: This is not at all intended as argument,

20   but simply to assist the Court and Mr. Veeder in knowing the

21   order in which I plan to proceed.

22          I intend to introduce first certain documentary evidence.

23   I will introduce an order in condemnation from the Superior

24   Court of this County by which Fallbrook Public Utility District

25   acquired title to some fourteen or fifteen parcels of land,

C2

1   most of which are riparian to the Santa Margarita River.

2           I will then introduce photographic copies of some 43

3   deeds by which Fallbrook Public Utility District acquired

4   additional property in the river valley-- some of which is

5   riparian, some of which is not.

6           In the case of the order in condemnation, that is a

7   certified copy, I believe.  In the case of the deeds, in

8   accordance with our prior agreement with Mr. Veeder on the

9   Master's hearings, those are not certified copies-- they are

10  photographic copies.  He has in the past made no objection, and

11  I understand he will make no objection to the lack of certi-

12  fication in these cases unless he finds something wrong with

13  them.

14          I will then introduce Exhibit C, which is a blank form

15  of the agreement used by Fallbrook Public Utility District for

16  the sale of certain real property in which the land owners

17  selling the property reserved or attempted to reserve their

18  riparian rights to the remainder.  That is not perhaps

19  technically a part of Fallbrook Public Utility District's case,

20  but in fairness to the land owners from whom we bought this

21  property I feel it should be put into the record and the

22  sooner the better.

23          I will then proceed through witnesses to go ahead with

24  the rest of my case and introduce the rest of the documentary

25  evidence.

1          I will call as my first witness Mr. Yackey, who has

2    been since 1946 until January of this year the full-time

3    general manager and chief engineer of the District.  Since

4    January 1 of this year Mr. Yackey is in a consulting capacity

5    for the District.

6          Through Mr. Yackey I will introduce evidence all of

7    the Fallbrook Public Utility District's applications, permits

8    and licenses to appropriate water of the river.

9          I will introduce a map of the Fallbrook Public Utility

10   District, showing its growth, its annexations as it has ex-

11   panded.  I will introduce an additional map of the District

12   showing its basic water distribution and storage system.  It

13   will not show every pipe line, but it will show the principal

14   connections with the San Diego County Aqueduct, the diversions

15   from the Santa Margarita River and its reservoir systems.

16         I will introduce through Mr. Yackey a tabulation of

17   the District's diversions from the Santa Margarita River

18   brought down through-- I think it is through the calendar year

19   1958-- the diversions by months through December, 1958 from the

20   Santa Margarita River.

21         I will also introduce evidence as to the water purchased

22   by the District from the San Diego County Water Authority

23   since its membership in that Authority.

24         I will then introduce copies of the Navy protests to

25   certain applications-- Vail Company, Santa Margarita Mutual

8166

1   and Fallbrook-- those matters being perhaps in the nature of

2   rebuttal testimony to the claim of the appropriative rights

3   of the United States.

4        Finally, I will introduce a certified copy of the

5   complaint in the case of Rancho Santa Margarita vs. Vail.  My

6   intention in introducing that document will be that it is an

7   admission against title by a predecessor in title.  It is not

8   an admission against interest of the character that concerned

9   your Honor with the Navy protests, but this is a predecessor

10  in title who stated the character of his title.

11       THE COURT:  You mean when Rancho Santa Margarita brought

12  the action against Vail--

13       MR. SACHSE:  They asserted no appropriative rights.

14       THE COURT: --they asserted no appropriative rights,

15  which now are asserted by the Government.

16       MR. SACHSE:  That is correct, your Honor.

17       THE COURT:  That is a nice problem on which Mr. Veeder

18  can do a little legal work.

19       MR. SACHSE:  I would like to bring up very specifically

20  one of my intentions--

21       THE COURT:  Contentions?

22       MR. SACHSE:  Intentions in the matter in which I intend

23  to present my case.  It is my present intention, your Honor,

24  to introduce no evidence whatsoever as to the riparian lands

25  owned by Fallbrook Public Utility District beyond the simple

1    fact of their ownership and location.

2            THE COURT:  By Fallbrook Public Utility District.

3            MR. SACHSE:  By Fallbrook Public Utility District as

4    such.  Now we have had an understanding with Mr. Veeder as to

5    individual ownerships that I hope we can carry forward as to

6    the District's ownership that if deeds are introduced which

7    establish that a parcel of land is traversed by or abuts upon

8    a stream it will be regarded as a prima facie showing of

9    riparian status in the absence of some knowledge by the

10   Government that it has been severed.

11           I have knowledge that some of these have been severed

12   and I will so indicate.  But it has been our practice on the

13   private owners-- Mr. Veeder, if I am wrong I wish you would

14   confirm it now-- it has been our practice on the private owners

15   that the owner was not required to introduce the entire chain

16   of title, but if he showed that his land abutted upon the

17   stream, in the absence of some knowledge by the Government

18   that it has been severed or in some way lost its riparian

19   right it would be treated as a prima facie showing, and I

20   will rely upon that same procedure as to the Fallbrook Public

21   Utility District's lands.

22           MR. VEEDER:  As I understand it, certainly if the land

23   was not abutting upon the stream and you condemned it, you

24   would not claim it to be riparian.

25           MR. SACHSE:  That is right.  These will all be lands

1  that abut upon the stream.

2      I want to repeat, for Mr. Veeder's protection and that

3  of the United States and to clarify this for the Court,

4  Fallbrook Public Utility District asserts no right to use any

5  riparian waters in its distribution system for resale for

6  irrigation, domestic or municipal purposes.  We do not assert

7  that right.

8      THE COURT:  In other words, you have condemned certain

9  riparian lands, but you are not contending that you have any

10  right to take water that might pertain to that riparian land

11  and use it in your distribution system.

12      MR. SACHSE:  That is correct.  We contend that we have

13  the same right as a riparian owner as anyone else has.  We

14  could lease that land for agricultural purposes or farm it

15  ourselves, using the water on that land.

16      THE COURT:  But you concede that you have no right to

17  move it around?

18      MR. SACHSE:  That is correct.

19      Now, the significant thing in what I have just said,

20  and I don't want either the Court or Mr. Veeder to misunder-

21  stand, is this:  I intend to offer no evidence whatsoever as

22  to irrigable acreage.

23      MR. VEEDER:  I move for judgment.

24      THE COURT:  The irrigable acreage of this riparian land

25  that belongs to the District.

MR. SACHSE:  Yes, your Honor.

I want to state at this time my reason, and I am not making this statement as to individual clients-- I may go this far even for them.  It is my position, your Honor--

THE COURT:  You are talking now only about your representation of the District.

MR. SACHSE:  That is correct, and only riparian lands of the District.

It is my contention, your Honor, that if land is riparian and at the conclusion of this case your Honor finds that a certain parcel of land owned by anyone is riparian, that any finding beyond that is complete surplusage, unless quantitative apportionment is presently to be made.  Mr. Veeder has repeated twice in this courtroom and once yesterday before the Master that he seeks no quantitative apportionment.  So I take the position that for Fallbrook to waste the time of this Court, spend its own money, proving what today is irrigable acreage is an absolutely fruitless and unnecessary act; that at such time as a deficiency exists in the water supply of this stream, your Honor has clearly indicated and we all agree that you should keep continuing jurisdiction, at such time as a deficiency exists, at such time as an allocation must be made between riparians, that is the time to receive evidence of irrigable acreage.

THE COURT:  Well, even then if the irrigable acreage

belonged to the District and you had not disposed of it, there would be no use going through it at that time.

MR. SACHSE:  If we chose to lease it for agricultural purposes, your Honor, it might be pertinent at that time.  My principal point is this.  Carrying it over beyond the District and applying this same principal to a private individual, I do not believe that simply because there is no evidence of irrigable acreage today a res adjudicata judgment can be entered that there is no riparian use of water.  The riparian use doesn't depend wholly on irrigable acreage.  Irrigable acreage is a yardstick by which the quantity is measured, and if any defendant, either through stupidity or planned design, does not prove irrigable acreage to this Court, that does not mean that he has no right to the use of water on his land. The question of how much water he can use on his land, what his share is of the stream, in my judgment, will be based upon the conditions that exist when the shortage exists or upon the demands asserted upon the stream at that time, and not on any abstract finding of irrigable acreage today when the occasion for a yardstick may not arise for another fifty years.

THE COURT:  Well, don't you think that, in fairness to your clients, the Fallbrook Public Utility District, there ought to be some estimate of the amount of irrigable land that is riparian in this District?  Otherwise, you have a

1   situation where people might be misled.   There is no doubt

2   that there is a vast amount of irrigable riparian land on

3   this watershed.   You seek appropriative rights.   If there is

4   water not being used by riparian owners, you may use that

5   water.   But when the riparian owners get ready to use that

6   water, you have no rights at all to it.

7   　　　　MR. SACHSE:   That is right, your Honor.

8   　　　　THE COURT:   Therefore-- your client contemplates

9   spending a lot of money-- it seems to me that there ought

10  to be some finding as to what the potential irrigable acres

11  are in this watershed.

12  　　　　MR. SACHSE:   If such a finding were made as an assist-

13  ance to the people of the District in deciding whether they

14  want to vote a bond issue or whether they want to attempt to

15  build a dam at all, I, of course, have no objection.   If such

16  a finding is made, however, with the thought that the finding

17  or irrigable acreage can have any practical benefit to the

18  questions that are presently before your Honor or that may come

19  before us twenty years in the future, if there is a shortage,

20  I think they are unnecessary, and I am so convinced of this

21  from my own research that in the case of Fallbrook at least I

22  have made up my mind that I will introduce no evidence of

23  irrigable acreage.

24  　　　　I will go further.   I am very seriously considering

25  doing the same thing in the case of individual riparian clients

1    as well.

2         To carry the argument one step further, this is an

3    abstract question that does not involve any of my clients,

4    obviously, because I am in the court.  This could only involve

5    people who are not represented by counsel.  But I have asked

6    myself this question:  Suppose that somewhere in this water-

7    shed is a man who owns ten acres of riparian land.  There is

8    no argument about it.  Either through stupidity or ignorance

9    or plain orneriness he doesn't come into this court.  He just

10   doesn't come in.  Now, in the DeLuz Watershed the United

11   States has done a very fine job and as far as I am aware every

12   single parcel of riparian land in that watershed there is

13   evidence that it abuts upon the stream and there is even some

14   kind of record by which such ornery individual can be found

15   to be a riparian.  But let's imagine that somebody up on

16   Tucalota Creek, some riparian, doesn't come into this court

17   and this Court finally enters a judgment and leaves his name

18   off.  I have done the best I can at researching the law, your

19   Honor, and I do not concede that that man loses any riparian

20   rights.  He is a riparian.  It is a physical fact that he is a

21   riparian.

22         THE COURT:  Well, if his name was omitted.  But if he

23   has been served and if after exercising our best efforts,

24   where he hasn't appeared, to find out what we can about his

25   property and its location, a judgment is entered, it is going

to be a different story.

MR. SACHSE:  I cite that example only to carry it a step further to the irrigable acreage.  The man has been served-- my client has been served.  He has even appeared by counsel.  His counsel are present throughout the proceedings. But this man, either through stupidity or through orneriness says, "I am not going to prove any irrigable acreage.  It is absolutely immaterial.  I am not using water today.  I don't intend to use it for many years to come."  Twenty years from now there is a shortage.  This Court orders some allocation among riparians.  This man comes in and says, "I am a riparian. I am entitled to a share of this water.  My irrigable acreage is so and so.  I now present the evidence."  And if you find irrigable acreage is the yardstick upon which you at that time have apportioned the water, that is my reasoning, and as I say, I want to advise Mr. Veeder so that he can, if he chooses, to prepare a motion.  I am perfectly satisfied with my position on it.  I am going to, in the case of the Fallbrook Public Utility District, going to offer no evidence beyond the fact of their riparian status.  I want it understood now so that we can try to clean the thing up as we go along.

I have nothing further in the way of a preliminary statement, your Honor.  I am sorry I don't have my witnesses today.  I could have, but I antitipated a full day with motions and I asked them to be ready tomorrow.

8174

Z38

1      THE COURT:  How much of this documentary material do

2  you have?

