# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

               Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      Thursday, February 12, 1959

Pages: 8249 to 8387

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ Deputy

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
        vs.                        )          No. 1247-SD-C.
                                   )
FALLBROOK PUBLIC UTILITY           )
DISTRICT, et al.,                  )
                                   )
                Defendants.        )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Thursday, February 12, 1959

APPEARANCES:

        For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                   Special Assistant to the
                                   Attorney-General,
                                   Department of Justice,
                                   Washington, D. C.

APPEARANCES (Continued):

|     |     |
|-----|-----|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney-General, by<br>Adolphus Moskovitz, Esq.,<br>  Deputy Attorney-General, |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al. | FRANZ R. SACHSE, ESQ. |
|     | WALTER GOULD LINCOLN, ESQ. |

## INDEX TO WITNESSES

For Defendant Fallbrook
Public Utility District:                    D        X        RD        RX

George F. Yackey            8264

## EXHIBITS

Defendant Fallbrook
Exhibit -                                        Iden.        In Evid.

A    Final order of Condemnation                              8260

B-1 - B-43    Deeds                                           8261

H    Map                                                      8278

I    Map of pipelines and reservoirs                          8284

M    Tabulation                                               8311

L    Tabulation                                               8322

D    Permit                                                   8347

E    Permit                                                   8348

F    Permit                                                   8350

G    Permit                                                   8350

A

Z$4

SAN DIEGO, CALIFORNIA, THURSDAY, FEBRUARY 12, 1959.  10:00 A.M.

THE CLERK:  Number one, the case on trial, 1247-SD-C, United States vs. Fallbrook.

MR. VEEDER:  Your Honor has ruled in regard to 41 of counsel for the Fallbrook Public Utility District's defendants who claim no water in the Santa Margarita River, and it occurs to me that we would probably make disposition of quite a number of defendants by having all of those that Mr. Sachse disclaims any rights to the Santa Margarita River simply listed and have them put in the same category.  I think that would dispense with the necessity of admissions, and we just follow the same procedure.  There are quite a number of them.  I think I counted around 50 this morning.  And I would like to have them put in the same category as the 41 yesterday, to the end that we can wrap up maybe a hundred.

THE COURT:  Does anyone present have any objection to that procedure?

MR. SACHSE:  I do.

THE COURT:  What?

MR. SACHSE:  I am not about to disclaim.  I do not.  I have never considered this a disclaimer.  Your Honor pointed out to Mr. Veeder yesterday it was a perfectly proper pleading asserting an affirmative right.  Mr. Veeder has not seen fit to answer requests for admissions for some of these other 50

A

Z5

1    he is talking about.  Another very great block of them are

2    covered by Master's findings that the water underlying their

3    grounds were vagrant, local, percolating.  Now, I certainly

4    don't want a partial judgment that says the United States'

5    title is quieted against them without the corollary, which

6    you pointed out yourself, your Honor, that their title is also

7    quieted against the United States.

8        MR. VEEDER:  Well, that is precisely what I said, your

9    Honor.  Now, he has disclaimed.

10       THE COURT:  He is willing to have these other people--

11       MR. VEEDER:  Treated the same way.

12       THE COURT:  --treated the same way.  And since we would

13   have to send around to everybody in the case proposed findings

14   and give them a day in court to be heard, I see no difficulty

15   in drawing up findings to cover any people that come in this

16   category.

17       MR. SACHSE:  The only difficulty I see is perhaps a

18   technical one Mr. Veeder could take care of with a word in the

19   record.  And that is whereas in the cases we argued yesterday

20   I can say in my findings, proposed findings, it appearing from

21   the pleadings and admissions on file, et cetera, et cetera.

22       MR. VEEDER:  That you claim no interest in Santa

23   Margarita?

24       MR. SACHSE: I claim no interest and that the United

25   States admits that the waters are vagrant, local, percolating.

A

Z6

1    In the case of the 50 that Mr. Veeder refers to, I cannot make

2    such a statement, that it appears that the United States admits

3    the waters are vagrant, local, percolating.

4         MR. VEEDER:  I have prepared a motion along this line,

5    your Honor, and I will tender it later in the day, to the

6    effect that all of these answers to which I am alluding consti-

7    tute disclaimers of any rights in the Santa Margarita River,

8    that they do say they have vagrant and percolating waters under

9    those lands.  And I have drawn the motion this way:  That there

10   is disclaimer of my right, title and interest in and to the

11   Santa Margarita River and its tributaries by Mr. Sachse's

12   clients, that they do claim vagrant, percolating waters to

13   which the United States makes no claim.  Wherefore, judgment

14   is entired quieting title in the United States against these

15   claiming defendants and declaring that the United States has

16   no interest in those vagrant, percolating waters.  Now, I think

17   that we could take care of a hundred that way.

18        MR. SACHSE:  That sounds wonderful, with one very minor

19   addition, Mr. Veeder.  Could you also say that it appears that

20   these are vagrant, local, percolating waters based on the

21   evidence and that the United States or no riparian would have a

22   right?

23        MR. VEEDER:  Here is what I propose to do on that, in

24   meeting that phase of it:  Simply saying that in regards to

25   those properties the United States admits that those are vagrant,

A

Z7

1  perodating waters.  Now, I think that would have the same

2  effect.

3      MR. SACHSE:  That would be wonderful, rather than notic-

4  ing a motion again.  It would save time if I intend to give

5  you a draft of my proposed finding.  If you want to modify it

6  to cover these other 50, you can submit what you think to me

7  and we will work together on the thing, and I think we will

8  get rid a couple of hundred of them instead of 41.

9      MR. VEEDER:  Well, I have listed all those you have

10  given me, and I will have that motion.

11      MR. SACHSE:  I urge that you don't go to the trouble of

12  a motion.  I am quite sure I will agree, and we will stipulate

13  to it.

14      THE COURT:  The motion has the effect of putting the

15  Government on record in the case that it claims no water in

16  this other property of these defendants.

17      MR. VEEDER:  That is right.  And they claim none against

18  us.

19      MR. SACHSE:  All right.  Let's go ahead.  Put it in the

20  form of a motion.  Are you going to include in your motion the

21  suggested form of the finding to be made as you just stated it

22  to me?

23      MR. VEEDER:  I haven't, but I think--

24      MR. SACHSE:  If you could, I think it would be helpful.

25      MR. VEEDER:  I think what we should do is prepare the

finding to that effect.  Now, as I understand it, your Honor,
I want to be sure that I have the correct view on this, there
would be no finality to the order, is that correct?  It would
be interlocutory in character?

THE COURT:  I had proposed to sign up findings first
with the loose end, with a paragraph stating that these find-
ings were satisfactory as between the Government and the
parties thereto; but the loose end to be left open was whether
anyone else in the watershed wanted to object and an opportunity
be given some way for anyone who objected, to come in and be
heard.  And in the absence of any further evidence or objection,
then, these would be the findings on these parcels binding
everybody in the watershed.  And then Mr. Sachse has suggested
that no judgment need be entered.  Instead of an interlocutory
judgment he suggests the matter await final judgment in the
case.  I don't see any problem there.  If we have interlocutory
judgments, all we have to do in a final judgment is incorporate
by reference the terms of the interlocutory judgments.

MR. VEEDER:  That is what I thought.  I thought that
was where we left it yesterday.

THE COURT:  It will save a lot of paper work actually,
because if we have a series of these interlocutory judgments,
your final judgment can merely say, "Incorporates all the terms
and provisions of the interlocutory judgments entered such and
such a date"; incorporated by reference without having to

A

Z9

1   repeat it.

2         MR. SACHSE:  I never thought of that angle.  That would

3   save time.

4         MR. MOSKOVITZ:  Your Honor, you want him to serve all

5   the other parties in the watershed to give him this notice,

6   and I wondered whether it might be better to wait on that

7   service until you have all such parcels in, the whole watershed

8   delineated and then have one service, and one day when anyone

9   can come in and contest the elimination of these people.

10        THE COURT:  The size of the document you would serve

11  in that instance would be terrific, and I think we are going

12  to have to do it piecemeal.  I think there are going to have

13  to be several services.  Can you imagine how big a document

14  would be that it would have the proposed findings for all the

15  parcels in this watershed?

16        MR. VEEDER: I am trying to do what your Honor has

17  directed me to.  I am trying to get some of these people out

18  of this case, and I think the way to do it is the way we out-

19  lined it.

20        THE COURT:  It seems to me you have to have several

21  services.  As to how much should go into one, that is a

22  question to decide.  I have been suggesting that we might take

23  care of some of these half-acre pieces.

24        MR. VEEDER:  Incidentally, the Clerk and I are also

25  progressing on these areas.  You asked me yesterday about it,

A2

Z10

1   and I think we have complete agreement as regard to all counsel

2   now and as to all parties represented by counsel.  We will

3   undertake to take the De Luz area and move on through, your

4   Honor.

5         THE COURT:  I have the list up here.

6         MR. VEEDER:  You have the list.

7         MR. SACHSE:  Is that all, Mr. Veeder?

8         MR. VEEDER:  Yes, sir.

9         MR. SACHSE:  Before I proceed there are two minor

10  corrections.  I haven't finished the transcript of yesterday.

11  On page 8130, line 3, it reads:  "Now, if Mr. Veeder disagrees,

12  I certainly am not going to belabor a dead horse."  The words

13  should be:  "Now, if Mr. Veeder agrees."  "dis" should be

14  deleted.

15        THE COURT:  What line, 4?

16        MR. SACHSE:  Line 3.

17        THE COURT:  3.

18        MR. SACHSE:  8130.

19        THE COURT:  The correction will be made.

20        MR. SACHSE:  The second correction is 8163, line 20.

21  It now reads:  "Simply to assist the Court in Mr. Veeder."

22  The "in" should be "and."

23        THE COURT:  The correction will be made.

24        MR. SACHSE:  I think the record should indicate that I

25  now commence the presentation of Fallbrook's case in chief.

1          May I have Fallbrook's Exhibit A, Mr. Clerk.

2          Do you have a copy of this, Mr. Veeder?

3          MR. VEEDER:  I do.

4          MR. SACHSE:  It is the final order of condemnation.  I

5    will offer in evidence Fallbrook's Exhibit A for Identification,

6    the same being a copy of the final order of condemnation in

7    the case of Fallbrook Public Utility District, plaintiff, vs.

8    Gene E. Martin, et al., No. 194,426, Superior Court of the

9    State of California, in and for the County of San Diego.

10         MR. VEEDER:  The United States desires to interpose

11   objection to the exhibit marked for identification Fallbrook's

12   A which is the final order of condemnation.  We believe it is

13   incompetent, irrelevant, and immaterial and not tending to

14   prove any issue in the case, in that certainly in this litiga-

15   tion the matter of the ownership of these lands is in no way

16   involved in any of the issues.  It is, moreover, our position

17   that the Fallbrook Public Utility District is totally and

18   entirely and completely without power or authority to condemn

19   lands for purposes of constructing an illusory reservoir which

20   would be used for purposes of irrigation.  It is our view, as

21   we have stated before, that Fallbrook Public Utility District

22   cannot and is not empowered to divert water for purposes of

23   irrigation.

24         THE COURT:  Isn't some of the land described in this

25   condemnation to pre-riparian?

A2

Z12

1    MR. SACHSE:  Yes, your Honor.

2    THE COURT:  The objection is overruled.  Received in

3    evidence as Exhibit A.

4    MR. SACHSE:  May I have Fallbrook's B-1 through B-43?

5    MR. VEEDER:  Mr. Sachse, am I right that B-1 through

6    B-43 are the deeds to the same land?

7    MR. SACHSE:  No, B-1 through B-43 are lands acquired

8    by negotiated purchase rather than by condemnation.

9    MR. VEEDER:  But part of the same area?

10   MR. SACHSE:  Same project, the same area.

11   MR. VEEDER:  Have you made your offer?

12   MR. SACHSE:  I would like to briefly identify them for

13   the record.

14   THE COURT:  Waiver is made of use of originals and

15   photostats may be used?

16   MR. VEEDER:  That is correct, your Honor.

17   THE COURT:  No objection to that?

18   MR. VEEDER:  No.

19   MR. SACHSE:  B-1 through B-43 for Identification which

20   I am now offering, your Honor, are copies of deeds and title

21   documents to lands presently owned by the Fallbrook Public

22   Utility District in the same area to which Mr. Veeder just

23   referred, that is, the proposed reservoir area.  Some of these

24   lands are riparian, some are not.  I now offer B-1 through B-43,

25   inclusive.

A

Z13

1    MR. VEEDER:  I renew my objection, your Honor, and may

2    I have a continuing objection to anything that relates to the

3    construction of the dam or the reservoir or any diversion by

4    the Fallbrook Public Utility District?  It will save time.

5        THE COURT:  The objection is overruled.  If the evidence

6    is admissible for any purpose, it goes into the record.  And

7    obviously, without ever reaching your other objection, Mr.

8    Veeder, some of this land is riparian; other is land which

9    though not riparian would be land which might have rights to

10   vagrant, percolating waters.  The objection is overruled.

11       MR. VEEDER:  I would like to interpose the additional

12   objection then on the basis of any of these lands that are

13   riparian that the Fallbrook Public Utility District is powerless

14   to exercise those riparian rights for anything but municipal

15   purposes, and then the municipal purposes only upon the lands

16   themselves.  That is, they could not divert water away from

17   the lands for utilization for municipal purposes.

18       THE COURT:  Mr. Sachse concedes that point; he cannot

19   divert water away from these lands.  Is it your contention that

20   if Fallbrook owns a piece of riparian land it could not lease

21   it to someone for farming purposes?

22       MR. VEEDER:  If they lease it for-- I am not sure.  I

23   thank you, your Honor.  I am going to raise an objection if they

24   try it.  But the point I make is that Fallbrook cannot use

25   riparian water off of the riparian land for municipal purposes,

A

Z14

1    THE COURT:  That is conceded.  That is conceded.  There

2  is no argument about that.

3        MR. VEEDER:  Fine.  And my objection is in the record.

4        THE COURT:  It is overruled.  B- 1 to B-43, inclusive,

5  is received in evidence.

6        MR. SACHSE:  May I have Fallbrook's C for Identification,

7  please.  If the Court please, Fallbrook's C for Identification

8  is a blank form agreement to sell real estate.  As I stated in

9  my opening remarks yesterday, I truly do not know that this

10  is a vital part of Fallbrook's case.  But a great many de-

11  fendants, in fact, every one of the defendants represented in

12  B-1 through B-46 --

13        THE COURT:  B-1 through B-43, isn't it?

14        MR. SACHSE:  B-43, pardon me.  Not every one but most

15  of the defendants in that B series transferred under this

16  agreement.  I realize that there will be argument in the case

17  of these private individuals as to the effectiveness of their

18  attempted reservation of their riparian rights, and I, there-

19  fore, feel that it would simplify the record to put it in as

20  part of the Fallbrook's case rather than put it in 43 different

21  times later on.  And I offer Fallbrook's C.

22        MR. VEEDER:  Your Honor, I object to this.  It is a

23  blank form, a copy.  It is totally without meaning.  I object

24  to it on the ground it is incompetent, irrelevant, immaterial.

25  There is not a single issue in the case to which it pertains.

A

Z15

1       MR. SACHSE:  If Mr. Veeder wants to press the objection,

2  I am afraid he may be right.  I am simplifying the case.  There

3  are going to be 43 co-defendants who are going to have to

4  produce this piece of paper, your Honor.

5       THE COURT:  Can't it be stipulated, Mr. Veeder, that as

6  to the parties named in the 43 title deeds, the exhibits B-1

7  to B-43, that each of them entered into an agreement on the

8  form shown as Fallbrook's C?

9       MR. VEEDER:  Your Honor, I haven't the slightest idea

10  about it.  I don't know.  And when we get down to the point

11  of reserving riparian rights, which I believe cannot be

12  accomplished, I believe that--

13       THE COURT:  Aside from whether it accomplishes anything

14  or not, we are trying to just find out now what the Fallbrook

15  situation is.

16       MR. VEEDER:  I don't know.  Let the record show I don't

17  know.

18       MR. SACHSE:  I withdraw the offer, and I will at a later

19  time by a subsequent witness establish a little better founda-

20  tion which people actually used this, and maybe it can go in

21  then.

22       MR. VEEDER:  You are withdrawing it?

23       MR. SACHSE:  I will withdraw the offer at this time.  I

24  am not withdrawing the exhibit, Mr. Veeder.

25       MR. VEEDER:  That is all I was interested in.

       MR. SACHSE:  I call Mr. George Yackey, please.

1                          GEORGE F. YACKEY,

2    called as a witness in behalf of the defendant Fallbrook Public

3    Utility District, being first duly sworn, testified as follows:

4

5                        DIRECT EXAMINATION

6    BY MR. SACHSE:

7          Q   Mr. Yackey, will you state your name and address,

8    please?

9          A   George F. Yackey, Fallbrook, California.

10         Q   What is your age, Mr. Yackey?

11         A   Fifty-eight years.

12         Q   And what is your occupation?

13         A   Civil and mechanical engineer.

14         Q   Are you licensed in the State of California?

15         A   I am.

16         Q   Will you please review for the Court your educational

17   background?

18         A   Public school education in St. Louis, Missouri,

19   including business college.  Attended the University of

20   Illinois and graduated with a Bachelor of Science degree in

21   mechanical engineering in 1923.  Subsequently took specialized

22   courses in California at the various colleges in night school.

23         Q   You acquired no further degrees, though, did you?

24         A   No.

25         Q   Now, will you please review for the Court your

1 professional employment since your graduation from the Univer-

2 sity, and I would like to know not only the employer but the

3 approximate dates and the type of work you performed.

4        A   Well, starting after graduation in 1923, in June, I

5 worked for about six months with the Moon Motor Car Company in

6 St. Louis, Missouri, in engineering inspection work in a

7 manufacturing plant.

8        Then the next approximately four years with the Packard

9 Motor Car Company in Detroit, Michigan, I was the plant con-

10 struction and maintenance engineer, dealing with construction

11 of buildings, pipe lines, equipment, manufacturing processes

12 and preparing estimates and designs and letting the contracts

13 and supervising the construction work.

14        Q   When did you leave the Packard Motor Car Company?

15        A   I left the Packard Motor Car Company in 1926 and

16 came to California and went to work at the County Surveyor's

17 Office first in Los Angeles, where I worked as a civil engineer

18 for approximately six months.

19        Then I went to work for the E. B. Wiggins Oil Tool

20 Manufacturing Company in Los Angeles as a general superintendent

21 of a business, which included the design, manufacture, advertis-

22 ing, sales and follow-up oil well drilling tools, especially

23 in the rotary fields.

24        I left Wiggins and for about six months was a free-lance

25 consultant and then went to work for the State.

1          Incidentally, that free-lance consultant work consisted

2     of about a year's time, about two-thirds of the time, back

3     East in marketing California products.

4          Then I went to work for the Department of Water and

5     Power for the City of Los Angeles as a mechanical engineer.

6          Q   What year, please?

7          A   I started there in 1931 and stayed with the Depart-

8     ment of Water and Power in various engineering capacities,

9     including mechanical, hydraulic, civil, metallurgical work,

10    until August, 1942.

11         During two of those periods with the Department of

12    Water and Power I was a resident engineer for the Department

13    in the East during the manufacture and testing of equipment

14    for the Boulder Dam transmission lines, which was mechanical

15    and civil work but verged considerably on the electrical field.

16         In 1942 I went into the military service in the United

17    States Army Air Corps, and during that period was classified

18    as a technical administrative officer.

19         I left the military service in the spring of 1946 and

20    went to work for the Fallbrook Public Utility District at that

21    time as their chief engineer and general manager, where I

22    have been until January 1, 1959, at which time I retired from

23    the Fallbrook Public Utility District to my own practice.

24         Q   Are you still employed by the District in any

25    capacity?

1      A   Yes, I am retained by the District as an engineering

2   and management consultant.

3      Q   And you are in that capacity now as you are testify-

4   ing here?

