# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No.   1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:   San Diego, California

Date:   Friday, February 13, 1959

Pages: 8388 to 8515

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ Deputy

JOHN SWADER
Official Reporter
United States District Court
325 West F. Street
San Diego 1, California
BElmont 4-6211 · Ext. 370

1   IN THE UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF CALIFORNIA

3   SOUTHERN DIVISION

4   - - -

5

6   HONORABLE JAMES M. CARTER, JUDGE PRESIDING

   - - -

7

8

9   UNITED STATES OF AMERICA,        )
                                     )
10              Plaintiff,           )
                                     )
11          vs.                      )        No. 1247-SD-C.
                                     )
12   FALLBROOK PUBLIC UTILITY        )
     DISTRICT, et al.,               )
13                                   )
                Defendants.          )
14

15

16   REPORTER'S TRANSCRIPT OF PROCEEDINGS

17

18   San Diego, California
     Friday, February 13, 1959

19

20   APPEARANCES:

21          For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                     Special Assistant to the
22                                   Attorney-General,
                                     Department of Justice,
23                                   Washington, D. C.

24

25

8389

APPEARANCES (Continued)

| | |
|---|---|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney-General, by<br>ADOLPHUS MOSKOVITZ, ESQ.,<br>Deputy Attorney-General. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al. | FRANZ R. SACHSE, ESQ. |
| For Defendant<br>Sawday Ranch | MESSRS. LUCE, FORWARD, KUNZEL<br>& SCRIPPS, by<br>ROBERT McGINNIS, ESQ. |
| | PHIL D. SWING, ESQ. |
| | WALTER GOULD LINCOLN, ESQ. |

1

## INDEX TO WITNESSES

2

3  For Defendant
   Fallbrook:                              D      X      RD     RX

4          George F. Yackey                       8394

5

6

7

8

9

10  Pl Ex.  155 A-I          8505

11          156              8503
            157              8508

12

13

SAN DIEGO, CALIFORNIA, FRIDAY, FEBRUARY 13, 1959.   10:00 A. M.

THE CLERK:  The case on trial, No. 1247-SD-C, United States of America vs. Fallbrook Public Utility District, et al.

MR. SACHSE:  Your Honor, I just started yesterday's transcript.  I find one small error that I would like to have corrected.  At page 8275, line 9, the question is indicated as being answered by Mr. Veeder.  It was answered by me.  It should "Mr. Sachse," instead of "Mr. Veeder."

MR. VEEDER:  Let's see that.  Here is another one, page 8275, line 2.

MR. SACHSE:  Beg your pardon, line 2, on the same page also, should read "Mr. Sachse."

MR. VEEDER:  I think this is Mr. Yackey.

MR. SACHSE:  That should be Mr. Yackey on line 2.

MR. VEEDER:  I started the sentence, he interrupted it with "No."  That is the way we have been operating for ten years now.

MR. SACHSE:  The Court requested that certain information be supplied to Mr. Veeder.  I want the record to indicate now that I am giving Mr. Veeder the legal description of the external boundaries of the Fallbrook Public Utility District as indicated on Fallbrook's Exhibit H, these being the boundaries that are recorded in Book 7364 at pages 454 through

1   476 of the official records of the County of San Diego.

2       This you may keep, Mr. Veeder.  That is a spare copy.

3       MR. VEEDER:  Thank you.

4       MR. SACHSE:  I would also like to indicate that I am

5   giving to Mr. Veeder, not to keep-- this is for comparison

6   with the photographs on file; these are our only originals--

7   the executed sealed originals of License 4906, Permit 7033,

8   Permit 8511, Permit 11356, and the order amending Permit

9   11356, and Permit 11357 and the order amending that permit.

10      Mr. Veeder, after you have checked them, I would

11  appreciate getting them back.  As you can see, they are our

12  originals.

13      I am also giving Mr. Veeder the typed sheet which is

14  the exact piece of paper given the Fallbrook Public Utility

15  District by Mr. F. E. Green, showing the daily flow observa-

16  tions in the Santa Margarita River at Fallbrook for the months

17  December, 1951, January, 1952, February, 1952, and March, 1952.

18      This is also our only copy, Mr. Veeder.

19      Now finally, I have here the original pumper's penciled

20  sheets of the meter readings that are reflected in Fallbrook's

21  Exhibit L.  These are the work sheets from which Exhibit L was

22  calculated.  These are originals and I would like them re-

23  turned.

24      Now, I would like at this time to request, your Honor,

25  something from the United States.  I also pointed out yesterday

1    that our examination of Exhibits 47 and 49 and 150 and 151

2    do not appear to coincide, Exhibits 47 and 49 being Mr.

3    Worts's calculations of pumpage and 150 and 151 being the

4    tabulation of the pumpage introduced by Col. Bowen, which

5    do not appear to coincide, and I will request that the United

6    States produce for me the original meter readings of the pumps

7    on Camp Pendleton on which both of those tabulations were made--

8    the equivalent, in other words, of the documents I am now

9    giving the United States.

10        May I have those, Mr. Veeder?

11        MR. VEEDER:  I will certainly find out.  The Colonel

12    shakes his head yes.

13        MR. SACHSE:  May I have them by the first of next week?

14        MR. VEEDER:  We will bring them down.

15        Now that you have brought the matter up, Mr. Sachse,

16    we have compared the protests with our records and I believe

17    there is no variance.

18        MR. SACHSE:  That will come up when I introduce my

19    exhibits.

20        MR. VEEDER:  Where is Mr. Yackey?

21

22             GEORGE F. YACKEY,

23    heretofore called and sworn, recalled as a witness in behalf

24    of the defendant Fallbrook Public Utility District, testified

25    further as follows:

1       THE COURT:  Mr. Veeder, you said you had compared what?

2       MR. VEEDER:  Mr. Sachse made a point yesterday in

3  regard to some rejected exhibits that there was a conflict in

4  the figures, and I just brought his attention to the fact

5  that we had checked them and found they were accurate.

6       MR. SACHSE:  I am going to introduce some exhibits on

7  it, so we will see.

8       THE COURT:  You mean the figures of the amount of water

9  used for military uses and for agriculture, as shown in those

10  protests, are accurate figures?

11       MR. VEEDER:  Yes, your Honor.

12       THE COURT:  And those same figures are included in one

13  of your other exhibits?

14       MR. VEEDER:  That is correct, your Honor.

15       THE COURT:  All right.

16       MR. SACHSE:  I can see that they are included in one

17  of them.  They don't appear to be included in both.  That's

18  my point.

19       THE COURT:  All right.

20

21                    CROSS-EXAMINATION

22  BY MR. VEEDER:

23       Q  When did you state that you became the manager of

24  the Fallbrook Public Utility District, Mr. Yackey?

25       A  In May or June of 1946.

1    Q   In other words, you would have been employed by and

2   would have been manager of the District on February 16, 1948,

3   is that right?

4    A   Yes.

5    Q   Now, I refer to the matter of the Vail application,

6   which is 11518, and the hearing in connection with that

7   application before the State Engineer of the State of Cali-

8   fornia, and ask you whether you attended the hearing in

9   regard to the protests of that application.  Do you recall?

10    A   If that was a hearing in Los Angeles, I did.

11    Q   And it was before the State Engineer?

12    A   Yes.

13    MR. VEEDER:  I would like to have this marked for

14   identification, if I may, your Honor.

15    THE COURT:  What do you want to have it marked?

16    MR. VEEDER:  It will be the next exhibit.

17    THE COURT:  Do you want to give it a Fallbrook number?

18   It concerns one of these permits, is that right?

19    MR. VEEDER:  I would just as soon have it a Fallbrook

20   number, yes.

21    THE COURT:  Which one does it concern?

22    MR. VEEDER:  It concerns the application which was

23   filed-- we discussed the protest yesterday, Mr. Sachse, of

24   the United States to the application of the Vail Company.

25    That would be Fallbrook's Exhibit--

1          THE CLERK:  O.

2          THE COURT:  Those objections were sustained to those

3     exhibits.

4          MR. VEEDER:  That is right.  Those are only for iden-

5     tification.

6          THE COURT:  Yes.  Does this concern the exhibit to

7     which I sustained an objection?

8          MR. VEEDER:  Well, yes, it will make reference to it,

9     but it will relate to the kind and type--

10         THE COURT:  To which permit does it refer?

11         MR. VEEDER:  It refers to 1157--

12         THE COURT:  11586?

13         MR. SACHSE:  11586 and 11518 of the Vail Company.  I

14    have no objection whatsoever.  I hope it gets in.

15         THE COURT:  Application 11586 matured to Permit.  That

16    is Exhibit D. Let's call this D-1, then.

17         MR. VEEDER:  All right.  Would you mark that, Mr.

18    Clerk.

19         (Fallbrook's Exhibit D-1 was marked for identification.)

20         MR. SACHSE:  Was that the date you gave us a moment

21    ago, 2-16, was that the date of that hearing, Mr. Veeder?

22         THE COURT:  What is this, a correspondence file?

23         MR. VEEDER:  The 16th day of February, 1948.

24         No, this is the decision of the State Engineer, your

25    Honor, in connection with the Vail application to appropriate

1  water.

2  MR. SACHSE:  And the Fallbrook application.

3  MR. VEEDER:  And the Fallbrook application.

4  Q  Did you testify at that hearing, Mr. Yackey, do

5  you recall?

6  A  I don't recall definitely, but I don't believe I

7  did.

8  Q  Now, it states here-- and I am reading from D-1

9  for Identification:  "Fallbrook Public Utility District

10 protests on two main counts:  First, that the proposed di-

11 version would materially reduce the amount available to down-

12 stream users, including this protestant; and second, that

13 this protestant as a municipal corporation organized for the

14 primary purpose of supplying water for domestic use has a

15 prior and preferential right to appropriate unappropriated

16 water from the source in question."

17 Now, did you testify that in your view the Fallbrook

18 Public Utility District was a municipal corporation?

19 MR. SACHSE:  That is objected to.  The question has

20 been asked and answered.  The witness says he doesn't believe

21 he testified.

22 BY MR. VEEDER:

23 Q  You don't believe you testified?

24 A  I don't believe I testified.

25 Q  Do you recall who did testify for the Fallbrook

1    Public Utility District?

2         A  No, not definitely.

3         Q  Were you employed by the Fallbrook Public Utility

4    District at the time that filings were made for 11586?

5         A  I was.

6         Q  And what function did you perform in connection

7    with that filing?

8         A  I didn't get that last word.

9         Q  What was your responsibility in connection with that

10   filing?

11        A  Well, I acted as  engineer and either signed it

12   under the direction of the Board or coordinated the activity

13   with the attorney at the time who may have signed it, or the

14   president who signed it, but I assisted in whatever way I

15   could.

16        Q  You worked, in other words, with Mr. J. E. Potter,

17   who signed the application.  Do you recall J. E. Potter?

18        A  Yes.

19        Q  And do you recall that at that time when the filing

20   was originally made that you claimed only water for municipal

21   and domestic purposes?

22        MR. SACHSE:  If the Court please, I am going to object.

23   We might as well straighten this out now.  I will object on

24   the technical grounds that this is incompetent, irrelevant

25   and immaterial and not tending to prove or disprove any issue

in the case, and that it is not within the scope of the direct examination and is improper cross-examination.

The Court in its pre-trial opinion has specifically ruled that this Court will not go behind the decision of the State Water Rights Board.  Mr. Veeder is now making reference to prior documents in connection with an existing license, applications which have been amended, acted upon, a permit issued, the permit perfected to license.

In the first place, I think it is immaterial and irrelevant under your Honor's pre-trial ruling.  If your Honor desires to reverse that pre-trial ruling, it is not within the scope of the direct examination.  Nothing of the kind has been offered in Fallbrook's case.  It is a proper matter, I concede, if your Honor reverses your ruling for Mr. Veeder to put on in his case.  But it is not a matter for proper cross-examination.

MR. VEEDER:  Your Honor, in connection with that, I desire to refer to the fact that the United States filed a motion for summary judgment against the Fallbrook Public Utility District, and you stated at that time that there were matters or facts which had to be considered.

THE COURT:  Well, just a minute.  As far as Mr. Sachse's contention about going behind the State Water Rights Board decision is concerned, I am going to stand by that ruling, and in any matter in which this is directed to upset orders

1  of the Board it wouldn't be admissible.

2  On the other hand, there is still open and was reserved

3  by my pre-trial ruling this problem about Fallbrook's capacity

4  until I heard the story.  This might have some bearing on that,

5  what representations the District made as to its capacity, what

6  it thought its capacity was, things of that sort.

7  However, the most important objection made is the

8  matter of the scope of the cross-examination.  Just because

9  the witness is put on the stand doesn't mean that you can

10  examine him on any subject matter.  What was brought out on

11  direct examination that opens the door for this inquiry?

12  MR. VEEDER:  Your Honor, on direct examination the

13  whole issue of this gentleman's responsibility for the Fall-

14  brook Public Utility District's operations and the whole issue

15  in connection with the mode and methods of operation were

16  squarely raised.  You will observe throughout the transcript

17  of yesterday that Mr. Sachse was most vehment, and for which

18  I was duly grateful.  When ever I raised an objection in re-

19  gard to this man's testimony, he would say, "Well, if you

20  don't want the Court to have information about the use of

21  water at Fallbrook, if you are not interested in that, if you

22  are not interested in this, fine.  We will just keep it from

23  the Court."  But your Honor overruled him, and the question

24  was squarely presented as to the method of operation of the

25  Fallbrook Public Utility District, the powers in effect that

1   it had.   Your Honor yourself interrogated about this 36-inch

2   pipe line that was shown on the exhibits.   Your Honor also

3   went into some question in regard to this condemnation

4   proceeding, to which I objected as to relevancy and was over-

5   ruled, and now we have before us issues in connection with

6   this area (indicating) which is condemned.   For what?

7        THE COURT:  Condemned?

8        MR. VEEDER:  Yes, the area was condemned, and the

9   titles are shown.

10        THE COURT:  You pointed to a larger area.

11        MR. VEEDER:  No, I pointed to this illusory reservoir.

12        THE COURT:  But you also pointed to the area of the

13   river, yes.

14        MR. VEEDER:  And if they didn't open up the business

15   when they came in and said, "We are going to prove that we

16   condemned this land," if they didn't open up the whole ques-

17   tion when they came in and said, "We are going to put in

18   evidence in regard to uses of water," when they interrogated

19   this gentleman in regard to hydrology and asked him how about

20   the runoff and when does it occur and he went into great

21   detail that the only time they could get the water was to

22   impound it when it runs down the river in a short period of

23   time, I submit, your Honor--

24        THE COURT:  All right, anything further?

25        MR. SACHSE:  Yes, your Honor.

2

8402

1        Of course, again the fact that this is not within the

2   scope of the direct examination.  This is properly a matter

3   of rebuttal or an affirmative defense or an attack of the

4   United States.  Finally, if Mr. Veeder attempts to determine

5   the legal capacity of a public agency of the State of

6   California by asking an employee, not even a director, that

7   is not the best evidence and it is irrelevant and immaterial.

8   The question of the legal capacity of the Fallbrook Public

9   Utility District is set forth in the statutes and decisions

10  of the State of California, and no testimony given by any

11  engineer is going to expand or to contract its capacity one

12  iota.

13        THE COURT:  I don't know how far we will go on this

14  or what it will lead to, but for the time being your objec-

15  tion is overruled on the ground of the scope of the cross-

16  examination.

17        Your objection is overruled with the understandin,

18  however, that I am not considering this as evidence going

19  behind the action of the State Water Rights Board.

20        MR. VEEDER:  As far as I am concerned, I don't want

21  your Honor to go behind anything.  I just want you to look

22  through Fallbrook--  it's phoney.

23        THE COURT:  Go ahead.

24        THE WITNESS:  May I have the question?

25        THE COURT:  What was the pending question?

1          MR. VEEDER:  Will you please read it?

2          (The Reporter read the pending question as follows:

3     "Q  Do you recall that at that time when the filing was

4     originally made that you claimed only water for municipal

5     and domestic purposes?")

6          THE COURT:  By "you" you mean the District?

7          MR. VEEDER:  Well, he said that he prepared these

8     applications  and did the technical work.

9          THE COURT:  I don't know that he said he prepared the

10    applications.

11         Did you help prepare the applications?

12         THE WITNESS:  I helped prepare them, yes, your Honor.

13    I didn't prepare them.

14         MR. SACHSE:  I suggest that you let the witness re-

15    fresh his recollection if he wants to, Mr. Veeder.

16         THE COURT:  Yes, let him see the applications if he

17    wants them.

18         MR. SACHSE:  It is a pretty long while ago.

19    BY MR. VEEDER:

20         Q  This is a copy that is in the record (handing

21    document to the witness).

22         A  My understanding--

23         Q  The question was not your understanding.  The

24    question was this:  Do you recall--

25         I would like to have the question read again, so there

1   will be no question about it.

2          (The Reporter again read the question as follows:

3   "Q  Do you recall that at that time when the filing was

4   originally made that you claimed only water for municipal

5   and domestic purposes?")

6          THE WITNESS:  We always claimed water for domestic,

7   municipal and irrigation purposes, and that was the under-

8   standing I always had, and that is the way we always considered

9   water use in the Fallbrook Public Utility District.  If the

10   word was left off at some time--

11          MR. VEEDER: You have answered the question.

12          MR. SACHSE:  Let him finish his answer.

13          THE WITNESS:  --it could have been by--

14          THE COURT:  He may finish his answer.

15          THE WITNESS:  --by a typographical error, which later

16   on was corrected. But my instructions always were that we

17   were getting water for domestic, municipal and irrigation

18   purposes.

19   BY MR. VEEDER:

20          Q  You have been looking at 11586; is that right?

21          A  Yes.

22          Q  And that is for the two and a half second feet?

23          A  Yes.

24          Q  I hand you a copy of 11587 as originally filed

25   and ask you to read into the record--

(Mr. Sachse coming forward and examining document.)

MR. VEEDER:  Plaintiff's 134, and it is Application No. 11587.

Q  I ask you, number one, do you remember that that was signed by J. E. Porter, President of the Board of Directors of the Fallbrook Public Utility District?

A  What do you wish me to read?

Q  I want you to read this line right here-- 3.

A  "3.  The use to which the water is to be applied is domestic and municipal use."

