# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Tuesday, February 17, 1959

Pages:  8516 to 8653

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
        vs.                    )        No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                Defendants.    )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Tuesday, February 17, 1959


APPEARANCES:

    For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                             Special Assistant to the
                             Attorney-General,
                             Department of Justice,
                             Washington, D. C.

APPEARANCES (Continued):

|  |  |
|---|---|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State | STANLEY MOSK, ESQ.,<br>Attorney-General, by<br>ADOLPHUS MOSKOVITZ, ESQ.,<br>Deputy Attorney-General. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al. | FRANZ R. SACHSE, ESQ. |
|  | WALTER GOULD LINCOLN, ESQ. |

# INDEX TO WITNESSES

**For Defendant Fallbrook:**          D          X          RD          RX

    Robert L. Engleman          8523

    Leland Illingworth          8593

# EXHIBITS

**Fallbrook's Exhibit:**                    Iden.          In Evid.

    J                                                  8550

    V                                                  8557

    V-1                                               8559

    U                                                 8560

    L, Plates 3 and 4, Appendix D        8631

    B - *Calif*                                   8644

1    SAN DIEGO, CALIFORNIA, TUESDAY, FEBRUARY 17, 1959.  10:00 A.M.

2

3         THE CLERK:  No. 2, 1247-SD-C, United States of America,

4    vs. Fallbrook Public Utility District, et al.  Further court

5    trial.

6         MR. VEEDER:  Your Honor, I have a couple of housekeep-

7    ing problems.  If I could get at them now, it might save time.

8         In regard to California's Exhibit A, AI and AJ and

9    perhaps some others, I observe that they are predicated upon

10   certain assumptions, such as the capacity of the ground water

11   basins, and assumptions as to runoff, and I was wondering--

12        Mr. Illingworth is not here?

13        MR. MOSKOVITZ:  He will be in later.

14        MR. VEEDER:  I was wondering if it would be agreeable

15   to Mr. Moskovitz to have Mr. Illingworth discuss these exhibits

16   with our Col. Bowen and Col. Robertson and outline for us the

17   assumptions upon which these exhibits are predicated.

18        MR. MOSKOVITZ:  I don't think we have any objection.

19   Those of course will be fully explained when Mr. Illingworth

20   takes the stand.  But if you want it done before, that's all

21   right.

22        MR. VEEDER:  It is important to us, because frankly we

23   don't understand it.

24        MR. MOSKOVITZ:  I see.

25        THE COURT:  Will you take care of that?

MR. MOSKOVITZ: Yes.

THE COURT:  All right.

MR. VEEDER:  There is another matter I would like to bring up-- and I am glad to see that Mr. Swing is in the court-room this morning.  We are moving along quite rapidly, your Honor, in connection with the analysis of parties who have appeared.  We are analyzing the answers that have been filed in regard to disclaimers by Mr. Sachse.  I think that it can be said that we are pretty well down the road on the matter of handling his clients, or at least his answers.

But we do have this problem in regard to Mr. Dennis. We find quite a number of parties there represented by him, we find that Mr. Krieger has quite a number, and Mr. Willett, and a few by Mr. Teasdale.

MR. SACHSE:  Mr. Teasdale is writing you and you should have that letter today or tomorrow.  I spoke to him.

MR. VEEDER:  I dislike contacting these people without your Honor's approval.  I would like to write these people and ask them to conferences or appearances here to the end that we could work out exactly who is representing whom, also as to whether they would be amenable to pursuing the course we are attempting to pursue with Mr. Sachse.   May we call them?

THE COURT: I have no objection to that.  I notice that most of Mr. Krieger's answers apparently involve people who are riparian or overlying owners.  I didn't check them all.

I noticed a number of them.

MR. VEEDER:  I think there are going to be instances where claims are made for riparian rights where it is conceivable they would say, well, we are just pleading a general affirmative answer.

THE COURT:  That is right.  I suggest that you contact them and see what their attitude is.  Some of them may want to file amended answers or some other document thatwould disclaim any interest in the stream.

MR. VEEDER:  If that is amenable I will go ahead that way, your Honor.

THE COURT:  All right.

MR. STAHLMAN:  In that respect, your Honor please, I have a situation where there will probably be an amendment to the answer.  However, I would like to wait for the proof on it.  It is a matter that we didn't anticipate, relative to a prescriptive right on some of the Vail property.  I may want to plead a prescriptive right if the evidence and the facts would warrant that pleading.

THE COURT:  It is satisfactory.  You may have the right to amend.

MR. SACHSE:  Your Honor asked me to prepare findings on my motion, and I agreed to do so in ten days.  I don't want your Honor to think that I am dragging my feet.  In the light of Mr. Veeder's motion, he and I are trying to get together

on what would be agreeable and it may be a little longer than

the ten-day period.  But we are working on it.

THE COURT:  That is satisfactory.  In other words, you

may incorporate in these findings more instances than the 41

that you mentioned in your motion.

MR. SACHSE:  We hope that it will apply to the ones

that Mr. Veeder mentioned, as well as the 41 that I mentioned,

and that it will be a pattern for others in the future.

THE COURT:  That is satisfactory.

MR. SACHSE:  Mr. Veeder, Mr. Yackey is in the court-

room, if you have further cross-examination on any of the

matters you wanted to examine him over the weekend.

MR. VEEDER:  As a matter of fact, we are in the process

of analyzing this data.  I would like to have the privilege

of recalling Mr. Yackey, if we find good cause to do so.

THE COURT:  You may.

MR. VEEDER:  Thank you, your Honor.

MR. SACHSE:  I will call Mr. Robert Engleman.


ROBERT L. ENGLEMAN,

called as a witness for defendant Fallbrook Public Utility

District, being first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. SACHSE:

Q  Will you state your name and address, Mr. Engleman?

A  My name is Robert L. Engleman.  I reside at 529 East Dougherty Street, Fallbrook, California.

Q  How old are you, Mr. Engleman?

A  Thirty-three.

Q  Will you please give us your educational background.

A  I was educated in the public schools in Vista, California.  I attended junior college at Oceanside and graduated from there.  I also attended the University of Colorado and graduated from there with the Bachelor of Science Degree in Mechanical Engineering.

Q  What year was that degree?

A  1950.

Q  Following your graduation from the University of Colorado, will you cover your employment and other activities since that time to the present?

A  After I left the university I came back to California and I was employed by the San Diego Gas & Electric Company in the capacity of a junior engineer, which job I held until approximately May, 1955, when I went to work for the Fallbrook Public Utility District as assistant engineer.

Q  And what is your present employment?

A  As the Assistant Engineer of the Fallbrook Public

Utility District.

Q What are some of your specific duties in that position?

A Specifically, I am under the direction of the Chief Engineer and am at his disposal.

THE COURT: Who is the Chief Engineer?

THE WITNESS: The Chief Engineer, up until Mr. Yackey's retirement, was Mr. Yackey. At the present time we do not have a chief engineer and I am more or less operating independently.

The duties entail many things. One of the large jobs I have had since coming to work was to become intimately acquainted with the condemnation action, more specifically as to the land that was involved in that condemnation, and some of the other routine jobs that I do are to keep track of all of our water use, our water production, do the actual calculations on them and report them to the chief engineer, and many other duties that are in an engineering capacity. I put out the preliminary designs on pipe lines, I actually survey them, make the drawings, keep track of our pumping equipment.

BY MR. SACHSE:

Q You did the physical drafting on the exhibits that have been introduced heretofore in this case?

A I have done the revision drafting of these exhibits, not the originals.

8525

Q  I placed on the easel, Mr. Engleman, Fallbrook's Exhibit J for Identification.  Who prepared that exhibit? Do you recognize that exhibit?

A  I do.

Q  Who prepared it?

A  The revision I prepared.

Q  Will you tell us what it is?

A  Exhibit J is a map of the actual survey made for the District on the area to be condemned for the Fallbrook reservoir project.

Q  This map does not delineate any topographic features, does it?

A  No, it does not.

Q  So that we understand clearly what the map indicates, the red line indicates what?

A  The red line indicates the outside perimeter of the reservoir area.

Q  That is, of the property condemned?

A  Yes.

THE COURT:  When you say property condemned are you including property that you acquired by negotiation and purchase?

MR. SACHSE:  Yes, your Honor.  Thank you for the correction.

THE COURT:  All right.

1    MR. SACHSE:  Property acquired by negotiation and

2    purchase?

3    THE WITNESS:  That is correct.

4    THE COURT:  When you speak of it as condemned we will

5    understand what you mean.

6    BY MR. SACHSE:

7    Q  I notice there are areas indicated by cross-hatching

8    and so on outside of that condemnation area.  What do those

9    areas indicate?

10    A  Those areas indicate the land of which the Utility

11    District is their agent for supplying them--

12    Q  Excuse me just a moment.  I think you are antici-

13    pating my question.  I am not speaking to the cross-hatching

14    only.  I am speaking to anything that is outside the perimeter

15    first.  What does it indicate?

16    A  It indicates the various ownerships in the surround-

17    ing area.

18    Q  In other words, would it indicate the remainder of a

19    total parcel of which a part only was condemned?

20    A  It would.

21    Q  Now, I see on the legend four different descriptions.

22    Let us start with the wide diagonal that runs from left to

23    right.  What does that indicate?

24    THE COURT: Wait a minute.  The wide diagonal?

25    MR. SACHSE:  The wide diagonal line cross-hatched.

THE COURT:  There are two wide diagonals.  The only difference seems to be that one is a heavier line than the other one.

MR. SACHSE:  On the large scale map it is a double diagonal.  On your copy you probably can't tell.

Q  The single diagonal that runs from left to right, what does that indicate?

A  That indicates those lands which are riparian and which the Fallbrook Public Utility District now owns.

Q  When you say which are riparian, that of course embraces a conclusion.  Will you tell us what you mean when you say that?

A  What I mean when I say "riparian" is a parcel of land which some part of that parcel touches an existing stream bed, and in the case of a few of the parcels which were in question the decision as to whether they were riparian or not was basedupon a title search we had made by the title company and also by the opinion of our attorney.

MR. VEEDER:  Your Honor, we move to strike that on the grounds that that testimony strictly is hearsay, from the standpoint of whether the lands are riparian or not.

THE COURT:  You are technically correct, Mr. Veeder. But do you  want to make an issue or a project out of this for another week while we explore the titles to each of these parcels and the basis of the proposed reservoir?  Isn't there

1    some easier or shorter way to do it?

2        MR. VEEDER:  I thought we had already pursued it.  I

3    thought the question of what was riparian and what was not

4    riparian was not going to be particularly at issue; that the

5    Fallbrook Public Utility District didn't claim any right to

6    use land for riparian uses; that if they leased the land to

7    a man who wanted to exercise riparian rights, we would in-

8    vestigate it at that time.  I didn't know that we were going

9    into any proof in regard to riparian characteristics.

10       MR. SACHSE:  That is correct, as far as Fallbrook is

11   concerned, and much of this can be extremely shortened if

12   neither you nor the Court want it.  I am not going to press

13   this on either you or your Honor.  There are, as you can

14   readily see, many parcels where the remainder is now left

15   in the hands of a private owner.  I presume that some of those

16   owners are going to show up.  I know that I represent some

17   of them. I presume that others will.  Fallbrook is prepared

18   to give you and the Court our best information on each of

19   these parcels, if you want it.  If you don't want it, I will

20   confine myself only to the parcels that directly concern

21   Fallbrook.

22       THE COURT:  I would suggest that we dispose of this

23   issue now as to the alleged riparian land by eventually a

24   finding to the effect that Fallbrook at this time disclaims

25   any right to use any water rights in connection with this land

1    in connection with their distribution system, that is, taking

2    water from these lands for their distribution system, and that

3    accordingly the Court finds that they are apparently riparian

4    lands; that if in the future the Fallbrook Public Utility

5    District leases or conveys these lands to persons who claim

6    the right to exercise riparian rights in connection with them,

7    at that time the Court on further hearings would go into the

8    matter.

9         MR. SACHSE:  That is quite satisfactory as far as

10   Fallbrook Public Utility District is concerned, your Honor.

11        THE COURT:  Can't se dispose of it now?  Apparently

12   there is no issue on the matter now, and may never be an issue.

13        MR. VEEDER:  I simply view this a little more seriously

14   than does your Honor.  Where there are parcels, for example,

15   where--

16        THE COURT:  I am not talking about those parcels.  I

17   may have to do something else about those.  You mean the ones

18   that are partly in and partly out?

19        MR. VEEDER:  That is right.  Where there has been a

20   severance, I certainly can agree that they are riparian.

21        MR. SACHSE:  We are ready to give you that information,

22   if you want it.

23        MR. VEEDER: I didn't think there would be any issue

24   about it at all.  My own view on it, as I expressed to Mr.

25   Sachse, if Fallbrook wants to lease a piece of land to a man

1    and he says, I have a riparian right, and we investigate and

2    he has a riparian right, by all means let him use it.  I don't

3    have any feeling on that.  I just don't want it in the record

4    that these lands are or are not riparian.  That's all I care

5    for.

6        MR. SACHSE:  Again, I am perfectly willing to drop it

7    entirely.  It seems to me rather unfortunate, your Honor.  You

8    have directed Mr. Veeder to try to get everything he can on all

9    theseparcels.  Here we have a man-- perhaps I am testifying

10   for him-- he has gone over this very carefully and he can tell

11   you a great deal about many of these individual parcels.  He

12   can save Mr. Veeder a lot of trouble.  He can point out where

13   severances have occurred, and the deeds are in evidence.  He

14   can show you, for example, that where my finger is pointing

15   a very large block has now been severed.  He can tell us these

16   things, which I think will help the Court.  It is not part of

17   Fallbrook's case, but I think it is part of the plenary

18   adjudication in which we are engaged.

19       THE COURT:  I think so, too, Mr. Sachse.  I think we

20   should take what general information we can from this witness,

21   plus the right of any part, if he thinks it is material, to

22   insist upon further evidence, as it were the best evidence.

23   Let's try to do this as easily as we can.

24       MR. VEEDER:  Your Honor, I am for that a thousand per

25   cent.  There are two words that I dislike for a layman to use

1   on the stand:  One is "riparian" and the other is "ownership."

2   I think both of them are legal conclusions.  I think they

3   should be avoided.  I think he can describe where the lands

4   abut upon the stream, and I think he can describe where they

5   don't abut upon the stream-- where there has been a severance.

6       MR. SACHSE:  That is satisfactory, and I am perfectly

7   willing that the word "riparian" should go out as being a

8   conclusion.

9       THE COURT:  I asked the witness what he meant, and he

10  explained it by saying that the land abutted upon the stream.

11  Then this matter of severance was gone into, and that he was

12  taking up the matter of title searches, which would refer to

13  certain deeds, and I suppose he would give us the deed records

14  in certain instances where there has been a severance.

15      Try as much as you can, Mr. Witness, to avoid these

16  legal conclusions and give us a picture of what your research

17  has demonstrated here.

18      Are you content to proceed on the basis I have outlined?

19      MR. VEEDER: Just so there will be no finding as to the

20  riparian character of the land or title or anything else.  If

21  he wants to show their physical aspects, I have no objection.

22      THE COURT:  As to whether there is a finding later on,

23  we are going to have to have some finding as to this property.

24  My suggestion is that we take what this witness has, and if

25  any party wants further evidence or, as it were, the best

1   evidence of deeds showing severance or particular evidence that

2   would bear on its riparian character, that any party have a

3   right to show it.  Let's see what we will get here.  Maybe

4   we will get enough to satisfy us.

5       MR. SACHSE:  I think we will, in many individual cases,

6   your Honor.

7       THE COURT:  Is that agreeable, Mr. Veeder?

8       MR. VEEDER:  Let's go ahead and see what happens.  I

9   may move to strike.

10      THE COURT:  All right.  The objection is overruled

11  presently.

12  BY MR. SACHSE:

13      Q  Mr. Engleman, I will direct your attention to the

14  second--

15      THE COURT:  Well, has he finished this first category?

16      MR. SACHSE:  The first category are lands which he

17  says are owned by the District and which he characterized as

18  being riparian.

19      THE COURT:  And as to which he said by that he meant

20  that they abutted upon the stream.

21      MR. SACHSE:  That is correct.  The second category are

22  the broad cross-hatches.

23      THE COURT:  You mean the very bottom one?

24      MR. SACHSE:  No, the cross-hatches X'd.

25      Q  Mr. Engleman, will you tell us-- I will indicate a

few of them on the map (indicating)-- what that category

describes?

A   That category describes the remainder lands of lands

that were purchased from the original owners, and these show

the remainder in which he has a contract with the Fallbrook

Public Utility District to the extent that Fallbrook is his

agent for his riparian water.

Q   And in which case he attempted to reserve the riparian

right to his own land?

A   That is correct.

THE COURT:   Let me understand that.   Let's take the one

on the bottom left-hand corner.

THE WITNESS:   Yes, sir.

THE COURT:   The very large area there.   I take it that a

small portion--

MR. SACHSE:   Step down and indicate to his Honor, please,

the portion of that ownership that was purchased, and the

remainder.

THE WITNESS:   (Stepping down)   The Utility District

purchased from this owner two parcels; one parcel that I have

my finger on now.

MR. VEEDER:   May I ask you to state the section, Mr.

Engleman.

THE WITNESS:   Which is a part of Section 12, Township

9 South, Range 4 West, being the Northeast Quarter of the

Southeast Quarter.  We took the most northerly portion of that

land.  Also, we purchased from this same owner a portion of the

Easterly Half of the Northwest Quarter of the Southwest

Quarter of Section 7, Township 9 South, Range 3 West.  Those

two parcels--

BY MR. SACHSE:

Q  Those two are indicated with the single diagonal

cross-hatch, are they not?

A  They are.

Q  The remainder of his land please point out to the

Court and describe how that is indicated.

A  The remainder of his land is indicated by a double

cross-hatching extending throughout said Section 7, said

Section 12, and also into Section 12, Township 9 South, Range

4 West.

Q  Do you remember the name of that owner?

A  That owner that we bought this property from is in a

dual ownership off Mott and Hilbert.

THE COURT:  May I ask, counsel, has there been a

severance of riparian rights because of these acquisitions?

MR. SACHSE:  That was going to be my next question, your

Honor.

Q  Would you tell the Court where the river flowed or

flows with relation to the parcels acquired by the Fallbrook

Public Utility District?

1      A   The river flows-- does not flow through either of

2   the two parcels that were purchased by the Fallbrook Public

3   Utility District, but the river does flow through much of the

4   remainder of the land in that it flows westerly of our most

5   westerly corner about-- well, let me explain it this way.   The

6   corner of our land is now approximately 20 feet off the bank

7   of the Santa Margarit River and this corner is right in the

8   center of the county road running along the river.   The river

9   also crosses the land in the lower portion of Section 12 and

10   the upper portion of Section 13.

11      THE COURT:   All right.   Now, without any attempt to

12   show accurately where the river is, except to indicate possibly

13   some of the 40-acre pieces that it runs through, take a pencil

14   and put a line on there indicating about where the river is

15   and where the flow of the river is, an arrow showing the flow.

16      MR. SACHSE:   It is understood that this is not entirely

17   accurate as to location.

18      THE COURT:   Accurate at best to 40-acre pieces.

19      THE WITNESS:   I will draw it as accurately as I can.

20      MR. VEEDER:   How about taking Fallbrook's quadrangle,

21   Exhibit 29, and getting it as closely as we can?

22      THE COURT:   I think what we are going to find out here

23   will be sufficient to answer our inquiry.

