Case 3:51-cv-01247-JO-SBC   Document 4577   Filed 09/24/63   PageID.29423   Page 1 of 146

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

---

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Wednesday, February 18, 1959

Pages:    8654 to 8788

# FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By_____ Deputy

MALCOLM E. LOVE

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1         IN THE UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF CALIFORNIA

3         SOUTHERN DIVISION

4         - - -

5      HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6         - - -

7

8 UNITED STATES OF AMERICA,   )
                               )

9           Plaintiff,   )
                               )

10      vs.            )      No. 1247-SD-C.
                               )

11 FALLBROOK PUBLIC UTILITY   )
DISTRICT, et al.,         )

12                       )

13         Defendants.  )

14

15      REPORTERS' TRANSCRIPT OF PROCEEDINGS

16

17         San Diego, California
      Wednesday, February 18, 1959

18

19 APPEARANCES:

20     For the Plaintiff       WILLIAM H. VEEDER, ESQ.,
                           Special Assistant to the

21                            Attorney-General,
                           Department of Justice,

22                            Washington, D.C.

23

24

25

APPEARANCES (Continued):

    For Defendant             GEORGE E. STAHLMAN, ESQ.
    Vail Company

    For Defendant State      STANLEY MOSK, ESQ.,
    of California            Attorney-General, by
                          ADOLPHUS MOSKOVITZ, ESQ.,
                          Deputy Attorney-General.

    For Defendants
    Fallbrook Public        FRANZ R. SACHSE, ESQ.
    Utility District,
    et al.

## INDEX TO WITNESSES

For Defendant California:          D      X      RD      RX

    Leland Illingworth          8658


## EXHIBITS

Defendant State of                          Iden.      In Evid.
California Exhibit -

| | Iden. | In Evid. |
|---|---|---|
| C | | 8661 |
| D | | 8664 |
| L, Appendix E | | 8695 |
| AD | | 8756 |
| D-1, D-2, D-3, D-4, D-5, D-6 | 8759 | |
| E-1 to 5 | 8760 | |
| **AF** | | **8774** |
| **AL** | | **8787** |

AC *see* p 8724

A
Z4

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, FEBRUARY 18, 1959.   10 A. M.

2

3              (Other matters.)

4              THE CLERK:  Case on trial, No. 3 -- 1247-SD-C, United

5    States of America vs. Fallbrook Public Utility District, et

6    al.

7              THE COURT:  What luck did anybody have with this B

8    series of deeds?  Did you check one of them to see how it could

9    be changed around to make some sense, Mr. Sachse?

10             MR. SACHSE:  Mr. Engleman is working at Fallbrook.  I

11   misstated to the Court.  I thought I had the full set of

12   deeds here, but I didn't even bring myself down a set, and

13   rather than cut up the Court's exhibits I asked him to do it

14   at Fallbrook, and I will have some for you tomorrow.

15             THE COURT:  All right.

16             MR. MOSKOVITZ:  Your Honor, to assist all of us in the

17   present of California's case I have typed out a list of

18   California's exhibits, and I have copies.

19             THE COURT:  Very thoughtful.  I will give you a star

20   today.

21             MR. MOSKOVITZ:  After you see my typing job you might

22   want to withdraw it.

23             THE COURT:  This includes those in evidence as well as

24   those marked for identification?

25             MR. MOSKOVITZ:  Yes, your Honor.

A

Z5

LELAND ILLINGWORTH,

recalled as a witness in behalf of the defendant State of California, having been previously sworn, testified further as follows:

DIRECT EXAMINATION (Resumed)

BY MR. MOSKOVITZ:

Q  Mr. Illingworth, I refer you to California's Exhibit C for Identification and ask you to read the title block of that exhibit.

A  This plate is entitled "Santa Margarita River Near Temecula, Mean Daily Discharge, 1942-1943 to 1957-1958."

Q  Will you describe how it was prepared-- under whose direction?

A  This was prepared under my direction.  It shows the mean daily discharge of the Santa Margarita River measured at the station near Temecula.  The daily flows are plotted, and in addition the peak flows of individual days are shown, and the quantity is labeled.

As an example, we have on March 4, 1943, the peak flow during the day March 4 was 5,880 cubic feet per second.  The mean daily flow on that day was only some approximately 2,900, as can be read from the legend in the left-hand margin labeled "Mean daily discharge in cubic feet per second."

Q  What records were utilized in drawing the graph;

1  California's Exhibit C?

2      A  Those records are the United States Geological

3  Survey official records presented in this case as Plaintiff's

4  Exhibit 21.

5      Q  Looking at the water year 1957-1958, what records

6  were used to draw the graphic representation for that year?

7      A  For that year only the records were preliminary records

8  obtained from the United States Geological Survey Office, and

9  they were indicated as being subject to revision.  They were

10  later revised after this plate was produced.

11      And if I can have Plaintiff's Exhibit 21 I will read

12  the differences between the two records.

13      Incidentally, on this plate, in addition to the mean

14  daily discharges, the total quantities for each month are

15  also tabulated along the bottom of the chart.

16      Q  And also for the year; is that not correct?

17      A  And summations for each year, yes.

18      MR. VEEDER:  And that doesn't differ from the other

19  exhibits, does it?

20      THE WITNESS:  No, sir; it is the same as California's

21  A, B and E already in evidence.

22      Now, for 1957-58 the total in the preliminary records

23  shown on California's Exhibit C is 193 acre feet for the month

24  of October.  The corrected record is 232.

25      For November we have preliminary 220, final 230.

A

Z7

1        For December preliminary 278, final 318.

2        For January preliminary 294, final 311.

3        For February preliminary 1790, final 1770.

4        For March we have preliminary 3020, final 3130.

5        For April we have 11,020 on the preliminary, and

6    10,560 on the final.

7        For May the preliminary is 272, the final is 339.

8        The preliminary records supplied to us were only through

9    May 31, 1958, and no figures show for the remainder of the year.

10   However, the corrected copy shows June having a total runoff

11   of 236 feet, July, 208, August 363, and September 267.  The

12   total appearing in the corrected copy is 17,960 acre-feet.

13   Indicated on 1957-58 through May 31st only is 17,090.

14   BY MR. MOSKOVITZ:

15       Q   That last figure is what appears in California's

16   Exhibit C?

17       A   That is correct.

18       THE COURT:  How much do those four additional months

19   total?  A little over a thousand, don't they-- about 1,100?

20       THE WITNESS:  Yes, sir.  The difference in the two

21   records is a little less than 900 total.

22       THE COURT: All right.

23       THE WITNESS:  The graphic presentation then, of course,

24   would not be greatly different from this had we graphed the

25   final records.  The regimen of flow appears much the same--

1    would appear in much the same way as it is shown here.

2    BY MR. MOSKOVITZ:

3         Q   With the explanation you have made with respect to

4    1957-58 water year, is California's Exhibit C correct, to your

5    knowledge?

6         A   Yes, it is.

7         MR. MOSKOVITZ:   I offer California's Exhibit C in

8    evidence, your Honor.

9         THE COURT:   California's Exhibit C received in evidence.

10        (Defendant State of California Exhibit C for Identifica-

11   tion was received in evidence.)

12        THE WITNESS:   It might be well to point out on this

13   chart that there is no time when the flow is zero at this

14   station; that although it looks like there is nothing plotted,

15   if observed closely you will find that there is a very small

16   flow at all times, and the peak in some of these dry years, like

17   1949-50 as an example, the peak flow for the entire year was

18   28 cubic feet per second, which occurred sometime during the

19   day of November 10, 1949.

20        THE COURT:   This is, in part, because of the requirement

21   of the decree of the prior suit that water be released, is it

22   not?

23        THE WITNESS:   This is probably true.

24        MR. VEEDER:   I object to that question.  I believe that

25   is a legal conclusion, your Honor.  And it is a very serious

1  problem.

2      THE COURT:  All right.  I have my own views on it.

3      MR. VEEDER:  I know.

4      THE COURT:  I will sustain your objection to my ques-

5  tion.

6      MR. VEEDER:  Thank you, your Honor.

7      MR. MOSKOVITZ:  But you can't erase the thought in

8  his mind.

9      MR. VEEDER:  Well, I have been accused of brainwashing.

10     THE WITNESS:  These are the flows that were measured.

11 BY MR. MOSKOVITZ:

12     Q  Mr. Illingworth, I will refer you to California's

13 Exhibit D for Identification and ask you to read the title

14 block of that exhibit.

15     A  The title of this plate is entitled "Murrieta Creek

16 at Temecula Mean Daily Discharge 1942-1943 to 1957-1958."

17     Q  How was this exhibit prepared?

18     A  This was prepared under my direction in the same

19 manner as the previous exhibit C and includes the same type

20 of information for the Geological Survey station some four-

21 tenths of a mile upstream from the previous station on

22 California's C.  This now is on Murrieta Creek, a tributary

23 of the Santa Margarita River.

24     THE COURT:  This measures only Murrieta; nothing from

25 Temecula?

A

Z10

THE WITNESS: That is correct.

BY MR. MOSKOVITZ:

Q And were the figures on which this graph was based also obtained from the United States Geological Survey records?

A Yes, sir. And similar to California's Exhibit C, the 1957-58 measurements are from the preliminary records subject to revision.

Q I hand you Plaintiff's Exhibit 22 and ask you to compare the runoff figures for 1957-58 on California's Exhibit D with the final figures that the Geological Survey released.

A Comparing the two records, we find that the peak flow, as indicated on the final record and on the chart, are exactly the same, namely, 5,730 cubic feet per second on April 1, 1958. The runoff for each month, total monthly runoff shown on the chart, is identical with that in the final record. The chart, however, does include data to May 31st, whereas the final record includes the record for June, July, August and September. The totals for those months ate 38, 29, 26 and 27 acre feet, respectively. The total shown on California's Exhibit D for the year through May 31st is 14,100 acre feet. The total for the entire year, according to the final Geological Survey record is 14,220, the difference being recorded entirely in the unrecorded months on California's D.

1  BY MR. MOSKOVITZ:

2     Q   Is California's Exhibit D correct, to your knowledge?

3     A   Yes, it is.

4     MR. MOSKOVITZ:  I offer in evidence California's

5  Exhibit D, your Honor.

6     THE COURT:  California's Exhibit D received in evidence.

7     (Defendant State of California Exhibit D for Identifica-

8  tion was received in evidence.)

9     THE COURT:  Apparently there has never been a month that

10 there has not been some water run past this gage over this

11 period from 1942 on?

12    THE WITNESS:  That is correct.

13    THE COURT:  I notice several months where it was as

14 low as 13 acre-feet.  Is that the lowest?

15    THE WITNESS:  Yes, sir, that is the lowest I see.

16 BY MR. MOSKOVITZ:

17    Q  Mr. Illingworth, what constitutes the flow that is

18 recorded on these low monthly periods?

19    MR. VEEDER:  I object to that, your Honor.  There is

20 no foundation.  What does it constitute? What are we talking

21 about?  Ground water?  Precipitation?  What is it?

22    I think it has to be clarified, Mr. Moskovitz.

23    MR. MOSKOVITZ:  I will reframe the question.

24    Q  These very low flows the Court has just noticed, where

25 do they come from, from your observation of Murrieta Creek?

A

Z12

1      A  Well, they occur in a very dry period of the year

2    when there is no rainfall, and the water rises as what we have

3    called rising water, which actually is the water that is

4    flowing downhill through the upper layers of the ground water

5    basin, the upper portion of the valley fill in the ground

6    water basin.

7      MR. VEEDER:  I object to this line of testimony, your

8    Honor.  There is not a scintilla of evidence or a scintialla

9    of foundation for this witness to say that the water that is

10   on the surface in the Murrieta Creek comes from the upper

11   strata of the water-bearing strata.

12     THE COURT:  The latter part may go out.  His observa-

13   tion of seeing rising ground water may remain in.

14     MR. VEEDER:  I have no objection to that.  But he

15   certainly doesn't know where it came from.

16     THE WITNESS:  The water first appears in the creek at

17   the location of the intersection of the ground surface with

18   the water plane or the water table surface, and from that

19   point down to the confluence of Murrieta Creek and Santa

20   Margarita River the flow gradually increases to the small

21   flows that are shown here.

22     MR. MOSKOVITZ:  You may resume your seat.

23     Q  Mr. Illingworth, I hand you California's Exhibit F

24   for Identification.

25     Do you have a copy, your Honor?

A

Z13

1        THE COURT:  No, I don't have a copy.

2        (Mr. Moskovitz handing a document to the Court.)

3   BY MR. MOSKOVITZ:

4        Q  And I ask you to identify that exhibit.

5        A  This is an exhibit prepared under my direction,

6   entitled "Measured Flow on the Santa Margarita River at

7   Ysidora."

8        Q  That is the first sheet, is it not?

9        A  Yes, that is the first sheet.  There are a number of

10  sheets in this.  The second is entitled "Measured Flow of

11  De Luz Creek Near Fallbrook."

12       The third, "Measured Flow on the Santa Margarita River

13  near Fallbrook."

14       Q  There are two sheets that contain the Fallbrook

15  records?

16       A  That is correct.

17       THE COURT:  These are actually maximum flows for

18  various periods; is that what it amounts to?

19       THE WITNESS:  Yes, sir.

20       The next is "Measured Flow of the Santa Margarita River

21  Near Temecula," consisting of two sheets.

22       And the final, "Measured Flow of Temecula Creek at Vail

23  Dam."

24  BY MR. MOSKOVITZ:

25       Q  These are the same gaging stations as are covered in

1    California's Exhibits A through E; is that not correct?

2         A  Yes, that is correct.

3         Q  Would you start on the first page--

4         THE COURT:  Are these taken from the same records that

5    Exhibits A, B, C, D, and E were taken from?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  In other words, you picked out the particular

8    things you wanted to demonstrate what the compilation purports

9    to show?

10        THE WITNESS:  Not exactly, your Honor.  We thought that

11   this shows--

12        THE COURT: You didn't understand me, I don't believe.

13   In other words, you took this column of the largest day, you

14   went through the records, Government's 20 series, whatever that

15   is, and you picked out for the particular place the largest day

16   shown?

17        THE WITNESS:  Yes, sir; that is true.

18        THE COURT:  And then when you wanted the largest five

19   consecutive days, you picked out the largest five-day period?

20        THE WITNESS:  Yes, sir.

21        THE COURT:  Then you compiled that material?

22        THE WITNESS:  Yes, sir.  It shows in numerical form the

23   extremes, as shown on the charts.  For instance, on the first

24   sheet, Santa Margarita River at Ysidora for the year 1942-43,

25   we have in the largest 30 days 50% of the flow occurred.

BY MR. MOSKOVITZ:

Q  50% of what flow?

A  Of the entire flow for the year, as listed in the second column of the table, which is "Total annual runoff in acre-feet" of 74,270.  50% of that occurred within a 30-day period.

THE COURT:  43% occurred within ten, 36% within five, 26% on one day?

THE WITNESS:  Yes, sir.  That is the day we discussed before.  It was January 23, 1943.

THE COURT:  What is the situation down here on water year 1949-1950?

THE WITNESS:  There is no flow past the station at Ysidora.

THE COURT:  I see.

MR. VEEDER:  You are not worried about percentages, then?

THE COURT:  A percentage of zero is zero.  Is that right?

THE WITNESS:  It is meaningless.

MR. VEEDER:  I will stipulate to that.

THE COURT:  I understand this part of it.  Is this true all the way through?

THE WITNESS:  Yes.  I don't think it would be particularly helpful to go through every one.  I could pick out certain extremes.

A

Z16

1      For instance, 1953-54 we have some 7,740 acre-feet.

2  This is a considerably drier year, or less wet than the 1942-

3  43 year, but even here we have 49% of the runoff occurring

4  in the maximum 30 days.  41% of that occurred in 10 days.

5  39% of that on the largest five days, and 25% of the total

6  runoff for the year occurred in one day again.

7      Other stations show similar variations.  On the second

8  sheet, the station near Fallbrook for 1942-43, we have 31% on

9  the largest day, 31% of the 27,890 acre-feet, and going down

10  thepage for the same year we discussed before, 1951-52, for the

11  Ysidora Station we have23% of the flow occurred in one day.

12  BY MR. MOSKOVITZ:

13      Q  At what station now are you referring to?

14      A  This is the station Santa Margarita River near

15  Fallbrook.  It shows the extreme variation in the flow and how

16  muchof it comes at a very high rate of flow.

17      Q  Turning to the sheet for the flow at Santa Margarita

18  near Temecula, would you point out the highest flow during

19  the particular year you want to call attention to?

20      A  In 1942-43 we have 49% occurring in the largest 30

21  days.  35% of the total annual flow of 47,620 acre-feet occurred

22  on the largest single day-- again this is January 23rd.  As we

23  go down the table we find that the largest single day in 1943

24  was only 11%.  But 36% of the total anual runoff did occur in

25  the maximum five days.

A

Z17

1    THE COURT:  In 1951-52, which was the year with 33,600

2  acre-feet, 21% of it occurred on one day?

3    THE WITNESS:  Yes, sir.

4  BY MR. MOSKOVITZ:

5    Q  Now, will you turn to the figures for the next

6  station and point out the same phenomena?

7    A  Murrieta Creek is the next one.  It shows similar

8  variations, even more extreme as we get into the upper part

9  of the watershed where the streams are flashier.  For the

10  largest 30 days in 1942-43, 58% of the runoff of 31,340

11  occurred, 56% of the total within 10 days, 52% within five

12  days, and 44% of the annual flow occurred in one day.

13  Comparing that with 1951-52, the percentage is quite similar

14  to the other stations discussed.  It is 23%.

15    Q  For the largest single day?

16    A  That is right.  We have 53% for 1951-52 in the

17  largest 30 days.

18    THE COURT:  1957-58, 87% within 30 days, 22% in one

19  day?

20    THE WITNESS:  Yes.

21    THE COURT: That is important because Mr. Veeder was here

22  at that time and so he can understand from his observations

23  the past actions of the river by comparing it with 1957-58.

24    THE WITNESS:  Yes.

25    MR. VEEDER:  Most unusual.  That has never happened

1    before, nor will it happen again.

2        THE WITNESS:  These records indicate that for the

3    period April 1 through 10 of 1958, 69% of the total annual

4    flow of 14,100, as measured through May 31, only occurred in

5    the ten days, 52% in the largest five days, and 22% on the

6    largest day, which was April 1.

7        THE COURT:  I notice that the sheet on Temecula at

8    Vail Dam, you have run it only up to the date of the con-

9    struction of the dam.

10       THE WITNESS:  Yes, sir.

11       THE COURT:  You didn't carry over the computation as

12   to the inflow into the dam after its construction?

13       THE WITNESS:  No, because this is the study of the

14   daily records, and we could have put this down for the

15   highest 30 days and probably it would have been better if we

16   had.  But the reason we didn't was that, as you recall, on the

17   exhibit we presented yesterday--

18       THE COURT:  You couldn't do it day by day?

19       THE WITNESS:  That is right.  The Geological Survey

20   does not report the records in that detail.  For instance, the

21   evaporation couldn't be accurately estimated on a daily basis.

22       THE COURT:  However, the one wet year for 1942-43 shows

23   much the same phenomena?

24       THE WITNESS:  Yes, sir.

25       THE COURT:  39% in 30 days, 22% within one day?

A

Z19

1          THE WITNESS:  Yes, sir.

2          THE COURT:  That was a pretty wet day, January 23rd,

3    wasn't it?

4          THE WITNESS:  Yes, sir.

5          MR. VEEDER:  16 years apart.

6          MR. MOSKOVITZ:  I think that is just the point.

7          MR. VEEDER:  That is just the point.

8          THE COURT:  Now, De Luz at Fallbrook, the last one.

9    BY MR. MOSKOVITZ:

10         Q  Would you point out the figures there which indicate

11   the flashy nature of the flow?

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A   Yes, these records are from 1950-51 through 1957-58

2   only.   This is the entire period of record at that station.

3   We have in '51-52, 53% of the runoff occurring in maximum 30

4   days; 29% in the largest ten days; 20% in the largest five

5   days; and 12% on the single day, January 16th.   The 1952-53,

6   we have 87% of it occurring in the maximum 30 days.   50% the

7   maximum 30 days in '53'54.   92% in '55-56, although that is

8   a small year.   The flashy nature in the small years is not

9   particularly significant.

10         THE COURT:   I understand the exhibit.

11   BY MR. MOSKOVITZ:

12         Q   Is California Exhibit F accurate, to your knowledge?

13         A   Yes.

14         MR. MOSKOVITZ:   I offer California Exhibit F in

15   evidence.

16         THE COURT:   F received in evidence.

17   BY MR. MOSKOVITZ:

18         Q   Mr. Illingworth, have you made any calculations of

19   the average runoff past Ysidora Gaging Station?

