VOLUME NO. 77

MR. WEEDER

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.  1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:   San Diego, California

Date:    Thursday, February 19, 1959.

Pages:  8789 to  8878

FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By

DEPUTY

MALCOLM E. LOVE
JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1
2
3
4

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

5

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6

- - -

7

8   UNITED STATES OF AMERICA,    )  )

9             Plaintiff,    )

10      vs.           )     No. 1247-SD-C.

11  FALLBROOK PUBLIC UTILITY   )
DISTRICT, et al.,       )

12             )

13           Defendants.   )

14

15         REPORTERS' TRANSCRIPT OF PROCEEDINGS

16

17             San Diego, California
             Thursday, February 19, 1959

18

19  APPEARANCES:

20       For the Plaintiff     WILLIAM H. VEEDER, ESQ.
                    and

21                      WILLIAM E. BURBY, ESQ.,
                      Special Assistants to the

22                      Attorney-General,
                      Department of Justice,

23                      Washington, D. C.

24

25

APPEARANCES (Continued):

    For Defendant    GEORGE E. STAHLMAN, ESQ.
    Vail Company

    For Defendant State   STANLEY MOSK, ESQ.,
    of California     Attorney-General, by
             ADOLPHUS MOSKOVITZ, ESQ.,
             Deputy Attorney-General.

    For Defendants
    Fallbrook Public    FRANZ R. SACHSE, ESQ.
    Utility District,
    et al.

    For Defendant Murray  WALTER GOULD LINCOLN, ESQ.
    Schloss Foundation

- - -

## INDEX TO WITNESSES

For Defendant State
of California:

|                        | D    | X | RD |
|------------------------|------|---|----|
| Leland Illingworth     | 8797 |   |    |

## EXHIBITS

| Defendant State of California Exhibit | In Evidence |
|---------------------------------------|-------------|
| AG | 8837 |
| AH | 8848 |
| AK | 8852 |
| AI | 8870 |
| AP | 8872 |
| AJ | 8877 |
| AQ | 8877 |

SAN DIEGO, CALIFORNIA, THURSDAY, FEBRUARY 19, 1959.   10 A. M.

THE CLERK:  Two.  No. 1247-SD-C, United States of America vs. Fallbrook Public Utility District, et al.   Further court trial.

MR. SACHSE:  Your Honor, I checked with Mr. Engleman this morning, and it appears that there are about three or four different combinations of physical ways that they pasted covers on and off these deeds in Fallbrook's B series, and he suggests that if your Honor desires that they be corrected so that the photographs will exactly reflect the appearance of the exhibit he would like to withdraw them over the weekend and have them exactly to compare with the deeds.  However, Mr. Veeder says that he doesn't particularly care, that he is having them checked out by Col. Bowen and if there are any discrepancies he will call them to my attention and that we will try to iron it out.  It is solely for your Honor's convenience.  But if you want the change I would ask to withdraw them over the weekend.

THE COURT:  I don't care.  I just couldn't understand them.  I looked at one side of the deed and the other side--

MR. SACHSE:  Apparently the girl photographed the whole page three times, because there were three different sheets of paper pasted on top.  Sometimes the description was too long and that is on top; sometimes the certificate of

Fallbrook accepting the deed is on top, sometimes they are both on top, and to create them so that they exactly reflect the instrument sometimes would take several overlays.

THE COURT:  I just thought that the exhibit ought to be an exact copy.  It doesn't necessarily have to look alike. The exhibit can be just a typed copy, but the material should be equivalent to what is on the original exhibit.

MR. SACHSE:  May we leave them until we see what Mr. Veeder has to offer on it.

THE COURT:  All right, let us wait and see.  Col. Bowen will be working with them.  He has already demonstrated that he is smarter than I am.  Maybe he can figure them out.

MR. SACHSE:  One further remark, your Honor.  With your permission, I am going to be out of the court at about 2:30 this afternoon and be gone the rest of the afternoon.  There is a meeting of the San Diego County Water Authority that I must attend.

THE COURT:  All right.  I

MR. SACHSE:  I will catch up on the proceedings by way of the transcript.

THE COURT:  All right.

MR. MOSKOVITZ:  Your Honor, I found a number of errors in the transcript for Tuesday, February 17 that I would like to correct.

The first correction is on page 8574 at line 11; the

8794

1    word "affect" should be "effect," and then it says, "Upon the

2    operation on the Santa Margarita Coastal Ground Water Basin"

3    and it should be "Upon the operation of . ."

4         At Line 16 it should be "State's Exhibit L."

5         At Line 24 the word "illustrate" is misspelled.

6         Moving on to page 8577, at line 20, there should be a

7    comma after the word "basin" where it appears the second time

8    in that line.  The word "and not" should be stricken follow-

9    ing the comma.

10        Moving to page 8587, on line 4 and on line 7, the

11   word "logged" should be "lodged."

12        On line 9 the word "athematical" should be stricken

13   and instead put "and arithmetical."

14        On line 11 after the words "would like" insert the

15   words "leave of."

16        At line 12 again the word should be, near the end

17   of the line, "lodged" instead of "logged."

18        On page 8597, at line 5 at the end of the sentence the

19   numbers "1925-26" should be added.

20        MR. SACHSE:  Precipitation season 1925-26?

21        MR. MOSKOVITZ:  That's right.

22        On page 8599, line 23, the word "athematic" should

23   be "arithmetic."

24        On page 8607, at line 7, after the words "notice that"

25   there should be inserted the word "between"-- "you will notice

     that between each of the horizontal . ."  Then after the word

8795

"horizontal" there should be inserted the word "lines."

At line 8 the second time the word "20" appears it should be "40" instead of "20."

THE COURT: So it is approximately 40, then?

MR. MOSKOVITZ: Yes, your Honor.

THE COURT: All right.

MR. MOSKOVITZ: At line 9 the word "deviation" should be "deviates"-- "this deviates from the average" instead of "deviation;" put a comma after the word "average" and a comma after the word "100," in line 10; and then near the end of line 10 the word "about" should be the word "to."

On page 8610, line 20, the word "accumulation" should be "accumulated," and in line 21 the word "smaller" should be "greater."

At page 8613, line 7, there should be a comma instead of a period at the end of that line, and then add the following words "and from 1917 through 1926."

THE COURT: All right.

MR. MOSKOVITZ: At line 13 of that same page, where the well number is given, it should be "15" instead of "50"-- "15C" instead of "50C."

At line 15 it should be "Table D" instead of "V."

At page 8614, line 12, the word "situation" should be changed to "station."  Then on line 24 the number 23 should be "3"-- "Table 3."

On page 8627, line 2, the word "two" should be "on." "Relationship on the two charts."

On page 8629, line 2, the word "Light" should be "Flood"-- Riverside County Flood Control and Water Conservation District"-- add the word "and" at the end of the line.

At line 13 the words "the same" should be stricken and inserted instead the word "another."

THE COURT:  So that it reads then another station.

MR. MOSKOVITZ:  At line 15 the word "not" should be stricken.

At page 8632, line 17, the word "tit" should be "pip."

On page 8638, line 3, the word "in" should be changed to "mean"-- Santa Margarita near Fallbrook mean Daily Discharge."

At line 13 strike the word "in" and then strike the word "prepared" and insert instead the word "presented."

On page 8643, line 19, the word "now" should be "not".

And then in line 20 after the word "entire" insert the words "basin including"--"the entire basin including," and after the word "upper" insert "and", -- entire basin including the Upper and Chappo Subbasins.

On page 8644, line 7, the word "and" should be instead the words "in the," so it would read "between the two stations in the reach;" and in line 8 the word "Creek" should be stricken and the word "gauge substituted."

That's all, your Honor.

A

Z9

1    THE COURT:  All right, the corrections will be made.

2

3                    LELAND ILLINGWORTH,

4    recalled as a witness in behalf of the defendant State of

5    California, having been previously sworn, testified further

6    as follows:

7

8                    DIRECT EXAMINATION (Resumed)

9    BY MR. MOSKOVITZ:

10        Q  Mr. Illingworth, referring to California's Exhibit

11   AF on the board, has the usable storage capacity of the Santa

12   Margarita Coastal Basin ever been fully utilized?

13        MR. VEEDER:  I object to that, your Honor.  There is

14   absolutely no basis for that conclusion, ever been fully

15   utilized.  No one knows that the utilization of it can be.

16   No one knows the criterion.  No one has the slightest con-

17   ception of what he means by that question.

18        THE COURT:  I don't know what "utilized" means.  The

19   objection is sustained.

20        Reframe the question.

21   BY MR. MOSKOVITZ:

22        Q  Referring to California's Exhibit AF, has the

23   storage capacity which you testified to yesterday, 24,000

24   acre-feet, ever been utilized in the sense that the water has

25   been withdrawn to the point that 24,000 acre-feet storage has

A

Z10

1  actually been used?

2      MR. VEEDER:  I object to that again.

3      THE COURT:  What do you mean by that?  Do you mean that

4  in order to store 24,000 acre-feet you have to draw that much

5  water out to leave a blank or void of 24,000 acre-feet?  Is

6  that what you mean?

7      MR. MOSKOVITZ:  That is what I mean.

8      MR. VEEDER:  I certainly object to that, your Honor.

9      THE COURT:  Your question is, then, have the water

10  levels in the basins ever been drawn down so that there re-

11  mained after the water was drawn down 24,000 acre-feet?  Well,

12  ask it that way, so that we will understand what you mean.

13  BY MR. MOSKOVITZ:

14      Q  Have the water levels ever been drawn down to the

15  point where 24,000 acre-feet of usable storage has existed in

16  the Santa Margarita Coastal Basin without water?

17      MR. VEEDER:  I object to that again, your Honor.

18      THE COURT:  It calls for the witness's opinion.  He

19  has made a study of these well levels, et cetera.  I think he

20  is competent to give an opinion.  The objection is overruled.

21      THE WITNESS:  No, the water levels have never been

22  drawn do the full extent that would be required to utilize

23  the full storage of 24,000 acre-feet.  Reference to California's

24  Exhibit AF indicates that in the Ysidora Subbasin the water

25  level at one time, the lowest that I have been able to de-

A

Z11

1  termine from any of the records available, occurred in August,

2  1951.  This is the purple line shown on Exhibit AF, and that is

3  the only time that the water levels were drawn down to that

4  extent.  In Chappo Subbasin and in Upper Subbasin the water

5  levels at the lowest of record were quite close to the surface

6  of the ground and many feet above sea level, which was de-

7  termined both by the United States Geological Survey and by my

8  staff as being the limit of the storage capacity-- that is,

9  sea level.

10        THE COURT:  As a practical matter, it would never be

11  economically feasible to draw that kind of basin down to where

12  there was 24,000 acre-feet of storage available, would it?

13        THE WITNESS:  On the contrary, I think it would be

14  economically feasible.  This was the basis--

15        THE COURT:  How would you know?  You draw it down to

16  where you had 24,000 acre-feet of storage because you anticipate

17  it is going to be filled up by rain next week; is that the idea?

18        THE WITNESS:  No, sir.  It is exactly the same thing as

19  a surface reservoir.  If you have a surface reservoir and it

20  has a certain capacity, as the Vail Dam, for instance in this

21  watershed, if it is full you utilize the water.  If that

22  reservoir is kept full at all times, it is not going to be of

23  any use to anyone, and it is only by drawing water out of it

24  that it is of value.  So that by using water you rely on your

25  judgment that it will fill at sometime.  If you didn't believe

1   it would have filled you would not have built it.

2           This is exactly the same situation that you have with

3   the ground water storage basin.  You make certain calculations

4   as to how much the water supply is to it and you make estimates

5   of how much you can withdraw, just as you would with a surface

6   reservoir, and you operate it in some manner that is appropriate.

7           THE COURT:  Well, if you are dependent for the opera-

8   tion of a military plant largely upon water in that basin, can

9   you pull it down to where you would have a void of 20,000

10  acre-feet, and then what would you do if rains didn't come

11  and you had a real dry spell?

12          THE WITNESS:  Certainly I would draw it down to some-

13  what approaching 24,000.

14          THE COURT:  I am not talking about drawing a basin

15  down 10,000, 5,000, 15,000; but I am talking about a basin

16  that has a storage capacity of 24,000 acre-feet, if you ever

17  draw it down to the bottom.

18          THE WITNESS:  You might say this is not the bottom in

19  this case.  This is what is considered safe to use.  There

20  is still quite a bit of water in storage below that.  I think

21  the calculations run from forty or fifty to sixty thousand

22  total acre-feet in storage.  To be sure you would have to

23  go below sea level to some extent.

24          However, if I were operating a military base, as you

25  asked me, I certainly would want to make provision for an

1    alternate supply of some sort.

