Case 3:51-cv-01247-JO-SBC   Document 4580   Filed 09/24/63   PageID.29680   Page 1 of 130

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

<div align="center">Plaintiff,</div>

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

<div align="center">Defendants.</div>

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Friday, February 20, 1959.

Pages: 8879 to 9007

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

MALCOLM E. LOVE
**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street,
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,       )
                                )
                  Plaintiff,    )
                                )
     vs.                        )        No. 1247-SD-C.
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
                  Defendants.   )

REPORTERS' TRANSCRIPT OF PROCEEDINGS

San Diego, California
Friday, February 20, 1959

APPEARANCES:

            For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                      and
                                     WILLIAM E. BURBY, ESQ.,
                                     Special Assistants to the
                                     Attorney-General,
                                     Department of Justice,
                                     Washington, D. C.

APPEARANCES (Continued):

| | |
|---|---|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney-General, by<br>ADOPHUS MOSKOVITZ, ESQ.,<br>Deputy Attorney-General. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al., | FRANZ R. SACHSE, ESQ. |
| For Defendant Murray<br>Schloss Foundation | WALTER GOULD LINCOLN, ESQ. |

- - -

# INDEX TO WITNESSES

For Defendant State
of California:                              D        X        RD

    Leland Illingworth              8886     8946


# EXHIBITS

Defendant State of
California Exhibit                  Iden.      In Evidence

    L, Appendix H                              8909

    AM-1                          8916        8943

    L, Plate 21A                               8929

    L, Plate 21B                               8929

    L, Table 25                                8938

SAN DIEGO, CALIFORNIA, FRIDAY, FEBRUARY 20, 1959.   10:00 A. M.

THE CLERK:  Number one, case on trial, 1247-SD-C,

United States of America vs. Fallbrook Public Utility District,

et al.

MR. SACHSE:  Your Honor, before Mr. Moskovitz proceeds

with the witness, I was reviewing yesterday's transcript and

I have reference to your Honor's remark to Mr. Veeder where

you made the comment that "Mr. Moskovitz is attempting to prove

there is a ground water basin here and that the United States

has a right to use riparian waters to recharge this basin.  Now

this is not in accord with the views of some of the other

litigants."

I think it would be appropriate at this time to state

very briefly what our position is on this, because I am afraid

there may be a misunderstanding on the part of your Honor.

Fallbrook concedes very frankly that the United States

has a right to the use of riparian water for recharge to an

extent limited by proper riparian uses.

Now we have two things we do not concede in this re-

charge problem.  One, we do not concede any right in the United

States to demand recharge water for waters that are exported

from the watershed; and secondly, we say that their right to

recharge is modified by the provisions of the constitutional

amendment requiring reasonable riparian uses.  And we feel, for

A

Z5

1    example, to be quite specific, that under the law, under the

2    Supreme Court decisions of California that have interpreted

3    the constitutional provision, it is unreasonable to demand any

4    given level in a basin.  There have been many cases that have

5    so decided.  Just as there have been cases that have decided

6    that a riparian has diverted for years from the surface has no

7    right to insist on a continuation of such surface flow.  He

8    may be forced to install pumps, he may be forced to go to

9    deeper depths, if that is the reasonable way to derive the

10   maximum utilization of the waters in this semi-arid country.

11       So I didn't want any misunderstanding on your Honor's

12   part as to Fallbrook's views on this recharge question.  We

13   think that the problem presented by the physical facts and

14   contentions of the United States are, first, the very serious

15   problem of export-- very serious; and on the riparian right, as

16   I understand it, Mr. Veeder himself has conceded that the

17   riparian right as such gives them no right to export.  Well,

18   if they are exporting riparian water, then obviously they

19   should have no right to recharge for those illegal exports.

20       And secondly, a more nebulous, not quite as specific

21   a complaint, as to what is a reasonable level at which they can

22   expect to operate this basin.  For that reason, I think the

23   testimony, some of which I have missed but I am trying to get

24   out of the transcript, on safe yields is perhaps critical in

25   this case.

A
Z6

1      I hope I have made myself clear.

2          MR. VEEDER:  I think a response to that is required, for

3  this reason, your Honor.  Mr. Sachse is dealing in a field of

4  what we would call the physical solution, and I don't fancy

5  that this Court or any Federal Court is empowered to enter a

6  decree of a physical solution, particularly against the National

7  Government.  In other words, if we prove rights to maintain

8  vegetative cover on our land based upon the yield of the basin,

9  there is no reason in the law why the Fallbrook Public Utility

10  District would be permitted to divert water which would reduce

11  that water level, assuming that there was the storage capacity

12  to which Mr. Illingworth has made reference.

13          Secondly, we are of the opinion that the United States

14  or any other riparian, while they cannot waste water, are not

15  subject to the rule of law of reasonable use of the character

16  that appertains between riparians.  We believe that the burden

17  resides with the Fallbrook Public Utility District to show

18  that there is water available for appropriation and show that

19  in that appropriation they do not invade the rights of the United

20  States.

21          Now in connection with the diversion of water out of

22  the watershed, I don't believe it is possible legally, and we

23  have never contended that we could divert riparian water out

24  of the watershed.  Now that was a horse that I thought died

25  long ago.  From our standpoint we do believe that we do have the

1   right to divert the appropriative rights we have outside the

2   watershed or use them any place we desire to, as long as we

3   are entitled to have the water come down to us.

4        On that background we would like to go ahead, pointing

5   out that from the evidence that is in the record there can be

6   no diminution of the quantity of water reaching us without very

7   very serious effect upon the vegetative cover of our basin to

8   start with.  Moreover, any time the basin is lowered there

9   immediately arises an increased cost to pumping, another element

10  that enters into this litigation, coupled with the fact that

11  we have the most serious threat of salt water intrusion.  Now

12  we have been able to at least stop that intrusion by regulation

13  of the basin.  Our problem now is to see that there are no

14  upstream diversions which will create a shortage of water

15  which will result in the destruction of our basin by salt

16  water intrusion.

17       THE COURT:  Let's go ahead.  It is not time for argument

18  yet.

19

20            LELAND ILLINGWORTH,

21  recalled as a witness in behalf of the defendant State of

22  California, having been previously sworn, testified further

23  as follows:

24

25

Illingworth - Direct

8886

# DIRECT EXAMINATION

BY MR. MOSKOVITZ:

Q   Mr. Illingworth, in the three studies which you testified to yesterday, did you consider consumptive uses of water by native vegetation growing on the surface of the Santa Margarita Coastal Basin?

A   Yes, we did.

Q   I did not notice that there is any specific figure for such consumptive uses in Exhibits AH, AI and AJ.  In what way did you consider consumptive uses of native vegetation?

A   We did not consider the runoff from Area D as a supply in the studies, as you will recall from the analysis we went through yesterday.  This supply, in my opinion, would be adequate to more than satisfy the requirements of the native vegetation, including the grasses and the phreatophytes growing on the surface of the coastal basin.

There is a further element of supply that we did not account for in these particular studies, which also would be available to satisfy the uses by native vegetation.  This is the underflow of De Luz Creek, which is not measured at the gaging station, the gaging station having been located in the section of De Luz Creek which has a rather sandy bottom.  The station is not located at a bedrock section of the stream. Therefore, measurements of the stream flow at the station do not include all the values.  They include the part of the values

Illingworth - Direct

889

of the river that is on the surface, but not the underflow.

Mr. Worts in his Plaintiff's Exhibit 49 indicated that his estimate of this flow was some 700 acre-feet a year. The runoff from Area D which has not been separately accounted for in this study I estimated would reach as large a figure as 5,000 acre-feet in the wettest years.

MR. VEEDER: Did you say the underflow would be that high?

THE WITNESS: No, I am now referring to the runoff from Area D, which was unaccounted for in the studies.

BY MR. MOSKOVITZ:

Q   What values of consumptive use by native vegetation were considered?

A   Inspection of Plaintiff's Exhibit 49, by Mr. Worts, indicates that his estimate of such uses of ground water by the native vegetation would not exceed 1300 acre-feet a year for the period of that study, which I believe was from 1942-- I have the copy of it before me-- from water year 1941-42 through 1956-57.

MR. MOSKOVITZ: This is Exhibit 49, your Honor.

THE COURT: I have a copy.

Would that leave out the block called "Evapo-transpiration"?

THE WITNESS: Yes, sir.

BY MR. MOSKOVITZ:

Q Would you point out to the Court the block which indicates the ground water inflow that is not measured from De Luz?

A Yes. That is a cross-hatch in the recharge section of the explanation. It is a cross-hatch running upward from right to left called "Ground water inflow."

My recollection of Mr. Worts's testimony is that this is the underflow at the De Luz Creek gaging station.

THE COURT: What do you estimate that to be from the chart?

THE WITNESS: About 700 acre-feet per year. It appears to be constant throughout the entire period of this analysis.

THE COURT: What do you estimate this evapo-transpiration chart would show?

THE WITNESS: Not exceeding 1300 acre-feet; some of the years are less than that, but the maximum appears to be about 1300 acre-feet per year.

BY MR. MOSKOVITZ:

Q Mr. Illingworth, will you compare the average waste to the ocean as shown on Study 1-- that is California's Exhibit AH, with the actual average waste to the ocean that occurred during that period of study?

A Yes. As I testified yesterday, the average actual amount of water which went to the ocean passed the Ysidora

1    gaging station for the period 1936-37 through 1956-57 was

2    29,355 acre-feet per year.   This is from the actual records?

3        A  Yes, sir, of the U.S.G.S.  From Study No. 1 the

4    calculated runoff to the ocean, the waste to the ocean for

5    this period and under the conditions of this study would have

6    been 24,000 acre-feet per year for the same period of time.

7        Q  What is the chief factor that accounts for the

8    difference in those two waste figures?  Why is it less under

9    the study than it actually was?

10       A  The chief factor is that the use of water obtained

11   from the Santa Margarita Coastal Basin would have been greatly

12   increased during the period of this study as compared with what

13   actually was taken from the Santa Margarita Coastal Basin

14   during this period of years from 1936 through 1958.

15       Q  Have you made a calculation as to what the use from

16   the coastal basin, the net use in the coastal basin actually

17   has been in the last three years?

18       A  Yes, I have.

19       Q  And how did you calculate that?

20       A  I utilized the records presented as exhibits in

21   this case.

22       THE COURT:  Have you worked out a chart on this, or

23   are you going to give it to us orally?

24       THE WITNESS:  I will give you just the results of it,

25   your Honor.

A

Z12

BY MR. MOSKOVITZ:

Q  Can you state what exhibits you utilized, so that it can be identified?

A  Yes.  I utilized Plaintiff's Exhibits 150 and 151 to determine the pumping from the basin, and Plaintiff's Exhibit 119 to determine the amount of sewage returned to the basin. The difference between pumping and sewage return is the net extraction from the basin.  For the three years 1955-56 through 1957-58 the pumping averaged 6,370 acre-feet per year.  The sewage return for the same three years averaged 2,549 acre-feet.  The difference or the net take from the basin was 3,821 acre-feet per year.

MR. SACHSE:  That is for what years again, please?

THE WITNESS:  Water years 1955-56 through 1957-58.

MR. STAHLMAN:  May I have that sewage figure again.

THE WITNESS:  Yes; 2,549 acre-feet per year.

Now, this does not represent the total derived on the basin because Lake O'Neill during this period of time was essentially full of water.  It had a consumptive use of about 400 acre-feet per year.

BY MR. MOSKOVITZ:

Q  What is the nature of that consumptive use of 400 acre-feet per year?  Why is there a consumptive use?

A  It is evaporation from the lake surface.

Q  Adding that to the other figure, what is the total

1    use derived?

2        A  The total then would be 4,221 acre-feet per year.

3        I will say that this water in Lake O'Neill came from

4    two sources:  Some by direct diversion from the stream, and

5    some from pumping indirectly through the sewage treatment

6    plants and as returned from the plants through a portion of

7    Fallbrook Creek, I believe, or at any rate through a stream

8    channel into Lake O'Neill.

9        Q  How does this figure of actual average use from the

10    ground water basin, net use, over the past three years compare

11    with the safe yield calculated under Study No. 1?

12        A  Safe yield calculated in this study was 8,600 acre-

13    feet per year, which represents the net extraction which

14    could be made on the basin under these assumed conditions.

15    This compares with 4,221 acre-feet per year of actual draft

16    from the same sources.

17        Q  Now, will you compare the waste which actually

18    occurred again during the period of study as shown by the

19    United States Geological Survey records with the--

20        MR. VEEDER:  Your Honor, I object to the use of the word

21    "Waste"  It might be the witness's conclusion, but I don't

22    believe that counsel can properly use the term "waste."  He can

23    talk about the water that goes into the ocean.

24        THE COURT:  You are using the term "waste" to mean the

25    water which runs into the ocean, without any connotations other

A

Z14

1    than that that is the meaning of it-- water that runs into the

2    ocean?

3         MR. MOSKOVITZ:  That is all I mean, your Honor, the way

4    we use it.

5         THE COURT:  The objection is overruled.

6    BY MR. MOSKOVITZ:

7         Q  Would you compare that figure with the waste to the

8    ocean which was calculated under Study No. 2?

9         THE COURT:  Compare what figure with the one calculated

10   under Study No. 2?

11   BY MR. MOSKOVITZ:

12        Q  Would you compare the waste which actually occurred

13   during the period of the study?

14        It is a figure that Mr. Illingworth has already given

15   in comparing that with Study No. 1.  I want him to compare that

16   same figure with Study No. 2.

17        THE WITNESS:  Yes, I can compare them.  The waste to

18   the ocean, as measured at stream gaging station at Ysidora,

19   was 29,355, the same value stated a few minutes ago.

20        THE COURT:  Actual?

21        THE WITNESS:  Yes, sir.  This compares with a waste

22   under the conditions of Study No. 2 of 8,600 acre-feet per year.

23   BY MR. MOSKOVITZ:

24        Q  What is the significant difference between the actual

25   conditions and the conditions under Study No. 2 which resulted

1   in such a drastic reduction in the amount of flow to the

2   ocean?

3          A  There were two reasons.  The supply reaching the basin was

4   decreased drastically.

5          Q  In what way was that supply reduced?

6          A  You will recall that in this study there would be

7   no runoff from the entire upper watershed above the location

8   of the stream gaging station "Santa Margarita River Near

9   Fallbrook."  This cuts off entirely the upper portion of the

10  watershed and it is as if a large dam were constructed at that

11  point and no water allowed to pass that point at any time

12  during the year or in any year throughout this entire period

13  of analysis.  This is a very drastic assumption as to water

14  supply-- it cuts it down materially.

15         And a second reason that the waste to the ocean would

16  be less under the conditions of Study No. 2 than actually

17  occurred is that the present uses above the ground water basin

18  are assumed to have been in operation throughout the entire

19  period of this analysis, whereas a number of those uses have

20  been increasing over the years.

21         Q  And were not as great during the whole period as

22  they are today; is that not correct?

23         A  That is correct.  A good example of this is the

24  Fallbrook diversion, which has been gradually increasing, and

25  we assumed that it had operated throughout this historic period

1   with water supply as occurred here, except that we assumed

2   the present Fallbrook diversion would have taken place each

3   and every year throughout this period of analysis.

4          Q  Will you compare the actual net extraction of water

5   from the Santa Margarita Coastal Basin that you previously

6   testified to with the safe yield which was calculated under

7   Study No. 2?

8          A  The yield even under these drastic conditions of water

9   supply previously mentioned is 4,200 acre-feet per year.  This

10  is almost identical with the actual net extractions which took

11  place during the last three years, the average being 4,221

12  acre-feet per year.

13         Q  Turning to Study No. 3 again, would you compare the

14  actual waste to the ocean which occurred during the period

15  of study with the waste to the ocean calculated under Study

16  No. 3?

17         A  Yes.  Actual waste to the ocean again was 29,355

18  acre-feet per year.  The waste to the ocean, as determined in

19  this study, is 18,600 acre-feet per year.

20         Q  What is the chief factor that resulted in a smaller

21  waste under this study than actually occurred under natural

22  conditions and which made this waste smaller than occurred under

23  Study No. 1?

24         A  The water supply again is reduced over what it was

25  under actual conditions.

A

Z17

Q  In what way?

A  The reductions have been made to reflect what the water supply would have been had present conditions existed throughout the entire period of analysis.

Q  And what were the principal corrections which have to be made to reflect that?

A  May I state another factor that decreases the waste to the ocean, and that is that the demand on the basin assume in this study was greater than the actual demand that occurred.

Q  Would you point out what corrections principally had to be made to reflect present conditions throughout the period of analysis?

A  As in Study No. 2, the present Fallbrook diversions were assumed to have taken place throughout the period, also the Naval Ammunition Depot diversions as at present, and another major adjustment was to account for the fact that Vail Dam had been constructed during the latter portion of this period of analysis.

THE COURT:  Your study assumed that Vail Dam was in existence from 1936-37 on down?

THE WITNESS:  Yes, sir.

BY MR. MOSKOVITZ:

Q  Would you compare the safe yield that resulted from Study No. 3 with the actual extractions from the basin during the past three years?

A

Z18

1    A  The safe yield, as determined by this study, is

2  8,000 acre-feet.  This compares with the 4,221 acre-foot net

3  extraction in the last three years on Camp Pendleton.

4    Q  Now, looking at the three studies together, what is

5  the most important variable amongt the three studies?  What is

6  the chief difference among the three studies?

7    A  As I have indicated, the chief difference is the

8  change in water supply that reaches the ground water basin in

9  each of the three cases.

10    Q  What are the factors which affect a change in water

11  supply?

12    A  Two things can affect the water supply.  One is

13  nature.  If water is not supplied in the form of precipitation,

14  there simply is not water available for use.

