# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

– – –

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

– – –

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.   1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:     Wednesday, February 25, 1959

Ponner: 9008 to 9119

**FILED**

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By

**J O H N   S W A D E R**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 · Ext. 370

1

IN THE UNITED STATES DISTRICT COURT

2

SOUTHERN DISTRICT OF CALIFORNIA

3

SOUTHERN DIVISION

4

- - -

5

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6

- - -

7

8

UNITED STATES OF AMERICA,　　　　)
　　　　　　　　　　　　　　　　　)

9

　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　　)

10

　　　　vs.　　　　　　　　　　　)　　　　No. 1247-SD-C.
　　　　　　　　　　　　　　　　　)

11

FALLBROOK PUBLIC UTILITY　　　　)
DISTRICT, et al.,　　　　　　　　)

12

　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　)

13

14

15

REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17

San Diego, California
Wednesday, February 25, 1959

18

19

APPEARANCES:

20

　　　　For the Plaintiff　　　　WILLIAM H. VEEDER, ESQ.,

21

　　　　　　　　　　　　　　　　Special assistant to the
　　　　　　　　　　　　　　　　Attorney-General,

22

　　　　　　　　　　　　　　　　Department of Justice,
　　　　　　　　　　　　　　　　Washington, D. C.

23

24

25

APPEARANCES ( Continued ):

| | |
|---|---|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney-General, by<br>ADOLPHUS MOSKOVITZ, ESQ.,<br>Deputy Attorney-General, and<br>FRED GIRARD, ESQ. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al. | FRANZ R. SACHSE, ESQ. |
| For Defendant Murray<br>Schloss Foundation | WALTER GOULD LINCOLN, ESQ. |
| | PHIL D. SWING, ESQ. |
| For Defendant Oviatt | MESSRS. BEST, BEST & KRIEGER,<br>By JAMES H. KRIEGER, ESQ. |
| For U. S. Navy | LCDR. REDD |

## INDEX TO WITNESSES

For Defendant State
of California:

| | D | X | RD | RX |
|---|---|---|---|---|
| Leland Illingworth (By Mr. Veeder) | | 9028 | | |
| (By Mr. Stahlman) | | 9083 | | |

## EXHIBITS

| Plaintiff's Exhibit - | Iden. | In Evid. |
|---|---|---|
| 158 - Stipulated Judgment | 9021 | |
| AM-1 | 9095 | |

9011

SAN DIEGO, CALIFORNIA, WEDNESDAY, FEBRUARY 25, 1959.   10 A. M.

THE CLERK:   The case on trial, No. 1247-SD-C, United States of America vs. Fallbrook Public Utility District, et al.

THE COURT:   Mr. Krieger, are you going to be ready to go on the 9th or 10th of March?

MR. KRIEGER:   Your Honor, I think we will be ready to go by the 30th of March.   I have taken that up since I chatted with you on the telephone, and I don't see any way in which we can prepare those exhibits prior to that time.

The difficulty appears to be this, your Honor.   We are collating both actual live well drillers' logs and pumping tests, and we are going to put that all forth on a map which is going to take some time to prepare, especially in conjunction with parcels which we represent.   We are going to have that all on one master exhibit.   And after talking with Mr. Webb, I don't think we can do that before the 30th.

THE COURT:   At that rate, then, we would have to take an adjournment for the weeks of March 3rd, 10th and 17th; is that right?

MR. SACHSE:   Are you still going on the 23rd, Mr. Stahlman?

MR. STAHLMAN:   On the 24th.   That is the day we are struggling for, your Honor.   It is going to take a lot of work,

1    but we hope to have it ready by that time.

2          THE COURT:  You would really start on the 31st, on

3    Tuesday.

4          MR. KRIEGER:  All right, the 31st.

5          MR. VEEDER:  Your Honor, I have a problem.  I have an

6    argument in Denver on the 25th of March.

7          THE COURT:  What is this, the Circuit Court?

8          MR. VEEDER:  The Circuit Court.  I will be back that

9    night, if the planes are operating.

10          MR. STAHLMAN:  We are going to need all the time we can

11    get, your Honor.  As I say, we are going just as rapidly as we

12    can.

13          THE COURT:  I am going to be gone beginning April 6th.

14    Do you know that, Mr. Krieger?

15          MR. KRIEGER:  Yes, I do know that, your Honor.

16          THE COURT:  Do you figure a full week for your case,

17    Mr. Stahlman, or more?

18          MR. STAHLMAN:  Yes, I think it will take at least a

19    week.  I don't want to beg the time, but if it would be con-

20    venient to have it after that we could surely use the time,

21    because we have a tremendous amount of work.  We have it

22    plotted and planned and are going on it at the present time.

23          THE COURT:  What about the Master using some of this

24    time?

25          MR. VEEDER:  I talked to the Master yesterday, your

1    Honor, and we have set up the dates for April in an effort to

2    work out most of the areas below the confluence of the Murrieta

3    during the month of April, during your absence.

4          I had planned on Mr. Krieger's going ahead on the 10th.

5          Let me think about some time on that.  I had been

6    planning the month of April on that work, your Honor, and I

7    will have to consult, but I will let you know.  If we can

8    move it up, we would attempt to.

9          THE COURT:  Of course, the Master can't proceed except

10   in areas where you have made the surveys.

11         MR. VEEDER:  That is the point.

12         THE COURT:  And have cataloged the ground.

13         MR. VEEDER:  That is right.

14         THE COURT:  Is there any area in the upper valley that

15   would be suitable?

16         MR. VEEDER:  I don't think so. As I say, I would want

17   to check this thing out to see whether we can move it up or

18   not.  I will let you know.

19         MR. STAHLMAN:  May I ask, if we finish today, what

20   will be the next court day?  Because I desire to make a motion

21   and I want Mr. Veeder to know about it, in relation to the

22   matter which we had previously agreed that during the time in

23   which the Government was putting on the case we would not bring

24   this motion.  It is the motion to be relieved of the stipula-

25   tion that was entered into in 1952.

1   THE COURT:  Are you going to make this motion in

2 writing, or are you going to make it orally?

3   MR. STAHLMAN:  I will make it orally.  I can make it

4 in writing, but I don't think it is necessary.

5   THE COURT:  It sounds to me like it might be an

6 important matter.  If you want to make it orally, all right.

7 But it looks to me like it ought to be made in writing.

8   MR. STAHLMAN:  Very well, I shall make it in writing,

9 then.

10   Do you know what our next court day will be here?  I

11 want to have it made prior to the time we proceed with our

12 evidence.  I can make it at that time, as long as we are aware

13 of the fact that that motion will be made.

14   The stipulation, I might indicate to your Honor, is

15 the stipulation that is reported in 109 Fed. Supp. 50.

16   MR. VEEDER:  I hand your Honor a copy of the stipulation

17 certified to by the Clerk of the Court.

18   THE COURT:  You make a written motion, but tell me what

19 the gist of your motion is.

20   MR. STAHLMAN:  This was a stipulation that was entered

21 into prior to the time of the filing of the Amendatory and

22 Supplemental Complaint, and it is a stipulation entered into

23 by the attorneys who represented Vail prior to my representation

24 of Vail, and the general purport of the stipulation is that

25 the Vail Company would not raise an objection to the stipulated

1  judgment during the course of the trial.   That is the general

2  purport of this stipulation.

3       It was, I think, a useless and unnecessary stipulation

4  at the time it was entered into, and is a stipulation which

5  would prevent the Vail Company from supplying evidence in

6  relation to the issues created by the Fourth Affirmative

7  Defense of Vail's answer-- the setting aside of the stipulated

8  judgment.

9       THE COURT:   In other words, you are going to move to

10  set aside the stipulation entered into in this case here on

11  trial--

12       MR. STAHLMAN:   Yes.

13       THE COURT:   Which was approved on July 8, 1952.

14       MR. STAHLMAN:   Yes.

15       THE COURT:   And if you get that set aside, you want

16  to attack the stipulation on which the State Court's judgment

17  was entered?

18       MR. STAHLMAN:   Yes, your Honor.

19       THE COURT:   And incidentally, it sounds to me like you

20  have cut yourself out a big piece of goods to work on.

21       MR. STAHLMAN:   That's right.   I think we did.   However,

22  I think that we feel firm in our position that we are taking.

23       THE COURT:   What will be your basis to ask to be relieved

24  of the stipulation in this case?

25       MR. STAHLMAN:   The basis for the motion to be relieved

1  of the stipulation in this case is:  In the first place, your

2  Honor, it is an unnecessary stipulation.

3       If it were considered in the nature of a contract, it

4  would be without any consideration whatsoever.  It is a one-

5  sided stipulation, by which one party to an action says, "We

6  will not put up a defense which we would be entitled to put

7  up."  That is the effect of the stipulation.

8       THE COURT:  Any other grounds?

9       MR. STAHLMAN:  I will file the motion.

10      THE COURT:  You are not going to contend that there is

11  fraud?

12      MR. STAHLMAN:  No.

13      THE COURT:  Or duress?

14      MR. STAHLMAN:  No.

15      THE COURT:  Or that anybody was insane?

16      MR. STAHLMAN:  No, sir.

17      THE COURT:  Or that anybody was intoxicated?

18      MR. STAHLMAN:  No.  I have looked into the law on this

19  question, your Honor, and I think  when we get down to it

20  your Honor will see that you have the right, sitting as a

21  chancellor in equity, if the judgment is unlawful, if it is

22  unconscionable, if it is contrary to equity, your Honor can

23  correct it.

24      THE COURT:  What is your ground for asking to set aside

25  the stipulation on which the State Court's judgment was based?

1      MR. STAHLMAN:  Your Honor, that will take quite some

2  considerable discussion with your Honor and citations of

3  authority.

4      THE COURT:  Is it generally on the grounds that it

5  is inequitable?

6      MR. STAHLMAN:  It is inequitable, it is unconscionable,

7  and it is contrary to law.  Those are the bases upon which your

8  Honor can set aside the stipulated judgment.

9      THE COURT:  I call your attention to the fact that this

10  stipulation in the State action was approved and a judgment

11  entered on it following a three-year trial, in which the court

12  was fully advised, apparently, of all of the issues between

13  the Santa Margarita and the Vails.

14      MR. STAHLMAN:  I am fully aware of that, your Honor, and

15  your Honor now is hitting upon the very questions that would

16  require, I think, some extensive discussion and argument.  I

17  am perfectly willing, however, --

18      THE COURT:  I just want to know generally what your

19  position is.

20      MR. STAHLMAN:  Yes.

21      THE COURT:  Make your motion in writing.

22      MR. STAHLMAN:  Very well.

23      THE COURT:  I suppose your motion had better encompass

24  all of this matter:  Your motion to strike the stipulation in

25  this case, your motion to set aside the stipulation, your

6918

1  motion to modify the judgment in the other case based upon a

2  modification of that stipulation or a relief from that

3  stipulation.

4  MR. STAHLMAN:  I just feel that we should not be ham-

5  strung if we are not able to negotiate a settlement in rela-

6  tion to the stipulated judgment.  It has been gone into and

7  there is already an indication that both parties realize that

8  this stipulated judgment needs some reformation at least.

9  However, if we are not able to get together, I do feel that the

10  facts pertaining to this stipulated judgment and the law

11  pertaining to it and the authorities that your Honor has in

12  relation to it should be fully set out before this Court in

13  this case.

14  MR. SACHSE:  It is listed as one of the issues.

15  MR. STAHLMAN:  Yes.

16  THE COURT:  All right.

17  Your inquiry was, when will we be back here again.

18  MR. STAHLMAN:  Yes. I had anticipated making this

19  motion at the early stages of this trial, and at Mr. Veeder's

20  solicitation I entered into another stipulation with him that

21  we would not raise the question to be relieved of this par-

22  ticular stipulation, reported in 109 Fed. Supp 50, until after

23  he put his case on-- for some reason he desired that-- unless

24  five days notice was given.  I have not taken advantage of that

25  at this point.  However, now that we are approaching the time

1   when the Vail Company's evidence will go into the case, I feel

2   that we should shortly make this motion to be relieved of

3   the 1952 stipulation.

4         MR. VEEDER:  And this is your notice to us?

5         MR. STAHLMAN:  Yes, this can be considered the notice.

6   Well, the five days notice is off now, the stipulation that

7   you and I had.  It could be made today or tomorrow or any

8   time.  However, you can have five days or ten days, whatever

9   time his Honor sets.

10        THE COURT:  All right.  You have notice, Mr. Veeder.

11        I would take it that Tuesday, March 23rd, would be the

12   next day that we would convene after we adjourn tomorrow.

13        MR. STAHLMAN:  Very well.

14        MR. SACHSE:  Tuesday, March 24th, is it not?

15        THE COURT:  Pardon me.  Tuesday, March 24th.

16        Now you have to be--

17        MR. VEEDER:  I have to be in Denver on the 25th.

18        THE COURT:  Can you fly over at night?

19        MR. VEEDER:  Yes.

20        THE COURT:  Then you would be back here on the 26th?

21        MR. VEEDER:  That is right.

22        THE COURT:  That is the best we can do.

23        MR. SACHSE:  Your Honor, as far as argument and notice

24   would be concerned-- simply to help Mr. Stahlman-- I can't see

25   that I, representing any of my clients, would have any position

1    on the first stipulation to which he has referred-- that is,

2    the one in these proceedings.  But I would like a copy of the

3    brief or motion, if this is going to be combined with it, on

4    the Vail-O'Neill stipulated judgment.  That we might have a

5    position on.

6         MR. STAHLMAN:  I would say this, your Honor, that

7    assuming that this first stipulation is set aside, then your

8    Honor, I am sure, would want to hear the evidence in the case,

9    which is evidence in relation to many other matters as they

10   affect other people.

11        THE COURT:  The evidence the State court took three

12   years to hear?

13        MR. STAHLMAN:  No, certainly not, your Honor.  We do

14   not anticipate going into that.  I feel that all the issues

15   are before the Court.  As I say, it is going to take some

16   considerable time to point out to your Honor the various

17   reason and the law that pertains to those reasons why this

18   judgment should be set aside if we do not negotiate a settle-

19   ment.

20        THE COURT:  All right.  Now let me ask you another

21   question and I am going to pass this matter and say that when

22   we adjourn this week we will adjourn to Tuesday, March 24th.

23   But will you negotiate this matter with Mr. Veeder, with my

24   assistance as an arbitrator?

25        MR. STAHLMAN:  Yes.  Not with Mr. Veeder alone, but if

1    your Honor sits in on it I will.

2         THE COURT:  We can then spend some time probably between

3    now and that date seeing just how far apart you are on this

4    matter.

5         MR. VEEDER:  Fine.  You set the time and we will be here.

6         THE COURT:  We will take that up later.

7         MR. STAHLMAN:  Very well.

8         MR. VEEDER:  Your Honor, I would like to have that

9    stipulation marked as an exhibit in this case and have it

10   assigned the next number.

11        MR. STAHLMAN:  This is the stipulation of 1952?

12        MR. VEEDER:  I will show it to you, George.  I had it

13   certified yesterday.

14        THE COURT:  Mark it Government's Exhibit next in order,

15   which would be--

16        THE CLERK:  No. 158.

17        MR. SACHSE:  Will you get copies, then, Mr. Veeder?  I

18   don't think I am concerned, but I would like to know.

19        MR. STAHLMAN:  Do you have another copy of this, Mr.

20   Veeder?  I don't mean a certified copy, but a copy which has

21   the signatures?

22        MR. VEEDER:  I will have copies made for counsel and I

23   will send you a copy.

24        MR. STAHLMAN:  Very well.

25        THE COURT:  It will be marked Plaintiff's Exhibit No. 158.

9022

1          (Stipulated judgment was marked Plaintiff's Exhibit No.

