# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

           Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

           Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:     Thursday, March 26, 1959.

Pages: 9120 to 9228

## FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
                DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA, )
                       )
          Plaintiff, )
                       )
    vs.               )       No. 1247-SD-C.
                       )
FALLBROOK PUBLIC UTILITY )
DISTRICT, et al., )
                       )
          Defendant. )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Friday, March 26, 1959

APPEARANCES:

      For the Plaintiff            WILLIAM E. BURBY, ESQ.,
                                    Special Assistant to the
                                    Attorney-General,
                                    Department of Justice,
                                    Washington, D.C.

APPEARANCES (Continued):

| | | |
|---|---|---|
| 2 | For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| 3 | | |
| 4 | For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney-General, by<br>ADOLPHUS MOSKOVITZ, ESQ., |
| 5 | | Deputy Attorney-General, and<br>FRED GIRARD, ESQ. |
| 6 | | |
| 7 | For Defendants<br>Fallbrook Public | FRANZ R. SACHSE, ESQ. |
| | Utility District, | |
| 8 | et al. | |
| 9 | For Defendant Murray<br>Schloss Foundation | WALTER GOULD LINCOLN, ESQ. |
| 10 | | |
| 11 | For Defendant Oviatt | MESSRS. BEST, BEST & KRIEGER,<br>By JAMES H. KRIEGER, ESQ. |
| 12 | For U. S. Navy | LCDR. DONALD W. REDD. |
| 13 | | PHIL D. SWING, ESQ. |

## INDEX TO WITNESSES

For Defendant
State of California:

| | D | X | RD | RX |
|---|---|---|---|---|
| Leland Illingworth | | | 9132 | |
| (By Mr. Krieger) | | | | 9162 |

For Defendant Vail:

| | | | | |
|---|---|---|---|---|
| John Elliott Coit | 9175 9214 | | | |
| Allen C. Bowen | 9204 | | | |

## EXHIBITS

| State Exhibit: | | | Iden. | In Evid. |
|---|---|---|---|---|
| AR | - | Analysis of water | 9129 | 9136 |
| AS | - | Status of water right applications, permits, etc. | 9129 | |
| AT | - | Summary of material re water use of vegetation | 9129 | |
| AU | - | Classification of wells | 9129 | |
| AV | - | Classification of wells | 9129 | |
| AW | - | Breakdown of wells | 9129 | |

8123

San Diego, California, Thursday, March 26, 1959. 10 A.M.


THE CLERK:  Number one, 1247-SD-C, United States vs. Fallbrook, et al.  Further court trial.

THE COURT:  Mr. Veeder called me yesterday on the telephone from Denver at about 4 o'clock and he said the court had just taken a recess until tomorrow morning; that originally he thought when they recessed they were just taking a short recess, but that apparently they didn't intend to come back on the bench and it was put over until this morning. I am doing some other things.  I don't remember whether he expressly asked that we not proceed without him.  I told him, "Well, I understand.  Don't worry about it."  There was no understanding.  I don't see any harm in going ahead.  We have Mr. Burby here and the two Colonels and Commander Redd representing the Government.  We will have a transcript of the proceedings.  If there is anything that is improper it can be straightened out when he gets here.

Any objection to that?  Mr. Burby?

MR. BURBY:  We have no objection, your Honor.  If any technicalities develop that you feel should be postponed, we would request your Honor to do that.

THE COURT:  Who is ready to proceed today?

MR. MOSKOVITZ:  Your Honor, we have some tag ends. Before we get into it, your Honor, we have typed up a list of

1   transcript corrections during Mr. Illingworth's testimony,

2   and I think it might save time if we handed these out to

3   counsel and gave them a chance to look them over and perhaps

4   move tomorrow to make these.

5        THE COURT:  Hand them to counsel.  If there is no

6   objection, we will merely file them and tell the reporter to

7   make them.

8        MR. MOSKOVITZ:  Yes, your Honor.  Before I do that, we

9   noted in going over the transcript that on the transcript

10  for February 18, Volume No. 76, there was some duplication

11  of page numbers.  The pages do follow in sequence as far as

12  the sense is concerned.  If you will note, beginning on page

13  8686, in Volume 76 for Wednesday, February 18th, the transcript

14  follows along in proper sequence of numbers of pages until you

15  get to page 8695, and then the following page is again 8686.

16  There was just an error in going down to the 8 instead of the

17  9.  So that there are duplicate pages, and one of our correc-

18  tions was on one of the pages which is a duplicate number.

19  I wonder if we might just make a correction that the second

20  time 8686 appears that would be 8686-A and 8687-A until we

21  get up again to 8695-A, and then we would be back in step

22  again.  Do I make myself clear?

23       THE COURT:  Yes.  The Reporter will see if that will

24  work out and report to us.

25       THE REPORTER:  It will work out, your Honor.

1      MR. STAHLMAN:  Your Honor, I have one situation I would

2   like to take up with the Court, and that is in relation to

3   how we are going to progress.  We are ready.  We figure we

4   have two days this week.  I received this letter from Mr.

5   Krieger-- I am glad that he just walked into the courtroom.

6   We have had to put on a tremendous amount of pressure and

7   a little extra time on some phases of this case.  It logically

8   breaks itself down, however.  If we can't get our exhibits

9   and maps in a little better shape.  We have those to start on,

10  however, at the present time.  If Mr. Krieger is ready as he

11  indicated, he could start in next week.  That would help us a

12  great deal.

13      Are you ready, Mr. Krieger?

14      MR. KRIEGER:  I will be ready on next Tuesday.

15      MR. STAHLMAN:  If we can work it that way, our case

16  logically breaks down into certain factors here, one of them

17  being the soil studies, and then the other matter pertains to

18  the ranch in which we have had to make new maps and formulate

19  new charts in relation to those maps, and we just got them

20  back from the printer yesterday and I would like to have a

21  little more time, if we could, to get them into shape.  I

22  think it would save time in the long run.  If that is agree-

23  able with the Court and we can plan on that, I will appreciate

24  it.

25      THE COURT:  All right, we will work along with you as

1    much as we can.

2        MR. STAHLMAN:  Your Honor, I have here that order in

3    relation to being relieved of the stipulation only between

4    Vail and the Government in relation to the stipulated judgment,

5    and I think, as much as Mr. Veeder and myself discussed it

6    with your Honor, I would like to present the order for signa-

7    ture at this time.

8        THE COURT:  Has it been signed by Mr. Veeder?

9        MR. STAHLMAN:  I haven't shown it to him yet, no.  He

10   hasn't been in town.  I could show it to Professor Burby here.

11   It merely carries out the--

12       THE COURT:  I think you had better make a stipulation

13   out of it.

14       MR. STAHLMAN:  Very well.

15       THE COURT:  Both of you sign it, and then I will sign

16   the order.

17       MR. STAHLMAN:  We agreed that I would prepare the order.

18   That was according to Mr. Veeder's agreement.

19       THE COURT:  Let's have some record to base the order on.

20   Let us have either an approval of the substance and form or

21   that it is so stipulated or something on that order and I

22   will sign the order.

23       MR. STAHLMAN:  Yes, of course, I have the letter from

24   Mr. Rankin, and I think your Honor has it.

25       THE COURT:  We will wait until  Mr. Veeder gets here

1     for that.

2             MR. STAHLMAN:  Very well, your Honor.

3             THE COURT:  Do you have a list of your exhibits?

4             MR. STAHLMAN:  Your Honor, no, we haven't, because as I

5     say we just got it yesterday, and we are only going to work

6     from two or three exhibits today which have been lodged.

7             THE COURT:  I have the exhibits listed down through I.

8             MR. STAHLMAN:  That is correct, and those are the ex-

9     hibits that we will work from.  I want to substitute for those

10    exhibits better maps, in the first place, and also we have

11    done a little coloring on them and there is a small additional

12    amount of property that has been studied that appears on this

13    new map, and I would like to substitute it when I proceed

14    for the Exhibit O.  It is the same basic map.

15            THE COURT:  The State of California has marked Exhibit

16    AR for identification.  You all have copies of that?

17            MR. MOSKOVITZ:  I haven't handed them out yet, your

18    Honor.

19            THE COURT:  But you will?

20            MR. MOSKOVITZ:  Yes, your Honor, and I have some others

21    to hand out at this time, if I may, including the information

22    we were to bring in.

23            I am handing out State's Exhibit AR for Identification.

24            This next one that I am handing out, a list of water

25    right applications, permits and licenses, will be State Exhibit

1  AS for Identification.

2       THE COURT:  I have a copy.

3       MR. MOSKOVITZ:  Then State Exhibit AT is the next

4  document.

5       State Exhibit AU for Identification is the next one.

6       State Exhibit AV for Identification.

7       I will read these off after they have all been marked

8  so that they will be plain in the record which one they are.

9       The last document is AW for Identification.

10      For the record, your Honor, Exhibit AR for Identification

11  is the analysis of a sample of water which was taken from the

12  Leo Roripaugh well-- that is Well 7 South, 3West, 25El.

13      Exhibit AS for Identification is a compilation of the

14  current status of water right applications, permits and licenses

15  before the State Water Rights Board respecting the streams

16  from the Santa Margarita River watershed.

17      Exhibit AT for Identification is a summary of the

18  material that Mr. Illingworth stated he had by which he had

19  concluded that the use by native vegetation of ground water

20  in the Santa Margarita Coastal Basin would be more than

21  accounted for by the inflow or contribution of water from

22  Area D, that is, the area around the basin.

23      Exhibit AU for Identification is a classification of

24  the wells which are shown on the brown-colored material, that

25  is, generally the basement complex, on Plate 9B of State

1  Exhibit L.  A classification of those wells would indicate

2  which of them may have an effect on the stream flow.

3      State Exhibit AV for Identification is a similar

4  classification.

5      By the way, on State Exhibit AU those wells are those

6  which are shown in hydrographic units 2 and 3 on Plate 9B.

7      In State Exhibit AV for Identification there is the

8  same breakdown with respect to wells which appear in or on

9  the boundaries of formations of low permeability, the purple

10  colored material-- that is generally the older continental

11  deposits.

12      And Exhibit AW for Identification is a similar break-

13  down of wells which are shown to be drilled in formations

14  .of moderate to high permeability-- that is, the yellow colored

15  material, which is the younger alluvium in those same hydro-

16  graphic units.

17      (State Exhibits AR through AW, inclusive, were marked

18  for identification.)

19

20              LELAND ILLINGWORTH,

21  recalled as a witness in behalf of the defendant State of

22  California, having been previously sworn, testified further

23  as follows:

24      MR. SACHSE:  Mr. Moskovitz, what you gave me as Exhibit

25  AU and Exhibit AV both say "Hydrographic Unit No. 2," and

1    yet the columns are different.

2         MR. MOSKOVITZ:  The difference is in the title.  You

3    will notice that in the title Exhibit AU refers to generally

4    impermeable formations (yellow color), and Exhibit AV refers

5    to formations of low permeability (purple color).

6         MR. SACHSE:  Thank you.

7         MR. MOSKOVITZ:  Your Honor, I am going to have Mr.

8    Illingworth explain these.

9         MR. BURBY:  Your Honor, many of these documents appar-

10   ently involve controversial material.

11        THE COURT:  They are not being offered.

12        MR. BURBY:  I am wondering if we shouldn't have the

13   ten-day rule apply or something of that kind, so that we will

14   have a chance to look these over.  For example, on California's

15   Exhibit AS, filings in the Santa Margarita River watershed,

16   the filings of the United States and Santa Margarita are both

17   eliminated from this, and those matters are still pending,

18   and there may be other things here that I certainly would not

19   want to commit the Government to some difficulty here.

20        THE COURT:  They will not be offered at this time and

21   you will have plenty of time to look them over.  Whether we

22   will have to wait the formal ten days or not we will see when

23   Mr. Veeder gets here and looks them over.

24        MR. BURBY:  Thank you.

25        THE COURT:  On Exhibit AS we were particularly interested

9131

1   not in the Government's filings or even in the Fallbrook

2   filings, but in the miscellaneous filings by other people.

3   I think that happened one day when you were not here.  So they

4   will not be offered.  They will be merely marked.

5       MR. BURBY:  As far as the witness is concerned, your

6   Honor, this is a little unexpected, if not a surprise, and I

7   certainly would like to reserve all rights respecting cross-

8   examination until Mr. Veeder can be here, if that meets with

9   your Honor's approval.

10      THE COURT:  We can probably work that out.  Do you want

11  me to be your attorney, too?

12      MR. BURBY:  I certainly won't object to any questions

13  you ask, your Honor.

14      THE COURT:  A judge asked that of a lawyer one time, and

15  the lawyer said that he didn't mind but he didn't want to lose

16  the case.

17      Mr. Moskovitz.

18      MR. MOSKOVITZ:  Your Honor, we were not trying to sur-

19  prise anybody.  We thought we were asked to bring in some

20  more material.

21      MR. BURBY:  It is a surprise only because Mr. Veeder is

22  not here.  I will put it that way.

23      MR. MOSKOVITZ:  I am surprised that he is not here also.

24

25

REDIRECT EXAMINATION

BY MR. MOSKOVITZ:

Q   Mr. Illingworth, I hand you State Exhibit AR for Identification and ask you to identify it and state what information it contains.

A   This is a statement of the ground water analyses, that is, the results of the analyses of a ground water sample obtained from the Leo Roripaugh well, which is designated 7 South/3West, 25E1 in Santa Gertrudis Basin.

Q   Who collected the sample?

A   This was collected by a man working under my direction.

Q   And when was this sample collected?

A   On the 26th of February, 1959.

Q   Is the name of the person who collected the sample and the date of collection shown on Exhibit AR?

A   Yes, they are.

Q   Indicate it, please.

A   Claud Carter collected the sample, and the date is indicated under the designation "Date collected" on the left-hand column.

Q   When was this sample analyzed?  Is that also shown?

A   Yes, that is shown as "Date analyzed."  The date stated is March 4, 1959.

Q   Was this collected at the request of the Court?

1        A   Yes, it was.

2        Q   By whom was the analysis made?

3        A   By a contract chemist for the State Department of

4   Water Resources Terminal Laboratories.   This is so indicated

5   near the lower left corner of the sheet by the letters "T-e-r-m,"

6   indicating Terminal Laboratories.

7        Q   Is the analysis and the types of chemicals for which

8   percentages were derived the same as analyses which were made

9   and shown on California's Exhibit AM?

10        A   Yes.

11        Q   Have you plotted where the analysis of this sample

12   shown on Exhibit AR would fall in the geochemical chart which

13   is on California's Exhibit AM?

14        A   Yes, I have on my own copy of California's Exhibit AM.

15        MR. MOSKOVITZ:   Your Honor, may we have Mr. Illingworth

16   put that on Exhibit AM on the board?

