# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al,

Defendants.

No. 1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**  San Diego, California

**Date:**  Friday, March 27, 1959.

**Pages:**  9229 to 9281

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

-----

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

-----

UNITED STATES OF AMERICA,      )
                               )
               Plaintiff,      )
                               )
      vs.                      )        No. 1242-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
               Defendants.     )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Friday, March 27, 1959

APPEARANCES:

      For the Plaintiff          WILLIAM H. VEEDER, ESQ., and
                                 WILLIAM E. BURBY, ESQ.,
                                 Special Assistants to the
                                 Attorney-General,
                                 Department of Justice,
                                 Washington, D.C.

APPEARANCES (Continued):

| | |
|---|---|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney-General, by<br>ADOLPHUS MOSKOVITZ, ESQ.,<br>Deputy Attorney-General, and<br>FRED GIRARD, ESQ. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al., | FRANZ R. SACHSE, ESQ. |
| For Defendant Murray<br>Schloss Foundation | WALTER GOULD LINCOLN, ESQ. |
| For Defendant Oviatt | MESSRS. BEST, BEST & KRIEGER,<br>By JAMES H. KRIEGER, ESQ. |
| For U. S. Navy | LCDR. DONALD W. REDD.<br><br>PHIL D. SWING, ESQ. |

# INDEX TO WITNESSES

**For Defendant State of California:**

|  | D | X | RD | RX |
|---|---|---|---|---|
| Leland Illingworth | | 9236 | | |

# EXHIBITS

| Defendant State of California Exhibits | Iden. | In Evid. |
|---|---|---|
| AT | | 9275 |
| AU | | 9275 |
| AV | | 9275 |
| AW | | 9275 |

1    SAN DIEGO, CALIFORNIA, FRIDAY, MARCH 27, 1959.   10:00 A.M.

2

3         (Other matters.)

4         THE CLERK:  Number two, the case on trial, 1247-SD-C,

5    United States vs. Fallbrook, et cetera, et al.   Further court

6    trial.

7         THE COURT:  The record will show that Mr. Veeder is

8    present.

9         MR. VEEDER:  Thank you, your Honor.

10        THE COURT:  We want you to know that we had Mr. Burby

11   really working here yesterday trying to protect the record--

12   reserved objections, et cetera.

13        MR. VEEDER:  Thank you.  I looked enough at the record

14   to know.

15        THE COURT:  He didn't miss a bet.  If somebody had

16   offered the Declaration of Independence he would have insisted

17   that we wait until today to have a ruling on it.

18        MR. VEEDER:  I am glad to hear that things went all

19   right.

20        Your Honor, Mr. Stahlman has talked to me about an

21   order respecting the stipulation of October 23, 1951, pur-

22   suant to which it was agreed that as between the Vail Company

23   and the United States there would be no trial in this pro-

24   ceeding.  Now we have agreed that that stipulation is no longer

25   effective.  I will present to your Honor on Tuesday morning a

1    proposed order to effectuate that.

2         THE COURT:  Mr. Stahlman has an order.  Did you see it?

3         MR. VEEDER:  Yes, I did, and I have made a suggestion to

4    him and he has agreed to it.

5         THE COURT:  Make it in the form of a stipulation that

6    you now stipulate to set aside the stipulation heretofore

7    entered into, and the Court will so order.

8         MR. VEEDER:  Fine.

9         MR. STAHLMAN:  And that it will be effective as of the

10   time we started our trial as of yesterday.

11        MR. VEEDER:  That is all right.

12        THE COURT:  All right.  Now go ahead.

13        MR. VEEDER:  I have nothing more.

14        MR. STAHLMAN:  One other thing, the matter you talked

15   to me about last Saturday morning.

16        MR. VEEDER:  Yes.

17        MR. STAHLMAN:  Do you want to take that up with the

18   Court?

19        MR. VEEDER:  We might as well touch upon it.

20        In connection with the rebuttal that we are preparing,

21   I have discussed with our scientists and engineers the ques-

22   tion of running some tests up in the upper area there, which

23   is our Storage Unit No. 4, and we are now outlining what we

24   tentatively consider a course to pursue.  I have talked to Mr.

25   Stahlman about it, pointing out that we desire to have this

1    for rebuttal and that it is our hope to be able to undertake

2    it, if we undertake it, during the time when your Honor is in

3    the East, which would be the greater share of April, as I

4    understand it.

5         Now, as I understand it, Mr. Stahlman has --

6         You had better express yourself on it.

7    MR. STAHLMAN:  In the first place, I take the position

8    that if there is to be any test made we would all like to know

9    what their tests are, the Court should be informed what the

10   object of the test is, and then we will cooperate in connec-

11   tion with any tests.  However, it must be done in consideration

12   of the activities which we have on the ranch out there.  We

13   can't just go in there and shut down the wells and start the

14   motors going.  I would suggest that before this is done some

15   of the people like Major Bowen, in whom we have confidence,

16   and Mr. Wilkerson, and maybe the engineers of the other people

17   would like to know what the tests are, so that we don't go out

18   there and have some tests made and then get some results and

19   somebody else has to make some other tests.

20        THE COURT:  Can't counsel in the case work this out?

21        MR. STAHLMAN:  I think so, your Honor.

22        MR. VEEDER:  I think so.  The only thing was that I

23   wanted to bring it to your attention.

24        MR. STAHLMAN:  I had the idea that Mr. Veeder wanted to

25   start Monday-- he called me Saturday morning-- he wanted to

1    start putting some measuring equipment up there, and I said,

2    "No, until we know what we are going to do."

3         MR. VEEDER:  I just wanted to put George on notice.

4         THE COURT:  Lay out a program in writing as to what you

5    want to test and for what purpose and let counsel know about

6    it and give them an opportunity to have engineers present,

7    if they want, and work out some time, if they want to.  It

8    shouldn't be difficult to do.

9         MR. VEEDER:  No.  But I do think that it is important

10   in conjunction with what Mr. Krieger is doing and what has

11   been said in the past by the State.

12        MR. MOSKOVITZ:  I wonder if counsel have had opportunity

13   to look over the transcript corrections that we suggested

14   yesterday, so that we may have those corrections approved by

15   the Court.

16        MR. VEEDER:  I haven't looked at them.  I think they

17   are mostly typographical errors.

18        MR. SACHSE:  I checked them over, your Honor.  They

19   appear to be all right.

20        THE COURT:  All right, the Reporter will be instructed

21   to make the corrections shown on the list that was handed

22   around and also to make them on my original.

23        Are you ready to proceed on cross-examination of Mr.

24   Illingworth, Mr. Veeder?

25        MR. VEEDER:  Yes, your Honor.

1          LELAND ILLINGWORTH,

2    recalled as a witness in behalf of the defendant State of

3    California, having been previously sworn, testified further

4    as follows:

5

6                      CROSS-EXAMINATION

7         MR. VEEDER:  As I understand it, these have only been

8    marked for identification, California's Exhibit AU; is that

9    correct?

10        THE COURT:  Yes.

11        MR. MOSKOVITZ:  Your Honor, I think only the first

12   one, California's Exhibit AR, was received, the sample

13   analysis.

14        THE COURT:  Exhibit AR is the only one that was re-

15   ceived.

16   BY MR. VEEDER:

17        Q  Now, in regard to California's Exhibit AU, do you

18   have that before you, Mr. Illingworth?

19        A  I probably do.  I don't have the number on it.  Which

20   one is this?

21        THE COURT:  The classification of wells in basement

22   complex on Plate 9B.

