# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

           Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

           Defendants.

No.  1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Tuesday, March 31, 1959

Pages:  9282 to 9417

FILED

SEP 2 4 1963

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____ Deputy

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 · Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA, )
                 )
        Plaintiff, )
                 )
    vs.             )     No. 1247-SD-C.
                 )
FALLBROOK PUBLIC UTILITY )
DISTRICT, et al.,      )
                 )
        Defendants. )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Tuesday, March 31, 1959

APPEARANCES:

     For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                  Special Assistant to the
                                  Attorney-General,
                                  Department of Justice,
                                  Washington, D. C..

1  APPEARANCES (Continued):

2        For Defendant                 GEORGE E. STAHLMAN, ESQ.
          Vail Company

3

          For Defendant State          STANLEY MOSK, ESQ.,
4         of California                Attorney-General, by
                                       FRED GIRARD, ESQ.,
5                                      Deputy Attorney-General.

6         For Defendants
          Fallbrook Public            FRANZ R. SACHSE, ESQ.
7         Utility District,
          et al.,

8
          For Defendant Murray         WALTER GOULD LINCOLN, ESQ.
9         Schloss Foundation

10        For Defendant Oviatt         MESSRS. BEST, BEST & KRIEGER,
                                       By JAMES H. KRIEGER, ESQ.
11                                        ARTHUR LITTLEWORTH, ESQ.

          For U. S. Navy               LCDR. DONALD W. REDD.
12

13

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX TO WITNESSES

For Defendant
Vail Company:                        D       X        RD        RX

    John Elliott Coit                        9292

For Defendant
Roripaugh, et al.

    Joe Mack Mims              9365      9382

    Alonzo Onel Lynch         9389

SAN DIEGO, CALIFORNIA, TUESDAY, MARCH 31, 1959.   10 A.M.

(Other matters.)

THE CLERK:  Number three, 1247-SD-C, United States vs. Fallbrook, et cetera, et al.  Further court trial.

MR. STAHLMAN:  Your Honor, I have some preliminary matters here in relation to exhibits which I desire to lodge at this time, so that when we proceed with the other phase of our case they will be in.

I would like to supply the Clerk with a copy of the list of exhibits and a copy to your Honor and a copy to Mr. Veeder. If other counsel can work with one, I will have them all for you.

Vail's Exhibit A, previously lodged, I desire to supply copies of to your Honor, to Mr. Veeder and to other counsel.

Vail's Exhibits down to Exhibit I have been lodged.

Vail's Exhibit J I will lodge at this time.  I hand a copy to the Court, a copy to the Government and a copy to other counsel.

I am lodging Vail's Exhibit L.  I hand a copy to the Court, a copy to the Government, and a copy to other counsel.

I now lodge Exhibit K for the Vail Company.  I hand a copy to the Court, a copy to the Government and a copy to other counsel.

THE COURT:  What does Exhibit K purport to be-- acreage

1    irrigated?

2         MR. STAHLMAN:  A tabulation of fields irrigated, your

3    Honor.

4         I now lodge Exhibit M.  That is present irrigation on

5    domestic and stock wells, a tabulation.  I hand a copy to the

6    Court, a copy to the Government, and a copy to other counsel.

7         I now lodge Exhibit N, water distribution of the Vail

8    Company, with a copy to the Court, a copy to the Government,

9    and a copy to other counsel.

10        I now lodge Exhibit O, studies of water yield of some

11   wells on the Vail Ranch, with a copy to the Court, a copy to

12   the Government and a copy to other counsel.

13        I lodge Exhibit P, a curve of the water studies of the

14   Windmill Well over a period of years, with a copy to the Court,

15   a copy to the Government and a copy to other counsel.

16        I now lodge Exhibit Q of the Vail Company, levels of

17   the Diesel pump area, with a copy to the Court, a copy to the

18   Government and a copy to other counsel.

19        I now lodge Exhibit R of the Vail Company, water levels

20   of the Cantarini Camp Well, with a copy to the Court, a copy

21   to the Government and a copy to other counsel.

22        I am now lodging Vail's Exhibit S.  It is a title chain

23   of Temecula and Pala.  I hand a copy to the Court, a copy to

24   the Government and other counsel will get one later.

25        MR. KRIEGER:  In that "other counsel" phrase, Mr.

1   Stahlman, I wonder if we can have extra copies of all these

2   exhibits, because after all it is the State of California, the

3   Fallbrook Public Utility District and others of us who are

4   involved. In due course may we each have a copy of these

5   various exhibits?

6      MR. STAHLMAN:  Yes, you may have other copies.  There is

7   going to be a month intervene.  I wanted to have these lodged

8   in plenty of time.

9      MR. KRIEGER:  Have you any idea when we may have our

10   copies?

11      MR. STAHLMAN:  Oh, within a week.

12      MR. KRIEGER:  Good.

13      THE COURT:  How many exhibits do you have lodged, Mr.

14   Krieger?

15      MR. KRIEGER:  I have lodged three exhibits, and I am

16   going to lodge another one in a moment as soon as Mr. Stahlman

17   is through.

18      MR. STAHLMAN:  I am now lodging Vail Company's Exhibit T,

19   with a copy for the Court, a copy to the Government and a copy

20   to other counsel.

21      I am now lodging Exhibit U.  This is a map of Fallbrook-

22   Santa Rosa, which shows property acquired since the previous

23   suit and the property that was not under the stipulated judg-

24   ment.  I hand a copy to the Court, a copy to the Government

25   and a copy to other counsel.

1    I am now lodging Exhibit V, a highway location map, with

2    a copy to the Court,

3    THE COURT:   A highway location map?

4    MR. STAHLMAN:   Yes, your Honor.   It shows certain

5    properties that were taken out.

6    I hand a copy to the Government, and we will also supply

7    other counsel a copy later.

8    I am now lodging Exhibit W, which is the Township of

9    Temecula.   I hand a copy to the Court.   We will supply smaller

10    sized maps to other counsel later.

11    I am now lodging Vail's Exhibit X, which is recent

12    acquisitions of the Vail Company properties, with a copy to the

13    Court, a copy to the Government and a copy to other counsel.

14    I am now lodging Exhibit Y, which is lands transferred,

15    with a copy to the Court, a copy to the Government and a copy

16    to other counsel.

17    I am lodging Exhibit Z, which is a compilation of acreages

18    of Vail's various properties, with a copy to the Court, a

19    copy to the Government and a copy to other counsel.

20    I would like to lodge Exhibit AA.   The copies are being

21    printed and we will have them this afternoon in all probability

22    I am lodging Exhibit BB, which is a copy of the Findings

23    of Fact and Conclusions of Law.   I would like to lodge with

24    the Court the certified copy of the County Clerk of San Diego

25    County, and I have copies.

1          THE CLERK:  Your Honor, did you want to use the designa-

2    tion BB on this?

3          THE COURT:  No, make it AA, AB, et cetera.

4          MR. STAHLMAN:  This is the last one so far.

5          THE COURT:  Make it AB.

6          MR. STAHLMAN:  Your Honor will note that the copy that I

7    lodged with the Clerk, being a certified copy, is a smaller

8    form than the copies we have here.  It is not easily readable,

9    but that is the way they supply them.  However, we have copies

10   that are available.  I hand a copy to the Court, a copy to the

11   Government.  I have had an arrangement with other counsel that

12   we will leave a copy with the Clerk and they would borrow it

13   from time to time.  Is that correct?

14         MR. SACHSE:  That is satisfactory with me.

15         MR. KRIEGER:  That is all right.

16         MR. STAHLMAN:  That is all the exhibits I am lodging at

17   this time, your Honor.

18         The other matter which we had pending was with relation

19   to the order on the stipulation.  However, Mr. Veeder has

20   prepared one here.  Maybe we might want to make some changes.

21   I made a suggestion.  Is that correct?

22         MR. VEEDER:  You made a suggestion; that is correct.

23         MR. STAHLMAN:  Do you wish to correct it according to the

24   suggestion?

25         MR. VEEDER:  It suits me.

1    MR. STAHLMAN: Fine. We can file it later.

2    MR. KRIEGER: While we are speaking of exhibits, your

3 Honor, I wonder if we could have permission to withdraw

4 Roripaugh, et al., A for Identification and substitute one

5 in its stead. There was a slight error that crept into the

6 preparation of that exhibit. It involved the schedule on the

7 lower left-hand corner of the map under the heading "Pull-down

8 in feet." There was a misinterpretation from the well driller,

9 Mr. Webb, who prepared the map. That figure was formerly the

10 depth to which the well had been sunk, instead of the actual

11 pulldown in feet. So we have corrected it with the pulldown

12 in feet. And with that change, which of course changes the

13 specific capacity heading in the fifth column, the exhibit is

14 otherwise the same.

15    MR. SACHSE: Which one of the parcels was that, Mr.

16 Krieger?

17    MR. KRIEGER: All of them under the lower left-hand

18 schedule under the well driller's logs.

19    MR. STAHLMAN: This was A.

20    MR. KRIEGER: A, yes. I will read for the record the

21 change in those figures. In the exhibit as lodged in the lower

22 left-hand corner under "Wells tested by drillers," the old one

23 as lodged in column 3 read 240 340 bail out, 35, 208, 112,

24 160, 220, 70 and 121; and the substitute exhibit reads: 166,

25 279 bailed out, 30, 147, 76, 67, 174, 58 and 90.

