1      MR. SACHSE:   There is only one thought, Your Honor, these
2 exhibits are not in evidence yet.
3      THE COURT:   That is right.
4      MR. SACHSE:   I have an objection, for example, which I
5 do not intend to press at all on any of Mr. Veeder's questions.
6 I am not making any objection whatsoever to foundation.   But
7 I have consistently, as Your Honor knows, before the master and
8 when the United States offered its evidence of irrigable acreage
9 at Pendleton, I objected to the materiality, and I am going to
10 continue to adhere to that position, that I do not believe that
11 irrigable acreage has any materiality until a quantitative
12 apportionment is to be made, and that when a quantitative is to
13 be made we should use the facts existing at the time the quant-
14 itative apportionment is made and not facts made 36 years prior.
15 I am not going to make it at all difficult for Mr. Stahlman to
16 put it in, but my objection is to the materiality.
17      THE COURT:   There is a lot of merit to what you say.
18 But didn't we discuss this among counsel at one of our hearings
19 that Mr. Veeder wanted to catalogue this matter in the decree
20 in a certain manner, and isn't this manner in which you finally
21 said, "Well, if the Government wants it this way we are not going
22 to object"?   Isn't my recollection correct on that?
23      MR. KRIEGER:   If I recall, Your Honor, was not the cata-
24 loging to be done of lands that were riparian and not riparian?
25 Were they to extend to those which are irrigable and irrigated

A10

1   as well?

2          MR. GIRARD:  Wasn't that objection in regard to one of

3   findings of the Master?

4          THE COURT:  That is when it came up.

5          MR. GIRARD:  I think it pertained primarily to Mr. Veeder's

6   objections to the Master's findings.  But I don't believe it

7   was ever contended by Mr. Sachse or by the State that our basic

8   objection to this evidence was abandoned.

9          THE COURT:  To refresh my recollection, it was a matter

10  which I think is pertinent here to which finally your remark

11  was, "Well, if the Government wants it, although we don't think

12  it is material, they can go ahead and do it."

13         MR. SACHSE:  Your Honor, if I didn't make myself clear,

14  I want to do it now.  I will not interpose any objection in the

15  way of Mr. Stahlman or Mr. Veeder as to foundation.  I think this

16  is a waste of time and I don't think it properly belongs before

17  this court.  But I am not going to quarrel about foundation.

18  As far as I am concerned, this can go in, if Your Honor over-

19  rules me on this.  I don't think you should.  I think that when

20  this decision is finally made by Your Honor you are going to be

21  confronted by a great deal of evidence in the case which you will

22  not be able to consider in making a final judgement, which may

23  be pure surplusage.  But for the record I insist that this evi-

24  dence, just as Mr. Veeder's evidence on Camp Pendleton, just as

25  the evidence before the Master on irrigable acreage, is

A11

1    immaterial.

2        THE COURT:  Who will refresh my recollection on this

3    conversation and hearing that we had?  What is your recollection

4    of it, Mr. Veeder?

5        MR. VEEDER:  I thought they were going ahead on the

6    basis--at least I had been proceeding on the basis that there

7    would be a cataloging of rights to the use of water based upon

8    the riparian character and also upon the irrigable nature of

9    the land.  It would be a waste of time if we don't do that.

10   That was my view.

11       THE COURT:  Is that the matter that we discussed?

12       MR. VEEDER:  I was trying to think when this matter

13   came up I didn't have the recollection that it pertained to

14   the findings of the Master.

15       THE COURT:  It grew out of the findings of the Master.

16       MR. VEEDER:  That may be true.  But we were talking

17   about this very area to which we are alluding now--I mean

18   farther up the valley.

19       MR. GIRARD:  Your Honor, as I recall, the Master made

20   the findings of certain irrigable acreage.  Mr. Veeder objected

21   to those findings on the basis that they weren't catalogued in

22   areas--in other words, that 15 acres weren't in the north portion,

23   it was just on the land owned.  And it was agreed that if Mr.

24   Veeder wanted a more detailed finding as to the specific loca-

25   tion of this irrigable acreage, he could prepare it.  That was

A12

1  what I understood it to be.

2  ---   Is that correct?

3      MR. SACHSE: That is correct. And my fundamental objection

4  is in writing before the Master. At the time the Master asked

5  us for a written memorandum on his proposed findings on De Luz

6  Creek, I spelled that out half a dozen times. The Master posed

7  us with, I think, 7 or 8 questions, and I answered every question;

8  but the first sentence of every one was that irrigable acreage

9  is immaterial and I don't think it is properly before. I don't

10 think it poses any real problem, Your Honor. I am not going to

11 quarrel about foundation. But I do not believe that this irri-

12 gable acreage adjudication is in any sense of the word material.

13     THE COURT:  On the grounds that there will be no quant-

14 itative apportionment?

15     MR. SACHSE:  That is correct Your Honor.

16     MR. STAHLMAN:  How do you know whether there will be a

17 quantitative apportionment until you get all your rights?

18     THE COURT:  Is it true that you are asking for a quanti-

19 tative apportionment in this matter Mr. Veeder?

20     MR. VEEDER:  My view has always been that there is no

21 such thing as a quantitative apportionment. My own view is that

22 you will determine the rights to the use of water based upon the

23 land to which those waters are pertinent. In other words, you

24 will determine that Mr. Rorapaugh has so many acres of land which

25 are riparian to Santa Gertrudis Creek and the Murrietta Creek,

8

A13

1   and then my view is that you should determine the irrigated

2   acreage at the present time and the maximum irrigable acreage.

3   But I don't believe that it is physically possible to make a

4   quantitative apportionment.  I don't believe that you can say

5   that there is so much water in the creek.  If I understand

6   what Mr. Sachse is saying, in the other words, you would say

7   you would give him so much water right now.  Well, I think

8   you can say the maximum is 4.2 per acre per year, Mr. Rorapaugh

9   has 1500 acres that are riparian and irrigable, and that would

10  be as far as you would go in regard to that phase of it.  Then

11  you would say how many acres of irrigated land he has.

12       THE COURT:  Your position is that you do not go all the

13  way on this quantitative problem, but you do ask that the irri-

14  gable and the irrigated acreage be catalogued?

15       MR. VEEDER:  Yes, sir.

16       THE COURT:  What is the purpose of that, if you are not

17  going to ask for a quantitative allotment?

18       MR. VEEDER:  May I ask Mr. Sachse to state into the

19  record what he means by quantitative allotment?

20       MR. SACHSE:  By quantitative allotment, Mr. Veeder, I

21  mean any apportionment of water in a specifically determinable

22  amount, either acre-feet or second-feet or percentage of flow,

23  any one of those, and if there is one I have overlooked I am

24  trying to cover them all--any determinable amount that can be

25  determined by formula that a given parcel of land is entitled

1  to a given amount of water.  That is what I mean by quantitative

2  apportionment.

3      MR. VEEDER:  If that is what you mean by quantitative

4  apportionment, I think it must necessarily be done.  For example,

5  right here on the Vail property certainly they have a large

6  acreage down in the Temecula or the Pauba Basin, as we have

7  called it, that is presently irrigated, and we know the size

8  of their parcels, we know the quantity of water that has been

9  delivered there historically, and to the point they are claiming

10  and appropriative right for that I think you would fix the

11  maximum now to the extent that it has actually used.

12      MR. SACHSE:  You have pointed out something that I

13  have overlooked and the record should be clear.  I believe as

14  to appropriative rights and prescriptive rights they must be

15  quantitatively determined.  I was making my remarks only, in

16  regard to riparian rights, Your Honor.

17      MR. VEEDER:  But in regard to riparian rights you never

18  make a quantitative apportionment because they share correla-

19  tively.

20      MR. SACHSE:  That is my entire point, Your Honor, and

21  when the time comes to determine the correlative share to which

22  Vail is entitled his share my be entirely different today from

23  what it would have been 26 years ago or from what it will be

24  26 years from now.

25      THE COURT:  Well, you are together in your positions.

A15

1          MR. VEEDER:  I think we are in agreement.

2          THE COURT:  The only loose end is why would we have to

3   have a cataloging as to riparian rights and overlying rights,

4   why should we have to have cataloging of irrigable and irritated

5   acres as of this time when we are agreed that as to riparian and

6   overlying rights we are not going to have a quantitative dis-

7   tribution of it?

259

1     MR. VEEDER:  We want to know what can be the maximum

2   demand upon this stream for Carl Vinson will agree, I believe,

3   to a very large expenditure of money down at Camp Pendleton.

4   I would assume that he would want to know if here are a

5   thousand acres of riparian land but only 300 of those acres

6   of riparian land are irrigable.  That is important, because

7   then there will be a manner of ascertaining what the maximum

8   potential demand for 300 acres would be, and I believe that

9   it can be made.

10     THE COURT:  If that were made, do you have any doubt

11   but that the potential of the upstream use is going to be

12   terrific?

13     MR. VEEDER:  I think it is going to be terrific, yes,

14   and we are concerned about it.

15     MR. STAHLMAN:  May I ask a question.  Assuming that there

16   is sufficient water in the river to supply all of the riparian

17   needs and that it is necessary for the Court to make a

18   correlative ruling, what is that gaged to-- how do you determine

19   it?  Correlative to what?

20     MR. VEEDER:  Reasonable use.  That is the measure.

21     MR. SACHSE:  I don't know whom you are asking the ques-

22   tion of, Mr. Stahlman.

