# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al,

Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Wednesday, April 1, 1959.

Pages:    9418 to 9560

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F. Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 83

9418

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,  )
                           )
            Plaintiff,     )
                           )
     vs.                   )         No. 1242-SD-C.
                           )
FALLBROOK PUBLIC UTILITY   )
DISTRICT, et al.,          )
                           )
            Defendants.    )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Wednesday, April 1, 1959

APPEARANCES:

        For the Plaintiff          WILLIAM H. VEEDER, ESQ., and
                                   WILLIAM E. BURBY, ESQ.,
                                   Special Assistants to the
                                   Attorney-General,
                                   Department of Justice,
                                   Washington, D.C.

APPEARANCES (Continued):

        For Defendant              GEORGE E. STAHLMAN, ESQ.
        Vail Company

        For Defendant State      STANLEY MOSK, ESQ.,
        of California           Attorney-General, by
                                FRED GIRARD, ESQ.,
                                Deputy Attorney-General.

        For Defendants
        Fallbrook Public
        Utility District,       FRANZ R. SACHSE, ESQ.
        et al.

        For Defendant Oviatt,   MESSRS. BEST, BEST & KRIEGER,
         et al.               By James H. Krieger, Esq.
                                  Arthur Littleworth, Esq.

        For U. S. Navy         LCDR. DONALD W. REDD.

        For Defendant Murray   WALTER GOULD LINCOLN, ESQ.
        Schloss Foundation

## INDEX TO WITNESSES

| For Defendant<br>Roripaugh, et al.: | D | X | RD | RX |
|---|---|---|---|---|
| Alonzo Onel Lynch | 9422 | 9425 | 9443 | |
| Albert A. Webb | 9445 | 9514 | | |

## E X H I B I T S

| Defendant Roripaugh<br>Exhibit - | Iden. | In Evid. |
|---|---|---|
| D - Well logs | 9505 | |
| A - | | 9508 |
| B | | 9510 |

9421

SAN DIEGO, CALIFORNIA, WEDNESDAY, APRIL 1, 1959.   10 A.M.

THE CLERK:  Number one, 1247-SD-C, United States vs. Fallbrook, etc., et al.  Further court trial.

MR. VEEDER:  If your Honor will look at line 6 on page 9360, I think they designated the wrong person.

THE COURT:  Yes.  The name "Veeder." will be changed to "Stahlman."

MR. LITTLEWORTH:  Your Honor, I have several small corrections, too.

On page 9393 at line 15, the word "fettling" should be "settling."

THE COURT:  Change the "f" to an "s".

MR. LITTLEWORTH:  On page 9396 at line 11 the word "fanned" should be "sand."

THE COURT:  Make the correction.

MR. LITTLEWORTH:  On page 9404, at line 3, the word "hold" should be "hole."

THE COURT:  Make the correction.

MR. LITTLEWORTH:  On page 9410, at line 3, the figure there should be 10 gallons a minute.

THE COURT:  You mean that small "o"?

MR. LITTLEWORTH:  The small "o" should be a large "O", so that it is 10.

THE COURT:  All right.

1      MR. KRIEGER:  Your Honor, may I ask two more questions

2  before Mr. Veeder takes over?

3      THE COURT:  Yes, sir.

4

5                    ALONZO ONEL LYNCH,

6  recalled as a witness in behalf of Defendant Roripaugh, et

7  al., having been previously sworn, testified further as

8  follows:

9

10                   DIRECT EXAMINATION

11  BY MR. KRIEGER:

12      Q  Mr. Lynch, on Exhibit A of Roripaugh you have now

13  located the Blackmore well, have you not?

14      A  Yes, sir.

15      Q  And you have located it with an ink circle at a point

16  about one-quarter mile or one-third of a mile almost directly

17  to the west of 17A1; is that correct?

18      A  That is right, sir.

19      THE COURT:  And as so indicated it is east of the fault

20  line, but west of the--  what highway is that?

21      MR. KRIEGER:  That is the freeway, I believe, your Honor.

22      THE COURT:  West of the freeway.

23  BY MR. KRIEGER:

24      Q  So you want to correct your testimony, don't you,

25  Mr. Lynch?

1       A   That is right, sir.

2       Q   That the well is to the north and east of the Wildomar

3 fault line?

4       A   That is right, sir.

5       MR. SACHSE:   Does that have a designation?

6       MR. KRIEGER:   Yes, it does; it has an ink mark, Blackmore

7 No. 2.

8       Q   Mr. Lynch, what happens to a well when you pump test

9 it and pull down the level of the water too far?

10       A   Well, as a general rule, sir, the well will start

11 pumping sand, and the harder you pump the well the sand will

12 accumulate in the bottom of the well and the majority of the

13 time will seal up to your water-bearing stratas.

14       Q   And becomes useless?

15       A   It becomes inefficient, yes, sir, and you have to

16 pull the pump and rework the well, and in a lot of cases

17 through hard pumping and over-pumping the well you will

18 accumulate a cavity around your gravel pack or your casing and

19 this cavity will hold for a certain length of time and then

20 when the thing does give away the whole thing goes at once,

21 which we commonly call squeezing the casing or collapsing the

22 casing of the well.

23       Q   Does that ruin it?

24       A   That is right.

25       Q   You have to dig a new well?

1      A   That is right, sir.

2      Q   Have you any way of telling when you are testing a

3  well that you are pumping it down too far?

4      A   Yes, sir, we do.   After we complete the drilling of

5  the well, in our testing we have sounding devices, which Mr.

6  Mims explained yesterday, the ringer, which is commonly known

7  as the ringer, and also--

8      THE COURT:   The what?

9      THE WITNESS:   Ringer.

10      THE COURT:   R-i-n-g-e-r?

11      THE WITNESS:   Yes, sir.   And we can tell from cascading

12  water above the point where we are pumping about where the

13  water is coming in.   You will get a constant ground at times,

14  and then you will get a negative ground where the water is

15  coming in, if the water isn't solid there.

16  BY MR. KRIEGER:

17      Q   And if you hear cascading water, what do you do--

18  rev your motor down?

19      A   We slow the motor down,  yes, sir, to that one point.

20      MR. KRIEGER:   That is all.

21

22                         CROSS-EXAMINATION

23  BY MR. VEEDER:

24      Q   Have you compared Plaintiff's Exhibit 17 with

25  Roripaugh's Exhibit A marked for identification?   Have you

1    had occasion to look at those two exhibits?

2        A  I have only looked at the one there, sir.

3        Q  This one here?

4        A  The top one.

5        Q  The top one?

6        A  Yes, sir.

7        THE COURT:  That is Roripaugh's Exhibit A.

8    BY MR. VEEDER:

9        Q  Have you had an opportunity to look at United States's

10   Exhibit 15-A, which is the map that is orange?  Have you

11   considered that one?

12       A  No, sir, I haven't.

13       Q  Where is the well that you said went thirteen hundred

14   and some feet down to what you said was basement complex?

15       MR. KRIEGER:  Bill, would you mind stepping over there

16   and talking up?  I can't hear you.

17       (The reporter read the pending question.)

18       THE COURT:  1360 feet.

19   BY MR. VEEDER:

20       Q  Can you locate that well?

21       A  That was on the E. W. Bennett Ranch, yes.

22       Q  Will you locate that well for me?  Do you recognize

23   the number of it?

24       THE COURT:  16K1.

25       THE WITNESS:  That is right.  It is up there at the top.

BY MR. VEEDER:

Q   Where would that be on Exhibit 15-A?  Are you capable of locating yourself on maps?

A   No, sir, I am not.

Q   When you were digging that well did you note any area where there was an outcropping of rock or basement complex, to which you made reference?

MR. KRIEGER:  I don't think the witness has testified that he knows what basement complex is.  That is a geologic term.

THE COURT:  What do you want to show?  That this is a certain area?

MR. VEEDER:  Yes, your Honor.

THE COURT:  Let's locate it on the other map.

MR. VEEDER:  Would you step up here, please?

THE COURT:  The witness needn't do it.  You do it.

MR. VEEDER:  All right; near Section 6 of 7 South, Range 3 West.

Q   That is the location, is it not, of the well in question?

THE COURT:  Will it be agreed, counsel?

MR. LITTLEWORTH:  It is already located on the map, your Honor.

MR. SACHSE:  It is already located.

MR. VEEDER:  That's right.

1    MR. KRIEGER:  It is already located on the other map.

2    MR. VEEDER:  That is right.  He has also located it on

3  Exhibit 15-A.

4    THE COURT:  Located in the older alluvium?

5    MR. VEEDER:  Yes, sir.

6    THE WITNESS:  The exact location of that, sir, is the

7  Northwest Quarter of the Southwest Quarter of Section 6,

8  Township 7 South, Range 3 West.

9  BY MR. VEEDER:

10    Q  How did it occur that you dug that well there?

11  Did you make the selection yourself?

12    A  No, I did not.

13    Q  You had nothing to do with it?

14    A  I am not a locator; no, sir.

15    Q  You never locate any wells at all?

16    A  That is right, sir.

17    Q  You just "Have rig, will dig;" is that right?

18    A  That is right.

19    Q  So you assume no responsibility whatever when you

20  dig a well?

21    A  Not on guaranteeing water; no, sir.

22    Q  You say that your company has dug from 75% to 80%

23  of the wells in the area?

24    A  Approximately, yes, sir.

25    Q  Are you digging wells in the Murrieta Valley now?

1       A   Yes, sir.

2       Q   How many?

3       A   We are digging one now.

4       Q   How many have you dug over the last year?

5       A   That would be hard to say.  Just estimating.

6       Q   Just give us an estimate and then I will ask you for

7   your record.

8       A   I would say three or four, sir.

9       Q   You dug three or four?

10      A   Yes.

11      Q   And generally where are those located?

12      A   Along in the same area close to the same area there.

13      Q   When you say the same area you are talking about near

14   this 6K1?

15      A   No, not near it.

16      Q   Where would they be, then?

17      A   It would be more or less in the Murrieta and

18   Temecula district, in the lower part.

19      Q   You don't have the section, township and ranges?

20      A   No, sir, I don't.

21      Q   Could you provide us with that?

22      A   Yes, I could.

23      Q   Suppose I gave you a copy of this map, which is

24   Plaintiff's Exhibit 17.  Could you mark the locations of the

25   wells that you have dug in the last year for us?

1      A   I could, yes.

2      MR. KRIEGER:   I don't see any reason for that, your

3   Honor.   First, that is on a map that has no section numbers

4   on it. Exhibit A is perfectly useful for that purpose, and he

5   has said that he sunk them in that area.

6      If you want that information we can get it for you, Mr.

7   Veeder.   You do have a copy of Exhibit A, don't you?

8      MR. VEEDER:   It is only Exhibit A for Identification,

9   as I see it, Jim, and it is not in evidence.   Maybe it will

10   be in evidence, and maybe it will not be.

11      THE COURT:   If it doesn't go into evidence, you wouldn't

12   be concerned about this cross-examination.   If it does go in

13   evidence, then you could put it on.

14      MR. VEEDER:   I will be concerned about this cross-

15   examination because I am extremely interested, based on his

16   testimony yesterday.   I thought he would never go into the

17   valley again and dig a well.

18      THE COURT:   Let him do it on Exhibit A of Roripaugh where

19   you have the section lines marked.

20      MR. VEEDER:   All right.

21      Will you do that for us?

22      THE WITNESS:   Yes.

23   BY MR. VEEDER:

24      Q   How many wells have you dug in the last five years in

25   the general area of Murrieta Valley?

9430

A   That would be almost impossible for me to say without going over my records.

Q   Would you go over your records and let us know?

A   I could, yes.

Q   And would you also put those wells onto that map which is Roripaugh's Exhibit A for Identification?

A   That is right.

Q   Have you turned in to the State all of the well logs that you have made as you have dug the wells?

A   Yes, I would think so.

Q   Are you still stating for the record that you think you have dug 75 to 80% of the wells in that area?

A   I would say so, yes.

Q   From the standpoint of production of water from a well such as you have testified to up at, we will call it, 6K1, what are the factors that could affect the productivity of water from such a well other than perhaps the paucity of water in the strata?

MR. KRIEGER:  May I have the question, please?

(The reporter read the pending question.)

THE COURT:  Pull your chair over here, Mr. Krieger.

BY MR. VEEDER:

Q   Do you understand what I said, Mr. Lynch?

A   No, not quite.

Q   What are the factors that might influence the

9431

1   productivity of a well?

2       A  If the water isn't there, you can't pump it out.

3       Q  Aside from that?

4       A  Well, there would be a lot of different opinions.  If

5   a well is put down right with your gravel pack and perforated

6   from your water level down, 99% of the time you will get the

7   water in the well.

8       Q  Isn't it true that sometimes the way you put mud down

9   in your well and whether you clean it out properly, isn't that

10  a factor?

11      A  If I could seal water with mud, I wouldn't be in the

12  water well drilling business.

13      Q  Have you ever sealed off a well with mud?

14      A  No.

15      Q  When you were making your tests up on 6K1, did you

16  make those tests yourself?

17      A  Yes, sir, I did.

18      Q  And how long did you run those tests?

19      A  When we first develop a well, we pump until the well

20  is clean, and then we put a 24-hour period test on the well

21  nonstop, anywhere from 12 to 24 hours-- it just depends on the

22  action of the well.  If the well pumps a certain amount of

23  water and has no reaction to it, whether it don't draw down

24  any farther or if it comes up, we test accordingly.

25      Q  And you ran 24 hours on this one, did you?

1       A   Yes.

2       Q   Have you dug any other wells in the vicinity of 6K1?

3       A   They are further down the line; yes, sir.

4       Q   About how far?

5       A   The next one would be-- well, the Blackmore well is

6   below there.

7       Q   How do you rate the Blackmore well?  Do you consider

8   that a pretty good well?

9       MR. KRIEGER:  Do you mean the second Blackmore or the

10  first Blackmore well?

11      MR. VEEDER:  Well, the first one here, the No. 1 well

12  listed.

13      THE WITNESS:  Well, the Blackmore well pumped 60 gallons

14  a minute.

15  BY MR. VEEDER:

16      Q   How would you view a well that pumped 60 gallons a

17  minute?

18      A   From an irrigation standpoint it would be no good,

19  in my opinion.

20      THE COURT:  It depends on how much you want to irrigate?

21      THE WITNESS:  That is right, sir, and how deep you are

22  pulling the water from the well, whether it would be a paying

23  proposition or not.

24  BY MR. VEEDER:

25      Q   People are, though, putting in wells all of the time

1   in the Murrieta Valley; isn't that right?

2       A  To some extent, yes.

3       Q  And by and large, are those going in for irrigation

4   or for domestic purposes, do you know?

5       A  They are both.

6       THE COURT:  May I ask some questions without interrupting

7   your chain of thought?

8       MR. VEEDER:  I think the chain of thought is through,

9   your Honor.  I don't believe there will be any further questions.

10      THE COURT:  Referring to the Brown wells up in Section

11  2, which were tested by you, they have green dots on them.

12      THE WITNESS:  That is right, sir.

13      THE COURT:  One is 2G1; the other is 2F2.  Are you

14  familiar with those wells?

15      THE WITNESS:  Yes, sir, I am.

16      THE COURT:  How deep is 2G1?

17      THE WITNESS:  That was Rudolph Brown, sir.  The depth--

18      THE COURT:  It doesn't show on your chart on Roripaugh's

19  Exhibit A, but I wonder if you know how deep the well was.

20      MR. LITTLEWORTH:  It shows on the chart; 231.

21      MR. SACHSE:  It shows on the chart.

22      THE COURT:  Where does it show on the chart?

23      MR. SACHSE:  Well data.

24      THE COURT:  Oh, pardon me.

25      Did that well go down to bedrock?

1          THE WITNESS:  Yes, sir, it did.

2          THE COURT:  It did?

3          THE WITNESS:  Yes, sir.

4          THECOURT:  Are you sure of that?

5          THE WITNESS:  That is right, sir.

6          THECOURT:  Between the two fault lines there?

7          MR. VEEDER:  Are you speaking of the Roripaugh well

8    now?

9          THE COURT:  No, the Rudolph Brown well 2G1.

10         THE WITNESS:  Yes, sir.

11         THE COURT:  It went to bedrock?

12         THE WITNESS:  Yes, sir.  Your Honor, we went from 221

13   feet to 231 feet in solid rock.

14         THE COURT:  221?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  You are familiar also with the David Brown

17   well 2F2, which is in the same section?

18         THE WITNESS:  Yes, sir,

19         THE COURT:  You drilled that well?

20         THE WITNESS:  That is right, your Honor.

21         THE COURT:  And that well went to 143 feet?

22         THE WITNESS:  That is right, sir.

23         THE COURT:  Did it go to bedrock?

24         THE WITNESS:  Yes, sir.

25         THE COURT:  At what depth?

1    THE WITNESS:  From 140 feet to 143.

2    THE COURT:  The chart says the diameter in inches of

3    the well is unknown.  Do you know what that means?

4    THE WITNESS:  I have that, sir.  It is 10 inches in

5    diameter, the casing, and the bore was 20 inches in diameter.

6    THE COURT:  In 1951 the Rudolph Brown well resulted in

7    a pretty good well?

8    THE WITNESS:  That is right, sir.

9    THE COURT:  In 1957 you dug the David Brown well within

10    a quarter mile of the Rudolph Brown well and you got 20 gallons

11    per minute?

12    THE WITNESS:  That is right.

13    THE COURT:  Was there anything unusual in the digging

14    of that well that occurred?

15    THE WITNESS:  Well, sir the David Brown well is on the

16    edge of the slope of the mountain, and the Rudolph Brown well

17    is right you might say in the center of the valley.

18    THE COURT:  In other words, although our map shows a

19    fault line on the surface there, which is shown on Roripaugh's

20    Exhibit A, actually that bedrock slopes down easterly toward

21    the bottom of that valley; is that right?

22    THE WITNESS:  Yes, sir.

23    THE COURT:  So you encountered bedrock sooner in the

24    David Brown well than in the Rudolph Brown well?

25    THE WITNESS:  That is right, sir.

1          Your Honor, may I add, before we drilled this well of

2     David Brown we drilled one just about a quarter mile from this

3     same location and we bedrocked at 40 feet.

4          THE COURT:  This was a quarter mile in which direction--

5     further west?

6          THE WITNESS:  It would be west.

7          THE COURT:  Over toward the mountain?

8          THE WITNESS:  That is right, sir.

9          THE COURT:  So you hit 40 feet in that one, then you

10    moved over and hit bedrock at 143, and in the Rudolph Brown

11    well bedrock is 221?

12         THE WITNESS:  That is right, sir.

13         THE COURT:  And from what evidence you saw of bedrock,

14    that bedrock slanted down then from the mountain?

15         THE WITNESS:  That is right.

16         MR. KRIEGER:  Is that one of the wells which you will

17    plot as having been drilled by you in the last five years?

18         THE WITNESS:  We made no record of that.

19         THE COURT:  You went only far enough, 40 feet, so you

20    didn't consider it worthwhile?

21         THE WITNESS:  Well, sir, we went from 40 to 80 feet in

22    the same formation on this first well.

23         MR. VEEDER:  What was that statement?

24         THE WITNESS:  40 feet to 80 feet.

25         THE COURT:  You wanted to be sure that you were in bed-

9437

rock and not just some outcrop?

