# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al,

Defendants.

No. 1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**       San Diego, California

**Date:**        Thursday, April 2, 1959.

**Pages:** 9561 to 9674

FILED

SEP 24 1963

CLERK, U.S. DISTRICT Court
SOUTHERN DISTRICT OF CALIF.

By _____ Deputy

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
    vs.                         )        No. 1247-SD-C.
                                )
FALLBROOK PUBLIC UTILITY        )
DISTRICT, et al.,               )
                                )
            Defendants..        )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Thursday, April 2, 1959

APPEARANCES:

    For the Plaintiff         WILLIAM H. VEEDER, ESQ., and
                              WILLIAM E. BURBY, ESQ.,
                              Special Assistants to the
                              Attorney-General,
                              Department of Justice,
                              Washington, D. C.

APPEARANCES (Continued):

|  |  |
|---|---|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney-General, by<br>FRED GIRARD, ESQ.,<br>Deputy Attorney-General. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al. | FRANZ R. SACHSE, ESQ. |
| For Defendant Oviatt,<br>et al. | MESSRS. BEST, BEST & KRIEGER,<br>By JAMES H. KRIEGER, ESQ.<br>    ARTHUR LITTLEWORTH, ESQ. |
| For U. S. Navy | LCDR. DONALD W. REDD. |

## INDEX TO WITNESSES

For Defendants
Roripaugh, et al.;

| | D | X | RD | RX |
|---|---|---|---|---|
| Albert A. Webb. | 9658 | 9565 | 9598 | |
| Leo Roripaugh | 9600<br>9607 | 9606 | | |
| Jack Roripaugh | 9609 | 9260<br>9645 | | |
| Alexander F. Borel | 9649 | 9653 | | |
| Leland Illingworth | 9655 | | | |

For Defendant Yoder:

| | | | | |
|---|---|---|---|---|
| Maurice J. Yoder | 9662 | | | |

For Defendant Shamel:

| | | | | |
|---|---|---|---|---|
| Jennigs B. Shamel | 9666 | | | |

## EXHIBITS

| | Iden. | In Evid. |
|---|---|---|
| Defendant Roripaugh,<br>Exhibit | | |
| D | | 9661 |
| Defendant State of<br>California Exhibit | | |
| AS | | 9671 |

SAN DIEGO, CALIFORNIA, THURSDAY, APRIL 2, 1959.  10:00 A.M.


(Another matter.)

THE CLERK:  Number two, case on trial, No. 1247-SD-C,
United States of America vs. Fallbrook Public Utility
District, et al.  Further court trial.

MR. KRIEGER:  Your Honor, before Mr. Webb's cross-
examination commences, I would like to say that following
our last adjournment, Mr. Veeder and I sat around and looked
over Defendant's Exhibit B and we worked out certain parcels,
largely in conformity with the testimony that was given
yesterday, which parcels would be excluded under an inter-
locutory decree.  Last night I drafted such findings of
fact, conclusions and a decree, and this morning Mr. Veeder
was good enough to offer the services of his secretary and
she has drafted those.  So I want you to know that we are
making progress on that matter.

THE COURT:  Good.  How many of these parcels will be
involved?

MR. KRIEGER:  I would say there were about fifteen
parcels.

Wouldn't you, Mr. Veeder?

Roughly in the area to the northeast of the fault line,
swing around the Santa Gertrudis Valley, and up in this area
(indicating map).

1     THE COURT:  Good.

2

3          ALBERT A. WEBB,

4  recalled as a witness in behalf of defendants Roripaugh ,

5  et al., having been previously sworn, testified further as

6  follows:

7

8          CROSS-EXAMINATION (Resumed)

9  BY MR. VEEDER:

10     Q  Would you state, Mr. Webb, the point of rising water

11  as you observed it in the Santa Gertrudis Creek?  The fact

12  is, I would like to have you mark it, if you would, please,

13  sir.

14     A  I think I marked it yesterday, sir.

15     Q  It was such a poor mark, I would like to have you

16  put it on in red, if you would.

17     THE COURT:  How are you going to indicate that on

18  Exhibit A?

19     MR. VEEDER:  He marked it with red pencil, your Honor.

20  I think you had better put your initials up there.

21  (The witness stepping down and marking the exhibit.)

22     THE COURT:  You write his intials.

23     MR. VEEDER:  What is your first name?

24     THE WITNESS:  A.A.W.

25  (Mr. Veeder marking the exhibit.)

9566

THE COURT:  All right.

BY MR. VEEDER:

Q  Now, do you agree that the point of rising water is where the water table intersects the ground surface?  Is that an acceptable definition to you?

A  Oh, I think so.  I think you might have to state that it is also the intersection of the dike or whatever obstruction causes the water to rise to the surface, although it could rise upstream from there.

Q  As a matter of fact--

A  I think your definition is correct.

Q  In other words, you are stating that in the north-east corner of the Northwest Quarter of Section 35, Township 7 South, Range 3 West the ground water table in the Santa Gertrudis Valley intersected land surface; is that right?

A  Well, I think that approximate location is correct.

Q  And you would also say that based upon your exhibit, which is Roripaugh's A, that it is about a quarter mile, perhaps a half mile upstream in Santa Gertrudis from the point where you have inferred the fault; isn't that correct?

MR. KRIEGER:  He hasn't inferred the fault.

MR. VEEDER:  I beg your pardon.

Q  Dod you accept the inferred fault as shown on Exhibit A?

A  Yes.  I have no reason to quarrel with your location

9567

1  of the fault line.

2      Q  So you will accept the premise, then, that it is about

3  a quarter to a half mile eastward?

4      A  Something of that sort.  Well, it won't be a half

5  mile.  That I am certain of, sir.

6      THE COURT:  A quarter mile it looks like.

7      MR. VEEDER:  Quarter mile.

8      THE WITNESS:  Quarter mile or less, perhaps.

9  BY MR. VEEDER:

10      Q  You would say then that the ground water table in

11  that area has been forced upward by the fault; is that right?

12      A  Yes.

13      Q  And you would also say that there is a progression

14  from wells 24-7-3A1, from 23-7-3A2 on down to that point where

15  the water rises?

16      THE COURT:  A progression of what?

17      MR. VEEDER:  Ground water, your Honor.

18      MR. KRIEGER:  I don't think that makes sense, your

19  Honor.

20      MR. VEEDER:  I will rephrase the question.  I want it

21  to make sense.

22      THE COURT:  In your opinion, does ground water movement

23  from the wells indicated by Mr. Veeder on the so-called Kunkel

24  line move in a southwesterly direction down toward the point

25  of rising water near the intersection of Santa Gertrudis Creek

1    and the fault line?

2         THE WITNESS:  You said the wells located along the

3    Kunkel line.  I think that in the Santa Gertrudis area--

4         THE COURT:  I referred to particular wells that he had

5    previously put into the record.  He read the descriptions of

6    the wells.

7         Show him again which wells you mean, Mr. Veeder.

8    BY MR. VEEDER:

9         Q  The wells in the northeast corner of 24, the north-

10   east corner of 23, the southeast corner of 15, and in Section

11   14.  Would you not say that there is a water-bearing strata

12   and that the progression of the ground water is southwesterly

13   toward the Santa Margarita River?

14        A  Well, there certainly is some type of groundwater,

15   and I presume, although I don't believe I have enough informa-

16   tion to project any hydrographic contours across there, but

17   I would think that such water as there is would percolate

18   down toward the fault.

19        Q  And would you say that there would be rising water

20   if there was not that percolation down toward the fault--

21   rising water in Section 35?

22        A  I would answer your question in the negative, but I

23   would like to explain it, if I might.

24   BY MR. VEEDER:

25        Q  Go ahead.

A   From the Santa Gertrudis , the valley itself, I have no doubt but what there is a progression, as you say, of underground water coming down the stream, and that would include the wells in Section 24-- that is the Ceas well-- and the new Campbell well shown with the green dot.

Q   Is that the one to which I am pointing now?

A   Yes, sir.

Q   Which would be in the southwest corner of 13?

A   Yes, sir.

Q   All right.

A   Now, on the other two wells, moving over a mile--

THE COURT:  Wait a minute.  Southwest?

THE WITNESS:  Moving westerly.

MR. VEEDER:  Southeast in 13.

THE COURT:  All right.

THE WITNESS:  On the other two wells, moving westerly a mile--

MR. VEEDER:  In Section 23.

THE WITNESS:  --in Section 23, the Well Al and the well A2, and if you mentioned the other two wells further over I don't remember whether you did or not.

MR. VEEDER:  We will give you Q2, if you want it.

THE WITNESS:  No, I don't want it.

THE COURT:  Is Q2 a hot water well?

THE WITNESS:  Those other two wells I am uncertain.  I

think that such underground water as there may be would

percolate in the same general direction that the surface water

runs along the streams.  But the only point of rising water

that I am familiar with, the most northerly point lies about

a little ways, approximately a mile northwesterly from the

intersection of Banana Street.

BY MR. VEEDER:

Q  Would you come here, sir, and mark those two points?

Would you mark that point of rising water that you said was

about a mile north?

A  This is the best of my recollection.  According to

my recollection-- I did not measure-- there is a spring up

in here which accounts for the reason that I used-- drew the

line as I did in Santa Gertrudis.

Q  Would you kindly put your initials right there, sir?

A  (Marking the exhibit.)

THE COURT:  That place that he marked there is right

below the figure 27?

MR. VEEDER:  Right at the figure 27.

Q  Isn't that correct, sir?

THE WITNESS:  Yes, sir.

MR. STAHLMAN:  May the record show that it is within the

area that he has previously designated as the Santa Gertrudis

Basin or storage unit?

THE COURT:  Yes, the record will so show.

BY MR. VEEDER:

Q   Would you state your opinion as to the source of that rising water that you just put on the center part of Section 27-7-3?

A   As I have previously stated, sir, Santa Gertrudis, I believe, progresses downstream in this manner.

Q   Why don't you just draw an arrow down there, so that we will see.

A   Such water as there is in here, I believe, comes down, percolates parallel with the various watercourses until it hits the dike.

Q   Do you think that the water that is percolating southwesterly from Sections 22 and 23 of 7-3 give rise to the spring to which you have made reference in Section 27?

A   Such underground water as eventually gets there, I suppose, would contribute to the spring.

MR. KRIEGER:   Your Honor, I think the record had better show that Mr. Webb has put a few red arrows on the map pointing a generally southerly direction in the Santa Gertrudis area and above it pointing to the Wildomar fault.

BY MR. VEEDER:

Q   And those arrows which you have now placed there are your view of the progression of ground water toward the Wildomar fault; is that correct?

A   As nearly as I can tell.

1    Q  Have you ever observed any springs south of Santa

2   Gertrudis down toward the Pauba-- down toward the Temecula

3   Creek?

4        MR. KRIEGER:  I think he already testified that he

5   didn't examine that area.

6        MR. VEEDER: He can answer if he knows.

7        THE COURT:  Answer yes or no.

8        THE WITNESS:  Yes, I have seen some springs there.

9   BY MR. VEEDER:

10       Q  What was the relative location of those springs?

11  Were they about in a line where you drew your rising water in

12  Sections 27 and 36?

13       MR. STAHLMAN:  Your Honor, that is objected to on the

14  grounds that it is indefinite and uncertain, unless it is

15  determined relative to what.

16  BY MR. VEEDER:

17       Q  Do you observe Section 27?

18       A  Yes, sir.

19       Q  And Section 35 where you marked rising water in both

20  of those?

21       A  Yes, sir.

22       Q  Would the springs that you observed south of the

23  Santa Gertrudis Creek be in a line with those two points along

24  the Wildomar fault?

25       A  Well, I think that the springs that I observed in the

location that I think you mean were along the alignment of the

Wildomar fault.

Q   Could you just mark them on there where you saw them?

A   No, I can't.

Q   You don't remember?

A   I don't remember.

Q   But you do think they are along the fault?

A   To the best of my knowledge, they are.

Q   Now, you stated that you made a contour map which you

disposed of because you didn't think it was satisfactory;

isn't that right?

A   That is right.

Q   Do you have the land surface elevations that you

utilized in making that water contour map?

A   No, sir, I do not.

Q   Do you remember the elvations?

A   No, sir, I do not.

Q   Were those elevations in the vicinity of Well 24-7-

3A1?

A   I do not recall.  The wells that I used were the

ones that the Government used.  I used the same wells that

the Government had used in the preparatinn of their hydro-

graphic contour map.

Q   Is it your opinion that there is a break in the

hydrologic continuity of the ground water between Sections 23

and 24 in 7-3?

A   I don't think I know what you mean by "hydrologic continuity," sir.

Q   I will start again.   Do you think there is a continuous water-bearing aquifer underlying the land in Sections 23 and 24, 7-3?

A   I don't know.

Q   Have you any reason to suppose that there is a break in the continuity of that water-bearing aquifer?

MR. SACHSE:   He just testified that he doesn't know that there is one, Mr. Veeder.

THE COURT:   Sustained.

BY MR. VEEDER:

Q   Have you observed the point of rising water in the Murrieta Creek?

A   I have driven over the area and flown over the area and I have seen the point of rising water where I thought water arose.

Q   Would you say it was about Section--

MR. KRIEGER:   Let's ask him where it is, Mr. Veeder.

MR. VEEDER:   I was just about to do that, Jim.

MR. KRIEGER:   Rather than pointing it out to him, let him place it for you.

MR. VEEDER:   All right.

Q   Would you say that the rising water is in Section 2,

7-3?

    MR. SACHSE:  Section 2?

    MR. VEEDER:  Yes.

    THE WITNESS:  Well, at the time I observed that perhaps I didn't attach as much importance to it as I should have, so that my location, I want you to know--

    MR. SACHSE:  Mr. Veeder, you are wrong; it is 8-3, it is not 7-3.

    MR. VEEDER:  Are we in 8 now?

    MR. SACHSE:  Yes.

    MR. VEEDER:  We are in 8; 2, 8-3.

    THE WITNESS:  It would be approximately some place, I would think, almost on the township line, along about in here.

    MR. VEEDER:  Mark it in red, please.

    THE WITNESS:  I want it understood, however, that that is my best recollection and an approximate location.

    MR. KRIEGER:  Why don't you put a symbol on there where you marked it in Section 35, township 7 South, 3 West, and why don't you put a figure on there A?

    (The witness marking the exhibit.)

    MR. VEEDER:  "A" meaning "approximate"?

    MR. KRIEGER:  About.

BY MR. VEEDER:

    Q  Now, you described the faults yesterday as zones. Would you state into the record what you meant by the term

1   "zone"?

2        A  Well, perhaps the best way I can tell you what I

3   mean by a fault zone is to tell you something that occurred

4   to me one time.  It became necessary for me to--

5        MR. VEEDER:  The Court wants to go to Brooklyn, friend.

6   So let's move.

7        THE WITNESS:  My apologies to your Honor.

8        THE COURT:  Go ahead, sir.  I am not laughing at you.

9   I am just laughing at counsel here.

10       THE WITNESS:  It became necessary to locate the San

11  Jacinto fault, known as Bunker Hill Dike.  It was located

12  upon a map, and it was in the San Bernardino Valley, very

13  similar to the map that you have here.  It is a pencil line

14  drawn on a map.  It ran through the intersection of South E

15  Street and the Santa Ana River.  I had to know, I thought, a

16  more definite location of that, and I didn't know how to

17  get it and I was not sure I knew where the fault zone was.

