# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                            Plaintiff,

vs.

                                       No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                          Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:       San Diego, California

Date:        Thursday, May 21, 1959.

            Pages: 9675 to 9756

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ Deputy

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 1247-SD-C. |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al., | ) | |
| Defendants | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Thursday, May 21, 1959

APPEARANCES:

    For the Plaintiff                WILLIAM H. VEEDER, ESQ., and
                                     WILLIAM E. BURBY, ESQ.,
                                     Special Assistants to the
                                     Attorney-General,
                                     Department of Justice,
                                     Washington, D. C.

APPEARANCES (Continued):

| | |
|---|---|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney-General, by<br>FRED GIRARD, ESQ.,<br>Deputy Attorney-General. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al. | FRANZ R. SACHSE, ESQ. |
| For Defendant Oviatt,<br>et al. | MESSRS. BEST, BEST & KRIEGER,<br>By JAMES H. KRIEGER, ESQ. |
| For U. S. Navy | LCDR. DONALD W. REDD. |
| For Defendant Murray<br>Schloss Foundation | WALTER GOULD LINCOLN, ESQ. |

1       SAN DIEGO, CALIFORNIA, THURSDAY, MAY 21, 1959.   10 A.M.

2

3       (Another matter.)

4       THE CLERK:   No. 4, 1247-SD-C, United States vs.

5  Fallbrook.   Further court trial.

6       THE COURT: Gentlemen, I am sorry, I thought we would

7  be ready to start this morning, but you can see where we are.

8  It is now 10:20.   I doubt very much if we can have the arguments

9  and instructions before the noon hour in this case that we are

10 now trying.

11      I have several suggestions.   First, since you are all

12 here, I think you could well confer and be ready to present

13 to me how you propose to proceed, what is the tentative order

14 of proof for the next week or so.

15      I think Mr. Veeder and Mr. Stahlman should confer, if

16 they haven't done so already, on a list of matters which they

17 want to take up with the Court in the nature of some pre-trial

18 discussion of various problems in connection with the case

19 between the two of them.

20      Have you done that?

21      MR. STAHLMAN:   I have tried to, your Honor, and haven't

22 found it very difficult.

23      THE COURT:   It will not be difficult.   I will instruct

24 you both to sit down and make a list of some of the problems

25 you are going to discuss with me.   You don't have to resolve

1    the problems.  I will resolve them.  But I want a list of them

2    so I will know what we are going to talk about.

3         MR. STAHLMAN:  We tried to do it, your Honor.  I met

4    with him, I went over to the Reche School and took several

5    people over there to have discussions.  We got absolutely no

6    place because he didn't discuss the matter.  He said, I am not

7    going to stipulate, that's all.  I don't think your Honor

8    indicated that there should be a stipulation.

9         THE COURT:  We didn't talk about stipulation.  I am

10   trying to find out what we have to discuss.

11        MR. STAHLMAN:  That is what I attempted to do.

12        THE COURT:  Adjourn to one of these rooms and start

13   listing them.

14        MR. VEEDER:  Your Honor, my failure to deny what George

15   has said is out of deference to the jury here.

16        THE COURT:  Well, it is fortunate then that there is a

17   jury here.  Go outside and start with a yellow pad and list

18   them.  If Mr. Veeder has any comments, maybe you will get some-

19   where, maybe you don't.  But I want to know what some of these

20   matters are.  Some of them I don't know.  One is the question

21   of this witness in Okinawa.  There are others.  But I want them

22   listed so that we can approach them seriatim in some order.

23        MR. VEEDER: Very well, your Honor.  When does your Honor

24   desire to do that?

25        THE COURT:  We will start, I am confident, by 1:30 or

9679

1  2 o'clock.  I am going to excuse you for the rest of the morn-

2  ing to save you some time.

3          I would also like to have some report from you or from

4  some spokesman as to what progress has been made on these

5  surveys of land so the Master can proceed further, what progress

6  has been made on these negotiations on more drillings and

7  well testings, what loose ends there are on that, the order of

8  proof here, who is going to go forward, and the anticipated

9  length of time on some of these matters.  Just sort of pick

10 up the loose ends.  You can spend some time and organize this

11 matter while we are finishing this case.

12          MR. VEEDER:  I can look forward to the rest of the

13 morning, your Honor.  We will do it.

14          THE COURT:  Now, counsel, I want this approached in a

15 cooperative attitude.

16          MR. VEEDER:  Yes, your Honor.

17          THE COURT:  I have just returned from Brooklyn, where

18 there were supposed experts in Manhattan and Brooklyn, and I

19 had to get a little tough back there.  I have come back with an

20 added respect for our local Bar.  Of course, I have come back

21 with my claws a little sharpened from practice in dealing with

22 some of these Manhattan and Brooklyn lawyers.

23          MR. STAHLMAN:  Mine have gotten a little duller, your

24 Honor.

25          MR. VEEDER:  Thank you, your Honor.

9680

1          THE COURT:   You may use my chambers if you wish.   They

2     are available.

3          (Recess.)

1    SAN DIEGO, CALIFORNIA, THURSDAY, MAY 21, 1959.  2:00 P. M.

2

3         THE COURT:  United States vs. Fallbrook.

4         MR. VEEDER:  Your Honor, do you want the appearances?

5         THE COURT:  Yes, state the appearances for the clerk.

6         MR. VEEDER:  For the United States of America, William

7    H. Veeder, William E. Burby and Commander Redd of counsel.

8         MR. SACHSE:  Your Honor, Franz Sachse for the Fallbrook

9    Public Utility District, the main individual defendant.

10         MR. GIRARD:  Fred Girard for the State of California.

11         MR. KRIEGER:  James H. Krieger for Leo A. Roripaugh and

12    other individuals.

13         MR. STAHLMAN: George Stahlman for the Vail Company.

14         MR. VEEDER:  Would you like a report, your Honor, as to

15    what transpired this morning?

16         MR. STAHLMAN:  Mr. Krieger had some things that he

17    wanted to take up first and I think it will tie into it.

18         THE COURT:  When did we meet last?

19         MR. KRIEGER:  April 2nd, your Honor.

20         THE COURT:  Yes, Mr. Krieger.

21         MR. KRIEGER:  If I may, your Honor, I would like to

22    report on the activities since we recessed on April 2nd.  When

23    we left court that day after having had time with you in

24    chambers and then having asked the final questions of our

25    expert witnesses, I had assumed that we had come pretty close

1  to arriving at some kind of understanding.  In fact, I think
2  we had before you at that time a proposed interlocutory decree.
3  We had even touched on the exact language that should go into
4  that decree.

5      Well, after we adjourned the first request was made of
6  me by Mr. Veeder if some kind of tests couldn't be made, and I
7  told him I thought that would be imprudent under the circum-
8  stances because I told him my clients had been here in court
9  and they thought we had virtually agreed on where we were
10 going from here, but offered to give him any tests that our
11 experts would acquire subsequently by checking these wells.

12     Following that Mr. Kunkel on his own initiative did make
13 some visits up in our country and I think talked with one or
14 two clients and then was asked not to explore further on our
15 clients' property.

16     Following that there were various communications be-
17 tween Mr. Rankin and ourselves, both in telegrams and in
18 letters.  Finally, it came to a conference in our office,
19 Mr. Veeder attended in great style by the United States Marine
20 Corpos which came in force, and we held a discussion-- Mr.
21 Kunkel, Mr. Webb, Mr. Sachse were present-- and for the first
22 time, your Honor, and that was after you wrote the letter to
23 me indicating that you could see no objection to these well
24 tests, for the first time Mr. Veeder and Mr. Kunkel were good
25 enough to tell me what they had in mind, what all this was

9683

1 about, because it seemed to me a vast departure from the spirit

2 in which we left the courtroom on the 2nd of April, and I was

3 told at that time that it was their intention now to take

4 tests which would demonstrate the transmissibility of the

5 soils.

6      As you may recall, there were three clusters of wells

7 that they wanted to check, and I understood from their conver-

8 sation that if they could show what the effect of pumping one

9 well was on a well close to it within a hundred or two hundred

10 feet of it, they could from that data then compute what the

11 transmissiblity was in a much broader area.

12      A   Well, that seemed to me not to be germane to the

13 issues that we had raised, and I told them so. We have since

14 then sparred in various letters. I have talked with my clients

15 and my clients of course are disillusioned and disappointed

16 that the agreement we thought we had has not jelled, but on

17 the contrary apparently has gone by the board and we are where

18 we were on the 2nd of April.

19      I cannot, your Honor, agree that the Government of the

20 United States come on to our clients' properties and use their

21 facilities to prove some theory that it may have, for several

22 reasons. First of all, to go along with the Government's

23 experts would be a prohibitive cost, as far as we are concerned,

24 and I think Mr. Kunkel talked about tests that would take an

25 indefinite period but I think he did say ten days possibly.

9684

1   It might require as many as ten men and I would feel that to

2   do this we would have to put men in the field to check these

3   tests.

4        In the second place, I do not believe that any of this

5   proposed testing is responsive to the case we have put on.  We

6   demonstrated only this, your Honor, that there is water in that

7   area up in Unit No. 4, it can be pumped out, but there is

8   precious little water there to be pumped out, and the prospect-

9   ive pumping will have no effect on the stream system of any

10  material dimension.

11       Now, if this whole testing program were an attack on

12  the credibility of our witnesses, if there had been some show-

13  ing that their data was not accurate, I would be inclined to

14  go along and to cooperate with their testing.  But I have

15  found no evidence that indicates that their tests were not

16  satisfactory, that they were not taken in a workmanlike fashion,

17  and that they didn't substantiate the conclusions that were

18  supposed to be drawn from them.

19       So for that reason, your Honor, it is my suggestion that

20  if the United States now wishes to pursue further hydraulic

21  tests in Unit No. 4 over the lands of my clients it be done

22  only by a showing of its witnesses, whom I may have the right

23  to cross-examine, to show what tests exactly they intend to

24  take  and what evidence they intend to adduce from those tests,

25  what conclusions they intend to draw, because if we don't do

1    than that it would not aid me very much.  If there were inter-

2    relationship between A-2 in 93 and A-1 in 5.2, as shown there,

3    I don't think that would prove anything about the wells in

4    Pauba Valley.

5         MR. VEEDER:  Your Honor, may I give an outline?  You

6    see, Mr. Krieger got the first crack here.  I would like to

7    outline what we actually talked about.

8         THE COURT:  Where is the map that shows the ownerships?

9         MR. KRIEGER:  That is Roripaugh's B, and I have it

10   right here, your Honor.

11        THE COURT:  This concerns 12-27.

12        MR. KRIEGER:  Yes, it does.

13        THE COURT:  And this is 6-12.

14        MR. KRIEGER:  As a matter of fact, your Honor, I think

15   you have in your files a proposed stipulated interlocutory

16   decree in which I set out all the parcels and identified them

17   by reference to this map, and they included only the ones

18   which lay outside the hydraulic area which Mr. Webb indicated

19   on this map.  In other words, we concede that a substantial

20   part of the Santa Gertrudis area was, in effect, in the stream

21   system.  We are only talking about the properties outside of

22   that.

23        THE COURT:  Actually, you are talking only about the

24   properties lying in here.  There is no dispute about these.

25        MR. KRIEGER:  No agreement has been made by the

1   that, if we don't find some focal point we are shooting at, it

2   seems to me that this case is going to go on forever and ever.

3   If that can be done by affidavit and later supported by direct

4   testimony, it would please me very much, and perhaps we can

5   cut short this protracted investigation of these same facilities.

6           THE COURT:  Where is this map that concerns this area?

7           MR. VEEDER:  Your Honor, I just sent for a map now.

8           MR. KRIEGER:  This is Roripaugh's A.

9           THE COURT:  I am talking about the one that showed the

10  ownerships.

