# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:     Friday, May 22, 1959

Pages:   9757 to 9909

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1247-SD-C. |
| | ) | |
| FALLBROOK PUBLIC UTILITY | ) | |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Friday, May 22, 1959

APPEARANCES:

    For the Plaintff             WILLIAM H. VEEDER, ESQ., and
                                     WILLIAM E. BURBY, ESQ.,
                                     Special Assistants to the
                                     Attorney General,
                                     Department of Justice,
                                     Washington, D. C.

1 | APPEARANCES (Continued):

2 |     For Defendant              GEORGE E. STAHLMAN, ESQ.
    Vail Company

3

4 |     For Defendant State      STANLEY MOSK, ESQ.,
    of California            Attorney-General, by

5 |                                  FRED GIRARD, ESQ.,
                                 Deputy Attorney General.

6 |     For Defendants
    Fallbrook Public       FRANZ R. SACHSE, ESQ.

7 |     Utility District,
    et al.

8

9 |     For U. S. Navy           LCDR. DONALD W. REDD.

10 |     For Defendant Murray    WALTER GOULD LINCOLN, ESQ.
    Schloss Foundation

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## INDEX TO WITNESSES

For Defendant Vail:                  Direct   Cross   Redirect   Recross

    James Vail Wilkinson      9834

## EXHIBITS

                                            Received

Defendant Vail Exhibit -

| Exhibit | Received |
|---|---|
| L | 9881 |
| M | 9881 |
| P | 9902 |
| O | 9902 |
| Q | 9905 |
| R | 9906 |

San Diego, California, Friday, May 22, 1959.   10 A.M.


(Another matter.)

THE COURT:   United States of America vs. Fallbrook.

The State of California sent in a letter of April 9 with various corrections in the transcript.  I will hand it to the reporter and unless there is some objections the corrections will be made.  They are only minor matters.

MR. STAHLMAN:   Your Honor, I would like to make some preliminary observations with relation to the matter we discussed last evening on these tests.  I had some opportunity to reflect upon it and some discussion with the representative of the State of California.

We feel-- just thinking aloud-- that if this is to be a cooperative test which may be conducted with some conclusions which would be beneficial to the Court and may be acted upon in the form of some character of decree, that we have an opportunity after learning what the Government desires to do to take this up with our engineers so that there may be suggestions that they can make that can work to save time and eliminate maybe future duplications and not run into the same situation that they did in the early Santa Margarita case where ten years later we find out that many of the conclusions that were reached by the Court are completely contrary to those which are advocated by the Government at this time and some

9760

1   of which have been established in evidence as definite proof

2   of the fact that those conclusions were erroneous.  If it is

3   possible to reach common ground as to what these tests will

4   result in, I think it should be done in that manner.  I think

5   all of the engineers should first make their suggestions.

6       As an example, we know that Mr. Veeder here is propos-

7   ing a test in the light of certain suggestions made by Mr.

8   Kunkel. And Mr. Kunkel may be right, we don't know.  He may

9   be the most brilliant hydrologist and geologist, a "Tiger",

10  or he may be an animal cracker.  I don't know. But there are

11  other engineers.  We have one that we would want to have an

12  opportunity to consider what these tests are that they

13  propose to make, and I think the State desires to do the same

14  thing, and I don't think we should rush into it too quickly

15  just because they have a well casing over there and a couple

16  of men ready to drill a well.  I think that two or three weeks

17  preparation will save us a lot of time in the end.  So at

18  this particular time I wouldn't want to give our consent until

19  we know a lot more about it.

20      THE COURT:  As I understand your position, it is that

21  the Government should specify, probably in writing, particularly

22  what they expect to prove, and then the State and the Vail

23  Company should be permitted, while these tests are going on,

24  to see what things there are that they might want to prove,

25  and if the thing can be worked as one experiment satisfying the

needs of the three parties then that that be done.

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  There is merit to what you say.  But what about this shallow well near the Pauba well?  Could that be an exception and could they start on that?

MR. STAHLMAN:  Your Honor, I don't know.  But suppose that we go to our engineer and he will say that a hundred feet will not give the answer, that it should be 500 feet or that there should be another one at 500 feet or something along that line, and maybe we can get on to common ground, or there may be some middle ground.

THE COURT:  I can see how that could happen.  But if the Government says that they want to drill a 100-foot well and pay the bill, I can't see how you are badly hurt.  You have another well up there.  The worst that could happen would be to cap it, and if later on while the well was going down you decided to make tests at a hundred feet and then to go on to 200 feet--

MR. STAHLMAN:  My guess is that if they put a well down to a hundred feet that would be of no benefit.  If the stipulated judgment remains in force and effect, it would be in an area where you couldn't pump anyway.  I am not sure, but I think so-- I think it is down in that area.

THE COURT:  Well, how would you be hurt by it?

MR. STAHLMAN:  We are not going to be hurt by it.  But

9762

1 will the Government, if they drill that well, suppose their

2 engineer says that that well is no good and we need five

3 wells out there, will they go ahead and drill them?

4   MR. VEEDER:  Sufficient to the day is the evil thereof,

5 as far as I am concerned on that.

6   THE COURT:  Certainly somewhere along the line I am

7 going to say that we have done enough.  After all, you have

8 a serious question in making an order to let somebody on

9 somebody else's property.  This is an equity suit and all that,

10 but this business of ordering that a litigant go on the other

11 man's property is a pretty drastic remedy.  I am willing to

12 go along on a reasonable basis, but I am not going to go along

13 indefinitely on that kind of business.

14   MR. STAHLMAN:  I talked this over with Mr. Veeder this

15 morning and I said that as far as that well is concerned that

16 he is anxious to drill I could have an answer on that by the

17 first of the week.  I would like to have the weekend to con-

18 sult with our engineer.

19   THE COURT:  Is it your position, first of all, that

20 you would like to start the shallow well?

21   MR. VEEDER:  Yes, your Honor.

22   THE COURT:  And that if that were started and their

23 work begun on that, there would be time enough to outline some

24 of the rest of these matters.  It really ought to be arrived at

25 by stipulation in writing.

1      MR. VEEDER:  That is correct, your Honor.  We have put

2  in writing what we thought was a clear statement, prepared by

3  representatives of the Marine Corps and the U.S.G.S., in a

4  letter of about three pages to Mr. Stahlman.  If it is not

5  sufficiently clear, we will be more explicit in the motion that

6  you suggest.

7      THE COURT:  Then they would want to show what they

8  would want to prove.

9      MR. VEEDER:  That is right.

10     THE COURT:  And it might require some variation of what

11  we have done to take care of what they would want, and

12  eventually the thing should be pulled together in a document.

13     MR. VEEDER: But we see no reason for delaying the

14  digging of the shallow well, which is a time-consuming matter.

15     THE COURT:  Are you willing to give Mr. Stahlman until

16  noon Monday to explore that?

17     MR. VEEDER:  Of course.

18     THE COURT:  And to make a decision on that particular

19  matter, apart from this other thing, by Monday?

20     MR. VEEDER:  That is correct.

21     MR. STAHLMAN:  Your Honor, I am not trying to be

22  capricious about this.  The letter which Mr. Veeder sent to me

23  was kicked around by the people in the State and they don't

24  understand that situation.

25     THE COURT:  What is the date of that letter?

MR. VEEDER:  The date of the letter was--

THE COURT:  May 19?

MR. GIRARD:  May 19, I believe.

MR. STAHLMAN:  I have it her-- May 19.

THE COURT:  I have it right before me.

MR. VEEDER:  I would be pleased to have them tell me what they don't understand and to try and straighten it out.

MR. STAHLMAN:  As far as I am concerned, I want to have an engineer to tell me.

THE COURT:  What doubt is there about paragraph 1, from the State's standpoint and from Vail's standpoint?

MR. GIRARD:  I think, your Honor, we are aware of what they intend to do under the letter of May 19, and our people have discussed it with Mr. Kunkel.  We understand what is to be attempted here.  Our primary doubt is whether or not what they do will be of any benefit to the lawsuit.  That of course will depend on a great many factors.  We really have no actual interest in whether or not Vail--

THE COURT:  Whether it accomplishes anything--

MR. GIRARD:  Yes.

THE COURT:  --is not to be determined now.

MR. GIRARD:  I mean our position is not that we have any lack of information on what they intend to accomplish by this or what they intend to do.  All we want to be assured is that when they do it, if the Court permits them to, that we be

1    fully apprised when and--

2            THE COURT:  Yes.

3            MR. GIRARD:  So that we will have our opportunity.

4    Our objection is not that we are not clear here.

5            MR. VEEDER:  We have invited them to have a man there.

6            THE COURT:  Well, I have your point.

7            MR. STAHLMAN:  Your Honor has asked me the question as

8    to what is wrong with number one.

9            Assuming that we do show the interconnection between

10   the wells of that character, that is, the Navy well or the

11   Pauba well and a well a hundred feet away, which, as I under-

12   stand from Mr. Kunkel, is still to be drilled in the older

13   alluvium, the source from which the Pauba well obtains its

14   water, undoubtedly, and we do show there is a connection, what

15   does that prove-- connection between the older alluvium a

16   hundred feet away?  What does it prove?

17           MR. VEEDER:  It proves, your Honor, if I may respond

18   to that, we have before us the exhibits of the State showing

19   what is known as a confining bed and a declaration that there

20   is a severance between the upper and the lower bodies of water.

21           THE COURT:  Well, I will tell you very frankly, Mr.

22   Veeder, on that score there is not much doubt in my mind what

23   that situation is.  There is not much dispute in the evidence

24   even between the Government and the State and the Vail.  There

25   is no doubt but that there are these lenticular bodies.

1   Nobody has claimed that there is a complete blanket across the

2   thing.

3            MR. VEEDER:  The State has.

4            MR. GIRARD:  No.

5            THE COURT:  No, they have not.  Once before I made

6   some tentative suggestions of what I would find and everybody

7   seemed to agree.  These lenticular bodies not being a complete

8   blanket, there is, of course, some interplay.  But on the

9   other hand, the very fact that these bodies are intermittent

10  and rather compact where they exist have the effect of

11  constituting some confinement, and it is because of the con-

12  finement that you have the artesian wells.  This is obvious.

13           Now you can dig all the wells you want-- maybe this

14  isn't a very judicious thing to say, but I am going probably

15  to wind up finding that there is some interplay between the

16  water in the upper bed and the lower bed, but that it is

17  limited because of the lenticular bodies that do not completely

18  shut off the interplay but they impede what would be the

19  interplay if the material was of one kind from the top on

20  down for six or seven thousand feet.

21           MR. VEEDER:  Your Honor touched the very point.  You

22  say there is a limited interplay.  We say there is a great

23  deal of interrelationship, that it is a reservoir complete in

24  itself, that there is complete interaction, that the surface

25  flow of the Temecula is directly and immediately interwoven

1   with the surface flow.

2          THE COURT:  Well, this is largely a matter of termin-

3   ology.  To what you say there is not much disagreement.  I

4   have no doubt but that the flow of the Temecula coming in on

5   the area immediately south of the Vail reservoir creates a

6   situation where some of the water goes into this looser

7   upper material, it works its way down at the north end and

8   up near the dam into the lower body.  I have no doubt but that

9   the exhaustion of the upper or the lower level would have a

10  very definite reaction on the other.  If you could conceive

11  of cutting off all inflow into this lower body and if you

12  could conceive of pumping it out completely, I have no doubt

13  but that the flow of water would then be from the upper body,

14  maybe slowly, but over a period of time eventually the lower

15  area would fill up. and I have no doubt either about the fact

16  that there is an interplay of water from the sides likewise

17  in there.  It is a matter of degree.  I don't think there is

18  any real dispute on this thing.

19         MR. VEEDER:  I feel, your Honor, that in the state of

20  the record findings would be entered that would be very in-

21  jurious to us, particularly in our struggle with the Vails as

22  it now stands.

23         THE COURT:  Why don't we explore to see what these

24  findings would be?  Maybe we can all agree on them.  I don't

25  think there has been any real dispute.  I have sat here and

1    listened to you men quibble and quarrel about this, that and

2    the other.  I went up and saw some of these lenticular bodies.

3    There is no blanket, there is no cement, or complete strata

4    in there that keeps the interplay of water.  But very definitely

5    there is an effect on the water which gives you your artesian

6    wells.  How would you have the artesian wells unless there was

7    some impeding of the interchange of water from the upper and

8    lower levels?

9         MR. VEEDER:  There could be a variety of circumstances,

10   your Honor.

11        THE COURT:  No witness that you have called has given

12   any explanation for the existence of artesian wells except

13   for some confining effect of the lenticular bodies.  Has any

14   witness given any other explanation?

15        MR. VEEDER:  Oh, yes; Mr. Illingworth.

16        THE COURT:  What?

17        MR. VEEDER:  Mr. Illingworth has testified that there

18   is a separation between the upper and the lower alluvium and

19   that the pressure comes -- I can break out one of the exhibits

20   of the State and show your Honor.

21        THE COURT:  Just tell me.  You don't need to show it

22   to me.  He says that the lenticular bodies have a confining

23   effect, that the water from below the dam gets into this

24   lower basin, some of it flows over and gets into the upper.

25   No one denies there is a confining effect there.  Do you deny

     it?

9769

MR. VEEDER:  I say simply this, that the matter of
taking water from considerable depth necessarily draws in the
pressure area.

THE COURT:  Right.

MR. VEEDER:  But we deny-- and this becomes extremely
important to us, when you have a picture which is in evidence,
which is here as Exhibit L, Plate 16, showing a confining bed
without any breaks, without any lenticular --

THE COURT:  Well, I am not going to find that.  The
diagram is only illustrative of the testimony.  There has been
no testimony that there was a confining bed without breaks.
And Mr. Illingworth now agrees.

MR. STAHLMAN:  Your Honor, in our conference in your
chambers yesterday I asked Mr. Kunkel two questions.  I said,
will these tests in their entirety that you propose to make
show the source of this water that is in the older alluvium,
or will they show a quantitative transmissibility of water
between the older alluvium or between the older and the younger?
And he said no.

THE COURT:  Well, gentlemen, let's go back to what I
said.  I think this is largely a matter of terminology, and
I think you could drill wells until the cows come home and
you would still have a physical situation that can't be
disputed that there are artesian wells in the lower end of
the Pauba Valley and that they are there because of the

9770

1  lenticular bodies, and the fact that the material is not uniform

2  from the surface down to 7,000 feet. Do you agree with that?

3          MR. VEEDER:  Why, yes, your Honor.

4          THE COURT:  Then what are we fighting about?

5          MR. VEEDER:  I will be very candid with your Honor about

6  it. The Vails have a dam above us. It is a big dam. It has

7  killed the Temecula dead. There is no stream there for

8  practical purposes.

9          Now we have a situation in which the State has drawn

10  a picture showing confinement laterally and vertically, and

11  this is our position. We are confronted with it, and I am

12  not sufficiently naive not to know what could happen if a

13  finding came down against us because there is conflicting

14  evidence.

15          We are saying that there is water coming in from all

16  sides into the Pauba Valley, we say that there is water going

17  into it from the Temecula surface stream during periods of

18  high runoff, but we are also saying that the Murrieta and the

19  Temecula, the surface streams, throughout most of the years,

20  and this year in particular and similarly dry years, they are

21  supported by the deep ground water.

22          Now, Mr. Kriger's clients and witnesses, and some of the

23  witnesses called by Mr. Stahlman, are saying, well, there is

24  no overall body of water underlying this triangular situation

25  that exists where the Murrieta and the Temecula converge, and

1    we say that every drop of water taken out behind the Wildomar

2    dike takes water upon which we sooner or later will be depend-

3    ent.

4         THE COURT:  Now, Mr. Veeder, you are jumping around too

5    much.

6         MR. VEEDER:  No.

7         THE COURT:  You are going too far now, because you are

8    trying to talk now about the Pauba Valley.

9         Now, the Wildomar dike and whether or not the basin

10   goes clear back to the edge of the basement complex-- I under-

11   stand that the Kunkel line now is proposed to be extended by

12   the Government clear back to the basement complex-- that is

13   another problem, and that is really the big issue that has

14   come up in this case.

15        But as far as what you had to say about the Pauba

16   Valley, taking it in general terms, I don't think there is

17   any dispute.  With the water coming out of Temecula stream

18   shut off by the Vail reservoir, to start with, and therefore

19   take a situation of a lower runoff, such as we had this year,

20   obviously there is not the amount of water that gets down

21   into the upper strata of the Pauba Valley that there is in

22   wet years; and I have no doubt but that in situations of that

23   sort the movement of water from the lower basin probably does

24   feed the stream.  I don't think we have a real issue there.

25   I think we could draw today-- and I have done it a time or two

1 | here in the record-- draw some findings which, with a little
2 | bit of work, we could agree upon on the Pauba Valley. I
3 | really believe that. I believe the State and you and Mr.
4 | Stahlman could agree on Pauba Valley.

5 | Now, we do have an issue in this case of the extent
6 | of a basin in the older alluvium north of the Pauba Valley,
7 | east of Murrieta Valley, how far that basin goes. We do have
8 | the question whether it extends only a short distance from
9 | Murrieta, whether it goes to the Kunkel line, whether it goes
10 | on up to the basement complex. We have also a problem of the
11 | rising water along the Wildomar fault and the extent to which
12 | that feeds into the Murrieta Valley. I don't think there is
13 | much doubt about that. There is not much doubt that water
14 | seeping out of the older continental, some of it, may pass
15 | through this fault to a limited extent and that a good bit of
16 | it may go over. The very fact that water rises would indicate
17 | that there must be water going over the fault line which
18 | doesn't rise-- we don't see.

19 | So our real issue in this case-- I will say it again--
20 | comes down to what is the extent of this basin in the older
21 | continental? It is not an issue as to the way Pauba Valley
22 | is constructed or where the water comes from into Pauba Valley.

23 | MR. VEEDER: May I interrupt your Honor. I realize
24 | this is general conversation. It is our view that as the
25 | water table in the Temecula falls that the water is moving in

1   laterally in large quantities to fill up the Temecula from the

2   older continental.

3       THE COURT:  Let me interrupt.  Now there is no dispute--

4   the State has conceded that water moves in laterally, the

5   Government contends that it moves in laterally.  The question

6   is, how much?  Now, I don't know of any way in which we ever

7   could make a finding in quantitative terms.

8       MR. VEEDER:  I don't think you have to.

9       THE COURT:  All right.  And since we can't do that, and

10  since you say we don't have to do it, a finding by the Court

11  that water moved in from the north of the Pauba Valley and

12  from the south in the older continental in the Pauba Valley,

13  that there was a difference in the types of material, the

14  older continental being somewhat tighter than the younger,

15  which you have to agree to, that there is this movement of

16  water.  Now, I don't know that we can go any further than that.

17  We can't quantitatively say how much.  If you put in a finding

18  that there is a large amount of water moves in, what does that

19  mean?  What does a large amount mean?  I think the only thing

20  we could say would be that the movement of water admittedly

21  is not as rapid through the older continental as it is through

22  the younger, but that there is a vast area of older continental

23  and that there is water moving southerly into the Pauba Basin

24  from the north and the south.  And I think we could also say

25  that to the extent that there was a depletion of the water in

9774

the younger alluvium in the Pauba Valley and in the area below

the lenticular bodies, to the extent that this depletion in-

creased, I think it is axiomatic that to the same extent

water comes in to a greater extent from the sides, and I think

to the extent that Pauba Valley is filled up and the area

below the lenticular strata is full, no water comes in except

in the sense that water is removed.  In the upper area, in the

younger alluvium, to the extent that that is filled up by

rains and big runoff, there is less water moves in.

By the same token you could say that if large numbers

of wells were drilled in the older continental, which would

create cones of depression north and south of the Pauba Basin,

you could have a situation, depending upon the runoff into the

Pauba Valley, that the movement of water might be reversed,

the movement of water might tend to fill from the Pauba Valley

the cones of depression on either side.

Now you could never do this quantitatively.  All you

could say is that there is a interrelation between the Pauba

Valley and the areas of older continental on either side.

MR. VEEDER:  But, your Honor, quantitatively it is not

of immense importance.  The fact remains, and here is the

concern which--

THE COURT:  Let me ask you.  Do you agree with what I

have said, generally?

MR. VEEDER:  Well, I agree generally.  But I feel this

1    way--

2            THE COURT:  I haven't been trying to draw artful find-

3    ings here off the cuff.  But do you agree generally with what

4    I said?

5            MR. VEEDER:  Yes.

6            THE COURT:  Is that your position?

7            MR. VEEDER:  May I go on and--

8            THE COURT:  Let me ask you, is that your position?

9            MR. VEEDER:  I will say this--

10           MR. STAHLMAN:  You are not going to get an answer.

11           THE COURT:  Yes, I will get an answer.

12           Is that your position, generally?

13           MR. VEEDER:  Generally it is this--

14           THE COURT:  Let's leave out Murrieta.  We are talking

15   about Pauba now.

16           MR. VEEDER:  I will state it in my words, and if you

17   agree with it then that is your answer.

18           THE COURT:  Mr. Veeder, let's make it easy.  Do you

19   generally agree with what I said?

20           MR. VEEDER:  Generally, yes.

21           THE COURT:  If I drew that kind of findings, where would

22   you attack it?

23           MR. VEEDER:  I would be more concerned with the ultimate

24   punch line of your findings than anything else.

