Case 3.51-cv-01247-JO-SBC   Document 4589   Filed 09/24/63   PageID.30713   Page 1 of 152

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No.  1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Thursday, May 28, 1959

Pages:  9910 to 10,059

# FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____
                    DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1              IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF CALIFORNIA

3                 SOUTHERN DIVISION

4                    - - -

5       HONORABLE JAMES M. CARTER, JUDGE PRESIDING

6                    - - -

7

8  UNITED STATES OF AMERICA,    )

9              Plaintiff,    )

10       vs.              )      No. 1247-SD-C.

11  FALLBROOK PUBLIC UTILITY  )

12  DISTRICT, et al.,       )

              Defendants.   )

13

14

15          REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17             San Diego, California
               Thursday, May 28, 1959

18

19  APPEARANCES:

20      For the Plaintiff      WILLIAM H. VEEDER, ESQ., and
                         WILLIAM E. BURBY, ESQ.,

21                         Special Assistants to the
                         Attorney General,

22                         Department of Justice,
                         Washington, D. C.

23

24

25

9911

APPEARANCES (Continued):

| | |
|---|---|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney General, by<br>FRED GIRARD, ESQ.,<br>Deputy Attorney General. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al. | FRANZ R. SACHSE, ESQ. |
| For U. S. Navy | LCDR DONALD W. REDD. |

## INDEX TO WITNESSES

| For Defendant Vail: | D | X | RD | RX |
|---|---|---|---|---|
| Louis Roripauth | 9922 | | | |
| James V. Wilkinson | 9952 | 10002 | | |
| Granville B. Vail | 9993 | | | |

## E X H I B I T S

| Defendant Vail's Exhibit | | Iden. | In Evid. |
|---|---|---|---|
| A | | | 9991 |
| J | | | 9951 |
| I | | 9953 | 9953 |
| AC | | | 9968 |
| AD | | | 9968 |
| U | | | 9983 |
| X | | | 9983 |
| V | | | 9986 |
| W, Y | | | 9988 |
| Z | | | 9990 |

| Plaintiff's Exhibit | | | |
|---|---|---|---|
| 160-A | Hydrograph | | 10,045 |
| 160-B | " | | 10,045 |
| 160-C | " | | 10,045 |

SAN DIEGO, CALIFORNIA, THURSDAY, MAY 28, 1959.   10:00 A.M.

THE CLERK:  Two, 1247-SD-C, United States vs. Fallbrook.

MR. VEEDER:  Your Honor, I tender to you through the Clerk a set of proposed findings drafted in regard to the matters, at least some of the matters, referred to in my letter to Mr. Stahlman of May 19, 1959, and concerning which we had discussions at the last session of court.

It is important, I believe, to bring to your Honor's attention now that in regard to the paragraph numbered 3 on page 3 of my letter to Mr. Stahlman, the Vail Company has already pulled the pump on the Schrode windmill well and has installed an automatic continuous water level recorder.

It is to run for a year; is that right?

MR. STAHLMAN:  Just a minute.  Go ahead.  Let's see what we have here.

MR. VEEDER:  I was just trying to inquire.

I think it will run for a year.  It has been installed and Mr. Kunkel and Mr. Wilkinson viewed it, noted the date when it started operation, and we have made a general reconnaissance in accordance with the agreement among the parties to go on the Vail properties and to see what kind of investigation should be made.

I believe that the proposed findings are reflective of what we think the evidence will support, and they would, if

1  adopted, certainly curtail the length of time in regard to the

2  geologic investigation.

3      I note that Mr. Sachse had a reaction.

4      Now I don't know just how your Honor desires to proceed

5  in this matter.

6      THE COURT:  When did you serve these proposed findings?

7      MR. VEEDER:  I haven't served them.  I just handed them

8  out to counsel this morning.

9      THE COURT:  Of course, I didn't ask you to draw findings

10 of what you thought you could eventually prevail on from here.

11 I asked you to prepare findings on matters which I thought would

12 not be in dispute.  I have read the first paragraph, and I

13 didn't do it physically but I mentally threw up my hands.  I

14 wondered whether you heard what I said, whether you knew what

15 I was talking about.

16     MR. VEEDER:  Your Honor, I think the record will support

17 each and every line.

18     THE COURT:  I am not asking what the record will sup-

19 port.  If this is done, it has to be done on some cooperative

20 agreement, not on my making findings over the protests of other

21 parties.  Therefore, the proposed findings I asked for were

22 those minimal findings on which there would be no dispute, not

23 which you thought you could eventually secure on an adjudication.

24 Do you follow me?

25     MR. VEEDER:  I follow you, yes, your Honor.  I think

1    that what we have tendered and what is here is certainly in

2    keeping with the evidence in the record.

3         However, I have one other matter I would like to touch

4    upon before--

5         THE COURT:  The question isn't whether it is in keeping

6    with the record; it is whether it is in keeping with the record

7    and whether it is a proposed finding which you, in the exercise

8    of your reasonable intelligence and good faith, can think that

9    at this stage the other parties would not contest.

10        MR. VEEDER:  Your Honor, if I were to express myself on

11   that I would probably be held in contempt of court.  I am sure

12   there will be no agreement.

13        The point that I make, however, is that I have sent a

14   motion to Mr. Krieger-- I don't believe it has anything to do

15   with the other parties, but I have sent a copy of this motion

16   to Mr. Krieger.  I have not noticed it for hearing by reason

17   of the fact that I don't know what is going to take place next

18   week and I hesitated to notice this matter until we had some

19   plan as to future proceedings, because certainly I wouldn't want

20   Mr. Krieger to come down here just for this matter, and if we

21   could figure out or calendar so that I could notice Mr. Krieger

22   on this matter I would appreciate it.  May I inquire, your

23   Honor, as to--

24        THE COURT:  Judge Weinberger is gone this week.  I have

25   gone over the calendar with the Clerk for next week and I think

1    that Judge Weinberger can handle the criminal calendar next

2    week.   It depends.   If he comes back with a cold or all worn

3    out from this trip, I don't feel like loading it on him.   But

4    if he comes back, having had a week off and some breaks the

5    last couple of weeks and wants to work there is one case for

6    trial and another case that could be tried next week.   That

7    would mean that we would have the whole week available.   That

8    is what I am hopeful of.   But we can't be sure.

9        We could notice the Krieger matter for next Thursday

10   and be sure we will be here.   We will probably be here Tuesday.

11       MR. VEEDER:   All right, your Honor, I will notice it for

12   Thursday, if that is agreeable.

13       THE COURT:   Make it clear that we are not certain yet

14   whether we start Tuesday or Thursday, but you notice the

15   motion for Thursday.

16       MR. VEEDER:   I will notice the motion for Thursday

17   morning at 10 o'clock, your Honor.

18       I am almost afraid to relinquish the floor, but that is

19   all I had to start with, your Honor.

20       MR. STAHLMAN:   Your Honor has expressed himself on the

21   proposed findings.   We were shocked by it, and I am not going

22   to harangue about it because I think it is so obvious what Mr.

23   Veeder is attempting to do here.

24       I went down this morning and asked Mr. Veeder whether

25   he had outlined a proposal for the tests that were to be made.

9917

1  I have taken the matter up with our hydraulic engineer, and he

2  can't outline any proceeding or program for us until we know

3  what these tests are.  We are up in the air about it.  In an

4  endeavor to find out what the facts are, Vail Company did

5  unsolicited put a water stage recorder on the Schrode well and

6  started operating.  Mr. Veeder and his Man Friday were up there

7  and immediately pounced on it and initialed it.  That's all

8  right.  We are not objecting to it.  We didn't have the right

9  kind of paper on it.  Then Col. Bowen came up the following day

10  and had the particular roll of paper that records on this

11  machine so that you have an accurate measurement in regard to

12  time and date, and we took this paper off that Mr. Veeder and

13  Mr. Kunkel put on there and put it on and it is now operating

14  for whatever it will show.

15  However, in all probability, they have some ideas about

16  some tests they want to make in connection with that, how it

17  might be affected by other wells, and we would like to have it

18  and have it in writing, if they want to make it.

19  These findings are reaching a conclusion at this time

20  as to what they propose to show by the tests, when we don't

21  know and is absolutely ridiculous and ludicrous and right in

22  keeping with the line and with the practices that Mr. Veeder

23  has indulged in in this case and has made it difficult and

24  complicated, and it is difficult to cooperate and try to bring

25  out the facts in this case.  We are doing the best we can.

9918

1  I thought when he left here he was going to do what your Honor

2  suggested and was going to give us this proposal, whether

3  they are going to drill these wells or not, which was a great

4  part of the written letter he sent to me.  They seem to have

5  abandoned that idea and we don't know and it is completely

6  up in the air, and it points out the necessity for having some-

7  thing definitely in writing when it comes from Mr. Veeder as

8  to what shall be done, so that we know what we can do.

9       MR. VEEDER:  Your Honor, I may say that in the present

10  posture of the record I believe that on cross-examination of

11  Mr. Wilkinson we can bring forth the need or the lack of need

12  of tests of the character of drilling the shallow well, and

13  these proposed findings are predicated upon cross-examination

14  of Mr. Wilkinson based upon evidence now in the record by both

15  the State of California and by the Vail Company.  I think that

16  by the time we have finished with our cross-examination your

17  Honor will be in a position to determine whether there is a

18  need for a shallow well.

19       Basically and fundamentally, there is a single question,

20  in our view, and that is whether there is a concession by the

21  Vail Company that the deep and shallow wells in the Pauba

22  Valley take water from the same aquifer.  I believe that the

23  cross-examination will show that.  If, at the conclusion of

24  the cross-examination or at any point in the cross-examination,

25  there is doubt that the Navy well, the Dairy well and the

1 shallow wells are all tapping the same aquifer, I will then

2 ask leave to dig the shallow well.  Otherwise, I believe that

3 it will be an unnecessary expenditure.  But until your Honor

4 has had an opportunity to hear the cross-examination, I don't

5 believe that it would be proper for me to ask leave to dig the

6 well, and certainly it would be improper for me to abandon the

7 thought.

8        THE COURT:  Are you through?

9        MR. VEEDER:  Yes, your Honor.

10        THE COURT:  I regret that ancestrally I am Irish, be-

11 cause I get hot and I blow off, and I cool off very fast.  But

12 this is one of those mornings when some of this Celtic blood

13 is uppermost.  Your requests for anything on the Vail Ranch

14 are now denied without prejudice to a renewal on a proper

15 application in writing in detail.  We will just clear the deck

16 right now.

17        MR. VEEDER:  Excellent, your Honor.

18        THE COURT:  If you want to talk about something else

19 there, reduce it to writing and specify what you want, make a

20 showing and we will talk about it.

21        MR. VEEDER:  Excellent.

22        THE COURT:  So the deck is clear now.  Your application

23 is denied without prejudice to a renewal upon proper showing

24        MR. VEEDER:  May I proceed with the cross-examination?

25        THE COURT:  Yes.

1    MR. SACHSE:  What is the status of these proposed find-

2  ings, your Honor?  If this is submitted for serious consider-

3  ation, I want to reply and I want to be heard at some length.

4  The very first statement is untrue, by Mr. Veeder's own exhibit.

5  If you will break out Government's Exhibit 15A you will find

6  that the 1200-foot contour drawn by Mr. Kunkel in Wolf Valley

7  is a mile and a half different than the 1200-foot contour just

8  on the other side of the fault.

9    THE COURT:  Let's wait until I have read the proposed

10  findings.  I have read only the first stage.  The first para-

11  graph, in fact, stopped me.

12    I may eventually find this, but this isn't what I asked

13  you to do.

14    MR. VEEDER:  Your Honor asked me to do this-- and I

15  will repeat what I recall your Honor asked me to do-- you

16  asked me to prepare findings and to tender them to your Honor

17  and have them reviewed by the parties here, to the end that

18  we would see whether tests were required.  As I just stated

19  to your Honor--

20    THE COURT:  Well, then, I didn't make myself clear.

21  Let's stop right now.

22    MR. VEEDER:  All right, let's call Mr. Wilkinson and

23  I would like to cross-examine him.

24    MR. STAHLMAN:  Why do you want to call Mr. Wilkinson?

25  He is not finished on direct by a long shot.

1    MR. VEEDER:  You told me he had.

2    MR. STAHLMAN:  No, I had not.

3    MR. VEEDER:  You asked me how long I was going to take

4  on cross-examination this morning.

5    MR. STAHLMAN:  That is an entirely different situation.

6  I asked how long you would be on cross-examination.

7    THE COURT:  I will try to make myself clear once more.

8  What I had suggested on these proposed findings as solving some

9  of these things requested in your correspondence was this:  Not

10  as to the whole case, not as to the whole alleged basin, but

11  as to segments of this case there were facts which weren't in

12  dispute between the parties and I asked you to try to draw some

13  findings on those particular matters, proposed findings, which

14  probably could be agreed to by all the parties.

15    MR. VEEDER:  Could you give me an example, your Honor?

16    THE COURT: Just a minute.  Everybody is adverse, so we

17  can't stipulate-- at least, we can't stipulate and bind every-

18  body.  But as to these parties, if they were agreed as to

19  certain findings, the chances are that the other parties upon

20  whom these proposed findings might someday be served would

21  probably go along with them, and to the extent that there was

22  agreement between the major parties we would take some of those

23  issues out of the case.  That is what I asked you to do.  Not

24  to draft a finding of what you thought the record shows from

25  your standpoint, but what you thought was supported by the

9922

1   record and would not be contested by the other parties in view

2   of statements that have been made, in view of the testimony

3   of witnesses, in view of our discussion.  That is what I asked.

4   Maybe you have in here, hidden away in your paragraphs, some

5   of that material.  I will look them over at my convenience.

6        MR. VEEDER:  Thank you, your Honor.  I didn't expect a

7   thousand percent on it.  I do expect some of them to be

8   accepted.

9        THE COURT:  Come forward, Mr. Wilkinson.

10       MR. STAHLMAN:  I would like to call a witness out of

11  order, if I may, your Honor.

12       Mr. Louis Roripaugh, manager of the Vail Ranch, has to

13  leave the State for several days, and I would like to call

14  him out of order, if I may.

15       THE COURT:  You may.

16

17                LOUIS RORIPAUGH,

18  called as a witness on behalf of defendant Vail, being first

19  duly sworn, testified as follows:

20       THE CLERK:  State your name, please.

21       THE WITNESS:  Louis Roripaugh.

22

23                DIRECT EXAMINATION

24  BY MR. STAHLMAN:

25       Q   How old are you?

1    A   Fifty-two.

2    Q   What is your present occupation?

3    A   Ranch manager for the Vail Company at Temecula.

4    Q   How long have you been such ranch manager?

5    A   Since 1936.

6    Q   Prior to 1936 were you generally familiar with the

7  area of the Vail Ranch?

8    A   I was working on different jobs on the ranch from

9  1928 until the present time.

10   Q   Did you during that period of time obtain some

11 familiarity with the operation of the ranch as to what it is

12 producing, the irrigation system, and matters of that

13 character generally?

14   A   Yes, I think so.

15   Q   Are you familiar with an area known as the Hutchinson-

16 Brown area?

17   A   Yes.

18   Q   Directing your attention to this map, Vail's Exhibit

19 J, do you recognize this area shown here on the map in which

20 the words "Hutchinson-Brown" are indicated to be the area of

21 the Hutchinson-Brown?

22   A   Yes.

23   Q   Is that all in one contiguous piece or is it

24 separated by any--

25   A   Only by -- originally by a railroad right of way and

1    the river.

2         Q  And that railroad right of way does not exist at

3    this time?

4         A  That is right.

5         Q  Do you of your knowledge know that there has been

6    irrigation waters applied to the lands in the Hutchinson-Brown

7    area?

8         A  Yes.

9         Q  Will you tell us what you observed in that connec-

10   tion?  About when, and what was being done?

11        A  I couldn't say the date exactly, but it was approximately

12   from 1927.  In late 1927 they started irrigating between where

13   the present pipe line is and the railroad right of way, and

14   it was irrigated several years.

15        Q  What type of crop was grown on there?

16        A  I think mostly lima beans and potatoes.  There might

17   have been some other crop, but that was the main rotation.

18        Q  Was there a well on the property at that time?

19        A  Yes, there was.

20        Q  Directing your attention to this map, being Vail's

21   Exhibit L, do you have familiarity with this map?  Have you

22   seen this map before?

23        A  Yes.

24        Q  Which of the wells shown upon this map is the well

25   that was in existence at that time?

9935

A  It would be the well-- this one in here.

Q  You have indicated a well which has been previously marked.  What is the name or designation of that well?

A  Hutchinson-Brown.

Q  You call that the Hutchinson-Brown well?

A  That is right.

THE COURT:  You say this was in 1927?

THE WITNESS:  I believe it was either '27 or early '28.

THE COURT:  Before you went to work for the Vail Company?

THE WITNESS:  No; about the time I went to work for the Vail Company.

BY MR. STAHLMAN:

Q  Then of your knowledge was that irrigation in that area discontinued at some time?

A  Yes.

Q  About when was that?

A  I don't remember.  It was discontinued at the time the Superior Court decision was handed down.  I don't remember the date.

Q  You refer to the first judgment of the Superior Court when the injunctive proceeding was in existence?

A  Yes.

Q  And then do you know when the other well that exists on the Hutchinson property was drilled?

A  1947-8.

1          THE COURT:   What do you mean by the other well?  There

2    seem to be four of them.

3    BY MR. STAHLMAN:

4          Q How many wells on the Hutchinson-Brown?

5          A   Two.

6          THE COURT: What are the two blue things?

7          MR. STAHLMAN:  Those are reservoirs, your Honor.

8          THE WITNESS:  Reservoirs.

9    BY MR. STAHLMAN:

10         Q   Then the other well as shown upon Vail's Exhibit L

11   to the north of the Hutchinson-Brown well, that is the well

12   you referred to, is it?

13         A   Yes.

14         Q   What is the name of that well?

15         A   We call it the Hutchinson-Brown No. 2.

16         MR. STAHLMAN:  May the record show that I have put

17   "Hutchinson-Brown" on the first well, and I will put a number

18   two on the second with an arrow from the Hutchinson-Brown.

19         THE COURT:  All right.

20         MR. VEEDER:  Hutchinson-Brown Well Numbers 1 and 2,

21   then, it is initialed.

22         MR. STAHLMAN:  Yes.  I put a 1 on the first well.

23         THE COURT:  When was No. 2 drilled?

24         THE WITNESS:  1947, your Honor.

25

9927

BY MR. STAHLMAN:

Q  Were you familiar with the drilling of that well at the time?

A  Yes, I was.

Q  Do you know its depth?

A  Approximately 250 feet.  I don't remember the exact depth.

Q  When the well was drilled was it put to any use at that time?

A  Yes, we irrigated for a short time afterward.

Q  Do you know the capacity of that well?

A  A hundred inches-- about a hundred inches.

Q  Were you familiar with its operation and testing in the--

A  Yes.

Q  Were there any conditions demonstrated during the pumping of that well as to its productivity?

A  It produced a hundred inches between 57 and 60 feet drawdown, and to 150 feet drawdown we picked up only 10 or 15 inches, which was unusual.

Q  In other words, with the added and greater drawdown there was a very slight increase in production?

A  That is right.

Q  Is that contrary to the other wells in the area?

A  Yes, very much so.

1       MR. VEEDER:  I object to this line of questioning.

2  He hasn't shown that he is familiar with any other wells or

3  production of any other wells.

4       MR. STAHLMAN:  Very well, I will withdraw that question,

5  your Honor, and the answer may be stricken as far as I am

6  concerned.

7       Q  There was a motor then equipped to this No. 2 well

8  at the time it went into operation, was there?

9       A  Yes.

10       Q  And you say it operated for only a short period of

11  time?

12       A  I think it was in the well maybe two years.

13       Q  Two years?

14       A  Yes.

15       Q  During that period of two years was the area of the

16  Hutchinson-Brown placed under cultivation?

17       A  Yes, part of it.

18       Q  Part of it?

19       A  Yes.

20       Q  Do you know about to what extent?

21       A  Probably about 70 acres.

22       THE COURT:  How many acres in the entire piece of

23  Hutchinson-Brown?

24       THE WITNESS:  About 240 that had been irrigated.

25       THE COURT:  How much in the entire piece shown on the

map as Hutchinson-Brown?

MR. STAHLMAN: Your Honor, I think I may bring that out.

Q  The Hutchinson-Brown, as indicated upon this map as being irrigated, that area contained within the confines of the green line, does that constitute the entire Hutchinson-Brown area?

A  No, sir.

