# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

———

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

———

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place: San Diego, California

Date: May 29, 1959

Pages: 10,060 — 10,126

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court,
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 38                                                                10,080

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
    vs.                        )          No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
              Defendants.      )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Friday, May 29, 1959

APPEARANCES:

    For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                               WILLIAM E. BURBY, ESQ.,
                               Special Assistants to the
                               Attorney General,
                               Department of Justice,
                               Washington, D. C.

JOHN SWADER, OFFICIAL REPORTER

1    APPEARANCES (Continued):

2          For Defendant            GEORGE E. STAHLMAN, ESQ.
           Vail Company
3
           For Defendant State of   STANLEY MOSK, ESQ.,
4          California               Attorney General, by
                                    Fred Girard, Esq.,
5                                   Deputy Attorney General.

6          For Defendants
           Fallbrook Public         FRANZ R. SACHSE, ESQ.
7          Utility District,
           Et Al.
8
           For U. S. Navy           LCDR DONALD W. REDD.
9

10

11                                  -- --
                                      -
12                                    -

13

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX TO WITNESSES

| For Defendant Vail: | Direct | Cross | Redirect | ReCross |
|---|---|---|---|---|
| J. F. Davidson | 10,064 | | | |

# E X H I B I T S

| Defendant Vail's Exhibits | | Iden. | In Evid. |
|---|---|---|---|
| AE | Map | 10,068 | 10,104 |
| AF | Map | 10,076 | |
| AG | Map | 10,076 | 10,106 |

10,663

SAN DIEGO, CALIFORNIA, FRIDAY, MAY 29, 1959.  2:00 P.M.

(Another matter.)

THE CLERK: Number five, 1247-SD-C, United States vs. Fallbrook.  Further court trial.

THE COURT:  With reference to next week's calendar, I talked to the United States Attorney and there is one criminal case that will have to be tried for sure, and I think Judge Weinberger will be able to try it and I apprehend that I will have all of next week available starting Tuesday morning.

During the following week, of course, the Marines are having an engagement, Wild Horse Week, that will knock out the 10th, 11th and 12th.  So I propose, when court is adjourned this afternoon, to adjourn the case until next Tuesday morning at 10 o'clock in this courtroom.

MR. VEEDER:  Has your Honor given any thought as to the week following Wild Horse Week?

THE COURT:  I didn't bring my book in, but there are two days that week, as I recall, when Mr. Stahlman has pleaded off on the ground that he has a case to try.

MR. STAHLMAN:  That is the 18th and 19th, your Honor.

THE COURT:  That is the following week.

MR. STAHLMAN:  Yes.

THE COURT:  What days are those?

1   MR. STAHLMAN:  Thursday and Friday, your Honor.

2   THE COURT:  We will try to work on Tuesday and Wednesday

3   of that week.

4   MR. STAHLMAN:  I don't know how long it will take us.

5   I know after we present this evidence this afternoon I can

6   give your Honor a better idea how long we will be before we

7   are concluded.

8   THE COURT:  All right.  Proceed.

9   MR. STAHLMAN:  I wonder if we could put on an out-of-

10  town witness.  He would like to get back and not drive at

11  night.

12  THE COURT:  Yes, call the witness out of turn.

13  MR. VEEDER:  While he is getting on the stand, your

14  Honor, may I inquire whether your Honor has given considera-

15  tion to any of the proposed findings I tendered to you yester-

16  day?

17  THE COURT:  I haven't had a chance to look at them, Mr.

18  Veeder.  I will try to do it over the weekend.

19

20           J. F. DAVIDSON,

21  called as a witness on behalf of Defendant Vail, being first

22  duly sworn, testified as follows:

23  THE CLERK:  State your name, please.

24  THE WITNESS:  J. F. Davidson.

25

1                           DIRECT EXAMINATION

2    BY MR. STAHLMAN:

3          Q   Mr. Davidson, what is your business or profession?

4          A   Engineer-- civil engineer.

5          Q   How long have you been a civil engineer?

6          A   For forty years.

7          Q   Where did you receive your primary education?

8          A   I received my education-- I am registered in the

9    State of California. My number is 862.

10         Q   Where did you receive your primary education?

11         A   I apprenticed through the Engineer with the County

12   of Riverside.

13         Q   Did you graduate from any college or university?

14         A   No, I never did.

15         Q   What is the present position that you occupy, or

16   business?

17         A   I am practicing engineering and surveying, and have

18   been for the last--

19         Q   At what place?

20         A   In Riverside.

21         Q   What is the name of the organization?

22         A   J. F. Davidson.

23         Q   Were you formerly associated with a partner in that

24   same business?

25         A   Yes; Mr. Fulmor.

1    Q   What is your specialty?   What do you do in that

2    business?

3    A   We have a general practice of engineering, land

4    surveying, all different types of engineering-- water.

5    Q   Have you in the past had working under you surveyors

6    and engineers and people qualified for the purpose of making

7    surveys?

8    A   Yes.

9    Q   Over what period of time have you been engaged in

10    that type of work?

11    A   Since January 1, 1923.

12    Q   Did you have occasion to make a survey of the Vail

13    Ranch?

14    A   Different surveys, yes.

15    Q   Different surveys?

16    A   Yes.

17    Q   Have you made a survey in relation to a soil survey

18    that was thereafter made by a Mr. Coit?

19    A   Well, I remember when that survey was made.   It was

20    done through our office.   I had nothing to do with it.

21    Q   You had nothing to do with the soil survey?

22    A   No.

23    Q   Are you familiar with the soil survey?

24    MR. VEEDER:   Your Honor, I don't believe that last

25    answer was responsive to the question.

1        I would like to have the question and answer read.

2        THE COURT:  Read it.

3        (The reporter read the last question and answer as

4    follows:  "Q  You had nothing to do with the soil survey?

5    A  No.")

6        THE COURT:  What exhibit number is this?

7        MR. STAHLMAN:  This is a new map, your Honor.  It is

8    just to show the process by which the soil survey map came

9    into existence.

10       MR. VEEDER:  That is the shortest ten days I have ever

11   seen, your Honor.

12       MR. STAHLMAN:  If you want to put this off we will lodge

13   it and put it on at a later time, if you are objecting by

14   reason of the ten-day rule.

15       MR. VEEDER: Well, let him go ahead and let him testify

16   to some point where it becomes essential for us to review what

17   has been done on the map.

18       THE COURT:  Then you may have time.  Is that agreeable?

19       MR. VEEDER:  Yes, I am anxious to be cooperative in

20   regard to this witness.

21       THE COURT:  All right, waive the ten-day rule.  If you

22   need time for cross-examination, it will be granted to you.

23       MR. STAHLMAN:  This map just came out of the printer's

24   about ten minutes ago, your Honor.

25       Q  Directing your attention to the map placed on the

board--

May we mark it as-- that would be AE, I believe.

THE COURT:  What is the next number, Mr. Clerk?

The Clerk has stepped out.  Yes, it is AE.

(Map marked Defendant Vail's Exhibit AE for Identifica-
tion.)

BY MR. VEEDER:

Q  Directing your attention to a map which has been
put on the board here designated as Vail's Exhibit AE for
Identification, are you familiar with that map?

A  Yes, sir.

Q  By whom was it prepared?

A  Prepared through our office.

Q  Were you in charge of the office at that time in
this type and character of work that was being done?

A  I knew this work was going on all of the time.

Q  It was through your office?

A  Yes.

Q  You run the office, do you?

A  Yes.

THE COURT:  The question was, were you in charge, was
this done under your supervision and control?

THE WITNESS:  To a certain extent.  Most of this work
was done under the direction of Mr. Jones, who was handling
the Vail Company's interests.

BY MR. STAHLMAN:

Q   Will you explain the arrangement that was made?
Mr. Jones was an engineer who was employed by the Vail Company?

A   That is right.

Q   And in so far as the making of the maps was con-
cerned, did your office make those maps?

A   We made the maps, yes.

Q   And in order to make the maps the various surveys
that were made for the purpose of obtaining the information
by which the map was constructed, was that done by your office?

A   That is right.

Q   What do you call this map that is represented by
Vail's Exhibit AE for Identification?

A   That shows the triangulation system which was de-
veloped by us for the purpose of obtaining the contours and the
segregation of the properties-- classes of soil.

Q   Will you explain to us the process by which and the
information that you obtained and used in order to construct
such a map?

A   Actually those triangulation points were done by the
normal way of triangulation, and from those points we used those
for a basis of our plane table work in constructing contours.

Q   Will you tell us the process by which you do that,
assuming that we know nothing about it?  In other words, give
us a description of what was done.  In other words, did you go

1   into the field, did you construct plane table maps, et cetera?

2       A  This work was done in the field from a plane table--

3   a plane table is normally about 24 by 30 or 36 inches in size--

4   with an instrument called an alidade.  That is used to locate

5   the elevation of that table from the triangulation points,

6   and you tie into the points of different triangulation with

7   the alidade to locate yourself on this plane table sheet, and

8   the contours are drawn in.  There are rodmen that follow the

9   contours, or they might get the section of certain areas and

10  contours are interpolated.

