# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.   1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Tuesday, June 2, 1959.

Pages:  10,127 to 10,248

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,    )
                             )
            Plaintiff,       )
                             )
    vs.                      )        No. 1247-SD-C
                             )
FALLBROOK PUBLIC UTILITY     )
DISTRICT, et al.,            )
                             )
            Defendants.      )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Tuesday, June 2, 1959

APPEARANCES:

        For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                 WILLIAM E. BURBY, ESQ.,
                                 Special Assistants to the
                                 Attorney General,
                                 Department of Justice,
                                 Washington, D. C.

APPEARANCES (Continued):

| | |
|---|---|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney General, by<br>FRED GIRARD, ESQ.,<br>Deputy Attorney General. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al. | FRANZ R. SACHSE, ESQ. |
| For U. S. Navy | LCDR DONALD W. REDD. |
| For Defendant Murray<br>Schloss Foundation | WALTER GOULD LINCOLN, ESQ. |

## INDEX TO WITNESSES

For Defendant
Vail:                          D       X       RD      RX

    James V. Wilkinson    10,175   10,183


## E X H I B I T S

| Vail's Exhibit | Iden. | In Evidence |
|---|---|---|
| S | | 10,175 |
| T | | 10,175 |
| IA | 10,226 | |
| I | | 10,228 |

SAN DIEGO, CALIFORNIA, TUESDAY, JUNE 2, 1959.  10:00 A.M.

(Other matters.)

THE CLERK:  Four, 1247-SD-C, United States of America

vs. Fallbrook.  Further court trial.

MR. SACHSE:  Your Honor, before Mr. Stahlman proceeds,

Mr. Veeder pointed out to me a slip-up.  I have double

checked and I note right in the judgment that I tendered your

Honor, it appears that the description of the property of one

defendant is missing-- Harry Chapman.  Somehow my secretary

forgot to include his property.  I would like, if I may, to

bring in an Exhibit A, page 22, and add him at the end.  Mr.

Veeder can check them over again.  It will be one additional

page of the description only.

MR. VEEDER:  Mr. Sachse has been running through that.

We are running through those back against the descriptions

in the stipulation.

May I tender the thought that there are some other

things that we ought to talk about.

MR. SACHSE:  You mean that there may be other errors?

MR. VEEDER:  Yes.

THE COURT:  Work it out.

MR. SACHSE:  We will work it out, your Honor.

MR. VEEDER:  I brought it to your attention this

morning.  I didn't know that you were going to bring it up in

1      court.

2            THE COURT:  Let me ask a question apropos of a matter

3      we will get into later.

4            Under the stipulated judgment between Vail and the

5      United States, no mention is made of the waters of Murrieta.

6      Who gets the water from Murrieta?

7            MR. VEEDER:  From the standpoint of the United States

8      of America, your Honor, the waters of the Murrieta, the

9      Temecula, the Pechanga, the system, in our view-- I don't know

10     how Mr. Stahlman feels about it-- in our view, so far as the

11     Vail Company and the United States of America are concerned,

12     it is all-embracing so far as the water that reaches the

13     United States.  In that regard it is important to note that

14     it is the combined flow that is measured at the mouth of the

15     canyon.  So I don't believe that from the standpoint of

16     measurements it would be best to separate the two.  In fact,

17     it is a composite of the runoff that is measured at Gaging

18     Station No. 3.

19            MR. STAHLMAN:  Has your Honor read the memorandum on

20     that, the reference made to Murrieta Creek and Santa Gertrudis?

21            THE COURT:  The memorandum was largely a citation of

22     textbooks.  I was not very much impressed.  I read it hurriedly.

23     I haven't studied it.

24            MR. STAHLMAN:  Your Honor, that very situation is

25     covered in the findings in relation to the previous suit, in

which it was the attitude of the Court at that time, as a

result of those findings, and those findings were certainly

not disturbed by the decision of the Supreme Court, in which

the Court found that the Vail Company was entitled to the

entire flow of Murrieta Creek and to the entire flow of Santa

Gertrudis-- that was the attitude of the Court.  I think if

your Honor seriously considers the reference in that memorandum

in relation to the findings of fact contained in the previous

trial to see what was in the minds of the parties and the

court at that time.

THE COURT: What have you got here?  You have a stipulated

judgment.  Does it rest on findings, Mr. Veeder?

MR. VEEDER:  Your Honor, in that regard, I wish to call

to your Honor's attention-- you poked a little fun at me about

going back to the pleadings, but I am the old-fashioned type--

the pleadings previously filed on March 12, 1951, by O'Melveny

& Myers--

THE COURT:  1951?

MR. VEEDER:  Yes, your Honor.

O'Melveny & Myers, representing the Vail Company,

deny that the stipulated judgment is predicated upon the

findings of fact and conclusions of law; and in that regard

I shall read, with your Honor's --

THE COURT:  Well, don't read it.  It is only a pleading.

MR. VEEDER:  Just one sentence.

1        THE COURT:  It could be amended, it could be changed,

2   it doesn't control.

3        MR. VEEDER:  May I finish the statement, your Honor?

4        THE COURT:  All right.

5        MR. VEEDER:  "These answering defendants and each of

6   them deny that said stipulated judgment was premised upon the

7   findings of the trial court or the decision of the Supreme

8   Court of the State of California in that case," referring to the

9   case of Rancho Santa Margarita vs. Vail.

10       Now, in the amended pleadings it is specifically

11  stated as follows:

12            "First Defense.

13            1.  Defendants herein, having on March

14       12, 1951, filed in this court an answer to

15       plaintiff's original complaint, adopt and

16       reaffirm all matters contained in said answer here-

17  tofore filed, except wherein any matters contained in

18       said original answer may be in confict

19       with or contrary to any matters alleged in this

20       amended answer."

21       Now, from our standpoint, your Honor-- it becomes

22  extremely important now-- from our standpoint the identification

23  marked BB-- I suppose that is because it is a big shot, I

24  don't know-- anyway, findings and conclusions have been marked

25  for identification.

THE COURT: AB, I have it.

MR. VEEDER:  I have it BB, your Honor.  If that is in error, let's change it.

THE COURT:  Let's find out.

MR. STAHLMAN:  The findings of fact and conclusions of law are AB.

MR. VEEDER: AB?  The copy I had had marked on it BB.

THE COURT:  All right, you have marked the findings. Go ahead.

MR. VEEDER:  Those are proposed as part of the evidence in this case by the Vail Company.  They contain a large number of statements which, to the United States of America, are highly objectionable.

THE COURT:  You mean the findings?

MR. VEEDER:  The findings AB of the old case.

THE COURT:  You still haven't answered my question. I will wait until you are through.

MR. VEEDER:  The proposition that we advance is that the stipulated judgment dated December 26, 1940, upon which we rely for our relationship with the Vail Company, is all-inclusive; that it merged all of the elements of the case between the two parties; that we should not go beyond the four corners of that stipulated judgment, other than as is provided that the findings of fact and conclusions of law are necessarily excluded from that judgment and that all other

matters are excluded from it.

THE COURT:  Then that is the answer to my question. You are relying on a so-called stipulated judgment without any findings to support it; is that it?

MR. VEEDER:  No, I am not.  I am standing on these grounds, your Honor, that the stipulated judgment contains recitations itself, agreed to by the parties and predicated upon their understanding, as I understand it, of the evidence that went into the record.  It goes beyond an ordinary contract.  It is, indeed, a stipulated judgment.  But it does not embrace or incorporate into it, the stipulated judgment, the findings which were reversed by the Supreme Court of the State of California.

THE COURT:  Then I say again, you rely upon the stipulated judgment and not upon the findings previously made.

MR. VEEDER:  That is correct, your Honor.

THE COURT:  There is nothing in the stipulated judgment about the waters of the Murrieta.

MR. VEEDER:  The stipulated judgment, your Honor, refers to the availability of water and relates to all rights of the parties.

Does your Honor have a copy of it?

THE COURT:  Yes.

MR. VEEDER:  That stipulated judgment is very explicit

and very clear, in our view, from the standpoint of the areas

to which it relates and of the lands upon which the waters

of the Santa Margarita River may be utilized.   In other words,

the reference is to the entire runoff, because in the second

section provision is made as follows:

> "The plaintiff (that is, our predecessor
>
> in interest) is entitled to take and use
>
> upon the whole or any part of its lands
>
> lying within the Rancho Santa Margarita
>
> y Las Flores, San Diego County, California,
>
> 66-2/3% of the water of said Temecula-
>
> Santa Margarita River and all its tributaries
>
> which naturally, when not artificially
>
> diverted or abstracted, flows and descends
>
> in the channel thereof at that certain
>
> joint gaging station hereinafter in this
>
> judgment designated as Measuring Station
>
> No. 6."

THE COURT:  Well, then tell me-- I have read that--

tell me what Section 9 means again on page 7.  You tried to

tell me the other day and I can't understand Section 9 on

page 7.

MR. VEEDER:  "For the purpose of apportioning to

defendants 33-1/3% of the waters of said stream as in Section

3rd provided, it shall be deemed that an amount of water

1    equal to one-half the surface flow at Station No. 6 or Station

2    No. 3, wherever the flow is greater. . pumped and/or diverted

3    from the subsurface and/or surface waters of said river . ."

4         What is the problem, your Honor?

5         THE COURT:  It is provided that one-half the water at

6    either Station No. 6 or Station No. 3 shall constitute 33-1/3%

7    of the water from the stream.  When I raised the question the

8    other day I thought some mention was made of the Murrieta as

9    having some bearing on that provision.

10        MR. VEEDER:  The Murrieta is one of the tributaries

11   that contributes waters that are apportioned.  Now, your

12   Honor, the point of all measurement, and the reason why it

13   was set up that way, is that we measure the waters that have

14   gone beyond any point of control by the Vails.  In other words,

15   Station No. 3, which is at the mouth of Temecula Canyon and

16   No. 6, which is at Ysidora are both below any point where the

17   Vails could interfere with those waters.  That is why it

18   is set up there in the manner that it is.

19        THE COURT:  Why is it said that half of the flow there

20   at the gorge shall be one-third of the waters in the stream?

21        MR. VEEDER:  Your Honor, it is a simple matter.  As

22   Col. Robertson points out, two-thirds has already gone by,

23   your Honor.

24        THE COURT:  What do you mean by that?

25        MR. VEEDER:  The half of the waters that are utilized

by the United States, by our predecessor in interest, would amount to one-third of the total water available for apportionment.

I gave your Honor a memorandum on this, and I would like to go back and rely on that memorandum. I think I gave it to you about six weeks ago.

THE COURT: I have it here.

MR. VEEDER: But there we set up the apportionment and how it was arrived at.

Now from the standpoint of calculations-- and this is matter that I desire to bring up this morning-- from the standpoint of the calculations that have been adopted by the Vail Company and by the United States throughout this long period of use under the stipulated judgment, there is agreement in the pleadings again that there has been full compliance by the parties to the stipulated judgment.

THE COURT: Let's not get off into other problems.

MR. VEEDER: All right.

THE COURT: That might or might nor be ratification, et cetera. I am still trying to figure out something that was said the other day, as I recall, about that provision about one-half of the waters at the gorge or at Ysidora being the one-third to which the Vails were entitled. Something was said about the Murrieta in that respect.

MR. VEEDER: Your Honor, the Vails have already used

their one-third before the water ever gets there.  So their

one-third amounts to one-half of the water that goes by there.

That is how it will work out, and I can show your Honor

the figures how they have actually been allocated on the

basis of that formula.  And I think that is the only way we

can do it.  In other words, what occurs is that the Vail use

of water is accomplished before the water passes the point of

measurement, and if it is found that they are using more than

one-third of the water-- I think your Honor has to read

paragraph 9 along with the balance of the stipulated judgment,

because I think it expressly provides that the quantities of

water that are utilized must be calculated together--

THE COURT:  Let me interrupt a moment.

Mr. Sinclair, are you ready?

(Another matter.)

THE COURT:  Where are the Vails to get their one-

third of the water?

MR. VEEDER:  They are to get their one-third of water

above the point of measurement.

THE COURT:  Above the gorge?

MR. VEEDER:  Yes, that is right.  And the point of it

is that the one-third that they have used is one-half of the

two-thirds that is already on the way to us.  That is what that

means.

THE COURT:  What about the people who have farms and

1    ranches over in the Santa Gertrudis who are not parties to this

2    suit, who have big wells, and they have got some riparian

3    rights and they have rights as overlying owners, and when I

4    make a final decree they will be entitled to the right

5    reasonably to use water-- correlative rights?  Whose share will

6    that come out of?

7        MR. VEEDER:  Your Honor-- Let me start again, because

8    I see Mr. Sachse over here and I don't want to be fined, your

9    Honor.  I am just making the observation.

10       THE COURT:  Whose share does that come out of?

11       MR. VEEDER:  In regard to the riparians who are

12   situated as the Roripaughs are and who are situated as other

13   owners are, our view is that they share correlatively with the

14   Vails and with the United States on the basis of our riparian

15   rights.  There is no question on that.

16       In regard to appropriators, such as Fallbrook--

17       THE COURT: Now, wait.  We will get to Fallbrook.

18       MR. VEEDER:  All right.

19       THE COURT:  You say they share correlatively?

20       MR. VEEDER:  That is right.

21       THE COURT:  Of course, that would be easy and I would

22   agree if it weren't for the fact that you have a judgment that

23   says that Vail gets a third and the United States gets two-

24   thirds.  Now when you say "correlatively" you mean that the

25   United States and Vail and these riparians all share correlatively?

1      MR. VEEDER:  From the standpoint of the operations,

2   your Honor, from the standpoint of the question whether it

3   is res adjudicata or whether it can be binding on anyone

4   other than the parties to it and other than the exception I

5   reserve here, I simply say that there is no problem from the

6   standpoint of the correlative shares, because the Vail

7   Company's riparian acres, the riparian acres of the National

8   Government, the Roripaugh correlative shares can all be

9   computed as if the stipulated judgment was not operative.

10   But from the standpoint of the Vails and the United States

11   the operation will and must continue, in our view, on the

12   two-thirds-one-third basis.  Now it is entirely possible to

13   enter such a decree without doing violence either to the

14   stipulated judgment or to the Roripaughs.

15      THE COURT:  How can you?  In other words, let's just

16   analyze this.

17      MR. VEEDER:  All right.

18      THE COURT:  Roripaugh, et al., named in the decree,

19   will have correlative rights, and the correlative rights will

20   be correlative not to all of the Rancho Santa Margarita, but

21   to the rights of the United States to water within the water-

22   shed of the Santa Margarita.

23      MR. VEEDER:  Your Honor, I am going to add an additional

24   factor, that it is entirely possible that the water in the

25   De Luz Creek wouldn't be shared correlatively with them.  I

1    don't know.

2         THE COURT:  Just a minute.  I am talking now about the

3    fact that this stipulated judgment provides that you can use

4    water anywhere on the Rancho Santa Margarita.

5         MR. VEEDER: As against the Vails, yes.

6         THE COURT:  Let's leave out the Vails.  As against

7    Roripaugh.  What do you have-- 90,000 acres there?  Instead

8    of having 90,000 acres, you have a smaller segment of riparian

9    land, or watershed land.

10        MR. VEEDER:  The riparian acreage is the same size

11   for all parties.

12        THE COURT:  The riparian acres are a lot less than the

13   land spoken of in the stipulated judgment.

14        MR. VEEDER: That is correct.

15        THE COURT:  So now Roripaugh's correlative share then

16   is based upon the number of watershed acres that are riparian

17   that the Government has and watershed acres that are riparian

18   which the Vails have, and they get a certain share.

19        MR. VEEDER:  Yes.

20        THE COURT:  Now, when you get all done, what do you do

21   with the Government and Vail?

22        MR. VEEDER:  From that standpoint it is immensely easy,

23   I believe.  The Roripaughs are situated above any Vail property.

24   By reason of the nature of the flow and the runoff-- and if

25   there is an error on that, you may correct me.

1    MR. STAHLMAN:  There is, because Santa Gertrudis goes

2  through the Vails both before and after.

