# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.

Defendants.

No.   1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:    San Diego, California

Date:    Wednesday, June 3, 1959

Pages:    10,249 to 10,304

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211, Ext. 370

VOLUME NO. 90                                                    10,250

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
              Plaintiff,       )
                               )
     vs.                       )      No. 1247-SD-C
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
              Defendants.      )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Wednesday, June 3, 1959

APPEARANCES:

        For the Plaintiff        WILLIAM H. VEEDER, ESQ.,

                                 Special Assistant  to the
                                 Attorney General,
                                 Department of Justice,
                                 Washington, D.C.

APPEARANCES (Continued):

| | |
|---|---|
| For Defendant<br>Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney General, by<br>FRED GIRARD, ESQ.,<br>Deputy Attorney General. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al. | FRANZ R. SACHSE, ESQ. |
| For U. S. Navy | LCDR. DONALD W. REDD. |
| For Defendant<br>Murray Schloss<br>Foundation | WALTER GOULD LINCOLN, ESQ. |

# INDEX TO WITNESSES

For Defendant Vail:                     Cross      Redirect

    James V. Wilkinson            10,254

1      SAN DIEGO, CALIFORNIA, WEDNESDAY, JUNE 3, 1959.   10:00 A.M.

2

3           (Other matters.)

4           THE CLERK:  Three, 1247-SD-C, United States vs.

5      Fallbrook.  Further court trial.

6           MR. VEEDER:  I have delivered to your Honor this morning

7      a copy of the motion revised in accordance with your direc-

8      tions-- the motion that I submitted yesterday.  I have served

9      copies of it on Mr. Stahlman, Mr. Sachse and Mr. Girard.

10          THE COURT:  They got copies this morning?

11          MR. VEEDER: That is right, your Honor.

12          THE COURT:  Then Mr. Stahlman hasn't had a chance to

13     take it up.

14          MR. VEEDER:  I was just making a record, your Honor.

15          MR. STAHLMAN:  The other day the Court indicated that

16     in Exhibit A there was an order missing from your Honor's

17     copy of the exhibit.  We now have a copy of it.  It is the last

18     sheet on Exhibit A.

19          MR. VEEDER:  Do I understand, your Honor, that the

20     Exhibit I is now Exhibit IA?

21          THE COURT:  No, Exhibit I remains Exhibit I, and we

22     marked as Exhibit IA the previous exhibit which had been

23     withdrawn, which you wanted to cross-examine about, and so

24     that the record would show what you are talking about we merely

25     marked it for identification.  I don't assume it has to go into

1    evidence.

2         MR. VEEDER:  I just wanted to make sure, your Honor.

3         MR. STAHLMAN:  I would like to make an explanation for

4    the record that Exhibit IA so marked now is the exhibit

5    previously lodged as Exhibit I, prepared by Mr. Hall, and

6    that Col. Bowen and Mr. Wilkinson when they checked over their

7    exhibits found it to be in error and corrected it to the present

8    exhibit I.

9         MR. VEEDER:  Mr. Wilkinson, take the stand, please.

10

11                   JAMES V. WILKINSON,

12   recalled as a witness in behalf of defendant Vail, having

13   been previously sworn, testified further as follows:

14

15                   CROSS-EXAMINATION (Continued)

16   BY MR. VEEDER:

17        Q  Now in regard to the Cantarini-Ludi tract of land,

18   you state now that all of the water utilized upon that parcel

19   is derived from the Cat and the Cantarini Pit Well; is that

20   right?

21        A  No, that is not right, Mr. Veeder.

22        Q  Well, then, would you state the source of the water

23   utilized upon that parcel?

24        A  The source of the water utilized upon that parcel

25   comes, in the main part, from those, but it is possible to

1   augment that water from the distribution system.

2        Q   In other words, part of that water that is utilized

3   down there in the Wolf Valley area in which the Cantarini and

4   Ludi tract is situated can come from the water impounded at

5   Vail Dam?

6        A   That is correct.

7        Q   Have you any way of determining how much water

8   gets down there?

9        A   No, I don't.

10       Q   Now you have prepared a hydrograph, Vail Company's

11   Exhibit R, showing a very precipitous drop in the ground water

12   table at the Cantarini Camp well, and that is based upon your

13   records; is that correct?

14       A   That is right.

15       Q   That Cantarini Camp well is situated, you stated, a

16   couple hundred feet north of the Cantarini-Ludi tract concerning

17   which you have been testifying?

18       A   I would say roughly 200 feet north, yes-- north and

19   east probably would be more properly stated.

20       Q   And where is that situate from the standpoint of

21   the stream, the bed of Temecula Creek?

22       A   I couldn't give you the exact distance, Mr. Veeder,

23   but, oh, maybe it is 800 feet, maybe a thousand feet.  I can

24   scale it off on the map.

25       Q   It is in the near vicinity, though?

A   It is noted on another exhibit.  We are looking at

J,  I believe, and it is shown on Vail's L more plainly.

Q   Would you approach L and-- help me a little bit.

May we borrow this red grease pencil, Mr. Reporter.

Now would you mark with sort of a curly line showing

where the dry streambed of Temecula Creek is situated on Vail's

L?  I am speaking now of the area where the Cat and the

Cantarini Pit Well are located.

A   You wish me to mark where the water rises?

Q   No, I want you to show the area presently dry by

reason of your pumping at the Cat and Cantarini well.

MR. STAHLMAN:  I object to that.

THE COURT:  Is there an area presently dry?

MR. VEEDER:  He testified there was, your Honor.

MR. STAHLMAN:  Your Honor, the objection I have to the

question is, it seems that it was dried up by reason of the

pumping of this well, and there may be other factors.

MR. VEEDER:  The witness testified to that.  He said

in so many words, "We can't dry up the stream by the use of

the Cat well alone, we can't dry up the stream by the use

of the Cantarini Pit Well alone, but the combination results

in the drying up of the area.

MR. STAHLMAN:  Read the question and see whether your

explanation covers that.

May I have the question read, your Honor?

1        THE COURT:  Read the question.

2        (The reporter read the last two questions.)

3        THE COURT:  The objection to the last question is

4   sustained.  The previous question is proper.

5        MR. STAHLMAN:  I don't object to the previous ques-

6   tion.

7   BY MR. VEEDER:

8        Q  Now, would you mark on the map Vail's L, using a

9   wavy red line to show the reach of the river that is presently

10  dry as you have already depicted on it?

11       A  (Witness marking map.)

12       Q  Is the bracket that you put on there, does that

13  show the area that is dry, Mr. Wilkinson?

14       A  It shows the area dry as of last Sunday.

15       Q  Now, would you show where Temecula becomes a live

16  stream?  Did you check that out for us?  You said you would.

17       A  That is the end of the dry section at the left.

18       Q  It becomes a surface stream then?

19       A  Yes, it does.

20       Q  What is the source of the water for the surface

21  stream?

22       MR. STAHLMAN:  Just a moment.

23  BY MR. VEEDER:

24       Q  Have you observed?

25       MR. STAHLMAN:  Just a moment.  I object to that as

1    being incompetent, irrelevant and immaterial, and no proper

2    foundation laid.

3         THE COURT:  If it is limited to what he observed

4    rather than giving some opinion.

5         MR. VEEDER:  All right.

6         THE COURT:  He may answer.

7         Do you see water bubbling up or spouting out or

8    seeping out of the ground?  Where did you see the water?

9         THE WITNESS:  I saw water at the left-hand end of this

10   bracket I have drawn.  There is water evident, shallow water,

11   the first water seen in the stream course.

