# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Thursday, June 4, 1959.

Pages:     10,305 to 10,386

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>        vs.<br><br>FALLBROOK PUBLIC UTILITY<br>DISTRICT, et al.,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 1247-SD-C. |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Thursday, June 3, 1959

APPEARANCES:

        For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                    Special Assistant to the
                                    Attorney General,
                                    Department of Justice,
                                    Washington, D.C.

APPEARANCES (Continued):

| | |
|---|---|
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendant State of California | STANLEY MOSK, ESQ., Attorney General, by FRED GIRARD, ESQ., Deputy Attorney General. |
| For Defendants Fallbrook Public Utility District, et al. | FRANZ R. SACHSE, ESQ. |
| For Defendant Murray Schloss Foundation | Walter Gould Lincoln, Esq. |
| For Defendants Oviatt, et al. | MESSRS. BEST, BEST & KRIEGER, By ARTHUR L. LITTLEWORTH, ESQ. |
| For U. S. Navy | LCDR DONALD W. REDD. |

1    SAN DIEGO, CALIFORNIA, THURSDAY, JUNE 4, 1959.  9:30 A.M.

2

3         (Other matters.)

4         (The case of United States vs. Fallbrook, No. 1247,

5    was continued until 1:30 P.M.)

6

7    SAN DIEGO, CALIFORNIA, THURSDAY, JUNE 4, 1959.  1:30 P.M.

8

9         (Other matters.)

10        THE CLERK:  Number five, 1247-SD-C, United States vs.

11   Fallbrook.  Further court trial.

12        THE COURT:  Proceed.

13        MR. VEEDER:  The first matter for consideration, your

14   Honor, is the motion for the purpose of obtaining water levels

15   on the properties owned by the clients of James H. Krieger.

16        I observe that Mr. Littleworth is here.  I assume he

17   is here for Mr. Krieger.

18        Is that right?

19        MR. LITTLEWORTH:  Yes.  Mr. Krieger is involved in

20   rather frantic negotiations going on right now, trying to

21   settle the North-South dispute in California on water problems.

22        THE COURT:  Do you have a copy of that motion?

23        MR. LITTLEWORTH:  Yes, your Honor.  I talked to Mr.

24   Veeder about it on the telephone and agreed that this was the

25   time we would be prepared to argue it.

1      THE COURT:  Mr. Clerk, do you have the motion here?

2      MR. VEEDER:  Your Honor, I just happen to have in my

3  possession the Court's record as marked.  That is the Clerk's

4  file right there (handing document to the Court).

5      Your Honor, we have set forth the names of the parties

6  to whom this motion is directed, we have set forth the kind

7  and type of tests to be made, and we have set forth the ob-

8  jective of those tests.  The motion was filed on May 27, so

9  I think everyone is fully apprised of our purpose, and I will

10  direct just a few remarks as to the reason why we feel that

11  these water level measurements should be taken and why we feel

12  that an order permitting those measurements to be taken be

13  entered by your Honor at this time.

14      We are at the moment conducting a canvass of all wells

15  in the area lying westward from the toe of the basement complex

16  and the residuum.  We have the U. S. Geological Survey con-

17  ducting that investigation.  It is a voluntary matter.  They

18  go in and ask the farmer if they can make measurements, and

19  up to date they have had very good cooperation and that has

20  been going on for about a week.

21      We find, in the area to which I am now pointing-- and

22  that would be in the area generally of Section 35, Township 6

23  South, Range 4 West, as set forth on Roripaugh's A-- that

24  there are a large number of wells with substantial pumping

25  equipment on them and that the water is being used for

1    irrigation in that area.

2         We find, moreover, in that investigation that there

3    has been a general decline of upward to 20 feet in the last

4    twenty years in the level of the water table.

5         We find further -- and these are facts that we knew

6    before this voluntary canvass was commenced-- that in the areas

7    in what we will call the general location of the Roripaugh

8    property and the Ceas properties there has been a decline of

9    approximately 20 feet in the last twenty years.  Now that

10   comports favorably, or unfavorably as the case may be--

11        THE COURT:  By that you mean it bears some relation-

12   ship?

13        MR. VEEDER:  It bears a relationship, your Honor-- I

14   don't say favorably; I wanted to correct that-- with the de-

15   cline in the Schrode well, which has been about 30 feet since

16   1926.  It points up our great concern as to what we have

17   stated before, that the ground water reservoir backed up

18   behind the Wildomar dike has declined steadily and has been

19   going on for about a quarter of a century.

20        Now, our problem, from the standpoint of rebuttal, is

21   not in any sense limited to the Krieger properties.  It relates

22   to the whole area depicted on the map 15-A of the United States,

23   and it certainly is of great importance to us in regard to

24   all issues arising from Storage Unit No. 4, which has been

25   roughly outlined by the Kunkel line.  We are confronted,

1    however, in the conduct of this canvass, with the objections

2    which are made by Mr. Krieger to our entering upon the property

3    of his clients.  We would have the anomalous situation of a

4    spotty area which would not bring to your Honor the fullest

5    information possible.

6        It will be noted, if your Honor will turn to Roripaugh's

7    B, that the clients of Mr. Krieger are scattered throughout

8    the entire area which we have shown on 15-A.  The result of

9    it is there will be islands concerning which we do not have

10   full information, and we believe that for the information of

11   the Court, not only in regard to the Krieger properties, but

12   also in regard to all other properties, it would be entirely

13   fitting and proper to permit the United States Geological

14   Survey to continue the tests which we desire to undertake.

15       It will be noted in particular, and we certainly de-

16   sire to proceed in this manner, that those tests would be

17   conducted with the least inconvenience to any of the named

18   defendants, which of course is the way we are conducting the

19   canvass generally.  It would coincide with pumping schedules,

20   it would entail a minimum number of entries upon their

21   property, and the results of those tests would be made avail-

22   able to everybody.

23       Now they are not tests which entail any expenditure,

24   as we see it, by the defendants themselves.  It would simply

25   be a matter of making water measurements in accordance with

1   the provisions set forth in the motion and would contribute

2   very greatly to the overall information which we would make

3   part of the record in this case.

4        We feel that the motion is entirely justified, and we

5   petition your Honor to enter an order accordingly.

6        MR. LITTLEWORTH:  If it please the Court, I want to make

7   one thing clear to start with, and that is that our opposition

8   to this motion, while I intend to be as vigorous as I can in

9   it, is not because we are in the position habitually of trying

10  to be obstructionists in the court proceedings.  I would point

11  out to the Court that of the some 50-odd parcels of land

12  which we represent, all but I believe two have already sub-

13  mitted many months ago the consents to permit the Government

14  to go on and make soil survey tests.  We felt that that was

15  a good thing for both parties and the proper way to approach

16  this lawsuit and we recommended it strongly to all of our

17  people.  Furthermore, last fall, in October, Mr. Veeder

18  requested informally much of this same type of thing, and

19  indeed Mr. Kunkel during October and September and perhaps

20  some of November scurried around on many of our people's

21  property and measured well levels and that was the result of

22  their 15-A.  We made no objection.  We welcomed that oppor-

23  tunity.  At the same time, there was a Sunday night telephone

24  call from Mr. Veeder to make pump tests at that time on the

25  Roripaugh and the Quarry wells, and it was given.  We have

1    up to this point tried to give all of the cooperation that

2    we felt was going to really point toward any truth in this

3    lawsuit and which we felt incidentally benefited our clients

4    also to conduct the lawsuit in that manner.

5        I think this motion falls into a quite different

6    category.  Let's take a look first at whom he has on the

7    motion.  He has listed 52 names.  Those are all of the clients

8    which appear on our map, Roripaugh's B, listed in precisely

9    the order in which they appear down in the lower chart.  That

10   happens to include 23 persons who own lands and own no other

11   lands outside of the Murrieta Valley proper, that is, their entire

12   ownership lies within the two fault lines.  We have conceded,

13   your Honor, that that property is within this lawsuit.  It

14   seems to me there is no other issue as to those persons ex-

15   cept the issues which will go before the Master as to their

16   acreage and ownership and water duty requirements and the like.

17   But certainly so far as whether or not they are to be in the

18   lawsuit or not, which is the principal thing we are now

19   concerned with, whether they are really taking water which is

20   part of this river system, we have conceded it.

21       There are other persons in the Santa Gertrudis area

22   named in the motion.  Again, we have conceded that area.

23       There are some persons who own property both inside and

24   outside.  I have not touched on those persons, but certainly

25   as to those properties, which lie within these areas, again

1   they are conceded.   There are no issues which are facing this

2   Court as to those persons.

3       Mr. Veeder has also included in his motion Mr. Frick

4   and Mr. Collins, two people away up in the outer limits there,

5   who, last Thursday he said, could be let out of this lawsuit,

6   but today he wants to make tests on their properties.

7       THE COURT:   Where are Frick and Collins located?

8       MR. LITTLEWORTH:   One of them is this particular yellow

9   up here, your Honor, and this bit of yellow up here is the

10  other, away up in the basement complex.

11      He has also included in this motion the lands of a

12  number of people who have no wells on them at all.

13      THE COURT:   Of course, if there is no well there, there

14  is no problem.   He just included all of your clients in the

15  motion.

16      MR. LITTLEWORTH:   The point is, your Honor, that it is

17  one of these shotgun motions without giving us any help at

18  what he is really aiming at.   He simply lists all of our

19  prople, and what he is really saying is, give us a carte

20  blanche authority to go in and find out what we can.

21      Now, let's see what he wants to do.   In the first

22  instance, he says that he wants to make certain water level

23  measurements.

24      In the correspondence which has preceded this motion,

25  your Honor, Mr. Rankin was a little more specific in what he

1    wanted, and he said he wanted static water level measurements.

2    To that we have already agreed in writing by letter dated May

3    11th.   So that if that is what is wanted, it has already been

4    agreed to and there is no need to be making a motion on it.

5    I presume that the outcome of further static water level

6    measurements would result in another water contour map.   I

7    don't know that that would be helpful.   There are two in this

8    case already, one of them made last fall, but certainly we

9    have no objection to that and we have already told Mr. Veeder

10   that in writing.

11        Now, he has put one other word in this motion which

12   bothers me, and if he means something by this word that he has

13   put in his motion which Mr. Rankin did not put in his letter,

14   then I have some objections.   He says that he wants to make

15   continuing water level measurement tests.   I don't know what

16   he means by that.   I have thought from Mr. Rankin's letter

17   that they wanted to go in and, as nearly as they could, in

18   three or four days or whatever it would take, canvass all

19   of the wells in the area and get a group of measurements which

20   would be taken all at approximately the same time so that

21   they would bear proper correlation.

22        THE COURT:   Well, you haven't been around all of the

23   time, and that is your privilege, and you may not have read

24   the transcript.   But he wants more than one reading because

25   he wants to see if he gets a different reading when some of

10,315

1    these other wells are being pumped.

2    MR. LITTLEWORTH:  That is right.  That comes to the

3    second thing.  Now, in so far as "continuing" means that he

4    wants indefinite authority for the future to come in and make

5    measurements whenever he wants to, we do have objection.  If

6    he wants to go in and measure them with a stand, static levels,

7    we have conceded that.

8    THE COURT:  Suppose he wants to measure them as they

9    stand statically without certain pumps being operated and then

10   he wants to measure them as other wells are being pumped.

11   MR. LITTLEWORTH: Now that brings us to the second point

12   he has in his motion, and that is he wants to make certain

13   pumping level measurements.  This is the point, your Honor,

14   where I think we have got to smoke out what the Government

15   really wants to do.

16   The form of this motion puts us back, so far as the

17   Government is concerned, where we were perhaps six weeks ago.

18   When this testing proposition first started, it started with a

19   telegram from Mr. Rankin and Mr. Rankin at that time said,

20   "Request permission to canvass, to test and to otherwise

21   investigate wells on properties of your clients.  Would

22   appreciate response by collect wire."  We did make a response,

23   and a good deal of negotiations and correspondence developed,

24   and finally Mr. Veeder came up to our office.  The result of

25   that was to make his test objective and the specific properties

10,316

1    that he wanted to test and he wanted to do it-- much more

2    specific.

