VOLUME NO.

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

                                    Plaintiff,

vs.                                                       No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                                    Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         Tuesday, June 23, 1959.

Pages:    10,387 to 10,488.

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
                                    DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 · Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1247-SD-C. |
| ) | |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Tuesday, June 23, 1959.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff | WILLIAM H. VEEDER, ESQ., Special Assistant to the Attorney General, Department of Justice, Washington, D.C. |

1    APPEARANCES (Continued):

2        For Defendant                GEORGE E. STAHLMAN, ESQ.
         Vail Company

3

4        For Defendant State          STANLEY MOSK, ESQ.,
         of California                Attorney General, by
                                      Fred Girard, Esq.,
5                                     Deputy Attorney General.

6        For Defendants
         Fallbrook Public
7        Utility District,            FRANZ R. SACHSE, ESQ.
         et al.

8

9        For U. S. Navy               LCDR. DONALD W. REDD.

10       For Defendants               MESSRS. BEST, BEST & KRIEGER,
         Oviatt, et al.               By ARTHUR L. LITTLEWORTH, ESQ.

11

12                                        JAMES H. KRIEGER, ESQ.
                                          (Afternoon session only)

13

14

15

16

17

18

19

20

21

22

23

24

25

San Diego, California, Tuesday, June 23, 1959.   10 A.M.

(Other matters.)

THE CLERK:   Four, 1247-SD-C, United States vs. Fallbrook Public Utility District, et al.   Further court trial.

THE COURT:   This is kind of a clean-up session before we leave for the summer, and I would like to have some sort of little agenda of what we are going to do and do it as promptly as we can and get on our way.   Mr. Veeder, what does this consist of?   What do you propose to do?

MR. VEEDER:   Your Honor had asked us to do several things in connection with the investigations that have been underway in regard to wells.

We have from the U.S. Geological Survey at the present moment the complete list of the wells that had been canvassed prior to June 4.   Now, Mr. Kunkel has just completed that and handed it to me this morning.   I will have prepared and dis- tributed to all counsel-- when I say "all counsel" I mean the ones who have been present here.

MR. STAHLMAN:   Will you pardon me just a moment, Mr. Veeder.   I have been informed that Mr. Krieger intended to be here this morning.

MR. LITTLEWORTH:   I am here.

MR. STAHLMAN:   Oh, pardon me.

THE COURT:   Mr. Littleworth is here for Mr. Krieger.

1      MR. LITTLEWORTH:  I am representing the firm, your

2  Honor.

3      THE COURT:  Before you start in detailing these, I

4  would like to know what we are going to do.

5      The well investigations.

6      MR. VEEDER:  The well investigations is the first thing.

7      THE COURT:  What is the second thing?

8      MR. VEEDER:  Your Honor had asked us to submit a pro-

9  posed revision of the motion for the Vail Company.  That has

10 been done.

11     THE COURT:  All right.

12     MR. VEEDER:  I have forwarded that to all counsel.  We

13 have prepared and filed with your Honor, and I think with all

14 counsel, a copy of our proposed amended order respecting

15 going on the lands of the clients of Mr. Krieger and other

16 counsel.

17     MR. GIRARD:  An amended order?

18     THE COURT:  I did not get a copy of it.

19     MR. GIRARD:  I got the order.

20     MR. VEEDER:  I meant an order.  The reason that I used

21 the term "amended order" is that we had an original order and

22 you asked me to redraft the order.  Those have been submitted

23 to all parties.

24     As I understand, the next thing in line was to be

25 comments or observations by counsel in regard to the acceptability

10,391

1    of the order and if your Honor would consider, the propriety

2    of entering it at this time.

3         Those were the first three things that were set up.

4         THE COURT: What else?

5         MR. VEEDER:  There was also a question as to investi-

6    gations, or checking, rather-- I guess that is a better word--

7    in connection with the Coit Survey.  I have talked to Col.

8    Bowen about that, as to the acceptability by the United States

9    of the survey.

10        THE COURT:  The Coit survey.

11        What is next?

12        MR. VEEDER:  The lands of the Vail Company which are

13   set forth on Vail Company's Exhibit N.  The question of the

14   installation on the Vail properties of the recorders.  Some

15   of those have been installed, and we are going to install

16   others.

17        There is further a question that had been raised in

18   connection with the acreages as set forth on Vail's Exhibit K.

19        Now those were the principal things that hour Honor

20   had directed us to do before leaving, in the order in which

21   you have presented them.

22        THE COURT:  Any other matters we are to take care of

23   today?  Mr. Stahlman?

24        MR. STAHLMAN:  Your Honor, in connection with this first

25   matter that Mr. Veeder mentioned--

THE COURT:  We are going to take them up one at a time.
I am just trying to get a list of things that we are going to
talk about.

MR. STAHLMAN:  That covers it, as far as I am concerned.

THE COURT:  Mr. Sachse?

MR. SACHSE:  The only possible addition, your Honor, I
would like to get squared away, if I could, on the language
of the formal order I have in your hands and in Mr. Veeder's
hands, leaving the descriptions, et cetera, any problems there,
for later.

MR. STAHLMAN:  I have one other matter, your Honor.  I
understand that Col. Robertson is to change his duty.  I just
would like to make the inquiry whether he will be available for
examination later on in this case.

MR. VEEDER:  I think the Colonel is the best one to
respond to that.

THE COURT:  I understand he is going to Okinawa.

COL. ROBERTSON:  I can be here on one week's notice.

THE COURT:  Mr. Girard?

MR. GIRARD:  I haven't anything to add to the comments
previously made, your Honor.

THE COURT:  Mr. Littleworth?

MR. LITTLEWORTH:  No, we are concerned only with the
order.

MR. STAHLMAN:  If this is the proper time, I would like

1   to know what your Honor's schedule is for the week, because

2   this case which I tried Thursday and Friday has not concluded

3   and it was put over until Thursday of this week, so I would

4   have to be in the Superior Court then.

5        THE COURT:  I propose to get you out of here today as

6   soon as I can.  I will not be here tomorrow, and Thursday and

7   Friday I have a criminal case to try.  On Monday I will be

8   here for awhile and then I am long gone.

9        MR. VEEDER:  First I did the housekeeping work that

10   your Honor directed me to undertake.

11        Then I have this letter to Mr. Stahlman in regard to

12   calling Mr. Hall for the purpose of perpetuating his testimony.

13   That is a matter separate and apart, and as I understand, Mr.

14   Stahlman has indicated to me that he wanted to make a state-

15   ment into the record.

16        MR. STAHLMAN:  I have not so indicated.  I have said

17   you try your case as far as the Hall thing is concerned.  We

18   think that if we go into the Hall matter we will open up the

19   entire thing in relation to Mr. Hall and Mr. Henderson and

20   those matters.  It was a surprise to me to get this letter from

21   Mr. Veeder because we have been attempting to get Mr. Hall

22   down in connection with the Coit survey and we have letters

23   from him in which he couldn't come.  He was so sick that he

24   wanted to send down a doctor's certificate instead.  And then

25   all of a sudden Mr. Veeder evidently has had some conversations

1  with him and Mr. Hall comes down here. So I think when Mr.

2  Hall is brought here it is going to be a rather lengthy process

3  and I think the entire Hall-Veeder-Henderson situation should

4  be gone into before this Court, because I think it will be

5  pertinent on cross-examination.

6      MR. VEEDER:  When would that matter come up?  That is

7  important.

8      MR. STAHLMAN:  Whenever you call Mr. Hall.

9      MR. VEEDER:  I have suggested that he be called this

10  week, if your Honor's schedule is such that it could be done.

11      THE COURT:  He will not be called this week.  That

12  disposes of that.

13      Let's start out with your number one, the matter of the

14  well investigations heretofore undertaken.

15      MR. STAHLMAN:  Your Honor, I would like to point out in

16  connection with that matter that we met with Mr. Veeder and

17  Mr. Kunkel at the ranch, and the agreement was-- they were so

18  anxious to get these meters on there, and I think two of them

19  have been installed.  Is that correct?

20      MR. VEEDER:  Two have been.

21      MR. STAHLMAN:  By the Government.

22      MR. VEEDER:  We are going to put on--

23      MR. STAHLMAN:  Then I understood from Mr. Kunkel this

24  morning that he has a man up there installing them today.  Our

25  understanding was that when he would go up there to install

1  these meters we would be there and know about it, and the

2  first thing he went up there to install meters without having

3  advised us.  I think it is contrary to the arrangement.

4      MR. VEEDER:  I didn't know that he was up there myself.

5  I will stop him.

6      THE COURT:  Is he up there?

7      MR. KUNKEL:  Yes, your Honor.  He has specific instruc-

8  tions to contact the Vails before he does anything on the

9  property.  Those are standing orders.  He is never to go on the

10  property without first checking with the office.

11      MR. STAHLMAN:  Mr. Wilkinson is the person he is supposed

12  to contact.  He wants to be there when the meters are installed.

13      THE COURT:  All right, go out and get a call in to him.

14      MR. VEEDER: We have no desire to do anything other than--

15      THE COURT:  Well, let's go back to the well investiga-

16  tions.  Have you submitted to counsel the data up to date?

17      MR. VEEDER:  It will be reproduced today and distributed

18  to all counsel.  I have copies of it here, if your Honor would

19  like to see what has been done.  It is just a matter of re-

20  production (handing document to the Court).

21      MR. SACHSE:  Is this the so-called inventory?

22      MR. VEEDER:  This is the inventory that was undertaken

23  up to June 4, 1959.  You will have copies.  It is a quite

24  lengthy matter to reproduce and I will have it in the hands of

25  all the parties.

MR. STAHLMAN:  Are these wells in the entire area?

MR. VEEDER:  These are the wells that are in the area.

MR. STAHLMAN:  These are wells of people that have been contacted within the area?

MR. VEEDER:  That is right.

MR. STAHLMAN:  That we don't know up to this point who they were, et cetera?

MR. VEEDER:  That is right, those are the ones.  You will get copies of the whole thing.

MR. GIRARD:  Does that include also the measurements where they have been done?

MR. VEEDER:  Yes, that is correct, to the extent they were available.

THE COURT:  It looks like most of them have already been measured.

MR. VEEDER:  That was done before June 4th, your Honor.

THE COURT:  What do you want to do, make these exhibits, or for identification, or just supply this informally to counsel?

MR. VEEDER:  I thought it would be better to supply it to counsel informally, if that were agreeable to your Honor.

THE COURT:  All right.

MR. VEEDER:  And then have it marked and lodged as any other exhibit.

1    THE COURT:  Later on.

2    MR. VEEDER:  Yes, your Honor.

3    THE COURT: All right.

4    MR. STAHLMAN:  I have another comment in relation to the

5 proposed order that Mr. Veeder has presented to your Honor.

6    THE COURT:  Well, let's take up one thing at a time.

7    Anything further now on these well investigations?  You

8 are going to supply this data when-- today, tomorrow, the next

9 day?

10    MR. VEEDER:  Today, your Honor, just as fast as we can

11 get it reproduced, I will distribute it.

12    THE COURT:  This goes up through June 4?

13    MR. VEEDER: June 4, yes.

14    In that connection, we are proceeding on the basis of

15 your Honor's direction that as soon as this matter has been

16 accomplished, that is, the distribution of these things, that

17 Mr. Kunkel will contact the State's representative and proceed

18 in accordance with your Honor's direction, all as set out in

19 the transcript heretofore.

20    THE COURT:  Well, I merely say in passing that the

21 matters set forth in the transcript are to be solidified into

22 an order.

23    MR. VEEDER:  That is right, and the copy of that order

24 has been submitted.

25    THE COURT:  And you will proceed according to the order.

1          MR. VEEDER:  Yes.

2          THE COURT:  Let's go to the second matter.

3          MR. VEEDER:  The second matter that I have is the

4    motion to go on the Vail Company's property for the purpose

5    of installing recorders and setting manometers.

6          MR. SACHSE:  This is not a new matter, but it has not

7    been called to his Honor's attention.  This is a matter that

8    I discussed with you and Col. Bowen yesterday at the Master's

9    hearing.

10         I suggested to Col. Bowen and Mr. Veeder that it might

11   be helpful if, during the summer, Col. Bowen's staff could

12   locate the wells that are in the river bottom below the

13   narrows -- when I say "locate them" I mean locate them with

14   reference to the geologic map, because we have in the past

15   run into this question whether a well was in so-called

16   alluvium or on the fringe areas. Col. Bowen agreed it would

17   be rather a simple matter.

18         I am prepared, on behalf of the Fallbrook Public Utility

19   District, which of course condemned a lot of that area and

20   has many of those wells in its jurisdiction now, to stipulate

21   to entry.  But there are a number of private owners who are

22   not represented by counsel, and it might be that the Colonel

23   might run into trouble, I don't know, and I would like to say

24   now on behalf of the Fallbrook Public Utility District and my

25   clients that I would like an order, if the United States wants

1   it, authorizing Col. Bowen to measure all of those stream

2   wells below the narrows.  I don't know that he will need an

3   order.  He may be able to walk in by consent of the people.

4           THE COURT:  Can you get an order drafted by the end of

5   this week?

6           MR. SACHSE:  I don't know that he will really need one,

7   frankly, I don't know who the people involved are, but I wanted

8   to go on record that I would have no objection at all and that

9   Fallbrook will stipulate to his entry to any of the lands we

10  have acquired by condemnation.

11          MR. STAHLMAN:  It may be, your Honor, that I could

12  inquire of Col. Bowen whether or not those wells are on the

13  property of the people I represent in connection with the

14  condemnation matter.

15          MR. SACHSE:  Yes, George, some of them would be.

16          MR. STAHLMAN:  You will not have any trouble there.

17  I will talk to those people.  I don't represent them in this

18  case, but--

19          THE COURT:  What I am thinking about is this-- Our

20  talk here is sufficient as far as Mr. Sachse and you are

21  concerned.  I am thinking about people in pro per who have

22  no counsel who might object, and I thought if there could be

23  a blanket order drawn authorizing the Government to go on in

24  this particular area then there wouldn't be any problem on it.

25          MR. VEEDER:  We prefer to have a formal order, your

1    Honor.

2            THE COURT:  Can you prepare one by the end of the week?

3            MR. VEEDER:  Yes, I will have one ready for your Honor.

4            THE COURT:  Do you want to look at the order, Mr. Sachse?

5            MR. SACHSE:  No, not at all, your Honor.

6            THE COURT:  Mr. Stahlman, do you want to look at the

7    order?

8            MR. STAHLMAN:  No, your Honor.

9            THE COURT:  Submit it to me.

10           MR. VEEDER:  How broad could we have that order?

11           MR. STAHLMAN:  Measurement of wells.

12           MR. SACHSE:  I would say to measure and locate the

13   wells.  The thing I am interested in primarily is the loca-

14   tion with reference to the Colonel's previous findings as to

15   the alluvium; and second, the depth.  I think those things we

16   ought to know.  Beyond that I don't think it is very important.

17           MR. VEEDER:  The breadth of it should be below Temecula

18   Gorge?

19           MR. SACHSE:  I would say below Temecula Gorge to the

20   Ammunition Depot boundary and on Sandia Creek.  There will not

21   be very many.  There will not be over 30 or 40 of them at the

22   outside.

