

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Tuesday, November 3, 1959.

Pages:     10,490 to 10,610

Corrected to 10,610     FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

VOLUME 94

10,490-A

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| vs. ) | No. 1247-SD-C. |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al., ) | |
| Defendants. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Tuesday, November 3, 1959

APPEARANCES:

For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                           WILLIAM E. BURBY, ESQ.,
                           Special Assistants to the
                           Attorney General,
                           Department of Justice,
                           Washington, D.C.

| | |
|---|---|
| For U. S. Navy | LCDR. DONALD W. REDD. CHARLES SALTER. |
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ |
| For Defendant State of California | STANLEY MOSK, ESQ., Attorney General, by FRED GIRARD, ESQ., Deputy Attorney General. |
| For Defendants Fallbrook Public Utility District, et al., | FRANZ R. SACHSE, ESQ. |
| For Defendants Oviatt, et al. | MESSRS. BEST, BEST & KRIEGER, By ARTHUR L. LITTLEWORTH, ESQ. |
| For Defendant Sawday | MESSRS. LUCE, FORWARD, KUNZEL & SCRIPPS, by ROBERT E. McGINNIS, ESQ. |

10,492-A

1

# INDEX TO WITNESSES

2

For Defendant Vail:                                        Page

3

BYRON R. BRUNER (Copied from                          10,540
    previous trial in Superior Court)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  San Diego, California, Tuesday, November 3, 1959.  10 A. M.

3      (Other matters.)

4      THE COURT:  In the Fallbrook case, gentlemen, next week

5  Wednesday is a holiday in the Federal Court, and Thursday a

6  judge's meeting has been called, so that takes Wednesday and

7  Thursday out of next week.  And I have a customer in the jail

8  over here who has brought a petition under 2255 that I plan to

9  try on Tuesday.  Do you want to come back Friday or cross off

10 the week?

11     MR. GIRARD:  I would prefer to cross the week off, your

12 Honor.

13     THE COURT:  With those two days out that we can't avoid,

14 I think we might as well.

15     The following week, the 18th, 19th and 20th are the dates

16 of this irrigation convention or whatever it is.  I understand

17 that certain of you want to attend that.

18     MR. SACHSE:  I will attend, your Honor.  Mr. Krieger

19 advised me that he will be in attendance.  I know that some

20 of the California engineers will be in attendance.  Whether

21 Fred (Mr. Girard) will be around I don't know.

22     MR. GIRARD:  I will not, your Honor.

23     THE COURT:  Can we work that week, or is it your desire

24 to have those days off?

25     You will not be particularly concerned, Mr. Sachse, if

10,494-A

1    we are going ahead with Vail's case.

2        MR. SACHSE:  If you are going ahead on Vail property, I

3    am not concerned.

4        THE COURT:  Didn't you plan to go ahead on Vail, Mr.

5    Veeder?

6        MR. VEEDER:  If Vail intends to go ahead.

7        As long as we are at this juncture, the pleadings have

8    not come in yet.

9        THE COURT:  Well, let's postpone that and we will take

10   care of it at the time.

11       (Another matter.)

12       THE CLERK:  Number five on the calendar, Case No. 1247-

13   SD-C, United States vs. Fallbrook.

14       THE COURT:  All right, gentlemen.

15       MR. VEEDER:  Your Honor, you made an inquiry to me a

16   moment ago before these other matters came up.  Mr. Stahlman

17   has asked for agreement on our part to withhold filing the

18   answer in the Vail Company case until Monday.

19       Isn't that right?

20       MR. STAHLMAN:  I did.  But I didn't receive too much

21   encouragement, so I worked over the weekend and I have it ready

22   to file at the present time.

23       THE COURT:  File it.

24       MR. STAHLMAN:  I want to look to see if I have signed it.

25       (Mr. Stahlman hands document to the Clerk.)

1          MR. STAHLMAN:  May the record show that the Government

2    has been served with a copy.

3          THE CLERK:  Mr. Stahlman (indicating)--

4          MR. STAHLMAN:  No, that is a verification.

5          I don't presume you want it verified, do you?

6          MR. VEEDER:  I don't think the rule requires it.

7          MR. STAHLMAN:  No.  We can dispense with the necessity

8    of verification.

9          THE COURT:  Just run a line through it.

10          Mr. Veeder, I will want some time to look this over.

11   No use doing it here.

12          You had a motion of some kind that should be disposed of,

13   a motion to strike some document on the grounds that it hadn't

14   been signed, and you were apparently ill-advised in making the

15   motion.  The original had been signed and filed with the Clerk,

16   and the copy you got was unsigned.  The copy doesn't have to be

17   signed.

18          MR. VEEDER:  Your Honor, in regard to requests for

19   admissions and in regard to interrogatories-- and those were the

20   matters to which the matter pertained-- I believe that they

21   have to be signed, and they certainly have to show some indica-

22   tion that they had been filed.

23          I might state, in regard to the subject matter, that they

24   related primarily to the question of a report by one Hooper,

25   and I have gone ahead to investigate and find out the matters

1  to which they pertained.

2      In regard to the Rules, your Honor, I believe it will be

3  observed that the rules under which he proceeded required that

4  they be served on the party from whom the data is desired.  I

5  don't even believe that it is necessary to file them with the

6  Court at all.  But certainly if one goes into the history of

7  Rules 33 and 36, the idea was that the relationship would be

8  between the parties and not to the court at all.  Now he was

9  not asking this Court for authority to serve those requests

10  for admissions or those interrogatories.  It has nothing to do

11  with the Court.

12      THE COURT:  I don't understand that at all.  In other

13  words, the original of a request for admissions is filed with

14  the Court, and the copy if served.  In the case of interroga-

15  tories, an original is filed with the Court and a copy is

16  served.  I don't know of any rule.  You will have to show me

17  the authority that the copy served upon you has to be signed.

18      MR. VEEDER:  I think I cited you authorities on that,

19  your Honor.  I think the authorities are very clear on that.

20      MR. STAHLMAN:  There are two other things on which Mr.

21  Veeder is a little misleading, I think.  In the first place,

22  the copy that was sent to Mr. Veeder was accompanied by an

23  affidavit of mailing.

24      THE COURT:  Let's wait until we see what we have here.

25      It was filed on October 24th, notice of motion to requests

1  for admissions to interrogatories.

2      MR. STAHLMAN:  What was the date your Honor had?

3      THE COURT:  Filed October 21st.  Pardon me.

4      MR. STAHLMAN:  It was mailed on the 12th of October.

5      MR. SACHSE:  His Honor is referring to the motion to
6  strike.

7      MR. STAHLMAN:  The motion to strike, yes.  The interroga-
8  tories were long before that, your Honor.  In fact, I have a
9  certification from the filing service that they were filed on
10 October 13th in the court at San Diego.

11     THE COURT:  Let me look at the motion.

12     Mr. Veeder, you submitted no authorities, except the
13 Rules and a couple of statements by Moore.  But those statements
14 are not in point; he doesn't talk about the copy having to be
15 served anywhere.

16     MR. VEEDER:  In that regard, your Honor, I believe that
17 the citations that are there and the comments that are made
18 make it clear, in my view, that certainly there must be some
19 showing as to the party from whom it came.  Here is George
20 Stahlman's name, completely blank.

21     THE COURT:  Let's see it.

22     (Mr. Veeder hands document to the Court.)

23     THE COURT:  Well, this is a silly motion.  It is just a
24 time waster.

25     MR. VEEDER:  I don't know why he doesn't sign it, your

1    Honor.

2         THE COURT:   The copy you received has his name up in the

3    corner; it says "Attorney for the Vail Company.  Request for

4    admissions," and there is typed in "George Stahlman, attorney

5    for the Vail Company."

6         MR. VEEDER:   Your Honor, I refer again to Rule 7(b)(2),

7    which requires signing.

8         THE COURT:   It doesn't talk about the copy.  Rule 7(b)(2)?

9         MR. VEEDER:   Rule 7(b)(2) requires signing.

10        THE COURT:   Let's just look at 7(b)(2).

11        All right.

12        I have been on the bench now ten years beginning last

13   Monday, and I have never heard this point even raised.   The

14   practice is always to file the original and to serve a copy.

15   Let's read Rule 7(b)(2):   "The rules applicable to captions,

16   signing and other matters of formal pleading apply to all motions

17   and other papers provided for by these rules."

18        MR. STAHLMAN:   Your Honor, may I make just one comment

19   also.   Several days prior to the time I received this so-called

20   motion of Mr. Veeder's I was called by Commander Redd, who

21   says that he had received a communication from Washington

22   requesting him to gather some of the information in relation

23   to the admissions and the interrogatories, that he didn't have

24   a copy and he was left a little in the dark.   So I made a

25   trip to Oceanside and personally delivered a copy to Commander

10499-A

1    Redd.

2        Furthermore, the procedure I have used here has been used

3    by Mr. Sachse for interrogatories to Mr. Veeder.  Mr. Veeder

4    answered those interrogatories.

5        MR. VEEDER:  He signed those.

6        MR. STAHLMAN:  No, they are not signed, any more than mine

7    were signed.  It is not required.  This is the same procedure

8    I have been following for thirty-five years in the serving of

9    documents, your Honor, and I don't think it was ever the intent

10   that a lawyer should sign every copy of every document that

11   goes out.

12       The one that was filed here in the court was signed, Mr.

13   Veeder.

14       THE COURT:  Any dispute about the fact that the original

15   was signed?

16       MR. VEEDER:  I didn't know it, your Honor.

17       MR. STAHLMAN:  He is right across the hall from the

18   Clerk's office.

19       I don't want to bring out the reason why Mr. Veeder is

20   picking fly specks out of pepper in connection with this case,

21   but I think it is obvious.

22       THE COURT:  The motion is denied.  It's a silly motion.

23   I have never heard it made before, and you have cited me no

24   authority.  The language you cite obviously refers to originals

25   and not to the copies.  The practice in California as long as

1   I have known it is to serve copies and to file originals. You

2   have a copy.

3       MR. STAHLMAN:  The time has elapsed, and time is very

4   vital.  When will we receive them?

5       THE COURT:  When are you going to answer them?

6       MR. VEEDER:  I will say this, that immediately upon

7   receipt of these interrogatories, or a copy of them, I called

8   the Marine Corps and asked them about it.  They knew nothing

9   about it, other than that there was in the file this statement

10  by Hooper of work apparently done for the Army.  We have con-

11  tacted Hooper, who now resides in Oceanside.  He states that he

12  has no knowledge or recollection in regard to the material there

13  involved.  We have, and are now, contacting everyone that we

14  can think of to find the data.

15      My own view is that it is completely irrelevant.  But if

16  we can find it, we will get it.  I simply don't have any source

17  of data or any means of finding out what those matters relate

18  to.

19      THE COURT:  Let me look at this.

20      Who was Hooper?  An agent of the Santa Margarita Rancho?

21      MR. VEEDER:  I understand he was a real estate man, and

22  I understand he is in San Francisco.  He was at Oceanside.

23  Apparently he is a real estate man in San Francisco.

24      THE COURT:  Is it conceded that he was a real estate man?

25      MR. STAHLMAN:  I don't know whether he is.

1          THE COURT:   What use do you expect to make out of the

2     document or the answers to your interrogatories and your

3     requests for admissions?   What use could you make of them?

4          MR. STAHLMAN:   I think it has a very significant use in

5     this case, your Honor.

6          THE COURT:   Well, what?

7          MR. STAHLMAN:   This document indicates that prior to the

8     time this document was submitted, which was February 24, 1941,

9     there was investigation on the Santa Margarita Rancho in line

10    with this by five Army officers investigating the ranch with

11    the objective in mind of some sale of that ranch to the Federal

12    Government.   That was less than two months after this document

13    here was transmitted, less than two months after the stipulated

14    judgment was signed.   Therefore, the significance of that phase

15    of this document-- there are several phases to it, but speaking

16    of that one phase of the document-- is that the United States

17    Government and the O'Neills, during the time of the negotiations

18    of the stipulated judgment, were aware of the fact that there

19    was in contemplation the sale of the Santa Margarita Ranch to the

20    Federal Government; and if that were so-- and I am sure it is

21    so and can be established as being so-- then in dealing with

22    the matter pertaining to the stipulated judgment there was a

23    confidence there that should have been divulged that this

24    ranch might, as it was the evidence showed a short time there-

25    after, be purchased by the United States Government and the

1   entire character of the property changed into a military

2   establishment, and in line with the rulings that your Honor

3   has already made in this case in pre-trial relative to the

4   water rights of the United States Government and the military

5   installation and the place of use that those are matters that

6   would naturally and logically be considered by the people who

7   were dealing in relation to the stipulated judgment, and I

8   think that those facts while they were dealing in relation to

9   this stipulated judgment should have been known to the other

10   side.

11      THE COURT:  I get it all but the "therefore."  Why was

12   there any duty on the O'Neills, when they were entering into

13   a stipulated judgment with the Vails, assuming that all you

14   say is true, to tell the Vails that the O'Neills were thinking

15   about selling their ground to the Government?  Where is there

16   any duty between people who deal at arm's length?

17      MR. STAHLMAN:  Are people dealing at arm's length when

18   they are sitting down and working out a stipulated judgment?

19      THE COURT:  Certainly if they are adverse parties to a

20   lawsuit and they are trying to settle it, they are dealing at

21   arm's length, if there was ever dealing at arm's length.  Where

22   is there any duty of a man who owns property, when he is dealing

23   with another property owner, to say to the man he is dealing

24   with, "I may sell my property next week to X, Y or Z"?

25      MR. STAHLMAN:  It is not a question of if I may sell.  It

1     is a question that they already had knowledge.

2          THE COURT:  What difference does it make?  They could

3     give this new buyer only the rights--

4          MR. STAHLMAN:  The rights at that time had not been

5     established.  That is the point, your Honor.

6          THE COURT:  Just a moment.

7          (An interruption.)

8          MR. STAHLMAN:  The rights at that time, your Honor, had

9     not been established.

10         THE COURT:  I still don't get it.  It is true that the

11    stipulated judgment between Vail and the O'Neills had not been

12    entered into.  But why would O'Neills plan to do with the Santa

13    Margarita have any effect upon their rights?

14         MR. STAHLMAN:  Let me put it this way, your Honor.

15    Assuming your Honor is sitting down and you are a lawyer now

16    and you are about to enter into or you are considering and you

17    are talking and advising in relation to what disposition should

18    be made of that case, and here are two people who over a period

19    of four years had had litigation in relation to two farm

20    properties, and one party knows that in the near future this

21    large ranch is going to be turned into a military installation

22    with different types and kinds and characters of water use and

23    different riparian considerations, which is what we are doing

24    in this case here now-- finding out something entirely different

25    than what was considered at that time.

1    THE COURT:  It is true that maybe the Vails would like

2  to have known this.  But where is there any duty-- assuming

3  that Santa Margarita was negotiating at the time the Vail

4  judgment was signed, where was there any duty on the O'Neills

5  to divulge these facts?

6    MR. STAHLMAN:  I think if your Honor wants to go into

7  the legal aspect of it, I think I would like to have a little

8  time.  I have just worked up this Answer.  We have some law

9  in connection with it.  The matter is in issue in so far as the

10  Answer is concerned, and before I answer your Honor on that

11  point I would like to have a little further opportunity to

12  look into it.

13    THE COURT:  If the Government by the purchase of the

14  Rancho Santa Margarita could enlarge water rights, if the

15  Government had any rights of sovereignty in this matter, which

16  of course they have been advancing and which I have ruled

17  adversely to them, if that were true, then there might be a

18  different situation.  But the Government came in and advised

19  the Rancho Santa Margarita.  They got just what they bought.

20  The mere fact that they are the Government doesn't give them

21  any more rights than anybody else.  Therefore, what difference

22  does it make?

23    MR. STAHLMAN:  I think a number of aspects of this case

24  would have been changed by what has succeeded the entry of that

25  stipulated judgment.  For instance, one thing they have that

1   the O'Neills didn't have is the very thing that was pointed

2   out in the Ninth Circuit decision, that within the enclave they

3   can do with the water what they want.

4       THE COURT:  How does that hurt you?  If they do with the

5   water within the enclave what they want, how does that hurt

6   you?  That doesn't mean that they have a right to have more

7   water come down.

8       MR. STAHLMAN:  Also in relation to the stipulated judgment,

9   it was provided that the parties could put water outside the

10  watershed.  The military then came down and put a vast quanity

11  of water outside the watershed.  That has also had an effect

12  upon the quantity of water that Vails may utilize in relation

13  to that provision of the stipulated judgment that provides

14  that one-half of the water used by the O'Neill Ranch would be

15  considered as the one-third.

16      THE COURT:  What was the date of the stipulated judgment?

17      MR. STAHLMAN:  The stipulated judgment was December 26,

18  1940, and the date of this document is February 24, 1941.

19      But the document itself shows-- and these things don't

20  move too fast-- there had already been a corps of five engineers

21  on that property down there, and that certainly must have

22  preceded this document here and this investigation.

23      THE COURT:  Let me hear from Mr. Veeder.

24      Am I wrong in my view in this?  What is your view?

25      MR. VEEDER:  I think your Honor is absolutely right in

1    that connection.