3      MR. SACHSE:  I have just three documents that I would

4  offer at this time, maybe four.  I would like to offer Exhibit

5  A and Exhibit B-1 through B-43, and C.

6      MR. VEEDER:  May I be excused for a moment, your Honor.

7  I have some notes I would like to pick up at the office.

8      THE COURT:  Well, it is ten minutes of 12.

9      MR. VEEDER:  I thought he was going to offer them.

10      THE COURT:  Just those three?

11      MR. SACHSE:  You have copies of all these, Mr. Veeder?

12      MR. VEEDER:  That is right.  I have notes on them, also.

13      MR. SACHSE:  You mean that you have objection to some

14  of these?  Then let's wait, if he has objection.

15      THE COURT:  Anything further we can do this afternoon?

16      MR. VEEDER:  Couldn't we have some pre-trial this

17  afternoon in regard to some matters I would like to raise?  I

18  would rather raise them in chambers, if I could, but I would

19  just as soon raise them here.  I think it would be a pious

20  idea at this time.

21      MR. SACHSE:  I am available.

22      MR. VEEDER:  I think it would be a good idea to get

23  into some of these matters which, in the course of the de-

24  velopment of the case, make it desireable, in my view, in-

25  formally at least to discuss some of the factors that do concern

us, and I think one of the elements that could very well be gone into this afternoon would be the question that Mr. Sachse used the term "quantitative apportionment" and our position in regard to it.  I think we could formulate some issues and do some good in that regard.

THE COURT:  All right, then, let's adjourn now until 2 o'clock.

MR. SACHSE:  I will be ready to proceed tomorrow, your Honor.

THE COURT:  And you postpone your offer of these exhibits and whatever objection you have and make it tomorrow morning.  This afternoon we will work awhile on these pre-trial problems.  My chambers are loaded up with books and other matters.  If you want to sit around the counsel table I would just as soon do that.

MR. VEEDER:  That's all right, your Honor.

THE COURT:  Anybody interested may attend.  I would suggest that Mr. Doherty should stay, and Mr. McGinnis, and anybody else interested in the problem is welcome to be present.

Do you want the reporter?

MR. VEEDER:  Yes, your Honor, I think it would be a good idea.

THE COURT:  Adjourn until 2 o'clock.

(Noon recess.)

SAN DIEGO, CALIFORNIA, WEDNESDAY, FEBRUARY 11, 1959.  2 P. M.

(Another matter.)

MR. VEEDER:  Shall I proceed, your Honor?

THE COURT:  Yes.

MR. VEEDER:  Your Honor, I have some matters which concern me respecting the kind and type of relief that would be forthcoming in the final judgment to be entered in the case, and that is the primary reason that I requested your Honor for time today.

It is our view that there can be no apportionment of water, the corpus of the water, that is, but it is certainly our view that there should be and must be, if we are going to obtain relief, an adjudication of the respective rights of the parties as of the day when the decree is entered, which in my view would entail a determination of the irrigable acreage of each parcel of land.

Now, listening to Mr. Sachse this morning it appeared that he did not contemplate such relief.  Now I really don't see how a decree which would be at all helpful to the United States could be entered without some delineation and some definition of what we could expect of upstream users from the standpoint of the exercise of their full potential.  I am speaking now of their riparian rights.  If Mr. Sachse is still of that view, and I assume that he hasn't changed over the noon

1   hour, it seems that we should go into that matter now and

2   give it consideration, unless you think it is premature.  We

3   have now gone to the point where the defendants are beginning

4   to put in their evidence, and I truly believe that there

5   should be some delineation and demarcation of the area which

6   they think at the time the decree is entered would be entitled

7   to use water, assuming that water is available for them.

8          I would just as soon hear from Mr. Sachse on that and

9   then have the matter reviewed a little more, if possible, to

10  see where we are going.

11         THE COURT:  You would want a finding as to how many

12  irrigable acres there were that were riparian, and how many

13  acres were presently being irrigated.

14         MR. VEEDER:  That is right, and as nearly as possible

15  the extent of the water that was being utilized.  I don't

16  believe it is an impossible task to make findings in regard

17  to the very matters to which your Honor has just referred, and

18  I think it is essential that the decree reflect that.

19         An additional factor which precipitated my thinking on

20  it has been-- well, I will not get into that other matter.

21         I think that we should have a delineation of the

22  irrigated and irrigable acreages which are riparian in character,

23  also a delineation of the appropriative rights to the use of

24  water and the lands upon which the waters are used, and the

25  extent of the inchoate rights claimed under the appropriative

8178

Z542

1    rights based upon the number of acres that they ultimately

2    intend to bring in.

3         For example, the Vail Reservoir was constructed for the

4    purpose of impounding upwards of 60,000 acre feet of water.

5    Now they delineated the area upon which they intend to use

6    their water.  I think that Fallbrook, under its claim, and

7    others under their claims, should and must do the same thing,

8    or the decree will not be operative.

9         MR. STAHLMAN:  May I say something, your Honor.

10        I think the question is a lot broader than the concept

11   that we have approached it at this point.  I envision a system

12   of water law, from what little study I have made of it, as

13   being a practical instrument to keep pace with the progress

14   and changed conditions in the utilization of water.  This

15   approach to what the determination is going to be in relation

16   to the water rights for the individual, it has to start some

17   place as of a locale, and as of a time in the social progress

18   of the community in which the water is to be applied.

19        We have such things as in the case of O'Neill vs. Vail

20   where it was not envisioned that when those people made de-

21   terminations of their rights there would be such drastically

22   changed conditions affecting the rural property of the O'Neill

23   Ranch to where it became a great military base with entirely

24   different uses of water and in all probability before we get

25   through a determination of the apportionment of that water on

8179

1   different principles than what a farmer would apportion it on.

2   However, we do have to start some place.  I am not

3   proposing in these few remarks to give the solution of this

4   thing.  I am merely casting it out as something to think about.

5   That we have to think about the tremendous development of this

6   part of the country, and that these rural areas where there

7   still remains lands which are subject to development, when

8   once it comes it comes with a tremendous rush, as we have seen

9   in some of the counties in Southern California, and there

10  will be a different character of use and changed conditions.

11  So as I have observed, and from what little understand-

12  ing and reading I have had of the law, there has been some

13  progressive thinking in relation to the attitude of the courts

14  in applying the principles of law.  We start out with this very

15  basic and fundamental thing that existed in the early state

16  of the development of California when the people themselves

17  made their laws.  They went out of necessity and by reason of

18  the urgency and the exigency of the moment they brought about

19  some rules that were practical and remain today.  However,

20  the courts and the Legislature and even the constitutional

21  changes have brought about conditions that have kept pace with

22  the development of the modern use of water.

23  So I envision that when we have terminated here that we

24  want some decree that is based upon these fundamental and

25  equitable rights in accordance with our laws and the recent

1    decisions of Moore vs. Moore, even in the Lodi case, where

2    the court attempted to grant a decision which would be

3    permanent and effective as to some future, and the Supreme

4    Court directed them to keep continuing jurisdiction.  So now

5    we have approached that situation which, I think, more and

6    more in these rivers in California where water hardships occur

7    we are finding that courts are doing that almost universally

8    in these cases.

9         Then in the matter of physical solutions, cases of

10   recent years resort to these various physical solutions.

11        I think we have some very important and cogent principles

12   of law to determine in this case, some of them that I think

13   should be approached and probably decided if we are going in

14   a sort of pre-trial conference with the various lawyers to

15   cast out their thoughts on this matter, that should probably be

16   settled before we start talking about what the final determina-

17   tion will be.

18        I attempted to follow Mr. Sachse's thinking this morning,

19   and I think I appreciate it, and there is some fundamental

20   basic right in what he says.  However, there are conditions

21   that I know about on this river that eventually will be before

22   this Court where one land owner who has riparian acreage and

23   not sufficient water for it and another owner who has a less

24   amount of land but who dips into the same bucket in the same

25   vicinity is able to irrigate a hundred percent of his land.

1  That to me indicates that there may be some shortage.

2       Now, some of these questions that I have in mind, I

3  think, basically should be determined.  I have repeatedly

4  indicated to your Honor that I felt that everyone on the stream

5  system who had a basic right to the use of water should be

6  interested in the preservation of the efficiency of the stream

7  system, so that this implication of the law that it shall be

8  for the benefit of all, this correlative principle, when it

9  is applied should be applied to the benefit of all persons.

10      And so there comes to my mind just a few of these

11 fundamental legal questions.  One of them is one that we have

12 kind of touched on and wrestled with and we got away from it,

13 but we are going to have to approach it soon, and that is

14 whether or not, knowing and understanding and there has been

15 no dispute about the condition of the basins on Camp Pendleton,

16 as to whether or not in view of this rule of the riparian not

17 being privileged in the cyclical storage of water, whether or

18 not the impounding of water and the release thereafter a

19 riparian may use that for the purpose of preserving and storing

20 and putting underground in this basin to maintain its

21 efficiency.  I think that is an important legal question that

22 should be determined.  I think it probably resolves itself

23 into whether or not a riparian owner may by artificial means

24 assist nature in restoring the basin levels and whether or not

25 that is a reasonable and beneficial use of water by a riparian

1    owner.

2          Then we come to this other vital question:  What will

3    be done about the salt water intrusion?

4          I think some of those questions, particularly when we

5    are reaching the point where we are going into what the

6    appropriators'ss rights will be-- I am fully conscious of the

7    fact that I represent a client who has appropriative rights,

8    and these matters will affect us, just as they would affect

9    Fallbrook, who would become a subsequent or junior appropriator.

10   So I think some of these fundamental questions we ought to

11   wrestle with and settle before we start talking about what is

12   going to be the final manner in which the judgment in the case

13   is to be written up.  I am not minimizing for one minute the

14   fact that it will be necessary as we go along to determine

15   how this apportionment will be, whether we will have merely to

16   say that a man is a riparian owner and stop there or whether

17   this stream system is at the present time in such condition

18   that the Court will have to go further and say whether at this

19   time it may be necessary to curtail and apply this principle

20   of correlative rights to the case.

21         Those are just a few of the things.  There are a lot

22   of legal points that have come up in my mind and sometimes I

23   forget some of them before I get to court, but those are some

24   of them that I think should be settled, and they are questions

25   that affect Camp Pendleton as well as every user on the stream.

1          MR. SACHSE:  Mr. Veeder asked that I comment.  I would

2    like to comment first on the specific area of agreement.  I

3    think Mr. Veeder is unquestionably entitled to and should get

4    the most definitive possible delineation of all appropriative

5    and prescriptive rights.  I believe he is entitled to have that

6    spelled out very clearly, and in the very nature of an

7    appropriative right it is spelled out in terms of an absolute

8    limit.

9          Taking, for example, Vail's appropriation, it has a

10   limit, I believe, of 60,000 acre feet.

11         MR. STAHLMAN:  40,000.

12         MR. SACHSE:  40,000.

13         Let's take the Fallbrook one.  I know what I am talking

14   about exactly on that.  I don't care how big a dam Fallbrook

15   might build, I don't care how much water might rush down the

16   river, Fallbrook's appropriative rights that they claim,

17   assuming they would be confirmed by this Court, would be limited

18   to the taking of 30,000 acre feet in a certain season of the

19   year, between April and May.

20         So Mr. Veeder is entitled to that kind of delineation

21   of every appropriative right and he ought to get it and he will

22   get it, and in the nature of an appropriative right he will get

23   it.

24         Now, in the nature of a riparian right, I don't think he

25   can get it.  There are certain Hornbook principles of riparian

1  law.  The riparian right is not absolute.  It changes as the

2  demands on the stream change.  It changes as the supply changes.

3  That is one of them.

4       The riparian right is not lost by disuse or gained by

5  use.  The mere fact that people may be making no present use,

6  that there may be not a foot of land irrigated, doesn't

7  destroy the right, and as a riparian owner the United States

8  has to recognize that fact.  The riparian right is going to

9  be greater or smaller in quantity as to any defendant or the

10  United States.  It is going to be greater or smaller, depending

11  on the water in the stream and depending on the uses of other

12  riparians.

13       My only point is this, that for the United States to say

14  that a determination that John Smith has X irrigable acres

15  today gives it this certainty that Mr. Veeder would like is

16  foolish.  In the case of Rancho Santa Margarita vs. Vail--

17  conceded that it did not go to final judgment, but it would be

18  interesting to assume for a minute that it had-- and the Court

19  found some 5,000 less irrigable acres on Camp Pendleton on the

20  Rancho Santa Margarita Property than Mr. Veeder contends for

21  today.  Now would he say that if this were a continuing juris-

22  diction proposition in that same case that he would not have

23  the right to establish the fact that the irrigable acreage has

24  increased with the approved techniques, et cetera?  Of course

25  he wouldn't.  And he would have a perfect right so to do.  He

1   would have a perfect right to show that the irrigable acreage

2   of the Rancho has increased because of improved techniques--

3   new farming methods, et cetera.