5      A   I am.

6      MR. VEEDER:   I have it here from 1931 to 1942 with the

7   Department of Water and Power; is that correct?

8      THE WITNESS:   That is right.

9   BY MR. SACHSE:

10     Q   Mr. Yackey, going back to your original employment

11  as chief engineer and general manager of the Fallbrook Public

12  Utility District, will you describe your duties and responsi-

13  bilities in that position?

14     A   Well, in general charge of the District's complete

15  operation, operations under the policies of the Board of

16  Directors.   It consisted of direct control or management of the

17  entire operations of the District, including its long-range

18  planning programs, design of equipment required by the Dis-

19  trict, the writing of specifications and putting out bids

20  where required for equipment, supervising the construction

21  of same, making analyses of the various parts of the District

22  and the requirements of the District and preparing solutions

23  for same, and in many cases offering multiple solutions to the

24  Board with recommendations for operations, direct supervision

25  of the personnel, contact with the various other agencies that

Yackey - Direct

1   it is necessary for the District to deal with-- for instance,

2   the San Diego County Water Authority, the Metropolitan Water

3   District, the Legislature in Sacramento, in some cases in

4   Washington, the contact with the technical associations that

5   the District keeps close contact with; making studies of the

6   water resources of the District and operations, and contacting

7   the State agencies that were affected and the Bureau of

8   Reclamation and the Corps of Engineers, in some cases the

9   Government agencies such as the Navy and the Marine Corps.

10   And in cases where the District built such things as reservoirs

11   and large pipe lines by its own crews, acted as supervising

12   engineer and directed the construction.

13       Q   Mr. Yackey, I am placing on the easel an exhibit

14   that has been marked Fallbrook's Exhibit H for Identification.

15   Are you familiar with that exhibit?

16       A   Yes, I am.

17       Q   Do you know where it was prepared and who prepared

18   it?

19       A   Yes; Fallbrook's Exhibit H was prepared in the

20   engineering department of the Fallbrook Public Utility District

21   offices under my direction and shows the Fallbrook Public Utility

22   District here--

23       Q   Just a minute before you describe it, please.  Is it

24   correct to the best of your knowledge?

25       A   It is.

1    Q  Now, will you tell us generally, without detail, what

2  it is?  The map of the district, is it not?

3    A  It shows a map of the district, which shows the area

4  that was part of the District in 1946-- that is shown with the

5  wide-space single cross-hatching, and then it shows the area

6  that was added in 1950 annexation.

7    THE COURT:  The map says 1938.  You said 1940-something.

8    THE WITNESS:  It was annexed in 1938, but it was as it

9  existed in 1946 when I went to work with the District.

10    THE COURT:  I see.

11    THE WITNESS:  That is why I mentioned it that way.

12    The 1950 annexation area is shown with the cross-

13  hatching closer together, and then the area that was annexed

14  in 1958 is shown within the heavy lines but is blank spaces.

15  BY MR. SACHSE:

16    Q  And the map also shows the range and section numbers,

17  does it not?

18    A  Yes, it shows the range and sections and the county

19  of Riverside and the San Diego County lines.

20    MR. SACHSE:  I will offer Fallbrook's Exhibit H for

21  Identification in evidence.

22    MR. VEEDER:  I would like to ask a question.  First, I

23  will object on the grounds that there is no proper foundation

24  for much of this.  I think the only proper way of showing the

25  delineation and outline of the areas would be to have whatever

1  orders of the court or if an election was involved proof that

2  these are the areas which are within the jurisdiction of the

3  Fallbrook Public Utility District and showing that there was a

4  proper establishment of the District, and that these lands

5  which have been annexed were properly annexed.  I don't believe

6  that this map can show that without that foundation, your

7  Honor.

8          THE COURT:  Is there any dispute about the matter of

9  the annexation?

10          MR. VEEDER:  Yes, your Honor.

11          THE COURT:  Reserving your point about the powers of

12  this Public Utility District, is there any dispute that land

13  was annexed to it?

14          MR. VEEDER:  I have no idea.  I think it is absolutely

15  essential that it be proved that this new land which encompasses

16  a large segment of the Santa Margarita River Valley be shown

17  that it was properly incorporated, and I don't believe there

18  is any presumption by simply putting a map up on the wall that

19  there has been proper annexation.  And I think that he should

20  also show the additional annexations that transpired.  Now

21  those are matters that are in issue.  Certainly it is in issue

22  as to where water can be used, and certainly it is in issue,

23  in my view, as to the whole operation of the Fallbrook Public

24  Utility District, and until those areas are shown to be part

25  of the District I certainly interpose the objection that I have

1   just made.

2       THE COURT:  Can't the Court take judicial notice of the

3   political subdivisions of the State?

4       MR. SACHSE:  Your Honor, the Court can take judicial

5   notice of the boundaries of the political subdivisions, and

6   the presumption is that the acts of State subdivisions are

7   carried out and performed legally.

8       It is obvious to me, from the first half-dozen objec-

9   tions that have been made here, that we are about to indulge

10  in or engage in a rather extensive filibuster.  If Mr. Veeder

11  or the Court wants, there is of record in the County Recorder's

12  Office the exterior boundaries of the District as it existed

13  and of each subsequent annexation.  I am sorry to say that

14  that is a document that is perhaps forty or fifty pages long,

15  as you can readily ascertain yourself when you look at the

16  irrigular lines.  I had hoped that the United States and the

17  Court would take a reasonable attitude in this.  This evidence

18  doesn't injure them in any way.  If Mr. Veeder insists that

19  I obtain such certified copies, or if the Court desires it, I

20  will get it.

21      MR. VEEDER:  I have never asked for a certified copy

22  from Mr. Sachse yet.  Certainly the District has copies of the

23  lands which have been annexed into it.  I don't ask for a

24  certified copy.

25      MR. SACHSE:  But you will not accept the statement of the

1    General Manager that this correctly reflects the boundaries,

2    but you will accept a description which he has written.

3              MR. VEEDER:  Who is the general manager?

4              MR. SACHSE:  Mr. Yackey was General Manager at the time

5    of all these annexations.

6              MR. VEEDER:  Your Honor, I simply renew the objection.

7              THE COURT:  You started to say that if the District

8    had maps of these annexations--

9              MR. VEEDER:  Copies of the legal descriptions, your

10   Honor.  This exhibit purports to show an area which is the

11   heart of this litigation really.

12             THE COURT:  You are talking about the area running up

13   to the Riverside County Line.

14             MR. VEEDER:  I am talking about the whole area.

15             THE COURT:  Well, the watershed line runs through the

16   lower half of it.

17             MR. VEEDER:  Yes, your Honor.

18             THE COURT:  What are you talking about particularly?

19   The white area?

20             MR. VEEDER:  I am particularly interested in this new

21   annexation, but I think that certainly have a description of

22   the exterior boundaries of their District, and I don't see

23   why it should not be in the record.

24             THE COURT:  If this were a civil case with you represent-

25   ing a private litigant and you would raise an objection like

1  this, after the pre-trial that we have had, you would be out

2  of here so fast that it wouldn't be funny.  Now you are repre-

3  senting the Government of the United States and you can stand

4  off and sharpshoot and make objections of this sort.  But I

5  certainly have no sympathy for this sort of objection at this

6  stage of the case, when you have known all along that the

7  Fallbrook Public Utility District intended to show this when

8  they prepared these maps and lodged them, et cetera.

9       MR. VEEDER:  May the record show, your Honor, when these

10  were lodged?  They were lodged on the 30th of January.  I never

11  saw this map before in my life.  I don't know that it is right.

12  With the responsibility that I have of representing the United

13  States, I don't believe that I have to accept it as being right.

14       THE COURT:  Suppose that they brought you the documents

15  that constituted the annexation, the legal descriptions and

16  all the procedures, you would have a far bigger job to check

17  those things out than you would to make some reasonable check

18  upon a summary map.

19       MR. VEEDER:  Your Honor, let me go into voir dire for a

20  few questions and I think your Honor's criticism of me just a

21  moment ago will drop.

22       THE COURT:  All right.

23       MR. VEEDER:  I don't believe these are right.

24       THE COURT:  All right, go ahead.

25

B

Z11

VOIR DIRE EXAMINATION

BY MR. VEEDER:

Q  Now, Mr. Yackey, I will ask you some questions on voir dire.  Are you representing that the Sandia Creek as depicted on Fallbrook's Exhibit marked for Identification H is correct where it is delinated on that map?

A  I do.

MR. SACHSE:  I object to that; it is improper voir dire, and this exhibit has never been tendered or intended to delineate the extent of Sandia Creek or any other stream.  You can look at the map and see that they end on the edges of the map.

THE COURT:  He has already answered the question. Overruled.  Go ahead.

MR. VEEDER:  Well, now, wait a minute.  Maybe Mr. Sachse has changed a little.

MR. SACHSE:  I didn't hear the answer.  What was it?

THE COURT:  He said yes.

THE WITNESS:  May I have the question over again?

MR. SACHSE:  He said yes, it is correctly delineated?

THE COURT:  Yes.

MR. VEEDER:  Is it being offered for the purpose of locating the streams and the high water mark?

MR. SACHSE:  It is being offered to locate the exterior boundaries of the Fallbrook Public Utility District.

B

Z12

1    THE COURT:  By legal section numbers only?

2    MR. VEEDER:  Yes, by legal sections and by-- no, the

3 metes and bounds are as correct as they can be drawn on a map

4 of that scale.

5    MR. VEEDER:  Where are the metes and bounds?

6    MR. SACHSE:  The outside blue mark.

7    MR. VEEDER:  And you are not offering this, Mr. Sachse,

8 to show the proper location of Sandia Creek or of the tributary?

9    MR. VEEDER:  Absolutely not.

10    THE COURT:  You are offering it to show the location

11 of the District as far as legal sections and township lines

12 are concerned.

13    MR. SACHSE:  That is correct, your Honor.

14    MR. VEEDER:  Now, is this map offered-- For example,

15 is Section 36 properly depicted on that map as to its shape?

16 Is it properly a rectangle or is it square, based upon the

17 actual surveys of the United States?

18    THE WITNESS:  For all general purposes, it is.

19    MR. VEEDER:  Could I ask you to come here for a moment.

20    (The witness stepping down to the counsel table.)

21    MR. VEEDER:  Do you recognize this quadrangle?

22    THE COURT:  Identify it for the record, Mr. Veeder.

23    MR. VEEDER:  I will tell you what it would be, your

24 Honor.

25    THE COURT:  The 29 series?

1    MR. VEEDER:  It would be the 29 series and it would be

2  on the Fallbrook and the Temecula Quadrangle.  If your Honor

3  will piece together Section 36 you will find that it is not

4  square.  You will also find that Section 6 is not square.

5    THE COURT:  29F and 29K, then?

6    MR. VEEDER:  Right.

7    THE COURT:  Fallbrook and Temecula Quadrangle.

8    MR. VEEDER:  That is right.

9    MR. SACHSE:  Your Honor, I am perfectly willing to

10 stipulate that this is not intended to show the streams, it

11 is not intended to do anything more nor less than show the

12 boundaries of the District.

13    MR. VEEDER:  Then why wasn't the offer made on the

14 restricted basis you are coming in on?

15    MR. SACHSE:  I did.  If I didn't, I will so restrict it.

16 This is offered to show the external boundaries of the Fall-

17 brook Public Utility District and the annexations that have

18 taken place.

19    MR. VEEDER:  Only for purposes of location, without any

20 finality as to the --

21    MR. SACHSE:  Only for purposes of location, with no

22 finality as to streams, watershed or anything of the kind.  In

23 fact, I pointedly left off the watershed.

24    MR. VEEDER:  And not in regard to the high water mark

25 of the reservoir that you depict?

1      MR. SACHSE:  I am perfectly willing to eliminate that.

2      MR. VEEDER:  All right.  Now what do we have?  We have

3   a piece of white paper with a blue line around it.

4      THE COURT:  Except that we have section numbers showing

5   that the line runs between certain sections.

6      MR. VEEDER:  Yes, and the sections are incorrectly

7   depicted.

8      Well, on that basis, your Honor, if that is all it is,

9   and if they will obtain for me-- I am sure that they had

10  publications of the exterior boundaries of this district.

11     MR. SACHSE:  I can bring you the most recent one readily.

12     MR. VEEDER:  Will you do that?

13     MR. SACHSE:  Mr. Veeder, I say the most recent.  I want

14  to be sure I know what you want.  I can bring you the one that

15  was sent to the County Recorder following the 1958 annexation,

16  which will give you the metes and bounds descriptions of this

17  outside line.

18     THE COURT:  The entire outside line?

19     MR. SACHSE:  The entire outside line.

20     MR. VEEDER:  That's all I want.  I am entitled to it.

21     MR. SACHSE:  That I can do readily.  Whether I can get

22  to the other two readily I don't know.  But if that satisfies

23  you, I can get you that by tomorrow.

24     MR. VEEDER:  All right.  If that is all it is, just a

25  blue line on a white sheet, I will withdraw my objection, if I

Yackey - Direct                              8278

1    can have it--

2           MR. SACHSE:  I will have it tomorrow.

3           THE COURT:  Well, a blue line on a white sheet plus

4    section numbers showing the blue line runs, for instance,

5    between Sections 35 and 36.

6           MR. VEEDER: I will accept that.

7           THE COURT:  All right.

8           MR. SACHSE:  Is it admitted, then, subject to my --

9           THE COURT:  All right, it is admitted in evidence.

10          MR. VEEDER:  On the basis of what it is.

11          (Map received in evidence and marked Defendant Fall-

12   brook's Exhibit H.)

13   BY MR. SACHSE:

14          Q   Now, Mr. Yackey, I think you have described this

15   already, but I want to make certain that we have the record

16   complete.  You have indicated that the area delineated in

17   Exhibit H with the wide diagonal cross-hatching running from

18   right to left was the area of the District when you first were

19   employed in 1946; is that right?

20          A   Yes.

21          Q   Then the second classification, the more narrow

22   diagonal cross-hatches going from left to right, what does that

23   represent?

24          A   That indicates the area that was annexed in 1950.

25          Q   And approximately how many acres?

1        A   About 3,200.

2        Q   I think I neglected to ask you, what was the acreage

3   of the District when you first were employed in 1946?

4        A   Approximately 5,000.

5        Q   The total at the end of the 1950 annexation was

6   about 8,200 acres?

7        A   Yes.

8        Q   The white area, the unshaded area within the ex-

9   terior blue line indicates what?

10       A   The area that was annexed in 1958.

11       Q   To be quite sure that the record is straight, does

12  that also include what appear to be islands or windows

13  scattered throughout the inside of the exterior line?

14       A   Yes.

15       Q   In other words, the exterior blue line, everything

16  within it is presently within the District?

17       A   Yes.

18       THE COURT:   There are no islands now at all?

19       THE WITNESS:   No, sir.

20  BY MR. SACHSE:

21       Q   And how many acres approximately are represented in

22  that white area, 1958 annexation?

23       A   Slightly over 7,000.

24       Q   The present area of the District is approximately

25  15,200 acres?

1      A   Probably closer to 15,500 acres.

2      Q   Now, I am going to direct your attention to a broken

3  line that is shown as meandering across the center of the

4  District.  Will you tell us what it is?

5      MR. VEEDER:  I object to this.

6      MR. SACHSE:  If you will permit me for a moment and

7  reserve a motion to strike, Mr. Veeder, I don't think you will

8  object when you get the answer.

9      THE WITNESS:  The heavy dash and two dot lines going

10  diagonally from the upper right to the lower left part of the

11  sheet denotes the division between the watersheds of the Santa

12  Margarita River and the San Luis Rey River watershed.

13  BY MR. SACHSE:

14      Q   That is not prepared on the basis of any exact

15  survey?

16      A   No, sir.  It was picked off a topographic sheet.

17      Q   And it is simply an attempt to indicate the approx-

18  imate area that lies within one watershed and the approximate

19  area in the other, without any attempt at being specific as

20  to the acreage or area in either?

21      A   Yes.

22      MR. VEEDER:  As long as it is within the blue line.

23      THE COURT:  All right, it is just a general indication

24  that the watershed line runs across there somewhere within, I

25  suppose, a mile or so.

Case 3:51-cv-01247-JO-SBC   Document 4574   Filed 09/24/63   PageID.29050   Page 34 of 139

B

Z18

MR. SACHSE:  In other words, your Honor, we are accepting the watershed line of the United States, for the record.

MR. VEEDER:  Thank you.

MR. SACHSE:  May I have Exhibit I for Identification, please.

Q  Now, Mr. Yackey, I will direct your attention to Fallbrook's Exhibit I for Identification.  Do you recognize that exhibit?

A  Yes, I do.

Q  Do you know who prepared it and where it was prepared?

A  Yes, it was prepared in the offices of the Fallbrook Public Utility District.  Mr. Engleman brought it up to date. It was done under my direction.

Q  Generally again, without the detail description, what does Exhibit I for Identification depict?

A  It is a master working layout of the Fallbrook Public Utility District as it was prior to 1958 annexation, showing the major sources of water, the reservoirs, the major pipe lines and some of the larger valve installations.

Q  Does it show the pipe lines by which the District takes water from the Santa Margarita River?

A  Yes.

Q  Does it show the pipe lines by which the District obtains water from the Colorado River Aqueduct?

A  Yes.

Q  Does it show your principal distribution lines within the District?

A  Yes.

Q  Is it accurate, to the best of your knowledge?

A  Yes, it is.

MR. SACHSE:  I will offer in evidence Fallbrook's Exhibit I, your Honor.

MR. VEEDER:  I would like to ask a few questions.

VOIR DIRE EXAMINATION

BY MR. VEEDER:

Q  I notice that this is drawn in December, 1947.  When did you go to work for the Fallbrook Public Utility District?

A  In May, 1946.

Q  And this was prepared under your direction?

A  It was.

Q  Now, I note this:  Information compiled from maps, surveys and data in files of Fallbrook Public Utility District. Leroy I. Weeks, Rodney-Stokes Company.  Fallbrook office of U. S. Soil Conservation and San Diego County agencies.  What does that mean?  Is that the source of the data?

A  That means that in 1946 it was made as a composite sheet from a number of sources.  It is not necessarily strictly accurate in some of the property lines or some of the

Yackey - Direct

8283

B

Z20

B3

1    small roads in the outlying areas.

2         Q  And you don't purport it to be accurate in regard

3    to locations?

4         A  No, not in so far as I mentioned.

5         Q  Can you read this part of it off?  I am pointing now

6    to the legend block up here.

7         A  I can't read it from here; no, sir.

8         Q  Can you read it from here?

9         A  I might.  It is fairly faint because it has been

10   printed out several times.  I can tell you what it covers

11   briefly.

12        Q  I am not interested particularly.  But is this

13   legible?

14        A  It is not too legible, no.

15        MR. VEEDER:  Your Honor, it is impossible to read the

16   legend on the map.  I have no objection if it is offered just

17   for location purposes.  But it can't be read.  I notice also

18   on it location of proposed dam and proposed pipe line, proposed

19   high water mark.  We have some green spots on it.  Those

20   haven't been identified.

21        Is this strictly a location matter?

22        MR. SACHSE:  The map is offered so that I can locate and

23   identify those other items you have just referred to--

24   reservoirs, pipe lines, et cetera.

25        MR. VEEDER:  Again, if they are just blue lines for

B

Z21

1    purposes of location in general terms, I have no objection to

2    it.

3        THE COURT:  It is offered merely to show the pipe line

4    systems from the Santa Margarita, from the San Luis Rey, from

5    the Aqueduct?

6        MR. SACHSE:  And the internal main distribution lines

7    and the small internal reservoirs in green.

8        THE COURT:  That is the sole purpose?

9        MR. SACHSE:  That is the sole purpose.

10       MR. VEEDER:  It doesn't in any way locate, for example,

11   here is what appears to be a take-out for a residence-- the

12   exact location is not in any sense intended to be shown?