Q  When was that filed?  That was filed March 11, 1946; is that not correct?

A  October 11, 1946.

MR. SACHSE:  What is the date?  You gave one and he gave another.

MR. VEEDER:  It is October 11, 1946.

Q  And that was filed on the same date as you filed your 11586; isn't that correct?

A  I think approximately so.  I would be better off if I compared the two.

Q  All right, just compare them.

A  They both show the date October 11, 1946.

Q  Now, then, in the statement on 11586, in paragraph 15, you stated that "This application is made for the purpose of serving Fallbrook Public Utility District, a public

1    and municipal corporation of 3,000 people.  There are no

2    incorporated towns within the district."  Now, you were not

3    making a claim at that time for any specific water for

4    irrigation; isn't that correct?

5        MR. SACHSE:  I object, if the Court please.  This

6    document is not signed by this witness.  The document will

7    speak for itself as to what it states.  This witness is not

8    going to interpret a document that he didn't even sign.

9        MR. VEEDER:  He said he prepared it.

10       MR. SACHSE:  He said nothing of the kind, Mr. Veeder.

11       THE COURT:  Sustained.  You may inquire whether he

12   helped prepare this one.

13       MR. SACHSE:  He helped prepare it.

14   BY MR. VEEDER:

15       Q  Did you help prepare this?

16       A  I think his Honor would be interested in knowing

17   that at the time Mr. Potter was President of the Board he was

18   superintendent of the High School at Fallbrook, and the District

19   had no operating staff that was capable of doing the clerical

20   and typing work and other work of that kind.  I was brand

21   new in the District.  So Mr. Potter would take notes and take

22   them up to his stenographer and have his stenographer type

23   them.  That is why there are so many typographical mistakes.

24   But the Board in formulating its policies had certain ideas

25   which I am sure I am familiar with.

1     MR. VEEDER:  I object to this; it is not responsive.

2     THE WITNESS:  So I was in on the discussions.

3     MR. VEEDER: Just a moment.

4     THE COURT:  Overruled.  So far his statement is all

5 right.

6     Now what is your particular question?

7     MR. VEEDER:  I asked him the question in regard to--

8 I will rephrase the question.

9     Q  In regard to the uses described on page 3 of the

10 application, paragraph 15, you refer to the municipal uses

11 there, do you not?  Did you not prepare that?

12     MR. SACHSE:  There is no reference to municipal use

13 on page 3, paragraph 15, Mr. Veeder.

14     MR. VEEDER:  He just read it.

15     THE COURT:  Of which?

16     MR. VEEDER:  11586, your Honor.

17     THE COURT:  11586-- the printed form starts out

18 "Municipal"--

19     MR. SACHSE:  The printed form, but there is no refer-

20 ence by the applicant.

21     MR. VEEDER:  We are going to delete that part.

22     MR. SACHSE:  All right, go ahead.

23     THE COURT:  What is your question?

24 BY MR. VEEDER:

25     Q  You prepared the data, did you not, for the

1    municipal uses as shown in paragraph 15?

2         A   No, I didn't prepare it.  I assisted in the prepar-

3    ation and the discussions that led up to the writing.

4         Q   Now, in connection with the development of--

5         THE COURT:  Am I looking at the same one?  Is this the

6    one that says "This application made for the purpose of

7    serving the Fallbrook Public Utility District, a public and

8    municipal corporation having a present population of 3,000"?

9         MR. VEEDER:  That is correct.

10        THE COURT:  "There are no incorporated towns within the

11   district"?

12        MR. VEEDER:  That is right, and then he goes on "1,620,000

13   gallons from the end of the first year after the application

14   is granted."

15        Q   Now, did you assist, Mr. Yackey, in the prepara-

16   tion of Applications No. 12178 and 12179 when those applica-

17   tions were first prepared?  Do you recall those?

18        A   Yes, I did.

19        THE COURT:  Are they in the record here now?

20        MR. VEEDER:  Yes, they are, your Honor.

21        MR. SACHSE:  Application 12178 is Fallbrook's Exhibit

22   F, your Honor, and Application 12179 is Fallbrook's Exhibit

23   G, I believe.

24        MR. VEEDER:  The numbers that have been assigned to--

25        MR. SACHSE:  F and G.

8409

1        THE COURT:  F and G, all right.

2        He hasn't answered the question.

3        Did you assist?

4        MR. VEEDER:  Excuse me.  I thought he said he did.

5        THE WITNESS:  Yes, sir.

6        THE COURT:  All right.

7  BY MR. VEEDER:

8        Q  In making your calculations in regard to the acreages

9  referred to in those applications--

10       THE COURT:  That is indefinite.  Do you mean acre-feet

11  of water or acres of land to be supplied or what?

12       MR. VEEDER:  I will ask him another question, then.

13       Q  Do you recall the filing of the applications on

14  November 28, 1947, of Applications 12178 and 12179?

15       MR. SACHSE:  May the witness have them in front of him,

16  Mr. Veeder, to refresh his recollection?  I will give him

17  copies, if you don't want to give him yours.

18       MR. VEEDER:  If you have extra copies, why don't we

19  give them to him and let him work off of those.

20       Q  Do you remember the preparation of those?

21       A  Yes, they seem familiar.

22       Q  Did you do the technical preparation on those

23  applications?

24       A  Again, I say I assisted in every way I could.

25       Q  Wasn't it your responsibility as manager to prepare

1    those?

2         A  I did the engineering work on it.

3         Q  And you made the calculations in regard to the

4    acreages within the District, did you not?

5         A  Well, I am not certain about that.

6         Q  Well, who would, if you didn't?

7         A  We had a board of directors that determined the

8    policies and everything was submitted to them and they

9    participated inthe discussions and their final decision of

10   course was theirs.

11        THE COURT:  The number of acres is not a matter of

12   policy, is it?  Or would it be?

13        THE WITNESS:  Well, in some cases it took an estimate

14   rather than a fixed sum.

15        MR. VEEDER:  I will read what I have in mind, then,

16   Mr. Sachse, and it will be at paragraph 13 on 12178:

17        Q  You refer to the fact that there are 6,000 acres

18   of orchard-- I will read the whole thing-- "Irrigation use.

19   Area to be irrigated, 7200 acres."  Now, when you made the

20   determination that there were 7200 acres to be irrigated,

21   what factors did you take into consideration?

22        A  Information that we were able to get from the Citrus

23   Association and the Soil Conservation experts and the various

24   people in the area that had knowledge of what acreage was

25   actually planted.

8411

Q  You made no soil survey?

A  No.

Q  And you made no determination in regard to the water available for the irrigation of any land within the Fallbrook Public Utility District at that time?

A  I didn't get the last question.

Q  Did you take into consideration the lands that already had a supply of water?

A  Yes.

Q  And how many acres of those did you determine had a supply of water at that time?

MR. SACHSE:  If the Court please, I object again.  We are getting completely off anything that was brought up in the direct examination.  Mr. Veeder has made great point out of the fact that he doesn't want us to produce this kind of evidence.  I introduced the use exhibit and bar graph and he objected to it.  There has not been one word by me as to how much acreage is irrigable, as to how much is irrigated, as to how much is orchard, or anything else.

MR. VEEDER:  In that connection, I wish to call your attention to the fact that Mr. Sachse offered in evidence a tabulation purporting to show the quantity of water diverted from the Santa Margarita River from 1948 to date.

MR. SACHSE:  I did.

MR. VEEDER:  And I certainly have the right, on the

1    basis of that, to interrogate in regard to the beneficial

2    use of that water and where it was applied and who used it,

3    and these steps are preliminary to that. We certainly have

4    the right to determine whether this water is beneficially

5    used, we have a right to determine who is using it--

6        THE COURT: Overruled. Go ahead. On that basis it is

7    all right.

8    BY MR. VEEDER:

9        Q  How many acres had a supply of water independent

10   of the irrigation or the distribution system of the Fallbrook

11   Public Utility District?

12       A  I don't remember, and I don't remember whether we

13   ever approached it from that angle. We did make studies that

14   generally indicated the total mount of water used in the

15   District. There was a certain percentage came from privately

16   owned wells, and that amount varied over the different years

17   and under different conditions in Fallbrook over the years.

18   Sometimes we considered that 25% of the total use in the area

19   came from privately-owned wells that the District had no

20   connection with, and at other times we dropped that figure down

21   to 20%. It varied, depending on the years and the status of

22   the District as to the development of pipe lines in the

23   District and the number of people it served and things of

24   that sort.

25       Q  Referring now to this Exhibit Fallbrook's I that

1   you said you prepared, in determining that there were 6,000

2   acres of land in the area did you make any investigation in

3   that part of Fallbrook which is located in Township 10 South,

4   Range 3West?

5           MR. SACHSE:  Just a minute, Mr. Yackey.

6           Where is that?

7           MR. VEEDER:  Township 10 South, 3 West.

8           MR. SACHSE:  I will submit that is too indefinite.

9   Township 10 South, 3 West goes clear over to the Ammunition

10  Depot and clear over the other way.

11          MR. VEEDER:  I said in the Fallbrook Public Utility

12  District.

13          THE COURT:  Overruled.

14          You may look at the map, Mr. Yackey.

15          THE WITNESS:  Thank you.  (Stepping down.)  Yes, parts

16  of that were securing service and were considered for service

17  in the Fallbrook Public Utility District.

18  BY MR. VEEDER:

19          Q   What kind of investigation did you make to determine

20  that?

21          A   I don't remember at this time.  The area you indi-

22  cate was known as, at that time, as the Winterwarm area, and

23  there was a Winterwarm Mutual Water Company which has fairly

24  close records of the number of acres planted, and I don't

25  remember how we arrived at the particular figure you speak

1    of, but probably a careful estimate was made of it.

2         Q  You don't know, though.  You don't know whether a

3    careful record was made of it?

4         A  Yes, I am certain.

5         Q  Where are your statistics on that?  Do you have a

6    record?

7         A  No, I would say it is an estimate made and probably

8    was discarded long ago.

9         Q  How did you estimate the acreages under those cir-

10   cumstances, if you didn't make a thorough investigation?

11        MR. SACHSE:  If the Court please, I object again.  This

12   witness has made no estimates of irrigable acreage.  If this

13   is supposed to be for impeachment, he hasn't said anything,

14   and the only earthly purpose it can have is impeachment.

15   Mr. Yackey hasn't given one word on direct examination of

16   irrigable acreage or anything of the kind.  And what is the

17   purpose of this, if not impeachment?

18        THE COURT:  Maybe yes, maybe no.  The application

19   states in paragraph 13, "The area to be irrigated is 7,200

20   acres.

21        Did you have some part in making that estimate?

22        THE WITNESS:  Yes, sir, I did.

23        MR. SACHSE:  Your Honor, that is obviously the whole

24   District.

25        MR. VEEDER:  That is the point.

8415

1        THE COURT:  This is the maximum amount of ground that

2   might be irrigated; is that right?

3        THE WITNESS:  That is the way it is interpreted here.

4   Actually there are 8,200 acres in the District, I think, and

5   we figured that of that 7,200 could be irrigated.

6        THE COURT:  Then you broke that down into 6,000 for

7   orchard and 1,200 for general crops?

8        THE WITNESS:  Yes, sir.

9        THE COURT:  And you say the estimate was 8200 acres

10   in the entire district as of 1947?

11        THE WITNESS:  Yes, sir.

12   BY MR. VEEDER:

13        Q  How many acres were there in the district in 1947?

14        A  This report shows 8,192 acres.

15        Q  In 1947?

16        A  At the time this report was made on November 28,

17   1947.

        THE COURT:  Where does that figure appear?

        THE WITNESS:  In paragraph 11, the gross area of the

    District, 8,192 acres.

        THE COURT:  Net irrigable, 7,200 acres.

22   BY MR. VEEDER:

23        Q  Wasn't there only 5,000 acres in the district at

24   that time, Mr. Yackey, in 1947?

25        A  I am trying to recollect.

1      MR. SACHSE:  If the Court please, before he goes a

2  step further, I want to be sure which of these documents Mr.

3  Yackey is reading from.  Mr. Veeder has given him one that

4  is dated November 28, 1947.  I have given him an amended

5  application received July 28, 1952.  If we are trying to booby-

6  trap the witness by mixing up two dates, let us not indulge

7  in any such cheap theatrics, Mr. Veeder, and tell him which

8  date you want to know.

9      MR. VEEDER:  I want the date when the application was

10  first filed.

11      MR. SACHSE:  Then don't have him read from an amended

12  application that states 7,000 acres in 1952.

13      THE COURT:  Now you have me confused.  I am looking at

14  the exhibits in evidence, Exhibits F and G.

15      MR. SACHSE:  Exhibits F and G in evidence, your Honor,

16  you will observe that the very next line down says "Amended

17  application July 28, 1952," which was after 1950 annexations.

18      MR. VEEDER:  And all I have to say, your Honor, is that

19  the data that I have been given and I have received shows

20  8,200 acres in the District and if I remember his testimony

21  it was 5,000 acres in 1947.

22      MR. SACHSE:  May I see your data, Mr. Veeder?  I am

23  frankly lost.

24      THE WITNESS:  Mr. Sachse is exactly right, your Honor.

25  These figures are in the amended application, and that is

where the question was.  There were only 8,200 or 8,192 acres

after 1950, but the application had been amended and those

figures had been changed and the date Mr. Veeder referred to

was the original date and the amended date is shown at the

top of the same application and I didn't notice it when I

was looking at it here.

BY MR. VEEDER:

    Q  Now how many acres did you calculate in 1947 that

were irrigable, then?

    MR. SACHSE:  If you are referring to a document, I am

going to ask you to show it to the witness so that he can

refresh his recollection as of up to 1947.

    THE COURT:  Do you have the application as originally

filed in 1947?

    MR. VEEDER:  I think we have it, your Honor.  I am

looking for the number on it now.  I believe it is in the

record and has been offered.

    THE COURT:  What are you trying to prove, Mr. Veeder?

Is this some more of this expert cross-examination to demon-

strate your ability allegedly to impeach a witness, et

cetera?  Are you just going to have another show, as we had

with some of these engineers, or are you going to get down

to some facts?

    MR. VEEDER:  I am getting down to facts, your Honor.

    THE COURT:  What is the purpose of the cross-

1    examination?

2         MR. VEEDER: I think I will be able to offer some

3    evidence here to show you that any kind of guesstimates that

4    this man made--

5         THE COURT: Let us assume that their estimates were

6    grossly erroneous.  What does that prove?

7         MR. VEEDER:  It proves to me, your Honor, from our

8    standpoint--

9         THE COURT: Suppose you prove that they defrauded the

10   State Water Rights Board.  Where does that get you?

11        MR. VEEDER:  Well, it gets this, that from our stand-

12   point--

13        THE COURT: I am not here to review what the State

14   Water Rights Board did.

15        MR. VEEDER:  I am not asking you to review it.

16        THE COURT:  Maybe you can prove that they misrepre-

17   sented.  What difference will it make?  I am not going to

18   set aside what the State Water Rights Board did.

19        MR. VEEDER: I am not asking you to now.  I am simply

20   saying that from our standpoint here is a situation where we

21   have asked to have our title quieted against an adverse

22   claimant.

23        THE COURT:  Yes.

24        MR. VEEDER:  The question of beneficial use and the

25   question of irrigated acreage is tied squarely together.

1    These claims have been put in for lands which, I think, on

2    cross-examination I can show are either non-irrigable, can't

3    be irrigated, by and large, or have a source of water inde-

4    pendent of the claims of Fallbrook Public Utility District.

5    I submit --

6            THE COURT:  Let us assume that you do that.  Then what?

7            MR. VEEDER:  I simply say that certainly your Honor

8    has the power to review and to determine whether, under the

9    law of California, if there is no showing that these waters

10   can be used beneficially, it is not even possible to acquire

11   a right to the use of water.  All that the Board did when it

12   came down with this determination was to say, "I think that

13   there is a surplus of water available for appropriation."

14   It didn't pass upon the question whether the lands were or

15   were not irrigable.  It did say that there was a demand for

16   water.  But there was no attempted resolution by that Board

17   of anything other than the presence of water in the stream.

18            I am not touching on that at all.  I am touching upon

19   a salient factor, which is part of this quiet title proceed-

20   ing, namely, can they beneficially use the quantity of water

21   which they are claiming?  And I submit your Honor has the

22   power to consider that.  He has the power to consider whether

23   these are ultra vires claims.  Certainly those are juritical

24   questions for determination, and certainly where we have a

25   situation, as we have here-- although I disagree with your

1  Honor's opinion, assuming that there is concurrent juris-

2  diction, I believe that it is sound law that both tribunals

3  can proceed concurrently in the matter and the permit could

4  continue to exist and to stand even if your Honor should

5  decide that these lands are not irrigable or have a source of

6  water from some other source.  It would be up to the State

7  Water Rights Board to review the matter then.  But they cer-

8  tainly did not take into consideration these questions which

9  I am now asking and which have been opened up by the direct

10  examination.

11       MR. SACHSE:  Are you through, Mr. Veeder?

12       MR. VEEDER:  Go ahead.

13       MR. SACHSE:  May I be heard very briefly, your Honor.

14       Mr. Veeder has completely ignored the fact that we

15  have all stipulated-- the State of California has agreed and

16  I have agreed-- that no permit gives anybody any right.

17       MR. VEEDER:  That is right.  Fine.

18       MR. SACHSE:  I concede right now-- save your cross-

19  examination-- there has not been one drop of water under

20  12178 or 12179 ever put to a beneficial use.  Those are

21  storage permits.  When we put the water to storage, we then

22  have to prove to the State of California that we put it to a

23  beneficial use.  Then we get a license.  The permit doesn't

24  give us a right.  The permit gives us a right to do the work

25  which will enable us to put it to beneficial use.  And to

start this complete filibuster dealing with something that isn't even before us, that we couldn't possibly do-- if Mr. Veeder wanted us to do it, we couldn't prove that this water has been put to beneficial use, because it has not been, and can't be until the dam is built.  Then we prove putting it to beneficial use, and then we get a license.  He is setting up another straw man that has no relationship whatsoever to what is before your Honor.  Your Honor has stated that you will not go behind the actions of the Board in granting us a permit.  They have done what Mr. Veeder said.  They have said, yes, we think there is water in the river for Fallbrook. If we take that water they will ask us the next question: Demonstrate that you can put it to beneficial use or you can't get a license.  And if you have no confidence in my statement of the law of California, I suggest that you ask the representative of the Attorney-General.  We will not have anything until we prove that we put it to beneficial use.