24      THE WITNESS:   That is the approximate course of the

25   river.

1      THE COURT:  Put an arrow on it.

2      THE WITNESS:  Flowing in a southwesterly direction.  I

3  shall label it as "Flow SMR," indicating Santa Margarita River.

4      THE COURT:  Now-- this is just inquiry of counsel-- If

5  the river flows across the balance of that piece of ground,

6  and if that has been in one ownership and there is no sever-

7  ance in the chain of title, then the balance of the land is

8  riparian; is that right, Mr. Veeder?

9      MR. VEEDER:  I would put in the additional caveat in

10  there that it would be riparain only as to the smallest parcel

11  of land in the chain of title.  In other words, I believe it

12  is a matter where we would have to look at the patent.

13      THE COURT:  What I had in mind when I said with refer-

14  ence to the chain of title that it included all of that that

15  you mentioned.

16      MR. SACHSE:  Your Honor picked a bad one.  That is one

17  where I know from my own knowledge that you probably will find

18  a number of things in the chain of title that may make parts

19  of that non-riparian.

20      THE COURT:  May we pass that up now.

21      MR. SACHSE:  Yes.  Your Honor selected it.

22      THE COURT:  Can that be gone into later?

23      MR. SACHSE:  I don't know who his attorney is.  I

24  don't know whether they are going to put it in or not.  We can

25  give you what we know, if your Honor wants.

THE COURT:  If he appears in pro per, will you be ready to give us what you have found from the search?

MR. SACHSE:  Yes, your Honor.

THE COURT:  And I think the Government has some information, too.

MR. VEEDER:  Frankly, I don't know anything about the property.

THE COURT:  At any rate, this piece that we have been talking about where the Fallbrook Public Utility District took a small piece by purchase under threat of condemnation or by condemnation; as to the balance of the property you have some contract where you are the agent for these parties for their riparian rights, if they have any, and such as they are.

MR. SACHSE:  That is correct, your Honor.

I should do this by question and answer, I think.  May I continue with the rest of the legend and get this cleared up?

MR. VEEDER:  I think I had better do a little clearing up myself.  The best evidence, of course, is the contract between the land owner and-- do you have that?

MR. SACHSE:  They are all in evidence.

MR. VEEDER:  The contract is in evidence now?

MR. SACHSE:  No.  Let's do that next.

THE COURT:  We had a form agreement marked, but you objected to using a form.

MR. VEEDER:  That is right.

BY MR. SACHSE:

Q   Mr. Engleman, I will hand you Fallbrook's C for Identification, and will you tell us how that document ties into the testimony you have just given here, what its relationship is to it?

A   This is a document that the Fallbrook Public Utility District and whoever the seller was which was executed between the two parties.

MR. VEEDER:   I am going to renew my objection here, your Honor.   I have no objection to Mr. Sachse's coming in with his contracts with these individuals.   I simply think that the record now would be completely incoherent without the regular contracts that were actually executed with these parties.

THE COURT:   I think that is what you were going to get, in view of Mr. Veeder's objection.

MR. SACHSE:   Your Honor, I can't.   I don't know what has become of those contracts.   Each of these has been incorporated, let us say embraced, in the deeds; each of these deeds now has a reservation of rights in it.   The deeds are in evidence. There is no objection to them.

THE COURT:   What do you mean, you don't know what happened to these?

MR. SACHSE:   I don't know.   The owner may have it or may not have it.

THE COURT:   Don't you have a copy?

1    MR. SACHSE: We have a copy of it. But as I say, I don't

2  want to attempt to prove these defendants' rights for them.

3    MR. VEEDER:  I urge the additional objection that all

4  previous contracts are merged into the deeds, your Honor.

5    MR. SACHSE:  I think that is a sound objection.

6    THE COURT:  Let's see one of the deeds.

7    MR. SACHSE:  If I can find one that has a reservation

8  in it.

9    THE WITNESS: B-1.

10    MR. SACHSE:  Here is one, your Honor.

11    THE WITNESS:  It should have.  We had to number the

12  first twenty, I believe, with the riparians.

13    MR. SACHSE:  B-2 has it, I see.

14    THE WITNESS:  Unless they shuffled them when they

15  numbered them.  It is the last sentence on the description on

16  the page.

17    THE COURT:  I am at a little bit of a loss.  The

18  document has "Grant Deed" on either side of it.

19    THE WITNESS:  That is because the original deed has a

20  piece of paper pasted on the front of it and to show what was

21  on the front of the piece of paper and also what was under-

22  neath it, it was necessary to photostat the deeds twice, and in

23  some cases in folding back the paper the title at the top

24  appeared the second time.

25    MR. VEEDER:  Your Honor, this does raise a legal point

1   to which I am going to make a suggestion now.   May I read

2   them.   I am looking now at Fallbrook's B-2, Grant Deed from

3   Charles F. Sell and Pauline Sell to the Fallbrook Public

4   Utility District.   It is stated in there at the bottom:

5          "Also excepting all riparian rights

6          which are retained and reserved for owners'

7          use upon the remainder of his said lands,

8          excepting that when the owner of said re-

9          maining lands or some substantial portion

10         thereof are annexed to the District the

11         owners irrevocably designate and appoint

12         the District their representative and agent,

13         subject to the covenant, conditions and

14         reservations, restrictions, rights of way,

15         and easements, if any, of record."

16      Now, your Honor, I believe that there can be no reser-

17   vation of riparian rights in the sense that they would be

18   effective against the United States of America.   I believe that

19   the only way you can possibly reserve a transfer or convey --

20   I don't believe it is possible to have a severance of a

21   riparian right.   I believe that the riparian rights were lost

22   as to all lands which no longer abut upon the stream.   And

23   also the additional fact respecting the chain of title and the

24   smallest parcel in that chain of title.

25      The point that I desire to raise now is that as between

8541

1   the Fallbrook Public Utility District and Sell, I think this

2   paragraph will be treated as a covenant not to sue.  As against

3   the United States of America, the Vail Company and other

4   riparians on the stream, I believe that it would be not

5   effective.  I think there has been to that extent a reduction

6   of the riparian right, and for that reason I will object to

7   any conclusions that have been expressed.

8        I have no objection, as I stated, to going ahead with

9   the physical features to which your Honor has referred.  But

10  I believe the law is as I have stated it.

11       MR. SACHSE:  May I offer a suggestion, your Honor.

12       THE COURT:  That is a legal matter that could be ironed

13  out at the time we drew the findings and judgment.  But I

14  think whatever facts we have should go into the record at this

15  time.

16       MR. VEEDER:  I have no objection.  I want the record to

17  show my objection, though.

18       MR. SACHSE:  May I offer a suggestion?  The question of

19  Mr. Sell's title, and he is one whom I will represent-- that

20  is the one Mr. Veeder read, and the validity of the reservation

21  will, of course, come up when evidence on Sell is presented to

22  this Court.  I am not attempting to present Sell's case at this

23  time.  It so happens that a single document by which Fallbrook

24  Public Utility District acquires Sell's property and by which

25  Sell attempts to retain something I am perfectly willing to

1  have the record indicate in any way the Court and Mr. Veeder

2  want that this question of the validity of the reservation and

3  the effect of the reservation is to be determined in the future

4  and that nothing here is binding in any way.  I am trying to

5  show now what Fallbrook owns, and it so happens that in their

6  ownership these reservations exist.

7      THE COURT:  All right.  In other words, by the intro-

8  duction in evidence of this evidence, it is received in

9  evidence.  The United States is not precluded from contending

10  that some of these documents that purport to transfer or

11  retain or affect certain rights do not have that effect.

12      MR. VEEDER:  That is right.

13      THE COURT:  The door is wide open for the Government

14  or any other parties to make that contention.  All we are doing

15  is taking evidence as to what the parties did and what shows

16  of record.

17      Let me inquire about this.  I have been looking at this

18  Fallbrook's B-1 in Evidence.

19      MR. SACHSE:  Who is the grantor?

20      THE COURT:  Kunkel.

21      MR. VEEDER:  The Tiger?

22      MR. SACHSE:  It is a different Kunkel.

23      THE COURT:  I can't make any sense out of this thing.

24  I can't determine what was done with these two sides.  I have

25  been studying it.  Maybe I am not as smart as some appellate

1    judge would be, but I don't know how he could figure out what

2    you have there.

3            MR. SACHSE: Frankly, I haven't looked at this myself.

4    I don't really know (examining document).

5            THE COURT: Your recording reference shows two different

6    pages.

7            MR. SACHSE: There must be two different deeds here.

8            THE WITNESS: May I explain it, please?

9            MR. SACHSE: Explain it to me. I don't know.

10           THE WITNESS: The side where it is marked "Fallbrook's

11   B-1"--

12           THE COURT: This shows at the top that it is on page

13   455.

14           THE WITNESS: That is correct. The deed is one sheet

15   of paper, with an insert pasted on the front of the sheet of

16   paper. This page that we are looking at, marked B-1, is a

17   photostat of the sheet as you would pick it up and look at it.

18   It shows the name and the description. Now the sheet was

19   not large enough for additional information on the deeds, so

20   underneath this insert is recorded Book 5885, Page 456, which

21   says "Pursuant to resolution of the Board of Directors of the

22   Fallbrook Public Utility District, we hereby accept and consent

23   to this conveyance." It shows the signature of the President

24   of the Board and the Secretary, and also there is a duplication

25   of the lower portion which appeared on the front page-- in

8544

1    other words, Mr. Kunkel and Mr. Kunkel's signature.

2    THE COURT:  I still don't understand it.  If you have a

3    flap, why don't you clip it on so that it looks exactly like

4    it looked in the original?

5    MR. SACHSE:  That is what should have been done.

6    THE WITNESS:  We can do it, your Honor.  I can take a

7    pair of scissors and do it.

8    MR. SACHSE:  You can't do it now, because it is the

9    Clerk's stamp.  But that is a good suggestion.  We will have

10   to restamp it.  The Clerk's stamp is in such a place that

11   some of it would be cut off.

12   THE COURT:  Why?

13   MR. VEEDER:  Where is the Clerk's stamp?

14   MR. SACHSE:  Right here.

15   MR. VEEDER:  He could probably stamp it again.

16   MR. SACHSE:  He probably could.  Shall we instruct the

17   witness during the recess--

18   THE COURT:  Take one as a sample and let him work this

19   over and see what he can do with it.

20   MR. SACHSE:  I think that is the way to do it.

21   THE COURT:  You must have a copy, and if you have some

22   problems about where the Clerk's stamp is, lend him your compy

23   and we will substitute.

24   MR. SACHSE:  I have copies of these, your Honor.  Shall

25   we do that now or shall we wait?

8545

1      THE COURT:  Do it at the recess.

2      Now we go back to where we were.  We were talking about

3 these contracts which Fallbrook has and which probably have

4 been incorporated by reference into the reservations in the

5 deeds.  The contracts themselves were never recorded?

6      MR. SACHSE:  No, your Honor.  I will not say in no case,

7 but as a general matter the mechanics was that the agreement

8 itself was signed by the owner, then this contract went in to

9 the bank for escrow, and the result was a deed.  It may be that

10 some individual owner even recorded the contract.  I don't know.

11      MR. VEEDER:  In any event, they would be merged in the

12 deed.

13      THE COURT:  Then, Mr. Veeder, can Mr. Sachse's statement

14 be accepted as the basis as to what Exhibit C is and that it

15 be received in evidence, so that we will know something about

16 what went on?  It being understood that where these contracts

17 were not recorded, obviously they are not part of the chain of

18 title.  If it turns out that they were recorded occasionally,

19 then in that instance we will have the recorded document here.

20 And use Exhibit C merely for illustrative purposes as to what

21 was submitted to the escrow, as a result of which the deeds

22 with the reservations came out and became recorded documents

23 in the chain of title.

24

25

8546

Z26

5

MR. VEEDER:  Your Honor, I would simply interpose an objection that it is incompetent, irrelevant and immaterial and has nothing to do with the case; that they are merged in the deeds.  You may overrule my objection, and that is it.

THE COURT:  I propose to do that, if you will concede for the purpose of foundation that Mr. Sachse's statement is correct.

MR. VEEDER:  Your Honor, I see no reason for that concession at this time.

THE COURT:  All right.

BY MR. SACHSE:

Q  Mr. Engleman, I will direct your attention to the third category shown on the legend, the small cross-hatching. I observe one up at the upper end of the reservoir, one down in the middle and one at the extreme upper end of it.  There are only the three such parcels; is that correct?

A  That is correct.

Q  What are those?

A  Those are parcels we have acquired either through purchase or through the condemnation action so far.

Q  Finally, at the bottom of the legend is a diagonal cross-hatching with double lines.  On his Honor's small copy they will show as heavy lines.  What does that indicate?

A  Those are the lands that the Fallbrook Public Utility District has purchased either directly or through condemnation,

1  which-- I can't use the word.

2  Q  Which we concede are not riparian.

3  A  All right.

4  MR. SACHSE:  If that is satisfactory, Mr. Veeder.

5  MR. VEEDER:  How do we identify that?

6  THE COURT:  Are there only three of them?

7  THE WITNESS:  No, there are a number of those.

8  MR. VEEDER:  Could you give us a list of the deeds, and

9  that would save us some time.

10  MR. SACHSE:  We will undertake to give you a list of

11  the ones we concede are non-riparian.

12  Q  Who prepared this exhibit, Mr. Engleman?

13  A  I did.

14  Q  In drawing the map, what was your source of material

15  as to boundaries and the way you delineated the ownerships?

16  A  Well, I prepared the exhibit as you see it.  As I

17  have stated before, only the revised form.  It was originally

18  drawn by Mr. Larick, who was my predecessor, but I have

19  checked everything on the drawing as far as every distance,

20  section number and everything that is on the drawing, I have

21  personally checked, and in some cases have had to revise it.

22  Q  Is this map to scale as to ownerships?

23  A  It is to scale.

24  THE COURT:  Now, the legal descriptions of this land

25  which you characterize as being riparian or lying on or across

1  the stream beds are contained in the deeds, the B series?

2      A  Yes, sir.

3      Q  And the land where Fallbrook has purported to become

4  an agent for land lying outside the area of the dam as shown

5  in the large squares cross-hatched are those legal descriptions

6  contained in the B series of deeds?

7      A  No, sir.

8      THE COURT:  They are not?

9      THE WITNESS:  Those descriptions were taken from the

10  title report that we received.

11      MR. VEEDER:  To which areas were you referring?

12      THE WITNESS:  Those in which we are the agent, the

13  remainderlands.

14  BY MR. SACHSE:

15      Q  And is Exhibit J then accurate to the best of your

16  knowledge?

17      A  It is.

18      MR. VEEDER:  Just a moment. Go ahead.

19      MR. SACHSE:  I will now offer Exhibit J for the limited

20  purposes we have heretofore discussed, your Honor.

21      MR. VEEDER:  The exhibit, as I observe it, has a red

22  line drawn on it, which is not indicated, as I see it, in the

23  legend, and until that is explained I am certainly going to

24  object to it, and I may raise an objection afterward.

25      MR. SACHSE:  It has been explained, Mr. Veeder.

8549

THE COURT:  He explained that that was the outside limits of the condemnation area within which land was acquired either by condemnation or by negotiated purchase under threat of condemnation.

MR. VEEDER:  Is it being offered as showing the high water mark of the alleged reservoir?

MR. SACHSE:  No, there are no topographic features.  I made that very clear, I thought, from the earlier examination. There do not purport to be any topographic features indicated on this map whatsoever.  It is purely and simply a survey map to show boundaries.

MR. VEEDER:  You don't purport to show it as a high water mark of the alleged reservoir?

MR. SACHSE:  Absolutely not.  There are no contours on it.  You couldn't draw any such conclusion.

MR. VEEDER:  Under the circumstances then, I raise the objection that it is incompetent, irrelevant and immaterial and does not tend to prove any issue in the case.  There is certainly nothing in this case to show that Fallbrook Public Utility District has any right to any water to be impounded in this reservoir area.

MR. SACHSE:  It is not offered for that purpose.

THE COURT:  It is not offered for that purpose.  The deeds are in evidence, and it is offered to demonstrate visually what property these deeds cover that Fallbrook has acquired by

1  condemnation or purchase for reservoir purposes.  The objection

2  will be overruled.  It will be received in evidence for the

3  limited purpose indicated by counsel.

4      (Defendant Fallbrook's Exhibit J for Identification was

5  received in evidence.)

6  BY MR. SACHSE:

7      Q  What familiarity do you have with the lands shown

8  on Exhibit J-- what personal familiarity do you have?

9      A  I have a very broad familiarity with the land shown

10  on Exhibit J, in that I have personally walked over every parcel

11  that is shown on that map.  In many cases I have actually had a

12  transit and tape along the boundary lines.  I have been on the

13  land showing it to the Superior Court during the condemnation

14  suit, and I am about as familiar with it as I guess I possibly

15  could be.

16      Q  Are you familiar with the present state of irrigated

17  development on any of it?

18      A  Yes, I believe so.

19      Q  I have particular reference now to those portions

20  acquired by the Fallbrook Public Utility District.  Are you

21  familiar with the present agricultural development on those?

22      A  Yes.

23      Q  Are you familiar with the present state of agricultural

24  development on the remainders when a part only was acquired by

25  the Fallbrook Public Utility District?

Z31

1    the Fallbrook Public Utility District?

2         A  Yes.

3         MR. SACHSE:  I would like to start at the extreme

4    upstream end.

5         THE COURT:  What is the purpose of this, now?

6         MR. SACHSE:  Again, your Honor, I am glad that you asked

7    the question.  This has nothing to do with Fallbrook.  If your

8    Honor wants it, we can give you what the present agricultural

9    development is, whether or not it has been severed now from

10   its water source on the river and is no longer a burden on the

11   stream, or we can defer the whole thing until each individual

12   parcel is taken up.

13        THE COURT:  Are you going to have this witness testify

14   about the lands you have acquired within the red line on Exhibit

15   J?

16        MR. SACHSE:  I had both in mind, your Honor.  For

17   example, I had in mind asking the witness about any single parcel

18   where we had acquired part and had not acquired part.  I was

19   going to ask him what is the present agricultural development on

20   the part we have acquired, and then I was going to ask him

21   what is the agricultural development on the part we have

22   severed-- in other words, which is now relieved from being a

23   burden on the stream.

24        THE COURT:  In certain cases you may have severed, and

25   in certain cases you didn't.

1        MR. SACHSE:  I mean in cases where we have severed.

2        MR. VEEDER:  I object on the grounds that counsel has no

3   authority to represent those people.

4        MR. SACHSE:  Many of them I do represent.  But I agree

5   if there is going to be the slightest trouble I would rather

6   do it with the individual parcels when they come in evidence.

7        MR. VEEDER:  I object to it.

8        MR. SACHSE:  All right, let's drop it.

9        THE COURT:  All right.

10   BY MR. SACHSE:

11       Q  Now, Mr. Engleman, I am going to hand you two exhibits,

12   Fallbrook's Exhibit V and Fallbrook's Exhibit V No. 1 for

13   Identification.  Will you first direct your attention to

14   Fallbrook's Exhibit V, please.  Do you recognize that exhibit?

15       A  Yes, I do.

16       Q  Who prepared it?

7        A  I did.

         Q  Will you tell us what the exhibit is?

         A  This is an exhibit which is compiled from two differ-

     ent sources of material, one being the United States Exhibit

     49 and the second being Fallbrook's answer to the United States's

22   Interrogatory No. 12-H.  The exhibit shows--

23       THE COURT:  You are talking about Fallbrook's Exhibit V

24   now?