20         A   Yes.

21         Q   For--

22         MR. VEEDER:   I object.   Go ahead and ask your question.

23   BY MR. MOSKOVITZ:

24         Q   For what periods have you made such calculations?

25         A   I made such a calculation for the period 1936-37

1    through 1956-57.  This was as indicated on our math diagrams

2    of precipitation presented yesterday.

3         MR. VEEDER:  Don't go too far, Mr. Illingworth.  I have

4    got an objection.

5         THE COURT:  Have you finished your statement?

6         THE WITNESS:  No, sir.

7         THE COURT:  I didn't hear the last part.  You say you

8    have made such a calculation, and it was used in connection

9    with your hydrograph that you presented?

10        THE WITNESS:  No.  No, I said that this period 1936-37

11   through '56-57 was a weather cycle.  There was a wet period and

12   a dry period both in it.  And therefore, it is more repre-

13   sentative of the long-time mean than if we had considered

14   simply a wet period or a dry period.

15        THE COURT:  What is this type of calculation you have

16   made, now?

17        THE WITNESS:  It is simply the arithmetic average of

18   the years of flow at Ysidora Gaging Station, the same ones

19   that appeared on California A.

20   BY MR. MOSKOVITZ:

21        Q  Except you went further back in years?

22        A  Except we went back to '36-37.

23        THE COURT:  You made an average?

24        THE WITNESS:  Yes, simply an arithmetic average.

25

B

Z3

BY MR. MOSKOVITZ:

Q   In other words, you totaled up the annual flow at Ysidora for the periods indicated and you divided them by the number of years?

MR. VEEDER:   I think we all understand what he did.

THE COURT:   All right.   Do you have an exhibit on this now?

THE WITNESS:   No.   I can give you the value.   It is 29,355 --

MR. VEEDER:   I move to strike the gentleman's statement. I knew he would do it.   These Californians jump like seals through the hoop.   I have never seen anything like it.

THE COURT:   The motion is denied.   It may remain in the record.   But I don't think average is going to help us very much.   We know an average flow occurs in that river.   Your very proof shows it, either way up or way down.

MR. MOSKOVITZ:   That is right, your Honor.   This is not meant to show you can count on this every year.   It is another way of understanding the figures.

THE COURT:   What was the average?

MR. VEEDER:   Before we go too far, could I get my objection in the record?

THE COURT:   I am going to ask a question.   You can object.

What was your average figure for this 2θ-year period?

Illingworth - Direct

B

24

1    MR. VEEDER:  I am going to object to the question, and

2    I am going to object to the relevancy of the evidence.  It

3    is incompetent, immaterial, irrelevant and not tending to

4    prove a single issue in this case.  There is not a repetitious

5    pattern.  We know it.  There is not a thing inthe record to

6    show it; that by the third-grade arithmetic that you can

7    demonstrate a single thing in regard to the runoff of the

8    Santa Margarita River.  It has nothing whatever to do with

9    this case.  It has nothing whatever to do with the availability

10   of the water. It has nothing whatever to do with the rights

11   of the use of water that are here involved.  We have made no

12   objection to the graphic showings, to the statistics.  When

13   he comes up and says the average is this, we say that it is

14   completely without meaning.  There is no repetitious pattern.

15   I renew my objection.

16       THE COURT:  I am inclined to agree; it doesn't have

17   much of a bearing on our problems.  But somewhere along the

18   line I might want to know what the average was.  And rather

19   than have it figured out, I would like to have it in the record.

20   Overruled.  You may state what the average is again.

21       THE WITNESS:  29,355 acre-feet.

22       MR. STAHLMAN:  To be sure:  What period of time was

23   this?

24       MR. VEEDER:  Was that '37 to '58?

25       THE WITNESS:  1936-37 through 1956-57.  It does not

B-1

Z5

1    include the wet year 1957-58.

2          THE COURT:  All right.

3          THE WITNESS:  We also made some similar averages for

4    a longer record at that station.

5          MR. STAHLMAN:  Why don't we have those?

6          THE COURT:  For a longer period?

7          MR. VEEDER:  Why don't we have the questions and answers.

8    I think it is very bad for this witness to be coming along and--

9          THE COURT:  Mr. Stahlman just asked him.

10          MR. VEEDER:  Is he handling the direct examination?

11    Now, I don't care whether the whole bunch of them ask.

12          THE COURT:  What other longer period did you make a

13    check?

14          THE WITNESS:  For the entire period of record at the

15    station.

16          THE COURT:  What period is that?

17          THE WITNESS:  1923-24 through 1937-38, omitting one

18    year where there as no record reported, and that was '29-30.

19    Eliminating that year the average is 24 thousand--

20          THE COURT:  Just a minute.  Let Mr. Veeder object.

21    You make the same objection?

22          MR. VEEDER:  I want the same objection with the same

23    inflection.

24          THE COURT:  All right.  It may be included in the

25    record.  Your objection will be overruled.

B

Z6

1     What was the average then for that period?

2     THE WITNESS: 24,794 acre-feet per year.

3     MR. VEEDER: We will ask him that on cross-examination.

4     THE COURT: All right.

5     THE WITNESS: And one further period after the break

6 in the record, since that included one year--

7     MR. VEEDER: I am going to object, your Honor, unless

8 questions are asked this witness.

9     THE COURT: I will ask the question.

10     Did you make a computation after the year '29-30 where

11 there was a break in the record?

12     THE WITNESS: Yes, sir.

13     THE COURT: From that period on through '57-58?

14     THE WITNESS: Yes, sir.

15     THE COURT: That would be the year '30-31 through '57-58?

16     THE WITNESS: Yes, sir. That is just less than 26,000

17 acre-feet; it is 25,985.

18     MR. VEEDER: Same objection.

19     THE COURT: Mr. Veeder may have the same objection and

20 the same ruling.

21     25,9 -- what?

22     THE WITNESS: 985.

23     THE COURT: 985.

24

25

B

Z7

BY MR. MOSKOVITZ:

Q   Mr. Illingworth, I direct your attention to--

MR. VEEDER:   Your Honor might ask the additional question as to the average from 1942 through 1955-56.

THE COURT:   Did you make that average?

THE WITNESS:   No, sir.  It doesn't include all the wet years and wouldn't be useful to us.

THE COURT:   Would you want to run that off?

THE WITNESS:   It could easily be done.

THE COURT:   Not right now.

THE WITNESS:   I don't know what significance it would have.

THE COURT:   You could do it in short order?

MR. VEEDER:   Except for the embarrassment of it.

THE COURT:   Over the recess, couldn't you?

THE WITNESS:   Surely.

THE COURT:   That would be the same as the chart California's A?

THE WITNESS:   Yes, sir.

THE COURT:   That would be '22-23 through '57-58.  And I take it if your chart has some significance, then the average for that same period ought to have equal significance?

THE WITNESS:   Well, as mentioned yesterday, this was just a series of years out of the record which represented those wet and dry periods.  It did not purport to include

B

Z8

1  anything that approached the long-time mean, anything of the

2  sort; just for illustrative purposes.

3      MR. VEEDER:  Without any meaning in so far as this

4  lawsuit is concerned.

5      THE COURT:  You can give me the figures for illustrative

6  purposes.

7      THE WITNESS:  I think it has very much meaning.

8  BY MR. MOSKOVITZ:

9      Q  I would like to refer now to California Exhibit L

10  for Identification, Appendix E.  That appears in Volume II

11  from pages E-1 through E-43.  Would you identify that appendix.

12      A  Yes.  This appendix was prepared under my direction.

13      Q  What is the title of it?

14      A  It is entitled "Records of Stream and Spring Dis-

15  charge not Previously Published."

16      MR. VEEDER:  May I inquire, Mr. Moskovitz, do we have

17  the basic data on this?  You gave us some, but I am not sure

18  we have them on this measurement of the springs.

19      MR. MOSKOVITZ:  I can't recall whether we gave you the--

20      MR. VEEDER:  I am sorry to interrupt you. Go ahead.

21      MR. MOSKOVITZ:  --basic books or not.  I think they are

22  available if you want to look them over.

23      Q  Is that not correct, Mr. Illingworth?

24      A  Yes.

25      Q  How were the data which are collected in this

B

Z9

1  appendix gathered and under whose direction?

2      A  They were gathered in the field by the staff working

3  on the investigation on Santa Margarita River, who worked under

4  my direction during the period of that investigation, and also

5  includes records obtained prior to that time at stations

6  established to develop information in the Barbee vs. Oviatt

7  suit in which the Division of Water Resources was the Referee.

8      Q  And under whose direction were those figures--

9      MR. VEEDER:  I object to that last answer as not being

10  responsive to the question.

11      THE COURT: Read the answer again which you are object-

12  ing to.

13      MR. VEEDER:  I would like to have the question answered.

14  How was this data obtained?  Certainly they went into the

15  field.  But I submit that the basis-- whether it was by

16  measuring, or how it was acquired.

17      THE COURT:  What was the answer?  I haven't heard what

18  he said.

19      THE WITNESS:  I said it was obtained by a crew working

20  in the Santa Margarita investigation; also a crew working

21  on the Temecula Creek reference; and it includes some other

22  miscellaneous measurements that were obtained from other

23  agencies and individuals prior to the time of both of those

24  studies.

25      THE COURT:  Overruled.  You may inquire as to which

1 is this miscellaneous information, where it has come from.

2 You may also inquire later in more detail as to how this was

3 secured. All right.

4 BY MR. MOSKOVITZ:

5 Q Now, turning to page E-2 of Appendix D, I note that

6 there are four tables which are listed. Would you explain

7 what these four tables are?

8 A Yes. Table E-1--

9 MR. STAHLMAN: What page is that?

10 MR. VEEDER: E-2.

11 MR. MOSKOVITZ: Page E-2.

12 MR. STAHLMAN: I have it missing here, evidendtly.

13 THE COURT: E-2. What is your question about E-2?

14 MR. MOSKOVITZ: I asked him to explain what the four

15 tables were that are listed in that table of contents. There

16 are four different tables all combined or compiled together

17 in Appendix E on page E-2. There is a listing of those four

18 tables.

19 THE COURT: All right.

20 MR. MOSKOVITZ: And I want him to explain them.

21 THE WITNESS: Table E-1 is entitled "Daily Discharge

22 Measurements at Gaging Stations Established by the Division

23 of Water Resources." These appear on pages E-3 through E-26.

24 Table E-2 is entitled "Daily Discharge Measurements With Less

25 Than One Year of Record on Temecula Creek." These records

B

Z11

1    appear on pages E-27 and E-28.  Table E-3 is entitled "Mis-

2    cellaneous Measurements of the Stream Discharge."  And these

3    appear on page E-29 and following pages.  Table E-4--

4            THE COURT:  Where do those come from?

5            THE WITNESS:  I believe it is indicated on the table in

6    each case.  They are from other agencies.  Referring to page

7    E-29, at the start of that table and on over to page E-40,

8    you will note that on page E-40 there is a notation that

9    certain measurements, on Footnote A:  "Measurements are from

10   water supply paper 300."

11   BY MR. MOSKOVITZ:

12           Q  Is that a U.S.G.S. water supply paper?

13           A  Yes, it was.

14           Now, we haven't indicated the source on these.  I

15   thought we had.  Actually, these older records are primarily

16   from Mr. Hall's records, records of the Vail Company.

17           THE COURT:  You have a column "Stream mile."  What

18   are those figures from?

19           THE WITNESS:  Fromthe ocean.

20           THE COURT: Those miles?  From the Ocean?

21           THE WITNESS:  That mileage appears on Plate 6.

22           THE COURT:  Plate 6, oh.

23           THE WITNESS:  That is this big one over here.

24           MR. MOSKOVITZ:  These all appear on this large map

25   which I will identify in just a moment, your Honor.

B

Z12

1    THE COURT:  In other words, for approximation your

2    juncture of the Murrieta and the Temecula is about 30, 30

3    miles?

4    THE WITNESS:  I think it is.  There actually is a

5    point.  There is a number on that confluence.

6    THE COURT:  30.1?

7    THE WITNESS:  30.1; is that it?

8    THE COURT:  As near as I can read it from 6.  Well,

9    then, these would all be measurements upstream from that

10    point?

11    THE WITNESS:  Yes, sir.

12    THE COURT:  At least as far as they pertain to Temecula

13    or Pechanga?

14    THE WITNESS:  Yes.  30.1 is the confluence.

15    THE COURT:  All right.

16    MR. VEEDER: Where from, high or low tide?

17    THE WITNESS:  Tide does not affect the stream at that

18    location.

19    THE COURT:  The measurement, though.  You say, "up-

20    stream from the ocean."  He is asking you what you measured

21    from, high or low tide.

22    THE WITNESS:  We measured from the ocean as shown on

23    the United States Geological Survey quadrangle sheets

24    entitled "Oceanside."

25    MR. VEEDER:  I think that is very important.

Case 3:51-cv-01247-JO-SBC   Document 4577   Filed 09/24/63   PageID.29455   Page 33 of 146

B

Z13

BY MR. MOSKOVITZ:

Q  Now, are the records which are compiled in Appendix D correct to your knowledge?

A  Yes, they are.

MR. MOSKOVITZ:  I am going to make the offer of Appendix E.

MR. VEEDER:  Have you made your offer?

MR. MOSKOVITZ:  I am offering Appendix E in evidence.


VOIR DIRE EXAMINATION

BY MR. VEEDER:

Q  Referring to Table E, Mr. Illingworth--

MR. SACHSE:  Table which, Bill?  Keep your voice up.

Q  Table E.  That will be on E-29.

THE COURT:  This would be Table E-3?

MR. VEEDER:  That is right; Table E-3 on E-29.

Q  Do you have the basic data from which that was compiled?

A  Yes.  Oh, let's see now; it goes back to 1914. I am not certain whether I have it or whether this was from records borrowed from Mr. Hall.  At any rate, they are in either the Vail Company records or our own files.

Q  Do you know who maintained those records during that period?

A  The only information I would have as to who actually

1    obtained the records would be whatever is shown in Mr. Hall's

2    records.

3    Q  I refer you to Hydrograph Unit No. 2 on page 32.

4    And I note the reference in the Footnote E:  "Rained two

5    days prior to measurement."  How would those data be available

6    to you?  From whom did you get them?  From whom did you get

7    those data that it rained two days prior to measurement?

8    A  That was a notation on the original record.

9    THE COURT:  What are those figures in parentheses?

10   Above that, that particular "e" symbol, small "e", is a note,

11   which appears on page E-31, and right above it concerns a

12   date of January the 31st, '51.  Right above it is in paren-

13   theses:  "1,550."

14   THE WITNESS:  That is the time according to the 24-

15   hour clock, your Honor.

16   MR. VEEDER:  I thought those were acre-feet.

17   THE WITNESS:  Sometimes it is significant as to what

18   time of day these measurements are taken.

19   MR. SACHSE:  That is stated in the footnote, Mr.

20   Veeder.

21   MR. VEEDER:  Which footnote?

22   MR. SACHSE:  Note, page 32:  "Time of observations is

23   in parentheses."

24   THE COURT:  All right.

25

B

Z15

BY MR. VEEDER:

Q   Now, in regard to upstream from diversion the
Shipley, at Township 7 South, Range 1 East-- Is that right?
I am looking at D.

A   Footnote D?

Q   Yes.  I am looking at page E-32.

A   The footnote says: "Upstream from diversion 7S, 1E,
24C (Shipley)".

Q   Was there a gaging station or some kind of a device
maintained there, do you know?

A   No, this was not a continuous record.  As indicated
here, these were spot measurements.

Q   And how then were they measured?  What was the means
of obtaining these figures, do you know?

A   Yes.  Sometimes it depended on the amount of flow.
Sometimes it was a current meter.  If the flow was smaller
than that, sometimes it was a five-gallon can and a stop
watch.

Q   And who handled the current meter, do you know?  I
am speaking now of this particular D.

A   Well, from the record here I can't tell you who
actually did it.  It would appear in our basic records.
However, if you want me to check on that particular one, I
can do it.

Q   I don't care about the particular one.  I think

B

Z16

1   what I am asking you about relates to each one of these

2   figures.

3        A   The measurements were not all made by the same

4   individual.

5        Q   Yes, that is true.  And that is why I am extremely

6   interested to know whether there is any accuracy to them.

7        A   They were made under my supervision.

8        Q   No, you didn't make the measurements in 1914, did

9   you?

10        A   No, but you have been referring to a Shipley

11   measurement.  That was made during our investigation.

12        Q   May I make myself clear:  Any one of these items

13   are the ones to which I am referring.  I have no way of

14   knowing the accuracy of them.  Could you produce those

15   data for us?

16        THE COURT:  Which data?

17        MR. VEEDER:  From the standpoint of each one of these

18   measurements, each of the figures that are set forth here.

19        MR. MOSKOVITZ:  I think he has explained that--

20        THE COURT:  Each figure in all Appendix E?

21        MR. VEEDER:  Well, your Honor, from our standpoint--

22   maybe I can shorten this up a little bit.

23        Q   Do you use these figures in any of your calculations

24   as to the term supply of water, for example, from the basin

25   underlying Camp Pendleton?

B

Z17

1      A   No, sir.

2      Q   These are not used for any calculations or any

3  analysis that you are going to make in this litigation, is

4  that right?

5      A   No, that is not correct.  Some of the measurements

6  that are shown here are the ones on which we relied to

7  produce the plates shown, which is Plate 6 in California L.

8  That is on the wall there now.

9      Q   That is this?

10     A   Yes.

11     MR. VEEDER:  Then, your Honor, I am going to object

12  to this E until we have an opportunity to review the basic

13  data.

14     MR. STAHLMAN:  May I ask a question?  What is the

15  purpose of this testimony, the purpose of this exhibit other

16  than it might show stream flow at some particular time?

17     MR. MOSKOVITZ: That is the purpose.  We want to get in

18  all the records that we have so that the facts are avail-

19  able for anybody.  And then, as Mr. Illingworth pointed out,

20  some of the records were used, those gathered in 1953, were

21  used to indicate the stream flow in the summer of 1953, as

22  shown on Plate 6 of Exhibit L; also on enlargment of California

23  A and B for Identification.

24     MR. STAHLMAN:  What does it ultimately prove for the

25  case?  I don't grasp it.

B
Z18

MR. MOSKOVITZ:  Merely again it illustrates the type
of stream we have in the summer period.

MR. VEEDER: Does anybody question that?  I don't want
to have him produce a great number of documents for us to
examine if they have no significance.  If they are part of
his analysis and part of his conclusion, we would have to
look at them.  But if it is just for the purpose of showing
that the Santa Margarita River is an intermittent stream that
runs sometimes, some years, and other times doesn't run at
all, I will stipulate to that.

MR. STAHLMAN:  One other, if I may ask one other
question:  Mr. Moskovitz, will this become significant when
we are considering the rights in relation to properties in
the vicinity of the places where these conditions are shown to
exist?

MR. MOSKOVITZ:  I don't know to what extent this would
be used by other parties.  They may want to refer to this
information.

B2

THE COURT:  If I understand this right, supposing your
proof would show that in a certain place in one of these
streams there was an intermittent flow of water, well, the
owner of that land that borders on that stream has a riparian
right.  It may be a right that is of questionable value.  It
may be a right where the only time that water comes down the
stream is during the winter and the flood time, and he is not

1    apt to be irrigating his property at that time of the year.

2    Nevertheless, he has got a riparian right, whether there is a

3    stream flow there or not. Am I correct in that?

4        MR. MOSKOVITZ: Yes, sir.

5        THE COURT: So it doesn't make a lot of difference,

6    as I see it, as to the rights of these individual owners from

7    a legal standpoint, whether there is an intermittent flow or

8    what month it flows in particularly. He has got that right

9    anyhow.

10       MR. MOSKOVITZ: That is correct.

11       THE COURT: As a practical matter, it might be very

12   important to him.

13       MR. MOSKOVITZ: That is right.

14       THE COURT: So that answers your inquiry now as to how

15   it would affect other people.

16       MR. VEEDER: Well, that was George's inquiry. My

17   inquiry is this: He is coming forward, as I understand the

18   exhibits that have been lodged, with certain very technical

19   and, in my view, very tenuous conclusions. Now, if those

20   conclusions are predicated upon these completely spotty

21   records-- I am referring particular now, your Honor, to the

22   first page of Table E-3. I have no objection. The fact is,

23   I am just as anxious as anyone else to have the record com-

24   plete. But I submit that if some man is going to come up with

25   a conclusion, reliant upon these various spotty and very

1  sketchy statistics, which I confess I don't understand in many

2  regards, I think that we should have the basic data.  And I

3  realize it is a burden on the State to bring it in, but we

4  should have it.  We should analyze it, and we should know it

5  before this exhibit, particularly this part here, is admitted

6  in evidence.