2         But I repeat the statement that if you have any kind

3    of reservoir and you maintain it full or nearly full at all

4    times, you are not utilizing it, and this is what the Geological

5    Survey had in mind-- Mr. Worts, I am sure.  The testimony will

6    indicate that he considered that 25,000 acre-feet, in his

7    view, could be utilized, and this is what he meant.  It could

8    be--

9         MR. VEEDER:  Your Honor, I move to strike that whole

10    statement in regard to Mr. Worts.  I move to strike everything

11    he says, but certainly this part psychoanalyzing Mr. Worts.

12         THE COURT:  His statement as to what Mr. Worts meant

13    may go out.

14         Go ahead, Mr. Moskovitz.

15         MR. VEEDER:  I desire also to make another motion to

16    strike his argumentative comments to your Honor.

17         THE COURT:  The motion is denied.  They are opinion.

18         MR. VEEDER:  I would like to have it in the record as

19    to why I think they should be stricken, your Honor.  He has

20    started arguing in connection with the matter why we should be

21    required to draw down our basin by 24,000 acre-feet and why

22    we should be placed upon the completely impossible legal

23    situation of drawing down our basins, destroying the vegetative

24    cover, making it more difficult to pump and have all these

25    thousands of different facts involved without a single bit

A

Z14

1  of foundation.  I object to the question in the original

2  instance.  Then he went ahead and compared it with the

3  reservoir put in by the Vails.  That reservoir has never been

4  a quarter full.

5       THE COURT:  He hasn't mentioned any particular reser-

6  voir.

7       MR. VEEDER:  I think he said the Vail Reservoir.

8       THE COURT:  I missed it if he did.  I thought he was

9  making a comparison with a surface reservoir.  So what if he

10  did?

11       MR. VEEDER:  I think that these argumentative statements

12  by the witness are almost as bad as-- I will not use the term.

13  But in any event, where are we going?  Does it say that we have

14  to use 24,000 acre-feet or leave it at 24,000 acre-feet pulled

15  down?

16       THE COURT:  He is giving his opinion.  Also, of course,

17  he said that if he was a military commander he would have an

18  alternate supply.  The thought went through my mind that maybe

19  having this basin full of water was an alternate supply for an

20  emergency.

21       MR. VEEDER:  That is exactly what it is.

22       THE COURT:  He can give his opinion.  The objection is

23  overruled.  The motions to strike are overruled.

24  BY MR. MOSKOVITZ:

25       Q  Mr. Illingworth, have you made any calculations of

1   the amount of water that could be withdrawn annually on the

2   basis of 24,000 acre-feet of usable storage being utilized,

3   taking into account a past period of record, assuming flows

4   and recharge into the basin?

5       A   Yes.

6       Q   In making such a study, is this what is known as a

7   yield study?

8       A   Yes.

9       Q   Will you explain what a yield study constitutes and

10  what factors are taking into account in making a yield study?

11      A   Yes.   In its most simple concept, a yield study

12  simply takes into account the water supply available to a

13  reservoir, the demands placed upon that reservoir, and takes

14  into account the amount of storage available.

15          For instance, the yield study is calculated on a year-

16  by-year basis.  Starting, say, with a full reservoir, we have

17  starting storage of, say, 50,000 acre-feet.  If the inflow

18  to the reservoir-- and I am speaking now of reservoirs in

19  general-- had an inflow of, say, 5,000 acre-feet and a demand

20  of 3,000 acre-feet, you would have more supply than demand

21  for a given period of time and you would have a waste beyond

22  this reservoir of some 2,000 acre-feet.  So that the storage

23  at the end of this period of time that we considered would

24  still be 50,000.

25          Now, assume a situation where the supply is only

A

Z16

Illingworth - Direct

8804

1,000.  You start with 50.  You add 1 and subtract 3--

Q  Why do you subtract 3?

A  That was the demand placed upon the basin for the same period of time as in the first example.  In this situation you are 2,000 acre-feet short of being full at the end of the period.  So that you have 48,000 acre-feet of water in storage in this example.  In other words, you start with your starting storage at the beginning of the period, you add your inflow or supply, subtract the demands during the same period of time, and you arrive at an ending storage.  You do this throughout a critical dry period and you select the most critical one that you can find, the driest record, and make such calcula- tion year by year.  The minimum yield that you could get throughout an entire dry period--

Q  You mean minimum or maximum?

A  It is a maximum that you could get without running the reservoir dry or just running it dry would be called the safe annual yield.

The reason it is called the safe annual yield is be- cause since you select the driest period you can find, on the basis of that period of record that you have this is the yield that could be taken out continuously over a long period of time if the weather conditions were similar to those that you assume, and you would not--

MR. VEEDER:  You say if weather conditions were similar?

A

Z17

1       THE WITNESS:  Yes.

2   BY MR. MOSKOVITZ:

3       Q  And what weather conditions do you assume?

4       A  I didn't finish that sentence, Mr. Moskovitz.

5       MR. VEEDER:  Sorry.

6       MR. MOSKOVITZ:  Go ahead.

7       THE WITNESS:  And the storage would not drop below

8   zero in the reservoir.

9   BY MR. MOSKOVITZ:

10      Q  What weather conditions do you assume in making such

11  studies?

12      A  Take the driest period to be safe that you have any

13  records of.

14      Now that was a general case.

15      In the case of a surface reservoir there are other

16  factors that have to be considered.  Evaporation is an important

17  factor.  The larger the reservoir, the larger the surface area

18  of the reservoir compared with the storage capacity, the

19  greater will be the evaporation, and this is an important factor

20  in the case of a surface reservoir.  In the case of a ground

21  water reservoir the evaporation factor is not important,

22  especially during the dry period, because the water levels are

23  drawn down below the surface and what evaporation there might

24  be or evapo-transpiration by vegetation overlying the basin

25  is a relatively insignifcant factor during this critical dry

Illingworth    Direct

8806

1    period.

2         Q  In making yield studies, in some instances is the

3    size of the reservoir the critical factor, the most critical

4    factor, whereas in other instances the water supply is the

5    most critical factor?

6         MR. VEEDER:  That is objected to as being completely

7    leading, your Honor.

8         THE COURT:  Overruled.

9         THE WITNESS:  Yes, the size of the reservoir compared

10   with the water supply available to it is a very important

11   factor.  For instance, if on the Santa Margarita River you

12   put a reservoir the size of Lake Mead it would never fill up.

13        Q  Lake Mead is where?

14        A  Lake Mead is the reservoir behind Hoover Dam.

15   And the yield that could be obtained from such a reservoir

16   would be equal to the water supply reaching the reservoir

17   less the evaporation, divided by the number of years that

18   you assumed for your study.

19        Now this obviously would not be an economical

20   structure.  But there in the situation with a large

21   reservoir with respect to the supply, the yield is equal to

22   the average supply.

23        Now in the case of a small reservoir the yield is

24   dependent on the storage capacity.  In the first case, with

25   a large reservoir, it could have been built ten times as

A

Z19

1    large as it was and the yield would be exactly the same.

2    It is entirely dependent upon the average supply.  In the

3    case of a small reservoir the yield is dependent to much

4    greater extent upon the storage capacity of the reservoir.

5              In the case of this Santa Margarita Coastal Basin--

6              MR. VEEDER:  I object until there are some more

7    questions, your Honor.  This going on without question and

8    answer makes it almost impossible to cross-examine.

9              THE COURT:  Ask another question.

10   BY MR. MOSKOVITZ:

11             Q  I have asked for the limiting factor in the case

12   of a small reservoir on the yield.

13             A  The limiting factor is the size of the reservoir.

14             Q  Is there a difference between a surface and an

15   underground reservoir with respect to the manner in which the

16   supply to the reservoir is received?

17             MR. VEEDER:  I object, your Honor.  That is too wild,

18   too speculative, too broad.

19             THE COURT:  Overruled.  Let's see what his views are

20   on this matter.

21             THE WITNESS:  Well, in the case of a surface reservoir

22   any of the surface waters reaching the reservoir through the

23   stream can be utilized as recharge to the reservoir.  In the

24   case of a ground water reservoir, however, as we noted in the

25   records of California's Exhibits A through E, water passes

A

Z20

over a basin at times that is in excess of the ability of the

basin to accept recharge, and the recharge or the supply to

this kind of reservoir, that is a ground water reservoir,

is the amount of water which will percolate into that basin.

It is not the entire stream flow. This is the basic difference.

THE COURT: What side are you on today, Mr. Veeder? As

I understand, the way things are going, Mr. Moskovitz is

attempting to prove that there is a ground water basin here

and that the United States has a right to use riparian water

to charge this basin. Now this is not in accord with the views

of some of the other litigants in this case, possibly not in

accord with them. Which side are you on?

MR. VEEDER: I am on this side, your Honor, that when

we get through I don't want anybody tampering with our basin,

and when I hear a man talking about some wild blue yonder

24,000 acre-feet of this intermittent flashy stream I say he

has gone far beyond any realm of common sense.

THE COURT: Your witness said 24,000 or 25,000 acre-

feet.

MR. VEEDER: That's right.

THE COURT: Your witness says about the same.

MR. VEEDER: We are saying that we could hit that basin

for two years for 23,000 acre-feet and then we would probably

be in a great deal of difficulty. That is the difference. Our

witness said this-- and I am glad that your Honor opened up this

proposition because I would like to unload for just a moment--
the point that I make is that we are going now into the area
where he is purely speculating, he is talking about taking
24,000 acre-feet of water out of a reservoir, and we know that
we couldn't possibly operate that way.

THE COURT:  What did your witness mean when he said
that the storage capacity of this basin was 24 or 25 thousand
acre feet?

MR. VEEDER:  He is saying that in a period of crisis
we could probably pull down to 24,000 acre-feet.  But below
that we would probably ruin our basins and we would probably
ruin our basin before that.

THE COURT:  I think California's view is the same.
They say 24 or 25 thousand acre feet.  I forget which has the
extra thousand acre-feet.

MR. MOSKOVITZ:  The United States's is the larger.

MR. SACHSE:  The United States's is larger.

THE COURT:  All right, California says 24,000, and I
assume, inferentially, that since that is the limit they put
upon the safe storage capacity that any use of more water out
of the basin would not ordinarily be the same thing to do.

MR. VEEDER:  And that is precisely the point I make.
We have never said that it was safe to withdraw 24,000 acre-
feet of water.  We say you could do it without destroying your
basin, but there is not the slightest reason for saying that

1   the basin would be recharged, that there would be any means

2   of recovering the level of the basin to the full basin again.

3   There is no reason whatever for tying Mr. Worts's testimony to

4   this man's mental gymnastics in regard to runoff and firm supply.

5   There is an entirely different aspect between firm supply and

6   the safe storage capacity.

7       THE COURT:  When we get to that we will let Mr. Worts

8   speak for himself.

9       Proceed.

10  BY MR. MOSKOVITZ:

11      Q  Is it an accepted engineering practice when you are

12  delving into the hydrology of a stream to make yield studies

13  such as you have just described?

14      A  Yes.

15      Q  And is this done both for surface storage dams

16  and for underground storage reservoirs?

17      A  Yes.

18      MR. MOSKOVITZ:  Your Honor, I would like to put up on

19  the board for illustration during the next series of questions

20  Plaitiff's Exhibit 40, which is an exhibit showing the Santa

21  Margarita Coastal Ground Water Basin, virtually with the same

22  outlines that the State has.  There is a slight difference,

23  but for the purpose of the testimony I think it will be very

24  helpful to have it here.

25      THE COURT:  What exhibit is this now?

1    MR. MOSKOVITZ:  This is Exhibit AK for Identification,

2  your Honor.  We haven't had this up yet.

3    Q  I refer you to California's Exhibit AK for Iden-

4  tification and ask you to read the title block.

5    A  It reads "Santa Margarita River Watershed Study

6  Areas."

7    Q  Who prepared this exhibit?

8    A  This was prepared under my direction.

9    Q  And what does this exhibit show?

10    A  This shows an outline of the watershed boundary of

11  the Santa Margarita River.  It shows lines dividing the

12  various hydrographic units that were outlined on Plate 6, that

13  were on the wall.  These boundaries I am point to with my

14  pointer, roughly.  I will point to the centers of this

15  Hydrographic Unit 1, Murrieta Creek drainage, Hydrographic

16  Unit 2, Hydrographic Unit 3, Hydrographic Unit 4, areas marked

17  A, B, and C together constitute Hydrographic Unit 5, Area D

18  plus the small area in white next to the ocean constitute

19  Hydrographic Unit 6.

20    THE COURT:  Mr. Veeder has a long-distance call.  I

21  will take a short recess.

22    MR. VEEDER:  Thank you.

23    (Recess.)

24    THE COURT:  The case is continued until 2 o'clock.  We

25  will adjourn a little early.  I have to to go a meeting and

Illingworth   Direct

8812

1    I have some other matters that have come up.

2         (Noon recess.)