15    Q  In these studies was that factor changed?

16    A  No.

17    MR. VEEDER:  I would like to hear the question.

18  BY MR. MOSKOVITZ:

19    Q  In these studies was that factor changed-- nature?

20    A  No, it was assumed that nature would have provided

21  the same amount of supply in each of the three studies.

22      Incidentally, this period of study taken included the

23  driest years of record, in fact the driest years of the last

24  65 years, which I analyzed in these and other studies.  This

25  includes the driest period as regards this particular basin,

1    basin of this size; these are the most critical dry years of

2    65 years of record.

3        Q  You mentioned that there were two ways by which the

4    water supply might be affected.  What is the second way?

5        A  The second way is by man's use upstream from the

6    Santa Margarita Coastal Basin.  These changing uses by man have

7    been taken into consideration in these studies.

8        Q  And it is that factor which makes the water supply

9    change in the three studies and therefore gives you different

10   results?

11       A  That is true.  As the supply decreases the yield of

12   the ground water basin decreases, and likewise waste to the

13   ocean decreases.

14       Q  Now, Mr. Illingworth, I call your attention to

15   Appendix H in Volume II of State's Exhibit L, beginning on

16   Page H-1 and going through page H-64.  Would you identify that

17   appendix, please?

18       A  Yes.  This appendix is entitled "Records of Mineral

19   Analyses."  It was prepared under my direction.

20       Q  Now, turning to page H-2, would you indicate what

21   information in tabular form is contained in this appendix?

22       A  Page H-2 is the table of contents for this appendix.

23   It indicates that the material is presented in four separate

24   tables:  The first table being "Mineral analyses of spring

25   waters in Santa Margarita River Watershed;" the second, Table

H-2, "Mineral Analyses of Surface Waters in Santa Margarita River Watershed;" the third, Table H-3, "Mineral Analyses of Ground Waters in and Adjacent to Santa Margarita River Watershed;" and the last table, Table H-4, "Partial Mineral Analyses of Ground Waters in Santa Margarita River Watershed."

1    BY MR. MOSKOVITZ:

2         Q  Now, turning to Table H-1, how is this table arranged

3    in so far as the information is organized?

4         A  First off, reading across the column headings we

5    have the spring number.  That is the location number similar

6    to well location numbers used in this litigation.  The spring

7    name, if any, is listed next.  The date the water sample was

8    obtained is next.  The electrical conductivity is the next

9    item.  Then the PH indicating the acidity of the water sample.

10   The next few columns report the mineral constituents in two

11   ways:  As a fractional symbol, the numerator indicating parts

12   per million and the denominator the equivalents per million

13   of the mineral constituents reported-- calcium, magnesium,

14   sodium, potassium, carbonates, bicarbonates, sulphates,

15   chlorides, and nitrates.  The next column is the fluorine

16   in parts per million.  The next, B, indicates boron in parts

17   per million.  The next column is total dissolved solids in

18   parts per million.  The next column is total hardness, as

19   calcium carbonate, in parts per million,  And the last column

20   on the right is percent sodium.

21        Q  What does Footnote A mean at the end of the title

22   of this particular Table H-1?

23        A  This is described at the end of the table on page

24   H-8.  It reads:  "All analyses by Division of Water Resources

25

B

Z2

1  unless otherwise noted."

2      Q  Who made these analyses at the Division of Water

3  Resources?

4      A  They were made, with certain exceptions which are

5  noted, by a chemist in the employ of the Division of Water

6  Resources at that time, and he worked at a laboratory located

7  at the University of California Citrus Experiment Station in

8  Riverside.

9      Q  Who collected the samples, Mr. Illingworth?

10     A  They were collected by the staff that worked on this

11 investigation of the Santa Margarita River under my direction.

12     Q  Now, apparently, some of these samples were collected

13 by other than the Division of Water Resources.  Could you

14 point out which ones, for example, were collected by others?

15     A  They are noted by a letter indication and a footnote

16 under the column "Date sampled."  For instance, on page H-3

17 we have the third sample at Murrieta Hot Springs.  The date

18 sampled was July, 1916.  This includes the symbol C which, on

19 page H-8, is described as:  "United States Geological Survey

20 Water Supply Paper 429, 1919."  1919 is the date of publishing

21 of that report, and this indicates that the sample was obtained

22 and the analyses copied fromthat report.

23     Q  And you believe that to be a reliable source of

24 information?

25     A  Yes.  There is another, footnote D, which similarly

MALCOLM E. LOVE, OFFICAL REPORTER

B

Z3

1    describes the samples obtained other than by the Division of

2    Water Resources.   And this on page H-8 is indicated to be an

3    analysis obtained from the Vail Company.

4         Q   And from whom did you secure that?

5         A   Mr. Hall provided these records.

6         Q   And you believe those to be reliable?

7         A   Yes.

8         THE COURT:   What is meant by "Dissolved solids"?   What

9    are dissolved solids?

10        THE WITNESS:   Well, these are the mineral constituents.

11   Parts of sodium, for instance, would be parts of the dissolved

12   solids.   It is all of the mineral constituents that are in the

13   waters.

14   BY MR. MOSKOVITZ:

15        Q   What is the distinction between dissolved solids

16   and other types of materials that can be found upon analyzing

17   waters, biological as contrasted with chemical?

18        A   We have such things as B coli counts, and so forth,

19   which are obtained in a sanitary analysis of the water sample.

20   And none of these data are reported in here.   These samples

21   were analyzed strictly on the basis of their mineral constitu-

22   ents, and no sanitary analyses were made.

23        Q   Are the samples organized with respect to hydro-

24   graphic units, for example?

25        A   Yes.   On page H-3 are listed all the samples listed

B
Z4

1    in Hydrographic Unit 1.  As we go through the table, the next

2    are the samples in Hydrographic Units 2, 3, 4, and 5.  No

3    samples of springs were obtained in hydrographic Unit 6.

4         Q  These hydrographic units are the same as shown on

5    California Exhibit AB?

6         A  Yes.

7         Q  Turning to Table H-2, would you describe the

8    differences between this table and the previous table, H-1?

9         A  This table starts on page H-9.  It includes the data--

10        MR. VEEDER: Could I have the page on that?  I am sorry.

11        THE WITNESS:  H-9.  This table includes the mineral

12   Analyses of surface waters as contrasted to the first table

13   which was spring waters.  The differences between this table

14   and the previous one are that now we have the stream named in

15   the first column and the location of the sample by stream

16   mile indication in the next column.  The table is arranged

17   by hydrographic units.  Again, all the stream samples taken

18   in Hydrographic Unit 1 are grouped together followed by the

19   samples in Units 2, 3, 4, 5, and 6.

20   BY MR. MOSKOVITZ:

21        Q  Does the Footnote A at the end of the title at the

22   top of the table have the same meaning as the footnote

23   previously used in Table H-1?

24        A  Yes, it does.  And it is described on page H-25, the

25   last page of the table.

1     Q  And that description is that the Division of Water

2  Resources obtained all samples?

3     A  Unless otherwise noted.

4     Q  Similarly, other footnotes shown in H-25 indicate that

5  samples were obtained by other personnel or other agencies.

6  Would you identify which agencies those were?

7     A  Looking at page H-25, Footnote B describes analyses

8  obtained from Vail Company.  As an example, on page H-9, the

9  first Murrieta Creek sample obtained in 1939 includes the

10  letter B.  This was obtained by Vail Company.

11     Q  Now, I notice that E says:  "Analyzed by Pacific

12  Chemical Consultants."

13     A  Yes.

14     Q  What does this mean?

15     A  This company is a contract chemist with the Division

16  of Water Resources.  A few of the samples were sent to this

17  private chemist for analysis.

18     Q  Were these samples collected by the Division of Water

19  Resources?

20     A  Yes, they were.

21     Q  And similarly, you have U.S.G.S. Water Supply Paper

22  429, United States Navy, and United States Geological Survey,

23  Quality Water Branch Unpublished record subject to revision?

24     A  Yes.

25     Q  Do you regard these various sources other than the

B

Z6

Division of Water Resources for analysis as being reliable?

A   Yes.

THE COURT:   How was this stream mile worked out?   Is 93 a symbol for the Santa Margarita system?

THE WITNESS:   Yes, sir.

THE COURT:   What is that, some State numbering system?

THE WITNESS:   Yes.

THE COURT:   Then, take the first one.   How do you read?   Page 2, Table H-2, page H-9, Cole Canyon Creek; 93, that is the Santa Margarita?

THE WITNESS:   Yes.   .31, as indicated on Plate 6, is the confluence of Murrieta Creek and Santa Margarita River.

THE COURT:   Yes.

THE WITNESS:   9.0 is the distance up Murrieta Creek to the confluence of Cole Canyon Creek.

THE COURT:   I am just curious.   How do you know that you should go up Murrieta instead of up Temecula?   Could you look on the--

THE WITNESS:   Well, Cole Canyon Creek is a tributary-- Oh, how can one tell this?

THE COURT:   You just had the number.

THE WITNESS:   Well, the system is such that, and this is described in the text.   I didn't mention it yesterday.

MR. VEEDER:   Which text?

THE WITNESS:   I should have.   Text which accompanies

these tables. The Santa Margarita-Temecula stream was con-
sidered for purposes as a stream mile designation as a single
stream, so that starting at zero at the ocean we come to a
confluence with Murrieta Creek at mile 30.1 and proceed on up
that--

THE COURT: Oh, I see.

THE WITNESS: --stream along the Temecula.

THE COURT: Where this first entry shows 30.1 and
then another --.0, you know that that means it is up to the
Murrieta which ran into the other stream?

THE WITNESS: Yes, sir.

THE COURT: Now, one-tenth of a mile up to Cole Canyon
Creek?

THE WITNESS: From Murrieta Creek, yes.

BY MR. MOSKOVITZ:

Q Turning now to Table H-3, what does this table
contain?

A This table contains mineral analyses of ground waters
in and adjacent to Santa Margarita River watershed. First
page is on H-27.

Q How does this table differ from the previous table?

A These analyses of ground waters were obtained from
water wells, and the well number is shown in the first column
and--

MR. VEEDER: What is the objective of going outside the

1   watershed?

2           THE WITNESS:  In some cases, we thought it might be

3   useful to show whether the water quality was different on the

4   other side of the watershed boundary or the same.  And this

5   is simply basic data.  It could be used for any purpose that

6   it was indicated later was necessary.

7           MR. VEEDER:  I am going to object then, your Honor.  I

8   see no reason for going outside the watershed in regards to

9   this analysis.  I don't know the relevancy of it, in the first

10  place.

11          THE COURT:  Overruled.  I don't know whether it will be

12  relevant or not.  It might be.  It won't do any harm, anyhow

13  We have got one situation-- I don't know whether it is shown

14  in here-- we have got the Rainbow Basin with the watershed line

15  right down the middle of the alluvial basin.  I don't know

16  whether this will have any bearing on it or not.  We have got

17  a similar situation up in Domenigoni Valley where-- it is the

18  contention, at least-- surface water runs one way and under-

19  ground water runs another way.  You might find something in

20  here that will help you.  Overruled.  Go ahead.

21          THE WITNESS:  Now, this table is arranged by hydrographic

22  unit.  And within each hydrographic unit the wells are located

23  within the basins designated on Plates 10B, and 10A, and 11A,

24  and on 11.  Then, for those wells that are located outside

25  of the designated basins, we have a separate section of the

B

Z9

1   table following the basins.

2   BY MR. MOSKOVITZ:

3       Q   And that heading reads: "Remainder of Unit"?

4       A   "Remainder of Unit," yes.  An example is on page H-32

5   where following Wildomar Basin we have a notation "Remainder

6   of Unit."  Those samples are from wells outside any of the

7   designated ground water basins.  Following that section, on

8   Page H-35, we have the remaining wells that are outside the

9   watershed but adjacent to Hydrographic Unit No. 1.  Each of the

10  subsequent sections of the table, Hydrographic Units 2, 3, 4,

11  5, and 6, are arranged similarly.

12      Q   And similarly to the other two tables already testi-

13  fied to, the samples and analyses were collected by the

14  Division of Water Resources and made by the Division of Water

15  Resources, unless otherwise noted; is that correct?

16      A   That is correct.

17      THE COURT:  Let's understand this:  The section called

18  "Remainder of Unit," that is within the basin?

19      THE WITNESS:  Yes, sir, and within the hydrographic

20  unit.  No, not within the basin.  It is within the watershed

21  of the Santa Margarita and within the hydrographic unit, but

22  not within any of these designated ground water basins.

23      THE COURT:  Oh, I see.  And then, the section called

24  "Outside of"-- what is it called?

25      THE WITNESS:  "Outside of the watershed but adjacent

1    to the hydrographic unit."

2         THE COURT:  Yes, all right.

3         THE WITNESS:  They are just over the borderline, for

4    the most part.

5         THE COURT:  All right.

6    BY MR. MOSKOVITZ:

7         Q  And similarly, analyses and samples gathered by

8    other entities were compiled here?

9         A  Yes, sir.  Footnote B includes samples obtained from

10   Water Supply Paper 429.  Footnote D indicates analyses

11   obtained from the Vail Company.  Footnote G, analyses obtained

12   from the United States Navy.

13        Q  And did you consider all these sources reliable for

14   the purposes of including the information in the record here?

15        A  Yes.

16        Q  Turning now to Table H-4, what does that table

17   include, beginning on page H-59?

18        A  This includes only partial mineral analyses of

19   ground waters.  And in this case, all of these partial

20   analyses were obtained from the Santa Margarita Coastal Basin.

21        Q  And all obtained from the United States Navy, is

22   that not correct?

23        A  Yes, that is right.  I should describe what a partial

24   mineral analysis is.  This is a water sample in which only

25   chlorides and totally dissolved solids have been analyzed.

1   This is a much simpler procedure, and it can be done rather

2   rapidly; whereas, the complete mineral analysis takes a

3   considerable period of time.  It is time-consuming and ex-

4   pensive both.

5        Q  And you regarded the United States Navy as a

6   reliable source to obtain these records from?

7        A  Yes.

8        Q  Now, to the extent that you have knowledge of the

9   information in Appendix H you believe that to be correct?

10       A  Yes.

11   MR. MOSKOVITZ:  I offer Appendix H in evidence.

12   MR. VEEDER: I have no objection.

13   THE COURT:  Appendix H received in evidence.

14   MR. MOSKOVITZ:  I would like to have Exhibit AM.

15   THE COURT:  Actually, it is Exhibit L, Appendix H, is

16   the title of it.

17   MR. MOSKOVITZ:  Yes, your Honor.

18   Do you want to take a recess now or do you want to con-

19   tinue?

20   THE COURT:  Yes, I suppose.

21   (Recess.)

22

23

24

25

C

Z21

Illingworth - Direct

8910

BY MR. MOSKOVITZ:

1

2      Q  Mr. Illingworth, I refer you to California's Exhibit

3  AM for Identification.

4      MR. VEEDER:  Mr. Stahlman is not here.

5      MR. MOSKOVITZ:  Pardon me.

6      (A pause.  Mr. Stahlman comes into the courtroom.)

7      THE COURT:  All right.

8  BY MR. MOSKOVITZ:

9      Q  I ask you to read the title block of that exhibit.

10     A  It is entitled "Mineral Character of Waters in

11  Pauba Valley and Vicinity."

12     Q  How was this prepared?  By whom?

13     A  It was prepared by a staff working under my direc-

14  tion.

15     MR. VEEDER:  Did you ask how it was prepared and by

16  whom?

17     MR. MOSKOVITZ:  And by whom.

18     Q  What is contained on the right-hand side of the

19  exhibit?

20     A  This is a planimetric map made up of sections of

21  United States Geological Survey 7½-minute quadrangle sheets.

22     Q  What area does it show?

23     A  It shows the lower portion of Murrieta Valley, Pauba

24  Valley, Wolf Valley-- that is the valley through which Pechanga

25  Creek flows, it shows the Vail Lake, Nigger Valley and

1    Lancaster Valley, as well as Radec Valley, and it also shows

2    the head of Temecula Canyon.

3    Q    And also Pauba Valley?

4    A    And also Pauba Valley.

5    Q    There are symbols that appear on that with numbers

6    by them.  Would you explain what they are?

7    A    The symbols indicate locations where water samples

8    were obtained. The triangular symbol indicates a surface water

9    sample taken from Temecula Creek.

10   Q    Would you identify the time when these were taken?

11   A    Yes.  The date of sampling is indicated in the

12   tabulation in the left-hand portion of the chart entitled

13   "Temecula Creek Water Samples."  Beside the plotting number

14   of each sample the date of taking is indicated, the mile point

15   on the stream is indicated, and the rate of flow in cubic feet

16   per second when it was known.

17   Q    Would you identify the other symbols?

18   A    The solid circle indicates the location of a sample

19   taken from an artesian well.

20        The solid circle surrounded by an additional circle is

21   a sample taken from the Schrode well and shows the location

22   of the Schrode well on the map.

23        The next symbol is an open circle.  This indicates the

24   location of a sample taken from a well in Pauba Valley other

25   than the artesian well.

1    And the open circle with a cross within it indicates a

2  sample obtained from the release of Vail Lake from the discharge

3  line of Vail Lake.

4    Q  I note on the map that there is a "&", a symbol that

5  looks like an "8" but is a little different from an "8."

6    A  That is a draftsman's version of the ampersand.

7  That indicates in that case that samples 1 and 2 were taken

8  from that particular location.

9    Q  That is on the right-hand side of the map?

10    A  Yes.  The indication you were pointing to is at the

11  bridge where Highway 71 crosses Temecula Creek just above

12  Nigger Valley.

13    Q  In other words, this symbol just means the same as

14  the word "and" doesn't it?