2    158 for Identification.)

3          THE COURT:  All right, Mr.Sachse.

4          MR. SACHSE:  Your Honor, there are two or three minor

5    correction in Friday's transcript, Volume 78.

6          On page 8992, line 25, at the end of the line the word

7    is "mined" and not "mind."

8          On page 8993, the first line, the same error; the word

9    is "mined" and not "mind."

10         And in the dame line the word "to" should be "the."

11         THE COURT:  "The discharge."

12         MR. SACHSE:  Yes; having mined out a cone, the recharge

13    into this thing is so minor and infinitesimal."

14         The next and last correction is on page 8996, line 22.

15    The word "or" should be deleted and after the word "entirely"

16    insert the word "by;" "by throwing them out entirely by a

17    dismissal . . "

18         That's all, your Honor.

19         THE COURT:  All right, the corrections will be made.

20

21              LELAND ILLINGWORTH,

22    recalled as a witness in behalf of the defendant State of

23    California, having been previously sworn, testified further

24    as follows:

25         MR. MOSKOVITZ:  Your Honor, before Mr. Veeder continues

1    with this cross-examination, there was one bit of information

2    that Mr. Illingworth didn't supply last week that he was

3    asked to, and that was the elevation of one of the wells in

4    the Ysidora Subbasin that was set forth on State's Exhibit AD-

5    Well 11 South, 5 West, 2N5.  Mr. Illingworth has that eleva-

6    tion.  He can write it inthat same place that the other

7    elevation was.

8        THE COURT:  State it for the record and then write it

9    on the exhibit.

10       THE WITNESS:  The ground surface elevation at Well 11S/

11   5W, 2N5 is 14.8 feet, and I am writing those words on

12   California's Exhibit AD.

13       MR. VEEDER:  Your Honor had asked me to make some in-

14   vestigation respecting the matter of basin characteristics of

15   Storage Unit No. 4 as depicted on Plaintiff's Exhibit 17.  I

16   have talked at considerable length with our geologists on it,

17   both Mr. Worts and Mr. Kunkel.  I have asked them to pull

18   together the data that they have respecting it, to outline to

19   me their views in connection with it, and I will be prepared

20   at the next session to go further into the matter.  It is very

21   technical and it is a very difficult problem.

22       THE COURT:  This is looking toward what now-- findings

23   on this?

24       MR. VEEDER:  That is correct.

25       THE COURT:  Or the question of asking these experts to

1    come down?

2        MR. VEEDER:  Well, I think it is a double-barreled

3    question.  The matter of bringing in the people from Cal Tech

4    is one element I want to talk to them about.  I am having them

5    come down here to talk to me during the month of March.  And

6    similarly the question whether Water Storage Unit No. 4 is

7    actually a portion of a ground water basin.  I think that is

8    what the implication of your questions was.  We will have that

9    data for you as soon as we can get it.

10       THE COURT:  I wrote this man at Cal Tech yesterday--

11   his name is Sharp-- and told him I had discussed this with

12   counsel, and I tried to give him a little more information as

13   to what our problem was.  It was one of these letters that I

14   dictated and didn't redictate, so I can't say that I did too

15   good a job.

16       I told him that it is the Government's contention that

17   this is a basin; that it is California's position that there is

18   not sufficient evidence; that it was the position of other

19   defendants that it was not a basin, although it was generally

20   conceded that the areas under the younger alluvium in Pauba,

21   Wolf and Murrieta were ground water basins.

22       MR. VEEDER:  And Santa Gertrudis.

23       THE COURT:  I didn't mention Santa Gertrudis.

24       I sent him also a preliminary copy of the map we had

25   of the older and younger alluvium in the Upper Valley, which is

1   the same as our present map, to let him have a picture of this.

2   Of course, he is in the branch at Cal Tech which deals in

3   geology, so he will be able to understand that map.

4       I told him also that we had other bits of evidence,

5   such as the evidence put on by the State of the similarity of

6   chemical content of water from deep wells in various parts

7   and the difference between the chemical content of water in

8   deep wells and some of the water from shallower wells.

9       That we had evidence put on by the United States show-

10   ing that there was some relationship between the elevations

11   of water in the wells.

12       That there was apparently no evidence in the record at

13   what rate water might move or percolate in this area.

14       That there was available the evidence of the Pauba

15   well, which had gone down over 2,500 feet without hitting

16   basement complex down near one fault.

17       And that there were other deep wells.  Although I

18   didn't mention particularly the oil well further up, which was

19   a deep well into the older alluvium.

20       I told him that there was also evidence that basement

21   complex had been encountered at depths of 150 feet, 250 feet

22   in the eastern portion of this area near the Murrieta Hot

23   Springs portion, and that it might appear that the basement

24   complex sloped seaward from northeast to southwest.

25       That the ultimate thing we had to decide was whether

1   this was a basin, and what the confines of it were, or whether

2   it was not a basin.

3        That was about it.

4        And that with this additional information if they

5   thought they could possibly be of some help to us, then we

6   would set up a meeting at which we would have all counsel

7   present, they could ask further questions, we could refer them

8   to such exhibits or bits of evidence as we had, and then let

9   them tell us whether they can help us.  If they wound up by

10  saying that they can't help us, that is one thing.  If they

11  think it is something they can give us some help on, that is

12  another thing.

13       MR. VEEDER:  Very good, your Honor.  I have asked Mr.

14  Worts and Mr. Kunkel to be here the week of the 23rd.

15       THE COURT:  I would think that if we get a reply that

16  they think it is worthwhile to come down that we could get

17  hold of the attorneys in this interim and meet, could we not?

18  Would most of you be available?

19       MR. KRIEGER:  Yes.

20       MR. SACHSE:  Yes, your Honor.

21       THE COURT:  Are you going somewhere?

22       MR. VEEDER:  Yes, your Honor.

23       THE COURT:  Where?

24       MR. VEEDER:  I am going back to the Land of the Potomac

25  Fever for a moment.

1      THE COURT:  You mean you are going home?

2      MR. VEEDER:  Yes.  But I can be here in seven hours,

3  assuming that the Wright Brothers folly holds together.

4      THE COURT:  All right.

5      MR. STAHLMAN:  As I indicated the other day, there is

6  a general text on the subject pertaining to many of the

7  factors we have in this area that was written by one of the

8  outstanding geologists of Stanford University, and I have that

9  book.  If there is no objection and your Honor would like--

10      THE COURT:  Anybody have any objection to the Court

11  improving its mind by reading some general literature on the

12  subject?

13      MR. SACHSE:  I have no objection.

14      MR. VEEDER:  I think it's fine.  I have been trying to

15  read it myself.  Excellent.

16      THE COURT:  It is not evidence in the case.  You under-

17  stand that.

18      MR. STAHLMAN:  Yes, your Honor, I understand that.

19      THE COURT:  Is Holmgren still at Stanford, or is he over

20  at Wyoming now?

21      MR. STAHLMAN:  Your Honor, I do not know.  The book was

22  published first in 1936.  I made inquiry of some people who

23  should have some familiarity with Stanford, and they don't know

24  whether he is there yet or not.

25      MR. VEEDER:  All geologists say, "Amen" when you mention

1    his name.

2              THE COURT:  All right, are you about ready to proceed?

3              MR. VEEDER:  I am, your Honor.

4              THE COURT:  All right.

5

6                        CROSS-EXAMINATION (Resumed)

7    BY MR. VEEDER:

8              Q   Now, referring to California's Exhibits AC and AD,

9    have you those available, Mr. Illingworth?  If not, I will

10   just let you use my copies.

11             A   I do not have at the moment.

12             Q   Do you find a correlation between the recharge in

13   the Pauba Valley and the recharge in the Coastal Basin?

14             A   Recharge is represented by what on these diagrams?

15             Q   By the correlation between the runoff down to the

16   Coastal Basin and the runoff in the Pauba Valley.

17             THE COURT:  You are comparing California's Exhibit AD

18   with what now?

19             MR. VEEDER:  California's Exhibit AD and California's

20   Exhibit AC.  I am just inquiring as to whether he finds that

21   the Coastal Basin is as receptive to recharge as is the Pauba

22   Basin, for example.

23             Q   Do you understand what I am trying to get at, Mr.

24   Illingworth?

25             A   If the latter is your question--

1    Q  That is the question.

2    A  --they both show a response to stream flow, that is,
3 the water levels in both the Pauba Basin and the Coastal Basin
4 rise when the stream flow increases.

5    Q  From the standpoint of time, do you find a correla-
6 tion between recharge and runoff in those two basins?

7    A  As near as you can tell, with the years plotted as
8 approximately half an inch on here, there is the same general
9 rapidity of rise.

10    Q  In fact, it is quite a striking rise in both those
11 cases; isn't that true?

12    A  Yes, at this scale it shows as something close to a
13 vertical line, that is, the rising water level in the wells
14 indicated.

15    Q  In other words, the rise is almost identical with
16 the runoff; isn't that right?

17    A  Yes.  This is what I had indicated was the import
18 of these exhibits.

19    Q  Now, would you say, based upon your investigation,
20 that the same phenomena would prevail, for example, on
21 Terwilliger Valley, which you have, I believe, alluded to as
22 Anza Valley?

23    A  I don't believe so.  I think the recharge would be at
24 considerably slower rate in Anza Valley.

25    Q  Now, in regard to the relationship between runoff and

1    recharge, what have been your investigations in the area above

2    Vail Reservoir in connection with the reference in the case

3    of Barbee vs. Oviatt?

4         A  I don't recall any specific studies or graphical

5    representations of the rise in water levels as compared with

6    stream flow in any of those basins.  I don't recall any

7    specific studies.

8         Q  Your investigations did show in that area, however,

9    that the pumping of water in your hydrologic units, 2, 3, and 4,

10   had an effect upon stream flow, did they not?

11        MR. MOSKOVITZ:  May I have that question, please?

12        (The Reporter read the pending question.)

13        THE WITNESS:  I can't very well answer that question

14   without knowing the specific study that you have reference to.

15   I have an opinion about these matters, but I don't remember

16   any particular studies.

17   BY MR. VEEDER:

18        Q  Well, you did make an investigation, however, did you

19   not, in regard to the utilization of ground waters in the

20   hydrologic Units 2, 3 and 4 in this reference case of Barbee

21   vs. Oviatt?

22        A  Yes.

23        Q  And you did conclude there, did you not, that the

24   ground water, at least in certain areas, was pumped from the

25   Santa Margarita River stream system; isn't that correct?

9031

1     I will help you.

2          A  We didn't make any-- I should say, we did very little

3     analysis in the Barbee vs. Oviatt suit.  This was almost

4     exclusively a suit or a reference to the Division of Water

5     Resources, in which we gathered basic data.  We had not started

6     on our analysis of the data at the time that the court said,

7     "Proceed no further.  Do nothing in addition to what you have

8     done, but maintain the records that you have already started."

9     And this is what we did.  So we made very few, if any,

10    analyses.

11         Q  Now, in the report of the Referee in the Superior

12    Court of the State of California, in and for the County of San

13    Diego, in the case of Barbee vs. Oviatt, No. 154140, at page

14    32, statements are made in regard to your studies of ground

15    water, and you state that in hydrologic Units No. 2, 3 and 4

16    the individual total for pumping in Unit 2 was 1600, in Unit 3,

17    500; and in Unit 4, 3700 acre-feet respectively.

18         A  May I see that.

19         THE COURT:  Per year?

20         MR. VEEDER:  Annually.

21         At pages 32 and 33.

22         THE COURT:  And were the same units designated by the

23    numbers 2, 3 and 4?

24         MR. VEEDER:  May I ask that question, your Honor?

25         Q  It is correct, is it not, Mr. Illingworth, that you

1    had the same hydrologic units in your Barbee vs. Oviatt in-

2    vestigation as are presently depicted upon California's Exhibit

3    AB?

4            A    I think the word "investigation" here is--

5            THE COURT:   First, let's find out about these units.

6    Are Units 2, 3 and 4 as referred to in this Superior Court

7    report the same as Units 2, 3 and 4 shown on California's map

8    AB?

9            THE WITNESS:   Yes, they are.   Perhaps a word of explana-

10   tion is necessary.   The Court asked us to summarize all data

11   we had with respect to the Temecula Creek watershed, and since

12   we made very little, if any, analyses in that investigation we

13   were specifically asked to include in a report, this report

14   that was requested, all information that we had, whether we

15   gathered it in the Santa Margarita or any other report, and

16   for this reason we included Plate 6 from the Santa Margarita

17   report and reprinted it in the Temecula reference just as is.

18   So that it actually includes Units 5 and 6, which are not even

19   in the Temecula Creek watershed.

20           MR. VEEDER:   Which have nothing to do with this situa-

21   tion?

22           THE WITNESS:   That is correct.   But you are correct

23   in saying that Units 2, 3 and 4 are the same units that we

24   have on Plate 6.

25           THE COURT:   Now the other question is concerning the

wording of this report.

THE WITNESS:  This is on page 32?

BY MR. VEEDER:

Q  Yes.  I believe the excerpt to which I have specific reference was the final sentence on page 33 of your ground water study.

A  These are ground water withdrawals by others, meaning others than the Vail Company, which was reported in the previous sentence.  They were not determined in detail, but the estimated ground water extractions in Temecula Creek watershed totaled 5800 acre-feet in 1933.

Q  You did conclude, however, that the extractions of ground water in the areas 2, 3 and 4 were from the Santa Margarita River stream system; is that not correct?

A  I don't read that into this.  This is simply ground water extractions.  We haven't said where the source was or anything of the sort.  These are just ground water extractions.

Q  You made no study then in regard to the ground water in water units 2, 3 and 4 on the basis of that reference; is that right?

MR. SACHSE:  May I have that question again?

(The Reporter read the pending question.)

MR. MOSKOVITZ:  I object to that question, your Honor; it is entirely too vague.

MR. SACHSE:  It is incomprehensible to me, your Honor.

1        THE COURT:  Well, it doesn't take so long a road.

2   Sustained.  He has indicated that he found broad ground water

3   extraction.  You tried to get him to say it was from the river

4   system.  He said no.  The objection is sustained.

5   BY MR. VEEDER:

6        Q  Did you make any study of the ground water in the

7   Santa Margarita River system in the reference to which I have

8   alluded?

9        A  No, we did not.  The matter that is reported in the

10  report on the Temecula reference with respect to ground water

11  extractions was obtained from the report on the Santa Margarita

12  River investigation reported in Bulletin No. 57.

13       Q  But do you not allude to the ground water in your

14  report to the Referee in the case to which I have made refer-

15  ence?

16       A  We do, and as I say this was not made as part of the

17  investigation of Barbee vs. Oviatt.

18       Q  But did you not tender it to the court as part of

19  your study of the ground water of the Santa Margarita River

20  and its tributaries?

21       A  No, not as part of that investigation.  It was

22  reported as being information from another investigation that

23  was pertinent to that area.

24       MR. VEEDER:  Well, I am on my good behavior today.  Not

25  that the spirit is broken, your Honor.  I feel very rested

9035

1    today.

2         Q   Now, in regard to the geology in the reference in

3    case of Barbee vs. Oviatt, aren't the geological studies that

4    you made in the case of Barbee vs. Oviatt identical with the

5    studies that you made in connection with the Santa Margarita

6    River investigation as disclosed in Bulletin No. 57?

7         A   We made no studies of geology in connection with

8    the Barbee vs. Oviatt case.

9         Q   And you didn't study at all the extraction of ground

10   water in the case of Barbee vs. Oviatt?