17        THE COURT:   Yes.

18        (The witness stepping down to the chart on the board.)

19        MR. MOSKOVITZ:   Perhaps you can use the symbol of a

20   square, which has not yet been used.

21        THE WITNESS:   Yes, I am so indicating the location of

22   the plotting of the points on the three sections of the

23   geochemical chart on California's Exhibit AM by a square.

24        THE COURT:   Assign the number 27 to it.

25        THE WITNESS:   Yes, sir, I will label the squares as 27.

1    Shall I also list--

2         THE COURT:  Yes.

3  BY MR. MOSKOVITZ:

4         Q  You are now listing a summary of that information

5  on the legend of California's Exhibit AM, are you not?

6         A  That is correct.  I am placing the number 27 in the

7  section of the chart which indicates "Well water samples."

8  The date indicated is February 26, 1959.  The well number is

9  7S/3W-25E1.

10        Q  Under "Remarks" would you put--

11        THE COURT:  Leo Roripaugh well.

12        THE WITNESS:  Yes, sir.  Under "Remarks" I am indicating

13  the Leo Roripaugh well.

14        Shall I also put the square in the legend?

15        THE COURT:  Yes.

16        MR. MOSKOVITZ:  Perhaps you can also locate the well

17  on the map that is part of California's Exhibit AM and put the

18  number there.

19        THE WITNESS:  Under the legend on this California's

20  Exhibit AM I am indicating after a square "Sample taken from

21  Leo Roripaugh well."

22        THE COURT:  To refresh my recollection, what was this

23  well 26 that we put on that chart?

24        THE WITNESS:  That was the artesian well of Jack

25  Roripaugh, the one for which we had a 1939 water analysis.

9135

1      I would like to have somebody check me on the location

2  of this well.  I am indicating by a square the location of the

3  Leo Roripaugh well by number 27 on the map portion of Exhibit

4  AM.

5      THE COURT:  I have mine marked on the bench, but which

6  of these wells is the Pauba well?

7      THE WITNESS:  17M1.

8      THE COURT:  Put a note there.

9      THE WITNESS:  Yes, sir.

10     THE COURT:  Plotting 19--

11     THE WITNESS:  Yes, sir.  Oh, it's in 25, isn't it?

12     THE COURT:  Has somebody got some ink eradicator?  That

13  will be better than trying to rub that out.  Well, work on it

14  later.

15 BY MR. MOSKOVITZ:

16     Q  Referring to the plotting of this sample on

17  California's Exhibit AM, on the geochemical chart portion,

18  where does it fall in relation to the other samples from wells?

19     A  In the section of the chart for anions, that is, the

20  lower right-hand triangle of the geochemical chart, it plots

21  well within the group of the artesian wells and the Schrode

22  well, but on the cation portion of the chart the, the lower

23  left-hand triangle, the sample plots about midway between

24  the grouping for the artesian wells and the grouping for the

25  other wells in Pauba Valley, and the surface water samples

1   obtained from Temecula Creek.  In other words, pointing out

2   the location of the sample 27 as compared with the grouping

3   of the surface waters and the shallower wells, and also-- I

4   am now pointing to the location of the artesian well samples.

5        THE COURT:  It is hard for me to see.  Put your finger

6   on that 27.  What group is that supposed to be now?

7        THE WITNESS:  This is the cation section of the chart.

8        THE COURT:  What is cation?

9        THE WITNESS:  The calcium, magnesium, sodium, plus

10  potassium.

11       THE COURT:  Go ahead.

12  MR. MOSKOVITZ:  I would like to offer California's Exhibit

13  AR in evidence.  I talked to Mr. Burby and he has no objection

14  to that, your Honor.

15       THE COURT:  California's Exhibit AR received in evidence.

16       (Defendant State of California Exhibit AR for Iden-

17  tification was received in evidence.)

18  BY MR. MOSKOVITZ:

19       Q  I present you California's Exhibit AS for Identifi-

20  cation and ask you to identify it and to explain what informa-

21  tion is contained in it and where it was secured.

22       A  This is essentially a reprint of a form supplied by

23  the State Water Rights Board.  I have added one column of

24  figures.  The far left-hand column was added in my office

25  under my direction.  It indicates the number of the diversion

9137

1    that appears in Bulletin 57, State's Exhibit L, for all those

2    diversions that were in existence at the time of the surveys

3    covered by Bulletin 57.  You will note that there is a number

4    for every diversion located, or for every water right applica-

5    tion listed on the first page.  But on the second page there

6    are a number of them missing.  Perhaps it would be well to go

7    down and state what these are.  The first three numbers that

8    are missing--

9         THE COURT:  What are you talking about?

10        THE WITNESS:  On the second page, the far left-hand

11   column, you will notice it is incomplete.  There are some

12   numbers missing.

13        THE COURT:  Yes.

14        THE WITNESS:  Those are applications by Fallbrook

15   Public Utility District, and no structure has been built for

16   which those applications were made, so we have therefore no

17   actual diversion as yet.

18        The Borell Application, 15377, is a pending application

19   and no structure has been built and no diversion has been

20   made.

21        Francis O. Baker's diversion was filed in 1956, and

22   those following that were filed after 1956, after the time

23   of the survey on State Exhibit L.  So that I am not acquainted

24   with whether a diversion has been made, but there has been no

25   number assigned for those applications in Bulletin 57.

BY MR. MOSKOVITZ:

Q  On what plate of State Exhibit L do you find these diversions located and numbered, if you can relate it to the map location?

A  They appear on State Exhibit L, Plates 21A and 21B.

Q  Will you go across the columns on State Exhibit AS for Identification and explain, referring to the very first one, what each one is supposed to depict?

A  As mentioned, the far left column is the Bulletin 57 diversion number.  The next column is the water right application number.  The date that application was filed appears in the next column, followed by the name of the applicant, the source of the water supply applied for.  The location is next, appearing as the quarter quarter section of the indicated township and range and the meridian that township and range is established from.  The next item is the amount for which the application was made.  In the first column, if it is a continuous diversion, the column indicates the number of second feet, unless it is otherwise indicated, and GPD on some of the values is gallons per day.  And the next column is acre-feet of storage.  I note that there has been evidently one value put in the wrong column here.  The last one on that page for Vail Company, Application 11518, 40,000 acre-feet (AF indicating acre-feet storage capacity) really should have been under the acre-feet column.

1    MR. MOSKOVITZ: May we make that correction now with

2 an arrow on the exhibit, your Honor?

3    THE COURT: Yes, make the correction on the exhibit.

4    THE WITNESS: The next column indicates the purpose for

5 which the application was made.

6 BY MR. MOSKOVITZ:

7    Q  How were those symbols described and translated?

8    A  The asterisk at the top refers to a footnote at the

9 bottom of the page. It indicates that the "D indicates

10 domestic use, the capital letter I indicates irrigation use,

11 the capital MU indicates municipal use, and M indicates

12 mining use, and there were no indications of power use so this

13 was stricken from the footnote.

14    The next column indicates the status of the application.

15    THE COURT: Before you finish that column on purpose,

16 on the second page you have several items "S-t-k."

17    THE WITNESS: That indicates "stock."

18    THE COURT: Stock?

19    THE WITNESS: Yes, sir. I see it is not in the legend,

20 but that is my understanding of the indication.

21    THE COURT: All right.

22    THE WITNESS: The next column, the last column on the

23 right, indicates the status of the application-- that is,

24 whether it is pending, as indicated by the word "pending" as

25 shown in the footnote at the bottom of the page. "I-n-c-l"

indicates that the application is not yet complete.  We asked
the State Water Rights Board rather than simply writing the
word "Permit" and "License" to indicate by "P" the permit and
the following number indicates the permit number, if one had
issued, and after the letter "L" the number indicates the
license number, if there is a license.

BY MR. MOSKOVITZ:

Q  As of what date is this information accurate?

A  As of the date shown in the upper right-hand corner
of the page-- February 24, 1959.

MR. MOSKOVITZ:  I understand that you would rather not
have this offered now?

MR. BURBY:  Yes.

MR. STAHLMAN:  I have a question on voir dire, if I may.

THE COURT:  It is not going to be offered, so we will
take it up on cross-examination.  Is it just one question?

MR. STAHLMAN:  Yes, it is just one question.

THE COURT:  All right.

MR. STAHLMAN:  It might be that he might want to check
on it, your Honor.


VOIR DIRE EXAMINATION

BY MR. STAHLMAN:

Q  Mr. Illingworth, in relation to the application for
Vail Company, the last one on page 1, do you know whether

1    or not the application 11518 was not an amended application

2    and that there was filed prior thereto an application that

3    had a prior date?

4        A  I do not know the details on this, and I don't think

5    I am qualified to answer that question.

6        Q  Are the records available to you by which you could

7    check and determine that?

8        A  Yes, they are.  They are records of the State Water

9    Rights Board and they are available to the public.

10       Q  Is Exhibit AS intended that the dates as shown here

11    as the date filed would be in relation to the other permits

12    as it falls in the column?

13       A  The date of priority, in other words.

14       Q  The priority, yes.

15       A  I believe that is true.  That is my understanding.

16       Q  Will you at your first available opportunity check

17    your record and determine if there was not an application

18    prior to the date of 8-16-46 for Vail Company, which was in

19    relation to a diversion at the same place, and that application

20    11518 was an amendment to that application?

21       A  I will check to see what I can find out about the

22    history of that.

23       MR. STAHLMAN:  Thank you.

24       MR. SACHSE:  Your Honor, I am perhaps anticipating an

25    objection that Mr. Veeder may have, but I have it also.  This

1  is hearsay data as it now appears and it is very important

2  data to this Court, and I would suggest that the State of

3  California should get a certified copy-- this is a public

4  record-- of the Water Rights Board's files, stating under the

5  certificate of the executive officer of the Water Rights

6  Board that these are the filings on the river as of such and

7  such date.  Because the significance of it goes as much to

8  the names that do not appear on the list as it does to names

9  that do appear, and as of now Mr. Illingworth can't tell us,

10  I know, whether these are all the filings or whether some may

11  have been overlooked, and I would like to request that the

12  State introduce a certified copy from the State Water Rights

13  Board of all pending filings as of a certain date.

14      MR. MOSKOVITZ:  I think perhaps the objection is

15  well taken, your Honor.  This was given us as being an accurate

16  and complete list, but there is no certification on it.

17      THE COURT:  All right, have it certified.

18      MR. MOSKOVITZ:  I will get it certified.

19      Q  Mr. Illingworth, I hand you California's Exhibit AT

20  for Identification and ask you to state what it is and where

21  the information was secured.

22      A  This is a tabulation entitled "Comparison of un-

23  measured water supply to Santa Margarita Coastal Basin with

24  ground water Supplied portion of consumptive use of native

25  vegetation on the basin."  It was prepared under my direction

1  and it consists of various columns of figures, one for each

2  year from the year 1936-37 through 1957-58.

3      Q   Why was that period used?

4      A   This was a period of a recent analysis that we made,

5  covered in California's Exhibits AH, AI and AJ-- studies 1,

6  2 and 3.

7      Q   Would you describe each column and explain what

8  information appears under it?

9      MR. STAHLMAN:   May I ask a question?  The areas are from

10  what exhibit?

11      MR. MOSKOVITZ:   That is from California's Exhibit AK.

12  Shall we have that put on the easel?

13      MR. STAHLMAN:   I think it would be a good idea.

14      (The Clerk places Exhibit AK on the easel.)

15  BY MR. MOSKOVITZ:

16      Q   Mr. Illingworth, would you point out where area D

17  is on California's Exhibit AK?

18      A   Area D is the portion of the Santa Margarita River

19  watershed lying between the De Luz Dam Site and the stream

20  gaging station at Ysidora.  It is the area shown in pink to

21  which I am pointing on Exhibit AK.

22      THE COURT:   What exhibits are these Studies 1, 2 and 3?

23      THE WITNESS:   California's Exhibits AH, AI and AJ, your

24  Honor.

25

BY MR. MOSKOVITZ:

Q   I believe you have indicated what the second column shows.  Would you summarize that again?

A   The second column shows the estimated runoff from Area D by water years.

Q   How were these values estimated?

A   These were estimated to be a certain fixed percentage of the runoff from Area B plus C, also shown on California's Exhibit AK, the areas shown in green and blue.

Q   What does the third column show?

A   The third column is entitled "Estimated underflow at De Luz Creek Gaging Station."  These values were obtained from Plaintiff's Exhibit 49, prepared by Mr. Worts.  It is a constant value, you will note, of 700 acre-feet each year.

Q   What does the fourth column show?

A   That column is entitled "Total water supply unaccounted for in Studies 1, 2 and 3"-- that is, California's Exhibits AH, AI and AJ.  It is simply the sum of the second and third columns.

Q   What does the fifth column show?

A   This is entitled "Portion of consumptive use of native vegetation on Coastal Basin supplied by ground water." This is also obtained from Plaintiff's Exhibit 49 prepared by Mr. Worts.

Q   And what does the footnote indicate?

1      A   I will read the footnote:   "Note that these values

2   were estimated by Mr. Worts for actual conditions which existed

3   and that consumptive use would be less for conditions assumed

4   in Studies 1, 2 and 3, State Exhibits AH, AI and AJ, because

5   of lowered ground water levels and improved pumping pattern."

6          THE COURT:   What does all this tend to prove?

7          THE WITNESS:   This is in answer to Mr. Veeder's question:

8   Would I produce some figures that would corroborate my state-

9   ment.

10         THE COURT:   You made a statement that you hadn't

11  computed how much the vegetative use would consume, but that

12  there was enough runoff in Area D, which you had not computed,

13  plus the underground flow, that one equaled the other?

14         THE WITNESS:   Or I said that generally it would be more

15  than enough.

16         THE COURT:   Column 4 is the water that would be avail-

17  able for this, and column 5 is what?

18         THE WITNESS:   Column 5 is the estimate of consumptive

19  use by the native vegetation from ground water that Mr. Worts

20  estimated actually did occur for the years indicated.   You

21  will recall that Exhibits AH, AI and AJ indicated that the

22  water level would be considerably lower during the dry years

23  than actually did occur; that is, by withdrawing some 8,000 acre-

24  feet it indicates that one of those studies of water levels

25  would have dropped down to where we could completely utilize

1  the 24,000 acre-feet of usable storage capacity.  Now, only

2  about 6,000 acre-feet of storage capacity actually was used.

3  So that if more of the capacity is used the ground water

4  level would be lower, the native vegetation would have less

5  opportunity to obtain water from ground water, and therefore

6  the values, in my view, as shown in column 5, would be

7  greater than actually would occur under the conditions of

8  studies 1, 2 and 3.