23        THE WITNESS:  Yes, I have it.

24   BY MR. VEEDER:

25        Q  I observe the statement in the heading that this

1    tabulation relates to wells in or on boundaries of generally

2    impermeable formations.   What does "impermeable formation"

3    mean to you?

4         A   Well, this is exactly the same terminology and has

5    the same meaning as is described in the legend on Plate 9B

6    of California's Exhibit L.

7         Q   Well, what does it mean to you-- "Generally im-

8    permeable"?

9         THE COURT:   So we will know what we are talking about,

10   the description on Plate 9B of California's Exhibit L shows

11   a brown color, which we talked about as basement complex,

12   and it says "Generally impermeable igneous, metamorphic and

13   cemented sediments, practically non-water bearing, with

14   limited quantities of water obtained from joints, fractures

15   and highly weathered zones."

16   BY MR. VEEDER:

17        Q   Are you stating that these 34 wells are in the base-

18   ment complex?

19        A   This classification shown in brown on Plate 9B

20   described as "Generally impermeable" is, generally speaking,

21   the basement complex as appears on the plaintiff's exhibits.

22   As was pointed out in the testimony by various witnesses,

23   these boundaries on the plaintiff's exhibits and on Cali-

24   fornia's exhibits are not exactly the same, but essentially

25   this brown area on Plate 9B is the basement complex.

1    Q   You are answering the question, then, affirmatively,

2    that ther are 34 wells in the basement complex; is that right?

3    A   With possible exceptions that I have noted that the

4    boundaries aren't exactly the same.

5    MR. MOSKOVITZ:   How many wells?

6    MR. VEEDER:   All presently used wells, plus domestic--

7    the second item of 34.

8    THE COURT:   In Hydrographic Unit No. 2.

9    THE WITNESS:   Yes, sir.   There are 58 wells altogether

10   shown within that classification of formation on Plage 9B.

11   BY MR. VEEDER:

12   Q   Do you know personally that those 34 wells are

13   operating or were operating in 1953?

14   A   Yes, this work was done under my direction.   I did

15   not see every well.

16   Q   How would they be drilled into this basement complex?

17   A   Mostly by cable tool rig.

18   Q   And they would be right straight down into the granite;

19   is that right?

20   A   In all cases I think the geologists who have mapped

21   this area have testified to the fact that we do not have hard

22   rock at all places shown as basement complex.   It is under-

23   lain by thin mantles of other materials, weathered materials,

24   and occasionally some thin alluvium.   But where it is so

25   shallow as to be considered essentially basement complex they

1    have so mapped it.  This is my understanding of their mapping.

2    This formation also contains fractures, et cetera, so that--

3        Q  But you don't know yourself, do you?

4        MR. MOSKOVITZ:  Know what?

5    BY MR. VEEDER:

6        Q  --know that these wells are drilled into the im-

7    permeable basement complex and that you get water from them;

8    you don't know that?

9        A  I know they are drilled in formations which the

10   geologists have classified on their maps as described in the

11   legend on Plate 9B for this particular brown color.  All of

12   these wells are so located.

13       Q  I will ask the question again.  You have put a

14   caption on this, you say this is "Generally impermeable."

15       A  Yes.

16       Q  Doesn't "impermeable" mean that water will not pass

17   through it?

18       MR. MOSKOVITZ:  Your Honor, I object to the question

19   because the witness has merely said that he has located

20   wells on material which on Plate 9B is so described.  His

21   testimony related to the location of the wells, and his

22   opinion as to what the effect of the pumping of those wells

23   would be on the stream, and not on the geology of the

24   materials.

25       THE COURT:  The caption doesn't say "impermeable

1    material;" it says "on boundaries of generally impermeable

2    formations."

3        MR. VEEDER:  "In or on boundaries."  I don't know what

4    it means.

5        THE COURT:  Yes, "in or on boundaries," it says.

6        MR. VEEDER:  I think it is highly important, your

7    Honor, that if we now have data that shows that pumping from

8    the basement complex will have an effect upon the stream,

9    I think it is time that this matter was straightened out.  It

10    is contrary to everything that has been testified to before.

11        THE WITNESS:  This is not contrary to anything that

12    was testified to before.

13        MR. VEEDER:  Just a moment.  I am talking to the Court.

14        THE COURT:  Reframe your question.  I think we are just

15    wasting time.

16        MR. VEEDER:  Your Honor, I don't want to waste any time.

17    I know that Mr. Moskovitz wants to get out of here at noon.

18    My objection is, why doesn't he have the caption to say simply

19    that these are the wells in Hydrographic Unit No. 2 that are

20    located on the brown area, and I would just forget it.  But

21    this coming up with a great deal of conclusions about "generally

22    impermeable material" just doesn't make sense to me.

23        THE COURT:  There is only one well listed that could

24    have any significant effect upon the stream, and another well

25    about which there is no information.  If you look where both

1   those two wells are, you will find that they are immediately

2   adjacent to, right near the boundary between the alluvium up

3   in the Anza Valley and the basement complex.  They are not

4   out in the middle of a big brown area.  And we all know that

5   the mapping of the alluvium is an approximation.  Here is a

6   well that they say could have a significant effect on the

7   stream, and the chances are that if it produced any sub-

8   stantial amount of water it is either because of its prox-

9   imity to some fault or crevice, or it is the fact that it

10  actually draws from some of the alluvium nearby.

11         MR. VEEDER:  So far as I am concerned, your Honor, I

12  feel this way, that this witness has gotten on the stand and

13  in the past when I interrogated him they said he is not a

14  geologist, he doesn't know anything about these things.  The

15  reason I took this course of cross-examination with him is

16  simply to bring out that Mr. Illingworth will say anything

17  under any circumstances.  I find that when I was out of the

18  courtroom he went back and began talking about Bulletin 57,

19  and I ask that every word about Bulletin 57 be stricken from

20  the record of yesterday as trying to breathe some life into

21  that book.

22         THE COURT:  The motion is denied.  Ask your question.

23  BY MR. VEEDER:

24         Q  How did you make the determination that this one well

25  would affect the stream flow?  How did you make that

9242

1    determination?

2        A  First off,  I didn't say categorically that it would;

3    I said that it could have an effect on stream flow.

4        Q  How does it differ from the other wells?

5        A  It has a much larger production rate than any other

6    wells located within this same classification of material.

7        Q  So as a matter of fact you simply took into consider-

8    ation, when you make this statement, the size of the well

9    without regard to any history of production of these wells;

10   is that right?

11       A  No, not entirely.  The well was a new well at the

12   time of our survey-- that is, in September, 1954.  We watched

13   rather carefully for a number of months thereafter and found

14   that it continued to produce rather large quantities of

15   water on the order of about 600 gallons a minute, and then

16   for a number of years I did not observe it.  It is my under-

17   standing, however, from information that I have received,

18   that it is still producing.  In what quantity I do not know.

19   But again it is my understanding that it is not extremely

20   small.  It is rather an appreciable quantity.

21       Q  This is all hearsay that you are testifying to now?

22       A  It is not hearsay.

23       Q  It is your understanding?

24       A  That part, if I understand the word correctly, is

25   probably hearsay.

1    Q   So you don't know yourself after 1953 anything about

2   this?

3    A   I know that as of 1954 and for some months there-

4   after that it continued to produce.

5    Q   Did you go up and see it yourself?

6    A   At that time, yes.

7    Q   And you rated the well yourself?

8    A   I made an estimate which checked rather closely with

9   the driller's evaluation of the quantity pumped.