9891

1          In the fifth column the exhibit as lodged read, under

2    "Specific Capacity," .25, .24, .00, 10, .35, 5.89, .13, .33,

3    22.9 and 3.   The new exhibit which we ask to be substituted

4    reads:  .36, .29, .00, 11.7, .49, 8.7, .30, .41, 27.6 and 4.

5          At the same time, where those wells have been located on

6    the map with the specific capacity indicated, the wells have

7    also been changed accordingly just in that respect.

8          May we have permission to withdraw that and substitute

9    the new one, your Honor?

10          THE COURT:   The corrected one may be substituted.

11   Counsel can readily see what the changes are.

12          MR. KRIEGER:   May the record show that the United States

13   has been handed a copy of the substituted exhibit A, so has

14   Mr. Stahlman, the State of California and the Fallbrook Public

15   Utility District, and I would like to hand your Honor copies

16   of the new substitute Exhibit A and Exhibits B and C, Roripaugh,

17   et al.

18          I might say for the record, so that there will be no

19   confusion, we have had to use one name of the several defendants

20   whom we represent and because the name Roripaugh and his

21   famous well on the Santa Gertrudis took on such large propor-

22   tions we decided to put his name on the exhibits.

23          MR. VEEDER:   Your Honor, do we proceed with the cross-

24   examination of Dr. Coit?

25          THE COURT:   You may.

1      MR. VEEDER:  Call Dr. Coit.

2

3                    JOHN ELLIOTT COIT,

4  recalled as a witness in behalf of the defendant Vail Company,

5  having been previously sworn, testified further as follows:

6      MR. VEEDER:  Your Honor, I desire, of course, to inter-

7  pose objection to the introduction of any evidence by the Vail

8  Company on the grounds that the matter has been entirely

9  concluded by a stipulated judgment.  I would like to have the

10  objection relate back, and I would further request your Honor

11  for the privilege of formulating the objection to the intro-

12  duction of evidence by the Vail Company in more or less memor-

13  andum form, because I think it is very important that the Vail

14  Company has now decided to run out on their stipulation as to

15  how this case was to be tried and also in regard to the stipu-

16  lated judgment.  So that I think that there are few matters

17  more important in this trial than what has transpired.  So if

18  I may put the objection formally, but it will generally point

19  to the fact that they were bound, and we believe are still

20  bound, by the stipulated judgment, and they cannot collaterally

21  attack it here.

22      THE COURT:  Of course, even if you are right as to Vail,

23  it is admissible for other parts of the case, because the

24  stipulated judgment between the Government and Vail couldn't

25  affect parties who were not in that litigation.  So make your

9693

1   objection.

2       MR. STAHLMAN:  Your Honor, I was merely going to add

3   that the evidence introduced thus far is along the same line

4   of the evidence introduced by the Government in their previous

5   trial before Judge Yankwich.  So I think we find them blowing

6   hot and cold on this matter.

7       THE COURT:  You have no objection if he relates his

8   objection back to the time you started your case?  That is what

9   he is asking to do.

10      MR. STAHLMAN:  No.

11      MR. VEEDER:  And I would like to be very specific on

12  the points I want to raise, but generally it will relate to

13  that fact.

14      THE COURT:  All right.

15      MR. SACHSE:  Will you see that we get copies of your

16  memorandum also, Mr. Veeder?

17      MR. VEEDER:  Yes.

18      MR. STAHLMAN:  I would also like to point out to the

19  Court that if that is true as to the Vails as to proof of

20  irrigable acreage and water duty, certainly the same thing is

21  true as to the Government; they are operating under a stipulated

22  judgment.

23      MR. VEEDER:  Whatever that means.

24      MR. STAHLMAN:  Yes, whatever the stipulated judgment

25  means.

1    THE COURT:  Of course, what he means is that if this

2  objection is good to evidence on the part of Vail, then Vail,

3  had they made one, or might later make a timely objection to

4  evidence that you would put on which would in any way affect

5  Vail, it would cut both ways.  But let's go ahead.

6    MR. VEEDER:  I doubt that, your Honor.

7    THE COURT:  Make your objection.

8    MR. STAHLMAN:  Your Honor, may I reserve, then, the

9  right to make the objection and the motion to strike in rela-

10  tion to the Government?

11    THE COURT:  We will take that up when the time comes.

12    MR. LINCOLN:  Your Honor, may I be heard in regard to this

13  matter for a moment.

14    THE COURT:  Yes, Mr. Lincoln.

15    MR. LINCOLN:  Your Honor perhaps will remember that I

16  represent clients who own properties on both sides of the Santa

17  Margarita River in the so-called Gorge and have, therefore,

18  something like eight or nine hundred acres of riparian rights

19  to be considered.  We were parties in the original case

20  No. 42850, which was tried in this County by Judge Jennings

21  for a period of about two years, and in the findings in that

22  case certain findings were made with regard to our rights and

23  our positions on the river and as to the number of acres, et

24  cetera.  When the appeal was made by both the Vail Company

25  and the Santa Margarita Ranch, we did not appeal, and in

1  consequence that judgment is affirmed in so far as we are

2  concerned. When the stipulated judgment was made, however,

3  we were referred to in that, but we were not referred to in the

4  details of all the findings which appeared in Judge Jennings'

5  judgment.

6      THE COURT: You didn't join in the stipulation for the

7  new judgment, then?

8      MR. LINCOLN: We did not, sir. We respectfully submit,

9  therefore, that in so far as the Vail Company is concerned, it

10  is bound by the original judgment affecting ourselves, and

11  also perhaps bound by the stipulated judgment which refers to

12  ourselves also.

13      We also respectfully contend that any change which might

14  be made in any stipulation by any parties, except ourselves,

15  with regard to any change in either the stipulated judgment

16  or the original judgment or any matters which flow from that,

17  would affect our rights, and we desire to be permitted to

18  object to it in due time.

19      THE COURT: Can you tell me in a paragraph or two what

20  is the effect, as you see it, of the fact that you have a

21  right to rely upon and are bound by the original judgment

22  entered in that case?

23      MR. LINCOLN: Yes, your Honor, I think I can. Your Honor

24  will perhaps remember that in the stipulated judgment there

25  was an agreement on the part of the Vail Company that a certain

1   gaging station should be and remain at about the entrance to

2   the Santa Margarita Gorge, just as the confluence of the

3   Murrieta River and the Temecula River enter that gorge, and

4   that through that gaging station a certain number of miners

5   inches would be released by the Vail Company daily or however

6   time it may be. Now, of course, that depended, of necessity,

7   upon the rainfall, and naturally the normal water supply which

8   affected the Vail Company's interests in the Temecula and the

9   Pauba Ranches. But we are entitled to rely upon that stipula-

10  tion, and in consequence we are entitled to rely upon the

11  receiving through our lands the total quantity of water which

12  they have stipulated shall go through the land.

13          Now, what any new change may be, that is, as to any new

14  stipulation may be, or what any new evidence may be, in so

15  far as it affects that right which we consider that we have,

16  not only by reason of the original judgment but by reason of

17  the stipulated judgment, we respectfully submit might be

18  injurious to us, and until we know what it is and what its effect

19  may be we respectfully submit we are entitled to object to any

20  change.

21          THE COURT: Did the original judgment that was entered

22  and from which you did not appeal provide for the release of

23  more water than did finally the stipulated judgment?

24          MR. LINCOLN: No, your Honor, it did not.

25          THE COURT: The same amount?

1    MR. LINCOLN:  Yes, your Honor.

2    THE COURT:  Then what difference does it make?

3    MR. LINCOLN:  Well, it makes no difference in so far as

4 that stipulated amount of water will remain in any new stipula-

5 tion or any finding which may be made.  But at the present

6 moment, if these other stipulations and judgments are completely

7 wiped out, as we expect the plan to be, by this new stipulation,

8 then we don't know what is going to happen to any quantity

9 of water which might or might not be released.

10   MR. STAHLMAN:  Your Honor, this further demonstrates the

11 fallacy of this stipulated judgment and further complications

12 that would arise by reason of it.

13   Now, if I understand Mr. Lincoln's position, he is

14 advocating that the judgment that was previously entered

15 should be considered by the Court, then we have a stipulated

16 judgment, and then we have the proposition that none of the

17 other parties on the river were considered in relation to

18 either one of those judgments.  I don't know Mr. Lincoln's

19 position, but it would seem to me that he should read the

20 judgments and see where he is curtailed in the use of any

21 water that flows down through the Temecula Gorge.  The water

22 allotted to them is the water off the Murrieta and the land

23 that they had at that time was considered and from what little

24 reading I have done on that particular matter as that land

25 not being riparian and not subject to water duty.

9298

1     MR. VEEDER:  I don't agree with what counsel said, but

2  I am not going to argue.  I would like to get going.  We have

3  spent half an hour while he lodged exhibits.

4     THE COURT:  Let's go ahead.  Make your objection.

5     MR. VEEDER:  Well, he is wrong about the Murrieta.  It

6  was not tried in the original case.

7     THE COURT:  Make your objection.

8     MR. VEEDER:  I have already objected that they can't

9  collaterally attack the stipulated judgment, your Honor.  That

10  is in the record.