23     THE COURT:  Well, let us not go into that now.  I can

24   give you a simple example.  As I understand it, you might have

25   a man upstream who had a thousand acres of riparian land and

1    presently was making now use of it. As of today, if a decree

2    were entered and you had to apportion water, everybody else

3    except that man would be apportioned water. But it wouldn't

4    affect his right later on to come in and later to claim use

5    of water on his thousand acres, and that would cut down

6    everybody else on the stream.

7         MR. STAHLMAN: There is no question about that. But

8    assume that the supply is only 75% of the water presently used

9    on the land for irrigation and it is necessary to cut down

10   to 25%. How do you cut down-- on what basis?

11        MR. KRIEGER: On the basis of irrigated acres.

12        MR. STAHLMAN: Then all a person has to do is to come

13   in next year and put in some more irrigated acres.

14        MR. VEEDER: That is right.

15        MR. SACHSE: That is how it happens.

16        THE COURT: You shouldn't be concerned about that.

17        MR. STAHLMAN: We have plenty of irrigated acres.

18        THE COURT: If anybody is in a position to increase

19   their irrigated acres, it is probably the Vail estate.

20        MR. KRIEGER: Your Honor, the things that Mr. Veeder

21   has been talking about seem to me to be the kind of things

22   that could be obtained from a good legal opinion and a good

23   hydrologic study. Col. Bowen can tell them and is probably

24   now well equipped to tell them how many acres are irrigable,

25   if they are looking toward the future. But the only thing this

1    Court can be concerned with now is the number of acres presently

2    irrigated.  If there is no shortage, there is no apportionment,

3    and if the shortage occurs ten years hence then it will be

4    determined on the basis of the acres then under irrigation.

5    Hence, all this business of future irrigable acres is in the

6    nature of a legal opinion and not a judgment of the Court.

7         THE COURT:  There may be something to what you say.  But

8    don't forget that the Government has spent a lot of money on

9    this lawsuit and Congress refuses to make appropriations until

10   there is some adjudication, and I can see Mr. Veeder's con-

11   cern to have as complete a picture in the decree as he can

12   obtain.

13        MR. KRIEGER:  So can I, and I think all the information

14   that has been gathered, whether it goes into a decree or not,

15   is most useful to Camp Pendleton in determining how far it

16   can go with the water supply it is going to have.

17        THE COURT:  In the hearings so far in the Fallbrook

18   area the Master has found as to the number of irrigable and

19   irrigated acres, has he not?

20        MR. SACHSE:  In the De Luz Creek area, your Honor, where

21   water was held to be part of the stream, yes, he made such

22   findings.  He did not make such findings on any of this land

23   which he found not to be connected with the stream.

24        MR. VEEDER:  Your Honor, I talked to him yesterday and

25   we are going ahead and working with him, as we have down to

1    date, and we are trying to put together, with the greatest

2    definitiveness that we can, the irrigated, irrigable and

3    riparian acreage, because to me without that knowledge neither

4    the Vail Company nor the United States can possibly know

5    where they stand.

6        THE COURT:  Mr. Krieger, in your case are you proposing

7    to have proof as to the irrigated and irrigable acreage?

8        MR. KRIEGER:  Your Honor, we are not going to put that

9    evidence in now.  In fact, I am a little surprised that Vail

10   is putting on that information at this stage of the game, be-

11   cause we had thought we would direct our efforts to hydrology

12   in this area.  But when our time comes to put on that evidence

13   we will work closely with Col. Bowen, and if he is going to

14   make a soil survey of all the parcels we represent and we find

15   that soil survey to be reasonably accurate we are going to go

16   along with him.

17       THE COURT:  The amount of proof necessary to put that

18   additional proof on wouldn't be too expensive in courtroom

19   time.  It might be a lot of work on Col. Bowen's part.

20       MR. KRIEGER:  That is correct, your Honor.

21       THE COURT:  But the courtroom time would be very short.

22       MR. KRIEGER:  Very short, your Honor.  And it seems to

23   me that the same thing could be done with Vail.

24       THE COURT:  Why don't we postpone at this time, without

25   making a ruling on the matter, let's postpone this question

363

1  of irrigable and irrigated acres and the soil surveys of the

2  Vail Estate and we will go into it later. We can't do every-

3  thing at one time. Mr. Krieger is ready to start with his

4  case, and let's start on it. How about that, Mr. Veeder?

5      MR. VEEDER: Your Honor runs the court. I will do what

6  you want.

7      THE COURT: That is what we will do, then.

8      MR. SACHSE: It is certainly all right with me, your

9  Honor.

10      MR. STAHLMAN: Your Honor, I have the copies of this

11  Exhibit AA which was lodged this morning. I present the Court

12  with a copy and Mr. Veeder with a copy and other counsel.

13      As I understand, the state of the record is that the

14  witness is withdrawn and we are merely suspending the further

15  proceedings on this phase of the testimony.

16      THE COURT: That is right.

17      MR. VEEDER: And these are merely for identification and

18  they are certainly not in evidence.

19      THE COURT: They are not in evidence.

20      When I come back and start hearings again in May, I

21  may want you to brief and scrap this thing out on this

22  cataloging of irrigable and irrigated acreage. Somebody

23  mentioned the magic number ten years-- that ten years from

24  now this might have to be done. Ten years from now I will

25  be retired and some other judge can do that.

1        MR. STAHLMAN:  I was retired ten years ago.

2        MR. VEEDER:  I didn't say a word.

3        MR. STAHLMAN:  Your Honor, may we approach the bench

4   on a matter that I think you will understand.

5        (The following proceedings were had at the bench:)

6        ~~MR. VEEDER~~ Mr Stahlman: Your Honor, our witness is 79 years old,

7   and if you postpone it too long I am wondering whether we are

8   going to have a witness.

9        THE COURT:  I will just say for the record that he

10  hasn't done you too much good, and I doubt that he can do

11  you too much more good if you keep him on for a couple of

12  days more.

13       MR. STAHLMAN:  We have some other testimony to follow.

14       THE COURT:  I think there is some other way to do this.

15       MR. STAHLMAN:  I think Col. Bowen can do it.  I am

16  perfectly willing for him to do it.

17       THE COURT:  All right.

18       (Proceedings resumed away from the bench as follows:)

19       MR. KRIEGER:  Your Honor, I wonder if I could make a

20  brief opening statement to show what position we take in this

21  matter.

22       MR. GIRARD:  Before you start, Mr. Krieger, I wonder

23  if we could find out from Mr. Veeder if he is through with that

24  Exhibit AS.

25       MR. VEEDER:  I have not, and I will have it for you

1       tomorrow.

2               MR. GIRARD:  Fine.

3               THE COURT:  You may proceed.

4               MR. KRIEGER:  My friend and colleague, Mr. Sachse,

5       reminded me this morning that we had a fine looking bunch

6       of jurors over there this morning.

7               THE COURT:  I take it that these are some of your clients

8       and that that has something to do with your opening statement.

9               MR. KRIEGER:  I just thought that if you wished to

10      empanel them and make them an advisory jury, we would be glad

11      to do it.

12              As a matter of fact, your Honor, I am very pleased that

13      some of our folks are here, to let them know what our position

14      in this rather complicated lawsuit has been and is going to

15      be.

16              In the first place, the United States has taken the

17      position that the entire watershed of the Santa Margarita

18      River, approximately 750 square miles, should be adjudicated

19      in this lawsuit, both as to surface water and as to ground

20      water.

21              Now, after the trial has progressed, there has been

22      some departure from that rule, but I don't know exactly where

23      it is.  The United States's witness, Mr. Kunkel, has drawn

24      several hydrographic areas on the map, and yet as the testimony

25      has evolved I don't know whether the Government intends to

1    include only the ground water within those hydrographic areas

2    or to go outside of them.

3         However, we rely on the basic presumption that all of

4    the ground waters are local, vagrant and percolating, and

5    until that presumption has been successfully rebutted we wish

6    to rely on it, and our case today is going to be an effort

7    not only to strengthen that presumption but to show some

8    surprising things, in fact, about the hydrographic units which

9    the United States has claimed are ground water bearing and

10   the pump water of which contributes materially to the stream

11   flow.

12        Now, on these two maps, Exhibits B and C, Roripaugh,

13   et al., we have simply designated in various colors for the

14   Court's convenience the parcels of land which we represent

15   in this action.  There are some 52 land ownerships, but many

16   more individuals involved than that.  On the Exhibit B we

17   have those that are in the hydrographic unit No. 4 in the

18   Murrieta-Temecula area, and in Exhibit C we have located those

19   lands which are further up Temecula and some of them up in the

20   Domenigoni Valley, Lancaster Valley, Oakgrove, et cetera, so

21   that the Court can see what kind of interest we have in this

22   case.

23        Now, contrary to the United States's position, your Honor,

24   that one can, by the filing of a complaint, include such a

25   large watershed within an adjudication of this Court, and

contrary to the further view that such hydraulic continuity

can be demonstrated by geological averages, which we think

has been the Government's position thus far, and we think

that that position has been taken because the enormity of

that task has simply dictated some convenient way of short-

circuiting the proof in this case, we take the view that no

matter whether it is the United States or whether it is one

square mile or 750 square miles that are involved, the United

States, as plaintiff in this action in a quiet title suit,

is obligated to prove that each parcel of land within that

watershed when pumped actually contributes to the stream flow

of the Santa Margarita River.  Thus far, we think the United

States has not fulfilled that burden of proof in any way,

shape or form, and the geological averages will not do the

trick.