MR. VEEDER:  In other words, you went 40 feet in bed-rock?

THE WITNESS:  That is right.

THE COURT:  Are you familiar, from your drilling opera-tions there in the valley, as to where that fault line runs along the foot of the Santa Rosa Mountains?

THE WITNESS:  Not too much, your Honor.

THE COURT:  When you select places to drill wells, don't you take into account things of that sort?

MR. VEEDER:  Your Honor, he has stated that he does not select places to dig wells.  I asked him that.

MR. KRIEGER:  That is right, your Honor.

MR. VEEDER:  In addition, when you submit those wells for the last five years, could we ask you if you have copies of the logs would you submit them?

THE WITNESS:  I will submit, Mr. Veeder, as much of the available records as I have.  You see, last June I took this business over and some of the records I do not have.  But I do have the records that I testified to here.

THE COURT:  What you have will you bring in?  We can photostat them and make a copy and then let you have your originals back.

THE WITNESS:  I will, sir.

MR. VEEDER:  Where would the balance of the records be,

1  then?

2  THE WITNESS:  They would be with the Van Winkle Company.

3  THE COURT:  Mr. Lynch, referring to the Gwynn well,

4  which is in Section 20, marked L2-- do you have it?

5  THE WITNESS:  Yes, sir, I do have, sir.

6  THE COURT:  That is one of the best wells in the valley,

7  1600 gallons per minute, is that right?

8  THE WITNESS:  That is right, sir.  That is one of the

9  best.

10  THE COURT:  And that well went down 334 feet?

11  THE WITNESS:  I believe that is correct, sir..

12  THE COURT:  On the chart.  Now, did you hit bedrock

13  on that well?

14  THE WITNESS:  No, I did not, sir.

15  THE COURT:  Now, referring to the Howell well, which is

16  nearby in 20K2--

17  THE WITNESS:  Yes,sir.

18  THE COURT:  That well went down 270 feet?

19  THE WITNESS:  I believe that is correct, sir.

20  THE COURT:  Did you hit bedrock in the Howell well?

21  THE WITNESS:  No, I did not, sir.

22  THE COURT:  Why didn't you go deeper in the Howell well?

23  THE WITNESS:  Because the owner didn't desire to go any

24  deeper than that, sir.

25  THE COURT:  You got gallons per minute of about 72

1    gallons per minute?

2        THE WITNESS:  That is right.

3        THE COURT:  And how much acreage did Howell have?

4        THE WITNESS:  That I don't know, your Honor.

5        THE COURT:  What I am trying to get at is, did he feel

6    that this was sufficient water?

7        THE WITNESS:  No.

8        THE COURT:  Or was the expense of drilling the thing

9    that motivated him in stopping the drilling at 270 feet?

10       THE WITNESS:  The reason he stopped drilling I do not

11   know, sir, but after the well was completed he didn't consider

12   it an irrigating well and he is now using that well for

13   domestic water.

14       MR. KRIEGER:  Your Honor, for what help it may be, may

15   I call your attention to parcel 29 on Exhibit Roripaugh B,

16   showing the Howell piece of land.

17       THE COURT:  Do you know how much he had?

18       MR. KRIEGER:  Mr. Littleworth, have you got that?

19       MR. LITTLEWORTH:  That record is in the hotel room.  We

20   can get it.  I don't know offhand.

21       MR. KRIEGER:  It is not a very large piece of land, your

22   Honor.

23       THE COURT:  Now, let us look at the wells in Section 19.

24   The Wright well is 19J2, and 19J1.

25       THE WITNESS:  Yes, sir.

1          THE COURT:   19J2 pumped 350 gallons per minute, and that

2     well went 200 feet?

3          THE WITNESS:   That is right, sir.

4          THE COURT:   Did you hit bedrock on that?

5          THE WITNESS:   No, I did not, sir.

6          THE COURT:   That was drilled in 1958?

7          THE WITNESS:   That is right, sir.

8          THE COURT:   In 1958 also you drilled 19J1?

9          THE WITNESS:   That is correct.

10         THE COURT:   And you went 277 feet?

11         THE WITNESS:   Yes, sir.

12         THE COURT:   Did you hit bedrock?

13         THE WITNESS:   No, sir.

14         THE COURT:   Why didn't you go deeper in that well?

15         THE WITNESS:   Well, the owner decided that instead of

16    trying to go deeper, of course, there is always a problem

17    whether you are going to get water or not, and the indications

18    that we had encountered to that depth were mostly clay forma-

19    tion.  So he wanted to move down to the lower part of the ranch

20    below the hill to put another well down and try down there.

21         THE COURT:   This 19J1 was no water at all?

22         THE WITNESS:   That is right, sir.  We bailed the well

23    dry.

24         THE COURT:   You bailed it out.

25         May I suggest that some of you experts on fault lines

1  give some consideration to the location of your fault line on

2  the map as far as 19J1 and 19J2 are concerned.  Who is

3  responsible for your fault line?  Both the Government and the

4  State of California have the same fault line here.  It would

5  seem to me that that well 19J2 might well be east of the fault

6  line rather than west of it.  No bedrock was encountered at

7  200 feet and 277 feet.

8      MR. VEEDER:  That is why I have asked this gentleman if

9  he would bring in the last five years of operations, because

10 we were extremely interested in what the testimony showed

11 yesterday.

12     THE COURT:  I haven't heard further from Cal Tech.  I

13 will let you know when I hear.  But in a situation like that,

14 a seizmographic test might be helpful.  They might be able

15 to tell us exactly where bedrock is in various areas of this

16 valley.

17     MR. SACHSE:  Your Honor, you raised this question of

18 the fault line.  May I call your Honor's attention that in

19 Plate L13B of the State's delineation of the fault lines in

20 this exact area shows five roughly parallel running northwest-

21 southeast and one running at right angles to it-- in other

22 words, according to the State's geology, this might not be

23 an unusual condition.  This map shows only the one located

24 by Mr. Kunkel.

25     THE COURT:  Yes.

BY MR. VEEDER:

    Q  I would like to ask you, when you describe bedrock, of what does it consist?

    A  Mostly granites.

    Q  And when you say mostly granite, what else is there in the bedrock?

    A  As a general rule, you will encounter decomposed granite first, and then go into the solid granite, has been my experience.

    THE COURT:  You don't consider decomposed granite bedrock?

    THE WITNESS:  No, sir.

    THE COURT:  In fact, is some of that water bearing?

    THE WITNESS:  In some ares it could be; yes, sir.

    THE COURT:  By some areas do you mean major areas like Temecula Valley, or do you mean isolated areas in the Temecula Valley?

    THE WITNESS:  I would say in part of the Temecula Valley it would be; yes, sir.

BY MR. VEEDER:

    Q  Do you have any sedimentary rock, for example, in that well that you went 1330 feet in?

    THE WITNESS:  No rock whatsoever.

    Q  There was no rock at all?

    A  That is right.

Q  Did you encounter any shale when you dug that well?

A  Yes, we did.

MR. VEEDER:  That is all I have, your Honor.


REDIRECT EXAMINATION

BY MR. KRIEGER:

Q  Mr. Lynch, when you talk about the Murrieta Valley, what are you referring to?

A  Well, mostly the low part of the valley from Wildomar fault down to the town of Murrieta and toward Temecula, more or less following the contour of the river or the creek.

Q  Are you talking of the area between the two fault lines, wherever they may be?

A  Yes, sir.

Q  You are not talking of the area to the northeast?

A  No; that is right.

MR. KRIEGER:  That is all, your Honor.  I would like to say that at the close of last night's session Mr. Kunkel asked us for copies of the well logs on the wells to which Mr. Lynch testified, and we gave them to him, and today we would like to offer -- and we certainly can't offer it if objections are raised to hearsay-- an exhibit containing all of the information which we have been able to obtain on these wells.  Some of them come from the owners, some of them come from copies of logs filed with the State, but they consist of all the

1    information we can get on these wells.  If Mr. Veeder would

2    like to have a copy of it, we are going to offer it for what-

3    ever it is worth.

4         THE COURT:  We have followed the practice in the past

5    of putting these well logs in as supporting data and let the

6    people use them.

7         MR. VEEDER:  Yes, from our standpoint, we would like

8    to have that data for the purpose of analysis.  To be per-

9    fectly candid with you, I think the selection of ten wells

10   is insufficient.  That is why we want to go back four or five

11   years.

12        MR. KRIEGER:  There are 32 wells located on Exhibit A,

13   and we have information on 22 of those 32 wells.  Only on

14   10 of them do we not have some information, and we want to

15   make available every trace of evidence to help the Court in

16   any way.

17        MR. LITTLEWORTH:  There are only 10 on which we do not

18   have logs, and even on the 10 we have some information.

19        MR. VEEDER:  When do you suppose this data will be

20   available?

21        MR. KRIEGER:  I will talk to you at the recess about

22   that.

23        MR. VEEDER:  I have no further questions.  Mr. Lynch will

24   be available for further examination when the material comes

25   in; is that right?

1    MR. KRIEGER:  Yes, but I think if we can put him on

2    call-- after all, he is a well driller and has to earn a

3    living.

4        THE COURT:  That is what we will do.

5        MR. VEEDER:  Yes.

6        THE COURT:  We will give you notice if we need you back,

7    and let you work out your schedule.  You are temporarily

8    excused.

9        THE WITNESS:  Thank you, sir.

10       MR. KRIEGER:  Mr. Webb.

11

12                ALBERT A. WEBB,

13   called as a witness in behalf of defendants Roripaugh, et al.,

14   being first duly sworn, on his oath testified as follows:

15       THE CLERK:  Would you state your name, please?

16       THE WITNESS:  My name is Albert A. Webb.

17

18             DIRECT EXAMINATION

19   BY MR. KRIEGER:

20       Q   Where do you live, Mr. Webb?

21       A   I live in Riverside, California, at 8615 Dufferin

22   Avenue.

23       Q   What is your age, Mr. Webb?

24       A   Sixty years old.

25       Q   And your occupation?

A   Civil engineer.

Q   I wonder if you would recite your educational and professional background.

A   I graduated from grammar school and high school in Storm Lake, Iowa, and from Iowa State College of Agriculture and Mechanic Arts with a Bachelor of Science Degree in Civil Engineering in 1922.

Shortly after I graduated from college I spent a few months in Mexico on canal location for the Richardson Construction Company, and for a period of approximately three years I was successively assistant to resident engineer for the Phoenix Utility Company, a subsidiary of the Electric Bond and Share Company of New York City, on hydroelectric construction in Northern Minnesota, during which time we built the Fond du Lac and Blanchard dams as well as substations and made preliminary investigations on other projects, including foundation investigations.

I then left Northern Minnesota and came to California. I spent one year with the City of Los Angeles in the Bridge Divison on the design of bridge and viaduct planning. That was followed by a year, or approximately a year, with Porter H. Allbright, who was then a consulting engineer in Los Angeles on hydraulic and subdivision problems. After leaving that assignment I spent three years with the Shell Company of California as a construction engineer-- well, actually two

1   of them were as a construction engineer in the Ventura Avenue

2   oil fields, and the last year being in the office of Shell in

3   Los Angeles.

4        After leaving Shell Company I spent two years operating

5   as engineer and manager of the Palisades del Rey Water Company,

6   serving domestic water in the Venice area and the City of Los

7   Angeles.

8        After leaving that, I spent three years with the

9   Metropolitan Water District for Southern California.

10       MR. VEEDER:  This does us no good, sir, unless you

11   tell us the years.  Do you have the years when you were doing

12   these things?

13       THE WITNESS:  Not with me, no, sir.

14       MR. VEEDER:  All right.

15       THE WITNESS:  I spent three years with the Metropolitan

16   Water District of Southern California in the distribution

17   section on the investigation for preliminary routes of the

18   feeder lines.

19       From 1935-- that is one date for you, Mr. Veeder.

20       MR. VEEDER:  Thank you, sir.

21       THE WITNESS: --to date I have been successively the

22   engineer, superintendent and general manager of the Riverside

23   Water Company, a canal company, serving approximately 6,000

24   acres of land in the Riverside-San Bernardino area.

25        Also, I happen to have two sons who took civil

1    engineering, and I opened a private office in 1945.  My sons

2    are now with me and we have a consulting engineering office,

3    doing general civil engineering work, and I still have a part-

4    time connection as General Manager for the Riverside Water

5    Company.

6        During the period 1935 to date I have been, as I said,

7    successively engineer, superintendent and general manager of

8    the Riverside Water Company, and the period 1945 to date runs

9    concurrently-- I have had my own office and engaged in the

10   general practice of civil engineering.

11   BY MR. KRIEGER:

12       Q   Under the name of Albert A. Webb Associates?

13       A   Albert A. Webb Associates; yes, sir.

14       I am currently consulting engineer for the Western

15   Municipal Water District of Riverside County, for the Elsinore

16   Valley Municipal Water District, for the Northridge Park

17   County Water District, the Fern Valley Water District, the

18   Desert Hot Springs County Water District, the El Sobrante

19   Mutual Water Company, the Eagle Valley Mutual Water Company,

20   the Highlanders Water Company, and there are quite a few

21   others that I don't happen to think of now.

22       Q   You are a consultant, are you not, for various water

23   disdributing companies other than those you have named?

24       A   Yes, sir.

25       Q   Incidentally, that Northridge Park district is in

the area of Sacramento?

A   That is right.

Q   The Fern Valley District is in Idyllwild?

A   That is correct.

Q   Did you say Twenty-Nine Palms?

A   No, sir.

Q   What was it?

A   Desert Hot Springs Water District.

Q   Desert Hot Springs is in the neighborhood of Twenty-Nine Palms?

A   Yes, sir.   That is not strictly correct.   The Twenty-Nine Palms road takes off near Desert Hot Springs, but Desert Hot Springs is on the north side of Coachella Valley.

Q   Have you testified as a water expert at various other proceedings before the Public Utilities Commission of this State?

A   Yes, I have.

Q   Are you a member of any honorary societies in engineering?

A   The American Society of Civil Engineers, yes.

Q   As manager of the Riverside Water Company, have you dealt with problems of both surface and ground water supply?

A   Yes, sir.

Q   By the way, where does that company operate?

A   It operates in the Counties of Riverside and San

1    Bernardino.

2          Q   With its service area in Riverside?

3          A   The service area being in Riverside, and the water

4    production coming from both counties.

5          Q   Does its supply come solely from ground water?

6          A   Presently, yes.  Originally, it was an entirely

7    gravity company or surface diversion.  The company was formed

8    in 1885.  Since that time there has been a gradual diminution

9    of the gravity supply until at the present time there remains

10   no gravity supply and we are a hundred percent pump water.

11         Q   Where does it pump its water?

12         A   It pumps its water from the upper San Bernardino

13   Valley above the so-called Bunker Hill Dike of the San Jacinto

14   fault in two locations, one part being in the northern part

15   of the San Bernardino Basin and the other section being

16   adjacent to the dike in the southerly portion; and also from

17   the lower end of the Rialto-Colton Basin, where we have several

18   wells, and then in the Riverside Basin.

19         Q   How many wells in all does the company operate?

20         A   Currently they are operating 29 wells.

21         Q   Are you familiar with all these wells?

22         A   Yes.

23         Q   Have you supervised their operation in one capacity

24   or another since 1935?

25         A   Yes, sir.

9451

1    Q  As such, with that experience, are you familiar with

2    the static water levels, gallons per minute, and the feet of

3    drawdown of all those wells?

4    A  Yes, sir.

5    Q  How much water, incidentally, do you pump from all

6    these wells?

7    A  Well, approximately 40,000 gallons per minute.

8    Q  Does the performance of a well, Mr. Webb, tell you

9    anything about the soil that you are pumping from?

10   MR. VEEDER:  I object to that, your Honor, unless there

11   is more foundation on this matter.  You can't ask a general

12   question about the efficiency of the pump.  Innumerable other

13   things are involved.

14   MR. KRIEGER:  Your Honor, I think that is a question

15   for cross-examination.  I tried to qualify Mr. Webb.

16   THE COURT:  In what subjects do you consider yourself

17   an expert?  You say you have testified as an expert witness.

18   You are a civil engineer, you are a manager of water companies.

19   Have you been an expert on locating wells?

20   THE WITNESS:  Not on well location, I would say, but

21   I do consider that I know quite a little bit about the opera-

22   tion of wells and how to fit pumps to wells and how wells

23   should be pumped.

24   THE COURT:  What about geology?  Have you made any

25   study of geology?

THE WITNESS:  My only geology was one year at Ames back in 1922, except my general knowledge of the country as you see it through the years.

THE COURT:  What about hydrology and ground water?

THE WITNESS:  Hydrology I have studied over many years.

THE COURT:  What would you define "hydrology" to be?

THE WITNESS:  My idea is that the study of hydrology is the movement of underground water and the quantities of water that one may expect to get from a basin, the performance of a basin under pumping, and material of that information.

THE COURT:  Have you studied ground water basins in connection with your work?  You are pumping out of a couple of them at least, or three of them.

THE WITNESS:  Yes, sir, I have, the San Bernardino Basin, the Colton Basin, the Riverside Basin, and I have spent a considerable period of time in preparation of the Exhibit A and these other maps and the study involved in my ideas, at least, to the underground conditions from which the water is pumped in the area covered on Exhibit A.

BY MR. KRIEGER:

Q  Haven't you also recently completed a study for the Metropolitan Water District on ground water basin of the Santa Ana River in Orange County?

A  That particular report involved a study of ground water conditions in Orange County and also in the Central

Basin.  The primary reason for the report was to determine what the reasonable value for irrigation water was.  But we ran into the spreading problem-- the amount of money that could reasonably be charged for water used for spreading purposes, which led us into a study of the underground basins both in the Orange County Coastal Basin on the Santa Ana and over particularly in the lower portion of the San Gabriel River after it emerges from the San Gabriel Narrows.

MR. KRIEGER:  May I put my question again now, your Honor?

THE COURT:  Yes.

MR. KRIEGER:  I will rephrase it to get away from the word "soil."  Perhaps that implied geology, and I didn't mean to do that.

Q  Does the performance of a well tell you anything about the water-bearing characteristics of the ground being pumped?

A  Yes, sir.

Q  What?

A  If you have a fairly high specific capacity, that indicates that the soil must be rather porous, because you get a reasonable amount.  It is a measure of the amount of water that it is possible to get out of that well with a given pulldown, and if you get water out of the well with a comparatively small pulldown, it means that the soil must be

9454

1    fairly porous in order to supply that quantity of water.

2         THE COURT:  Let's get a definition of "specific capacity."

3    It is the relationship between pulldown and water pumped?

4         THE WITNESS:  That is right.

5         THE COURT:  How would you define it?

6         THE WITNESS:  Specific capacity is the gallons per

7    minute per foot of pulldown.

8    BY MR. KRIEGER:

9         Q  Tell me, Mr. Webb, do ground water level contours

10   tell you anything about the water-bearing character of soils?

11        MR. VEEDER:  I object, your Honor; there is no founda-

12   tion.  There is nothing to show that this witness is quali-

13   fied to talk about ground water contours.  There is no basis

14   whatever.  He says that the only training he has had in

15   geology, as I understand it, was back many years ago.  There

16   is nothing to show that he has made any studies pursuant to

17   which he could come up with an opinion.