18       So I will tell you what I did.  I took pipes 15 feet

19  in length, and I made well points out of them and I slotted

20  them about a foot from the bottom with a welded bottom and

21  every 200 feet, 200 feet a part, for a distance of 2,000

22  feet across where I thought that fault may possibly be, I

23  drove those pipes off the back end of a truck, I ran levels

24  over the top of them and I measured them hourly the first day

25  and I measured them daily thereafter for a period of some

considerable time, and strangely enough, believe it or not,

some of the pipes flowed-- they were small artesian wells,

and I had to wire a piece of hose to the top, and as a result

of that in all of the profiles that I drew across that 2,000

feet I thought that possibly I could settle within a distance

of two or three or four hundred feet where that fault might

conceivably be.  And that is the reason that I said I hesi-

tated to call a fault a line rather than a zone.

Q  I am with you.  I think you are all right.  Would

you say that it was an impervious barrier-- the Wildomar

fault?

A  I don't think I can answer that.  It certainly is an

impediment to the flow of underground water.

Q  If it were an impervious barrier, the water coming

down Santa Gertrudis, for example, would just back up and

pond up there, would it not?

A  I think all fault lines or all fault zones have in

them areas that are as impervious as it is possible to get

them.  In other places there are gaps.

Q  You would say, would you not, that certainly the

Wildomar fault is not an impervious barrier the full length

of the Murrieta Creek?

A  As far as I am concerned, most fault lines-- and I

know nothing to the contrary-- the Wildomar fault is perhaps

not.  It depends upon your degree of imperviousness.  There

1    probably is some water that gets through it all right.  But

2    I regard it as a barrier to the flow of underground water.

3         Q  But certainly not an impervious barrier?

4         A  It depends entirely upon your definition of the word

5    "impervious."

6         Q  We are still in a hurry.  Do you think the water

7    goes through the fault or not?

8         A  I suppose in places some of it gets through.

9         Q  Doyou think that more water goes through the fault

10   than flows over the top of it?

11        A  No, sir.

12        Q  How much water do you think is flowing over the top

13   of it?

14        A  I don't know.

15        Q  Why do you say that you think there is less water

16   going through underground than on the surface?

17        A  It certainly has a differential pressure head at

18   the present time.  As you have recited, there is a difference

19   in water levels below the fault and above the fault, and it

20   does act as some type of submerged dam, and for that reason

21   I believe that probably there is more going over the top

22   than there is coming through the bottom, unless there is a

23   gap some place.

24        Q  What do you think would be the elevation of the top

25   of the fault?

A  I wouldn't know that, sir.

Q  It would be several feet down, would it not?

A  It could be.

Q  Do you think it is at the surface?

A  I don't know.

Q  You don't know?

A  No, sir.  In my classic illustration here awhile ago, or at least I thought it was, the top of the dike was down about 200 feet as near as I could tell.

Q  The Wildomar fault could be down 200 feet, could it not?

A  It might be, or it might be right at the surface.  I do not know.  Certainly in the case of the Wildomar fault I would think it was very close to the surface.  Otherwise, I don't see how in many of these locations you would have the springs that you have now.

Q  Nevertheless, we are not seeing at the surface all of the water that is passing over the Wildomar fault, are we?

A  I wouldn't think so.

Q  Have you any reason to assume that the water would run uphill in the Murrieta Valley?

A  No, sir.

Q  If the water that you saw coming out of 27 is coming from what you have marked as a Santa Gertrudis Basin, it would run uphill, would it not?

1    MR. SACHSE:  I don't understand the question.

2    THE WITNESS:  I don't understand the question.

3    THE COURT:  That reminds me of a classic remark of a

4  judge who ruled against the lawyer.  The lawyer was one of

5  these fellows who always rolled with the punch and went

6  along with the Court.  He said, "Well your Honor, I never

7  knew before now that water ran uphill, but now I know."

8  BY MR. VEEDER:

9    Q  Well, explain to me then, sir, if you will, how you

10  could have water emanating from Section 27, which is at a

11  higher elevation than Section 35, if it did not run uphill?

12    A  I don't think I still quite understand the question,

13  sir.

14    Q  All right.  Are you stating to the Court that the

15  water that you have marked emanating out of Section 27 comes

16  from the Santa Gertrudis Creek?

17    A  (Stepping down to the exhibit.)  Would you ask that

18  question once more, please?

19    MR. KRIEGER:  Read it, please.

20    (The reporter read the pending question.)

21    THE WITNESS:  No, sir, I don't think I stated that.

22  BY MR. VEEDER:

23    Q  You don't think you stated what?

24    A  That the water that emanates from Section 27 came

25  out of Santa Gertrudis Creek.

9581

Q  Oh, you say, then, that it comes from Sections 23, 26 and 22?

A  I think I testified yesterday that I didn't know where it did come from.  I have given you the best ideas that I know of as to how water might get down there.

Q  It would necessarily come down the gradient, would it not?

A  I think such water as there is underground will percolate in that general direction; yes, sir.

Q  Is it not true that the static water level in your wells-- I will give you the well 23, 7-3A2; the static water level of that well is higher than the point where the ground water emanates in Section 27, is that not correct?

A  Well, I will check.  I think you are correct, but I would like to look at the elevation.

Q  Well, I want you to look at it.

MR. KRIEGER:  Just a moment.  We will get you the exhibits.

(Mr. Krieger handing documents to the witness.)

Go ahead and answer the question.

THE WITNESS:  Yes, sir, it is higher.

BY MR. VEEDER:

Q  And is it not also true that the static water level in your Well 24-7-3A1 is higher than the point where the water emanates in Section 35?

A   I think that is correct.

Q   And isn't it also true that the static water level in your well in 15-7-3Q2 is higher than the point of rising water?

A   Well, since the general slope --

MR. SACHSE:   Which point of rising water, Mr. Veeder?

MR. VEEDER:   In Section 27.

THE WITNESS:   Since the general slope of the ground is that way, I think you are correct.

Q   And you would say that there is a continuous water-bearing aquifer, would younot?

A   That I don't know, sir, whether there is.   There must be a-- I can't see underground, sir.

Q   I thought you could.

A   I don't know whether there is a continuous aquifer. I don't know exactly what you mean by "aquifer." I think I do.

Q   A water-bearing strata.

A   I do not know whether there is a continuous water-bearing aquifer or not.  If you mean a blanket X feet wide of uniform material laid down down there, I wouldn't think there would be.  I suppose by some strange and devious course water will find its way from one location to another.

Q   As a matter of fact, when you take into consideration your land elevation and your static water level in Wells

1    24-7-3-WA1, 23-7-3-WA2, 15-7-3-WQ2, and 16-7-3K1 you find that

2    there is approximately the same water elevation in each of

3    those wells, do you not?

4         A   I can't answer that.

5         Q   Could you do some numbers for us sometime and figure

6    that out for us?

7         A   You mean as to elevations?

8         Q   Yes, sir, land elevations and also static water level

9    elevations?

10        MR. KRIEGER:  I don't think that is necessary, your

11   Honor.  That isn't part of the direct examination.  Further-

12   more, the testimony has been introduced by the United States

13   itself on the elevations, and Mr. Webb said that the only

14   information that he used was the United States's information

15   when he made the contour which he has since destroyed.

16        THE COURT:  In view of that statement I will sustain

17   the objection.  All he had was your figures.  They are already

18   in the record.  You may call attention to them.

19        MR. VEEDER:  Your Honor, here is a man who says it is

20   impossible to draw, or maybe it is just his own limitation.

21        THE COURT:  Wait a minute.  We haven't gotten into the

22   question of whether he can draw a water contour yet.  But as

23   to the figures, he said he took your figures from your ex-

24   hibits.  So get your exhibits out, if you want to, and read

25   him the figures he took from your material and then see what

he says about it.

1      MR. VEEDER:  I have them marked, your Honor.  I am so

2  proceeding.

3      THE COURT:  In fact, I would be interested, if you have

4  those water levels, I would like to put them on this map.

5      MR. VEEDER:  In 7-3-W-23A2 your static water level is

6  78.  That is from ground surface to water level.  I will get

7  your Honor the land elevation later.

8      THE COURT:  All I want is the ultimate figure at sea

9  level-- static level or present sea level.

10     MR. VEEDER:  All right, I will get you those, too.

11     MR. KRIEGER:  It seems to me that that could be done

12  during the recess, and we have no objection to Mr. Veeder's

13  putting that over there in a column next to our Exhibit A.

14     THE COURT:  Yes, do that at the recess.

15     MR. VEEDER:  All right, your Honor.

16     Q  Now, as a matter of fact, it would be possible,

17  would it not, to draw , with the data that you have, a water

18  level contour at approximately 1100; isn't that right?

19     MR. KRIEGER:  I am going to object to that as being

20  outside the direct examination.  This witness has said that

21  he hasn't drawn water contours on this map.

22     MR. VEEDER:  Your Honor, the witness has said he couldn't

23  draw one.

24     THE COURT:  Yes, that is what he said.  Overruled.

25     THE WITNESS:  Well, certainly it is possible to determine

1    the elevation above sea level of the water surface in each

2    one of the wells shown on the map, but those wells are a

3    long distance apart, sir.

4        Q  Let's see how far.

5        A  On all the hydrographic contour maps I have drawn I

6    never attempted to project a mile or more with a hydrographic

7    contour line because I was never certain as to the accuracy

8    of the point in between.

9        Q  How close do you think the wells have to be before

10   you can draw a line?

11       A  Very fortunately, perhaps, in the areas in which I

12   have worked with hydrographic contour maps always have been

13   quite close-- quarter mile, some of them closer than that.

14       Q  What you are saying, then, is that you are not saying

15   that it could not be drawn; it is simply that you have not,

16   is that right?

17       A  No, sir, I have not.

18       Q  Now, in regard to the waters in the Murrieta Creek,

19   you have stated that you observed the rising waters at a point

20   near the township line between Townships 7 South and 8 South;

21   isn't that right?

22       A  Yes, at that approximate location.

23       THE COURT:  Where was that?  Between what?

24       MR. VEEDER:  The common boundary between Townships 7

25   South and 8 South, your Honor, in Section 2-8-3.

THE COURT:  All right.  That is between the two fault lines.

MR. VEEDER:  That is correct, your Honor.

Q  Have you given consideration to the proximity to the surface of the water table in Sections 20, 28, 34 and 18, all in 7-3?

A  No, sir.

Q  You haven't.  I thought that you investigated wells, for example, in 20.

A  I thought you were referring to surface waters.  A moment ago you were.

Q  I was.  But I move around.  Now I am talking about the level of the ground water.  For example, in Section 20 of 7-3 --

A  In the Murrieta Basin.

Q  Can you locate those on here?  Could you locate the well with which you have a familiarity?  Well, let's take Sections 19, 20 and 21 of 7-3, within the two fault lines.

A  I visited all those wells.

Q  Are you aware of the static water level of those wells as they relate to ground surface in that area?

A  As indicated by the pump tests and the data that appears in these table.

Q  How far would be the static water level as it relates to land surface, for example, on 7-3-20H3?

9587

1    A  Static water level is shown as 54.5 feet.

2    Q  That is below ground level; is that right?

3    A  Yes, sir.

4    Q  Let's just take a couple more of those.  How about

5  20-7-3L2?  Did you get the water level on that?

6    A  That is 7 South, 3 West, 20L2?

7    Q  That is right.

8    A  I will have to refer to the notes on that.

9    Q  I am for that.  You go ahead.

10  THE COURT:  We haven't any dispute about the Murrieta

11  Basin, Mr. Veeder.  Nobody is contesting anything about the

12  Murrieta Basin.

13  MR. VEEDER:  Your Honor, since the Marines got their

14  stab in the back by the Vails, it becomes very important to

15  us to show that this water from the Murrieta comes down to

16  us.

17  MR. STAHLMAN:  Now, wait a minute.  I didn't hear that.

18  THE COURT:  Read it, Mr. Reporter.

19  (The reporter read Mr. Veeder's last remark.)

20  MR. STAHLMAN:  Your Honor, if this is going to be the

21  kind and type of tactics that Mr. Veeder is continually going

22  to pursue in this case--

23  MR. VEEDER:  George was asleep, your Honor.  I take it

24  back.

25  MR. STAHLMAN:  I think we should about reach the point

1    of some admonition to Mr. Veeder.

2         THE COURT:  Apologize to him, Mr. Veeder.

3         MR. VEEDER:  I don't think the Vails did it.

4         THE COURT:  Apologize to him.

5         MR. VEEDER:  I apologize for waking George up, and I

6    apologize for what occurred.

7         MR. STAHLMAN:  Now here we have the same thing.

8         THE COURT:  Let's go ahead.  I have problems enough here

9    without keeping you fellows happy.  Let's leave out person-

10   alities and wisecracks and let's get on with the case.

11        MR. STAHLMAN:  Well, if they are continually going to

12   be injected, I have a few that I would like to--

13        THE COURT:  I know.  You have contributed a few

14   occasionally when Mr. Veeder has been quiescent, not to the

15   extent that he has injected them.  Fun is fun, but let's get

16   on with the case.

17        MR. KRIEGER:  Your Honor, may I get the answer that Mr.

18   Veeder gave your question?  You asked him, I think, what

19   interest the Government had now in the Murrieta Valley inas-

20   much as Mr. Webb had testified that all the pumping there

21   did contribute to the stream system.  I don't believe he

22   ever answered your question.

23        THE COURT:  All right, give me a reasonable, sensible

24   answer.  Now what are we worrying about in the Murrieta Valley?

25        MR. VEEDER:  Well, your Honor, may I ask him about two

1    or three more questions?

2        THE COURT:  All right.

3    BY MR. VEEDER:

4        Q  You have located the static water level on those

5    wells, have you not, as they relate to the ground surface in

6    the Murrieta Valley?

7        A  I have taken them from either pump tests or driller's

8    reports, and they are contained on those tables, with the

9    exception that the wells tested by drillers show the pulldown

10   only and I have in a separate table the pumping water level,

11   the static water level from which I computed the pulldown.

12   I can now give you the static water level.

13       Q  Would you give me the static water level of 20-7-3L2?

14       A  I don't understand.

15       Q  What is the static water level?

16       A  You mean this particular well right there?

17       Q  Yes.

18   MR. SACHSE:  20L2; is that it, Mr. Veeder?

19   MR. VEEDER:  Yes.

20   THE WITNESS:  The static water level was 12 feet.

21   BY MR. VEEDER:

22       Q  And what was the static water level--

23       A  That was, however, in 1956.

24       Q  1956 was a good year, wasn't it?

25   MR. KRIEGER:  In what way?

1    MR. VEEDER:  Well, it was a wet year.

2    THE WITNESS:  I have not realized, sir, that we had any

3    wet years recently.

4    MR. VEEDER:  Well, we haven't.  Since the Marines bought

5    that place we have been dried out.

6    THE COURT:  Let's go ahead.  That remark will be

7    stricken from the record.