11          MR. KRIEGER:  That is Roripaugh B, your Honor.

12          We are concerned, however, with the area which has the

13  red and the green dots, where all this pumping information was

14  given during the presentation of our case, and to point it

15  out a little more accurately the tests that Mr. Veeder has been

16  requesting involve wells that are up close to the Kunkel line--

17  you recall this is the Kunkel line, we tabbed it-- where there

18  are clusters here, and here, and here; and as I understood

19  Mr. Kunkel's informal talk, that they could show a relation-

20  ship between, say, A-2 and A-1 and indicate what the trans-

21  missibility was, which I understand is in gallons per day per

22  foot of aquifer, they could then correlate somehow that informa-

23  tion on wells, say, down near the dike, and I do not think that is

24  proper rebuttal to the testimony we were attempting to show.

25          THE COURT:  I would say offhand that if it goes no further

1      Government on any of these parcels, other than what I had under-

2      stood to be virtual agreement in your chambers and later in

3      court covering all of the land outside of Santa Gertrudis with

4      the possible exception of the Ceas property, as to which there

5      was some genuine dispute.

6              THE COURT:  All right, Mr. Veeder.

7              MR. VEEDER:  Well, let's get the record straight.  In

8      your office I made the specific statement, and it is in the

9      record, that I would take the data that was placed before us,

10     that I would check it out with our experts, and predicated

11     upon that checking out I would advise Mr. Krieger as to the

12     course which we were going to adopt.  He did this.  He drew

13     an arbitrary line, amazingly, along some sections-- just an

14     arbitrary line, like that.  He says, everything up there north

15     and east of that, out of the lawsuit.  Ridiculous.  We know--

16             THE COURT:  When I get ready to decide this case, do

17     you think I am not liable to just pick an arbitrary line?

18             MR. VEEDER:  I don't think, when our evidence is in,

19     you will, your Honor.

20             THE COURT:  My present guess is that it is going to be

21     rather arbitrary and along some section lines.  I don't expect

22     to make findings to the last hundred or two hundred feet of

23     where I think a basin goes.

24             MR. VEEDER:  I don't expect you to, your Honor, but I

25     daresay that your Honor will not take the line that was drawn

1   right along here by Mr. Krieger.  He says it may split the

2   Roripaugh property in half, but that is our line.  This is the

3   line right here, you can see it.  Here are Sections 25, 26, 27,

4   draw a line right along there, which is all in Township 7-3,

5   and from there on they say there is no hydrologic continuity.

6   We know better.  Because we know there is a cluster of wells

7   all through this land.  All you have to do is take a look at

8   their own evidence.  Their own evidence shows that along the

9   toe of the basement complex there is a series of very good wells

10  in close proximity one to another, and unquestionably, in our

11  view, tapping exactly the same source of water that these

12  other wells down here below the arbitrary line tap.

13      So we went out, taking each one of these parcels along

14  this line, north of the line, and we checked it through.  As

15  I said, there was no agreement for settlement, although I

16  understand that Mr. Krieger told his clients there was.  There

17  was no agreement for settlement.  We said we would check it out.

18  We did.  We find that through the areas in which he said there

19  are poor wells that indeed there are some very good wells.

20  We know, your Honor, and as the evidence proceeds we know more

21  clearly every day that the water which comes down the gradient

22  to the Wildomar fault and behind which it is impounded, in

23  effect, we know that that is the source of the surface stream

24  except during the periods of extremely high runoff, and we

25  live on that except during the periods of extremely high

9689

1  runoff, and it is our position that every well that taps into

2  the water backed up behind the Wildomar fault is reducing the

3  quantity of water which supports the surface flow.  The further

4  we investigate the more that fact becomes apparent.

5       Now we certainly did not limit, in our discussions with

6  Mr. Krieger, the question of transmissibility.  We said "inter-

7  connection.  We said the full aspect of this reservoir, and it

8  is a reservoir and it is a reservoir that supports both the

9  Temecula and the Murrieta Creeks, and it is the heart, in our

10 view, of this phase of the lawsuit.  I don't see how your

11 Honor could conceivably enter a finding today on the basis of

12 the record and say that these people north of the Krieger line

13 have no interest.  If we get one more K we will have--

14      THE COURT:  Well, we will have the Carter line when I

15 get through with it.  We will have the Krieger and the Carter

16 line.

17      MR. VEEDER:  Well, you don't spell your name with a K,

18 so I am not worried.

19      The point I make, though, is that I didn't agree to let

20 these people out.  I will not agree to let them out.  Your

21 Honor can let them out on his own.  That I understand.  But on

22 the basis of our data, on the basis of consulting with my

23 client, which is represented by Col. Robertson, relying on the

24 "Tiger" I say all those factors restrain and prevent me from

25 agreeing to what Mr. Krieger has asked.  And it hurts me that

1    he says that I agreed to it, because I didn't, and the record

2    will show that I didn't.

3         THE COURT:  Of course, it is not agreed to until the

4    stipulation is signed up.  But I understand that your discus-

5    sions were informal.  However, isn't there a large area that

6    can be eliminated even if we reopen this question?

7         MR. VEEDER:  No, there is not, your Honor, not at the

8    moment.  And I will bring into your office, if you will let

9    me, or I will bring into the courtroom and show you that we

10   have progressed very far in checking out every single indi-

11   vidual, and I have asked your leniency in that regard.

12        THE COURT:  I am talking about these people north and

13   east of the Kunkel line.

14        MR. VEEDER:  There are some areas in there, yes.

15        THE COURT:  Aren't there a number of these people who

16   can be eliminated from this case presently, even if we have

17   to fight on?  For instance, this area up in here?

18        MR. VEEDER:  Your Honor, here we go through here.  These

19   are areas inwhich we find some younger alluvium, we find

20   streams intersecting them. That is one of the tributaries of

21   the Santa Gertrudis Creek.  Here is Santa Gertrudis Creek right

22   along there.

23        THE COURT:  What about up in here?

24        MR. VEEDER:  The point that I make, right up in here,

25   now here is a dandy.  We went through each one of these here.

1   Here is a stream, younger alluvium right straight across those

2   three parcels.  You find it all the way through here, your

3   Honor.  We have gone through this, geologically speaking.

4          THE COURT:  When you find a stream in younger alluvium,

5   those people who have riparian rights on the stream, I thought

6   part of the understanding was that some of them would waive

7   any riparian rights and in turn the Government would admit that

8   they weren't part of the stream.

9          MR. KRIEGER:  That is part of the settlement that we

10  were talking about in your office.  We are willing to waive

11  those.

12         THE COURT:  If they are going to claim riparian rights

13  in that younger alluvium, that is a different story.  But if

14  they are going to, which is entirely possible, limit them-

15  selves to not wells in the younger alluvium but to water else-

16  where in the area.

17         MR. SACHSE:  Parcel 8 hasn't any younger alluvium.

18         MR. KRIEGER:  Many of them haven't.

19         MR. SACHSE:  Section 31 is entirely basement complex.

20         THE COURT:  These stretch across an area of alluvium.

21  Where are your clients' wells?

22         MR. SACHSE:  There is alluvium, yes.

23         THE COURT:  Are your clients' wells in the alluvium?

24         MR. KRIEGER:  Most of this area has no wells at all.

25         THE COURT:  But let's take these three.

1       MR. KRIEGER:  I am sure there are no wells up in that

2   area.

3       THE COURT:  Whether there are wells now or not, you

4   would have the right, if they are riparian to a stream, to

5   insist upon riparian rights.

6       MR. KRIEGER:  That is correct, your Honor.

7       THE COURT:  There would be a correlative right.  On

8   the other hand, if you felt that that is pretty much a dry

9   creek bed, as it probably is except in flood time, and you

10  were going to limit yourself not to put wells in the alluvial

11  area, then it seems to me that a thing like that could be

12  disposed of.

13      MR. KRIEGER:  That is exactly what we talked about in

14  your chambers, and it even went further, if you remember.  We

15  talked about check dams at that time, whether there would be

16  enough water to water stock.  I suggested to Mr. Veeder that if

17  there were existing ones perhaps they could be left there,

18  slight check dams to get part of the winter runoff.  Otherwise,

19  we agreed to abandon our riparian rights up there in favor of--

20      THE COURT:  What would be wrong with a situation like

21  that, Mr. Veeder?  This was a quid pro quo on some of these

22  things.  Many of these defendants had an illusory right, an

23  alleged riparian right over a watercourse which flowed only

24  in wintertime, and any contention to go through with a trial

25  and get a decree wouldn't mean anything to them because they

1   are not going to use water in the winter, and the thought was

2   to see if we couldn't work out some mechanics to where, in a

3   place like this, it would seem to me, with the stretches of

4   alluvium in there, you might have to have some understanding

5   that wells would not be inserted in there because that would

6   be a part that would feed the stream.  But if their riparian

7   rights and overlying rights are abandoned, it seems to me that

8   the Government ought to wipe it out.

9        MR. VEEDER:  And you would enter a judgment to that

10   effect?

11        THE COURT:  That is what we talked about.

12        MR. KRIEGER:  Now the whole point of the thing we were

13   talking about is this.  If we could now define the area within

14   which we are working, we could limit the United States' effort

15   on all of these soil surveys, we could limit our Master's

16   hearings to all of the lands that remained in the suit, and

17   eliminate maybe 600 of the 750 square miles of land we are

18   talking about.

19        THE COURT:  That is what we are talking about.

20        MR. VEEDER:  I am always glad to talk about eliminating

21   things, if I can.  But in talking about whom we would eliminate

22   and how we would eliminate them, we would have to, for the

23   preparation of our rebuttal, get in and get some more informa-

24   tion, and I would like to have an order discussed today so

25   that we could go in and check out these areas that will be in

1  the litigation that can, in our view, be out because of this

2  area in here.  I think, your Honor, that the United States is

3  entitled to be heard in many of these things without being

4  accused of doing something bad to a man's client.  I can't

5  agree to eliminate one small area which is part of one answer

6  and say there you go-- you are out of that--

7      THE COURT:  Why can't you?  Do you want to trade?  Do

8  you want to hold a bunch of this arid ground as a trade to

9  get somebody to give you a concession on another piece of

10  ground?

11      MR. VEEDER:  No.  I think it will probably be used

12  politically against us.  But I have never been afraid of

13  politics up to now.

14      The point I make is this.  We have stirred up a big

15  dust storm about nothing, your Honor.  There is no reason,

16  none, why we can't go ahead and try this lawsuit in a normal

17  way without interrupting and saying let's get Joe's ten acres

18  out and keep Joe's twenty acres in.  It just doesn't make sense

19  to me.

20      Here is 49 here, here is 49 here, split parcels, both

21  of them in the same answer, and you enter an order dismissing

22  part of the lands in regard to ground water in 49 but keep the

23  rest of the parcel described in the answer in the litigation.

24  Now we can't do it.

25      THE COURT:  I will tell you why it should be done.

1      MR. VEEDER:  Why, your Honor?

2      THE COURT:  You have brought all the owners into this

3   lawsuit.  They have had to hire lawyers.  The longer a lawyer

4   represents you the more you are going to have to pay him.

5   These people are entitled, where it is obvious that they are

6   not going to have any interest in this stream, to get out or

7   settle up with their lawyers and be through with it.  It is

8   one thing to say that the lawyer will charge what is fair, et

9   cetera, but you and I both know that if a lawyer has a client

10   on his neck for the next two or three years thekind of fee he

11   has to charge is different than the kind of fee he has to

12   charge if the client is out of the case now.  So that is my

13   interest.  The sooner I can get some of these people out with

14   interlocutory decrees, I am going to get them out even if it

15   means splitting an answer.

16      MR. KRIEGER:  Let's bring this thing to sharp focus.

17   Mr. Veeder called this the Krieger line.  I want to say that

18   this was a question that you asked yourself of Mr. Webb, and

19   it was not as to any split parcels of land at all.  You took

20   all the land that was north of this line, which is 25, 26, 27

21   and 35, we excluded those four sections, and then said:  Leaving

22   those in the lawsuit, do any of the ground waters that lie

23   north of that line on this map have any effect on the Santa

24   Margarita River system?  And the answer to the question was:

25   No material effect.  And then you asked the question:  If more

9696

1  wells are drilled in that same area what effect will it have?