25           THE COURT:  What punch line?

1   MR. VEEDER:  The punch line would be this, that further

2   diminution of water coming into Temecula Basin has an immediate

3   and a direct effect upon the availability of water to the

4   Marines from the Temecula, and that--

5        THE COURT:  Let's leave out Murrieta now.

6        MR. VEEDER:  But you can't.

7        THE COURT:  Yes, you can, temporarily.

8        MR. VEEDER:  All right.

9        THE COURT:  They are interrelated, particularly at the

10  gorge, but--

11       MR. VEEDER: Well, we say we could put a string here

12  and run it like this, your Honor, right around like that,

13  and you have a reservoir which supports the surface stream

14  of both Murrieta and Temecula and they are inseparable.

15       THE COURT:  All right.  Now, with reference to your

16  punch line--

17       MR. VEEDER:  Further diminution of water by the Vails

18  in the Temecula Basin, further diminution of water in the

19  Murrieta can have no other effect than the reduction of the

20  quantity of water which ultimately reaches the Marines.

21       THE COURT:  Anybody disagree with that?  Is there any

22  question?

23       MR. STAHLMAN:  Well, since Mr. Veeder said it, I would

24  like to have it read over again.

25       THE COURT:  You can read it over when it's cold.  But

9777

1   let me ask you generally-- now I have talked off the cuff--

2   do you have serious objection to what I said about Pauba

3   Valley?

4       MR. STAHLMAN:  No, I think your Honor is generally

5   correct.

6       THE COURT:  Mr. Illingworth and Mr. Girard?

7       MR. GIRARD:  I think the question is not whether it

8   affects the amount that goes by, but that it affects the

9   amount that they can get out of the ground water basin.

10      THE COURT:  That is what he means.  He is not concerned

11  with measuring particularly the flow over the rock at the

12  gorge, but what they eventually get.  Is there any argument

13  but that extensive pumping, ten times what has been done in

14  the Pauba Valley, where you pull this thing down, couldn't

15  help but have an effect downstream?  Or if Vail shut down

16  all their pumps and Mr. Malin decided to go to Europe and take

17  Sandy along with him for a couple of years, is there any doubt

18  but that there would be a lot more water downstream?

19      MR. STAHLMAN:  Would you invite me on this trip too?

20      THE COURT:  There is no real argument about this.  The

21  real argument is, actually, the extent of this basin.  That's

22  the real argument in this case.  Let's keep our eye on what

23  our problem is.

24      MR. VEEDER:  I am keeping my eye on it, your Honor.  I

25  have never lifted my eye off of it.

1    MR. STAHLMAN: I realize that there is some interrela-

2    tion there, and I don't have the slightest concept as to what

3    the extent of it is.  However--

4    THE COURT:  George, I don't think I do either.  But is

5    there any finding we can make except to say, describe the

6    older continental, describe the younger alluvium, describe the

7    area of the younger alluvium, describe the lenticular bodies,

8    and to point out that probably the flow is not as even through

9    the older continental as it is through the younger, but that

10    there is an interchange of water, and the interchange may vary,

11    depending upon where the pumping is done and where the water

12    is pulled out.

13    MR. STAHLMAN:  Just so we do not have, when we get

14    through, a finding that ties in the correlative rights of the

15    riparian with those of the overlying land owner.  I don't think

16    we can, unless we know what the degree is.  In other words,

17    this overlying basin having a right to the extraction of water

18    from such basin as ultimately is established here, if they

19    would have the correlative rights each with the other, but that

20    the riparian right, and the correlative rights would not be

21    merged.

22    THE COURT:  I don't follow you on that.

23    Let's take just a minute on that.  There is no doubt

24    but that the people who have land on the Santa Gertrudis have

25    overlying rights because there is a basin.  If the water at

the gorge ran into the ocean so that we could eliminate every-
thing downstream, then what happened in Santa Gertrudis would
not have too much effect on what happens in Pauba Valley.

MR. STAHLMAN:  Evidently I haven't stated myself clearly.
I realize that many of these tributaries may have riparian
rights and that their riparian rights should be measured in
relation to the stream upon which that land abuts, but that
the overlying lands that are not part of any stream system are
not merged as legal rights.  I am not talking about that there
may not be some interrelationship there; legal rights with
those of the riparian.

MR. VEEDER:  May I ask you to straighten out what you
mean by "merged"?

THE COURT:  I don't follow you.

MR. STAHLMAN:  I believe there are a number of cases in
California to the effect that the riparian rights and the
correlative rights of the riparian, when they are joined with
a basin which is not a part of the stream system and receives
charge from the stream system, in other words the stream system
itself supplies the water in this basin, such as we unques-
tionably have in the lower alluvium in the Pauba Basin, that
is definitely part of the stream system, it receives its charge
from the stream system-- that anyone who is riparian to that
basin or overlies that basin has correlative rights.  But
assuming that we have a situation where there is a basin which

1  receives a charge from some other or different source and

2  that the water that flows down through the stream does not

3  charge that basin or if, as in the Lodi case where they

4  determined what the degree of charge was and they determined

5  the degree of the quantitative rights of the City of Lodi in

6  the basin which abutted upon the river, then the finding would

7  be that the quantitative amount of water which the people

8  overlying that basin were privileged in pumping was that

9  quantity of water which received its charge from the stream

10  system.

11      Now we have here waters in the underground basin, for

12  instance.  Those waters may have been deposited there in

13  antiquity.  I have had explanations by geologists as to how

14  this may have occurred.  These are all guesses.  We have no

15  evidence here.  But that water may have lain down there for

16  years and years and the source of that water may even be out-

17  side the watershed.  Some of these artesian wells are charged

18  in places from sources outside the watershed.  That then there

19  should not be a commingling of the rights except to the extent

20  which they are proved.

21      We have a number of California cases to the effect

22  that-- not to the effect, but right on the nose-- that there

23  is a presumption that a body of material that surrounds a

24  definite portion of a known stream system is not to be con-

25  sidered as a part of the stream system.  The presumption is

1    that it is not, unless it is proved. Therefore, I contend that

2    it is necessary to prove the extent to which any basin that

3    abuts upon what is definitely a part of the stream system,

4    that the rate of charge should be determined.  If you did not

5    have that, you could have people up in here pumping water out

6    that were not riparian, pumping water out of a basin, water

7    that may come from an entirely different source, and that

8    themselves are not charged by the stream system, and if the

9    riparian were restricted in the quantitative use of water by

10   reason of a lot? of pumping that would be allowed-- in other

11   words, if your Honor says that they are all the same, then you

12   say they have a right to pump on a correlative basis the same

13   as a riparian, and they may not have a right to pump on the

14   same basis because excessive pumping there may affect the

15   stream system.

16        MR. VEEDER:  May I go on with my statement as to why

17   we have laid out--

18        MR. STAHLMAN:  Let me ask if your Honor follows me on

19   that?  Or did I fall off the sled?

20        THE COURT:  Well, I can't say, honestly, George, that I

21   do follow you all the way.  I would like to have you put it

22   this way.  Now let's do it the other way around.

23        MR. STAHLMAN:  All right.

24        THE COURT:  Here is the Vail Company owning the Pauba

25   Valley, owning a large part of what the Government says is a

1   basin north and south of Pauba.  What particular thing is it

2   that the Vail Company is worried about?  What are they

3   concerned about?  All their land is riparian.  Therefore, they

4   have riparian rights to all their land.  If there is the

5   finding that it is a basin, not only is their land riparian but

6   their land overlies a basin where they have correlative rights.

7   What particular thing is it that the Vail Company is worried

8   about that causes you to spell out this long argument, which

9   I have trouble following?  Just pinpoint it.  What are you

10  concerned about?

11      MR. STAHLMAN:  Your Honor asked me what is the Vail

12  Company concerned about?  We are not convinced, as a result

13  of all the operations that have occurred on the Vail Ranch to

14  date, that there is sufficiently free movement of water from

15  the older alluvium to the younger alluvium to make them part

16  of the same basin.

17      THE COURT:  Pinpoint it.  Let's be practical.  You repre-

18  sent the Vail Company.  The Vail Company has a major economic

19  stake in this area.  You are their attorney.  Now you are

20  interested in doing the things which will best protect them.

21  Of course, you are interested in finding out the truth.

22      MR. STAHLMAN:  That's right.

23      THE COURT:  You are interested in having the law applied

24  properly.  But what particular things are there that are

25  worrying you or concerning you about this basin?  How is Vail

1  hurt if the Court should find that this basin goes as far as

2  the Government says that it does?  How is Vail hurt?

3       MR. STAHLMAN:  As the ranch sits at the present day,

4  where we have the overlying right as well as the riparian

5  rights, maybe not.

6       THE COURT:  It seems to me that Vail sits in an ex-

7  cellent position in this case, leaving out the question of the

8  stipulated judgment.  As far as their property is concerned,

9  it is riparian.  If a basin exists there, it overlies it.

10      MR. STAHLMAN:  Here is one of the things I can foresee

11 that can occur.  We will be plagued from here on out, I think,

12 if this would be considered part of the same basin-- there is

13 a free interchange of quantitative water between those two

14 areas there-- that from here on out every time someone up in

15 herewho is not on a stream system drills a well and has some

16 difficulty and the water goes down they are going to blame it

17 on Vail for having pumped down there.  And it may not be.

18      MR. VEEDER:  That is why we want the tests.

19      MR. STAHLMAN:  Well, the tests, you say, will not prove

20 that, though-- won't prove the quantitative.

21      MR. VEEDER:  I have only shown one phase of our tests.

22      MR. STAHLMAN:  I am not objecting to the tests, if they

23 are going to show something.

24      THE COURT:  Mr. Girard.

25      MR. GIRARD:  Our position is this.  I think your Honor

1    has definitely analyzed all of the evidence, both of the

2    Government and of the State.  There is a barrier there, but it

3    is not absolute, and there is transmission.  If all these tests

4    are going to do is to show that there is transmission, you can

5    drill a hundred wells, we concede that already, and I think

6    when it finally comes down to the end no matter how much drilling

7    and how much testing, your Honor somewhere along the line is

8    going to have to make up his mind where to draw a line, and

9    I don't know whether these tests will help your Honor in that

10   or not.

11        THE COURT:  This particular well, for instance, a

12   hundred feet from the Pauba well is not going to tell us very

13   much, because if there is not a relationship between this 100-

14   foot well and the Pauba well, I think I ought to quit.

15        MR. STAHLMAN:  I think they are going to show a rela-

16   tionship.

17        MR. VEEDER:  If your Honor so finds, we will not have to

18   dig it.

19        THE COURT:  Nobody contends that it is not there.  Now

20   if, on the other hand, you are going to take an area up in

21   here--

22        MR. VEEDER:  Your Honor, may I finish out one phase of

23   our proposal before you go further?

24        THE COURT:  Yes.

25        MR. VEEDER:  Here is what we intend to do.  We have

1   asked permission, right in the area you were pointing to, to

2   put an automatic recorder on the Shrode well to see an inter-

3   relationship between the Pauba well and that well.  We also

4   intend to request permission to make studies in regard to the

5   August Cantarini well to the end that we will see whether there

6   is an interrelationship.

7          THE COURT:  Mr. Veeder, you pointed to an area--

8          MR. VEEDER:  This Shrode well.

9          THE COURT:  The Shrode well wouldn't give me very much

10   concern.  It lies between the Pauba and Long Canyon.  It

11   doesn't lie very far from the junction of the Murrieta and

12   the Pauba Valleys, and I don't think there is anybody here who

13   would contest the fact that as far as the Shrode well is

14   concerned there is probably interplay in here and that the

15   Shrode well will have to be considered as having an effect on

16   the stream.

17          The problem arises, Mr. Veeder, when you get back up in

18   here on Buck Mesa and you get back up along the toe of the

19   casement and you get into an area like this area up here in the

20   older continental.  There is where the Court would have some

21   problem.

22          Now if there were going to be a well put down over in

23   this area along the 1150 line, a deep well into the older

24   continental, to see what kind of water there was down in the

25   older continental and what the pumping of a deep well would have

9786

1    on some of these other wells around here, that might tell the

2    story.  This isn't going to help very much.

3        MR. VEEDER:  This is our view in regard to this matter.

4    Here is a barrier which backs water up so that the water table

5    east of the Wildomar fault today is some 20 feet higher than

6    the surface stream, than the Murrieta.  We find that these

7    wells in here-- I am now pointing to the Santa Gertrudis

8    and Long Canyon areas-- we find that wells when drilled were

9    flowing wells.  They are no longer flowing wells, showing that

10   the water table is falling.  We find along here, further up

11   here, that when some of these wells were drilled before the

12   turn of the century that water was within a foot and a half

13   of land surface.  We find now that there has been a very

14   material drop.  The point that we are making--

15       THE COURT:  Well, let's stop right there.  There can't

16   be any dispute about this bunch of wells close to the Wildomar

17   fault.  Everybody concedes that it has a barrier action, and

18   probably before the turn of the century before wells began

19   to pump and we had winter seasons the thing was filled up

20   much higher than it is now and you probably had water at

21   higher levels.  The problem doesn't exist either in the Santa

22   Gertrudis or in the area near the Wildomar fault.

23       MR. VEEDER:  But the additional factor remains, and

24   this is the reason why it is extremely important to us, as

25   the head is reduced behind this mound of ground water that was

9787

1   built up by the diking effect of the Wildomar fault, the water

2   levels tend to fall.

3         Now the State has put in a great deal of evidence, we

4   have put in evidence, and the others have put in evidence that

5   the diking effect, the further you go underground in the

6   Wildomar fault, becomes tighter.  The net result of it is--

7   and you can see it on here, you can look right now, and I am

8   pointing to the stream of the Murrieta-- we have east of the

9   fault wells which were flowing now no longer flowing.  We have

10  a series of springs which have dried up along the Wildomar

11  fault.  We have a recession in the surface flow of the Murrieta.

12  We say that every single factor and element concerning which

13  I am now making reference has an immediate effect upon our

14  future supply of water.

15        Now I am pointing further away from the Wildomar fault.

16  I am now pointing along almost at the toe of the basement

17  complex and of the residuum.  We have a series of wells along

18  there.  We have asked to make tests on those.  There are three.

19  We want to test the Yoder well and the Gunther wells and I

20  have forgotten the other wells.  But in any event we have a

21  desire to show that there is an immediate interrelationship

22  between those wells, that there is a relationship between those

23  wells and the wells I am now pointing to in the Roripaugh

24  area.  And we are saying that the reduction-- we don't say

25  just the pumping out of water would be the sole reason for a

deleterious effect to us-- we are saying that the reduction of head by reason of pumping, maybe not great pumping, can further reduce the quantity of water built up behind the dike and further reduce the quantity of water which meets down here at the confluence of the Murrieta and the Temecula.  Those are the reasons why we have asked to test the Shrode well.

I have a list of 100 wells north of the Krieger line that we would like to make tests on to show static levels and pumping levels, for this reason!  We believe that we are solely and entirely dependent upon a ground water basin which supports both the surface flow of the Temecula and the Murrieta.

MR. STAHLMAN:  Your Honor, there is one deduction that can be made from the very statements that Mr. Veeder made here that may logically be contrary to the conclusion that he is reaching here.  He says that twenty years ago there was a difference in head between this area in through here and the area of the Murrieta Creek.  If in the state of nature there was twenty feet more head of water over here than there was in Murrieta Creek, it certainly must be a very poor barrier to let it through, because if in the thousands of years that that water was operating in that area prior to the pumping, if the head remained twenty feet higher, it certainly was not coming through that barrier very rapidly.

MR. VEEDER:  George, it is the water going over the

1   barrier that we are concerned about.

2         MR. STAHLMAN:  But what is wrong with the deduction

3   that I am making here that if you had in the state of nature

4   a twenty-foot head on the other side of that barrier, that it

5   could be up there twenty feet higher than it would on the

6   other side, that there would certainly be poor transmissibility

7   into the stream system?

8         MR. VEEDER:  I don't follow that.

9         MR. STAHLMAN:  Does your Honor follow it?

10        THE COURT:  No, I have a little trouble, too.

11        Do you, Mr. Girard?

12        MR. GIRARD:  I didn't quite comprehend it.

13        MR. STAHLMAN: As I understand it, he says that the

14   water level in this area was twenty feet above the water level

15   in the stream.  Well, if there were complete transmissibility

16   into that area, the water level would be the same, wouldn't

17   it?

18        THE COURT:  He doesn't claim that there was complete

19   transmissibility.  He never did.

20        MR. STAHLMAN:  Well, the fact that there is a 20-foot

21   head in a short distance would indicate that there was quite

22   a barrier there, wouldn't it?

23        THE COURT:  That is right.  That is what the Government

24   contends.  The Government contends that there is a barrier

25   there.  Nobody says that the barrier is absolute.  There may

1  be fractures, there may be areas where the barrier isn't as

2  tight as it is in other places, some water goes over the

3  top.

4     MR. VEEDER:  It is the water that goes over the top

5  that supports the stream.

6     MR. STAHLMAN:  How do we know?

7     MR. GIRARD:  What time of the year?  Summer?  Winter?

8  Are you concerned with the summer flow?

9     MR. VEEDER:  Why, of course we are concerned with the

10  summer flow.

11     MR. GIRARD:  All our concern is that these tests that

12  they are going to run here are going to establish something

13  that everybody can see.

14     THE COURT:  I have the same view as to some of the

15  tests.  On the other hand, there are things that interest me.

16  Here is a hot water well and a cold water well.  I would be

17  interested in the reaction to the pumping between those two

18  wells.  I have a feeling that the hot water well is from a

19  different source entirely than the cold water well, and if there

20  is no interrelation that might solve that problem.

21     I would also be interested in the reation of these

22  wells along the toe of the basement complex with some of the

23  wells further down.  That might tell us something.  I don't

24  think the Shrode well in itself, although there is no objec-

25  tion to doing it, is going to help us very much, because I

9791

1   think we are going to concede that further down here you are

2   going to find interaction.

3       I am hopeful that I can convince you gentlemen to

4   narrow your issue, to pinpoint your issue, and to get on

5   with this case and see if we can't agree upon some things.

6       MR. VEEDER:  All I want to be sure of is that when the

7   record is closed we get judgment, your Honor.

8       MR. GIRARD:  I agree with your Honor that it certainly

9   should be possible to make a fairly good guess.  Nobody could

10  be certain.

11      MR. VEEDER:  May I ask Mr. Kunkel to point out the

12  cluster of wells we are interested in making tests now.  I am

13  sorry that Mr. Krieger isn't here, but we have those wells.

14      MR. KUNKEL:  The Gunther, the C. Shamel, the Parris,

15  the Gunther.

16      THE COURT:  Those wells along the toe of the basement

17  complex; is that right?

18      MR. KUNKEL: Yoder, Oak Spring-- That's right.

19      THE COURT:  And you are going to test them in relation

20  to each other, such as the relationship between the two that

21  are close together, the relationship between these and other

22  wells along there?

23      MR. VEEDER:  Whatever relationship there is there.

24      THE COURT:  And their relationship with the wells in

25  the Santa Gertrudis?

1          THE WITNESS:  If the pumping schedules could be so

2     arranged.  In anticipating what the demands of the owners

3     would be at the present time, it is unlikely that those tests

4     at that distance, fitted into the existing pumping schedule,

5     would be conclusive.  We would make the observations, but we

6     would have to--

7          THE COURT:  You pointed to this well here.

8          MR. KUNKEL:  I meant to point to the A-1, A-2 at Oak

9     Springs Ranch.  There are two wells there.

10          THE COURT:  What relationship would you seek there, with

11     what other wells?

12          THE WITNESS:  The immediate relationship that we would

13     be after in every one of these two pairs would be to determine

14     the transmissibility of the deposits and, if possible, the

15     storage capacity, at which time you could make quantitative

16     estimates.

17          THE COURT:  Are there other wells that you would seek

18     a relationship with the Oak Springs wells?  Certainly you

19     couldn't get any relationship between them and the wells down

20     in the Santa Gertrudis or along the toe of the basement complex.

21     What wells would you have a relationship on, then?

22          MR. VEEDER: Here is a list of the wells.  There are

23     about a hundred of them, which are scattered throughout.

24     These wells are north of the Krieger line.  We believe that

25     by static and pumping level tests we can show some interaction.

1  But we can certainly demonstrate --

2       THE COURT:  Well, now, let's not talk generally.

3  Answer my question.

4       MR. VEEDER:  All right.  Let Mr. Kunkel.

5       THE COURT:  Mr. Kunkel has said that he would show the

6  relationship between two wells close together on the Oak

7  Springs Ranch.  In what other wells would you seek any rela-

8  tionship with those particular wells?

9       THE WITNESS:  There are wells in this area that we have

10 no data on.  We don't know the condition of them. They have

11 never been visited by the State, they have never been visited

12 by the Geological Survey.  However, on the basis of one source

13 or another we realize that they exist.  Until we canvass those

14 wells and know their condition, it is impossible to predict,

15 not knowing where the wells even exist at the present time,

16 what relationships could or could not be shown.

17      THE COURT:  How far distant a well would you think you

18 could show some relationship to?

19      MR. KUNKEL:  Depending on the degree of confinement.

20 The distance varies considerably.  The greater the degree of

21 confinement, the more rapid the interaction between wells as

22 far as a mile or two apart.

23      THE COURT:  Well, let's be practical.  If you were

24 testing wells up along the toe of the basement complex, you

25 would be rather surprised if you found reaction down two miles

1    further, would you not?

2         THE WITNESS:  Not if I could control the pumpage down

3    in the area.

4         THE COURT:  Taking your own theory that this is all

5    a basin, if these wells were being pumped they are calling

6    upon water all around them in such an immense area around

7    them that no matter how hard you pumped a well two miles away

8    would probably show very little reaction on the well below.