Q  In other words, all of Hutchinson-Brown was not irrigated?

A  That is right.

Q  Just this.

THE COURT:  Going back to 1927, was the area shown in the green line on Vail's Exhibit J the area irrigated in 1927?

THE WITNESS:  Yes, that is when that area was first irrigated.

THE COURT:  And that entire area enclosed within the green line was at one time or other irrigated?

THE WITNESS: That is right.

THE COURT:  In 1947 you say there were about 70 acres irrigated?

THE WITNESS:  That is right.

THE COURT:  What part of that would that be?

THE WITNESS:  The land right adjacent to the new Hutchinson-Brown No. 2 was irrigated.

THE COURT:  That would be the northwest portion of it?

1          THE WITNESS:  Yes, between the river and the boundary

2     there, and a small area around the well was irrigated at that

3     time.

4          THE COURT:  You say between the river and the east

5     boundary line?

6          THE WITNESS:  That is right.  And a small amount on the

7     west side of the river.  But up on the foothills, between the

8     old right of way and present abandoned pipe line we didn't

9     irrigate.

10    BY MR. STAHLMAN:

11         Q  What was the size of the motor on that No. 2 well on

12    Hutchinson-Brown?

13         A  It is an immersible motor, I believe 20-horse.  I

14    wouldn't be certain about it.

15         Q  When you discontinued the irrigation after two years,

16    starting about 1947, what was done with the pump on that well?

17         A  It was installed in the Navy well.

18         Q  In other words, the present pump in the Navy well

19    is the pump that you had on the Hutchinson-Brown?

20         A  That is correct.

21         Q  When you irrigated the Hutchinson-Brown properties

22    in 1947, what was the condition of the pipe line at that time?

23    Did you install a new line, or was the old line in there?

24         A  The old line was in there, but we found that it was

25    not usable.  We had put some pressure to get on the main part

1  of that land, the biggest acreage of it, and every time we put

2  pressure we blew the pipe line.  So we just abandoned that

3  pipe line and put a new one in.

4          THE COURT:  A concrete pipe?

5          THE WITNESS:  Yes, it was concrete.  It had been so

6  many years without water in it.

7  BY MR. STAHLMAN:

8          Q  Now then, Mr. Roripaugh, you are familiar with the

9  stock watering wells generally?

10          THE COURT:  Before we pass Vail's Exhibit J, you or

11  Mr. Wilkinson or somebody had better write the names of those

12  various pieces on there.

13          MR. STAHLMAN:  Yes, I think he started to do it this

14  morning and he didn't get it finished.

15          THE COURT:  All right.

16  BY MR. STAHLMAN:

17          Q  Are you generally familiar with the stock watering

18  wells and their location on the Vail Ranch?

19          A  Yes.

20          Q  And were you present and supervised and were some

21  of these wells drilled under your direction?

22          A  That is right.

23          Q  Referring to a well known as the Long Canyon Well,

24  as shown upon Vail's Exhibit L and designated thereon as "Long

25  Canyon" in pencil, and the Windmill Well, do you know when

1        that well was drilled?

2                A   1938, I believe, either 1938 or early '39.

3                Q   Was that well drilled under your direction?

4                A   That is right.

5                Q   Were you present during the drilling of that well?

6                A   Yes.

7                Q   Do you know whether or not there is a log available

8        for that well?

9                A   Not that I know of.

10               Q   Have you attempted to find the log on the Vail Ranch

11       for that well?

12               A   Yes.

13               Q   Have you been able to do so?

14               A   No.

15               Q   Do you have a recollection as to what occurred during

16       the drilling of that well and as to what was demonstrated in

17       the drilling as the drilling progressed?

18               A   Yes, I do.

19               Q   Will you tell us what occurred when that well was

20       drilled by stating the depth and what was found as you observed?

21               A   That well was drilled by Everett Brockman & Son of

22       Corona, and it is a 7-inch casing, 320 feet deep, and the only

23       water-bearing sand that we hit with any amount at all, and

24       that is not very much, was at 92 and 95 feet, approximately

25       three feet of gravel and water, and the rest is clay all the way--

1   no water-bearing sand that we know of.

2   Q   Now, you drilled that well, then, through this three

3   feet of water-bearing sand or so and continued to a further

4   depth?

5   A   Yes, we felt we didn't have enough water in that three

6   feet of water-bearing gravel.

7   Q   How far then did you drill that well--to what depth?

8   A   A total of 320 feet.

9   Q   What occurred after you reached the 320 feet?

10   A   They broke the casing off and had to quit drilling at

11   that point.

12   Q   What was the water productivity of the well at that

13   point?

14   A   Well, to keep a windmill, pump enough water for

15   livestock, that's about all.

16   Q   What was thereafter done with the well?  Was there

17   anything done with the well in order to rehabilitate it to

18   the point where it would pump sufficient water to water some

19   livestock?

20   A   After we had used it about two or three years the

21   well went dry and went below the setting of the windmill pump,

22   set at around 85 or 90 feet, a little above where the sand

23   and gravel was, and they quit pumping and the boys pulled it

24   out and they came back and said there was no water in the well.

25   So we checked it and the water had gone down.  We left the

1   pump laying on the ground for a year or two, and I went out

2   one afternoon, thinking I would look around if we could drill

3   another well, and I could hear some water seeping down in the

4   casing, a trickle of water going down the well.  I was sur-

5   prised at that, and I went back the next day and the same

6   thing was happening.  So I sent the boys over there with a

7   load of clay and we filled the hole up to a hundred feet.

8   The water came back up.  I think now it is standing at about

9   70 feet from the surface, and we put the pump back in and it

10  has operated ever since the time we filled it back up.

11       Q   That is a windmill pump you put back in?

12       A   A windmill pump.

13       Q   What can you tell us regarding its ability to

14  produce water?

15       A   To just water cattle.  I imagine five gallons a

16  minute would be the outside it is producing, and possibly

17  not that.

18       Q   It is still equipped with 7-inch casing?

19       A   Yes.

20       Q   Have you drilled some other wells in other areas of

21  Long Valley?

22       A   Yes, we drilled one in what we call Long Valley

23  Camp.  It was originally an abandoned well there and a well

24  that was used for domestic.  And we drilled a third well in

25  the last seven or eight years.

1          THE COURT:  Is it marked "Long Valley Camp"?

2          MR. STAHLMAN:  I am not quite sure of the situation

3    myself, your Honor.

4          Q   There is a "Long Valley Camp" marked here.  Is that

5    intended to be--

6          A   Yes, that is the spot.

7          Q   Then there is an indication here on the north of

8    the roadway of a well which is designated on Vail's Exhibit L

9    as yellow color, and then there is also a windmill well

10   designated in green to the south of the roadway.  Are those

11   the two wells you are talking about?

12         A   Those are the two wells.  And there was originally

13   another well east of it, the well designated in green and

14   blue, there was a well out east there about 300 feet.

15         Q   About 300 feet east of the well designated as "D-o-m",

16   meaning domestic.

17         A   The other well was about 300 feet off to the east.

18         Q   Let's start with the well that was about 300 feet

19   to the east of the domestic well.  What is the history of

20   that well as you personally know it?

21         A   It was abandoned when I went there and told it was

22   dry.

23         Q   In other words, it was a well that had existed prior

24   to the time that you went to work for the Vail Company?

25         A   That is right.

1        Q   That would be prior to 1927?

2        A   That is right.

3        Q   Then the domestic well, what is the history of that

4    well as you know it?

5        A   That well furnishes very little water.  It wouldn't

6    furnish water enough to water, say, two or three hundred

7    cattle, would drink it dry every day, and probably less cattle

8    than that.  So we turned that over to our tenant there and he

9    uses that for domestic supply, and we drilled the other well

10   on down the valley.

11       MR. VEEDER:  What does he mean by "the other well"?

12       MR. STAHLMAN:  We will get to that, Mr. Veeder.  Don't

13   get anxious.  You will have this whole thing explained.

14       MR. VEEDER:  I'm glad to help you.

15       MR. STAHLMAN:  I need your help like I need to cut my

16   throat.

17       Q   This well you have indicated that is now used for

18   domestic purposes, what is the extent of the domestic use?

19       THE COURT:  Omit these remarks from the record, and I

20   am about ready to make an order that I am going to charge both

21   counsel an increasingly small amount of money each time any

22   of these wisecracks is made.  I wouldn't be surprised that you

23   will pay more than Mr. Stahlman.  You generally start these

24   matters, Mr. Veeder, and then Mr. Stahlman feels that he has

25   to rejoin.  Let's conduct the trial of the case and act like

1  lawyers.

2          MR. STAHLMAN:  Do you recall the last question, Mr.

3  Roripaugh?

4          THE WITNESS:  No.  Repeat it, please.

5          MR. STAHLMAN:  Read it, please.

6          (The reporter read the pending question.)

7          THE WITNESS:  Well, just a man and his wife live there

8  and they have a very small yard and a few trees around the

9  yard, I don't believe any garden-- they might have a row or

10  two of vegetables or something, but I don't believe so.

11  BY MR. STAHLMAN:

12          Q  And that is the present use to which that well is

13  put?

14          A  Yes.

15          Q  They live there the year around, do they?

16          A  Yes, they do.

17          Q  By the way, as to that domestic well--

18          THE COURT:  Is it marked on the map as a domestic well?

19          MR. STAHLMAN:  Yes, your Honor.

20          THE COURT:  And it is south of the road, is it?

21          MR. STAHLMAN:  Yes, it is south of the road.

22          Q  Was that well in existence at the time you went to

23  the ranch?

24          A  It was, yes.

25          Q  And at that time when you went to work there had it

9938

1    been abandoned for cattle usage at that time?

2        A   No; it was abandoned later.

3        Q   What is your best recollection as to when it was

4    abandoned?

5        A   When we drilled the other well in 1946 or '47,

6    approximately.

7        Q   Was that at the approximate time you drilled the well

8    which is designated as Long Valley shown with the yellow?

9        A   That is correct.

10       THE COURT:   Did you say yellow, or red there?

11       MR. STAHLMAN:   No, this is yellow here, your Honor.

12   Stock wells are yellow on this map.

13       THE COURT:   Call it the Long Valley Well?

14       MR. STAHLMAN:   Yes, your Honor.

15       Q   Do you know how deep that well was and the history

16   of its drilling and productivity?

17       A   The last well?

18       Q   Yes.

19       A   It was even 200 feet deep, I believe, with a 10-inch

20   casing, and could possibly be 12, and the water stands at about

21   180 feet.

22       Q   And what is the productivity of that well?

23       A   Just a windmill.

24       Q   What do you use it for-- watering cattle?

25       A   Just for watering cattle.

Q  To what extent will it supply water for cattle?

A  I suppose it would be as many as four or five hundred cattle in there at times.

Q  By the way, what will these cattle drink?

A  Approximately five gallons a day.

Q  And that well is now in operation, the stock watering well?

A  Yes.

Q  Equipped with a windmill?

A  Yes.

Q  Now, did you drill some other wells in the general area on the Vail Ranch?

A  Yes, there have been other wells drilled.  I think they are marked there.

Q  This well referred to on Vail's Exhibit L as the Adobe Windmill well, are you familiar with that well?

A  Yes.

Q  When was that drilled, if you know?

A  I believe that was about 1943 or '44.

Q  Was that drilled under your direction?

A  Yes.

Q  Can you tell us about that well, its depth and its productivity, et cetera?

A  It is 120 feet deep, and the water stands at about 30 feet from the surface.  I think it probably produces -- of

9940

1   course, we just use it for water, we never tested it-- I don't

2   know how much water it would produce.

3       THE COURT:  How big a casing?

4       THE WITNESS:  I believe that is 8-inch, your Honor.

5   BY MR. STAHLMAN:

6       Q  And you water cattle from that well?

7       A  Yes.

8       Q  To what extent? Can you give us any information as

9   to how productive it is?

10      A  No.  I know it is sufficient for watering cattle,

11  but I think--

12      MR. VEEDER:  He has already answered the question; he

13  says it has never been tested.

14      THE COURT:  Overruled.

15      MR. STAHLMAN:  Sufficient for watering cattle.  Is there

16  anything else you wanted to add?

17      THE COURT:  Did you finish, Mr. Roripaugh?

18      THE WITNESS:  I was going to say my opinion is that that

19  well will probably furnish a little more water than the well

20  below it, but I have no way of--

21  BY MR. STAHLMAN:

22      Q  When you say "the well below"--

23      A  The Long Valley.

24      Q  The one at the Long Valley Camp?

25      A  Yes.

1     THE COURT:  Is this last well, this Adobe Well in

2  Long Valley rather than Long Canyon?

3     THE WITNESS:  It is in Long Valley, yes.

4     THE COURT:  Therefore, it is one of the tributaries of

5  the Santa Gertrudis?

6     THE WITNESS:  Yes.

7     THE COURT:  While the previous wells were in Long

8  Canyon?

9     THE WITNESS:  The one well was in Long Canyon.  That well

10  is Long Canyon.

11     THE COURT:  Then this second well that you described,

12  the Long Valley Camp well, is in Long Valley, too, then?

13     THE WITNESS:  That is right.

14  BY MR. STAHLMAN:

15     Q  You have a well designated as the Hyatt Windmill

16  Well on Vail's Exhibit L.  Are you familiar with that well?

17     A  Yes.

18     Q  What is the history of that?

19     THE COURT:  Point it out again.

20     MR. STAHLMAN:  It is on the roadway, your Honor, near

21  the northern boundary of the Vail Ranch, on this road.

22     THE COURT:  It would be up in Section 24, wouldn't it--

23  below Section 13?

24     MR. STAHLMAN:  Below Section 13, yes.

25     THE WITNESS:  That is a year-around spring and the

well is a dug well, just a curved well, and it is a matter of just draining the water into the well.  It is not over ten foot of curve.  It is a reservoir for the windmill to pump out from that seep there.

BY MR. STAHLMAN:

    Q  It is equipped with a windmill?

    A  It has a windmill, yes.

    Q  How productive is that well?

    A  Well, it is on a windmill pump.

    Q  Used for watering cattle?

    A  Watering cattle; that is right.

    Q  It supplies sufficient water for cattle purposes?

    A  Yes.

    Q  Now, there is another well known as and designated as the Link Pierce Well-- I presume that would be in Section 12-- shown here as the spring, and it is also on a road that is just about where the road leaves the Vail boundary, the northern part of the map.  Are you familiar with that well?

    A  Yes.

    Q  Tell us the history of that well.

    A  That well is 33 feet deep, and on rock, and is a very shallow well and furnishes water for cattle, if there aren't too many cattle.  It doesn't pump much water.

    Q  Do you have difficulty with that well in supplying sufficient water for the cattle?

9943

1    A   We have had, yes.

2    THE COURT:   What is the name of that well?

3    MR. STAHLMAN:   Link Pierce.

4    THE COURT:   You show it as being directly east of

5  Section 13.

6    MR. STAHLMAN:   Yes, Range 1 West-- that would be Section

7  12, I presume, wouldn't it?

8    THE COURT:   It is probably in 18.   It is just south

9  of the boundary of the Vail property; is that right?

10    THE WITNESS:   Yes.

11    MR. VEEDER: Could we have placed on there the numbers

12  that are in the exhibits, in other words, the State numbers

13  on each one of these wells?   We will do it ourselves or have

14  Mr. Stahlman's man do it.

15    THE COURT:   You do it and have it checked to be sure

16  it is satisfactory.

17    MR. STAHLMAN:   Your Honor, we have an exhibit here with

18  all those numbers on it.   It is just a matter of transferring

19  them.

20    THE COURT:   On Exhibit 15-A this Link Pierce well is

21  in the basement complex on this map.   It is shown as a wind-

22  mill on the map.

23  BY MR. STAHLMAN:

24    Q   Was that well, the Link Pierce well, on the property

25  when you came there?

1      A  No.

2      Q  Were you present, did you direct the drilling of

3  that well?

4      A  I did, yes.

5      Q  What did you observe as to the drilling of it?

6      A  Well, about five feet of water from the bottom.  I

7  think we undoubtedly were on solid granite at 40 feet, the

8  depth of it.  It is just a little canyon and a small amount

9  of water going down the bottom.

10      Q  There is another well, the Agua Media designated on

11  this map, also designated as a windmill well, which is just

12  off of the roadway that leaves the southeast corner of

13  Section 13, Range 2 West, being the northern boundary of the

14  Vail Ranch, the road then traverses to the east and passes

15  close to this well designated on Exhibit L as Agua Media.  Are

16  you familiar with that well?

17      A  Yes.

18      Q  Will you tell us about it?

19      A  That was drilled in the last six months, and we just

20  have installed a windmill and a pump and we don't know how much

21  it pumps.  It is approximately 30 feet deep, a very shallow

22  well.

23      Q  What has it demonstrated up to the present?

24      A  The water came up to within eight feet of the sur-

25  face there.

1    Q  And then immediately eastward on the same road on

2  Exhibit L there is another designation of a windmill well

3  called  Glen Oak.  Are you familiar with that well?

4    A  Yes.

5    Q  Will you explain that well?

6    A  That was drilled at the same time as Agua Media in

7  the last few months, and it is a windmill well, a stock well

8  purely.

9    Q  What have you observed about it up to the present

10  time?

11    A  Well, plenty of water for a windmill.  It is drilled

12  in a cienega-- valley, you know.  I think it is about 40 feet

13  deep, as I recollect.  I am not sure.  Maybe 10 feet to water

14  from the surface.

15    Q  Then there is a well up in the extreme upper right-

16  hand corner of the Exhibit L within the boundary of the Vail

17  Ranch close to the north boundary line, there are the words

18  "Marsh and meadow land, windmill well" and the word written

19  in "Tucalota," and it is in the area designated on the map as

20  Tucalota Valley.  Are you familiar with that well?

21    A  Yes.

22    Q  What is the history of that well?

23    A  It was drilled about four years ago and installed

24  not for a year later but it has been pumping there approximately

25  three years.  It is a stock well, plent of water for a windmill,

1  and about 40 feet deep.

2  Q  In this area that has been designated here where

3  these stock windmill wells are located that you have been

4  testifying to, can you tell us the operation in relation to

5  the stock in that area?  In other words, is there all of this

6  stock there, or are they put out at certain times of the year,

7  or can they range from one of these wells to the other?  What

8  is the picture there?

9  A  It is more or less cut up in pastures by the fences,

10  as you can see from that, and we don't have cattle the year

11  around on most of that.  Some years we might, but we don't

12  necessarily have cattle the year around on all of it.  In

13  other years, as I say, we might have cattle in there the year

14  around.

15  Q  What number of cattle do you have in any of those

16  pastures, the greatest number, approximately, at any time?

17  A  We have to see how much rain and how much grass

18  grows.  It is a little hard to say.  There are several pastures

19  there and it is a little hard for me to recollect right off.

20  I would say in what we call Tucalota and Glen Oak we usually

21  probably put 250, 300 cattle in there in the winter and spring.

22  Q  The length of time they are there and the amount of

23  cattle, is that limited by the feed?

24  A  By the rainfall and the season we have largely.

25  Q  Have you drilled other wells on the Vail Ranch since

1    you have been there in which you were unable to obtain water?

2           A   No, I don't think of any well that was completely

3    dry.  We were able to get enough water for livestock in most

4    every instance.

5           Q  But you have had wells go dry?

6           A   We have had wells go dry.  We have some of these

7    wells that are limited in the amount of water.  If you get

8    too many calves and too many hot days sometimes they get a

9    little short of water.

10          Q   You were in your present capacity on the Vail Ranch

11   at the time the Navy drilled the Pauba Well?

12          A   Yes.

13          Q   Directing your attention to Exhibit G, a copy of a

14   letter--

15          MR. VEEDER:  Just a moment.

16          MR. STAHLMAN:  May I ask the question first?

17          MR. VEEDER:  I object--

18          THE COURT:  Let him ask the question and then make

19   your objection.  Isn't that the way lawsuits are handled?

20   Or do you object because you think you are reading the man's

21   mind?

22          MR. VEEDER:  I was going to inquire, and I think it is

23   entirely proper to inquire, whether this is now an exhibit or

24   whether it has been simply marked for identification.

25          MR. STAHLMAN:  Marked for identification.

1        THE COURT:  Marked for identification.

2        MR. VEEDER:  But it is not an exhibit?

3        MR. STAHLMAN:  That's right.

4        THE COURT:  That's right.

5        MR. VEEDER:  That was the point I was raising.

6   BY MR. STAHLMAN:

7        Q   I show you a copy of a letter bearing date of April

8   1, 1952, addressed to Mr. N. B. Smith, a typewitten copy, with

9   the typewriting "Louis L. Roripaugh" on it.  Did you write a

10  letter to that party on that date?