11      THE COURT:  Let's go back.  This map, Vail's Exhibit

12  AE, doesn't have contours on it, does it?

13      THE WITNESS:  No, this one hasn't.

14      THE COURT:  Well, now, you have to have a starting

15  point.  Did you get a base map of the county?

16      THE WITNESS:  We had lots of monuments in that area

17  and we tied into property lines.  We tied into property lines.

18      THE COURT:  Were there U. S. Geological Survey monu-

19  ments on the property?

20      THE WITNESS:  Bench marks, yes.

21      THE COURT:  You start out, do you, with a bench mark,

22  identify the bench mark, and then proceed from there?

23      THE WITNESS: We take our levels off the bench mark and

24  follow through the circuit to perhaps another one within the

25  area to check ourselves.

THE COURT:  A bench mark tells you exactly where you are and tells you also the elevation.  It tells you two things, doesn't it?

THE WITNESS:  No, a bench mark doesn't tell you where you are.  It gives you the elevation.

THE COURT:  Can't you find a bench mark and from U. S. Geological Surveys find out where that bench mark is?

THE WITNESS:  Not accurately, no.

BY MR. STAHLMAN:

Q  But you have available to you the original maps that were recorded in the County Recorder's Office of the Vail properties?

A  Yes.

Q  In fact, you have copies of those in your office, to this day?

A  That is right.

Q  And you used those and such other information as was available to you for the purpose of locating yourself in relation to the construction of this map?

A  Yes, sir.

MR. VEEDER:  I object to that question as being leading, and I am certainly going to object to any more of these leading questions, your Honor.

THE COURT:  Overruled.  The answer may stand.  That is what every surveyor does.  He takes all the information

1    available to him.

2    MR. VEEDER:  I am very familiar with that, your Honor.

3    But I feel on the basis of what has gone on up to now I don't

4    think this witness did the work himself in this regard.  I

5    believe that Willis Jones did it.  But go ahead.  It is cross-

6    examination.

7    THE COURT:  It was done under his direction, control and

8    supervision.  That is all that is required.

9    BY MR. STAHLMAN:

10    Q  After you obtained the triangulations, were there

11   further maps prepared in relation to this particular project

12   you had under consideration at that time?

13   A  Contour maps were prepared.

14   Q  You then prepared contours?

15   A  Yes.

16   Q  The first step, of course, was preparing this

17   triangulation?

18   A  That is right.

19   Q  Is this map, Vail's Exhibit AE for Identification,

20   in your opinion, a correct map of the conditions that it

21   attempts to portray as a map?

22   A  Yes, sir.

23   THE COURT:  You got your directions and bearings by

24   instrument, I take it?

25   THE WITNESS:  Yes, sir.

THE COURT:  And your distances, did you work those out by triangulation, or were they chained off, or what?

THE WITNESS:  Some of them were chained off.  Others were computed.

THE COURT:  When you had certain angles and distances, then other distances could be obtained by triangulation?

THE WITNESS:  Yes, sir.

THE COURT:  And the bearings and distances, to your knowledge, are accurate?

THE WITNESS:  Yes, sir.

THE COURT:  Was this map placed upon some base map to start with?  What did you use as a starter?  I see part of some old subdivision up here, and the Temecula subdivision down below.  Was there a base map prepared that you started with?

THE WITNESS:  Yes, sir.  The original maps of that area are recorded in the Courthouse here in San Diego, and there are a great many of those lines are surveys the County have established-- county roads that we tied into.  In other words, we used all the available data that was possible.

BY MR. STAHLMAN:

Q  Was there also a survey made by Mr. Taylor that preceded this survey?

A  Yes.

Q  Did you utilize the benefit of the map that Taylor

10,074

1   had constructed?

2       A  Yes, sir.

3       THE COURT:  Was his survey recorded and filed with the

4   County Recorder?

5       THE WITNESS:  Judge, I don't know, but I have a copy of

6   it here.

7   BY MR. STAHLMAN:

8       Q  Showing you a map, you brought this into court today,

9   did you?

10      A  Yes.

11      Q  Directing your attention to the map that we have

12  placed upon the board here as the map of Pauba Rancho, River-

13  side County, Pauba Land & Water Company, surveyed and sub-

14  divided 1894-1895, by J. A. S. Taylor, is that the map you

15  previously referred to as one of the maps that you utilized?

16      A  Yes, sir.

17      Q  The map that you made and the survey that you made

18  was a survey that was your own survey from start to finish,

19  however; is that right?

20      A  Yes, as far as our work is concerned, yes, sir.

21      Q  Was this Taylor map in your possession since the

22  time that you made this survey?  You had it filed in your

23  office?

24      A  Before that.

25      THE COURT:  Where did you get the Taylor map?  This is

10,675

1    Exhibit AF.

2        THE WITNESS:  Well, Judge, it was in our possession.

3    My former partner was the County Engineer and he obtained this

4    map some place.  Where I don't know.

5        THE COURT:  Did you check the Taylor map, Exhibit AF,

6    against the existing recorded maps in San Diego County?

7        THE WITNESS:  Yes.

8    BY MR. STAHLMAN:

9        Q  You had a copy of the San Diego County map in your

10   possession at that time, did you not?

11       A  Yes.

12       Q  What was the name of your former partner?

13       A  Mr. A. C. Fulmor.

14       Q  Was he your partner at the time the survey was made

15   of the Vail Ranch?

16       A  Yes, sir.

17       MR. STAHLMAN:  Unless there is some particular reason--

18   this is the only copy he has of this map-- I would prefer not

19   to put it in evidence, your Honor.  It is merely explanatory

20   of the process.

21       MR. VEEDER:  I would certainly prefer not to put it into

22   evidence, because I have an objection to it.  It has not been

23   offered.

24       MR. STAHLMAN:  No.

25       THE COURT:  It may be withdrawn, then.  Is that agree-

1    able?

2        MR. VEEDER:  Well, let's let things develop a little

3    bit here, your Honor.

4        THE COURT:  All right, it is marked for identification

5    as Vail's Exhibit AF.

6        (Map marked Defendant Vail's Exhibit AF for Identifica-

7    tion.)

8        THE COURT:  Now, is this a new map?

9        MR. STAHLMAN:  Yes, your Honor.  May this be marked

10   Vail's Exhibit AG for Identification?

11       THE COURT:  Vail's AG for Identification.

12       (Map marked Defendant Vail's Exhibit AG for Identifica-

13   tion.)

14       MR. STAHLMAN:  This is the same as Vail's B that has

15   already been used.

16       THE COURT:  You say it is the same?

17       MR. STAHLMAN:  Yes.  It is a different scale, however,

18   your Honor.  I will try to follow through on the same scale as

19   the original map.

20       Q  Now, directing your attention to the map Vail's AG

21   for Identification, are you familiar with that map?

22       A  Yes, I am familiar with it.

23       Q  Who made this map, if you know?

24       A  That was compiled by our office.

25       Q  Was this the map that was made after your triangulation

1  map was prepared?

2      A  Yes, sir.

3      Q  What was the purpose of this Map AG?

4      A  That was to show the roughness of the soil and the

5  area, the terrain.

6      Q  You would commonly refer to this as a contour map,

7  would you?

8      A  Yes.

9      Q  During the time you were making the survey, did you

10  have a man in your employ named Mr. Bruner?

11      A  Yes.

12      Q  Who was Mr. Bruner?

13      A  He was our office man on this job.

14      Q  Did he, to your knowledge, work on the job?

15      A  Yes.

16      THE COURT:  Was Vail's AG made under your supervision

17  and control?

18      THE WITNESS:  Yes, sir.

19  BY MR. STAHLMAN:

20      Q  This Vail's Exhibit AG, in your opinion, is this map

21  correct in portraying the different conditions that the map

22  purports to exhibit?

23      A  Yes, sir.

24      Q  Now this map I am showing you here has heretofore

25  been marked as Vail's C for Identification.  It shows lots and

1    blocks on this map.  Are you familiar with the fact that such

2    a map was prepared?

3          A  Yes.

4          THE COURT:  Who prepared it?

5          THE WITNESS: Mr. Bruner worked on that map.

6          MR. VEEDER:  I object, your Honor.  Now the question

7    was, who made the map?  He says Mr. Bruner worked on it.

8          THE WITNESS:  Mr. Bruner made the map.

9          THE COURT:  This was while he was in your employ?

10         THE WITNESS:  Yes.

11         THE COURT:  Made under your supervision and control?

12         THE WITNESS:  Yes.

13   BY MR. STAHLMAN:

14         Q  How long had Mr. Bruner been in your employ at that

15   time?

16         A  Several years.  I don't remember.

17         Q  Had he done this type and character of work on other

18   projects that you had handled?

19         A  I presume he had.  I don't recall any instance.

20         MR. VEEDER:  I move to strike the answer as being not

21   responsive, your Honor.

22   BY MR. STAHLMAN:

23         Q  You don't recall?

24         A  No.

25         THE COURT:  It may go out.

BY MR. STAHLMAN:

Q  Was Mr. Bruner in your opinion a man capable of designating upon a map the areas and planimetering the areas and determining acreage within those areas?