3    MR. VEEDER:  I am talking about where the Santa

4  Gertrudis enters the Murrieta.

5    The Roripaughs are riparian to the stream only at the

6  time that it is carrying water.

7    THE COURT:  Well, they are overlying owners on the

8  basin.

9    MR. VEEDER:  That is correct, to some degree, and the

10  apportionment on that must be taken into consideration.  But

11  from the standpoint of using water outside the watershed--

12  and that is the question you are asking-- we certainly have

13  no right as against the Roripaughs as a riparian owner to do

14  that.

15    We are, of course, an appropriative owner, at least,

16  and of course my incorporeal hereditament will go on appeal.

17    The point I desire to make is that from the standpoint

18  of the Roripaughs, with the exceptions that will come up later,

19  and we know that they will come up, there is no difference,

20  there is no greater right against the Roripaughs by reason

21  of the stipulated judgment.  They are in precisely the same

22  position.  They are not parties to the stipulated judgment,

23  unless I find something contrary-- and I don't believe that

24  there is anything contrary.  The Roripaughs, the other numerous

25  parties upstream on the Murrieta and upstream on the Temecula

1   are in no sense, in our view, bound by the stipulated judg-

2   ment.

3        THE COURT:   That is just accepted.   Don't argue about

4   that.   I am talking about the problems--

5        MR. VEEDER:   What is the problem, your Honor?

6        THE COURT:   The problem is, what are you going to do

7   with this stipulated judgment when it comes to determining the

8   correlative rights of the parties?

9        MR. VEEDER:   At any time that it conflicts with the

10  correlative rights of the Roripaughs, it cannot be applicable.

11       THE COURT:   Then what do you do?   You say the Govern-

12  ment has two-thirds, Vail has one-third.   Here are land owners

13  upstream on the Temecula, here are land owners upstream on the

14  Murrieta.   When you go to apportion the waters between the

15  Government and Vail, trying to live up to the stipulated

16  judgment, where does the third and two-thirds come in?   Out

17  of what is left after the other correlative rights are taken

18  care of?

19       MR. VEEDER:   No, there is no real problem, your Honor,

20  from our standpoint.   All that is necessary is simply to enter

21  a decree in regard to the correlative rights of all the parties.

22  But as between the Vails and the United States, they par-

23  ticipate on a two-thirds-one-third basis.

24       THE COURT:   Let's assume that we are going to live with

25  the stipulated judgment.   So you get a decree that the rights

1   of all the parties are correlative except as to Vail and the

2   United States, and by giving correlative rights to people

3   upstream on the Temecula and on the Murrieta a big dent is

4   made in the amount of water available.  Now, trying to apply

5   the stipulated judgment, what do we do?  Take what water is

6   left and apply it one-third to Vail and two-thirds to the

7   United States?

8        MR. VEEDER:  No, your Honor.  In regard to both the

9   Vails and the United States, their correlative shares, after

10  all other parties who have enjoyed their correlative shares,

11  will be apportioned on a one-third-two-thirds basis.

12       THE COURT:  You said no, but you are saying yes.  You

13  are saying just what I said, that after the correlative rights

14  of all the other parties are taken care of, what is left,

15  living with the stipulated judgment, is divided, on your

16  theory, one-third to Vail and two-thirds to the United States.

17       MR. VEEDER:  I am worried about what your Honor has

18  in mind by "what is left."  But I am not going to argue that.

19       THE COURT:  Well, obviously, there are going to be a

20  lot of rights to the use of water, with these riparian owners

21  upstream on the Temecula and upstream on the Murrieta; it is

22  going to make a big dent in the amount of water available.

23       Let's assume for argument that it makes a big dent in

24  the amount of water available.  What are you going to do?

25  Divide what is left one-third to Vail and two-thirds to the

1   United States?  Or do these rights come out of Vail's share,

2   and does the Government get at the gorge the same amount of

3   water shown in this decree?

4          MR. VEEDER: As against Vails, it does.

5          THE COURT:  Then you are saying that you get the amount

6   of water at the gorge as provided in the stipulated judgment.

7   Then you would say that all these other rights upstream have

8   to come out of Vail's share.

9          MR. VEEDER:  No.  The point I am trying to make is that

10  after each riparian acre has been determined to have its

11  riparian right, then the correlative rights are determined.

12  But-- and this is very important-- there is nothing whatever

13  against the law that two riparians cannot, as between them-

14  selves, without burdening other riparians, settle their

15  respective rights and their respective apportionments.

16         THE COURT:  Mr. Veeder, generally speaking, that is

17  true.  But you keep avoiding what I want to get some help on.

18         Let's reduce it to some simple things.  Let's say--

19  and this is a suppositious case-- let's say that there is

20  a hundred inches of water in this watershed to start with,

21  and we have the stipulated judgment that says the Government

22  gets two-thirds or 66% and that Vail gets 33%.  After the

23  rights of the people upstream on the Temecula and upstream

24  on the Murrieta are taken care of-- and we agree that they

25  have correlative rights with Vail and the United States, there

1    is no problem there.

2        MR. VEEDER:   That is right.

3        THE COURT:   Let's assume for argument that out of the

4    100 inches-- this may be an extreme case,but I want to

5    illustrate my point-- they get 50.

6        MR. VEEDER:   Vails get 50.

7        THE COURT:   No, these other owners get the equivalent

8    of 50.  So that it leaves in the stream now only 50 inches

9    remaining.  Now as between the United States and Vail, what

10   is the Government's position?  That the Government gets the

11   two-thirds of the remaining 50 inches, or that the Government

12   gets the flow at the gorge as provided in this stipulated

13   judgment?

14       MR. VEEDER: As  between the parties, it necessarily

15   must be the amount of water that is available to the two

16   parties, which will be apportioned.  Now we have the full

17   Vail riparian acreage, we have the full Santa Margarita

18   riparian acreage.  Those acres, quite aside from the stipu-

19   lated judgment, are entitled to participate correlatively in

20   the available quantity of water.  Now whatever that works out

21   to--

22       THE COURT:   Wait a minute.  You say the Vail acres are

23   entitled to participate correlatively regardless of the

24   stipulated judgment?

25       MR. VEEDER:  No, I didn't say that.

THE COURT: That is what you said.

MR. VEEDER:  No, I didn't say that, your Honor.

THE COURT:  Counsel heard you.  Say it right then.

MR. VEEDER:  Well, you see, your Honor, the point that I make to your Honor is that the apportionment should start out among all parties on a correlative basis.

THE COURT:  I go with you so far.

MR. VEEDER:  Now, I don't know exactly what the share would be.  Your Honor said 50 second feet.  Possibly that is right.

THE COURT:  The figure I took was a suppositious case to illustrate my point.

MR. VEEDER:  I am proceeding with your Honor's suppositious point.

THE COURT:  Attach no significance to it as having any relation to this case presently, in the proportions.  But let us say a hundred inches in this stream, and under the judgment that would--

MR. VEEDER:  You see, with all respect to your Honor, your Honor has not let me finish my statement.

THE COURT:  Mr. Veeder, you are not directing your attention to what I am asking you about.  You get off continually.

MR. VEEDER:  Because you have not let me finish my statement.

THE COURT:  And you divert my attention from what I ask you.

MR. VEEDER:  You asked me, what is the effect of the stipulated judgment, and I will tell you what it is.

THE COURT:  All right.

MR. VEEDER:  I have said that every riparian right in the Santa Margarita participates correlatively, and among those who participate correlatively, at this juncture of my statement, are the Vails and the Rancho Santa Margarita.  When that correlative share has been determined -- and that can be hour to hour, day to day, it can be widely variant-- but as between the Vails and the Rancho Santa Margarita, from the standpoint of their respective correlative shares, the National Government is entitled to participate two-thirds and the Vail Company is entitled to participate one-third, and their measurements would be geared to and governed by the stipulated judgment.

Now, there is nothing difficult about it.  We make no claim that the Roripaughs would be in any way affected by it. We say that the Roripaughs will take their correlative share. But after the Roripaughs, after the Garnseys, after those other people have had their apportionments of the whole melon and the Vails and the United States are entitled to a share of the melon, then as between those two the stipulated judgment is the Government and the Vails receive two-thirds

1  and one-third on the basis of that apportionment.  How else

2  could it be?  It was never intended to be any other way,

3  because there are no other parties.

4          THE COURT:  I understand your position.

5          Now, let's apply that to these figures just to see

6  what we can do.  Let's assume there is a hundred inches in

7  the stream altogether.  So there is a correlative apportion-

8  ment, and on the basis of the correlative apportionment it

9  is found that other owners upstream on the Temecula and other

10 owners upstream on the Murrieta are entitled to at least 50

11 inches from the stream.  This is an extreme example.  Now it

12 is your position then that this 50 inches that remains, as

13 between the Vails and the United States, are divided one-

14 third and two-thirds.

15         MR. VEEDER:  Necessarily.

16         THE COURT:  What did you do then about the provision

17 that there shall always be so much water running by the

18 gorge, and if there is not enough Vail shall pump water out

19 to make that amount at the gorge?  Suppose the situation is

20 such that after the correlative rights of other riparians

21 are taken care of there is not enough water running in the

22 stream to comply with this stipulated judgment?  What isVail

23 to do then?  Pump their underground storage basin to make

24 the amount of water run there?

25         MR. VEEDER:  Your Honor, whatever the facts are, and

this hypothesis worries me a little that you have set up be-
cause I think the facts which will be introduced will have
a great deal of bearing upon what can transpire and what will
transpire.  So I am sincerely hopeful that your analysis is
simply a hypothesis.

THE COURT:  A hypothesis.  But what happens then?
Suppose there is no water running in the gorge.  Are the
Vails then required to pump the underground basin to make
water run in the gorge?  Then of course eventually the
underground basin would be exhausted.  And then what?  Vails
have no water at all?

MR. VEEDER:  No.  I don't believe such a thing could
ever occur.  But secondly-- and your hypothesis, as I say,
concerns me greatly-- the fact remains that this stipulated
judgment was entered into in contemplation of a valleywide
situation that existed at that time and that the Vails today,
namely, it was recognized by all parties that there are water
users upstream--

THE COURT:  Where?  You are talking about the four
corners of the stipulated judgment.  Where is there anything
in the four corners of the stipulated judgment that these
facts were considered?

MR. VEEDER:  Well, your Honor, all one needs to do is
simply read the stipulated judgment, and it refers to all the
tributaries and to the main stem, and that it is in contemplation

1   of the quantity of water that is in the Temecula-Santa Margarita

2   River, and it is in perpetuity and for all time.

3       THE COURT:  You say that it was done in contemplation

4   of the fact that there are other water users.  But there is

5   nothing in there except the two or three intervenors that are

6   mentioned, there is no contemplation, if you look at the four

7   corners of the stipulated judgment, of any other users any-

8   where else, except the two major parties and the three

9   intervenors.

10      MR. VEEDER:  The only thing I say in that connection

11  is that the calculations are on the basis of the availability

12  of water in the stream, whether it is reduced from the

13  standpoint of a drouth or whether it is reduced from the

14  standpoint of uses upstream, which were going on at the time,

15  or whether it was reduced by any number of different factors.

16  It was agreed by the parties that those measurements would be

17  maintained.  Now we certainly know, and I am sure that your

18  Honor would know, and I am sure that all your have to do is

19  to take a look at the stipulated judgment itself.  You will

20  find that it relates to the entire runoff available at any

21  given time, and it doesn't say if somebody should use some

22  water, or it doesn't say if we have a bad drouth, or it

23  doesn't say if the Vails lose 10,000 acre-feet of water

24  through evaporation; it says there will be apportionment

25  among the parties on the basis of two-thirds-one-third

1   availability.

2        Now I don't believe that anyone could argue that most

3   competent counsel prepared that stipulated judgment, and the

4   point that I make, your Honor, is that as long as the United

5   States and the Vails recognize the correlative shares of other

6   parties who are not bound by the stipulated judgment it cannot

7   be doubted that the idea was to share on the basis set forth

8   in the stipulated judgment.

9        So we have now a question presented by this late

10  declaration that the agreement is null and void.

11       THE COURT:  What provisions were made in the stipulated

12  judgment for water from the Sandia and from the De Luz?

13       MR. VEEDER:  Those are taken into consideration by

14  reason of the measurements-- and it is a very propitious

15  provision-- if the waters at Ysidora, which is Gaging Station

16  No. 6, are greater than the measurements at the mouth of the

17  Temecula Gorge, which is Station No. 3, then the apportionment

18  is two-thirds-one-third on the basis of that measurement,

19  which takes into consideration Rainbow, Sandia, Fallbrook and

20  De Luz.  So you always compute your one-third back after Vails

21  have used their water.  But they would be entitled to a much

22  larger share if you had a high runoff in the De Luz-- those

23  calculations are made on that basis, your Honor, and if we

24  should receive large quantities of water, as sometimes occurs,

25  from De Luz, it inures to the benefit of the Vails.

But certainly, your Honor, the judgment that was entered by the Superior Court was in contemplation of a continuing arrangement among the parties in the light of the runoff, whatever it may be.

One of the reasons that I haven't precipitated this matter by the motion that I had talked about in the past is that I believe that the development of these facts that we are going into at the present time, in the light of the proposed findings that I handed to your Honor, would be most helpful in the consideration of--

THE COURT:  Do you want me to consider the findings?

MR. VEEDER:  What findings?  I have handed your Honor a copy of proposed findings.

THE COURT:  Oh.

MR. VEEDER:  If your Honor will just let me have my objection, you may consider them.

No, I don't believe that your Honor should consider the findings and conclusions of law in the original case by reason of the present posture of the pleadings, and also I don't believe that it is proper for your Honor to review what the State court did.

In any event, I have outlined to your Honor and I have tried to explain to your Honor my views, the Government's views, as to how you would interpret the stipulated judgment in the light of the presence of other parties.

I believe that the cross-examination which we will

endeavor of our friend Mr. Wilkinson might have some bearing

on the thoughts that have been advanced here this morning.

THE COURT:   Was there a stipulation signed in writing

on this matter?

MR. VEEDER:   In what regard?

THE COURT:   On the stipulated judgment.

MR. VEEDER:   On the stipulated judgment?

THE COURT:   All I see is a recitation that a stipulated

judgment was entered.   Did the intervenors sign the stipula-

tion?

MR. VEEDER:   No.

MR. STAHLMAN:   No, nobody.

THE COURT:   How was it done?   Was it stipulated in

open court in the minutes, or was there a written stipulation?

MR. VEEDER:   I would assume that there was a written

stipulation, your Honor, and I will go to the records and

obtain it, if they haven't been destroyed.

THE COURT:   Other than that, the stipulated judgment

that has been handed to me-- I don't know whether it has been

marked yet or not-- would not be complete without these

various exhibits that are referred to, parts of the transcript,

et cetera.   To understand this document you would have to have

all that material.

MR. VEEDER:   Yes, your Honor.

The point being, from the standpoint of the apportion-
ment of these waters, I think yourHonor will find, and it is
going to be extremely important in this case, that the loca-
tion of the wells, the location of the pumping, the effect
upon the stipulated judgment by the construction of the Vail
Dam and Reservoir, all those matters must necessarily be
considered.

Now the question of the witnesses who could testify in
regard to it is important.  That is a matter that I desire to
bring up later in the day.

But from our standpoint, your Honor, the question at
this moment is not what kind of decree your Honor would enter
respecting other parties. .It is whether at this moment your
Honor desires to rule as inoperative the stipulated judgment.

THE COURT:  I am not going to rule on it now without
further study.  I have been studying the matter and I just
wanted a little help as to your position.  Mr. Stahlman.

MR. STAHLMAN:  I hope your Honor will not take my
silence or dearth of remarks as any comfort to Mr. Veeder.
I feel that he has taken an inconsistent position and jumped
sideways on this matter.

Mr. Veeder says that it is not based on the findings
of fact, when in his Complaint and Supplementary and Amendatory
Complaint he has alleged that the judgment was based on the
findings of fact.

1          There are a great many factors that enter into this

2    thing.  I don't know how extensively your Honor wants to go

3    into it at this time.

4          In the first place, there has been a great deal of

5    difficulty in the operation of this judgment.  Nobody seems

6    to know just how it should operate.