12   BY MR. VEEDER:

13        Q Does it rise out of the sand in the stream bottom?

14   Is that what you observed?

15        A  That is right.

16        Q  And is there any increment of tail water from the

17   Studley field?

18        MR. STAHLMAN:  Just a moment.

19        MR. VEEDER:  He knows what I am talking about.

20        MR. STAHLMAN:  The fact that he knows what you are

21   talking about doesn't prevent my objecting.

22        That is objected to as being incompetent, irrelevant

23   and immaterial, and no proper foundation laid, your Honor.

24        THE COURT:  Overruled.

25        I understand the question to mean did you observe

1   water running into this creek bottom that had come from

2   irrigation or other activities on the Studley field?

3        MR. VEEDER:  That is correct, your Honor.

4        THE WITNESS:  I did not observe such, your Honor.  It

5   is possible that it might happen on occasions.

6   BY MR. VEEDER:

7        Q  You don't know then that it is coming off of the

8   field?

9        A  There was no irrigation on Sunday in that field,

10  the Studley field you refer to.

11       Q  Where is the nearest irrigation then north of the

12  point of rising water?

13       THE COURT:  You mean where it was on that Sunday?

14       MR. VEEDER:  Yes, that is right, north.

15       THE COURT:  What?

16       THE WITNESS:  On that particular day?

17       MR. VEEDER:  Yes.

18       THE WITNESS:  Mr. Veeder, I don't believe any of that

19  area was being irrigated.

20  BY MR. VEEDER:

21       Q  Is there any area in the near vicinity that is being

22  irrigated?

23       MR. STAHLMAN:  The question is objected to as being

24  indefinite and uncertain.

25       THE COURT:  On that particular day?

10,260

1          MR. VEEDER:  On that particular day.

2          THE COURT:  Overruled.

3          THE WITNESS:  I don't believe there is any to the north

4    of that on that particular day, Mr. Veeder.

5    BY MR. VEEDER:

6          Q  Well, then, to the south?

7          A  Or to the south.

8          Q  Perhaps I don't have myself oriented.  Now, referring

9    to Vail's J, can you point out where Temecula Field is

10   situated as it related to the point where you have indicated

11   rising water?  Now I am referring to Vail's J and I am referring

12   to Vail's L.  Where would that be?

13         A  Well, Temecula field, as shown on J, is where

14   "Temecula Field" is written in.

15         Q  Immediately north, is it not?

16         A  No, it is not immediately north.

17         THE COURT:  Put in the same brackets, if you can, as

18   to where you observed the stream bed dry.  Put on Exhibit J

19   the same thing that you put on Vail's L.

20         THE WITNESS:  (Marking the map.)

21   BY MR. VEEDER:

22         Q  Now, you have placed on J the bracket showing between

23   the points of which Temecula Creek is dry; is that correct?

24         A  Dry as of last Sunday.

25         THE COURT:  It was dry on--

1      MR. VEEDER:  Sunday.

2      THE COURT:  Last Sunday is what he is talking about.

3    BY MR. VEEDER:

4      Q  And beyond that point there is rising water in the

5    stream Temecula Creek?

6      A  That is right.

7      Q  And that is immediately below the McSweeney field;

8    is that right?

9      A  On the map as we are looking at it it would be below

10   it.

11     THE COURT:  South?

12     THE WITNESS:  It would be south.

13   BY MR. VEEDER:

14     Q  And the source of the water for both the Old Horse

15   Pasture tract and the McSweeney tract is the Pauba, the Navy

16   well; is that right?

17     A  No, that is not right.

18     Q  What is the source of the water then for those?

19     A  It is possible for a portion of McSweeney to get

20   water from the Navy well, but the Old Horse Pasture does not

21   get its water from the Navy well.

22     Q  What is the source of that water?

23     A  From the distribution system.

24     THE COURT:  On the basis of the branch line--

25     THE WITNESS:  Of the branch line, your Honor.

1     THE COURT: -- that takes off up in the --

2     THE WITNESS:  Headquarters Pasture.

3     THE COURT: --Headquarters Pasture.

4  BY MR. VEEDER:

5     Q  In other words, it could be from the Vail Dam and

6  it could be from any of the other wells that are pumping?

7     A  It is possible.

8     Q  Have you observed any substantial quantity of return

9  flow and waste water coming off of either the McSweeney or

10 the Temecula field or the Old Horse Pasture?

11    MR. STAHLMAN:  I object to that as being indefinite and

12 uncertain, your Honor.

13    THE COURT:  Overruled.  You may make it more specific

14 on direct examination or cross-examination.

15    THE WITNESS:  There is runoff water from the Temecula

16 Field and when we irrigate-- we are not irrigating the McSweeney

17 field this year-- there has been runoff water from that.

18 However, that doesn't apply this year.  There is no irrigation

19 going on in the Old Horse Pasture at thepresent time.  The

20 Studley pasture has been irrigated this year-- the number of

21 times I don't know, and at that time there is runoff water.

22 BY MR. VEEDER:

23    Q  And that flows on down and is an increment to Temecula

24 Creek; is that right?  Have you observed that?

25    A  I assume that it is an increment to Temecula Creek,

1    in that it goes either into the creek or in the basin.

2         THE COURT:  Have you observed it, is the question.  It

3    is not what you assume.

4         THE WITNESS:  Yes, I have observed it.

5    BY MR. VEEDER:

6         Q  And it runs down to the--

7         THE COURT:  In fact, there is a reservoir right near

8    the roadway used to catch some of that water.

9         THE WITNESS:  I was referring to the Studley field,

10   your Honor, this field here.

11   BY MR. VEEDER:

12        Q  You have observed water running off of part of that?

13        A  Not the entire Studley.

14        Q  Well, the lower end?

15        A  No, the upper end.

16        THE COURT:  By "upper end" you mean toward the west?

17        A  Toward the eastern and-- the eastern portion; one,

18   two, three blocks of it, it is possible for the tail water to

19   go out through this watercourse depicted here with a long dash

20   and three dots into the Temecula Creek.

21        Q  Is that flowing now, did you say, or is it not?

22        A  It flows only when we irrigate it.

23        Q  From the standpoint of contributions to the stream

24   flow of Temecula Creek, have you observed any runoff of tail

25   water or waste water  from the Cantarini-Ludi tract into

1  Temecula Creek?

2       A  I have observed it in the past.  At the present time

3  we try to utilize that tail water on what we refer to as the

4  "River Bottom Field."

5       Q  And the River Bottom Field, is that lying directly

6  north?  Well, you have it marked here "River Bottom Field"?

7       A  That is right.

8       Q  So what you do then is that you use and reuse the

9  water that is applied to the Cantarini-Ludi tract; is that

10  right?

11       A  What water runs off in the process of irrigation we

12  try to utilize in the  River Bottom Field.

13       Q  And how about the School House Field?

14       A  There is no way to recapture that water.

15       Q  Where does that go?

16       A  That goes into the basin of the river.

17       Q  Into the basin?

18  MR. STAHLMAN:  Are you talking about the irrigation of

19  the School House Field now?

20  MR. VEEDER:  Yes.

21       Q  Is that field irrigated this year?

22       A  It will be irrigated this year.

23       Q  But not presently irrigated?

24       A  Not presently irrigated.

25       Q  Have you observed where the tail water or waste water

1  from the Temecula Field Cemetery flows?