3        THE COURT:  Can't we forget the preliminary correspond-

4    ence and look at the motion?

5        MR. LITTLEWORTH:  Yes, we can, your Honor, except that

6    the motion is so vague that I can only believe that he wants

7    to really do, under this large authority, what he has told us

8    privately and what is in the correspondence.

9        Now what he told us, Mr. Kunkel said, was that what

10   they really wanted to do here was to test certain pairs of

11   wells.  They wanted to take one well and pump it and see if

12   there is an effect on a well a hundred feet away.  We said,

13   what is that going to prove?  We would be surprised if there

14   were not when you are testing wells that close together.  And

15   then came out what was really in the back of their mind.  They

16   wanted then to take that, drop it into a mathematical formula

17   and prove mathematically and on certain hypothetical assump-

18   tions that if there is an effect between these two wells

19   a hundred feet away, that if you pump that same well there

20   will in due course of time also be an effect on a well a mile

21   away.  They don't want to measure the well a mile away.  They

22   want to prove mathematically that that could happen.

23       What they are really saying is that they want to make

24   transmissibility tests, although they have not said so in the

25   motion.  Now transmissibility is a complex thing, I have found

1   out, talking to some of the engineers.  But I have found

2   enough, your Honor, to convince us that if this is what

3   really the Government has in mind, and I think it is because

4   a pumping level measurement by itself is going to do nobody

5   any good-- just to know where the water level stands when a

6   well is being pumped doesn't do you any good by itself.  You

7   have got to know how much water is being pumped and how far

8   the drawdown is.  That gives you specific capacity.  That was

9   the kind of test we put in, and they have not objected to the

10  accuracy of any of that testing information.  And if you want

11  then to compare that against another well, then you are in

12  fact carrying on a transmissibility test.

13          Your Honor, let me explain very briefly why I think

14  that is not only irrelevant in this case, but I think will

15  be misleading in the way they have proposed to set up this

16  thing.

17          To begin with, they have tried to sugarcoat this and

18  have said, we will fit this into the convenience of your

19  pumping schedule, we will not make you pump when you don't

20  want to pump.  The fact of the matter is that a transmissi-

21  bility study cannot be accurately conducted when you are

22  doing it for just 12 hours or even 24 hours or 48 hours.  You

23  have to be pumping your test well for at least a couple of

24  weeks.  And indeed Mr. Kunkel has been conducting a trans-

25  missibility study in our area on the Bunker Hill dike trying

1  to find out how much, if any, water passes through there be-

2  tween San Bernardino and Riverside Counties.  He has been

3  pumping  his test well six months in order to try to get an

4  accurate result.  Now that is the first thing.  You can't do

5  this simply at the convenience of the pumping schedules and

6  have accurate results.

7      In the second place, you can't do it without having

8  controls.  You have either to control the pumping, or at the

9  very minimum you have got to know what is going on in a wide

10  area so that you can then make compensating adjustments in

11  your calculations.

12      Thirdly, Mr. Veeder doesn't say that he wants to do this

13  in his motion, but he has to do it if the tests are to have

14  any relevancy.  You have to measure the quantities of water.

15  Pump level measurements will not do any good.  You have to

16  know how much water is being pumped.

17      Now next, and perhaps what bothers us most of all, is

18  that this type of thing is workable at best even under the

19  most ideal conditions only where you have uniform conditions.

20  What the Government is proposing here is to take a couple of

21  wells out of a pocket where there is some water, determine

22  that there is a transmissibility factor between those two

23  wells, and then apply that across many miles of area of land

24  which certainly is not uniform and which is not the same kind

25  of ground.

1   THE COURT:   Well, we can cross that bridge when we come

2   to it.   But let's not foresee difficulties.   If there are

3   two wells pumped and if it develops that they are being pumped

4   out of a common pocket, that proves something as to those two

5   wells.

6   MR. LITTLEWORTH:   I don't know that it would prove

7   anything that would be helpful here, your Honor, if you pump

8   a couple of wells; and I can specify, if we have to, the ones

9   they have asked for, but they are wells within a hundred feet

10   of one another.   That isn't going to help this Court to de-

11   cide anything to know if you pump one well a hundred feet

12   away from another one you get a result.

13   THE COURT:   If you get a positive result that the

14   pumping of one well affects another one a hundred feet away,

15   it is quite easy to infer that those two wells draw from a

16   common source.

17   MR. LITTLEWORTH:   I wouldn't doubt it, your Honor.

18   THE COURT:   Then if you found that No. 2 of those wells

19   reacted with Well No. 3, which was 400 feet away, again you

20   have some connection.   I don't know what this is going to

21   show.   But I have a little trouble following you on your

22   suppositions as to what the Government may say they have proved

23   after they get through.

24   MR. LITTLEWORTH:   Your Honor, that is why I say they

25   can't divorce this motion from what they have talked to us

about in our office and what our correspondence is, because

I know what they are going to try to prove.  He doesn't say so

here.

THE COURT:  I am not going to pass on what they are

going to try to prove.  When they get to submitting some

testimony, I will rule on whether it is admissible, and if

it is a matter of inferences to be drawn I will draw the

inferences or I will not draw them.

MR. LITTLEWORTH:  All right.

Let me point out one other factor, your Honor, which I

think indicates that this kind of thing is irrelevant and

perhaps at worst is misleading, and that is that no trans-

missibility test is really valid unless you take into account

recharge, and there has been no evidence in this case what-

soever of the quantitative amounts of recharge.  Now unless

you know that, your transmissibility study can't really help

you.  But you have got to know not only what is being taken

out and whether if we take it out that will affect some place

down here, but also how this water comes back in, if it is

going to be meaningful and helpful.

I want to make one other objection, your Honor-- and

this perhaps goes less to the law and more to the practical

side of this thing.  The Government has a tremendous advantage

in this case in that it has unlimited resources, at least

compared to the individual defendants.  Look around this court

10,321

1   and you find that the only individuals, outside of the Vail

2   Ranch-- and they are hardly to be compared with a small farmer--

3   the only individuals who have ever been represented in this

4   court are our clients.

5         THE COURT:  What about Mr. Sachse's clients?

6         MR. LITTLEWORTH:  Yes, Mr. Sachse.  But he is primarily

7   here for Fallbrook.

8         THE COURT:  What about Mr. Lincoln's clients?  There

9   are various attorneys here.

10        MR. LITTLEWORTH:  That was too broad, your Honor, but

11  at least there are relatively few individuals who have par-

12  ticipated in a major way.  This case had already gone nine

13  months to trial and the Government now proposes a series of

14  tests which, in our view, are not properly rebuttal, but which

15  really are going to the proposition of opening up the

16  Government's entire case and they are going to start all over

17  on a third way to try this case.

18        I think they have already been to bat twice.  Mr. Kunkel

19  first testified, basically, on '53 data for some two weeks

20  while we listened and then there was cross-examination and

21  what have you.  Then they decided that they needed more accur-

22  ate data and more tests and they went out in the fall of last

23  year and came back and started all over with new maps.  This

24  was the second time the Government came to bat.  The third

25  time is what they are proposing now, to go out and start all

1    over again with more tests, which will go really to try to

2    prove their basic theories in simply another way.

3        Now individual defendants have a real stake in trying

4    to keep the scope of this lawsuit as narrow as possible

5    commensurate with getting a good result.  I can't see that

6    this kind of testing program is going to do anything but

7    expand the issues in this case and wear us down to the point

8    where we finally have to rely on somebody else to protect

9    our rights.

10        It seems to us that the Government does not show the

11   good cause which is required to conduct pumping tests on this

12   kind of scale.  They have not defined really what they want

13   to do-- what wells they want to test, how they want to do it,

14   or that there is any reliability in the testing procedure

15   that they propose.  They simply say, let us go in and when

16   we get there let us make up our mind what kind of pumping

17   tests we will want to use.

18        THE COURT:  Let me comment only that the wearing down

19   process of Krieger and Littleworth and their clients has been

20   very minor compared with the participation of other parties

21   in this litigation.  The number of times that you gentlemen

22   have been in my court since this case has proceeded has been

23   relatively few in comparison with other counsel, who have

24   attended.  You represent a number of defendants, and you have

25   that privilege under the order I made.  But I can't go along

10,323

1   with your wearing down process on Krieger and Littleworth

2   and their clients.

3        MR. LITTLEWORTH:  We recognize that this Court has

4   been eminently fair in trying to protect the rights of private

5   individuals and to make it as easy as possible to try a law-

6   suit of this complexity, and we don't for a minute think the

7   Court has not done all that has been possible to decrease the

8   burden on private individuals.  And while certainly our part

9   has been small compared with Fallbrook and the Vails and the

10   State, I think it has not been small compared with the re-

11   sources of the people who are represented, and I think that

12   is borne out by the fact that you don't find more individual

13   defendants here.  They can't simply sit through nine months

14   of trial.

15        I think also, your Honor, that what the Government

16   proposes now is certainly not proper rebuttal to anything which

17   we put on in our portion of this case.  It involves areas

18   that we did not cover, clients that we did not cover, and it

19   has for its objective purposes that we had nothing to do

20   with.  I think that the results that will be achieved will

21   not be relevant to anything which is going to really help

22   the Court to decide the major issue, and that is what ground

23   waters are properly a part of this stream system.

24        It seems to me also, your Honor, that what the Govern-

25   ment is proposing now is not really proper.  It is part, if

1    anything, of what should have been done in discovery procedure.

2    The Government put on its entire case without recourse to

3    well tests or anything else.  They put it on the basis of

4    theoretical geologic averages.  They didn't think that well

5    tests and the like were important.  Now, having rested, they

6    come in and indicate that they have to have these in order

7    to proceed.  I think, your Honor, that this is simply and effort

8    effort to go back and retry their case on basically what is

9    another theory, but with the same objectives in mind.

10        We object on those grounds.

11        MR. SACHSE:  Your Honor, I am not a party to this

12   motion, but I have two comments.

13        First, I learned today for the first time that Mr.

14   Veeder or the U. S. Geological Survey have been for two weeks

15   taking water level measurements already in the Upper Murrieta

16   Valley.  It was my understanding that what was to be done was

17   to be done with an opportunity to all interested parties to

18   participate in that kind of measurement, and I want to tell Mr.

19   Veeder now that I want the U.S.G.S. to stay away from any of

20   my clients, not knock on their doors and ask for permission

21   but ask me.  I have expected that if any tests were made I

22   was going to be told, and I have assumed that this motion was

23   the one that was going to determine what tests were going to

24   be made.  If the United States is making tests on any of my

25   clients, I would like to know about it.

1    MR. VEEDER:  I don't believe they are, Mr. Sachse.

2    MR. SACHSE:  All right.

3    MR. VEEDER:  And I hasten to add now that the U.S.G.S.

4    has been making tests for a great many years and has continued

5    to make tests by men working under Mr. Kunkel in the U.S.G.S.,

6    and certainly no effort is being made to circumvent you Mr.

7    Sachse, or to circumvent any other lawyer.

8    MR. SACHSE:  The second point is that I have under-

9    stood that the results of these tests were to be made avail-

10   able as fast as they were made; not the conclusions drawn by

11   Mr. Kunkel or by the U.S.G.S., but the physical factual data

12   obtained was to be made available to all of us who have an

13   interest in this very broad question of where does the

14   limits of the stream system begin and end.  And I would like

15   to have the opportunity of having the engineers upon whom I

16   rely have the exact work data-- not Mr. Kunkel's conclusions.

17   Now we can settle that later on.

18   MR. VEEDER:  You will have that, Mr. Sachse.

19   MR. SACHSE:  I would like to have known it before you

20   did it.  I would have appreciated it.  And it was my under-

21   standing that that was the way we were going to operate.

22   Now my only comment on the motion itself is this.  I

23   feel very strongly in accord with the last remarks made by

24   Mr. Littleworth.  In so far as my individual clients are

25   concerned-- of course, Fallbrook is in no way concerned with

10,326

1    this, but my individual clients are-- to them there is only

2    one real question:  Are they in the stream system or are they

3    not?  If they are in the stream system, they fully understand,

4    if I have been capable of putting it across to them, that

5    they are going to stay in here for a long time, that they are

6    going to be subject to orders to show cause under your Honor's

7    continuing jurisdiction if they take more than their share.