23           MR. STAHLMAN:  I wonder if Col. Bowen and Mr. Sachse

24   are familiar with the fact that on some of these properties

25   where there was a severance of the stream from the property

1   there were two wells that I know of drilled in that area.

2       MR. SACHSE:  That is the reason I thought this order

3   would be desirable.  There are at least two new ones right on

4   the fringe.

5       THE COURT:  These are people who have appeared pro per,

6   apparently?

7       MR. SACHSE:  Yes, your Honor.

8       MR. STAHLMAN:  Yes, your Honor.

9       THE COURT:  Well, then, make the order cover the area

10   between the narrows and the gorge and the north boundary of

11   the Ammunition Depot and Sandia Creek.

12       MR. VEEDER:  That involves all of the tributaries then.

13       THE COURT:  DeLuz?

14       MR. SACHSE:  It's a big job.  There are more of them

15   there.  I don't think that is too important here.  Mr. Veeder

16   may want to do that on his own.

17       MR. VEEDER:  My only thought is that if an order is

18   going to be entered we would like to have some flexibility on

19   it.

20       MR. SACHSE:  I will stipulate on behalf of all my

21   clients on DeLuz Creek, if you want to go ahead and include

22   that.

23       MR. VEEDER:  We have the situation up in De Luz Creek

24   there where we have been wondering where the residuum and the

25   alluvium are separated.

1    THE COURT:  All right, draw a broad order, and put a

2  further provision in it that if any person who has not through

3  counsel in court agreed to the order has any objection he may

4  bring a proceeding before this Court for a hearing on the

5  matter.

6    MR. VEEDER:  Thank you, your Honor.

7    THE COURT:  If you run onto somebody who wants to scrap

8  about it, pull yourself out and tell him he will have to come

9  down and present it to the Court.  He can do it orally, of if

10  he has an attorney he can do it by motion.  That will keep you

11  out of breaches of the peace.  Put that kind of a catch-all

12  in the order.  Then make it broad enough to cover anything you

13  want.

14    MR. VEEDER:  Thank you.

15    The next thing I have, your Honor, is the motion to go

16  on the Vail Company's property.  You asked me to broaden that.

17  I have submitted to all counsel copies of it.

18    Do you have a copy, George?

19    MR. STAHLMAN:  Yes.

20    MR. VEEDER:  As I understand, it was a matter to be

21  discussed this morning, if anyone has any comments on it.

22    MR. STAHLMAN:  Yes.  In the first place, I think the

23  order has been extended beyond what Mr. Veeder previously

24  talked about.

25    THE COURT:  We are talking not about the order now.  We

1   are talking about the motion.  The Government filed an amended

2   motion.  Is there any objection to this amended motion?  He

3   has a right to move for anything he wants.

4          MR. STAHLMAN:  We have this situation to which I would

5   like to call your Honor's attention.  We have had our engineer

6   look at it and he is of the opinion that this is a waste of

7   time, that this type of order, the actions done under it, will

8   not accomplish or make the determinations which are specified

9   in this order as to the purpose for which the order is re-

10  quested.

11         MR. VEEDER:  You are speaking of the motion, George?

12         MR. STAHLMAN:  Yes, I am speaking of the motion, and we

13  are prepared here to present evidence on that subject if your

14  Honor desires to hear it.  Mr. Cromwell is the engineer who is

15  quite familiar with these rivers.

16         THE COURT:  Suppose it was the opinion of your engineer

17  or three engineers that nothing useful would come of it.  What

18  is the harm if the Government wants to do it?  They may have

19  the view that they can prove something.  What is the harm?

20  How is Vail hurt?

21         MR. STAHLMAN:  The only thing is that if it is an un-

22  necessary thing we are spending a lot of time and hiring

23  engineers to keep track of this thing.  It would take several

24  years of tests to determine what is stated as the purpose.

25         THE COURT:  Well, I don't commit myself to several years

1    of tests.  We will have that understanding to start with.

2         MR. VEEDER:  Certainly we have no desire--

3         THE COURT:  I will go for it for some reasonable time,

4    but we are going to have an end to this case someday.

5         MR. STAHLMAN:  That is the only comment I have on it.

6    If they want to go ahead and do it, we are not going to-- my

7    attitude is the same as I expressed to your Honor previously.

8         MR. VEEDER:  Your Honor will observe on the third page,

9    at line 24, that we followed your Honor's direction that we

10   specify a time.

11        THE COURT:  Yes, I notice.

12        Now the next thing is the proposed order.  Is that

13   right?

14        MR. VEEDER:  Well, your Honor, may I inquire, we would

15   like to have a formal order entered on the basis of the motion

16   to go on the Vail property and I would incorporate into that

17   order the content of the motion and present it to your Honor

18   in chambers, if that is agreeable.

19        THE COURT:  You don't have an order drawn on it?

20        MR. VEEDER:  No, your Honor.

21        THE COURT:  I thought you had an order.

22        MR. VEEDER:  I have an order in regard to another matter,

23   your Honor.

24        THE COURT:  The order in the Krieger matter?

25        MR. VEEDER:  In the Krieger matter, yes.

MR. STAHLMAN:  May I see your order in the Vail matter?

MR. VEEDER:  There is no order.

MR. STAHLMAN:  You have not drawn it?

MR. VEEDER:  There is no order.  It is just the motion.
I would incorporate into the order what is contained in the
motion.

MR. STAHLMAN:  I would like to make this observation,
then, your Honor.  If there is this order made and the order
in relation to the other properties in Murrieta, that the
order should provide that there will be a free exchange of
information between what observations and tests are made in
the Murrieta Creek with Vail, et cetera.

MR. VEEDER:  That will be contained in the Krieger
order.  We have distinguished between those two because there
is a difference.

MR. GIRARD:  It is not a very complicated matter, Mr.
Veeder.  Maybe you can make up this new one so that we can
consider it this afternoon and get it out of the way.

MR. VEEDER: What I would do, if agreeable with everyone,
I would simply draw a couple of lines of order to the effect
that we incorporate into this order all of the contents of the
motion.

THE COURT:  That is not necessary.  The defect in your
motion was the grounds in what you proposed to prove.  Now
you have enlarged upon it in this motion, which is really an

1 amended motion, the one filed June 15th.

2      MR. VEEDER:  That is right.

3      THE COURT:  Your order could be very short.

4      I suggest that we go to the Krieger order and it may be

5 that some of the safeguards in that order you will want to

6 incorporate in this Vail order.

7      MR. VEEDER:  Precisely what I thought, your Honor.

8      THE COURT:  But the order, except for the safeguards,

9 would be a very short order and you ought to be able to draw it

10 up this afternoon.

11      MR. VEEDER:  I can draw it up in ten minutes.

12      THE COURT:  Now we come to the Krieger order.

13      MR. LITTLEWORTH:  I have several comments on that, your

14 Honor.

15      THE COURT:  Let me find it first.

16      MR. VEEDER:  In regard to the Vail Company order, there

17 are no objections to the motion, as presented, by the State or

18 by the Vail Company?

19      MR. GIRARD:  Not by the State.

20      MR. SACHSE:  I have no objection.  I would like the same

21 safeguard as to information of counsel, et cetera.

22      MR. STAHLMAN:  And whenever you go on the property to

23 make tests, that we be notified in advance and be given an

24 opportunity to be there.

25      MR. LITTLEWORTH:  The first comment, your Honor, is that

1   this order has no time limit in it.  Your Honor was quite

2   clear when we argued this that it should be set for a period

3   of perhaps 30, 60 or 90 days.  There is no time limit in this

4   at all.

5          THE COURT:  Why shouldn't there be a time limit, Mr.

6   Veeder?

7          MR. VEEDER:  My own view in that regard, your Honor, is

8   that the time limit could be put in here at 90 days, with a

9   right of renewal.  I will be glad to write that in.

10         THE COURT:  With the right to request a renewal.

11         MR. VEEDER:  That is right.

12         THE COURT:  Of course, the difficulty with the 90-day

13  time limit is that you then limit yourself entirely to the

14  summer period-- you have June, July, August and part of

15  September, which is the dry summer period, and I suppose that

16  it will continue to get dryer until October or the end of

17  October or the first of November, when you might anticipate

18  the first rain.

19         MR. LITTLEWORTH:  Your Honor, the Vail order, or the

20  motion, at least, which would be incorporated in the order,

21  had a 90-day time limit.  It seems to me that they ought to

22  correlate it.

23         THE COURT:  It seems to me that you would make some

24  tests this summer, and if the case is still proceeding this

25  fall or winter it might be proper to have further tests made

1    after the rain, to supply some information.

2    　　　　MR. LITTLEWORTH:  That is right.

3    　　　　THE COURT:  But I wouldn't think that the thing would

4    have to be done continuously between now and the conclusion

5    of the rainy season.

6    　　　　MR. LITTLEWORTH:  I would think, your Honor, that it

7    would be better to take up the fall tests after we see what

8    this develops and see how the case goes along.

9    　　　　THE COURT:  Put the 90-day provision in the order.

10   　　　　What is your second point?

11   　　　　MR. LITTLEWORTH:  In paragraph F it is mentioned that

12   the data would be supplied to us at periodic intervals, for

13   example, week to week.  It seems to me that that ought to be

14   specified exactly.  You mentioned week to week and that you

15   would probably not hold anyone in contempt if it were ten days.

16   But periodically is a broad phrase.  I think we would be best

17   off if we had a definite time scheduled here.  Whether it is

18   one week or two weeks I don't care, but it seems to me that it

19   should be definite.

20   　　　　MR. VEEDER:  Your Honor, if we could have, simply from

21   the standpoint of reproduction of the data that we are gather-

22   ing-- I left the terminology in that matter for the purpose

23   of discussion-- two weeks or three weeks would be better for

24   us.  But I want to get along here and get this done.  If we

25   could have a longer period, that is, longer than a week.

1        THE COURT:  Let's say two weeks.  Is that agreeable?

2        MR. LITTLEWORTH:  Two weeks is fine, your Honor.  I just

3   think it should be set definitely.

4        MR. STAHLMAN:  Well, now, is that in all cases, two

5   weeks before the information is supplied after you obtain it?

6   I think they ought to get it to us as soon as possible, be-

7   cause there may be situations that we want to check on as to

8   the condition of it.

9        MR. VEEDER:  It is not a matter of holding it up.  It

10  is simply a matter of reproduction.

11       THE COURT:  Why are you in any more of a problem on a

12  week-to-week basis than you are on a two-weeks basis?

13       MR. VEEDER:  It is simply a matter of mailing it to

14  counsel and getting it typed up and sent out.  We have men

15  working in the field on these matters.  The matter has to be

16  brought in, just like this canvass I showed your Honor.  It

17  does take some time.  I don't want to be in contempt of court.

18  When all is said and done, I have a family.

19       I will make that two weeks, your Honor, if that is agree-

20  able.

21       Now, in regard to George's request, I don't know--

22       MR. STAHLMAN:  I think it should be supplied as soon as

23  it is obtained and in no case longer than two weeks.

24       THE COURT: Can it be done this way?  Make it two weeks,

25  but in your case at the ranch, if you are interested in day-

1    by-day information, is there any reason why Vail shouldn't have

2    a right to inspection of this material day by day as it is

3    made up?  But the formal report comes every two weeks.  Is that

4    agreeable?

5         MR. VEEDER:  If they want to catch our man in the field,

6    they can look at the material right there.  I have no objec-

7    tion.

8         THE COURT:  They don't have to catch him in the field.

9    They can look at it at the ranch.

10        MR. LITTLEWORTH:  It is my understanding that the State

11   people will be participating in these tests anyway, so there

12   will be another channel of information.

13        MR. VEEDER:  It is fine with me.  It is just a

14   mechanical problem on this two weeks matter.

15        MR. LITTLEWORTH:  My point was that it should be

16   definite, your Honor.  I don't care whether it is one week or

17   two weeks.

18        THE COURT:  We have agreed on your end of it that it

19   should be two weeks.

20        Now we are talking about Vail, because some of these

21   things may be brought into the Vail office.  What do you

22   think?

23        MR. STAHLMAN:  I think we ought to have a situation

24   similar to what we have with Mr. Green.  He does a great deal

25   of work.  First he makes pencil notes of what he has done, and

1    then later on there is a report brought in.  I think that if

2    they are up there and they are making out some information

3    relative to some tests, that they made, that they could drop

4    off a copy at the office and the formal report come later and

5    keep up with this thing.

6              MR. VEEDER:  Are you speaking mostly about the recorders?

7              MR. STAHLMAN:  I don't know what all you are going to

8    do.  You have a very broad request here.

9              MR. VEEDER:  In regard to recorders that have been in-

10   stalled and are going to be installed, the Vail Company have a

11   key.

12             MR. STAHLMAN:  Yes, we can see that.

13             MR. VEEDER:  Any time that a man goes onto Vail Company's

14   property, I will ask him to check in with Mr. Wilkinson and

15   let Mr. Wilkinson observe the data that have been gathered that

16   day.  Will that be helpful?

17             MR. STAHLMAN:  Yes.

18             THE COURT:  The State is going to have a representative

19   on this, too, are they not?

20             MR. GIRARD:  Yes, your Honor.

21             THE COURT:  And the information will be available if

22   the State man will be compiling it at the same time that Mr.

23   Kunkel is compiling it, Mr. Stahlman.

24             MR. STAHLMAN:  In regard to the recorders, are we going

25   to be furnished with a copy of the sheet?  You are not going

1    to remove them at anytime without our knowing it?  Are you

2    going to have a copy of it?

3         MR. VEEDER:  Why don't we do this?  When the recording

4    is taken off we will deliver it to Mr. Wilkinson for observa-

5    tion and he can look at the data himself.

6         THE COURT:  Can't ou get him photostatic copies?

7         MR. STAHLMAN:  Yes, photostatic copies.

8         MR. VEEDER:  All right, photostatic copies.  Is that

9    what you want?  It will take a day or two.

10        MR. STAHLMAN:  That's all right.

11        MR. VEEDER:  We don't have one with us.

12        THE COURT:  Then make your formal reports every two

13   weeks, Mr. Stahlman, with the understanding that they will

14   check with Mr. Wilkinson, plus the fact that the State man

15   will be available where you can get day-to-day data if you

16   want it, and photostatic copies of the tracing sheets be

17   supplied to you.

18        MR. STAHLMAN:  Very well.

19        THECOURT:  What other point, Mr. Littleworth?

20        MR. LITTLEWORTH:  The motion, your Honor, said that the

21   tests would be made at the convenience of the farmers' pumping

22   schedules and with a minimum of entrances on the property.

23   That does not appear anywhere in the order.  I think that

24   should appear.

25        THE COURT:  Any objection to including that?

1    MR. VEEDER:  No, your Honor.  I will write that in.

2    THE COURT:  Any other point?

3    MR. LITTLEWORTH:  I am a little puzzled as to what

4  paragraph B means, the first sentence:  "The United States

5  of America must advise counsel as to the information which it

6  desires from their clients in connection with this order."

7    I don't quite understand what they mean by that, or

8  whether they are going to tell us what they are going to do

9  prior to making the test, or whether they want information from

10  us.