2         I add this additional fact, that the apportionment

3    between the Vail Company and the United States of America is

4    precisely the same as it was between the Rancho Santa Margarita

5    and the Vails.  There is no increased burden on the Vail

6    Company by reason of the fact that we are using the water for

7    purposes of the military.  If we said that we want three-fourths

8    rather than two-thirds, or if we wanted to change it; but we

9    don't-- we simply say we are living with the stipulated

10   judgment.  What difference would it make-- indeed, if we

11   review the stipulated judgment we will observe that there is

12   no mention of the agricultural uses.  The idea is the use

13   of the water two-thirds and one-third.  Had we attempted, or

14   had we even suggested, that we desired more than is provided

15   for in the stipulated judgment, there might be some basis to

16   what Mr. Stahlman has said.

17        Otherwise, my view is that they were dealing at arm's

18   length.

19        I truly don't see the relevancy of it.  When I first read

20   this matter I was prepared to file an objection on the grounds

21   that it was totally irrelevant.

22        THE COURT:  Is there any dispute that this document was

23   received by the military, by the Government?

24        MR. VEEDER:  I will say this, your Honor.  I have had

25   the Marines check on it, and in the central files there is a

1  copy of this letter.

2      THE COURT:  Then you could stipulate that it had been

3  received by the Government?

4      MR. VEEDER:  I will say that a copy of it had been

5  received, yes.  I don't think it is even doubtful.  But I

6  don't know whether anybody with any authority -- I don't know

7  where it came from.

8      MR. STAHLMAN:  Your Honor recalls how that document

9  came into this court.

10     MR. VEEDER:  Col. Robertson brought it in.

11     MR. STAHLMAN:  Mr. Sachse asked for it.  There were a

12  number of documents, and they picked out the one.  I didn't

13  realize the significance of this document until I started

14  working out the Answer and found out the dates that appear on

15  the document.

16     Beside that there are a lot of dates in there on the

17  water situation.  But I don't attach the significance to that

18  that I do to the--

19     THE COURT:  Well, I will not rule on it finally.  But

20  you write out what you expect that you would prove with this

21  document and with these requests and these interrogatories--

22  what issue in the case you think it would prove.

23     MR. STAHLMAN:  Very well.

24     THE COURT:  How it is material.

25     MR. STAHLMAN:  When your Honor reads the Answer you will

1   see the significance that we attach to it in so far as the

2   Answer is concerned, and then it may be necessary in order to

3   settle that one point to present law to your Honor.

4       You see, here is the fallacy of the thinking at this time.

5   The stipulated judgment is now in existence. Yes, you can

6   say, "O.K., we live by the stipulated judgment." But the

7   considerations that went into it in sitting down and determin-

8   ing this stipulated judgment, I think it would certainly be

9   of the utmost significance and importance to the people who

10  were dealing on behalf of Vail Company to know about this

11  impending change of the character of this property, and they

12  are matters of consideration that would certainly go into

13  whether or not we would sign the stipulated judgment.

14      THE COURT:  When are you going to submit that to me?

15      MR. STAHLMAN:  I would like to have a little time on it,

16  your Honor.  I don't know how busy we are going to be.  I have

17  a number of other things to takeup that I hope will not give

18  Mr. Veeder as much comfort as this does.

19      THE COURT:  How long do you want?

20      MR. STAHLMAN:  I would like to have as much time as your

21  Honor can give me-- at least I would say 30 days.  15?

22      THE COURT:  You don't need 30 days.

23      MR. STAHLMAN:  I am going to be in court here this week.

24      THE COURT:  We didn't finally decide about the week of

25  the 17th.  What about this convention?  Are we going to go

10,509-A

1  ahead that week?

2      MR. SACHSE:  I feel confident, your Honor, that anything

3  that would be going on here for those three days I could take

4  care of from a transcript.

5      THE COURT:  It will depend on what work we line up.

6      It doesn't have to be lengthy, Mr. Stahlman.  I want to

7  know the logic of it, what you think you could prove by this

8  document and these answers, if you get them.

9      MR. STAHLMAN:  Very well.

10     THE COURT:  What you could prove by it and how it would

11  be material in this case.

12     MR. STAHLMAN:  Fine.

13     THE COURT:  You file that by November 17th.

14     MR. STAHLMAN:  All right, November 17th.

15     MR. SACHSE:  While you are talking dates, your Honor,

16  apparently I made a mistake in my notes in what you said about

17  the preceding week.  Did you say you have Tuesday occupied also?

18     THE COURT:  I have Tuesday occupied.  I am going to close

19  that whole week because the middle days are out and these

20  gentlemen from some distance coming down here for Friday would

21  be a silly thing.

22     MR. SACHSE:  Thank you.

23     MR. GIRARD:  Your Honor, is it finally determined whether

24  we are going on the following week?

25     THE COURT:  Tentatively we are.

10,510-A

1    MR. GIRARD:  All right.

2    MR. STAHLMAN:  Another thing that I think has significance

3  in relation to a number of things that have occurred, and that

4  is, has the Government rested, or when will they rest in this

5  case?

6    MR. VEEDER:  I think that is extremely clear.  I think

7  a year ago, and I have repeated it once a week, that until I

8  find out where the Vail Company stands in this matter I am not

9  going to rest, and I haven't rested.

10    THE COURT:  The answer is that you haven't rested?

11    MR. VEEDER:  That is right.

12    THE COURT:  You will tell us after you have reviewed Mr.

13  Stahlman's answer?

14    MR. VEEDER:  I think this, your Honor.  From our stand-

15  point, the ruling on the stipulated judgment is of most import-

16  ance to us.

17    I had quite a conversation the other day with George

18  Grover, who represents Gibbon and Cottle, and he asked me to

19  state into the record now that he didn't think there was any

20  reason for him to be here, but if there is going to be any-

21  thing that could involve his client's interests he asked me

22  to call him on it.

23    MR. STAHLMAN:  He hasn't answered your Honor's question

24  at all.

25    MR. VEEDER:  In regard to the matter of the stipulated

1  judgment, if your Honor rules one way the case we will try

2  against Gibbon and Cottle will be quite different than the case

3  we will try if the stipulated judgment is sustained.  Obviously

4  the Vail Dam and reservoir is a matter that changes the entire

5  circumstance factually so far as the National Government is

6  concerned, and if that structure is to be operated in accord-

7  ance with the stipulated judgment we have one set of facts and

8  circumstances with which we will be concerned.  However, if the

9  Vail Company says it is no longer bound by the stipulated

10  judgment, our concern is greatly different.  And that is why I

11  have not rested.  I will rest as soon as I find out what is

12  going to be done about the stipulated judgment.

13      MR. STAHLMAN:  The brief that Mr. Veeder filed in opposi-

14  tion to the brief we had submitted in connection with the

15  stipulated judgment requires an answer-- at least, we want to

16  answer it, and I think that should be in the case submitted

17  here before we take testimony on the stipulated judgment.  And

18  there are a lot of other reasons why the matters pertaining

19  to the stipulated judgment should not be heard until the end

20  of this case, and they are as follows:--

21      THE COURT:  This is going to be pertinent, because I

22  have expected thatyou were going to go forward with proof on

23  whatever your case was on this judgment.  Why shouldn't you

24  go forward now?

25      MR. STAHLMAN:  There is a great deal of evidence that

1  affects this stipulated judgment that must come into this case,

2  your Honor.  For instance, one point that we have raised --

3  and here is the difficulty of getting into these discussions

4  such as we have had here at the present time-- the answer has

5  just been filed and there is reference made to one aspect of

6  this stipulated judgment that is incapable of performance,

7  and one of the factors that enters into its incapability of

8  performance is the development to the east and to the north

9  of the Vail Ranch, and I think that testimony should be in

10  this record to determine what the water usage is or the water

11  duty or the water rights of the streams which flow into the

12  Vail properties.  I think it will clearly show, when the

13  evidence is in here, that your Honor couldn't possibly enforce

14  this stipulated judgment.  And those are cogent and important

15  facts that should be in the case.  If this judgment is to

16  remain in force and effect, then your Honor has got to be in a

17  position to say that it is a judgment that you can enforce, and

18  we submit that it cannot be enforced, and it is one of the

19  factors that enter into it.

20      There are other factors that enter into it.  I have

21  reserved cross-examination of some of Mr. Veeder's witnesses

22  that have a bearing on some of the matters which we have alleged

23  in our Answer here; that the stipulated judgment is completely

24  inequitable and unfair, that you cannot determine the quantity

25  of water that Vail receives in relation to the character and

1  kind of measurements that are made.  And there are many other
2  factors that are coming into this case as evidence that have
3  a bearing upon the stipulated judgment.  I don't feel that we
4  should try it piecemeal.

5      THE COURT:  Wouldn't this break itself down in this
6  respect, that persons who had lands and rights upstream from
7  the Vail Dam, in those instances the Government's position would
8  be that they would have to find out where they stood on the
9  Vail judgment before we try those parcels; but as to the area
10  that you are talking about, north and east-- Temecula and east
11  of the Murrieta, those areas would not be upstream from the
12  dam, and would your argument be as pertinent as to those?

13      MR. VEEDER:  I think it would be, your Honor.  First, I
14  want to be sure to orient myself on the basis of what Mr.
15  Stahlman has just stated.

16      When you say north and east, George, are you speaking of
17  matters above Vail Dam?

18      MR. STAHLMAN:  I am speaking of above Vail Dam and also
19  to the north, which is on the Santa Gertrudis and the Murrieta.
20  There are factors up there that importantly enter into this
21  situation.  As to whether or not the Vail judgment is to remain
22  in force and effect or to be abrogated, why should that in any
23  way affect the testimony that comes in in relation to the land
24  and the water duty of these other people?  Vail is already
25  putting in evidence in relation to those matters, and none of

1  these other people has--

2  THE COURT: It doesn't make a lot of difference which

3  goes in first. I am not going to decide the matter until all

4  the evidence is in. It doesn't make any difference which comes

5  in first-- I don't see anything to that, except the Government's

6  intimation that they are going to fight harder on some of this

7  area if the Vail judgment goes out and they are going to fight

8  if the Vail judgment stays in.

9  Isn't that the intimation in your remarks?

10  MR. VEEDER: I certainly didn't intimate that I would

11  try the case any less hard one way or the other.

12  But I want it clear as to what we were talking about.

13  In regard to Cottle and Gibbon, for instance-- they are up-

14  stream, they are above Vail Reservoir-- they are claiming

15  appropriative prescriptive rights and a variety of rights,

16  as are the Oviatts-- they are claiming a variety of rights.

17  Now, from our standpoint there is a very sharp and immediate

18  conflict, in our view, between Vail Company and those interests.

19  But from our standpoint if we have to try each parcel of land

20  to determine whether it is riparian or not, we could stipulate

21  to a great many things with these people, but as it now stands

22  we don't know whether we are going to have the regulation on

23  the stipulated judgment which will guarantee us a supply of

24  water from the Vail Company or whether we will have to determine

25  the Vail Company correlatively with everybody upstream. That

1    is our concern.

2         Your Honor raised another question in regard to north

3    of the area-- the Roripaughs.  Your Honor will note that the

4    crest of the watershed is the subwatershed of Santa Gertrudis

5    Creek, which is between the Roripaughs and the main place of

6    water use by the Vails.  The rights and interestes of the

7    Roripaughs take on an entirely different aspect when we

8    consider the right to use water outside the watershed, or we

9    have in the stipulated judgment an arrangement whereby Vails

10   can use the water anywhere.  It will make a great deal of

11   difference to us whether Vails transport the Temecula water

12   over into the Santa Gertrudis watershed for use or if they

13   have that right.  They have it now under the stipulated

14   judgment.  Our views and the trial of our case in regard to

15   what is riparian and what is not riparian becomes greatly

16   accentuated if the stipulated judgment goes out, and that is

17   why the Vail Company, having started to put in their case then

18   this issue came up that George hadn't pleaded yet.  Now that

19   George has pleaded in the middle of this case, in my view the

20   Vail Company should go on and wind up their case.  I am

21   anxious to wind up ours, but until I know where we stand in

22   regard to the Vail Company, the Coahuilla Indians, all those

23   other matters that turn directly and immediately upon this

24   thing, I think should be resolved first.  At least, George

25   should complete his case so we know where we stand.

1    MR. STAHLMAN:  I don't think he has answered the question.
2  I think he has wandered around.  What he has said leaves me
3  rather cold.  I don't think he is meeting the issue at all.
4        Here are several other factors.  We are talking about the
5  time when the Vails should present their evidence.  Here is
6  another factor.  Mr. Veeder submitted to your Honor awhile
7  back proposed matters to be considered on pre-trial in connec-
8  tion with this stipulated judgment, and your Honor, I believe,
9  has indicated that there should be some pre-trial.  That hasn't
10 been had.
11       In addition to that, this brief which Mr. Veeder filed,
12 raising these questions-- the matter of the relation to the
13 Vail Dam, the matter in relation to the drilling of this so-
14 called Navy well-- those are important factors.  I have gone
15 so far into it.  I haven't had the opportunity to know that
16 Mr. Veeder hasn't presented all of the matters that pertain to
17 those things.  There are various documents.  We are the process
18 of gathering those now.  That has to be done.  And as your
19 Honor indicated the last time, that I would have further time
20 in connection with that brief.  Mr. Veeder has raised questions
21 in connection with that brief that, I think, we have to meet,
22 and I think we should meet and we will meet.  But he has just
23 raised them for the first time.  I have made one trip to
24 Sacramento already and have obtained a number of documents,
25 which I found out Mr. Veeder has and didn't know he had, and he

1   presented part of them and not all of them.  And I want to be

2   careful when I go into this stipulated judgment that I have

3   had the opportunity, particularly in relation to those matters

4   that Mr. Veeder has raised in this ramified brief of his, to

5   be able to meet those situations, because there is considerable

6   background to the drilling of the Navy well, there is con-

7   siderable background to the letter that was written with

8   relation to withdrawing the application of Vail to the Water

9   Resources Board.  All those matters should come in before this

10  Court.  He has raised them just recently.  He knows that we

11  have raised the question in connection with the stipulated

12  judgment.

13          However, as I say, there is other testimony in connection

14  with these cases and you have to have the rounded picture--

15  what is the resume of this river, and how it functions-- in

16  order to determine whether or not the judgment itself could

17  even be enforced.  So I submit that the kind and type of

18  evidence that he talked about here would have no effect what-

19  soever.  These people's physical facts that they have in

20  relation to their property, whether they have appropriative

21  rights or riparian rights or what rights they have, cannot in

22  any possibility be affected by whether or not the stipulated

23  judgment as a matter of law should remain in force and effect

24  or whether it should not.

25          So I would think we are going to be hitting at this

1  stipulated judgment all through this case. Here and there

2  it will come up when we can take the evidence in this case.

3      THE COURT: I am going to give you some time, but it

4  comes will ill grace to come in here at this late date and

5  say you want additional time to prepare your case. The case

6  has been pending for a long time, we have had long recesses,

7  and apparently you are still not ready to go ahead. It doesn't

8  look to me like it makes a lot of difference.

9      MR. STAHLMAN: What does your Honor say in relation to

10 these matters that Mr. Veeder has put into this brief, which

11 I haven't even had an opportunity fully to assimilate, and

12 which requires the obtaining of documents in other places? He

13 has raised those questions. We certainly should have an

14 opportunity to gather that evidence together.

15     MR. VEEDER: I believe those matters-- and I want to

16 check, Mr. Stahlman, but I believe I have lodged those matters

17 as exhibits in this case several months ago.

18     MR. STAHLMAN: Not several months ago. Some short time

19 ago you put in some of them.

20     But in this brief, your Honor, where he rambles on about

21 what happened to the Navy well and the great wealth of the

22 Vails and all those matters, there are some significant things

23 there. This letter in relation to the withdrawing of the Navy

24 permit, it is going to take several days to put that evidence

25 on. It shows an entirely different picture than he has in his

1    brief.  And there are other matters in that brief which I want

2    an opportunity fully to go into before we put on our evidence.

3         THE COURT:  Did you file some suggestions on pre-trial?

4         MR. STAHLMAN:  Yes, your Honor.

5         THE COURT:  If you did, I didn't see them, Mr. Veeder.

6         MR. STAHLMAN:  At least, I have a copy of it.

7         MR. VEEDER:  I think they are in the Court file, your

8    Honor.  They were filed just in rough outline on September

9    26, I believe it is, your Honor-- just the modus operandi.

10        MR. STAHLMAN:  Suggested pre-trial order.

11        MR. VEEDER:  I believe I did that after the conversations

12   with your Honor.

13        THE COURT:  I find the original here.

14        MR. STAHLMAN:  My copy isn't signed.  Nor is it dated.

15        MR. VEEDER:  I move to strike that.

16        THE COURT:  Take a short recess.

17        (Recess.)

18        MR. VEEDER:  That was a most tentative write-up I put

19   in there, your Honor.

20        THE COURT:  Yes.  I can't find my copy of it.  That was

21   a good start on it, and now in view of the Second Amended

22   Answer we could restudy it.

23        I think Mr. Stahlman should have prepared something in

24   the way of an outline of what his case is going to be.

25        MR. STAHLMAN:  Very well.

THE COURT: How can we get this case on the road and start taking testimony and get through with all this argument? We can have plenty of argument later on.

MR. STAHLMAN: There is one other thing I would like to mention in relation to what we have been talking about, your Honor, and that is that they are still making tests up there that have a bearing on this situation.

THE COURT: George, it's like trying a conspiracy case. You have tried them. You can't put in all the evidence at one time.

MR. STAHLMAN: I don't like the way most conspiracy cases are tried.