4        So my point is only this:  What earthly benefit do we

5   achieve by trying to make certain something which in the very

6   nature of the beast can't be made certain?  Mr. Veeder would

7   like an assurance, and I have the utmost sympathy for him--

8   I am sure that Camp Pendleton would like to know down to the

9   last drop just exactly how much water they could depend upon

10  for the indefinite remote future, but it can't be done.

11  Nobody knows how much water is going to be running down the

12  stream, and nobody knows what use is going to be made upstream,

13  and since it can't be done I don't see why we should do a lot

14  of running in place, produce mountains of figures on irrigable

15  acreage and acreage presently irrigated, which are not going

16  to help us one iota.  If three or four or five years from now

17  a critical shortage arises and the Vail Ranch comes in-- to

18  move to another section of the watershed-- the Vail Ranch

19  says, "We insist that Mr. Sievers (one of my clients) is

20  taking too much water.  We want an apportionment because we

21  are not getting our share," the determination today is not

22  going to cut off one day's trial when that new controversy

23  arises.  It is just going to pile on extra expense today for

24  all of these litigants to no earthly benefit that I can see.

25       That is my reason for taking the position I have

1     taken with Fallbrook Public Utility District.  I want to make

2     it quite clear.  I am not going that far with my individual

3     clients.  As I continue to get the pulse of this case, if I

4     feel that, in fairness to them and to protect their rights,

5     according to how I judge your Honor's attitude toward the

6     evidence, I may feel it is necessary in those cases to put it

7     in.  But I am so convinced of the correctness of my position

8     that in the Fallbrook Public Utility District case I am going

9     to ride the horse that there is no need for a finding to

10    protect Fallbrook, there is no need for any kind of finding

11    as to the irrigable acreage on that land, and I therefore am

12    not going to take the time of the Court or to spend the money

13    of my client to try to prove it.

14           Now, very early in this case your Honor told the United

15    States that you expected them to produce evidence to the Court

16    of everything they knew about any of this land, and they have

17    done so.  As I said, in the De Luz Creek watershed I don't

18    believe there is a single parcel of land that the United States

19    has not produced some evidence and there is something before

20    your Honor on which you could make a finding even to the extent

21    of the irrigable acreage, if you desired.  What I am saying is

22    if the United States wants to put that evidence in, I am not

23    going to attempt to rebut it-- I am going to take their figures.

24    But I am convinced that their figures don't mean anything,

25    and if six years or ten years or twenty years from now a new

1   apportionment or a first apportionment quantitatively had

2   to be made those figures will have to be redone.

3       That is my position stated as simply as I can state it.

4       MR. VEEDER:   I think that Mr. Sachse has touched on

5   something that we have been reviewing back and forth for quite

6   awhile now.   As I understand it, in regard to Fallbrook's

7   lands he is not going to show irrigated and irrigable lands,

8   but in regard to his private lands there is some doubt.   The

9   point that he has made, however, respecting the possible

10  change is true in regard to any decree quieting title to the

11  rights to the use of water.

12      In other words, frequently we are in this position, a

13  decree will be entered, for example, in 1944 on the Truckee

14  River.   The lands will become waterlogged--alkaline-- 1,500

15  acres.   I am just using an example.   So you file a motion to

16  show cause as to why water should no longer be delivered to

17  those lands but to some other lands presentlyin need of water.

18      So a decree is probably out of date the moment it is

19  entered, but it does fix the rights as of that moment.   And

20  what Mr. Sachse is saying is, "Well, the National Government

21  is now claiming 18,000 acres of land, whereas it was originally

22  determined in the State court that it has only 12,000."   Well,

23  there is another instance where, in my view, you simply file

24  a motion requesting an order to show cause as to why additional

25  lands wouldn't be designated as being irrigable.   I don't

8188

believe that the fact that a decree may be out of date the moment it is entered is any reason for not entering it.   Every decree that is ever entered in any quiet title suit is probably out of date the moment it is entered.   But the fact remains that from the standpoint of the determinations which I believe your Honor must make in regard to the claims of the United States at Pendleton, in regard to the claims of Fallbrook, in regard to the claims of Sawday, if there is not a chronicling of the riparian and irrigable acreage I don't see how an effective decree could be entered.

I am thinking now of Mr. Roripaugh's property.   The area that he is presently irrigating, I think, should be defined. If all of his land is irrigable, I think similarly it should be defined.

In other words, while I haven't gotten any cooperation from my colleagues up here, I still believe that we should have a tabular form showing the parcels and the descriptions and the places of use, the irrigable lands, the irrigated lands, the quantity of water presently used, and I believe that kind of decree chronicling the rights of each party is the only kind and type of effective decree that could be entered. Absent such decree I don't believe we could get the determinations that I believe we have to have.

Now, there is the sum and substance of my concern that I have expressed this morning.   I think we are certainly at

8189

C

Z53

1     the juncture where a determination, I believe, would be most

2     helpful.

3          THE COURT:  Mr. Moskovitz.

4          MR. MOSKOVITZ:  Your Honor, I agree with Mr. Sachse's

5     analysis of the problem, and I want to add just this further

6     question.  Maybe Mr. Veeder's answer would help my thinking.

7          Assuming that he did get the kind of decree that he

8     wants, which recited what the irrigated acreage and the

9     irrigable acreage was as of the date of the decree, how as a

10    practical matter would that be used to make it worth doing?

11    He concedes that it is out of date practically as of the time

12    it is entered.  How will it actually be put to use to help the

13    parties in this case?

14         MR. VEEDER:  This is probably an instance of the devil

15    quoting scripture.  In the Shotford case, in which I par-

16    ticipated before a state court, the old Water Resources State

17    Engineer's Office, and in the Indian Creek and in the others

18    in which we have participated, it was exactly that situation

19    that the State obtained.  They went ahead and got a determination

20    of the irrigated and irrigable acreage.  And he asks why is it

21    important?  It is important so that the Court will know and

22    so that every individual on the stream will know the present

23    demand.  We have a very pressing problem.  We have a Congress

24    looking us squarely in the eye, if Congress can look you

25    squarely in the eye, and saying, "Until these rights are

1   adjudicated we are not going to build brick buildings down

2   there."  We have presently the kind of buildings that we have.

3   Now that is a very grave problem, and until we know, until

4   these rights are defined-- and I think that we have enough

5   data to make them quite definitive--  until we know the thing

6   that I have made reference to , in response to Mr. Moskovitz's

7   question, until we know the present uses, how they are diverted,

8   where they are utilized, the extent of the use, we can

9   calculate the return flow, that is the only way that we will

10  know how much water we, being the last man on the totem pole,

11  will receive.

12          In addition, it is extremely important to know what we

13  can reasonably anticipate from the standpoint of potential

14  development.  Anyone who has spent fifteen minutes in this

15  Valley-- I shouldn't say fifteen minutes, I have spent almost

16  ten years now, believe it or not-- when I first came here the

17  development was just in its inception.  You can scarcely drive

18  up the valley now without seeing sprinklers, without seeing

19  development going on constantly.  That is the thing that we

20  must know.  Here is a riparian user.  He has a perfect right to

21  share correlatively with the United States of America the waters

22  of the stream.  What can we reasonably anticipate today's use

23  will be?

24          Now there is the problem, your Honor.  We are making an

25  investigation on 500 parcels of land.  If it is not for the

8191

purpose of determining the irrigable and irrigated acreage,
we have been wasting a great deal of time and money. But we
don't want to come down to the wire and be told that we will
not get that kind of adjudication.

MR. MOSKOVITZ: Your Honor, I want to point out this,
that the two cases Mr. Veeder mentioned in which there was a
listing of irrigated and irrigable acreages, were cases in
which there was a desperate shortage of water. This was the
reason why the proceedings were begun and the result of the
proceedings was to have an actual allocation of water in
quantitative terms.

THE COURT: How does anybody know we are not going to
wind up in that situation here?

MR. MOSKOVITZ: If we are, that is a different case.

THE COURT: I haven't seen any evidence that there is
a superfluity of water in the Santa Margarita. I hear this
talk about only in cases of shortage of water. Does anybody
contend that there is water in the Santa Margarit available
for appropriation other than possibly flood waters?

MR. MOSKOVITZ: Your Honor, the United States has
certainly proved no shortage of water for itself. If the
United States is asking for the apportionment, it has not
shown that it needs it.

MR. VEEDER: Well, we are living on sewage.

MR. MOSKOVIT: Its ground water basin has hardly been

1   touched.  It has used far less water than it can secure from

2   the natural replenishment of the ground water.

3        THE COURT:  Well, we will cross those bridges when we

4   get to them.  But where the evidence shows without dispute

5   that one basin was pumped down to where salt water intrusion

6   was destroying its wells, it is pretty hard to reconcile your

7   statement with the transcript.

8        MR. MOSKOVITZ:  Your Honor, on that point, I think the

9   evidence is clear that it was because of an improvident pattern

10  of pumping that that resulted, not because there was a shortage

11  of water.  But they chose to pump right at the lower end

12  of the basin where that would being in the sea water almost

13  immediately as soon as the level dropped below sea level.  As

14  soon as they stopped pumping there and started pumping else-

15  where that situation corrected itself.  That was Mr. Worts's

16  testimony.  If you look at the levels of wells you will see

17  that there has been hardly any use of the ground water basin

18  where it could be used without hazard of salt water intrusion.

19  But if the evidence is that there need be an apportionment,

20  then all this is relevant.  But Mr. Veeder, I thought, said

21  that he is not asking for an apportionment.

22       MR. VEEDER:  I had better straighten that out.  I am

23  not asking for an apportionment.  I am asking for a determination

24  of the rights to the use of water, and there cantbe and there

25  will never be an allocation quantitatively speaking.  By that

1   you mean it will be declared that during the month of June

2   the United States of America will get 10,000 acre feet of

3   water and somebody will get none.  It would be impossible.  You

4   don't know how much water is going to be used there from day

5   to day.

6          What we are asking for, though, is a determination of

7   rights.

8          This "quantitative" deal is something so entirely new

9   and foreign to me that I don't even know what they are talking

10  about.  I am talking about rights to the use of water and the

11  right to demand water if the water is available, and that is

12  what we must know, and that is why your Honor's continuing

13  jurisdiction is so very important.

14          Here is a man up here who has five acres of riparian

15  land.  He has a right to a correlative share of that.  He

16  brings in ten acres in 1960.  He has 15 acres now to irrigate.

17  And I think it is extremely important that we know that.

18          In the Indian Creek and in the Shotford and in the

19  Feather River and other adjudications they did precisely what

20  I am speaking about; they made the determinations.  Acreagewise

21  they took the history of diversions, they took the rate of

22  delivery, but there was certainly no allocation as to how much

23  water would be available for a man on the 15th of June, because

24  that is impossible.  But there was a determination in every

25  one of those instances where you knew the maximum potential

1    demand on the stream, and upon that basis you knew if there

2    was 100 second-feet of water flowing on the 15th of June you

3    knew how many acres of land were entitled to participate in

4    that 100 second-feet.  And that is as far as I can go.

5        THE COURT:  That still wouldn't help you out unless you

6    knew how many want to exercise their right.

7        MR. VEEDER:  There is the additional thing.  I would

8    assume there will be some kind of administrative procedure

9    set up, and it may be that on a given day you could rotate the

10   available quantity of water so that the gates would be closed

11   down in the particular area or the pumps would be closed down

12   in a particular area and the operation would go ahead.  So that

13   on a given day at a given moment your adjudication would indi-

14   cate who would be entitled to receive water, and if he had

15   all the water he required or if he didn't need water on that

16   day, certainly he would get none, but his neighbor would.

17       MR. MOSKOVITZ:  Perhaps there is a misuse and a mis-

18   understanding as to terms.  I think what Mr. Veeder is talking

19   about is what I meant when I said "quantitative allocation."

20

21

22

23

24

25

1  you would have a decree under which a Water Master could

2  operate and tell people on a particular date how much water

3  they could take.  If that is what Mr. Veeder wants, and if that

4  is what the evidence  shows is necessary, then all this informa-

5  tion about irrigable acreage is relevant.  If that is where

6  we are going, we should be coyer about.

7       MR. VEEDER:  There has never been any doubt in my mind

8  that that is where we are going.

9       THE COURT:  How do we know whether we are going there

10  or not?

11       MR. SACHSE:  There is tremendous doubt in my mind where

12  we are going.

13       THE COURT: How do we know until we find out what the

14  story is?