13       MR. SACHSE:  You mean these small meter connections?

14       MR. VEEDER:  Yes.

15       MR. SACHSE:  They are immaterial to the case and could

16   be completely disregarded.

17       THE COURT:  All right.  You are just interested in the

18   major pipe lines and the reservoirs.

19       MR. VEEDER:  Just for location purposes.

20       THE COURT:  All right.

21       MR. VEEDER:  I have no objection.

22       THE COURT:  Received in evidence, Exhibit I.

23       (Map marked Defendant Fallbrook's Exhibit I in Evidence.)

24   BY MR. SACHSE:

25       Q  This exhibit does not represent every foot of pipe

1    operated by the District, does it?

2         A  No.

3         THE COURT:  You had better supply a better legend to
4    go with it.

5         MR. SACHSE:  I am sorry, I didn't realize that it was
6    such a poor printing, and we will.

7         THE WITNESS:  Mr. Sachse, those are old identifications,
8    things like hotel locations, schools and churches.

9         MR. SACHSE:  Or they could be reproduced-- typed and
10   pasted on.

11        THE COURT:  They are not material?

12        THE WITNESS:  No, sir.

13        THE COURT:  If that upper legend is only as to schools,
14   et cetera, they are not material, you may forget about it.
15   The lower legend is readable, is it not?

16        MR. SACHSE:  The lower legend appears to be.

17        THE COURT:  No, I mean right above the arrow, right in
18   there-- is that legible?

19        THE WITNESS:  Yes.

20        MR. SACHSE:  Well, there are two lines that are not
21   legible.  I will undertake to have this replaced.

22        THE COURT:  All right.

23        MR. SACHSE:  Even the schools might be useful to point
24   your finger and say next to somebody's school.

25        THE COURT:  All right.

B

Z23

BY MR. SACHSE:

Q   Generally speaking, what are the black lines?

A   The heavy black lines generally indicate the main pipe lines of the District.

Q   Starting at the south near the San Luis Rey River and immediately above Section 14, Township 10 South, Range 3 West, I see a black line starting in.  Will you tell us what that line is?

A   You asked about a minute ago.  Right above Section 14 is the 80-acre San Luis Rey River well field of the Fallbrook Public Utility District with seven wells, with pipe lines running from them to a central pipe line that goes on up to the west to a sand trap reservoir and sand trap and then goes on into Fallbrook through a 24-inch line to what is known as a gird pumping plant.

MR. VEEDER: Now, I want to interpose this objection, your Honor-- I just consulted with Mr. Stahlman on this matter-- that the area in the San Luis Rey pumping basin is presently under injunction.

MR. SACHSE:  So stipulated, and I am going to have him testify to it in a minute.

MR. VEEDER:  I object on the grounds that this phase of the testimony is incompetent, irrelevant and immaterial and has nothing whatever to do with the litigation involving the Santa Margarita River.

B.

Z24

1          MR. SACHSE:  So stipulated.  I would like it as part

2   of an explanation to his Honor as to what the map is.  I

3   don't want him to think that there are lines on the map that

4   he doesn't understand.  I will stipulate we are enjoined.  I

5   am going to have it testified to in a moment.

6          MR. VEEDER:  Thank you.

7          THE COURT:  Overruled.

8   BY MR. SACHSE:

9          Q  Will you please continue, Mr. Yackey?

10         A  The 24-inch line that runs from the sand trap

11  reservoir to the gird pumping plant, and at the gird pumping

12  plant is a booster station that pumps the water from the San

13  Luis Rey River through two 12-inch lines to the first green

14  circle on the map, which is the Lange Reservoir.

15         THE COURT:  Where is that?

16         THE WITNESS:  That is in-- not right in the middle of

17  the sheet; it is right to the left of Section 28.

18         MR. SACHSE:  It overlies the mark of Section 27.

19         THE COURT:  All right.

20         MR. SACHSE:  Mr. Yackey, stop there, please.

21         MR. VEEDER:  Your Honor, I would like to have read back,

22  if I may, this description about the taking of water from the

23  San Luis Rey River.

24         THE COURT:  What materiality is it?

25         MR. VEEDER:  I think it is important in this litigation

B

Z25

1   to show the Fallbrook Public Utility District has a history

2   of going out and trying to get water from people and invading

3   their rights, and I think it is very important.  Before you

4   castigate me, your Honor--

5   THE COURT:  Well, you wanted to keep it out a minute

6   ago.

7   MR. VEEDER:  I want to show this, though.

8   THE COURT:  You have changed your mind.  I overruled

9   your objection.  I let it in.  It is in the record.

10   MR. VEEDER:  But he testified that they were taking

11   water, he said that they take San Luis Rey water up through

12   here.  I don't believe it is true.

13   MR. SACHSE:  If you will let me ask the next question--

14   MR. VEEDER:  I would like to have it read back.

15   THE COURT:  Read it, Mr. Reporter.

16   (The Reporter read the answer of the witness as follows:)

17   "A You asked about a minute ago.  Right

18   above Section 14 is the 80-acre San Luis Rey

19   well field of the Fallbrook Public Utility

20   District with seven wells, with pipe lines

21   running from them to a central pipe line that

22   goes on up to the west to a sand trap reservoir

23   and sand trap and then goes on into Fallbrook

24   through a 24-inch line to what is known as a

25   Gird pumping plant."

B

Z26

1          MR. VEEDER:  May I inquire, is it dismantled or is it

2    not?

3          MR. SACHSE:  If you will wait a minute, I will bring

4    this out for you.

5          THE COURT:  Go ahead.

6    BY MR. SACHSE:

7          Q  Is that pipe line that you have just described still

8    in existence?

9          A  It is.

10         Q  The wells are still there?

11         A  Yes.

12         MR. VEEDER:  Are they connected?

13         THE COURT:  Mr. Veeder, please refrain until Mr. Sachse

14   completes his examination.

15   BY MR. SACHSE:

16         Q  Are the wells pumping?

17         A  No.

18         Q  When did they cease pumping?

19         A  A temporary injunction stopped us pumping in 1953,

20   but under that injunction we pumped briefly in the winter of

21   1954 and there has been no pumping since then.

22         Q  How is it that under the temporary injunction you

23   pumped briefly in the winter of 1954?

24         A  The judge who ruled on the case said that whenever

25   the water in the ten sample wells in the San Luis Rey Basin

1  averaged above a certain depth we were permitted to pump, and

2  at the time that we did the pumping there was water available.

3        THE COURT:  And that injunction is permanent now instead

4  of temporary?

5        THE WITNESS:  No, your Honor; it is still temporary.

6        MR. SACHSE:  It is still temporary.

7        Q  Now, there has been no water diversion then from the

8  San Luis Rey system since 1954?

9        A  No, sir.

10       Q  Now, Mr. Yackey, will you please proceed northward

11  along the easterly side of the map and I see a heavy black

12  line that is broken and marked "Under construction."  Will you

13  tell the Court what that represents?

14       A  If I may interrupt a second, a San Luis Rey system

15  pumped to Lange Reservoir, which is in the heart of the system

16  and is at an elevation of approximately 771 feet.  It is sort

17  of a key place to orient yourself from Fallbrook is why I

18  would like to mention it again.  This reservoir like most of

19  the other reservoirs at Fallbrook has a pressure zone that

20  they serve, and the reservoirs that are next higher can be

21  supplied from that reservoir by automatic pumps that turn on

22  and pump it uphill, or in case there is a shortage in any one

23  reservoir as the water gets to the bottom of the reservoir

24  valves automatically open, which permits it to fill from the

25  higher reservoir.  I wanted to mention that because the Lange

1   Reservoir was the reservoir which we supplied from the San Luis

2   Rey system.  Now, inasmuch as we have been supplying from the

3   San Luis Rey system, we have been supplying all the systems--

4           MR. VEEDER:  I object to anything further, your Honor.

5   Let's go ahead by question and answer.

6           MR. SACHSE:  Yes, Mr. Yackey, please answer now.

7           THE WITNESS:  All right.

8   BY MR. SACHSE:

9           Q  Describe the heavy black broken line marked "Under

10  construction."

11          A  The heavy black line marked "Under construction" with

12  a 20-inch mark above it is a new line going in now that will

13  connect the new San Diego No. 2 Aqueduct to Fallbrook, bringing

14  it into the Lange system directly west of the take-off.

15          Q  Now, moving still north along the same edge of the

16  District, will you tell the Court what the next heavy black

17  line which starts out right under the word "Rainbow" represents?

18          A  The line starting under the word "Rainbow" and going

19  to the west and southwest shows a 24-inch aqueduct built and

20  owned by the Fallbrook Public Utility District that brings

21  water from the present two pipes of the No. 1 aqueduct of the

22  San Diego County Water Authority into the Fallbrook Public

23  Utility District and into it at the Red Mountain area.

24          Q  Now, immediately above that line in Section 15 I

25  see a small triangular shaped green area marked on the map

B

Z29

1    "Red Mountain Reservoir."  Will you tell the Court what that

2    is and what its relationship is to the aqueduct line that you

3    have just described?

4         A   That is a reservoir that the District has which has

5    approximately 150 working acre-feet.  The total capacity is a

6    little over 200 acre-feet, but below 150 it is non-usable

7    because it is below the outlet.  The outlet is at 1057 feet

8    elevation, and high water is approximately 1092.  That acts

9    as a terminal storage reservoir for a few days operation to

10   equalize load on that 24-inch aqueduct coming in from Rainbow.

11   The Red Mountain Reservoir is the highest reservoir in the

12   District system and by having it float on that 24-inch line

13   to Rainbow we are able to distribute out of that to the rest

14   of the District.

15        THE COURT:  Before you go further, I notice down in the

16   center there where it says "Tract C."

17        MR. SACHSE:  Those two parallel lines you mean, your

18   Honor?

19        THE COURT:  No, that line there-- is that a roadway?

20        THE WITNESS:  Yes, sir.

21        THE COURT:  And the line further over to the right is

22   another roadway running up north is a roadway?

23        THE WITNESS:  Yes, sir; that is 395.

24        THE COURT:  Which is 395?

25        THE WITNESS:  The heavy one.

Yackey - Direct

B

Z30

1        THE COURT:  You are in the way.  I can't see.

2        THE WITNESS:  I am sorry.  The heavy one here is to the

3   right of the word "Tract C."

4        THE COURT:  That is 395?

5        THE WITNESS:  Yes.

6        MR. VEEDER:  What did you say Tract C was?

7        THE WITNESS:  That is part of the Monserat nomenclature.

8   It is a real estate nomenclature that is of no importance to

9   our district.

10       THE COURT:  395 runs clear down off the map at the

11  botoom?

12       THEWITNESS:  Yes, sir; it comes out just above the

13  words "M-102."

14       THE COURT:  All right.

15       MR. VEEDER:  And Tract C has nothing to do with this;

16  is that what you said?

17       THE WITNESS:  No, sir, it has not.

18       MR. SACHSE:  Trst C is not even in the watershed.

19       Q  Now, Mr. Yackey, moving westward toward the top of

20  the map, I will direct your attention to a solid black line

21  running approximately from the Santa Margarita River southward

22  into the District.  Will you tell us what that line represents?

23       A  There are two lines, and the one to the right that

24  you indicated is the existing 12-inch line from our sump

25  pumping station in the Santa Margarita River on into Fallbrook.

B

Z31

1        Q  That is the line, is it not, through which the

2   District diverts all of the Santa Margarita River water which

3   it is taking?

4        A  Presently, yes, sir.

5        THE COURT:  What is the broken line beside it?

6        MR. VEEDER:  Your Honor, I object to that on the grounds

7   that we served interrogatories upon the Fallbrook Public Utility

8   District asking them to give us the description of their

9   alleged proposed system to divert water from the Santa Margarita

10  system.  We were advised that the plans had not been completed.

11  I think that that broken line which indicates a proposed system

12  certainly is not an element in the case.

13       THE COURT:  Wouldn't you like to have me know that the

14  map shows that they have a 36-inch line right up to the Santa

15  Margarita River proposed?  Wouldn't you like that in the record?

16       MR. VEEDER:  I would like to have it the way I am

17  putting it as a great big dream and they couldn't even answer

18  an interrogatory about it.

19       THE COURT:  Well, the record shows, whether they answered

20  it or not.  The objection is overruled.

21       Is this 36-inch line what you proposed to use to take

22  the water you are going to get from the Santa Margarita River,

23  if, as and when you get it; is that right?

24       THE WITNESS:  It is one of the suggested ideas, yes.

25       THE COURT:  One of the suggested ideas?

B

Z32

1       THE WITNESS:  Yes, sir.  There has been no approval on

2    it.  There has been no solification of the idea.  It is just

3    the indicated proposal.

4       MR. VEEDER:  I have no objection to that.

5       THE COURT:  That would be the biggest line you have so

6    far?  You have only 24-inch lines over to the San Diego

7    Aqueduct; is that right?

8       THE WITNESS:  Yes, we have a 24-inch, and we are

9    putting in a 20.

10      THE COURT:  This 36-inch line will be bigger than any

11   of the rest?

12      THE WITNESS:  Yes, because it will be handling peak

13   loads and it will have to be of maximum capacity.

14      THE COURT:  Is this tied in with the proposal for a dam,

15   or is it there independent of a dam?

16      THE WITNESS:  No, sir, that would be tied in with the dam,

17   because some sort of dam is going to have to be had for the

18   Fallbrook Public Utility District to have--

19      MR. VEEDER:  I object to these speeches by Mr. Yackey,

20   your Honor.

21      THE COURT:  The statement that a dam will have to be

22   had will go out.

23      Go ahead, Mr. Sachse.

24      Do you gentlemen want a recess or do you want to continue?

25      MR. SACHSE:  Let's take a recess, your Honor.

B

Z33

1          THE COURT:  All right, take a short recess.

2          (Recess.)

3  BY MR. SACHSE:

4          Q  Will you please describe the operation of the water

5  supply system of the District, limiting yourself now to the

6  Colorado River supply?

7          A  There are two pipelines coming from the Colorado

8  system into Fallbrook.  The first one is a 16-inch line that

9  comes through the middle of Fallbrook, and our takeoff point is

10  at this station.

11          Q  Indicating a station immediately--

12          A  Above Lange Reservoir.

13          Q  --above Lange Reservoir?

14          A  Yes.  And we have a takeoff for a meter house at

15  that point.  We have a meter house slightly below Red Mountain

16  Dam where this line crosses our system.  Either one or those

17  two or both can put water into the District.  However,--

18          Q  Just a moment, please.

19          MR. VEEDER:  Either one?

20  BY MR. SACHSE:

21          Q  Is that a District line?

22          A  No, that is a line owned by the San Diego County

23  Water Authority and provided by them.

24          THE COURT:  That is a 16-inch line?

25          THE WITNESS:  That is a 16-inch line; yes, sir.

B

Z34

1          THE COURT:  You said either one.  What other line are

2   you talking about?

3          THE WITNESS:  There are two stations.  One station right

4   north of the Lange Reservoir, one of them right south of the

5   Red Mountain Reservoir.  There are two outlets on that pipe.

6   The other line takes off at approximately the same place on

7   the aqueduct line, parallels the 16-inch line-- that is our

8   24-inch, and it terminates just below Red Mountain Reservoir

9   in a construction detail we call the "Bird Cage."  The meter

10  for that line is at the San Diego County Water Authority line

11  at Rainbow.

12  BY MR. SACHSE:

13          Q  Who owns that line?

14          A  Fallbrook Public Utility District owns that line

15  entirely.  The Water Authority will supply us water through

16  any of those three connections.  However, the connections--

17          Q  We are limited to our entitlement.

18          A  However, on the 16-inch line, it is owned by the

19  Water Authority, we can only take out of that line our entitle-

20  ment supply as a rule because the same line is used to supply

21  Oceanside, and in order to get their entitlement we are cut

22  down to our entitlement.

23          Q  How is the supply which the District can obtain from

24  the Water Authority limited?

25          MR. VEEDER:  I object; that calls for a legal conclusion.

1    MR. SACHSE:  I don't think it calls for a legal con-

2  clusion.  It calls for an operating conclusion.  This is the

3  gentleman who runs the system.

4    THE COURT:  Do you object to having some general in-

5  formation put into the record about how the aqueduct works?

6    MR. VEEDER:  I have no objection to general information.

7  I think if they have a contract--

8    MR. SACHSE:  We don't have a contract.

9    MR. VEEDER:  --with the MWD or if they have an arrange-

10  ment with the MWD or if it is some law that provides them with

11  water, it should be a matter of record instead of an explana-

12  tion by an engineer.

13    MR. SACHSE:  I will withdraw the question.  I will then

14  ask the Court to take judicial notice of the existence of the

15  Water Authority Act of the State of California, and I will get

16  it for you during the noon recess out of West Code, which

17  prescribes a mechanical method of allocating the water among

18  the member agencies.  If you don't want to hear it, you can

19  look it up.  Now if you want to have it explained, I will be

20  glad to have it explained.

21    THE COURT:  What do you call it?

22    MR. SACHSE:  Water Authority Act of the State of

23  California, which contains special statutory provisions--

24    THE COURT:  And how you become a member of that?

25    MR. SACHSE:  And how the water is allocated among

Yackey - Direct

B
Z36

1    members.  It is set forth in the statute.

2              THE COURT:  Who are members?  Any public utility

3    district?

4              MR. VEEDER:  What is the citation?

5              MR. SACHSE:  I can't give it to you right offhand, Mr.

6    Veeder.

7              THE COURT:  Who are members-- cities, public utility

8    districts?

9              MR. SACHSE:  The members-- I don't know that I can

10   name them all offhand-- are the City of San Diego, Helix

11   Irrigation District, South Bay Irrigation District, City of

12   Escondido, Escondido Mutual Water Company, City of Oceanside,

13   City of Carlsbad, Buena Colorado Irrigation District, Rainbow

14   Municipal Water District; in other words, they are entirely

15   public agencies of one kind or another.

16             THE COURT:  They are members?

17             MR. SACHSE:  They are members.

18             THE COURT:  And then there is some formula set forth in

19   the statute?

20             MR. SACHSE:  As to what share each member gets.

21             THE COURT:  And the members are named therein?

22             MR. SACHSE:  No.  The original act is a general statute,

23   and additional members come in.  The members aren't all named

24   in the act.

25             MR. VEEDER:  I think this man can testify to how much

1  water is delivered.  But how the Fallbrook Public Utility

2  District gets the water from there under a legal authority is

3  certainly a legal question.

4       MR. SACHSE:  I am asking the Court now to take judicial

5  notice of the statutes of California, which the Court can do,

6  and I will bring it in here.  If you would like to have it

7  briefly explained, I will have it done.

8       THE COURT:  Is Fallbrook Public Utility District a

9  member under this statute?

10       THE WITNESS: Yes, sir.

11       THE COURT:  And has been a member since when?

12       THE WITNESS: 1946.

13       MR. SACHSE:  We were a charter member of the Authority,

14  your Honor.

15       THE WITNESS:  Yes.

16       THE COURT:  And you get water from the Colorado River

17  by virtue of that membership?

18       THE WITNESS:  Yes.

19       MR. VEEDER:  What is the name of that again?

20       MR. SACHSE:  San Diego County Water Authority, and the

21  statute is known as the Water Authority Act.

22       MR. VEEDER:  And you don't have the citation?

23       MR. SACHSE:  I am sorry, I can't give it to you offhand.

24       THE COURT:  For my information, is there a maximum set

25  as to the amount of water you can get?

B

Z38

1     THE WITNESS:  Yes, sir.

2     THE COURT:  Is that set by the statute?

3     THE WITNESS:  Yes, sir.

4     THE COURT:  What is that maximum?

5     THE WITNESS:  Our share is in proportion to the amount

6 of moneys that we have paid in to the Water Authority.