MR. VEEDER:  But, your Honor, that is precisely the point I am making.  Here is a claim which is inchoate in character.  It is inchoate until water is actually diverted and applied to beneficial use.  But it is also very elementary law that where there is a claim for an inchoate right it constitutes a cloud upon the title of the owner of the rights to the use of water, as the National Government is at this time.

1          THE COURT:  I will go that far.  Go on.

2          MR. VEEDER:  So in the interrogation if I can show,

3     and I believe that I can, that they could not irrigate the

4     lands for which they are claiming water, then you can dissi-

5     pate the cloud upon the title of the United States of America

6     by showing that it would be impossible for them ever to

7     divert and apply the water to beneficial use.  I will demon-

8     strate in that regard--

9          THE COURT:  Are you going to take the burden of show-

10    ing that there is not a single acre to which water could be

11    beneficially applied?

12         MR. VEEDER:  No, but I can demonstrate--

13         THE COURT:  In other words, you will take the burden

14    of showing that instead of being able to irrigate 6,000

15    acres, maybe they could use it beneficially on only three;

16    is that right?

17         MR. VEEDER:  Yes.

18         THE COURT:  So what good does that do?  That is an

19    idle act, because it is only after they have beneficially

20    applied the water to the land and made a showing that they get

21    any license.

22         MR. VEEDER:  But, your Honor, I am not--

23         THE COURT:  So we could spend a year determining how

24    much they might apply it to, and they may decide never to

25    apply it to that particular land or to this particular land.

1          MR. VEEDER:  And so we sit unable to develop the

2     enclave by reason of this cloud upon the title.

3          MR. SACHSE:  Your Honor read the permit.  It is no

4     cloud on the riparian.

5          THE COURT:  Let Mr. Veeder continue.

6          MR. VEEDER:  It remains a cloud upon the title just so

7     long as the claim is asserted, and I think that Castro vs.

8     Berry, which I cited to your Honor in our brief in regard to

9     Mr. Sachse's disclaimer, is very good.  I can't quite state

10    it the way it is said, because California has a way of saying

11    things.  But it says, "Anyhow, you can shut their mouths in

12    regard to their claims, irrespective of whether there is any

13    validity to the claims or not."  And we feel this way, that

14    just so long as they go out and put on this song and dance,

15    this condemnation proceeding that they just accomplished, so

16    long as they sit as they are sitting today and saying that

17    they can divert water from the Santa Margarita River and

18    apply it to a beneficial use down there in Township 10, 3

19    South, I think in Section 2, as long as they say that, they

20    cloud our title and there continues to be this conflict be-

21    tween Fallbrook and the National Government.

22         THE COURT:  What title do they cloud?  Let's be

23    specific.  Do they cloud your title to riparian water by

24    that claim?

25         MR. VEEDER:  To this extent.

THE COURT:  How?  Because the very permit itself makes it clear that this applies only to unappropriated water.  It does not affect the vested rights.  How can it be a cloud on your riparian rights?

MR. VEEDER:  Just as long as a man is in there claiming that the United States of America cannot divert and apply water for military purposes under the riparian right, just as long as they claim that we can't take water for Lake O'Neill, so long as they say you can't take Lake O'Neill water, out of deference to your Honor, out of the watershed and use it for military purposes, just so long as those things continue to exist our title is clouded.  And if anyone has any doubt about it, just go up the hill and try to get some money to round out Camp Pendleton.  I think the best proof of that is what is occurring and what has occurred ever since this spurious claim was instituted.

Now our view is this, that we can show-- Mr. Sachse opened it up for us-- we can show that the Fallbrook Public Utility District hasn't the power--

THE COURT:  I have said that I would let you go into that issue and I haven't passed on that.  That issue is open.

MR. VEEDER:  Second, assuming that it has the power, we can show that the Fallbrook Public Utility District cannot develop its project.  Why?  Assuming that they could levy special assessments, which they cannot, assuming that under

8425

1     their power as a municipality they could use the right to levy

2     a general assessment, we can prove by cross-examination--

3     he is a wiggleworm, he is hard to keep up with-- but we will

4     show that they could not finance a project.

5          MR. SACHSE:  I object to the materiality of that, your

6     Honor.  I might as well tell you right now--

7          MR. VEEDER:  We will go to California law on that.

8     The law is very clear and very specific that one of the im-

9     portant factors in regard to the development of any of these

10    projects is financial feasibility.  Very early in the history

11    of this State the question arose as to the financial feasi-

12    bility of a project and the court said very clearly--

13         MR. SACHSE:  Which court, Mr. Veeder?

14         MR. VEEDER:  The California court said very clearly--

15          MR. SACHSE:  Give me the case.  There is no such case.

16         MR. VEEDER:  The California court said very clearly

17    that they have no right to assert an inchoate claim for

18    rights to the use of water when they do not have the financial

19    ability to develop that water.

20         THE COURT:  What is your case on that?

21         MR. VEEDER:  Let me see.  I never thought I would cite

22    Mr. Hutchins.  I think it appears at page 108.

23          MR. SACHSE:  I would appreciate it if you would show

24    it to me.  Look it up during the recess.

25         THE COURT:  Maybe you can get it at the recess.

MR. SACHSE:  I told you it was a good book.

MR. VEEDER:  It is not The good book.

On page 117 of The California Law of Water Rights it says:

> "The exercise of diligence is a question
> of fact for the court or the jury to decide.
> In determining diligence, consideration may
> be given to the surrounding circumstances,
> such as nature of the country, climate, and
> difficulty of procuring labor and material.
> But lack of pecuniary means to complete the
> work within a reasonable time was not recog-
> nized by the court as an excuse for not
> prosecuting the work."

MR. SACHSE:  A very good case, Mr. Veeder.  Just the exact opposite.

MR. VEEDER:  Just the exact opposite of what?

THE COURT:  What you just read was that lack of financial ability was not an excuse.

MR. VEEDER:  That is precisely what I am saying.  The fact remains that where an agency lacks the financial capacity to develop a project the matter of due diligence immediately arises and the fact that they say that we don't have the money to develop this project is not grounds for the loss of the inchoate right because of the failure to exercise

due diligence.

THE COURT:  Due diligence.  Now you jump around here so rapidly it is hard for me to follow.  You say that the lack of financial means to finish or complete the project raises the question of due diligence.  What has due diligence got to do with a permit issued by the Water Rights Board of the State of California?

MR. VEEDER:  It has this to do, your Honor.  If we can demonstrate, and I think that we can, that there is a total incapacity on two counts to develop this project, then their lack of financial capacity becomes a question of law as to whether they can sit dog in the manger upon claimed rights to the use of water.  It is not a matter of going behind the permits.  It is a question of law as to whether they can exercise-- and I am glad you all laughed because we will be able to point this up for the rest of the trial.  I will demonstrate, your Honor, very clearly from the cases--

THE COURT:  What are these two grounds you are talking about?  One is power.

MR. VEEDER:  That is right.

THE COURT:  What is the other one?

MR. VEEDER:  Secondly and equally important, the question of due diligence.

THE COURT:  Due diligence in what?

MR. VEEDER:  Due diligence in completing their

8428

1    project.

2          THE COURT:  In completing the project?

3          MR. VEEDER:  Yes.

4          THE COURT:  Well, we haven't even got to that point.

5    The permit says that they must start before July 1st--

6          MR. SACHSE:  1959 we shall commence work, according to

7    the permit.  We aren't even at the place where we have to

8    start.

9          THE COURT:  How can you talk about due diligence?

10         MR. VEEDER:  That is the exact point I am saying.  If

11   your Honor is powerless at this juncture to say, based upon

12   the law and based on the facts, it is evident to me that the

13   Fallbrook Public Utility District cannot and will never de-

14   velop this project, and I can show your Honor, if your Honor

15   will just permit me--

16         THE COURT:  If that is true, what are you concerned

17   about?  If your crystal ball is so clear, what are you

18   concerned about?

19         MR. VEEDER:  One, I want you to see it the same way I

20   do, and the crystal ball is a dandy.  The point I want to

21   make, though, in regard to the question of the financial

22   feasibility, in regard to due diligence and in regard to the

23   cases I just cited--

24         THE COURT:  What cases have you just cited?  The page

25   you gave me from Hutchins?

1    MR. VEEDER:  You see, this is all in the brief I handed

2    your Honor.  I regret that you didn't really memorize it.

3         THE COURT:  Some time back?

4         MR. VEEDER:  Kimball vs. Gerhardt, 12 Cal. 27, 30

5    (away back in '59), and then Mitchell vs. Amador Canal

6    Company, 75 Cal. 464, 482 (17 Pac. 246, 1888)-- I argued that

7    to your Honor quite at some length and it is a dandy case.

8    Now I have briefed those quite at length, your Honor, and you

9    sort of brushed them off.

10        THE COURT:  Was this in your brief at the time I wrote

11   the pre-trial opinion?

12        MR. VEEDER:  Yes, and those are reviewed extensively

13   in the brief.

14        The point that I wish to reiterate, and I hope your

15   Honor will bear with me, in this cross-examination is that I

16   believe from aerials, from the data that we have, the evidence

17   will prove, your Honor, that these claims in regard to irri-

18   gated acreage are as spurious as the claims that they will

19   ever build a dam, and I think that your Honor in considering

20   the question of due diligence and in considering the question

21   of financial feasibility, which I read to your Honor, that

22   the fact that they don't have the power to build a project is

23   certainly a factor to be taken into consideration when you

24   consider their claims to rights to the use of water.

25        THE COURT:  We will take a recess now.  Then I will

8430

hear from Mr. Moskovitz.  And I want you to tell me what you

expect to prove and what issue it bears upon, and let's see

if we can make some determination of this matter.  You are

certainly covering a pretty wide field in some of these state-

ments that you make.

MR. VEEDER:  Well, it is a wide lawsuit, your Honor.

THE COURT:  I am not apt to sit as a review court of

the State Water Rights Board.  You may organize your thoughts

over the recess and I will give you the first crack at it

when we come back.  Tell me what you expect to prove by this

witness specifically.

MR. VEEDER:  Fine.

THE COURT:  And how it is material to anything I can

decide in this case.

Take a short recess.

(Recess.)

MR. VEEDER:  The proposition was raised, your Honor,

as to why the United States of America would be concerned

about a claim of the character being asserted by the Fallbrook

Public Utility District, if it should be shown that they could

not use the water beneficially.

It is our view that the very concept of the right to

the use of water, as is comprehended in Western water law,

is that there must be as the primary element the ability

ultimately to use water upon the land.  That goes to the very

heart of an appropriation and intent.  It is our view,
wholly aside from the powers of the District, that you don't
have the power to formulate an intent to appropriate rights
to the use of water for any lands which already had a supply
of water or which were not irrigable in character.  It then
becomes essential for us to consider what is the effect of
that circumstance?

To begin with, it is a matter of finances.  We know
that if an acre of land cannot support a crop, it cannot
support an irrigation system.  That is pure economics.  And
yet that kind and type of thinking has controlled the de-
velopment of Western water law.  There can be no dog in the
manger in an area of short water supply.  And our position
in regard to that issue is that the Fallbrook Public Utility
District, within the confines of that district, when these
filings were made, did not and could not apply water bene-
ficially to the acreage within those confines.

THE COURT:  Are you prepared to prove to me that there
was no ground within the area to which they could apply
water beneficially?

MR. VEEDER:  I can demonstrate to your Honor--

THE COURT:  Your answer is no, that you are not
prepared to do that.

MR. VEEDER:  I am prepared to show, however, that--

THE COURT:  Answer my question, because I have a

8432

1    couple more on the same point.

2         MR. VEEDER:  All right.

3         THE COURT:  You are not prepared to show that?

4         MR. VEEDER:  The answer is, I don't know.  I don't

5    know for this reason--

6         THE COURT:  It must be obvious that there would be an

7    acre somewhere within the District to which they could bene-

8    ficially apply water.  Isn't that true?  Then are you going

9    to ask me to go through the thousands of acres in that District

10   and find out which acres they could have had an intent to

11   apply water to and to which they could not?

12        MR. VEEDER:  I think that your Honor, before he can

13   decide the question that I am presenting to him, he must

14   consider the financial feasibility of irrigating those lands.

15   But I don't say that there is not one acre.  But it would be

16   an extremely honest acre that could pay off three million

17   dollars or five million dollars or six million.

18        The point that I am making is that in this litigation

19   we are entitled to present to your Honor through cross-

20   examination and then on rebuttal that a claimant in this

21   proceeding, which is filed affirmatively against the United

22   States in this proceeding, we are entitled to demonstrate

23   (1) that the Fallbrook Public Utility District is claiming

24   rights to the use of water that it can never exercise, but

25   as long as those claims are made it is clouding the rights of

1    everyone on the stream.  We can show that from 1947 to date

2    they have changed and rechanged and changed and rechanged

3    their claims all down through the period of time.  We can show

4    that they don't know today the acres that can be irrigated,

5    that they cannot prove that they could assess against those

6    acres and create a project.  And if that circumstance

7    prevails I respectfully submit that it comes squarely within

8    your Honor's jurisdiction to review whether they have in fact

9    have a claim to a right to the use of water.

10        It has nothing to do with the question of the permit

11   that the State of California issued.  The State of California,

12   I think Mr. Moskovitz, quoting the Temescal case, says that

13   it is jurisdictional whether we find that there is a surplus

14   of water.  And beyond that they took not one step.  Your

15   Honor will review that proceeding, if he desires to.  And there

16   was no determination, indeed there was no evidence, in regard

17   to the methods of diversion and the application of water to

18   beneficial use in the Fallbrook Public Utility District.

19        Now, Mr. Sachse opened the door wide open when he filed

20   with your Honor and in this court the exhibit purporting to

21   show the water diverted from the Santa Margarita River and

22   purportedly applied to a beneficial use.  And our view is

23   this-- and I was glad that your Honor said, "Well, what about

24   this 36-inch pipe line?"  Your Honor asked the $64 question,

25   if I may go back a few years.  He asked the question that is

in the minds of all of us:  Where would you use that kind of water?  How would you use it?  Who needs it?  And I respectfully submit that in this dry area the burden should be and must be upon the Fallbrook Public Utility District to prove that it needs that water.  And more than that, that it has the capacity to finance a project which will divert and deliver that water to those acres of land.  Absent that, your Honor, what do we have?  We have nothing.  We have a claim.  We are not permitted to cross-examine.  We will simply have a piece of paper that will continue to cloud the rights of the United States, just so long as your Honor refuses to consider the facts in the case.  Certainly anybody can write a piece of paper and file it with the State Water Rights Board.  The mere claim clouds our title and has clouded our title for ten years, and I submit that until they demonstrate that there are acres that need the water, acres that can be irrigated, and I say can be, and the only way you can irrigate them is by means of having the finances to do so, and until that is demonstrated then their claims must fail.  And we have the right on cross-examination to demonstrate that they cannot finance such a project.

THE COURT:  How old is this boy of yours that you told me about?

MR. VEEDER:  Which one, Mike or Bill?  Bill is eighteen.

THE COURT:  The one who follows your activities in the

1    courts, the one who is going to read my pre-trial opinion.

2          MR. VEEDER:  The eighteen-year-old is bitter about that,

3    your Honor.

4          THE COURT:  I would like to say something if you

5    promise not to show him the transcript of today's proceedings.

6          MR. VEEDER:  If you are going to cut me in half, your

7    Honor, I don't want that to happen-- I am too young.

8          THE COURT:  This speech you made would be a great jury

9    speech, but it is just as broad as all outdoors.  The general-

10   ities you use do not make it even possible to pinpoint what

11   the legal problems are.  You are talking about clouding the

12   rights of the United States.  Now if you mean that because

13   this litigation has pended the Congress has been hesitant

14   to appropriate money, yes.  But that is not a legal problem.

15   That is a practical political problem.

16          Now what rights have been clouded, specifically?  You

17   have riparian rights, you have substantial riparian rights.

18   You may have prescriptive and appropriative rights growing

19   out of the operation of the ditch and Lake O'Neill.  But what

20   rights have been clouded?  Because a would-be appropriator

21   makes an application to the State and gets a permit to take

22   unappropriated water, if there is any unappropriated water

23   over and above the demands of the vested rights on the stream.

24   You cover it with a light and nimble touch.  You talk about

25   the rights of the United States are clouded.  Is your

1   riparian right clouded?  Assuming that you have a prescriptive

2   right, is it clouded?  Is your appropriative right clouded?

3   If you are claiming the right to take unappropriated water

4   without complying with State law, maybe that right is clouded.

5   But I have held that you don't have that right.

6        MR. VEEDER:  But may I interrupt right there, your

7   Honor.  Your Honor is limiting this matter--

8        THE COURT:  I am not limiting anything.  I am just

9   telling you that your showing so far is so broad I can't even

10   put my finger on what you are talking about.

11        MR. VEEDER:  I will be very specific.

12        THE COURT:  Secondly, you talk about the fact you

13   are going to show that there is not land within the District

14   to which water could be put to beneficial use.  If you were

15   prepared-- this is off the cuff-- if you were prepared to

16   show that there was no land within this district to which

17   water could be put to beneficial use, then maybe in an equit-

18   able suit, with the idea in mind of terminating other litiga-

19   tion, the Court might say, "Why, yes, let's forget about

20   this application and permit."  But you can't tell me that

21   you could ever take that burden, and the Court knows by

22   judicial knowledge that there is land to which water could be

23   put to beneficial use in that area.  That is just elemental.

24        Now, the next question is, am I going to segregate

25   and say instead of there being 4,000 acres to which water

could be applied in that District there are only 1,672 acres,
et cetera?  Am I going to be required to go into the ques-
tion of feasibility of a project which may never come into
existence?  The fact that Fallbrook has a permit does not say
that Fallbrook has to build a dam.  Fallbrook may or may not.
If they decide to build a dam, then we get to the place where
the rights of the United States have to be protected as to
the water that would go down the stream through the dam which
would go down to bedrock.  And if they decide to build a dam
and try to catch some flood waters, after they have placed
that water to some beneficial use, then they get a license.
But if they never place that water to any beneficial use,
they don't get a license.