25       THE WITNESS:  Yes, sir.  Exhibit V shows--

BY MR. SACHSE:

Q  Start at Column A, please, and describe column by column what they are.

A  For the water years between 1943 through 1957, the column B shows the total pumpage as shown on Exhibit 49, which I arrived at by scaling off from Exhibit 49 those waters that were shown as total pumpage.

Columns C and D are both parts of the total pumpage shown in column B designated as use by the watershed, that portion in column C being outside the watershed, as shown in interrogatory answer 12-H, and that inside the watershed as a mathematical calculation of column B, subtracting column C from it.

Columns E and F are the percentages which are arrived at from columns B, C, and D, the first in column E being outside the watershed, which is column C divided by column B, and column F is the percentage of use inside the watershed, which is merely 100% minus column E, and at the bottom each has been totaled for the period of years, column B showing 89,600--

MR. VEEDER:  Now just hold it.

Your Honor, this is perhaps a fine piece of work for a brief.  It might be important from the standpoint of analysis and argument by counsel.  It might be a pious idea for your Honor to consider a year from now when we are arguing this. But I submit that it is not proper evidence and is not

Z34

1  evidentiary in character.

2      THE COURT:  The objection is overruled.  Let's finish

3  the explanation.  You interrupted the witness.

4  BY MR. SACHSE:

5      Q  Without reading the totals, Mr. Engelman, did you

6  then do anything further or did you use any other sources to

7  check any of the figures that appear on Exhibit V?

8      A  Yes, sir, I did.  I checked Exhibit 49, which is

9  shown here.  I also checked this against the United States's

10 Exhibit 47, which showed a very close similarity between the

11 two.  There was only a deviation of 10 to 30 acre-feet differ-

12 ence.  And I also checked it against some records in our files

13 in the office, which are those pumpages reported when the

14 United States filed a protest against the Fallbrook applica-

15 tions.

16     Q  Did you find that column B in general agreed or

17 disagreed with those?

18     A  It agreed.  The three source of figures very closely

19 agreed.

20     THE COURT:  Of course, what you have checked on, which

21 is not here in the record for us to look at, the Court will

22 ignore.  You say you checked on some figures in your office.

23 That doesn't mean anything to us.

24     MR. SACHSE:  They have been marked for identification,

25 your Honor.

Z35

1      THE COURT:  They have?

2      MR. SACHSE:  Those are the protests of the United

3  States to the Vail, to the Fallbrook, to the Santa Margarita

4  applications.

5      THE WITNESS:  That is correct.

6      THE COURT:  All right.

7      MR. SACHSE:  I will offer this, your Honor.  And in

8  response to Mr. Veeder's objection already expressed, I think

9  it is one of the silliest things I ever heard in my life.  If

10  there is any exhibit that is customary when experts testify it

11  is to have one or another double check or make a different

12  kind of calculation off the figures presented by one expert.

13  This is exactly that.  Exhibit 49 is the United States's

14  exhibit.

15      THE COURT:  That is right.  Make your objection.

16      MR. VEEDER:  Your Honor, I renew my objection that I

17  already made.

18      THE COURT:  There was no offer of the exhibit when you

19  made the objection.

20      MR. VEEDER:  May I state, then, that I object on the

21  grounds that this witness is attempting to usurp the powers

22  of the Court in making an analysis that should only be made

23  by the Court itself; that there is no place for a witness to

24  assume the functions of the Court; and while this, as I said,

25  might be appropriate for a brief, it certainly has no place

Z36

1    evidentiary in character.

2         THE COURT:  You have never tried any incometax  cases,

3    have you?

4         MR. VEEDER:  No, I never did.

5         THE COURT:  If you had tried income tax cases you would

6    find that after a mass of evidence is put in of this matter and

7    that-- figures, figures, figures-- then an expert gets it to-

8    gether and prepares some charts and compiles some totals and

9    makes comparisons, and it is a very common method in the trial

10   of criminal cases.  Now if that kind of evidence is admissible

11   where a man's liberty is at stake, there is not much question

12   in my mind that it can be used here.  They are generally

13   received for illustrative purposes.  They rely for their

14   efficiency on the exhibits in evidence upon which they are

15   based.  They are only an expert's opinion in black and white.

16   An expert's opinion is only as good as the material on which

17   he bases it.

18        MR. VEEDER:  That is correct, and the point that I would

19   like to amplify a little more, this is simply a mechanical

20   procedure that I think your Honor should perform and certainly

21   not an expert.

22        THE COURT:  Well, I don't intend to perform it.  If you

23   want to help me--

24        MR. VEEDER:  I think that is the way it should be

25   handled.  I will write a brief.

1       THE COURT:  The objection is overruled.  Fallbrook's

2   Exhibit V is received in evidence for illustrative purposes.

3       (Fallbrook's Exhibit V for Identification was received

4   in evidence.)

5   BY MR. SACHSE:

6       Q  Referring to column B on Exhibit V, you have a total

7   figure of 89,600.  What does that represent?

8       A  That represents the sum of the pumpages as reported

9   on Exhibit 49 from the beginning of the year 1943 through 1957.

10  It is merely an addition of all of the figures in column B.

11      Q  And columns C and D are likewise additions of all the

12  figures in those columns?

13      A  That is correct.

14      Q  Your percentage columns E and F, however, are indi-

15  cated as "Average."

16      A  That is correct.

17      Q  What are they?

18      A  Column E, the average shown as 63.8% was obtained by

19  dividing 57,174 by 89,600, or the total of column C by the

20  total of Column B.

21      Column F, the average shown there as 36.2% was arrived

22  at in the same method as shown for column F, a hundred percent

23  minus E, and was checked by dividing 32,426 by the total

24  89,600.

25      Q  Now, I will direct your attention to Fallbrook's

1    Exhibit V-1, please.  Are you familiar with that exhibit?

2           A  I am.

3           Q  Who prepared it?

4           A  I did.

5           Q  Will you again by columns tell us what it is,

6    starting with Column A?

7           A  Exhibit V-1 was compiled from the United States's

8    Exhibits 150 and 151.  Column, as in Exhibit V, shows the

9    water years from 1944 through 1957.  Column B is derived from

10   the addition of those figures shown on Exhibit 150 plus the

11   figures shown on Exhibit 151 to arrive at a total use.

12          Q  Just a minute.  Exhibits 150 and 151 of course are

13   already in evidence, and those were United States pumpage,

14   one of them within and one without the watershed?

15          A  That is correct.

16          Q  So you totaled the two to arrive at V and V-1?

17          A  That is correct.

18          Q  And how about C and D?

19          A  Column C was taken directly from Exhibit 150, showing

20   the use outside the watershed.  Column D is taken directly

21   from Exhibit 151, showing the use inside the watershed.

22          Q  And your percentage columns, were they calculated in

23   the same way that you calculated the percentages on Exhibit V?

24          A  They were.

25          Q  And your totals at the bottom, were they accomplished

1  by totaling columns B, C, and D?

2      A  They were.

3      Q  And your average totals for Columns E and F, were

4  they accomplished by making the arithmetical calculation

5  to convert the totals to percentages?

6      A  They were.

7      MR. SACHSE:  I offer in evidence Fallbrook's Exhibit V-1,

8  your Honor.

9      MR. VEEDER:  Your Honor, I renew my objection on the

10  grounds that it is not proper evidence, it is not evidentiary

11  in character, it has no place in the trial.  It is usurping

12  the powers and functions of the Court.  It might be all right in a

13  brief, but certainly not in evidence.

14      THE COURT:  Overruled.  It is received in evidence for

15  the limited purpose, as was Exhibit V.

16      (Fallbrook's Exhibit V-1 for Identification was received

17  in evidence.)

18      THE COURT:  I notice that Governments Exhibits 150 and

19  151 include the '58 water year.  You stopped short of that.  Is

20  there any particular reason for that?

21      MR. SACHSE:  To have them match exactly with the pre-

22  ceding exhibit.  We have in our interrogatories no figures for

23  the '58 water year, your Honor.  Therefore, I wanted the two

24  exhibits to be directly comparable  and told him to stop with

25  that year.

z40

1    THE COURT:  Is this a good place to stop for a recess?

2    MR. SACHSE:  I am going to advise Mr. Veeder to cross-

3    examine, so I think it is an excellent place for a recess.

4    THE COURT:  Take a short recess.

5    (Recess.)

6    MR. SACHSE:  Before Mr. Veeder cross-examines, your

7    Honor, I want to clear up a couple of housekeeping matters,

8    as Mr. Veeder terms them.

9    Fallbrook's Exhibit U, according to the record, was

10   offered.  Your Honor deferred ruling until Mr. Veeder had an

11   opportunity to check the F. E. Green figures used in compiling

12   it.

13   MR. VEEDER: For what it is worth, I withdraw any objec-

14   tion on that.

15   THE COURT:  Fallbrook's Exhibit U received in evidence.

16   (Fallbrook's Exhibit U for Identification was received

17   in evidence.)

18   MR. SACHSE:  Fallbrook's Exhibits O, P, and Q are marked

19   for identification, but your Honor excluded them on the basis

20   that there was no materiality.  Now, I submit that on the basis

21   of Fallbrook's Exhibits V and V-1 being in evidence, Fallbrook's

22   Exhibits O, P, and Q, each being used by Mr. Engleman as

23   part of the calculations, should now be admitted.

24   MR. VEEDER:  I renew my objection, your Honor.

25   THE COURT:  The same ruling.  The objection is sustained.

Z41

1      MR. SACHSE:  You may cross-examine.

2      MR. VEEDER:  Fallbrook has asked for the diversions by

3   Camp Pendleton from the Santa Margarita River.  I want the

4   record to show that I am delivering those to Mr. Sachse, and

5   we would like to have those back.

6      MR. SACHSE:  I will give them back in the next day or

7   two.

8      Mr. Moskovitz asked me to apologize to the Court.  He

9   anticipated that he might be called upon to put his case on

10  very quickly and he went to get his witness.

11

12                     CROSS-EXAMINATION

13  BY MR. VEEDER:

14      Q  How long have you been employed with the Fallbrook

15  Public Utility District, Mr. Engleman?

16      A  Since May, 1955.

17      Q  And during that time you have become familiar, have

18  you, with the entire area of the Fallbrook Public Utility

19  District?  Is that right?

20      A  That is correct.

21      Q  And at the present time you are the assistant

22  manager of that District?

23      A  I am not.

24      Q  What is your title?

25      A  I am the assistant engineer.

Q   And who is presently in charge of the office in which you are employed?

A   Mr. Boren.

Q   Who is Mr. Boren?

A   He is the acting manager.

Q   And he is the man who is directly and immediately in charge of the functions of the District; is that right?

A   That is correct.

Q   Now, in making your surveys and investigations in regard to the acquisition of lands concerning which you have testified, what was the purpose, if you know, for the acquisition of those?  What was the objective for which those lands were purchased, if you know?

A   They were purchased for a dam and reservoir purposes.

Q   And what studies have you made in connection with the dam and reservoir?

MR. SACHSE:  Who-- this witness?

MR. VEEDER:  This witness.

THE COURT:  It is not within the scope of the direct examination, I think.

MR. VEEDER:  Are you objecting to the question, your Honor?

THE COURT:  I can if I want to.

MR. VEEDER:  I know you can.

THE COURT:  I want this trial to proceed.  Why shouldn't

243

1   this be excluded?  Why do you want to go into this with this

2   witness?

3        MR. VEEDER:  My own view is that it has become extremely

4   important as to the relevancy of this evidence.  If this land

5   was purchased for the purpose of impounding water for purposes

6   of irrigation, I submit that there is absolutely no basis what-

7   ever for the introduction of it into evidence.  Now I will

8   withdraw the question, because I would not want to get into

9   any extraneous issues at this time.

10       The point that I am making, your Honor, is that Fall-

11  brook Public Utility District has gone out and condemned lands,

12  and they have gone to great length in putting in evidence in

13  regard to the acquisitions in question.  I have objected to

14  the offer of evidence.

15       THE COURT:  It has not been received as having any

16  relationship to any question about their right to store water

17  or anything of that sort.  It has been received as showing

18  what lands that were acquired by them were riparian or non-

19  riparian in character.  That was the purpose of the offer and

20  that is why it was received.  It is in line with our catalog-

21  ing of the various lands within the watershed.  They either

22  have or do not have a right to build a dam and to impound

23  water, apart from this evidence.  This doesn't add anything to

24  that.

25       MR. VEEDER:  Your Honor, I renew an additional objection--

1    MR. SACHSE: Objection? This is your question.

2    MR. VEEDER: No. His Honor brought up something that
3    is entirely new here.

4    I am going to renew the objection, and I move to strike
5    this evidence on the grounds that the Fallbrook Public Utility
6    District is totally, completely and entirely without power to
7    go out and buy land without some express purpose and for some
8    express reason. It is manifest that irrespective of the
9    subterfuge that those lands were purchased and had to be
10   purchased for some activity of the Fallbrook Public Utility
11   District and had to be within the scope of its authority.

12   If this matter is in here from the standpoint of proving
13   riparian land claimed by the Fallbrook Public Utility District,
14   I submit that the Fallbrook Public Utility District had no
15   power or authority to buy that land, and I renew the objection
16   and I move to strike the evidence on the basis that this
17   subterfuge cannot be permitted to stand. There is no reason
18   why the Fallbrook Public Utility District would go out and buy
19   a piece of land just to be going out and buying a piece of land.
20   We know that. Mr. Sachse comes along and says, I don't want
21   this question of ultra vires brought up here. We say we simply
22   bought us a piece of riparian land.

23   MR. SACHSE: No, we bought it for a dam and reservoir.

24   THE COURT: The testimony shows that the red line is the
25   area of the condemnation for the reservoir.

1    But what I am pointing out to you is that the admission

2  of this evidence does not justify a right to build a reservoir.

3  They have that right or they don't, apart from the evidence.

4    Your objections are overruled.  Your motion to strike

5  is overruled.

6    My reporter loves you, Mr. Veeder, because this all

7  adds pages to the transcript, and I am glad that Mr. Swing

8  could be here today when you put on one of these fiery demon-

9  strations of defending the rights of the Marines at Camp

10  Pendleton.

11    Proceed.

12    MR. VEEDER:  The point that I make, your Honor, is this:

13    THE COURT:  By the way, your point as to the ultra vires

14  as to Fallbrook's legal capacity has been reserved.  It is a

15  legal point.  I want it discussed later.  I want to spend some

16  time reading these cases.

17    MR. VEEDER:  This goes squarely and entirely to the

18  question, your Honor, that has been raised here, and I am

19  raising it now in regard to the authority of the Fallbrook

20  Public Utility District to acquire land for purposes of irriga-

21  tion.

22    THE COURT:  All right, that point you have saved until

23  we can discuss it.

24    MR. VEEDER:  This is an additional point entirely in

25  addition to what I have said before.  The evidence that you

1   have before you here, as I understand it, is to show that

2   there are lands in here that have riparian rights, lands are

3   being irrigated that the Fallbrook Public Utility District

4   owns, lands that are now being irrigated, and that was the

5   sole reason for this man's testimony in regard to the investi-

6   gations and in regard to the use of water, in regard to the

7   leases, in regard to the reservations, in regard to all these

8   elements that were raised today, and I submit that there is

9   presented just as squarely in regard to the evidence here

10   now as to the power of the Fallbrook Public Utility District

11   to acquire riparian rights for irrigation purposes as there

12   were if they had had the courage to offer some evidence in

13   regard to their illustory dam.

14       THE COURT:  Well, now, they haven't ever contended that

15   they acquired this riparian land or the riparian rights for

16   irrigation purposes.  They have disclaimed that already.  They

17   acquired the land in order to build a dam on it, and they have

18   disclaimed any right to use any of the riparian rights in

19   connection with this land in their irrigation system.

20       MR. VEEDER:  But they are insisting that they have now

21   acquired riparian rights, rights which they say are to be

22   exercised by the owners presently upon those lands; that they

23   are asserting a right that they have a right to lease those

24   lands for irrigation purposes; that they have a right to

25   proceed in the utilization of water in these areas; and I

8567

1    submit that they have no such power, and I submit that now

2    is the point where the issue is squarely presented in regard

3    to their use of water.

4         THE COURT:  I will reserve you the right to argue that

5    and you may make a motion to strike the exhibit.  But we are

6    not going to do it today.  When argue it I want to have read

7    these cases over and to have looked at the statute and given

8    it more study, because I haven't done it since we had it up

9    at pre-trial.  I will hear you in detail on Fallbrook's power

10   as a utility district or a public agency to acquire land, to

11   build a dam, et cetera.

12        MR. SACHSE:  I would suggest that when thattime comes,

13   it is purely a legal question, your Honor, and that you give

14   us a few days warning and I would like to brief it in a little

15   more detail than we did on the pre-trial.

16        THE COURT:  All right.

17        MR. VEEDER:  As I understand it, then, the only thing

18   this is offered for is that title has passed to the Fallbrook

19   Public Utility District for these lands and nothing else?

20        THE COURT:  And that certain of them are riparian in

21   character.  But Fallbrook Public Utility District disclaims

22   the right to use the water rights from that land, as it were,

23   to feed water into their irrigation system.  So you don't

24   have that problem.

25        There is left open the question, which may never arise

Z48

1    and will be decided later, if, as and when it does arise,

2    as to what would happen if Fallbrook abandoned its project

3    for a dam and never built it and instead decided to lease out

4    this land for farming purposes or decided itself to go into

5    agricultural pursuits and to grow crops on this land.  That

6    point we don't reach now.

7        MR. VEEDER:  Reserving the right, then, your Honor,

8    may I recall Mr. Yackey and Mr. Engleman?

9        THE COURT:  You may have that right.

10       MR. VEEDER:  But I want to reserve the right to call

11   them both in regard to this analysis they are making about

12   the water uses inside the Fallbrook Public Utility District,

13   the 2½ second-feet, how they are used, where they are used,

14   and that type of matter.

15       THE COURT:  You don't want to go into that now?

16       MR. VEEDER:  Well, this witness hasn't testified on

17   anything but this single exhibit.  But I want to reserve that

18   right.

19       THE COURT:  This witness testified on Exhibits V and V-1.

20   He made those two charts.

21       MR. VEEDER:  I am coming to those later.  I am only

22   abandoning this point momentarily because I want to go into

23   where the water is presently used, how it is used, whether it

24   is used for irrigation.  Those matters, as I understand, are

25   reserved, and Mr Yackey will be interrogated in regard to those

8569

Z49

1    matters.

2         THE COURT:  I don't understand you on that.  I said

3    that Fallbrook had disclaimed any right to take the riparian

4    rights from this land condemned or purchased under threat of

5    condemnation and to use that water to put into their irrigation

6    system; that if, as and when Fallbrook claimed the right or

7    asserted the right to lease any of these lands for agricultural

8    purposes or to use the lands themselves for agricultural

9    purposes and claimed in connection with the lands shown on

10   Exhibit J and claimed riparian rights and used those rights in

11   connection with such matters, we would then go into it.  I

12   didn't mean at this trial.  I meant at sometime in the

13   future, under the reserved jurisdiction of this Court.

14        MR. VEEDER:  The point that I make, your Honor, if we

15   may look at Fallbrook'sExhibit L--

16        THE COURT:  This witness didn't testify to Fallbrook's

17   Exhibit L.

18        MR. VEEDER:  I am talking about Mr. Yackey.  I desire

19   to recall him.