7  MR. MOSKOVITZ:  Your Honor, I can set Mr. Veeder's

8  fears at rest.  The studies to come are not based upon these

9  data.  They are based upon the stream flow records maintained

10  by the United States Geological Survey at the gaging stations

11  that we already reviewed.

12  THE COURT:  And this document is going to be used

13  largely-- by this document I mean L, Appendix E-- is going to

14  be used largely in connection with Plate 6?

15  MR. MOSKOVITZ:  That is right.

16  THE COURT:  In connection with which of these streams

17  flow intermittently?

18  MR. MOSKOVITZ:  That is correct, your Honor.

19  THE COURT:  Therefore, upon L, Appendix E, there will

20  not be based minute mathematical calculations?

21  MR. MOSKOVITZ:  That is correct.

22  THE COURT:  Does that satisfy you?

23  MR. VEEDER:  No, I am going to object.  There is not

24  proper foundation on this. And you can dispose of the objec-

25  tion.

B

Z21

1    MR. SACHSE:  Your Honor, I would like to add one other

2    thing that I think is important here.  I just barely con-

3    sidered this.  I speak now not for Fallbrook but specifically

4    for my client, W. C. Severs, Stardust Ranch.  I notice the

5    Footnote B--

6        THE COURT:  What page?

7        MR. SACHSE:  Page E-32, indicates stream flow measure-

8    ments of Lancaster Creek.

9        THE COURT:  E-32?

10       MR. SACHSE:  E-32.  I am referring just to Footnote B.

11       THE COURT:  All right.

12       MR. SACHSE:  It indicates measurements upstream from

13   the Stardust Ranch diversion.  Now, if you will turn to the

14   preceding page, E-31, you will see that the third column of

15   figures is that one footnoted B, and it covers readings on

16   such periods as July, August, September, May, May, August,

17   April, July.  Now, I haven't analyzed this.  I don't know what

18   it is, but I am absolutely certain that Stardust Ranch would

19   like to have this material available when they go before the

20   Master.  And I think probably Mr. Stahlman, his client down-

21   stream from Stardust would like to have the Vail granted.  It

22   is extremely limited.  It doesn't prove much, but no one else

23   has offered any proof yet of the flow of these upper streams,

24   and Stardust has an appropriation.  That is the point I am

25   making now, your Honor.  It goes beyond being a simple

riparian.  He asserts that appropriative right.  Now, it seems

to me just reasonable, if this isn't going to hurt Mr. Veeder,

if he could get the foundation now so this material would be

available for the Master's hearing without drawing Mr.

Illingworth down again and putting all this in at a later date.

There may be many other cases when I go through this where the

same thing is true.

MR. VEEDER:  The only point I have made, and I repeat

it, your Honor, is that we are getting into a phase of the

lawsuit where 50 acre-feet one way or the other--

THE COURT:  You want the basic records?

MR. VEEDER:  Yes, I do.

THE COURT:  Let me ask you this now, Mr. Illingworth:

On your Table E-1-- I take it Table E-1 all concerns matters

sometime in between '50 and '54?

THE WITNESS:  Yes, sir, that is true.

THE COURT:  These were made by your team?

THE WITNESS: Yes, sir.

THE COURT:  Under your direction?

THE WITNESS:  Yes.

THE COURT:  Do you have those basic records?

THE WITNESS:  Yes.

THE COURT: They can be produced?

THE WITNESS:  Yes.

THE COURT:  Bring them in, then.

B

Z23

1      THE WITNESS:  Actually, I might be able to clarify

2  this.  Take page E-3, for instance, first page.  This is a

3  daily tabulation of the record at a station where there was

4  a recorder established.  It is pretty explicitly set forth

5  here.

6      MR. VEEDER:  I haven't referred to those.

7      THE COURT:  You are not concerned then, Mr. Veeder,

8  with the Table E-1, these recordings that were made?

9      MR. VEEDER:  As I see it, those were maintained in the

10  regular course of business.

11      THE COURT:  So the only question would be of errors in

12  copy, matters of that sort?

13      MR. VEEDER:  That is right.  I made no objection.

14      THE COURT:  All right.  Let's wind up Table E-1 by

15  saying this:  That the witness has said the original records

16  are available and if there is any contention of error or any

17  correction should be made a check can be made on them.  Is

18  that satisfactory?

19      MR. VEEDER:  Yes.

20      THE COURT:  With Table E-1?

21      MR. VEEDER:  I know of no--

22      THE COURT:  All right.  Now, Table E2, commencing on

23  page 27.  What are the original records on which those two

24  pages are based?

25      THE WITNESS:  Exactly the same as E-1, only these were

B

Z3# 24

1   very short records.  They were recordings that were only for

2   a short period of time.

3        THE COURT:  All right.  The same understanding we

4   had as to Table E-2, then?

5        MR. VEEDER:  Right.

6        THE COURT:  Now, we go to Table E-3.  As I understood

7   your testimony, this was a matter of gathering together what

8   you could find from various sources?

9        THE WITNESS:  Yes, sir.

10       THE COURT:  Some of it came from the Vail Ranch, from

11   Mr. Hall?

12       THE WITNESS:  Mr. Hall, yes.  Some of this, I recall

13   that this first data shown on page E-29 for Murrieta Creek

14   at Stream Mile 30.1 - 0.4 for 1914, '15, '17, and through

15   '19, were in a report by a consulting engineer made for Vail

16   Company.

17       THE COURT:  Do you have the original material on which

18   Table E-3 is based?

19       THE WITNESS:  $N_o$t all of it.  For instance, that

20   report was just loaned to me by Mr. Hall, and he has it, or

21   the Vail Company has it.  So if I were to go back to that, I

22   still wouldn't have basic information; I would have the

23   reports that I obtained it from.  Now, as to those records

24   from '52 on, they were obtained by our own crew, and we have

25   all the records there.

1     Now, taking page E-31.

2     THE COURT:  Now, wait a minute.  Those records from '52,

3     that would be 12/2/52 on, and that is the balance of page

4     E-29 and E-30?

5     THE WITNESS:  Yes, sir.

6     THE COURT:  Would you want the original records on those,

7     Mr. Veeder?

8     MR. VEEDER:  Well, if he has them available I would

9     like to look at those.

10    MR. MOSKOVITZ:  We do have them, do we not?

11    THE WITNESS:  We have them, yes.

12    THE COURT:  All right.

13    MR. MOSKOVITZ:  We will bring those in.

14    MR. VEEDER:  But in regard down to there you say the

15    Vail Company has that.  Is that right?

16    THE WITNESS:  Yes.

17    MR. VEEDER:  I want to ask you one question.  What

18    significance does that have, that column, your first column

19    there on E-29?  Does that mean anything at all to you or--

20    THE WITNESS:  It means something to me, yes, sir.  We

21    can compare the runoff for similar dates in later years.  And

22    by comparing the two we can make certain conclusions as to

23    how conditions may have changed since that date.  Old records

24    are often very useful for various and sundry purposes, and

25    it is hard to predict exactly what is useful.

1     MR. VEEDER:  That is my problem.  I am not quite sure

2   how I can predict what you are going to do with them.

3     THE WITNESS:  I can assure you we didn't pick and choose

4   these data.  These are all the data we could find.

5     THE COURT:  All right. At any rate, down through 1919

6   on Page E-29, that came from Mr. Hall's records, the Vail

7   Company, and from '52 on down to page E-30 it was your own

8   stuff?

9     THE WITNESS:  Yes, sir.

10     THE COURT:  And those records you will have available?

11     THE WITNESS:  Yes, sir.

12     THE COURT:  Now, take E-31,  There are some records

13   from '43 down to--

14     THE WITNESS:  Yes, this is in Hydrographic 2, Unit 2,

15   the area upstream from Vail Reservoir on the Wilson Creek

16   branch of the stream.  And the record shown from 1943, the

17   first one, through, I believe it would be through June 15,

18   1941-- '49.

19     MR. VEEDER:  What is your page, Mr. Illingworth?

20     THE WITNESS: E-31.

21     THE COURT:  E-31.

22     THE WITNESS:  All the records down through June 15,

23   1949, were obtained again from Mr. Hall's records.  I believe

24   in this case that all of these are from records obtained by

25   Mr. Green, the hydrographer, F. E. Green.

8689 A

B

Z27

1    THE COURT:  Mr. Hall would have the records that you

2    refer to?

3    THE WITNESS:  I believe I have photostatic copies of

4    all of these.

5    THE COURT:  Could you bring them in?

6    THE WITNESS:  Yes.

7    THE COURT:  All right.  From '50, 11/21/50 on down the

8    balance of page 31 and 32, this again was your team effort?

9    THE WITNESS:  Yes, sir.

10   THE COURT:  And those records are available?

11   THE WITNESS:  Yes.

12   THE COURT:  Turn to E-33.  Where are these earlier

13   records from?

14   THE WITNESS:  Early records again are from, the first

15   one in 1943 through June 15 of '49, are from the same source.

16   THE COURT:  Mr. Hall?

17   THE WITNESS:  That is Mr. Hall's records obtained

18   originally by Mr. Green.

19   THE COURT:  You have photostats of these, too?

20   THE WITNESS:  Yes, sir.

21   THE COURT:  Bring them in.

22   Then on page E-34, the data there are team efforts,

23   and E-35?

24   THE WITNESS:  Yes, sir.

25   Now, near the bottom of the page or at the bottom of

B

Z28

1    the page we have--

2          THE COURT:  E-35?

3          THE WITNESS:  Yes.  --we have records about, well,

4    fairly frequent intervals, every few weeks; and these were

5    obtained by our staff.

6          MR. VEEDER:  You have the data for those?

7          THE WITNESS:  Yes.

8          THE COURT:  All right, E-36.

9          MR. VEEDER:  May we have those data?

10         MR. MOSKOVITZ:  We will bring those in.

11         MR. VEEDER:  35, 36.

12         THE COURT:  He will bring in all that material he says

13   he has.  That is the understanding.

14         Now, E-36 has some records that go back to '48.

15         THE WITNESS:  Here again, the 1948 records were from

16   Mr. Hall or from Mr. Green via Mr. Hall.  And those from '50

17   on are our own records.

18         THE COURT:  There are just two items there that came

19   from Mr. Hall?

20         THE WITNESS:  I believe that is true.  I am not

21   absolutely certain about this break-off date, but we will

22   check that.

23         THE COURT:  You will bring that material in?

24         THE WITNESS:  Yes, sir.

25         THE COURT:  No, on E-37, we have got some very old

B

Z29

1    ones here.

2         THE WITNESS:  Yes.  This is Temecula.

3         THE COURT:  E-37, E-38, E-39, and E-40 down through

4    September 3rd of '48.  Where did these come from?

5         THE WITNESS:  The earliest records, those footnoted A,

6    are from Water Supply Paper 300.  That is the United States

7    Geological Survey publication.

8         MR. VEEDER:  You are back on E-37, Mr. Illingworth?

9         THE COURT:  Yes.

10        THE WITNESS:  Now, the first two figures, 1894 and

11   1898, I believe were in Mr. Hall's records, again probably

12   one of the early reports that he has.  Then, through 1906 are

13   the ones from Water Supply Paper 300.  And the following

14   records from 1908 through 1920, on page E-39, were from

15   publications that Mr. Hall has.  And from 1943 through

16   September 3, 1948, are from Mr. Hall's records taken originally

17   by Mr. Green. Following that, starting in January 24, '51,

18   they are from the Division of Water Resources' records.

19        THE COURT:  Bring in such material as you have on that,

20   will you?

21        THE WITNESS:  Yes, sir.

22        THE COURT:  Now, E-41, you have two old dates in there.

23        THE WITNESS:  They would be similarly obtained and

24   records, or I obtained them from records of Mr. Hall.  And

25   starting in June 19, 1953, would be from our own records.

1    THE COURT: Down at the bottom you have some old

2    records-- 1894 to 1917.

3    THE WITNESS: Yes, sir.  These are records at the

4    location of the station now called Santa Margarita River

5    near Temecula.  At that time it was referred to as Temecula

6    Creek at Railroad Canyon.  And these are records obtained

7    prior to the continuous operation of the station.  I believe

8    these again were-- let's see now.

9    THE COURT: "The available U.S.G.S. publication since

10   '23."  These were all part of 23?

11   THE WITNESS:  I believe what happened, they went back

12   and published the summary of some of this previous informa-

13   tion, according to my footnote.  I don't have a clear

14   recollection of that.  I can check that, however.

15   THE COURT: Bring in whatever you have on that.

16   THE WITNESS: Yes, sir.

17   THE COURT: With reference to source.

18   And E-42?

19   THE WITNESS:  Through 1918, the source would be Mr.

20   Hall's records.  And from '53 on would be our own records.

21   THE COURT:  E-43?

22   MR. MOSKOVITZ:  Now, we are getting into spring

23   discharge measurements, your Honor, starting on E-43.  That

24   is Table E-4.

25   THE COURT:  That is another table?

1      MR. MOSKOVITZ:  Another table.

2      MR. VEEDER:  Did your offer include these spring tables,

3  Mr. Moskovitz?

4      MR. MOSKOVITZ:  Yes.  I offered the entire Appendix D.

5      THE COURT:  Well, then, where did you get the data for

6  the springs?

7      THE WITNESS:  These were obtained by our staff, some

8  of the measurements.

9      THE COURT:  All was staff effort?

10     THE WITNESS:  Yes, sir.  I made some of these measure-

11  ments myself.

12     THE COURT:  Do you have any records on these?

13     THE WITNESS:  Yes.

14     THE COURT:  Can you bring them in?

15     THE WITNESS:  Yes.

16     MR. VEEDER:  I think I would like to ask a couple of

17  questions on this, if I may, your Honor.

18     THE COURT:  Yes.

19     MR. VEEDER:  If you look at the top line there somebody

20  determines that there is a trickle, then dry, trickle, trickle,

21  dry, dry, trickle, trickle, trickle.  "Trickle" is scarcely a

22  scientific term.

23     THE COURT:  What would you call it?

24     MR. VEEDER:  Well, I am going to ask Mr. Illingworth

25  to tell me what he means by a "trickle."  I don't know.

B

Z32

1    THE COURT:  He may, but let me ask you this:  In view

2  of the background that the witness has given us to his source

3  material, can't we receive this in evidence subject to any

4  checkups you want to make on this material and motions to

5  strike?

6    MR. VEEDER:  Well, yes.

7    THE COURT:  It seems to me that this has been compiled

8  in a scientific manner.  You get to gether all the materials

9  that you possibly can and, in any case of a compilation of

10  that sort you are at the mercy of the accuracy of somebody

11  in the past who gathered some material up.  It is no different

12  than a lawyer citing a case reading something that some judge

13  has written.  You don't always go back and see whether he

14  accurately read the cases he relied upon.

15    MR. VEEDER: It depends on what he said, your Honor.

16  Well, he can put it in.  If he can come up with a conclusion

17  as to what a "trickle" is, I will appreciate it.

18    THE COURT:  You offer F?

19    MR. MOSKOVITZ:  I offer E.

20    THE COURT:  E?

21    MR. MOSKOVITZ:  Yes, sir.

22    THE COURT:  E received in evidence subject to a motion

23  to strike all or any part of it, depending on such checkups

24  as counsel desire to make in connection with--

25    THE CLERK:  Your Honor, he said E.  I believe that is

B

Z33

L, Appendix E.

THE COURT:  L, Appendix E. --with the material that will be produced.

MR. MOSKOVITZ:  May we have a recess?

THE COURT:  Yes.

(Recess.)

BY MR. MOSKOVOTZ:

Q  Mr. Illingworth, referring now to California's Exhibit AB for identification, which is on the wall to the Court's left.

Your Honor, when this is being described you may want to come a little closer.  Although it is a large map, some of the points show up better when you are standing in front of the jury box.

Q  Is this Exhibit AB for Identification an enlargement of one of the plates which is in California's Exhibit L?

A  Yes, it is; it is Plate 6 in Exhibit L.

THE COURT:  Plate 6 is in evidence, isn't it?

MR. MOSKOVITZ:  No, your Honor, not yet.

THE WITNESS:  With certain minor revisions.

BY MR. MOSKOVITZ:

Q  Would you point out the differences between California's Exhibit AB for Identification and Exhibit L, Plate 6?

A  First, Plate 6 in the report is a two-color plate, black and red  The items that are shown in red in the Bulletin are also-- that is, the springs are red here, as in the bulletin.  But the boundaries of the political subdivisions that are shown-- the Santa Margarita Mutual Water Company, the Vail Company, the Naval Reservation, Fallbrook Public Utility District, Rainbow Municipal Water District-- are

Z21

C

1   shown in separate colors here, whereas they are shown in

2   different types of red cross-hatching in the Bulletin. Stream

3   gage station names have been added here for convenience.

4       Q  Added on California's Exhibit AB?

5       A  Yes.

6       MR. STAHLMAN:  Did you say political subdivisions?

7       THE WITNESS:  I should say propertylines of districts.

8       THE COURT:  Do you have the same number of spring

9   references as you have on the plate?

10      THE WITNESS:  Yes, it is exactly the same.

11      MR. STAHLMAN:  On plate 6 your cross-hatches there are

12  for water service organizations.

13      THE WITNESS:  Yes.

14      MR. STAHLMAN:  You change that over here.

15      THE WITNESS:  No; it is the same here, I believe.

16      MR. VEEDER:  Vail Company is shown as being a water

17  service organization on Plate 6.

18      THE WITNESS:  The only significance to that is that these

19  or organizations or individuals who serve water, not neces-

20  sarily to others, but who have substantial water systems.

21  BY MR. MOSKOVITZ:

22      Q  Will you point out the other information which is

23  depicted on California's Exhibit AB, Plate 6 of Exhibit L?

24      A  In addition to these boundaries that I referred to,

25  we have, first off, the watershed boundaries shown in green,

C

Z22

1    we have the hydrographic unit boundaries shown in green.

2         Hydrographic Unit 1 is the Murrieta Creek Drainage

3    bounded on the southwest by the Santa Rosa Plateau and on the

4    southeast by the watershed boundary between Temecula Creek

5    and Murrieta Creek.

6         Hydrographic Units 2, 3 and 4 together constitute the

7    drainage area of Temecula Creek above the confluence with

8    Murrieta Creek to form the Santa Margarita River.

9         Hydrographic Unit 4 is that portion of the Temecula

10   Creek watershed which is downstream from Vail Dam.

11        Hydrographic Units 2 and 3 constitute the remainder of

12   the area upstream from Vail Dam.

13        Hydrographic Unit 3 is that portion of Upper Temecula

14   Creek itself, and Hydrographic Unit 3 is the remaining area

15   upstream from Vail Dam which is drained by what has been

16   variously known as Wilson Creek, Lancaster Creek and Coahuilla

17   Creek.  On this map it is called Lancaster Creek.

18        MR. VEEDER:  And Coahuilla Creek, did you say?

19        THE WITNESS:  Yes.  This stream system here has been

20   called Coahuilla Creek all the way down sometimes.  At other

21   times this portion of it has been called Lancaster Creek.

22        THE COURT:  The lower portion?

23        THE WITNESS:  Yes, sir, below the confluence with what

24   is called Wilson Creek on this plate.  And now I believe that

25   the latest Geological Survey map which came out after this,

1   which was published, calls this section below the confluence

2   with Wilson Creek as Wilson Creek.

3   BY MR. MOSKOVITZ:

4        Q   What is the date on this map?

5        A   This information is as of 1953, and the District

6   boundaries shown here are as of that date and do not neces-

7   sarily represent today's conditions.  They are approximately

8   the same locations, however.

9        Q   Will you continue to describe the hydrographic units

10  as shown on California's Exhibit AB?

11       A   Yes.  Hydrographic Units 5 and 6 constitute the area

12  downstream from the confluence of Temecula and Murrieta Creeks,

13  Unit 5 being that portion of the coastal area upstream from the

14  location of the De Luz Dam Site at this point, and hydrographic

15  unit 6 constituting the remainder of that portion between

16  De Luz Dam Site and the ocean.

17       MR. STAHLMAN:  What was the basis upon which these

18  hydrographic units were determined?  Was that the watershed

19  boundaries within the large boundaries?