SAN DIEGO, CALIFORNIA, THURSDAY, FEBRUARY 19, 1959.   2:38 P.M.


        MR. SACHSE:  Your Honor, with your permission I will
absent myself for the rest of the afternoon from the proceeding,
as I mentioned this morning.

        THE COURT:  You may.  Did we hold you up too long?

        MR. SACHSE:  No, your Honor.  As a matter of fact, I
could stay a little longer, but I would rather not interrupt.

        THE COURT:  All right.


                    LELAND ILLINGWORTH,
recalled as a witness in behalf of the defendant State of
California, having been previously sworn, testified further
as follows:


                    DIRECT EXAMINATION (Resumed)
BY MR. MOSKOVITZ:

        Q  Mr. Illingworth, when we recessed you were discussing
the California's Exhibit AK for Identification.

        A  Yes.

        Q  I believe we can start with your explanation of the
areas that are outlined on that exhibit.

        A  I had mentioned the areas A, B, C and D which are
outlined on this chart.  Area A is the watershed of the Santa
Margarita River which lies between the two stream gaging

1  stations entitled "Santa Margarita River near Temecula," and

2  "Santa Margarita River near Fallbrook," and I am pointing for

3  the first station to the No. 3 on California's Exhibit AK and

4  the second station is the No. 2 on California's Exhibit AK.

5      Area B is the watershed of the Santa Margarita River

6  lying downstream from the stream gaging station at Fallbrook

7  and upstream from the location of the De Luz dam site and

8  excluding that portion of the watershed which constitutes the

9  drainage area of De Luz Creek above the stream gaging station

10  of the Geological Survey entitled "De Luz Creek near Fallbrook"

11  and this is located on the map at the No. 4.

12      Area C then is the watershed of De Luz Creek above that

13  gaging station.

14      Area D represents the watershed of the Santa Margarita

15  River lying downstream from De Luz Dam Site and upstream from

16  the stream gaging station entitled "Santa Margarita River at

17  Ysidora."  I am pointing to the map at the number 1 which

18  indicates the location of that station.

19      Q  Would you point out the location of the other gaging

20  stations which are marked on California's Exhibit AK?

21      A  Yes.  The remaining stations and all stations shown

22  on this map are those operated by the United States Geological

23  Survey.

24      Number 3 is the location of the Santa Margarita River

25  near Temecula Station.

1          Number 5 is the station on Murrieta Creek near Temecula.

2          Number 6 is the location of the stream gaging station at

3    Vail Reservoir.

4          There is one further or one additional station operated

5    in the watershed currently by the United States Geological

6    Survey that is not shown on this map.  It is on Temecula Creek

7    near Aguanga.

8          Q  Now, what are these study areas, areas A, B, C and D,

9    as shown on California's Exhibit AK, used for or what were these

10   used for?

11         A  They were used in determining the runoff from un-

12   measured areas, areas unmeasured by stream gaging stations,

13   to which we have just referred.  During the course of the

14   studies, or during the period of analysis of the studies, the

15   station on De Luz Creek was not in operation throughout the

16   entire period.

17         Q  Referring to Plaintiff's Exhibit 40, which is entitled

18   "Santa Margarita River Watershed Within Camp Pendleton," would

19   you point out the limits of the Santa Margarita Coastal Basin

20   as delineated on that map?

21         A  This map, Plaintiff's Exhibit 40, delineates the

22   basin as depicted by the witness for the plaintiff, Mr. Worts.

23   It is not exactly the same as the ground water basin as defined

24   by the State, but it very closely approximates the same.  And

25   you will note that it extends from the southern boundary at

1   Ysidora Narrows to the northern boundary at De Luz Dam Site,

2   and the basin boundary is shown in a heavy black line which I

3   am following with my pointer.  The basin is subdivided into

4   three subbasins by a dotted line at this location, which is

5   in Section 18 of Township 10 South, Range 4 West.  The second

6   boundary is the boundary between the Chappo Subbasin and the

7   Ysidora Subbasin, to which I am now pointing.  It lies in

8   Section 26 of Township 10 South, Range 5 West.

9        MR. MOSKOVITZ:  You may resume your seat, Mr. Illing-

10   worth.

11        Q   I hand you California's Exhibit AH for Identification

12   and ask you to read the title block of that exhibit.

13        A   The study is entitled "Yield of Santa Margarita

14   Coastal Basin and waste to ocean under actual conditions of

15   water supply, 1936-37 through 1957-1958, assuming full de-

16   velopment of usable ground water storage capacity."

17        Q   Now, would you read the information set forth in the

18   upper left side of the first page of this exhibit.

19        A   Yes.  This information summarizes the assumptions

20   of the study.

21        Q   And what study number is this, for purposes of the

22   testimony?

23        A   This is Study 1.

24        MR. VEEDER:  Your Honor, I am going to object to having

25   these things read in.  I think he can identify the exhibit

1  without reading into the record the data contained upon it.

2  I submit that proper identification doesn't entail a reading

3  of what appears on the document.

4  THE COURT:  These are the assumptions that you acted

5  under, the matters contained in the typewritten material

6  under the words "Study 1."

7  THE WITNESS:  Yes, sir.

8  MR. MOSKOVITZ:  Your Honor, I believe some explanation

9  is necessary to make this fully understood.

10  THE COURT:  All right.  The objection is overruled.  I

11  want to know just what these assumptions were.

12  You assumed a basin capacity of 24,000 acre-feet?

13  THE WITNESS:  Yes, sir.

14  THE COURT:  That was California's figure.  The United

15  States's figure was 25,000.

16  THE WITNESS:  Yes, sir.

17  THE COURT:  And your period of analysis--

18  THE WITNESS:  --was 1936-37 through 1957-58.

19  MR. MOSKOVITZ:  Your Honor, I would like him to develop

20  why that period was chosen.

21  THE COURT:  Why was that period taken?

22  THE WITNESS:  This was the weather cycle which included

23  a full period of wet years and the dry years ending in 1956-

24  57.  It also includes the wet year 1957-58 to show that the

25  basin would be recharged at the end of this dry period.

1    THE COURT:  Then you say "Critical period for ground

2   water yield April 1, 1947, to January 1, 1958."  Why did you

3   take that period?

4    THE WITNESS:  This is not an assumption.  This is one

5   of the results of the study.

6    THE COURT:  This is a conclusion, then?

7    THE WITNESS:  Yes, sir.

8    THE COURT:  Now the next line says, "Safe seasonal

9   yield."  This is a conclusion?

10    THE WITNESS:  Yes, sir.

11    THE COURT:  Why is 8,600 underlined instead of 8,630?

12    THE WITNESS:  It is rounded off to the nearest hundred

13   acre-feet.

14    MR. VEEDER:  Your Honor, may I interrupt for just a

15   moment.

16    I have these graphs that you just showed me, Mr.

17   Moskovitz, marked Exhibit AO.  Which one correlates with AH?

18    MR. MOSKOVITZ:  AO correlates with AH.

19    MR. VEEDER:  Thank you, sir.

20    MR. MOSKOVITZ:  And successively AP will correlate with

21   the next one, and AQ will correlate with AJ.

22    MR. VEEDER:  Thank you, sir.

23    THE WITNESS:  There is one further item there.

24    THE COURT:  What is the "October-March 45%," what does

25   that mean?

THE WITNESS: This is an assumption as to the way the demand on the basin would be made. In other words, during the winter six-months period, that is October through March, it was assumed that 45% of the demand on the basin would occur.

THE COURT: This is assumed or this is a conclusion after you made the study?

THE WITNESS: No, the percentages represent an assumption.

THE COURT: The 8600 acre-feet is a conclusion after you got through with these studies?

THE WITNESS: Yes, sir. But the percentages--

THE COURT: 45 and 55 are assumptions?

THE WITNESS: Yes, sir.

THE COURT: Based on what?

THE WITNESS: The records of pumpage at Camp Pendleton.

MR. MOSKOVITZ: Showing the distribution that they have had roughly in the past?

THE WITNESS: Yes, sir.

THE COURT: Then your next "Average Seasonal Waste to Ocean for 21 Winter Seasons, 2,400 acre-feet" per season, is it?

MR. MOSKOVITZ: 24,000.

THE COURT: 24,000 per season?

THE WITNESS: Yes, sir.

THE COURT: But this is the average?

THE WITNESS: Yes, sir. It does not include the wet

year 1957-58, incidentally. It goes from the start of the wet
period to the end of the succeeding dry period.

BY MR. MOSKOVITZ:

Q And this is also the figure which is derived from the
study?

A Yes, sir, it is.

Q Would you begin with the description or discussion
of the various column headings which is shown underneath?

A Yes.

MR. VEEDER: Is your question for a description or a
discussion, Mr. Moskovitz?

MR. MOSKOVITZ: I want him to identify the column head-
ings and explain what they are.

MR. VEEDER: I would rather not have a discussion, if
it is all the same. I would just as soon have it identified.

MR. MOSKOVITZ: Identification and explanation.

THE WITNESS: This table has been divided into two
sections. It will be noted the first column on the left is
the period and the next four columns represent water supply
data. The next column, "Available Percolation" stands by it-
self. The three columns "Recharge," "Demand," and "Storage at
end of period" together constitute the actual yield study based
on the water supply that is developed in the previous columns.
And the last column stands by itself; it is "Waste to Ocean."
It represents the difference between total flow in the river

1    at the head of the basin, minus the recharge to the basin

2    during the given period, as indicated in the left-hand column.

3         THE COURT:  Your first column after the period, "Measured

4    Flow of Santa Margarita River near Fallbrook," that is at

5    Gaging Station 2?

6         THE WITNESS: Yes, sir.

7         THE COURT:  On Exhibit AK.

8         THE WITNESS:  Yes.

9         THE COURT:  And these figures that you have for the

10   periods that you have broken down October to March and April

11   to September are taken from the Government's runoff records now

12   in evidence?

13        THE WITNESS:  Yes, sir, they are.

14        THE COURT:  The next column says, "Estimated Runoff

15   from Area B," and you have a Footnote A.

16        THE WITNESS:  Shall I read that?

17        THE COURT:  Let's see what it says.

18        MR. MOSKOVITZ:  That footnote applies to three of the

19   columns, your Honor.

20        THE COURT:  Read the note A there.

21        THE WITNESS:  "Note that estimated values of runoff from

22   Area B for the entire period and Area C prior to February,

23   1951 are considered to be equal to or less than actual values

24   of runoff.  Thus, values of runoff from Area B, Area C and

25   total runoff at De Luz dam site are conservative and result in

1  estimate of ground water yield and waste which are

2  ingly conservative."

3      MR. MOSKOVITZ:  This will be developed in the explanation

4  of how these figures were computed, your Honor.

5      THE COURT:  I don't know that I understand it so far.

6      So under that column you put in B each time?

7      THE WITNESS:  Yes.

8      MR. MOSKOVITZ:  Down to a certain point, your Honor.

9  If you will note, the B is last seen on the third page for

10  October-January, 1950-51.

11      THE COURT:  What does B say?

12      THE WITNESS:  "Estimated runoff from Area B included

13  with runoff from Area C prior to February, 1951."  This was

14  done for simplicity only in making the calculations.  The

15  runoff from Area B and C was calculated at once.

16      MR. STAHLMAN:  Let's see if I get this.  Is this after

17  the meter was added?

18      THE WITNESS:  Prior to the time of the gaging station.

19      MR. STAHLMAN:  B was prior to the time the meter was

20  added.  Then thereafter you have the two columns?

21      THE WITNESS:  Yes, sir.  After that we separately

22  estimated runoff from Area B, added it to the quantity of

23  measured runoff from area C, along with addition of those two

24  items to the flow at Fallbrook we have the total runoff at

25  De Luz Dam Site.

THE COURT: For a certain part of the time you had a gaging station at point 4 for De Luz?

THE WITNESS: Yes.

THE COURT: But you never did have a gaging station down at De Luz Dam Site?

THE WITNESS: No.

THE COURT: So your area B is entirely an estimate?

THE WITNESS: Yes, sir; as it is labeled on the head of the column.

MR.MOSKOVITZ: Estimated runoff from Area B, and it is estimated throughout the period of the study.

THE COURT: And up until February, 1951, whatever you estimated for the column area B has been included with the column area C?

THE WITNESS: That is right.

THE COURT: Then your De Luz runoff is next?

THE WITNESS: Yes, sir.

THE COURT: The total?

THE WITNESS: Yes. Wherever the B is shown is total, B plus C. That is an estimate down to and including--

THE COURT: Are you talking about column area C now, or total runoff column?

THE WITNESS: I was talking about Column Area C.

THE COURT: All right.