15    A  That is correct?

16    Q  Are the townships and ranges shown on these maps,

17  Mr. Illingworth?

18    A  No, they are not.

19  MR. VEEDER:  In Section 34-- 24.

20  THE WITNESS:  Section 24 immediately upstream from

21  Nigger Valley or in the upper portion of Nigger Valley.

22  BY MR. MOSKOVITZ:

23    Q  What information is set forth under the legend for

24  well water samples?

25    A  Did I understand you correctly-- what data?

Illingworth - Direct

Q  What data, yes, what information?

A  The plotting number of the well sample is indicated, the date the sample was obtained, the location number of the well by township, range and subdivision of section, and a remark concerning whether it is an artesian well and the special notation that one of the samples was obtained from the Schrode well.

Q  Turning to the chart on the left side of the exhibit, what information is set forth there?

A  This is a geochemical chart.  The left-hand triangle indicates the cations.  The right-hand side of the chart, the right-hand triangle includes data on the anions.

THE COURT:  What are they?

A  Cations and anions.

THE COURT:  How do you spell it?

A  C-a-t-i-o-n-s and A-n-i-o-n-s.  The cations being calcium magnesium and sodium potassium.  The anions chloride carbonates and bicarbonates and sulphates.

BY MR. MOSKOVITZ:

Q  These are similar chartes to those that Mr. Worts presented in analyzing the character of water in the wells of the Santa Margarita Coastal Basin; is that not correct?

A  Yes, the chart is identical.

Q  And the quadrilateral chart above the two triangular ones is what?

1      A  It summarizes the data in both the other charts.  It

2  will be noticed that for a given plotting point one can follow

3  up the diagonal line in this direction, going upward toward the

4  right from the left-hand triangle to the quadrilateral and the

5  same sample location is located on the same line.  Similarly,

6  the plotting of a given sample on the lower right-hand triangle

7  may be followed along a line parallel to the base lines of the

8  triangle up to the quadrilateral for the same location.

9      Q  In what manner were the samples, the chemical analyses

10  of the samples plotted upon the charts on the left?

11      A  On this type of chart the percent of the mineral

12  constituent is plotted.  Taking sample 16 as an example, in

13  the left-hand chart, we have magnesium with a percent of the

14  total cations of about 11%, the zero line being the base line

15  of the triangle, the 10% line being the next horizontal line,

16  the 20% line the next horizontal line, et cetera.  100% would

17  be indicated at the vertex of the triangle near the symbol

18  NG.

19      Going back to sample 16, then, this is about 11%

20  magnesium.  Reading from the left-hand side downward toward

21  the right we find that sodium plus potassium is about 62%,

22  and reading downward from the right to left we find that

23  calcium is about 24%.  If I have read these values correctly,

24  they would total 100%.

25      Q  Where can the chemical analyses that were used in

C

Z26

1 plotting these points for the various samples be found so that

2 they can be checked?

3    A  All of these samples, the data of all these samples,

4 except the single sample of May 23, 1958, obtained from the

5 Vail Reservoir, are included in Appendix H, although-- I may

6 be incorrect here-- I believe sample 12, 13 and 14, because

7 of the dates, probably also were obtained at a later date then

8 is included in the report and I would have to produce the

9 results other than in Appendix H.

10    THE COURT:  Do you have those and also the ones on the

11 Vail Reservoir?

12    THE WITNESS:  Yes, I do.

13    THE COURT:  Will you bring them in, or do you have them

14 here?

15    THE WITNESS:  I have them here.

16    THE COURT:  They will be marked for identification as

17 AM-1

18    MR. MOSKOVITZ:  Do you have them here?

19    THE WITNESS:  I will have to copy them off so that we

20 can submit them.  Can I do that at the lunch hour?

21    THE COURT:  It can be done.  They will be marked AM-1

22 for Identification.

23    (Defendant State of California Exhibit AM-1 marked for

24 Identification.)

25

BY MR. MOSKOVITZ:

Q  Now, in analyzing the location of the plotting of the various samples on the chart on the left-hand side of California's Exhibit AM, what did you note as to their position?

A  The majority of the artesian well samples plot in one section of the chart, both the left-hand triangle and the right-hand triangle.  Samples 15 through 19 plot very close to one another in the lower right-hand corner of the left-hand triangle.

THE COURT:  15 through 19?

THE WITNESS:  Yes, sir.

MR. MOSKOVITZ:  Those are the artesian samples?

THE WITNESS:  That is correct.

THE COURT:  Where are they located?

THE WITNESS:  In this corner of the triangle.  They similarly plot close to one another in the right-hand triangle. They are over at the lower central portion of the chart.

BY MR. MOSKOVITZ:

Q  Where does the Schrode well sample fall?

A  The Schrode well sample falls within the same group in both triangles.

THE COURT:  As the artesian wells?

THE WITNESS:  Yes, sir.  There is one exception to that.  The water sample from Well 16 plots between the location

1    of the surface water samples and the artesian well samples--

2    well, in the case of the left-hand triangle.  In the case of

3    the right-hand triangle, it plots well within the grouping of

4    the artesian wells and the Schrode well.

5         The surface water samples plot very close to one another

6    in both the left-hand and the right-hand chart, as well as the

7    combination rectilinear chart in the center.

8         And the water samples obtained from the wells other

9    than the artesian wells also plot very close to one another

10   and very close to the grouping of the surface water samples.

11        THE COURT:  These other wells other than artesian,

12   what are they?  Wells on the Vail property that are shallower?

13        THE WITNESS:  They are shallower wells, and they are

14   the wells that are used for producing the good majority of

15   the water used for irrigation that is obtained from ground

16   water on Pauba Basin.  It does not include all of such wells,

17   but it included a typical group of such wells.

18   BY MR. MOSKOVITZ:

19        Q  What conclusions do you draw--

20        THE COURT:  First, where does the Vail Reservoir water

21   plot?

22        THE WITNESS:  In the same group of surface water

23   samples as the--

24        THE COURT:  Other wells?

25        THE WITNESS:  --other well samples, yes.

C

Z29

1      THE COURT:  You didn't put the Pauba well in here?

2      THE WITNESS:  No-- Yes, I believe so.  Sample 19 is

3  from that well, designated 8 South, 2 West, 17-M.  That is the

4  Pauba well.

5  BY MR. MOSKOVITZ:

6      Q  Is California's Exhibit AM correct to your knowledge?

7      A  Yes.

8      MR. MOSKOVITZ:  I offer California's Exhibit AM in

9  evidence, your Honor.

10      THE COURT:  It is received in evidence.

11      (Defendant State of California Exhibit AM was received

12  in evidence.)

13      THE COURT:  I interrupted the witness.  You had asked

14  him what conclusions he had drawn.

15      MR. MOSKOVITZ:  Yes, I was going to ask him now, your

16  Honor.

17      Q  What conclusions do you draw from the plotting of

18  these samples as to the identity and source of the waters

19  in the various sample locations?

20      A  First, I would say that the waters obtained from the

21  shallower wells differ markedly in mineral character fromthe

22  waters obtained from the artesian wells and the Schrode well.

23      Secondly, I would say that the waters from the

24  shallower wells are very similar in mineral character to the

25  surface water samples of water released from Vail Reservoir,

Illingworth - Direct

8919

C

Z30

1  as well as the rising water flowing in Temecula Creek at the

2  central portion and downstream end of Pauba Valley.  Likewise,

3  the shallow well waters are quite similar to surface water

4  samples obtained from Temecula Creek above Vail Reservoir.

5      Q  What conclusions do you draw from this data as to the

6  movement of water under the surface of the ground in Pauba

7  Basin?

8      A  I would conclude that the rising water which flows

9  down Temecula Creek through the lower end of Pauba Valley is

10  primarily obtained from-- primarily comes from the upper zones

11  of the ground water basin of Pauba Valley.

12      Q  And what conclusions do you draw as to the movement

13  of water between the lower zones, that is, tapped by the

14  artesian wells in Pauba Basin, and the shallow wells in Pauba

15  Basin which are not artesian?

16      A  I believe that the primary source of water for the

17  artesian wells is distinctly different from the surface waters

18  and the well waters, the water samples obtained from the

19  shallow wells.

20      MR. VEEDER:  May I have that answer read, please?

21      (The reporter read the last answer.)

22      MR. VEEDER:  The primary source-- well, I will ask it

23  on cross-examination.

24  BY MR. MOSKOVITZ:

25      Q  And is there any conclusion that you can draw as to

C

Z31

1   the movement of water between the zone tapped by the artesian

2   wells and the zone tapped by the shallow wells in the ground

3   water basin itself?

4        A  I think that the rising water in Temecula Creek, the

5   lower end of Pauba Valley, is supplied primarily by the upper

6   portions of the Pauba Valley and does not come from the lower

7   zones from which the artesian wells obtain their supply, the

8   artesian wells being some 500 feet or more in depth.

9        THE COURT:  Read that back, Mr. Reporter.

10       (The Reporter read the last answer.)

11       THE COURT:  Did you run a chemical analysis on the

12  Roripaugh well, too?

13       THE WITNESS:  Well, of course, we wouldn't have one on

14  the new Roripaugh well, but--

15       MR. VEEDER:  That is the one to which you are referring.

16       THE COURT:  What do you mean, the new Roripaugh well?

17       THE WITNESS:  We have obtained no sample from that new

18  well.

19       MR. MOSKOVITZ:  His Honor is asking you what you mean

20  by the new Roripaugh well.

21       THE WITNESS:  The one that was drilled relatively

22  recently and the one which we visited on the field trip.

23       THE COURT:  The one we saw being drilled?

24       THE WITNESS:  No; the one called the Roripaugh well is

25  the one adjacent to the stream where we got out and inspected

C
Z32

1    the stream bed.

2            THE COURT:  On Santa Gertrudis?

3            THE WITNESS:  Yes.

4            THE COURT:  And of that you have taken no chemical

5    analysis?

6            THE WITNESS:  That is true.

7            THE COURT:  Wouldn't that be important?

8            THE WITNESS:  It may be.

9            THE COURT:  Here is a deep well.

10            THE WITNESS:  We do not have an analysis of it, and

11    we did not go out and make one.  This could be done.

12            THE COURT:  Could you do that?

13            THE WITNESS:  Yes, sir.

14            THE COURT:  You will have to contact Mr. Krieger, I

15    suppose, to get his approval.

16            THE WITNESS:  I might say that we do have samples

17    that were obtained from wells of similar depth in Santa

18    Gertrudis Valley during our investigation, which are reported

19    in Appendix H.

20            THE COURT:  Wells of similar depth to the Roripaugh

21    well?

22            THE WITNESS:  Yes.  I think Mr. Roripaugh himself

23    stated that this new well replaced an older one which was

24    about the same general type of well in depth.

25            THE COURT:  You say you have information in Exhibit L,

1    Appendix H on that?

2            THE WITNESS:  Yes.

3            THE COURT:  That doesn't give you the percentages.  You

4    still have to translate it out, don't you?

5            THE WITNESS:  Oh, yes.  But this could be done in a

6    relatively few minutes.

7            MR. MOSKOVITZ:  We could do that for your Honor and

8    have it after the noon hour.

9            MR. STAHLMAN:  May I ask how much trouble it would be

10    to take a sample from the Roripaugh well?  I am informed I

11    think they have it.

12            THE COURT:  It wouldn't be much of a problem.  Let's

13    see what other wells you have up around that Santa Gertrudis

14    area that are equivalent to the Roripaugh well.

15            MR. MOSKOVITZ:  If you like, we can plot them, your

16    Honor.

17            THE COURT:  And plot them on this chart.

18            THE WITNESS:  Yes, sir.

19    BY MR. MOSKOVITZ:

20            Q  Mr. Illingworth, I want to call your attention now

21    to Plates 21A and 21B in Volume I, State's Exhibit L.  Those

22    are plates which are entitled "Location of Diversions and

23    Irrigated and Irrigable Lands."

24            A  I have them before me.

25            THE COURT:  Let me have the numbers again.

MR. MOSKOVITZ:  Plates 21A and 21B, your Honor.

Q  What area does Plate 21A depict?

A  The coastal area, a portion of the Santa Margarita River watershed; that is the area including Hydrographic Units 5 and 6.

Q  How was this map prepared, and by whom?

A  This was prepared by a staff working under my direction.

Q  And during what period of time?

A  During the period of the investigation of the Santa Margarita River.

Q  And the conditions depicted thereon are as of what date?

A  As of 1953.

MR. MOSKOVITZ:  Your Honor, at this time we are not offering either Plates 21A or 21B for the purpose of showing where irrigable land is located.  That may be ignored.  And also we are not offering these for the purpose of showing the location of consumptive use study plot or the location of climatological station, those showing on the legend, but for the other information of your Honor.

MR. VEEDER:  What other information is there?

MR. MOSKOVITZ:  Location of irrigated land, location of diversions, location of--

MR. VEEDER:  Location of irrigated lands?

C

Z35

1       MR. MOSKOVITZ:  Of irrigated lands.

2       THE COURT:  Irrigated lands and what else?

3       MR. MOSKOVITZ:  Everything else in the legend, your

4  Honor, beside the three things I mentioned.

5       THE COURT:  Diversion conduit, diversion locations?

6       MR. MOSKOVITZ:  Yes, sir.

7       MR. STAHLMAN:  Irrigable land is out?

8       MR. MOSKOVITZ:  Location of consumptive use study plot

9  is out, and location of climatological station is out.

10      THE COURT:  And urban and military lands?

11      MR. MOSKOVITZ:  No; that remains in.  But this would

12  be for the purpose of showing the condition at that time.

13      Q  Mr. Illingworth, would you describe in what manner

14  the irrigated land was plotted on Plate 21A?

15      A  This was plotted from the results of a survey

16  made of land uses in the watershed conducted in 1953.  It

17  was checked against a similar survey that was made in 1952,

18  and it was further checked by observations of these irrigated

19  lands not only on a one-look survey but by observing the

20  lands throughout this calendar year 1953.  So that this map

21  is intended to represent those lands which were irrigated

22  sometime during that year.

23      MR. MOSKOVITZ:  Your Honor, I want to make a statement

24  at this time about the irrigable lands plotted on this map.

25  If they prove to be important and if you would desire to

C

Z36

1    have the evidence that we have, a lot of background material,

2    we can present it. But it occurred to us that it might re-

3    sult in an extensive lengthening of the trial, and unless

4    you really desire it we will not offer it for that reason.

5         THE COURT: What are you offering this for? We

6    couldn't get a legal description from this map of any of this

7    irrigated land. We can just get a general impression from

8    the map as to where the irrigated land is.

9         MR. MOSKOVITZ: It occurs to us that there may be

10   some of the other defendants who will want to use these maps

11   to relate to their own parcels when the time comes.

12        THE COURT: Do you think they could find their parcel

13   on a small-scale map like this?

14        MR. MOSKOVITZ: I think in some cases they could locate

15   their lands within the larger areas.

16        Q  Mr. Illingworth, do you think that could be done?

17        A  Yes. This map is a reduction of a map drawn to

18   large scale and it is accurate in considerable detail. And

19   furthermore, the basis for this map is United States

20   Geological Survey quadrangle sheets and such maps as were

21   available at this time. That would include the 15-minute

22   quadrangle sheets of the United States Army map surveys and

23   they could be referred to to indicate in more detail than is

24   shown here the areas that were plotted as of 1953.

25        THE COURT: What are these numbers in boxes?

1    THE WITNESS:  That is a designation of the diversion

2    number.  As an example--

3    THE COURT:  Those are all diversions?

4    THE WITNESS:  Yes, sir, of one sort or another.  On

5    the key to numbering system, on the lower right-hand section

6    of Plate 21B, you notice that typical land section.

7    THE COURT:  Yes.

8    THE WITNESS:  This shows at larger scale how we numbered

9    them.  The stream is shown as a solid line running from right

10   to left across this page.  There is a diversion in the H

11   40-acre piece of Section 22.  The diversion is located in that

12   section and would be known, if this were in Township 8 South,

13   Range 2 East, the total number of the diversion would be

14   Township 8 South, Range 2 East, 22H.  The diversion line is

15   shown as a dashed line.  This would indicate the ditch or

16   pipe line running from the diversion to the point of use.

17   MR. MOSKOVITZ:  Your Honor, I am also going to offer

18   two tables in Volume I which list the diversions and give

19   information about them so that they can be cross-checked with

20   the map, and those are Tables 24 (pages 116 to 127) and Table

21   25 (pages 128 to 129), and I will refer to them and have Mr.

22   Illingworth testify to them in a moment.

23

24

25

D

Z12

THE COURT:  Before you go ahead on this map-- this is off the record.

(Discussion off the record.)

THE COURT:  The map, Plate 21A shows "Fallbrook Naval Reservation."  Is that the new title that you are--

THE WITNESS:  I think it has been sometimes known as that.

THE COURT:  The new title somebody has given to the--

MR. VEEDER:  They have taken all our water.  Now, they are taking our land, apparently.

THE WITNESS:  I think the official title has been Naval Ammunition Depot, Fallbrook.

MR. VEEDER:  We have called it United States Naval Ammunition Depot.

THE WITNESS:  Yes, I realize that.

MR. VEEDER:  Seal Beach Annex.

THE WITNESS:  Located at Fallbrook?

MR. VEEDER:  Located in California, that is right.

BY MR. MOSKOVITZ:

Q  Mr. Illingworth, how did you plot the urban and military lands receiving water service on Plate 21A?

A  This map was constructed from data obtained in the same land use survey that was referred to before in the plotting of irrigated lands.  This was done at the same time.

Q  And the map also shows the watershed boundary and

D

Z13

1      boundary of hydrographic units and hydrographic unit numbers?