11        A   Did you say "study"?

12        Q   Yes.

13        A   We did not study them in that case, no.

14        Q   Did you maintain the well records in the areas 2,

15   3 and 4 pursuant to the reference of the San Diego County

16   Superior Court in the reference of Barbee vs. Oviatt?

17        A   Yes, we did.

18        Q   What was the objective of maintaining those?

19        A   To gather basic data which could be later analyzed.

20        Q   When you undertook the accumulation of that data,

21   did you believe that it might be reflective of the surface

22   runoff of the Santa Margarita River and the Temecula?

23        A   I don't believe we considered that.

24        Q   You just went out and made the measurements just to

25   be making measurements?

9036

1      A  Did you say the ground water level would be indicative

2 of the runoff in the stream?

3      Q  No.  I will ask the question again.  Did you maintain

4 well measurements for the purpose of determining a relation

5 ship between ground water extractions and the runoff of the

6 Santa Margarita River and its tributaries?

7      A  That would have been one of the possible reasons--

8 one of the probable reasons.

9      Q  What would be the other reasons?

10      A  Well, to determine how they fluctuated, the extent

11 of the use of the ground water basin, and probably other

12 reasons.

13      Q  Wasn't the matter referred to you for the purpose

14 of determining runoff of the Temecula stream?

15      A  Not for that purpose alone.

16      Q  What were the other purposes, then?

17      A  I don't know.  I suppose the record would speak

18 for itself.  The reference stated what we were supposed to

19 obtain, what issues there were.

20      Q  Are you stating then that you do not have sufficient

21 data in regard to the withdrawals of ground water in water

22 units No. 2, 3 and 4 so that you could predict a conclusion

23 upon those withdrawals as they relate to the surface runoff of

24 the Temecula Creek?

25      MR. SACHSE:  May I ask that you make quite clear that

you are referring to Units 2, 3 and 4 on Exhibit AB and not to your Storage Units 2, 3 and 4.

MR. VEEDER:  Yes, by all means.

Hereafter my references to 2, 3 and 4 relate to the State's hydrologic units as depicted on Exhibit AB.

THE COURT:  Your question is, does he now have such information?

MR. VEEDER:  Yes.  I will rephrase the question.  This man is hard to pursue.

THE COURT:  Don't comment.  Just ask your questions.

BY MR. VEEDER:

Q  Do you have data in sufficient quantity so that you could make any determination as to relationship of withdrawals of groundwater from Units 2, 3 and 4 as it pertained to the surface runoff of Temecula Creek?

Are you having a problem there?

A  Yes.

Q  I will state it again, then:

Is there any relationship, in your opinion, between the extractions of ground water in Units 2, 3 and 4 and the surface runoff of Temecula Creek?

MR. MOSKOVITZ:  Your Honor, I object; this is a compound question for this reason, he brings in three hydrographic units in one question.  No. 4 is the area which is covered by a number of our exhibits inthis case, which shows such

1   relationship.  I wonder if he could separate them.  The answer

2   may be different.

3       THE COURT:  Well, Unit 4 is Pauba Valley.  You have

4   already covered that.  Why don't you limit your question to

5   2 and 3?

6       MR. VEEDER:  All right, I will limit it to Units 2 and

7   3.

8       Do you want the question read?

9       THE WITNESS:  No, I can answer it.

10      There probably is some relationship.

11  BY MR. VEEDER:

12      Q  How did you arrive at that conclusion?

13      A  Primarily from observation of the location and the

14  nature of the wells, and the location and nature of the stream

15  flow.

16      Q  Which wells?

17      A  Well, the general observation of all the wells in the

18  areas of Units 2 and 3.

19      Q  Of all the wells?

20      A  Yes.

21      Q  And you found a correlation between the surface

22  runoff of the Temecula Creek and of all the wells that you

23  investigated; is that right?

24      A  No, that is not right.

25      THE COURT:  He didn't say that.

1          •   Let's get it straight.  He said that he based his opinion

2     on his observation of all the wells.

3          MR. VEEDER:  All right.

4          Q  Now, can you designate for us any wells in Units 2

5     and 3 which, in your opinion, are hydrologically interconnected

6     with the surface runoff of Temecula Creek and its tributaries?

7          MR. MOSKOVITZ:  I object to the question, your Honor.

8     I think this is going beyond any possible impeachment, and

9     it goes beyond the scope of the direct examination.  Mr.

10    Illingworth didn't testify to that relationship in Units 2 and

11    3.  He just made no studies for this case of those units.

12         THE COURT:  Are you objecting on the ground it is

13    beyond the scope of the cross-examination?

14         MR. MOSKOVITZ:  On the ground that it is beyond the

15    scope of the direct examination, your Honor.

16         THE COURT:  And therefore of proper cross-examination?

17         MR. MOSKOVITZ:  Yes, your Honor.

18         THE COURT:  What is the other objection?

19         MR. MOSKOVITZ:  That is the objection.

20         THE COURT:  What direct testimony did this witness

21    give that entitles you to ask these opinions of him on cross-

22    examination?

23         MR. VEEDER:  Your Honor, I think these studies, studies

24    1, 2 and 3, are predicated upon his analysis of runoff, to

25    begin with, of the whole area.

1          THE COURT:  Downstream.

2          MR. VEEDER:  Yes.  But the Lord provided up above, and

3   that is where the water is coming from, and certainly the

4   whole question of hydrology has been opened up by this witness

5   by his statements in regard to runoff and his statements in

6   regard to the analysis and the studies that he has made in

7   connection with the availability of water for development

8   upstream.  They have offered these very broad and very ex-

9   tensive plates to which I have made reference.  If he is not

10  talking about Units 2 and 3, then what did he offer Exhibit AB

11  for-- if he is not talking about the whole question.  Moreover,

12  he has gone into the question of the availability of water now

13  that the Vail Dam is in operation.  He has gone into the

14  availability of water out of the Murrieta.  He has gone into

15  the question of the availability of water throughout the

16  whole area.  Indeed, his Study No. 2 envisions the complete

17  cutoff of all water above the confluence of the two streams.

18  In addition, he gave an estimate of the quantity of water that

19  could be anticipated would spill over Vail Dam, assuming that

20  we got some water in it at some time.

21         THE COURT:  Overruled.

22         MR. VEEDER:  Would you read the question, Mr. Reporter.

23         THE COURT:  Your reference to Study No. 2 doesn't help

24  us, because in Study No. 2 he clipped it off at the confluence

25  of the Temecula and Murrieta.  He was not taking into account

1   any water in Study No. 2 coming from above. But the Studies

2   1 and 3-- I think I have the numbers right-- did contemplate

3   water from above.

4       MR. VEEDER:  That is right;

5       THE COURT:  Go ahead.

6       (The Reporter read the pending question.)

7       THE WITNESS:  I would like to ask a question.  Is this

8   question now specifically in line with these studies?  Do I

9   understand this question to be--

10       MR. VEEDER:  I am just asking you the general question.

11   I don't want you to be limiting it.

12       THE COURT:  In answering the question, Mr. Illingworth,

13   my ruling was based in part upon these studies, but that

14   doesn't mean that your answer is.

15       THE WITNESS:  I see.

16       THE COURT:  There is a difference between the Court's

17   ruling and your answer.  You are asked the general question

18   now as to whether you can pinpoint certain wells the pumping

19   of which would have an effect upon the surface runoff of

20   Temecula Creek.

21       MR. VEEDER:  In the hydrologic units,--

22       THE WITNESS:  Without reference to some detailed study,

23   I can't.  I can show you--

24       MR. VEEDER:  Will you get us that detailed data?

25       MR. SACHSE:  Let him finish his answer, Mr. Veeder.

1          THE COURT:  Yes, let him finish the answer.

2          THE WITNESS:  I can tell you in general where such

3     wells would be.  For instance, the wells up in the areas

4     primarily composed of basement complex, there would be, in my

5     opinion, a negligible effect on stream flow.

6          MR. VEEDER:  Now this is not responsive to the ques-

7     tion, your Honor.

8          THE COURT:  Overruled, Mr. Veeder.  After he finishes

9     you may move to strike.

10          Go ahead.  You say in the case of wells in the basement

11     complex there would be negligible effect?

12          THE WITNESS:  Yes, sir.  Now, for a well located in a

13     ground water basin that straddled Temecula Creek, such as

14     Aguanga Basin, a well located in the lower reaches of such a

15     basin would probably have some effect on the stream.  Whether

16     it would have an effect for many miles downstream or even

17     for anything more than the reach immediately downstream from

18     that basin, I don't know at this time.  But it would have an

19     effect on stream flow in some location along the stream.

20     BY MR. VEEDER:

21          Q  Would you designate those wells for us in a list

22     and just give us the number, so that we can locate them?

23          THE COURT:  Would you include in your answer all wells

24     that had been drilled in the areas of younger alluvium that

25     you have shown on your geologic map?

1          THE WITNESS:   I would say that that is probably right.

2     There may be an exception, but generally speaking I would say

3     that 95% of the wells would be in the younger alluvium.

4          THE COURT:   There might be some exception that would

5     not.

6          Might there be some of the wells in the older alluvium

7     that would also affect the stream flow?

8          THE WITNESS:   In Units 2 and 3?

9          THE WITNESS:   Yes.

10         THE WITNESS:   I am not sure I recall where the older

11    alluvium is up there.   Well, there is some, I guess.

12         MR. MOSKOVITZ:   Are you referring to Plate 13B?

13         MR. VEEDER:   I have Plate 13B up so he can see it.

14         MR. MOSKOVITZ:   That is Plate 9B.

15         MR. VEEDER:   This is Plate 9B, and this is plate 13B.

16         MR. SACHSE:   Do you want Exhibit 15?

17         MR. MOSKOVITZ:   Whichever the witness wants to refer to.

18    Plate 13B is the one in his study.

19         MR. VEEDER:   Here is Plate 13B right here, if you want

20    it.

21         THE WITNESS:   I have it.

22         This would probably be true, or possibly be true in

23    areas of older alluvium in hydrographic Units 2 and 3.   But

24    observation of Plate 13B indicates that such geologic materials

25    are not extensive in those units.

1        Q   You will make us a list, though, of the wells to

2   which you have made reference?

3        THE COURT:   Now just a minute.   I have before me Plate

4   9B, and if you will look over here, Mr. Illingworth-- it is the

5   same plate that is on the board.

6        THE WITNESS:   Yes, sir.

7        THE COURT:   And here the areas of younger alluvium are

8   shown in yellow?

9        THE WITNESS:   Yes.

10       THE COURT:   And the older continental material is shown

11   in purple, is it not?

12       THE WITNESS:   The purple is not necessarily areas of

13   older alluvium.

14       MR. VEEDER:   It could be residuum.

15       THE WITNESS:   They are areas of an intermediate water-

16   bearing characteristic.

17       THE COURT:   I have a note that somebody testified

18   along the line that residuum was not included in the purple

19   areas.

20       MR. VEEDER:   Maybe that is the case.   I think the legend

21   shows that it is.

22       MR. MOSKOVITZ:   No.   I think his Honor is right.

23       THE COURT:   The legend shows "Low permeability older

24   alluvium of Upper Pleistocene sediments minor ground water

25   yield."

1          Well, isn't that purple area generally the same as the

2     older continental deposits?

3          THE WITNESS:  Yes, it is.

4          THE COURT:  Well, now, the wells are shown on this

5     exhibit and take-- What is the name of this valley here?

6          THE WITNESS:  Oakgrove.

7          THE COURT:  Take Oakgrove.  Most of the wells are

8     within the area of the younger alluvium?

9          THE WITNESS:  That is correct.  That includes many dry

10    holes, incidentally.  They are all located there as the same

11    kind of dot on this map, whether they are active or just a

12    test hole.

13         THE COURT:  When you get down to Radec there are

14    numerous wells there shown in the older continental material?

15         THE WITNESS:  Yes.

16         THE COURT:  Would the pumping of those wells affect

17    stream flow?

18         THE WITNESS:  It is conceivable that they could.  But

19    they are very small wells for the most part-- that is, they have

20    small yields.

21         MR. VEEDER:  Your Honor, this is all going into the

22    record now.  I view it this way, that this witness is seeking

23    to protect himself and the reports of the State by these

24    little offside speeches that he makes.

25         THE COURT:  What do you mean, offside speeches?  He is

1   answering questions that I ask him.

2        MR. VEEDER:  He invariably goes far beyond the question.

3   I just want the record to show an objection to it.

4        MR. MOSKOVITZ:  Mr. Veeder has asked questions to raise

5   this issue, your Honor.

6        THE COURT:  You have asked very broad questions about

7   pumping of what wells would affect the stream flow in the

8   Temecula.  I am wondering whether or not we can save time by

9   taking some exhibit that has been prepared.  The witness has

10  now indicated that in the case of most of the wells in the

11  younger alluvium pumping would affect stream flow.  In the

12  Radec area most of these wells are shown in the older material.

13  He has indicated that they might, but that they are relatively

14  small wells.

15       Now, back to your request, how big a job would it be

16  to tell us which wells do not affect stream flow units?

17       THE WITNESS:  I could list everything that is shown on

18  here in the brown area as being not affected.

19       MR. VEEDER:  When you say the brown area--

20       THE WITNESS:  The area called generally impermeable on

21  Plate 9B.  I could list such wells.  I would point out, how-

22  ever, that this is not an up-to-date list.

23       MR. MOSKOVITZ:  Those in brown would do what?

24       THE WITNESS:  Would not affect the stream.

25       MR. VEEDER:  I have asked the question, and you said

1  there were wells which probably would.   "Probably" is good

2  enough to me.

3       THE COURT:  Not in the brown.  The brown area is the

4  basement complex area he is talking about now.

5       MR. VEEDER:  That is right, and all I am asking is very

6  simply which are the wells which probably affect the surface

7  runoff of the Temecula Creek, and I would like to have a list

8  of the wells which he thinks do-- the actual list.

9       THE COURT:  Talk it over at the recess.  Take a short

10 recess.

11      (Recess.)

12      MR. VEEDER:  Your Honor, I will have no further ques-

13 tions along that line, depending upon--

14      THE COURT:  All right.

15      Mr. Illingworth, the State of California entered this

16 case to be helpful, as it were, to the Court-- pro patria, et

17 cetera.  So here is a chance to be helpful.

18      Your Plate 9B shows the hydrographic Units 2 and 3?

19      THE WITNESS:  Yes, sir.

20      THE COURT:  Here is what I would suggest that you do:

21 First of all, on the brown colored area, which is marked

22 "Generally impermeable," which is most of the basement complex,

23 we start with the premise that those wells do not affect the

24 flow the stream, and all you will do will be to list such

25 wells that appear in the brown area that you think do have some

1    effect on the flow of the stream.

2          THE WITNESS:  Those in the brown area that do have

3    some effect?

4          THE COURT:  I understood your testimony to be that

5    most of the wells in the brown area do not; is that right?

6          THE WITNESS:  That is right.  Although I don't believe

7    I would be able at this point, without making further in-

8    vestigations, to single out the few wells that might.

9          THE COURT:  If you can't, then say so.  But if you do

10   know of any well that does, indicate it.

11         Now, as to the yellow area we will take the reverse

12   position.  We assume, from what you have said, that there are

13   wells in the younger alluvium, the pumping of which will

14   affect the flow of the stream, and if you know of any excep-

15   tions list them.

16         THE WITNESS:  Yes, sir.

17         THE COURT:  That leaves then the purple colored area,

18   the older alluvium, and to the extent that you can I would

19   like to have you list the wells there that do affect the flow

20   of the stream.  There are not so many of those.  They are

21   largely in the Radec Valley.

22         THE WITNESS:  Will it be sufficient if I confine my

23   efforts to the data that was gathered as of this time?

24         THE COURT:  As of this time.  I don't expect you to go

25   out and make some further investigation.

1      THE WITNESS:  Yes, sir.  This is 1953.

2      MR. VEEDER:  As of today; not as of 1953, but as of

3  today.