9        MR. MOSKOVITZ:  I would like to offer California's

10 Exhibit AT in evidence, your Honor.

11       THE COURT:  Let's hold these matters up, unless we have

12 some understanding with Mr. Burby here.

13       MR. BURBY:  Yes.

14       MR. MOSKOVITZ:  All right.

15       Q  I hand you, Mr. Illingworth, California's Exhibit

16 AU for Identification and ask you to identify that exhibit and

17 describe its purpose.

18       A  This exhibit was prepared under my direction.  The

19 title is "Classification of wells located in or on boundaries

20 of generally impermeable formations (brown color) depicted

21 on State Exhibit L, Plate 9B.

22       MR. MOSKOVITZ:  Your Honor, if you recall, you asked

23 Mr. Illingworth if he would give his views as to which wells

24 in the various categories of materials would or would not

25 have a significant impact on the stream flow, and this is his

summary of that study.  Exhibit AU relates just to the

generaly impermeable materials.  The succeeding two exhibits

cover the other two types of materials, which are not shown

on Plate 9B.

THE COURT:  I am trying to find the plate.

Exhibit AU is Hydrographic Unit No. 2.

THE WITNESS:  Hydrographic Units No. 2 and 3.

MR. MOSKOVITZ:  It shows both Hydrographic Units 2 and 3,

your Honor.

THE COURT:  Yes, 2 and 3.

BY MR. MOSKOVITZ:

Q  Would you describe the information which is shown on

California's Exhibit AU?

A  Perhaps it would be well first to point out the

significance, because all these details are not significant in

this particular formation inthese units.  The significant

feature is, in answer to the Court's question, that only two

of these wells in the generally impermeable formation, that

is, the brown color, in Hydrographic Units 2 and 3, would have

any appreciable or significant effect.  One of those is in

Unit 2 in the fifth category entitled "Irrigation wells which

could have a significant effect on stream flow more than a few

miles downstream."  This is under *the column titled* a number of wells indicated

as 1, with a footnote A, which indicates that that is Well

7S/3E-20C2.

9148

1          THE COURT:  3E.

2          THE WITNESS:  It is on the fringe of Anza Valley, on the

3    west side of Anza Valley.

4          MR. SACHSE:  Just below the road?

5          THE WITNESS:  Yes, it is.

6    BY MR. MOSKOVITZ:

7          Q  Who owns that well?

8          A  It is owned, or was at the time of the last informa-

9    tion I had, by a Mr. Pursche,-- P-u-r-s-c-h-e.

10         Q  Do you know any details about the well?

11         A  Well, this is a well drilled in a hard rock forma-

12    tion which had, at the time of drilling, a production rate of

13    about 600 gallons per minute.  I have no direct information

14    with respect to that well at the present time, but it is my

15    understanding that it is still producing.

16         Q  What factors cause you to conclude that this is a

17    well which could have a significant effect on stream flow

18    more than a few miles downstream?

19         A  It is located rather close to Anza Valley and there

20    are some significant irrigation wells, that is, irrigation

21    wells with significant production in Anza Valley, and it was

22    my feeling that it would not be safe not to include this well

23    with the others.  It seemed that they most likely would be

24    receiving water from generally the same source.

25         Q  You mentioned that there might be two wells in this

9149

1    formation of generally impermeable material that might have

2    an effect.  What is the other well you had in mind?

3         A   Yes.   That is the well in the last category under

4    Hydrographic Unit No. 2, entitled "Wells other than windmills

5    for which use is unknown," and there was one such well; it

6    is 7S/3E-20B2, as indicated by Footnote B.  It is in Anza

7    Valley, but we just don't know what its use is.

8         THE COURT:  Is it near this C-2?

9         THE WITNESS:  Well, it is out in the valley itself.

10   Just a moment.

11        THE COURT:  It should be closeby.

12        THE WITNESS:  I am sorry.  It is not.  I am confusing

13   another well.  It is also in the basement complex, the brown

14   area.  It is near C2, but we don't have any information on it,

15   or sufficient information to classify it.

16        MR. STAHLMAN:  Do you know whose well it is?

17        THE WITNESS:  I can find out in just a moment.

18   BY MR. MOSKOVITZ:

19        Q   Referring to what information?

20        A   Referring to Appendix F, the second volume of Cali-

21   fornia's Exhibit L, under 7S/3E-20B2, the owner is indicated

22   as being H. A. Pursche, the same owner of Well 20C2.

23        Q   Do you have any information that indicates that that

24   Well 7S/3E-20B2 is a well that could have a significant effect

25   on stream flow?

1      A  No, I don't.

2      Q  It is just a well that doesn't fall in any of the other

3   classifications; is that not true?

4      A  That is true.  Our information, as shown in Appendix

5   F, indicates that the well was equipped with a gasoline

6   engine, and I do not know what the size of that was.  It might

7   have a one or two horsepower gasoline engine or it might be

8   something significant.  It is my belief that it is not of a

9   significant size or I would have had a clear recollection of

10  it.  But lacking certain information, we put it into this

11  unknown use class.

12     Q  Within Hydrographic Unit No. 3, the summary shown

13  on California Exhibit AU shows no wells which could have a

14  significant effect on stream flow, that is, wells which are

15  in the generally impermeable formations; is that correct?

16     A  That is correct.

17     Q  But you have compiled-- at least totaled all the

18  wells which are shown on California's Plate 9B of California's

19  Exhibit L so that they are all indicated here in various

20  categories?

21     A  That is correct.

22     THE COURT:  Well, in Hydrographic Units 2 and 3 only?

23     THE WITNESS:  Yes.

24     MR. MOSKOVITZ:  Yes.

25     THE WITNESS:  Most of the wells fall in either the

1   unused or the abandoned well class or windmill wells or other

2   domestic and stock wells, that is, domestic and stock wells

3   pumped by other than windmills.

4       MR. MOSKOVITZ:  I will not offer this exhibit now, your

5   Honor, until Mr. Veeder returns.

6       Q I hand you California's Exhibit AV for Identification,

7   Mr. Illingworth, and ask you to identify it.

8       A  This exhibit is similar to California's Exhibit AU.

9   The title of Exhibit AV is "Classification of Wells located

10  in or on Boundaries on Formations of Low Permeability (purple

11  color) Depicated on State Exhibit L, Plate 9B."

12      Q  And is that material depicted in the purple color

13  generally what has been referred to in this case as older

14  continental deposits?

15      A  Yes.  On plate 9B they are referred to as "Older

16  alluvium" or "Upper Pleistocene sediments."

17      Q  Would you indicate the information which is summarized

18  in this exhibit?

19      A  Here we have in Hydrographic Unit No. 2 one well

20  which would have a significant effect on stream flow.  This

21  is in the fifth category of the upper portion of the exhibit,

22  entitled "Irrigation wells which could have a significant

23  effect on stream flow more than a few miles downstream."

24  One such well is indicated by Footnote B.  This is Well

25  8S/1E and it is in Section 8.  I do not have a final location

on it.  It was drilled in February, 1958.

Q  So it is not on the map?

A  That is correct.  This is one that came to our knowledge during this trial.

Q  What information do you have on that well that leads you to conclude that it could have a significant effect on the stream flow a few miles downstream?

A  It has a significant production rate and it is located near Lancaster Valley, that is, the upper portion of Lancaster Valley east of Highway 79.

Q  Can you identify it by relation to any ownership of a ranch in there?

A  Yes.  It is on the Stardust Ranch owned by Mr. Sievers.

Q  Do you have any specific information as to its production?

A  Yes-- if you will allow me to refer to my notes.

MR. MOSKOVITZ:  Is Mr. Sievers one of your clients, Mr. Sachse?

MR. SACHSE:  Yes.

THE WITNESS:  I had some information on the well and I don't locate it at the moment.

THE COURT:  Well, it is time for a recess.  Take a short recess.

(Recess.)

MR. MOSKOVITZ:  Your Honor, Mr. Illingworth has informed me that he expects to receive in the mail today from the Riverside County Flood Control and Water Conservation District a log of the well we were just discussing, this well that was drilled in February, 1958, 8S/1E-Section 8, which will contain all of the information, and I thought we might delay any further discussion until we get that.

THE COURT:  All right.

BY MR. MOSKOVITZ:

Q  Now, I note that you have indicated one well as having a negligible effect on stream flow in Hydrographic Unit No. 2 on California's Exhibit AV.  Could you explain that?

A  This is the well indicated by Footnote A as 7S/3E-4J1. It is a well north of Anza Valley and it is owned by J. E. Cartier and it is close to the boundary between the purple and the brown areas, also near the head of a small stringer of alluvium.  It is a relatively small irrigation well and so far from the main valley that I considered it would be a negligible effect on the stream flow.

Q  Would you describe the item for which you list eleven wells in Hydrographic Unit No. 2 on California's Exhibit AV and why you placed that number of wells in that category?

A  This category includes all windmills that are presently being used, that is, as of the time of the survey in 1953,

1    approximately, plus domestic and/or stock wells which are

2    pumped by other than windmills.  The pumping of any of these

3    wells is considered to have a negligible effect on stream

4    flow because of the small amount of water pumped.

5        Q  Turning now to the wells which are identified for

6    Hydrographic Unit No. 3 on California's Exhibit AV, what

7    conclusions do you have on those wells?

8        A  We have 23 wells in the category of either windmills

9    or domestic and/or stock wells pumped by other than windmills,

10   and we have one well for which the use is unknown.  It is

11   not a windmill and it is Well 8 South, 1 East, 19F1.  It

12   does have a six-inch casing, according to our information

13   in Appendix F of State Exhibit L, which does indicate that

14   it is probably a small well.

15       Q  Were there any wells in that hydrographic unit

16   drilled in or on the boundaries of the older continental

17   deposits which, in your opinion, would have a significant

18   effect on the stream flow?

19       A  No-- correction-- the one that we have spoken of

20   before the recess.

21       Q  That was in Hydrographic Unit No. 2, wasn't it?

22       A  Yes, it is.

23       Q  I hand you California's Exhibit AW for Identification

24   and ask you to identify it.

25       A  This exhibit is entitled "Classification of wells

1 located in formations of moderate to high permeability

2 (yellow color) depicated on State Exhibit L, plate 9B."  The

3 data, as in all these exhibits of the classification of wells,

4 is as of approximately 1953, except as otherwise indicated.

5  Q  The yellow-colored material on Plate 9B is what we

6 usually refer to as younger alluvium; is that correct?

7  A  That is correct.

8  Q  First, on those wells which are located in Hydro-

9 graphic Unit No. 2, what conclusions did you have on those?

10  A  Well, of the 135 wells indicated on Plate 9B, 54

11 were unused or abandoned, 58 fall in the category of either

12 windmills or domestic and/or stock wells pumped by other than

13 windmills, the pumping of which wells is considered to have

14 a negligible effect on stream flow.

15  Q  And what was the reason that you concluded that?

16  A  Again, because the pumping, the extraction of water

17 by these wells is small.

18  We have four wells in the category "Irrigation wells

19 which probably would have a significant effect on stream

20 flow only for a few miles downstream from such wells."  The

21 numbers of these wells are indicated by Footnote A as 7S/1E-1J1.

22  Q  Would you locate that one first of all?

23  A  This is located on a stream tributary to Coahuilla,

24 Wilson Creek-- well, it is Wilson Creek itself.  It is in a

25 small area of Recent alluvium.

9156

1       MR. MOSKOVITZ:  Have you located it, your Honor?

2       THE WITNESS:.  It is in an area known as Reid Valley.

3       THE COURT:  Are you talking about 7 South, 1 East?

4       THE WITNESS:  Yes, sir.

5       THE COURT:  1J1?

6       THE WITNESS:  1J1, yes.  That well is located in what

7   could be considered a very small groundwater basin.

8       The next well indicated in Footnote A is in the same

9   township in Section 17, and the number is 17G1.  It again is

10  in a Recent alluvium in a small ground water basin.

11  BY MR. MOSKOVITZ:

12      Q  And that is on a different tributary, is it not?

13      A  Yes, it is.  It is about four miles west of the other

14  tributary, north of Lewis Valley.

15      Q  Are the names of these valleys shown?

16      A  Lewis Valley is shown in small letters.  There is no

17  name on the valley in which Well 17G1 is located.

18      Let me correct something.  I noticed that there was

19  evidently an error and it is on this sheet.  This should be

20  17G3 rather than 17G1.

21      Q  Could you locate the other two wells that are in this

22  category?

23      A  Well, 20Q1 is in Lewis Valley itself about two miles

24  south of the previous well located, 17G3.  This is also a

25  small ground water basin.

1      Then we have one additional well in 7S/2E-13D1.  This

2   is just north of the Coahuilla Indian Reservation, a few

3   miles west of Anza Valley.  The well is located very close

4   to the edge of the basement complex.  That is the brown area.

5      Q  What factors caused you to conclude that those four

6   wells, which are irrigation wells, would have a significant

7   effect on stream flow for only a few miles downstream from

8   the well?

9      A  I considered that pumping of these wells would

10  affect immediate neighbors of the owners of these wells, but

11  that since the basins were very small that the change in

12  storage and the regulation of water possible through this

13  change in storage of ground water would be so small that

14  it would not have a significant effect on stream flow for

15  any great distance downstream.

16     Q  What is the next category of wells in Hydrographic

17  Unit No. 2 on California's Exhibit AW?

18     A  The next category is "Irrigation wells which could

19  have a significant effect on stream flow more than a few

20  miles downstream."  We have 13 in this classification.  The

21  numbers are indicated in Footnote B.  We have Well 7S/3E-15N2.

22  This is in Anza Valley.

23     THE COURT:  The difference between these two categories

24  is the word "would" and "could"?

25     THE WITNESS:  Not entirely, your Honor.  Possibly

9758

1    "could" would be a better word to use in the first category.

2    But the significant thing is that the effect would be for only

3    a small distance downstream in the one case, whereas in the

4    other case it could have a more important effect.

5    BY MR. MOSKOVITZ:

6         Q   The category in which you have four wells listed is

7    which one?

8         A   These could or would have a significant effect on

9    stream flow only for a few miles downstream from such wells.

10        THE COURT:  You don't place much significance, then,

11   on the use of the word "would" or the word "could"?  The

12   important thing is that the category you have just mentioned,

13   the effect involved is only for a few miles downstream?

14        THE WITNESS:  That is right.

15        THE COURT:  While in the second category, with the 13

16   wells, the significance is that it affects more than a few

17   miles downstream?

18        THE WITNESS:  Yes, sir.

19        THE COURT:  So that this "could" or "would" you use

20   alternately?

21        THE WITNESS:  I thought it had more significance in the

22   second category.  But it is a matter of degree.  I think the

23   word "could" would be better used in both cases, because there

24   is no guarantee that it would have an effect.