10    Q   How did you determine, then, on the basis of your

11   statement here, that this well or any other well would or

12   would not have an effect on the stream flow?

13    A   This is based largely on my judgment of the situation.

14   I considered that such a larger producer located so close to

15   an alluvial valley evidently on some sort of fracture or fault

16   could be considered to have a possible effect.

17    Q   A probable effect or possible effect?

18    A   A possible effect.  I would go so far as to say a

19   probable effect in this case.

20    Q   You had only one well in the whole Anza Valley that--

21    A   No, that is not true now.  We are talking about the

22   basement complex or this brown area, more specifically, and

23   this is a very exceptional well.  The only one in the entire

24   watershed that I know of that has a production rate of anywhere

25   near this magnitude that is located in the brown area, not

9244

1  only in Units 2 and 3 but the entire Santa Margarita River

2  watershed.

3       THE COURT:  Did you check back to see whether possibly

4  this mapping of the alluvium in the yellow area should have

5  been extended so that it clearly covered this well, or did

6  you check to find out from the driller's logs the type of

7  material encountered in this well?

8       THE WITNESS:  Yes, sir, we checked it very carefully,

9  and our geologists inspected the drilling at various times

10  during the actual drilling, and it very definitely is not

11  in the alluvium of the valley.

12       THE COURT:  How deep a well is it?

13       THE WITNESS:  I can check it.  It is a few hundred

14  feet.

15       THE COURT:  All right.

16  BY MR. VEEDER:

17       Q  Now, in regard to California's Exhibit AT for

18  Identification-- Do you have that?

19       THE WITNESS:  Yes, I have it.

20       Q  I observe that you have at the bottom "Note that

21  these values are estimated by Mr. Worts."  You put that on

22  yourself; is that right?

23       A  Yes, this was prepared under my direction.

24       MR. VEEDER:  Your Honor, I move to have that part of

25  this exhibit cut off entirely.

1    THE COURT:  Why?

2    MR. VEEDER:  I believe that this witness is evaluating

3    the testimony of Mr. Worts.  I don't believe it is proper.

4    I think it is the province of the Court.

5    THE COURT:  If there is in the record certain evidence,

6    another witness may rely upon that evidence.  There is no

7    problem there.

8    MR. VEEDER:  I really think, your Honor, that this

9    goes beyond reliance of an expert upon data in the record.

10   He is making a complete interpretation of Mr. Worts's testi-

11   mony, and if he is going to make an interpretation of testimony

12   he should take into consideration Col. Bowen's and the rest of

13   it.  I believe this is a conclusion that could be--

14   THE COURT:  Let's understand.  As I understand what he

15   has taken from Mr. Worts, it is only the estimate for actual

16   conditions which existed, down to that comma, and then his

17   statement that consumptive use would be less for conditions

18   assumed in Studies 1, 2 and 3 is this witness's conclusion

19   and not Mr. Worts's conclusion.

20   Is that right?

21   THE WITNESS:  That is correct.

22   THE COURT:  So all he is relying on Mr. Worts for is

23   the figure  shown in the last column, and his statement that

24   these values were estimated by Mr. Worts for actual conditions

25   which existed.

1    MR. VEEDER:  To my original objection, your Honor, I

2    add the additional objection that this is an effort to put in

3    writing the testimony of a witness, whereas, I think he

4    should testify to it orally, in accordance with the Rules.

5        THE COURT:  Overruled.

6    BY MR. VEEDER:

7        Q   Now, I observe that youhave estimated that the under-

8    flow at De Luz Creek is 700 acre-feet a year; is that right?

9        A   I did not estimate this.  This is again a tabulation

10   of an estimate made by somebody else.

11       MR. SACHSE:  Would you keep your voice up, please?

12       THE WITNESS:  Yes.  This was an estimate made by Mr.

13   Worts and presented in Plaintiff's Exhibit 49.

14   BY MR. VEEDER:

15       Q   And you didn't check this out yourself; you don't

16   know that it is right or wrong?

17       A   I did not make a separate calculation on this.

18       THE COURT:  Don't you think the witness would be entitled

19   to rely upon the testimony of your witnesses?

20       MR. VEEDER:  I am just trying to find out how he came

21   up with these conclusions.

22       THE WITNESS:  I did check the transcript.  The method

23   described there which was used to arrive at these figures

24   appeared reasonable to me.

25

1    BY MR. VEEDER:

2        Q  Did you compare the areas of vegetative cover as

3    shown in your last column on Exhibit AT with the testimony

4    of Col. Bowen?

5        MR. MOSKOVITZ:  I don't think the areas are shown here,

6    Mr. Veeder.

7        MR. VEEDER:  It is certainly important--

8        MR. SACHSE:  Your Honor, I object because the question

9    is incomprehensible, if he is referring to the last column

10   and areas in the last column.

11       MR. VEEDER:  I will reframe the question, then.

12       Q  In arriving at the figures in the last column, what

13   were the elements that you took into consideration?

14       A You are referring, I presume, to the last column on

15   the right here?

16       Q  Yes.

17       A  The only factors I took into consideration in

18   presenting these was the fact that these are the values that

19   I scaled off from Exhibit 49.

20       Q  Did you take into consideration, in preparing

21   California's Exhibit AT, the testimony by Col. Bowen?

22       A  Yes, I did.

23       Q  Are they reflected in that last column?

24       MR. MOSKOVITZ:  Is his testimony reflected in the last

25   column?  Is that your question?

1      MR. VEEDER:  Yes-- Col. Bowen's.

2      THE WITNESS:  No, they are certainly not directly

3   reflected.  I considered his testimony, however, inarriving

4   at--

5      MR. VEEDER:  It is reflected.  You have answered my

6   question.

7      THE WITNESS:  I am not sure that I have completely.

8      THE COURT:  Go ahead.

9      THE WITNESS:  I considered his testimony in deciding

10   whether or not it was proper to conclude that these values,

11   as shown on Exhibit 49, should be used.

12   BY MR. VEEDER:

13      Q  Now, did you compare the areas of vegetative cover

14   as used by Col. Bowen with the areas of vegetative cover

15   alluded to by Mr. Worts?

16      A  I do not recall that Mr. Worts ever alluded to any

17   particular areas in arriving at the values of consumptive

18   use obtained from ground water and used by the native vegeta-

19   tion on lands overlying the coastal basin.

20      Q  It would certainly make a difference, would it not,

21   whether the areal extent utilized by Col. Bowen and the

22   areal extent utilized by Mr. Worts in arriving at the con-

23   sumptive use of water by the plants; isn't that right?

24      MR. MOSKOVITZ:  May I have the question, please?

25      MR. VEEDER:  I will rephrase it.

1    Q  Is it not true that the areal extent is probably the

2    chief factor in determining consumptive use of the vegetative

3    cover?

4         MR. MOSKOVITZ:  Your Honor, I object to the question;

5    it is beyond the scope of the direct examination.  Mr. Illing-

6    worth testified that he took figures from Mr. Worts's exhibit,

7    Exhibit 49.  He didn't testify that he himself calculated

8    how much consumptive use there would be by vegetative cover.

9         MR. VEEDER:  Well, if this is not reflective of anything,

10   it suits me, I can just stop the examination.

11        THE COURT:  The objection is overruled.

12        Do you have the question in mind?

13        THE WITNESS:  Was it completed?  I think it should be

14   read.

15        MR. VEEDER:  Read it, please, Mr. Reporter.

16        (The Reporter read the pending question.)