11     THE COURT:  You told me that you wanted to make a detailed

12  objection.

13     MR. VEEDER:  I will.  I will file it.

14     THE COURT:  You want to file it in writing?

15     MR. VEEDER:  Yes, I do.  I asked that.

16     THE COURT:  Oh, I thought you were going to read something

17  in the record.

18     MR. VEEDER:  Oh, no, I am going to read what is referred

19  to as the soil survey.

20     THE COURT:  I misunderstood you.  You may have permission

21  to file this objection to the introduction of evidence on the

22  part of the Vail Company and the Vail interests in writing, and

23  the objection by agreement with Mr. Stahlman may go back and

24  be effective as of the beginning of the Vail case.

25     MR. STAHLMAN:  Of course, that is with the understanding

1  that this order that your Honor signs in relation to the

2  vacating and setting aside of the stipulation of 1951 goes back

3  to that same date.

4      MR. VEEDER:  So specified in the order that I prepare.

5      MR. STAHLMAN:  All right.

6      THE COURT:  All right.

7

8                    CROSS-EXAMINATION

9  BY MR. VEEDER:

10     Q  Dr. Coit--

11     THE COURT:  The Doctor is hard of hearing.  You will

12  have to practically shout at him.

13     MR. VEEDER:  I will shout at him.

14     THE COURT:  All right.

15  BY MR. VEEDER:

16     Q  Who is Dr. Ford A. Carpenter?

17     A  He was a Weather Bureau man as I knew him.

18     Q  He is dead?

19     A  I don't know.  I presume he is.

20     Q  However, you relied upon his work when you prepared

21  this material referred to as a soil survey; isn't that right?

22     A  His work was in the background of my mind and was

23  gone over after we determined the climatic conditions on the

24  different lots and his work had a certain effect.

25     Q  In other words, you took it into consideration?

1          A  Yes.

2          Q  And you know what effect it had upon your soil survey?

3          A  It had no effect on the soil survey.

4          Q  Did it have any effect upon the designation of classes

5     in regard to the lands?

6          A  It had some effect, yes.

7          Q  In other words, where you have a Class A land, which

8     would be citrus land, you depended upon Dr. Ford A. Carpenter

9     in making that determination; is that right?

10         A  I made the determination first myself and later

11    checked some of the records of Dr. Ford A. Carpenter, and in

12    some cases where there was a divergence it probably had an

13    effect on our final decision.

14         Q  And you revised your determination predicated upon

15    Dr. Carpenter's advice to you; is that right?

16         A  To a certain extent, predicated upon his record.

17         Q  Now, I observe this statement:  "The method of survey

18    has been to visit and examine the lots in each block which are

19    indicated on a map by engineers as susceptible of irrigation."

20    Now, who were those engineers?

21         A  I don't remember.

22         Q  Do you have the criteria that they utilized in desig-

23    nating land as being irrigable?

24         A  No.

25         Q  So as a matter of fact, this Vail D doesn't reflect in

1    it the criteria that was utilized in determining what lands

2    were irrigable; is that right?

3        MR. STAHLMAN:  Just a moment. I object to the question.

4    It is indefinite and uncertain.

5        MR. VEEDER:  Read it, Mr. Reporter.

6        MR. STAHLMAN:  I heard it.

7        THE COURT:  Read it, Mr. Reporter.

8        (The reporter read the pending question.)

9        MR. STAHLMAN:  I object to it as being indefinite and

10    uncertain, your Honor.

11        MR. VEEDER:  I am not at fault because of counsel's

12    limitations, your Honor.

13        MR. STAHLMAN:  Now, if you are going to start these

14    arguments--

15        Your Honor, if Mr. Veeder is going to make these insulting

16    remarks, like he has to the other attorneys, I want the same

17    privilege of responding to it.

18        THE COURT:  No.  Just conduct yourself without offensive

19    remarks to other counsel, Mr. Veeder.  Reframe your question

20    in simple language to the Doctor.

21        MR. VEEDER:  I will, your Honor.

22        Q  In other words, there is no way of determining what

23    is irrigable land by viewing your Exhibit D?  Exhibit D is

24    the soil survey.

25        MR. STAHLMAN:  I don't understand the question, your

1   Honor.

2        THE WITNESS:  I don't understand the question.

3        THE COURT:  I don't either.  The objection is sustained.

4   BY MR. VEEDER:

5        Q  You state here "The method of survey has been to

6   visit and to examine the lots in each block which were indicated

7   on a map by engineers as susceptible of irrigation."  Now what

8   does that mean?

9        A  That means that we were furnished a map.  We had

10  nothing to do with the survey of the engineers.  We had one

11  of the engineers with us at all times to assist us in locating

12  the corners and the boundaries, so that we could be sure that

13  we were describing the same lot that we were looking at on the

14  map.

15       Q  The engineering data is not set forth in Defendant's

16  Exhibit D; is that right?

17       MR. STAHLMAN:  Just a moment.

18       THE COURT:  By "engineering data" do you mean the map

19  itself that was used, or do you mean other material such as

20  descriptions, et cetera?

21       MR. VEEDER:  I mean the material that is alluded to, your

22  Honor, in this exhibit, "Map by engineers as susceptible of

23  irrigation."

24       THE COURT:  Let me ask you, Dr. Coit, when you went out

25  with an engineer you had the map that is Exhibit A on the board?

1    THE WITNESS: Yes.

2      THE COURT: And the map has on it points and ridges and

3  little valleys and various physical phenomena; is that right?

4      THE WITNESS: The map that we used did not have all the

5  physical phenomena on it. It had the lines and the boundaries

6  and the blocks and the lots. It was not a contour map.

7      THE COURT: It was not a contour map. But from inspecting

8  a certain lot and block could you say, from an inspection on

9  the ground, what particular area was covered in a certain lot

10  and block?

11      THE WITNESS: Oh, certainly.

12      THE COURT: How could you tell?

13      THE WITNESS: By walking over the lot and examining it.

14      THE COURT: And how did you know where the edges of the

15  lot were?

16      THE WITNESS: The surveyor who was with us would point

17  out the corners or locate them accurately and indicate the

18  lines and boundaries, and we would walk over the lot, bore the

19  necessary holes, we would examine cuts, gullies or any other

20  way, to tell the type of soil. If one of the corners was

21  over a ridge or something, we would walk on top of the ridge

22  and look down and the engineer would point out that the corner

23  of this lot is approximately so and so. So then we would write

24  the description of the lot.

25      THE COURT: Who made the determination whether certain

1    land within that lot was irrigable?

2    THE WITNESS:  I don't know.

3    THE COURT:  You didn't make it?

4    THE WITNESS:  Well, yes, to the extent that some of it is

5    classified as suitable for citrus or deciduous fruits, alfalfa,

6    or waste land, that was classified as waste land at that time

7    in 1926-- it was considered waste land.

8    THE COURT:  Who made that determination?  Did you make

9    it from an inspection of the gound?

10    THE WITNESS:  Yes, the waste land we did.

11    THE COURT:  Suppose Exhibit D, this soil survey, showed

12    a certain little mesa as suitable for citrus.  Who made that

13    determination?

14    THE WITNESS:  I did or my assistant, yes.

15    THE COURT:  It was made by you or under your direction?

16    THE WITNESS:  On the ground.

17    THE COURT:  From an inspection of the land?

18    THE WITNESS:  Yes, sir.

19    THE COURT:  The elevation?

20    THE WITNESS:  Yes, sir.

21    THE COURT:  The way it lay, et cetera?

22    THE WITNESS:  Yes, sir; all of the factors that were

23    taken together in connection with the growth of that crop.

24    THE COURT:  Is it your purpose to make some objection

25    to this exhibit?

1          MR. VEEDER:  Yes, your Honor, I am going to move to

2     strike this, because there is no foundation for it.

3          THE COURT:  First of all, this happened in 1926, which

4     was some 33 years ago.

5          MR. VEEDER:  That is right.  That is one of the principal

6     objections

7          THE COURT:  And certainly we are going to take into

8     account the fact that in the course of years people die.

9          MR. VEEDER:  It could happen to anybody, your Honor.

10          THE COURT:  Meanwhile, Col. Bowen was put on the stand

11     and testified that he spot checked this map as to area and as

12     to adaptability of various of the lots and that in his view it

13     was reasonably accurate.  Did you read the transcript?

14          MR. VEEDER:  Yes, your Honor.  I am going to cross-

15     examine Col. Bowen.  I have been in the business a long while

16     and I don't get kidded very often about no foundation.

17          MR. STAHLMAN:  If Mr. Veeder is so concerned about this,

18     let Col. Bowen go out and make a survey on the Vail Ranch

19     like he did on any other property.

20          MR. VEEDER:  It has nothing to do with this exhibit,

21     your Honor.

22          THE COURT:  Remember what I told you a long time ago.

23     If you are doing this for my benefit, that is one thing.  If

24     you are doing it for the record, that is another ting.

25          MR. VEEDER:  I am doing it for the record, your Honor.

9306

1          THE COURT:  All right, go ahead.

2    BY MR. VEEDER:

3          Q  Now, what does the word "irrigable" mean to you?

4          A  It means capable or suitable for irrigation.

5          Q  And when you say "suitable for irrigation" did you

6    limit that to the kind of crops that might be grown?