Now we have proceeded to do in perhaps a small measure

what we think the United States might have done in order to

prove its case.  We have done this for the purpose of demon-

strating to the best of our ability what lands are within and

what lands are outside the river system.  We have no quarrel

with surface waters. We admit that any surface stream or any

tributary to the stream that runs through any parcel of land

that we own, if it fulfills the other requirements of riparian

ownership, should be included in a decree of this Court.  But

where we draw the line is on ground water extraction.  Here we

Z68

1    represent farmers and ranchers all over that country who are

2    just barely making a living off of that land.  Now suddenly

3    they have thrown at them a lawsuit which challenges their

4    right to take water off of that land and in fact clouds it

5    and, we believe, to a great extent limits the salability of

6    that land.

7         Now, in order to put the thing in proper focus, we have

8    engaged a civil engineer, who has had a great deal of experience

9    in hydraulic work, we have talked to all of the well drillers,

10   we have talked to the pump testers, we have gotten all the

11   physical data together that could be accumulated to show not

12   what this basin does on the basis of averages and soil analyses,

13   but what that soil does in action, and we believe the only way

14   to demonstrate that is through pump tests in the field, and we

15   are now going to introduce evidence to show what that so-called

16   Hydrographic Unit No 4 within the so-called Kunkel line-- and

17   I hope that Mr. Kunkel will pardon my suggestion of the use

18   of his name, but it was for convenience that we superimposed

19   on this map the Kunkel line as described in Exhibit 15-A,

20   being the upper limits of Hydrographic Unit 4.

21        Now, to our surprise, the wells inthis area have a

22   surprising lack of uniformity.  Even when wells have been

23   sunk in the Murrieta Valley in Hydrographic Unit No. 4 itself,

24   those wells have shown an astonishing inconsistency.  When we

25   go up onto the rim of the so-called Kunkel line, we find that

Z69                                                                            9365

1    instead of having economically feasible productive wells, as

2    Mr. Kunkel testified to, we have wells that are practically

3    useless for all intents and purposes, and the only place where

4    we find that there is water in Hydrographic Unit No. 4 is at

5    the juncture of the Santa Gertrudis River with the Murrieta

6    Basin, and also within the Murrieta Basin in certain parts.

7         With that, your Honor, I will proceed now to call our

8    first witness.

9         Mr. Mims.

10

11                        JOE MACK MIMS,

12   called as a witness on behalf of the defendants Roripaugh and

13   others, being first duly sworn, on his oath testified as

14   follows:

15        THE CLERK:  Would you state your name, please?

16        THE WITNESS:  Joe Mack Mims.

17

18                      DIRECT EXAMINATION

19   BY MR. KRIEGER:

20        Q   Where do you live, Mr. Mims?

21        A   737 North Clifford Avenue, Rialto, California.

22        Q   What is your occupation?

23        A   Pump tester for the California Electric Power Company.

24        Q   How long have you been employed by the California

25   Electric Power Company in that position?

1    A  Five years.

2    Q  Before that what kind of work did you do?

3    A  I was a meter reader for the Electric Company.

4    Q  How many pump testers are there engaged by the

5  California Electric Power Company?

6    A  Two.

7    Q  How do you do most of your testing? What territory

8  do you cover?

9    A  I cover what is known as our southern area, which

10  is Hemet, Parris, Elsinore, Murrieta, Temecula, Riverside,

11  San Bernardino, Palm Springs, Blythe and Corona.

12    Q  What are your duties as pump tester for the company?

13    A  Upon customer request we go out and test the well

14  as to its capacity, amount of water and various things along

15  that line.

16    Q  Do you personally conduct these tests?

17    A  I conduct the tests myself.

18    Q  How long have you been conducting tests in the

19  Temecula-Murrieta area?

20    A  For the past three years I have been in this area.

21    Q  Are you familiar generally with the wells located

22  in that area?

23    A  I am.

24    Q  I wonder if you could tell me how often in the last

25  three years have you made tests in the Temecula-Murrieta area?

Z71

1    A  Upon the customer's request, I go there approximately

2    once a month; it would vary some, but at least an average of

3    once a month.

4    Q  When the customer makes requests, I take it you go

5    down and test his well and pump; is that right?

6    A  That is correct.

7    Q  Did you recently make some tests in the area shown

8    on the map which has now been posted on the board as Roripaugh,

9    et al., Exhibit A?

10    A  I did.

11    Q  And were these also done at customer requests?

12    A  They were.

13    Q  When were they made?

14    A  They were made the first week of February.  The ones

15    for Gunther were made on December 5, 1958.

16    Q  Mr. Mims, if you would look at that map, Exhibit A,

17    and down in the lower left-hand corner there are two schedules,

18    and the upper schedule in the lower left-hand corner is

19    entitled "Pump Test Data from California Electric Power

20    Company Records."  Are those the wells listed there which you

21    have tested?

22    A  They are.

23    Q  Over in the left-hand column there is a well number.

24    Now, how were those wells numbered?

25    A  We have our own numbering system-- "we" meaning the

Z72

1   California Electric Power Company. I met with Mr. Albert

2   Webb, of Webb Engineering, and he and I not only located those

3   corresponding wells on the map, but we went there in person

4   into the area.

5        Q  And in addition to the well numbers which are shown

6   on the exhibit you have numbers of your own, do you not?

7        A  That is correct.

8        Q  Were those wells set forth on that schedule tested on

9   the dates set forth in the last column?

10       A  They were.

11       Q  Did you use the same procedure for testing each well?

12       A  I did.

13       Q  Is this procedure which you used a standard one used

14   by the California Electric Power Company in testing all its

15   wells?

16       A  It is.

17       Q  Would you explain that procedure?

18       A  Upon arrival at the property I would contact the

19   customer and go with him to the pump and immediately I would

20   obtain a static level. If the pump is not running, I would

21   obtain this static level. The static level when the pump is

22   not running is where the water stands. I use a sounder line,

23   which is a line that you let down between the column and the

24   casing, and from this I can obtain the level of the water. It

25   has a 6-volt battery.

1          MR. VEEDER:  I didn't hear what you said.

2          THE WITNESS:  It has a 6-volt battery.

3          MR. KRIEGER:  Go ahead.

4          THE WITNESS:  I connect it to the pump by grounding it

5    to the pump, and when this line is let down into the well,

6    which is a 16-strand plastic wire with a weight on it, showing

7    that I am not hung up in any way-- I can always feel when I am

8    free-- when this line touches water it makes a contact, and

9    from this method I mark immediately then when I am sure I

10   have a true pumping level or static level, I mark this with a

11   rubber band very securely.  The next step would be for the

12   owner to start the pump.  Upon starting the pump immediately

13   the level will begin to drop.  I immediately lower my line

14   to where it will contact again.  I mark this place so that I

15   may know if it continues to pull down.  The next thing I will

16   do is to measure the ID of the discharge pipe.

17         Q  Before you do that, now, now long do you let the

18   pump run usually before you measure the pumping level?

19         A  I would make this observation at the very moment.

20         Q  I see.

21         A  The reason being to see if it will continue to pull

22   down.  Otherwise, I would not know.  By having this second

23   rubber band on there very securely, which does not slip, I

24   know then whether I am going to have to lower it or not.  It

25   is very simple.  The needle breaks contact and I know I am

274                                                                9370

1    out of water.

2         While this pump is continuing to draw down, I take down

3    certain information, such as horsepower, meter number, in-

4    formation off the motor and off the pump.  This is to help the

5    customer in future work.  After waiting a satisfactory number

6    of minutes, or sometimes it is an hour, when I am positive

7    that the level is not going to drop any further, then I

8    proceed to measure the flow.  On all of these tests I have

9    waited approximately 45 minutes to an hour, when I was sure

10   that the water was not going to go down any further for the

11   next-- well, I would say if you pump another 12 hours it may

12   go down some, but for our own test this would be very satis-

13   factory.

14        Then by using our method-- I say "our;" it is my method--

15   of testing the pump, I use a Pitot tube, which is two tubes in

16   one.  One of them is a velocity tube, and the other is a

17   static tube.  The velocity tube comes out on the end.  I might

18   add that this pitot tube comes down at a right angle.  If I

19   could draw it on the board over there it might help you.

20        MR. KRIEGER:  Why don't you come over there and do that,

21   if you like.

22        THE WITNESS:  All right, this might help you to under-

23   stand.

24        MR. KRIEGER:  While you are coming over here, Mr. Mims,

25   what do you do with that pitot tube?  Do you put it into the

Z75

1   discharge pipe?  How do you get it in there?

2       THE WITNESS:  (Stepping to the board and drawing.)  This

3   would be the motor right here.  This would be the pump base.

4   Your well is down here like this.  This is your discharge pipe.

5       If we have tested this pump previously, I have already

6   drilled a three-eighths-inch hole and tapped it at a good

7   distance from the pipe.  We like them eight diameters of the

8   straight pipe, no fittings involved, so that your readings

9   will be uniform without any obstruction.  The hole is drilled,

10  the pitot tube comes in like this and turns upstream and comes

11  out.  As I pointed out, there are two tubes in one.  It is

12  the velocity which hits it up here.  There are eight static

13  holes at 45-degree angles off of here.  The velocity comes

14  out the back side, the static out the front side.