18        THE COURT:  Sustained.

19        Have you made any studies of ground water contours in

20   connection with your study of ground water basins?

21        THE WITNESS:  Many times; yes, sir.

22        THE COURT:  In what basins?

23        THE WITNESS:  I have done it in the Riverside Basin,

24   I have done it in the Colton Basin, I have done it in the

25   San Bernardino Basin, and I attempted to do it in the basins

1   shown on Exhibit A, if it can be known as a basin-- I think

2   perhaps that is the wrong nomenclature.

3        MR. VEEDER:  I move to strike the last statement, your

4   Honor.

5        THE COURT:  The last statement that he thinks it is

6   the wrong nomenclature may go out.

7        How do you make a ground water contour study?

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A1**

1    THE WITNESS:  In all the studies I have made of that

2    sort, what I have done, I have located all the wells in the

3    study area, I have spotted those wells or located them on a

4    map and their correct location, I have then run differential

5    levels with a survey instrument so that all measuring points

6    at the wells, the top of the casing or at some bench mark may

7    be known, the elevation of it may be known at each individual

8    well on some datum.  Ordinarily we used either the U.S. Coastal

9    geodetic datum or the United States Geologic Survey datum, both

10   of which usually mean sea level as true datum.  So as you know

11   the elevation of every measuring point of each well above sea

12   level, it puts you on a common datum.  Then my usual procedure--

13   and I have done this time after time after time--is to take a

14   steel tape, and I take that steel tape with the end broken off

15   ordinarily to about 25 feet, and I usually carry a 200 foot

16   tape and a 500 foot tape, depending upon the area that I am

17   going to be in, and when I arrive at the well I dust the bottom

18   of that tape by dragging it on the ground or the use of blue

19   carpenter's chalk so that it is possible for me to determine

20   where the water level hits.  Then I put that tape down in the

21   well.

22       THE COURT:  When the well is inactive or when the well

23   is being pumped?

24       THE WITNESS:  If you want to make a hydrographic study,

25   you usually disregard pumping water levels, because you get an

A2

erroneous result.  The thing you are after is hydrographic contours based upon static water levels, and you want your measurements taken all over your study area as nearly as possible as of the same date.  Of course, if your are covering a very large area you manifestly can't get them all on the same date, but you go as rapidly as you can.  You run your tape down into the well, and if you happen to know the depth you know how far to go down.  If you don't know the depth you have to do what is known as fishing for it.  You run it down to some certain foot and you hold that foot on your measuring point.  You then note the foot in your notebook, the depth that you went in.  You then reel up the tape, watching for the water level as it comes out.  If you go in 75 feet and you note that the tape reads 25.2, in your notebook you recite the depth that you went in, where your water mark was, and you subtract the two and that is the depth that you want.  Then you subtract that depth to water from the elevation of your measuring point and you have the true elevation of the water surface.

After you have completed all of your well measurements, you then take your true elevation of the water surface and you write it beside each well on your map, and from that point on it is not much different than attempting to draw contours on the surface.  What you do is, you draw contours of the water surface, only you normally term them hydrographic contours.

I once made a map in preparation of a lawsuit for the

9458

A3

1   complete San Bernardino valley, all of the area northerly of

2   the Santa Ana, around as far as Fontana and as far up as Mentone.

3   I think we ran some 150 miles of levels to reference points in

4   an effort to be sure that we were all completely on the same

5   datum, and as I recall it we covered some 250 to 300 wells in

6   that well survey.  Of course, we had three survey parties doing

7   the work of running the levels--I headed it up, and we had three

8   measuring crews measuring the depths to water.

9          THE COURT:  I think the witness is qualified to answer

10   the question.

11          We will take a short recess.

12          (Recess)

13          THE COURT:  Proceed.

14   BY MR. KRIEGER:

15          Q  Mr. Webb, what do water level contours tell you about

16   the water-bearing characteristics of the soil being pumped?

17          A  Nothing.

18          MR. VEEDER:  I object to that, Your Honor.  I move to

19   strike the answer.  I object on the grounds that the witness

20   has not been qualified.

21          THE COURT:  The answer may go out.  What is your objection?

22          MR. VEEDER:  I object on the grounds that this witness

23   is not qualified to testify in regard to matters involving

24   geology.  He has said so in so many words.  He may have carried

25   out somebody's instructions in regard to the work that he

1    described in some detail just a moment ago, but he is talking

2    about surface operations,  and he hasn't shown that he knows

3    any geology, nor has he shown the elements that would normally

4    be taken into consideration in making a determination of that

5    character.

6        THE COURT:  It goes to the weight, Mr. Veeder.  The

7    objection is overruled.

8        THE WITNESS:  Nothing.

9        THE COURT:  Your answer is made advisedly?  No informa-

10   tion whatsoever is told you about the character of the soil and

11   ground underneath by water level contours?

12       THE WITNESS:  I think, sir, that is correct.  Normally

13   when you have a hydrographic contour map, the thing that you

14   seek to determine from that hydrographic contour map is the

15   depth at which you will encounter water.

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Let me ask you.  This isn't cross-examina-

2    tion, but I am just interested.  Suppose you have a well and

3    it is at an elevation of a thousand feet, and a hundred yards

4    away there is another well and it is at an elevation of a

5    thousand feet, and if you pump the first well there is

6    immediately a drawdown on the other well.  Does that tell

7    you anything about the intervening material between the two

8    wells?

9        THE WITNESS:  Well, yes, it would.  It would tell you

10   that they were interrelated in some way.  However, the type

11   of hydrographic contour map that I had in mind was a map which

12   would show the elevations of the underground water table in

13   the shape of contours, with no particular pumping measure-

14   ments.

15       THE COURT:  Go ahead.

16       MR. KRIEGER:  My question was addressed to the water-

17   bearing qualities of the ground, your Honor.

18       THE COURT:  The water-bearing qualities--

19       MR. KRIEGER:  Yes.

20       THE COURT:  --is a very broad term.  Go ahead.

21   BY MR. KRIEGER:

22       Q   Now, you have, in the course of your management of

23   the Riverside Water Company, supervised the drilling of many

24   wells; is that right?

25       A   Yes, sir.

Q   And you have also been in charge of determining where those wells are located?

A   Yes, sir.

Q   Now, in order to make such determination, what do you take into account?

A   Ordinarily, when it has been necessary for me to locate a new well, I attempt to determine all the wells in the immediate surrounding area of the point at which I expect to drill a well.  Ordinarily, one of the things that governs would be the parcel of property that is available upon which to drill a well.  I get their logs, I get their depths to water, and I get all the information that I can.

On all of the Riverside Water Company wells and on wells for other companies in which I have been engaged, what I have ordinarily done then is to plot a graphic log of the nearby wells and attempt to project across in a profile form to see whether or not I think the strata may be continuous.  Then I spot my well, start to drill, and usually rather it is a process of hope for the best.  On my profile I then usually by scale locate my new hole on the work profile that I have, and I keep a running total, plotting up the log as the drilling of the well progresses to see whether or not it is following at all the strata that I have gotten from adjacent wells and to see whether or not I hit water at the same point.

But that is the usual procedure that I use for drilling

9462

5

Z41

1   a well.  Of course, if there is an entirely new area and

2   there are no wells in the area, the only thing you can do is

3   use your best judgment.

4       Q  Now, in the accumulation of data from adjoining wells,

5   do you attach any significance to the gallons per minute which

6   those wells produce?

7       A  The gallons per minute are certainly important, but

8   that isn't the whole story.  You also have to know what the

9   pulldown is in the well in order to get that number of gallons

10  per minute.

11      Q  Why is that significant?

12      A  Well, on all of our wells, and I believe the rule

13  of thumb measurement is that you should never over-pump a well.

14  I have had that experience a time or two, and I believe that

15  the pulldown should be kept in the neighborhood not to exceed

16  50 feet.

17      Q  What happens to a well that is over-pumped?

18      MR. VEEDER:  I think that is repetitious.

19      THE COURT:  Overruled.

20      THE WITNESS:  I drilled a well known as Meeks No. 1,

21  or rather I had charge of the drilling of that particular

22  well.  I wanted to drill that well out in the river bottom,

23  but the cost of construction for protecting the well would be

24  so great that I decided to take a chance and I moved it over

25  next to the bank and got it up on the bank, thinking that

Z42

1    certainly the material would be the same.  Roscoe Moss Drilling

2    Company drilled the well for us, and they did an excellent job.

3    It was a cable tool or a chug-chug outfit, and as I recall,

4    we went about 600 feet.  From all the information I had

5    available, I thought I would really get a good well.  I put

6    a test pump in and tested it and I was pulling it down about

7    a hundred feet and not getting very much water, and I thought,

8    well, I will hold it there.  Usually when you are developing

9    one of these wells-- the Riverside Water Company for years

10   and years and years has had its own test outfits, motors,

11   pumps, et cetera.  So after searching it a while and not being

12   able to particularly bring it in and get it to where I thought

13   it should be, I thought I will just hold it at about a hundred

14   feet or thereabouts for a few days and see what happens.  And

15   I did.  One afternoon I went over to take a look at it and

16   I found the pump still running and the water still coming

17   out, but over on one side of the casing there was a place as

18   large as four or five of these desks put together caved in.

19   I should have said that the well was also pumping sand.  I

20   had pumped a cavity of some sort.  The well had caved com-

21   pletely from the surface, and I was afraid that I had lost

22   the well.  Of course, the thing that usually happens to you

23   is if you put a kink in the casing the pump shaft snaps.

24   Since the pump was still running and the water was still

25   coming out, I felt a little bit better about that, and

1    finally decided that the only thing I could think of to do was

2    to fill the hole up with gravel, which I did, and immediately

3    cut the pump back.  That pump right now is running with about

4    40 feet pulldown and it has a capacity of slightly under 900

5    gallons per minute, and under no circumstances would I attempt

6    to get more out of it.

7        Q  What, in your opinion, Mr. Webb, characterizes a

8    productive well?

9        A  Well, the amount of water that you get out of the

10   well-- well, you come back to specific capacity-- the amount

11   of water that you get out of the well per foot of pulldown

12   in the well is a measure of the real productivity of a well.

13       Q  Mr. Webb, sometime ago you were asked to do some

14   well studies over in the Temecula-Murrieta area; is that right?

15       A  Yes, sir.

16       Q  When did you start that study?

17       A  It was in the month of August last year.

18       Q  Have you any estimate of how much time you spent on

19   that study to date?

20       A  Well, I spent slightly in excess of a month.

21       Q  What have you done in the course of that study?

22       A  I contacted all of the well drillers that I knew and

23   could reach who had drilled wells in the area, including Mr.

24   Lynch, who has testified here, Dr. Trineri, who has a general

25   familiarity with the area and who has drilled a few wells--

Z44

1    not nearly as many as Mr. Lynch, also the man who took over

2    E. W. Brockman's business, who formerly drilled a number of

3    wells in the area.  I talked with them about the wells that

4    they knew about, not only the wells that currently had pumps

5    on them but also wells that they had drilled which had been

6    bad ones and wells that they had drilled that had been good

7    ones, and after having discussed it with them Mr. Trineri and

8    Mr. Lynch and I visited all of the locations that are spotted

9    in green on the map.

10        Q  On Exhibit A?

11        A  On Exhibit A, yes, sir.  Then we contacted Mr. Mims

12    of the California Electric Power Company and his superiors

13    and decided that the thing to do in that whole area would be

14    to take very pump that we could find of three horsepower and

15    greater and run actual capacity tests on the wells.  Mr. Mims

16    has already testified to the results of those tests, which are

17    shown also on Exhibit A.  I went in to the field with Mr. Mims

18    and visited each one of the wells.

19        THE COURT:  Those are the wells marked in red?

20        THE WITNESS:  Yes, sir, those are the wells marked in

21    red.  As to the locations of them as they appear on Exhibit [A],

22    I took individual quadrangle sheets of the United States

23    Geological Survey and went into the field part of the time

24    with Mr. Mims and sometimes with Mr. Lynch, and occasionally

25    alone and located the wells on the quadrangle sheets from the

1   topography and then returned to the office and took the field

2   locations from my quadrangle sheets and placed them in the

3   positions shown in Exhibit A.

4   I also got all of the information that I could on the

5   well logs.  Many of the wells, particularly those shown in

6   red, it seemed that it was not possible to get well logs.  We

7   got as much information as we could from owners and otherwise.

8   In some instances we have hand-drawn graphic logs prepared by

9   the owners.  In other instances all we have is the diameter

10   of the well and a statement by the owner as to the depth.

11   And with that information we prepared the map and the

12   tables shown.

13   Q  In the course of your field work you also talked

14   with some or most of the owners of all these lands where the

15   wells are located, didn't you?

16   A  Yes, sir, I have.

17   Q  Now, calling your attention to Roripaugh's Exhibit A,

18   I will ask you whether or not you designated the well numbers

19   on the first schedule under pump test data from California

20   Electric Power Company on the left-hand column?

21   A  Yes, sir.

22   Q  And I take it that you located all of those wells

23   with the help of Mr. Mims?

24   A  That is correct.

25   Q  And you sat here and heard all of his testimony, too,

z46

1    didn't you?

2           A   Yes, sir.

3           Q   You also heard the testimony of Mr. Lynch?

4           A   Yes, sir.

5           Q   Now, coming on to the same schedule over to the fifth

6    column, "Pulldown in feet," did you make that computation?

7           A   Yes, sir.

8           Q   And did you make it from simply subtracting the

9    static from the pumping level?

10          A   Yes, sir.

11          Q   And also in the seventh column, "Specific capacity,"

12   did you make that computation?

13          A   Yes, sir.

14          Q   And how did you do that?

15          A   By dividing the gallons per minute by the pulldown.

16          Q   And all of the rest of the data on that schedule was

17   provided you by Mr. Mims; is that right?

18          A   That is right.

19          Q   Now, going down to the schedule below that, the one

20   entitled "Wells tested by drillers," here again did you provide

21   the well number on the left-hand column?

22          A   Yes, sir.

23          Q   And did you also fill in the column entitled "Specific

24   capacity"?

25          A   Yes, sir.

9468

Z47

1    Q  And did you do that the same way you have just re-

2    cited as to the other schedule?

3    A  Yes, sir.

4    Q  Did you put in any other information, or was the

5    rest of it provided you by Mr. Lynch?

6    A  The rest of it was provided by Mr. Lynch.

7    Q  Now, referring to the map itself, the base map, I

8    believe you testified that that was a quadrangle map of the

9    U.S.G.S.; is that right?

10   A  Well, it is a map composed of several quadrangles and

11   portions of quadrangles, all from the U. S. Geological Survey.

12   Q  You pasted those together and made a photograph of

13   it?

14   A  Yes, sir.

15   Q  And then on this base map did you trace on the left

16   side of it in the dotted line the watershed boundary?

17   A  Yes, sir.

18   Q  And where did you get that information?

19   A  Merely from the topography itself.

20   Q  You took it from the topography itself?

21   A  From the topography itself.

22   Q  And that also is true of the dotted line in the

23   top middle of the map?

24   A  Yes, sir.

25   Q  Then referring to the dashed lines along the Murrieta

z48

1    Valley that are referred to as the Elsinore fault and the

2    Wildomar fault, did you transpose that information onto this

3    map from one of the United States maps Exhibit 15?

4        MR. VEEDER:  Your Honor, I haven't objected up to now,

5    but I am going to begin to object to the leading questions.

6        THE COURT:  If you are not objecting, don't object.

7        MR. VEEDER:  I am going to from here on.

8        THE COURT:  Go ahead.

9    BY MR. KRIEGER:

10       Q   What is the answer?

11       A   I took the Wildomar fault from Exhibit 15 and the

12   Elsinore fault, I believe, was from Exhibit 17.

13       Q   And you transposed that on to the Exhibit A; is that

14   right?

15       A   That is right.

16       Q   Is that the same thing you did with the lines shown

17   in the Pauba Valley?

18       A   Yes, sir.

19       Q   They were transposed from one of these two exhibits

20   to which you have referred?

21       A   Yes, sir; Exhibit 17.

22       THE COURT:  They are basin lines.

23       MR. KRIEGER:  Basin lines.

24       THE COURT:  The Government's proposed Pauba Basin.

25       MR. KRIEGER:  Yes.

2470

z49

1    MR. VEEDER:  Your Honor, I must object to your Honor's

2 statement in that regard.  We are saying that where those

3 lines are located along the Pauba Valley that there is a

4 basin delineated there.  We believe that the whole area is

5 a basin, actually.

6    THE COURT:  Your exhibit showed units, and then you had

7 Unit 4, which overlapped the other units.

8    MR. VEEDER:  That is correct.

9    THE COURT:  I understand your position.

10    MR. KRIEGER:  Actually, that portion has no significance

11 in this exhibit, just to indicate that it was transposed.

12    THE COURT:  You took the Kunkel line as the outline of

13 the Government's ground water basin 4?

14    MR. KRIEGER:  Is that right?

15    THE WITNESS:  Yes; from Exhibit 15.

16 BY MR. KRIEGER:

17    Q  Mr. Webb, did you use the State method in Bulletin

18 57 of identifying those wells by number?

19    MR. VEEDER:  Your Honor, I object from her on.  I

20 object to the question as being entirely leading.

21    THE COURT:  Overruled.

22    THE WITNESS:  Yes, I used the State's well numbering

23 system, and I used the State number where one existed.  Where

24 one did not exist, I assigned a number in accordance with their

25 well numbering system.

Z50

BY MR. KRIEGER:

Q   Now, Mr. Webb, how much water is being produced from all of the wells shown on Exhibit A northeast of the Wildomar fault and excluding those wells in Sections 25, 26, 27 and 35, in Township 7 South, 3 West?

MR. VEEDER:  I object to that question as being too vague and general and rambling.  As of what time were these wells producing?

MR. KRIEGER:  From the day which appears on the exhibit itself.

THE COURT:  Wait just a minute.

Mr. Veeder's objection is good as to whether this is a test made as of wintertime when there may be more water available or in the summertime.  Secondly, you say "is" being produced.  You mean what the capacity of these wells would be if they were pumped 24 hours a day continuously?

MR. KRIEGER:  May I rephrase the question, your Honor?

THE COURT:  Yes.

BY MR. KRIEGER:

Q   How much water, Mr. Webb, can be produced by all of the wells shown on Exhibit A based upon the productivity of those wells shown on the exhibit in the lower left-hand corner--

MR. VEEDER:  I object--

MR. KRIEGER:  I haven't finished yet.

Z51

THE COURT:  Let him finish.

MR. VEEDER:  Go ahead.

BY MR. KRIEGER:

Q  --exclusive of the--

Well, I have to go back.  I am sorry.

THE COURT:  What area?

MR. KRIEGER:  Well, the area is all of those wells shown on this map, which is northeast of the fault line, your Honor.

THE COURT:  Northeast of the fault line?

MR. KRIEGER:  Northeast of the fault line and excluding those wells in Sections--

THE COURT:  Northeast of the Wildomar fault?

MR. KRIEGER:  That is correct, and excluding the wells in Sections 25, 26, 27 and 35, 7 South, 3 West.

MR. VEEDER:  I have interposed an objection to that, your Honor.