8    MR. KRIEGER:  Perhaps we can expedite some of this if

9    we can ask Mr. Webb if he has the static water levels on

10   all of those wells on the lower left-hand schedule of the

11   well testers, your Honor, and if he has we will put them on.

12   THE COURT:  All right-- as another column.

13   MR. KRIEGER:  Yes, your Honor.

14   THE COURT:  And put on as another column the elevation

15   above sea level or static water level.

16   MR. KRIEGER:  Certainly.  We will save some time.

17   MR. VEEDER:  Let's save some time.  If we can have a

18   recess now, your Honor, I will have my friend put them on the

19   exhibit and I will ask him three more questions and turn him

20   loose.

21   THE COURT:  Three questions.

22   MR. VEEDER:  Well, now, your Honor,--

23   MR. KRIEGER:  He was not counting the subdivisions.

24   THE COURT:  You are almost through, then?

25   MR. VEEDER:  Yes, your Honor.

1    THE COURT:  All right, take a short recess.

2    (Recess.)

3    MR. KRIEGER:  Your Honor, we have had Mr. Webb place on

4    Exhibit A, under a column entitled "Static under wells tested

5    by drillers," the static level of all the wells as to which

6    testimony was given by the well driller.

7    And then also Mr. Veeder and I have been talking about

8    data assembled by Mr. Kunkel in which he has given us the

9    elevation of the wells mentioned on our map, and from that

10   we have subtracted the static water level and have come up

11   with the elevation of the water itself for a water contour,

12   which we have agreed to place on the map during the noon

13   recess underneath the respective wells in green figures, if

14   that's all right.

15   THE COURT:  Fine.

16   MR. KRIEGER:  It is to be understood, however, that

17   these are not with pinpoint accuracy, because they have to

18   be interpolated between 20-foot contour lines.  Probably the

19   measure of error is not more than ten feet one way or the

20   other.

21   THE COURT:  That is understood.  And it is also subject

22   to correction.  If any grievous error is found, you may call

23   it to the Court's attention.

24   MR. VEEDER:  We have turned our notes over to them, if

25   they want to check them out.  But I would like to put them on

1    during the noon recess, if we may.

2         MR. KRIEGER:   I will have Mr. Webb put them on at that

3    time, inasmuch as it is our map.

4    BY MR. VEEDER:

5         Q   Mr. Webb, you stated that the dike created by the

6    Wildomar fault could be anywhere from 200 feet beneath land

7    surface to land surface; isn't that right?

8         A   No, I think I said that the one in San Bernardino

9    that I attempted to locate I thought was about 200 feet down.

10   This one, the Wildomar fault, I think I said was very close

11   to ground surface because of the rising water in the shape of

12   springs.

13        Q   Well, it could be, though, at ground surface at some

14   point, it could be 20 feet below in others; is that right?

15        A   I don't know, Mr. Veeder, where the top of that dike

16   is.

17        Q   You didn't investigate it?

18        A   I drilled no holes or did anything of that sort.

19        Q   Did you see any phenomena on the earth's surface in

20   this area where the inferred fault line is situated that would

21   indicate the presence of the fault at the surface?   That is

22   two questions.

23        A   Well, in the springs-- I saw several springs that

24   had apparently been in existence for many, many, many years.

25   When I see a spring it would indicate to me that the obstruc-

1  tion, whatever it may be, must be very close to the surface

2  of the ground in order to force the water up.

3      Q   And where the springs do not appear you would infer,

4  would you not, that the dike is considerably below the surface

5  of the ground?   Isn't that right?

6      A   It could be.

7      Q   Based upon the phenomenon concerning which you have

8  now testified, it is apparent, is it not, that some water passes

9  directly through the dike into the area between the Elsinore

10  and the Wildomar faults, and also that some of the water

11  passes over the top of the dike into the area between the

12  Elsinore and the Wildomar faults; isn't that correct?

13      A   Well, I would assume that some water probably gets

14  through that dike.  As to how much I don't know.

15      Q   I simply asked a yes or no question.

16      MR. KRIEGER:  You may explain the answer, Mr. Webb.

17      THE COURT:  You may explain it.

18      THE WITNESS:  Well, in any earthquake fault-- and this

19  certainly is an earthquake fault-- it is very difficult to

20  tell how much water does get through the dike or where the

21  top of the dike is.

22  BY MR. VEEDER:

23      Q   I haven't asked you how much.  I said some does.

24      A   I cannot answer your question yes or no, sir.

25      Q   Well, you can answer, can you not?

9594

1    A   I said, or attempted to say, sir, that I believe

2    that there is some water passes through the dike.  I would

3    think that it might be comparatively small.  How many gaps

4    there may be in the dike and at what locations I do not know.

5    Q   And you would say that some water necessarily passes

6    over the top of the dike into the Murrieta?

7    A   I would assume that that would be correct.  I might

8    say that I think Mr. Kunkel's organization spent many months

9    in just exactly such a study as that on leakage through the

10   San Jacinto dike in the San Bernardino Valley.  I don't know

11   many months they spent in there.

12   Q   I bet it was geared to appropriations-- how many

13   months.

14   A   I wouldn't know, sir.

15   Q   Now, the fact then is that some of the water which

16   comes down this gradient enters the Murrieta Creek area,

17   which is between Elsinore and Wildomar faults; that is cor-

18   rect, is it not?

19   A   I don't know, sir, where that percolating water goes.

20   Certainly there are no pipes.  I think it does find its way

21   down the pond behind the dike.  Some of it may get through

22   the dike, some of it may get over the dike.

23   Q   And to the extent that it gets through and gets over

24   it contributes to the surface flow of the Murrieta Creek,

25   does it not?

A   I think that the area that I have outlined, what I call the Santa Gertrudis area, that that would be true.

THE COURT:   You have had your three questions and three times three, Mr. Veeder, and this is all repetitious.   Let's go on to something else.

MR. VEEDER:   Your Honor, I have just one.

Q   Now, the reduction there of the quantity of water in storage beyond the dike created by the Wildomar fault would, to some degree, reduce the quantity of water proceeding down Murrieta Creek to the mouth of Temecula Canyon?

A   If you confine that to my Santa Gertrudis area, I think that is correct.

MR. VEEDER:   I have no further questions, your Honor.

MR. SACHSE: I have just one question, your Honor.

THE COURT:   Mr. Sachse.


CROSS-EXAMINATION

BY MR. SACHSE:

Q   Mr. Webb, if I understood you correctly, you answered one of Mr. Veeder's questions by stating that the absence of springs east of any area of the Wildomar fault would indicate that the fault was a substantial distance beneath the surface. Might it not indicate that there is not any water?

A   That is correct.   And that is my belief in that particular area.

1          MR. SACHSE:  That's all.

2          THE COURT:  Mr. Stahlman.

3          MR. STAHLMAN:  I have just a few questions, your Honor.

4

5                          CROSS-EXAMINATION

6     BY MR. STAHLMAN:

7          Q   Are you familiar with the history of those springs

8     that border upon the east of the Wildomar fault in relation

9     to their performance over past year?

10         A   Only in a very, very general way, sir.

11         Q   In what respect to you refer.when you say in a

12    general way?  Do you mean as to whether or not some of them

13    flowed differently in the past than they do at the present?

14         A   Well, it is my understanding that in many--

15         MR. VEEDER:  Your Honor, I object to the response that

16    it is his understanding.  If he knows, all right.  If he

17    doesn't know, I object.

18         THE COURT:  If you know, say so.  If not, say so.

19         THE WITNESS:  I read the U. S. Geological--

20         MR. KRIEGER:  If you yourself know, Mr. Webb, of your

21    own knowledge, yes.  If you have to refer to a book or some-

22    body else's testimony, you are not permitted to answer the

23    question.

24         THE WITNESS:  Well, I think I know.

25         MR. KRIEGER:  All right, say so.

9597

THE WITNESS:  I think that the springs are approximately the same now as they have been for many, many, many years.

BY MR. STAHLMAN:

Q  And you mean by that as to the quantity of water?

A  As to the quantity of water.

Q  And you are talking about the springs in any particular area, or all of the springs along the fault line?

A  I was speaking particularly of the spring slightly downstream from Santa Gertrudis.

Q  Downstream.  Do you have any familiarity with the fact that many of the streams that had flowed in the past are dry?

A  No, sir.

MR. STAHLMAN:  That's all I have.

THE COURT:  Any other counsel?

MR. Krieger, any redirect?

MR. KRIEGER:  No redirect, your Honor.

THE COURT:  Mr. Veeder?

MR. VEEDER:  Yes, your Honor.


FURTHER CROSS-EXAMINATION

BY MR. VEEDER:

Q  Presence of wells along the Wildomar fault on the north side of the dike would evidence to you, would it not, that there is water north of that dike?  Isn't that right?

1      A   Where are these wells?

2      Q   I say the presence of them.   There are wells.

3      MR. KRIEGER:   You mean the ones shown on the map, Mr.

4   Veeder?

5      MR. VEEDER:   Yes.

6      THE WITNESS:   Yes, sir.

7      MR. VEEDER:   I have no further questions.


9                   REDIRECT EXAMINATION

10   BY MR. KRIEGER:

11      Q   The fact that there are wells there, Mr. Webb, doesn't

12   tell you anything about how productive they are when being

13   pumped; is that right?

14      MR. VEEDER:   Your Honor, I object to that question.

15   How far is up?

16      THE COURT:   Well, that is the same question you asked

17   about water running uphill.   But I will sustain the objection

18   and let's get on with the case.

19      MR. KRIEGER:   That's all, Mr. Webb.

20      I have no further questions, your Honor.

21      THE COURT:   Thank you, Mr. Webb.

22      MR. VEEDER:   Will he be available for further interroga-

23   tion?

24      THE COURT:   Mr. Webb, we are excusing you temporarily.

25   You may still be required to respond if we need you later, and

1    if we do, we will try to give you some reasonable notice.

2        THE WITNESS:  Thank you, sir.

3        MR. KRIEGER:  Your Honor, I would like to offer Exhibit

4    D in evidence.  That is the collection of the well data which

5    we presented yesterday.

6        THE COURT:  The well logs?

7        MR. KRIEGER:  The well logs and other miscellaneous

8    information.

9        MR. VEEDER:  Subject to reviewing it.  I haven't had a

10   chance to review it.

11       MR. STAHLMAN:  Is there something in there besides well

12   logs?

13       MR. KRIEGER:  They are all well logs, but they are not

14   well logs in the traditional sense, Mr. Stahlman.  Why don't

15   you look them over at the recess and let me offer them again

16   after lunch.

17       THE COURT:  All right.  Call another witness.

18       MR. KRIEGER:  Mr. Leo Roripaugh.

19       I think Mr. Roripaugh has already been sworn, your

20   Honor, on the field trip.

21       Is that right?

22       THE COURT:  Were you sworn?

23       THE WITNESS:  Yes, sir.

24       THE COURT:  All right.  I can't remember.

25

LEO RORIPAUGH,

recalled as a witness in his own behalf, having been

previously sworn, testified further as follows:


DIRECT EXAMINATION

BY MR. KRIEGER:

Q   Mr. Roripaugh, state again for the record your name

and where you live.

A   Leo Roripaugh.   I live in Temecula.

Q   At the moment I would like to have you come over

here to Exhibit A and show us where you live.

(The witness steps down to the exhibit and indicates.)

MR. KRIEGER:   He is pointing to a place right next to

Well 35C1, your Honor.

THE COURT:   All right.

MR. KRIEGER:   Right next to the Santa Gertrudis River.

Q   What is your business, Mr. Roripaugh?

A   Farmer.

Q   What kind of farming do you do?

A   Well, general farming.   We have cattle and alfalfa

and permanent pasture and we dry farm on a pretty big scale.

Q   How long have you been farming in this area?

A   Well, about twenty years right where I am now.

Q   Are you pretty familiar with farming operations all

around you?

A   Fairly so.

Q   Now, you heard some comments made yesterday about farming.  You were in court yesterday, were you not?

A   Yes.

Q   And about how many inches of water it took to supply so many acres with water.  I just wonder if you can tell me how many acres of land, in your opinion, can be irrigated for alfalfa with 40 inches of water?

MR. VEEDER:  I object to that; there is no proper foundation.

THE COURT:  The man has been growing alfalfa.  He can give his estimate and opinion.  It will go to its weight.  You may cross-examine and find out how he irrigated.

MR. VEEDER:  I am with him on that.  But my point is, how many cuttings does he get?

MR. KRIEGER:  We will get into that.

THE COURT:  The objection is overruled.

THE WITNESS:  What was the question, please?

BY MR. KRIEGER:

Q   The question is, how many acres of alfalfa could you irrigate with 40 inches of water?

A   Well, the rule of thumb is 40 acres with 40 inches, and a lot of different things enter into the picture-- the soil composition, the grade of the land, whether you sprinkle or flood.

1     THE COURT:  What is the rule of thumb-- one acre to an

2  inch?

3     THE WITNESS:  Yes, sir.

4  BY MR. KRIEGER:

5     Q  Now, to carry on such an irrigation project as that,

6  would you need to have a reservoir?

7     A  Yes.

8     Q  How often would you irrigate alfalfa?

9     A  Well, roughly, in our area, it is approximately every

10  30 days.  Now, you might have a month in the summer, if the

11  weather is really hot, when you would have to irrigate it

12  twice, possibly, in 30 days, if the water is available.

13     Q  How many days would you irrigate at one time for

14  flood irrigation?

15     THE COURT:  On a particular piece.

16     MR. KRIEGER:  I am assuming now for the moment-- and

17  I should tell you this throughout-- we are talking about a

18  40-acre parcel irrigated by 40 inches of water.  That is what

19  I asked him about, and that will be the assumption I will

20  make throughout my questions.

21     THE COURT:  I am trying to find out, are you going to

22  irrigate the whole 40 at once, and tell me how many days it

23  takes, or are you asking how long you run the water on a

24  particular parcel?

25     MR. KRIEGER:  We are going to irrigate the whole 40

acres at once.

THE WITNESS:  You progressively irrigate across the field, and that is at once, I guess.

THE COURT:  On each piece on which you put water, how long do you let it run?

THE WITNESS:  In flood irrigation it would probably take you ten to twelve days to get over the 40 acres, providing you had this reservoir so that you could run your pump 24 hours a day and have a good head of water during the daytime.

THE COURT:  You say you irrigate progressively.  As I understand, you turn the water first on one portion, and then you turn all the water that is available on another portion.

THE WITNESS:  Yes.

THE COURT:  How long do you let the water run on one portion?

THE WITNESS:  That would depend on the length of the check.  It could be different on different pieces.  But probably one check might run two hours-- that would be just taking the middle of the road situation, and then you would move it into the next check, and the ordinary checks in our area are roughly 27 feet wide.

BY MR. KRIEGER:

Q  How many cuttings of alfalfa can you get in one year?

A  I think the normal situation up there would be about

1    six cuttings.

2        Q  How many tons of alfalfa could you expect to get off

3    of an acre?

4        A  Well, the normal yield in our particular area

5    probably might be approximately a ton per acre per cutting,

6    if everything was on a normal schedule.

7        Q  So on a 40-acre piece you would get 640 tons; is

8    that right?