2  The answer was:  My answer would be the same.  There is not

3  enough water there to have any material effect on the stream

4  system.  And it was my understanding that it was that testimony

5  that was the basis for the negotiations that we carried on on

6  April 2nd.

7     THE COURT:  Well, to a certain extent, that is, in the

8  sense that your position was then clear, we thought we knew

9  what the Government's position was, and it seemed to me that

10  we had a basis for getting rid of a number of people.  That

11  doesn't mean that the Court accepted Mr. Webb's testimony as

12  contrasted with someone else's.  But I would say that if there

13  is a dispute now as to Section 23 and 24 that lie above this

14  line--

15     MR. VEEDER:  There is.

16     THE COURT:  It seems to me that we could still immed-

17  iately get rid of some of these other people and decide later

18  what we are going to have to do to settle the rest of the

19  controversy.  But you have these wells that lie along the edge

20  of the Kunkel line; and they will run--

21     MR. VEEDER:  They run all the way down.

22     THE COURT:  There aren't many down in here.

23     MR. VEEDER:  May I show you on this, your Honor-- this

24  is Roripaugh's A-- here is what the evidence brings out as

25  we have run it through:  These are scattered wells which, the

more we have gone into the more convinced we are that they are
not representative wells. We think there are other wells that
should be in here that are reflective, and I will give you a
basis of disagreement that we had, with the thought that the
arbitrary (I call it) the Krieger line, because we have been
using it in our discussions.  Here is a good well with a
specific capacity of 9.  You come down here and here is a bad
well.  Here is a bad well there.  But you get down in here and
I will guarantee you that a canvass will show you some good
wells. We went up the other day on the way up to see Jim, we
came into an area where they have a 30-horsepower well, which
was a tremendous deal.

THE COURT:  You have a well here with 16 capacity.

MR. VEEDER:  That's right.

THE COURT:  But it is in the bed of the creek.

MR. VEEDER:  Well, it is.

THE COURT:  It is right off of the end of the alluvium
shown here.

MR. VEEDER:  The point I make is that when you get into
this matter and we have gone into it as thoroughly as we know
how, we are convinced now, on the basis of these investigations,
that for us to agree to eliminate anyone--

THE COURT:  Where?  Anywhere?

MR. VEEDER:  No, up through here, I am talking now on
up the valley, because anything above here we say that we see

1   no basis for it-- none.  We have gone into the question of

2   the Borel properties -- those are these properties in here.

3   We have gone into the question of the water rising, some of the

4   waters from Tucalota Creek and others, that Mr. Krieger has

5   said that he wants out.  We simply say that we see no basis

6   for it.  If your Honor wants to split these two parcels up,

7   here is a parcel in one answer and here is a parcel in the

8   same answer, let's re-examine them.

9       THE COURT:  The point is this.  Here is your Murrieta

10  Basin.  There is no disput about this Murrieta Basin.  Here is

11  an area roughly between the Kunkel line and the Wildomar fault.

12  There may be some controversy about that.

13      MR. VEEDER:  Isn't this the Kunkel line?

14      MR. KRIEGER:  Yes.

15      THE COURT:  Here is the Wildomar fault.  Let's assume

16  that there is some argument down here.  Then let's assume for

17  argument that in Sections 23, 24 and 19, where I think those

18  two wells were--

19      MR. VEEDER:  Yes.

20      THE COURT:  And up in 15 you have the hot water well

21  and the cold water well, which offhand it would seem to me your

22  hot water obviously comes out of a different place than the

23  cold water.

24      MR. VEEDER:  Of course, I want the record to show that

25  we don't accept that.

1    THE COURT:  Those are the Yoder wells.  Now let's assume

2  that there is some dispute in here south and along the Kunkel

3  line clear up running along the Murrieta fault.  There is a

4  lot of this area that ought to go out of the case.  They are

5  small people.

6    MR. VEEDER:  May I be excused to go down and get the

7  maps I am working on to show you what we are doing on that

8  from the standpoint of getting these people out, your Honor,

9  getting the answers established so that we don't piecemeal this

10  thing.  I don't believe Mr. Krieger is charging a dime more.

11    THE COURT:  What are you doing on that?  You are working

12  on other people?

13    MR. VEEDER:  We are working the whole area, your Honor.

14    THE COURT:  What have you got?

15    MR. VEEDER:  May I be excused a moment, your Honor?

16    THE COURT:  Yes.

17  (Mr. Veeder leaves and momentarily returns to the

18  courtroom.)

19    THE COURT:  Back in session.

20    MR. VEEDER:  Your Honor, here is what we are doing from

21  the standpoint of analyzing the status of every single person

22  who was served, and you can see our problem.  This is the

23  Wison Creek area.  We have taken every parcel of land, had it

24  put on here, we have had it numbered.  We show where there is

25  no answer, where a stipulation exists, where the answer claims

1  overlying rights, where the answer claims riparian rights--

2  in other words, we are undertaking the only method that I know

3  of in running a lawsuit like this of doing a businesslike job.

4  It may be that when we get to checking further, and we have

5  done this in the past so I know it will work, it may be that

6  when we check further we will find that this parcel of land

7  for which no answer has been filed is in such a category that

8  there be no reason for giving him further notice; but it may

9  also be, and I believe in this instance there will be a reason

10 for notifying that man and saying, if you have a right you

11 had better get in here and check it out.  The thing that

12 concerns me, and it has been slower on the Murrieta than on

13 the other, we are doing exactly the same thing on the Murrieta.

14 We will know when we are through the status of every single

15 party in this litigation.

16      THE COURT: This is only their claims, Mr. Veeder.

17      MR. VEEDER:  Sure, it is only their claims, your Honor,

18 but so far as we are concerned we are seeking a complete

19 adjudication, and I want to know-- we are making up files as we

20 go-- I want to know the position of everyone in this litigation

21 from the standpoint of pleading.  It may be that a default

22 would be desired in some of these cases.  But when you start

23 talking about the dismissals or the changes of status or the

24 splitting up of answers, I say, your Honor, with all respect,

25 your Honor is complicating our job a thousand times over.  I am

1   willing to do it, and if your order is to do it we will cer-

2   tainly abide by your order.  But you can see what it means in

3   the area above Vail Lake.  You can see the vast amount of

4   work that is involved   Mrs. Tooker is down there tabulating

5   the material now, setting it up on the basis of whom I, as

6   running the Government's lawsuit, must contact to determine in

7   my own mind whether we can get the kind of decree we desire

8   in regard to these people.

9        Now I am not being adamant in the slightest.  I will do

10   what you direct us.  But I truly believe that we have to look

11   at 750 square miles rather than a few, actually, in comparison

12   with the whole of the watershed, a few answering parties up

13   here.  We will check this out.  We are moving as rapidly as

14   we can.  I think you can see the extent of the burden we have,

15   just from the standpoint of mechanics.  We have had a burden

16   that I don't believe has ever been sustained in any other case.

17   We have been preparing the cases for the opposition as we went

18   along.  Now true, it would be nice to say, you people are out,

19   you people are in, you people are in, and you people are out.

20   I would rather not do that until the case is completed.

21        THE COURT:  How many of these people are pro per?

22        MR. VEEDER:  There are some up there that are repre-

23   sented by counsel, all the way through here.  The bookkeeping

24   task in regard to a pro per, we assume the full responsibility

25   for that man-- we have to.

9702

1    MR. KRIEGER:  The thing that troubles some of us is

2  this.  Why can't we arrive at the hydrologic conclusions of

3  this case, cut down the enormous task that you have in your

4  office, and once make a sensible boundary of what we are working

5  at?  Why pursue people who are going to be obviously dismissed

6  from this case on one ground or another and continue to make

7  all this elaborate study over their parcels?

8    MR. VEEDER:  I tell you what I have in mind.  We have

9  the primary responsibility to see that this thing is com-

10  pleted and that everybody is taken care of.  I have thought

11  about getting an arbitrary line.  I don't know whether there

12  is an arbitrary line.  I can't tell you whether there is an

13  aribtrary line.  The more I talk with Mr. Werts and Mr. Kunkel

14  the more convinced I am that it is impossible to get it.

15    Now it might be good politics to attack the Government

16  and say, look what you are doing arbitrarily.  But I can't bow

17  to that, and I don't intend to.

18    MR. KRIEGER:  We are not talking politics here as much

19  as we are talking common sense.  Can't we at some stage of

20  this proceeding simply say to the Court, we are through on

21  hydrology, you draw the line, and then if his Honor draws the

22  line one place or another then work within that line?

23    MR. VEEDER:  No.

24    MR. KRIEGER:  Why?

25    MR. VEEDER:  This is a quiet title suit.  What advantage

1   is it to you, Jim, for us to draw an arbitrary line in Anza

2   Valley?

3        MR. KRIEGER:  I am not saying for you to draw it.  I am

4   saying for the Court to draw it.

5        MR. VEEDER:  I don't think he can.  He hasn't got the

6   data.

7        MR. KRIEGER:  Then we will not have to go to work for

8   clients and charge them money for a case that has absolutely

9   no bearing on their water rights.

10       MR. VEEDER:  Have you any clients right now that you

11  are not representing at all, I mean that have come in, outside

12  of this group you have referred to here that is on your map?

13       MR. KRIEGER:  Well, our clients are all set out on

14  Roripaugh's B.  But what I am trying to do is let those people

15  get out so that they don't have to go along for several months

16  while the case is being tried with Vail and others, and all I

17  am suggesting is, can't we sometime submit this case to the

18  Court to let him draw a line?

19       MR. VEEDER:  Naturally.

20       MR. KRIEGER:  That is what I thought we did on April 2nd

21  as to Unit 4, virtually. We didn't do that?

22       MR. VEEDER:  No, and I didn't even ever intimate that

23  we had approached that, for the very simple reason that I

24  wanted you to see this picture, your Honor.

25       THE COURT:  That doesn't interest me.  That is in another

section entirely.  Go ahead and work on it.  Get it done.  You are doing a good job.  We are talking now about another section entirely.

MR. VEEDER:  Yes, and we are working on Murrieta, we are going to do exactly the same thing on Murrieta that we are doing here.  But your Honor, Murrieta is a thousand times more complex than the area we are showing right there, and we are working on it.

I don't see how it would be possible arbitrarily at this time to say that this man should be in and that man should be out.  I just don't think it can be done.  I think if your Honor directs it we will bow.  But at this juncture I simply say it is precipitous action, it is piecemeal action, it is not sound practice from our standpoint.

THE COURT:  When you get through running the case let me say what I think about it.  Are you ready to let me talk a little bit?

MR. VEEDER:  Your Honor, necessarily from the standpoint of running the Government's case, not in any sense trying it, but from that standpoint we have to plan as we go along.

THE COURT:  We have had to try the case in parts because of the very nature of it, and we have a situation now where Mr. Krieger and his associates, representing certain people, have come in with a map and have shown us whom they represent

1    and where this property is.  Now it was not my intention that

2    we would have Mr. Krieger here today, and then six months from

3    now, and then back again.  We were going to try to do what we

4    could with Mr. Krieger's end of it while he was in here.  We

5    are going to try to do what we can with other people in this

6    particular area.

7         Now I am not saying that in cases where the Government

8    asserts there is a dispute, which is the wells along the

9    Kunkel line, that maybe we shouldn't except those out.  But I

10   see no reason why we can't take others of these parcels where

11   either from what we know about the area where there is no

12   alluvium at all or where there is alluvium and there is a

13   dry stream and the owners are now represented by a lawyer, not

14   pro pers who don't know how to amend and state what their

15   position is, come in and say, I disclaim any right in the

16   stream and I assert, however, a right to the underground waters,

17   and it may be by negotiation possibly-- I don't care where they

18   are, situated here and there, but as many of Mr. Krieger's

19   clients as we can.  Then we get an interlocutory decree.  Now

20   that is a proposed finding, but it is signed up, and it is true

21   it has to be eventually served on everybody in the watershed,

22   and it is true that somebody else who is adverse can object to

23   it.  But for all practical purposes Mr. Krieger can then tell

24   Client A that this probably disposes of his matter.  There

25   will be a hearing someday in the future where somebody could

object to this proposal.  The chances are 9,999 out of 10,000

that they will not and you are out of the case.  It narrows

the issues we have to decide, it leaves before us just those

parcels where there are disputes, and as we go along we take

these people out of the case.  That is what I want to do.