9    Doesn't that follow, if your theory is right that there is a

10   basin?  If there is a basin and you pump a well heavily here,

11   where is the water going to come from?  It is going to come

12   from the surrounding area.  So you pump this well at any rate

13   you want to, and then you pump the one up here while you are

14   pumping it.  How are you going to show a relationship between

15   them when, under your theory, this is a basin and water is

16   coming in from all around?  Do you expect to show any relation-

17   ship with a well two miles away?

18        THE WITNESS:  It is possible or probable.

19        THE COURT:  "Maybe" would be your answer?

20        THE WITNESS:  The possibility definitely exists.

21        THE COURT:  If it did exist, the thing that I might

22   find might be entirely different from what you anticipate.  If

23   you found a pumping situation with wells up on this toe had a

24   definite impact on some well down here, instead of that being

25   proof that there was a large basin out here, I would be more

1  inclined to think there was a valley of looser material where

2  this water was coming from, because if this showed up as you

3  thought it would I can't imagine that you could have a basin

4  with water all around coming from the cone of depression

5  into the well you pumped and show it with any marked degree

6  up here, and if you did show a marked reaction I would be

7  inclined to find that you had established some area in here

8  where there was transmissibility and less transmissibility

9  around the other well.

10  MR. VEEDER:  That is why we need access to a hundred

11  wells, your Honor, because we think we could prove the con-

12  trary.  We think we could show this-- and this is the whole

13  theory-- we believe that we could show, and the idea of the

14  tests would be, to show that there is a complete interrelation-

15  ship throughout the whole area.

16  THE COURT:  Then the effect of pumping wells up at the

17  toe, under your theory, would have to have the same effect on

18  a well down about here that would have a well equal distant

19  down there.

20  MR. VEEDER:  Not necessarily at all.  But the point

21  that I am making-- and it is a very important point now because

22  I know of no evidence that would support what your Honor just

23  got through saying, with all respect to your Honor-- the point

24  that I am making is that we believe that this whole area is

25  interrelated; that the greater the pressure the more rapidly

9796

1    would be demonstrated the interrelationship among them. In

2    other words, as I understand, once you start pumping a well

3    pressure may show up, depending on confinement, a very con-

4    siderable distance and almost immediately. That is by reason

5    of pressure. And pressure is the thing, so far as we are

6    concerned, that is getting water over and through the fault

7    which supports our surface stream.

8           THE COURT: I don't anticipate that you would have

9    any problem with a test showing any interrelationship between

10   two wells as close together as these. I would be interested

11   very much in the tests between the hot and the cold water

12   wells, which are close together. But two wells like these

13   over here close together, I haven't any doubt that you would

14   show a relationship.

15          The thing that would interest me most, if you want to

16   know, would be these water level lines. I made a bunch of

17   notes on my exhibits which showed a series of wells on which

18   these water levels were based.

19          Let's take an example. Suppose you had two wells on

20   the 1200 line water level and had a certain static water level,

21   and suppose two miles down here you heavily pumped a well.

22   Now if, for instance, the drop in the water level of the two

23   wells-- I don't know how far they would be, but say equal

24   distant from a couple of wells-- if the drop in the static

25   water level was similar, it would seem to me good proof of the

9797

interrelationship.  As a matter of fact, it has already been conceded that there is an interrelationship.  The State has conceded that.  There is some question as to degree.  Nobody can tell what that degree is.  But as I understand the record, the state has conceded that there is an interrelationship between these wells up in this basin.

MR. GIRARD:  Your Honor, we said that there probably is, but that we were not at all sure of the underground formations or that it was homogeneous throughout.

THE COURT:  Right.  And also I don't anticipate that, if you could excavate this whole area, you are going to find that it is just one big flat bottom.  You are going to have ridges, you are going to have valleys, you are going to have different kinds of material.

MR. GIRARD:  They are observable on the surface, some of them.

THE COURT:  Your are going to have something coming down here, and even if it is all one basin you are going to find one particular area where you have a different terrain than you have in another.  You may find a mass of basement complex that comes up here to the surface so that you could put a well down here and might not get any water.  It wouldn't prove that it was not a basin.  It might merely prove that you had hit basement complex because of--

MR. VEEDER:  Because of a protrusion.

1      THE COURT:   --because of a protrusion.

2      MR. VEEDER:   That's right.   We have no denial on that.
3  There is only one concern we have ever had, and that is that
4  when we get through the decree will not be effective throughout
5  the whole area.

6      THE COURT:   That the decree will not be what?

7      MR. VEEDER:   That the decree will not be effective
8  throughout the whole area, if it is found that the pumping
9  in one area has an effect upon our downstream rights.   That is
10  the only thing we can hope for, and that is the only kind of
11  control and protection we think we can get.   Without that kind
12  of control, I don't believe that the rights of the Marines can
13  be protected.   And that is the whole thing.

14      If your Honor feels right now that he can enter a
15  finding that there is a complete interrelationship, that the
16  whole area, all parties--

17      THE COURT:   Well, the trouble is we get started on one
18  thing and then we flop over onto something else.

19      MR. VEEDER:   With all respect to your Honor, we don't
20  believe that you can separate or segregate the Pauba Valley
21  and Santa Gertrudis from the areas up here behind the horst.
22  I do not believe you can do it.   I believe the whole thing is
23  interrelated.   I don't believe you can talk about Pauba
24  Valley without talking about the balance of the area, without
25  talking about the Murrieta.   That is the problem.   And we

1    don't want it piecemeal, your Honor.

2         MR. STAHLMAN:  If these tests can show something, O.K.

3         THE COURT:  Well, I have varied reactions.  (I am

4    going to take a recess in a minute).  I have varied reactions.

5    I am cold to what your hundred-foot well a hundred feet from

6    Pauba would show.  It is not going to prove anything that we

7    don't know already.  Certainly there is  going to be an inter-

8    relationship shown between the younger alluvium and the deep

9    well.  How much it will show is a question of degree.  To me

10   that is a waste of time.

11        I would be interested in tests on the wells up along

12   the toe of the basement complex and what relationship is

13   shown between them and those other wells.  I would be inter-

14   ested in the relationship shown in static water levels by the

15   pumping of the various of the major wells, if they could be

16   pumped at some high rate, to see what you could find.

17        But I am still of the opinion that the major part of

18   this matter is not in dispute, and that the sole dispute is

19   exactly how far this basin extends toward the basement complex.

20   That is the sole issue to be decided.  Everybody will concede

21   that you are not going to cut it off on the Wildomar fault line.

22   Everybody concedes that the Santa Gertrudis Valley is a part

23   of it-- that there is an interplay there.  Really, the ques-

24   tion is, is it near the Kunkel line or is it up by the base-

25   ment complex, or is it closer to the Murrieta Valley?  That is

9800

1    the only issue.

2         MR. STAHLMAN:   And there may be some engineers and

3    hydrologists, your Honor, who may make some other suggestions,

4    and they may be able to suggest a manner in which to simplify

5    these tests.   That is the only reason I have asked to have an

6    opportunity not to rush in and start making some tests that

7    we might have to do all over again if somebody comes up with a

8    different idea or tests that will show nothing that we don't

9    already know.

10        MR. VEEDER: As I understand what your Honor has said--

11   our requests have already gone out to start tests on these

12   clusters of wells in keeping with your thinking-- that in

13   regard to static and pumping levels throughout this general

14   area north of the Krieger line is also in keeping with your

15   thinking.

16        THE COURT:   I think that hits on the issue.   But I

17   think that the rest of this is a matter of terminology and in

18   the present state of the record I think you would all agree

19   on most of the rest of it, and I think that the sooner we draw

20   up something and see if we can all agree to it the better and

21   mark out where our differences are, and then direct our

22   activities to solving those differences.

23        MR. VEEDER:   Your Honor, as long as there is agreement--

24   here is the Krieger line-- as long as there is agreement that

25   there are issues of fact there, we would like to be on and

1   undertake the tests that we are speaking about, and if your

2   Honor thinks that the interaction is truly extant from the

3   standpoint of the younger alluvium and the deeper alluvium

4   on the Pauba Valley  then there is probably no need for a well.

5   The only reason we were going to put that in, the only reason

6   we were anxious to get it done is that we are greatly concerned

7   about what the Vail Dam is doing to us, and we want to show

8   it is the deep and the shallow water that supports the surface

9   runoff of Temecula, and I think that that will do it.  And

10  if everybody concedes it, there is no sweat.

11          MR. STAHLMAN:  Just take it easy, Mr. Veeder.

12          THE COURT:  Take a short recess.

13          (Recess.)

14          THE COURT:  Let me look at the rest of this letter of May

15  19.

16          (10) It may be necessary to drill a deep well in the

17  older continental deposit north of the Pauba well.

18          MR. VEEDER:  That would be in the area about 2,000 feet

19  directly north of the Pauba well between the Shrode well and

20  the Pauba well.

21          THE COURT:  How is that going to help me on the matters

22  I am in doubt about.

23          MR. VEEDER:  If you are not in doubt about--

24          THE COURT:  How is it going to help me on the extension

25  of the Kunkel line?  It is not going to show me anything about

9802

1    that.

2         MR. VEEDER:  In view of what your Honor has said and

3    the apparent concessions that the people are all in agreement

4    with our geology up to the Krieger line, then these tests on

5    the Pauba become more or less academic-- if there is agreement

6    on it.  The extension of the Kunkel line necessarily turns,

7    very largely upon the pumping along the toe of the residuum,

8    as shown on 15-A, and the pumping on up the valley and upon

9    the static and pumping level tests throughout the valley north

10    of and east of the Krieger line.

11         THE COURT:  The shallow well on the Vail Company's

12    property near the Query well.

13         MR. VEEDER:  We would like to demonstrate that there is

14    real interaction between the Pauba well and the alluvial

15    deposits west of the Wildomar fault.  It may be that that

16    will be conceded, too.  And it becomes important because of

17    the very drastic drop in the water table in the Temecula Basin.

18         THE COURT:  I would think that the logical way to

19    proceed on this would be to have the Government prepare a

20    proposed tentative set of findings as to what they think the

21    facts are.  This should be done not on the basis of finding

22    the most favorable finding that could be found for the Govern-

23    ment, but a realistic finding of what you think the facts are

24    in this record, starting with the narrows and describing (1)

25    The Pauba Valley--

1     MR. VEEDER:  When your Honor says "the narrows," do

2  you mean Nigger Canyon?

3     THE COURT:  No, we are talking about the matters up-

4  stream from the juncture.

5     MR. VEEDER:  I see.

6     THE COURT:  (1) Describe the Pauba Valley from the

7  junction on up to the dam.  We have had a lot of testimony

8  on that.  It is not very much in dispute.

9     (2) You would describe the Murrieta Valley between

10  the fault lines, between the juncture with the Temecula and

11  on up to the end.

12     No particular order in theses.

13     (3) In describing the Pauba Valley, you would describe

14  these artesian wells, their cause, how water gets into the

15  Pauba Valley at least from Vail Dam or from flow on the ground

16  or from streams and rivulets in there.

17     MR. VEEDER:  Did your Honor say flow underground?

18     THE COURT:  No, either flow from the Vail Dam or

19  rainfall on the ground or flow in--

20     MR. VEEDER:  Laterally.

21     THE COURT: No, first from the streams.  Let's talk now

22  about matters other than this water that comes in from the

23  sides and how this water feeds the deeper areas under the

24  lenticular deposits and how it feeds the younger alluvium on

25  top and the difference between a heavy flow and a light flow.

1    Obviously, a heavy flow is going to pass over more rapidly and

2    is going to have a different effect than a rainfall in a dry

3    year.

4        Then the interplay of water between the older contin-

5    ental and the younger alluvium.  And it seems to me only fair

6    to make a finding that there is a difference between the two

7    materials, that the movement of water in the older is at a

8    slower rate than through the younger, but that there is an

9    interplay of water between them.  Let's not worry presently

10   about how far this goes, but that there is this interplay of

11   water.

12       Then you would describe the Wildomar fault and the fact

13   that it is not an impervious barrier but is a barrier to the

14   extent that water passes over the top of it and the effect

15   it therefore has on the older continental material lying east

16   of the Wildomar fault, and the interplay between that water

17   and the water in the Murrieta and the Santa Gertrudis Valleys.

18   And I think at this stage we could make a finding-- I don't

19   know how you would describe it presently, but that for some

20   distance east of the Murrieta Valley there is not much dispute

21   that the wells in that area should be considered as part of

22   the stream system, as tapping a basin that is part of the

23   stream system.

24       MR. VEEDER:  That is east of the Wildomar?

25       THE COURT:  That is east of the Wildomar.

1        And then probably a tentative finding that the issue

2   in this case is the extent of this basin and the movement of

3   water in it and further to the east from the Wildomar and

4   further to the north from Pauba Valley.  That is really the

5   issue in the case.

6        I wouldn't be surprised that you could agree on a set

7   of findings that would satisfy us in so far as the two main

8   valleys are concerned, the fact that there is an interchange

9   of water, and leave open for further evidence, for further

10  testing and things that have to be done, as to what is the

11  extent of this thing.

12       If this kind of job were done and we agreed upon some

13  of these basic findings, which I don't think we are really

14  in dispute about, we would narrow our case as to just what

15  goes on up on Buck Mesa and the older continental and up along

16  the toe of the basement complex, and then these tests that you

17  propose, as to which you could work out an agreement or

18  stipulation, if not by motion, might be very helpful.

19       MR. VEEDER:  The tests north of the Krieger line.

20       THE COURT:  Yes, the tests up along the toe and further

21  north of the older continental, the north part, north and east

22  of the upper part of the northern part of the Murrieta.  I

23  think that is our area under disagreement.

24       Now, let me ask Mr. Kunkel and Mr. Sachse:  Do you

25  think that is a fair statement of where our area of disagreement

1    is?

2         MR. SACHSE:  Your Honor, I think the area of disagree-

3    ment is somewhat larger.  Part of this your Honor requested

4    over the Christmas holidays, and in response to your 15th

5    question I spelled out our position, which is somewhat closer

6    to the United States's than to Mr. Krieger's.  I have taken

7    the position that the evidence only established a true inter-

8    connection between ground water and the younger alluvium

9    deposits, and that there was no evidence sufficient to

10   establish connection between the older and the younger even

11   below the Krieger or the Kunkel line, as Mr. Veeder calls it.

12   Mr. Krieger and I have parted company on the effect of the

13   younger above it.  Mr. Krieger seems to think that the younger

14   alluvium above the Krieger line ought to be thrown out of the

15   case.

16        Your Honor will recall that I even drew a little picture

17   and I attached to my answer to your fifteen questions a

18   statement of what I felt the finding as to the geology and

19   hydrology on the basis of the then record ought to be, and

20   very frankly there is nothing introduced by anyone so far that

21   makes me change my mind.  I still think the determination on

22   the basis of the evidence that is in is going to be that the

23   areas of younger alluvium are part of the stream system and

24   that if a land owner overlies-- call the shaded part the

25   younger alluvium and call this older alluvium and then the

residuum-- if a land owner overlies a block like that, the
most your Honor can be expected to do, on the status of the
record, is to eliminate that piece of ground.  The rest of it
is going to have to stay in the case.  Now if he lies like
this and doesn't touch the younger, so that he has no riparian
status whatsoever, I think he should be eliminated, on the
basis of the present record.

        But I certainly concur that we ought to try to shrink
the issues in this case.  I think there are many things, as
your Honor has pointed out, where we are in no disagreement
and where findings, proposed by Mr. Veeder or probably by Mr.
Girard, as to the effect of the Wildomar fault, with perhaps
a change of a word here and there, would probably be agreed
to.

        THE COURT:  Mr. Girard, what do you think?

        MR. GIRARD:  Your Honor, our position is somewhat
similar to Mr. Sachse's although I haven't quite made up my
own mind yet on some of the areas that are actually not
younger alluvium but actually close to it.  I would like an
opportunity before I do so to read a little bit of Mr.
Moskovitz's work.  I agree that maybe we should, during June
and July recess or a little earlier, see if we can work that
out by drawing findings.  I am in accord that--

        THE COURT:  Don't you agree that there is no substantial
dispute as to the Pauba Valley-- let's leave out the older

1    alluvium on either side-- Pauba Valley and the Murrieta Valley?

2    MR. GIRARD:  Yes, your Honor.

3    MR. VEEDER:  You say there is agreement.

4    THE COURT:  If we left out any reference at all to the

5    older alluvium, for instance.

6    MR. GIRARD:  Yes.

7    THE COURT:  I think the Pauba Valley and the Murrieta

8    Valley and the Wildomar fault could all be eliminated by

9    agreed findings.  Mr. Stahlman, what do you think?

10   MR. STAHLMAN:  If I understand your Honor correctly,

11   I am in accord with it.  In other words, that there is no

12   question as to whether or not the younger alluvium is in the

13   stream system.  Is that the point?

14   Now, talking about the decree, I think that is an

15   important factor as to whether it is part of the stream system

16   or not.  We have no quantitative way of determining it.  I

17   don't know whether it would take a year or a hundred years

18   or a thousand years to have an effect, what the rate of re-

19   charge is in the older alluvium, where it comes from.

20   As far as the findings in relation to the Murrieta

21   Valley are concerned, that is, within the fault line, and as

22   far as the Pauba Basin is concerned, yes, I go along with

23   it.

24   THE COURT:  Mr. Veeder.

25   MR. VEEDER:  Your Honor has outlined, and I would like

9809

1   to have the reporter run off those points to which you have

2   made reference, and I think we would be happy to have the

3   opportunity to outline our views and to set up the findings.

4   I believe that what you say is all right.

5       We are, of course, extremely interested in the lateral

6   effect upon the Pauba basin of water in the continental

7   deposits.  But from our view I think that we could delineate

8   and define our position on the basis of your inquiries, and

9   that if we have that written up we will get right at it.

10      I feel that we shouldn't delay, though, these determina-

11   tions or these tests.  I think we should get at the ones your

12   Honor has indicated are of concern-- they are our gravest

13   concern, too-- that triangular area that runs on up there

14   along the toe of the older residdum.  We would like to get at

15   that.  We would like to get at it next week, if possible, and

16   get in and make a canvass of these wells to ascertain if there

17   is a pattern which would bear out the contentions that we

18   have advanced throughout this trial.  I think it is highly

19   important that we have this opportunity to go upon the land

20   and make this canvass of wells.

21      MR. STAHLMAN:  If there are some tests or some method

22   by which those things can be determined, well and good.  Just

23   as we experienced here this morning, your Honor has made some

24   suggestions that would be more conformative to the Court if

25   it were done in a different way, and maybe that is the way

1  it should be done.  So I think we should spend a little time

2  in deciding how it should be done before you start poking

3  holes in the ground.

4          MR. VEEDER:  I am not talking about holes at all.  I

5  am talking about static and pumping levels in the area to

6  which your Honor made reference.

7          MR. SACHSE:  If I understood you correctly, Mr. Veeder,

8  this will have to do with the big triangle of residuum?

9          MR. VEEDER:  Yes.

10         THE COURT:  The residuum?  Or do you mean the older

11  continental?

12         MR. VEEDER:  No, I didn't say the residuum.  I said

13  there is an area here roughly drawn in by Mr. Krieger-- you

14  can observe it here.

15         MR. SACHSE:  In the older continental deposits.

16         MR. VEEDER:  Yes, in the older continental deposits.

17         MR. SACHSE:  All right.

18         MR. VEEDER:  That's right, and up to the toe of the

19  basement complex and the residuum.

20         MR. SACHSE:  I concur that we are in disagreement as

21  to the older basement complex.  I just want to be sure whether

22  we are now in disagreement as to the residuum again.  I thought

23  we were in agreement as to the residuum.

24         MR. VEEDER:  The point I make is that this is an ex-

25  tensive and an expensive job, and we are set up to go about it.

1    You have asked that I draw a motion in regard to Mr. Krieger's

2    clients.  His clients are only a very small part of the whole

3    area.

4         That raises a point on which I would like some direc-

5    tion.  There are many of these people who haven't answered

6    and who haven't appeared.  I don't know whether your Honor

7    would enter an order permitting us on, but we would like to

8    go and knock on the door and say, can we test your well static

9    and pumping, and we would like to get at it.

10        On Mr. Krieger's, I think he has got to have an order.

11   He told me that he had to have an order.  We will try and get

12   it.

13        MR. STAHLMAN:  What are you going to do if you go out

14   there and find a lot of them who won't let you do it and you

15   have to get an order on those?

16        MR. VEEDER: Well, we may have to do that.

17        MR. STAHLMAN:  I would like to see some sanity on these

18   tests, where there would be compatible, reasonable tests made

19   between the engineers of all the parties concerned, so that we

20   don't have duplications and have to come back to the court-

21   room and find--

22        THE COURT:  I have agreed with you on that, because you

23   may want to prove something that will be demonstrated by the

24   same tests.  They should be dovetailed.  But you have to go at

25   this step by step.  There has to be outlined what the Government

1    wants to do and why, and then you talk to your engineers and

2    see what you want to do and why.

3          MR. STAHLMAN:   That is it.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5-22

THE COURT:  It would seem to me that either we ought to spend time here or you ought to spend time between yourselves, and I don't know whether you can do it without somebody holding a club over you, and go through these things in this letter and take them up one by one and see what has to be and what doesn't.

For example, (1) In your letter of May 19, a shallow well near the Pauba well.  The objective of this test well is to determine interconnection between the shallow and deep water.