11       A   Well, I don't remember writing a letter exactly,

12  but I see it is a letter.  Undoubtedly I did write it, yes.

13       Q   And it was in connection with the report that you

14  sent to Mr. Smith, Chief Engineer of the Riverside County

15  Flood Control, was it?

16       A   Yes.

17       Q   Directing your attention to Vail's Exhibit F for

18  Identification, which is a copy of a report designated "County

19  of Riverside Official Well Record," and "Ranch Manager,"

20  written there.  Did you file such a report with the Riverside

21  Flood Control?

22       A   I don't remember for sure whether I did or not.

23       Q   Is that your writing?

24       A   I would say so, yes.

25       Q   Do you recall that you did make application for the

9949

1    drilling of the Pauba well?

2         A   The Navy well?

3         Q   Yes.

4         A   I believe I did, and I believe I did it after the

5    major drilling had started.  It seems to me that I overlooked

6    it for some time.  I don't remember just how the circumstances

7    were.

8         Q   Showing you a receipt bearing date of June 5, 1951,

9    "Received from the Vail Company," this being Exhibit E for

10   Identification and signed by Betty Cook, Deputy of the Office

11   of County Clerk, did you receive such a receipt from the

12   Riverside County in connection with that application?

13        A   I probably did, if I filed the application.  I am

14   not positive.  I don't recall the receipt.

15        MR. VEEDER:  I move to strike all the evidence in re-

16   gard to this whole transaction.  The witness does not remember.

17   He says, "If I filed the application, if I signed the letter."

18        THE COURT:  It may go out.

19        Did you distribute copies of these exhibits?  I don't

20   have any copies.

21        MR. STAHLMAN:  I can.  Your Honor will recall that the

22   manner in which these were lodged as exhibits, there was an

23   attack made in regard to the secrecy of the drilling of the

24   well and that the object of it was to demonstrate that it was

25   not done that way at all.  I can't quite understand the

1  objection, so I will refrain from pursuing the question.

2      THE COURT:  I am still asking, did you lodge with me,

3  did I get copies of any of these exhibits?

4      MR. STAHLMAN:  No, they were done in open court here,

5  your Honor.

6      THE COURT:  Did you supply copies?

7      MR. STAHLMAN:  No, your Honor.  Does your Honor desire

8  that I file copies of these?

9      THE COURT:  Yes.  I don't know how important they are.

10 I didn't even have a chance to look at them.

11     MR. STAHLMAN:  The only significance that I attach to

12 these exhibits at all is the fact that there was an attack

13 made by some cross-examination early in the case in which the

14 indications were that there might be some collusion by the

15 Vails and the Navy in drilling the well.  I wanted to show, and

16 I did show, I have shown these other witnesses on cross-exam-

17 ination--

18     MR. VEEDER:  Then I object to the whole line as being

19 incompetent, irrelevant and immaterial and not tending to prove

20 a single issue in this case.  We are trying to get away from

21 that kind of thing, I thought.

22     THE COURT:  There has been nothing offered.

23     MR. STAHLMAN:  Cross-examine.

24     MR. VEEDER:  I have no questions.

25     MR. SACHSE:  No questions.

9951

1    MR. GIRARD:   No questions.

2    THE COURT:   Take a recess.

3    You may step down, Mr. Witness.

4    (Recess.)

5    MR. STAHLMAN:   Mr. Wilkinson.

6

7              JAMES V. WILKINSON,

8    recalled as a witness in behalf of the defendant Vail, having

9    been previously sworn, testified further as follows:

10

11    MR. STAHLMAN:   Your Honor, we will now offer in evidence

12    Vail's Exhibit J.

13    MR. SACHSE:   That is the one with the irrigated areas?

14    MR. STAHLMAN:   Yes, that is the one you recall we had

15    discussion on.  The Hutchinson area has now been testified to

16    by Mr. Roripaugh.

17    THE COURT:   Vail's Exhibit J is received in evidence.

18    But it is understood that I want those names put on those

19    pieces of ground and tie them in with Exhibit K, which is your

20    tabulation, so that we can refer back and forth.

21    MR. STAHLMAN:   Yes, your Honor.

22    (The document referred to was received in evidence as

23    Defendant Vail's Exhibit J.)

24

25

FURTHER DIRECT EXAMINATION

BY MR. STAHLMAN:

Q   In reference to Exhibit K -- Do you have a copy of that with you, Mr. Wilkinson?

A   I do, Mr. Stahlman.

Q   Did you discover a necessity for correction on Exhibit K that has been marked for identification?

A   I did.   The Judge wished the names to be placed on the map, and going through that I discovered that there was an error in Exhibit K.

Q   What was the error on Exhibit K?

A   One field was omitted, what was referred to as the "Schoolhouse Field."

Q   And how many acres is there encompassed within that field?

A   111 acres.

THE COURT:   May it be inserted right beneath "Head-quarters Pasture."

THE WITNESS:   I have made complete additional copies for everyone, your Honor.   Do you wish to do that?

MR. STAHLMAN:   May we substitute a corrected copy for Exhibit K?   Shall we recall the one marked K for Identification heretofore?

MR. VEEDER:   I have no objection.

THE COURT:   All right, substitute a new Exhibit K.

1        (Defendant Vail's new Exhibit K marked for identifica-

2  tion.)

3        MR. STAHLMAN:  Here is a copy for your Honor and for

4  Mr. Veeder.

5        Q  Then of course you have corrected the totals to

6  include that?

7        A  I have corrected the totals.

8        MR. STAHLMAN: We will offer in evidence Vail's Exhibit

9  K as corrected, your Honor.

10        THE COURT:  Vail's Exhibit K received in evidence.

11        (Defendant Vail's Exhibit K was received in evidence.)

12  BY MR. STAHLMAN:

13        Q  Then this exhibit that we were inquiring about at

14  our last session here, you and Col. Bowen were to meet and

15  recheck the figures on it.

16        A  That is Vail's Exhibit I.

17        Q  Vail's Exhibit I.  Do you have a copy of that before

18  you?

19        A  I have a copy of the new Vail's Exhibit I.  It

20  developed after discussion and examination of the ranch records

21  with Col. Bowen--

22        Q  Well, you did meet with Col. Bowen as the Court

23  directed?

24        A  I did.

25        Q  And when was that?

1     A  That was on Tuesday of this week.

2     Q  Did you and Col. Bowen then make reference to the original ranch records that are kept at the ranch for the purpose of determining the results of that exhibit?

5     A  We did.

6     Q  Were there errors noted?

7     A  There were errors noted.

8     Q  Have you made a corrected copy?

9     A  I have made a corrected copy.

10     Q  Do you have that copy there?

11     A  I have copies of that.

12     MR. STAHLMAN:  Your Honor, may we substitute Vail's Exhibit I as corrected for Vail's Exhibit I heretofore lodged as an exhibit for identification?

15     THE COURT:  Yes.

16     (Vail's Exhibit I as corrected was marked for identification.)

18     MR. STAHLMAN:  Here is a copy for your Honor and a copy for counsel.

20     Q  What was the process that you and Col. Bowen engaged in there in order to develop the figures as shown on the Exhibit I that you have just presented here in relation to the draft from the lake and the waters used for irrigation and that which went into the basin?

25     A  The simple process of just arithmetic checking of

1   our ranch records in comparison with the original Exhibit I.

2   It showed small errors in some instances, and in the year

3   1952-53, April through September showed sizeable errors.

4        Q  As I recall, the original record was prepared by

5   Mr. Hall and you have now prepared one from the record your-

6   self and went over the process of the preparation with Col.

7   Bowen?

8        A  I did.

9        Q  And the original records of the ranch that you

10  prepared this exhibit from, were those the Green records?

11       A  Those are records that are kept in the ranch offices.

12  They are records produced by Mr. Green.

13       MR. STAHLMAN:  Your Honor, I will offer in evidence

14  Vail's Exhibit I.

15       MR. VEEDER:  I would like to have an opportunity to

16  review this, your Honor, whether there is objection or not;

17  this is the first time I have seen this revision.

18       MR. STAHLMAN:  Surely.

19       THE COURT:  All right.

20  BY MR. STAHLMAN:

21       Q  Now, on the occasion that Col. Bowen and you met

22  and developed this exhibit, did you also make a visit to the

23  Schrode well?

24       A  Yes, we did.  It was Tuesday afternoon.  We went

25  to the Schrode well and installed a new roll of paper proper

9956

1  for a Stevens recorder.

2      Q  And the paper that you installed was the paper

3  supplied by the manufacturer for the purpose of actual record-

4  ing of that kind and type of machine?

5      A  I assume it is.  It is so labeled.

6      Q  The paper was supplied by Col. Bowen?

7      A  That is right.

8      Q  And when did you install this water stage recorder

9  on the Schrode well?

10      A  The water stage recorder was installed last Sunday--

11  without the calendar I couldn't tell you the date-- at around

12  3, 3:30 in the afternoon.

13      Q  And the time of the installation and the starting

14  of the recording device was indicated upon the paper that you

15  had in the machine at that time?

16      A  It was indicated and was initialed.

17      Q  By the way, you have preserved that paper that was on

18  the machine from the time of its installation up until the

19  time you and Col. Bowen installed the recording paper?

20      A  I preserved the paper.

21      Q  The recorder is now in operation?

22      A  The recorder is now in operation with the new sheet

23  on it, so initialed by myself as well as Col. Bowen.

24      Q  On Monday of this week you were visited by Mr. Veeder

25  and Mr. Kunkel?

9957

1    A   By Mr. Veeder and Mr. Kunkel and Col. Robertson.

2    Q   You took them over the ranch, did you?

3    A   The portions of the ranch that they wished to visit.

4    Q   You also took them to the Schrode well?

5    A   I did.

6    Q   And this recorder was in operation at that time?

7    A   That is right.

8    Q   And they initialed the paper that was in the machine

9    on that occasion?

10   A   They did.  I shouldn't say they did; Mr. Kunkel did.

11   Q   Now, directing your attention to Exhibit N, did you

12   review this Exhibit N since the last time you were in court?

13   A   Exhibit N has been reviewed due to the revision of

14   Exhibit I.  Exhibit I enters into Exhibit N.

15   Q   And Exhibit N was the exhibit we had under discussion

16   last week when the Court suggested that Col. Bowen and you

17   re-evaluate Exhibit N?

18   A   That is right.

19   Q   And you did that, did you?

20   A   Yes, I did.

21   Q   And what was the process by which you made a re-

22   evaluation of Exhibit N?

23   A   Simple substitution of the figures from Exhibit I.

24   Q   In other words, when you re-evaluated Exhibit I it

25   changed the figures as shown in Exhibit N?

9958

1          A  Yes; to no great extent, with the exception of the

2  year I mentioned a moment ago-- I believe it was 1952-53.

3          Q  The reference made to Exhibit N in (b) on page 4,

4  that the draft allocations are from a study by Mr. M. H. Hall,

5  you have now yourself made those studies?

6          A  Yes, I have.

7          Q  Did you correct Exhibit N?

8          A  I corrected Exhibit N.

9          Q  Did you make additional copies of that?

10         A  I made additional copies of that.

11         MR. STAHLMAN:  May we substitute Exhibit N as corrected

12  for Exhibit N heretofore lodged as an exhibit at this time

13  for identification?

14         THE COURT:  It may be substituted.

15         MR. VEEDER:  Exhibit N has been merely marked?

16         THE COURT:  Merely marked before.

17         MR. STAHLMAN:  No, it is not offered as yet.

18         Here is a copy for the Court and a copy for counsel and

19  Mr. Veeder.

20         (Substitute copy of Defendant Vail's Exhibit N was

21  marked for identification.)

22  BY MR. STAHLMAN:

23         Q  Now, Exhibit N, as you have now marked for identi-

24  fication and as you have restudied and revised it, is it in

25  your opinion correct and does it show the different conditions

9959

1   that are demonstrated on the exhibit?

2        A As far as I know, it is correct.

3        Q And were they all taken from the original records

4   of the Vail Ranch?

5        A They were.

6        MR. STAHLMAN:  I will offer in evidence Exhibit N.

7        THE WITNESS:  May I qualify or explain, the factual

8   points in there arefrom records.

9        MR. VEEDER:  I didn't hear that last statement.

10       THE WITNESS:  The factual points are from our records,

11  but the last column, acre-feet per acre, is just an arithmetic

12  development.

13  BY MR. STAHLMAN:

14       Q You did that yourself?

15       A I did that myself.

16       Q And in your opinion it is correct as nearly as you

17  can get it?

18       A As nearly as I can get it, it is correct.

19       MR. STAHLMAN:  I offer it in evidence.

20       MR. VEEDER:  I would like to have an opportunity to

21  review it.  I haven't had an opportunity.

22       THE COURT:  You may.

23       MR. STAHLMAN:  Exhibit M is in evidence.

24       THE COURT:  Exhibit M is in evidence.

25

BY MR. STAHLMAN:

Q   In any of the evaluation of the figures of other exhibits, was there any correction as to Exhibit M?

A   Just this morning I found a discrepancy in Exhibit M.  Under the irrigation wells, the well depicted as "Hutch north of the river" I have listed as 124 feet in depth, which is incorrect.

Q   What is the depth of that well?

A   As far as I can tell, the depth is 246 feet, and that is the well that Mr. Roripaugh mentioned this morning in his testimony.

MR. STAHLMAN:  May that be corrected by interlineation, your Honor, the 124 under the column "Depth"?

THE COURT:  Which well is it again?

THE WITNESS:  "Hutch north of the river."

MR. STAHLMAN:  Referred to here as "Hutch north of the river."

THE COURT:  It shows a depth of 124.  What should it be?

THE WITNESS:  246.

MR. STAHLMAN:  Any objection, Mr. Veeder?

THE WITNESS:  Drilled in 1947.

THE COURT:  It will be corrected.

MR. STAHLMAN:  Then we may put the date in there?

THE COURT:  What date?

BY MR. STAHLMAN:

Q   You say it was drilled in 1947?

A   Drilled in 1947.

Q   Then how about the date on the "Hutch south of the river"?  That date would be incorrect, would it?

A   As far as I know, that date is correct.

THE COURT:  The witness testified that there was irrigation at the well in 1927.  So this checks out.

MR. STAHLMAN:  That's right.  May we then insert the well being drilled as testified here this morning under the column "Drilled date" 1947.

THE COURT:  Hutch north of the river 1947.

MR. STAHLMAN:  And then the asterisk which appears would not apply.  We will scratch that out.

THE COURT:  You are taking out the asterisk on the Hutch north of the river?

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  All right, it may go out.

MR. STAHLMAN:  I have copies of an exhibit lodged last week as the graph, being Exhibit AC for Identification.  I hand a copy to the Court and a copy to counsel.

I also have copies of Vail's Exhibit AD as lodged last week.  I will supply the Court with a copy.

Q   Directing your attention to the Vail's Exhibit AD for Identification, will you explain what it purports to show?

9962

1          A   Exhibit AD is simply a compilation of records which

2    have been kept at the ranch, showing the flows as well as the

3    use to Vails and the flow of Murrieta Creek, Temecula Canyon,

4    Fallbrook, and diversions to Lake O'Neill and flows at Ysidora.

5          Q   Are these records that are turned in as a result of

6    the measurements by Mr. Green?

7          A   They are.

8          Q   And you have merely taken those figures and arranged

9    them according to what system?

10         A   Well, I am just using the water year.

11         Q   Taking the year?

12         A   That is used by the U.S.G.S. and others.

13         Q   Taking the exhibit, for instance, in the column

14   "Nigger Canyon," that would be the measurement of the flow in

15   Nigger Canyon for the years and months as designated upon the

16   Exhibit AD; is that right?

17         A   That is correct.

18         Q   And the Vail use is taken from what information?

19         A   From the ranch records.

20         Q   And what do the figures comprise?  Is that the use

21   for the purpose of irrigation and for domestic use on the

22   ranch?

23         A   It is strictly irrigation uses; it is in acre-feet.

24         Q   Then you have in the other column Murrieta Creek,

25   Temecula, Fallbrook Creek, Lake O'Neill and Ysidora; those

1  are the measurements for the times as indicated upon the Exhibit

2  AD; is that correct?

3      A   That is correct.

4      Q   What relationship do the figures on Exhibit AD bear

5  to the exhibit for identification--

6      MR. VEEDER: Beg your pardon, Mr. Stahlman.  I am looking

7  for Exhibit AD and I don't think I have a copy.

8      MR. STAHLMAN:  I don't think I have given you one.

9  Mr. Wilkinson neglected to bring them this morning.  However,

10  we will get them to you.

11      THE COURT:  Do you want to look at mine?

12      MR. STAHLMAN: Col. Bowen has one.

13      THE COURT:  I will let you look at mine.

14      MR. VEEDER:  Thank you, your Honor.

15      THE COURT:  But give it back to me.

16      MR. VEEDER:  Yes, your Honor.

17      MR. STAHLMAN:  I am looking at Col. Bowen's.

18      Q   What relation do the figures as shown in the Exhibit

19  AD bear to the graph chart Exhibit AC?

20      A   It is just a graphic representation of the items

21  that were covered in Exhibit AD.  They are shown on the graph,

22  with colors indicating the portions and locations, or amounts

23  and locations.

24      Q   Directing your attention to Exhibit AC, the graph

25  now on the board, will you explain what you did in the

1      construction of that graph-- explain the graph.

2          A   Simple addition for the water year.  And depicting--

3      the first item by the yearly group would be Nigger Canyon or

4      Vail Dam.

5          Q   That is shown in red?

6          A   That is shown in red.

7          Q   Using the color red then on your chart along the

8      base where it is designated in years, wherever the red appears

9      that would be volume graphically shown that passed the gaging

10     station in Nigger Canyon for the years indicated?

11         A   That is right.

12         Q   And the yellow figure would be the Temecula figure?

13         A   That is right; the yellow figure is Temecula Creek,

14     and just below that on the graph is the portion represented by

15     Murrieta Creek.

16         Q   In other words, the green referred to as Murrieta

17     Creek on the chart, where that is shown underneath the yellow

18     in each of the columns is the contribution to the stream flow

19     by Murrieta Creek?

20         A   Yes, the two gaging stations being located in close

21     proximity they have that relation; one is part of the other,

22     of course.

23         Q   Then the blue is the Ysidora?

24         A   The blue is the flow at Ysidora, and topping that

25     are diversions made into Lake O'Neill-- that is a lighter blue.

Q  The records from which this graph was compiled are the records of Mr. Green that are filed with the ranch and as to which there is arrangement made for the Navy to obtain copies thereof; is that correct?

A  That is correct.  These records are part of the ranch records.  Of course, the period covered is prior to the acquisition of the Santa Margarita Ranch by the Navy, but since the time of the acquisition they have undoubtedly the records.

Q  The point I make is that the records that you use are those which are made jointly by Mr. Green for Santa Margarita and Camp Pendleton and Vail?

A  That is right.

Q  Then you have a list of figures attached to the exhibit under the heading "average flow for 35-year period in acre-feet", and you have merely compiled the figures in acre-feet for the different gaging stations?

A  That is true.  That is depicted on the graph also on the bottom right-hand corner.

Q  And graphically shown here under the last column that is designated "averages"?

A  That is correct.

MR. STAHLMAN:  Your Honor, we will offer in evidence for the purpose of illustration Exhibits AC and AD.

MR. VEEDER:  I would like to ask a few questions.

1        THE COURT:  All right.

2

3                    VOIR DIRE EXAMINATION

4    BY MR. VEEDER:

5        Q  At the point marked 48 I don't see any indication

6    on the proposed exhibit as to the meaning of that.

7        A   The meaning of that is when the Vail Dam gates were

8    closed.

9        Q  You did not utilize the U.S.G.S. records in the

10   compilation of this?

11       A  I did not.

12       Q  And those are not a matter of record in the court.

13       MR. STAHLMAN:  Just a moment.  What are not a matter

14   of record?

15       MR. SACHSE:  What are not a matter of record?

16       MR. VEEDER:  This was not a question.  It was a

17   pronouncement.  The Green records are not exhibits in the

18   court, and there is a variance between the U.S.G.S. figures

19   and Mr. Green's figures.

20       MR. STAHLMAN:  So what?

21       MR. VEEDER:  So I object to the exhibit because it

22   doesn't have a proper foundation.