A  Yes.

THE COURT:  Is this map Vail's Exhibit C made on the same base as the contour map Exhibit AG?

THE WITNESS:  Yes, Judge, on the same base.

THE COURT:  Exhibit AC doesn't take in the Santa Rosa?

THE WITNESS:  There is more here.  This is added on. This has been added on.

THE COURT:  You are concerned here only with the part of it shown with the lot numbers in blue?

MR. STAHLMAN:  Yes.

THE COURT:  That is made on the same base as Exhibit AG?

THE WITNESS:  Yes.

THE COURT:  And the contours on Vail's C are the same as the contours on Vail's AG?

THE WITNESS:  They are over in that area; not in this area.

THE COURT:  By that you mean the area shown by the lot numbers in blue?

THE WITNESS:  Yes.

THE COURT:  Leaving out the Santa Rosa.  Was this prepared by your company for the Vail Company?

1          THE WITNESS:  Yes, sir.

2    BY MR. STAHLMAN:

3          Q  In fact, you have your records with you that show

4    the preparation of this map and the charges therefor-- your

5    ledger sheets?

6          A  I have the ledger sheets, yes.

7          Q  By the way, what were the dates of that ledger sheet

8    that showed when this soil map was prepared?

9          A  I have some notations here on the entries in the

10   book.

11         MR. VEEDER:  Just a moment.  We ought to have some

12   foundation.  Is he the one who kept the books?  Who kept the

13   books?

14   BY MR. STAHLMAN:

15         Q  Are those your official records and ledger books of

16   your office?

17         A  These are our records.

18         Q  Kept under your direction and control?

19         A  Yes.

20         Q  What is the information there pertaining to this?

21         A  August '26 is the date that this--

22         THE COURT:  What year?

23         THE WITNESS:  1926.

24         THE COURT:  August of 1926.

25         THE WITNESS:  Yes.

BY MR. STAHLMAN:

Q   Do you have entries in relation to the preparation of the original map, that is, the triangulation map as well as the contour map and then the work that Mr. Bruner did for you?

A   All the work that we have done on this.

Q   And it does include the Bruner work?

A   Yes.

MR. STAHLMAN:   I will offer in evidence these maps, your Honor.

MR. SACHSE:   Which are you offering?

MR. STAHLMAN:   First I will offer Vail's Exhibit C in evidence.

MR. SACHSE:   That is the one on top?

MR. STAHLMAN:   Yes.

MR. VEEDER:   Of course, we object on the grounds that this is strictly hearsay, the whole basis of it is hearsay.

THE COURT:   What do you mean "hearsay"?

MR. VEEDER:   Just that, your Honor. The Taylor map he didn't make.  He didn't know when it was made.

THE COURT:   The Taylor map was only one, he said, of the various maps.  He got information from various recorded maps in the County Recorder's Office, and he mentioned also that he looked at the Taylor map.

MR. VEEDER:   I object on the grounds that this is

1    hearsay and the whole basis is hearsay.

2         I object further on the grounds that there is an

3    obvious disparity among these maps.

4         I object on the grounds that there is no proper

5    foundation laid for these maps, nor for the data they purport

6    to show.

7         I would like to ask some questions on voir dire just

8    generally and then specifically as to how these documents,

9    these maps, were drafted and prepared, reserving of course the

10   opportunity for more full investigation of them by reason

11   of the ten-day period.

12

13                    VOIR DIRE EXAMINATION

14   BY MR. VEEDER:

15        Q  Now, at the outset-- your name is Davidson?

16        A  Davidson, yes.

17        Q  At the outset, Mr. Davidson, are you stating that

18   these two maps-- I am now referring to Vail's C and Vail's AG--

19   are identical?

20        A  No, they are not identical.

21        Q  They are not identical?

22        A  No.

23        Q  Now, will you state for us where they are at variance

24   one with the other?

25        A  Mr. Stahlman presented these to show the progress,

I believe--

Q   Now where are they at variance?

A   --of the triangulation.  Number one shows the triangulation system; number two shows the contours; number three shows the segregation of the different soils.

Q   Speaking from the standpoint whether the data-- for example, I am referring to the Nigger Canyon Dam and Reservoir.  I observe that on one map you refer to it as Nigger Canyon Dam and show a reservoir.  Now what was the date when that map Vail's AG was made?

MR. STAHLMAN:  Be sure you know what AG is.

THE COURT:  AG is the contour map.

THE WITNESS:  The contour map was made-- that is, most of the contour map was made in-- it was over a period of two or three years or several years.  Some of that work was done in 1923.

BY MR. VEEDER:

Q   Which part was done in 1923?

A   The part around in the-- close to the ranch, in the ranch area where they were farming.

Q   Which ranch?

A   The Vail Company ranch down near Temecula.

Q   Show me the part that was made in 1923.

A   I can't show you the definite part.  That is 33 years ago or more.

1    Q   That is one of the problems.

2    A   I don't remember that.  But I can show you where we
did the first work.  In this area here (indicating).  We did
a lot of work up in here on our contours, and down in here
when they were developing that farming.

6        THE COURT:  Indicating at the western end of the Pauba
Valley.

BY MR. VEEDER:

9    Q   What year was that work commenced?

10   A   Well, it was done over a period of different times.
It was not all done at once.  As they would develop a field we
would contour it for them.

13   Q   You did the first contour work?

14   A   Through our office.

15   Q   Who did it?

16   A   I think I did it.

17   Q   Can you point out what work was done?

18   A   I know that this-- I did this job in here (indicat-
ing.)

20   Q   You are pointing to what?

21   A   This area that is east of Temecula.

22   Q   And you did it all yourself?

23   A   No.  I did some work there on my own.

24   Q   Do you have the original notes on it?

25   A   Yes.

JOHN SWADER, OFFICIAL REPORTER

1      Q  Can you produce them?

2      A  I presume I can.

3      Q  Will you do so?

4      A  I can't now.

5      Q  We will have you bring them in.

6      A  Yes.

7      Q  What work did Willis Jones do?

8      A  Willis Jones was the engineer that the Vail Company

9  employed to put this thing together, to put this suit to-

10  gether.

11     Q  Is it not a fact that he started in 1919 doing some

12  contour work?

13     A  Probably did.

14     Q  Long before you started?

15     A  No, we did most of the work-- that is, the physical

16  work.

17     Q  When did you first start doing contour work for the

18  Vail Company?

19     A  Oh, we did some work probably in-- I would make a

20  guess about--

21     Q  I object-- don't guess.

22     MR. STAHLMAN:  Is this cross-examination, or voir dire,

23  or what?

24     MR. VEEDER:  It is voir dire.

25     THE COURT:  Give us your best recollection, Mr.

1  Davidson.

2       THE WITNESS:  Oh, I would say around about 1914-15.

3  BY MR. VEEDER:

4       Q  1914 or 1915?

5       A  Yes.

6       Q  And you did that work in 1914 and 1915 down in the

7  area which would be referred to as the southeasterly--

8       A  Down by the Lower Camp where the potato field is,

9  down here (indicating).

10      Q  What acreage did you contour at that time?

11      A  I don't recall.

12      Q  You don't know?  Where was the next work you did

13 yourself?

14      A  I don't recall.

15      Q  But this work you did.  I am pointing now to the

16 Lower Camp, which would be the southeasterly portion, would it

17 not, of the Temecula grant?  Are you familiar with the Temecula

18 grant?

19      A  Yes.

20      Q  And that would be the southeasterly part?

21      A  Yes.

22      Q  You don't know the acreage that you did there?

23      A  No.

24      Q  What was the next date when contour mapping was under-

25 taken?

1    A  I don't recall.

2    Q  What was the next area that was contoured?

3    A  I just don't remember.

4    Q  Do you know the area which the Vail Company did

5    itself independently?

6    A  No, I don't.

7    Q  It did some?

8    A  I don't know what they did.

9    Q  To which area of the map showing the triangulation

10   does the Taylor map pertain?

11   A  Well, the Pauba Ranch.

12   Q  The whole ranch?

13   A  Practically, yes.

14   Q  In other words, the Taylor map is basically the map

15   upon which Vail's Exhibits AG, C; etcetera, are based; isn't

16   that right?

17   A  It is on the Pauba Ranch, the Taylor map of the

18   Pauba Ranch.

19   Q  And you based all of your maps on the Taylor map;

20   isn't that right?

21   A  No, we don't.

22   THE COURT:  Where is the Taylor map now?

23   THE WITNESS:  We tie into all the corners we could find.

24   THE COURT:  Go ahead.  I am listening.

25   MR. VEEDER:  I would like to have him locate the

1   points relied upon by him in establishing this triangulation

2   map that appear on the Taylor map, which is Vail's AF.

3         MR. STAHLMAN:  That is not a question.

4   BY MR. VEEDER:

5         Q  Would you please? Can you?

6         MR. STAHLMAN:  I don't understand it.

7         THE WITNESS:  I don't know what you are talking about.

8   BY MR. VEEDER:

9         Q  Turning to the Taylor map, Vail's Exhibit AF, would

10  you state what part of the Taylor map is used in establishing

11  and making your triangulation map which has been numbered, I

12  believe, Vail's AE?