7          Secondly, I can perceive, that, with what evidence we

8    have in this case at this time, those difficulties are

9    going to be increasingly great and become insurmountable.  We

10   can't work this judgment in relation to this case and have an

11   equitable distribution of this water as to all parties

12   concerned.  I don't want to go into a complete analysis of

13   this matter, which I hope to do some of these days.  But I

14   perceive all different things there.

15         Whatever agreement was made, or whatever gave rise to

16   the stipulated judgment, as far as I have been able to find

17   there was no stipulation entered into.  The judgment was

18   merely taken over and filed.  The judge who signed the judg-

19   ment did not try the case, and it became a matter of record

20   in the case.

21         Then as your Honor pointed out, all these exhibits

22   were part of the judgment.

23         When you get into the ramifications of this document,

24   it certainly doesn't comport with any logical basis upon which

25   the Court ultimately can determine the water rights on this

river.

THE COURT:  Well, go ahead.

MR. STAHLMAN:  There are so many things, your Honor, that it is going to take some extensive argument.

One of the things indicated here is that Vail would certainly come out with nothing in this case, with a destruction of their property, if that stipulated judgment remains in force and effect.  All these tributaries downstream are feeding water into Camp Pendleton, without any development there. All of the development is north of Vail's, all of the development is east of Vail's on these tributaries, and the streams which feed into the Vail Ranch, all the development is in that area.  Some interesting figures were given to me by Mr. Sachse here.  I haven't had an opportunity to analyze them.  But as this thing progresses, Vail couldn't even get its one-third under this judgment and Pendleton would be fat with water.  So it is an inequitable situation.

At the time this matter was in the Superior Court, Vail went before the court and asked that these other people who were extracting water be made parties to this suit, filed an amendatory answer to an amendment of the complaint, and the court overruled them and said no, these people are not necessary.  And here within a few years the Federal Government comes in and says it is completely necessary.  And the understanding that these people had on the stream only ten years

10,159

1   ago is completely different from what the Government is

2   contending in their facts here today.

3        THE COURT:   I get the impression that the Santa

4   Margarita and the Vails and the Court proceeded upon the

5   theory that they could divide up the water in the watershed

6   for use upon watershed or upon non-watershed ground, without

7   any consideration of the rights of other parties.

8        MR. STAHLMAN:   That is exactly what was done.

9        THE COURT:   Except for the few intervenors.

10        MR. VEEDER:   I find no basis for your Honor's con-

11   clusion, and certainly there is no evidence in the record to

12   support your conclusion, and I object to it.

13        THE COURT:   The very fact that it provides that water

14   can be used upon riparian and upon non-riparian ground and

15   in the watershed and out of the watershed.

16        MR. VEEDER:   Your Honor, it is not unusual for

17   riparians to do that.

18        THE COURT:   How can they do that, except with an utter

19   disregard of the rights of other parties?

20        MR. VEEDER:   Well, Prather vs. Hogard, I think is the

21   name of the case, in which riparians did that.

22        MR. SACH3E:   The wrong case.

23        MR. VEEDER:   I think that is the case but I will check

24   it back.

25        In any event, there is nothing wrong.   All you have to

1  do is go through the San Joaquin Valley and see what has

2  occurred there.   Numerous instances arise where riparians,

3  by contract or by decree, may operate as between themselves

4  on a different basis.

5        THE COURT:  I am talking about something else.  That

6  is true.  But I say that I get the impression that this whole

7  thing was done as if the two big land owners were just dividing

8  up the pot without reference to anybody else in the watershed.

9        MR. VEEDER:  I don't believe the evidence will support

10  such conclusion, your Honor, and I know of no such basis for

11  such a conclusion.

12        I just handed your Honor Identification marked 162,

13  and I am handing it to counsel.

14        And also I have marked this morning Identification 161.

15        THE COURT:  Let me read this.

16        MR. VEEDER:  I realize the ten-day period has not

17  expired.  I am just bringing it to your attention.

18        (A pause.)

19        THE COURT:  Before I pass this matter and take a recess

20  and start with the witness, I would like to ask, for the

21  assistance of the Court, if Mr. Sachse has any observations

22  on this matter that he cares to make.

23        MR. VEEDER: So that we will have a little further

24  background, I had one identification presented to your Honor

25  for consideration.  I have also had marked for identification

Exhibit 161. Now that is the hearing before the State Water

Rights Board in regard to the Vail application.

THE COURT:  For the dam?

MR. VEEDER:  For the dam, yes, your Honor.

Excuse me for interrupting.

MR. SACHSE:  Your Honor, I don't want to try to express

an opinion on whether the stipulated judgment ought to be set

aside or not at this time, but I think your Honor is reaching

at some of the most complicated and difficult problems, and I

agree that Mr. Veeder hasn't answered them-- at least not to

my satisfaction.  I would like to know what his position is.

You have a stream system (drawing on the board), to

make it extremely simple, with just the two big tributaries,

and you have here a situation where two large land owners,

one at the bottom and one at the top, agreed on a one-third-

two-thirds riparian apportionment of water.  I will agree with

Mr. Veeder up to this point that that can properly be done.

Riparians do it every day as between themselves.  I don't

believe that by so doing they can affect the rights of anyone

else on the stream.  But as between themselves it can be done.

But here is what happens.  Take your Honor's figures.

Let's say there is a hundred second-feet in the stream, and

that when you finally make an actual detailed apportionment

of every irrigable acre on this stream, you should find that

the United States is entitled to 40% and the Vails to 30%--

1   I am pulling these figures out of the blue just as you did--

2   and the others are entitled to 30%. I think everybody will

3   agree that the stipulated judgment can't affect these.  So

4   on a two-thirds-one-third you have 30% off here.  Now then,

5   the United States, under Mr. Veeder's contention, would be

6   entitled to two-thirds of 70 or 46.66, or an increase over

7   its true correlative share, by reason of the Vail contract.

8   Vail would get 23.33, or a decrease from its true correlative

9   share.

10  But it is even more complicated, because these people

11  up here have to take their water from the water that is

12  available to them.  They have to take it from that.  There

13  isn't any other place they can get it.  They can't bring it

14  back up from down here.  So in practice the Vail Ranch, the

15  Roripaughs, my client, Sievers and Stardust and others are

16  going to have to divide the water that is here, and in so

17  doing they are going to have to take care of the United

18  States's riparian rights downstream also.

19  It is at that point that I haven't any answer, and I

20  would like to know how Mr. Veeder practically says it happens.

21  When Roripaugh, Ceas and others on the Murrieta watershed

22  have had their shares calculated, purely on the Murrieta,

23  and when Sievers has had it calculated on the Temecula, and

24  when Vail has had their fair share of all this water and the

25  fair share has been allowed to flow down to the United States,

1  forgetting entirely the stipulated judgment for the moment,

2  when that calculation has been made, how do we take the

3  two-thirds-one-third and back up and apply it?  Frankly, I

4  don't know.

5          MR. VEEDER:  Your Honor, may I make just one statement

6  before the recess.  I think it is an important thing, and this

7  is undoubtedly the reason I was so prepared.

8          The gauging station at Ysidora is very important here,

9  gaging station No. 3 is very important here at the mouth of

10  the Temecula.  The apportionment is always figured subsequent

11  to the time of measurement of the stream flow.  So it is not,

12  as Mr. Sachse says, that we will be down there fat on water--

13  although I don't see how you get fat on water.  In any event,

14  suppose that you do get a contribution from the De Luz to us,

15  that measurement comes down and is included in the two-thirds-

16  one-third apportionment.  If Rainbow contributes, it is

17  calculated in the two-thirds-one-third apportionment.  Sandia

18  comes in and is calculated on the two-thirds-one-third ap-

19  portionment.  So that there is nothing inequitable about this.

20  Suppose we had, as we do sometimes, a freak storm where the

21  contribution of the De Luz is extremely high.  You don't make

22  your calculations on station No. 3 at all.  You make your

23  calculations on No. 6.  You don't pull down the Roripaugh and

24  the Vails at that time on a one-third-two-thirds apportion-

25  ment at the canyon.  You do it here and you take into

consideration the runoff.

Now you may have a situation where we would have to make calculations, where we do make calculations of an entirely different set of circumstances that prevail at Gaging Station No. 3, and there is where the division and the apportionment is completely equitable.  We don't participate in a drop of water concerning which the Vails are not entitled to their fair allocation, and necessarily in regard to the Roripaughs and to the others we simply say that the stipulated judgment has no effect.  And it can be done, your Honor.

There is one thing that I say now, though, and I think it is extremely important, I think that Mr. Hall's testimony is requisite in this case.  And I am going to add another thing-- I did a little checking-- whether you want to call him yourself-- Wigmore says that any time the court wants to call a witness he can-- whether we call him, whether Vails call him, or whether you call him, I think it is imperative now that these issues have been opened up, and I have waited patiently for this day, that we have called and placed on the stand a man who has had the full experience and the full background in connection with the operation of the stipulated judgment.

I think Malin Vail should also be here.  Whether we call him or whether Mr. Stahlman calls him is something concerning which I can't express now.

10,165

1    But I think those men have to testify to clear up these

2  questions into the record that your Honor has raised.

3    THE COURT:  Mr. Girard, did you have something you

4  wanted to add?

5    MR. GIRARD:  No, your Honor, except that I agree

6  generally with Mr. Sachse.  I think regardless of whether you

7  have a stipulation or not, it is going to be extremely

8  complicated matter when you apportion this water, specifically

9  taking into account, for example, that Roripaugh here has a

10  right to a correlative share on the Murrieta.  As against the

11  United States, Vail can take into account all of its irrigable

12  acreage on both streams.  It can't as against Roripaugh; only

13  its irrigable acreage on the Murrieta.  But basically,  when

14  you have the stipulated judgment, and I think Mr. Sachse's

15  figures are correct, if it is applied it couldn't be applied

16  adversely at all to any other owners other than Vail, and

17  clearly if it is applicable, Vail is going to get less than

18  it would have got under a straight correlative apportionment.

19  In addition, it will have to guarantee three second-feet--

20    MR. SACHSE:  I overlooked that last factor.

21    MR. GIRARD:  Either by pumping or otherwise, it will

22  have to get that three second-feet down to the United States,

23  if the stipulated judgment is applicable or not set aside.

24  Either the stipulated judgment applies, or it does not apply.

25    MR. STAHLMAN;  There is another situation, your Honor,

1  in connection with that three second feet.  I can conceive

2  that if that judgment were in force and effect and Vails

3  were compelled under certain conditions, and we are rapidly

4  reaching that if we don't have some rainfall, that the basins

5  underlying Vail could be completely destroyed, you would pump

6  it down below the safe annual yield, and if your basin on

7  Vail is destroyed it is certainly detrimental to everybody

8  on the stream system.

9         THE COURT:  Well, I thought of another very insidious

10  argument that might be advanced by the Government, but since

11  Mr. Veeder hasn't mentioned it--

12         MR. VEEDER:  I don't purport to pump the well dry now,

13  your Honor.  I am going to write a brief.

14         THE COURT:  Since he is renowned for his ingenuity,

15  I will not mention it presently.

16         That stipulated judgment gives me a lot of concern,

17  Mr. Veeder.

18         Take a short recess.

19         (Recess.)

20         MR. VEEDER:  Your Honor had asked Mr. Stahlman and

21  me to confer in regard to Vail's Exhibit C, which is the Coit

22  survey map, and we have asked that we obtain a linen upon

23  which that map was originally traced and originally drawn.

24  If they don't have it, we would like them to produce, if they

25  would, the source.

10,167

MR. STAHLMAN:   I think we have a negative, your Honor.

MR. VEEDER:   May I ask you to look for it, Mr. Stahlman.

MR. STAHLMAN:   What is the next step?  You need that in order to make this comparison?  Can we outline here so that these people can get to work and start checking and determine the accuracy?

THE COURT:   What is the purpose of the linen map?

MR. VEEDER:   Your Honor, it is impossible accurately to measure a reproduction from the standpoint of using a planimeter because there is always shrinkage, there are always changes in reproduction; so to run a planimeter back against Vail's Exhibit C as introduced would not be reflective of the real acreage that is involved.

THE COURT:   The discrepancies would be very minor, wouldn't they?

MR. VEEDER:   No, your Honor, we have found that the discrepancies in other instances are quite material.

MR. STAHLMAN:   You used a planimeter here on maps that the State and you people put in in order to determine acreage. Why couldn't you do it here?

We will try to get it.  I know we have the negative. Where that tracing is I don't know.  We will have to check and see whether there is a tracing.  I would start in up at the office of the surveyor to see whether he has it.  It may

1    have been put into court.  The exhibits that were put into

2    court in the early case, some janitor went down and burned

3    up the originals, according to the report we get.  But it

4    would seem to me that with the aid of aerials and with the

5    aid of U.S.G.S. topos, the accuracy of this map could be

6    determined.

7            THE COURT:  Incidentally, along this same line, I

8    notice that the stipulated judgment refers to a triangulation

9    map of the Pauba Ranch.  I take it the triangulation map

10   referred to on page 3 is the same one about which you had the

11   big argument; am I right?

12           MR. VEEDER:  I think that is correct.

13           THE COURT:  Then you are relying on the judgment, and

14   yet you made a fight about the triangulation map that was

15   offered.

16           MR. VEEDER:  If your Honor would tell me how he is

17   going to rule, it would make a great deal of difference as

18   to the kind of objections I make.

19           THE COURT:  How can you be inconsistent?  You are

20   relying on a judgment, and the judgment in part talks about

21   the triangulation map.  How can you then in good faith come

22   in and object to the introduction of the triangulation map

23   when it is offered?

24           MR. VEEDER:  I can in good faith because if your Honor

25   should-- and I am sure he is too wise to do such a thing--

1  rule that the stipulated judgment is inoperative, I am not

2  going to be without a complete record as to the data before

3  your Honor when he enters judgment.

4  THE COURT:  Actually, that triangulation map is made

5  a part of the judgment.  Properly to understand the judgment

6  I would have to have the triangulation map here.

7  MR. VEEDER:  And if you throw out the judgment, I have

8  to have a record on appeal.

9  Your Honor, when you speak of inconsistencies-- of

10  course, you crush me frequently-- the point that I make is

11  that from our standpoint we can't let Vails have a floor of

12  one-third and if they should happen to win a little more or

13  should happen to win on the stipulated judgment, then they say

14  we are scot-free, we are off and away.  I am going to say

15  to your Honor that I believe they are much better off with

16  the stipulated judgment than they would be if we dried up

17  Vail Dam.

18  THE COURT:  You are off the subject.  I will say no

19  more about it.  I am merely commenting on the fact that you

20  rely on a judgment that incorporates by reference a triangula-

21  tion map.  If this isn't that map, that is something else

22  again.  But I think your observation has probably shown you

23  that that was the map.

24  MR. VEEDER:  There is no question in my view.  But I

25  certainly am not going to stand by and let these things go in

1    without objection.

2         THE COURT:   Would you object to the actual exhibit that

3    is incorporated by reference in the stipulated judgment?

4         MR. VEEDER:   It is all going to be in before this part

5    is over.

6         THE COURT:   Then your observation could easily have

7    shown you whether this exhibit that Vail offered was a copy

8    of the exhibit named in the stipulated judgment as Plain-

9    tiff's Exhibit U-4.

10        MR. VEEDER:   Plaintiff's U-4, and it is also, as I

11   recall, 265.

12        THE COURT:   Are you going to see if you can find what

13   you have, Mr. Stahlman?

14        MR. STAHLMAN:   Yes, we will, your Honor.

15        THE COURT:   Would you like to confer further on this

16   matter?

17        MR. STAHLMAN:   I will.  But I wonder if Col. Bowen

18   being here could say that from these maps by making a comparison

19   with the aerials and other information that they have as well

20   as the U.S.G.S. topo maps whether they could not with reasonable

21   accuracy determine whether or not this exhibit C portrays what

22   it purports to portray in the way of acreage.

23        Here is another thing that we run into.  We have attempted

24   at all times to cooperate in this matter in every way possible.