2      A   I have.

3      Q   Where does that go?

4      A   It goes into the Murrieta Creek.

5      Q   It goes into the Murrieta?

6      A   If there is a sufficient amount it will reach

7  Murrieta Creek.

8      Q   And you have observed it going into Murrieta Creek?

9      A   At the exact entrance of the creek, no, Mr. Veeder.

10 I have seen it--

11     Q   Is there a swale?

12     A   There is a swale through which it could go, but I

13 have never observed it flowing into Murrieta Creek.

14     Q   And the return flow from the August Cantarini field

15 and the Temecula School House field, where does that go?

16     A   That can go into Murrieta Creek.

17     Q   Have you seen it go?

18     A   Yes, sir.

19     Q   And how about the Piece by Jack's, where does the

20 return flow from that go?

21     A   That goes into a tributary, I would say, of Long

22 Canyon, which in turn will go into Murrieta Creek.

23     Q   Tell me, what is your opinion as to the area of

24 the Pauba Basin?

25     MR. STAHLMAN:   I object to the question as being

1  indefinite and uncertain, your Honor.

2       THE COURT:  Sustained.

3  BY MR. VEEDER:

4       Q  Will you state for us what you mean on Exhibit I

5  by your reference "Vail Lake direct to basin"?  What is the

6  "basin" to which you have reference?

7       A  The basin to which I have reference is the Upper

8  Basin of the Pauba Valley as it connects with the stream course

9  in Nigger Canyon.

10      Q  What are the confines of that basin?

11      MR. STAHLMAN:  That is objected to as being incompe-

12  tent, irrelevant and immaterial.

13      MR. SACHSE:  I object that there is no foundation

14  laid with this witness.

15      THE COURT:  Not only that, but the question is uncertain.

16  Even if there were qualifications, you are not asking if he

17  knows the areal limits on the surface or the underground limits.

18      MR. VEEDER:  I will rephrase it, your Honor.

19      THE COURT:  It is just a shotgun question.

20  BY MR. VEEDER:

21      Q  What is the areal extent of the Pauba Basin?

22      MR. STAHLMAN:  Well-- Go ahead.

23      THE COURT: Go ahead.  By that you mean from observa-

24  tion on the surface what would appear to be the limitations

25  on the surface of the basin?

1    MR. VEEDER:  I am just searching for the truth, your

2    Honor.  I am referring to N now.

3    THE COURT:  Well, now, a man could say that water went

4    into the basin, and the next minute he could say, "I don't

5    know the extent of the basin.  I know there is a basin here

6    and I know this water goes into it, but I couldn't tell you

7    whether it goes one mile or ten miles."

8    MR. VEEDER:  But the important thing your Honor, in

9    that regard is that he has set up a tabulation here and he is

10   seeking to prove beneficial use of water and he is saying that

11   the water goes into a basin.

12   THE COURT:  That is right.

13   MR. VEEDER:  And we are entitled to know what he means

14   by the basin as set out.

15   THE COURT:  Well, then, ask him what he means by the

16   basin as set forth there, if that is what you want.

17   BY MR. VEEDER:

18   Q   What is the basin to which you refer when you say,

19   under the heading "Water Distribution Vail Company Lake

20   Irrigation Acre-Feet (b)" and under that you set forth acre-

21   feet that you say is released from Vail Lake for irrigation,

22   you say, and then the column immediately next to it you say

23   "Lake to basin acre feet?"  What is the basin to which you

24   have reference?

25   MR. STAHLMAN:  I object to all of the question except

1    the last portion-- the basin to which you have reference.

2        THE COURT:  Overruled.  The question of course will be

3    directed to the very last part:  What is the basin to which

4    you have reference in that exhibit?

5        THE WITNESS:  The basin I have referred to is the basin

6    that lies in the Pauba Valley.

7    BY MR. VEEDER:

8        Q  And in your opinion what is the Pauba Valley, from

9    your observation?

10       MR. STAHLMAN:  What do you mean by that?

11       I object to that as being indefinite and uncertain.

12       MR. VEEDER  What does he mean by the Pauba Valley?

13       THE COURT:  Overruled.

14       What do you mean by Pauba Valley?  You say the basin

15   lies in Pauba Valley.  Generally what do you mean?

16       THE WITNESS:  By the Pauba Valley, your Honor, I mean

17   the areas that are in the flat lands of the Pauba Valley.

18       THE COURT:  Have you made any study of the extent of

19   the underground basin in the Pauba Valley?

20       THE WITNESS:  No, I haven't, your Honor.

21       THE COURT:  That ends that right there.

22   BY MR. VEEDER:

23       Q  Then how do you know that 167 acre-feet of water in

24   the month of May, 1958, went into that basin?

25       MR. STAHLMAN:  That is objected to as being merely

1   argumentative.

2       MR. VEEDER:  No, it is not argumentative.

3       THE COURT:  Overruled.

4       I take it that this water is released from the dam and

5   flows down that narrow little channel down to where the weir

6   is, where it is picked up?

7       THE WITNESS:  That is right.

8       THE COURT:  Is some of it permitted to flow on down the

9   canyon past the weir?

10       THE WITNESS:  It has in the past.  But the year 1957-

11   58 all that reaches the catch reservoir and the weir is put

12   into the pipe line.  The losses occur in the open porous

13   gravels of the ditch above that.

14       THE COURT:  So those figures on that exhibit are the

15   best job you could do from the records at the ranch and with

16   the help of Col. Bowen to tell us how much water would seep

17   into the sand or gravel between the place that the water is

18   released from the dam and the place where it reached the weir?

19       THE WITNESS:  That is correct.

20       MR. VEEDER:  I object.  Col. Bowen didn't help him write

21   N.

22       THE COURT:  Make your objection.

23       MR. VEEDER:  I object to your Honor's question on the

24   grounds that there is nothing in the evidence to show that

25   Col. Bowen assisted him in preparing the tabulation "Lake to

1    Basin Acre Feet," as shown on N.

2          THE COURT:  Wasn't that one of the things you and Col

3    Bowen went over?

4          THE WITNESS:  That is right, your Honor.

5          THE COURT:  The objection is overruled.

6    BY MR. VEEDER:

7          Q  You worked on I, didn't you?

8          A  Perhaps I missed the reference there.  Was it I we

9    were talking about?

10         Q  I am talking about N.

11         THE COURT:  Show him the exhibit so we will know what

12   we are talking about.

13         THE WITNESS:  Oh, in N those figures are I-- I is

14   incorporated in N.

15   BY MR. VEEDER:

16         Q  And did you revise N, then?

17         A  Yes, I did.

18         Q  To include that figure?

19         A  Yes, I did.

20         Q  And did Col. Bowen rework with you all of the figures

21   "Lake to Basin" on N?

22         A  We went over the source information, Mr. Veeder.

23         Q  And what was the source information?

24         A  The records.

25         Q  And what are those records?

1     A  They are part of the ranch records.

2     Q  How were those figures arrived at "Lake to Basin"

3 in the year 1951?

4     A  Well, from our ranch records and meter readings.

5     Q  But you didn't have any weir readings, did you, in

6 1951?

7     A  No, we didn't have any distribution system for

8 irrigation.

9     Q  And so the water was released from Vail Dam, it

10 flowed down the canyon and it ran somewhere and it was con-

11 cluded that 114 acre-feet during the month, I guess it was,

12 April, as near as I can tell, according to your figure, went

13 into the basin; is that right?  Is that April or May?

14     THE COURT: April.

15     MR. GIRARD:  It should be June to correlate with I.

16     MR. SACHSE:  Which exhibit.

17     MR. VEEDER:  Looking at N for 1951.  I am looking at

18 the column "Lake to Basin."