8    But if they are not in the stream system, I have led them to

9    believe that they will be free to pump unless their neighbor

10   comes after them.

11        Now when we went away on our Christmas recess and your

12   Honor asked these fifteen questions, I hoped that we would

13   be able to come back to the Court and say, we have agreed that

14   all evidence is in accord that certain areas are outside the

15   stream system.  We haven't done it.  I think I have attended

16   every day of every hearing in this Court and before the Master,

17   and if I have heard it once I have heard it at least twenty-

18   five times now from the Government's own witnesses, that as

19   to certain areas, certain types of geologic structure, the

20   ground water shall be considered to be not part of the stream

21   system.  But I am absolutely convinced that Mr. Littleworth

22   is correct when he says that this is nothing more nor less than

23   an attempt to reopen the whole case clear back to the question

24   of what is and what is not a part of the stream system.  If

25   there is the slightest doubt about it, all we have to do is

1   to look at the proposed findings that Mr. Veeder presents,

2   when he says, "The areal extent of the ground water body

3   alluded to above may be enlarged based upon the introduction

4   of additional evidence."  What he is after is an attempt to

5   reopen the whole case, to start out from scratch, because of

6   the deficiencies he has found in the testimony of his own

7   witnesses, who consistently and repeatedly have drawn lines

8   with which he is unhappy and dissatisfied.  And I do not

9   believe it is proper to put the burden on these small in-

10  dividuals of permitting them to start all over again and

11  having us attempt to rebut this all over again.

12         THE COURT:  Mr. Girard.

13         MR. GIRARD:  Your Honor, I would like to make just a

14  couple of comments.

15         First, I, like Mr. Sachse, am astonished to find out

16  that there have been tests for two weeks, because I can recall

17  at least two instances in the record where I specifically

18  asked the Court to make sure we had notice of these tests

19  and that we be given an opportunity to check them, and your

20  Honor on both of those occasions -- I am sure we can check it

21  in the transcript-- said that we would be given notice.

22         THE COURT:  I can't understand, Mr. Veeder, in view

23  of the understanding we have had of their participation, how

24  you started this matter without advising counsel for the

25  State, for Fallbrook and other counsel in this case.

10,338

1    MR. VEEDER:  I truly believe this, your Honor-- and

2    Mr. Illingworth, I think, will bear me out on it-- I think

3    that Mr. Kunkel has been in communication with him in regard

4    to it and what has been done.

5    THE COURT:  Mr. Illingworth, has he?

6    MR. ILLINGWORTH:  No, he hasn't, your Honor.

7    MR. GIRARD:  I don't want that as an excuse, your Honor.

8    I represent the State and I want the notice to come to me,

9    and let me handle that arrangement.

10   MR. VEEDER:  We have stayed away from the properties

11   of any counsel--

12   THE COURT:  Mr. Veeder, direct yourself to the points

13   that have been made.  Why haven't you notified counsel that

14   you proposed to start this and why haven't you given them a

15   chance to participate?

16   MR. VEEDER:  They certainly can participate.

17   THE COURT:  Why haven't you notified them?

18   MR. VEEDER:  I am telling them now.

19   MR. STAHLMAN:  Your Honor, the other evening, coming

20   back from Riverside, we saw a U.S.G.S. truck.  We wondered

21   what it was doing there.  There was a strange person in it.

22   We followed it down to the motel in Temecula.  That is the

23   only indication I have had up until today that any tests were

24   going to be made in that area that might have any relationship

25   to this case.  I have said repeatedly that we would cooperate.

1    But this should be a mutually cooperative venture.

2        THE COURT:  That is right.

3        MR. STAHLMAN:  I think what is happening in this case

4    is that Mr. Veeder has a witness who, I believe, will try to

5    satisfy and please Mr. Veeder and come up with the test he

6    wants.  That is why we want to watch this witness and watch

7    these tests, and I think we are obligated to do it.  I think

8    it is highly improper that he has not advised us that these

9    tests were going on, if they have been going on for two weeks.

10   We had no idea that that was going on.

11       THE COURT:  When did they start, Mr. Veeder?

12       MR. VEEDER:  I think they started, in regard to Mr.

13   Kunkel's work--

14       THE COURT:  I don't care about--

15       MR. VEEDER:  I am going to ask Col. Robertson.

16       I think it was Thursday or Friday of last week.

17       I asked Mr. Kunkel to do this, in anticipation of what

18   has occurred here--

19       I will tell you, George, about that truck in just a

20   minute.

21       From the standpoint of the United States, we had

22   encountered this situation.  We had wondered what the results

23   would be of an overall canvass.  The only thing they have

24   done is located some wells.  They have dropped a tape down a

25   well to see where the water level was, as I explained to your

1    Honor.  These aren't pumping tests.  They are nothing more nor

2    less than locating wells which would be part of an overall

3    canvass.  Perhaps I used the term incorrectly when I said

4    "tests."

5         I explained to Mr. Kunkel this, I said from the

6    standpoint of making an overall survey it is essential that

7    I have some data.  He went out with his man and they said

8    this, that in regard to the areas which are located-- I am

9    pointing now to this area 35 in 6 South, 4 West-- that there

10   were numerous wells which would be of importance in view of

11   the testimony of Mr. Webb on the stand that he was testing

12   all wells.

13        THE COURT:  That who was?

14        MR. VEEDER:  That Mr. Webb had tested-- that he was

15   testing any wells over three horsepower.

16        THE COURT:  That Mr. Webb was?

17        MR. VEEDER:  Mr. Webb.  That was the basis of his

18   testimony.  It didn't sound correct to me, as I had been

19   through that valley many times and I had seen some wells.

20        MR. LITTLEWORTH:  Let me correct one thing before this

21   gets any further, your Honor.

22        You said in the upper part of Storage Unit No. 4.  You

23   are indicating wells within the two fault lines.  We have

24   never said that we tested all of those wells.  We said that

25   we thought that we had tested every well lying northeast of

the fault line and within the outer limits of that Storage

Unit No. 4 Boundary.  We have made no such claim as to the

wells lying within the fault line.

MR. VEEDER:  I have no objection to your interruption,

Mr. Littleworth.  If you will observe where I was pointing,

I was pointing between the toe of the basement complex and the--

MR. LITTLEWORTH:  Right now you are running your pencil

down the middle of the valley.

MR. GIRARD:  Your Honor, we are getting far afield.

THE COURT:  Yes, we are getting far afield.

Mr. Veeder, who is in charge of this U. S. Geological

Survey that is being made.

MR. VEEDER:  Mr. Kunkel, your Honor.

THE COURT:  He is in charge?

MR. VEEDER:  Yes, your Honor.

THE COURT:  And what has been done to date?  Locating

and ascertaining the whereabouts of wells that you are going

later on to test?

MR. VEEDER:  That is correct, your Honor.

THE COURT:  And too, taking water levels?

MR. VEEDER: Yes, if they are--

THE COURT:  Just answer my question.  Taking water

levels?

MR. VEEDER:  That is right.  Nothing more.

THE COURT:  And no pumping tests?

1    MR. VEEDER:  None.  It has been the purest kind of a

2  canvass of wells.

3    THE COURT:  A canvass is one thing.  The taking of

4  water levels of wells is another thing.

5    MR. SACHSE:  Your Honor, I am not satisfied.  I want

6  to know that because one of my biggest quarrels with 15 and

7  15-A-- there was extensive cross-examination, trying to get

8  Mr. Kunkel to admit that the ground water contour isn't worth

9  one bit more than the number of reference points from which it

10  is drawn, and if he is starting to take static water level

11  measurements all over that valley I want to know every one

12  of them and exactly where they are and when he does it, be-

13  cause frankly I agree with George that I don't trust Mr.

14  Kunkel.  I think he is liable to come into this courtroom and

15  lay down here a set of static water levels and say, these

16  are the ones I checked, and unless we know the ones he looked

17  at we will have no data whatsoever.

18    THE COURT:  I understand.

19    MR. VEEDER:  Now, before anyone gets too heated about

20  this, we have taken a U.S.G.S. quadrangle, Col. Robertson and

21  Mr. Kunkel and I, and we have sat down and have looked at the

22  general area where these people, the U.S.G.S., have made

23  this canvass, for the sole and only purpose of ascertaining

24  the worthwhileness of proceeding with this motion.  We know

25  now, and we know very well, that based upon that canvass which

1    was made, every well will be made available to everyone and
2    all the locations are spotted on a map.

3          THE COURT:  Mr. Veeder, let's direct ourselves to the
4    inquiry-- and this has probably been sufficiently kicked
5    around-- the inquiry was, why didn't you notify counsel you
6    had started this?

7          MR. VEEDER:  As a matter of fact, the canvass that
8    was being made, it didn't occur to me that it would come
9    within the category of their desires to know.

10         THE COURT:  Well, let's take up the matter of the alien.
11         (Another matter.)

12         THE COURT:  Mr. Girard.

13         MR. GIRARD:  If I may, your Honor, I would like to
14   make a couple of observations on these two motions directed to
15   both Mr. Krieger's clients and to the Vail Company.

16         Of course, in so far as all of the Vail Company wells
17   that are listed, that are set forth to be tested, every one
18   of them lies in the Wolf Valley, Pauba Valley, or Murrieta
19   Valley.  I think in so far as Mr. Krieger's clients are con-
20   cerned, a substantial number of them lie in that valley.

21         Now Mr. Sachse has referred to the findings of fact
22   which were drawn by Mr. Veeder and submitted to the Court.
23   I would like to refer to that briefly, too.

24         As I recall, when your Honor suggested these findings
25   of fact, you did so on the idea that findings of fact would

1  be made which would in effect wipe out these things out of the

2  lawsuit because there was no substantial disagreement among

3  anyone that they were included as part of the stream.  I am

4  sure that is still the conclusion of all the defendants and

5  certainly of the plaintiff.  It seems to me that if that is

6  the conclusion of everyone, any testimony which is directed

7  to any wells in that area doesn't help anyone at all.  They

8  are clearly in the lawsuit regardless of transmissibility,

9  water levels or anything else.

10  THE COURT:  What do you say to the fact that there

11  might be situations where the testing of wells admittedly

12  within the basin or over a basin interact with some wells

13  further up in the older alluvium?

14  MR. GIRARD:  In other words, if he drew down in Pauba

15  Valley it might affect a well upstream?

16  THE COURT:  Not only upstream, but outside the valley

17  into the older alluvium.

18  MR. GIRARD:  I think under those circumstances they

19  would probably be desirable.

20  THE COURT:  That is the only reason I can see why

21  there would be any need to test at all wells that are actually

22  in the Wolf Basin, the Temecula Basin or the Murrieta.

23  MR. GIRARD:  I agree with your Honor, if the tests

24  are going to be to show interrelation between the wells in

25  those areas, it is a waste of time.  If they are going to

1    be used to show relationship with wells outside the areas,

2    then it is a different story.

3         But specifically referring to Mr. Veeder's conclusions

4    to be drawn, in both of the motions he specifically states:

5    "To determine the interaction between the shallow well and

6    the deep well in the water body which underlies the Vail

7    property within Pauba Valley." In other words, in both he

8    limits himself to the Pauba Valley. And the same is true of

9    his motion with regard to Mr. Krieger: "To determine the

10   relationship of water levels throughout the entire Murrieta

11   and Temecula River Valley." Now in so far as those areas are

12   concerned, which are specifically what he says in his written

13   motion, I don't think it will do anyone any good to find a

14   relationship at all, because the basic issue is whether or

15   not they are part of the stream. Everyone concedes it.

16   Whether there is a relationship between the wells doesn't

17   help anybody in so far as the issues of this case are con-

18   cerned.

19        THE COURT: He is talking about two wells, say, located

20   over the Pauba Basin, with two wells in the Wolf Basin and two

21   wells in the Murrieta.

22        MR. GIRARD: Even if there is a relationship, it

23   doesn't help us in this lawsuit.