11    THE COURT:  That resulted from this discussion, and at

12  your request or somebody's I suggested this go in-- in other

13  words, that the United States was to tell you what informa-

14  tion it wanted in connection with this.  In other words, if

15  they wanted to make a well measurement, or if they wanted to

16  test a pump statically, or if they wanted to test a pump when

17  it was in operation, to give you some idea what the testing

18  was for.

19    MR. LITTLEWORTH:  Would this be done prior to the making

20  of the test?

21    MR. VEEDER:  Yes.

22    MR. LITTLEWORTH:  That is what I wanted to clarify.

23  Mr. Krieger read this particular sentence and he thought that

24  that meant that the United States was going to request some

25  information of us.  I simply wanted to make this clear.

1    THE COURT:  Mr. Krieger was not here, as I recall.

2    MR. VEEDER:  That is a direct quote from the transcript.

3    MR. LITTLEWORTH:  The second sentence is also a direct

4    quote from the transcript, but I think it takes words out of

5    context.  I don't think it really means that.  It says, "Sim-

6    ilarly, all counsel will be advised of tests and investigations

7    on other lands of these people."  I think it means ands of

8    other people.

9    MR. VEEDER:  Your Honor had used "these people" in

10   regard to the lands on which investigations were being made,

11   people who were not represented here by counsel.  That is what

12   that means.

13   THE COURT:  It was my intent that all counsel appearing

14   in this case in the sense of participating in the trial would

15   receive reports of investigations made, no matter where made,

16   if it concerned them.  That could be worded more artfully.

17   MR. VEEDER:  I simply followed the transcript, your

18   Honor.  What it means is what I have already said it meant,

19   and if you would like to have that rewritten to say, "All counsel

20   be advised of tests and investigations conducted on the

21   properties of all people on whose lands tests will be made,"

22   I will do that.

23   MR. GIRARD:  Just drop out "other lands of these people,"

24   and make it "all tests and investigations."

25   MR. VEEDER: Similarly, all counsel will be advised of

1    tests and investigations--

2         THE COURT:  And supplied with copies of the results.

3         Anything else?

4         MR. LITTLEWORTH:  Just one other question, your Honor.

5         The Court indicated when it ruled that there might be

6    other situations where tests would have to be run and if so

7    then the costs should be borne by the Government, and Mr.

8    Veeder at that point said, "I don't believe that is necessary.

9    We are not going to ask anyone to do it."  I am wondering if,

10   in view of that statement, it is necessary to have that

11   portion in the order, if the Government in fact is not going

12   to be causing pumps to be run during any period of time but it

13   is just going to be making measurements when they are run

14   during the normal farming operations.

15        MR. VEEDER:  I think your Honor had a very pious idea

16   and I would like to adopt it, because there might be a situation

17   where we might run into it.

18        THE COURT:  It doesn't do any harm to leave it in.  You

19   are talking about paragraph G?

20        MR. LITTLEWORTH:  Yes, your Honor.

21        THE COURT:  If they do require some tests, they will

22   have to pay the bill.

23        MR. LITTLEWORTH:  Those are the only comments I have

24   on the order, your Honor.

25        THE COURT:  Mr. Girard.

MR. GIRARD:  Mine are relatively minor,  However, I will mention them.  I might add that probably some of my objections are pretty technical and arise out of the fact of this Footnote 1 defining "all counsel" as certain people and assuming that when the term "counsel" is used it doesn't mean all counsel.  Paragraph A, right about in the middle of it, states, "then the United States of America will immediately inform counsel for the defendant or defendants . ."  I would prefer to have "all counsel" stated in there and to delete the language "for the defendant or defendants."

MR. VEEDER:  Line 7?

MR. GIRARD:  That is correct.

MR. VEEDER:  That the United States will immediately inform all counsel?

THE COURT:  It reads all right.

MR. GIRARD:  I am sure that Mr. Veeder didn't intend that.  We wouldn't get the information.

MR. VEEDER:  You are not being restricted at all.  If you want "all counsel" I will put it in.

THE COURT:  This concerns only those instances where they are not interested and they merely notify counsel for the particular defendant that they are not going to look at that well.

MR. GIRARD:  That is correct.  And we would like to know that they are not going to look at that well.  If you think

1   that that is unreasonable, I will withdraw it.  It may turn out

2   that we may feel that that well should be looked at.

3         THE COURT:  Then we could do it by merely striking

4   "the defendant or"-- ". . inform counsel for defendants."

5         MR. GIRARD:  That is all right with me.

6         MR. VEEDER:  And that counsel may notify the defendant or

7   defendants.

8         THE COURT:  That is the purpose of it.  That the United

9   States of America inform counsel for defendants.

10        What else?

11        MR. GIRARD: Going to page 4, paragraph D, your Honor:

12   "Before commencing any additional tests, except on the Vail

13   property, all counsel are to be supplied. ."  We would like,

14   of course, that not to exclude the Vail Company property, be-

15   cause if we are going to be out there we would like to receive

16   notice of the Vail Company testing.

17         THE COURT:  What was contemplated there would be a

18   separate order in the Vail matter.

19         MR. GIRARD:  Fine.  If we are going to incorporate it

20   in this order, then I presume it will be in such language that

21   everybody will get the notice on Vail Company.

22        THE COURT:  That is right.

23        MR. STAHLMAN:  By the way, I have not received a copy

24   of this order that you are talking about now.

25        MR. VEEDER:  It was mailed to all counsel.

1          MR. GIRARD:  Dropping down to paragraph F, on page 4,

2     Much of that was covered in Mr. Stahlman's statement in so far

3     as photostats of well recorders, et cetera.  I would prefer

4     to have it.  Also, we would prefer to have photostatic copies

5     of field data as well as well recorders.  I would prefer it

6     to read, "As original data is gathered it is to be photostated

7     and supplied to all counsel at two-weeks intervals" or what-

8     ever Mr. Veeder and the other parties work out.  We will have

9     a man out there, of course, but as to a lot of this material

10    evaluations are going to have to be made from the original

11    material and not from notes or compilations.  Now if Mr. Veeder

12    feels that that is too great a burden, that is all right.

13          MR. VEEDER:  I think it is a burden, because the

14    original field notes are going to be available to everyone and

15    when they are reproduced, if they think there is anything

16    wrong they can go to the original field notes.  I have no

17    objection to photostating the recording sheets, but I think

18    it is going to be very expensive.  I don't know how many small

19    sheets of paper we have that this data is taken down on.  To

20    have each one of those photostated and distributed to all

21    counsel is going to be extremely costly, and we do have forms

22    like I have shown your Honor that can be filled in easily

23    and submitted to all counsel.

24          MR. GIRARD:  Without incorporating it in the order,

25    if Mr. Thomas feels that he would like copies of certain ones

1    photostated, you will provide those?

2         MR. VEEDER:  Isn't Mr. Thomas or one of his men going

3    to be along?

4         MR. GIRARD:  Yes, on most of the occasions.

5         THE COURT:  Well, let's have that understanding.

6         MR. GIRARD:  It doesn't have to be in the order.

7         THE COURT:  Without putting it in the order, if he wants

8    certain of the original notes photostated he may have it.  And

9    let's have it also understood or put in here that the original

10   field notes will be available at all times for inspection.

11        MR. VEEDER:  Yes.

12        THE COURT:  What else?

13        MR. GIRARD:  I think that is the only comments I have.

14        THE COURT:  Mr. Sachse?

15        MR. SACHSE:  My only comment was just covered, your

16   Honor.  I want to request that the original field notes be

17   brought into court and be available for examination.

18        THE COURT:  Eventually they will be, and meanwhile they

19   will be available for inspection.

20        Anyone else have any suggestions on this order?

21        What about this long list of names?  Some of these names

22   concern people who haven't wells on their property.

23        MR. GIRARD:  That is right.

24        MR. VEEDER:  That has been covered, your Honor in

25   paragraph A.  We have already covered that in the order in

1    accordance with your direction.

2         MR. LITTLEWORTH:  It says that after Mr. Veeder has

3    ascertained which properties do not have wells and cannot

4    be productive in these tests, he will let us know, and then

5    those people will be dismissed.

6         MR. VEEDER:  Mr. Kunkel is getting that data together

7    and we will supply it.

8         MR. LITTLEWORTH:  I wonder if that can have a time limit,

9    if you can let us know which people are going to be out of

10   this at a fairly early time, because a lot of these people, I

11   know, aren't going to contribute anything.

12         MR. VEEDER:  You mean to your firm or to the case?

13         MR. LITTLEWORTH:  To the case.

14         THE COURT:  Well, of course, in a way it is kind of a

15   silly thing.  Take, for example, A. M. Shaw.  Suppose he had

16   no well.  If he had no well on his property, he is not going

17   to be concerned anyhow.  "You can come up here and look around

18   for a month.  There is no well on this property."  But as to

19   those who have wells there might be some that the Government

20   will not elect to bother with; they will know either from the

21   location of the well or what they know about it already that

22   it will not serve any useful purpose.

23         MR. LITTLEWORTH:  Some of these people, your Honor,

24   like Mr. Swanguen, as I recall, has four town lots in either

25   Temecula or Murrieta, a little over half an acre, and a little

1   domestic well.  I don't think he is going to contribute any-

2   thing to this testing thing.  But when this order goes out we

3   have to advise all of our people of the scope of it, and it

4   would be helpful if we could know as soon as possible the

5   names of the persons who are not really involved in this, be-

6   cause this just appears to be a list of all of our clients.

7       THE COURT:  It seems to me that you ought to cross off

8   of this list those people who have no wells on their property.

9   Otherwise, Mr. Krieger will be charging them additional money

10   for sending them properties of this order and will be put to

11   additional work and they will pay additional fees.

12       MR. VEEDER:  As we went into this on June 4th, your

13   Honor, just as soon as we know these matters, and if you want

14   to put a ten-day limit on it we will do that.  But I am not

15   going to accept anything until we are told by our investigators

16   that that is the way it is.

17       MR. LITTLEWORTH:  It will be helpful if there is a

18   ten-day limit.

19       MR. VEEDER:  I will agree to it.

20       I am advised by "his Honor" back of me here that ten

21   days is not enough.  Would two weeks be enough?  Would two

22   weeks be all right?  We will try to get it done in two weeks.

23       MR. LITTLEWORTH:  Yes.

24       MR. VEEDER:  All right.

25       MR. LITTLEWORTH:  Put that in the order also.

1          THE COURT:  On some of these pages if you want to do

2  it by interlineation, to save time, such as page 3, that can

3  be done.

4          MR. VEEDER:  I think we had better re-run the whole

5  thing.

6          THE COURT:  Anything else on the order?

7          MR. VEEDER:  Will you be here this afternoon?

8          THE COURT:  Yes.

9          Number four, the Coit Survey and Vail Exhibit N.

10          MR. STAHLMAN:  Your Honor, we met with Col. Bowen and

11  Mr. Veeder, Mr. Wilkinson and myself.

12          THE COURT:  Refresh my recollection as to Exhibit N.

13          MR. VEEDER:  It is the water distribution that shows

14  the acreage.

15          THE COURT:  I have it here.  I know what you are

16  talking about now.

17          MR. STAHLMAN:  I inquired of Col. Bowen.  I think he

18  has made some examination and comparisons.  Is that correct?

19          MR. VEEDER:  We have some observations to make ourselves

20  in regard to this.

21          MR. STAHLMAN:  Do you want me to put him on the stand?

22          MR. VEEDER:  If you want to call the Colonel, it suits

23  me.  Go ahead and make your statement.

24          MR. STAHLMAN:  I just want to know what he found.

25          THE COURT:  Let's hear from Mr. Veeder.

10,423

1        MR. VEEDER:   I would like to refer to Exhibits K and N.

2        THE COURT:   What is K?

3        MR. VEEDER:   K is a tabulation of total acreages.

4        I am making this statement into the record so that the

5   Vail Company will know our position in regard to these acreages.

6        It will be observed that on the far right-hand side

7   of the page on Exhibit K, where there are numerous-- well, the

8   fields are listed.  I looked at the maps myself that were at

9   the Vail headquarters and I was unable to identify, from

10   viewing them, the means for determining those actual acres in

11   the fields.  Col. Bowen did not measure those, did not

12   planimeter them, and I don't believe it would have been

13   possible for him to do so anyway, based upon the references

14   on the left-hand side of the exhibit as to the fields that are

15   involved.  So there has been no agreement in regard to that

16   at all.

17        MR. STAHLMAN:   This is not the Coit deal.

18        THE COURT:   This is your irrigable land down in the

19   valley.

20        MR. STAHLMAN:   That is right; what has been under irri-

21   gation.

22        THE COURT:   That is right.  The point was, could any

23   agreement be arrived at as to the acreage of this ground, or

24   couldn't it?

25        MR. VEEDER:   That is reflected on Exhibit K, and I say

1      there is no agreement as to that.

2          MR. STAHLMAN:  Well, is there anything further that

3      should be done?  These are the ranch records that we have

4      there.  You say that it can't be planimetered.  Maybe it

5      can't.  No one has done anything on that except Mr. Veeder

6      looking at it.

7          THE COURT:  Why can't it be planimetered off the exhibit

8      that shows the areas that were irrigated or are irrigated?

9          MR. VEEDER:  There is no exhibit in evidence at the

10     present time that would be reflective of the data on Exhibit

11     K.

12         THE COURT:  Yes, there is an exhibit, and I instructed

13     Mr. Wilkinson to go through it and write on that map the

14     names of the fields to show the correlation between that map

15     and K.

16         MR. VEEDER:  Which he did, your Honor.  But this is what

17     I was saying, that there is no evidence in the record from which

18     it is possible to come up with these acreages.  You can find

19     where he has written "Temecula Cemetery Field" or something like

20     that, but you can't planimeter that field and come up with the

21     acreages that Mr. Wilkinson drew on there.  If I am in error

22     on that, I would like to have him say so.

23         THE COURT:  Why can't you?  I know this, from what I saw

24     here.  What is the name of that exhibit?

25         MR. STAHLMAN:  That map?

1    THE COURT:  Yes.

2    MR. VEEDER:  That is L.

3    THE COURT:  All right.  There would be two adjacent

4    fields on that map which were circled with the same blue line,

5    so that on the map it looked like one big field.  Actually

6    it was composed of maybe two or three of the fields as shown

7    on K.  Therefore, it would be impossible to know where-- this

8    isn't a true example.  Just take an example.  Suppose the

9    Studley pasture and the Studley hillside were within the same

10   outside green or blue line.  You couldn't tell where the pasture

11   ended and the hillside started.  But it seems to me that the

12   two together ought to check out as a total of the two acreages

13   shown.

14   MR. VEEDER:  May I ask your Honor to see our problem.

15   You will observe Upper JK Mesquite.  There is no delineation.

16   THE COURT:  But this illustrates exactly what I am

17   talking about.  It is true that we can't tell from Exhibit J

18   where Mesquite is and where Upper JK is.  But on the basis of

19   adding together can't we make the computations?

20   MR. STAHLMAN:  I think it could be done.  As Mr.

21   Wilkinson said, there were no surveys made of these maps.

22   That is correct, isn't it?

23   MR. WILKINSON:  Right.

24   THE COURT:  Now, for instance, here is what is called

25   China Garden, which, I take it, runs to this line, Diesel North

1    and Lower JK North.  Of course, you still don't have correspond-

2    ence here.  Here you have on K China Garden North.  Where is

3    China Garden North?  Instead of being China Garden, this should

4    be China Garden North.  Then the total of the China Garden

5    North, and Lower JK should be a total of these.  Isn't it

6    possible to planimeter the areas shown and see if it bears

7    any reasonable resemblance to the three acreages shown here?