THE COURT: Well, whether you like the way they are tried or not, that is the way they are tried. And the defense will object that this doesn't prove anything. You have to wait until it is all in.

Now, this can't be decided in segments. I am willing to give you some more time to get ready to come forward with your witnesses and try this case. But meanwhile let's start to take some evidence and get moving in this case.

MR. STAHLMAN: Very well, your Honor.

Now there is one other thing. You recall that we started taking testimony up there in relation to these properties in Murrieta Valley on the same subject that Vail has already introduced evidence on, and all of a sudden they stopped. I

1   anticipated that these people up in the Valley would come in.

2   Vail has been most cooperative in this case, I think.  They have

3   been going on our ranch, they have been taking all these tests,

4   we have produced documents for them, we have produced exhibits.

5        THE COURT:  You have all been cooperative, we will agree.

6   The question is now, when can you start to try the issues on

7   the stipulated judgment?

8        MR. STAHLMAN:  As I indicated to your Honor, I am firmly

9   of the belief that we would save a lot of time by trying the

10   matter of the stipulated judgment after the other evidence is

11   in in this case and the geology is completed.  It has a direct

12   bearing on matters that are affected by the findings of fact

13   in the previous case-- the matters pertaining to the irrigable

14   acreage that is on the upper reaches of the stream before that

15   water reaches the Vail property, so that you can determine

16   whether or not, from those circumstances, this judgment is

17   capable of performance.  So I think the logical process, in my

18   mind, to save time in this case, is to get this type and kind

19   of evidence completed in the record, such as what is the

20   irrigable acreage in that watershed-- it has a bearing upon

21   it, and when we have that in there it will reflect upon the

22   factors in relation to the stipulated judgment.

23        THE COURT:  We are not going to be able to accommodate

24   both of you in your request that all of one kind come in before

25   all of the other, but before the thing is decided it will all

1    be in.  So I don't think that makes a lot of difference.

2         Mr. McGinnis, when would you be ready to go forward with

3    your client?

4         MR. McGINNIS:  Your Honor, in connection with my client,

5    I have before the Court this morning a motion to remand the

6    trial of their case to the Special Master.  I think, upon

7    reviewing the situation, if the Court will feel so inclined,

8    we have and claim no rights to take water from the river at

9    all.  The affidavit of Mr. Sawday, one of the partners in the

10   ranch, to that effect is in the file.

11        THE COURT:  You claim no right what?

12        MR. McGINNIS:  To take water from the Santa Margarita

13   River itself.  At the beginning of the trial we owned land on

14   that river and we had a pump and sump located on that land

15   for the purpose of taking water from the river.  Since then

16   that property has been subject to a condemnation suit by the

17   Fallbrook Public Utility District and the case was settled

18   last November, with the result that we were condemned out,

19   our property rights were all taken by the District, and conveyed

20   to them, and we claim absolutely no right to take water from the

21   river itself, other than of course to receive it from the

22   Fallbrook Public Utility District as a paying customer like

23   anyone else in the area.

24        THE COURT:  Then you don't claim any rights in the stream,

25   and all you claim is what vagrant percolating water lies under

1    your ground.  Is that it?

2        MR. McGINNIS:  Your Honor, first of all, as to to the

3    vagrant local percolating water, Col. Bowen has testified that

4    all of the ground waters on our ranch are of that kind.

5        THE COURT:  Tell me where your ranch is located, so that

6    I can get oriented.

7        MR. McGINNIS:  I don't believe it shows on that map,

8    your Honor, but it is just east of Sandia Creek and north of

9    the river.

10       THE COURT:  You are downstream from the Narrows?

11       MR. McGINNIS:  Yes, sir.

12       MR. STAHLMAN:  I happen to know where it is.  It is up

13   on Sandia Creek.

14       MR. SACHSE:  It is not on Sandia.  It is on a tributary

15   of Sandia; it is on Lyons Creek.

16       MR. McGINNIS:  Just east of Sandia Creek.  And I believe,

17   as Mr. Veeder stated this morning, it is below the river.

18       THE COURT:  How many acres?

19       MR. McGINNIS:  We have about four to five hundred acres

20   of land.  In the Answer we alleged we had irrigable acreage

21   of about 290 acres.  Of course, we have received a soil survey

22   from the Government since that time.

23       THE COURT:  Are you riparian?

24       MR. McGINNIS:  We are riparian to Bryan Creek.  The legal

25   status of that creek, I believe, is somewhat in question.

1    THE COURT:  Bryan Creek doesn't flow except in the

2  wintertime?

3    MR. McGINNIS: That is right; it flows only during and

4  after periods of precipitation.  But we are contiguous to it.

5    THE COURT:  And the Master has taken testimony as to the

6  character of the water underneath the ground?

7    MR. McGINNIS:  He has not.

8    THE COURT:  I thought you said that Col. Bowen had

9  testified.

10    MR. McGINNIS:  Col. Bowen testified to that during the

11  main trial here, your Honor.  I have a copy of that portion

12  of the transcript.  It was in connection with the general

13  evidence, I believe, that was taken here in trial, and I

14  believe Mr. Sachse was cross-examining Col. Bowen at that time

15  and brought out the information which just happened to cover

16  our lands.  It came out incentally in the previous trial of the

17  case.

18    THE COURT:  And it covers all of your land?

19    MR. McGINNIS:  That is correct.

20    THE COURT:  Is there any problem here, then?

21    MR. VEEDER:  Your Honor, I think this may be helpful to

22  your Honor.  I have been talking to Mr. McGinnis quite ex-

23  tensively on this matter.  He has requested data from us.  We

24  have it available for him.  He is viewing it.  I believe,

25  actually-- and I want him to correct me on this if I am in

1    error-- I believe the only issues that would arise are by

2    reason of appropriative filings or applications to appropriate

3    rights to the use of water which are now pending but concerning

4    which no action has been taken in Sacramento.

5         Isn't that right?

6         MR. McGINNIS:  That in essence is correct.  The question

7    that might arise before the Master, your Honor, with reference

8    to this creek is whether or not, since it did flow only during

9    or after periods of precipitation, there was any question of

10   rights on it or whether the water was just surface water that

11   flowed off any land.  But the only matters that could remain

12   in issue are, first, the applications to appropriate water

13   which have not been acted on.

14        THE COURT:  Are these to appropriate water out of Bryan

15   Creek?

16        MR. McGINNIS:  That is right, not out of the river.

17        MR. VEEDER:  I have suggested to Mr. McGinnis that before

18   he go any further in regard to hearings before your Honor or

19   before the Master, that I believe his case is ripe for settlement

20   by stipulation between us, and we are working on it at the very

21   moment.

22        Isn't that right?

23        MR. McGINNIS:  I agree with Mr. Veeder.

24        I have this to advance, your Honor.  It is obvious that

25   we have no rights, and claim no rights, in the main stream.

1    So I would suggest that while we are negotiating, and now, the

2    Court make an order that any rights we do have, since they

3    are not affected by the main stream, be decided before the

4    Special Master.

5        THE COURT:  Why before the Master, since the evidence

6    as to the vagrant percolating waters was taken before me--

7    why before the Master?

8        MR. McGINNIS:  Because it affects lands which are not

9    on the main stream.

10       THE COURT:  That doesn't make any difference.  I am going

11   to have to adopt, reject or modify the Master's findings on

12   these other areas.

13       MR. McGINNIS:  It is so much simpler, from our stand-

14   point, to attend a Special Master's hearing, which at the most

15   I would anticipate would last part of a day, instead of being

16   involved in the trial which, with other matters being argued,

17   for example like this morning, would involve a lot of time.

18       THE COURT:  It seems to me that we can get you out of

19   this case pretty shortly, if the record as to the character of

20   the waters under the ground is as you say it is.

21       MR. McGINNIS:  Yes.

22       THE COURT:  And if you make no claims to the waters of

23   the Santa Margarita, or to put it another way, if all you claim

24   is what rights you might have in Bryan Creek, which flows only

25   in the wintertime.

1    MR. McGINNIS:  That is right.

2    THE COURT:  And if you have pending applications to

3    appropriate which would have to run their own course, and this

4    appropriation, I would take it, would mean building a dam

5    or something on Bryan Creek to impound some of that water.

6    MR. STAHLMAN:  The dam is already there.

7    MR. McGINNIS:  The conservation dam is there now, your

8    Honor.

9    THE COURT:  It seems to me that this is right for an

10   interlocutory judgment.

11   MR. VEEDER:  Precisely, your Honor.

12   MR. McGINNIS:  I agree.  It is just a question of

13   mechanics.

14   THE COURT:  Is this the only client you represent?

15   MR. McGINNIS:  That is all, your Honor.

16   THE COURT:  Then I would suggest that you immediately

17   start on this.  We have had two of these judgments already,

18   one involving Mr. Swing's client where the part of the land

19   lay outside the watershed and some of it was in the watershed

20   on top of a mountain.  We have the second one involving a

21   series of Mr. Sachse's clients.  I would suggest that you

22   start the preparation and work with Mr. Veeder on an inter-

23   locutory judgment based upon the record so far in this case.

24   MR. SACHSE:  Your Honor please, I am very familiar with

25   this, because as Mr. McGinnis says, we bought their land.  It

1  seems to me that unless Mr. Veeder chooses to rebut the matter

2  that is already in evidence, everything necessary for a claim

3  in this case is in.   It was my cross-examination, your Honor,

4  will recall generally, where Col. Bowen was testifying to Sandia

5  and so on, and I asked him the broad general questions about

6  land indicated as residuum, et cetera, and in each case in that

7  area he stated that in his opinion the water was vagrant, local,

8  percolating.  We can stipulate readily the record shows that

9  Sawdays no longer divert water from the river proper and now

10  take water from Fallbrook as a paying customer.  Now the

11  question of their appropriative rights are already in evidence.

12  If we don't -- don't forget that the State introduced copies

13  of every pending application on these streams.

14          THE COURT:  Those aren't yet appropriative rights.

15          MR. SACHSE:  They are pending applications.

16          THE COURT:  They are pending applications.

17          MR. SACHSE:  In other words, if Mr. Veeder wanted to

18  elaborate or to rebut, there is enough here that some kind

19  of judgment could be written already on this parcel.

20          MR. McGINNIS:  There is no question either, your Honor,

21  that pending applications would be subject to the downstream

22  riparian rights of the United States anyway.

23          MR. VEEDER:  Mr. McGinnis and I have gone about as far

24  as we can go.  We are now down to writing the findings of

25  fact.

1      THE COURT:  Specifically, do you intend to rebut the

2  testimony in the record as to the character of this vagrant

3  percolating water?

4      MR. VEEDER:  At this present juncture, no.

5      THE COURT:  Well, let's forget present juncture.  Do you

6  now, or at any time, propose to rebut that?

7      MR. VEEDER:  No.

8      THE COURT:  Then we are prepared to work on an inter-

9  locutory judgment and get Mr. McGinnis's client out of this

10  case.

11      MR. VEEDER:  That is right.  We agree with him.

12      THE COURT:  When will you start to do this?

13      MR. VEEDER:  We started this morning, your Honor.

14      MR. McGINNIS:  In that connection, your Honor, I would

15  like to mention that last year I filed a request for admissions

16  and then I submitted some title information to Mr. Veeder, and

17  finally this fall I made a motion to compel the answer of them,

18  and that motion also was on for hearing this morning.  This

19  morning then Mr. Veeder handed me a letter which embodies the

20  proposed answers which he has.  I agreed with Mr. Veeder that

21  I would sit down with Mr. Sawday and go over these, and I feel

22  very much inclined that we could probably stipulate to every-

23  thing, with minor modifications, and arrive at agreement.  I

24  would suggest that, first of all, this motion of mine to compel

25  answers be continued until some date reasonably off in the

1  future and that I go ahead then and --

2      THE COURT: Instead of that, why don't we just deny it

3  without prejudice to your renewing it later at some time, if

4  necessary?

5      MR. McGINNIS: All right.

6      THE COURT: I think you are going to be able to work it

7  out.

8      Is that agreeable?

9      MR. McGINNIS: Agreeable.

10      THE COURT: Denied without prejudice to being renewed

11  if you are so advised. You have already got some of the

12  material, and you may never have to bring it up.

13      MR. VEEDER: Haven't we just about answered everything,

14  and haven't we just about agreed upon everything?

15      MR. McGINNIS: I think we have.

16      THE COURT: Your motion to remand to the Master will be

17  denied, because we are in a position now to draw an inter-

18  locutory judgment and get you out of the case, subject to a

19  final hearing when everybody can object to the interlocutory

20  judgment. You understand the procedure we are following on

21  that, do you?

22      MR. McGINNIS: I have seen one of the interlocutory

23  judgments that has been entered.

24      THE COURT: Our thought is this. The interlocutory

25  judgment would be signed up, but it would provide that sometime

16,531-A

along the line this interlocutory judgment would be served on

every defendant in this watershed, and they would be given a

chance to object, and if there was no objection, as there

probably wouldn't be-- I can't see how anybody would be con-

cerned-- then this judgment would be found to be binding on

all the parties in the case and eventually in the final

judgment the interlocutory judgment would be incorporated by

reference.

Your motion to remand to the Master is denied.  I don't

think you are going to have to sit around and listen to this

Vail argument.

MR. McGINNIS:  I hope not.

THE COURT:  I have already ruled on the motion of the

Government to strike the requests for admissions.  That was

denied.

What about the motion of Vail Company to admit the

testimony of Byron R. Bruner, the man in Okinawa?

MR. VEEDER:  I will make a statement of our position in

that connection, your Honor.  We certainly have no desire to

keep that evidence away from your Honor, and we feel that,

subject to my review of George's Answer, that as of the moment

I simply say, "Well, by all means review it, subject neverthe-

less to our objections on the grounds of its relevancy, if I can

reserve that right, and then a motion to strike because of the

irrelevancy of it.

10,532-A

THE COURT:  All right, the motion of the Vail Company to admit the testimony of Bruner is granted.  The Government is granted the right to reserve a motion to strike all or parts of it if they are so advised.  You have to bring them up specifically.

MR. VEEDER:  Yes, your Honor.  I am simply bringing the point up that I don't know what is in this Answer yet.

There is an additional factor that I would like to bring up.  We have contacted Mr. Bruner, and he is available to be called, if George wants to call him.

MR. STAHLMAN:  I received this copy of this telegram from Col. Robertson.  He is in Okinawa, and he was in the Government service in Okinawa.  If it would be necessary to bring him over here for that short testimony.

MR. VEEDER:  I sent another wire-- another wire went out just the day before yesterday.  He is still available.

THE COURT:  If the Government wants to call him, they may call him.  But meanwhile I understand we are going to admit his testimony.

Was it set forth as a supplement to your motion?

MR. STAHLMAN:  Yes, I have submitted to Mr. Veeder photographed pages of the testimony.

THE COURT:  Did I get a copy of it?

MR. STAHLMAN:  I filed it.  I have one for your Honor now.

1    MR. VEEDER:  I do have the right, as I understand it,

2  by agreeing to this situation, to file a motion to strike on

3  the basis of irrelevancy and lack of foundation.

4    THE COURT:  Let's forget about lack of foundation.  What

5  do you mean by "lack of foundation"?

6    MR. VEEDER:  I am still talking about the--

7    THE COURT:  You are talking about materiality?

8    MR. VEEDER:  Yes, that's right.

9    THE COURT:  Whether it tends to prove or disprove any

10 issue?

11   MR. VEEDER:  Yes, and whether it tends to support the

12 Coit survey.  That is the only thing I am interested in.

13   THE COURT: Let's get it clear.  You are making no

14 objection to the competency of this testimony which was taken

15 in the former trial?

16   MR. VEEDER:  That is right; we are letting it in.

17   THE COURT:  But if later on you say that granted every-

18 thing that Bruner said, it doesn't tend to prove any issue in

19 the case or doesn't support the conclusions that Mr. Stahlman

20 wants to draw from it or that it doesn't lay a foundation for

21 certain maps or exhibits.

22   MR. VEEDER:  It is not evidentiary in character from the

23 standpoint of supporting what we say is a lack of foundation

24 in the Coit survey.  That is the precise point on which I

25 will file a motion to strike.

1      THE COURT:  Why waste time on that?  In other words, if

2  it goes into evidence, you can argue when we come to making

3  a decision on that how far it goes.  I haven't read it, but

4  I would guess that it would certainly go a step or two-- it

5  would have to go some distance.  Otherwise, this man has

6  testified about a bunch of properties that--

7      MR. VEEDER:  Whenyour Honor looks at it I think you

8  will understand.

9      THE COURT:  You make no objection to receiving it?

10     MR. VEEDER:  I am letting it go in from the standpoint

11  of competency, that's all.

12     THE COURT:  All right.  The motion is granted, reserving

13  to Mr. Veeder the right to move to strike particular parts of

14  the testimony.

15     MR. STAHLMAN:  So that it will be understood by the Court,

16  Mr. Bruner testified to a good many things besides the matters

17  which we have excerpted and photographed.  Is there any desire

18  to see the other matters?  In other words, the different map

19  making that he had done on Santa Margarita, et cetera.  But the

20  matters that pertain to the Coit survey and the work that he did

21  is in this testimony.

22     THE COURT:  Did your motion have this attached to it?

23     MR. STAHLMAN:  Yes, it is attached to it and filed with

24  the Clerk, and here is a copy for your Honor.  And there are

25  also two maps that we have photographs of here that were

1   submitted and lodged here as exhibits and also sent Mr. Veeder

2   a copy that makes some explanation of the testimony.  And I

3   might briefly indicate to your Honor how they fit into it.