15       MR. SACHSE:  We know this much.  We know what has been

16  shown by the plaintiff--by the plaintiff alone.  He is the per-

17  son who brought this action.  The plaintiff has shown by their

18  own exhibits, a maximum use of 6,800 acre feet in any one year

19  out of this basin.  The plaintiff by his own exhibits has shown

20  50% of that use is used outside the watershed.  The plaintiff

21  has stipulated, and Your Honor has not even bothered to write

22  an opinion on it--you have simply referred to his stipulation

23  in the pre-trial opinion--that as a riparian he has no right to

24  use water outside the watershed.  Now if he has only a riparian

25  right--and that is what we are talking about when we talk about

8196

C

A 2

1   this Water Master--and if its greatest use today shown on any

2   of plaintiff's exhibits, scale them off to 6,800 acre feet, if

3   50% of that has been used outside the watershed, I can see that

4   there is no evidence under which any court can find that there

5   is any need as far as that evidence is concerned for this type

6   of Water Master adjudication at this time.

7        Now I frank to concede that Your Honor will keep juris-

8   diction, and if these growths that Col. Robertson testified to

9   should arise, if the day should come when there are 25,000 acre

10  feet demand for Camp Pendleton, you might have to appoint a

11  Water Master.  But until you do I simply don't see any sense

12  in cluttering the record with that.

13       THE COURT:  Mr. Stahlman.

14       MR. STAHLMAN:  This kind of bothers me a little too,

15  Your Honor, I am trying to look for some homely illustration

16  that might show the simplicity of this.  Say we have a bunch

17  of farmers and they all have a different amount of acreage and

18  their going to do something for the benefit of all and they

19  participate in a fund based upon an acreage basis, and they put

20  into a bank and the bank goes broke.  We find out, however, that

21  over a period of time they are going to pay out a portion of

22  what the full amount was, and they pay it out periodically.

23  Well, they pay it out in proportion to the amount of money that

24  was put in by each one, which in turn was determined by the num-

25  ber of acres.

A 3

1    There has to be some measurement for the determination.

2    We are going to have to go on a correlative basis here because

3    there is certainly not enough water in this river during the

4    irrigation system for everybody to take as much water as they

5    would like to take at the present time.  Then we have to have

6    a yardstick to determine what is going to be the quantity that

7    each one takes.  I presume there will be a Water Master.  Your

8    Honor will settle the ground rules.  But there has to be some-

9    thing by which you can measure.  Now if it were just merely

10   the amount of riparian acreage, one man may use a type and kind

11   of irrigation and put a dual amount of water on there.  I mean,

12   reasonable and beneficial is a factor in this case.  When you

13   apply reasonable and beneficial use, you have to tie it into

14   something to determine it by.  I think we have to make these

15   determinations.  I wish that it were as simple as Mr. Sachse

16   thinks it is.

17       THE COURT:  Well, let's inject two other factors.  The

18   first one is the most obvious one, and that is if we got into a

19   military crisis where Pendleton had to operate at capacity--

20   what was the testimony, 20,000 acre feet?

21       MR. VEEDER:  23,000.

22       MR. SACHSE:  23,000.

23       THE COURT:  There is no doubt in my mind that the Govern-

24   ment overnight could step in and take all the water they need.

25   They could condemn Vail Dam, if they needed it.  They could take

C  5
A  4

1   all the water on the stream.  They might have to pay compensation,

2   but let's not worry about that.  If we get into a case where

3   the survival of this country is involved, the power of the

4   Government is commensurate with its desire to protect itself.

5   So we have that possible situation.  And with that it mind the

6   possibility of cataloging these matters might be as of this

7   time some help.

8          Secondly, if the court rules that this use of water out-

9   side the watershed is not a proper riparian use and can't be

10  so used, and Mr. Veeder advises the Government not to appeal

11  an obviously correct decision of this court, or if it is appeal-

12  ed and affirmed, then immediately you have another fact of life

13  staring you right in the face, and that is that the neck of the

14  Santa Margarita River watershed is a very narrow one as it comes

15  down through the coastal plain and some of the best ground avail-

16  able for installation is up on the high ground outside the water-

17  shed, some of it has already been used, others of it could be

18  potentially used, and the Government is liable the next day

19  after this decree becomes final to proceed to condemn sufficient

20  water to take care of the housing units that are on the bluffs

21  outside the watershed and those that they would reasonably con-

22  template in the future.  At least, if I were Solicitor for the

23  Department and a decree became final that I couldn't use ripar-

24  ian water for these valuable installations outside the watershed

25  on either side of the Santa Margarita, I think that is what I

A  5

1  would do.  I would condemn sufficient water to proceed to operate

2  them, if I couldn't get the water elsewhere at a reasonable price

3  possibly.  Possibly the water can be secured from the San Diego

4  Aqueduct.  I don't know.  That is another factor that is pert-

5  inent and that may lead to a conclusion that there ought to be

6  a certain amount of cataloging.

7      Now this thing breaks down, of course, into various

8  catagories:  (1)  What land is riparian and (2) What land is

9  overlying land?

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Now, that is not going to change.  If it

2   is true today, it is going to be true ten years from now,

3   barring some major earth change, some faulting or some major

4   physical phenomena.  And I see no reason why there shouldn't

5   be cataloged the land that is riparian and the land that is

6   overlying on basins.

7        Your next point is:  What land is irrigable?  Now, we

8   could make a determination today, and it wouldn't be too

9   conclusive ten years from now.  Take some of the Vail land

10  upland from Pauba Valley.  It is suitable today for running

11  beef, jackrabbits.  Ten years from now, well, anything could

12  happen.  You could have an air strip in the Pauba Valley, and

13  you could have a housing development or a small farm, small

14  homes on that upland ground.  This situation can change com-

15  pletely.  And I don't propose to be any prophet and make any

16  finding that wouldn't take into account changed conditions

17  for all of this property.  What is the highest and best use

18  of this property at any particular time is going to depend

19  upon changed conditions.  But we could catalog, for what it is

20  worth, what ground is irrigable, and we could even go so far

21  as to say only upon a showing of some change in conditions could

22  we later on re-examine the total mount of irrigable land.  How

23  much is presently being irrigated?  Well, that again would be

24  just exactly what it purports to be.  Presently in the case,

25  change from day to day would be differently maybe the next day

8291

D

Z29

1 after the decree was entered.  Finally, we have the possibility

2 that we may wind up with a water master.  We may wind up

3 with some administrative proceeding to properly handle the

4 available water for the persons entitled thereto; when at

5 this stage of the proceedings I don't know how any of us can

6 say yes or no to that.  If the Government should decide to

7 take a certain amount of the water in a condemnation suit,

8 very definitely the remaining water would have to be handled

9 very carefully, even make a pretense of going around to the

10 persons who would have claim upon it.  We are thinking out

11 loud.  I am not deciding this.

12          Mr. Krieger?

13          MR. KRIEGER:  May I comment on your recitation just

14 now, your Honor?  I think there is one step that might have

15 been left out.  I think we all here are agreed that it is

16 proper in this lawsuit to chronicle or catalog the riparian

17 land to the stream.  But before we come to the conclusion that

18 we must make any kind of determination of the irrigable land

19 or irrigated land, it seems to me we must first determine that

20 there is a shortage on the stream and some party is injured.

21 Until we have injury, it seems to me there is no reason to

22 make that finding.  Now, I would agree with Mr. Veeder that

23 it is highly desirable for the United States to know exactly

24 what lands are going to make a demand upon this stream system,

25 and I also agree that it would be desirable to know what

E

Z30

1   quantities of water they are going to need in the future.

2   But I think under California law those things are not found

3   until such time as the party is damaged.  Then, you find them.

4   In the meantime, itseems to me that the United States has all

5   of the information that it wants through its own staff, be-

6   cause it is the only one that is compiling all the data on

7   the irrigated or irrigable land.

8       Now, to point that up, Mr. Sachse said that Fallbrook,

9   in so far as its riparian lands are concerned, is not even

10  going to put in evidence to show what lands are irrigated or

11  what lands are irrigable.  Then, there are probably thousands

12  of defendants who are not going to make any appearance in

13  this lawsuit, who are not going to make any showing either of

14  what their water needs will be or what they presently are.

15  Therefore, isn't it true that any such findings as to future

16  ultimate use or demand are useless until such time as somebody

17  proves to this Court that there is a shortage and he is being

18  hurt.  When that time comes, I conceive it to be the plain-

19  tiff's burden of proof to show how much irrigated land it has

20  or how much land it has in use, what the duty of water is on

21  that land, what the total water in the stream system is, what

22  the safe yield of the stream system is, how many other parcels

23  there are  depending on that supply, and so forth.  But until

24  we come to a specific situation of damage there is no need

25  for a decree that would constitute specific apportionment or

D

Z31

1   allocation of quantities.  And so I see the only thing we

2   are going to arrive at from the evidence is categorizing the

3   cataloging of lands, whether they are inside or outside of

4   the watershed.  Now, if there is something beyond that, I

5   think it rests on the Government to prove that it has been

6   shorted when it is making a proper use of its riparian rights.

7        MR. VEEDER:  I would like to make observations on that

8   too, if I may.  Under the acts pursuant to which this lawsuit

9   was brought, the United States, in effect, is asking for

10  declaratory relief, declaratory judgment.  And there are

11  certainly the issues here which would entitle us to know that

12  irrigated and irrigable lands.  I admit that we have under-

13  taken the primary burden on the matter from the standpoint of

14  obtaining the data.  And in regard to those people who don't

15  show up, we are taking a long step right now.  But I am con-

16  vinced that we should tender to your Honor evidence, as nearly

17  as we can obtain it, as to what we can reasonably anticipate

18  their irrigable acres to be.  A default is no good to us.  We

19  would much prefer to have a review of these people's properties

20  who didn't even appear and in some manner contact them and

21  bring it to their attention that this suit has gone ahead and

22  that there is a chronicling and cataloging of these rights.

23  But I can't accept the theme that we aren't entitled to declar-

24  atory relief to which I have made reference, namely, a

25  determination of the irrigated and irrigable acreage.  I think

D

Z32

1    it can be done, and I truly think that it must be done if we

2    are going to get our relief.

3         MR. STAHLMAN:  I have only one illustration that might

4    indicate just what the situation is.  Now, we know by reason

5    of the previous adjudication that Vail Ranch has three 28,000

6    acre feet, at least 20,000 acres of riparian rights proper

7    for irrigation.  Now, your Honor has been up to that ranch,

8    and there is some beautiful property up there, and we would

9    like to put that property into production.  We can't do it,

10   because there is not enough water up there.  That is, when the

11   Vail evidence comes in it is going to show there is not enough

12   water in there at the time of irrigation season.  When you need

13   water to grow crops on it, you can't do it. We have gone into

14   dry farming on that land up there, because we don't have the

15   water.  And we have tried to comport with logic and reason and

16   common sense.  We realize that if we did try to over-pump

17   those wells up there, you are going to ruin your basin.  We

18   have held back on it in putting land into production that

19   could go into production, some of it right in the near vicinity

20   of where the water is available.  So we are going to have a

21   shortage on this ranch.  Now then, it would not be right if

22   some other owner, simply because we can use 10% of our land

23   and somebody else who overlies the basin and has maybe, say,

24   300 acre feet and they irrigate the full 300 acres.  It goes

25   right back to your fundamental law of your riparian rights,

8205

D

Z33

1   your correlative rights.  That party has to cut down not only

2   for the benefit of the fact that the larger owner has, but

3   there will be small owners that in time will be hurt with

4   this thing and have to cut down, balance it off. So I think

5   that you have to have the rod, the measuring stick, by which

6   you can determine what the rights are, what the quantities of

7   water are a person, by reason of their rights, is able to

8   utilize in the condition of the stream at the season of the

9   year.  And anybody that thinks that that river is not over-

10  produced, that is, there is not a great deal more desired in

11  the development there to utilize the water than what the

12  river has, has just got to go to a psychiatrist.  In this

13  part of the country we have a semi-arid district where they

14  are depending upon that type of water supply.

15      MR. SACHSE:  Your Honor, it seems to me we can all

16  stop short and concede everything Mr. Stahlman says, and I

17  think there is a lot of merit to it.  And let's assume that

18  a judgment was entered whereby your Honor, take solely the

19  stream upstream from the Vail Ranch, did determine all your

20  acreage, judgment, everything.  Then what are you going to do

21  with it?  What are you going to do with it?  Until Mr.