7     MR. VEEDER:  I can't hear that.

8     MR. SACHSE: Start over again, please.

9     THE WITNESS:  Our share of--

10     MR. SACHSE:  Everyone's share.

11     THE WITNESS:  Anyone's share of water that they can get

12 through the San Diego County Water Authority is that portion

13 of the total amount which has been paid into the San Diego

14 County Water Authority that was paid by that district.  In

15 other words, the amount we have paid in by our District,

16 divided by the total amount paid into the Water Authority by

17 all agencies, determines our proportionate share of the Water

18 Authority available water.

19 BY MR. SACHSE:

20     Q  And how is that expressed, Mr. Yackey; in acre-feet

21 or in a percentage of flow or what method?

22     A  It is done in a percentage of flow, and it boils

23 down to an instantaneous rate in second-feet that we are

24 entitled to.

25     MR. VEEDER:  Percentage of flow of what?

1          MR. SACHSE:  The aqueduct of the San Diego County Water

2     Authority.

3          THE COURT:  Well, the first aqueduct, if I recall, has

4     two lines, has it not?

5          MR. SACHSE:  That is right, your Honor.

6          THE COURT:  Now they are building a second aqueduct

7     which will have one line?

8          MR. SACHSE:  Yes, your Honor.

9          THE COURT:  There will be three tubes eventually?

10         MR. SACHSE:  That is right.

11         THE COURT:  But presently there are two tubes?

12         MR. SACHSE:  That is right.

13         THE COURT:  How big are those first two tubes?

14         MR. SACHSE:  The total carrying capacity of the first

15    two tubes is approximately 200 cubic feet per second full and

16    running full.  The second one will be as big as the other two

17    put together.

18         THE COURT:  That will be 400?

19         MR. SACHSE:  No, that will be about 450.

20         THE WITNESS:  About 250.

21         MR. SACHSE:  About 250.  The total will be a little over

22    400.

23         THE COURT:  The first lines, then, were a hundred cubic

24    feet a second each?

25         THE WITNESS:  Approximately.

B

Z40

1        MR. SACHSE:  Not exactly.  The total of the two was

2   200, your Honor.

3        THE COURT:  And the third line now being built is a

4   much bigger one than the first one?

5        MR. SACHSE:  Slightly bigger.  It is about 250.

6        THE COURT:  It is bigger than the other two put to-

7   gether?

8        MR. SACHSE:  That's right.

9        THE COURT:  I understand that these districts get water

10   on the basis of how much money they pay in.  Therefore, is it

11   possible that some small district could have money and could

12   pay in a larger amount of money and get a larger percentage of

13   water than some larger district that couldn't afford it?

14        MR. SACHSE:  I would like to read the Authority, your

15   Honor.  May I state it briefly?  I realize I am not on the

16   stand.  If Mr. Veeder has objection, I will get at it in

17   another way.

18        Mr. Yackey's statement is technically correct.  What

19   is meant by paid in is that your total contribution toward

20   capital outlay of the District, as a rule of thumb we can say

21   that the share of each member agency represents the proportion

22   that the assessed valuation of that member agency bears to the

23   total assessed valuation of the Authority, because the amount

24   they had paid in by taxes is directly in relation to the

25   assessed value.  So while it is not literally true to say that

the share is based upon assessed value, for all practical pur-
poses as a rule of thum you can say that the share of the
City of San Diego equals the proportion of the total assessed
value of the Authority that is represented by the assessed
value of San Diego.  The share of Fallbrook represents the
proportion of the total assessed value of the Authority that
is represented by Fallbrook.

THE COURT:  What happens to new units that come in?

MR. SACHSE:  As each new unit comes in, it is charged
a fee.  It is required to make a back payment.

MR. VEEDER:  That is a share of the construction costs?

MR. SACHSE:  It is a share of the obligations that
have been paid.  For the future obligations, of course, it
keeps paying them.  They have to catch up with those that have
gone on before.

MR. VEEDER:  You pay your share of what has gone in
from the standpoint of costs of construction and then your
anticipatory costs?

MR. SACHSE:  That is right.

MR. STAHLMAN:  You pick that up over a period of years,
and then of course you pay proportionately to your assessed
valuation as time goes on.

MR. SACHSE:  In the future.

MR. STAHLMAN:  Yes.

MR. VEEDER:  And you reduce the obligation of the

B

Z42

1    others; is that right?

2         MR. SACHSE:  Yes, you spread it out amoong more people.

3         When we say the contribution paid, I want to be quite

4    sure you are not confused.  The money you pay for water to

5    the Authority has no effect on your entitlement.  It is only

6    the money you pay in taxes toward the capital operation.

7         THE COURT:  You are paying for your water as you take

8    it?

9         MR. SACHSE:  That is right.

10        MR. STAHLMAN:  The legislative act sets that out.

11        MR. SACHSE:  This is all in the statute, your Honor.

12        THE COURT:  Fallbrook then is a member of that San Diego

13   County Water Authority?

14        MR. SACHSE:  Yes.

15        THE COURT:  And its entitlement is approximately what?

16        MR. SACHSE:  That was my next question.

17        Q  Mr. Yackey, what is the entitlement at the present

18   time under the Water Authority Act of the Fallbrook Public

19   Utility District?

20        A  Last year it amounted to about 86 acre-feet a month,

21   and some months or some periods when one agency won't take

22   its entire entitlement there is some left over and that is

23   redivided among the other agencies.  So that I believe we

24   averaged about 1200 acre-feet last year on our entitlement

25   from the Water Authority.

THE COURT:  1200 acre feet?

THE WITNESS:  Yes, sir.

MR. SACHSE:  In a year.

THE WITNESS:  It runs from about 89 to 100 acre-feet a month.

THE COURT: You say "averaged."  You mean the aggregate last year was 1,200 acre-feet?

THE WITNESS:  Yes, the aggregate last year was about 1,200 acre-feet.

THE COURT:  All right.

BY MR. SACHSE:

Q  However, your entitlement is not expressed in terms of acre feet, is it?

A  No, sir; it is a percentage of flow.

Q  And what are the operating requirements of the Water Authority as to how you take this water?

A  Well, they insist that the districts take their water at a uniform rate; that you don't change the rate hourly, daily or in a matter of several days.  They would like to have you set it at a certain flow rate and maintain that rate steadily and if you want to change you have to give them a sufficient notice so that they can gradually change it, because they are running the pipe lines at full capacity and any fluctuation causes spills and troubles to their operations.

Q  Have you ever in the past obtained more water from

B

Z44

1    the Authority than your entitlement?

2        A   Yes, we have at various times secured a surplus

3    over our entitlement, and at other ti es when we couldn't

4    secure any more than our entitlement we have arranged to get

5    water from some of the other districts, some of the other

6    member agencies of the Water Authority that they would release

7    to us or that they, for a fee, would release to us.  For

8    instance, in the last few years we have needed water so badly

9    that we made arrangements with the City of San Diego to pay them

10   for the right to take some of their water.

11       Q   You said in the last few years.  Would you be a

12   little more specific as to when this arrangement with the City

13   of San Diego took place, and then tell us what it was?

14       A   For about three or four years we have had to get

15   water from the City of San Diego, and 1957 was the peak year

16   that we needed water and the dry year that there was no water

17   available from other sources for anybody in the County and that

18   year we paid the City of San Diego $50 an acre-foot for the

19   water that they released to us from their share of the aqueduct.

20       Q   That was in addition to the San DiegoWater Authority

21   charges?

22       A   Yes, that was in addition to that.  Well, no, that

23   included the San Diego County Water Authority charges, because

24   that was $50 we paid the City for that water out of our pipe

25   line.

B

Z45

THE COURT:  What would you ordinarily pay the Authority for the water?

THE WITNESS:  Right now we are paying $17, and for that portion that is used for irrigation we get a $3 refund, making it $14.  In 1957 we were paying $12 to the Authority.

BY MR. SACHSE:

Q  This recent change went into effect in July of last year?

A  Yes.

THE COURT:  You are paying $12 to the Authority, and San Diego charges you $50 an acre-foot to let you have some of their water?

THE WITNESS:  Yes, sir.  We had to get it from some place.

BY MR. SACHSE:

Q  Mr. Yackey, I am going to show you an exhibit that has been marked for identification Fallbrook's M.  Are you familiar with that exhibit?

A  Yes.

Q  Will you tell the Court and counsel what it is?

A  That shows the water deliveries to Fallbrook from the San Diego County Water Authority, starting with the first delivery in April, 1948, and concluding with the January, 1959, delivery.

THE COURT:  What are these figures-- acre-feet?

1      THE WITNESS:  These figures are in acre-feet, your

2  Honor.

3  BY MR. SACHSE:

4      Q  A moment ago you were describing the arrangement

5  with San Diego.  Do these figures include those purchases

6  from San Diego?

7      A  I haven't checked the critical ones, but I am

8  certain it does, because San Diego water was delivered to

9  Fallbrook Public Utility District through the San Diego County

10  Water Authority line.

11      Q  That is the point I wanted to make.  The purchases

12  from San Diego came from no different pipe line or no differ-

13  ent source, did they?

14      A  No, sir.

15      Q  In other words, they came right out of the aqueduct?

16      A  They came right out of the aqueduct.

17      Q  Where did you obtain these figures on Exhibit M for

18  Identification?

19      MR. VEEDER:  Calling your attention, counsel, before

20  going any further, that the figures that are given here are

21  signed by one Richard somebody.

22      MR. SACHSE:  Holmgren.

23      MR. VEEDER:  And which is certainly not this gentleman.

24      MR. SACHSE:  That is right.

25      Q  Where did you obtain these figures?

1    A   These were supplied by the general manager and chief

2   engineer of the San Diego County Water Authority-- Richard S.

3   Holmgren.

4    Q   Have you checked these figures against your records

5   of your purchases?

6    A   We have spot checked them and find they are correct.

7    Q   Do you believe these figures to be correct as to the

8   amount of water you have received from the San Diego County

9   Water Authority?

10    A   I do.

11   MR. SACHSE:   I offer in evidence Fallbrook's Exhibit M,

12   your Honor.

13   MR. VEEDER:   I object to this tabulation, your Honor,

14   and to all this data in regard to the receiving of water from

15   the San Diego County Authority.  I don't believe it has any

16   relevancy at all with regard to the issues in this case.  It

17   is totally irrelevant, incompetent and immaterial that they go

18   out and buy water from some other source.  I see no basis

19   whatever or any reason for this tabulation in this litigation.

20   THE COURT:   Most of what you say I agree with, but you

21   are not objecting on the basis of any foundation?

22   MR. VEEDER:   No, your Honor.  I say it is irrelevant.

23   THE COURT:   Most of what you say I agree with, except

24   that it does show importation; of course, not entirely into

25   the District.

B

z48

1          MR. SACHSE:  Not entirely in the watershed.

2          THE COURT:  Not entirely in the watershed, because

3    part of Fallbrook is in the watershed and part of it is out-

4    side.  But for whatever it is worth, I will overrule your

5    objection.  It might have some evidentiary value.

6          Fallbrook's Exhibit M received in evidence.

7          (Defendant Fallbrook's Exhibit M for Identification was

8    received in evidence.)

9    BY MR. SACHSE:

10         Q  Has the District ever failed to take its entitlement

11   from the San Diego County Water Authority?

12         A  Oh, there have been periods of a few weeks or a

13   month or two when we haven't taken Colorado water, but I would

14   say that that is during the heavy rains in the winter when we

15   had the line out for construction work or something of that

16   sort.  But generally I would say we have taken it at all times.

17         Q  Now I direct your attention to the District's water

18   supply from the Santa Margarita River.  You have already

19   testified that the solid black line shown on Exhibit I and

20   running north to the Santa Margarita River is the existing

21   line to that river.  Will you describe for the Court the

22   diversion works in the river itself as they now exist?

23         A  The river has about 15 or 20 feet of sand in it at

24   the point of our diversion plant, so we have thrown up a

25   small revetment and caused the formation of a sump that the

B

Z49

Yackey - Direct

1    Santa Margarita runs into, and from that sump we pump water

2    into this pipeline through two 200-horsepower deep well, high-

3    pressure type pumps that pump it directly into Fallbrook

4    through the 12-inch line.

5         Q  Going back to 1946 when you were first employed

6    by the District, was your diversion point at the same location

7    on the Santa Margarita River?

8         A  The diversion point was approximately the identical

9    point where we are now.

10        Q  And was the location of this sump you have described

11   at the same location or at a different location?

12        A  The location was the same.

13        Q  What about the pumping facilities in 1946?

14        A  They were different.

15        Q  Describe them, please.

16        A  When I took over in 1946 there had been a Diesel

17   engine down there with a generator to drive a small well pump

18   out in the river, and the Diesel engine had blown up and

19   they had put in an electric pump with a supply line from the

20   San Diego Gas & Electric, and that was in there pumping and

21   it was pumping up to Fallbrook through a six and seven-inch

22   pipe line-- part of it was six-inch and part of it was seven-

23   inch.

24

25

1    Q   Now, Mr. Yackey, what I want to do now-- I will

2  stop you right there-- is to have you tell us how the distri-

3  bution in the diversion system has changed since you took over

4  in '46 right on up.  What changes have been made up to date?

5    A   They had a lot of trouble when I came in with the

6  pumps and with the motor operation, so we took out the old

7  pumps and put in other pumps operated by gasoline engines.

8  And for the first year or two we operated various types of

9  pumps down there with this gas engine to pump the water up

10  into Fallbrook.

11    Q   Through what size line?

12    A   Through a line that existed at that time of a six

13  inch partway and a seven inch the rest of the way, and then--

14  that was because of the terrible shortage of equipment after

15  the war.  You couldn't get anything new or used that would

16  be suitable.  And that is why we used the gas engines.  Then,

17  when the shortage eased up, we changed the pumps and put in

18  one of the two pumps that we have in there now.  We, in the

19  meantime, tried several other pumps and motors, electric

20  motors, and we finally put in one of the pumps that we have

21  now and gradually replaced the pipe line into town.

22    Q   And when this replacement process was completed,

23  what was the size of the line?

24    A   Well, it was a 12-inch line.

25    Q   And that is the present line?

Yackey   Direct

C

Z17

8314

1    A  That is still the line that is there presently.

2    Q  And again, please, these present pumps, what size

3  are they?

4    A  At present down there the water is lifted directly

5  out of the sump and pumped into the 12-inch pipe line with

6  two 200-horsepower Peerless pumps.  We lift the water all

7  the way into Fallbrook at one stage, although after the 1953

8  temporary injunction on the San Luis Rey, in order to be able

9  to get increased peak capacity we installed a booster pump

10  out on what is known as the Point, which is about 1,000 feet

11  south of the Santa Margarita pumping station on a hill on the

12  12-inch line.  And we put that booster station in so that we

13  could increase the capacity of the taking out of the Santa

14  Margarita River.

15    Q  That booster pump to which you have just referred

16  is not at the river proper?

17    A  It is up on a hill above the river.

18    THE COURT:  Once the water gets in this 12-inch line

19  it comes out of the Santa Margarita River; the water runs

20  through the whole system?  It runs through the system that is

21  outside of the watershed line and the system inside of the

22  watershed line?

23    THE WITNESS:  Yes, sir.  It goes into the portion of

24  the system that is interconnected.

25

Yackey   Direct

8315

C

Z18

BY MR. SACHSE:

Q  Have you any devices or means of knowing the amount of your diversions from the Santa Margarita River?

A  Yes, we have a meter in the pumping line on the edge of Fallbrook.

MR. SACHSE:  May I have L, please.

Q  That meter is in the 12-inch line you just referred to that runs to Fallbrook from the river?

A  Yes.

Q  Does it measure all the water that is pumped from the river?

A  It measures all the water except for a couple of very small consumers that have been put on since the meter location was put in.

Q  I will hand you an exhibit that has been marked Fallbrook L for Identification and ask you if you are familiar with that exhibit.

A  Yes.

Q  Who prepared this tabulation?

A  It was done in our office under my supervision.

Q  And what does it purport to set forth?

A  It shows the diversions by months from the Santa Margarita River in acre-feet.

Q  And through what period of time?  For what period of time?

C

Z19

Yackey — Direct

8316

A   It covers 1948 through 1958.

Q   Now, from what source was these figures obtained?

A   These were taken from the meter I referred to and its predecessors in the pipe line.

Q   Predecessor meters, you mean?

A   Yes.

THE COURT:   This is based on Permit 30--

THE WITNESS:   7033.

THE COURT:  7033?

THE WITNESS:   Yes.

THE COURT:   And what does $2\frac{1}{2}$ cubic feet per second amount to in acre-feet?

THE WITNESS:   About 150 acre-feet a month or 1,800 acre-feet a year, approximately.

THE COURT:   $2\frac{1}{2}$ cubic feet--

THE WITNESS:   Per second.

THE COURT:   --equals what a month?

THE WITNESS:   About 150 acre feet a month.

THE COURT:   Per month.

MR. SACHSE:  Or 1,800 a year.

THE WITNESS:   1800 acre feet a year.

THE COURT:   Eighteen per year.

BY MR. SACHSE:

Q   Now, are these figures accurate to the best of your knowledge, Mr. Yackey?

Yackey - Direct

C

Z20

8317

A   They are.

Q   These figures have been required to be submitted to any other agencies?

A   Yes.   Over the years we have supplied them to a number of people.   The State of California got them every year during the period that our permit was in operation and before we got our license, and today there are a number of agencies that come in or write in and get these figures every year.

MR. SACHSE:   I offer in evidence Fallbrook's L for Identification.

MR. VEEDER:   I would like to ask a few questions on that.

THE COURT:   All right.


VOIR DIRE EXAMINATION

BY MR. VEEDER:

Q   Now, what is the source of these records?   What is the source of the figures that are set forth here?

A   Well, the last ones are from the meter that is in now, and the earlier figures are from the meters that were in before that meter was in.   And there were times, of course, when the meters were broken or out of repair, and there were some estimates.   But generally speaking, they were all metered.

C

Z21

Packey - Direct                                                                8518

1      Q  Could you tell us which of the areas were estimates?

2      A  No, I don't.  But I imagine it would be in early

3  years, because the last four or five years we have had one

4  meter in that has proven very satisfactory.

5      Q  Do your figures in the office of the Fallbrook Public

6  Utility District reflect the periods when you don't have

7  actual measurements but you are estimating?  Could we look

8  at your figures in the Fallbrook Public Utility District and

9  determine when you are estimating and when you have actual

10  meter readings?

11      A  I don't know.  As I say, it has been a number of

12  years since we had to do any of that estimating.  I could look

13  back and find out, but I imagine--

14      Q  Could you bring in for us to consider the meter

15  readings that you have?  I would like to have them brought in,

16  if I may.

17      MR. SACHSE:  We will bring them in.

18  BY MR. VEEDER:

19      Q  Now, I notice here that you have "Available Colo-

20  rado River Water taken in lieu."

21      MR. SACHSE:  I intended to inquire about it.  Go

22  ahead, Mr. Veeder.

23      MR. VEEDER:  Well, you made your offer.

24      MR. SACHSE:  Yes.

25      THE COURT:  What does it mean?

Yackey          Direct                                    8319

C

Z22

1          MR. SACHSE:  Explain the exhibit.  Go ahead.

2          THE COURT:  What does it mean?

3          THE WITNESS:  The California Legislature in its try-

4     ing to husband all the water possible in a state of natural

5     resources has been endeavoring to encourage the use of

6     imported water in order to save the local water sources

7     wherever possible.  And so some years ago they passed this

8     ruling that stated that if any agency that had an option of

9     taking its local appropriations or if they could take an

10    imported supply and would take the imported supply, that the

11    imported supply would be credited to their appropriative use

12    just the same as though they had taken the appropriative

13    water.  And on both the San Luis Rey and the Santa Margarita

14    we have been very careful whenever there was Colorado River

15    water available to do that.  And they said that we would lose

16    no appropriative standing by doing that.  So we have been

17    very careful to do that.

18         THE COURT:  What years does this apply to?  All these

19    years or--

20         THE WITNESS:  No, sir, to the available Colorado taken

21    in lieu is in addition to the figures shown on this sheet.