MR. VEEDER:  But, your Honor, you have said that I
have spoken with too broad a stroke.  I will narrow it down.
The Fallbrook Public Utility District does this, under its
claimed right-- and if these gentlemen want to concede that
what I am saying in error, they can stipulate themselves out
of court-- they are claiming--

THE COURT:  Let me follow you.

MR. SACHSE:  I don't get that.

THE COURT:  If they want to concede that what you say
is in error?

MR. VEEDER:  If they want to agree with what I am
saying, they are out of court.  Put it that way, then.

1    The point that I make to your Honor is that they are

2    claiming that they can take -- and I am being very specific

3    now-- they are claiming that they can take from this stream

4    and irrigate lands within the Fallbrook Public Utility

5    District in a quantity and for a firm supply of 5100 acre-

6    feet a year.  That is Mr. Yackey's testimony.  He has

7    testified that they can take a firm supply of 5100 acre-feet.

8    Now that is specific.

9    MR. SACHSE:  That has not been testified to in this

10   court.

11   THE COURT:  We should skip some of these matters, but

12   how has he testified to that?

13   MR. VEEDER:  He has testified before the State Water

14   Rights Board, he has testified -- I don't know just exactly

15   the quantity of water he claimed, but he has testified in the

16   condemnation proceedings in regard to the quantities of water

17   that are required.

18   MR. SACHSE:  Mr. Veeder, you said that if we want to

19   challenge you we are out of court.  I am happy to challenge

20   any time you want.  If you want me to do it now, I will do it

21   now.

22   THE COURT:  Let Mr. Veeder finish, Mr. Sachse.

23   Go ahead and finish, Mr. Veeder.

24   MR. VEEDER:  The point that I make is that they are

25   claiming, and the general manager of their District-- and I

1   am being specific-- says that there is a firm supply of water

2   in the Santa Margarita River which will yield 5100 acre-feet a

3   year, that they can divert out of the watershed and utilize

4   5100 acre-feet of water or approximately that.  Now I cannot

5   imagine a more specific claim.

6       Now you say, how does that cloud your title?

7       THE COURT:  I haven't heard him testify, and I doubt

8   if I am going to let him testify to anything like that.  So

9   let's not cross that bridge until we get to it.

10      MR. VEEDER:  But your Honor has asked me and I simply

11  say that in a quiet title suit when the manager of an

12  organization says that we are going to take a firm supply

13  of 5100 acre feet, that clouds our title to the rights to the

14  use of water.

15      THE COURT:  To your riparian rights?

16      MR. VEEDER:  Of course, and I will tell you how.

17      THE COURT:  It is obvious that they can't take any of

18  your riparian water, if you have a use for it.

19      MR. VEEDER:  But it is also very obvious that while you

20  say they cannot, they are nevertheless making a claim that,

21  in our view, and we have the right to pursue it to its end,

22  in our view we have the right to demonstrate that a diversion

23  of 5100 acre-feet of water would encroach upon our vested

24  rights.

25      Now you say, "Well, they can't do it."  I say that in an

8440

1   equitable proceeding and in a quiet title proceeding, even

2   though their claims are as phoney as they are, and they

3   couldn't be more phoney, they are claims against which we are

4   entitled to a decree quieting those rights and quieting the

5   claims of those people.  Now that is California law.  When a

6   man comes along-- it may be that he was in a tribunal of the

7   character to which I have referred unkindly, and I regret it,

8   it may be that he was in such a place as that unfortunate

9   person-- but the fact remains that he did make the claim, and

10  any time that they divert 5100 acre-feet of water a year they

11  have to encroach upon our rights.

12      So we get back to the question, am I specific?  And I

13  certainly am.  I am specific in this, that the rights that

14  we have already proved inthis case, in my own view, would be

15  materially and greatly damaged by the exercise of a claim of a

16  firm supply of 5100 acre-feet of water.

17      THE COURT:  Now, wait.  If you are right about that,

18  it is already in the record.  Assume for argument that your

19  contention is right, it is already in the record, because you

20  have made your showing of what the rights are of the United

21  States on this land, and we know that the Water Rights Board

22  has given a permit for them to store water.  Now if you are

23  right and if, when we get through-- there are a lot of ifs

24  because I haven't got that far in my thinking in this case--

25  but if you are right that the riparian rights of the United

1   States downstream are such that there is no possibility of

2   their storing this amount of water, obviously they can't store

3   it because they can't take any vested rights on the river.

4   MR. VEEDER:  But, your Honor, that is not answering

5   our question.  Our question is this, are we entitled to have

6   our rights quieted against those spurious claims?  You say

7   they can't do it.  I say they are claiming it and I say that

8   is the remedy that we desire and that is the relief for which

9   we pray.

10   THE COURT:  How can you ever hope to get a decree

11   that there would not be some surplus water on this river?  How

12   could you ever hope to get a decree which would say that the

13   Court looks forward and knows that there never will be a week

14   when it will rain ten inches a day all week long and there

15   will be so much water running down the river that it will all

16   run out to the ocean?  How can you get a decree that there

17   will never be any surplus water on this river?  You can get a

18   decree as to what your rights are.  But how much water comes

19   down this river is something that God will determine-- and I

20   don't know that He is sure how much water is going to come

21   down the river.

22   MR. VEEDER:  I think He is, your Honor.

23   THE COURT:  How can you say that there will not be

24   surplus water?

25   MR. VEEDER:  The point I make--

1    THE COURT:  And Fallbrook started in with this case,

2    Mr. Sachse stated very plainly that all that Fallbrook actually

3    hoped to obtain was the right to store some flood water once

4    in awhile which would otherwise run to the ocean.  How can

5    you say there will never be someday flood waters which will

6    otherwise run into the ocean?

7    MR. VEEDER:  I have never in all my life said that

8    your Honor has the power or the authority or that he should

9    consider the question of surplus.  That is not here at all.

10   With all respect to your Honor's great powers, you couldn't

11   determine whether it is going to rain tomorrow or not.

12   THE COURT:  That is all their permit operates on-- is

13   surplus.

14   MR. VEEDER:  But their claim is what we are seeking

15   to quiet.

16   THE COURT:  In order to get a chance to operate on

17   surplus, they have to make a claim.

18   MR. VEEDER:  Sure they do, and they are claiming that

19   every year-- and this is the heart of this lawsuit, and I

20   respectfully submit it is a matter to be adjudicated-- they

21   are claiming that they can divert 5100 acre-feet of water

22   from this watershed, or at least for use, and that they can

23   apply that water to beneficial use, and the crux of the

24   question is this and it is very important, here is a man

25   clouding our title with a claim of 5100 acre-feet of water a

1    year, and we say even--

2         THE COURT:  Quit talking about clouding your title and

3    let's you tell me what title is being clouded.  Title to what?

4    Generalities don't mean a thing.

5         MR. VEEDER:  But, your Honor, I am not being general.

6         THE COURT:  Title to what is being clouded?

7         MR. VEEDER:  The right to the use of water that we

8    have and which we have proved.  As long as there is a claim

9    that they can divert 5100 acre-feet of water from the stream

10   above our land, our rights are clouded.

11        Now the fact remains that those are the claims that

12   they are making, and those are the proofs that they put in.

13   I am not saying review that proof.  I am saying that is the

14   cloud that exists on our right, and I submit that one of the

15   elements in disproving that claim is to demonstrate what I

16   would like to demonstrate here, that they don't know what

17   acreage could possibly be irrigated; that one of the elements

18   of proving an appropriative right is to be able to prove that

19   the water can be beneficially used in the quantities claimed

20   and then show where it can be used.

21        THE COURT:  They haven't even got an appropriative

22   right yet.  They have a filing, they have an inchoate right

23   and they have a permit.  It may grow into a license.

24        MR. VEEDER:  Right.  But it is a claim.  They have

25   that claim, and that is what we are seeking to quiet.  I

1   don't care what old man Holsinger did about a permit.  But

2   I do claim there is an assertion here of a right to divert

3   water.  They say, "We are not going to encroach on anybody's

4   rights."  I say we are entitled to have eliminated that claim

5   as long as it is a claim that, if it is exercised, has an

6   effect upon our title-- and it most certainly does.  Any

7   time we get into the hydrology of this case you always find

8   one thing, they are making claims to build a dam.  How could

9   they possibly build a dam?  They could build a dam in only

10  one way.  They could build a dam by assessing the acreage

11  that will support the dam.  And we believe that we can show

12  on this cross-examination-- I have exhibits here, I have

13  aerials here, I have maps here which I can demonstrate on

14  cross-examination that Mr. Yackey cannoot locate the lands

15  for which those waters are claimed and he cannot show that

16  those lands would be irrigated.

17          Now against such a claim as he has asserted--

18          THE COURT:  Let me interrupt you to show you how silly

19  this is.  Suppose you prove that Mr. Yackey couldn't locate

20  this.  Is Yackey the only man who might do the necessary work

21  for this District?

22          MR. VEEDER:  I will guarantee, your Honor, there is

23  no one else they are going to put on the stand who can show

24  this irrigated or irrigable acreage.

25          THE COURT:  I have heard enough for the time being.  I

want to hear from Mr. Sachse or Mr. Moskovitz.

1        MR. SACHSE:  Your Honor, I am going to make a very

2   brief statement only.

3        I don't like misstatements of the record.  It has been

4   repeated about five times by Mr. Veeder, or perhaps more, that

5   there is an assertion in this case that we demand the right

6   to take 5100 acre-feet of water a year out of the stream system.

7   I respectfully ask Mr. Veeder to show me a single pleading, to

8   show me single exhibit, to show me a single document in this

9   case that is in evidence now that makes any such assertion.

10  The documents that are in this case show that Fallbrook asserts

11  the right, under a State permit, to impound not to exceed

12  30,000 acre-feet of flood waters during the period Nov. 1 through

13  May 1, I believe it is, annually.  That is what the documents

14  show.  There is no assertion whatsoever that we take 5100 acre-

15  feet out of the stream system.

16        He is again doing the same old trick of setting up a

17  straw man.  This 5100 acre-feet is a very real athematic figure,

18  and what it is is the figure which was developed by the State

19  of California--this isn't in evidence, but he keeps talking

20  about it, so I am going to tell you what it is--it is the figure

21  developed by the State of California in Bulletin 57.

22        MR. VEEDER:  I thought 57 had been withdrawn.

23        MR. SACHSE:  You have repeated the 5100, and you can show

24  me no document about this 5100, and I am going to tell his Honor

25  what it is.

6

A 2

1          THE COURT:  What is it?

2          MR. SACHSE:  It is the figure used in Bulletin 57 as

3  developed by the State Engineer as being the safe annual yield

4  of a 35,000 acre-foot reservoir on the Santa Margarita River.

5  That's all it is.  It means that such a reservoir, having filled

6  up from rains, and projecting into the future our knowledge of

7  the runoff of that stream, and taking the surplus to which these

8  permits would entitle Fallbrook, taking very little water some

9  years and filling up over others, that in the best judgement

10  that those engineers could calculate that reservoir would yield

11  indefinitely that amount.  That is this 5100.

12          Fallbrook has never said 5100.  We have never written

13  a piece of paper with it on it.  We have made no claim in this

14  court.  Our pleadings are right in front of you.  We plead that

15  these permits which have been introduced, far from 5100, those

16  permits us to impound not to exceed 30,000 acre-feet in a year.

17          So much for the 5100.  The only other thing I want to

18  say, and I am going to stop.  Mr. Veeder says that he can demon-

19  strate and he would like to demonstrate now that we can't put

20  5100 acre-feet of water to beneficial use.  I am going to recall

21  your Honor's attention to the fact that after vigorous objection

22  from Mr. Veeder, with some sympathic listening from your Honor,

23  Fallbrook Exhibit K, which was sitting on this blackboard, was

24  finally withdrawn.  I stated I don't care, if Mr. Veeder doesn't

25  want this in evidence, it is not important to me.

A   3

1        May I have Exhibit K please, Mr. Luddy.

2        Exhibit K was exactly this.  Exhibit K demonstrates, not

3   hypothetically or theoretically or anything else, Exhibit K is

4   the actual water sold, not diverted, sold through meters for

5   which money has been paid by consumers each month for the years

6   indicated.  The Fallbrook Public Utility District has sold in

7   excess of 8 and 9000 acre-feet already in its past history.

8   Mr. Veeder didn't want this evidence yesterday.  If he wants

9   it now, I will be very happy to let him take Exhibit K and offer

10  it.  There it is.  That is the water sold.  The people paid

11  for it.  If he wants to get into it, there it is.  He objected

12  yesterday strenously.  If he has changed his mind, he may have

13  it now.

14        THE COURT:  Mr. Moskovitz.

15        MR. MOSKOVITZ:  Your Honor, I want to make just two

16  points to clarify what I think was an erroneous impression left

17  by Mr. Veeder or attempted to be made by Mr. Veeder.

18        First of all, the fact that land has a water supply from

19  some other source doesn't mean that rights can't be appropriated

20  to use water on that land from a different source.  For example,

21  if water is used from wells for particular land, or if water is

22  diverted from the Colorado River Aqueduct for certain lands,

23  that doesn't mean that the District may not appropriate water

24  from the Santa Margarita to substitute for that existing supply.

25  So that all the land that is now irrigated in the Fallbrook

1   Public Utility District could be irrigated and a right could

2   be acquired from the Santa Margarita River to irrigate that land.

3   I think that is clearly the law.  There is no doubt about that.

4           Secondly, Mr. Veeder for the first time today has in-

5   troduced the question of due-diligence.  He did so after reading

6   it in another book.  He did not mention it until he read it

7   there, and he thought it had something to do with financial a-

8   bility.  And it has.  This is what it has to do with financial

9   ability.

10          As you well know, a right of priority of an appropriator

11   dates from the time when he takes the first step that indicates

12   and intent to appropriate.  In the old days before we had statua-

13   tory appropriation procedure that could have been the day when

14   he first started building his works or could have been the day

15   when he posted a notice at the place where he intended to start

16   a diversion ditch, or a it could have been the day when he filed

17   a notice with the County Clerk.  From that day on, if he pro-

18   ceeded diligently with the project that he proposed, and completed

19   it, his priority date dated back to the first day on which he

20   took this action.  And it was an important thing, because it

21   took time to build a project, and if you couldn't date your

22   priority back to the first action you took some intervener

23   with a quickie project might come ahead of you by building fast.

24   So it was important.  Today that date is the day when you file

25   an application.

8449

A   5

1    Now it is also important that the applicant or intended

2    appropriator proceed diligently because if he wastes time, long

3    years may go by and the water remains unused and someone else

4    ought to have a chance at it.  So there is the requirement to

5    proceed with diligence.

6    Now the cases that Mr. Veeder cited are cases which in-

7    volve the question where a man has not proceeded with diligence

8    and he says, " I wish I could have.  I proceeded as diligently

9    as I could have, but I didn't have the cash in my pocket. Doesn't

10   that excuse me from proceeding?"

11   And the courts say no; if when you start out, you don't

12   have the financial ability, it is clear to everyone concerned

13   that you don't have the financial ability and you delay and pro-

14   crastinate and finally someday someone else appropriates the

15   water and the question is whether you still have a good right,

16   you can't say, "I'm sorry I delayed, but I didn't have the money."

7

17   In other words, the question arises only when due diligence

18   has failed to be exercised.  There is no such showing here.  The

19   Fallbrook Public Utility District just got its permits last year.

20   The time that the Water Rights Board has set for beginning the

21   work is not until next year, and there are good reasons why, in

22   the circumstances today, that that day probably may be extended.

23   There is a lawsuit pending.  No one in his right mind would pro-

24   ceed with this project until some of these issues are out of

25   the way.  So no question of due diligence could even arise at

1  this point where financial ability would be even at issue.

2      MR. VEEDER:  I am glad that Mr. Moskovitz brought this

3  up, your Honor.

4      I think that a court of equity, and I think your Honor

5  is fully empowered to consider at this juncture the power of

6  the Fallbrook Public Utility District to appropriate rights to

7  the use of water under the circumstances that exist and from

8  the standpoint of their financial ability to do so, and I think

9  that your Honor is entitled to consider the question of what

10  were the lands to be irrigated when the first attempt to create

11  an appropriative right was taken.

12      Now, to begin with, they claim only municipal and domestic

13  uses.  Then they come along with 12178 and 12179 and they made

14  claims on Sandia, on Rainbow, and on the Santa Margarita River,

15  10,00 a piece or approximately that.  Now at that time the

16  question was presented, does the Fallbrook Public Utility District

17  have the capacity to build this kind and type of project?  That

18  is a question that is presented.

19      THE COURT:  The question was presented to whom?

20      MR. VEEDER:  It was presented to the world at large.

21      THE COURT:  Let's limit it to tribunals of law.

22      MR. VEEDER:  All right.

23      THE COURT:  To what tribunal of law was it presented?

24      MR. VEEDER:  Just exactly the same as when a deed is

25  incorrectly executed and is placed on record.  It may not be

1   litigated for 25 years, but if that moment there was presented

2   a question of law for decision.  And when the Fallbrook Public

3   Utility  District came along and filed 12178 and 12179 there

4   was a question presented right then.  It is true that it was

5   not litigated.  It was not litigated until now.  But the question

6   was presented then, could they appropriate rights to the use

7   of water under the existing circumstances?

8           THE COURT:  Will show me, after you come back from the

9   noon hour, your authorities that under California Law, either

10  the old appropriative method or the new method under the statutes

11  to appropriate water, any authority to the effect that the per-

12  son had to show that he had the financial ability to  carry out

13  his project?

14          MR. VEEDER:  Yes, your Honor.

15          MR. SACHSE:  At the time of the application you mean.

16          MR. VEEDER:  The point I make is that that is just ex-

17  actly what I said just now, that the fact remains that an im-

18  properly executed deed may create a situation that needs to be

19  litigated, but it may await 2U years.

20          THE COURT:  You get your authorities and show me that

21  that is in issue.

22          MR. VEEDER:  I think it is in issue, your Honor.

23          THE COURT:  If a man fails to pursue his application,

24  fails to pursue his permit, he may do it for various reasons.

25  If he fails, he has lost whatever appropriative right he has.

But how can anyone come in before he has a chance to carry it
out and say, "Now you have made a filing here with the State,
but you haven't got the means to put this ditch in or to build
this dam, and so therefore we are going, by some judicial pro-
ceeding, to terminate your inchoate right or whatever you have
right now."  Show me a case like that.