20        THE COURT:  You may recall him.

21        MR. VEEDER:  In regard to Exhibit L?

22        THE COURT:  In regard to L, that is right.

23        MR. VEEDER:  All right.

24        Q  Now, in making your calculations appearing on

25   Fallbrook's Exhibit V, and particularly columns C and D, what

1   was the watershed line that you took into consideration when

2   you made that tabulation, Mr. Engleman?

3       MR. SACHSE:  I object, if the Court please.  That

4   assumes facts not in evidence.  The witness testified that he

5   took the data from answers to interrogatories, not from any

6   watershed.

7       THE COURT:  Overruled;  the witness may answer whether

8   he did or did not.  This is cross-examination.  You can ask

9   a leading question on cross-examination.  You can say, isn't

10  it a fact that you did so and so?  Or in the English method,

11  I put it to you that you did so and so.  That is entirely

12  proper cross-examination.

13      THE WITNESS:  I did not take into consideration where

14  the watershed boundary was.

15  BY MR. VEEDER:

16      Q  And you didn't take into consideration the location

17  of the watershed boundary in regard to Fallbrook's Exhibit V-1

18  either; is that correct?

19      A  I did not.

20      THE COURT:  In other words, you just took the material

21  that was on the Government's exhibits?

22      THE WITNESS:  That is correct.

23      THE COURT:  And if the Government had the right water-

24  shed line, you are right.  If the Government had the wrong

25  watershed line, you are wrong.

1          MR. VEEDER:  Or if we changed the watershed line, he

2    was probably wrong to start with.

3          Q   Now, I observe on Exhibit V, Column B, the figures

4    that you have set up there show pumpage on the basis of Exhibit

5    49.  Did you know that that omits the pumpage for the NAD (Naval

6    Ammunition Depot)?

7          A   I did not.

8          Q   In other words, when you prepared that, you assumed

9    that it took into consideration all the pumpage on the Camp

10   Pendleton, is that right, and on the NAD?

11         A   I don't know as I made any assumption.  I merely took

12   the exhibit and took what it had on it.

13         Q   But you don't purport to show the water pumped at the

14   Naval Ammunition Depot; is that right?

15         A   That is your statement, not mine, because I don't know.

16   I merely took what was on Exhibit 49.

17         Q   So as a matter of fact, if it didn't include the Naval

18   Ammunition Depot, the Naval Ammunition Depot figure is not in-

19   cluded here; is that right?

20         A   I would assume so, if what you say is correct.

21         Q   Now, these figures, I observe, have been rounded off

22   to 50; isn't that correct?

23         A   They appear to be, yes.

24         Q   So it is entirely possible that with the variances that

25   are shown in rounding these figures off to the fifties and the

1   omission of the Naval Ammunition Depot, assuming that it was

2   omitted, the figures would not be too far apart then.   I am re-

3   ferring to Column B, the column that the United States has

4   offered.

5       A   Column B on Exhibit V and V1, with the assumptions

6   you have made, could conceivably be identical.

7       MR. VEEDER:   I have no further questions.

8       MR. SACHSE:   I have no re-direct examination.

9       THE COURT:   Thank you, Mr. Engleman.

10      MR. SACHSE:   At this stage of proceedings, then, your

11   Honor, Fallbrook Public Utility District rests.

12      I understand that these witnesses will be available for

13   Mr. Veeder's cross examination.   I am not going to have them in

14   court everyday.

15      Can I ask you to give me about 24 hours notice?

16      MR. VEEDER:   Yes, I will give you--

17      MR. SACHSE:   48 hours I would prefer, but 24 hours is

18   probably all right.

19      MR. VEEDER:   I will give you until after California's

20   case is in.   I think that would make more sense.

21      MR. SACHSE:   Then I will bring them back.

22      May I ask at this time if there is any of the material

23   that I gave Mr. Veeder that he still desires to keep, or may I

24   pick it up?

25      MR. VEEDER:   Why don't you come down to the office.

1    MR. SACHSE:  All right, I'll check with you.

2    Thank you, Mr. Engleman.

3    THE COURT:  What about Exhibit N?

4    MR. SACHSE:  Exhibit N I will withdraw entirely, your

5    Honor.

6    Exhibit C I would like to leave marked.

7    THE COURT:  It will be marked.

8    MR. SACHSE:  Because we may want to use it with some of

9    these subsequent witnesses who own land of their own.

10    THE COURT:  It is marked for identification.

11    MR. SACHSE:  But Exhibit N can be withdrawn.

12    THE COURT:  All right.

13    MR. MOSKOVITZ:  Your Honor, I assume that it is now time

14    for the State to put on its case.

15    THE COURT:  It looks like the time has come.

16    MR. MOSKOVITZ:  May I go off the record for just a minute.

17    MR. VEEDER:  Why should we go off the record for just a

18    moment.

19    MR. MOSKOVITZ:  I want to explain something.

20    Mr. Illingworth is not present right now and I haven't

21    been able to find him in his hotel room or in our office.  I

22    can make an opening statement now which will take up some time

23    and during the noon hour I am sure I will be able to locate him.

24    MR. VEEDER:  He came down with you, didn't he?

25    MR. MOSKOVITZ:  Yes, he came down.  We got here at 5

1   o'clock in the morning and I didn't ask him to come with me

2   when we first arrived this morning.

3          THE COURT:  He is probably asleep.  Go ahead.

4          MR. MOSKOVITZ:  Your Honor, the State proposes to put in

5   expert testimony by Mr. Illingworth and various exhibits pre-

6   pared by him or under his direction, which will help to fill in

7   what we think are some gaps in the evidence relating to the

8   hydrology of the Santa Margarita watershed.  We think this

9   evidence will be of assistance to the court and all the parties

10  in understanding the nature of the precipitation, the runoff

11  and its affect upon the operation of the Santa Margarita coastal

12  ground water basin and on the amount of runoff that than can be

13  expected to occur into the ocean.

14         We propose to put in some precipitation data which the

15  State has gathered and which is compiled in various of the

16  appendancies and tables in Bulletin 57, State's Exhibit L for

17  identification.

18         We will also offer in evidence the isohyetal map which

19  was prepared on the basis of that precipitation data.

20         Thereafter, we propose to offer hydrographs of daily

21  flow at the various gauging stations in the Santa Margarita

22  River for which the U.S.G.S. has kept records.  These will be

23  to depict in graphic form the runoff records which are already

24  in evidence and will illustrate the nature of the flow of this

25  stream.

1       Then we propose to put in evidence an analysis of some

2 of the years of record, which will show how the flow is distri-

3 buted in a year in terms of percentages--that is, what percentage

4 of the runoff at these various gauging stations occurred during

5 the highest 30-day period during the year, what percentage occurred

6 during the highest 10-day period during the year, what percentage

7 occurred during the highest 5-day period during the year, again

8 demonstrating the type of flow we have in the stream system.

9       Then we propose to offer in evidence our hydrographic

10 map which is Plat 6 in State's Exhibit L.  We have an enlargement

11 of it, which has been marked with another exhibit number, and

12 on it will be illustrated the type of intermittment flow you

13 have in the summertime, certain areas of the stream having flow

14 and certain areas of the stream having no flow at all.

15       I see our witness is here.

16       These are flows in a certain year when the old Division

17 of Water Resources conducted the investigation.

18       After that we will offer in evidence hydrographs of well

19 levels that are a graphic representation of the water levels in

20 wells at various portions of the watershed, showing their charac-

21 ter as they go up and down, and then correlate those levels with

22 stream flow of the Santa Margarita River in the vicinity of these

23 wells, indicating the relationship between the stream flow and

24 ground water in these areas.

25

#10

1        Then we will offer in evidence an exhibit showing the

2    profile of ground water levels in the Santa Margarita Coastal

3    basin for various years and showing the fluctuation of the

4    ground water table by years, and relating those fluctuations

5    to stream flow and of course to the level of water in wells

6    from which the profiles were derived.

7        Then we will embark upon an analysis, a study, if you

8    will, a routing study of flows of water into the Santa Margarita

9    Coastal Basin.  We will first indicate the assumptions used as

10    to the amount of storage capacity in the Santa Margarita

11    Coastal Basin, how that storage capacity which we have utilized

12    compares with the storage capacity which has been calculated

13    and estimated by the United States in this case.

14        THE COURT:  Your figures so far are very close.  Are

15    you going to offer evidence to change that close relationship?

16        MR. MOSKOVITZ:  No, your Honor, that close relationship

17    is not going to be altered, but we want to illustrate how

18    those two figures do compare.  Slightly different assumptions

19    were used in arriving at those two figures, which we want to

20    show how they do relate and how the calculations work out.

21        Then these studies of yield of the Coastal Basin, of

22    which we have three.  Study No. 1 assumes a certain past period

23    of record of flow into the Coastal Ground Water Basin.  The

24    period that has been selected appears to be the last complete

25    cycle which terminates in approximately the spring of 1958

1  when we had fairly high flows and runoff into the ocean,

2  breaking a record dry period.   Our analysis indicates there

3  was a record dry period that terminated just this past year.

4  It assumes that the flow was as it occurred according to

5  record and the calculation will indicate what would be the

6  safe yield of the Santa Margarita Coastal Basin during that

7  period of record of the flows as they occurred.   In certain

8  instances we have to estimate the contribution to the ground

9  water basin of the Santa Margarita Coastal Basin because we

10  did not have measured flows during the entire period from the

11  areas which contributed to that basin.   But the calculation

12  will show what is the fixed amount which could have been

13  extracted from the coastal basin during this period of time

14  and not run out of water, taking that fixed amount until the

15  end of the period when the dry spell was broken by the heavy

16  precipitation and runoff of the 1957-58 water year.   In these

17  calculations there will be estimates of what is the percolation

18  rate of stream flow into the Santa Margarita Coastal Basin.

19  Because what affects the amount that can be withdrawn from the

20  basin is how much goes into the basin, and not what flow

21  percolates, according to the analysis which has been made, and

22  we will indicate the studies which we made to attempt to

23  estimate what that percolation rate would be.

24      THE COURT:  Do you expect me to make a finding that there

25  is a safe yield of this river over and above the demands of the

1    riparians and to make a finding that therefore Fallbrook Public

2    Utility District can take so much water a year out of this

3    river?

4            MR. MOSKOVITZ:  No, your Honor.

5            THE COURT:  It sounds to me like the case you are out-

6    lining is directed toward that kind of finding.  It sounds to

7    me like your case has been outlined for me to make some find-

8    ing that Bulletin No. 57 was a very fine job and that the

9    conclusions in it are correct.  I am not interested in that.

10   I am going to find what riparian rights, prescriptive rights

11   and appropriative rights there are on this river, and I am not

12   going to try to use a crystal ball to find out what is going

13   to happen year by year in the future, because I don't know.

14   If your case is directed for me to make some finding that there

15   is a safe yield on this river, you are wasting a lot of time.

16           MR.MOSKOVITZ:  Your Honor, we don't expect you to make

17   that kind of finding.  We don't think this is what you should

18   do.

19           THE COURT:  A lot of this material you are talking about

20   doesn't seem to me to be too pertinent.

21           MR. MOSKOVITZ:  We feel these analyses are methods of

22   understanding the nature of the flow in the stream, not for

23   the purpose of predicting the precise amount which will come

24   down in the future and what can be used, but to give you a

25   picture of what the character of this stream is and how it can

1    be utilized for pumping ground water and under certain condi-

2    tions what will be the results.

3         THE COURT:  It might have some bearing on the question

4    of the depletion of the downstream basins and the intrusion

5    of salt water.

6         MR. MOSKOVITZ:  We also feel that it would have some

7    bearing on understanding whether the rights of a riparian,

8    overlying in nature, can take all the water that has come down

9    in past years of record.  This is another way of illustrating

10   the type of stream we are dealing with, a type of stream where

11   no matter what assumptions you use-- and these are varying

12   assumptions in studies 2 and 3, different from Study 1-- to

13   show that under varying assumptions and some very extreme

14   assumptions as to what the effect would possibly be, the

15   conceivable effect of future development, that no matter what

16   these assumptions be, no matter how extreme they are, the

17   stream is such that there could always be expected to be in

18   certain years outflow to the ocean and what the various

19   assumptions would do to the expectation of pumpage and safe

20   yield from the basin.  Again, not for the purpose of your

21   making a finding that this will happen, but I think for the

22   purpose of helping us all understand the physical situation

23   better.

24        MR. VEEDER:  Is the opening statement to enlighten

25   counsel?  If it is, I would like to have the last part read

back, because I don't understand what he means.

THE COURT:  How far back?

MR. VEEDER:  Back where he started talking about assumptions.  I don't know what he said there.  I really don't.  I don't know what he is going to prove.

THE COURT:  Back up a ways and read some of it, Mr. Reporter.

(The Reporter read the last part of the opening statement.)

MR. VEEDER:  I don't know what he is talking about. Do you, your Honor?

THE COURT:  Well, it sounds to me, Mr. Moskovitz, like you are trying to prove that the State of California did a good job and made correct conclusions when they said there was a safe yield to the river and that Fallbrook could therefore build a dam.  I am not concerned with that.  If there is flood water that goes to the ocean, certainly somebody has a right to take it.  But I am not going to decide how much water is going to go down the river. I may have to decide how much water will have to be release through any dam that is built, and I will have to decide who has riparian rights on this river and who hasn't.

Have you geared this case to try to convince me that Bulletin No. 57 is a very fine report?

MR. MOSKOVITZ:  No, your Honor, that isn't the purpose

1  of this.  I truly believe that it will clarify and help all

2  of us in understanding what we are talking about, because the

3  basis of this case is a stream system, how it acts, what it

4  produces, and I think these are ways of showing this, and

5  again I want to assure you that I wouldn't expect you to make

6  findings as to how much water is unappropriated or whether

7  there is any, because I don't think this is within your juris-

8  diction.  But I do think think these are helpful to you and to

9  all of us.

10  THE COURT:  I say again that much of what you are

11  talking about may be very helpful in the question of salt

12  water intrusion and depletion of the downstream basin and

13  things of that sort.

14  Have you finished?

15  MR. MOSKOVITZ:  No, your Honor.

16  THE COURT:  Go ahead.

17  MR. VEEDER:  I am sorry to have interrupted.  I just

18  didn't know what he said.

19  MR. MOSKOVITZ:  One of the questions you yourself have

20  asked in past discussions in the case, your Honor, has been,

21  how does water percolate, how much water percolates, and you

22  had some ideas of your own on the basis of observations you

23  have made.  We have done some calculating.  We think it gives

24  you a little better idea than just making estimates without

25  data, and we have taken the actual physical facts from runoff

10
Z57

1    records and applied them under various assumptions to see what

2    the result would be.  I mentioned study No. 1 as taking the

3    flow as it actually occurred and as we estimated it actually

4    occurred during the period of record.  I believe the period

5    is 1936-37 through 1957-58.

6        In study No. 2 we make a very drastic assumption, again

7    for the purpose of illustrating the nature of this stream--

8    we make the assumption that assume there had been no outflow

9    at all from Murrieta Creek or Temecula Creek-- in other words,

10   that all that water was used up in some way and nothing came

11   out.  This is not to say that this would ever occur, but again

12   to illustrate.  Assume that the only contribution to the coastal

13   basin and the only source of water for wastage into the ocean

14   was the rainfall and the runoff below Temecula Gorge.  How

15   would this affect the yield of the Santa Margarita Coastal

16   basin?  How would this have affected that, and how would this

17   have affected the amount of water going into the ocean during

18   this same past period of record, modifying the records and

19   the estimates by this assumption I have mentioned.

20       And then the third study is in between these two

21   extremes, and it attempts to illustrate what would have

22   occurred during this period of record if throughout this

23   period you had the present status of development-- by "present"

24   we mean 1958-- present status of development throughout the

25   watershed.  Of course, that would have affected the amount

10

Z58

1  of water that could be withdrawn safely from the basin and the

2  amount of water that would go out into the ocean.

3  We also have some graphs. We have just gotten them

4  and have not lodged them yet. We hope that we can use them

5  to illustrate graphically the figures which would be shown

6  in these studies No. 1, 2 and 3.

7  Then your Honor, we would offer the figures that we

8  have compiled showing the mineral character of the waters in

9  the Santa Margarita watershed and using certain of those

10  figures of the chemical character of the waters, to put in an

11  exhibit that compares the mineral character of surface waters

12  in Temecula Creek with the mineral character of ground waters

13  found in non-artesian wells in Pauba Basin with the mineral

14  character of water drawn from artesian wells of the Pauba

15  Basin, and from one other well.

16  THE COURT: To prove what?

17  MR. MOSKOVITZ: Your Honor, there was a fair amount of

18  testimony and opinion expressed as to the amount of inter-

19  change or continuity between the deeper aquifers in Pauba Basin,

20  the older continental deposits and the Recent alluvium under

21  the surface of Temecula Creek and the source of the water in

22  Temecula Creek, as to whether it came from the ground water in

23  the Recent alluvium or from the deeper aquifers, and this would

24  be to point out the difference in chemical character from which

25  a conclusion can be drawn as to the source of the water.

8584

10

259

1    THE COURT:   What is that conclusion?

2    MR. MOSKOVITZ:   The conclusion, your Honor, is that the

3    chemical character of the water in the Recent alluvium, the

4    shallow wells, the non-artesian wells, is similar to the

5    chemical character of the water in the surface stream, both

6    upstream from Pauba Basin and at the lower end of Pauba Basin,

7    and it differs markedly from the chemical character of the

8    artesian wells, such as the Schrode well, which are outside

9    the Pauba Basin.

10    THE COURT: Where does the water from the deeper aquifers

11    come from?

12    MR. MOSKOVITZ:   The fact that it has a different

13    chemical character indicates that it has been in storage for

14    a long time.

15    MR. VEEDER:   That is not in response to your Honor's

16    question.

17    MR. MOSKOVITZ:   Ultimately, of course, your Honor,

18    all the water which is found in the ground at one time or

19    another came from the surface, except for connate waters.

20    But this shows that the source today of the waters from the

21    stream is from the shallow aquifers.   This is a point that we

22    discussed many times and that on cross-examination people

23    have referred to and I would like to put on evidence as to

24    that point.

25    THE COURT:   I want to know what your conclusion is

going to be.  That this deeper water has been in there a long
time? What is a long time?  Thousands of years?

MR. MOSKOVITZ:  It has been in there thousands of years,
some of the testimony has indicated.

THE COURT:  And that it is not immediately fed by waters
coming down Nigger Valley?

MR. STAHLMAN:  May I have your Honor's statement?
I am very much interested in that.

THE COURT:  And is not fed immediately by waters coming
down Nigger Valley below the dam?

MR. MOSKOVITZ:  By the difference in chemical character,
it is not currently being replenished by water from Temecula
Creek, and that the rising waters at the lower end of Pauba
Valley doesn't come primarily from the deeper aquifers.  It
comes primarily, perhaps almost exclusively, from the waters
in the shallower Recent alluvium, because of the identity of
the chemical characters of those two waters.

THE COURT:  By rising water you mean the springs and
not the artesian wells?

MR MOSKOVITZ:  I mean, your Honor, the water that comes
to the surface and constitutes the flow of Temecula Creek at
the lower end of Pauba Valley and which constitutes the
flow that goes downstream through Temecula Canyon.

THE COURT:  If you have more, why don't you conclude
it after lunch?  I have a luncheon appointment.