20       THE WITNESS:  Yes, sir.  They are watershed boundary

21  lines, for the most part.  I can point out this line running

22  from stream mile 30.1 between 1 and 5, which is the meandering

23  line across Santa Rosa Plateau.  It is a watershed line between

24  what drains inland toward Murrieta Creek and coastward toward

25  De Luz and Sandia Creek.

Illingworth   Direct                    8700

1          The boundary line between 1 and 4 is likewise the

2     watershed line, and in this case it is between the streams

3     that drain to Murrieta Creek to the northwestward and to

4     Temecula Creek toward the southeast.   The line is the boundary

5     between Units 1 and 4 for a portion and then becomes the

6     boundary between Units 1 and 2 from there to the vicinity of

7     Red Mountain in the San Bernardino National Forest.

8          The line between Units 2 and 3 divides the drainage to

9     Lancaster, Wilson and Upper Temecula Creek.   It is a watershed

10    line.   The line going northward and southward from Vail Dam

11    is a watershed line.

12         The line between Hydrographic Units 2 and 4, and 3 and

13    4, is the line which follows a surface divide.   In this case

14    it is defined as the surface divide starting at Vail Dam and

15    follows along the river and you end up on Agua Tibia Mountain

16    on the south, and the line running northward from Vail Dam

17    intersects the line between the Murrieta Creek and the

18    Temecula Creek drainage in the vicinity of Oak Mountain.

19         Q  Would you point out what the red dots distributed

20    throughout the watershed are?

21         A  Those simply represent the location of springs.   I

22    might point out that they are much smaller than they appear

23    on this map.

24         MR. VEEDER: You mean that the dots are larger than the

25    springs?

THE WITNESS:  Yes.  Most of these springs are very small flowing springs.

BY MR. MOSKOVITZ:

Q  Would you point out the stream gaging stations that are spotted throughout California's Exhibit AB?

A  Yes.

Q  Starting from the ocean, perhaps.

A  Starting from the ocean, we have the location here, indicated by the black triangle entitled "Santa Margarita River at Ysidora."

Proceeding upstream, we have a station that I referred to yesterday as having been in operation for only a couple of years.  This is very close to the De Luz dam site.  It was entitled "Santa Margarita River near De Luz Station."

Proceeding upstream to the confluence of De Luz Creek at Stream Mile 3.2 and on up that stream approximately a half a mile, we have a station on De Luz Creek called "De Luz Creek near Fallbrook."

Going back to the Santa Margarita River up to Stream Mile approximately 20.2, we have the location of the gaging station called "Santa Margarita River near Fallbrook."

Then proceeding upstream, we have the station just below the confluence of Temecula and Murrieta Creek at Stream Mile approximately 30.0, the station entitled "Santa Margarita River near Temecula."  This is at the head of the Temecula

C

Z26

1    Gorge and follows southwesterly from that point.

2         Proceeding northerly from this confluence, at Stream

3    Mile 30.01 upstream on Murrieta Creek we find the location

4    of the station "Murrieta Creek at Temecula."

5         Q  Why don't you proceed up Murrieta Creek?

6         A  All right.  All the stations I have mentioned to

7    this point have been operated by the United States Geological

8    Survey.

9         Proceeding upstream on Murrieta Creek, we find the

10   location of three stations which were established during the

11   investigation by the Division of Water Resources, none of

12   which are on Murrieta Creek itself.  The first and most

13   southerly one is on Santa Gertrudis Creek.  The station was

14   located at the Highway 71 Bridge.

15        The second one is on Warm Springs Creek located also

16   at the Highway 71 Bridge again.

17        The third one was on the creek that drains Cole Canyon.

18   This has also been called Slaughterhouse Canyon, but the local

19   information is that this is Cole Canyon-- that Slaughterhouse

20   is something else.  This station we entitled "Cole Canyon

21   Creek near Murrieta."

22        Q  Are any of these last three stations in operation

23   now?

24        A  No.

25        Q  How long were they in operation?

1    A    Approximately two years.   The records in Defendant's

2    T indicate.

3    Q    Proceeding up Temecula Creek, willyou point out the

4    gaging stations there?

5    A    The next station upstream from the confluence of

6    Murrieta Creek is located at Vail Dam, or it is immediately

7    downstream from Vail Dam.   Until the construction of Vail

8    Dam in 1948 the stream gaging station was located in Nigger

9    Canyon a few hundred feet downstream from the dam.   This was

10    called "Temecula Creek at Nigger Canyon."

11    Upon construction of the dam that gaging station was

12    maintained, but the Geological Survey commenced to publish a

13    record entitled "Santa Margaraita River at Vail Dam," which

14    gives the monthly runoff into the Vail Reservoir.

15    THE COURT:   That eliminated the station downstream?

16    THE WITNESS:   No, sir; it is still there, but they

17    don't report it.   Apparently they maintain it in case of

18    flood flows, they will measure it.

19    THE COURT:   You say they don't report it.   Do they read

20    it?

21    THE WITNESS:   They do read it. Actually, it is in-

22    directly reported in the Vail Dam record because they measure

23    the releases at that station.   Those releases are measured

24    in two ways:   By the Geological Survey, and also by the meter.

25    That is the Geological Survey station, and that is the furthest

C

Z28

1   upstream station.  No, they have a new one since this map was

2   prepared, since this investigation was made, and we did locate

3   that here.  That is the station I am pointing to now near

4   Radec.  It is entitled "Temecula Creek near Aguanga," Aguanga

5   being the nearest post office.

6   BY MR. MOSKOVITZ:

7       Q   Who maintains this last station?

8       A   The United States Geological Survey.

9       Q   How long has that been in operation?

10      A   It has only been in operation about a year.

11          Immediately downstream, approximately half a mile from

12  that point, is another black triangle indicated.  This is the

13  location of the station operated by the Division of Water

14  Resources for approximately two years.

15      Q   It is no longer in operation?

16      A   No, sir.

17          Correction.  This has been operated, I believe, about

18  four years.  It was started earlier than the other two stations.

19  It is entitled "Temecula Creek near Radec."  The records for

20  the station appear in Plaintiff's Exhibit E.

21          Proceeding upstream, we have another station located

22  along Temecula Creek.  This is one of the short record stations

23  referred to in Appendix E.  It was entitled "Temecula Creek

24  below Aguanga Valley."

25          We have similarly a short record station--

C

Z29

1    Q  What do you mean by "short record"?

2    A  Less than a year.

3        The second station was a short record station entitled

4   "Temecula Creek above Aguanga Valley," and that was operated

5   for a period of a few months.

6        Again proceeding upstream on Temecula Creek, about a

7   mile or two southeast of Aguanga, we have another station

8   indicated.  This one was operated the same length of time as

9   the station near Radec.

10   Q  How long is that?

11   A  Approximately four years.

12   Q  But no longer in operation?

13   A  That is correct.

14   THE COURT:  What is it called?

15   THE WITNESS:  It is called "Temecula Creek near Aguanga."

16   We have the last station located.

17   THE COURT:  That is what you call the station "Temecula

18   Creek near Aguanga"?

19   THE WITNESS:  I believe we have two of them named the

20   same thing.  This station I last referred to was the Division

21   of Water Resources station, a temporary station operated for

22   about four years.  This other station is the new station

23   established by the Geologic Survey and it does appear that

24   they selected the same name.

25   THE COURT:  Let's write U.S. over this one right there--

8706

Illingworth – Direct

1    put "U.S." after it.

2         MR. VEEDER:  U.S.A.

3         THE COURT:  All right, U.S.A.

4         And put "California" after the one below the stream

5    that has the same name.

6         THE WITNESS:  I have written "U.S.A." following the

7    description of the station near Radec, and "(California)"

8    following the name "Temecula Creek near Aguanga" on the

9    station which is approximately two miles southeast of Aguanga.

10        We have one further station.  It is upstream from the

11   previous station and downstream from Oakgrove Valley.  This is

12   at approximately Stream Mile 54.  It is entitled "Temecula

13   Creek near Oakgrove Valley."  It was operated for approximately

14   four years.

15   BY MR. MOSKOVITZ:

15        Q   And is no longer in operation?

17        A   That is correct.  Going back to Lancaster Creek, we

18   have a station which operated for only a short period of time.

19        Q   Less than a year?

20        A   I believe it was somewhat more than a year.  It does

21   not appear with the short record stations.  It was washed out

22   in 1952.  It is called "Lancaster Creek near Radec."

23        We have one more station, and it is on Coahuilla Creek

24   downstream from Anza Valley at Stream Mile approximately 11 on

25   Coahuilla Creek as measured upstream from Vail Dam.  This

C

Z31

1    station is entitled "Coahuilla Creek near Anza."

2         Q  How long was that operated?

3         A  Approximately four years.

4         Q  It is not operated any longer?

5         A  That is correct.

6         Q  Will you describe the stream mile system that you

7    use when you come to a tributary of the Santa Margarita system?

8    I think you have already explained how you measured the stream

9    mile on the main stem.

10        A  Yes.  To describe the location of the station "De

11   Luz Creek near Fallbrook," for instance, which lies approximately

12   half a mile upstream from the confluence of De Luz Creek and

13   Santa Margarita River, we would say that is located at Stream

14   Mile 12.2--0.5, indicating half a mile upstream from the

15   confluence.

16        We use this same system to locate water samples that we

17   obtained from the rivers.  For instance, to give another

18   example, we might have a sample obtained one mile on Warm

19   Springs Creek, one mile above the confluence with Murrieta

20   Creek.  This would be called Stream Mile 30.1--4.8--0.10.  It

21   would be called Warm Springs Creek at that stream mile.

22        Q  What do the stream symbols in black and in red, as

23   shown on California's Exhibit AB, indicate?

24        A  They indicate the magnitude of the typical summer

25   flow situation on the streams in the watershed.

1    Q  And what year was taken for this particular map?

2    A  The year 1953.  This was a relatively dry year and

3  it was a year during the period of our investigation where we

4  had a number of records.

5    Q  What is indicated by the lines that are solid and

6  then dotted?

7    A  These are streams which are intermittent, which have

8  no perennial flow.

9    Q  What flow did they have in the summer of 1953?

10   A  The ones with a dash and dot had no flow in the

11  summer of 1953.

12   Q  Would you explain the magnitude of flow indicated

13  by the various red lines for streams?

14   A  Yes.  By the red indication, by varying the width

15  of the red lines, we have indicated varying rates of flow.

16  The narrowest line is from one onehundredth to .5 of a cubic

17  foot per second.  The intermediate width line is from .5 to

18  4 cubic feet per second, and the widest line represents 4 to

19  6 cubic feet per second.

20   Q  From what sources did you get the information that

21  you based the width of the lines drawn on California's Exhibit

22  AB?

23   A  From information obtained by measuring creeks and

24  estimating flows in the creeks obtained by the staff of the

25  Division of Water Resources and by myself.

8709

THE COURT:  The only one big line, 4 to 6 cubic feet per second, is from the junction of the Murrieta and the Temecula down.  Describe that point.

THE WITNESS:  It is at stream mile about 20.8.

MR. STAHLMAN:  Near Fallbrook?

THE WITNESS:  Yes, sir; just above Sandia Canyon.

THE COURT:  Then below that it drops down to an intermediate rate of flow?

THE WITNESS:  Yes, sir.

BY MR. MOSKOVITZ:

Q  Doesn't the four to six second-foot flow start above the confluence of the Murrieta and Temecula Creeks on this map?

A  Yes, it starts just above Highway 395 and just below the Pala-Temecula Road.

Q  Through Pauba Valley would you describe the flow?

A  Yes.  At the time this map represents, 1953, the point of rising water was just upstream from the crossing of Highway 71 and Temecula Creek.

MR. VEEDER:  I would like to tender this thought-- I think these are sufficiently identified-- there are many instances where I would like to ask some questions.

THE COURT:  What time in 1953?  In the summer of 1953?

THE WITNESS:  In the summer, yes.

THE COURT:  Is the map sufficiently identified now?

Illingworth - Direct   8710

MR. VEEDER:  I think he is now putting in some evidence in regard to stream flow and matters such as that.  I have no objection to the identification.  But once he gets in to the question of the number of second-feet, it immediately becomes important as to the source of the data and the time of year and the circumstances under which those lines were drawn, and I think that is a proper matter for voir dire.

MR. MOSKOVITZ:  I will ask another question for foundation and then I will offer the exhibit.

Q  Under whose direction was this map prepared?

THE WITNESS:  Under my direction.

Q  And is it correct, to your knowledge?

A  Yes, it is.

MR. MOSKOVITZ:  I offer California's Exhibit AB, then.

THE COURT:  You don't offer it as being exact proof of the stream flow of any of these streams?

MR. MOSKOVITZ:  No, sir, not as exact flow.

THE COURT:  Just as being generally illustrative?

MR. MOSKOVITZ:  Yes, sir, and to illustrate the other matters appearing thereon.  These boundaries are not supposed to be precise, just general.

THE COURT:  Any objection?

MR. VEEDER:  I would like to ask a question about it, or else have that legend changed.

THE COURT:  What?

1    MR. VEEDER:  Here he has it .01 to .05, and then he

2    has half a second-foot to four second-feet running from

3    Fallbrook's pumping station down to the gallery of the NAD.

4    That is extremely important to us.  We don't believe that is

5    the circumstance that prevailed, and I don't believe the data

6    in the record will support it.

7        THE COURT:  That is why I asked him the question

8    whether this was generally illustrative of the situation and

9    not offered as definite proof of any stream flow.

10       MR. VEEDER:  May I ask him to change the legend, then?

11       THE COURT:  He can write on there, if it will make

12   you feel better, general information.

13       MR. MOSKOVITZ:  I want to ask the witness a question,

14   your Honor.

15       Q  Are those limits supposed to represent the limits

16   that prevailed in the summer of 1953, the limits that are

17   shown in the legend as to stream flow?

18       A  They represent the general average flow at that time.

19   I am not saying there was not some day when it was less or

20   more, but inspection of the records indicates that it was

21   about of this magnitude.

22       MR. VEEDER:  But our records also show that we had to

23   pump water up to the NAD to get water up there.

24       MR. SACHSE:  Your records don't show that for 1953.

25       THE COURT:  I am trying to get this into the evidence

C

Z36

1   so we can go on with the case.  Now you asked a question and

2   we are back in trouble again.  Because if you want to prove

3   stream flow, obviously you have to prove it by certain days

4   and certain amounts.  You are not going to be able to prove it

5   by a chart, are you?

6           MR. MOSKOVITZ:  That is correct, your Honor.

7           THE COURT:  Then your chart is only generally

8   illustrative of the places in the watershed where sometime

9   during the summer of 1953 there was some flow as indicated.

10  You don't claim that every day in 1953 there was flow of the

11  second-feet that you indicate?

12          MR. MOSKOVITZ:  No.  But I don't know that we say just

13  sometime during that summer.  I think this is supposed to be

14  typical.

15          THE WITNESS:  Yes.

16          MR. VEEDER:  But there is no measurement at the NAD.

17  So how could you have that straight line all the way down?

18          THE WITNESS:  There are conditions of record at this

19  point.

20          MR. VEEDER: That is right.  But go down another two or

21  three miles.

22          THE COURT:  Let me try again.  For stream flow at any

23  particular place for any particular date can we agree that we

24  will rely upon some other record other than this map?

25          MR. MOSKOVITZ:  Yes, your Honor.

C

Z37

MR. VEEDER:  Just write up there that it is a general estimation.

THE COURT:  That's what I suggested.

MR. MOSKOVITZ:  General estimation is quite general.  I think the witness has testified to more than that, your Honor.

THE COURT:  It has to be general.  He put the map on for 1953.  Are you going to contend, therefore, that where he has drawn a red line that means every day in 1953 the flow was that amount?  He has already said that it was generally in the summer.  Are you going to list on the map what days of the summer?

MR. MOSKOVITZ:  No, your Honor.  I think this witness has said this is the general situation throughout the summer.

MR. STAHLMAN:  He said more than that.  He said that this was a dry year.  This year succeeded a year of rather heavy rainfall.

THE COURT:  If you can't get together, I will overrule the objection and receive it in evidence, but I will inform you I am not considering the map as any proof of stream flow at any particular time or at any particular place.

MR. VEEDER:  May I have that drawn on that?

THE COURT:  In view of what I have done, you don't have to have that drawn on there.

MR. SACHSE:  You used the word "summer," Mr. Illingworth.  Can you be more specific?  Do you mean the period

1    of low flow, such as August, September, October?  Or do you

2    mean June, July, August?

3          THE WITNESS:  July, August, September, generally

4    speaking.

5          MR. SACHSE:  July, August, September flow is what you

6    are attempting to indicate on that map?

7          THE WITNESS:  Yes.

8          MR. SACHSE:  That's all I have.

9          MR. VEEDER:  Here we have summer flow, and we know it

10   is a general statement.  We know that that legend can be used

11   a year from now to our great detriment.  I would much prefer,

12   if your Honor would hear my request, to have it marked again

13   that this is a general statement from July, August and

14   September.

15         THE COURT:  Well, it has to be, because it doesn't

16   purport to be the flow at any particular time, and you have

17   more specific records in evidence from which the map was

18   drawn.

19         MR. MOSKOVITZ:  That is correct.

20         THE COURT:  Let's have him write on there.  Let's put

21   Mr. Veeder's mind at rest.

22         MR. MOSKOVITZ:  All right, your Honor.

23         THE COURT:  General statement, July, August and

24   September-- are those the months?

25         MR. MOSKOVITZ:  That was the months which were testified

1   to.

2       Q  Is that right, Mr. Illingworth-- July, August and

3   September?

4       THE WITNESS:  Yes, that is generally it.

5       What shall I write on here?  -- Depicts typical summer

6   conditions, not necessarily the record of any one day?

7       MR. MOSKOVITZ:  Your Honor, I think the record may be

8   enough here.

9       MR. VEEDER:  Just go ahead and write up there what his

10  Honor said.

11      THE COURT:  Can you write up there without affecting

12  your conscience, "General Statement as of July, August and

13  September"?

14      THE WITNESS:  Yes, I will insert here after "Summer"--

15      THE COURT:  Just put a bracket after those three red

16  lines.  Can you do that without damaging your conscience?

17      THE WITNESS:  Yes.  By "summer" I mean July, August,

18  September.

19      THE COURT:  Can you put in front there "General state-

20  ment, July, August and September"?  Then I think Mr. Veeder

21  will quit objecting and we can get on with this case.

22      MR. VEEDER:  I have one more little proposition I have

23  to bring up.  It has nothing to do with this.

24      THE COURT:  Can you bring it up between now and 12

25  o'clock?

Illingworth - Direct

8716

C

Z40

1      MR. VEEDER:  Yes.  It will take only about one swish.

2      How about Plate No. 6, which has been marked for iden-

3  tification?  It has been superseded, as I understand it.

4      MR. MOSKOVITZ:  I would like to offer that, too.

5      MR. VEEDER:  I certainly am going to object to that.

6      THE COURT:  What is the difference?

7      MR. VEEDER:  Isn't it superseded, Mr. Moskovitz?

8      MR. MOSKOVITZ:  There is a little more information on

9  this one.  I have no objection.  Plate 6 can go out.

10      THE COURT:  All right, California's Exhibit AB is

XXXXXXXX   11  received in evidence.

12      MR. VEEDER:  And Plate L is out.

13      MR. MOSKOVITZ:  You mean Exhibit L, Plate VI?

14      MR. VEEDER:  Yes, Exhibit L, Plate 6 is out.

15      THE COURT:  It is still marked for identification, but

16  apparently will not be offered.

17      MR. VEEDER:  That is right.

18      MR. MOSKOVITZ:  That is right.

19      THE COURT:  All right.

20      MR. MOSKOVITZ:  I wonder what Mr. Veeder has found in

21  Plate 6.

22      Did you take a recess for lunch, your Honor?

23      THE COURT:  Yes, we will adjourn until 2 o'clock.

24      Mr. Krieger called and said he has a trial the week

25  of March 16th, 17th, so he couldn't start then.  Vail, as I

1   understand, is going to start the week of the 24th.  Accord-

2   ingly, he is going to see if he can start and put his case

3   on during the week of March 10th.  But he isn't sure.  He

4   may have to ask a waiver of the ten-day rule on some of these

5   exhibits.

6           MR. VEEDER:  We will give him that.

7           THE COURT:  This would mean then that California's

8   case would finish up the middle of next week.

9           MR. MOSKOVITZ:  On direct examination , I think before

10  that.

11          THE COURT:  So that we might have to take an adjourn-

12  ment next week and the week after, and I might have to go back

13  trying criminal cases.  The arraignment calendar will be on

14  the 24th in any event.  So that's all I know.  Mr. Krieger is

15  going to let us know on Monday.  He said Monday, and I didn't

16  think about Monday being a holiday.  He said he would call

17  me Monday as to the situation.  You gentlemen can talk to

18  him again.

19          MR. SACHSE:  I will check with him again this weekend.

20          (Noon recess.)

21

22

23

24

25

C

Z42

1   SAN DIEGO, CALIFORNIA, WEDNESDAY, FEBRUARY 18, 1959.   2:00 P.M.

2

3      (Criminal matters.)