THE WITNESS: Estimated down to and including the period

1  October through January on page 3 of 1950-1951.  From that

2  time on the quantities shown are the actual measured quantities.

3       THE COURT:  In Area C?

4       THE WITNESS:  In Area C; yes, sir.

5       THE COURT:  But Area B is then estimated separately?

6       THE WITNESS:  Yes, sir.

7       THE COURT:  All right.

8  BY MR. MOSKOVITZ:

9       Q  Would you explain the general manner in which the

10  runoff from Area C was estimated up until the time the gaging

11  station was installed on De Luz Creek and how the runoff from

12  Area B was estimated throughout the period?  To start with, the

13  runoff from Area C during the period it was estimated?

14       A  The runoff from Area C for the period of operation

15  of the stream gaging station on De Luz Creek was correlated

16  with measured runoff from nearby areas.  With this correlation

17  then the estimates of runoff from that area, Area C, were made

18  for the time preceding February, 1951, when the stream gaging

19  station was established.

20       Q  And how did you estimate the runoff from Area B

21  during the entire period for which this study was made?

22       A  Well, on the basis of rainfall and runoff relation-

23  ships, utilizing the isohyetal map that was presented yester-

24  day, the runoff from Area B was correlated with the runoff from

25  Area C and an estimate of the runoff from Area B made on that

1    basis.

2         Q   And these estimates varied from year to year, as shown

3    in the Exhibit AH?

4         A   Yes.

5         Q   Now the total runoff at De Luz dam site is the result

6    of adding the measured flow of the Santa Margarita near Fall-

7    brook plus the other columns?

8         A   Yes, sir; that is correct.

9         Q   And is this consistent with the Exhibit AK which you

10   have on the easel?

11        A   Yes.   The stream gaging station near Fallbrook on the

12   Santa Margarita River measures the runoff reaching the point

13   indicated as No. 2 on California's Exhibit AK.   This represents

14   the runoff from the entire area upstream from that station.

15        Q   Both Area A and the upper watershed, which is not

16   colored on this?

17        A   That is correct.   The runoff from Area B, as shown

18   in the third column, is the green area shown on this map

19   indicated as Area B, and the fourth column of runoff from Area

20   C is indicated in blue on this map and labeled "Area C."   This

21   constitutes runoff then from all areas upstream from De Luz

22   dam site.

23        Q   What is the significance of De Luz dam site in these

24   studies?

25        A   De Luz dam site is the head of the ground water basin,

1    the upstream boundary of the ground water basin.

2    MR. MOSKOVITZ:  Your Honor, the next exhibit I am

3    going to show is Exhibit AG, and it is an enlargement of Plate

4    19 in Volume I of Exhibit L.  You will note that Plate 18 and

5    Plate 19 are on the same page.

6    THE COURT:  Are these plates in evidence?

7    MR. MOSKOVITZ:  No, this plate is not in evidence, I

8    don't believe.

9    Would the Clerk check?

10    MR. VEEDER:  It has been marked.  You put in 18.  19

11    and 18 are together, are they not?

12    MR. MOSKOVITZ:  They are on the same page.

13    MR. VEEDER:  That's right.

14    MR. MOSKOVITZ:  But I have never offered, to my knowledge,

15    Plate 19.  It was not identified before.

16    THE COURT:  I see.

17    BY MR. MOSKOVITZ:

18    Q  Referring again to California's Exhibit AH, the

19    next column is entitled "Available percolation."  What does

20    that column contain?

21    A  The values in this column represent the portion of

22    the total flow at De Luz dam site shown in the preceding column

23    to the left, which could percolate into Santa Margarita Coastal

24    Basin, provided there were space available in the basin to

25    accept it.

1    Q  When you say "could percolate", what do you mean by

2    that?

3    A  I mean that this is the quantity which would percol-

4    ate, that the limiting quantity-- correction-- or the quantity

5    limited by the capacity of the sands in the river bottom to

6    pass water from the stream downward through the sands into the

7    basin.

8    Q  And is that quantity affected by the magnitude of the

9    flow?

10   A  Yes, it is.

11   MR. VEEDER:  I object to that, your Honor.  There is

12   no evidence and no basis for this conclusion as expressed by

13   this witness at this point.  If I understood the question, he

14   is now stating that this water would be-- it would be possible

15   for this water to percolate into the basin.

16   Is that what your question was?

17   MR. MOSKOVITZ:  The last question was whether the

18   quantity that percolates is affected by the magnitude of the

19   flow.

20   MR. VEEDER:  I object to that, your Honor.  There are a

21   great many questions that are entailed in making that kind and

22   type of decision.  Admittedly, this is probably in favor of

23   the United States, but I don't believe there is any basis upon

24   which this conclusion could be expressed at this time.  There

25   are a great many factors that are involved.

1          THE COURT:  Overruled.  He may give his opinion, and

2   you may cross-examine.

3          THE WITNESS:  I did answer the question.

4          THE COURT:  If it is a motion to strike, the motion is

5   denied.

6   BY MR. MOSKOVITZ:

7          Q   I will refer you to California's Exhibit AG for

8   Identification and ask you to read the title block.

9          A   This is a chart entitled "Relationship Between Dis-

10  charge of Santa Margarita and Percolation in Santa Margarita

11  Coastal Basin."

12         Q   Would you explain the various designations on the

13  chart and what it shows?

14         A   This is a chart plotted on log-log paper.

15         THE COURT:  On what kind of paper?

16         THE WITNESS:  Log-log paper.  It is logarithmic paper

17  in both directions.  It will be noticed that we do not have a

18  uniform scale from left to right in the horizontal or from

19  bottom to top in the vertical direction.  This is in accordance

20  with the logarithmic scale.

21  BY MR. MOSKOVITZ:

22         Q   And what is shown on the vertical coordinate on the

23  left?

24         A   The mean daily percolation in cubic feet per second.

25         Q   What is shown on the horizontal coordinate?

1        A   The mean daily discharge at De Luz dam site in cubic

2   feet per second.

3        I will say here that this quantity--

4        Q   What quantity?

5        A   The quantities represented in the horizontal

6   coordinate, the mean daily discharge at De Luz dam site, is

7   an approximation of the total flow.  It ignores Area B, as

8   shown on California's AK.  It is for simplicity the sum of the

9   quantity measured at Stream Gaging Station No. 4 on De Luz

10   Creek and No. 2 at Fallbrook on the Santa Margarita River.

11        Q   There are a number of circles which are plotted

12   on California's Exhibit AG for Identification.  What do those

13   circles represent?

14        A   They represent plotted points for a period of about

15   three weeks starting on the 30th of December, 1951, and ex-

16   tending through the 18th of January, 1952, which period is the

17   time of rapid recharge of the ground water basin on Camp

18   Pendleton, a period during which the water levels in wells

19   rose rapidly.

20        Q   Is that shown on California's Exhibit AD?

21        A   Yes, it is.  Well 11S, 5W, 2N5 shows a rapid increase

22   between the first of the year and approximately February.  Well

23   11S, 5W, 2E1 shows a rapid increase from the first of the year

24   through approximately the same period of time.  Well 7J1 shows

25   the same thing to a lesser degree.  As was pointed out yester-

1    day, the well level in this well was near the ground surface

2    and it rose to a point nearly equal to its maximum.  Well 10

3    South, 5 West, 23N1, the water level likewise rose to near

4    its Maximum at the same time.

5         Q   How did you determine where these circles were to

6    be placed?  What measurements and calculations did you use?

7         A   These measurements are based on the actual measurements

8    made and as shown on the calculation sheets of the United States

9    Geological Survey.

10         Q   For example, how did you determine what the amount

11    of mean daily discharge at De Luz dam site in second-feet was

12    for the circle which is designated 1-13-52?

13         A   The measurement at that time, the sum total of the

14    flow at De Luz Creek Station and the Fallbrook Station is, or

15    was, about 950 cubic feet per second.  The difference between

16    that quantity and the flow at Ysidora station is, as shown on

17    the chart, some 260 cubic feet per second.

18         Q   Why is the difference between the flow at Fallbrook

19    and De Luz together and the flow at Ysidora plotted as being

20    the mean daily percolation in second-feet for that day?

21         A   The flow at De Luz Dam Site represents the flow

22    which reaches the ground water basin, that is, the inflow.  The

23    outflow is measured at the Ysidora Gaging Station No. 1 on

24    this chart, Exhibit  AK.  Therefore, the difference between the

25    two is the measure of the amount of water which percolated

8831

1  into the sands of the ground water basin for any given time.

2  In this case we have the one 24-hour period representing January

3  13, 1952.  Now, there has been a correction made in the record

4  of the station in this regard:  There is a time lag for the

5  water to run from the Fallbrook station down to De Luz Creek,

6  and further delay down to De Luz dam site, and there is an

7  additional delay for water to flow the few miles across the

8  basin to Ysidora.

9       Now, in my view, it is not proper to compare the inflow

10  measured for a given 24-hour period here with measured flow

11  at the Ysidora station for the same 24-hour period.  A time

12  lag was taken in this case.  It was nine hours for the flow

13  from Fallbrook, and six hours for the flow from the De Luz

14  Creek station.

15       Q  Down to Ysidora?

16       A  Yes.  So that what is plotted here for January 13th is

17  the flow from 1,500 hours on January 12, 1952, to 1,500 hours

18  on January 13, 1952 at the Fallbrook Station, plus the flow

19  for the 24-hour period from 1,800 at De Luz Creek Station on

20  January 12 to 1,800 on January 13, 1952.  The sum of these

21  two quantities was compared then with the measured runoff at

22  the Ysidora station for the 24-hour period from 00 hundred

23  on the 13th to 2400 on the 13th.

24       Q  The sum of the first two in Ysidora would be the

25  amount of loss during the passage of the river over the basin

1  and that is the figure which is plotted on the vertical

2  coordinate; is that correct?

3      A  That is correct.

4      THE COURT:  By the amount of loss you mean the amount

5  of percolation?

6      THE WITNESS:  Yes.

7  BY MR. MOSKOVITZ:

8      Q  I note that you did not include a figure for runoff

9  from Area B or from Area D in determining the amount of flow

10  into the basin in this diagram, California's Exhibit AG.

11      A  That is correct.  Had we added an estimate for

12  runoff from those two areas, the total inflow would have been

13  somewhat larger.  Therefore, the values as plotted on a

14  horizontal coordinate as daily discharge at De Luz dam site

15  would have been larger, the corresponding percolation would

16  have been greater, the points would have therefore plotted

17  somewhat to the right and higher on the chart.

18      Q  Did you follow the same procedure in plotting the

19  other circles which are shown on California's Exhibit AG?

20      A  Yes, for all those except the points appearing on

21  the 45-degree line, which I now lay my pointer on, which

22  represents a line of percolation equal to inflow.  Now, since

23  every one of these points that lies on the line represents the

24  day on which there was no flow at Ysidora, it was not neces-

25  sary to correct for the delay time and the points shown that

1    are plotted on this 45-degree line are the actual sum totals

2    of the 0000 to 2400 totals at the other two stations.

3         Q   Taking, for example, the circle plotted as being

4    for 1-1-52, that is, January 1, 1952, is it not?

5         A   Yes, it is.

6         Q   And on that day how much discharge was there at the

7    De Luz dam site in second feet?

8         A   30 cubic feet per second.

9         Q   And how much outflow was there from Ysidora?

10        A   30 cubic feet per second.

11        Q   Outflow past Ysidora?

12        A   None.  Percolation was equal to 30.  It is approx-

13    imately 30 in each case.  It is exactly the same in each case.

14        MR. VEEDER:  Are you talking about that now (indicating)?

15        THE WITNESS:  Yes, I am-- 20, 30.

16    BY MR. MOSKOVITZ:

17        Q   And is this also true for the flow for December 31,

18    1951?

19        A   Yes. On that day the inflow was somewhat greater

20    than 400 cubic feet per second, and the outflow at Ysidora was

21    zero.  Therefore, the percolation is equal to the total or

22    somewhat over 400 cubic feet per second.

23        THE COURT:  Why do you put that in as a dotted line

24    there, and why does the solid line go off to the right?

25        THE WITNESS:  I do not believe those two days represent

Illingworth - Direct

1   a true condition of percolation. Not that that flow did not

2   percolate-- I believe that is true; but it is not what one

3   could expect over a long period of stream flow. Those two

4   days, if you recall, are the first two days of storm flow

5   that occurred after two or three very dry years. It is the

6   first flow that occurred at Ysidora for a number of years.

7        Q  And what effect would that have on the amount of

8   percolation?

9        A  Well, conditions at that time of the ground were very

10  dry, the soils overlying the Camp Pendleton Basin were very

11  dry, the stream bed was very dry and a great deal of water

12  was probably absorbed into the surface sands of the stream

13  bottom and surrounding area in those two days.