2      Are those similar, the same as those that are shown in

3      California Exhibit AB?

4              A   Yes.

5              Q   On Plate 21B is the information depicted thereon and

6      the source and method of gathering the same as in 21A except

7      for the inland area?

8              A   Yes.

9              Q   Are these two plates, 21A and 21B, correct to your

10     knowledge?

11             A   Yes, they are.  Our attempt was to locate all of

12     the diversions of water which were of any significant size

13     or for which water right application has been made.  We have

14     some very small diversions located here which we otherwise

15     probably would not have located other than the fact that an

16     application has been made.  There was a record of it, and we

17     included it here.  But our attempt was to locate all sig-

18     nificant diversions.  And this includes a rather small-size

19     diversion.  We probably did not get every one.  And I believe

20     that at one meeting I attended, the Fallbrook hearing, the

21     hearing at Fallbrook by the Master, one of the owners testified

22     that he had a diversion up there.  And I made a brief check,

23     and I could not locate his particular diversion in these

24     records. It may be that we omitted his.  Others have changed

25     ownership names since the time of this survey, but for the

D

Z14

1  most part it includes all the diversions that were in exist-

2  ence in 1953.

3.      MR. MOSKOVITZ:  I offer California Exhibit L, Plate 21A,

4  and California Exhibit L, Plate 21B in evidence.

5      MR. VEEDER:  No objection.

6      THE COURT:  Received with the understanding that the

7  same limitations you placed on 21A applying 21B are not

8  concerned with irrigable land; is that right?

9      MR. MOSKOVITZ:  Yes, your Honor.

10      THE COURT:  Is that right?

11      MR. MOSKOVITZ:  That is right.

12      Q  I refer you now, Mr. Illingworth, to Table 24 in

13  Volume I of State Exhibit L beginning on page 116, and I ask

14  you to read the title of that table.

15      A  Table 24 is entitled:  "Descriptions of Surface

16  Diversions."

17      Q  How was this table prepared?

18      A  This was prepared from the list of the diversions

19  located in the field by a staff working under my direction.

20      Q  What information is set forth in this table?

21      A  The owner of the land on which the diversion is

22  located is shown in the left-hand column.

23      Q  And are they listed alphabetically?

24      A  Yes, they are.

25      Q  By owner?

D

Z15

Illingworth - Direct

1    A   Yes.  The next column indicates the diversion

2  number, and this is the same numbering system utilized with

3  the wells, the precipitation stations, and the springs in this

4  investigation.

5    Q   It may be correlated with the information on Plates

6  21A and 21B?

7    A   Yes.  They are all located on one or the other of

8  those plates.  The next column tabulates the appropriations

9  on file with the State.  If there were none, this is so

10  indicated.  If the status of the appropriation is still in the

11  application stage, the application number is listed.  If it

12  has gone to permit, the permit number is listed.  And if it

13  has gone on license, the license number is listed.

14    Q   When you say "if it has gone," as of what date

15  are you speaking?

16    A   As of the date of the tabulation of applications to

17  appropriate water listed in this Appendix K.

18    THE COURT:  Appendix K?

19    THE WITNESS:  Yes.  I thought it was indicated on here

20  but--

21    THE COURT:  Why don't you bring these down to date

22  for us?

23    THE WITNESS:  We can do this.

24    THE COURT:  Particularly as to-- For instance, you have

25  "Appropriations on file with the State:  None."  This is of

D

Z16

1    as of the date this chart was made up.  Now, maybe there have

2    been some applications made.  Couldn't you put--

3        MR. SACHSE:  There have been, your Honor, and I was

4    going to make that request of the State.  Definitely there

5    are applications that I know of my own knowledge that are

6    recent.

7        THE COURT:  Can't you bring this down to date for us?

8    Any objection to that?

9        THE WITNESS:  I will be glad to do that.

10       THE COURT:  Mr. Veeder?

11       MR. VEEDER:  I think it is a pious idea.

12       THE COURT:  All right.

13       MR. MOSKOVITZ:  We will bring a complete list of all

14   applications and other missing data.

15       THE COURT:  What I am thinking about is on the exhibit

16   you can if there is an application on file, put it in here in

17   place of the "None."

18       MR. MOSKOVITZ:  I see.  There may be other applications

19   that would not relate to the diversions listed there.  Would

20   you want those up to date?

21       THE COURT:  See what you find first.  Maybe you won't

22   want to doctor this up.

23       MR. MOSKOVITZ:  All right.

24       THE COURT:  What date would this exhibit speak of?

25   Certainly before you published this report.

D

Z17

1             THE WITNESS:  Before we published the report.  It

2  would be approximately 1954.

3  BY MR. MOSKOVITZ:

4           Q  Now, will you continue with the information that

5  is set forth in Table 24?

6           A  In the next column is listed the water supply

7  source, whether it be a creek, a stream.  And the next is the

8  year the diversion started.  The next, the use as was observed

9  in 1953.  The next column indicates the amount of that irri-

10  gated in 1953, if one of the uses was an irrigation use.

11  The next column is a brief description of the diversion

12  system, followed by a column indicating the measuring device

13  that was used to measure the water, if any.  The next is

14  the available records of water use.  And the last column

15  includes remarks of various nature.

16           Q  Where did you get the information set forth under

17  the column heading "Years started"?

18           A  This was obtained by interview with the owner, by

19  reference to water rights applications and-- those are the

20  primary sources.

21           MR. VEEDER:  Your Honor, in regard to two elements on

22  here I have to interpose an objection.  Of course, I think

23  they are desirable data.  The points of diversion and as to

24  the extent of possible places of use, in so far as it relates

25  to the dates when that information was current.  But there are

D

Z18

1   two aspects here that I think are extremely important concern-

2   ing which I think this witness should not testify-- one in

3   regard to the ownership of the land.  Ground ownership, he

4   certainly doesn't know that.  Secondly, in regard to priority

5   or the similar aspects to the right to the use of water.  I

6   believe he should be eliminated from this, because I think

7   it is an issue that the individual should introduce him-

8   self.  I don't think it is proper for discussion in priorities

9   or anything like that.  We use tabulations.

10      THE COURT:  This is not binding.  The is the informa-

11  tion the State has been able to gather for their records

12  to the best of their information as of sometime late in

13  '53 or early in '54, as to those dates.  I see dates in the

14  chart running through September, '54.  So the report wasn't

15  filed until after that.

16      MR. VEEDER:  We have no objection to the matter, in

17  general, but I do believe that the individual owner is the

18  only one who can properly testify on those subjects.  I don't

19  see why it is offered for that purpose.

20      THE COURT:  Overruled.

21      MR. SACHSE:  Your Honor, this grieves me a little.

22  That is the very reason I was going to ask myself the

23  State to bring us in a current list of applications-- pardon

24  me, of permits and of licenses.  If they are brought in,

25  offered in evidence here, and no objections made to them,

1   assuming now the case of a person who claims nothing but an

2   appropriative right, I might well instruct that client he

3   doesn't have to do anything further if, in my judgment, I

4   think that is sufficient proof. But I do want it in for

5   the purpose of showing the priority of the application of

6   some of these people.

7       MR. VEEDER: But I am saying these data here shouldn't

8   be the source material. I think they should come in and

9   prove their right.

10      MR. SACHSE: I don't. I am perfectly willing if the

11  State comes in and gives us the tabulation of the data on

12  which permits were issued, the date of the license and the

13  date of the appropriation to which it dates back. I don't

14  see where the individual has to come in and repeat the whole

15  thing. It is a public record, just exactly as is a deed. A

16  deed you can look at and see the date it was recorded. This

17  is a public record of the Department of Water Resources, and

18  we can find out the dates at which these permits and licenses

19  were given; and it is a fact--

20      THE COURT: The objection is overruled. It is a

21  compilation made by the State. It has to do with the

22  situation as in '53. And there is a presumption that when

23  a thing shown to exist continues to exist-- but we are

24  going to ask the State of bring the matter up to date for

25  us for whatever use we can make of it. Now, many of these

D

Z20

1   people will be in here, and you can go over it with them, the

2   matter, and show them this chart.  There may be situations

3   of people who appear pro per who will not respond.  We may

4   end up with a whole new list in evidence.  We will have to

5   do the best we can.  All the law requires is to use the best

6   evidence the case is susceptible of, and this may be the

7   best evidence.  The objection is overruled.

8           MR. VEEDER:  In regard to ownerships, your Honor--

9           MR. SACHSE:  Well, by ownership I--

10          THE COURT:  Apparent.  Apparently your apparent

11  ownership--

12          MR. VEEDER:  I interpose my objection to those two

13  phases of it.  I repeat, I don't believe this man can testify

14  in regard to owner.  I don't believe it is proper for him

15  to do so.

16          THE COURT:  Overruled.

17          MR. MOSKOVITZ:  Your Honor, we don't purport this was

18  a result of a title search.  This is apparent owner.  That is

19  all.

20          THE COURT:  That is right.  I understand it.  Now,

21  let's see, this is Table 24 and 25, isn't it?

22          MR. MOSKOVITZ:  24 is the only one I have described so

23  far, your Honor.

24          Q  I will ask Mr. Illingworth whether-- Do you believe

25  Table 24 to be correct?

1  A Yes, sir.

2  MR. MOSKOVITZ: I offer Exhibit L, Table 24 in evidence.

3  THE COURT: Received.

4 BY MR. MOSKOVITZ:

5  Q Now, referring to Table 25 of California Exhibit L

6 for Identification--

7  MR. VEEDER: Which page is that on?

8  MR. MOSKOVITZ: Pages 128 and 129.

9  Q --would you read the title of that table?

10  A This is Table 25 entitled "Estimated Annual Surface

11 Diversions."

12  Q And how was this table prepared?

13  A This was prepared from records obtained during the

14 course of this Santa Margarita River investigation by a staff

15 working under my direction.

16  Q What information is set forth in this table?

17  A The diversion number, the owner of the diversion

18 and--

19  Q That would be the apparent owner, as far as you

20 could tell at the time?

21  A Yes, that is correct.

22  Q Without a record title search? You made no record

23 title search?

24  A That is correct. And the diversions for the

25 calendar years 1951, '52 and '53, are shown in this table.

D

Z22

1    It will be noted that in many cases these are very small

2    diversions, and Footnote C has been utilized.  This indicates

3    less than one acre-foot per year.  And this is our best

4    estimate of the situation in these cases.

5        Q Are the figures which are set forth amounts based

6    upon measurements in all cases?

7        A  No, they are not.  In some cases they are based

8    on estimates.  And in some cases they are based on measure-

9    ments by others, other persons than those on my staff.

10       Q  Those persons that just gave the information to

11   you?

12       A  That is correct.

13       Q  You cannot vouch for the accuracy of those, can you?

14       A  No; but there was a showing that they were reason-

15   able.  They were obtained from meter readings or some similar

16   record of apparent reliability.

17       Q  In your opinion, is the information set forth in

18   Table 25 correct?

19       A  Yes.

20       MR. MOSKOVITZ:  I offer Exhibit L, Table 25.

21       MR. VEEDER: I am going to object on the ground it is

22   obvious hearsay from what this witness has stated.

23       THE COURT: It is.  It is a type of thing that has to

24   be done in cases of this sort.  We don't expect to bring in

25   at this stage of the case for the purpose of this table the

8938

D

Z23

1   title reports as to these people.  It is a table which

2   estimates annual surface diversions; it gives a diversion

3   number so it can be found on the map, and the name of the

4   reported owner, reputed owner.  Overruled.

5       MR. MOSKOVITZ:  Your Honor, this completes the direct

6   examination of Mr. Illingworth, and he can now be cross-

7   examined.

8       MR. VEEDER:  Are we taking the short afternoon this

9   afternoon, your Honor?

10      MR. MOSKOVITZ:  Your Honor, the Clerk mentioned to me

11  that you had not actually admitted Table 25.

12      THE COURT:  Received in evidence.

13      Yes, I hope so.  We must come back at 1:30.  You

14  think you can complete your cross-examination this afternoon?

15      MR. VEEDER:  It depends a great deal on your Honor's

16  rulings.

17      THE COURT:  Well, I might help.  I might be of some

18  assistance in getting your cross-examination completed.

19      MR. VEEDER:  I know, your Honor.  I have experienced

20  that on several occasions.  I wouldn't undertake to estimate

21  at this time, your Honor, .This covers the whole waterfront,

22  so to speak .

23      MR. STAHLMAN:  We have some cross-examination also.

24      MR. SACHSE:  I have very brief cross-examination.

25      MR. VEEDER:  I don't see how we can finish up this

D

Z24

afternoon myself.

THE COURT:  You have to be back here next week to
finish it up then.

I have been thinking about the matter we discussed
yesterday, and my present inclination is to proceed with this
lawsuit and not hold any hearings on any other matters ex-
cept the matters concerning the trial of the merits of this
case until this case is over with.  And if anybody wants to
object to that procedure, he may do so, do so this afternoon.
Otherwise, we will finish up with the case with the State
of California.  We will find out whether Mr. Krieger can
go forward, when he can go forward, and we will take him on
when he is ready.  Then, take on the Vail Company.  Beginning
the 24th of March we will proceed with the case.  We will
take up other matters extraneous to the issues of this case
when the trial of this case is completed.

MR. VEEDER:  We don't have the party that was set for
the 10th at 10 o'clock on Tuesday, is that right?

THE COURT:  What?

MR. VEEDER:  We are not going to have a hearing that
you said thatyou wanted to have?

THE COURT:  No.  My present feeling now is we are not
going to interrupt the trial of this matter for any matters
of that sort.  It will be postponed until this case is
concluded.  I take it no party has moved or intends to move

D

Z25

for a mistrial?  Is that right?

MR. STAHLMAN:  We do not.

MR. SACHSE:  I don't.

THE COURT:  If there were a contention of mistrial, that would be a different proposition.  But I understand no one has moved or intends to move for a mistrial.

MR. MOSKOVITZ:  That is correct as far as the State is concerned.

THE COURT:  In that event, I intend to proceed with the trial of this action.  And subsequently, when we have completed the trial of the merits of this case, take up other matters that are extraneous to the issues or the merits of this cause.  Unless I hear some objection this afternoon, that is what we will do.  We will finish up cross-examination of this witness if we can.  If not, we will be back here Tuesday or Wednesday to finish up Mr. Illingworth.

MR. VEEDER:  And I am not to call these parties in?

THE COURT:  No.  Now, if there was a contention, somebody wants to move for a mistrial or says they may want to move for a mistrial, then that is a different problem. Then, the Court should proceed to conduct this hearing into these collateral matters which were discussed in chambers. But as I understand it, nobody has moved and nobody intends to move for a mistrial.  If that is the case, as far as I am concerned, the completion of the trial of this case

D

Z26

1   on the merits is far more important than these extraneous

2   matters; and I don't intend to go into them until later.   You

3   can take them up at some later time, and you can have as much

4   time as you want to, have as much fun as you want when that

5   time comes.   I am interested in getting this case concluded.

6   And we have made fairly good progress.   We have been moving

7   along.

8        In view of the fact that you don't think you can

9   finish up this afternoon, we will adjourn until 2 o'clock.

10        (Noon recess.)

SAN DIEGO, CALIFORNIA, FRIDAY, FEBRUARY 20, 1959.  2:00 P. M.

1

2

3          MR. MOSKOVITZ:  Your Honor, over the noon recess Mr.

4    Illingworth has located and plotted a sample from a well in

5    Santa Gertrudis Valley on the California's Exhibit AM.

6          THE COURT:  Has he put it on this other map yet?

7          MR. MOSKOVITZ:  He is just now locating it on the other

8    map.

9          Also, he has written the information on three of the

10   samples which do not appear in Appendix H.

11         THE COURT:  This map on the board is California's

12   Exhibit AM?

13         MR. MOSKOVITZ:  Yes, your Honor.

14         THE COURT:  This material we have told the Clerk to

15   mark is California's AM-1 for Identification.

16         MR. MOSKOVITZ:  Yes, your Honor.

17         THE COURT:  Or we can put it in evidence.  Is there any

18   objection?

19         MR. MOSKOVITZ:  This includes three samples.  There is

20   one further sample.

21         THE COURT:  This was the material that is not in

22   Appendix H?

23         MR. MOSKOVITZ:  That is right.

24         There is one further sample, a sample from the Vail

25   Reservoir, and he has not been able to locate that in his

Illingworth - Direct                    8943

notes yet.

THE COURT:  When he finds it he can add it to California's AM-1.

MR. MOSKOVITZ:  Very well.

THE COURT:  Is that agreeable?  Any objection?

MR. VEEDER:  No.

THE COURT:  All right, California's AM-1 received in evidence, with permission to add the material concerning the Vail Reservoir sample.

(Defendant State of California Exhibit AM-1 was received in evidence.)

THE WITNESS:  I have located this well, the Roripaugh well, from which we had a sample.

MR. MOSKOVITZ:  What is the number of that well?

THE WITNESS:  7 South, 3 West, 35B2.

THE COURT:  That is one of the Roripaugh wells?

THE WITNESS:  Yes.

MR. MOSKOVITZ:  35B2.

THE COURT:  It is not the one we speak of as the Roripaugh well?

THE WITNESS:  That is correct.

MR. STAHLMAN:  Do you have the depth of that well?

THE WITNESS:  I do not have the depth of that well.

BY MR. MOSKOVITZ:

Q  What notes do you have concerning that well?  You

are looking now at Appendix F?

A   Page F-29.  It is called here the Roripaugh

Artesian.  Its owner was Jack Roripaugh.

I have no indication of the depth, casing diameter,

pumping equipment, or use, but we do have a mineral analysis,

which was obtained in 1939.

Q   Could you point out the page where that mineral

analysis appears in Appendix H?

A   Yes; on page H-31.

Q   In California's Exhibit L, Appendix H?

A   Yes.

Shall I mark this location on the map?