4      THE COURT:  As of the information you now have.

5      THE WITNESS:  Yes, sir, which is as of 1953.

6      THE COURT:  You don't have anything on this from 1953

7  down to the present?

8      THE WITNESS:  None other than just one or two wells

9  that we noticed on our field trip and a previous trip that I

10  had made.

11      THE COURT:  It will be as of 1953, unless you indicate

12  otherwise.

13      THE WITNESS:  Yes, sir.  All right.

14      THE COURT:  And I suggest that you have it in writing

15  and give all counsel a copy of it.

16      THE WITNESS:  Yes, sir.

17      THE COURT:  Now are you through with cross-examination?

18      MR. VEEDER:  No, your Honor.

19      THE COURT:  Or are you through with this subject matter?

20      MR. VEEDER:  I have just gone once over very lightly

21  on that topic, your Honor.

22      THE COURT:  All right, I just wanted to inquire.

23  BY MR. VEEDER:

24      Q  Now, alluding to Study No. 1, which is California's

25  Exhibit AH, do you have that before you, Mr. Illingworth?

1        A  Just a moment, I will get it.  (Witness stepping

2   down).  I have it before me.

3        Q  How did you arrive at the figure 8,600 acre-feet as

4   depicted on California's Exhibit AH as a safe seasonal yield?

5        THE COURT:  He already answered it, but if you don't

6   remember it he can answer it again.

7        MR. VEEDER:  I just want to see if he will repeat what

8   he said to your Honor.

9        THE WITNESS:  This will take about half an hour.

10       MR. VEEDER:  Why don't you just generally state it.

11       THE COURT:  Just generally.

12       THE WITNESS:  First off, we determined the stream flow

13   of the Santa Margarita River near Fallbrook for the periods

14   of time indicated in the left-hand column marked "Period."  We

15   added to that the runoff from Areas B and C, either measured

16   or estimated-- B and C being the areas indicated on California's

17   Exhibit AK.  The sum total of flow in Santa Margarita River

18   near Fallbrook, plus the runoff from areas B and C was

19   designated "Total runoff at De Luz dam site."  From this total

20   then, making a study of the percolation that would take place,

21   the study being made on a daily basis and summarized by the

22   periods indicated on Exhibit AH, we have the "Total quantity

23   available for percolation" listed under the column so designated.

24   BY MR. VEEDER:

25       Q  It is not, however, reflective of the actual

9051

1    situation which prevails from the standpoint of the present

2    use of water by the Marines; is that right?

3        A  I believe it is reflective of the actual situation.

4    The only manner--

5        Q  The actual situation--

6        MR. MOSKOVITZ:  Let him finish, Mr. Veeder.

7        MR. VEEDER:  No, no, now.

8        THE COURT:  Let him finish, Mr. Veeder.

9        THE WITNESS:  The only manner in which this differs

10   from actual is that the study is to determine the amount of

11   water which could have been obtained from the ground water

12   basin had it been fully utilized throughout the period 1936-37

13   through 1957-58.

14       THE COURT:  Safely without bringing water levels down

15   below sea level; is that right?

16       THE WITNESS:  Yes, sir.

17       THE COURT:  And you started out, of course, with the

18   premise that the storage was zero at the beginning of the

19   period?

20       THE WITNESS:  Yes, sir, that is correct.

21       THE COURT:  That the basin was completely empty.  So

22   you had to put in 24,000 acre-feet to start with?

23       THE WITNESS:  That is right.

24       THE COURT:  Plus the additional demand of 3,883?

25       THE WITNESS:  3,883 in the period October to March

1   each year, and 4,747 for the period April-September each year.

2       THE COURT:  And you also worked this out on a period

3   beginning from 1936-37 down to 1957-58 and took a figure that

4   would bring you out even, as it were, at the end of the

5   period?

6       THE WITNESS:  Yes, sir.

7       THE COURT:  In other words, a complete utilization of

8   your storage basin at the end of 1957-58?

9       THE WITNESS:  Yes.

10      THE COURT:  So that in that period your basin would

11  again be empty?

12      THE WITNESS:  Yes, sir.

13      THE COURT:  And if, of course, you didn't get a wet

14  year, it wouldn't fill up?

15      THE WITNESS:  That is correct.  But it did more than

16  half fill in the spring rains of 1958.  It would have, under

17  these assumed conditions.

18      THE COURT:  All right, one thing more.  And that you

19  arrived at this figure as a sort of trial-error figure, the

20  one that starts at the beginning of this period and brings

21  you out even at the end?

22      THE WITNESS:  That is correct.

23  BY MR. VEEDER:

24      Q  You did not take into consideration the construction

25  of this proposed, this illusory dam of Fallbrook, did you?

1        A  No, sir.  It did not enter into these studies at all.

2        Q  You did not take into consideration the fact that

3    Col. Robertson testified that had the Marines been permitted

4    to proceed the actual uses of water by the Marines would have

5    been 13,900 acre-feet a year, did you?

6        A  This is not one of the assumptions of the study.

7        Q  Nor did you take into consideration the testimony

8    by Col. Bowen in regard to the quantities of water utilized

9    in the maintenance of a vegetative cover on the surface of

10   the ground water basins to which your study pertains?

11       A  Yes, that was taken into account.

12       Q  How much water in the period of 1956-57 did you

13   consider was utilized by the vegetative cover from the ground

14   water basin?

15       A  As pointed out in the direct testimony, we did not

16   make specific calculations of what this use by the native

17   vegetation would be throughout this period of analysis.  Nor

18   did we specifically calculate for each year what the runoff

19   from Area D, as shown on Exhibit AK--

20       MR. VEEDER:  I object to this, your Honor; he is going

21   beyond the question.

22       THE COURT:  Overruled.

23       Complete your answer, Mr. Illingworth.

24       THE WITNESS:  The Area D runoff was not included as an

25   item of supply in Study No. 1.  Nor was the depletion by use

1    of native vegetation overlying the basin considered, that is,

2    accounted for separately year by year.

3         THE COURT:   What did you do?   Just equate the two?

4    You just said, here is area 2.   We didn't take into account

5    water that would run into that area or fall in that area, and

6    therefore we will consider it the equivalent of water for the

7    vegetative cover?   Or did you have some computations that

8    indicated that they were about equivalent?

9         THE WITNESS:   We made some calculations that led me to

10   believe that the runoff from Area D would be more than

11   adequate to take care of the uses by native vegetation.

12   BY MR. VEEDER:

13        Q   Would you produce those studies, please?

14        A   I will find what I can.

15        Q   Would you bring them in when you bring in your

16   data in regard to the list to which you made reference earlier?

17        A   Yes.

18        Q   Now, Col. Bowen has testified that the vegetative

19   cover would utilize approximately 5,200 acre-feet a year.

20   Were you acquainted with that testimony?

21       MR. MOSKOVITZ:   I object to that question, your Honor.

22   I don't think Col. Bowen testified that it would use that

23   much a year.   He said that in a particular year when the water

24   table was high that was the calculated figure.   But he testi-

25   fied that it would be less if the water table were lower.

1        MR. VEEDER:  I would refer you, your Honor to page 7687

2   of Volume 68.

3        THE COURT:  Read the testimony to me.

4        MR. VEEDER: (Reading)

5            "Q   Would you go ahead and state then

6        when you made the determination, then, Col.

7        Bowen, as to acreage?

8            "A   The determination as to the acreage

9        I have stated into the record was made in the

10       fall of 1958.

11           "Q   Would you proceed to state then the

12       quantity of water consumptively used from

13       the Santa Margarita River by the vegetative

14       cover of the area to which you have made

15       reference?

16           "A   About 5,200 acre-feet annually.

17           "Q   Now, Col. Bowen, have you considered

18       the question of the quantity of water . ."

19       That was the end of it.

20       MR. MOSKOVITZ:  Then, if you recall, your Honor, on

21   cross-examination that was brought out that that was calculated

22   as of the all-time high water table of that year.

23       THE COURT:  Well, he has testified there "annually."

24   It doesn't make any difference what he said on cross-examina-

25   tion.  Any part of his testimony may be used as a basis for a

9056

1   question to this witness.

2      MR. MOSKOVITZ:   I just think it is misleading if it is

3   assumed that he testified that each and every year, no matter

4   what the conditions of the water table, this amount of water

5   would be utilized by native vegetation.

6      THE COURT:   Overruled.

7      THE WITNESS:   My understanding of his testimony that

8   this was--

9      MR. VEEDER:   Just a moment.   Will you answer it yes or

10  no.

11     THE COURT:   What was the question.

12     MR. VEEDER:   I asked him if he took into consideration

13  the fact that Col. Bowen had testified that there would be

14  consumed 5,200 acre-feet annually.   And the answer is yes or

15  no.

16     THE COURT:   You may answer that whether you took that

17  into consideration in making your study.

18     THE WITNESS:   I will answer yes, that I considered this

19  testimony.

20  BY MR. VEEDER:

21     Q   Now, what would be the effect of lowering the water

22  table in the coastal basin to the depth assumed in the period

23  1957-58 upon the vegetative cover?

24     A   Lowering the water table would deprive the native

25  vegetation of the opportunity to obtain water from ground water,

9957

1    and it would thereby decrease the use by native vegetation,

2    including the phreatophytes, the use of which is generally

3    considered to be a waste.

4         Q  It would, would it not, destroy the perennial

5    vegetative cover upon the surface of the coastal basin?

6         A  I am not an agronomist, but I believe that it would

7    not destroy all types of vegetation.

8         THE COURT:  When you referred to something as being

9    "waste," you were referring to the phreatophytes and not to

10   the other vegetative cover, were you not?

11        THE WITNESS:  Yes, sir.

12        THE COURT:  You don't consider the growing of grass

13   wasteful?

14        THE WITNESS:  No, I don't think so.

15        THE COURT:  But phreatophytes that grow in these creek

16   beds, et cetera?

17        THE WITNESS:  Certainly the willows would be a wasteful

18   use of water.

19   BY MR. VEEDER:

20        Q  Now, would it be correct to state that any time that

21   the water table was drawn below the root zone of the perennial

22   grasses, that those perennial grasses which cover the coastal

23   basin would be destroyed?

24        A  By perennial grasses do you mean the grasses that

25   are used--

Q   Bermuda grass.

A   Are these the grasses that are used for grazing?

Q   Yes.

A   On the camp?

Q   Yes.

A   It is my recollection of the testimony by --

Q   Answer the question, please.  I will make it a hypothetical question, so you won't argue.

A   I will say no, I don't think they would be destroyed.

Q   How would they be maintained, then, if the water table was pulled below the root zone of the perennial grasses?

A   The grasses used for forage primarily receive their water supply from the rainfall, and they are green in the spring and they finally dry up during the latter part of the spring or early summer and they again return the next season and again are used for forage.  But it is the rainfall--

Q   I asked you about perennials now.  Do you know the difference between a perennial and an annual?

A   Give me a specific example.

MR. MOSKOVITZ:  I object to this as going far beyond the scope of the direct examination, your Honor.  He is not an agronomist.

THE COURT:  I don't know that this man was qualified as an expert in plants or grasses.

MR. VEEDER:  I will stipulate to that, your Honor.

1        THE COURT:   Then the objection is sustained.

2   BY MR. VEEDER:

3        Q   Now, in considering the effect of the draw-down,

4   did you take into consideration the increased cost to the

5   United States of America to pump the water from the greater

6   depths?

7        A   Yes, I did, and in this way--

8        Q   You have answered yes.  I have the next question.

9        MR. MOSKOVITZ:   Let him finish his answer.

10       THE COURT:   You may explain, Mr. Illingworth.

11       Personally, I can't see how he would take it into

12   account.  I am interested in knowing why he made a study of

13   the safe yield of this basin.  What has that got to do with the

14   cost of pumping?

15       MR. VEEDER:   I am going to move to strike this whole

16   thing, because I think it is an absurd Alice in Wonderland

17   approach.

18       THE COURT:   All right, go ahead, answer the question.

19       THE WITNESS:   Actually, the cost of pumping, your

20   Honor, is an important factor in determining how much of the

21   basin is usable.  In many areas in Southern California, at a

22   200-foot depth the pumping is not considered to be an ab-

23   normally great amount of pumping.  It is getting to the point

24   where it is expensive, but they go much deeper than that in

25   many places for agricultural uses, to say nothing of domestic

1    uses.   Therefore, I consider that when we set a limit of 100

2    feet only as the maximum drop of the ground water table which

3    would entail a pumping lift of somewhat greater than 100, that

4    we were taking into account this factor of economics, and we

5    considered well within the limit of a water user to pay for

6    the pumping of some 100-foot lift.

7         THE COURT:  All right.

8    BY MR. VEEDER:

9         Q  Now, from the standpoint of your chart, which is

10   Exhibit AO, Graphical Summary of Study 1--

11        MR. MOSKOVITZ:  May I have it revealed on the board--

12   it is under one of the other exhibits-- if you are going to

13   have cross-examination on it.

14        MR. VEEDER:  Yes.

15        MR. MOSKOVITZ:  Which plate are you referring to now,

16   Mr. Veeder-- which exhibit?

17        MR. VEEDER:  I am referring to Exhibit AO.

18        Q  From the period 1942 to 1946, as shown on Exhibit AO,

19   the basin appears to be relatively full, does it not?

20        A  (Stepping down.)  Yes.

21        Q  Then from the year 1947 through 1951 there was a

22   marked and virtually steady decline in the quantity of water

23   in the coastal basin; is that not correct?

24        A  There would have been under these conditions, yes.

25        Q  Well, we were talking about your assumptions now.

1      A   Yes.

2      Q   So it is true, is it not, that as the water table

3  declined the cost of pumping the water would increase?  Is

4  that not correct?

5      A   That is true.

6      Q   And when the water is greatly depleted the cost

7  would be greatly increased; is that not right?

8      A   It would be increased.  I don't know to what

9  proportion.  Actually, there is a considerable pumping lift

10  in addition to the pumping lift from the ground.  In the case

11  of Camp Pendleton much of the use is on the higher elevations

12  and the reservoirs are at some 400 feet.  So going from 400,

13  or say 430 to 500 is not a great percentage increase.  And

14  this must all be taken into account, not just the lift from the

15  water level up to the ground surface.

16      Q   So the system that is utilized becomes increasingly

17  costly as the ground water table is depleted?

18      A   It would be somewhat more costly, yes.

19      Q   Now, in your calculation did you consider the depth

20  that the water-bearing formations would be dewatered at the

21  low point shown in 1957-58 on your Exhibit AO?

22      A   Yes.

23      Q   How deep was that?  I am speaking of Chappo now.

24      A   Not more then 100 feet nor more than the depth to

25  sea level-- not below sea level, that is.

1      Q   Well, the water would be down 100 feet; is that

2   right?

3      THE COURT:   It depends on the basin.   It wouldn't be a

4   hundred feet at Ysidora.

5      MR. VEEDER:   I am talking about Chappo Basin, your

6   Honor.   That was the question.

7      THE COURT:   I didn't understand that you were talking

8   about Chappo.

9      THE WITNESS:   It would not quite achieve a depth of 100

10  feet, as indicated on cross-section Plaintiff's Exhibit 38B.

11  But it would never be below sea level.

12  BY MR. VEEDER:

13     Q   Now, assuming that there was a continued drouth of

14  the character that we have had and as depicted on your chart,

15  continued use of the basin would reduce even more the level

16  of the water table; isn't that right?

17     A   That is right.   If nature had provided dryer years

18  after this time, it would have gone down farther.   But the fact

19  is that it didn't.

20     Q   We are not talking about the fact, are we, in regard

21  to your charts here?   This is purely assumption, isn't it?