25        THE COURT:  All right.

1      MR. MOSKOVITZ:   Would your Honor like Mr. Illingworth

2    to point out the location of all these wells under this last

3    category where there are 13 to help you spot them on the map?

4    They are described in the exhibit.  We can go through them.

5           THE COURT:  I don't think it is necessary.

6    BY MR. MOSKOVITZ:

7           Q   What factor caused you to conclude that there were

8    13 wells, these specific wells which could have a significant

9    effect on stream flow more than a few miles downstream?

10           A   These are wells that are located in a relatively

11    large ground water basin and one in which the change in

12    storage might be appreciable and therefore the recharge of

13    this ground water basin could decrease the flow downstream by

14    a significant quantity.

15           Q   Does the fact that these are irrigation wells have

16    any significance?

17           A   Yes.  The fact that they are irrigation wells

18    indicates that they are larger producers of water.  As I

19    indicated before, I put the domestic wells and stock wells

20    and all windmills in the second category, and because pro-

21    duction by these wells is so small as to be insignificant.  It

22    is true, as indicated on the Footnote B, the statement there

23    that some of these 13 wells may also have such small production

24    that they would not have a significant effect downstream, but

25    our information was not complete enough to indicate what the

1    production of all the 13 wells was.

2         THE COURT:  You have one well listed as 8 South, 1 East,

3    and I take it that it is 7Q1?

4         THE WITNESS:  Yes, sir.

5         THE COURT:  7N1, and then you say Q1.

6         THE WITNESS:  Yes; that would be 7 also.

7    BY MR. MOSKOVITZ:

8         Q  You have six wells in the category of wells other

9    than windmills for which the use is unknown, and on that do

10   you have any conclusion as to the effect on the stream flow?

11        A  No, for the reason that we do not have definite

12   information as to the size of the wells or what the use was.

13   Footnote C, however, indicates that we had some information

14   on a couple of the wells that may have some significance.

15   7S/3E-16L1 is the number of the well which has the six-inch

16   casing.  This is probably, therefore, a small producing well.

17        The next well in the list, the last on the page, is

18   8S/1E-7P2, which was being drilled at the time of our survey

19   in 1954, and we don't know what the use was of that well and

20   what it may be today.

21        Q  Turning to the next page of California's Exhibit AW,

22   it summarizes categories of wells in Hydrographic Unit No. 3.

23   State what information you have and what conclusions you drew

24   as to those wells.

25        A  We have 28 unused or abandoned wells, 26 of which are

1   the small wells, including all windmills, which were used at

2   that time, plus domestic and/or stock wells which were pumped

3   by other than windmills.  The pumping of these wells is con-

4   sidered to have a negligible effect on stream flow.

5       We had one well-- we probably should change this-- which

6   probably could have a significant effect on stream flow only

7   for a few miles downstream from such wells.  This is the well

8   indicated in Footnote A as 9S/3E-16A2.

9       Q   Where is that well located?

10      A   This is located in Chihuahua Valley, a ground water

11  basin of small size.  The areal extent is rather large, but

12  it is a shallow basin.

13      Q   Could you turn to the next category and indicate

14  what wells are listed there?

15      A   Yes.  The next category includes eight wells which

16  are irrigation wells which could have a significant effect on

17  stream flow more than a few miles downstream.  These are the

18  wells listed in Footnote B.

19      Q   Generally speaking, where are they located?

20      A   These are the wells in ground water basins along

21  Temecula Creek, that is, upper Temecula Creek above Vail

22  Reservoir, and they are in the valleys of Dodge Valley, Oak

23  Grove Valley, what is now called by the Geological Survey

24  quadrangle sheets as Dameron Valley, the Aguanga Valley, the

25  Radec Valley and Nigger Valley.  Some of these basins are

1   very small, but since they are located on Temecula Creek,

2   which is an intermittent stream having more flow than some

3   of the other streams-- Coahuilla, Wilson, et cetera-- that it

4   appeared to be unsafe not to include all wells which had a

5   significant pumping rate in the Recent alluvium in these

6   basins along Temecula Creek.

7        The last category includes five wells other than wind-

8   mills for which the use is unknown.  These are listed in

9   Footnote C at the bottom of the page, and there we have a clue

10  as to the capacity of two of the five wells.  Well 8S/1W-25Q1

11  was equipped with a two-horsepower motor, and Well 9S/2E-17K4

12  was equipped with a one-half horsepower motor.  This is an

13  indication in each case that the production must have been

14  very small.

15       MR. MOSKOVITZ:  Your Honor, this completes the presenta-

16  tion of the information that was still left for us to bring

17  in.  I would like to offer these in evidence when the time

18  comes.  But otherwise counsel may cross-examine.

19       THE COURT:  Bring the matter up later when Mr. Veeder

20  is here.

21       Who wants to cross-examine?  Anyone?

22       MR. KRIEGER:  I have some questions I would like to ask,

23  your Honor.

24       THE COURT:  Mr. Krieger:

25

CROSS-EXAMINATION

BY MR. KRIEGER:

Q   I think you just stated a few minutes ago that you consider wells to be significant on the stream flow of the system when they had a pumping rate which was a certain quantity.  What would that quantity be?

A   I would say, oh, something on the order of 100 gallons a minute.  It is hard to draw a hard and fast line on this and say that anything above this is not significant and anything below it is.  For instance, a domestic well that had a pumping rate of 150 gallons per minute that was used exclusively for one house and a quarter-acre of garden, for instance, would not have a great production rate and should be included with the small domestic producers.  Whereas, another well might have 95 gallons per minute production and be pumped 24 hours a day and irrigate a significant acreage of land and this would draw enough water to be included in the significant wells.

Q   Then in the selection of these wells you had to use a judgment factor, did you not?

A   Yes.  In other words, I did not determine what the production was of each well, but rather the use to which it was put.  A domestic well was listed in the second category of the tables in each case, without regard to the actual pumping rate.  Certainly it is true that most of these domestic wells

1  have a low production rate, generally less than a hundred

2  gallons per minute.

3      Q  But for irrigation wells what figure did you use as

4  being a significant one-- what rate, I mean, did you use?

5      A  Well, again, we didn't use a rate.  I would consider,

6  however, that a hundred gallons, anything above a hundred

7  gallons a minute would be significant.  Actually, we have the

8  use for some of the wells indicated in these tables and I

9  think the footnotes indicate that while they are called

10  irrigation wells in Appendix F, it may be that they are listed

11  that way simply because they are not used for any other purpose

12  than irrigation.  The irrigation may have been for a half-acre

13  of garden, but nevertheless they are indicated as an irriga-

14  tion well here.  And if we knew that this was a windmill, for

15  instance, then we knew it was a small producer.  If we knew

16  what the horsepower of the engine on it was, we knew that, and

17  if it was, say, less than five horsepower we knew that was a

18  small producer.  But whe we got into a case where we have

19  just irrigation and an electric pump indicated, we have no

20  knowledge from the information here exactly what the size of

21  that well is and we have included it in the irrigation wells

22  in general in these exhibits, which could have a significant

23  effect.

24      Q  Is there any way of telling whether any of these

25  wells that you have listed in these several exhibits do, in

1    fact, have any effect on the stream flow down at the gorge, say?

2         A   Are you asking if there is an actual way to measure

3    the effect?

4         Q   Yes.

5         A   I don't know of any direct measurement that could be

6    made of such an effect.   It would be a very difficult thing

7    to do.

8         Q   It is true, isn't it, that the entire effect of any

9    of that pumping could be lost along the way in other respects,

10   such as evaporation?   Isn't that right?

11        A   That is very true.   A well in a small ground water

12   basin that under natural conditions would have rising water

13   which flowed downstream for, say, two miles along the stream

14   channel and then disappeared completely because of native uses

15   along the stream channel would not have an effect downstream

16   if all the well did would be to pump this quantity of rising

17   water.   It would simply dry up the stream for this two-mile

18   stretch and the trees would do rather poorly, probably.   But

19   unless there were a diverter along this stretch of the stream

20   there would be no effect on anyone.

21        Q   And isn't it also true that the entire effect of all

22   this pumping could be taken up in the Vail Reservoir itself

23   through evaporation?

24        A   This is a possibility.

25        MR. STAHLMAN:   I think that is too conjectural, your

1    Honor.

2         THE COURT:  Are you talking about one little pump or

3    two little pumps, or all the pumping in the valley?

4    BY MR. KRIEGER:

5         Q   I mean the pumping from the wells that you have

6    listed in your exhibits, all of the effect of bringing that

7    water to the surface could be taken up through evaporation

8    in the reservoir and hence have no effect on the ultimate

9    flow of the stream?

10        MR. STAHLMAN:  I object to that as being indefinite

11   and conjectural.

12        THE COURT:  Sustained.

13   BY MR. KRIEGER:

14        Q   Do you know of any efforts that have been made to

15   measure the effect of pumping in these tributaries at the

16   point of convergence of Murrieta and Temecula?  Have ny

17   studies been made, do you know?

18        A   Not to my knowledge.

19        Q   Some of these wells which are, say, good producers

20   and some which are not are located in the same type of soil,

21   that is, as shown on your Plate 9B, are they not?

22        A   Yes.

23        Q   How do you account for the difference?

24        A   Could you state that some other way?  I am sorry.

25        Q   I just wonder if there is any way of telling the

9167

1   difference between the production of a well-- say two wells

2   are drilled to the same depth, with the same overlying

3   material, say high permeability as shown on your last exhibit,

4   equipped with the same motor pump, and yet they have a differ-

5   ent production.  How do you explain that?

6       MR. BURBY:  Your Honor, this goes beyond anything that

7   has been discussed with this witness today.  In other words,

8   his testimony up to this point has been the effect and known

9   results produced from these wells.  Certainly it is going

10  beyond anything that has been discussed today to question why

11  one well is producing more water than another.  In fact, I

12  don't know whether this witness is a geologist or not and

13  competent to testify to that matter.  I object to the question.

14      MR. KRIEGER:  I was not asking on the basis of a

15  geologic answer.  There are wells here that are productive

16  and others that are not, and I am just wondering, inasmuch as

17  they overlie the same deposits, if the witness can explain the

18  difference.

19      THE COURT:  Overruled.

20  You may answer, if you know.

21  Are you postulating the same size well?

22      MR. KRIEGER:  Yes, your Honor.

23      THE COURT:  And the same depth?

24      MR. KRIEGER:  Yes, your Honor.

25      THE COURT:  And your material on the surface is the

1    same-- for instance, younger alluvium?

2           MR. KRIEGER:  Yes, your Honor.

3           THE COURT:  Are you also postulating that it goes

4    through the identical kind of material clear to the bottom

5    of the wells, if the two wells are identical?

6           MR. KRIEGER:  No, I am not.  I can't ask that question,

7    because we are talking about wells that are in a single basin

8    here, and I am asking about comparative wells in the same

9    basin-- why some are good and why some are not good, if the

10   witness knows any reason for that.  That is all I am asking.

11          THE COURT:  Can you answer it, Mr. Illingworth?

12          THE WITNESS:  I think so.  In a basin which had, say,

13   a 500-foot depth of material-- excuse me, I have to ask a

14   question here.  Did you say both these wells would have the

15   same depth? .

16          MR. KRIEGER:  Yes.

17          THE WITNESS: In a single basin you can have a well near

18   the edge of the basin where the materials thin out, that is,

19   where the valley fill would be to a shallower depth than it

20   would near the center of the basin, say, even though both wells

21   were drilled to the same depth.  One would tap a greater depth

22   of Recent alluvium than the other well.  The one that would

23   tap the greater depth of materials of higher specific yield

24   would probably have a greater production.  This could be one

25   explanation for differences in production.

BY MR. KRIEGER:

Q  Would there be any other explanation that you can think of?

THE WITNESS:  Well, you might have wells in two differ-ent basins, both of which are the same depth, but one has an areal extent of, say, ten or a hundred times the other; you might be able to get the same rate of production for a limited period of time from the two, but the larger basin would have a greater storage capacity and you could pump over a longer period of time at that rate.

Q  Would you say in conclusion then that as far as Hydrographic Units 2 and 3 on State's Exhibit L are concerned, the only wells which, when pumped, could have any material effect on the stream flow are those which you have set out, I think, in the fifth category in each of these Exhibits AU, AV and AW?

A  Yes.

MR. KRIEGER:  That is all, your Honor.

THE COURT:  Mr. Sachse, do you have any questions?

MR. SACHSE:  I have no cross-examination.

THE COURT:  Mr. Moskovitz?

MR. MOSKOVITZ:  No, your Honor.

THE COURT:  Mr. Stahlman?

Do you want to defer cross-examination, Mr. Burby?

MR. BURBY:  Yes, your Honor, by all means, and also

1  motions to strike and all those various items that come into

2  it.

3    THE COURT:  I thought you would be just looking for an

4  opportunity to demonstrate here how you can cross-examine a

5  witness.  You have been sitting around in these law schools

6  for thirty years.

7    MR. BURBY:  Frankly, your Honor, I have a good many

8  questions I would like to ask this witness, but I don't think

9  it would further the cause any.  It would just merely tend

10  to delay for another ten or fifteen minutes.

11    THE COURT:  We will postpone it.  Let Mr. Veeder look

12  the record over and see if he wants to cross-examine.

13    What will be the procedure this afternoon?

14    MR. STAHLMAN:  We are ready, your Honor.

15    THE COURT:  Do you have a witness ready?

16    MR. STAHLMAN:  Yes, your Honor.

17    THE COURT:  You can work on these older exhibits that

18  you have already lodged?

19    MR. STAHLMAN:  Yes, your Honor.  We just got these

20  exhibits yesterday, a good many of them, that will be lodged,

21  and I will make a list of them and have it here the first of

22  the week anyway.

23    MR. MOSKOVITZ:  May I have permission to withdraw

24  Exhibit AS and get that certification?

25    THE COURT:  You may.

1          Adjourn until 2 o'clock.

2          (Noon recess.)

1    <u>San Diego, California, Thursday, March 26, 1959.  2 P.M.</u>

2

3         MR. MOSKOVITZ:  Your Honor, before we begin, we got the

4    log of the new well that was drilled in 1958 and I passed

5    out copies to counsel.  I wonder if we could put this in

6    evidence.

7         MR. STAHLMAN:  Which well is that?

8         MR. MOSKOVITZ:  The well at the Stardust Ranch.

9         It has an indication of a pumping test showing a yield

10   of 500 gallons per minute, with a 65-foot drawdown, made in

11   1958 when the well was drilled.

12        THE COURT:  What exhibit number will be attached to it?

13        MR. MOSKOVITZ:  I think it should be together with all

14   the other logs and given the next number in order.