17        THE WITNESS:  No, I don't believe it is the chief

18   factor.  It is an important factor.

19   BY MR. VEEDER:

20        Q  What would you say would be the important factor?

21           First, are you a qualified agronomist?

22        A  I don't believe so.

23        Q  Are you qualified as a soils man?

24        A  No.  This is not my specialty.

25        Q  In other words, all that you have done is gone

9250

1    through and done some arithmetic in regard to Exhibit AT; is

2    that right?

3        A   Oh, no, that is not true.

4        Q   What did you do, then, if you are not qualified either

5    in regard to soils or to agronomy?   What did you do in making

6    this Exhibit AT?

7        A   Well, if you are talking about the last column only--

8        Q   Yes.

9        A   I copied these figures off of Exhibit 49 after I

10   studied them, in conjunction with the testimony, and de-

11   termined that they appeared to be reasonable.

12       Q   But your background and training wouldn't give

13   you any basis for making that evaluation; isn't that right?

14       A   No, that is not correct.

15       Q   I thought you said you were not an agronomist?

16       A   You evidently don't understand the function of what

17   is important in this type of calculation.

18       MR. VEEDER:   I move to strike the observation by the

19   witness, your Honor.

20       THE COURT:   Let the witness continue.

21       THE WITNESS:   Certainly the type of vegetation overlying

22   the basin and the areal extent of such vegetation is import-

23   ant.   What the rainfall that falls on the area is important,

24   the location of the ground water level with respect to the

25   surface of the ground is important, and actually the primary

1   consideration in this calculation is-- indeed, what it is

2   all about is how much of this native vegetation consumptive

3   use could be supplied by ground water.  So ground water is

4   the important factor here, and I do consider myself quali-

5   fied to talk about ground water matters.

6   BY MR. VEEDER:

7        Q  Did you study the root zone of the vegetative cover?

8           I will strike that.

9        THE COURT:  Just a moment.  Maybe I misunderstand this

10   exhibit.  As I understand the purpose of the exhibit, it is

11   as follows:  When the studies were presented by the State of

12   California there was no estimate at that time made of the

13   runoff of water in the area D, which is that very lowest part

14   of the basin.

15        MR. VEEDER:  That's right.

16        THE COURT:  Nor was any study made of consumptive use of

17   water by vegetation.  And the witness took the position that

18   the amount of runoff in this area D would equal or exceed the

19   amount of water used by vegetation.  I think that is the

20   situation.  Then some question was raised about that, and

21   this exhibit has been brought in merely to show the basis

22   for the witness's opinion that in his calculation of water

23   balances, or whatever it was, that there was as much or more

24   water running off that he didn't list from this area D as

25   water that was being used by vegetation.  That is all he is

1    trying to show.  Do you dispute that issue?

2         MR. VEEDER:  Oh, yes, I dispute it, and I raise the

3    additional factor--

4         THE COURT:  Do you think the amount of runoff in area

5    D is not as much as the use by native vegetation?

6         MR. VEEDER:  I think all one has to do is look at the

7    second column, and you will observe, your Honor, that the

8    consumptive use as shown on the last column, except in six

9    years of twenty-two, that appears to be the situation.  But

10   for the balance of the time it is manifest that the consumptive

11   use of vegetative cover, even the factors which he used,

12   which I think are incorrect for this purpose, it will be

13   observed that by and large most of the years the water arising

14   in the area to which he has made reference is far less than

15   the vegetative cover demands, and I think that--

16        THE COURT:  You are not thinking that this figure on

17   the second column of runoff is water that is in the ground,

18   that it is ground water?  There has been no contention of that.

19   This is runoff.

20        MR. VEEDER:  That is right.

21        THE COURT:  This is runoff.  This is water that is gone,

22   in that second column.  This goes back to some calculations

23   made as to the amount of water available and used, et cetera.

24   There was no contention that this right-hand column showing the

25   use of water by vegetation comes from this water which ran off.

9953

1    Am I right about this?

2    MR. VEEDER:  I think what this column is, your Honor, the

3    second column is a "guestimate" as to what is yielded in that

4    area.

5    THE COURT:  It says "runoff."

6    MR. VEEDER:  I know.

7    THE COURT:  And as I understand "runoff," unless I am

8    wrong-- is this, instead, rainfall in that area?

9    THE WITNESS: No, this is the rainfall that would run

10   off from the hills adjacent to the basin and it is water that

11   we didn't account for in our studies 1, 2 and 3, which

12   actually does exist and would runoff in conditions that ex-

13   isted in 1936 through '58, and we didn't include these values

14   as items of inflow, nor did we include as items of outflow

15   or discharge the quantity of water used by the native vegeta-

16   tion, and all I have said is that I have considered that under

17   the conditions of studies 1, 2 and 3 this unaccounted for

18   runoff--

19   THE COURT:  Well, then, I am right.  This second column

20   is not rainfall figures, although it may be calculated from

21   rainfall figures.

22   THE WITNESS:  That is correct.  It is the portion of

23   the rainfall that would run off.

24   THE COURT:  It is a runoff figure, and you are not

25   concerned where it runs to; it is just water that you did not

1   take into account in these studies that you made.

2   THE WITNESS:  Yes.  It is imporant in that it is

3   available to this basin and to the native vegetation of the

4   basin.

5   THE COURT:  Therefore, it is not water that ran down

6   into the ground and would be available in place for the

7   native vegetation; it is not water that soaked into the

8   ground.  It is runoff water.

9   MR. VEEDER:  No.

10   THE WITNESS:  It would be available.  Well, now, if

11   you are thinking of the ground as, say, the hillsides, it did

12   not run into those hills; it ran down the gullies and

13   eventually came out onto the valley.

14   THE COURT:  And it would be available maybe to be

15   picked up.

16   THE WITNESS:  Yes.

17   THE COURT:  But it is not water that went into the hill-

18   sides to support the native vegetation?

19   THE WITNESS:  No, not the native vegetation on the

20   hills.  It would have been available, however, to the ground

21   water basin, and therefore available to the native vegetation

22   overlying the basin.

23   THE COURT:  And this Exhibit AT is done to sort of

24   complete the picture, to show your estimates of runoff in

25   area D which you didn't have before and to take into account

1    some figure for the use of vegetation on the hills as well as

2    in the valleys?

3        THE WITNESS:  Yes, sir.  I would emphasize, however,

4    that I do not present this last column on the right as my

5    estimate of what I think this consumptive use would be under

6    conditions of studies 1, 2 and 3.  Because as I point out in

7    the statement at the bottom of the page, I think that under

8    conditions of studies 1, 2 and 3 the water level, especially

9    during this critical dry period from about 1945 on through

10   1958, would be considerably lower than would have been, had

11   they pumped out the quantities which we said could be pumped

12   out in studies 1, 2 and 3 than the actual water levels that

13   existed.  In other words, the water level was much closer,

14   under actual conditions, to the ground surface than it would

15   have been under conditions of studies 1, 2 and 3.

16       THE COURT:  Since the water level under studies 1, 2

17   and 3 would be lowered, at least in basin areas, there would

18   be less use by the vegetative cover?

19       THE WITNESS:  That is correct.

20       THE COURT:  This would not have had much effect, how-

21   ever, on the use of water by the vegetative cover on the

22   hillsides?

23       THE WITNESS:  That is not a factor here, because that

24   only enters into the determination of what proportion of the

25   rainfall would run off, and what we have shown in the second

9256

1    column here is just that portion which would run off from the

2    hills.