7          A  No.

8          Q  What did you use-- what other factors?

9          MR. STAHLMAN:  If you don't understand the question,

10   ask.

11         THE WITNESS:  I don't understand that.

12   BY MR. VEEDER:

13         Q  What other factors-- you say crops alone were not the

14   only thing you considered in determining irrigability-- what

15   else?  Or maybe I misunderstood you.

16         A  Oh, I get you now.  The crops and the slope of the

17   land and the type of the soil.

18         Q  And how did you determine the slope of the land?

19         A  By walking over it and looking at it.

20         Q  You determined that it was two or three percent by

21   walking over it and looking at it?

22         A  You don't have to.  I didn't have to determine it

23   that close, but from my experience I can tell whether it is

24   too steep for economical irrigation.

25         Q  Did you take into consideration the depth of the

1  soil in every instance?

2      A  Yes.

3      Q  How did you determine that?

4      A  By examining the cuts and the excavations and by

5  boring holes with a soil auger where there was doubt.  We

6  didn't bore holes on every lot because it was not, in my

7  judgment, necessary.  A good many areas of that soil are

8  fairly uniform.

9      Q  And did you consider field efficiency when you made

10  your soil survey?  Do you know what "field efficiency" means?

11      A  No, sir.

12      Q  Have you considered the quantity of water that would

13  be required to irrigate a particular piece of land?

14      A  Yes.

15      Q  And what determination did you make in that connection?

16      A  I didn't include any figures on that in my descriptions.

17      Q  Would it not make a difference?  Assuming that you had

18  soil that was ten inches deep underlain with gravel, wouldn't

19  that make a difference as to the quantity of water that was

20  used?

21      A  It might, yes.

22      Q  And did you take that into consideration?

23      A  While I know in a general way the amount of water

24  necessary properly to irrigate a number of different crops,

25  I didn't enter that in these notes.  I did not put in the

1    water duty.

2         Q  You did not put in water duty?

3         A  No.

4         Q  Well, isn't that a factor in determining whether land

5    is irrigable or not?

6         A  I don't think so.

7         Q  Assuming that it took 10 acre-feet per acre per year

8    to raise a ton of alfalfa, would you say the land was irrigable?

9         A  I would not.  I mean to say that that is an excessive

10   amount of water for alfalfa.  Your land might be irrigable,

11   but it wouldn't be common sense to use that much water on an

12   acre of alfalfa.

13        Q  Did you consider duty of water on land where the

14   water table was extremely high?

15        A  I don't remember.

16        Q  Now, in making your determination did you consider

17   source of water at all?

18        MR. STAHLMAN:  I object to that, unless it is indicated

19   what he means by "source of water."

20   BY MR. VEEDER:

21        Q  Well, did you take into consideration the lands that

22   were located in Long Valley?  Are you acquainted with  the

23   area?

24        MR. STAHLMAN:  Don't drop your voice, Bill.  I don't

25   think he gets your question.

9309

BY MR. VEEDER:

Q Are you acquainted with the various streams that run off in the area?

A Not by name, no.

Q So you wouldn't know what watersheds the lands are situated in?

A No.

Q And did you take into consideration, when you made your soil survey and classification, the subwatersheds in which these lands were located?

A No.

Q Now, in determining the acreages in a particular lot of a particular block, how did you make that determination?

A Determine the acreage did you say?

Q Yes.

A I didn't determine the acreage. It was determined by the engineers who made the map.

Q Doctor, could I impose on you to join me down here at this map. I want to ask you some questions.

THE COURT: Before you go down, when you were here the other day and I questioned you, I thought you told me that when you went out to one of these pieces, a lot, the engineer would say, "Well, there are 115 acres in this block." You would look it over and you would say, well, 50 of it is suitable for alfalfa, ten of it is waste, so much of it is good for this

1 and so much of it is good for that," and you would arrive at

2 a total, which you yourself determined on the basis of the

3 area pointed out to you, the general boundaries of the area

4 pointed out by the engineer, and then you would check against

5 the acreage figure that the engineer had and sometimes you

6 were a little over and sometimes you were a little under.  Is

7 that what you told me?

8     THE WITNESS:  That is right.  The acreage figure was

9 printed on the map that we were using in every case, the

10 number of acres and the percentage, right on that lot.

11     THE COURT:  You didn't make that determination that

12 appeared on the map?

13     THE WITNESS:  No.

14     THE COURT:  But did you make a determination of the

15 number of acres within one of these lots that was suitable

16 or unsuitable for various purposes?

17     THE WITNESS:  In a general way.  Not by measuring it,

18 your Honor, but I have a certain amount of experience in

19 experting lands to walk over a piece of ground and form a fair

20 idea of what the acreage is.

21     THE COURT:  You say you measured it.  You didn't use a

22 steel tape?

23     THE WITNESS:  No, sir.

24     THE COURT:  Did you do any stepping off?

25     THE WITNESS:  I did.  In many cases, if we came to a

1   little mesa or something of that sort and the boundary was not

2   in sight on account of a rise, we would step it off, sometimes

3   both ways, and calculate roughly about how many acres was in

4   that area.

5        MR. VEEDER:  May he come down here, your Honor?

6        THE COURT:  He may.

7        (The witness stepping down to the board.)

8   BY MR. VEEDER:

9        Q  This is down at Presa Seco; are you familiar with

10  that-- dry reservoir?

11       A  No.

12       Q  Well, that is what it is now.  Right here, the con-

13  fluence of the Temecula-- I can't see the name of this.  I

14  think it is Arroyo Seco, which runs into Presa Seco.  I observe

15  you have marked in Block 1, Lot 2, you have 63.2 acres.  Now,

16  you have 31.6 on one side, and you have 31.6 on the other.

17  Are you telling the Court that there is exactly the same

18  acreage on both sides of that creek?

19       A  No, I am not telling the Court that.

20       Q  You don't know that yourself, do you?

21       A  No.

22       Q  And you have no way of proving it, have you?

23       A  No.

24       Q  And the fact is that you couldn't estimate within

25  25 acres what is on either side of that creek, could you?

1      A   Yes.

2      Q   Here is 31.6.  How many acres are down there?

3      MR. STAHLMAN:  You mean from the map?

4      MR. VEEDER:  From the map.

5      MR. STAHLMAN:  Or from going down and looking at it?

6      MR. VEEDER:  From the map.

7      THE WITNESS:  I will not attempt to do that.

8   BY MR. VEEDER:

9      Q   Now here is the other side, 31.6.  How many acres

10   are over there, do you think?

11     A   I would have to be on the ground.

12     Q   In other words, you would not want the Court to

13   accept this map as testimony, would you?

14     MR. STAHLMAN:  I object to that as invading the province

15   of the Court.

16     THE COURT: Sustained.

17   BY MR. VEEDER:

18     Q   You are not stating, in other words, that those

19   acreages are right?

20     A   I don't know.

21     Q   You don't know.  Now we will turn to that piece of

22   property--

23     THE COURT:  What page?  Lot 2, Block 1, is it?  Page 5.

24     MR. VEEDER:  That is right.  I don't have the numbers on

25   this.  I guess I do, at that.

1          THE COURT:  Number it in the lower right-hand corner.

2          MR. VEEDER:  Page 5.

3          MR. STAHLMAN:  Which one is this?

4          THE COURT:  Lot 2, Block 1.

5  BY MR. VEEDER:

6          Q  Now, you state that the full 63.2 acres is susceptible

7  of irrigation and that there is no waste.  Do you recall that

8  land, Dr. Coit?  Can you hear me?

9          A  Yes.

10         Q  Do you recall that piece of land down in there?

11         A  I did not do the work on that.  One of my assistants

12  did the original work on it.

13         (Mr. Stahlman conferring with the witness.)

14  BY MR. VEEDER:

15         Q  Block 1, Lot 2-- you don't recall that land?

16         A  No.

17         Q  And the work was not done by you?

18         A  It was done by Mr. Hutchinson and later checked by

19  Mr. Nichols.

20         Q  But you did not check it yourself?

21         A  No, not at that time.

22         Q  Or did you ever check it?

23         A  Yes.  I beg your pardon.  No, I haven't checked that

24  one.

25         Q  Could I impose on you, sir, to come down here again,

9314

1  because I want to be oriented.

2        Which is the line that shows the outer extremity of the

3  31.6 acres, the accuracy of which you do not know-- right

4  here-- what line do we look to to determine that?

5        A  I don't know.

6        Q  You don't know?  And you don't know--

7        A  I did check the acreage on the ground, but from that

8  map there I can't tell just which of those lines-- what they

9  mean.

10       Q  Would you say that in regard to the entire map that

11  would be the circumstance; you don't know what line means what,

12  is that right?

13       MR. STAHLMAN:  Just a moment.

14       THE WITNESS:  No, that isn't right.

15       THE COURT:  We will take a short recess.

16       MR. VEEDER:  This is not my idea, your Honor.

17       THE COURT:  What?

18       MR. VEEDER:  Having to litigate with the Vails.

19       (Recess.)

20  BY MR. VEEDER:

21       Q  Immediately prior to the recess you stated that you

22  did not know what line delineated the 31.6 acres.  Would it

23  not make a very great difference if the line closest to the

24  east bank of Arroyo Seco was the boundary line-- wouldn't that

25  make a great deal of difference in acreage?  Are you oriented,

1  sir, with what I am talking about?