15

16

17

18

19

20

21

22

23

24

25

A16

1  Then I use the water to air monometer for measuring the flow--

2  I should say for obtaining my readings.

3       (Drawing)  This is solid metal.  This is glass.  You

4  have fittings in through here.  One of these will come in on

5  this side.  These come in two tubes which are a quarter inch

6  in diameter and enter your fittings here at the bottom.  At

7  this point I would clean out my monometer, make sure there is

8  no air in this line anywhere, because if there is any air in

9  the line it throws off my readings.  So I clean out my tubes

10  all the way through and when I am positive by shaking it that

11  there is no air in my lines then I can I can cut off the valves

12  here and let my tubes drain down and then seal it off again

13  when I let the water rise up.  As I point, at this time the

14  water is the same on both sides in a sense, because I have this

15  valve open.  Now I have closed this valve and by reading the

16  scale I can obtain velocity in feet per second on this monometer.

17       We have been using this method for testing pumps since,

18  I believe it is, 1939, if I remember correctly.

19       THE COURT:  Do you convert velocity in feet per second

20  to gallons per minute?

21       THE WITNESS:  I can by knowing the inside diameter of

22  the pipe.  I have measured that.

23       MR. KRIEGER:  Will you explain the rest of the formula

24  how you arrive at gallons per minute from velocity?

25       THE WITNESS:  Yes.

1      MR. KRIEGER:  Will you go back to the stand.

2           I think he will come to that, Your Honor, and also the

3      formula that is used to compute it.

4           THE WITNESS:  There is a formula which I am sure you

5      could find in any mathematics book.  It is the average velocity--

6      as I point out, I am measuring velocity--average velocity times

7      the area of the pipe times the amount of water in a cubic foot,

8      which is 7.48, times 60, which is 60 seconds in a minute, divided

9      by 144, which is the amount of square inches in a square foot,

10     and you will come out with gallons per minute.

11     BY MR. KRIEGER:

12          Q  Mr. Mims, going back for just a minute, do you just

13     test this discharge pipe in one place or in several places?

14          A  We take readings--we speak of average velocity because

15     the method I use in testing pumps I think is the best--we take

16     readings every inch through the pipe top and bottom.

17          Q  And then average them out?

18          A  I average out.

19          THE COURT:  You mean you drill holes in this pipe every

20     inch?

21          THE WITNESS:  No, sir.  The Pitot tube there can slide.

22     There is a packing gland that allows me to lower it through

23     the pipe.  I start at the top and every inch circle I take a

24     reading and keep lowering it every inch through the pipe.

25

BY MR. KRIEGER:

Q  When you have completed this operation, what do you do with the information?

A  Naturally I am inserting it on my field notes and I take it back to the office. At that time I make a field calculation and tell the customer how much he is pumping. Then I go back in the office and from a calculating machine the results are obtained and sent out to the customer.

Q  Did you prepare that information on cards for each one of the wells listed on the first schedule on Exhibit A?

A  I did.

Q  Can you tell me whether the information which you obtained has been accurately translated to Exhibit A?

A  It has.

Q  When you make these tests, Mr. Mims, do you make any other observations?

A  As I spoke once before, I said of the horsepower I take notice, and I took notice as to the well casing and whether it was gravel-packed or not--these wells.

Q  This information, then, you say you take back to the office and you put it on a card and you send all of the information in a letter to the customer; isn't that right?

A  I put the information down immediately upon a card, because I do not trust my memory in the sense that you are testing a lot of pumps. When I get back to the office then we do send out the same information to the customer and the

A19

customer has received a copy of each of these tests.

Q  Now looking at the schedule on Exhibit A, you will notice that in the third column there is a heading entitled "Depth To Water In Feet" and two subcolumns under that entitled "Pumping" and "Static".  Now under those headings have you included the data that you said you took from each of these wells after making the measurements you spoke of?

A  That is correct, I did.

THE COURT: Does "Static" mean the depth to water before pumping starts?

THE WITNESS: Yes, sir.

THE COURT:  And the pumping figure is the depth to water while it is being pumped?

THE WITNESS:  Yes, sir.

MR. VEEDER:  That is after 45 minutes?

THE WITNESS:  In this particular case, that is correct. And as I said, from my experience, that if your pump were to continue to run even for 24 hours it would not drop very much more--I mean not that it would throw off the pump by producing that water.

BY MR. KRIEGER:

Q  Referring to the next column entitled "Pull Down Feet," did you make that computation or not?

A  I did not.

Q  Referring to the next column "GPM Pumped," what does

A20

that mean?

    A  That is the amount of water that the pump is producing.

    Q  Did you gather the information for that column?

    A  Yes I did.

    Q  In the way in which you have described?

    A  Yes.

    Q  The following or next column is entitled "Specific Capacity."  Did you prepare that column?

    A  No I didn't.

    Q  The next column is entitled "Pump H.P.;" I guess that is horsepower?

    A  That is right.

1    A   That is right.  That is the name plate rating.

2    Q   That information comes from your cards; is that right?

3    A   That is correct.

4    Q   And the date tested I think you have already stated

5  is information also from your cards; is that right?

6    A   That is correct.

7    Q   Now, Mr. Mims, I wonder if you could locate on the

8  schedule the so-called Turner well.  I think it is the second

9  from the last in that column, in 7S/3S, 6D1.

10    A   Yes, I see it.

11    MR. KRIEGER:  Let me see for a moment if I can-- 6D1,

12  yes.

13    THE COURT:  What is this figure after the D-1 in there?

14    MR. KRIEGER:  Those figures, your Honor, Mr. Webb will

15  testify to.  They correspond to the specific capacity related

16  in the schedule here.

17    THE COURT:  I see.  So that the letter and the number is

18  the identification, along with the section, township and range?

19    MR. KRIEGER:  That is correct.  We follow the State

20  numbering on that, your Honor.

21    THE COURT:  All right.

22  BY MR. KRIEGER:

23    Q   Now, referring to the Turner well, 6D1 in 7 South,

24  3 West, did you ever make any previous tests of that well?

25    A   I have.

1      Q   When?

2      A   I checked our previous records and I find that in

3   1956--

4      MR. VEEDER:   Just a moment.   Did you make the test?

5      THE WITNESS:   I made the test myself.

6      MR. VEEDER:   And these records are your own tests?

7      THE WITNESS:   These records are of my own tests, yes,

8   sir.

9   BY MR. KRIEGER:

10     Q   What did you find?

11     A   On October 26, 1956, there was a pumping level of

12   51.5 feet and the gallons per minute is 7.5-- $7\frac{1}{2}$ gallons per

13   minute.

14     THE COURT:   $7\frac{1}{2}$?

15     THE WITNESS:   Yes, sir.

16     THE COURT:   Now it is 67?

17     THE WITNESS:   I checked it that day.   It is correct.

18     THE COURT:   You corrected the $7\frac{1}{2}$ gallons per minute?

19     THE WITNESS:   Yes, sir.

20     MR. KRIEGER:   It is not a corrected figure, your Honor.

21   It was taken at a different time.

22     THE WITNESS:   This was taken on October 26, 1956.

23     THE COURT:   I was wondering whether it was 76 gallons

24   per minute instead of 7.6.

25     THE WITNESS:   No, sir; 7.6-- 7.5.

1        THE COURT:  What is the explanation?

2        THE WITNESS:  Let me quote another figure for you and

3   I think I can point out why.  May I?

4        THE COURT:  Yes.

5        THE WITNESS:  On September 28, 1954, I made a test on

6   this well and the pumping level was 63 feet and it was pumping

7   11 gallons a minute.  This shows to me, from my experience in

8   testing pumps--

9        MR. KRIEGER:  Go ahead.

10       THE WITNESS:  From my experience in testing pumps, I

11  find this to be true.  First of all, this pump had been running

12  for a considerable period of time when those two tests were

13  made in 1954 and in 1956.  Secondly, the pump has continued to

14  wear, and so that is why in 1956 I was getting less water.

15  Do you follow me there?  In 1954 I got 11 gallons from 63

16  feet, and then in 1956 I got 7½ gallons from 51½ feet.  So that

17  shows me that this pump is wearing.

18       Now then you want to know why today I got 67 gallons

19  per minute.  The pumping level today-- I shouldn't say today;

20  it was on February 4, 1959-- the pumping level was 16½ feet

21  and I got 67 gallons a minute.  If this pump had been allowed

22  to run for a period of quite some time, I would say days, then

23  the pumping level would have dropped, because I have known

24  from previous history of this well--

25       THE COURT:  I thought you said that after the pump ran

1   for 45 minutes, you got a report, it could run a lot longer

2   and it wouldn't affect appreciably the result?

3       THE WITNESS:  On these others I would agree to that.

4       THE COURT:  But not on this well?

5       THE WITNESS:  Not this well.

6       THE COURT:  This is an exception?

7       THE WITNESS:  Yes, sir.  Because I have made tests of

8   these other wells at different times and I know their previous

9   history.

10  BY MR. KRIEGER:

11      Q  Do you know how long it was before this well had been

12  run?

13      THE WITNESS:  This well, from talking with the customer,

14  had not been run since he bought the place and that would date

15  back to the summer of 1958-- the present new owner.  So I

16  knew this pump had not been run for quite some time.

17      Q  Mr. Mims, did the result of pump tests vary at any

18  time with the time of the year that you made them?

19      A  Yes, they do.

20      Q  What is the difference?

21      A  In the summer there is a lower pumping level than in

22  the fall or winter months.

23      Q  So you took these tests at a time when the results

24  would be most unfavorable; is that right?