THE COURT:  Wait a minute.  Excluding Sections 25, 26, 27 and 35?

MR. KRIEGER:  That is right.

THE COURT:  Have you finished your question yet?

MR. KRIEGER:  Well, now that we have the area delineated and the wells we are talking about, the question is this:

Q  How much water will all those wells produce, based upon the information shown in the lower left-hand part of

Exhibit A?

MR. VEEDER:  Your Honor, I renew my objection.  Certainly there is insufficient data in the question.  It calls for a conclusion in regard to a matter that, in my view, is not subject to determination by this witness.  Certainly it is very clear that there are innumerable factors that are involved in the problem that has been asked.

THE COURT:  Do I undrstand your question to be that if the wells shown in the area you have just marked were pumped continuously on a 24-hour basis?

MR. KRIEGER:  Your Honor, it is in terms of gallons per minute.  I am drawing right out of the schedule that is on the map.  You take all the productivity of all the wells.

THE COURT:  I mean, if they are all produced on a 24-hour-around-the-clock basis?

MR. KRIEGER:  We are getting into a difference of whether we are talking about quantity or rate of flow.  I am only talking about rate of flow, gallons per minute  I am not talking about any particular 24-hour period of time

THE COURT:  If you are not talking about that, what good is it going to do me?  Suppose you had a series of wells and you could pump a thousand gallons a minute out of them, but you could do that for only about 30 minutes.

MR. KRIEGER:  The significance is that these wells, under the conditions set forth on the schedule, will produce

Z53

1   so much water.  If we reduce the gallons per minute to an inch

2   measure, we are going to be able to tell something about the

3   entire productivity of this area, and that is what I am driving

4   at.

5          THE COURT:  I think we are talking about the same thing.

6   But why aren't you willing to limit your question to pro-

7   ductivity as to production of all the wells in the area you

8   have outlined on an around-the-clock basis?

9          MR. KRIEGER:  All right, put it on the around-the-clock

10  basis.  It is all right with me.  I was trying to derive it

11  directly out of gallons per minute.

12         THE COURT:  Well, put it on gallons per minute, but

13  considering that the wells are being pumped not for 30 minutes

14  or 10 minutes but for 24 hours.

15         MR. VEEDER:  Your Honor, I am going to ask that the

16  question be rephrased, then.

17         MR. KRIEGER:  Let me rephrase the question.

18         Q Without repeating the definition of the area we are

19  talking about, Mr. Webb, if all of the wells that we have

20  defined were pumped continuously for 24 hours, how much water

21  would they produce?

22         MR. VEEDER:  I object to that completely and entirely.

23  There is no basis for him to make such a conclusion whatever.

24  He hasn't tested these wells for 24 hours, to begin with.

25  He hasn't the slightest conception whether the pumps would

Z54

1     stand up for 24 hours.

2         In addition, I object on the grounds that it is in-

3     competent, irrelevant and immaterial and not tending to prove

4     a single issue in this case.  This is a lawsuit to try out

5     the title to the rights to the use of water.  It is not to see

6     whether a man has a good or a bad well or pump, or whether

7     he has the money to run his pump for 24 hours.

8         MR. KRIEGER:  You can't adjudicate water when it is not

9     there.

10        THE COURT:  The objection is overruled.  The evidence

11    has shown that these wells have been tested on a basis of

12    continuous pumping in order to get this gallons per minute

13    shown on the chart.

14        MR. VEEDER:  May I ask a few questions, then, on voir

15    dire?  I want to know exactly what wells, the exact name of

16    the wells to which he is going to refer when he makes response

17    to this question.

18        THE COURT:  I think it is pretty clear that it is in the

19    area that has been accepted.  But you may inquire on voir

20    dire.

21

22                     VOIR DIRE EXAMINATION

23    BY MR. VEEDER:

24        Q   Will you state the wells to which you have reference

25    when you undertake to respond to the question presented to


---

you?

A Individually, sir?

Q Yes, the numbers.

9477

A5

1    A  7 Southwest 1A2, 7 South 3 West 6 D1, 7 South 3 West

2    16K1, 7 South 3 West 15 Q2, 7 South 3 West 23A1, 7 South 3 West

3    23A2, 7 South 3 West 24 A1, 7 South 3 West 19C1, 7 South 3 West

4    19C2, 7 South 2 West 8H1.  May I step down?

5    THE COURT:  Yes.

6    THE WITNESS:  (Stepping down to the map.) 7 South 3 West

7    24A2.

8    THE COURT:  Have you finished?

9    THE WITNESS:  Yes sir.

10    THE COURT:  Are you including this well up in Section

11    8, H1?

12    THE WITNESS:  I included that, sir.

13    THE COURT:  You included all of the wells except those

14    in Sections 25, 26, 27 and 35?

15    THE WITNESS:  No, sir.  I think I should explain that I

16    have omitted two wells; one of them is the Murrieta Hot Springs

17    well, and one of them is the Yoder Hot well.

18    MR. SACHSE:  What are the numbers of those?

19    BY MR. KRIEGER:

20    Q  Let us define those, Mr. Webb.  The Murrieta Hot

21    Springs Well is 14J1; is that it?

22    A  That is correct.

23    MR. KRIEGER:  All of these are in 7 South 3 West, Your

24    Honor.

25    Q  And the Yoder well is what?

A

6

A6

1          A  It is the most southerly of the two wells in Section

2     16.

3          MR. SACHSE:  15, is it not?

4          THE WITNESS:  15.

5          MR. KRIEGER:  That is 15Q3; is that right?

6          THE WITNESS:  That is correct.

7          MR. VEEDER:  That is 7-3-15Q3?

8          MR. KRIEGER:  That is right.

9          THE COURT:  Why did you exclude Q3 and include Q2?

10         THE WITNESS:  They seem to be an entirely different

11    quality of water, according to my understanding.  They are a

12    hot mineral water, and it didn't seem to me that they should

13    be included.  They appeared to be not clearly adaptable to

14    irrigation, and I felt that they should be omitted from the

15    other water.

16         THE COURT:  All right.

17    BY MR. KRIEGER:

18         Q  What is your answer, Mr. Webb, to the question, what

19    is the total production of the wells that we are talking about?

20         A  Those wells will produce 1899 gallons per minute

21    based upon the tests run by Mr. Mims, which is the equivalent

22    of 210 miner's inches.

23         Q  In your opinion, can any more water be produced from

24    those wells safely?

25         MR. VEEDER:  I object, Your Honor.  There is nothing

A7

1   to show a proper foundation for such question--whether more

2   water can be produced from these wells.  There are a great

3   many factors that could be involved in these matters.

4       THE COURT:  That is a conclusion the Court might draw

5   from other testimony, such as Mr. Lynch's, but I don't think

6   this witness has shown that he has himself made a pumping test

7   and can draw that conclusion.

8       MR. KRIEGER:  Very well.  It's not important.

9       THE COURT:  Sustained.

10  BY MR. KRIEGER:

11      Q  Now, do you know how much land could be irrigated

12  with 210 inches water if that land were planted to alfalfa or

13  permanent paster?

14      MR. VEEDER:  I object, Your Honor; there is no foundation.

15      THE COURT:  What difference does it make, Mr. Krieger?

16  Suppose there is only 210 inches, but suppose it comes from a

17  basin.  It might be a big amount of water, but if it is used

18  by an overlying owner then his right is correlative.  The law

19  doesn't say that you have to have a certain quantum of water

20  before there attaches to it the characteristics of riparian

21  water or water subject to the rights of overlying owners.  The

22  amount doesn't make any difference.

23      MR. KRIEGER:  The difference is this, Your Honor, in my

24  opinion:  That measured by that rule every square inch of water-

25  shed theoretically is riparian to the stream.  But based upon

1    the rule that only that ground water which materially effects

2    the stream is part of the stream system, and if it doesn't

3    materially effect the stream it should be excluded, we rest

4    on the presumption that this is local, vagrant, percolating

5    ground water.

6         THE COURT:  I am going to let him answer the question.

7    But let's take a simple example.  Suppose there is a little

8    brook a couple of feet wide that carries a little bit of water.

9    It doesn't even carry a miner's inch.  It runs down into the

10   Santa Margarita.  Have you any doubt but that that is part of

11   the stream?  Have you any doubt that the people who are ripar-

12   ian to that brook are riparian owners and that their rights

13   are correlative?

14        MR. KRIEGER:  No Your Honor.

15        THE COURT:  By the same token, have you any doubt that

16   nobody would ever claim that the uses made by the owner of that

17   brook in any way violated anybody else's correlative rights

18   downstream?  I don't know what you are getting at.  I'll let

19   him answer the question.

20        MR. VEEDER:  I renew the objection, Your Honor.  There

21   are a great many factors that will enter into it.  You might

22   have one cutting and pasture the alfalfa after that.  There are

23   so factors that go into the maximum quantity of water that can

24   be applied to a field of alfalfa, particularly in the long-

25   growing season that you have here.  More than that, he hasn't

A9

1    shown that he is a farmer and knows anything about it.

2         THE COURT:  The latter part is true.  But as to the

3    other objection, the Government is proceeding on the basis that

4    there certain fixed acre-feet per year.

5         MR. VEEDER:  If he wants to say 4.2, it suits me.

6         MR. KRIEGER:  That is all right, except that I am not--

7         THE COURT:  Everybody seems to be accepting these figures

8    as to different types of crops.  Have you any objection to the

9    general figures that have been used?

10        MR. KRIEGER:  No, Your Honor.  I would be glad to inject

11   the figure 4.2 into my question.

12        But may I respond to Your Honor's comment a minute ago,

13   because I want to make it very clear to show that it is material.

14   This whole area we are talking about here has in it approxi-

15   mately 7000 acres of land and we have 210 inches of water that

16   is being produced in this area.  With everything going at once

17   and going 24 hours a day, 210 inches of water isn't going to

18   irrigate very much land and it is our position that ground

19   water taken in such negligible amounts should not be included

20   in a definition of the stream system because it doesn't con-

21   tribute, and the penalty of including these people far outweighs

22   any benefit to Camp Pendleton by having the few drops of water

23   that might otherwise get down there.

24        THE COURT:  Let me comment, without deciding this matter,

25   to show how wrong I think you are.  There is testimony here that

1    these well companies are continually drilling wells.  There

2    are all sorts of areas up here where wells have not been

3    drilled.  So based upon the testimony you have given me and

4    the argument, I decide that because there is only 200 inches

5    produced this is de minimus and therefore doesn't affect the

6    stream.  Then in the course of ten years there are a hundred

7    wells drilled in the Murrieta Basin and various places and

8    instead of 200 inches there is 2000 inches taken out of the

9    basin.  Do you see what I am getting at?  The question is

10   really not how much water is now being produced .  The question

11   is, is the water being produced part of a basin or part of a

12   stream system?  I don't think you are going to prove that by

13   this type of testimony.  It may have some bearing.

14          Take another example.  Suppose you had an area which

15   everybody else, we will say, conceded lays  over a basin and

16   the testimony showed that there was just one windmill well on

17   that basin and the windmill well was pumping just enough to

18   keep a water trough full of water.  Do you think that you could

19   come in and say that because there was just the windmill well

20   being pumped out of this basin and the pumping was infinitesimal,

21   that therefore the Court should find that this was not a basin

22   and did not affect the stream.?  I am giving you an assumption

23   that everybody else knows this windmill well is over a basin.

24          So it is not a question of what is being pumped.  It

25   is a question of what water is there.

All

1          Now, as far as these people that you represent are

2   concerned, so that they will not have any great concern, how

3   they can be hurt when they are pumping only this amount of water,

4   if they are found to have a correlative right, I can't possibly

5   conceive.  If that bunch of farmers, with the wells that you have

6   listed, are producing only 210 miner's inches, with the acreage

7   that must be involved, I can't conceive how that wouldn't be a

8   reasonable correlative right.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

256                                                                        9484

1        No matter what the claims other riparians would make,

2   if we find it is a basin, they have a right to their

3   correlative use out of this water system.  So your clients

4   won't get unnecessarily stirred up about it here, this seems

5   to me rather an academic problem.  I haven't yet been able to

6   determine how these people are hurt, when they are pumping

7   these minor amounts of water, if they are found to lie over a

8   basin or to be outside a basin.

9        MR. KRIEGER:  I think the answer to your statement is

10  this:  If you take all of that area that is on Exhibit A and

11  you cloud that title by making those lands forever subject

12  to the continuing jurisdiction of this Court, regardless

13  whether a person pumps one inch or pumps a hundred inches of

14  water, we know that not one of these people is going to

15  develop any water on his land and is not going to do it for

16  the simple reason that if the United States down below, with

17  its means of doing it, comes into court one day next year

18  and files an affidavit and says that Mr. Smith and Mr. Jones

19  and so on are taking more water than they are entitled to,

20  you and I know what will happen.  Those people will close

21  up their wells and quit.  They cannot afford to have this

22  cloud hung over their title on the assumption, which I

23  think your Honor made, that nobody will ever raise the

24  question whether they are taking more water than they are

25  entitled to.  And you take the Vail Ranch alone, you just

9485

Z57

1  take Dr. Coit's testimony of the number of irrigable acres

2  included in his study.  If those acres are ever put into

3  cultivation, the quantity of water that he is going to draw

4  from this stream will be so great that Mr. Veeder will be the

5  first one to be up here challenging the right of everybody to

6  take the amount of water, not which he might take, but which

7  he is presently taking, and they are just going to be out of

8  business.

9      THE COURT:  You have mixed the various matters in this

10  discussion.

11      Take the Vail estate.  Of course, there is a decree in

12  effect.  But apart from that decree, I haven't any doubt but

13  that the potential rights of Vail upstream are just as great

14  as the rights of the Government downstream.  So you have a

15  decree of course which presently fixes the correlative rights

16  between Vail and the United States.

17      But you mentioned clouding your title.  You sound as

18  if I am doing some dastardly thing if I find that a certain

19  man has a well that overlies a basin.  My job is to find the

20  facts.  I am not saying how I am going to find them.  If as a

21  result of what I find a man's title is in some way affected,

22  I didn't do it.  It was done when the land was created and the

23  water was put there.

24      I am going to do this-- I have told counsel beforehand--

25  that where I am on the fence as between whether the water is

Z58

1    ground water or part of the stream, I am going to be pushed

2    over easily that it is ground water, percolating vagrant

3    water, and not part of the stream.  But where the fact shows

4    that it is part of the stream, I am going to so find.  In

5    other words, I am going to give the benefit of the doubt to

6    the small land owner where I am in doubt. But I am not going

7    to be influenced by any suggestion of counsel that I am

8    clouding people's title or that I am doing some great injury

9    to them.  I am going to find the facts as they come along.

10   I am not going to decide it on the basis of how much present

11   use is going on.  Present use is only one factor.  What is the

12   potential?  What are the characteristics underground?  Is

13   there a basin, or isn't there?  If there is a basin, how far

14   does it go?

15        MR. KRIEGER:  Let me respond to that, your Honor, because

16   that is the first point you made when we started this discussion.

17   You said you are not concerned with this present pumping.

18   You are looking ahead to what might be done.

19        THE COURT:  I am interested in the present facts, but

20   that is not the sole criterion.

21        MR. KRIEGER:  What I am trying to show you, your Honor--

22   and I am delighted to have this opportunity to say it-- I

23   am trying to show you through this testimony that this whole

24   land we are talking about isn't worth anything waterwise,

25   not only on its present use but on future use.  Future use

1   becomes ridiculous because these wells are so bad that not

2   only are they not productive and capable of doing any irriga-

3   tion job, but more than ever would another well ever be put

4   down there to do that job.  It is for that reason that we are

5   trying to exclude these lands, leaving in the Santa Gertrudis

6   area, which we think does contribute.

7       THE COURT:  Your question included the Gwynn well in

8   Section 20, L2, pumping 1660 gallons per minute, and lying

9   right in the bottom of the Murrieta Valley.

10      MR. KRIEGER:  No, it didn't, your Honor.

11      MR. SACHSE:  No, your Honor.

12      THE COURT:  All right.  As I followed you, you said

13  exclude the wells in Sections 25, 26, 27 and 35, and exclude

14  the Murrieta hot well and the Yoder hot well.

15      MR. KRIEGER:  And northeast of the Wildomar fault line.

16  That is extremely important.  We are not trying to get that

17  Murrieta Valley out of there.

18      THE COURT:  All right.

19      MR. KRIEGER:  And even so, your Honor, we have demon-

20  strated that the production of those wells in Murrieta Valley

21  is just as ununiform as they can be.  But we are not making

22  that argument.  We are only talking about that which lies

23  northeast.

24      So the whole purpose of this examination is to demonstrate

25  that those wells, with all the water they produce, aren't

9488

Z60

1   going to irrigate any appreciable amount of acreage, and hence

2   it follows that if you can't even do the job you are trying

3   to do with the present water supply you have you are not

4   concerned with the future water supply.  That is the focus of

5   our testimony.

6       MR. VEEDER:  I think your Honor touched the very heart

7   of the issue when you said, "Well, so what? You have so many

8   wells.  What about next year?"

9       But in addition, the simple answer to Mr. Krieger's

10  argument is to disclaim any right, title or interest in and

11  to the rights to the use of water of the Santa Margarita

12  River, and that would be the end of the matter for him.

13      THE COURT:  Now wait, Mr. Veeder.

14      MR. VEEDER:  It would be very simple.

15      THE COURT:  Wait, Mr. Veeder.  Let's find out if you

16  are making a proposal or not.

17      MR. SACHSE:  If that is an offer, I want to get in on it.

18      THE COURT:  Is there a reciprocal part of this that the

19  United States will also disclaim any right to water on these

20  lands?

21      MR. VEEDER:  These people say that we have no interest--

22      MR. KRIEGER:  He is not answering your question, your

23  Honor.

24      THE COURT:  He may.  Let's wait and see.

25      MR. VEEDER:  You say that they have no right, title,

1    claim or interest in the Santa Margarita River or its

2    tributaries.  Then so far as we are concerned they are out

3    of the litigation, and if your Honor determines that those

4    rights are percolating waters and not part of the river, I

5    think you should have a finding on it.  Then we say the

6    United States is certainly not interested in that water.

7        MR. SACHSE:  If we say that we have no claim in the

8    river, will you stipulate that they are percolating waters?

9    It is that simple.

10        MR. KRIEGER:  If you do, we are through.

11        MR. SACHSE:  Then we are through.

12        MR. KRIEGER:  And we can get out of here.

13        THE COURT:  Go ahead, Mr. Veeder.

14        MR. VEEDER:  I have said that I thought that the Court

15    would make a finding that they are percolating, so that they

16    will be res adjudicata and they would be out.  If they did use

17    any water that influenced the Santa Margarita River, we would

18    enjoin them.

19        THE COURT:  What is your last statement?

20        MR. VEEDER:  I say that if you make the finding that

21    those waters are percolating and local and are not part of the

22    Santa Margarita River, and then a well goes in and it does

23    influence the Santa Margarita River, they are enjoined from

24    using that well.  Now that is essential.  But I think it

25    necessarily follows when they sign a disclaimer.  I think it

1   very important right now, because Mr. Krieger has come in for

2   his clients and delineated-- and that is why I wanted to be

3   sure I got the wells listed-- and on their behalf he is saying

4   that they have no claim in the Santa Margarita River system.