9        A  It would be 240 tons, I believe.

10       Q  240 tons off your 40-acre parcel for one year; is

11   that right?

12       A  That is approximately true.

13       Q  What is the present price that alfalfa is bringing

14   per ton?

15       MR. VEEDER:  Your Honor, that is objected to as being

16   incompetent, irrelevant and immaterial, not tending to prove

17   a single issue in this lawsuit.

18       THE COURT:  What do you propose to prove?

19       MR. KRIEGER:  I am trying to get around to the comments

20   that were made yesterday about how prosperous a farmer on a

21   40-acre parcel could be.

22       THE COURT:  Nobody said anything about prosperity.  I

23   said that if I had 40 acres of ground in this country and

24   had 40 inches of water, I think I said I would have a gold

25   mine.  I didn't mean that I would have a chance to make a

9605

1   lot of money. But I think I would have a good bit of water

2   in this area.

3        MR. KRIEGER:  Your Honor, all I am trying to see is

4   what kind of gold mine you would have, measured by the

5   actual operations in the field, and I think I can show by

6   the price they get per ton and the cost to raise it and how

7   much it is going to produce, and it isn't going to produce

8   very much.

9        THE COURT:  I know.

10       MR. VEEDER:  I renew my objection.

11       THE COURT:  Sustained.  There is no argument about that.

12   I don't think the farmer has a bed of roses.  When I said

13   gold mine, I was using a figurative phrase; not as to how

14   much money he would make from the property, but the fact that

15   in this arid country 40 inches of water on 40 acres-- if you

16   had an average of 40 inches of water on 40 acres on all the

17   tillable ground in this arid country, you would have a lot

18   more water than presently exists here.  That's all I meant.

19       MR. KRIEGER:  I understand now, your Honor.  I didn't

20   understand yesterday.  I thought perhaps we had gotten into

21   the record the fact that that was a prosperous operation.

22       THE COURT:  We are not trying the question whether these

23   farmers are prosperous or not.  That doesn't enter into it.

24       MR. KRIEGER:  By the showing of this proof, your Honor,

25   I would simply endeavor to show that all you could net off an

1      operation like that would be about $6 an acre.

2          MR. VEEDER:  Your Honor, I move to strike it.

3          THE COURT:  I lived on a farm, and I was never poorer

4      in my life than when I lived on a farm.

5          MR. KRIEGER:  Then you know this without introducing

6      any evidence.

7          THE COURT:  Yes.

8          MR. KRIEGER:  This is the only purpose of introducing

9      Mr. Roripaugh's testimony at this time, so I will withdraw

10     him.

11         THE COURT:  All right.

12         MR. STAHLMAN:  I have a question, your Honor.

13         THE COURT:  Mr. Stahlman.

14

15                    CROSS-EXAMINATION

16     BY MR. STAHLMAN:

17         Q  This method that you employ in irrigating alfalfa,

18     as you have described it here, by flooding-- you called it

19     flooding?

20         A  Yes.

21         Q  Is that the method that is customarily used in the

22     area there by people who grow that kind and type of crop?

23         A  There is some sprinkling, but the major part is by

24     flooding.

25         Q  And traditionally throughout the years, though, that

1      was the method of irrigation, wasn't it?

2          A   Yes, flooding has been the major part.

3          Q   And is still practiced to a very large extent in that

4      community?

5          A   That is true.

6

7                      FURTHER DIRECT EXAMINATION

8      BY MR. KRIEGER:

9          Q   Incidentally, Mr. Roripaugh, what other kind of crops

10     are grown in your area?

11         A   Well, they grow alfalfa, permanent pasture, there

12     have been some vegetables, watermelons, potatoes, carrots,

13     there has even been some lettuce on a small scale.

14         Q   No citrus?

15         A   No.

16         Q   No avocados?

17         A   No.

18         MR. KRIEGER:   That's all.

19

20                         CROSS-EXAMINATION

21     BY MR. VEEDER:

22         Q   Isn't it true, Mr. Roripaugh, that Mr. Query down

23     here simply throws the fire under his pump and has sprinklers

24     and he takes care of about 80 acres with a single pump?  Isn't

25     that right?

1      MR. KRIEGER:  That, of course, is outside the direct
2  examination, your Honor.

3      THE COURT:  The Court is familiar with these matters.
4  All you have to do is drive around this country and you see
5  different methods of irrigation used.  Now the question doesn't
6  mean anything.  It would depend on how big a well he had, the
7  drawdown and all of that.

8      MR. VEEDER:  Your Honor, I am simply trying to bring out,
9  as long as all counsel are testifying, I will throw in mind.

10      THE COURT:  What are you trying to show?

11      MR. VEEDER:  I am trying to say that it is not absolutely
12  essential that you have a reservoir; that you can pump out of
13  a well and have your sprinklers operate in one operation.

14      THE COURT:  Why don't you ask him that question?

15      MR. VEEDER:  I was making it easy for him.

16      Q  Isn't it entirely possible to have an irrigation
17  system with a pump and your sprinkler simply operating off
18  the pumping system without a reservoir?

19      A  I believe that is true.

20      MR. VEEDER:  That's all.

21      MR. KRIEGER:  That's all.

22      THE COURT:  Thank you, Mr. Roripaugh.  You will not
23  object if I cut you off kind of short here.

24      THE WITNESS:  It pleases me very much, your Honor.

25      MR. KRIEGER:  I don't know why nobody wants that seat,

1    your Honor.   They are not anxious to get up there.

2         I have another witness-- Mr. Roripaugh's father, Jack

3    Roripaugh.

4         Would you take the stand, please,

5         THE COURT:   Did we swear Mr. Roripaugh, Sr., on the

6    field trip?

7         MR. LITTLEWORTH:   I don't believe we did, your Honor.

8

9                        JACK RORIPAUGH,

10   called as a witness in behalf of defendant Roripaugh, et al.,

11   being first duly sworn, testified as follows:

12

13                     DIRECT EXAMINATION

14   BY MR. KRIEGER:

15        Q   Mr. Roripaugh, where do you live?

16        A   On what is now called Winchester Road.   It used to

17   be Banana Street, known as Highway 395, about a mile and a

18   half above Temecula.

19        THE COURT:   You may point it out on the map, Mr.

20   Krieger.

21        MR. KRIEGER:   Fine.

22        Q   You live at the spot shown on this map as 35B1--

23   Everyone lives by a well site here; is that right?

24        A   That is right.

25        Q   And how long have you lived there?

A   Well, I moved there in 1910.

Q   How long have you lived in the valley?

A   I have lived in that general locality ever since 1892; not down in the valley-- I was still very close to the Vail Ranch.

Q   How much of the land around your place was irrigated in 1900, do you remember?

A   Well, almost none.  There was a small piece down below in the Murrieta Valley that was irrigated there, and that is about all at that time.  About 15 acres, I should say.

Q   Do you remember where the point of rising water was on the Santa Gertrudis River about that same time?

A   Yes, sir.

Q   Where was it?

A   Well, it was about 400 yards above where it is now.

Q   In relation to your home where was it?

A   It was almost directly across the valley, the creek bed there, from my house.

Q   I see.  It would be directly to the west and north; is that right?

A   That is right.

Q   Did the point of rising water change from 1900 until 1941?

MR. VEEDER:  Your Honor, I object.

Would you state the time and year you are referring to the

rising water?

BY MR. KRIEGER:

Q  At what time of the year did you observe the point of rising water?

A  All the seasons of the year.

THE COURT:  Was it about the same all the year around?

THE WITNESS:  Well, no, it was not.  There was a difference, your Honor.  In the fall it would run clear down. What made me consider that the point of rising water was because along in the fall there was water there in the pool all of the time.  When it would start to rain it would run down through the sand down to where it is now up until about-- well, I don't know.  We had the flood there in 1940-41, about that time.

BY MR. KRIEGER:

Q  What happened at that time?

A  The channel changed on the opposite side of the valley, this little valley where the creek runs through, where the flood waters run, and at that time that water stopped rising there.

Q  That was about 1941?

A  Yes, it was '41.  I am not positive.  About '41 or '42.  I think it was '41, but I am not sure.

Q  Where did you next observe the point of rising water after the flood of 1941 or '42?

1    A   Well, it cut a channel across there and the water

2  came around there and for two or three years it was on the

3  surface there, I should say maybe a couple of years, just a

4  dribble down there where it cut the new channel, and then it

5  gradually disappeared and went underground or somewhere.  I

6  couldn't say where.  My idea was that it cut a rather deep

7  channel there and had gone underground.

8    Q   And has the point of rising water changed over the

9  years since then or has it remained about the same?

10    A   Well, it has remained about the same.

11    Q   From the year 1900 to the year 1941 or '42 did

12  much of the land in that area go into irrigation?

13    A   A great deal of it.

14    Q   Do you have any idea how much?

15    A   Up to '42 I should say about 500 acres.

16    Q   500 acres?

17    A   I should think so.

18    Q   And what was grown on those lands?

19    A   After it was irrigated?

20    Q   Yes.

21    A   Well, mostly alfalfa, but vegetables were grown

22  there at different times-- potatoes.

23    Q   Has any more land been put in irrigation since 1941-

24  '42?

25    A   Yes.

Q  How much?

A  Let me see now.  I want to think that one over a little bit.

MR. VEEDER:  Could you define the area that you are talking about?

THE WITNESS:  I think perhaps a small amount, rather a small amount has been put in.

BY MR. KRIEGER:

Q  What do you mean by a small amount?

A  Well, that is rather hard for me to say, because I don't know the date some of that stuff was put in and I wouldn't want to say because I don't know.  I think quite a considerable amount was put in there on Santa Gertrudis Creek and over in the Murrieta Valley just opposite Santa Gertrudis-- below.

Q  What I am talking about, and I want to clarify this point, when I asked you the land that had been put into irrigation, Mr. Roripaugh, I meant the lands on the Santa Gertrudis down to the Wildomar fault.

A  I understand.

Q  Not beyond it.

A  I understood you.

Q  Was your answer responsive to my question when you said 500 acres in 1951 had been put into irrigation on the Santa Gertrudis?

1      A   That is right.  Not between the dates 1941 and '52,

2   but previous to that-- most of it was put in previous to

3   that.

4      Q  And you don't know how much, if any, acreage was put

5   into irrigation after that date; is that right?

6      A   I am not sure, no.

7      Q   You are familiar with the so-called Wildomar fault

8   or dike, are you not?

9      A   I think I am.

10      Q   Do you know where the Barnett springs are?

11      A   Yes.

12      Q   If I were to locate them-- you see where I am locat-

13   ing from here?

14      A   I can see approximately.

15      Q   Is the Barnett springs almost--

16   MR. VEEDER:  I don't mind your leading so much.  Why

17   don't you just let him go down and mark it.

18      MR. KRIEGER:  I will be glad to.

19      THE COURT:  Are they on the Barnett property?

20      MR. KRIEGER:  The Barnett property, the Barnett springs.

21      THE COURT:  You have your pencil on the Vail property.

22      MR. KRIEGER:  I am very close to it.  It is right at

23   that juncture.

24      Will you come down, Mr. Roripaugh.  I want you to mark

25   the place where the Barnett springs are.

THE COURT:  Explain the things on the map to him-- which is 395, which is the old road, and which is the fault line.

BY MR. KRIEGER:

Q  Here is the fault line in this dotted area, and here is the Garfield Road right here, and here is your home as you have designated it.

A  Yes.

Q  This is Section 35, and this is the Vail line right here, this red line is Vail.

A  That is the Vail line?

Q  Yes.  Where are the Barnett springs, to the best of your recollection?

A  (Witness marking the map.)

MR. KRIEGER:  May I retrace that in green, your Honor, and mark it "Barnett Springs"?

THE COURT:  Yes.  Let's see where you are putting it.

MR. KRIEGER:  Right here.

THE COURT:  Right on the fault line?

MR. KRIEGER:  Right on the fault.

Q  That is only approximate, isn't it, Mr. Roripaugh?

A  Yes, but it would be very close.

Q  How long have you observed those springs?

A  I am very familiar with them since 1905.

Q  Has the amount of water that flowed from those

1    springs changed during the years?

2        A  Not perceptibly that I can tell.

3        Q  I want to call your attention to another portion

4    of the Santa Gertrudis Valley and ask you if you know of any

5    wells that have been drilled up the valley from you which are

6    not shown on this Exhibit A?

7        A  Yes.

8        Q  Tell us about them, will you?

9        A  Well, there was a well drilled up near the junction

10   of the so-called Nicholas Road and that Winchester Road.

11       MR. KRIEGER:  Nicholas and Winchester Road-- I am

12   pointing to it here, your Honor.  It is right on the inter-

13   section of Sections 24 and 25.

14       THE COURT:  All right.

15   BY MR. KRIEGER:

16       Q  Do you know when that was?

17       A  No, I am not certain of the date.

18       Q  Do you know whether it was in 1920, '30 or--

19       A  Oh, yes, it was approximately 1930, I would say.  It

20   might be a little later than 1930, maybe '31.

21       Q  Did you watch that well being drilled?

22       A  Yes, I did.  I was there twice when that well was

23   being drilled.

24       Q  Do you know how deep they went?

25       A  I am not certain.

1         MR. VEEDER: I object on the grounds that it is hearsay,

2 your Honor.

3         THE COURT: Overruled.

4         Do you know?

5         THE WITNESS: I think it was 140 feet, but I wouldn't be

6 positive about that.

7 BY MR. KRIEGER:

8         Q Do you know why they stopped?

9         MR. VEEDER: Your Honor, I object on the grounds that

10 it is hearsay.

11         THE COURT: Overruled, if you know.

12         THE WITNESS: They stopped because they struck a rock

13 there.

14 BY MR. KRIEGER:

15         Q You watched the rig when it hit that rock; is that

16 right?

17         A Yes, I was there two different occasions when they

18 were drilling on that rock.

19         Q What did they finally do with that well, if you know?

20         A They just pulled out of it, they quit it.

21         Q And what is the status of that well today?

22         A There is plenty of water in it, but I think it

23 pumps out very quickly. There is seepage.

24         MR. VEEDER: I move to strike that as being not

25 responsive, your Honor.

1          THE COURT:  Overruled.

2    BY MR. KRIEGER:

3          Q  Have they capped it?

4          A  It is used for a domestic well at times.

5          THE COURT:  Whose well is it?

6          THE WITNESS:  It is on my son's place.

7          THE COURT:  On Jack's place?

8          THE WITNESS:  Yes.

9          THE COURT:  I mean on Leo's place?

10         THE WITNESS:  That is right.

11   BY MR. KRIEGER:

12         Q  Is there any other well up there that you know of

13   that isn't shown on that map, Exhibit A?

14         A  There is another well about a quarter of a mile

15   easterly, a little southeasterly, near that Nicholas Road.

16         Q  Southeasterly of the point you were talking about

17   before; is that right?

18         A  That is right, almost east but a little bit southerly.

19         Q  Just off Nicholas Road?

20         A  Yes.

21         Q  What happened with that well, do you know?

22         A  I know they quit it.  My brother-in-law drilled both

23   wells, and he just said he hit rock there.  But I was not

24   there when they were drilling that well.