MR. VEEDER:  I have taken every single land description

of Mr. Krieger's clients.  I have gone to the smallest legal

subdivision.  I have gone through on the basis of whether it

was on a tributary, whether there was younger alluvium, whether

it was on the older continental, whether it was residuum-- I

have taken each parcel.  I am ready to sit down and talk with

him in regard to, I think, two parcels.

THE COURT:  Only two?

MR. VEEDER:  I think when he gets through he will find--

he can have my list and go through it with me now, if he wants

to.

THE COURT:  You are going on the basis of what is in

the answers or pleadings on file?

MR. VEEDER:  That is right, your Honor.

THE COURT:  Well, you are familiar with how lawyers

operate.  They ask for the moon.  They assert all possible

rights.  It seems to me that if you have made that analysis of

all of Mr. Krieger's properties you are then entirely in a

position for the two of you to sit down and go over these.  Mr.

Krieger undoubtedly is familiar with these properties of his

1  client.  And you say, here is one on the stream and therefore

2  we can't concede.  Mr. Krieger may say, I know where that is.

3  There is no water there except in the winter months.  We are

4  willing to disclaim.  We will amend our answer and disclaim

5  any right in the stream.

6      MR. VEEDER:  Fine.

7      THE COURT:  Am I thinking like you are?

8      MR. KRIEGER:  Yes, your Honor.  It is what has been

9  done that is the only unfortunate thing.

10      THE COURT:  What do you mean by what has been done?

11      MR.KRIEGER:  We have made exactly the same proposition

12  you are speaking of, and that was the basis of the inter-

13  locutory decree which we drew, and I have given the precise

14  parcels and Mr. Veeder has had them for several weeks now.

15      MR. VEEDER:  And Mr. Veeder has gone through them, and

16  there you are.

17      THE COURT:  Well, if Mr. Veeder felt there should be

18  something besides the disclaimer that should appear in your

19  proposal, that could be drawn up.  But I think you are in a

20  position now to find out what parcels you are in dispute on

21  and the ones you aren't I don't see any reason why we shouldn't

22  get a proposed interlocutory decree and get them out of the case.

23      MR. KRIEGER:  Your Honor, we have been to this point

24  before and as he has just said now there are just two parcels

25  in which we have no interest.  So nothing is being accomplished.

1      MR. VEEDER:  Let him take a look at my list.  Maybe he

2  will disagree.

3      MR. KRIEGER:  Let me pursue your thought here a minute

4  ago.  You stated that perhaps if the line we talked about the

5  other day was not quite satisfactory, let's broaden it a little

6  bit, let's take any areas that are in doubt.  Well if we did

7  that we wouldn't affect more than two or three extra parcels

8  on this very map.

9      THE COURT:  I don't want to make a finding of a line

10  at this stage of the case, and I don't think it is necessary.

11  But I think there is enough in this record that the two of you

12  can get together on various of the parcels and see whether or

13  not they are not subject to some disposition on the basis of

14  what your claims are.  Mr. Veeder is a great man to go back to

15  the answer and see what you claim.  If you came in for a client

16  and you claimed overlying rights and you claimed riparian

17  rights and you claimed three or four other things, which you

18  may have done in a general answer--

19      MR. KRIEGER:  Surely.

20      THE COURT:  It may be that on analysis you are going to

21  abandon everything except your claim to percolating water, and

22  if so, with the information that he has and that you now have,

23  I am sure certain of these are susceptible of disposition.

24      MR. VEEDER:  I think you are right.

25      MR. KRIEGER:  Well, he has all that information in his

1   hands, he has had it for weeks in this proposed decree and a

2   letter in which I have set forth every single parcel that I

3   think should be handled this way, and all he has to do is write

4   back and say how many are in and how many are in and how many

5   are out and we have a starting point.

6         THE COURT:  I am going to ask you to sit down together

7   with what you have.

8         MR. KRIEGER:  I will be glad to do that.

9         THE COURT:  Maybe there are misunderstandings,  Maybe

10  Mr. Veeder didn't realize that you thought you had enough in

11  the proposed interlocutory decree.  Maybe you haven't got

12  enough.  Maybe he wants an amended answer setting forth

13  particular disclaimers.  But I am going to ask the two of you

14  to sit down and go over parcel by parcel a list of people you

15  represent shown on these exhibits, and then I want to be

16  advised which ones you still have a controversy about.  I am

17  sure there are more than two on which you can reach agreement.

18        MR. KRIEGER:  We can do that at the recess or right now.

19        MR. VEEDER:  Aren't you going to have your other case

20  now?

21        THE COURT:  I just have to take the verdict.  I will

22  take a short recess in the Fallbrook case.  You can talk about

23  it.  Maybe you can get started on this.

24        (Another matter.)

25        THE COURT:  Proceed.

9710

1    MR. VEEDER:  Your Honor, we have had some discussions

2    in regard to a parcel up here, which is Parcel 22 on Roripaugh's

3    B.  It is in Section 28-6-2.  Now in French Valley our evidence

4    is that there is some surface flow there.  The evidence is that

5    there is a minor amount of ground water, if any.  Col.

6    Robertson says the thing to do is to look over the fence and

7    if we are in accord on that thing out she goes.

8    MR. KRIEGER:  It is basement complex, isn't it?

9    MR. VEEDER:  That is what you wanted to do, isn't it?

10   Now here is 8, which is in Section 31.

11   THE COURT:  For the time being just give me the numbers

12   on this map.

13   MR. VEEDER:  All right, 22 and 8.  Now here is a

14   proposition that has been raised.  Here is Parcel 6, which is

15   situated in the Southwest Quarter of Section 4, Township 7,

16   Range--

17   THE COURT:  We can get them all from this map.

18   MR. VEEDER:  There is a parcel that I think we can check

19   out.  I think that can probably go.

20   THE COURT:  It is also related in ownership to another

21   section.

22   MR. VEEDER:  That is right, and that is one of the problems.

23   But as I understand it, you desire to have it done.

24   You will observe that Tucalota Creek has a tributary

25   running straight through it there, so there is a surface

1   situation there.   There will be an abandonment to us of all
2   surface flow, as I understand.
3          THE COURT:   What about 6?
4          MR. KRIEGER:   I think we can put this in a little better
5   focus, if you don't mind, because when we finished court the
6   last time I went back and on the basis of our discussions I
7   actually set forth parcel by parcel sections which I thought
8   we were going to include in this decree, sent a copy of that
9   letter to you of April 6, and we have all the parcels set out
10  in this letter.
11         MR. VEEDER:   In a tentative list.
12.        MR. KRIEGER:   In a tentative list.   They included
13  Parcels 22 and 8, and then they included all these other
14  parcels which were just to the north of Sections 25, 26, 27
15  and 35.   I carefully went through each one of them to include
16  them in this.
17         THE COURT:  Do I understand that your proposal is to
18  disclaim any right to riparian water?
19         MR. KRIEGER:   That is right.
20         THE COURT:   And any right as overlying owners of basins?
21         MR. KRIEGER: We are not disclaiming.   We are holding
22  onto the right of an overlying owner and disclaiming any
23  surface flow, and the Government is disclaiming any overlying
24  right and retaining the surface flow. That was the separation.
25  We are retaining the percolating ground water rights.

1      THE COURT:  I understand that.  But I am using the word

2  "overlying owners" to indicate a person who owns land lying

3  over an alluvial basin of any kind as an equivalent of a

4  riparian right.

5      MR. KRIEGER:  The answer to that would be that if any

6  of the extractions interfered with the surface flow or the

7  subsurface flow it would be estopped.

8      MR. VEEDER:  When you say "estopped", what do you mean

9  by that?

10      MR. KRIEGER:  By reason of this decree that we have been

11  talking about.  We could not interfere with the surface flow

12  and the subsurface flow of the Santa Margarita River or its

13  tributaries, nor could Mr. Veeder interfere with all the balance

14  of the land.  That is the way the thing broke down.

15      THE COURT:  That is the way I understand it.

16      MR. VEEDER:  I will give you an example, because I want

17  to be sure I understand this.  Here is a good example.  Here

18  is Parcel 49, and it looks like about the North Half of the

19  North Half of Section 1.  Now there you have a situation where

20  certainly a well in the alluvium would dry up the stream.  What

21  about that, Jim?

22      MR. KRIEGER:  As we have introduced testimony, there is

23  no pumping in this area which will affect the stream flow of

24  the Santa Margarita River-- no pumping.  I don't care whether

25  it is alluvium or what it is.  There is such a small quantity

9713

1   of water that no matter how hard or how long you pump you are

2   not going to affect the runoff of the stream.

3        MR. VEEDER:  But if you should affect it by some subse-

4   quent pumping, you would cease; is that right?

5        MR. KRIEGER:  Why, of course not.  I mean, we are not

6   about to abandon our ground water, our overlying rights.

7   What we are doing is abandoning any right to stream flow,

8   surface and subsurface.

9        THE COURT:  If you abandon your right to stream flow,

10  surface and subsurface, don't you abandon your right to put

11  wells in the alluvial area?

12       MR. VEEDER:  To withdraw any water that would support

13  the surface stream?

14       MR. KRIEGER:  I see.  If the pumping did that.

15       MR. VEEDER:  That is what I am saying.

16       MR. KRIEGER:  If the pumping did that.  And what I was

17  trying to say was that there would be no problem, as I see it,

18  on that score, because so far we have nothing to show that

19  the pumping of any of this alluvium is going to in any way

20  affect the stream down below.  Now I will agree with you that

21  if it does affect, under our decree we would have to cease.

22       MR. VEEDER:  That is all my concern is, that a deal

23  like that, when you zip this thing up and this part of your

24  answer is out of the litigation, it is nevertheless subject

25  to our paramount right to the water that is part of the Santa

1  Margarita River system and subsequent interference would not
2  be permitted.
3      MR. KRIEGER:  If there is any water there.
4      MR. VEEDER:  Well, yes.  No, no.  Strike that last
5  statement.
6      MR. SACHSE:  I am lost, frankly.  It seems to me that
7  what we are trying to do here is to arrive at what amounts to
8  a stipulated finding of fact.  Now a finding of fact, whether
9  it is stipulated or whether your Honor does it on the basis
10  of the evidence, is going to be that the ground water is a
11  part of the stream or is not a part of the stream.  So apply
12  it to this.
13      THE COURT:  The situation here would be a finding that
14  this area of younger alluvium is a part of the stream system
15  and any water in it is a part of the system, that the areas of
16  basement complex other than the younger alluvium, any water
17  under it is vagrant, percolating water in which the Government
18  and any other persons claiming rights in the stream have no
19  interest.
20      MR. SACHSE:  That is right.
21      THE COURT:  You therefore would have a situation, you
22  could still leave the door open where, if you wanted to take a
23  chance and put a well down in the younger alluvium and the
24  Government didn't claim that it interefered with the stream,
25  you might get by with it.  But you would be putting a well in

9715

1  the younger alluvium at your peril.

2  MR. KRIEGER: There is only one disadvantage in what

3  you have said. This kind of finding would leave us in a very

4  uncertain position on both sides. It seems to me that under

5  the circumstances you have just related there would be no

6  point in making that kind of a deal because we would then

7  simply be disclaiming our riparian rights and getting nothing

8  back.

9  THE COURT: Well, you are claiming your riparian rights,

10 but your riparian rights-- let's talk about riparian alone--

11 MR. KRIEGER: Yes.

12 THE COURT: --amount to nothing, because your riparian

13 flow in here is only during the winter.

14 MR. KRIEGER: That is right.

15 THE COURT: So you can't ever use it. Now if there is

16 a basin-- that would take a lot of work, et cetera-- and you

17 are an overlying owner of a basin, you would have some

18 correlative right. But it is an illusory right in view of the

19 size of that alluvium in there.