Now, two things are involved there:  (1)  Is there interconnection?  And (2) Is it possible to show anything mathematically as to quantity or rate or something?  I am not concerned about it.  I don't think that anybody here disputes that there would be some interconnection between the shallow well and the deep well.

Is that your view, Mr. Illingworth?

MR. ILLINGWORTH:  Yes, sir.  I would say offhand as a prediction on this that this might not show any effect, pumping of the Pauba well might not show an effect on the shallow well.

THE COURT:  Whether it did or not, you would concede that there is some interconnection?

MR. ILLINGWORTH:  I would still say there is probably some interconnection whether it showed such effect or not,

2

1   because I just don't believe any of these things are absolutely

2   tight.

3       THE COURT:  That is my view on that.  Regardless of

4   what you showed, I would still think there was some inter-

5   connection.  And I don't know that if you were able to show

6   mathematically what the rate was or the amount, that it would

7   advance us very far because we are not concerned really with the

8   problem between an area a hundred feet around that Pauba well.

9   That is not the real issue in this case.  And that is why I

10  suggested that the findings on the Pauba Valley probably would

11  dispose of your need to drill this shallow well there.

12      MR. VEEDER:  If those points are conceded, it would

13  be a worthless effort.

14      THE COURT:  Then it seems to me that as to number (1),

15  the well would cost money; it would delay us-- it seems to

16  me there should be proposed findings on the Pauba Valley that

17  I suggested and see if we are in agreement, and if we are the

18  shallow well is not going to help us a bit.

19      Now, number (2)-- of course, this is a shotgun proposi-

20  tion:  All wells of Vail, irrespective of the location of the

21  wells.  You are not interested in these windmill wells.  These

22  windmill wells will not tell you anything anyhow.  They are

23  wells that pump a small amount of water, they are mostly shallow

24  wells, and certainly this shouldn't be a shotgun paragraph.

25  You should tell us what particular wells you want and not state

3

1    all wells.

2         MR. VEEDER:  I will be specific, your Honor.

3         THE COURT:  Other than that, your request is not un-

4    reasonable.

5         I am not too concerned about (3), but it might help

6    us on the question of the older continental.  Again, that is

7    a question whether you could get together on any findings on

8    that part of it.  As far as the area up around the Shrode well

9    is concerned, if it is conceded that there is interconnection,

10   number (3) doesn't have to be done.  If it is not conceded,

11   then it seems to me that the Shrode well would tell us some-

12   thing about Long Valley and Pauba Valley.

13        MR. VEEDER:  In other words, we will tender the finding

14   and if there is agreement on it, it is a matter of--

15        MR. SACHSE:  I will not agree, your Honor, on any find-

16   ing that the Shrode well is interconnected.  I will say frankly

17   that number (3) is one of the few in this whole list that would

18   interest me.  I don't think he can establish--

19        THE COURT:  Does it interest the State also?

20        MR. GIRARD:  Yes, your Honor, we would like to have that

21   one.

22        THE COURT:  Then it seems to me that that is one that

23   should be spelled out.

24        MR. STAHLMAN:  We said yesterday that we will do every-

25   thing that we possibly can.  It is a question of moving the

4

1    cattle out of there.

2         MR. VEEDER: We will adjust to whatever is necessary.

3         MR. STAHLMAN:  We will cooperate.

4         MR. VEEDER:  I want this clear, though.  As I under-

5    stand it, number (3) is not one to be embraced in the proposed

6    findings; rather, it is a test to be run.

7         THE COURT:  That is right.

8         MR. VEEDER:  And as I understand, there is agreement

9    that we can go on and run that test.  We will adjust to the

10   uses of the Vail's livestock up there and whatever is necessary.

11        MR. GIRARD:  We want to know when you are going to do

12   it.

13        MR. VEEDER:  You will have your man there.

14        MR. STAHLMAN:  That is along the line that you will be

15   given an answer on Monday.  I want to talk to the engineers

16   over the weekend.  As far as I am concerned, I have no objec-

17   tion to the test.  I am not going to be guided in technical

18   matters by my own judgment, because I don't know enough about

19   it.

20        MR. VEEDER:  We are going to be able to reach you there?

21        MR. STAHLMAN:  Yes.

22        THE COURT:  (4), Water level measurements of wells in

23   the Vail Ranch seems a reasonable request.  I am definitely

24   interested in water levels

25        What is the objection?

5

1    MR. STAHLMAN:  That is all right, your Honor.  But the

2    method, and when.  You have certain wells pumping that affect

3    certain other wells, and if we can make some agreement as

4    to when and under what conditions they are to be measured so

5    that they will tell us something, fine.

6    THE COURT:  It seems to me that that would be a matter

7    to be worked out between your representative and the Govern-

8    ment's representative.

9    MR. VEEDER:  There are measurements now being taken.

10   We would like to take a few more and see if we can get a

11   pattern.

12   MR. STAHLMAN:  Your Honor, there is a man named Green

13   who three times a week or so measures all the operating wells

14   on the Vail Ranch and gives a copy to Pendleton and to us.  So

15   there is a lot of that data already.  It has been going for a

16   long period of time.

17   MR. VEEDER: We know that.

18   THE COURT:  Could you specify the particular other wells

19   that you want?

20   MR. VEEDER:  Yes, your Honor.

21   MR. STAHLMAN:  We will even concede that there may be

22   some conditions under which you may want to measure these

23   wells which are probably contrary to what their present usage

24   is.  That would show something. We will endeavor to cooperate.

25   MR. VEEDER:  I will give you an example.  We found out

6                                                                                    9818

1   today that they run the Navy well for two weeks at a time.

2   That is an important factor that we didn't know.  It might be

3   reflective.

4        MR. STAHLMAN:   That is not what you learned at all, Mr.

5   Veeder, that we run the Navy well two weeks at a time.   The

6   Navy well has been run for a couple of weeks.

7        MR. VEEDER:  I am sorry.

8        THE COURT:   (5) Water level recorders on selected wells

9   with open casings.  That is on Vail Ranch and elsewhere?

10        MR. VEEDER:  No, this is all the Vail Ranch.  This

11   whole letter is directed solely to that.

12        We have a letter to Mr. Krieger asking permission to

13   go on his land for the purpose of running static and pumping

14   level tests.

15        THE COURT:  Isn't this a matter that can be worked

16   out with your engineers and the Government's engineers?

17        MR. STAHLMAN:  Yes.  But I got this letter on Friday

18   and I have never had a chance to talk to the engineers.  That

19   is my only problem, your Honor.

20        THE COURT:  All right.

21        MR. SACHSE:  This seems to me to be another one that is

22   a perfect example where you ought to try to get a finding

23   first.  I don't think there is going to be any disagreement on

24   the interrelation of water over the Wildomar fault.  They are

25   on opposite sides of the fault.  They want permanent water level

7

1    recorders to see what the interaction is.

2          THE COURT:  This may be one where you can propose the

3    finding and dispose of it.

4          MR. VEEDER:  We will propose a finding, your Honor.

5          MR. STAHLMAN:  The engineers may say no.  I don't know.

6    I haven't talked to them.

7          THE COURT:  Do you think a finding could be made?  What

8    you expect to prove is that there is an interaction between

9    the water on one side of the Wildomar fault in Pauba Valley

10   and on the other side of the Wildomar fault in Pauba Valley?

11         MR. VEEDER:  Yes, your Honor.

12         THE COURT:  Is that agreed?

13         MR. GIRARD:  It is by the State, in a shallow well.

14         THE COURT:  Isn't that agreed?

15         MR. STAHLMAN:  We have no way of telling, your Honor.

16   There are no wells in that area to test that.  I called Mr.

17   Hall.  Years ago they ran some well--

18         THE COURT:  If you don't think it can be agreed upon,

19   then of course there would have to be these tests

20         MR. STAHLMAN:  I will bring that question up with the

21   engineers we talk to over the weekend and maybe we can.  I

22   don't know.

23         MR. VEEDER:  I will put a question mark on it.

24         THE COURT:  (6) is a general one:  Other casing wells.

25   What are they?  Which ones?

9820

8

1     MR. VEEDER:  There are open casing wells on the Vail

2   property concerning which we don't have information, and the

3   only way we could get it would be to check it out with them.

4     THE COURT:  Specify what they are.

5     MR. VEEDER:  That is right.  We don't know which ones

6   they are, but we know there are some, and those are of interest

7   to us.

8     At least, I am advised there are some, George.

9     MR. STAHLMAN:  I don't know, Mr. Veeder.  I thought Mr.

10  Kunkel knew all the wells.  There are some wells up there, yes.

11  There are some wells in such condition that they haven't been

12  used, some that you can't use.

13    MR. VEEDER:  We can work that out, George.

14    THE COURT:  (7) Studley well, to show any response in

15  the Pauba well.

16    MR. STAHLMAN:  That has already been testified to.

17    MR. VEEDER:  I think that would be one of those.

18    MR. STAHLMAN:  There is a response.  You come to the

19  question of why there is a response and you have another

20  situation.  But there is a response.

21    THE COURT:  Do you want to see whether Mr. Veeder can

22  draw some findings on that?

23    MR. STAHLMAN:  He can shoot at these findings, if he

24  wants to.  Maybe they will go.

25    THE COURT:  Both these wells are in the Pauba Valley,

9

1    aren't they?

2    MR. STAHLMAN: Both these wells are in the Pauba Valley.

3    MR. SACHSE:  They are both flowing wells, too.

4    MR. STAHLMAN:  They both go into the older alluvium.

5    THE COURT:  What is it going to prove, Mr. Veeder?

6    Maybe a finding will dispose of that.

7    MR. VEEDER:  That is exactly what I would like to do.

8    THE COURT: Try it.

9    (8) Temporary measuring device to determine pressure

10   levels in the flowing wells.

11   MR. VEEDER:  Again, we are seeking an interrelation

12   between the wells and perhaps a finding will take care of that.

13   THE COURT:  Which three wells are listed?  I can't

14   recognize them.

15   MR. VEEDER:  The China Garden, the Dairy and the Navy.

16   Isn't that right?

17   MR. GIRARD:  That would be in connection with 4, Mr.

18   Veeder.  8 works with 4; is that correct?

19   THE COURT:  No, they are a different proposition.  (4)

20   concerns not flowing wells, but wells generally; and (8) con-

21   cerns the three artesian wells.

22   MR. VEEDER:  That is right.

23   MR. GIRARD:  But still water levels?

24   THE COURT:  Yes.  But it is a pressure level.  As I

25   understand, it is how far above the level of the ground the

10

1  water level would be.

2  MR. ILLINGWORTH:   The same thing, but obtained in a

3  different way.

4  THE COURT:  Yes.

5  What are the other two wells?

6  MR. VEEDER: China Garden, Dairy and the Navy well.

7  I understand from Mr. Wilkerson that the headquarters--

8  in any event, the list that we discussed, as I understand,

9  one of them wouldn't be proper to test.

10  MR. STAHLMAN:  Yes, one of them I don't think you can

11  test, and the Dairy well is an automatic well that is used to

12  water all those cattle in there and that comes off and on

13  automatically.

14  MR. VEEDER:  That is out

15  MR. STAHLMAN:  We are going to give some testimony as

16  soon as we start in relation to how all these wells operate

17  up there and it might be well to do that before we--

18  MR. VEEDER:  We might do that this afternoon.

19  THE COURT:  Whom do you have available?

20  MR. STAHLMAN:  Mr. Wilkerson here, who has been with

21  us for years.

22  MR. GIRARD:  What was the conclusion on (8)?

23  THE COURT:  What is the purpose of measuring these

24  water levels in these artesian wells?

25  MR. VEEDER:  From the standpoint of interrelation or

11   1   interaction among the wells.

2   THE COURT:  Wouldn't a finding dispose of that?  Isn't

3   it agreed that there is interaction between the artesian

4   wells and Paube Basin?

5   MR. VEEDER:  I will undertake to write a finding on

6   that.

7   THE COURT:  (9) is just a supplement to some of the

8   other proposals, to accomplish the desired ends, et cetera.

9   Do you mean that these wells are to be pumped for their

10  relationship one to the other, or are to be pumped in connection

11  with the tests above?

12  MR. VEEDER:  If there is interrelation between the one

13  and the other.  We have the August Cantarini well and the Pauba

14  well and the Cantarini pit well.  We are seeking there, of

15  course, to find in broad general terms-- the August Cantarini

16  well is a long way up here, the Pauba well is here, and the

17  Cantarini pit well involve the question of the Wildomar fault.

18  I will try a finding on that, if you want me to, your Honor.

19  THE COURT: All right.

20  (10) of course is not an immediate matter.  That is

21  something that you don't presently propose, to drill another

22  test well, do you?

23  MR. VEEDER:  Depending on what the results would be.

24  But in view of the concessions--

25  MR. SACHSE:  Your Honor, that is what fascinates me.

9824

12

1   The reason I am interested in the Shrode well, apparently Mr.

2   Veeder's geologists think that by pumping the Pauba or by

3   pumping wells in Long Canyon they are going to find a reaction

4   in the Shrode well.  Let them go ahead and try it.  Then they

5   say, if we don't find a reaction we will drill another well

6   closer, and if we don't find a reaction in that one we will

7   drill another well still closer.  I think this is a little bit

8   silly.  If he thinks there is a reaction between the older

9   continental deposits and the Pauba Valley, let's not drill

10  sixteen new ones and steadily sneak up on the younger alluvium.

11      THE COURT:  We will postpone number (10) to some later

12  date.  If it were drilled, it would seem to me that it ought

13  to be up --

14      MR. VEEDER: Further.

15      THE COURT: --away up in the area of the basin and not

16  closer than the Shrode well to the Pauba well.

17      MR. VEEDER:  All right.

18      THE COURT:  (11) Shallow well on the Vail property near

19  the Query well.  Is the Query well within the Pauba Valley?

20  It is, isn't it?

21      MR. VEEDER:  It is in the Wolf Valley.

22      THE COURT:  Is this the reaction between Wolf Valley and

23  Paube Valley?

24      MR. VEEDER:  That is right.

25      THE COURT:  Wouldn't a finding dispose of that?

9825

13

1      MR. VEEDER:   It could be.   We will try a finding on that.

2      THE COURT:   Is there any dispute on that, Mr. Stahlman?

3      MR. STAHLMAN:   On what?

4      THE COURT:   The Query well is in Wolf Valley, the

5  Pauba well is in Pauba Valley, and Mr. Veeder claims there is

6  a reaction between the wells in those two valleys.

7      MR. STAHLMAN:   I think there is.

8      MR. VEEDER:   We will try a finding on it.

9      MR. STAHLMAN:   Does Mr. Krieger represent Mr. Query?

10  Of course, we have been trying to get a well log on that Query

11  well and that has never been in here and we have asked for it.

12      THE COURT:   Who has it?

13      MR. STAHLMAN:   We have even gone to the trouble to talk

14  to the former owner and he gave us some information out of

15  his head that we made notes of as to the depth and where the

16  water-producing sands were.

17      THE COURT:   Who owns the Query well?

18      MR. STAHLMAN:   Mr. Query owns it now.

19      MR. VEEDER:   And he is represented by Mr. Krieger and by

20  Mr. Littleworth and we have put the arm on both of them trying

21  to get it and we couldn't get it.

22      MR. SACHSE:   Mr. Krieger stated into the record that he

23  tried to get it and he simply hasn't been able to get it.

24      THE COURT:   An examination would show the depth of the

25  well, would it not?

14

1    MR. STAHLMAN:  Mr. Veeder, I understand you could get
2  it by subpoenaing the records of the Riverside County.  I
3  don't know.

4    MR. VEEDER:  You mean that the log was filed there?

5    MR. STAHLMAN:  It should have been filed.

6    MR. VEEDER:  We will make a check on that.  I didn't
7  know that.  But I would think that Mr. Littleworth or Mr.
8  Krieger would know that.

9    THE COURT:  Where did you get that information, Mr.
10  Stahlman?

11    MR. STAHLMAN:  From Mr. Roripaugh on the ranch.  He
12  had made inquiries around up there and he was informed that
13  there was a copy of it filed in Riverside County, and I believe
14  he had some discussion up there with someone in the office and
15  the effect was -- I don't think they went to look it up, but
16  they said that they couldn't give it to him because of the law.
17  But it certainly could be subpoenaed into court.

18    THE COURT:  Couldn't the State obtain it?

19    MR. SACHSE:  I was just asking Mr. Illingworth.  He
20  said he tried to find it.  The law would require that it be
21  filed with the State Water Pollution Control Board.  But their
22  records are pretty sloppy.

23    MR. ILLINGWORTH:  Apparently they don't have the funds
24  to keep these in absolute order and according to the new owner's
25  name and that sort of thing.  Furthermore, the numbering system,

15

1  that not being sectionized, the owners couldn't put on a number

2  in accordance with our ordinary well numbering system and

3  consequently couldn't find it.  If you knew what date it was

4  filed, you could probably pick it out of the record.

5      THE COURT:  Did you have some check made in Riverside

6  for this?

7      MR. ILLINGWORTH:  I didn't attempt to find it.  I was

8  under the impression that we had it here.

9      MR. STAHLMAN:  I think we can get an approximate date on

10 it.

11     MR. VEEDER:  Was your Honor's request, could he or had

12 he?  I think it would be good if he could and would.

13     THE COURT:  I think the State would ve an easier

14 opportunity to get it, if it could be found, than any of the

15 other parties here.

16     MR. GIRARD:  Could you give us the date it would have been

17 filed?

18     MR. STAHLMAN:  I will try to determine.

19     THE COURT:  If you think it is here, you may check, Mr.

20 Illingworth.

21     MR. ILLINGWORTH:  Yes, sir.

22     THE COURT:  We will adjourn until 2 o'clock and you can

23 put Mr. Sandy Wilkinson on.

24     MR. STAHLMAN:  Yes, your Honor.

25     (Noon recess.)

9828

SAN DIEGO, CALIFORNIA, FRIDAY, MAY 22, 1959.  2 P.M.

THE COURT: Call your witness, Mr. Stahlman.

MR. STAHLMAN:  I wonder if we can spend just a couple of minutes working on our schedule for the next couple of weeks, your Honor.  As I have indicated before, I have to try a case on the 18th and 19th of June-- it has been continued about nine times-- and on the 10th and the 11th of June Col. Bowen, I understand, can't be here, and there is an affair going on up at Camp Pendleton in which I have taken part for years.

THE COURT:  Well, that can be postponed.  This is more important than the rodeo.

MR. STAHLMAN:  I know it is, but we are stuck.  Col. Bowen bought a new horse in anticipation of this.

THE COURT:  What is it, the 10th and 11th?

MR. STAHLMAN:  The 10th and 11th.

Isn't that correct?

COL. BOWEN:  Yes.

THE COURT:  Is it your desire not to hold court on those days because Col. Bowen will be absent?  Can't you get along without him?

MR. STAHLMAN:  I think he is a necessary component part of this case.

MR. VEEDER:  I would like to have George speak for

9829

1    himself.  The reason is that you are not going to be here.

2    Isn't that right?

3    　　　　MR. STAHLMAN:  That's right.

4    　　　　MR. VEEDER:  Let's keep the record straight.

5    　　　　THE COURT:  What else?

6    　　　　MR. STAHLMAN:  That's all.

7    　　　　MR. GIRARD:  As I understand it, your Honor, we are

8    not going to be here next week?

9    　　　　MR. STAHLMAN:  We may be finished by that time, how-

10   ever, even though we are not here all next week, with the

11   exception--

12   　　　　THE COURT:  Well, here is the situation next week.

13   I had the United States Attorney in to find out about these

14   cases, and from what he tells me I think I will be busy only

15   through Wednesday.  So I would have Thursday and Friday again

16   and that would give you some time to work on this program that

17   you are talking about, and I would tentatively put the matter

18   over from this afternoon to Thursday, the 28th of May, with

19   about a 90% expectancy that I would be available on those two

20   days.

21   　　　　Then the following week it is too far ahead to tell,

22   but we will figure on taking off these days when George

23   Stahlman and/or Col. Bowen will be unable to be present.  This

24   case that you have to try, Mr. Stahlman, I know is very

25   important to you, in your financial condition.

1      MR. STAHLMAN: Yes.

2      MR. SACHSE: What were those dates again, George, the

3  10th, 11th and 12th, and the 18th and 19th?

4      MR. STAHLMAN: The 10th, 11th and 12th, and the 18th

5  and 19th.

6      THE COURT: The order of procedure on the Vail case

7  would be that you would be proceeding with your case, I take

8  it.

9      MR. STAHLMAN: Yes, your Honor, and as to whether we

10  can conclude with the matter relative to the irrigable

11  acreage is something -- we sent that telegram, I presume, and

12  we haven't heard from this witness in Okinawa. I don't know

13  whether the witnesses that we have here will be sufficient to

14  get these exhibits admitted in evidence.

15      THE COURT: I want to spend some time, which I can do

16  outside of court, with you and Mr. Veeder on this list of

17  matters that you have been getting up. I take it that you have

18  been working on that list, so that we can discuss them. I

19  hope I haven't made an erroneous assumption here. I asked

20  you to make up a list of these matters that you want to talk

21  about.

22      MR. STAHLMAN: We have settled the matter relative to

23  the proof in regard to the title to the ranch. That will not

24  be any problem. It is only this other matter.

25      And then, as I have indicated to your Honor right along,

9831

1    the matter relative to the issue on the stipulated judgment,

2    I think, is something that should not be heard until after we

3    have heard all of the matters on the stream system.  I think

4    your Honor will want to have some familiarity with the matters

5    that are east of the Vail Dam and the effect it would have

6    upon us.