23       MR. STAHLMAN:  It is the ranch records.

24       THE COURT:  You have copies of the Green records, so

25   you can verify this.  Do you not?  Your client gets copies of

1    Mr. Green's records, do they not?

2         MR. VEEDER:  Yes, we do.  If this were based on the

3    U.S.G.S. records it would go in automatically.  I will just

4    check it out against Mr. Green's records, and when I have

5    checked it out there will be no objection, I assume.  But I

6    can't see the reason for departing, at this juncture and at

7    this late date, from the U.S.G.S. records.

8         MR. STAHLMAN:  Your Honor, we are privileged to put in

9    such evidence as is reflected by the records of our ranch.

10   That is what we are doing.  If there is a difference there,

11   that can be pointed out.  However, these are the records upon

12   which we operate, the records that are kept at the ranch,

13   and they are records which are jointly kept by Pendleton and

14   the Vail Company.

15        MR. VEEDER:  I just don't think it is a good idea to

16   operate on two separate sets of figures.  Why doesn't he put

17   the Green figures into the record and that will be it.

18        THE COURT:  But you have the Green records where you

19   can verify them.

20        MR. VEEDER:  Yes, and I would like to have them in the

21   record.

22        THE COURT:  Since you have them, and since you can make

23   any check you want, the only purpose of bringing them in and

24   marking them would be to give you an opportunity to verify

25   them.  You admit that you have them.

1    MR. VEEDER:  That is right.  But it is beyond my

2  comprehension to understand why we would have this exhibit in

3  a bar graph-- and there are material differences-- representing

4  a series of studies which are different than the official

5  records.  I will check it out.  But I believe that before we

6  are through Mr. Green will have to be called, and I believe Mr.

7  Green's records will become extremely important.

8    I have made my objection.

9    THE COURT:  Overruled.  They will be received subject

10  to any corrections you want to later call attention to.  Your

11  only objection is on the ground that the Green records aren't

12  marked for identification.  No other party has asked for them.

13  You have them.  There is no sense, then, to do anything about

14  it except to receive it in evidence and give you a right to

15  call attention to any discrepancy or error that you find.

16    MR. STAHLMAN:  Your Honor will recall in connection with

17  this same line of argument--

18    THE COURT:  Do you want me to change my mind?

19    MR. STAHLMAN:  No.

20    THE COURT:  What exhibit is this now?  The bar graph

21  is Exhibit AC?

22    MR. STAHLMAN:  Yes, your Honor, the bar graph is

23  Exhibit AC, and the figures compiled from the Green records

24  and set-up is exhibit AD.

25    THE COURT:  Vail's Exhibit AC and AD received in

1  evidence.

2       MR. VEEDER:  Your Honor, I have an objection certainly

3  to Exhibit AD.  Exhibit AD is the exhibit that you have just

4  received.  The question of Vail's uses becomes extremely

5  important-- how they were used, how they were measured, and

6  to what they relate.

7       THE COURT:  The witness said, as I got it, that the

8  column "Vail's uses" are the waters they use for irrigation.

9  I took it from that, although no one questioned him, that that

10  excluded any waters that they released for the purpose of

11  replenishing the underground basin.

12       THE WITNESS:  That is right, your Honor.

13       THE COURT:  You may examine further, if you want to,

14  and if you want to look it over I will hold up ruling on

15  Exhibit AD.

16       MR. VEEDER:  I would like to have you do that, your

17  Honor, and there may be additional questions in regard to it.

18       THE COURT: All right.  Since we are going to give you

19  some time, and since Mr. Stahlman is going to give you a copy,

20  and since Col. Bowen has a copy, may I have mine back?

21       MR. VEEDER:  Yes, your Honor.

22  BY MR. STAHLMAN:

23       Q Directing your attention to Vail's Exhibit U hereto-

24  fore marked for identification, what is the base map upon

25  which the different colored lines have been drawn, Mr.

1  Wilkinson, if you know?

2      A  The base map is a map prepared by the Title Insur-

3  ance & Guaranty Company of Riverside, California, based on the

4  surveys made, I believe, by Taylor.

5      Q  And you have a copy of the original Taylor maps, have

6  you not?

7      A  I do not.

8      Q  I say, you have seen them?

9      A  I have seen them.

10     Q  Is this base map here a map which you have as a

11  part of the records of the Vail Ranch?

12     A  It is.

13     Q  You have made some colored lines upon this map

14  Exhibit U?

15     A  I have.

16     Q  What is purported to be shown by these colored maps?

17     A  The map, you will note, is dated March, 1922.  The

18  colored portions represent acquisitions after that date.

19     Q  Will you designate them as they appear upon the

20  maps.  By the way, where did you get the information as to the

21  acquisitions, the information that you used in placing the

22  lines upon the map?

23     A  The descriptions of the various parcels, which are a

24  matter of record of Riverside County.

25     Q  You also prepared from those records, did you, an

1      exhibit in this case?

2              THE COURT:  I don't understand.  You say the colored

3      portions.  The outside orange line is generally the Vail

4      Ranch?

5              THE WITNESS:  That is correct, your Honor.  There are

6      islands within the ranch, as depicted in different colors,

7      that have been acquired since 1922, and there are also sections

8      outside the original border of the ranch, or I should say the

9      border as of 1922, which have been added.

10             MR. STAHLMAN:  I think I might clear that up, your Honor.

11             Q  The map that would show the original boundaries of

12     the Vail Ranch, is that in orange-- is that correct?

13             A  As of 1922.

14             Q  For instance, taking this Parcel 10, Lot 23, shown

15     on the Santa Rosa Ranch, you have an orange marking on the

16     exterior and the gray color within it.  The gray color would

17     be the acquisition since that time, would it?

18             A  That would be the acquisition.

19             Q  In other words, there were these islands within the

20     ranch, those that are within the orange boundaries that were

21     not owned by Vail at that time?

22             A  That is correct.

23             Q  You have prepared an exhibit showing the date of

24     the acquisition of those parcels of property?

25             A  I have.  That is Vail's Exhibit X.

1      THE COURT: Do I understand that there was a recorded

2  map, for instance of the Pauba Land & Water Company showing

3  these tracts as listed here?

4      THE WITNESS:  There is, your Honor.  I do not have

5  copies of it.

6      THE COURT:  But it is of record?

7      THE WITNESS:  Official record of San Diego County.

8      THE COURT:  Is there also a recorded map here on a

9  large portion of the Vail Rancho where it says Pauba Rancho,

10  showing recorded lots or areas?

11      THE WITNESS:  There are two maps that cover the general

12  area.  They are both matters of record in SanDiego County.

13  I would be glad to--

14      MR. STAHLMAN:  Is your Honor familiar with the early

15  recordations, that that portion of the copy was first recorded

16  in San Diego County and the conveyances and descriptions of

17  property in some of the areas in the southern part of Riverside

18  County even today refer to the recorded maps and records of

19  San Diego County?

20      THE COURT:  No, I am not familiar with that.  In other

21  words, there was a map of record of this Rancho, showing these

22  various tracts of this character?

23      MR. STAHLMAN:  Yes, your Honor.

24      Q  Do you have the designation as to the book and page

25  number of the original records as filed in San Diego County?

1        A  As far as I know, these are correct:  Book 13, page

2   601 of San Diego County Records.

3        Q  And that shows what map?

4        A   That was filed December 23, 1876, topographical

5   map of Ranchos Temecula and Pauba, by Wheeler.

6        THE COURT:  This was Book 13--

7        THE WITNESS:  Page 601.

8        THE COURT:  You say this was a topographical map?

9        THE WITNESS:  Topographical map.

10       THE COURT:  Did it have lots by numbers on it?

11       THE WITNESS:  No.

12       MR. STAHLMAN:  No.  We have seen the map, your Honor.

13       THE COURT:  That is one of them. What is the next one?

14       THE WITNESS:  The other is Pauba Land & Water Company's

15   subdivided portion, dated March 15, 1888, Book 11, page 507.

16       THE COURT:  And that had the lots shown?

17       THE WITNESS:  I don't believe so, your Honor.

18       MR. STAHLMAN:  I don't think so.  No, your Honor.  I

19   have seen the original.  It does not.  It does not until after

20   some years later when this later map was made.

21       THE COURT:  Isn't there a map of record showing these

22   lots as they are laid out here?

23       THE WITNESS:  The Riverside County Assessor's Office has

24   their Assesor's Map that covers those.

25       THE COURT:  I am not talking about an Assessor's Map.

1    I am talking about a recorded map in the County Recorder's

2    Office.   The Assessor in his practice often draws lots and

3    uses them for the lot numbers for assessment purposes.   But

4    they have no legal significance in conveying property.

5            MR. STAHLMAN:   I cannot answer that.

6            THE COURT:   Where was this base map acquired that

7    Exhibit U was made on?   Compiled by--

8            MR. VEEDER:   Union Title Company, your Honor.

9            MR. STAHLMAN:   Your Honor, we have that.   We will have

10   a surveyor here who has a copy of the original Taylor map,

11   which we think is the map from which this was compiled.

12           THE COURT:   Let me ask Mr. Wilkinson this:

13           Referring to the areas shown as Pauba Land & Water

14   Company, you have drawn an island of what consists of Lot 6

15   and Lot 7 in there?

16           THE WITNESS:   That is right.

17           THE COURT:   And that was conveyed to the Vail Company?

18   Was it transferred as Lots 6 and 7?

19           THE WITNESS:   It was conveyed.

20           THE COURT:   By that number?

21           THE WITNESS:   By that number.   That is in Parcel 2.

22           THE COURT:   That ought to answer it.

23           MR. STAHLMAN:   Yes, your Honor, that should be of record

24   then.

25           THE COURT:   It should be of record.

1          Also in this subdivision by Fox and Ryan shown up on

2    the top of Santa Rosa Mountain, when the Vail Company acquired

3    the lots shown in the islands in that area were they conveyed

4    to the Vail Company by lot number?

5          THE WITNESS:  The description is by lot number, your

6    Honor.

7          THE COURT:  Lots 68, 69, et cetera?

8          THE WITNESS:  As shown in Vail's Exhibit X.

9          MR. STAHLMAN:  I am trying to find Exhibit X, your

10   Honor.

11         MR. VEEDER:  Here is a copy of Exhibit X.

12   BY MR. STAHLMAN:

13         Q  You compiled the information as contained in

14   Exhibit X, did you not?

15         A  Yes.

16         Q  And the parcel as shown in Exhibit X you have

17   indicated upon the map in these colors as the acquisitions?

18         A  That is right.

19         Q  And then in Exhibit X you made a compilation of the

20   various parcels that were acquired by Vail since what date?

21         A  Since this map was made, March of 1922.

22         Q  Also in Exhibit X  you have indicated the date on

23   which the conveyance was recorded, the amount of acres, and

24   a short description of the water status, that is, whether or

25   not it is touching a creek or has a well on it or none at all?

1          Also in this subdivision by Fox and Ryan shown up on

2   the top of Santa Rosa Mountain, when the Vail Company acquired

3   the lots shown in the islands in that area were they conveyed

4   to the Vail Company by lot number?

5          THE WITNESS:  The description is by lot number, your

6   Honor.

7          THE COURT:  Lots 68, 69, et cetera?

8          THE WITNESS:  As shown in Vail's Exhibit X.

9          MR. STAHLMAN:  I am trying to find Exhibit X, your

10  Honor.

11         MR. VEEDER:  Here is a copy of Exhibit X.

12  BY MR. STAHLMAN:

13         Q  You compiled the information as contained in

14  Exhibit X, did you not?

15         A  Yes.

16         Q  And the parcel as shown in Exhibit X you have

17  indicated upon the map in these colors as the acquisitions?

18         A  That is right.

19         Q  And then in Exhibit X you made a compilation of the

20  various parcels that were acquired by Vail since what date?

21         A  Since this map was made, March of 1922.

22         Q  Also in Exhibit X  you have indicated the date on

23  which the conveyance was recorded, the amount of acres, and

24  a short description of the water status, that is, whether or

25  not it is touching a creek or has a well on it or none at all?

1          A   That is right.

2          Q   And the water service; that would be the present

3    use?

4          A   The present use.

5          Q   And the present grazing use, with the number of

6    acres?

7          A   The present use, and then whether there is grazing

8    or farming.

9          Q   Grazing or irrigable.  And then the water duty on

10   these newly-acquired pieces?

11         A   That is right.

12         THE COURT:  Point out on the map Exhibit U where Parcel

13   3 is that you referred to in Exhibit X.

14         THE WITNESS:  Parcel 3 is noted right next to where it

15   says "Little Temecula Rancho."

16         MR. STAHLMAN:  The triangular portion.

17         THE WITNESS:  That triangular portion, yes.

18         THE COURT:  That says 5.

19         THE WITNESS:  Excuse me, your Honor.

20         MR. STAHLMAN:  Here is Parcel 3.

21         THE WITNESS:  Parcel 2 is right by the "P" in Pauba

22   Land & Water Company.  It is a portion of Lot 6, Block 3,

23   Lot 7, Block 3, Pauba Land & Water Company.

24         I think your Honor was referring to Parcel 2.  Or was

25   it 3?

1          THE COURT:  Parcel 3.

2          THE WITNESS:  I am sorry.  Parcel 3 is right above

3    Section 25-- it is in 24, actually, Lots 4 and 5 in the

4    Northwest Quarter of the Southwest Quarter of Section 24,

5    Township 8 South, Range 3 West.

6          THE COURT:  Where do you get this description that

7    you have?  Is this a description out of the deed?

8          THE WITNESS:  That is right.

9          MR. STAHLMAN:  Your Honor, the object of this is--

10   this is merely preliminary-- these lands have a different water

11   status, of course, than the lands within the ranch, and they

12   differ.

13         THE COURT:  I am just curious about these legals,

14   whether these are legals or not.  This Parcel 3 looked to me

15   like that was almost a description from an assessor's map.

16   It is in Section 24.  There is no map involving that part

17   of the section, apparently, and Parcel 3 refers to Lots 4 and

18   5 of the Northwest Quarter.

19         MR. STAHLMAN:  It says, "Official Record of Riverside

20   County."  I am sure those were taken off deeds sent to the

21   office.

22         MR. SACHSE:  I think I can perhaps straighten this out,

23   your Honor.  All of these bastard sections in San Diego County--

24   you will see them frequently, the ones that stub up to the

25   grant line-- where there is not room for a full quarter

1   section-- I know Col. Bowen can confirm this-- the Government

2   surveys call them lots.  You will see it on the U.S. Topo map.

3   They will say "Lot" when it is less than a full quarter

4   section.  You will see the word "Lot" in many cases, even

5   when there is no recorded map.  And I think that is what you

6   will find in this case of Parcel 3.

7       MR. STAHLMAN:  We will have a witness here who has

8   charge of these documents that the Vail Company has and we

9   expect to put him on to show how these descriptions were

10   obtained.

11       THE COURT:  Any objection to Exhibit U?

12       MR. VEEDER:  It is not going to be offered now.

13       MR. STAHLMAN:  I will offer it, if you have no objec-

14   tion.

15       MR. VEEDER: I don't think a proper foundation has been

16   laid yet.  I think Mr. Wilkinson has already indicated that

17   there has not been a proper foundation, and Mr. Stahlman

18   told me he was not going to offer it now, because he was

19   going to call another witness.

20       MR. STAHLMAN:  I was merely going to call an officer

21   of the Vail Company to testify that these are properties owned

22   by the Vail Company, that he has charge of the records, and

23   that this list was compiled from the records of the Vail Company.

24   I had that understanding in the early part of the case that

25   we wouldn't have to bring all of the deeds in.

9979

1          MR. VEEDER:   That's right.

2          THE COURT:   We will take our recess and talk about it

3    after the recess.

4          (Noon recess.)

9980

1    SAN DIEGO, CALIFORNIA, THURSDAY, MAY 28, 1959.   2:00 P.M.

2

3        (Other matters.)

4        THE CLERK:  No. 1247-SD-C, United States vs. Fallbrook.

5    Further court trial.

6

7                  JAMES V. WILKINSON,

8    recalled as a witness in behalf of the defendant Vail, having

9    been previously sworn, testified further as follows:

10

11        MR. STAHLMAN:  Your Honor, I believe a short explanation

12   with relation to Exhibits U and X might be in order.  The

13   only purpose of these two exhibits is, first, the map shows

14   the boundaries of the Vail Ranch and the relationship of

15   properties that Vail have acquired since 1922.

16        THE COURT:  And the sole purpose, then, is to show the

17   newly-acquired property, and the only reason you have a

18   general outline of the ranch is to show  where it lies in

19   relation to the ranch.

20        MR. STAHLMAN:  That is right.  And the purpose of

21   Exhibit X is that I thought it would avoid possibly some

22   lengthy examination of the witness by outlining its description,

23   the acreage, and how the water lies so that it may be determined

24   what the water rights are and what the present use is and what

25   it is suitable for.

9981

THE COURT:  As I understand, Exhibit X would be the testimony of the witness?

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  And any statement as to water services or duty is a matter which could be disputed by other testimony.

MR. STAHLMAN:  That is right.

THE COURT:  And there is nothing binding in so far as this being anything like a finding of any kind.

MR. STAHLMAN:  That is right.

MR. VEEDER:  And it has nothing to do with the Coit Survey.

MR. STAHLMAN:  It has nothing to do with the Coit survey.

If I may carry it one step further, I would presume that Mr. Veeder may cross-examine on it, and then probably they will want to check the land and adduce further evidence.

THE COURT:  All right.

I was interested largely as a matter of curiosity about these legal descriptions, but we can find out about legal descriptions later on.

BY MR. STAHLMAN:

Q  Referring to Exhibit X, Mr. Wilkinson, the matters contained therein, you obtained the description from the records of the Vail office; is that right?

A  That is right.

1    Q   And the matter relative to the recording date.  The

2    other information contained on here relative to present use

3    and whether or not there is any water facility on the property

4    at this time, et cetera, those matters are of your own

5    personal knowledge?

6    A   That is correct.

7    Q   You have a familiarity with the property?

8    A   I do.

9    THE COURT:   Where did you secure the acreages?  Are

10   those included in the deed references in some instances?

11   THE WITNESS:   Those are included in the deed references

12   in some instances, your Honor.  I think they are in practically

13   all instances.

14   THE COURT:   The deed recites a certain amount of

15   property?

16   THE WITNESS: That is right.

17   MR. VEEDER:   Your Honor, I have advised counsel in that

18   regard that as far as we are concerned, as to these columns

19   1, 2 and 3, unless we find some reason to interrogate further,

20   we have no objection.

21   In regard to water status, I simply ask leave to check

22   it out.  We may put in some rebuttal.

23   In regard to water service, that means nothing more

24   nor less than the wells that might be on the property.

25   Present use, irrigable acreage and water duty are

9983

1    matters which counsel and I have agreed to, that if we check

2    it out and find something in error I would rebut it.

3         MR. STAHLMAN:  That's right.

4         MR. VEEDER:  But otherwise we have no objection to

5    Exhibit X.

6         THE COURT:  All right.

7         MR. VEEDER:  And a new day has dawned.

8         THE COURT:  Do you offer Exhibits U and X?

9         MR. STAHLMAN:  We offer in evidence Exhibits U and X,

10   your Honor.

11        THE COURT:  Exhibit U received in evidence and Exhibit

12   X received in evidence.

13        (Defendant Vail's Exhibits U and X were received in

14   evidence.)

15   BY MR. STAHLMAN:

16        Q  Directing your attention to Exhibit V for Identi-

17   fication, which I have placed on the board, Mr. Wilkinson,

18   what generally does that map depict?

19        A  It is a descriptive map showing the parcels trans-

20   ferred from the Vail Company's ownership to the State of

21   California for the new State Highway 395.

22        Q  What is the red line there?  Is that the highway line?

23        A  The red represents the highway line except in the

24   Town of Temecula, which can be shown on another map.  The red

25   represents portions of transfers outside of the Town of

1   Temecula.   The orange boundary depicts the boundary of the

2   Vail Company holdings.

3       Q   In other words, this map represents a portion of the

4   Town of Temecula; is that correct?

5       A   No; the Town of Temecula is within the map.   This

6   is a portion of the Pauba Land & Water Company and other

7   pieces adjoining.

8       THE COURT:   You said within the map.   You mean outside

9   of the map?

10       THE WITNESS:   The Town of Temecula is within the map,

11   but the coloring has not been put in because the scale would

12   be so small that it would be hard.

13       MR. STAHLMAN:   We have another map for that purpose,

14   your Honor.

15       THE COURT:   Down in the bottom corner, is that where

16   it is?

17       THE WITNESS:   No, your Honor.   It is right in the center

18   of the map.   This is the Town of Temecula.

19       THE COURT:   I see.

20   BY MR. STAHLMAN:

21       Q   In other words, these red lines are now the highway

22   now in existence, the property for which was transferred to

23   the State?