13        A  To clarify this I would like to make a statement that

14  this Taylor map is a reproduction of the original of Pauba

15  Ranch.  Mr. Taylor made that survey, he established rented

16  monuments in all corners, and consequently whenwe were running

17  this triangulation we kept tying in, we would tie into Mr.

18  Taylor's rented corners.

19        THE COURT:  Are those what are referred to on Exhibit

20  AG as PR16, PR17?

21        THE WITNESS:  Yes, those are Pauba corners, and they

22  are numbered on the ground.

23        THE COURT:  Those are monuments on the ground?

24        THE WITNESS:  Yes.

25        THE COURT:  In making your survey you located those

1  old corners?

2        THE WITNESS:  Yes, sir.  We would tie into them.

3        THE COURT:  The record will show, from an inspection

4  of the Taylor map, which is Exhibit Vail's AF, that at the

5  corners on the outside of the ranch, starting at the very

6  upper right-hand corner P8, crosswise P9, following around P10,

7  P11, P12, P13, P14, P15, P16; on Vail's Exhibit AG appears PR8,

8  PR9, PR10, PR11, PR12, PR13, "PR" apparently meaning "Pauba

9  Ranch" and P on the Taylor map meaning "Pauba."

10        THE WITNESS:  Yes.

11        THE COURT:  And these tie in with the outside perimeter

12  of the Ranch.  Other than that, the Court sees very little

13  similarity between the Taylor map and the other maps on the

14  board.

15        MR. VEEDER:  That is so true; your Honor.

16        THE COURT:  Let's see where we are.  The record shows

17  that monuments were set at the corners of the ranch in some

18  early survey and they were called the Pauba Ranch monuments

19  1, 2, 3, 4.  That constituted the outside perimeter.  They

20  appear on the Taylor map, an old map, which, it is true, has

21  very little identification.  But they appear there.

22        On the maps this witness has been testifying to, he

23  testified that they picked up those old monuments and they have

24  been numbered PR8, PR9, PR10, et cetera, around all the outside

25  corners of the ranch.  Other than that I don't see any

1  similarity.

2      MR. VEEDER:  There isn't any.  It is strictly hearsay,

3  your Honor.

4      THE COURT:  Comparing these maps, the Court has

5  observed that the corners set on triangulation on Map AE have

6  been carried over on the contour map AG and carried over on

7  to the soil map C, and you can pick up the identical triangula-

8  tion monuments on all three maps.  Starting in the upper

9  right-hand corner of the map, up by P9 is the corner GX.

10  You will find it also on map C and on the other maps.  You

11  will find all the triangulation monuments that appear on the

12  triangulation map carried over onto the contour map.  A

13  cursory check of the contours on AG shows that they have been

14  carried over onto Vail's C.  The words "Nigger Canyon Dam"

15  appear on all three of the maps.  When those words were put

16  on I don't know.  On one of the early maps it appears as

17  "Nigger Canyon Dam Site."

18      MR. VEEDER:  And it shows up again as "Nigger Canyon

19  Dam Site."

20      THE COURT:  Yes.  In other words, apparently the base

21  map had it as "Nigger Canyon Dam Site," and on one of the

22  early maps it appears as "Pauba Reservoir Site."  On another

23  map it appears as "Pauba Reservoir."  But it is obvious that

24  the contours are the same on Vail's AG and on Vail's C.

25      MR. VEEDER:  Your Honor, I move to strike your Honor's

10,091

1  statement.  I don't believe it can be said that they are obvious

2  without running them out, and I certainly haven't run them out.

3  I don't know.  I have no basis for knowing that the Taylor map

4  is identical.

5  THE COURT:  There are no contours on the Taylor map.

6  I merely say that it is obvious from an inspection that the

7  contours on Vail's AG and Vail's C are the same.  I have spot

8  checked two or three of them and they are the same contours.

9  MR. VEEDER:  I renew my objection, of course.  But I

10  point out that there is nothing to show that this witness ran

11  out these corners, located the monuments, made the surveys,

12  and I would like to ask him some more questions.

13  THE COURT:  It is your view of it, Mr. Veeder, that for

14  a big survey the job had to be done by some firm?

15  MR. VEEDER:  Not in the slightest.

16  THE COURT:  That you would have to bring in every chain-

17  man who held a line and every rodman who carried a rod in

18  order to lay a foundation for a map?

19  MR. VEEDER:  Not in the slightest.

20  THE COURT:  Many surveys can't be done by one man.  Many

21  surveys would be impossible to be done by one man.

22  MR. VEEDER:  I will stipulate to that, your Honor.

23  Q  Now, you don't know, then, who established all of

24  the contour lines that appear on Vail's AG?

25  A  Where is Vail's AG?

THE COURT:  The contour map right there.

THE WITNESS:  Is this--

MR. VEEDER:  Here.  Do you want to get down closer?

THE WITNESS:  All the contours under that triangulation system were developed by our office.

BY MR. VEEDER:

Q  Under your direction?

A  From field notes and from plane table sheets.

Q  And who made the plane table sheets?

A  The field men under our direction.

Q  Are there not on Vail's AG contour lines that were made by parties concerning whom you have no knowledge?

A  Not in this affected area.

Q  What do you mean by the affected area, sir?

THE COURT:  I take it he is eliminating that Santa Rosa map.

THE WITNESS:  That is right.

THE COURT:  Off to your left.  We are concerned only here with the Temecula grant, the Pauba, and the Little Temecula.

BY MR. VEEDER:

Q  Now you state that the first contour work you did was in 1914 and 1915-- you did that yourself?

A  Well, somewhere along there.

Q  And you said there was other contour work that was

1    done at times concerning which you had no knowledge?

2         MR. STAHLMAN:  Just a moment.

3         MR. VEEDER:  That's what he said.

4         Well, I will renew the question, then.

5         Q  Was there not contour work done on the Pauba Ranch,

6    the Temecula grant, and the other areas shown on Vail's AG--

7         A  The contours weren't used on this map.

8         THE COURT:  I was just going to object to your question

9    as being so ambiguous as to confuse the witness.  But he has

10   given an answer that clears it up.  Go ahead.

11   BY MR. VEEDER:

12        Q  What was the source of the data, then, that you

13   utilized in putting on all of these contours?

14        A  The data which we accumulated.

15        Q  And nothing else?

16        A  Not since--  No.

17        Q  Only your data?

18        A  That map shows our work.

19        Q  And only your work?

20        MR. SACHSE:  That is objected to as having been asked

21   and answered.  I have to pay for this transcript.

22        MR. STAHLMAN:  I am wondering if we had made this

23   attack upon Mr. Veeder's foundation what his attitude would

24   have been.

25        THE COURT:  He would still be here laying a foundation,

1   if you had.

2       MR. STAHLMAN:  Yes.

3   BY MR. VEEDER:

4       Q   Now, in regard to the work that was done by Willis

5   Jones for the Vail Company in regard to surveys and in regard

6   to contour maps, establishing contours, can you state what

7   those areas were?

8       MR. STAHLMAN:  I object to that as being indefinite

9   and uncertain, your Honor.  The kind of surveys he is talking

10  about that Jones did-- he was an engineer, he might have made

11  various surveys.

12      THE COURT:  Well, if he knows what Jones did, he may

13  answer.

14      THE WITNESS:  I know of no surveys that Jones made,

15  any field surveys down there.  He might have made some.  I

16  don't know.

17  BY MR. VEEDER:

18      Q   Did you utilize any of his work?

19      A   Not to my knowledge, no.

20      Q   In regard to the areas which are shown on this map,

21  referring now to Vail's C, on which there are shown the

22  acreages, can you state that they are accurate to your personal

23  knowledge?

24      A   That work was done by Mr. Bruner, a reliable

25  engineer who had done a lot of work for us, and I am sure

over

1  they were accurate as can be.

2       Q   I am going to ask you to step down to Vail's C and

3  I will point out to you in Lot 1, Parcel 2 and ask you to state

4  into the record what appears-- Have you oriented yourself?

5  Lot 1, Parcel 2, Vail C-- I observe that through that parcel

6  there runs Arroyo Seco on one side, on the south side of the

7  Wash it says 31.6 acres; on the north side it says 31.6 acres.

8       THE COURT:  You ignore the tie-in symbol there.  Aren't

9  you familiar with the tie-in symbol?

10      MR. VEEDER:  I am.

11      THE COURT:  Which reads, as I read maps, that those two

12  are one parcel of 31.6 acres.

13  BY MR. VEEDER:

14      Q  Are you stating that is 31.6 acres?

15      THE COURT:  Let's find out first.

16      Is that what that symbol means, Mr. Davidson?

17      THE WITNESS:  It shows they are tied in together.

18      THE COURT:  So that down below in the parcel below on

19  one side of the river is--

20      MR. VEEDER:  22, and the other 26.

21      THE COURT:  --22 and 26.

22      MR. VEEDER:  Interesting.

23      THE COURT:  Yes, it is.

24      In other words, the symbol ties them together, but the

25  acreage may be separately stated.