25   Even since the last court session we turned all our records

relative to temperature over to the Navy and let them check them.  They want to use them not only for Vail but in other areas in which they are making studies.

I think we have a situation here where our engineers and Pendleton's engineers, eliminating the feelings of the lawyers and their opinions and the hysteria that goes into it could make a determination as to whether that map is accurate or not.  I think they can.

MR. VEEDER:  I think that when we go on to a little cross-examination, as I have been desirous of doing all morning, you will see some developments that will be of interest to you.

MR. STAHLMAN:  Let's get into the cross-examination then and see.  We are always confronted with these threats.

MR. VEEDER:  There is no threat.  I think I have a right to cross-examine.

THE COURT:  Let's proceed.

MR. STAHLMAN:  You even threatened the Court that you are going to take an appeal on everything.

THE COURT:  Let's proceed.  Who was on the stand? Mr. Wilkinson?

MR. STAHLMAN:  Yes, your Honor.

10.172

JAMES V. WILKINSON,

recalled as a witnes in behalf of the defendant Vail, having
been previously sworn, testified further as follows:

MR. STAHLMAN:   There are a few matters here.  Your
Honor had asked in regard to this Vail's Exhibit U, being the
title map, that the boundary lines be placed thereon.   I
understand that Mr. Wilkinson and Commander Redd took out the
old maps and the basic maps and established those lines and
boundaries.   Therefore, we will offer in evidence that exhibit,
Exhibit U.

That is the one on the board, counsel.

MR. GIRARD:   That is in evidence.

THE COURT:   Vail's U is in evidence.

The boundaries were to be put in.  I can't see whether
that has been done.

(Stepping down.)

On Exhibit U there has been put in, in yellow, an
outline of the Pauba Grant, in green an outline of the
Temecula, in red the Little Temecula, and in brown the
Government.

CMDR. REDD: This is the Temecula, and this is the
Little Temecula down here, and the Government lands are here.

THE WITNESS:   Actually, that is not quite right
technically, I found out after looking things over.

MR. STAHLMAN:  However, Pauba, Temecula and Little Temecula are accurate.  That is all we are concerned about.

MR. VEEDER:  I think it would be a good idea to have Mr. Wilkinson testify to that, from our standpoint and from your standpoint.

MR. STAHLMAN:  Yes, we will let him testify.

I understand that the map itself is accurate, your Honor.  It is merely the terminology.

What do you mean by that, Mr. Wilkinson?

THE WITNESS:  I mean what was referred to as Government lands, I myself assume when you say Government lands, Mr. Veeder, you mean what was considered Government lands in the previous litigation.

MR. VEEDER:  That is correct, and it is only important by reason of the references that were made in connection with the status of it.

THE COURT:  In other words, that is just a handle we use, whether they were Government lands or not.

THE WITNESS:  That is right.  And the ones referred to as Government lands are only in one portion.  Commander Redd and I put in an additional portion.  This is what you referred to as Government lands in Section 28 there.

THE COURT:  In the first suit.

THE WITNESS:  In the first suit, that's right.

THE COURT:  And now you have an additional area?

THE WITNESS:  These were all acquired at the time of the first suit, but they were not referred to as Government lands.

MR. STAHLMAN:  They were not part of the land which came down in the chain of title as being the Pauba or the Little Temecula, to which they are contiguous at this time.

MR. VEEDER:  May I tender a suggestion, your Honor. That Mr. Stahlman interrogate the witness and put on the lines to the end that it will be in the record.

THE COURT:  I notice an angle up here in Section 5, where there is a piece of grown shown as oblong.  That was not part of the original Pauba grant?

THE WITNESS:  That is right, your Honor.

THE COURT:  That is taken care of in your other acquired property?

THE WITNESS:  No, sir.  This is taken care of prior to '22.  This land was in ownership in the original suit.

MR. VEEDER: Again, I state that the record is not showing the matters to which you are having reference.

THE COURT:  You may have the record show it.  I just wanted to see what the map showed.

MR. STAHLMAN:  I have another preliminary matter, your Honor.  Exhibits S and T, which are the chain of title.  That was a title search made by the Security Title Company, and Mr. Hall, working in connection with them drew up the title

trees, which are in evidence, showing the--

THE COURT:  They are not in evidence.

MR. STAHLMAN:  They are not in evidence.  I am offer-
ing them at this time.  I took the matter up with Mr. Veeder
and he says the foundation that would be necessary by reason
of the representative of the title company, whom we can bring
here, if necessary, that he will not require that.

Is that correct?

MR. VEEDER:  I stated that I had no objection to the
entry into evidence of this matter, always subject to the
right to review for ourselves.

MR. STAHLMAN:  All right, Exhibit T, the chain of
title on the Little Temecula, will be received in evidence.

Exhibit S, the chain of title on the Temecula and
Pauba grant will be received in evidence.

(Defendant Vail's Exhibits S and T were received in
evidence.)

MR. STAHLMAN:  I have another matter.  I would like
to ask Mr. Wilkinson about it.  It is a correction on Exhibit
N.


FURTHER DIRECT EXAMINATION

BY MR. STAHLMAN:

Q  In checking this, we find that one of the wells
was left off.  Directing your attention to a newly prepared

purported copy of Exhibit N--

MR. VEEDER:  Are you referring to N, George?

MR. STAHLMAN:  Yes.  One well was left off.  It is identical with that exception.

Q  Showing you this newly prepared copy, will you state any differences that exist between this copy and the Exhibit N heretofore introduced in evidence?

A  In cross-referencing the information on Exhibit N, I found an error of omission which applied to the years 1958, '57, '56, '55 and '54.  The omission amounted to the fact that the pumpage from the August Cantarini well was not in the column "Vail Pumps Acre-Feet."

Q  Is that the only correction?

A  Well, that correction, and also by pure mathematics it does correct the figure noted "Acre-Feet per Acre" in the last column to the right.  But that is the only--

Q  Let me ask you this question, however, Mr. Wilkinson.  The August Cantarini well does not pump into the distribution system of the Vail Ranch in relation to the distribution of the waters on Pauba, Temecula and Little Temecula?

A  It does not pump in the main distribution system located in the Pauba Valley generally.

Q  Then I am going to suggest that instead of supplementing this we merely put in the August Cantarini well

1   separately, because I think--

2       A   I will say one thing.  It is not entirely erroneous

3   in that there are some places it did appear and there are

4   some places it didn't.  So that it confuses the--

5       THE COURT:  Let's see it.

6       THE WITNESS:  This is my work sheet.

7       THE COURT:  Didn't you revise Exhibit N then?

8       THE WITNESS:  We have copies.

9       THE COURT:  Do you have it revised?

10      THE WITNESS:  We have revised copies.

11      MR. STAHLMAN:  We have it revised.  As long as it is

12  shown in the record that the August Cantarini well and its

13  position is not connected therewith.  I think we will have

14  occasion to evaluate the pumpage, eliminate the August

15  Cantarini well, which can be done as a mere mathematic process.

16  You have all the Vail pumpage, however, on this new Exhibit N.

17      THE COURT:  Are you going to substitute a new Exhibit N?

18      MR. STAHLMAN:  Yes.

19      THE COURT:  And eliminate the old N?

20      MR. STAHLMAN:  Eliminate the old N, yes, your Honor.

21      THE COURT:  Do you have it here?

22      MR. STAHLMAN:  Yes, your Honor (handing document to

23  the Court and copies to counsel).

24      We will offer in evidence this new Exhibit N.

25      MR. VEEDER:  I have no objection, subject to running

through it.

THE COURT:  This is actually the third N that has come along.

MR. STAHLMAN:  Yes.

THE COURT:  How will you identify that, Mr. Clerk?

THE CLERK:  I am just substituting, your Honor.

THE COURT:  Tossing out the old one?

THE CLERK:  Yes, sir, marking off the other number and returning it to Mr. Stahlman.

THE COURT:  This new N will be received in evidence as of today and the old N will be eliminated.

(Defendant Vail's new Exhibit N was received in evidence.)

MR. STAHLMAN:  Exhibit D, which is the Coit soil survey study, the land classification of the Coit survey, I think possibly the offer of that should wait until such time as the map has been studied.

MR. VEEDER:  That is in.

MR. STAHLMAN:  Exhibit D is in?

MR. VEEDER:  Isn't D in?

MR. STAHLMAN:  No, D is not in.  C is in.

MR. VEEDER:  Oh, you are speaking of the tabulation.

MR. STAHLMAN:  However, on second thought, your Honor, maybe it would be better to offer D subject to the same conditions under which he accepted C. The tabulation works

1   in connection with the map, and then if there are any correc-

2   tions or errors.

3        THE COURT: Well, there is a sufficient foundation

4   with Col. Bowen's testimony probably for both of these.

5        MR. STAHLMAN:  We will offer in evidence D.

6        MR. VEEDER:  I want the record to show an objection

7   to your Honor's observation in regard to Col. Bowen's testimony.

8        THE COURT:  An objection to my observation?

9        MR. VEEDER:  If it is a ruling.

10       THE COURT:  Is that a new legal animal of some kind?

11       MR. VEEDER:  If it is a ruling.

12       THE COURT:  I haven't ruled yet.

13       MR. VEEDER:  I just want the record to show, because I

14   never know whether your Honor is making an observation or a

15   ruling.  I just have to keep track.

16       THE COURT:  Col. Bowen testified at page 9206:

17          "A  It is my opinion that the results

18         of the study made by Dr. Coit and his

19         assistants here on the Pauba Ranch are

20         reasonable in that they show land which

21         is reasonably susceptible of economic

22         and profitable irrigation.

23         "THE COURT:  What about the areas

24         in the lots?  On the map Exhibit C each

25         lot has in it a certain area.  Did you

do any spot checking to see how accurate those

estimations or surveys were as to the area?

"THE WITNESS:  Yes, sir.  I found it

very easy to orient myself with this map

on the ground with the physical features--

ridges, gullies, roads, stream systems,

et cetera-- and I spot checked the area of

some of those lots in there and found them

to be quite close, that is, the total area

of the block and lot."

MR. VEEDER:  I desire to have applicable to Exhibit D

all the objections to foundation that were interposed in

regard to Exhibit C.

THE COURT:  They are different.  Your request is

denied.

MR. VEEDER:  May I have an explanation, your Honor,

to guide me.

THE COURT: Exhibit D is a tabulation of what the

grounds were usable for, what was irrigable, what could be

grown on them.  As to Exhibit C your objections went to an

entirely different proposition.

MR. VEEDER:  Exhibit C goes to acreages, your Honor.

THE COURT:  That is right.

MR. VEEDER: And I certainly desire to have made

applicable my objection to the areas which are shown on

1    Exhibit C and set forth on Exhibit D from the standpoint of

2    the areal extent.

3         THE COURT:  In so far as Exhibit D should show areas.

4         MR. VEEDER:  That is correct.

5         THE COURT:  All right.

6         MR. VEEDER:  And also in regard to the other matters

7    contained in Exhibit D, which are, namely, the classification

8    of lands and the acreages of those classifications, I desire

9    to object on the grounds that there is no proper foundation

10   and that exhibit D is predicated entirely upon hearsay.  Those

11   two objections, your Honor, I desire to have applicable.

12   I realize that in regard to the acreages one phase is import-

13   ant.  In regard to the acreages of land classification another

14   objection is applicable.  So I have made my statement into

15   the record as to what those objections are.

16        Of course, we have the continuing objection that in

17   view of the validity of the stipulated judgment the matter

18   is entirely resolved and this is incompetent, irrelevant and

19   immaterial and does not tend to prove any issue in this case.

20        MR. STAHLMAN:  Mr. Veeder has made that statement

21   several times, and I would like to answer it.  They have

22   projected us into a lawsuit where we have to establish this

23   as against all the other people who are in the lawsuit.  Those

24   acreages have to be established.

25        THE COURT:  Wait just a minute.  I am reading something

10,182

(A pause.)

THE COURT: The Government's objections to Exhibit D are overruled and there is reserved to the Government a right to move to strike the exhibit upon a showing of inaccuracy after doing the checking which the Court requested them to do as to Exhibits C and D. There is also reserved the right to the Government to cross-examine Mr. Coit further, as provided in the record.

MR. STAHLMAN: Mr. Veeder made a suggestion, to which I am agreeable, that possibly tomorrow, if we don't have court-- I think we will be through with Mr. Wilkinson today-- that we would meet at the Vail Ranch, we would have Col. Bowen there and he would be there and Mr. Wilkinson and myself, and we will get out the base maps and start the checking on it and see what is necessary to be done.

Is that about it?

MR. VEEDER: That is right, because from the standpoint of the cross-examination of Mr. Davidson it may be that it will not be necessary for him to break out all the basic data to which I have made reference.

MR. STAHLMAN: That is agreeable, then.

THE COURT: Whether it is done tomorrow or not we will see.

MR. STAHLMAN: Yes, tomorrow or the next available time we can get together. Even next Saturday would be satisfactory.

10,183

THE COURT:  Are you ready to proceed further with the examination of Mr. Wilkinson?

MR. VEEDER:  Yes, your Honor.

THE COURT:  You haven't put the names of the various fields in there, have you?

THE WITNESS:  Yes, I have, your Honor, just a few minutes before court this morning.


CROSS-EXAMINATION (Resumed)

BY MR. VEEDER:

Q  Now, Mr. Wilkinson, alluding to the Exhibit N, I observe that you have set forth, for example, for the year 1958 a total acreage of 2492; is that correct?

THE COURT:  Irrigated acreage are you talking about?

MR. VEEDER:  That is right.

THE WITNESS:  That is right.  You mean in the second column?

BY MR. VEEDER:

Q  The second column.

A  That is right.

Q  Now, is there included in that acreage the "Piece by Jack's," which is in the northern part of-- well, about the most northern piece that you have marked as irrigated acreage on Vail's J?

A  I don't know, Mr. Veeder.  I would have to check our

records.

Q  You don't know?

A  I don't know.  I would have to check our records.

Q  It would make a difference, would it not, from the standpoint of water uses from Temecula Creek if the "Piece by Jack's" was not included in N?

MR. STAHLMAN:  You mean if it was?

MR. VEEDER:  Well, whichever way it is.

Q  It would make a difference, wouldn't it?

A  If it appeared in 1958 it would make a difference. I don't know whether it appears there or not.

Q  In other words, it is manifest that releases from Vail Lake would not be used on that piece of land?

A  No, they would not.

THE COURT:  Do you remember what crop was grown on the Piece by Jack's in 1958?

THE WITNESS:  I believe we had a barley crop, your Honor, but I would have to check our records.

BY MR. VEEDER:

Q  Now, I refer to Defendant Vail's Exhibit J, which shows a total of--

Can you read the total at the bottom of K?

MR. STAHLMAN:  3520.

BY MR. VEEDER:

Q  --3520; is that it?

THE COURT:  J or K?

MR. VEEDER:  K.

THE WITNESS:  3520?

MR. VEEDER:  Yes.

THE WITNESS:  I have never explained that figure, if I remember, prior to this.

BY MR. VEEDER:

Q  Well, would you do so into the record, then?

A  That figure is in there as a figure-- the bottommost one is a figure of-- at the bottom of the page, 3520?

Q  Yes.

A  That is a figure in there as a potential.  In other words, we planned to put another crop in below that section in yellow on Vail's J.

Q  May I ask you to explain that once more?

A  It is a potential.  We are to follow down in that area west of that yellow area.

Q  Do you intend to enlarge the yellow area?

A  We intend to enlarge the yellow area.

Q  And do you intend to enlarge the yellow area by 275 acres; is that what your intentions are?

A  That is right.

Q  In other words, it would be correct to state that Vail's Exhibit J does not correspond with Vail's Exhibit K at the present time; is that right?

A   No; it corresponds to it, all right.

Q   You haven't embraced, though, this additional acreage?

A   I had only embraced the acreage in yellow, Mr. Veeder.

THE COURT:   This additional 275 acres is not included within the yellow area on J, but is a prospective farm ground that you propose to irrigate and farm westerly of what is now marked in yellow?

THE WITNESS:   That is right, your Honor.

MR. VEEDER:   May I request the witness during the noon recess to show approximately where that 275 acres would be situated.