19     Q Do you follow me?

20     A  Just a moment.  I think that perhaps there has been

21 a slip in the typing.  You are just referring to the 114

22 acre-feet?

23     Q  I am referring to the 114 acre-feet, and if it is

24 in April or May I am not going to be concerned about that.

25 I can't tell, frankly, can you?

1     A   It looks like there is a slip in the figures there

2   and they did not line up between the two.

3     Q   So you don't know whether it is April or May?

4     THE COURT:   On mine it is very clear.

5     MR. GIRARD:   Check with I and it will show in June.

6     THE WITNESS:   I believe it is in June.   I think it

7   slipped.

8   BY MR. VEEDER:

9     Q   In other words, you would say that N was incorrect

10  as set up, then?

11    A   It is not incorrect in that we are only talking about

12  totals there.

13    Q   Well, now, Mr. Wilkinson--

14    A   I am only talking-- excuse me.

15    Q   It is incorrect from the way N is presently set up,

16  is it not?   114 is not in the proper line?

17    A   Perhaps you are right.

18    Q   Am I not right?

19    A   I would have to check to make sure, Mr. Veeder.

20    Q   You don't know?

21    A   I don't know.

22    Q   How did you arrive at that 114 acre-feet?

23    A   That was the discharge from the dam as our records

24  showed.

25    Q   And are you saying that the full 114 acre-feet

1   released from the dam went into the basin?

2        A   I have made no calculations as to that.   Those are

3   records.   It was released from the dam.   Perhaps there was a

4   minor amount of evaporation or transpiration that occurred,

5   but it would be minor.

6        THE COURT:   And it was not picked up from the weir?

7        MR. VEEDER:   It didn't have a weir.

8        THE WITNESS:   We didn't have a weir at that time, your

9   Honor.

10        THE COURT:   It was not picked up by any distribution

11   system?

12        THE WITNESS:   No, it was not picked up in the distri-

13   bution system.

14   BY MR. VEEDER:

15        Q   So you would say the 114 acre-feet you picked there

16   is an interpretive figure, is it not?

17        A   I don't know what you mean by "interpretive", Mr.

18   Veeder.

19        Q   I will be more specific.   In other words, the 114

20   acre-feet as depicted on the exhibit to which I am now making

21   reference, which is N in the year 1951, is a figure that is not

22   the result of just a measurement; isn't that right?

23        MR. SACHSE:   If the Court please, that is an absolute

24   mistake.   He just said it is the result of a measurement with-

25   out any interpretation.

MR. VEEDER:  I just wanted to be sure.

Q  You are saying that you measured 114 acre-feet out of Vail Dam; is that right?

A  That is right.

THE COURT:  In other words, there is no doubt that you had measurements of water that left the dam; is that right?

THE WITNESS:  That is right, your Honor.

THE COURT:  Let's assume that is June 114 acre-feet and there was no actual pickup of water into your distribution system in June and you released 114 acre-feet from the dam, you then put down 114 acre-feet as having gone into the basin?

THE WITNESS:  That is right, your Honor.

BY MR. VEEDER:

Q  Then would you explain to me why in the 1958 figure you released a total of, well, whatever 150 and 160--

THE COURT:  Well, now, wait.  Those aren't totals.  This is something I want to ask about.  You are off on the wrong track.  Let's get it straightened out.

MR. VEEDER:  Your Honor, may I ask these questions?

THE COURT:  May I ask a question?

MR. VEEDER:  Certainly, your Honor.

THE COURT:  I will pull my rank on you.  I will ask mine first, if you don't mind.

Mr. Wilkinson, I have been studying this, and apparently

1   your column entitled "Lake Irrigation Acre-Feet" has been added

2   to the column "Vail Pumps" to give you gross figures; is that

3   what you did?

4        THE WITNESS:  That is right.

5        THE COURT:  Now you have not added in the column

6   "Lake to Basin" as part of the gross figure, have you?

7        THE WITNESS:  No, sir.

8        THE COURT:  Because the gross figure is what you use

9   for irrigation and therefore you have not added the water you

10  released into the basin?

11       THE WITNESS: That is right.

12       THE COURT:  Now in most instances it appears that the

13  figure "Lake to Basin" is less than the figure for the

14  corresponding month for lake irrigation except in two instances,

15  and I inquire whether those are right.  Take in 1958, in May

16  it shows lake irrigation 151 acre-feet, it shows released to

17  the basin 167 acre-feet.

18       THE WITNESS:  That is right, your Honor.

19       THE COURT:  That is correct.  In other words, there was

20  more water--

21       THE WITNESS:  There is a high loss in the initial opening

22  of the dam gates in that porous material.

23       THE COURT: So actually if we want to know what you had

24  released from the dam in that month we would take the total

25  of 151 and 167?

1        THE WITNESS:  That is right, your Honor.

2        MR. VEEDER:  Which is 318.

3        THE COURT:  Which is 318, of which 151 was picked up

4 at the weir?

5        THE WITNESS:  That is right, your Honor.

6        THE COURT:  Now, Mr. Veeder, if you want to ask some

7 questions you may.

8        MR. VEEDER:  Thank you, your Honor.

9        Q  In other words, you credit yourself in 1951 with

10 all of the water released at Vail Dam as going into the basin

11 and attribute no losses whatever between the Vail Dam down

12 to the basin; is that right?

13        THE COURT:  That is just not what he said.  You are

14 only adding to the confusion.  Let's start all over again.

15        In 1951 you have no figures of lake water used for

16 irrigation?

17        THE WITNESS:  That is right, your Honor.

18        THE COURT:  And your three figures shown of "Lake to

19 Basin," 34, 114 and 93, I take it, were readings of water

20 released from Vail Dam?

21        THE WITNESS:  That is right.

22        THE COURT:  And no waters were carried into your

23 irrigation system?

24        THE WITNESS:   That is right.

25        THE COURT:  Therefore, you took the three items of 241

1    acre-feet as having gone into the basin?

2         THE WITNESS:  That is right.

3         MR. VEEDER:  Where I fall off the sled, your Honor, if

4    I can explain it, maybe you can help me.

5         THE COURT:  I think I know now.  Tell me what your

6    problem is.

7         MR. VEEDER:  As I see it, he shows a loss of 167 in

8    1958.

9         THE COURT:  In May.

10   BY MR. VEEDER:

11        Q   What are the losses that are shown, Mr. Wilkinson,

12   in the year 1951?

13        THE COURT:  It is not a loss.  He doesn't show a loss,

14   Mr. Veeder.

15        MR. SACHSE:  It is not a loss at all.

16        THE COURT:  He has a reading at Vail Dam where water

17   was released.

18        MR. VEEDER: That is right.

19        THE COURT:  And in May , 1958 there was a total of

20   151 plus 167 acre-feet released out of Vail Dam.

21        MR. VEEDER:  Yes.

22        THE COURT:  They picked up into the irrigation system

23   151 acre-feet.  That left 167 acre-feet.  You call it a loss.

24   It is listed here as water that went into the basin, into the

25   sand of this open ditch.  In 1951, I take it, the records of

1    Vail Dam show the release to be the three figures shown.

2          MR. VEEDER:  That released at Vail Dam, 114 acre-feet.

3          THE COURT:  In that month.  And they picked up nothing

4    in the irrigation system.

5          MR. VEEDER: And he says everything went into the basin.

6          THE COURT:  Well, if they picked none of it up in the

7    irrigation system, where did it go?