24        THE COURT: As between those two wells, that relation-

25   ship doesn't help.

1      MR. GIRARD:  No.  Or it doesn't help us really in

2   relationship between valleys.  Because the only purpose of

3   these tests is to show whether or not the ground waters are in

4   effect a part of the stream.  Whether they are related or not

5   does not alter the result.  We all admit they are.  And clearly

6   any water that is pumped out of there now and indefinitely

7   is subject to this Court's jurisdiction.

8      Now your Honor did point out the fact, which I had

9   thought of originally, but I do point out that none of Mr.

10  Veeder's motion covers that situation.  Every one of his

11  statements in here on what he expects to prove is limited to

12  a relationship between wells within the area within the Pauba

13  Valley or within the area within Murrieta Valley, et cetera.

14     THE COURT:  You are now talking about his motion as to

15  Vail.

16     MR. GIRARD:  Yes.  And I believe also as to Mr. Krieger's

17  clients.

18     There are just a couple of other comments, your Honor.

19  Looking at Vail's motion, the first one is to determine the

20  relationship of the wells which underlie the Pauba Valley.

21  Whether there is or is not a relationship doesn't mean any-

22  thing.  They are still a part of the lawsuit.

23     In the motion as to Vail, (b) The effect of pumping

24  uses of water in the Pauba Valley as they relate to the uses of

25  water in Wolf Valley, Pechanga Creek and Murrieta Creek.  All

1  of those areas are clearly within the lawsuit.  Whether there

2  is a relationship or not in so far as the issues to be decided

3  here are concerned it is immaterial.

4      (3) Seasonal fluctuation of the ground water body.

5  I am sure that everyone here will agree that there are seasonal

6  fluctuations.  In fact, the United States has just introduced

7  Exhibit 160 which shows them.  We have introduced several

8  exhibits, California's AC and California's AD, which are all

9  in evidence, which clearly show fluctuation in the ground

10 water level seasonally, and I don't think anyone here is

11 arguing about it.  Merely because you show seasonal fluctuation

12 isn't going to help anyway.

13      I don't object to the tests, in so far as the State is

14 concerned, in so far as what these things would show.  My

15 objection, basically, is that they don't add anything, they

16 take a lot of time, and all they can contribute is confusion,

17 in so far as his specific requests in the motion are con-

18 cerned.  And I am limiting my comments to that because I was

19 under the impression that the words of the motion could

20 properly be relied upon by the parties as to what was intended.

21      Frankly, I might add also, your Honor, I think

22 certainly we defendants agree that the offered findings are

23 not sufficient, on behalf of Mr. Veeder, because they raise

24 substantial controversial problems.  If you desire, I will

25 be willing during the recess to draft findings of fact which

10-338

1    will, in effect, say that the ground water underlying those

2    areas, and of course the surface waters, are part of the

3    stream.   In other words, I will narrow it down to findings of

4    fact, I believe, to the satisfaction of the United States

5    that they are clearly within the stream system in so far as

6    those valleys are concerned.   In other words, I would attempt

7    to do what you directed Mr. Veeder to do.

8        MR. STAHLMAN:   Your Honor, in so far as the motion as

9    to the Vails is concerned, I have taken up this matter with

10   our engineer and the information we get is that these tests

11   will prove nothing.   There are too many factors there, as

12   counsel has indicated, that it will merely result in confusion.

13   You get various reasons why you would have reactions between

14   these wells in close proximity to each other.

15       We have put a water stage recorder on the Schrode

16   well and we are doing everything we can to determine in our

17   own minds what the factual situation is there.   We think in

18   that instance whatever facts are developed as a result of that

19   test might mean something.   We have even invited the Govern-

20   ment in when they were up there.   They can observe it and see

21   it.   And we have even gone to the inconvenience-- that is a

22   well that we have used for pumping water for cattle-- of

23   pulling the pump on it and putting this recorder on there,

24   with the object of determining the facts, as I have indicated

25   to your Honor throughout this trial, because it is our desire

1    in this case to see what the actual factual situation is, and

2    we are operating even to the inconvenience of certain irriga-

3    tion by shutting down at certain times to see what effect

4    other wells would have on this well.

5        I don't think the tests that are included within this

6    motion are going to add anything but confusion to the case.

7    I think that Mr. Veeder has some preconceived idea that he

8    feels that his "Tiger" will come up with an answer to please

9    him.  I don't think it is going to result in a determination

10   of factual matter that is going to alter the evidence that is

11   in the case in relation to those matters.

12       MR. VEEDER:  Your Honor, do you desire me to respond?

13   There are two or three points I would like to raise, if I may.

14       THE COURT:  Go ahead, Mr. Veeder.

15       MR. VEEDER:  The question that has been presented by

16   Mr. Littleworth, I don't think there is any need of responding.

17       MR. STAHLMAN:  Keep your voice up.  I can't hear you.

18   Excuse me.

19       MR. VEEDER:  I will say that in my letter of, I think,

20   it was the 11th of April-- the letter was signed by Mr.

21   Rankin, but I wrote it.

22       The point I am trying to make is that we have been

23   trying for two months now to accomplish what we know has to be

24   done, and that is to prepare proper rebuttal, and I think we

25   have a perfect right and obligation to do that.

1      THE COURT:  You started to answer something that Mr.

2  Littleworth said and then you got off the track.  Now what

3  was done?

4      MR. VEEDER:  Mr. Littleworth is in error when he makes

5  this comment that our tests are limited in any degree to the

6  matter of transmissibility.  I think that when you make a test

7  in preparation for rebuttal in a case of this magnitude it

8  can involve a great many things, including transmissibility,

9  and it was never intended and there was never any limit to the

10  question of transmissibility.  There are innumerable conclu-

11  sions which your Honor will have to draw before this case is

12  through.

13      So from the standpoint of attempting to limit the

14  Krieger clients to one phase of the litigation is, of course,

15  an impossibility, because they are all tapping the same

16  source of water.

17      Now, in connection with the motion which I have pre-

18  pared and filed in regard to the Vails, I will show, if your

19  Honor will look at Vail's Exhibit R, Vail's Exhibit P and

20  Vail's Q, the soundest kind and type of reason for the course

21  we are pursuing there.  When the Vail Dam was closed the water

22  levels at Windmill Well in 1946 dropped precipitously.

23      THE COURT:  What exhibit is that?

24      MR. VEEDER:  That is Exhibit P.

25      Now the windmill well, as your Honor well knows, is

10,341

1  located well up the valley.  We proceed down the valley to the

2  New Diesel Well, or 30, or 30A.  When the Vail Dam was closed

3  another precipitous drop in 1948.

4          MR. STAHLMAN:  You said 1946 on one of them.

5          MR. VEEDER:  I beg your pardon.  It is 1948.  The

6  drop began in 1946.  The precipitous drop occurred in 1948 and

7  has been continuing, with interruption in the high water years

8  of 1952 and 1958.

9          But here is a very interesting exhibit-- Exhibit R.

10  This is a well situated in the graben between Wildomar and

11  Ysidora faults.

12          THE COURT:  This is the Cantarini?

13          MR. VEEDER:  This is the Cantarini, your Honor.  It is

14  Exhibit R.  It shows, most interestingly, that the hydrograph

15  stays up down to 1954, but in 1954 the Quarry well was dug and

16  went into operation and your Honor will observe that in 1954

17  the bottom dropped out of the water level in the Cantarini

18  Camp Well.

19          THE COURT:  The Quarry well is east of the Wildomar

20  Fault.

21          MR. VEEDER:  No, the Quarry well is west of the --

22          THE COURT:  They are both between the fault lines.

23          MR. VEEDER:  They are both in the graben, yes, your

24  Honor.

25          THE COURT:  Then you would say there is a relationship

1    between those two wells.

2         MR. VEEDER:  Yes.  And I also think that there is a

3    relationship, your Honor--

4         THE COURT:  That is not disputed, is it?

5         MR. VEEDER:  I think that there is also a relation-

6    ship between the waters that are released from Vail Dam and

7    Reservoir, your Honor.  I think there is a complete inter-

8    relationship between the wells which are situated at the far

9    end.  I don't have 15-A here, but your Honor is well acquainted

10   with it.  I think that we can show that there is presently

11   water being drained out from under the lands of the Pechanga

12   Indians by reason of the operation of the Quarry well and of

13   Vail's operation.

14        THE COURT:  How are you going to show that?

15        MR. VEEDER:  By reason of the fact that the Indian

16   land overlies part of the Wolf Basin.

17        THE COURT:  How are you going to show that?  Do you

18   have any wells up in the Indian reservation that you can test

19   in connection with--

20        MR. VEEDER:  If your Honor will locate the wells that

21   we have shown here in our motion--

22        THE COURT:  Let's direct ourselves to the pumping

23   tests we are talking about, not what is in the record already.

24   Do you have any wells you will be able to test up on the

25   Indian Reservation?

10,343

1    MR. VEEDER:  We desire to put recorders on wells right

2 up in the Wolf Valley.

3    THE COURT:  But are there any wells in the Indian

4 territory that you say overlies this basin?

5    MR. VEEDER:  Yes, there are, your Honor, and in very

6 close proximity to where we desire to put these recorders.

7 The wells on the Indian Reservation are not in such condition

8 that they can put recorders on.  However, they do overlie the

9 basin, and it is obvious to me that the present operation of

10 the Quarry and the other places are draining water out from

11 under a water-bearing area.

12    THE COURT:  Limit yourself, Mr. Veeder, to what you are

13 going to prove by these tests, not what is obvious to you

14 from the record.  We are talking now not about what is in

15 the record already; we are talking about what you expect to

16 prove if these motions are granted.

17    MR. VEEDER:  Well, I further intend to prove, your

18 Honor-- and this is a matter that has been brought up and was

19 pinpointed yesterday when you admitted into the record the

20 findings of fact and conclusions of law in the old Vail case,

21 and I don't know what your Honor would intend to do with those--

22 but it will be observed in this Exhibit A and Exhibit B that

23 was offered and admitted that there is a variance between

24 what we think is the ground water situation in the valley as

25 our evidence now proves and the findings of fact as contained

1   in that offer.

2         THE COURT:  I guess I can't talk English.  We are not

3   talking now about what the exhibits and the record will show

4   or will not show. We are not talking about the stipulated

5   judgment.  We are considering two motions, we are considering

6   certain tests that you propose to make, and frankly I am

7   inclined, upon certain conditions, to grant these motions,

8   But I am asking you to tell me what you expect to prove by

9   tests.  You started out talking about the Indian lands in the

10  Wolf Valley and then you are off into the blue again.

11        MR. VEEDER:  What is it that your Honor desires?

12        THE COURT:  How many wells are there on the Indian

13  Reservation that you expect to test in connection with wells

14  in Wolf Valley, for instance?

15        MR. VEEDER:  The wells are not located on the Indian

16  Reservation.  But your Honor will find that the wells--

17        THE COURT:  Then there are no wells, your statement is,

18  on the Indian Reservation that you can test.

19        MR. VEEDER:  Suitable at this time to put recorders

20  on.  But your Honor will find, if you check out the wells

21  to which we have made reference on 15-A, that we have asked to

22  put recorders on wells which would be clearly reflective, in

23  our view, of what is transpiring at the southern end of the

24  Wolf Valley Basin, and that with the rapid decline-- and

25  this is something that is not inthe record-- the rapid decline

1    as shown on Vail's R indicates that the gradient is away from

2    Wolf Valley, a thing that didn't exist before, and the water

3    is proceeding downward and reducing levels very rapidly in

4    that area.

5         Have I departed again from something, your Honor?

6         THE COURT:  Yes, you started to wander again.

7         In the Vail motion you limit yourself to three things

8    that you expect to show.  Your objective, as pointed out by

9    Mr. Girard-- it is a sloppily-drawn motion-- I think obviously

10   you have in mind more than you have listed.

11        (a) The interrelation between the shallow and deep

12   wells underlying the Vail property in the Pauba Valley.  There

13   is no argument about that.  You obviously want to prove more

14   than what you have said there.