8         MR. VEEDER:  Can you have that done, George?

9         MR. STAHLMAN:  Can you do that?

10        MR. WILKINSON:  Yes, we can have it planimetered by

11   the Colonel.  Yes, we can do that.

12        THE COURT:  Well, let me tell you what I think should

13   be done.  Mr. Wilkinson and somebody ought to sit down here

14   and put the proper descriptions on here to make them cor-

15   respond with K.

16        MR. VEEDER:  That is right.

17        THE COURT:  That hasn't been done yet.

18        MR. VEEDER:  That is right.

19        THE COURT:  And where there is a division line that he

20   asserts exists between certain fields, it ought to be put in.

21        MR. VEEDER:  Right.

22        THE COURT:  Put it roughly here.  For instance, here is

23   Airport.  Where does Airport appear on this?  Airport Pasture.

24   This is called Studley.  What is it, Studley Pasture?

25        MR. WILKINSON:  Studley Pasture, Studley Hillside,

1    Studley Substation Pasture.

2           THE COURT:  Is this all Studley?

3           THE WITNESS:  This is all Studley.  There is no

4    delineation between the Temecula fields.

5           THE COURT:  Then there should be a delineation between

6    the field and Studley.  And how do you divide up the four

7    Studleys?  How is that divided up in here?

8           MR. WILKINSON:  It would be rather hard to show on

9    this.  They are there.  The total is there.

10          THE COURT:  Then what would be important would be the

11   total.

12          Then what I had in mind is that after you got the two

13   so that they corresponded, you take a planimeter and see if

14   you have some reasonable coincidence.  If you have, all right,

15   let's forget about that.  And if you haven't, then we will

16   order somebody to survey the particular piece in question

17   and find out how many acres there are in there.  Bht instead

18   of ordering a whole survey of the whole valley, let's find out

19   where it is necessary.  Some of these may be fairly accurate.

20   If Vail Company happened to survey part of the valley, all

21   right.

22          MR. VEEDER:  That is the reason I couldn't agree to K.

23          THE COURT:  You can sit down and work this out without

24   my holding the club over you.

25          MR. VEEDER:  While your Honor is down here, if we can

1    just talk about Exhibit N for a moment.

2          THE COURT:   What is N?

3          MR. VEEDER:   N is the tabulation showing the yearly

4    crops under irrigation which, I believe, presents much the same

5    problem as K, at least from our standpoint, to ascertaining

6    what these acreages are-- what was in alfalfa in 1958, what was

7    in alfalfa in 1957, and matters like that.   If there are field

8    notes or something, I think we should be supplied them.

9          MR. STAHLMAN:   Surely.   When you were up there you

10   should have mentioned it.

11         MR. VEEDER:   I did.   I mentioned it.

12         THE COURT: Apparently you haven't looked at anything

13   they have.

14         MR. VEEDER:   Oh, yes, I have.

15         MR. STAHLMAN:   We set out a program on that, your Honor,

16   when he was up there, and I don't recall his ever coming up

17   with it.

18         MR. VEEDER:   Yes, we did.

19         MR. STAHLMAN:   All right, we will do it.

20         MR. VEEDER:   All right.   As I understand it, then, we

21   will be provided with the field notes that will show these

22   acreages on N.

23         MR. STAHLMAN:   Yes.

24         THE COURT:   That is what I understood was going to be

25   done.

1          MR. VEEDER:  That is what I understood, too.

2          MR. STAHLMAN:  You were right there.  Why didn't you

3     ask for them?

4          MR. VEEDER:  I did.

5          THE COURT:  Well, I am not going to resolve that

6     dispute.  Mr. Wilkinson says you didn't, and you say you did.

7     The only thing that is now apparent is that you didn't see

8     anything they had.

9          MR. VEEDER:  That is right.

10         THE COURT:  I am not concerned whether you asked or

11    not.  Get together and look at what they have.

12         MR. VEEDER:  Also, I would like to have them bring in

13    the map which we looked at for the ascertainment of these

14    fields, the base map on which are written the acreages pur-

15    porting to represent the fields, as I understand it, appearing

16    on both K and N.

17         MR. STAHLMAN:  You didn't ask for it up there, did

18    you?

19         MR. VEEDER:  I looked at the map.

20         MR. STAHLMAN:  Did you look at it?  Do you want a

21    copy of it?

22         MR. WILKINSON:  It will be difficult to get a copy of

23    that.  It is 400 feet to the inch instead of a thousand feet

24    to the inch.

25         MR. VEEDER:  That is the one we looked at from the

1    standpoint of the acreages.  I don't believe they can be

2    correlated.

3        THE COURT:  What can't be correlated?

4        MR. VEEDER:  These tabulations and the maps that I

5    looked at.  The only data I saw up there in regard to maps

6    disclosing the acreages of fields that were in cultivation and

7    in crops.

8        MR. STAHLMAN:  We were there in the office, I thought

9    we had everything he wanted and asked for and it was given

10   him.  Col. Bowen was there.  We brought out these maps.  He

11   could have had anything he wanted.

12       MR. VEEDER:  Why don't you bring the big map down?

13       MR. STAHLMAN:  We will bring the whole office down and

14   fill up the courtroom.

15       THE COURT:  As to the tabulations on N, as I recall

16   the record and testimony, there is evidence in the record that

17   in his opinion these were the acreages used at various times

18   in these various crops.  This goes to weight.  But I think

19   that a man who is familiar with acreages, who is not only

20   helping run the farm operations but has had some engineering

21   training, is qualified to make at least an estimate of the

22   acreages.  I don't think the law requires that you have a

23   surveyor come in and get your acreages down to the last decimal.

24   This goes to the weight.

25       My present view is that there is enough in the record to

1    support this.  On the other hand, if you want to see the data

2    on which it is based, you have a right to.

3            MR. VEEDER:  I want to see it, your Honor.

4            THE COURT: And there is a question now whether you have

5    seen all the data on which it is based.  You say you have

6    seen some maps.  You didn't see anything else.  Apparently,

7    there are other records or notes were made of what crops were

8    on what fields in what year.

9            Is that right, Mr. Wilkinson?

10           MR. WILKINSON:  That is right, your Honor.

11           MR. VEEDER:  I made notes as I looked at these things.

12           THE COURT:  Then it was my hope that when you got to-

13   gether on this you could do the same thing as we are hoping

14   you could do with J.  You could find out what areas there was

15   dispute about and what areas there was not dispute about.  But

16   if there were going to be further proceedings we could center

17   our attention on those particular parts involved, and if there

18   was dispute as to whether in 1956 there was 558 acres of al-

19   falfa, if we desired we could take further testimony.

20           MR. VEEDER:  In that regard, your Honor, timewise, we

21   have hearings set at Reche School for July 21 and 22.  It

22   appears to me that a week prior to that hearing we could go

23   through this data, these notes in regard to both J and N and

24   perhaps resolve them at that time, timewise, if that is agree-

25   able with everyone.

1    THE COURT:  Is that agreeable?  The week preceding--

2 the week of July 14 to July 21.

3    MR. STAHLMAN:  Surely, we can do it.  Mr. Wilkinson

4 will be available at any time.  I presume that they will have

5 Col. Bowen come up and check with him.

6    MR. VEEDER:  I think that is the best way to do it.  I

7 will give you a specific time when he will be available.

8    MR. STAHLMAN:  Very well.

9    THE COURT:  Do you know what I am talking about as to

10 J, K and N?  Find out where your areas of dispute exist, and

11 instead of like the farmer who says, Gee-Haw, the whole field

12 has to be plowed anyhow," let's find out what particular areas

13 there is dispute about.

14    MR. VEEDER:  We will do that, your Honor.

15    Now, if it is agreeable, we will proceed to Vail's

16 Exhibit D, which is the tabulation of the Coit Survey.

17    THE COURT:  Well, we will probably go on at least

18 until noon.  Let's take a short recess.

19    (Recess.)

20    MR. LITTLEWORTH:  Your Honor, while we are waiting, I

21 might mention one thing that Mr. Veeder and I have just

22 discussed.  We are going to try to take a few minutes this

23 afternoon and pencil out the changes that have been suggested

24 in the order on our clients' property, and then it can be

25 presented to you and it will not be necessary for Mr. Veeder

1    to submit any further proposals-- it will be ready for signa-

2    ture then.

3          MR. VEEDER:   Good.   Is that agreeable, your Honor?

4          THE COURT:   Yes.

5          This is Exhibit N, is it?

6          MR. VEEDER:   No, this is C.

7          I now have in my hand Exhibit D.   Your Honor has asked

8    that we check out and advise your Honor as to the acceptability

9    of the Coit Survey.   We followed your direction in that regard.

10   Col. Bowen has made measurements using a planimeter in regard

11   to the exterior boundaries of the Blocks 6, 8, 11, and 10.

12   By and large, the aggregate acreages in those blocks are not

13   so much at variance that we would raise complaint about it.

14   There may be a hundred acres one way or the other, but I think

15   it is just about set off.

16         Am I right, Colonel?

17         COL. BOWEN:   Pretty close.

18         MR. VEEDER:   But in regard to the lots which are the key

19   to the soil survey, by reason of the fact that they contain the

20   soil survey itself, Col. Bowen advises me that there is no

21   basis upon which to make an acreage determination.   For ex-

22   ample, on Lot Block 7, your Honor observes, there are set out

23   the lots which contain specified acreages of Classes A, B, C,

24   D.   Now, there is no basis upon which to determine the classes

25   of lands or to determine the areas which are in waste and so

1   designated.  For that reason, we could not and do not approve

2   or agree to stipulate, as your Honor inquired whether we could

3   or not, in regard to Vail's D or in regard to Vail's C, because

4   the very basis of this matter is the soil classification.

5        MR. STAHLMAN:  What do you concede is the irrigable

6   acreage?  Don't you think we should put Col. Bowen on the stand

7   and see what he has done thus far?

8        THE COURT:  Does the Government have an estimate as to

9   how much irrigable acreage there is in the Vail Ranch?

10        MR. VEEDER:  No, we do not, and the only way that we

11   could come up with the irrigable acreage would be to have--

12   well, I will not say it.  It involves a survey, your Honor.

13        MR. STAHLMAN:  Your Honor, it was testified to by Mr.

14   Hall as their witness in the other trial, and then Col. Bowen

15   has planimetered these things and found them, as Mr. Veeder

16   says, accurate.  Let's see how far Col. Bowen went with it.

17   It would seem to me that we can say the same thing about the

18   Government's survey.  We have no way, unless we make a com-

19   plete survey, to determine the accuracy of it.  But there is

20   testimony on the part of Dr. Coit as to what this irrigable

21   acreage is.  I think we have substantial proof on this.  Mr.

22   Veeder is questioning what the acreage was.  I understand

23   there is as little as five acres difference in some of those

24   blocks, and that is certainly pretty accurate.

25        THE COURT:  I understood the record so far shows that

1    Col. Bowen spot-checked some of those lots as to acreage and

2    as to the type of ground and what it was suitable for, and that

3    on the basis of spot checking he put a stamp of approval on

4    the survey.  Isn't that what the record shows?

5         MR. VEEDER:  The point of the matter that we are

6    objecting to, and these objections are based on conversations

7    with Col. Bowen and Col. Robertson, is that it is impossible

8    to ascertain the acreages as set forth in these lots as to

9    classes, as to irrigability, as to the actual properties

10   within a given watershed.

11        THE COURT:  I understand what you are saying.  But you

12   haven't answered my question.  Isn't there testimony in the

13   record, when Col. Bowen was put on the witness stand by Mr.

14   Stahlman and then I questioned him also, in which he said

15   that on the basis of spot checking the classification of the

16   land in the areas he checked was generally proper?

17        MR. VEEDER:  I haven't read Col. Bowen's testimony in

18   the last couple of weeks on that, but I don't recall that he

19   did testify, and he can be called now if somebody desires to

20   call him.

21        MR. STAHLMAN:  It is already in the record.

22        MR. VEEDER:  If your Honor would just step here, I

23   would like to have you view, for the record, Vail's C and I

24   will point out the primary objections that I have and the

25   basis upon which those objections are made.

1    Your Honor will view these areas-- I am now pointing

2  to Block 6, and here are the lots, 49, 50, 67, 68.  You cannot

3  even find the exterior boundaries of those lots.

4    Has somebody got objection to what I have said?

5    MR. STAHLMAN:  The map you looked at up at Vail's--

6  Was Col. Bowen given a copy of that?

7    MR. WILKINSON:  Yes.

8    MR. STAHLMAN:  He was given a copy.  It has that in

9  there.  This is a reproduction.  It hasn't shown through here.

10 But the other map was in the same condition it was at the first

11 trial, and that map was turned over to Col. Bowen.

12    MR. VEEDER:  I checked that out yesterday and there

13 is no basis for finding out how the yellow lines which appear

14 on that map were arrived at, and I point out to your Honor

15 that the exhibit and the tabulation that is before you defies

16 determination as to acreage.

17    MR. STAHLMAN:  We can have them put on this map also

18 the same as they were on the original map in the original

19 trial.

20    THE COURT:  Who has this original map?  Do you have it?

21    COL. BOWEN:  The Vail Company has it, your Honor.

22    THE COURT:  I thought you said it was turned over to

23 Col. Bowen.

24    COL. BOWEN:  A copy was turned over.

25    THE COURT:  Who has the original map?

1    MR. STAHLMAN:  Do you have the original?

2    MR. WILKINSON:  That is the best original we have.

3    MR. VEEDER:  Who put the yellow lines on it?

4    MR. STAHLMAN:  On the original map?

5    MR. VEEDER:  On the map that we have.

6    MR. WILKINSON:  I did.

7    MR. STAHLMAN:  Are they the same lines that were

8    surveyed off the other map?

9    MR. WILKINSON:  I just copied the yellow lines.

10   THE COURT:  What did you copy it from?

11   MR. WILKINSON:  From an exhibit, your Honor, in the

12   previous case.

13   THE COURT:  Where is that exhibit?

14   MR. WILKINSON:  It is in the office of the Vail Company,

15   your Honor.

16   MR. STAHLMAN:  Mr. Veeder saw it, and Col. Bowen saw it.

17   THE COURT:  Is the exhibit available?

18   MR. WILKINSON:  It is there, your Honor.

19   MR. STAHLMAN:  We can bring it down if you want it.

20   THE COURT:  The same kind of map as this?

21   MR. WILKINSON:  No; a different scale.

22   THE COURT:  Smaller?

23   MR. WILKINSON:  Smaller.  This is what was used in the

24   original.  These copies of the exhibits in bound form are on

25   a smaller scale.

1      MR. STAHLMAN:  Mr. Wilkinson explains in the reproduction

2  the yellow didn't show through on here, but they were on the

3  original map, and they are there.

4      MR. VEEDER:  I think your problem is this, from our

5  standpoint.  As yet there has been no witness testify as to

6  the accuracy of those lots, there is no way of defining it

7  from the record that is here before your Honor, and we renew

8  our objection on the grounds that there is no proper founda-

9  tion.