4        THE COURT:  Let's see what numbers there are on these.

5        MR. STAHLMAN: AH and AI.

6        THE CLERK:  AH is the soil survey map of the part of the

7   Santa Margarita Ranch.

8        THE COURT:  Have you lodged these already?

9        MR. STAHLMAN:  Yes, your Honor. Vail's AH and Vail's AI.

10        THE COURT:  Which is which?

11        THE CLERK:  The soil survey map is AH.

12        MR. STAHLMAN:  They are both soil survey maps; one of

13   them is the Santa Margarita Ranch, and one is Vail.

14        THE CLERK:  Santa Margarita is AH, and Vail is AI.

15        MR. STAHLMAN:  Those two go together, and these two go

16   together.  I might explain how that works.

17        THE COURT: AI then is the Vail Ranch?

18        MR. STAHLMAN:  Yes, your Honor.

19        THE CLERK:  On October 22nd they were marked for iden-

20   tification.

21        THE COURT:  By the Clerk?

22        THE CLERK:  Yes.

23        THE COURT:  We had no reporter here.

24        MR. STAHLMAN:  Would your Honor want the testimony copied

25   into the record?   I think it should be.

1    THE COURT:  Let's go back to AH.  It consists of two maps.

2    MR. STAHLMAN:  Yes, your Honor.  They work together.

3 You have to put them together.  You will notice that on each

4 of these maps there is an exhibit number and a clerk's stamp

5 in the Santa Margarita trial showing what exhibit number

6 they were in that case.

7    THE COURT:  All right, AH will be AH-1 and AH-2 for the

8 two maps, AH-1 being the most westerly starting with the ocean

9 and AH-2 being the portion running to the east.

10    MR. STAHLMAN:  That is on the Santa Margarita.

11    THE COURT:  On the Santa Margarita.  And these in the

12 trial court were together L-9.

13    MR. STAHLMAN:  L-9, yes.

14    THE COURT:  Now, as to the Vail Rancho--

15    MR. STAHLMAN:  They would overlap when they are put

16 together.

17    THE COURT:  We will start the same way, with the most

18 westerly as AI-1 and the most easterly as AI-2, and these in

19 the trial court were Z-9 in the Superior Court.

20    MR. STAHLMAN:  Yes.  I might explain to your Honor, if

21 you read the testimony, they had a different number than Z-9

22 during the trial, until we excerpted the last page.  When you

23 get to the last page you will see that the Z-9 was referred to

24 in the testimony according to a different exhibit number--

25 they changed the number.

1    THE COURT:  This map A-1, with the two pages, looks very

2 similar to the map you had in evidence here.

3    MR. STAHLMAN:  This is a photographic copy of the original

4 soil survey map that Coit made and that Mr. Bruner worked on that

5 was introduced at the Santa Margarita vs. Vail suit.

6    THE COURT:  Is there a map in evidence now in our suit

7 that is identical?

8    MR. STAHLMAN:  Yes.

9    THE COURT:  What map is that?

10    MR. STAHLMAN:  The one we put in on the Coit survey which

11 is C, I believe.

12    MR. VEEDER:  It is C and part of D.

13    MR. STAHLMAN:  No, D is the compilation of the acreage

14 and C is the map.

15    MR. VEEDER:  That's right.

16    THE COURT:  This is the same map, then?

17    MR. STAHLMAN:  Yes, your Honor.

18    THE COURT:  Is that agreed, Mr. Veeder?

19    MR. VEEDER:  Your Honor, it appears to be, but I want

20 to compare it, if I may.

21    MR. STAHLMAN:  I might explain, your Honor, that the

22 reason for the two maps is that there was a soil survey made

23 on the Rancho Santa Margarita as well as the Vail Ranch and

24 that Mr. Bruner did the same work on both those ranches and

25 most of the examination in relation to the details as to how

1    he performed his work was on the map in connection with the

2    Rancho Santa Margarita, and then you will find further in the

3    testimony that he was asked the question if, in preparing this

4    map, which is the map of the Vail Ranch-- that would be AI-1

5    and 2-- that he performed the same type and kind of planimeter-

6    ing on that map that he did on the map of the Rancho Santa

7    Margarita.

8           THE COURT:  Can it be stipulated by which side of the

9    case Bruner was called?

10          MR. STAHLMAN:  Yes; he was called by Vail Company.

11          THE COURT:  Is that agreed, Mr. Veeder?

12          MR. VEEDER:  That is correct.

13          MR. STAHLMAN:  Does your Honor wish the transcript

14   written into the record?

15          I think it should be.  Don't you?

16          THE COURT:  That is up to counsel.

17          MR. VEEDER:  Well, I still am reviewing this matter.  I

18   would rather not have it in until I raise my points on it.  I

19   don't believe it hurts anything for the moment just having it--

20          THE COURT:  If later on you move to strike it, it would

21   be a lot easier to have it in the pages of this record, what

22   you are going to move to strike.

23          MR. VEEDER:  That will suit me, your Honor.

24          THE COURT:  Are you certain that this copy that I have

25   is --

19,539-A

1    MR. VEEDER:  I think we should compare it, your Honor.

2    THE COURT:  Have the reporter copy it out of the file

3  here.

4    MR. STAHLMAN:  Very well.

5    THE COURT:  Mr. Clerk, flag this for the reporter to be

6  copied.

1

"<u>Monday, March 28, 1927. 10 A.M.</u>

"BYRON R. BRUNER,

a witness called on behalf of the defendants, after being

sworn, testified as follows:

DIRECT EXAMINATION

"BY MR. HAAS:

"Q  Mr. Bruner, where do you reside?

"A   Permanently, in Riverside.

"Q  What is your age?

"A   Twenty-five.

"Q  Where were you born, and when?

"A   Akron, Ohio, July 24, 1901.

"Q  Did you attend public schools there?

"A   I did.

"Q  Completed your grammar school course?

"A   Yes, sir.

"Q  At Akron?

"A   Yes, sir.

"Q  And after completing your grammar school course,

what was your next schooling?

"A   Central High School, Akron, Ohio.

"Q  Graduated from that school?

"A   Yes, sir.

2

"Q   In what year?

"A   I graduated in June, 1916.

"Q   And upon graduating there, what other institution of learning did you attend?

"A   University of Akron, Municipal.

"Q   How long were you at the University of Akron?

"A   I was first there for two years, from the fall of 1916 till the spring of 1918.

"Q   And while there during that period, what course did you take?

"A   I followed the course of Bachelor of Arts Degree, Philosophy and Economics.

"Q   Did that include the study of scientific matters?

"A   They are not embraced in the course itself, but they are always open to anyone who cares to take them as extra.

"Q   Did you take them during that two years?

"A   Not during those two years, no.

"Q   And at the end of those two years where did you go?

"A   Joined the Army.

"Q   In what capacity?

"A   I joined as a private.

"Q   Did you go overseas?

"A   Yes, sir.

"    While overseas, what was your first appointment in the Army?

3

1    "A   I was with the First Corps Ammunition Train, Motor

2   Truck Company 449, Motor Train 414.

3    "Q   Did that involve any engineering?

4    "A   The only engineering involved in that was reading

5   maps as to the location of thedifferent batteries and other

6   units to which the ammunition was to be taken.

7    "Q   Your duty was to ascertain locations and see that

8   the ammunition was delivered there?

9    "A   Yes, sir, in case I was in charge of the particular

10   train which was carrying the ammunition, or if I was merely

11   subordinate to the lieutenant who was in charge, then it

12   was a case of checking up, first reading the map in order

13   to ascertain that we were on the correct roads and that we

14   were proceeding in the correct course.

15    "Q   And were you elevated from private to a higher rank?

16    "A   Yes, sir, I was at that time a sergeant, - Sergeant

17   Truck Master.

18    "Q   And from that corps, did you go into another corps,

19   or employment in the Army?

20    "A   After the Armistice we were transferred to the Third

21   Army Corps and sent with the Army of Occupation into Germany,

22   and from there I was taken on special detail with five trucks

23   in connection with the 310th Engineers, Company E, and later

24   was transferred to that outfit.

25    "Q   And while in that Engineering Corps, what did you do?

4

1      "A   We were engaged in the reconstruction of roads in

2  the area used by the American forces.

3      "Q   Did that involve any engineering work?

4      "A   Nothing more than the depositing on the road of the

5  road material, which we took from the quarries.

6      "Q   Did it require the reading of maps or anything of

7  that kind?

8      "A   Nothing in particular, no, sir.

9      "Q   When were you discharged from the Army?

10     "A   In July, 1919.

11     "Q   And coming back from Europe, what did you do in the

12  way of further education?

13     "A   Went back to the University of Akron.

14     "Q   Remaining there how long?

15     "A   1920 completed my course.

16     "Q   Graduating with what degree?

17     "A   Bachelor of Arts, Philosophy, and Economics.

18     "Q   Graduating from that institution, what vocation did

19  you follow then?

20     "A   I was salesman for the Washburn-Crosby Company, Gold

21  Medal Flour.

22     "Q   That did not involve engineering?

23     "A   No, sir.

24     "Q   How long were you so engaged?

25     "A   I was with them for approximately a year, from ten

1 | months to a year.

2 | "Q   Then when you completed that employment, what did

3 | you do?

4 | "A   I went to work for the La Salle Extension University,

5 | of Chicago, selling business educational courses.

6 | "Q   Remaining in that employment for how long?

7 | "A   About fifteen months.

8 | "Q   Then where did you go and what did you do?

9 | "A   I came to California in July, 1922.

10 | "Q   Taking employment where?

11 | "A   With the Palos Verdes project, Redondo Beach.

12 | "Q   That is the Vanderlip properties?

13 | "A   Yes, sir.

14 | "Q   Consisting of how many acres?

15 | "A   The work at that time under contemplation by Mr.

16 | E. G. Lewis proposed to develop the entire 16,000 acres of

17 | the Palos Verdes estate.

18 | "Q   And what was the nature of your employment with that

19 | concern?

20 | "A   I was employed on a triangulation party as flagman

21 | and recorder.

22 | "Q   And under what engineer or engineers?

23 | "A   As I recall, Mr. Norman E. Sellew was consultant.

24 | "Q   And who was your chief of party?

25 | "A   Mr. W. W. Michaels, M-i-c-h-a-e-l-s, who was

6

1 instructor at the California School of Technology, in Surveying

2 and Civil Engineering.

3      "Q  Now, what was the first work you did in conjunction

4 with Mr. Michaels?

5      "MR. COSGROVE:  He stated he was flagman on triangulation

6 first.

7      "MR. HAAS:  He also said recorder.  I don't know which

8 he did first.

9      "A  The first work was as flagman.

10      "Q  How long were you employed as flagman?

11      "A  I alternated as flagman and recorder, after the first

12 couple of weeks, for the entire six months in which I was

13 connected with that party.

14      "Q  There were how many in the party?

15      "A  Five men.

16      "Q  Was that plane table work, or what was it?

17      "A  No, sir, it consisted of turning the angles of the

18 triangulation system, according to the points spotted on the

19 ground from the topographic map.

20      "Q  The topographic map having been previously made?

21      "A  Yes, sir, there was a topographic map of the country

22 made by Koebig and Koebig in 1914.

23      "Q  Had the stations been established, the triangulation

24 points?

25      "A  No, sir.  We of that particular party established

7

1    our own triangulation points in the convenient spots.

2        "Q   And before that was done, were the points established

3    before you did the surveying work, or subsequently?

4        "A   The points were established before any angles were

5    turned to them.

6        "Q   That is what I mean.

7        "A   Yes, sir.

8        "Q   Then, while recorder, you took down the distances,

9    as observed, and called to you by the topographer?

10       "A   Of the angles.

11       "Q   Of the angles, I mean, not the distance-- the angles,

12   I should say.

13       "A   The angles are turned by the transit man.

14       "Q   And were you required in that connection to make any

15   computations?

16       "A   Yes, sir.

17       "Q   What were they?

18       "A   The transit man would, in the first place, turn the

19   angle and read it, and read it off to me, and I would record

20   it in the book, then he would turn six angles, turn an

21   additional five, and read the sixth to me, which would be the

22   sum of the six angles turned, and inverting his instrument

23   he would read the first angle again with the instrument

24   inverted, and read the sixth to me, then it was a question

25   of finding the mean of the original six angles turned, that the

8

1 mean of the six angles equaled or approximated the first angle

2 which he had given to me off of the plate, and after doing that,

3 in both places checking the mean of the two sets of angles as

4 turned; if they didn't check, the angles were re-turned and

5 a new mean was figured.

6     "Q   And you were employed in that work how long?

7     "A   Six months.

8     "Q   And at the end of thatfield work, what did you do?

9     "A   I was checking in the office of the Palos Verdes

10 engineering project.

11     "Q   And you did what, while there?

12     "A   I did various things.

13     "Q   I mean in an engineering way.

14     "A   Computations--

15     "Q   (Interrupting)  Computations involving what?

16     "A   The first computation I did was in connection with the

17 triangulation system.  As we turned the angles in the field

18 the original closure of the triangulation system was, as I

19 recall it, a trifle over a foot in error in thirty-five miles

20 of triangulation traverses, and in order that we might eliminate

21 that error, the triangulation system was adjusted on the

22 Merriman System of least squares, as used by the United States

23 Government, I understand, and any errors in the griangles were

24 taken up by the formulas of that system.

25     "Q   Did that also involve the computation of the length

of

9

of the sides of the triangulation system?

"A  Yes, sir, the Merriman System of least squares takes care of the varying weights of the angles in relation to the weights of the side.

"THE REPORTER:  Is that word "Weights"?

"THE WITNESS:  Weights, the measure of value.

"Q  By the weights, you mean the same as I have used here the words 'value of angles' to determine the degrees, minutes and seconds?

"A  They are to determine the relationship between the sides in certain triangulation figures which are turned, in their relation, as they relate to the angles of the figure.  If the angles of a figure-- if you have one triangle and there are sixty degrees on each side, it is simple,  if you have a triangle where two angles are thirty degrees, and one is 120, and your error is on the long side of the triangle, it is likely to be large, in case there is any error in the corresponding angle, because of the fact of the divergence of a less angle carries you much further with a small error, and the Merriman System of least squares reconciles the angles and the sides of the triangulation figure.

"MR. COSGROVE:  May I interrupt, just there.  When you say 'corresponding angle', you mean an opposite angle?

"THE WITNESS:  Yes, sir, the angle which controls the length of the side.

10

"Q   Did you do any drafting in connection with the triangulation work?

"A   Yes, sir.

"Q   Platting them on sheets, and ultimately tracing them?

"A   Yes, sir.

"Q   What other work did you do while in the office?

"A   From the original Koebig & Koebig survey, from that original survey, a design would be made up, and was made up for the subdivision which it was proposed to produce, and a road line, the angular points of the roads would be taken from that map upon which had been placed the rectangular coordinate grid, and from that preliminary angular traverse which we would compute in the office, the field man would establish the points on the ground. Then to establish those points, he would either run cross-sections of that land at intervals of 25 or 50 feet, according to the kind of country it was, and take the elevations for 100 feet on each side, 75 to 100 feet on each side, depending upon the necessity of taking the longer shots, and in some cases that work was done by plane table, but in a great many instances it was done with a transit and stadia, and hand level, and after the cross-section had been taken in the field, the notes would be brought into the office, they would be platted up on a sheet corresponding to the road as proposed on the

ground, and the contours would be platted on that sheet.

"Q  Did you do that platting?

"A  Yes, sir.

"Q  And the computing?

"A  Yes, sir.

"Q  These cross-sections had about what number of shots or points of observation?

"A  Well, I would say they varied from five to a dozen, usually in a country where it was not necessary to take many shots, they would take one at the center, and two on each side, they took them at the breaks of grade.

"Q  Where ver that occurred?

"A  Yes, sir.

"Q  How did you plat the roadways on the map, from those maps and plane table sheets?

"A  Yes, sir, it would be a case of taking the roadway as shown and figuring the cuts and fills on that road, and in case there was any great discrepancy between the amount of cuts and fills, then it was perhaps a case of shifting the road in order to eliminate that, and at the same time not destroy the designer's idea of what his subdivision should look like.

"Q  That is a hilly country, is it not?

"A  Yes, sir.

"Q  To a large extent?

12

1    "A   Yes, sir.

2       "Q   What other work did you do, if any, connected with

3 that project?

4       "A   I adjusted the net works, on the traverse over the

5 entire 3,000 acres-- or perhaps I should say 2500 acres,

6 I think, as I was not there the entire time, but I was

7 acquainted with the entire 3,000 acres.  That consisted

8 of taking the traverses as run in the field and adjusting

9 all errors which occurred in those traverses, finding them

10 wherever possible, and having them checked up in the

11 field, and in other cases, where they were too small to

12 be checked, to adjust them in, so that the final traverse

13 which we accepted had no appreciable errors in it, whatsoever.

14       "Q   That involved computations, did it?

15       "A   Yes, sir, entirely.

16       "Q   As well as drafting and so forth?

17       "A   Yes, sir.

18       "Q   And that was done by you?

19       "A   Yes, sir.

20       "Q   And you completed your work with the Palos Verdes

21 project when?

22       "A   In July, 1924.

23       "Q   What was the next work you did?