22  Stahlman would come in taking that stretch of the stream and

23  say to your Honor, "Your Honor, Vail is suffering.  Vail

24  hasn't got enough water because Stardust Ranch, Mr. Sachse's

25  client, or Oviatts, Mr. Krieger's client, or somebody else up

D

Z34

1  the watershed is taking more than its share.  For that reason

2  I don't have enough, your Honor.  Now you have set up these

3  yardsticks.  Here are your irrigable acreages.  Now, please

4  make an apportionment."  He knows that.  Now, what are you

5  going to do?  You make an apportionment, not only for Vail and

6  Mr. Krieger and Stardust, who are presently using water, but

7  you will make an apportionment, a theoretical apportionment,

8  for these people who aren't using any water but who are

9  riparians and you have determined they have irrigable acreage

10 but they aren't using it.  So the law would permit any other

11 riparian to use it as long as they don't.  The man immediately

12 upstream wouldn't be using it, but he would have an allocation

13 to it.

14      THE COURT:  But these people using unused riparian

15 water would again have to use that correlatively.

16      MR. SACHSE:  Perhaps again correlatively, but all I

17 am saying is that until the condition exists where someone

18 would come to you, even assuming all these findings Mr. Veeder

19 requests, and someone says, "This is the injury.  This is why

20 I am hurt.  I don't have enough water."  Until then you have

21 no reason to use this finding that we are discussing making.

22 And I don't believe the condition exists.  I don't see anyone

23 asking for an injunction against anybody, any riparian user,

24 for taking more than his share.

25      MR. VEEDER:  I think Judge Stahlman and I can answer

that.

MR. STAHLMAN:  I was going to say, Mr. Sachse, following your reasoning out:  The only purpose of this law-suit then would be so that you could have lawsuits in the future.

MR. SACHSE:  That is right.  That is absolutely right.

MR. STAHLMAN:  And I would hate to think that we went all through this just merely to determine we can have some more lawsuits when if you can in this case determine the equation by which the persons may operate.

MR. VEEDER:  He says there is no injunction.  We are living at the very moment with what is tantamount with an injunction between the Vails and the United States.  If anyone thinks that if the Vails used all the water that they could on their irrigable land that we would receive any, they are very wrong.  We wouldn't.  They have got the land; they have got the means; they have got the facilities to dry up the creek.  Now, that is the situation that prevails throughout the whole valley.

MR. STAHLMAN:  Providing it doesn't get dried up before it gets to us.

MR. VEEDER:  Then, that is the point that I am making here.  Here are these people up above Vail.  They compete with us just as much as they compete with Vail.  And our view is that the fact that the man isn't exercising his riparian

D

z36

1   rights at the moment doesn't render the determination of the

2   extent of his rights unimportant.  On the contrary, I think it

3   is more important because we don't know when he is going to

4   begin using additional water.

5   MR. KRIEGER:  Your Honor, I say that every water suit,

6   every adjudication of every stream lives with a varying

7   equation, as I tried to point out on the board this morning.

8   This denominator which is the irrigated lands in any stream

9   system keeps changing.  Now, the Government and the Vail

10  Ranch too have everything they are entitled to, it seems to

11  me, just like all the rest of us do on the stream, once we

12  know who is riparian to this stream.  We pointed out the

13  number of irrigable lands may change.  The duty of water may

14  change, and a lot of other things may change.  Certainly, the

15  supply of the stream may change.  But to put those three

16  factors together depends on the time they are brought to the

17  Court's attention, and they are brought to the Court's

18  attention at such time as somebody is being hurt and can

19  demonstrate it.

20  THE COURT:  The Government claims it is hurt, or they

21  wouldn't have brought this suit.  The Government claims they

22  have to use sewage down below.

23  MR. KRIEGER:  But the Government is also, through its

24  own testimony, demonstrating that perhaps the use it has made

25  of this water is  not entirely proper as a riparian user.

D

Z37

1      THE COURT:  Let me ask you this:  We are going to have

2  to catalog by description the lands which are riparian and

3  overlying.  We all agree to that?

4      MR. SACHSE:  Yes, sir.

5      THE COURT:  Now, how much of a job is it while we are

6  going that far to also add how much of that land is irrigable

7  and how much is irrigated? The Government has done a lot of

8  work on this.  The Government has done the major part of the

9  work.  How much of a job is it to add these two additional

10  matters?

11      MR. KRIEGER:  From our point of view, and I think we

12  are in a pretty good position to speak up in Murrieta, so

13  far we have no Government surveys on our land.

14      THE COURT: Have you asked for any?

15      MR. KRIEGER:  Yes. As a matter of fact, I have asked

16  Mr. Veeder for surveys on all of our lands.

17      THE COURT:  How long ago?

18      MR. KRIEGER:  When we first started this lawsuit,

19  sometime considerably before Christmas.  And he told me at

20  that time they were very busy.

21      THE COURT:  Before Christmas of 1958?

22      MR. KRIEGER:  Last Christmas.

23      THE COURT:  '58?

24      MR. KRIEGER:  About October the 2nd is when we started

25  here.

THE COURT:  Well, that has been going on for a long

time.  And the Government has been working on surveys down-

stream.  They will get around to you.  But in view of the

size and amount of work to be done there is a little delay.

Since Christmas of '58 isn't very long.

MR. KREIGER:  But isn't there another factor involved

there, your Honor?  And this brings up one of the points I

was anxious to raise this afternoon.  The extent of the

Government's job on soil surveys is dependent wholly upon

where the line is drawn as to what lands are riparian; because,

if the Government is going to undertake to have soil surveys

on 440,000 acres, or whatever we have in this watershed,

we are all in for a long, long wait.  But if it comes right

down close to the stream and comes within the Kunkel line,

the job is going to be much simpler.

THE COURT:  We all realize that there is a lot of this

land that is going to go out as not part of the stream water,

not part of the stream, not on overlying basins.  We don't

need any soil surveys in that area.

MR. KRIEGER:  Where is that line?  Has the Government

conceded that everything outside of the Kunkel line is such

land?

THE COURT:  No.

MR. KRIEGER:  I have a number of clients that I would

just be delighted to know didn't have soil surveys because they

were outside of the stream system.

MR. VEEDER:  I have, in answer to the fifteen points, pointed out what our views are in the matter, your Honor. And I looked at it this way:  If a man is outside of the so-called Kunkel line in Unit No. 4 and he is using water, and I think that probably he should be made a party to any decree that was entered.  That is the reason why I think it is so very important to have as many of these farmers as we can have appear to testify in regard to their own rights.  I think the best testimony-- experts are fine-- but I think the best testimony you will get is from a man who is running a farm and who says, "These are the number of acres I am irrigating; here is the number of acres I believe can be subjected to the irrigation if they have some water."  Now, that is what I think we should do as much as possible, is have the individuals testify.  In regard to the number of soil surveys I understand there have been 500 requested.  We have finished 350. And we are moving along as rapidly as we can. I think Col. Bowen is doing a wonderful job on it.  I don't know when he gets up to your place or not, Mr. Krieger; but I know they are working up that way.  I think, though, that in response to your inquiry, the question came up yesterday, perhaps as clearly defined as we can get it:  We have objected to the findings of Mr. Cranston on the ground that they weren't sufficiently definite.  The question was as to

whether we would be able to make them more definite. I think
we can. I think it is a matter of doing some work, but I
think that we can break them down so that we can show the
irrigable acreage in each forty.

THE COURT: How would you do it, by maps attached to
these findings?

MR. VEEDER: Well, I think that in most instances,
a general description would do it. I think we could say,
"Define the Southwest Quarter of the Southwest Quarter." That
is a 40-acre parcel. And say, "In the South Half of the
Southwest Quarter of the Southwest Quarter there are 20 acres
of land which are irrigable." I don't believe you would
have to go beyond that. If you got into an area where there
was a great deal of dispute, then I would incorporate by
reference the soil surveys that have been made. But I truly
believe that we should be as specific as we can and if your
Honor agrees with the approach that I have been recommending,
I think we should start in attempting to spell out that kind
and type of decree now.

THE COURT: I meant to inquire what happened up there
and what other views were expressed about this matter of
certainty.

MR. VEEDER: I am not sure whether you want to know
what happened, your Honor.

MR. SACHSE: There were some very strong opposing

1  views expressed, and I would rather let Mr. Cranston speak for

2  himself.  But I will try to state it fairly.  Mr. Cranston

3  stated that he thought-- in the first place, that he believed

4  that the delineation of the particular lands that were irrigable

5  should be by description rather than just by a statement of

6  acres.  He did state the irrigable acreage in each parcel, your

7  Honor understands.  Mr. Veeder wanted to describe the lands

8  that were irrigable.  Mr. Cranston said, first, he thought it

9  was practically impossible.  Mr. Veeder thinks it is possible.

10  I have a much more fundamental objection.  I think it is not

11  only unnecessary; I think it is legally irrelevant and im-

12  material.  A leading case in California on the subject:  It

13  is the roughest apportionment case I know of in our courts,

14  in our appellate courts-- Half Moon Bay against Collins; where

15  the court even refused to allocate water to certain irrigable

16  lands which they conceded were irrigable, because they thought

17  it was too remote from the stream, too high up, too far away

18  and not capable of or susceptible of profitable irrigation.

19  But it is a concrete allocation in quantity to competing

20  riparians.  And the court speaks out in words of one syllable

21  in that case:  That once having made an allocation to a

22  riparian of his share, he can use it anywhere on his land he

23  wants and for any reasonable purpose he wants.  So what in

24  heaven's name is the purpose of saying you have ten acres of

25  riparian land, and they are described by such and such a metes

D

Z42

1   and bounds description.  It adds absolutely nothing to anybody's

2   knowledge, either the land owners' or the Government's.

3        THE COURT:  Say that again.  Once an allocation is

4   made a riparian may use--

5        MR. SACHSE:  He has a certain water right.

6        THE COURT:  Has so many acres.

7        MR. SACHSE:  Then he can use it anywhere.

8        THE COURT:  He can use it anywhere.

9        MR. SACHSE:  Anywhere on his riparian land for a

10   reasonable or beneficial purpose.  He doesn't have to

11   irrigate with it.  He can put it in the lake and use it for

12   recreation.

13        THE COURT:  Or he can use his allotment of ten acres

14   all on five acres?

15        MR. SACHSE:  Yes, your Honor.

16        MR. VEEDER:  It has to be beneficially used.

17        MR. SACHSE:  As long as it is used beneficially.  So

18   for what earthly purpose do we have--

19        THE COURT:  Or his allotment for ten acres he could

20   spread over twenty?

21        MR. SACHSE:  Over fifty if he wants to irrigate with

22   half the water.

23        THE COURT:  You agree that that is the law?

24        MR. VEEDER:  Well, I think again we get back to

25   semantics.  He is talking about this allocation of water.  I

8215

D

Z43

can't go with that at all.  If a man is entitled to ten second

feet of water and he can use it beneficially on ten of his

hundred acres, I am for him all the way.

MR. SACHSE:  If he chooses to spread it over the whole

hundred, can he not, Mr. Veeder?

MR. VEEDER:  As long as it is beneficially used, yes.

MR. SACHSE:  Right.

MR. VEEDER:  The point I am making and the thing we

are concerned about, certainly that I am concerned about--

MR. SACHSE:  If that is the fact, your Honor, then what

do you gain by spelling out the exact location?

MR. VEEDER:  Why don't you let me finish.  So we have

declarations that there are 105 acres of riparian lands, 69

and one-fifth of which are irrigable.  Now, it is entirely

possible, in keeping with what Mr. Sachse was saying, that

some of that land would be found to be so situated that it

would be uneconomical to irrigate.  My view, under the

California law, is that there would not be, that land owner

probably would not be entitled to water.  But, in any event,

I have felt and I still feel that where you say, as he says,

as the Master has said, 105 acres with 69 acres irrigable,

it is so indefinite that you don't know which lands are

irrigable on the basis of a legal subdivision.  Now, my view--

THE COURT:  May I ask:  Did the Master spell out the

description of the land that he found was riparian?

D

z44

1        MR. VEEDER:  He spelled out he would give a legal

2   subdivision.

3        THE COURT:  That is done specifically?

4        MR. SACHSE:  Yes, there is an exhibit attached with

5   the legal description.

6        MR. VEEDER:  That is right.

7        THE COURT:  So that we know by legal description what

8   is the riparian land and the overlying land?

9        MR. VEEDER:  Well, you don't know what is the overlying

10  land, because there is no way of describing.  You say there

11  would be five acres of overlying land in a parcel of 45 acres.