22         THE COURT:  For what years?  All years?

23         THE WITNESS:  Since we have been making the report

24    and we have taken Colorado water we have claimed in-lieu water

25    for any months that we didn't take, or any years that we didn't

C

Z23

1   take 1,800 acre feet.  In other words, if you look, for

2   example, at 1954-- February,March and April-- we didn't take

3   any water, because we had the pumps down for work on them.

4   Well, during those three months we took all in-lieu water,

5   so there would be 150 acre-feet a month we took those three

6   months.  Right now, the Santa Margarita has water in it,

7   but we are taking Colorado water whenever we can as a block

8   load and just calling on the Santa Margarita to pick up our

9   peak loads that we couldn't get an increase in the Colorado

10  fast enough to handle.  In other words, we take an even block

11  load of the Colorado and meet the peak requirements out of

12  the Santa Margarita.  If we had a possible line that we could

13  fluctuate on the Colorado, we would probably take a block

14  load on the Santa Margarita and meet our peaks with the

15  Colorado line.

16      MR. VEEDER:  I am going to object to the exhibit on

17  the grounds that it is obviously incomplete on the basis of

18  what the man has just got through saying; the available

19  Colorado River water taken in lieu.  It is impossible for me

20  to understand the measurements that are shown.  And I would

21  like to have the data that I have asked for.

22      MR. SACHSE:  We will bring them, Mr. Veeder.

23      MR. VEEDER:  I further object--

24      THE COURT:  Before you go ahead, what he said about

25  the in lieu has nothing to do with these figures.

C

Z24

1      MR. VEEDER:  I think that when we check--

2      THE COURT:  Isn't all of these figures at all.

3      MR. SACHSE:  He says they are metered figures.

4      THE COURT:  These are metered figures.  And he merely

5  put a flag down at the bottom that under state laws or

6  regulations they were told that if they took Colorado water,

7  what they took could be added to what they took from the

8  Santa Margarita to make up their appropriative use.  That

9  doesn't affect these figures.  Now, do you still object upon

10  the ground that these figures are--

11      MR. VEEDER:  I object, because I simply say that I

12  think there are additional data that I would like to check

13  back against them.  I am not sure they are accurate.  Maybe

14  proper cross-examination.

15      MR. SACHSE:  I submit, your Honor, that is cross-

16  examination.  I am going to bring him the originals.

17      MR. VEEDER:  All right.

18      MR. SACHSE:  He can have them.  I will bring them

19  tomorrow.

20      MR. VEEDER:  I also ask the legal conclusion in the

21  heading be stricken.

22      MR. SACHSE:  What be stricken, now?

23      MR. VEEDER:  "Diversion by months from the Santa

24  Margarita River under Permit No. 7033."  That is strictly

25  a legal conclusion, under permit 7033, and I ask that that be

C

Z25

1    deleted.

2           THE COURT:  Why is it a legal conclusion?

3           MR. VEEDER:  It is certainly a legal conclusion as to

4    whether or not they are entitled to take water throughout

5    the period that is shown here under Permit No. 7033.  I

6    think they are stealing the water, so I am going to object to

7    any reference that has the sanction of the State under Permit

8    No. 7033.  It is strictly a legal conclusion and should not

9    be part of the heading.

10           THE COURT:  Well, objection overruled.  If you want

11    your point reserved, you can argue it and make whatever

12    showing you want to.  We are not concerned about that.  The

13    exhibit is offered showing the number of acre-feet taken

14    from the river.  The objection is overruled.

15           MR. SACHSE:  Now, you want, Mr. Veeder, as I under-

16    stand it, the original meter sheets?

17           THE COURT:  L received in evidence.

18           MR. SACHSE:  And the pumpers' readings?

19           MR. VEEDER:  Yes, please.  Can we get those tomorrow?

20           MR. SACHSE:  Can we get those tomorrow, Mr. Engleman?

21           MR. ENGLEMAN:  For what period, Mr. Sachse?

22           MR. SACHSE:  A week.

23           MR. ENGLEMAN:  What type of basis, daily, monthly?

24           MR. SACHSE:  Whatever you have got, bring them in;

25    what you have got.  It just gives his engineers some work to

C

Z26

1    do.

2         THE COURT:  What did you make Exhibit L from?

3         MR. SACHSE:  From these-- Excuse me.

4         THE WITNESS:  Since the meters have been used, we used

5    the meter figures.

6         THE COURT:  What year was the meter put in?

7         THE WITNESS:  We have had a number of them in over the

8    years, and I don't recall exactly when each meter was put in.

9    But I would have to check back to 1948 to find out.  We kept

10   lots since '46, but--

11        MR. SACHSE:  Do you have anything else, your Honor?

12        THE COURT:  You have seets showing these meter readings?

13        THE WITNESS:  We have our pumpers.  We call them in

14   that take care of our pumps and diversion works.  They make

15   daily reports three or more times a day of the condition of

16   the reservoirs and the pumps and all the equipment and read

17   the meters.  And on these meters they read them once a day

18   at the same hour every morning.  They have been doing that

19   for a number of years.

20        THE COURT:  These meters show a quantitative flow as

21   to how much has gone through?  Or do they only show the actual

22   flow at the particular moment?

23        THE WITNESS:  They show a quantitative flow.  They

24   accumulate.

25        THE COURT:  What is the necessity of having them read

8324

C

Z27

1    every day?

2           THE WITNESS:  We found from experience that something

3    can come up to the line or stick or mass of moss or something

4    and get into the instrument and destroy its effectiveness;

5    so by checking it daily we have not over a day's outage on it.

6           THE COURT:  Those records, original records, that have

7    been kept are what you are going to bring in?

8           MR. SACHSE:  That is right, your Honor.

9           THE COURT:  What do you want to do, just some spot

10   checking, Mr. Veeder?

11          MR. VEEDER:  That is right.  I wanted to see how the

12   quantities of water correlate with the water that we think

13   is in the river, and I am extremely anxious to see the

14   relationship between overall uses in the Santa Margarita as

15   they relate to this tabulation.  I have no other way of

16   checking them, your Honor.

17          MR. SACHSE:  We have no objection to his having them

18   all, your Honor.

19          THE COURT:  All right.  We will adjourn until 2 o'clock.

20   I have a luncheon today.

21

22

23

24

25

C-2

Z28

SAN DIEGO, CALIFORNIA, FEBRUARY 12, 1959.  2:00 P. M.


MR. SACHSE:  Before we proceed with Mr. Yackey, your

Honor, I have had called to my attention another error, on

page 8135 of the transcript, line 1; reading:  "Waters, if

any, underlying their lands are not vagrant. . ."  The word

"not" should be deleted.  That is line 1, 8135.

MR. VEEDER:  Your Honor, I mentioned to your Honor

this morning that I had a motion in regard to certain of Mr.

Sachse's clients, and I would like to have the record show

they are now filed with the Clerk.  Copies will be distributed

to one and all.  I think Mr. Sachse now has a copy.

MR. SACHSE:  I have a copy.  I think this is important

enough, your Honor.  I agree with Mr. Veeder that it offers

a vehicle for a great many people.  However, I haven't had

time to go over it, and I think there are a couple of changes

in language I am going to suggest.  I wonder if we could

agree now, though, on a time when we could discuss this,

giving us a little time to be sure to check out we have our

right parties and give me an opportunity to comment on some of

this language.

MR. VEEDER:  I have certainly no objection to that,

and Mr. Sachse, if you have additional parties that should be

added to that motion, I would appreciate it.

MR. SACHSE:  Do you have any particular preference

8326

C2

Z29

1    when we do this?

2           MR. VEEDER:  No.  No.

3           MR. SACHSE:  Then, can we leave it that way, your

4    Honor:  I will work together with Mr. Veeder, get in touch

5    with him, tell him any additional parties I have, submit my

6    proposed changes to him; and if we get anywhere near together,

7    we will then ask your Honor to hear it?

8           THE COURT:  Allright.  It can be brought up at any

9    time.

10          MR. VEEDER:  I didn't hear.

11          THE COURT:  It can be brought up at any time.

12          MR. VEEDER: Yes, your Honor.  I think this:  That

13   there are other counsel with similar answers.  We will

14   simply file a supplemental motion and will try to get them

15   all in at the same time.

16          MR. SACHSE:  I had brought to my attention, your Honor,

17   one other error in a statement of mine in the record this

18   morning.  I described the Lange Reservoir as delineated on

19   Fallbrook's Exhibit I as being right on top of the numeral

20   of Section 27.  I am in error.  They are right on the numeral

21   of Section 29.  You can't read it, because it is in green.

22          MR. VEEDER:  You weren't under oath anyway.

23          MR. SACHSE:  I would like to correct that.

24          THE COURT:  All right.

25          MR. SACHSE:  And also for the record, to give the

8327

k C2

Z30

1    Court and Mr. Veeder the citation of County Water Authority

2    Act and the particular section thereof that governs prefer-

3    ential rights to water.  The County Water Authority Act is

4    Statutes of 1943, Chapter 545, Page 2090.  It is found in

5    West's Annotated Code, Water Code Appendix, Chapter 45, and

6    the particular section spelling out the preferential right is

7    Section 11.

8

9                          GEORGE F. YACKEY,

10   heretofore called and sworn, recalled as a witness in behalf

11   of Defendant Fallbrook Public Utility District, testified

12   further as follows:

13

14                   FURTHER DIRECT EXAMINATION

15   BY MR. SACHSE:

16          Q  Now, Mr. Yackey, do you have before you Exhibit L?

17          A  Yes, sir.

18          Q  I will direct your attention particularly to the

19   months of August, September and October, 1953, shown on

20   Exhibit L.  Will you locate them, please?

21          A  Yes, I have them.

22          Q  Is there any circumstance or condition in those

23   months that is different from the rest of the months indicated

24   in the exhibit, and if so, tell us what it is?

25          A  Yes.  During those months of that year the District

C2

Z31

1   had the San Diego County Authority release water above

2   Temecula Narrows from the Colorado line directly into Temecula

3   Creek so it flowed down Temecula Creek and on down the Santa

4   Margarita River to our pumping station where the District

5   diverted it.  As I recall, we ran it about six second-feet

6   down that channel at that time.

7       Q  On other words, the stream flow at that time was

8   increased by reason of discharges from the Colorado River

9   Aqueduct into the stream which the District attempted to take

10   out farther down?

11       A  That is right.

12       THE COURT:  That was released up somewhere between

13   near the Vail Ranch?

14       THE WITNESS:  On the Vail Ranch.

15       THE COURT:  On the Vail Ranch?

16       THE WITNESS: Above the 395 Highway crossing on the

17   Temecula Creek side.  It was done with the agreement of Mr.

18   Vail of the Vail Ranch and the Water Authority.

19       THE COURT:  All right.

20   BY MR. SACHSE:

21       Q  May I also direct your attention to the months of

22   August and September of 1958, as shown on Exhibit L, and will

23   you tell us if there is anything unusual about those figures

24   and what is unusual?

25       A  Well, those were the two months of this year when the

C2

Z32

1    contractor building the third barrel on the second aqueduct

2    of the County of San Diego Water Authority made the crossing

3    of the Temecula Creek and Murrieta Creek-- No, Temecula

4    Creek. And in order to get the pipe line deep enough they

5    had to dewater the river, and they put in a series of de-

6    watering pumps and pipe lines and, in effect, put in some

7    very large wells and pumped water down so there was an

8    increased flow available that normally wouldn't have been

9    there.

10   THE COURT: Well, was that why Fallbrook took more

11   water out those months?

12   THE WITNESS: It was why we were able to, your Honor.

13   We didn't get it all, but we were able to take more water.

14   See, we jumped in July from 77 on up to those two months,

15   then had to drop back again.

16   MR. SACHSE: May I have Exhibit K, please, Mr. Luddy.

17   MR. VEEDER: Now, we would like, your Honor, if we

18   could ask the Fallbrook Public Utility District to supply us

19   with their records of power costs for this pumping as a means

20   of cross-checking the quantity of water taken from the stream.

21   MR. SACHSE: We can give you the power bills.

22   MR. VEEDER: The power consumption is what we are talk-

23   ing about, the quantity of power that was utilized for pump-

24   ing.

25   MR. SACHSE: Those pumps are independently metered, and

C2

Z33

1   we can bring you the power bills for those meters, and we

2   will undertake to do so.

3       THE COURT:  All right.

4       MR. STAHLMAN:  May I make a suggestion?  The ledger

5   sheets of the power company are in evidence as an exhibit

6   in the condemnation action across the street.

7       MR. SACHSE:  That is a very good idea.  Can't we do

8   that instead of using Fallbrook's, Mr. Veeder?  Instead of

9   taking our originals?  I forgot.  Mr. Stahlman is right.

10  The original ledger sheets of the power company have been

11  photographed and introduced.  Thank you.  I forgot about it,

12  Mr. Stahlman.  Would those be satisfactory for you?

13      THE COURT:  Is that judgment final?

14      MR. STAHLMAN:  I beg your pardon?

15      THE COURT:  Is that judgment final across the street?

16      MR. STAHLMAN:  Yes, final.

17      THE COURT:  Then, those exhibits could be released.

18      MR. SACHSE:  They could be withdrawn, yes, your Honor.

19      MR. STAHLMAN:  I put them in.

20      (Discussion off the record.)

21      THE COURT:  What exhibit?

22      MR. SACHSE: Will those be sufficient for you, Mr.

23  Veeder?

24      MR. VEEDER:  I will look at them.  If not, I will let

25  you know.

C2

Z34

1          MR. SACHSE:  Look at them and let me know.

2          THE COURT:  What exhibit number is this?

3   BY MR. SACHSE:

4          Q  Mr. Yackey, I will direct your attention to

5   Fallbrook's K for Identification.  Are you familiar with that

6   exhibit?

7          A  Yes, I am.

8          Q  And where was it prepared and who prepared it?

9          A  Made in the Fallbrook Public Utility District

10  office, and I made the early part myself and since the

11  engineering staff have maintained it under my supervision.

12         Q  You supervised its preparation?

13         A  Yes.

14         Q  All right.  You are familiar with all phases of the

15  exhibit?

16         A  Yes.

17         Q  It is accurate to the best of your knowledge?

18         A  Yes.

19         Q  What do the yellow bars on the exhibit indicate?

20         A  The yellow bars indicate the water sales for each

21  month since 1940 on up to the present time.

22         Q  And are they scaled to a --

23         A  They are on there two scales and can be read across

24  the left-hand column as to what the figures are.

25         Q  Now, the left-hand column appears to have two scales

C2

Z35

1    on it: Acre feet and meters. Can you explain the difference

2    between the two?

3         A  Yes. The yellow bar graphs read from the acre

4    feet index, and the meter indication covers the thin black

5    line on the chart that is marked "Meters installed," and it

6    starts from the left and goes on up to the right.

7         THE COURT: It is the number of meters?

8         THE WITNESS: The number of meters installed each

9    month.

10        THE COURT: It starts out with about 250 on up to now

11   to about 1700, is that it?

12        THE WITNESS: Yes, sir, pretty close to 1800, I think

13   it is.

14   BY MR. SACHSE:

15        Q  And likewise, the water use, let us say for

16   December of 1940, as indicated, would be under 100 acre feet

17   and rising up to highs indicated of 1361 for September of

18   '55?

19        A  Right.

20        Q  I see also a line indicated "Yearly average." Can

21   you explain how that line is calculated?

22        A  Yes. It goes up in a series of steps, one step

23   covering each year. And that is the average amount of water

24   per month that was used in any one year. In other words, if

25   you take all the months of a year and add them together and

Yackey  Direct

8333

C2

Z36

1    divide by 12, you get that bar, bar form.

2        Q  Now, to the extreme right of the chart I notice

3    your yearly average line is continued with a designation

4    "Further estimates."  What is that?

5        A  Well, the purpose of this chart is not only to see

6    where we have been but to indicate where we are going so we

7    can prepare for it and we have in the tall blank bar graphs

8    for future years, we have estimated what the peak months

9    sales will be for each year and, likewise, have indicated

10   what the average for the year would be across the chart.

11       Q  Those, in other words, are your own engineering

12   estimates; they are not intended to be exactly your allocation

13   of the future?

14       A  Those are our prognostications as to what the use

15   will be.  If you will notice, on the right-hand column, I

16   think it is 1970, we reached a peak which was the time we

17   figured that our load curve would flatten off.  Now, with the

18   recent annexation, of course, this curve will have to be

19   modified.

20       MR. SACHSE:  I will offer in evidence Fallbrook's K

21   for Identification, your Honor.

22       MR. VEEDER:  I object on the grounds there is no

23   proper foundation.  There is nothing to show that the water is

24   from the Santa Margarita River, so the question as to the

25   relevancy is immediately raised.  The question as to the

C2

Z37

number of meters and the quantities of water which have been sold, there is absolutely no foundation for that. We don't know who got the water, the circumstances of the delivery of it, how it was delivered, the methods of delivery, records for delivery. Here we have a fine picture, but there is absolutely no foundation to support it. I object also on the grounds that there is complete lack of foundation in regard to the crystal ball approach that Mr. Yackey has attempted here. What in the world, how would you possibly conceive, what would be in his mind to come down the line with a series of numbers here? And what do they meant o anyone? There is absolutely no foundation for the exhibit, your Honor. I renew my objection.

MR. SACHSE: If the Court please--

THE COURT: Now, wait. If you rely on foundation, of course, I take it this exhibit is based on records of the District as to your water sales?

THE WITNESS: Yes, sir.

MR. VEEDER: I will have some others after we get by the foundation, your Honor.

THE COURT: If you object on the foundation, of course, there has to be some showing made. But that is not your real objection. The real objection is the materiality, isn't it?

MR. VEEDER: That is right.

THE COURT: Why don't you waive this foundation matter?

1       MR. VEEDER:  Well, your Honor, I don't like to piece-

2  meal a deal like this.  We don't know who got the water.  We

3  don't know where it was delivered.  We don't know that this is

4  Santa Margarita River water, to begin with.

5       MR. SACHSE:  I will concede it is not all Santa

6  Margarita water.  We just told you.

7       MR. VEEDER:  So I object on the grounds it is in-

8  competent, irrelevant, immaterial, and not tending to prove

9  any issue in the case, coupled with the question of founda-

10  tion.

11       MR. SACHSE:  Now, if your Honor please, on the founda-

12  tion, if Mr. Veeder wants a little more elaboration on where

13  this was obtained, I will give it to him.  But on this

14  materiality, your Honor pointed out this morning that the

15  exhibit, purchases from the San Diego Water Authority might

16  be material on the basis that it showed imports to the water-

17  shed.  I will invite your Honor's attention to the fact that

18  in our affirmative defenses we expressly allege that our

19  imports to the watershed are greatly in excess of our

20  diversions from the Santa Margarita River and that the return

21  flows from our imports are greatly in excess of our diversions

22  from the Santa Margarita River.  So on that one single basis,

23  regardless of weight-- your Honor may not give it much weight--

24  but on that single basis it is certainly material.

25       MR. VEEDER:  He has got a bear trap on each foot now.

C2

Z39

1      THE COURT: This is entirely different. What does this

2  prove?

3      MR. SACHSE: This proves the total water sold by the

4  District.

5      THE COURT: What difference does it make?

6      MR. SACHSE: Well, it makes this difference, your Honor:

7  That if you want the picture, we have given you what we took

8  from Colorado. We have given you, and now it is in evidence,

9  what we took from Santa Margarita River. The two parts are

10 there. This is the whole case. That is all.

11     MR. VEEDER: I think that term "the whole" is good.

12     MR. SACHSE: This is the total of what you have before

13 you in two tabulations. This is in graphic form. If you

14 feel that the graph is not necessary, it is before you already

15 in tabular form. All we have to do is add them up. So the

16 only new material involved in this exhibit that isn't in

17 evidence already is the total meter installations. That is

18 the only new material and the future prognostication.

19     MR. VEEDER: Oh, but, your Honor, now he is talking

20 about the quantity of water that will return from that yellow

21 picture there.