MR. VEEDER:  I will undertake it, your Honor.

THE COURT:  And I want you to make a specific offer of
proof as to what you want to prove by this witness, because I
am not going to spend a lot more time on this matter unless you
can convince me that there is some issue here that can be tried
out.

MR. VEEDER:  Do you want me to start now on the offer of
proof?

THE COURT:  No, I will let you have over the noon hour
to tell me what you are going to do about it.

MR. VEEDER:  I am perfectly willing to start right now,
your Honor, and show you what I think are issues before your
Honor.

THE COURT:  I have ruled on some of these.  Count Seven
of your Complaint alleged that Fallbrook failed to prosecute
with due diligence their applications to appropriate water and
the rights to the use of water, and permits for the construction
of their project.  They have lost claimed rights through latches
and they are now stopped.  A motion to dismiss was granted.

1   That knocked that count out.

2        Now, that is not exactly the same, but you talked about

3   due diligence.

4        MR. VEEDER:  Well, it is certainly an issue here, irre-

5   spective of what your Honor did, the fact remains that we have

6   these claims of the Fallbrook Public Utility District dating

7   back to 1947, asserting interests in the Santa Margarita River,

8   asserting a right to create a project, and certainly I don't

9   believe that the law is such an ass as it is made out to be that

10  it will turn its back upon the proposition that here is a cloud

11  upon the rights of the United States and that has caused, in

12  our view, irreparable damage.  That is what our claim is here.

13

14

15

16

17

18

19

20

21

22

23

24

25

THE COURT:  Let's give a little thought also over the noon hour to the practical way in which the decree would be worded which decided the rights of the Government.  Let us assume, for the purpose of our discussion, that there were findings in the decree that the United States has riparian rights, and that it has appropriative rights, and that it has prescriptive rights.  Let us assume that for argument, and we are going to word a decree.  In that decree we are going to mention, as I say, something about this inchoate right or this permit which Fallbrook has to impound water.  Let's see what we could say about it.

It seems to me rather elemental that you would catalog the riparian, the appropriative, the prescriptive rights of the United States, holding that they were vested rights, that they were superior to any claimed appropriative right of Fallbrook; that Fallbrook had a permit from the State of California to impound water, which was an inchoate right, which had gone so far now to permit; that upon the construction of the project and the application of the water to beneficial use could result in a license; that any dam built on the river would be subject to the power of this Court to regulate what the Court would consider to be the ordinary flow of the river, surface and subsurface, through the dam that would have to be permitted to flow through; and that if, as and when the dam was constructed, no waters could be impounded

in the dam which would impinge upon the vested rights of the

United States; that as to flood waters coming down in flood

season, which were in excess of those to which the United

States were entitled to have flow down clear to the last inch

of ground before it got to the ocean, that there would be a

right to impound those waters.  And we will not complicate

it by discussing at this time whether or not the United States

also doesn't have rights to have flood waters flow down in

sufficient volume to recharge their basin.  Let's leave that

problem out of the case.

Now let's talk about the kind of decree.  That is the

kind of decree that I think would be entered.

MR. VEEDER:  Your Honor, I think that that will be a

pious idea, except for two things.  I don't believe we have

to take the additional step.  I think that we should be free

from this claim upstream, which necessarily, in our view,

clouds our title.

THE COURT:  2 o'clock.  You have told me that three

or four times.  I don't understand you yet.

(Noon recess.)

8

Z60

1    SAN DIEGO, CALIFORNIA, FRIDAY, FEBRUARY 13, 1959.   2:00 P.M.

2

3        THE COURT:  Mr.Moskovitz, I wrote once before, but

4    apparently it was not called to your attention.  I wish you

5    would change my mailing address to San Diego.  All your

6    correspondence comes to Los Angeles and then it is sent down

7    here.

8        MR. MOSKOVITZ:  I am sorry, your Honor.  I told my

9    secretary.

10       THE COURT:  I know.  You also have them send to me a

11   list of what summaries I should have.  I have no way of

12   knowing whether I have a complete list of your summaries or

13   not.  Do you have them listed by dates?

14       MR. MOSKOVITZ:  They are listed by dates, your Honor.

15       THE COURT:  Have them sent to me.

16       Here is the envelope.  You can see what happens.

17       MR. MOSKOVITZ:  I see what happened, your Honor.  This

18   was sent from Los Angeles, and I instructed the people up in

19   Sacramento.

20       THE COURT: Mr. Boronkay is the gentleman who sends the

21   letter to me.

22       MR. MOSKOVITZ:  Yes, I will tell him.

23       THE COURT:  All right, Mr. Veeder.

24       MR. VEEDER:  Your Honor had requested that I investigate

25   the law in regard to the propriety of a quiet title suit, as

8457

8

Z61

1   I see it, in connection with an inchoate claim and whether

2   under the circumstances a quiet title decree could be entered.

3       THE COURT: Against what kind of claimant?

4       MR. VEEDER:  Against an inchoate claim.  I think that

5   is the correct review of the issue that you raised.

6       The facts with which we are here confronted are these:

7   The Fallbrook Public Utility District, as shown by the witness,

8   has installed two large pumps immediately above Camp Pendleton

9   and is now diverting water and using it, and in its prayer for

10   relief and in its answer sets up claims for the $2\frac{1}{2}$ second-feet

11   of water and asserts its right, title and interest to that $2\frac{1}{2}$

12   second-feet, and further asserts that it is entitled to have

13   a decree quieting its title.

14       In addition to that claim, there was previously made

15   the prescriptive claim, now abandoned by the Fallbrook Public

16   Utility District.

17       Further, Fallbrook Public Utility District pleads that

18   it has permits to construct and to utilize water from the

19   Santa Margarita River.

20       Your Honor has questioned whether under the circum-

21   stances a court could adjudicate the rights claimed by the

22   Fallbrook Public Utility District.  We didn't touch upon the

23   $2\frac{1}{2}$ second-foot right, pursuant to which they are now taking

24   water.  However, that is part of their claim and it is

25   certainly important in this consideration.  It was unfortunate

that we didn't discuss that this morning-- although maybe
we discussed too many things as it was.

In any event, the question presented is whether
equity in this court can render justice to the United States.
And of course we believe that it can.  We believe that any
claim adverse in nature to the United States of America could
be quieted in this cause.  I realize that the thing that your
Honor has called attention to repeatedly is the fact that
Fallbrook says, "Amen.  We don't want to steal anybody's
water."  I don't believe that-- I mean, I don't believe
Fallbrook.  But in any event, I am convinced that their claim,
under California law, is such that a decree quieting the
title to it is entirely proper, and moreover, that based upon
their pleadings and based upon their case in chief in support
of those pleadings we are entitled to interrogate extensively
and completely in regard to all the features and aspects of
their claims.

In the State or California the law is very clear that a
plaintiff in a quiet-title action is entitled in the action
to dispell whatever may be regarded by third persons, as
well as by defendants, as a cloud upon his title.  For even
though the defendant makes no adverse claim, third parties
may regard plaintiff's claim as being subject to an adverse
claim by the defendant, which would be a cloud upon the
plaintiff's title, depreciating its value, and which he would

8

Z63

1   be entitled to have removed by the decree of the court so

2   that his record title may appear perfect, not only to the

3   defendant but to all persons whom it may thereafter concern.

4   Now that is a quotation from the case of Bulwer Consolidated

5   Mining Company vs. Standard Consolidated Mining Company, 83

6   Cal. 589, 23 Pac. 1102, at 1104.  It is also cited in Federal

7   Home Land Bank vs. Long Beach, 122 Fed. Supp. 401, 423.

8        So we have the circumstance where a plaintiff is

9   entitled to have quieted the claims against his property--

10  his rights.

11       THE COURT:  If the claim is of no value, and if there

12  is no substance to the claim.  But if there is any right

13  whatsoever in the other party, you can't have a blanket quiet

14  title against him.  There is nothing wrong with the law you

15  have read, but you come in to me with a simple quiet title

16  action-- somebody has a mining claim on your property they

17  placed on it years ago.  If there is any value of any kind

18  to that mining claim, you can't get your title quieted.  You

19  have a title subject to it.  If you can show that claim is

20  utterly without merit, then maybe you succeed.

21       Now, just to cut this short, maybe, tell me what kind

22  of decree could I enter that would completely cut Fallbrook

23  off from having any right under their permit and license for

24  the 2½ second-feet?  How would it be worded?

25       MR. VEEDER:  I would word it, first, that whatever right,

8

z64

1  title and interest they have would be limited solely and

2  entirely to municipal uses, and then I would restrict it

3  entirely from uses for purposes of irrigation with specific

4  language.  In the event that your Honor should decide that

5  rights to the use of water may be used for the purposes of

6  irrigation, I think that it is essential that you define and

7  delineate the areas where that water is required and where it

8  will be utilized.

9        The additional factor that I make, though, your Honor,

10  in this whole matter is that you have a public entity that is

11  in here claiming rights to the use of water, and an irriga-

12  tion district couldn't and is never permitted to come in and

13  simply say, "I am entitled to claim for blank area," without

14  showing where that water could be beneficially applied.

15       I can show your Honor from aerial photographs in

16  regard to this matter the kind and type of land for which this

17  water is claimed.  I think we can show that those lands could

18  not, under any sensible or reasonable means of diversion and

19  application of use, be subjugated.  I think that is true, and

20  I certainly believe that it is in issue before your Honor in

21  making the determination in regard to this matter.  I think

22  that our title is clouded, as I have said before, by these

23  claims.

24       You raise the point-- you said, "Well, what have you

25  to worry about until they build the dam, divert the water and

8

Z65

1    get a license for it?"  Well, of course, the law, in my view,

2    would be entirely in error if that were permitted.

3        THE COURT:  You don't need to worry about that.  I

4    am going to put in this decree that Fallbrook builds no dam

5    until there has been a complete understanding about the

6    ordinary flow of this stream.  You don't need to worry about

7    that.  They know that they can't go down to bedrock and build

8    a dam and cut off the surface and subsurface flow of that

9    stream without protecting your rights as a downstream owner.

10   They are not going to argue about that.  So how can you be

11   hurt?

12       MR. VEEDER:  How can we be hurt?  We are hurt, and

13   the thing that is so frustrating at the moment is this, that

14   the rule of law and the rule that has been adhered to through-

15   out the whole history of these water cases, quiet-title cases,

16   is that there needs be no invasion.  It is not necessary that

17   there be an invasion.  Else you would have the circumstance

18   where, if we sat by and let them go ahead, we would be con-

19   fronted with their structure up there.  You said, "Well, it

20   is taxpayers' money.  Go ahead and condemn it."  But I don't

21   believe that is the situation.  I believe that before they

22   are permitted to go ahead and build their dam they have to

23   prove in this court the kind and type of use to which they are

24   going to apply the water, and I don't believe that they can

25   just come in and say, "Here is the permit.  We don't have to

1    do more." We have come in and we have said that based upon

2    their allegations and based upon their pleadings they have

3    burdened our title, that they have made adverse claims, which

4    they truly do, if you read their complaint and their answer--

5    it is obvious that they do, irrespective of the pious state-

6    ment of the State of California and of Mr. Sachse, "We are

7    not going to steal anything at all," the fact remains that

8    they are claiming adversely to us, and the law on that is

9    clear. It says that there need not be an actual interference

10    with plaintiff's rights before an action may be maintained.

11    The assertion of an adverse claim is sufficient. It would

12    be impossible to cite all of the cases where suits to quiet

13    water rights have been brought under this section.

THE COURT:   How can this claim that Fallbrook has to some of this water be adverse, when I am going to hold that any right they have to water is subject to and inferior and subsequent and junior to any rights that the United States has to their riparian rights, to their appropriative rights and to their prescriptive rights?  So what is it adverse to? If it is adverse to anything, it is adverse to the claim the right of the United States to use this same water which Fallbrook is trying to appropriate.  So how is it adverse to any of your rights?  I am going to hold that this right can't any affect any vested rights on the stream.  It is only a right if, as and when a lot of water comes down and goes to waste.  How can it be adverse to any right of the United States?

MR. VEEDER:   Your Honor, I think you have not taken the additional step that the California Law and I think the law of equity demands in this kind of suit.  It says that every description of a claim is included and it involves any claim that would depreciate the value of the plaintiff's property--any claim that would discommode.

THE COURT:   Suppose you had a first mortgage on some property.  Could the fact that somebody asserted a second mortgage that was subject and inferior to your first mortgage in any way affect your first mortgage?

MR. VEEDER:   I don't know your Honor.  It would depend on a great deal.

All

1        THE COURT:  It would upset all of the real estate laws

2    of the State of California if that second trust deed or mortgage

3    could in any way affect the validity of the first.  The very

4    essence of it is that it is junior and subject to the first.

5        MR. VEEDER:  Here is an interesting case from the State

6    of Oregon:

7        "It is also argued that since the defendants concede

8    the plaintiff's prior right and manifest no intention of con-

9    tinuing the interruption, the suit may not be maintained."  Now

10   that case is very similar to this.  They say, "No, we are not

11   going to take any water."  But they are pumping now, I dare say,

12   they will pump every day, and will continue to pump, and under

13   an adverse claim of right.  That does discommode the United

14   States.

15       THE COURT:  What do you mean, under an adverse claim of

16   right?  Adverse to what?

17       MR. VEEDER:  Adverse to the United States.

18       THE COURT:  To the United State's riparian right?

19       MR. VEEDER:  Yes.

20       THE COURT:  Appropriative?

21       MR. VEEDER:  Sure.

22       THE COURT:  I don't so understand it.

23       MR. VEEDER:  All you have to do is go down to see it,

24   your Honor.  The point that I make, your Honor, in this regard

25   is, that we are entitled, in our view, to have adjudicated this

8464

A12

1   right.  We are entitled to have it reviewed.

2          THE COURT:  What right? This right that Fallbrook claims?

3          MR. VEEDER:  The affirmative claim of the Fallbrook Public

4   Utility District.

5          THE COURT:  I propose to adjudicate it, and I want to

6   know what this evidentiary showing you are proposing to make

7   has upon the adjudication of it,  when it is conceded that it

8   is subject  and inferior to the rights of the United States.

9          MR. VEEDER:  But the fact remains, your Honor--

10         THE COURT:  You want me to adjudicate it by just wiping

11  it off of the board and saying there is no such right.

12         MR. VEEDER:  Truly, I think that your Honor has juris-

13  diction, and with all respect I think that jurisdiction should

14  be exercised for the purpose of reviewing the claims that started

15  out for 5000 acres, for 8200 acres, and now for 15,000 acres.

16  I think that the very elements that exist here are the cloud

17  upon the title, and I think that part of the cloud upon the

18  title, the claim that is being asserted, entails the irrigation

19  of land by this defendant.  We say, and I think it is the law,

20  that before the Fallbrook Public Utility District could have

21  an adverse claim declared here affirmatively, asserting a right

22  to divert and apply water to a beneficial use, we are asserting

23  that by so doing, and certainly their pleadings disclose it,

24  that they are claiming adversly to us.

25         Now it may be that when everything is said and done

1    your Honor will do what you say you will.  But it is a long

2    way to the end of the line, and there are a great many legal

3    issues entailed.  Our view is this, that where an affirmative

4    claim to divert and apply water to beneficial use exists and

5    there have been the overt acts that are here present, namely,

6    a condemnation proceeding for a dam site, the installation of

7    pumps--as I understand it, the Sawday pump is now within the

8    jurisdiction of the Fallbrook Public Utility District--every

9    single one of those factors and issues clouds our title.

10        You say, "Well, their not such bad people.  They will

11   not interfere with your right."  We say that they have.  We

12   say that there is a claim above our lands.

13        THE COURT:  You are not properly quoting me on that

14   score.  I didn't say that they were good people.

15        MR. VEEDER:  You said that they are not going to interfere

16   with your rights.

17        THE COURT:  I have said that any rights that they have

18   are junior to the rights of the United States.  That's all they

19   claim.  That's all I say.  I am not in sympathy with all they

20   have done.  I think there are some people speculating on land.

21   I think they are trying to get water.  There will never be water

22   enough in the stream to take care of all the plans they have in

23   mind.  But that doesn't keep them from hoping.  They might build

24   a dam.  There might be some rain someday to fill it up.  But

25   all I am saying is that their rights, if any, are junior to those

1    of the United States.

2        MR. VEEDER:  But your Honor, I believe even a junior

3    claimant, although I am not conceding that they take that

4    position, they are in the position before their own tribunal

5    of declaring an intention to irrigate several thousand acres

6    of land.  They are in the position now of asserting that their

7    rights are ahead of Lake O'Neill, that their rights are ahead

8    of claims that we are now exercising.  They are asserting that

9    they have rights to impound water, the impoundment of which,

10   in our view and based upon the evidence in the record, would

11   destroy the vegetative cover on our property.

12        Now it is certainly an element in this litigation, in

13   our view, that if they should fail in proving the elements that

14   we think are essential for proof of an appropriative right in

15   California, the cloud would be removed.  You say, " Well, there

16   is no cloud."  There is, your Honor, if you will consider their

17   claims and the evidence that they have put in in other cases.

18   You say, "Well, that is not before me."  I submit that the

19   law in regard to quiet title, your Honor, doesn't require that

20   the adverse claim necessarily be asserted before you.   They

21   could do as they have done.  They have gone before a State

22   Tribunal and have interfered with our developments by their

23   adverse claims.  We know that as long as those adverse claims

24   are in existence that the Congress will refuse to appropriate

25   money.  You say, "Well, that is not legal."  The law in

1   California--and I am glad your Honor had me go take one more

2   look at it, although I looked at it before I ever started this

3   lawsuit--the law in California, I think, is extremely clear.

4          I will cite you another case, Peregoy versus Sellick,

5   79 Cal. 568, 21 Pacific 966.  Here again was a quiet title

6   action and it was brought against a man who was not diverting

7   all of the water, although he was claiming a right to water,

8   and two questions were presented:  Whether under the circum-

9   stances, it being an inchoate claim, there could be a decree

10  quieting title.  The court reviewed the second question, and

11  the question was this:  Whether the defendants, who are not

12  shown to have interfered with the use of water at the season

13  when plaintiff was entitled to it could be sued.  And the court

14  said, "As to that point, it is only necessary to say that the

15  right to maintain this action does not depend on an actual

16  interference with the plaintiff's rights.  The assertion of

17  an adverse claim is all that is required."