10

Z61

1        MR. MOSKOVITZ:   This concludes the statement, your

2  Honor.

3        THE COURT:   Well, if you have anything that you want

4  to add after lunch, you may do so.

5        Recess until 2 o'clock.

6        (Noon recess.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  SAN DIEGO, CALIFORNIA, TUESDAY, FEBRUARY 17, 1959.  2 P.M.

2        THE CLERK: The case on trial, No. 1247-SD-C, United States

3  of America versus Fallbrook Public Utility District et al.

4        MR. MOSKOVITZ:  Your Honor, I have logged with the Clerk

5  California's Exhibit AO, California's Exhibit AP and California'

6  Exhibit AQ, which are graphic summaries of studies contained in

7  previous exhibits already logged.

8        In addition, your Honor, we have located some minor

9  typographical and arithmetical errors in California's Exhibit AH,

10 California's Exhibit AI and California's Exhibit AJ, and we have

11 made corrections and would like leave of the Court to substitute the

12 corrected tables for the ones which were previously logged.  The

13 errors can be explained at the time they are presented.

14       THE COURT:  All right, they will be substituted.

15       How far do they go, Mr. Clerk?

16       THE CLERK:  They will go down through AQ, now, your Honor.

17       THE COURT:  Any of them have subdivisions?

18       THE CLERK:  No, your Honor.

19       MR. MOSKOVITZ:  Your Honor, I had just about concluded

20 my opening statement.  I wanted to mention another exhibit which

21 we have available to introduce.  We will offer it if it appears

22 to be of any assistance at all, and that would be two plats,

23 Plat 21A and Plat 21B in Exhibit L, which would be introduced

24 for the purpose of showing the amount of land that was actually

25 irrigated in 1953, and also to show the locations of the points

1  of diversions which were spotted at the time of the State's

2  investigation was made.

3      MR. STAHLMAN:  Have you completed your statement?

4      MR. MOSKOVITZ:  Yes.

5      MR. STAHLMAN:  I wonder if I might inquire how long Mr.

6  Moskovitz expects to take on his evidence, because I have a

7  matter I would like to present.

8      Do you know how long it will take you?

9      MR. MOSKOVITZ:  I think to present this on direct ex-

10  amination will probably take 3 or 4 days.

11      MR. STAHLMAN: I would like to indicate, your Honor, that

12  I had assumed that Fallbrook's case would take longer.  It was

13  our intention and our plan and we had so prepared to follow along

14  after the State.  However, there are some circumstances that

15  have come up which are beyond our control, which require and

16  necessitate changing of witnesses, so  that it will be necessary

17  that we have additional time for Vail Company to proceed in the

18  case.  I think it will be at least 3 weeks before we will be

19  ready.  We are going to have to work and to crowd ourselves to

20  do it within that time.

21      THE COURT:  Mr. Moskovitz, you would be through then at

22  this rate, depending upon cross examination, some time next week?

23      MR. MOSKOVITZ:  That is what I expect, your Honor.  Per-

24  haps Mr. Veeder may have some idea how long his cross examination

25  will last.

1      MR. VEEDER:  It is hard to estimate now.

2      THE COURT:  How long will your case take, Mr. Stahlman?

3      MR. STAHLMAN:  I think about a week at the outside, your

4  Honor.

5      MR. SACHSE:  Your Honor, I am under the impression that

6  Mr. Krieger is almost ready now.  I can't speak for him.  I can

7  get in touch with him by tomorrow and see what he thinks.  I

8  definitely had the impression that he would be ready to come

9  within a week or so.

10      THE COURT:  We could check on that.

11      Meanwhile, will you be ready to proceed by, say, the 24th

12  of March?

13      MR. STAHLMAN:  I am sure we can, your Honor.

14      THE COURT:  Even after the end of next week, that would

15  given you the 3rd, the 10th and the 17th.  That would give you

16  a month in there from today.

17      MR. STAHLMAN:  We will certainly do everything we can,

18  and I am quite sure we can.

19      THE COURT:  Did I say the 24th?

20      MR. STAHLMAN:  Yes, the 24th of March.

21      THE COURT:  If we can get Mr. Krieger in ahead of you,

22  we could get a good bit of this done before April 6th.

23      MR. VEEDER:  I am going to have a matter, I think, on the

24  23rd of March.  I am scheduled in Denver the 23rd of March.

25  Does your Honor have a calendar there?

1    THE COURT:  That is a Monday.  Is that a one-day matter?

2    MR. VEEDER:  Yes, just a one-day matter.  However, I will

3 pinpoint that date.  It is in that period.

4    THE COURT:  That is a Monday.  The 24th is a Tuesday.

5 Is there any objection to Mr. Stahlman proceeding as indicated?

6    MR. VEEDER:  I have no objection.

7    THE COURT:  If we can't get hold of Mr. Krieger, then

8 what do we do?

9    MR. SACHSE:  We can try calling him this afternoon.  I

10 definitely had the impression that he was going to be ready within

11 a week or ten days.  Before we are through today we can call him

12 and have an answer.

13    THE COURT:  All right, proceed.

14    MR. MOSKOVITZ:  I would like to recall Mr. Illingworth

15 to the stand.

16    MR. VEEDER:  At this time, your Honor, I would like to

17 make inquiry in regard to California's position in this matter.

18 There are pending motions by the State of California for a judge-

19 ment against the United States of America in regard to prescrip-

20 tive rights, and based upon Mr. Moskovitz's statement this morning

21 it was not clear to me whether California was seeking affirmative

22 relief against anyone or against the United States, and I think

23 it is extremely important because if this is simply data to be

24 of assistance to the Court it has one aspect.  If it is in support

25 of a judgement against the United States in favor of the State of

1  California, it is an entirely different matter.

2  My own thinking on the matter, if I may express it, is

3  that it occurs to me that California is not seeking judgement

4  against the United State.  It is simply here, as I recall, as

5  parens patriae, and not desiring affirmative relief.  If that

6  is the case, the evidence which is tendered has one aspect to it.

7  Of course, if it is not, if you are desiring affirmative judge-

8  ment against the United States, it is another wholly different

9  matter.

10  MR. MOSKOVITZ:  Your Honor, on the basis of the evidence

11  that the United States has presented--it rested subject to cer-

12  tain reservations--the State did not believe that prescriptive

13  rights had been proved.

14  MR. VEEDER:  Your motion was directed, as I remember it,

15  in regard to the Indian lands, the BLM lands and Forest.

16  MR. MOSKOVITZ:  The Court had previously stricken a para-

17  graph relating to prescriptive rights for Naval Reservation.  So

18  that is no longer in the case.

19  MR. VEEDER:  Go ahead and make your statement.  I am

20  sorry I interrupted.

21  MR. MOSKOVITZ:  The State made that motion because it

22  believed the evidence at the time the United States suspended

23  presentation of its case did not support the prescriptive right.

24  Now the motion is off calendar pending further evidence by the

25  United States.  The evidence which we propose to present through

1    Mr. Illingworth will not be on that issue at all.

2         THE COURT:  The inquiry was, do you ask any kind of

3    affirmative?  I take it that you ask an affirmative judgement

4    as to the lands, the very few parcels, that the State of California

5    owns in this watershed.

6         MR. MOSKOVITZ:  That is right.

7         THE COURT:  That is the only affirmative judgement of

8    any kind that you seek in this case?

9         MR. MOSKOVITZ:  Those are our only land ownerships.

10        THE COURT:  You of course do not seek any over-all

11   judgement that the State is the owner of the water or anything

12   of that sort?

13        MR. MOSKOVITZ:  No, your Honor. As stated in our prayer

14   for relief, your Honor, we have asked to have other parties'

15   rights to be adjudicated pursuant to California Law.

16        THE COURT:  That's all.  You are just here parens patriae

17   to see that the law is applied as you think it should be---you,

18   representing the State of California, in accordance with California

19   Law.

20        MR. MOSKOVITZ:  Yes.

21        THE COURT:  You don't ask any affirmative judgement  ex-

22   cept insofar as you prove ownership of certain small parcels of

23   school land and matters of that sort?

24        MR. MOSKOVITZ:  That is correct.

25        THE COURT:  In which event you would ask that the judgement

1  find that those lands were either riparian or that the waters

2  on them were vagrant, percolating waters.

3      MR. MOSKOVITZ:  Yes.

4      MR. VEEDER:  Where are those lands with relations to the

5  Indian lands, Mr. Moskovitz?

6      MR. MOSKOVITZ:  I sent Col. Bowen a letter with a de-

7  scription of the lands and a map which locates, generally speak-

8  ing.  These lands are, I think, with only one exception, in the

9  upper watershed.

10      THE COURT:  How many parcels?

11      MR. MOSKOVITZ:  I think right now there are no more than

12  8 or 9.

13      MR. VEEDER:  That is what I want to know.

14      THE COURT:  All right, proceed.

15

16          LELAND R. ILLINGWORTH,

17  recalled as a witness on behalf of the Defendant the State of

18  California, being first duly sworn, testified as follows:

19          DIRECT EXAMINATION

20  BY MR. MOSKOVITZ:

21      Q  Mr. Illingworth, in the course of the investigation

22  of the Santa Margarita River watershed which culminated in

23  Bulletin 57, State's Exhibit L for identification, were data

24  relating to precipitation in this watershed collected?

25      A  Yes, there were.

1        Q  Let me call your attention to Volume 11 of Exhibit L,

2   Appendix D, and ask you if you are familiar--this appendix begins

3   at page D1, Volume 11, and goes through page D17--and ask you

4   if you are familiar with that appendix?

5        A  Yes, I am .  It was prepared under my direction and

6   supervision.

7        Q  Would you describe what data are included in that

8   appendix?

9        A  The Appendix D is compiled in three sections, three

10  separate tables.  D1, which shows monthly precipitation records

11  at stations which were established by the Division of Water

12  Resources within the Santa Margarita River watershed, which

13  data were not previously published.

14       The second section is Table D2, which shows monthly pre-

15  cipitation records of ten years or longer at stations in the

16  Santa Margarita River watershed which were not previously pub-

17  lished.

18       And Table D3 presents the seasonal precipitation records

19  at other stations within and closely adjacent to the Santa

20  Margarita River watershed.

21       THE COURT:  These have been previously published?

22       THE WITNESS:  Many of them have been.  Others, of course,

23  are the same stations, the records from the stations as were

24  presented in Tables D1 and D2.

25  BY MR. MOSKOVITZ:

1      Q   Where were these records secured?

2      A   Correction--that is not true.   The stations are not

3   repeated.   Your Honor is correct.   Those other stations were

4   not--

5      THE COURT:   Table D3 had been heretofore published some-

6   where, the material in that Table?

7      THE WITNESS:   Yes.

8      THE COURT:   Where?

9      THE WITNESS:   Well, the United States Weather Bureau

10   records, previous reports on hydrology by the United States

11   Geological Survey, and other reports by the Division of Water

12   Resources.

13   BY MR. MOSKOVITZ:

14      Q   Turning to Appendix D1, how were the figures which

15   are set forth there kept?

16      A   Appendix D1?

17      Q   Table B, Appendix D.

18      A   Table B1, the records are presented for stations which

19   were established during the investigation by the Division of

20   Water Resources in the Santa Margarita River watershed.   These

21   are relatively few in number.   Some of them are at the location

22   of evaporation stations that were established during the investi-

23   gation, and some others were rainfall gauges that were located

24   at private residences where the owner read the gauge.

25      A   Turning to Table D2, beginning on page D4, where were

1    the records which are set forth there acquired, and in what

2    manner?

3         A  These were collected from various Governmental agencies

4    and private individuals.  We had two primary sources of informa-

5    tion here.  I believe the majority of the records either came

6    from the United States Geological Survey Office in Los Angeles,

7    the Surface Water Branch, or from the Vail Company.  I should

8    say a third source probably.  The United States Weather Bureau

9    has a number of records which they have not published but which

10   we utilized here.  The records indicate, however, what the source

11   is for each station.

12        THE COURT:  Where is that?

13        THE WITNESS:  We will refer to that.  It is a table within

14   Volume 1.

15        MR. MOSKOVITZ:  It will be referred to in a moment, your

16   Honor.

17        Q  Table D3, where were the figures set forth therein

18   acquired and in what manner?

19        A  In a manner similar to those obtained in Table D2,

20   with the addition that we went into all the published records

21   we could and extracted the seasonal precipitation amounts and

22   retabulated them here for convenience.

23        THE COURT:  What is meant where you show, for instance,

24   in one year the figure will be 24-25 and the next one is 26, the

25   next 27?

1        THE WITNESS:  Well, first, 24-25 means the precipitation

2   year 1924-25, that is from July 1, 1924 through June 30, 1925;

3   and then down below we simply did not repeat the first year in

4   each case.  Where the 26 appears that is to indicate it is the

5   precipitation season ∧ 1925-26".

6        THE COURT:  What is the purpose of the breaks?  Were

7   they put in five-year intervals?

8        THE WITNESS:  Yes, just for convenience for looking at

9   the table it is pretty hard to read.  It just clutters up with

10  numbers otherwise.

11  BY MR. MOSKOVITZ:

12       Q  Is the precipitation season for which these figures

13  are given throughout Appendix D the precipitation season that

14  you have just explained to the Court?

15       A  Yes it is.

16       Q  And this is the standard method of recording preci-

17  pitation date?

18       A  Yes.

19       Q  Turning next to Table 4 in Volume 1 of Bulletin 57,

20  pages 36 and 37, are you familiar with that table?

21       A  Yes, I am.  This was prepared under my direction and

22  supervision.

23       Q  Will you describe how that was prepared and where the

24  figures came from?

25       A  These data were obtained--first, I should say there

1   are four stations which we utilized as key stations in this in-

2   vestigation.   They are for Cuyamaca, Elsinore, Escondido Station

3   No. 1 and San Jacinto.   The sources of the records, I believe,

4   in each case is the United States Weather Bureau, and they are

5   the four long record stations closest to the Santa Margarita

6   River watershed which we felt as a group would represent the

7   regimen of precipitation in that watershed.

8       Q   Taking, for example, the year 1899--1900, on page 36,

9   explain the figures that appear in that line all the way across.

10      A   Well, under Cuyamaca we have 27.70 inches.   This is

11  the total rainfall at Cuyamaca for that particular season.

12          THE COURT:   At what year are you looking?

13          THE WITNESS:   1899-1900.

14          MR. MOSKOVITZ:   Taking this as an example to explain

15  the figures.

16          THE COURT:   All right.

17          THE WITNESS:   The precipitation at that station was 27.70

18  inches in that season.   The next line 71 indicates that this

19  27.70 inches was 71% of the long-time mean.

20  BY MR. MOSKOVITZ:

21      Q   By "long time mean", what do you mean?

22      A   The mean precipitation was determined from an analysis

23  of the accumulated deviations from a straight line average of

24  all the records.   We obtained from this a curve, accumulated

25  deviation from the mean, or a mass diagram similar to diagrams

1    that were presented previously in the courtroom here by Mr.

2    Hofmann. From an analysis of these records you find that you

3    will have a series of years which are wetter than normal, follow-

4    ed by a series of years which are drier than normal.  This is

5    called a weather cycle.  It is never repeated exactly.  But in

6    determining a long time mean we would go from the start of a

7    dry period to the start of a dry period, or take a series of

8    years from the start of wet period to the start of a wet period,

9    which was not thereby unduly influenced by an uneven number of

10   wet and dry periods.

11          Q  What mean period was used in making your analysis of

12   the index or percentage as referred to?

13          A  The mean period is indicated at the top of the table.

14   It is 1897-1898 through 1946-1947.

15          Q  Would you continue your explanation of the figures

16   appearing in the line for the year 1899-1900?

17          A  Yes.  In that year there was 5.98 inches of rainfall

18   at Elsinore.  This was 45% of the mean.  At Escondido No. 1 the

19   precipitation was 13.89 inches, which was 82% of the mean.  And

20   at San Jacinto the precipitation was 9.58 inches or 71% of the

21   mean.  The average for the four stations is thus 67%.

22          Q  How was that average obtained?

23          A  Simply the arithematic average of 75, 81, 42, and 71.

24          Q  That is the indexes for each of the four stations?

25          A  Yes.

1      THE COURT: Did you have a separate mean for each station

2  or one general mean?

3      THE WITNESS: No; a separate mean for each station.

4  BY MR. MOSKOVITZ:

5      Q  Will you point out where that is shown?

6      A  Yes.  The long time mean for each station is shown

7  at the end of the table on page 37, where at Cuyamaca the long

8  time mean is 38.96 inches, at Elsinore 13.29 inches, at Escondido

9  No. 1 17.01, and at San Jacinto 13.54.

10     Q  Are the figures which are set forth on Table 4 correct,

11  to your knowledge?

12     A  Yes, they are.

13     MR. MOSKOVITZ: Your Honor, I am not going to offer any

14  one of these tables or exhibits referring to precipitation, but

15  it is because they all tied in together and I think they will

16  be  explained and related to one another and offered all at one

17  time, if that is satisfactory.

18     THE COURT:  Do you have more tables to come?

19     MR. MOSKOVITZ: Yes, there are some more.

20     MR. VEEDER:   May I have a list, then, of what you are

21  going to be working on, Mr. Moskovitz?

22     MR. MOSKOVITZ: Yes.

23     MR. VEEDER:  You have Table 4 on page 36.

24     MR. MOSKOVITZ: You have already referred to Appendix D.

25     MR. VEEDER:  Yes, and you have the full Appendix D, is

1   that right, that you are going to offer?

2          MR. MOSKOVITZ:  Yes.

3          And then we have also Table 3 in this Volume 1, which

4   appears beginning on page 27 and going through page 34.

5          MR. VEEDER:  Table 3, mean maximum and minimum?

6          THE COURT:  Where does it start?

7          MR. MOSKOVITZ:  On page 27.

8          Then we will also offer Plat 4 at the back of Volume 1,

9   and I will have Mr. Illingworth explain that and relate it to the

10  other materials.

11         THE COURT:  What is Plat 4 called?

12         MR. MOSKOVITZ:  It is called, "Composite Accumulated

13  Departure From Mean Seasonal Precipitation At Key Stations."

14         Finally, we will offer Plat 3 in Volume 1, which is en-

15  titled, "Lines of Equal Means Seasonal Precipitation," and it

16  also has been referred to as an isohyetal map.

17         MR. VEEDER:  Is that the same one?  Is it identical with

18  the one that Mr. Hofmann offered?

19         MR. MOSKOVITZ:  I don't believe it is identical.  I don't

20  there any significant variation, but it is not identical.

21         THE COURT:  Are you going to have an exhibit number for

22  this Table 3 and Table 4, or how are you going to identify them?

23         MR. MOSKOVITZ:  I though we would identify it by calling

24  it Exhibit L  Table 3, Exhibit L Table 4, as we have done with

25  other tables.

1          THE COURT:  All right.

2 BY MR. MOSKOVITZ:

3          Q  Mr. Illingworth, turning to Exhibit L Plat 4,

4 "Accumulated Mean Departure from Mean Seasonal Precipitation at

5 Key Stations," are you familiar with that graph?

6          A  Yes.

7          Q  How was it prepared?

8          A  It was prepared under my direction and supervision

9 from the data which we previously had been discussing, included

10 in Table 4.  The average index values shown in the right-hand

11 column of Table 4, is the basis for this graphic presentation.

12          Q  How was the mean period which is shown on Plat 4

13 selected?