4     THE COURT:  Proceed.

5     THE CLERK:  The case on trial, No. 1247-SD-C, United

6  States of America vs. Fallbrook Public Utility District, et

7  al.

8     MR. SACHSE:  Your Honor, before Mr. Moskovitz starts,

9  my calendar evidently did not note correctly what you told

10  us regarding your plans for April.  As I have it, you are

11  going to be gone for three weeks starting the 6th, but did

12  you give us a date of May 4th that we would start this

13  proceeding again?

14     THE COURT:  No.

15     MR. SACHSE:  Well, I have something wrong.

16     THE COURT:  I told you I would be gone beginning April

17  6th for three weeks and I would rather not start again the

18  27th, so it would be about May 5th, a Tuesday.

19     MR. SACHSE:  Thank you, sir.

20

21       LELAND ILLINGWORTH,

22  recalled as a witness in behalf of the defendant State of

23  California, having been previously sworn, testified further

24  as follows:

25

C

Z43

8718

Illingworth    Direct

DIRECT EXAMINATION (Resumed)

BY MR. MOSKOVITZ:

Q  Mr. Illingworth, referring to California's Exhibit AB, did you have stream flow measurements for all the reaches which on California's Exhibit AB are indicated to have surface flow during the summer of 1953?

A  We did not have measurements of all those reaches that are indicated.  Generally we had one or two measurements on each reach, but in some cases we did not have a measurement taken during the period of July through August and we used what measurements we had for other periods and from the knowledge of the general area and observations at other times and in other years the map was drawn according to our best judgment.

MR. VEEDER:  The answer is no; is that right?

THE COURT:  That would be a short answer.

BY MR. MOSKOVITZ:

Q  With respect to the flow of the stream from the vicinity of the confluence of the Temecula with the Murrieta downstream to the vicinity of Fallbrook, what adjustments, if any, did you make from the actual records?

A  With reference to the actual records of the discharge at the stream gaging station at the head of the gorge, entitled "Santa Margarita near Temecula," it indicates that generally speaking the flow was in the vicinity from 12 to 14

C

Z44

1 cubic feet per second during August and September, 1953. This

2 was an abnormal situation. It was not typical. It was caused

3 by release of water from the Metropolitan Water District's

4 aqueduct, San Diego branch, to the Fallbrook Public Utility

5 District, and we corrected for that. The wide red line at that

6 location, this 4 to 6 cubic feet per second, does not repre-

7 sent 14 or 12, as the records show.

8          Q  You have detailed knowledge, do you not, of the

9 Santa Margarita River watershed and the stream flow character-

10 istics from your investigation?

11          A  Yes.

12          Q  In your opinion what is the reason for the fact that,

13 as depicted on California's Exhibit AB, you have interspersed

14 reaches of various streams, areas of surface flow and areas

15 where there is no surface flow during the summertime?

16          A  Reference to a topographic map would show that

17 these reaches on Upper Temecula Creek, for instance-- for

18 instance, the flow out of Dodge Valley and the flow in the

19 vicinity of Oakgrove Valley-- are in canyon sections where

20 the valleys narrow down and the flow is on the surface

21 through these reaches.

22          Taking the stream gaging station entitled "Temecula

23 Creek near Oakgrove Valley" and following downstream for

24 some distance there, we find that there is no flow indicated.

25 The reason for this particular one is that the water was being

C

Z45

1    diverted at that point and the stream was dry for awhile.

2         Then we go into a canyon section and it is a live stream

3    at the lower end of which the flow is diverted, but also it

4    opens up into a wide valley and had there been no diversion,

5    as there was not at certain periods of the year, the water

6    still would have percolated into that basin.

7         This reach of the stream across Aguanga Valley I

8    observed many times at various times of the year, and I never

9    observed flow across it.  I saw evidence that there had been

10   flow after some storms.  But this reach is through a very

11   porous stretch of the stream.

12        Down below Aguanga Valley again--

13        MR. VEEDER:  Let's hold up there.  You had a pretty

14   simple question.

15        I would like to have that simple question read back,

16   please.

17        (The reporter read the pending question.)

18        MR. MOSKOVITZ:  That is a responsive answer, your Honor.

19        THE COURT:  I think he has answered.  He has told how

20   the valleys narrow down.

21        MR. VEEDER:  I think that is about the extent of it,

22   your Honor.

23        THE COURT:  What is the difference on that Exhibit AB

24   between the solid black lines and the dotted black lines on

25   stream beds, Mr. Witness?

C

Z46

1   THE WITNESS:  As an example, up here on Upper Coahuilla

2   Creek?

3   THE COURT:  Yes.

4   THE WITNESS:  There is no difference.  This is a symbol.

5   It is a long dash with three dots and then a long dash.

6   THE COURT:  I see.  All right.

7   BY MR. MOSKOVITZ:

8   Q   Had you finished your answer illustrating the causes

9   for the--

10   A   I gave certain examples of the causes.  One cause

11   being that at certain places you have a diversion out of the

12   stream which would dry the flow.

13   Another cause, and a more general one, is that the

14   stream is a large stream, that is, the water flows on the

15   surface through the canyon sections and when the stream reaches

16   a point where the canyon widens into a valley the waters seep

17   into the sands of the valley and do not appear on the surface

18   again until the lower end of the valley is reached, where the

19   waters appear as rising water and flow on downstream.

20   MR. MOSKOVITZ:  Your Honor, the Clerk called my

21   attention to the fact that Exhibit L, plate 6 actually had

22   been received in evidence in December.

23   THE CLERK:  December 3rd.

24   THE COURT:  Yes, I just now noticed my records.  That

25   is what my records show.

MR. VEEDER:  I move to strike it, then, as not repre-
sentative of the situation, and as depicted by this witness
it is changed very materially and in a very important and a
very material aspect, showing that the plate in question
purports to indicate that at that time, for the time of year in
question, that the witness knew what the situation was.  Now
he says that it only depicts a general situation during the
months of July, August and September.  I believe that under
those circumstances the oral testimony has indicated the error.
And on Plate 6, moreover, it will be noted that the Vail
Company properties and the properties of the National Govern-
ment are shown to be served by water service organizations as
distinguished from this map here.

MR. SACHSE:  It is the same word that is on this map,
isn't it?

MR. VEEDER:  What?

MR. SACHSE:  It is the same language that is on your
exhibit:  Water service organization.

THE COURT:  He explained generally what it meant--
big ranches or districts-- in fact, he even got in your naval-
Marine Corps set-up.

MR. VEEDER:  His explanation was such that it clarified
what he was talking about, but --

THE COURT:  Do you move to strike Plate 6 from the
record?

C

Z48

1          MR. VEEDER:  Yes, your Honor.

2          MR. MOSKOVITZ:  I have no objection.

3          THE COURT:  Plate 6 may go out.

4          MR. VEEDER:  Thank you, your Honor.

5          THE COURT:  Which ones are you going to go into now?

6          MR. MOSKOVITZ:  We are now going to go into some ex-

7     hibits showing the hydrographed wells correlated with the stream

8     flow in the vicinity.

9          THE COURT: Which ones are those?

10          MR. MOSKOVITZ:  California's AC, AD, AE.

11          THE COURT:  I don't have a copy of AE.

12          THE CLERK:  Neither have I.

13          MR. MOSKOVITZ:  California's AE compiles certain well

14     hydrographs that appear in Plate 12, I believe-- yes, certain

15     of the hydrographs that appear on Plate 12 are those which

16     are on Exhibit AE, I believe, and we will point to which ones

17     they are.

18          MR. VEEDER:  Are you going to supply us with Exhibit AE?

19          THE COURT:  What is Exhibit AE?

20          MR. MOSKOVITZ:  You do not have a reduced copy of it,

21     your Honor, for the reason that they can be found in reduced

22     form on Plate 12.

23          Q  Mr. Illingworth, I call your attention to California's

24     Exhibit AC for Identification and ask you to read the title

25     block.

1    A  This exhibit is entitled "Hydrographs of selected

2  wells and runoff in Pauba Basin."

3    Q  Who prepared this exhibit?

4    A  It was prepared by men working under my direction.

5    Q  Would you describe the upper graph in this exhibit?

6    A  The upper graph is a hydrograph of the Windmill Well,

7  Well 8 South, 2 West, 12H1, located in Pauba Valley.

8    Q  What is shown on the left side?

9    A  The elevation of the water table at various times is

10  shown there.  The time is indicated across the bottom, one

11  space equaling a year.  The hydrograph runs from the year 1923

12  through calendar year 1958.

13    Q  What is the surface elevation at the point where the

14  well is drilled?

15    A  Ground surface elevation is 1215 feet at the location

16  of the well.

17    Q  And is that shown on the graph?

18    A  Yes, it is denoted under the designation of the well

19  number.

20    Q  And the depth of the well is also shown?

21    A  Yes.

22    Q  What is represented by the line in some places

23  solid and in some places dashed that begins at the upper left-

24  hand corner of the upper graph?

25    A  The line represents the water level at any one time.

Ellingworth - Direct

8786

The times as indicated on the bottom.  For instance, in 1923 the elevation as of the 1st of January was approximately 1212 feet and it rose to the surface, the top of the casing of the well, and actually flowed, the water flowed out the top of the well for a period of approximately a month and was an artesian well with a slight flow.  The water table then, oh, approximately the 1st of May started to drop in the well and until about the 1st of October we have a record, and then for a period of about eight months or so, eight or ten months, there were no measurements available, and that is shown by the dotted line.  The next measurement was at approximately 1208, and that would have been in about--

Q  1208 is the elevation above sea level?

A  Yes.  The time was September, 1924.

Q  Wherever an F is indicated with an arrow pointing to it at a point on this line, is that an indication that the well was flowing?

A  Yes, it is.  It flowed for the period of time indicated by the break in the record.  This occurred in 1923, '27, '37, '38, 39, '40 and my understanding is that there was a cap on the well from 1941 on and there was no water actually flowed in the years 1941, '42, '43, '44, when the--

MR. VEEDER:  I object to this if the witness doesn't know this himself.  He says it has a cap on it.  I raise again the objection in connection with these exhibits as Mr.

Case 3:51-cv-01247-JO-SBC  Document 4577  Filed 09/24/63  PageID.29507  Page 85 of 146

1   Moskovitz is offering them.  The identification, first, doesn't

2   show the source of the data.

3          MR. MOSKOVITZ:  I haven't asked the question yet.

4          MR. VEEDER:  That is exactly the point I am making.

5   When it is in evidence I don't mind these explanations.  His

6   identification is going into evidence before he makes his

7   offer, and I object to it, your Honor.

8          THE COURT:  The objection is overruled.

9          Where did you secure the information about the cap?

10         THE WITNESS:  For portions of this period a similar

11  hydrograph was made by Mr. Hall, and it is my recollection

12  that on this it indicates that the well was capped and that is

13  the reason it didn't flow.  I was just showing that the same

14  identical condition existed in 1941 as in 1940, but the reason

15  the F is not indicated there is that the records do not show

16  there was any flowing water.

17         THE COURT:  How did you get this information from Mr.

18  Hall?  By word of mouth or some record he had?

19         THE WITNESS:  No, he showed me his hydrograph that he

20  had drawn and he showed me the records on which it was based

21  so far as he had them.

22         THE COURT:  Do you have those in your files?

23         THE WITNESS:  We have them in one of the appendices,

24  the appendix that covers water level measurements in the second

25  volume of Exhibit L.

1          MR. MOSKOVITZ:   I believe that is already in evidence.

2          THE WITNESS:   It does not cover the entire period, how-

3    ever.

4          MR. VEEDER:   Your Honor, you have a unique situation

5    where you have what purports to be a flowing well from 1936

6    through 1940.   Then he says it would have flowed if it hadn't

7    been capped.   I believe we are getting far into deep water--

8    and I am not being facetious when I say that--having a witness

9    come along and make such conclusions without his own observa-

10   tion and strictly on heresay.   We do know that the matter of

11   pressure of these wells is important and is going to be increas-

12   ingly important in this lawsuit.

13         THE COURT:   On this particular point there should be

14   some supporting evidence from Mr. Hall or someone on that issue,

15   and that will be subject to a motion to strike thereafter if the

16   particular thing Mr. Veeder is talking about is not supplied.

17   It is one thing to pick up old records which have been kept in

18   the regular course of business and to try to coordinate them

19   into some chart.   It is another thing to take heresay word of

20   mouth testimony and then build a chart on it.   Whether or not

21   this will would have flowed if the cap had been removed may be

22   proved and may not be proved.   If the testimony only shows there

23   was a cap on the well, that doesn't mean that the well would have

24   flowed.

25         THE WITNESS:   This has no significance here.   The

1  significant point, your Honor,--

2          MR. VEEDER:  I object again to this speech.

3          THE COURT:  Go ahead.  You can fill this gap in later.

4          THE WITNESS:  The water level was above the elevation

5  1215 for a period of time.

6          THE COURT:  How do you know, if the well was capped?

7          THE WITNESS:  This hydrograph was based on measurements

8  to the water level in the well.

9          THE COURT:  Who measured them?

10          THE WITNESS:  An employee of the Vail Company or Mr.

11  Green after he was the employee.

12          THE COURT:  Do you have this supporting data on this

13  matter?

14          THE WITNESS:  I have much of it.  There is a period of

15  time in here--

16          MR. VEEDER:  We are measuring above the surface of the

17  ground at this juncture.

18          THE COURT:  The pipe is above the surface of the ground.

19          MR. VEEDER:  But he says at the point where it is capped.

20  How does he know?

21          THE WITNESS:  It is not capped at ground surface.

22          THE COURT:  Mr. Veeder, you may go into it later.

23  What supporting data do you have?

24          THE WITNESS:  For most of this period we have the support-

25  ing data in Volume 11 of Exhibit L.

BY MR. MOSKOVITZ:

Q  Would that be Appendix G?

A  Yes, Appendix G.

MR. MOSKOVITZ:  Which is already in evidence.

THE COURT:  Which shows the well measurements from the Windmill well?

THE WITNESS:  Yes, sir. Now, not every measurement that is shown on the graph is shown in there.  These measurements, were, generally speaking, taken every day. We would have filled up the volume just with those measurements alone, and so we selected weekly measurements, as I recall, and so they are representative.  But they can be used to check this out.

THE COURT:  All right. Go ahead.

THE WITNESS:  Following the year 1944--

THE COURT:  Let me interrupt before you go ahead.  In other words, based upon the measurements shown in Appendix G for the Windmill well you could have drawn this chart as showing this well as a well which flowed above the level of 1215 ground level for 1941-42, 43, and 44, if it had not been for the fact that you were told that the well was capped and therefore you knew that the well didn't flow; is that the point you are making?  The well measurements showed that the well had a water level above ground level of 1215 feet.

THE WITNESS:  Yes, sir.

THE COURT:  And the only reason the curve has closed at

1  the top and don't put the "F" in for the years 1941, 42, 43

2  and 44, is that you were told that the well is capped and there-

3  fore you don't show it as a flowing well?

4       THE WITNESS:  Yes, sir.

5       THE COURT:  All right.  In each case on the line showing

6  the level of the Windmill well where there appear dotted lines,

7  does that indicate it is a period when there were no records?

8       THE WITNESS:  That is correct.  Where the period is long

9  enough to be significant and you would have had changes up or

10  down within it, we dotted the lines so that it will not be mis-

11  leading.

12  BY MR. MOSKOVITZ:

13       Q  Is the source of all the records that were used to

14  draw the line for the Windmill well the Vail Company or Mr. Hall?

15       A  Yes.

16       Q  Go down to the next line underneath the line showing

17  the Windmill well.  What does that line show?

18       A  This line similarly represents the water level surface

19  for the period mid-1941 through to the latter part of 1958 for

20  another well, Well 8 South 2 West 11J1, known to the Vail Company

21  as their Well No. 30.  The No. 30 record just goes to the latter

22  part of 1955 and then we take up the record with a well located

23  very close to No. 30, which was Well No. 30A, Well 8 South 2 West

24  11J2.

25       THE COURT:  How far were these two wells from the Windmill

A 5

1  well?

2          THE WITNESS:  I have to refer to my well location map.

3  I think it is a matter of a mile or a couple of miles.

4          THE COURT:  What plat had these?

5          THE WITNESS:  Plat 9B.  It is almost exactly a mile, as

6  nearly as I can scale it here, downstream.

7          MR. SACHSE:  Mr. Moskovitz, may I interrupt.

8          Are these water years or calendar years?

9          THE WITNESS:  These are calendar years.

10  BY MR. MOSKOVITZ:

11          Q  What is the ground surface elevation for Well 8 South

12  2 West 11J1?

13          A  1180.5.

14          Q  And the ground surface elevation for Well 8 South 2

15  West 11J2?

16          A  1182.3.

17          Q  What was the source of the data that was used to draw

18  that line, the lines for those two wells?

19          A  Those are also records of the Vail Company.  I believe

20  these were obtained by Mr. Green exclusively.

21          Q  And are there records in Appendix G of Exhibit L which

22  can be used to check these levels--this line?

23          A  Yes.

24          Q  Now, turning to the lower graph on California's Exhibit

25  AC for identification, would you explain what that graph shows?

1    A  The lower graph shows pictorially the stream flow in

2  Temecula Creek at Nigger Canyon,  These are the records of the

3  U.S.G.S. Station above that name which was reported by the G.S.

4  until the time the gates of the Vail Dam were closed, at which

5  time the records of release from Vail Reservoir were available.

6  The importance of this record is that this represents the flow

7  in Temecula Canyon, and after the--

8    Q  Pardon me, Mr. Illingworth.  In what units is that

9  flow represented on the map?

10    A  It is represented as a block diagram, as a block

11  representing one month of record.  The height of the block in-

12  dicates runoff for the month in acre-feet.  This record extends

13  from 1923 to 1948, to November 1948, and from that time, and

14  from that time forward the only water going downstream from the

15  dam through Nigger Canyon is the release from Vail Reservoir,

16  which is shown in the right-hand portion of the graph.  This

17  also is shown by a bar graph, each bar representing the monthly

18  release in acre-feet.

19    Q  Where was that data secured?

20    A  This was secured both from records of the Vail Company

21  and the United States Geological Survey.

22    MR. VEEDER:  Could you state which are the Vail Company

23  records that were used?

24    THE WITNESS:  These are all United States Geologic Survey

25  records, wherever there was any disagreement, as there was

1  sometimes slight disagreement.

2      THE COURT:  When there was disagreement you took the

3  U.S. Geologic Survey records?

4      THE WITNESS:  Yes, sir.

5  BY MR. MOSKOVITZ:

6      Q  This lower graph is also broken up into years.  Are

7  those yearly indications correlated with the upper graph?

8      A  Yes.  You will note that each year of the well hydro-

9  graph is plotted directly above the year for which the stream

10 flow is indicated.

11     Q  I note that some of the blocks showing monthly runoff

12 at the lower graph are broken at a point just above the graph

13 and with an arrow and some figures pointing to that place.  Would

14 you explain those figures?

15     A  Yes.  In order to keep the size of the paper down to

16 something we could put on the easel and still represent what we

17 thought this indicated, it was necessary to not show to graphic

18 scale the extremely wet months.  For instance, the month of

19 February 1927 we have a total runoff for the month of 35,700

20 acre-feet.  The top line of our graph is only 3300, which means

21 that to be at scale this month would have to be plotted approxi-

22 mately ten times higher than this chart.  It would be considerably

23 above the top of the paper.  That is the most extreme condition.

24 We have others. We have 23,830 acre-feet in March 1938, 12,650

25 in 1937, ecetera.

c 3
A8

1      Q  Is California's Exhibit AC accurate, in your knowledge?

2      A  Yes.

3      MR. MOSKOVITZ:  I offer in evidence California's Exhibit

4  AC, your Honor.

5      THE COURT:  It is received in evidence.

6      (California's Exhibit AC received in evidence.)

7  BY MR. MOSKOVITZ:

8      Q  When you correlate these two graphs that appear in

9  California's Exhibit AC, what do they show?

10     A  It may be noted that the hydrographs have periods of

11  time in which the slope of the line is downward to the right,

12  indicating that as the time proceeds the water level is dropping

13  and there are abrupt rises in it also occasionally, and it will

14  be noted by comparing the upper chart and the lower chart that

15  these abrupt rises or times of recharge of the ground water basin

16  occur when the large flows occur in the stream flow.  This is

17  shown in the winter of 1926, the winter of 1927.  We have a

18  smaller flow in the winter of 1928, and its effect on the water

19  level in the well was only to retard the downward trend.  It

20  did not reverse it and cause the water level to go up.  However,-

21     MR. VEEDER:  Your Honor, I am going to interpose an

22  objection at this juncture.  The question was the correlation as

23  to runoff as related to the chart.  It is manifest, your Honor,

24  that this witness is going beyond the question, because during

25  that period there was pumping out of the basin, there were a

1   great many things that would affect the fluctuations of the

2   water within the basin.  So I think if he would stick to the

3   question, instead of going on, I wouldn't have these objections.