14       Q  What does the solid line which goes off on an angle

15  less than 45 degrees at the 150-second-foot point indicate?

16       A  That is my best estimate of the line which should be

17  followed to determine percolation into the Coastal Basin from

18  inflow at De Luz dam site.

19       Q  All the points which are marked, the dates for which

20  you have figures marked on California's Exhibit AG appear in

21  December, 1951, and in January, 1952. Why is that?

22       A  This is the only period of time in the history of the

23  records at Camp Pendleton up to this time in which there was

24  both space available in the ground water storage basin to

25  accept recharge and stream flow in sufficient magnitude that

Hillagworth - Direct    8835

1  some portion of it flowed on to the sea.  This was the only

2  time when the runoff records could give a measure of the

3  percolation rate.  It is useless, of course, to make any

4  detailed calculation of inflow minus outflow when the ground

5  water basin levels were so high that no water could percolate.

6  This would be similar to trying to put more water into a

7  bucket that was already full.

8        Incidentally, this entire concept of percolation into

9  a basin may be likened to a bucket with a piece of filter

10  paper overlying it in the form of a V-shape --

11        MR. VEEDER:  I object to this, your Honor.  I believe

12  it goes beyond the scope of the question.  If you want to ask

13  questions about it, all right; but I don't think his lectures

14  are good.

15        THE COURT: Overruled.

16        THE WITNESS:  If water is poured at one end of this

17  piece of filter paper, which we will further assume is on

18  somewhat of a slope, if water is poured at a very slow rate

19  the filter paper will pass all of the water into the bucket.

20  If the water comes at a high rate, some of it will go on

21  past the bucket and some of it will go into the bucket.  The

22  higher the rate of flow across the filter paper, the higher

23  the rate of recharge also to the bucket, the higher the rate

24  also of waste beyond the bucket.

25  BY MR. MOSKOVITZ:

      Q  What effect does the level of the water in the bucket

1    have on this?

2         A  If the bucket is full, no water can go into it, and

3    this is the situation that occurred in most of historical

4    times during the period of record at these stations on Santa

5    Margarita Coastal Basin.

6         Q  How is the line that you have shown on California's

7    Exhibit AG utilized in your yield studies?

8         A  This is the basis on which we determine our available

9    percolation, as shown on California's Exhibit AH.  It is the

10   basis for the transition between the column entitled "Total

11   Runoff at De Luz Dam Site" and "Available Percolation."

12        Q  You mentioned that the period for which the circles

13   are plotted on California's Exhibit AG was the first period up

14   until then when you had conditions in which you could determine

15   percolation rate by the records.  Has there been any other

16   period when that could have been done?

17        A  Yes.  In 1954 was such a time.  There was a fair

18   amount of runoff, but it did not last long enough to get much

19   of a record.  In 1958 we had a similar situation.  At this time,

20   however, there were a large number of dams in operation which

21   had been constructed across the reservoir.

22        Q  Across the reservoir?

23        A  Across the stream which overlies the ground water

24   reservoir.

25        MR. VEEDER:  Your Honor, I am going to object again;

1  this goes far beyond any question that was asked him.

2  THE COURT: The question was, what other times had it

3  been done? He has given one date. Now he is telling us why

4  he could or could not have done it in 1957-58. Overruled.

5  MR. VEEDER: I think, as I said before, cross-examination

6  is virtually impossible when a witness goes ahead, as this

7  witness is going on beyond the question.

8  THE COURT: I don't consider that he is going beyond

9  the question. Overruled.

10  THE WITNESS: An analysis of the records in 1958

11  indicates that this type of analysis could not be properly

12  made because of the effect of the temporary storage in these

13  surface ponds.

14  THE COURT: The surface ponds across the basins would

15  have resulted in more or a different type of percolation than

16  would have occurred in a state of nature?

17  THE WITNESS: A different type; yes, sir.

18  BY MR. MOSKOVITZ:

19  Q  Who prepared California's Exhibit AG?

20  A  I did.

21  Q  Is it correct, to your knowledge?

22  A  Yes.

23  MR. MOSKOVITZ: I offer California's Exhibit AG in

24  evidence, your Honor.

25  THE COURT: It is received in evidence.

1      (Defendant State of California Exhibit AG was received

2   in evidence.)

3   BY MR. MOSKOVITZ:

4      Q  How did you actually utilize the line, the curve

5   shown on California's Exhibit AG in determining the figures

6   which appear in the column "Available Percolation"?

7      A  This was done on a daily analysis of the records of

8   stream runoff as measured at the stations of the Geological

9   Survey.  What is shown in the tabulation in California's AH

10   is a summary of these studies.

11      Q  For the six-months period shown in each line?

12      A  Well, for the periods shown.  We sometimes have a

13   smaller or a shorter period than six months shown here.

14      THE COURT:  This exhibit that we are working up to,

15   Exhibit AH, I understand that you go ahead and you find out

16   what your safe seasonal yield is, and then you work backwards

17   on it?

18      THE WITNESS:  No, up to this point we have not made any

19   assumptions as to safe seasonal yield.

20      THE COURT:  How did you?

21      THE WITNESS:  Well, it is a trial-and-error solution,

22   your Honor.  First, we assume something, and then we work it

23   out and see whether run short of water or whether we have a lot

24   of water left in the basin.

25      THE COURT:  That is what I mean.  You have to practically

Illingworth - Direct

1   work backward on it.  You arrive at this figure which you

2   consider is a safe yield, and then you use that figure

3   throughout the period involved?

4        THE WITNESS:  Yes, sir.  May I go to the blackboard and

5   put on an equation which might clarify this?

6        MR. VEEDER:  Did the witness say "trial and error"?

7        THE COURT:  Yes.

8        MR. VEEDER:  I just wanted to be sure.

9        THE WITNESS:  (Stepping to the blackboard)  Safe

10  seasonal yield is simply equal to the storage capacity plus the

11  inflow during the critical dry period divided by the number

12  of years in the dry period.

13       Now, storage capacity, this item, is further equal to

14  water in storage at start of the dry period, less water in

15  storage at end of the dry period, which of course is equal to

16  the storage capacity, if it is assumed that it starts out full

17  and it ends up empty.  And this is the definition of the critical

18  dry period:  The critical dry period starts at the last time

19  that the reservoir was full.  It ends at the time it reaches

20  zero storage.

21  BY MR. MOSKOVITZ:

22       Q  The safe seasonal yield is the one amount that could

23  be withdrawn each year, the same amount throughout that period

24  and end up with virtually an empty reservoir; is that not

25  correct?

Illingworth Direct

1    A   That is correct.

2    Q   Now, I note that in the column headed "Available

3  Percolation" in California's Exhibit AH there are symbols

4  to the left of the figures that look like pointers.  What do

5  they mean?

6    A   That is simply the mathematic symbol indicating

7  greater than or more than.  The first value in the column

8  labeled "Available Percolation" is 27,883 acre-feet.  What

9  the symbol indicates is that the quantity for that particular

10 period of available percolation is greater than 27,883 acre-

11 feet.

12   Q   Now the next column, entitled "Recharge," indicates

13 what?

14   A   It indicates the proportion of the total runoff at

15 De Luz dam site which would have percolated into the basin

16 were space available to accept it, and in this case it repre-

17 sents the amount which could have percolated under the

18 assumption there was space available to accept it.  In other

19 words, it is the proportion of the available percolation that

20 actually is utilized as recharge for the basin.

21   Q   What does the next column "Demand" refer to?

22   A   The first column, 3,383, is 45% of the demand for the

23 year.

24   Q   And what figure is that, demand for the year?

25   A   8,630 acre-feet, before rounding it off.

Q And that is the same as the safe annual yield for this basin, under these assumptions?

A Yes. As indicated to the Court, this is a trial-and-error solution and what is represented here is the final trial. Other demands were assumed to start with, and when the demand was assumed too small we ended up with water in storage at the end of the period. When we assumed it was too large, we would go below zero storage.

Q At the end of what period?

A At the end of the critical period. This, therefore, represents the final trial. This is a standard engineering procedure.

Q What does the column "Storage at End of Period" refer to?

A That refers to the amount of water which would have been in storage in the ground water basin at the end of this period October-March of 1936-37, had we started with an empty reservoir at the start of that period as of October 1, 1936.

Q And the column headed "Waste to Ocean," what does it signify?

A That represents the difference between the total runoff at De Luz Dam Site and that portion of the water measured at that point or estimated to have been at that point which would have percolated under thse conditions. The total

Illingworth - Direct

1    quantity of runoff at De Luz dam site is 101,644 acre-feet.

2    Since the recharge is 27,883 acre-feet, the waste to the ocean

3    is the difference, or 73,761 acre-feet.

4        MR. MOSKOVITZ:  Before we go into any more of the

5    figures, I would like to put this in evidence.

6        Q  Who prepared California's Exhibit AH?

7        A  This was prepared under my direction.

8        Q  Is it correct toyour knowledge?

9        A  Yes.

10       MR. MOSKOVITZ:  I offer California's Exhibit AH in

11   evidence, your Honor.

12       MR. VEEDER:  I would like to ask some questions on

13   voir dire.

14

15                    VOIR DIRE EXAMINATION

16   BY MR. VEEDER:

17       Q  When you have the figures set forth under the column

18   "Demand," which is the third column from the right, what is

19   the meaning of the word "demand" as it relates to the present

20   uses of the Marine Corps?  Is there any relationship?

21       A  The uses by the Marine Corps at the present time

22   put a demand on the basin.  This demand is represented by the

23   difference between the amount of water which is pumped from

24   the basins and the recharge.

25       Q  I will rephrase my question.

1          THE COURT:  Your column with the word "Demand" doesn't

2     refer to that, does it?  Your word "Demand" has a relation to

3     what you found by trial and error to be what you call the safe

4     seasonal yield of 8,600 acre-feet, which you break down over

5     the two periods and list under the column shown as "Demand,"

6     isn't it?

7          THE WITNESS:  That is right.  But Mr. Veeder asked me

8     what the relationship was to the present demands on the basin,

9     and I am just indicating that definition of the word "Demand"

10    means the difference between the amount of water that is

11    pumped and the return flow to the basin of that pumped water.

12    For instance, in the Camp Pendleton case, by sewage return.

13         MR. VEEDER:  I don't quite understand that, your Honor.

14         THE COURT:  I don't understand what he is talking about.

15         Is there anything in this column that you have listed

16    as "Demand" on Exhibit AH that has anything to do with how

17    much water the Marines need or demand at CampPendleton?

18         MR. VEEDER:  Or used, as a matter of fact?

19         THE WITNESS:  No.  It is not related to the--

20         THE COURT: In other words, this "Demand" in this column

21    is related entirely to what you have, by trial and error, found

22    to be the safe seasonal yield?

23         THE WITNESS:  Yes, sir.

24         THE COURT:  That would be the safe seasonal yield of

25    8,600 acre-feet if the demand of the Marine Corps was for

1    2,000 acre-feet or was for 50,000 acre-feet?

2         THE WITNESS:  Oh, no.  Well, we are using a different--

3         MR. VEEDER:  The word "demand" is used in two senses.

4         THE WITNESS:  We are using different definitions of

5    the word "Demand," your Honor.

6         THE COURT:  My statement is correct, isn't it?

7         THE WITNESS:  By your definition, I presume so.  But

8    "Demand" as I have used it here, is the demand on the basin.

9         THE COURT:  What the basin would stand?

10         THE WITNESS:  It is the amount of water which could

11    be extracted from the basin.

12         THE COURT:  Regardless of how much they needed?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  I understand.

15         MR. VEEDER:  The reason that I am asking these questions

16    on voir dire, if you read the caption "Yield of Santa Margar-

17    ita Coastal Basin and Waste to Ocean"-- I am going to cry

18    bitterly about that term-- "Under Actual Conditions of Water

19    Supply, 1936-37 to 1957-58 Assuming Full Development of the

20    Ground Water Storage Capacity."

21         Q  Now, if your demand is not reflective of what

22    actually transpires from the standpoint of the pumps of the

23    Marines, but rather a trial and error figure, then your

24    caption is not reflective of the situation that prevails;

25    isn't that right?

Z57

A   As the Court pointed out, the figures in this column bear no relationship to the actual quantities of water which were pumped?

Q   Then how can you say "under actual conditions"?

MR. MOSKOVITZ:  Let him finish, please.

MR. VEEDER:  I thought he had.

THE WITNESS:  However, demand, as calculated here, is a realistic thing.  The definition of demand used here is that quantity of water which could be taken out of the basin by pumps, deep well turbines, less the amount of that water which might return.

MR. MOSKOVITZ:  The last line "Assuming Full Development of Usable Ground Water Storage Capacity."

MR. VEEDER:  But "Under Actual Conditions of water supply."

MR. MOSKOVITZ:  "Assuming full development of usable ground water storage capacity."