THE COURT:  Yes.

THE WITNESS:  This is an approximate location.

THE COURT:  All right.

THE WITNESS:  It is reasonably close.

THE COURT:  What was that other one you were working

on?  The Schrode well is already on there, isn't it?

THE WITNESS:  Yes, sir.

MR. MOSKOVITZ:  Shall we have Mr. Illingworth number

that 26?

THE COURT:  This new one he marked?

MR. MOSKOVITZ:  Yes, your Honor.

THE COURT:  Mark it 26.

THE WITNESS:  I will put this symbol here as a solid

circle to indicate this is an artesian well and number it
26.

MR. STAHLMAN:  Do you know whether that is the well
that is presently supplying the water for the Jack Roripaugh
ranch?

THE WITNESS:  I do not know.

MR. MOSKOVITZ:  Shall we also have Mr. Illingworth,
your Honor, put the information in the legend?

THE COURT:  Yes, just add it right to the legend.

THE WITNESS:  I am placing the number 26 in the table
of well log samples, indicating the date the sample was taken
as 1939, the location number of the well as 7S, 3W, 35B2,
and indicating that it is an artesian well.  In the three
sections of the geochemical chart I am also placing solid
circles and the number 26 at the correct plotting point.

BY MR. MOSKOVITZ:

Q  Where does the point plot for that well sample on
your geochemical chart?

A  On the left-hand triangle of the geochemical chart
it plots among the samples of the other artesian wells, the
other artesian wells being those in Pauba Valley.

Q  And where the Schrode well is also?

A  Yes.  And on the right-hand chart it plots gener-
ally in the same area, somewhat to the right or toward the
higher chloride side.

E
242

XXXXXX

THE COURT:  I can't see from up above where you put

it in here.  (Stepping down to the map.)

In other words, the conclusion would be that that

water is much more like the water from the artesian wells

than it is from the shallow wells in Pauba or the surface

water coming down Temecula Creek?

THE WITNESS:  Yes, sir.

MR. MOSKOVITZ:  You may cross-examine, Mr. Veeder.

MR. VEEDER:  Thank you, sir.


CROSS-EXAMINATION

BY MR. VEEDER:

Q  You stated this morning, Mr. Illingworth, that it

is your view that there was a difference as to source of

water between the waters which constitute the surface flow

of Temecula Creek and those waters which are purported to

reside in the area below that designated as confining bed.  I

am referring to Plate 16 now.  Would you explain that state-

ment, please?

A  I don't think that is what I said.

Q  Well, you state what you recall you said, then,

please.

A  I said nothing about the source of the Temecula

Creek surface water.

Q  I think you used the word "primary."  My notes

E
z43

1    indicate that you said that you believed that the primary

2    source of the waters differed.  Isn't that what you said?

3        A  The primary source of the waters obtained from the

4    wells differed.

5        Q  And when you say the primary source of the waters,

6    what is the meaning of that term?

7        A  I mean by that that I think the majority of the

8    water came from different sources-- that is, in the two

9    situations:  The artesian wells and the shallow wells.

10       Q  You are simply saying, then, that the waters coming

11   from the zone designated zone of confined water as dis-

12   tinguished from the zone of unconfined water, is that what

13   you mean?

14       A  May I have the question read, please?

15       (The Reporter read the pending question.)

16       MR. VEEDER:  I will start again.  I want to be very

17   sure that we understand each other.

18       Q  You said that the primary sources of the water from

19   the two wells differed.  Isn't that what you said?

20       A  Yes.

21       Q  And when you said the primary sources differed, what

22   were the primary sources to which you alluded?  Do you under-

23   stand what I am saying?

24       A  Yes, I think I do.  The primary source of water for

25   the deep artesian wells is the lower zone or zones of Pauba

E

Z44

8948

1    Valley.

2        Q   Which you have indicated here as zone of confined

3    water.  I am now alluding to Exhibit L, Plate 16.  Are we

4    together now?

5        A   Yes.  That is the general portion of the basin that

6    I am referring to.

7        Q   And you say that there is a different primary

8    source for the waters in the shallower wells?

9        A   Yes.

10       Q   Now what do you mean by primary source?  Do you

11   mean that the waters in the area of so-called zone of confined

12   waters differ from the zone of unconfined waters?  Are they

13   not both from the Temecula Creek?

14       A   They are not necessarily both from Temecula Creek.

15       Q   Where would the water in the confined zone come from

16   if it didn't come from Temecula Creek?

17       A   From precipitation percolating deeply through the

18   overlying lands and percolation from small creek channels

19   other than Temecula Creek.

20       Q   Are you stating to the Court that precipitation

21   will come down and enter the area, the pressure zone?  Would

22   it not be repelled?

23       A   Are you speaking of the vicinity of that cross-

24   section?

25       Q   I am speaking now of Exhibit L, Plate 16, and as

1    I understand your testimony precipitation is what made this

2    water down here available in the zone of confined water.

3         A  Well, let us remember that this is a cross-section

4    and it is a two-dimensional picture.  There are three dimensions

5    in nature.

6         Q  Will you answer the question.  Are you stating

7    that on Plate 16--

8         A  The answer is no.  That is not what I am stating.

9         Q  In other words, it is not precipitation that makes

10   this water available in the zone of confined water; is that

11   right?

12        A  Precipitation is part of it.

13        Q  How would precipitation get into that area of zone

14   of confined water?  That is a pressure area, is it not?

15        A  It is in that location, yes.  There are forebays

16   for pressure areas.

17        Q  Would you answer my question?  How would precipita-

18   tion get into the zone of confined water?

19        A  By percolating either directly through lands over-

20   lying the forebays and from stream channels that pass over

21   the forebay areas.  Percolation would take place--

22        Q  Would you take--

23        A  May I finish my sentence.

24        Q  Yes.

25        A  Percolation would take place from percolation of

1  the minor stream channel flows as well as by direct percola-

2  tion of precipitation.

3      Q  Well, now, presently we are looking down on

4  California's L, Plate 9B.

5      A  Yes.

6      Q  Now, would you state where precipitation would

7  enter the zone of confined water?  Right here (indicating)?

8      A  I do not know the exact location of all the fore-

9  bay areas for that confined area.

10      THE COURT:  What is a forebay?

11      MR. VEEDER:  Thank you, your Honor.

12      THE COURT:  What do you mean by a forebay?

13      THE WITNESS:  May I draw a diagram on the board?  A

14  typical example of a pressure area in a forebay area would be--

15      MR. VEEDER:  Could I ask you to make us an exhibit of

16  that?  I will give you a piece of paper.

17      Or would you rather have him do it on the board?

18      THE COURT:  All right, have him do it on the piece of

19  paper.  Then it can be in the record.

20      MR. VEEDER:  I want you to draw a picture of a forebay

21  through which precipitation would enter the zone of confined

22  water in the Pauba Basin.

23      THE WITNESS:  We have such a diagram here that we can

24  use, if you want to confine it to this particular area.

25      MR. VEEDER:  You asked his Honor about it.  If you can

E
Z47

1   demonstrate it on the exhibit, fine.

2         THE COURT:  Yes.  What exhibit are  you working on?

3         THE WITNESS:  This is Geologic Section G, G-prime on

4   Plate 16 of Exhibit L.

5         THE COURT:  All right.

6         THE WITNESS:  Assuming that the geologists have

7   correctly indicated this pinching out of the zone of con-

8   finement or the confining bed here, which they have indicated

9   with questions as to the exact nature of it, but assuming that

10  this is the nature of the bed, Temecula Creek flows across

11  the surface of the land from the upper end of the basin to the

12  lower end.  As the creek passes over this upper portion of

13  the valley, it passes over an area of sandy material.  Percola-

14  tion can take place into that material.

15        MR. VEEDER:  The creek does that?

16        THE WITNESS:  Creek waters percolate.  Now assuming that

17  this percolation takes place over a long period of time, this

18  area fills up with water, all of this material becomes satur-

19  ated.

20        THE COURT:  You are talking there about the upper

21  portion of the basin.

22        THE WITNESS:  All the way from the fault on upstream.

23        THE COURT:  To where the question marks are?

24        THE WITNESS:  Yes, sir, to what I have termed the fore-

25  bay area.

THE COURT:  That is the forebay area?

THE WITNESS:  Yes; the supply area for the zone of confined water.  The forebay area is simply the supply area.

THE COURT:  It is the area above the zone of confined water?

THE WITNESS:  It is upstream from it.  It is also above in elevation.

THE COURT:  I am lost now.

THE WITNESS:  Well, it is this entire area.  Now the forebay is simply the surface area that overlies this section. Percolation supplies the water that is in existence in this area.

THE COURT:  You have indicated on the map that the water coming down and starting down the Pauba Valley comes first to that area to the east end of the valley?

THE WITNESS:  Yes, sir.

THE COURT:  Which we observed on our trip was rather coarse in nature.

THE WITNESS:  Right.

THE COURT:  And on the plate that you have been looking at-- what is the number again?

THE WITNESS:  Plate 16.

MR. VEEDER:  16G, G-prime.

THE COURT:  There is shown an estimated line by

Case 3:51-cv-01247-JO-SBC   Document 4580   Filed 09/24/63   PageID.29755   Page 76 of 130

8953

question marks which demarks the eastern limit of the area of

confined water.

THE WITNESS:  Yes.

THE COURT:  And immediately east of that where the

question mark line runs toward the surface is this area of

porous material which you call the forebay?

THE WITNESS:  Yes, sir.

THE COURT:  And that is the source of supply to the

general area of confined water extending the entire length

of the basin down to the fault on the west side?

THE WITNESS:  Yes.  I believe this to be one of the

forebays.  This is not necessarily the only forebay.

THE COURT:  All right.  A forebay, then, is defined as

a supply area or a place where water enters to reach some

other place.

THE WITNESS:  That is correct.

BY MR. VEEDER:

Q  May I ask you to write "Forebay" and then draw

some lines showing the water going in there.

A  I don't think it is proper.  I was using this as

an example.  But there are question marks on this and we

are not certain this is the forebay for this area.  We think

it is probably one, and we think there are many others,  So it

wouldn't be proper to change this.  I was using this as an

example.  That if this is correct, and if this does pinch out

1   like this, then this is the forebay, and if all of these

2   materials became saturated to this point there would be water

3   standing in here at a higher level-- it would be a free

4   water surface at this point.

5        Q   When you say "here", you are pointing at --

6        THE COURT:   In the forebay?

7        THE WITNESS:   In the forebay.   The water would be

8   standing in the forebay at a higher elevation than the

9   surface of the soil at the lower end of the Pauba Basin.

10  A well drilled in this location at the west end of the basin

11  upstream from Wildomar Fault would tap waters which would then

12  be under pressure.   Since this is at a high elevation in the

13  forebay area, water in the entire zone is under pressure, as

14  it would be in a large pipe with a small vertical pipe, say,

15  with a funnel at the top.   If you fill water in there the

16  entire pipe would be under pressure.   If you tap it at this

17  end water would come out above the surface of the ground.

18  This is a classical example of a forebay area, a confining zone

19  and a zone of confined water.

20  BY MR. VEEDER:

21       Q   But is it a true example of what exists there?

22       A   I believe the cross-section speaks for itself of

23  what exists there.   I have said that I think this is a forebay

24  area, one of the forebay areas for this zone of confined water.

25       Q   The original question was this, are you stating that

1    precipitation would enter that zone of confined water?

2         A   Yes.   But not directly through this confining bed

3    and down to this zone, but by a very circuitous route.   If

4    we refer to California's Exhibit AM for a plane view of the

5    valley of Pauba and the surrounding land, we see that there

6    is a large area on either side of the valley which could

7    serve as a forebay area.

8         Q   And when you say that you are pointing to the areas

9    which constitute Storage Unit No. 4 of Plaintiff's Exhibit 17;

10   is that right?

11        A   Portions of that unit, yes.

12        Q   In other words, those areas in subwater unit number

13   4 constitute a forebay, in your view, for the Pauba Basin;

14   is that right?

15        A   I say I believe there are probably portions of that

16   unit which act as forebays.   I think generally speaking they

17   would be on the easterly and northeasterly end of that Unit

18   4.

19        Q   So as a matter of fact what you are stating is that

20   if water is pumped from, for example, the Pauba well, you

21   are drawing down water in the confined zone which must be

22   recharged by surface runoff in the Santa Margarita River

23   Valley; is that right?

24        A   What do you mean by Santa Margarita River Valley?

25        Q   Oh, then let's say the Pauba Valley.

A   No.

Q   Are you stating that you could pump the Pauba well without reducing the quantity of water in the zone of confined water, as depicted on California's Exhibit L-16?

A   Let me see if I have that straight.  I want some further understanding.  I understand what you said, or the words that you used.  I am not sure that I understand your meaning.  Did you say that pumping from such a well would reduce the amount of water in the confined zone?

Q   I inquired, sir-- I am searching for the truth-- tell me, when you pump from the Pauba well, does it deplete the water in the zone designated as confined, in your opinion?

A   No, in a confined zone there is no change in storage.  There might be some change in storage in the fore-bay areas of such confined zone, but not within the area. This is a fact which is a primary fact in areas of confinement You don't have storage changes with extraction of water.

Q   You are stating that nature abhors a vacuum; is that what you are stating?

A   No.

Q   What are you stating, then?

A   I think the record will show.

Q   You say if you pumped five second-feet daily out of the Pauba well it would not reduce the quantity of water in the zone of confined water?

A

E

Z53

ILlingworth   Cross                                                     8957

A   Yes, that is what I said.

Q   You say it will not?

A   Yes.

Q   Then how could such a phenomenon transpire?

THE COURT:   I think I know what you are talking about.
You are talking about a matter of degree.  Let's see if I
understand it.  Because it is an area of confined water which
is being fed by forebays, therefore the tendency is for this
to be full of water at all times?

THE WITNESS:  Yes, sir.

THE COURT:  There is no vacuum there.  Therefore,
depending on the size of this area of confined water and
depending upon how much you pumped out of it you would answer
the question whether or not you would ever deplete it.  Take
a good-sized basin of confined water.  You might have two
or three very good wells that would never diminish the water
in the area of confinement.

THE WITNESS:  Yes, sir.

THE COURT:  But by the same token you could take a
smaller basin and you could put big wells in it.  Wouldn't it
be entirely possible finally to pull the water out of this are
of confinement and from the forebay supply areas and, in
substance, have a situation where you have taken water out of
it?

THE WITNESS:  That is right.  The first water that you

1    take out simply lowers the pressure in the confined area.

2         THE COURT:  And would be replenished by the forebay

3    areas?

4         THE WITNESS:  Yes.  The first stage was to decrease

5    the pressure in the confined zone.

6         THE COURT:  Yes.

7         THE WITNESS:  The next stage is that you gradually

8    dewater the confined zone and it becomes a free water zone.

9    You no longer have artesian pressures.  You pump out of it

10   just like you do out of any free water basin.  And eventually

11   you could deplete if if you took enough water out and pumped

12   long enough.

13        THE COURT:  If you dug a big enough well and took

14   enough water out.

15        THE WITNESS:  That's right.

16        THE COURT:  I don't believe there is any dispute.

17   BY MR. VEEDER:

18        Q  If I understand correctly, what you have just

19   stated, then, is that if we pump from the Pauba well and

20   from the Dairy well and the others, the result would be, first,

21   to reduce the pressure in the confined zone and then the

22   surface flow and the other sources of water would flow into

23   the zone of confined water to recharge it; is that right?

24        A  No, sir.  In my opinion, you could never dewater

25   this area by pumping from those wells alone.

E

Z55

1      Q   Why is that?

2      A   Simply because I think the supply, the amount of

3   water in storage, the amount of storage in that area is much

4   greater than could be pumped out by those three wells alone.

5      Q   Suppose you put 20 wells on there?

6      A   It is a matter of degree.  You will take out more

7   water.

8      Q   And the water ultimately has to be replaced, does

9   it not, by surface runoff?

10     A   Plus direct percolation of precipitation.

11     Q   And as a matter of fact, we have all come to the

12  agreement that this Plate 16 doesn't correctly depict what

13  exists in Pauba Valley, because we have all agreed that there

14  is no solid confined zone, rather it is lenticular throughout;

15  isn't that right?

16     MR. STAHLMAN:  I don't think that is even a question.

17     THE COURT:  Are you objecting, Mr. Stahlman?  Is that

18  an objection?

19     MR. STAHLMAN:  I don't think it is a question.

20     MR. VEEDER:  I said, is that not right?

21     MR. STAHLMAN:  It is for him to say what he agreed to.

22     MR. VEEDER:  I think California has filed a statement

23  in agreement, George.

24     MR. STAHLMAN:  It doesn't mean anything to me.

25     MR. VEEDER:  Well, I will ask another question:

E

Z56

1    Q   This bed depicted as a confining bed does not

2    reveal the true circumstance which exists; is that not right?

3    A   That is not right.

4    Q   It is lenticular in character; isn't that the

5    situation?

6    A   I believe that to be the situation.

7    Q   It is not a solid confining bed?

8    A   It is not a castiron bed, if that is what you mean.

9    Q   And it is lenticular throughout; isn't that right?

10   A   It is lenticular, yes.  It is still a confining bed.

11   It is a confining bed made up of lenticular deposits.

12   Q   But it is not solid is what you have said?

13   A   I said it was not solid castiron.

14   Q   Well, it is not a solid clay bed either, is it?

15   A   No, it is not.

16   Q   So as a matter of fact, there is an interchange,

17   is there not, between the waters you have depicted here as

18   unconfined water and confined water?

19   A   I know of no such interchange.

20   Q   Did you hear Mr. James testify?

21   A   I was here most of the time.

22   Q   Did you not hear him testify there was an inter-

23   change between the two?