22     A   No, sir.   It is actual fact as regards water

23  supply.   The only difference between this and fact is that we

24  assume that the ground water basin would have been drawn down

25  to a greater extent than it actually was.

1    Q  As a matter of fact, if there was not a recharge the

2  situation would have, for a period of, say, three to four

3  years, the situation would have been this, would it not, that

4  salt water intrusion would have actually entered Chappo

5  Subbasin?  Isn't that right?

6    A  No. Had the years been dryer, our calculations would

7  have indicated that less than 8,600 acre-feet could have been

8  taken out each year and we still would not have gone below

9  sea level.  We would not have gone below zero water in storage

10  at any time.

11    Q  Had we actually used the demands of the Marines if

12  they had been permitted to go ahead and utilize that 13,900

13  acre-feet, your calculations would show that the basin would

14  have been dewatered very much sooner; is that not correct?

15    MR. MOSKOVITZ:  Are you talking about the gross pumpage

16  or net use-- that is, pumpage minus sewage?

17    MR. VEEDER:  I am talking about gross pumpage.

18    Let me rephrase that.

19    Q  Had you utilized 10,000 rather than 8,600, your

20  depletion would have been more rapid; is that not correct?

21    A  Yes.  Our calculations indicate that 8,600 is the

22  limit you could take out without drawing it below the stated

23  limit.

24    Q  Did you take into consideration the diversions for

25  Lake O'Neill when you made that calculation?

A   No.   As I indicated in the direct testimony, 8,600 would have to supply the 400 acre-feet, too.

Q   Which 400 acre-feet?

A   That is the 400 acre-feet of evaporation from Lake O'Neill.

Q   According to the United States of America, 400 acre-feet of water for Lake O'Neill?

A   Yes, sir.   That is what I consider the beneficial use of that fixture to be each year.

Q   What do you consider the fixture to be utilized for?

A   The lake?

Q   Yes.

A   It is a recreational lake, it is an item of beauty, it is a--

Q   Did you take into consideration the military use?

A   Yes, such uses as the use for training crews in construction of pontoon bridges and that sort of thing.   Is that what you mean?

Q   Yes.

A   So far as I know, this does not use water.   It simply makes use of the fact that the lake is there.   But there is no consumptive use from that type of use.

THE COURT:   What was your figure?   400 acre-feet, the amount of evaporation a year?

THE WITNESS:   Yes.

1    THE COURT:  So that if Lake O'Neill were used merely

2    for military maneuvers water would not be used up, except

3    in so far as it evaporated?

4    THE WITNESS:  Yes, sir.

5    THE COURT:  Therefore, from that standpoint, you said

6    that 400 acre-feet was the amount necessary to maintain the

7    lake?

8    THE WITNESS:  Yes, sir.

9    THE COURT:  You didn't take into account any diversions

10   for the purpose of irrigation out of the lake?

11   THE WITNESS:  No.  It was my impression that water

12   was not taken out for the purposes of irrigation.

13   BY MR. VEEDER:

14   Q  Did you take into consideration any losses from

15   seepage?

16   A  Yes.

17   Q  How much?

18   A  No specific amount.  But any amount of water that

19   would seep into the basin would have the same effect as

20   sewage water discharged out onto the basin.  It would go back

21   as a recharge to the ground water basin.

22   Q  Now, assuming that the United States of America

23   diverted out of the watershed approximately 3,000 acre-feet

24   of water a year, none of which returned to the watershed, would

25   that have an effect upon your study number 1?

1   A No. 8,600 less 400 or 8,200 acre-feet of water

2 could actually have been pumped over the hill or to the ocean

3 or taken away in tank cars or in any other way taken from the

4 watershed, and this is the amount you could have gotten out

5 each year without going below the sea level line in 1957.

6   Q Now, assuming that the Fallbrook Public Utility

7 District diverted out of the watershed or diverted above Camp

8 Pendleton 5,100 acre feet of water annually, what effect would

9 that have upon your calculation in Study No. 1?

10   MR. MOSKOVITZ: Just a moment. I want to be sure I

11 understand this question. When you say "diverted annually"

12 do you mean from natural stream flow or in connection with the

13 storage project? I think it makes a big difference.

14   THE COURT: He is talking about Study No. 1.

15   Aren't you?

16   MR. VEEDER: That is right.

17   THE COURT: According to Study No. 1, under actual

18 conditions, there is no storage up there. So it would have

19 to be diverted from stream flow to make sense.

20   MR. VEEDER: That is right, your Honor.

21   THE COURT: You do mean by direct diversion, then?

22   MR. VEEDER: Yes.

23   THE WITNESS: I am not certain that they could have

24 gotten that much water each year. Some of those years were

25 pretty dry. But had they taken it out, it would have depleted

the stream flow in the same manner that their actual diversions
did deplete the flow-- the actual diversions that were made.
BY MR. VEEDER:

Q   What do you mean by the same manner?

A   If you took a hundred acre-feet out of the stream
in a given year, that is a hundred acre-feet less that would
have gone down the stream in that particular year.  It may be
that that 100 acre-feet had been taken at such time as there
would have been waste to the ocean.

Q   Will you answer the question, which was in regard to
5100 acre-feet?

THE COURT:  Let him finish his answer.

THE WITNESS:  This is part of the question.

So that in this situation that I have just cited the
taking of 100 acre-feet would make no difference.  In another
year, say it occurred during the period from 1947 through
1951 when the ground water basins were dropping, the taking
of a hundred acre-feet would have depleted the downstream
supply by that amount.  If that were increased from 100 to 5100,
that would have decreased the use.  Now, in order to determine
the long-time effect, the average effect, or even the effect
by individual years, one would have to make a study of those.
I can't say.  But you would have the two extreme situations:
One in which it makes no difference, and one in which it makes
some difference.

3068

BY MR. VEEDER:

Q   Let's take a look here.  We start downhill--

MR. MOSKOVITZ:  Are you looking at Study No. 2 now?

MR. VEEDER:  Study No. 1.  It doesn't make any differ-
ence.

Q   We are looking at a line between 1948 and 1949 over
to 1951.  Now, assuming that the Fallbrook Public Utility
District diverted 1800 acre-feet of water each year, would
that have made a difference in your calculations in regard to
the availability of the 8,600 acre-feet of water annually?

A   I would say it would have made a difference, yes.

THE COURT:  Let me inquire. I thought you picked up
on Study No. 1 a total of the available water at the De Luz
dam site.

THE WITNESS:  Yes, sir, we did.

THE COURT:  Isn't that downstream from Fallbrook?

THE WITNESS:  Yes.

THE COURT:  Then if Fallbrook had been diverting 1,800
acre-feet a year above De Luz, that is then already reflected in
your study, is it not?

THE WITNESS:  If they had been taking it, yes.

THE COURT:  The 1,800 acre-feet, as I get it, is the
figure based upon the $2\frac{1}{2}$ second-feet?

MR. SACHSE:  If we had taken $2\frac{1}{2}$ second-feet, your Honor.
But as Fallbrook's Exhibit L, I think, discloses, your Honor,

1   we have never quite made 2½ second-feet.  That is what the

2   hesitation is.  We have never actually taken 2½ second-feet.

3   We have taken varying amounts less than that.

4          THE WITNESS:  This study reflects what they actually

5   did take, your Honor.

6          THE COURT:  I see.

7   BY MR. VEEDER:

8          Q  Now, assuming that you had a structure above Camp

9   Pendleton at the Fallbrook Lippincott site and 5,100 acre-

10  feet of water was taken out of storage each year, what in your

11  opinion would be the effect upon your study as disclosed in

12  Study No. 1?

13         A  I can't give you a specific answer, but the effect

14  could be as low as zero.

15         Q  And could be as high as what?

16         A  Well, if the storage in this hypothetical reservoir

17  were zero that you are speaking of, it would be something less

18  than 5,100 acre-feet, but it would probably approach that

19  figure.  Again I say that actual studies indicate what can

20  happen, and I can't sit here and tell you the exact answers.

21         Q  So as a matter of fact, this study is not reflective

22  at all of what would transpire should the Fallbrook Public

23  Utility District put in a dam and pumped from the dam or the

24  reservoir created by the dam a total of 5,100 acre-feet of

25  water annually?

1     MR. SACHSE:  Just a moment.  Will you identify this

2  study?  You have three of them there.

3     MR. VEEDER:  Study No. 1.

4     MR. SACHSE:  All right.

5     THE WITNESS:  No.  As I previously stated, this study

6  has nothing to do with such a reservoir.

7     THE COURT:  By the same token, had Fallbrook Public

8  Utility District had a 30,000 acre-foot dam in 1936 it could

9  have been filled up with flood waters that year?

10     THE WITNESS:  Yes, sir.  That is why I say it might have

11  no effect at all.

12     THE COURT:  You could make a study from 1936 on down

13  showing what would have happened had the dam been in existence?

14     THE WITNESS:  Yes, sir, we could have made a study.

15  This is not such a study, however.

16     THE COURT:  Then you would have had theproblem of

17  trying to make it come out even again at the end of 1957-58

18  and by trial and error figure what amount of acre-feet could

19  have been used from that reservoir and still let the supply

20  stretch over the full period?

21     THE WITNESS:  Yes, sir.  It would be done in a manner

22  very similar to this study.

23  BY MR. VEEDER:

24     Q  Now, it would be your opinion, then, that during this

25  period from 1948 to 1951 the diversion and use above the Naval

1    enclave of 5,100 acre-feet by the Fallbrook Public Utility

2    District would greatly accelerate the reduction of the water

3    table in the coastal basin; isn't that correct?

4         A   No.   On the other hand,--

5         THE COURT:   It depends on when the water was taken out,

6    to me.   If it were flood water that went to the ocean, it

7    would have no effect on your chart.

8         Take a recess until a quarter of 2.

9         I will call your attention again to my classic ex-

10   pression.   If this cross-examination is for my benefit, please

11   go faster.   But if it is for the Circuit's, take all the time

12   you want.

13        MR. VEEDER:   It is for the Circuit, your Honor, you may

14   rest assured.

15        THE COURT:   All right.

16        (Noon recess.)

17

18

19

20

21

22

23

24

25

SAN DIEGO, CALIFORNIA, WEDNESDAY, FEBRUARY 25, 1959.  1:45 P.M.


THE COURT:  Proceed.


LELAND ILLINGWORTH,

recalled as a witness in behalf of the defendant State of

California, having been previously sworn, testified further

as follows:


CROSS-EXAMINATION (Resumed)

BY MR. VEEDER:

Q  Now, as I understand, these studies that you have

made-- studies No. 1, 2 and 3-- would vary, of course,

dependent upon the quantities of water utilized above Camp

Pendleton; is that correct?

A  That is correct.  That is the primary variation

between them.

Q  What do you mean by the primary variation between

them?

A  It is the primary variable between the three studies.

Q  In other words, if there were water utilized above

Camp Pendleton in Study No. 1 there would be a variant

between the 8,600 that you set out and the quantity of water

that was reduced which reached Camp Pendleton; is that right?

A  I don't believe I can answer that question.  But

9073

1   let me express what the variable is between the three studies.

2   It is water supply in each case.  As I mentioned previously,

3   this water supply can vary for two reasons:  (1) By nature;

4   and (2) By man-made uses.  Now in the three studies the effect

5   of nature has been exactly the same.  In other words, we have

6   taken the same periods of years for the analysis.  But man's

7   use upstream has assumed to be different in the three cases.

8   In Study No. 1 we have taken the actual flow that occurred

9   upstream from De Luz dam site or the actual flow that occurred

10   at De Luz dam site.  This takes into account automatically

11   all of the uses that had been made by man of this water

12   supply upstream from that point throughout the period of years

13   1936-37 through 1957-58.  Now Study No. 2, on the other hand,

14   corrects the records of stream flow to account for present

15   conditions.  It assumes that the actual stream flow that

16   occurred--

17        MR. MOSKOVITZ:  What study was that?

18        THE WITNESS:  Study No. 2.

19        MR. MOSKOVITZ:  You have the wrong one.

20        THE COURT:  No, Study No. 2, I thought you said, assumed

21   the runoff only below the intersection of the Temecula and the

22   Murrieta.

23        THE WITNESS:  Well, I hadn't finished yet.  Actually,

24   Studies 2 and 3 are similar as regards the water supply, with

25   the exception that in one case we have ignored completely all

9074

1    of the water coming down from the upper watershed past the

2    stream gaging station Santa Margarita River near Temecula.

3          THE COURT:   That is Study 2?

4          THE WITNESS:   Yes, sir.   And in Study 3 we have assumed

5    that the water supply reaching De Luz dam site reflects all

6    present uses and assumes that water supply would have occurred

7    as it did in the past years, with the exception that the

8    present uses are assumed to have existed throughout.   As an

9    example, it is assumed that Vail Dam had been in operation

10   throughout the period of study, not simply from 1948 on as

11   actually occurred.

12   BY MR. VEEDER:

13         Q   Now, as a matter of fact, there is another very

14   important kind and type of study which would have been more

15   helpful to the Court, would it not, if you had made a study

16   as to the quantity of water which would have reached Camp

17   Pendleton if there had been the dam constructed by the Fallbrook

18   Public Utility District?

19         MR. MOSKOVITZ:   I object to that question, your Honor.

20         THE COURT:   Sustained on the grounds of the reference

21   to "more helpful to the Court", et cetera.

22         MR. VEEDER:   I withdraw the reference "helpful to the

23   Court."

24         THE COURT:   What is the number of this plate that you

25   have on the wall?

9075

MR. VEEDER:  The number of that plate on the wall is 23, your Honor.  It is a "Tree."  It is occurrence and disposition of mean seasonal runoff at Santa Margarita under present conditions of development in 1953.

THE COURT:  Having objected strenuously to all matters in this Bulletin earlier, you now want to use this plate, I suppose.  Go ahead.  Inconsistency has its virtues.

MR. VEEDER:  I think it is quite consistent.

Q  When you made your study depicted on Plate 23, to which I am making reference, you took into consideration a great many factors that you did not take into consideration, isn't that correct, in making your Studies 1, 2 and 3?

A  No.  I don't know that that is true.  Oh, it does have some additional items on it, but they are not in addition to those taken into consideration.

Q  Are they not very materially different than the ones that you set forth in your Studies 1, 2 and 3-- for example, the quantity of water diverted by the Fallbrook Public Utility District?

A  That does differ, as I mentioned previously.  The present uses, that is, present as of 1953, as depicted on Plate 23 are as of 1953 when the average diversions by the Fallbrook Public Utility District were about 1,200 acre-feet per year.  In the studies 1, 2 and 3, California's Exhibits AH, AI and AJ-- correction-- California's Exhibits AI and AJ

9076

only, the diversions by Fallbrook Public Utility District under present 1958 conditions were estimated to be 1,400 acre-feet rather than the 1,200 indicated there.

Q  Didn't you also take into consideration in this study on Plate 23 a materially different quantity of water for the Vail Dam and Reservoir than you did in Studies 1, 2 and 3?

A  No, I don't believe so.

Q  How much water did you calculate in your study for the Vail Reservoir, for example, in Study No. 3?

A  We took these matters into account in a different way in Study 3 than we did in Plate 23, but they were still taken into account, and I actually haven't made a strict comparison between the two.  So I can't tell you.  I guess what you are asking me is, what is the average flow out of Temecula Creek assumed for these studies.

Q  Yes.

A  Taking Study No. 1, it was not necessary separately to distinguish the flow out of Temecula Creek because we used the flow at Fallbrook, which includes not only Temecula Creek water but Murrieta Creek water and includes the runoff from Area A on California's Exhibit AK.  Now, study--

Q  May I ask a question right there.

MR. MOSKOVITZ:  How about letting him finish?

MR. VEEDER:  All right, go ahead and finish your answer.