15        THE COURT:  Exhibit 16A were the well logs for Exhibit

16   16, Exhibit 16B was a list of 146 wells.  It must be 16A.

17        THE CLERK:  Let me check it, your Honor.

18        MR. MOSKOVITZ:  The Clerk says they are not necessarily

19   in the right order.  We want to check that before we assign

20   it a number.

21        THE COURT:  Have they been assigned subnumbers in

22   Exhibit 16?

23        THE CLERK:  Yes, they have, your Honor.

24        THE COURT:  The Clerk can check that later and tell us

25   what it is.

1    expect to put those in through his testimony.

2         THE COURT:  Do you propose to substitute this exhibit,

3    or do you want to give this the No. C-1?

4         MR. STAHLMAN:  I think it should be substituted, because

5    it will just clutter up the record.  This other map can be

6    kept in, if you wish.

7         THE COURT:  All right, it may be substituted as Exhibit

8    C for Identification.

9         MR. STAHLMAN:  Very well.

10        I may explain to your Honor how we proposed to proceed.

11   The studies, as will be shown on this map, were made by Dr.

12   Coit.  In addition to that, we have acquired other lands,

13   which we did not feel were sufficient, by reason of the

14   character of the land or the amount of the land, the size of

15   the parcel, that it would be necessary for Dr. Coit to make

16   the study on and we will have other evidence in relation to

17   those.  They are small pieces.  And there are quite a large

18   number of them and they are scattered throughout the area,

19   which we will demonstrate by the witnesses later on.  Also,

20   in the town of Temecula the Vails own considerable of the lots

21   within the townsite itself, and we will treat that as a

22   separate subject.

23        With that explanation, I am ready to put Dr. Coit on

24   the stand.

25        THE COURT:  All right.

9175

JOHN ELLIOT COIT,

called as a witness in behalf of the defendant Vail, being
first duly sworn, testified as follows:

DIRECT EXAMINATION

MR. STAHLMAN:  Possibly I should also indicate to your
Honor that in connection with the map the classificatin or the
key that works in connection with the map was lodged as Vail's
D.  I think that should be substituted also.  I have the
identical information as contained in Vail's D previously
lodged.  However, in addition to that, we have the additional
testimony in relation to the newly-acquired parcels, as shown
on the map, and also there has been some reconsideration of
some lands, the character of which has changed, as will be
explained by the testimony, and that is in a newly-prepared
study.  However, the study contains all of the information
which was in the original deed, together with this recent
study.

THE COURT:  Do you have copies for counsel?

MR. STAHLMAN:  Yes, your Honor.  I have a copy for the
Court also.

THE COURT:  All right.

MR. STAHLMAN:  So if we may either put it in or substitute
it-- it doesn't make any difference.

THE COURT:  It will be substituted.  You call this D,

1   do you?

2          MR. STAHLMAN:  Yes, D.

3          THE COURT:  It will be substituted for the original D.

4          MR. STAHLMAN:  I have a limited number of copies.  I

5   have one for the Court.  I have handed the Government a copy.

6   And I have another available copy here.  Can you gentlemen all

7   use this same copy?  The Exhibit D which was withdrawn from

8   the evidence could be used.

9          Q   What is your full name, Doctor?

10         A   John Elliot Coit.

11         Q   Where do you reside?

12         A   At 690 Ocean View Avenue, Vista.

13         Q   How old are you?

14         A   Seventy-nine.

15         Q   What is the present business in which you are engaged?

16         A   I am head of Coit Agricultural Service.

17         Q   Where did you receive your elementary education?

18         A   You mean the grammar school?

19         Q   Yes, grammar school; just briefly, where did you go

20   to grammar school?

21         A   I was raised in the South before they had any grammar

22   schools, after the Civil War.  I started under my mother and

23   father, who were school teachers.

24         Q   I see.  Have you had some formal schooling after

25   that?

1    A   Yes.

2    Q   Will you start in, Doctor, and just give us a resume

3  of your education?

4    A   I graduated in agriculture at the North Carolina

5  State College, and then I went to Cornell University and

6  spent four years in graduate work, receiving my master's de-

7  gree and finally my doctor's degree in horticulture at Cornell.

8    Q   What was the master's degree?

9    A   Master of Science in Agriculture.

10   Q   And those were the subjects you pursued in your

11  regular course as well as in your post-graduate course?

12   A   Right.

13   Q   Have you been connected with any of the universities

14  in California?

15   A   Yes.

16   Q   Will you tell us which university and the way in

17  which you were connected?

18   A   I first came to California from the University of

19  Arizona and joined the University of California and was

20  stationed at Whittier in what was known at that time as a

21  pathological laboratory, which has since been combined with

22  the Citrus Experiment Station at Riverside.

23   Q   What was the nature of the service there, Doctor?

24  What did you do there?

25   A   I assisted in investigations in citrus and avocados,

1  walnuts, and other subtropical fruits.

2  Q  You mentioned the University of Arizona.  Did you

3  spend some time there, too?

4  A  Yes.

5  Q  What did you do in Arizona?

6  A  I did research work and investigation, principally in

7  Citrus, olives, figs and dates.

8  Q  How long were you there at the University of Arizona?

9  A  About two and a half years.

10  Q  And then at Whittier connected with the university

11  there, how long were you with them during that period of time?

12  A  At Whittier?

13  Q  Yes.

14  A  I don't remember exactly-- two or three years, when

15  I was transferred to Riverside as Superintendent of the Citrus

16  Experiment Station.

17  Q  How long were you connected with that station?

18  A  Not very long, about one year, and I was transferred

19  again to Berkeley.

20  Q  How long did you remain at Berkeley?

21  A  Oh, it depends.  I served in other places.  I was

22  in Berkeley six or seven years as head of the Division of

23  Citriculture, which I organized.

24  Q  In addition to the universities that you attended as

25  a student, have you taken other work also?

1        A  I don't understand that question.

2        Q  In addition to the universities, the education that

3   you received as a student in these other universities, such

4   as Cornell, et cetera, have you taken other educational work?

5        A  You mean graduate work?

6        Q  Yes.

7        A  No.

8        Q  When you were connected with the University at

9   Berkeley were you a teacher?

10       A  Yes.

11       Q  Just what did your work comprise there during that

12   period of time?

13       A  I organized a division and taught citrus and sub-

14   tropical horticulture and did experiment and research work

15   on various problems connected with citrus and avocados, dates

16   and other subtropical fruits.

17       Q  Have you performed any other work as instructor or

18   teacher in agriculture?

19       A  Yes.  After I resigned from the university I taught

20   night school at the junior college in Fullerton for a year or

21   so, and I have delivered lectures at Palomar College, et

22   cetera.

23       Q  Have you written any books?

24       A  Yes.

25       Q  What were the character and nature of the books you

1    have written?

2         A   I wrote the book entitled "Citrus Fruits," which was

3    published by MacMillan & Company and is used in various

4    countries of the world as a textbook.

5         Q   Have you written other pamphlets also?  Have you

6    written on the subject for magazines?

7         A   Yes, a great many.

8         Q   Have you had general supervision of agricultural lands

9    where diversified crops were produced?

10        A   Since I left the university, you mean?

11        Q   Yes.  Or at any time?

12        A   Yes.

13        Q   Will you tell us something about that experience,

14   the manner in which your work was performed in connection

15   with it?

16        A   The agricultural service?

17        Q   Yes.

18        A   I supervised the operation of many citrus and avocado

19   and walnut ranches.  I do a good deal of experting for

20   prospective buyers who come down to buy places of that sort.

21   I do and have done a great deal of damage claim adjudication

22   for the oil companies, for a number of them.  And for public

23   utilities, irrigation districts and private growers who

24   suffer damage from fire, flood or other causes.

25        Q   How long have you engaged in general agricultural

1     management service?

2          A   Since 1919.

3          Q   And during that time have you had contact with the

4     type and kind of farming that is diversified where there are,

5     for instance, row crops and alfalfa and crops besides citrus

6     and subtropical fruits?

7          A   Yes.

8          Q   And a good many of those?

9          A   Yes.

10         Q   And you have some familiarity with methods of irriga-

11    tion in this part of the country, have you?

12         A   Yes.

13         Q   And water duties?

14         A   Yes.

15         Q   And you have some familiarity with soils?

16         A   Yes.

17         Q   With plants in general?

18         A   Yes.

19         Q   Since 1919 have you been almost constantly employed

20    in this type of work in connection with agriculture of a

21    diversified nature?

22         A   Yes, continuously.

23         Q   And still are at the present time?

24         A   Yes.

25         Q   You are at present managing a number of farms?

A   Quite a number.

Q   The Doolan Ranch, I believe you manage that, do you not?

A   I don't use the word "manage."   I prefer the word "supervision."

Q   Very well.   And you do supervise that?   That is a large diversified type farm?

A   Yes.

Q   Several thousand acres?

A   Yes.

Q   And you have managed or supervised other operations of that character, have you?

A   Yes, in the various counties-- Santa Barbara to San Diego.

Q   Did you have occasion to make a study of the Vail properties that resulted in the preparation of the map here which is marked as Vail's Exhibit C for Identification?

A   Yes.

Q   When did you first engage in the study of the Vail properties?

A   The first engagement was in the summer of 1926.

Q   And that was in connection with the old suit we referred to as Santa Margarita vs. Vail?

A   Yes.

Q   And over what period of time were you engaged in that

1    study, the sum total of the time?

2         A  It is pretty hard for me to remember exactly, but we

3    began the studies in the summer of 1926 and worked on them

4    off and on and completed the studies and I think offered the

5    testimony in court here in the summer of 1927.

6         Q  Will you state to the Court just generally how this

7    study was made?  By that I mean if you can give us a word

8    picture of how you went about the study-- in other words,

9    how many people and who was doing what in connection with

10   this study?

11        MR. SACHSE:  Are you referring now to this 1926 study?

12        MR. STAHLMAN:  Yes.

13        THE WITNESS:  The work was so extensive that it was

14   necessary to secure assistants, and I secured a man by name

15   of Carl Nichols, who graduated in my department at Berkeley

16   and had previously been employed by me in Coit Agricultural

17   Service.  I also employed a man by name of George Hutchinson,

18   who was a graduate also of Berkeley but had never previously

19   been employed by me.

20        Of course, in examining the lands where there were so

21   many blocks of lots we had to have at all times the assistance

22   of one of the surveyors who did the survey work and laid out

23   these blocks.  He was always with us to locate us and point out

24   the corners and the boundaries and give us the number of the

25   lot that we were working on.

1    Q And did you yourself work in the field on this study?

2    A  I made the plan of the work and worked with these

3    two men in the field sufficiently to satisfy myself that they

4    were doing it acceptably, and I worked with them from time

5    to time, and part of the time they would ask me to be in

6    court here and I would go back with them again and check on

7    their work and compile the figures from their notebooks in

8    company with these two men.  I also did a number of lots alone.

9    Q And these men who worked for you, did that include the

10   surveyor and these other two gentlemen whom you mentioned

11   were under your supervision and control of the work?

12   A  Yes, sir.

13   THE COURT:  Do you have a copy of that map there?

14   MR. STAHLMAN:  Yes, your Honor.

15   THE COURT:  Let me look at it.

16   MR. STAHLMAN:  I can give your Honor a copy like this,

17   if you like.  However, you can use the old copy.

18   THE COURT:  Do you have an extra copy?

19   MR. STAHLMAN:  Yes, I have a limited number.

20   THE WITNESS:  Your Honor, may I have permission to take

21   off my coat?

22   THE COURT:  Yes, you can take off your coat.  Don't let

23   these lawyers get you excited.

24   MR. STAHLMAN:  I give your Honor a copy.  I have another

25   copy that we can divide among counsel here.

1    Q   Now, Doctor, will you just generally tell us what

2    your plan and system was by which you were making this study?

3    A   When the surveyor had located a lot for us and

4    designated the corners and in general the boundaries, we

5    walked over it and examined the soil and the slopes, we

6    examined erosion cuts, and in a good many cases we bored auger

7    holes and we observed the temperatures which in our judgment

8    applied to those lots or different parts of those lots, and

9    the elevation above sea level, and the character of vegetation

10   on the lots and those things.

11   Q   And there was a temprature study made in connection

12   with this?

13   A   Yes.   Dr. Ford Carpenter had made extensive tempera-

14   ture studies and we looked over his records and discussed

15   them with him and we had those things in the back of our minds

16   when we judged the temperature conditions on any one lot.

17   Q   Directing your attention to the map here, I notice

18   that there are large figures, such as I am indicating 11 here

19   in the center and 8; what do you call the area that is en-

20   compassed within the lines to which that figure designation

21   is given?

22   A   We call them blocks.

23   Q   And the lots that you refer to, then, were they the

24   smaller figures that are outlined within the heavy lines

25   constituting the block?

9186

A   Subdivisions of the block.

Q   And when you say that when this lot was located for you a surveyor surveyed these lots, did he, and did he stake them out?  Were they staked at the time?

A   I didn't hear that.

Q   You say you had a surveyor?

A   Yes.

Q   And he would survey out these lots; is that right?

A   He had already surveyed them.

Q   He had preceded your study?

A   Yes.

Q   Did he stake them out?

A   He didn't drive stakes, no, but he indicated the corners in a general way.

Q   So that when you went upon the property you knew where the corners were?

A   Approximately.

Q   Directing your attention to the key which has been introduced in evidence as Vail's D, I believe you have a copy of that, have you not?

A   Yes.

MR. MOSKOVITZ:  Introduce it in evidence?

MR. STAHLMAN:  Mark it for identification at this time.

Q   Will you explain the manner in which the key system worked in relation to the map, Vail's C?

A   I don't understand that exactly.

Q   Let's approach it in another way.  Who prepared the map showing the lots and the blocks?

A   I don't know.  That was done before I came to the property.

Q   I see.  And the designations that were given to the various lots, do you know who did that?  Was that the surveyor?

A   Yes.  I assume so.

Q   Then the chart that you have here in front of you, or the key-- what do you call that?  Give it the proper designation.

A   It is a classification key.

Q   A classification key.  And how does that work?in relation to the designations upon the map Vail's C?

A   The lots when we made the examination were either all in one class or they were divided, part one class and part another class, and different classes were described in detail in this key.

Q   Now I notice that in the key which you have referred to as Vail's D, under the heading of "Report on Soil Classification and Crop Adaptation of Parts of the Pauba and Santa Rosa Ranches"--

THE COURT:  That is the first long sheet.

MR. STAHLMAN:  Yes, your Honor, the first long sheet

1    here.

2        Q  --that we have on page 2, Class A, Class B, Class

3    C, Class D types of land.  You did give classifications A,

4    B, C, and D, did you not?

5        A  Yes.

6        Q  The copy you have is not exactly like mine.  This is

7    your working copy, isn't it?