3    BY MR. VEEDER:

4        Q  How did you make your calculations of consumptive

5    use of water in the areas upon which this precipitation fell?

6        A  This is the result of studies of rainfall-runoff

7    relationships.  In other words, the portion of the rainfall

8    that runs off can be measured and has been--

9        Q  Did you do this yourself?  Did you make this cal-

10   culation yourself of the quantity of water that would run off?

11       A  Yes.

12       Q  And how did you calculate consumptive use of water

13   in that area?

14       A  There are two ways--

15       Q  How did you?

16       A  I will say I didn't.

17       Q  All right.

18       A  But this is because there are two ways--

19   MR. VEEDER:  I move to strike the exhibit, your Honor.

20   MR. MOSKOVITZ:  Just a moment.  Your Honor, the witness

21   wants to explain how he did it.

22       MR. VEEDER:  Oh, the Commissar was saying--

23       MR. MOSKOVITZ:  Your Honor, I resent Mr. Veeder's

24   remarks about the witness.

25       THE COURT:  Mr. Veeder, just settle down now.

1    Complete your statement, Mr. Witness.

2    THE WITNESS:   There are two ways of determining runoff

3    from an area:   (1) You could put a number of precipitation

4    gages throughout the area, measure the rainfall, make an

5    estimate of what you think the native vegetation would use,

6    and then come up with a calculation of what the residual is,

7    which would be the runoff.   This is a very poor way of doing

8    it, because roughly 90% or something of that nature of the

9    rainfall actually is used by the consumptive use.   If you

10   made a small error in estimating the consumptive use, your

11   runoff would be greatly in error.

12   A better way of doing it is simply to measure the

13   runoff by a stream gaging station, and this is what we have

14   relied on for the most part in this area.

15   Now in an area where we do not have the actual runoff

16   measured, as in Area D, we make an estimate based on the

17   actual measured runoff quantities.   This is a ver more reliable

18   method of doing it than estimating consumptive use and de-

19   ducting that from the rainfall.

20   THE COURT:   How did you do it for the purpose of this

21   exhibit?   How did you have it done by someone under your

22   direction?

23   THE WITNESS:   As I mentioned yesterday, this is a uniform

24   percentage of the total estimated and measured runoff from

25   Areas B, C and D.

1    MR. MOSKOVITZ:  Do we have that exhibit on the board

2  that shows the study areas?  It is Exhibit AK.

3    (Mr. Moskovitz placing exhibit on the easel.)

4    MR. VEEDER:  What are you doing now?

5    MR. MOSKOVITZ:  The witness has referred to areas B,

6  C and D, and I think we ought to have it shown on the board

7  so that what we are talking about is clear.

8  BY MR. VEEDER:

9    Q  Would you again state how you arrived at the figures

10  of estimated runoff in Area D?  How did you do it here?

11    A  It is a certain fixed percentage of the total runoff

12  from Areas B plus C plus D.

13    Q  So it was simply a mathematical calculation that

14  you made, is that right, to come up with this figure?  I am

15  referring to the second column.

16    A  Yes, in this case.  But it is based on a lot of

17  additional work.

18    Q  But you didn't make any consumptive use studies in

19  area D, did you?

20    A  No.  As I stated, that is not the way I estimated the

21  runoff.

22    Q  And you didn't make any calculations in regard to

23  temperature in that area?  Nor did you use those temperature

24  figures in making your calculation as to runoff; is that

25  right?

9259

A   No, I certainly didn't use the temperatures.

Q   What measurements did you use to arrive at these figures, then?   What were the measurements?

A   The values in the second column for estimated runoff from Area D are in each case 14% of the runoff shown in the tabulation of Studies 1, 2 and 3 for the total runoff from Areas B plus C.

Q   How did you arrive at the 14%?

A   On the basis of studies of rainfall-runoff relationships in the entire coastal area, consisting of areas A, B, C and D.

Q   Did you make any consumptive use studies yourself?

A   This is not the way I determined runoff.   I determined runoff from actual records maintained by the Geological Survey.   You asked me--

Q   Did you make any consumptive use studies of the plants growing in area D?

A   Oh, we are not talking about runoff now as in the second column, but we are talking about the last column, are we?

Q   No, I am talking about-- you know what vegetative cover is?

A   Yes, I do.

Q   Do you know what consumptive use is?

A   Yes, I do.

Q   And aren't those factors that are important in regard to runoff?

A   They have a great deal to do with the proportion of rainfall that actually runs off from an area.  But the way to determine--

Q   Is it not essential to have that data in mind when you make this calculation?

MR. MOSKOWITZ:  I object to Mr. Veeder's interrupting the witness before the answer is finished, your Honor.

MR. VEEDER:  I object myself to the way the witness makes a speech to get off the hook.

THE COURT:  Just a moment.  Let the witness answer the question.  Just relax, Mr. Veeder.

THE WITNESS:  But as I mentioned before, in my opinion the most reliable method of determining runoff is to measure the runoff; not to measure the rainfall, then estimate the runoff, then subtract one from the other and come up with a value of the runoff.

BY MR. VEEDER:

Q   Where were the points of measurement that you utilized in coming up with these figures in the second column?

A   The stream gaging station operated by the United States Geological Survey at location 1 on California's Exhibit AK, which is at Ysidora, the measurements at Station 4, which is at De Luz Creek station.

1      Q  How much sewage effluent did you include in your

2  calculations in measurement No. 1 at the point of measurement

3  No. 1?

4      A  I utilized the records that the Geological Survey

5  produced.

6      Q  But you didn't actually, then, you don't really know

7  what transpired in that area from the standpoint of water

8  being available to the vegetative cover in Area D?

9      A  Oh, I think I do.

10     Q  Did you take into account the quantity of water

11 released from Lake O'Neill and run down into that area?

12     A  Let's get something straight here.

13     Q  Why don't you just say yes or no?

14 THE COURT:  Let the witness answer.

15 THE WITNESS:  What I estimated was the runoff from Area

16 D.  I didn't estimate what sewage came in here and what pump-

17 age went out, et cetera.  This is not the way I did it.  I

18 estimated what proportion of the rainfall would run off from

19 Area D.  This is not done by the method which you evidently

20 have in mind, but by the method which I described, which

21 necessarily does not take into account the sewage and the

22 pumping, et cetera.  It is reality, and it is a better way

23 to do it, in my estimation.

24 BY MR. VEEDER:

25     Q  Isn't it true, though, that there are contributions

1   that come in here-- for example, stored water, sewage

2   effluent; aren't all those factors that would have an in-

3   fluence upon the level of the ground water table?

4       A   Yes.  But this is a different subject matter that

5   we have been discussing.  We have been discussing the runoff

6   from Area D.

7       Q   And isn't it true that the water table has some-

8   thing to do in regard to the receptivity of the basin for

9   runoff?

10      A   Yes.  But it has nothing to do with the amount of

11  the rainfall which will run off from those hillsides surround-

12  ing the Coastal Ground Water Basin.  The level of the water

13  in the basin has nothing to do with that.

14      Q   Isn't it true that it depends somewhat on how much

15  water will go into the ground in making such a calculation?

16      MR. MOSKOVITZ:  Your Honor, I object to that question.

17  I think it is not--

18      THE COURT:  Overruled.

19  BY MR. VEEDER:

20      Q   Isn't the moisture in the soil important from the

21  standpoint of the quantity of the water of the runoff?