2          A  Yes.  But I don't understand just what you--

3          Q  All right, I will start again.  I want you happy.

4  Here is a heavy line.

5          A  Yes.

6          Q  That would make a great deal of difference, would it

7  not, from the standpoint of acreage, if that were the line

8  that were the eastern boundary of this so-called 31.6 acres?

9          A  That probably is the eastern boundary, the dark-

10  colored line.

11          Q  All right, sir, now if you will do me the favor--

12          MR. STAHLMAN:  Pardon me.  He was about to explain

13  something else to you, and if you were not such an eager

14  beaver you might get more information.

15          MR. VEEDER:  Your Honor, I move to strike the "eager

16  beaver".

17          MR. STAHLMAN:  I apologize to the Court.

18          THE COURT:  All right, complete your answer, Dr. Coit.

19  Did you have something else you wanted to add when you were

20  interrupted?

21          THE WITNESS:  I would like for him to ask the question

22  again and I will try and get it.

23          MR. VEEDER:  I thought you had answered it, sir.

24          Will you read back the question and answer, Mr. Reporter?

25          (The reporter read the last question and answer.)

1    THE WITNESS:  The surveyor was with Mr. Hutchinson.

2    MR. VEEDER:  I object to this as being hearsay, your

3  Honor.

4    THE COURT:  Overruled.

5    Tell us the background.  Go ahead.

6    THE WITNESS:  A surveyor was with Mr. Hutchinson and

7  pointed out the boundary lines the same as he had for Mr.

8  Nichols and for me, and sometimes we worked together.  In the

9  case of this particular lot Mr. Hutchinson first worked it

10  over and at some later date Mr. Nichols went back and checked

11  it.  So both initials are on the report.

12  BY MR. VEEDER:

13    Q  Are you stating then that it is your view that this

14  contour line is the eastern boundary of the 31.6 acres?

15    A  It would have been my view if I had been there and

16  the surveyor had said so.

17    MR. VEEDER:  I move to strike the answer, your Honor.

18    THE COURT:  It may go out.

19    MR. VEEDER:  Would you answer the question?  Do you want

20  the question read?

21    THE WITNESS:  Yes.

22    MR. VEEDER:  Read it, please, Mr. Reporter.

23    (The reporter read the pending question.)

24    THE WITNESS:  Yes.

25

BY MR. VEEDER:

Q   Now, I observe from this statement of yours --
don't go back to the stand, sir, please-- Block 1, Lot 2,
all Class D, no waste. Now, I ask you to view the United
States of America's Exhibit 29R, which is the Vail Lake
quadrangle. Can you orient yourself now as to where you would
be?

A   Yes.

Q   And are you stating to this Court that there is no
waste land between the contour line which appears on Vail's
Exhibit C and the thread of Arroyo Seco?

MR. STAHLMAN:   Do you mean as of the present time?

MR. VEEDER:   No; at the time he made the survey. He
doesn't know now.

THE WITNESS:   There was no waste at that time.

BY MR. VEEDER:

Q   Do you know that personally?

A   I didn't do the work personally.   It was done by Mr.
Hutchinson originally and checked by Mr. Nichols.

Q   Are you stating then that there is no waste land from
thecontour line to the thread of the stream?

THE COURT:   You said "there is no waste land."  Are you
talking of the present, or as of--

MR. VEEDER:   Well, at the time he made the survey.

THE COURT:   Then use "was."

1      MR. VEEDER:  All right.

2      THE WITNESS:  At the time we made the survey I relied on

3  Mr. Hutchinson and Mr. Nichols to say that there was no waste

4  because they made the examination.

5  BY MR. VEEDER:

6      Q  Well, that is an irregular contour line, is it not?

7      MR. STAHLMAN:  I object to that as being argumentative,

8  your Honor.

9      MR. VEEDER:  What is argumentative about saying that it

10  is irregular?

11      THE COURT:  Overruled.

12      MR. STAHLMAN:  It is not even a question.

13      THE COURT:  Let us get on to something else.

14  BY MR. VEEDER:

15      Q  Well, the contour lines as shown on Plaintiff's

16  Exhibit 29-R are irregular, are they not?

17      A  Yes.

18      Q  And the contour line shown on Vail's Exhibit C in

19  this area 2 of Block 1 is irregular, is it not?

20      A  That is right.

21      Q  What causes that irregularity?

22      A  Nature.

23      Q  And when you say "nature" are you not speaking of

24  erosion?

25      A  Perhaps.

1     Q  Well, perhaps.  And what else would make it irregular?

2     A  There are changes.

3     Q  What would cause the changes other than erosion?

4     A  Well, that is the principal reason for the change.

5     Q  And the irregularity would indicate, would it not,

6 that there would be some waste land in that 63 acres; isn't

7 that correct?

8     A  There might possibly be some.

9     Q  In other words, your statement that there was no

10 waste is incorrect?

11     A  The way these men did the work, they did not use a

12 tape measure and get down to feet and yards.

13     Q  In other words--

14     MR. STAHLMAN:  Just a moment.  While he is talking,

15 extend him the courtesy of not interrupting.

16     THE WITNESS:  Walking over the land they estimated as

17 near as they could.

18 BY MR. VEEDER:

19     Q  In other words, they were able to estimate 31.6

20 acres.  That is pretty close, isn't it?

21     A  They estimated no waste.

22     Q  Well, now, let's go back to my question.  I asked

23 you did they estimate 31.6 acres?

24     A  That was on the map.

25     Q  In other words, they did not estimate 31.6 acres?

9320

1        THE COURT:  Now you are talking about two different

2   people.  I understand what he is saying.  The first thing you

3   know you will have everybody confused.

4        The surveyors, Mr. Coit, measured the ground; is that

5   right?

6        THE WITNESS:  How is that, your Honor?

7        THE COURT:  Did the surveyors measure the ground?

8        THE WITNESS:  I presume they measured it.

9        THE COURT:  But the men you are speaking of, Mr.

10   Hutchinson and Mr. Nichols, who worked with you, estimated the

11   area the same as you did?

12        THE WITNESS:  Yes, sir.

13        THE COURT:  All right.

14   BY MR. VEEDER:

15        Q  Now, as a matter of fact, there would necessarily be

16   waste, would there not--

17        A  Not necessarily.

18        Q  Let me finish.  I have to let you finish.

19        THE COURT: Ask your question.

20   BY MR. VEEDER:

21        Q  In the areas that are eroded there must be waste from

22   the standpoint of irrigability; is that not correct?

23        A  Not necessarily.

24        Q  Well, let's be specific, then.  In this area 2 where

25   you have a highly eroded precipitous bank, as shown on

1    Plaintiff's Exhibit 29-R, would you not necessarily say that

2    there was waste?

3         A  No.

4         Q  Why not?

5         A  Because of a sand bank in that locality which could

6    easily be smoothed down.

7         Q  In other words, you are stating to the Court that

8    where you have a sand bank 10 feet high, just for example, you

9    are saying it is not waste because it could be smoothed out?

10        A  Well, 10 feet high is perhaps a little high, but it

11   is quite possible to smooth out some of this eroded land, and

12   it is done all of the time everywhere sufficiently to irri-

13   gate it.

14        Q  All right, sir.  Now, will you read into the record

15   the elevation of that contour line?  I am pointing now to

16   Plaintiff's Exhibit 29-R.

17        MR. STAHLMAN:  Which contour line are you pointing to?

18        MR. VEEDER:  The contour line that is the eastern boundary

19   of Area 2.  I am asking him to give us the elevation.

20        MR. STAHLMAN:  He says he has to have a magnifying glass.

21   He can't see it on that small map.

22        THE COURT:  Read it to him, Mr. Veeder.  We will take

23   your word for it.

24        MR. STAHLMAN:  I will not.  I want to see what he says.

25        MR. VEEDER:  You read it, Georgie.  Not that I trust you.

9322

1        MR. STAHLMAN:  I don't know which one you are pointing

2    at.

3        MR. VEEDER:  Well, I will change my glasses and read it.

4        MR. STAHLMAN:  You are going to put your straight glasses

5    on?

6        MR. VEEDER:  Your Honor, the way they make me suffer,

7    and you let them get away with it.

8        THE COURT:  All right, Mr. Stahlman, you are leading

9    with your chin.  Let's cut out the horseplay and get on with

10    the case.

11        MR. VEEDER:  This is 1612.  Am I right?  Can you see

12    that, George?

13        MR. STAHLMAN:  Yes, that is 1612.

14        MR. VEEDER:  Now, let us find the bottom of the arroyo.

15    It would look to me like it would be 1451.  Is that right?

16        MR. STAHLMAN:  I don't know.  I will not say.  It is

17    away down.

18    BY MR. VEEDER:

19        Q  In other words, if there were a hundred feet or 200

20    feet between the upper contour and the bottom of the Arroyo

21    Seco, you wouldn't say that that could be leveled out, would

22    you?

23        A  Do you mean vertically or horizontally 200 feet?

24        Q  It looks to me like it would be almost vertically at

25    points.  You couldn't level off 200 feet, could you?