25      A  They would produce more water.

280
3381

1    THE COURT:   What do you mean by "unfavorable"?

2    MR. KRIEGER:   I think he answered the question, your

3  Honor.   I don't mean unfavorable.   I mean exactly what the

4  witness testified to; they would produce more water.

5    THE COURT:   At a time when they would produce probably

6  the maximum?

7    THE WITNESS:   Yes.

8    MR. KRIEGER:   That is right.

9    Q   Now, you said that you were generally familiar with

10  this entire area.   Do you believe that you tested all of the

11  wells that are located in that area?   And the area I am

12  talking about is shown on Exhibit A, which is from the Santa

13  Gertrudis River to the northwest and below and around the

14  so-called Kunkel line and including Murrieta Valley.

15    A   To my knowledge I have tested each one that you have

16  pointed out in that area between the fault line and the Kunkel

17  line.

18    Q   No wells that you have missed that you know of?

19    A   Not that I know of.

20    Q   Have you available with you the testing equipment

21  that you used in making these tests?

22    A   It is in the company car over in the lot.

23    Q   It is pretty bulky, isn't it?

24    A   Yes.

25    MR. KRIEGER:   Your Honor, we simply have that available

z81

1    if anyone wishes to examine this witness on his knowledge of

2    handling those instruments.

3         THE WITNESS:  I might add that this equipment has been

4    tested at Cal Tech and it has been tested up at Davis on at

5    least three occasions, and the Peerless Pump Company, and I am

6    positive that it is as correct a method of field pump testing

7    as you will find anywhere and I will be glad to test it with

8    any other equipment at any time.

9         MR. KRIEGER:  You may cross-examine.

10        THE COURT:  Take our recess.  It's 3:15.

11        (Recess.)

12

13                     CROSS-EXAMINATION

14   BY MR. VEEDER:

15        Q  Will you state into the record the objective of your

16   pumping tests, Mr. Mims?  What do you run these tests for?

17        A  On the customer's request.

18        Q  But what is the objective?  What does the customer

19   want to find out when he has you run these tests?

20        A  How much water his well is producing.

21        Q  And that is really a test as to the efficiency of

22   the pump, isn't it?

23        A  He usually is interested in efficiency; that is right.

24        Q  Well, he wants to know what his pump will yield?

25        A  That is correct.

1     Q  In making your investigations, do you determine the

2  setting of the pumping bowls?  Do you know where they are

3  situated when you make your tests?

4     A  Not unless the pump is breaking suction.

5     THE COURT:  What is a pumping bowl?

6     THE WITNESS:  The bowl is the pumping assembly.  That

7  is the part that actually delivers the water, lifts the water.

8  BY MR. VEEDER:

9     Q  Where would that be located in the well?

10     A  There is a column of pipe down below your pump that

11  you see over there.  There may be a hundred foot of column

12  pipe or there may be 200 feet of column pipe.  And at the

13  end of this you will have a set of bowls, and there are

14  different stages, each one composed of a collar, and then

15  below that usually there is a suction, a piece of straight

16  pipe and a screen.

17     THE COURT:  Is this as true of centrifugal as well as

18  jets?

19     THE WITNESS:  No, sir.  A centrifugal pump does not have

20  a set of bowls down at the bottom in the water.  A centrifugal

21  pump is by the base part there.

22     THE COURT:  What are these-- jets?

23     THE WITNESS:  No, sir.  These are called deep well turbine.

24  BY MR. VEEDER:

25     Q  So as a matter of fact, where the pump bowl is

1    situated can be important from the standpoint of your water

2    level; isn't that right?

3        A  What are you thinking about, Mr. Veeder?

4        Q  Well, you could have it ten feet below the static

5    level of the well, or you could have it clear the bottom of

6    the well; isn't that right?

7        A  If it was ten feet below, it would break suction

8    probably.

9        Q  When you pull it down?

10       A  Yes.

11       Q  So as a matter of fact, there are quite a few elements

12   that are involved, isn't that correct, when you are running

13   one of these pump tests which have nothing to do with the

14   quantity of water that a well will yield?

15       A  What are you driving at?

16   MR. VEEDER:  That will come out later.

17   THE WITNESS:  I mean, I don't know what you are trying

18   to get at.

19   THE COURT:  Put it this way.  These tests are made, in

20   most instances, for the owner or the farmer to find out what

21   his well is yielding.

22   THE WITNESS:  Yes, sir.

23   THE COURT:  Mr. Veeder is pointing out that various

24   other factors besides the well itself would affect the yield.

25   In other words, if you have a poor pump or the wrong kind of

1  set-up, various things might affect the yield of the well

2  when you measure it this way; is that right?

3      THE WITNESS:  That is correct.

4      THE COURT:  Is there any other way to measure the

5  yield of a well outside of taking a pump test?

6      THE WITNESS:  A test pump.

7      THE COURT:  Put a test pump in and use the same pump on

8  every well then?

9      THE WITNESS:  Not necessarily-- I mean a test pump would

10  be one that you could put in a well, that is correct, and you

11  would determine the capacity of the well from this test pump.

12      THE COURT:  To make it uniform, then, you would use the

13  same pump on each well you test.  Suppose you are trying to

14  find out to a mathematical certainty a comparison between two

15  wells.  To make a really absolutely fair test, you would use

16  the same pumping equipment on each well, wouldn't you?

17      THE WITNESS:  I follow what you are thinking.  If this

18  pump does not break suction, I will go along.  Yes, sir, you

19  are right.

20      THE COURT:  Go ahead, Mr. Veeder.

21  BY MR. VEEDER:

22      Q  How deep is the well, your 7S/3W-6D1, do you recall?

23      A  Which one is that?

24      Q  That is the one concerning which you testified.

25      MR. KRIEGER:  The Turner well.

1          MR. VEEDER:  The Turner well.

2          THE WITNESS:  That one I do not know.  If there is a log

3     on it, the log would say.

4     BY MR. VEEDER:

5          Q  You don't know yourself?

6          A  No, sir.

7          Q  And that, in your opinion, would be an important

8     factor, would it not, as to the yield of the well-- the depth

9     of the well?

10         A  Not in every case, no.

11         Q  But it could be important in that instance, could it

12    not?

13         A  The pump setting would be important.  By "setting"

14    I mean how much pump is in the well.

15         Q  Isn't it entirely possible that your well would be

16    no deeper than 20 feet at that point?

17         A  I know it is more than 20 feet because we have a

18    pumping level of 90 on one previous test, which I did not

19    make, so I didn't mention it.

20         Q  You really don't know how deep the well is?

21         A  No.  I told you I don't know.

22         Q  And you have no idea as to the kind of material into

23    which it was drilled, do you?

24         A  None whatsoever.

25         Q  And you don't know anything about the perforation in

1     the wells?

2           A   None whatsoever.

3           Q   And that would be true in regard to all the wells

4     concerning which you have made your investigation?

5           A   Some of the wells the customer told me the depth

6     of the well.

7           Q   That would be just hearsay, though; you wouldn't

8     know yourself?

9           A   Only what the customer told me.

10          Q   Just how accurate are your water level measurements

11    that you have made?

12          A   How accurate are they?

13          Q   Yes.

14          A   I would say they are within-- well, on a deep level

15    they would be within two feet.

16          Q   And would the atmospheric pressure have anything to

17    do with the static level of the water in your well, do you

18    think?

19          A   To my knowledge, I don't think so.

20          Q   Well, at least you didn't take that into considera-

21    tion?

22          A   No, I did not.

23          THE COURT:   May I interrupt?

24          Did I understand you to say that the only well in this

25    group in the first box that you have been testifying about on

:87

1    Exhibit A for Roripaugh, the only well that had this erratic

2    behavior was the Turner well; that these other wells, after

3    they had been pumped for about 45 minutes, the gallonage

4    pumped per minute would stay about the same if they pumped

5    12 or 24 hours?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  This one well had an erratic behavior?

8         THE WITNESS:  I knew that from previously being there.

9         THE COURT:  And no other well?

10        THE WITNESS:  No, sir.

11        THE COURT:  All right.

12        MR. VEEDER:  I have no further questions, your Honor.

13        THE COURT:  Mr. Sachse?

14        MR. SACHSE:  No questions.

15        THE COURT:  Mr. Girard?

16        MR. GIRARD:  No questions.

17        THE COURT:  Mr. Stahlman?

18        MR. STAHLMAN:  No questions.

19        THE COURT:  Mr. Krieger?

20        MR. KRIEGER:  That is all, your Honor.

21        THE COURT:  Anything further?

22        MR. KRIEGER:  No further questions, your Honor.

23        THE COURT:  You may step down.  Thank you, Mr. Mims.

24        MR. KRIEGER:  May he be excused, your Honor?

25        THE COURT:  You may be excused.  If we need you to

Z88

1    come back, we will call you.  You are excused unless you hear

2    from us.

3        THE WITNESS:  Thank you.

4        MR. KRIEGER:  Mr. Lynch.

5        THE COURT:  By the way, Mr. Mims, the supporting data,

6    your cards, et cetera, that this material was taken from that

7    is put on this chart, you have available if we need it?

8        THE WITNESS:  They are in our company office in our file,

9    yes, sir.  They are here.

10       THE COURT:  Is there any need to have them marked, Mr.

11   Veeder?

12       MR. VEEDER:  I don't believe so, your Honor.

13       THE COURT:  Preserve them.  If we need them we will ask

14   you for them.