5   If that's the case, then there is no issue between the United

6   States and those people.

7        THE COURT:  Mr. Veeder, let us understand each other.

8   I agreed, first of all, that the matter should be based

9   upon a finding and not upon a stipulation of the parties

10  who were here, because there were many other parties who were

11  not here, and in this case everybody is adverse to everyone

12  else.

13       But if a particular defendant in this area we are now

14  talking about should disclaim any interest in the river

15  system, and if the United States agreed that the water on that

16  man's land was vagrant, percolating water, and if I had some

17  evidence where I could make a finding to that effect, then I

18  would make a decree, as we are going to do in the Sachse

19  parcels, to the effect that these people have disclaimed any

20  right to the river system, and conversely, that the United

21  States has no rights against their land or the water developed

22  thereon and that any water now or hereafter found on that

23  land is vagrant, percolating water.  I don't think we have

24  a loose end where you say that the present wells they have are

25  all right, but that if another well is produced which does

1    affect the stream, then you would want to bring them in.

2    Maybe some of them would want to stand still for that.   I

3    don't know.

4         MR. SACHSE:  Not my clients.

5         MR. KRIEGER:  No, your Honor.

6         THE COURT:  That is what you said.

7         MR. VEEDER:  Well, I mean precisely that, your Honor,

8    and it is the thing that has concerned me, and this Kunkel

9    line is extremely important to us, and I am glad to have this

10   matter up now.

11        We will go back to our old friend up here at 6K1.  They

12   say there is no water there that has any relationship to the

13   Santa Margarita River system.  I would say if they disclaim--

14   depending somewhat upon Mr. Kunkel-- and they say it is

15   percolating water, we would say, "Fine, you are out of the

16   lawsuit.  There is no issue."

17        But suppose that he put in a well down here and the well

18   was of such character that it was reflected in the Santa

19   Margarita River system when that pump was run, then I would

20   say that that well would be tapping the aquifer which

21   contributed to the Santa Margarita River and would be enjoined

22   and should be enjoined.

23        THE COURT:  You couldn't enjoin it completely.  You

24   would still have a right.

25        MR. VEEDER:  You would have a correlative share.

Z64

THE COURT:  It is pretty hard for me to see if a man has 160 acres and has enough water to irrigate 160 acres that you could enjoin him from doing it.

MR. VEEDER:  I should say that his rights would be part of the system.

MR. KRIEGER:  Unless he was using more than his share.

MR. VEEDER:  That is right.

THE COURT:  I ask you gentlemen during the recess to explore this very problem.  I asked Mr. Krieger to get this map up.  I pointed out that a large portion of Basine No. 4 concerned only the Vails, and  I pointed out that there was a relatively small area up here, and I asked you to explore this thing before we ever came back after the last recess.  Apparently you haven't done it.  It looks to me like there might be some possibility of a disposition here.

MR. KRIEGER:  Your Honor, we always get to this same stop sign, we drive up to this point and we all stop here together and we don't know where to go, because Mr. Veeder makes this offer of disclaimer, and that is very good and we buy that.

But then when you turn around and put the shoe on the other foot and say, "Will you disclaim any of the ground waters in our area," he says, "No," or "Yes, we will do it if the Court makes a finding," but the finding is then subject to being abused later on by pumping.

Z65

THE COURT:  Now, wait.  That restriction was not put in the other cases we have considered so far.

MR. KRIEGER:  It was not, and if we can make the thing stick here, that is fine.

THE COURT:  It may be done in some cases, and it may not be done in others.  It seems to me this is a matter to explore. In other words, certain of these wells that the Government has may be sufficient to indicate that they are entirely satisfied that the water is ground water and that no well would ever be sunk there which would have an effect.  There may be others where they are not going to go that far.  It may not be possible to lump them all in one group.

MR. KRIEGER:  It seems to me that if it could be done through such studies as the one we are trying to make here, your Honor, it gives the Court some evidentiary basis for making a finding that cannot be disturbed.  If you start to select wells out of the picture, then we get into trouble.

THE COURT:  Well, I am going along with you so far.  I told you I was going to let this last question be answered, although I thought you were off on the wrong track and I was trying to straighten you out on it.

MR. KRIEGER:  I hope you see I am on the right track or see where I am trying to go, your Honor.

THE COURT:  I still say that the fact that 200 inches is being produced from this area does not mean that a thousand

Z66

1    inches might not be produced tomorrow, if wells were dug, on

2    the evidence so far.

3         MR. KRIEGER:  Then we will produce this line of evidence

4    this afternoon and try to show your Honor that you can't get

5    any additional amounts of water out of this territory.

6         THE COURT:  I think you ought to talk to Mr. Veeder and

7    Mr. Kunkel as to whether there are certain of these people

8    that the Government would be willing to have the reciprocal

9    findings that are being made in the case of some of Mr.

10   Sachse's parcels, and as to those people out they go right

11   now.  You can put on some evidence so that I can make a find-

12   ing, and if we find that their water is vagrant, percolating

13   water, anything that they get there is theirs and they are

14   lucky to have it.  And you in turn disclaim that you have

15   any interest in the river or any part of the system, and the

16   Court then finds that your water is vagrant and percolating,

17   it quiets your title against the claims of the United States,

18   and quiets the United States's title against the other claims.

19   However, you can't treat all your clients alike.  You can't

20   say, "Give us this deal for everybody we represent."

21        MR. KRIEGER:  We are not trying to, your Honor.  We have

22   already admitted that Santa Gertrudis is in.

23        THE COURT:  All right.  Now there may be particular

24   owners who should go out of the case, and I think you and

25   Mr. Veeder should have lunch together today with Mr. Kunkel

z67

1    and discuss this.

2           MR. KRIEGER:  I would be delighted, Bill.

3           MR. VEEDER:  I would be honored, sir.

4           THE COURT:  All right, adjourn until 2 o'clock.

5           (Noon recess.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    SAN DIEGO, CALIFORNIA, WEDNESDAY, APRIL 1, 1959.  2:00 P.M.

2

3        MR. KRIEGER:  Your Honor, we had an interesting lunch.

4    We were surrounded by all the experts that have been in this

5    court on this subject, and I think we have come into an area

6    of agreement at least to the point where Mr. Veeder and I

7    feel that we can either this afternoon or this evening and

8    by tomorrow morning possibly have something that we can at

9    least show to the Court in a tentative draft to represent our

10   mutual feelings toward certain parcels of land.  This is

11   only addressed to the area we have been discussing today.

12       Is that right?

13       MR. VEEDER:  That is right; findings of fact and

14   conclusions of law along the line of what we have talked to

15   Mr. Sachse and your Honor.

16       THE COURT:  Good.

17       MR. SACHSE:  And on the ones that have been heretofore

18   submitted on my 41, I am to redraft them, this in the actual

19   parties involved, and Mr. Veeder is to check the actual names,

20   and by the time you are back in May, your Honor, we hope to

21   have a draft down to such matters as what type of notice

22   should be given to other defendants.

23       THE COURT: Good.  This is what I anticipated you

24   gentlemen could do when you got your map prepared, but you

25   didn't follow my instruction and get together and talk about

1  it.  So I had to bump your heads together here in the court-

2  room.

3      MR. KRIEGER:  Thank you.

4      I had a question pending before the Court, which I

5  will withdraw, having to do with the number of acres that can

6  be irrigated, because once you introduce the figure 4.2 you

7  can make the mathematical computation yourself.  I don't think

8  Mr. Webb has to do it as an expert.

9      THE COURT:  You are willing to accept the figure 4.2

10  for-- what is it, alfalfa?

11      MR. KRIEGER:  Yes.

12      THE COURT:  The various acre-footage as shown by --

13  what is the source of these figures?

14      MR. VEEDER:  Our data we have been using is from Col.

15  Bowen, and he worked that out on the basis of soil conserva-

16  tion.

17      THE COURT:  It is spread all over the record.  We have

18  it already in here.

19      MR. KRIEGER:  Yes.

20      MR. VEEDER:  I think it is our Special Master's Exhibit

21  89.

22      THE COURT:  A different figure for permanent pasture,

23  a different figure for citrus, a different figure for

24  avocados, a different figure for alfalfa, et cetera.

25      MR. KRIEGER:  Inasmuch as it is only a mathematical

Z70

1    computation to go back from gallons per minute to how many

2    acres can be supported, we will withdraw the question, your

3    Honor.

4          THE COURT:  All right.

5    BY MR. KRIEGER:

6          Q  Now, Mr. Webb, what effect on the Santa Margarita

7    River system will pumping in the following described area

8    have:  North and east of the Wildomar fault, north and east

9    of the Vail Ranch, and up to and including the Kunkel line

10    and those wells spotted on the map to the north of the Kunkel

11    line, with the exception of the Yoder and Murrieta wells,

12    which you have talked about, and also excepting Sections 25,

13    26, 27 and 35, 7 South, 3 West?

14          MR. VEEDER:  I have an objection on that that there is

15    no proper foundation, your Honor.  There are a tremendous

16    number of questions that are involved in there:  Permeability,

17    transmissibility, innumerable other points involving the

18    geology of the area, the receptive character of the soils

19    underlying the streams, in fact, precipitation in the area

20    itself during a given year or a series of years, all have

21    effect and certainly there is no data in the record upon

22    which this witness could testify, and my own view is that he

23    is not qualified to make response to the question.

24          THE COURT:  Overruled.  This matter goes to the weight

25    of the testimony.

Z71

1          But I want to find out again what this area is.  You

2     are excepting Sections 25, 26, 27 and 35 down at the joinder

3     of the Santa Gertrudis with the Murrieta?

4          MR. KRIEGER:  That is correct, your Honor.

5          THE COURT:  You are excepting the area you have

6     previously inquired about lying east of the Wildomar fault?

7          MR. KRIEGER:  That is right.

8          THE COURT:  And north and west of this Santa Gertrudis

9     area?

10         MR. KRIEGER:  That is correct.  Generally speaking, it

11    is to the north of the Wildomar fault, to the west of the Vail

12    property, excluding the Santa Gertrudis Basin, if it is a

13    basin, and coming out to the Kunkel line and beyond the

14    Kunkel line to the north and east.  That is the area we are

15    talking about.

16         MR. SACHSE:  And then on to the watershed; is that it?

17         MR. VEEDER: Does that include the wells that you listed

18    in your previous testimony, Mr. Webb?

19         THE WITNESS:  Yes, sir.

20         MR. VEEDER:  And no other wells?

21         THE WITNESS:  No other wells.

22         THE COURT:  Well, now, wait.

23         MR. KRIEGER:  It is not a question of wells.

24         THE COURT:  It doesn't include wells that he previously

25    listed.  The wells he previously listed were in this first

9500

Z72

1    area that we described?

2         Are you including that area within this question?

3         MR. KRIEGER:  Let's see where the confusion is, your

4    Honor.  Shall I try to delineate the area again on the map

5    that we are talking about?

6         MR. VEEDER:  Why don't you call it by sections?  That

7    will be simpler for everybody.

8         THE COURT:  No, wait a minute.  Let me get this straight.

9    You described an area earlier which the witness testified

10   produced 1899 gallons per minute.

11        MR. KRIEGER:  Yes.

12        THE COURT:  And that area lay up east of the Wildomar

13   fault and it lay north of the Santa Gertrudis area, which is

14   Sections 25, 26, 27 and 35, and it excluded the two Yoder

15   wells.

16        MR. KRIEGER:  Yes.

17        THE COURT:  Now, I didn't think it went any further

18   south--

19        MR. KRIEGER:  Well, you have just described it in such a

20   way that makes any reference to the west line of the Vail

21   Ranch unimportant, and it is perfectly satisfactory.

22        THE COURT:  This area you are now describing includes

23   the area you previously described--

24        MR. KRIEGER:  Yes.

25        THE COURT:  Plus the area down through the Vail Ranch.

273

1   What is the difference between this area that you described and

2   the area you described the first time?

3       MR. KRIEGER:  The only difference, if it is a difference--

4   I don't recall-- is that I am using the west line of the

5   Vail Ranch as my point on the south and the east of the

6   property we are discussing.

7       THE COURT:  I will say it again.  The area you now

8   describe includes the area you previously described.

9       MR. KRIEGER:  Yes.

10      THE COURT:  Plus that it goes down to the Vail Ranch.

11      MR. KRIEGER:  That is right.

12      THE COURT:  All right, I understand.

13      MR. KRIEGER:  And I am not talking about particular

14  wells here.  I am talking about pumping that area.

15      THE COURT:  All right.

16      MR. VEEDER:  Your Honor, I make the additional objection

17  that there is no evidence upon which this conclusion can be

18  predicated.  Certainly you can't look at the surface of the

19  land and come up with such a conclusion.

20      THE COURT:  Overruled.  The witness has done more than

21  look at the surface of the land.  He is familiar with the

22  wells, he is familiar with their capacity, he has made studies

23  of basins, and I take it-- I don't know whether the question

24  was ever asked him.

25      Did you make a study of this area to determine whether

274

1    or not there was a basin?

2         THE WITNESS:  Yes, sir, I did.

3    BY MR. KRIEGER:

4         Q  What is your answer to the question, Mr. Webb?

5         A  Well, I do not believe that pumping from the area

6    that you have described--

7         MR. VEEDER:  Now this is not in response to the question

8    that you asked.

9         MR. KRIEGER:  This is in response to the question which

10   I asked.

11        THE COURT:  The question was, what effect would it have

12   on the flow of the Santa Margarita River.

13        MR. KRIEGER:  Precisely.

14        MR. VEEDER:  There are two questions pending.  One was

15   asked if there was a basin--

16        MR. KRIEGER:  Oh, no.

17        MR. VEEDER:  All right, go ahead.  If he is answering

18   the question to which I have both my objections, let him go.

19        THE COURT:  Restate your question now so that there will

20   be no confusion.  You don't need to redescribe the area.

21   That is clear.  What is your question about the area?

22   BY MR. KRIEGER:

23        Q  What effect on the Santa Margarita stream system will

24   pumping in the area described heretofore have?

25        A  It is my opinion that pumping in the area you have

Z75

1    described would have a very negligible effect upon the stream

2    system of the Santa Margarita River.

3    Q   Why?

4    A   In the first place, a study of the capacities of the

5    wells in the area has shown that they have such a very low

6    specific capacity that it shows a very tight material and

7    it is very difficult  to get water out.  It doesn't act to

8    me at all like a basin.  It doesn't seem to function, so far

9    as I can tell, as a basin.

10    Then you have the additional dry holes that have been

11    drilled in the area that are entirely unproductive.  And it

12    is my belief that with material as tight as that, that it

13    would be extremely difficult to recharge it.  So that I don't

14    think that pumping in the area would have any material effect

15    upon the stream.

16    Q   What effect on the Santa Margarita stream system

17    would pumping have in the Santa Gertrudis area, and more

18.    particularly Sections 25, 26, 27 and 35 in 7 South, 3West?

19    A   Well, now, in the area that you just described as

20    the so-called Santa Gertrudis area, to me that acts very much

21    like a basin.  I do not believe that pumping in the area,

22    the pumping that has been done in the area, has had any

23    particular effect upon the stream system.  But it is conceivable

24    that pumping in the future in that area might at some future

25    time have some effect upon the stream system.

1　　　　Q  Mr. Webb, I am going to show you a group of papers

2　with a covering sheet entitled "Logs and other available data

3　on wells appearing on Roripaugh, et al., Exhibit A," and ask

4　you if this material includes the data which you studied in

5　connection with making Exhibit A and your testimony in connec-

6　tion with it?

7　　　　A  Yes, sir, it does.

8　　　　THE COURT:  Do you want to give this an exhibit number?

9　　　　MR. KRIEGER:  No, your Honor.

10　　　　THE COURT:  Why not?

11　　　　MR. KRIEGER:  Because as I said earlier, this is the

12　one that has all of the data that is objectionable as hearsay,

13　your Honor, and if the Court wants to accept it, it is fine.

14　But it is nothing that we can introduce as primary evidence.

15　　　　THE COURT:  You mean these are the well logs?

16　　　　MR. KRIEGER:  Some of them are the well logs, some of

17　them come from owners, some of them from the State.  They are

18　not primary evidence.  Let me show them to you.

19　　　　MR. VEEDER:  We might review them.  They might be ad-

20　missible.

21　　　　THE COURT:  There is no reason why you can't give a

22　document a number for identification.

23　　　　MR. KRIEGER:  Oh, I beg your pardon.

24　　　　THE COURT:  That is what I was starting to do.  Now in

25　the course of this trial so far we have had a number of well

Z77

1    logs, and my recollection is that they have all been put into

2    evidence. We realize that many of them are technically

3    objectionable in that it would be very difficult to lay a

4    foundation, but they are the materials with which geologists,

5    hydrologists and engineers have to work, and as I understand

6    to date there has been no objection even by the Government to

7    the use of such material in evidence.  We have used it largely

8    as supporting data to support conclusions of witnesses in

9    other studies.

10           MR. VEEDER:  In regard to well logs.

11           THE COURT:  Yes.  It may be that you have something

12   more here besides well logs.  But it would be a physical

13   impossibility in many cases to go back and identify the man

14   who made the log, and recognizing that I think counsel have

15   all agreed that we can use these well logs with the under-

16   standing that a well log-- and we have had a lot of testimony

17   in the record on that-- isn't always the most accurate thing

18   in the world.  One well driller will characterize material

19   one way and another well driller will characterize it another

20   way.

21           We will mark them for identification and later on determine

22   whether they go into evidence.  The group of documents will

23   be Roripaugh's Exhibit D for Identification.

24           (The well logs referred to were marked Defendant

25   Roripaugh Exhibit D for Identification.)

Z78                                                                                      9506

1          MR. KRIEGER:  And on the top of that, for the convenience

2     of everyone, we have prepared this tabulation ourselves to

3     put together some of the data that is found in this material,

4     without any thought that it is evidence.

5          THE COURT:  First, how many sheets are there on the

6     tabulation?

7          MR. KRIEGER:  The first three sheets are tabulation.

8          THE COURT:  It will be understood that that is only a

9     tabulation, subject to correction.  This will be to assist

10    counsel in finding what is in the compilation.

11         MR. KRIEGER:  That is right.  For example, the perfora-

12    tions, which we think might be very useful to other witnesses.

13         I will offer Exhibit A, Roripaugh, in evidence.

14         THE COURT:  It is received.

15         MR. VEEDER:  I was going to ask him a couple of questions,

16    your Honor.

17         THE COURT:  Well, I waited.  Go ahead.  I will set aside

18    my ruling.

19

20                         VOIR DIRE EXAMINATION

21    BY MR. VEEDER:

22         Q  In arriving at your location of the fault line, did

23    you take into consideration the difference in scale of the

24    maps that you were utilizing?

25         A  Yes, I did, sir.

Z79

9507

1        Q   And are you stating that the fault line as located

2   on Roripaugh's Exhibit A is exact, to your personal knowledge?

3   I am referring now to the Elsinore fault.

4        A   Well, the Elsinore fault was taken from Government's

5   Exhibit 17.  Government's Exhibit 17, as I recall, was on the

6   scale of one inch to a mile.  Roripaugh A is on the scale of

7   one inch to 2,000 feet.  I did take that into consideration.