25         MR. VEEDER:  I move to strike the answer as being hearsay,

1    your Honor.

2           THE COURT:  It may go out.

3           We had some testimony yesterday about this same well, or

4    this week, and I had a note here "Deal m-i-t-e-r."  Is that

5    the name of some person?  I am trying to read by writing.

6    Did your son own the property when this first well you are

7    talking about was drilled?

8           THE WITNESS:  No.

9           THE COURT:  Who owned it then?

10          THE WITNESS:  I think that some company in Los Angeles

11   owned it.  Fidelity, wasn't it, owned that tract of land there.

12   I wouldn't be certain.

13          LEO RORIPAUGH:  Fidelity Realty Corporation in Los

14   Angeles.

15   BY MR. KRIEGER:

16          Q  Who was it owned the land on which the second well

17   was drilled?

18          A  That was the same tract of land.

19          Q  The same tract, the same owner?

20          A  The same tract.

21          Q  That also belongs to your son now?

22          A  Yes, sir.

23          Q  Do you know what the status of that well is today?

24          A  That is used for a domestic well.

25          MR. KRIEGER:  You may cross-examine.

CROSS-EXAMINATION

BY MR. VEEDER:

Q  Mr. Roripaugh, just a couple of questions.  You said that you figured the rising water in the Santa Gertrudis was about 400 yards, did you say, upstream?

A  Yes, about.

Q  Could I ask you to come down and sort of mark that on there for us with a green pencil and put your initials-- how far you figure the 400 yards.

MR. KRIEGER:  Now you are asking about where it rose in the year 1900, are you not?

MR. VEEDER:  Well, whenever he said it.  He said it used to be 400 yards upstream.

THE COURT:  Before the flood of 1941.

MR. KRIEGER:  That is right.

THE WITNESS:  That would be about the point where the water was rising at that time.

MR. VEEDER:  You can make a bigger mark than that.

THE WITNESS:  I can make any kind of mark you like.

MR. VEEDER:  Well, you make a big one.

THE WITNESS:  (Marking the map.)

MR. VEEDER:  May I ask you to put your initials there.

MR. KRIEGER:  Just put your initials right next to it, will you?

(The witness marking the map.)

1    MR. KRIEGER:  He has put "J-E-R" next to it.

2  BY MR. VEEDER:

3    Q  Now, the rising water is no longer there; it has

4  moved down?

5    A  That is right.

6    Q  But the Barnett Spring continues about the way it

7  was?

8    A  As near as I could judge.

9    MR. VEEDER:  Thank you very much.

10    THE COURT:  Where did he put this mark?  I can't see

11  it.  Tell me.

12    MR. VEEDER:  It is right across from B-1.

13    THE COURT:  On the section line?

14    MR. VEEDER:  Well, a little above it, about an eighth

15  of an inch.

16    THE COURT:  Right near that figure 1100?

17    MR. VEEDER:  Yes, it is between B-1 and the 1100.

18    THE COURT:  All right.

19

20                    CROSS-EXAMINATION

21  BY MR. STAHLMAN:

22    Q  Jack, you know you are under oath, don't you?

23    A  I assumed I was in the proceedings.

24    Q  Did you shoot a deer last year?

25    A  I think I will invoke the Fifth Amendment on that.

1    MR. STAHLMAN:  All right.  I have just one question.

2         Q  You have known of other wells drilled around in that

3    area when there were dry holes and no water throughout the

4    years?

5         A  Yes.

6         Q  There have been quite a few of them?

7         A  Well, quite a few.

8    MR. STAHLMAN:  That is all.

9    THE COURT:  Any further questions?

10   MR. KRIEGER:  No further questions, your Honor.

11   THE COURT:  Thank you, Mr. Roripaugh.

12   THE WITNESS:  Thank you.

13   THE COURT:  That question he asked you, he was just

14   having a little fun.  It has not anything to do with this

15   lawsuit.

16   THE WITNESS:  It might have been well taken at that.

17   MR. KRIEGER:  Thank you very much, Mr. Roripaugh.

18   Your Honor, I would like to make this request of your

19   Honor.  Mr. Veeder's office has very kindly now prepared the

20   first draft of this document that we are working on, and I

21   wonder if it would be possible for all of us to sit around

22   together for maybe thirty minutes this afternoon, with your

23   Honor and Mr. Sachse and Mr. Girard for the State and Mr.

24   Stahlman, if he likes, and discuss this thing.  Would you

25   be agreeable to that?

THE COURT:  I will ask you to meet first and then I will look it over after you have kicked it around.

MR. KRIEGER:  The reason I am suggesting this is that we thought you could give us some suggestions along the lines that I am talking about.

THE COURT:  All right.

Do you have any further witnesses?

MR. KRIEGER:  Yes, I will have two.

THE COURT:  Couldn't you call some of these?

MR. KRIEGER:  If you want to wait a few minutes, we can go right on with our witnesses now.

THE COURT:  I have a short motion at 2 o'clock.  I don't know how long it will be.  We will adjourn until 2:15.

MR. KRIEGER:  Where will we meet with you?  Can we meet at 1:30 in your chambers?

THE COURT:  Can we meet at 2:15?

MR. KRIEGER:  In your chambers?

THE COURT:  Fine.

Court will be recessed until 2:15.  We have to keep continuing jurisdiction of this case.  We will start in chambers.

MR. KRIEGER:  I understand.

THE COURT:  Take the noon recess.

(Noon recess.)

SAN DIEGO, CALIFORNIA, THURSDAY, APRIL 2, 1959.   2:15 P.M.

(In Chambers:)

THE COURT:  On these suggested findings of fact, conclusions of law and interlocutory decree concerning this land lying north and east of the upper part of the Murrieta Valley or basin, it starts out:

> "Evidence having been adduced that all
> of the water underlying the lands of certain
> defendants to this action are vagrant, local
> and percolating . ."

Do you have evidentiary support of that in the record?

MR. KRIEGER:  Yes, your Honor.

THE COURT:  Were any of your witnesses asked that question?

MR. KRIEGER:  So far Mr. Webb has testified that the waters underlying these lands do not contribute that the pumping of these lands would not affect the stream flow in the river system, yes.

THE COURT:  He referred to the pumping that is going on. But have you asked him specifically whether, in his opinion, that water was vagrant, local, percolating water?  We get the old problem that we had yesterday.  You might have a situation where the present pumping from certain wells would not affect the stream.  You see what I mean?

1      MR. KRIEGER:  I asked him that question.

2      THE COURT:  What question?

3      MR. KRIEGER:  I asked him specifically if pumping, not

4  present pumping, but if any pumping in this present area which

5  he could foresee, considering the amount of water you can get

6  out of that land, would affect the runoff of the stream

7  system, and I think he answered that it would not.

8      MR. VEEDER:  I don't remember that particular question.

9      THE COURT:  Why didn't you ask him the $64 question

10  whether this was vagrant, percolating water?

11      MR. KRIEGER:  Because I thought that that was a legal

12  conclusion.

13      THE COURT:  Well, you have a point there.  But you have

14  been a lot more circumspect than some of the other counsel

15  in this case.

16      MR. KRIEGER:  I thought when he said that it had

17  negligible effect on the stream system I would not ask him

18  for the legal conclusion.

19      THE COURT:  Well, you can check the record.  Certainly

20  you can get somebody to come in and get something into the

21  record.

22      MR. VEEDER:  I am going to have to repeat the question

23  here, though.  Perhaps I missed it, but I did not realize

24  that the question had been asked in regard to these tracts of

25  land whether pumping at any time could ever affect the

1   property.  Now I am speaking of tracts on Roripaugh's B:

2   22, 6, 25, 48, 49, 26, 8, 15 (that is in Sections 3-7-3 and

3   27-7-3).

4       May I go ahead and put them in?

5       MR. KRIEGER: Surely.

6       MR. VEEDER:  Because these are the ones I am talking

7   about.

8       MR. KRIEGER:  You are right.

9       MR. VEEDER:  17, 19, 12 (Sections 21 and 22 of

10  Township 7, Range 2 and Section 22, Township 7, Range 3),

11  and then Lots or Tracts (whatever you call them) 9, 52,

12  16 (Section 1 in 7-4), 50 (1-7-4), 40 and 12.  And as I

13  understand it, you have now added 42.

14      MR. LITTLEWORTH:  Our No. 42 on our B.

15      MR. KRIEGER:  Those references are all to the parcels

16  that are referred to in the lower half of Exhibit B Roripaugh.

17      THE COURT:  And numbered.

18      MR. KRIEGER:  That is right.  And what Bill says is

19  correct.  I have not asked the witness specifically as to

20  these parcels, and I will put Mr. Webb back on to ask him

21  that.  I would like to do that.

22      THE COURT:  All right.

23      MR. LITTLEWORTH:  42 is Gunther.

24      THE COURT:  For the time being we can proceed on the

25  basis that that record has been made or will be made.  My

recollection was that you asked if pumping of those upper

wells excluding the Santa Gertrudis area would affect the

stream.  But it leaves the question open.  It is not the same

as proof that there is vagrant, percolating water there, and

I would suggest that you put him back on for a question or

two on that.

MR. KRIEGER:  Fine.

THE COURT:  Well, let's go ahead with this.  I have

been down through part of the second page.  Let me read the

rest of it.

MR. KRIEGER:  There is a little mixup on some of that

language there, but it is typographical-- I can cure it later.

On the first page, at line 24:  ". . the Court having

previously made its order that all parties are adverse one

to another and issued its order that all other parties to

this proceeding. ."

MR. VEEDER:  Have you looked at this, Franz.

MR. SACHSE:  Yes, and I have Phil Swing's notes in my

pocket and he asked me to go ahead in his behalf on the one

you discussed with him.

MR. KRIEGER:  Down at the bottom of page 2, would you

look at that for just a minute.  That also was a little mixup.

Starting on line 29:  ". .the title to which is quieted

against plaintiff and all parties to this action who are

riparian to the Santa Margarita River and in favor of the

1    owner of each said parcel, his heirs, successors and assigns

2    . ." That is the way it should read.

3        MR. VEEDER:  You are going to give that to Mrs. Tooker

4    to re-run it?

5        MR. KRIEGER:  Yes.

6        THE COURT:  I would cut it down and make two sentences

7    out of it instead of an involved sentence there.  Your first

8    sentence is complete at the comma on line 29.  "Plaintiff and

9    all other parties to this action . . have no right, title

10   or interest in or to the waters underlying the lands. ."  And

11   what about overlying owners?  Do we have to mention those,

12   for instance, who are riparian or overlying owners?  It might

13   be better.

14       MR. SACHSE: In mine I phrased it just a little differ-

15   ently.  This is just a thought.

16       THE COURT:  It seems to me that an overlying owner

17   might have a piece of ground where he was not riparian to the

18   stream, but he was overlying a basin and he would have

19   practically the same rights in the river that a riparian owner

20   would have.  So I think you had better include those who

21   are riparian to the Santa Margarita River and its tributaries

22   or are overlying owners.

23       MR. SACHSE:  I don't think that is enough.  This ought

24   to quiet the title to everybody on the river, even a pre-

25   scriptive user or an appropriator, because they have no

1   interest in these ground waters.  The phrase that I used is

2   "The rights of the plaintiff and all other parties in this

3   action having a right to the use of the Santa Margarita River,"

4   whether they are riparian or appropriative or anybody.

5       THE COURT:  Use Franz's language.

6       MR. KRIEGER:  That's a good phrase.

7       THE COURT:  You say here "And its order that all other

8   parties to this proceeding shall be given a full opportunity

9   to be heard and to introduce evidence in opposition. .  This

10  Court proposes to make the following findings of fact . ."

11      MR. KRIEGER:  We did it shis way specifically so that

12  instead of talking about proposed findings and a proposed

13  decree we simply put it in the recitation.

14      THE COURT:  That is all right.  And then there would

15  go out with this a notice.

16      MR. KRIEGER:  That is precisely it.

17      MR. SACHSE:  In mind I just left a blank and Bill was

18  going to work out the notice.

19      THE COURT:  I would break that sentence down at the end

20  of line 29 on page 2.  The first sentence states, "Plaintiff

21  and all other parties to this action . . have no right, title

22  or interest in or to the waters underlying the lands."  And

23  then "the title to which is quieted against all parties. ."

24      MR. KRIEGER:  All right.

25      THE COURT:  Outside of dressing it up, I don't see any

objection to it, although I think Franz's language is better.

MR. KRIEGER:  On that phrase I do.

THE COURT:  Have you any objections, Mr. Veeder?

MR. SACHSE:  Let me read it so that Bill can do it:

"The plaintiff and all other parties in

this action having rights to the use of

water of the Santa Margarita River and its

tributaries have no rights in or to the

ground waters underlying the lands of the

above defendants."

MR. VEEDER:  Isn't that about the language that you
and I talked about before I left town, Franz?

MR. SACHSE:  Yes.

MR. KRIEGER:  I think it is worth saying that in
arriving at this form of decree we had to come to a conclu-
sion that was a little bit hard to make, and that was whether
or not we could assert a right to the ground water in this
area and still reserve some rights to the surface water, if
it amounted to anything.  We concluded that we could not.

THE COURT:  I was going to raise that question.  What
about the flood waters?  Do you want something in this decree
that this hasn't anything to do with flood waters?

MR. VEEDER: No, I think once a party is out of this
litigation, if I may suggest it, your Honor, I think it
should be for all kinds and types of water.

1        MR. SACHSE: Surface runoff.

2        MR. VEEDER:  Surface runoff and ground water.

3        THE COURT:  Well, let's understand you, Bill.  You mean

4   by that that therefore a man could build a dam up there and

5   impede the surface water?

6        MR. VEEDER:  I don't think he could.

7        THE COURT:  I don't think he could either.  That is

8   what I am getting at.  It seems to me that this decree

9   should provide that it has no effect, that it does not

10  adjudicate the rights to flood waters, and that flood waters,

11  unless otherwise provided in some decree of this Court,

12  shall be permitted to follow their natural courses.

13       MR. VEEDER:  What I am trying to say is that we take

14  the position that these men in the upper watershed could

15  not put in check dams and impede the water.

16       THE COURT:  I would rather leave it open with that

17  "except as otherwise provided," because I have this one

18  thought.  I agree that on general principles any check dam,

19  no matter how small, is contrary to the water law.  But you

20  do have situations of some of these fellows where their

21  check dam is used only to store a little water to water

22  cattle, and it seems to me that the Government ought to unbend

23  enough to permit that, because some of this ground around

24  here is no good for anything except raising cattle.

25       MR. VEEDER:  I would want Col. Robertson to give thought

1    to this, because it is the Marines' problem.  I think it is

2    more than just a legal conclusion.  It might be that we would

3    have to have the situation where a man wanted to put in some

4    check dams by a separate agreement or understanding, because

5    I think they could kill our stream up there by too many

6    check dams.

7        THE COURT:  I agree that there should be some control

8    over it.  But can't we put in these proposed judgments, in-

9    cluding Franz's, which we haven't formally signed yet, that

10   these decrees as to ground water, et cetera, do not concern

11   flood waters, unless and except as otherwise provided by a

12   final decree of this Court, which leaves it open.