20 Mr. Sachse, of course, had this cleancut. He had this

21 where they said, we claim no rights in the stream at all, and

22 he proposed a decree whereby the Government's right to the

23 stream flow would quiet title against his property. By the same

24 token, he had property which probably in most instances didn't

25 have any alluvium, or very much of it.

1     MR. SACHSE:  That is right.

2        THE COURT:  And where he could say, by the same token
3   we have a right to all of the water we have here outside of
4   surface water.  Surface flow, of course, is entitled to run
5   on down into the stream.  Any water we get out of the ground,
6   our rights are quieted against the Government and anybody else
7   who has an interest in the stream system.

8        It seems to me that in an instance like this, this is
9   susceptible of some kind of decree getting it out of the case.
10  Certainly a finding that the rest of this is basement complex
11  gets the rest of this ground out of the case.  So the only
12  part in which there is any question at all is a little bit of
13  alluvium down through here.

14       Now, as to your riparian rights, if you want to wind
15  those up-- by that I mean a right to pump out of the stream--
16  you have nothing but an illusory right anyway.

17       MR. KRIEGER:  That is right.

18       THE COURT:  The only possible right you would have would
19  be that of an overlying owner over a basin which might be
20  part of a stream.  The fact that it is alluvium doesn't mean
21  that it is a basin.  There maybe some underground flow in there,
22  but the chances are that the underground flow this high up
23  doesn't amount to anything except in the wintertime.

24       MR. KRIEGER:  That is right.

25       THE COURT:  It seems to me that you have to make a

1    decision as to what you are going to do on that.  If you

2    concede that the Government is entitled to the surface flow

3    and the underground flow, and if you are willing to agree that

4    any well dug in this younger alluvium that interferes with the

5    flow of the stream may be anjoined, then that is susceptible

6    of settlement.  As a matter of fact, you might take a chance.

7    If you got a well, there might never be any contention.  But--

8        MR. VEEDER:  And I think 75% of the cases are going to

9    be settled along the line you have just described, because I

10   think that is what is going to occur.  That is the history of

11   this kind of litigation.  Sooner or later you get down to the

12   point where you say, here is the extent of the rights I am

13   going to claim, irrespective of anything else, and on that

14   basis--

15       THE COURT:  Of course, you get others.  Here is another

16   6 over here.

17       MR. SACHSE:  Is 6 down in here?

18       MR. VEEDER:  That is the Ceas property, and there you

19   have problems.

20       MR. KRIEGER:  We have no problem there, because we have

21   them all parceled out in sections.

22       THE COURT:  Where is your problem?  It is residuum.

23       MR. VEEDER:  I say we are going to do it.

24       THE COURT:  That could be eliminated, it seems to me,

25   immediately.  In other words, the Government would concede that

1    your rights to percolating water be quieted against it, and

2    you in turn would concede that the Government would quiet

3    title its rights to any surface waters or any part of the

4    stream water.

5         MR. VEEDER: We have problems there.

6         MR. GIRARD:  Are you contending that any of these areas

7    other than in younger alluvium are other than vagrant waters?

8         MR. VEEDER:  No.  Here is what I am saying, that on

9    the basis of the data-- here is what we have done on each

10   subdivision.  We have gone through, checked it out the best

11   data that we have, we have come up with residuum, no surface

12   stream, here it appears there would be no claim whatever in

13   the Santa Margarita River.  That is how it looks to me.

14        THE COURT;  In other words, this one is an easy one.

15        MR. VEEDER:  That is right.

16        MR. KRIEGER:  Most of them are easy, I think.

17        THE COURT:  You do have a little problem here.

18        MR. KRIEGER:  There is only one question I have to

19   raise to your suggestion.  I think everything we are talking

20   about is incorporated in this proposed decree, but I think

21   you raise a problem in this case.  Let me illustrate it.

22   Suppose you have a stream like this that only runs during the

23   wintertime, and here is your alluvium on either side of it

24   like that.  Whether or not a well that is sunk here actually

25   hits a subsurface stream which is really part of the surface

1    stream or whether this is a basin becomes a question.  If it

2    is a basin and not part of the subsurface stream, under this

3    proposal our clients would have a right to pump it and take

4    water from it.

5         THE COURT:  If it is a basin.

6         MR. KRIEGER:  If it is a basin.

7         THE COURT:  If you have an agreement where you reserve

8    that right, you would.

9         MR. VEEDER:  You will not get that agreement from me.

10        MR. KRIEGER:  If you don't, then what is the considera-

11   tion?  Your land owner is out here, presumably like this, and

12   he has got to have some rights in his land.

13        MR. VEEDER:  Which is the stream?

14        MR. KRIEGER:  This is the stream right here.

15        MR. VEEDER:  You have alluvium on both sides?

16        MR. KRIEGER:  Yes, you have alluvium on both sides,

17   and he sinks a well here but it is not part of the underground

18   stream.  The underground stream, say, goes along this dotted

19   line like that.

20        MR. VEEDER:  Let me draw a little onto that picture.  If

21   you put a well in there and your cone of depression goes out

22   like that.

23        MR. KRIEGER:  Let's say that it does.

24        MR. VEEDER:  And it kills the surface stream, we would

25   cry until the cows come home.

1  MR. KRIEGER: Now let me go back to one of the key

2  things we have tried to show from the very beginning, that no

3  matter how much you pump in this area it is not going to affect

4  the stream.

5  THE COURT: I am not going to find that now on the

6  basis of what testimony you have offered. If you want to

7  dispose of these, you can't dispose of them that way. If you

8  think I am going to hear your witness and then make a finding,

9  I am not going to do it. That is not the way we are going to

10  try the lawsuit.

11  MR. KRIEGER: I hadn't expected that you would do that,

12  your Honor, except that I thought after we finished our

13  presentation that we had come pretty well to the conclusion

14  that the quantity of waters that were pumped up in this area

15  did not affect the stream system.

16  THE COURT: Well, some of them may, and some may not.

17  There are little alluvial basins at various places around this

18  watershed, and in all our discussions we realized that we would

19  either have to take proof in each particular one of these or

20  we would have to get some agreement. If you have a little

21  stretch of sand running across a piece of property, it may well

22  be that you would say that there is no basin here where I can

23  claim to be an overlying owner and share prorate with people

24  down the stream. All I have is a worrying right. My riparian

25  right means nothing. I can only pump in the wintertime.

1   Therefore, I am willing to say that the Government may have

2   their title quieted to surface flow of that stream, the under-

3   ground flow of that stream, and if there is any basin there

4   the water there.  The rest of the water underlying the ground

5   is percolating water and I want my rights quieted as to that.

6          Mr. Sachse's cases were a little easier.  He did not

7   have these areas of alluvium in there.

8          MR. SACHSE:  The only ones I have presented so far are

9   100% disclaimers on both sides where the land owner has dis-

10  claimed all interest in the stream and the United States is

11  being asked to disclaim all interest in the ground waters.

12         THE COURT:  If you have land overlying a basin you are

13  an overlying owner, you have correlative rights with everybody

14  else who has a right in the stream system, then you are

15  obviously in the case and from here on eternally your client

16  is part of the decree that involves the stream of the Santa

17  Margarita River, if that is what you want.

18         MR. KRIEGER:  That is right.  But there must be a showing

19  that the water from that basin somehow contributes to the

20  stream system.  The mere fact that there is some alluvium in

21  the hinterlands doesn't, by any manner of means, indicate that

22  it is part of the stream system.

23         THE COURT:  I don't think that is going to give me much

24  trouble.

25         Now, if the evidence shows that there is a basin, how

9722

1    can you separate the basin-- it may exist only part of the

2    year-- from an underground stream or part of the stream?

3    I don't think you can.

4          MR. KRIEGER:  What concerns me is the definition of a

5    basin.  Certainly the Government is not going to put in any

6    evidence of what is a basin.

7          MR. VEEDER:  Let's do a little semantics.  I will show

8    you something.  You can call this whatever you want, but if

9    your pumping kills the surface stream you can call it a basin

10   or call it whatever you want, it is invading our rights.

11         MR. KRIEGER:  Then if this is hardpan over here and

12   you put down a well and it may in five years or ten years

13   affect the stream system the same argument holds.

14         MR. VEEDER:  No, I don't see how it could affect it.

15         MR. KRIEGER:  How do you make the distinction?  A cone

16   of depression may be made instantly, it may be made--

17         THE COURT:  You can't have a cone of depression through

18   basement complex.  You only have a cone of depression where

19   you have alluvium.

20         MR. VEEDER:  Where you have some sand.

21         THE COURT:  Where you have some sand, where you can

22   have a basin of water.  You have lost me somewhere just like

23   you lost Mr. Sachse on this thing.

24         MR. KRIEGER:  I am concerned about this area of the

25   basin.  That is the only thing that troubles me in what we are

9723

1    talking about.  What is a basin?

2        MR. VEEDER:  What you have up there in this area con-

3    cerning which you are speaking now, your 49, 6 and 26, you

4    have a situation where there may be shallow alluvium.  I have

5    seen a lot of areas where it is deep enough so that you can

6    dig a well.  It may not be a basin.  But you put the pump on

7    there and it simply dries up the surface stream.  Call it

8    whatever you want, call it pumping from the stream, but if it

9    destroys the surface runoff that in the state of nature was

10   there--

11       MR. KRIEGER:  If it does, yes.

12       MR. VEEDER:  Yes.  Well, if it doesn't, there is no

13   sweat.

14       THE COURT:  Well, let's go back.  We started out on

15   this thing on the basis that where there was ground with only

16   vagrant, percolating water we would try to get them out of

17   the case.  Nobody ever made any proposition that there was any

18   way to get people out of the case where they claimed a riparian

19   right on the stream or where they claimed a right as a riparian

20   owner.

21       MR. KRIEGER:  That is right.

22       THE COURT:  Because automatically if they claim those

23   rights then they are part of the river system, if their con-

24   tentions are upheld, and they are in the case from here to

25   eternity and there is no way of getting them completely out.

1   That is the basic premise you have to start with.

2        MR. KRIEGER:  Yes.

3        THE COURT:  Now there may be situations like here where

4   there could be a finding that as to the west half of this

5   ground or down to some line the water is vagrant, percolating

6   water, but as soon as you get to piddling around with the

7   stream bed and alluvium and the basin it is either fish or

8   fowl; you either claim you are part of the stream, that you

9   have correlative rights, riparian and overlying, or you say

10  you are not part of the stream.

11       MR. KRIEGER:  I think that is completely right.

12       THECOURT:  You have to make your choice which way you

13  are going to jump.

14       MR. KRIEGER:  But aren't we in a no man's land in a

15  lot of these cases?  Take the case I have here on the board.

16  It might be that there is so little water that ever gets into

17  the underground here that these people can use that they are

18  willing to say, we are willing to let the surface water go

19  right on through to Camp Pendleton if you will let us have the

20  ground water here and pump the way we want to pump.

21       MR. VEEDER:  We are right back where we were.

22       THE COURT:  We are right back where we were.  Do it the

23  easy way.  Make up your mind either that you are going to

24  claim to be part of the river system or you are not.

25       MR. KRIEGER:  Yes.

9735

1     THE COURT: If you claim you are not part of the river

2  system, then you quitclaim any rights to the river, the under-

3  ground flow, and stick to your vagrant percolating water.

4  Now some of this is neither black nor white. Then the only

5  thing I can think of presently is what you and Mr. Veeder

6  talked about, and that is that you enter some agreement which

7  would not prevent you from putting a well down but with an

8  understanding that if it were shown in the future that your

9  well in any way interfered with the river system you would

10  be restrained.

11     MR. KRIEGER: I think that just leaves to future de-

12  termination whether the well violates the right or not,

13  doesn't it?

14     THE COURT: That is right.

15     MR. KRIEGER: Now Mr. Sachse's case is made simpler

16  simply because you don't have any of these margins where water

17  is, do you? He just has it running over bare rock, so to

18  speak.

19     THE COURT: Well, let's call it that. So he says, my

20  riparian right means nothing to me. We will throw it out.

21     MR. KRIEGER: That is right.

22     THE COURT: In turn, I want my title quieted to my

23  percolating water, if any.