7          THE COURT:  Your proposal, then, would be not to go

8    into the matter of setting aside the Vail judgment until

9    sometime later inthe case?

10          MR. STAHLMAN:  That is right.

11          THE COURT:  Any objection to that?

12          MR. VEEDER:  Violent.  I am going to object to any

13    further evidence, because I think if your Honor--

14          THE COURT:  I said, do you have any objection to

15    postponing that part of the Vail case until sometime later in

16    this case?

17          MR. VEEDER:  I think we could ask your Honor to rule

18    on it now, and if your Honor rules as I think--

19          MR. STAHLMAN:  You mean before we put on any evidence

20    whatsoever?

21          MR. VEEDER:  --that honesty and justice and fairplay

22    would dictate that the stipulated judgment remain in effect,

23    and then we wouldn't have to worry about the matter of

24    irrigable acreage.

25          THE COURT:  You could get a motion ready to bring on

1  your legal position, and if there is a legal position it could

2  be ruled on one way or the other.  You can bring that on at

3  that time.  If I should rule in your favor that it is just a

4  question of law to be decided, that is the end of it.  If I

5  rule that there is a fact question to be decided, then that

6  part of the case could be postponed until later in the trial.

7  Is that agreeable?

8        MR. VEEDER: All right.

9        THE COURT:  If you are going to make that kind of

10 motion-- Mr. Stahlman has pleadings in here, I take it, that

11 make an attack on this judgment, so you really have a pleading

12 question as to whether he has stated enough, under the law, to

13 be entitled to put on any evidence, or whether it is strictly

14 a matter of law and can be ruled on as a matter of law.

15       MR. VEEDER:  Your Honor, from our standpoint we have

16 viewed it this way.  I have interposed objections to evidence.

17 I have already stated what I think the situation is.  I believe

18 that, by and large, a ruling now on the question of the

19 stipulated judgment would save time, and I will proceed in

20 accordance with your direction.  I can't see how anything

21 upstream could have much effect on the stipulated judgment,

22 but that is a matter that we can consider later.

23       MR. STAHLMAN:  I am not so much concerned when you want

24 to get into it.  I think we are prepared for an orderly proof

25 in relation to matters of inquiry here in regard to Mr. Veeder's

1    tests that he wants to make.

2         THE COURT:  Let's do it as I suggested.  That Mr. Veeder

3    make a written motion raising as a legal question whether

4    there is anything to be tried, and he will support it with a

5    brief and you will have a chance to reply to the brief.  Then

6    if it turns out to be a matter of law, I will try to rule on

7    it.  If it turns out that there is a question of fact involved

8    there will have to be a trial.

9         MR. STAHLMAN:  I would like to point out to your Honor

10   in connection with that that there is also a pleading in the

11   record in this case in connection with Dr. Henderson, who is

12   successor in interest to the Plater property, in which he is

13   also making an attack upon this judgment.

14        THE COURT:  He is a successor in interest to what

15   property?

16        MR. STAHLMAN:  The Plater property.

17        THE COURT:  Who represents him?

18        MR. STAHLMAN:  He represents himself,  He appeared in

19   propria persona.

20        THE COURT:  He will probably make a very helpful

21   argument.

22        MR. STAHLMAN:  I will help him, and he will help me,

23   and I think, your Honor, before we are concluded here, you

24   are going to find that there are other people who are going

25   to make an attack upon that.

```
1        MR. VEEDER:  I have the question whether to amend our
2   complaint again.  I am worried about that, because if we are
3   going to have to sue the Vail Company for a hundred thousand
4   dollars for the value of the Navy well we ought to get at that.
5        MR. STAHLMAN:  Go ahead and sue them.  File your action.
6   It costs you forty and you are suing for about a hundred.  I
7   guess that would be about right.
8        THE COURT:  Well, let's go ahead.  Call your witness.
9        MR. STAHLMAN:  Mr. Wilkinson.
10
11              JAMES VAIL WILKINSON,
12   called as a witness in behalf of the defendant Vail, being
13   first duly sworn, testified as follows:
14        THE CLERK:  State your name, please.
15        THE WITNESS:  James Vail Wilkinson.
16
17              DIRECT EXAMINATION
18   BY MR. STAHLMAN:
19        Q  You are the James Wilkinson who is known as "Sandy,"
20   is that right?
21        A  That is right.
22        MR. VEEDER:  I will stipulate to that.
23        MR. STAHLMAN:  Just let's not start interfering with
24   the examination.
25        MR. VEEDER:  All right.
```

BY MR. STAHLMAN:

Q  Where do you live, Mr. Wilkinson?

A  I live at the Pauba Ranch, part of the Vail holdings at Temecula.

Q  How old are you?

A  Thirty-six years old.

Q  Where did you receive your primary schooling?

A  My primary schooling was in Los Angeles.  I graduated from Los Angeles High School in the winter of 1940.

Q  Did you proceed further with some studies?

A  Yes, I went to Stanford University, took up engineering, in the fall of that year.

My studies were interrupted by the war.  I enlisted in December, 1942, and was discharged from the Air Force in February, 1946.

At that time I resumed my studies at Stanford University and continued until May, 1947, when the doctors found that I had-- I broke down with tuberculosis, with a service-connected disease.  At that time I spent approximately three years in bed, and then returned to Stanford University for one quarter to graduate, and I graduated in the class of 1951 in the School of Engineering.  My degree is Bachelor of Science in general engineering.

Q  And then what occupation did you pursue after your graduation from college?

1      A  From that time on I have been occupied with duties

2  at the Pauba Ranch.

3      Q  When you say occupied with duties at the Pauba Ranch,

4  did you live upon the ranch from that time on?

5      A  I lived at the ranch from that time on, assisting

6  generally, in the beginning in a supervisory capacity because

7  of my health, and later getting into more active work, helping

8  with general farm problems, in which of course irrigation and

9  wells and records and such things became familiar to me.

10     Q  And you are at present then the general manager

11  of the ranch, are you not?

12     A  No, I am not.

13     Q  What is your capacity?

14     A  I am an assistant manager and engineer.

15     Q  And as such assistant manager and engineer are you

16  familiar with the system of water and water distribution upon

17  the land of the Vail Ranch?

18     A  Yes, I am.

19     Q  Are you generally familiar with the lands and the

20  areas occupied within the boundaries of the Vail Ranch?

21     A  Yes, I am.

22     Q  Do you have under your care, custody and control

23  the records that are kept in relation to the matters pertaining

24  to irrigation, the water measurements that are kept there at

25  the ranch?

9837

1       A  I do.

2       Q Directing your attention to a map, Vail's Exhibit J

3 for Identification--

4       May this be identified, your Honor?  I believe it has

5 just been lodged.

6       THE CLERK:  It has been marked for identification.

7       MR. STAHLMAN:  Very well.

8       Q  Are you familiar with the map Vail's Exhibit J?

9       A  Yes, I am familiar with this map.  This map is based

10 on the original map by Davidson and Fulmore.

11       Q  Who are Davidson and Fulmore?

12       A  Davidson and Fulmore are engineering surveyors

13 located at Riverside.

14       Q And is this a basic map that has been used for various

15 purposes on the Vail Ranch for illustrating different con-

16 ditions that exist upon the ranch?

17       MR. VEEDER:  Your Honor, I object to the question as

18 being incompetent, irrelevant and immaterial.  It doesn't tend

19 to prove any issue in the case.  What it has been used for or

20 how it was used or what Mr. Wilkinson did in regard to it is

21 immaterial.

22       THE COURT:  Overruled.  You may answer.

23       THE WITNESS:  Yes, this is a map that has been used for

24 that purpose.  There are others on different scales, larger

25 and smaller, but this is a convenient size for what is to be

1  depicted.

2          THE COURT:  How long has it been so used?

3          THE WITNESS:  Since the map was made, and that was in--

4          MR. VEEDER:  I object on the grounds that this is hear-

5  say, your Honor.

6          THE COURT:  Do you know when it was made?

7          THE WITNESS:  I would say it is in '24.

8          MR. VEEDER:  I move to strike the answer as being hear-

9  say.

10         THE COURT:  This is certainly going to take up a lot

11  of time over matters that--

12         MR. STAHLMAN:  We have the same situation here that they

13  had.  They came out with a basic map, and we have one here

14  that has been used.

15         THE COURT:  If other counsel had been as technical as

16  you are, your exhibits wouldn't have gone in as rapidly.

17         MR. VEEDER:  But we got them in, your Honor.

18         THECOURT:  Yes, because nobody was objecting.  Nobody

19  was trying to cause you any trouble.  They wanted to speed up

20  the case.

21         MR. STAHLMAN:  Mr. Veeder takes more pride in his

22  cunning than he does in the facts.

23         THE COURT:  I will sustain the objection.

24         Tell us what you know about this map.  Was this part

25  of the files of the ranch when you went up there?

1   THE WITNESS:  This is part of the files and records of

2  the ranch.  Maps such as this and contour maps have been used

3  for many plans of irrigation systems, areas, fence lines,

4  location of wells, such as that.

5   MR. VEEDER:  Unless he is testifying to his own knowledge,

6  I object to it, your Honor.

7   THE COURT:  This is his own knowledge.  I asked him

8  since he went there.

9   When did you first have contact with the ranch where

10  you would know about this map, Exhibit J?

11   THE WITNESS:  I would say the first time I had put it

12  to any great use was in 1951.

13   THE COURT:  And was it then one of the records of the

14  ranch company and had been used by you and other people on

15  the ranch since in matters concerning irrigation lines--

16   THE WITNESS: It has, your Honor.

17   THE COURT:  --planning and grading?

18   THE WITNESS:  It has, your Honor.

19   THE COURT:  In connection with various matters in

20  which the map might have been of any assistance?

21   THE WITNESS:  That is right.

22   This map in itself is not a contoured map.  A contoured

23  map would be clumsy in this use.

24   THE COURT:  You are familiar with the ranch properties?

25   THE WITNESS:  Yes, I am.

1        THE COURT:  And the physical lay of the ground?

2        THE WITNESS:  Yes, I am.

3        THE COURT:  And in the sense that this map purports to

4    depict those ranch properties, is it accurate, to your

5    knowledge and information?

6        THE WITNESS:  It is quite accurate to my knowledge,

7    yes, your Honor.

8        THE COURT:  The roadways shown are accurate, are they?

9        THE WITNESS:  The roadways shown are accurate.  There

10   have been modifications on this map that don't appear on the

11   original map in the location of roads that have come into ex-

12   istence since the creation of the map.

13       THE COURT:  And the cultivated areas correspond with

14   your knowledge of the areas on the ground?

15       THE WITNESS:  They correspond.  I placed them on there

16   myself.

17       THE COURT:  What do you want, Mr. Veeder?

18       MR. VEEDER:  I wanted the objection on the grounds that

19   any further evidence in regard to this map is, of course, in

20   my view, in conflict with the stipulated judgment, and I want

21   a continuing objection to all evidence that goes in on the

22   grounds that the matter is purely a question of law now.

23       THE COURT:  We don't even know what the map is going

24   to be used for yet, Mr. Veeder.

25       MR. VEEDER:  I can shorten this up a little bit.  If

1     this is solely for the purpose of location and doesn't show

2     acreages or anything else, I will forget about it.

3          THE COURT:  What is the purpose of the exhibit?

4          MR. STAHLMAN:  Your Honor, the purpose of this map is

5     to show areas that are under cultivation and under irrigation

6     and which have been under cultivation and under irrigation,

7     and they have been plotted upon this map.  This isn't for the

8     purpose of showing the irrigable acreage.

9          THE COURT:  The purpose is to show those areas that

10    have been cultivated and irrigated?

11         MR. STAHLMAN:  Yes.  And we would also like to show

12    your Honor where the reservoirs are, where the irrigation

13    system is and how it works and how it operates, so that we

14    can understand these tests, for one thing.  It is similar to

15    the evidence that was put on by Camp Pendleton showing where

16    the use was of their water and the distribution system and

17    matters of that character.

18         THE COURT:  Mr. Wilkinson, as to the areas depicted in

19    green, I take it that those are cultivated areas, are they?

20         THE WITNESS:  Those are irrigated areas, areas that

21    have been irrigated now and in the past.

22         THE COURT:  You mean all of them are presently irrig-

23    gated?

24         THE WITNESS:  No, they are not, your Honor.

25         THE COURT:  They are areas which have been either

1   irrigated in the past or at present or both?

2          THE WITNESS:   That is right.

3          THE COURT:   And are those areas generally drawn to

4   scale, as nearly as you could put them on there?

5          THE WITNESS:   They are generally drawn to scale as

6   closely as I could put them on there.

7          THE COURT:   Do you have an objection, Mr. Veeder?

8          MR. VEEDER:   I certainly do have.   I don't believe

9   this witness is qualified to put anything on there to scale,

10  under the questions that have been asked.

11         THE COURT:  What do you mean, not qualified?   He has

12  a degree in engineering from Stanford.

13         MR. VEEDER:   Well, I have seen a lot of engineers who

14  couldn't draw a map, your Honor.

15         MR. STAHLMAN:   I have seen a lot of lawyers who couldn't

16  try a case.

17         MR. VEEDER:   Georgie, you suffer that way yourself.

18         THE COURT:   Well, now, let's stop.

19         MR. VEEDER:   The problem is this, your Honor, when

20  he begins talking about what was irrigated in the past, I

21  object certainly on the grounds of hearsay because they have

22  been running this show out there since1889, something like that.

23         THE COURT:   We will get to that when the time comes.

24         Go ahead.

25         MR. STAHLMAN:   If you don't want to know what was

irrigated in the past and what is irrigated now, let's fold

up the exhibit.  I think it is informative to the Court.  It

is the same type and character of evidence that Camp Pendleton

put on.  I think if you can determine whether or not the areas

of irrigation, for instance, that are shown on there--

THE COURT:  You didn't understand what he said.  He

said anything about the past would be hearsay.  We will come

to that when we come ot it.

MR. STAHLMAN:  I see.

THE COURT:  Do you have an objection so far?  Nothing

has been offered.  This is all preliminary.  Do you have

some objection?

MR. VEEDER:  Yes, I have made my objection.

THE COURT:  Objection to what?  My last question?  Or

what?

MR. VEEDER:  Well, you have asked so many, your Honor.

I put in first the objection in regard to the question of law

and the stipulated judgment, and I want that clear.

THE COURT:  The objection is overruled without prejudice

to raising any legal question.

MR. STAHLMAN:  I would like to make an explanation, in

view of the--

THE COURT:  You are just wasting tim, too.  Let's go

ahead with your identification.

BY MR. STAHLMAN:

Q  Have you a familiarity with the area that has been under irrigation since the time you first came to the ranch?

A  I have a familiarity.  It has been my duty to make reports that go in to the State of these various areas and the crops planted on them.  That is an operation that has been carried on, I believe, since 1954.

Q  Generally, what is shown on this map in relation to the irrigation system?

A  This shows the lands that are under pipe line that can be irrigated and--

THE COURT:  That is in green?

THE WITNESS:  In green.  Now, in the area which is encircled in yellow, this at the time the map was prepared was not irrigated and had never been irrigated, but at the present time that area in yellow is now in potatoes and is irrigated.

THE COURT:  How long has that been irrigated?

THE WITNESS:  Oh, it has been irrigated perhaps six weeks.  This is the first time that this land has ever been used under irrigation.

THE COURT:  The areas in green, then, demark the areas to which there is a pipe line system?

THE WITNESS:  That is right, your Honor.

THE COURT:  Were there records at the ranch from which you were able to ascertain whether or not those areas to which

1 there were pipe line services had at any time ever been irri-

2 gated?

3      THE WITNESS:  My knowledge of irrigation in itself on

4 the ranch during the period that I have been active there

5 covers all areas but one on that map.

6      THE COURT:  Which one is that?

7      THE WITNESS:  That is the area in the left-hand corner

8 of the map, to which we refer as the "Hutchinson Brown Field."

9 This area enclosed in here (indicating).

10      THE COURT:  Other than that, every area enclosed in

11 green you know of your own knowledge has been irrigated?

12      THE WITNESS:  I know of my own knowledge it has been

13 irrigated, your Honor.

14      MR. VEEDER:  You are pointing to the field north and

15 west of Temecula; is that right?

16      THE WITNESS:  That is right.

17      If Mr. Veeder has any question about it, call another

18 witness as to that area, Mr. Stahlman.

19      MR. VEEDER:  Let him go ahead.  If it is only for

20 location, I said long ago--

21      THE COURT:  Go ahead.

22 BY MR. STAHLMAN:

23      Q  Referring to the Hutchinson Brown is that presently

24 under irrigation?

25      A  No, that is not.

9846

1    Q  What is on the land in the way of any wells or

2  pipe lines at the present time?

3    A  There is a pipe line on the higher ground that runs

4  roughly parallel to the old railroad right of way and two

5  wells which are unused, without pumps into them.

6    MR. VEEDER:  They are under casing; is that right?

7    THE WITNESS:  Casing wells there, but no pumps.

8  BY MR. STAHLMAN:

9    Q  How long a period of time have the wells been in

10  that condition, to your knowledge?

11    THE WITNESS:  Since the original injunction in the

12  Santa Margarita vs. Vail case  At that time the pumping was

13  stopped-- somewhere, I would say, in the period 1925, '26,

14  '27, I believe.

15    THE COURT:  You are referring to the pumping for that

16  one area?

17    THE WITNESS:  That one section.

18    THE COURT:  On the west side of the map, the left-hand

19  side of the map?

20    THE WITNESS:  Yes.

21    THE COURT:  What was that called again?

22    THE WITNESS:  Hutchinson Brown.

23    THE COURT:  Do you want to write it in with a pencil,

24  Mr. Stahlman?

25    MR. STAHLMAN:  Yes, your Honor.

1     THE COURT: <sup>H</sup>ave you got a colored pencil?

2     THE WITNESS:  Here is a green one.

3     MR. STAHLMAN:  Hutchinson -- H-u-t-c-h-i-n-s-o-n

4  (writing)?

5     THE WITNESS:  Yes.

6     MR. VEEDER:  And that is under injunction?

7     MR. STAHLMAN:  No, no.  I will object to Mr. Veeder

8  asking for a legal conclusion.

9     THE COURT:  It may be stricken.  This is not the time

10  for cross-examination.

11     Proceed.

12  BY MR. STAHLMAN:

13     Q  Now, directing your attention, Mr. Wilkinson, to the

14  area in green that I am indicating here, which is along the

15  borders of the Roripaugh property, that is the--

16     A  That is the J. E. Roripaugh property, and also

17  Shamel.

18     Q  Is that area which I have indicated here on the

19  Map Exhibit J known by any particular name?

20     A  As far as I know, it is always referred to as the

21  "Piece by Jack's."

22     THE COURT:  Meaning by Jack Roripaugh.

23     THE WITNESS:  By Jack Roripaugh.

24  BY MR. STAHLMAN:

25     Q  Now, this area in green across the road, is that

9848

1    part of the same parcel?

2        A  That is part of the same parcel, unirrigated now

3    due to the crossing of the new State Highway 395.

4        Q  What is the water system and supply by which this

5    property, the "piece by Jack's," which I have designated upon

6    the map is supplied?

7        A  The water for that piece is obtained from J. E.

8    Roripaugh's well.

9        Q  In other words, Roripaugh leases that land, does he?

10       A  He leased it for many years and raised seed alfalfa

11   as well as alfalfa.  Recently he has taken the alfalfa out

12   and has gone into other crops.

13       THE COURT:  Is he still leasing it from you?

14       THE WITNESS:  No, he is not, your Honor.

15       THE COURT:  And are you farming it now, the Vail Estate?

16       THE WITNESS:  We are farming it.

17       THE COURT:  And you are using water from Roripaugh's

18   well?

19       THE WITNESS:  That is correct.

20       THE COURT:  By agreement with him?

21       THE WITNESS:  That is right.

22   BY MR. STAHLMAN:

23       Q  Directing your attention to another green lot, to

24   which I am pointing here in Murrieta Valley right north of

25   Temecula, does that have a designation or reference?

1          A   We call that the "Temecula School pasture."

2          Q   Across the highway from that, the other enclosure in

3     green, is that also a part of the same piece?

4          A   No; that is what we refer to as the "August

5     Cantarini."

6          Q   This other small portion of green that is immed-

7     iately to the northeast of the Cantarini piece?

8          A   That is also August Cantarini.

9          MR. STAHLMAN:   I will mark that on the map "A. Cat."

10         Q   Directing your attention to this area here that I

11    am pointing to, what is that referred to?

12         A   We refer to that as the -- the entire area is

13    broken into two pieces; one piece we call the Cantarini, and

14    the other we call the Ludy.

15         Q   In other words, Cantarini-Ludy?

16         A   That is right.

17         THE COURT:   Does it cover the area also across the road

18    to the north?

19         THE WITNESS:   No, it does not, your Honor.

20    BY MR. STAHLMAN:

21         Q   Are there any other local designations that you

22    have given to any of the other properties in this area shown

23    on the map?

24         A   Yes, there are.   This small piece that is separated

25    by the Pechanga Wash is called the Hipilote.

1    Q   Does the Hipilote consist of both these areas?

2    A   No.

3    Q   Just the small one.

4    A   Yes.

5    MR. STAHLMAN:   I have written "Hipolite" on that area.

6    Q   Now, the next area to it, does that have a name or

7    designation?

8    A   Yes.   That is the "School House Field."   That would

9    be confusing with the other, but the name sticks.