24       A   That is right.

25       Q   What is this down here in the lower portion, No. 1--

1    what is that property?

2         A  That property is a parcel referred to in Exhibit X

3    as Parcel 9.  The bottommost portion of that was transferred.

4    BY MR. STAHLMAN:

5         Q  That is the red portion shown on the map?

6         A  The red portion.

7         Q  Transferred to whom?  Vail Company no longer owns

8    it?

9         A Vail Company no longer owns that portion.

10        Q  But they do own this other portion, Parcel 9, and

11   that is the same Parcel 9 shown on the map Exhibit U?

12        A  That is correct.

13        Q  So that I may understand it, this red line here,

14   for instance, State Highway as it traverses through this

15   portion here of Parcel 2, that goes through property acquired

16   since 1922 by Vail, but the other portion goes through

17   property which was part of the Vail Ranch?

18        A  That is right, prior to 1922.

19        MR. STAHLMAN:  We will offer in evidence this map, your

20   Honor.

21        MR. VEEDER:  Just one question, Mr. Stahlman.  Do you

22   have the document that transferred that strip of land?  Is

23   that available?

24        MR. STAHLMAN:  If you want to see it, it is available.

25        MR. VEEDER:  I have no objection to the exhibit, but I

1    would like to see whether it is a fee simple transfer, an

2    easement, or whether it might have some effect on the

3    riparian nature.

4         MR. STAHLMAN:  You may see that this afternoon.

5         THE COURT:  Exhibit V received in evidence.

6         (Defendant Vail's Exhibit V was received in evidence.)

7         THE COURT:  Do you have a copy?

8         MR. STAHLMAN:  Do you have a copy of that map, Mr.

9    Wilkinson?

10        THE COURT:  It is not important.

11        MR. STAHLMAN:  Do you have a copy, Mr. Veeder?

12        MR. VEEDER:  Yes.

13        MR. STAHLMAN:  I think I have given out copies.

14        MR. VEEDER:  Do you want this?

15        THE COURT:  I don't care.  I haven't got a copy, I

16   don't believe.

17        MR. STAHLMAN:  I believe it was lodged.

18        THE COURT:  Maybe it was.  Yes.  I have it.

19   BY MR. STAHLMAN:

20        Q  Directing your attention, Mr. Wilkinson, to Vail's

21   Exhibit W, for Identification, what does this map purport to

22   be?

23        A  This shows the Vail Company's holdings in the town

24   of Temecula as outlined and bordered in light gray.

25        Q  Since what date have those holdings been acquired,

1    do you know?

2        A    Those holdings have been acquired at various dates,

3    as depicted in Vail Company's Exhibit Y.

4        Q    In other words, you have made up an exhibit now

5    lodged as Exhibit Y for Identification in which you have listed

6    these various lots that are shown on this map, the dates on

7    which they have been acquired, and the acreage of the various

8    lots and the description thereof?

9        A    Yes, that is right.  Exhibit Y also covers the

10   previous map in some portions.  It is a compilation of the

11   acreage that has been transferred from the Vail Company.

12       THE COURT:  Just as a matter of curiosity, did the

13   Vail Company or the predecessor of the Vails originally

14   subdivide Temecula?

15       THE WITNESS:  No, they did not.  The Southern Railway,

16   I believe, was the subdivider.

17       THE COURT:  And the Vail Company has been acquiring some

18   of this property in Temecula?

19       THE WITNESS:  It later bought up the portions owned

20   by the railway and others owned by a man by the name of

21   Machado.

22   BY MR. STAHLMAN:

23       Q    As an example, there was a railway right of way

24   that had previously existed and the station grounds, which

25   Vail has acquired, as shown on this map?

1          A   A portion of the station grounds and the right of

2    way.

3          MR. STAHLMAN:  I might also state that this has nothing

4    to do with the survey as far as the ranch is concerned.  It

5    is merely to show the ownership of Vail, the location of the

6    property, and the description.

7          MR. VEEDER:  May I inquire.

8          MR. STAHLMAN:  Surely.

9          MR. VEEDER:  Is water presently used on those lots?

10          THE WITNESS:  Water is not used on any of the lots

11    outlined in gray.  However, the Murrieta Creek does run

12    through portions of those lots.

13          MR. VEEDER:  No objection.

14          MR. STAHLMAN:  I offer Exhibits W and Y in evidence,

15    your Honor.

16          THE COURT:  Vail's Exhibits W and Y received in evidence.

17          (Defendant Vail's Exhibits W and Y were received in

18    evidence.)

19    BY MR. STAHLMAN:

20          Q   Directing your attention to Vail Company's Exhibit

21    Z for Identification, the title of which is "Acreage of the

22    Vail Company lands," did you compile that acreage and totals?

23          A   Yes, I compiled the acreage and totals.

24          Q   Where did you obtain the information as to the acreage

25    which you placed upon Exhibit Z?

1      A  As depicted on Exhibit Z, it is from the Riverside

2  County Assessor, from an examination of copies of their

3  records.

4      MR. STAHLMAN:  I might say, your Honor, this is only

5  one phase of the determination of the acreage.  In other

6  words, this shows what the Assessor has determined to be the

7  acreage.  I appreciate that it is necessary to bring him down

8  if we wanted to show that.

9      MR. VEEDER:  May I ask a question?

10     MR. STAHLMAN:  Surely.

11

12              VOIR DIRE EXAMINATION

13  BY MR. VEEDER:

14      Q  I notice that you have the Santa Rosa Ranch, Pauba

15  Ranch, Little Temecula Ranch, Pauba Land & Water Company, land

16  outside of grants, Inc. Town of Temecula.  Is there not the

17  Temecula grant?

18      A  The Pauba Land & Water Company is the Temecula Grant.

19      Q  In other words, the exterior boundaries of the lands

20  designated Pauba Land & Water Company are identical with the

21  exterior boundaries of the Temecula grant, to your knowledge?

22      A  To my knowledge.  Of course, the Vail Company does

23  not own all of the Temecula grant.

24      Q  I will rephrase it.  To the extent that you own land

25  within the Temecula grant, does the Pauba Land & Water Company

1    embrace that land?

2        A   As far as I know, it embraces the land.   The

3    Assessor refers to that as the Pauba Land & Water Company.

4        MR. VEEDER:   I have no objection.

5        MR. STAHLMAN:   I offer in evidence Vail's Exhibit Z.

6        THE COURT:   Exhibit Z received in evidence.

7        (Defendant Vail's Exhibit Z was received in evidence.)

8    BY MR. STAHLMAN:

9        Q   Directing your attention to Vail's Exhibit A for

10   Identification--

11       THE COURT:   A?

12       MR. STAHLMAN:   Yes, that is a filing with the State

13   Water Rights Board for the Vail Dam.

14       Q   Do you recognize this as being a photostatic copy

15   of the records that the Vail Company has and the photostat

16   of the original filing?

17       A   I recognize it as such.

18       Q   And the permit attached thereto also in connection

19   with the filing as part of the exhibit?

20       A   This permit is a portion of that.

21       Q   Directing your attention to the last document, being

22   a photostat of a letter, the State of California and the State

23   Water Rights Board, dated June 4, 1957, which is an order

24   granting an extension of time within which to complete con-

25   struction and use, that is part of the record which you had

1  at the ranch?

2       A  That is part of the records which are kept by the

3  Vail Company.

4       THE COURT:  I don't have the letter on mine.

5       MR. VEEDER:  Neither have I, your Honor.

6       THE WITNESS:  I am sorry, your Honor, the blueprinter

7  is producing more of those.  I will have them for you tomorrow.

8       THE COURT:  All right.

9       MR. STAHLMAN:  We will offer in evidence Vail's Exhibit

10  A.

11       MR. VEEDER:  No objection.

12       THE COURT:  Exhibit A received in evidence.

13       (Defendant Vail's Exhibit A was received in evidence

14  and so marked.)

15  BY MR. STAHLMAN:

16       Q  Directing your attention to Exhibit AC-- by way of

17  explanation, your Honor-- in connection with this bar graph

18  yesterday there was some explanation you wanted to make in

19  regard to what the determination of the red line was.

20       A  I believe there might be some misunderstanding as

21  to the period after which the Vail Dam gates were closed.  I

22  didn't want anyone to believe that that was the flow out

23  of the dam.  That is the catchment figure.

24       Q  In other words, the bar graph, as it illustrates

25  with the red coloring, from the time of 1948 where the asterisk

1    was placed, from that point on that is the catchment?

2             A   That is right.

3             THE COURT:   What do you mean by "catchment"?   The

4    amount of water that has been received into the dam?

5             THE WITNESS:   That is right, your Honor.

6             THE COURT:   Figured on the basis of the raising or

7    lowering of the level of the dam, less that taken out for

8    irrigation?

9             THE WITNESS:   That is correct.

10            THE COURT:   Adjustments for evaporation, et cetera?

11            THE WITNESS:   That is correct.

12            MR. STAHLMAN:   Your Honor, if I may have a word with my

13   witness, I think I am just about finished.

14            This witness may be called on other phases of this case.

15   However, this concludes the examination on these matters.

16            You may cross-examine.

17            Pardon me.   I just got a signal from my witness.

18            (Mr. Stahlman conferring with Mr. Wilkinson off the

19   record.)

20            MR. STAHLMAN:   I wonder if we could have a short

21   witness here that we could put on.   I think he has already

22   been stopped from going to the races at Indianapolis.   I

23   wonder if we could put him on.

24            THE COURT:   Is he going as a racer or as a spectator?

25            MR. STAHLMAN:   He has a car out there, but I believe

1    he is going as a spectator.

2         THE COURT:  If he is going to race in the contest, he

3    is disqualified, in my opinion, from even being a witness.

4         You may step down, Mr. Wilkinson.  We will call you

5    back when we need you.

6

7                    GRANVILLE B. VAIL,

8    called as a witness on behalf of Defendant Vail, being first

9    duly sworn, testified as follows:

10        THE CLERK:  State your name, please.

11        THE WITNESS:  Granville B. Vail.

12

13                    DIRECT EXAMINATION

14   BY MR. STAHLMAN:

15        Q  You are an officer of the Vail Corporation?

16        A  Yes.

17        Q  How long have you been such?

18        A  Since the 31st of December, 1957.

19        Q  When it was incorporated?

20        A  Yes.

21        Q  What office do you occupy?

22        A  I am Treasurer.

23        Q  Do you have under your possession and control in the

24   Vail Company's office the deeds and records which show the

25   ownership of Vail properties?

9994

A  That is correct.

Q  You have the Mexican grants, for instance, do you?

A  Yes.  Yes, we have the-- well, whatever through the years we would have needed to convince ourselves and the title companies and whoever else would be involved in it that the pieces of property that were acquired were acquired properly.

Q  You graduated in law from Stanford?

A  No; from the East.

Q  But you did go to Stanford?

A  Yes.

Q  As an officer of the corporation you have under your control these records?

A  I am the custodian of the records of the Vail Company.

Q  And the real estate transactions you look into to see they are proper records?

A  Yes.

Q  There was a list of properties compiled that were acquired by the Vail Company, by Mr. Wilkinson, which in this case is Exhibit X.  Are you familiar with the portion of that exhibit as it relates to the information that he obtained from the office relative to the description of the property, the date on which it was acquired?

A  What I did was to start in, as a source of an index,

the books.   Then I went from January 1, 1924, up to the present

for each piece of property that is listed in the various

places in the three land accounts, and then prepared from that

a description of the property going back to the deeds them-

selves.

Q  And you have the deeds in your office?

A  Yes.   Everything that I furnished him I took from

the deeds-- recording data, et cetera.

Q  And all of the properties that are listed upon that

exhibit you know to be owned by the Vail Company, do you?

A  I would like to look at that exhibit, if I might.

I sent it down to him.

Q  Directing your attention to the exhibit before you,

do you recognize those as the properties?

A  Yes.

Q  It is your testimony that Vail Company is the owner

of all that property?

A  I would have to see my schedule.   I would say that

yes, except I cannot remember every legal description.

Q  All of the property that you designate for Mr.

Wilkinson, those were owned by the Vail Company?

A  Certainly, yes.

Q  Did you also do the same thing with the properties

in Temecula Township?

A  Yes.

1    Q  And you have the deed in your office to all of that

2    property?

3    A  Oh, yes.  He referred to them, I believe.  That one

4    was relatively simple.  One was 260 lots, I believe.  One was

5    a purchase in either late 1920 or 30 from Mr. Machado.  The

6    second one was a purchase from Santa Fe.  Those were the

7    roughly 400 lots.

8    Q  Then the ownership as to the Vail Ranch itself, as

9    indicated by the records in your office, that is, of the

10   Santa Rosa, the Pauba, the Temecula, the Little Temecula?

11   A  Those I have gone over, not for any particular

12   reason, but I have from time to time read the abstracts.  In

13   those days I believe it was San Diego County, so they came

14   from the San Diego Abstract Company, those that had been gotten

15   up since about 1902, some such date as that.

16   Q  And you know that the Vail Company is the owner of

17   that land?

18   A  Yes.

19   Q  And you know there is also a parcel of land known

20   as the Government land.  Are you familiar with that?

21   A  Yes.

22   Q  The Vail Company is the owner of that particular

23   parcel?

24   A  Yes.

25   THE COURT:  You have an Exhibit T here on the chain of

1 title.

2      MR. STAHLMAN:  Your Honor, if we have to go into that--

3 I didn't think we would, but we have another witness who

4 assisted in the preparation of that, whom we would bring down

5 if it becomes necessary.

6      MR. VEEDER:  As far as I can see, I see no question

7 about the title.

8      THE COURT:  It is pro forma.  But when you ask the

9 question, does the Vail Company own what is known as the

10 Government Lands, that doesn't mean a thing for the record.

11 Do we have any map which shoes the Government land?

12      MR. STAHLMAN:  We will show it, yes.

13      THE COURT:  You were asked about the Little Temecula.

14      THE WITNESS:  Yes.

15      THE COURT:  Are these shown as such on some of our

16 exhibits?

17      MR. VEEDER:  It is going to be extremely important.

18      THE COURT:  It is only pro forma.  But I think the

19 record should show ownership.

20      MR. STAHLMAN:  We will get it.

21      THE COURT:  There is the Temecula grant, the Pauba

22 grant, and the Little Temecula grant?

23      THE WITNESS:  Yes.

24      THE COURT:  Does the Vail Company own all of the

25 original Pauba grant?

9998

THE WITNESS:  That I would say was before my time, your Honor.  That was when it was purchased in -- you see, it has gone through a number or reorganizations and conveyances.  It was at one time owned by an Arizona corporation. An Arizona corporation granted it to a business trust, and from there it came to the present corporation.

BY MR. STAHLMAN:

Q  Are you familiar with the location of these so-called Government lands on the map of the Vail Ranch?

A  I don't think I could designate them.  I am familiar with the ranch basically, but as to picking out any particular parcel I can't.

THE COURT:  Can it be stipulated which are the Government lands?

MR. VEEDER:  That is going to be an important question from the standpoint of rights to the use of water.  I think we should stipulate as to what will be designated as Government lands in this litigation.

MR. STAHLMAN:  Yes.

MR. VEEDER:  I think we have the data upon which we can enter into such a stipulation.

THE COURT:  And get a description of them, and thereafter just refer to them as the government land.

MR. VEEDER:  Yes.

THE COURT:  Can you work that out?

9999

1      MR. STAHLMAN:  Yes, your Honor, we can work that out.

2  I would like to indicate that they are shown on Exhibit U here.

3  Mr. Wilkinson can designate them.

4      MR. VEEDER:  They are not designated on Exhibit U as

5  Government land, though, are they?

6      MR. STAHLMAN:  No, but Mr. Wilkinson is familiar with

7  them as they appear on the map, and he can go that far, and

8  then we can get into the stipulation.

9      THE COURT:  Are you familiar with Vail's Exhibit U?

10     THE WITNESS:  No, sir.  That was prepared down at the

11 ranch.

12     THE COURT:  Then you don't know whether the Vail

13 Company owns the Santa Rosa Ranch or not?

14     THE WITNESS:  Let's say I know they own the ranch

15 somewhat the same as a land owner comes home and knows he

16 owns the house but he doesn't know the legal description of

17 it.  But he has been there for awhile.

18     MR. STAHLMAN:  That's all.

19     MR. VEEDER:  That's all.

20     THE COURT:  You are excused, sir.  Stay out of those

21 automobiles.

22     THE WITNESS:  By all means, your Honor.

23     MR. STAHLMAN:  I think we can clear up this matter on

24 the Government lands in just a minute with Mr. Wilkinson, if

25 you don't mind, one moment.

MR. VEEDER:  No, George.

I would also, if we could, like to work out a stipulation in regard to the exterior boundaries of the Pauba grant and the Temecula grant.

MR. STAHLMAN:  Why don't we do that in this case.

THE COURT:  Is that all shown on the map?

MR. STAHLMAN:  Yes, your Honor.

MR. VEEDER: Frankly, when I put this thing together in the quiet of my lonely room I haven't been able to determine exactly where some of the lines are.

MR. STAHLMAN:  I have a suggestion.  I am sure that Col. Bowen is familiar with it.  Why don't they and Mr. Wilkinson get together and agree on it?  You are familiar with it, Col. Bowen is familiar with it, and Mr. Wilkinson is familiar with it.  I will ask a couple of questions here now that might lay a further foundation for it.

MR. VEEDER:  Then draw the extremities of the Temecula, the Little Temecula and the Pauba grants.

MR. STAHLMAN:  That's right.

BY MR. STAHLMAN:

Q  Can you do that, Mr. Wilkinson?

A  I can do that on this map.

THE COURT:  You could use a different colored line to show the boundaries here.

THE WITNESS:  I could, your Honor.

10,001

1      MR. STAHLMAN:  And I think if he does it with Col.

2  Bowen then we will have it.

3      Q  Just generally speaking, where does the Government

4  land lie in relation to the map here?

5      A  The Government lands are these irregular portions

6  outside of the Little Temecula Rancho--

7      THE COURT:  Lying south and east of the Little Temecula

8  Rancho?

9      THE WITNESS: That is right, your Honor.

10     THE COURT:  And lying south and east of--

11     THE WITNESS:  Part of the Pauba Rancho in Sections 23,

12  24, and 13.

13  BY MR. STAHLMAN:

14     Q  Roughly what is the acreage, approximately, of the

15  Government lands?

16     A  The Government lands, prior to 1922, I could not give

17  you definitely.

18     MR. VEEDER:  I think we have an exhibit on that, don't

19  we, as to the acreage of the Government lands?

20     MR. STAHLMAN:  It is included in that exhibit as to

21  acreage, but not as to the date acquired.

22     Q  This Government land was acquired at different times,

23  was it, Mr. Wilkinson?

24     A  The Government lands outlined in orange on this map

25  were acquired prior to March, 1922.  Those are the irregular

portions I just mentioned.  There have been additional lands

acquired since that time.

THE COURT:  Parcel 5, Parcel 6 and Parcel--

THE WITNESS:  Another Parcel 6, Parcels 1, 3, and they

lie outside the grants.

BY MR. STAHLMAN:

Q  Do you know the acreage as differentiated between

that which was Government land prior and that which was

acquired afterward?

A  No, I cannot break down the two.

Q  You and Col. Bowen can do that?

A  I don't see why not.

MR. STAHLMAN:  Is that a satisfactory arrangement,

Mr. Veeder?

MR. VEEDER:  Fine.

MR. STAHLMAN:  You may cross-examine.


CROSS-EXAMINATION

BY MR. VEEDER:

Q  When did you state that you became the assistant

manager of the Vail Company?

A  I don't believe I stated when I became assistant

manager.

Q  Well, let's get that straight, then.  When did

you become the assistant manager?

10,003

1        A   It was a position that I gradually got into from

2   1951 on.   I believe that would be somewhere in the period 1954

3   or '55.

4        Q   1954-55?

5        A   1954-55.   There is no definite time. Titles are not

6   given on the ranch.   It is just a matter of who is the bigger

7   boss and who is the littler boss.

8        THE COURT:   The big boss is stil. Malin Vail?

9        THE WITNESS:   The big boss is still Malin Vail.

10        MR. VEEDER:   Thank you, your Honor.

11        MR. STAHLMAN:   If it weren't for what your Honor said

12   this morning, I would have something to say, but I am afraid.

13   BY MR. VEEDER:

14        Q   In your work as the assistant manager were you on

15   the land at the time the Pauba well was drilled?   Were you

16   there?