1      THE WITNESS:  There is where it shows that this acreage

2 is tied across the road.

3      THE COURT:  But the acreage is given for the whole

4 piece.

5      Go ahead, Mr. Veeder.

6 BY MR. VEEDER:

7      Q  Are you stating to the Court that this parcel of

8 land to which I am now referring, Lot 1, Parcel 2, is 63.2

9 acres or 31.6 acres?

10      A  I have no way of knowing.  I would have to planimeter

11 that to find out.

12      Q  Would you compare the size of Parcel 2 with Parcel

13 1 and state into the record their respective acreages as shown?

14      A  I don't think that is exactly a fair question to ask

15 me without being able to planimeter it myself.

16      Q  In other words, you don't know whether it is accur-

17 ate or not, do you?

18      A  I don't know whether it is accurate, but I assume it

19 is.  The man who did this was a high-class man.  Of course,

20 this is a 40-acre piece.  What relation is this to this?  It

21 looks to me like that is probably 51 acres there.

22      MR. STAHLMAN:  We are also talking about land that is

23 going to be cut out.  That is behind the dam, isn't it?

24      THE COURT:  Has any effort been made to run a total on

25 the acreages shown in these various lots and tracts on an

1    adding machine?

2         MR. STAHLMAN:  From this map?  It was done at the time

3    the soil survey was done.  We have that, an accumulation of

4    these different acreages, broken down into classifications of

5    soils.

6    BY MR. VEEDER:

7         Q  In other words, you can't say, you don't know your-

8    self?

9         A  That is right.

10        Q  The meaning to be ascribed to the acreages set forth

11   in 1 and 2 on Parcel 1?

12        THE COURT:  The meaning to be ascribed?

13        MR. VEEDER:  Yes; whether it is the total acreage,

14   whether it is the irrigable acreage.

15        MR. STAHLMAN:  I object to that, if your Honor please.

16   That is not cross-examination.

17        THE COURT:  Sustained.  The witness didn't testify about

18   that at all.

19        MR. VEEDER:  Well, your Honor, he is offering it from

20   the standpoint of acreages, and I respectfully submit that if

21   they want to take the acreages off, fine.  But from my standpoint

22   I simply say, and I renew my objection, that this map purports

23   to show acreages, and I am referring to Vail's C.  The witness

24   who has been called to identify it and upon whose testimony

25   it is to be offered says he doesn't know what those acreages

10,098

1    spell out.

2         THE COURT:  He has not said that.  You asked him

3    whether it showed irrigated or just total acreages, and I

4    sustained the objection to the question because he didn't

5    testify about that.

6         MR. VEEDER:  Your Honor has forgotten an earlier

7    question I asked.  I asked him, does he know, in regard to

8    Lot 1, Parcel 2, whether that is 63.2 acres or 31.6 acres, or

9    what does the figure-- I will ask him another question.

10        THE COURT:  Let's just ask him that question.

11   BY MR. VEEDER:

12        Q   What does this mean, Mr. Davidson?

13        A   What?

14        Q   Is this 31.6 acres or is it 62--

15        A   I would assume it is 63 acres.

16        Q   But you don't know?

17        A   No, I don't know.

18        Q   Do you know whether that purports to be irrigable

19   acres?

20        A   I don't know that.

21        MR. STAHLMAN:  Just a moment before you answer.

22        THE COURT:  The objection is sustained to that.  He was

23   not asked about that.

24        MR. VEEDER:  I just renew my objection.  There is

25   certainly no foundation for this map.

10,099

THE COURT:  Take a recess.

(Recess.)

MR. VEEDER:  Shall I proceed, your Honor?

THE COURT:  Yes.  You made some objections.  Do you want to go further?

MR. VEEDER:  I am on voir dire, your Honor, if I may continue.

THE COURT:  Then you just withdraw your objections presently, is that it?  Just before I left you made some objections.  I was going to rule on them after the recess. If you want to go further on voir dire, that's all right.

MR. VEEDER:  Yes.

THE COURT:  Proceed.

BY MR. VEEDER:

Q  When did you start to work as a surveyor?

A  1908.

Q  When dis you establish your firm in Riverside?

A  January 1, 1923.

Q  In other words, the work that is on this map, the 1914-1915 work that you did that is on this map, was not done under the firm of Davidson & Fulmor; is that right?

A  Probably.

THE COURT:  When did you say you started to work as a surveyor?

THE WITNESS:  1908.

1      THE COURT:  Then it was not until 1923 that you

2 associated with Fulmor; is that right?

3      THE WITNESS:  From 1914 until I established my own

4 business I was Chief Deputy in the County Engineer's Office,

5 at which time we did work for Vail Company; the County Engineer

6 was permitted to do work, and on Saturdays and weekends I

7 would go down and do extra work.

8      THE COURT:  When did you line up with Fulmor?

9      THE WITNESS:  As a partner?  In 1923.

10      THE COURT:  Had he been a county official there in

11 Riverside?

12      THE WITNESS:  Yes.

13      THE COURT:  What was his title?

14      THE WITNESS:  He was County Surveyor.

15      THE COURT:  In 1923 you and Fulmor went into business

16 together?

17      THE WITNESS:  Yes, but he remained in the County.

18      THE COURT:  And he continued to work with you and

19 carried on his County duties?

20      THE WITNESS:  That is right.

21      THE COURT:  So that the surveying work that you talk

22 about, then, was either directly under your supervision as an

23 individual or under your supervision as a member of this firm?

24      THE WITNESS:  That is right.

25

BY MR. VEEDER:

Q   Did Mr. Fulmor do any work on the Vail Company property prior to the time you associated with him?

A   Yes.

Q   And you used his work on this map?

A   If available, I would have used it, yes.  I don't recall.

Q   Who else worked on the maps, Vail's AG and Vail's C and Vail's AE besides Mr. Bruner?  Do you know?

MR. STAHLMAN:  Just a moment.  Who worked on them besides Mr. Bruner?  Any kind of work?

MR. VEEDER:  Yes.

Q   Did Miss O'Neill do some work on them?

A   I don't know whether she did or not.

THE COURT:  Who was Miss O'Neill?

BY MR. VEEDER:

Q   Wasn't Miss O'Neill employed by you at one time?

A   I don't recall.  The name is familiar, but I just don't recall.  She didn't work very long for us.  She might have been in the office down at Santa Margarita.  I don't know.

Q   Didn't Mr. Mosher work for you at one time?

A   That name is familiar, too.

Q   And it is possible that they worked on this map; isn't that right?

A   I suppose they did.  Many of them worked on it.

1    THE COURT:  What is the name of the witness who was

2 called here and talked about the soil survey?

3    MR. STAHLMAN:  Mr. Coit.

4    THE WITNESS: Dr. Coit.

5    MR. VEEDER:  Your Honor, I renew all of my objections

6 to this:  (1) there is not the proper foundation laid, (2)

7 there are patent ambiguities on the face of Vail's C concerning

8 which this witness admits, by his own statement, that work

9 has gone into the production of Vail's AG, which is the

10 contour map, concerning which he didn't do it himself, and

11 there is no evidence that it was all done under his direction.

12    THE COURT:  That isn't what he said.  He said that

13 Fulmor may have done some work and that he probably relied

14 on it.  That doesn't mean that Fulmor worked on these maps.

15 A surveyor trying to make a survey relies on the physical

16 ground, the monuments, upon prior maps, upon everything he

17 can find, and when they get all done very often they will

18 find discrepancies that they as surveyors have trouble in

19 justifying and they try to show what monuments they find on

20 the ground, they use their best judgment as professional men.

21 That isn't what he said.  He didn't say that Fulmor worked on

22 these maps.

23    MR. VEEDER:  I was not even thinking of Fulmor at the

24 time.  I was thinking of Willis Jones when I made that

25 observation.

1    I make the further observation that the basic map that

2  the Vail Company seeks to put in, Vail's C, he is unable to

3  explain the acreage depicted on there or how those acreages

4  were arrived at.

5    Now the objection that I direct to this map--

6    THE COURT:  Dr. Coit has given some testimony on that.

7    MR. VEEDER:  Which was equally ambiguous with this

8  witness.

9    THE COURT:  It goes to the weight.  It doesn't go to

10  admissibility.

11    MR. VEEDER:  In any event, I object on the grounds that

12  it is hearsay.  This map, particularly Vail's C, is clearly

13  hearsay.  There are obvious unexplained acreages set forth

14  on the map.  The witness has been unable to determine what

15  those acreages are, the witness has been unable to state of

16  his own personal knowledge what they are.  On those grounds I

17  object to the maps that are being offered by the Vail Company.

18    THE COURT:  Take this Exhibit AG off so that I can see

19  AE and I will make some rulings here in short order.  I want

20  to look at AE first.

21    MR. STAHLMAN:  I offer in evidence Vail's Exhibit AE

22  for Identification.

23    THE COURT:  I take it that AE is offered solely in

24  so far as it concerns the Temecula grant, the Pauba grant and

25  the Little Temecula?