THE COURT:   Put it in in red, Mr. Wilkinson.

By the way, this piece by Jack's, is it listed on Exhibit K?

THE WITNESS:   Yes, it is listed as the third one from the bottom, by J. E. Roripaugh.

MR. VEEDER:   Now that your Honor has referred to that--

Q   This 55 acres, does that embrace the small green area between the two highways?

THE COURT:   He previously testified that that was part of it, as I recall.

THE WITNESS:   It is part of the piece that in the small green area west of the new Highway 395 has been irrigated in

10,187

1    the past, Mr. Veeder.  It is not now irrigated.

2         THE COURT:  It is considered, is it, a part of what

3    you would call the "Piece by Jack's"?

4         THE WITNESS:  It is considered part of the "Piece by

5    Jack's," but due to the intersection of the new highway it is

6    too small a piece.

7    BY MR. VEEDER:

8         Q  Is it presently in the irrigation system?

9         A  It probably could be worked out.  However, we

10   haven't irrigated it.

11        Q  At the present time it does not have irrigation?

12        A  No, it would have to come from some other direction.

13        THE COURT:  How many acres were cut off by that highway

14   in that small strip?

15        THE WITNESS:  I don't remember, your Honor.  I would

16   judge it to be a small amount.

17        THE COURT:  Five acres?

18        THE WITNESS:  Five and a half at the outside.

19   BY MR. VEEDER:

20        Q  In regard to the August Cantarini parcel, I inquire

21   as to whether the portion of the land marked in green which

22   is directly east from where you have marked "A. Cat," is that

23   included in the August Cantarini part?

24        A  That is included.

25        Q  In other words, we should view that--

A   As one parcel.

Q   --as one parcel, and the A. Cat. applies to both parcels?

A   That is right.

THE COURT:   Tie those together with a little symbol over the noon hour, the piece by Jack's and the Cantarini piece, to show that is the same parcel.

Take our adjournment until 2 o'clock.

(Noon recess.)

SAN DIEGO, CALIFORNIA, TUESDAY, JUNE 2, 1959.  2:00 P. M.

(Other matters.)

THE COURT:  Proceed.

THE CLERK:  Four, 1247-SD-C, United States vs. Fallbrook.


JAMES V. WILKINSON,

recalled as a witness in behalf of the defendant Vail, having been previously sworn, testified further as follows:


CROSS-EXAMINATION (Continued)

BY MR. VEEDER:

Q  Now, you have provided us with calculations respecting the distribution of water.  Is the Temecula School property presently served by water from the irrigation system that you have described?

A  Yes, the piece opposite the Temecula School is irrigated by water from the irrigation system.

Q  The piece opposite?

A  Well, I would say opposite, or it would be north of the present Temecula Grammar School.

Q  Perhaps I was not clear.  The part that you have marked "T School"?

A  That is right.

Q   That is irrigated at the present time?

A   That is irrigated at the present time.

Q   And what is the source of the water for that?

A   August Cantarini well.

Q   That is the August Cantarini well which is shown here in Long Canyon?

A   That is right.

Q   And it is part of your overall system then, the system from the Vail Dam and Reservoir?

A   That is right.

Q   Now, in regard to the acreages which you have on this Exhibit N, Mr. Wilkinson-- going back to 1954, if you would, please, sir-- I observe --

MR. SACHSE:   Which exhibit is that?

MR. VEEDER:   Exhibit N, on page 2 of Exhibit N revisited, and it is the second column.  I am now referring to the period 1954.

Q   I observe you have 671 acres of alfalfa?

A   That is correct.

Q   Is that 671 acres of alfalfa inclusive of the piece by Jack's?

A   I would have to check the records to verify that one way or the other.

Q   It is true, is it not, that Jack Roripaugh operated the piece by Jack for a time?

A  For a time, that is correct.

Q  And that time is inclusive within this tabulation for the period within the tabulation marked N?

A  Part of the time, yes.

Q  Will you tell us the years in which that situation prevailed?

A  I still say I will have to look at the records.

Q  You don't know?

THE COURT:  I didn't understand the answer.  Jack Roripaugh operated this field part of the time?  When he operated it he was a tenant under the Vail Company?

THE WITNESS:  Well, yes, I guess you could call him a tenant.  It was a contractual agreement.

THE COURT: So you have included, whenever a tenant had land which was irrigated, you have included it in these lists?

THE WITNESS:  I believe it is included, your Honor. I would like to check to make sure, but I believe it is.

BY MR. VEEDER:

Q  Would that be true in regard to all of the other acreages?  For example, the Temecula School acreage, the August Cantarini and the Piece by Jack acreage are all included in N?

A  Mr. Veeder, I am not sure about the Piece by Jack. I would like to check it.  The August Cantarini pieces are

included, as well as the Temecula School House Piece is
included in Exhibit N.

Q   The latter two, both of which are being served by
the August Cantarini well?

A   That is right.

Q   In regard to your lands--

I am now pointing, your Honor, to the Cantarini-
Ludy field down there.

Is the water for the Cantarini field derived from
the-- Could we call it the central system of the Vail Company?
Would that be proper?

MR. STAHLMAN:  Just a moment.  To keep the record
straight, you are referring to Exhibit J?

MR. VEEDER:  Yes.

MR. STAHLMAN:  And the witness just wrote something.

Did you write something on the map?

THE WITNESS:  Yes, I located it.  It was put on the map
as Cantarini-Ludy, which is true.  However, Ludy represents
the upper portion of that lot, the uppermost in the valley.
That would be the most southerly portion of it.

MR. STAHLMAN:  Is that what you have just written on
the map?

THE WITNESS:  That is right.  I put the word "Ludy."

THE COURT:  On your Exhibit K you have listed
Cantarini, 414 acres; and Ludi, 105.

10,193

THE WITNESS:  That is right.

THE COURT:  Those two together, 519 acres, constitute the parcel that is marked now "Cantarini-Ludi" on Exhibit J?

THE WITNESS:  That is right.

MR. VEEDER:  I didn't realize what you were doing, Mr. Wilkinson.

THE WITNESS:  I am sorry.

MR. VEEDER:  No, I am not being captious in the slightest.

I notice that you ran lines through the "Ludi" part of the "Cantarini-Ludi."  Have you stricken that?

THE WITNESS:  For descriptive purposes we refer to the Ludi as the top three blocks or the uppermost elevation line, the southerlymost three blocks.

Q  In other words, you are going to leave your map presently, Exhibit J, with just the Cantarini designation on that area; is that correct?

A  That is correct.  I will endeavor to print it a little more carefully when we have a recess.

THE COURT:  Actually, that field is the combination of what is shown on Exhibit K as Cantarini and Ludi?

THE WITNESS:  That is right, your Honor.

BY MR. VEEDER:

Q  What is the source of the water for the Cantarini-Ludi field?

A   The source of the water for the Cantarini-Ludi fields

is the two wells located and designated as the Cantarini and

the Cat wells.  Those wells, until the building of the

distribution system, from which we can take water from the

Vail dam to that area, were the only two wells that supplied

water to that.  Frankly, the Cat well, both the Cat wells

are new wells.  However, the older wells, referred to as the

Pit Wells, did supply water for that particular land there.

THE COURT:  Presently the water system is hooked up

with the central system?

THE WITNESS:  Presently it is hooked up with the dam

distribution system and the two wells, Cat well and the

Cantarini well.

THE COURT:  You say the dam system.  You mean hooked

up with all the wells that feed down through the valley?

THE WITNESS:  It is possible to hook up into the other

wells through the distribution system, your Honor.

BY MR. VEEDER:

Q   Is it correct then to state that the water from the

New JK Well, when it is pumped into the central Vail system,

in part at least is utilized in the Cantarini-Moody field?

A   It is possible, Mr. Veeder, although not too

probable.

Q   You don't know, do you?

A   It is hard when you intermingle water in a

reservoir to say whether the water from the JK well went down there or the water from the dam went down there.  They are both put into a reservoir and taken out again.  So I say it is possible that some of that water could reach that.

Q  The reservoir to which you have just made reference is your ground water basin; is that not right?

A  No; the reservoir I made reference to was the big reservoir, Vail Dam.

Q  Where does the intermingling take place?

A  The intermingling of the lake water and the pump water, is that what you mean?

Q  Yes.

A  Well, it can occur in many places.

Q  Well, does it take place, for example, when you release Vail Dam water into the outwash area?  Isn't that water commingled with the water that is pumped out of the JK well?

A  You mean the water I referred to in the basin?

Q  Yes.

A  If it is dug in the basin, if there is a chance to pick it up at the pump, I imagine we will pick it up at the pump.

Q  In other words, what you do is recharge the entire basin and pump out of it?

A  I assume we recharge the entire basin.  However, the

recharge is in the upper reaches.

Q   When you put, as you are now putting, as I understand, when you run the Navy well into the central Vail system, water from that well can be utilized and probably is utilized on the Cantarini-Moody piece; is that correct?

A   Impossible.

Q   Why is that impossible?

A   Because there is no hookup to get into that piece.

Q   Then where is the hookup that permits this intermingling of water down to the Cantarini-Moody piece?

A   There is a series of interconnections between the two main distribution lines from the highestmost, being at the New JK, and it goes down in various cross-laterals.  I think it can be shown on another exhibit where the interconnections are, and that continues on down the valley until the Y branch lines are reached, which are above the Headquarters Camp.

Q   Where then does the water that you now pump from the Navy well enter the central system?  Where does that take place?

A   Well, to say "Central System" is a little vague.  It enters--

Q   You describe the system that it goes into, then.

A   It enters on the northernmost branch of our irrigation system and it is used in the Temecula field and the Temecula Cemetery field.

Q  Just a moment, please, sir.  The Temecula field is the field--

A  Marked "Temecula Field" on the map.

Q  In other words, marked by you "Temecula Field" on the map.  And may I inquire, is the northwesterly portion of that Temecula field a cemetery?  Is that right?

A  That is a designation.  But it is closer to the little cemetery out at the town of Temecula there.  There is a very narrow neck dividing the two.

Q  And the water from the Navy well goes there?

A  It is possible.

Q  Does the water from the Navy well go any place else?

A  Yes, it can go into the old peach orchard, which I failed to mark on the map and I will mark it right now.

Q  "Peach orchard field," is that what you call it?

A  Old peach orchard, and also the McSweeney field.

THE COURT:  Where is it marked?

MR. VEEDER:  It is immediately south of the word "Temecula" in "Temecula Field."

THE COURT:  Referring to the Exhibit K, you have listed the Temecula field pasture as having 130 acres and the Temecula field pasture and cemetery as having 55 acres.  The larger one, Temecula Field Pasture, is the one you had listed on Exhibit J as Temecula Field?

THE WITNESS:  That is right.

10,198

1    THE COURT:  And the one northerly of it and hooked on

2  by the small neck is the Temecula field pasture and cemetery?

3    THE WITNESS:  That is right.

4    THE COURT:  Now where is this old peach orchard on

5  Exhibit K?  Part of McSweeney, is it?  Is it also called

6  McSweeney?

7    THE WITNESS:  I assume it is.  Perhaps there is an

8  error in this.

9    THE COURT:  You have on Exhibit K, McSweeney 25 acres.

10    THE WITNESS:  It couldn't be part of that.  I am afraid

11  it is an omission, your Honor.

12    MR. STAHLMAN:  Is that an omission of the peach orchard?

13    THE WITNESS:  The old peach orchard.

14    THE COURT:  Where is McSweeney shown on that map?

15    THE WITNESS:  It is shown right here, your Honor.

16    THE COURT:  I see it on K.  But where is it on Exhibit

17  J-- McSweeney?

18    THE WITNESS:  Right here, your Honor, just below where

19  it says "Lower Camp" on the map.

20    THE COURT:  It is part of a larger field then, isn't

21  it?

22    THE WITNESS:  It is part of a larger field.

23    THE COURT:  What is the larger field called?

24    THE WITNESS:  That is called the old horse pasture.

25    THE COURT:  Then on Exhibit K the old horse pasture

1    and McSweeney make up the units you have outlined in green?

2            THE WITNESS:  That is right.

3            THE COURT: All right.

4            MR. VEEDER:  Let me proceed along this line, then.

5        Q  How did you determine the acreage--

6            MR. STAHLMAN:  Would you mind if I ask a question on

7    the peach orchard?

8            MR. VEEDER:  No; might as well clear it up.

9            MR. STAHLMAN:  Is that planted at the present time?

10           THE WITNESS:  Yes, it is.

11           MR. STAHLMAN:  And is it being irrigated?

12           THE WITNESS:  Yes, it is.

13           MR. STAHLMAN:  That is all.

14   BY MR. VEEDER:

15       Q  What are the other fields that are irrigated with

16   the Navy well?

17       A  It is possible to irrigate a small portion of the

18   Studley field.

19       Q  May I inquire, is it, or do you know?

20       A  It has been, and also it is possible to irrigate

21   the sidehill in Studley from that, and it has been in the

22   past.

23       Q  Do you commingle water from the Studley well with

24   the Navy well at the present time?

25       A  The Studley, no.

Q   You don't.   What other waters are commingled with the Navy well water?

A   We get back right to where we were.

Q   Let me try again.   Can you tell me which are the wells--

A   That cannot be mingled with it?

Q   I think I had better finish these questions.

Which are the wells which contribute to the Studley field that you have marked here, Mr. Wilkinson, for the irrigation of the Studley field?

A   They are all the wells. the name of them would be the New JK, it's possible-- First of all, you just wish the wells?

Q   Yes.

A   The New JK, the Diesel, the 40 and the 50.

Q   The Diesel well is how deep?   Do you recall?

A   I don't recall at the moment.

Q   In other words, you commingle the waters from the very deep wells with the shallower wells in your pumping operation; is that right?

A   You say the very deep wells.   It sounds like you refer to all our deep wells.

Q   I don't intend to.   You mix the water from the shallow wells, as we recognize them here, with the water from the Navy well; isn't that right?

A   On occasions,  It is not a good practice to run water downhill whenyou can hold it higher up, and the Navy well and reservoir is lower down the valley.  They can be intermingled, but it is best to hold water higher up so you can utilize it to go in various directions.

Q   How many acres are presently being irrigated, I mean at the present time?  I mean do you know how many acres are being irrigated of this area which you have embraced in green, from the Navy well?

THE COURT:  Which area?  All of it?

MR. VEEDER:  All of it.

THE COURT:  On J?

MR. VEEDER:  Yes.  I am just asking.  I don't know.

MR. SACHSE:  Was the question, how many acres are irrigated from the Navy well?

BY MR. VEEDER:

Q   What is the acreage irrigated presently from the Navy well?

A   That would be the Temecula field, the old peach orchard--

Q   Do you recall how much is in the old peach orchard? I don't remember your saying.

A   I didn't say.  I believe it is 11 acres.

Q   And what other?

A   At the moment, I believe that is all, Mr. Veeder.

1 Q And that would run, do you figure, 195 acres?

2 A No, I don't.  I said Temecula field pasture alone.

3 THE COURT:  That is 130.

4 THE WITNESS:  That is 130.

5 BY MR. VEEDER:

6 Q And you are not irrigating the 55 acres; is that

7 right?

8 A No.

9 Q When did you last irrigate that, do you recall?

10 A Irrigation-- the Temecula field?

11 Q No; Temecula field pasture and cemetery?

12 A Not the cemetery.  Let's leave the cemetery part

13 out and I can give you a very definite time for Temecula

14 field pasture.

15 THE COURT:  He is asking you about the cemetery.

16 THE WITNESS:  Oh, the cemetery?

17 THE COURT:  The 55-acre field.

18 MR. VEEDER:  Let's start again, your Honor.  I am

19 confused on this designation here.

20 Q We have Temecula Field pasture and cemetery, 55

21 acres.  Now is the cemetery part of that 55 acres?

22 A No, that is just a descriptive term.  It is close

23 to the cemetery.

24 Q In other words, it is a 55-acre field?

25 A Yes.

1 Q When was the last time you irrigated that?

2 A I am not sure.  I would say probably 1954.

3 Q In regard to the pumping higher up I see you have

4 the "Upper JK or Mesquite from canyon mouth to fence above

5 old JK Well."  How much is in the upper JK and how much is in

6 the Mesquite field?