8          MR. VEEDER:  I am going to ask him now.

9          Q  Are you saying that there is no evapo-transpiration

10   losses between your point of release--

11         MR. SACHSE:  That is objected to as having been asked

12   and answered.  The witness stated not two minutes ago--

13         MR. VEEDER:  I have a right to finish the question.

14         THE COURT:  Finish the question.

15   BY MR. VEEDER:

16         Q  Are you stating that in 1951 every drop of water

17   released from the Vail Dam went into the basin?

18         MR. STAHLMAN:  That is objected to.  He didn't say that

19   at all.

20         THE COURT:  Overruled.

21         THE WITNESS:  As I mentioned, there is a possibility

22   of small evaporation and evapo-transpiration losses occurring.

23         THE COURT:  What is that distance between the release

24   point at Vail Dam and the weir pickup, approximately?  I saw

25   it.  Is it half a mile?

1    THE WITNESS:  It is half a mile, your Honor.

2    THE COURT:  And my recollection of the condition of that

3 valley was that it was a very rocky valley.

4    THE WITNESS:  That is right, your Honor.

5    THE COURT:  With some small alluvium in the bottom.

6    THEWITNESS:  Yes.

7    THECOURT:  And a valley bottom of not over 100 to 200

8 feet in width?

9    THE WITNESS:  At places it is wider than that, your

10 Honor, but the upper end of it is very coarse material.

11 BY MR. VEEDER:

12    Q  And it is very coarse material, is it not, immediately

13 below the dam?

14    A  Yes, immediately below the dam.

15    THE COURT:  Let me ask another question.

16    When this water was not picked up by your weir, it

17 then continued down the canyon below where the weir was located?

18 Did you ever see it running past the weir?

19    THE WITNESS:  I have only seen it running past the

20 present location of the weir once, your Honor.

21    THE COURT:  Do you remember when that was?

22    THE WITNESS: That was when there was a large amount

23 released, 1951-52, in the month of February.

24 BY MR. VEEDER:

25    Q  How far did it run then?

1          A   At that time it ran--

2          THE COURT:   You mean past the weir?

3     BY MR. VEEDER:

4          Q   From  our release where you have your meter at Vail

5     Dam, how far did the water run when you observed it at that

6     time in 1952?

7          A   It ran past the canyon mouth.

8          THE COURT:   Down into that alluvial flat at the mouth

9     of the canyon?

10          MR. VEEDER:   At the outwash.

11          THE WITNESS:   The outwash or in the flat as you

12     mentioned, your Honor.

13          THE COURT:   Take a recess at this time.

14          (Recess.)

15          THE COURT:   Yesterday I made an observation when I

16     overruled your objection to Exhibit D, which was the soil

17     survey, and I said that pursuant to your further right to

18     cross-examine as provided in the record, and I thought after-

19     ward I ought to be more fair to you and tell you what I meant,

20     because the record shows that I said we would use that document

21     as Mr. Coit's testimony on direct and you would have a right

22     to cross-examine on it.  So I want it clear what I meant when

23     I said "as provided in the record."

24          MR. VEEDER: Thank you, your Honor.

25          Q Now, the distance, Mr. Wilkinson, from the Vail Dam

1   to the point of intake of your distribution system is approx-

2   imately a mile and quarter, is it not?

3       A  It is in the vicinity of a mile, Mr. Veeder.  To be

4   exact I would have to measure it.  It is five or six thousand

5   feet.

6       Q  The area is very gravelly, cobbly and rocky, is it

7   not?

8       A  It is, Mr. Veeder.  There is some sand, but generally

9   it is coarse material.

10       Q  And it is grown up with willows to quite an extent

11   or degree, is it not, with phreatophytes?   You know what

12   phreatophytes are?

13       A  Yes, I do.

14       Q  Are there not quite a lot of water-loving plants

15   in the mile stretch from Vail Dam down to the point where the

16   water would enter the distribution system?

17       A  There are plants of that nature, and although we

18   make an attempt every year by chopping the plants out and

19   bluestoning the ditch on various occasions to reduce these

20   losses.

21       Q  So as a matter of fact you would conclude, would

22   you not, that your figure of 114, to which I have made refer-

23   ence in the year 1951, Exhibit N should be substantially

24   reduced, isn't that correct?

25       A  I would not say substantially, Mr. Veeder.

Q   10%?

A   I have made no studies, but I think that figure is too high.

Q   But you would say, though, that 114 is not correct as to what goes into the basin?

A   It is not correct in the sense that there must be some small losses.

Q   When you say "small losses," what do you mean?

A   Small losses in the sense that there is some evaporation and some evapo-transpiration losses.

Q   And also isn't it true that when the water moves on down the valley and debauches out there are some evaporation losses even from the soil itself; isn't that right?

A   I would rather doubt that.

Q   How deep is the soil in there, in the length of the canyon?

A   I don't know.

Q   If it was a shallow mantle of alluvium the full length youwould have quite high losses, would you not, from the area extending below the one mile and a quarter to which we made reference?

THE COURT:   This is argumentative.   The witness says he doesn't know how deep it is.   He has made no study of these matters, and you have already covered the matter.   I will object to it myself and sustain the objection.   Go on to

something else.

BY MR. VEEDER:

Q  You don't know what the losses are?

MR. STAHLMAN:  The Court's objection was sustained.

THE COURT:  He said he doesn't know.

MR. VEEDER:  I am going to move to strike the figures in the line "Lake to Basin" from 1949 on through 1952, there being no proper foundation and no proof to support those figures on Exhibit N.

MR. SACHSE:  I will submit that that objection goes to the weight and not to the admissibility, your Honor.

THE COURT:  The motion is denied.  You have the figures and you have the statement that he has not considered evaporation loss and evapo-transpiration, and you have the door of the court open to present evidence.

MR. VEEDER:  Thank you, your Honor.

Q  Now, in regard to the location of the Cantarini Pit Well, you have stated that the wells to which you made reference are situated on the flat lands of the basin; isn't that what you said?

MR. STAHLMAN:  Just a moment.  He talks about the Cantarini and then the wells to which you made reference.

MR. VEEDER:  I will state it again.

Q  Where are the wells that are in this irrigation system as they relate to the Pauba Valley as you have described

1  it?

2          MR. SACHSE:  That is incomprehensible to me, your Honor.

3          THE COURT:  Sustained.

4  BY MR. VEEDER:

5          Q  In regard to the wells that contribute water to the

6  irrigation system which is depicted on L, is it your statement

7  that those wells are all in the basin to which you refer in

8  your Exhibit N?

9          MR. STAHLMAN:  Just a moment.  That is objected to as

10  being indefinite.  The basin to which you refer in ExhibitN--

11  I don't know what he means.

12          THE COURT:  Sustained.

13  BY MR. VEEDER:

14          Q  Would you state that the Cantarini pit well is in

15  the basin to which you refer in Vail's Exhibit N?

16          MR. STAHLMAN:  Just a moment.  I want to see Exhibit N.

17          THE COURT:  Exhibit N is the one that shows release of

18  water into the basin.

19          MR. VEEDER:  And it shows the water pumped from the

20  basin.

21          MR. STAHLMAN:  May I have the question again, please,

22  Mr. Reporter.

23          THE COURT:  It doesn't say pumped from the basin.  It

24  says "Vail pumps acre-feet."

25          MR. VEEDER:  That is what I am coming to.

1        THE COURT:  Do you have an opinion as to what this

2  basin is?