15        (b) To ascertain the effect of pumping and uses in

16   Pauba Valley as they relate to uses of water in Wolf Valley.

17   I follow you on that.  In other words, you are going to show,

18   I take it, that your objective is to show that if Pauba Valley

19   was drained the water would run from the Wolf Valley down

20   into the-- well, that there would be a reaction between them.

21        MR. VEEDER:  That is correct.  And if I may put in a

22   point right there, I think that the pumping of the Cantarini

23   Pit Well that is now going on and on the Cat well obviously

24   is going to have an effect upon the water in Wolf Valley.

25        THE COURT:  (c) Seasonal fluctuations of ground water

1  body.

2      MR. VEEDER:  That is right.

3      THE COURT:  And by "ground water body," I take it, you

4  mean in the basins.

5      MR. VEEDER:  In that regard, I would like to refer to

6  the findings that we have proposed.  It is our view-- and if

7  your Honor thinks I am going into the wild blue yonder, call

8  me back because I want to make everybody happy.  I haven't

9  responded to any of this hat busting.  Anyway, the point that

10  I make is that we have here a triangle of the Temecula and

11  the Murrieta Creeks, and that the water backed up behind the

12  Wildomar Fault is really the water upon which we live during

13  the low water season, and by combining the motions that we

14  have filed in connection with the Krieger properties with

15  those which we have filed in connection with the Vail properties

16  you have a composite overall study which is part, not of our

17  case in chief at all, because as a matter of fact we didn't

18  have to put this matter in as our case in chief-- we made an

19  undertaking and perhaps I should never have done it-- this is

20  now part of our rebuttal to the State's contention that al-

21  though there is hydrologic continuity in the area of water

22  unit No. 4, the older continental alluvium is so tight that

23  the water cannot be extracted, and we can refute that.

24      Now that is the overall reason.  Those are the objectives

25  of the two motions.

THE COURT:  I merely comment that you haven't said that in the motion as to Vail.  I think it is a proper thing to explore, but you haven't said that in the Vail motion.

MR. VEEDER:  What is that?

THE COURT:  Just what you have now talked about, as to whether Ground Water Unit No. 4 is a part of a basin that is connected hydrologically with Pauba Valley and/or Murrieta Valley.

MR. VEEDER:  But, your Honor, when all is said and done, these tests are going to be run.

THE COURT:  I am not concerned. I will permit you to amend.  I merely call your attention to what a sloppy job you did and how counsel are justified in picking up your motion and saying, if this is what you intend to prove what is it all about?

MR. VEEDER:  Your Honor, you may call it sloppy, if you will.  The point that I make is that from our standpoint you insist that I draw a motion and set out what I want to know from the Vails, and I do so.  That is precisely what I did.  This is what we want to know from the Vails.  I have set out precisely what I want to know from the Kriegers.

THE COURT:  We are not talking about what you wanted to do.  We are talking about your objectives, your purposes. That's all we are talking about.

I am not going to waste any more time on this.  I am

1    going to take a recess and probably rule on these motions.

2         What other business do we have to take care of this

3    afternoon?

4         MR. SACHSE:  Your Honor, the most important thing is,

5    what is ahead of us, and these motions, as I see it, will have

6    a very direct bearing on it.  I don't think Mr. Veeder is

7    ready to start rebuttal tomorrow.  I haven't any more evi-

8    dence.  I think the next big question is, where do we go from

9    here?

10         MR. VEEDER:  Well, I will not even answer that.

11         I am ready to put in rebuttal when all of the defendants

12    have their case in.  I think they are a far cry from having

13    their case in.

14         I will raise the point-- No, I will not bring that up

15    now.  I will let one bird get shot at a time.

16         MR. LITTLEWORTH:  Your Honor, I probably ought to point

17    out that Mr. Dougherty in Riverside from time to time has

18    asked that we remind the Court that he would like to have a

19    day or two to put in some evidence on the Domenigoni area

20    and further up.

21         THE COURT:  Is he advised about these tests that Mr.

22    Kunkel is making?

23         MR. LITTLEWORTH:  I am sure that he is not, because he

24    gets his information from me, and we were not, and he has

25    pretty much relied upon us for his information.

THE COURT:  Has Mr. Dougherty been advised of these tests that you are making up thereas to whether water runs into this basin or into Riverside?

MR. VEEDER:  We are not making any tests as to whether water runs into any place at this juncture, your Honor.

THE COURT:  I thought that someone stated here this afternoon that for six months there has been some pumping going on up in that area that we inspected where there was a question of which way the water went.

MR. VEEDER:  No, your Honor.

MR. LITTLEWORTH:  Your Honor, I said that that was with reference to our own area where I come from in Riverside; that this is the type of test that Mr. Kunkel has been running there, and that is the time of sustained pumping that it took to be an accurate test to determine transmissibility.

THE COURT:  Take a short recess.

(Recess.)

THE COURT:  Does somebody have something else to say?

MR. GIRARD:  Your Honor, I just wanted to comment briefly, before you rule on these motions, to the effect that I made certain argument which pointed out the language used in the motions as far as the objective is concerned, and you commented on those and pointed out something which these tests might show, which clearly was not within the stated objectives.

1    You directed inquiries to Mr. Veeder as to specifically

2    what he intended to prove, what is the objective of these

3    tests.  You got a lot of answers about Vail Dam, you got a

4    lot of answers about the stipulated judgment.  But the de-

5    fendants, particularly the State, who is going to have to go

6    out and in a sense work on these tests, are still left without

7    a written statement, without a verbal statement, defining

8    what the objectives are, and the sole purpose of your bringing

9    this matter up by motion formally was so that the defendants

10    would know what the objectives are, and we are still faced--

11    we don't know what the United States's objectives are.  We

12    concede certain valid objectives by certain of these tests,

13    but still we haven't been answered by the United States in

14    writing or in answer to your Honor's specific inquiries which

15    tell us anything.

16        THE COURT:  And I would assume that if I made a ruling

17    that the motion was granted but that the material obtained

18    would be available only for the objectives set forth in the

19    motion that you filed as to Vail-- the motion as to Mr.

20    Krieger's clients is a little broader, but the motion as to

21    Vail, you would be unhappy with that limitation on the grant-

22    ing of the motion.

23        MR. VEEDER:  I will say this, when that evidence is

24    offered based on those tests, what will be done with the

25    evidence, I assume, will be its admission for all purposes

1  for your Honor to draw conclusions upon those facts for all

2  purposes.

3          THE COURT:  It might be, unless I limited the granting

4  of the motion to the objectives set forth.

5          MR. STAHLMAN:  Your Honor, I think it is obvious--

6  at least the continual activities that Mr. Veeder indulges in

7  make us suspicious that he has some motives and ideas in mind

8  that are not encompassed, that he expects to draw some con-

9  clusions that we would not be aware of and would not have

10  the opportunity to cover on these tests.

11          While I am on my feet, your Honor, I would like to

12  say that the fact that I haven't answered the many arguments

13  that Mr. Veeder put in that I think have no application to the

14  present motion doesn't mean for one moment that I agree with

15  anything he said.  I think Mr. Veeder used the form of this

16  motion here for the purpose of making arguments on entirely

17  different matters.  I think he should spell out specifically

18  to the Court, and that we should know what is being done.

19          In addition to that, when tests are made, if they are

20  to be made, I think it should be strictly understood that

21  we would be informed as to what is being done at all times

22  that we may be alerted throughout the entire tests so that we

23  may keep up with them, because frankly we have some mistrust.

24          THE COURT:  Mr. Girard.

25          MR. GIRARD:  Your Honor, in regard to your last comment,

1  if you were to grant the motion subject to the specific

2  objectives set forth in the motion, if we are going to do

3  these tests--

4  THE COURT:  Well, I am not going to do that.

5  MR. GIRARD:  If we are going to do them, we should

6  do it with a valid objective.

7  THE COURT:  All right, I am prepared to rule on this

8  matter.

9  MR. GIRARD:  I would like to get a valid objective.

10  THE COURT:  I propose to grant the motions, but on a

11  series of conditions.

12  One, as to the Vail motion, on the condition that an

13  amended motion is filed specifically setting forth enough

14  detail so that the State of California, who has raised the

15  question particularly, and the Vail Company also, who has

16  raised the question, may know the particular things, the

17  objectives that the Government proposes.  It is obvious that

18  if the tests were carried on they might be useful to show

19  other things that are listed in the three general categories

20  listed.  So there should be an amended motion filed setting

21  forth specifically what the objectives are.

22  Incidentally, I don't think there is any question of

23  the power of the Court to grant the motion.  Rule 34 of the

24  Rules of Civil Procedure provides that the court may permit

25  entry upon designated land, et cetera.  I don't think there

1   is any doubt about the power of the Court to grant the motion.

2       And the Court is interested in this issue.  I have

3   stated on numerous occasions that up to now the only major

4   issue in this case is the extent of this basin near the

5   Murrieta, the Pauba and the Wolf Valley, and this may be

6   helpful in throwing light on it.

7       Secondly, the motions would be limited as to time.  I

8   don't intend to make an order that is going to run continuously

9   forever or until somebody gets wearied of taking these tests.

10  I want a specified time in the order.

11      MR. VEEDER:  Your Honor, as you proceed would it be

12  proper for me to make inquiry, or would you rather wait until

13  we are through?

14      THE COURT:  Yes, you may make inquiry.  You will have

15  to draw the order on these.

16      MR. VEEDER:  That is the thing I am making reference

17  to now.

18      In regard to specifying in connection with the Vail

19  Company properties--

20      THE COURT:  What I am thinking about is this.  You must

21  be able to demark a certain period of time-- a period of 30,

22  60, 90 days.

23      MR. VEEDER:  We would like in that connection to run

24  these tests with a minimum of inconvenience to all concerned,

25  at least until the rainy season starts in the fall.  In other

1    words, we have written down the reason we put in the Vail

2    Company motion seasonal fluctuation of the ground water body.

3            THE COURT:  It depends on what you are talking about.

4    If you are talking about taking water levels, I don't think

5    there is any objection to taking water levels at various times

6    on an orderly basis, and the time should be set forth that

7    you are going to take water levels periodically so often, you

8    are going to take water levels while certain wells are being

9    pumped, et cetera.

10           When it comes to taking these pumping tests, with the

11   inconvenience that will be involved, then it seems to me that

12   if you want to consider the situation before and after the

13   start of the rainy season, you should limit yourself to some

14   reasonable period now and some reasonable period later on after

15   the rains come.  But I don't see any reason to have a con-

16   tinuous order running from now clear into 1960 on these tests.

17           MR. VEEDER:  No, your Honor.  I hope your Honor will

18   observe that we have specified, in regard to the Vail

19   properties, only the wells which are unused, with the ex-

20   ception of those wells which will be the deep wells which are

21   1, 2, 3 and 4 on page 2.  There will be involved, in that

22   regard, on the Main Camp Artesian Well-- Mr. Wilkinson and

23   we have gone down and looked at that.  I think that can be

24   arranged without difficulty.  As I recall, the Navy well--

25           I want you to comment, if you will, Mr. Wilkinson,

1  because I think the Court should know.

2  THE COURT:  What do you mean by a "manometer"?

3  MR. VEEDER:  Your Honor, it is a glass tube, or at

4  least a tube, that will show the level at which the water

5  pressure will rise.

6  THE COURT:  Can that be inserted so that the well

7  can thereafter be operated without any inconvenience?

8  MR. VEEDER:  It will be done that way, your Honor.

9  MR. WILKINSON:  Mr. Veeder, it can be done that way,

10  but it can be done only intermittently.

11  MR. VEEDER:  That is correct.

12  THE COURT:  What do you mean by "intermittently"?

13  MR. WILKINSON:  Because that is the source of water

14  for the Headquarters Camp.  It has to be stopped to get a

15  pressure reading, and then after the pressure reading is

16  taken it has to be released again.  It is a question of

17  how long it has to be stopped--

18  THE COURT:  How long does it have to be stopped to

19  get a pressure reading?

20  MR. WILKINSON:  To get an accurate pressure reading--

21  who knows?

22  MR. VEEDER:  It will be a short period of time.

23  MR. WILKINSON:  I don't know.  Say it did.  I just

24  don't know, Mr. Veeder.