10     THE COURT:  That objection is not good.  It is over-

11  ruled because that is not the state of the record.  The state

12  of the record is that Exhibits C and D are in evidence already.

13     MR. VEEDER:  Then I move to strike them on the grounds

14  that there is no foundation, your Honor.

15     THE COURT:  Here is what you are going to have to do,

16  then, Mr. Veeder.  You are going to have to go back and pull

17  out the entire record on the question of the foundation that

18  was laid.  I am inclined to think that there is sufficient

19  foundation for both of them in the record.  It is a matter of

20  weight, and after I review the transcript on the parts that

21  you rely upon for your motion-- I am not going to hear it today.

22  You may withdraw your motion now and make it later or let it

23  pend, but call my attention to it.

24     MR. VEEDER:  I would like to have it stand, your Honor,

25  and I will call your attention to it the next time we meet.

1      THE COURT:  And go through and submit to Mr. Stahlman

2  in writing a list of the pages and lines where the foundation

3  material appears, and Mr. Stahlman can then look the record

4  over and see if there are additional areas where the founda-

5  tion materials appear, and then I will rule on it.  If the

6  Court denies your motion to strike, then you are faced with

7  the proposition of what you are going to do about it.  Are

8  you going to put in any contrary evidence to what has been

9  introduced?  That is the way it would stand.

10      MR. VEEDER:  Your  Honor, I am not going to agree to

11  that.

12      THE COURT:  That is the law.  You then would have to

13  either stand on what there was in the record on the subject

14  matter, or you would have to make a survey and come in with

15  contrary evidence.  As I recall, the testimony of Coit-- was

16  it Coit who was called?

17      MR. VEEDER: Dr. Coit was called.

18      MR. STAHLMAN: We also had the surveyor here who made

19  the first map, your Honor will recall.

20      THE COURT:  We had Coit here first.

21      MR. STAHLMAN:  Coit was first, yes.

22      THE COURT:  And he told about going over this land.

23  He would come to one of these parcels and the surveyor who

24  was with him would say, "This lot so and so, block so and so,

25  has about 65 acres," and he knew the surveyor.  Then Coit

1    testified that he walked over most of this, looked at it, and

2    made his calculations as to how much of it was waste and how

3    much was irrigable for this purpose and that purpose, and

4    when he got through he had a total for that lot.  As I recall,

5    that was when he would check with the surveyor and see how

6    many acres the surveyor had laid out, and if he would come to

7    a conclusion that there was 150 acres in that particular lot

8    and the surveyor said there was 155, then he made some

9    adjustments.  And if, on the other hand, the surveyors'

10   figures were a little more than his, he may have adjusted them

11   the other way.

12          In other word, here was a practical man who was familiar

13   with land measurements making his own estimation, and I submit

14   to you that there must have been hundreds of years in American

15   jurisprudence when there was not known such a thing as a

16   transit or surveyor, and when people in courtrooms described

17   lands and gave their opinions that this land had so many acres,

18   and I don't think there is any reason why it couldn't be done

19   today.

20          So that on the basis of the record, as I recall it, and

21   I recall that I examined the witness and sort of rehabilitated

22   him.

23          MR. VEEDER:  I am glad you said "rehabilitated" after

24   what Mr. Sachse did to him.  Resuscitated, wasn't it?

25          THE COURT:  Then Mr. Sachse dug a hole big enough for

1   for an elephant and the witness walked right into it.  And

2   then I took him back again, and before we got through you had

3   evidence on both sides of the record.  But that doesn't mean

4   that a foundation was not laid.

5        MR. VEEDER:  That is where I disagree, of course, your

6   Honor.

7        THE COURT:  So our legal question is, is there a legally

8   sufficient foundation for Exhibits C and D which are in evi-

9   dence?  And you are going to raise the question that there is

10  not.  I have been trying to ask you if you can't get together

11  and obviate this by conferences, and you say you can't.

12       MR. STAHLMAN:  I thought we did, your Honor.

13       THE COURT:  No, he said that they are satisfied with

14  the total acreage shown in each of the blocks, but they are

15  not satisfied with the lots and with the--

16       MR. VEEDER:  Or the irrigable or non-irrigable acreage,

17  which is the heart and soul of the exhibit.

18       THE COURT:  Also, I asked Coit whether, if he were

19  interrogated piece by piece, his testimony would be the same

20  as in Exhibit D, and he said yes, and I think the record shows

21  that I was going to consider that document as his testimony on

22  direct examination.

23       MR. VEEDER:  Yes, and your Honor, I will tender the

24  thought that on cross-examination the gentleman showed that he

25  didn't know what he was talking about, and that is the reason

1   I made the motion.

2        THE COURT:  That goes to the weight.  So if I determine

3   that these exhibits are properly in the record, then you are

4   faced with the alternative of either letting the record stand

5   that way or making a soil survey in contradiction.  Is there

6   any other answer to that?  Do you have any other alternative?

7        MR. VEEDER:  Well, appeal, of course.

8        MR. STAHLMAN:  It will not be necessary to get a court

9   order to go on the land to make the survey, if you desire to

10   make it.

11        MR. VEEDER:  I wouldn't let my men on there without an

12   order.  If anybody got shot, I would be blamed.

13        MR. STAHLMAN:  I wish you would quit threatening the

14   Court with an appeal.

15        THE COURT:  We will bring this matter up after you have

16   exchanged transcript references, Mr. Veeder, and I can look

17   this matter over.  Meanwhile, I would like to see the original

18   map and these yellow lines which supposedly didn't come out

19   on this document.  I can see what you are talking about, that

20   in certain instances it is difficult to see what is the actual

21   area.  But a study of that map shows where it is obvious that

22   he used a watercourse or used a fence line as a dividing line

23   between blocks.  It is apparent from looking at it.  And I

24   would wager that if we had the original you will find every

25   lot enclosed some way or other.

1    MR. VEEDER:  I would never bet with your Honor.

2    THE COURT:  Here is a further possible solution to your

3 problem.  Do you know how much irrigable land Vail has claimed?

4    MR. VEEDER:  Yes, and that is an interesting matter that

5 we get into a little later on in regard to their pleadings.

6 I think they have pleaded around 30,000 acres of irrigable

7 land, plus other lands on tributaries.  The pleading is vague

8 in that regard.

9    MR. STAHLMAN:  I don't think that is it.

10    THE COURT:  So what?  What do they claim now?  How many

11 acres?

12    MR. VEEDER:  I think 30,000 out of-- the pleadings are

13 clear and I have read them.  They say 30,000 plus additional

14 unspecified and unidentified acres.

15    THE COURT:  Forget about the pleading.  What do they

16 claim, apart from the pleadings, that they have in irrigable

17 land?  Pleadings can always be amended.

18    MR. VEEDER:  I think we ought to ask George about it.

19    THE COURT:  What do you claim in irrigable acres?

20    MR. STAHLMAN:  Around 33,000, your Honor.

21    THE COURT:  What does the Government contend exists in

22 irrigable acreage?

23    MR. VEEDER:  I am not going to contend, your Honor.

24    MR. STAHLMAN:  About the same figure as their witness

25 said at the previous hearing.

1    MR. VEEDER:   I would think that in the present state of

2  the record, if your Honor will observe-- I am glad to see that

3  the people from Murrieta Valley are here, and from the sur-

4  rounding areas-- the question of the watershed line, the

5  question as to what is riparian to what, and the circumstances

6  under which riparian acreage can be claimed, is a matter of

7  considerable importance in an inter se proceeding like this.

8  So when we get into the matter of rebuttal, whether we put in

9  additional evidence to rebut the Vail Company's testimony will

10  depend somewhat on time.

11    THE COURT:   Do you represent to the Court that you have

12  no estimate at all of the irrigable acreage of the Vail Ranch?

13    MR. VEEDER:   I have none.  Nor, might I add, have I

14  asked anyone to advise me in that regard at the moment, be-

15  cause from our standpoint I think the question of Vail's

16  irrigable acreage is certainly one of the most important

17  questions we have, now that the Vail Company is seeking to

18  avoid the stipulated judgment.

19    THE COURT:   Of course, if you have no estimate there is

20  no use talking about it.  I don't know how you are in a

21  position, really, to take up the Court's time if you are not

22  able to represent that the estimate made by Vail is not

23  accurate.  If you did have an estimate, I was wondering

24  whether there could be some overall agreement between you.

25    MR. VEEDER:   It is possible that we can get an estimate.

1      THE COURT:  I am not concerned where it is specifically;

2  just an overall agreement.  There is certainly enough irrigable

3  land up there that some compromise within an area of four or

4  five percent wouldn't hurt anybody.

5      MR. VEEDER:  I believe this-- your Honor has pointed out

6  the rule to me before-- I think they have to win on the

7  strength of their case and not on the weakness of someone

8  else's case, and I think the burden is on them.

9      MR. STAHLMAN:  The burden is on the plaintiff.

10      MR. VEEDER:  The plaintiff has no burden in regard to

11  your cross-complaint, Mr. Stahlman.

12      We will pursue what your Honor has directed us to in

13  regard to these matters.  We have pointed out our objection

14  to Vail's C and D.  If they have a map which shows an en-

15  closure of these lots, it will make some difference to us.

16  I have seen a map with hand-drawn yellow lines on it, I

17  don't believe it is evidentiary in character, and I can't tell

18  from viewing it the acreages which are and which are not

19  irrigable, and that is the prime objection we made, and I

20  repeat it.

21      THE COURT:  Were there any witnesses called at the first

22  trial between Vail and Santa Margarita who testified as to

23  irrigable lands?

24      MR. STAHLMAN:  Yes, your Honor.

25      THE COURT:  And who are not now available?

1    MR. STAHLMAN:  Yes.

2    THE COURT:  Mr. Stahlman, have you cracked the books

3    to see whether that testimony is available to you?

4    MR. STAHLMAN:  Your Honor, Mr. Veeder has gone on here

5    talking.  I would like to make an observation.  He goes off

6    of the track on this thing, and the thing that undoubtedly

7    is irking him is the fact that we filed in this later action

8    the affirmative defense of the stipulated judgment.  We know

9    that during the first part of this trial the Government was

10   trying to show the great irrigable acreage on the part of the

11   Vail Ranch and so produced a witness in front of Judge

12   Yankwich, and now for him to answer your Honor that he doesn't

13   know, we have a situation where Mr. Veeder blows hot and

14   cold, depending on what suits his convenience in the case.  I

15   think his feelings are hurt.  He represents himself as being

16   a very calloused trial lawyer, but he is the most sensitive

17   man I ever met in the courtroom.  He even projects it into the

18   arguments to the Court.

19   MR. VEEDER:  Your Honor, I thought we were going to have

20   no more of this.  I raise my right hand and said I can't spend

21   any money on contempt charges and we all agreed, and now he

22   is riding us.

23   MR. STAHLMAN:  I think it is about time that someone

24   called Mr. Veeder on these various and different kinds of

25   approaches that he has made to this case all the way through.

He runs up and down one alley and into another and sometimes
I don't think he knows where he is going himself.  I think he
is afraid of the dark.

THE COURT:  Of course, the judicial precedent, such as
it is, in United States vs. Fallbrook, commented on the
ingenuity of the Government's counsel.  But being perfectly
frank, although I admitted your Exhibits C and D, some of the
foundational material that you supplied was, to say the best,
pretty sloppy.

MR. STAHLMAN:  That's right.

THE COURT: Now, I ask you, were any of these maps in
existence at the first trial between Santa Margarita and Vail?

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  In the case in the State court?

MR. STAHLMAN:  Yes.

THE COURT:  Were witnesses called to identify them?

MR. STAHLMAN:  Yes.

THE COURT:  Have you looked up the law as to what you can
do with that testimony in a prior action?

MR. STAHLMAN:  I didn't think it was necessary, your
Honor.  I think we have sufficient foundation.  However, I
will be glad to do that.

THE COURT:  I am inclined to think that maybe you have,
too.  But maybe a couple of more spikes in the lid might pin
it down-- if these were exhibits in the first trial.  I have

1    had my law clerk do a little research on it.  It doesn't seem

2    to be too difficult a problem.  I will even lend you the

3    material I have.

4        MR. STAHLMAN:  I will be glad to get any help I can

5    get.

6        Your Honor, here is what happened at the first trial.

7    Coit made a survey not only of the Vail ranch but of the Santa

8    Margarita, and so testified at the first trial.

9        THE COURT:  He surveyed both of them?

10       MR. STAHLMAN:  Both of them, yes.  He made the same

11   type and kind of examination of Santa Margarita.

12       THE COURT:  You mean the apportionment made which is

13   carried over into the Vail judgment was then based on Coit's

14   testimony?

15       MR. STAHLMAN:  No.  No, that is not right.  That part is

16   not right.  What happened at the first trial was, after the

17   testimony was in the court ruled out certain land as not being

18   riparian because it was over the crest line into Murrieta

19   Valley.  However, the Supreme Court, when they reversed the

20   case, that was the major point on which it was reversed, that

21   the Court had not considered that land in the Murrieta Valley

22   as being riparian to the Santa Margarita River stream system.

23       THE COURT:  Coit testified as a witness for Vail?

24       MR. STAHLMAN:  Yes.

25       THE COURT:  How did he happen to make a survey of the

1    Santa Margarita?

2        MR. STAHLMAN:  Made at the same time.  I don't know.  I

3    can't answer the question.  I assume the lawyers probably

4    got together.

5        THE COURT:  He made both surveys?

6        MR. STAHLMAN:  He made both surveys.

7        THE COURT:  Did he make the survey for the purpose of

8    that litigation?

9        MR. STAHLMAN:  Yes, your Honor.

10        THE COURT:  Then I ask you again was-- whether or not

11    it was right or wrong, as shown by the case on appeal, was

12    the apportionment of the irrigable acreage between Santa

13    Margarita and Vail based substantially on Coit's testimony?

14        MR STAHLMAN:  That I can't answer without checking it,

15    your Honor.

16        THE COURT:  It would be a pretty important point,

17    wouldn't it?

18        MR. STAHLMAN:  Yes.

19        THE COURT:  If the Government is relying on a stipulated

20    judgment, in part based upon that trial-- it had to be based

21    on that trial, and if Coit was the only witness or the major

22    witness who testified what was irrigable land on the two

23    big ranchos, it would seem to me to be pretty pertinent.

24        MR. STAHLMAN:  I will check that and indicate to your

25    Honor when we resume.

THE COURT: Also, where are the exhibits in that old trial? Was there an exhibit of this kind of soil suitability and irrigable land in the first trial?

MR. STAHLMAN: Yes. Whether that original exhibit is available I don't know. The exhibits were burned at one time. The story we get is that they told some janitor to clean up thebasement and he burned up a lot of exhibits in a lot of cases, including Vail's.

MR. GIRARD: Many exhibits are on the photostat at the Courthouse. Whether that one is or not I can't say. But I ran it through and it took me about an hour to turn the crank on it. There are numerous exhibits.

MR. STAHLMAN: Also, there are some exhibits reproduced in the briefs on appeal. I will go over these matters as your Honor as questioned me about and when we resume in September--

MR. VEEDER: Doesn't the Vail Company have a complete set of the exhibits?