24       "A   I worked for the Bell Corporation, at Bel Air west of

25 Los Angeles.

13

"Q  And that consisted of what?

"A  Mapping, subdivisions, and computations.

"Q  Flat work or topographic, or both?

"A  Both, the work was laid out in the same manner as the Palos Verde project, from a topographi map.

"Q  That Bel Air area is in rolling hills west of Los Angeles?

"A  Yes, sir, very much so.

"Q  You were connected with that work how long?

"A  Until February, 1925.

"MR. COSGROVE:  From when?

"THE WITNESS:  From August, 1924.

"Q  Did that involve computing as well as drafting?

"A  Yes, sir.

"Q  After you got through with that work, what did you do?

"A  I want back East, to Ohio.

"Q  To Akron?

"A  Yes, sir.

"Q  And did you engage in professional work there?

"A  Yes, sir, in connection with the City Engineer, Mr. Archie E. Ranney, of Coyahoga Falls, which is a suburb of Akron.

"Q  What was the character of your work there?

"A  He had a private job in view consisting of 112 acres of very valuable land on the western side of the city of Akron, and there were 36 signers on the map, I don't know how

10,553

many were actual owners of the land themselves, but it was

necessary to get the lines all adjusted, so that each one

was satisfied with the particular part allotted to him.

That was done by means of making a survey of the land as

shown on the ground, and then making a map showing what you

could find according to the deeds, as shown in the Recorder's

Office; in getting all of the owners together, and agreeing

they would accept a mean line, or whatever should be done in

connection with the adjusting of that line.

"Q  It was a re-alignment?

"A  Yes, sir.

"Q  You were engaged in that work how long?

"A  Three months, up to its completion.

"Q  Did you do field work as well as office work?

"A  Yes, sir.

"Q  Using any instruments?

"A  Yes, sir.

"Q  What instruments?

"A  Transit.

"Q  And in the office work, did you do any drafting?

"A  Yes, sir, I drafted the maps.

"Q  When you got through with that work, where did you go?

"A  I came to California.

"Q  Arriving here when?

"A  Let's see-- June 18th, 1925.

"Q  And you went to work then, for whom?

1    "A  For Davidson & Fulmor, went to work for them on the

2  22nd of June, I believe.

3    "Q  1925?

4    "A  Yes, sir.

5    "Q  And you have been working for them ever since?

6    "A  Yes, sir.

7    "Q  In connection with their work, what was the general

8  character of work that you did, field or office work?

9    "A  Office work.

10    "Q  Consisting of what?

11    "A  The first job I did--

12    "Q  (Interrupting)  I did not mean to have you detail

13  all the jobs, but generally, what was the office work,

14  computation, or drafting, or both?

15    "A  Computation and drafting, yes, sir.

16    "Q  Did you do any work in connection with the Vail lands

17  in Riverside County and in connection with the Santa Margarita

18  Ranch, or that part of it in the Santa Margarita watershed?

19    "A  I did.

20    "Q  On which of those ranches did you do the first work,

21  the Vail lands, or the Santa Margarita?

22    "A  Well, I applied for the job, they tried me out

23  computing on the Pauba Ranch, the triangulation system; I was

24  only there for half a day or so, and they sent me down to

25  Oceanside to work on the Santa Margarita.

16

10,555

"Q  Then your actual work, outside of that half a day or so, started on the Santa Margarita, did it?

"A  Yes, sir.

"Q  Withyour headquarters, when you started on that work, you say, at Oceanside?

"A  Yes, sir.

"Q  What was the first work you did in the Santa Margarita survey?

"A  I platted the stadia traverse of the watershed lines-- no, that is not right, I recomputed the triangles which had been computed before I came there, and checked them, and computed the rest of the trianguation system.

"Q  On the Santa Margarita?

"A  Yes, sir.

"MR. COSGROVE:  Just a moment; will the reporter read that last answer of the witness, after he said, 'No, that is not right'.

"(Reporter reads as requested.)

"Q  And what did you do in the recomputation of the triangulation system?

"A  I took my own computation from the field notes as shown, and after arriving at my own conclusion, checking it against the conclusions which had been drawn by the man who first computed them and in case of any error, finding out whether his work was right, or whether my work was right.

17

1    "Q  In your computation, what did you do, is what I am

2    trying to get at.

3        "A  I took the field notes, and first added the angles

4    in the triangles, to see that they approximated 180 degrees;

5    in case there were angles turned around, completely around

6                          ------

7                                    "12959

8                    "BYRON R. BRUNER

9    (Recalled)

10       "MR. HAAS:  Gentlemen, we are about to go into another

11   subject, so you may be informed, and that this is to lay the

12   foundation for our soil survey by Dr. Coit.

13

14                    "DIRECT EXAMINATION

15   "BY MR. HAAS:

16       "Q  Mr. Bruner, I cal your attention to a map on the

17   board, which for identification I will mark 'L-9", and will

18   as you if you had anything to do with the preparation of the

19   map in question?

20       "A  I did.

21       "(L-9 is later designated as 'L-9-a.)

22       "Q  From what base is the map made, what base map?

23       "A  The base map of the Santa Margarita Rancho.

24       "Q  The same as the Exhibit V-4?

25       "A  Yes, sir, with the exception of the omission of the

lines of the triangulation system.

"Q But the boundary lines, crest lines, and area subdivisions, and so forth, that were shown on Exhibit V-4, are all on the document I have marked L-9 -- let us put that over on the other board here, it will be more convenient, I think.

"A The topographic features which are shown on V-4, Mr. Haas, are identical with the ones shown on the map on the board, which is now known as 'L-9'.

"Q And what additions, if any, did you place upon the map now marked L-9 that were not shown on Exhibit V-4-- I am asking you what you put on there.

"A I put certain lines on it, dividing it into parcels of land, placing those lines on the map in such a position that I felt the man who was out in the field would be able, from the topographic features shown on the map, to locate the lines which I drew on the map, to locate them on the ground.

"Q Will you indicate to Court and counsel which those lines are-- may I ask your Honor to step here just a moment.

"A For instance, in this case, I drew a line from the fence corner just below the number '17', to a point in conjunction with the two stream lines, which would be readily recognizable on the ground, that I considered the division line between lots Numbers 17 and 22.

"Q The purpose being simply to fix areas which anyone

1   taking the map could employ in looking over the ground?

2       "A  That is correct, yes, sir.

3       "Q  And you followed the same course throughout the

4   map, did you, using topographic features and tying them

5   together by lines, so as to divide it into blocks or lots?

6       "A  There may be an instance or two where the line

7   would not be very clear, but that was the general idea.

8       "Q  The plan being simply to divide it in some

9   arbitrary way into lots and blocks which could be readily

10  recognized on the ground?

11      "A  Yes, sir.

12      "Q  And for that purpose you employed topographical

13  features?

14      "A  Yes, sir.

15      "Q  Did you put any lettering or numbering on the map?

16      "A  I put the acreage on the map that I determined by

17  planimeter.

18      "Q  Using what areas for planimetering?

19      "A  The areas of the individual lots.

20      "Q  As fixed by you?

21      "A  Yes, sir.

22      "Q  And in what manner are those areas indicated on the

23  map?

24      "A  Indicated in black figures in the lots to which they

25  belong.

20

10,559

1          "Q   For instance, the figures here 87-8 means what?

2          "A   That is the acreage included within the lines of the

3    topographic features within the lines that I drew from the

4    junction of the stream-- to the beginning of the stream.

5          "MR. COSGROVE:   Parcel 21.

6          "Q   Indicating acres?

7          "A   Yes, sir.

8          "Q   And have you given the various parcels numbers by

9    which they can be identified in tabulation, or otherwise

10   referring to them?

11         "A   The numbering was not done by me.

12         "Q   But are they so numbered?

13         "A   They are.

14         "Q   And you adopted the same course with regard to each

15   lot?

16         "A   Yes, sir.

17         "Q   Now, in the subdivison of the lots, were not included

18   any part of the areas indicated in white on this map now

19   marked L-9?

20         "A   No, sir.

21         "Q   You used only the areas that are now colored in some

22   color othr than whate?

23         "A   Yes, sir, that is correct.

24         "Q   And did you have anything to do with the coloring of

25   the map?

1          "A   Yes, sir.

2          "Q   What significance is attached to the yellow color?

3          "A   The yellow color indicates the irrigable land.

4          "Q   That is, those that are intended to be classified

5   as irrigable?

6          "A   Yes, sir.

7          "Q   And what is the significance of the greenish color?

8          "A   The green indicates land which is irrigated, or has

9   been irrigated, is capable of irrigation from the facilities

10   at hand.

11          "Q   From the systems at hand?

12          "A   Yes, sir.

13          "Q   And what is intended by the areas colored in pink?

14          "A   Brown.

15          "Q   Is that brown?  I am color-blind, I guess.

16          "A   The brown indicates the brush lands on the river,

17   which are subject to overflow.

18          "Q   And what is intended by the blue color?

19          "A   That is the wash land of the river itself, the lowest

20   land.

21          "Q   And in classifying this what data did you employ

22   for the application of your color scheme?

23          "A   The sheets which have been prepared in the field

24   by the field men, the plane table sheets.

25          "Q   Including the segregation sheets, testified to by

1　Mr. Dauchy and Mr. Evans?

2　"A　Yes, sir, included all of the sheets of the Santa

3　Margarita Rancho.

4　"Q　And determining the lands that you classified as

5　irrigable, what did you employ in the determination of

6　which lands you were so classifying?

7　"A　The determination which had been made on the field

8　sheets by the field men themselves.

9　"Q　And that have been offered here?

10　"A　Yes, sir.

11　"Q　And are they marked on these sheets as 'irrigable'?

12　"A　Yes, sir, they are.

13　"Q　They are the plane table sheets we have been using in

14　court here, and numbered as heretofore identified?

15　"A　Yes, sir.

16　"Q　You did not then, act on your own initiative, in

17　regard to any of the classifications?

18　"A　Not at all.

19　"Q　There is a legend attached to this map, indicating

20　what these colors mean, is there not?

21　"A　Yes, sir.

22　"Q　Now, what is the pencil memoranda on the map?

23　"A　My tabulation of the various features which I drew

24　from the individual lots.

25　"Q　Will you-- does the tabulation correctly express

23

1    the result of your labor?

2         "A   It does.

3         "Q   Will you kindly state what it is, lot for lot?

4         "A   The first notation is 'Acres in stream below tide,

5    97 acres.'

6         "Q   Below what?

7         "A   Below tide, in that case I referred to the crest

8    line which has been referred to here previously as "salt

9    water crest line".

10        "Q   And being indicated on Exhibit V-4?

11        "A   Yes, sir.

12                              - - - - - - -

13                                   "13260

14                          "BYRON R. BRUNER

15   (Recalled)

16   "BY MR. HAAS:

17        "Q   Mr. Bruner, I call your attention to a brown print

18   marked by me 'Sheet O-9-A', as I understand the next exhibit

19   would be 0-9, and I will ask you if you had anything to do

20   with the preparation of that sheet.

21        "A   Yes, sir, I did.

22        "Q   What did you do on the sheet O-9-A?

23        "A   I took the thin paper tracing as it came from the

24   blueprinters, with the background, with the flat map, upon it.

25        "Q   The background is made from what map?

1    "A   From the original tracing, 'Twining No. 1', as I

2   understand it, and on that I drew lines in orange ink dividing

3   the different sections up into parcels of ground which I felt

4   would be recognizable upon the ground, that is, the limits

5   of them would be recognizable, and those areas I planimetered

6   and recorded the results of the planimetering upon the map.

7    "MR. HAAS:   Will your Honor kindly step here for a

8   moment, the yellow lines cannot be seen very well at any

9   distance.

10    "Q   Indicate where the lines are that you stated you

11   put on.

12    "A   These lines in the yellow, running from the triangula-

13   tion point to the junction of the streams, and so on, and

14   the fence line, and the road.

15    "Q   In other words, you arbitrarily divided the area

16   something after the same plan that you divided the area on

17   the Santa Margarita, to which you testified the other day?

18    "A   Yes, sir.

19    "Q   Taking natural objects, as nearly as you could,

20   to indicate where the divisions were?

21    "A   Yes, sir.

22    "Q   And these divisions are shown by the yellow lines,

23   are they, on this sheet O-9-A?

24    "A   Yes, sir, they are.

25    "Q   Now, did you put on the brown lines, the brown lines

1    and red lines, I guess they are.

2          "A  Yes, sir, I believe that I did.

3          "Q  What are they intended to show?

4          "A  They merely cut the entire piece of land into

5    different blocks.

6          "Q  And then those blocks--

7          "A  Are given identifying numerals.

8          "Q  Being the numerals in the larger figures on the

9    board, such as '13, '14,' '16', '8', and similar large-sized

10   figures?

11         "A  Yes, sir.

12         "Q  And what was employed in giving numbers to the lots

13   within these blocks, in other words, does each block have

14   numbers running from '1' consecutively, odd numbers on the

15   lots?

16         "A  Yes, sir, I believe so, the numbering of those lots,

17   I did not do.

18         "Q  But you have looked at it, and can tell us?

19         "A  Yes, that is the way it is run, the numbering is

20   from '1', consecutively, within the individual blocks.

21         "Q  Are there any other features that you put on this

22   sheet O-9-A?

23         "A  No, sir, I believe that is all.

24         "Q  Now, before taking that down, I want to call your

25   attention to the sheet that I will mark 'Sheet O-9-B', and

1   ask you if you had anything to do with that particular sheet.

2        "A  No, sir, I believe I did not; it seems to me to be a

3   duplicate print of this other one insofar as its divisions

4   of lots are concerned.

5        "Q  But it is printed on a different basis?

6        "A  Yes, sir.

7        "Q  On the same as R-4 that was upon the easel, along

8   by the rail?

9        "A  Yes, sir.

10       "Q  You did not do this work?

11       "A  No, sir, I did not.

12       "Q  Can you say generally whether the lots as shown

13  there correspond with the divisions as shown on your sheet?

14       "A  I think the idea was to get them about the same.

15       "Q  Well, I will introduce the party who did put those

16  on.  Now, if you will help me one minute with this one.  We

17  will take it down, and put this one over on the other easel

18  for a minute.  Now I show you a sheet which I will mark '0-9

19  for Identification' and ask that it be marked '0-9 for Iden-

20  tification', and I will ask if you had anything to do with the

21  preparation of that map?

22       "A  That is a print of the map 0-9-A.

23       "Q  That is, the sheet 0-9-A?

24       "A  Yes, sir.

25       "Q  And with other features placed upon it?

1        "A   Yes, sir.

2        "Q   You had nothing to do with the placing of the other

3   features on it?

4        "A   I did not.

5        "Q   And does this base print contain the divisions of

6   lots and blocks that were shown on this sheet O-9-A?

7        "A   Yes, sir, it does.

8        "Q   And was made, was it, from that sheet?

9        "A   Yes, sir.

10        "Q   The block lines are colored in dark black, are they?

11        "A   Yes, sir, that is a printed line.

12        "THE COURT:   It may be marked for identification,

13   'Defendants' Exhibit O-9.'

14        "MR. HAAS:   That is all.

15                        "CROSS-EXAMINATION

16   BY MR. COSGROVE:

17        "Q   You recall, Mr. Bruner, having been interrogated

18   regarding map R-6, and particularly with reference to the

19   extending of the crest line shown thereon, dividing the

20   Temecula and Murrieta Creeks?

21        "A   Yes, sir, I recall that.

22        "Q   We asked that Miss O'Neill, who stated that she

23   colored these lines, if she would not color this line for us.

24   We are very anxious to have it done, and she has not done it,

25   and I will ask you if you will do it at this time.

10,567

1    "MR. HAAS: The reason for that is, she was here twice

2    to do it, and we had the map covered up.

3    "MR. COSGROVE: Well, let's have it done now.

4    "(WITNESS MARKS ON map R-6.)

5    "Q  Thanks very much, Mr. Bruner.  The sheet which is

6    on the easel now to your right, is the one that Mr. Haas

7    called O-9-A?

8    "A  Yes, sir.

9    "Q  And so far as the Pauba, Temecula, and Little

10   Temecula sections are concerned, and the Government land,

11   immediately adjacent, and Little Temecula, was it taken from

12   the same base map as the sheet which was been received

13           - - - - - - -

14                                "13686

15   "A  Well, these were, as I remember, checked up with the

16   contour map.

17   "Q  I see.  Now let us take lot 24.  What percent of

18   waste do you show?  I believe you read 15 percent, didn't you?

19   "A  15 percent, yes.

20   "Q  Well, you have got 92 acres.  15 percent of that

21   would be at least 14 acres, but you only show 10 acres waste.

22   Same explanation of that?

23   "A  Yes.

24   "Q  Take lot 35.  I understood you to say that 10 percent

25   of that was waste according to Dr. Coit's notes?

29

1          "A   Yes, that is what I have here.

2          "Q   That is 10 percent of 31 acres would be 3 acres,

3     and it shows in the report one acre waste.

4          "A   Yes.

5          "Q   And lot 36, I understood you to say 20 percent waste.

6          "A   Yes, 20 percent waste.

7          "Q   20 percent of 76 acres would be about 15 acres, and

8     it shows in the report 5 acres waste.

9          "A   These were all checked up with the contour map.

10         "MR. COSGROVE:  I think that is all.

11         "MR. HAAS:   That is all.  May we have the map that was

12    referred to as sheet O-9-B, marked for identification

13    by the next appropriate number?