12       THE COURT:  But riparian and overlying whether they

13  are broken down separately are described by legal description?

14       MR. VEEDER: Well, in the broad general sense.  It

15  would be the Southwest Quarter, I mean, the South Half of the

16  Northwest Quarter, something like that.

17       THE COURT:  That is a legal description, isn't it?  What

18  do you mean "in the broad sense"?

19       MR. VEEDER:  The point I am making:  I can give you an

20  example of what I am speaking about on these things.  Did they

21  take those soil surveys?  My thought on the matter is this,

22  your Honor, if I may continue on with it.  I would like to

23  undertake-- I showed you a format the other day of what I

24  think the decree, a page in the decree should appear like.

25  And I think that we should shoot toward getting that kind of

D

Z45

definity in our findings.  In other words, I think that your

Honor should find the parcel of land that is involved, the

legal description, the irrigable acreage, and as nearly as

possible where it is located.  I admit that the metes and

bounds description in many instances would be impracticable,

but I do believe that the terms are frequently too general to

be of any assistance.  We talked about this yesterday:  If the

lands were sold, if it is cut in half, a man loses his

riparian right.  That is important.  We have factors in this

area where I think subdivisions are going to come about.  And

if there is a diminution in the riparian acres, that is

important.  But by and large, as of the present time, I think

that it is essential to locate as nearly as we can within

legal subdivision a description of the irrigable acreage and,

similarly, of the irrigated acres.  I think this:  That it

might be desirable for the United States, in view of we are

the sponsors of this idea, to attempt to come up with a kind

and type of a decree in the form that we think it should be

in regard to De Luz Creek.  And in that way you can see what

we are doing.  And if it is agreed, why then it would be time

enough for us to cease that course.  But I don't want to see

a decree that is so vague and general in terms that we really

don't know what lands are involved.  And I tendered that

thought to the Master, and I repeated that I think we should

undertake now, the United States should undertake, the

obligation of tendering to you in regard to specific tracts the kind and type of decree we think we should have.

MR. SACHSE:  Your Honor, could I correct something? Mr. Veeder, I think, either misstated it or I have misunderstood you.  Now, the very first finding of fact of the Master reads as follows:

> "The legal descriptions of all of said
> parcels excepting Parcels 1 and 92"-- I
> forget which is which.

By "1", I think Vail and "92" is Pendleton, or vice versa. Those two he didn't describe.

> "The legal descriptions of all of said
> parcels excepting Parcels 1 and 92 are
> set forth in Plaintiff's Exhibit M-125-A,
> a copy of which is attached hereto,
> marked Exhibit A, and by reference in-
> corporated hereto."

Then he proceeds parcel by parcel and defines what is riparian and is not riparian.

THE COURT:  The whole parcel?

MR. SACHSE:  And if the parcel is part riparian and part not riparian by reason of a severance he made such findings.  So we do know the riparian status.  Now, he does not spell out, he clearly does not.  For example, here is just, slipping to any single one of them, here is someone who owns

D

Z47

1   157 acres, 57 of which are irrigable.  And this whole thing

2   is riparian.  He just finds that 57.9 of the 157 are irrigable.

3   Well, I say that is all he has to find.  He knows the land is

4   riparian.

5        THE COURT:  Why should he have to go any further, par-

6   ticularly in view of the fact that five years from now if

7   some problem comes up 90 of it might be irrigable?

8        MR. VEEDER:  Well, I can give you another example.  And

9   the reason why I think we should be as definite as possible.

10  Here is an example:  This is Parcel 18.  380 acres are

11  riparian, 68 acres are irrigable.  Now, my thought is that

12  based upon the data that we have we can be fare more specific

13  in saying that 68 acres out of in excess of a half section

14  are irrigable.  I think we can.  And Mr. Sachse says, "So

15  what?"  I think it is important to know these lands, where they

16  are situated.  And if there is a question-- let me go ahead

17  on the basis I recommended to the Special Master, and if you

18  don't think it is necessary throughout the area, we can drop it.

19  But I do feel that as of the present time we would have a

20  completely unwieldy decree from the standpoint of being able

21  to determine by rapid view of the premises to determine  what

22  had been determined to be irrigable.  In other words, you have

23  a situation where you have a section.  In this instance that

24  I am referring to, there is 380 acres, a little better than

25  half a section.  68 acres of that are irrigable.  Where are

D

z48

1    they?  They could be in the Southwest Quarter.  They could be

2    in the Southeast Quarter.  They could be in the northwest

3    Quarter and the Northeast Quarter of the South Half.

4            THE COURT:  Well, so what?

5            MR. VEEDER:  So you don't locate them at all.

6            THE COURT:  Supposing I went in and bought half of that,

7    I bought 180 acres from the man but the decree didn't say

8    whether my land was irrigable or not.  If I bought a portion

9    that extended down to the stream, so it wasn't a severance

10   from my riparian rights, all my land would be riparian.

11           MR. VEEDER: Yes, but who would own the irrigable

12   acreage?  I am glad you brought that up for this reason, for

13   this reason right here.  You have the situation:  You could

14   go in and buy 180 acres.  You might get the 68 acres of

15   irrigable land, and you might not.  And you certainly wouldn't

16   know.

17           THE COURT:  I am postulating my proposition on that

18   proposition.  And so then I say, "Now, my piece I want borders

19   or crosses the stream.  It is, therefore, riparian."  And I

20   claim that I am one here to get some of this land.  You say,

21   "Well, the decree doesn't say whether you have got irrigable

22   land or not."  Any finding we made here would not be binding

23   hereafter on what was irrigable and what wasn't, if there were

24   changed situations.  If the man could prove that his ground

25   was irrigable and it was, we concede, riparian, he would have

D

Z49

1    a right to irrigate it.

2        MR. VEEDER:  Oh, but, your Honor, I would take a good

3    long look at what you just said, for this reason:  And the

4    point that I make is precisely that.  If you bought 180 of

5    the 380 acres, you wouldn't know, we wouldn't know, and no

6    one would know where those 68 acres of irrigable lands were

7    at the time of the decree.  It is true that you might want

8    to come in and open this matterup with a motion to show cause

9    and relitigate this whole case again or, at least, relitigate

10   it in regard to the parcel of land.  You might want to do that.

11   But I would submit that when we are quieting a man's title,

12   as we are here, to the rights to the use of water appurtenant

13   to the 380 acres, we should, certainly, if we can spell out

14   where those 68 acres are located.

15       THE COURT:  Well, then, you mean a finding I would make

16   today on what land is irrigable would be binding hereafter?

17       MR. VEEDER:  Up to the point--

18       THE COURT:  Except under what, changed conditions or?

19       MR. VEEDER: Well, up to the point a man would come in

20   and say whatever was the finding, that 68 acres of the South

21   Half of the South Half of Section 31 was found to be irrigable.

22   And then he says, "But I don't know where those acres are."

23   So you would have another lawsuit.

24       THE COURT:  Let's take 160 acres, and we found a

25   particular quarter was irrigable and the other three quarters

were presently not irrigable.

MR. VEEDER:  That is what I want.

THE COURT:  You contemplate that the finding is going to be conclusive hereafter?

MR. VEEDER:  I think that finding, unless the man comes in and shows something to the contrary is final.  And here is the point that I am making, and it is precisely the thing that your Honor raised--

THE COURT:  Suppose he comes in later on and says that it is now discovered that some South American berry can be grown up in the rocks and he has run a sprinkler system up there and he can grow his South American berry.

MR. VEEDER:  I am with that all the way.  So you have 68 acres plus 35 acres.

THE COURT:  Is he going to be bound by a finding I made as of today that so much was irrigable?

MR. VEEDER:  Not in the slightest.  Not in the slightest.

THE COURT:  I would say this:  If I make findings that certain ground is irrigable, I think I will make them with an express provision subject to review upon a showing of changed conditions.  I am not going to tie this countryside down to conditions as they are today.

E

A   6

1   that would be inherent if Your Honor didn't say it.

2   The point that I am making to Your Honor is that if

3   the southwest quarter of the southwest quarter is irrigable

4   as of now, let's find it so, and if it is found that at the

5   present time the southeast quarter of the southeast quarter is

6   not irrigable then there would be no finding that it was irri-

7   gable.  But subsequently if the southeast quarter of the south-

8   east quarter was found to be irrigable the owner would come in

9   and ask you to revise the decree.  That is all I am saying.

10  That is our problem here.  We don't know what lands within the

11  south half of this particular section are irrigable.  We have

12  just a shotgun statement that 68 acres of them are.  I think

13  we can be more definite.  I think we should be.

14  THE COURT:  I just had a distress signal from our brother.

15  Take a short recess.

16  (Recess)

17  MR. MOSKOVITZ:  The thought that I had, your Honor, is

18  that the United States apparently feels quite strongly about the

19  necessity of having findings on irrigable land, and I believe

20  that feeling that strongly the Government certainly should be

21  entitled to put in that kind of evidence, and apparently they

22  are proceeding along with such programs, and I believe that if

23  they carry the ball and are willing to do this for all the land

24  owners that request it, as they have previously indicated, fine.

25  Perhaps the information will needed when the decree is finally

8224

E
A 7

1    written and all our talking today is just to get ourselves in

2    tune with the problems that we ultimately face.

3        MR. VEEDER:  That is why I asked your Honor today that

4    there be a coalescence as nearly as we can get it.

5        THE COURT:  It doesn't seem to me that it will take much

6    more work, once you look at the land, to determine whether it

7    is riparian, to present evidence and to make a determination as

8    to how much is irrigable and ask how much is being irrigated.

9    The legal descriptions of course would involve quite a bit more

10   work.

11       MR. SACHSE:  I would string along with what Mr. Moskovitz

12   said, with only this qualification.  My one and only concern,

13   your Honor, is time and time is money.  Lots of people have

14   paid no fees other than the most nominal fees who are in this

15   case.

16       I would second as strongly as I can what Mr. Krieger said.

17   Let's start at the back end of this for a minute and say where

18   are we not going to have to ask Mr. Veeder, where is he not going

19   to have to do them, where are they going to be unnecessary?  I

20   don't know how many studies Col. Bowen made in the Fallbrook

21   Creek watershed, but I would venture that he made three or

22   four hundred of them.  He made them for practically all of my

23   clients.  And what happened? He appears before the master and

24   testifies that every bit of ground water is vagrant percolating

25   local and not part of the stream.  Why does the Government waste

1    that time and money?  They could have been doing some studies

2    up where they would have been of some use, if we had agreed on

3    that initially.  Here are their own witnesses who say this isn't

4    a part of the stream and you don't need this evidence now.

5        Let's face the real issue here, which is to try to get

6    rid of some of these people, like we got rid of 41 little ones

7    this morning, and if we can eliminate just one section here or

8    one there in basement complex or residuum and say to Mr. Veeder,

9    "Forget them.  On those you don't need irrigable acreage.  That

10   is not part of the stream," we will shorten this lawsuit and

11   save everybody tens of thousands of dollars.

12       THE COURT:  I agree.  Every time I urge this Mr. Veeder

13   says that he and the clerk are working out a list of parcels

14   and the descriptions.  Until we get those we can't do anything.

15       MR. VEEDER:  We are moving religiously and rapidly and

16   someday I hope someone sits in this corner chair and says--no

17   one will do it, of course--that they know exactly what to do

18   about every parcel of land.

19       THE COURT:  Explain to me what you are doing and why you

20   need this cataloging that you and the clerk are working on.

21       MR. VEEDER:  From the standpoint primarily of finding

22   out who has appeared and who has not appeared, who has filed

23   answers, who has not filed answers, who we think should file

24   answers, those who we think could be dropped without any further

25   pleading.  I am just as anxious to get rid of these people as

1  anybody, but I am certainly not going to go any faster than I

2  think we can do it on the basis of the record.

3      THE COURT:  Can't we, for instance, as to attorneys who

4  come in here representing clients, find out right now as to

5  some of those if they are out of this case?  Why should the

6  clients have to continue hiring the attorney to represent them

7  on a piece of ground if they are going to be outside the case?

8      MR. VEEDER:  I think this, in regard to Mr. Sachse's

9  request for admissions on the basis of what has occurred now--

10  we had 41, and I don't know how many more requests for admissions

11  he has given us but there are quite a number--I think now that

12  the ice has been broken along the line, that is very satisfactory

13  to me.  I admit that in regard to the Murrieta--

14      THE COURT:  You want to do it that way you mean?  You

15  want requests made to you?

16      MR. VEEDER:  No, I will be able to go along on several

17  fronts, and I am going on several fronts now in regard to parties.