22     THE COURT: Oh, he is not talking about return.

23     MR. VEEDER: That is what he said.

24     THE COURT: No. No, he didn't. He said he referred

25 to some allegations in the answer about return. This has

C2

Z40

1    nothing to do with return.

2        MR. SACHSE:  This doesn't show return.

3        MR. VEEDER:  I know it doesn't.  Then, why does he

4    bring up the proposition that the assertion is made that by

5    reason of water sales the quantity of water returning to the

6    Santa Margarita River watershed is in excess of that diverted

7    away from it.  Now, I submit--

8        THE COURT:  He didn't say it that way.

9        MR. VEEDER:  I wish he would say it again, then,

10   because that is what I understood.

11       THE COURT:  He merely said these charts show what the

12   District did with the water it got from three sources:  From

13   the San Luis Rey, the Aqueduct, and from the Santa Margarita.

14       MR. VEEDER: But, your Honor, it doesn't show whether

15   it is in or outside the watershed.

16       THE COURT:  Right.  Right.  I don't think it proves

17   very much.  But I don't like this business of technical

18   objections based on lack of foundation.

19       MR. VEEDER:  Your Honor, I would feel this way:  That

20   as long as it is not reflective of anything in particular I

21   wouldn't worry very much.  Right down to here it is meaning-

22   less, but from here on out where he is prognosticating the

23   future--

24       MR. SACHSE:  I withdraw it, your Honor.  Let's make

25   Mr. Veeder happy.

C2

Z41

THE COURT:  Let me ask Mr. Veeder this:  You had a witness, Mr. Veeder, who did some prognosticating.

MR. VEEDER:  With some foundation, your Honor.

THE COURT:  What kind of foundation?

MR. VEEDER:  He is one of the finest, finest witnesses there ever was.

THE COURT:  He is familiar with the Base and familiar with the activities there, and he prognosticated how many gallons of water would be used per man and what the maximum number of men would be at this installation in time of emergency.  What is future planning but a little crystal ball reading?  And it is good or bad, depending on generally the man's background and what experiences he has had.  Now, here is the man who has been in charge of the activities of this District.  And he has never been as qualified from his experience in the District to tell you what he thinks they would use in water, if they had it available in the District, as probably Col. Robertson was to tell you what the Marines would use at Pendleton.

MR. VEEDER:  Then, I would like to ask a few questions on voir dire.  You have hurt me greatly, your Honor.  The Colonel really knows what he is talking about.

THE COURT:  Mr. Sachse says withdraw it.

MR. VEEDER:  All right, if he wants to withdraw, fine.

MR. SACHSE:  In fact, the more this goes on, your

C2

Z42

1    Honor, I think I am going to change my estimate of how long

2    it will take to present Fallbrook's case.

3         MR. VEEDER:  If you keep withdrawing them, it will

4    take very little time.

5         MR. SACHSE:  I think it will take us about until noon

6    tomorrow, because if Mr. Veeder doesn't want any evidence of

7    what Fallbrook does with its water or how it uses it, I

8    certainly am not a bit concerned with giving it to them.  I

9    thought it would help the Court and help Mr. Veeder to know

10   what the story is.  We will withdraw K.

11        MR. VEEDER:  Withdraw it?

12        MR. SACHSE:  It is withdrawn, Mr. Veeder, if it will

13   make you happy.  There is nothing to cross-examine on K.

14        Now, may I have Fallbrook's D, please.

15        MR. VEEDER:  Fallbrook's D?

16        MR. SACHSE: D.

17        Q  Mr. Yackey, I hand you an exhibit marked Fallbrook's

18   Exhibit D for Identification.  Will you please examine it and

19   tell us if you recognize it and what it is?

20        THE COURT:  Can we save some time?  It is a photostatic

21   copy of application 11586, and Permit No. 7033 issued pur-

22   suant thereto.

23        MR. SACHSE:  And License No. 4906 should also be

24   attached, your Honor. Doesn't your Honor's copy have the

25   license?

Z43

1    THE COURT:  Oh, yes, license. Which part of it is the

2    permit?

3        MR. SACHSE:  The permit appears on the--

4        THE COURT: Back side.

5        MR. SACHSE:  --back side of the application.  And the

6    license is a separate sheet.

7        THE COURT:  It is stipulated, Mr. Veeder, that the

8    photostatic copy may be used in lieu of the original?

9        MR. VEEDER:  It is not a proper copy, your Honor.  It

10   is not a photstatic copy of what was filed with the State, so

11   I object to it.

12       THE COURT:  In what respect is it not?

13       MR. VEEDER:  It is not a document that is with the

14   State if my records are correct.

15       THE COURT:  It says the typed signature on one part of

16   it.  The permit has the written signature of Hyatt, and the

17   license has the written signature.  Is that the only differ-

18   ence?

19       MR. VEEDER:  Oh, no.  No.  The document that I have

20   was photostated from Mr. Moskovitz's document and sent down.

21   It is different in quite a number of respects.

22       THE COURT:  Let me see it.

23       MR. VEEDER:  If your Honor will observe, there is a

24   penned alteration on the form and other revisions.  For

25   example, the original Application No. 11586 was filed for

C2

z44

1    domestic municipal uses only.  You will observe down there on

2    line 3, paragraph 3 a very material change there.

3         THE COURT:  Well, now, can we substitute the actual

4    photostatic copy of the original?  Let's have the record

5    show--

6         MR. SACHSE:  I have no objection.  Let's get this clear,

7    though, where we are with proof.  Well, Mr. Veeder's statement

8    is quite correct, your Honor.  If you will look at the top

9    of Fallbrook's D, you will see "Amended Application Received

10   dated December 22, 1946."  The reason that I am offering this

11   in evidence in this form is twofold.  First, this is the

12   application upon which the permit was granted.  In fact, it

13   is right on the same piece of paper.  The permit is a part,

14   a physical part of the application itself.  It is one sheet.

15   It is not the prior one.  It is this one that the permit

16   appears on.  Secondly, your Honor has ruled that you will not

17   go behind the action of the Water Rights Board.  If you do

18   choose to go behind the action of the Water Rights Board, Mr.

19   Veeder has a chance at his own leisure and in his own case to

20   introduce anything he wants.  Thirdly, the very document that

21   h e is complaining about and that your Honor just asked, can

22   we substitute, that is the original one with the penned or

23   penciled corrections.  It is already in the stipulated facts

24   of this case as a part of Mr. Veeder's exhibits attached to

25   the pre-trial stipulation of facts.  The exhibit that Fallbrook

C2

Z45

Yackey - Direct

1   tenders is the piece of paper on which we claim our rights.

2   Nothing went before it.  Now, if Mr. Veeder wants to put in

3   things that went before it and attempt to open up what

4   happened before, your Honor, of course, will have to rule on

5   it.

6        THE COURT: You say the piece of paper.  And the pece

7   of paper you rely upon, whatever it is, is the one with the

8   interlineation on it?

9        MR. SACHSE:  That is correct.  That is this one that

10  you have before you.

11       MR. VEEDER:  It is a different piece of paper.

12       MR. SACHSE:  No, your Honor, the piece of paper you

13  have before you is the one we rely on.

14       THE COURT:  This one, not the one that is marked

15  Fallbrook's D?

16       MR. SACHSE:  Yes, the one that is-- Oh, I beg your

17  pardon.  I didn't see which one you were waving.  The one I

18  rely on is Fallbrook's D, because Fallbrook's D, the physical

19  factors-- as you know, you don't photograph on both sides--

20  but this represents a single sheet of paper.  The next single

21  sheet of paper, the permit, is actually written onthe reverse

22  of a four-sheet piece of paper; and that is the piece of

23  paper the permit is written on.

24       THE COURT:  The permit is written on the back of a

25  sheet of paper.

C2

Z46

1        MR. SACHSE:  That has the application on the front.

2        THE COURT:  Without signature?  A copy of the applica-

3    tion?

4        MR. SACHSE:  That is correct.  It is written on the

5    back of the application form.

6        THE COURT: The fact it is written on the back doesn't

7    add anything to it.  It is based upon the application that was

8    filed and amended in writing, is it not?

9        MR. SACHSE:  That is correct.

10       THE COURT:  Well, to show the true facts, whatever

11   they are worth, I don't attach any particular significance

12   to the matter.  Why don't we use the copy that shows the

13   interlineation?

14       MR. SACHSE:  You can use them all, your Honor.  In

15   fact, as I say, the copy that shows the interlineation is

16   before your Honor already.  It is in the pre-trial stipulation

17   of facts attached as an exhibit.  I agreed to it.  I just

18   don't want it substituted for this one which is what Mr.

19   Veeder wants.  You may have to determine.  I will concede

20   he can argue.

21       THE COURT:  Why don't you want to substitute it?

22       MR. SACHSE:  This is our permit, not the prior one.

23   This is our permit.  The other one has no permit.  Mr. Veeder's

24   sheet of paper hasn't got a permit.

25       MR. VEEDER: I have additional objections, your Honor.

C2

Z47

8544

1   THE COURT;  Then, if I receive your exhibit into

2   evidence, it will go into evidence solely as your permit.

3   MR. SACHSE:  That is correct. But I feel that your

4   Honor doesn't have facts before you, because a permit refers

5   to the application as you readily see.  You must have before

6   you to know what a permit says the application on which the

7   permit was granted.  The permit alone is not complete.

8   THE COURT:  This permit says:  "This is to certify

9   that the application of which the foregoing is a true and

10  correct copy."

11  MR. SACHSE:  That is right.

12  THE COURT:  In other words, it doesn't purport to be

13  the original application.  ". . .has been considered and is

14  hereby approved subject to vested rights and the following

15  limitations and conditions."

16  MR. SACHSE:  That is correct.

17  THE COURT:  So actually what happened was they took

18  what they said purported to be a copy--

19  MR. SACHSE:  Of an amended application.

20  THE COURT:  And they put a permit on the back of it.

21  They didn't say this was the original application.

22  MR. SACHSE:  Oh, not at all.

23  THE COURT:  It is their view of what is a copy of the

24  original application.

25  MR. SACHSE:  That is correct.  I want to be sure you

C2

Z48

Yackey — Direct                                                                 8345

are correct--

THE COURT:  If those are all the true facts, then Mr. Sachse is right.

MR. VEEDER:  Well, but he doesn't show a complete application, and that is the problem here.

THE COURT:  Maybe he doesn't want to show one.  He can show his permits.  If you want to show the application, I will receive the application in evidence.

MR. VEEDER:  Your Honor, the thing that I am raising on all these matters as we go through is that here we have an offer of what is purported to be a copy of an application.

THE COURT:  That is all it purports to be is a copy.

MR. VEEDER:  But it is not complete.  There should be a map with it.

MR. SACHSE:  Mr. Veeder, I am not offering an application; I am offering a permit and a license.  It so happens physically that the permit is a part of an application.  If you want to tear the application off, tear it off.

MR. VEEDER:  I would like to tear it off.

MR. SACHSE:  That is satisfactory with me.  I have a license and a permit that can go in.

THE COURT:  You concede that the documents that Fallbrook has marked as D, whether you like it or not, is a copy of the permit and license which they got?

MR. VEEDER:  May I see the certificate on it, please,

1   sir?

2          THE COURT:  And if you do, then I will admit it as

3   evidence of their permit and license.

4          MR. SACHSE:  That is all I want.

5          THE COURT:  With the understanding that it is not the

6   original application and merely has a certificate which the

7   Water Board says that there is attached a copy of the applica-

8   tion.

9          MR. SACHSE:  That is absolutely correct, your Honor,

10  and it is spelled out.

11         MR. VEEDER:  Where is the original certificate, Franz?

12         MR. SACHSE:  What original certificate?

13         MR. VEEDER:  Is this a signed certificate?

14         MR. SACHSE:  This is the photograph of our license

15  signed Leslie C. Jopson.

16         THE COURT:  License and permit both signed?

17         MR. SACHSE:  License and permit.  It is not a certified

18  original.

19         THE COURT:  You have the original?

20         MR. SACHSE:  I have the original in our District files.

21  This is a photograph of our District file.

22         THE COURT:  You will be glad to exhibit the original

23  to him any time he wants to see it?

24         MR. SACHSE:  I will be glad to bring the original down

25  for Mr. Veeder to look at.

C2

Z50

1      MR. VEEDER:  Thank you.

2      THE COURT:  All right.

3      MR. VEEDER: This doesn't purport to be anything but--

4      MR. SACHSE:  Permit and a license.

5      THE WITNESS:  And a license.

6      MR. VEEDER:  Well, if it is properly certified, why,--

7      MR. SACHSE:  Wait a minute.  Are you asking me to get

8  it certified?

9      MR. VEEDER:  Well, if you bring me down the certificate

10  that is all I want.  I would like to see what it looks like.

11      MR. SACHSE:  This is a photograph. Do you want the

12  original, Mr. Veeder?

13      MR. VEEDER:  My own view on it is this, your Honor,

14  and it is very, very, very important in this lawsuit.

15      THE COURT:  You bring it down, and if it turns out that

16  this is not a copy, you can move to strike it.  Is that satis-

17  factory?

18      MR. VEEDER:  Fine.  That is all I want.

19      THE COURT:  Received in evidence as the permit and

20  license.  And there is attached to it what the Water Board says

21  purports to be a copy of the application.  And it is conceded

22  it is not the application itself.

23      MR. SACHSE:  I realize it is in and, again, why belabor

24  a dead horse; but this is coming up with my next exhibit.  And

25  I would like to point out to your Honor the pre-trial

1    stipulation of facts by Mr. Veeder, signed by him, admits this

2    license and permit were issued.

3         THE COURT:  Let's just keep the record straight as

4    we go along.  Go ahead, Mr. Sachse.

5         MR. SACHSE:  May I have Fallbrook's E for Identifica-

6    tion, please, Mr. Luddy.

7         Q  Mr. Yackey, I will hand you a document entitled

8    Fallbrook's E for Identification, which purports to be

9    amended application to appropriate unappropriated water,

10   No. 11587.

11        THE COURT:  No, it doesn't purport to be that.

12        MR. VEEDER:  That is right.

13        THE COURT:  It purports to be Permit No. 8511 to

14   which is attached what the Water Board says is a true copy

15   of the application.

16        MR. SACHSE:  I will accept the correction.  You are

17   right, your Honor.  Permit 8511 and to which is also attached

18   on the face order granting extension of time signed by the

19   executive officer of the State Water Rights Board.

20        THE COURT:  Any objection to this document as Permit

21   No. 8511?  Received as Exhibit E.

22        MR. SACHSE:  May I have now Exhibit F.

23        MR. VEEDER:  Mr. Sachse, you are going to bring down

24   those certified copies, are you not, for this, too?

25        MR. SACHSE:  I don't have certified copies.  I have

C3

Z52

1  originals, Mr. Veeder.  I will let you examine them.

2      MR. VEEDER:  The originals?

3      MR. SACHSE:  Yes.

4  And G, also I will need also, Mr. Luddy.

5      THE COURT:  What happened to--

6      MR. SACHSE:  They are in front of Mr. Yackey.

7      THE COURT:  What happened to my exhibit, my copy of the

8  exhibit?

9      MR. SACHSE:  I think Mr. Veeder carried yours away

10  with his own.

11      MR. VEEDER:  Did I purloin yours, your Honor?

12      THE COURT:  Yes, you took mine, Mr. Veeder.

13      MR. SACHSE:  D?

14      THE COURT: D.

15      THE CLERK:  D?  Where is mine?

16      MR. SACHSE: Here is yours.  That is his Honor's. And

17  there is L, D, and E.  Here, we are all straightened.

18      MR. VEEDER:  I think that is his Honor's.

19      MR. SACHSE:  No, he has got one.

20      THE COURT:  I have got E up here.  Is that what you

21  are talking about?

22      MR. SACHSE:  Oh, here they are.

23      I will now offer in evidence Fallbrook's Exhibit F,

24  being Permit No. 11356 of the State Water Rights Board, to

25  which is attached what purports to be a copy of Application

1   12178, and to which is attached order allowing change in point

2   of diversion.

3   THE COURT:  There is also an order amending permits

4   attached.

5   MR. SACHSE:  Pardon me.  Yes, order amending permits

6   and order allowing change in point of diversion, and permit.

7   MR. VEEDER:  Well, subject to the objection that I

8   have made and the understanding that I will see the originals--

9   MR. SACHSE:  I will bring you the originals.  But what

10  is the objection, Mr. Veeder, then, if you get them?

11  THE COURT:  I don't know what you mean, subject to

12  objection made.  The understanding was the originals would be

13  produced and if these weren't copies of the originals, you

14  can move to strike the copies.

15  MR. VEEDER:  Let it go at that.

16  THE COURT:  All right.  Fallbrook's F received in evi-

17  dence.

18  MR. SACHSE:  I now offer in evidence Fallbrook's G,

19  being Permit No. 11357 of the State Water Rights Board to

20  which is attached order amending permit and order allowing

21  change in point of diversion, and also what purports to be a

22  true copy of Application 12179.  It is with the same under-

23  standing; I will bring you the originals, Mr. Veeder.  I offer

24  this.

25  THE COURT:  G received in evidence with the same

Ce

Z54

1  stipulation as F; if this is not a true copy, counsel may then

2  move to strike.

3      MR. VEEDER:  I wanted an objection in the record in

4  regard to any of these permits which relate to the use of

5  water for the purposes of irrigation, of course, because it

6  is our view that the Public Utility District does not have the

7  power to appropriate water for that purpose; and on that basis,

8  I asked for a continuing objection this morning on any of

9  these materials where Fallbrook Public Utility District

10  purports to have, is asserting power to appropriate rights

11  to the use of water for the purposes of irrigation, on the

12  ground it is ultra vires, and has no power to undertake

13  appropriation of water for that purpose.

14      THE COURT:  Overruled.  And I will reserve for you the

15  right to make a motion to strike when we argue that matter

16  out.  If you want to, you can then move to strike any of the

17  exhibits at that time.

18      MR. VEEDER:  Thank you, your Honor.

19      THE COURT:  I want to hear some argument and discussion

20  on that problem when we get to it.

21      MR. SACHSE:  Now, may I have, Mr. Luddy, O, P, Q, R

22  and S.

23      I will offer in evidence Fallbrook's Exhibit O for

24  Identification, the same being a photographic copy of the

25  protest of the United States Navy to application 11518 of

Yackey - Direct                    8352

the Vail Company.

MR. VEEDER:  I object on the grounds it is incompetent, immaterial, not tending to prove a single issue in the case. We object to the Vail Company's building a dam.  And I submit it has not one thing in the world to do with this litigation.

MR. SACHSE:  I would like to be heard very briefly, your Honor, as to its materiality.

THE COURT:  First of all, Mr. Veeder, you don't raise any question about the use of the copy?

MR. VEEDER:  No.

THE COURT:  No foundation problem?

MR. VEEDER:  No.

THE COURT:  All right, Mr. Sachse.

MR. SACHSE:  It has two materialities, your Honor.  One is the one you commented upon yourself when I used the same documents, I referred to this document on cross-examination, that it may have some weight as an admission against interest. Your Honor indicated your lack of appreciation of that position.  It has something more important, though, for future exhibits.  I intend to introduce-- and I believe it is essential-- I intend to introduce a calculation, an exhibit, which has already been lodged-- Mr. Veeder has copies-- showing the percentage of water used by the Navy inside and outside the watershed.  One of the figures which I have had used by my engineers to double check the accuracy of our calculations are

C3

Z56

8353

1   the pumping figures for the years '42, '43, through '45, '46,

2   which your Honor will observe are a part of this very document,

3   that is, a document where the Navy says it took certain amounts

4   of water out of Camp Pendleton for those years.  It is

5   certainly admissible as impeachment or as substantiating data

6   for my Exhibit V.  I believe it is V, or V-1, which I intend

7   to offer shortly.