18         Now there is certainly an adverse claim asserted here.

19  It is not even doubtful.  Your Honor says, "Well, we will pro-

20  tect you to the full extent of your rights."  That may be so.

21  The ultimate may come by that way.  But at this juncture in the

22  trial, the question, and the only question, is, is there an

23  adverse claim?  I am sure that Mr. Sachse will not concede the

24  Lake O'Neill right, the right to maintain a vegetative cover

25  on our property, the right to transfer the Lake O'Neill water

9
9
A16
A16

1   outside the watershed and use it there.  To all these numerous

2   rights that we are claiming he is saying, "No, I contest those

3   claims."

4          THE COURT:  Let's stop right there.  Let's take your

5   Lake O'Neill rights.  If the Government's right as to Lake

6   O'Neill is established, or whatever rights are established,

7   Fallbrook's rights are subordinate to that Lake O'Neill right.

8   I am not going to prevent you from making any proof that you

9   want to make as to your Lake O'Neill right.  But what you are

10  offering to prove now doesn't establish your Lake O'Neill rights.

11  If I may put it this way, you merely say, "We have made a saying

12  about our Lake O'Neil rights.  Now we want to show that this

13  claim by Fallbrook is an entirely fictitious right."  You don't

14  succeed in a quiet title action on the weakness of the other

15  man's claim.  You succeed on the strength of your own.  If you

16  establish rights at Lake O'Neill, then those rights are superior

17  to anything that Fallbrook establishes.  If you fail to establish

18  rights at Lake O'Neill, then this business about Fallbrook is

19  something else again.  If there is water that is subject to

20  appropriation, maybe they will get some.  But that hinges on

21  whether or not you establish a right at Lake O'Neill, and not

22  on whether or not you knock down a supposed claim of the other

23  man.

24

25

8469

Z 10

Z67

MR. VEEDER:  Your Honor, if I may respectfully submit, you are talking one side of the coin.  In our view, and California appears to agree with us, we have approved an appropriative right under the law of California in 1914.

THE COURT:  I am going to give you every possible right I can at Lake O'Neill.

MR. VEEDER:  All right.

THE COURT:  I don't know what that is yet.  But I am satisfied that there has been water used there for a long time and we will have to scrap out what it is.  But I haven't seen anything to indicate to me that as a long-time user of water there it could be taken away from you.  But that is neither here nor there.  You have to stand or fall on what you have made on Lake O'Neill, and you don't bolster Lake O'Neill's rights by trying to take cracks at the alleged inchoate right that Fallbrook wants to press.

MR. VEEDER:  But, your Honor, if I may say, we have put in our claim for the enclave.  Now, the burden of proof actually became Fallbrook's burden of proof.  It is more than just a shift to them to go ahead with the evidence.  They have come forward now.  They have proceeded just like a plaintiff to prove their rights.

THE COURT:  What have they proved?  They have proved that they have gone to the State Water Rights Board and have got a license and a permit to take some water, which permit

10

Z68

1  or license right on the face of it says that it is subject to

2  all vested rights on the river.

3  MR. VEEDER:  Yes.  But we are talking about Fallbrook's

4  claims, and that is what is at issue, not what some bureau-

5  crat in California handed them as a piece of paper.  We are

6  talking about the adverse claims that exist now.

7  And if I may go on just once more, in regard to what

8  you have stated, sure, we have to win on the strength of our

9  title, and there is only one issue we are arguing about most

10  of this day, and that is my right to cross-examine from the

11  standpoint of the claim of Fallbrook to a right to the use of

12  water.  That is the only issue.  Fallbrook has to win on the

13  strength of its title just the way the United States has to

14  win on the strength of its title in this kind of litigation,

15  and I submit that there is only one question here for your

16  Honor's consideration at this juncture:  Will we be entitled

17  to the right to cross-examine for the purpose of destroying,

18  if possible, what we think is a cloud upon our title.

19  THE COURT:  I will ask you again, what do you propose

20  to show?  What evidence do you propose to bring out?

21  MR. VEEDER:  All right, I will show your Honor.  First,

22  I will show, in regard to Mr. Yackey-- and I think that the

23  interest of a witness is always at issue-- we will show that

24  Mr. Yackey bought a ranch--

25  THE COURT:  Let's not go into that.  You can always

Z69

1    attack the interest and the bias of a witness.  There is no

2    argument about that.

3         MR. VEEDER:  That would be one of the factors that I

4    would go into.  But if your Honor could come here, I would

5    show you the kind and type of interrogation upon which I

6    would proceed.

7         (The Court stepping down to the counsel table.)

8         MR. VEEDER:  Now, here is a ranch.  Here is where our

9    friend Mr. Yackey resides.

10        MR. SACHSE:  Mr. Veeder, his Honor asked you not to

11   indulge in personalities except under proper circumstances.

12   I am going to formally request your Honor to ask Mr. Veeder

13   to confine himself to proper cross-examination.

14        THE COURT:  Tell me what you expect to prove.

15        MR. VEEDER:  All right.  I will orient your Honor

16   on the quads.  Here is Sandia Creek coming up here.  Here is

17   where the De Luz Creek Dam is situated.

18        MR. SACHSE:  You are mistaken, Mr. Veeder.

19        MR. VEEDER:  Well, it is right below Sandia.

20        MR. MOSKOVITZ:  You pointed to this point.

21        MR. VEEDER:  All right, here.

22        Now, we would show on cross-examination, we would

23   demonstrate that these areas which are part of the 15,000

24   acres, couldn't be irrigated by billygoats carrying the water

25   up there on their back.  That is part of the proof of any

man's right to appropriate rights to the use of water.

MR. SACHSE:  I can't tell offhand, your Honor, what we are looking at.  I don't know whether we are on the right river.

MR. VEEDER: All right, I will help orient you.  You see this reservoir here.  There it is right there.  I am not being critical of Mr. Yackey.  Here is the Martin Ranch right there-- there it is up there.  Now, this area in here, this green area right in here, right through there.

MR. SACHSE:  Can you also point out that everything I see here-- all of this, all of this, all of this, all of this-- appears to be presently in orchard?

THE COURT:  Is this all of the District here?

MR. VEEDER:  Yes, your Honor.

THE COURT:  Now, when we got all through it would become apparent that there would be certain portions of this that probably could never be irrigated.  It would also be apparent that other portions could be irrigated.  Is that correct?

MR. VEEDER:  Your Honor, in that regard, I don't believe there is any of that area at which we are now looking that could be irrigated from the kind and type of system-- I am talking about a firm supply and I am talking about financial ability to pay for this.

THE COURT:  Do you expect me to go into an estimate now

1  as to whether or not financially this dam would ever be a

2  success, how big a burden it would be per acre?

3  MR. VEEDER:  I think that is certainly part of the

4  appropriative right in this State.  I think that certainly

5  from the standpoint of the inchoate claimant you have a right,

6  and I respectfully submit, I think an obligation to consider

7  at this juncture the question of the feasibility of a project.

8  THE COURT:  Let me interrupt a minute.

9  MR. VEEDER:  All right.

10  THE COURT:  Leave out economic feasibility for the

11  moment.  You would concede that within the area you have

12  shown me within the new addition to the District there would

13  be areas that could be irrigated.

14  MR. VEEDER:  From the system?  Well, now, I will have

15  to say this.  I have a map that was prepared and filed,

16  showing Sandia Creek and Rainbow Creek and the other reser-

17  voirs, that when read back against these contours and against

18  this aerial photograph, I think your Honor would observe that

19  a vast share of the area which is shown on Exhibit H, I think

20  it is-- what is that exhibit?

21  MR. SACHSE:  Exhibit H, I think.

22  May I point out, Mr. Veeder, that Exhibit H, by your

23  express consent and by his Honor's express ruling, is not

24  purporting to show the high water mark or the boundaries of

25  any reservoir.

11

Z72

MR. VEEDER:  All I am talking about is the area encompassed within the blue line as shown on Exhibit H.

THE COURT:  What about it?

MR. VEEDER:  I think when your Honor will view this area in here he will observe and will be able to find and should find, in my view, that there could be no irrigation system constructed based upon the claims that are made by Fallbrook in the application attached to permits which were issued on 12178 and 12179.

I further believe that when we get into the question of the utilization of water in this area, based upon the availability of it, you will also find that again predicated upon Mr. Yackey's own statement that the water would be of a sufficient elevation in the reservoir for such a short duration of time within the 20-year span that he has figured that it would be impossible to conduct an irrigation system and to operate an irrigation system, assuming that the Fallbrook Public Utility District had the power, which it is denied.

I think that it is the obligation of any court to review and to consider the area to be served by an entity which is claiming the rights to the use of water.  I believe that is the law.

THE COURT:  Isn't the area to be served also the area below which has been heretofore developed?

1    MR. VEEDER:  Yes.

2    THE COURT:  What do you say to Mr. Moskovitz's sug-

3    gestion that you can substitute water?  The mere fact that

4    they are irrigating some of that with aqueduct water doesn't

5    preclude them from irrigating it from Santa Margarita water,

6    if there is water over and above the demands of the vested

7    rights on the river.

8    MR. VEEDER:  I think, your Honor, that we still have

9    to go back and find out about the needs and uses.

10    Now here is another aerial.  Here is the area in which

11    they are claiming water to irrigate 5,000 acres of land.

12    MR. SACHSE:  Just a minute, Mr. Veeder.  5,000 acres

13    on that little picture?

14    MR. VEEDER:  No, I say in the area for which they are

15    claiming water for 5,000 acres of land.

16    THE COURT:  6,000.

17    MR. VEEDER:  I think they started off with 5,000, and

18    then they went to 8,200, and now out of that 8,200 they claim

19    7,200 irrigable acres.

20    I daresay that when you get through viewing these areas

21    for which they are making these fantastically high claims you

22    will be able to find as to the whole area that there is a

23    serious question, which they should be able to prove, that

24    they could construct and maintain and operate a system.  I

25    don't believe you can simply presume it.  I think they

11

Z74

1   have to prove it. He came in and made a claim on that quantity

2   of water. The burden was on them to prove it, and I think I

3   have a right to cross-examine and to show that they couldn't

4   and won't and haven't the power to do it. Stop and think in

5   regard to the burden that would be required to be placed upon

6   the lands for which these claims are being made. I think

7   that the question of feasibility is squarely presented to

8   your Honor, and I think that as a part of their case in chief--

9   they have entered their case in chief-- I think that I have

10  the right to cross-examine in regard to it.

11           MR. SACHSE:  Your Honor asked for some expressions of

12  opinion as to what kind of judgment ought to be entered. Do

13  you want to hear that now?

14           THE COURT:  Yes.

15           MR. SACHSE:  First, I would like to comment that I

16  wish your Honor would read the case cited by Mr. Veeder,

17  Bulwer vs. Consolidated Mining Company, 83 Cal. 589.  In that

18  case the defendant expressly admitted that the plaintiff was

19  the owner of a mining claim which the plaintiff sought to

20  quiet title to.  Defendant asserted ownership in an adjoining

21  and different claim.  It is a very beautiful case.  It fits

22  right into this situation.

23           Fallbrook expressly admits the rights of the United

24  States as a riparian.  Fallbrook asserts the ownership of a

25  different type of claim.  Read that case and you will see

1  what action the Court took in the case.  I am very happy

2  that Mr. Veeder cited it.

3        One factual statement.  Mr. Veeder said that the

4  Sawday pumps are within the jurisdiction of Fallbrook Public

5  Utility District.

6        MR. VEEDER:  I inquired.  It is not.

7        MR. SACHSE:  The Sawday pump is within the area

8  physically annexed.  The Sawday pump is not operated by or

9  in the control of the Fallbrook Public Utility District.

10        I am not going to argue most of what Mr. Veeder has

11  discussed here because, frankly, I don't think it is neces-

12  sary.  I don't think it is this Court's place-- in fact, we

13  argued this at some length at pre-trial-- to substitute its

14  judgment as to the wisdom of a project, the economic feasi-

15  bility of a project, the desirability of a project.  It is

16  for the citizenry and the governing body of an agency of the

17  State of California.  I don't think this Court will do that.

18  I think it is this Court's duty and obligation to find the

19  rights of the parties, to spell out in detail, as Mr. Veeder

20  has asked, the extent of the rights of the United States and

21  the rights of all of the other claimants to the stream.

22        I am going to try to be very specific, even as to ex-

23  act language, and I might point out before I start--

24        THE COURT:  You are talking about the form of a decree.

25        MR. SACHSE:  I am talking about the form of a decree

8478

11

Z76

1    as it would affect Fallbrook.

2         I would like to mention first, your Honor, that we

3    don't have to be hypothetical.  There will be in this decree,

4    beyond any question, language exactly like what I am going to

5    say, except for different facts, because the Vails have a dam

6    and have a permit.  One of my clients, Mr. Garnsey, has a

7    very small reservoir and has a valid permit under which he

8    is taking water.  So your Honor will make findings of this

9    kind regardless of Fallbrook.

10        But now confining myself to Fallbrook, I think your

11   Honor's decree will find that Fallbrook is the owner of

12   Permit 8511, Permit 11356 and 11357 of the State of California.

13        And now I am going to start taking language from one

14   of those permits.  I think your Honor will find that the

15   amount of water appropriated by Fallbrook shall not exceed--

16   I am pooling the three together-- 30,000 acre-feet per annum

17   from the Santa Margarita River by storage to be collected

18   from about November 1 of each year to about June 1 of the

19   succeeding year.

20        I think your Honor will find and order that the permitee

21   shall release water into the Santa Margarita River downstream

22   from the point of diversion in such amounts and at such rates

23   as will be sufficient, together with the inflow from down-

24   stream tributary sources, to supply downstream diversions of

25   the surface flow under vested prior rights to the extent that

11

277

1   water would have been available for such diversions from

2   flow unregulated by permitee's works and sufficient to

3   maintain percolation of water from the stream channel as

4   such percolation would occur from flow unregulated by

5   permitee's works in order that operation of the project

6   shall not reduce natural recharge of the ground waters from

7   the Santa Margarita River.

8           And finally, I think your Honor will find something

9   to this general effect-- I am still reading from the permit.

10  That last was verbatim.  This is slightly modified:  All

11  rights and privileges under this decree, you will say, in-

12  cluding the quantity of water diverted, are subject to the

13  continuing authority of this Court.

14          I think that is what your decree is going to say.

15          I do not believe that your Honor is going, in the

16  initial decree in the case of Fallbrook, which after all

17  hasn't got a dam yet, say that the gate has to be so many

18  feet wide or that the capacity has to be so much.  I think

19  you are going to make a general finding of that kind, with

20  continuing jurisdiction to implement in specific terms the

21  general charge or burden that you have placed on the permitee

22  Fallbrook, just as the Water Rights Board has placed in

23  general terms a burden.  But the Water Rights Board says

24  that all rights and privileges under this permit, including

25  the method of diversion, the method of use and quantity of

11

Z78

1   water diverted, are subject to the continuing authority of

2   the State Water Rights Board.

3       When I read that I simply deleted the words Water

4   Rights Board and substituted the words "continuing order of

5   this Court."

6       The only alternative to that kind of order-- again I

7   am speaking not only of Fallbrook but of Vail, Garnseyp, and

8   anybody else that I can conceive of-- the only alternative

9   would be to determine that the situation at that moment is

10  so critical that your Honor would set up , through your

11  equity powers, some sort of administrator, which we call in

12  California water law a water master.  I don't believe that

13  would be necessary.  I think it would be undesirable.  I

14  have serious doubt as to the willingness of the United States

15  to accept the jurisdiction of a water master, since they are

16  the last user on the stream.  But the only alternative to the

17  type of decree I have just outlined for your Honor is a water

18  master.  I know of no other.

19      MR. VEEDER:  Your Honor, if I may, the point that I

20  make is that the question is not as to the form of the decree.

21  The question is whether I will be permitted full latitude on

22  cross-examination.

23      MR. SACHSE:  I was only replying to his Honor's ques-

24  tion.

25      MR. VEEDER:  And that is the only issue that is here:

12

Whether Fallbrook's claims can be accepted without proof

beyond the piece of paper given them declaring that there is

a surplus of water. That is the only thing. And we say that

they have offered a case in chief and that we are being

prevented from full cross-examination.

Now, there is an additional authority that I think

would be of interest to your Honor. It is Inyo Consolidated

Water Company vs. Jess, 161 Cal. 516, 521 (119 Pac. 934).

That goes back again to the question whether a claimed

inchoate right constitutes a cloud on the title.

We go beyond that. We say there is now an actual

diversion and use of water that clouds our title. It may be

that they are acting in excess of their permit. But there is

another case from California that is important in that connec-

tion. There, there was a decree that was entered and the

defendants were asserting the right to take a quantity of

water based upon their construction of the decree, and

California's highest court reviewed the matter and said, "Well,

we have jurisdiction to enforce the decree." I will give

you the citation of that-- Howell and Company vs. Corning

Irrigation Company, 177 Cal. 513 (171 Pac. 100). The Court

said that in regard to the claim by these defendants of a

construction of the decree which would give them more water,

the court declared that it had powers to entertain the pro-

ceeding and had power to adjudicate it.

Now my position is this.  I think your Honor concedes and has recognized, and indeed has declared, and I believe everyone has recognized your Honor's jurisdiction here.  It turns on one question:  Must this Court restrict cross-examination by reason of concessions by the Fallbrook Public Utility District that its rights are subject and subordinate to whatever rights you adjudicate to us?  My view is that thus to restrict cross-examination strikes at the very heart of our right fully to try this case.  So that is our position, your Honor.  I believe it is not a matter of the kind and type of decree.  But are we permitted to find out what Fallbrook is actually claiming, how can it use the water, where will it use the water, how can it build a dam, what money does it have to build a dam, does it have enough money to build a dam, what kind of plans does it have?  I think that is all proper cross-examination in this proceeding.

MR. SACHSE:  Your Honor, I will repeat, to all of those offers, if I may call them offers, although I realize Mr. Veeder didn't make them exactly as an offer--

MR. VEEDER:  They will be made.