14          A  This mean period, it will noted, starts in 1897-98 and

15 goes through 1946-47.  That is the same one that appears at the

16 top of Table 4, and by observing the graph it will be noticed

17 that this period does not go from a peak to a peak, but you get

18 exactly the same mean if you do go from the peak to the peak,

19 that is, from 1892-93--correction--it would be starting in 1893-

20 94 through 1941-42--no, correction again--it is 1943-44.  So it

21 agains conforms with my statement of a few minutes ago in that

22 the mean period is the period of years which goes from a peak to

23 a peak, or it could be, as you will see, if you took the period

24 starting in 1904-05 and ended up insofar as this graph goes in

25 1952-53, you would have almost identically the same average.

12
a22

1        THE COURT:  I understood there was a mean period for each

2   of these key stations.

3        THE WITNESS:  It is the same mean period.  There is a

4   difference--

5        THE COURT:  The mean period is the same, but I understood

6   there was a mean of precipitation for each of the separate four

7   stations.

8        THE WITNESS:  Yes.

9        THE COURT:  How do you translate that into one line for

10   the four of them?

11        THE WITNESS:  For instance, if one station has a 20-inch

12   average long time mean and in a particular year there is only

13   10 inches, that is 50% of normal for that station.  In other

14   words, the index is 50.  If another station had 40 inches of

15   rain, but in that particular year it would have 20 inches of

16   rain, this would also be an index of 50.

17        MR. VEEDER:  May I inquire, is there such a circumstance

18   existing, or could you have such a wide variation?  I am sorry

19   to interrupt, but your Honor asked the question that I think is

20   very important.

21        THE WITNESS:  Yes.

22        MR. VEEDER:  Is there such a broad variance in any of

23   your stations as discussed?

24        THE WITNESS:  Yes.  I have previously noted the means at

25   the bottom of Table 4, you have 38.96 inches at Cuyamaca as the

1    long time mean, the long time mean at Elsinore is only 13 inches.

2    But the regimen of rainfall is the important matter here.   If

3    you have 50% of the normal at Oceanside, you are likely to have

4    50% of normal at Elsinore.   It would approximate this.   Now

5    what we done here, we have taken stations on all sides of the

6    Santa Margarita and averaged these indexes.   You will note that

7    most of the time there is not too great a variation in the indexes.

8         THE COURT:   I still don't understand.   I understand how

9    on your Table 4--where is that page?

10        THE WITNESS:   36 and 37.

11        THE COURT:   At the bottom of page 37, I understand how

12   you get a mean seasonal precipitation for this period, and I

13   see how it varies for the stations.   Then on your Table 4, you

14   have one line where, in some way, you have correlated the four

15   stations to give you the one line.   How do you do that?

16        THE WITNESS:   Well, that is through that average index

17   that appears in the right-hand column of Table 4.

18        THE COURT:   How do you do it?

19        THE WITNESS:   Let's take the year 1949-50.   You have 78%

20   of normal at Cuyamaca, you have 46% of normal at Elsinore, you

21   have 63% at Escondido No. 1, and 53% at San Jacinto.

22        THE COURT:   That is what year?

23        THE WITNESS:   1949-50.   And the average of those four

24   values is 60%.

25        THE COURT:   Show me where that 60% appears on your Plat 4.

12
A25

THE WITNESS:  The values in the last column here, which include the figure 60, are accumulated in this diagram.

BY MR. MOSKOVITZ:

Q  Would you explain what you mean by "accumulated"?

A  Well, for instance, the very first figure--I think, your Honor, it would be easier if we take the very first value, the 86 in the table.

Q  You mean for the year 1886-87?

A  Yes.

Q  At the top of the column on page 36, Plat 4?

A  Let us refer to the next year.  This will illustrate it a little better.  You see 100.  That appears as a horizontal line.  In other words, there is no change in the accumulated index because it was exactly--

Q  What year are you refering to?

A  1887-88.

THE COURT:  1887-88 on Plat 4 isn't anywhere near the minus 100 mark.

THE WITNESS:  No.  Well, your Honor, what we did here was start at the mean period at 0 way back at the start of the mean period.  At the end of the year 1896-97, at the end of the year 1896-97--that is where we start with a 0.

THE COURT:  Now you are starting something else again. Let's see if I can find you there.  1896-97.

THE WITNESS:  Yes, sir.  That is on the 0 line of the chart.

BY MR. MOSKOVITZ:

Q  In other words, you start your mean period at 0?

A  That is correct.

Q  And you end your mean period at 0?

A  That is correct.

Q  And you work both ways from there?

A  That is correct.

THE COURT:  I see where on 1896-97 your line is at 0. What do you do next?

THE WITNESS:  We have a total accumulation there.

THE COURT:  That year 1896-97 showed an index average of 108; is that right?

THE WITNESS: Yes, sir.

MR. VEEDER:  Would you show me where that 0 was?

THE WITNESS:  Right here.

MR. VEEDER:  That 0 was 96; is that right?

THE WITNESS:  It is 96-97.  This would be 96.

MR. VEEDER:  That is where you stopped?

THE WITNESS: That is the end of that year.

BY MR. MOSKOVITZ:

Q  In other words, the end of 1896-97 starts the beginning of your mean period?

A  That is correct.  The next year we have 61.

THE COURT:  Before you go to the next year, what is the significance of the fact that this year you started at 0 has 108?

Illingworth - Direct

1   Anything at all except that we know it is 108 average index?

2          THE WITNESS:   It has a significance, your Honor, if you

3   go backward.

4          THE COURT:   Let's go forward.

5          THE WITNESS:   Let's go forward.   The 61 is the next year,

6   and that is 39% below normal.   So we drop down 39 points on this

7   graph and you will notice that between each of those horizontal lines is a

8   difference of 20, so it is approximately 40.   Now we have the

9   second point.   The next point is 57.   This deviation from the

10  average, or 100, by minus 43, so we should be down to 82, and

11  that is where the next point plots into the next year.

12  BY MR. MOSKOVITZ:   In other words,

13         Q   In other words, when there is a period that is below

14  normal or below the mean in percentage, the line drops down?

15         A   That is correct.

16         Q   And later on when you have an above normal period of

17  precipitation then the line will go up again?

18         A   That is right.   If we go a couple of more years, we

19  will illustrate this.

20         THE COURT:   All right.   1889-1900 is the next one.

21         THE WITNESS:   That is 33% below normal, and we have gotten

22  down to 82, so we have 82 and 33 or 115.

23         THE COURT:   Why do you keep going down when the average

24  is higher than the year before?

25         THE WITNESS:   Because both years were less than normal.

1          THE COURT:  All right.

2          THE WITNESS:  And it was below normal to start this year,

3   and it is even more below.  That is the nature of this chart,

4   to accumulate these differences.  It is an athematic accumulation

5   of the differences.

6          THE COURT:  I don't follow you.  You start out with 108.

7          THE WITNESS:  No, your Honor, we start at 0 at that point.

8          THE COURT:  That figure--

9          THE WITNESS:  We didn't use the 108.

10         THE COURT:  That was 0.

11         THE WITNESS:  That was 0.

12         THE COURT:  And you used it to substract 61 from 108?

13         THE WITNESS:  No, from 100.  We start at 0 there, you see,

14  your Honor.

15  BY MR. MOSKOVITZ:

16         Q  Will you explain to the Court how the 108 was utilized

17  in the year just prior to the starting point?

18         A  Yes.  You will notice that in the year prior to the

19  starting of this chart at 0, the line was on a rising grade from

20  left to right and it was 8% rise according to this legend on the

21  side.  In other words, it was 8% above normal at that time.  So

22  you had a rising line up to the 0 point, and then we have three

23  succeeding years which were less than normal and the line drops

24  in each case.  The next year was a 100% of normal and we have

25  a horizontal line on the chart indicating that there is no

1  deviation from normal.

2      THE COURT:  You still have me lost.  You have three years

3  where the average index was 61, 57 and 67.

4      THE WITNESS:  Yes; minus 39, minus 43 and minus 33.  Then

5  the next one is still minus 33, because there was no change.

6  It did not deviate from the normal.

7  BY MR. MOSKOVITZ:

8      Q  In other words, it is whether the line goes up or

9  down that reflects whether the year is normal or wet?

10     A  Yes.

11     THE COURT:  I can see that this is going to be a big

12  help to me in deciding this case.

13     MR. MOSKOVITZ:  This is foundational data, your Honor.

14     THE COURT:  I know, but it is going to be of great help

15  to me in deciding this case.  If I can't understand it, I can't

16  see how it is going to be any help to me.  Go ahead.

17     THE WITNESS:  Perhaps it would be helpful to point out

18  that this exactly the same as the accumulated mass diagrams we

19  had where we were looking at the tree-ring studies, where a

20  rising line indicated a wet period and a falling line indicated

21  a dry period.  I don't believe we went into detail on those

22  studies, but they were done in exactly the same manner.

23     THE COURT:  Go ahead and let us follow this through and

24  see what happens.  Your next year your average index is 100, so

25  you just have a straight line across?

1    THE WITNESS:  Yes.  Then the next year we drop 26% again.

2  It is less than normal.

3  BY MR. MOSKOVITZ:

4    Q  Will you relate that to the average index for that

5  year?

6    A  The average index is 74.  Seventy-four from a 100 is

7  26.  So our accumulated departure is now 26 points below where

8  it was at the start of the year.

9    THE COURT:  What is the purpose of accumulating them?

10    THE WITNESS:  It is simply a tool, it is simply a means

11  of graphically presenting data in a table of this sort, which is

12  much easier to utilize.  In other words, you can see when the

13  dry periods occur and when the wet periods occur, and this shows

14  that from the high point in this chart in the 1890's there it

15  drops down and for the next 12 years or so you have less than

16  normal precipitation on the average, and then you have starting

17  in 1904 or 1905 some rising lines indicating wetter than normal

18  period.

19    THE COURT: Which you also accumulate?

20    THE WITNESS:  Yes, sir.  As soon as your accumulated

21  values become greater ~~smaller~~ your line rises, indicating that the period

22  is wet, so you go up for a period of years and it is wet, and

23  then there are a few years that are relatively dry, and then wet,

24  and then it goes up and down, pretty well averaging out to the

25  normal amount for the next 25 or 30 years, and then starting in

1   1936-37 we have a very wet period again and that ended in 1944-

2   45, 1943-44 actually was a drier than normal period, and from

3   then on to the present time, with the exception of 1951-52 and

4   1957-58, we have had drier than normal years.

5   BY MR. MOSKOVITZ:

6       Q   Is Plat 4 correct, in your opinion, in depicting the

7   dry and wet cycles as derived from Table$?

8       A   Yes, it is.

9       Q   Turning now to Table 3, beginning on page 27 of Volume

10   1 of Exhibit L, are you familiar with that table?

11      A   Yes I am.  That was prepared under my direction.

12      Q   And what does this table indicate?

13      A   This is a summary of the precipitation data presented

14  in Appendix D and it summarizes pertinent information about the

15  stations--the name, the reference number on the isohyetal map,

16  the elevation of the station, the period of record of the station,

17  the source of the record, the estimated mean seasonal precipitation

18  in inches.

19      THE COURT:  Are you talking about Table 3 or Plat 3?

20      MR. MOSKOVITZ:  Table 3, your Honor.

21      THE WITNESS:  Table 3.

22      MR. MOSKOVITZ:  Beginning on page 27.

23      THE COURT:  We have along with the station and number the

24  period of record, the source, the estimated mean seasonal preci-

25  pitation in inches, and the recorded maximum and minimum

1   precipitation, and the season in which these quantities were

2   recorded.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

13

Z62

BY MR. MOSKOVITZ:

1    Q  Let us take the very first station as an example to

2  explain how these values were derived and how they relate to

3  the other precipitation data previously explained.

4    A  Yes.  The first station, the Greenwood station at

5  Los Alamos Valley, is a private record.  It appears in Table

6  D-2 on Page D-4 of Appendix D.  It indicates that the record

7  extended from the year 1912 through 1914, and from 1917 through 1926.

8    THE COURT:  It appears where?

9    THE WITNESS:  On page D-4 of the appendix.

10    MR. MOSKOVITZ:  The top of page D-4 of Volume II.

11    MR. VEEDER:  Have you identified the map reference

12  number now, Mr. Moskovitz?

13    MR. MOSKOVITZ:  7S, 2W, 50C.
                                    15

14    THE COURT:  How can you tell from Table 3 that you

15  refer back to Table D-2?  You just know that?

16    THE WITNESS:  That is where this data was compiled.  It

17  all appears in D-1, D-2 or D-3.

18    THE COURT:  What data, you say, is compiled there?

19  Not the elevation?

20    THE WITNESS: No.

21    THE COURT:  The period of record?

22    THE WITNESS:  The period of record is.

23    THE COURT:  The source of record is not compiled there?

24    THE WITNESS:  No, sir.

25    THE COURT:  The estimated mean seasonal precipitation

13

Z63

1   in inches?

2          THE WITNESS:  It is not here.  But simply the total

3   is here.

4          THE COURT:  What is the total?

5          THE WITNESS:  Seasonal total each year for the years

6   of record is shown on Table D-2. These were the data that

7   were utilized in determining the estimated mean seasonal

8   precipitation.

9          THE COURT:  Could you relate the figures shown on the

10  record maximum and mean seasonal precipitation on Table 3,

11  that is, the last column on Table 3, for this Greenwood

12  situation?  Could you show where those figures were secured

13  from Table D-2 on Page D-4?

14         THE WITNESS:  Yes.  You will notice that the least

15  value appearing in the right-hand column, seasonal total under

16  the Greenwood tabulation, is the very first one-- 6.64.

17         MR. VEEDER:  That was in 1912; is that right?

18         THE WITNESS:  1912-13.

19         THE COURT:  I follow you.  Then in 1921-22 is your

20  maximum of 24.28.

21         THE WITNESS: That is right.

22         THE COURT:  So you list those two?

23         THE WITNESS:  Yes.

24         THE COURT:  Then your 12.88 shown on Table 3 is your

25  mean?

THE WITNESS: Yes.

BY MR. MOSKOVITZ:

Q  How was that 12.88 derived?

A  It is not the average of these values appearing in the last column, because these readings could have been obtained during a series of wet years or during a series of dry years and it would not represent a long-time mean.  Therefore, we related those values to the average index values for the four key stations, which show on Table 4.  In other words,—

THE COURT: All right.  Go ahead.

THE WITNESS: Taking an extremely simple case, if you have in a year in which the index is 100 a station with one year of record that has ten inches of rainfall and it is in a year in which these key stations had an average index of 100, the best estimate that I could make of the mean seasonal precipitation based on that one year of record, which obviously isn't very reliable, would be ten inches.

BY MR. MOSKOVITZ:

Q  What is the purpose of obtaining the mean seasonal precipitation for all these stations that are set forth in Table 3?

A  The sole purpose in this investigation, outside of tabulating the data for any use to which it might be put, was the construction of the isohyetal map, and the isohyetal map was later used to relate rainfall and runoff in certain

1   watershed areas.

2           MR. SACHSE:  What is the fourth line of RCFCWCD?

3           A  Riverside County Flood Control Water Conservation

4   District.  All those symbols are explained at the end of the

5   table.

6           MR. VEEDER:  May I ask a question?

7           If you look at the last column on Los Alamos Valley

8   youwill observe 1953-54, 12.76; 1953-54, 12.76, but estimated

9   mean seasonal precipitation in the third column over from the

10  right-hand side of the page is 15.19.  How would that come

11  about?

12          A  That is just what I was attempting to explain a

13  minute ago.  If you had  a hundred percent year when the

14  average index of the four key stations is 100, then in that

15  year the rainfall that occurred at any other station approximates

16  the long-time mean.  It is a 100% year.  Now, if that average

17  index was 50%, meaning that this was a 50% year and you

18  measured 10 inches at a station, you would say that was only

19  half of the long-time mean.  The long-time mean would be twice

20  that or 20 inches.

21          THE COURT:  I understand the difference between

22  "average" and "mean," generally speaking.  But are you using

23  the word "mean" here advisedly?

24          THE WITNESS:  Yes, sir.  "Mean" is not the arithmetic

25  average in this case.  We are using "mean" to mean seasonal

Illingworth - Direct

13

266

1   precipitation, as we have termed it, and this is our estimate

2   of what the mean would be for this period of time.

3           THE COURT:  How do you define "mean"?

4           THE WITNESS:  It is the arithmetic average of the

5   precipitation for a mean period, where a mean period is

6   defined as this period of time that we showed on the plate.

7           THE COURT:  You don't say "mean period."  You say

8   "estimated mean seasonal precipitation."

9           THE WITNESS:  Yes, sir.

10          THE COURT:  Is there a difference between the estimated

11  mean and the estimated figure for a mean period?

12          THE WITNESS:  No.  That is what it is.

13          MR. VEEDER:  Is it proper for me to ask another question,

14  or shall I wait for voir dire or cross-examination?

15          MR. MOSKOVITZ:  I don't mind if Mr. Veeder wants to

16  clarify something.

17          MR. VEEDER:  I may be extremely off the beam, but it

18  appears to me that based upon your figures to which I have

19  just made reference you have an actual figure of 12.76.

20          MR. MOSKOVITZ:  I think I can satisfy your question

21  by a couple of questions to the witness, Mr. Veeder.

22          MR. VEEDER:  But that 15.19 would increase it three

23  inches, wouldn't it, above what actually existed?

24          THE COURT:  Let me see how this works out.  Let's take

25  the year you are talking about, 1953-54.  Where did you pick

1    up your 12.76?

2        MR. VEEDER:   Table 3.

3        MR. MOSKOVITZ:   I think the witness can explain where

4    the 15.19 was derived for Los Alamos Valley on the basis of

5    that one season of record.

6        Q  Will you do that, Mr. Illingworth?

7        THE COURT:   Please, Mr. Moskovitz, if I am going to

8    understand it let me do it my way.   Then if you want to do

9    it so that Mr. Veeder can understand it, you may do it.

10        Where did you get your 12.76, which appears to be both

11   high and low for this period for Los Alamos Valley?   That is

12   taken from what?

13        MR. MOSKOVITZ:   You find it in Table D-1.

14        THE WITNESS:   I skipped that over.

15        THE COURT:   And since you had only one year that was

16   complete there, 12.76 became your high and your low?

17        THE WITNESS:   Yes, sir.

18        THE COURT:   You convert that to see how that fits in

19   with your mean period?

20        THE WITNESS:   Yes.

21        THE COURT:   What did you use for that?

22        THE WITNESS:   We find by referring to Table 4 that that

23   was an 84% year.

24        THE COURT:   Table 4?

25        THE WITNESS:   Table 4 on page 37, 1953-54, is the last

13

Z68

1    line the right-hand column 84.

2        THE COURT:  That was an 84% year?

3        THE WITNESS:  Yes, sir.

4        THE COURT: Therefore, assuming that the fall at Los

5    Alamos Valley was in line with the mean that you have here,

6    this 12.76 then was an 84% year?

7        THE WITNESS:  Was 84% of the mean.

8        THE COURT:  And therefore the mean or 100% would be

9    15.9?

10        THE WITNESS:  That is absolutely right.

11        THE COURT:  Let's see if I get all these assumptions.

12    In this particular case you assume that one year in Los Alamos

13    Valley, which is the only one complete year you have, is both

14    the high and the low?

15        THE WITNESS:  That is no assumption.  That is the high

16    and the low of the period of record.

17        THE COURT:  But you have only one year?

18        THE WITNESS:  Yes, sir.

19        THE COURT:  Wouldn't it have been better judgment to

20    have rejected a location where you had only a one-year aver-

21    age? What does picking one year out by itself, how much faith

22    can we put in one year?