4           THE COURT:  He may give his opinion.  Overruled.

5           THE WITNESS:  Again in 1930, in the winter and spring,

6   we have relatively large runoff and we have a rise in the water

7   level.  It did not rise a great deal, only a matter of about

8   5 feet.

9           Then proceeding to the next year we have no individual

10  records, however, from the low period of 1930 to the low period

11  of 1932 there is a drop in the water level indicated.  In 1932

12  we had substantial runoff and the water level rose.  It came

13  almost to the surface, almost to the top of the casing in the

14  Windmill well.

15          One can follow through the years and note that where the

16  stream flows are small the water level generally drops, and

17  where we have substantial runoff the water level comes to the

18  surface.  In the wet calendar year 1937 through calendar year

19  1945 there was substantial runoff.  The water level went down

20  each summer as the pumping occurred, but returned each winter

21  when the runoff came, and from that time forward the water level

22  continued to drop.

23  BY MR. MOSKOVITZ:

24          Q  Would you point out the correlation with the record

25  for Well 8 South 2 West 11J1, when that record first started?

C 3
A10

8737

1    A   Yes.   It will be noted that Well 11J1 reflects the

2   same type of fluctuations, somewhat dampened, the same type as

3   the Windmill well.

4        MR. VEEDER:   What do you mean by "dampened"?

5        THE WITNESS:   The fluctuations are not as extreme.   For

6   instance, I refer to this January 1943, at the beginning of the

7   calendar year 1943.   We find that the Windmill well at the time

8   the runoff occurred rose from elevation 1210 to the surface at

9   1215 or 1216, and at the same time this other well, Well 11J1,

10  went up from 1166 to about 1168, only a matter of about 2 feet.

11  Nevertheless, it shows the same type of fluctuation as the

12  Windmill well.   And so it can be observed that it rises in the

13  winters of  1942, 43, 44, 45, and then gradually it drops in

14  elevation.

15  BY MR. MOSKOVITZ:

16       Q   I note that in 1946 the water level in both the wells,

17  the Windmill well and Well 11J1, begins to decline.   Can you

18  correlate that with the runoff shown in the lower graph?

19       A   Yes.   This decline is of exactly the same nature as

20  occurred back in the years 1933, 1934 and other previous years

21  where the runoff was rather low, and graphically the years 1947

22  and 1948 are generally of this same magnitude as those of 1933-34

23  and the fluctuations are quite similar.

24       Q   Does the lower graph indicate the date when the gates

25  were closed of Vail Dam?

1          A  Yes, the date is indicated as November 1948.

2          Q  After that is there a correlation between releases

3   from Vail Reservoir and the level of water in those two wells

4   that are shown on the upper graph?

5          A  Yes, insofar as the drop continues or is--well, it

6   continues, it continues downward.  It should be pointed out

7   that these releases, the releases in these first few years,

8   were releases to the stream bed and the flow had a chance to

9   return to the basin in the same manner as natural flow would

10  have and as natural flow did in these years.

11         Q  What years are you referring to?

12         A  In the years 1949, 50 and 51.

13         THE COURT:  Was that all the water that was released

14  during those years by Vail?

15         THE WITNESS:  Yes.

16         THE COURT:  I was under the impression that they were

17  required to release a certain minimum each year.

18         THE WITNESS:  This is what the records show, your Honor.

19         MR. STAHLMAN:  You will find out that there wasn't much

20  water in there until you get up to 1952.  Those were very dry

21  years.

22         THE COURT:  Didn't have any to release?

23         MR. STAHLMAN:  Didn't have any to release.

24         MR. SACHSE:  Your permit doesn't require any releases

25  from the dam.

C 3
A12

1          THE COURT:  It requires a minimum flow to be permitted

2    to go down the gorge.

3          MR. STAHLMAN:  In those first few years, if you get

4    your rainfall charts, you will find that those were very dry

5    years, there was very little water in the Vail Dam, and of

6    course the object of the dam is to try to build it up if you

7    can.  But it couldn't even accomplish that purpose.  1951-52

8    was the first year that we had any substantial runoff into the

9    dam.

10          MR. VEEDER:  Would it be permissable to ask a question,

11    your Honor.

12          THE COURT:  Yes.

13          MR. VEEDER:  Do these bar graphs showing the 1953, 54 and

14    1955, were these indicative of the time of year, the month of

15    the year, or is that indicative of just the year?

16          THE WITNESS:  Each vertical bar represents a month.  As

17    in 1952, the long bar is February.  There was nothing released

18    in January, nothing released in March, then some approximately

19    400 acre-feet was released in April, and perhaps 100 in May.

20          MR. VEEDER:  Were there any late releases as shown on

21    there now?

22          THE WITNESS:  No relases at all.

23          MR. VEEDER:  I am talking about releases in 1953.  There

24    are late releases there, are there not?

25          THE WITNESS:  I don't know what you mean by late releases.

1    MR. VEEDER:  June, July, August, September.

2    THE WITNESS:  Yes, sir.  This is the calendar year from

3 here to here.  It can be noted from the graph that these releases

4 occurred during the summer months primarily.

5    MR. MOSKOVITZ:  1953.

6    THE WITNESS:  Yes.

7    MR. VEEDER:  Then there is no correlation, actually,

8 on the month-to-month basis of what transpired before; is that

9 right?

10    THE COURT:  He is not offering this to show correlation

11 of what happened after the dam was closed or what happened be-

12 fore.  He is offering it to show correlation between the release

13 of water or the water getting into the Pauba Basin and the charts

14 above showing levels of wells.  That is the only correlation he

15 is showing.

16    MR. MOSKOVITZ:  That is correct your  Honor.

17    MR. STAHLMAN:  We have logged exhibits showing the re-

18 leases, your Honor.

19    MR. VEEDER:  The point I am making is that you have

20 irrigation releases brought down to the pipe line, water that

21 goes into the ground in that manner as distinguished from the

22 way it would go in under a state of nature.  There can be no

23 correlation between anything from 1948 on down by reason of the

24 different means of releasing and by reason of the different

25 period in which the releases were made.

C   3
A14

1       THE COURT:   It is true that your downstream area would

2   be in an entirely different category because the irrigation

3   water went downstream.   But as far as the Windmill well goes,

4   it probably shows what it purports to show.

5       MR. VEEDER:   I truly believe that the pipeline would

6   take the water past the Windmill well.

7       THE COURT:   I think so too.

8       MR. STAHLMAN:   Mr. Veeder is jumping the gun again, as

9   he usually does on these matters.

10      THE COURT:   Proving your case for you.

11      MR. STAHLMAN:   I think he is. Let him go.   He is a great

12  fellow to take the rains and run with them.

13      MR. MOSKOVITZ:   I was asking Mr. Illingworth to show the

14  correlation between the releases from Vail Reservoir and the

15  level of the Windmill well and the other two wells.

16      THE COURT:   He has already explained that.

17      THE WITNESS:   I have something more to say on the sub-

18  ject, if I may.

19      THE COURT:   All right.

20      THE WITNESS:   I had gotten to the year 1953 and I think

21  I had said that these releases in these earlier years were

22  directly to the stream and occasionally there was a release

23  to the stream after that, but certainly for this big block of

24  runoff or release in 1953 this was released through the pipeline

25  of the Vail Company.

1    THE COURT:  Are you telling me now that your figures

2    of releases from the Vail Reservoir include not only water

3    released down Nigger Canyon but also water released to their

4    irrigation system from the dam for each of the years in question?

5    THE WITNESS:  Yes, sir.  From 1949 on that is what is

6    represented here.  Now if you will call the physical situation

7    at the dam, water is released through the outlet and it actually

8    flows down the canyon for a distance of approximately a mile,

9    where it is then picked up in the pipeline.  This flow labeled

10   on this chart as Release is the flow  that is released to the

11   natural channel.

12   THE COURT:  You mean released down this channel and

13   then picked up by the pipeline?

14   THE WITNESS:  From these records on California's Exhibit

15   AC you can't tell whether it went on downstream past the pipe-

16   line diversion or whether it went into the pipeline.

17   MR. VEEDER:  Your Honor, I respectfully submit that

18   there can't be a correlation, and I object to the Exhibit as

19   presented--it is not clear.

20   THE COURT:  Overruled.

21   THE WITNESS:  As I was saying, in 1953 these were prim-

22   arily releases into the pipeline and irrigation in that year

23   was practiced upstream from the Windmill well in a rather large

24   area of some few hundred acres.

25   THE COURT:  This you observed?

1            THE WITNESS: Yes, sir.

2            THE COURT:  All right.

3            THE WITNESS:  In my opinion, the reason that the

4    Windmill well level rose from 1170 to about 1174 in 1953,

5    around the middle of 1953, was of because of these releases.

6    And similarly Well 11J1 had a rise at about the same time.

7    This definitely broke the downward trend in the water level as

8    measured in the Windmill well and as measured in Well 11J1.   It

9    didn't stop it completely, but it certainly changed the slope

10   of it.  Now from other records that have been presented here

11   we know that 1951-52 was a very wet year, shown on the other

12   hydrograph, and also including the inflow to Vail Reservoir.

13   Wells in other locations show a definite rise from those storms.

14   There is no such rise indicated here except for the approximately

15   1 foot or less rise in Well 11J1 during January 1952 and a

16   very slight rise which from this chart appears to have occurred

17   in the Windmill well around March or April.

18            I believe that had the dam not been here there would have

19   been a rise at that time, but the water was held back by the

20   dam and was later released--

21            MR. VEEDER:  Your Honor, I move to strike that as being

22   purely speculative.

23            THE COURT:  The objection is overruled.

24            You may continue.

25            THE WITNESS:  The water was later released and then did

1     show up as recharge to the ground water basin.

2          THE COURT: All right, have we got enough on California's

3     Exhibit AC?

4          MR. MOSKOVITZ:  Yes, your Honor.  I offer it in evidence.

5          THE COURT:  California's Exhibit AC received in evidence.

6          (California's Exhibit Ac received in evidence.)

7     BY MR. MOSKOVITZ:

8          Q  Would you identify California's Exhibit AE for ident-

9     ification?

10         A  This exhibit is entitled "Fluctuation of Water Levels

11    In Selected Wells," and was prepared under my direction.

12         THE COURT:  Is there a chart on this in the book, you

13    say?

14         MR. MOSKOVITZ:  Yes, I am going to ask Mr. Illingworth

15    to point it out.

16         THE COURT:  What is the number of the plate?

17         MR. MOSKOVITZ:  Plate 12, your Honor.

18    BY MR. MOSKOVITZ:

19         Q  Would you point out where on Plate 12 the hydrographs

20    that are shown on California's Exhibit AE for identification

21    can be found?

22         A  They appear on Plate 12 in the central portion of the

23    chart and they are identical reproductions of those plates

24    simply enlarged for display purposes.

25         MR. VEEDER:  Please read off, Mr. Illingworth, the ones

1    that are on that, so that we can mark them.

2           THE WITNESS: Yes; Los Alamos Valley, Murrieta Basin,

3    Rainbow--

4    BY MR. MOSKOVITZ:

5           Q  Will you read off the well hydrographs on Exhibit

6    AE which are shown on Plate 12 Exhibit L?

7           A  Yes; Los Alamos Valley Well 7S2W8A1, Murrieta Basin

8    Well7S3W16N5, Rainbow Basin Well 9S3W1Q1, Fallbrook area Well

9    9S3W18B1, Oak Grove Basin Well 9S2E16F1, Anza Basin Well 7S3E21J1,

10   Nigger Basin Well 8S1W13Q1, Upper Lancaster Basin 8S1E17A1, and

11   Lower Lancaster Valley Well 8S1E7N1.

12          THE COURT:  You don't propose to use these other charts--

13   Pauba Basin, Pachanga Basin?

14          THE WITNESS:  We brought the others up to date and we

15   will have reductions as well as the enlargements of those.

16          THE COURT:  And the Santa Margarita ones?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  So I can tear these off of this copy I have

19   here.

20          MR. MOSKOVITZ:  Yes, your Honor.  We have reductions

21   of the other well hydrographs which we are presenting at this

22   time.  We are not presenting all of the hydrographs that appear

23   on Plate 12 in evidence.  The ones that have just been read off

24   are the only ones of which we do not have another reduction.

25          THE COURT:  What is the number of this exhibit that you

1    are showing me on the board?

2            MR. MOSKOVITZ:  Exhibit AE.

3            THE COURT: Proceed.

4    BY MR. MOSKOVITZ:

5            Q  What data did you use to draw the various graphs on

6    this exhibit?

7            A  Fo r  the most part, these are records of rather short

8    duration.  They were records obtained by the Division of Water

9    Resources in the investigation on the Santa Margarita River and

10   the work done on the Temecula Creek reference, Barbee versus

11   Oviatt.

12           Q  And those were obtained by personnel working under

13   your direction?

14           A  That is true.  There are two exceptions on this map

15   to that general statement.  One is the well measurement of

16   Well 8S1E17A1 in May 1948, which is shown as being at elevation

17   1634.  This was obtained from--

18           MR. VEEDER:  What year did you say--1948?

19           THE WITNESS:  Yes.

20           MR. VEEDER:  I see.

21           THE WITNESS:  It is shown in the open space on the chart.

22           MR. VEEDER:  Yes.

23           THE COURT:  Where did it come from?

24           THE WITNESS:  To the best of my recollection, this is a

25   measurement by Mr. F. E. Green.  I believe I can substantiate

1    that.

2         MR. VEEDER:   Mr. Green must have traveled more than we

3    knew.  Go ahead.

4    BY MR. MOSKOVITZ:

5         Q   What is the other exception?

6         A   The other exception is the well measured in August

7    1916 in Anza Basin, then called Baptiste Valley, as reported

8    in U.S. Geological Survey Water Supply paper 429 by Waring.

9    This is for Well S73D21J1.

10        Q   Beginning with the hydrograph in the upper left-hand

11   corner of Exhibit AE, what does the line there indicate?

12        A   The line, as in the previous exhibit, is a plot of

13   the water level elevation in the well graphed through a period

14   of time.  In this case through mid-1952 through the spring of

15   1954.

16        THE COURT:   What do the dotted lines mean?

17        THE WITNESS:   There again we had a longer distance be-

18   tween points of measurement we put the dotted in.

19        THE COURT:   I can understand where you do that between

20   two known points.

21        THE WITNESS:   We had a known point to start with, and

22   the next known point was here.  We had a known point around the

23   end of August, and we had another known point about the first

24   of 1953.

25        THE COURT:   I see.

C 4
A21

8748

THE WITNESS:  So it joins those two points.

THE COURT:  All right.

BY MR. MOSKOVITZ:

Q  Going down through the various hydrographs, are there any points, any of these lines which are of significance?

MR. VEEDER:  If there aren't, they shouldn't be here.

THE COURT:  Let's go ahead.

THE WITNESS:  This chart represents the water levels in a group of wells and it shows how in some cases the water levels fluctuate rather greatly.  For instance, in Nigger Basin we have--

MR. VEEDER:  I object, your Honor, because there is no proper foundation for this.  We have to know whether this is a domestic well, whether they are irrigating from it, whether the man lives there.  There are thousands of things that could cause these hydrographs to fluctuate in the manner they do.  I submit there is no proper foundation.

THE COURT:  I think there are many things that could cause fluctuation.  You may cross-examine.  If the basis of the witness' opinion is not sound, then his opinion is worth nothing.  The objection is overruled.

THE WITNESS:  These are static water levels, not taken during pumping conditions.

BY MR. MOSKOVITZ:

Q  Continue.

A  Referring to January 1952, we find that there is a

1    rapid rise in Well 8S1W13Q1.  This again was, in my view, the

2    effect of the rather large runoff we had in January 1952.

3            THE COURT:  Nigger Basin is below Nigger Canyon?

4            THE WITNESS: No; it is upstream, just upstream from Vail

5    Lake.

6    BY MR. MOSKOVITZ:

7            Q  Going to Anza Basin, what significance, in your

8    opinion, is there in the August 1916 level shown there as

9    compared with the line for the more recent years between 1950

10   and 1954?

11           A  The significance of that is that a measurement taken

12   back in August 1916 indicates that water levels in that valley

13   represented by that well were substantially the same as they

14   were in 1951, 52, 53 and 54.

15           THE COURT:  This Anza Basin is well upstream?

16           THE WITNESS:  Yes, sir.

17           THE COURT:  How do you account for what looks like a

18   raise in water levels in the middle of May 1952?  Are these

19   water years or calendar years?

20           THE WITNESS:  These are calendar years, your Honor.

21           THE COURT:  That would be the middle of May 1952.

22           THE WITNESS:  There is a drop.

23           THE COURT:  There was a rise until the middle of May.

24           THE WITNESS:  That was the winter runoff season.

25           THE COURT:  May?

1          THE WITNESS:  Well, January through May.

2          THE COURT:  This is upstream.  You wouldn't have to

3     wait for water to reach this basin.  The water either got into

4     this basin or it didn't right now.

5          THE WITNESS:  Well, all these stations record  stream

6     flow within a day of each other.  There is no real lag in water

7     reaching the basin.  The water that reaches this basis is water

8     that runs off the hills immediately adjacent to Anza Valley.

9          THE COURT:  Also, looking at that Anza Basin--January,

10    February, March, April, May,June, July--beginning the 1st of

11    August the basin begins to rise.  How do you account for that--

12    in 1952?

13         THE WITNESS:  There are a number of reasons.  I can't

14    explain every zig and every zag in the chart.  Generally speak-

15    ing, the water levels are low in the summertime because they

16    are pumping.  Now I know that in some of that area they have

17    had seed alfalfa and that is not irrigated after the spring

18    months, after mid-summer.  It could be that that is the reason

19    it came up.  I don't know just off-hand exactly which well that

20    is.  But there are a number of reasons.

21         What this indicates to me is that the fluctuations up

22    there are not great; that this is only a matter that varies from

23    elevation 3834 to 3843, and this is a relatively small fluctua-

24    tion for a winter to summer change.  In fact, that is generally

25    what all these hydrographs represent.  There has not been a

1    great change during this period of observation.

2    BY MR. MOSKOVITZ:

3        Q  Is that also true of the Upper Lancaster Basin where

4    you have a reading in May 1948 and then a break in the records?

5        A  Yes, it shows that after 1948 the water levels appar-

6    ently did not drop to any great extent.  The majority of the

7    readings are actually higher than that reading.

8        Q  Are the hydrographs shown on California's Exhibit

9    AE correct, in your knowledge?

10       A  Yes.

11       MR. MOSKOVITZ:  I offer California's Exhibit AE, your

12   Honor.

13       THE COURT:  It is received in evidence.

14       ( California's Exhibit AE received in evidence.)

15       MR. VEEDER:  While we are waiting for the change of

16   exhibits, as I recall, Mr. Sachse, the statement was made that

17   we didn't do any pumping to NAD in 1952-53, and you by a few

18   crisp, short, well-designed matters on cross-examination proved

19   to the contrary.  Am I right?

20       MR. SACHSE:  Frankly, I don't recall, but if you pumped

21   22 acre-feet I will let you have it, Mr. Veeder.

22       The United States may have an extra 22 acre-feet, your

23   Honor.  The record may so show.

24       THE COURT: Well, you have lost me, I don't even know

25   what you are talking about.  Go ahead.  It is not part of the

1    record anyhow at this point.  Go ahead.

2    BY MR. MOSKOVITZ:

3        Q  Calling your attention to California's Exhibit AD

4    for identification, Mr. Illingworth,  would you read the title

5    block of that exhibit?

6        A  This is a chart of the hydrographs of selected wells

7    and runoff in the Santa Margarita Coastal Basin.

8        Q  How was this exhibit prepared?

9        A  This was prepared under my direction.

10       Q  There are apparently 4 hydrographs on well levels in

11   the upper portion of the exhibit.  Where did you secure the

12   information on which you drew these hydrographs?

13       A  These are from records obtained from the Department

14   of Water Resources; in some cases I believe the measurements

15   are by the Department, but in a great majority they are from

16   measurements either made by the U.S. Geologic Survey or members

17   of the staff of the Office of Ground Water Resources on Camp

18   Pendleton, and they are either--well, I believe the values

19   shown here have already been presented as exhibits in this case.

20       Q  Where are the 4 wells for which levels are graphically

21   shown in the upper 4 hydrographs located?

22       A  Well 11S5W2E1 is located just upstream from the

23   Ysidora Narrows, in Ysidora Sub-basin of the Santa Margarita

24   Coastal Basin.

25

BY MR. MOSKOVITZ:

Q   And what is the ground surface elevation at that well?