MR. VEEDER:  I would like to ask the question, if I may.

Q   You have there "Under actual conditions of water supply 1936-37 through 1957-58, assuming full development of usable ground water storage capacity."  Now, are you purporting to state that those conditions are conditions that can be anticipated in the future?  Is that what that statement means?  And does the demand relate to what could be expected

1  in the future?

2      A  May I tell you what it does mean?

3      Q  Just answer that yes or no, to begin with.

4      THE COURT:  Answer yes or no and then explain it; if

5  you can.

6      THE WITNESS:  No.  What it does represent is the amount

7  of water which could be taken out of the Camp Pendleton

8  Ground Water Basin, called herein Santa Margarita Coastal

9  Basin, throughout the period 1936-37 through 1957-58 without

10  drawing water levels below sea level.  The result is some

11  8,600 acre-feet of water which could be drawn out each and

12  every year of that period, which means if some water was used

13  and a portion of it returned to the basin, even more water

14  could have been pumped.  In other words, if some 12,000 acre-

15  feet were pumped and the difference between 12,000 and 8,600

16  returned, 12,000 could have been pumped each and every year.

17      THE COURT:  Let's forget about return in the way of

18  return of sewage and return by irrigation and things of that

19  sort.

20      THE WITNESS:  Well, the important thing here is that

21  this is the net demand on the basin, the net discharge.

22      THE COURT:  The purpose of this Exhibit AH is to show

23  your conclusion that on a proper operation of this underground

24  basin the amount of water that could be pumped year after year

25  would be 8,600 acre-feet.

1      THE WITNESS:  No, sir, that is not what this represents.

2   It is close to that, but it is not that.

3      THE COURT:  I say, leaving out questions of return of

4   water by sewage, et cetera.

5      THE WITNESS:  There is another difference.

6      THE COURT:  I am wrong?

7      THE WITNESS:  Yes, you are wrong, your Honor.  It is

8   not exactly this, because this is the amount that could have

9   been taken with the water supply conditions as they did exist,

10  as they were measured in the period 1936-37 through 1957-58.

11  Now we know that Vail Reservoir dam was constructed during

12  this period of time and the water supply in the early part

13  of this period to Camp Pendleton was more as represented in

14  these figures than actually could have reached or actually did

15  reach the De Luz dam site.  Therefore, it is unrealistic to

16  conclude from this study that they could take 8,600 acre-feet

17  a year.

18      My statement was that has they pumped it down to the

19  full 24,000 for these past twenty years, twenty-two years,

20  they could have taken this amount of yield out without

21  drawing the water level below sea level with the proper pumping

22  pattern.

23      MR. VEEDER:  Of course, I don't follow it, in view of

24  the actual issues in the case.

25      Q  But what would have been the effect of the operation

1    the calculations, rather, for the period, for example, 1950

2    down to September, 1957?

3         A    This is--

4         MR. MOSKOVITZ: Just a moment.  I object to the question,

5    your Honor.  This is cross-examination now, I believe.  I

6    haven't finished examining him on this document, your Honor.

7    There is a lot to be brought out.

8         THE COURT:  All right, I will sustain the objection.

9    You may do it later on.  But I am still not sure that I know

10   what he means about this.  I thought I knew.

11        MR. MOSKOVITZ:  Your Honor, I think I can bring it

12   out by some more questioning.

13        THE COURT:  We will take a short recess.

14        (Recess.)

15        MR. VEEDER:  I understood his Honor wanted me to proceed

16   on cross-examination rather than on voir dire?

17        THE COURT:  Later on.  Not now.

18        MR. VEEDER:  That's what I say.

19   I have ceased, believe it or not.  Go ahead and get it in and

20   we will cross-examine.

21        MR. MOSKOVITZ:  I offer California's Exhibit AH in

22   evidence, your Honor.

23        THE COURT:  California's Exhibit AH received in evidence.

24        (Defendant State of California Exhibit AH was received

25   in evidence.)

1      MR. MOSKOVITZ: Your Honor, I think there was some

2  misunderstanding between you and the witness just before we

3  took our recess.

4      THE COURT: Yes, it sounded to me like there was.

5      MR. VEEDER: I would ask that that writing up there be

6  left on the blackboard, if you will, please, sir.

7      THE COURT: All right, it will be left on.

8      Was California's AG offered?

9      MR. MOSKOVITZ: California's Exhibit AG was offered

10  and received, your Honor.

11      THE WITNESS: California's AG was received.

12      THE COURT: California's AG is in evidence.

13  BY MR. MOSKOVITZ:

14      Q  The Court asked you whether these calculations show

15  that 8,600 acre-feet, under the assumptions of this study

16  California's Exhibit AH, could have been withdrawn each year

17  according to this study during the period of record.

18      A  The answer is yes.

19      THE COURT: And if you had drawn out more than 8,600

20  acre-feet, forgetting about return, et cetera, then before

21  the end of this period your basin would have gone dry?

22      THE WITNESS: Yes, sir.

23      THE COURT: If you had drawn out less than 8,600 acre-

24  feet, the you wouldn't have been using the basin to the maximum

25  capacity?

1        THE WITNESS: Yes, sir.

2        THE COURT: Do I understand it?

3        MR. MOSKOVITZ: I believe you do, your Honor.

4        MR. VEEDER: You understand the Alice in Wonderland of

5 it, your Honor. We are worried about reality and Marines

6 drinking and using water.

7        THE COURT: All right.

8        You said something about the fact that Vail Dam had some

9 effect on this?

10       THE WITNESS: Yes, sir. This is the amount, the 8,600

11 is the amount they could have taken out over this historic

12 period. Now, we will have a later calculation which will

13 show how much could have been obtained from the basin under

14 assumptions of all development on the watershed as it is

15 today, which will be somewhat less than this.

16       THE COURT: But what do you mean by "actual conditions

17 of water supply"? If you give that the literal meaning in

18 your title, "actual conditions of water supply, 1936-37

19 through 1957-58," then that, I would assume, means that Vail

20 Dam has been operating up above.

21       THE WITNESS: Only since 1948.

22       THE COURT: That is right; from 1948 on.

23       THE WITNESS: That is true.

24       THE COURT: And that the measurements that you have

25 here were measurements that occurred while Vail Dam was

1    operating.

2         THE WITNESS:  That is correct.

3         THE COURT:  Then I don't understand what you mean.

4    How would Vail Dam enter into this?

5         THE WITNESS:  If we were to say now, what could they

6    do in the future, assuming weather conditions were the same

7    as in the past, we would have to correct these records for the

8    fact that Vail Dam was not in for the period 1936 through

9    1948.

10         THE COURT:  I see.  All right.

11   BY MR.MOSKOVITZ:

12         Q  In other words, Mr. Illingworth, California's

13   Exhibit AH is not a prediction that this is how much you could

14   take from the basin in a future period, is it?

15         A  No.

16         MR. VEEDER:  Then I move to strike it as being in-

17   competent, irrelevant and immaterial, your Honor, and it has

18   nothing to do with the case.

19         THE COURT:  Overruled.

20         California's AK has not been offered, has it?

21         MR. MOSKOVITZ:  No, your Honor.  Let me check.

22   California's AK is the watershed study area.  I thought that

23   had been offered, your Honor.

24         THE COURT:  If it has not been, do you want to offer

25   it?

1        MR. MOSKOVITZ:  I would like to offer California's

2   Exhibit AK in evidence.

3        THE COURT:  It is received in evidence.

4        (Defendant State of California Exhibit AK was received

5   in evidence.)

6        MR. VEEDER:  Mr. Moskovitz, have you moved to another

7   one of these?

8        MR. MOSKOVITZ:  No, we are going to go through some

9   of these calculations to see how they work.

10       THE COURT:  On California's AH?

11       MR. MOSKOVITZ:  Yes, your Honor.

12       THE COURT:  Let's skip it for cross-examination

13   argument.

14       MR. MOSKOVITZ:  All right.  There are some more things

15   I want to clarify in California's AH that we haven't come to.

16       THE COURT:  All right.

17   BY MR. MOSKOVITZ:

18       Q  Turning to page 3 of California's Exhibit AH--

19       MR. VEEDER:  May I inquire, does this appear in

20   Bulletin No. 57?

21       MR. MOSKOVITZ:  This does not appear in Bulletin 57.

22       Q  --in the first line for 1950-51, October to January,

23   under the column "Storage at End of Period," the figure

24   12,469 has parentheses around it.  What does that mean?

25       A  That is an indication of the amount of water in

storage at the end of a period which is other than the six

months period.

MR. VEEDER:  Could I ask you to use the word "assumed"

quantity of water.

THE WITNESS: This is the calculated quantity of water.

THE COURT:  I don't get that, other than the six

months.

THE WITNESS:  We will refer back to page 21.  You will

notice there is a storage given at the end of each six-months

period.

THE COURT:  Yes.

THE WITNESS:  This is true through pages 1 and 2.

THE COURT:  Except in 1951 you split the six-months

period up into four and two.

THE WITNESS:  Yes, sir.  The reason for that was, it

was during that period the stream gaging station was established

at De Luz Creek.  So we have part of that as estimated runoff

from Area C and part of it is measurement.

THE COURT:  The parentheses doesn't mean that this was

an overdraft?

THE WITNESS:  No, sir.

THE COURT:  It is just a different period?

THE WITNESS:  Yes, sir.  The same thing is true at the

bottom of the page 1957-58 where we have--

THE COURT:  By months?

Illingworth - Direct                                                                   4854

1          THE WITNESS:  Yes.

2   BY MR. MOSKOVITZ:

3          Q  What was the reason for having it by months in

4   that period?

5          A  The reason it was by months is because it was a

6   critical time.  It was near the end of the critical dry

7   period, and in order precisely to determine when it would

8   end it was necessary to go to a monthly calculation rather

9   than to a six-months period calculation.

10          THE COURT: Actually, in January, 1958, then, you had an

11   overdraft of 23 acre-feet?

12          THE WITNESS:  Yes, sir.  We simply did not run this

13   down to the last acre-foot.

14          MR. MOSKOVITZ:  I want to ask one more question before

15   passing over it, your Honor.

16          Q  On page 1, at the top of the columns of figures,

17   appear the words "Water in Storage October 1, 1936 - zero."

18   What is the explanation for that?

19          A  That is an assumption.  To start the study we

20   assumed that the ground water basin would be absolutely down

21   to sea level, and then as demonstrated by the calculations in

22   the first line that there would have been sufficient water in

23   that six-months period alone to have not only taken care of

24   the demand on the basin during the six months, but also to

25   fully recharge and fill the basin to its full capacity 24,000.

1　　　　THE COURT: This is the way you would make a stu

2　for a reservoir built aboveground, and of course it would

3　start out empty?

4　　　　THE WITNESS: Yes, sir. This is the most adverse

5　assumption you could assume; that since 1936 marked the end

6　of a dry period, it may have been zero there. We just wanted

7　to demonstrate that it would have been able to fill.

8　　　　MR. VEEDER: Are you through with this now?

9　　　　MR. MOSKOVITZ: No.

10　　　　MR. VEEDER: I would like to raise one proposition

11　before you depart from it.

12　BY MR. MOSKOVITZ:

13　　　　Q Have you compared the figures for total runoff at

14　DeLuz Dam Site that appear on this exhibit with any exhibit

15　of the United States where runoff at De Luz Dam Site is

16　estimated?

17　　　　A I have not compared the runoff at De Luz Dam Site,

18　but I have compared the runoff from Area C which was

19　calculated on Plaintiff's Exhibit 62.

20　　　　MR. VEEDER: Is that Mr. Hofmann's? May I see it?

21　　　　MR. MOSKOVITZ: Yes, this is Mr. Hofmann's.

22　　　　Q In other words, you have compared the estimates

23　which Mr. Hofmann made for De Luz Creek runoff with the

24　estimates which you have made for De Luz Creek runoff?

25　　　　A Yes.

1    MR. VEEDER:  Or have you?

2    MR. MOSKOVITZ:  He said yes.

3    Q  And how do they compare?

4    A  Our estimates of runoff from De Luz are less in

5    all years except one, and that was the year of only a few

6    hundred acre-feet of runoff and we were slightly greater than

7    theirs.

8    THE COURT:  I was just looking at my calendar for

9    Tuesday morning.  We have a very light calendar.  We will

10    have the Marshal bring them up at 9:30.  We will figure to

11    start here at 10.