24   A   Perhaps you could refresh my memory by referring

25   to the testimony.

Q  I will.

A  I do not remember such a thing.

THE COURT:  If the water in the so-called confined zone which leads to the artesian wells was under a certain amount of pressure, as it would have to be to throw water up above the level of the gound, and if there were very much water moving upward out of the confined zone, wouldn't the tendency be to lower the pressure in the confined zone?

THE WITNESS:  Yes, sir.

THE COURT:  And as long as there was pressure in the confined zone, it wouldn't be very difficult for water to seep even though the lenticular deposits into the pressure zone below?

THE WITNESS:  That is right.  If there were any great amount of leakage there, we wouldn't have the pressure; yes, sir.  The pressure would dissipate.

BY MR. VEEDER:

Q  Why would that phenomenon not exist here where you say the forebay area recharges the water in the so-called confined zone?

A  I think it does exist here.  That is the pressure relationship that the Court just mentioned.  I believe they do exist here.

THE COURT:  Except this, take the east end of the area of confined zone where you have on your Plate 16 a row of

E

Z58

Illingworth - Cross
8962

1    question marks.  Those confining lenticular beds, if they run

2    up that far, are lying generally parallel with the surface,

3    and if there were water in the forebay area up toward the

4    surface, which would tend to give pressure to the confined

5    zone, there might well be some interchange of water from that

6    forebay area into the area of free water where there was no

7    pressure, where further down when you got into the area of

8    pressure there might not be as much movement, if there were

9    any.

10       THE WITNESS:  Well, I think that there is not an

11   interchange at the upper end, but rather a splitting of the

12   water.  Surface water which comes down Temecula Creek can

13   do two things or three things.  It can run down on the sur-

14   face, it can percolate down and part of it go into this

15   confined zone here and part of it go on down into the shallow

16   zones as underflow.

17       THE COURT:  That is what I was suggesting.  That is

18   a possibility, is it?

19       THE WITNESS:  Yes, sir.  A probability, I would say.

20   BY MR. VEEDER:

21       Q  So that the primary source of water for both what

22   you have indicated here as the pressure zone and the unconfined

23   zone is the same; is that not right?

24       A  No.

25       THE COURT:  And your answer is no because the water

Illingworth - Cross

8963

E

Z59

1   coming down the surface of Pauba Valley, of course, would

2   probably be the primary source of water in the upper zone?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  But as to the confined zone, that zone may

5   run out laterally to the sides to where the forebay is some-

6   distance from Pauba Valley, maybe supplying some of the water

7   and some of the pressure to that confined zone?

8          THE WITNESS:  That is my view.

9          THE COURT:  I don't know whose attorney I am with

10  this question.

11         MR. VEEDER:  I think you have done it very well, your

12  Honor.  I will accept you as counsel.

13         Q  The point that I make, is it not true, then, Mr.

14  Illingworth, that pumping in the zone, for example, where the

15  Roripaugh well is situated would tap waters which contribute

16  to the pressure zone in the Pauba Valley?

17         A  That is a possibility, but I do not have enough

18  information to come to that conclusion, and I have not heard

19  any presented in this court that would led me to believe that.

20         Q  How about the Schrode well?

21         THE COURT: Let him finish.

22         THE WITNESS:  I have finished, sir.

23         THE COURT:  Now, Mr. Veeder, you may ask your question.

24  BY MR. VEEDER:

25         Q  What about the Schrode well?  Do you think there is

1   an interconnection between the Pauba Valley and the water

2   that is tapped by the Schrode well?

3       A  My answer is the same as with respect to the

4   Roripaugh artesian well.

5       THE COURT:  Now, you say there was no evidence pre-

6   sented.  Let me test your conclusion by asking you about the

7   well which you numbered as 26 on chart California's Exhibit AM.

8       THE WITNESS:  Yes, sir.

9       THE COURT:  And when you checked the character of that

10  water, that water was of very similar character to the

11  artesian water out on Pauba Basin, was it not?

12      THE WITNESS:  Yes, sir.

13      THE COURT:  That would be a scintilla of evidence,

14  would it not?

15      THE WITNESS:  It would indicate that this was a

16  possibility.  It would further indicate that the waters passed

17  through the same source material, the same geologic forma-

18  tions, not necessarily formations in the same locality but

19  of the same material spread out over a large area.

20      THE COURT:  I follow you there.  But conversely, if

21  the chemical content of that Roripaugh well or of the Schrode

22  well were of an entirely different chemical nature and placed

23  itself somewhere else on your charts, then that might well be

24  evidence-- I am thinking out loud now-- that there was no

25  connection?

E

261

THE WITNESS: Yes, sir.

THE COURT: Or it might, on the other hand, be merely evidence of different chemical condition of the material down in the bottom of the basin?

THE WITNESS: Yes.

THE COURT: Would that be a possibility?

THE WITNESS: Yes.

THE COURT: You would have actually some connection between wells a good ways apart coming, we will say for supposition, out of a large general confining basin and yet the water from one well was coming through material of higher chemical content and the other water was coming through a different kind of material, so there was a connection between them, yet the chemical content might be different?

THE WITNESS: I am not sure that I follow that.

THE COURT: Let us take the artesian wells in the Pauba Valley. We are all pretty well agreed that all the artesian wells there go down into the same confined zone.

THE WITNESS: Yes, sir.

THE COURT: But suppose that in one of those artesian wells you found an entirely different chemical content than in the other artesian wells. That wouldn't necessarily mean that the water didn't come out of the same basin. One explanation might be that there was a pocket of chemical materials in one well that varied from the chemical composition of the material in the other well?

Illingworth - Cross                    8966

E

Z62

THE WITNESS:  This is true.  You can have exceptions.
This is one reason that, in order to make any broad conclusions
over a large area, we should have a lot of evidence, not
just spotty evidence here and there.  There are exceptions,
as you indicate, to the general situation as you find.  And
you really have to have a preponderance of evidence to prove
these things.

THE COURT:  What about the fact of the relationship
between well levels in the area the Government called Basin
No. 4?  Did you find some relationship between various well
levels?

THE WITNESS:  Well, I found that they were at similar
elevations for similar distances from northeast of Murrieta
Falls or Murrieta Valley.

THE COURT:  Does it do violence to your sense of
logic to think that if at a certain depth wells had a general
water level that bore some relationship that maybe there was
a basin of water down there that stood at that level throughout
that area?

THE WITNESS:  This is a possibility.  But it is only
one of the possibilities.  There are other possibilities,
too.  Take the situation where you have a number of streams
passing over basement complex.  All these streams have more or
less the same grade.  One of them is here, and a mile away
you have another stream.  They converge and join to make a

E

Z63

1   larger stream.  Say that these are tributaries of a creek

2   such as Murrieta Creek, but instead of having older alluvium,

3   as we have northeast of that valley that Murrieta Creek

4   follows through, we have basement complex.  Well, since these

5   tributary streams have similar grades, you go a similar

6   distance away, two miles, say, upstream on each one, your are

7   going to find windmill wells, stock wells, located along

8   those streams that are just tapping the sands adjacent to the

9   streams.  You find that one of them has an elevation of 1150,

10  you will find that another one has an elevation of 1125,

11  another one 1130.  You can draw a wonderful line right

12  through there.  But it doesn't mean a thing as regards ground

13  water being in existence between those streams.  So what your

14  Honor said was one possibility.  This is another.

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. VEEDER:

2          Q  You are not advancing that theory though?

3          A  I say it is just as valid an assumption or conclusion

4  which one can draw from such well levels as the one the one the

5  Court mentioned.

6          Q  Now, I shall read to you an excerpt from Bulletin--

7  I won't say it--Appendix B page 62, referring to Pauba Valley;

8  it says:

9                  "The old alluvium which flanks Pauba

10                 Basin on the northeast and southwest con-

11                 sists of interfingering lenses of sediments.

12                 Some of these lenses are known to be moder-

13                 ately permeable since they supply deep wind-

14                 mill wells located in the hills on either

15                 side of the basis.."

16      Do you agree with that?

17      A  Yes.

18      Q          "In effect these lenses constitute

19                 conduits through which ground water may

20                 either escape from or enter the basin

21                 depending upon the direction of the ground

22                 water slope existing at any particular time.."

23      Do you agree with that?

24      A  Yes.

25      Q          "  Because of the irregular shape of

1                    these lenses, their heterogeneous compo-

2                    sition, and unknown areal extent, the

3                    evaluation of the leakage through them

4                    becomes a complex problem."

5          You do agree, though, that there is an interchange

6    between the Pauba Basin and Ground Water Unit No. 4 as shown

7    on Plaintiff's Exhibit 17?

8          A  No, I just don't know whether there is an interchange

9    or not.  I think there is a possibility of it.

10         Q  I thought you said you agreed with what was written

11   here:  "In effect these lenses--

12         A  This says "may either escape from or enter the

13   basin.."  It doesn't say that it does.

14         Q  You say, " some of these lenses are known to be

15   moderately permeable since they supply deep windmill wells

16   located in the hills on either side of the basin."  That certain-

17   ly is indicative that it conveys water out and away; isn't that

18   right?

19         A  No.

20         Q  Of what is it indicative to you then?

21         A  Just what it says.  It says some wells have been

22   obtained, deep wells, that have yields indicating that the

23   materials at the top are moderately permeable.  It doesn't say

24   that there is a broad avenue from one end to the other.

25         Q  I didn't say broad avenue.  All I am asking you is

1  that the water does pass out of Pauba Valley into those windmill

2  wells; isn't that right?

3      A  And I said no.

4      Q  You say doesn't? .....

5      A  I say that I do not know that it does.

6      Q. "In effect these lenses constitute conduits through

7  which ground water may either escape or enter the basin." What

8  do you mean by that?

9      THE COURT:  What are you reading from, Bulletin 57?

10     MR. VEEDER:  I am reading from Appendix B page 62, the

11  second paragraph, your Honor.

12     MR. MOSKOVITZ:  Your Honor, I don't mind Mr. Veeder

13  going through this and asking Mr. Illingworth about what he

14  reads in the Geology Appendix.  However, I believe it is going

15  beyond the scope of the direct examination, and it can get us

16  away from the area that Mr. Illingworth is competent to testify

17  as an expert on.

18     MR. VEEDER:  Oh, he is not competent to testify--

19     MR. MOSKOVITZ:  He is not a geologist.

20     MR. VEEDER: All right.  I hope you don't feel badly,

21  Mr. Illingworth.

22     THE WITNESS:  Are those my exact words?

23     THE COURT:  Just ask your questions and avoid personal-

24  ities, Mr. Veeder.

25

BY MR. VEEDER:

Q  Now Mr. Illingworth, we have a windmill well here which is five hundred and some feet deep.  I am alluding to California's Exhibit AC.

Do you have that, Mr. Moskovitz?

MR. MOSKOVITZ:  I will find it.  Yes, I have it here.

BY MR. VEEDER:

Q  And that windmill well--correct me if I am in error-- appears to tap the confined water zone, does it not?

A  Yes, according to the Plate that you refer to.

Q  That is Plate 16?

A  Plate 16.

Q  Now, I observe that we have another well which is 8S2W-11J.  It has a depth of 119 feet.

A  That is 11J1.

Q  --11J1, depth 119 feet.

A  Yes.

Q  You would say that is in the younger alluvium, would you not?

A  It would tap the zone of unconfined water that is indicated on Plate 16.

Q  Now, you show, do you not--

A  Let me add one further thing.  I agree that that is in Recent Alluuvium., according to that.

Q  Fine.  Now you testified, did you not, that there

E   4
A   5

1  a correlation between the fluctuations in the windmill as de-

2  picted--

3        I'll start again.

4        You have stated that there is a correlation between

5  the fluctuations of the windmill well and the Well 8S2W-11J1;

6  isn't that right?

7        A  Yes.  They fluctuate in a similar manner as shown

8  on California's Exhibit AC.

9        Q  And they fluctuate in a similar manner, moreover, do

10  they not, based upon the availability of surface runoff in

11  Temecula Creek?  Isn't that correct?

12        A  This is a correlation indicated by this chart, yes.

13        Q  In other words, when the Vails release water from

14  the Vail Reservoir there is an immediate--strike "immediate"--

15  there is a rise in the water level in the Windmill Well and then

16  there is a rise in the water level in Well 8S2W-11J1; is that

17  not right?

18        A  That is right.

19        Q  And the rises, in fact, follow the--

20        A  May I add a further statement?

21        Q  Yes.

22        A  That it is not simply the release of water, but the

23  irrigation with that water of lands overlying the basin which

24  are adjacent to both the Windmill Well and Well 11J1.

25        Q  Then you would say, would you not, that the well is

1   in the confined zone and the well in the unconfined zone are

2   both sensitive to the surface releases of water, whether it is

3   in the stream of Temecula or whether it is by reason of irrigation?

4          A   Yes.   And I would like further to comment that the

5   Windmill is near the upstream end, near the forebay of the con-

6   fined area.   I would like to show that on California's Exhibit

7   L Plate 10-B; the apparent area of confined water is indicated

8   in Pauba Basin extending from the fault at the lower end of the

9   basin--

10         Q   That is the Wildomar Fault, is it not?

11         A   Yes--extending from that line to the approximate

12   vicinity of the Windmill well.   This is what we consider to be

13   the general limit of the confined-water area.

14         Q   So as a matter of fact, at least in regard to the

15   confined-water area and the unconfined areas, as shown on your

16   Exhibit AC, we can presume, can we not, that they both receive

17   surface water from Temecula Creek?

18         A   This is what I said a little while ago, that water

19   coming down Temecula Creek could go both ways, into the upper

20   zones, and both those wells show the effect of such recharge

21   from Temecula Creek.

22         Q   Have you any idea how far down Pauba Valley you

23   could expect such correlation in the fluctuations of the well

24   in the confined area and in the unconfined area?

25         A   By "fluctuation" do you mean fluctuation in the

1   pressure surface?

2          Q   I beg your pardon.   Thank you very much.   I am

3   speaking of California's Exhibit AC, which shows that graphically.

4   How far down the Pauba Valley do you think that phenomenon would

5   prevail?

6          A   I am not sure I know what you mean by phenomenon.

7          Q   The phenomenon of the inter-relationship between

8   the fluctuations in the well which is 119 feet deep and the

9   well which is 515 feet.

10         MR. MOSKOVITZ:   May I have the last question?

11         MR. VEEDER:   I will rephrase it.

12         THE WITNESS:   I don't think there is inter-relationship

13   between the two wells.   I think they show effective recharge,

14   both of them show it, because the recharge is coming at the

15   same time.

16         Q   And the recharge is reaching, then, both at virtually

17   the same moment, is it not?

18         A   They are both located, one very close to Temecula

19   Creek in the shallow zone, the other one at the edge of the fore-

20   bay area.

21         Q   So you would say that it is a matter of degree, then,

22   in this confined area as to where the inter-relationship between

23   a shallow well and a deep well would cease; is that right?

24         A   No.   I am not sure what you are getting at.   But a

25   deep well near the lower end of this valley, a deep artesian

1  well, would show the same kind of fluctuations, in my opinion,

2  that the Windmill well does.  In other words, when you increase

3  the water level in the forebay area you increase the pressure

4  in the confined zone.  This is one of the facts of life in

5  dealing with confined zones.  And the pressure in the confined

6  zones is also affected by extractions from the zones.

7        Q  Then would you just state for us the objective of

8  this Exhibit AC when you offered it from the standpoint of a

9  science?  What does it mean to you?

10       A  It means that the recharge to those wells comes at

11 a time when there is a stream in Temecula Creek.

12       Q  And they are both dependent on that source of

13 recharge?

14       A  Or from irrigation.  I wouldn't say they are both

15 dependent upon it.  You mean those two wells?  Is that all you

16 are talking about?

17       Q  That's right.

18       A  Well, certainly Well 11J1 is dependent upon that.  I

19 would say that the Windmill well, 12H1, is not entirely depend-

20 ent upon that, since it is connected with the confined zone, and

21 the confined zone may have other recharge areas other than this

22 single forebay on Temecula Creek.

23       Q  Now, have you plotted the chemical analysis of the

24 Windmill well as it relates to the wells in the shallower allu-

25 vium or the younger alluvium?

1          MR. MOSKOVITZ:  You mean has he plotted it on this

2   Exhibit AM?

3          MR. VEEDER:  Yes.

4          THE WITNESS:  No, it is not located on that chart.

5          Q  Have you given consideration as to whether there

6   would be a correlation between the chemical content of the waters

7   from the Windmill well and this well, Well 8S11J1?

8          A  I have not plotted the analysis.

9          Q  Do you have the data with which you could make such

10  an analysis?

11         A  Yes.

12         Q  From the standpoint--

13         MR. MOSKOVITZ:  Your Honor, we didn't have a recess

14  today.

15         THE COURT:  Do you want one?

16         MR. MOSKOVITZ:  I think we could probably use one.

17         Also, if you would like to go beyond 4 today, we can't

18  get out when we usually do, so as far as our own convenience

19  is concerned you may stay, if you like, and go on until 4:30

20  or so.  We couldn't get reservations on our usual flight and

21  we are stuck here until 7:30 this evening.

22         THE COURT:  Take a short recess.

23         (Recess)

24  BY MR. VEEDER:

25         Q  Now Mr. Illingworth, what is your explanation for

1    the variant between the chemical content in the confined zone

2    and the waters in the unconfined zone?

3         A  The waters have not reached the respective wells by

4    same path, and probably not in the same amount of time.

5         Q  I didn't frame my question properly, apparently.

6         THE COURT:  That makes sense to me. Go ahead and ask

7    him another question.

8         MR. VEEDER:  I was being critical of myself, your Honor.

9         Q  Would you state what is the source of the chemical

10   content--would you state for me what is the predominant chemical

11   that you find in the waters in a confined zone?