9977

THE WITNESS:  In Study 2 it was not necessary to take into account the runoff from Temecula Creek because it was assumed to be zero along with that from Murrieta Creek.  In Study 3 we again have the flow at Fallbrook, which now we adjusted for operation of Vail Dam prior to 1948, and this was done in the same manner in the studies leading to Plate 23 as it was in Study 3.

THE COURT:  In adjusting for Vail Dam, what did you do? Let Vail Dam fill up in some of the wet years after 1936-37 and then take the use out of Vail Dam and the spill over and that sort of thing?  Is that the way you made the adjustment?

THE WITNESS:  Not exactly.  We studied the daily records, and on days when we thought the flow was sufficiently high to have come on down and affected the stream flow at Fallbrook gage then we subtracted something from the Fallbrook gage.  On days, for instance during the summer when the only flow reaching Santa Margarita River near Temecula would have been rising water out of Pauba Basin, it was assumed that that rising water would have been there whether the dam had been built or not, and to the extent that the flow at Fallbrook reflected rising water out of Temecula Creek, out of Pauba Valley, that this flow would not require correction.  So it was a daily analysis of the stream flow records.  Generally speaking, we did not adjust the low flow records, and we did adjust radically the high flow records.  We assumed that all the

9978

1    high flows would be stopped at the Vail Dam.

2    BY MR. VEEDER:

3        Q  Have you assumed in your calculations a full opera-

4    tion-- I want to be sure I understand.  Have you calculated

5    that the Vail Dam would stop all of the high runoffs of

6    Temecula Creek, in making your calculations in your Study No.

7    2-- would stop everything?

8        A  In Study No. 2 there was no flow passing.

9        Q  None at all?

10       A  Not only out of Temecula Creek, but none out of

11   Murrieta Creek either.

12       Q  Did you make your calculations in your Study No. 3

13   that there be no high flow at all coming down from the Vail

14   Dam?

15       A  That is correct.  No high flows would pass Vail Dam.

16       Q  And what about the low flows?

17       A  To the extent that the low flow out of Temecula

18   Creek consisted of rising water entirely, no correction was

19   made of the measurement at Fallbrook.

20       Q  How would you determine rising water entirely?

21       A  We made a study of the flow coming out of Pauba

22   Valley and we were able to determine how much of that actually

23   consisted of rising water and how much was flood water.

24       Q  And you assumed then that that condition would

25   continue to prevail; is that right?

9979

1    A   What condition now, specifically?

2    Q   The rising water coming out of the Pauba Valley and

3    coming on down to the enclave; is that right?

4    A   Yes.   One of the assumptions of the study was that

5    the ground water level in Pauba Valley over a period of years

6    would fluctuate in the same manner that it has fluctuated in

7    the past.

8    Q   But that the Vail Company would not increase its

9    uses over and above what it has used in the past?

10   A   No,  I believe that some increase in use would be

11   possible by virtue of the fact that the reservoir is storing

12   water that would otherwise waste to the ocean, but that the

13   ground water levels in Pauba Valley would over a period of

14   years fluctuate in the same manner and through the same range

15   as they have in the past.   The additional consumptive use of

16   water would have been made by virtue of the fact that Vail

17   Reservoir was storing water which otherwise would have gone

18   to the ocean.

19   Q   Now, you are calculating then on that basis that

20   as against the downstream riparian the Vail Company would have

21   the right to impound all of the surface runoff reaching the

22   Vail Reservoir; is that right?

23   A   This study has nothing to do with the rights.  I

24   made certain assumptions as to what could occur.   And a further

25   factor was that I feel that there would be some waste--

correction-- some spill from Vail Reservoir during this period

of analysis, but I did not calculate what it would be.

Q   You don't know how much spill?

A   I did not calculate it.  Whatever it would be, it

would add to the waste to the ocean, as shown in these studies.

Q   And you are stating then that you didn't take into

consideration the fact that a riparian owner might be in a

position to demand the release of that impounded water down

to, for example, Camp Pendleton?

MR. STAHLMAN:  Just a minute.  Go ahead.

THE WITNESS:  I didn't consider that they would have

a right to do this.  Under the assumptions of the study as

stated, they would not enter into what they did or did not

have a right to do.

Q   All right.  And that would be your same premise in

regard to all the rights on the Murrieta; is that right?

MR. STAHLMAN:  That becomes complicated.  It calls

for a conclusion.

MR. MOSKOVITZ:  I object to that on the same ground,

your Honor.

THE COURT:  Sustained.

BY MR. VEEDER:

Q   In other words, if there were further development

upstream, your calculations in connection with Study No. 3

would be subject to change; isn't that right?

1    MR. MOSKOVITZ:  Upstream from what place?

2    MR. VEEDER:  We will say upstream from the confluence

3    of the Murrieta and the Temecula.

4    THE COURT:  Answer the question.

5    THE WITNESS:  To the extent there was increased use up

6    there, it possibly could affect the downstream flow.

7    BY MR. VEEDER:

8    Q  And that would be true, of course--

9    THE COURT:  How would that be true of Study 3?  Pardon

10   me.  Study No. 2 is the one you took from the gorge on down,

11   wasn't it?

12   THE WITNESS:  Yes.

13   THE COURT:  In Study No. 3 you assumed that Vail

14   Reservoir was in place during the entire study?

15   THE WITNESS:  Yes, sir.

16   THE COURT:  I would like to ask a question to get the

17   position of counsel on it-- on these two permits.

18   The permit for Vail Dam granted to the Vail Estate can

19   ripen into a license to the extent that Vail impounds water

20   behind that dam.  You are all agreed on that.

21   MR. MOSKOVITZ:  Impounds it and puts it to beneficial

22   use.

23   MR. SACHSE:  Impounds it and puts it to beneficial use.

24   MR. STAHLMAN:  Yes.

25   THE COURT:  And that license that results cannot impinge

9082

1    upon riparian rights downstream.

2         MR. SACHSE:  That is correct.

3         MR. STAHLMAN:  It cannot.

4         THE COURT:  Now the same is true, then, as to Fall-

5    brook's permit to take this 2½ second feet.

6         MR. SACHSE:  That is a license now.  But it still

7    cannot impinge--

8         THE COURT:  As a license it cannot impinge on riparian

9    rights downstream.

10        MR. SACHSE:  That is right, your Honor.

11        THE COURT:  Riparian rights downstream are still ahead

12   of that license.

13        MR. SACHSE:  That is correct.

14        THE COURT:  All right.

15   BY MR. VEEDER:

16        Q   Now, in making your studies for Plate 21B--

17        THE COURT:  Plate 21B?

18        MR. VEEDER:  Yes; that is the soil survey.

19        Q   --did you take into consideration the acreage

20   actually irrigated in the area annexed into the Fallbrook

21   Public Utility District in 1958?

22        MR. SACHSE:  That is not Plate 21B, Mr. Veeder; it

23   would be 21A.

24        MR. MOSKOVITZ:  21A.

25        MR. VEEDER:  21A; that's right.

THE WITNESS:  With respect to Plate 21A, the lands that we surveyed for determination of land use, that is, the number of acres of irrigated land in 1953, are those that are shown in green on this plate and they have no relationship to the then existing boundaries of the Fallbrook Public Utility District or additions to it.  These lands are simply the lands that we found to be irrigated in that year and I do not know exactly where these new boundaries are.  I have never made a comparison between this map and the Fallbrook exhibit that was recently submitted.

MR. VEEDER:  I have no further questions.

MR. SACHSE:  I have no cross-examination, your Honor.


CROSS-EXAMINATION

BY MR. STAHLMAN:

Q  Mr. Illingworth, the study that you made regarding the safe annual yield of the basins on Camp Pendleton, what was the overall object of that study?

A  The object was to add to the hydrologic knowledge that had been previously testified to in this case.

Q  To add to the knowledge. But do you have an opinion as to the necessity and the reason for knowing the safe annual yield of the basin?  In other words, what factors does that assist you in, from an engineering point of view, in rela- tion to the determination of the storage units?

1          A   I believe it is important when discussing the rights

2     to water to know what is physically available, what physically

3     can be done with a stream, a ground water basin or any other

4     water facility, such as a reservoir.  Safe yield is certainly

5     one of the useful means of studying such conditions.

6          Q   Assuming a basin-- speaking now of any basin-- by

7     which the use of water from the basin has been utilized beyond

8     what would be determined to be the safe yield of the basin,

9     what are the circumstances, conditions and factors which may

10    occur to show injury to the basin or stream system?  Do you

11    have an opinion on that?

12         MR. VEEDER:  May I have the question, please?

13         (The Reporter read the pending question.)

14         MR. STAHLMAN:  Do you understand the question?

15         THE WITNESS:  I think I do.

16         MR. STAHLMAN:  All right.

17         THE WITNESS:  I believe that the situation you have

18    referred to would be termed an overdraft of a basin-- of a

19    ground water reservoir, for instance.  This could occur when

20    a given set of undesirable conditions prevails.

21    BY MR. STAHLMAN:

22         Q   What are some of those that you have experienced in

23    other basins, if you have?

24         A   Occasionally a ground water basin will be drawn down

25    to the point where a poor quality of water begins to enter the

1   basin, the waters extracted from wells deteriorate in quality,

2   and in some cases --

3           THE COURT:   Is this ordinarily where brackish or salt

4   water intrudes?

5           THE WITNESS:   This could be.   It could be from sea

6   water, it could be from coney brines.   It is a situation that

7   is prevalent in parts of the San Joaquin Valley where they are

8   pumping from such low level that the water quality has

9   deteriorated.   Another set of circumstances which would

10  indicate that a ground water basin was overdrawn would be

11  one where the pumping lift had gotten excessively great, so

12  great that it was no longer economically feasible to pump

13  from the basin.   This would be overdraft from an economic

14  standpoint.

15  BY MR. S TAHLMAN:

16          Q   These conditions that you speak of that occur in

17  relation to the deterioration of the water in the basin, the

18  deterioration occurs in basins that are far removed from the

19  ocean, does it not?

20          A   It certainly may.   San Joaquin Valley is such an

21  example.

22          Q   Did you work on the Bonsall Basin studies?

23          A   No.

24          Q   Do you have familiarity with the Bonsall Basin and

25  the quality and character of water that is being extracted

1   from the basin at this time by reason of the low water level?

2   A   I am not acquainted with Bonsall.   I am acquainted
3   with the nearby Mission Basin to some extent.

4   Q   Well, of course, the Mission Basin is a basin which
5   again we find adjacent to the shoreline of the ocean?

6   A   Yes.   Although it apparently is experiencing
7   deterioration in quality, not from sea water, but rather from
8   connate waters.

9   THE COURT:   Where is the Mission Basin?

10   THE WITNESS:   The San Luis Rey River.

11   MR. STAHLMAN:   Your Honor, the Bonsall Basin terminates
12   about at the bridge that crosses on the road from Vista to
13   Fallbrook.   There is a concrete arch bridge, and approximately
14   at that bridge is the end of the Bonsall Basin and the Mission
15   Basin then carries on down to the ocean from there.

16   Q   That is correct, isn't it?

17   A   Yes, to my knowledge.

18   Q   Do you have an opinion, or have you had experience
19   in determining what the effect of this poor quality of water
20   is either for domestic or for irrigation use?

21   A   I am not intimately acquainted with the details
22   of that situation.

23   Q   I will ask you if it is not a fact that when you
24   get down in the lower end of the basin that the type and kind
25   of water that is extracted can be detrimental to domestic use,

1   if you know?

2       A   Yes.   Ordinarily agricultural problems are created

3   before domestic use problems occur.

4       Q   Have you heard of the occasion where the taking

5   of water from those lower levels in these basins in Southern

6   California, when used for domestic purposes, has a high

7   cathartic action?

8       A   I am not acquainted with that.

9       Q   Anyway, there is injury to the basin if you pump

10   beyond that figure that you reasonably determine to be the

11   safe annual yield to the basin?

12       A   That is correct.

13       Q   When did you make your study regarding the safe

14   annual yield of the basins on Camp Pendleton?

15       A   The ones reported in Studies 1, 2 and 3?

16       Q   Yes.

17       A   In the last couple of months.

18       Q   How long did it take you to make those studies?

19       A   A couple of months.   I am not sure of the man hours.

20   More than one person worked on it.   It was a considerable

21   amount of work.

22       Q   Do you have an opinion as to whether it would be

23   desirable to have studies made of the Pauba Basin to determine

24   its safe annual yield?

25       A   I think it would be desirable.

Q   Do you feel that you have the material available by which you could make a similar study of the Pauba Basin as you did in the basins at Camp Pendleton?

A   No, for the reason that the size of the basin is a difficult matter, a difficult question to determine in the case of Fallbrook, and there is a possible extension of it on either side of Pauba Valley itself, and it would be quite difficult and costly to determine exactly what this extent is, and lacking a basin size it would be difficult or impossible to make the study.  Certain assumptions could be made as to what this basin size is and perhaps a useful study could be made along that line.  Assuming the basin size is so much you would have a certain yield.  Assuming some other size, you would have another yield, et cetera.  That is the only approach that I know of at the moment.

Q   Do you have an opinion as to whether or not the accumulation of additional data in relation to either experimental wells that might be desirable or natural development as to whether or not it may within the reasonable future be determined to have sufficient data available to determine what the safe annual yield of the Pauba Basin would be?

MR. VEEDER:   I object, your Honor; it is purely speculative; it goes beyond the scope of the direct examination.

1    MR. STAHLMAN:  I think probably it is objectionable,

2  your Honor.

3    Q  In addition to the data which you have available

4  by which you feel that it may not be determinable at this time,

5  what other data would be necessary in order to make that

6  determination, in your opinion?

7    MR. VEEDER:  Your Honor, I object again on the grounds

8  that it is speculative; and on the grounds that it is beyond the

9  scope of the direct examination.

10    THE COURT:  Overruled.

11    THE WITNESS:  It is a difficult question to answer

12  specifically.

13    THE COURT:  Let me modify it and see what your answer

14  would be.  We have the contention of the United States that

15  there is a large basin.  You have heard that testimony?

16    THE WITNESS:  Yes.

17    THE COURT:  Which embraces both the Murrieta Valley,

18  the Pauba Valley and the Wolf Valley, and the areas lying east

19  and west of Pauba and lying east of Murrieta.  Do you have

20  sufficient data to calculate the safe annual yield of that

21  basin to the depth that the Government's testimony referred to

22  in this record?

23    THE WITNESS:  No, sir.  I feel, if you are speaking

24  of this entire area of the valleys you have mentioned, that

25  ground water storage capacity is not an important factor.  It

1    is again like the Lake Mead situation.  If you put Lake Mead

2    on the Santa Margarita River, the basin size is insignificant.

3    It is the amount of water that goes in to recharge this

4    reservoir that is important, and there we have a great lack

5    of information.

6         THE COURT:  In other words, you have no way of estimat-

7    ing the water that would come out of the Santa Gertrudis or

8    upstream from the gaging stations from some of these other

9    tributaries?

10         THE WITNESS:  That is correct.  Long Valley and all

11    these other smaller tributaries.

12         THE COURT:  That is the main thing that would be lacking?

13         THE WITNESS:  Inflow to the ground water basin, now,

14    your Honor; not just stream flow, but how much of that stream

15    flow would go into the ground, actually.  This is the real

16    problem here.

17         THE COURT:  Correspondingly, you do not have enough

18    information to estimate the safe yield of the basins contended

19    for by the State of California-- the Murrieta Basin, the Pauba

20    Basin and the Wolf Basin?

21         THE WITNESS:  It is a matter of degree there.  I

22    think Pauba Valley would be difficult, and Murrieta Valley--

23    well, Murrieta Valley would probably be less difficult; but

24    when we get into this Unit No. 4 it is very difficult.  I

25    think I could make some reasonable assumptions on Pauba Valley

and Murrieta as to the percolating capacity, but I just have nothing to go on in the other areas excepting the indications are that it is quite tight and percolation therefore would be very small.