8        A  That is right.

9        Q  Now, Classes A, B, C and D, who designated those

10   classifications?

11       A  I did.  And I had some collaboration with Mr. Carl

12   Nichols.

13       Q  Who is Mr. Carl Nichols?  Was that one of the gentle-

14   men working with you?

15       A  Yes.

16       Q  So the classification that you designated here,

17   then, was something that you had determined to be a proper

18   method the classification of this land for the suitability for

19   the crops that could be grown on that land?

20       A  That is right, yes.

21       Q  Your page 13 is the same as what I have here, is it

22   not?

23       A  Yes.

24       Q  Starting in on this type of classification as you have

25   it here, Lot 1, et cetera, will you explain to the Court just

1    how this works in relation to the map?

2         MR. SACHSE:  We are lost, Mr. Stahlman.  Exactly where

3    are you working?

4         MR. STAHLMAN:  Page 13, block 1.

5         THE COURT:  Page 13?

6         MR. STAHLMAN:  The top of the page.

7         MR. SACHSE:  It is page 5 on the bottom.

8         MR. STAHLMAN:  I will indicate to your Honor.  It is

9    page 5 on the bottom, but it is page 13, according to the

10   original record.

11        THE COURT:  Let's use the bottom number, page 5.

12        MR. STAHLMAN:  Very well.  The original record he worked

13   on doesn't have this number.  However, it is designated here

14   as Page 5 on the exhibit and also referred to as Block 1 in

15   the upper right-hand corner.

16        Q  Will you explain, Doctor, how these different lots,

17   the designations there, work in relation to your study and in

18   relation to the map?

19        A  When we located the lot-- we had of course the map

20   also in addition to the surveyor-- we went over the lot, as

21   I explained before, and made an examination of it and wrote

22   down in our notebooks.  We always accepted the same acreage

23   that the surveyor designated.  For example, Lot 1 is 51 acres,

24   and the map indicated that the elevation was 1363 to 1460 feet

25   above sea level-- we accepted that.  Now as we went over it

1  we classified it as all Class D and that there was no waste

2  in that land and that it was level valley land with vigorous

3  native vegetation, lies immediately east of Nigger Canyon dam

4  site, and that the soil type was Hanford sandy loam, and

5  that that examination was made by N. and H., meaning Nichols

6  and Hutchinson working together.

7      Q   Now, then, the information relative to the Classi-

8  fication D, you have a designation here--

9      That would be on page 2, I believe, your Honor.

10     Q   -- which tells what the character and kind of land

11 would be in that particular classification; is that correct?

12     A   Yes.  My designation or explanation of Class D is

13 lands which by reason of their soils, air drainage, topography,

14 slopes, exposures and temperatures are suitable for the growth

15 of such crops as alfalfa, annual summer crops such as potatoes,

16 lettuce, onions, Indian corn, sorghum, et cetera, assuming

17 the summer temperatures between May 1 and October 1 do not

18 fall below 30 degrees Farenheit or rise above 110 degrees

19 Farenheit oftener than once in five years.

20     THE COURT:  Where are you reading from?

21     MR. STAHLMAN:  Page 3 at the bottom.

22     THE COURT:  On page 2 you have a short summary of the

23 various classes, showing particularly what could be grown there?

24     MR. STAHLMAN:  Yes.

25     THE COURT:  Classes A, B, C, and D and waste land.  And

1   then on Class 3 you have a more detailed breakdown as to the

2   incidence of temperatures, et cetera.

3        MR. STAHLMAN:  Yes.

4        THE COURT:  I see.

5   BY MR. STAHLMAN:

6        Q   Doctor, taking an example, as I have here, that Lot

7   1 of Block 1, when you put that land in that catetory that

8   was a result of the study that you made of the land and the

9   conclusion that you reached as to its adaptability for that

10  purpose; is that right?

11       A   That particular lot where the study was made by Mr.

12  Nichols and Mr. Hutchinson together, and I went over their

13  notes, I had instructed them previously and worked with them

14  enough to be satisfied that they were doing it correctly.

15       Q   And that is the same process that you used on each

16  and every one of the lots as shown upon the map, Vail's C?

17       A   That is correct.  My old work copy here shows at

18  the end of each lot certain initials who did the work, and

19  you will find some of them show C, meaning I did it, and some

20  N, meaning Nichols did it, and some N and C, meaning we did it

21  together, et cetera.  I don't believe that is in your copy.

22       Q   Yes, it is here.  Then when you went out into the

23  field and made these studies and made your notes, then what

24  was the next process?

25       A   We got together after supper in the evening and went

9192

1    over the notes and checked them with the map and copied them in

2    proper order and in permanent form.

3         Q  So then it would be correct to say, would it, that

4    if we would take any lot and block number as shown upon the

5    map here and make reference to the key that you have here, you

6    would then find the classification and the kind and character

7    and suitability of the land in that particular lot?

8         A  That is correct.

9         Q  Now, Doctor, the lands that you made a study of at

10   that time, you are familiar with the part of the ranch that

11   is known as the Pauba Grant-- do you know generally where that

12   is located here?

13        A  I don't know the word "grant."  I know the Pauba

14   Ranch.

15        Q  Pauba Ranch?

16        A  Yes.

17        Q  You made studies of the Pauba, the Temecula and the

18   Little Temecula and some parts of Santa Rosa, did you not?

19        A  I did.

20        Q  Now, as to the studies which you made on the Pauba

21   Ranch, you made those as the Pauba Ranch existed at that time,

22   did you not?

23        A  Yes.

24        Q  And also the Temecula and the Little Temecula?

25        A  Yes.

1   Q Now, did you make a compilation, after your study,

2 as to what was the total irrigable acreage on the different

3 ranches?

4   A Yes.

5   Q Are they contained within this key that has been

6 referred to as Vail's Exhibit D for Identification?  Do you

7 have totals there?

8   A Yes.

9   Q Are they totals for each of the separate ranches?

10   A Yes.  There is a total for the Pauba Ranch and a

11 total for the Santa Rosa and the Temecula together.

12   MR. MOSKOVITZ:  On what page is that?

13   MR. STAHLMAN:  On page 4.

14   Q I am referring here to the particular copy that

15 is marked as D for Identification and referring you to page 4.

16 Is that the totals?

17   A Do you wish me to compare these?

18   Q Yes, will you?

19   MR. SACHSE:  Just a moment, your Honor.  If this testimony

20 is going to amount to a statement by this witness that these

21 are the irrigable acreages, I have an objection and I have

22 some voir dire.  It is my specific recollection that Dr. Coit

23 said that he accepted the acreages of these lots and parcels

24 on the basis of figures given him by unknown surveyors.

25   MR. STAHLMAN:  The surveyor worked under his direction

1   and control.

2     MR. SACHSE:  I don't think there is enough foundation

3   to accept the acreage figures as such.

4     MR. STAHLMAN:  Is that an objection?

5     MR. SACHSE:  Yes, that is an objection.

6     THE COURT:  Are you going to put in evidence of the

7   survey here on the acreage?

8     MR. STAHLMAN:  I am going under the impression that the

9   surveyor worked under his direction and control and therefore

10   these surveys are correct.

11     THE WITNESS: Do you want me to answer the question?

12     MR. STAHLMAN:  Just a moment.

13     Shall I explore it further, your Honor?

14     THE COURT:  Yes.

15   BY MR. STAHLMAN:

16     Q  Do you know who the surveyor was who worked for you?

17     A  Who I worked for?

18     Q  Did you work for him or did he work for you-- the

19   surveyor?

20     A  Oh, the surveyor?

21     Q  Yes.

22     A  I beg your pardon.  I thought you said Vail.

23     Q  No, the surveyor.

24     A  I don't remember his name.

25     Q  Do you know whether he was a licensed surveyor?

1      A   I don't know from my own knowledge.

2      Q   Do you know who he was?

3      A   No.

4      Q   You don't remember?

5      A   I don't remember.

6      Q   You accepted the figures that he gave you as to this

7   survey?

8      A   He was furnished by the Vail Company to do this work

9   for me, to assist me in finding these blocks.

10     MR. STAHLMAN:   I think we can connect it up if it is

11   necessary to show that this man was a licensed surveyor and

12   worked for the Vail Company.

13     MR. SACHSE:   Nothing has been offered yet, your Honor.

14   I am just anticipating.  I want to be sure that I don't slap

15   an objection at Mr. Stahlman later that can be fixed.  My

16   objection is going to be to any specific conclusion by Dr.

17   Coit as to the number of acres that are irrigable if we don't

18   have some proof of the acreage of these parcels.  That is the

19   point.

20     MR. STAHLMAN:   We will get at it, Mr. Sachse.  I think

21   I see what your point is.

22     Q   Now, for instance, Dr. Coit, the acreages that appear

23   upon the sheet being No. 4 in Vail's Exhibit D, you have

24   Class A, Class B, Class C, Class D, and waste acreages.

25     A   Yes.

1    THE COURT:  And he had in Block 1 a series of lots?

2    THE WITNESS:  Right.

3    THE COURT:  So you get up on a place and you say, "Here

4  is Lot 1."  Now this surveyor didn't tell you how many acres

5  in Lot 1 was Class D, did he?

6    THE WITNESS: No, sir.

7    THE COURT:  Who did that?

8    THE WITNESS:  I did.

9    THE COURT:  How did you estimate the number of acres in

10  that lot?  You looked over this place and--

11    THE WITNESS:  I walked back and forth over it and if I

12  was with one of my men we discussed it together and if I was

13  alone I went alone and after walking over it I decided as near

14  as I could in my judgment how many acres beloned in Class A

15  and how many acres was B and how many acres was waste.

16    THE COURT:  You have had some experience at this, have

17  you?

18    THE WITNESS:  Yes, sir.

19    THE COURT:  In your lifetime of farm work?

20    THE WITNESS:  I have; yes, sir.

21    THE COURT:  You go out and look at a field and you

22  could pretty accurately estimate the number of acres in it?

23    THE WITNESS: Yes, sir.  We did not do any tape measuring

24  of these lots or we would have been five years at it.

25    THE COURT:  In addition to being able to estimate

1  rectangular pieces as to the number of acres, did you have

2  any experience at having to look at a little mesa somewhere

3  that was cut off by a ravine or something and estimate the

4  number of acres on that mesa?

5      A  We have.  And in my cases we would step it off, step

6  off across this way and step off across that way, and that

7  would help us get an idea of about how many acres there were

8  in that.

9      THE COURT:  These were reasonable approximations based

10 upon your judgment and experience?

11     THE WITNESS:  I believe they were.

12     THE COURT:  Is that going to satisfy you, Mr. Sachse?

13     MR. SACHSE:  Not quite, your Honor.  Maybe I could ask

14 a question or two on voir dire.

15     THE COURT:  I think you could do the same thing.

16     MR. SACHSE:  I am not quarreling with this.

17     MR. STAHLMAN:  It is not much different than taking an

18 areal map and comparing it.

19     THE COURT:  Mr. Sachse, what is your question?

20     MR. SACHSE:  Just about one or two questions, Dr. Coit.

21

22              VOIR DIRE EXAMINATION

23 BY MR. SACHSE:

24     Q  How did you know how many acres were in the lot, the

25 individual lot?  Let's pick any one lot-- well, Lot 22 in

1   Block 1, how did you know how many acres were in that lot?

2           MR. STAHLMAN:  It is on the map.

3           THE WITNESS:  I had to accept that.  I didn't do the

4   surveying work.

5   BY MR. SACHSE:

6           Q  And then you, from your own visual observation,

7   decided that 30% of that was class A; is that right?

8           A  That is right.

9           Q  So then you would take 30% of the figure 22 and

10  representing Class A; is that how you did it?

11          A  Right.

12          MR. STAHLMAN:  I have another question, your Honor.

13          THE COURT:  Wait a minute.  Mr. Sachse just dug a hole

14  for you and let you drop right into it.

15          You go out, you look at a piece of ground, you had the

16  map with you, and on the map this surveyorhad Lot 23, Block 4

17  and he had the figure 59 acres?

18          THEWITNESS:  Yes.

19          THE COURT:  Then you looked over the classification

20  of the various grounds and let us assume that you had one

21  piece of ground there that looked to you like Class A.  Did

22  you approximate the number of acres in that particular piece,

23  or did you merely estimate what percentage that was of the

24  whole of the lot?

25          THE WITNESS:  I estimated the number of acres in the piece

THE COURT:  Then you saw another piece of ground that looked like Class B and you estimated the number of acres in it?

THE WITNESS:  Yes.

THE COURT:  So when you got all done you would come up with a figure, and suppose when you got all done with your estimation you came up with a figure of 55 acres and the surveyor told you that actually, according to his computation, there was 59 acres in that lot.

THE WITNESS:  That is right.

THE COURT:  Did that happen sometimes?

THE WITNESS:  Sometimes it did.  Sometimes I would be a little under and we would go back and adjust that as near as we could.

THE COURT:  But your estimations of the number of acres in each classification were based upon your observation and your experience plus stepping off, if necessary?

THE WITNESS:  That is right.

THE COURT:  Plus some minor adjustment down or up, based upon some other calculations that the surveyors made?

THE WITNESS:  That is right.

THE COURT:  Did you do it that way?  Or did you go into this particular lot and look it over and after you got through looking it over did you say, "Well, I think 10% of this is Class A, 20% is Class B, 30% is Class D?"

THE WITNESS:  No, we didn't do that.

MR. KRIEGER:  May I ask one question, your Honor?

THE COURT:  Well, now that we have rehabilitated the witness, go ahead, Mr. Krieger.


### VOIR DIRE EXAMINATION

BY MR. KRIEGER:

Q  When you were taken out and shown these lots, were the corners of the lots pointed out to you, or were there any kind of guides to designate where the lot fell?

MR. STAHLMAN:  Pardon me, Mr. Krieger.

Did you hear that question, Doctor?

THE WITNESS:  No.

MR. STAHLMAN:  He has a little difficulty in hearing, so I suggest that you come up a little closer.

BY MR. KRIEGER:

Q  (Approaching the witness.)  My question, Dr. Coit, was this:  When you went out and looked at the land and saw a particular lot, were the corners of that lot pointed out to you or were they flagged in some way?

A  In some cases they were flagged, in many cases not; but the surveyor pointed them out as well as he could to us so that we could get the corners and in general the boundaries of that lot.

Q  I am just wondering how he pointed them out.

1      A   With his fingers; about here.  That is just about

2  where the corner of that lot is, and the boundary comes right

3  along here, and then it goes down this way over that ridge

4  and back over there.  Then we would walk up the ridge and

5  look down and he would show us just about where that was.