22      A   Yes.

23      Q   So it would be important, would it not--

24      MR. MOSKOVITZ:  Mr. Veeder, please.

25      THE WITNESS:  You are referring back now, I presume, to

1   Studies 1, 2 and 3, because this whole table was in support

2   of the question asked with respect to those studies.  Now as

3   regards those studies, the location of the water level is

4   important to determine whether or not this runoff would

5   enter the basin and therefore become available for use by

6   the native vegetation.

7       Q  Did you take that into consideration in coming out

8   with column 2?

9       A  It has nothing to do with that.  That is what I was

10   trying to explain.

11       THE COURT:  Tell me now how it was done.  You have

12   mentioned two methods:  One was the method of calculating

13   rainfall and then estimating consumptive use and coming up

14   with a different possible runoff.

15       THE WITNESS:  Yes.

16       THE COURT:  And by "runoff" you mean water that would

17   run off the hillsides and the high places and run into the

18   valley?

19       THE WITNESS:  Yes, sir.  That is not the method I used,

20   and I think it would be a very poor method.

21       THE COURT:  What is the other method?

22       THE WITNESS:  The other method is to determine what

23   proportion of the rainfall-- correction.  First actually to

24   measure the runoff for a given period of time.

25       THE COURT:  Like at Ysidora?

1    THE WITNESS:  Yes, sir, and then correlate that with

2    the various other measurements, such as the De Luz Creek

3    measurement, et cetera, and on the basis of studies of this

4    nature I determined that 77% of the runoff from the total

5    area B plus C plus D would run off from the De Luz Creek

6    area, 11% would run off from the area B, and 12% from area D.

7    12% is 14% then of B plus C, 12 being 14% of 88, 88 being

8    the sum of 77 for area C and 11 for area D.

9        THE COURT:  Taking your starting place of runoff figures

10   at Ysidora, did you make adjustments for sewage effluent that

11   might be contained in that runoff at Ysidora?

12       THE WITNESS:  These measurements of runoff are based

13   on periods of time primarily during the storm periods when

14   such sewage return and pumping would have a negligible effect

15   on the total quantity of runoff.  Most of this runoff, as we

16   noted from some of the exhibits we presented, is of a flashy

17   nature and it occurs within a relatively few days, so that

18   the pumping that would take place during those few days of

19   runoff and the sewage effluent returned during those few days,

20   et cetera, is relatively unimportant.

21       THE COURT:  Then your answer is that you didn't take

22   them into account except to--

23       THE WITNESS:  --to consider that they were negligible.

24       THE COURT:  That they were unimportant?

25       THE WITNESS:  Yes.

BY MR. VEEDER:

Q  You didn't take them into account?

THE COURT:  He said he did take them into account, and that they were unimportant.

MR. VEEDER:  I would like to ask him a couple more questions, your Honor.

Q  Do you say that the rate of runoff in Area C would be the same as the rate of runoff in Area D?

THE COURT:  The rate?

MR. VEEDER:  Yes.

THE COURT:  Are you talking about acre feet or rate?

MR. VEEDER:  No, I am talking about what percentage of the return goes into the ground and what percentage runs off the side of the hills.

THE WITNESS:  Very definitely not.

BY MR. VEEDER:

Q  What was the criterion you used in area D, then?

A  Well, we have a measurement at Ysidora of stream flow, we have a measurement of the stream flow at Fallbrook and at Santa Margarita, we have measurements of stream flow at De Luz Creek at point No. 4 indicated there, and it is a relatively easy matter to determine what proportion of the runoff from the total area B plus C plus D actually comes off from area C and the remainder that comes off from area B plus D.  Then the residual runoff coming off area B plus D was

1    split between the two on the basis of a study of rainfall and

2    runoff relationships.

3        Q   Are you saying that for each acre-foot of water that

4    falls in area C there would be the same quantity of water

5    run off as falls in area D?

6        A   No, I didn't say that.  I said what runs off is what

7    was measured to have run off.  It is what it was.  And if you

8    want me to say what the percentage of it is, I say 77% of the

9    total runoff from those three areas B, C and D comes from

10   area C and the remainder of 23% comes off from area B, plus

11   D, and of that I estimated that there was 11% from area B and

12   12% from area D.

13       Q   And the fact then that sewage effluent was being

14   turned into the area, that sewage effluent was backed up

15   behind some of the dams, that water was released from Lake

16   O'Neill, all those factors you thought were negligible?

17       THE COURT:  I think they are too, because it is flash

18   floods that are really measured.

19       Take a short recess.  When you come back tell me what

20   you are trying to prove.

21       MR. VEEDER:  I am trying to prove that these people

22   from California are very evasive.

23       (Recess.)

24       THE COURT:  Without abusive generalities now, what are

25   you trying to prove?

1          MR. VEEDER:   I will be very specific, and I don't intend

2     to be abusive, your Honor.

3          THE COURT:   Just tell me what you are trying to prove.

4     Are you trying to impeach the witness?

5          MR. VEEDER:   Definitely.

6          THE COURT:   Period.

7          MR. VEEDER:   I am trying to impeach him (1) On the

8     grounds that the man is not qualified to do these things.   I

9     know that.

10         Secondly, I am trying to demonstrate that he has a

11    very definite personal objective to put some blessing onto

12    Bulletin 57.  He spent $275,000 and they haven't even been

13    able to offer it in the litigation.   I want to show that

14    he is using exactly the same tactics that he used in Bulletin

15    57, and I think it is extremely important--

16         THE COURT:   What are you trying to prove as to the facts

17    of the matter?   Let's get down to the facts.   His exhibit was

18    offered to show that although in these studies he didn't take

19    into account runoff from Area D, nevertheless there was some

20    kind of balance or relationship between use of water by

21    vegetation and runoff on area D.  Do you dispute that fact?

22         MR. VEEDER:   There may be such relationship, but the

23    procedures that he used are so crude that they would

24    certainly not be reflective nor anything upon which your

25    Honor could make a finding.

9868

1    THE COURT:  Do you concede the ultimate fact, if there
2    is some relationship, that there is at least enough water
3    that runs off in area D to take care of the use by the vege-
4    tative cover?

5    MR. VEEDER:  Definitely not, your Honor.

6    THE COURT:  You will not concede that?

7    MR. VEEDER:  No.

8    THE COURT:  What percentage of the water used by the
9    vegetative cover would be represented by the runoff in area
10   D?

11   MR. VEEDER:  It is certainly not for me to say.

12   THE COURT:  10%, 75%, 50%?

13   MR. VEEDER:  No.  The fact remains that we show by
14   competent and capable witnesses that upward to 6,000 acre-
15   feet of water would be consumed by vegetative cover.  Now we
16   think that we have a right to the use of that quantity of
17   water.  We are making a claim against the stream for that
18   quantity of water.  So when we have merangue like this
19   presented into the record which shows, and I am referring to
20   Exhibit AT--

21   THE COURT:  Let me interrupt.

22   In your figures on vegetative cover were you taking the
23   entire area, Mr. Illingworth, of Areas A, B, C, and D?

24   THE WITNESS:  No, sir.  The vegetative cover that has
25   been referred to here, and it is my understanding of that

1  which Mr. Worts has in his Exhibit 49, is only the native

2  vegetation on the lands overlying the Coastal Basin, that is,

3  the vegetation which could draw water from ground water.

4      THE COURT:  And therefore that would be contained within

5  Area D and partly within Area B?

6      THE WITNESS:  Not entirely within area B, because the

7  De Luz dam site, which is at the boundary between areas B and

8  D, is also the upstream boundary of the basin.

9      THE COURT:  I couldn't tell from the map.  And it is

10  your contention that the vegetative cover in the area over

11  the basin, which would be within area D, is 6,000 acre-feet

12  a year?