1      MR. STAHLMAN:  Your Honor, I object to this line of

2   testimony.  It is not getting us any place.  It is a matter

3   of common sense.  You could take judicial notice of the fact

4   that you can still have acreage, some of it is lower and some

5   of it is higher, and the can still both be irrigable even

6   though you have a bank there.  It is done on ranches all over

7   the northern part of the county.  You find ranches with a bank

8   and you have trees planted above.  I think the cross-examination

9   is frivolous.  I don't think it attacks the testimony or the

10   credibility of the witness.

11      THE COURT:  Mr. Veeder, how much longer are you going to

12   spend on this?

13      MR. VEEDER:  Well, we have a big map, your Honor, and

14   we have much said about it, and I say that when a man comes

15   in and says that he has a tabulation of material and it is

16   offered in evidence as what he would say, I have to cross-

17   examine.  Now I know and I believe that your Honor will make

18   a field trip and we will observe that some of this is a most

19   precipitous area in the county and he says there is no waste

20   and I say that is in error and I think I have a right to cross-

21   examine him until he says "Yes, you are right, it is an error."

22      THE COURT:  Does the Government propose to make a survey

23   of this Vail estate?

24      MR. VEEDER:  Well, for rebuttal we certainly are.

25      THE COURT:  That is what you may be working up to.

1    MR. VEEDER:  What is that?  A soil survey for the richest

2    man in America, almost.

3        THE COURT:  Well, that might be debated.

4        MR. STAHLMAN:  It was all right to use Mr. Hall, as the

5    Government did, in the first trial of this case, using the same

6    material and palming those figures off on the rest of the

7    water users on the stream; but when the man who has made this

8    survey comes in here it becomes an entirely different situa-

9    tion.

10       THE COURT:  Do I understand that the Government in the

11   first trial of this action used this map and these figures?

12       MR. STAHLMAN:  Yes, your Honor, and I would like to

13   offer in evidence at this time the testimony of Mr. Hall, who

14   was placed on the stand by the Government and was--

15       MR. VEEDER:  I thought I was cross-examining, your Honor.

16       MR. STAHLMAN:  Just a moment.

17       THE COURT:  Just a moment.

18       MR. STAHLMAN:  While I am making a statement I hope I

19   will have the courtesy of your silence, Mr. Veeder.

20       THE COURT:  Let him continue, Mr. Veeder.

21       MR. STAHLMAN:  I am making an offer of three volumes

22   of testimony of Mr. Hall, whom the Government placed on the

23   stand before Judge Yankwich, whose testimony was received

24   and on which findings were made and conclusions of law drawn

25   therefrom, which were not disturbed by the Ninth Circuit Court

1    of Appeals, and I think as long as they have put that evidence

2    in in that trial it comports with exactly what this witness

3    has testified to and this becomes competent.  I offer it in

4    evidence, your Honor.

5         MR. VEEDER:  Your Honor, I think he has not complied

6    with the law of the State of California in regard to an effort

7    to get evidence from a previous case into the record of a

8    subsequent case.

9         But we must bear in mind that O'Melveny & Myers stipulated

10   with us that there would be no litigation with the Vail Company.

11   So when that evidence went into the record, if it did-- I

12   don't know-- when that evidence went into the record, it went

13   in on the basis of an agreement with O'Melveny & Myers that

14   there would be no litigation.  Now we are in contentious

15   litigation, I assure you, and we are in litigation to the

16   very end from the standpoint of acreage, and I submit that this

17   witness is not qualified and there is no foundation for Vail's

18   Exhibit C for Identification or Exhibit D for Identification,

19   and the mere fact that people wanted to settle and get along

20   and we did, I stipulated with O'Melveny & Myers and put this

21   lawsuit to the side and it was not going to be tried.  So when

22   anyone comes along and tries to get that record in here, it

23   will be over my strenuous objection.

24        And I make the additional point, your Honor, that one

25   of the reasons for the Vails asking to be relieved of a

1    stipulation with O'Melveny & Myers was the fact that issues are

2    different, facts are different, things have changed.  So what

3    happened in the original trial has not one thing to do with

4    this case, because when people are settling things that is one

5    thing, and when they are going to litigate for two or three

6    years it is something else.

7        THE COURT:  Just a moment.  The Vail Estate was not a

8    party to the severed trial.

9        MR. STAHLMAN:  It was not.  But the Government put the

10   evidence in.

11       THE COURT:  Do you have any authority on this proposition

12   where the Government uses a witness and vouches for his

13   veracity and integrity that you have a right thereafter to

14   use that testimony, as it were, against the Government?  Do

15   you have any authority on that besides--

16       MR. STAHLMAN:  Your Honor, I can't offhand cite it to

17   your Honor, but to me it is a matter of common sense.  I have

18   found the rules of evidence are based on common sense.  That

19   if the Government here just a few months before contended

20   against all of the other litigants on this stream that there

21   was a situation that is a situation of fact and that there

22   existed in the record-- they placed in the record those factual

23   matters.  These vindictives that Mr. Veeder hurls here and

24   his scare tactics in opposition and the speeches that he wants

25   to make here are not going to scare us.  However, I think when

9387

1   he in the previous trial contended for the very same thing as

2   against all the litigants on this river and then comes back

3   and says, "I want to attack this testimony that was previously

4   given"-- that is the effect of it-- I think it becomes compe-

5   tent to show that they at another time and in another place

6   gave testimony and put a witness on the stand for whom they

7   vouched for the same kind and character of evidence.

8       THE COURT:  Do you have any authority besides Stahlman

9   on Evidence for this?

10      MR. STAHLMAN:  Well, Stahlman is a pretty good authority,

11  your Honor, but I will go to Whittier and I will go to Green-

12  leaf and I think I will come up with something.

13     THE COURT:  You may.  I will sustain the objection now,

14  without prejudice.  You look up some law and renew it.

15     Logically, it seems inconsistent for the Government to

16  blow hot and cold, and in one trial to present certain

17  evidence and then at a second trial to object to the same

18  evidence.  But let us get some authority for it.

19     MR. KRIEGER:  Your Honor, we will join in the objection

20  to the introduction of that testimony as being hearsay.

21     MR. STAHLMAN:  It may be that the method by which I am

22  offering it is not the best, but I will assure you that when

23  you look up the cases we are going to find that the evidence

24  is competent.  It may be that Mr. Hall will have to be the

25  witness for it.  If that is so, we will bring him down here.

1       THE COURT:  Do I understand that Mr. Hall identified this

2  map Exhibit C now on the board?

3       MR. STAHLMAN:  Here is the very map, your Honor.  I

4  will ask it to be marked C-1.  It was Exhibit C in that trial

5  under Mr. Hall's testimony.

6       THE COURT:  Mr. Hall identified that

7       MR. STAHLMAN:  Yes, your Honor.

8       THE COURT:  Did he participate in these surveys of

9  the land?

10      MR. STAHLMAN:  We haven't found out that he did.  But he

11  certainly testified that he did, and the Government put him

12  on the stand to so testify.  That is what happened in the

13  first trial.

14      THE COURT:  Mark the map as Exhibit C-1.  The objection

15  is sustained without prejudice to renewing it after you have

16  done a little research on it.

17      MR. STAHLMAN:  Yes, your Honor.

18      MR. SACHSE:  So that I am straight, your Honor, that is

19  the objection that was made to the tender of the record of the

20  first trial?

21      THE COURT:  That is right.

22      We probably had an objection on this cross-examination.

23  I am going to sustain it.  An objection was also pending,

24  I think, to this line of cross-examination.

25      What is the Government's plan here?  To resist the

1       introduction of this map and this soil survey?

2              MR. VEEDER:  Yes, sir.

3              THE COURT:  Then do you propose to make one of your own?

4              MR. VEEDER:  No, your Honor.

5              THE COURT:  You brought this lawsuit.  You may be

6       required to make some of these surveys.

7              MR. VEEDER:  Your Honor, I settled the lawsuit once nine

8       years ago.  Now I am litigating it.  It is a horse from a

9       different merry-go-round when we are on that side.

10             MR. STAHLMAN:  Your Honor, did he settle the lawsuit

11      when he filed an amended and supplemental complaint here just

12      about a year ago and made Vails a party defendant again?

13

14

15

16

17

18

19

20

21

22

23

24

25

A1

1      MR. VEEDER:  This is George's idea, not mine.

2      MR. STAHLMAN:  Yes, George's idea--and let George do it.

3   Probably will before we are through.

4      THE COURT:  Now let's cool off.

5      MR. VEEDER:  Your Honor, I am cool.  May I go ahead with

6   the cross-examination?

7      THE COURT:  Yes, but let us not run too long in one

8   place.  Let us move on with it.

9      MR. VEEDER:  Yes, sir.

10     THE COURT:  All right.  May the doctor go back to his

11  seat on the witness stand?

12     MR. VEEDER:  Yes, Your Honor.

13     THE COURT:  Step back to the witness stand doctor.

14     MR. VEEDER:  Would it be helpful to him if I put the

15  map in front of him?  Or we might sit at the table here.

16     THE WITNESS:  I don't object to standing up, Your Honor.

17     THE COURT:  Wherever you are comfortable.

18     MR. VEEDER:  Why don't you pull up the stump here and

19  then we will work right like this and when you have to get up

20  and protest why you can.

21     Q  Now doctor, I am referring to Block 13 Lot 20.  I

22  observe that the acreage there is 51 plus.