15       THE WITNESS:  Yes, sir.

16       THE COURT:  Thank you.

17

18                    ALONZO ONEL LYNCH,

19   called as a witness in behalf of defendants Roripaugh and

20   others, being first duly sworn on his oath testified as follows:

21       THE CLERK:  State your name, please.

22       THE WITNESS:  Alonzo Onel Lynch.

23

24

25

1                         DIRECT EXAMINATION

2    BY MR. KRIEGER:

3         Q   Where do you live?

4         A   I live in San Jacinto, California, at 1055 South

5    State Street.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Q How long have you lived in there?

A Since 1946.

Q What is your occupation?

A Up until June 1958 employed L. Van Winkle Drilling Company as driller and supervisor of the drilling operations.

Q When did you become manager of that drilling company?

A 1948, sir.

Q And you held that position until when?

A June 1958.

Q And since that time what has been your connection with the drilling company?

A I have a lease from Van Winkle of the business.

Q Would you explain what your duties were as manager of the Van Winkle Drilling Company?

A Well, I was in charge of all the drilling operations, the supervision of the men, the supervision of the casing, the perforation, the test hole, and all the drilling operation and test pumping combined of the well.

Q During that time would you contact farmers who wanted to have wells drilled?

A Yes I did, sir.

Q And you would also supervise the drilling of those wells, would you not?

A Yes, sir, I would.

Q Those wells would be located by whom?

1    A   The owner or the farmer.

2    Q   You also prepared logs in connection with those wells?

3    A  Yes sir, I did.

4    Q   And what would you do after the well was completed?

5   Conduct a pump test?

6    A   We would install a test pump; yes sir.

7    Q   Have you supervised well-drilling operations in the

8   Murrietta-Temecula area?

9    A   Yes, I have, sir, since 1948.

10   Q   Up until the present time; isn't that right?

11   A   Yes sir; that is right.

12   Q   Is it possible for you to estimate what percentage

13  of all the wells that have been drilled in that area since

14  1948 were done by the Van Winkle Drilling Company?

15   A   Well, I would say approximately from 75 to 80% of the

16  irrigating wells were drilled by Van Winkle Drilling Company.

17   Q   What type of rig do you use in your drilling operation?

18   A   We have the rotary type drilling, sir.

19   Q   I wonder if you would explain the principle of rotary

20  drilling?

21   A   Well, rotary drilling is done by the rotation of mud

22  and the rotation of tools, and as a general rule with rotary

23  we usually run a test hole down first on our operation and then

24  the casing and the determination of the perforations etc., are

25  determined by our test hole and sometimes we run an electric

1  log or have it done.

2  Q  Now just go a little slower.  In your rotary drill

3  operation you have holes drilled; is that correct?

4  A  That is right.

5  Q  And you force mud through that drill, do you?

6  A  Yes, sir.

7  Q  What is the purpose of that?

8  A  To wash our cuttings and samples of the formation

9  that we are encountering out to where we will have a free and

10  open hole.

11  Q  And as that mud comes out with the materials and the

12  soil mixed with it, do you make your well log from that obser-

13  vation?

14  A  Yes sir, we do.  We have what we call fanned shakers

15  or a fettling basin, which is a ditch between our well and our

16  mud sump where our mud hog sets.

17  Q  Are you the one who makes those observations and

18  records them on your well log?

19  A  Yes sir, I am.  During the drilling process throughout

20  the day myself, if I am there, and my driller will take down

21  the samples or look at the samples and take down the depth of

22  the samples etc., and at the end of each day the driller turns

23  this information in on his time sheet, and we then at the

24  completion of the drilling of the test hole as general rule

25  myself, the driller and the owner of the property where we are

13

9394

A24

1   drilling will get together and determine our size of casing

2   etc., from the formations that we have encountered.

3        Q   These drillers are under your supervision, are they

4   not?

5        A   Yes sir they are.

6        Q   Incidentally, is there another type of drilling

7   operation other than rotary?

8        A   Yes sir; there is a standard type of drilling.

9        Q   How is that done?

10       A   It is generally called by the expression cable tools

11  or standard or chug-chug.  A lot of the guys call it the old

12  chug-chug.  The operation is done by solid tools or a bailer.

13  It just depends upon the formation that you encounter whether

14  you are using an open bucket in your drilling or a string of

15  solid tools, and it works up and down in the well as they are

16  drilling.

17       THE COURT:  Let me interrupt.  When we took our inspection

18  tour of the valley there was a well being drilled upon the

19  property of the sister of Mr. Roripaugh; isn't that right?

20  What is the name?

21       A VOICE:  Ramsey.

22       THE COURT:  That operation was by the old chug-chug

23  method?

24       THE WITNESS:  That is right.

25       THE COURT:  Are you familiar with that well that was

A25

1    being drilled?

2        THE WITNESS:  Yes sir.

3    BY MR. KRIEGER:

4        Q  But you use exclusively rotary-type drilling; is

5    that right?

6        A  Yes sir.

7        Q  How do you determine how far down you go when you

8    are drilling a well, Mr. Lynch?

9        A  Well, as I said before, we generally run a test

10   hole down first and most of the time the owner has in his

11   mind and when we get the test hole down as to how far we will

12   ream out this hole, open the hole up and set the casing.

13       THE COURT: How big is this test hole in diameter?

14       THE WITNESS:  Twelve inches.

15       THE COURT:  When you say "ream" you mean make it bigger

16   to put in a bigger casing?

17       THE WITNESS:  That is right sir.  For instance, a 12-inch

18   casing we ream and open to a 24-inch hole.

19   BY MR. KRIEGER:

20       Q  How do you do that, Mr. Lynch?

21       A  We do it by hole openers.  First, we would go to an

22   18-inch hole opener from the 12-inch, and then from the 18-inch

23   hole opener to 24 and then set our 12-inch casing in that, which

24   would give us the 6 to 8 inch gravel envelope around our well--

25   our well casing.

A26

1    THE COURT:  Pack the open space with gravel?

2    THE WITNESS:  Yes sir.

3    BY MR. KRIEGER:

4    A  When you drill the test well and determine how much

5    casing is going in that hole, do you then determine where the

6    perforations are going?

7    A  Yes sir we do.

8    Q  And how do you determine where the perforations are

9    going?

10   A  As a general rule we will perforate from the first

11   fanned or gravels we encounter in our drilling of the test hole,

12   from there to the bottom of the well, where we set the pipe.

13   Q  Who does the perforations?

14   A  Mostly by the pipe companies, the factories.

15   Q  They are done on your order?

16   A  By machines; yes sir.

17   Q  After the hole has been drilled and the casing has

18   been put in, what do you do?

19   A  Well, we have a pump, what we call a test pump.  Say

20   if we drill a hole and set casings 450 deep, we install our

21   test pump, which is a large pump, within, I would say, most of

22   the time anywhere from 25 to 45 feet of the bottom of the well,

23   and we run this test pump either by diesel, propane or gasoline

24   engines, and that way we can regulate our speed and pump the

25   well to its fullest capacity.

13

A27

1      Q  But prior to that, or in connection with it, you

2  introduce bowls into the hole, don't you?

3      A  Yes sir we do.

4      Q  At the end of a column?

5      A  Yes sir.

6      Q  And it is that column that you connect with your

7  gasoline or diesel engine?

8      A  That is right, with a line.

9      Q  Then you test that well for how long?

10     A  We develop--what we call develop the well first.

11  It might take anywhere from 6 to 24 or 48 hours to develop the

12  well until it is clean, free from sand etc., and then we will

13  put a 12 to 24-hour constant test without a shutdown on the

14  well for its capacity.

15     Q  By a constant test do you mean one in which you dont

16  change the speed of the motor?

17     A  That is right sir.

18     Q  What can you determine from such a pump test?

19     A  Well, we will run the test pump at the speed to keep

20  from breaking suction, just above the breaking suction point,

21  and then we can determine where and how deep we are pulling

22  down by the method Mr. Mims described here, and we also would

23  be able to check this method by an air line and gauge which

24  we install with our test pump.

25     Q  How is that used?

1    A   It is a ½ inch air line which is adapted to the

2    test pump when we install it down to the top of the pumping

3    bowls, and we have the air gauge which we pump up.  We install

4    the gauge on top of the line, which is on top of the ground

5    and part of the pump, and from that gauge we can read where

6    we are pumping from and check our electric         as Mr. Mims as

7    demonstrated.

8         Q   You are checking the level of the water; is that

9    right?

10        A   Yes sir, that is right, where we are pumping from.

11        Q   Incidentally, can you tell when you are pumping a

12   test well what level the water is coming from, coming into the

13   well?

A   As a general rule we can, yes, sir.  We can first pump the well to its fullest capacity, and then we slow our engine down, back up to higher points, and we can find and determine from the variations of speed in our engines in the pump as to about where the water is coming in.

Q   Can you also tell how much the well will pump at a maximum rate?

A   Yes, sir, we can.

Q   Can you also ascertain how much can be safely pumped from that well?

A   Yes, sir.

MR. VEEDER:  May I have that last question and answer?

THE COURT:  Read it.

(The reporter read the last question and answer.)

BY MR. KRIEGER:

Q   Is that information, the data that you use for determining the size of the pump and the bowls that will be used in connection with the pumping of that well?

A   Yes, sir, that is right, from our chart, our test pumping chart, the pump company can design the pump to go in the well.

Q   Now, Mr. Lynch, I will call your attention to Roripaugh, et al., Exhibit A that is there on the board and ask you if you are familiar with that map?

A   Yes, sir, to a certain extent I am, sir.