8   But you must realize that it is a little difficult to scale

9   on a map whose scale is one inch to a mile.  But I believe that

10  the Elsinore Fault on Roripaugh A is located as closely as it

11  is possible to locate it from Government's Exhibit 17.

12       Q   Can you see where I am pointing here in Section 19-

13  7-3?  We have J1 and J2 well designations.

14       A   Yes, sir.

15       Q   Is it not entirely possible that the Elsinore fault

16  line would run between those two wells, the one which we show

17  00 and the other which we show with a specific capacity of

18  11.7?

19       A   Yes, sir.

20       Q   It is entirely possible?

21       A   It is possible.

22       Q   That the fault line would run between the two of

23  them?

24       A   Yes.

25       Q   And you certainly are not intending to convey to the

Z80

1    Court the idea that J2 is west of the Elsinore fault?

2        A  Not at all.  I attempted to reproduce your line as

3    closely as I could.  I presume that at the time you made

4    your map on a rather small scale you didn't have available

5    the logs of those two wells, which would explain the differ-

6    ence.

7        Q  And the fact that it is an inferred fault line, in

8    other words, a fault line that cannot be observed from the

9    surface, would make a difference, too, would it not, from the

10   standpoint of exactly where the fault line would fall?

11       A  That may be a personal observation, sir, but I don't

12   like the word "fault line" really.  Actually, a fault line

13   isn't a line as such.  It is not like a knife edge or a piece

14   of paper stood up on edge.  You have a zone that may in

15   locations be very wide.  In other locations it may be very

16   narrow.  So I would have no hesitation in accepting your

17   statement that possibly that line should be moved over between

18   those two wells.

19       MR. VEEDER:  I have no further questions.  Thank you.

20       THE COURT:  All right.  Roripaugh's Exhibit A was

21   offered in evidence.  It is received.

22       (Roripaugh Exhibit A was received in evidence.)

23       THE COURT:  You didn't ask the witness about the effect

24   of pumping the wells shown between the two fault lines in the

25   Murrieta Valley.  Did you omit that purposely?

Z81                                                                                             9509

MR. KRIEGER:  The reason we haven't done that is that we are willing to concede that all of the lands lying between the two fault lines are riparian to the stream system.  But I would be glad to ask the question.

THE COURT:  Of course, again, with our 6,000 defendants, having matters in the record is also helpful.

Mr. Witness, you are familiar with the well shown by the green and red dots lying between the two fault lines, the Wildomar fault and the Elsinore fault.  There seem to be about eight wells there, leaving out for the moment 19J1 and 19J2. In your opinion, would the pumping of those wells have an effect on the Santa Margarita River system?

THE WITNESS:  Yes, sir, I think that eventually they would.  I think right at the present time it might be a little difficult to show the effect because the stream flow for the period 1931 through 1957 in Temecula Creek at the gorge, as evidenced by the records of the U. S. Geological survey, doesn't indicate that there has been any marked decreas in the stream, even though there have been many wells drilled up-stream.  But I think it would be unfair to say that pumping in that area may not in the future affect the stream flow.

THE COURT:  All right.

BY MR. KRIEGER:

Q  Mr. Webb, calling your attention to Roripaugh B for Identification, did you prepare this map?

Z82

         A   Only in part, and in part it was done under my super-
vision.

         Q   In your office?

         A   In my office.

         Q   What is the base map?

         A   It is identical with Roripaugh A.

         Q   And what have you attempted to show on it?

         A   We have attempted to delineate the exterior boundaries
of the parcels owned by the defendants represented by you.

         MR. KRIEGER:  I offer this in evidence, your Honor.

         THE COURT:  May it be received in evidence, Mr. Veeder,
subject to correction?

         MR. VEEDER:  And subject also to basic data.  I assume
that he took deeds, is that right, or abstracts?  Or what
did he take?

         THE WITNESS:  I used the answers furnished me by the
firm of Best, Best & Krieger, the descriptions shown in the
answers-- they are plotted, and the description contained in
Mr. Krieger's answers.

         THE COURT:  Let's have it received subject to correction.

         MR. VEEDER:  Subject to check.

         THE COURT:  If it is in error, that can be corrected.

         MR. KRIEGER:  Fine.

         THE COURT:  Otherwise, there is no reason why it shouldn't
be received in evidence.

         (Defendant Roripaugh Exhibit B was received in evidence.)

A12

1      MR. KRIEGER:  Do you want to ask some questions about

2  that?

3      THE COURT:  No, I just wanted to get a look at it.  I

4  can't see it that far.

5      What is the difference in color?  Just merely to distin-

6  guish one parcel from another?

7      MR. KRIEGER:  Yes.

8      THE WITNESS:  We used colors for the individual parcels

9  until we ran out of colors, and after we ran out of colors we

10  used yellow for the smaller parcels.  Actually there is no

11  particular significance.  The red happens to be Roripaugh, who

12  has the largest, I believe, single ownership.

13      THE COURT:  This area then that cuts across Sections

14  34, 35, 27, 26--

15      MR. VEEDER:  Number 12.

16      THE COURT:  Number 12--that is all Roripaugh property?

17      THE WITNESS:  Yes.

18      THE COURT:  Plus the other section over here--21?

19      THE WITNESS:  In the lower left-hand corner there is a

20  table.

21      THE COURT:  Number 12.

22      THE WITNESS:  Number 12; yes sir.

23      MR. KRIEGER:  All these numbers are numbers which you

24  have given to respective owners; is that right?

25      THE WITNESS:  Yes.

A13

1      MR. KRIEGER:  And some of the owners have several parcels

2 of land?

3      THE WITNESS:  Yes.

4      MR. KRIEGER:  And you have given the same number to each

5 parcel?

6      THE WITNESS:  Yes sir.

7      THE COURT:  May I inquire, in your discussion at noon-

8 time I take it that some of these parcels north of the Kunkle

9 line are some of the parcels you have been talking?

10      MR. VEEDER:  That is right.  In fact, we didn't delineate

11 at all.  We were talking about all the parcels in which Mr.

12 Krieger has an interest.

13      THE COURT:  You are going to work that out?

14      MR. KRIEGER:  We are going to do that this afternoon

15 or tonight.

16      THE COURT:  This is a matter of information.  As far as

17 the Roripaugh property is concerned, it is riparian in any event

18 and it covers the sections which involve the Santa Gertrudis?

19      MR. KRIEGER:  It appears to cover most of it. I see that

20 Sections 24 and 23 are not in the area we have been talking about.

21      THE COURT:  Will your proof show that they were so acquired

22 that they possess riparian rights to the Santa Gertrudis and

23 the Murrieta?

24      MR. KRIEGER:  We will show that as to the great bulk

25 of the property.  Now in that connection we knew that at this

A14

1   stage of the game we would not be putting in evidence on this

2   score, so I can't give you a categorical answer.

3          THE COURT:  I see.  All right.

4          MR. KRIEGER:  As long as Your Honor is down here, let's

5   talk about the next exhibit, which is Exhibit C for indentifi-

6   cation.

7          Q  Mr. Webb, what does this map show?

8          A  It shows those ownerships or parcels of property of

9   owners represented by yourself that fell outside the exterior

10  boundaries of Exhibit B, and for that purpose we used an exhibit

11  that the Government was good enough to give us a number of its

12  blank copies, Government's Exhibit No. 17, and we simply used

13  their exhibit for plotting thereon the exterior boundaries of

14  the property.  I think there are five of them.

15         Q  You have used the same numbering system that you

16  used on the previous exhibit, have you?

17         A  Yes sir.

18         Q  Those numbers appear on Exhibit B , and on Exhibit B

19  they are noted as not shown on Exhibit B.

20         Q  In the plotting of these parcels you also worked from

21  the answers filed by these several defendants?

22         A  Yes.

23         THE COURT:  What did you say about numbers?  You used

24  different numbers?

25         THE WITNESS:  No sir.  The numbers are the same as those

1 shown on Exhibit B, but where it will recite on Exhibit B the

2 fact that the parcel is not shown.

3 THE COURT:  Therefore it is shown on C?

4 THE WITNESS:  Therefore it is shown on C.

5 MR. LITTLEWORTH:  Everyone is listed on B.

6 MR. KRIEGER:  This is offered in evidence.

7 THE COURT:  Subject to correction as to accuracy.

8 MR. VEEDER:  That is right.

9 THE COURT:  All right, Roripaugh's Exhibits B and C

10 will be received in evidence on that basis.

11 (Defendant Roripaugh's Exhibits B and C offered in

12 evidence).

13 MR. KRIEGER:  That is all, Your Honor.

14 CROSS EXAMINATION

15 BY MR. VEEDER:

16 Q  In making your determinations concerning which you

17 have testified, Mr. Webb, did you undertake a delineation be-

18 tween what has been termed the older alluvium and the younger

19 alluvium?

20 A  I had occasion to look at one of the Government's

21 maps, but I made no determination of my own.

22 Q  You didn't distinguish in any way between the two

23 classes of alluvium as has been used in this litigation; is

24 that right?

25 A  No sir.

A16

1    Q  Would you define for the record what the term

2  "cone of depression" means to you?

3    A  "Cone of depression" to me means a cone in the ground

4  water table normally occasioned by the operation of a pump.

5    Q  Could you describe that phenomena as to the manner

6  in which it spreads out from the well which is being pumped?

7  Is it circular or how is it--the outer extremities now ?

8    A  Well, I would regard it pretty much as circular,

9  unless there was some interference with the cone of depression

10  from some other well or some physical obstruction such as a

11  fault or something of that sort.

12    Q  Have you encountered any such obstructions in your

13  investigations, such as faults, that would cause an otherwise

14  circular cone of depression to be other than circular in form?

15    A  You mean in this particular investigation?

16    Q  Yes.

17    A  I wonder if I might have that question again.

18    Q  I will rephrase it.  It might not have been a heppy

19  question.

20    Did you encounter any cones of depression which you

21  found were not circular in character?

22    A  No sir.  I'll tell you what I did do.  I took the

23  best available water records, water level records that I had

24  and tried to plot a few hydrographic contours over the entire

25  area.  But I found that as far as I was concerned it was very

1  difficult for me to plot the hydrograph because of the extreme

2  distance between the wells and the sparsity of them.

1    Q   Let's take a look here.   Can you see Sections 25 and

2    26 in 7-3 on Exhibit 15A?

3    A   Yes, sir.

4    Q   Do you observe there what has been termed a well

5    hole?   Do you see that phenomenon there?

6    A   I see a closed contour hydrographic contour, yes.

7    Q   Did you have occasion to investigate that?

8    A   No, sir, I did not.   In fact, I am not sure that that

9    contour closes.

10   Q   But you are not sure that it does not?

11   A   That is correct.

12   Q   Did you have occasion to investigate the kinds of

13   soil and, I guess you people call them, the rock formations

14   in the bottom of the Santa Gertrudis and the areas immediately

15   adjacent to it?

16   A   I spent quite a little time in the area, I looked

17   around, and as far as I am concerned, Mr. Veeder, my main

18   investigation was where the water actually was found.   In

19   most all instances it was in the bed of the stream.

20   Q   When you say in the bed of the stream are you speaking

21   of the surface water now?

22   A   No, sir.   The well locations.

23   Q   And did you undertake to determine the point where

24   what has been termed the Recent alluvium changed into the

25   older alluvium by checking the well log?

284

1          A  No, sir.

2          Q  So you have no idea as to where the older alluvium

3     and the younger alluvium are situated?

4          A  That is right.

5          Q  Did you find any confinement at all in the areas

6     that you investigated?

7          MR. KRIEGER: What do you mean by "confinement," Mr.

8     Veeder?

9          MR. VEEDER:  I will start again.

10          Q  What does "confinement" mean to you from the standpoint

11     of ground water?

12          A  I don't know exactly how to phrase it.  There is

13     so many different ways that water can be confined.

14          Q  Did you encounter any artesian water?

15          MR. KRIEGER:  Wait just a moment.

16          MR. VEEDER:  Excuse me.

17          THE COURT:  Did you finish, Mr. Webb?

18          THE WITNESS:  Well, if you think of confinement of water,

19     it can be in so many different ways.

20          MR. VEEDER:  All right, I will start again.

21          MR. KRIEGER:  He is trying to answer it.

22          THE WITNESS:  I didn't mean that, sir.  I was just more

23     or less thinking to myself.  Normally there is some type of

24     clay bed, which water at some perhaps remote point or some

25     close point percolates upstream, finds its way underneath the

285                                                                                                                            9519

1    clay bed and is confined.  Assuming that there is some type

2    of barrier, fault zone or something downstream which places

3    the water under pressure, and of course if you puncture that

4    overlying clay bed with a well or a pipe you have what you

5    call an artesian flow.  Or you can have it like it is in the

6    central basin where it is not completely that way at all.  It

7    goes through almost in pipes or lenses.

8         THE COURT:  Which basin is the central basin?

9         THE WITNESS:  I am sorry if I have digressed.  That is

10   down in the San Gabriel.

11   BY MR. VEEDER:

12        Q  But you didn't find that phenomenon in this valley?

13        A  The only confinement that I know about in the valley

14   is really the Wildomar fault, which confines certainly the

15   waters on the Santa Gertrudis, also in Pauba Valley, and I

16   suppose the surface flow which passes across that fault is

17   aided also by the Elsinore fault on the other side.

18        Q  You made no specific study of that phase of it,

19   though, did you?

20        A  No, sir.

21        Q  How would you describe the alluvium that has been

22   laid into this Murrieta Valley?  Is it lenticular in nature,

23   or how do you think it is laid?

24        MR. KRIEGER:  I object to that as going into the geology

25   of the area, and this witness has not testified to geology.

1    MR. VEEDER:  This witness has gone into great length

2    about the yields of wells, and he has gone into very consider-

3    able length in regard to specific capacity, he has testified

4    in regard to the tightness, as I remember the term that the

5    man used, respecting the yield of these wells.  He was not

6    speaking of anything but the geology when he was talking

7    about "tightness."

8        THE COURT:  The objection is overruled.

9        You may answer, if you know, and if you don't know say

10   so.

11       THE WITNESS:  May I have the question?

12       MR. VEEDER:  Read the question, please.

13       (The reporter read the pending question.)

14       THE WITNESS:  I myself think it is a heterogenous mix-

15   ture.  It is all mixed up.  That is the reason that we chose

16   the green spots that you see on that map.  We checked locations

17   at which the drillers have drilled very poor wells and for

18   every one of those we checked we attempted to pick a well

19   nearby that had a reasonable capacity and a fair specific

20   yield just to show that very thing.  A basin isn't like a

21   big bathtub, fully uniform grain sizes that you can poke a

22   hole down anywhere and put a pump in it and pump out an equal

23   amount of water in one location the same as you can in another.

24       Q So it is entirely possible to have a good well in the

25   Southwest Quarter of the Southwest Quarter of Section 16 and

Z87

9521

1   the poor one up in the Northeast Quarter of the Northeast

2   Quarter of Section 16; isn't that right?

3       A   In the Murrieta Valley, yes.

4       Q   And it is entirely possible by reason of the hetero-

5   genous character, did you say, of the--

6       A   I hope, sir, that is a correct term.   That is what I

7   said.

8       Q   I will accept it.   In other words, that means that it

9   is entirely possible that you have water-bearing strata more

10  or less scattered throughout the whole area; is that right?

11      A   You are talking about the Murrieta Valley?

12      Q   Yes.   What do you mean by the Murrieta Valley?

13      A   When you said Murrieta Valley I thought we were

14  talking about the area between the two fault zones.

15      Q   No, I am going farther than that.   I am taking in the

16  area that is in orange on Exhibit 15A.

17      THE COURT:   Before you go further, let's see if I under-

18  stood what the witness said.   I understood the witness to say

19  that assuming a basin it was entirely possible to have a good

20  well and a bad well in the same basin.

21      THE WITNESS:   That is correct.   I did say that.

22  BY MR. VEEDER:

23      Q   Would you say that that is also true in areas north

24  of the Wildomar fault?

25      A   Well, in certain portions of the area, yes.   If you

1 talk about the Santa Gertrudis area, I would think that you

2 could get a good well.  500 feet from it you could get a well

3 that isn't anywhere near as good, which merely indicates

4 the heterogenous deposits that are in the basin, because I

5 really believe that there is some type of basin in the Santa

6 Gertrudis but not much of that other area north of the so-

7 called Santa Gertrudis or northwesterly of the Santa Gertrudis

8 area and lying above the fault, with the exception that I

9 think there will be a piece of that area-- may I step down,

10 sir?

11     THE COURT:  Yes, sir, you may.

12     THE WITNESS:  This is what I meant by the Santa Gertrudis

13 area, right along the Santa Gertrudis Creek.  Now this well

14 right here is a comparatively new well.

15     THE COURT:  Give us the number of it.

16     MR. VEEDER:  State what it is.

17     MR. KRIEGER:  No. 27.

18     THE WITNESS:  27H3.  It has a specific capacity of 52.4.

19 It is a pretty good well.

20     This Santa Gertrudis area or basin area, I believe,

21 starts up in here some place.  I don't think you have enough

22 wells now really to tell how far up this way.

23     MR. VEEDER:  When you say starts right in here--

24     THE WITNESS:  Starts about the middle of Section 27 and

25 curl around running northerly to the freeway and then roughly

z89

9523

1    parallel with the freeway to Santa Gertrudis, up Santa

2    Gertrudis to about Nicholas Canyon Road, down around Nicholas

3    Canyon Road southerly and come down in through about to the

4    section of 35 or possibly it will turn and run along the base

5    of the hill to some place over about Long Canyon.  That, I

6    believe, will possibly function as a basin.

7         Now the other area that they have been talking about

8    doesn't act to me like any water basin I ever saw, and I

9    don't believe it is.

10        MR. KRIEGER:  You may resume the stand, Mr. Webb.

11        Do you want to show that he marked that area on the map?

12        While he was testifying, your Honor, the witness has

13   penciled in a general area defining what he considers to be

14   the Santa Gertrudis Basin on Exhibit A Roripaugh.

15        THE COURT:  The record will so show.

16   BY MR. VEEDER:

17        Q  Would you give us your definition of a basin?

18        A  I have certainly seen a lot of water basins, but it

19   is a little hard on the spur of the moment to describe on.  To

20   me a water basin is a collection of miscellaneous material--

21   sand, boulders, gravels, topsoil-- in which water has been

22   deposited.  I think that is it.

23        Q  You are talking about the specific capacity.  What

24   do you think is a well with a good specific capacity?  You

25   said 52 was, in your view, a specific capacity that demonstrated

Z90

1    a good well.

2        A  I think for this area that is good.  If you really

3    want to know what I think is a good well--

4        Q  Let's don't go out of this area.

5        A  All right.

6        Q  We can go a long way, you know.

7        MR. KRIEGER:  Let him answer that, won't you, please,

8    Mr. Veeder.

9        THE COURT:  We have one more on Exhibit A showing as

10   having 98 specific capacity.

11       THE WITNESS: Yes, sir.  That is Roripaugh's well.

12   BY MR. VEEDER:

13       Q  That is a pretty good well?

14       A  For this area that is a very good well.

15       Q  What about 29?  Would that be a good well?

16       THE COURT:  Do you mean 29%?

17       MR. VEEDER:  That is right.

18       THE WITNESS:  Yes, I think that would be a pretty fair

19   well for this area.