13       MR. SACHSE:  I was almost willing, your Honor, in fact

14   I will-- I may hedge, but I don't think I will-- to go a

15   step further.  In the 41 cases that Bill and I have discussed

16   I have expressly disclaimed any interest in surface waters.

17   Of course, I have other situations more like Jim Krieger's

18   where the ground waters perhaps are vagrant, local, percolat-

19   ing, but there will be occasionally surface runoff.  I am

20   almost prepared-- I want to consider each case separately,

21   but I am almost prepared to have included it in, so to

22   speak, a disclaimer by this proof of any right to surface

23   water-- not even flood water, just any surface water.

24       THE COURT:  I think it would be a wise thing to do it

25   and have it out of the way and when anybody else buys the

ground they know that is the situation.  If you want to put it in in certain of these, all right.  But in others, where there is any question, say except as otherwise provided in a final decree of this Court, and then the door is open, and we can work out an agreement arrangement.  My view is that check dams, as they are built by the Soil Conservation for the purpose of retaining water and letting it soak into the ground, violate the water law.  Technically, the check dam that is not built for that purpose but is built for a water-hole has the same effect, but generally it is a smaller dam and generally it is used only where water can't be developed on the ground by windmill or something to water stock.  I think we ought to give come consideration to that.

MR. VEEDER:  I have expressed myself.  I would like to talk it over with Col. Bowen a little more.  My own personal feeling on it, though, is that there is a very real threat in an area like this, with a hundred small check dams in the upper reaches of Warm Springs Creek.

THE COURT:  For instance, if it were done by agreement you could provide that it would be permitted only in areas where they couldn't develop ground water, and the man would have to try to get a windmill well to water his stock.  If he were in an area where he couldn't get even that, there might be a situation where he could do it.

MR. GIRARD:  Technically, you can't have a check dam,

1   outside of prescription, without filing for a permit.  You

2   can't do it.  It is storage, isn't it?

3       MR. STAHLMAN:  Your Honor, if my information is

4   correct-- this is gossip-- in the northern part of the county,

5   particularly Lake Henshaw, the information is that there has

6   been a series of small dams built in that drainage area,

7   but the accumulation of them is such that it has materially

8   affected the flow into Lake Henshaw.

9       THE COURT:  I agree.  I am only thinking about the

10  man who has a thousand acres and he wants some waterholes.

11  If he can get a windmill well, he is all right.  Suppose

12  that he can't and he is in some of this basement complex.

13  I don't think anybody is going to be hurt if he were permitted

14  to put a check dam there to collect water to water his stock.

15      MR. STAHLMAN:  Sandy will bear me out on this-- tell

16  me if I am right, Sandy-- that some little check dams built

17  up there are no good.  They will catch a lot of water in the

18  wintertime, but in the summertime when you need water your

19  cattle are dried up.

20      MR. WILKERSON:  It depends on the rain.  If we have the

21  feed, we have the water.

22      THE COURT:  Of course, Mr Girard has brought up another

23  point.  This will irritate Mr. Veeder, of course.  But I

24  suppose the State Water Rights Board would have a right to

25  hold a hearing and to grant or deny an application to build

1   a small check dam for catching water for stock purposes.  I

2   suppose they would have that right.

3       MR. GIRARD:  If they are claiming an appropriation,

4   I don't think, under the State law, you can get it any other

5   way.

6       MR. SACHSE:  I think we are borrowing trouble.  If the

7   decision in any of these cases eliminates riparian rights,

8   then this individual can only store water either by an adverse

9   act or else by going to the State, either of which would leave

10   Mr. Veeder or the United States either of two means of re-

11   butting it-- either coming in here and asking for an order

12   to show cause to prevent it or opposing it before the State

13   Water Rights Board.

14       MR. VEEDER:  I think there should be some flexibility.

15   I will have to talk to the Marines a little more about it.

16       THE COURT:  How are we hurt if we say that these people

17   who have percolating water, that this decree does not affect

18   flood waters?

19       MR. SACHSE: I have no objection to it.

20       MR. GIRARD:  If you are talking about excess waters not

21   covered under the riparian right, no one has a vested right

22   to them.  They belong to the State.

23       MR. KRIEGER:  Do you have to file an application to

24   appropriate flood waters on a minor basis like this?

25       MR. GIRARD:  I don't think the statutes distinguish

9636

between one gallon and 100 gallon.

THE COURT:   We are talking about natural runoff, too.

MR. GIRARD:   Yes.

MR. VEEDER:   When you put in one of these check dams--

THE COURT:   You catch both.

MR. VEEDER:   You catch the whole thing.

THE COURT:   What is the harm, Bill, of putting in the decree that nothing shall affect the problem of runoff or flood waters?

MR. VEEDER:   I will be candid with you.  I would like to have it cover everything, but--

THE COURT:   Of course, we may breed some trouble for ourselves.  We try to get these people out of this case and then we leave a loose end and they all have to be served again.  It may be that if we make this clear enough we can talk about riparian rights and percolating waters in the sense that we don't talk about anything else and that is the end of it.

MR. KREIGER:   That is the decision we came to.  We thought we have to make a decision for each one of our clients as to whether or not he is willing to surrender any right in the stream flow in exchange for a quitclaim by the Government that he has the absolute right to take all the waters underneath his land.

THE COURT:   Then put in there that they have no rights

1    to any natural runoff.

2         MR. KRIEGER:  I think we have said it here.

3         MR. SACHSE:  Let me give you a concrete example of

4    something that is puzzling me.

5         MR. KRIEGER:  Look at No. 2 on page 2.

6         THE COURT:  "All of the water underlying the lands of

7    the defendants as set forth and described in Exhibit A

8    attached hereto are local, vagrant and percolating waters,

9    not a part of the surface or subsurface stream and subsurface

10   basins of the Santa Margarita River and its tributaries."

11        MR. KRIEGER:  We tried to be as broad as we could.  We

12   simply feel that whatever meager water supply these people

13   get is more important to them than the surface water.

14        THE COURT:  There is none of these people that have a

15   stream that runs at any time except when it rains.  Some

16   of them, I suppose, have little gullies when the rains come.

17        MR. SACHSE:  For example, I am quite willing in most

18   cases to disclaim surface runoff.  But to show you the kind

19   of problem that can arise, in the case of one of my clients,

20   Harry Bergman, the testimony is undisputed-- I double-checked

21   with Col. Bowen and he agrees-- that all of the ground water

22   on Harry Bergman's place are vagrant, local, percolating

23   waters.  However, across the corner of Harry Bergman's place

24   runs Wilson Creek, and at that point on top of the basement

25   complex and runs most of the year, and he is a riparian to it.

9638

1    I have told Mr. Bergman that he is just stuck, he is going to

2    be in this case forever if he asserts a riparian right to that

3    water, that this amount is so minor to him that if he chooses

4    to surrender and give up his right to any surface water that

5    I am hopeful that I can obtain from the United States a

6    quieting of his title to the ground waters.  But that even

7    though the evidence is undisputed that the ground waters will

8    be vagrant, local, percolating waters under the rest of his

9    land, that because he is riparian he is going to stay in this

10   case forever.  I think that is the physical situation.

11       THE COURT:  What is wrong with adding another finding,

12   that the surface runoff-- I don't know how to word it-- but

13   the natural runoff and the flood runoff over these lands are

14   part of the Santa Margarita water system?

15       MR. SACHSE:  I would say that you could have a finding

16   that the entire surface runoff is part of the Santa Margarita

17   River system.

18       THE COURT:  And that the owner of the property disclaims

19   any right to this surface or flood water runoff.

20       MR. SACHSE:  Go beyond the disclaimer.  If he would find

21   that the surface runoff is part of the Santa Margarita, that

22   would also protect the United States against plaintiff's

23   who are not disclaiming.  The United States in such case might

24   be willing, even if the man has never appeared, to see judgment

25   entered quieting his title to the ground waters if the same

1     judgment made a finding that all of the surface water was part

2     of the stream.

3          MR. VEEDER:  You are taking one step beyond where I

4     think we should go today, because we are working on these

5     people who have not answered and they are going to be a tough

6     nut for us to crack.  But I would like to have this as a

7     precedent of how to treat those people.

8          THE COURT:  What do you propose today?

9          MR. VEEDER:  My view is that I think Jim and I have

10    to work out a little more with Franz the findings of fact

11    and conclusions of law that have been proposed.

12         THE COURT:  But nothing about surface waters?

13         MR. VEEDER:  I think that as worded it includes

14    everything, unless changed.

15         MR. KRIEGER:  I am inclined to agree.

16         MR. VEEDER:  As I read it, if there were a flash flood

17    it would come on down to us and he could not interfere, he

18    could not impede it, he could not stop it.

19         THE COURT:  All right.

20         MR. KRIEGER:  I think that is right.

21         But I do think we should make the one change that was

22    suggested by Franz's language.

23         THE COURT:  All right, you gentlemen go ahead.

24         MR. SACHSE:  May I have one question on mine, your

25    Honor.  Is there any objection, speaking formwise, so to

9648

speak, to make two separate orders on this so that I can do it better, and say that there will be a separate order regarding the exact manner and time of giving notice.

MR. VEEDER:  I think we have to have that.

MR. SACHSE:  Then I can finish this thing and leave the notice part as a separate document.

THE COURT:  That's right.  Then we can gather up some of these interlocutory orders and send a whole bunch of them out at one time.

MR. VEEDER:  That's right.

I have some housekeeping to do besides this.

MR. KRIEGER:  May I go on to something that has to do with this?

MR. STAHLMAN:  I presume that you are going to send out this notice, then there is another batch ready and you will have to send a notice out again.

THE COURT:  We are going to wait and see.  We don't know when we will send these out.  We will send a bunch out at one time and then have a hearing on it.

MR. VEEDER:  We are finishing up our maps now locating each tract and the status of defendants, whether defendants have answered or defaulted.

MR. KRIEGER:  As far as we are concerned, there is no problem of including more lands in this very same decree.  We will make it as broad as you want to make it.

9643

1    THE COURT:  That isn't important.  You can half a half

2  dozen interlocutory decrees and send them out all at one time

3  and send out a notice that there will be a hearing and if

4  anybody is not satisfied now is the time to be heard.  As a

5  practical matter I don't think anybody is going to complain.

6  But that takes care of due process.  Then these interlocutory

7  orders are made, and then when we make our final decree we

8  merely incorporate these by reference.

9    MR. VEEDER:  Your Honor has touched on something.  We

10 are arranging to have from our geologist and engineer a

11 statement in regard to each one of Mr. Krieger's properties.

12 In other words, as I understand, he is going to put in his

13 evidence.  By and large, I think we will agree with it.  But

14 I am going to have each one of these checked out.  If there

15 is disagreement, I will notify Jim about it.

16   THE COURT:  As I understand you, your man is going to

17 survey this property?

18   MR. VEEDER:  Yes.

19   THE COURT:  And he is going to testify as a witness in

20 the record?

21   MR. VEEDER:  Yes; it will be in effect rebuttal.

22   THE COURT:  And then these suggested findings we are

23 working on will not be signed until after that record is made.

24   MR. VEEDER:  That is correct.

25   THE COURT:  Then we are all right.

1     MR. VEEDER:  It is going to move just as fast as you

2  give me these names and numbers.

3         It is a matter that I think the Marines should agree

4  upon before we say the matter is done.

5     THE COURT:  All right.

6     MR. GIRARD:  Will this order you have quiet title in

7  all surface runoffs?

8     MR. SACHSE:  No.

9     MR. VEEDER:  I think anybody downstream is going to

10 look forward to getting that runoff, if that is what you mean.

11    MR. SACHSE:  It is not going to quiet anybody's title

12 to all the surface runoff.

13    MR. GIRARD:  I don't think it can.

14    MR. VEEDER:  No.

15    MR. KRIEGER:  That is why we have been careful to say

16 plaintiff and all other parties riparian on the stream.  Now

17 we are going to change that to Franz's language.

18    MR. SACHSE:  My language would include them.

19    MR. KRIEGER:  While we are on the same subject, I wonder

20 if youwould look at page 9502 of the transcript, where Mr.

21 Webb testified, on line 23.

22    MR. GIRARD:  You would have to go back five or six

23 pages, but actually it covers the land with no specific wells

24 but the area which was described at length yesterday.

25    THE COURT:  The area north and east of the Santa

Gertrudis.

MR. GIRARD:  Yes.  I agree with your Honor, there may be some doubt whether that is enough.

THE COURT:  We don't have to worry about that now, because Mr. Veeder's proof will be in the record, and then we will have a complete record which will clearly support the findings.  So I wouldn't worry about it.

MR. KRIEGER:  To cover the point, I will put Mr. Webb back on for this one point.

THE COURT:  Anything else we can do now?

MR. SACHSE:  No.

MR. KRIEGER:  No.

THE COURT:  How much longer this afternoon?

MR. SACHSE:  I have no cross-examination.

MR. KRIEGER:  We have two witnesses.  One witness will be five minutes, and the other just a few minutes.

MR. STAHLMAN:  I would like to call a couple of Mr. Veeder's witnesses for just a very short question.

MR. VEEDER:  Mr. Roripaugh?

MR. STAHLMAN:  No.

MR. VEEDER:  I wanted to ask him two questions.

MR. GIRARD:  If this is our last date, I wanted to make the record, whether it is successful or not, to get in the State of California's Exhibit AS.

MR. VEEDER:  That is going to take a long time.

1      THE COURT:  Why?  A certified list?

2      MR. VEEDER:  I object to it in the present form.

3      THE COURT:  What is wrong with it?

4      MR. VEEDER:  First, Bulletin 57 has nothing to do with

5  it.

6      MR. GIRARD:  That reference to Bulletin 57 prepared

7  Mr. Illingworth to locate the diversion points.

8      THE COURT:  The only point is, I want to get you out

9  of here as fast as I can.  So let's get back in there and do

10  what we have to do.

11      MR. GIRARD:  Are we assured that we are not going to

12  go tomorrow?

13      THE COURT:  No.

14      (Whereupon, the proceedings continued in the courtroom

15  as follows:)

16      MR. VEEDER:  Your Honor, I had mentioned some house-

17  keeping.  We have gone through the record and we find that

18  there are some slight errors, typographical and otherwise.

19  I would like to deposit these with the reporter and also

20  with counsel and they can go through them and when you return

21  in May, or whenever it is, the record will be brought up to

22  date from our standpoint in regard to any corrections.

23      THE COURT:  All right.  Do you have copies for counsel?

24      MR. VEEDER: Yes, your Honor.

25      That is all.

9645

1      THE COURT:  Mr. Reporter, you are not to make these

2  corrections until counsel have checked them.

3      MR. KRIEGER:  May the record show that during the

4  recess, on Exhibit B Mr. Webb has put under certain wells

5  in green numbers the elevation of water above sea level and

6  he has put a legend on the map entitled "Lower number equals

7  altitude of water surface determined from interpolated land

8  surface altitudes."  Mr. Kunkel has apparently checked them

9  out and found them to be accurately transcribed.

10      THE COURT:  All right.

11      MR. KRIEGER:  Mr. Veeder has asked that Mr. Roripaugh

12  be put back on the stand for two questions.