24     MR. KRIEGER: Now in the other situation, we have the

25  one that is clearly riparian, and in between we have our noman's

1   land here.  All I am trying to say is that I think there are

2   cases where the margin of the stream, the alluvium adjoining

3   the stream is so small and so insignificant to hold so much

4   water that we would all be in better position rather than

5   leaving this open to future litigation to say, you take the

6   surface water and we will have the right to put down pumps,

7   not to tap the stream and its subsurface, but anywhere else

8   on this land.

9       THE COURT:  That last sentence is so broad that you

10  include within it percolating water, you include within it

11  water that might come out of basins, water that might be

12  collected in alluvium that would otherwise assist in the

13  stream. Your last sentence is too broad.  You have to make a

14  choice,  You have to say as to this piece of ground my client

15  contends that he is part of the river system, that he has

16  water in a basin or in the sand here and he wants the correla-

17  tive rights to it, and if you say that and you can't make some

18  compromise then you are going to be in the case from here to

19  eternity.  On the other hand, you may have a situation where

20  this little bit of alluvium or little basin that might exist

21  is so small that you might say, we don't want to be connected

22  with this litigation, we want to get out of it, we therefore

23  consent that the government have a decree that we can't pump

24  in there because it might be part of the river system.

25      MR. KRIEGER:  Where is that in there?  That is the thing

1    that troubles me.

2         THE COURT:  That gives you a right to your vagrant

3    percolating water, but it doesn't seem to me that it would

4    give you a right to put wells down in the alluvial basin.

5         MR. KRIEGER:  What if Mr. Kunkel believes that this is

6    alluvium off here to the side like this, and suppose another

7    person says that it is not?

8         THE COURT:  Then it is going to have to be decided.

9         MR. KRIEGER:  Then it will have to come up in a contempt

10   proceeding under this decree, isn't that right?

11        MR. VEEDER:  It is an issue of fact, isn't it?

12        THE COURT:  It is an issue of fact to be decided in this

13   court.

14        MR. STAHLMAN:  Isn't it possible to have an underground

15   basin in close proximity to the stream system but not part

16   thereof?

17        THE COURT:  It could be.  Probably it would have to be

18   part of some tributary of the stream.  It is pretty hard for

19   me to imagine a basin up there in a vacuum, as it were.

20        MR. STAHLMAN:  It isn't that.

21        MR. VEEDER:  I think we ought to take the problems that

22   are before us, though.

23        MR. KRIEGER:  I think what George is talking about is a

24   situation like this.  If you have a shallow alluvial basin and

25   we are away up in the watershed, and that no matter how much

1    water flows down here and how much water is stored in that

2    basin, and if you pump it all out, I think we have testimony

3    here that that water, even if it were left in, wouldn't con-

4    tribute to the stream system.

5        THE COURT:  You lose me completely.  Let's take an

6    example.  I think I know what you are talking about.  Here is a

7    steep grade and somewhere along here here is a pocket of some

8    kind and in flood water flows on through.  You say we can pump

9    this pocket out because it doesn't affect the stream.  You

10   pump that pocket out.  The first flood waters that come down

11   are going to fill up the pocket.  So you have taken that much

12   water out of the stream.  One the pocket is filled up the

13   water will flow on by.  Therefore, what you take out in that

14   pocket affects in some degree the flow of the stream.

15       MR. KRIEGER:  It certainly does, and I haven't argued

16   that it didn't affect it to some extent.  But I have argued

17   and I tried to introduce evidence that it is not a material

18   effect on the stream.  Suppose that this water that you have

19   referred to here runs down say twelve days out of the year

20   and that's all.  Let's suppose in this little pocket you have

21   drawn on the board only 1% of that small quantity of water would

22   ever be used to recharge this basin.  Could it be said then

23   that the pumping of that basin has a material effect on the

24   stream flow, and could it be said therefore that if we had

25   such pocket as my illustration over here, that pumping it as an

1  overlying land owner would in any way affect the stream

2  sytem?

3      MR. VEEDER:  Could I interpose an inquiry right now?

4      THE COURT:  Well, I want to answer it first of all.

5  Let's say for argument that there is your one little pocket

6  of 1% in the stream that you say doesn't affect the stream.

7  But in the course of the stream down the line let's say there

8  are fifty pockets there and each one takes 1% to fill it up.

9  What have you done to the flow of the stream?  Therefore, this

10  business of saying something is so small, if you could con-

11  vince the Government that there is a little bit of alluvium

12  that they are not concerned with by agreement, all right. But

13  otherwise the thing is going to have to go to findings.

14      MR. KRIEGER:  You spoke of cumulative effect of a lot

15  of little pockets.  But ifyou took the cumulative effect of

16  all the little pockets together and showed that all the re-

17  charging of those pockets took 1% of the runoff which runs

18  off anyway and has continued to run off by reason of our showing

19  that there has been no material reduction in the amount of

20  runoff over the gorge through the years, then would it make

21  any difference if you took a hundred small pockets of water,

22  if the total effect of recharging those was only a fraction of

23  a percent?

24      THECOURT:  Well, it would be just a fraction of a per-

25  cent.

9730

1        MR. VEEDER:  That is right, and that is the whole law-

2    suit.

3        MR. KRIEGER:  So far I think the Government has not

4    suggested that it makes any material difference.

5        THE COURT:  On this stream that you talk about all the

6    pockets together on this particular tributary are only 1%.

7    How many tributaries do you think there are on this stream?

8        MR. KRIEGER:  I don't know.

9        THE COURT:  It is the same problem of your check dams.

10   The check dam as a practical matter, in my mind, no one check

11   dam has any calculable effect on the stream.  But you can

12   put a thousand check dams in a watershed and I suppose you

13   could make an impact on the stream.

14       MR. VEEDER:  It has been done, your Honor, in the

15   Cheyenne River andalso on the Salt River and the Gila River.

16       MR. KRIEGER:  I suppose it could.  But I have been

17   looking for some indication that pumping in this very difficult

18   territory is reducing any stream flow or prospective stream

19   flow.

20       THE COURT:  Mr. Krieger, you have lost me, because you

21   are talking about making some findings on contested matters,

22   and I am not prepared to do that piecemeal.  I am prepared to

23   sign proposed interlocutory findings on areas where there is

24   not too much dispute, and I am prepared to make findings that

25   a certain area has no alluvium, that a certain area is basement

1   complex and that sort of thing that there will be no dispute

2   about.  But there is a big difference between making some

3   findings on contested matters at this stage of the case and

4   getting some of these people out that you say don't belong in

5   here.

6       MR. KRIEGER:  I think there is no disagreement there

7   at all.  I think in our illustration on the board we have used

8   a matter that may have been exaggerated somewhat.  As to such

9   matter the way you have been talking, I think we could relate

10  it to the Santa Gertrudis itself.  We have no contest with

11  that.  We know that any pumping in that valley is going to

12  affect the stream system and we have omitted it.  We are talking

13  though now about areas up here that have practically no

14  younger alluvium in them.  We have been talking about lands

15  which the pump tests show produce no water of any significance,

16  where the specific capacity is so low--

17      THE COURT:  We started out talking about what areas?

18      MR. VEEDER:  That is what we would like to go ahead

19  with, because we would like to check these out and get them

20  done.

21      MR. KRIEGER:  Outside of the Kunkel line.

22      THE COURT:  What areas are they?

23      MR. KRIEGER:  The other areas are Sections 22, 23, 24.

24      THE COURT:  The Government has told us there is an

25  argument on that.

1        MR. KRIEGER:  They have said that today, that is right.

2   Before it was down in these three sections.  But now they have

3   moved up three sections.

4        THE COURT:  And they have told you 15, one of the Yoder

5   wells, they want to talk about.

6        MR. KRIEGER:  And they have also moved it up to 13,

7   14 and 15.

8        MR. VEEDER:  We have never agreed at any time--

9        MR. KRIEGER:  To anything.

10       MR. VEEDER:  That is right, and I want the record to

11  show it.

12       MR. KRIEGER:  I certainly want to admit that you have

13  never agreed to anything.  I don't mean that facetiously.  You

14  have always surrounded your offers with--

15       MR. VEEDER:  Caveats.

16       MR. KRIEGER:  --checking out of these findings.  So

17  now we are up in 3, 6, 4 sections, and we are substantially

18  outside the Kunkel line by doing that.  We have Murrieta Hot

19  Springs--

20       MR. VEEDER:  What is your number here?  19?

21       THE COURT:  15, 17, 19.

22       What about 15 up here?

23       MR. VEEDER:  Older continental deposits and basement

24  complex in your section 3.

25       THE COURT:  It is in the corner of it.

1      MR. VEEDER:  It splits right across through there.

2  Section 20--

3      THE COURT: What is your position on 15 here?

4      MR. VEEDER:  Section 15?

5      THE COURT:  No, it is parcel 15.

6      MR. VEEDER: That is what I am on.  Your Section 3 is

7  in older continental alluvium and basement complex.  The older

8  continental deposit we are not going to agree can go out.

9      THE COURT:  With reference to the Kunkel line--

10     MR. VEEDER:  We just moved the Kunkel line.

11     MR. KRIEGER:  You say they will not go out?

12     MR. VEEDER:  Section 3 will not go out.

13  Section 20, 15--

14     MR. SACHSE:  Here is 15.

15     THE COURT:  Here is another part of 15.

16     MR. VEEDER:  This is E. M. Lincoln's.

17     THE COURT:  I don't see any inSection 20.  Here is

18  Section 20 over here.  Well, that is right in the basin.  I am

19  not talking about those.  Here is a piece of 22.

20     MR. VEEDER: But you see you didn't include that.  That

21  has not been included.

22     MR. KRIEGER:  It has not been included in what?

23     MR. VEEDER:  I don't believe that is in your answer.

24  I want to check that, because when we went back and checked

25  it we couldn't find it.  But I see it is on the map here, so

9734

1  we have checked it out and we have just left it.  But it is

2  in the older continental.

3      THE COURT:  The only one presently that would be worth

4  talking about is up here.

5      MR. VEEDER:  No. 3.  You would have to split off right

6  about along there on 3.

7      MR. KRIEGER:  What is your basis for saying what is in

8  and what is out?

9      MR. VEEDER:  On the basis of what Col. Bowen, Mr.

10  Kunkel and Col. Robertson tell me now.  It is based on our

11  soil surveys, and based on checking out.

12      MR. KRIEGER:  What is the basis?

13      MR. VEEDER:  Anything that is alluvium cannot come out.

14      MR. KRIEGER:  Any kind of alluvium?

15      MR. VEEDER:  Any kind of alluvium, because they have

16  found water all the way through it.

17      MR. SACHSE:  The older alluvium, as I understand what

18  you are saying, is going to have to stay for findings of the

19  Court.

20      THE COURT:  What about this up here in 32, 25, 52 and 9?

21      MR. SACHSE:  According to my map that should be all

22  residuum.

23      MR. KRIEGER:  That is in, too, isn't it?

24      MR. VEEDER:  Yes.

25      MR. KRIEGER:  Everything is in-- residuum, older

1    continental.

2           MR. VEEDER:  No, sir.

3           What is the name of the party on that?

4           MR. SACHSE: Wilks.

5           MR. KRIEGER: Wilks.

6           MR. GIRARD:  No. 9 is Lowe.

7           MR. VEEDER:  Wilks is not on your list in here.

8           Your Honor, the reason that these two are not in there

9    is because they are not on the list.

10          MR. KRIEGER:  Is that 7 South, 3 West?

11          CMDR. REDD: It is 6 South, 3 West.

12          MR. VEEDER: Do you want that included?

13          MR. KRIEGER:  It is in my list.  This is my letter--

14   Parcels 9 and 52 right here.

15          MR. SACHSE:  Look at it right now where it is, Bill.

16   Here is your corner, here is your corner.  This is your exhibit.

17   Perhaps the barest corner of it is in the question marked older

18   alluvium not confirmed. The rest of it is in residuum.

19          MR. VEEDER:  I am going to say this in that regard, your

20   Honor, I was guided by this list that was submitted to us

21   and so I didn't check that.