10   Q   Let's take this next area here.  Does that have a

11   name or designation?

12   A   We refer to that as the "River Bottom Field."

13   Q   Any further designations of any of the areas?

14   A   There are many small names, if you wish me to give

15   you those.

16   Q   All of the others, though, are generally within the

17   area referred to as the Pauba Basin, are they?

18   A   Except for that one, which we would call the

19   "Temecula Field," which is located north and east of Highway

20   71, the intersection.

21   Q   How far does that extend?

22   A   Technically, the Temecula field we consider from the

23   road going into the Navy reservoir and on toward Temecula.

24   Q   In other words, at this point where the map shows

25   the Lower Camp and a road going up from there to a designation

1  "Navy Reservoir Well," about from that point on this portion

2  in here you call the "Temecula Field"?

3       A   That is right.

4       Q   And generally speaking the entire area from there on

5  up is the area referred to as the Pauba Basin?  Or how do you

6  designate it?

7       A   I would say so.

8       Q   Now, then, does this map show your irrigation system

9  and the wells and the reservoirs that work in connection with

10  those wells?

11      A   No; there is a map on the same base that does show

12  that.

13      Q   The purpose of preparing this map was merely to

14  show the fields that have been under irrigation or are under

15  irrigation?

16      A   That is right.  And there is also a compilation

17  that follows with this.

18      Q   That is not Exhibit K, is it?

19      A   That is right.

20  THE COURT:  Do I have copies of these?

21  MR. STAHLMAN:  Yes, your Honor.

22  THE COURT:  Copies of this compilation?

23  MR. STAHLMAN:  I will ask the witness to explain.

24  THE WITNESS:  I have a copy here.

25

BY MR. STAHLMAN:

Q   Referring then to Exhibit K for Identification, with the designations as to the properties and acres, will you explain what those figures are?

THE COURT:  I don't have a copy of it.  I am trying to see.

MR. STAHLMAN:  We gave your Honor one.

THE COURT:  When?

MR. STAHLMAN:  I lodged them here in open court.  Does your Honor have the Vail exhibits that you do have?

THE COURT:  I have the maps, but all the smaller ones I put in the file.  Lend me a copy and I will look later. What is it, Vail K?

MR. STAHLMAN:  Vail's Exhibit K.

THE COURT:  Yes, I have it.

BY MR. STAHLMAN:

Q   Now, the matters and figures contained upon Vail's Exhibit K, were those placed on there by yourself?

A   Yes, they were.

Q   What was the source of your information in obtaining this information?

A   From the records of the ranch that we keep regarding fields, acreages, and names and designations.

Q   Will you explain to the Court what the designations and the acreages are and what they purport to determine?

9853

1          MR. VEEDER:  I would like to ask some questions on

2     voir dire.

3          THE COURT:  Well, you have a series of names here,

4     and it seems to me, if you are going to tie this in with the

5     Exhibit J, you ought to, at the recess or some time, put in

6     the names of these other fields so that this would tie in

7     with the map.  Some of them you have already identified--

8     I can see that-- Cantarini and Ludy are separately stated

9     here, but are marked together as one field on the map; is

10    that right?

11         THE WITNESS:  That is right.

12         THE COURT:  Do you have Temecula field listed separ-

13    ately?

14         MR. STAHLMAN:  Temecula Field pasture is down near

15    the bottom-- Temecula Field Pasture and Cemetery.

16         THE COURT:  You have two separate ones there.  You

17    ought to really identify each of these fields to fit in with

18    the map.  Can you do that after court?

19         THE WITNESS:  I will, your Honor.

20         MR. VEEDER:  I would like to ask some questions, your

21    Honor.

22         THE COURT:  Does Exhibit K comprise all the green areas

23    shown on Exhibit J?

24         THE WITNESS:  That is right.

25         THE COURT:  I notice two columns here.  The Upper JK or

9854

1   Mesquite from Canyon Mouth, that is the new area in yellow?

2        THE WITNESS:  Yes, that concerns the new area.

3        THE COURT:  Why is it put over in a separate column?

4        THE WITNESS:  Because at the time this was made it had

5 not been irrigated, and since that time it has been irrigated

6 and it should be included all in one column.

7        THE COURT:  And this other one in the left-hand column,

8 Present Planting Spuds in Old Upper Alfalf"?

9        THE WITNESS:  That is a portion of the spring crop

10 of potatoes, which has already been in potatoes in the past

11 as well as alfalfa and such as that.  The yellow area you

12 see on the map actually is not the entire new spring planting.

13 The spring planting runs across into the green.  But since the

14 green had already been irrigated I broke it down in that

15 fashion.

16        MR. VEEDER:  Your Honor, I would like to ask some

17 questions as to the sources of this data.

18

19                VOIR DIRE EXAMINATION

20 BY MR. VEEDER:

21      Q  I observe here the statement "Spuds in old upper

22 alfalfa."  Where did you obtain that data?

23      A  That data is a matter of ranch records.

24      Q  Under whose direction have those been maintained?

25      A  Under whose direction have the records been main-

tained?

9855

Q  Yes.

A  By myself.

Q  For how long?

A  That particular acreage I would say since 1954.

Q  In regard to the other acreages, how were they determined?

A  They were taken from the area map of the ranch.

Q  And who did that?

A  That map was a scale map, a larger scale map than this, but on the same basis, made by Davidson and Fulmore.

Q  In other words you don't know the accuracy of these figures yourself that are set forth upon this?

A  I have checked them.

Q  How did you check them?

A  By planimeter on a few occasions.  Generally by the cross-section paper.

Q  Now, when you say "planimeter on a few occasions," what do you mean by that?

A  Well, that I found it is more satisfactory to use cross-section paper than it was to use a planimeter on a map that was rough and had creases in it.

Q  You took this Davidson survey and simply ran the planimeter around the areas as depicted on that map; is that right?

A  Depicted on--

1      Q   On the base map.

2      A   On the base map, yes.

3      THE COURT: You are also familiar with the area itself?

4      THE WITNESS: Oh, yes.  I have measured these fields

5   for land surveys-- I mean for land leveling work and such as

6   that.  I have been on the land.  I know how far it is between

7   the lines and such as that.

8   BY MR. VEEDER:

9      Q   Did you survey the fields?

10      A   I have surveyed some of the fields for land leveling

11   work,

12      Q   But you didn't survey them all?

13      A   No.

14      Q   Well, as a matter of fact this data is largely from

15   the Hutchinson, or what is it-- Davidson base map; is that

16   right?

17      A   That is right.

18      THE COURT:  Plus your knowledge of the fields?

19      THE WITNESS:  Plus the knowledge of the fields, of

20   course, your Honor.

21      THE COURT:  The extent of the fields, where they go,

22   as to roadways, physical characteristics?

23      THE WITNESS:  Boundaries, fence lines, your Honor.

24      THE COURT:  So that you could test the accuracy of

25   the fields as shown on the map; is that right?

1        THE WITNESS:  That is right.

2        MR. VEEDER:  I wish somebody would help me sometime.

3        MR. STAHLMAN:  I am going to help you sometime.

4        MR. VEEDER:  I have asked my questions, George.  Now

5   it's your turn.

6        THE COURT:  Anything further?

7   BY MR. STAHLMAN:

8        Q   In your opinion--

9        MR. VEEDER:  I object to the opinion on this, your

10  Honor.  It is not a matter of opinion.

11       MR. STAHLMAN:  Wait until I ask the question, Mr.

12  Veeder.

13       Q   In your opinion, are the acreages as shown upon

14  Vail's Exhibit J reasonably accurate?

15       MR. VEEDER:  I object; it is not a matter for opinion.

16  He is here offering acreages.  They are either right or they

17  are not.  It is not a matter of opinion.

18       THE COURT:  I disagree.  Overruled.  What is an expert's

19  view as to the number of acres but an opinion?

20       MR. VEEDER: Acreage is not a matter of expert opinion,

21  your Honor, and that is certainly--

22       THE COURT:  If it is error, you make the most of it.

23  The objection is overruled.  I think he has laid a foundation

24  for it.  Let him answer the question.

25       THE WITNESS:  To my knowledge, these acreages are

9858

1    reasonably accurate.

2    BY MR. STAHLMAN:

3        Q  Exhibit K includes all of the land, does it, that

4    is presently being irrigated and that which has been irrigated

5    in the past?

6        A  With possibly one--

7        MR. VEEDER:  I object to the question as leading, and

8    it also involves hearsay, your Honor.  Unless the man identifies

9    the areas concerning which he has knowledge, I have no

10   alternative but to object.

11       THE COURT:  Overruled.  He says all but one area that

12   has not been irrigated while he was there, and Mr. Stahlman

13   reserved a right to bring in a witness on that.

14       What is the exception?

15       THE WITNESS:  The exception of course is the one area

16   that I have not been on when it has been irrigated, and there

17   is one small portion--

18       THE COURT:  The Hutchinson Brown?

19       THE WITNESS: Hutchinson Brown, and there is one small

20   portion that is omitted in this map.  It has only been irrigated

21   once since I have been there, and I was the one who irrigated

22   it.

23       THE COURT:  You say it is not shown on the map?

24       THE WITNESS:  It is not outlined in green on this map.

25       THE COURT:  Is it included in the compilation?

THE WITNESS: It is not included in the compilation.

THE COURT: How many acres?

THE WITNESS: I would guess it to be 15-18 acres.

MR. VEEDER: I object; he can't guess on acreage.

THE COURT: Strike out the guess.

THE WITNESS: I would judge it to be 15 to 18 acres.

THE COURT: In your opinion how many acres are there?

THE WITNESS: 15 to 18 acres, your Honor.

BY MR. STAHLMAN:

Q   Where is that located?

A   That is above the Temecula field.

Q   When was that irrigated?

A   1955, possibly '56.

Q   Not since?

A   Not since, and not before.

Q   Is this list tabulated as to any particular time?
In other words, what I am getting at, did you change crops
in different fields at different times, the character and kind
of crop that is shown?

Pardon me. This isn't the one that shows the crop.
It's another exhibit.

And the total?

A   The total that would be accurate as of this date
would be the total in brackets at the middle and bottom of the
page.

1          THE COURT:  3,649 acres?

2          THE WITNESS:  That is right, your Honor.

3          THE COURT:  Plus 15 or 18 acres?

4          THE WITNESS:  Plus 15 or 18 acres irrigated just once.

5    BY MR. STAHLMAN:

6          Q  Those acreages as shown on there, excluding the

7    Hutchinson Brown for the moment, are they irrigated each and

8    every year, or--

9          A  They are not.  We have not sufficient water to do

10   that.

11         Q  To keep them under irrigation every year you have

12   not sufficient water; is that correct?

13         A  That is correct.

14         Q  Do you have an opinion as to the number of acres

15   that are under irrigation as of this year?

16         A  Our irrigation system has really not started yet,

17   so it would be impossible to say how many will be under

18   irrigation this year.

19         Q  Do you know last year?

20         A  I could find out.  It is a figure that I don't carry

21   in my head.

22         THE COURT:  Are you leaving Vail's Exhibit J now?

23         MR. STAHLMAN:  Yes, I believe so.

24         THE COURT:  After court or before court, either today

25   or next week, the witness will complete the titles of the

1    various fields.

2              THE WITNESS:   I will do that, your Honor.

3    BY MR. STAHLMAN:

4              Q  Will you state, Mr. Wilkinson, whether in your

5    opinion this map accurately depicts the areas which you

6    designated as being under irrigation and which have been under

7    irrigation?

8              MR. VEEDER:  I am going to object to that on the grounds

9    that there is no proper foundation for this testimony in

10   regard to the acreages, on the grounds that it is clearly

11   hearsay.

12             THE COURT:  He has already answered it of his own

13   knowledge, except as to the Hutchinson Brown piece.

14             MR. VEEDER:  I renew my objection.

15             THE COURT:  The objection is overruled.

16             MR. VEEDER:  Has there been an offer made of Exhibit J?

17             MR. STAHLMAN:  We are offering Vail's Exhibit J in

18   evidence now.

19             THE COURT:  In view of the statement about Brown-

20   Hutchinson, you had better call another witness on Brown-

21   Hutchinson.

22             MR. STAHLMAN: Very well, your Honor.

23             THE COURT:  Postpone the offer on Exhibit J.

24             What is your next exhibit?

25             MR. STAHLMAN:  I offer in evidence Vail's Exhibit K,

1    your Honor.

2            MR. VEEDER: I renew my objection, your Honor.

3            MR. SACHSE: Exhibit K is the tabulation?

4            MR. STAHLMAN:  Yes.

5            MR. VEEDER: I renew my objection to Exhibit K, your

6    Honor, on the grounds that there is no proper foundation, that

7    it is based on hearsay-- the witness has no personal knowledge

8    in regard to the acreages that are shown, and also this Brown-

9    Hutchinson field is on there.

10           THE COURT:  Because the Brown-Hutchinson field is on

11   there, I will postpone the ruling on Exhibit K and you may

12   offer it again.

13           Is this Exhibit L?

14           MR. STAHLMAN:  Yes, your Honor, this is Vail's Exhibit

15   L now placed on the easel.

16           Q  Mr. Wikinson, directing your attention to Vail's

17   Exhibit L for Identification, is this the map made from the

18   same basic map as Exhibit J?

19           A  Yes, this is a copy of the same map which we just

20   looked at.

21           Q  And upon this map you have placed some lines, figures

22   and designations, have you?

23           A  Yes, I have.

24           Q  And what would you purport to depict by reason of

25   those lines and designations which you have placed thereon?

9863

1       A  To show the irrigation system, the irrigation wells,

2  the domestic wells, the stock wells.

3       Q  Mr. Wilkinson, will you explain what these various

4  designations refer to generally?

5       A  The various designations are self-explanatory from

6  an examination of the map.  The wells that are used for

7  irrigation are noted.  They are mainly in the main field.

8  They are circled in red, going from the east end of the Pauba

9  Valley toward Temecula.  We go from the New JK--

10      Q  Will you take these slowly so that we might get

11  them.  This one I am designating is the New JK?

12      A  Yes, drilled in the 4th month of '57 to a depth of

13  228 feet.

14      Q  What is the present condition of that well and its

15  use and function?

16      A  The well is in operation now.  In the year 1958 it

17  was yielding around 165 miner's inches.

18      Q  How is it operated in connection with the system

19  to distribute water on the ranch?

20      A  The well is tied into the system which is used

21  throughout the ranch.  It is possible for this water to go

22  a long distance, practically to Temecula.

23      Q  Before we get into the map, would you indicate where

24  the pipe line system is on the map and explain the manner in

25  which it is used in connection with the irrigation system

1    generally?

2          A  Well, there is one basic system of 24-inch line

3    which is utilized in irrigation from the Vail Reservoir.  There

4    is an intake after an open ditch on the right-hand portion

5    of the map in the area designated "Nigger Canyon."

6          Q  Take this pointer, please, and as you indicate where

7    the line is, point it out to us.

8          A  The intake from the open ditch which comes from Vail

9    Dam downstream is picked up at this portion here marked "In-

10   take reservoir."  From that point on it is then a 24-inch

11   pipe line.  That goes down to what we call the "Mesquite

12   Reservoir."  That is a small reservoir utilized in the

13   irrigation of the uppermost portion of the valley.  From that

14   point down it goes through what we refer to as the Upper JK,

15   the Mesquite, down to the JK reservoir, which is the first

16   main holding reservoir of the system.  Before it reaches this

17   JK reservoir it is also joined by water from the New JKWell.

18   From this point down there can be intermingled of the two waters,

19   that from the Lake and from the highestmost pump in the valley.

20   There it goes down and through a series of laterals may be

21   diverted both north and south.

22          THE COURT:  The dotted lines there are laterals?

23          THE WITNESS:  All the lines are designated by dotted

24   lines.  Some are larger than others.  The main dam distribution

25   line is the 24-inch line, and it is paralleled by a 20-inch

1   line, part of the older distribution system.

2   BY MR. STAHLMAN:

3       Q  Will you indicate on the map where those 24 and 20-

4   inch lines are shown?

5       A  The 24 and the 20-inch line are parallel to the road

6   running east in the valley.  They are not far apart.  It is

7   impossible to show them in exact scale.  They are perhaps

8   one-sixteenth of an inch apart on the map.

9       Q  For the record, however, they are the dotted lines

10  which run north and parallel to the highway which runs down

11  through the Pauba Valley; is that correct?

12      A  The lines themselves run each and west.  The laterals

13  run north and south.

14      Q  I say these lines are north of the highway?

15      A  Right.

16      Q  And the lines that run out from there, the dotted

17  lines, are the laterals?

18      A  That is right.

19      Q  What distance apart are the two lines actually on the

20  ground?

21      A  About 20 feet.

22      Q  Continue on down and show us the terminus of these.

23      A  Going west toward Temecula, we find other wells.

24  On the lateral line marked E, we see the Diesel well and the

25  Well 30A.  The Diesel is a pumping well of small capacity,

1    15-horsepower, and in 1958 yielded around 50 miner's inches.

2         Just to the south of the Diesel well is Well 30A.   It

3    is a test well which is used in water level measurements on

4    the ranch.   There is no pump installed and it is not hooked

5    up with the irrigation system in any form.

6         Q   Does that well have any name to it other than 30A?

7         A   That is the only name.

8         Q   Continue then to the west.

9         A   Going west on the next lateral line, which is F,

10   we find the Diesel reservoir, which is a holding reservoir

11   for waters that come down.

12        Going further west we come to the No. 40 Reservoir,

13   which is north of the No. 40 pump which is located in the

14   area we designated as the Upper Camp.

15        Q   These two wells that you have designated, the Diesel

16   and the No. 40 well, do they connect directly to both main

17   lines?

18        A   They are interconnectable with both main lines.   The

19   No. 40 pump has a 30-horsepower electric motor on it and is

20   drilled to a depth of 298 feet, and produces in the neighbor-

21   hood of 130 to 35 miner's inches.

22        Q   Going back to your New JK well that you have stated

23   discharges into the JK Reservoir, does it discharge directly

24   into the reservoir or does it go and connect up with the main

25   pipe line?

9867

1          A   It connects through pipe lines to the reservoir.  It

2   is tied into the distribution system that comes from the dam.

3          THE COURT:  How deep is that Diesel well?

4          THE WITNESS:  The Diesel well is 171 feet, your Honor.

5   BY MR. STAHLMAN:

6          Q  You have explained the No. 40 well.  Continue on

7   to the west from that point.

8          THE COURT:  Tell us, first, about that UC.

9          THE WITNESS:  That is one of the domestic wells.  There

10  are a series of them on the ranch.  I can cover them as I come

11  to them or all at once.

12         THE COURT:  Pass it up, then.

13         MR. VEEDER:  You don't have a State designation on them?

14         THE WITNESS:  Yes, I do.

15         MR. STAHLMAN: Do you have those, too?

16         THE COURT:  They can be put on later.

17         MR. VEEDER:  I say if he has them, it will help.

18         THE WITNESS:  They are part of my exhibit.

19         MR. STAHLMAN:  That other exhibit?

20         THE WITNESS:  Yes.

21         MR. STAHLMAN:  We have another exhibit that ties this

22  right in, your Honor.

23         THE WITNESS:  Yes.

24  BY MR. STAHLMAN:

25         Q  All right, continue on then.  I am mainly concerned

1    now with the irrigation system or any wells that tie into the

2    irrigation system and we will come to the other wells.

3         A Going west, the first thing that we come to is the

4    Tule Reservoir.  That is a catch reservoir not only for waters

5    from the irrigation system but for runoff waters which are

6    again redistributed on the ranch.

7         Just below that is the No. 50 well.  It is equipped

8    with a 25-horsepower motor.  I would have to check on the depth

9    of that.  It yields around 100 miner's inches of water or a

10   little less.

11        Q  In connection with any of these other wells, are

12   there any other names by which you know them on the ranch

13   other than the names designated here on the map?

14        A  No.

15        Q  Continue west from that point, if you will.

16        A  Going west from there, the next irrigation well and

17   reservoir is what we refer to as the Studley Reservoir and

18   artesian well.

19        Q  Will you point that out on here?

20        A  That is north of the highway and just below the

21   headquarters camp.  In other words, when I say just below I

22   mean just west of the Headquarters Camp, north and west of the

23   Headquarters Camp.

24        Q  These wells here you refer to in the green are not

25   tied into the system, of course, are they?

9869

1          A   No, they are not.

2          I omitted the branch lines which are shown just eas

3     of the Headquarters Camp.  It will be noted there is one line

4     going to the north and west and one that goes approximately

5     west, but they branch from the highway and diverge.  This is

6     the split which we utilize in going to different areas of

7     higher ground.

8          Q   Will you point that out now so that there will be

9     no mistake.  You refer to these dotted lines which go past these

10    letters "Headquarters Camp" and then go to the southwest?

11         A   Between the two wells designated as "Cat." and

12    "Catarini."

13         Q   And then the other one comes from the same point

14    of divergence?

15         A   The other is a branch that runs into the Studley

16    Reservoir.

17         Q   Now, take the uppermost branch first and continue.

18         A   The uppermost branch is the one that goes to the

19    Studley Reservoir and there it is again redistributed into

20    other laterals and finds its way back into a line paralleling

21    the highway again.  This time you will note that the line

22    instead of being to the north is to the south of the highway.