17        Strike that

18        We will use the term "Navy well."   You are familiar

19   with the term "Navy well"?

20        A   I am familiar with the term Navy well.

21        Q   We will use "Navy well" hereafter and henceforward.

22   Is that all right?

23        A   It is perfectly all right with me.

24        Q   Were you down there when it was drilled?

25        A   I was down there when it was drilled.   However, as

10,004

1   I stated, I was not as active then as I am now.  I was on the

2   ranch.

3          Q   I hand you an exhibit marked for identification

4   159 and ask you to state whether in your capacity as Assistant

5   Manager of the Vail Company you have in the files a copy of

6   that document?

7          MR. STAHLMAN:  That is objected to as being incompetent,

8   irrelevant and immaterial and not proper cross-examination.

9          THE COURT:  That objection is proper.  But is there

10  any dispute now about this permit agreement?  Is there any

11  issue about this matter?

12         MR. STAHLMAN:  Not that I know of.

13         THE COURT:  If it can be identified by this witness,

14  why don't we do it?

15         MR. STAHLMAN:  If he know when it was supplied.  I

16  merely felt that he hadn't been examined about it.

17         THE COURT:  It is not proper cross-examination, if you

18  want to stand on that objection.

19         MR. VEEDER:  May I inquire why it is not?

20         THE COURT:  Because he was not interrogated on direct

21  examination about this matter.

22         MR. VEEDER:  With all respect to your Honor, he was

23  interrogated in regard to the digging of the Pauba Well and

24  the Navy well.

25         THE COURT:  Well, now, wait.  This goes back maybe to

1   when he was on the stand some days back and I have forgotten

2   about it.  But I don't remember that he was interrogated about

3   digging the Pauba well.

    MR. STAHLMAN:  Never.

    MR. VEEDER:  Certainly about the operation.

    MR. STAHLMAN:  Never.

    MR. VEEDER:  About the operation of the Pauba Well?

    THE COURT:  I don't recall.  Who has been making a
summary of the transcript?

    MR. VEEDER:  I think that I can show your Honor, in
that regard, that he did interrogate him about the Pauba well,
the use of it, the connection of the Pauba well into the
distribution system of the Vail Irrigation Company.

    MR. STAHLMAN:  The fact that the well connected with
the distribution system I don't think opens up the door to go
into this permit.

    THE COURT:  Is there any dispute about it?  Here is a
document in writing.

    MR. STAHLMAN:  Your Honor, there is going to be, I
think, considerable evidence in relation to that document.

    THE COURT:  Regardless, is there any dispute about the
document?  There may be disputes about other things-- what was
said, when it was delivered, whether it was delivered; but is
there any dispute that these are the documents?

    MR. STAHLMAN:  Your Honor, I have never seen them

1    until Mr. Veeder had lodged them.  I have never seen them in

2    Vail's files, I have never had an opportunity to talk to Mr.

3    Vail about them, who is purported to have signed them.

4    However, I did have some conversation in relation to the

5    circumstances surrounding a document that was signed at about

6    that time.  I don't think this is the time to go into it on

7    cross-examination.  I know Mr. Veeder's purpose in it, and I

8    think it is something that pertains to the matter of the

9    stipulated judgment.

10          MR. VEEDER:  Certainly it is related to the stipulated

11   judgment.

12          MR. STAHLMAN:  It is not proper cross-examination of

13   this witness and I think it should be gone into at the time

14   we have that matter under consideration.

15          THE COURT:  Let me read it.  If it is this important

16   I will have to see what is in it.

17          Are you worried about the language of paragraph 4?  Is

18   that what is bothering you?

19          MR. STAHLMAN:  Not at all.  Here is a witness who is

20   put on for an entirely different purpose.

21          THE COURT:  This is a technical objection.  What is

22   your real concern?  Paragrph 4?

23          MR. STAHLMAN:  My real concern is--

24          THE COURT:  With reference to the stipulated judgment?

25          MR. STAHLMAN:  With reference to the stipulated judgment,

1    the circumstances under which this document was signed, there

2    is a lot to be said, and I think the party to be examined in

3    relation to this would be Mr. Vail himself, and I think he

4    should be here when this is done to explain the circumstances

5    surrounding the document and other occurrences that happened

6    at that time that put an entirely different complexion on this

7    matter than what might be obtained by querying somebody who

8    is not familiar with it.

9         THE COURT:  There is an eminent legal authority in this

10   case who recently filed a brief, which I read with great

11   interest.

12        MR. VEEDER:  Perry Mason.

13        THE COURT:  I am talking about Erle Stanley Gardner.

14   Did you read the brief he filed?

15        MR. VEEDER:  Was that a brief, your Honor?

16        THE COURT:  Well, it had a very definite effect upon

17   my thinking.  It was very stimulating to my mental apparatus.

18   It started me to thinking about all sorts of things, some of

19   the matters he set forth in there.  Maybe you didn't think it

20   was a very good brief, but I found it very stimulating.  I

21   don't know that I agree or disagree, but it opened up vistas

22   of thought I hadn't even thought about.

23        You have read it, I take it?

24        MR. VEEDER:  Oh, yes.  I have been thinking what to do

25   about it.

1      THE COURT:  I think it is on file.

2      MR. VEEDER:  I think it is very favorable to the

3  Government's position.

4      THE COURT:  The objection is sustained without

5  prejudice to renewing your cross-examination if you can point

6  out to me the direct examination upon which this cross-

7  examination is based.  So we will just terminate that right

8  now.

9      MR. VEEDER:  I also have in that identification your

10  Honor, a letter, you will observe, signed November 9, 1950,

11  by Mr. H. M. Hall and also a letter of August 2, 1951.

12      THE COURT:  That is not in mine.  I don't have any

13  letter signed by Mr. Hall.  I have a letter to Oliver Smith,

14  Major General, signed by Lawrence M. Wright.  That's all.

15  Here is what you gave me.

16      MR. STAHLMAN:  That is all I received in the mail from

17  Mr. Veeder.  There is no letter from Mr. Hall.

18      THE COURT:  I don't know what else you have in that

19  other document.

20      MR. STAHLMAN:  And I don't think this witness is the

21  witness.  Your Honor has ruled.

22      MR. VEEDER:  Your Honor, the point I would like to make

23  in regard to this witness, and if Mr. Stahlman is going to call

24  Malin Vail that puts a different complexion on this identifica-

25  tion, for this reason:  I certainly must get into evidence

1   this permit, and if there is going to be called Mr. Wilkinson's

2   boss that is one thing.  I didn't know that.

3       MR. STAHLMAN:  Just a moment, Mr. Veeder.  I don't

4   think you should jump the gun on this.  You are making an

5   explanation after the Court has ruled.

6       THE COURT:  Let's save time.  If Mr. Stahlman didn't

7   call him, you could call him.

8       MR. VEEDER:  That is right.

9       THE COURT:  So let's not be concerned about it.

10      My inquiry is, is my exhibit complete, or do you

11  have something I haven't got?

12      MR. STAHLMAN:  I do not have the Hall letter.  He sent

13  me the two.

14      MR. VEEDER:  I will withdraw the Hall letter and leave

15  the matter with the letter from the then counsel for the Vail

16  Company, O'Melveny & Myers, together with the identification

17  as part of the identification 159, the principal document

18  being the license between the United States of America and the

19  Vail Company.

20      MR. VEEDER:  May I see the Hall letter you are with-

21  drawing?

22      MR. VEEDER:  Yes.

23      MR. STAHLMAN:  As I understand, this is merely lodged.

24      THE COURT:  He is taking the Hall letter out.  It is

25  not part of this exhibit any more.

1          MR. VEEDER:  Your Honor, may I have your ruling in

2   regard to the testimony on the Navy well?  You said if there

3   was any reference to it--

4          THE COURT:  No, I didn't say that.

5          MR. VEEDER:  I was trying to find out what your ruling

6   was.

7          THE COURT:  I said if you could show me the testimony

8   on direct examination to which this was directed on cross-

9   examination, you might do so, and when you did that then this

10   ruling is without prejudice.

11          MR. VEEDER:  Thank you.

12          THE COURT:  I told Mr. Stahlman it is a technical

13   objection and I can't understand his concern about it, if this

14   witness can identify it.  But technically it is correct.  But

15   I don't think you have covered anything about the drilling

16   of the well, by this witness.  This witness, the facts show,

17   came onto the ranch about the time this well was being drilled

18   to convalesce, as I understand, and it was not until later

19   on that he took on any official duties, and I don't think he

20   knows first hand the inception of the drilling of the well.

21   This was after the time he came on the ranch.  As I recall

22   his testimony, when he went to school he got sick, he had to

23   come down to take it easy for a year or so, and then went back

24   to school, and finally came back to the ranch.

25          MR. STAHLMAN:  We are going to run into this head-on

1   before the trial is over, your Honor.  This is not the time

2   for it with this witness.

3          THE COURT:  Sustained without prejudice to your showing

4   me where your cross-examination has anything to do with

5   anything on direct examination.

6          MR. SACHSE:  Mr. Veeder, I don't have a copy of that.

7          MR. VEEDER:  Everybody will get copies.

8          Q   Now, Mr. Wilkinson, I am going to ask you to look

9   at some aerial photographs which are in evidence in regard

10  to the Temecula Valley, and first ask if you can orient

11  yourself on those aerials, starting up the valley and then

12  put them in order so that we will see that you are fully

13  acquainted with the aerials and with the layout of the Pauba

14  Valley.

15         MR. STAHLMAN:  Now wait a minute.  We have a bad

16  record here.  May the record show--

17         THE COURT:  You have handed him--

18         MR. VEEDER:  Exhibit 78W--

19         THE COURT:  15, 16, 17--

20         MR. VEEDER:  --18 and 19.

21         Q   See if you can orient yourself on there and point

22  out for the Court the several reservoirs in which water is

23  impounded and used on the Vail Company property.

24         THE COURT:  Could this be done by taking a grease pencil

25  and putting them on?

1      MR. VEEDER:  No, I will interrogate him, your Honor.

2  I will just go ahead and take the time.

3      THE COURT:  Can't you just put it on there?  Are you

4  trying to test his recollection?

5      MR. VEEDER: To a degree, and to test his knowledge of

6  where these locations are.

7      THE COURT:  All right, do it at the recess with a grease

8  pencil.  Put the reservoirs you want on there.

9      MR. VEEDER:  All right.

10      THE COURT:  You are not serious about testing his

11  recollection about the ranch, are you?  And secondly, a man

12  could be well acquainted with the ranch and might have trouble

13  with an aerial.  A farmer isn't trained in reading aerial

14  photographs.

15      MR. VEEDER:  This man is a qualified engineer.  He has

16  been qualified in every respect, your Honor, as an engineer.

17      THE COURT:  If you are serious about testing his

18  recollection, I will take the time.

19      MR. VEEDER:  I am very serious, because as this

20  evidence develops, your Honor will understand more why I am

21  taking this course.

22      MR. STAHLMAN:  Why don't you tell us now?

23      THE COURT:  That remains to be seen.  But go ahead and

24  look at them, Mr. Wilkinson, and see if you can put them in

25  order.

BY MR. VEEDER:

Q   Can you locate the JK Reservoir for us and then refer to the aerial on which it is located?

A   The aerial on which the JK Reservoir is located on 78W-17--

THE COURT:   Do you have a grease pencil here, Mr. Clerk?

Put a mark on it "JK Reservoir."

BY MR. VEEDER:

Q   What is the source of the water that goes into that reservoir?

A   At the present time?

Q   Yes, sir.

A   It is either the New JKwell or water released from the dam.

Q   In other words, you have a combination of the water from the basin and from the reservoir?

A   It can be both, it can be one, it can be the other.

Q   And all of the water that you take out of the JK well goes into that reservoir; is that right?

A   Not necessarily.

Q   Do you know what quantity goes in that is impounded in that reservoir?

A   It depends on our farming uses.   We have ways of going past the reservoir or into the reservoir.

1      Q   When you divert water in there and impound it, what

2  is the reason for that impounding?

3      A   Irrigation, Mr. Veeder.

4      Q   And that reservoir is full throughout the non-

5  irrigation season, is it not?

6      A   Not necessarily.

7      Q   It has been full, has it not?

8  THE COURT:   Through the non-irrigation season?

9  MR. VEEDER:   Non-irrigation season.

10  THE WITNESS:   What do you mean by "full"?

11  BY MR. VEEDER:

12     Q   Well, it is impounding water.

13     A   Has it had water in it?

14     Q   Yes.

15     A   Well, I would say we have shot ducks on that

16  reservoir in December and January.  We are not doing much

17  irrigating then.  But ducks can get on a pond only six inches

18  deep.  Is that full?

19     Q   I ask you, do you maintain a full reservoir throughout

20  the winter season, the non-irrigation season?

21     A   No, we do not maintain a full reservoir.

22     Q   What is the areal surface, if you recall, during the

23  non-irrigation season, of the JK Reservoir?

24     A   I do not know.

25  MR. STAHLMAN:   I didn't get the full import of the

question.

MR. VEEDER:  I asked the areal extent.

MR. STAHLMAN:  All right.

BY MR. VEEDER:

Q  And when the reservoir is full do you know what the areal extent of that is?

A  No, I do not exactly.

Q  What would you estimate it to be?

A  I would assume that the areal extent would be in the neighborhood of two acres, but I would have to measure it to be sure.

Q  What is the depth of it, do you know?

THE COURT: When?

MR. VEEDER:  When it is full.

THE WITNESS:  That is another question as to what one calls a full reservoir.  It could be six, perhaps eight feet, maybe more.

BY MR. VEEDER:

Q  During the irrigation period how is the water handled out of that reservoir?  You fill it up and then you release it as you need it; is that right?

A  Not exactly.

Q  How is it handled?

A  Sometimes the reservoir is filled.  Usually it is a matter of continued flow into the reservoir and out of the

1   reservoir, depending on whether we irrigate both night and

2   day or just daytimes alone.

3       Q  But your whole operation envisions the filling up

4   of the JK Reservoir, the holding of storage water in it, and

5   the release of it; is that right?

6       A  It acts as a balancing reservoir.

7       Q  But you do retain water in it and impound it; is

8   that right?

9       A  Impound it, yes.

10      Q  What are the other reservoirs? Will you just mark

11  them on these aerials as we go along, showing us where you

12  impound water for the purpose of use?

13      THE COURT:  Is one of the points you are trying to

14  make that there was water in this reservoir in the wintertime

15  and that because of seepage and evaporation this interfered

16  with the use of the Marines downstream?

17      MR. VEEDER:  Well, that gives me a thought, your Honor.

18  As a matter of fact, your Honor, we are confronted with the

19  problem of a riparian upstream impounding water.

20      MR. STAHLMAN:  That is what I thought he was getting

21  at.

22      THE COURT:  Water impounded or released from the dam.

23  This is not the impounding of runoff water.

24      MR. VEEDER:  Your Honor, I think they are claiming

25  riparian water, and I think they are claiming riparian water

109017

1  from the Temecula Creek, and I think the water that is taken

2  out of the JK pump is just as much water out of the Temecula

3  Creek as if they diverted it directly from the surface flow

4  of that stream, and part of the cross-examination that we

5  will go through will demonstrate that point.

6  THE COURT:  It is your contention that the land owner

7  can't pump water into a reservoir to thereafter use on his

8  land?

9  MR. VEEDER:  If he is claiming it under a riparian

10  right, he can't.

11  MR. STAHLMAN:  Not even a balancing reservoir working

12  with an irrigation system?

13  MR. VEEDER:  Yes.

14  MR. STAHLMAN:  Go ahead, Mr. Veeder.

15  MR. SACHSE:  I would like to inquire of Mr. Veeder

16  if this same answer that he gave that a riparian can't pump

17  into a reservoir applies to the reservoirs that are strung

18  along the top of the reservation at Camp Pendleton into

19  which water is pumped for fire protection and domestic and

20  irrigation uses.

21  MR. VEEDER:  Do you desire to have me respond to that,

22  your Honor?

23  THE COURT:  I would like to know whether you are going

24  to take consistent or inconsistent views in this.

25  MR. VEEDER:  I am taking exactly the same view as was

1   applied to us by the State of California in regard to our

2   reservoirs, and that is the reason for this interrogation.

3   THE COURT:  I didn't hear any testimony from the State

4   of California about your reservoirs.

5   MR. VEEDER:  The cross-examination was certainly

6   directed to that:  We pump water into our reservoirs, we hold

7   it for use and it is used after impoundment, and a point has

8   been repeatedly made in this courtroom that any storage is

9   outside the riparian right.

10   THE COURT:  So you want a consistent position taken,

11   and you are not ready to take a position yet but you want it

12   to be consistent as to all parties to this litigation.

13   MR. VEEDER:  Well, I hope so.  Your Honor is not going

14   to cut us in half, I sincerely hope, by ruling that we can't

15   impound water, and at the same time every drop of water that

16   the Vails use under their claim of riparian right is impounded.

17   THE COURT:  I am glad to know what your position is.

18   It seems to me to have more substance than I thought to

19   start with.  I thought you were just talking about some ponds

20   that had a few ducks on in the wintertime.

21   In other words, your position is--

22   MR. VEEDER:  They are doing exactly the same thing we are

23   doing.

24   THE COURT:  --that there is an attack made upon your

25   storage below, and you want to show the storage of Vail upstream.

1     MR. VEEDER:  Yes.

2     THE COURT:  All right, I get your point.

3     MR. VEEDER:  Thank you, your Honor.

4     THE COURT:  Take a short recess.

5     (Recess.)

6     THE COURT:  Before we leave the JK Reservoir--

7     Is the reservoir ever pumped full and then just allowed

8  to stand there for days at a time in the summer season?

9     THE WITNESS:  No, it is not.

10     THE COURT:  Generally when the reservoir is used it

11  is in connection with balancing the irrigation water, the

12  water pumped in and out to the irrigation land?

13     THE WITNESS: That is right.

14  BY MR. VEEDER:

15     Q  In regard to the delivery of water into the JK

16  Reservoir, you have a direct connection with the Vail Dam

17  itself?

18     A  We do.

19     Q  And you release the water down there, and you mix

20  it with what would be your riparian water; is that right?

21     A  I am not going to say Riparian water.

22     Q  Well, your water pumped from the basin?

23     A  I would say water pumped from the JK well.

24     Q  All of your irrigation water is put into the

25  reservoirs and held for a time, is it, or do you have some

10,020

1    that you apply directly?

2         A   Both the situations exist; some directly; some

3    through a reservoir, as a balancing factor.

4         Q   Would you state your opinion as to whether there is

5    a percentage of water that is impounded?

6         A   I could.

7    THE COURT:  Percentage impounded.

8    MR. VEEDER:  Percentage of the water that is impounded.

9    THE COURT:  I don't understand you.

10   MR. VEEDER:  Does the witness understand?

11        Q   Is there a percentage of the total water--

12   THE COURT:  Well, if he understood and I didn't it

13   wouldn't do me much good, would it?

14   MR. VEEDER:  I thought he might explain it.

15        Q   Could you arrive at a percentage or quantity of

16   water actually used out of the basin that is impounded before

17   its use?

18   MR. STAHLMAN:  I object to the question as being

19   indefinite and uncertain.  There is no proper foundation for

20   it.

21   THE COURT:  Overruled.  But it will be understood that

22   the question only goes to impounding for at least a second

23   or a fragment of time.

24   MR. VEEDER:  I object to your statement on that,

25   your Honor.

1       THE COURT:  Unless your question is made more certain.

2  This question is as wide as all outdoors.  So to limit it

3  I made that statement.  If you want to limit the question--

4       MR. VEEDER:  Could you answer the question that was

5  asked first, and then--

6       THE COURT:  With the limitation I put on it, you may.

7       THE WITNESS:  Your question was, what percentage of

8  the irrigation?

9       THE COURT:  See if I can tell you what he is thinking

10  about.  Let's take your JK well.  Then you state what percent-

11  age of the water that is pumped out of the JK well is impounded

12  even momentarily in the JK reservoir before it goes into the

13  irrigating system.

14       THE WITNESS:  That would be very difficult to answer,

15  your Honor, depending on how our operations are going, because

16  it varies from time to time and it would be purely a guess,

17  unless I was given definite times.

18       THE COURT:  Are there instances when you pump the JK

19  well into the JK reservoir and do not mix with it any water

20  coming down from the dam?

21       THE WITNESS:  There are instances where that occurs.

22       THE COURT:  When that occurs, when water is pumped into

23  the JK Reservoir, I take it that if the water didn't go out of

24  the reservoir into an irrigating system the reservoir would

25  run over, wouldn't it?