1        MR. STAHLMAN:  That is correct.

2        THE COURT:  What is the name of that AE?  What is it

3   being called?  A triangulation map?

4        MR. STAHLMAN:  Let me ask one other question.

5   BY MR. STAHLMAN:

6        Q   Was the northeast corner of the Santa Rosa Ranch

7   surveyed, do you know, by your company?

8        A   Contoured?

9        Q   Yes.

10        A   Yes, we contoured it.

11        Q   Just a portion?

12        A   A portion of a little part up there.

13        THE COURT:  There is no triangulation shown on AE.

14        MR. STAHLMAN:  No.

15        THE COURT:  I take it that AE is offered as to the

16   Pauba, the Little Temecula and the Temecula grants by the

17   Vail Ranch to show the triangulation stations and the bearings

18   and the distances on the triangulation stations?

19        MR. STAHLMAN:  That is correct.

20        THE COURT:  That is the limit of AE?

21        MR. STAHLMAN:  That is right.

22        THE COURT:  The objections are overruled and it is

23   received in evidence.

24        (Defendant Vail's Exhibit AE for Identification was

25   received in evidence.)

1    THE COURT: The next one is--

2    MR. STAHLMAN: AG.

3    THE COURT:  --AG.  Hold it clear out, Mr. Wilkinson,

4    so that I can see it.  AG has contours on the Santa Rosa.

5    Have you laid any foundation as to those, or are you offering

6    it only for the Temecula, the Pauba and the Little Temecula?

7    MR. STAHLMAN:  I am offering it for the Pauba, the

8    Temecula and the Little Temecula.

9    Q Do you have any data that would show what portion

10   of the Santa Rosa Ranch that you worked on and obtained

11   contours?

12   A  Yes.

13   Q  Can you tell us at this time what portion it was?

14   A  No.  It is just up in the north country.

15   Q  Do you have some map of that in your office?

16   A  Yes.

17   MR. STAHLMAN:  At this time we will offer in evidence

18   this map for that purpose.

19   THE COURT:  For what purpose?

20   MR. STAHLMAN:  The Temecula, the Little Temecula, and

21   the Pauba, and the north of Santa Rosa.

22   THE COURT:  You haven't laid any foundation for Santa

23   Rosa on this map.

24   MR. STAHLMAN:  No.

25   THE COURT:  You offer AG, then as to the portion of the

1 .Vail Ranch comprised of that part of the Temecula, the Pauba

2 and the Little Temecula grant as showing the triangulation

3 stations established by AE and as showing the contours in

4 the area that we have mentioned, excluding the Santa Rosa?

5      MR. STAHLMAN:  Yes.

6      THE COURT:  We are not interested in the Town of

7 Murrieta or the Murrieta subdivision up there.

8      MR. STAHLMAN:  No.

9      THE COURT:  The objection is overruled and it is

10 received in evidence for that purpose.

11      I notice in the Pauba Valley on this map there

12 apparently have been superimposed some data down in the Pauba

13 Valley on those lateral lines.  They haven't been identified

14 and they will not be part of the exhibit unless they are

15 identified.

16      MR. STAHLMAN:  They will not be part of this exhibit.

17      MR. VEEDER:  May I ask you what those are specifically?

18      THE COURT:  I don't know.  There is this business in

19 the Pauba Valley on the laterals-- numbers. But they are not

20 apparently offered as part of this map.

21      MR. STAHLMAN:  I think I can lay a foundation for that,

22 your Honor.

23      Q  Were irrigation lines in and did you show those on

24 the map?

25      A  Yes, we showed those.

1        MR. VEEDER:  Which map?

2  BY MR. STAHLMAN:

3        Q  Is it shown on AG?

4        A  I don't know.  It should.  No, it doesn't.

5        MR. VEEDER:  Then I move to strike the answer.

6        MR. STAHLMAN:  Wait a minute.

7        Will you come down here a minute?

8        MR. VEEDER:  I have a motion to strike the answer where

9  he says, "I don't know," and "It should."

10       THE COURT:  It may go out.

11  BY MR. STAHLMAN:

12       Q  Directing your attention to the mark shown here in

13  the Pauba Valley in the vicinity of China Garden and extending

14  down here, lateral as well as the longitudinal lines, were

15  they put in by you?

16       A  Yes.  That is the irrigation system.

17       Q  And you put it in such as it existed at that time,

18  did you?

19       A  Yes.

20       THE COURT:  What do the numbers refer to?

21       THE WITNESS:  Those are the different stands on the lines.

22  They have all the stands lettered-- I mean lettered lines,

23  like M, N, O, P.

24       THE COURT:  I propose to rule on AG.

25       MR. STAHLMAN:  I offer it in evidence, your Honor.

1  THE COURT: The objections are overruled and it is

2  received in evidence, excluding the Santa Rosa and limiting

3  it to the part of the Rancho coming out of the Temecula,

4  the Little Temecula and the Pauba grant to show the triangula-

5  tions stations carried over from the previous map AE and also

6  the monuments on the corners of the Rancho that were shown on

7  the previous map and carried over, and to show the contours

8  and the physical characteristics of the ground.

9  (Defendant Vail's Exhibit AG for Identification was

10  received in evidence.)

11  MR. STAHLMAN: I would like to ask one other question

12  of the witness before I offer Exhibit C, your Honor.

13  Q  Were you acquainted with Mr. Coit?

14  A  Dr. Coit, yes.

15  Q  During the period of time that the map was being

16  prepared, in relation to the soil study which was made by Mr.

17  Coit, did you maintain an office in the vicinity of the Vail

18  Ranch?

19  A  Yes.

20  Q  Did Mr. Bruner work down there during that period

21  of time?

22  A  Yes, he was down there.

23  Q  Did Mr. Coit work there also?

24  A  Yes, at times he was there?

25  THE COURT: Mr. Coit wasn't working for you, though,

was he?

THE WITNESS:  No, sir.

BY MR. STAHLMAN:

Q  Of your own knowledge did Mr. Coit and Mr. Bruner converse with each other in relation to the study?

A  Dr. Coit was the expert on the soil and he outlined these areas as shown on this map.

THE COURT:  Shown on C?

THE WITNESS:  Shown on C, and Mr. Bruner planimetered all the different areas and came up with the acreage.

MR. STAHLMAN:  I will offer it, your Honor.

THE COURT:  And the material from Bruner was supplied to your office and this map was made?

THE WITNESS:  Yes.

MR. STAHLMAN:  I will offer Vail's Exhibit C for Identification, your Honor, that portion of it which applies to the--

THE COURT:  One other thing.  I am inclined to over-rule the objection and admit it in evidence, but I don't see any reason why there couldn't be made a summary of the acreages shown in the tracts shown for some comparison with other known figures as to the acreage of the Vail Ranch.

MR. VEEDER:  We have done this before.  Why couldn't Mr. Wilkinson and Col. Bowen get together and make these comparisons?  Just go into the thing and find out whether there

19-110

1    are any discrepancies here.

2        THE COURT:  All right, the objection is overruled

3    and it is received in evidence, reserving to the Government

4    a motion to strike if they discover upon checking that there

5    are discrepancies of any materiality in area.  This is a

6    matter which they could do by spot checking.  Or you must know

7    the areas of the Little Temecula, the Temecula and the Pauba,

8    and it would be entirely possible to check the acreages shown.

9    If there is a correspondence in the total of those acreages

10   shown on the various parcels within the various tracts, that

11   fact in itself would be corroborating evidence of the accuracy

12   of this survey.

13       MR. STAHLMAN:  Your Honor, we will cooperate in any

14   method or reasonable manner that will determine those condi-

15   tions.

16       MR. VEEDER:  Fine.  I would like to have the basic

17   data:  The Field Notes, the Plane Table Surveys and the data

18   upon which each one of these maps was prepared.  I think

19   there is a disparity.  I can't ingood conscience let these

20   things go by.  I ask for the basic data and I ask that he

21   be ordered to bring it in, because I will review it and I

22   will show the disparities in it.

23       THE COURT:  The witness will be directed to gather up

24   such material as he has.  We all know that the lapse of time

25   means that records disappear and are lost and misplaced.  But

1    if there are basic records and material which would be of

2    any help in making any check, gather them together and produce

3    them and let the Government look at them.

4            MR. VEEDER: For each of the maps.

5            MR. STAHLMAN:  Your Honor, we will extend ourselves

6    as far as possible by producing such data as--

7            THE COURT:  I limited it originally to C.  I don't know

8    what your concern is on the first two maps.  The first map

9    shows the monuments around the outline of the Vail Ranch, and

10   I take it that if you checked the County Recorder you would

11   find all sorts of references to those physical monuments

12   which the witness says he found on the ground.  It also shows

13   triangulation stations with distances and bearings.  Are you

14   concerned about that?

15           MR. VEEDER:  I certainly am, your Honor.

16           THE COURT:  The notes in connection with any of these

17   three maps and the basic material gather together and make

18   them available to the Government.  Will you do that?