7 A The portion outlined in green on the map in that

8 area is 260 acres.

9 THE COURT:  Which portion is this?

10 THE WITNESS:  That is the most easterly portion

11 outlined in green, your Honor.

12 THE COURT:  What field do you call that?

13 THE WITNESS:  That is referred to as the Upper JK and

14 in some instances the Mesquite.

15 THE COURT:  Well, it is part of the Upper--

16 THE WITNESS:  There has been a line.  They used to

17 refer to it as the Mesquite at one time.  The mesquite trees

18 have been removed and such as that and it has kind of lost

19 its identity.  They say mesquite.

20 THE COURT:  The point is that Exhibit K shows Upper JK

21 or Mesquite to canyon mouth or fence above old JK well.

22 THE WITNESS:  That is another illustrative figure,

23 your Honor.  It is made up of other acreages.  That is the

24 whole piece that runs down to where the old JK well was.  There

25 was mention made of that this morning.

1   THE COURT:  Then what makes it up, looking at Exhibit K,

2   it is made up of 260 acres referred to as "Alfalfa and

3   potatoes"?

4   THE WITNESS: That is right.

5   THE COURT:  "Present planting spuds south of old upper

6   alfalfa 240."

7   THE WITNESS:  That is the area in yellow.

8   THE COURT:  And "Lower JK 179."

9   THE WITNESS:  If you will drop down to the bottom of the

10   page, your Honor, there is a figure 275.  That is the one I

11   referred to this morning.  That is not yet in crops, but we

12   plan to put that in, in the near future.

13   THE COURT:  Then the figure 775 is made up of the

14   figures 260, 240 and 275?

15   THE WITNESS:  That is right.

16  BY MR. VEEDER:

17   Q   And what you have here depicted in the red then--

18   A   That is the 275 acres.

19   Q   That is the 275?

20   A   That is right.  That is proposed to be used.

21   THE COURT:  Well, then, what on the map is the 260-

22   acre and the 240-acre piece?

23   THE WITNESS:  The 260 is the area in green, and the

24   240 is the area in yellow.

25

BY MR. VEEDER:

Q   As a matter of fact, then, Upper JK and Mesquite relate to exactly the same pieces of land encompassed in green; is that right?

A   I realize your problem, Mr. Veeder.   Those two names we have used in that area.   "Mesquite" would refer to the upper portion of it, and where the division line would be would be hard for me to say.   I use both the names so that I would be using similar terms on the ranch.

Q   For the purpose then of our view of this matter, we could refer to the 260 acres, which is the top of your column on Exhibit K, as being the Upper JK piece and/or the Mesquite; is that right?

A   That is right.

Q   In that connection, what are the sources of water for the irrigation of those parcels?

A   The source of water for the irrigation of those parcels is Vail Reservoir.   However, when it comes down to the New JK well it is possible to irrigate a portion of it from the well, and actually portions above that, depending on what type of irrigation system you use.   We have boosted the water backwards in that area.

Q   You have boosted it backward?

A   I wouldn't say backwards.   I should say we have boosted it up the line through sprinkler boosters.

1    Q  Now during to your Exhibit I, do you have that, Mr.

2    Wilkinson?

3    A  I do.

4    Q  Referring to Exhibit I, how do you determine the

5    quantities of water that are turned from Vail Lake directly

6    into the basin?

7    A  The method of determination there is made on meter

8    and weir readings at the discharge and the intake, at the

9    discharge of the dam and the intake of the pipe line system.

10    Q  In other words, your operation, just for illustration

11    purposes, in 1950 and '51, during the periods of October to

12    March, there were no releases whatever from Vail Lake drafted

13    into the basin; is that right?

14    A  In the period 1950-51-- I don't quite follow you

15    there.  I see there are some releases.

16    Q  Maybe I don't read this correctly.  We have a line

17    of zeros from October through March.

18    A  Oh, I didn't hear you say that.

19    Q  From October through March you made no releases at

20    all?

21    A  That is right.

22    Q  Now, from April through September you made releases

23    you made releases totaling 241; isn't that correct?

24    A  That is right.

25    Q  How was that operation conducted?  Did you just

simply open up a spigot and run it out on the outwash, or
what did you do?

A  It was released.

Q  Were you there?

A  When it initially was released I probably was not
there.  I was there while they were in the process of
releasing some of it.  Probably not in the period 1951,
though.

Q  As a matter of fact, those figures come from the
records; isn't that right?

A  That is right.

Q  How would you make your calculations for the same
period to which I have made reference?  You have lake
irrigation-- I am now referring back to Exhibit N-- you have
a heading "Lake to basin," and we drop down to the year 1951
and I see 241.  That is the water that went right down and
was released into the basin?

A  That is right.  As I remember, that was before we
had our distribution system built, so it had to go no place
but the basin.

Q  You just released it down there into the basin.
What is the difference in the operation then when we turn
to 1958, for example?  I am referring to Exhibit N.  Are
you releasing the 3184 down there for purposes of irrigation
and also some for purposes of recharge?

A  The recharge is incidental to the operation.  There is an open channel, and that being an open channel, of course, porous material takes up a certain amount of water.

Q  I just want to be sure that I understand what you do. If you will refer to Exhibit I and to Exhibit N, you have here "Lake to basin acre feet" on Exhibit N, "827 feet."  Do you have that?

A  Yes.

Q  Now you have '57-58, 774 acre-feet goes direct to the basin?

A  That is right.

Q  What is the reason for the variance?

A  One is a calendar year and one is a water year, and you notice both these figures don't appear.

Q  And that is the explanation?

A  Oh, yes.  You notice at thebottom of the column the figures 20 and 33 do not appear on Exhibit I.

Q  Why is it you release water in that manner just on the outwash area rather than putting it into your system?

A  I said it is incidental to the operation of our system in that there is an open channel between the intake of the irrigation system and the outlet of the dam.

Q  And you put it in there for the purpose of re-charging your basin?

A  We put it in there in order to get water into our

distribution system, and it is incidental that it goes into the basin at the same time.

Q   You make no releases whatever, then, just for the purpose of recharge?

A   Oh, yes, releases have been made in that fashion.

Q   Where will I find those?

A   You can see those in Vail's Exhibit I.  In the month of February there was 1028 acre-feet.

Q   And that was released solely for the purpose of discharge?

A   There was no distribution system completed at that time.

Q   Do you do that now?

A   We don't do that at this time.  Due to the drouth we haven't sufficient water.

Q   In other words, you are doing this, you are taking water that is impounded in the Vail Lake, putting it into the system and also pumping water into the system and commingling and distributing it that way?

A   Commingling to an extent, of course.  It can't help but be commingled in the holding reservoirs.

Q   Now when you set up your acreages as you have on Exhibit N, there is no method, is there, of determining what water has been used on any particular field?

A   No, there isn't.

Q   And it is a complete pooling of the water, isn't it?

A   That is right.

Q   For example, on your barley, when do you quit irrigating your barley?

A   It all depends on the weather.

Q   Well, when did you quit this year?

A   Our barley this year was mainly dry land barley and most of it was not irrigated.  There was one-- No. Frankly, I would have to check to make sure.  I don't think we did have the irrigated barley this year.

Q   When you are saying this year you are saying 1959?

A   Yes.

Q   How much irrigation was there on your barley in 1958?

A   I don't know, Mr. Veeder.

Q   Do you think you irrigated it or not?

A   Oh, yes, we irrigated barley.

Q   Did you irrigate your oats?

A   Yes, we irrigated oats.

Q   In other words, what you have done is, just taking your aggregate water here, this 2,492, divided it by the number of acres to get your acre-feet?

A   I think you have it backward.  That isn't aggregate water.  That is acreage.

Q   I mean you divided your aggregate acres by your

1   aggregate water?

2   A   Yes.

3   Q   So as a matter of fact in years when you didn't

4   irrigate your barley you included that in your total of

5   irrigated acreage anyway, didn't you?

6   A   We have a lot of dry land barley.  If I put that

7   in there it would change the figure entirely.  When you say

8   barley, now what barley do you mean?

9   Q   I don't know.  The problem is created by the fact

10  you have included each year, the 1927 year 691 acres of barley.

11  A   I see what you are getting at.

12  Q   Fine.

13  A   Maybe I don't.  Go ahead.

14  Q   You are including some dry land areas in your

15  acreages, are you not?

16  A   No, I am not.

17  THE COURT:  That is all irrigated?  Sometime or other

18  during the year that was irrigated?

19  THE WITNESS:  It was all barley that had been planted

20  on land that is under pipe line, your Honor.

21  THE COURT:  And has been irrigated during the year?

22  THE WITNESS:  And has been irrigated during the year.

23  BY MR. VEEDER:

24  Q   So as a matter of fact then what would you think

25  would be your water duty on your alfalfa, which appears to be

10,212

1    the largest area that you have there?

2         A  I would assume our water duty, and I have no method

3    to check it.

4         Q  In other words, you don't know?

5         A  No, I do not know.

6         Q  Now, you have irrigated, have you, the Hutchinson-

7    Brown property-- I have been using the it as the central

8    system-- the system that irrigates the Pauba Valley; isn't

9    that right?

10        A  It is a separate system in itself.

11        Q  And you had a well in there, I believe, in 1947,

12   that was entirely independent of the central system, wasn't

13   it?

14        A  Independent in the sense that it is a different

15   well.  There is no pipe line hookup.

16        Q  That is right.  And you would say the Hutchinson-

17   Brown property is in the northwestern portion of the Temecula

18   grant; is that correct?

19        A  That is approximately correct.  I would like to

20   check.

21        Q  Well, take a look.  I moved this down for your

22   convenience, sir.  You can look at your Exhibit U and you can

23   look at your J.

24        A  Yes, it is in the Temecula grant.

25        Q  And it is in the northwestern portion of the Temecula

grant; is that right?

A   That is not correct, Mr. Veeder.  It is under our ownership in the northwestern portion.

Q   That is right, under your ownership it is in the northwestern portion of the Temecula grant; isn't that right?

A   That is right.  It is in the portion of the Temecula grant which we own, it is in the northwest portion.

Q   Are you aware that there is in the stipulated judgment a proviso that only the southeasterly portion of the Temecula grant would be irrigated?

MR. STAHLMAN:  That is objected to as being incompetent, irrelevant and immaterial, and not proper cross-examination.

MR. VEEDER:  No, your Honor, I think I can interrogate whether this man knew it or not.

THE COURT:  Read the question.

(The reporter read the pending question.)

THE COURT:  Overruled.

BY MR. VEEDER:

Q   Were you aware of that proviso?

A   I am not aware of that proviso, Mr. Veeder.

Q   Have you knowledge as to why the Brown-Hutchinson property has not been irrigated down through the years?

MR. STAHLMAN:  That is objected to as being incompetent, irrelevant and immaterial and not proper cross-examination.

THE COURT:  Overruled.

THE WITNESS:  Why it hasn't been--

MR. VEEDER:  Irrigated?

THE WITNESS:  --irrigated?  Well, as to dates I cannot be sure, but I know there was an injunction at the time of the original Santa Margarita vs. Vail case.  I don't know exactly what date that was, and that was before it was appealed.

MR. STAHLMAN:  Just a moment.  Have you finished the answer yet?

THE WITNESS:  That represents a portion of it.  I know that irrigation was stopped at that time.

BY MR. VEEDER:

Q  And during the period in which you have been there the Hutchinson-Brown property, with perhaps the exception of 1947, was not irrigated?

A  I was not there, Mr. Veeder.

Q  It has never been irrigated since you have been there; is that right?

A  That is what I testified to.

MR. STAHLMAN:  He didn't know this, and Mr. Roripaugh was the witness on this matter, so he is cross-examining Mr. Wilkinson now on the testimony given by Mr. Roripaugh.  That is why I think it is not proper cross-examination.

MR. VEEDER:  I am simply asking him if he knows these

things.

MR. STAHLMAN:  These questions should have been asked Mr. Roripaugh to clear up this matter.

THE COURT:  Go ahead.  Overruled.

BY MR. VEEDER:

Q  In other words, while you have been there the Hutchinson-Brown property has not been irrigated?

A  No.

Q  You are aware, are you not, that there are two substantial sized reservoirs located on the Hutchinson-Brown property?

A  Yes, I am aware of that.

Q  And you are acquainted with the fact, are you not, that along the western extremity of the Hutchinson-Brown property there is a pipe line?

A  Yes, I know there is a pipe line.

Q  Would you describe that as an irrigation pipe line?

A  Yes.

THE COURT:  On your Exhibit K you have "Hutch above railway," "Hutch below the railway Gonzales,"  Those two together make up Hutchinson-Brown?

THE WITNESS:  They make up the area in Hutchinson-Brown.  I believe one of them is above the railway.  I should qualify that as the most westerly portion of the old railroad right of way, I think it is around 170 acres, and the other

portion is to the east of the right of way and adjoins the

old Gonzales piece.  That is in the vicinity of 70 acres.

BY MR. VEEDER:

Q  Now I hand to you the identification marked United

States of America's 162.  On top is a copy of a letter marked

October 6, 1947, signed by Malin Vail, Managing Trustee, and

I ask you whether you have ever observed that letter or a

copy of that letter in the files that are maintained under

your direction?

MR. STAHLMAN:  That is objected to as being incompe-

tent, irrelevant and immaterial and not proper cross-examina-

tion.

MR. VEEDER:  Your Honor, the witness has testified

quite at length in regard to the filing of the application to

appropriate water at the Vail Dam and also in regard to the

issuance of the permit.

THE COURT:  When did he testify anything about that?

MR. STAHLMAN:  That's right.

THE COURT:  Did you?

MR. VEEDER:  He testified in regard to the permits

that have been maintained there, your Honor.

MR. STAHLMAN:  What did he testify to?

MR. VEEDER:  I refer to (handing document to the

Court)--

MR. STAHLMAN:  What is the page?

1        MR. GIRARD:  The permit was what exhibit?

2        MR. VEEDER:  I think that is Exhibit A, is it not?  It

3  was offered while this witness was on the stand.

4        MR. STAHLMAN:  What page do you have there, your

5  Honor?

6        THE COURT:  He showed me page 990.

7        MR. VEEDER:  What is the objection?

8        MR. STAHLMAN:  Not proper cross-examination.

9        THE COURT:  All right, let me read this.

10       (A pause.)

11       MR. VEEDER:  Before your Honor rules, may I have one

12  more word?

13       THE COURT:  What is the pending question?

14       MR. VEEDER:  Read it, please.

15       (The reporter read the pending question.)

16       THE COURT:  The objection is overruled.

17  BY MR. VEEDER:

18       Q  Have you ever observed that letter?

19       A  No, I haven't, Mr. Veeder.

20       Q  Or have you observed the letter signed by Captain--

21       A  Mr. Veeder, before you go on, let me say--

Q   I ask you whether you observed in the files that are maintained under your direction a letter to one Mr. Hyatt, the letter dated October 29, 1947, and it is signed by A.K. Fogg, by direction.   Are you acquainted with that letter?

MR. STAHLMAN:   Objected to as incompetent, irrelevant and immaterial, and not proper cross-examination.

THE COURT:   Overruled.

THE WITNESS:   Not to my knowledge I haven't seen it.

THE COURT:   These two letters are now Exhibit 162 for Identification.

MR. VEEDER:   That is correct.

MR. STAHLMAN:   They were just lodged when-- this morning?

MR. VEEDER:   Yes.

THE COURT:   No harm has been done, Mr. Stahlman.   The witness says that he never saw them.   So let's go ahead.

BY MR. VEEDER:

Q   I am asking you whether-- and I am presenting to you for observation Plaintiff's Exhibit for Identification 161, which is the reporter's transcript in the matter of the Application No. 11518 and 11586 of the Vail Company and Fallbrook applicants.   Have you ever seen that in the files

which are maintained under your direction?

MR. STAHLMAN:  That is objected to as being incompetent, irrelevant and immaterial and not proper cross-examination.

THE COURT:  Overruled.

THE WITNESS:  Perhaps I have seen it.  I do not remember.