3        THE WITNESS:  I have an opinion, your Honor, yes.

4        THE COURT:  Have you made any study of the basin?

5        THE WITNESS:  No, I have made no study of the basin.

6        THE COURT:  What is your opinion based on?

7        THE WITNESS:  My opinion is based on the lay of the

8  land in that I refer to the basin as the flat lands and these

9  wells are all more or less located on relatively flat and

10  irrigable lands.

11  BY MR. VEEDER:

12        Q  Are you stating that the Cantarini Pit Well is

13  situated on more or less level and irrigable land?

14        A  It borders almost level and irrigable land.

15        Q  Wasn't it necessary to cut off the toe of a hill

16  quite a substantial excavation before the well was drilled?

17        A  I was not there when they drilled the Cantarini

18  Pit wells, Mr. Veeder.

19        Q  Have you observed where they are situated?

20        A  Yes, I have.

21        Q  And will you describe into the record the area in

22  which it is situated?

23        A  The areas on the map?

24        Q  As it exists in your memory.

25        A  In my own memory, they are at the toe of a slope of

hills that lie between the Wolf and the Pauba Valleys.

Q And you have no personal knowledge that that well actually penetrates into the basin to which you make reference in your N?

MR. STAHLMAN:  That is objected to as being indefinite and uncertain; no proper foundation laid.

THE COURT:  Overruled.

BY MR. VEEDER:

Q  You have no personal knowledge that that well penetrates into the basin to which you refer in--

THE COURT: Exhibit N.

BY MR. VEEDER:

Q  --Vail's I and N?

A  I don't know, Mr. Veeder.

Q  So your conclusions in regard to the waters released into the basin as being a source of water for pumping does not apply to the Cantarini pit well, is that right?

A  I believe I made no reference to the fact that the water was a source of water for pumping, Mr. Veeder.

THE COURT:  I didn't hear any.

BY MR. VEEDER:

Q  You don't know then whether the water that comes out of the Vail Reservoir is pumped; is that right?

MR. STAHLMAN:  I object to it.

THE COURT:  Overruled.

THE WITNESS:  I don't know whether the water is pumped or not.

BY MR. VEEDER:

Q  In the second column of N designated "Acres" did you include any of the Hitchinson-Brown properties?

A  I think that was gone into yesterday, wasn't it?

MR. SACHSE:  It surely was.

MR. VEEDER:  I am going to ask that question.

MR. STAHLMAN:  Objected to as having been asked and answered.

THE WITNESS:  No, I didn't include it.

BY MR. VEEDER:

Q  You did not?

A  No.

Q  Now, in regard to the lands which you set up as irrigated lands in K, are you able to locate on Vail's J what lands were actually irrigated in 1958?

A  Not without reference to the records.

Q  And you have those records?

A  I have those records.

Q  And you have records, do you, that would show the quantity of water that was applied to your barley, the 403 acres of barley, as appearing on N?

A  No, I do not.

Q  Then how do you know that 403 acres of barley were

1    irrigated?

2        A   You asked, first of all, if I had records as to the

3    amount of water?

4        Q   No, I said to show if the barley was irrigated,

5    first.

6        A   I don't understand you, Mr. Veeder.

7        Q   I will rephrase it.   Do you have records showing that

8    the barley which appears in N for the year 1958 was irrigated?

9        A   Possibly it could be developed from the records.

10       Q   What do you mean by that?

11       A   I would have to consult the records to find out.

12       THE COURT:   I thought your Exhibit N, on the column on

13   acres, showed the acres that were irrigated sometime during the

14   years shown.

15       THE WITNESS:   That is right, your Honor.

16       THE COURT:   And I thought this exhibit was prepared

17   from records that you have.

18       THE WITNESS:   It is prepared from records, but the feature

19   that you mention is a little --

20       THE COURT:   Well, you have listed, under the column

21   "Acres," "Barley 403 acres."   There is no indication here

22   what month it was irrigated.   But as I understood the exhibit,

23   that meant that in 1958, at least, you must mean that 403

24   acres of barley was irrigated.

25       THE WITNESS:   That is right

1    THE COURT:  Do you have records to show that?  That is

2  what counsel is asking about.  Not how much water you put on

3  it.  He is not asking that yet.  But do you have records to

4  show there was a barley patch or patches totaling 403 acres

5  that were irrigated in 1958?

6    THE WITNESS:  They are part of the records, the reports

7  that we have compiled, your Honor.

8  BY MR. VEEDER:

9    Q   What are those reports?

10    A   They are reports that are turned in to the State.

11    Q   And who prepares those?

12    A   The information on the reports I would have gathered

13  myself.  I have actually not prepared the reports.

14    Q   Did you go out and measure the fields?

15    A   No, Mr. Veeder.

16    THE COURT:  Do you have a cost distribution system at

17  the Vail Ranch?

18    THE WITNESS:  No, I do not.

19    THE COURT:  You don't have any system, therefore, where

20  you allocate the amount of labor on a certain day of the week

21  or month to the certain field?

22    THE WITNESS:  No, we have made no studies.  But we

23  don't have any--

24    THE COURT:  Do you have any reports made by foremen

25  of what areas men are working on on certain days of the week,

1    weeks or months?

2        THE WITNESS:  In a very rough fashion, your Honor.

3        THE COURT:  What I am wondering about, do you have any

4    reports where a foreman would say ten men irrigated the Studley

5    Pasture?

6        THE WITNESS:  No, we have no record such as that.

7    BY MR. VEEDER:

8        Q  And would you say that the situation in regard to

9    records is the same in so far as the column on oats, which is

10   187 acres on N for 1958?

11       MR. STAHLMAN:  What is the question?

12       MR. VEEDER:  I am asking him if the situation in regard

13   to records of the Vail Company as you have described them

14   respecting barley is the same as in regard to oats?

15       A  The same thing applies.  I know the lands irrigated.

16   I can't say how much water was applied.

17       THE COURT:  In other words, take 1958, that is not so

18   far distant but what you remember what patches were irrigated

19   that year?

20       THE WITNESS:  That is right.

21       THE COURT:  Can you go back and do that for 1954?

22       THE WITNESS:  I have made notes on that, your Honor.

23   I can't remember it, no.

24       THE COURT:  You have made notes when?

25       THE WITNESS:  Year by year, your Honor.

1        THE COURT: I see.  Do you have those notes?

2        THE WITNESS:  Not with me.

3        THE COURT:  Do you have them at the ranch?

4        THE WITNESS:  I have them at the ranch, yes, sir.

5        THE COURT:  And your computation of acres only goes

6    back to 1954?

7        THE WITNESS: That is right.

8        THE COURT:  You were there in 1954?

9        THE WITNESS:  I was there in 1954.

10       THE COURT:  Do your notes go back that far?

11       THE WITNESS:  Yes, sir.

12       THE COURT:  Do you want to see the notes?

13       MR. VEEDER:  I do.

14       THE COURT:  When Mr. Veeder gets up there, dig them

15   up for him.

16       THE WITNESS:  All right.

17   BY MR. VEEDER:

18       Q  When you say on N "Lake to Basin Acre-Feet," par-

19   ticularly from 1949 through 1952, you would state, would you

20   not, that that column heading is an interpretation by you and

21   not actual measurements; isn't that right?

22       THE COURT:  Mr. Veeder, we have covered this ad nauseam.

23       MR. VEEDER:  I am just asking one more question.

24       THE COURT:  You have covered it.  You are asking him

25   to give his opinion and state a conclusion.  We have covered

1  it.  He told you how he has done it.  He took the readings

2  when the water left the dam and later on when there were

3  weirs they picked it up at the weir.  In the years you talk

4  about some of those years at least there was no weir and the

5  water didn't go into the system.  We have covered the whole

6  thing.