25  THE COURT:  What have you been told by your experts

1  as to how long a well has to be shut down to get a proper

2  reading?

3      MR. VEEDER:  I think that is a matter that is going to

4  have to be worked out with Vails when we put those on, and if

5  it interferes with them we can skip them.  That's how it is.

6  I have no desire whatever to interfere.

7      THE COURT:  Now the automatic water level recorders

8  will not--

9      MR. VEEDER:  They will be on unused wells.

10      THE COURT:  They will not cause any interference?

11      MR. VEEDER:  No, and I truly don't believe that the

12  manometers will interfere.

13      We have all sort of poked some fun at Mr. Kunkel.

14  These matters have been gone into with Col. Bowen and Col.

15  Robertson, and the four of us have agreed upon them.  It is

16  believed, for example, that the Navy well is already equipped

17  with the means for making this manometer test, and that of

18  course would accord fully with Mr. Wilkinson's operations.

19  I am not personally acquainted with the China Garden situation,

20  but as I understand it that is possible, too.  So that those

21  tests will be run toward determining the present pressure

22  under which that water is now situated.  We can make that

23  determination, and we will attempt to correlate, indeed we

24  will correlate it entirely with the Vail operations.  Now

25  that will be written into the order that your Honor asked me

1    to draw, so I will take care of that.

2        MR. STAHLMAN:  Your Honor, we have got away from the

3    question of the time.

4        THE COURT:  You are not taking any pumping measurement

5    tests at all on the Vail wells?

6        MR. VEEDER:  That is correct, your Honor, and the only

7    pumping tests on the Krieger property will be in conformity

8    with their pumping.  In other words, we are not going to ask

9    them to turn on a pump.

10        THE COURT:  What have you installed in the Schrode

11    well?

12        MR. VEEDER:  That is a recorder.

13        MR. STAHLMAN:  We installed that ourselves.  They didn't

14    do that.

15        THE COURT:  All right.

16        MR. VEEDER:  And we intend to put the same kind of

17    recorders on the Vail property.

18        MR. GIRARD:  As far as Vail is concerned, you just

19    intend to put recorders on it?

20        MR. VEEDER:  Yes, that's right.

21        MR. GIRARD:  No pumping?

22        MR. VEEDER:  That's right.  We do ask the cooperation

23    of these people.

24        THE COURT:  But you will arrange so that when they pump

25    certain wells you can take the recorders.

10,358

1    MR. VEEDER:  Yes.  Also when they switch on a pump, that

2    they please write it down on a piece of paper that we can give

3    them.  We would like to know when the pump is turned on and

4    when it is turned off.

5    THE COURT:  Then in substance you aren't taking pumping

6    tests, but you want the Vail Company to keep a record of the

7    dates and hours that they pump.

8    MR. VEEDER:  If possible, yes.  We think it would be

9    helpful.

10   Here is a matter that I would like to inquire about.

11   I have a truck-- I say I-- the U.S.G.S. would have to bring

12   the recorders.  We have recorders that we would like to install

13   tomorrow, if possible.  We have a meeting up there tomorrow

14   morning at 9 o'clock anyway to look at these other matters.

15   I will draw the order and get started.

16   THE COURT:  How can you handle these other matters and

17   also satisfy the curiosity of counsel and their interest in

18   seeing about the installation of these recorders?

19   MR. STAHLMAN:  You have to do it on two different days,

20   Bill, because we are the only ones interested in the one matter

21   and other people are interested in the other.

22   MR. WILKINSON:  We could spend some time investigating

23   the situations as they are.  We didn't go to all of the wells

24   you are talking about, Mr. Veeder.  That would probably be an

25   advisable move.

1        MR. VEEDER:  All right.

2        MR. GIRARD:  Your Honor, we want to be there when the

3 recorders are installed, too.

4        MR. VEEDER:  Would it be possible for you to have a

5 man there tomorrow?

6        MR. GIRARD:  No.

7        MR. VEEDER:  When would be the first time?

8        I hate to take your Honor's time, but as long as we

9 are all here together.

10     — MR. GIRARD:  I will be leaving for Sacramento shortly

11 and would have to arrange by phone call in Los Angeles.

12        MR. VEEDER:  All right.

13        THE COURT:  Can you have a man available next week

14 sometime?

15        MR. GIRARD:  Yes, your Honor.

16        MR. VEEDER:  If Mr. Kunkel were to get in touch with

17 you, is that right?

18        MR. GIRARD:  If Mr. Kunkel were to get in touch with

19 Bob Thomas.

20        MR. VEEDER:  Bob Thomas?

21        MR. GIRARD:  Yes; he is the geologist.

22        MR. VEEDER:  I will have that done, your Honor.

23        THE COURT:  These comments aren't limited to one order

24 or the other.  They are general comments.

25        (3) The Government in the motion as to Krieger's

1  properties has listed a number of defendants, some of whom are
2  alleged to have no wells on their property and others who are
3  up in the basement complex where it may be that no work will
4  be done, and so the Government will advise those defendants
5  who are not involved in your shotgun motion that you are not
6  going to do anything about their property.  Do you follow me?
7  Or you eliminate them from the order.

8      MR. VEEDER:  I am not arguing the point, your Honor,
9  but it would seem to me-- I don't know whether they have
10 wells or not.  I haven't any idea.

11     THE COURT:  That's right.  You have a shotgun motion.
12 I am suggesting that you eliminate from your order those who
13 have no wells and those who are up in the basement complex,
14 which you probably don't intend to do anything about unless it
15 is to measure water levels as opposted to pumping tests, and
16 that you put some of these defendants' minds to rest by
17 advising counsel that certain people are named here but we
18 have no concern with them.  Other people are named but we
19 don't want to take pumping tests of their wells-- we want to
20 take a water level.

21     MR. VEEDER:  I don't know how we would know without
22 going to their properties, your Honor.

23     MR. LITTLEWORTH:  Your Honor, there is permission
24 granted to them already under the soil survey authorization
25 to visit all of our properties.

1    THE COURT:  You don't have to advise each defendant in

2  the order.  But one provision of the order will be that after

3  you have made your checkup on it, if a certain defendant is

4  not going to be concerned with this order that you notify

5  counsel and that counsel notify his client that although he

6  is named in this order the Government is not interested, or

7  that the Government is interested only in water levels and is

8  not interested in the pumping tests.

9    MR. VEEDER:  Of course, my view of a pumping test is

10  where you are going to turn the pump on yourself and run it

11  for awhile to test what occurs.  We are simply saying, let

12  us know when you are pumping so that we can measure the levels

13  in your well.  But I will draw the order.

14    THE COURT:  Is that what you mean by pumping tests in

15  the Krieger motion?

16    MR. VEEDER:  That is correct.

17    MR. STAHLMAN:  In our motion you mean every time we turn

18  a pump on you want to know it?

19    MR. VEEDER:  No, not every time.  We would like to know

20  it if it is cooperative.  If not--

21    MR. LITTLEWORTH:  We have a great many people, we have

22  fifty-odd pieces of land and a lot more people involved.

23    THE COURT:  What is your inquiry?

24    MR. LITTLEWORTH:  Are we expected to notify him every

25  time a pump goes on?

1          MR. VEEDER:  No, I haven't suggested that at all.  I

2    say that the U.S.G.S. does have a form that it uses that it

3    would like to have put on the pump house wall and when a man

4    turns on the pump he could put down the hour and date.  That

5    is all we want to know.

6          MR. LITTLEWORTH:  That is all you want to know from our

7    people on the pump tests?

8          MR. VEEDER:  Well, we want to measure the levels.

9          MR. STAHLMAN:  What do you do about automatic wells?

10         MR. VEEDER:  I would assume there would be nothing to

11   do.  I wouldn't want you to stay out there.

12         Now that is in general what it is, and I will draw the

13   order, your Honor.

14         THE COURT:  Are you going to take such pumping tests

15   of the wells up in the basement complex?

16         MR. VEEDER:  No, I don't think so, your Honor.  What

17   has been proposed in regard to this canvass, we find that

18   there are wells that nobody has heard of up in there that are

19   really producing some water, and I will report to your Honor

20   the results of those and I will get the results to all of

21   these others.

22         MR. STAHLMAN:  Why wasn't Mr. Kunkel here today?  He

23   might have learned something about this.  He is a man who

24   could answer a lot of these questions that are unanswered.  We

25   could have had a better start if he had been here.  He has

1  been here every day until today.

2      MR. VEEDER:  There is nothing very clandestine about

3  it, your Honor.

4      MR. SACHSE:  On the matter of the canvass, your Honor,

5  that was not a facetious request.  If this canvass includes

6  any checking of the wells of my clients, I want to know it in

7  advance.

8      MR. LITTLEWORTH:  Do you have other conditions with

9  respect to this, your Honor?

10     THE COURT:  Yes.

11     MR. LITTLEWORTH:  Well, I will let you finish, then,

12  but I have a couple of other questions.

13     THE COURT:  That all counsel be advised as requested

14  here of what is desired from their clients, and that you not

15  go on other land of these people without communicating with

16  the attorneys and advising them of what is going to be done

17  and let everybody be advised.  Because the State has an inter-

18  est in all of this, and some defendants may have an interest

19  in an adjoining land owner's operation.  All counsel should be

20  advised of what these schedules are, of what you are going to

21  do.

22     MR. STAHLMAN:  That would include then advising us if

23  they do something on their own property, like Pechanga.  If

24  they are going to do somethingup there we should know about it.

25     THE COURT:  That is right.

1   These tests are to be run under the U.S.G.S. survey,

2   and Mr. Kunkel will be in charge of the project, is that

3   right?

4       MR. VEEDER:   That's right, your Honor.

5       THE COURT:   Inquiries for information can be made of

6   Mr. Kunkel.   He is the man to talk to.

7       MR. VEEDER:   That is right.

8       THE COURT:   Counsel know where he can be located.

9       MR. STAHLMAN:   Long Beach.

10      THE COURT:   Will he have an office here on the ground?

11      MR. VEEDER:   He can be reached from my office, your

12   Honor.

13      THE COURT:   Will he be up here during these tests?

14      MR. VEEDER:   He will be in the field.   I will have a

15   contact for him.

16      THE COURT:   Tell counsel where he will be.

17      MR. VEEDER:   I think in that connection the best thing

18   to do, if somebody wants to contact him in the field, Col.

19   Bowen has an office in Temecula at the Swing Inn.   We have an

20   office at the Swing Inn, and they can swing in there and let

21   him know if they want to contact Mr. Kunkel.   That will be

22   simpler than calling my office.

23      THE COURT:   Is there a phone number up there?

24      MR. SACHSE:   It is a motel.   I am sure it has a phone.

25      MR. VEEDER:   I will get it.

19.365

1      THE COURT:  The next condition, that all the data that

2  has been already secured since these tests started-- a list

3  of the wells that you have made a survey of that you are going

4  to handle, those that you have made any water level tests on,

5  all data be supplied immediately to counsel for all parties,

6      MR. VEEDER:  When you say "immediately" you mean a

7  letter written to them?

8      THE COURT:  Before you start any more testing, let us

9  catch them up to date on what the results are; not Mr. Kunkel's

10  conclusions, but the measurements he has taken of the wells

11  he has measured and what wells he has listed on the survey.

12      MR. VEEDER:  I want to be sure I understand.  Shall we

13  tell this man who came down here from Sacramento to make this

14  canvass to stop until everyone has been advised of what has

15  been done?  I hate to have it done because-- I will be per-

16  fectly candid with you-- it is a matter of money, and we have

17  money tied up to pay this man.

18      THE COURT:  Not only is he canvassing, but he is taking

19  well levels, isn't he?

20      MR. VEEDER:  Well, yes, when the farmer says all right.

21  If you want me to stop it, I will, your Honor.

22      THE COURT:  Counsel are entitled to know what the

23  program is, and once they know what the program is they can

24  be advised, they can have somebody accompany him.

25      MR. VEEDER:  They can be fully informed right now what

1    the man is doing.