MR. STAHLMAN: I don't think so. Are you talking about all of the exhibits in the case?

MR. VEEDER: I mean this, and I mean 265, I mean all the other exhibits.

MR. STAHLMAN: That I don't know.

THE COURT: Don't you have copies of most of them?

MR. STAHLMAN: Most of them I think we have copies of in

some form or other.

MR. VEEDER:  We would be interested to know.

THE COURT:  All right, you are going to look into the thing further.

Number 5 listed here was the installation on the Vail property of recorders.  There is nothing more on that, is there?

MR. VEEDER:  No, your Honor.

MR. STAHLMAN:  No.  If they are going to put some more up there and will get hold of Mr. Wilkinson, O.K.

THE COURT:  Acreages, Vail's Exhibit K, we have talked about.

We have three matters left.  One of them has been taken care of.  Col. Robertson will be available on one week's notice.  We have two matters left:  The Sachse order and the letter concerning the calling of Mr. Hall as a witness.  I said that I am not going to call him today or tomorrow.  But what do you propose to do about that in the future?

MR. VEEDER:  I would like very much to call Mr. Hall, frankly, for the perpetuation of his testimony.  I view it this way, that Mr. Hall's information in regard to the runoff of the Santa Margarita River, particularly the Temecula, in regard to the alluvial basin, the whole valley, is extremely important in this case.  He testified in part.  I called him as a witness earlier in the case.  I think there is data that has come in now that Mr. Hall's testimony would cast a great

10,452

1    deal of light on.

2        THE COURT:  Did you ever hear the admonition given to

3    the small boy not to go out in the garage and pull the powder

4    and shot out of a cartridge and fool around with the cap with

5    a hammer?

6        MR. VEEDER:  I was always around intelligent small boys

7    who never had to have that admonition.

8        THE COURT:  You know the situation I am talking about.

9        MR. VEEDER:  Very well, your Honor.

10       THE COURT:  And I have preferred to put this matter over

11   until after this case is over and not clutter up the case with

12   issues that are not relevant to the trial of this action, and

13   you are proposing to bite right into it.

14       MR. VEEDER:  That is right.

15       THE COURT:  Striking the cap right on the head with the

16   hammer.

17       MR. VEEDER:  I have spent too many years living without

18   fear to start living with it.

19       THE COURT:  The testimony you want from Mr. Hall con-

20   cerns only runoff of the Santa Margarita?

21       MR. VEEDER:  I can point out what I am interested in.

22       MR. STAHLMAN:  May I ask if your Honor read the letter

23   that he sent to me?

24       THE COURT:  Yes, I read it hurriedly.  I have had a lot

25   of things to read.

10,453

1      MR. VEEDER:  It sets out in there the matters concerning

2  which we want to question him.

3      THE COURT:  Aren't the runoff figures the figures on

4  both the Temecula and Murrieta?  Or does this testimony merely

5  antedate the charting of those figures?

6      MR. VEEDER:  His testimony would be in part an analysis

7  of that runoff and an interrogation respecting the runoff

8  prior to the Vail Rancho-Santa Margarita litigation.  He is

9  one of the few men who has the background and knowledge, your

10  Honor.  I don't enjoy calling him particularly.  But I think

11  he has information that is important.

12      MR. STAHLMAN:  Have you been talking to him lately?

13      MR. VEEDER: Yes, I talked to him on Sunday.  He said

14  he would be available if we wanted him down here this week.

15      THE COURT:  Is this information available anywhere else?

16  What is this testimony in regard to runoff?  Don't we have

17  recordings from the gaging stations?

18      MR. VEEDER:  I don't believe there is data in the record

19  now, from the standpoint of an analysis of that runoff, that

20  would be particularly helpful to your Honor in regard to the

21  present situation.  Now the Vail Company put in hydrographs

22  showing the sharp peak line of water at Windmill Well, at

23  Diesel Well and at the Cantarini Camp well.  That evidence is

24  in there.  Part of the interrogation that I would present to

25  Mr. Hall would be to find out his interpretation of that very

1   sharp decline.  It is important because we have here-- I am
2   referring now to C-- the Windmill Well is away up the valley,
3   the Cantarini Camp Well is down across the Wildomar fault.

4       THE COURT:  Well, you have a right to call any witness
5   you want to call.  I have indicated what I think about it,
6   but you have a right to call any witness you want to call, and
7   you can call Mr. Hall if you want to.  But I am speaking
8   advisedly when I say that unless this testimony is entirely
9   necessary you are just creating unnecessary trouble.

10       MR. VEEDER:  I think the testimony would be most helpful
11   to your Honor and to the parties in the case, certainly to the
12   United States.

13       THE COURT:  The only power I would have would be to say
14   when you called him.  It might be that I would call him as the
15   last witness in the case and then let you and Mr. Stahlman
16   go at it tooth and nail.  The rest of the case would be over
17   with and I would preside here while you tore each other apart.

18       MR. VEEDER:  He is not going to tear me apart.

19       THE COURT:  With Mr. Hall in the middle.  It is a
20   spectacle that I don't look forward to.

21       You advise me at least ten days or two weeks ahead of
22   time that you want to call Mr. Hall and I will decide whether
23   you call him then or at the end of the case as the last witness.

24       MR. VEEDER:  There will be no time this week for it?

25       THE COURT:  No time this week.

1      MR. STAHLMAN:  It is not going to be while this court

2  is in recess until September?

3      THE COURT:  You are not proposing to take a deposition,

4  are you?

5      MR. VEEDER:  No.

6      THE COURT:  You plan to call him before the Court.

7      We will adjourn until 2 o'clock.  Meanwhile, you and

8  Mr. Sachse, if you have any loose ends on his order, see

9  where you are on it.

10      MR. VEEDER:  I would like to work with Mr. Littleworth

11  during that period to get that in shape, because he wants to

12  go home.

13      THE COURT:  Mr. Sachse wants to go to Europe.  Let's

14  see if you can work with both of them.

15      Adjourn until 2 o'clock.

16      (Noon recess.)

17

18

19

20

21

22

23

24

25

1        San Diego, California, Tuesday, June 23, 1959.   2 P.M.

2

3        (Other matters.)

4        MR. VEEDER:   Are you ready to proceed, your Honor?

5        THE COURT:   Yes.

6        MR. VEEDER:   Respecting the order prepared in regard to

7    the claims of Mr. Krieger-- and let the record show that Mr.

8    Krieger is in the courtroom-- it has been reviewed by Mr.

9    Krieger, Mr. Littleworth, the State, and I believe all counsel

10   have copies of this proposed revision.  If amenable to your

11   Honor, because the order has not been drafted in final yet,

12   I would read into the record how we propose to revise the

13   order originally distributed, have your Honor sign it, and

14   send copies to the counsel, if that is agreeable with your

15   Honor.

16       THE COURT:   Is it agreeable to counsel?

17       MR. LITTLEWORTH:   Yes, your Honor, I have worked with

18   Mr. Veeder on this language.   I think the record is clear that

19   it is not a stipulated order.   We made our objections to the

20   order.   But these amendments now give the conditions which the

21   Court put on it before and those discussed this morning.

22       THE COURT:   When do you propose to have the order for

23   me to sign?

24       MR. VEEDER:   Your Honor, I am hopeful to have it before

25   you leave this afternoon.

10,457

1      MR. LITTLEWORTH:  Can't we just give it to the reporter?

2      MR. VEEDER:  It is agreeable just to give it to the

3  reporter.  But if your Honor would want to hear it I would be

4  glad to read it.

5      THE COURT:  Does this embody what we talked about this

6  morning?

7      MR. VEEDER:  That is correct.

8      MR. LITTLEWORTH:  Yes, your Honor.

9      THE COURT:  You don't have to read it to me.

10     MR. VEEDER:  Let the record show that I give the reporter

11  the language agreed upon by counsel for the revision of the

12  order that was distributed among the parties in accordance with

13  the original.

14     THE COURT:  These are only the sections that have to be

15  revised?

16     MR. VEEDER:  That is correct.  But it is necessary to

17  re-run the whole order.

18     THE COURT:  All right, the reporter can type it into the

19  record.

20     MR. VEEDER:  There is no objection, as I understand it.

21     MR. LITTLEWORTH:  I think the record is clear.  We made

22  our objections to the order, but we have no objection to this

23  specific language in so far as it carries out the--

24     THE COURT:  Approved as to form, reserving whatever

25  objections you made.

1        MR. LITTLEWORTH:  Yes.  It carries out the Court's con-

2    ditions.

3        (The material ordered by the Court to be typed into the

4    record is as follows:)

5                              "ORDER

6        Page 3, line 7   (a)

7            . . . the the United States of America

8            will immediately inform counsel for defend-

9            ants to the end that counsel may notify the

10           defendant or defendants that although named

11           in the order, the United States of America

12           has no further interest in connection with the

13           subject matter of this order in those properties;

14           the notice referred to in the preceding

15           sentence will be forwarded to counsel not

16           later than July 15, 1959.

17

18       Page 3, line 16   (b)

19           Similarly all counsel will be advised of

20           tests and investigations and supplied with

21           results.  The United States of America,

22           before making tests or investigations must

23           advise counsel.

24

25

Page 4, line 19    (f)

        As data is gathered it is to be supplied
to all counsel at intervals of two weeks.
The field notes upon which the data re-
ferred to in the preceding sentence is
based will be available for inspection by
all counsel.


Page 5, new subparagraph (i)

        Tests and investigations referred to in
this order will, as far as practicable, be
conducted in a manner which will result in
the least inconvenience to the parties and
will coincide with their pumping schedules,
will be conducted in a manner entailing a
minimum number of entrances upon the
properties of the defendants and the re-
sults of investigations and tests will be
made available to all parties.


Page 5, line 3    subparagraph (i) change to (j).


Page 5, new subparagraph (k).

        This order will be effective for a period
of ninety days from the date of ninety days from

10,480

1          the date of its entry with the right to seek

2          an extension of time of it if desired."

3

4          MR. VEEDER:  The next matter we have under considera-

5     tion is the kind and type of order that would be applicable

6     to the Vail Company and the same condition exists.  We have

7     not put in final form that order, but Mr. Stahlman and I have

8     reviewed the form of the order and we have agreed as to the

9     language, and if your Honor wants that dictated into the

10    record I will do so and then prepare the form for your sig-

11    nature this evening or in the morning.

12          THE COURT:  How many sections are there to dictate?

13          MR. VEEDER:  There are about five or six, your Honor.

14          THE COURT:  You had better dictate them into the record.

15    Knowing how you and Mr. Stahlman get along, let's find out what

16    it is and see if you both agree.

17          MR. VEEDER:  The order as agreed to by Mr. Stahlman and

18    me:

19          Good cause being shown, this Court grants the motion dated

20    June 13, 1959, filed by the United States of America, that

21    motion being designated "Motion to Go Upon Vail Company's

22    Property to Set Water Level Recorders and Manometer, subject

23    to the following conditions:

24          1.  The investigation and tests to be in a manner which

25    will not interfere with the normal operation on the Vail

10,461

1    Company's property;

2        (2)  Any representative of the United States of

3    America, prior to going upon the properties of the Vail

4    Company, will first contact James V. (Sandy) Wilkinson or

5    Mr. Wilkinson's designee, who will be appointed by Mr.

6    Wilkinson, should he find that he will not be available for

7    any extended period of time at the Vail Ranch, of the inten-

8    tion of going upon its properties.  Adequate notice will be

9    given Mr. Wilkinson prior to any investigation or tests to the

10   end that he or his designee may accompany the representative

11   of the United States of America;

12       (3) All of the data and information obtained by the

13   investigations and tests provided for in this order shall be

14   made available to all parties.  In addition, the Vail Company

15   will be provided with a photostatic copy of the water level

16   charts taken from the records installed pursuant to this order.

17       Mr. Wilkinson has also suggested that copies of the

18   chart from the Barograph will likewise be photostated and made

19   available to the Vail Company.

20       There is provided a place for the date and for your

21   Honor's signature.

22       THE COURT:  Approved as to form?

23       MR. STAHLMAN:  Approved as to form, your Honor.

24       MR. GIRARD:  Your Honor, it is understood that we will

25   get the same copies that the Vail Company get?

1          Do you have any objection to that?

2          MR. STAHLMAN:  It says in the order, "To all parties."

3          MR. VEEDER:  In regard to the photostats, I would rather

4    not have to make distribution on those, if we can get out of

5    it.  We will make them available.  They will be exhibits in

6    the court.

7          MR. STAHLMAN:  I will not make a point of it in the

8    order, because I think we can work that out with the people

9    in the fields.  If we need them and request them, we have been

10   assured that we can get them.

11         MR. VEEDER:  That is all I have in regard to those two

12   orders, your Honor.

13         I am preparing a general order which will permit Col.

14   Bowen to go upon the properties where the new wells are loca-

15   ted, and I will submit it to your Honor.  I have discussed it

16   with counsel and I understand there is no objection to it.  It

17   will be sent out to all parties.

18         I have nothing further on these matters, your Honor.

19         MR. SACHSE:  The next matter then is the form of the

20   proposed order and interlocutory judgment on the 41 individual

21   defendants for whom I made motions last February, your Honor.

22   Mr. Veeder has found a number of minor errors that need

23   correction in the matters of descriptions.  But I am not

24   concerned with the legal descriptions at this time.  I am

25   talking about the order itself.  I have reviewed it with Mr.

1  Veeder and there appears to be only one objection.  It occurs

2  five or six times during the course of the order, but it is

3  the same objection in each case.  Does your Honor have a copy

4  of the old order before you, the one that I presented to the

5  Court for signature?

6          THE COURT:  I have had various drafts of this.  I think

7  this is the one that was lodged on May 21, 1959, is it not?

8          MR. SACHSE: Yes, your Honor.  If you would look on page

9  2-- this will be typical example of Mr. Veeder's objection,

10 as I understand it.

11         Please correct me, if I am wrong.

12         MR. VEEDER:  I will.

13         MR. SACHSE:  On the next to the last line, Item 5, the

14 order as I drafted it reads:

15             "The plaintiff has no right, title or

16             interest in or to the ground water percolat-

17             ing in and underlying lands of the above-

18             named defendants."

19         Mr. Veeder feels that that language should be "has no

20 right, title or interest in or to the vagrant, local, per-

21 colating ground waters percolating in and underlying the lands

22 of the above-named defendants."

23         To insert that language destroys the entire effect of the

24 order.  Your Honor is well aware that the sole purpose of this

25 motion was to get a basis for a res adjudicata judgment getting

1   these people out and finding in effect that they have no inter-

2   est in this stream, and that whatever water underlies their

3   lands is their water.   This motion and your Honor's order was

4   predicated in each case upon requests for admissions and ad-

5   missions of the United States that the waters were vagrant,

6   local, percolating, and I believe the findings should be that

7   they are vagrant, local, percolating waters.

8       THE COURT:   As usual, you fellows have made a big issue

9   about nothing.   The key finding is number 4.

10      MR. SACHSE:   Mr. Veeder has no objection.

11      THE COURT:   And that finds that the waters underlying the

12   lands of the defendants are vagrant, local, percolating waters

13   not a part of any surface or subsurface stream or basin, et

14   cetera.   Therefore, No. 5 could read that the plaintiff has no

15   right, title or interest to the waters in and underlying the

16   grounds of the defendants.