14         THE CLERK:   Z - 9.

15                         - - - - - - - -

15

17

18

19

20

21

22

23

24

25

1    THE COURT:  Now, we have one other motion, the motion

2  of Vail Company to admit the testimony of H. M. Hall.

3    MR. VEEDER:  I want to review that further, your Honor,

4  on the basis of the Answer which is filed.

5    MR. STAHLMAN:  Very well.

6    There is one statement I would like to make, your Honor,

7  in that connection which is quite startling, and that is that

8  the Coit survey of the Rancho Santa Margarita made in 1926

9  and 1927, when that survey was made, at the same time he made

10  the Vail survey and used the same methods; that there is only

11  a difference of less than 400 acres in the entire Santa Margarita

12  between what Coit came up with and what Major, now Colonel,

13  Bowen at this time has come up with and testified to in this

14  court.

15    THE COURT:  In other words, you argue from that that this

16  man was a pretty good surveyor and pretty accurate?

17    MR. STAHLMAN:  Yes, and that Mr. Coit made a very good

18  survey and he and Col. Bowen see eye to eye on it.

19    THE COURT:  To go back again to the motion to admit Hall's

20  testimony, you concede, do you not, that the law as cited by

21  Mr. Stahlman--

22    MR. VEEDER:  Cited by your Honor.

23    THE COURT:  No, I think the law I supplied Mr. Stahlman

24  referred to--

25    MR. STAHLMAN:  A little different situation.

1   THE COURT: --the Okinawa man. But it is similar.

2   Anyhow, you concede the law, don't you, that where you

3 called a witness or your predecessor has called a witness, his

4 testimony may come in in a subsequent action?

5   MR. VEEDER: Your Honor, I don't make that concession.

6 I simply have given this matter consideration as far as I was

7 concerned. It was a motion that appeared to me to warrant no

8 great fight about.

9   THE COURT: What do you want to do?

10   MR. VEEDER: I have already done what you wanted me to

11 do in regard to the Bruner testimony. I haven't read all of the

12 material as it relates to the Answer in regard to Mr. Hall.

13 I would like to have some time on it.

14   THE COURT: Have you set up in this motion the transcript

15 of Hall's testimony?

16   MR. STAHLMAN: Your Honor, I made reference to the pages

17 and lines. I assumed they had copies of the Hall testimony.

18 I have it here.

19   THE COURT: It is not in the record of this case.

20   MR. STAHLMAN: You have a copy of it, don't you? I can

21 have this photographed the same as I did in the Bruner case.

22   THE COURT: Let's not have any mistakes.

23   MR. STAHLMAN: Here is a certified copy.

24   THE COURT: A transcript of the evidence in the prior

25 case is not part of the record in this case, unless the Clerk

1    has that transcript and unless you incorporate it by reference.

2         MR. STAHLMAN:  Yes.

3         THE COURT:  Does the Clerk have the transcript of Hall's

4    testimony in the prior action?

5         MR. STAHLMAN:  I am sure they have, your Honor, because

6    we have our copies here which are certified.

7         THE CLERK:  We have no transcripts at all here, your

8    Honor.

9         MR. STAHLMAN:  They must be in the file.

10        MR. GIRARD:  Mr. Hall's testimony is in the Superior

11   Court.

12        MR. STAHLMAN:  No.

13        THE COURT:  This was in the trial before Judge Yankwich.

14   But you see, the way that works out, Mr. Stahlman, a reporter's

15   transcript was probably prepared and it may have been used in

16   the appeal, but I don't know that it was ever filed.

17        THE CLERK:  I could call our Los Angeles office at noon

18   and see if it is up there.

19        THE COURT:  The Clerk will find out about that.

20        MR. STAHLMAN:  Very well.

21        THE COURT:  What does Hall's testimony relate to?

22        MR. STAHLMAN:  It relates to the irrigable acreage on

23   the Vail Ranch.  I set it out fully in my motion.  He testified

24   to what the number of irrigable acres were and the character-

25   istics of the land.

1    THE COURT:  As I recall, you made a little summary in

2  your motion, didn't you?

3    MR. STAHLMAN:  Yes.  Hall testified to many other things

4  while he was on the stand.  However, those are the pertinent

5  things, and I can outline it.  I believe I gave page and line

6  numbers.  I can outline it, if it is necessary tocopy it

7  into the record.

8    THE COURT:  Mr. Veeder, by the 17th advise me what your

9  position is on that.

10    MR. VEEDER:  Yes, your Honor.  The issues are radically

11  different.  That is the big problem I have here.

12    MR. GIRARD:  One other clarification, your Honor.  On

13  these transcripts, et cetera, both of Hall and Bruner, I under-

14  stand you are only offering that in so far as it pertains to

15  the survey of the acreage of the Vail land.  If there is

16  anything else in this testimony, it is not--

17    MR. STAHLMAN:  Yes, that's right.

18    MR. GIRARD:  Frankly, I have never seen the transcript.

19    MR. STAHLMAN:  That's right.

20    THE COURT:  Can we pass that for a moment?

21    MR. LITTLEWORTH:  I wonder if before the noon hour we

22  can do anything about scheduling our client, your Honor.  We

23  have 15 people who are included in this last order pertaining

24  to the people who are to try their cases here as opposed to

25  those to be tried before the Master.

1    THE COURT:  Other than Sawday?

2    MR. LITTLEWORTH:  Yes, your Honor.

3    THE COURT:  Where are these people?

4    MR. LITTLEWORTH:  Our people are all above the Narrows,

5 generally, in the Murrieta area.  Some of them are complete

6 riparians, either astride Murrieta Creek or some on Sandia

7 Creek and some in this 15 stretching farther outside Unit 4,

8 further up into the residuum.  The Government is giving us

9 soil surveys on all of those.  I think we are just about com-

10 plete on it.  Commander Redd says that he has the last just

11 about ready to go.  When we have had a chance to review those,

12 and the ones we have had so far we have had no quarrel with,

13 we would be ready to put on a case as to those 15, which I

14 think would be very brief, on the basis of what we have seen so

15 far.

16    THE COURT:  Would you be ready to go on the 17th of

17 November?

18    MR. LITTLEWORTH:  I would like a little bit more time

19 than that, because we haven't got some of the big ones yet.

20 Mr. Roripaugh's isn't in, Mr. Ceas, Mr. Lincoln-- some of them

21 which have a few more problems.  We have some of the smaller

22 ones, which present no problems.

23    THE COURT:  When will the soil surveys be in?

24    MR. VEEDER:  We are expecting that everything will be

25 completed, at the outside, by two weeks.  Most of those, however,

1   will be available by the end of the week.

2        MR. LITTLEWORTH:  We have quite a number already.  But I

3   would like, if possible, to get a relatively firm date for all

4   of our people and we will take them all at one time.

5        MR. VEEDER:  There are some of those that we can handle

6   with interlocutory judgments, of the character that Mr. Sachse

7   and I have been working out.

8        MR. LITTLEWORTH:  Right.

9        THE COURT:  How about the week of the 24th?  How many

10  days do you think it will take you?

11       MR. LITTLEWORTH:  If we don't get into problems on

12  Roripaugh or some of the others, because I think most of our

13  people are going to be admitted riparians and it is just a

14  question of irrigable acreage, I think our people are going to

15  go in virtually by stipulation or very nearabouts.  We may

16  want to add a little testimony here and there on individual

17  cases.

18       THE COURT:  Why don't we say tentatively the 24th?

19       MR. LITTLEWORTH:  All right.

20       THE COURT:  We have the 24th and 25th and the 27th that

21  week.  Thanksgiving Day is out.  We might not meet on Friday

22  in view of the distance that the learned counsel for the State

23  of California travels from.  He would probably like to be home

24  with his family on Thanksgiving anyway.  Shall we say the 24th?

25       MR. LITTLEWORTH:  If the schedule is met on the soil

10,575

1  surveys, that will be satisfactory with us, I believe.

2          THE COURT:  What shall we call these?

3          MR. LITTLEWORTH:  I don't know.  It is this group, your

4  Honor, that is called the Santa Margarita River Water Rights

5  Association--that is the name of the group, and about half of

6  them or a little less than half are coming before you and the

7  remainder before the Master.

8          THE COURT:  This is the Krieger group?

9          MR. LITTLEWORTH:  Yes.

10         THE COURT:  We will put it down tentatively for the 24th.

11         MR. LITTLEWORTH:  All right, your Honor.

12         THE COURT:  Now, one thing more before the noon hour.  At

13  our last meeting I directed Mr. Stahlman to search through the

14  record and find certain material.  Mr. Stahlman read back in

15  the record and found I had previously ordered Mr. Veeder to do

16  the same job and so Mr. Stahlman rested on his oars and called

17  my attention to the previous order that Mr. Veeder was to do

18  this.  What have you done about it, gentlemen?  As my order now

19  stands I have directed you both to do it.

20         MR. STAHLMAN:  I have done it.

21         MR. VEEDER:  As the matter now stands, your Honor, the

22  record is unchanged.  I stated at the time, with all due respect

23  to your Honor, that I really couldn't see myself outlining

24  George's foundation, and I repeat that from my standpoint George

25  has already done the work-- he has outlined what he thinks is

1   the foundation.

2       THE COURT:   Where have you done that?   What have you

3   filed on that?   I don't believe I have seen that.

4       MR. STAHLMAN:   I outlined all of the Coit testimony.

5       THE COURT:   What document was this?

6       MR. STAHLMAN:   Memorandum of Testimony Re Soil Survey

7   Vail Properties was filed-- we mailed it to Mr. Veeder on the

8   21st of October and filed it in the court.

9       THE COURT:   I will look for it.

10      Now, Mr. Veeder, regardless whether you think you ought

11  to do anything about this, I am still running the court, and

12  whether you are going to prepare a foundation for Mr. Stahlman

13  or not is another matter.   Have you looked over the material

14  Mr. Stahlman has prepared?

15      MR. VEEDER:   To a degree, yes.   I haven't compared it

16  line by line.

17      THE COURT:   You are either going to tell me you are

18  satisfied that he has made a correct summary of it, of if you

19  are not satisfied then you are going to have to make one.

20      MR. VEEDER:   On that score, your Honor, with full respect,

21  as I said on June 23rd, your Honor, I simply can't do that for

22  Mr. Stahlman.   But I will respond to Mr. Stahlman's memorandum

23  here.   There was no order, if your Honor recalls--

24      THE COURT:   When will you have that ready?   By the 17th?

25      MR. VEEDER:   Yes, your Honor.

10,577

1       THE COURT:  All right.  Then we are going to be pretty

2   well in a position to decide whether or not the Vail Company

3   has made a prima facie case on this matter.

4       MR. VEEDER:  That relates strictly and solely to the

5   Exhibits C and C.

6       MR. STAHLMAN:  Yes, the soil survey.  Yes, that is all

7   the testimony.

8       THE COURT:  Irrigable acreage, the areas, things of that

9   sort, is that right?  It is not anything to do with the Vail

10  Dam?

11      MR. STAHLMAN:  No.

12      MR. VEEDER:  No.

13      THE COURT:  That is what you mean.  That's what you are

14  talking about.

15      MR. VEEDER:  That is the only thing with which I am

16  concerned.

17      THE COURT:  No, you gentlemen were going to do something

18  to work on a better map and an agreement as to irrigaged land

19  in the Pauba Valley.

20      MR. STAHLMAN:  I think Mr. Wilkinson and Col. Bowen have

21  met on that and are ready to put the map in shape, and I think

22  they have been in substantial agreement.  Of course, they will

23  have to speak for themselves.  This irrigated acreage is what

24  your Honor has reference to, shown on Vail's Exhibit J.

25      THE COURT:  Have you come to some agreement, Col. Bowen?

10578

1    COL. BOWEN:  Your Honor, our measurements total 17 acres

2  less than those of Mr. Wilkinson for the total irrigated

3  acreage.

4    THE COURT:  17 acres out of how much?

5    COL. BOWEN:  Mr. Wilkinson's was 3,320 acres, and ours

6  was 17 acres less than that.

7    THE COURT:  Have you agreed upon a map of some kind that

8  will demonstrate this?

9    COL. BOWEN:  Yes, sir, we have.

10    THE COURT:  When will you have that ready?

11    COL. BOWEN:  We simply numbered the fields here.  It can

12  be ready in five minutes, your Honor.

13    THE COURT:  What was your disagreement, an overall matter,

14  or did it involve some particular field or fields?

15    COL. BOWEN:  There were minor differences in each of the

16  fields, your Honor.  It would be virtually impossible for two

17  people to come to the same answer.

18    THE COURT:  In other words, it would be scattered

19  throughout the fields?

20    COL. BOWEN:  Yes, your Honor.

21    THE COURT:  What suggestion do you have as to that matter,

22  Mr. Veeder?  You are 17 acres apart on 3,300 acres.

23    MR. VEEDER:  I haven't seen the figures myself and I

24  will withhold any statement on it until I have seen them.  I

25  want to know where those irrigated acres are located first.

1    THE COURT: You may be able to accept, in view of this

2    small difference, the Vail figures?

3    MR. VEEDER: Entirely possible. We were not greatly

4    concerned about the irrigated acreage in the Pauba Valley.

5    THE COURT: Let's get that matter cleaned up. Let's get

6    that map in and see if you can some to some understanding on

7    it. Will you work on that?

8    MR. STAHLMAN: That can be done during the noon hour, I

9    guess.

10    THE COURT: What do you gentlemen propose to take up

11    this afternoon and the rest of the week?

12    MR. VEEDER: Your Honor, to be perfectly candid with you,

13    I came out here for the purpose of trying the Vail case, and I

14    thought we would go ahead and try the Vail case and we sched-

15    uled everything on the basis that we would try the Vail case

16    and the stipulated judgment. It was my understanding when I

17    left town the last time when this matter was adjourned that

18    the Vail case would be tried in advance of everything else.

19    And I feel that when we have studied over the Answer, we are

20    ready and anxious and able to go ahead with this matter, and

21    it will not take me very long to study over the Answer, I

22    assure you. What are we ready to go ahead with? I am certainly

23    ready to go ahead with George's case.

24    MR. STAHLMAN: You certainly switch around pretty quick,

25    Mr. Veeder. A short time ago you put in this pre-trial matter

1   that was supposed to have some merit to it, and I am perfectly

2   willing to sit down at any time in connection with the pre-

3   trial.  You have also filed this lengthy brief that raises many

4   questions-- in fact, the entire brief pertains to the Vail

5   judgment, and before those matters are before the Court I

6   think it would be a waste of time to start taking testimony.

7       THE COURT:  Well, I am going to lunch, gentlemen.  I am

8   going to suggest that you sit here for ten or fifteen minutes,

9   and I will appoint Mr. Sachse, who has no particular axe to

10  grind one way or the other, as the presiding officer, and let's

11  have a little discussion as to what you want to do this

12  afternoon and tomorrow.

13      We could over the noon hour read the Vail Answer.  We

14  could spend some time on at least determining some of these

15  issues to be tried.  What else we can do I don't know.  I

16  broke my neck to make this week available for you.

17      MR. VEEDER:  So did I, your Honor.

18      THE COURT:  I have postponed criminal cases so that I

19  could start back to trial on this case.

20      I have a luncheon appointment.  Mr. Sachse, you are in

21  charge.  See what you can come up with by 2 o'clock.

22      (Noon recess.)

23

24

25

10,581

San Diego, California, Tuesday, November 3, 1959.  2:00 P.M.

THE CLERK:  Five, 1247-SD-C, United States vs. Fallbrook.

MR. SACHSE:  Your Honor, I have nothing very dramatic to report from my session as chairman over the conference on where do we go from here.  The position appears to be this.  The United States of America feels that since the stipulated judgment is of record inthis case, has been filed in evidence and is valid on its face, that the burden of going forward with the challenging of that stipulated judgment rests with the Vail Company, and the United States is not at this time prepared to do anything on any of the other issues that may be involved in the proceeding beyond the stipulated judgment, having understood that we came back for that express purpose.

MR. STAHLMAN:  May I have that remark?

MR. SACHSE:  The United States is not prepared at this time to go forward on any of the other issues in thecase, having taken the position that we came here today for the purpose of going ahead.

MR. STAHLMAN:  The United States's position.

MR. SACHSE:  Yes.

Mr. Stahlman for the Vail Company states that they are not prepared at this time to offer evidence in substantiation of theirattack on the stipulated judgment, and his best indication is that he would be ready to proceed at the time he has

10,582

1   already suggested to your Honor and had your Honor's approval

2   for, for certain other documents he is to file in this case.

3   What is it, the 24th?

4        MR. STAHLMAN:  No, I haven't said that.

5        MR. GIRARD:  The 17th.

6        MR. STAHLMAN:  That isn't exactly what I said.  Go ahead.

7        MR. SACHSE:  That is the story, your Honor.  In other

8   words, we are not prepared to go ahead at this time on the

9   matter of the stipulated judgment or the Vail case.

10       There are, however, your Honor, one or two little house-

11  keeping matters that Mr. Veeder and I would like to discuss

12  with you later.

13       MR. STAHLMAN:  I would like to wind this up.  Your Honor,

14  in view of the record and what occurred here the last time,

15  how anybody could be of the opinion that the Vail Company was

16  to proceed with evidence at this time I can't understand. I

17  have gone through the record here and every reference as to the

18  3rd of November , to which date this case was continued, and

19  the many things your Honor gave me to do--

20       THE COURT:  Well, let's not beat it to death.  If you

21  are not ready to go ahead now, you will be ready when-- on

22  the 17th of November?