18  I have Comdr. Redd working constantly on it, and Mr. Salter,

19  who was just admitted into this case, is going right down the

20  line on these parties, and we are giving you a complete list.

21  I think there a lot of parties who can be dropped, and I think

22  they will be dropped.

23      THE COURT:  Dropped?

24      MR. VEEDER:  Yes.

25      THE COURT:  We are not interested in dropping them.

A  10

1    MR. VEEDER:  Well, use your own term.

2    THE COURT:  I want the same kind of findings that I am

3  going to make as to Mr. Sachse's client.

4    MR. VEEDER:  We are getting it for you, and we will have

5  it.  The only point that I make, your Honor, is that when we

6  get through I want it a good job, and it will be.

7    May I bring up one more thing?

8    MR. SACHSE:  Before you do, Mr. Veeder, you just said

9  something that I know is of moment to you.  In fairness to the

10  court I think I ought to direct your Honor's and Mr. Veeder's

11  attention to it.  When I made those motions I expressly called

12  attention to the fact that I recognize your right to renege on

13  them.  You haven't reneged.  The judge has issued an order.  I

14  am perfectly willing, if you want to tell me.  There are two of

15  those motions where I am sure that your staff made a bonehead.

16  You have admitted that the ground water of Murrieta Townsite is

17  vagrant local percolating.  Do you want to withdraw them?  I

18  will forget them if you want to withdraw them, but I want you

19  to tell me so.

20    MR. VEEDER:  I was thinking that he made the bonehead.

21    THE COURT:  Well now, wait.  I am not going to make any

22  finding that water in the Murrieta Townsite is vagrant percolating

23  water.  So let's correct this right now.

24    MR. SACHSE:  The admission so states.

25    THE COURT:  I don't care what the admission states.

A 11

1      MR. VEEDER:  But your Honor, I want this clear.  If he

2  wanted to file a disclaimer in regard to water in the Murrieta

3  Valley, that suited me fine, and I didn't understand why he

4  thought that we made the boner.  He came in and admitted that

5  he had no claim in the Santa Margarita River.  We knew obviously

6  that he had.  I felt sorry for him.  I will let him off the hook

7  if he wants to get off.

8      MR. SACHSE:  Well, I will leave it if you like it.

9      THE COURT:  Well, I don't know, but if a man owns a

10  homesite in the Murrieta Townsite his interests certainly are

11  not being served if he gets a decree quieting title to the

12  Government's right to water under his ground.

13      MR. VEEDER:  That is right.

14      MR. SACHSE:  But the admission in this case is that

15  the water under his ground is vagrant local percolating water

16  and not part of the Santa Margarita River system.  That is what

17  the admission says.  This a block of six town lots.

18      THE COURT:  This probably explains all this sparring

19  around this morning between the Government and Mr. Sachse as

20  to what the findings will be.

21      MR. VEEDER:  Yes, and the point that I make is this,

22  that he came in and in his answer said, "we have no claim to

23  water in the Santa Margarita or its tributaries."

24      MR. SACHSE:  The answer says that the land is not ri-

25  parian to the Santa Margarita River, and it is not, and it says

the ground water underlying are vagrant local and you admitted it is not riparian, which it is not, and you then admitted that the ground waters are vagrant and local.

MR. VEEDER:  And the point is that you disclaimed any right in Santa Margarita River and its tributaries, and it suits me.  I think you did your client a very bad disservice.

THE COURT:  Well, the two of you get together and straighten it out, because I am not going to make a finding, I don't care what your admissions are on that.

MR. VEEDER:  Well, his disclaimer is what worries me.

THE COURT:  Work it out between you.  Obviously the Murrieta Townsite lies over the basin, nobody can dispute that.

MR. VEEDER:  I think it does, too.  I don't know why he disclaimed.

THE COURT:  All right, what is your other point?

MR. VEEDER:  The point that I make, your Honor, is one that I truly don't how to handle, and that is why I thought we ought to talk about it in chambers.  You said to talk about it here and so I will talk about it here.

In the Fallbrook area the United States of America entered into quite a number of agreements with people on these stipulations where we settled their rights.  Now the special master has come along and has stated that wherever a stipulation as defined in Finding 3 (that is our stipulation) has been or is hereafter executed with reference to a parcel or portion of

A 13

1   property of the Fallbrook Creek watershed, such stipulation

2   shall not be construed as an execution of that stipulation and

3   shall not constitute any limitation upon or determination of

4   the rights as owners of such parcel either to develop or to use

5   water on said parcel.  No adjudication as to the water rights

6   and uses of parcels of property need be made.

7         Now, we have entered into those agreements with those

8   people--and I might add that the master has given me until

9   Monday to make a filing on this thing.  I think he went beyond

10  his order of reference, and I told him that yesterday.

11        Secondly, I think we are in a very difficult spot where

12  we have gone ahead and made these settlements with quite a

13  number of water users and claimants to water and home people

14  who have lands in that area.  We settled the lawsuit with them.

15        THE COURT:  Let me get this straight.  Here is a concrete

16  situation.  Here is a person who owns a half acre or less in

17  the Fallbrook area, and they have pursuant to publicity put out

18  signed this stipulation with the Government that they may use

19  what water they want for house and incidental purposes for not

20  more that half an acre.

21        MR. VEEDER:  Yes.

22        THE COURT:  Now it turns out that their land is located

23  in an area which the master has found to contain only vagrant

24  percolating water.

25        MR. VEEDER:  I am not sure in every instance on that.

1    I think there are some instances.

2         MR. SACHSE:  Everyone in the Fallbrook watershed.

3         MR. VEEDER:  There are areas, though, that we believe

4    have the riparian rights.  We believe that when this settlement

5    was made it was a sensible contract.

6         THE COURT:  Let's take the situation first of a person

7    whose offer to you concerned land which is now found by the

8    master to contain only vagrant percolating water.  The master

9    says that his offer and your acceptance are in effect.  Is that

10   the substance of it?

11        MR. VEEDER:  Yes.

12        THE COURT:  Well, number one, these so-called settlements

13   were never effective until approved by the court.  Number two,

14   we understood from the beginning that you and this particular

15   party could not of yourselves settle the lawsuit.

16        MR. VEEDER:  That is right.

17        THE COURT:  That eventually it had to go out to give

18   other people a chance to be heard--somebody else might object,

19   although it was problematical that they would.  I don't see

20   that any violence was done to anybody if the master says "Forget

21   about.  You have all the water you need without signing stipula-

22   tions."

23        MR. VEEDER:  I don't know that there is any violence

24   done by it, but I do feel this way in regard to this matter,

25   that the general overall approach that none of these stipulations

1  has any validity is the proper one to pursue.  First, I don't

2  believe he had any authority to do it.  Secondly, I think that

3  in the area in question there are problems that I brought to

4  his attention that cause me to desire to have this matter held

5  in abeyance at the present time.  I will be frank with you, I

6  don't want an outburst of publicity in regard to this situation

7  until we are certain ourselves as to the status of all these

8  matters.  Frankly I don't know how to handle it.

9       THE COURT:  What is his finding again in the Fallbrook

10  area?

11       MR. VEEDER:  His finding is that wherever a stipulation

12  as defined in Finding 3 has been or is hereafter executed with

13  reference to a parcel or portion of a parcel of property in the

14  Fallbrook Creek watershed, said stipulation shall not be con-

15  strued as execution of such stipulation and shall not constitute

16  any limitation upon or determination of the rights of the owners

17  of such parcel either to develop or to use water on said parcel.

18  No adjudication to the water rights and uses of parcels of

19  property in the Fallbrook Creek watershed need be made or should

20  be made in this action.  No judgement hereafter rendered in this

21  action shall in any manner limit or impair the rights of the

22  owners of any property within the Fallbrook Creek watershed,

23  whether or not said property is riparian to Fallbrook Creek or

24  any tributary thereof.

25       MR. SACHSE:  Go ahead, as to ground waters; to extract

1      or use waters underlying any of said property.

2           MR. VEEDER:  To extract or to use water underlying any

3      of said property.  Nor shall any judgement rendered herein have

4      any effect upon any of said parcels of property, and any judge-

5      ment rendered in this action shall express and declare that all

6      subsurface waters in said Fallbrook Creek watershed are vagrant

7      percolating waters not part of the subsurface flow of Fallbrook

8      Creek or the Santa Margarita River system and shall further

9      clear each of said parcels from any cloud cast upon the title

10     of the water rights of said parcel by the filing of this action

11     and the recording of the lispendens herein or the execution of

12     any stipulation.

13           My concern about that terribly long sentence--I don't

14     know what it means to begin with.

15           THE COURT:  Well you have a pretty good idea what it

16     means.

17           MR. VEEDER:  Well, yes, I think I got a knife right

18     between the ribs.

19           THE COURT:  I thought you were the man who expressed

20     concern about these small people occasionally.

21           MR. VEEDER:  I am.  I am concerned about them.

22           THE COURT:  Well, here the master is showing a little

23     concern for them himself, and he says, in substance, that if

24     some of them have inadvertently signed some of these stipulations,

25     since there is only vagrant percolating water under his ground,

1    let us not worry about the stipulation.  That is the substance

2    of it.

3           MR. VEEDER:  The thing I want to bring to your Honor's

4    attention here is simply this, that I believe that there may

5    be instances where what he said would be effective, but we don't

6    know how many instances that would be.

7           THE COURT:  Well, you should have a right to call parti-

8    cular matters to our attention where some injustice might have

9    been done.  But the master has given you time to do that, has

10   he not?

11          MR. VEEDER:  He has given me until Monday, and right

12   at the moment I am before your Honor.

13          THE COURT:  If you need more time, will you inquire of

14   him?  I am not now considering objections to the Master's

15   findings, you know.  We can't informally bring on the Master's

16   findings before me on this matter and have me make any ruling

17   on it.

18          MR. VEEDER:  I know.  But also I don't want to be caught

19   with these findings being tendered to you and have you approve

20   them.

21          THE COURT:  They will have to be noticed for hearing

22   before me.  The Master is not going to bring them around some

23   afternoon and have me approve them.  They will have to be

24   noticed for approval before me.  That was one of the steps laid

25   out, as I recall, in the master procedure.

1          MR. VEEDER:  Of course, I will add the additional factor

2     that I never dreamed that such a thing would be included in a

3     set of findings.

4          THE COURT:  Outside of the isolated cases that you talk

5     about, why should some person who had a half acre of ground up

6     there and wanted to get out of the lawsuit and signed a stipu-

7     lation, which has never been approved by the court and which

8     has never yet been submitted to the scrutiny of other parties

9     who might want to object to it, why should that party be bound

10    by that proposed stipulation now when the finding is that there

11    is no water up there except vagrant percolating water underground?

12         MR. VEEDER:  I would be inclined to say there was no

13    basis for the agreement at all under those circumstances.  But

14    I don't want a blanket shot at it.

15         THE COURT:  Would you prefer to have the Government asked

16    to be relieved of those themselves rather than have the Master do

17    it by a finding?

18         MR. VEEDER:  Yes, I think it would be a whole more sensi-

19    ble than just giving a blanket shot, which as I say, I know will

20    get a great deal of publicity.  Then if we find that something

21    has to be changed--I know the kind of publicity that will occur.

22         THE COURT:  What kind of publicity are you afraid of?

23    I understand you have had in the past some pretty good publicity.

24    What could happen out of this that would add anything to the

25    fire that you have been subjected to?

8236

E

A   19

1          MR. VEEDER:  I am not thinking of myself.  I am thinking

2     of humanity, and also of politicians in general.

3          The point I make is that I would like very much to have

4     this thing held up for a little while, if I could, till we get

5     this thing settled.

6          THE COURT:  How else could it be done? It seems to me

7     that the Master is doing it rather expediously.  Would you want

8     to have to write a letter to each one of these people with whom

9     you have agreed and say that you want to terminate your agree-

10    ment?  Or how do you want to do it?

11         MR. VEEDER:  I would a whole lot rather do it that way

12    than to have just a blanket dismissal of all these people and

13    then find that we have to say, " Just a minute, we talked too

14    soon."  I'd rather go back.  I realize that my friends across

15    like to paint with a broad bush.  I like to pinpoint myself.

16         THE COURT:  How many of them are there in the Fallbrook

17    area?

18         MR. VEEDER:  I don't know.  I haven't even had a chance

19    to count them. But I will.

20         MR. SACHSE:  I think, as a allowed guess, there are

21    something between 100 and 200 stipulations in the Fallbrook

22    Creek area.

23         MR. VEEDER:  There are too many for us to be taking a--

24         THE COURT:  What kind of situation do you think could

25    occur that you would try to find?  Give me an example of one.