8         MR. VEEDER:  Well, your Honor, if that is what the

9   offer is made for, I certainly renew my objection to it; and

10   with the additional objection that there be no officer of the

11   United States of America who will be empowered, certainly,

12   to change the rights to the use of water, the claims of the

13   United States or its title to any rights.  I think the Utah

14   Power & Light Company as reported in 243 U.S. is one of the

15   leading cases on that; that certainly any statements or

16   admissions or declarations by any official could not possibly

17   affect our rights to title and interest in this lawsuit.  That,

18   of course, is the rule in United States vs. California or

19   California vs. the United States in 332 U.S. 19.

20         THE COURT:  What about a business record, though?  Here

21   is a document made contemporaneously in 1947 which showed

22   that in the year previously and the year before that listing

23   the amount of water used at Pendleton for military purposes

24   and the amount of water used upon the mesa as a Government

25   record made, apparently, from Government records.  Why doesn't

C3

Z57

Yackey   Direct                                                            8354

1    it have some evidentiary value?

2         MR. VEEDER:  I certainly don't think it is evidentiary

3    value for the reason that this man, whoever signed it-- I

4    don't know who signed that-- certainly had no power or

5    authority to come up with figures that could, in any way,

6    vary from the official figures.  Now, Mr.--

7         MR. SACHSE:  How do they vary?

8         THE COURT:  Where are the final figures?

9         MR. VEEDER:  The final figures are in the records from

10   us, and the point I make--

11        MR. SACHSE:  They may coincide.  Check them out.

12        MR. VEEDER:  If Mr. Sachse desires to attack our

13   figures-- he filed numerous interrogatories with your Honor

14   to which we made response, and I don't believe taking out a

15   piece of paper from a state agency has any materiality, any

16   relevancy, or that there is a proper foundation again for

17   this.  He has to show where those records came from.  He has

18   to show that they are accurate.  He has to show a great many

19   things.  Now, simply to go to a state record and come back

20   with a piece of paper with the objective of impeaching a

21   witness or, in some way, attacking our rights to the use of

22   water, I submit that there is absolutely no basis for it, and

23   it is totally without evidentiary value from the standpoint

24   that I just made, on the basis of the standpoint I just made.

25        THE COURT:  How do these figures check out with the

1  other figures on which you base—

2          MR. SACHSE:  The figures, your Honor, check out almost

3  to the dot with Mr. Worts's figures as set forth in Exhibits

4  44 and 49, the two bar graphs.

5          MR. VEEDER:  Then it is cumulative.

6          MR. SACHSE: These figures do not check out, drastically

7  do not check out with Exhibits 150 and 151 as produced by

8  Col. Robertson at the end of the case-- that is the fact--

9  end of the United States' case.

10         THE COURT:  All right.  Now, specifically what would

11 this tend to prove, Mr. Sachse, this Exhibit O?

12         MR. SACHSE:  Your Honor, I believe every objection

13 Mr. Veeder has made is one as to the weight.  If your Honor

14 chooses to tell me you are going to give it no weight, you

15 have a perfect right to do so.  What it tends to prove is

16 this--

17         THE COURT:  What does it tend to prove?

18         MR. SACHSE:  It is hard for me to say that without

19 having Exhibit V before you and Exhibit V Mr. Yackey is not

20 going to testify to.  But I intend to introduce into evidence--

21         THE COURT:  Let's forget about V.  Let's take one at

22 a time.  What does O tend to prove?

23         MR. SACHSE:  O tends to prove that Exhibit V, Mr.

24 Worts's figures are right, and that Col. Robertson's figures

25 are wrong.  And that the percentage of water used outside the

C3

Z59

9356

1   watershed by the United States is something in excess of

2   68% of their total pumping.  This substantiates Mr. Worts's

3   figures as distinct from Col. Robertson's figures.

4           THE COURT:  Then, you are, in substance, using this

5   to impeach Col. Robertson?

6           MR. SACHSE:  Correct.

7           MR. VEEDER:  I believe he has got the wrong Colonel,

8   myself.

9           MR. SACHSE: And to substantiate--

10           THE COURT:  Have you got the wrong Colonel?

11           MR. VEEDER:  I think you are picking on the wrong

12   Colonel.

13           MR. SACHSE: Col. Bowen; I beg your pardon.  That was

14   the last day of the trial.  It happened very fast.

15           They substantiate Exhibits 44 and 49; they contradict

16   Exhibits 150 and 151.  I don't recall the witnesses other

17   than Mr. Worts who testified to this now.

18           THE COURT:  You offer no proof as to who made the

19   report, though?

20           MR. SACHSE:  Nothing beyond the document itself.  The

21   document speaks for itself.  It is a Navy protest signed

22   by the Commandant representing the command, Eleventh Naval

23   District.

24           THE COURT:  Who was the Commandant?  It is signed A. K.

25   Fogg, whoever he was.

MR. SACHSE:  He was the Commandant, wasn't he?  Or Public Works Officer.  I don't know.

COL. BOWEN:  Public Works Officer.

THE COURT:  The objection is sustained.  You can't estop the Government. Estoppel doesn't run against the United States.  You have got it marked.  Might as well sustain the objection and have it over with.

MR. SACHSE:  All right, your Honor.  I am going to make similar offers and do them very swiftly, because I concede frankly your ruling should be the same, if that is the ruling?

THE COURT:  Yes.

MR. SACHSE:  I am going to offer Fallbrook's P for Identification, the same being the protest to the United States Navy to application of the Santa Margarita Mutual Water Company.

THE COURT:  And do you offer it to prove the same sort of thing?

MR. SACHSE:  Same purposes.  It has the same tabulation on it.  It is just cumulative.

THE COURT:  Same objection, Mr. Veeder?

MR. VEEDER: Yes, your Honor.  I want a continuing objection on all of them.

THE COURT:  The objection is sustained.

MR. SACHSE:  I offer Fallbrook's Q for Identification,

C3

Z61

Yackey  Direct                                        8358

1    the same being protest of the United States Navy to applica-

2    cation 11586 of the Fallbrook Public Utility District.

3         MR. VEEDER: Well, now, Mr. Sachse, let's just back

4    up here for a second.  You are certainly not offering the

5    filing by Mr. Agnew for the same purpose as you stated you

6    are offering the thing signed by Mr. Fogg, are you?

7         MR. SACHSE:  This isn't by Mr. Agnew.  You have the

8    wrong one, Mr. Veeder.  Fallbrook's Q is signed by J. B.

9    Odendorf, Commandant, Eleventh Naval District, Fallbrook's Q.

10        THE COURT:  Same objection?

11        MR. VEEDER:  Yes, same objection.

12        THE COURT:  Offer it for the same purpose?  Same

13   objection?  Same ruling.

14        MR. SACHSE:  It has just been called to my attention--

15   I had better, for the record, clarify one thing.  I am not

16   offering this to estop anybody; I am offering this to impeach.

17   But you still feel it is immaterial for impeachment?

18        THE COURT:  How could you impeach Col. Bowen by what--

19   somebody who puts a stamp under his name as Commandant would

20   say?

21        MR. SACHSE:  I can impeach an exhibit, not a witness.

22   I can show that an exhibit is incorrect in exactly the same

23   way that Mr. Veeder attempted to show that calculations were

24   incorrect by having another man calculate acreage.

25        THE COURT:  There are things I let you do in these

C3

Z62

1    documents.  I would let you on cross-examination of Col.

2    Bowen say, "Did you have access to these documents?  Did you

3    consider them?  And if you did, how does it happen that your

4    figures are different from these figures?"  But to put these

5    in evidence and say that because somebody filed these that that

6    impeaches another witness or contradicts him, I don't follow

7    that.

8         MR. SACHSE:  They are still marked for identification.

9    Possibly we will go at it that way later, then.  The ruling

10   is the same then, your Honor?

11        THE COURT:  As to Q, yes.

12        MR. SACHSE:  Then, I am going to offer Fallbrook's R

13   for Identification, protest of the United States Navy to

14   Application 12179, in this case signed by David Agnew,

15   Special Assistant to the Attorney General.

16        MR. VEEDER:  That is what I was alluding to.  You

17   were not making this from the standpoint of impeachment or

18   anything like that?  This is a part of the record?

19        MR. SACHSE:  The sole purpose for R would be for its

20   value as an admission against interest.  That would be the

21   sole purpose for R.

22        MR. VEEDER:  I renew that objection; admission against

23   interest.

24        THE COURT:  What objection do you renew?  You haven't

25   made it yet.

C3

Z63

1       MR. VEEDER:  I make the same objection to R and S as
2    I do to the Q and R on the grounds that certainly Agnew
3    couldn't make an admission against interest which would
4    conceivably affect the rights and interests of the United
5    States of America.

6       THE COURT:  You probably couldn't do it this way.  He
7    was a counsel in this case.  I think he appeared in this
8    court.

9       MR. SACHSE:  He did.

10      MR. VEEDER:  Yes.

11      THE COURT:  Had he made it in a courtroom, I might
12   take a different view of it.  But having made it in some
13   filing elsewhere, I will sustain your objection.

14      MR. SACHSE:  I will make the same offer as to Exhibit S,
15   protest signed by Mr. Agnew to Fallbrook's application 12179.

16      THE COURT:  And your point is--

17      MR. SACHSE:  The same point, your Honor.

18      THE COURT:  --Agnew filed tis and didn't talk about
19   any appropriative or prescriptive rights the Government might
20   have?

21      MR. SACHSE:  Yes, your Honor.

22      THE COURT:  The objection is sustained, same grounds.

23      MR. SACHSE:  Excuse me just one moment, your Honor.
24   I will take a look at my notes here.

25      Q  Now, Mr. Yackey, what is the extent of your personal

Ce

Z64

1   familiarity with the Santa Margarita River?

2       A  Well, since the District has been taking water from

3   it since 1946, I have had practically daily contact with it.

4   I have examined the river minutely from the Temecula Narrows

5   down to the Naval boundary line, the Government boundary line.

6   I have read innumerable reports about it in the District files.

7   I have constantly checked the reports of F. E. Green, and

8   when they came out later in the U.S.G.S. I have observed them.

9   I have explored the river with the idea of its best use for

10  Fallbrook and, generally, I think I am quite familiar with

11  that portion of it, that is, especially between the Temecula

12  Narrows and the Government boundary line.

13      Q  Would you describe the stream between the Temecula

14  Narrows and the Naval Ammunition Depot as to its surface

15  characteristics, what it looks like, what kind of stream it

16  is?

17      A  It is a very narrow channel.  Most of the time the

18  stream flows over bare rock.  At the most, there are very, very

19  few, very small pockets-- that won't hold, I imagine, over

20  25 or 30 acre feet of water-- and in some places it is just a

21  very steep ribbon-like canyon.  The fall is material through

22  it, and it is fed, after it reaches the railroad canyon

23  narrows, the river itself is fed by several other streams

24  from the south and from the north, and they contribute to the

25  stream.  The river gets down in the summertimes, in the spring

C3

Z65

1   and summer and early fall, to a very small trickle.

2   MR. VEEDER:  I am going to object to this, your Honor.

3   It goes beyond the inquiry.

4   MR. SACHSE:  I don't think it does.  I will ask another

5   question, then.

6   Q  Will you tell us what you have observed as to the

7   surface flow of the river in the same stretch?

8   A  Well, I have noticed the flow in the summer for

9   months at a time getting down to a few hundredths of a second-

10  foot, which means just a few gallons a minute.  In fact, I

11  have noticed the fords that you cross with automobiles being

12  bone dry for periods of time.  And at other times I have

13  noticed that a few hours after a heavy rain reaching up to

14  practically astronomical figures, 4,500, 5,000 cubic feet per

15  second.  The stream will go along at a very modest rate,

16  very small rate, and then it will have a sudden rain storm

17  and it will pick up a volume quite rapidly and hold that

18  volume for just a couple or a few hours, two or three hours

19  at the most, and then drops down again very rapidly.  It is

20  one of very, very great flash floods.

21  Q  May I again direct your attention to an exhibit

22  marked Fallbrook's Exhibit U for Identification.  Are you

23  familiar with that exhibit?

24  A  Yes.

25  Q  Do you know who prepared it?

C3

z66

A  Who prepared it?  The Fallbrook Public Utility District officers under my direction.

Q  Will you describe that exhibit to us, please?

A  That is a chart showing the daily average flow, the average flows for each day for the period of December 16 to March the 31st, 1951, and '52.  It shows--

Q  Before you interpret the exhibit, some more explanation.  The bars colored red on the Exhibit then indicate average daily flow, is that correct?

A  That the amount of water that flowed down in that day.

Q  And the numbers that run along the bottom, those are the days of the month-- 16, 17, 18, and so on?

A  Yes.

Q  You can approach the exhibit if you want to.

And the scale on the left-hand side, that is a scale on which one inch equals what?

A  One inch equals ten cubic feet per second.  One inch equals 20 cubic feet per second.

Q  From what source did you obtain this data?

THE COURT:  Wait a minute.  One inch equals 20 cubic feet?  Where do you get one inch?

THE WITNESS:  One vertical inch.

THE COURT:  Oh, the big scale.

MR. SACHSE:  On the big scale, yes, your Honor.  Those

C3

Z67

1    are small reproductions which you have.

2            THE COURT:  All right.

3    BY MR. SACHSE:

4        Q  My last question was:  Where did you obtain the

5    information from which this exhibit was drawn, Mr. Yackey?

6        A  From the daily figures of F. E. Green, hydrographer

7    on the Santa Margarita River.

8        Q  Did you check those against any other runoff figures

9    for the river?

10       A  Well, they are reflected later in the U.S.G.S.

11   figures, because U.S.G.S. uses those.

12           THE COURT:  Where are Green's figures?  Are they

13   published?

14           MR. SACHSE:  Green, your Honor, is the man who has

15   been testified to here earlier by Col. Bowen and Mr. Stahlman

16   as being the paid hydrographer by the United States and the

17   Vail Company.  They shared the expense of him.

18           THE COURT:  Yes.  Where does he get his figures?

19           THE WITNESS:  Each month he brings in a copy of the

20   figures for the previous month and leaves them with our office.

21   These are at the Fallbrook Gaging Station, right north of

22   Fallbrook.

23           MR. SACHSE:  That is the next question I wanted to ask.

24       Q  At what gage are these figures taken?

25       A  These are taken at the Fallbrook Gaging Station

1    right north of Fallbrook.

2         Q  And that would be the gage that is designated

3    Santa Margarita River near Fallbrook?

4         A  Yes.

5         MR. SACHSE: Excuse me for a moment.

6         (Discussion off the record.)

7         THE COURT:  It is obvious what you are getting to.

8         MR. SACHSE:  Could we check?

9         THE COURT:  It is obvious it is in the record what

10   gauge it is.

11        MR. SACHSE:  I want to refer in the record to this

12   Government exhibit that has those tabulations.

13        It is 23.

14        Q  Mr. Yackey, I will hand you the United States

15   Exhibit 23, being the United States Geological Survey runoff

16   figures for the Santa Margarita River gage near Fallbrook.

17   Please examine it and tell us if that is the same gage that

18   you are referring to in Exhibit U.

19        A  It appears to be the same place.

20        THE COURT:  I don't understand this.  This column on

21   the left says:  "Cubic Feet Per Second."  This isn't the

22   total amount of water that flowed by on each of these basins?

23        THE WITNESS:  No, this is the rate of flow.

24        THE COURT:  At what particular segment of the day?

25        THE WITNESS:  They took it every hour of the day, and

1   add them all up and then divide by 24 hours, and they get the

2   average flow which a--

3        THE COURT: Average or mean?  We have called it mean

4   heretofore.

5        THE WITNESS:  It would be mean in this respect.

6        THE COURT:  What is it, average or mean?

7        THE WITNESS:  It is an average in this case.  It is

8   an average and a mean in this case, because it is divided by

9   the 24.  It is divided equally.

10       MR. SACHSE:  It is indicated in exactly that manner,

11  your Honor, on Government's Exhibit 23,  if you will refer

12  to--

13       THE COURT:  In other words, you have used the figures--

14       MR. SACHSE:  Same figures, yes.

15       THE COURT:  -- out of 23 and drawn a chart to demon-

16  strate it?

17       MR. SACHSE:  If you take the same dailies you will

18  find the same figures.  It is a chart form.

19       THE WITNESS:  Actually, it is a hypothetical figure,

20  because to get a figure of, say, 20 second-feet you might have

21  had as low as two or three second feet.  You might have

22  jumped up to two or three hundred second feet in that same

23  period of time.  But this is breaking it down to one unit,

24  whereas we could go a step farther and do it by hours if we

25  wanted, or by minutes.  But this is breaking down what is

C3

Z70

1    usually shown in a monthly chart into a daily chart, chart

2    by days.

3    BY MR. SACHSE:

4        Q   Now, Mr. Yackey, let's start at the extreme left

5    of the chart.   And with the scale of one inch equaling 20

6    cubic feet per second, will you give us your interpretation

7    of that chart, of the flow of the stream for the 16th of

8    December through the 29th?

9        MR. VEEDER:   Now, this is not in evidence, yet.

10       MR. SACHSE:   No.

11       MR. VEEDER:   And I am going to object until the offer

12   is made.

13       MR. SACHSE:   I will make the offer.

14       Q   Is this accurate to the best of your knowledge, Mr.

15   Yackey?

16       A   It is.

17       Q   And this chart does, to the best of your knowledge,

18   reflect the average daily flow of the Santa Margarita River

19   at the Fallbrook gage for the period 16 December, 1951,

20   through 31 March, 1952?

21       A   It does.

22       Q   In a graphic form?

23       A   It does.

24       MR. SACHSE:   I will offer it in evidence, your Honor.

25       MR. VEEDER:   Well, I know what I have to do, and I

C3

Z71

1   have got a duty.  I have to object to this thing.

2          THE COURT:  Well, object.

3          MR. VEEDER:  No proper foundation, your Honor.  **There**

4   **is no showing.**  If he said that it came from the U.S.G.S.

5   records, I might agree with him.  He says it comes from some

6   records of F. E. Green who happens to be an employee of the

7   United States of America and who should never have given them

8   the data to begin with; but--

9          THE COURT:  The witness tells me, or at least Mr.

10  Sachse said, that it has been taken from your Exhibit 23;

11  the same figures are in your Exhibit 23.

12         MR. VEEDER:  If he wants to backup and start again and

13  say that he knows that these are the exact figures from our

14  Exhibit 23, I think then he has a proper foundation.  But the

15  testimony that I heard was that this daily came from F. E.

16  Green and was not from the U.S.G.S. records.

17         MR. SACHSE:  I don't know.  If I have given the Court

18  the wrong impression that I said these are exactly the

19  figures of U.S.G.S., I don't know.  I thought the question

20  I asked Mr. Yackey was they had been checked against the

21  U.S.G.S. figures and do they jibe.  That was what I was

22  attempting.

23         THE COURT:  You made this from figures Mr. Green

24  supplied your office?

25         THE WITNESS:  Yes.

C3

Z72

1  THE COURT: And you checked Mr. Green's figures as

2  supplied to you with the figures in Exhibit 23?

3  THE WITNESS: I don't remember. It has been a number

4  of years since I did this, and I don't remember at the time.

5  But it is my understanding that the U.S.G.S. uses F. E.

6  Green's figures, because they are the only ones that are

7  taken down there.

8  THE COURT: You have Mr. Green's figures available

9  that this was based upon?

10  THE WITNESS: Yes.

11  THE COURT: It could be brought in?

12  THE WITNESS: Yes, sir.

13  MR. VEEDER: I dislike being technical on this thing,

14  your Honor, but I do think that this could be sufficiently

15  important so that if he wants to check it back against Exhibit

16  23, fine. I haven't had a chance to do it, and I don't know.

17  MR. SACHSE: Suppose he brings in Mr. Green's figures?

18  THE COURT: Suppose he brings in Mr. Green's figures?

19  MR. VEEDER: It suits me. I have always wondered

20  what he was doing with them.

21  THE COURT: Suppose he brings in Mr. Green's figures?

22  MR. VEEDER: Let him bring them in. I would like to

23  look at it.