MR. SACHSE: To all of the offers, the offer of proof as to what it will cost, the offer of proof as to how big it will be, the offer of proof as to how it will operate, et cetera, to every one I will have two identical objections:

The first objection will be that it is outside the

1    scope of the direct examination.

2         The second objection will be that it is immaterial, in

3    any event.

4         I don't need to argue it further. Those are the

5    objections.

6         THE COURT: Mr. Moskovitz, do you have any information

7    to assist the Court? Do you have some clear and lucid

8    explanation of what the problem is and how it should be

9    resolved?

10        MR. MOSKOVITZ: Your Honor, in my opinion the kind of

11   decree that you will enter with respect to Fallbrook's permits,

12   which have not yet gone to license and under which there

13   has been no construction or diversion of water or storage

14   of water, would merely be to recite the fact that a permit

15   has been issued and recite the details and recite further

16   that if and when the District proceeds to construct the works

17   proposed and to put the water to beneficial use and is able

18   to prove up on that use, in that event it may have perfected

19   a vested right. What I am saying is that the kind of decree

20   you will enter does not require you to go into the question

21   at this time of the financial feasibility of the project.

22        THE COURT: What about the Fallbrook permit that has

23   already gone to license?

24        MR. MOSKOVITZ: As to those, I think for the Fallbrook

25   Public Utility District to have a decree that they have a

13

Z82

1    vested perfected right the Fallbrook Public Utility District

2    will have to prove beneficial use.  Thus far, there has been

3    no evidence of beneficial use.

4         MR. SACHSE:  Of 2½ second-feet.

5         MR. MOSKOVITZ:  Of 2½ second-feet.  That is what I

6    am talking about.  The water that they have already appar-

7    ently put to use because they have secured a license.  But

8    I think they will have to prove that beneficial use to you.

9         MR. SACHSE:  I concede that as to the 2½ second-foot

10   license it will be necessary for the Fallbrook Public Utility's

11   case to prove that 2½ second-feet stream flow per annum taken

12   under the terms of that license has been put to beneficial.

13        THE COURT:  Whom do you expect to call to prove that?

14        MR. SACHSE:  I expect to re-offer-- I knew full well

15   yesterday when Mr. Veeder started this performance that this

16   was all going to come out, I knew it beyond any question of

17   doubt-- that exhibit is going right back into evidence on

18   redirect examination.  That exhibit shows the water used in

19   Fallbrook, and the exhibit already in evidence, your Honor,

20   Exhibit L, shows the water diverted from the Santa Margarita

21   River.  I contend that the diversion of water and the sale

22   through a meter for money paid by consumers is a showing of a

23   beneficial use by a public agency.  If Mr. Veeder thinks that

24   we pumped that water out of the Santa Margarita River and

25   let it run down a gully to a non-beneficial use, Mr. Veeder

Z83

1   can prove it.  Let him show the Court.  We will tell the

2   Court that we have pumped the water out of the river and sold

3   it to consumers, and that is a beneficial use of the highest

4   kind we are capable of exercising, to sell it to somebody.

5   That's all we can do with it, and we have done it.  We have

6   so proved already, I might add, without Exhibit K.  Your Honor

7   has before you Exhibit L.

8       MR. MOSKOVITZ:  Your Honor, to go a little further, I

9   know of no case-- that doesn't mean that there isn't any,

10  because I haven't done research on this question specifically--

11  I know of no case in an action where inchoate rights are

12  involved that it is necessary for the appropriator to prove

13  all these elements that Mr. Veeder has asked for:  The

14  financial ability, the places where the water specifically

15  will be put to use.  It is premature at that time.  It becomes

16  relevant when there is an attempt to assert and prove a vested

17  right after the water has been put to use.  I just don't think

18  it is necessary to go into it at this time.

19      MR. VEEDER:  Your Honor, if we wait to try all the

20  questions that these gentlemen want to put aside, we will be

21  back here in two years.

22      The point that I make, and I am glad that Mr. Sachse

23  brought up the proposition that he did, he concedes that in

24  regard to the 2½ second-feet they have to show beneficial use.

25  I submit that when you are proving an inchoate right in this

1   kind of litigation you have to prove that there are lands

2   susceptible of using the water in question.

3       THE COURT:  There isn't any argument, Mr. Veeder, that

4   there are lands susceptible.  Now there are lands probably

5   that are not susceptible, and if you, on your honor as a

6   member of the bar of this Court, would try to say to me that

7   there are no lands within the Fallbrook Public Utility

8   District susceptible to the use of this water, a thing you

9   can't say, that might be one thing.

10      MR. VEEDER:  I have never undertaken to say that, your

11  Honor.

12      THE COURT: I know.  If you are trying to say that you

13  want to prove that certain lands are not and other lands may

14  be and some it will be too costly and go on forever on that

15  kind of a showing, I am not going to permit you to do it.

16  You have to concede that there are some lands within the

17  district on which water could be used.  Is that right?  You

18  have to concede that?

19      MR. VEEDER:  Well, sure.  The point that I make, though,

20  your Honor, and the initial point is that in water litigation

21  there are certain things that have to be proved, and Mr.

22  Sachse undertook to prove them in his case in chief, and all

23  I say is that I have a right to cross-examine in regard to it.

24      THE COURT:  You may make your offer of proof on your

25  cross-examination, but to assist you in the matter I am going

13

k Z85

1    to rule that I am not going to go into a detailed description

2    of what part of the lands within the District are susceptible

3    to irrigation and what are not, what parts are susceptible to

4    irrigation from a reservoir at a certain level by gravity

5    flow and what parts would be susceptible by pumping water

6    to higher elevations.

7        I am not going to go into the question of economic

8    feasibility of the project, which is entirely a question for

9    the property owners and the electors of the District.

10       Let me ask counsel, first, some figure which is the

11   relative cost of water per year.

12       MR. SACHSE:  Are you asking me, your Honor?

13       THE COURT:  Yes.  Twenty, thirty dollars an acre a

14   year?

15       MR. SACHSE:  Our present rate is in excess of $32 per

16   acre foot, and as Mr. Yackey testified in this court, our

17   growers have paid for about three years, and gladly and have

18   made money on it-- I have myself.

19       MR. STAHLMAN:  N$_o$t gladly.

20       MR. SACHSE:  Not gladly, but glad to get the water.

21   In excess of $50 an acre foot.

22       MR. STAHLMAN:  $70.

23       MR. SACHSE:  Seventy-some dollars.

24       THE COURT:  Take an example.  Suppose the evidence

25   should show, after we have explored all this matter, that

12

Z86

1   water would be available for land within the District at a

2   cost of $45 per acre-foot.  That is a pretty high figure, but

3   let's suppose we had that figure.  Am I going to say what

4   the property owners in this District may vote on this kind

5   of project?  Am I going to say that that figure is too high

6   and that I therefore prophesy that if put to a ballot the

7   project would be defeated?

8        MR. VEEDER:  Not in the slightest, your Honor.

9        THE COURT:  Or am I going to say that if it was down

10  to $36.50 then I would conclude that the property owners would

11  vote for it?

12       MR. VEEDER:  The point that I make, though, your

13  Honor, is this.  Here we have a claim I don't know how many

14  irrigable acres they are claiming now.  They are claiming in

15  the old district in 1951 that there are 7,200 acres of lands

16  to be irrigated by this project, and I submit that inthis

17  kind and type of litigation one of the primary issues is,

18  what land will use it?  That is very important.

19       You say, "Well, it's none of my business whether it

20  is $45 or $50 an acre-foot."  That you couldn't prognosticate

21  as to that.  But you can tell very easily that if this dam--

22  and here again is this illusory thing, and whenever we start

23  to get near that they all run-- we ask them, "How much are

24  you going to spend on this dam?"  "Oh, three, five, six, ten

25  million.  We don't know."  Then we say, "Well, how are you

12

Z88

the claims in acquiring this land.

MR. VEEDER:  I would have to see that, your Honor.

MR. SACHSE:  May I continue?

THE COURT:  It is probably there.

MR. VEEDER:  I want to see it.

MR. SACHSE:  I have never told Mr. Veeder, nor has anyone told Mr. Veeder, that this is going to cost three or five or ten or any other figure.  We have told Mr. Veeder that it is none of his business what it is going to cost.  It is Fallbrook's business and nobody else's.  And as your Honor just pointed out, if Fallbrook thinks it can pay the freight, if Fallbrook people are willing to take the risk, it is Fallbrook's privilege to do so and it is not within this Court's jurisdiction to tell them that they can't.  As far as financing is concerned, we have paid our bills.  We have never been delinquent.  We have substantial bonding capacity available unused.  The matter is absolutely irrelevant and immaterial.

But I resent Mr. Veeder's gratutous testimony.  He subscribes to the oath here, your Honor, that if you keep stating a falsehood often enough to even as intelligent a listener as your Honor, sooner or later some of it trickles through and has an effect.  He hopes that it will have an effect.  Mr. Veeder thinks that if he says "Steal water, steal water, steal water, steal water," a sufficient number of

12

Z87

1   going to operate it?" "We don't know." The fact remains

2   that as long as they sit by and conduct themselves as they do,

3   without telling us what they have, they are certainly leaving

4   the rights to the use of water in the river in a situation

5   that has and will continue to cause irreparable damage.  I

6   daresay that if your Honor would permit the investigations

7   to go forward and we were to show, as I think we can show, that

8   they couldn't conceivably build a project, that would be the

9   end of these spurious claims.

10          MR. SACHSE:  Your Honor, Mr. Veeder blithely stated in

11   this courtroom not very long ago, in fact you facetiously

12   during a recess commented, your Honor, that he understood

13   the District was going to be bankrupt day after tomorrow.

14          MR. VEEDER:  When did I say that?

15          MR. SACHSE:  When the eminent domain proceeding was

16   pending.

17          THE COURT:  You intimated that theywouldn't be able

18   to pay for the--

19          MR. VEEDER:  Who said that?

20          MR. SACHSE:  Mr. Veeder did.

21          MR. VEEDER:  Is that in the record?

22          MR. SACHSE:  No.

23          THE COURT:  There is an intimation in the record,

24   maybe not expressly, but it is inthe record, the intimation

25   about the fact that they wouldn't be able probably to satisfy

12

Z89

1    times--

2        MR. VEEDER:  You will steal it.

3        MR. SACHSE:  Though your Honor constantly cuts him

4    down--

5        Mr. Veeder, please stop that.  It is like repeat

6    advertising.  It is like repeat advertising on the radio.

7        THE COURT:  Brainwashing.

8        MR. SACHSE:  It is brainwashing.

9        Now, your Honor, my position is a little different.

10   I know that when I sit in front of the TV-- and I am a heavy

11   smoker-- when I sit in front of the TV and I hear the TV

12   announcer say, "Why are you," the gentleman who is fooling

13   with the chemical retort, "smoking Viceroys?  Are you a

14   chemist?"  "Why, nobody but a thinking man smokes Viceroys."

15   I have seen that so often that finally I get to the point

16   where I almost vomit, and I wouldn't smoke a Viceroy for a

17   million dollars.

18       Now, my hope is that this constant repetition to your

19   Honor, "Steal water, steal water, steal water, steal water,

20   Fallbrook can't foot the bill, Fallbrook can't do this"--

21   my hope is that instead of working as the advertising geniuses

22   hope that this repetition to your Honor is working on your

23   Honor the way the Viceroy ad works on me.  I trust -- and I

24   am very sincere, I am not facetious-- I trust that simply

25   because he repeats again and again this nebulous project, this

imaginary dam, that simply because he repeats again and again the word "steal," I trust your Honor is not absorbing it.

MR. VEEDER:  There is one thing that I think is important, and having started this matter I have the closing. I called Bulletin 57 a series of names.  I was very right--

THE COURT:  Do you have some change with you?

MR. VEEDER:  Oh, I didn't say the word.

THE COURT:  All right.

MR. VEEDER:  But you realize, your Honor, that the State of California is afraid to offer it now, and that Mr. Sachse says, "I am not going to offer it."

MR. SACHSE:  Just a minute.  I didn't say that.

THE COURT:  This is what you would call in military tactics a flanking attack.

MR. VEEDER:  Well, I was right then, and I am right now.

THE COURT:  We were talking about something else.  Let's not get off on that.

A  Right, Mr. Veeder, make your offers of proof of what you want to show on cross-examination of this witness.

MR. SACHSE:  Mr. Yackey, please get back on the stand.

THE COURT:  And under the rule of Lane vs. United States, or United States vs. Lane, you had better break them down by categories.

1                          GEORGE F. YACKEY,

2  recalled as a witness in behalf of the defendant Fallbrook

3  Public Utility District, having been previously sworn,

4  testified further as follows:

5        MR. VEEDER:  All right.

6        Now, your Honor, there are certain phases of this that

7  I would like to --

8        THE COURT:  Maybe you would rather write the thing

9  out over the weekend and make a written offer of proof.

10       MR. VEEDER:  No.

11       THE COURT:  It would be done more accurately.

12       MR. VEEDER:  But it wouldn't be done with such spirit,

13  your Honor.

14       Now, I would interrogate and I would seek to prove by

15  this witness that when the filing was made for 5,000 acres

16  of land that there were not 5,000 acres of irrigable land

17  in the Fallbrook Public Utility District for which water could

18  be benefically used.

19       MR. SACHSE: Do you want to break this one at a time

20  for objection, Mr. Veeder?  I will do it any way you want to.

21       MR. VEEDER:  This is my second offer.

22       THE COURT:  All right, what is your objection.

23       MR. SACHSE:  I object that it is not within the scope

24  of the direct examination; incompetent, irrelevant and

25  immaterial; not tending to prove or disprove any issue in the

case.

THE COURT:  And you incorporate the discussion we have

heretofore had?

MR. SACHSE:  That is right, your Honor.

THE COURT:  The objection is sustained.

What is your next offer?

MR. VEEDER:  I make an offer to show that there was

included in the claim the right to divert and to impound

water from Rainbow Creek in the quantity of-- it is not shown--

I think it is 9,500 acre-feet.  I don't see it on the original

filing, and I am referring now to Plaintiff's Exhibit 136.

I would show that there was no means or facilities for the

impoundment of 10,000 acre feet of water by the kind and

type of structure described on Sandia Creek, and that the

claim to appropriate water under the circumstances was a

wholly and entirely spurious claim.

MR. SACHSE:  On that one there is a slightly different

objection, your Honor.  I object that it is not within the

scope of the direct examination; incompetent, irrelevant and

immaterial.  Furthermore, I object that that very point has

been ruled upon by your Honor in the pre-trial opinion and

disposed of heretofore, and I incorporate the previous

argument already had.

THE COURT:  The objection is sustained.

MR. VEEDER:  I make a further offer of proof in regard

8495

12

Z93

1    to Application 12179, Plaintiff's Exhibit 137, that there was

2    not available for appropriation from Sandia Creek the quantity

3    of water set forth in the application, and that the claimed

4    appropriation was entirely spurious, and that there could be

5    no right established upon that kind and type of thing.

6        MR. SACHSE:  I have the same objection as to the last

7    one, namely, that it is not within the scope of the direct

8    examination; incompetent, irrelevant and immaterial; already

9    disposed of by his Honor's ruling in the pre-trial opinion;

10   and I incorporate the arguments heretofore made.

11       THE COURT:  Sustained.

12       MR. VEEDER:  In regard to the claims of the Fallbrook

13   Public Utility District which have been filed by the Fallbrook

14   Public Utility District, which are Fallbrook's Exhibits F and

15   G--

16       THE COURT:  These are permits you are talking about?

17       MR. VEEDER:  These are the applications.  Well, the

18   permits with the applications attached to them.

19       I would show--

20       THE COURT:  By this witness, I take it?

21       MR. VEEDER:  --by this witness, that the Fallbrook

22   Public Utility District in effect abandoned the original

23   filings made with 12178 and 12179 and undertook a claim for

24   a wholly new and entirely new project, and in so doing had

25   lost the priority originally claimed under Applications No.

8496

12

Z94

1   12178 and 12179; that each of the projects on Sandia Creek

2   and on Rainbow Creek, as originally claimed, have been

3   abandoned.

4       MR. SACHSE: I will add to that offer the objection

5   that it is not within the scope of the direct examination,

6   that it is incompetent, irrelevant and immaterial, that it

7   has been ruled on by the Court in a pre-trial order, and

8   specifically in this case that it is not within the pleadings

9   in the case since the Court has already stricken the particular

10  counts and paragraphs of Plaintiff's Complaint asserting this

11  very abandonment, and I will incorporate in my objection the

12  argument we have already made.

13      THE COURT: Sustained. Plus the fact that you probably

14  couldn't prove, if you were even permitted to, anything but

15  an infinitesimal part of that by this witness.

16      MR. VEEDER: I couldn't prove anything by this witness,

17  your Honor, because I don't believe you can prove anything

18  by him. I don't believe they have a project.

19      THE COURT: What you are proposing to do is to tell me

20  what you are going to prove by this witness. Go ahead.

21      MR. VEEDER: I would further prove that the claims in

22  connection with the alleged 7,200 acres of irrigated land

23  are entirely spurious and there is absolutely no ground or

24  basis for the claim. It is on both Exhibits G and F. It is

25  a single project.

12

Z95

1    I would show that the Fallbrook Public Utility

2    District was totally without plans and wholly without means

3    of constructing such a system--

1          THE COURT:  Wholly without means.

2          MR. VEEDER:  Your Honor, all I am doing is--if you want

3  me to argue it, that is fine.

4          THE COURT:  I expect you to have a little self-respect

5  as a member of the bar of this court.  When you say that you

6  offer to prove that it is wholly without means, the people in

7  the district own property;  they cannot therefore be wholly

8  without means.  But go ahead and make your offer of proof.

9          MR. VEEDER:  You have raised an important point, your

10  Honor.

11          THE COURT:  If you want to say--go ahead.

12          MR. VEEDER: This Fallbrook Public Utility District has

13  power to assess something in the neighborhood of--

14          MR. SACHSE:  Twenty per cent of the total assessed

15  valuation, Mr. Veeder.

16          MR. VEEDER:  At the time of the issuance of  the permit?

17          MR. SACHSE:  No, 20% of the total assessed valuation at

18  the time the bond issue is floated.

19          MR. VEEDER:  The assessed valuation according to the

20  records of the State at the time the permits were issued, was

21  $7,100,000.