23        THE WITNESS:  Not too much, and we took this into account

24    when we drew our map.  We simply presented the data here.  We

25    are not saying we gave equal weight to all stations.

1      MR. VEEDER:  Now when you say you drew your map, you

2  are referring to Plate 3?

3      THE WITNESS:  Yes.  That is the isohyetal map.

4      MR. VEEDER:  Yes, Plate 3.  I am just trying to string

5  along here.

6      THE COURT:  So although you had seasonal totals for

7  various locations within the watershed, such as Los Alamos,

8  Anza, Wilson Creek, Sage, Greenwood, Temecula, you were not

9  content with those; you had to adjust those on the basis of

10  four other stations located around the outside of this valley

11  at various places?

12      THE WITNESS:  The best four stations that we could find.

13  Had we had some long-time stations in the watershed we

14  certainly would have used them.  We just did not have them.

15  Unfortunately, you don't have all the basic data you would

16  like to have.

17      THE COURT:  I understand what you did.  But you took

18  Cuyamaca, Escondido, San Jacinto, Elsinore.

19      THE WITNESS:  Yes, sir.

20      THE COURT:  And as it were, you took your figures from

21  within the watershed and adjusted them against long-time

22  records from these four other stations?

23      THE WITNESS:  Yes.

24      THE COURT:  These long-time records from these other

25  stations, the variations that appear in there doesn't look

1   very convincing to me.

2        THE WITNESS:  It is simply the best record we had

3   available, your Honor. There are other things we could have

4   done.  We could have asked ourselves, why not use Elsinore?

5   We find that Elsinore, when we check it with Warner Springs

6   rainfall, just doesn't have the same regimen.  We check Ocean-

7   side against Oakgrove and we find that the regimen is differ-

8   ent there.  So we simply took the best thing that we could

9   locate, which were the long-time records, and admittedly

10   these percentages are not the same.  Take this 84% we just

11   referred to.  It varies from 91 at Cuyamaca to 80 at San

12   Jacinto.  This is not a great variation in matters of this

13   nature.  I believe you well understand, from your previous

14   statement, that nature just isn't perfect.

15        THE COURT:  Take the example of 1902-03, where at

16   Cuyamaca you had 96, at Elsinore you have 121-- in other words,

17   at your driest area, Elsinore and San Jacinto-- at your driest

18   area you had a higher index figure than at your wettest area
                          Elsinore,
19   at Cuyamaca: 96,/121, Escondido 104, and San Jacinto 115.

20        THE WITNESS:  These indexes have nothing to do with the

21   amount of precipitation, your Honor.  It is merely whether

22   it is above or below normal for that place.

23        THE COURT:  The point being, though, that your wettest

24   area is four points below normal, your driest area is 21 points

25   above normal.

1    THE WITNESS:  Yes, sir.  That is just the way it was.

2    THE COURT:  So anyhow, then, after you get this estimated

3    mean seasonal precipitation on Table 3, then you take that

4    and draw your chart, Plate 3?

5    THE WITNESS:  Yes, sir.

6    THE COURT:  And from this chart then you determine how

7    many inches of rain will fall on the watershed?

8    THE WITNESS: That is right.

9    MR. VEEDER:  Did your Honor say "would fall"?

10   THE COURT:  Would fall.  This is a hypothetical thing,

11   because it is a mean.

12   THE WITNESS:  No, don't forget it is based on the

13   actual records.

14   THE COURT:  But your chart shows what falls, since it

15   is a mean figure.

16   THE WITNESS:  If we had 30 years of record at a station,

17   it is very little affected by this--

18   THE COURT:  I don't make myself clear.  When you wind

19   up with your Plate 3, it is a mean figure based upon these

20   available records, and so it is just a one-shot proposition.

21   This is a basis you used, then, for how much water would fall

22   within the watershed.

23   THE WITNESS:  Yes, sir. But I am not sure that--

24   THE COURT:  Well, you would apply the same plate to each

25   year, then, don't you?

13

272

THE WITNESS:   No.  It is nothing more than we say it is. It is the long-time mean.

MR. VEEDER:   From 1897 to 1947, is that right?

THE WITNESS:   Yes.

THE COURT:   It is a long-time mean.  Do you use the Plate 3 in estimating the amount of water that fell in this watershed?

THE WITNESS:   We did for a long-time mean, not for any one particular year.  We said the long-time average pre-cipitation would be so much.  We presented thatin here simply as a factual item.

THE COURT:   And you stopped there?

THE WITNESS:   We related it to runoff and showed that it was a very small percentage-- 4% or something like that. We have a figure for each hydrographic unit, which shows that there is an extremely small percentage of the total pre-cipitation that actually runs off as stream flow.  That is the only way we used the total precipitation.

MR. MOSKOVITZ:   Do you want to take a recess now, your Honor.

THE COURT:   Yes.

(Recess.)

B

Z1

1   BY MR. MOSKOVITZ:

2       Q   Mr. Illingworth, referring to Table 4, Volume I,

3   pages 36 to 37, and to Plate 4, Volume I, why were the sta-

4   tions Cuyamaca, Elsinore, Escondido No. 1, and San Jacinto

5   used in order to derive average indexes?

6       A   They were used because they were the longest period

7   stations with reliable records that were located the closest

8   to the Santa Margarita River watershed.

9       Q   Is this a standard, accepted engineering method

10  of determining mean seasonal precipitation for stations where

11  you do not have long periods of records, that is, to relate

12  them, adjust them, by using indexes from other nearby stations

13  that do have long records?

14      A   Yes, it is.

15      Q   Now, you have sat through the testimony of this

16  case, have you not?

17      A   Yes.

18      Q   Were you here when Mr. Hofmann testified to the

19  manner in which the United States Exhibit 30, Santa Margarita

20  watershed isohyetal map which is on the board, when he

21  testified as to the manner in which that was drawn?

22      A   Yes, I was.

23      Q   And did he not use the same method that you have

24  testified to in drawing this isohyetal map?

25      MR. VEEDER:  I object to that, your Honor.  There is

no way of this witness' knowing exactly how Mr. Hofmann did his work.

THE COURT:  He sat here and heard him testify.  That is what he has been asked.

MR. VEEDER:  I further object on the ground this whole matter is apparently completely repetitious of the material that the United States has already put in the record.

THE COURT:  Overruled.

THE WITNESS:  Yes, this is a method that Mr. Hofmann described.

BY MR. MOSKOVITZ:

Q  And what stations outside the watershed did Mr. Hofmann relate the precipitation figures within the watershed to?

A  He stated the at the long-term stations that he used were Los Angeles, California, which was Plaintiff's Exhibit 27-B, the precipitation--

Q  I don't think that is the one.  Yes, 27-B.

A  The second chart or table that he utilized was the station at Fallbrook which is-- I am not certain of this exhibit number, whether it is M-35-A or whether it is 27.

Q  No. 27.

A  No. 27.  And the third one was precipitation at San Diego.  And then--

B

Z3

1    Q  What exhibit number was that?

2    A  That is Exhibit No. 27-A.  And another exhibit, 28,

3    utilized records at Los Angeles, Tustin, Riverside, Elsinore,

4    Fallbrook, Valley Center, Warner Springs, Escondido and San

5    Diego.

6    Q  Have you compared Exhibit L, Plate 3, of the State,

7    that is isohyetal map of the State, with Plaintiff's Exhibit

8    30, the isohyetal map presented by the United States in this

9    case?

10   A  Yes, sir.

11   Q  And what is your opinion as to their comparability?

12   A  They show the mean seasonal precipitation through-

13   out the watershed as being quite comparable.

14   MR. VEEDER:  Quite comparable to what, Mr. Illing-

15   worth?

16   THE WITNESS:  Two of them compare favorably with one

17   another; but with the exception that in some localities the

18   Plaintiff's Exhibit 30 shows a somewhat less, one to possibly

19   two inches less, precipitation on the average than is shown

20   on Plate 3, Exhibit L.

21   THE COURT:  30 is the Government's?

22   THE WITNESS:  Yes, sir.

23   THE COURT:  It shows a less precipitation?

24   THE WITNESS:  In some areas.  In some areas it is

25   almost identical.  But the regimen, that is, the change from

1 one locality within the watershed to another bear the same

2 relationship ~~to~~ ⁿON the two charts.

3 BY MR. MOSKOVITZ:

4  Q  By whom was Exhibit L, plate 3, the isohyetal map,

5 prepared?

6  A  It was prepared by a staff working under my direc-

7 tion.

8  Q  And is it correct, in your opinion?

9  A  Yes.

10  MR. MOSKOVITZ:  I offer in evidence Exhibit L,

11 Appendix D; Exhibit L, Tables 3 and 4, which appear on pages

12 27 to 34 and pages 36 to 37, respectively; Exhibit L, Plate

13 3; Exhibit L, Plate 4; all relating to precipitation in the

14 Santa Margarita River watershed.

15  MR. VEEDER:  I would like to ask a couple of ques-

16 tions just on voir dire.

17  THE COURT:  All right.

18

19      VOIR DIRE EXAMINATION

20 BY MR. VEEDER:

21  Q  I am referring now to Plate 3.  I think it would

22 be now designated California's exhibit marked for identi-

23 fication L, Plate 3.

24  Is that what it is, Mr. Moskovitz?

25  MR. MOSKOVITZ:  Yes.

B

Z5

BY MR. VEEDER:

Q   How would you obtain the small circled areas that you show on that plate?  Now, I am referring specifically to this.  What is that No. 4 there?

A   No. 1.

Q   1.  Beg your pardon.  How would you arrive at that small encircled area that you have designated on there in there?  Do you see that?

A   Yes.  In exactly the same manner as we determine all of the lines of equal mean seasonal precipitation that appear on the map.

Q   What were the factors that you took into consideration in arriving at those mean seasonal designations?  How would you get such a small area as that I am now pointing to immediately above the number 1?

A   Well, first off, I should say that is a line of 14-inch precipitation which actually probably surrounds a hill in that area.  The reason it appears there is because the elevation at that location is higher than the surrounding territory.

THE COURT:  How did you make these plates up?  Tell me again now.  You use elevations?

THE WITNESS:  Well, first off, I should say, your Honor, that this was done the same way as Mr. Hofmann described that his was done.  His Exhibit 30 states that it

1     was taken from hydrology of Western Riverside County, a
2     publication published by the Riverside County ~~Light~~ FLOOD Control
3     Water Conservation District prepared by Mr. Harold Troxell and
4     of the United States Geological Survey, Los Angeles office.
5     And the method I used was the same as that described by Mr.
6     Troxell in that report. And, therefore, it is the same as
7     appears in the Exhibit 30.

8         THE COURT: Tell me what, generally, that method is.

9         THE WITNESS: Well, it is a rather complicated pro-
10     cedure, but it is procedure of double interpolation, which
11     first interpolation takes into account the fact that you have
12     areas on the coastal slopes of mountains that have more
13     precipitation at a given elevation than the ~~same~~ another station
14     at the same elevation on the lee side of the mountains. That
15     is, I shouldn't say it is ~~not~~ because it faces the ocean but
16     because it faces the prevailing wind which, in this case,
17     happened to be from the ocean in this watershed. So that,
18     for instance, on Palomar Mountain at a given elevation of,
19     say, of 4,000 feet on the coastal slope of Palomar, you
20     will get rainfall of some 30 inches as a long-time mean,
21     whereas at the same elevation on the northeasterly side of
22     the mountain, the dryer side of the mountain, you will get
23     somewhat less than that amount of rainfall. Now, this method
24     of double interpolation, first interpolation took into
25     account that effect, and the second interpolation takes into

1 account the effect of the records themselves.  So we correct

2 the records as they appear by-- or I should say, that in

3 interpolating between two given readings, stations with two

4 given readings on the map, we do take into account the differ-

5 ence in elevation as well as this second effect of, stated

6 simply, which side of the mountain is it on?  I could go into

7 more detail than that if you wish.

8           THE COURT:  No.  That is sufficiently complex to take

9 care of the situation.

10          MR. VEEDER:  I hope your Honor understands it.  I

11 don't.  I am going to object to it on the grounds that there

12 has not been sufficient foundation laid to arrive at these

13 conclusions that have been expressed here; that the plates

14 3 and 4 to which we have alluded-- I mean Plate 4-- and to

15 the data upon which that plate is, and other data utilized,

16 simply, from our standpoint, do not support such a specific

17 offer in evidence; that there is no correlation, in our view,

18 between the statistics to which he has made a reference

19 and to these lines that he has delineated on Plate 3.  Simply

20 stated, I object to the foundation that has been laid.

21          THE COURT:  Overruled.  If I sustain this, I will go

22 back and strike out 30.

23          MR. VEEDER:  You mean suasponte, your Honor?

24          THE COURT:  Suasponte.  Overruled.

25          MR. VEEDER:  That would break my heart, your Honor.

B

Z8

xxxxxxxx

THE COURT:  Received in evidence, Plate 3, 4, Appendix

D, precipitation records, and Table 3, which was pages 27

to 34, Volume I, and Table 4, pages 36 to 37, Volume 1.

MR. MOSKOVITZ:  May I have State's Exhibit A through

E, please.

THE COURT:  What matter are you going into?

MR. MOSKOVITZ:  Now we are going into hydrographs of

mean daily discharge at the various gauging stations.  These

are California's exhibits A through E, inclusive.  And I

believe, your Honor, you have a reduction as to all counsel

of these exhibits.


FURTHER DIRECT EXAMINATION

BY MR. MOSKOVITZ:

Q  Now, Mr. Illingworth, referring to California

Exhibit A for Identification, would you identify it, please?

A  Yes.  This is a chart prepared under my direction.

THE COURT:  You say I have reductions?

MR. MOSKOVITZ:  I believe I gave the Clerk some, your

Honor, sometime ago.  If not--

THE COURT:  Well, I don't have these.  I have H, C,

and A--

THE WITNESS:  Your Honor, here is one.

MR. MOSKOVITZ:  Your Honor, I will present my copy

to you.  These are A through E, which are stapled together.

B
Z9

1       Q   Now, what is the title of California's Exhibit A

2   for Identification?

3       A   This is entitled:   "Santa Margarita River at

4   Ysidora.   Mean daily discharge 1942-43 to 1957-58."   That

5   is actually through 1957-58.

6       Q   And what is depicted on this exhibit?

7       A   The runoff records on a daily basis in so far as

8   they can be plotted to scale are shown on the chart.

9       Q   And where were these runoff records secured?

10      A   These are at the station on Santa Margarita River

11  entitled:   "Santa Margarita River at Ysidora."   The solid

12  blue on the chart represents the actual flow.   For instance,

13  in December there was a very small flow.   The mean daily

14  discharge in cubic feet per second, the maximum that occurred

15  at any day during December of 1942-43 was, oh, something less

16  than 100 cubic feet per second.   It appears as a very small

17  tit.

18      Q   Where is mean daily discharge indicated on this

19  graph?

20      A   On the left-hand, the vertical scale, in daily

21  discharge.   It goes up to a maximum at the top of thepage

22  of 15,000 cubic feet per second.

23          THE COURT:   Now, you use the word "mean,"  Do you

24  mean mean for the month?

25          THE WITNESS:   This is the United States Geological

Survey's use of the word "mean". In this case it is the mean daily discharge. It is the average for the day.

BY MR. MOSKOVITZ:

Q Now, can you refer to the United States' exhibit which contains the discharge at Ysidora and point out where the figures were secured?

A The values used to prepare these charts are those which appear in Plaintiff's Exhibit 26 which is entitled "United States Geological Survey Runoff Records, Santa Margarita River at Ysidora." Also shown on this chart are the peak flows that occur within a given day. They are shown in dotted lines. For instance, in January-- it would be around the 20th of the 25th of the month-- there is a mean daily discharge of about 9700 cubic feet per second, shown by the solid line.

THE COURT: Yes.

THE WITNESS: But during that day there was a peak flow, instantaneous flow of 19,000 cubic feet per second.

THE COURT: How long did that 19,000 cubic feet per second flow keep up?

THE WITNESS: Simply instantaneous value. It probably wasn't that way for more than a few minutes.

THE COURT: How long did the 9890, or whatever it is, flow keep up?

THE WITNESS: Well, that is the average for the 24-hour

B

Z11

1    period, the whole day.

2            THE COURT:  That is an average for the day?

3            THE WITNESS:  Yes, sir.

4            THE COURT:  One day?

5            THE WITNESS:  It was neither at 19,000 all day nor

6    was it at zero, but it varied.

7            THE COURT:  How do we know what day that is?  We know

8    the peak was January 23rd.

9            THE WITNESS:  The day can be obtained from the basic

10   records.

11           MR. MOSKOVITZ:  What exhibit is that?

12           THE WITNESS:  Plaintif's 26.

13           THE COURT:  Is the day that is shown as the peak

14   always the same day as that for the mean?

15           THE WITNESS:  The day of the highest mean there?

16           THE COURT:  Yes.

17           THE WITNESS:  Yes.  I know of no exceptions to that.

18           THE COURT:  Then, at the bottom you have also the

19   acre-feet during the month.

20           THE WITNESS:  Yes, sir.  So during the month of

21   January there were some 32,700 acre-feet passed that

22   station.  Now, referring to exhibit 26 on that day in January

23   we find that 9700 was the mean daily flow reported for

24   January 23rd, 1943.

25

B

Z12

BY MR. MOSKOVITZ:

Q In what unit? That is cubic feet per second, isn't it?

A Yes, it is. It does not appear on this particular chart, but the actual peak daily discharge usually discharge usually appears on these charts. If it is not on our copy of it, at least it appears in the published records of the United States Geological Survey. That is where the 19,000 came from.

THE COURT: What 19,000 now are you talking about?

THE WITNESS: This peak flow that is indicated here. It also indicates that it occurred on January 23rd. Now, the value of monthly runoff, the 32,700, that appears at the bottom of the graph for January of '42-43 is the same figure of 32,700 that appears in the Plaintiff's Exhibit 26.

THE COURT: Well, the purpose of this is to take the records and to demonstrate visually the peak flows and the average flows on certain days during these months; right?

THE WITNESS: That is all that this is to show.

THE COURT: And there are none of your figures that differ from the Government's figures?

THE WITNESS: Not unless-- there might be a very slight discrepancy here at the right-hand chart into the chart for 1957-58. There will be a difference for one of the latter charts in so far as there was a change in the

MALCOLM E. LOVE, OFFICAL REPORTER

B

Z13

1    Exhibit.

2        BY MR. MOSKOVITZ:

3        Q  Point out why there would be a change.  What figures

4    did you utilize?

5        A  The figures we had were preliminary records

6    supplied by the United States Geological Survey office,

7    Surface Water Branch, in Los Angeles.

8        THE COURT:  Then you made your chart and they later

9    changed the figures?

10       THE WITNESS:  To a very minor extent.

11       Now, for this particular chart at Ysidora there was

12   no change at all.  Well, correction; one acre-foot was

13   the change for the year.

14   BY MR. MOSKOVITZ:

15       Q  Between the preliminary and final figures?

16       A  Out of 30,370 acre-feet one acre-foot was added

17   for one month.  This goes through May 31.  And during the

18   month of June there was one acre-foot passed the station.

19   So they very slightly differ from the final records.

20       Q  Mr. Illingworth, does California Exhibit A show

21   graphically the flow at Ysidora for the entire period

22   shown on the exhibit, that is, from 1942-43 through May 31,

23   1958?