A   1918 feet.

Q   What do the numbers on the left-hand vertical coordinate of that graph indicate?

A   Elevation above sea level.

Q   And those elevations can be compared with the 19.8 feet of ground surface elevation?

A   Yes.

Q   To compute how much below ground surface the water was?

A   Where we have the negative value indicated, it indicates the water levels are below sea level.

Q   Now turning to the Well 11 South, 5 West 2N5, where is that well located?

A   That is located in Ysidora Narrows very close to the location of the stream gaging station known as Santa Margarita River at Ysidora.

THE COURT:   Was it down the canyon from the first well near the ocean?

THE WITNESS:   Yes, sir.   It is right in the narrows and right at the southern boundary of the ground water basin.

BY MR. MOSKOVITZ:

Q   There is no indication on the exhibit of the

1    elevation of the surface of the ground at that well.  Can

2    that be supplied?

3            A   Yes.  May I look it up later?

4            Q   Look it up later.

5            THE COURT:  Give it to us later.

6    BY MR. MOSKOVITZ:

7            Q   And again, the numbers on the left-hand side indicate

8    feet above and below sea level, is that correct?

9            A   Yes.

10           Q   Where is Well 10 South, 4 West, 7J1 located?

11           A   That is located in the upper subbasin.

12           Q   What is the ground surface elevation at that well?

13           A   93.0 feet.

14           Q   Again, the numbers in the left side indicate the

15   level above sea level?

16           A   The water level in the well above sea level, that is

17   right.

18           THE COURT:  Now, you say, "Upper subbasin"?

19           THE WITNESS:  Yes, sir.

20           THE COURT:  Is that above the Chappo?

21           THE WITNESS:  Yes, sir.

22           THE COURT:  The highest part of the coastal basin?

23           THE WITNESS:  Yes, it is highest in elevation of the

24   three subbasins

25           THE COURT:  All right.

D

Z36

BY MR. MOSKOVITZ:

1

2      Q  Well, 10 South, 5 West, 23L1, where is that well

3   located?

4      A  In the Chappo Subbasin of the Santa Margarita coastal

5   basin.

6      Q  And what is the ground surface elevation of that

7   well?

8      A  51.3 feet.

9      Q  Looking at the two graphs, the lower part of California

10  Exhibit AD for Identification, what do they depict?

11     A  As in the previous, or as in--

12     Q  California Exhibit AC?

13     A  --California Exhibit AC, they represent by block

14  diagram the monthly runoff in acre-feet which approximates

15  the runoff at the De Luz Dam Site.  The barred graphs represent

16  the sum of the runoff at the gaging stations called Santa

17  Margarita River near Fallbrook and De Luz Creek near Fallbrook.

18     THE COURT:  You added the two together?

19     THE WITNESS:  Yes, sir.

20     THECOURT:  And the two bar graphs are identical?

21     THE WITNESS:  Yes, sir.

22     THE COURT:  At the bottom you merely duplicated it for

23  comparison?

24     THE WITNESS:  Yes, sir.

25

D

Z37

BY MR. MOSKOVITZ:

1    Q  And the same yearly blocks are correlated with the

2    years for the well levels, is that correct?

3    A  Yes, the years are plotted directly below one another.

4    Q  In the period 1949 until the first part of 1951,

5    there is an indication that the totals are partially estimated.

6    What is the explanation for that?

7    A  The De Luz Creek stream gaging station was not

8    installed until February, 1951.  And for the period prior to

9    that, namely, the first couple of months, the first month in

10   '51, and the two years 1949 and 1950, an estimate was made of

11   the De Luz Creek runoff, and that was added to the measured

12   flow of Fallbrook.  And these bars are open, are left open for

13   those years rather than being filled in solid as they were for

14   the succeeding years.

15   Q  Are the graphs appearing on California Exhibit AD

16   for Identification correct, to your knowledge?

17   A  Yes.

18   MR. MOSKOVITZ:  I offer California Exhibit AD in evidence.

19   THE COURT:  AD received in evidence.

XXXXXX   20   BY MR. MOSKOVITZ:

21   Q  Now, correlating the runoff from the lower graphs

22   with the well levels in the upper graphs, taking first the

23   level of Well 11 South, 5 West, 2E1, Ysidora Subbasin, what

24   opinion do you have as to the correlation?

D

Z38

Illingworth — Direct 8757

1    A  Well, by observing the runoff hydrographs with the

2  well hydrograph for 2E1 directly above it, it will be noted that

3  the rise in the water level in the well comes at the time that

4  the runoff occurs in the two stream gaging stations, the sum

5  of which is shown in the lower bar graphs.

6    Q  What is the significance of using those two stream

7  gaging station totals to compare with the well levels?

8    A  The runoff as measured at those two stations is the

9  runoff which comes down Santa Margarita River and either passes

10  over the Santa Margarita coastal basin or percolates into it

11  or partially does each thing; and, in my opinion, is the basic

12  cause for the rise in the water level at Well 11S, 5W, 2E1.

13  Similarly, we may note that each winter there is a rise in the

14  well  and that the greatest rises occur when the greatest flow

15  occurs up to the point that-- well, for that well that is what

16  it represents.  I have nothing further to add.

17    THE COURT:  This is offered, I take it, on the part of

18  California to prove that it is necessary that water come down

19  into the Ysidora Basin to see that the well levels are raised

20  up?  Is that the purpose of it?

21    THE WITNESS:  That is one of the purposes,

22    MR. MOSKOVITZ:  That is right, your Honor, it is.

23    MR. VEEDER:  I think it is a very fine demonstration.

24    THE COURT:  I assume you are going to object, Mr. Veeder?

25    MR. VEEDER:  Well, I am going to object if they didn't

1   advance this sooner.

2        MR. MOSKOVITZ:  Your Honor, all along we have been saying

3   we want the facts and we are here to help everybody, including

4   the United States.

5        MR. VEEDER:  Oh, well, we will have our laughs.

6        THE COURT:  What about the other two charts, Mr.

7   Illingworth?

8        THE WITNESS:  The charts for 11S, 5W, 2N5 show--

9   BY MR. MOSKOVITZ:

10       Q  That is all in the Ysidora subbasin, is it not?

11       A  Yes. It shows similar rise when the runoff occurs.

12   That is when the ground water is recharged, and its effect is

13   shown to the rise in water level in the wells.  I might explain

14   one circle here, a dot with a circle around it, in 1949 for

15   this well.  That is just an isolated measurement.  We didn't

16   join that to the end of this other line by a dotted line,

17   because I know from other information that that would definitely

18   not be a true representation.  There was nearly a vertical

19   rise and then a drop in there.

20        THE COURT:  Put the dot in anyhow?

21        THE WITNESS:  It is a good measurement.

22        MR. VEEDER:  Well, you had an extra dot.  What differ-

23   ence does it make?

24        MR. MOSKOVITZ:  Your Honor, I have an S.O.S. from one

25   of our friends.  He would like a recess.

1     (Discussion of f the record.)

2     THE COURT:  Take a recess.

3     (Recess.)

4     MR. MOSKOVITZ: Your Honor, before noon we were asked

5  to bring in the basic data on which Appendix E was based, the

6  stream flow records, and we have them here.  They consist of

7  seven volumes of material.

8     MR. VEEDER:  Are we going to have them identified?

9     THE COURT:  They concern E?

10     MR. MOSKOVITZ:  That is right, your Honor.  Those

11  miscellaneous stream gaging measurements of various kinds and--

12     THE COURT:  Do your exhibits go any further than AE?

13     MR. MOSKOVITZ:  Yes, they go to AQ now, your Honor.

14     THE COURT:  AQ.  All right, call these--  How many

15  volumes?

16     MR. MOSKOVITZ:  There are just six volumes.

17     THE COURT:  D-1, D-2, D-3, D-4, D-5, D-6, marked for

18  Identification.

19     MR. STAHLMAN:  May I ask a question?  Are these from

20  Mr. Hall or did you make copies off of Hall's and return them

21  to him?

22     MR.MOSKOVITZ:  One of them which has a designation on

23  the cover, a portion of Exhibit L-5, "Rancho Santa Margarita

24  v. Vail Company, Santa Margarita River diversions 1943-1947"

25  are photostatic copies of material from Mr. Green.  Is that

D

241

IIII

right?

THE WITNESS: No, they are from Mr. Hall's records. Now, that is what the book was entitled that we copied those from. But it appears to me that some of those data must have been gathered after the other trial was completed.

MR. STAHLMAN: That may be the point I am trying to find out about. Was this given to you by Mr. Hall or did you--

THE WITNESS: Yes, from Mr. Hall. No, these are photostatic copies of information, of material that he loaned us.

MR. STAHLMAN: Oh, I see. O.K.

MR. MOSKOVITZ: The other five are--

THE COURT: They are used to support D?

MR. MOSKOVITZ: D or E? I believe it is E, your Honor.

THE WITNESS: The runoff records.

MR. MOSKOVITZ: E.

THE COURT: E? Then, they will be E-1 to 5.

MR. MOSKOVITZ: Yes, it is E, your Honor.

THE COURT: For Identification.

MR. STAHLMAN: Just one other question, then: You returned the other to Mr. Hall?

THE WITNESS: Yes, sir.

BY MR. MOSKOVITZ:

Q Now, Mr. Illingworth, continuing with California Exhibit AD will you point out the correlation between stream flow and level of the wells in the Ysidora Subbasin, the two

on the left side of the exhibit, with the runoff in 1958?

A  Yes.  In both cases a rise was indicated starting about February of 1958.  And in the case of Well 2N5 the rise was from about elevation 6 feet to nearly 12 feet.  And in Well 2E1 the rise which occurred after the first of the year-- first of the year the well level was just slightly over 8 feet; and it rose to a maximum of some 15 feet.

MR. STAHLMAN:  Did you get the ground level of that well?

MR. MOSKOVITZ:  Have you got these in order?

THE WITNESS:  I want to check it with Plaintiff's Exhibit 51 or 51A.

MR. MOSKOVITZ:  You had better do that.  We will do that later.

THE WITNESS:  Yes.

BY MR. MOSKOVITZ:

Q  Turning to the well 10 South, 4 West, 7J1 which is the well in the upper subbasin, what correlation does that show with the stream flow, graph flow?

A  Well 7J1 does not show a great fluctuation from minimum to maximum at any time during that period.  The lowest level was recorded in about August or September of 1958, about 85 feet above sea level, and the maximum was in approx- imately March of 1952, when the water level was about 91 feet. Now, in each winter period there is a rise indicated.  The

8762

1 maximum rises that have occurred occurred in 1952, calendar

2 year, and in 1958. However, they are both appreciably

3 greater than the others, other rises. It will be noted that

4 this elevation, the ground surface at this well is 93 feet,

5 and at all times the water level is very close to that surface,

6 being, oh, generally, about five feet below the surface. So

7 that while the large years do not show a much greater fluc-

8 tuation than the years of relatively little runoff, the reason

9 is that it was not possible for the water to rise any higher.

10 The small years provided enough water to bring the water level

11 up.

12     MR. VEEDER: Willyou say that again? I didn't hear.

13 What is the last thing you said?

14     THE COURT: Read it.

15     MR. MOSKOVITZ: Have it read.

16     (The Reporter read the record as follows: "The

17 reason is that it was not possible for the water to rise any

18 higher. The small years provided enough water to bring the

19 water level up.")

20     MR. VEEDER: I object to that, your Honor. Here

21 again, we have an instance where he goes right on down the

22 line. We have Lake O'Neill right there. We have a situation

23 where pumps are down, farther down. Perhaps this is cross-

24 examination. But I think that when the witness goes ahead

25 and comes up with these conclusions without a particular

8763

1    question being addressed to him, it is extremely difficult

2    to handle the trial.

3         THE COURT: It is his opinion, and you can cross-

4    examine. Obviously, he hasn't taken into account the fact

5    that you quit pumping downstream at Ysidora and started to

6    pump up in Chappo.

7                   When you do, it is pretty obvious that

8    the level in the Chappo begins to drop.

9         MR. MOSKOVITZ: I am glad younoticed that. I was

10   going to ask that question, your Honor. I think it is very

11   important.

12        MR. VEEDER: So do I.

13        THE COURT: Well, go ahead.

14        MR. MOSKOVITZ: When I have finished with all four of

15   the hydrographs, then, I will point out the difference.

16        MR. VEEDER: It is much better to go ahead with question

17   and answer, though, than--

18        THE COURT: Let's get the question and answer, Mr.

19   Moskovitz.

20   BY MR. MOSKOVITZ:

21        Q  Now, turning to Well 10 South, 5W, 23L1, would you

22   correlate those well levels with the runoff?

23        A  Yes. Hereagain, the water levels show rises in the

24   wintertime and drop in subsequent summer season. The rise in

25   1951-52 was even less than the rise which occurred in the year

MALCOLM E. LOVE, OFFICAL REPORTER

D

Z45

1   1954.  That is from the summer of '53 to the winter of '54.

2   Although the runoff for 1954 was considerably less than it

3   was in '52.  Here again, the water level is near the surface

4   of the ground, ground surface being 51.3 and the water levels

5   generally in the years '52, '53, '54 were around 44 feet;

6   and then the maximum that they reached in these years was

7   about 46 feet, which was only five feet below ground surface.

8   Now, then after 1954, we find that the water level gradually

9   drops.  It still shows a rise each winter, but the subsequent

10  drop is greater than the rise of the previous winter.

11  BY MR. MOSKOVITZ:

12      Q  Until 1958?

13      A  Yes.  In 1958, the rise in ground water level at

14  Well 23L1 was appreciable.  It is the maximum of this period

15  of record at the well, and water level from the first of

16  January, 1958, rose from approximately 36½ feet to about 46

17  feet in a matter of a few months.

18      THE COURT: Followed by a very sharp drop?

19      THE WITNESS:  Yes, sir.  This downward--

20      MR. VEEDER:  Ask a question, Adolph.

21      MR. MOSKOVITZ:  Yes, sir.

22      THE COURT:  What about it?

23  BY MR. MOSKOVITZ:

24      Q  The Judge asked you what about the sharp drop.

25      A  The drop that occurred from the year 1954 through

D

246

8765

1   1957 represents, in my view, the change in pumping pattern

2   in the Camp Pendleton Basin. More pumping was done upstream

3   in the years '55, '56 and '57 than was done, say, in 1951.

4   1951 was an all-time low year, in general, for Santa Margarita

5   Coastal Basin. But very little rise was indicated, or the

6   water level was at a rather high elevation in the summer of

7   '51 compared with what it was in the summer of '57.

8       THE COURT: What I was asking you: What significance do

9   you attach to the sharp drop in '58?

10      THE WITNESS: Oh, in '58.

11      THE COURT: After a peak, say, in March or April, then

12  you have a sharp drop sharper than any other previous year.

13      THE WITNESS: Well, I am not sure.

14      THE COURT: The way it drops, sharper than even in '53

15  where you had a big drop--

16      THE WITNESS: It dropped pretty sharply in '55.

17      THE COURT: You had a pretty sharp drop in '55, although

18  it was, well, how do you account for the drop? Pumping?

19      THE WITNESS: It is just pumping, yes, sir.

20  BY MR. MOSKOVITZ:

21      Q  Is there not a similar drop, not quite as sharp but

22  a drop, in 1958 after the peak was reached at that time in the

23  Upper Basin?

24      A  Yes, as represented by Well 10, 4, 7J1, there is a

25  rather rapid drop, not quite so abrupt as the one in '58,

D

Z47

1  although it represents generally the same thing in both cases.
2  It dropped about five feet.

3      Q  And do you have an opinion as to the cause of the
4  drops indicated on 10, 4, 7J1?

5      A  I believe that is because of pumping in the upper
6  subbasin.

7      Q  And can you compare the drops in the general trend
8  shown on the wells in the upper and Chappo Subbasins with the
9  trend of Well 11 South, 5 West, 2E1 shown over the years since
10  1952?

11      A  Yes.  In 1951, the water level at Well 11 South,
12  5 West, 2E1, in 1951, was in the vicinity of minus 7 feet. It
13  rose from that elevation to nearly 12 feet to the fall of '51
14  and the spring of '52.  This is a much greater increase than
15  similar increases for the similar time in the other two wells,
16  7J1 and 23L1 previously discussed.

17      Q  And the trend since 1952, all the fluctuating has
18  been generally upward in Well 2E1?

19      MR. VEEDER:  I object.  This is leading, completely
20  leading.

21      THE COURT:  Reframe it.
22  BY MR. MOSKOVITZ:

23      Q  What, in your opinion, is the reason why the trend
24  of the well level, water level in 2E1 is generally upward
25  since 1952?

1    A  This indicates that there was a decreas in pumping

2  in this vicinity of this well as compared with the amount

3  of pumping prior to 1951.  The pumping records of Camp

4  Pendleton bear this out.  This trend, incidentally, at Well

5  2E1--

6        THE COURT: What do you understand is the date when the

7  pumping was terminated in the Ysidora Basin and moved up

8  Chappo?

9        THE WITNESS:  Well, it hasn't been entirely terminated

10  yet, your Honor.

11        THE COURT:  The major portion of the pumping was diverted

12  upstream when?

13        THE WITNESS:  I have a record of when the Well 2E1

14  started pumping, stopped pumping.

15        THE COURT:  2E1?

16        THE WITNESS:  Yes, sir.

17        THE COURT:  When?

18        THE WITNESS:  I thought I had it right there.

19        THE COURT:  Sometime late on '51?

20        THE WITNESS:  It was in '51, yes, sir.

21        THE COURT:  All right.

22  BY MR. MOSKOVITZ:

23        Q  Now, Mr. Illingworth, this morning-- I guess it was

24  before the recess this afternoon; I am not sure-- the Court

25  asked you to compute the average runoff past Ysidora Gage for

1    the period 1942-43 through 1957-58, which is a period covered

2    in California Exhibit A.  Have you made that computation?

3         A  Yes.

4         Q  And what is the result?

5         A  For the period 1942-43 through 1957-58, the average

6    runoff measured at the stream gaging station at Santa Margarita

7    at Ysidora is 14,674 acre-feet per year.

8         MR. VEEDER:  Just half?

9         MR. SACHSE:  What was that?

10        THE COURT:  Half of the long-time record from '36-37

11   to '56-57.

12        THE WITNESS:  I repeat what I said this morning,

13   however; this is not representative--

14        MR. VEEDER:  I object to this.  We don't want speeches.

15        THE COURT:  Overruled.  You raised the question by

16   your interjection.  Now, let's find out what he was going to

17   say.  Go ahead, Mr. Illingworth.

18        THE WITNESS:  It does not represent an average con-

19   dition; it represents the tail end of a wet period and a full

20   dry period.

21        MR. VEEDER:  I move to strike the answer.  There is

22   absolutely no basis for the man's conclusion that it was a

23   wet or dry period.  There is no showing of anything, whether

24   it was a wet or dry period.  There is no cycle whatever shown.

25        THE COURT:  The record is replete with evidence of the

1    cycles.  Overruled.

2          MR. VEEDER:  I object, your Honor, to the term "cycle,"

3    because--

4          THE COURT:  Now, we are starting on which one?

5          MR. MOSKOVITZ:  We are starting on Exhibit AF.

6          THE COURT:  AF.  What is this directed to?  Coastal

7    basin?

8          MR. MOSKOVITZ:  Coastal basin, that is right, your

9    Honor.  Levels of water in the coastal basin.  We have another

10   one here?

11         THE COURT:  Well, now, your AD concerned with coastal

12   basin, too, didn't it?

13         MR. MOSKOVITZ:  I beg your pardon?

14         THE COURT:  Your AD concerned the coastal basin, didn't

15   it?

16         MR. MOSKOVITZ:  Let me check my--

17         MR. VEEDER:  Yes, that was the bar graph.

18         MR. SACHSE:  That is the one you just had.

19         MR. MOSKOVITZ:  Yes, that is the one we just had.

20         Q  I will call your attention to California Exhibit AF

21   for Identification.  Would you read the title block of that

22   exhibit?

23         A  The title block states:  "Profiles of Historical

24   Ground Water Levels, Santa Margarita Coastal Basin."

25         Q  And who prepared this exhibit?

1      A   This was prepared by a staff working under my direc-

2   tion.

3      Q   What data were utilized in preparing this exhibit?

4      A   Water level records obtained by the United States

5   Navy.

6      Q   And how did you obtain those?

7      A   And also I state records of December, 925, as

8   interpolated from a ground water contour map of that date

9   which I obtained from Mr. Hall.