12    MR. VEEDER:  10 o'clock on Tuesday morning.

13    THE COURT:  Go ahead.

14    THE WITNESS:  The question was asked, did I compare

15    the total runoff at De Luz dam site with the estimate on

16    Plaintiff's Exhibit 62.

17    MR. MOSKOVITZ:  That was Mr. Hofmann's estimates, your

18    Honor.

19    THE WITNESS:  Yes.  These can be compared by inspection

20    of Study 1, the column entitled "Total runoff at De Luz Dam

21    Site."  For the first period 1936-37 there are some approx-

22    imately 114,000 acre-feet of runoff, the sum of the two six-

23    months period in 1936-37, which compares with 116,000 on

24    Exhibit 62.  The next year is approximately 122,000.

25    Q  Whose estimate is that?

1     A  By my estimate, and 123,000 by Mr. Hofmann.  The

2  next year is 25,060 by me, and 28,600 by Mr. Hofmann.

3     Q  Without going through all the figures, what is

4  your conclusion as to the comparison between the estimates?

5     A  Our values are less in all the years except one.

6     Q Referring you now, Mr. Illingworth, to California's

7  Exhibit AO for Identification, would you read the title

8  block of that exhibit?

9     A  This is a grouping of two charts entitled "Graphical

10  Summary of Study 1." The upper chart represents--

11     Q  First of all, who prepared this exhibit?

12     A  This was prepared under my direction by my staff

13  working under my direction.

14     Q  Would you explain what the upper chart shows?

15     A  The upper chart is the representation of the dis-

16  position of seasonal runoff at De Luz Dam Site.

17     Q  Is this taken from the figures which are contained

18  in California's Exhibit AH?

19     A  Yes, it is.

20     Q  Will you describe what is shown on Exhibit AO in

21  the upper graph?

22     A  The total runoff at De Luz Dam Site for the year

23  1936-37--

24     Q  And all succeeding years?

25     A  --and all succeeding years is shown by bar graphs.

Illingworth    Direct                                          6858

1    The first graph for 1936-37 indicates by its total height that

2    approximately 114,000 acre-feet of water was the runoff at

3    De Luz Dam Site.  This is broken at a point about 32,000

4    acre-feet above the base.  The lower portion is colored pink.

5    This represents the recharge to the basin.  The upper portion

6    is a gray shading, and that represents the proportion of that

7    total runoff that wasted to the ocean.

8        MR. VEEDER: Your Honor, I am going to interrupt.  I

9    think, in regard to the use of the word "wasted" on Exhibit

10   AH and on Exhibit AO, it is very improper.  I think it is

11   water that goes into the ocean, but certainly it is not

12   necessarily wasted, and I think it would be better to have

13   these designations changed to "Water flowing to the ocean"

14   rather than "wasted."

15       THE COURT:  It is a conclusion.  Objection overruled.

16       THE WITNESS:  A third thing is shown on the chart, and

17   that is a horizontal line drawn at a point 8,600 acre-feet

18   above the base, which is entitled "Safe Seasonal Yield,"

19   8,600 acre-feet.

20   BY MR. MOSKOVITZ:

21       Q  And that is the figure which was derived in Study

22   No. 1, California's Exhibit AH, as being the yield under

23   those conditions?

24       A  Yes.  The total runoff for each year is that which

25   is the summation of the two six-months periods shown in the

1  column on Exhibit AH entitled "Total Runoff at De Luz Dam

2  Site."  The upper portion of the bar "Waste to Ocean" is the

3  value that appears in the right-hand column of Exhibit AH.

4  The lower portion of it, colored in a lavender shade, is the

5  recharge, and that is the quantity that appears in the column

6  entitled "Recharge."

7  THE COURT:  Then your bar graph at the bottom is just

8  graphically illustrative of what is shown above, with the

9  basin starting out at a supposed zero at the beginning

10  of 1936-37 and winding up with another zero early in the

11  water year 1957-58?

12  THE WITNESS:  Yes, sir.  The lower chart represents

13  water in storage at the end of each of the periods reported

14  in Exhibit AH.  It generally shows two points for each year,

15  at the end of each six-months period.

16  THE COURT: All right.

17  BY MR. MOSKOVITZ:

18  Q  Is California's Exhibit AO correct to your knowledge?

19  A  Yes, sir.

20  MR. MOSKOVITZ:  I offer California's Exhibit AO in

21  evidence, your Honor.

22  MR. VEEDER:  I would like to ask a couple of questions

23  about it.

24  THE COURT:  You may.

25

## VOIR DIRE EXAMINATION

BY MR. VEEDER:

Q Would you explain that phase of the bar graph on Exhibit AO in regard to the year 1947. Of what is that indicative? Pointing now to this area which appears to be-- You have "Waste to the Ocean" and "Yield" shown in 1947.

A Yes.

MR. VEEDER: Does your Honor see that?

Q What does that mean?

A That is indicative of the fact that in spite of the fact that the recharge to the basin was less than the demand or safe seasonal yield of the basin, nevertheless there was some waste to the ocean. Waste to the ocean is determined by the rate of flow and not by the water level in the basin.

Q By rate of flow?

A Or the demands on the basin.

Q Go ahead and state what you mean by "rate of flow."

A Rate of stream flow. At high rates of stream flow, by use of California's Exhibit AG, you find that some water not capable of percolating into the ground water basin because the sands in the stream bottom are simply not capable of passing all the water into the basin at certain rates of flow-- at the higher rates of flow.

Q In 1956 did water actually go into the ocean?

A We are switched to another year now?

1      Q   I am looking for the year where that phenomenon

2   appears to exist. You have 1953, and you have 1956, and you

3   have 1947, and I am asking if water actually went into the

4   ocean in those years?

5      A   I would like to refer to the exhibits, the 20 series

6   by the Plaintiff. That was the year 1955-56.

7      Q   You have 1956 showing that situation, you have --

8   well, you look at 1956 first. Did water go into the ocean

9   that year?

10      A   No.

11      Q   In other words, this is not reflective of actuality?

12      A   This is reflective of exactly what I said; it

13   represents the results of this study.

14      Q   I am not being critical, not in the slightest. I

15   would be the last to be that way. How about 1947? Some

16   went in at that time, did it?

17      A   6,930 acre-feet, according to Plaintiff's Exhibit

18   26.

19      Q   Is this reflective of the quantity of water?

20      A   What quantity of water?

21      Q   When you show that line-- do you see what I am

22   pointing to?

23      A   No.

24      Q   Here you have an area showing stars stars and then

25   indicating into the ocean. That isn't indicative of quantity

1    at all; is that right?

2           A  Yes, it is indicative of quantity.

3           Q  Then what about on 1956?

4           A  That is indicative of quantity.

5           Q  But none went into the ocean?

6           A  That is indicative of the results of this study.

7           MR. VEEDER:  Thank you.

8           MR. MOSKOVITZ: Anything more?

9           MR. VEEDER:  No.

10          MR. MOSKOVITZ:  I made the offer of California's

11   Exhibit AO in Evidence, your Honor.

12          THE COURT:  California's Exhibit AO received in

13   evidence.

14          (Defendant State of California Exhibit AO was received

15   in evidence.)

16   BY MR. MOSKOVITZ:

17          Q  Mr. Illingworth, do you have an explanation as to

18   the fact that California's Exhibit AO shows for 1956 some

19   waste to the ocean when the record at Ysidora shows there

20   was no flow to the ocean?

21          MR. STAHLMAN:  What year did you say?

22          MR. MOSKOVITZ:  1955-56.

23          MR. STAHLMAN:  You mean 1954, don't you?

24          MR. MOSKOVITZ:  No, 1955-56.

25          THE WITNESS:  Yes, I have an explanation.  This

1    percolation curve shown on California's Exhibit AG is not a

2    perfect instrument.  It represents less percolation, in my

3    opinion, than actually does occur, or did occur under assumed

4    conditions in the basin.  As you will note, even in the year

5    1952, wherein these measurements were made, flow and percola-

6    tion greatly in excess of the measurement one would obtain

7    from the use of this graph actually flowed out at Ysidora.

8    BY MR. MOSKOVITZ:

9         Q  You mean actually percolated?

10        A  Actually percolated  Excuse me.

11        MR. VEEDER:  Thank you, Mr. Moskovitz.

12        THE WITNESS:  If we take as an example the flow on

13   January 14, 1952, the inflow was some 700 second-feet

14   percolation as actually measured by the inflow, and outflow

15   calculation is some 360 or 70 second-feet.  If one were to

16   use this chart to calculate what percolation would have

17   occurred from such a flow, one would go to 700, follow

18   vertically up to the slant line on the chart and then

19   horizontally to the left and obtain a value of something around

20   260 or 270 acre-feet.  In other words, this chart is con-

21   servative as regards the amount of water which could

22   percolate into the basin.

23        MR. VEEDER:  Does it take into consideration a 35,000

24   acre-foot reservoir above Camp Pendleton at the Lippincott

25   site?

1    THE WITNESS: It has not anything to do with anything

2  upstream, except the rate of flow that passes at the head

3  of the basin at De Luz dam site.

4    MR. VEEDER: I see.

5  BY MR. MOSKOVITZ:

6    Q  Mr. Illingworth, I hand you now California's

7  Exhibit AI for Identification and ask you to examine it.

8  Would you read the title block, please?

9    A  It is entitled "Yield of Santa Margarita Coastal

10  Basin and Waste to Ocean Under Present Conditions of Water

11  Supply, Except With No Flow from Murrieta or Temecula Creeks,

12  Assuming Full Development of Usable Ground Storage Capacity."

13    THE COURT: Which one is this?

14    THE WITNESS: It is Study 2. It is California's

15  Exhibit AI.

16  BY MR. MOSKOVITZ:

17    Q  Who prepared California's Exhibit AI?

18    A  I did, or it was prepared partially by me and under

19  my direction.

20    Q  In what respects does California's Exhibit AI,

21  Study No. 2, differ from California's Exhibit AH, Study No. 1?

22    A  It differs in the fact that it is assumed that no

23  runoff reaches the head of the ground water basin at De Luz

24  dam site, from this large area shown in white on California's

25  Exhibit AK. In other words, the only runoff that was assumed

1   in this study, Study No. 2, was the runoff from Area A,

2   Area B, and Area C.  This is a drastic assumption as regards

3   water supply and is not my estimate of what would happen in

4   the future.  It is simply a limiting condition which, for

5   purposes of illustration, was made.

6   MR. VEEDER:  I don't understand the use of the word

7   "limiting."  Would you explain that?  Would you like to

8   have it read back to you?

9   THE WITNESS: This represents the yield of the ground

10  water condition under an extremely low water supply assumption.

11  THE COURT:  In other words, again you did the same

12  thing.  By trial and error you arrived, in view of the more

13  limited area from which the water was coming, at a figure of

14  4,200 acre-feet?

15  THE WITNESS:  Yes, sir.

16  THE COURT: So this then was worked out on the same

17  ratio, 45% between October and March, 55% April to September,

18  with a total of 4290 acre-feet, and having got that figure

19  by trial and error you then applied it to this limited runoff

20  and started with an empty basin and came up with an empty

21  basin-- well, almost empty in October to January of water year

22  1957-58.

23  THE WITNESS:  Yes, it would have been the end of

24  January-- January 31 of 1958.

25  THE COURT:  Again, the parentheses does not mean an

1    overdraft, but means a different period was reported?

2            THE WITNESS:  Yes, some period other than one of the

3    six-months periods.

4            THE COURT:  Other than that, this is done in the

5    same manner?

6            THE WITNESS:  Yes.

7            THE COURT:  Area A-- what is this diversion column?

8            THE WITNESS:  In the first study we made it was not

9    necessary to make any calculation of the amount of diversion

10   by Fallbrook Public Utility District, or the Naval Ammunition

11   Depot, for the reason that those diversions were actually

12   made and were reflected in the measurements.

13           THE COURT:  Measurements made below?

14           THE WITNESS:  Yes, sir.  This is not exactly true in

15   the case of the Naval Ammunition Depot.  It is true in the

16   case of Fallbrook.  The Naval Ammunition Depot diverts down-

17   stream from the Fallbrook gage--

18           THE COURT:  Since you were considering the watershed

19   below the juncture of the Murrieta and the Temecula, which

20   includes Area A shown on your Exhibit AK, you therefore had

21   to take into account the diversions that had been made some-

22   where in Area A?

23           THE WITNESS:  Yes.  We did this in the first study also,

24   your Honor, but there the measurements already had this

25   diversion taken out.  In other words, the water was taken out

1    and the quantity--

2              THE COURT:  What was left was all you could measure?

3              THE WITNESS:  Yes, sir.  Now our system is somewhat

4    different in this study.

5    BY MR. MOSKOVITZ:

6         Q   Will you explain the difference?

7         A   Yes.  In this study we made a separate calculation

8    of the runoff from Area A, and then--

9         Q   How was that made?

10        A   We subtracted what we assumed to be the present

11   diversions by Fallbrook Public Utility District and NAD.  Now

12   for diversions that were the same under these historical

13   conditions as they are today, it is not necessary to make

14   any correction.  But in the case of Fallbrook where the

15   diversions back in 1936 were very small and which today are

16   appreciably greater, it is necessary on the one hand to add

17   them back into the actual measurement of flow at Fallbrook

18   and later on in the calculations subtract out their present

19   diversions.