12        A  Anions and Cations.

13        Q  What is it, a chloride?  In more simple terms for me,

14   what kind of chemicals do you find in the waters in the confined

15   zone?

16        A  Well, it would be a sodium carbonate.

17        Q  A sodium carbonate?  Is that good or is that bad for

18   irrigation?

19        A  Well, a high percent sodium indicates a water that is

20   not good for irrigation, especially if the soils have a tendency

21   to be relatively tight soils.

22        Q  And the sodium appearing in the water comes from

23   what source?

24        A  I do not know.

25        Q  Well, why in your opinion is there a difference

1   in the sodium content between the waters in the unconfined zone

2   and the confined zone?

3          A   Other than the reason I gave for the difference,

4   I don't know the exact mechanics of how the sodium got into the

5   water in either case.

6          Q   Wouldn't it be that the waters in the confined zone

7   being retained perhaps a little longer in that area that they

8   simply picked up the sodium from the beds in which they reside?

9   Wouldn't that be the reason?

10         A   I don't know.

11         Q   Well, haven't you some explanation as to why the

12  sodium content is higher in the area of confined zone that in

13  the area of unconfined?

14         A   No, other than what I said, that they evidently reach

15  the two locations, the two respective types of wells, by a

16  different route.

17         Q   Do you think that the water that entered the confined

18  zone is a water of a different chemical content than that water

19  that reaches the unconfined zone?

20         MR. MOSKOVITZ:   Do you mean at the time they were first

21  were on the surface?

22         MR. VEEDER:   Right.

23         MR. MOSKOVITZ:   Or at the time they reached their source?

24         MR. VEEDER:   When it was surface water.

25         THE WITNESS:   I don't know about when it was surface

1    water, or before it was surface water when it was rainfall.

2    They are probably quite a bit the same.

3    BY MR. VEEDER:

4         Q  As a matter of fact, they both came from precipita-

5    tion; isn't that right?

6         A  This is probably the case.  I doubt if these are

7    connate waters, although they could be.

8         Q  So as a matter of fact, they both started out with

9    the same chemical content; isn't that right?

10        THE COURT:  We are not getting anywhere with this,

11   Mr. Veeder.  It is obvious that what material the water passes

12   through could give some chemical content to it.  That is how

13   it gets the chemical content.  I don't know that you are assist-

14   ing the case any by this cross-examination.

15        MR. VEEDER:  I think it is very important from our

16   standpoint, your Honor.  We are taking the position, and I

17   think it is a position that is a correct position, that the deep

18   wells are just as much a burden on the Temecula creek as the

19   shallow wells.  It may be that the time--

20        THE COURT:  Does anybody dispute that?

21        MR. VEEDER:  I am not quite sure of what Mr.--

22        THE COURT:  Let's find out right now.

23        MR. VEEDER:  All right.

24        THE COURT:  State your proposition, but leave out "just

25   as much", because it depends on how big the well is.

1       MR. VEEDER:  All right.

2       THE COURT:  The proposition is that a deep well in the

3 Pauba Valley is, to the extent that it produces water, to that

4 extent a burden on Pauba Valley or a burden on Temecula Creek

5 as a shallow well?

6       MR. VEEDER:  That is right.

7       MR. STAHLMAN:  What do you mean by "Pauba Valley"?

8 Do you mean the Unit No. 3?

9       THE COURT:  Yes, I think he is limiting this now to

10 Unit No. 3 in Pauba Valley.

11       MR. VEEDER:  I am.  I am limiting it to the surface

12 flow of Temecula creek at this point.

13       THE COURT:  Anybody dispute that proposition?

14       MR. STAHLMAN:  I will not say I dispute it, but I don't

15 think there is sufficient evidence here to indicate that that is

16 the only source from which the charge comes in that lower end.

17       THE COURT:  Well, I don't think his statement precludes

18 that.  But his statement is that a deep well is a burden on the

19 stream the same as a shallow well.

20       MR. VEEDER:  Yes.

21       MR. MOSKOVITZ:  Your Honor, I think there is some dispute

22 as to the extent to which it is a burden, that is, the extent

23 to which the flow in a given year is going to be taken to re-

24 plenish a shallow well as compared to the extent to which it

25 will be taken to replenish a deep well  in a given year.

THE COURT:  Well, in any given segment of time, yes.
But on the long haul, aren't a deep well and a shallow well
both a burden on the stream?

MR. MOSKOVITZ:  Yes.  But the time is important, be-
cause it will control how much of the flow of a stream that
comes down in a particular year will pass over the surface of
the ground and go downstream and how much of that will go into
the ground to replenish either one of these two types of wells.

THE COURT:  Do you think there is sufficient evidence
before me, or ever will be, that I can make any determination
on that except to say that some of the water helps to replenish
deep wells and some of the water goes downstream and some of it
replenishes the upper part of the basin?

MR. MOSKOVITZ:  I agree with the implication of your
question, your Honor, that you don't have that evidence.  The
point that I am making, your Honor, is that in some areas you
cannot conclude that there is such a response--

THE COURT:  In other words, I would be prepared, from
what I have heard here--we can terminate--to make a finding that
water coming down Temecula creek, either released from Vail
dam or in the irrigation, that hits the western part of Pauba
Valley, the forebay as the witness calls it--

MR. VEEDER:  Don't you mean the eastern part, your
Honor?

MR. MOSKOVITZ:  The eastern part.

E 5
A15

THE COURT: --the eastern part, the forebay, to some extent that can't be ascertained by me, feeds the zone of confined water, that it also feeds an upper zone, and that some of it flows on down the canyon.

MR. MOSKOVITZ: We can't dispute that.

THE COURT: Now, that statement does not say that these zones may not be fed from some other area.

MR. VEEDER: We are not arguing that.

THE COURT: But it is self-evident that water that hits that forebay does to some extent all three things.

MR. MOSKOVITZ: Yes, your Honor.

THE WITNESS: I have a view on this.

Case 3:51-cv-01247-JO-SBC  Document 4580  Filed 09/24/63  PageID.29785  Page 106 of
130

Illingworth - - - Cross

6983

A16

i と6

1    THE COURT:  Before you add a view that might disrupt

2  what is now apparently a unanimous opinion, let's find out,

3  does everybody agree that that is a correct statement?

4    MR. VEEDER:  I think that is a correct statement,

5  your Honor.

6    MR. MOSKOVITZ:  I would like to hear my witness.

7    THE COURT:  All right, go ahead, Mr. Witness.

8    THE WITNESS:  Well, there is an important factor

9  that hasn't been mentioned in the discussions of the last few

10  minutes, and that is the rate of travel through these mater-

11  ials.  I have said that what I thought was a forebay, one of

12  the forebays of this area --

13    THE COURT:  Well, I would be prepared to find that

14  if there were a relatively small amount of water dumped on

15  that forebay, the tendency for it to feed the area of confined

16  water and the upper zone, too, would be greater than if a

17  flash flood went by.

18    THE WITNESS:  Yes.  I am speaking --

19    MR. STAHLMAN:  I don't think that is what he means.

20  He is talking about percolation.

21    THE WITNESS:  Yes, the horizontal percolation, the

22  movement of water horizontally through this confined layer,

23  the confined zone of water.  I am not saying that it all goes

24  directly down Pauba Valley, because some of it may come in

25  from the sides, some of it may go out through the sides.  But

Illingworth          Cross

2 E6

A17

1  I am saying that water that does come down or could move down

2  at an extremely low rate.  Now there has been no test put on

3  this --

4        THE COURT:  I go along with that, that it may or

5  may not.  We don't know at what rate it travels down there.

6  And if there is a feeding of that confined zone laterally

7  from the sides, then the rate at which it moves and the rate

8  at which water fed into the forebays supplies it would be

9  decreased.  If there were a low feeding laterally from the

10  sides, I would take it that there would be more of a movement

11  from the forebay down into the confined zone.

12        MR. VEEDER:  Would your Honor, nevertheless, say

13  that whatever the sources, these are all part of the water

14  resources of the watershed of the Santa Margarita River Valley,

15  and that they all have a direct bearing upon the surface runoff

16  of the streams constituting the water system in the Santa

17  Margarita River Valley watershed?

18        MR. SACHSE:  I hope that his Honor won't say it.

19        MR. STAHLMAN:  I don't think you have sufficient

20  evidence for your Honor to say that.

21        THE COURT:  This is all part of the stream system.

22  The upper bed, the confined bed is certainly all part of the

23  stream system, isn't it?    If anybody wants me to find that

24  this area of confined water is not part of the stream system,

25  you had better get busy and put on some evidence.

1          MR. STAHLMAN:  Is your Honor still talking about the

2  Pauba basin?

3          THE COURT:  Yes.

4          MR. SACHSE:  Your Honor, I happen to know that the

5  evidence that is going to be produced by Mr. Krieger --

6          MR. VEEDER:  I object to this, your Honor.

7          MR. SACHSE:  -- is going to deal, to a very large

8  extent, with physical pumpging tests; in other words, an

9  exhaustive pumping of any well, where everyone agrees that a

10 given set of circumstances exist, the static level measurements

11 on a well a hundred feet or twenty feet or thirty feet away,

12 which might prove -- I don't know what the results are, but

13 which might well prove that the connection between these two

14 is so remote that you cannot, for practical purposes, say that

15 the man who pumps that one well shall be held to be part of

16 the stream system because it doesn't have any effect on it.

17 It is so demonstrated by physical pumping tests.  That is the

18 evidence that may yet be offered.

19          Up to now we have had theory.

20         MR. VEEDER:  But your Honor, I dispute with Mr. Sachse

21 in regard to theory.  Here we have the State of California's

22 evidence which shows that there is a rapid transmission of

23 water through the alluvium constituting the Pauba Valley basin,

24 and we also observe that when waters are released from the Vail

25 Reservoir there is almost a simultaneous reflection of the

1   speed with which that water gets to the Windmill Well,

2   similarly the speed with which it gets to the shallower well.

3   In other words, we are no longer dealing with theory.  We are

4   dealing with an exhibit showing a high rate of transmissibility

5   in the very area concerning which this evidence is being

6   directed.

7            MR. SACHSE:  Don't misunderstand me, Mr. Veeder.  I

8   would concede, and I did in my memorandum on his Honor's 15

9   points or questions, that there is not any question that we

10  should regard in this case the waters that are found beneath

11  areas of younger alluvium -- that we should treat them as part

12  of the stream system.

13           MR. VEEDER:  When you say "younger" --

14           MR. SACHSE:   The surface delineations of younger

15  alluvium.

16           I so said, and I am bound by it.

17           MR. VEEDER:  Irrespective of the depth?

18           MR. SACHSE:  Irrespective of depth.

19           But I am considerably concerned about the very broad

20  statement that because this may come in from the side and

21  because it may do this or do that, we shall treat the whole

22  thing as part of the stream system.

23           MR. STAHLMAN:  The thing that I find laking here

24  in the evidence is the rate of transmissibility.  That has

25  occurred in other cases.  Professor Tollman of Stanford, who

1    wrote a book on this subject, shows what the charge would be

2    into a certain area, given a stream flow in relation to the

3    percolation.  With all the scientific investigations that have

4    been made here, there has been none of that evidence here.  And

5    yet we go down to the San Luis Rey River, where 16 or 25 years

6    ago they made tests on those basins.  And we don't have the

7    evidence here.

8              MR. VEEDER:  Of course, I disagree with that.

9              THE COURT:  I don't know.  You have lost me here.

10   Are we talking now about just the wells in the Pauba Valley?

11             MR. STAHLMAN:  We talking about the wells just in

12   the Pauba Valley.

13             I think what your Honor has said in relation to

14   them, from the evidence here, you can go that far.  But if we

15   are going to extend it out --

16             THE COURT:  To wells like the Schrode Well and the

17   Roripaugh Well.

18             MR. STAHLMAN:  Yes, if you get over in there, then

19   you have entirely different questions, to my mind.

20             MR. SACHSE:  That is my point.

21             THE COURT:  I don't know whether I can show you with

22   a diagram or not.

23             MR. VEEDER:  Do you want Exhibit 17, your Honor?

24             THE COURT:  No.

25             MR. VEEDER:  Did you copy that down off the board,

1    Mr. Burby?

2            MR. BURBY:  Yes.

3            MR. VEEDER:  You may take that off, your Honor.

4            (Mr. Moskovitz erases the blackboard.)

5            THE COURT:  Let me see what I can do.  (Drawing)

6    Here is the gorge, and here comes the Murietta, and here is

7    the Temecula over here.  Here is the Santa Margarita.

8            There is no dispute that we have a basin up here/

9            MR. STAHLMAN:  No dispute.

10           THE COURT:  There is no dispute that we have a basin

11   here.

12           MR. STAHLMAN:  No dispute.

13           THE COURT:  Now the Roripaugh well is in the Santa

14   Gertrudis alluvial area, and it seems to me that there is not

15   much argument but that there is some connection between the

16   Roripaugh well and the Murietta.  Now is it necessary that

17   there has to be any connection between the Roripaugh well and

18   the Temecula?

19           MR. VEEDER:  I think there is this interrelation,

20   though --

21           THE COURT:  If there is a relationship between the

22   Roripaugh well and the Murietta, isn't the thing a part of

23   the stream system regardless whether there is the relationship

24   between the Roripaugh well and the Temecula?

25           MR. VEEDER:  Right.

1          THE COURT:  Now here is a second idea I have.

2    Assume that this is the fault line over by the Santa Rosa,

3    and assume that this is the fault line over by Murietta Hot

4    Springs.  This is east, and this is west.  And here is the

5    area that is part of the basin which the Government calls

6    Basin No. 4.

7          Now if this basement complex, which is at a great

8    depth down near this fault line, should lay level as a table

9    across here, and you had a basement complex, and you had a

10   water table that was not level but proceeded up in that manner,

11   you would have lesser depth to wells up here and you would

12   have greater depth down here, which has already been shown in

13   the record; and if this basement complex lay in there in that

14   manner, the chart that Mr. Worts had showing the relationship

15   of water depths might make some sense.

16         MR. MOSKOVITZ:  You mean Mr. Kunkel.

17         THE COURT:  Mr. Kunkel, yes.

18         But I am not convinced at all that this basement

19   complex lies in there in that fashion.  It would be supposing

20   a lot to think that this basement complex between the Murietta

21   fault and the Santa Rosa is a flat valley.  What happens is

22   just as Mr. Sachse is indicating.  Looked at from this

23   direction, it is like this, and here is a peak in here, etc.

24   Now it could be.  You don't know.  It could be.

25         As a result, you could have situations where you

1   would have a shallow well here and you wouldn't get much

2   water, and you would have a deeper one here.

3   　　　　And these convolutions of this basement complex

4   could work the other way.  We are standing on the Wildomar

5   fault line, and we are looking east up toward the Murietta

6   fault.  We take a cross section across there.

7   　　　　MR. MOSKOVITZ:  Your Honor, there is no Murietta

8   fault.  There is a Wildomar fault, and there is a Willard

9   fault.

10   　　　　MR. SACHSE:  This is Wildomar.

11   　　　　THE COURT:  Looking up toward Murietta Hot Springs

12   from the Wildomar fault.  If you cut across that basin, it is

13   true that you might find again basement complex as level as a

14   table.  The chances are that you are not going to find that.

15   The chances are that you are going to find you have situations

16   like this in the basement complex.  And you may have a

17   situation where the Roripaugh well may be down in one of these

18   depths where there is a lot deeper water than some nearby.  It

19   may be, however, that your water level could well be above

20   these humps.  So that there is interplay in the water that

21   feeds this depression, feeds that depression.

22

23

24

25

THE COURT:  I am not convinced that we are--

MR. VEEDER:  If you put in 2,000, it would make a difference, wouldn't it?

THE COURT:  2,000 what?

MR. VEEDER:  You got from the surface down to basement complex.  We know in at least a long way eastward in the Storage Unit 4, the depth of the alluvium is extremely great; so that these convolutions would have no effect upon our storage water unit, because we have taken only 100 feet from the top from the water table.

THE COURT:  Well, my convolutions may be entirely out of proportion.  In other words, we know the greath depth of alluvial down near the Wildomar fault, and in proportion these convolutions might be only 100, 500 feet in here.

MR. STAHLMAN:  We also know the basement complex is extended right up through the top in some places.

THE COURT:  Some places.

MR. VEEDER:  But only after you have gone a long way aways from the Wildomar fault.

THE COURT:  Off to the east.  But even if you had convolutions, if a water zone that covered the tops of them, you could well have movements of water in here.  In other words, here is a deep well.  Water is pulled out of this deep well.  As water is pulled out, the tendency is for water to come in from other sides.

F

Z28

MR. VEEDER: Right.

MR. SACHSE: Let me ask you a question. Now, suppose you have a well like this. This is a well. And you pump it. Now, you expect that this well creates a cone of depression.

THE COURT: Yes, all right.

MR. SACHSE: You would expect that it would have an effect, if this is your water table, on a well that is 150 feet away. Now, suppose you find that it has no effect, period, zero. Now, where are you?

MR. VEEDER: Well, I would say there are 15-- excuse me. Your Honor may answer, may desire to answer.

THE COURT: There could be various explanations. Now, if this situation occurred throughout Area 4, that would be one thing. But if there were a few isolated cases, it would either mean some channeling of water that is coming down to feed the deep well; or, if you have a well over a hump; or it could mean pumpage; or it could mean a shallow well up in some convolution where it was cut off, where it was away from the other well. I imagine there are all sorts--

MR. SACHSE: I would like to suggest there exists one other thing which has been hinted at by several witnesses, expressed by several witnesses, one other thing for convenience, that these older continental deposits may well be full of water, and they may be well full of water which you can extract. But when you are doing so, you mined what is

F

Z29

in the immediate area.  And having ~~mind~~ *mined* out a cone ~~to~~ *the* recharge
into this thing is so minor and infinitesimal from the sides
that you simply, for all purposes, just destroyed your well.
The thing you do then if on your ranch you do have enough
acreage, you move over 150 feet and you drill another well
and you mind some more of that water.  And those waters are
not, for practical purposes, in close contact with each other.
I suggest that that is a possibility.