I might say, your Honor, that this matter of calculating safe yield of ground water basins is one that hydrologists ordinarily don't get into until a basin approaches being overdrawn, until it is developed quite a bit, and these areas that we are speaking of outside of Pauba Valley and the Santa Margarita Coastal Basin, there just has been very little development compared to the size of the areas involved, and until an engineer or hydrologist has a number of wells with a lot of logs and pumping tests and records of ground water extractions he doesn't have much to work with. And this is the situation we are confronted with in the upper area. Usually we are brought into a case after it is--

MR. VEEDER:  After the damage is done.

THE WITNESS:  After the basin is overdrawn, and then you know where you should have stopped. And we haven't even started in this case.

MR. STAHLMAN:  I think that is about all I have, your Honor. I just want to check my notes here.

(A pause.)

That is all I have.

THE COURT:  Mr. Moskovitz, any questions?

9092

1    MR. MOSKOVITZ:  I have no redirect, your Honor.

2    THE COURT:  Mr. Krieger?

3    MR. KRIEGER:  I have no cross-examination now, your

4    Honor, in view of your own questions.

5    THE COURT:  May the witness step down?

6    MR. VEEDER:  And out.

7    THE COURT:  All right, thank you, Mr. Illingworth.

8    You will be available.

9    MR. VEEDER:  He is going to show up with some of that

10   data I asked for.

11   THE COURT:  Yes.

12   Does that complete your work here?

13   MR. VEEDER:  I have nothing more for today, your Honor.

14   MR. SACHSE:  Would this be a good time, your Honor,

15   to set our schedule for the future?

16   Where are we, Mr. Veeder, on the tabulation that his

17   Honor asked for about the lands that may be riparian, et

18   cetera, upstream-- the public domain lands?

19   MR. VEEDER:  I think we will have that for the 23rd of

20   March.

21   THE COURT:  Public domain lands only you are talking

22   about now?

23   MR. SACHSE:  Yes.  I think the Indian lands were

24   covered.  I started to cross-examine Col. Bowen section by

25   section, and your Honor asked for a tabulation where Col.

9993

1    Bowen would say such and such land abuts upon such and such a

2    stream.  That is the one I was referring to.  That would be

3    public domain and Forest both, I believe.

4        MR. VEEDER:  That's right.

5        MR. MOSKOVITZ:  Your Honor, there is some information

6    we are still getting from the Water Rights Board concerning the

7    up-to-date status of the applications and permits.  We will

8    be bringing those in.

9        THE COURT:  All right.

10       MR. MOSKOVITZ:  Your Honor, Mr. Illingworth reminds me

11   that we secured another sample of water quality that we did

12   not have last week, and I think he can put it in evidence right

13   now.

14       MR. VEEDER:  Is that the Roripaugh one?

15       THE WITNESS:  No, I think the Vail Reservoir sample.

16       MR. MOSKOVITZ:  We didn't have the basic data on that.

17   We will just put it in evidence.

18       MR. STAHLMAN:  Are you going to have a sample on the

19   Roripaugh well?

20       MR. MOSKOVITZ:  We haven't gone out and taken another

21   sample.  We did put in evidence the record we had.

22       THE COURT:  All right, the Vail water analysis, are

23   you going to chart it chemically on this map?

24       THE WITNESS:  It is already on there, your Honor.  This

25   is just the basic data for it that we did not have.

1    THE COURT:  The basic data for the chart?

2    THE WITNESS:  Yes.

3    THE COURT:  All right, it's already on the map.

4    Now, which Roripaugh well did you get a sample of and

5    chart on that exhibit?

6    THE WITNESS:  Jack Roripaugh's artesian well.

7    THE COURT:  That is the one in Santa Gertrudis?

8    THE WITNESS:  Yes, sir.

9    THE COURT:  What is the other Roripaugh well you are

10    talking about?

11    MR. VEEDER:  The one that was drilled in 1956.

12    MR. SACHSE:  Neil Roripaugh.

13    THE COURT:  That is the one that was no longer used?

14    MR. STAHLMAN:  There has been no testimony about the

15    new well.

16    THE COURT:  You are talking about the new well that we

17    saw being drilled?

18    MR. STAHLMAN:  No, no, your Honor.  Not the one we

19    saw being drilled, but the large producing well that we talked

20    about that is on the Katz and Roripaugh property, that we

21    visited up there.

22    MR. VEEDER:  On Santa Gertrudis Creek.

23    MR. STAHLMAN:  That well has not been put in evidence

24    as to the quality of the water.  The water sample that Mr.

25    Moskovitz put in, as I understand it, is the Jack Roripaugh

1   well, which is across the road and down a ways from there.

2        THE COURT:  Can somebody show me on the map?

3        MR. STAHLMAN:  Yes.  It was placed on the map wrong the

4   other day, I noticed.  It was on the wrong side of the road.

5        MR. MOSKOVITZ:  I remember that Mr. Illingworth said

6   that he was not quite sure just where it was.

7        THE COURT:  What map was that?

8        MR. MOSKOVITZ:  Exhibit AM, I believe.

9        MR. SACHSE:  He is Mr. Krieger's client.  He can tell

10  you.

11       THE COURT:  Is Exhibit AM the one?  Did the Clerk find

12  it?

13       THE CLERK:  Here it is, your Honor.

14       (Exhibit AM is placed on the board.)

15       MR. MOSKOVITZ:  Your Honor, may we put in evidence this

16  chemical analysis of the sample from Vail Reservoir?

17       THE COURT:  Yes.  I thought we reserved a number

18  for it, didn't we-- AM-1?

19       MR. MOSKOVITZ:  We already have one sheet of water

20  analysis data that we put in evidence.

21       THE COURT:  It will be Exhibit AM-1; that is the water

22  analysis data.

23       MR. MOSKOVITZ:  All right, your Honor.

24       (Defendant State of California Exhibit AM-1 was received

25  in evidence.)

1      MR. STAHLMAN:  Here is my position.  This well belongs

2  here.  That is the Jack Roripaugh well.

3      THE COURT:  That is the one of which we have a sample?

4      MR. STAHLMAN:  Yes.  Now the other well is about up

5  in here, and we do not have a sample of it.

6      MR. VEEDER:  That's right.

7      MR. KRIEGER:  We don't have a sample of that.  We know

8  you have this one across here.

9      MR. STAHLMAN:  That's right.

10      MR. KRIEGER:  These are all Leo Roripaugh wells up

11  here.  And the big one, sometimes called the big new well, is

12  up in here.

13      MR. VEEDER:  That was drilled in 1956.

14      MR. KRIEGER:  Yes.

15      THE COURT:  May this be corrected now to show the well

16  where it should be?  Run an X through the circle where it

17  appears and put it down where it belongs.

18      MR. KRIEGER:  Yes.

19      MR. VEEDER:  Moving the 26 now down to --

20      THE COURT:  Run a line through that and put 26 through

21  there.

22      Can we get a sample from this other well?

23      MR. KRIEGER:  Yes, I suppose we can.

24      THE COURT:  Can we get a sample of the Leo Roripaugh

25  well?

1    MR. KRIEGER:  We will get it, if you want us to get it.

2    MR. MOSKOVITZ:  We could make a test on it, couldn't we?

3    MR. KRIEGER:  Yes.

4    THE COURT:  Let the State take the sample and make the

5    test.

6    MR. MOSKOVITZ:  All right, your Honor, we will make

7    the arrangements.

8    THE COURT:  Now, I raised the question before we

9    adjourned one evening as to whether or not there was any

10   possibility that we could demark some area that was clearly

11   outside any basin and another area that was within a basin and

12   leave some noman's ground without an adjudication as to

13   whether it was in or out of the basin.  Have you given any

14   thought to that?

15   MR. VEEDER:  We have, your Honor.  We have talked to

16   the U.S.G.S. about that proposition, particularly in regard to

17   Unit No. 4.

18   THE COURT:  That is what I am talking about.

19   MR. VEEDER:  To my surprise, the U.S.G.S. said that they

20   felt that they should enlarge rather than constrict Unit No. 4.

21   I say to my surprise.  I had not discussed with them the area

22   thus delineated, believing that they had used their best

23   judgment, as they did.  They said they were extremely con-

24   servative.  That in their view the basin in Unit No. 4 was

25   larger than they had originally thought it to be; that based

upon their information and data -- and I have talked both to
Mr. Worts and Mr. Kunkel about it, Mr. Worts being the man
ultimately responsible, I believe, in that area, and he said
that in his view the area was substantially correct.  Mr.
Kunkel says that he should extend it more.  There is apparently
agreement with them as to present size, and I believe they
will both agree that it should be extended.

THE COURT:  That isn't what I ask.  I know what your
position is.  That is clear.  That the basin is as big as you
put proof on, and you now say it may be bigger.

My question was this:  I don't know how many individual
ownerships there would be in what I call this no man's land.
I don't think there are too many.  I am inquiring as to the
Government's position, whether they could stand still for a
situation where we marked out some smaller basins, made no
adjudication that this no man's land was or was not part of the
basin and left the matter open for some determination at some
future day when there was more physical data available, and
therefore no one would be prejudiced except in the sense that
the matter is not adjudicated and there would have to be a
hearing later on.  Do you follow me on that?

MR. VEEDER:  Yes, I do, your Honor.

THE COURT:  My thought that the United States might be
content to go along with that kind of proposition is this,
that I haven't heard yet any serious contention by the United

States that pumping activities in that particular area are the cause of any of the problems the United States claims to exist. I don't think there has been any excessive use of water in that particular area. There are a few good wells in there and a few good farms. But I haven't heard any evidence that this was any problem presently.

Now if that is the case, I was exploring whether or not you could be content to follow the suggestion of Mr. Sachse that I not adjudicate it one way or the other. That has the disadvantage of leaving the owner who has property in there subject to some further litigation on that question, if, as and when it arises. Any alternative we take has certain disadvantages. If we attempt to find and there is evidence enough to support it that there is this large basin, then automatically this man who owns property in this basin is subject to future litigation among the riparians and overlying owners on this stream. If, as and when shortages occur and problems arise, his right is a correlative one. So he is, as it were, in the same position of being a continuing defendant to the riparian litigation.

If, on the other hand, we find that the water is vagrant, percolating water, he goes out of the case as far as all future litigation is concerned. But on the other hand, in the present state of the evidence, I don't know that you could say, in any event, that this is vagrant, percolating water.

1    Even the State's testimony indicates that there is water there.

2    The only problem they have is the rate at which it percolates,

3    and whether that causes it not to be a basin with overlying

4    owners and constitutes, therefore, vagrant, percolating water

5    is a serious question.

6          So you have problems any way you look at this thing.

7          Does anyone have a property map that shows how many

8    owners or who the owners are who are involved in that area?

9          MR. VEEDER:  That right now is going forward.  We are

10   locating the name of each land owner on a tract map.  We

11   will know the exterior boundaries of his property, we will

12   know his location.

13         THE COURT:  Well, Mr. Krieger may have one.  He

14   represents people in that area.

15         Do you have any map, or at least informally you could

16   show me how many--

17         MR. KRIEGER:  Your Honor, I have just a rough sketch

18   here of some of our principal people.  I don't have the map

19   showing all of them, though we are preparing a map with all

20   of them.  These are the big property owners (showing map.)

21   I have those cataloged down here.

22         THE COURT:  Mr. Reporter, this may be off the record.

23         Let's just look at this a minute or two.

24         (Discussion around the map off the record.)

25         MR. VEEDER:  Your Honor, I would like to lay some

1  groundwork for scheduling the Cal Tech people.

2      THE COURT:  I will let you know as soon as I hear

3  from them.

4      MR. VEEDER:  We will be notified?

5      THE COURT:  Yes.

6      Before we pass that, don't you think there is a

7  possibility that you can work something out on this?

8      MR. VEEDER:  I think it ties right in with the Cal

9  Tech people and with our U.S.G.S. people.

10     MR. KRIEGER:  Your Honor says leave them in, but no

11 finding against them.  I am wondering how such a decree against

12 them would differ from those who are left in, because as I

13 conceive this case so far there is not going to be any limita-

14 tion put on anyone using water.  Maybe there is.  If there is,

15 then it would be different.

16     MR. VEEDER:  I think, your Honor, we are getting down

17 now to a point where Mr. Sachse raised an important question

18 the other day, and that question is twofold:

19     THE COURT:  This is on the record.

20     MR. VEEDER:  The question of declaratory relief, and

21 the question of regulation.  In our view, they are two separ-

22 ate and distinct aspects.  In other words, it is quite possible

23 to have a declaratory judgment in regard to a man's property

24 and withhold regulation in regard to his use of water until

25 there is the occurrence of a conflict.

1       MR. SACHSE:  I agree.

2       MR. VEEDER:  Now, I think that Katz vs. Walkinshaw is

3   the prime case in that regard, and I think this area that you

4   are alluding to now falls into that category.

5       MR. SACHSE:  It would fall into it provided you had the

6   kind of evidence they had in Katz vs. Walkinshaw.

7       THE COURT:  Take a short recess.  I have a telephone

8   call.

9       (Recess.)

10      MR. KRIEGER:  Your Honor has suggested the no man's

11  land as a category of defendants whose rights simply might be

12  adjudicated in this way, that their lands are adjacent to the

13  stream but we don't know whether the waters underneath them

14  contribute to the stream-- we will leave that for future de-

15  termination.

16      THE COURT:  I wouldn't say adjacent to the stream.  I

17  would say that the Court is unable to determine whether or

18  not the waters under their lands are part of the stream system

19  or are vagrant, percolating waters, and that therefore no

20  further findings are made and the Court retains jurisdiction

21  later to make some determination upon the availability of more

22  data at some time in the future.

23      MR. KRIEGER:  With the exception of the continuing

24  jurisdiction, I would agree with all of that.  I would like to

25  see the suit dropped against them, though, because I think the

1    man who owns a piece of land in that territory is going to

2    have a far better chance to develop it or to sell it or to

3    do whatever is necessary if he has no cloud of litigation

4    hanging over him than if he has one where he has to answer

5    every time he puts down a well to develop his own water supply.

6        THE COURT:  You mean that he should go out without

7    adjudication?

8        MR. KRIEGER:  Yes, your Honor.

9        THE COURT:  You mean that the Court find merely that

10   there is insufficient evidence?

11       MR. KRIEGER:  That is exactly right.

12       THE COURT:  Dismiss as to them and leave it open with

13   the express provision that this would not be an adjudication

14   of their rights?

15       MR. KRIEGER:  That is exactly it.

16       MR. SACHSE:  That was my original proposal, if you

17   recall, your Honor.  I even drew a sketch on the back of my

18   answer to the fifteen questions.

19       MR. KRIEGER:  I would say that there are three cate-

20   gories of defendants in this case, as I said before:  Those

21   who are clearly in, those who are clearly out, and when we

22   put our case on we will try to show that many of these people

23   who are categorized as no man's land defendants are clearly

24   out.  But assuming that there is still this uncertain terri-

25   tory in here, I would like to see the Government nonsuited as

1    to those people, because I think it gives them a chance to

2    develop a much greater opportunity than if they remain in under

3    this nebulous cloud, we don't know whether you are in or out.