6      THE COURT:  Did you use the natural boundaries?  I

7  noticed that many of these lots seem to have lines that follow

8  a contour or a ridge or something.

9      THE WITNESS:  In many cases that was the case.

10      THE COURT:  In other cases that was not true?

11      THE WITNESS:  That is right.

12      MR. KRIEGER:  And when he pointed the corners of the

13  lot out to you, at that time did he designate how many acres

14  he thought were in that lot?

15      THE WITNESS:  We had the figures before us.

16      MR. STAHLMAN:  Are you through?

17      MR. KRIEGER:  Yes.

18      MR. STAHLMAN:  I think I have something else here that

19  I think might refresh his memory.

20

21                  FURTHER DIRECT EXAMINATION

22  BY MR. STAHLMAN:

23      Q   By the way, on this map it says "From surveys made

24  by Davidson & Fulmor," and then the signature "Willis S.

25  Jones."  Who was Willis S. Jones?

1     A   Jones was an engineer employed by the Vail Company,

2   who had a good deal to say in regard to what type of work I

3   was expected to do.

4     Q   And Mr. Jones has passed away, has he not?

5     A   I don't know.  Mr. Jones took me in his car all over

6   the property pretty thoroughly before we ever started work

7   and explained what was needed to be done.

8     THE COURT:  This Jones, I suppose, is long gone?

9     MR. STAHLMAN:  Yes, your Honor, he has passed away.  He

10  was, however, an engineer for Vail Company and was a very

11  well-known and recognized engineer.

12    MR. SACHSE:  As far as I am concerned I have no objec-

13  tion to the admissibility of this at all.  I think it has

14  come out now clearly enough that what my objection will be,

15  if it is any, will be to the weight really, and it will be a

16  question of how reliable it is.  There is no objection to Dr.

17  Coit testifying on the basis of the figures.

18    THE COURT:  Of course, this is what every farmer has

19  done for years, starting back in the days when you described

20  a piece of ground as being from the white oak to the stump,

21  et cetera, and a man who knows the soil can make pretty

22  accurate estimations of amounts of ground.  I haven't any

23  doubt about that.  It goes to the weight, I think.

24    MR. SACHSE:  Actually, what is worrying me is that Mr.

25  Veeder isn't here.  I can't help but recall my map of the

1   boundaries of the Fallbrook Utility District.

2       MR. STAHLMAN:  Don't go helping Mr. Veeder out.  When he

3   shows up here we will have enough trouble.

4       I think I could settle this thing very quickly.

5       THE COURT: How?

6       MR. STAHLMAN:  If your Honor will permit me to withdraw

7   the witness from the stand for just a moment.

8       THE COURT:  You are putting on your case.  Of course,

9   I am acting as co-counsel here, but you are putting on your

10  case.

11      MR. STAHLMAN:  May I withdraw him for a moment?

12      THE COURT: Just step down for a minute.

13      MR. STAHLMAN:  I will call Col. Bowen.

14      THE COURT:  The Colonel is a man of parts and experience.

15  Many things he has been able to contribute.  We will see.

16

17                  ALLEN C. BOWEN,

18  called as a witness for the defendant Vail Company, being

19  previously sworn, testified as follows:

20

21                  DIRECT EXAMINATION

22  BY MR. STAHLMAN:

23      Q  Col. Bowen, have you become familiar with the studies

24  that were made by Dr. Coit in connection with the soil

25  classification of the Vail Ranch?

1        A  Yes, sir.

2        Q  And have you checked those studies to determine the

3   reasonable accuracy of them?

4        A  Yes, sir.

5        Q  Did you go upon the properties in many instances

6   in your check?

7        A  Yes, sir.

8        Q  And you had in your possession the key to this first

9   study prior to the time these other additions were made,

10  such as shown on Exhibit C, did you not?

11       THE COURT:  You mean Exhibit D?

12       MR. STAHLMAN: Exhibit D, yes.

13       THE COURT:  With the exception of the material concern-

14  ing the later acquisitions.

15       THE WITNESS:  Yes, sir, I had that in my possession.

16       THE COURT:  Did you have a map such as Exhibit C?

17       THE WITNESS:  Yes, sir.

18       THE COURT:  Except for the new additions?

19       THE WITNESS:  Yes.

20  BY MR. STAHLMAN:

21       Q  Did you form an opinion as to the reasonable accuracy

22  of the acreages that Dr. Coit had determined in this study?

23       A  Yes, sir.

24       Q  What is your opinion as to whether or not they are

25  reasonably accurate?

9206

A   It is my opinion that the results of the study made by Dr. Coit and his assistants here on the Pauba Ranch are reasonable in that they show land which is reasonably susceptible of economic and profitable irrigation.

THE COURT:   What about the areas in the lots?  On the map Exhibit C each lot has in it a certain area.  Did you do any spot checking to see how accurate those estimations or surveys were as to the area?

THE WITNESS:  Yes, sir.  I found it very easy to orient myself with this map on the ground with the physical features-- ridges, gullies, roads, stream systems, et cetera-- and I spot checked the area of some of those lots in there and found them to be quite close, that is, the total area of the block and lot.

BY MR. STAHLMAN:

Q   And did you reach an opinion as to the sum total of the area also as being reasonably accurate?

A   Yes, sir.  For the crops designated by Dr. Coit, which included subtropical fruits, excepting Dr. Coit's valuation of the suitability for the growth and production of subtropical fruits on those steeper sites there, in my opinion these are accurate.

Q   And that applies also to the totals?

A   Yes, sir.

MR. KRIEGER:  May I ask Col. Bowen a question, your Honor?

1          THE COURT:  Yes.

2

3                         VOIR DIRE EXAMINATION

4     BY MR. KRIEGER:

5          Q  Did you assume the same acreages that are set forth

6     on that Exhibit C, Col. Bowen, as being correct?

7          A  In most instances, Mr. Krieger, I did.  I spot checked

8     those.

9          Q  How did you spot check them?

10         A  By planimetering the map in the office.  I made no

11    field surveys to determine areas.

12         Q  No field survey on any of the lots; is that right?

13         A  That is correct.

14         Q  To your knowledge, has there been any survey of the

15    land subdivided on that map or shown on that map since 1926?

16         MR. STAHLMAN:  May I have the question?

17         (The Reporter read the pending question.)

18         MR. STAHLMAN:  I don't know what he means.

19         THE WITNESS:  That is a pretty broad question, Mr.

20    Krieger.  There are many kinds of surveys.

21    BY MR. KRIEGER:

22         Q  I mean, to confirm the information on Exhibit C.

23         A  Do you mean soil surveys?

24         Q  No, I mean land surveys-- acreage.

25         THE COURT:  You are talking now particularly about

1    acreage areas in the lots?

2         MR. KRIEGER:  Yes.  I am not talking about the other

3    part of the report.

4         THE COURT:  Not the breakdown of the lot into various

5    classes, but the total acreage in a lot.

6         MR. KRIEGER:  That is correct.

7         THE WITNESS:  I know of no such surveys.

8    BY MR. KRIEGER:

9         Q  Did you check this Exhibit C against any aerial

10   surveys?

11        A  How do you mean, Mr. Krieger?  Do you mean the

12   topography against aerial surveys?

13        Q  To determine the acreage within the lots.  I am

14   concerned here just as a matter of foundation to see that these

15   estimates of acreage or these that were made by a surveyor

16   many years ago were correct.

17        MR. STAHLMAN:  I will put your mind at ease on that,

18   if you think it is important.  One of the surveyors is still

19   alive and still available and we will have him here, if you

20   want him.

21        THE COURT:  Col. Bowen, this base map on Exhibit C,

22   before the lots and blocks were put on it, shows a lot of

23   topography.  It shows contour lines and stream beds and

24   ridges and gullies, et cetera.  Did you make any spot check

25   to see generally that the topography was generally all right?

1    THE WITNESS:  Yes, sir, both on the ground and by

2    comparison with aerial photographs.  Of course, the topography

3    at that time was undoubtedly made by triangulation methods

4    and they didn't use the refinements of aerial photography to

5    get more exact topography in those days, so there are some

6    differences between the actual topography and what is depicted

7    on this topographic map.  But they are not serious differ-

8    ences.

9    THE COURT:  Generally speaking, then, the topography

10   would be reasonably accurate?

11   THE WITNESS:  Yes, sir.

12   THE COURT:  And then you spot checked also the areas

13   shown in certain of the lots to see whether the acreage listed

14   was a reasonable approximation of the acreage?

15   THE WITNESS:  Yes, sir.

16   THE COURT:  That checked out, too?

17   THE WITNESS:  Yes, sir.

18   THE COURT:  Then as to the breakdown of the area within

19   a lot between the various classifications, you found that

20   generally acceptable, except as to the conclusions as to some

21   of the subtropical fruits?

22   THE WITNESS:  Yes, sir.

23   THE COURT:  In other words, where the key Exhibit D

24   would show in a certain lot a certain number of acres in

25   Class A, high mesas and high slopes, the number of acres shown

9210

1    in that classification was reasonably accurate, but your

2    difficulty came with agreeing with the conclusion that it was

3    suitable for oranges, lemons, avocados and cheramoyas.

4         THE WITNESS:  Yes, sir.  I have no temperature data

5    which Dr. Coit says was available to him when he made these

6    decisions.  It is possible, as I testified here earlier, there

7    is an area upstream from Temecula Canyon which is much more

8    temperate and even in climate, that is, it doesn't experience

9    as low a temperature or as high temperatures because of the

10   ocean breezes that pour up the canyon, and somewhere in there

11   can be, in my opinion, drawn a line downstream from which

12   suitable soils would be susceptible to the production of

13   subtropical fruits.

14        THE COURT:  Downstream or upstream?

15        THE WITNESS:  Downstream, sir, coming down toward the

16   Temecula Canyon.

17        THE COURT:  However, when you got further downstream--

18        THE WITNESS:  As you get further away from Temecula

19   Canyon, the climate is not tempered as much by the ocean

20   breezes that funnel up that gorge.

21        THE COURT:  When you get clear down in Temecula Canyon

22   toward the beginning of the Santa Margarita, you get so low

23   that it gets too cold, doesn't it?

24        THE WITNESS:  Yes, sir, and that is true even of the valley

25   lands like the Temecula and Murrieta Valley; your cold air

1   moves down into those valleys and they would be colder than

2   the higher lands.

3       THE COURT:  This is an intermediate area between the

4   lower reaches of the Temecula and the upper reaches; there is

5   an intermediate area in there that you are talking about?

6       THE WITNESS:  Yes, sir.

7       THE COURT:  Mr. Krieger, do you have some further ques-

8   tions?

9       MR. KRIEGER:  No, your Honor.  My objection goes only

10  to the acreage in the lots, and I understand that Mr. Stahlman

11  is going to tie that together later on.

12      MR. STAHLMAN:  Yes, if you feel that we have to have the

13  surveyor, I think we can get hold of him.

14      THE COURT:  I think there is a reasonable foundation

15  laid.  He is not claiming that these are accurate to the last

16  tenth of an acre, but the Colonel says that spot checking shows

17  these were reasonably accurate estimates of acreage and that

18  he has spot checked the topography and with minor exceptions,

19  shown by the difference in working from aerial surveys and

20  from the old method of running lines, that the topography is

21  reasonably accurate.  It seems to me that that is a reasonable

22  foundation.

23      MR. STAHLMAN:  Then at this time I will offer in evidence

24  the map Vail's Exhibit C.

25      THE COURT:  We will not pass on that today because Mr.

1    Veeder will undoubtedly want to be heard at length.

2         MR. STAHLMAN:  Very well.

3         That is all I have of Col. Bowen at this time, your

4    Honor.

5         MR. SACHSE:  May I ask one question of Col. Bowen on

6    Cross-examination.

7

8                    CROSS-EXAMINATION

9    BY MR. SACHSE:

10        Q  Has the Office of Ground Water Resources prepared a

11   soil classification of the Vail properties?

12        A  Of a portion only, Mr. Sachse, and that is the Santa

13   Rosa Grant.  We have not made any surveys, according to our

14   system, on the Pauba or Temecula or Little Temecula, which are

15   depicted on Vail's Exhibit C.

16        MR. SACHSE:  That is all.

17        MR. KRIEGER:  One further question, your Honor.

18

19                    CROSS-EXAMINATION

20   BY MR. KRIEGER:

21        Q  In reviewing this portion of the Vail Ranch, when did

22   you do that, Colonel?

23        A  I did that first in 1952, Mr. Krieger.  We were then

24   preparing for the trial in the fall of 1952.  I remember it

25   very distinctly, because I spent a long weekend around the 4th

1    of July out there making a study-- that weekend and others.

2    It was in the period July to mid-July that I first made a

3    rather detailed check on the ground of this report, and since

4    then I have had occasion to spot check it from time to time.

5        Q   Does that include the additional parcels shown on the

6    map?

7        A   No, I am testifying only to the original survey.  I

8    have not checked any of these parcels shown in color on

9    Vail's Exhibit C.

10        THE COURT:  That is 1 to 5, inclusive?

11        THE WITNESS:  Yes, sir.

12        THE COURT:  Mr. Clerk, you gave me a number, but it is

13    not in the record for this well log of the Sievers well.

14        THE CLERK:  16A-160, your Honor.

15        THE COURT:  16A-160.

16        (California's Exhibit 16-A-160 marked for identification.)

17        THE COURT:  We will take our recess at this time.

18        (Recess.)

19        MR. STAHLMAN:  Your Honor, I am through.

20        Anybody else any questions of Col. Bowen?

21        Resume the stand, Dr. Coit.

22

23

24

25

1          JOHN ELLIOTT COIT,

2   recalled as a witness in behalf of Defendant Vail Company,

3   having been previously sworn, testified further as follows:

4

5               DIRECT EXAMINATION (Resumed)

6        MR. STAHLMAN:  Your Honor, to pursue this matter a

7   little further, I would like to alert the Court as to what

8   has heretofore happened in relation to the testimony that has

9   been given here.  The plaintiff in the case, the Government,

10  in the first trial before Judge Yankwich established proof

11  by a witness that they called.  They called Mr. Hall and he

12  gave testimony in connection with Dr. Coit's study, as well

13  as the map, and it was all admitted in evidence in the first

14  trial, findings of fact were based upon it, as to what the

15  irrigable acreage was.

16       THE COURT:  Did the Government introduce Exhibit C?

17       MR. STAHLMAN:  That is right.

18       THE COURT:  Except for the new additions?

19       MR. STAHLMAN:  Yes, your Honor.

20       THE COURT:  And they introduced Exhibit D except for

21  the new additions and reclassifications?

22       MR. STAHLMAN:  That was introduced, and the findings of

23  fact and conclusions of law were based on it, and none of

24  those were disturbed by the Ninth Circuit hearing.