13      MR. VEEDER:  Upward of 6,000.

14      THE COURT:  That is shown in--

15      MR. VEEDER:  Col. Bowen's testimony.

16      THE COURT:  Is it shown in Mr. Worts's Exhibit 49?

17      MR. VEEDER:  No.  The circumstance is entirely different.

18  The fact remains that the calculations of Col. Bowen are

19  based upon summarization of consumptive use and precipitation

20  and the other elements that would normally be used in the

21  calculations.  Now our position is that the methods utilized

22  and the data shown here are not reflective of the actual

23  demands of the vegetative cover.

24      THE COURT:  The chart Exhibit 49 has a symbol "Evapo-

25  transpiration."  Isn't that the equivalent of use by

1   vegetative cover?

2       MR. VEEDER:  To some degree it is. But you will note

3   that Mr. Worts did not use the same figures, nor did he use

4   the same acreages, nor did he use the same factors that were

5   utilized by Col. Bowen in coming up with his calculations.

6       MR. SACHSE:  Which witness are we impeaching, your

7   Honor?

8       THE COURT:  I am just trying to understand this.

9       Let's go ahead.  What could Mr. Worts, according to

10  your recollection of the testimony, mean by "evapo-transpira-

11  tion"?

12      MR. VEEDER:  I think what he meant was vegetative

13  growth.  But he didn't mean for the full area.  He directed

14  most of his testimony to the areas of heavier growth of tules,

15  plants like that.

16      THE COURT:  His chart says "Ground water recharge and

17  discharge lower Santa Margarita River Basin."  I take it,

18  therefore, that is the part of the basin that would be

19  covered in area D.

20      MR. VEEDER:  No, sir, not the whole area, your Honor.

21      THE COURT:  Well, the lower basin, according to the

22  witness here.  No part of the basin extended beyond the De

23  Luz dam site upstream.

24      MR. VEEDER:  I didn't hear your Honor.

25      THE COURT:  Apparently no part of the lower basin

9871

1    extends upstream beyond the De Luz Dam Site.

2         MR. VEEDER:  Your Honor, it does extend above that to

3    an appreciable extent.  I have forgotten just how far, but

4    the upper basin does extend above the location of the dam.

5         MR. SACHSE:  Not where the dam is; the dam site.

6         MR. VEEDER:  The dam site, yes.

7         THE COURT:  The Upper Basin, the Chappo Basin and the

8    Lower Basin all are below the De Luz dam site.  There is some

9    alluvium above.

10        MR. VEEDER:  Yes.

11        THE COURT:  Small portions.  But the three basins such

12   as we discussed are all below the De Luz dam site.

13        MR. MOSKOVITZ:  Mr. Worts introduced an exhibit showing

14   the outlines of the Coastal Basin, which are the same as the

15   outlines that we used.

16        MR. VEEDER:  Your Honor, if the record is checked back

17   it will be found that Col. Bowen utilized the actual areas

18   wherein there is vegetative growth.

19        THE COURT:  I am not saying that he didn't, and it may

20   be that Col. Bowen's study is more detailed and worthy of

21   more consideration than what Mr. Worts has on Exhibit 49.

22   But that doesn't prevent another litigant in this case from

23   taking evidence offered by the Government and utilizing that

24   evidence and basing an exhibit on it.

25        MR. VEEDER:  Of course, I am going to interpose an

1    objection on the ground that that is usurping the province

2    of the Court, which this witness has attempted to do, and I

3    do interpose that objection, your Honor.

4            THE COURT:  I understand.  You have answered my ques-

5    tion.  I understand the purpose of your cross-examination..

6    Proceed.

7    BY MR. VEEDER:

8            Q  Isn't it true that you took into consideration the

9    underflow as shown in De Luz Creek in estimating your total

10   runoff in the area?

11           A  I used it in estimating the total water supply un-

12   accounted for in studies 1, 2 and 3, which appears in

13   California's Exhibit AT in column 4.

14           Q  Aren't you utilizing that underflow twice in making

15   your calculation, then?

16           A  No.  It is used --

17           Q  In this column isn't 700 acre-feet included in your

18   Studies 1, 2 and 3?

19           A  No.  The 700 acre-feet is not used as an item of

20   supply in those studies.

21           Q  It is not included?

22           A  That is right.

23           Q  In making your calculation did you take into con-

24   sideration the fact that not infrequently the De Luz Creek

25   area, which is your area C, has high precipitation and high

1 runoff, whereas Area D frequently has no runoff at all?

2  A Yes, that is taken into account.

3  Q How did you take that into account?

4  A These are annual figures, you will notice, and we
5 didn't say that every time there was an average of an inch
6 of runoff from area C that there was just 14% of it from
7 area D, but on the average the annual figures would be a
8 certain percentage one of the other.

9  THE COURT: His figures demonstrated, of course, that
10 a far larger percentage of runoff in area C than in area D
11 and as between area B and area D, area D is probably three
12 times as big in area as area B, and yet he assigned 12% to
13 area D and 11% to area B, didn't he?

14  MR. VEEDER: Your Honor, if you comprehend what the
15 man has done, you are far ahead of me.  I don't see how he did
16 it, because I think as a matter of fact he simply reached for
17 some figures and came up with these things.

18  THE COURT: Go ahead.

19 BY MR. VEEDER:

20  Q From the standpoint of the flashy character of
21 this runoff, I observe that we have in 1957 11 acre-feet,
22 in '56, 193 acre-feet; in '55, 25 acre-feet, in '54, 797;
23 in '53, 240; then we have one year of 1,866; then we go on
24 to 5, 13, 84, 102, 204.  Are you stating to the Court that
25 those are figures of flashy runoffs?

1    THE COURT:  Mr. Veeder, I will make my own objection

2  to the question.  The point is that these are annual figures.

3  He said that the flashy character of the runoff was dependent

4  upon the storms.  These are annual figures.  These don't

5  represent a flash situation.  You can't have a flash for a

6  whole year.  A year is a sum total of what happens during the

7  year.

8    MR. VEEDER:  I know what his answer will be.  But is he

9  telling me that a 5 is a big flash?

10    THE COURT:  There is a non sequitur there.  Go on to

11  something else.

12    MR. VEEDER:  I have no further questions.

13    THE COURT:  Mr. Sachse?

14    MR. SACHSE:  No questions, your Honor.

15    THE COURT:  Mr. Krieger?

16    MR. KRIEGER:  No questions.

17    THE COURT:  Mr. Stahlman?

18    MR. STAHLMAN:  No questions.

19    MR. MOSKOVITZ:  Your Honor, I would like to offer in

20  evidence Exhibits AT, AU, AV and AW, which have not yet been

21  received.

22    Exhibit AS we will withhold until we secure the

23  certification from the State Water Rights Board.

24    MR. VEEDER:  I may have an objection when that comes

25  up.

1          THE COURT:  Pass up Exhibit AS.

2          What about Exhibit AT, Mr. Veeder?

3          MR. VEEDER:  I object on the grounds that there is no

4     proper foundation, that they are incompetent as they fail

5     to show any factor involved in this litigation, and it is

6     irrelevant.  This is a litigation involving the rights to

7     the use of water, and he has come up with figures during a

8     drouth period which certainly are not reflective of any

9     element that is important here from the standpoint of the

10     right of the United States of America to have sufficient

11     water come to it to maintain vegetative cover throughout the

12     basin area of Camp Pendleton.