23     MR. SACHSE:  What block?

24     MR. STAHLMAN:  Block 13 Lot 20.  It is 81.

25     MR. SACHSE:  It's 81.

MR. VEEDER:  Wait a minute.  That must be 17.  That is Block 17 Lot 20.

Q  Are you familiar with that?

MR. KRIEGER:  Block 17, Lot 20?

BY MR. VEEDER:

Q  Can you locate yourself, doctor?

A  Just a minute.  Block 17 Lot 20.

Q  Here you are period.  Now where does that tract of land lie in regard to the Murrietta Creek?

A  It apparently adjoins the Murrietta Creek.

Q  And when you made your survey did you run to the thread of the creek or to the bank of the creek or where did you run?

A  I don't know.  I didn't do that work.

Q  In other words, you don't know that the 51.1 acres is correct or not?

A  No.  The surveyors made it.

Q  Now you say there are 51.1 acres of irrigable land and that there is no waste in that area.  What do you mean by no waste in that area?

A  I mean that there is no land that is not capable of irrigation.

Q  And are you familiar with the land contours down there?

A  I didn't do the work on it.

1      Q  You didn't do this work down here either on Block 17

2   Lot 20; is that right?

3      A  That is right.

4      Q  In other words, you accepted somebody else's state-

5   ment about it?

6      A  Mr. Nichols and Mr. Hutchinson, yes.

7      Q  And what you are saying then would also be true in

8   regard to Lot 19, which shows 50.4 acres, saying that there is

9   no waste there--you don't know that yourself, do you?

10     A  In Lot 18--

11     Q  I am talking about 19, sir.

12     A  Oh, 19.  That is right; no.  No I didn't go over that

13  lot myself.

14     Q  Do you have any present recollection of that area?

15     A  Not specifically.

16     Q  So you couldn't testify now that there is no waste

17  in that land?

18     A  No.

19  THE COURT:  Where does 17 and 18 lie?  Right adjacent?

20  MR. STAHLMAN:  Right across; 18 is to the south.

21  THE COURT:  Both 17 and 18 indicate waste in the creek.

22  MR. VEEDER:  I am talking about 19, Your Honor.

23  THE COURT:  19 is across from what?

24  MR. VEEDER:  Across from 16.

25  THE COURT:  All right, 16 says 6 acres waste in creek.

A4

1    What is 20 across from--17?

2         MR. SACHSE:  17.

3         THE COURT:  17 says 10 acres waste in creek.  What is

4    18 across from?

5         MR. SACHSE:  The creek runs through 18.

6         THE COURT:  Well, 18 says 10.8 acres waste in the creek.

7    Apparently waste in the creek was taken into account on the lots

8    immediately across.  You wouldn't want it taken into account

9    in both lots, would you?

10        MR. VEEDER:  Your Honor, this is not my exhibit.  I am

11   simply attacking it, and I respectfully submit that this witness

12   has shown that he doesn't know and has no personal knowledge

13   and never had any personal knowledge in regard to these tracts

14   of land.  It happens, I think, that we made a field trip down

15   through there and we didn't meet Dr. Livingston, but I am sur-

16   prised that we didn't, down in that sort of jungle area there

17   where he says there is no waste.

18        MR. STAHLMAN:  Your Honor, I think Mr. Veeder--

19        THE COURT:  There is no objection pending.  Go ahead.

20   All we had is a speech.

21        MR. VEEDER:  Yes, we've here them before.

22   BY MR. VEEDER:

23        Q  So would you state then that you have no personal

24   knowledge in regard to all of Block 17?

25        Why don't you sit down, sir.

A   The work on all of Block 17 was done either by Mr.
Hutchinson or by Mr. Hutchinson and Mr. Nichols together.  I
didn't check over any of that block.

Q   You did not?

A   Not that I remember now.

Q   Did you do any of the work up in Block 13?

A   Apparently not.

Q   When you say "apparently not"--

A   I don't see any of my signatures to that.  I looked
after these men from time to time and went out and checked with
them and worked with their notebooks in the evening and so on.
But there is no record here of just any of those particular
blocks that I examined.

Q   In other words, where it shows up in here "No Waste",
for example, in Lots 19 and 20 in Block 17, you don't know
whether that is right or not, do you?

A   I only relied on them.

Q   Yes.  Now, I observe, for example, on Block 12 it says--
you have a parenthetical statement under the designation "Block
No. 12", "Inspected on September 7, 1926."

MR. SACHSE:  What page is that on?

MR. STAHLMAN:  62.

THE WITNESS:  Yes.

BY MR. VEEDER:

Q   What does that mean?

A6

1       A  That means what it says, that it was inspected on

2  September 7, 1926.

3  BY MR. VEEDER:

4       Q  By whom?

5       A  The notes indicate that Mr. Nichols did the bulk of

6  that lot.

7       Q  Now, are you stating for the record that--what is his

8  name, Nichols?

9       A  Yes.

10       Q  That on one day he went out and checked out that whole

11  thing and made a soil survey?

12       A  No.

13       Q  What does it mean then?

14       A  It means that he started in on that date.

15       Q  And that was on the 7th.  Now I observe here that

16  somebody inspected Block 13 on September 2nd and 11th.  Who did

17  that?

18       A  That was done also by Mr. Nichols.

19       Q  Mr. Nichols must have been using a helicopter, am I

20  right?

21       A  No, he did not.

22       Q  He didn't?

23       A  Those were the dates he just put down in his notebook

24  to give a general idea.  He worked many many days on this work--

25  in fact, months he put in on it.

1    Q  Were you through?

2    A  Yes.

3    Q  Did you do the actual work on any block?

4    A  Yes, I was working with them on some blocks.  Of

5    course, you remember that over thirty years ago it is very hard

6    for me to remember exactly what was done.

7    Q  Well, I was not bothered with things like that thirty

8    years ago.  For example, how would you--

9    MR. SACHSE:  Did we have an answer to the last question

10   yet, Mr. Veeder?  I think you asked the witness which blocks

11   he worked on.

12   MR. VEEDER:  I did.  He and I were just having a colloquy

13   now.

14   Q  Which blocks did you work on?

15   MR. STAHLMAN:  When you say "work" what do you mean?  That

16   he did the whole thing himself or participated with the others?

17   BY MR. VEEDER:

18   Q  What did you do in connection with any of the blocks?

19   A  In most cases I supervised the work of the two men and

20   helped them but I have no record just where I did, except in

21   certain cases where I was with them and collaborated in the note

22   taking.  I notice that there is one block here that has just

23   "C" after it, and I think that was done by me probably alone,

24   if one of the boys had to go back.

25   THE COURT:  Which one is that?

THE WITNESS:  That is in the soil and crop survey of

Wildomar and Murrietta Tract--

BY MR. VEEDER:

Q  What block is it?

A  I don't believe they have any.  It is just divided

into lots.

MR. SACHSE:  What is the page reference?

THE COURT:  Does he have the same type of exhibit that

we have here?

MR. VEEDER:  Maybe we can work this out, doctor.

THE COURT:  They start at 89.  Turn to page 39.  That

is the first place I find an initial C--Block 7, Lot 10.

THE WITNESS:  These pages are numbered differently.

THE COURT:  On page 39 on the right-hand corner.

THE WITNESS:  What block is that?

THE COURT:  Block 7 Lot 10, and there are several more

following.

Does that C indicate that you did that by yourself?

THE WITNESS:  Either by myself or I wrote up the notes

for it.

49

1    Q  And if you wrote up the notes, what would that mean?

2    A  It means that I either went over it alone or else

3  one or two of the men were with me and they left and I finished

4  writing up the notes and put my signature to it.

5    Q  Now, where you have this C-- let's look at Block 7

6  in Lot 10, if we can find it again.  Here is 10.  Now, I

7  observe that you have a 43-acre total that somebody told you,

8  and then you have 27.4 acres Class A land.  Would you state into

9  the record how, in an irregular piece of land like that, you

10  could determine that there were 27.4 acres?

11    A  I determined it by going over the land, examining

12  it, and from our experience in experting lands over a long

13  period of years.

14    Q  And will you state for the record--

15    A  I did not measure it with a tape measure or anything

16  of that sort, but I estimated it as near as I could.

17    Q  And you believe that you can state to the Court that

18  there are 27.4 acres of Class A land just by eyeballing it?

19    A  Yes.

20    Q  I wish I had known you a long time ago.

21    MR. STAHLMAN:  You can do it by highballing it.

22    THE COURT:  Let's go ahead.

23  BY MR. VEEDER:

24    Q  And you were able to determine each one of those just

25  by looking at it?

9339

250

1          A   Not determining it, but deciding from my experience

2     about what the acreage was in these different classes.

3          Q   And you figured that there was about 27.4?

4          A   Yes.

5          Q   Now, did you take into consideration, when you made

6     these determinations, the high point of the land when you

7     determined the irrigable acreage?

8          A   Yes.

9          Q   How did you determine the high point of the land?

10         A   I had no surveyor's level with me.  I estimated it.

11         Q   And you estimated that from the particular high point

12    of the land you could irrigate 27.4 acres up here in this No.

13    10; is that right?

14         A   Yes.

15         Q   And then you would take-- still with your own No. 10,

16    Block 7-- you would take a look at it and you say there were

17    six acres of Class B; is that right?