9400

1        Q  Have you examined the schedules down on the lower

2  left-hand corner?

3        A  Yes, sir, I have.

4        Q  And in particular the lower schedule that is marked

5  "Wells tested by drillers"?

6        A  Yes, sir.

7        Q  As a matter of fact, all of those wells were examined

8  by you, were they not?

9        A  That is right, sir.

10        Q  Incidentally, you will note that in the third well

11  entitled the L. L. Wright well, 19J1, under the column

12  entitled "Diameters in inches", it is recited that it is

13  unknown.  Have you since determined what the diameter is?

14        A  Well, sir, that well was not cased.

15        Q  I see.  So that is not known.  You have answered that

16  it simply isn't cased.

17        Going over to the last column, the date that it was

18  drilled, do you know that?

19        A  Yes, I have the record here with me, sir.

20        MR. VEEDER:  Before that is answered, may I inquire as

21  to the source of this data that he is going to rely upon?  Is

22  it his own record?

23        MR. KRIEGER:  Just a moment.  Wait until he gets it.

24        THE WITNESS:  That was drilled in May, 1958.

25  BY MR. KRIEGER:

        Q  In May, 1958?

1      A   Yes, sir.

2      Q   What is the source of that information?

3      A   This is my own personal record.

4      MR. KRIEGER:  As long as you are standing there, Mr.

5  Veeder, I wonder if I could ask you to write it on that column

6  next to "Unknown" 1958, with the Court's permission.

7      MR. VEEDER:  Date drilled you mean?

8      MR. KRIEGER:  Yes.

9      MR. VEEDER:  Always glad to help the taxpayers.

10     MR. KRIEGER:  Thank you very much.

11     Q   If you would also look at the same schedule, well

12  No. 2F2, David Brown, under the column "Diameter in inches,"

13  it is stated that that is unknown. Have you obtained informa-

14  tion now to know what the diameter is?

15     A   That is ten inches, sir.

16     Q   Ten inches?

17     A   Yes, sir.

18     Q   And what is the source of that information?

19     A   That is my own personal record.

20     MR. KRIEGER:  Mr. Veeder, would you oblige me again?

21     MR. VEEDER:  I anticipated your whim.

22     MR. KRIEGER:  Thank you.

23     Q   Looking to the third column in that schedule, would

24  you explain the column "Pulldown in feet"?  What does that mean?

25     A   Well, the pulldown in feet is the difference between

1      the static level of the well and the pumping level.

2          Q   What does the second column, GPM mean?

3          A   That means gallons per minute, sir.

4          Q   And that figure was obtained under test conditions;

5      is that right?

6          A   That is right, sir.

7          Q   Did you compute that figure in the third column **under**

8      "Specific capacity," or was that done by Mr. Webb?

9          A   No, sir; that was done by Mr. Webb.

10         Q   Under "Diameter in inches," what does that indicate?

11         A   That means the size of the well casing in the well.

12         Q   And the depth in feet?

13         A   That means the depth of the well-- cased, completed

14     well.

15         Q   All the way down?

16         A   That is right.

17         Q   And in the next column you have indicated that the

18     log is available, and by that you mean the original log of

19     each well?

20         A   That is right.

21         Q   And in the last column, the date that these wells

22     were drilled by you or under your supervision; is that correct?

23         A   That is right, sir.

24         Q   Does all the information on this schedule on Exhibit A

25     conform to the information from your well logs, with the

1    exception of the column entitled "Specific capacity"?

2        A  To the best of my knowledge, yes, sir.

3        Q  Now, Mr. Lynch, I wonder if you would point out the

4    second well, the Bennett Ranch well in 7S/3W-6K1.  The Bennett

5    well, referred to as 6K1, is here, is it not, where I am

6    pointing on Exhibit A?

7        A  That is right, sir.

8        Q  And that well lies north and east of the Wildomar

9    Fault, does it not?

10       A  That is right, sir.

11       Q  Now, did you drill that well in 1953?  I think you did.

12   Your testimony already indicates that.

13       A  That is right, sir.

14       Q  Who located that well, Mr. Lynch?

15       A  Dr. Mann did, sir.

16       Q  The geologist?

17       A  Yes, sir, Dr. Mann, the geologist.  At that time he

18   was employed at Cal Tech, to the best of my understanding.

19       Q  How deep did you go when you drilled that well?

20       A  1380 feet, sir.

21       Q  Did you stop along the way at any time?

22       A  Yes,  The original contract called for 750 feet,

23   and--

24       Q  What happened at 750 feet?

25       A  Well, we were supposed to bedrock at 750 feet.

1    Q   Did you?

2    A   No, sir, we didn't.

3    Q   Was the size of that test hole 12 inches?

4    A   That is right, sir.

5    Q   So what did you do?  Go on down?

6    A   I called Mr. Bennett, who was the owner, and he in

7  turn called Dr. Mann and went into conversation with him, and

8  he advised Mr. Bennett to go on to 1200 feet if we didn't

9  encounter bedrock beforehand and run an electric log.

10   Q   Did you run an electric log at 1200 feet?

11   A   Yes, we did, sir.

12   Q   And then what did you do?

13   A   Well, Dr. Mann then told us to go head until we

14  hit bedrock.

15   Q   Did you?

16   A   Yes, we did, sir.

17   Q   At what depth was that?

18   A   Right close to 1360 feet.

19   Q   How do you know you hit bedrock?

20   A   By the samples and the drillings, sir.

21   Q   Any other way you tell when you hit bedrock?

22   MR. VEEDER:  I object; this witness is not a qualified

23  geologist.

24   THE COURT:  Overruled.  It seems to me that a well driller

25  would have to know whether he hit bedrock or not.

1          MR. VEEDER:  Well, he might hit a boulder or something.

2          THE COURT:  That is one of the things he would find out

3    in his business, I would think.

4          THE WITNESS:  Dr. Mann examined--

5          MR. VEEDER:  I object to anything about Dr. Mann.

6    BY MR. KRIEGER:

7          Q  Mr. Lynch, my question was simply whether or not there

8    was any other way of knowing when you hit bedrock?

9          A  Well, you can tell when you hit it because you just

10   don't go.

11         THE COURT:  Suppose you hit a boulder, as Mr. Veeder

12   suggested.

13         THE WITNESS:  Well, over a boulder you will have an

14   easier penetration on a boulder, and as a general rule most

15   of the time a boulder your tools will act up very much, and

16   you will have rough places and crevices more or less in boulders

17   where your tools just will bounce and raise a lot of Cain,

18   where if you hit bedrock once you get the rough edge wore off

19   it just sets there and rotates, you might say-- there is just

20   no penetration.

21   BY MR. KRIEGER:

22         Q  After you hit bedrock did you measure the static

23   water level?

24         A  Yes, we did, sir.

25         Q  Where did it stand?

1      THE COURT:  So this was a little less than ten inches,

2  then?

3      THE WITNESS:  That is right, sir.

4  BY MR. KRIEGER:

5      Q  Could you tell from your test where the water was

6  coming from?

7      A  Yes, we could.  That 80 gallons a minute was coming

8  from approximately 340 feet.  A variation of it on the big

9  casing and the small casing was right close to the 300-foot

10      Q  I don't believe you testified what the size of the

11  first casing was.

12      A  That was 10 and 12-inch, sir.

13      Q  And the second was 8-inch; is that right?

14      A  8-inch; that is right, sir.

15      Q  Has that well since been abandoned?

16      A  To my knowledge, yes, sir.

17      Q  Now, Mr. Lynch, let us look at Well 7S/3W-17A1.

18      Mr. Veeder, do you see that?  Maybe you will be good

19  enough to point it out for him.

20      MR. VEEDER:  I am looking for it.  Where is it?

21      MR. KRIEGER:  Here it is (indicating).

22      THE COURT:  It doesn't seem to be listed.

23      MR. KRIEGER:  I want to point out its general location,

24  your Honor.  Well 17A1 is just over the section line below

25  Section 8.

9408

1  Q  You drilled that well in 1955; is that right?

2  A  That is correct, sir.

3  Q  Who determined where that well would be drilled?

4  A  The owner, sir.

5  Q  What size hole did you drill?

6  A  We drilled a 24-inch hole there, sir.  First we

7  drilled the 12-inch hole as usual.

8  Q  And then an 18, and then a 24?

9  A  That is right, sir.

10  Q  How deep did you go?

11  A  409 feet, sir.

12  Q  Do you know what kind of material you hit at that

13  depth?

14  A  Yes, sir.

15  Q  What?

16  A  At 409 feet was clay and rock.

17  Q  Did you stop drilling?

18  A  Yes, sir.

19  Q  Why?

20  A  Because the owner stopped us.

21  Q  Did you run any test on the well?

22  A  Yes, sir, we installed a test pump in it.

23  Q  What did you find?

24  A  We found 60 gallons a minute from 240 feet, sir.

25  Q  What did you do with the well?

1    A  It was capped and abandoned.

2    Q  As no good; is that right?

3    A  That is right, sir.

4    Q  Did you make another attempt on the Blackmore property

5    to locate a well?