20   BY MR. VEEDER:

21       Q  So your well in 7-3-6K1 is a pretty good well in your

22   view?

23       A  Would you point it out, please, sir.

24       Q  That is .29.

25       A  0.29.  No, that is no well at all, sir.

Z91

Q  How about the well here?

THE COURT:  Watch your decimals, Mr. Veeder.

MR. VEEDER:  It is my glasses, your Honor.

Q  In other words, you think 29% is good; is that right?

A  Well, show me which well you mean.  Yes, I think a specific capacity of 29-- it is not 29%, it is plain old 29-- I think it would be a good well.

Q  What is the number that you would say would be a good well?

A  Well, you have to take into account a great many factors to say.  I wouldn't think that any well, in this particular area, that had under 12 to 15 would be a very good well.

Q  Wouldn't the specific capacity of a well be influenced by the depth of the well?

A  Not necessarily.  It could.

Q  Isn't depth a factor?

A  Or it could not.

Q  Wouldn't you say that depth is a factor from the standpoint of specific capacity?

A  In answering that, I wonder if I might digress a little bit, your Honor.

THE COURT:  Try it.  We may cut you off or strike it. See what you want to digress on.

THE WITNESS:  All right.  You talk about depth, is depth

1    a factor in specific capacity?  I had occasion to drill a

2    well over on the Santa Ana River and I thought I was in a

3    really good place.  We started out with a 24-inch casing, a

4    cable tool method.  We went 988 feet, and I think we would

5    have gone deeper only the money got a trifle short, and we

6    went through such beautiful looking gravel and so many boulders

7    that we had roll-ins and we were afraid to shove the 10-inch

8    casing in any further.  So I decided I would cut that well in

9    the bottom part and I cut everything from 700 feet down.  Some

10   of that gravel went to six inches, and I put a test pump in

11   that hole with a 150-horsepower motor on it set at 180 feet.

12   I remember that test very well-- I will never forget it.  That

13   pump broke suction within about 25 sections and throttling

14   it with a butterfly valve the best I knew how, I found that

15   I could pump about five inches.  We reworked that well the

16   best we knew how by swabbing and doing everything we could.

17   We paid demurrage on the rig and kept it there and worked it.

18   We then pulled that test pump out of the hole and we cut some

19   gravels that didn't look nearly so good.  We cut them from

20   about 300 feet down.  And we went through the same performance

21   again and we found out from 180 feet we could pump 30 inches.

22   We pulled the test pump out again and cut it clear to the

23   surface and we got 257 inches.

          THE COURT:  What do you mean by cut to the surface?

          THE WITNESS:  What I mean by that, it was cut up to the

Z93

1    topsoil-- I mean perforated, sir.  We perforated from 257 on

2    up to below the first seal, which was about 20 feet, and we

3    got 257 inches at the time of the test.  That well is still

4    in existence and still running.  In that particular instance

5    the depth of the well didn't have anything to do with the

6    specific yield.  We would have been just as well off if we

7    had drilled a 300-foot well, and a lot of money ahead.

8    BY MR. VEEDER:

9        Q  You have a well here that shows 350 gallons per

10   minute.  That is your Well 7S/3W-19J2.  You said this morning

11   that was a good well, did you not?

12       A  That is the green dot right next to the fault zone

13   in Section 19.

14       Q  Yes.

15       A  I can't see what that specific yield is, but I

16   wouldn't think that would be too bad a well for that area.

17       Q  The specific capacity of that well is 11.7.

18       A  Yes.

19       Q  So you would think a well down to 11.7 is a pretty

20   good well?

21       A  If you want it for irrigation, I don't think that

22   well would be really good for irrigation, because I don't think

23   it is large enough.

24       THE COURT:  Doesn't the question whether the well is

25   good for irrigation depend upon how much land the man has?

1   How many acres would a well of that sort pumping 350 gallons

2   per minute irrigate in some particular kind of crop?

3      THE WITNESS:  That is just under 40 miner's inches.  I

4   divided by nine and to make it easier I called it 40, which

5   would be 360.  If it was 360 gallons a minute, it would be 40

6   miner's inches.  Of course, the thing that you have to figure

7   on that is your maximum months, the hot summer months.  Usually

8   it will occur ordinarily during July, August or September,

9   and I would think that with a well like that it would be

10   difficult to irrigate more than one are per inch.

11      THE COURT:  One acre?

12      THE WITNESS:  Yes.

13      THE COURT:  With 40 inches of water?

14      THE WITNESS:  Yes.  It would take care of about 40 acres.

15      THE COURT:  Now let's analyze this.  Let's say that the

16   man put the 40 acres in alfalfa, and let's say that he was

17   raising stock where he could use his own feed and could cut as

18   he pleased from time to time.  Couldn't he irrigate that 40

19   a few acres a day and have water to spare?

20      THE WITNESS:  I don't think so, sir.

21      THE COURT:  How many hours do you run water on alfalfa

22   to irrigate it?

23      THE WITNESS:  I think normally during the summer months,

24   from my experience with the Water Company, they run a couple

25   of times a month.

295                                                                                      9529

THE COURT:  But how many hours do you run it at a time?
12 to 24 would be sufficient, wouldn't it?

THE WITNESS:  Ordinarily, no.  They usually keep it on
24 hours a day on a 40-acre patch.  I would think you would
run for probably around three or four days.

THE COURT:  I am talking about just one parcel of it.
You have one parcel that you are going to irrigate.  How many
hours would you run the water on it-- 24 hours?

MR. STAHLMAN:  What kind of irrigation is this-- are
you running it in furrows?

THE COURT:  Let's take both.  Let's take the check
system and let's take sprinklers.  I know something about the
check system because I used to have to stay up all night to
irrigate.  How many hours would you run the water if you were
going to irrigate a five-acre patch?

THE WITNESS:  You are talking about five acres.

THE COURT:  Let's put it this way.  You are going to
run the 40 inches consecutively for 24 hours.  How many acres
could you figure to irrigate?

THE WITNESS:  I would rather try your first question,
sir; you specified the five-acre patch.

THE COURT:  All right.

THE WITNESS:  If you were putting on six inches, that
would be 2½ acre-feet.  If you divide 40 inches by 25, that is
1.6 acre-feet in a 24-hour period.  So you would probably

Z96

1    irrigate-- well, you wouldn't cut off in the middle of the day--

2    1.6 divided into 2½ would give more than once.  I guess you

3    would run a couple of days.

4        THE COURT:  To irrigate five acres?

5        THE WITNESS:  Yes, sir, or a little less, a day or day

6    and a half.

7        THE COURT:  And you have 30 days in the month, and so

8    you could irrigate fifteen 5-acre pieces?

9        THE WITNESS:  Well, an individual operation usually

10   doesn't work that way.

11       THE COURT:  I am not talking about the man's convenience,

12   but I am trying to point out that it is one thing to say

13   that 40 inches of water is a small amount of water for 40

14   acres if you are going to irrigate the whole 40 acres at the

15   same time; but it is another thing to say that 40 inches of

16   water is a small amount of water if the man wants to utilized

17   the amount of water that he has.

18       THE WITNESS:  That is standard irrigation practice, sir.

19   BY MR. VEEDER:

20       Q  How many acres of land do you calculate can be

21   irrigated by a second-foot of continuous flow?

22       A  One second-foot of continuous flow?  What duty did

23   you want?

24       Q  Well, 4.2.

25       THE COURT:  You wouldn't put your 4.2 all on at one time,

1   would you?

2        MR. VEEDER:  Throughout the irrigation system that

3   is what the aggregate would run to.

4        THE WITNESS:  One second-foot, sir, is two acre-feet

5   daily.

6        MR. VEEDER:  Yes.  But in the State of California in

7   this area what do you think a second-foot would take care of

8   during the irrigation season, having continuous flow?

9        THE COURT:  I am going to quit at 4 o'clock tonight, so

10  I am going to take a short recess.

11        I don't want to pre-judge this.  It is probably not too

12  material, this matter we have been going into.  But offhand

13  I would think that a man who had 40 inches of water continuous

14  flow on a 40-acre piece of ground in Southern California would

15  have a gold mine.

16        MR. VEEDER:  I am with you all the way, your Honor.  I

17  think you are right.  It is a lot of water-- better than half

18  a second-foot.

19        MR. SACHSE:  Are we storing this, or do we have to

20  use it as it comes through the pipe?  That is a big question.

21        THE COURT:  You have it available for use 30 days a

22  month.

23        MR. VEEDER:  It seems to me that the significant thing,

24  speaking as a farmer myself, is, do you have to put this water

25  on at the moment, or can you put it into a reservoir and on

Z98

1   certain hours of the day have a flow far greater than half a

2   second-foot and on other days have none?  That is the rub.

3       MR. KRIEGER:  I think the witness has some familiarity

4   with the problem.  I would like to let him commment on this,

5   your Honor.

6       MR. VEEDER:  I have been waiting for some time.  I am

7   doubting his expertness now.  That is my problem.

8       MR. KRIEGER:  They can't come up with good answers like

9   attorneys can.

10      THE WITNESS:  I would like to try to work this out during

11  the recess, if I may.  You said one second-foot?

12      MR. VEEDER:  50 inches in Southern California is a

13  second-foot, isn't it?

14      THE WITNESS:  Yes, sir.

15      MR. VEEDER:  Shouldn't that irrigate about 70 or 80

16  acres?

17      MR. KRIEGER:  There is a question before him now.

18      THE COURT:  Let's let him work on it during the recess.

19      MR. VEEDER:  I am giving him some help.

20      THE COURT:  We got started on this with one question,

21  and that is how good a well is depends on how much a man has

22  to irrigate.  YYou would accept that as being axiomatic,

23  wouldn't you?

24      THE WITNESS:  That is right.

25      THE COURT:  How good a well is depends on how much land

he has to irrigate?

      THE WITNESS:  That is right.

      THE COURT:  Take a short recess.

      (Recess.)

1    MR. VEEDER:  Mr. Webb, have you come up with an answer

2  on the question of the acreage, which in your view, could be

3  irrigated with 40 miner's inches?

4    A  Yes sir I have.  While I was figuring I made a mis-

5  take in the decimal point, and under pressure I didn't find it.

6  I would like to explain how I got it, if I may.

7    Your question was how much land would 50 inches in

8  continous flow irrigate?  I will answer the best I know how.

9  In the first place, 50 miner's inches in Southern California

10  is 2 acre-feet, for all practical purposes, daily.  The thing

11  that is going to govern is the maximun months.  There are a

12  lot of other things that govern as well, but the maximum month

13  is the thing that really governs.  If you take 30 days in a

14  maximum month and multiply that by 20 to get 60 acre-feet that

15  it is possible for you to deliver during a maximum month, and

16  it has been experience at the Riverside Water Company over the

17  past 25 years that from 15 to 17% of the total annual use is

18  delivered during the period of the maximum month--if you take

19  the 60 and assume 15% as the use, you will find that the total

20  annual use for the parcel of property in question would be 400

21  acre-feet.  Once again if you take that 400 acre-feet and assume

22  that the duty is 4 or 5--if you say it is 5 it will hit about

23  80 acres, and if you say that your duty is going to be 4 it will

24  be a little more acreage.  However, I think that the duty would

25  vary with the kind of land, the way the land lay, many factors

A19

1   such as that.

2   BY MR. VEEDER:

3       Q  We were talking about 40 miner's inches, weren't

4   we?

5       A  Yes sir.

6       Q  That would be 10 miner's inches less than a second

7   foot?

8       MR. KRIEGER:  No.

9       THE WITNESS:  That is correct.

10      MR. KRIEGER:  The confusion is that you have changed

11  the question.  You started with 50 inches when we went into our

12  recess.  Now you are back to your original question of 40 inches.

13      MR. VEEDER:  Yes, we got around 80 acres, as I see it,

14  for a second foot, so 40 inches would be just a proportioned

15  reduction.

16      Isn't that about right?

17      THE WITNESS:  That is right.

18      THE COURT:  And we were talking about a well that had

19  40 inches on a 40-acre parcel, weren't we?

20      MR. VEEDER:  That is right.  I think the man would proba-

21  bly have a swimming pool down there.

22      THE WITNESS:  I take it that my statement on the rule of

23  thumb method appears to be somewhat unacceptable, but I think

24  you will find that that is normally used throughout the country.

25      THE COURT:  Who found it unacceptable?

1      THE WITNESS:  I don't know sir.  I had the feeling that

2    Mr. Veeder didn't accept it.

3      MR. VEEDER:  Everybody has been trying to psychoanalyze

4    me young man.  Don't try that.  You'll break your pick.

5      Q  You didn't undertake to differentiate, then, from

6    the standpoint of the availability of water in the Santa

7    Gertrudis Basin as you outlined between the older continental

8    and the younger alluvium; isn't that correct, Mr. Webb?

9      A  I did not.

10      Q  So you think that they will yield about the same

11    quantity of water per cubic foot of water-bearing strata;

12    isn't that right?

13      A  I don't think that I think that, Mr. Veeder.  I

14    don't know.  I have made no differentiation.  I did say that

15    the producing wells were in the existing streams, that is,

16    the wells that I think are good producers.

17      Q  And the wells undoubtedly went into the older alluv-

18    ium, did they not?

19      A  I would think that they must have at some point.

20      Q  Now, I observe in the outer delineation of the Santa

21    Gertrudis Basin as you have depicted it here on Roripaugh's

22    Exhibit A that you have included areas that obviously that are

23    part of the older continental alluvium.

24      MR. KRIEGER:  That is, if the witness knows again, Your

25    Honor, he is going into geologic terms.

THE WITNESS:   I do not know whether I included it or not.

BY MR. VEEDER:

Q But your delineation is rather an odd shape, is it not?

A Well, it doesn't look particularly odd to me, sir.

THE COURT:   You mean from a symmetrical standpoint?

BY MR. VEEDER:

Q How would alluvium get laid down under those circumstances?

A I don't know.

Q So you really have no basis for delineating your basin in that general form?

A I think that I have.

Q What would be the basis.

A Water production.

Q You think that the water came in there and created that basin right smack in the middle of the Murrieta Valley?

A Well, let me answer this way.  No wells, as far as I know, have struck bedrock in the area that I outlined, but as you go up along the Kunkle line you will find that several of them have.  You will find that well--I suppose I should call them by number, but I can't read them from here.  They are the two Gunther wells.

Q Do you want to approach the exhibit there and give us the benefit of your thinking?

A22

1    A  (Stepping down)  According to the best information

2    that we have been able to obtain from well logs which are

3    graphic, 23A2 and 23A1, both struck bedrock.  The new Shamel

4    well, being 24A2, also hit bedrock, and it looks to me as though

5    bedrock is comparatively shallow here, dips this way so that

6    there is a basin created.  As to how the basin got filled, I

7    suppose it got filled by the natural processes of erosion.

8    Q  Have you hear the theory, though, that the continental

9    alluvium was actually laid in this way, by a flow that went

10   into the Santa Ana Basin?

11   A  Yes sir.

12   Q  Do you agree with that?

13   A  Well, I presume that at one time the river flowed

14   through Lake Elsinore and joined the Santa Ana, but as to how

15   the material was laid down I don't know.  All I know is is that

16   that is where the water is, and if I wanted to drill a well

17   that is where I would go.

18   Q  It would be most odd to have a basin of the character

19   that you described, would it not, if that phenomenom to which

20   I just made reference actually transpired?

21   A  I don't think I can answer that.  All I do know is

22   that that is the only place that you really get water.

23   Q  When you drilled your wells in the area between the

24   two faults, you found you did not encounter any basement complex,

25   did you?

11

A23

1    MR. KRIEGER:  When he drilled the wells, you say?

2    BY MR. VEEDER:

3        Q  When you investigated the wells, I mean, you found

4    no basement complex?

5        A  On some of the green dots I think Mr. Lynch testified

6    that there were a number  of places of  where bedrock was en-

7    countered.

8        Q  Perhaps I missed it.

9        A  Within the area between the two faults in Murrieta

10   Valley.  I think I could spot them.  I believe I have them

11   marked on my work copy.

12       THE COURT:  2F2 was one where he hit bedrock at 40 feet

13   and went on to 83 feet.

14       THE WITNESS:  Rock was encountered in 2F2 as Your Honor

15   says.  Rock was encountered at 221 feet, I believe, in 2G1.

16   Rock was encountered in 12H3 at 170 feet.

17   BY MR. VEEDER:

18       Q  Are you stating that that is basement complex? Were

19   you between the fault lines, in your opinion?

20       A  Well, from Mr. Lynch's testimony and my observation

21   of the well logs, I am free to confess to you, sir, that when

22   I see a well log and the driller says that he hit bedrock,

23   drills into the bedrock a little ways and rig pulls off, as

24   far as I am concerned, that is bedrock.  You say it is basement

25   complex.  I think they are different.

A24

Q  Now, you encountered the situation, though, in the well 7-4-6K1, where you went 1330 feet to bedrock.

MR. SACHSE:  7-3-6K1, isn't it?

MR. VEEDER: 7-3-6K1.

THE WITNESS:  That is the Bennet well 6K1.

BY MR. VEEDER:

Q  You have given consideration to the fact that base-ment complex was--the depth was so great there and relatively shallow in an area which is approximately at the out side 2 miles?

THE COURT:  It looks like a mile to me.

MR. VEEDER:  Well, call it a mile.  Give him the benefit.

THE WITNESS:  Well, I knew that the condition existed, yes.

BY MR. VEEDER:

Q  You knew that the condition existed?

A  After I studied the well logs.

Q  From the standpoint of the water-bearing character-istics of this area, do you think that the fact that the base-ment complex is shallow in one point and deeper in another has anything to do with the yield of the well?

A  The 1380-feet  well which you referred to as 6K1 didn't produce much water according to the driller's test.

Q  Do you think the depth of the alluvium has anything to do with the productivity of the well?

1     A  In that location I don't think it has, because it

2  was unproductive, and it has been so proven.

3     Q  As a matter of fact, isn't the water-bearing strata

4  that is trapped--transmissability, in other words, isn't that

5  the governing factor as to whether a well is going to be a well

6  that will yield substantial quantities?

7     A  The porosity of the gravels in which the well is

8  drilled, yes.

9     Q  Isn't it also true that even in areas where your

10  permeability may not be high, if you have a water-bearing

11  strata of 500 to 1000 feet, perforate the casing, that you can

12  still produce very considerale quantities of water from such

13  a well?

14     A  I suppose it depends, sir, upon what your specific

15  capacity is and how far you are willing to pull your well down.

16     Q  Isn't transmissability the real criterion in making

17  a determination as to the productivity of a well?

18     A  As far as I am concerned, the specific capacity--

19     Q  Do you know what transmissability means?

20     A  I think so.

21     Q  What does it mean to you?

22     A  It means the ability-- it is a measure of the porosity

23  of the soil to transmit water in flow from one location to

24  another.

25     Q  Then isn't that the real criterion that will govern

1 to determine the quantity of water that will be produced from

2 a well?

3     A  At this particular point, sir, the 6K1, there must

4 be very poor transmissability because no water was being obtained.

5     Q  None?

6     A  No water was apparently transmitted to that particu-

7 lar location.

8     Q  Assume that you had a water-bearing strata, for example,

9 within the Kunkle line here.  The witness has testified that

10 there is a water-bearing strata at depth down to 100 feet.