13      THE COURT:  Mr. Jack Roripaugh?

14      MR. KRIEGER:  That is right.

15      MR. VEEDER:  That is right.

16

17                  JACK RORIPAUGH,

18  recalled as a witness in behalf of the defendant Roripaugh,

19  et al., having been previously sworn, testified further as

20  follows:

21

22              FURTHER CROSS-EXAMINATION

23  BY MR. VEEDER:

24      Q  Mr. Roripaugh, did you have on your property a

25  flowing well at one time?

Q  And what happened to that flowing well?

A  Well, it flowed for a good many years and finally ceased to flow.

Q  And when did that occur?

A  That occurred when my son drilled a well down below me about a quarter of a mile.

MR. VEEDER:  They'll do it every time.

I have no more questions.


REDIRECT EXAMINATION

BY MR. KRIEGER:

Q  When did that happen?

A  I wouldn't want to attempt to fix the date.  I find that at my age my mind is not too good on dates.  It was, I should say, approximately six or seven years ago, whenever he drilled that well.  That is the well below the Highway 395 and just west of Winchester Road about a hundred yards.

THE COURT:  Your son-in-law, Mr. Ramsey, is that who you mean?

THE WITNESS:  No.

MR. STAHLMAN:  His son.

THE COURT:  Oh, your son.

THE WITNESS:  Yes.

Mr. Ramsey did drill a well there.

MR. VEEDER:  Where was your well located with relation

9647

to it?  Which well was yours?

THE WITNESS:  That second well from where-- above there.

MR. VEEDER:  R-2?

THE WITNESS:  Below there, in the middle.

MR. VEEDER:  B?

THE WITNESS:  I don't know.

MR. KRIEGER:  Why don't you come up and locate it.

THE COURT:  The well that was right across from that point of rising water?

THE WITNESS:  That is right.

MR. VEEDER:  That is shown on Roripaugh's A as B-1-21.5, and the legal description is 35-7-3.

THE COURT:  All right.

MR. VEEDER:  Thank you, Mr. Roripaugh.

THE COURT:  Any further questions?

MR. STAHLMAN:  I have one question.


FURTHER CROSS-EXAMINATON

BY MR. STAHLMAN:

Q  Mr. Roripaugh, this well that you are talking about that your son drilled, is that the last well he drilled?

A  No, sir.

Q  In other words, this is the well he drilled prior to this last well?

A  I think it is the next to the last well that he

1   drilled.

2       Q  In other words, you believe that well was drilled

3   about seven years ago.  What is your best judgment as to

4   how long ago the last well was drilled?

5       A  I should say about three years ago.

6       Q  About three years ago?

7       A  Yes.  Those are approximate.

8       THE COURT:  The well that your son drilled that affected

9   your well was drilled downstream from you?

10      THE WITNESS:  That is right..

11      MR. VEEDER:  And across the fault.

12      THE WITNESS:  No.

13      MR. VEEDER:  It was not?

14      THE COURT:  It must have been Cl, then.

15      What did you say?

16      MR. VEEDER:  I thought for a moment it was across the

17  fault.

18      THE COURT:  It must be the well shown as Cl in Section

19  35.

20      MR. VEEDER:  That's right.

21      MR. KRIEGER:  That is all.

22      THE COURT:  All right, step down, Mr. Roripaugh.

23      MR. KRIEGER:  Mr. Borel, will you come up for just a

24  minute.

25

1                     ALEXANDER F. BOREL,

2  called as a witness in behalf of defendants Roripaugh, et al.,

3  being first duly sworn, testified as follows:

4

5                     DIRECT EXAMINATION

6  BY MR. KRIEGER:

7       Q  What is your name?

8       A  Alexander F. Borel.

9       Q  Where do you live?

10      A  I live on Borel Road in Section 8, Township 7 South,

11  Range 2 West.

12      Q  Is that generally in the vicinity of the well

13  located on Exhibit A as 8H1 in Township 7 South, 2 West?

14      A  It would be in the Southwest Quarter of that sec-

15  tion.

16      THE COURT:  Is that your well up there that is marked

17  with red?

18      THE WITNESS:  Yes, sir.

19      THE COURT:  That is H1 in Section 8.

20  BY MR. KRIEGER:

21      Q  How long have you lived there, Mr. Borel?

22      A  Since I was born in 1910.

23      Q  What is your business?

24      A  Ranching, farming.

25      Q  Have you been ranching and farming in that country

1    ever since then, ever since you were a boy?

2         A   Since I was 17 years old.

3         Q   Tell me how many acres of land do you own in that

4    area around your home?

5         A   Approximately 2300 acres.

6         Q   How many wells have you got on all of your lands?

7    THE COURT:   So many you have to count them?

8    MR. KRIEGER:   Not counting dry holes now.

9    THE WITNESS:   The windmill wells, which is what I am

10   referring to mostly, there are four of them, I believe,

11   windmill wells, and we have a little pump in one.

12   BY MR. KRIEGER:

13        Q   What about this one up here, H1, that we were talking

14   about; is that your well?

15        A   Yes.

16        Q   How much water do you get from that well?

17        A   Approximately ten inches.

18        Q   Do you do any farming with that water from that well?

19        A   Well, no, we don't use it because we don't get

20   enough water out of it to irrigate any acreage to do us any

21   good, to pay the costs and expenses, you might say it that

22   way.

23        Q   Have you tried to drill anyother wells in that

24   neighborhood?

25        A   Yes, sir.

9651

Q   Where?

A   Well, we drilled one right there at our home.

Q   That is in the Southeast quarter of Section 8?

A   Yes, right next to the Tucalota Creek.

MR. SACHSE: Southwest Quarter.

MR. KRIEGER: Southwest Quarter is right.

THE WITNESS: Right in the corner there, and we went down approximately 60 feet with a rotary rig, and Mr. Lynch, who drilled the well, said we had hit bedrock and we couldn't go on any further.

BY MR. KRIEGER:

Q   So you quit?

A   So we quit.

Q   Pulled the rig?

A   Pulled the rig.

Q   What did you do with the well?

A   So later on, two or three years later, we had another man that drilled a well for one of my neighbors up there with cable tools. So I thought, "Well, we will go down in that hole and see if we can't get through that rock." I thought it might be just eight or ten or twenty or a hundred feet or so thick. We went on another hundred feet and we hit granite, as the driller explained it. We never did. It came out to be a windmill.

Q   You hit water but you couldn't pump it?

1     A   There wasn't any water.   In other words, it could

2   be bailed dry.

3     Q   So what did you do with that well?

4     A   We covered it up.

5     Q   Did you try to sink any other wells on your

6   property?

7     A   Yes.   My dad di in 1928-29, along in there, on that

8   same area, only possibly five or six hundred yards to the

9   north, and he went on down to 256 feet and that well was

10   able to be pumped dry with a bailer.

11     Q   What did you do with that well?

12     A   We used it as a domestic well with a windmill on it.

13     Q   Did you try to sink any other wells on your property?

14     A   No, I don't believe we have.

15     Q   Have any of your neighbors around you tried to sink

16   anywells that you know of?

17     A   Yes, there was one of my neighbors up in Section 6,

18   just east of the Winchester and Auld Road.

19     Q   Am I pointing to the right section?

20     A   Range 2 West.

21     Q   7 South, 2 West; is that it?

22     A   Yes.   There is a point on the map some place that

23   shows a windmill.

24     Q   Right here?

25     A   Yes.

Q  Southeast Quarter of the section?

A  Yes.

Q  All right.

A  I observed that well pretty closely because I own land in Sections 6 and 7 both, and they went on down to better than 460 feet and that well was also able to be pumped dry with a bailer.

Q  Any other wells that you know about that were attempted?

A  Well, no, I guess not.

MR. KRIEGER:  That is all.


CROSS-EXAMINATION

BY MR. VEEDER:

Q  Do you have any points of rising water on Tucalota Creek on your premises?

A  We have a little spring.

Q  You have a spring?

A  Yes, sir.

Q  Where is that located from the standpoint of the wells to which you made reference, I mean the well that your father drilled at 200 feet, for example?

A  It would be east, approximately.

Q  May I ask you to come down here, Mr. Borel.  It might save a little time for all of us if you would just come down

9654

1      here and mark that spring.

2           Here is your property.

3           A   Here shows the reservoir where we store the water,

4      and the spring is right through the reservoir, at the same

5      level.

6           Q   Just mark "Spring" there, if you will, please.

7           MR. KRIEGER:   Mark it "Spring" and then put your initials

8      under it.

9      BY MR. VEEDER:

10          Q   Did you ever have a flowing well on your premises

11     there?

12          A   No.

13          Q   And where is this spring located-- I can't tell from

14     where you drew it--from Tucalota Creek, how far is it?

15          A   From Tucalota Creek it is right alongside it,

16     approximately a 20-foot elevation higher than Tucalota Creek.

17          MR. VEEDER:   I have no further questions.

18          MR. KRIEGER: That is all.

19          THE COURT:   Any other questions of Mr. Borel?

20          MR. SACHSE:   No, your Honor.

21          THE COURT:   Thank you, Mr. Borel.

22          MR. KRIEGER:   I would like to say, your Honor, that I

23     invited both Mr. Veeder and Mr. Girard to have two of their

24     witnesses testify on this area following the testimony which

25     we have introduced.   I suggest that possibly that Col. Bowen

1  might testify, and he isn't here, as a matter of fact, and

2  Mr. Veeder didn't think much of that suggestion, or rather,

3  he didn't want to do it for a good reason.  So at the same

4  time I asked the State if they would be willing to have

5  Mr. Illingworth testify, and they have said they would, and

6  I want to ask him just one or two questions about this area.

7      THE COURT:  All right, come forward, Mr. Illingworth.

8

9              LELAND ILLINGWORTH,

10  Called as a witness in behalf of defendants Roripaugh, et

11  al., having been previously sworn, testified further as follows:

12      THE COURT:  You have been previously sworn?

13      THE WITNESS:  Yes, sir.

14      MR. VEEDER:  When is your Honor due in Brooklyn?

15

16              DIRECT EXAMINATION

17  BY MR. KRIEGER:

18      Q  Mr. Illingworth, you have testified at length in

19  this case and you have been sitting through this last three

20  days of testimony, have you not?

21      A  Yes, I have.

22      Q  Based on all of the information which you have at

23  this time, can you tell this Court what pumping in the areas

24  shown on Roripaugh A to the northeast of the dike?

25      THE COURT:  Make it clear:  Northeast of the Wildomar

1  fault.

2       MR. KRIEGER: All right, let me rephrase it.

3       THE COURT:  Do you want me to be an attorney in this

4  matter?

5       MR. KRIEGER:  Yes.

6       THE COURT:  Go ahead.

7       MR. KRIEGER:  All right.

8       Q  What effect will pumping have on the Santa Margarita

9  River stream flow in the area northeast of the Wildomar

10  fault and northwest of the Vail Ranch line?

11       MR. VEEDER:  I object to that on the grounds that there

12  is no foundation, your Honor.

13       THE COURT:  That includes, of course, Santa Gertrudis

14  Valley.

15       MR. KRIEGER:  I want him to comment on that, your Honor.

16       MR. VEEDER:  I object to it.  There is no foundation.

17  It is as broad as the great outdoors.

18       MR. KRIEGER:  No.

19       THE COURT:  What is it going to prove when you throw

20  the Santa Gertrudis Valley in with the rest of that area?

21       MR. KRIEGER:  He can testify to two different types of

22  conditions, I suppose.  I suppose the witness can say that

23  it affects it at one place and doesn't affect it in another.

24       THE COURT:  Mr. Krieger, at our conference it was under-

25  stood that Mr. Veeder was going to make this survey and put

1       in some proof.

2            MR. KRIEGER:  Yes.

3            THE COURT:  When that is put in, your problems may all

4       be solved.

5            MR. KRIEGER:  This is true.  I am just simply bolster-

6       ing the situation that your Honor thought should be bolstered

7       with some testimony that I thought would be useful.

8            THE COURT:  Let's wait and see if we need it.  You are

9       not going to be precluded from making any showing.

10           Mr. Veeder facetiously asked when I was going to

11      Brooklyn.  You were around when he cross-examined Mr.

12      Illingworth.  If you ask just half the questions, he will be

13      here half a day cross-examining Mr. Illingworth.  Let's not

14      do it this time.

15           MR. KRIEGER:  Well, if it is not necessary--

16           THE COURT:  It may not be.  If it turns out to be

17      necessary, you can call any witness you want to.

18           MR. KRIEGER:  Then let's forget it.  Then let's

19      withdraw the question and withdraw the witness.

20           THE COURT:  All right.

21           MR. KRIEGER:  And I ask if your Honor has the same

22      feeling toward Mr. Webb's testifying to the several parcels

23      we have included in our proposed interlocutory decree.

24           MR. VEEDER:  I will not cross-examine on that.  You

25      put it in and I reserve our right to put our witnesses on

later.

  MR. KRIEGER:  I would like to do that.

  THE COURT:  All right.

  MR. VEEDER:  I reserve the right to cross-examination until later, though, Jim, if that's all right.

  THE COURT:  Come forward, Mr. Webb.


     ALBERT A. WEBB,

recalled as a witness in behalf of defendants Roripaugh, et al., having been previously sworn, testified further as follows:

  THE COURT:  Mr. Webb, referring to the area north and east of the Wildomar fault line-- you see where I am talking about now?

  THE WITNESS:  Yes, sir.

  THE COURT:  How far do you want to go?  To about Section 22 there?

  MR. KRIEGER:  I want to go down to the Vail Ranch on one side, I want to exclude Sections 25, 26, 27 and 35, 7 South, 3 West.

  THE COURT:  All right, excluding those sections.  And going up to the Kunkel line?

  MR. KRIEGER:  Yes, going up to the Kunkel line and far beyond it, your Honor, when we get into other ownerships that are the subject of this recent decree we prepared.

1    THE COURT:  Mr. Krieger, will you point to that extension of the Vail line.  Now extend it, an imaginary extension of the Vail line.  Let's take that area north and east of Wildomar fault and north and west of an extension of the line of the Vail Ranch as indicated-- that is the line which runs through Sections 36 and 25, 7 South, 3 West, and then corners up in 19, 7 South, 2 West, and excluding Sections 25, 26, 27 and 35, what effect would pumping of the present wells in that area have on the flow of the Santa Margarita River?

THE WITNESS:  I think the effect would be very negligible.

THE COURT:  What effect would additional wells added to the wells already existent in that area we have marked have upon the flow of the river?

THE WITNESS:  I think the same statement would apply, that the result would be negligible.  That formation is so tight that I don't ordinarily get very many good additional wells.

THE COURT:  Is it your opinion that the waters underlying those grounds are vagrant, percolating waters or part of the stream system of the Santa Margarita?

THE WITNESS:  I think they are vagrant, percolating waters.

THE COURT:  Can you reserve cross-examination?

9660

1          MR. VEEDER:  Yes, sir.

2          May I also reserve objections to your Honor's questions?

3          THE COURT:  It may be that when you make your surveys

4     this will fall into place.

5          MR. VEEDER:  That is right.

6          MR. KRIEGER:  I have to extend that question just a

7     little bit, your Honor, to cover all of the people we are

8     talking about.