22          MR. KRIEGER:  You did see the letter I sent on April 6th?

23          MR. VEEDER:  Yes.

24          MR. KRIEGER:  So it would have them on there.

25          MR. VEEDER:  Here is what we found.

1    MR. KRIEGER:  What is your answer to that on 9 and 52?

2    MR. VEEDER:  I have to go back and check with Mr.

3 Kunkel.  But we have gone through each one of those and I

4 think the way to do it, your Honor, is the way you have sug-

5 gested.

6    THE COURT:  What do you have down here in 48 and 49?

7    MR. VEEDER:  We have been talking about 1.  That is the

8 picture on the blackboard.  On 7, Tucalota Creek, younger

9 alluvium, residuum and basement complex.  The creek goes

10 right through this chunk of alluvium and younger alluvium and

11 residuum and back here and then there is an outcropping of

12 basement complex.

13    THE COURT:  What about 17?

14    MR. VEEDER:  17 is in No. 6.  That is the Ceas property.

15 We have touched on that.

16    THE COURT:  Section 17 can go out, then, can it not?

17 What about Section 8?

18    MR. VEEDER:  Tucalota Creek is younger alluvium.

19    THE COURT:  This would be in.  And of course if this is

20 all in one ownership at one time it is all riparian, if there

21 is any riparian right there.  It is again a question of you

22 making up your mind what you want to do, Mr. Krieger.

23    MR. KRIEGER:  I have made up my mind sometime ago what

24 I wanted to do and presented it, but we haven't been able to

25 come to this or any other modification of this solution and

1  maybe it is time for some kind of counter-offer.

2      MR. VEEDER:  I gave you the criteria just a moment ago.

3  I thought you summed it up very succinctly

4      THECOURT:  Let's go to another thing.  You men can work

5  on this.  But I think Mr. Krieger has to make up his mind which

6  way he wants to jump.  You either want your client to claim

7  that he is part of the stream system, in which event he is

8  included in a decree which eventually defines the stream system,

9  he has correlative rights and is in the litigation from here

10  on out.  Or you want to say that we don't claim to be part of

11  the stream system, we disclaim any right to surface flow,

12  underground flow, any right to water out of the alluvial areas,

13  but we want our rights to vagrant percolating water, et cetera.

14  You have to make that decision.  Unless you can make some

15  compromise which would be acceptable to the Government and say,

16  we will kick a certain piece of it out, but as to the remaining

17  piece we want to be in or we want a right to drill a well in

18  some alluvial area, but with the understanding that if later

19  on the well interferes with the flow of the river we will ben

20  enjoined.  I don't know what else you can do.

21      MR. KRIEGER:  We have made that and we have listed the

22  parcels and they are all before Mr. Veeder.  I think we ought

23  to have a response from him in letter form and maybe we can

24  put this thing together.

25      MR. VEEDER:  Aren't you going to be here tonight and

9738

1   tomorrow?

2       MR. KRIEGER:   I don't intend to be here tomorrow, but

3   I can.   But the point of it is if we can push this with a

4   reply to my proposal, which he has, going parcel by parcel

5   yes or no, I think we will have arrived at an answer to your

6   inquiry.

7       MR. VEEDER:   Are you going to correct the disparity

8   between the form you submitted to me in your letter-- I mean

9   Wilks and those other clients that are in?

10      MR. KRIEGER:   Why don't you answer my letter the way

11  you want it, with such qualifications as I know you will want

12  to add, how will that be?   And then we can move from there.

13      MR. VEEDER:   It suits me.

14      MR. KRIEGER:   May I raise another question for just a

15  minute while we are on our property, your Honor?

16      THE COURT:   Yes.

17      MR. KRIEGER:   Many months ago we requested the Government

18  to come in and make soil surveys, and I understand sometime

19  ago that many of those have been completed.   For some

20  reason we have not received any one of the soil surveys to date

21  and I would certainly like to know that the progress of that

22  is, because we are going to be left high and dry here if those

23  surveys are not made available.

24      MR. VEEDER:   Col. Bowen tells me that the field work is

25  done, that we are in the process now of preparing the reports

1    and that they will be available to you as soon as possible.

2         MR. KRIEGER:  What does that mean?

3         MR. VEEDER: Col. Bowen, what is your thought onthat?

4         COL. BOWEN:  Mr. Query's we have finished, and I am

5    prepared to give that to you tomorrow.  Or do you have one down

6    here now?

7         Mr. Oviatt's is almost complete.  That was the next one

8    we took.  That was a big one.  It amounted to about 60 pages

9    or so.  I am not certain just when that will be completed.

10        Mr. Leo Roripaugh's will come along.

11        Mr. Albert Ceas, Mr. Gunther's and those others that we

12   have done thefield work on will be completed as rapidly as we

13   can get the maps drawn and the acreages measured.

14        MR. KRIEGER:  Is that a matter of days or weeks or how

15   long?

16        COL. BOWEN:  I would say it is probably a matter of

17   weeks before we get all of them finished.

18        MR. KRIEGER:  That probably then won't be done until

19   this vacation stretch is over; is that right?

20        THE COURT:  It probably wouldn't be ready until after

21   the first of September, then, all of these.

22        COL. BOWEN:  I expect, your Honor, that they will all be

23   ready by this fall.

24        THE COURT:  You would know a little more about the

25   situation by that time.

1          MR. KRIEGER:   I wonder if we could have them as they

2    come off the press.

3          COL. BOWEN:   If you desire I could turn over a copy of

4    the soil survey map to you without any tabulation of acreages

5    and then we could go ahead and make it

6          MR. KRIEGER:   I think that would help.  Any information

7    would help reduce our burden i duplicating this process.

8          THE COURT:   You work with Col. Bowen on that.

9          MR. KRIEGER:   I will be glad to.

10         MR. VEEDER:   As long as we are trading horses here,

11   we are extremely anxious to continue through on our canvass

12   of wells.  We have asked Mr. Krieger to permit us, based upon

13   the letters, copies of which your Honor has received, to go up

14   on the land, with no interference other than for the simple

15   purpose of making these measurements.  I have outlined this

16   in the simplest form, with the least interference, complete

17   adjustment to their well uses.  But we do believe, your Honor,

18   that there are issues here now, and we have proceeded and

19   asked to obtain personnel for the purpose of running through

20   in the preparation of our rebuttal to meet these contested

21   issues of fact.  We are desirous of an order from your Honor

22   permitting us to go on and complete this well canvass.

23         I understand Mr. Krieger's problem.  He says, I can't

24   give you the voluntary consent.  Will you get an order?  I

25   ask for an order.  There will be no interference, I don't

1   believe, with any of the wells.  We have outlined to him what

2   we want, and as long as he is leaving and will not be here

3   tomorrow I am greatly concerned about it because I would like

4   to get his consent this evening, if we can get it, to proceed

5   now to make a canvass throughout the whole area of all wells

6   and take measurements of static and pumping levels.

7   MR. KRIEGER:  Your Honor, I will interpose the same

8   objection to that that I did before.  But I will say this.  I

9   have offered Mr. Veeder every opportunity to come and check

10  the static water levels on these wells.  But I cannot authorize

11  him to pump those wells or to in any way interfere with those

12  wells.

13  MR. VEEDER:  I didn't say a word about pumping.  I said

14  testing the static and pumping levels of the wells.  That is

15  all I have asked.

16  THE COURT:  His request is to go in and make measurements

17  of static levels when the well isn't pumping and to make

18  tests when the well is pumping, not to pump the well.

19  MR. VEEDER:  That is right.

20  THE COURT: To go in when your people are pumping and

21  when they are not pumping.

22  MR. KRIEGER:  Let me ask this:  Is it the purpose of

23  the Government, when it does that, to make observations on

24  other wells at the same time the wells are pumping?

25  MR. VEEDER:  Yes, we desire to see if there is inter-

1    action on the well.

2        MR. KRIEGER:  I will object to that, your Honor.  I will

3    say that it is not germane to the issues that have been raised

4    by our people, and our facilities will not be available for

5    that, unless the Court orders it.

6        MR. VEEDER:  It is passing strange to me, your Honor,

7    that when wells are being pumped-- the Yoder well, for example,

8    and the Gunther well-- that there would be any objection to

9    seeing whether there is interrelation and interaction among

10   those wells during the time that the man is pumping for his

11   own irrigation and not at our convenience, but at his conven-

12   ience.  What difference does it make?  And why are they so

13   afraid of this question of interaction?  I think I know.  All

14   we say is that we could do it without interference to them,

15   and to me it is the simplest kind of request that could be made.

16       THE COURT:  Well, you have a shotgun request.  I don't

17   know what wells you are asking to check.

18       MR. VEEDER:  I will narrow it down.  First, in regard

19   to Mr. Krieger's clients, we would like to run the simple test

20   to which I alluded on all the wells that are on Roripaugh A.

21   Those are the ones that are right here (indicating.)

22       MR. KRIEGER:  Your Honor, I think Mr. Veeder ought to

23   set out exactly what he intends to do in the form of a motion

24   and when he intends to take these tests, because our people,

25   about a hundred of them, are going to want to know exactly what

9743

1    the basis of this motion is and what the Court orders.

2         THE COURT:  What wells are you talking about now?  The

3    red and the blue on Roripaugh's A?

4         MR. VEEDER:  The red and green on Roripaugh's A.

5         THE COURT:  You mean wells down in the Murrieta Basin,

6    too?

7         MR. VEEDER: Well, if required.  We would like to have

8    access to those wells.  It would certainly be helpful.  But in

9    particular we are concerned in this area up in here where

10   they say, we want out.

11        Your Honor, as long as we are talking about blanket

12   approaches, and the thing that concerned me and I brought

13   you this map on Wilson Creek area showing these answers and

14   lack of answers, et cetera, you can see the picture here. We

15   know that scattered throughout this whole area are innumerable

16   wells concerning which there is no data today.  Yet the issues

17   that are presented by both the State of California and by Mr.

18   Krieger would indicate that their contention is clear; that

19   say there is no interrelation with the runoff of the Santa

20   Margarita River. We deny it.  We believe that we can show that

21   there is truly an interaction among those wells, and by the

22   simple process of taking the static and the pumping levels

23   throughout that area I believe we can prove our point, and it

24   is certainly proper rebuttal because we are confronted with

25   the Vail's position, the State's position, Mr. Krieger's

     position, and of course there are a lot of people who have

1  been served who have not appeared who have wells, too, and

2  we would like to have an order from your Honor to do just what

3  I said.  It is the simplest kind of request.

4      MR. STAHLMAN:  Your Honor, my approach is a little

5  different in this case and my attitude to it.

6      THE COURT:  Well, let's not take yours up.

7      MR. STAHLMAN:  If this is something different, I will

8  desist for the moment.  I thought as long as he mentioned

9  Vails, et cetera.

10      MR. VEEDER:  I was responding, Mr. Stahlman, to the

11  proposition advanced by Mr. Krieger that our requests for going

12  upon these lands related only to whatever issues-- I think he

13  opened up all the issues-- that he says are involved.  I

14  say that we are confronted not only by Mr. Krieger's issues

15  here, but by the issues of the State and of the other people.

16      THE COURT:  Before I am going to make any order, in

17  view of Mr. Krieger's position, it has to be by motion.  I

18  have to have spelled out the name of the well and exactly

19  what you want to do.

20      MR. VEEDER:  All right, your Honor.

21      THE COURT:  How you are going to do it, and the purpose

22  of the test.

23      MR. VEEDER:  Yes.

24      THE COURT:  So unless there is some agreement between

25  you, you make the motion.

1    MR. VEEDER:  While I was here I wanted to present to

2  him what we wanted.

3    MR. KRIEGER:  You said that we have in issue many of

4  these things on our Roripaugh's Exhibit A. Well, we don't.  We

5  have agreed that the whole Murrieta Basin contributes to the

6  Santa Margarita River.  That eliminates a great number of our

7  wells.  We have also agreed that the Roripaugh and the Shamel

8  well and the other wells on the Santa Gertrudis are in.  There

9  is no sense in opening up all those clients' wells for these

10  tests when by admission they are in the stream system.  Then

11  on the other hand I would like to keep them as low as possible,

12  if the Court should issue an order, because when the Govern-

13  ment intends to go in there and measure we will try, if we can

14  possibly raise the money, to go in and check those levels

15  with them and make our own observations.