23    That line is tied in again in an area designated as the Lower

24    Camp.  It ties into the Navy well and Navy well reservoir,

25    and that in turn is tied into what we refer to as the

9870

1   McSweeney Reservoir.

2           From the McSweeney Reservoir-- or not from the

3   McSweeney Reservoir, but from that tie-in line there is a

4   branch line irrigating the Temecula field.  That is the dotted

5   line that runs approximately toward Temecula following the

6   contour, and in that field are two more reservoirs; one is a

7   catch reservoir and the one furthest to the east is a balancing

8   reservoir.

9           Q   Is this what you refer to as the catch reservoir?

10          A   That is what I refer to as the catch reservoir.

11          Q   And that is the reservoir which is right about an

12   inch above from the designation on Exhibit L of "Lower Camp"?

13          A   That is right.

14          Q   The other reservoir is the one which is about

15   roughly three inches on the map directly to the west?  It

16   looks like the shape of a boot.

17          A   It is within a hundred feet of California Highway

18   71.

19          Q   And what do you call that reservoir?

20          A   That is just a settle reservoir at the end of the

21   field.

22          Q   There is no pipe line to that reservoir?

23          A   No pipe line to that.

24          Q   What is the function of that reservoir?

25          A   The function of that reservoir is to catch runoff

1   water for cattle to water in before it is returned to the

2   basin.

3       Q   Take the line where it diverges here from the two

4   main lines and trace it, if you will, to the west.

5       A   The diversion line goes right by the headquarters

6   camp, veering at a greater angle and then going between the two

7   wells that we call the Cat well and the Cantarini well.   The

8   Cantarini well is equipped with 25-horsepower motors and

9   produces about 130-35 inches of water.   The Cat well is

10  powered by a Caterpillar engine which would probably be

11  rated at 25 to 30 horsepower and produces about 110 miner's

12  inches.

13      From there the water of both wells and also the line

14  which I just mentioned join in the Cantarini Reservoir.

15      Q   The line you say you just mentioned is the one that

16  branched off?

17      A   The one that runs by the headquarters camp.

18      Q   Yes.

19      A   These all join in two systems, actually, in the

20  Cantarini Reservoir.   From there to the south waters are

21  boosted by the three boosters designated on the map as Booster

22  1, Booster 2 and Booster 3, to the additional three reservoirs

23  which are only named as the Booster Reservoirs-- Booster 2

24  Reservoir, Booster 3 Reservoir, and the top the Ludy Reservoir.

25      Taking waters from the Cantarini Reservoir it is

9872

1    possible to go by laterals towards the Temecula-Pala Road,

2    thence under the road into what is referred to as the School

3    House Field.  Again we find another reservoir, which is a

4    holding reservoir for that field, and from that we continue

5    on across Old Highway 395, which has been replaced but still

6    exists, into the Hipilote.

7         Q  Will you expline the function of these various

8    reservoirs in this respect?  What are the uses to which you

9    put the various reservoirs you tie into your system, you hold

10   water over, or you water cattle at the time, et cetera.

11        A  Generally, the larger reservoirs are balancing

12   reservoirs, so to speak, so that water can be gathered from

13   a pump and held until we can get a sufficient amount of water

14   to operate with a large head, or in some instances we find it

15   necessary when water is released from the dam, in order not

16   to irrigate at night, we must hold it in a smaller reservoir

17   and use it the following day.  They are entirely purposes--

18        Q  To balance out your system generally?

19        A  In a balancing fashion.

20        Q  Are they also used for watering cattle?

21        A  Since it is a cattle ranch, practically all of the

22   reservoirs are used for watering cattle at one time or another.

23        Q  Have you given us the depth of all the wells now

24   that you know of?

25        A  I haven't given the depth of the Cat well.  However,

1    that will all appear on another exhibit.

2          Q   All right, we will get into that.

3          Now you have other designations here as irrigation

4    wells up at the August Cantarini.

5          A   That is right.  The August Cantarini property, which

6    is north of Temecula, has its own well and distribution

7    system.

8          Q   The August Cantarini property, do you know when that

9    was acquired?

10         A   No, I don't, but I can find out.  It was fairly

11   recently.

12         Q   It was fairly recently acquired.  It was not part

13   of any of the original grants?

14         A   It was not within the original grants.

15         Q   On the August Cantarini property is there a reservoir

16   also?

17         A   There is a reservoir and a well.  The August

18   Cantarini well is equipped with a 25-horsepower motor and

19   is drilled to, I believe, 822 feet.  This produces around 100

20   miner's inches of water.

21         Q   And what is the purpose, use and function of that

22   well?

23         A   That well is for irrigation purposes in the area

24   which lies below it.

25         Q   Do you have in another exhibit the use and the acreage

1  to which that well supplies water?

2      A  Yes, that appears on another exhibit.

3      Q  How about the other two wells?  Will you conclude

4  by designating the other two wells which are shown here on

5  Murrieta Creek?

6      A  These other two wells are not in use and haven't

7  been used for some time.  The distribution system exists and

8  the reservoirs exist.

9      Q  And you know the wells, where they are?

10      A  I know the wells and where they are.

11      THE COURT:  They are in the Brown-Hutchinson?

12      THE WITNESS:  In the Hutchinson-Brown area.

13  BY MR. STAHLMAN:

14      Q  And those are the wells you previously testified are

15  not equipped with pumps and have not been used for some time?

16      A  That is right.

17      Q  How about these reservoirs that are designated in that

18  same general area, two of them?

19      A  I know them to be in existence because I have seen

20  them.

21      Q  Are they reservoirs that presently have water in them?

22      A  The only water the reservoirs have in them is what

23  the rain puts in them.

24      Q  For instance, about this time of year, do you know

25  what their condition is now?

1    A  Empty-- dry.

2    MR. STAHLMAN:  May I have a recess before we go into the

3  other wells?

4    THE COURT:  All right.

5    (Recess.)

6    MR. VEEDER:  Your Honor, may I inquire now about these

7  water level measurements.  Your Honor has indicated that he

8  was interested in them, and we are interested in making water

9  level measurements, if we can, on the Vail properties, using

10  what data is available now, and I was wondering if we can

11  start on that on Monday, if there would be agreement with Mr.

12  Stahlman and under your Honor's directions-- just for water

13  level measurements.

14    THE COURT:  For water level measurements only.

15    MR. STAHLMAN:  The ones that Mr. Green is making are

16  not sufficient?

17    MR. VEEDER:  That is right.  All I know is what Mr.

18  Kunkel has told me, and I would like to go on and make some

19  water level measurements.

20    THE COURT:  What is the matter with Mr. Green's measure-

21  ments?

22    MR. KUNKEL:  Nothing whatsoever, except that he doesn't

23  measure all of the wells.

24    THE COURT:  Then you want to measure some wells that

25  he doesn't measure; is that right?

9876

1    MR. KUNKEL:  That is correct.

2    THE COURT:  Can you give Mr. Stahlman a list of those

3 wells?

4    MR. KUNKEL:  I am not sure just which ones Mr. Green

5 measures.

6    MR. VEEDER: If we can get on, that is all we want to

7 do.

8    MR. STAHLMAN:  When you say get on, what do you mean

9 by that?  Are you just going to measure some wells, or are

10 you going to measure them with us, or --

11    MR. VEEDER:  We are going to measure a series.

12    THE COURT:  Can't you make arrangements and let Mr.

13 Green and Mr. Kunkel or whoever is going to do it go together?

14    MR. STAHLMAN:  Mr. Wilkinson can measure the wells.  I

15 have no objection to the wells being measured on the ranch.

16 What is the purpose of measuring these wells now?

17    THE COURT:  For water levels.

18    MR. VEEDER:  That's right; just water levels.

19    THE COURT:  I thought you had water levels on all these

20 wells on the vail property.

21    MR. VEEDER:  No, we don't, your Honor.

22    THE COURT:  Is there any objection to measuring the

23 water levels?

24    MR. STAHLMAN:  No, but I think we would like to have

25 Mr. Wilkinson with them.

1          Do you have some thought on this?

2          THE WITNESS:  The only thing I have to say is, not to

3     the interference with anything we are doing.

4          MR. VEEDER:  That is implicit.

5          MR. STAHLMAN:  That is why I think Mr. Wilkinson can

6     go with him, if he wants to make water level measurements.

7          THE COURT:  All right, work it out.

8          THE WITNESS:  I feel that probably you would have some

9     trouble finding some of these wells.

10         MR. VEEDER:  Would Monday afternoon be all right to

11    start?

12         MR. STAHLMAN:  Well, we have a lot to do.

13         MR. VEEDER:  That is why I am inquiring.  We have three

14    days next week when there is no court.

15         THE WITNESS:  Monday afternoon.

16         MR. STAHLMAN:  You might do it Monday afternoon.

17         THE COURT:  Work something out.  If you can't do it

18    Monday, do it Tuesday or Wednesday.

19         MR. STAHLMAN:  We have a lot to do.

20         THE COURT:  Does the State want to have somebody

21    present?

22         MR. GIRARD:  There is one problem.  As we understand

23    it, in order to have any meaning as to ground water levels

24    the wells measured will have to be static.

25         THE COURT:  Well, I take it these are all static wells

1   or Mr. Green wouldn't be measuring them.

2          Isn't that the situation, Mr. Kunkel?

3          MR. STAHLMAN:  No.  No, that is not quite true, your

4   Honor.

5          Well, let him answer it.

6          MR. KUNKEL:  It is the static measurements we are after.

7   The reason we asked for a series of measurements is that if a

8   well has been shut off prior to our measurement, one measure-

9   ment doesn't tell you the static level.  You may be ina

10  period of recovery and one needs a series of measurements

11  to find out if you have recovered to a true static measurement.

12         MR. STAHLMAN:  May I ask Mr. Kunkel some questions here.

13         Go ahead, Mr. Wilkinson.

14         THE COURT:  Mr. Wilkinson.

15         THE WITNESS:  In other words, the wells that are being

16  pumped are meaningless as far as you are concerned right now.

17         MR. KUNKEL:  The pumping measurements, the static

18  level.

19         THE WITNESS:  Do you want thepumping levels, or do you

20  want the static levels?

21         MR. KUNKEL:  I want the static levels in wells.

22         THE WITNESS:  I am afraid you will not find too many

23  wells that aren't operating.

24         MR. STAHLMAN:  You have to shut a well off for a couple

25  of days or more to get a static water level on it.

1    MR. GIRARD:  In your artesian wells, even if one is

2  shut off, as I understand, if there are others surrounding it

3  that will affect the static level of the one you are testing.

4    THE WITNESS:  That is also my understanding.

5    I will be more than glad to go over it.  I think it

6  would be of help.

7    MR. STAHLMAN:  I would like to know where we are going.

8    THE WITNESS:  I think it would be of help for you and I

9  to go over it and then we will see what some of the problems

10  are.

11    THE COURT:  Go to work on it and see if some arrangement

12  can be made to shut the well down, if it has to be shut down,

13  without interference with the operation of the well and see

14  what you can do.  If it can't be done this week it might be

15  done next week or the week after.

16    MR. STAHLMAN:  For instance, if there is some well up

17  there that is being used for irrigation and next week, we

18  will say, we are not going to be irrigating with it and it

19  can be shut off sufficiently so that it reaches a static level,

20  they can take a measurement.

21    THE COURT:  You keep in touch with Mr. Girard or Mr.

22  Illingworth, and if you want to go along you may.

23    MR. GIRARD:  Yes, we would like to go along.

24    THE COURT:  Meet after court and work our your preliminary

25  plans.  Certain of the wells that aren't being pumped you will

1   not have any problem on.  The pumped wells you may have to

2   lay out a program extending two or three weeks to find a time

3   when you can measure them.

4           MR. VEEDER:  That is correct.

5           THE COURT:  All right, let's go ahead.  I don't think

6   you gentlemen ought to bother the Court with things like this.

7   You ought to sit down and work it out.

8   BY MR. STAHLMAN:

9           Q  Mr. Wilkinson, will you now take up the list that you

10  have designated in the green colored area and explain what

11  those areas are, giving us some information as you have in

12  relation to the well as to its function, its production, its

13  purpose.

14          A  The wells circled in green on Vail's Exhibit L are

15  domestic wells, in other words, their use is only for

16  domestic purposes.  They are located, the uppermost one, in

17  the valley is at the Upper Camp.  It is a well with a small

18  one-horsepower motor on it.  It was drilled in 1953 to a depth

19  of 114 feet.  It is just south of Highway 71 before it

20  makes the turn crossing the Temecula River.

21          THE COURT:  Do you have another map that shows the

22  depth of these wells, the motors, et cetera?

23          MR. STAHLMAN:  I have Exhibit M, which has been lodged,

24  if you will refer to that.  It has the horsepower, the date

25  of drilling, the depth, and then it also has the designation

1    which the State has given the well.

2         THE COURT:  All right, go ahead.

3         MR. STAHLMAN:  So we might work with these two exhibits

4    together.

5         THE COURT:  The record will show that the other exhibit

6    contains the information.

7         MR. VEEDER:  Have you offered Exhibit M?  I have no

8    objection to it.

9         MR. STAHLMAN:  I will offer it.

10        Have you any objection to offering Exhibit L at this

11   time?

12        MR. VEEDER:  Well, no, I have no objection to that.

13        THE COURT:  All right, Vail's Exhibits L and M are

14   received in evidence.

15        (Vail's Exhibits L and M were received in evidence.)

16   BY MR. STAHLMAN:

17        Q  I believe I asked you if there was a name desig-

18   nation to that well.

19        A  Upper camp well.

20        Q  UC?

21        A  Noted as UC well on the map.

22        Q  Where does that supply water to and for what purpose?

23        A  To a group of buildings where workers live on the

24   ranch.  They are located in close proximity to the well.

25        Q  It is devoted entirely to domestic use and not for

1    irrigation?

2         A   That is right.

3         The next well that is listed under the domestic

4    category is at the mill.  The reference to the mill is where

5    the cattle feed lots are.  This happens to be the Old Dairy

6    Artesian Well.  At the present time it has a 3-horsepower

7    electric motor on it.  The well was drilled in 1903 to a

8    depth of 548 feet.  This supplies not only the workers living

9    around the mill itself, but also is the water supply for the

10   feed lot operation conducted in that area.

11        THE COURT:  Is it any longer an artesian well?  You say

12   you have an engine on it.

13        THE WITNESS:  It is artesian.

14        THE COURT:  It will flow without an engine?

15        THE WITNESS:  It will flow; not in sufficient

16   quantities to take care of our uses.

17        The next well is south of the road.  This is referred

18   to as the Main Camp Artesian.  It is right next to the Indian

19   Graveyard which is designated on the map there.  This is another

20   old well.  It has no pump on it.  It was drilled in 1903 to

21   a depth of 412 feet.  This well supplies the Headquarters

22   Camp with its domestic water.

23        THE COURT:  That's a great place to drill a domestic

24   well, right by the Indian Graveyard.

25        THE WITNESS:  This well is an old well.  As the fellows

9883

1    at the ranch would say, it has a hen skin casing, so it is

2    very delicate as far as any pressure tests are concerned.

3         THE COURT:  Go ahead.

4         MR. SACHSE:  Those impermeable lenses keep the Indian

5    graves out of that deep water.

6         THE WITNESS:  The next domestic well is what we refer

7    to as the Castle Loma domestic well.  It is located in one

8    of the old No. 28 pit wells or the Cantarini pit wells.  This

9    supplies the foreman's house, which is located on the hill

10   above.

11        The next domestic well we come to is at the Lower Camp.

12   This well, I believe, was drilled in 1947.  I do not know the

13   depth, although I have been told it is a hundred feet.  It

14   supplies the area of the Lower Camp, the buildings and dwellings

15   that are in the area.

16        There is another well in what we call the Hipilote,

17   the Baskus well.  It is a very shallow well-- eight feet.

18   That is located between Highway 71 and Highway 395.

19        THE COURT:  Later on mark it on the map.  It is not

20   marked.

21        MR. STAHLMAN:  We are going to put the State designa-

22   tions on as well, your Honor.

23        THE COURT:  Put the name on there.

24        Go ahead.

25        THE WITNESS:  The next domestic well is the August

1    Cantarini well, which is located south of the well designated

2    "August Cantarini well."  It is circled in green.  It is a

3    source of domestic water for houses in that area.

4         The only other domestic well--

5    BY MR. STAHLMAN:

6         Q  By the way, on that August Cantarini well, how is

7    that pumped?

8         A  Well, it is a small fractional-horsepower pump and

9    the well was drilled in 1925 to a depth of 245 feet.

10        The next domestic well is what we call the Long Valley

11   or Yoder Camp.  That is out Long Valley Road approximately

12   in the middle of the map in the upper portion above the words

13   "Long Valley Camp."  The well itself is circled in green and

14   has a windmill to its left.  I don't know when this well was

15   drilled, but it is approximately 260 feet deep.

16        Q  What does it supply?

17        A  That is the supply for Yoder's Camp, Long Valley,

18   Yoder being a tenant farmer on the ranch.

19        Q  Now then, the other stock wells which are in yellow,

20   can you explain those wells?

21        A  The stock wells are those which are in remote areas,

22   used strictly for the watering of cattle in pasture.

23        THE COURT:  Later on, if you haven't got the designations

24   that you have on Exhibit M, write them in.  Some of them are

25   just called windmill wells on the map.  Write in the names as

1  you have them on Exhibit M.

2       THE WITNESS:  I will do that, your Honor.

3       THE COURT:  The map then speaks for itself on your stock

4  wells?

5       MR. STAHLMAN:  Except I think there is one well there

6  that has had some problems.  The well that we have referred to

7  in our testimony as the Windmill Well is designated here as

8  JK Windmill.  That is the measuring well?

9       THE WITNESS:  That is the measuring well.

10      THE COURT:  Where is it located?

11      THE WITNESS:  The JK Windmill well is located about

12 due north of the New JK Well.

13      THE COURT:  I see it.

14      THE WITNESS:  Which is encircled in red.

15 BY MR. STAHLMAN:

16      Q  And this well that exists at the present time as the

17 JK Well is the one recently drilled?

18      A  That is recently drilled.  You are speaking of the

19 irrigation well, the one circled in red?

20      Q  No, I am talking now about the well from which

21 measurements are taken in relation to the stipulated judgment.

22      THE COURT:  Exhibit M says "Drilled 1904," the measuring

23 well.

24      THE WITNESS:  You are right, your Honor.

25      MR. STAHLMAN:  And that is still used for that purpose

1    at this time?

2         THE WITNESS:  It is still measured.  There are other

3    wells that are--

4         MR. VEEDER:  May I hear that again?  JK Well is still--

5         MR. STAHLMAN: JK Windmill well.

6         MR. VEEDER:  You are still measuring that?

7         THE WITNESS:  Yes.

8         MR. VEEDER:  Thank you.

9         THE COURT:  I will give you my map.  Put the names on

10   mine, too.  Give you something to do.

11   BY MR. STAHLMAN:

12        Q  This well I have made reference to that was drilled

13   two or three years ago that is out in the field up there--

14   that is the New JK-- and that is now equipped for pumping?

15        A  That is right.

16        Q  Do you have a copy of Vail's Exhibit N?

17        A  I do.

18        Q  Directing your attention to Vail's Exhibit N for

19   Identification, you have in recent years kept a record of

20   water distribution and the type and kind of crop and quantity

21   thereof?

22        A  I have.  They are shown on Vail's Exhibit N.

23        Q  Will you explain the various columns and what they

24   purport to show on Vail's Exhibit N?

25        A  The water distribution by the Vail Company.  At the

9887

1 lefthand side by years are found the crops grown, such as

2 alfalfa, potatoes, barley, and the number of acres in such

3 crop, the amount pumped by the Vail Company pumps throughout

4 that year, the lake irrigation in acre-feet to the crops.

5     Q  What do you mean by lake irrigation?

6     A  That is irrigation water drawn from the lake used

7 on the crops.

8     In the next column is the lake water drawn from the lake

9 that has gone directly to the basin as recharge.

10     In the final column is the gross irrigation in acre-

11 feet, the combination of the Vail pumps and lake irrigation.

12     MR. VEEDER:  When you say lake, you mean the big--

13     THE WITNESS:  I mean the big reservoir.

14     THE COURT:  Your column on crops has no particular

15 reference to the particular month following?

16     THE WITNESS:  It has none whatsoever, your Honor.

17     THE COURT:  In other words, the alfalfa was irrigated

18 at various times during the year, the potatoes were irrigated

19 at various times, so that actually there is a break between

20 your acres and your months, is there not?

21     THE WITNESS:  That is right.

22     THE COURT:  And your months breakdown are the twelve

23 months of the year, and irrigation could have been for one

24 month of various crops during those months?

25     THE WITNESS: Yes, that is right, except as shown.  The

1    final column gives you the acre-feet per acre of water duty

2    based on the gross irrigation and the number of acres irrigated.

3    BY MR. STAHLMAN:

4         Q   Now, you have a final page, page 4.  What does that

5    purport to show?

6         A   Page 4 refers back to various years as marked, the

7    first notation being "a."  That refers to the acre-feet per

8    acre figure on page 2.  This is regarding the amount of water

9    which is shown to be quite high that year in explanation for

10   the amount of water duty being quite high that year.

11        This is evident.  If you wish me to read it, I will

12   read it.

13        MR. VEEDER:  I am going to ask some questions on that.

14        MR. STAHLMAN:  Do you want some voir dire?

15        MR. VEEDER:  Yes.

16   BY MR. STAHLMAN:

17        Q   Just continue on down and explain what the other

18   symbols designate.

19        A   The asterisk covers acreages which the Vail records

20   did not produce.  It is just the reversal of the total amount

21   of water to get an estimate of the acres irrigated.