1    THE WITNESS:  That is correct, your Honor.  There are

2    instances when we are just using the JK.  It is common to

3    fill up the reservoir at night and draw it down the following

4    day.  When our irrigation day stops and the pump is running

5    continuously it fills up again at night.

6    THE COURT:  That is what Mr. Veeder is getting at.

7    So then there are situations when during the nighttime you

8    fill up the JK Reservoir?

9    THE WITNESS:  Yes.

10    THE COURT:  Then the next day you start irrigating

11    again.  Do you depend entirely on what is in the JK reservoir,

12    or do you also operate the JK well?

13    THE WITNESS:  When we are operating that way, generally

14    the JK runs continuously 24 hours a day.  So during the

15    nighttime period the continuous flow of the well goes directly

16    to the reservoir, and in the daytime the flow as well as what

17    is in the reservoir is distributed into the fields for irriga-

18    tion.

19    THE COURT:  Would you say then that this nighttime

20    impounding would be about all the impounding you ever do in

21    that reservoir?

22    THE WITNESS:  That would not necessarily be the case,

23    because the dam water sometimes comes in, and to break that

24    down would be rather difficult.

25

BY MR. VEEDER:

Q  In the operation of the JK Reservoir are there not times when you shut down the outlet of the reservoir into your irrigation system and back up and impound the water and hold it for at least twelve hours?

A There are certainly instances such as that.  If we break the pipe line we have to stop the flow of water to repair the pipe line.

Q  In your management of the water, in the use of it, do you do that?

A  We shut the reservoir entirely for twelve hours.

Q  Fill it up?

A  I believe I just got through saying that we close it every night when we are operating that way and the flow goes into the reservoir, and release it the following morning.

Q  In other words, you build up a head?

A  That is right.

Q  Now, in regard to the other reservoirs on the 78W-17, I observe that there are two other impounding reservoirs. What are the names of those?

A  The two other reservoirs there we refer to as the Diesel and No. 40 Reservoirs.

Q  Would you just write "Diesel" and "No. 40" on those and state whether they are operated in the same manner as the JK Reservoir?

A   They are operated in the same manner, except for the fact that there is an additional well.  Perhaps some of the JK water will run over into the Diesel or the No. 40, and perhaps some of the Diesel water will run into the No. 40. There is an intermingling; the lines are cross-connected.

Q   But in each instance you do, as you have stated, during the night you fill the reservoirs up, you close them off, you fill them up and you use them the next day?

A   We don't always use them the next day, no, Mr. Veeder.

Q   In other words, it is quite possible that you will impound the water from those wells for from twelve hours to several days; isn't that right?

THE COURT:  What do you mean by "those wells"?

MR. VEEDER:  No. 40, Diesel and JK.

THE COURT:  He has identified reservoirs, Diesel and No. 40.  Are you speaking about wells in connection with them?

MR. VEEDER:  I will rephrase it.  I was familiar with these wells.  I will clarify that.

Q   You have mentioned the Diesel well.  That is a well from which you pump water into the Diesel reservoir; isn't that right?

A   We pump it into the distribution system.  Sometimes it goes into the Diesel reservoir, sometimes it goes somewhere else entirely.

Q   But you do fill up the Diesel reservoir from the Diesel well at least at times?

A   At times.

Q   And it is quite possible that you will hold the water pumped from the Diesel well into the Diesel reservoir for twelve hours and sometimes for several days; isn't that right?

A   On occasions it will hold it for several days until we are prepared to start a new piece.

Q   And that is true also in regard to the JK reservoir; you will impound water for twelve hours and then it is entirely possible that you will let it stand there for three or four days, isn't that right?

A   It is entirely possible that that might occur.

Q   Now as a matter of fact, isn't this about the way you operate those?  You have an areas in there that you irrigate, you fill up your reservoir and then you drain it, and when you have completed the irrigation in the area served by that JK reservoir you fill the reservoir again and hold the water until it is time to irrigate again; isn't that right?

A   Your statement is a little bit incorrect.  The water held there may not be in that general area.  We may use the water down the pipe line which, as you know, goes a long way. It might be quite a ways off, even below the 40 or on some other pieces that water will come from the JK to irrigate

1   the pieces below, both the 40 pump, the 40 reservoir and the

2   Diesel reservoir.

3       Q   So as a matter of fact, though, it is entirely

4   possible, and in fact you do impound water in the JK and

5   hold it for several days at a time?

6       A   There are unquestionably portions of the water.  As

7   long as we are using the JK pump we must lower the reservoir.

8   Now that water may be built up for a day, two days, three days

9   in order to fill the reservoir and it may be held for a few

10  days.  But as to the exact length of time it is held there,

11  perhaps in some instances, I know over the winter season we

12  shut down the irrigation and there is a puddle in the bottom

13  of the reservoir that stays there over the winter.

14      Q   Isn't it true that your practice is this:  You will

15  use the water from the JK reservoir, pull it down while you

16  are irrigating from it, then close it off and pump water into

17  it until it is full, and then hold the water there until

18  you start irrigating again?

19      A   We have to build up a head.

20      THE COURT:  May I ask you, is the Diesel well and the 40

21  well used to supply water directly to your main pipe line

22  down the valley?

23      THE WITNESS:  They can be interchanged.

24      THE COURT:  Just like the JK is?

25      THE WITNESS:  Yes, we have two main lines.

1          THE COURT:  And the Diesel and the No. 40 can both run

2   water into those two main lines?

3          THE WITNESS:  Yes; there are cross-connections of the

4   two main lines.

5          THE COURT:  Don't you have one little reservoir up

6   there that you limit the use in connection with lands

7   adjacent to it?  Where did I get that impression?

8          THE WITNESS:  And nothing else.  That would apply in

9   a different area, your Honor.  That would be on the August

10  Cantarini place.

11  BY MR. VEEDER:

12         Q  Proceeding on down the stream, which is the next

13  aerial where you have a reservoir which is part of your system

14  and in which you hold water?

15         A  Well, the next reservoir is shown on both 17 and 18.

16         Q  What is the name of that?

17         A  The Tule reservoir.

18         Q  And the Tule reservoir, the water is pumped into it

19  from what source?

20         A  Water is not pumped into that.  It comes out of the

21  end of the 20-inch distribution line and is collected in there

22  to build a head to irrigate the lands below that.  The Tule

23  reservoir also can be pumped into directly from No. 50 pump.

24         Q  In other words, you take water pumped from the JK

25  well, the Diesel well and your No. 40 well, put it into the

1    Tule reservoir and hold it there?

2        A   Some of the water.  It is a small reservoir.  It

3    is used in portions for smaller areas.

4        Q   And your No. 50 well, then, is pumped directly into

5    that?

6        A   It can be, or it can be pumped directly to the other

7    mains going down the valley.

8        THE COURT:   Will you mark the Tule reservoir on the

9    exhibit?

10       THE WITNESS:   17 or 18, your Honor?

11       THE COURT:   Where do you want it?

12       MR. VEEDER:   If it is on both, I would ask that you mark

13   it on both so that there will be no unmarked area.

14       (The witness marking the exhibit.)

15       THE COURT:   Let me see that.

16       Go ahead.

17   BY MR. VEEDER:

18       Q   It is true, is it not, Mr. Wilkinson, that by the

19   use of the JK, the Diesel and the 40 and 50 pumps that you

20   can completely dry up the surface stream of the Temecula Creek?

21       A   Not to my knowledge.

22       THE COURT:   Dry it up where?

23   BY MR. VEEDER:

24       Q   Is it not true that there is an area at the present

25   time in Temecula Creek where you have a point of rising water,

1  the water flows for a short distance and the Temecula Creek

2  is again dropped; isn't that true?

3          THE COURT:  On the Vail property?

4          MR. VEEDER:  On the Vail property.

5          THE WITNESS:  I don't know what a short distance is.

6  BY MR. VEEDER:

7          Q  Where does water first appear at the present time in

8  Temecula Creek as a surface stream?

9          A  It is below the Upper Camp area.

10         Q  The Upper Camp area.  Could I ask you to step to the

11  exhibit on which you have marked these various camps and

12  indicate where at the present time you have rising water.

13         THE COURT:  You put your hand away up on Long Valley.

14  You are talking about Pauba Valley, aren't you?

15         MR. VEEDER:  Your Honor, I haven't any extra money, so

16  I will not respond.

17         THE COURT:  I am just asking you.  Are you asking for

18  rising water in Long Valley or--

19         MR. VEEDER:  I was just patting it, your Honor.  I was

20  just patting it.

21         THE COURT:  All right.  You directed my attention to

22  Long Valley, but I take it you are asking about Pauba Valley.

23         MR. VEEDER:  I want the witness to testify, your Honor.

24         Q  Mark on the exhibit, Vail's Exhibit L, the first

25  point of rising water in Temecula Creek as it crosses through

1   the Vail property.

2        A   I will mark it in a general way, because I am not

3   sure as to the location.

4        Q   All right, you go ahead.

5        THE COURT:  You mean now as of May 28, 1959?

6        MR. VEEDER:  Yes, sir.

7        THE COURT:  All right.

8        THE WITNESS:  It will be in a general area.  I would

9   have to refer to laterals and such as that.

10  BY MR. VEEDER:

11       Q   Put "Point of rising water, May 28, 1959".

12       A   (Witness marking diagram.)

13       MR. STAHLMAN:  Put "Approximate" on there, too.

14       MR. VEEDER:  Now, now.

15       THE WITNESS:  Do I put "Approximate" on there, or don't

16  I?

17  BY MR. VEEDER:

18       Q   I would like you to put on "1959" there, because we

19  are going to be around for quite awhile.

20       Now, next mark with an X the point approximately where

21  there is no longer a surface stream in Temecula Creek at the

22  present time.

23       A   Where there is no water flowing?

24       Q   No surface stream.

25       A   That is the area we were in the other day, this road

1     crossing right here.

2             Q  End of surface stream.

3             A  No, that is not the end of the surface stream.

4     It is above that.  You asked me to mark the point where there

5     was none, and I marked it.  We saw that the other day, the

6     two of us, along with Col. Robertson and Mr. Kunkel.

7             Q  Is there any other point below the point of rising

8     water where there is no longer a surface stream?

9             A  Not to my knowledge.  The water disappears in an

10    area somewhere in the vicinity of Headquarters Camp.

11            Q  Have you observed a correlation between the use of

12    the Vail Company pumps for purposes of irrigation and the point

13    where Temecula Creek is a surface stream?

14            A  Which pumps, Mr. Veeder?

15            Q  Any pumps.

16            A  Yes, there is a correlation.

17            Q  Which are those pumps?  Which pumps have you observed

18    when they are in operation cause the Temecula Creek to be no

19    longer a surface stream?

20            THE COURT:  On the Vail Ranch as shown on Exhibit L.

21            MR.VEEDER:  We will all agree hereafter that when I

22    ask the question it is on Vail's L on the Vail property.

23            THE COURT:  All right.

24            THE WITNESS:  The pumps which are influential to the

25    flow of the stream are what we refer to as the Cat well and

1    the Cantarini well.  Those are located to the south of the main

2    highway approximately midway between both the Lower Camp and

3    the Headquarters Camp.

4        Q  Have you observed any relation between the surface

5    stream and the new JK well?

6        A  None.

7        Q  Since you closed the dam have you ever observed that

8    there was a surface stream except when you were releasing

9    water from the reservoir at or near the new JK well?

10       A  I never have noticed the surface stream in that

11   area in that period as well as before.  The only stream flow

12   is in flood times.

13       Q  And you never did have a surface stream there?

14       A  Not in that JK area.  In the New JK area.

15       Q  And in regard to the windmill well, would you state

16   which is the windmill well?

17       A  The windmill well is circled in yellow.

18       Q  When you turn on the Cantarini pump you dry up the

19   surface stream of Temecula Creek; is that right?

20       A  Not necessarily.

21       Q  Well, you have dried it up at the present time,

22   haven't you?

23       A  You said the Cantarini pump alone?

24       Q  What do we call these?

25       A  The Cantarini and the Cat pump.

1     Q  When you run the Cat pump and the Cantarini pump

2  you kill the surface stream and it disappears; is that right?

3     A  In the summer period, in the heavy pumping period.

4  I don't think one of those is capable of drying up the stream,

5  although it is possible.  To my knowledge it has never

6  happened with just a single pump running.

7     Q  Have you observed any relationship between the

8  surface stream and any of the other wells between the point X

9  you have marked and the "Point of rising water May 28, 1959"?

10     MR. STAHLMAN:  I object to the question as being in-

11  definite and uncertain, your Honor.

12     THE COURT:  Sustained.

13     Are you talking about wells between those points?

14     MR. VEEDER:  I said wells between those points.

15     THE COURT:  Or the stream between those points?

16     MR. VEEDER:  I will start again, your Honor.

17     THE COURT:  Or are you talking about wells between those

18  points having an effect on the stream between those points?

19     MR. VEEDER:  I will rephrase it.

20     Q  In the reach of the river between the point where

21  you have said "Point of Rising Water, May 28, 1959," which

22  extends down to the X you have marked here on Vail's Exhibit

23  L, have you observed that the operation of the wells situated

24  between those two points has an effect upon the surface stream

25  of Temecula Creek?

1       A   As far as I know there is no relation.   There is only

2  one well in that area you have mentioned.

3       Q   You have never seen any effect?

4       THE COURT:   What well is that?

5       THE WITNESS:   That is No. 50.

6       This may be improper. As I look at it, I may have

7  marked that rising water wrong on the map, and I would like

8  to locate myself with one of those laterals over the weekend

9  and make sure I have placed it in the right position.

10      MR. VEEDER:   Fine.

11      THE COURT:   You may do so.

12  BY MR. VEEDER:

13      Q   In regard to the areas below the Cantarini well

14  and the Cat well, have you observed the distance where the

15  stream is dry, where Temecula Creek is dry?

16      MR. STAHLMAN:   I object to that; I don't understand it.

17      THE COURT:   Do you mean in those instances where the

18  pumping of those two wells had dried up the stream?

19      MR. VEEDER:   I will say at the present time.

20      Q   Have you observed how far down?

21      A   Not at the present time.   I have been too busy with

22  other things, Mr. Veeder.

23      Q   What is the first extent downstream that you have

24  observed that those two pumps have dried up the surface runoff?

25      A   I wouldn't want to answer that, because I am not too

1   sure.  I know where I have seen rising water below there.  But

2   as to where it began, I will go and look and I will tell you

3   next week.

Q   In other words, you don't know?

A   No, I don't know now.

Q   Could you indicate the furthest point downstream at

7   the present time that you have observed the stream is dry?

MR. STAHLMAN:  I don't quite get that.  Do you mean at

9   any time?

MR. VEEDER:  I said at the present time.

THE WITNESS:  I would judge it to be in approximately

12   this area (indicating).

BY MR. VEEDER:

Q   Would you make a circle with an X in it so that we

15   can see.

A   I will check this.

Q   And you are also going to check the point of rising

18   water?

A   I will check the point of rising water.

Q   What are the depths, if you recall, of the JK well

21   and the Diesel well?  Do you remember?

A   I can look on the exhibit and tell you.  The New JK

23   well is 228 feet deep.

Q   What is the depth of the Diesel well?

A   And the Diesel is 171 feet deep.

1    Q  Were you present when the New JK well was dug?

2    A  At various times.

3    Q  Did you observe the materials that were taken out

4  of that well?

5    A  At various times.

6    Q  Have you viewed the log of that well?

7    A  I have seen the log and I believe the samples are

8  still in existence.

9    Q  Have you compared that log with the windmill well

10  log?

11   THE COURT:  You mean the windmill well right next to

12  it?

13   MR. VEEDER:  The windmill well as the key well in the

14  stipulated judgment.

15   THE WITNESS:  I probably compared them.  I don't

16  remember what the comparison would be.

17  BY MR. VEEDER:

18   Q  Well, they are pretty close together, are they not?

19   A  They are close together, yes.

20   Q  Would you state how far apart they are?

21   A  Probably about 500 feet.

22   Q  I am going to put State's Plate L-16 and I ask you

23  to view that plate and locate on there the windmill well.

24   A  I can make an assumption as to what it is, but I

25  don't know because I don't know the State designation on it.

10,037

1     THE COURT:  Can't we stipulate which one it is and save

2  time?

3     MR. VEEDER:  I will have you view this.

4     THE WITNESS: I assume that is the well.

5     THE COURT:  Which is that?

6     THEWITNESS:  The well--

7     MR. VEEDER:  The one furthest --

8     THE WITNESS:  To the right.

9     MR. VEEDER:  --to the right.

10     THE COURT:  On the top graph?

11     MR. VEEDER:  That is right.

12     Q  Would you view the legend and state what you observe,

13  from the standpoint of the log of the well, as shown on that

14  exhibit?

15     MR. STAHLMAN:  I object to that as not proper cross-

16  examination.  It is in the record and it is part of the exhibit

17  and shows what it purports to show.

18     THE COURT:  The exhibit speaks for itself.  Sustained.

19  BY MR. VEEDER:

20     Q  Assuming that the black areas marked on L-16 are

21  shown to be clay for a depth-- Can you see the depth mark on

22  that?

23     A  I can.

24     Q  Would you state into the record what those depths are?

25     MR. STAHLMAN:  I object to that.  The exhibit speaks for

1   itself.

2        THE COURT:   The exhibit speaks for itself, but if you

3   want something in the record, state it into the record your-

4   self.

5        MR. VEEDER:   I would like to have it in the record,

6   your Honor.

7        THE COURT:   The exhibit shows from about a little past--

8   These are from sea level, aren't they?  These are not depths

9   into the ground.  How is this worked out?  From sea level?

10  A little over 900 feet on up to a little short of 1,100 feet,

11  is that right?

12       THE WITNESS:   Approximately 200 feet, it looks like.

13  With the 200 section lines in there, I don't know what they

14  represent.

15  BY MR. VEEDER:

16       Q   Now, you observed the drilling of the JK well, you

17  state?

18       A   Yes, I was up there while they were drilling the

19  well.

20       Q   And you looked at the well log?

21       A   I have seen the well log.

22       Q   In viewing that drilling, did you note whether there

23  was any extended area of clay in the stratas through which the

24  JK well was dug?

25       A   To my recollection the well was not cased to the

bottom because there were unproductive areas in that, between

the bottom of the drilling and where you set the casing.

Q   What were those unproductive areas, if you recall?

A   I think, and I may be mistaken, the well was drilled

to a depth of 317 feet, and in the area in which casing was

set, which I think was 228, there were unproductive areas.

Q   But you don't know the depth of those?

A   I would say it was between 228 and 317.

Q   In regard to the perforations on the well, if you

recall, are there perforations below that point?

A   Below what point?

Q   Below the point of 228?

A   That is the bottom of the casing.

Q   That is the furthest down it went?

A   There would be no perforations if there is no casing.

Q   And you are drawing your water, then, from the area

above 228; is that right?

A   I assume that is where the water is coming from.

Q   From the standpoint then of the use of this water,

would you state whether you think you are getting water from

the shallower alluvium or the deeper alluvium?

MR. STAHLMAN:  I object to that.  There is no proper

foundation.  It is not proper cross-examination.

THE COURT:  I don't know how he could state from having

visited up there a time or two and looked at it.  He didn't

1   testify that he was there all of the time it was drilled.  He

2   said that he saw the well log, but he couldn't remember about

3   it.  Sustained.

4          Where did you say the perforations were?

5          THE WITNESS:  The bottom portion.  I don't know.  I

6   would have to get the log out.

7          THE COURT:  You don't know even how much it is

8   perforated from the bottom?

9          THE WITNESS:  It might be perforated from practically

10  the top down, and I have a suspicion that it is not too far

11  from the top.  But I would have to look.  I think Mr. Veeder

12  has a copy of the log right there.

13  BY MR. VEEDER:

14         Q  In regard to the Diesel well, were you there when

15  the Diesel well was dug?

16         A  No, I was not.

17         Q  I observe from your Exhibit Q, Vail's Exhibit Q, a

18  diagram that you have prepared in regard to the Diesel well,

19  a hydrograph showing the decline of water in that area--

20         A  That is right.

21         Q  You prepared that on the basis of your own investi-

22  gation; is that right?

23         A  No.  These are a matter of record in the company

24  records.  Depths are taken by Mr. Green and they are turned

25  in to us and I just put it on a piece of paper.

1     Q  Have you made any analysis of a correlation between

2  the runoff and the decline?

3     A  I have made no analysis or correlation between

4  runoffs and declines in water levels.

5     Q  You have simply then taken the data that you had

6  and simply drawn a picture; is that right?

7     A  That is correct.

8     Q  And you don't intend to show any analysis; is that

9  true?