19           MR. STAHLMAN:  Yes, your Honor.

20           MR. VEEDER:  When will they be available?

21           THE COURT: . How long do you think it will take you to

22   make a search and get them together?

23           MR. STAHLMAN:  Your Honor, could we do it this way?

24   It is going to take some running around.  Mr. Wilkinson has

25   some records at the ranch, I presume, some records in the

1  office, and if this matter could be worked on a cooperative

2  basis with Mr. Wilkinson and whomever the Government desig-

3  nates.

4       THE COURT:  Mr. Veeder, I don't like this shotgun

5  approach.  If you are interested in particular things, that

6  is one thing.  But this shotgun approach doesn't impress me

7  very much.

8       MR. VEEDER:  I will be specific, your Honor.  I would

9  like to have the field notes in connection with this survey

10  that he made in 1914-1915-- I am not sure whether he was a

11  chainman or what his responsibilities were-- I would like to

12  have the data upon which this triangulation map was made, I

13  want to have the plane table survey-- he must have copies of

14  them, so that we can review them.  That is not shotgun, your

15  Honor.  That is material that goes into making up these things

16  and I am certain that he has his field notes, he must have

17  his field notes to have accomplished what they purport this

18  Mr. Bruner to have done.  I have studied Mr. Bruner's testimony,

19  not only on appeal but in the transcript of the record.  I

20  don't believe that Mr. Bruner did all these things that are

21  said to have been done.

22       THE COURT:  That is not before me.  I have never seen

23  it.  No one has asked me to look at it.  So your remark will

24  be ignored.

25       MR. VEEDER:  Do you want to look at it, your Honor?

THE COURT:  Is it admissible?

MR. STAHLMAN:  We will offer it in evidence.

MR. VEEDER:  You can offer it in evidence and I object to it.

MR. STAHLMAN:  You are misrepresenting to the Court what he said.

THE COURT:  Do you want to offer the prior testimony in evidence?

MR. VEEDER:  Your Honor may look at it if you want to. I am not offering it in evidence.

One of the basic reasons for my objection is this very important factor that when I reviewed the Bruner evidence it was apparent that the only thing the man did was to sit down on some occasions and run out some ink lines.  We were not given the data upon which he relied to do that.

THE COURT:  What is the basis of your objection?  Do you claim there is more acreage shown in there than exists, or do you claim there is more acreage shown in one parcel and less in another?

MR. VEEDER:  I certainly do.  All anyone has to do is to take a look at the acreages that are set forth on Vail's C and it is apparent that you can't possibly know-- the witness himself doesn't know what those acreages are, and it is the basis of the claim of irrigated and irrigable acreage of the Vail Company.

1       MR. STAHLMAN:  I thought we had reached an agreement

2  that we are now going to make a determination to satisfy Mr.

3  Veeder to see whether or not--

4       THE COURT:  Mr. Veeder, you are rapidly digging a hole

5  for yourself, and in case you don't know what it is I will

6  explain it to you.  The Government brought this lawsuit.  The

7  Government was the instigator of this lawsuit.  If we can't

8  come to some reasonable basis for introduction of the old maps

9  based upon notes made years ago, I have a notion to direct

10  that the Government make a survey of the Vail Company and

11  produce it at Government expense.

12      MR. STAHLMAN:  We would be satisfied with it.

13      MR. VEEDER:  I have stated already, your Honor, our

14  position in that regard.

15      THE COURT:  What is your position?

16      MR. VEEDER:  That the United States will not make that

17  survey.

18      THE COURT:  You are in a position where you brought

19  this lawsuit and you are the man who is now delaying the

20  progress of it.  I am not so sure but that I wouldn't have

21  ample authority to make that order.

22      MR. VEEDER:  The only thing I ask, then, is that an

23  appealable order be entered.

24      THE COURT:  I don't know whether it is an appealable

25  order.  It would be an interlocutory order.  And we could

1  provide that the case would be in recess for awhile until you

2  made it.  Personally, I think this is just playing poppycock.

3  If you have something you want to pinpoint--

4      MR. VEEDER:  I have pinpointed it.

5      THE COURT:  --that's different.

6      MR. VEEDER:  How can I be more exact than what I have

7  just said?  That this witness doesn't know what these acreages

8  are.

9      THE COURT:  You asked him about one piece, and the mere

10  fact that the witness at this late date couldn't remember

11  exactly only goes to weight and it doesn't go to the

12  admissibility of the document.

13      MR. VEEDER:  But, your Honor, he said he didn't know

14  how it was calculated, and that applies to the whole map.

15      THE COURT:  I don't recall his saying that.

16      MR. SACHSE:  Your Honor, I want to remind you that if

17  you care to reverse a couple of earlier rulings there is a very

18  easy way out of it.  I have been objecting consistently since

19  the beginning of this case to the introduction of any evidence

20  of irrigable acreage on the basis that it is absolutely

21  irrelevant and immaterial.  There is no reason to put it in

22  at this time.  Your Honor is going to keep continuing juris-

23  diction.  I objected to the admission of the United States's

24  maps.  I objected initially the first time that Mr. Stahlman

25  offered this one on that single ground-- not on foundation.

1    I don't think there is any reason to waste all of our time on

2    this.  I don't think we should have irrigable acreage in this

3    case.

4         I renew my objection to this map on that sole and single

5    ground, being perfectly content with the foundation.

6         MR. STAHLMAN:  You are not objecting to the map?

7         MR. SACHSE:  I am not objecting to the map at all, but

8    the fact that any evidence of irrigable acreage is absolutely

9    irrelevant and immaterial.

10        THE COURT:  How far apart is the Government and the

11   Vails on what they claim are irrigable acreage in the Vail

12   Ranch?

13        MR. VEEDER:  I will state that there has been, quoting

14   Col. Bowen-- and Col. Robertson was there and I want him to

15   verify this because my memory is involved in it-- I think that

16   Col.Bowen said that, from the standpoint of irrigated and

17   irrigable acreages, he would assume that there was a 10%

18   variance.  Purely an assumption.

19        MR. STAHLMAN:  Up or down?

20        MR. VEEDER:  Either way; he didn't know.

21        MR. STAHLMAN:  Then let Col. Bowen-- You have these

22   U.S.G.S. Maps-- compare them.

23        THE COURT:  Do you have an exhibit here which shoes your

24   contentions as to irrigated and irrigable acreage?

25        MR. STAHLMAN:  Yes, your Honor.

10,117

1        THE COURT:  You have Exhibit K, a tabulation of

2   irrigated fields.  What do you have on irrigable as con-

3   trasted with irrigated?

4        MR. STAHLMAN:  Vail's D, your Honor.

5        THE COURT:  D is not yet received in evidence.

6        MR. STAHLMAN:  No, it is not yet received in evidence.

7        It is on page F.  It is not tabulated.  The classes

8   of different lands are tabulated, but not the total acreage.

9        We have this other exhibit that--

10       THE COURT:  I thought we had agreed that there would be

11  some spot checks made by Col. Bowen.

12       MR. STAHLMAN:  Col. Bowen testified on this matter that

13  he made some.

14       THE COURT:  On some of these blocks and lots.

15       MR. VEEDER:  That we had agreed?

16       THE COURT:  Yes.

17       MR. VEEDER:  I don't recall that, your Honor.

18       MR. STAHLMAN:  Col. Bowen testified that he had made

19  this check, if your Honor will recall, and that he thought

20  they were substantially correct.  I don't know whether there

21  has been any agreement.  I would be perfectly willing, from

22  our point of view, to have it checked by Col. Bowen, just like

23  we checked other matters, or anyone else they designate.

24       THE COURT:  Exhibit D is based on the lot map, Exhibit

25  C?

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  Find me the part of the transcript where Col. Bowen testified at that time.  I will read it over for Tuesday.  Can you find it, Mr. Veeder?

MR. VEEDER:  Yes, I will have it up to you this evening.

THE COURT:  It seems to me that we ought to center our attention not upon a shotgun attack upon this thing, but if there is a particular contention that Lot 60 was 25 acres and that Lot 63 was 20 acres, et cetera, where improperly classified, all right.

It seems to me also that a check of the total acreage shown on Map C against the acreages in the grants, et cetera, would tell us whether the totals are correct, and then if there are discrepancies call our attention to the discrepancies.

Answering Mr. Sachse's objection, there is a lot of merit to what he said.  But the difficulty I am encountering now is the impact of this Vail-Santa Margarita stipulated judgment and what will flow out of that.  I could sustain an objection now and reverse myself later on, but we have gone this far on this route and I don't think this is an insoluble problem.  The very statement that some ten percent might be the difference, it seems to me it would be a matter which could be worked out between the parties by spot checking or some way other than by taking up the whole afternoon going after a bunch of old maps and asking for old notes going back as far as 1914.

MR. SACHSE:  You are right, your Honor, and your Honor
will recall that while I had objected vigorously to Col.
Bowen's introduction of thesoil classifications of the United
States on the basis that I just expressed here, I have never
quarreled with them.  To me the mere fact that I argue that
it is immaterial also means it is not worth all this fighting
about an extra 15 acres here or 50 acres there.  I think it
is ridiculous.