BY MR. VEEDER:

Q  Why don't you just take a look and see if you can recall it?

A  You showed me the document.  Perhaps I have and perhaps I haven't.  I don't remember.  That is comething my attention hasn't been brought to other than just now.

THE COURT:  We will take a short recess. We will adjourn at 4 today.

(Recess.)

MR. VEEDER:  I would like to hand your Honor through the Clerk a copy of a motion to go on Vail's property to set water level recorders.  I have delivered a copy of this motion to counsel for the Vail Company.  We have discussed it. He has some question in regard to it and I would suggest that we might save some time by having him present the question first.

MR. STAHLMAN:  Your Honor, this was only handed to me this morning.  I wonder if this couldn't go over as a motion at the time you are hearing the matter in relation to the

motion by the Roripaugh property.

The first thing I note, I don't know what the purpose of the test is, what the object is that is expected to be accomplished.  That is not indicated.  They merely want to put the recorders by certain wells.  It is pointed out to me by Mr. Wilkinson that we have some domestic wells running in this first group that are cut off at various times, depending on the use of water automatically.

If we conclude what the object of those particular tests is to be, I don't think they will show anything.  You can't tell where the action comes from.

Secondly, the reason we brought this up today is that we have a hydraulic engineer to whom we wented to take this matter.

THE COURT:  I thought you were going to do it.  When are you going to do it?

MR. STAHLMAN:  If I take this to him as I did to Mr. Illingworth, he would say, "I don't know what they are trying to do."  There is not enough here from which you candetermine that.  If I take this to our engineer and say they want to put these recording devices on, the first thing he will ask me is, what is the purpose of it?  We are not going to fight putting anything on there.

THE COURT:  When I was a young lawyer, the first thing I learned about a motion is that it has three parts:  When it

1   is to be for, what you move for, and the grounds of the

2   motion.  Now of course we don't have to worry about when it

3   is heard.  But there are no grounds stated in here.  It is

4   just a motion to do something.  I always thought it was kind

5   of fundamental when you made a motion that you moved for a

6   certain kind of relief and stated your grounds and, if neces-

7   sary, you also stated on what you based your motion-- upon

8   affidavits, upon the record in the files, upon the pleadings,

9   whatever it was.  There are no grounds stated at all for

10  this motion.

11      MR. VEEDER:  I have been through this before, and you

12  asked me to specify the wells to which I was making reference,

13  and I will state now--

14      THE COURT:  I told you that if you and Mr. Stahlman

15  couldn't get together to make your motion and set forth the

16  grounds and lay a basis for a ruling on the motion.  Do you

17  recall?

18      MR. VEEDER:  I don't recall that phase of it, but I

19  am certainly willing and desirous to state to you now the

20  reasons why we would like to put on these recorders.  I have

21  gone into it before, and I will say here--

22      THE COURT: Since apparently you haven't been able to

23  get together and you may not be able to and I may have to

24  rule on the motion, make the motion and state the grounds for

25  your motion, what you propose to prove by it, what you are

1   going to do, so that I can determine the materiality of it.

2      MR. VEEDER:  All right.  Could that be heard on

3   Thursday?  Or is that too soon?

4      MR. STAHLMAN:  As long as you get me one night so that

5   I can go to the engineer with this.

6      MR. VEEDER:  We have Mr. Krieger coming in Thursday

7   morning at 10 o'clock.

8      THE COURT:  Can you redraft your motion tomorrow?

9      MR. VEEDER:  I will redraft it and I will get it to

10  him.

11     THE COURT:  So that he can talk to his engineer about

12  it.

13     MR. VEEDER:  I might say in regard to some of these

14  things it is extremely difficult to spell out with precision.

15  I think you will find, as I have stated in my original motions

16  that were filed with your Honor, it is the desire to show

17  interaction among the wells.  I think we could prove that,

18  I think the recorders will prove it, but I will take care of

19  it as you want me to.

20     THE COURT:  Mr. Stahlman asked to have at least an

21  evening.  If you get the thing to him tomorrow, Wednesday night

22  he can talk to his engineer, and be ready Thursday.

23     MR. STAHLMAN:  Your Honor, I don't know whether you

24  are going to conclude with Mr. Wilkinson this afternoon.

25     Do you think you will or not?

1    MR. VEEDER:  I don't know.

2    MR. STAHLMAN:  I am going to make another suggestion

3  that I think might be helpful, your Honor, that if we didn't

4  have court tomorrow and we were going up to look at these

5  maps at Vail's he could bring it up to me at that time up

6  there.

7    MR. VEEDER:  I will do that.  One thing I want to do,

8  though, that is important to me, and that is that Mr. Kunkel

9  be along for the purpose of locating these recorders, and I

10  will explain then the purpose of it.

11    MR. GIRARD: We would like at least to see it in writing,

12  also, because looking at these things they are all in areas

13  about which there is no dispute about their being in the

14  lawsuit.  We are more or less interested in what they intend

15  to prove by it.

16    THE COURT:  Will you serve copies upon the State and

17  Mr. Sachse and Mr. Krieger?

18    MR. VEEDER: All right.  I am trying to make this as

19  simple as I can, your Honor.

20    Q  Now, from the standpoint of the use of water from

21  the Vail Dam, referring to Exhibit I, it is noted that you

22  have in the year 1952-53 asterisks to a footnote which says,

23  "These are based on percentage losses as experienced with

24  equivalent flow."  What does that mean, Mr. Wilkinson?

25    A  The measurements for the months that you mention were

1    not available and the only way to determine or to arrive at

2    a figure was to go back to the other periods where there were

3    equivalent flows and determine the percentage loss as based on

4    records which showed that loss.  Col. Bowen and I went over

5    that.

6        Q   Who made the determination as to the figures that

7    would be set out on Exhibit I?

8        A   I did.

9        Q   You made those determinations yourself?

10       A   After my conversation with Col. Bowen.

11       Q   What were the factors that you took into consider-

12   ation in arriving at those figures?

13       A   Just as I said, losses experience with equivalent

14   flows.

15       Q   With your experience in regard to those losses?

16       A   When I said "Experience with equivalent flows" I

17   meant as a record of losses with equivalent flows.  "Exper-

18   ience" should perhaps be "accompanied" instead of the word

19   "experience."

20       Q   I observe that there are only two years antecedent

21   to 1951-52-- do you see what I am stating-- in your column

22   here on Exhibit I that is under 1949, '50 and '51?

23       A   That is right.

24       Q   Now, are those the years upon which you relied in

25   making your determination in regard to the interpolations or

1    the interpetations that you make?

2          A   No, I use the entire period, looking for flows that

3    were equivalent.

4          Q   Which entire period?

5          A   The entire period covered by this exhibit.

6          Q   In other words, you projected it forward and backward;

7    is that right?

8          A   That is right.

9          Q   And what were those figures that you took into

10   consideration, for example, in 1958, in making this determina-

11   tion?

12         A   Just as it is stated there, equivalent flows per-

13   centage losses.

14         Q   Doesn't all of the Vail water go into the irrigation

15   system at the present time rather than being released as was

16   the practice at that time?

17         A   The operation since 1951-52 to the present, there is

18   no difference in it; the fact that the only period we are

19   considering would be the period 1951-52 to 1957-58.

20         Q   I turn over here to the original exhibit lodged

21   and I note--

22         THE COURT:   You mean the one that has been withdrawn

23   now?

24         MR. VEEDER:   Yes, Vail's Exhibit I, which apparently

25   has been withdrawn.

1    THE COURT:  If you are going to talk about it we will

2  have to get it back into the case for identification as

3  Exhibit IA.

4    MR. VEEDER:  I thought you would have a copy of it,

5  your Honor.

6    THE COURT:  I probably have, but I am talking about the

7  record.

8    MR. VEEDER:  I have no concern what is done about it.

9  This is proper cross-examination to refer back to the original

10  figures, your Honor.

11    THE COURT:  Not if the exhibit was withdrawn.  It is

12  no longer part of the record in the case.

13    MR. VEEDER: Well, then, I would like to have it back

14  in.  I am not proud.

15    THE COURT:  Do you have it, Mr. Clerk?

16    THE CLERK:  I gave it to Mr. Stahlman, your Honor.

17    MR. VEEDER:  Don't you have it?

18    THE COURT:  You may have mine.  Mark it.  It is not

19  the one you are looking at.  It is a handwritten one,

20  apparently.  Mark it IA.

21    MR. VEEDER:  I think you have a negative and I have a

22  positive, or you have a positive and I have a negative-- I

23  am not sure.

24    THE COURT:  IA for Identification.

25    (Defendant's Exhibit IA was marked for identification.)

BY MR. VEEDER:

Q  Have you viewed this column here, which is 1952-53, in the original Vail's Exhibit I?

A  I see, Mr. Veeder.

Q  Have you considered it?

A  I say I considered it because Col. Bowen and I found that to be mistaken.

Q  How did you arrive at the conclusion that it was in error?

A  By inspection of other periods.

Q  It is your interpretation; is that right?

MR. STAHLMAN:  What is his interpretation?  I object to the question as being indefinite and uncertain, your Honor.

MR. VEEDER:  The column that is now here.

THE COURT:  The column now reads what?

MR. VEEDER:  The column which is on the present Exhibit I, 1952-53, your Honor will observe the asterisk to which I am making reference and the numbers that are beside it, and I am asking him this, is this his interpretation?

Q  Are these figures your interpretation?

MR. STAHLMAN:  I object to this as not proper cross-examination, and it is incompetent, irrelevant and immaterial. The reason I think it is immaterial, in the first place, the exhibit as originally lodged was an exhibit prepared by Mr. Hall, and they brought up some question when there were matters

1   in this exhibit carried over into Exhibit N, and then Col.

2   Bowen and Mr. Wilkinson went up and checked it.  However, Mr.

3   Wilkinson himself supplied the figures for the exhibit which

4   is now in evidence as Exhibit I.

5          THE COURT:  It is not in evidence, according to my

6   records.

7          MR. STAHLMAN:  I will offer in evidence Exhibit I.

8          MR. VEEDER:  As I recall, Exhibit I was offered and was

9   admitted.

10         MR. STAHLMAN:  I thought it was in.

11         THE COURT:  Mr. Clerk?

12         THE CLERK:  No, it is not in, your Honor.

13         THE COURT:  I received in evidence.

14         (Defendant Vail's Exhibit I was received in evidence.)

15   BY MR. VEEDER:

16         Q  As a matter of fact, did you work out these figures

17   yourself?

18         A  I did, Mr. Veeder.

19         Q  You say you turned to other runoff figures.  What

20   were the other runoff figures that you turned to to arrive at

21   these numbers?

22         A  I couldn't tell you definitely.  I would have to get

23   my notes to see which periods I used.

24         THE COURT:  You are talking now about these figures

25   starting from April to September in the column 1952 to 1953?

1          MR. VEEDER:  That is correct, your Honor.

2          THE COURT:  And the figures with the asterisks, 127,

3    153, 125, 101, 105 and the 109?

4          MR. VEEDER:  That is right.

5      Q   Now, what reach of the river was involved when you

6    undertook to make that interpretation?

7      A   The same reach as was considered in the others.

8      Q   What is that reach?

9      A   The distance, or the area between the outlet of the

10   dam and the intake of the distribution system.

11     Q   What was the percentage loss you calculated in that?

12     A   It varied, Mr. Veeder.

13     Q   What were the factors that you took into consideration

14   in arriving at that variation?

15     A   The initial losses in the first release as compared

16   to other years, and then--

17     Q   Excuse me just a moment.

18         MR. STAHLMAN:  He is answering the question.  Why not

19   let him finish?

20         THE COURT:  Let him finish.

21         THE WITNESS:  The initial losses in other years and a

22   decreasing loss or loss in transmission or recharge to the

23   basin as the area became saturated as evidenced by other years

24   of evaporation at the same flow levels.

25         THE COURT:  Let me see if I understand this.  You release

1  water out of Vail Dam and you have a meter there to know how

2  much you release?

3      THE WITNESS:  That is right.

4      THE COURT:  The water flows in this channel below Vail

5  Dam until it comes to this little pond where you pick it up

6  and put it into your system?

7      THE WITNESS: That is right.

8      THE COURT:  It is then metered as it goes into the

9  system?

10      THE WITNESS:  There is a weir there.

11      THE COURT:  Do you have measurement readings on that

12  weir?

13      THE WITNESS:  We have measurements, all except for this

14  one period.

15      THE COURT:  This is the period then that you don't

16  have the exact readings?

17      THE WITNESS: That is right.  The other periods we had

18  exact readings.

19      THE COURT:  So this is an attempt to reconstruct what

20  the loss would have been in water released from the dam at

21  the time it entered your weir into your distribution system?

22      THE WITNESS:  That is right.

23      THE COURT:  In reconstructing it, in addition to the

24  factors you have listed, did you have other factors that you

25  took into account?

1          THE WITNESS:  The only factors I took into account,

2     your Honor, were the flows of other years, equivalent flows,

3     as well as the initial losses which occur with the same amount

4     of flows.  The initial losses are high and then they gradually

5     decrease.

6     BY MR. VEEDER:

7          Q  The initial losses are high when?

8          A  When the channel has been dry.

9          THE COURT:  You and Col. Bowen worked on these figures

10    together?

11         THE WITNESS:  Yes, we did, your Honor.

12         THE COURT:  And the supporting data was there available

13    to him as it was to you?

14         THE WITNESS: We examined it carefully.

15         THE COURT:  And you and he were in agreement that these

16    were fair figures?

17         THE WITNESS:  Yes, we were in agreement; not as to the

18    figures themselves, but the percentages.

19         THE COURT:  And then you took the percentages and

20    converted them to --

21         THE WITNESS:  To actual acre-feet.

22         THE COURT:  --to acre-feet?

23         THE WITNESS:  That is right.

24    BY MR. VEEDER:

25         Q  Did you take into consideration temperature and

factors like that?

    A  No, I didn't, Mr. Veeder.

    Q  Would you say that this is the combined work of Col. Bowen and yourself?

    THE COURT:  By "this" you are referring to--

    MR. VEEDER:  I am still referring to the same column, your Honor.

    THE COURT:  To the six figures with the asterisks; is that right?

    MR. VEEDER:  Yes, your Honor.

    THE WITNESS:  I am not too sure what you mean by the combined work, Mr. Veeder.

    MR. STAHLMAN:  I object to it as calling for a con-clusion.  He can tell what was done.

BY MR. VEEDER:

    Q  What was done?

    THE COURT:  Overruled.  Let's find out.

    THE WITNESS:  We went up and inspected the records that show this loss and by going back and forth, the first thing was to establish that the original losses were correct, and in looking it over we found it to be correct except in this one location where obviously some error had occurred, and then we discussed the method by which we could rebuild or create this period of April to September, 1952-53.

BY MR. VEEDER:

Q  Did you do any other rebuilding on this Exhibit I?

A  I think there was one other instance, but I am not certain.  I would have to compare the two to make sure. My memory is not--

Q  Would you do that for us?

A  I will.

THE COURT:  Let's see Exhibit IA for Identification.

What is the purpose of the cross-examination on this point?

MR. VEEDER:  I am just wondering as to the source, because he has a great deal more.

THE COURT:  The reconstructed figures show that that summer flow was 720 acre-feet.  Exhibit I originally showed it was 186 feet.  The new exhibit shows more water direct to the basin than the original exhibit.  Are you interested in showing how little water goes into the basin or how much goes into the basin?

MR. VEEDER:  It is extremely important to us.

THE COURT:  Which way?

MR. VEEDER:  Certainly the more appropriative water that is used by the Vail Company and is a historical use of appropriative water--

THE COURT:  Appropriative water?

MR. VEEDER:  Yes.  It becomes extremely important to

1  us when we take into consideration the possibility that your

2  Honor will declare the stipulated judgment invalid.  We are

3  going to be in this position, of a history being made of

4  beneficial use, because certainly they haven't got 40,000

5  acre-feet or anywhere near it, they haven't got that much water.