7  BY MR. VEEDER:

8      Q   In other words, it is purely interpretive?

9      THE COURT:  Let's go on to something else.

10     MR. VEEDER:  I would like to have that straight.

11     THE COURT:  The objection is sustained to your question.

12  Go on to something else.

13     MR. VEEDER:  I make an offer of proof.  I would like

14  to have shown in regard to Vail's N that this witness would

15  testify on cross-examination that the column "Lake to Basin

16  Acre-Feet," is interpretive by him and that there is no basis

17  for the figures that are set forth.

18     THE COURT:  My ruling is the same.  Go ahead.

19     MR. VEEDER:  Subject to reviewing this data that he

20  has said he will produce, I will stop the cross-examination

21  now, reserving the right, after having reviewed those figures,

22  to renew the cross-examination.  I have one question, though.

23  We will convene, will we not--

24     As I understand it, George, you have no further testi-

25  mony?

1        MR. STAHLMAN:  This concludes our testimony on this

2   phase of the case.  On the stipulated judgment there will be

3   testimony, and there undoubtedly will be testimony as a re-

4   sult of these tests, if they are made, as you have indicated.

5   I don't want to be in the position of resting.

6        But I have one more offer, your Honor.

7        THE COURT:  Do you want to finish with this witness?

8   Are you through?

9        MR. VEEDER:  I would like to be sure of this.  We

10  convene tomorrow, do we not, with Mr. Krieger?

11       THE COURT:  Yes.

12       MR. VEEDER:  And we may know by tomorrow as to whether

13  Mr. Stahlman will agree to entry upon his property for the

14  purposes set forth in the motion.

15       MR. STAHLMAN:  I will take that up this evening and

16  give you an answer in the morning.

17       I might say right now that some of these wells you have

18  indicated, with what little knowledge we have, it looks like

19  some of them have been destroyed in the past.

        THE COURT:  That's easy.  Obviously if they are

    destroyed they can't be tested and there is no problem.

        Any further questions at this time?

3       MR. VEEDER:  I have no further questions.

4       THE COURT:  Mr. Sachse?

25      MR. SACHSE:  No, your Honor.

1    THE COURT:  Mr. Girard?

2    MR. GIRARD:  No, your Honor.

3    THE COURT:  Mr. Stahlman?

4    MR. STAHLMAN:  No, your Honor.

5    I will offer in evidence Exhibit AB at this time.  That

6    is the certified copy of the findings of fact in the previous

7    trial.

8    MR. VEEDER:  Of course, I object to it as being in-

9    competent, irrelevant and immaterial; it doesn't tend to

10    prove any of the issues in this case.  It is predicated upon

11    testimony in a previous trial and in a different forum.  There

12    has been no possibility of cross-examination by the United

13    States in regard to the testimony upon which the findings are

14    predicated.  They relate to an entirely different lawsuit.

15    THE COURT:  This actually goes into the second phase

16    of the case.

17    MR. STAHLMAN:  I can wait on it.

18    THE COURT:  But if you want me to rule on it, I will

19    admit it in evidence subject to the Government's motion to

20    strike later on.

21    MR. STAHLMAN:  I was going to point out, your Honor,

22    that they have pleaded--

23    THE COURT:  It is admitted in evidence subject to the

24    Government's motion to strike later on.  What else can I do?

25    I haven't heard the full argument or presentation of this

stipulated judgment and I haven't determined whether or not your judgment can stand without findings or whether it has to have findings.  This doesn't prejudice you.  It goes into evidence reserving you a right later on to strike it.

MR. STAHLMAN:  May I point out that the Government have alleged in their complaint that the stipulated judgment was predicated upon the findings of fact.  This language appears in their complaint in paragraph 5 at page 6 and also in the amendatory and supplementary complaint in paragraph 6 at page 6.  They have alleged that the stipulated judgment was predicated upon the findings of fact.

MR. VEEDER:  Which Mr. Stahlman has now denied, and which I will concede that he was right in his pleading.

MR. STAHLMAN:  Mr. Stahlman is going to make a motion to strike from the answer filed by O'Melveny & Myers that portion of the answer when we get to it regarding the--

THE COURT:  What is your desire in this matter?  The findings have been offered.

MR. VEEDER: I have raised my objection to them, your Honor.

THE COURT:  They are received in evidence, reserving to the Government a motion to strike.

MR. VEEDER:  Your Honor, I have the additional point that I desire to raise.  A brief has now been filed by Mr. Stahlman in regard to the attack upon the stipulated

1  judgment.  I am going to have to respond to that brief.

2       Now, I have had marked for identification the permits

3  signed by Malin Vail and also the letter from Malin Vail

4  agreeing to the applicability, in our view, of the stipulated

5  judgment if we would withdraw our protest to their filings.

6  Now there has been no objection to the first exhibits which I

7  had marked, showing the permit pursuant to which the Navy well

8  was dug.  I would like to offer that exhibit which, I believe,

9  is 159, it having been lodged far more than ten days ago and

10 no objection having been made to it.

11      MR. STAHLMAN:  That is merely a copy of a letter of Mr.

12 Vail.

13      MR. SACHSE:  He is talking about Exhibit 159, the

14 terms of the permit on the Navy well.

15      MR. VEEDER:  Exhibit 159.

16      MR. STAHLMAN:  The letter of O'Melveny & Myers I have

17 not had a chance to talk to O'Melveny & Myers and this is

18 only a copy.  I don't think there is substantial proof.

19 However, when we get around to the point I doubt that there

20 will be any objection to that.  But at this point I don't think

21 any foundation has been laid as to the copies of these letters

22 being the letters.

23      THE COURT:  All right, there is no foundation.  The

24 problem will be solved and you can get it in later.

25      MR. VEEDER:  However, I would like, in preparing a

1   brief in response to Mr. Stahlman's brief--

2        THE COURT:  Before you prepare a brief in response, I

3   think Mr. Stahlman has to be a lot more specific than he has

4   been in the brief.

5        MR. VEEDER:  I think that's right, your Honor.  There

6   is a lot more to this.

7        THE COURT:  If you are going to make an attack on the

8   judgment, then I have got to have some grounds.  What are

9   your grounds to set aside the judgment?

10       Fraud is a ground.  Extrinsic fraud is a ground.

11  Intrinsic fraud is probably not.  Fraud in a courtroom as

12  contrasted with fraud outside a courtroom.

13       Mistake may be a ground.

14       Then you have the question of mutuality, et cetera.

15       What other grounds?  I haven't given this any study.

16  But mistake might be part of the grounds-- an agreement made

17  in which the parties assumed the existence of a certain thing

18  and the thing didn't exist.

19       MR. STAHLMAN:  That's right.

20       THE COURT:  This would have to be spelled out if you

21  are going to rely on that.  What is it that the parties

22  assumed that existed that didn't exist?

23       Impossibility of performance.

24       I think if you are going to pursue this attack on the

25  stipulated judgment in the nature of pre-trial proceedings

1   as we progress, you should submit your grounds specifically.

2   It doesn't have to be a brief that thick, but submit spe-

3   cifically the grounds on which you are going to make this

4   attack.

5        MR. STAHLMAN:  All right.

6        THE COURT:  And spell it out in a lot less time than

7   you did in this brief.  And then your authorities that bear

8   on the particular points that you have in mind.