2         THE COURT:  Well, let's cut it off and have the material

3    supplied of what you have to date, and when you are going to

4    start again, so that counsel can have somebody there if they want

5    to.  The point is that the State apparently will assign some-

6    body down here who will work on this, and he will be here in

7    the capacity of a sort of guardian of everybody's interests--

8    the chances are that everybody will be well protected by the

9    presence of a State man to check these tests and see what is

10   going on.

11        MR. GIRARD:  We have no objection if he is just out

12   there trying to locate wells.  But if he is measuring them,

13   we would like to be notified.

14        MR. VEEDER:  If I put the stop sign on the man this

15   afternoon immediately, would youhave somebody available on

16   Monday?  It is a matter of great importance to us.

17        THE COURT:  I see no objection to his trying to locate

18   wells.

19        MR. GIRARD:  I don't either.

20        THE COURT:  If you want to puthim on that for awhile,

21   all right, and then he can get a list of wells he has located

22   and what he is going to do about it.

23        MR. VEEDER:  It is just such a waste to locate a well

24   and not drop a tape down and measure it.  But I will tell him

25   to stop.

12,367

1    THE COURT:  Well, you brought this on yourself by

2  starting this without advising counsel.

3    MR. VEEDER:  I will do what you say.

4    THE COURT:  (7) I want the data to be supplied as

5  secured to the attorneys week by week, on a weekly basis--

6  what data you have secured.  Again I don't care about the

7  conclusions, but the data that you collect made available.

8  When I say counsel who have appeared, I do not mean counsel

9  who have appeared by answers but who have participated here

10  in the trial.  That would include Mr. Dougherty, Mr. Krieger,

11  Mr. Lincoln, Mr. Grover-- there is a limited number of counsel.

12  That can be done on a weekly basis.  It could be done period-

13  ically.  If it goes over ten days, it is going to be all

14  right.  But periodically gather together the material you have

15  selected and say week by week or period by period supply it.

16    MR. VEEDER:  Do you think the State could have somebody

17  available by Monday, or will you work on that, because this

18  man is here and I would like to--

19    MR. GIRARD:  As I understand, the man you want available

20  is just to go out with the fellow you have out tere searching

21  for wells and check the tests-- nothing else on Monday.

22    MR. VEEDER:  All this man is doing and all he has ever

23  done--

24    MR. GIRARD:  I will do my best, Mr. Veeder.  Where will

25  he meet?

1    MR. VEEDER:  I will tell you what I will do.  I am going

2 to talk to Mr. Kunkel right now.  Why not have him meet Mr.

3 Kunkel at the Swing Inn in Temecula on Monday morning?

4    MR. ILLINGWORTH:  May I make a comment.  I think it is

5 a worthwhile objective if at this stage we want to go out and

6 locate new wells.  But I would hate to see one of our people

7 have to go around with another man beating the brush looking

8 for old abandoned wells.  If the United States wants to do

9 this, it's perfectly all right with me.  Go ahead and find

10 the new wells and then give us a list and then we can measure

11 them jointly.  There won't be too many.

12    THE COURT:  I think that is more logical.  Put your man

13 to work locating these wells, or if he has located all that he

14 is going to test already, submit the list.  If he hasn't, put

15 him to work locating them and then later on make the arrange-

16 ments.

17    MR. VEEDER:  I am perfectly willing to do anything that

18 needs to be done.  Do I understand that the State will not

19 have a man there on Monday?

20    MR. ILLINGWORTH:  I would prefer that if it can be worked

21 out.

22    THE COURT:  What you want us to do is to make a canvass

23 and then go back again and measure the wells; is that right?

24    MR. GIRARD:  Mr. Illingworth has advised me and I am

25 in agreement.  You are not going to find so many wells up there

10 369

1   that it will be a tremendous task to go back and measure them.

2        MR. VEEDER:  You would be amazed.

3        MR. GIRARD:  How many have you found now?

4        MR. VEEDER:  I don't know.

5        THE COURT:  All right, let's leave it this way.  If

6   you have a man working, put him to work on this canvass which

7   nobody is going to object to unless it is going on the land

8   of Mr. Sachse's client-- he says he wants to be told.  Get a

9   list of wells he has located that you are going to measure

10  and then you notify the State and work out some time and notify

11  other counsel and they can be present and measure these wells.

12        (8) A further condition, that if there are any situa-

13  tions where pumps are required to be run for a long time, in

14  excess of the period the land owner needs them, that the

15  Government pay all expenses and charges in connection with the

16  excess pumping.

17        MR. VEEDER:. I don't believe that is necessary.  We are

18  not going to ask anyone to do it.

19        THE COURT:  You might run onto a well that you might

20  want to pump for 48 hours or a week, and the land owner

21  shouldn't have to pay any expenses in connection with that.

22        MR. VEEDER:  All right, your Honor.

23        THE COURT:  Work out some reasonable way of compensating

24  him.

25        Now I have a note here on a further condition, but I

1  don't know that I am going to have you around here long enough

2  to enforce it.  I would like to make it as a condition that

3  you sit down and do some work on these proposed findings that

4  I have asked, with the objective of proposing some findings

5  on which agreement could be reached, few as they might be,

6  which you haven't done.  You have shotgunned that the same way.

7  Your first paragraph of your proposed findings was one on

8  which there is no agreement-- the major issue in the case.  It

9  was not in compliance with the direction of the Court.  I would

10  like to make it a further condition that you start work on

11  these findings that can probably be made.

12      I don't know how I could very well make it a part of

13  this order and still get this matter started, but I am going

14  to tell you right now that there will be times in the future

15  that you will want some cooperation and assistance from this

16  Court and if I don't get cooperation from you I am going to

17  rely on the old law of reciprocity and I am not going to

18  cooperate with the attorneys.  That ought to be pretty plain.

19  Do you follow me?

20      MR. VEEDER:  I understand completely, your Honor.

21      THE COURT:  Just so you understand.  I will not make

22  it a condition of this order because I can't enforce it

23  immediately and it would hold the order up.  I am very much

24  interested in seeing what can be done to eliminate segments

25  of this case, no matter how few individuals are involved or

1    how small the area.  It can be done.  There are areas in this

2    case in which there is no dispute.  The sooner we take them

3    out of the case agreeably to all here concerned, and I am

4    confident nobody else will kick about it, the better we will

5    do.

6         MR. VEEDER:  Now, in regard to timing on this--

7         THE COURT:  Mr. Littleworth.

8         MR. LITTLEWORTH:  Your Honor, I have a couple of

9    questions with respect to our part of this.  We have a lot of

10   people to inform of what is going to happen.  Do I understand

11   that one of the things you will be doing will be over a limited

12   period of time, whether it goes to the rainy season or whether

13   it is 90 days or whatever it will be, you will be running a

14   series of water level measurements, you will be coming in once

15   a week or once a month or whatever it is and measuring the

16   wells.  Can we be apprised roughly of the schedule you are

     going to have, so that we can get this out and the people will

     know what is going to happen?

          THE COURT:  That is going to be difficult to schedule,

     Mr. Littleworth, because as a practical matter I think what

     is going to happen, I would think, if this is done right,

2    here is some good producer up in the area and the Government

2:   finds that it is being used extensively for several days by

24   pumping.  That would be a time when I would suppose that an

25   engineer or some Geological Survey man would want to go around

1  and check the water levels of wells in some reasonable prox-

2  imity.  You may not be able to know when these people are

3  going to pump until you find out.  As far as water levels

4  are concerned, as long as the State is fully advised of the

5  taking of water levels, I don't think you have too much

6  concern.

7       MR. LITTLEWORTH:  No, I am only concerned about letting

8  our clients know what is going to happen so that they will

9  understand what is involved.  Now I understand there are two

10  parts to this motion:  One is to take static water levels.

11  This is what I am asking, if it cannot be scheduled.

12       THE COURT:  "Static"meaning when the well is not

13  pumping.

14       MR. LITTLEWORTH:  I had understood-- maybe I am wrong--

15  I had understood that the Government wanted to go through the

16  whole area within three or four days and try to get a correlated

17  series of measurements so they would know what all those well

18  levels were at the present time, and then they might want to

19  do that a month later, and maybe a third time.  If that is

20  what they have in mind, can we have some type of scheduling?

21       Now the second type of thing is this business of measur-

22  ing when there is pumping, and I wonder if Mr. Veeder as soon

23  as possible can tell us the wells which he is going to intend

24  to rely upon in these pumping measurements.  Now they have

25  already told us by letter, there are four of them.  If there

1   are going to be any more, I would like to know so that we can

2   advise those people of what would be involved there.

3          MR. VEEDER:  I will advise you.

4          THE COURT:  The trouble is that Mr. Veeder himself

5   doesn't know exactly the extent of--

6          MR. LITTLEWORTH:  I am aware of that, your Honor.

7          MR. VEEDER:  I daresay that no one really knows until

8   you start making some of these investigations.

9          THE COURT:  I think that is true.  I will go that far

10  with you, that situations will come up where you will find,

11  for example, certain wells are being pumped, the following week

12  maybe two wells are being pumped at the same time, which might

13  well have some effect.  So you want to see what happens

14  elsewhere.

15         MR. GIRARD:  That is right.

16         THE COURT:  So you have all sorts of possible situa-

17  tions.

18         MR. LITTLEWORTH:  Your Honor, so far as the pumping is

19  concerned, as I say, I think what this really is, is trans-

20  missibility testing.  Now do I understand that the Government

21  on that score will keep the State informed?  Because I think

22  those tests have to be run under controls or they are not

23  only confusing, they are misleading.

24         THE COURT:  Well, they are going to have a State man

25  with them all of the time.

1    MR. LITTLEWORTH:  The State isn't going to be with them

2  when they are searching for wells, but when they get to the

3  point of recording pump levels and determining what pumps

4  they are going to check and what the correlation is, that is

5  when the State will be with them all of the time.

6    MR. VEEDER:  That brings up one important point right

7  now, your Honor.  Assuming that we have completed the canvass

8  down to a particular area and we have the personnel available

9  so that we can go ahead with some water level measurements,

10  can we then call on the State and say, in so far as this area

11  is concerned we would like to start on the water level

12  measurements while the canvass goes ahead in some other part?

13  I don't believe that is unreasonable.

14    THE COURT:  That's all right, but it is going to have

15  to be cooperative.  You don't merely notify the State that

16  you are going to start at a certain hour and on a certain

17  date.  You make inquiry and arrange with them what date is

18  agreeable.  And I expect them to cooperate the same as I

19  expect you to cooperate with them.

20    MR. VEEDER:  And your Honor is directing them to

21  cooperate with us?

22    THE COURT:  Yes.

23    MR. GIRARD:  I don't know that the State wants to have

24  its man running around following each particular measurement,

25  but when you are going to make tests and when you are going to

1   make observations we would like to know the time and the

2   schedule, if possible.  Now, we understand-- we have talked

3   to our geologist-- that the tests that he thinks the Government

4   is desirous of running might require, in order to be efficient,

5   some controls as far as the operation of the wells is con-

6   cerned.  I am sure we are interested in finding out, and

7   certainly Mr. Krieger's clients are, now that the order is

8   going to be made, and we will cooperate.  In that event, of

9   course, maybe additional notice should be given to the man.

10          MR. VEEDER: The only question I asked-- it sounds to

11   me like Mr. Girard is equivocating a little here.

12          MR. GIRARD:  No.

13          MR. VEEDER:  The only thing I asked is this, if we

14   have reached a point now or in the middle of next week where

15   we believe it would be the most efficient use of time and

16   money and help to start some water level measurements, would

17   they then have a man available?

18          MR. GIRARD:  Well, we have to know your schedule.  If

19   you are going to put fifteen men out there at one time and

20   make fifteen separate tests all over the area, that is one

21   thing; but if you are going to run it on a schedule basis

22   with Mr. Kunkel and a few men, that is another.

23          Merely calling us up and saying we are going to make

24   tests on such and such a day, one man may be inadequate and

25   maybe that type of man isn't the type of man that we want.

1      THE COURT:  It will have to be done on a cooperative

2   basis and counsel for the State has assured me that they will

3   cooperate.