17      MR. SACHSE:   Mr. Veeder objects to that language.

18      THE COURT:   You don't need to have anything else in it

19   because we have a finding that that is the only water there is

20   available-- vagrant, local, percolating water.

21      MR. SACHSE:   That's right.

22      THE COURT:   Isn't that right, Mr. Veeder?

23      MR. VEEDER:   Well, I would just as soon have it repeated,

24   "Plaintiff has no right, title or interest in or to the vagrant,

25   local, percolating ground waters underlying these lands."

1   Why not repeat it?

2        THE COURT:  I don't think it makes a lot of difference.

3   I think you could say, "The said waters referred to in para-

4   graph 4," or you could say, "The waters underlying the lands

5   of the defendants."

6        MR. VEEDER:  Or "The vagrant, local, percolating waters."

7        THE COURT:  Because we have already found what they are.

8        MR. SACHSE:  The matter is perhaps a little more import-

9   ant when you get to some of the proposed interlocutory judgment

10   on page 4, your Honor, where the judgment itself, on line 10--

11   Mr. Veeder wants to insert "in or to the vagrant, local, per-

12   colating waters."  In other words, the United States will have

13   no right to the vagrant, local, percolating waters.  I want it

14   to say that the United States has no right in the waters under-

15   lying the lands of these defendants.  I think as your Honor

16   just pointed out, the findings have already determined that

17   these are all vagrant, local, percolating waters, and therefore

18   the United States has no right in any of the waters underlying

19   the lands of the defendants.

20        The same thing again on line 4 at page 24.

21        THE COURT:  Mr. Veeder, this case has been long and will

22   be long and there ought to be an end to the litigation, and

23   this business of trying to reserve some kind of a loose end

24   doesn't meet with my sympathy at all.  I think you might as

25   well go all the way and word this so that at no time in the

1  future anybody is going to make any contention about it.  Let

2  these people get a certificate from a title company which

3  refers to the decree and provides what their rights are.

4       MR. VEEDER:  I am for that.  I simply can't understand

5  the variant that is proposed, or the reason for it.

6       THE COURT:  If I were doing it I would leave No. 4 as is.

7       MR. SACHSE:  Are you speaking now of--

8       THE COURT:  On page 2, and I would add, "and are here-

9  after referred to as ground waters."

10      MR. VEEDER:  The only thing I have insisted upon.

11      THE COURT:  We have a definition of what they are, we

12  have found what they are.  Then 5 could read, "Ground waters."

13  Actually, there is merit to the criticism that in 4 you give

14  them one name and in 5 you give them another name.

15      MR. VEEDER: That is my objection.

16      THE COURT:  If you just say, after 4, "hereinafter called

17  ground waters," and thereafter where the decree talks about

18  ground waters we know what we are talking about.  And I think

19  that 4 could be further tightened up to say, "The only waters"

20  instead of "The waters."

21      MR. SACHSE:  All of the waters.

22      THE COURT:  All of the waters.

23      MR. SACHSE:  I would think that your Honor's suggestion

24  at the end of that sentence on line 4 would take care of the

25  matter clearly, because consistently thereafter is used the

1  phrase "ground waters."

2       THE COURT:  And then in 4 change the word "the" to "all"--

3  "all waters underlying the grounds of the defendants."

4       MR. VEEDER:  As long as "all waters" embrace the vagrant,

5  local percolating waters presently underlying the land, and

6  that is all to which it is applicable, I have no objection.

7       THE COURT:  It might conceivably be that there would be

8  some physical catastrophe someday, although it is hard to

9  understand, that might open up some big current of water that

10  doesn't now exist.  But as of the date of these findings all

11  of the waters underlying the grounds of the defendants are

12  vagrant, local, percolating waters, not part of the surface

13  or subsurface stream or subsurface basin of the Santa Margarita

14  or its tributaries, are hereafter referred to as ground waters.

15       MR. SACHSE:  That would do the whole job, as far as I am

16  concerned.

17       THE COURT:  Do you agree, Mr. Veeder?  Make me happy in

18  these last days before vacation and for once say "Yes."

19       MR. VEEDER:  I move to strike that statement, your Honor.

20  I have been the most amiable person in this courtroom.

21       MR. STAHLMAN:  He is not going to say "Yes" and he is

22  going to make a speech and get away with it.

23       MR. VEEDER:  I will see what your Honor said and we

24  will revise it accordingly and Mr. Sachse and I will take one

25  more look at it.

1    THE COURT:  Don't you think that will do it, Mr. Veeder?

2    MR. VEEDER:  I am hopeful, your Honor.

3    THE COURT:  What reservation do you have?

4    MR. VEEDER:  My intuition indicated to me, as soon as I

5    raised the point, that I could see no reason for the change

6    in the terminology.  I don't know why there was this suggested

7    change.  Because as far as I am concerned, if there should be

8    an occurrence such as the importation of a large quantity of

9    water into the area and these lands would be charged with

10   large quantities of imported water and from those waters

11   there would be an increment into the Santa Margarita River and

12   its tributaries, you might have a situation where the matter

13   of the terminology "vagrant, percolating waters" could be very

14   important.  I think that is the principal reason that I have

15   in mind.  If we are dealing as things are now, I think that

16   is all we can do with it.

17   THE COURT:  The decree can only speak of what has

18   happened up to June 23rd or whatever date this matter came up

19   for hearing.

20   MR. VEEDER:  That is right.  If it is limited now to the

21   vagrant, percolating waters and not to what might happen sub-

22   sequently, I would say yes.

23   THE COURT:  However, I will say that this supposititious

24   case that you state leaves me rather cold.

25   MR. VEEDER:  Pat Brown has 1,700,000,000 up there.

1   THE COURT:  I can't imagine water now being placed on

2   these grounds, I can't imagine that there is such a vast area

3   that is going to be subject to irrigation that there would be

4   any amount of water that would feed this stream.  But that is

5   another battle.  We will fight that when we come to it.  But

6   presently, "all waters underlying," can't you agree to that?

7   MR. VEEDER:  I think if we say that anything that is

8   under there is vagrant, percolating water, it is agreed by all

9   parties, and that this order only relates to vagrant, percola-

10  ing waters as of now, I can't see any objection.

11  THE COURT:  The decree has to speak as of the time it is

12  signed.  I don't think there will ever be another lawsuit about

13  the matter that you suggest of about the alternative that I

14  suggest about some major upheaval spouting a stream of water

15  in that area.  Wouldn't you say that we can do it this way?

16  MR. VEEDER:  I think we probably can, your Honor.

17  THE COURT:  When do we get rid of the word "probably"

18  and say that you can?

19  MR. VEEDER:  When Mr. Sachse and I tender to you a form

20  that has been agreed upon by both of us.

21  MR. SACHSE:  This form, in many revisions, has been

22  tendered since shortly after February 11.  I have never yet

23  had an objection in writing from Mr. Veeder.  Mr. Stahlman

24  pointed out this morning, as has been said before in this

25  courtroom, his ingenuity is boundless.  I would like sooner or

1    later to get together.  I went downstairs at noon and we found

2    this one single objection.  Now if this objection is met,

3    let's get the order signed.

4         MR. VEEDER:  All right, let's take it up.

5         THE COURT:  He has agreed.

6         On page 4, at the end of it, did you do anything about 5?

7         MR. SACHSE:  Yes, you had a suggestion; you offered two

8    choices of language, and my preference, simply because it was

9    short, was to add on the end "adverse to the above-named de-

10   fendants," simply to clarify the intent of the paragraph.

11        THE COURT:  I think it was clear enough, probably, but

12   this doesn't hurt anything.  Other than that it approved as to

13   form, Mr. Veeder; is that right?

14        MR. VEEDER:  There are going to be changes in additional

15   paragraphs, your Honor.

16        THE COURT:  Before we leave it, though, in paragraph 4,

17   "all waters" instead of "the waters," and then add "hereafter

18   referred to as ground waters," and then carry your language

19   of "ground waters" through.

20        MR. SACHSE:  Consistently through.

21        THE COURT:  All right.  Agreed, Mr. Veeder?

22        MR. VEEDER:  If the term "vagrant, percolating, ground

23   waters" is as you have stated it to be, I see no objection to

24   it.

25        THE COURT:  It has to be as of the present, as of the date

     this is signed.

1    MR. VEEDER:   Who is going to prepare the form of the

2  order?

3    MR. SACHSE:   I will draw the order and send it direct

4  to his Honor and a copy to you.

5    The other minor request that Mr. Veeder had was that

6  apparently at several places I have used the word "plaintiff"

7  instead of "United States of America."  He asked that I put in

8  the language "United States of America."

9    Furthermore, I want it strictly understood, to protect

10  Mr. Veeder, that Exhibit A attached hereto he has not con-

11  sented to in its entirety and he does reserve the right to

12  make objections to the descriptions contained herein, and I am

13  perfectly agreeable that that caveat be left here since this

14  is not final in any event, to be absolutely certain that the

15  descriptions are right.

16    MR. VEEDER:   Here is a point that I want to raise.  The

17  questions I have presented to Mr. Sachse on paragraph 5 of

18  page 2, and on paragraph 6 of page 3--

19    MR. SACHSE:   That is the same thing.

20    MR. VEEDER:   You have terminology here that you didn't

21  bring to the Court's attention.

22    MR. SACHSE:   What is that?

23    MR. VEEDER:   "Underlying these lands has not and will not

24  cause intrusion of salt water."  I don't see how we can agree

25  that it will not.

1      MR. SACHSE:  That one you didn't point out to me today.

2  Let's go into that.

3      MR. VEEDER:  In regard to paragraph 2 of the proposed

4  conclusions of law, the same language, "vagrant, percolating. ."

5      THE COURT:  What is this, now?

6      MR. VEEDER:  I think we either have to revise the

7  language in the conclusion of law and in the proposed inter-

8  locutory decree or I think we have to revise the language in

9  each paragraph.

10      THE COURT:  To which paragraph are you referring?

11      MR. SACHSE:  You are referring to Line 24, are you not?

12      MR. VEEDER:  I am referring to Line 25.

13      THE COURT:  Page 3.

14      MR. VEEDER:  The language in the findings will be made

15  applicable to that; is that right?

16      MR. SACHSE:  If you will go back and read the language

17  that his Honor inserted, it says, "And are hereafter referred

18  to as ground waters."  I am using the words "ground waters"

19  consistently all the way through in the conclusions and in the

20  Judgement, and the reference is back to the findings.

21      MR. VEEDER:  All right.

22      THE COURT:  Now, you just touched on something with a

23  rather light and nimble touch in paragraph 6 on page 3, at

24  the top of the page.  You seemed to voice some objection to

25  the language "and will not cause the intrusion of salt water."

1   MR. VEEDER: I don't believe that your Honor can prog-

2 nosticate.

3   THE COURT: If the waters aren't part of a basin, then

4 how do they have any effect?

5   MR. VEEDER: I don't know why you have the terminology

6 in it at all.

7   MR. SACHSE: I have it in because you have an express

8 allegation in your complaint, Mr. Veeder, which sooner or

9 later his Honor is going to have to make findings on or else

10 you are going to have to amend your complaint. Your complaint

11 has the express allegation that the acts of every defendant

12 have caused salt water intrusion and will cause salt water

13 intrusion on Pendleton. Now that is a specific allegation

14 which has been contradicted by me in every instance, and if

15 I understand the first fundamental of a judgment in a lawsuit

16 it is that the Court will have to meet that issue and make a

17 finding on it. You will have to find that it will or that it

18 will not cause intrusion.

19   MR. VEEDER: As far as I am concerned you have said

20 "has not and will not.

21   MR. SACHSE: And you allege that "it has and will."

22   MR. VEEDER: No, I don't think I said "will."

23   THE COURT: It is certainly a minor matter.

24   MR. VEEDER: Yes.

25   MR. SACHSE: It is hair-splitting, as far as I am

1    concerned.

2         MR. VEEDER:  I will drop it.

3         THE COURT:  Let's let it go as it is.  Let's see that when

4    we put people out of the case let's put them out with as clean

5    a bill of health as we can, and if they are in the case let's

6    keep them in with as strong a hand as we can.  Let's not have

7    any halfway ground.  A person either has a correlative right

8    on a stream or he hasn't, and let's say it in so many words.

9         MR. VEEDER:  It suits me.

10        THE COURT:  All right.

11        MR. SACHSE:  One last word, your Honor,  This is inter-

12   locutory and it is so provided, and the order in its last page

13   provides that all parties will be given a full opportunity

14   upon due notice to interpose.  I am not suggesting at this time

15   that any specific notice be given because I think it is a

16   little silly until we have a few more bodies.

17        MR. VEEDER:  I am making definite objection if you are

18   proposing to make notice to anyone or that it has any appli-

19   cation to anybody but these 41 people.

20        MR. SACHSE:  I don't think that any notice should be

21   given to even these.

22        THE COURT:  Presently we are not going to give notice to

23   anybody.

24        MR. VEEDER:  Fine.

25        THE COURT:  But before we get through this interlocutory

1   order and any others that I anticipate that may come along are

2   all going to be mailed out, so that upon every defendant in

3   this litigation, if you are going to have a binding decree.

4          MR. VEEDER:  I just don't want to do it piecemeal, your

5   Honor.

6          MR. SACHSE:  I agree.

7          THE COURT:  I agree with you.  Let's not do it piece-

8   meal.  Let's send them a good bundle of reading when the time

9   comes.

10         MR. SACHSE:  Thank you, Mr. Veeder.

11         MR. VEEDER:  Thank you.  And thank you, George.

12         MR. KRIEGER:  Your Honor, isn't this a good time to state

13   that the very order that has been talked about now is an

14   amplification or the same kind of order that we were talking

15   about earlier before recess, and when this testing gets

16   through in the next ninety days we should be prepared to come

17   in and resurrect that interlocutory order that we discussed

18   in chambers at one time, with a view of getting still more

19   people out on the basis of this testing program.

20         THE COURT:  If you get your thinking straightened out

21   so that you are not riding with one foot in the saddle of

22   each of two horses, there is no doubt that there are certain

23   types of property that should be given the same treatment.

24   But there is also certain property which can't be given that

25   treatment, unless you give it a little more thought and decide

10,476

1   which way you are going to jump.

2        In other words, it seems to me that if you have a land

3   owner who wants to say, "Now, I am going to abandon all rights

4   I have to possible underground waters"-- of course, surface

5   flow obviously should go down-- "I am going to abandon all

6   rights I have to any part of the stream.  I don't want to be

7   in the stream system, but I would like to keep what water I

8   can develop and share it correlatively only with my immediate

9   neighbors," if you want to make that decision and the Govern-

10  ment is willing to go along with it, I think the thing could

11  be worked out.  But you can't have your cake and eat it, too.

12  You can't say that you are going to claim rights to a part of

13  the stream system and still get out of this case.

14       MR. KRIEGER:  Of course, we have done just that.  We are

15  willing to surrender all rights to the stream system if the

16  Government releases us from all ground waters.  That is the

17  way that decree is now shaped.  If we can define the parcels--

18  that's the big issue.