23       MR. STAHLMAN:  Your Honor, in so far as introducing

24  evidence is concerned, I think I would like to have the Court

25  and Mr. Veeder to have a better understanding of what our

1  position is in relation to this stipulated judgment.  There is

2  already a great deal of evidence in the record, and I have

3  repeatedly said that the most important evidence in this case

4  is the evidence that bears a relationship to whether or not this

5  stipulated judgment can operate.

6  THE COURT:  Well, you can as part of your case call my

7  attention to other evidence in the record.

8  MR. STAHLMAN:  Fine.

9  THE COURT:  But that is not going to take too long.  In

10  an hour you could probably pull together the loose ends of the

11  evidence already in the case.

12  MR. STAHLMAN:  Already in the case, yes, I think so.

13  THE COURT:  Will you be ready to go ahead on the 17th?

14  MR. STAHLMAN:  To put witnesses on the stand?

15  THE COURT:  Well, that day or that afternoon.  This first

16  matter that you mentioned shouldn't take too long.

17  MR. STAHLMAN:  We still have this matter up in the air.

18  Reading this transcript, the last time we talked about that we

19  were going to have some pre-trial on this matter.

20  THE COURT:  I am thinking about tomorrow.  I have some

21  time.

22  When is that civil case set, tomorrow or the next day?

23  THE CLERK:  Tomorrow at 10 o'clock, your Honor.

24  THE COURT:  Did you call the attorney?

25  THE CLERK:  I called Mr. Reed.  I have a call in to Mr.

1  Finaldo.

2          THE COURT:  Are they ready?

3          THE CLERK:  They are ready as far as I know.

4          MR. STAHLMAN:  Mr. Veeder has made a big point that he

5  expected us to go ahead today.  The record shows quite the

6  contrary.

7          THE COURT:  Mr. Veeder has made a start on this pre-

8  trial by outlining the issues and the evidence.  Can't you and

9  Mr. Veeder sit down and do some work next week on this?

10          MR. STAHLMAN:  Certainly.

11          THE COURT:  Can't you be ready then to start in with

12  some of your proof on the 17th?

13          MR. STAHLMAN: Yes.  But I think most of this proof,

14  as I have indicated to your Honor, the majority of this proof

15  bears relationship to the geology and the very things about

16  which they are making well tests, which have not been termin-

17  ated.

18          THE COURT:  I don't propose to make a decision on this

19  Vail judgment the minute the case is over.

20          MR. STAHLMAN:  All right.

21          THE COURT:  If you have other matters that are important,

22  if you want to wait until the testimony is in on Santa

23  Gertrudis.

24          MR. STAHLMAN:  Certainly I think we will have to, your

25  Honor.

19,585

1      THE COURT:  That's all right.  But what about the major

2   part of your case-- the background and contentions concerning

3   this decree?

4      MR. STAHLMAN:  One of the issues bears relationship to

5   the matter we had under discussion this morning that your Honor

6   referred to as wanting to have pointed out to you, the matter

7   in relation to how this document where I have asked for

8   interrogatories and admissions may be proper.  Those are all

9   matters that I think we can work out on pre-trial.  I am not

10   trying to horse the Court around here and not meet this issue.

11   I know that it eventually has to be done.  But I think the

12   logical way in which to meet it, from my point of view, is to

13   meet it in relation to certain evidence that has a bearing on

14   it, which is not in the record yet.

15      THE COURT:  The way you do this, Mr. Stahlman, you sit

16   down and take a yellow pad and pencil and start to outline

17   what your case is on the Vail decree, and you work it out, and

18   if there is something already in the record you get the page

19   and volume that you call the Court's attention to, and if there

20   is something that is going to come in in the future you call

21   the Court's attention to it.  Then you put on your witnesses

22   and offer your documents on the other matters you are concerned

23   with in connection with the Vail decree.  It just takes some

24   work to organize it.

25      MR. STAHLMAN:  Of course, I might have to learn to write

10,586

1    first.  I think it will take more than an hour, frankly, be-

2    cause I am quite familiar with a great deal of the evidence

3    that bears on it.  But I think I will have to go over the record

4    and point it out, like I did in connection with the Coit

5    survey.  Those things weren't done in just a few minutes.  It

6    took a lot of time to work them out.  I don't think I can do

7    it in an hour.

8         I think the first step, from my point of view, is to work

9    out on pre-trial what the issues are.  I don't think Mr.

10   Veeder will ever agree with anything I suggest, but I am per-

11   fectly willing to try.

12        THE COURT:  Is there any possibility that some of these

13   other defendants who are not here today could be ready to go

14   on the Santa Gertrudis area on the 17th?  Has anybody made any

15   inquiry?

16        MR. VEEDER:  I think Mr. Littleworth.

17        MR. LITTLEWORTH:  I think we probably have most of the

18   parties on Santa Gertrudis, and as I say, we have been waiting

19   for our soil surveys, which are rapidly coming in, and we are

20   tentatively scheduled on the 24th.  We should have them all by

21   that time and should have a chance to review them for a few

22   days.

23        Your Honor will remember that last spring we put on some

24   evidence on well tests and the like on the general hydrology

25   of that Basin 4 area in Santa Gertrudis.  Now we are concerned

1    with the individual cases of fifteen people, and that will be

2    primarily their irrigable acreages and whether they are

3    riparian and that type of thing, and a few of them have a few

4    other fringe problems-- perhaps they store a little water for

5    longer periods of time, and that evidence should come in.  But

6    I think our case is going to be relatively brief.

7        THE COURT:  I dug up a civil case to try tomorrow and

8    probably part of Thursday.  I propose, then, to continue this

9    case until Thursday at 2 o'clock.  The purpose of the meeting

10   at 2 oclock on Thursday will be in the nature of pre-trial

11   between the United States and the Vails, and that will give

12   you gentlemen a day and a half to do some conferring and then

13   see if we can outline a series of issues that we are going to

14   try and lay out some plan for trying them, and to continue the

15   trial of this matter to the 17th.

16       MR. STAHLMAN:  Another matter, your Honor.  The Clerk has

17   located the transcripts of the Hall testimony in the files of

18   the case, and here they are.

19       THE COURT:  Then that should probably be given an exhibit

20   number-- AJ for Identification.

21       MR. STAHLMAN:  These are the two volumes.  They are bound

22   together, but they are for the days of October 29, 1952, and

23   October 30, 1952, and they are from pages 1 to page 232.

24       THE COURT:  They will be marked for identification, and

25   when we finally decide the Hall motion we will take certain

1    pages that are pertinent from that transcript and receive them

2    in evidence, if that is the ruling of the Court.

3          All right, Thursday at 2 o'clock.  Mr. Veeder.

4          MR. VEEDER:  I was hopeful your Honor would give us a

5    little time this afternoon for other matters that are import-

6    ant.

7          MR. SACHSE:  I concur, your Honor.

8          MR. GIRARD:  This Thursday at 2 P.M. will be a pre-trial

9    primarily on Vail and the United States on the stipulated

10   judgment?

11         THE COURT:  That is right.  The rest of you needn't come,

12   unless you want to, because what we are going to try to do is

13   to lay out some way to try this matter.

14         MR. GIRARD:  Do I understand that the decision as to

15   what will be heard on the 17th will be decided at that pre-

16   trial conference on Thursday?

17         THE COURT:  Well, it may be.  In other words, I want

18   Mr. Stahlman to start in on the 17th with some part of his case.

19         MR. GIRARD:  I don't mean to be pushing anyone, but

20   frankly I think the trial should concern some evidence here

21   shortly.

22         MR. STAHLMAN:  As I have indicated to your Honor, I

23   think a very important part of that case is the irrigable

24   acreage that is east of Vail.

25         THE COURT:  We will get to that later.  I don't care

1  what order this comes in.

2       MR. STAHLMAN:  All right.  Don't you think we can better

3  determine after we get out pre-trial and see what are issues are?

4       THE COURT:  We can do better.  But other counsel here will

5  want to know what is going on on the 17th, and I am just

6  warning you now that that is what we are shooting for, to start

7  on the 17th.

8       MR. STAHLMAN:  Why couldn't your Honor set some of these

9  other matters, like the Murrieta Valley, on that date to start?

10      THE COURT:  Is there other matter that can go forward

11  on the 17th?  What is it?

12      MR. LITTLEWORTH:  I don't understand what other matters

13  there are.  We have put in for our clients all of the general

14  testimony concerning hydrology that we are going to put in on

15  direct.

16      THE COURT:  I am not talking necessarily about you.  But

17  there are other counsel, some of whom aren't here today, who

18  represent people who have been told that someday we would get

19  to them.  Is Mr. Dougherty still in the case with some clients?

20      MR. SACHSE:  Your Honor, Mr. Dougherty has been substi-

21  tuted out as to Searl Brothers, and I have been substituted in--

22  that is the Domenigoni and the Diamond Valleys, your Honor, and

23  Mr. Veeder and I are hoping to work out a special procedure on

24  that, which we probably couldn't get to, if we wanted to, in the

25  next week or two.

1    Now I represent-- I will give you just a sample-- two

2  very small land owners in the Town of Murrieta.  They are the

3  ones we had the laughter about the United States having ad-

4  mitted their waters were no part of the stream system, and that

5  admission has long since been disregarded.  Mr. Veeder and I

6  have worked briefly at noon and we have made a date for

7  tomorrow, and I can say very honestly that we could probably

8  today give your Honor an interlocutory judgment on about 30

9  bodies, but rather than do it with so few at one time we are

10  going to work out now the exact form here of the interlocutory

11  judgment that will be used with people have a technical riparian

12  right but so to speak one that they have very little practical

13  opportunity of using, and I am going to come down tomorrow and

14  work with Mr. Veeder on it.  I sincerely believe that the way

15  the United States is working with me on it and the progress we

16  are making that by the first of the year we are going to give

17  you a large and substantial bundle of the "outs".

18    Am I not right, Mr. Veeder?

19    MR. VEEDER:  I have no reason to assume to the contrary.

20    MR. SACHSE:  I think it may do more toward winding this

21  whole case up to clear up some of those issues than just a lot

22  of talk here.

23    THE COURT:  Suppose that after your meeting on Thursday

24  with Mr. Veeder and Mr. Stahlman we find that for some reason,

25  which I don't foresee right now, that Mr. Stahlman can't go

1  forward on the 17th.  What do you want me to do?  Continue the

2  date then to the 24th and advise you so that you will not have

3  to come down on the 17th?

4      MR. GIRARD:  I will probably be here for that meeting on

5  Thursday anyway, your Honor, if you are talking to me.

6      MR. SACHSE:  I will come down for the pre-trial hearing,

7  your Honor.

8      THE COURT:  We are going to shoot for the 17th, and if

9  we can't make it then we will have to put it over to the 24th

10 and Mr. Littleworth will start in.

11     But you contemplate only a couple of days at the outside?

12     MR. LITTLEWORTH:  I contemplate less than that, from

13 what I see at the present time, because, as I see it, our only

14 concern is with how much acreage these people own and how much

15 is irrigable, and the surveys we have had so far have been in

16 agreement with what the individual landowner believes to be

17 the case.  So it may be just a reliance on the soil surveys

18 of the United States, with maybe a little additional testimony

19 here and there.  But I think it is going to be very brief for

20 us.

21     MR. SACHSE:  Your Honor, while we are airing troubles,

22 I think probably on the 17th or at the very next session after

23 that at the latest I am going to come in with a motion to be

24 relieved in the case of at least one defendant, and an import-

25 ant defendant, a defendant whom you have directed to present his

1   case here.  I am just calling this to your attention to let

2   you know.  I do sympathize with Mr. Veeder on the fouled-up

3   state of the pleadings here.  The property has been sold, the

4   people don't get in touch with me any more, I don't know who

5   they are, and it is a large and important defendant-- the

6   Stardust Ranch.  I am not going to let myself stay on the

7   record when I can't get in touch with the owners or my clients.

8   As I say, I have sympathy with Mr. Veeder on the pleading

9   problems.  A lot of this is really fouled up.

10        MR. VEEDER:  Your Honor, I found somebody to sympathize

11  with me for a change.

12        THE COURT:  What about some of these defendants in the

13  Wolf Valley?  Are some of those in a position where they

14  could be heard?

15        MR. VEEDER:  Your Honor, I have no knowledge.  I don't

16  know.

17        MR. SACHSE:  Wolf and Pechanga are the same.  I have four

18  clients, and as far as I am concerned their case on Wolf is

19  finished with the presentation made solely on the few words

20  of brief cross-examination of Col. Bowen.  Those are done.

21        MR. VEEDER:  Those are situations where we will have this

22  interlocutory number two.

23        MR. SACHSE:  We expect to have the stipulated judgment

24  for your Honor very quickly, without even waiting for the

25  Master's findings.

1    THE COURT:  What about the Gardner problem?  Is that being

2  handled by the Master?

3    MR. VEEDER:  That is completed, and I had assumed it

4  would be heard here.

5    MR. GIRARD:  I think it is one of the defendants that

6  was incorporated into that order of yours, wasn't it?  I am

7  pretty sure it was.

8    MR. STAHLMAN:  Yes, Gardner is in there.

9    THE COURT:  Are there any contested issues in connection

10  with that property?

11    MR. VEEDER:  I would think, with the soil survey com-

12  pleted, that there would be-- unless he has some objection,

13  and I understand that he doesn't.

14    THE COURT:  Didn't he appear before the Master?

15    MR. VEEDER:  No.  That is going to be here.

16    As far as we are concerned, as I said, we are greatly

17  more concerned with the Vail matter than with anything else.

18    THE COURT:  Some of these loose ends could be gathered

19  in.  You might, between now and Thursday afternoon, check with

20  Gardner and find out if he wants to present any evidence and

21  whether he would be ready to present any the week of the 17th,

22  if he does.

23    MR. VEEDER:  We will do that, your Honor.

24    THE COURT:  He may be content with what evidence has gone

25  into the record already.  He has some riparian ground, doesn't

1  he?

2        MR. VEEDER:  That is right-- apparently.

3        MR. GIRARD:  One thing always bothered me in reading his

4  brief.  Apparently he was under the assumption that there was

5  going to be an allocation of water at this proceeding.  I

6  don't know whether anybody has advised him to the contrary

7  that no one is seeking that.

8        THE COURT:  He has appeared pro per, too.

9        MR. GIRARD:  Yes.  Many of the objections he made were

10 based on the assumption that there was to be an allocation

11 here.

12       THE COURT:  We could sell tickets the day he shows up.

13       MR. GIRARD:  When that fact is removed, certainly some

14 of the legal objections, it would appear to me, should have

15 vanished.

16       THE COURT:  Mr. Veeder, let's you and I arrange to

17 contact him about finding out.  Has he had these soil surveys?

18       MR. VEEDER:  Yes, he has.

19       THE COURT:  How long ago?

20       MR. VEEDER: He has had them for about three weeks to a

21 month, and it is important to point out that that material,

22 of course, is not in the record yet.  Col. Bowen will be the

23 witness.

24       THE COURT:  It will be put into the record?

25       MR. VEEDER:  Yes.  We would call him and ask if he has any

1   objections and tell him that on the 17th we intend to go ahead

2   with his case, unless he advises us otherwise.

3      THE COURT:  This soil survey only shows his irrigable

4   acreage and what land is riparian?

5      MR. VEEDER:  I wouldn't say it shows what land is

6   riparian.

7      THE COURT:  It shows irrigable acreage.  It doesn't go

8   into any question of what water may underlie parts of his

9   ground.

10     MR. VEEDER:  Well, no.  Part of his ground, I am con-

11  vinced, is overlying land.

12     THE COURT:  If his land is all riparian and part of it

13  is verlying a stream or basin, then all his land is riparian.

14     MR. VEEDER:  Well, it depends, your Honor, if it all came

15  down in a single tract.  I don't know that myself.

16     THE COURT:  I don't know whether it lies over the

17  mountain or not.  Let's find out about that.

18     MR. VEEDER:  We will follow through on that.

19     THE COURT:  What else this afternoon?

20     MR. SACHSE:  Your Honor, I have two clients-- this is in

21  answer to the question you asked other people whom you directed

22  to be heard here-- I have discussed it with both of them, I

23  have reviewed the cases carefully, and I will have absolutely

24  no case on either one of them, except a few questions of Col.

25  Bowen and/or Mr. Kunkel.

1          THE COURT:  You would be ready to go on those?

2          MR. SACHSE:  I could do them today, except that I don't

3  have their files here.

4          THE COURT:  You would be ready to go on those a week from

5  today?

6          MR. SACHSE:  Any time, your Honor.  I have nothing on

7  their case except a few questions of the United States's

8  witnesses to clarify a few things that I am not satisfied with

9  in the record.

10         MR. GIRARD:  I don't think Franz will be ready on the

11  17th.

12         MR. SACHSE:  No, I may not be here on the 17th.

13         MR. GIRARD:  How about the 18th?

14         MR. SACHSE:  On the 18th, 19th and 20th I will be out

15  of town.

16         Then I will state this-- it is simply advisory to your

17  Honor, I have no official status-- your Honor directed that

18  George Yackey be prepared to present his case here.  I took

19  it upon myself as a friend to send him notice.  He is in

20  Honolulu.  I don't know what he is going to do.  I am not his

21  attorney.  He is appearing pro per.  He is in Honolulu, not

22  on vacation, but on a job.  If your Honor contemplates asking

23  him to come in to do something, I will be happy to take care

24  of it myself, advising him just as a friend.