8237

E

A   20

MR. VEEDER:   I will agree with this.   I have no sympathy with the thought that there should be no judgement at all on Fallbrook Creek.   I can't accept that.   But I don't know of the circumstances which prevail.   We know that there is water being impounded up there in several small reservoirs--they are not so small, 4 acre feet or something like that.   We know there is development up there.   We know there are some privately owned wells.   We know there are quite a number of things up there, and I don't want to see a blanket dismissal of those things and then subsequently find that somebody should be brought back in.   Let's make a recheck on it and write them a letter.   Nobody is going to be hurt the way the thing sits now.   Certainly they are not being hurt if they have the stipulation with us.   Let's check it out and get it done in a workman-like way.   But I don't want to be pressed to this Monday date, because I just can't make it.

THE COURT:   I can't understand what kind of situation you would be concerned with.   Now you talk about reservoirs. This doesn't talk about reservoirs.   It says underground waters.

MR. VEEDER:   All I am asking, your Honor, is for the right before this thing is made final, to make a check through on it and make a determination on it.   We will do it.

THE COURT:   I still can't understand what kind of situations you might be concerned with.   Can you give me a typical supposed situation that might exist?   Or are you concerned in general with the fact that the Master is, as it were, kicking

1    out a bunch of your stipulations?

2             MR. VEEDER:   That is right.

3             THE COURT:   Is that what you are concerned with?

4             MR. VEEDER:   That is the primary one.  I think it is a

5    very precedent.  Secondly, I think there is always the possi-

6    bility that with a broad stroke of finding a situation where

7    we will have to go back and correct it, and all I am asking

8    is that at this juncture let's not--

9             THE COURT:   How long would it take you to check them?

10            MR. VEEDER:   Just as fast as we can get at it.

11            THE COURT:   That doesn't tell me anything.  How long

12   do you think it will take you to check them?

13            MR. VEEDER:   Give me two weeks, 15 days.

14            THE COURT:   There is another alternative, of course, and

15   that is when these matters are submitted to me if you found

16   some case of an unjust situation where the Master has made

17   certain findings and there should be some correction made, I

18   don't have to take the Master's findings in toto, or I can take

19   them in part, and I am certainly going to try to see all the way

20   along that justice is done in this matter.

21

22

23

24

25

E -2

Z59

1    Even if I approve the Master's findings, I have a right

2  to correct them before final judgment.  If you found some

3  situation to which you wanted to call my attention where you

4  wanted to put on particular evidence, I could go into that.

5    MR. VEEDER:  I know that you could do that until the

6  final judgment is made.

7    And here is an additional factor I would like to bring

8  up about De Luz Creek.  It seems to me that there should be

9  an agreement as to the kind and type of finding in regard to

10  irrigable land, just like I am talking about that there should

11  be an agreement as to what should be done in regard to these

12  stipulations, so that we will not have to retry before your

13  Honor everything we are doing before the Master.  That is my

14  problem.

15    THE COURT:  If you are worried about publicity and the

16  specific reference to these agreements, there is another way

17  to do it, and that is the Master could merely make findings

18  that certain parcels of land had vagrant, percolating waters

19  and say nothing about the stipulations and we would just never

20  approve those stipulations and return them to the people in-

21  volved.

22    MR. VEEDER:  That is a good idea, and then we will

23  have a chance to check them.  Publicity is part of it, but at

24  the same time I don't think it is a good idea to have 200

25  stipulations thrown out.

1    THE COURT: Actually they are not operative until they

2 have been approved.

3    MR. VEEDER:  That is right.  But why do we take this

4 course at this juncture is all I am asking.

5    THE COURT:  Mr. Krieger, did you have something?

6    MR. KRIEGER:  Just one thing, your Honor.  I would

7 like to determine whether the case of our clients is going to

8 be heard before the Special Master.  I understand that we

9 will come before this Court with our findings on water-bearing

10 properties of the soils up there.  But as far as the individual

11 defendants are concerned, are we going to do that before the

12 Master?

13    THE COURT:  I think I will hear the matter concerning

14 the Murrieta Basin.  That is the area in this case in which

15 there is the largest divergence of opinion, and my present

16 intention would be to hear the part of the case that concerns

17 the Murrieta Basin and the Pauba Basin and the Government's

18 proposed Unit 4, and if I use the Master in the Valley I will

19 use him up in Domenigoni Valley and Terwilliger Valley and

20 those other areas where there is younger alluvium and ground

21 overlying basins where the land would have to be cataloged.

22    MR. KRIEGER:  Is this also true of Temecula?

23    THE COURT:  Temecula is, as I consider it, within the

24 Murrieta Basin.

25    MR. KRIEGER:  I see.  If that will be our course I

1    take it, however, we will not put on any evidence or be asked

2    to produce any evidence of irrigable acreage or water use or

3    anything else until we have the Government's surveys and

4    those will be put on, I take it, before we put on any evidence

5    of those facts; is that right?

6           THE COURT:  I don't know.  I haven't gone that far

7    along.

8           MR. KRIEGER:  The reason I am asking that question is,

9    I think it has been our understanding from the start that we

10   are to work from those surveys, and if those surveys are good

11   and we have no objection that is the case.  I don't want to

12   start building up a lot of evidence along that line for several

13   reasons.  One of them is that I think we should first determine

14   where the line is before we go away out, for example, to

15   Murrieta Hot Springs and get somebody outside the Kunkel line

16   to determine all the water uses out in that country, or where

17   Mr. Burrell's land is.  All I am trying to do is to find out

18   if we can present our case in this way, if we can come in on

19   the riparian issue solely when the other defendants here are

20   through and then be given an opportunity to come in with our

21   individual defendants and their land use at such time as the

22   Government has given us the time to analyze their soil surveys.

23          THE COURT:  Well, yes and no.  I would say that if the

24   Government has had time to make these reports, then certainly

25   you should have a chance to see whether you are content with

E2

Z62

1  what the Government's position is and you should not be

2  required now to do something until you find out what position

3  the Government is going to take.  On the other hand, it seems

4  to me that the matters concerning your clients ought to be

5  presented together.  If it is a matter of wanting additional

6  time to present your matters, maybe it would be better to

7  continue the matter until everybody gets ready to go on it

8  rather than put it on piecemeal.  I don't know that I follow

9  you.  How can you present evidence as to the riparian rights

10  of one of your clients without getting into the question of

11  where his land is located, what is irrigable, what is irri-

12  gated, et cetera?

MR. KRIEGER:  We should take somewhat the same approach

14  that the United States has used.  They have used theoretical

15  geology in order to establish some sort of line, and we will

16  try through the use of pump tests to determine a line our-

17  selves.

THE COURT:  In other words, you are going to put on a

19  general geology and hydrology case?

MR. KRIEGER:  Yes.

THE COURT:  Without reference to particular defendants?

MR. KRIEGER:  That is precisely correct.

THE COURT:  That is entirely all right.

MR. KRIEGER:  Not geology so much as hydrology.  Then we

25  will have time to put on the individual parcels later.

THE COURT:  I don't think it would delay it.  The first question is whether there is any possibility after you have talked with your engineers that they could find anything out by seizmographic tests or other modern scientific methods that would give us any information on that basin problem.

MR. VEEDER:  Only from the standpoint of digging quite a number of test holes.

THE COURT:  What is that?

MR. VEEDER:  Only by quite extensive test holes for the purpose of making these investigations.

THE COURT:  Who said that, your engineers?

MR. VEEDER:  Yes, and I will get their precise language on it for tomorrow.

THE COURT:  Will the location of the basement complex over that basin area be of any help to us?

MR. SACHSE:  You mean the depth, your Honor?

THE COURT:  Yes.

MR. VEEDER:  Our response to that would be that we just took a hundred feet of water-bearing area.  Whether it goes all the way down is not important.

MR. STAHLMAN:  I would like to call your Honor's attention to one thing-- maybe you are familiar with it, and I have no objection myself, but I think you ought to be aware of the fact that Cal Tech is a defendant in the case by reason of Palomar.

THE COURT:  Cal Tech is a defendant?

E2

265

8245

1          MR. STAHLMAN:  They are a named defendant in the case.

2   They have answered and have attorneys.

3          MR. VEEDER:  I don't think that would make any differ-

4   ence to us.

5          MR. KRIEGER:  My own thinking on that, your Honor, is--

6          THE COURT:  Well, defendants can put on testimony.

7          MR. STAHLMAN:  I have no objection to it whatsoever.  I

8   just thought we ought to be aware of the fact that they are

9   a defendant.

10          MR. KRIEGER:  Our own proof will be aimed at showing

11   that it is not the soil characteristics, theoretically anyway,

12   that determines what is and what is outside of the stream

13   system, but rather what the wells will produce, and I don't

14   suppose that the Cal Tech testimony would show that.  It would

15   just show further geology.  Is that not so?

16          THE COURT:  Actually we don't know what they could show.

17   The only point is that they are a modern educational institu-

18   tion that is well recognized for their scientific achievements

19   and they have offered to lend us whatever facilities they had,

20   if it would help us any.  I don't know what they could tell us.

21   The chances are that they could probably tell us where the

22   basement complex lay underneath that basin.  I imagine that

23   modern seizmographic tests could distinguish between the

24   alluvial fill and the basement complex, from the previous

25   conversations I have had.  Maybe they could tell us that.  I

1    don't know if they could tell us much more.  It is conceded

2    that there is water down there.  At least the State took the

3    position that there is no doubt that there is water in that

4    alluvium.  The question is the extent to which it moves, where

5    it comes from, and that sort of thing.

6           MR. STAHLMAN:  It would be very important if we could

7    learn those things, I would think.

8           MR. KRIEGER:  Could we talk with any of their people

9    to determine what they could do?  Is there any way of finding

10   out more explicitly?

11          THE COURT:  Yes, the proposal was that they would send

12   these men down here, if we wanted to meet with them, and sit

13   down with the attorneys and the engineers and just talk over

14   what the situation was and what they could or could not do for

15   us.

16          MR. STAHLMAN:  I think that is something that we should

17   do and shouldn't overlook the opportunity.

18          MR. MOSKOVITZ: For your benefit, your Honor-- I don't

19   have any objection to sitting down with them-- Mr. James felt

20   that without having spoken with them that the type of survey

21   they would make would be rather costly, I think well over

22   $10,000, and that he didn't think, knowing what he did, that

23   the results would be particularly conclusive on the issues

24   that we now have.

25          MR. STAHLMAN:  Let's hear from them.

THE COURT:  My contact was made through a gentleman who secured them a very large endowment recently and they are very grateful.  This needn't be in the record.

(Off the record.)

THE COURT:  The thing I was inquiring was whether you had talked to your engineers, your scientific men, as to what it is they might be able to tell us with modern testing equipment.

MR. VEEDER:  I think it would be a very good idea to sit down and talk with them and take time during court and just go into pre-trial or whatever you want to call it and confer with them.

MR. STAHLMAN:  I don't think we should overlook it.

THE COURT:  In other words, if nothing comes of it they have made a trip down here and have met some interesting lawyers and you have met some interesting scientists.  Maybe that will be the end of it.  I will explore it further and see if we can set it up for an afternoon.

This can be off the record.

(Off the record.)

THE COURT: Finally, in view of the statements made by Mr. Moskovitz and Mr. Sachse we will proceed upon the basis of trying to form decrees which will list a description of land which is riparian or overlying and try to describe as accurately as we can the irrigable land and the irrigated land.  I am

more concerned, of course, with the specificity in the riparian and overlying lands. That is a must. But where we can, to describe as accurately as we can the irrigable lands and the irrigated lands. Any finding that I made as to what lands are irrigable would be, however, subject to an express exception that the showing of changed conditions would undo any finding that was made. I don't intend to make a finding to be binding forever on what is irrigable and what is not. My crystal ball isn't that good. And of course how much is now irrigated is only a finding as to that fact. It doesn't show how much is going to be irrigated tomorrow or the next day.

All right, 10 o'clock tomorrow morning.

MR. VEEDER: Do I have fifteen days in regard to these stipulations, your Honor?

THE COURT: You talk to the Master.

MR. VEEDER: All right.

THE COURT: And suggest to him the other suggestion I made that possibly this can be done without holding up this red flag with the resulting problems that you fear.

MR. VEEDER: I will talk to him and I will tell him your views, your Honor.

(Adjournment until Thursday, February 12, 1959, at 10 A. M.)