24  MR. SACHSE: We will bring them in.

25  THE COURT: He was employed by the Government and the

Ce

Z73

1    Vail Company to make-- his figures are used by the U.S.

2    Geological Survey for their calculations.  You have put

3    calculations in evidence here which are based on Mr. Green's

4    figures in part.  How can you deny the basic material?

5         MR. VEEDER:  I would hate to say how I can deny that,

6    your Honor.  We found that a great many times they are in

7    error.  I have no objection to a bar graph.  I simply say

8    that if it was based on the U. S. G. S. material, it would

9    be one thing.  If based on some figures that we haven't seen,

10   we would like to see them.

11        MR. SACHSE:  We will bring them in, Mr. Veeder.

12        THE COURT:  Bring them in.

13        MR. SACHSE:  Can we take a recess, your Honor?

14        THE COURT:  Yes.

15        (Recess.)

16

17

18

19

20

21

22

23

24

25

MR. SACHSE:  Your Honor, I think the last status of this was that there was an offer and our offer to produce the Green figures and no ruling on the offer.

MR. VEEDER:  I would like to ask one or two questions, if I may now.

VOIR DIRE EXAMINATION

BY MR. VEEDER:

Q  You referred to the exhibit of the United States of America No. 23 and stated that that was the same gauging station from which you received the figures from Mr. F. E. Green; is that correct?

A  Up to the time that the new gauging station was put in, that was my understanding, yes.

Q  In other words, the Plaintiff's Exhibit No. 23 is not reflective of the measurements of the Fallbrook gauging station which was in operation when you got these figures; is that right?

MR. SACHSE:  I don't understand that question. Plaintiff's Exhibit No. 23, Mr. Veeder, is reflective of two different locations of a gauging station.

MR. VEEDER:  That is correct.

MR. SACHSE:  Would you spell out to the witness which of the two locations you are referring to?

BY MR. VEEDER:

Q  Are the figures you are using, Mr. Yackey, figures

D

A  2

1   that were taken from the Fallbrook gauging station prior to the

2   time it was moved within the Naval enclave?

3       A  Yes, on the original site that has been used since

4   1925.

5       Q  Yes.

6       A  Yes.

7       Q  And that is the gauging station to which you had

8   reference?

9       A  That is the gauging station we got the figures from

10  Mr. F. E. Green.

11      Q  And is not from the present U.S.G.S. gauging station?

12      A  No.

13      Q  Is that correct?

14      A  That is my understanding, yes.

15  THE COURT:  When was it moved?

16  MR. VEEDER:  When was it moved?  1956, I think it was.

17  MR. SACHSE:  These figures are for 1951.

18  THE COURT:  These are for 1951-52.

19  MR. VEEDER:  I am just inquiring where they came from.

20      Q  Now Mr. F. E. Green gave you those figures that you

21  are there using; is that right?

22      A  Yes.

23  MR. VEEDER:  I renew my objection, your Honor.

24  As I understand it, you will produce the figures?

25  MR. SACHSE:  I will bring in the F. E. Green figures

1    tomorrow.

2         MR. VEEDER:  It is not from an official publication;

3    that is the primary objection.

4         MR. SACHSE:  Your Honor, regardless whether it is from

5    an official publication or not, I submit that I have qualified

6    Mr. Yackey as an expert.  The objection goes to the weight. If

7    his material is ill-chosen, if Mr. Veeder can find that there

8    are mistakes--

9         THE COURT:  Do you want to wait until he brings the

10   papers in, or do you want me to admit it subject to your  motion

11   to strike?

12        MR. VEEDER:  Then I object on the grounds that it is

13   heresay.

14        THE COURT:  Pass it over until the supporting material

15   is brought in.

16        MR. SACHSE:  May I interrogate about the exhibit then,

17   or shall we withhold everything?

18        MR. VEEDER:  I would just as soon have him interrogate

19   about the exhibit and just explain what it purports to show.

20   It may be stricken if the data is not good.

21        MR. SACHSE:  Fair enough.

22        Q  Let me direct your attention, Mr. Yackey, to the por-

23   tion of the exhibit covering the period 16 through 29 December.

24   What does the bar graph indicate as to the flow of the Santa

25   Margarita River at the Fallbrook gauge during that period?

1    A   It indicates that the average second foot flow, the

2  mean second-foot flow per day ran a little under ten second-

3  feet. On the 20th it came up slightly, and then on the 27th,

4  28th dropped down to about five second-feet, and then on the

5  29th came back to approximately eight or nine second-feet.

6    Q   What happened on the 30th and 31st of December 1951?

7    A   On the 30th we evidently had a rainstorm and the mean

8  flow for that next day, the 30th, went up to about 350 second-

9  feet. So what probably actually happened on that day was that

10  the cubic foot per second flow actually sky-rocketed and then

11  came back down giving an average, as I show here, of about 350

12  second-feet for that day.

13    MR. VEEDER:  Your Honor, I move to strike the statement

14  that it probably went up and it probably went down.

15    MR. SACHSE:  That may go out.  I will ask a question.

16    Q   That represents the average, does it not?

17    A   Yes, sir.

18    Q   So an average is arrived at by having a higher figure

19  and a lower figure, is it now?

20    A   Yes, that's right.

21    Q   Then what happened on the 31st?

22    A   The rain either let up some or stopped entirely and

23  the runoff of the river still kept around 240 second-feet for

24  that day, but it dropped down some.

25    Q   What was its average runoff for the next day, the 1st?

D
A: 5

1      A  It dropped way down again to about 40 second-feet and

2  the following day to about half of that, and then it practically

3  resumed for a matter of 9 days its former flow of about 10

4  second-feet.

5      THE COURT:  Well now wait a minute.

6      MR. SACHSE:  Just one or two things where the gaps are

7  in the bar graph, your Honor.

8      MR. VEEDER:  I object on the grounds that the exhibit

9  speaks for itself, if it is in evidence.

10      THE COURT:  What do you want to show?

11  BY MR. SACHSE:

12      Q  Mr. Yackey, referring to the bar graph now for the

13  17th of March, I observe that there is a break in the graph and

14  it is not continuous.  What does that break signify?

15      A  The break signifies that there was not room enough

16  on this drawing to make the bar graph.  For instance, on the--

17      THE COURT:  That isn't on the 17th; that is on the 16th.

18      MR. SACHSE:  That is on the 16th.  Pardon me.

19      THE WITNESS:  On the 16th the bar graph, if made in the

20  true scale, would have to have gone up above the sheet some $16\frac{1}{2}$

21  feet into the air.

22      THE COURT:  $16\frac{1}{2}$ feet on that scale?

23      THE WITNESS:  Yes, sir.  On this scale.

24  BY MR. SACHSE:

25      Q  On this scale to delineate a flow of 4,532 cubic feet

D

A    6

1    per second would take how high a column?

2        A   16½ feet above this.

3        MR. VEEDER:   Why doesn't he put the 16 feet on there?

4    think it would be very impressive.

5        THE COURT:   He is giving it the only way he can.   The

6    ceiling is not 16 feet high.   So he has to put it in by testi-

7    mony.

8    BY MR. SACHSE:

9        Q   Similarly, I observe numerals written at the columns

10    at the top of the page for the next date back--I guess that is

11    the 15th, the 14th--I see the large numeral 651.   What is that?

12        A   It was 651 cubic feet per second.

13        Q   And I see a smaller numeral above it, plus 2½ inches;

14    what does that mean?

15        A   That shows that the curve should have gone 2½ inches

16    above--the chart should have gone 2½ inches above.

17        Q   For the 8th of March the 719 then indicates cubic feet

18    per second?

19        A   Right.

20        Q   And the plus 6 inches means that the column should

21    have been 6 inches higher; is that right?

22        A   That is right.

23        MR. VEEDER:   We will accept it, your Honor.   I think your

24    Honor understands it.

25        THE COURT:   Well, you have the big one, the 16-foot one in.

1        Let's stop there.

2        BY MR. SACHSE:

3            Q   Now Mr. Yackey--resume your seat, please--why did

4        you select the water-year 1951-52 for this exhibit?

5            MR. VEEDER:   I object entirely.

6            THE COURT:   Overruled.

7            MR. VEEDER:   There is no basis for it.  Why in the world

8        did he select it?  It is high water year.  We stipulate to it.

9            THE COURT:   Overruled.

10           THE WITNESS:   We actually prepared this for another

11       purpose.  It was handy, so we used this one.

12           THE COURT:   For what purpose was it prepared?

13           THE WITNESS:   We used it in some talks, and we used this

14       one, I believe, in the Water Rights hearing, before the Water

15       Rights Board, because we were endeavoring to show that the flow

16       of the stream ordinarily is very small even in the winter, your

17       Honor.

18           MR. VEEDER:   I object to these speeches, your Honor.

19           THE COURT:   Overruled.

20           THE WITNESS:   Even in the winter it runs from around 5

21       or 10 second-feet, as you can see, day after day, and then you

22       get a rain and it goes up to these sky-rocket figures, showing

23       that it is the flood waters that really bring the water down.

24       That year, if I recall, the total amount of runoff was approxi-

25       mately 38,000 acre-feet, and those were the storms that produced

D

A 8

1    it--just about 5 big days, as you see; and the split storm on

2    the right, which only shows a matter of 2 days, periods of 2

3    days each, that accumulated about half the total runoff for that

4    whole year, which meant that without the flood waters of those

5    two periods you wouldn't have had any rain that year to speak of.

D    2

6        MR. VEEDER:  We wouldn't have had a drop of water at our

7    place if it hadn't come down at that time, your Honor.

8        MR. SACHSE:  May I continue my examination, your Honor.

9        THE COURT:  Continue Mr. Sachse.

10   BY MR. SACHSE:

11       Q  Now, during these periods of high runoff, such as

12   are reflected on Fallbrook's Exhibit U, has the Fallbrook

13   Public Utility District been able to increase its surface flow

14   diversions from the river?

15       MR. VEEDER:  I object to that your Honor.

16       May I have the question read.

17       (The reporter read the pending question)

18       MR. VEEDER:  Go ahead.

19       THE WITNESS:  No, because--

20   BY MR. SACHSE:

21       Q  Why not?

22       THE WITNESS:  Because at the time those heavy runoffs

23   occur they are produced by heavy rains and the grounds are all

24   soaked and there are no demands for water anywhere and the only

25   people who can gain anything by those heavy runoff periods during

1    the time it is raining and the ground is soaked and everything

2    is all wet would be--

3         MR. VEEDER:  I object to that as going beyond the scope

4    of the question.

5         MR. SACHSE:  I asked him why not, Mr. Veeder.

6         THE COURT:  Go ahead.

7         THE WITNESS:  Would be the people who had storage capa-

8    city that they could run that water into and store it.  That

9    is the first reason.

10        MR. VEEDER:  I move to strike it.

11        THE COURT:  Motion denied.  Go ahead.

12        THE WITNESS:  The second reason is that frequently at

13   times of those heavy runoffs the river gets so roiled and carries

14   so much silt and debris with it that you wouldn't to pump it

15   into a domestic tank without it settling out.  But the big reason

16   for it, of course, is that everything is wet and there is no

17   demand for water at that time, and unless you have a storage

18   reservoir to put it you haven't any use for it.

19        MR. VEEDER:  I move to strike the answer on the grounds

20   that he went far beyond the question, your Honor.  He said there

21   was no demand.  He knows very well that the Naval enclave is

22   immediately below and that there is a tremendous/for it to re-

         demand

23   charge our basin.  I move to strike the answer.

24        THE COURT:  The motion is denied.

25        MR. SACHSE:  I asked him why don't they pump it into the

1  of the United States, did not assert any prescriptive or appro-

2  priative rights when they filed this complaint; is that right?

3      MR. SACHSE:  Yes, your Honor.  It is a lengthy complaint.

4  It is a verified complaint, verified by Jerome O'Neill, who was

5  the chief of the family and manager of the ranch and is now

6  deceased.  He is a predecessor in title.  The complaint discloses

7  very clearly and sets forth or attempts to set forth, all the

8  rights to water of the Santa Margarita River which that Rancho

9  claimed against the Vail interests and others.  Now as such I

10  submit that this is not an admission against interests.  This is

11  an admission in derogation of title by a predecessor in title.

12      THE COURT:  Isn't the law clear that it is admissible?

13      MR. SACHSE:  The law is clear.

14      MR. VEEDER:  Your Honor, I think the law to which he is

15  alluding has no relevancy here at all.  Here is a litigant

16  claiming only in regard to riparian water, and if your Honor

17  will look--I am sure you have--at 11 Cal. (2d), where this

18  Rancho Santa Margarita versus Vail is reported, it will be noted,

19  that the litigation involves the riparian right entirely.

20      THE COURT:  Well, wouldn't you assume that if they had

21  a good appropriative or prescriptive right they would have

22  asserted it against an upstream owner?

23      MR. VEEDER:  I couldn't possibly attempt at this point

24  to figure out what a man had in mind 30 years ago.

25      THE COURT:  Rather than listen to Mr. Veeder on real

D   2

A   12

1   property, we have an expert right here in the room--Burby on

2   real property.

3          Isn't it the law, Mr. Burby, that if John Jones owned

4   blank acre and while he owns it he says to X, "There is a

5   question about my title to the northwest quarter of this prop-

6   erty that has never been ironed out," cannot that admission

7   later on be used against a successor in interest to the title?

8          MR. BURBY:  It is my understanding, your Honor, that

9   such an admission would be admissible.  But in this instance,

10  I frankly can see nothing in that Vail decision that would in-

11  dicate--

12         THE COURT:  This is the Complaint, not the decision.

13         MR. BURBY:  --or in the Complaint that would necessarily

14  limit the pleader's theory to anything beyond riparian rights.

15  In other words, we are merely guessing.  If we take the position

16  that because he said nothing in this Complaint about appropri-

17  ative rights, therefore they did not think they had any.  And

18  even going further than that, it is entirely possible that they

19  were not fully aware of all of their rights.  And certainly un-

20  less it was necessary for them to plead them, we could not use

21  that as an admission that would be binding upon the Government.

22         THE COURT:  Wouldn't most of that be answered by reading

23  the documents?

24         MR. BURBY:  I think perhaps, your Honor, it would have

25  to be read before it is admitted.

1          MR. VEEDER:   And I also say in that connection, your

2    Honor, that it would be a rare circumstance where a successor

3    in interest would be bound by the kind and type of allegation

4    that is set forth in there, when the issue was not whether there

5    would be summer water available or the circumstances that it

6    would be delivered.   They were fighting about riparian rights

7    entirely.   So there is no doubt in my mind that a man can come

8    along and sue another man in regard to a piece of property and

9    get a judgement in connection with the property without pleading

10   every right, title and interest that he may have.   The mere

11   fact that there is an omission, and there is no authority what-

12   ever to support the proposition that the mere fact that a man

13   didn't claim everything would preclude a successor in interest

14   from subsequently claiming some additional rights that were not

15   averred in the Complaint.

16          THE COURT:   Is there any doubt but that the Complaint

17   is at least admissible on the basis of historical background

18   of this whole litigation?

19          MR. VEEDER:   I have never heard of such a thing myself,

20   your Honor--for a historical background.   Now I would object

21   entirely to that for this reason;  it would be incompetent,

22   irrelevant, immaterial and not tending to prove a single issue

23   in this lawsuit.

24          THE COURT:   Wasn't a consent decree based upon the

25   Complaint?

D   2

A 14

1          MR. VEEDER:  There is an extremely important factor,

2    your Honor.

3          THE COURT:  Wasn't it this Complaint that the consent

4    decree was based upon after the reversal?

5          MR. VEEDER:  No, the consent decree was not predicated

6    upon that Complaint.  It may have been the one that started the

7    lawsuit.

8          THE COURT:  Was there any amended complaint filed?

9          MR. SACHSE: No, your Honor;  that is the only complaint

10   that was filed.

11         THE COURT:  Then the consent decree has to have a basis

12   in the Complaint.  You can't bring a suit to enjoin somebody

13   from walking on your strawberry patch and then cook up some

14   consent decree that concerns something else entirely apart from

15   the matter set forth in the original complaint.

16         MR. VEEDER:  I think you are probably right there.  But

17   if you will check back with the consent decree against that

18   Complaint you will observe that the basis of the settlement is

19   entirely and completely different from the allegations that are

20   set our there.  They came down and finally on the basis--

21         THE COURT:  Are you arguing that the decree is void and

22   that it goes far beyond the basic complaint on file in the action?

23         MR. STAHLMAN:  I will stipulate to it.

24         THE COURT:  Mr. Stahlman will probably go right along

25   with you on that.

                don't

1      MR. VEEDER: I like being facetious about these things,

2 your Honor, but--

3      THE COURT: You are just talking yourself right into

4 that position.

5      MR. VEEDER: No, your Honor.

6      THE COURT: Either this decree between Vail and Santa

7 Margarita was based upon this Complaint and was a legal decree

8 within the framework of this Complaint, or it probably is a

9 void decree.

10      MR. VEEDER: No, your Honor. There has been a complete

11 departure from the original basis on which this argument started

12 on the basis whether there had been a divestiture of a right

13 because it was not pleaded.

14      THE COURT: No, there was no contention of that sort.

15      MR. SACHSE: That was not the argument.

16      MR. VEEDER: Yes. Here we have in the record in this

17 case the statement that there was an appropriative right, a

18 storage right since 1886--that is in without objection--in re-

19 gard to Lake O'Neill. We have in this record an abundance of

20 evidence in regard to the storage right at Lake O'Neill, and

21 I respectfully submit that the mere fact that Lake O'Neill was

22 not spelled out as an appropriative right there, or spelled out,

23 for that matter, in the stipulated judgement, has no effect

24 whatever upon the character of that right. And that is the

25 whole point.

1      MR. SACHSE:  It seems to me that Mr. Veeder's argument

2  is a matter of weight again.  Professor Berby admits that this

3  type of document is admissible. If the Complaint doesn't go as

4  far as I think it goes--

5      MR. BERBY:  Your Honor, in self defense I certainly would

6  not want the record to show that I admit that this record is

7  admissible in this case.  I answered the court's inquiry merely

8  as to whether or not the admission of a prior owner would be

9  admissible as against a subsequent owner.  That was the extent

10  of my answer.

11      MR. SACHSE:  That is all I intended to say.

12      THE COURT:  Are you going to offer the consent decree

13  in evidence Mr. Veeder?

14      MR. SACHSE:  It is attached to the Complaint, your Honor.

15      MR. VEEDER:  It is already in the record, your Honor.

16      MR. SACHSE:  It is an exhibit on the Complaint.

17      THE COURT:  The objection is overruled.  At least this

18  is admissible to show me what the action was before the court

19  when the consent decree was entered into to.

20      MR. VEEDER:  On that limited basis I certainly have no

21  objection.

22      THE COURT:  At least it is admissible for that purpose.

23  I don't know whether I will draw anything else from it or not

24  until I look it over.

25      The objection is overruled.  It is received in evidence.

1      (The document above referred to was marked and re-

2  ceived in evidence as Fallbrook's Exhibit T.)

3      MR. SACHSE:  What is the status of Exhibit U, your

4  Honor?  Is the offer to be held until the supporting data is

5  produced tomorrow?

6      THE COURT:  Yes.

7      MR. VEEDER:  Mr. Sachse, you raise a point that concerns

8  me.  Did you say the stipulated judgement had not been admitted?

9      MR. SACHSE:  I said the stipulated judgement is a part

10  of the Complaint.

11      MR. VEEDER:  It is offered and is in evidence.

12      MR. STAHLMAN:  That is right.

13      MR. SACHSE:  No, I didn't mean to imply that it is not

14  admitted.

15      You may cross examinine.

16      THE COURT:  Do you want to adjourn now?

17      MR. VEEDER:  I think we could do a better job of cross-

18  examining if we were to adjourn now.

19      THE COURT:  All right, I have some other things that I

20  could do.

21      MR. VEEDER:  I think that would be a good idea, your

22  Honor.

23      THE COURT:  All right.

24      (Adjournment until Friday, February 13, 1959, at ten

25  o'clock a.m.)