22          THE COURT:  Was what?

23          MR. VEEDER:  $7,100,000. That 20% of that is about

24  $1,500,000.

25          MR. SACHSE:  As of what date?

1　　　　MR. VEEDER:　The date of the permits.

2　　　　MR. SACHSE:　Which permit?

3　　　　MR. VEEDER:　11356 and 1135--

4　　　　MR. SACHSE:　Just a minute.　Are you telling me that the

5　assessed value of the Fallbrook Public Utility District as of

6　November 1958 was how much?

7　　　　MR. VEEDER:　As to financial status of the district, and

8　I am quoting from the opinion of the State of California as to

9　the financial status of the distict, Mr. Yackey testified that

10　the present assessed value of the--

11　　　　THE COURT:　What does "present" refer to?

12　　　　MR. SACHSE:　That's what I'm trying to get at.

13　　　　MR. VEEDER:　All I can do is read to your Honor　from

14　the permit.

15　　　　MR. SACHSE:　I can cover it.　Obviously the testimony

16　was at the date of the hearings on the application; the date

17　was in April 1958.

18　　　　MR. VEEDER:　In any event, that is what the statement

19　is, that the present assessed value of the real and personal

20　property was $7,1000,000, and that they had a bonded indebtedness

21　of $300,000, and apparently they had $200,00 of general obligation

22　bonds which have not been voted upon.　Now whether there is

23　additional value I don't know.　It may be a matter of proof.

24　　　　In any event, we would show that they do not have the

25　means, irrespective of the included area, to build a dam at the

1    cost that would entailed.

2         MR. SACHSE:  To that I object that it is incompetent,

3    irrelevant and immaterial, not within the scope of the direct

4    examination, and I incorporate the same arguments I have here-

5    tofore made.

6         THE COURT:  Sustained.

7         MR. VEEDER:  I would show, moreover, by interrogation

8    of this witness, that there has been no project as such which

9    could be developed;  that there are three different permits;

10   one for 10,000 acre-feet and two for 10,0000 acre-feet, with

11   the varying kinds and types of project described.

12        I would also show by this witness that though they have

13   made application for an illusory project they have no plans as

14   yet for a dam, no plans as yet for an irrigation system.

15        I would show by this witness that they do not have the

16   materials with which to construct the dam, that they have no

17   access to the materials for tne construction of the dam, that

18   they have no plans to obtain the materials for the construction

19   of the dam.

20        MR. SACHSE:  To that I will make the same objection;

21   that it is outside the scope of the direct examination; that

22   it is incompetent, irrelevant and immaterial; and I incorporate

23   the arguments I have heretofore made.

24        THE COURT:  Sustained.

25        MR. VEEDER:  I would show that the lands that have been

A20

1    brought into the district by the most the recent annexation

2    are lands which are of such kind and character that the vast

3    majority of them are not susceptible of irrigation; that the

4    construction of a system would be totally impractical and finan-

5    cially infeasible.

6        MR. SACHSE:  To that, your Honor, I would object on the

7    same grounds;  that it is not within the scope of the direct

8    examination;  that it is incompetent, irrelevant and immaterial;

9    and the additional ground that no foundation has been laid to

10   date that this witness is in any way qualified to testify to

11   the character of the lands in this area that Mr. Veeder has just

12   described; and I incorporate the same arguments I have heretofore

13   made.

14       THE COURT:  Sustained.

15       MR. VEEDER:  Now, your Honor, I have had marked the exhi-

16   bit, I think we have called it Fallbrook's D1 this morning.  That

17   is the hearing before the State Engineer, it which it was testi-

18   fied that the Fallbrook Public Utility District, or least a find-

19   ing was made that the Fallbrook Public Utility District repre-

20   sented itself as a municipality.

21       MR. SACHSE:  I have no objection to the document.

22       MR. VEEDER:  I make the offer now.

23       THE COURT:  Fallbrook's D1 received in evidence.

24       (Fallbrook's Exhibit D1 received in evidence).

25       MR. VEEDER:  Your Honor, I would like to have marked for

A21

1   identification and to offer certain aerials showing the Fallbrook

2   Public Utility District, with the right to withdraw them until

3   somebody desires to use them.   They are work sheets from our

4   office.

5           THE COURT:   You are talking about the photographs?

6           MR. VEEDER:   That is right.

7           THE COURT:   The District is not marked on there, is it?

8           MR. VEEDER:   The District is not marked, but it is very

9   easy to orient yourself.

10          MR. SACHSE:   I have no objection to the introduction of

11  these.

12          THE COURT:   Do you want to have the District put with a

13  red line?

14          MR. VEEDER:   I thought you were going to reject them,

15  your Honor.   I hate to spend time--

16          MR. SACHSE:   I have no objection.

17          THE COURT:   You have offered them and Mr. Sachse doesn't

18  object.

19          MR. SACHSE:   With one qualification, your Honor.   I want

20  to go into where they are.   There are a number of these that

21  have soil delineations on them, and I want to have that.   In

22  other words, if you reproduce them, I don't object, but repro-

23  duce them exactly as they appear here, Mr. Veeder.

24          THE COURT:   We will call them Plaintiff's Exhibit 155.

25  That is the next Government's exhibit, and the clerk will number

1   applications which were filed.

2       MR. SACHSE:  I object, if the court please.  This is

3   a map, as your Honor can readily observe if you will look at it,

4   of a reservoir and a dam project, or I should say three dam

5   projects are delineated on it.  I object on the grounds that

6   this is incompetent, irrelevant and immaterial; that it is not

7   within any of the issues in the case.  This is the very type

8   of thing that Mr. Veeder just covered by oral proof or attempt-

9   ed to cover by oral offers of proof.

10      THE COURT:  Was this a part of Government's Exhibits

11  136 and 137?

12      MR. VEEDER:  No, your Honor.

13      THE COURT:  The applications that were filed?

14      MR. VEEDER:  Government's Exhibits 136 and 137 were just

15  the filled in forms.

16      THE COURT:  They were applications 12178 and 12179.

17      MR. VEEDER:  That is right.  This map was submitted long

18  subsequent to the filing of those applications with the State.

19      MR. SACHSE:  I have the further objection that it has no

20  foundation.

21      THE COURT:  Sustained.

22      MR. SACHSE:  I am not objecting to the foundation that

23  it is Fallbrook's map.  I say that it has no foundation to esta-

24  blish where it fits into this case.

25      MR. VEEDER:  I would like to ask some questions on it then.

1      MR. SACHSE:  I will stipulate, your Honor, that it is a

2  Fallbrook map.  I will not stipulate, and by my foundational

3  objection what I mean is that there is no showing of any kind

4  that this map is material to any issue in this case.

5      MR. VEEDER:  I will ask Mr. Yackey some questions.

6      THE COURT:  This map was presented to the Water Rights

7  Board after applications 12178 and 12179 were presented?

8      MR. VEEDER:  But as part of them.

9      MR. SACHSE:  Ask Mr. Yackey.  I don't know.

10      THE WITNESS:  They were submitted as part of it and a

11  followup of it.  It is part of the application, you might say,

12  but as the application was amended this dropped dropped out of

13  the picture.

14      THE COURT:  Why shouldn't it be part of the record, then,

15  since the applications are in evidence?  The applications are

16  in evidence.  The permit that was finally granted is in evidence,

17  and this is an intermediate step.

18      MR. SACHSE:  I have no objection.  I will withdraw the

19  objection.  Le it in.

20      THE COURT:  Received in evidence as Government's Exhibit

21  156.

22      (Plaintiff's Exhibit 156 received in evidence.)

23      MR. VEEDER:  You have withdrawn all objection to--

24      MR. SACHSE:  Yes;  it is received in evidence.  I have

25  no objection.

BY MR. VEEDER:

1    Q   I hand you Fallbrook's Exhibit L and ask you to view
the quantities of water that appear to have been pumped during
the year 1952.  Now you will observe that there were 27.8 acre-
feet of water pumped during the month of January, and on the
basis of the record which I have been supplied it appears that
the amount of power that was required to pump one acre-foot of
water was 188 kilowatt hours.

MR. SACHSE:  If your Honor please, I object.  This isn't
a question.  I want Mr. Veeder to state this as a question.  If
Mr. Veeder is asking him to assume a certain fact, I want him
to please state that he is asking him to assume a certain fact,
not to tell him that this has happened.

THE COURT:  Re-frame the question.  There is nothing in
evidence about power.

MR. SACHSE:  There is no evidence whatsoever.

MR. VEEDER:  Do you have records, Mr. Yackey, as to the
number of kilowatt hours that were used in the pumping operations
for the water out of the Santa Margarita River?

A   I have none in my mind or before me.

Q   Can you supply us with those?

A   I think there was some discussion of that exhibit that
the power figures were to be transferred from the State Court.

MR. SACHSE:  You have them in your hands, haven't you,
Mr. Veeder?

1          MR. VEEDER:  No, I don't have.

2          May I have just a moment, your Honor.

3          Q  I hand you a tabulation taken from the State Court

4   records:  Fallbrook Public Utility District's kilowatt hour

5   consumption--

6          MR. SACHSE:  Are you going to mark it?

7          MR. VEEDER:  I am going to have it marked.  I asked

8   you, first, if you know that that is--

9          MR. SACHSE:  I don't know it, Mr. Veeder.  I object until

10  you give us a foundation, unless you do this on the basis of an

11  assumption.

12          MR. VEEDER:  Assuming that those are the records that

13  were in the Superior Court in the litigation to which you have

14  referred--

15          MR. SACHSE:  Ask him.

16          MR. VEEDER:  I have to ask counsel.

17          THE COURT:  Can't we find out?

18          MR. VEEDER: I am not sure.  Let's have it identified.

19          MR. SACHSE:  I have no objection, if it is, but I don't

20  know who took them or where they came from.

21          THE COURT:  Who made a copy of them?

22          MR. VEEDER:  Did you get that, Col. Bowen?

23          COL. BOWEN:  Yes, sir.

24          THE COURT:  Copy of an exhibit in the State Court matter?

25          COL. BOWEN:  Yes, sir.

1      MR. SACHSE:  If Col. Bowen states that he made the copy

2 of it, and if it is a copy of the exhibit, I have no objection

3 to its admission.

4      THE COURT:  Mark it Plaintiff's 157 for identification.

5 Do you offer it in evidence?  Apparently there is no objection

6 now.

7      MR. VEEDER:  I offer it in evidence, and they may have

8 the right to check it if they want to.

9      THE COURT:  All right, Exhibit 157 in evidence.

10      (Plaintiff's Exhibit 157 received in evidence.)

11      THE COURT:  Do you have a copy of it here somewhere?

12      MR. VEEDER:  Yes.

13      Q  Mr. Yackey, assuming that it took 188 kilowatt hours

14 to pump 1 acre-foot of water for January 1952, and assuming that

15 the calculations shown for the month of February that it took

16 2858 kilowatt hours to pump 1 acre-foot of water,  how do you

17 explain the disparity between the figure 188 for the month of

18 January and the figure 2858 kilowatt hours to pump water during

19 the month of February?

20      MR. SACHSE:  Just a minute.  Don't answer that.

21      I object, if the court please, because this is not only

22 assuming facts not in evidence, but is in direct contradiction

23 to the exhibit, if I understand this exhibit.  This exhibit says:

24 "Fallbrook Public Utility District's Kilowatt Hour Consumption."

25 Now Mr. Yackey specifically testified to at least two pumps.

1   All you have to do is to look at this map and Fallbrook Public

2   Utility District has pumps all over the district. Now I don't

3   know, and I am not trying to be difficult, but I think Mr.

4   Veeder ought to lay a foundation. I don't know whether this

5   is the kilowatt hours for every pump that the District owns,

6   whether this is the kilowatt hours for the San Luis Rey pumps,

7   whether this is the kilowatt hours for the Santa Margarita

8   pumps. We haven't the foggiest idea what this piece of paper

9   indicates.

10         MR. VEEDER: I will ask the witness.

11         Q Viewing the Exhibit 157, can you state, Mr. Yackey,

12   whether the kilowatt hour consumption as shown there is for the

13   Santa Margarita River pumps or for the entire Fallbrook Public

14   Utility District?

15         A I wouldn't know.

16         Q You have no way of ascertaining?

17         A Not here from looking at those, no.

18         MR. VEEDER: Then I will ask counsel to obtain that

19   data for us.

20         MR. SACHSE: Can't we ask Col. Bowen exactly what this

21   is? He had a photostat. There were a set of photostats in

22   evidence in the other court covering many pumps. If he will

23   tell us which ones this represents, I will not argue. They

24   are only across the street. We can bring the originals over.

25         THE COURT: Are they broken down by pumps?

15

A29

1      MR. SACHSE:  There was a mountain of them.

2      MR. STAHLMAN:  No.  I haven't had anything to do with

3 this in this case.  I did in the other case.  I had the power

4 company exhibits, and they left in the court 40 some exhibits

5 for the pumps on the Santa Margarita.

6      MR. SACHSE:  And for other pumps.  It had many district

7 meters on those exhibits.

8      MR. STAHLMAN:  But we had photostats made of only those.

9      MR. VEEDER:  I would like to check this out, your Honor.

10 I will have to check it out and lay the proper foundation, your

11 Honor.

12      I have no further questions at this time.

13      MR. SACHSE:  Your Honor, I have very little on re-direct.

14 I think we could probably finish this afternoon, if we want to

15 continue.

16      THE COURT:  Let's go ahead.  We will wind up early.

17      Let's take a short recess for the reporter.

18      (Recess)

19                    REDIRECT EXAMINATION

20 BY MR. SACHSE:

21      Q  Mr. Yackey, Mr. Veeder pointed out to you on the

22 original of Government's Exhibit 134, being Application 11587,

23 that item 3 as originally filed stated,      "The uses to which

24  the water is to be applied are domestic and municipal uses."

25 Do you recall that?

1       A  Yes, sir.

2       Q  Now, I direct your attention to item 13 on that very

3  same Government's Exhibit 134.  Will you read item 13 please?

4       A  "13. Irrigation Use.  The area to be irrigated is

5  5,000 acres of a public and municipal corporation."

6       MR. VEEDER:  That is so much better.

7       THE WITNESS:  "The segregation of crop acreage as to

8  crops is as follows:  Orchards 5,00 acres."

9  BY MR. SACHSE:

10      Q  Considering that statement that the area to be irri-

11  gated is 5,000 acres, appearing under item 13, and considering

12  also the failure to state the word "irrigation" on item 3, have

13  you any possible explanation?

14      A  Yes, sir.

15      MR. VEEDER: I object to that, your Honor.

16      THE COURT:  If he wants to tell us something about how

17  it is drawn, the objection is overruled.

18      THE WITNESS:  I think it was a typographical error.  As

19  I explained this morning, it was done by the President's

20  secretary, who is not familiar with these things, and she acci-

21  dentally left it off.

22      MR. SACHSE:  I have no further questions, your Honor.

23      THE COURT:  Anything further?

24      MR. SACHSE:  I will now offer, your Honor, Fallbrook's

25  Exhibit K for identification.  I re-offer it.

1          MR. VEEDER: I certainly object to that now. There is

2    no foundation whatever. The very thing that your Honor pre-

3    cluded me from interrogating about is covered by this part of

4    the exhibit from 1958 on down through 1970. You wouldn't let

5    me interrogate.

6          THE COURT: About what?

7          MR. VEEDER: In regard to the development, in regard

8    to acreages, in regard to demand.

9          MR. SACHSE: Fallbrook's case shows water sales. If

10   you want to ask him how much water was sold, I don't mind.

11   There was no objection to such a question, and no such question

12   was asked. I am perfectly willing, your Honor, to eliminate

13   the estimates if Mr. Veeder is worried about them.

14         THE COURT: Mr. Yackey, you drew this exhibit from the

15   records in your company?

16         THE WITNESS: Yes, sir.

17         THE COURT: As to the number of meters, for instance?

18         THE WITNESS: The meters and the water sales.

19         THE COURT: The meter records are available and could

20   be brought in to substantiate it?

21         THE WITNESS: Yes, sir.

22         THE COURT: Your records of sales available?

23         THE WITNESS: Yes, sir.

24         THE COURT: They could be brought in here for inspection?

25         THE WITNESS: Yes, sir.

1           The estimates, in view of the objection as to years to

2     come, is eliminated and is not part of the exhibit.

3           MR. SACHSE:  I don't think we would serve any useful

4     purpose by calling our witness this late in the day, your Honor.

5           THE COURT:  All right.

6           MR. VEEDER:  How many other witnesses are you going to

7     have?

8           MR. SACHSE:  Only one more at the moment.

9           I would like, however, since you seem to determined to

10    continue to press this issue and his Honor can change his mind,

11    I wonder if you could be sure also to have Col. Bowen available

12    on Tuesday?

13          MR. VEEDER:  What for?

14          MR. SACHSE:   If the door is opened that has so far

15    been kept closed by his Honor, if the door is opened as to

16    land uses ecetera, I definitely want Col. Bowen.

17          THE COURT:  My records show that not in evidence yet

18    are Fallbrook's  Exhibit C, Fallbrook's Exhibit J, Fallbrook's

19    Exhibit N.  Objection was sustained to Exhibits O, P, Q, R and

20    S.  Exhibits U, V and V1 are not in evidence.

21          THE CLERK:  That is right.

22          THE COURT:  And the designations X, Y and Z were not

23    assigned.

24          Exhibit AA is Bulletin 57.

25          Exhibits AB and AC are in evidence.

1          And Exhibit Dl was received in evidence.

2          MR. SACHSE:  Dl was received, yes, your Honor.

3          THE CLERK:  Was Exhibit K received, your Honor.

4          THE COURT:  Yes, Exhibit K was just received.

5          Exhibit J was withdrawn.

6          MR. SACHSE:  Exhibit J hasn't been offered at all, your

7  Honor.

8          THE COURT:  Maybe you just withdrew the offer of it at

9  that time.

10          MR. SACHSE:  No, your Honor, J hasn't even been pulled

11  out of the file.  There is some mistake here.  It was K that

12  was withdrawn and re-offered.

13          THE COURT:  All right.

14          Adjourn until Tuesday morning, February 17, 1959 at

15  ten o'clock a.m.

16          (Adjournment until Tuesday, February 17, 1959 at 10 a.m.)

17

18

19

20

21

22

23

24

25