24       A  Yes, it does.  And perhaps it would be well to

25   point out that this does not include all of the wet years

B

Z14

of a complete weather cycle.  It simply -- we went back to
'42, because it showed some typical wet years.  It did not
show all of them.  The years '36-37, '37-38 were also very
big years, and there are some other wet years prior to this
time that are not shown.  This shows a few typical wet years
and the very dry years that followed, where it is indicated
on the chart that there was no flow, for instance, in the
year '54-55, '55-56 and '56-57; likewise, in '49-50, in
1950-51.  But the chart does show the extreme variation where
it goes from nothing to very high rates of flow, and it does it
over night.

        (Discussion off the record.)

BY MR. MOSKOVITZ:

        Q  Is California Exhibit A accurate to your knowledge?

        A  Yes, it is.

        MR. MOSKOVITZ:  I offer California Exhibit A in
evidence.

        MR. VEEDER:  I have no objection.

        THE COURT:  Received in evidence.

        MR. STAHLMAN:  May I ask one question:  Did you
strike an average for all those?  Is that on that?

        THE WITNESS:  That does not appear in this chart nor
have I calculated for this particular period.

BY MR. MOSKOVITZ:

        Q  Now, referring to California Exhibit B for

XXXXXXX

Identification would you read the title block.

A   This is entitled:  "Santa Margarita River near Fallbrook ~~in~~ mean Daily Discharge, 1942-43 to 1957-58."

Q   That is the same period covered by California Exhibit A?

A   Yes, it is.

Q   How was this exhibit prepared?

A   In the same manner, under my direction, as Exhibit A.

Q   And what runoff figures were utilized in drawing this graph?

A   The runoff figures obtained by the United States Geological Survey ~~in~~ and ~~prepared~~ presented here as Plaintiff's Exhibit 23.

Q   Now, would you point out the peak flows, both daily and instantaneous, which appear on this exhibit?

A   Well, of the records shown here the highest flow occurred on January 23rd, the same day that we referred to in discussing the Ysidora record, where 22,000 cubic feet per second passed the station as an instantaneous peak. At Fallbrook the average for that day was about 9,000 cubic feet per second.

Q   Would you relate that peak flow at Fallbrook on California Exhibit B with the peak flow for that day at Ysidora on California Exhibit A?

1    A  Yes.  The peak at Fallbrook was somewhat greater

2    than at Ysidora, namely, 22,000 as compared with 19,000 at

3    Ysidora.

4    Q  And how does the acre-foot runoff for the month

5    during which that peak flow occurred compare at the two

6    stations?

7    A  There is more runoff at Ysidora.  Ysidora totals

8    74,270 acre-feet for the month for the-- correction-- for

9    the month; is that the question?

10   Q  For the month?

11   A  For the month Ysidora totals 32,700, and Fallbrook

12   station is 25,610.

13   THE COURT:  What month are you talking about?

14   THE WITNESS:  This is January of 1943.  This same

15   month we referred to before.  It is Ysidora.

16   BY MR. MOSKOVITZ:

17   Q  In other words, for that particular month the

18   highest daily flow in second-feet was greater at Fallbrook?

19   A  Yes.

20   Q  But the acre-foot outflow for the month was

21   higher at Ysidora?

22   A  That is true.  The reason for this is that the

23   flow--

24   MR. VEEDER:  I object to this.  It is not going to

25   be responsive to the question, the reason for it.  And

B

Z17

moreover, I object to this line of examination; that the exhibit speaks for itself.

MR. MOSKOVITZ: It may go out. I just wanted to draw the Court's attention to some of the salient points.

THE COURT: I am curious about some of these things.

MR. MOSKOVITZ: Very well, your Honor.

MR. VEEDER: Well, the original objection was that the witness was preparing to make a statement which was not responsive to the question which was asked. I made that objection.

THE COURT: Sustained. I notice inChart B, which is the flow at Fallbrook for the entire-- well, it isn't the entire water year, but it is most of it, '57-58-- B runs through April 30th; A runs through May 31st-- there were some 30,000 acre-feet flowed by Ysidora as compared to a little under 19,000--

THE WITNESS: Those are not comparable, because that one month is left out there.

THE COURT: What month is left out?

THE WITNESS: Well, one goes through May 31, and the other one only goes through April 30.

THE COURT: Would there be very much water flow in that period of time?

THE WITNESS: I can refer to the Fallbrook record. We asked for the latest records when we got these preliminary

MALCOLM E. LOVE, OFFICAL REPORTER

B

Z18

1   data, and they simply weren't available for that month at

2   that time.

3        THE COURT:  All right, then.  Let's forget about that

4   one.

5        MR. MOSKOVITZ:  Would you like to refer to the

6   runoff figures, your Honor, to get the runoff at Fallbrook

7   for the month of May, 1958, to see how that compares?

8        THE COURT:  Is it available?

9        MR. MOSKOVITZ:  Yes.  Yes, it is one of the exhibits;

10  Plaintiff's Exhibit 23.

11       THE WITNESS:  23.

12       MR. VEEDER:  Could I have, your Honor, the question

13  again?  It has been so much time.

14       THE COURT:  Wait until he gets his figures.  This is

15  a figure you would add to the 18,800, is that right, shown

16  on Fallbrook?

17       THE WITNESS:  Yes.  Actually, it is not appreciable.

18  The total year is only 18,000.  Wait a minute.  The total

19  is 19,200.  In May there was some 350 acre-feet in addition

20  that flowed at Fallbrook.  It is not shown on California B.

21       THE COURT:  Then, using that 350 acre-feet for May

22  to make the figures comparable, would that make a total on

23  California's Befor water year '57-58 at Fallbrook of 19,200

24  with 30,000 feet at Ysidora?

25       THE WITNESS:  Yes, sir.

Illingworth - Direct

2642

B

Z19

THE COURT: Now, on the other hand, on years like 1945-46, the figures are about the same; some 11,000 acre-feet. The years '51-52, 47,000 acre feet.

THE WITNESS: They are almost identical that year.

THE COURT: What explanation do you have for situations like that?

THE WITNESS: Well, there are two things that happen to the water after it passes the Fallbrook gauge. There are contributions from De Luz Creek and there are depletions in the Santa Margarita Coastal Basin, the ground water basin on Camp Pendleton, and there is a certain amount of percolation that takes place from stream flow into that basin. So you have the two factors working against one another. Now, in these--

THE COURT: So it is pretty hard to draw any conclusions, then?

THE WITNESS: Well, the conclusion is that in the larger years the contribution from De Luz Creek is much greater than the recharge that takes into the basin, so the resulting flow at Ysidora is considerably larger than it is at Fallbrook. On dryer years the reverse is true, and you have more flow at Fallbrook than you do at Ysidora. That is certainly true in the years when Ysidora flow is zero. You still have something at Fallbrook.

8643

B2

Z20

MR. VEEDER: Was that true in '51-52?

THE WITNESS: '51-52 was a pretty wet year, and they were nearly identical in that year.

THE COURT: '50-51, there was no flow at Ysidora while there was flow at Fallbrook?

THE WITNESS: Yes, sir.

THE COURT: The same is true of '49-50?

THE WITNESS: Yes.

THE COURT: '48-49, a small flow at Ysidora but 5,800 acre-feet at Fallbrook?

THE WITNESS: Yes.

THE COURT: Now, what is your conclusion again for this phenomena?

THE WITNESS: Well, I say--

THE COURT: That if there is a dry year, what you would call a dry year, there is maybe flow at Fallbrook but it is absorbed on the way down through the Ysidora Basin and in the Ysidora Basin?

THE WITNESS: Yes. not only Ysidora Subbasin but the entire basin including upper Chappo and Subbasin.

THE COURT: Because the small flow is used up?

THE WITNESS: Entirely. It percolates.

THE COURT: Now, on a wetter year, what is your conclusion?

THE WITNESS: Well, the contribution from De Luz Creek

B2

Z21

1   is greater, De Luz Creek and the other areas-- I cite De Luz

2   Creek, because it is the primary contributor downstream from

3   the Fallbrook Gauge-- but the flow from De Luz Creek and

4   these other unmeasured tributaries is greater than the effect

5   of the percolation that takes place from the river to the

6   Basin.   Therefore, there is an accretion of flow from in

7   between the two stations ~~and~~ in the reach of the stream between

8   Fallbrook ~~Creek~~ gauge and the Ysidora station.

9        MR. MOSKOVITZ:  Your Honor, this may be illustrated

10  by comparing the De Luz Creek hydrograph at this point.

11  However, before I do so, I would like to complete a founda-

12  tion for introducing California Exhibit B.

13       Q  Is California Exhibit B correct, in your opinion?

14       A  Yes, it is, for what it purports to be.  As I

15  indicated, it does not include the entire water year of

16  '57-58 as it is indicated.

17       MR. MOSKOVITZ:  I offer California Exhibit B in

18  evidence.

19       MR. VEEDER:  No objection.

XXXXXX  20    THE COURT:  B will be received in evidence.

21  BY MR. MOSKOVITZ:

22       Q  Now, Mr. Illingworth, referring to California

23  Exhibit E for Identification--

24       THE COURT:  E?  Are you skipping now?

25       MR. MOSKOVITZ:  I am skipping, your Honor, so we can

B2

Z22

1    get De Luz Creek at this point.

2         MR. VEEDER:  This is De Luz Creek in the box?

3         MR. MOSKOVITZ:  De Luz is in the upper hydrograph and

4    Temecula at Vail Dam is shown in the lower hydrograph.

5         Q  Now, referring to California Exhibit E, how was this

6    exhibit prepared?

7         A  This was prepared by the staff working under my

8    direction.

9         Q  And what gauging stations are indicated in this

10   exhibit?

11        A  The runoff records at two United States Geologic

12   Survey stream gauging stations are shown on this chart.  The

13   first is De Luz Creek near Fallbrook, and the second is

14   Temecula Creek at Vail Dam.  The former is shown for the

15   period, plotted for the period 1950-51 to 1957-58.  And the

16   Temecula Creek record is plotted for the period as in

17   California A and B, from 1942-43 to through '57-58.  It will

18   be noted that on the Temecula Creek--

19        Q  Before we get to Temecula Creek, discuss the De

20   Luz Creek record.  Why does the record or the hydrograph

21   start in 1950-51 instead of 1942-43 as it did on the other?

22        A  The station was not established until the 5th

23   of February, 1951.  Only the record for that date on is shown.

24        Q  Referring to the years in which the flow at Ysidora

25   equaled or exceeded the flow at Fallbrook, would you point

B2

Z23

1    out the flow that is shown for the De Luz Creek station?

2    A   Yes.   The De Luz Creek station of 1951 and '52 was

3    11,690 acre feet total for the year.   This contribution to

4    the stream flow at Fallbrook, which was measured as 47,010

5    acre feet, made up a portion of the total of 47,640 at

6    Ysidora.   Now, this might be compared--

7    Q   157-58?

8    A   Yes.   Comparing with the three records for 1957-58,

9    in which it was already pointed out aht some 19,200 acre

10   feet of water passed Fallbrook, whereas over 30,000 passed

11   Ysidora, well, this would indicate as one item an increase

12   in the proportion of flow that came from De Luz Creek over

13   the period, the year 1951-52.   And in this year we have some

14   20,770 acre feet passing the De Luz Creek gaging station;

15   whereas, in '51-52 there was only some 11,690.

16   THE COURT:   The De Luz Station is above the Fallbrook

17   Station?

18   THE WITNESS:   No, sir.

19   MR. STAHLMAN:   Below.

20   THE COURT:   Below?

21   THE WITNESS:   Yes.

22   BY MR. MOSKOVITZ:

23   Q   Referring to Plate 6, Exhibit L, Volume I,

24   Bulletin 57, that will show where the De Luz Gaging Station

25   is, would it not?

B2

Z24

1      A   Yes.   The De Luz or all the stream gaging stations

2  that have been referred to appear on Plate 6 of California

3  Exhibit L.   Starting at the downstream point near the

4  Pacific Ocean the first triangle, black triangle, is the

5  location of the Ysidora Gaging Station.

6      Q   Would you continue your description.   I think

7  his Honor has that plate.

8      A   Yes; the farthest downstream station triangle

9  shown in black is the station called Santa Margarita River

10  near or at Ysidora.   Proceeding upstream near the words that

11  appear in red as "Naval Reservation" there is another triangle.

12  That is the location of an old station on Santa Margarita

13  River.   It was only in existence for a couple of years.   Just

14  immediately above that at the stream mile number shown as

15  12.2 is the confluence of De Luz Creek and Santa Margarita

16  River.   Proceeding upstream about, oh, three-eighths of an

17  inch upstream on De Luz Creek is another triangle, and that

18  is the location of the stream gaging station on De Luz Creek,

19  which is shown on California E.   The Fallbrook station is

20  some eight miles, almost eight and a half miles upstream

21  on Santa Margarita River; and it is near the confluence of

22  Sandia Creek and Santa Margarita River which is at stream

23  mile 20.7.   Are those the only stations which we have

24  considered so far?   Well, the Vail station on Temecula

25  Creek is also shown as a black triangle immediately downstream

B2

Z25

1    from Vail Dam.

2        THE COURT:  All right.

3    BY MR. MOSKOVITZ:

4        Q  Would you point out the flow at the De Luz Creek

5    station in the years when the Fallbrook flow exceeded the

6    Ysidora flow?

7        MR. VEEDER:  Again I object on the ground that the

8    exhibits speak for themselves and show very clearly all the

9    things that are being interrogated about.

10        THE COURT:  Overruled.

11        THE WITNESS:  In general, the years which Fallbrook's

12    flow exceeds Ysidora flow are the years which are relatively

13    dry; for instance, 1948-49.

14        THE COURT:  There is no flow at De Luz, so you can't

15    do anything about that.  We don't have a record for De Luz.

16        THE WITNESS:  No, sir.

17        Well, 1954-55 would be a typical year then.  3420

18    acre feet passed Fallbrook, and there was no flow at Ysidora.

19    During that same year at De Luz there was some 158 acre-

20    feet passed the station, and at the Temecula Creek at Vail

21    Dam there was an inflow to the reservoir of 1820 acre feet.

22        THE COURT:  What year is that?

23        THE WITNESS:  '54-55.

24        THE COURT:  Are these figures now in the chart below

25    Vail Dam, after 1948, are these inflow into the dam?

THE WITNESS:  Yes, sir.  We have a notation there. It appears before the year 1948-49:  "Records of Temecula Creek at Vail Dam."  It says "of" Vail Dam, but it is supposed to be "at" Vail Dam.

MR. MOSKOVITZ:  The witness is changing the "of" to "at" on California Exhibit E.

THE WITNESS:  And the only thing we attempted to put on the map, on the chart, was the monthly runoff.  These are the records of the United States Geological Survey, and they do not report the daily inflows.

THE COURT:  How did you compute this so-called runoff? It is runoff at Vail Dam.  You mean runoff into Vail Dam?

THE WITNESS:  Yes, sir.

THE COURT:  You computed that by the height of the dam?

THE WITNESS:  This is not computed by us.  It was computed by the  United States Geological Survey.

THE COURT:  Well, whoever computed it computed by the height of the dam and the water discharged from the dam?

THE WITNESS:  It is measured by the change in elevation of the water level of the dam, and that is related to change in storage.  And the evaporation is estimated and taken into account.  And the discharges are measured and taken into account.

THE COURT:  This is actually then runoff after

Bw

Z27

1  January or after October 1st, 1948, which is the starting

2  time of Vail Dam?  It is actually an amount of runoff into

3  Vail Dam is what it amounts to?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Prior to that time this record at Nigger

6  Canyon was a gaging station?

7          THE WITNESS:  Yes, sir; just a few hundred feet

8  downstream from the dam.

9          THE COURT:  At that time it gaged water that passed

10  the gaging station?

11          THE WITNESS:  Gaging station, yes, sir.  The records

12  tended to be comparable.

13          THE COURT:  Roughly comparable?

14          THE WITNESS:  Yes, sir.

15  BY MR. MOSKOVITZ:

16      Q  With respect to the hydrograph for Temecula Creek

17  at Vail Dam, would you point out the relationship in quantities

18  of water that you can determine for the year 1942-43 between

19  the Vail Dam Hydrograph and the hydrographs down in the lower

20  basin at Fallbrook and at Ysidora which are depicted on

21  California Exhibit A and B?

22          MR. VEEDER:  I am going to have that question read

23  back.

24          THE COURT:  I don't get it either.

25          MR. MOSKOVITZ:  I will reframe it.

B2

Z28

Q  Would you point out the relationship of the
quantities of runoff between the Vail Dam station or Nigger
Canyon station prior to 1948 and the runoff for the same
year at the downstream stations at Ysidora and Fallbrook?

A  Yes.  The Temecula Creek station is located
considerably higher in the water shed than any of the stations
that we have discussed so far.  And it does not have as
large a tributary area contributing runoff to it. Therefore,
the measurements of runoff at that station are considerably
less than at either Fallbrook or Ysidora.  They total, 1942-
43, the total for Temecula Creek at Nigger Canyon is 13,630
acre feet, whereas at Fallbrook the total for the year was
57,890; and at Ysidora 74,270 acre feet.

THE COURT:  Well, that same thing is not true for all
the years.  Take the year '47-48, which was the last year
before Vail Dam went into operation. There was only 562
feet passed Ysidora.

THE WITNESS:  Yes, sir.  That is a so-called dry year.
But the flow as regards the difference between Vail and
Fallbrook is still the same; that is, 2,370 passed Nigger
Canyon station and 6,640 passed the Fallbrook station.

MR. VEEDER:  You said: "so-called dry year."  Wasn't
that a dry year?

THE WITNESS:  I would call it a dry year.

MR. MOSKOVITZ:  Mr. Stahlman points out to me that it

B2

Z29

1   is the hour of 4:30.  He didn't want me to get any more maps

2   out.

3        THE COURT:  All right.  Are you offering E?

4        MR.MOSKOVITZ:  Yes, I would like to offer E before we

5   adjourn.  I want to ask one further question.

6        Q  Are the two hydrographs depicted on California

7   Exhibit E for Identification correct, in your opinion?

8        A  Yes, they are.

9        MR. MOSKOVITZ:  I offer California Exhibit E--

10       THE WITNESS:  Again, I point out that the De Luz Creek

11  station is only through May 31 and the Vail Dam is also through

12  May 31 and does not include the entire year '57-58.

13       MR. MOSKOVITZ:  I renew the offer.

14       THE COURT:  E received in evidence.

XXXXXX

15       I must have it listed wrong in my index.  It is ac-

16  tually Temecula at Vail Dam, isn't it?

17       MR. MOSKOVITZ:  Temecula Creek at Vail Dam and De Luz

18  Creek near Fallbrook are combined on the same exhibit.

19       THE COURT:  Is this a substituted one or this is the

20  one as you originally proposed them?

21       MR. MOSKOVITZ:  This is the one as I originally

22  proposed it, your Honor.  The two that have not yet been

23  offered at C and D which cover--

24       THE COURT:  I have listed here as an F for Iden-

25  tification:  "De Luz, '51 to '58."  That is now in E, isn't

B2

Z30

1   it?

2        MR. MOSKOVITZ:  Yes, sir.  Perhaps there was a change,

3   by putting two of them on one.  E has both De Luz and

4   Temecula Creek at Vail Dam added to something else.

5        THE COURT:  All right.  Take a recess until tomorrow

6   morning at 10 o'clock.

7        (Adjournment until Wednesday, February 18, 1959, at

8   10 A.M.)