10     Q   Would you explain what is depicted on California

11  Exhibit AF?

12     A   This is a profile through Santa Margarita Coastal

13  Basin along the river bed of Santa Margarita River along

14  the line of the river from the Pacific Ocean to De Luz dam

15  site.   The black line on this graph represents the elevations

16  of the river bed as interpolated from the United States

17  Geological Survey quadrangles.   The data with respect to the

18  water surface and the lagoon of February, 1948, are from an

19  exhibit which has been testified to by Mr. Cannon in this

20  litigation.

21     Q   What is shown on the vertical coordinates on each

22  side of the graph?

23     A   They represent the elevation in feet abo e sea

24  level and the negative value below sea level.

25     Q   And what is represented by the numbers on the

D2

Z52

1    horizontal coordinates at the bottom of the graph?

2        A  This represents distance in miles from the Pacific

3    Ocean upstream.  De Luz Dam Site is the upper end of the

4    chart, being located somewhat beyond 12 miles from the ocean.

5        Q  And then, the graph is broken up into 10-foot

6    intervals above sea level, is that right?

7        A  Yes, that is correct.  And it will be observed that

8    this is a greatly exaggerated vertical scale, 10 feet or

9    approximately 20 feet representing nearly a mile in the

10   horizontal direction.

11       Q  Would you point out the various water level profiles

12   which are shown there beginning with the earliest one?

13       A  In December, 1925, we were in a series of rather

14   wet years; and it probably represents near the all-time high

15   water level record in the basin.

16       THE COURT:  That is the blue line, now?

17       THE WITNESS:  Yes, sir.  Its water level was right on

18   the surface above the point where it joins the surface at

19   about stream mile 9.2 or 3.  Then, as we proceed downstream

20   it departs from the surface, gets to a maximum of approximately

21   five feet below, five or six feet below the surface at stream

22   mile 8; gradually approaches the river bed surface again and

23   is within a foot or so in the vicinity of stream mile 6.  Down

24   below that, downstream from that point, it again departs from

25   the stream bed reaching in maximum of some five feet or so

1   in the vicinity of stream mile 4.  Proceeding downstream from

2   that point the water level profile indicates, the water level

3   surface indicates that it is approaching the surface, and in

4   the vicinity of Ysidora stream gaging station it must get on

5   the surface.

6   BY MR. MOSKOVITZ:

7        Q   Before we proceed with any more of the details,

8   description, explanation, is this exhibit, California Exhibit

9   AF, correct to your knowledge?

10       A   Yes.

11       MR. MOSKOVITZ:  I offer California Exhibit AF in

12   evidence.

13       MR. VEEDER: I would like to ask a few questions.

14       THE COURT:  Go ahead.

15

16                    VOIR DIRE EXAMINATION

17   BY MR. VEEDER:

18       Q   When you referred to the interpolation of your

19   December, 1925, ground water level, did you check that back

20   against any other data or did you just accept that contour

21   map without any additional correction on your part or checking

22   out on your part?

23       A   I accepted it because, with the only evidence, that

24   Mr. Hall said he believed it to be reliable; and I could find

25   no background information for it.

D2

Z54

Q  Could you produce that map for us to view?

A  Would I?

Q  Yes.

A  I will ask Mr. Hall if he still has it in his records.

MR. MOSKOVITZ:  You don't have it, do you?

THE WITNESS:  I do not have a copy of it.

BY MR. VEEDER:

Q  You will do that?

A  I will ask the Vail Company attorney if he can obtain it for me.

MR. STAHLMAN:  I think Mr. Veeder can take care of that.

MR. VEEDER:  I will ask the Vail Company attorney for it, then.

THE COURT:  What are you asking for?

MR. VEEDER:  There is a line, the line of December, 1925, which is a blue line, which I am advised by the witness, in regard to California Exhibit AF marked for identification, he states that Mr. Hall provided him with that contour, with a contour map showing the water levels as of December, 1925. I asked this map be delivered to us for examination.

MR. MOSKOVITZ:  The witness stated he doesn't have the map in his possession.  Mr. Hall does.

THE COURT:  See if you can produce it.

D2

Z55

1    MR. STAHLMAN:  I will look for it, your Honor, and I

2  will produce it.

3    MR. MOSKOVITZ:  Have you any more questions on voir

4  dire?

5    MR. VEEDER:  No, let her go.

6    THE WITNESS:  I might say, one--

7    MR. MOSKOVITZ:  I renew the offer, your Honor.

8    THE COURT:  AF received in evidence.

9    What might you say, Mr. Illingworth?

10   THE WITNESS:  There have been some records submitted

11 in this case by the United States.  I haven't checked them

12 back against this.  It may be that some of the wells there

13 are close enough to this line of profile to be useful for

14 checking purposes.  I have not done so myself.  I don't know

15 what they would reveal.

16

17                  FURTHER DIRECT EXAMINATION

18 BY MR. MOSKOVITZ:

19    Q  Now, would you continue, Mr. Illingworth, to describe

20 the other water level contours after December, 1925?

21    A  Yes.  We have four others shown in chronological

22 order.  We have August, 1951, and March, 1952, November, 1957,

23 and May, 1958.

24    Q  Now, on each of those lines I notice that there are

25 some symbols.  X on the green line; triangle on the purple line;

D2

Z56

1    a circle on the red line; and a square on the orange line.

2    Would you explain what those are?

3        A   Those symbols indicate measurements.  For instance,

4    going back to Well 11S, 5W, 2E1 located at mile 2.9, we have

5    a circle indicating that the water level in May, 1958, was

6    measured at approximately the surface of the stream bed at

7    that point.  We have a measurement indicated at that well by

8    a square for March of 1952.  We have measurements indicated

9    as an X at that well in November of 1957.  And in August of

10   1951, we have indicated a well level by a triangle.  And so

11   under each well is located the measuring point for a particular

12   month and year for which profiles were drawn.

13       THE COURT:  December, '25, was listed as what kind of

14   symbol?

15       THE WITNESS:  We have no symbols on that line, your

16   Honor.

17       THE COURT:  No symbols?

18       THE WITNESS:  Since it was interpolated from a ground

19   water contour map.

20   BY MR. MOSKOVITZ:

21       Q   I notice that some of the symbols are away from a

22   line, and there are dots to a line.  What does that indicate?

23       A   The dotted lines indicate that the X belongs at the

24   end of the dotted line.  In the case of the measurements at

25   Well 10S, 5W, 13J1 at stream mile 8.2 we have two measurements

Illingworth - Direct

D2

Z57

1    that are very close to the same for those two periods of time--

2    November, 1957, and August, 1951.  Rather than confuse the

3    symbols by drawing one over the other, the draftsman chose

4    to arrow it in in that manner.

5         Q  Would you continue with your discussion of the

6    August, 1951, profile?

7         A  Yes.  August, 1951, shows a water level at its all-

8    time low in this basin, as far as Ysidora Subbasin is con-

9    cerned.  The succeeding March of 1952 shows the location of the

10   water levels in the basin after the winter runoff of '52.

11   Similarly, we have a pair of profiles, November, 1957, indi-

12   cating the low point at these wells prior to the runoff of

13   the spring of 1958.  The May, 1958, shows the high point after

14   ground water basins were recharged.

15        Q  Comparing the August, 1951, profile which was prior

16   to the runoff in 1952, with the November, 1957, profile which

17   is prior to the runoff of 1958, what differences are noted?

18        A  Well, the most marked difference is that in the

19   Ysidora subbasin the water level was below sea level in August

20   of 1951, whereas in November of 1957 the water level in the

21   basin is somewhat above sea level, namely, well, 10 feet above

22   sea level in Well 10S, 5W, 35K5.

23        Q  What, in your opinion, was the cause in the differ-

24   ence in elevation at that point?

25        MR. VEEDER:  Good husbandry.

MALCOLM E. LOVE, OFFICAL REPORTER

1    THE WITNESS:  The pumping in that subbasin decreased

2    quite rapidly in the years preceding November, 1957, over

3    what it had been in the years prior to August, 1951.

4    BY MR. MOSKOVITZ:

5        Q  Going upstream.

6        A  Yes; going upstream comparing the same two profile

7    lines, we have the November, 1957, profile showing the water

8    levels were lower in most of the restof the coastal basin.

9    This is true at Well 10 South, 4 West, 5-1 at the right-hand side

10   of the chart, on down through Well 10, 5, 13J1; and approximately

11   the same from that point down to the middle of Chappo Subbasin

12   at about stream mile 7.2.  From that point downstream to Well

13   10, 5, 26L1 the November, 1957, profile is lower.

14       THE COURT:  That is about the bottom part of the Chappo

15   Subbasin there, isn't it?

16       THE WITNESS:  Yes.  I should point out the extents of

17   the subbasin are indicated at the top of the chart.  Those

18   are the significant points that I see.  The change in pumping

19   pattern is what caused this shift from a low water level to a

20   higher water level in Ysidora Subbasin and a higher water

21   level to a lower water level in Chappo and Upper Subbasins

22   between those two years.

23       THE COURT:  You offer it?

24       MR. MOSKOVITZ:  Your Honor, this has already been

25   offered and not received, I believe.

THE COURT: All right. Received.

MR. MOSKOVITZ: Yes, in evidence.

Q Now, have you made any study of or was any study made in the course of the investigation of the Santa Margarita River by the Division of Water Resources of the usable storage capacity of the Santa Margarita Coastal Basin?

A Yes.

Q And what was the usable storage capacity calculated to be?

A We calculated it to be--

MR. VEEDER: Now, just a moment. Let's have some foundation on that. I object to it.

MR. MOSKOVITZ: This is already in evidence.

THE COURT: Do you have an exhibit on this?

MR. MOSKOVITZ: We have an exhibit, yes. Exhibit AL. But the usable storage capacity is already in evidence. That was testified to by Mr. James, as to this foundation.

THE COURT: All right. What is the exhibit, though?

MR. MOSKOVITZ: AL.

THE COURT: The objection is overruled.

You made a calculation, and what was the usable storage capacity of the --

MR. SACHSE: I don't understand the question myself, your Honor. Is this the whole basin or is this any one of them?

MR. MOSKOVITZ: This is the Santa Margarita Coastal

Basin.

THE COURT: All three of the subbasins?

MR. MOSKOVITZ: Yes.

Q Was such a calculation made?

A Yes.

Q And what was the usable storage capacity?

A 24,000 acre-feet.

Q And what is meant by usable storage capacity?

A This is the amount of storage underground that could be utilized without adversely affecting the quality of water in the wells, and without unduly increasing the pumping lift.

Q And what were the limitations which were used in computing that total?

A The limitations varied from subbasin to subbasin--

MR. VEEDER: Now, I am going to interpose another objection on this until the matter is cleared up. As I recall now, Mr. James was testifying as an independent entrepreneur at the time. He was not acting under your direction then, was he?

THE WITNESS: At the time he testified?

MR. VEEDER: No, when he made the calculations in regard to the ground water basins underlying the enclave.

THE WITNESS: He was working under my direction.

MR. STAHLMAN: I didn't hear the answer.

D2

Z61

1    MR. VEEDER:  He was under your direction?

2    THE WITNESS:  He was working under my direction at

3    the time he made the calculations.

4    THE COURT:  Are you starting in on AL?  Is that what

5    you are doing?

6    MR. MOSKOVITZ:  Yes, your Honor.

7    THE COURT:  Well, AL will explain these various

8    conditions and limitations.  Have you looked at it?

9    MR. VEEDER:  Yes, I have, your Honor.  I am trying to

10   keep up with the changing panorama of who did what in this

11   investigation.  Now, I wasn't sure that this was the one that

12   was responsible for the undertaking.

13   THE WITNESS:  Is there a question pending?

14   BY MR. MOSKOVITZ:

15   Q  The question is: What were the limitations on which

16   the usable storage capacity that was calculated was based?

17   A  In the Ysidora Subbasin it was assumed that the

18   water level would not be drawn below sea level, and in the

19   Chappo Subbasin the limitation was that it would not be drawn

20   below sea level, nor would it be drawn below 100 feet depth

21   from ground surface.  And in Upper Subbasin it was the same

22   as in Chappo, not more than 100-foot depth below ground surface

23   and not below sea level.

24   Q  And was there any limitation as to the upper boundary

25   of the Basin?

D2

Z62

1    A  Yes, we did not include in the calculations the top

2    ten feet; that is, from ground surface down to ten feet below

3    ground surface.

4         THE COURT:  In any of the subbasins?

5         THE WITNESS: That is correct.

6         MR. SACHSE:  What were those last figures again that

7    you did not add?

8         THE WITNESS:  The top ten feet.

9    BY MR. MOSKOVITZ:

10        Q  Now, I present to you California Exhibit AL for

11   Identification and ask you if you are familiar with that ex-

12   hibit?

13        A  Yes, I am.

14        Q  Would you read the title of that exhibit into the

15   record?

16        A  It is entitled: "Comparison of Usable Storage

17   Capacity of Santa Margarita Coastal Ground Water Basin as

18   Determined by the UnitedStates and by the State of California."

19        Q  Who prepared this exhibit?

20        A  I did.

21        Q  And what does it show?

22        A  It compares the calculations of estimated storage

23   capacity in each of the subbasins; first in accordance with

24   the criteria set up by the United States; and second, by the

25   criteria set up by the State.

THE COURT: Well, I don't know if I can understand it.

BY MR. MOSKOVITZ:

Q Would you first--

A Maybe I should point out the differences in the two. The United States calculated storage capacity in upper sub-basin. Instead of from 10 feet below the surface to 100, their calculation was from 5 feet to 70 feet. In Chappo Subbasin--

THE COURT: And they came up with 10,000 acre-feet, is that it?

THE WITNESS: Yes, sir. If you take our figure of 9,200 acre-feet, which was from 10 to 100, and correct for the fact that we went to 100 instead of 70, utilizing Plate 18 of State Exhibit L, you would subtract 1600 acre-feet. Then, to add the capacity to account for the top five feet, that is the available from 5 to 10 feet, you would add 1600, so that the net result is it is still 9,200 acre-feet of capacity. This compares with 10,000 by the United States. We did this for each of the subbasins.

THE COURT: I see it is on Chappo the United States said--

THE WITNESS: 5 feet to sea level, and we had 10 feet to sea level or not more than 100. And their calculation is 15,000 acre-feet. Our calculation, correcting it to their conditions, is 15,400.

1    THE COURT:  It appears you added what?

2    THE WITNESS:  We added capacity in 5 to 10-foot

3    elevations, levels.

4    THE COURT:  Previously you had--

5    THE WITNESS: We had gone from 10 feet down.

6    THE COURT:  10 feet downward or 10 feet up?

7    MR. STAHLMAN:  I don't get this.

8    THE WITNESS:  No, our capacity was based on the space

9    from 10 feet below ground surface down to 100 feet or to sea

10   level.  Actually, sea level was the controling factor here.

11   THE COURT: All right.  Now, Ysidora, you didn't count

12   the first five feet and went to sealevel and got 1200 acre-

13   feet?

14   THE WITNESS:  Yes, sir.

15   THE COURT:  And you didn't count the first 10 feet?

16   THE WITNESS:  Yes.

17   THE COURT:  You went to sea level and got 1200?

18   THE WITNESS:  Yes.  So to correct ours to be the same,

19   that is, from 5 feet down to sea level, if we add 500 to

20   ours, that results in a calculation of ours of 1700 acre-

21   feet compared with theirs of 1200.

22   THE COURT:  Now, the second part of it:  How did you

23   do this?

24   THE WITNESS:  Well, we reversed the procedure.  There

25   we took our criteria and adjusted the United States' data to

D2

Z65

1   it.  For instance, we had reported for the Upper Subbasin a

2   capacit8 of 9,200 based on 10 feet to 100 feet, and United

3   States Exhibit was 12,500.  From 5 feet to 100 subtracting

4   from--

5           THE COURT:  I thought it was 5 feet to 70.

6           THE WITNESS: 5 feet to 70 is correct.

7           THE COURT: And how do you get twelve five instead of

8   ten thousand?

9           MR. MOSKOVITZ:  Well, I think--  No.

10          Let me ask a question.  Perhaps that will help.

11          Q  You were correcting the United States to the State

12  criteria, is that correct?

13          A  Yes.

14          MR. VEEDER: Where are you now?  I am off the sled again.

15          MR. MOSKOVITZ:  We are in the lower portion.  We are

16  talking about the Upper Basin.

17          MR. VEEDER:  That is the last item?

18          MR. MOSKOVITZ:  The last item on the first page.

19          THE WITNESS:  Yes, your Honor, this is true.  But

20  Plaintiff's Exhibit 42 shows all of the data, and you can

21  select from those the capacity of five to 100.

22          THE COURT: So that gave you 12,500?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  Then you cut it down from five to ten feet?

25          THE WITNESS:  Yes.

THE COURT: All right.

THE WITNESS: So that was eleven six compared with 9,200. In Chappo Subbasin we have 10 feet to sea level, which, according to the State's Exhibit, is 13,600 and according to the United States Exhibit for 5 feet to sea level we have 15,000. Subtracting the capacity 5 feet to 10 feet from Plaintiff's Exhibit 42, we get adjusted capacity of 10 feet to sea level of 13,000. This compares with the State's 13,600. And Ysidora Subbasin, the State's calculation is 1,200 acre feet for 10 feet to sea level, and the United States calculation is 5 feet to sea level, is 1,200 acre feet from the Plaintiff's Exhibit 42 subtracting 5 feet to 10 feet is 800. The adjusted capacity is 400 acre-feet. That compares with 1200. Now, these are all summarized on the lower part of the second sheet. And under-assuming U.S. conditions the State would calculate a total for the entire basin of 26,300. The United States would calculate a capacity of 26,200. Assuming the State conditions, that is, the criteria established by the State, the United States data would yield a result of 25,000 acre-feet, whereas our reported value was 24,000. Now, both of those comparisons, incident- ally, I believe are very close to one another. The last couple of lines in the table compare with what the United States has relied on, as presented by Mr. Worts, 25,000 acre- feet; and that usable storage capacity reported by the State

1    is 24,000.  That again is a close comparison.  So, apparently--

2         THE COURT:  This last couple of lines aren't based on

3    the chart above?  The 24,000 for the State is?

4         THE WITNESS: Yes.  Well, the other--

5         THE COURT:  The 25,000, where do you get it?

6         THE WITNESS:  It is also based on this data in that they

7    said they did not feel it was useful or reasonable to rely on

8    the 1200 acre-feet in Ysidora, and so they said usable storage

9    capacity is 25,000.  They cut it down from 26 to--

10        THE COURT:  You mean in testimony?

11        THE WITNESS:  Yes, sir.

12        THE COURT:  Not cut down in the exhibit above?  In

13   other words, there is no way on this Exhibit AL that you arrive

14   at this 25,000 acre-feet for the United States?

15        THE WITNESS:  No, it was reported in testimony.

16        THE COURT:  Based on testimony?

17        THE WITNESS:  Yes, sir.

18        THE COURT:  All right.

19        THE WITNESS:  I believe it is also shown on one of the

20   Plaintiff's exhibits.

21        CDR. REDD: It is shown on Exhibit 43.

22        THE WITNESS:  43, yes.

23   BY MR. MOSKOVITZ:

24        Q  Is California Exhibit AL correct to your knowledge?

25        A  Yes.

D3

Z68

1    MR. MOSKOVITZ:  I offer California Exhibit AL in Evidence.

2    THE COURT:  AL received in evidence.  This doesn't show

3  much variation.

4    THE WITNESS:  Right.

5    MR. MOSKOVITZ:  Your Honor, the next part of our case

6  will concern the usability and method of use and the effective

7  use of a ground water basin, Santa Margarita Coastal Basin.

8  It begins a new phase.  I could start on it now or we could

9  wait until tomorrow.

10    THE COURT:  We lack fifteen minutes rather than to

11  start on it now?

12    MR. MOSKOVITZ:  Yes, I think it would be a little

13  better.

14    THE COURT: That is satisfactory.

15    MR. VEEDER:  May I inquire:  Will that terminate your

16  evidence, Mr. Moskovitz?

17    MR. MOSKOVITZ:  After we go through the three studies

18  we are going to put in the evidence about the mineral character

19  of waters in Pauba Basin, and then we also will offer for the

20  Court's consideration Plates 21A and 21B, if it appears to be

21  of some assistance to the Court.

22    MR. STAHLMAN:  Did you make a study of the capacity of

23  Pauba Basin?

24    MR. MOSKOVITZ:  No such study has been made beyond what

25  has already been made in connection with geology.

D3

Z69

1      THE COURT:  All right, we will adjourn until 10

2  o'clock tomorrow morning.

3          AG hasn't been offered, has it?

4          MR. MOSKOVITZ:  No, we haven't offered that yet.

5          THE COURT:  All right.

6          (Adjournment at 4:15 P.M. until Thursday, February 19,

7  1959, at 10 A.M.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25