20        Q   And what is the reason for doing that?

21        A   This is to reflect present conditions of operation.

22   As stated in the title, this is under present conditions of

23   water supply and this implies present conditions of development

24   of water in the watershed.

25             THE COURT:  I see how you add them in this column.

1    Where do you take them out?

2        THE WITNESS:  In the second column, the 750 is a

3    deduction.  There the 750 is for a six-months period.  For

4    the whole year it would be 1500.  The assumption is that

5    1400 acre-feet would the diversion by Fallbrook and 100

6    acre-feet per year would be the diversion by the Naval

7    Ammunition Depot.

8        THE COURT:  But you start out in the first column after

9    the period of measured runoff from Area A and you have a

10    figure there of 14,955.

11        THE WITNESS:  Yes.

12        THE COURT:  Your 750 in the diversion by Fallbrook

13    and the NAD, is that subtracted then from the 14,955?

14        THE WITNESS:  Yes, it is.

15    BY MR. MOSKOVITZ:

16        Q  Was there a previous addition?

17        A  Yes.  In order to determine the runoff from Area A,

18    we used the Fallbrook record at the gaging station, plus the

19    actual diversion by Fallbrook, and subtracted the measurement

20    for the same day at the station "Santa Margarita River Near

21    Temecula."  The difference between those two records then

22    corrected for the Fallbrook diversion was the runoff.

23        THE COURT:  When we get down to total runoff at De Luz,

24    what figures make up this 47,195?

25        A  The Area A measurement less the 750, plus the runoff

1       from B, plus C.

2               THE COURT:  I see.

3       BY MR. MOSKOVITZ:

4          Q  Now, are there any other differences between this

5       study and the previous study that should be explained?

6          A  Well, one point that I see that bears some explana-

7       tion is the fact that running down the third column labeled

8       "Present Diversion by Fallbrook Public Utility District and

9       Naval Ammunition Depot" we note that it is 1500 for most

10      years, but not always.  For instance, in the period of April

11      through September of 1938-39 we have only 604 acre-feet.

12      This is based on an assumption that between the two diverters

13      not more than 360 acre-feet would ever be taken in one month,

14      and this is simply by inspection of the past records of

15      diversions by those entities.  We have decided-- I made the

16      decision that it wouldn't be reasonable to assume that any

17      more than 350 acre-feet would be taken in any one year.

18         Q  In any one month?

19         A  Any one month.  And based on this assumption of

20      the 648 acre-feet in the April-September period, as indi-

21      cated as the measured runoff from Area A, only 604 acre-feet

22      would have been diverted by those two entities.

23              THE COURT:  Since this is supposed to be a study under

24      present conditions, you have run back  the Fallbrook and the

25      NAD diversions even prior to the time they began?

1　　　　THE WITNESS:  Yes, sir.

2　BY MR. MOSKOVITZ:

3　　　　Q  Now, you have made similar reductions for the

4　present diversions throughout the study, did you not, when the

5　water supply was such as to require it?

6　　　　A  Yes.  It will be noted that there were many years

7　during the dry years when the full 750 acre-feet for a six-

8　months period could not have been supplied under these drastic

9　assumptions of water supply limited to the area downstream

10　from Temecula Gorge; there would not have been water enough

11　to satisfy the past demands or the assumed present demand

12　here of these entities.

13　　　　MR. MOSKOVITZ:  Your Honor, if you don't want to go

14　through any of the calculations--

15　　　　THE COURT:  I don't see any reason for going through

16　them, if they are done on the same basis as previously done.

17　　　　MR. MOSKOVITZ:  Very well.

18　　　　Q  Is California's Exhibit AI correct in your knowledge?

19　　　　A  Yes, it is.

20　　　　MR. MOSKOVITZ:  Your Honor, I offer California's

21　Exhibit AI in evidence.

22　　　　MR. VEEDER:  I am proceeding on the same assumption

23　that there will be full opportunity of cross-examination on

24　this, so I will not go into voir dire.

25　　　　THE COURT:  All right.  California's Exhibit AI received

Illingworth - Direct    8871

1    in evidence.

2         (Defendant State of California Exhibit AI was received

3    in evidence.)

4         THE COURT:  Now California's AQ is the corresponding--

5         MR. MOSKOVITZ:  California's AP will be the correspond-

6    ing graphical summary of the study.

7         Q  Would you read the title block on California's

8    Exhibit AP for Identification?

9         A  Yes.  This is entitled "Graphical Summary of Study

10   No. 2."

11        Q  Going back for a moment to California's Exhibit AI,

12   would you explain the parentheses which appears on page 2

13   for the period April, 1945, under the column "Storage End of

14   Period"?

15        A  Yes.  April of that year represents a year of

16   relatively large runoff, that is, the runoff exceeded the

17   assumed demand rate, and there would have been some waste to

18   the ocean.

19        THE COURT:  What period are you talking about?

20        THE WITNESS:  The year 1944-45, the month of April.

21        THE COURT:  Yes.

22        THE WITNESS:  We had to check these six-months period

23   calculations occasionally by months in order to assure that

24   we were not over-filling the basin, or in the case of the end

25   of the period that we didn't go below zero, and in this case

it results in small waste to the ocean of some 355 acre-feet. I just want to explain why we have that extra month at that time.

BY MR. MOSKOVITZ:

Q Turning to California's Exhibit AP for Identification, was it done in the same manner and related in the same manner to California's Exhibit AI as the previous summary Exhibit AO was related to California's Exhibit AH?

A Yes.

MR. VEEDER: And had the same objective?

BY MR. MOSKOVITZ:

Q And had the same objective of summarizing the result; is that not correct?

A Yes, it does summarize the results.

THE COURT: Do you offer California's AP?

BY MR. MOSKOVITZ:

Q Is California's Exhibit AP correct, in your opinion?

A Yes.

MR. MOSKOVITZ: I offer California's Exhibit AP, your Honor.

THE COURT: California's AP received in evidence. That is Study No. 2?

THE WITNESS: Yes, sir.

(Defendant State of California Exhibit AP was received in evidence.)

1  BY MR. MOSKOVITZ:

2       Q  I hand you California's--

3       THE COURT:  Wait just a minute.  How long will it take

4  you-- Do you want to just offer the other one?  It is done

5  on the same basis, isn't it?

6       MR. MOSKOVITZ:  I just want to have explained the

7  difference between this one and the previous one, your Honor.

8       THE COURT:  All right.

9  BY MR. MOSKOVITZ:

10      Q  I hand you California's Exhibit AJ for Identifica-

11  tion and ask you to read the title block.

12      A  It is entitled "Yield of Santa Margarita Coastal

13  Basin and Waste to Ocean Under Present Conditions of Water

14  Supply assuming full development of usable ground water

15  storage capacity."

16      Q  In what respect does this study--

17      THE COURT:  Let me back up a moment.  How many parts

18  of Exhibit AI were amended?  Only the first page?

19      MR. MOSKOVITZ:  Yes, your Honor.

20      THE COURT:  Only the first page?

21      MR. MOSKOVITZ:  That is right.

22      THE COURT:  I used the wrong sheet.  Where was it

23  amended-- in how many places?

24      MR. MOSKOVITZ:  We gave you a new first page, your

25  Honor.

(The witness indicates to the Court on the exhibit.)

THE COURT:  Is that the only place?

THE WITNESS:  Yes, sir.  This is not a footnote over here.

THE COURT:  54.  This is 2304?

THE WITNESS:  Yes.  That should be 461.

MR. VEEDER:  Which column is that now, your Honor?

THE COURT:  You have the amended one.  I just happened to use the old one and got mixed up here.

Is that the only change?

THE WITNESS:  That is correct.  Similar for the first page.

THE COURT:  Just the first page?

THE WITNESS:  Yes.

THE COURT:  Go ahead.

BY MR. MOSKOVITZ:

Q  Explain the differences between California's Exhibit AJ and the previous study, California's Exhibit AI

A  This study is similar to the second study, Study No. 2.  But now we assume that there will be some flow from the portion of the watershed above the gage "Santa Margarita River Near Temecula."

Q  And what assumption of flow did you make?

A  We assumed that Vail Dam would have been in operation throughout this entire period of record.  This is a present

1    condition.  The dam is there and for these studies, as in the

2    case of the diversions by Fallbrook and NAD, it would have

3    been in operation throughout the entire period.

4        Q  What safe seasonal yield did you arrive at under this

5    assumption?

6        A  8,000 acre-feet.

7        Q  And what average seasonal waste to the ocean for

8    the period ending 1956-57?

9        A  18,600 acre-feet per year.

10       THE COURT:  What is this now?

11       THE WITNESS:  The results of the study are 8,000

12   acre-feet safe seasonal yield and 18,600 is the average waste

13   to the ocean for the 21-year period-- 21 winter seasons.

14   BY MR. MOSKOVITZ:

15       Q  There is a Footnote C after the indication of the

16   average seasonal waste on the upper left-hand side of the

17   page, and similarly showing the same footnote under the

18   column "Waste to Ocean."  What does that mean?

19       A  It is described on page 4.  I will read it:  "Does

20   not include spill from Vail Reservoir."

21       Q  What does that mean?

22       A  It means that we did not attempt to make any cal-

23   culation of what spill might occur from Vail Reservoir.

24       THE COURT:  If it should become full? .

25       THE WITNESS:  Yes.  During water supply conditions as

1   occurred in the years 1936-37 through 1942-43 it very likely

2   would have been spilled, your Honor.

3   BY MR. MOSKOVITZ:

4        Q  Do you have an estimate as to what that spill would

5   have averaged during the period of record which was used

6   for this study?

7        A  Two to three thousand acre-feet per year on the

8   average.  But it would have occurred in probably one or two

9   seasons.  It would have been perhaps 1938 and 1940-41.

10       Q  Are there any differences that should be pointed

11   out between California's Exhibit AJ and California's Exhibit

12   AI?

13       A  I note that on page 2 we have monthly calculations

14   for the months December, 1946 and January, February, March

15   and April, 1947.  This again was for the purpose, as in Study

16   2, for determining the waste which would have occurred in those

17   particular months, and further to determine exactly as the

18   start of which month the basin would have been full.  This is

19   necessary to determine the start of the critical dry period.

20       Q  Is California's Exhibit AJ correct, in your opinion?

21       A  Yes, it is.

22       MR. MOSKOVITZ:  I offer California's Exhibit AJ in

23   evidence, your Honor.

24       MR. VEEDER:  Subject to the right I have asked for in

25   the past of full cross-examination, no objection.

Illingworth 4-Direct

1       THE COURT:  California's Exhibit AJ received in

2   evidence.

3       (Defendant State of California Exhibit AJ was received

4   in evidence.)

5   BY MR. MOSKOVITZ:

6       Q   I call your attention to California's Exhibit AQ

7   for Identification and ask you to read the title block of

8   that exhibit.

9       A   That is entitled "Graphical Summary of Study 3."

10      Q   Does it bear the same relationship to Study 3, that

11  is, California's Exhibit AJ, as the prior graphs California's

12  Exhibits AP and AO bore to their respective studies?

13      A   Yes, it does.

14      Q   Is it correct, in your opinion?

15      A   Yes.

16      MR. MOSKOVITZ:  I offer California's Exhibit AQ in

17  evidence, your Honor.

18      THE COURT:  It is received in evidence.

19      (Defendant State of California Exhibit AQ was received

20  in evidence.)

21      MR. MOSKOVITZ:  I think this is a convenient stopping

22  point, your Honor.

23      THE COURT:  California's Exhibit AI is in evidence, isn't

24  it?

25      THE CLERK:  Yes, your Honor.

1          MR. VEEDER:  Mr. Moskovitz, before the recess, could

2    you advise how much more direct you think you will have?

3          MR. MOSKOVITZ:  I would say an hour should cover it.

4          MR. VEEDER:  Thank you, sir.

5          THE COURT:  You say an hour?

6          MR. MOSKOVITZ: An hour tomorrow morning, I think.

7          THE COURT:  What do we have left, Mr. Clerk--

8    California's AM and AN?

9          MR.MOSKOVITZ:  Your Honor, we are not going to offer

10   AN.  We can withdraw that one.

11         THE COURT: But AM will be offered?

12         MR. MOSKOVITZ:  Yes.

13         MR. VEEDER:  This you are not offering?

14         MR. MOSKOVITZ:  No, we are not going to offer

15   California's AN.

16         THE COURT:  All right.  Adjourn until 10 o'clock

17   tomorrow morning.

18         (Adjournment until Friday, February 20, 1959, at 10

19   A.M.)

20

21

22

23

24

25