THE COURT:  Is there testimony that there has been
this mining of water and the exhausting of it?

MR. SACHSE: Mr. Roripaugh told us on this trip that he
has abandoned one well and drilled the one we saw, and they
are very close together.

MR. VEEDER:  The mere fact that he had a bad well
doesn't mean--

MR. SACHSE:  He used it for years, Mr. Veeder.

MR. VEEDER:  But a well can be worn out, the perfora-
tion goes bad.

THE COURT: Any number of things can happen to a well.
As Mr. Veeder said, perforations go bad, it gets clogged up,
it sands up, any various things could happen.  If, on the
other hand, there was proof that a well, they attempt to clean
a well out, and there just was no water, the water had been
mined out, there might be something.

MR. SACHSE:  To me the most significant thing, Mr.

MALCOLM E. LOVE.  OFFICAL REPORTER

1    Stahlman suggested it several times and it has been done in

2    lots of cases, is this kind of test:  If you pump Well A, it

3    shows an effect on Well B.  Now, Mr. Worts gave us some of

4    this testimony, or Mr. Kunkel, I forget which one it was, in

5    connection with the very well which we drew in Pauba Valley.

6    I don't think anyone would argue that a tie-in would show

7    that some of those wells at the lower end of the Pauba Valley,

8    it is logic, when pumped, the other one went down.  Now, if

9    you run the same kind of test in this older, tighter

10   material, then you don't find that close connection, then the

11   inference you have to draw is that the material in the clay

12   is so impermeable that the water simply doesn't, for practical

13   purposes, one area contributes to the other.

14        THE COURT:  The one conclusion would be that it

15   doesn't have an immediate effect.  That wouldn't mean that

16   there wasn't an effect.  It might have something to do with

17   the rate water percolated.  How fast does water have to

18   percolate to be part of a stream system?

19        MR. STAHLMAN:  You see, if my recollection--

20        THE COURT:  Does anybody know?

21        MR. STAHLMAN:  No.  If it is part of the underground

22   stream system, if my recollection is correct on the tests

23   that were made on the Bonsall Basin, I think the percolation--

24   and that is a rather porous material-- was five feet a day.

25   And, of course, the gradient of the water, gradient affects

1    it.  When you pump it down, like if you create pumping in a

2    certain situation, create your gradient, why you get a higher

3    rate of percolation.  But the gradient is a factor, and the

4    material is a factor.

5         THE COURT:  Is there any statement of the law as to

6    how fast water must percolate before it is part of the stream

7    system?

8         MR. STAHLMAN:  I don't think there is any legal--

9         MR. VEEDER:  No.

10        THE COURT:  Let's take the example Mr. Sachse gave

11   us.  Here is a well, and you pump it, and you, in substance,

12   pump it out.  But a week later the thing is filled up again

13   so it can be pumped.  Now, you compare that with another well

14   where you pump it out and the next morning you can pump her

15   out again.  One is filling up seven times as fast as the

16   other.  Is there any line we draw and say if water only

17   percolates so fast it is one thing and if it percolates

18   slower it is another?

19        MR. SACHSE:  I think there is a practical line, your

20   Honor.  The rights are all pretty much in agreement as to

21   what happens to these different types-- I am leaving out

22   appropriators now-- as to these different types of water right

23   in which you determine the riparian correlative with other

24   riparians; and if they overlie the stream system, they are

25   also correlated with it; and if they are vagrant, local

F

Z32

8996

1   waters, why, they are correlative with their neighbor to the

2   extent that they can't injure him.  That is the rub.  If

3   they are held to be a part of the stream system, then no

4   adjudication is possible.  At a future date when there is a

5   real shortage and the riparians are hurting, they are really

6   hurting, a hypothetical case, when we now have to have a

7   watermaster and set everybody down for a portion, if all

8   this is part of the stream system, then it is impossible to

9   have this regulation at a later date without regulating all

10  of this stuff.  And yet you are going to find, if my

11  assumption here is correct, that regulating it doesn't have

12  any effect upon helping the other riparians.  If there is a

13  very slow, percolating process, regulating this man wouldn't

14  help the downstream riparian a bit.  It does nothing for him.

15      THE COURT:  Your point is that the Court, as to this

16  Basin 4, should take the position that it doesn't have

17  sufficient evidence now to make any finding and leave it

18  open?

19      MR. SACHSE:  My position, yes, your Honor, is that--

20  well, no.  I went a step farther.  But I will concede there

21  is a real argument on whether you do the people a kindness

22  by throwing them out or entirely by a dismissal which will

23  be subject to a new suit or keeping them in.  But I will say,

24  at worst, they should be kept in with no finding.  At best,

25  they should be dismissed as distinct from res adjudicata

F

Z32 33

1   judgment.  The point is to make a broad, broad hold that

2   Unit 4 is a part of this stream system.  And if we take  Mr.

3   Veeder's worst fears and anticipations that in the future

4   someday perhaps a watermaster is going to have to stand here

5   and say, "Bill can have so much, so and so can have so much,

6   so and so"-- I am forgetting Fallbrook entirely in this

7   matter.

8         MR. VEEDER:  I wish I could.

9         MR. SACHSE:  We would be all out under those circum-

10  stances.  This critical situation exists.  What then is the

11  use of this watermaster going and marching up to John Smith

12  and saying? "All right, you have to reduce pumping in your

13  well."  It doesn't help Mr. Vail a bit, or it doesn't help

14  the Navy a bit.

15        THE COURT: All right, Mr. Stahlman.

16        MR. STAHLMAN:  Your Honor, there is one thing that

17  concerns me, and that, of course, is what the ultimate

18  conclusion will be as to these rights, whether or not they

19  overlie and the riparian rights merge.  And that, of course,

20  depends upon the evidence.  The thing that gives me concern,

21  I have seen where the courts have made mistakes in some other

22  cases.  It is very well pointed out.  I think the outstanding

23  work is this Professor of Ground Waters from the Stanford

24  University who treated this very situation.  In fact, he

25  has diagrams in there that show the situation so identical

F

Z34

1   to what we have in the spread of the McCloomey River where

2   they had basins that were in contact.  However, in those

3   cases they had the evidence in relation to what the rate of

4   percolation is, what could be the charge from-- the amount

5   of charge with a given stream flow into these areas.  That

6   was evidence in the case from which findings could be made.

7        THE COURT:  Is this a book or an article?

8        MR. STAHLMAN:  Oh, this is a standard text.

9        THE COURT:  Do you have it?

10       MR. STAHLMAN:  Yes, your Honor.  I would be very

11  happy to let your Honor have it.

12       THE COURT:  Bring it down and let me have a look at it.

13       MR. STAHLMAN:  I have it over at the hotel in my

14  room.

15       THE COURT:  Well, bring it in.

16       Let me ask you, though:  It is your position-- Mr.

17  Sachse's position is that the Court should, as I heard his

18  position, is that where the Court is sure it is vagrant,

19  percolating, I should so find and have a res adjudicata

20  judgment.  That in these places where the evidence is

21  uncertain, the Court should do one of two things:  Either

22  dismiss them out so that there was no res adjudicata effect

23  leaving the matter to some subsequent litigation, if necessary,

24  on the subject matter or leave them in without a finding.

25       MR. SACHSE:  That is exactly correct.

F

Z35

8999

1   THE COURT:  Without a finding one way or the other.

2   Now, what is your position?  Is it the same as Mr. Sachse's

3   MR. STAHLMAN:  Well, I feel if they were left in

4   without a finding, it would be the proper thing; because I

5   think that at this time we just don't have sufficient evidence

6   to determine that.

7   THE COURT:  Now, Mr. Veeder, let me ask you:  Does

8   the Government make any contention that there is any water

9   users-- this largely concerns the area north and east of

10  the Pauba Valley.

11  MR. VEEDER:  That is right.

12  THE COURT:  And east of the Murrieta and north and

13  east of the Pauba Valley.  Does the Government make any

14  contention that there are present uses of water in that

15  area which are seriously affecting the flow of the stream?

16  MR. VEEDER:  I think that they are affecting the flow

17  of the stream, your Honor, but I think that where the

18  confusion emanates, from what has been said, it turns more

19  on a question of law than on a question of fact.  I think

20  Katz vs. Walkinshaw is the prime case which pertains to your

21  Area No. 4.  In other words, I don't believe that the

22  Marines have to wait until they are hurt before they have an

23  adjudication.  In other words, Kats vs. Walkinshaw is a

24  pioneer case holding that  you can have a quiet title suit

25  and an adjudication without using the water and without

MALCOLM E. LOVE. OFFICAL REPORTER

F

Z36

1    regulation.

2          THE COURT:  I wasn't interested so much in your legal

3    position as I was in the practical matter, and that was this:

4    Would the Government be content to have a finding made, as

5    suggested by Mr. Sachse and Mr. Stahlman, on this Area 4.

6    In other words, if the Government is presently suffering no

7    injury, particularly in this Area 4, and if the Government

8    was content to have the Court say:  We don't have sufficient

9    information now.  We are not going to, therefore, make a

10   guess.  We leave this thing open for determination.  It may

11   be determined as more wells are drilled, more evidence is

12   available these people are part of the stream, or it may be

13   determined subsequently they have vagrant, percolating waters.

14   Than to do any injustice to anybody at this time in this

15   particular area we are going to leave the matter open-- now,

16   if the Government will be content to stand still for that

17   kind of a proposition on the theory you are not being presently

18   hurt over in that area (and, as I have heard the testimony

19   here, there hasn't been too much complaint about what has

20   been going on up there.  There are only a few fairly good

21   wells, and the water is being used for proper purposes)--

22   if theGovernment is content to say that, we could save a

23   lot of time in this case; and we would ultimately come up

24   with a better decision than we will come up with now, no

25   matter how carefully we try to do it.

MR. VEEDER:  It is unavoidable for me to answer un-
equivocally on that point.  Here is our view:  I think, and
I am now pointing to the State's Exhibit AO-22, Santa
Gertrudis--

MR. MOSKOVITZ:  That is AM.

MR. VEEDER:  Isn't that-- Oh, I beg your pardon.  It
is AM.  Here is the situation where the Roripaugh properties
are located.  There are many other wells in the basin of the
Murrieta.  Our view is this:  That they have a right to the
use of water in the Santa Margarita River.  That they should
have their rights declared; namely, for example, Roripaugh,
in my view, is an overlying land owner.  And I believe that
he should be so declared as an overlying land owner.

MR. SACHSE:  I agree, incidentally.

MR. STAHLMAN:  That is all right, that part.

MR. SACHSE:  He is overlying young alluvium on the
stream.

THE COURT:  I don't think there is any dispute about
him.  Let's take some of the others.  Wouldn't you be content
to make your calculated guess now and leave the door wide
open for a future determination when there were more wells
and more evidence?

MR. VEEDER:  No.  Well, I think this--

THE COURT:  If you are, we can save a lot of time.

MR. VEEDER:  I am not going to respond until I hear

F

Z38

1    what Mr. Krieger has to say.  But here is how I think the

2    decree can run:  One, at the present moment I would say there

3    would be no regulation in the area-- now, I am pointing to

4    the area which is the orange on Exhibit 15A.  I think that

5    you can adjudicate the existence of those rights without

6    saying-- Mr. Sachse took the additional step that concerns

7    me-- we are not saying that there should now be appointed a

8    watermaster to regulate the wells; we are saying that these

9    people can be declared to be overlying owners; that they

10   have rights to the use of water in the Santa Margarita River

11   Valley; and when they pump the water they are, in effect,

12   pumping Santa Margarita River water.  Now, you say what would

13   occur?

14          THE COURT:  Well, now, wait.  I am going to leave

15   here this afternoon.  I am going to adjourn at 4, and it is

16   4 now.  But you think over until we come back again this:

17   I have to do one or two things.  I either have to choose

18   between the two findings that certain of those people have

19   vagrant, percolating water, or that they are overlying a

20   basin.

21          MR. VEEDER:  Yes, I know.

22          THE COURT:  If I go that way.  A third alternative

23   which Mr. Sachse and Mr. Stahlman have been suggesting is

24   this:  Because of the fact that we admittedly have less

25   information in that area than we have, for instance, in the

9003

F

Z39

1    Pauba Valley, why couldn't we mark out an area there in
2    which we would say:  "We are not deciding yet whether you
3    have vagrant, percolating water or whether you are in part
4    overlying a basin.  We are not adjudicating this at this time.
5    Go ahead and pump your wells until some situation comes along
6    which will require a determination"?  The Government is not
7    being presently hurt by the uses up in that area.  And let's
8    let the matter go over until there was additional evidence.
9    When additional wells were drilled and more information was
10   available, we might be able to mark out very clearly where a
11   basin was and where it wasn't.
12       MR. VEEDER:  Well, of course, I take a different--
13   and I will certainly do what your Honor has directed.  My
14   own view is that it is no kindness to a man to exclude him
15   at this juncture.  He is joined.  He is in the suit.  I
16   think that we should have the bloody stumps bound up.  I
17   think that we should say, and I believe the evidence which
18   we have offered scientifically will support a finding, that
19   this area here overlies water which constitutes part of the
20   stream system.
21       MR. STAHLMAN:  No, it doesn't.
22       MR. VEEDER:  You don't have to go any farther, in my
23   opinion.
24       MR. STAHLMAN:  There is no evidence here to do that.
25       THE COURT:  Well, now, wait.  Mr. Veeder, you think

F-
Z40

1    it over and see.  I agree that where we can adjudicate a man's

2    rights with finality we ought to do it.  But there is an

3    area, there will eventually be an area at the breaking line.

4         MR. VEEDER:  That is right.

5         THE COURT:  Now, can we have a noman's land?  Can we

6    lay out a no man's land where we are not going to finally

7    adjudicate, partidularly since it is an area where the

8    Government isn't presently being hurt?  The number of people

9    in there are limited.  It is true they still face the future

10   litigation.  But meanwhile, they go ahead and use their

11   wells.  And as new wells are put in, as more information

12   is available, we get better acquainted with whether or not

13   eventually they are over a basin or whether they have

14   percolating waters.

15        MR. STAHLMAN:  Your Honor, Mr. Veeder, I am not saying

16   he may not be absolutely correct, but the evidence here

17   doesn't demonstrate.  Now, if we should have a finding based

18   upon that at this stage of the evidence, it may be ruinous

19   to us later on.

20        THE COURT:  I want you to think over whether or not

21   the Government could go for that.  Now, there would be areas

22   where there were we will say diversions out of a watershed

23   or where there was excessive pumping.  Maybe the situations

24   in the upper part of the Temecula might be different.  But

25   from what I have seen so far, and I have only seen a small

F

Z41

1    part of it on the trip we made, and so forth, the amount

2    of pumping over in this area is not very much.  The Roripaugh

3    well probably is going to be held to be over a basin.  It

4    is the younger alluvial.  And I think Mr. Krieger has indi-

5    cated that it has to be.  And after you took that well out,

6    there is probably not over a half dozen good wells up in

7    there that would be involved.

8         MR. VEEDER:  You say, "Talk it over."  I have talked

9    this over very carefully with Mr. Kunkel based upon the evi-

10   dence that is now in the record.  And I have a lot of respect

11   for his thinking.  Now, I will say this:  That it is our view

12   that the mere fact that a man doesn't have a well doesn't mean

13   that he shouldn't be adjudicated in this proceeding.  Because

14   I think this:  That subsequently, five years from now, ten

15   years from now, we will be back relitigating this thing.

16        THE COURT:  Well, we may be relitigating it anyhow

17   as this valley develops and more uses occur.  But why try

18   to do everything at this one time?

19        MR. STAHLMAN:  Your Honor has mentioned the matter of

20   these University of California-- what was it?  Cal Tech?

21        MR. SACHSE:  Cal Tech.

22        THE COURT:  Yes.

23        MR. STAHLMAN:  And I presume some of those people

24   would have in mind some of the very things, the tests which

25   have been made in areas where they made these determinations.

F

Z42

1    I may be that those tests were made within a comparatively

2    short period of time, a year or two or three.  You could find

3    out what the actual conditions are.

4         THE COURT:  We are going to adjourn tonight.  You

5    will probably finish up your cross-examination in a day?

6         MR. VEEDER:  I think so.

7         THE COURT:  Then, let's adjourn until Wednesday

8    morning rather than Tuesday.  Is that agreeable?

9         MR. VEEDER:  It suits me.

10        There is on-- I realize you are ready to go.  I have

11   been doing some work along this line of the Special Master

12   hearings, and I wanted to bring to your attention some

13   thinking that we have as to the kind and type of notice that

14   should go out hereafter.

15        THE COURT:  Can you do that Wednesday?

16        MR. VEEDER:  Yes.

17        THE COURT:  Tuesday I have a short calendar, but my

18   desk is terrible.  I have got a lot of work to do.

19        MR. STAHLMAN:  Maybe one or two days next week you

20   think?

21        THE COURT:  Well, probably not over a day or two days.

22   I have got another case set for trial Thursday afternoon.

23   So it will be a day and a half.  We ought to be able to finish

24   up.

25        MR. VEEDER:  I think so, your Honor.

F

Z43

1        THE COURT:  Wednesday morning at 10 o'clock.

2    Think over what I have suggested.

3        MR. VEEDER:  Yes, your Honor, we will.

4        (Adjournment until Wednesday, February 25, 1959,

5    at 10 A.M.)