4         MR. VEEDER:  I don't follow the nonsuit, in particular.

5    The burden resides with the defendant.  Here we have set up

6    our allegations.  Here is the thought that Franz and I went

7    into very extensively in regard to his clients.  If a man comes

8    in and says, I do not own any rights to the use of water in the

9    Santa Margarita River, thus disclaiming, then for all time

10   you have a decree that terminates the litigation.  Otherwise,

11   they are going to do just as what I have been afraid of

12   throughout, that we would have a litigous situation left un-

13   settled for years and years to come.  Now I have no objection

14   if a man says, I am sitting here on Section 16, I have no

15   right in the Santa Margaraita River, I disclaim; he is out,

16   there can't be any cost charged against him.  He is donw.  But

17   he will never put in a structure which will interfere with the

18   water that the Marines are seeking to defend.

19        MR. STAHLMAN:  Let me ask you this:  Do you contend,

20   Bill, that there is insufficient evidence here to show that

21   that is part of the stream system?

22        MR. VEEDER: In our view there is.

23        MR. STAHLMAN:  I don't agree.

24        MR. VEEDER:  In our view, Mr. Kunkel and Mr. Worts have

25   both testified.

1       THE COURT:  Let's get one thing straight.  It is only

2   a procedural matter, but the plaintiff has the burden of proof

3   in a quiet title suit.  So it is entirely possible to make a

4   finding that plaintiff hasn't sustained its burden as to a

5   certain parcel, and then it is entirely possible, as I under-

6   stand it, to go two ways:  (1) To make an adjudication on the

7   merits; (2) To make a dismissal without an adjudication on the

8   merits.

9       MR. KRIEGER:  That is right.

10      MR. VEEDER:  Not in a quiet title suit.  I think we

11  have put in evidence, your Honor, that Camp Pendleton is

12  dependent upon the Murrieta and all of its tributaries for a

13  supply of water.  Now, if a man comes in and pleads that he

14  has a right to the use of water, I believe that California

15  law is that he will have to come in and assume the affirmative

16  and prove it.  If the United States, having pleaded as it has,

17  comes in and says, we claim rights to the use of water and

18  we believe that you are making claims adjacent to us, it is

19  not for us to go one step further under the California law.

20  I think your friend Pierson Hall settled that very nicely in

21  saying that you have the alternative of answering, setting

22  up your claim; you have the right to disclaim, or you have

23  the right to default.

24      THE COURT:  The rule of quiet title law in California

25  is that the plaintiff must rely on the strength of his own

1    title and not on the weakness of the defendant's.

2        MR. VEEDER:  I am not saying anything about that, your

3    Honor.

4        THE COURT:  And the Government has the burden of making

5    the case.  That is clear.

6        Looking at this map further, however, you have this

7    further thing.  Here are these little alluvial cones.  That

8    land is clearly riparian land.  It may be that the man has an

9    illusory right in that there is never water enough runs down

10   that stream on the surface to be any good to him, but he

11   certainly is riparian to that stream; and when you see these

12   fingers that run up in here, there could only be a very small

13   amount of ground that was not riparian to the Murrieta.

14       MR. KRIEGER:  Well, isn't it true that while he might

15   be and is riparian to the stream as a stream flow, he might

16   very well not be riparian or overlying as a pumper?

17       THE COURT:  If he is riparian as a stream flow and is

18   on an area of younger alluvium, there is not much question but

19   that water underneath is part of the stream.

20       MR. KRIEGER:  I think we will show something here that

21   may be will show those wells that would appear even on the

22   younger alluvium to be productive are not so productive-- they

23   really are not, and that is why I am asking that that decision

24   be withheld until we can get that whole picture.

25       THE COURT:  How big a job would it be to have somebody

1    during the recess get us a map of this area, Mr. Veeder, down

2    to the Vail line here, with the ownerships and find out just

3    who they are and what we have involved in this so-called no

4    man's land in here?

5         CDR. REDD:  We are working on maps on all of the areas

6    at the present time, your Honor.

7         THE COURT:  Could some concentration be put on that

8    area?

9         CDR. REDD:  Yes, your Honor.

10         THE COURT:  And by the same token could this area lying

11    over the Radec Valley here--

12         MR. MOSKOVITZ:  It is called ground water unit No. 5 on

13    Exhibit 17, your Honor.

14         THE COURT:  Could the same ting be mapped out, because

15    you have a similar problem there.  Let's find out who the

16    people are, and what land is riparian, and see what we have

17    left.

18         MR. VEEDER:  That will be done, your Honor.

19         MR. STAHLMAN:  After you get your riparian, there may

20    not be much left.

21         THE COURT:  I don't think there will be much left.

22         MR. VEEDER:  You were pointing at those fingers.  There

23    they are as depicted on Exhibit 15.  Now the thought that we

24    had when we advanced the water units was that you have a

25    circumstance where a person on Warm Springs Creek or on

1    Tucalota Creek or on any of these others obviously should be
2    in.  But we also felt, and this was the basis of our prepara-
3    tion, that if a man's lands were situated as those to which
4    you have just alluded, and this is the no man's land down
5    here toward the upper end of the Murrieta Valley, we felt that
6    there was and there is sufficient reason for a man to come in
7    and set up his claim.  I realize that your Honor disagrees
8    with me in regard to burden of proof.  But I do feel that we
9    have set up sufficient evidence in the record to show that if
10   a man were to pump from that finger of alluvium near this
11   contour line 1175 and he affected the Murrieta stream, we
12   would either have to bring a new lawsuit against him if he were
13   dismissed or if your Honor had continuing jurisdiction without
14   declaring his rights other than saying that he is an overlying
15   land owner, we would be in a perfect position.

16        MR. STAHLMAN:  I don't quarrel with that point.  But
17   any land that is riparian should be declared riparian right
18   now when that is established.

19        MR. SACHSE:  I agree to that same thing on all your
20   yellow area.

21        MR. STAHLMAN:  If it is riparian, fine.

22        MR. KRIEGER:  I have to just hold that in abeyance until
23   we get our test to show that maybe even some of these fingers
24   are not productive.  As Mr. Illingworth pointed out, this
25   ground water basin is not significant at all.  Take your own

1  case over here, George, with the Vail Ranch.  Suppose one day

2  this Vail Ranch is split up.  Suppose it sells to a thousand

3  owners when you start to subdivide that land down there.

4  Certainly the person who buys those lots is not going to have

5  any riparian right in this stream system, or if he has it is

6  not going to do him any good.

7       MR. STAHLMAN:  It could be.

8       MR. KRIEGER:  The thing that troubles me about this,

9  your Honor, is this:  The more lands that are declared to be

10  riparian to the stream, the lower this denominator becomes and

11  the numerator remains the same-- 30,000 acre-feet or whatever

12  it is.  Finally, we get so little water and so many acres of

13  land that the effect of that judgment is going to be to prevent

14  people from developing their land.  That sounds logical, and

15  it is logical up to this point.  When you take a person who

16  owns land up in this area, who may go down and drill enough

17  water for his own domestic needs, he isn't going to have such

18  a material effect on the flow of this whole stream as to hurt

19  anybody, and yet you are going to permit him to develop his

20  land.

21       MR. VEEDER:  I would be very glad to have his Honor--

22  Jim has raised a point-- I would say that there should be a

23  declaration in any decree that is entered taking cognizance

24  of the very point that you just raised.  Our concern, by and

25  large, is not the worry of a windmill well or domestic well

1    going in.  Our worry, and with all respect to his Honor here,

2    we are concerned about the Wherrys, the Roripaughs and further

3    big developments.  I think it would be completely feasible

4    and entirely sensible to enter such finding or conclusion, be-

5    cause if it is deminimus, if there is no effect--

6         THE COURT:  In other words, a finding that if here-

7    after a well for domestic use or for irrigation on a farm lot,

8    half an acre, et cetera, is developed, it will not be con-

9    sidered part of the river system.

10        MR. VEEDER:  That makes sense to me.

11        MR. MOSKOVITZ:  Your Honor, under California law those

12   who pump for domestic purposes would have absolute priority

13   over those who pump for irrigation anyway.

14        MR. VEEDER:  I am just meeting Jim Krieger's point.

15        MR. KRIEGER:  Suppose he has a hundred acres with a

16   crop, can you do it?

17        MR. VEEDER:  Then you might run into a problem.

18        MR. KRIEGER:  You aregoing to stop that man from using

19   his land on the basis not that he hasn't the right to do it,

20   but on the fear basis that because there is so little water

21   for so many acres of land he can't afford to take the chance

22   to do it, because the other people using that water on the

23   stream system are so much more powerful and wealthy than he.

24        MR. STAHLMAN:  Here is another point we are overlooking.

25   I don't see how we can avoid a declaration regardless of what

1    the stream is or whether or not it is practical to extract

2    water or to divert water from it, if it has to be on these

3    various tributaries.  If you don't do that, if these went out--

4    and I have never contended that a tributary should go out--

5    if these went out of the case, you would have a fellow sitting

6    back there who would start building check dams all over the

7    stream, and the first thing you know you wouldn't have any

8    water.

9            MR. KRIEGER:  I have no quarrel with that, as far as

10   surface water is concerned

11           THE COURT:  Let's get a map prepared of this area here,

12   Mr. Veeder, down to the Vail property, that will cover your

13   proposed basin.

14           MR. STAHLMAN:  It should probably come around here, too.

15           THE COURT:  All right, to cover the whole basin, be-

16   cause you will not be too concerned with the Vails.

17           MR. VEEDER: Unit No. 4.

18           THE COURT:  Yes.  And find out who the property owners

19   are, who is represented, and we can also find out who is

20   riparian, and we will know where we are.  Then go over here

21   to--

22           MR. SACHSE:  Unit No. 5.

23           MR. VEEDER:  Unit 5.

24           THE COURT:  --Government's Unit 5 and do the same job

25   there, and find out who the ownerships are, and where we are

1          MR. SACHSE:  All right.

2          THE COURT:  Mr. Sachse, I looked that over.  That is

3     so full of holes--

4          MR. SACHSE:  I haven't had time to look at it.  I say

5     it looks, generally speaking, adequate.

6          The one question that I would like to raise, that Mr.

7     Veeder raised, and I would like to have your Honor's thoughts

8     on before we try to draft it any further, and that was Mr.

9     Veeder's objection expressed in a letter to me.  Mr. Veeder

10    objected in a letter to including a conclusion of law as to

11    the status of these people whose lands overlie vagrant waters

12    with relation to their neighbors, whether there should be any

13    recital that they are correlative with each other or not.  I

14    have proposed that they should be, in my first draft.  Mr.

15    Veeder proposed that they should not be.

16         MR. VEEDER:  I simply don't know.

17         THE COURT:  First of all, these can't be findings.

18    They are going to be called proposed findings and conclusions.

19         MR. VEEDER:  That is quite right.

20         THE COURT:  They will have to go out to everybody in

21    the watershed with some notice that unless somebody objects

22    the Court proposes to find as indicated herein.  Then if

23    nobody objects, then the finding can be made and interlocutory

24    judgement will be made.

25         MR. VEEDER:  Your Honor, may I say this.  That was

1    tendered to Mr. Sachse with the understanding that when there

2    was agreement by those of us who were presently viewing it, it

3    would be distributed, and not until then.

4        THE COURT:  All right, now, take page 2, Finding 4:

5    The parties have agreed that the ground waters, if any,

6    underlying the lands referred to in Finding No. 1 above are

7    vagrant, local, percolating.

8        That does not mean a thing as a finding.

9        If you go further and say:  The parties-- whomever you

10   mean by the parties; you can't mean all the parties in this

11   lawsuit-- certain parties have agreed, and the court finds--

12       MR. VEEDER:  That is all right.

13       THE COURT:  In other words, without some finding by the

14   Court that certain people have agreed, it wouldn't mean a

15   thing, except as to those people.

16       MR. VEEDER:  Yes.  But, your Honor, here is the point

17   you raised, and I am perfectly willing to proceed on that

18   basis.  I think that we would have to put some evidence in the

19   record to take your additional step.  That is the point I make.

20   I think your Honor could find that Mr. Sachse and I have

21   agreed, but for your Honor to find that those waters are

22   vagrant, percolating, I think we would have to open up the

23   record and put in evidence.

24       THE COURT:  Well, we may have to as to those lands that

25   are referred to here.

1        MR. VEEDER:  That is all right with me.

2        THE COURT:  But down in the Fallbrook watershed, there

3   is evidence in the record.

4        MR. VEEDER:  I have no objection.

5        THE COURT:  In other areas we may have to have some

6   general evidence to the effect that lands that are in the

7   basement complex area, et cetera--

8        MR. VEEDER:  That suits me fine.

9        THE COURT:  And then you are right that there has to be

10   evidence in the record on which to base a finding.

11        MR. VEEDER:  That is right.  But I thought that if you

12   would find on the basis that Mr. Sachse and I had agreed on it,

13   that would be all right.  But we will put in some evidence.

14        MR. STAHLMAN:  I have one other question.  In connec-

15   tion with this motion I have indicated to your Honor that we

16   desire to make to be relieved of this first stipulation, I

17   wanted Mr. Veeder to express himself if he opposes that.

18        MR. VEEDER:  I am going to see Mr. Rankin on Friday

19   and I will talk to him.

20        MR. STAHLMAN:  In other words, I don't want to do all

21   the work if there is going to be--

22        THE COURT:  Advise Mr. Stahlman as to the first stipula-

23   tion, and if you don't object to having that set aside--

24        MR. VEEDER:  I will notify him as soon as I talk to my

25   superior.

1    I will let you know, George, as soon as I talk to Mr.

2    Rankin, which will be on Friday, if I can get my force out

3    of here by this evening.

4    MR. STAHLMAN:  In other words, I will know by the first

5    of the week?

6    MR. VEEDER:  I will try very hard.

7    THE COURT:  What is your program?  Where are you going

8    to be?

9    MR. VEEDER:  I am going to be in Washington, D.C., for

10   the next week.  Beyond that I can't guarantee.

11   THE COURT:  The first week in March you are going to

12   be in Washington?

13   MR. VEEDER:  That is right.

14   THE COURT:  I have some criminal cases I have to try.

15   I may have some time during the week of the 9th to the 16th to

16   sit down with Mr. Stahlman and Mr. Veeder.

17   MR. VEEDER:  I will figure on that.  I want to talk to

18   your Honor about it.  I want to be back here before the week

19   of the 23rd to consult with our experts in regard to our

20   geology.  Now if you would like to have me back here-- I

21   don't have a calendar here, your Honor.

22   THE COURT:  I merely suggest that you advise me when

23   you get back to California and I will get in touch with Mr.

24   Stahlman and we can sit down and we will see what we can work

25   out.  Or we can do it in the evening if I am tied up in a

1247.

MR. VEEDER:  The 24th of March.

THE COURT:  He is going to notice his motion.  But he wants to know whether you are concerning that the stipulation in case No. 1247 can be set aside, in which event he goes directly to the problem of the stipulation in the old case between Vail and Santa Margarita.

MR. STAHLMAN:  The matter relative to the factors that surround that and the arguments on it should be taken up after the evidence is in for all parties.

MR. VEEDER:  I would like to have the record show that in regard to the 1951 stipulation pertaining to this case, that will be up for the 24th, unless there is some settlement.

MR. STAHLMAN:  Yes.

MR. VEEDER:  However, Mr. Stahlman contemplates the full trial of the Vail case prior to the hearing in regard to his motion to abrogate the stipulated judgment of December, 1940, between the Vail Company and the Rancho Santa Margarita.

MR. STAHLMAN:  Yes-- if I get you right on that.

THE COURT:  He says that you contemplate that you will not urge that motion for hearing until your case is in.

MR. STAHLMAN:  All right.  I don't think we should.  I think your Honor should know all the evidence.

MR. VEEDER:  I just want the record to show that.

THE COURT:  Allright, Tuesday, March 24, 1959, at

1    10:00 o'clock A.M.

2              (Adjournment until Tuesday, March 24, 1959, at 10:00

3    A. M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25