25       THE COURT:  Of course, the fact that the Ninth Circuit

1   didn't say anything about that, that was not the problem that

2   they considered.

3       MR. STAHLMAN:  No, it was not.  I have the testimony

4   here that was given at that time.

5       THE COURT:  Dr. Coit, if we were to take you over this

6   Exhibit D block by block and parcel by parcel, would you

7   testify to the matters that are contained in this report?

8       THE WITNESS:  Yes, I did, here in court.

9       THE COURT:  You say you did?

10      THE WITNESS:  Yes, sir.

11      THE COURT:  Would you, if I asked you as to each lot and

12  each block--

13      THE WITNESS:  Yes.

14      THE COURT:  Would this be your testimony as shown in

15  Exhibit D?

16      THE WITNESS:  Yes.  Yes, it would again.

17      THE COURT:  By again you mean you testified before Judge

18  Yankwich at the first trial?

19      THE WITNESS:  Yes.

20      MR. STAHLMAN:  Not before Judge Yankwich.  He testified

21  in the first trial of Santa Margarita vs. Vail.  But the same

22  testimony he has given here was given by Mr. Hall, who was

23  called as a Government witness before Judge Yankwich.  Of

24  course, we have this matter clear here that your Honor asked

25  him the question that if he were to be asked each one of the

1    questions as to the particular lots and figures in Vail's

2    Exhibit D, your testimony would be the same as it is written

3    in this exhibit, would it?

4        THE WITNESS:  That is right, yes.

5        THE COURT:  For example, on page 17, let's take Lot

6    11, Block 3, you would testify that there was approximately

7    31.5 acres; that the elevation was from 1525 to 1625 feet,

8    that it was all class A and no waste; that there were slopes

9    of 7 to 23 degrees; that there were hills, Ramona sandy loam,

10    and the end would indicate that Nichols did that work?

11        THE WITNESS:  Yes, he made the inspection under my

12    direction.

13        MR. KRIEGER:  Where are you, your Honor?

14        MR. STAHLMAN:  Page 17.

15        THE COURT:  I just took one example.

16    What I would propose to do would be to do as I did

17    before, to permit this document, when Mr. Veeder gets here,

18    into evidence as the testimony of this witness on direct

19    examination, subject to cross-examination if anyone is inter-

20    ested in cross-examining him.

21        MR. SACHSE: Would that include the new areas also, your

22    Honor?

23        MR. STAHLMAN:  Well, it would, because they are in here.

24    However, I can go over these new areas with him.

25        THE COURT:  Lay some foundation about what this

1    reclassification consisted of in the new areas.

2        MR. STAHLMAN:  Yes, your Honor.

3    Q  Now, Doctor, recently you have made some reclassifica-

4    tion of some portions of the land on the Vail Ranch, haven't

5    you?

6        A  My attention was called to certain parcels of land

7    in the Pauba Ranch, the use of which had changed completely

8    since the original classifications, and I was asked to re-

9    classify them.

10       Q  And you went up to the Pauba Ranch and inspected those

11   particular areas, did you not?

12       A  I did.

13       Q  You had made a report on those areas?

14       A  Yes.

15       Q  You have it with you here?

16       A  Yes.

17       Q  And it is in this portion of Vail's Exhibit D, is

18   it not?

19       A  Yes.

20       THE COURT:  The first two pages.

21   BY MR. STAHLMAN:

22       Q  And from your personal inspection on the ground and

23   the observation that you made and consideration of the

24   examination you previously made, did you come to the conclu-

25   sion that the changes as shown on these first two pages were

1    changes that showed the condition of the land at the present

2    time?

3        A  Yes.

4        Q  And then you made a calculation from that, did you

5    not, that changed the number of acres in relation to those

6    particular lots and blocks?

7        A  Yes.

8        THE COURT:  Is this based entirely on what the Vail

9    Company is now doing with the land, or was it based upon a

10   change in your judgment as to what the land would be suitable

11   for?  Do you understand my question?

12       THE WITNESS:  Yes, your Honor.  I think 95% of it was

13   due to the change in the condition of the land, when most of

14   it up there on the Pauba Ranch was classified previously as

15   waste because it was river bottom full of gullies and a tangle

16   of cottonwood trees and willows and everything of that sort

17   and we classed it originally as waste land.  But now when I

18   go there I find it is all cleared and leveled and it is

19   beautiful agricultural land in crops.  But in checking these

20   different crops there are two or three here that might be a

21   little bit different from my original.

22       THE COURT:  Of course, when you made the survey in 1926

23   the Vail Dam had not been built; is that right?

24       THE WITNESS: No, it had not.

25       THE COURT:  So therefore these river bottoms were subject

1    to flood?

2         THE WITNESS:  Certainly.

3    BY MR. STAHLMAN:

4         Q  And the major portion of the changes that you made

5    were in this area immediately downstream from the dam that

6    has now been put under cultivation; is that correct?

7         A  Yes.

8         THE COURT:  Were most of them in the river bottom?

9         THE WITNESS:  Most of them.

10        THE COURT:  Now, what about these new acquisitions,

11   the five parcels?  Have you looked those over?

12        THE WITNESS:  I did.

13        THE COURT:  And how did you get the acreage on those?

14        THE WITNESS:  It was furnished to me by the Vail Company.

15   MR. STAHLMAN:  Mr. Wilkinson gave you the--

16        THE WITNESS:  Yes.

17   MR. STAHLMAN: We went with you and had the map.

18        THE WITNESS:  Mr. Wilkinson went with me and to locate

19   the parcels and the corners and the boundaries and he furnished

20   those acreages, which I put down in my notebook, and we went

21   all over the land and examined it in very much the same way we

22   did originally and made the classifications accordingly for

23   the five of those parcels.

24        THE COURT:  Did you again yourself estimate the number

25   of acres in each classification?

1          THE WITNESS:  Yes.

2          THE COURT:  And then checked your totals to see how they

3     compared with the figure that Mr. Wilkinson gave you?

4          THE WITNESS:  Yes.

5          THE COURT:  Were there again some adjustments that had to

6     be made?

7          THE WITNESS:  Yes, some slight adjustments.  The last

8     one X-5 there, if you will notice, your Honor, I classified

9     as all waste.

10         MR. STAHLMAN:  That is this one here.

11         THE COURT:  Now, let's number these short pages on

12    Exhibit D as A, B, C, so we will know what we are talking

13    about.

14         Starting from the top.

15         Now, in addition to what you have already told us, you

16    then figured the water duty for various parcels of ground;

17    is that right?

18         THE WITNESS:  I didn't put any figures on the water duty

19    in my report here, no.

20         THE COURT:  Who figured the water duty on Exhibit D,

21    page E, portion of Santa Rosa, Wildomar and Murrieta tract

22    only?

23         THE WITNESS:  I don't remember.

24         MR. STAHLMAN:  Those water duties, your Honor, are the

25    same water duties that the Government used, the standard water

1    duty.  We will show how that was put on there.

2         MR. SACHSE:  I don't think it should be on the exhibit,

3    if this man didn't do it.

4         THE COURT:  Except that someone else could identify it

5    in the exhibit and the exhibit could go ahead.

6         There is an obvious error, though, on page E.  You have

7    Class A, Class B, Class C, and the next class is Class A

8    again.  It should be Class D, I take it.

9         MR. STAHLMAN:  Yes, your Honor.

10        THE COURT:  Will you correct it, Mr. Clerk?

11        MR. STAHLMAN:  I will correct it right here, your Honor.

12   I have the original.

13        THE COURT:  You have the original?  Correct it.

14        And also on page F there are figures of water duty and

15   someone else did that work too; is that right?

16        MR. STAHLMAN:  That is right.  That is merely a matter

17   of calculation, using the same standards that we used in

18   connection with all the soil surveys.

19        THE COURT:  Let's go to something else.

20        MR. SACHSE:  Just a moment, please, your Honor.  If you

21   are through with these preliminary questions, I have a specific

22   objection to the admissibility of any of the conclusions in

23   Exhibit D, and I will use for my example Parcels 2 and 3 of

24   the new parcels.

25        Parcels 2 and 3, if you will observe the map, are

1    obviously non-riparian.  They are subsequent acquisitions

2    added to the Vail Ranch and are not traversed by any water-

3    course, and they are, if your Honor will compare them with

4    Government's Exhibit 15, et cetera, wholly located in areas

5    of older alluvium, and it is my position-- and your Honor

6    knows that I have consistently followed it-- that water duty

7    on irrigable acreage is absolutely immaterial if the only

8    water that can be used on the land is vagrant ground water,

9    and I contend that that is the situation as to Parcels 2 and 3.

10   And that small parcel below it, which has no number,

11   which is outlined in green-- I don't know what that is.  What

12   is that?  Oh, it's just that my number is marked wrong.

13   In other words, Parcels 2 and 3 cannot share in any Vail

14   riparian right, and therefore any evidence as to irrigable

15   acreage on them is immaterial because they are using ground

16   water.

17           THE COURT:  What do you say to that, Mr. Stahlman?

18           MR. STAHLMAN:  I have this to say, your Honor, that on the

19   map that was introduced by the Government this land here is

20   riparian to a tributary of the Santa Gertrudis Creek.  It is

21   not our contention that this land here, having been subse-

22   quently acquired, it is not our contention that it is subject

23   to the riparian waters of the Santa Margarita proper.  However,

24   it does have some riparian rights, such as they may be, upon

25   this tributary of that creek which is shown on the Government's

1    map.

2         And that is true also of No. 1, which we recognize--

3    it has been talked about previously in this case, the August

4    Cantarini piece which the Vails acquired.  That is on the

5    tributary of this Long Canyon.  It is a small tributary.

6    So it is not our contention, however, that that land is

7    subject to water duty from the Temecula Creek.

8         THE COURT:  The record will show Mr. Sachse's position

9    and yours, and we will pass it until Mr. Veeder gets here.

10        MR. SACHSE:  I think there is one other matter I should

11   state for the record, and that is that I think all of this

12   should be subject to a motion to strike until the riparian

13   status is clarified.  I want to make it entirely clear, Mr.

14   Stahlman.  You don't have to clarify it for me.  I am satis-

15   fied of my own knowledge that the Vail properties are riparian.

16   But since this is an adversary proceeding of everybody against

17   everybody, I think you ought to get it in.

18        MR. STAHLMAN:  We expect to have that testimony from

19   another witness.

20        THE COURT:  Do you want to cross-examine the Doctor now?

21        MR. SACHSE:  I have no cross-examination as to the

22   irrigable acreage, your Honor.

23        MR. MOSKOVITZ:  I want to ask just one question, your

24   Honor.

25

1    which is not now and never has been covered by water?

2         MR. STAHLMAN:  Yes.  I think there are certain amounts

3    of acreage that should be knocked out of there that will never

4    be irrigated.

5         THE COURT:  That has at any time been covered by water.

6         MR. STAHLMAN:  But we have this situation, your Honor.

7    Take Hodges Dam, for instance.  Year after year water could be

8    applied to that land, it would have a water duty, and some

9    of it is farmed.

10         THE COURT:  In figuring your totals you have enough

11    irrigable land that you are not going to worry.

12         MR. STAHLMAN:  We are not going to worry if you knock

13    out a couple of hundred acres or whatever it is going to be.

14         THE COURT:  Give us some approximation.  The dam would

15    vary from time to time, but give us a starter of the area

16    that has at some time or other been covered by water from Vail

17    Dam.

18         MR. STAHLMAN:  We will check that and I will give it to

19    your Honor.  I don't want to pick a figure out of the air.

20         THE COURT:  And what parcels it concerns.

21         MR. STAHLMAN:  Yes.

22         THE COURT:  It would be all of some parcels and maybe

23    parts of others.

24         MR. STAHLMAN:  Very well, I will do that.

25         THE COURT:  All right.

1      Mr. Moskovitz, any further questions?

2      MR. MOSKOVITZ:  No, your Honor.

3      THE COURT:  Mr. Krieger?

4      MR. KRIEGER:  I just wondered if the witness might not

5  be able to help us with that problem right now, inasmuch as

6  he is the one who introduced this exhibit.  We could go over

7  those parcels, Mr. Stahlman, if it is convenient for you.

8      MR. STAHLMAN:  I can go over it.  I think that is

9  probably an engineering problem entirely.  We will go over it

10  and come in here with something and you can bat it around.

11  I will have Mr. Wilkinson testify on that.  He has been there

12  and he knows how the dam is formed and how it functions and

13  what area has been covered.  However, I don't want to give you

14  an answer on it at this moment.  I would like to have over

15  night at least or over the weekend to make a check.  I think

16  it is reasonable that there are areas there that are dis-

17  qualified.

18      MR. KRIEGER:  It is all right with me.  I thought it

19  was convenient for you to do it with this gentleman on the

20  stand.

21      THE COURT:  Well, I would like to adjourn early, if you

22  don't mind.  We could adjourn right away.

23      MR. STAHLMAN:  Not at all, your Honor.

24      THE COURT:  Any objection?

25      MR. STAHLMAN:  No objection.  I presume that Mr. Veeder

1   will be here in the morning and we had better have Dr. Coit

2   back here, as he might want to cross-examine him.

3   THE COURT:  Yes, Dr. Coit, be back tomorrow morning.

4   I haven't heard any more from Mr. Veeder, but he is

5   probably on his way here now.

6   MR. KRIEGER:  Your Honor, is it understood that Mr.

7   Veeder will complete his cross-examination of Mr. Illingworth

8   before we start on Tuesday?

9   THE COURT:  That is what I am going to ask  him to do.

10   I asked Mr. Moskovitz to tell Mr. Veeder tonight.  He will

11   probably be here sometime this evening.  I would like to have

12   him complete Mr. Illingworth's cross-examination while Mr.

13   Moskovitz is here before Mr. Fred Girard takes over.

14   You have some other witnesses to go forward with tomorrow

15   if we finish up with Dr. Coit?

16   MR. STAHLMAN:  The next witness is Mr. Wilkinson.  As

17   I say, we just got these maps yesterday and I certainly like

18   to spend some time on them before we get into them.

19   THE COURT:  Well, I have an awful lot to do before

20   April 6th when I get out of here.  Any time that somebody

21   suggests that we adjourn you will find a receptive ear.

22   MR. STAHLMAN:  Why don't we adjourn tomorrow then after

23   cross-examination of Dr. Coit and Mr. Illingworth.

24   THE COURT:  Mr. Krieger, you will start on Tuesday

25   morning?

1    MR. KRIEGER:  Yes.

2    THE COURT:  All right, let's adjourn until tomorrow

3  morning at 10 o'clock.

4        (Adjournment until Friday, March 27, 1959, at 10 A.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25