13          THE COURT:  If that is your objection to Exhibit AT,

14     it will be overruled, and Exhibit AT is received in evidence.

15          What about Exhibits AU, AV and AW?  Those were the

16     classifications of wells.

17          MR. VEEDER:  I have no objection to that.

18          THE COURT:  All right, California's Exhibits AU, AV and

19     AW are received in evidence.

20          (Defendant California's Exhibits AT, AU, AV and AW were

21     received in evidence.)

22          THE COURT:  Now, what do you want to do, gentlemen?

23     Mr. Krieger is going to start on Tuesday with his case, Mr.

24     Veeder.  He has lodged some exhibits.  Exhibit A was lodged

25     on March 19th, and Exhibits B and C on March 23rd.

9276

1    MR. VEEDER:  I have those, your Honor, and I have no

2  objection on the ten-day rule.

3    THE COURT:  Do you want to examine Dr. Coit, then?

4    MR. VEEDER:  I would like to have a little more

5  opportunity to study some of those exhibits that went in.

6    THE COURT:  Which exhibits?

7    MR. STAHLMAN:  They were marked merely for identi-

8  fication.  We didn't introduce them.  They have been lodged

9  for months.

10    THE COURT:  Vail's Exhibits C and D are the only two

11  that Mr. Stahlman questioned on, and he is substituting the

12  one on the board for the Exhibit C heretofore lodged, the

13  only difference being the addition of the five areas marked

14  with the colored numbers 1, 2, 3, 4 and 5, which are new

15  acquisitions by the Vail Company.  Other than that, Exhibit

16  C is the same as lodged.

17    Also he examined Dr. Coit on Exhibit D, which is this

18  large document.

19    MR. VEEDER:  I have looked at that.

20    THE COURT:  The long sheets, which are numbered from

21  1 to 93 are the same as the exhibit heretofore lodged.  To

22  the front of that has been fastened some short letter-sized

23  sheets, which we numbered yesterday by letters A to G,

24  inclusive, and those have been added to the new Exhibit D

25  which will be substituted for the Exhibit D heretofore lodged.

1   You haven't had a chance to look that over yet?

2          MR. VEEDER:  I have just skimmed over it.  I haven't

3   had an opportunity to study it.

4          THE COURT:  Also when Dr. Coit was on the witness stand

5   I asked him this question, of which you thoroughly disapprove,

6   and that is:  Dr. Coit, if we examined you in detail as to all

7   the lots, parcels and materials contained in Exhibit D, would

8   your testimony be the same as set forth in this exhibit?  And

9   he said that it would.  And I then proposed that we use

10  Exhibit D, plus what small amount of oral interrogation went

11  on, as the witness's testimony on direct examination,  subject

12  to the right of any party to cross-examine.

13         MR. VEEDER:  May I ask your Honor to permit me to have

14  time to go through this matter with Col. Bowen.  He was not

15  in town this morning when I had this material.  I would like

16  to talk to him a little bit about it and there will probably

17  be a few minutes of cross-examination on Tuesday.  I don't

18  know how much.

19         Would it be possible to have Dr. Coit down here?

20         MR. STAHLMAN:  We will have him here.

21         THE COURT:  Do you want to adjourn until Tuesday

22  morning?

23         MR. VEEDER:  I think Mr. Moskovitz does.

24         THE COURT:  Goodbye, Mr. Moskovitz.

25         MR. SACHSE:  Your Honor, don't you think we ought to

1    give Mr. Moskovitz some sort of scroll or letter of appre-

2    ciation?

3      MR. VEEDER:  I have a thought of what we can do, your

4    Honor.  I am going to tender a thought.  Let's tear out of

5    Bulletin 57 those exhibits that went in and give him the

6    residue, which will be much more than what was originally

7    offered, and then he can always remember me.

8      MR. MOSKOVITZ:  Your Honor, I would like to take a few

9    lines of the transcript to express my regrets at leaving at

10   this time.  I would like to have finished the case.  Although

11   we have had some stormy times, it has been an important

12   experience for me.  I have learned a lot from Mr. Veeder as

13   well as from other people about how to try a lawsuit and

14   about geology and hydrology and about human relations, and I

15   leave the case, I think, in very good hands with Mr. Girard.

16   I hope that I may have an opportunity to come back and maybe

17   participate to some further extent in the trial or the further

18   proceedings in this case.

19     I want to thank your Honor for the help you have given

20   me and for the patience you have had with me at times when I

21   am sure I have tried your patience.

22     THE COURT:  We are sorry to let you go, Mr. Moskovitz.

23   If you were leaving to go to a well-paid job instead of to

24   open your own law office with your associate, I would think

25   that Browning's verse "The Lost Leader" would be very

9279

1    appropriate.  It starts out:  "Just for a handful of silver

2    he left us, just for a ribbon to pin on his coat."  I am

3    afraid, however, that starting a practice doesn't fit into

4    that.

5         The Court has appreciated your help and your knowledge

6    and understanding of California water law.  You have been

7    very helpful in your discussions and suggestions.  You have

8    not always been in agreement, of course, with Mr. Veeder,

9    but you have not always been in agreement even with Mr.

10   Sachse.  You have independently taken positions on matters

11   as you thought best.

12        So we part temporarily until you come back again to

13   litigate something in this Court.  I will say the experience

14   has been a happy one, and if I have been short-spoken or

15   intemperate I haven't intended it.

16        You know, a judge sometimes doesn't realize-- I know I

17   don't many times-- just exactly how what you say affects

18   counsel.  You say something off the cuff and it may mean

19   nothing to you, but the attorney is hanging on what the judge

20   has to say as to how it may affect his lawsuit and thinks it

21   is something very important or may have some serious impact

22   on the attorney's view of the case.  Judges should I suppose,

23   learn to keep their mouths completely shut.  I have never been

24   able to do that.  Judge Ling is an exponent of that.  He says

25   that a judge can only say four things:  Granted, denied,

1   sustained, overruled; and he fairly well lives up to that.

2   He sits back in his chair and let's counsel argue and never

3   interrupts.  When it is over with he says one of those four

4   things.  He said to me one day, "Do you listen to counsel

5   when they argue these matters before you?"  I said, "Yes,

6   I try to follow them."  He says, "I don't.  I don't pay any

7   attention to them.  I just let them have their run and when

8   they get through I make my ruling."  I think he was being

9   facetious, because he is a hard worker and a good judge.

10  But it is a fact that that is about all he says-- those four

11  things.  I have never been able to operate that way.

12       We have been happy to have you around, Mr. Moskovitz.

13  Come back at any time.

14       MR. MOSKOVITZ:  Thank you very much, your Honor.

15       MR. STAHLMAN:  Your Honor, may I add my good wishes to

16  the success of his law venture, and if I thought I could get

17  your Honor to say some nice things about me I would give

18  serious consideration to joining the Foreign Legion.

19       THE COURT:  Well, I think we will adjourn until Tuesday

20  morning.  Today is Good Friday and many of the courts are

21  taking it easy this afternoon, and I have a lot to do.  This

22  will give Mr. Veeder an opportunity to look this matter over.

23       Your cross-examination you do not think will be lengthy

24  of Dr. Coit on Tuesday morning?

25       MR. VEEDER:  I really don't think so, your Honor.  I

9281

1    will go over it with Col. Bowen.

2         (Adjournment until Tuesday, March 31, 1959, at 10

3    o'clock A.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25