18         A   You are getting it backward.

19         Q   Well, you put it forword for me, then.

20         A   Generally I would look over the ground, and as a

21    rule I would estimate the waste first, as near as I could,

22    and then the Class B land, the lower land which was still

23    irrigable, and then by adding those two together the rest of

24    the land might be irregular but if I had estimated the waste

25    reasonably correctly and the Class B reasonably correctly the

9340

251

1  two added together and subtracted from the total amount would

2  give me the Class A, which I would then walk over and see if

3  there was any of that too steep or otherwise unsuitable for

4  irrigation.

5      Q  When you walked over it how would you locate the

6  outer extremities of the field 27.4 acres in size?  Wouldn't

7  you have to run a contour or run a line or something to do

8  that?

9      A  No.  The surveyors were with us and they showed us

10  the extremities and corners.

11      Q  And they were able to walk out a contour along the

12  high points of the land?

13      A  They didn't walk out any contours, no.

14      Q  I observe that you have in here the statement that

15  there are many steep clay washes.  That was where the waste

16  came in.

17      Q  The waste came in in the steep washes?  Well, now,

18  could you determine, were they isolated parcels in there that

19  were irrigable, cut off by steep clay washes?

20      A  I don't understand exactly what you mean there.  You

21  say "isolated parcels".  How big a parcel?  If the parcels

22  ran in size, I could judge them pretty well.  But if you are

23  speaking of a little point of only a few feet, we disregarded

24  it.

25      Q  We will go back to your 27.4 acres.  Was that all in

1   a piece?

2       A   There is 43.4 acres in the piece.

3       Q   And you don't know whether the 27.4 is a single

4   tract or whether it is four tracts?  Is that right?

5       A   I don't remember now.  It has been too long ago.

6       Q   What was the criteria that guided you at that time?

7       A   The lay of the land, the slope and the character of

8   the soil.

9       Q   In other words, it is entirely possible that the 27.4

10  acres would be scattered throughout some of these clay cuts;

11  is that right?

12      A   No.

13      Q   Well, would it be all in a block?

14      A   I didn't get that.

15      Q   Would it be all in one contiguous tract?

16      A   Not necessarily, but sufficiently so to permit of

17  irrigation economically.

18      Q   And what was the criteria that you used to determine

19  economic feasibility for the 27.4 acres?

20      A   Well, if it had been broken up into many small pieces

21  it would be more expensive to get pipelines to all these four

22  pieces or five pieces or whatever it was; but if it was in

23  sufficient areas to warrant putting water on it, then it was

24  irrigable.

25      MR. VEEDER:  I move to strike the answer as being not

1    responsive, your Honor.

2         MR. STAHLMAN:  I think it is responsive, your Honor.

3         THE COURT:  Overruled.

4    BY MR. VEEDER:

5         Q  You say you took into consideration the costs of that

6    irrigation.  What were the actual costs that you considered?

7         A  I don't know in that case how much it would cost to

8    put water on this particular block.  That is out of my

9    specialty.

10        Q  It is entirely possible, then, that this Parcel 10

11   up here was not irrigable because you couldn't afford to

12   bring water to it; isn't that right?

13        A  I don't know.

14        Q  I thought you said you took into consideration

15   economic feasibility when you made this determination as to

16   irrigability.

17        A  I had to assume that there was water. To be irrigated,

18   I assume that there is water.  If there is no water, why, you

19   can't irrigate.

20        Q  Did you take into consideration the costs of bringing

21   the water there?

22        A  No, sir, I don't know what that cost would be.

23        Q  Did you take into consideration the costs of irrigating

24   the 27.4 acres?

25        A  But I know this--

1    Q  Just a moment.

2    MR. STAHLMAN:  Just a minute.  You can't stop him.  You

3  can make a motion to strike, but how do you know what he is

4  going to say, because you don't like the answer?

5    THE COURT:  Let him answer.

6    Answer the question, Mr. Coit.

7    THE WITNESS:  What is it again, please?

8    MR. VEEDER:  Read the question, please, Mr. Reporter.

9    (The reporter read the pending question.)

10    THE WITNESS:  No.

11  BY MR. VEEDER:

12    Q  Now, in regard to the lands which we have situated

13  down here in Block 9--

14    A  Where is that?

15    Q  Here in Block 9.  Do you recall whether you did the

16  work in Block 9?

17    A  Mr. Hutchinson did part of it in a good many blocks,

18  and Mr. Nichols did a good many blocks.

19    Q  Did you do any?

20    MR. STAHLMAN:  Do you mean all by himself, Mr. Veeder?

21    MR. VEEDER:  Yes.

22    THE COURT:  Well, it's 12 o'clock.  Take a recess until

23  2 o'clock.

24    (Noon recess.)

25

255

SAN DIEGO, CALIFORNIA, TUESDAY, MARCH 31, 1959.   2:00 P.M.

(Other matters.)

THE CLERK:  Number three, the case on trial, No. 1247-SD-C, United States vs. Fallbrook, et cetera, et al.; further court trial.

THE COURT:  Let's postpone this cross-examination on this exhibit and on Exhibit D until we can have a little conference about this and see where we are. There isn't any question in my mind-- there is no question in yours, Mr. Veeder-- that the Vail estate has a large amount of irrigable land, and if it is ground that is high enough to be out of the frost zone, even if it is rough, if Fallbrook is any criterion, you can grow citrus and avocados on hillsides that you have trouble walking up.  It seems to me that you are wasting a lot of time with something that is not really in issue. Nobody questions that the Vail estate has a vast amount of land up there that is subject to irrigation.  Doyou have any doubt about that, Mr. Veeder?

MR. VEEDER:  On the basis of the record, I certainly do, your Honor.

THE COURT:  You mean the record that is made so far?

MR. VEEDER:  Yes, sir.

THE COURT:  If we get through here and make an honest record to show the true facts, do you have any doubt about that?

1    MR. VEEDER: Yes, sir.

2    THE COURT: That there are thousands of acres of irrigable

3    ground?

4    MR. VEEDER: I think the areas with which I am pretty

5    familiar, I believe there are economic reasons why it probably

6    will not be irrigated. I think there are reasons, from the

7    standpoint of development of the land into units where it could

8    be irrigated, I think there is a great deal of that land--

9    we have competent people and I am perfectly willing to stipulate

10   on lands where I believe that it can be taken care of.

11   THE COURT: Much of this land lies within the area, or

12   a good portion of it lies within the area that the Government

13   says is a water basin.

14   MR. VEEDER: Yes, sir.

15   THE COURT: As we look ahead into the future development

16   of Southern California, do you have any doubt that the time

17   will come when that someday will be split up, for example,

18   into five or ten-acre pieces where people might have a country

19   home and grow a few things, and if they are over a water basin,

20   as you contend, all they have to do is put down a well into

21   this basin and they have water.

22   MR. VEEDER: Yes. But they are not going to take it

23   from the surface flow of the Temecula. And that is my concern,

24   your Honor. My client is downstream.

25   Here is my view about it, your Honor. I see a lot of

1    area up here.  I don't know when the Lord will call us.  But

2    in any event, I wouldn't be surprised to see quite a municipal

3    development up in there, and industrial development.  I have

4    no denial.  The fact is, I have spent a good share of my time

5    working to show that there is a ground water basin up there.

6    But I can't concede, nor will I, that these areas in here are

7    susceptible of irrigation.  I will not concede it.

8         THE COURT:  What I am getting at is that we are wasting

9    time, if there is some easier way to do this.  You have

10   cross-examined Dr. Coit here and the record is pretty clear;

11   he indicates that he has no personal recollection clear back

12   to 1926 about these matters.  He has relied upon some surveyors,

13   who are now dead.  He estimated some area in acreage.

14        MR. VEEDER:  It couldn't stand any place.

15        Excuse me, your Honor.

16        THE COURT:  I am not so sure about that.  On a finding

17   by the Court or by a jury, all the inconsistent statements

18   that you might bring out on cross-examination wouldn't mean a

19   thing, if the Court accepted other parts of his testimony.  You

20   know the rule.  And there may or may not be enough in the

21   record to support it.

22        But the point is, let's spend some time, so that we are

23   not taking up the time of the Court in the courtroom here to

24   decide how we are going to do this.  If this can't be used,

25   of course, there can be a survey made.  The Government could

9347

1   be directed to make a soil survey of this area, as it has made

2   of other areas.  The Court could appoint an expert to make a

3   survey.  There are many ways that this could be done.

4   What we are trying to find out is what the facts are.

5   We are not playing a game.  The problem is not who is the best

6   lawyer, who is the best cross-examiner, or what you can do to

7   make a witness look bad.  We are just interested in the facts.

8   Let's find some easy way to get at them and not spend another

9   half day cross-examining Dr. Coit.

10   I am not going to say at this time that you can't con-

11   tinue your cross-examination.  But Mr. Krieger, as I understand,

12   is ready to go forward.  Let's suspend on this matter, and

13   during the time I am gone you and Mr. Stahlman can talk this

14   matter over.  I noticed that you called him "Georgie" this

15   morning.  Maybe you can discuss this in a friendly vein.

16   MR. VEEDER:  Well, I love the "guy," as a matter of fact.

17   THE COURT:  Is this agreeable--

18   MR. STAHLMAN:  Now don't you knife me in the small of

19   the back.

20   THE COURT:  -- to suspend on this and go on to something

21   else?

22

23

24

25