6    A  We did, sir.  We moved about half a mile from there.

7    Q  That second well is not located on Exhibit A, is it?

8    A  No, sir, it is not, sir.

9    Q  When was it drilled?

10   A  It was drilled the fourth and the third in 1955.

11   Q  How deep did it go?

12   A  To 250 feet.

13   Q  What diameter was it?

14   A  That was 14-inch, sir-- 12-inch.  I beg your pardon.

15   Q  12-inch?

16   A  Yes

17   Q  You have the log of that available, don't you?

18   A  Yes, sir, I have it here in my hand.

19   Q  What material did you hit at 250 feet?

20   A  There was fine sand and rocks.

21   Q  Did you put a pump test in?

22   A  Yes, sir, we did.

23   THE COURT:  You went only to 250 feet?

24   THE WITNESS:  That is right, sir.

25

15

Z101

BY MR. KRIEGER:

Q   What did you find from the test?

A   We found 10 gallons a minute with a 60-foot drawdown. But you could draw the well down to 250 feet and it would not produce any more water.

MR. SACHSE:   10 gallons a minute with how much drawdown?

THE WITNESS:   60 feet.

BY MR. KRIEGER:

Q   What happened to that well?

A   The owner installed a windmill on it and it is used for a stock well.

Q   It still is?

A   Yes, sir, to the best of my knowledge.

Q   In which direction from the first Blackmore well did you sink the second one?

A   That would be south and west, sir.

Q   Was that second well drilled on the south of the Wildomar Fault, do you know?

A   I would say so, yes, sir.

Q   And generally in the area that I am pointing with my pen; is that correct?

A   Yes, that is right, sir.

THE COURT:   If we are going to locate it on the map, we ought to have it located more accurately than that.

MR. VEEDER:   Is that the northwest of 17?

1    MR. KRIEGER: Would you come over here, Mr. Lynch, and

2  locate that, please?

3    THE COURT: Does the State of California have a nota-

4  tion of that well in the well log?

5    MR. GIRARD: I will have to check it, your Honor.

6    THE COURT: Let's not mark it until we can find an exact

7  description of where it is and then put it in. Let's not guess

8  at it.

9    MR. KRIEGER: The witness will mark that Blackmore 2, if

10  that is all right with you.

11    THE COURT: All right.

12  BY MR. KRIEGER:

13    Q  Now, calling your attention, Mr. Lynch, to the Shamel

14  well-- that is the last one shown on Exhibit A.

15    A  Yes, sir.

16    Q  That is defined as 7S/3W-24A2. Do you see where I am

17  pointing on Exhibit 2?

18    A  Yes, I do.

19    Q  Is that the well we are talking about?

20    A  That is right.

21    Q  That is up in the corner of Section 24, the northeast

22  corner. Was that well drilled by you this year?

23    A  Yes, sir, just recently, sir.

24    Q  How deep did you go?

25    A  258 feet, sir.

15

9412

Z103

1   Q   Did you hit rock?

2   A   Yes, sir.

3   Q   At what depth?

4   A   We hit bedrock at 241.

5   Q   Did you go on down through the rock?

6   A   To 258.

7   Q   How did you do that?

8   A   By a slow process.

9   Q   Using the same rig?

10   A   Same type drilling, only we had the rock bit on it--

11   we used a special rock bit.

12   Q   And you quit at 258 feet?

13   A   That is right, sir.

14   Q   Did you then take a test of that well?

15   A   Yes, sir, we did.

16   Q   And what did it show?

17   A   From 121 feet we pumped 360 gallons per minute and

18   you could draw the well on down to the bottom and you would

19   not increase the flow of water.  It would pump as much from

20   121 feet as it would from 258.

21   Q   What was the static level, do you recall?

22   A   31 feet, sir.

23   Q   So when you pumped the test pump you pulled her all

24   the way down to the bottom; is that right?

25   A   That is right, sir.

Q   Could you tell from that test where the water was coming from?

A   Yes, sir.

Q   What depth was it coming from?

A   Well, from our test it showed that the main stream of water was coming from around 120 to 125 feet.

Q   What has been done with that well?

A   There has been a new pump installed on it, sir.

Q   Now, Mr. Lynch, have you examined most of the wells shown on Exhibit A in red as pumping tests?

A   Yes, sir.

Q   Those are the ones that were measured by Mr. Mims; is that right?

A   That is right, sir.

Q   Are you generally familiar with those wells and pumps?

A   Yes, sir, to a certain extent I am.

Q   Now, so far as you know, are there any wells aside from those that are shown on that map, that is, irrigation wells, used today which lie northeast of the Wildomar Fault and within the so-called Kunkel line as shown on that map?

A   No, sir.

Q   Are there any wells beyond that Kunkel line that you know of to the northeast, irrigation wells, that are used today?

A   Not irrigation.  Most of the wells up in there-- well, a lot of them were put in for the intention of irrigation, but

2105

1  they wound up as stock wells and windmill wells.

2       Q  Based upon your experience as a driller in this area,

3  do you have any opinion as to where irrigation wells can be

4  found in the area that is under study and to which you have

5  been testifying?

6       A  Well, from the--

7       MR. VEEDER:  I object to the question, your Honor.  I

8  don't believe the witness is qualified.

9       MR. KRIEGER:  Just a moment.

10       MR. VEEDER:  I object on the grounds that this witness

11  is not shown to be qualified to respond to such question.

12       THE COURT:  It goes to the weight entirely, Mr. Veeder.

13  Locating water wells is done by all kind of means from water

14  witches on down.

15       MR. VEEDER:  That is right, it is very speculative.

16  You have overruled my objection.

17       THE COURT:  I overruled your objection.

18       My father owned several thousand acres of land in the

19  Los Posos in Ventura County, and they drilled a water well and

20  went over a thousand feet and got a dry hole.  It practically

21  broke him-- plus a fire that year.  So he sold the ranch to a

22  fellow who was not accused of having good sense.  He turned

23  pigs loose on the ranch.  The pigs almost ran crazy for lack

24  of water.  He had been all over the ranch looking for any kind

25  of spring for water.  Water had to be hauled in.  The pigs

9415

Z106

1    began to come in with mud on their snoots.  He traced the pigs

2    back up into the hills and developed a little spring.  Today

3    the ranch has a little supply of water about as big as your

4    finger that runs continuously.  That is the only water on the

5    ranch.  And he had had experts come in to try to locate water.

6         MR. VEEDER:  I have always had a lot of respect for hogs.

7         THE COURT:  It goes to the matter of weight.  The objec-

8    tion is overruled.

9         MR. KRIEGER:  We have not conducted anypig tests on this

10   area, your Honor.

11        MR. VEEDER:  They are coming in here unprepared--

12   no pig tests.

13        THE WITNESS:  I am prepared, frommy past experience,

14   as long as you stay within the flow of the river, the river

15   basin there, you get better wells down in that basin; but once

16   you get outside of that basin, the wells are not so good.

17   BY MR. KRIEGER:

18        Q  How about the Santa Gertrudis area?

19        A  From our past experience, there is no uniformity about

20   any of it.

21        Q  But there are some good wells in that area?

22        A  That is right, there are some good wells in that area.

23        MR. VEEDER:  Which area?

24        MR. KRIEGER:  I was referring to the Santa Gertrudis.

25        THE COURT:  Actually, they refer to the sections 25, 26

1    and 35.

2        MR. KRIEGER:  That is correct, exactly.

3        THE COURT:  3 West, 7 South,

4        MR. KRIEGER:  That is right.

5        Q  Are most of the wells which are productive at all

6    located in the river bottom?

7        A  I would say so, yes, sir.

8        Q  Do you know of any wells that are located up in the

9    hills?

10       A  Well, I know of several locations, but not many wells,

11   sir.

12       THE COURT:  What do you say about that $^S$hamel well?  Is

13   that 360 gallons per minute, up in the Santa Gertrudis Valley?

14   It is right up near the boundary of the Kunkel line.

15       THE WITNESS:  It would be right on the edge there.

16       MR. KRIEGER:  That is 24A2, specific capacity of 4.

17       Q  Do you have the well logs, Mr. Lynch?

18       A  Yes, sir, I do have.

19       MR. KRIEGER:  Mr. Stahlman just asked if that was

20   Tucalota Creek.  Yes, it is.  It is just above the point of the

21   confluence with the Santa Gertrudis.

22       THE COURT:  Do you represent Shamel, too?

23       MR. KRIEGER:  Yes, your Honor.

24       That is all, your Honor.

25       MR. STAHLMAN:  Before we go into cross-examination--

1   I see that it is reaching a late hour-- Mr. Veeder called me

2   yesterday and said that he wanted to talk with Mr. Vail and

3   myself and Mr. Wilkerson this evening regarding some tests on

4   the Vail Ranch.   In keeping with my statement which I made to

5   the Court the other day, I feel that it should be a matter of

6   interest to anyone else who is concerned in these tests that

7   he is going to make.   I don't know what they are or what he

8   wants to talk about.   But I do feel that the Court should be

9   apprised of them.

10      THE COURT:   I think it is up to the parties immediately

11   involved first.   There is no use having all counsel present.

12   You work some kind of schedule out as to what you are going

13   to do, where you are going to do it, and when you are going to

14   do it, and then if you reach agreement tonight, advise other

15   counsel when this will go on so that they can be present or

16   have their experts present to see all the tests.

17      MR. STAHLMAN:   Very well.

18      THE COURT:   Is that agreeable?

19      MR. STAHLMAN:   That is agreeable.

20      THE COURT:   We will let you start your cross-examination

21   tomorrow morning, Mr. Veeder.

22      MR. VEEDER:   Thank you, your Honor.

23      THE COURT:   Adjourn until 10 o'clock tomorrow morning.

24      (Adjournment until Wednesday, April 1, 1959, at 10 A.M.)

25