11 Now in that area, assuming that you had a well there and the

12 casing was perforated, isn't the criterion that would govern

13 the transmissability of water through that water-bearing strata?

14     A  I don't think I understand the question, sir.

15 Where do you drill this well?

16     Q  Well, anyplace in the whole area.  Take your Section

17 23.  Assuming that you put a well in there, assuming that you

18 encountered a water strata 100 feet in depth and you perforated

19 your pipe in  that area, wouldn't you expect to get pretty good

20 production from that well?

21     A  I can tell you better after I test pumped it.  I

22 wouldn't know.  If I had really good-looking gravels, I would

23 expect that probably I would get some water.  But it has been

24 a long time since I have decided in advance how much water I

25 was going to get out of any given well.

12

A28

1    A  I think you probably would strike water, yes sir.

2    Q  And wouldn't it be reasonable to assume that a well

3  drilled in that area would be a productive well?

4    A  You are down in the Vail Ranch area, sir, where your

5  hand is.

6    Q  Yes. Would you just answer the question?

7    A  Do you mean in that particular area?

8    MR. KRIEGER:  I will ask you to define the area you are

9  talking about, then, Mr. Veeder, precisely.

10    MR. VEEDER:  I will be glad to talk precisely.

11    Q  Sections 5, 6, 7 and 8.

12    MR. KRIEGER:  The witness hasn't testified to that area,

13  Your Honor.  I think the question is improper.

14    MR. STAHLMAN:  Objected to as being improper cross-examina-

15  tion Your Honor.

16    MR. VEEDER:  He said he was acquainted with the fact

17  that the springs were coming out there and he is talking about

18  the whole geology.

19    THE COURT:  There is no evidence that he made any in-

20  vestigation at the Vail Ranch.  I will sustain the objection.

21  BY MR. VEEDER:

22    A  Is it not an indication, the springs being along that

23  area, that you have a basin underlying?

24    MR. STAHLMAN:  I object to the question unless you

25  specify what area.

12

A27

Q  Isn't it entirely possible to calculate water-bearing strata throughout a general area?

A  To calculate a water-bearing strata throughout a general area?

Q  Yes.  Isn't it entirely possible, for example, here where you have--are you acquainted with the prescence of springs along the Wildomar Fault?

A  Yes, I have seen them.

Q  What would that phenomenom indicate to you?

A  Water under pressure and a dike of some sort or an obstruction.

Q  What would be the level of the water table, in your view, along that area?  What would be the characteristic of it? Wouldn't it have to be at least as high as the Wildomar Fault?

A  Do you mean at the spring?

Q  Yes.

A  The water level would be at the ground surface at the location of the spring.

Q  And would it not also be true that it would be necessary for the water table to extend backward for a very considerable distance from the point where the springs arise?

A  There would have to be a pressure; yes sir.

Q  So as a matter of fact, when that condition exists, wouldn't it be reasonable to assume that you would strike water in the area eastward from the Wildomar Fault?

12

A29

MR. VEEDER:  Speaking of that area eastward from the line of springs that he has observed.

THE COURT:  The area on the Vail Ranch that you previously described?

MR. VEEDER:  That is right.

MR. STAHLMAN:  That is objected to as being not proper cross-examination.

MR. KRIEGER:  Same objection.

THE COURT:  Sustained.

BY MR. VEEDER:

Q  Now, in the basin that you have drawn in the Santa Gertrudis Valley, do you believe that basin is recharged entirely by the surface flow of the Santa Gertrudis Creek?

A  I would think that it was in part, yes sir--in large part.

Q  Where would water come from other sources?

A  I wouldn't know, unless it ran parallel along the fault line.

Q  And when you say ran parallel along the fault line, would it be moving downward toward the Pauba or upward toward Warm Springs creek?

A  It could be either way.

Q  You don't know.

A  No.

Q  And as a matter of fact that additional water over

A30

1   and above the surface flow of the Santa Gertrudis, did you say

2   you had know idea where that water came from?

3       A   That is right.

4       Q   As a matter of fact, though, the wells that had been

5   pumped--for example, the Roripaugh well is a very good well,

6   is it not?

7       A  Yes it is.

8       Q   And during the last several years the Santa Gertrudis

9   creek has been very short supplied; isn't that correct?

10      A   I hadn't supposed it was.  It is not to my knowledge.

11      Q   You don't know?

12      A   I don't think it is.

13      Q   Santa Gertrudis Creek?

14      A   No.

15      Q   It hasn't been dry the last--

16   MR. KRIEGER:   That is outside the scope of the direct

17   examination, Your Honor.   The witness hasn't testified to any

18   of these things about the flow of theSanta Gertrudis Creek.

19      THE COURT:   Overruled on this one.

20      THE WITNESS:   There is rising water in the creek.

21   BY MR. VEEDER:

22      Q   There is rising water in the Santa Gertrudis?

23      A   Yes sir.  I have seen it.

24

25

Q   Would you step down and mark where you have seen rising water in the Santa Gertrudis creek?

A   Along about in here.

Q   Would you mark it right where you saw it?

A   (Marking map.)

Q   What time of year did you see that rising water?

A   During the time I spent in the area.

Q   And what time was that?

A   I can't tell you the exact day.

Q   Was it in the fall or--

A   I think perhaps a month or so ago.

Q   Had it been raining recently just prior to the time you saw the rising water?

A   No, I don't think so.

Q   So the rising water must come from the ground water; is that right?

A   Yes.

Q   Do you think that rising water is interconnected with the water that the Roripaughs pump from their well?

A   It could be.

Q   In other words, in your opinion there is no separation between the rising water, the surface water, rather, of the Santa Gertrudis Creek and the water in the Santa Gertrudis Basin; is that right?

A   Possibly there would be at times, and at other times

Z101

not.

Q  What do you mean by that?

A  If you have a comparatively full basin and a very high water table I would assume that the surface water and the underground water were in contact.  If the basin had been pumped down to where the depth was a very considerable depth below the surface and you had stream flow, there might be percolation from the stream flow which would pass vertically downward on the area inundated by the creek and you might be pumping from the underground without intercepting at all the so-called underflow of the creek.

Q  Did you know that the State of California said that there was an actual clay confined bed between the surface flow and the gound water table of Santa Gertrudis Basin?

A  I wouldn't be surprised that there was. I didn't know that the State of California said so.  Because there used to be some small, I think, artesian wells upstream in the early days.  There is the U. S. Geological Survey report which I reviewed in connection with my study-- I have forgotten the number of the report, and that mentioned artesian flow.

Q  Basically, however, you would state that you do not have very much information in regard to the ground waters in the areas concerning which you have testified; isn't that right?

A  No, sir, I couldn't agree with you on that, sir.

Z102

Q  The only information, as a matter of fact, that you have is some information gleaned from several wells that you have investigated?

A  We went to every producing well that we knew of in the area and we got all of the information that we could get concerning it.  So that in the areas in which there are no wells I do not know howmuch ground water could be extracted, but I believe it to be a comparatively small amount, based upon the production of the existing well.

Q  But you have also said that in your view the area is heterogenous; isn't that right?

A  I think that is correct, sir.

Q  So as a matter of fact you wouldn't want to convey to the Court the idea that you are testifying, for example, that in Section 23 you wouldn't get water if you put down a well properly drilled and with proper perforation; isn't that right?

A  I think you would probably get water.

Q  And if you got water you would probably, depending somewhat upon the depth of the water-bearing aquifer, you would probably get pretty good production, would you not?

A  It would be my expectation that you would in the location where you put that thumbtack.

THE COURT:  Which I assume is Section 23 that you were talking about, is it?

MR. VEEDER:  I didn't know that the man was going to testify in regard to the thumbtack.

THE COURT:  Was that Section 23 you said?

MR. VEEDER:  All right, Section 23.

Q  Why would you so conclude?

A  On the basis of the nearby wells.  The closest are located a half mile north or a little less than half a mile north.

Q  You have a well with a specific capacity there of 9.3-- I want to be sure you and I understand each other-- it shows 251 gallons per minute.  That is a pretty good well, isn't it?

A  Fair for that area; yes, sir.

Q  We went through this on 350 gallons per minute.  What in your opinion would be the production in miner's inches of 251 gallons per minute?

A  I beg your pardon.

Q  Let's go through this rigamarole again.  You have 251 gallons per minute.  How many miner's inches would that produce?

A  251 divided by 9.  I believe that is about 28 inches.

Q  And assuming a miner's inch to the acre, you would irrigate about 28 acres of land, wouldn't you?

A  Approximately that.

Q  That is a pretty good well, isn't it?

1    A   Of course, I would think that with that volume of

2   water it would also be necessary to build a reservoir.  You

3   might care to irrigate with larger heads than the 28 inches.

4    Q   And isn't that generally the method that is used?

5   You pump into a reservoir, you retain it, and then you release

6   a larger head for better efficiency; isn't that right?

7    A   That is right.

8    Q So as a matter of fact, you have a pretty good well

9   there?

10    A   Well, I don't know, sir, whether you realize it or

11   not.  With reference to the well logs that have been submitted,

12   there is information collected on that particular well.  An

13   effort was made to pump more water than is currently shown,

14   and they almost lost the well by reason of it, and there may

15   be a possibility that it being a little over-pumped now.

16    MR. VEEDER:  I move to strike the answer, your Honor.

17    THE COURT:  Motion denied.

18    THE WITNESS:  The well did a little caving from the

19   surface-- pumped into the sand, sanded up.  They had to remove

20   the pump.

21    MR. VEEDER:  I move to strike the answer, your Honor.

22    MR. KRIEGER:  It is responsive to the question, your

23   Honor.

24    THE COURT:  It doesn't make any difference one way or

25   the other.

Z105

1    MR. VEEDER:  He is wandering, your Honor.

2    THE COURT:  Overruled.  Let's go ahead.

3   BY MR. VEEDER:

4    Q  In other words, you have a well up there in the

5   area right at the Kunkel line where you have produced 28

6   miner's inches; isn't that correct?

7    A  That is right.

8    Q  Now, as a matter of fact, if you move just about

9   half a mile from Murrieta Hot Springs you have your well there--

10   is that the hot water well?

11    A  Themost southerly of the two, I believe, is the hot

12   water well, and the northerly-- they are both Yoder wells.

13    Q  And they produce, I observe, 28-plus miner's inches;

14   isn't that correct?

15    MR. KRIEGER:  15Q2-- is that what you are talking about?

16   BY MR. VEEDER:

17    Q  Come here and look, if you want to.  How much does

18   that produce?  216.  Well, I was wrong on the 28.  Figure that

19   out for me, will you?

20    A  That is 216 divided by 9.  That is 24 inches.

21    Q  24 inches is a pretty good well, isn't it?

22    A  It would depend upon what you wished to do with it.

23    Q  What would you say, a miner's inch to the acre?  That

24   would run 6.6, would it not, through the irrigation season

25   of about seven months?

THE COURT:  6 acre-feet?

BY MR. VEEDER:

    Q  Can you figure that out for me?  What is your
irrigation season in there-- how many days?

    A  I can't tell you that, sir.  I would imagine it
would vary widely throughout the years.

    Q  You will observe here that we have in Section 24
a specific capacity of 14.9.  Now I am referring to Well A-1.
Thatwould be 7-3-24A1.

    A  That is the Ceas well.

    Q  Are you familiar with that well?

    A  Yes, sir.

    Q  Where do I find it here-- on which tabulation?

    A  The upper tabulation.

    Q  That is 283 gallons per minute.  That is not such a
bad well, is it?

    A  No, sir; that is a better well than the others.

    Q  And those are all right along the Kunkel line, are
they not?

    A  Yes.

    Q  How did it happen that you selected the wells that
you did, Mr. Webb?

    A  As far as I know, they are the only wells in the area--
let me qualify that-- that have pumping plants in them.

    Q  Isn't it reasonable to assume that you could put in a

Z107

9354

1    well, for example, other wells in Section 24 and come up with

2    pretty good wells?  There is no reason to assume that you

3    only have one good well in that area, is there?

4          A  Well, yes and no.  An attempt was made to drill a

5    well.  It is not shown upon that map.  The well is stillin

6    existence.  It is being used for domestic purposes. Its

7    depth led me to wonder whether or not possibly that it might

8    not be deep enough because it didn't pump.  It is right at

9    the intersection of Banana Street with Nicholas Road.

10         Q Banana Street and Nicholas Road?  Now you have me,

11    sir.  Oh, this is Banana Street, and this is Nicholas Road?

12         A  No.  Here is Nicholas Road.

13         Q  Would you mark that well?  Is that where it was lo-

14    cated?

15         A  Yes, sir.

16    THE COURT:  Where is Nicholas Road?  I don't see it on

17    the map.

18    MR. KRIEGER:  It goes right up the middle of Section

19    24, your Honor.  Nicholas Road is over to the right.

20    THE COURT:  I see it.  So down toward the bottom of

21    Section 24.

22    MR. KRIEGER:  And the witness has circled the contour

23    line of, I think, 1087, right in that area.

24    THE COURT:  How deep did thatwell go?

25    THE WITNESS:  This will have to be from memory only, sir.

Z108

1   I think it was slightly in excess of 200 feet.

2   BY MR. VEEDER:

3       Q  You think if they had dug a little deeper they might

4   have got a little better well?

5       A  I don't know.  I think it is possible had the well

6   gone deeper it might have produced more water.

7       Q  But certainly it would be reasonable to assume --

8       A  I could find no log on it, and I don't know whether

9   rock was encountered or not.

10      Q  Have you given thought to the question of progression

11  of ground water in this area?  Would it not be down toward

12  the Murrieta Valley?

13      A  Yes, the streams all run that way.

14      Q  So it would be reasonable to assume that if you have

15  a well up here in the northeast of Section 24 that the pro-

16  gression of ground water would be westward toward the Wildomar

17  fault; isn't that correct?

18      A  Yes, sir.

19      Q  And it would be reasonable to assume that you would

20  have ground water available there at least as good as up there

21  in the northeast corner of 24?

22      A  That hasn't been proven, sir.

23      Q  That is that heterogenous situation again; is that

24  right?

25      A  That is correct, sir.

Q But assuming that water is situated up here in the
northeast corner of the section, you would necessarily assume
that there is other water in the water-bearing aquifer extending
all the way down to the Wildomar fault; am I right?

A I think there is undoubtedly water.  Of course, the
Albert Ceas well, that 24A1 that we are speaking about, from
memory that well is only 169 feet deep and I could find no
log on it.  Now the recitation is that it is bottomed either
on rock or on boulder.

Q But it is still a pretty good well?

A It pumps fairly well.

Q And you wouldn't expect to find just an isolated
quantity of water right up there in that corner, would you?

A I wouldn't be surprised at most anything, sir, that
we found in that particular area.

Q You are not telling the Court that there was just a
pool there from which Mr. Ceas pumped, are you?

A I would think that that would be the extreme upper
end where you have your finger up around those two wells.  That
was why I purposely did not continue my line up as far as the
Ceas well, because it seems to me that that is right on the
border where you could possibly expect to get very decent
water.

Q But you didn't answer my question.

A I am sorry.

JOHN SWADER, OFFICIAL REPORTER

Q  The question was, you wouldn't expect to find just a pool of water up there from which Mr. Ceas would be pumping, would you?

A  I don't think you would find a pool.  It looks to me as though that is getting up very far into the watershed, sir.

Q  The Tiger's line is right up there.  There is no question about that.  But there would be a continuous water-bearing aquifer, would there not?

A  I have no doubt but that the full distance between the fault and the so-called Tiger's line there is water.

Q  Well, yes.  So it would be reasonable to assume that you would find other wells, other water in that area, would you not?

A  I have no doubt, sir, if you drilled a well you would get water.  As to the volume of water you would get I don't know.

THE COURT:  May I interrupt for a few questions?

MR. VEEDER:  Certainly, your Honor.

THE COURT:  In preparing Roripaugh's Exhibit A, did you take the static elevation of water in these various wells mapped on this exhibit?

THE WITNESS:  Yes, sir.  They are shown on the pump test data from California Electric Power Company.

THE COURT:  That is the distance to water from the surface?

1    THE WITNESS:  Yes, sir.

2    THE COURT:  Do you convert that to elevation from sea

3  level?

4    THE WITNESS:  No, sir, I did not.

5    THE COURT:  Do you have the elevation of the top of the

6  casing head of any of these wells?

7    THE WITNESS:  I have them only through one of the

8  Government's exhibits, which I used when I attempted to make

9  a hydrographic map.

10    THE COURT:  If you attempted a hydrographic map, then you

11  must have had the elevation above sealevel of these wells?

12    THE WITNESS:  I used the Government's data, but I did

13  not do the work myself.

14    THE COURT:  Was there an elevation above sea level to

15  the static level of water in each of the wells shown on

16  Roripaugh's Exhibit A.?

17    THE WITNESS:  No, sir, I don't-- many of them, I believe,

18  were not used by the Government, and those I did not have

19  reference point elevations.

20    THE COURT:  Did you find a relationship between the

21  static level of the water above sea level between certain

22  of the wells shown on Roripaugh's Exhibit A?

23    THE WITNESS:  No, sir, I did not.

24    THE COURT:  No relationship at all?

25    THE WITNESS:  What I mean to say is I did not investigate

1    that phase of it.

2        THE COURT:  You say you started to make water level

3    contours.  How far did you get on them?

4        THE WITNESS:  Well, I drew a complete tracing and

5    discarded it.  What I had done was checking the hydrographic

6    contours shown on Government's Exhibit 15, using the water

7    levels that I got from the State.

8        THE COURT:  Did you make any pump tests of wells closely

9    located one to the other where there was some close connection

10   in the static elevation above sea level, the water levels?

11       THE WITNESS:  Those were made by Mr. Mims at the time

12   he made the tests.  The two Bennett wells showed a release

13   one with respect to the other.  Others showed no particular

14   relationship.  One didn't go down while the other one was

15   being pumped.

16       THE COURT:  What are you talking about now, the Bennett

17   wells?

18       THE WITNESS:  The Bennett wells showed a reaction with

19   respect to the other.

20       THE COURT:  Which of the wells did not show a reaction?

21       THE WITNESS:  Some of the others I would have to examine

22   the California Electric reports in order to tell that.  The

23   difficulty is, sir, I did not attach importance to that,

24   because of the comparatively short duration of the test.

25   Usually in an effort when you are determining the effect of

1   one well upon another unless you have experience with it

2   over a considerable period of time of operation, you are not

3   sure.  It may be that you could run a pump an hour and pump

4   150 feet away or 200 feet away and it shows no particular

5   reaction when you measure the depth to water in it.  But if

6   you ran it longer, if the pump is on a 24-hour service and

7   runs over a considerable period of time, such effect might

8   conceivably show up.  So I did not include any of those in

9   the information I have presented here in court.

10      MR. VEEDER:  I observe that it is 4 o'clock, your Honor.

11      THE COURT:  Yes.  I am going to adjourn a little early

12  and give you gentlemen a chance further to discuss this

13  problem that you are working on.

14      MR. VEEDER:  Yes, your Honor.

15      THE COURT:  Adjourn until 10 o'clock tomorrow morning.

16      (Adjournment until Thursday, April 2, 1959, at 10 A.M.)