9          THE COURT:  Let us take particular parcels, then.

10         MR. KRIEGER:  I am going to do that.

11         Q  What would your answer be, Mr. Webb, if the same

12    question which his Honor has addressed to you were asked you

13    concerning parcels on Exhibit B Roripaugh marked 27, 12

14    in Section 12, 7 South, 2 West, Parcel 25 in Sections 13 and

15    14, 7 South, 2 West, and Parcel 6 in Section 17, 7 South,

16    2 West?  What would your answer be as to those parcels?

17         A  It would be the same.

18         MR. KRIEGER:  That is all.

19         MR. VEEDER:  I have reserved everything.

20         THE COURT:  Yes, you have reserved everything.

21         MR. STAHLMAN:  Your Honor, I realize that you want to

22    get away, but I think it will take just a few minutes, and

23    as long as two of our witnesses are here who, I think, will

24    show some characteristics that may be of benefit to us later

25    on in this area.

1    THE COURT:  Are we through with Mr. Webb, except for

2    Mr. Veeder's reservation and any other cross-examination

3    that anybody else may have, if and when it becomes necessary?

4         Mr. Webb, you are not excused, but you will come back

5    upon reasonable notice.

6         THE WITNESS:  Thank you.

7         THE COURT:  We hope we will not have to have you back.

8         THE WITNESS:  I hope so, too.

9         THE COURT:  Not that we don't like you.

10        MR. STAHLMAN:  Your Honor, I would like to call Mr.

11   Yoder.

12        MR. VEEDER:  What is this?

13        MR. KRIEGER:  You are taking this out of order?

14        THE COURT:  Are you through, Mr. Krieger?

15        MR. KRIEGER:  Yes, I am through, except again I would

16   like to offer Exhibit D, which are the well logs.

17        THE COURT:  It will be received in evidence subject to

18   correction or without prejudice to some specific objection

19   to some particular part of it if somebody finds they are not

20   accurate.

21        MR. KRIEGER:  All right.

22        (Defendant Roripaugh Exhibit D was received in evidence.)

23        MR. VEEDER:  Mr. Stahlman, are you going ahead with

24   your case in chief now?

25        MR. STAHLMAN:  No, this applies to some of the

1    area of storage unit 4.  The witnesses happen to be here

2    today.  I would like to put them on in order not to have to

3    bring them down at some later time.

4         THE COURT:  Mr. Krieger, it is understood that you are

5    not resting your case, but you are through with this par-

6    ticular part of your showing.

7         MR. KRIEGER:  Yes, your Honor.

8         THE COURT:  Do you have any objection, Mr. Veeder, if

9    Mr. Stahlman asks a couple of questions?

10        MR. VEEDER:  No, sir.  Just so it is part of his case

11   in chief.

12        THE COURT:  All right, come forward.


14                      MAURICE J. YODER,

15   called as a witness in behalf of himself, being first duly

16   sworn, testified as follows:


18                   DIRECT EXAMINATION

19   BY MR. STAHLMAN:

20        Q  State your name, please.

21        A  Maurice J. Yoder.

22        Q  Mr. Yoder, you have property located in this general

23   area that has been discussed here as Storage Unit No. 4 in

24   the Murrieta area?

25        A  I have property there at the intersection of Highway

1    395 and Murrieta Hot Springs Road.

2         Q   Do you have some wells on that property?

3         A   Yes, sir.

4         Q   How many?

5         A   I have three wells there.

6         Q   Will you indicate on the map here?  Are these two

7    of your wells?

8         A   Those are two of the wells.

9         Q   Q3 and Q2?

10        THE COURT:   In Section 15?

11        MR. STAHLMAN:   Yes, in Section 15, your Honor.

12        Q   Then you have a third well.  Where is the third well

13   with relation to the two wells as shown on Roripaugh's

14   Exhibit A?

15        A   Well, it is toward Highway 395 from those two.

16        Q   About what distance?

17        A   Well, approximately halfway between those two wells.

18   It is a little closer to Highway 395 than to those two wells.

19        Q   Can you tell us about what the distance would be

20   in measurement?

21        A   Oh, roughly 500 feet.

22        Q   Now, the top well here, the most easterly well,

23   being Q2 in Section 15, what is the temperature of that well?

24        A   About 90 degrees.

25        Q   And the well also in Section 15 designated  Q3, how

far is that well from the well which we have just talked

about-- Q2?

A  131 feet.

Q  And what is the temperature of the second well Q3

in 15?

A  138 degrees.

Q  What is the water level of your well Q2-- that is,

the most easterly well?

A  I think the static is 127.

Q  And what is the water level of the well Q3 in 15?

A  40 feet.

Q  Now the other well which you have estimated about

500 feet from these two wells, what is the temperature of

the water in that well?

A  It is considerably cooler than 90.  I think that is

approximately 80 degrees.

Q  And what is the depth to water in that other well,

if you know?

A  Approximately 112.

MR. VEEDER:  Could we have his location of that well,

the last one to which he just testified?

THE COURT:  Is it north or south of Webster Road?

THE WITNESS:  It is south, your Honor.

BY MR. STAHLMAN:

Q  You say it would be about 500 feet, about halfway

1    between the present wells and Highway 395?

2         A   I think it is a little closer to Highway 395 than

3    those other two wells.

4         Q   But you would estimate about 500 feet.  Would this

5    be approximately the location where I am pointing?  Can you

6    see?

7         THE COURT:  Do you want to step down?

8         THE WITNESS:  That map doesn't show our --

9         THE COURT:  Yes, it shows Webster Road, it shows a

10   water tank below in the next section.

11        MR. STAHLMAN:  Yes, here is the water tank.

12        THE WITNESS:  That well is right where that water tank

13   used to be.  The water tank has been taken away and a pressure

14   tank put there.

15        MR. STAHLMAN:  Would you mark it there and put your

16   initials on it.

17        May the record show that with an orange pencil he has

18   made a circle about the center and southerly line of Section

19   15 at a place where the map is designated "Water tank."

20        THE COURT:  The record will so show.

21   BY MR. STAHLMAN:

22        Q   Do you have any other wells on your property?

23        A   No, sir.

24        MR. STAHLMAN:  That's all the questions I have of this

25   witness.

1    MR. VEEDER:  I will ask no questions now.  We may call

2    him back, if that's all right.

3    THE COURT:  All right.

4    MR. STAHLMAN:  Mr. Shamel.

5

6    JENNINGS B. SHAMEL,

7    called as a witness in his own behalf, being first duly

8    sworn, testified as follows:

9    THE CLERK:  State your name, please.

10   THE WITNESS:  Jennings B. Shamel.

11

12   DIRECT EXAMINATION

13   BY MR. STAHLMAN:

14   Q  Mr. Shamel, you own some property in the Murrieta

15   Valley?

16   A  Yes, I do.

17   Q  Directing your attention to this map Roripaugh's

18   Exhibit A, can you indicate upon it the position of your

19   property?  Can you orient yourself to this map?

20   A  Yes, I can.

21   Q  Where would that be?  In which section is it?

22   May the record show that he has circled the two wells

23   M2 and R3, M2 in Section 25 and R3 in Section 26.

24   Now, do you have any other wells on your property?

25   A  I have two other domestic wells.

Q   Directing your attention to the more easterly well in the one Section 25 designated M2, what is the temperature of the water in that well, if you know?

A   73 degrees.

Q   And what is the depth to water level in that well?

A   I don't believe I have that information.

Q   How far is this well in Section 26, R2, from the well which we have just designated as being well M2?

A   Approximately a thousand feet.

Q   What is the temperature of the water in the well R2?

A   I never checked it, but it is palatable to drink.

Q   Is that different than the other well?

A   Yes, sir.

Q   Is there some considerable difference in temperature?

A   Yes, there is.  I checked the first well because in pumping into a reservoir I noticed the water was extremely warm coming from the pump.

Q   The other wells that you have on your property, the domestic wells, where are they in relation to these two wells about which we have just been talking?

A   One is east, a little north of east, probably a thousand feet or so.

Q   In which section would that be?

A   I can't say.

Q   Is it a thousand feet northeast of--

1      A   Of the first well.

2      Q   That is the more easterly well.  Would that be up

3   in this direction some place?

4      A   Yes.

5      Q   What is the temperature of that well?

6      A   That is cool water.  We use that for our house.

7      Q   And that is decidedly much cooler?

8      A   Much cooler.

9      Q   Then the water in the well M2 is also cooler than the

10   water in R2?

11      A   Yes.

12      Q   How about the other domestic well?

13      A   It is also much cooler.

14      Q   Where is it located?

15      A   It is 300 feet north of the lower well there.

16      Q   About 300 feet of the lower well.  That would be

17   near Banana Road, would it?

18      A   Yes, toward Banana Road.

19      Q   Is it still to the south of Banana Road?

20      A   Yes.

MR. VEEDER:  May we have him put those on?

MR. STAHLMAN:  Yes.

Could you put the approximate location of those two

wells on there?

May the record show that he has put a dot with a green

1   pencil immediately to the north or the left of the designation

2   of the well R2 in Section 26, and a second green mark on the

3   map about half an inch to the east of well M2 in Section 25.

4        THE COURT:  I can't see where he put them.  Is that

5   second well near Banana Avenue or removed from it?

6        MR. STAHLMAN:  That would be across from Banana Avenue

7   then, would it?

8        THE WITNESS:  On the same side.

9        MR. STAHLMAN:  He has put it where it would be across

10  from Banana Avenue.

11       THE WITNESS:  It is on the same side approximately

12  200 feet east of Banana Road.

13  BY MR. STAHLMAN:

14       Q   The map refers to a reservoir.  Is that well in the

15  vicinity of the reservoir?

16       A   The well is in the vicinity of the reservoir north

17  and a little east of the reservoir (indicating).

18       MR. STAHLMAN:  May the record show that the green mark

19  is put to the south of Banana Road, and may the other mark

20  that was first placed be eliminated?

21       THE COURT:  You will erase it after court.

22       MR. STAHLMAN:  Yes.

23       THE COURT:  Since you put it on there.

24       MR. STAHLMAN:  That's all I have.

25       MR. VEEDER: I have no questions.  I may call him back

later.

THE COURT:  You may step down, Mr. Shamel.

Mr. Girard, you wanted to offer an exhibit?

MR. GIRARD:  Yes, Exhibit AS.

THE COURT:  That is a certified copy of the various applications to appropriate water and their status?

MR. GIRARD:  That is correct. Here is a copy of the certification which is attached to the original.

THE COURT:  What is your objection, Mr. Veeder?

MR. VEEDER:  Primarily, your Honor, it refers to identifications which are not in the record, namely, the reference to "B-u-1-l 57."  I know your Honor is in a hurry. May I make my objections later?

MR. GIRARD:  I would like to get it settled now.

THE COURT:  I think we can.

MR. VEEDER:  I think we ought to take the scissors, then, and just cut off the furthest left column.  I don't think it contributes a thing.

MR. GIRARD:  You will note in the certification that it eliminates the correctness of the furthest left-hand column. Mr. Illingworth testified that he put that in for the con- venience of the Court because it refers to a certain location on a map to show where the diversion is.

THE COURT:  All right.  This system of numbering on the furthest left-hand column is the same system we have been

using for numbering wells?

MR. GIRARD:  I presume that is correct.

MR. ILLINGWORTH:  That is correct.

THE COURT:  The township and the range and the section, and then the lettering A, B, C, depending on the part of it.

MR. ILLINGWORTH:  Yes, sir.

MR. VEEDER:  Let's mark that out, then.

THE COURT:  Suppose we just mark off on Bulletin 57 and leave the diversion number showing, because we can identify these springs by that method.

MR. GIRARD:  Fine.

MR. STAHLMAN:  May the record show that Mr. Veeder mutilated the exhibit before your Honor ruled?

MR. GIRARD:  Yes, he mutilated it by striking off the word "Division Number," too.

THE COURT:  You will erase the part referred to.

Any other objection to it?

MR. VEEDER:  There is a reference to that.  You are going to strike it out of the certificate, too, is that right?

MR. GIRARD:  I have no objection to striking it out.

MR. VEEDER:  All right, strike it out.

We don't agree to anything.  It is just a certification and a tabulation.  I have no objection, your Honor.

THE COURT:  All right, it is received in evidence.

(Defendant State of California Exhibit AS was received

1    in evidence.)

2    THE COURT:   I understand there are going to be some

3    Master's hearings while I am gone; is that right?

4    MR. SACHSE:   They are scheduled for Monday at Fallbrook,

5    your Honor.

6    MR. STAHLMAN:   Is that on Fallbrook Creek?

7    MR. SACHSE:   I believe the next order of business is

8    Rainbow Creek.

9    MR. VEEDER:   Yes.

10    MR. SACHSE:   Then it moves across the river and stays

11    on areas below the gorge.   It is not getting up into the

12    Murrieta section.

13    THE COURT:   Have you completed your mapping of land and

14    are you ready to go on that?

15    MR. VEEDER:   Yes, we are ready to go below the gorge.

16    THE COURT:   The only other thing I have is that Mr.

17    Ramsey dropped in today and handed me two photostatic copies

18    of well logs on his two wells, the older well and the new well,

19    and I suppose if you want to look at them it is all right.

20    Just lay them back on the bench and we will later on decide

21    what we will do with them.

22    Anything further?

23    MR. KRIEGER:   Mr. Dougherty, who represents some of the

24    people in Diamond Valley, would like to have a day, or two

25    days, rather, to be heard on the Domenigoni Valley hydrology

1   and he asked me if I would not request the Court to give him

2   a couple of days on that at the end of everybody else's

3   testimony, the way he put it.

4        MR. STAHLMAN:  He will have to wait a long time.

5        THE COURT:  That's a long time from now.

6        MR. KRIEGER:  I think what he means is after the Vail

7   case, because that is the last one, as I see it, to be

8   presented.

9        MR. GIRARD:  Your Honor, we have some corrections to

10   make in the transcript.  May we do it by letter?

11        THE COURT:  Do it by letter.

12        Tell Mr. Dougherty he will have a chance to be heard.

13   We will arrange a time later.

14        Anything further?

15        MR. STAHLMAN:  What date are we coming back?

16        THE COURT:  Is the Government going to need any of the

17   Clerk's exhibits in this Master's hearing?

18        MR. VEEDER:  If I do, I will get in touch with Bill.

19        THE COURT:  Bill (the Clerk) may have to go, too.  You

20   can find them, can't you?

21        MR. VEEDER:  Yes, I can find them.

22        THE COURT:  Will counsel trust Mr. Veeder to rumage

23   through the Government's exhibits?

24        MR. STAHLMAN:  I have some observations on that,

25        MR. KRIEGER:  He can have Bulletin 57 to take with him.

1    MR. STAHLMAN:  Does the Court want a respectful reply

2    or the truth?

3    THE COURT:  Well, why don't we adjourn until the 5th

4    or the 12th of May.  Judge Weinberger may have a lot of

5    work when I get back here.  What about May 12th?

6    MR. KRIEGER:  That is satisfactory.

7    MR. VEEDER:  It suits me.

8    THE COURT:  The case is continued until Tuesday, May

9    12, at 10 o'clock.

10   (Adjournment until Tuesday, May 12, 1959, at 10 A.M.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25