16    MR. VEEDER:  I realize the burden upon Mr. Krieger's

17  clients.  I was wondering if the State could assign someone

18  to work with our people to the end that there would be this

19  checkback on all of our data by an adverse party, and I am

20  sure a party that would be acceptable to Mr. Krieger.

21    THE COURT: Mr. Girard?

22    MR. GIRARD:  In the first place, we don't classify our-

23  selves as an adverse party particularly, Mr. Veeder.

24    THE COURT:  Well, the Government does.  But even if you

25  are not?

1    MR. GIRARD:  We would like very much to cooperate or

2    at least to have our engineering and professional people there

3    when the tests are made, to be given notice of the tests and

4    specifically to discuss them with the Government if the Court

5    grants the order, what they intend to prove by the tests.

6        THE COURT:  Would that satisfy your need, Mr. Krieger?

7        MR. KRIEGER:  I think it might, your Honor.  Here again,

8    if the tests are made pursuant to a court order and if the

9    State will send its men in, in place of ours, it will certainly

10   reduce our burden.

11       MR. GIRARD:  I would like to make one thing clear--

12   perhaps I should not-- but it was not the State's position,

13   I don't believe, that there was no effect in this area, but

14   that there is no material effect.

15       MR. VEEDER: But it is in issue.  You say there is no

16   material effect, and we would like to rebut their contention,

17   that's all.

18       THE COURT:  I understand.

19       Mr. Krieger suggested that you eliminate the wells in

20   the Murrieta Basin.

21       MR. KRIEGER: And the Santa Gertrudis, too.

22       THE COURT: Can you do that?

23       MR. VEEDER:  Mr. Kunkel, what are your thoughts on that?

24   This is new to me.

25       MR. KUNKEL:  I am not exactly clear on what is meant

1  by the Santa Gertrudis Basin.

2      MR. KRIEGER:  On Roripaugh's Exhibit A we have indicated

3  that portion of the Santa Gertrudis which is admittedly in the

4  basin and it has all the wells located on it.

5      MR. VEEDER:  Between the Wildomar and the Elsinore faults;

6  is that right?

7      MR. KRIEGER:  Roripaugh's A admits all the wells.  Let

8  me name them here:  7 South, 3 West, H-3 in Section 27, J-1

9  in 26, and R-2 in 26, E-1 and M-2 in Section 25, B-1 and C-1

10  in Section 35, and all of the wells that are within the two

11  fault lines, and I can recite them but I don't think there

12  is much reason for it.  It would be better to name the wells

13  that are outside the area in question.

14      MR. VEEDER:  The question of temperature is in there,

15  your Honor.  The issue has been raised that there is a variance

16  in temperatures, and we would like to run those tests out.

17      MR. KRIEGER: We have never raised it.

18      MR. VEEDER:  I think Mr. Stahlman did.

19      Didn't you put in some testimony in regard to the

20  temperatures at the Shamel well and the other well in this

21  Santa Gertrudis area?

22      MR. STAHLMAN:  Yes, we had a witness here who showed

23  that there was a difference in temperature.

24      MR. VEEDER:  We would like to make tests on that.

25      MR. STAHLMAN:  Do you recall which wells they were?

9748

MR. VEEDER:  Yes.

MR. STAHLMAN:  Which do you say they were?

MR. VEEDER:  I think they are M-2 and R-2, were they not?

MR. STAHLMAN:  Yes, M-2 and R-2.

MR. VEEDER:  And then there are also some wells that were not shown.

MR. KRIEGER:  We have no control over those.  There are just fifteen wells that are outside the area.  We have agreed to the area otherwise, and as to those wells we of course will still raise the same objection.  But I am suggesting that there is no reason at all for--

MR. VEEDER: We will itemize the wells, your Honor.  We will attach it to a motion and file it with your Honor.

THE COURT:  I would like to have you talk first and see if you can by agreement reduce the area that you are going to cover.

MR. VEEDER:  I will restrict it as much as I can.

You are not going to be here tomorrow, are you?

MR. KRIEGER:  No.

MR. VEEDER:  I would like to have this order as soon as I could, your Honor.

THE COURT:  You will have to make a motion.

MR. VEEDER:  That is what I say.  But he is not going to be here tomorrow.

MR. KRIEGER:  You will not have it ready by then, anyhow.

THE COURT:  You can make your motion and notice it for the following Monday.

MR. VEEDER:  I have men standing by to go on this land, your Honor.

THE COURT:  You have lots of work to do besides getting them on the land.

MR. STAHLMAN:  Is this test in conjunction with the test on the Vail Ranch in any way whatsoever?

MR. VEEDER:  Yes, it is.  When we set up our proposal directed to Mr. Krieger and directed to Mr. Stahlman, the objective was as nearly as possible a correlation showing interaction among the wells in the area.  We propose, in regard to Mr. Stahlman's properties-- and he and I spent a pleasant time at noon-- we dug the Pauba well, we had referred to the Navy well, we want to dig a shallow well next to it.  We desire also to make tests in the Cantarini well, the Cantarini pit well and other tests on all open wells on Vail property.

THE COURT:  If you can, get a stipulation.  If you can't, make a motion.

MR. STAHLMAN:  Your Honor, I have not taken the position that it would be necessary to make a motion.  However, I do think and I have been trying to find out from the conversations I have had with Mr. Veeder and Mr. Kunkel, and we spent some considerable time, what they propose to show by those tests.

1  Will these tests show the source from which this area is

2  charged?  Will it show a quantitative transmissibility of

3  water?

4  　　　MR. VEEDER:  If we knew, we wouldn't need to take the

5  tests.

6  　　　MR. STAHLMAN:  Then why make the tests?  It is merely a

7  sympathetic action.

8  　　　THE COURT:  Either have written out what you think you

9  are going to show so that Mr. Stahlman can pass on this and

10  get a stipulation, or make a motion.

11  　　　MR. VEEDER:  I have given him a letter on it already.

12  　　　MR. STAHLMAN:  I got a letter yesterday.  We are going

13  to have to take this up with an engineer who knows something

14  about it.  I don't know.

15  　　　THE COURT:  Either get a stipulation or make a motion.

16  Now to get a stipulation you may have to satisfy Mr. Stahlman.

17  　　　MR. VEEDER:  I will do that.

18  　　　THE COURT:  Now I want to hear from Mr. Swing.

19  　　　MR. SWING:  Your Honor, I think in a very few minutes

20  I can present a situation by which two defendants can be gotten

21  out of the trial of the case, and they fall within the situa-

22  tion you mentioned of making up their mind either to get out

23  now or be in for the rest of the entire trial.

24  　　　I represent Cosette S. Garner and Jack Garner, who are

25  the owners of some 1700 acres of cattle ranch.  Approximately

33 or 35 are within the Santa Margarita Watershed.  Col. Bowen and I went up there and took a look at it.  It is rather steep and precipitous.

We have claimed in our answer riparian rights for stock water purposes, but we have made up our minds that it is not worth the struggle of staying in and we are willing and desirous to disclaim against claiming any rights whatever in the Santa Margarita River or any of its tributaries and ask the Government to accept our disclaimer, and based upon that stipulation for them to disclaim against the rest of the water of the Garner ranch.

MR. VEEDER:  As I understand it, you are going to come forward shortly with the kind of form you want us to agree to.

MR. SWING:  Yes.

MR. VEEDER:  Mr. Swing and I are going forward shoulder to shoulder as we always have.

MR. SWING:  I don't want to get too close.  What I am trying to do is to get away from him by getting out of the case.

MR. VEEDER:  In any event, I think this is the prime example your Honor was talking about.  We have checked it out, Col. Bowen has looked at it, and he says that is it.

THE COURT:  You think you can work it out?

MR. SWING:  Yes, your Honor.

THE COURT:  Because of what you have put in your answer,

1   you may have to by disclaimer or stipulation modify your claims.

2          MR. SWING:  Yes.

3          THE COURT:  And then the proposal would be to have a

4   proposed interlocutory decree and findings, which eventually

5   would be submitted to everybody to object to.

6          MR. SWING:  That is right.

7          THE COURT:  But meanwhile as a practical matter your

8   client would be out.

9          MR. SWING:  That is what I would like.

10         THE COURT:  Mr. Veeder says that he thinks it can be

11  accomplished.

12         MR. VEEDER:  Spoken like a statesman.

13         THE COURT:  Watch out for this shoulder to shoulder

14  business, Mr. Swing.

15         MR. SWING:  I don't adopt that quotation.

16         MR. VEEDER:  There is nothing like being surrounded by

17  friends.

18         THE COURT:  Can we adjourn until tomorrow?

19         MR. SACHSE:  May I ask what the status is.  I have

20  submitted to your Honor two days ago the order.

21         THE COURT:  Yes.

22         MR. SACHSE:  That is the same one.  I gave it to Mr.

23  Veeder that afternoon or that same day.  However, that was the

24  first occasion-- I want to be quite fair-- that was the first

25  time Mr. Veeder ever received the exact descriptions of the

9754

1    to make sure who "they" is.

2         These can be handed to the Clerk to be lodged.  You can

3    look them over.

4         MR. VEEDER:  Yes.  We are running them out now.

5         MR. STAHLMAN:  Your Honor, I would like to lodge two

6    exhibits tonight, if I may, and I will get copies later.

7         The large chart will be Vail's AC, which is next in

8    order, and the series of papers, a compilation of figures in

9    connection with the chart, as Vail's AD.

10        THE COURT:  Do you have any copies available for counsel?

11        MR. STAHLMAN:  Yes, I have.  I thought I would give them

12   out tomorrow or tonight.

13        THE COURT:  All right, they will be lodged, Vail's AC

14   and AD.

15        MR. VEEDER:  Is there a possibility of getting some

16   determination tonight whether we can dig the shallow well?

17   We have to get the pipe in there and get our people down there.

18        MR. STAHLMAN:  I don't know that that is going to pre-

19   sent a problem.  I will let you know in the morning.

20        MR. VEEDER:  Thank you.

21        MR. STAHLMAN:  I would like to know the objective of it,

22   though.

23        MR. VEEDER:  Interaction between the deep and the shallow

24   water.

25        THE COURT: Fight it out or satisfy him.  You either have

1    to do it by stipulation or by motion.  Don't take up my time.

2          MR. VEEDER:  I am not taking your time, your Honor.

3    This is one thing about getting a well in there.

4          MR. STAHLMAN:  I think before we agree to drill wells

5    we should know what you want to do.  You say interrelation

6    between two wells.  That doesn't mean a thing.

7          THE COURT: Describe what you want.

8          Mr. Girard.

9          MR. GIRARD:  Along the same line, being as we are

10   going to have engineers out there with your crew, could you

11   send us copies of that letter to Mr. Stahlman, at least so our

12   people will know the same thing.

13         MR. VEEDER:  Didn't you get a copy of my letter?

14         MR. GIRARD:  No.

15         MR. STAHLMAN:  I have taken this up with an engineer

16   and none of us know what you are trying to accomplish.

17         THE COURT:  Sit down tonight and work it out and make it

18   clear.  If there is any argument come in tomorrow morning and

19   tell the Court what the purpose is.

20         Anything further?

21         MR. SACHSE:  What is our schedule going to be?

22         THE COURT:  We will work tomorrow.

23         MR. SACHSE:  Next week?

24         THE COURT:  Next week Judge Weinberger has a very import-

25   ant matter out of the State, which should appear in the papers

1   shortly.

2        MR. SACHSE:   I have a very brief matter, your Honor,

3   in the Superior Court and I will be late, but there isn't any

4   reason why you shouldn't proceed anyway.   I am not going to

5   request that you do not.

6        THE COURT:   I will see you at 10 o'clock tomorrow

7   morning, then.

8        (Adjournment until Friday, May 22, 1959, at 10 A.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25