22        MR. SACHSE:  Where is one of those asterisks?

23        THE WITNESS:  You will find them from the year 1953,

24   '52, '51, '50, '49.

25        MR. VEEDER:  Have you covered the exhibit, Mr. Stahlman?

1     MR. STAHLMAN:  I have some other questions.

2     MR. VEEDER:  I was going to ask him some questions

3 whenever you are ready.

4     MR. SACHSE:  I would like to have a copy of that as

5 soon as I can have it.

6     MR. STAHLMAN:  Yes.

7     THE COURT:  What does the "b" mean up at the top under

8 "Lake irrigation acre-feet"?

9     THE WITNESS:  On page 4?

10     THE COURT:  No, on the very first page.  It appears

11 at the top of each page.

12     THE WITNESS:  "b" is in reference to the note at the

13 end.

14     THE COURT:  I see.  It means the records upon which

15 this is based.  Are they available for inspection at the Vail

16 Ranch?

17     THE WITNESS:  They are, your Honor.

18 BY MR. STAHLMAN:

19     Q  Are these also figures that you submitted to the

20 State?

21     A  Yes, these are the result in the years 1954 through

22 '58 of reports that are sent in to the State in regard to

23 Application 11518.

24     Q  In going back as far back as you went on this thing,

25 the earliest year would be 1949; is that correct?

A  That is right.

Q  And beyond that you figure your records are accur-
ate or not?  Or are they kept?  What is the situation there?

A  The records are not complete, I wouldn't say
complete, but not accurate enough really to make a study such
as this or a compilation such as this, and also this is just
considering the period since the Vail dam gates were closed.

Q  That being the period in which you were keeping
records so that you could report upon the use?

A  That is right.

MR. STAHLMAN:  Did you have some questions?

MR. VEEDER:  Yes.


                    VOIR DIRE EXAMINATION

BY MR. VEEDER:

Q  In regard to your (a) there, "This figure is high
due to excessive amounts of water used in irrigating the
spring potatoes in the Upper JK" and the uses there; is that
from your personal knowledge?

A  That is my personal knowledge, talking to the
tenant farmer who raised the crop of potatoes, figuring out
his water bill for that year.

Q  In other words, he told you?

A  He told me, and I knew it to be true because I was
familiar with the amount of water that he had used because of

1       the billing.

2               Q  What is your (b) down there?  "These draft alloca-

3       tions are from a study by Mr. H. M. Hall based on meter and

4       weir records in the distribution system below Vail Dam."

5               THE COURT:  That is the (b) I asked about.

6               MR. VEEDER:  Is that the same (b), though?

7               THE WITNESS:  That is the same (b).

8               MR. VEEDER:  You have a big "B" and a little "b".

9               THE WITNESS:  It should be a little "b".

10              MR. VEEDER:  This should be the reference here?

11              THE WITNESS:  That is right.

12              MR. VEEDER:  Have you made an offer?

13              MR. STAHLMAN:  I will offer it at this time.

14              MR. VEEDER:  I object to it, your Honor.  The evidence

15      here, of course, is extremely important to the United States

16      in regard to the column (b) as to the distribution and alloca-

17      tion of impounded water.  It is apparent to me that the Hall

18      study would be hearsay in that regard, and that it would be

19      an analysis by Mr. Hall, and I believe Mr. Hall alone would

20      be the one who could testify in regard to it.  The very crux

21      of the tabulation, from the standpoint of actually what

22      waters are used, whether they are riparian, whether they are

23      appropriative, whether they were in accordance at one time

24      with the stipulated judgment.

25              MR. STAHLMAN:  This exhibit is not for the purpose of

1    showing those things.

2         THE COURT:  These two columns are lake irrigation and

3    that is the column where the water left the lake and went

4    into the irrigation system.  The second column is lake to

5    basin water which was purportedly used to feed the underground

6    basin, I suppose.

7         THE WITNESS:  Yes.

8         MR. STAHLMAN:  This has to work in connection with

9    Exhibit I, your Honor.

10        THE COURT:  Wait a minute.  These records and alloca-

11   tions made by Mr. Hall, are they based upon some State records

12   that you have at the ranch?

13        THE WITNESS:  I talked to Mr. Hall about this study

14   that he made.  He made it at the ranch from ranch records and

15   described the fashion in which he made it.  To me it is a

16   matter of readings at the outlet of the dam and the intake

17   of the pipe line system.

18        THE COURT:  Are those readings available at the ranch?

19        THE WITNESS:  Those readings are available at the

20   ranch.

21   BY MR. STAHLMAN:

22        Q  In other words, you have records of all the data

23   from which this was compiled?

24        A  I have the records.  How he compiled it I do not

25   know because I didn't have anything to do with it.

9893

Q  Are the records kept in the ordinary course of business by the Vail Company?

A  Yes.

Q  And are the records which you have submitted to the State and the compilation of those records, the information you submitted to the State under the State law?

A  I don't believe these records were submitted to the State.

Q  I mean the compilation.

A  This compilation by Mr. Hall, I would have to look and see.

MR. STAHLMAN:  Very well.

MR. VEEDER:  May I ask a couple more questions, your Honor?


FURTHER VOIR DIRE EXAMINATION

BY MR. VEEDER:

Q  You testified earlier that some of these waters are commingled, isn't that right, they are released from the lake and so as a matter of fact the columns are, to a degree, interpretive, are they not?  In other words, what Mr. Hall did was to make a study and to make an analysis of these releases and then calculate them based upon his knowledge of the opera-tion; isn't that right?

A  I am afraid you don't quite get the picture.

Q   I probably don't and I would like to have you
explain it.

A   These figures are made in an area above which there
can be any mixture of water.  As shown on this map here, you
will note the intake reservoir has a weir.  First of all,
I should say the dam has a meter, the intake reservoir
has a weir, and from there on down there are other meters.
It is not possible to have any other water intermingled
with the water that he has measured.  The highest point is
at the New JK well, which is below the point where any readings
would be taken.

THE COURT:  How are the measurements taken at the weir?
By the height of the water on the weir?

THE WITNESS:  That is right.

THE COURT:  Were those records taken daily, weekly or
how were they taken?

THE WITNESS:  At one time or another they had a Stevens
recorder, but that did not prove satisfactory, and then readings
were taken by Mr. F. E. Green, an employee of the Government
as well as ours.

MR. STAHLMAN:  These are based upon these measurements
that were made by Mr. Green.  Their records are all in there.

THE COURT:  How big are these records on which these
two columns are based?

THE WITNESS:  They are quite voluminous, your Honor.

1    MR. VEEDER:  The Government has a copy of all those.

2  He supplied them, and he supplied us.  If you don't want them

3  in here--

4    THE COURT:  Just two observations.  Your foundation

5  is pretty sloppy.

6    MR. STAHLMAN:  That's right.

7    THE COURT:  On the other hand, if the records could

8  be produced and made available to the Government for spot

9  checking or whatnot, it seems to me that we could save a lot

10 of time.

11   MR. VEEDER:  That is correct.

12   THE COURT:  Obviously, they measured the water that

13 left the reservoir, so there is a measurement on that.  It

14 was a record probably in the regular course of business,

15 which you can prove, if you want to take the time to do it.

16 there is also a meter downstream from the weir.  I suppose

17 there are readings on that meter.  There is also a weir and

18 there were recordings, I take it, of how much water went into

19 the system by the weir.  Then there were releases of water

20 into the basin and other water that went into the irrigation

21 system.  Let's see if we can't work out some way to satisfy

22 ourselves on the reasonable accuracy here and get this in and

23 go on with the case.

24   MR. VEEDER:  Is it too difficult to bring in the records?

25   THE COURT:  How bulky is it?

THE WITNESS:  It is not a matter of the bulk, but the extractions that would have to be made from the bulk.

MR. STAHLMAN:  May I make an observation here, your Honor.  I think this objection goes to the foundation, since Mr. Hall made the compilation.  Is that correct?

MR. VEEDER:  Well, that certainly is part of it.

MR. STAHLMAN:  We will subpoena and get Mr. Hall down, if you want to get that.

MR. VEEDER:  I would be very pleased to have him here.

May I ask another question in regard to the column, your Honor.

Q  Mr. Wilkinson, in regard to the column "Vail pumps acre-feet," and immediately across you have the first number 248, I assume that is for the month of January, and you have 636.

A  That is the acreage of alfalfa. There is no relationship between the two.

THE COURT:  He has already explained that.  You don't read from the column on crops across to the right, because alfalfa was in months other than in January.

BY MR. VEEDER:

Q  So how did you arrive, then, at this total of 248, 1, 0, 168?

A  That is my ranch records.

Q  That is off a meter; is that right?

1          A   Those are metered readings.

2          Q   To a particular field?

3          A   All the pumpage is in that figure.  Any pumps

4     that ran in the month of January are included in that figure.

5          Q   Was it only alfalfa that was in crop then?

6          THE COURT:  You don't understand yet, Mr. Veeder.

7          MR. VEEDER: That's right.

8          THE COURT:  Draw a line, if you will, between the

9     acreage and the months and the first two columns, crops and

10    acreage, have no relationship to the particular things that

11    follow on the same line.  During 1958 there were 626 acres

12    in alfalfa.  During that year there were 240 acres in potatoes.

13    There was a total of 2,492 acres.  But the next things across

14    in the column do not mean that in January there were 240

15    acre-feet of water put on alfalfa.  The total amount of

16    irrigation pumped in January, regardless of what crop it went

17    to.  It is not broken down as to crops.

18    BY MR. VEEDER:

19         Q   And the total down below, then, was the aggregate

20    in acre-feet that was diverted and applied throughout the

21    12-month period?

22         A   That is the total of the pumpage for the 12-month

23    period.

24         THE COURT: For the overall crops which were grown during

25    the 12-months period.

BY MR. VEEDER:

Q   Now, we have over here 3.7 acre-feet per acre; is that right?

A   That is right.

Q   And all you have done is just a mathematical computation to come up with--

A   Simple division.

MR. SACHSE:  May I ask a question, your Honor.  I am still a little lost on this.

May I see your copy for just a second, Mr. Veeder.


VOIR DIRE EXAMINATION

BY MR. SACHSE:

Q   Mr. Wilkinson, on the Vail pumps, the first column, you have meters on all your pumps?

A   Yes, we have meters on all our pumps.

Q   What about the flowing wells?

A   We have meters on the flowing -- the only flowing well we have a meter on is the Navy well, as we refer to it, and that is metered.

Q   All I want to know is, is your natural artesian water metered or is it estimated?

A   The natural artesian water is metered where it is used for irrigation purposes.  The only well that we could use for irrigation purposes is the Studley well, and it is

1  now capped.  So there is no source of water from that.  The

2  Navy well is metered.

3  MR. SACHSE:  That's all.

4  MR. STAHLMAN:  If Mr. Veeder is concerned about this,

5  let him send anyone he has up there and look at the records

6  and come back and see whether it is right or not.

7  THE COURT:  I think it is a good suggestion.  I don't

8  want to subject Mr. Hall to any more embarrassment than I need

9  to.  Between the two of you gentlemen we have a situation

10  where an elderly gentleman, whom I had very high regard for,

11  is in a rather embarrassing position.  And I am not fastening

12  any blame.  He has been apparently fired from the Vail Ranch,

13  and apparently Mr. Veeder had something to do with it.

14  MR. VEEDER:  Your Honor, I do object to that statement.

15  THE COURT:  At any rate, I don't want to, if we can

16  avoid it, embarrass this elderly man any more than is neces-

17  sary.  Therefore, I am going to suggest that you defer your

18  offer on Exhibit N and let Mr. Kunkel or one of the other--

19  MR. VEEDER:  I think Col. Bowen.

20  THE COURT:  --go up and look this over and make some

21  spot checks and satisfy yourselves as to whether they are

22  reasonably accurate.

23  MR. VEEDER:  All right, we will do that.

24  BY MR. STAHLMAN:

25  Q  Now, directing your attention to Vail's Exhibit O

for Identification, did you make a compilation of the water

yield in some of the Vail Company wells used for irrigation?

A  That is right.  This shows the wells presently

used.  The column to the left is our numbered designation,

the second column is the Vail Company designation by name or

number, the third column showing the horsepower on the wells,

the fourth column is the depth to which the wells are drilled,

the fifth column is the State designation, and then from there

on the compilation shows -- the fifth column would show miner's

inches from daily yield and that is based upon production of

continuous run of more than five days, with the least five

days previous operation.

THE COURT:  Is that true for all in that column, or

just for the August Cantarini well?

THE WITNESS:  That is true for all of those in that

column.

THE COURT:  Then your letter (a) should be not right

by the Cantarini well; it should be at the bottom or at the

top, shouldn't it?

MR. STAHLMAN:  You mean this (a) down here?

THE COURT:  Yes.

MR. STAHLMAN:  Yes.

THE WITNESS:  Yes, (a) is an exception to that.  You

will notice just to the right of the 1958 you will see an

asterisk with an arrow beside it on each side of it, and then

you see 1957 and an asterisk.  Those asterisks are what I

referred to.  That means production based on a continuous

run of water of more than five days or at least five days

previous operation.  Then under that it gives an acre-foot

per day figure, and this is just a simple matter of a little

mathematics to come out with the miner's inches per day.

Then as a comparison to that there is the power company

tests, which were run in that year, and that goes through back

to the year 1953, and you will note that as you get toward the

right of the Vail's Exhibit O the numbers become more sparse.

That is because those wells were not in operation and had not

been drilled at that time.  This shows the pumping capacity

or capabilities of these various wells.

BY MR. STAHLMAN:

    Q  This says up here, "Water yield of some of Vail

Company's wells used for irrigation."  Are there other wells

used for irrigation in addition to those which you have

designated hereon?

    A  There could be others used, if there were pumps

installed.

    Q  I see.

    A  These are the wells that we use.

    Q  And were during the years which were designated on

Exhibit O?

    A  That is right.

MR. STAHLMAN:  I offer it in evidence, your Honor.

THE COURT:  Vail's Exhibit O received in evidence,
subject to correction, et cetera.

(Compilation received in evidence as Defendant's
Vail's Exhibit O.)

BY MR. STAHLMAN:

Q  Mr. Wilkinson, did you prepare some graphs of water
levels, as shown in Exhibits P, Q, and R?

A  I did, Mr. Stahlman.

Q  What was the source of the data from which you
obtained the information by which you drew these graphs?

A  Records kept at the ranch.

Q  And who were those measurements made by, if you know?

A  They generally were made by Mr. Green.  As far as
I know, they were Mr. Green's measurements.

Q  And then by taking the Green measurements and
referring to Exhibit P, you prepared a graph which shows the
water levels on Exhibit P or the Windmill Well.  That is the
JK Windmill Well, is it?

A  That is right.  That is the JK Windmill Well, the
well that is measured frequently.  It covers the period
1931 through 1958.

MR. STAHLMAN:  We will offer in evidence Vail's Exhibit
P.  It is illustrative of other information, your Honor.

THE COURT:  Vail's Exhibit P received in evidence.

1   (Graph received in evidence and marked Defendant

2   Vail's Exhibit P.)

3   MR. SACHSE:  May I inquire for a minute, your Honor.

4

5   VOIR DIRE EXAMINATION

6   BY MR. SACHSE:

7   Q   Mr. Wilkinson, a hasty glance at Plate 12 of

8   California's Exhibit L, which has a tabulation of the same

9   well, would appear to indicate that they are very similar.

10  At any rate, these were made from the same records?

11  A   8 South, 2 West, 12H1.

12  Q   That is the same well.  But do you know whether the

13  records were the same?

14  A   I don't know.

15  Q   Then I observe that for the years 1936, '37, '38,

16  39 the State of California shows that this well was flowing.

17  MR. VEEDER:  Mr. Sachse, may I interrupt just for a

18  minute, because they are not-- State's Exhibit N is almost

19  identical with this.  There is another exhibit showing "F"

20  at the top of these, showing that it would have flowed except

21  it was capped.

22  Excuse me for interrupting, but I think there is another

23  exhibit that might be more helpful to the Court.

24  THE COURT:  What is the subexhibit number?

25  MR. ILLINGWORTH:  I am not certain whether it is L12 or

8904

not.

MR. SACHSE:  Well, may I ask it this way, your Honor, on voir dire.

Q  Do you know whether any of the dates indicated on your Exhibit P, the Windmill Well, was flowing?

A  Yes.  From the records it shows that to be the top elevation of the well, the distance right here.

Q  Would you explain how the plate shows where it flowed? In other words, when your graph gets above what crossline would the well be flowing?

A  Well, it is approximately at where 1 would be on the left-hand column.

Q  In other words, when there is any substantial distance over the numeral 2 it would be a flowing well; is that right?

A  That is right.

MR. SACHSE:  That's all.

BY MR. STAHLMAN:

Q  You also made graphs of the water levels in the Diesel pump area; is that correct?

A  That is correct.

THE COURT:  That is Exhibit Q?

MR. STAHLMAN:  Exhibit Q, yes, your Honor.

Q  That is the figures of two wells?

A  Yes, the Diesel pump was utilized up to the year

1   1954, at the end of 1954, and then from the end of '54 on

2   30A was used.   These wells are in close proximity and it was

3   very easy to continue the line as they were in the same

4   portion of the valley.

5       Q  Is this the well that I am indicating now on

6   Vail's Exhibit L?

7       A  That is right.

8       Q  About how far was the new well from the old well?

9       A  From looking at the map I would say it was probably

10  1200 feet toward the river.

11      Q  So then as I understand it, after that well went out

12  of existence you continued the measurements with the other,

13  30A?

14      A  I didn't continue the measurements.   Our records

15  were such that it was 30 and then it changed to 30A.

16      Q  And so your graph carried on from that point?

17      A  They are located on the same lateral line as shown

18  on the map Exhibit L.

19      MR. STAHLMAN:  I offer Vail's Exhibit Q in evidence,

20  your Honor.

21      THE COURT:  Vail's Exhibit Q  received in evidence.

22  I see that Mr. Veeder is not objecting.

23      MR. STAHLMAN:  No.

24      THE COURT:  Mr. Stahlman is proving his case for him.

25

1     MR. VEEDER:  I couldn't ask for more.

2     THE COURT:  I understand, you are very happy.

3     MR. STAHLMAN:  These are factual matters.

4     MR. VEEDER:  It doesn't matter whether you win or lose;

5 it's how you play the game, George.

6     (Graph received in evidence and marked Defendant Vail's

7 Exhibit Q.)

8     THE COURT: Vail's Exhibit R the same way-- the Cantarini

9 Camp well?

10    MR. STAHLMAN:  Yes.

11    THE COURT:  Offer it inevidence?

12    MR. STAHLMAN:  Yes

13    THE COURT:  Received in evidence.

14    (Graph received in evidence and marked Defendant Vail's

15 Exhibit R.)

16    THE COURT:  Well, I am getting tired of you fellows.

17 As far as I am concerned, you can go home.

18    MR. GIRARD:  We would like to try to keep a complete

19 set of these exhibits.  May I have all of Vail's exhibits

20 sometime, Mr. Stahlman?  I don't think we have any of them.

21    MR. STAHLMAN:  You have some of them, I know.

22    MR. GIRARD:  We have none that you have talked about

23 today.

24    THE COURT:  Didn't you make copies for everybody?

25    MR. STAHLMAN:  Unfortunately, I didn't have sufficient

1    When did your Honor want to talk with Mr. Veeder and

2  myself regarding that matter on this Vail acreage?

3    THE COURT:  I had asked you if you made a list and you

4  told me you had talked about the witness in Okinawa and

5  you talked about the title.

6    MR. STAHLMAN:  There was a matter that your Honor said

7  you wanted to talk to Mr. Veeder and myself about.  What was

8  that?

9    THE COURT:  What is the thing you wanted to talk about?

10  You were to make a list and you told me you were working on

11  the witness problem and that you disposed of the title problem,

12  and I never heard any more about the list.  Is there another

13  problem about acreage?

14    MR. VEEDER:  The only problem is the drilling of wells,

15  and we are working on that.  Isn't that right?

16    MR. STAHLMAN:  Yes.  And after we have the matter of

17  the title here, I don't think that will take too long.

18    MR. VEEDER:  I see no problem on title at all.

19    MR. STAHLMAN:  All right.

20    MR. VEEDER:  Even when I can get along with him I can't

21  get along with him.

22    MR. STAHLMAN:  I am talking about the time of the case.

23  I am not talking about getting in evidence.  This man is so

24  sensitive.

25    THE COURT:  You are talking about what?

1    MR. STAHLMAN:  The timing of the case, to have my

2  witnesses here in connection with these matters.

3    MR. VEEDER:  I say cross-examination two hours, maybe

4  six.  But two hours we can figure.

5    THE COURT:  You have the time next week on Thursday

6  and Friday.

7    MR. STAHLMAN:  I will not take up that much time, I

8  don't think, because we will not be ready.  Mr. Veeder wants

9  to read some evidence in relation to the irrigable acreage,

10  and I don't think it is necessary to put that evidence on at

11  this time anyway.  We are going to have some time in here.

12    THE COURT:  You are not going to make me angry if we

13  get some time.  I have plenty of things to do.  Let's see

14  where we are on Thursday and let's move along with what you

15  have.  You think you will wind up then next week.

16    There are a series of exhibits here that aren't in

17  evidence yet.

18    MR. STAHLMAN:  That is true.

19    We have Col. Bowen coming up in connection with the

20  one matter. That is Exhibit M, I believe.

21    THE COURT:  I will see you Thursday morning at 10

22  o'clock then.

23    (Adjournment until Thursday, May 28, 1959, at 10 A.m.)

24

25