10     A  I don't really know what you mean by analysis.  I

11  think that is a question you should ask Mr. Stahlman.

12     Q  Well, you are not purporting to know what causes the

13  fall in the water table in these areas; is that right?

14     A  I am not purporting to know.  I don't think I

15  would be qualified as a hydrologist.

16     Q  When was the Quarry well dug, do you know?

17     A  I do not know for sure, but I believe it was in

18  1954.

19     Q  I hand you Vail's Exhibit R, which is the water level

20  of the Cantarini Camp Well, and ask you how frequently those

21  well level measurements are made.

22     A  I would have to go back to the ranch records and

23  tell you the frequency.  As you will note, this is not done

24  on a daily basis.  It covers, I believe, four periods in the

25  year taken as points.

Q  Do you know the date when the Roripaugh well was dug?

A  No--

Q  Speaking of the Leo, the most recent, the 1900 gallon per minute.

A  No, I don't, Mr. Veeder.

Q  You don't know.  Now, in regard to Vail's Exhibit R, you have put down in the right-hand corner a statement "Unexplained fluctuations."  What did you mean by "Unexplained fluctuations"?

A  Well, there were variances in the water level readings.

Q  Are you purporting to state that you explained the other factors that appear on this exhibit?

A  I do not try to portray anything but water levels, and during the period when there were unexplained fluctuations I didn't want to mislead anybody.  During the period after that the points fall in a regular pattern and as evidenced by can be established.  During the period I said "Unexplained fluctuations," I do not know why they varied.  They varied from day to day and week to week and back again and it was a confusing situation to me and so I--

THE COURT:  In other words, in those periods shown as "Unexplained fluctuations" you don't actually have on the graph every reading you had there?

1    THE WITNESS: That is right.

2    THE COURT:  You took a sort of general pattern?

3    THE WITNESS:  I tried to stay within the pattern there.

4    BY MR. VEEDER:

5    Q  But you don't purport to explain any of the Exhibit

6    R at all?

7    A  I really don't know what you mean by explanation,

8    other than the fact that it shows that the water levels have

9    gone down.

10    Q  You don't purport to explain any of it, do you?

11    A  I still don't understand you.  I just told you that

12    the explanation is right there that the water levels have

13    gone down.

14    THE COURT:  In other words, by your statement "un-

15    explained fluctuations" what you mean is that when you

16    prepared the chart in those two areas of time that you refer

17    to by the asterisk, there are a number of individual readings

18    which actually aren't shown on your chart which didn't seem

19    to fit into the pattern and you took, as it were, the pattern

20    shown from that period rather than each particular daily

21    fluctuation that you might have found?

22    THE WITNESS:  That is right, your Honor.

23    THE COURT:  While in the other areas your chart closely

24    follows the readings shown?

25    THE WITNESS:  The pattern does not fluctuate so greatly

1    in the other section.

2    BY MR. VEEDER:

3        Q   And that is your interpretation?

4        A   That is my interpretation then.

5        Q   And you don't purport to interpret any of the rest

6    of Vail's Exhibits Q or R?

7        A   I can't understand what you mean by "interpret,"

8    Mr. Veeder.

9        Q   I can tell you what I mean by "interpret."  When

10   an exhibit is offered in evidence and shows a very marked

11   decline on a particular year, there must be some reason for

12   your drawing that line and there must be some reason for the

13   matter being offered in evidence.

14       MR. STAHLMAN:  I ask that those remarks be stricken as

15   being argumentative, your Honor.

16       THE COURT:  They may go out.

17       As I understand, the witness only drew charts as to

18   what he found, and he offered no testimony as to what he

19   thought that meant.   .

20       MR. VEEDER:  And they are simply in evidence without

21   meaning, as I understand.

22       THE COURT:  You may understand what you want to.  They

23   may have some meaning for me, but you may understand what you

24   want about whether they have any meaning.  I don't know what

25   you are talking about.

BY MR. VEEDER;

Q  I am going to ask you to view a series of hydrographs, the top one of which is marked "F. E. Green,"--

THE COURT:  Have these been marked for identification, this exhibit?

MR. VEEDER:  If it has not been, I will ask that it be marked.

THE COURT:  Give it a number.  What is the Government's next number?

MR. VEEDER:  The next will be 160, I believe.

THE CLERK:  The next number will be 160.

THE COURT:  We will call them Government's Exhibit 160-A, 160-B and 160-C.

(Plaintiff's Exhibits No. 160-A, 160-B and 160-C were marked for identification.)

BY MR. VEEDER:

Q  I am asking you to view these hydrographs, at least these drawings marked Exhibit 160-A, B, and C--

MR. STAHLMAN:  Just a moment.  May I ask a question of the witness on voir dire, your Honor?

MR. VEEDER:  I don't believe voir dire is proper, is it, your Honor, until I make an offer.

THE COURT:  That is right.  Let's finish your question, Mr. Veeder, and then we will see.

BY MR. VEEDER:

Q  I am going to ask you first to look at the top hydrographs, which relate to the Coastal Basin or that within the Camp Pendleton enclave, and ask you if you have ever seen that series of hydrographs?

A  No.

Q  I will next ask you to view the hydrographs that are marked 160-A and would you read what it says up in the left-hand corner, "For PV one-half pipe"?

MR. STAHLMAN:  You have already read it.

BY MR. VEEDER:

Q  Have you seen these hydrographs?

THE WITNESS:  I haven't seen these, no.

Q  You have never seen them?

A  Not that I know of.  I may have seen-- No, I don't think I have ever seen these, Mr. Veeder.

Q  I am asking you also to view 160-C and ask you if you have ever seen those.

A  They are probably evidence in the previous suit.

MR. STAHLMAN:  Just a moment.  I ask that be stricken.

THE COURT:  It may go out.

Have you ever seen them?

THE WITNESS:  I have never seen them.

BY MR. STAHLMAN:

Q  Have you observed any interrelation between the well

1  levels of your JK well, your Diesel well, your Cantarini pump

2  pit well and your Cat-- you call it the Cat well?

3      A   The Cat well.

4      Q   Have you observed that there is any interrelation

5  or interaction among those wells when you are pumping them?

6      A   I have not observed that as such.   Observations such

7  as that could be made.

8      Q   You have never made the study?

9      A   I have never made the study.

10     Q   Have you ever observed anyinteraction among the deep

11  wells, the Navy well, the Dairy well or the Main Camp Well

12  when, for example, the Navy well is running?

13     A   I personally have not made any observations, although

14  I know observations have been made.

15     Q   You don't know yourself?

16     A   I haven't made the observations myself as to inter-

17  action between the wells at any precise moment.

18     Q   Referring again to the series here that we have of

19  70-W-15, 16, 17 and 18, would you locate the McSweeney Spring,

20  where it used to be at least, and mark on the exhibit?

21     A   (Marking exhibit.)

22     Q   And then would you mark on the same exhibit the

23  location of the Navy well?

24     A   (Marking exhibit.)

25     Q   When was the last time--

10,048

1      THE COURT:   Where is the McSweeney Spring supposed to

2  be?

3      THE WITNESS:   It is right in the middle of this circle,

4  your Honor.

5  BY MR. VEEDER:

6      Q   Would you describe the location of the McSweeney

7  spring?

8      A   It is west of the Navy well, probably about a hundred

9  yards or so.

10     Q   How does it relate, from the standpoint of elevation,

11 that is, what is the relative elevation between the McSweeney

12 spring and the Navy well?

13     MR. STAHLMAN:   Pardon me for a moment.   Do you want

14 just his guess or judgment on it, or has he measured it, or--

15 BY MR. VEEDER:

16     Q   You have observed the elevation of the--

17     A   I have observed it.   I have never run a line of

18 levels or anything like that.

19     Q   As an expert engineer, would you estimate for us the

20 relative elevation between the McSweeney spring and the Navy

21 well?

22     A   They are approximately the same elevation.   Perhaps

23 the spring is a little lower down the valley.

24     Q   Are you stating for the record that the McSweeney

25 Spring--

16,049

1        MR. STAHLMAN:  Just a moment.  He has answered the

2 question.  He has given his judgment on it.

3        THE COURT:  Let him finish, Mr. Stahlman.

4 BY MR. VEEDER:

5        Q  Are you stating for the record that the elevation

6 of the McSweeney spring is lower or higher than the Pauba

7 well?

8        THE COURT:  The top of the Pauba well?

9        MR. VEEDER:  Yes.

10       THE WITNESS:  The McSweeney spring has not flowed for

11 a long time.  I haven't paid any attention to it.  I will go

12 and measure it and find out and tell you for the record.

13       MR. VEEDER:  You don't need to do that.

14       Q  Is the McSweeney spring dry now?

15       A  It is dry.

16       Q  How long, to your knowledge, has it been dry?

17       A  I would have to check with others.  I believe it is

18 five or six years or something like that.

19       Q  You have seen the McSweeney spring flow water your-

20 self, have you not?

21       A  I have.

22       Q  Would you compare the dates, as you recall them,

23 between the time that the Navy well was dug and the flowing

24 of the McSweeney spring?

25       A  I wouldn't be certain within a year or two, Mr.

1  Veeder.

2       Q  Give us the best you can.

3       A  I would say that the McSweeney spring probably

4  ceased flowing a year or maybe two years after the Navy well.

5  I was not too active on the ranch at that time.

6       Q  Have you considered the depth to water in the

7  Schrode well when that well was dug as it relates to the

8  depth to water at the present time?

9       A  I have not.

10      Q  So you don't know whether there has been a decline

11  in the level of the water in theSchrode well or not?

12      A  Not to my knowledge.  It could well be.

13      Q  When you placed the recorder in that well do you

14  recall the depth to water when you put the recorder in?

15      A  I believe the depth was 90.6, Mr. Kunkel told me.

16  I think I have written it down.  No, it was less than that.

17  The recorder is 91.9 feet from water.

18      Q  Didn't you measure the depth when you put the

19  recorder in?

20      A  No, I did not.

21      Q  At the time you put in the recorder were you pumping

22  from the Pauba well or the Navy well?

23      A  Yes.

24      Q  And do you know how long that well had been pumping?

25      A  Not definitely.  I assume it probably was a couple

10,051

1  of weeks, but I would have to check our ranch records to tell

2  you that.

3      Q   Is it customary to run the Navy well for so long a

4  period?

5      A   Customary to the number of cattle that are on the

6  pasture and whether we have the opportunity to irrigate it

7  and the condition of the irrigation.  Sometimes we can't

8  irrigate because they have cattle on there.

9      Q But it is not unusual to run the Navy well for two

10  weeks at a time?

11     A   Not unusual.

12     Q   Do you know whether the August Cantarini well was

13  in operation at the time you put the recorder on the Schrode

14  well?

15     A   I believe the August Cantarini well was in opera-

16  tion.

17     Q   So both the Navy and the August Cantarini well were

18  running at the time you put that on?

19     A   I didn't go and look, but I assume it was.  It had

20  been running the previous day, and the irrigation has been

21  going on.  We have records on that.

22     Q   By the way, will you supply us with the records

23  showing when you started the Pauba well or the Navy well

24  and the August Cantarini well as that relates to the date

25  when you established and installed the recorder?

1    MR. STAHLMAN: Do you want the records, Mr. Veeder, or

2    do you want just the information?

3    MR. VEEDER:  I may ask for the records later, but if

4    he could just make a check on it.

5    THE COURT:  In other words, you want to know how long

6    these two wells had been operating at the time the recorder

7    was put on the Schrode well?

8    MR. VEEDER:  That is right.

9    MR. STAHLMAN:  If he could give you the information,

10   you could check it if you want to.

11   MR. VEEDER:  I would like to have it in the record is

12   all.  He will return, will he not?

13   MR. STAHLMAN:  You are not going to finish with him

14   today, I assume.

15   MR. VEEDER:  I don't think so.

16   MR. STAHLMAN:  The next time he returns.

17   MR. GIRARD:  Better wait until the tests are run.  All

18   that will come in when Mr. Kunkel and whoever is checking the

19   Navy well give their conclusions.

20   MR. VEEDER:  It depends to a degree how long that

21   recorder is going to be on the Schrode well.

22   THE COURT:  The witness will get you the information

23   and put it in the record now how long the wells were pumping

24   at the time the automatic tester was put on the Schrode well.

25

BY MR. VEEDER:

Q   Mr. Wilkinson, will you take Vail's Exhibit U, which shows the outer extremities of the Vail property, and draw on there for us, if you can, as nearly as you can, the area of the Temecula grant?  Or perhaps it is already on there. I will ask you this:  Is the north line of the Pauba, the area marked "Pauba Land & Water Company," is that the area which is known as the Temecula grant?

A   That is a portion of the Temecula grant.   There are two grants.

Q   Owned by the Vail Company?

A   Owned by the Vail Company, yes.

THE COURT:  Counsel are going to get together, with the assistance of the Colonel here, and put those lines in.   You can do it after court or tomorrow.  You will have a lot of time tomorrow morning working on these-- probably all morning. I have a naturalization ceremony at the High School at 10 o'clock.  I think the Government has a non-jury case that is supposed to take half an hour or an hour.  So instead of coming in for an hour in the morning, I am going to try that case, and you may come in tomorrow afternoon at 2 o'clock. So you will have a lot of time in the morning to fix up these maps and show where these grant lines are.

BY MR. VEEDER:

Q   In regard to the use of water upon the parcel of

1   land that you have designated as, I think you call it, "Jack's

2   piece"--

3       A   "Piece by Jack's."

4       Q   --"Piece by Jack's," are you irrigating that land

5   now?

6       A   Not at the moment.

7       Q   Are you cropping it this year?

8       A   We pre-irrigated it.

9       Q   And you are irrigating it at the present time?

10      A   It will be under irrigation this season.

11      Q   That is what I mean.  What is the source of the water

12  for that land?

13      A   Water is obtained from the well on Jack Roripaugh's

14  property.

15      Q   And where is that well situated?

16      A   It is situated on Winchester Road in close proximity

17  to Winchester Road.

18      Q   It is in the Santa Gertrudis?

19      A   It is not far from Santa Gertrudis Creek.  I suppose

20  it is within a hundred yards of the watercourse of Santa

21  Gertrudis Creek.

22      Q   Do you have knowledge as to whether the Vail Company

23  owns an easement or a right to use that well, or what is the

24  arrangement?

25      MR. STAHLMAN:   That is objected to as calling for a

10,655

1    legal conclusion.

2           MR. VEEDER:  I simply asked him if he knows.

3           THE COURT:  Overruled, if he knows.

4           THE WITNESS:  Would you repeat it?

5    BY MR. VEEDER:

6           Q  Do you have knowledge as to the arrangement that

7    you have with Jack Roripaugh for the use of that well?

8           A  In the past, no, I don't know just what the arrange-

9    ment was at the present time.  Although I haven't made the

10   arrangements myself, I assume that we pay him for the water,

11   as we use it.

12          Q  You don't know, though?

13          A  I don't know what the exact arrangements are.  No,

14   I don't.  I haven't made them myself.

15          Q  And from your records do you have knowledge as to

16   how long that piece has been operated from that well?

17          MR. STAHLMAN:  Do you mean from the inception, or

18   while the Vails have had it?

19          MR. VEEDER:  I am not concerned about who had it.  I am

20   inquiring as to how long it has been irrigated.

21          THE WITNESS:  My knowledge is not sufficient to give

22   a definite number of years.  It has been a long time.

23   BY MR. VEEDER:

24          Q  Has it been irrigated since the time you went on as

25   assistant manager?

1    MR. STAHLMAN:  Your Honor, I would think that if he

2  wants to cross-examine on Jack Roripaugh's property and

3  matters which may affect him, that Jack Roripaugh should be

4  notified so that he may have an opportunity to be heard or

5  to have his counsel present or to be present himself, because

6  I think he has an answer in here that touches on this.

7    THE COURT:  What point are you getting at?  That this

8  ground is not irrigated by wells that belong to Vail, that

9  Vail has no right to water on that land?

10    MR. VEEDER:  That is correct, your Honor.  Here is the

11  situation.  We have, for example, a series of exhibits, with

12  tabulations of acreages which are irrigated.  We have tabulations

13  showing the total.

14    THE COURT:  You don't assume that the Vail Company are

15  contending that because they put on proof that they irrigate

16  this land from the Jack Roripaugh well that they are staking

17  any claim to his well, do you?  I apprehend that all they are

18  showing is that it has been irrigated.  If it has been

19  irrigated, is there any doubt in your mind that it could be

20  irrigated if lines were stretched from the various wells on

21  the Vail property?

22    MR. VEEDER: No, your Honor.  I am always happy to have

23  you anticipate me.

24    THE COURT:  What are we talking about, then?

25    MR. VEEDER:  In this regard.  Here they are claiming

1   water for a piece of land down here, they are pumping water

2   from the Santa Gertrudis, as I see it, or certainly the

3   Santa Gertrudis Valley, and I want to know for myself, the

4   record and for your Honor as to whether they are claiming

5   water from Temecula Creek for the irrigation of that parcel,

6   whether they are asserting a claim as a riparian owner to

7   the Temecula Creek, assuming that your Honor should decide

8   that the stipulated judgment is not binding.  I think we

9   have to know this.  We don't know what you are going to do on

10   it.  Certainly it is important as to the sources of water as

11   to each parcel of land, certainly it is important, and I am

12   assuming this is the man we can interrogate on this matter.

13          THE COURT:  I will direct Mr. Stahlman to supply

14   whatever your contractual arrangement is with Mr. Roripaugh

15   on that well.

16          MR. STAHLMAN:  Very well, your Honor.  The only point

17   I am making is that I don't think Mr. Veeder should go in

18   and make an attack which may affect the water rights of Mr.

19   Roripaugh without Mr. Roripaugh's being present.

20          THE COURT:  Well, the rule is that they stay away at

21   their own peril, but I think you should call Mr. Krieger, who

22   is representing him.

23          MR. VEEDER:  No, he is not represented by counsel.

24          MR. STAHLMAN:  He is representing himself.  But like

25   those other people, he anticipates that his case will be heard

1    when the Murrieta Valley is being heard.

2        THE COURT:  If you want to examine as to the situation

3    between Vail and Roripaugh, arrange to do it someday when

4    Roripaugh can be here, if he has no counsel.

5        MR. VEEDER:  He has no counsel.

6        THE COURT:  Will you do that?

7        MR. VEEDER:  Yes, I will.  I think it is important to

8    us, too.

9        THE COURT:  Let him know sometime when it is agree-

10   able.  These matters can be taken up at various times.  I

11   don't see what is involved here, unless of course the pumping

12   by Roripaugh or by Vail of the Roripaugh well for the benefit

13   of Vail might be contrary to the stipulated judgment.  There

14   is no doubt but that this piece of ground is riparian as a

15   connected part of other grounds.  Water could, therefore, be

16   piped to it from other wells.  And I assume that when proof

17   was put on that the proof was only put on to show that it

18   had been irrigated and that it was irrigable lands.

19       MR. STAHLMAN:  That's all.

20       THE COURT:  Without making any contentions as to

21   Roripaugh.  If you are going to contend that there is something

22   illegal as to Roripaugh--

23       MR. VEEDER:  Nothing illegal, no.  I am interested,

24   and I have a right to know, as to what arrangement is made,

25   whether it is under the stipulated judgment, whether they are

1   claiming it under the stipulated judgment, how they are

2   operating.

3       THE COURT:  I have directed Mr. Stahlman to produce

4   for you whatever there is, a written contract, if not some

5   witness.

6       MR. STAHLMAN:  I don't know.  I will get it, your

7   Honor.  I could assume about what happened, knowing how those

8   farmers operate.

9       THE COURT:  Yes, I could assume what happened.  They

10  just said, "Go ahead and pump it.  We don't care." That's

11  probably what happened.

12      MR. VEEDER:  I am happy to know it.

13      THE COURT:  The fellow that owns 160 acres next to

14  my property in Valley Center said, "You mind if I hook onto

15  your well?  I am sort of water this summer."  So he takes a

16  tractor and a three-inch line and pumps the well.  It doesn't

17  hurt the well.  It's all in the same watershed.

18      I imagine that you will find that this is no formal

19  document, notarized and subscribed before witnesses.  It is

20  probably just an arrangement where he said, "Just go ahead

21  and pump the well."  But Mr. Stahlman will get you the

22  information.

23      Adjourn until 2 o'clock tomorrow afternoon.  I have a

24  naturalization ceremony at 10.  This is a non-jury case, so

25  I think you might as well save your time and come in at 2.

        (Adjournment until Friday, May 29, 1959, at 2 P.M.)