THE COURT:  I am in agreement.

MR. STAHLMAN:  The Government having made all these
surveys on all these properties, I feel I am willing to go
along with them.  As your Honor says, it may have a bearing on
the matter pertaining to the stipulated judgment, and if we
reach the point, which we might in this case, where there is
not a shortage of water in the river and where there has to be
a correlative basis, I presume then it does become material.

THE COURT: To clear up the record presently, I have
received in evidence C, reserving to the Government the right
to strike when they find discrepancies and make a showing;
and I have instructed the witness to start to gather up his
old notes, such as he has; and I have also instructed that
there be pointed out to me the transcript reference where Col.
Bowen testified.

I am also going to request that Mr. Veeder, Col. Bowen
and Mr. Stahlman see if there is any practical solution to

1    this matter, so that we can go ahead with the case.

2         MR. VEEDER:  All right, your Honor.

3         THE COURT: For instance, it might be found that as

4    far as the Little Temecula was concerned there was some

5    question, as far as Pauba and Temecula, no question, or vice-

6    versa.  It might be found that in a certain area there was some

7    question.  Let's see what we can do to eliminate some of these

8    things.

9         Mr. Sachse's objection is overruled without prejudice

10   to some later renewal.

11        MR. STAHLMAN:  Your Honor, I might point out, in pass-

12   ing, that the area where Mr. Veeder seems to think there is

13   such a great discrepancy in that map, that area now is under

14   inundation by water of the dam, and we are later prepared to

15   offer a plan as to what acreage should be taken out by reason

16   of the dam-- surveys we have made in connection with that.

17        MR. VEEDER:  Those are just examples.

18        MR. STAHLMAN:  I know.  But I know your example.

19        THE COURT:  Are you through with this witness?  Any

20   further questions?

21        MR. VEEDER: Subject to being recalled on the basis of

22   the data.

23        MR. STAHLMAN:  So that we may have no misunderstanding,

24   your Honor-- we will cooperate-- you want Mr. Wilkinson, Col.

25   Bowen and Mr. Veeder and I to agree that they can make this

1    study that you request be made.

2        THE COURT:  Make available to them, if they think it is

3    necessary, such basic material as you have.  But I want you

4    first to see if there is some way to solve this matter either

5    as to areas or certain matters for specific attention or some

6    compromise reaching a general figure on irrigable land.  There

7    is enough Vail land that a little give and take wouldn't make

8    much difference in this case.

9        MR. VEEDER:  Your Honor, I would like to inquire, has

10   there been a survey, a soil survey made, or rather have aerial

11   photographs been made of the irrigated acreage on the Vail

12   property and has there been a calculation of acreage based upon

13   those aerials?  The soil survey, for example, does that.

14       MR. STAHLMAN:  I was under the impression that you

15   people had done all of that.

16       MR. VEEDER:  No, we haven't.  We do have aerials.  But

17   I am inquiring --

18       THE COURT:  The Vail Estate says they have never made

19   any calculations.  I take it that you have made no calculations

20   of either total area of the ranch based either on aerial

21   surveys or of particular areas based on soil surveys?

22       MR. STAHLMAN:  Not on aerials, no.

23       MR. VEEDER:  You have not?

24       MR. STAHLMAN:  No.

25       THE COURT:  There is a practical solution to this

1    problem.  You have aerials.  You can match up aerials with

2    this Exhibit C and you can make some spot checks and see how

3    close you come.

4         MR. VEEDER:  Trying to get a start, that's all.

5         THE COURT:  If you made a few spot checks and found you

6    were within five or ten percent on the spot checks, it seems

7    to me you ought to be able to get together.  Or you may be

8    able to find there are areas that you have no dispute about.

9    Take the Pauba Valley.  That area ought to be easily ascer-

10   tained and there shouldn't be any dispute about that area.

11   There are certain areas here that obviously are mountainous

12   and rugged and unirrigable.  That ought to be eliminated.

13   There shouldn't be any question about that.  There are certain

14   areas where there could be dispute.  Vail doesn't claim that

15   there is eighty-seven or eighty-nine thousand acres that are

16   all irrigable.

17        MR. VEEDER:  That's right.

18        MR. STAHLMAN:  Talking about Santa Rosa, I know that

19   Col. Bowen made a check on DeLuz and Sandia.

20        THE COURT:  I am under the impression that he made some

21   spot checks in this area at least sufficiently that I recall

22   his view was that this was substantially correct.  He was not

23   going to say that it was correct down to the last dot and the

24   last t.

25        MR. VEEDER:  I will get your Honor the testimony that

1    he offered.  I don't believe it related to acreage.

2         MR. SACHSE:  Mr. Stahlman, you called Col. Bowen.

3         MR. STAHLMAN:  Yes.

4         MR. VEEDER:  That is right.

5         THE COURT:  You may be excused, Mr. Witness.  Within a

6    reasonable time gather this material together.  I suggest that

7    you wait a week before you start to see what they work out,

8    and then if you don't get some word from them you will have to

9    start togather together what you can find of the old records.

10        MR. VEEDER:  I wonder if it would be possible for us to

11   get a list of what he relied upon in making the map.

12        THE WITNESS:  Can I submit photostats?

13        THE COURT:  No, if you have the originals we would

14   like to have the originals and we will see that they are

15   not destroyed.

16        MR. STAHLMAN:  How about this Taylor map?  It is an

17   old copy and an office copy.

18        MR. VEEDER:  It can be withdrawn, as far as I am con-

19   cerned.

20        MR. STAHLMAN:  All right.

21        THE COURT:  I don't attach any significance to it.  It

22   shows the outside boundaries of the Ranch and the monuments

23   that were found.

24        I am going to adjourn until 10 o'clock Tuesday morning.

25        Mr. Witness, you are going to be temporarily excused

1   and subject to recall if we need you.

2      MR. STAHLMAN:  I doubt if we will be going all day

3   Tuesday.  We are going to make this spot check.  I see no

4   necessity for bringing Mr. Coit back here at that time.  We

5   had Mr. Nichols, who worked with Mr. Coit.  Mr. Veeder has some

6   further cross-examination of Mr. Wilkinson, and then we are

7   just about through.

8      THE COURT:  You have a series of exhibits that haven't

9   been offered yet.

10      MR. STAHLMAN:  We have the title situation.

11      THE COURT:  Exhibits B, D, E, F, G, H, and I.

12      MR. STAHLMAN:  Exhibits B, D, F and G Mr. Veeder objected

13   to.

14      MR. VEEDER:  What are those?

15      MR. STAHLMAN:  That is the receipt of the Riverside

16   County for the permit to drill the Pauba well.

17      THE COURT:  Look over your list.

18      MR. STAHLMAN:  Yes.

19      THE COURT:  I have listed also AA, BB as not being

20   in evidence.

21      MR. VEEDER:  Yes.

22      THE COURT:  AF, the old Taylor map, may be withdrawn.

23      MR. VEEDER:  May we withdraw, your Honor, the Identi-

24   fication 160A, B and C, which I had Mr. Wilkinson view

25   yesterday.  He said he was unacquainted with it.

MR. STAHLMAN:  What is that?

MR. VEEDER:  The hydrograph 160A, B and C.

THE COURT:  You mean you will not offer them again, or you merely want to withdraw them for study?

MR. VEEDER:  I would like to withdraw them, your Honor, because we are going to supplement those and work on them.

THE COURT:  I don't understand your word "withdraw." You mean you want to take them out of the courtroom?

MR. VEEDER:  Out of the courtroom.

THE COURT:  Or do you want to cancel the markings?

MR. VEEDER:  No, I don't want to have the markings cancelled.  I would like to remove them from the courtroom to work with them.

MR. STAHLMAN:  Which are those?

MR. VEEDER:  The hydrographs.

THE COURT:  You may withdraw them and take them from the courtroom-- 160A, B and C.

MR. GIRARD:  Will we get copies of those, Mr. Veeder?

MR. VEEDER:  If they are reproduced.  We are working on them now.  I am trying to get some data together.

THE COURT:  I take it, Mr. Stahlman, you will be then toward the end of your case except for the question of the Vail judgment?

MR. STAHLMAN:  Yes.

THE COURT:  And that you do not prefer to go into at

1 | this time?

2 | MR. STAHLMAN: No, I do not. However, I might indi-

3 | cate, your Honor, that we consider it to be serious and I

4 | have prepared a preliminary memorandum in connection with it.

5 | I don't think the time for hearing it is at this time.

6 | However, I do have some research of the law and other matters.

7 | Would you like to have it filed now or later?

8 | THE COURT: I would like to have it filed because I can

9 | be studying it at my leisure, if any.

10 | MR. STAHLMAN: This is the original. Are there two

11 | copies to be filed or just one?

12 | THE COURT: Are you short of copies?

13 | MR. STAHLMAN: We have more coming.

14 | THE COURT: The Clerk will hand it up to me as soon

15 | as he puts the stamp on it.

16 | 10 o'clock Tuesday morning. Court is in recess.

17 | (Adjournment until Tuesday, June 2, 1959, at 10 A.M.)