6  But they are going to claim, and I assume your Honor will be

7  asked to find, the quantities of water actually appropriated

8  by the Vails by impoundment and application to a beneficial

9  use, and I want to know what it is, and I think it is extremely

10  important in this lawsuit now to segregate and determine the

11  waters which come in the category of riparian rights, those

12  which are appropriative rights, those which are commingled,

13  because I think we are going to come down to the point where it

14  will be impossible to ascertain which is which.  But to the

15  extent that it is possible, we are entitled to know what waters

16  have actually been used beneficially.

THE COURT:  I have your point.  Now you have asked the

18  witness to look for something for you?  What was it?

MR. VEEDER:  I want to know how many changes have been

20  made in Vail's Exhibit I.  I haven't been able to ascertain

21  what they are or how extensive they are or the reason why they

22  were made.  I know that those changes were made.

Q  Now, in making your calculations, Mr. Wilkinson,

24  in regard to the waters used, have you taken into consideration

25  the evaporation losses as to the waters impounded behind Vail

Dam?

MR. STAHLMAN: Just a moment. I object to the question as being indefinite and uncertain and no reference has been made to what particular calculations.

THE COURT: Sustained. I can't understand. You are talking about the calculations of water direct to the basin from the dam. What has evaporation got to do with that?

MR. VEEDER: I simply asked if he has taken into consideration evaporation losses in these calculations as such.

THE COURT: You mean evaporation losses in the interval during the time when the water left the dam until it got into the weir?

MR. VEEDER: I will ask that question. I will just go back upstream.

Q Did you take into consideration the evaporation losses down the canyon?

A I said nothing about evaporation losses. They are strictly measurements.

Q Now in regard to the waters impounded behind Vail Dam, have you made any studies as to the evaporation losses which take place in that area?

A I have made no studies myself.

MR. SACHSE: I object to that as being incompetent, irrelevant and immaterial. It is not proper cross-examination.

THE COURT: It is not, but he said he hasn't made them,

1  so let's go ahead.    There is other evidence about evaporation

2  losses.

3      MR. VEEDER:  That is right.

4      Q  Now in regard to your calculations as to water uses,

5  have you made any computations as to use and re-use of water

6  in the system?

7      A  You mean as depicted on this Vail's Exhibit N?

8      Q  Yes.

9      A  No, I haven't.

10      MR. STAHLMAN:  Let's see if we understand what you

11  mean, Mr. Veeder.  That question is as to the return flow from

12  irrigation?

13      MR. VEEDER:  That is right.

14      Q  Have you made any calculations in regard to return

15  flow?

16      A  These are strictly records from pump meters, weirs

17  and such as that.

18      Q  In other words, it is entirely possible that in regard

19  to the figures shown on Exhibit N and also the figures that are

20  shown on Exhibit I-- No, just on N-- there is depicted only on

21  N actual measurements?

22      THE COURT:  The question started, is it entirely possible?

23      MR. VEEDER:  All right, strike it.

24      THE COURT:  Rephrase the question.

25

BY MR. VEEDER:

Q   These figures as set forth on N are not representative, are they, of the actual demand of the Vail Company upon the waters, the natural flow of Temecula Creek and of the waters impounded behind Vail Dam?

MR. STAHLMAN:  I object to the question as being indefinite and uncertain, your Honor.  I don't understand it.

THE COURT:  Sustained.

MR. STAHLMAN:  It is compound.

THE COURT:  The witness has already said that these figures in N represent only figures taken from weirs, meters, et cetera, and as I understood he said he did not calculate any return flow or re-use of water.

Is that right, Mr. Wilkinson?

THE WITNESS:  That is right, your Honor.

BY MR. VEEDER:

Q   Now, it is true, is it not, when you apply water for purposes of irrigation on your field in Upper JK and Mesquite, as you have marked there, that the water, after you have used it for irrigation, will enter the basin and at least some of the waters will be pumped again; isn't that right?

A   I will not say that they will be pumped again because I don't know just where those waters go.  It depends on the type of irrigation we are using, Mr. Veeder, whether there is going to be a considerable amount go down or practically

10,238

1    none.

2          Q   In other words, where you use sprinklers the burden

3    on the stream, your evaporation losses are one thing, and

4    when you use rill irrigation they are another; is that right?

5          A   Real irrigation?

6          Q   I said "rill" irrigation.

7          MR. STAHLMAN:  I don't think it is proper cross-

8    examination.  He is asking some obvious things.

9    BY MR. VEEDER:

10         Q   Do you know what "rill" is?

11         A   I don't know.  I would have to make an assumption.

12   What is "real" irrigation?

13         Q   I said "rill" irrigation.

14         THE COURT:  Overruled.  Answer the question.

15         MR. VEEDER:  He says he doesn't know.

16         MR. SACHSE:  Try "furrow irrigation," Mr. Veeder.

17         MR. VEEDER:  Thank you, Mr. Sachse.

18         MR. STAHLMAN:  Flood irrigation.

19         MR. VEEDER:  Furrow irrigation.

20         THE WITNESS:  In order to answer this correctly--

21         THE COURT:  What is the question.

22         MR. STAHLMAN:  Wait a minute.

23         THE COURT:  What is the question?

24         MR. STAHLMAN:  What about flood irrigation?

25         MR. VEEDER:  I didn't mention anything about flood

1    irrigation.

2         THE COURT:   Ask your question.

3         MR. STAHLMAN:   Well, furrow irrigation.

4         MR. VEEDER:   I will ask the question again.

5         MR. STAHLMAN:   What about it?

6         MR. VEEDER:   Your Honor, I thought we had knocked some

7    heads together and we were going to treat everybody nice.

8         THE COURT:   Ask your question.   Go ahead.

9    BY MR. VEEDER:

10        Q   Is there a difference between your losses when you

11   are irrigating by sprinklers and by water running down between

12   two rows of growing crops?

13        MR. STAHLMAN:   I object to the question on the grounds

14   that it is incompetent, irrelevant and immaterial; no proper

15   foundation has been laid; it is not proper cross-examination.

16        THE COURT:   Overruled, if he knows.

17        THE WITNESS: There is a difference.   It depends on the

18   type of soil, Mr. Veeder.

19   BY MR. VEEDER:

20        Q   Have you made any calculations at all in that re-

21   gard?

22        A   The only calculations that I have made are noted in

23   the back of Exhibit N and knowledge through reading.

24        Q   Would it be proper to state that in your calculations

25   there is no way of determining the actual burden upon the

Temecula Creek and the basin underlying Temecula Creek within

the Vail property and the burden upon Vail Dam and Reservoir?

MR. STAHLMAN:  Just a moment.  I object to the question

as being incompetent, irrelevant and immaterial, no proper

foundation has been laid, and it asks him for something that

may be in the knowledge of other people and not his own.

MR. VEEDER:  All I can say, your Honor, in regard to--

THE COURT:  Well, that is not a complete question.

I will sustain the objection on that ground.  It didn't go

anywhere.  It just started, but didn't get off the ground.

Try again.

BY MR. VEEDER:

Q   Is it correct to state that your Exhibit N is not

reflective of the burden placed by the Vail Company upon the

natural flow of Temecula, the basin which underlies the Pauba

Ranch along the Temecula Creek and the water impounded behind

Vail Dam?

MR. STAHLMAN: I object to the question as being in-

definite and uncertain, your Honor.

MR. VEEDER:  Read it, if you can't understand it.

MR. STAHLMAN:  I don't understand it, no.

THE COURT:  You use the word "burden".  What you meant

was, I take it, the total burden, the complete burden; is that

what you are talking about?

MR. VEEDER:  If your Honor wants to put in "total" or

1    "complete", I have no objection.

2         THE COURT:  If I were asked the question as you worded

3    it, I think a person could honestly say this represents the

4    major part of the burden.

5         MR. VEEDER:  I wish he would say that.

6         THE COURT:  It may not represent all of it.

7         MR. VEEDER:  I am just hoping he will say that.  Let

8    him say it.  I think he understands it.

9         THE COURT:  With the understanding that you are

10   talking about the total burden.

11        Do you understand the question?

12        THE WITNESS:  Not quite, your Honor.

13        THE COURT:  Read it.

14        (The reporter read the pending question.)

15        MR. STAHLMAN:  Do you understand the question?

16        THE WITNESS:  I understand it, but I don't wish to

17   answer it at the moment until I-- Let me answer it this way,

18   Mr. Veeder.  The Exhibit N does not consider any return water.

19   It is strictly a matter of pumps and the records of the pumps

20   and the Vail Dam and such as that.  The return water may and

21   may not be an influence in this exhibit.

22   BY MR. VEEDER:

23        Q  In other words, where you have your column "Gross

24   irrigation in acre feet," that figure may or may not, so far

25   as you have knowledge, be representative of the actual burden

1  upon the stream by Vail pumping, by Vail diversions and by

2  Vail Dam?

3      MR. STAHLMAN:  I object to the question.  I think whether

4  it is a burden upon the stream would be a legal conclusion.

5  He can tell what was done.

6      THE COURT:  Sustained.

7      I know what you are talking about.  The witness has

8  answered the question.  Why beat it to death.  He admits that

9  he has made no calculations of water return, he has made no

10  calculations on evaporation between the dam and the intake,

11  if that is of any moment.  There are several hundred yards

12  there.  Evaporation must be a factor there.  But he has not

13  done it.

14      MR. VEEDER:  I would like to have the record show that

15  your Honor has sustained an objection.

16      THE COURT:  I have sustained the objection, yes.

17      MR. VEEDER:  And I will now make an offer of proof to

18  show that I would elicit, if permitted to, from this witness

19  the fact that the gross irrigation by the Vail Company in the

20  year 1958 and all the other years, as shown here, is 9,247,

21  water that has been used over a basin; that the water has

22  perhaps as high as 40% been re-used, and that the 9,247 cannot

23  be viewed as the net burden upon the Temecula Creek by the

24  Vail Company, and that for each of the years going back to

25  the first year shown on N, which is 1949, is not proof of the

1   actual burden placed upon the stream by the Vail Company

2   through their dams, through their irrigation system or by

3   means of their surface system which was originally used

4   prior to putting in their present system.

5       THE COURT:  I didn't rule thatyou were cut off on

6   further cross-examination.  I merely ruled that the witness

7   had explained what the exhibit was.  He told you that it did

8   not include return water.  You may ask further questions.

9   You can't prove everything by this witness that you just stated

10  in your offer of proof.  But go ahead and cross-examine and

11  prove what you can get from him.  But I will not let your

12  offer of proof stand in that form.

13      MR. VEEDER:  I didn't hear your Honor.

14      THE COURT:  I will not rule on an offer of proof like

15  that.

16  BY MR. VEEDER:

17      Q  Now, in regard to the areas to which you have made

18  reference on your Exhibit K, will you state how you arrived at

19  those total acres?  Do you know the one to which I am making

20  reference?  Exhibit K is the tabulation, Mr. Wilkinson.

21      A  May I have the question?

22      Q  I will rephrase it to save time.  How did you arrive

23  at the figures that are set forth in the right-hand column on

24  K?

25      A  These are a matter of ranch records.

Q  Do you know the source of those figures?

A  The figures have been developed as the fields have been used.  The figures themselves are incorporated on a map.

Q  And what is the map?

A It is a map of the Pauba Ranch and vicinity.

Q  Is it the same map as that which has been entered in evidence as Exhibit C?

A  When you say C, Mr. Veeder, I believe that was in regard to soil survey.

Q  Well, that is correct.  But do you use that acreage in arriving at the Exhibit K?

A  The soil survey acreage is Exhibit K.

Q  Yes.

A  There is no relation between the two.

Q  There is none at all?

A  No.

Q  Did you have a survey made in arriving at these figures in the right-hand column?

A  I do not know.  It is a matter of record at the ranch.  There is a map with the various acreages and parcels depicted.

Q  And you don't know from your personal knowledge as to the accuracy, for example, of the Studley pasture, do you?

A  Oh, I have checked the acreages on the map, yes.

Q  Did you go out and survey the areas?

1     A   I had the area-- particularly with survey instru-

2 ments and such as that?

3     Q   Yes.

4     A   My experience is just what I know the features to

5 be, and they correspond with the map, and I have checked the

6 acreages on the map, so I assume they are correct.

7     Q   You say that you know there is 37 acres in Studley

8 pasture; is that right?

9     A   Studley pasture, 37 acres.

10     Q   And on each one of those figures you personally

11 know that by reason of investigation of your own?

12     A   Not on all pieces, no.

13     Q   Could you tell us on which ones you don't know?

14     A   I do not recall.

15     Q   In other words, would you say half of them came off

16 of the map?  I am referring to the figures on K.

17     A   Possibly.  I don't know.

18     Q   You don't know how many came off of the map?

19     A   All the figures came off the map, Mr. Veeder.  I

20 didn't say how many I have checked.

21     Q   Is that map available for inspection?

22     A   It is.

23     Q   And we could inspect it, for example, if we went

24 out there tomorrow?

25     A As far as I am concerned.

1      Q   Now in regard to any of the fields that you have

2   shown here, have you compared those acreages with the Coit

3   survey, Exhibit C?

4      A   No, I haven't.

5      Q   Have you noted how the Coit survey acreages are set

6   up in C?

7      A   Yes, sir, I have.

8      Q   And have you compared the map that you have out at

9   the Vail Company building or wherever it is with this C?

10      A   Which map is it you refer to, Mr. Veeder?

11      Q   I am referring to the one from which you took this

12   K.

13      MR. STAHLMAN:   That has been asked and answered.

14      THE COURT:   Overruled.

15      THE WITNESS:   I have not compared the two maps, the

16   Coit map and the other one.   They are different scale.

17   BY MR. VEEDER:

18      Q   Now, in connection with the areas which you have

19   checked on your K, for example, the Cantarini-Ludi parcel,

20   are you stating to the Court that the waters used there all

21   come from the Vail Dam and Reservoir and from the Vail basin?

22      MR. SACHSE:   Which parcel, Mr. Veeder?

23      MR. VEEDER:   Cantarini-Ludi.

24      I will change it again.

25      Q   Is there any other source of water than Vail Dam,

1    Vail Basin and the surface runoff of Temecula Creek for the

2    irrigation of the Cantarini-Ludi property?

3        A   In the past there were wells located on the Cantarini-

4    Ludi property.  They are not operative now.  At the present

5    time our irrigation water comes mainly from the Cat and

6    Cantarini wells as well as into the dam distribution system.

7        Q   In other words, you are no longer taking any water

8    out of Wolf Valley for the irrigation of those lands?

9        A   It is hard to say just where Wolf Valley begins and

10   ends.  I don't know.  I don't think anyone else does.

11       THE COURT:  Are you pumping any wells now that are

12   located on the Cantarini-Ludi piece as shown on Exhibit J?

13       THE WITNESS:  No, we are not, your Honor.

14       THE COURT:  But there formerly were wells on that

15   property?

16       THE WITNESS:  That is right, your Honor.

17   BY MR. VEEDER:

18       Q   And the Cantarini Cat well is the well concerning

19   which you offered in evidence a hydrograph, which is Vail's

20   Exhibit R; isn't that correct?

21       A   That is the Cantarini Camp well.  It is located in

22   that area.

23       THE COURT:  Is it located on the Cantarini-Ludi parcel

24   as shown on J?

25       THE WITNESS:  No, it is not, your Honor.

BY MR. VEEDER:

Q   Would you state in to the record where it is located in connection with the Cantarini-Ludi property?

A   As depicted on the map in green there?

Q   Yes.

A   It is within 200 feet of the green area marked "Cantarini-Ludi."

THE COURT:   Let's determine it.   Do you have your transfer, Mr. Veeder?

Do I understand that you gentlemen have something else you are going to do tomorrow on this program?

MR. VEEDER:   I had desired to go up sometime and have installed these recorders to which I have made reference, your Honor.

THE COURT:   Have you some agreement on certain of the recorders?

MR. VEEDER:   No, there is nothing at all.   I think we can probably finish up with our cross-examination tomorrow with Mr. Wilkinson.

THE COURT:   I am trying to decide whether you are going to come in tomorrow or not.

MR. VEEDER:   I thought we were.   I know we are still cross-examining him.

THE COURT: All right, adjourn until tomorrow morning at 10 o'clock.

(Adjournment until Wednesday, June 3, 1959, at 10 A.M.)