9        MR. STAHLMAN:  Very well.

10       MR. VEEDER:  May I inquire in that regard-- I don't

11  want to hold things up, but we are going into recess, as I

12  understand, for a couple of weeks anyway, and then perhaps

13  into a summer recess, and I was wondering when we could

14  anticipate the basis upon which he is going to attack it.  It

15  is important to us.

16       THE COURT:  All right, tell me tomorrow how much time

17  you want to do it.

18       MR. STAHLMAN:  Yes.

19       THE COURT:  And I will fix some time.

20       MR. STAHLMAN:  I believe, however, that the evidence

21  in relation to the circumstances in Murrieta and the evidence

22  in relation to the lands which lie east of the Vail Ranch

23  should be in the case before we go on with the very last thing

24  in this case.

25       THE COURT:  I am not talking about when you put on your

1   proof.   I am talking about preliminarily getting down to brass

2   tacks as to what particular grounds you are going to rely upon.

3          MR. STAHLMAN:   Yes.

4          THE COURT:   Think it over and estimate to me tomorrow

5   when you want to do this and how much time you want.

6          Now you say we are going into a recess for a couple

7   of weeks.   Next week we would have only one day available,

8   which is Tuesday, and I am inclined not to meet that entire

9   week.   The following week we would, however, have a couple

10   of days, and maybe we should meet at least one of those days

11   to finally line out a program from here on out.   I don't think

12   we have to decide that now.   I haven't given your calendar a

13   lot of study as to when we can be here.

14          MR. STAHLMAN:   That would be the week when I have this

15   trial on the 18th and 19th.

16          THE COURT:   Yes, I know.

17          MR. SACHSE:   Tuesday and Wednesday your Honor indicated

18   we might go ahead, the 16th and 17th.

19          THE COURT:   Yes, the 16th and 17th will probably be

20   available, and probably the entire following week.   I will

21   try to make the entire following week available, if necessary.

22   But we can decide on that tomorrow.

23          There is another thing I am going to direct you to do.

24   I take it that your Exhibit J, Mr. Stahlman, is the basis of

25   your showing of what lands on the Vail Rancho have in the

1   past at any time been irrigated.

2          MR. STAHLMAN:  That is correct.

3          THE COURT:  I don't think your showing as to the acreage

4   of those lands is at all satisfactory and I am going to

5   suggest this.  If you have a planimeter available--

6          MR. STAHLMAN: We have planimeters.

7          THE COURT:  I am going to require that you work out,

8   piece by piece, as you have the parcels shown on J, the acreage

9   on those lands, and I am going to request that the Government

10  also, from what sources they have available, make a check, and

11  let's find out where we are in dispute.  In other words, if

12  there is no dispute about the area of Hutchinson-Brown, we

13  go on from there.  If there is dispute about the area of the

14  Studley piece, maybe somebody is going to have to survey some

15  of this.

16         MR. VEEDER:  I am very much in favor of your Honor's

17  suggestion.

18         THE COURT:  Secondly, I think you should submit a list--

19  the only thing you have on your irrigable lands is your Exhibit

20  D; is that right?

21         MR. STAHLMAN:  That's right.

22         THE COURT:  Do you have a summary in front of Exhibit D?

23         MR. STAHLMAN:  Yes, there is a summary, your Honor.

24  However, I think that summary should be explained.  We are

25  relying upon the agreement that we made that Col. Bowen and

1   Mr. Wilkinson and Mr. Veeder said he wanted to be there and I

2   will be there to get this thing started for them to make their

3   check to determine the correctness of the map Exhibit C.

4       Also, we might point out that in doing that we have

5   prepared a map as to what we feel should be deleted as a

6   result of the reservoir area of the dam, and I thought that

7   when these people get together they could delete that and

8   reach some agreement as to what would be deleted there and

9   then check and probably come in here with a determination as

10   to the accuracy of the C.  Then of course D, which your

11   Honor is looking at, could bear relationship to the accuracy

12   of C.

13       THE COURT:  What is your claim of the total irrigable

14   acreage?

15       MR. STAHLMAN:  33,000 some irrigable acres now.

16       MR. VEEDER:  George, it's 33,000 which were subject

17   to land classification; is that not right?

18       MR. STAHLMAN:  Yes.

19       THE COURT:  Class A, 10,900; Class B, 7,000, Class C,

20   5,000; Class D, 6,000; waste, 3,290.  That would be about

21   29,000.

22       MR. STAHLMAN:  There will be taken from that about

23   600 acres in the reservoir area, I think.

24       THE COURT:  I want you to confer as to what can be done

25   to see if we can solve all or part of these discrepancies.

1  Does the Government have an estimate or a tabulation of the

2  irrigable lands on the Vail Rancho?

3      MR. VEEDER:  No, we do not, your Honor.

4      MR. STAHLMAN:  I might point this out to the Court--

5  I have alluded to this before-- that the Government use Mr.

6  Hall and use this same material in the previous trial before

7  Judge Yankwich, and Judge Yankwich made findings upon that

8  which are still part of this record.  Although the Santa

9  Margarita case was reversed, there was no phase of the case

10  in any way which upset the findings which Judge Yankwich made

11  in relation to those irrigable acres.

12      MR. VEEDER:  I don't think it is part of the record in

13  this case.

14      THE COURT:  The case was reversed because it was tried

15  as to one party.  How could the findings that he made have

16  any validity as to the other parties in this case?

17      MR. VEEDER:  It went to jurisdiction.

18      THE COURT:  Now I want some work done on that and I

19  want some suggestions tomorrow or before we adjourn for the

20  recess as to what is going to be done about it.

21      MR. VEEDER:  That's right.

22      THE COURT:  There may be areas where there is dispute.

23  But there oughtn't to be any dispute about a lot of it.

24      MR. STAHLMAN:  Haven't we agreed that we would get

25  together on this?

MR. VEEDER:  I thought we had agreed we would get there Friday.

MR. STAHLMAN:  What is the date on Friday?

THE CLERK:  The 5th.

MR. STAHLMAN:  Friday will be fine.

THE COURT:  Then you want to be excused this afternoon and come back tomorrow morning when Mr. Krieger will be here?

MR. VEEDER:  At 10.

MR. GIRARD:  Is it your understanding that we will not meet Friday in court?

THECOURT:  That is apparently their feeling, that tomorrow we will wind up with the motions that apparently by agreement will be heard tomorrow, and any loose ends, and spend some time on laying out the fall program when we are going to meet again.  But they don't contemplate meeting Friday and not this afternoon.

MR. GIRARD:  Thank you.

THE COURT: Also, if you finally get something worked out on your irrigated acres, it seems to me you ought to give some thought to making your tabulation K correspond more correctly with your map J.  I notice several times I have asked Mr Wilkinson on the tabulation of that two fields by names which on the map he will have shown as one field.

MR. STAHLMAN:  Frankly, I think we might have some little difficulty there, because I believe the way some of

1  that field is put out there and they don't survey it and they

2  say it is about so many acres in there put into corn or

3  whatever it is.

4        MR. VEEDER:  That is one thing we will check out

5  Friday on N.

6        MR. STAHLMAN:  Yes.

7        MR. VEEDER:  I am interested in correlating N to K to

8  J.

9        MR. STAHLMAN:  Take the notes Mr. Wilkinson has made

10  relative to those plantings.

11        THE COURT:  You know what I am interested in.

12        MR. VEEDER:  Yes.

13        THE COURT:  See what you can submit to me tomorrow.

14        Adjourn until tomorrow at 10 o'clock.

15        (Adjournment until Thursday, June 4, 1959, at 10 A.M.)

16

17

18

19

20

21

22

23

24

25