4      MR. VEEDER:  All right.

5      MR. GIRARD:  I think it can be worked out with Mr.

6   Thomas and Mr. Kunkel.

7      THE COURT:  Now, you raised one point, and he raised

8   another.  His point was that water levels are one thing,

9   but that where you are going to make pumping tests it is a

10   little different proposition and he wants to be advised

11   when these are going to be made and where.

12      MR. VEEDER:  He also wants to be advised of the water

13   level measurements.

14      THE COURT:  Yes, he wants a little more notice than

15   on the pumping tests, because he may want a different kind of

16   expert.

17      MR. VEEDER:  As I understand, they have assigned a man

18   whom Mr. Kunkel will contact.  We will go ahead that way.

19      MR. GIRARD:  He will be in charge of it, yes.  As far

20   as the State goes, Mr. Thomas will be in charge for the

21   State.

22      THE COURT:  When are you going to prepare this order?

23      MR. VEEDER:  I will get to it just as fast as I can,

24   your Honor.

25      THE COURT:  Are you going to submit it to counsel for

1    approval?

2         MR. VEEDER:   I assume that I should distribute it to all

3    counsel.   I know of no other way.

4         MR. LITTLEWORTH:   Since this is going to involve a

5    lot of things that we have not yet decided, like the length,

6    et cetera, I think it would be advisable if we could see a

7    proposed order first and be allowed to make our comments.

8         MR. VEEDER:   When do we get back here?

9         MR. GIRARD:   A week from Tuesday.

10        MR. VEEDER:   Who ruled that?

11        MR. GIRARD:   As I understood, we were going to meet

12   next Tuesday.

13        THE COURT:   We are not going to meet next week at all.

14   It will be a week from next Tuesday.

15        MR. VEEDER:   How much more evidence is the Vail Company

16   going to put on?   You are not going to put on any more; is

17   that right?

18        MR. STAHLMAN:   I put it in the record yesterday.   We

19   have the matter in relation to the irrigable acreage, and we

20   have the matter in relation to the stipulated judgment.   Outside

21   of that, we have put in our evidence, except that we might run

22   across something like you did here where we might want to make

23   some tests-- we might have to come into court.

24        MR. VEEDER:   I am simply thinking schedule.   I am not

25   asking for any favor-- you know that.   But my own view is that

1  to go where I have to go next week and then to come back for

2  two hours to San Diego doesn't add up very sensibly to me.

3  MR. SACHSE:  Are you getting at the question of what

4  other evidence goes on here in the courtroom?

5  MR. VEEDER:  Yes.

6  MR. SACHSE:  There have been too many cases where

7  counsel here feel they have been booby-trapped.  I want to

8  remind Mr. Veeder, and respectfully your Honor, of something

9  that I said a long while ago.  With all due respect to your

10  Honor, I do not intend to put on one single private client

11  until there is in that transcript the words "The United States

12  of America rests," and it has not been in there yet, and I

13  don't think it is my obligation to do so.

14  MR. VEEDER:  I don't know what brought that on.  I

15  understood you were leaving for Europe.

16  MR. SACHSE:  You are asking whether any of us are going

17  ahead, Mr. Veeder.  I am not going to put on anybody until you

18  rest.

19  MR. VEEDER:  I would like to know what is going to occur

20  a week from Tuesday, just so I can make some plans for myself.

21  If there will be only a hearing in regard to the order, fine.

22  If there is going to be any evidence from the Vails, I would

23  like to know that.  I think I am entitled to know.

24  MR. STAHLMAN:  There will not be anything from the Vails.

25  THE COURT:  I don't anticipate that we propose to take

1   any evidence.  I may not be able to give you very much time.

2   I have been trying to go over this calendar to see what other

3   work I will have to do.  But unless you are notified otherwise,

4   you will be in on the 16th.

5        MR. VEEDER: The 16th and 17th are the only two that

6   are available anyway.

7        THE COURT:  Do you want to put it over until the 23rd?

8        MR. VEEDER:  I have to be here on the 22nd.

9        THE COURT:  Do you want to put it over to the 23rd,

10  then?

11       MR. VEEDER:  I want to do what we can do most effectively,

12  your Honor.

13       THE COURT:  Let's say the 23rd, then.  That means,

14  however, that, I assume, you are going to get together on this

15  order, and if you don't you will have to come in some morning

16  betweentimes and see what we can do about the order.

17       MR. VEEDER:  I will draft the order and distribute it

18  to all counsel.  If I am in Washington I will leave a place

19  where they can correspond with me.

20       THE COURT:  Then we will say the 23rd.

21       MR. SACHSE:  And the purpose of the 23rd?

22       THE COURT:  The purpose will be to sort of lay out some

23  work foryou and see where we are going from there.

24       MR. SACHSE:  During the recess, as I understand it,

25  certainly no later than the 25th, because I heard your Honor

1    schedule a case for the 26th.

2          THE COURT:  Yes.

3          MR. STAHLMAN:  We have the matter relative to the DeLuz

4    and Sandia hanging fire, which is going to rely upon the

5    testimony of the studies of Col. Bowen.  You recall that.

6          MR. VEEDER:  That is nothing that you are going to

7    bring up the week after next.

8          MR. STAHLMAN:  No.  That can be brought up at any time.

9          MR. GIRARD:  Mr. Veeder is going to serve us with this

10   order and, I presume, the amended motion as to Vail.

11         THE COURT:  That is right.

12         MR. GIRARD:  Assuming that no one objects, it will be

13   quite proper to commence the tests.

14         THE COURT:  I am assuming that you can start some of

15   this preliminary work before the order is ever signed.

16         MR. VEEDER: The water level measurements can go ahead,

17   can't they?

18         THE COURT:  Yes.

19         MR. GIRARD:  I have no objection, no.  I am just

20   wondering, suppose it is received and one of the defendants

21   who has an interest fires in an objection.  What will we have

22   to do?

23         THE COURT:  You will have to work it out.  Go ahead

24   with what you can on the assumption that an order is going to

25   be made as indicated here.

1        MR. GIRARD:  I have no objection to that.

2        MR. VEEDER:  May I inquire about one additional thing.

3   If there is agreement between Mr. Stahlman and Mr. Wilkinson

4   and our people in regard to the installation on their property

5   of water level recorders, could we go ahead prior to the entry

6   of the order upon notice being given to the State?

7        THE COURT:  Yes.

8        MR. GIRARD:  Yes.

9        MR. VEEDER:  I want that in the record, because I don't

10  think we should hold this thing up.

11       THE COURT: All right.

12       Another thing I want done, and I might as well make an

13  order on it now-- I talked about it the other day-- I want a

14  document in the nature of a pre-trial statement of some kind

15  from Vail in which the Vail Company outlines their grounds

16  for their attack upon the stipulated judgment.  I don't want a

17  long statement.  I want specific grounds and specific authority.

18  You don't have to quote from them.  I can read.  If you have

19  some leading cases on it I want those.  I want to fix a time

20  to have that in, and then I want a reply after you get that in

21  from the Government in which they reply to this document and/or

22  the brief you have heretofore filed.

23       MR. STAHLMAN:  I hope your Honor doesn't make that too

24  soon, because I want to take a little vacation too.

25       THE COURT:  What do you suggest?

1    MR. STAHLMAN:  Your Honor is going to be gone how long?

2    THE COURT:  I have told Mr. Sachse and the rest of

3  counsel here that the Court will be in recess as far as

4  Fallbrook is concerned during July and August.  I will not

5  be gone all that time.  I will be back the latter part of July

6  and I will be here part of August, and somewhere in there I

7  want to get a little vacation.  But we will eventually have

8  to adjourn this case to September.

9    MR. STAHLMAN:  How about having it in by September?

10    MR. VEEDER:  Correct me on this, because there is

11  timing involved for all of us because we have things to plan

12  on.  I thought that first George was going to file with your

13  Honor just a list of the points upon which he was going to

14  attack the stipulated judgment and thereafter file a brief.

15  Maybe I didn't get it straight yesterday.

16    THE COURT:  That might speed it up.  Can't you do that

17  pretty promptly?

18    MR. STAHLMAN:  I could.  But your Honor brought up

19  some matters yesterday that are going to require a searching

20  of the records and they are voluminous and they are difficult

21  to search.  I have been over there and gone through some of

22  these and it is matter of great difficulty, even with the

23  help they give you in the County Clerk's office.

24    MR. VEEDER:  May I tender a thought.  Your Honor

25  was asked about resolutions for the entry of the stipulated

10,383

1   judgment.  Did you want those?  I have checked them.  They are

2   there.  But I would like to avoid, if George has copies of

3   the resolutions of the Vail Company--

4        THE COURT:  Since you have checked them, supply them

5   to Vail and the Court.

6        MR. STAHLMAN:  Yes.

7        MR. VEEDER:  What I was going to say is this, the

8   resolution of the Rancho Santa Margarita unfortunately is

9   attached to the stipulated judgment.  Therefore, the County

10  tells me that when I buy the resolution for the stipulated

11  judgment for Rancho--

12       THE COURT:  We are not concerned particularly about

13  the Rancho's consent.

14       MR. VEEDER:  Fine.

15       THE COURT:  You are the one who is relying on the

16  judgment.

17       MR. VEEDER:  I was simply inquiring, your Honor.

18       In regard, however, to the Vails, there is the

19  resolution by the Vail Company, there is the approval by

20  Malin Vail as Trustee, and there is the approval by Malin

21  Vail as Executor.  Those three documents, I thought, the Vail

22  Company might have copies themselves.

23       MR. STAHLMAN:  We have been unable to locate any such

24  documents.

25       MR. VEEDER:  They are across the street and I can get

1  them.

2      MR. STAHLMAN:  The thing is this, Bill, as far as

3  those records are concerned, you can order two pages out of a

4  document, if you want to.

5      MR. VEEDER:  I tried that yesterday and they slammed

6  the door on my fingers worse than happened today.

7      THE COURT:  You will get the resolution?

8      MR. VEEDER:  Yes, all right.

9      THE COURT:  Can't you then, regardless of what you find

10  in the record-- I am interested in knowing what your grounds

11  are to set aside this judgment, your grounds as to why this

12  judgment should not be binding.  That is what I am interested

13  in.  Pinpoint what you are going to rely upon.

14      MR. STAHLMAN:  When does your Honor desire that?  You

15  know I am going on this horseback ride, and I have this case

16  to try, and I promised to take my wife up to Pebble Beach.

17      THE COURT:  Couldn't you get them in by the first of

18  August?

19      MR. STAHLMAN:  By the first of August, surely.

20      THE COURT:  Get those in by August 1st, Mr. Stahlman.

21      MR. STAHLMAN:  What your Honor is talking about now is

22  merely in the nature of a pre-trial memorandum indicating the

23  points we rely on and the citations in support thereof.

24      THE COURT:  If you want to take more time on your

26  citations of authority, I will give you more time on that.

1    I will give you until August 17th on your authorities.

2        Mr. Veeder, what time would you want to get this brief

3    in in reply?

4        MR. VEEDER:  I had hoped I would get George's points so

5    that I could be writing my own brief when I have about a ten-

6    day period that I was looking forward to.  But if you want to

7    have it August 1st, I would like to have thirty days after I

8    get his points and authorities.

9        THE COURT:  All right.  Make it September the 21st,

10   a month.

11       MR. SACHSE:  Mr. Veeder, what is your schedule here

12   going to be?  Because I would like you and I to get together

13   and finally hammer out this order and see if before the

14   recess is over we are going to be able to say that we agree

15   or we do not agree, and if we do not agree--

16       MR. VEEDER:  I had planned to work this weekend and go

17   back to Washington on Monday.

18       MR. STAHLMAN:  I would like to get together with you

19   tomorrow or Saturday and see how close we are.

20       MR. VEEDER:  I will do my best.  I  will call you.

21       THE COURT:  When do you want to go back?

22       MR. VEEDER:  I want to go back Monday.

23       THE COURT:  If necessary, take another day before you

24   go, to work this out with Mr. Sachse.

25       MR. VEEDER:  I am studying his descriptions now.

1          THE COURT:  All right, then, we will adjourn until

2   the 23rd.

3          (Adjournment until Tuesday, June 23, 1959, 10:00 A.M.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25