19       THE COURT:  It is up to the Government to decide just

20  what you have up there.  I think we have demonstrated to date

21  that when the Government is satisfied that a certain parcel is

22  not going to affect the stream they are willing to apply the

23  same treatment.  Is that right, Mr. Veeder?

24       MR. VEEDER:  That is correct, your Honor.

25       THE COURT:  Mr. Stahlman, this is a service that the

10,477

1    Federal Court renders to counsel occasionally.  Here is just a

2    little two-page memorandum from my law clerk on the subject

3    of "Use of prior reported testimony."

4         MR. STAHLMAN:  I am very happy to get it, your Honor.

5         THE COURT:  Have a copy of it made and send it to Mr.

6    Veeder, Mr. Sachse, Mr. Girard, and Mr. Krieger, and then re-

7    turn me the memorandum.

8         MR. STAHLMAN:  Yes, sir.

9         MR. VEEDER:  What is the caption of the memorandum?  I

10   think it should be in the record.

11        THE COURT:  "Use of Prior Recorded Testimony."  This

12   pertains to what use can be made of witnesses who testified

13   in the first trial between Vail and the Santa Margarita.

14        MR. VEEDER:  That is reported in 11 Cal.(2d), as I re-

15   call.

16        THE COURT:  The case is.

17        MR. GIRARD:  There is a California statute on it.

18        THE COURT:  This is a very simple little memorandum.  I

19   don't think it is a difficult problem.  This is just a starter.

20   You will probably want to crack the books and look up some

21   cases.  You know, there is no rule of court that says a lawyer

22   can't read a law book in his preparation for the trial of an

23   action.

24        MR. STAHLMAN:  You have to learn to read first.  I went

25   to school so far back in the woods, the woodpeckers ate the

1    schoolhouse before I got through the fourth grade.

2        MR. VEEDER:  You laid yourself wide open, but I am not

3    going to say anything.

4        THE COURT:  Anything further?

5        MR. SACHSE:  Your Honor, on this same subject of the

6    order that you just passed on, I wrote to Mr. Veeder on June

7    12th--- that is this second letter, Mr. Veeder, that lists

8    some sixty-odd defendants who, I feel, on the state of the

9    record as best I could find it on the state of the pleadings,

10   would all be subject to the identical treatment we have just

11   covered; that is, they assert no rights in the stream, they are

12   all on uplands and far removed from the stream, and I have

13   broken it down by watersheds to make it simple, and I hope

14   that by the first of September you will give me an answer on

15   those.

16       MR. VEEDER:  I have already stated that we have in-

17   vestigated those, Mr. Sachse.

18       MR. GIRARD:  Your Honor, one other comment in the spirit

19   of friendliness which has been evident on this last day and

20   in the light of the article in the San Diego Union this

21   morning, I wonder if defendants can anticipate the calling

22   of General Allen in September.

23       THE COURT:  What is the article about General Allen?

24       MR. GIRARD:  I will not read it into the record, your

25   Honor (handing paper to the Court).

10,479

1    MR. VEEDER:  I wish the record could disclose what Col.

2  Robertson said when he read it.

3    MR. STAHLMAN:  Of course, you know that the rule is that

4  the proceedings shall be in the English language.

5    MR. VEEDER:  There wasn't any doubt about what he meant.

6    Let the record show a long pause.

7    THE COURT:  I will have to read the last paragraph:

8        "You do not envision any possibility,

9      then, that the litigation, even if adverse,

10     would seriously jeopardize the camp?"

11     Jonas persisted.

12       "No, sir," General Allen answered.

13     "An adverse decision against us would not

14     take our water away from us."

15   I think probably the Marine Corps should have a new

16  department, and that department would be the Department That

17  Tells the Right Hand What the Left Hand Is Doing.

18    MR. VEEDER:  Which I am going to undertake to do, just

19  as soon as I get the opportunity.

20    THE COURT:  And this without the aid of colonels and

21  generals sitting back in the Pentagon throwing plans for

22  installations costing a lot of money outside the watershed

23  would require that some man given the responsibility of spend-

24  ing Government money would make some rudimentary inquiry into

25  California law of riparian use within watersheds, public

10,480

1    speeches by generals before appropriations committees--

2         MR. VEEDER:  Couldn't we go off the record, because I

3    would like to see them start some permanent building down

4    there.

5         THE COURT:  Let the record show that all of this is

6    facetious.

7         When do we meet again?  Did I fix a date the last

8    time?

9         MR. SACHSE: No, your Honor.

10        MR. GIRARD:  No, your Honor.

11        THE COURT:  What will be the program when we come back?

12   We have to hear the case of the attorney from Riverside.

13        MR. LITTLEWORTH:  Mr. Dougherty.

14        THE COURT:  Mr. Dougherty.

15        MR. LITTLEWORTH:  I think Mr. Grover wants to put on

16   something.

17        MR. GIRARD:  Mr. Grover phoned me and indicated that he

18   would be ready in September, if he were advised to be so.

19        THE COURT:  Mr. Dougherty.  Who else?  Mr. Lincoln?

20        MR. STAHLMAN:  Mr. Dougherty and Mr. Grover represent

21   two different parcels, don't they?

22        MR. LITTLEWORTH:  Yes.

23        It may be that you will want some of our people have

24   their cases put on in this court rather than before the Master.

25   We have not decided that, and we have not gone ahead because

1   we haven't received the soil surveys.  Col. Bowen says they

2   will probably be done by the end of this summer.  You may want

3   some of our people here rather than before the Master.

4        MR. VEEDER:  I propose, your Honor, in the next sixty

5   days-- I would assume that we are going to recess now until

6   the first of September, at least-- to file with your Honor

7   a list of the defendants' cases which should be tried before

8   your Honor rather than before the Master.  For example, the

9   Oviatts, Quary, the Murray Schloss Estate, Yackey, and those

10  matters.

11       THE COURT:  That is Mr. Lincoln's client?

12       MR. VEEDER:  Yes, your Honor.  I think that those pre-

13  sent matters involving the stipulated judgment.  The Murray

14  Schloss Estate and I think the Quary matter are closely re-

15  lated to the Vail Company matter.  I am sure that we can get

16  an agreement in regard to this Oviatt matter.  I think the

17  Vail Company is just as interested as we are in regard to those

18  matters above Vail Dam.

19       MR. STAHLMAN:  Very much interested.

20       MR. VEEDER:  We think it would be better to try that case

21  here rather than before the Master.  I don't know how the Vail

22  Company feels about it.

23       THE COURT:  I am generally agreeable to that, and I think

24  that in the case of this basin area I will have to take the

25  proof on that.  I think I would probably have the Master

1    tabulate a lot of this land now in the basement complex, un-

2    less the Government wants to advise me that it can go out of

3    the case in the same method that some of Mr. Sachse's clients

4    went out.

5         MR. VEEDER:  We are working on that.

6         The next hearing before the Master on July 21st and 22nd

7    is the area of Temecula Creek below Vail Dam, including

8    Pechanga Creek and excluding the Vail Company's property.  I

9    don't know how many parcels there are-- there are not many.

10   And then we are going around Temecula Creek, taking the small

11   parcels before the Master, segregating these larger tracts

12   which I think should be heard before your Honor, if that is

13   agreeable with your Honor.

14        THE COURT:  Generally agreeable.  Mr. Stahlman?

15        MR. STAHLMAN:  Your Honor, we got off of this matter

16   this morning.  I am wondering if during this time we are

17   going to be out of session Col. Bowen would feel that he might

18   go any further on this matter with Mr. Wilkinson up there and

19   make some checks.  When it comes to this matter of Government

20   examination they are going to examine all the land around

21   except Vail Company and then fight on that proposition.  But

22   I understand they are making soil surveys on lands as much as

23   6,000 acres of an individual.  Mr. Veeder raised the question

24   about the worth of the Vails.  Some of them are just as

25   affluent as are the Vails and have a lot less expense on their

1   ranches, and yet they are making those surveys.   I think if

2   there is some way that we can further bear out the correctness

3   of this situation or the incorrectness of it, it could be done

4   during this time.

5         THE COURT:   This is a compliment to Col. Bowen and his

6   staff that you would be anxious to have him make a soil survey.

7         MR. STAHLMAN:   As long as they are objecting to our

8   survey, I say go ahead and make their own.   Everybody else

9   has been satisfied with Col. Bowen's work.

10        THE COURT:   How big a job would this soil survey be on

11  the Vail Estate?   There are certain areas that could be broken

12  out immediately, couldn't they, like a lot of the Santa Rosa?

13        MR. STAHLMAN:   They made some on the Santa Rosa.

14        MR. VEEDER:   That was during happier days, though,

15  George.

16        MR. STAHLMAN:   In other words, it is your feelings in the

17  matter that are hurt, Mr. Veeder.

18        THE COURT: How big a job would it be, Col. Bowen?   Give

19  us some idea of what this entails.

20        COL. BOWEN:   My estimate earlier in these proceedings of

21  about 170 man days is still about right to make a detailed soil

22  survey on the Pauba, the portion of the Temecula and Little

23  Temecula Grants which are shown on Vail's C.

24        MR. STAHLMAN:   How many men do you have working at one

25  time on that?

1    MR. VEEDER:  I might add that the Government has some work

2    of its own to do, too.

3    COL. BOWEN:  I have about two, your Honor, that would

4    be competent to put on that job.

5    THE COURT:  Don't you have more men than that on your

6    soil survey staff?

7    COL. BOWEN:  I did have some more this spring.  I had

8    some men on loan from the Department of Agriculture.  They

9    have since returned to their primary duty station.  The

10   Department of Justice paid the bill of those people, and if

11   they are willing to pay the bill once more it is O.K. with me.

12   MR. VEEDER:  It is not.

13   THE COURT:  Of course, you have to be fair-handed, Mr.

14   Veeder.  You have made a lot of surveys for other people and

15   you had better face up to the possibility that this may have

16   to be done.  I still suggest that you spend some time with Mr.

17   Wilkinson, Mr. Stahlman and Mr. Vail and see what can be worked

18   out.  Even if you could agree on certain areas it might cut

19   down eventually the potentiality of a complete survey.

20   MR. VEEDER:  I thought it was understood that we were

21   going to discuss with the Vail Company prior to the hearing

22   of July 21st and 22nd dates to be set.  That was agreed to this

23   morning in accordance with your directions, your Honor.

24   THE COURT:  This hearing of July 21st and 22nd is before

25   the Master.

10,485

1      MR. VEEDER:  Yes, but I would be out here a few days

2  before for the purpose of meeting with them.

3      THE COURT:  You are going to discuss it further with the

4  Vails.  But I am merely suggesting that you give this some

5  thought and really work on this.

6      MR. VEEDER: I have, your Honor.

7      THE COURT:  There shouldn't be any problem about a soil

8  survey of the Pauba Valley.  A person could almost drive up

9  that highway and study a few thermometer readings over the

10  past years and give an answer to it.

11      MR. STAHLMAN:  Your Honor, we turned over to Col. Bowen

12  a while back, they wanted it for another purpose-- this was

13  after happier days, too, Mr. Veeder, and nevertheless we

14  cooperated and permitted them to come up and look at all of

15  the records, and they are using it in relation to other

16  properties.  And yet we meet with this situation with Mr.

17  Veeder.

18      MR. VEEDER:  It is not Mr. Veeder.

19      THE COURT:  He is going to try again the week of July

20  14th.  You had better make it definite with Mr. Stahlman when

21  you will be here.

22      MR. VEEDER:  When are you going to Pebble Beach?

23      MR. STAHLMAN:  I am going as soon as I can.  When is our

24  next date in court?

25      THE COURT:  We are not going to meet again until

16,486

1   September.   This meeting you are talking about is while Mr.

2   Veeder is here for the Master's hearings.

3       MR. STAHLMAN:   I will go to Pebble Beach in August.

4       MR. VEEDER:   You have a big brief to write.

5       MR. STAHLMAN:   I know.   I will probably wind up not

6   getting up there.

7       THE COURT:   Let's say September 22nd for our next

8   session here.   I will see what I can do in the first two weeks

9   of September to clean up my calendar.

10       MR. SACHSE:   September 22nd is our date back here, then?

11       THE COURT:   That is our opening day.

12       MR. LITTLEWORTH:   Mr. Veeder has mentioned the Master's

13   hearings in the Pechanga area.   We have Mr. Quarry in that

14   area.   Mr. Veeder would like the case to go before you.   It makes

15   no difference to us.   But I think it should be clear who is

16   going to hear it.   The soil survey is in.   We could put it on

17   before the Master, or we could wait.

18       MR. VEEDER:   I would rather have it before your Honor

19   for the reason of the ground water situation.

20       THE COURT:   All right, let's put it on before me.

21       And, Mr. Littleworth, I will charge you with the respons-

22   ibility of talking to Mr. Grover and to Mr. Dougherty and out-

23   lining some kind of program after we come back on the 22nd of

24   September.

25       MR. LITTLEWORTH:   All right.

10,487

MR. SACHSE:  Your Honor, I think we ought to face up to one other thing.  I have at least one or two other clients. Your Honor has asked to have their cases presented before you. I definitely intend to advise those clients that I do not intend to put in any evidence on their behalf unless there is a "Rest" here from the United States.  I am not trying to booby-trap anybody.  I will state very frankly for the record what the facts are.  At least in the case of one of those clients I am absolutely satisfied, on the case of the United States alone in this record and if there is no further evidence by the United States, I will put on nothing.  But I am not about to do so unless the United States has rested.

MR. VEEDER:  You repeated that the last time that you were here.

MR. SACHSE:  I am bringing this up now because it seems to me that if I am taking this type of position for my own people it is only fair for me to say in the presence of Mr. Littleworth and Mr. Krieger, and it might develop that the same type of reasoning might apply to Mr. Dougherty.  But it seems to me that if we are going to start to listen to cases of individual defendants we should have sooner or later the words that you rest, and I think we are wrong if we don't.

MR. LITTLEWORTH:  I think that is understood, from our point of view, that we are not going forward with our individual clients until the United States has rested.

1          MR. VEEDER:  It suits me.

2          THE COURT:  When do you propose to rest?

3          MR. VEEDER:  As soon as I have made a complete review of

4    this record.

5          THE COURT:  You mean you are about ready to rest?

6          MR. VEEDER:  Yes, your Honor.

7          THE COURT:  And then any further matter obtained by these

8    new surveys of wells and all will be rebuttal?

9          MR. VEEDER:  That is what we intend to use it for.  We

10   have a great deal of evidence in the record, and I want to

11   review it.

12         THE COURT:  See if you can't advise counsel before we get

13   back on the 22nd that you rest.

14         MR. VEEDER:  I intend to.

15         THE COURT:  Or if not, that you have certain loose ends

16   that you want to clean up.

17         MR. VEEDER:  That is what I intend to do.

18         THE COURT:  Anything further?

19         MR. SACHSE:  Nothing further, your Honor.

20         MR. STAHLMAN:  Nothing further.

21         MR. VEEDER:  I hope you have a nice holiday, your Honor.

22         (Court's remarks off the record about the naturalization

23   of Mr. Herrera.)

24         THE COURT:  Have a nice vacation time.

25         MR. VEEDER:  Thank you, your Honor.

          (Adjournment until September 22, 1959.)

JOHN SWADER, OFFICIAL REPORTER