25         THE COURT:  Is this land below the Narrows?

1    MR. SACHSE:  It is below the Narrows on Sandia Creek, and

2  it has a pending appropriation which Fallbrook is resisting

3  to take water from Sandia Creek.

4    THE COURT:  This would be a very short hearing?

5    MR. SACHSE:  That would be brief, yes.

6    THE COURT:  What other matters this afternoon do you want

7  to take up?

8    MR. VEEDER:  I have a couple of things, perhaps more for

9  direction than anything else.  Based on investigations that

10  have now been made in the ground water studies, it is apparent

11  that important data could be obtained by the installation of a

12  water level recorder on the Roripaugh well which is 23K1.

13  I have talked to Mr. Littleworth about it.  He said that the

14  Roripaughs are willing, and so is he, for the installation of

15  it.  I wonder whether you think we should get an order from

16  you.  I would prefer an order, if possible, simply for the

17  protection of both parties.

18    MR. LITTLEWORTH:  Your Honor, we are agreeable, as I

19  have already told Mr. Veeder, on two conditions:  One is that

20  it is a well which is used for cattle during summertime and

21  we would want it made available for use when the next season

22  would begin when cattle need the water; and secondly, it has

23  a pump on it which Mr. Veeder thinks is going to have to be

24  removed, and that should be done by the United States and

25  holding them responsible to restore the well to its former

1  condition-- if there is any damage they would be responsible

2  for it.

3        MR. VEEDER:  That is proper.

4        THE COURT:  Draw the order, Mr. Veeder, and submit it

5  to Mr. Littleworth for approval and I will sign it.

6        What else do you have to present?

7        MR. VEEDER:  We have a question, your Honor-- and I

8  haven't talked to George about it-- we desire, if possible,

9  to go onto the Vail property for the purpose of taking water

10  level measurements on wells in addition to those on which we

11  have recorders established, and if there is no objection to it

12  from Mr. Wilkinson or Mr. Stahlman--

13        THE COURT:  Is this to install new water recorders?

14        MR. VEEDER:  No, just water level measurements.

15        THE COURT:  Just to take water level measurements?

16        MR. VEEDER:  That is all it is, your Honor.

17        THE COURT:  On one occasion, or on more than one occa-

18  sion?

19        MR. VEEDER:  I think we would want to take them on more

20  than one occasion, because we are trying to make one complete

21  canvass at this time of year concerning all the wells for

22  which we have data.

23        MR. STAHLMAN:  Do you have a list of these wells?  Some

24  of the wells are pumping, aren't they?

25        MR. VEEDER:  I have a list of the wells here, if you want

1   to see those, George.

2          MR. STAHLMAN:  You have quite a list there.

3          THE COURT:  Work it out between you and give the list to

4   Mr. Stahlman and let's see if you can come to an agreement by

5   Thursday afternoon.

6          MR. STAHLMAN:  Do you want to give me this?

7          MR. VEEDER:  I will have a copy made and give it to you

8   this afternoon.

9          MR. STAHLMAN:  All right.

10         MR. VEEDER:  One other thing, your Honor.  We were

11  wondering if the Vail Company would give us the recorder chart

12  from the Schrode well.  It has been removed.  Could we get

13  that?

14         MR. STAHLMAN:  We have one chart, yes.

15         MR. VEEDER:  Can we have it reproduced?

16         MR. STAHLMAN:  I think we can.

17         THE COURT:  What else?

18         MR. VEEDER:  That is all I have, your Honor.

19         MR. STAHLMAN:  This matter as to the time which we may

20  have to answer this brief that Mr. Veeder has filed in connec-

21  tion with the stipulated judgment, which I think should be

22  answered, may we set that over to Thursday and decide at that

23  time to see where we are going.

24         THE COURT:  All right.

25         The Government had another motion on here called "Motion

1  With Respect to the Vail Company Pleadings and Pending Motions."

2      MR. VEEDER:  That was simply to ask that we have an

3  opportunity to review the Answer before taking any action in

4  regard to this Bruner and in regard to Hall.  Those two matters

5  have been covered, your Honor.

6      THE COURT:  Then the motion will go off calendar.  I have

7  ruled on the Bruner motion.  The Hall motion I will continue

8  to the 17th of November at 10 o'clock.

9      MR. VEEDER:  I am advised, Mr. Stahlman, that we have a

10 man standing by who would like to go on the Vail property to

11 make these measurements but would not go near any pumping wells.

12 Would it be possible to do that today or tomorrow?

13     MR. STAHLMAN:  In accordance with what we had before in

14 the order, if you come up there and Mr. Wilkinson can go with

15 them, or let me know ahead of time.  Somebody wanted to make

16 some measurements real quick the other day and Mr. Wilkinson

17 was busy with machinery being broken down, et cetera.

18     MR. VEEDER:  I will fit your convenience.  But we would

19 like to get it done as soon as we can.

20     MR. STAHLMAN:  We have always cooperated.

21     MR. VEEDER:  I have nothing more, your Honor.

22     THE COURT:  Mr. Lincoln, what kind of a case do you have

23 to present?

24     MR. LINCOLN:  About all I have, I think, your Honor, is

25 to be permitted to attempt to prove my title and then show

1    how much acreage there is and how much water we hope flows

2    through the river.

3         THE COURT:  You were a party to the stipulated judgment?

4         MR. LINCOLN:  I was not, sir.

5         THE COURT:  When would you be ready to put on your case?

6         MR. LINCOLN:  I can be ready in a comparatively short

7    time, possibly a week or even less, if your Honor requires.

8         THE COURT:  Have you requested a soil survey from the

9    Government?

10        MR. LINCOLN:  No, your Honor.

11        THE COURT:  You are going to have independent proof of

12   that character?

13        MR. LINCOLN:  I think that Col. Bowen has a sufficient

14   knowledge of the soil in our vicinity to be able to testify as

15   much as may be required.

16        THE COURT:  Your property is riparian?

17        MR. LINCOLN:  Yes, your Honor.

18        THE COURT:  Suppose you confer with Col. Bowen before the

19   17th and we might get to you that week also.

20        MR. LINCOLN:  Thank you, your Honor.

21        MR. STAHLMAN:  The stipulated judgment, however, does

22   mention the property that you have in mind, does it not, Mr.

23   Lincoln?  You have read the stipulated judgment, and the

24   stipulated judgment makes reference to his property.

25        THE COURT:  It doesn't make any difference if they made

1  reference to it.  Was he a party to the stipulated judgment?

2      MR. LINCOLN:  I was not.

3      MR. STAHLMAN:  There was a previous judgment, however,

4  entered in the other case, which was never appealed.

5      THE COURT:  You were a party to the previous judgment?

6      MR. LINCOLN:  Yes, but we did not appeal from the previous

7  judgment.

8      THE COURT:  It is your view, then, that you are bound by

9  the previous judgment?

10      MR. LINCOLN:  Yes, your Honor.

11      MR. VEEDER:  That is certainly our view, your Honor.

12      MR. STAHLMAN:  I have talked with Mr. Lincoln, and he is

13  of the opinion, as he expressed it to me, that he will have

14  the right to the use of water from the Santa Margarita River

15  on whatever land is riparian to the river, and that was com-

16  pletely contrary to what the original judgment says.

17      Isn't that right, Mr. Veeder?

18      THE COURT:  Do you have excerpts?  Or we have the

19  original judgment in this case?

20      MR. VEEDER:  That's right.

21      THE COURT:  We ought to pull out those parts of that

22  concerning the property of Mr. Lincoln's client and see just

23  exactly what this judgment provides.  Also the findings and

24  conclusions in that prior case that concern that property.

25      MR. STAHLMAN:  The findings, I believe, are in evidence.

1   I have read those findings on it.

2        MR. VEEDER:  I don't believe they are in evidence.

3        THE COURT:  Let's find out where they are, so that we

4   can either extract the pertinent parts or the whole thing.

5        MR. VEEDER:  Are you speaking of the findings?  You have

6   had those marked for identification, but they certainly have

7   not been in evidence.

8        THE COURT:  I am not going to spend any more time on it

9   now.  I think I know what the problem is.

10       Anything further?

11        MR. SACHSE:  Yes, your Honor.  I have to raise painful

12   subjects, but I think it should be faced up to.  We have lodged

13   at the moment but not filed the Master's Findings on two water-

14   sheds.  Now, I am interested in seeing them filed, if it is

15   possible.

16       THE COURT:  Here is what happened-- and I didn't have a

17   chance to tell you gentlemen what happened-- I directed first

18   that they be filed.  Whereupon the Clerk called my attention

19   to the fact that the Rules provide that once the Master's

20   Findings are filed, within ten days they must be served on

21   everybody.  So this therefore presented a situation that we

22   were not ready to face and I directed the Clerk therefore to

23   lodge them rather than file them.

24       MR. SACHSE:  I called that Rule to the Court's attention.

25   I was well aware of it.

1          THE COURT:  Figuring that at some later date when we
2   get ready to send out some of these interlocutory judgments
3   and serve them on everybody, we can then shortly file these
4   Master's findings and serve them at the same time.
5          MR. SACHSE:  My thought was only this-- and I am not at
6   all concerned with pressing this and I don't want to make
7   problems come to a head sooner than they have to-- I don't know
8   if anybody else has thought of this except me, but it occurs
9   to me that parties who are in the same watershed, for example,
10  or in the same general area as someone affected by Interlocutory
11  Judgment No. 2 or was under the Master's Findings on Fallbrook
12  Creek and would have a right, it would appear to me, to know
13  what the Master's Findings are, if they are different-- and I
14  don't think they are.  In this case, in the case of Fallbrook
15  Creek, Interlocutory Judgment No. 2 so far is a cinch, it is
16  the same, it will not be any problem.  But I can see where
17  situations are going to arise where we will work out a proposed
18  stipulated judgment that possibly might conflict with something
19  the Master found or in the view of some other defendant he might
20  rather have this under the Master's Findings than the stipulated
21  judgment we have agreed to.
22         THE COURT:  Let's not talk about "stipulated judgment."
23         MR. SACHSE:  I shouldn't have used the words.  I mean we
24  may work out and agree on a form of interlocutory judgment in
25  various cases.  But it seems to me-- I am just talking about

due process now in the abstract, your Honor-- that other land

owners unaffected by these findings of the Master and may be

affected by an interlocutory judgment entered by your Honor

would have a right to know what both these sets of findings are

before they could be asked to approve or disapprove of our

interlocutory judgment.

THE COURT:  Well, they are in a position to be sent out

at the same time, as your interlocutories, are they not?

MR. VEEDER:  They are enormous.

MR. SACHSE:  They are a big thing.  It is a tremendous

problem, and the real reason I am suggesting this is that I

hope somebody can dream up a way that we could get around

this rule.  For instance, in the case of De Luz Creek-- I am

thinking aloud now-- True, the Federal Rule says that you have

to serve every party.  Does that literally mean "every party,"

Mr. Veeder, in your judgment?  Or would it only be the parties

who would be directly involved in the De Luz controversy?

THE COURT:  That wouldn't be too many.  That would be

Vail plus--

MR. SACHSE:  The De Luz Creek defendants themselves,

plus the United States.  They are, as we all know, a little

isolated branch.  Could we get away with that?  I don't know.

I am just asking.

MR. VEEDER:  I want to enter a thought on that, Mr.

Sachse.  You and I are working on one line at the present

1 moment.  Let's work along that line and see where we come out

2 with regard to the findings that have been lodged.  I don't

3 know the answer.

4 THE COURT:  Let me inquire.  The Master has followed

5 through the procedure we outlined, and before he finally signed

6 these findings and conclusions was everybody in the watershed

7 notified and given a chance to be heard before him, or did he

8 only conduct his hearings in a piecemeal fashion as he had to

9 and then made his findings?

10 MR. SACHSE:  There were public notices posted and notices

11 published in the newspaper, et cetera, of the two that he has

12 lodged findings on so far-- De Luz and Fallbrook Creeks.  I

13 don't know.

14 Mr. Veeder, I don't think personal notices were served

15 on everybody.

16 THE COURT:  Has everybody in those creeks had a copy

17 of those findings?

18 MR. SACHSE:  No.

19 MR. VEEDER:  They were sent out.

20 COMMANDER REDD:  The proposed findings were sent out

21 months ago.

22 MR. SACHSE:  To everybody in Fallbrook Creek?

23 COMMANDER REDD:  Yes, Fallbrook Creek.  I mailed them

24 out.

25 MR. SACHSE:  That's wonderful.  I didn't know that.

1      THE COURT:  These were the proposed findings as later

2   adopted by the Master?

3      MR. VEEDER:  No, there were changes in some of them. But

4   my own view is that Mr. Sachse has raised a point of great

5   importance, concerning which we haven't worked out a procedure.

6   We are working out a procedure in regard to those who are

7   represented by lawyers.  We are next going to move on those

8   who filed their answers in regard to the procedure of the inter-

9   locutory orders.  I would have to give it further considera-

10   tion, Mr. Sachse, before I could do any good.

11      MR. SACHSE:  Well, I am not bothering anybody, but I

12   don't believe we can afford to close our eyes to it.

13      MR. GIRARD:  How can you get around serving everybody

14   in the watershed?

15      MR. VEEDER:  I don't think we can.  But I certainly

16   don't want to undertake it now.

17      MR. GIRARD:  They have a right to protest if you, in

18   effect, find some area of the watershed outside the stream

19   system.

20      MR. STAHLMAN:  Another matter enters into that, your

21   Honor.  There is De Luz Creek and Sandia Creek on which Col.

22   Bowen was making a study on the Vail property.  That was put

23   over to another date.

24      MR. VEEDER:  In this trial?

25      MR. STAHLMAN:  Yes.  That should be completed.

THE COURT:  That is interesting, because Vail has property up on the headwaters of both De Luz and Sandia.

MR. STAHLMAN:  Yes.

THE COURT:  But not Fallbrook.

MR. STAHLMAN:  Not Fallbrook.

THE COURT:  When would you be prepared to put on your proof on that, with the idea in mind of being able to wrap up the complete watershed?

MR. STAHLMAN:  I think the Colonel has finished the study. Haven't you?

COL. BOWEN:  We have finished the field work on it, but we haven't finished the office work on it yet.

THE COURT:  Any estimate when you would be ready to present it?  Because it would seem to me that the Master's Findings on the lower part of those watersheds ought to be integrated some way with the testimony of Vail and the Government on the Vail property above, and some integration made for the whole watershed.

MR. VEEDER:  May I interpose a thought there.  What transpired yesterday, I had an extended talk with the Master on the subject, and we have already undertaken to supply to the Master all references to oral testimony and all documents which could in any way relate to the matters concerning which he is making findings.  That of course will apply to De Luz, that will apply to Sandia, that will apply to every aspect of

1   the valley.  We have taken that original step of integration

2   now, which occurred to me would be the best way to do it.

3           THE COURT:  Except it looks to me like you are doing it

4   backward.  The Master didn't hear testimony in this court.  He

5   is a trier of fact.  He can't take the record we make here

6   and make findings from it.  But the reverse can be done.  I

7   can take his findings, plus the testimony I hear here, and I

8   can make findings.

9           MR. VEEDER:  That is correct, your Honor.  Nor did he

10  intend to make findings on the basis of that data.  But he is

11  getting evidence on a piece of land here, evidence on a piece

12  of land there, evidence on a piece of land there.  He wanted

13  to get the overall geology and I objected; I said that from

14  our standpoint we don't want to repeat that in the Master's

15  hearings.  Accordingly, it was agreed that we would submit

16  to him all the page references to testimony and all the ex-

17  hibits to the end that he could correlate his thinking.

18  Certainly he couldn't make findings on matters heard before

19  your Honor.  But we have started on that, and I believed that

20  was the initial step that had to be taken.

21          THE COURT:  All right.

22          MR. VEEDER:  Thursday at 2 o'clock?

23          MR. STAHLMAN:  So that our record here is not misunder-

24  stood and Mr. Veeder will go out of here with the right thought

25  in mind, those findings of fact and conclusions of law were

10,610

1  admitted on June 3, 1959.  They are in the record.

2      THE COURT:  Of the first judgment?

3      MR. STAHLMAN: Yes, your Honor.

4      THE COURT:  Before the stipulated judgment?

5      MR. STAHLMAN:  Yes, that's right.

6      THE CLERK:  Vail's Exhibit AB, your Honor.

7      MR. VEEDER:  I recall how that was admitted now.  That

8  was admitted simply for the purpose of having them in the

9  record, but at that time, as I remember-- and this is ex-

10 tremely important to me-- you said they were not admitted for

11 all general purposes.

12     THE COURT:  There is nothing to be alarmed about.  They

13 are facts that exist, they involve certain parties who didn't

14 appeal.  Certainly they go in evidence, but that doesn't mean

15 that they supersede the stipulated judgment as far as the

16 Government and Vail are concerned.

17     MR. VEEDER:  That's all I wanted to know, your Honor.

18     THE COURT:  Anything further?

19     You gentlemen are free to stay around here and talk

20 over some of these problems.

21     MR. VEEDER:  Thank you, your Honor.

22     THE COURT:  Court will be in recess until 2 o'clock P.M.

23 on Thursday.

24     (Adjournment until Thursday, November 5, 1959, at 2

25 o'clock P.M.)