VOLUME NO. 98

# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| vs. | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al, | |
| Defendants. | |

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Tuesday, November 24, 1959.

**Pages:** 10,626 to 10,783

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,    )
                             )
              Plaintiff,     )
                             )
      vs.                    )        No. 1247-SD-C.
                             )
FALLBROOK PUBLIC UTILITY     )
DISTRICT, et al.,            )
                             )
              Defendants     )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Tuesday, November 24, 1959.

APPEARANCES:

    For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                               WILLIAM E. BURBY, ESQ.,
                               Special Assistants to
                               the Attorney General,
                               Department of Justice,
                               Washington, D. C.

```
1    For U. S. Navy            LCDR. DONALD W. REDD.
2                             LT. CHARLES SALTER.

3    For Defendant Vail        GEORGE E. STAHLMAN, ESQ.
     Company                   EARL K. STANTON, ESQ.
4
     For Defendants
5    Fallbrook Public         FRANZ R. SACHSE, ESQ.
     Utility District,
6    et al.

7    For Defendant State      STANLEY MOSK, ESQ.,
     of California            ATTORNEY GENERAL, by
8                             FRED GIRARD, ESQ.,
                              Deputy Attorney General.
9
     For Defendant
10   Murray Schloss          WALTER GOULD LINCOLN.
     Foundation
11
     For Defendant           ERLE STANLEY GARDNER,
12   Gardner                 In propria persona.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## INDEX TO WITNESSES

| For Defendant Erle Stanley Gardner: | D | X | RD | RX |
|---|---|---|---|---|
| Sam Hicks | 10,629 | | | |
| | 10,660 | | | |
| For the Plaintiff: | | | | |
| Allen C. Bowen | 10,646 | 10,648 | | |
| | 10,710 | 10,717 | | |
| For Defendant - | 10,755 | 10,757 | | |
| Ralph O. Barnett | 10,703 | 10,707 | | |
| Alexander F. Borel | 10,723 | 10,752 | | |
| | 10,771 | | | |

## E X H I B I T S

| Plaintiff's Exhibit - | For Iden. | In Evidence |
|---|---|---|
| 163 - Gardner Soil Survey | 10,632 | 10,648 |
| 164 - Bethell Soil Survey | 10,633 | 10,660 |
| 165 - Land Ownership Map | 10,639 | 10,640 |
| 166 - Engineering Report | 10,705 | 10,716 |
| 166-A Aerial Photo | 10,716 | 10,716 |
| 167 Aerial Photo | 10,716 | 10,716 |
| 168 Aerial Photo | 10,716 | 10,717 |
| 169 Soil Survey (Borel) | 10,724 | 10,757 |
| 170 Aerial Photo | 10,756 | 10,757 |
| 171 Engineering report (Reyes) | 10,772 | 10,775 |

19629

1    San Diego, California, Tuesday, November 24, 1959.  10:00 A.M.

2

3        THE COURT:  Call the next matter.

4        THE CLERK:  Nine, 1247-SD-C, United States vs. Fallbrook,

5    et al.

6        THE COURT:  What is the plan of procedure this morning?

7        MR. GARDNER:  If the Court please, I am Erle Gardner.

8    I have a stipulation with Mr. Littleworth that I can put on a

9    case very briefly.  I am appearing in propria persona, not as

10   attorney.  I would like to call one witness.  I think I could

11   be very brief.

12       THE COURT:  Do you think you need counsel, or can you

13   proceed without counsel in this matter?

14       MR. GARDNER:  I would like to have the Court appoint one

15   for me.  I think we can proceed, your Honor.

16       THE COURT:  All right.

17       MR. GARDNER:  Mr. Hicks, will you come forward and be

18   sworn, please.

19

20               SAM HICKS,

21   called as a witness on behalf of the defendant Erle Stanley

22   Gardner, being by the Clerk first duly sworn, on his oath was

23   examined and testified as follows:

24       THE CLERK:  Please stand and give your name.

25       THE WITNESS:  Sam Hicks.

1       MR. GARDNER:  If the Court and counsel please, I will try

2   to do this very expeditiously, the short way, unless I am

3   stopped.

4

5                       DIRECT EXAMINATION

6   BY MR. GARDNER:

7       Q  Mr. Hicks, you are ranch manager for me and have been

8   for some period of time?

9       A  That is correct.

10      Q  And you reside on Rancho del Pesano at Temecula,

11  California, Post Office Box 67?

12      A  That is right.

13      Q  How many acres are involved or included in the ranch

14  generally?  In the home piece, about how many?

15      A  In the home piece about 876 acres.

16      Q  And in the piece to which we refer as the Nienke piece,

17  which I believe is called Parcel 36 on the survey?

18      A  Approximately 313.

19      THE COURT:  What was the other name you applied to that?

20      MR. GARDNER:  Nienke.

21      THE WITNESS:  That is right.

22      MR. GARDNER:  May it be stipulated that the report

23  which was made by the Ground Survey may be received in evidence

24  as part of this case?

25      MR. VEEDER:  Your Honor, in that regard we have worked

10,631

1    out with Mr. Littleworth the procedure that perhaps Mr.

2    Gardner would be amenable to, namely, that we would call Col.

3    Bowen ourselves for the purpose of identifying these exhibits

4    and for the purpose of offering them.   I believe in that way

5    it will be possible to obtain a more clear statement as to

6    exactly what is involved in these.

7         THE COURT:   I think it would be better to do it that way,

8    for the reason that all parties are adverse and therefore a

9    stipulation with the Government would not be effective as to

10   other people.   If the Survey is identified and goes into

11   evidence, then it is binding on everybody in this case.

12        MR. GARDNER:   I thought, if the Court please, that

13   perhaps there had been some preferred procedure by which those

14   surveys would be introduced in evidence.

15        As I understand it, while the Answer contains allegations

16   about springs on the property, the springs are not involved in

17   any way as far as this litigation is concerned, or does the

18   Court care to hear testimony on it?

19        THE COURT:   Will Col. Bowen's testimony cover the springs?

20        MR. VEEDER:   Your Honor, the matters concerning which

21   Col. Bowen will testify will be limited very largely to the

22   soil surveys.

23        My own view-- and I am not being presumptious when I

24   recommend to Erle Stanley Gardner how to proceed, but I do

25   think that evidence in regard to the springs would be important,

10,632

1   and then the question as to whether or not your Honor believes

2   they are part of the stream system.

3       THE COURT:  Do we have a map of any kind that I can look

4   at that shows this area?

5       MR. VEEDER:  We have the soil surveys, your Honor.

6       THE COURT:  What number are you going to propose for

7   the soil survey?

8       MR. VEEDER:  I think it would be Government's Exhibit

9   163.

10      THE CLERK:  163 would be the next in order, your Honor.

11      THE COURT:  Mark the soil survey for identification as

12  Government's Exhibit 163.

13      (The soil survey was marked as Government's Exhibit No.

14  163 for Identification.)

15      MR. VEEDER:  May I also inquire-- we have here the soil

16  survey for Agnes H. Bethell.  Mr. Gardner, are you representing

17  her?

18      MR. GARDNER:  I think probably I could.  Let's suggest

19  that any stipulations that we wish to make or anything of that

20  sort will be binding, unless there is some objection on her

21  part in the next 48 hours.

22      MR. VEEDER:  It occurred to me that we have these two

23  soil surveys--

24      MR. GARDNER:  That's right.  They are adjacent parcels.

25      THE COURT:  Mark the Bethell soil survey as Government's

1   164 for Identification.

2           (The soil survey was marked as Plaintiff's Exhibit No.

3   164 for Identification.)

4           MR. GARDNER:  She also resides on the Rancho del Pesano.

5       Q   Mr. Hicks, what about springs on the property?  How

6   many springs are there that you know of?

7       A   We have approximately four springs.

8       Q   Some of them are developed?

9       A   Yes.

10      Q   What are the ones that are developed?

11      A   One is developed presently primarily for stock water;

12  another is developed for domestic use.

13      Q   Those are springs that are up on the hill to the

14  general southeasterly direction of the residences?

15      A   That is right.

16      Q   Then there is one spring that has not been developed

17  that is up in a little canyon more to the west?

18      A   That is true.

19      Q   And there is one spring on Parcel 36?

20      A   That is correct.  That one also has been developed

21  for domestic use and is presently being used as such.

22      Q   I notice in the report that was made that it was

23  reported that that spring was dry.  Do you know the facts

24  concerning that at the present time or what the situation has

25  been?

1     A   The spring is not dry.  It is supplying water for

2  domestic use on what we refer to as the Nienke place.

3     Q   And that is the part of Parcel 36?

4     A   That is right.  It is described as Parcel 36.

5     MR. GARDNER:  If the Court please, I will state that

6  Parcel 36 consisted of two separate purchases; one was from

7  Nienke, and one was from Downs; and for the purpose of explain-

8  ing this testimony we keep the two parcels separate, but they

9  are both put together under the same ownership in Parcel 36.

10     THE COURT:  Is there anything in the record that shows

11  what Parcel 36 is?  Is it referred to by that number in the

12  soil survey?

13  BY MR. GARDNER:

14     Q   Do you know, Mr. Hicks?

15     A   I can answer it.  Parcel 36 is identified on the

16  Ground Water Resources Ownership Map.

17     THE COURT:  By that number?

18     THE WITNESS: By that number.

19     MR. GARDNER:  I may state to the Court that this is a

20  case where the witness hasn't coached his counsel.

21     THE COURT:  I see.  Here is Exhibit 163.  Can you show

22  me which of these--

23     THE WITNESS:  I can show you back here, your Honor.  These

24  parcels will be described as Parcels 31 and 36 in the Office

25  of Ground Water Resources Ownership Map entitled "Temecula River

1  Watershed."  Parcel 31 applies to our headquarters part of the

2  ranch.  Parcel 36 is the part we refer to as the Nienke place.

3      THE COURT:  Is this map which is referred to on this

4  opening sheet of the engineering report, Exhibit 163 for Iden-

5  tification, a map entitled "Office of Ground Water Resources

6  Ownership Map," is that map in evidence, or will it be in

7  evidence?

8      MR. VEEDER:  That is not in evidence, your Honor, It is

9  in evidence before the Special Master, and I am perfectly

10  willing, if there is agreement among the parties to have that

11  made part of this record for the purpose of identifying these

12  parcels.

13      THE COURT:  I think it should be part of the record here.

14      Do you have any objection to receiving that map in

15  evidence in this case?

16      MR. VEEDER:  I will have to get that from Mr. Cranston,

17  and I will.

18      THE COURT:  All right.

19  BY MR. GARDNER:

20      Q  You have examined the maps, Mr. Hicks, on this ground

21  survey, a copy of which we have and a copy of which, I believe,

22  the Court has and has just shown you?

23      A  Yes, sir.

24      Q  Those maps are photographic and the boundaries delin-

25  eated on them are substantially correct, are they?

1      A   To the best of my knowledge, yes, sir.

2      Q   In regard to what I will call the home place, how many

3  houses are on that home place?

4      A   We have nine dwellings, sir.

5      Q   How many houses altogether?

6      A   23 buildings.

7      Q   Of which nine are dwelling houses?

8      A   Yes, sir.

9      Q   How many baths, sewers, toilets-- How many bathrooms

10 in there?

11     A   We have 11 bathrooms in the nine dwellings.

12     Q   The property is not being used to any great extent

13 for agricultural purposes and it has not been used for some

14 years?

15     A   To no great extent, no, sir.

16     Q   The farming is mostly dry farming.  There is only about

17 one or two acres that have been irrigated and put in cultiva-

18 tion that way?

19     A   That is right.

20     Q   Now, in regard to wells, first taking up Parcel 36,

21 you have read the Answer in this case?

22     A   Yes, I have.

23     Q   There are two wells referred to in the Answer which

24 are on the so-called Nienke place, which is Parcel 36, accord-

25 ing to this ground survey.  One of those wells--

1          MR. VEEDER:  Just one moment, please.  In regard to your

2     Answer, Mr. Gardner, are you referring to page 6, paragraphs

3     1 and 2?

4          MR. GARDNER:  I will have to find out what I am referring

5     to.  Yes.  In fact, I will take them up in the order of the

6     Answer.

7          I will withdraw that question.

8          Q  The Answer lists a dug well to a depth of about 30

9     feet which has produced water for limited irrigation in times

10    past, that the capacity of this well is unknown but is not

11    large.  That is the well that is near the old pumping plant

12    by the vineyard and has not been used since you were on the

13    ranch?

14         A  No, sir, it has not.

15         Q  You don't know the capacity of it, but you do know

16    the well exists there and has been pumped in the past?

17         A  That is right.

18         THE COURT:  Is there a map or document that will show

19    the location of these wells and springs?

20         MR. GARDNER:  We can show them on the map which is part

21    of the ground survey, if the Court please.

22         You can point out the general location, or there may be

23    a map--

24         MR. VEEDER:  Referring to Exhibit 15-A, your Honor, and

25    it might be that Mr. Hicks could identify-- from this map and

1  the Answer we are incapable of determining the well to which

2  reference is made.  However, it may be that Mr. Hicks--

3      MR. GARDNER:  May we suggest, in the interest of saving

4  time, that we can perhaps-- I thought we had these maps available

5  to point them out on the ground survey.

6      THE COURT:  Well, I was going to say that we can postpone

7  until we can see if we can identify these  wells and springs,

8  but we might as well get it done as we go along.

9      This 15-A does not demark the area of the Gardner property,

10  though.

11      MR. VEEDER:  It doesn't, but I think it can be identified,

12  the sections are in there, and we have pointed out to Mr.

13  Hicks in general where his wells are.

14      THE WITNESS:  (Stepping down.)  To this extent, that they

15  have the two of our wells shown, but not the well you are now

16  referring to or still another dug well, which would be--

17      MR. GARDNER:  Can you locate where those wells are on

18  that map?

19      THE WITNESS:  Roughly, yes.

20      THE COURT:  We have quarter section geology maps here,

21  do we not, of the Geodetic Survey?

22      MR. VEEDER:  We do have, your Honor.  I believe that is

23  Exhibit 29.  I would have to see which one it is that would

24  take care of this.

25      MR. GARDNER:  We could locate them very readily, generally,

1    on this map, but to pinpoint the location--

2         THE COURT:  Just a minute.  Look at Exhibit 29-K, Mr.

3    Clerk.

4         MR. VEEDER:  Your Honor, while the Clerk is securing

5    that exhibit, I would like to refer to the fact that we now

6    have the exhibit which will set out the land ownership tracts

7    which might be helpful to your Honor-- that is from the

8    Special Master's records MT-4-- and on that we can locate the

9    exterior boundaries of the Erle Stanley Gardner tract.  May I

10   have that marked now as Exhibit 165, your Honor?

11        THE COURT:  All right.  Exhibit 165 is the Office of

12   Ground Water Resources map that we have previously referred to?

13        MR. VEEDER:  Yes, that is, your Honor.  It is what we

14   call the "Land Ownership Map," from the title block "Temecula

15   River Watershed Below Vail Dam and Above Temecula Gorge."

16        (The map was marked Plaintiff's Exhibit No. 165 for

17   Identification.)

18        THE COURT:  In other words, do you have these land

19   ownership maps for various areas, and this is for this particular

20   area, is that right?

21        MR. VEEDER:  That is right.  This is for the Pechanga--

22   I have read in the area.

23        THE COURT:  Any objection to receiving Exhibit 165 in

24   evidence?

25        MR. GARDNER:  No objection as far as I am concerned.

1        (Plaintiff's Exhibit No. 165 was received in evidence.)

2        MR. GARDNER:  If the Court please, I don't like to be

3    caught in the position where I seem to be taking up the time

4    of the Court with something which perhaps I should have an-

5    ticipated.

6        THE COURT:  I think the map in which you are interested

7    is Exhibit 29-O.  Does this show (handing exhibit to the

8    witness)?

9        MR. GARDNER:  May I make the suggestion, if the Court

10   and counsel please, I believe I can secure a photographic

11   map, a larger scale photographic map of our holdings.  I can

12   examine Mr. Hicks in regard to key numbers and then put those

13   key numbers on the photographic map and Mr. Hicks can return

14   to court with the photographic maps, in case counsel wish to

15   question him on it.

16       THE WITNESS:  I think we can identify our wells on this

17   map.

18       THE COURT:  This is my copy.  Get Exhibit 29-O.

19       (The Clerk hands exhibit to the Court.)

20       THE COURT:  This is the same thing; this is the exhibit,

21   and the one you are looking at is my own copy.

22       THE WITNESS:  As I interpret this map, this is the Pala

23   Road, this is our access road here, and these are our build-

24   ings.  This will only be an approximation, but I think it will

25   be within a reasonable distance of the exact location.  Our

1   main domestic well is at this point where I am making a dot.

2   Our auxiliary well is slightly north and west of it approx-

3   imately 150-200 feet.

4           THE COURT:  I have marked on Exhibit 29-O "Gardner

5   Auxiliary Well."  The witness has located the well practically

6   between the letters "EE" in the word "CREEK" in Section 28,

7   and the main domestic well as at the foot of the letter "K"

8   in the word "CREEK," in Section 28.

9           What other wells have you there?

10          MR. GARDNER:  For the purpose of orienting the pleadings,

11  if the Court please, the main well is described as "Well No.

12  3 in the Answer," and the Auxiliary Well is "Well No. 4."

13          THE COURT:  Then we will put that on here:  "Well No.

14  3," and "Well No. 4," to tie it in with the Answer.

15  BY MR. GARDNER:

16          Q  Well No. 1, the well which is to a depth of about 30

17  feet, to which we refer as the "Vineyard well," Well No. 1 in

18  the Answer, can you make an approximate location of that?

19          A  Yes, I can.

20          Q  Just mark that "No. 1" on the map.

21          MR. VEEDER:  That is your No. 1 on page 6?

22          MR. GARDNER:  That is our No. 1 on page 6, yes.

23          THE COURT:  The witness has put it in on Exhibit 29-O

24  about an inch south of the other two wells in Section 28.

25          What is Well No. 1?  What kind of well is that?

1       THE WITNESS:  It is a dug well that at one time was used

2   for irrigation water.  It has not been used for qute a period

3   of years.

4       MR. GARDNER:  It has not been used, I believe, since the

5   main well was put into production, which was done when we got

6   electric power on the ranch.

7       THE COURT:  What is the main well?  What kind of pipe?

8       THE WITNESS:  It has a 12-inch casing, your Honor.

9       MR GARDNER:  No. 3?

10      THE WITNESS:  Well No. 3.  It has a 12-inch casing.  It

11  now stands at a depth of approximately 270 feet.

12      THE COURT:  You mean the water stands?

13      THE WITNESS:  No, the well is to a depth of 270 feet.

14  Water stands, at our last measurement, at 87.02 feet below the

15  surface.

16      THE COURT:  When was the last measurement made?

17      THE WITNESS:  November 2, 1958.

18      THE COURT:  What about Well No. 4-- what is in there?

19      THE WITNESS:  Well No. 4 is a dug well.

20      MR. GARDNER:  On Well No. 4, if the Court please, I have

21  the Answer and I will read from the Answer.

22      THE WITNESS:  Excuse me.

23      MR. GARDNER:  Well No. 4:  "There is another cased well

24  about 100 feet from the well last referred to, put down as an

25  emgency measure by the defendant some ten years ago, which,

1   according to the best recollection of the defendant, tested at

2   about ten gallons a minute."

3       Q   That is the well you referred to in your testimony

4   as the Auxiliary Well and which is marked on the map?

5       A   That is right.

6       MR. GARDNER:   That is No. 4 in the Answer on page 7.

7       THE COURT:   The statement of counsel is correct, accord-

8   ing to your information?

9       THE WITNESS:   That is correct.   That well is 100 feet

10  deep.   It has an 8-inch casing, and water stands at approx-

11  imately 47 feet from the surface of the ground.

12      MR. GARDNER:   The Answer sets forth Well No. 5:   "That

13  on the lands described as Exhibits C, D and E, which is Parcel

14  36, there are two wells, both relatively close together; one

15  is cased and has been pumping with a windmill for more than

16  twenty years.   According to the best information of the defend-

17  ant, this well is used to water stock and for a small amount

18  of irrigation, but there are indications that it will produce

19  more water than that developed at the present time by the

20  windmill.   But it is used generally for windmill pumping.

21      Q   Can you locate that well on the map?

22      THE COURT:   First, is counsel's statement correct that

23  he has read, to your knowledge and belief?

24      THE WITNESS:   It is.

25      MR. GARDNER:   It is correct as far as recent developments

1    are concerned.

2           If your Honor will let me examine the witness I will try

3    to get it straightened out.

4           THE COURT:  The point is this, when you read from the

5    answer that is not evidence.  I want this in the record.

6           MR. GARDNER:  I am just refreshing his recollection, your

7    Honor.  Since this Answer was prepared, the well has been put

8    on an air compressor, which gives more of an idea of the

9    capacity of the well.  So it was more than a windmill well,

10   which I want to bring out.  I am just trying to identify the

11   well in the answer and then ask the witness about the capacity

12   of it.

13          THE COURT:  That is Well No. 5?

14          MR. GARDNER:  Yes, that is Well No. 5.

15          THE COURT:  Will you locate it, Mr. Witness?

16          That is in Parcel 36?

17          MR. GARDNER:  In Parcel 36, the so-called Nienke piece.

18          MR. VEEDER:  I just told Mr. Sachse he would not be

19   permitted to get away with what Mr. Gardner is getting away

20   with.

21          THE COURT:  Well, I don't want to be discriminating

22   against Mr. Sachse.

23          THE WITNESS:  I am afraid I can't accurately locate the

24   property.

25          MR. GARDNER:  That is located on the Ground Survey Map.

1   Court and counsel may be able to locate that well on the

2   Ground Survey Map, and then locate it on this other map.

3           THE COURT:  Let's look at Exhibit 165, the ownership map.

4           MR. VEEDER:  Your Honor, would it be permissible to

5   interrupt for the moment and put Col. Bowen on the stand for

6   the purpose of getting these soil surveys into the record, so

7   that when they are testified to they will be part of the

8   record?

9           MR. GARDNER:  May I ask the witness about one more well,

10  I believe is all, and then we will try and locate them with

11  Col. Bowen.

12          This well is shown on this map (handing document to the

13  witness).  You may be able to locate it.

14          THE COURT:  If you will pardon me, I can work better off

15  of 136 here.

16          MR. GARDNER:  I was just trying to refresh the witness's

17  recollection, because he has checked it on this map, if the

18  Court please.

19          MR. VEEDER:  Your Honor has referred to 136.

20          THE COURT:  I mean 165, the Land ownership map.

21          MR. GARDNER:  Is that well shown on 165?

22          THE COURT:  It is Parcel 36.  This corresponds with the

23  same area shown in here in Section 22.

24          THE WITNESS:  Yes, I see that now.

25          THE COURT:  Now with that in mind, can you locate this

1    Well No. 5 on Exhibit 29-0?

2            THE WITNESS:  Are you looking at the right page there?

3            MR. GARDNER:  Yes, that is the well.

4            THE WITNESS:  This is photographic.  I can locate the

5    well here, your Honor.  I can locate one well there, and one

6    well there, on this particular photographic map.  But when it

7    comes to correlating them with this map with any degree of

8    accuracy, I am afraid I can't.

9            THE COURT:  Does the Gardner property extend any further

10   over here?

11           THE WITNESS:  As I understand it, this is our property,

12   referred to in Parcel 36.

13           MR. GARDNER:  I might ask Mr. Hicks to step down, if the

14   Court please, and let the Government put the Colonel on the

15   stand to locate these wells.

16           THE COURT:  All right.

17           MR. GARDNER:  Just step down, please.

18           MR. VEEDER:  Call Col. Bowen.

19

20                        ALLEN C. BOWEN,

21   having been previously duly sworn, on his oath was examined

22   and testified as follows:

23           MR. VEEDER:  Your Honor, may I have Exhibits 163 and 164

24   for Identification.  I think those are the soil surveys.

25

DIRECT EXAMINATION

BY MR. VEEDER:

Q  Col. Bowen, I hand you the exhibit marked for iden-
tification 163 and ask you to state into the record the content
of that exhibit.

A  Plaintiff's Exhibit 163 for Identification is a copy
of an engineering report prepared on the property of Erle
Stanley Gardner.

Q  And under whose direction was that prepared?

A  It was prepared under my direction.

Q  And would you state the procedures followed in connec-
tion with the preparation of that identification?

A  Well, the exterior boundaries of the property are
delineated on aerial photographs, those aerial photographs
are taken into the field and soil borings are made to determine
the depth, type of structure, other modifying factors of the
soils themselves.  The soil sites are further delineated on
significant slope breaks, erosion features and nature of parent
material or underlying geology.  The soil sites are indicated
by a fractional symbol.  The elements of that symbol are
explained by the legend sheet enclosed with the report, the
sheet entitled "Map Symbols" immediately following the signature
sheet in this instance.

Q  Will you state whether the identification marked 163
was delivered to the defendant Erle Stanley Gardner?

1          A   Yes, sir.

2          Q   And is that Identification 163 accurate to your per-

3   sonal knowledge?

4          A   Yes, sir.

5          THE COURT:  You mean the entire report and the map was

6   delivered to the defendant Gardner?

7          MR. VEEDER:  Yes, your Honor.

8          THE WITNESS:  Yes, sir, the entire report was received

9   by Jean Bethell for Erle Stanley Gardner on the 21st day of

10  September, 1959.

11         MR. GARDNER:  Stipulate that it was received.

12         MR. VEEDER:  We offer in evidence the exhibit marked

13  for Identification 163, your Honor.

14         MR. GARDNER:  No objection.

15         THE COURT:  Exhibit 163 received in evidence.

16         (Plaintiff's Exhibit No. 163 was received in evidence.)

17    .    MR. VEEDER:  Do you care to interrogate him further about

18  the wells, Mr. Gardner?

19         MR. GARDNER:  Yes.

20

21                        CROSS-EXAMINATION

22  BY MR. GARDNER:

23         Q   Colonel, directing your attention to the map, if I

24  may, there is somewhere in here a well pump house, indicating

25  a point on the map, which is just above the figure 2 on the

1   figures IM-3 IA-I-W-I.  Did you notice a pump house there?

2       A   That point, Mr. Gardner, appears in the Southwest

3   Quarter of the Southwest Quarter of Section 28, Township 8

4   South, Range 2 West.

5       Q   Can you locate that point on the map which his Honor

6   has, which is No.--

7       THE COURT:  29-O.

8   BY MR. GARDNER:

9       Q   --29-O?  Can you locate that point I have just

10  designated on the Court's map?

11      A   Just make sure that I understand the well, Mr.

12  Gardner, referring to page 6 of Plaintiff's Exhibit 163, under

13  "Engineering," the first paragraph describes the domestic well

14  for the main parcel of land, that being Parcel 31, as shown

15  on Plaintiff's Exhibit 165, describes that as being about

16  1,500 feet northeast of the main house, with a 12-inch casing.

17  pumped by a 5-horsepower electric motor.

18      MR. GARDNER:  That is the well which was referred to in

19  the testimony of Mr. Hicks as the main well.

20      MR. VEEDER: Marked No. 3, is that right?

21      MR. GARDNER:  No. 3.

22      Q   I am now asking you about another well by an old

23  pumping house, and for your information, Colonel, this is

24  referred to in the Answer as No. 1 on page 6, and is an old

25  pumping house.  That is a dug well, according to the testimony

10,650

1   of the witness, some 30 feet deep, which is not in use.   There

2   is an old pump house there.

3       A   I did not locate that well, Mr. Gardner.

4       Q   Can you locate on the map of the Court the point I

5   designated on this map, approximately?  I believe Mr. Hicks

6   has already designated that on the map which the Court has.

7       MR. VEEDER:  29-O, the U.S.G.S. map?

8       THE COURT:  Yes, Exhibit 29-O in Evidence.

9   BY MR. GARDNER:

10      Q   Can you locate this particular point right in here

11  on the Court's map?

12      MR. VEEDER:  You are asking him now to identify the well

13  on Exhibit 29-O?

14      MR. GARDNER:  No, I am asking him to locate the point

15  which I have designated on this map, on the map of the Court,

16  which I am unable to do.

17      THE WITNESS:  Yes, sir, I can locate that point on the

18  map.

19      MR. GARDNER:  Your Honor, if I could have Mr. Hicks just

20  check this point for the moment.  I think perhaps he knows

21  more about it.  I would hate to locate the point on the Court's

22  map and then find out we are off on our bearings somewhere.

23      (Mr. Hicks comes forward to the witness stand.)

24      MR. HICKS:  Yes, I would say that is it.  You can see

25  the little road from the tennis court out to it.

BY  MR. GARDNER:

Q  Can you locate that on the Court's map, Colonel?

A  Yes, I can.

Q  Suppose you make a mark designated by whatever symbols you wish on the map which the Court has there.

A  May I borrow a pencil, please?

MR. VEEDER:  May I tender the thought that if Mr. Hicks would initial it and Col. Bowen would initial it, we would be better able to identify it.

MR. GARDNER:  I think he initialed it No. 1 in trying to put it on there.  I am just trying to get these locations straight.

THE COURT:  Are you talking about Well No. 1 now?

MR. GARDNER:  That is Well No. 1, yes.

THE WITNESS:  That is approximately correct as Mr. Hicks has located it on 29-0, your Honor.

THE COURT:  Now we have Wells 1, 3 and 4 located.  Is there a Well N . 2?

MR. GARDNER:  There is a Well No. 2, the so-called Tony Well.  Can you locate that on this map for the Colonel, and then the Colonel can locate it on the map of the Court, just the point that you designated, Mr. Hicks?

MR. HICKS:  I would estimate it to be about in that position.

MR. GARDNER:  You are designating about what?  That is

1   about four or five hundred feet from the road you have just

2   referred to as Well No. 1?

3        THE WITNESS:  Yes, sir, I would say 500 feet in a

4   westerly direction.

5        MR. GARDNER:  I think that is east on the map.

6        THE WITNESS:  That would be in a southwesterly direction

7   from the site indicated as that of Well No. 1, sir.

8        MR. GARDNER:  If you can make a point on that map and

9   then ask this witness if he can orient that on the map of the

10   Court.  Where was your Point No. 1, Mr. Hicks?  That was here?

11        MR. HICKS:  That was about there.

12        MR. GARDNER:  Yes, there is your Point No. 1.  This is

13   Tony's house here, this is the road going up.  I think we

14   are confused on this direction here.  Here is the road coming

15   in from Pechanga, here is Tony's house.  You can see the road

16   there.  The well is up in there.

17        MR. HICKS:  That is right.

18        MR. GARDNER:  Can you locate that somewhere on this map,

19   and then ask the Colonel to locate that?

20        MR. HICKS:  Certainly.  We will have to disregard that.

21   I was not fully oriented.  If these are what we refer to as the

22   Tony buildings, then this must be the actual well site, this

23   point right here, that we call the Tony well.

24        MR. VEEDER:  You are pointing to the aerial.  What is the

25   aerial number on that, Colonel?

1          THE WITNESS:  This is the soil survey map showing the

2     soils on Parcel No. 31 of the Erle Stanley Gardner report.

3          MR. GARDNER:  For the information of Court and counsel,

4     that is referred to in the Answer as Well No. 2 on page 6.

5          MR. HICKS:  That would be the point I would locate No. 2.

6          MR. GARDNER:  Well No. 3 has already been located on the

7     map which the Court has, I believe.  That is the main well.

8          THE COURT:  Can you translate that Well No. 2 you have

9     now located onto this map 29-O?

10          THE WITNESS:  Yes, your Honor.  The point most recently

11     indicated by Mr. Hicks is approximately 600 feet south on the

12     sixteenth of a section line, the easterly boundary of the

13     Northwest Quarter of the Northwest Quarter of Section 33,

14     Township 8 South, Range 2 West.  I will indicate, your Honor,

15     with a blue ink the approximate location of that well site on

16     29-O.

17          THE COURT:  Mark it "Well No. 2."  That is what you have

18     been talking about.

19     BY MR. GARDNER:

20          Q  Can I ask you to check the location, Colonel-- just

21     wait there, Mr. Hicks-- of Well No. 3, the main well, as made

22     by Mr. Hicks on the map which the Court has, and see if that

23     location conforms to your recollection of the place of the well?

24          A  Yes, sir, that is approximately correct.

25          Q  Well No. 4 is another cased auxiliary well described

1    on page 7 of the Answer.  No. 4 is about a hundred feet from

2    the well last referred to.  Did you locate that in your sur-

3    vey?

4        A   No, sir.

5        Q   Does the point designated by Mr. Hicks as No. 4 come

6    within that general measurement on the map?

7        A   Yes, sir.

8        Q   Now we come to paragraph 5 on page 7 of the Answer.

9    On the lands described as C, D and E, which is Parcel 36 in

10   your survey, Colonel, there is a well which you refer to as

11   the Windmill Well in your survey?

12       A   Yes, sir.

13       Q   Can you locate that on the map which is before the

14   Court and mark that, if you will, Well No. 5 or point No. 5,

15   however you want to designate it?

16       A   That well, your Honor, is symbolized on the last

17   aerial photograph contained in Plaintiff's Exhibit 163 as

18   lying about midway along the north-south boundary of the

19   property as shown on the aerial photograph.

20       THE COURT:  It is property shown right here on 29-0,

21   isn't it?

22       THE WITNESS:  It is in the valley, your Honor.  It lies

23   about 2,000 feet northeast of the house situated near the

24   southwest corner of Section 22.  2,000 feet on this scale,

25   your Honor, is about one inch-- that is, on the scale of 29-0.

1   The well itself is located --

2       THE COURT:  Let me suggest something, off the record.

3       (Off the record.)

4       THE WITNESS:  The red boundary shown on the last aerial

5 photograph in Plaintiff's Exhibit 163.

6       MR. VEEDER:  What is the number of that, to be sure we

7 have it?  Do you have the aerial number on that, Colonel?

8       THE WITNESS:  That is 3-0098.  The westerly boundary

9 of the property as surveyed on 3-0098 coincides, in part, with

10 the easterly boundary of the area mapped on the preceding

11 photograph.

12       I might better refer to the description of Parcel No. 36,

13 your Honor, which is contained beginning on page 2 and ending

14 on page 3 in Plaintiff's Exhibit 163, which describes it as

15 Government Lots 1 and 2, being the Northeast Quarter of the

16 Southeast Quarter and the Southwest Quarter of the Northeast

17 Quarter and the Northwest quarter of the Southeast Quarter,

18 the South half of the Southeast Quarter, the South half of the

19 Southwest Quarter, and Tract D of lands of Machado Brothers and

20 Wolfe Judicial Maps containing approximately 312.98 acres.

21 The property runs over to the Vail boundary, which trends from

22 the northwest to the southeast through Section 22, 8 South, 2

23 West.

24       THE COURT:  Is that what you have shown on the last page?

25       THE WITNESS:  Yes, sir, that is what is shown on the last

10656

1   page, approximately.

2       MR. VEEDER:  The last page of Exhibit 163?

3       THE COURT:  Yes.

4       THE WITNESS:  Except that the north-south line, your

5   Honor, would be a little easterly of that point.

6       MR. GARDNER:  That well, if the Court and counsel please,

7   is described on page 7 of the Answer in Paragraph No. 5 as

8   Well No. 1.

9       THE WITNESS:  That is approximately right, your Honor.

10      The Windmill Well, then, would be located, as I have

11  symbolized it, in Section 22, Township 8 South, 2 West, as

12  shown on Plaintiff's Exhibit 29-O.

13      THE COURT:  I will mark it on 29-O, the point indicated

14  by the Colonel, as "No. 5 Gardner."

15  BY MR. GARDNER:

16      Q  Now, did you notice a well immediately, I believe

17  the direction is, north and east of that well within a short

18  distance of the well which you have just testified to, Colonel?

19      A  No, sir.

20      MR. GARDNER:  The well which he has referred to as the

21  Windmill Well, which is referred to in our testimony as the

22  Nienke well or the well on the Nienke property-- just for the

23  purpose of getting oriented, I will state to Court and counsel

24  that at the time we bought the property there had been two

25  pieces, the Downs property and the Nienke property adjoining--

1   the well which the Colonel refers to as the Windmill Well is

2   on the so-called Nienke piece, and the Downs persons, being

3   unable to use the Nienke well, put down a well immediately

4   over the boundary, which is a very short distance from the

5   Nienke well.  That well is referred to in the Answer on page

6   7, subparagraph 5, as the second well.

7      Q  Colonel, you have referred to this as the Windmill

8   Well.  Did you make any inquiry to find out whether the well

9   has been used other than as a windmill well?  I am referring

10   now to Well No. 1 in subparagraph 5, which I have referred to

11   as the Nienke well.

12      A  No, sir.

13      Q  Did you test the capacity of it in any way?

14      A  No, sir.

15      Q  Your report, you have stated, is substantially correct,

16   this report that you have referred to and which has just been

17   identified?

18      A  Yes, sir.

19      MR. GARDNER:  As to all matters, I would like to have

20   that introduced in evidence.

21      THE COURT:  It is already in evidence.

22   BY MR. GARDNER:

23      Q  While you are on the stand, Colonel, the Bethell

24   piece joins--

25      THE COURT:  Before we go into that, do you want to get

1  this other well identified that you talked about?

2      MR. GARDNER:  Yes.  He can't do that.  He has been put

3  on while Mr. Hicks was temporarily withdrawn, and then I am

4  coming back to Mr. Hicks, your Honor.

5      THE COURT:  All right, go ahead with the Bethell property.

6      MR. VEEDER:  Why not offer the Bethell soil survey now,

7  and then you can interrogate later?  Is that all right with

8  you?

9      MR. GARDNER:  That is quite all right with me.

10      THE COURT:  All right, examine on the Bethell property.

11  BY MR. GARDNER:

12      Q  Did you locate on the Bethell piece an old windmill

13  well which was abandoned?

14  BY MR. VEEDER:

15      Q  I hand you, Col. Bowen, Exhibit marked for Identi-

16  fication 164 and ask you to read into the record to what that

17  identification pertains.

18      A  Plaintiff's Exhibit 164 for Identification is a copy

19  of an engineering report prepared for the property of Agnes

20  H. Bethell.

21      Q  Under whose direction was that identification pre-

22  pared?

23      A  Under my direction.

24      Q  Would you go on and state its contents?

25      A  Plaintiff's Exhibit 164 contains a soil survey, a

1  tabulation of irrigable acreage, a report on the water develop-

2  ment which we observed, a report on the geology, and a legal

3  description of the property.

4      Q  You have the tract number on that so that it will be

5  identified on MT-4, which is now in evidence in this case as

6  Exhibit 165?

7      THE COURT:  Parcel Number?

8      MR. VEEDER:  Yes, your Honor.

9      THE WITNESS:  If I may refer to Plaintiff's Exhibit 165,

10  your Honor, Parcel No. 32, delineated on Plaintiff's Exhibit

11  165, shows the exterior boundaries of the property reported on

12  in Plaintiff's Exhibit 164.

13      THE COURT:  Let me ask you.  You say Parcel 32?

14      THE WITNESS:  Yes, sir.

15      THE COURT:  Is this the same area that I am indicating?

16      THE WITNESS:  Yes, sir; it cuts across the section line

17  which is shown with the dash.

18      THE COURT:  All right.

19      THE WITNESS:  The property is also, your Honor, delineated

20  in red on the aerial photograph contained with Plaintiff's

21  Exhibit 164.

22      MR. VEEDER:  And which is a part of 1964?

23      THE WITNESS:  Yes, sir.

24  BY MR. GARDNER:

25      Q  Did you locate a well on that property, Colonel?

1      A   No, sir.

2      MR. VEEDER:  Is this accurate, to your personal

3  knowledge, Col. Bowen?

4      THE WITNESS:  Yes, sir.

5      MR. VEEDER:  I am referring now to Identification 164.

6      THE WITNESS:  Yes.

7      MR. VEEDER:  We offer in evidence the exhibit marked

8  for identification 164.

9      THE COURT:  It will be received in evidence, if there

10  is no objection.

11      (Plaintiff's Exhibit No. 164 was received in evidence.)

12      THE COURT:  I have also marked on 29-0 the very general

13  area shown as the Bethel property.

14      MR. GARDNER:  I think that concludes my cross-examination,

15  your Honor.

16      Mr. Hicks, if you will resume the stand, please.

17

18                    SAM HICKS,

19  heretofore called and sworn, recalled as a witness in behalf

20  of the defendant Gardner, testified further as follows:

21      MR. GARDNER:  If the Court will pardon me if I approach

22  the witness with the Answer.  We have just one copy.

23      THE COURT:  You may.

24

25

FURTHER DIRECT EXAMINATION

BY MR. GARDNER:

Q   Referring to paragraph 5 on page 7 in regard to the well which has just been described as the windmill well by the preceding witness, which we know as the Nienke well, what can you say with reference to the pumping of that well-- what has been done with it recently?

A   Well, a year or so ago, during the time when the windmill was broken down, it was necessary to pump that well considerably in order to water a large number of stock, so we moved an air compressor in there and put down a 2½-inch column pipe and a 1-inch air line so that we could fill approximately a 3,000-gallon water tank adjacent to the well. The water could then subsequently supply the stock.

Q   Do you know what the capacity of the well was-- that is, how long it took to fill that tank with that compressor?

A   I can't say exactly how long, because I never timed it; but it is my recollection that with a compressor we could fill-- we never left the tank go completely dry, but when it was half full I would say we could fill it by putting in approximately 1,500 gallons in a matter of five minutes.

Q   The well to the north-- I believe it is to the north, or just over on the Downs property, which we refer to as the Downs property, which is described in the Answer as Well No. 2 of subparagraph 5 on page 7 and which the person who prepared the

1  Answer stated had not been cased-- what do you know about that

2  well, Mr. Hicks?

3      A  1952 I had the occasion to pump that well in order

4  to put water into the same 3,000-gallon tank that I have

5  mentioned. I did not pull the pump from the head of the well,

6  so I can't say that it is not cased, but it is my belief that

7  it has to be cased, otherwise it would have caved in.

8      Q  That was in 1952?

9      A  Yes, sir.

10     Q  The well was working then?

11     A  Yes, sir.

12     Q  And what was the capacity of the well-- in other

13  words, how long did it take to fill the tank or to give you an

14  estimate as to what the well would do?

15     A  At that time I would say it took some four or five

16  hours to fill the tank, which was not empty at the time--

17  possibly it was half empty.

18     Q  How was the well being pumped?

19     A  At that time it had an ordinary cylinder pump and a

20  pump jack on it that I powered with a power takeoff on a Ford

21  tractor.

22     Q  Referring to Well No. 3, which you referred to in your

23  testimony as the main well and which is shown on Col. Bowen's

24  survey, what is the capacity of that well and to what extent

25  is it used generally?

A   We use the well daily to some extent.  Sometimes if
we are irrigating a lot we pump eight hours, sometimes if we
are not we pump three hours.

MR. VEEDER:  You say irrigating?

BY MR. GARDNER:

Q   What do you irrigate?

A   Primarily lawns, shrubs, trees, a small orchard.

Q  Right in the vicinity of the house?

A  Yes.

Q   How is that water stored?  There are two steels tanks
of what capacity?

A   We have two steel tanks of approximately 25,000 gallons
capacity.

Q   Then there is a wooden tank by the old orchard that is
pumped from that well?

A   There are two wooden tanks up there of about 2,000
gallons each.

Q   And those are filled from the well?

A   Those are filled from the well.

Q   Do you know the capacity of that well, how much water
it is capable of producing per minute?

A   Approximately 20 gallons a minute at the location of
the 25,000 gallon tanks.

Q.  Has that well been used as a matter of neighborly
accommodation on the Bethell property also?

1      A   Yes, it has.

2      Q   For what purpose?

3      A   For irrigating an orchard on the Bethell property.

4      Q   Were you in my employ when there was a windmill

5   well in operation on the Bethell property?

6      A   No.

7      Q   That windmill was broken down when you came there.

8   Do you know where the well is located on the Bethell property?

9      A   Yes, sir.

10     Q   Could you point out to the Court the approximate

11  location of that old well on the Bethell property?

12     A   Yes, sir.

13     Q   Will you do so, please?

14     THE COURT:   Put it on 29-O.  I will mark it.  Bethell

15  Windmill, is it?

16     THE WITNESS:   No, there is no windmill there.

17     MR. GARDNER:   Old windmill.

18     THE COURT:   Old Bethell Windmill.  All right, I have so

19  marked it on 29-O.

20  BY MR. GARDNER:

21     Q   Mr. Hicks, in regard to the springs, some of these

22  springs have been developed and the water has been piped.

23  Referring, first, to the spring which is up on the bench by the

24  trees, can you tell about how many feet of pipe run down from

25  that spring?  That is the one in which a tunnel has been dug.

1     A  Yes.

2     MR. VEEDER:  May I ask to have that spring carefully

3 identified so that we can locate it?

4     THE COURT:  We will take a recess now and I will let the

5 witness--

6     How many springs are there?

7     MR. GARDNER:  There are four springs.  I am just about

8 done.  In three minutes I think I will be done.

9     THE COURT:  To save some time, let the witness mark them

10 as Spring 1, Spring 2, Spring 3 and Spring 4.

11     MR. GARDNER:  If we are going to mark it, the Court might

12 as well take a recess and he can confer with Col. Bowen.

13     (Recess.)

14     MR. GARDNER:  Mr. Hicks, you were on the stand.

15     THE COURT:  Has Mr. Hicks marked those springs?  Let me

16 see the map.

17     I have Exhibit 29-O in front of me, and on that I see

18 that four small dots have been marked.

19     Mr. Hicks, on Exhibit 29-O are the four dots that you

20 marked for the four springs you are talking about?

21     THE WITNESS:  Yes, sir, to the best of my knowledge.

22     THE COURT:  Back of the dwelling house?

23     THE WITNESS:  Yes, on the hill.

24     THE COURT:  We will draw a circle around them and write

25 in "Springs" on 29-O.

BY MR. GARDNER:

Q   Is that the spring, the tunnel springs?

A   Yes, sir.

Q   Or the Nienke springs?

A   No, these are the springs above the main dwelling on the hill.

Q   Is that the tunnel spring that has just been marked?

A   One of them is; yes, sir.

THE COURT:   I have marked all four of them.

BY MR. GARDNER:

Q   Will you make a mark "1" on what we call the "Tunnel Springs," which is up on the hill in a grove of live oaks?

A   Yes, sir.

THE COURT:   I will mark them.

THE WITNESS:   This one.

MR VEEDER:   Would you have the witness initial those, please.

BY MR. GARDNER:

Q   Can you describe that spring, Mr. Hicks-- that is, the spring where there was an old tunnel which was partially caved?   How much pipe is in it?

A   There is about a half mile of pipe that extends from that spring down the hill toward the buildings.

Q   And joins with the pipe from the other spring and comes down to the tank house?

10,667

1    A   Right now, no, the one from the tunnel spring isn't

2  connected with the other spring; but it goes down to it.

3    Q   When I say "other spring," we will call that Spring

4  No. 2.  Can you point that out on the map?

5    A   Yes, sir.

6    THE COURT:  I have marked it "No. 2."

7  BY MR. GARDNER:

8    Q   That spring is piped down to where?

9    A   Down into the vicinity of the two 2,000-gallon wooden

10  tanks that I earlier described and into a stock watering

11  trough there.

12    Q   And then there is a line of pipe which was connected

13  with that spring going down to the house?

14    A   Yes, sir.

15    Q   About how many feet of pipe would you say?

16    A   There is another quarter of a mile of pipe.

17    Q   That is three-quarter-inch galvanized pipe?

18    A   Yes.

19    MR. GARDNER:  I dislike to inflict this upon the Court,

20  but when we got in there there were evidences of illicit

21  activities.  We have referred to this as the "Whiskey Spring."

22    Q   Can you locate the Whiskey Spring on the map?

23    A   Yes, sir.

24    THE COURT:  We will mark it as No. 3.  It will be easier

25  than writing "Whiskey."

BY MR. GARDNER:

Q   That is mainly a trickle of water at the present time?

A   Yes.

Q   Just a small trickle?

A   Undeveloped.

Q   The spring on the Nienke place, you know it generally from your position-- this was before Mr. Hicks' time.  I will have to go over this very carefully.

THE COURT:  Before we go into that, there is one other spring here.  We will call that No. 4.

THE WITNESS:  That is just a seep that has never been developed.

THE COURT: All right, call it No. 4.

Go ahead.

BY MR. GARDNER:

Q   The spring on the Nienke place, before you arrived there, was dug around a redwood tank, a bulkhead was put in, rocks were put in to filter the water, and augers were bored into the hill so that the water comes down, and then it was all covered over.  It is an improved spring, but it is now down to a very small amount.  Col. Bowen thought it was dry when he made the survey, and it is so listed in the survey, but actually the family of Frank Cascara that has been living on there for many years gets its entire water supply from that spring.  Is that correct?

1 A That is correct.

2 MR. GARDNER:  If there is no objection to a leading

3 question, that concludes our case.

4 THE COURT:  How much of this statement is correct?  Your

5 counsel recited a number of things that happened before you

6 got there and some afterward.

7 THE WITNESS:  The last sentence of the question.

8 MR. VEEDER:  I would like to have that last sentence.

9 THE WITNESS:  The fact that Frank Cascara and his family

10 have lived in the dwelling there and have been supplied with

11 water from this spring is correct.

12 THE COURT:  Let's make this record complete.  Raise your

13 right hand, Mr. Gardner, and be sworn here.

14 MR. GARDNER:  Yes, sir.

15 (Mr. Erle Stanley Gardner, a defendant herein, was by

16 the Clerk duly sworn.)

17 THE COURT:  I will ask you just one question.  These

18 various statements you have made as this matter has been

19 proceeding are all true and correct?.

20 MR. GARDNER:  Yes, your Honor.

21 THE COURT:. All right, now we have a record.

22 MR. GARDNER:  I thought I would be a witness, and then I

23 thought perhaps I shouldn't.

24 THE COURT:  Well, you became one.

25 MR. GARDNER:  Is there any cross-examination of Mr.

1    Hicks?

2         MR. VEEDER:  No, but I would like to ask Mr. Gardner

3    a couple of questions.

4         MR. GARDNER:  Yes, sir.  On the stand?

5         MR. VEEDER:  Yes.

6         THE COURT:  Just a moment.  Mr. Hicks wants to finish

7    up.

8         This spring that the Cascara family got some water

9    out of, is that the one you are talking about on the Downs

10   property?

11        THE WITNESS:  No, that is on the Nienke property.  This

12   is formerly known as the Downs property.  This is the Nienke.

13   Now it is one piece.

14        THE COURT:  What shall we mark this spring?

15        THE WITNESS:  Nienke Spring.

16        THE COURT:  N-i-e-n-k-e.  All right.  I have marked it

17   in Section 22.

18        MR. GARDNER:  If the Court and counsel please, during

19   the recess Mr. Hicks and Col. Bowen conferred, and it was

20   agreed that we could very quickly point out the location of

21   these springs to Col. Bowen with binoculars up on the hill,

22   in case the Court is interested in it, and these points can

23   be numbered and he can check them accurately on the map.

24        THE COURT:  I don't think there is any problem about the

25   springs.  They are up on the hillside.

1          Do you think they are part of the stream system?  Is

2     there any contention that they feed the stream?

3          MR. VEEDER:  In that regard, one reason why I was extremely

4     anxious to have this evidence in is that we would like, if

5     possible, to have access for the purpose of checking out this

6     ground water situation that exists in this area.

7          THE COURT:  Is there any problem?

8          MR. GARDNER:  No, your Honor.

9          THE COURT:  All right, you have it.  You may cross-

10    examine.

11

12                        CROSS-EXAMINATION

13    BY MR. VEEDER:

14         Q  Mr. Gardner, in reviewing your Answer I find no

15    reference to the stipulated judgment in the case of Rancho

16    Santa Margarita vs. Vail, concerning which you filed a brief

17    in this case.  Do you recall?

18         A  Yes.

19         Q  Does that stipulated judgment appear any place in the

20    record of your title to either Parcel 31, Parcel 36, or in the

21    Bethell Parcel 32?

22         A  What do you mean by "record"?

23         Q  Well, the record of the title.  Have you ever con-

24    sidered the title?

25         A  I have never examined the title.  I have only had a

1   certificate of title and a title insurance policy, so I can't

2   tell you.

3        Q  And you are presently the owner of that property; is

4   that correct?

5        A  Yes.

6        Q  Do you claim any benefits whatever under the stipulated

7   judgment?

8        A  Yes.

9        Q  What are the benefits you claim?

10       A  As a riparian owner, it is my position that if there

11  is going to be any adjudication whatever of the rights of water

12  as between two of the parties, all of the parties along the

13  watershed should be a party to that.

14       Q  Have you at any time been controlled by the stipulated

15  judgment in the wells you have drilled or the water you have

16  used?

17       MR. STAHLMAN:  Just a moment.

18       MR. VEEDER:  Is that an objection, or what, George?

19       MR. STAHLMAN:  Yes.  Your Honor, I am just pondering.

20       MR. VEEDER:  We have all the time in the world.  Go ahead

21  and ponder.

22       MR. STAHLMAN:  I object to that as calling for a con-

23  clusion of the witness, in that form.

24       THE WITNESS:  I think my answer might clarify that.

25       MR. STAHLMAN: Go ahead.  I will withdraw the objection.

1        THE WITNESS:  The wells were all drilled before I was

2   on the property.  I purchased the property after the wells were

3   all drilled, with the exception of the so-called Auxiliary

4   Well, which goes down 100 feet.

5   BY MR.VEEDER:

6        Q   Would you answer the question?  Have youever been

7   controlled by the stipulated judgment in the use of any water

8   from any of the wells?

9        A   In the use of the water I have never asked anyone

10  about using water, no.

11       Q   Has anybody ever tried to enforce it in regard to you?

12       A   What do you mean by "enforce"?  Enforce what?

13       Q   The judgment against your use of water, has anyone

14  ever undertaken that?

15       A   No one has ever tried to restrict my use of water in

16  any way.  That includes--

17       Q   That would include the enforcement of the stipulated

18  judgment?

19       A   That includes--

20       MR. STAHLMAN:  Just a moment.  That is objected to as

21  calling for a legal conclusion on the part of the witness.

22       THE COURT:  Sustained.

23       MR. VEEDER:  Well, certainly, your Honor, I can inquire

24  as to whether he has ever been controlled by the stipulated

25  judgment or whether anyone has ever tried to enforce it against

1  him.  That is not a legal conclusion.  It calls for a question

2  of fact.

3      MR. STAHLMAN:  The question is too broad.

4  BY MR. VEEDER:

5      Q  Has anyone ever endeavored to enforce the stipulated

6  judgment against you in the use of water on your property, Mr.

7  Gardner?

8      MR. STAHLMAN:  I object to the question in that form

9  as being incompetent, irrelevant and immaterial, and calling

10  for a legal conclusion.

11      MR. VEEDER:  I would like to respond to that, your Honor.

12      THE COURT:  Why don't you ask him a factual question?

13      The objection is sustained.

14      Why don't you ask him whether anyone has ever asked him

15  or demanded that he gauge the use of his water by virtue of

16  this judgment?  You use the word "enforce."  What do you mean

17  by "enforce"?  Do you mean in legal proceedings?  Do you mean

18  by demand?

19      MR. VEEDER:  So far as I am concerned, the use of the

20  word "enforce" embraces all of them.

21      THE COURT:  That's the difficulty.

22      MR. VEEDER:  All right, I will be glad to break it down.

23      THE COURT:  All right.

24  BY MR. VEEDER:

25      Q  Has anyone ever come to you, either the Vails, the

United States of America, the Rancho Santa Margarita, prior to

10,875

1   the acquisition by the National Government, have any of those

2   parties ever endeavored or requested you in the pumping of any

3   of your wells or using any water to comply with the stipulated

4   judgment?

5        A   That is a broad question, and if I answer it in

6   detail you might not care for the answer.

7        Q   All I want is the facts.

8        A   At the time of the first lawsuit somebody came to the

9   property and stated to one of my employees that the Government

10  had lots of money and we could fool around all we wanted to

11  but the Government would be here when we quit or something of

12  that sort.  I don't remember exactly what it was.  It was not

13  made to me.  It was made to one of my employees.

14       MR. VEEDER:  I move to strike the answer.

15       MR. STAHLMAN:  Well, it came to him.

16       THE WITNESS:  It was made to one of my employees in the

17  course of employment.  I was busy and they couldn't see me.

18       THE COURT:  Overruled.  He may recite what was related to

19  him about this matter, as a matter of general information.

20       MR. VEEDER:  He didn't say that it was to enforce the

21  stipulated judgment, your Honor, and that is the point I am

22  interrogating about.

23       THE COURT:  That is the point.  What does "enforce" mean?

24  He said that somebody came to him or came to one of his

25  employees and made some remark.

1      Did anybody ever talk to you about it?

2      THE WITNESS:  No, your Honor.  I have never been

3  approached by anyone from the Vail Company or Camp Pendleton

4  or anyone with regard to the limiting the use of my water in

5  connection with that judgment.

6      MR. VEEDER:  I have no further questions.

7      THE COURT:  Does anybody want to examine Mr. Gardner?

8      All right, step down.  Thank you.

9      MR. GARDNER:  That concludes our case, if the Court

10 please.

11     THE COURT:  I take it that you are content with the soil

12 survey made of both your property and the Bethell property?

13     MR. GARDNER:  I am content with Col. Bowen's integrity

14 in what I heard about him.  I haven't read the surveys, but

15 if he says they are correct, they are quite satisfactory with

16 me.  And I am content with the Court's judgment.

17     THE COURT:  Mr. Littleworth.

18     MR. LITTLEWORTH:  Your Honor, I think perhaps we need a

19 word or two of explanation before we get into the matter of

20 our clients.

21     Your order of September 2nd, 1959, included the following

22 persons, who are clients of ours, whose cases are to be heard

23 here as opposed to those to be heard before the Special Master:

24 Barnett, Borell, Ceas, Collins, Dixon, Margarita and Domenigoni,

25 Frick, Hinckley--

1    MR. VEEDER:  May I go off the record for just a moment?

2    I have not handed this proposed pre-trial order to Mr.

3    Littleworth, and it may simplify matters (handing document to

4    Mr. Littleworth).

5    MR. GIRARD:  Do you have another copy of that?

6    MR. VEEDER:  Yes (handing document to Mr. Girard).

7    I would like the record to show this tentative or

8    proposed pre-trial order has been delivered to the Court.  I

9    haven't had an opportunity to meet with Mr. Littleworth and

10   discuss it.

11   (A pause.)

12   MR. LITTLEWORTH:  Your Honor, may I complete the list,

13   then, of our clients who are included in that order, and then

14   I have a couple of comments about this order.

15   Mr. Reporter, may I have the last name that I listed?

16   THE REPORTER:  Hinckley.

17   MR. LITTLEWORTH:  Lincoln, Nicholas, Quarry, Reyes,

18   Roripaugh, Security First National Bank as Trustee-- that is

19   really Gunther's Murrieta Hot Springs, Charles Yoder, and

20   M. J. Yoder.  Those are the clients of ours who are included

21   in that order, your Honor.

22   We have had soil surveys on all of those persons, except

23   Collins, and Collins appears as No. 8 on Roripaugh's B, which

24   is up here in Section 31, 7 South, 2 West.  Mr. Veeder and I

25   have had some discussion about him, and I think there is a fair

10,678

1  prospect that he may go out on a judgment something like the

2  interlocutory judgment No. 2, and so I wouldn't see that there

3  is any difficulty in not having his survey at this time.

4      MR. VEEDER:  That is correct.

5      MR. LITTLEWORTH:  In the case of Domenigoni the survey

6  has not yet been prepared, and that property is in a quite

7  different area, so I think there is no difficulty about not

8  proceeding.

9      THE COURT:  Yes, there are two defendants up there,

10 Domenigoni, and what is the other one?

11     MR. VEEDER:  Searl Brothers.

12     THE COURT:  And this involves the problem whether the

13 surface runs one way and the underground water runs the other;

14 is that correct?

15     MR. VEEDER:  That is correct, and we are investigating

16 that matter.

17     MR. LITTLEWORTH:  I think Domenigoni might be grouped

18 other than with the people we are including now.

19     THE COURT:  All right.

20     MR. LITTLEWORTH:  We have not received the survey on

21 Frick, which is our No. 22 on Roripaugh's B, and he is, again,

22 away up in Section 28.  Mr. Veeder and I have had some conver-

23 sation about him, and I think that, too, will be left out at

24 this time.

25     The last one we have not received a survey on was

1  Roripaugh, but that has just been given us.  That was a mammouth

2  job in preparing descriptions, and I think we will need a

3  little time for checking, so we probably will not be able to

4  take care of him in this group of people we will be taking this

5  afternoon and tomorrow.  But as soon as we have had a chance

6  to check that we would be prepared to go along on his case.

7       THE COURT:  Whom does that leave, then, as to the case

8  you are going to present?

9       MR. LITTLEWORTH:  It leaves, if your Honor wants to check

10  the order, Barnett would be our first one, and then Borell.

11       MR. VEEDER:  We would be glad to give you the numbers

12  on Roripaugh's B.

13       MR. LITTLEWORTH:  Yes, I can give you that.

14       THE COURT:  Barnett is what?

15       MR. LITTLEWORTH:  Barnett is No. 30, Borell is No. 25,

16  Cease is 6 on Roripaugh's B, Collins we are skipping, Dixon

17  is 26, Domenigoni we are skipping, Frick we are skipping,

18  Hinckley is 49, Lincoln is No. 15, Nicholas is No. 27, Quarry

19  is No. 43, Reyes is 48, Roripaugh we are skipping now, Security

20  Bank or Gunther is 42, Charles Yoder, 19, and M. J. Yoder, his

21  father, is 17.  And I would expect, your Honor, to proceed

22  pretty much in that order.  We would like to vary it a little

23  bit, because I say one or two people are not here, but

24  essentially we would take them in alphabetical order.

25       THE COURT:  All right.

6

1      MR. LITTLEWORTH: So far as this pre-trial order is con-

2  cerned, Mr. Veeder and I have discussed the general contents

3  of this over the telephone yesterday, and I think the ground

4  rules set forth in here are, generally speaking, all right.   I

5  have one or two comments.

6      The first thing is that he sets forth some of the things

7  that our witnesses will testify to, and I don't think that each

8  person is going to testify in this detail.

9      MR. VEEDER:  Mr. Littleworth, in most general terms I

10  have outlined what I thought would be your evidence.

11      MR. LITTLEWORTH:   Then, particularly in paragraph 6 on

12  page 2 you have a statement that the quantities of water

13  applied to beneficial use will be testified to.   I really doubt

14  that many of these people will be able to testify to quantity,

15  because most of these wells are not metered.   If we know the

16  quantities we will be happy to give them, but I think that is

17  going to be difficult...

18      Similarly, your Honor, on page 3 and paragraph 3 is the

19  statement that to the extent possible we would locate all

20  wells.   With due respect to Mr. Gardner, I would not propose

21  to locate every domestic or every windmill.   I think the main

22  wells are or can be located with reasonable accuracy, but I

23  do not propose to go into a great deal of detail on the smaller

24  wells.

25      And lastly, on page 3 in paragraph C there is a statement

1  that the lands which actually abut on surface streams would be

2  considered riparian and lands overlying subterranean basins

3  would be considered to have overlying rights in the ground

4  water to the exterior boundary of the ground water basin.  I am

5  not sure that I agree with Mr. Veeder's law on that point,

6  and I think there is further considerable disagreement on the

7  extent of some of the basins in this area, and so I think this

8  is not necessary here.  We will testify, generally speaking, to

9  where water has been used and the type of water developments

10  on the property, et cetera.  But I think this becomes more a

11  letal question, which need not be--

12        MR. VEEDER:  If you want to eliminate it, it's fine with

13  me.

14        MR. LITTLEWORTH:  I would rather eliminate that, except

15  to the extent, I believe, Mr. Veeder will agree, that the land

16  which touches a surface stream we are presuming to be riparian,

17  unless Mr. Veeder comes back with testimony at a later time to

18  show that there may have been a severance of the water rights

19  as a matter of chain of title.

20        THE COURT:  It is understood, then, that where a land

21  owner makes a prima facie showing that his land touches a

22  stream or a tributary or crosses it, we can proceed upon the

23  theory that that land is riparian, unless the Government

24  demonstrates that there has been a severance by prior conveyances

25  of land.  Is that agreeable?

MR. VEEDER:   I think that is proper, yes, and we will undertake that.

THE COURT:   Does everybody agree that that is a proper procedure?

All right.

MR. LITTLEWORTH:   One other general comment, your Honor. By and large, we have no disagreements with the soil surveys. In discussing who would put these into evidence, I agreed with Mr. Veeder that probably it would be best for the Government to do so, and we will make no objection to the introduction of any of the surveys.   But I want it to be under-stood that there are some things in these surveys which I do not believe are technically relevant at this stage.   Irrigable acreage is agreeable, numerically, on all of our clients' properties.   However, I think that irrigable acreage is part of a case where an apportionment is shown, and as I understand the Govenment's position the present apportionment of water is not now being shown-- at any rate, I do not believe the evidence at this stage would support such an apportionment. For that reason, I do not believe it is perhaps legally relevant, although undoubtedly helpful to the Government at this point.

MR. VEEDER:   May I ask what you mean by "apportionment"?

MR. LITTLEWORTH:   That is, a person may be cut back to 75% of the water he has been using or something of that nature.

1  You may have individual instances where there is an improper

2  use of water, which may be curtailed.  But I do not believe

3  the present state of the record would permit a general appor-

4  tionment of all persons in the suit.

5      MR. VEEDER:  Before going any further-- and this is

6  relevant to what I am going to follow up with-- as I see it,

7  there is agreement in regard to the ground rules in the pre-

8  trial order.  C is all right through the first sentence.  The

9  balance you do not want in here, is that right?

10      MR. LITTLEWORTH:  That is correct.

11      MR. VEEDER:  Repeatedly we have heard the term that this

12  would not be an apportionment of water, and I would just like

13  to take about a minute on this point.

14      THE COURT:  Before you take the minute, over the noon

15  hour take this document and cross out what you are not con-

16  cerned with and submit the document and I will sign it.

17      MR. STAHLMAN:  Is it intended, by the first paragraph

18  in the document, that it is a pre-trial order in so far as

19  it pertains to the clients of Mr. Littleworth?

20      MR. VEEDER:  That is what we intend.

21      THE COURT:  Just a general set of ground rules.  The

22  Court will permit variation, if necessary.  It is not an

23  attempt to put anybody in a straightjacket.  Just to give us

24  some ground rules in our procedure.

25      MR. VEEDER:  On that point, on the point of the appor-

1  tionment of water, it is a matter of increasing concern to the

2  United States, for this reason:  We believe that in regard to

3  a riparian's rights that the quantity of water that he might

4  enjoy by reason of the yield of his rights is a variant that

5  changes from day to day, dependent upon the supply of water

6  used by other people, and for that reason I do not believe

7  that it is possible to declare X acre feet to Joe Doakes by

8  reason of his riparian land.  I have never seen a decree with

9  that in it.  But I do believe that there can be regulation

10  by reason of an "apportionment" or whatever you want to call it.

11  There can be regulation if it is determined that a riparian is

12  using an excess quantity of water over and above his correlative

13  share.

14        Now, in regard, however, to appropriative and prescriptive

15  rights, concerning which there are a great many claims, we

16  believe that there is-- if you want to use the term "appor-

17  tionment"-- I believe there will be an apportionment as to the

18  maximum extent of the rights to the use of water of appropriative

19  and prescriptive nature.

20        THE COURT:  That is not apportionment.

21        MR. VEEDER:  Call it what you will.

22        THE COURT:  You mean the decree that a man either had or

23  did not have a prescriptive right, and if he had one the

24  nature and extent of it.

25        MR. VEEDER:  That is correct.  The reason why I am worried

1  about semantics is that repeatedly we have heard this word

2  "apportionment."  I want it understood that from our stand-

3  point I have expressed what we think would be the kind and

4  type of decree for riparian rights.  I believe, in regard to

5  the owners of a prescriptive right, you would set the maximum

6  to which he would be entitled, the lands upon which it can

7  be used, the period of use, similar matters, all of which

8  pertain to prescriptive right.

9      THE COURT:  I don't think we have any dispute on pre-

10  scriptive right.

11      MR. VEEDER:  Now, in regard to appropriative rights,

12  I believe that your decree that we would desire to have entered

13  would disclose the date of priority, the lands to which the

14  appropriative right pertains, the use of water, the size and

15  type of the structures utilized to divert and apply the water

16  to beneficial use, if there is a storage right claimed as dis-

17  tinguished from a direct diversion right we would desire to

18  have the decree show the maximum quantity of water that could

19  be impounded in the structure.

20      To this point I have talked about vested appropriative

21  rights.  Now there are inchoate rights.  The Vail Company,

22  for example, has what I consider to be an inchoate appropriative

23  right.  Surely Vail Dam has never been filled to the fullest

24  extent, and to that extent we don't believe that the Vails

25  could prove a vested appropriative right, because to this

10,686

1    point they have never used water beneficially to the extent

2    of the full forty to fifty thousand acre feet.

3        I think that is certainly true in regard to the Fall-

4    brook claim.

5        So I think what you would have, if you want to call it

6    apportionment, in regard to appropriative rights it would be

7    the vested rights which stem from actual diversion and

8    application of water to beneficial use, then the maximum

9    quantity of water they could under State law acquire through

10   ultimate application of the water to beneficial use.

11       I am sorry that I took so much time, but I think if there

12   is disagreement with what I have said I would like to hear it.

13       THE COURT:  I follow you on everything except that you

14   would do to the riparian owner.

15       MR. LITTLEWORTH:  That is what my remarks were directed

16   to, really.

17       MR. VEEDER: So far as the riparian owner is concerned,

18   I think the question of irrigable acreage, in most instances,

19   will be the criterion that will be the guide in this decree

20   as to what his potential use could be.  Now, I think that when

21   you have declared that the land is riparian, that the land is

22   irrigable, and that water can be beneficially applied to it,

23   I don't believe you go one step further.

24       THE COURT:  You are getting now to what we are talking

25   about.

10.685

1      MR. VEEDER:  Yes.

2      THE COURT:  You are going to find that X has 200 acres

3  of ground, all of which is riparian, and 150 acres of irrigable

4  ground that has a water duty of a certain amount.

5      MR. VEEDER:  Maximum, yes.

6      THE COURT:  Maximum.  Now, you are not going to go

7  further and try to seek any apportionment of use between

8  riparians.

9      MR. VEEDER:  I truly don't believe it possible in regard

10  to a riparian owner.

11      If there is disagreement with it, I would like to hear

12  it, because I have been worried for a year no with this con-

13  tinual reference to "apportionment," and that there could be

14  an apportionment.  I think you can declare what is riparian,

15  and that is all I am concerned about.  But if there is another

16  significance to be ascribed to "apportionment," I would like

17  to know it now.

18      MR. GIRARD:  Are you interested in determining what is

19  the correlative share of each riparian?

20      MR. VEEDER:  No.  All I am saying is that this correlative

21  share will vary by the quantity of water in the stream on a

22  given day.

23      THE COURT:  If we understand you, your position may be

24  a little different than it was.  You don't expect, then, to

25  have in the decree any regulation of the use of these

1   riparians at this time.  If in the future some problem arises,

2   at that time the matter will have to be gone into again.

3        MR. VEEDER:  For example, your Honor-- and again this

4   is extremely important to us, and with all respect to Mr.

5   Roripaugh, and I have been using his name frequently down

6   through the years and I hope he doesn't think I am picking on

7   him-- but the point is that the Roripaugh lands are so situated

8   that there may be a question as to the extent of his riparian

9   acreage.  If we are to find Roripaugh using what he claims to

10  be his riparian water on non-riparian land, I think your

11  regulation will come into effect.

12       THE COURT:  That is not regulation.

13       MR. VEEDER:  Well, call it what you will.

14       THE COURT:  But you don't propose that there be any

15  general allotment on the river nor any water master appointed

16  at this time to control the use of the river?

17       MR. VEEDER:  In regard to whether there is a water master

18  appointed or not, you are taking a step beyond where I have

19  ever gone.  I am going to prove that someday you are going to

20  have to have one.  But I believe there is agreement among us

21  that in regard to riparian acreage you don't have to have a

22  second foot or an acre foot allocation, as you do in the

23  case of appropriative and prescriptive rights.  I do believe

24  that there would be a day to day variant as to the quantity

25  of water any riparian owner might use.

1  THE COURT:  But the Government still wants to have
2 cataloged the extent of the riparian acreage on the stream
3 and the water duty pertaining to it.

4  MR. VEEDER:  That is correct, and the measure is usually
5 the irrigable acreage which is riparian to the stream.

6  Is California agreed on that?

7  MR. GIRARD:  I cannot agree with the necessity for the
8 irrigable acreage in figures, unless you are going to de-
9 termine the correlative shares.  Otherwise, it doesn't mean
10 anything.  If you are not going to allocate, the only purpose
11 of the irrigable acreage is to help the Government  in their
12 planning, and that has no more validity in a Government file
13 than it has in evidence.

14  THE COURT: Except this, Mr. Girard, that we are all
15 citizens of this country, and notwithstanding what we think
16 about rights on the stream, we are all interested in the
17 Marine Corps being an effective arm of the Government, and if
18 the Government, with a reasonable amount of work on its part,
19 wants to know just exactly what the potential is on this
20 watershed in order that that might assist them in determining
21 whether they are going to have to condemn Gardner's ranch or
22 the Vail Ranch or other property to get enough water for the
23 camp, I think we ought to go along on it.

24  MR. GIRARD:  I agree with you on that basis.  But if you
25 are trying to use irrigable acreage to put some limitation on

water use by individual riparians, I think we ought to know about it now. But if all we are interested in is cataloging irrigable acres so that the United States can have some justifiable basis for future development and planning, that is fine. But if we are going to use these irrigable acreages to put a limit on the riparian, we ought to know about it.

THE COURT: Mr. Veeder has disclaimed that.

MR. GIRARD: If he disclaims that, that is fine.

THE COURT: Except in situations that really don't come within apportionment, namely, a use by a riparian of water on ground which is non-riparian, or an excessive use of a person of a claimed prescriptive right, that is of that sort, which would be isolated instances.

MR. GIRARD: Yes, they would not be proper riparian uses.

MR. VEEDER: I invited Mr. Girard's statement for the reason that he and I have touched on this in the past.

The term "apportionment" to me isn't sufficiently precise. One can have a situation here where you have the Barnett property, which is No. 30 on Roripaugh's B, and the Roripaugh property, which is No. 12, both of which lie between the Elsinore and the Wildomar faults, and I believe that clearly they are riparian. It would occur to me that it was entirely possible that there would be such an extensive use of water on either one of those parcels of land that it would be very clear that on a given day or in a given season that they are

1    using far in excess of their correlative shares as a riparian.

2    Now, would it not be appropriate, in your Honor's view, to

3    limit them to what you would think would be a fair share,

4    based upon the quantity of water available?

5        MR. LITTLEWORTH:  I think what you are talking about has

6    to occur at some later proceeding in this suit under con-

7    tinuing jurisdiction.  It could not occur in the state of the

8    record in this suit as it now stands.

9        MR. VEEDER:  Absolutely.  I agree on that completely.

10   But I didn't want anyone to think that inherent in a decree

11   is a possibility of one day limiting a man to what would be

12   his fair share based on the available supply of water.

13       MR. STAHLMAN:  How would you reach the situation that

14   we have in some instances where at the present time one

15   riparian owner is irrigating, say, a hundred percent of his

16   riparian property and another can irrigate only 5% of it out

17   of the same source of water?  Are we going to reach a point in

18   this case where the Court will be able to control that, or

19   will it be necessary to come back in some other action?  What

20   is the objective in this case?  If it is merely to determine

21   the quantitative water in the stream, that could have been

22   done with a study without the necessity of a law action.

23       MR. VEEDER:  I think on the basis of a showing of

24   irrigable acreage-- I have just selected those two numbers

25   there-- it is entirely possible that in 1961, if there has

been an expanded use of water, there would be a motion for an order to show cause why that shouldn't be limited to the quantity of water that was used as of today.

THE COURT: If that happens, then in 1961 you would have to find out how many irrigable acres there are.

MR. VEEDER: That is right, and that is why I wanted it done now. I want to know how many irrigable acres.

THE COURT: If you did it now, in 1961 you might come up with a different answer.

MR. VEEDER: It is entirely possible, your Honor. But I don't believe that will be the case, because, by and large, we have made thorough investigation of irrigable acreage and I think you can put in this decree what is the irrigable acreage as of today. I would say that is how decrees are generally written.

MR. STAHLMAN: How are we going to meet this situation? Judge Yankwich made a determination in his findings in the hearing in Santa Margarita that there was not sufficient water in the stream system to supply the present need of all the riparian owners. Are we going to reach that in this case or not?

MR. VEEDER: I think we are already there.

MR. STAHLMAN: Then what are we going to do with it? Is this case going to terminate with a decree that riparians, as I have previously stated, will be able to irrigate a hundred

1  percent of the land where another one can irrigate only 5% out

2  of the same source?

3  MR. VEEDER:  Suppose that situation occurs and No. 30

4  down here says that the man above me is using too much water,

5  then he comes in with a motion to show cause and your Honor

6  can restrain him.

7  MR. SACHSE:  I agree with Mr. Veeder's analysis as to

8  how this will happen in the future, and I agree that it will

9  be by an order to show cause.

10  I have been fascinated listening to this, and I wrote a

11  letter, which Mr. Veeder hasn't had a chance to see.

12  MR. VEEDER:  I would like to see that letter.

13  MR. SACHSE:  It is on his desk.  He hasn't had a chance

14  to see it yet.  I hand-delivered it this morning.

15  In that letter I express some of these things we are

16  discussing .

17  I can say right now, your Honor, for the sake of short-

18  ening this trial, that based on what I have just heard from

19  Mr. Veeder I have a number of riparian clients for whom I

20  will put on no evidence.  They are making no use.  I don't care

21  how much irrigable acreage they have, and they don't care, and

22  I am not going to spend their money today.  If the United

23  States wants to put it in, let them.  The record is such that

24  it will establish their riparian ownership.  The record is

25  such that your Honor will have to find that they are riparians,

1    and as such they are entitled to their correlative share.  And

2    when this 1961 problem arises, if it arises on their creek,

3    which I am not even sure it will on their creek, then at that

4    time I will suggest that they hire some engineer and spend some

5    money.  But I am not going to do it today, and I will be

6    prepared at a very early date, if your Honor is anxious to

7    get this information, to shorten this case, to tell you

8    exactly which ones they are.

9         MR. VEEDER:  Tell me.

10        MR. SACHSE:  I will tell you one right now, Tule Land &

11   Cattle Company.  I will introduce not a word of evidence.

12        MR. VEEDER:  We might be able to stipulate on them.

13        THE COURT:  Then what is going to happen out of this

14   lawsuit, this colossus, beginning in 19 and--.

15        MR. SACHSE:  The mountain will bring forth a mouse.

16        MR. VEEDER:  That's right.

17        THE COURT:  In 1961 all that will happen will be that

18   we will wind up with a certain number of defendants that the

19   Court says have rights on the stream system, and we will

20   get rid of a lot of defendants who have no rights on the

21   stream system, and that is about all we are going to accomp-

22   lish.

23        MR. SACHSE:  That's right, your Honor.

24        MR. VEEDER:  No, your Honor.

25        THE COURT:  In other words, we will have a smaller list

10,695

of defendants when the next go-around comes.

MR. VEEDER:  No.

THE COURT:  Isn't that what it amounts to?

MR. VEEDER:  Well, your Honor, if that is your Honor's interpretation of a decree adjudicating the rights to the use of water, it may be.

THE COURT:  You have just told me that you are not going to seek, and it is not proper now, to make any apportionment between riparian owners.  What else can we do, then, except to find that certain people are riparian, certain people are overlying owners, that there are so many defendants who are interested in the stream system, and that everybody else is out and if they have water they are lucky to have it?

MR. VEEDER:  Then I would like to have your Honor define for me what he means by "apportionment," because that has been the thing that has worried me throughout this litigation. There are innumerable decrees of exactly the same kind and character that I have described to you.  I know of no way of having a decree other than that I have stated.  I believe they are effective.  I believe they chronicle the rights, I think they show the irrigable acreage.  I think they are subject to enforcement.  I think they are the quiet title type of decree.  I think they are effective, and that is what we seek.

Now the reason why I am talking about apportionment,

again, I have difficulty in using such terminology. I am worried about it. I think you can make what is tantamount to an apportionment, as I said, under prescriptive and appropriative rights. But it is daily, it is a changing, it is a variant in regard to riparian rights. I don't know what experience others have had in this kind of litigation. My experience has been exactly what I have said it is. You will have an adjudication of a man's maximum on the river, and it is a matter of enforcement. If some man comes in and says that this fellow is taking more water than I think he is entitled to--

THE COURT:  We are probably up against a problem of semantics. The Government, of course, is the last user on the stream, and if the Government is not at this time seeking what we generally call apportionment, then there may be other better results out of the suit than I indicated in my very broad statement.

For instance, if we found the irrigable acres and the water duty and all, if a dispute arose on some little branch or run or whatever you call it-- creek, and it involved two people closeby, and one was using a terrific amount of water and the other fellow was suffering, it might well be that that dispute could be heard on some order to show cause without bringing everybody else in on the other creeks of the system. It might be that at that time, having found a certain number

1   of irrigable acres and a certain amount riparian, that at the

2   new hearing the parties would say, "Well, we are content,

3   there has been no change, we accept those figures now," and

4   go on from there.  And we would also, of course, have the

5   advantage of the decree, because it would tell us what the

6   maximum usage was above, and we would have a lot of things

7   that would assist us in determining this little brush fire

8   between several owners which didn't concern the whole water

9   system.

10          MR. VEEDER:  Precisely.

11          THE COURT:  But the real difficulty would come when the

12   Government comes in as the last owner downstream and says,

13   "Now we have a certain maximum use, and now we want to slow

14   down the use of everybody upstream from us."  Then you have

15   got the whole lawsuit to try all over.

16          MR. VEEDER:  No, your Honor, definitely not.  I don't

17   think that, and you worry me when you say-- you worry me

18   terribly.

19          MR. STAHLMAN:  How do you reconcile your position?

20          MR. VEEDER:  May I finish right now?

21          MR. STAHLMAN:  You will never get finished, but go ahead.

22          MR. VEEDER:  Maybe we ought to have some luch.  George

23   would be more pleasant.

24          THE COURT:  Let's be agreeable, and you pay for the

25   lunch today because of that remark.

1   MR. VEEDER: Thank you, your Honor. I don't have to

2 eat one, do I?

3   Your Honor, truly, as I say, you frighten me when you say

4 such things.

5   Our view is this. Assuming that your Honor will sustain

6 the stipulated judgment, it will cut down the problem a great

7 deal by knowing that the Vail Company's rights are already

8 resolved. So in regard to the administration of the stream

9 we are in good shape. Vail Reservoir is up there and all is

10 right with the world. It is entirely possible, and this is the

11 thing we think is occurring today, we believe there is an

12 excess of pumping upstream.

13   THE COURT: You say upstream, but you put your hand over

14 on the Murrieta.

15   MR. VEEDER: That's right, because we have already taken

16 care of the Vails.

17   Here is the Murrieta in here, and here is Santa Gertrudis.

18 It is entirely possible that the pumps have been thrown on

19 there so hard that they are killing and have destroyed and

20 wiped out Murrieta Creek.

21   Now, I see no reason whatever for saying that everybody

22 would have to be back in here. Certainly that is not the case.

23 We would have data chronicled for your Honor, and we will make

24 it available, and we are proceeding on that course now, so

25 that we will know in this quasi in rem proceeding the lands

which are riparian, the lands which could use water, the maximum irrigable acreage as determined by you, so that there will be no -- I don't want any newspaper men saying that we are going to try this again in 1961.  The point I am trying to make is that we will be in the position, with the chronicling and cataloging your Honor will do in this proceeding, to limit very closely and very carefully the matter on an order to show cause naming the parties who would be before your Honor.

THE COURT:  There is another result that would flow from it also, and that is that from this cataloging there might be enough material in there that many of these disputes would be settled between the parties.

MR. VEEDER:  That is right.

THE COURT:  The parties could see, from the facts as found, that the use they were making was excessive, and negotiations might bring about a determination of the dispute without having to go to court.

MR. VEEDER:  That is right.

MR. GIRARD:  But there is no attempt to limit any riparian use, as long as the riparian is using water beneficially.

MR. VEEDER:  We will go along on that, and if something shows up to the contrary this afternoon I might change my position on it.

MR. LITTLEWORTH:  One other point before we go on.

We would take the same position on water duty.  I think it falls into the same category, except that in this area they have used a figure on water duty per acre on crops which I think is actually wrong.  Now, I don't mind it going in-- it's in the survey.  I will not object to it, but I want it to be clear that it is not our position.  They have used 3.83 acre feet on alfalfa and permanent pasture.  Most of our men say that that is not adequate, and so does the County Farm Advisor.  They recommend in this area a higher water duty.

I don't think that water duty need be in issue right at this time, so I don't propose to put in any evidence on it. But I don't want to let the record indicate that we do go along with it.

THE COURT: Suppose that Mr. Veeder requests a finding on the water duty.

MR. VEEDER:  That is just what I am going to do.

THE COURT:  Take Mr. Sachse's situation.  Suppose he puts on no proof on irrigable acreage and water duty, and the Government then calls a witness and puts on some evidence. What are we going to do then, Mr. Sachse?

MR. SACHSE:  Well, your Honor, if the Government calls a witness and puts on evidence of irrigable acreage, of course I will have to meet it.  But water duty, I absolutely say, has no significance except at the moment it is considered, because

regardless of the maximum water duty for any crop, no riparian is entitled to use more water than he can beneficially use on the crop he is then growing.  It is no good to say that the maximum use is 6 acre feet.  If he is growing a crop that takes only 2, his water entitlement at that time, if there is an apportionment, is going to be based on the water duty of the crop being grown at the time of the apportionment.  So water duty is of no value to your Honor.  It may be of very real value to the United States in its long-range plan, but it is of no value to your Honor in making a judgment, unless you are simultaneously allocating water.

MR. VEEDER:  May I make a statement in that regard again. The reason why we called Col. Bowen to testify in regard to the 4.2 acre feet per acre was to show the maximum quantity of water that we thought could be utilized.  If you will observe the soil reports that have been made and the testimony that has been introduced through Col. Bowen, you will see just exactly, as Mr. Sachse says, that there is a variant as to the quantity of water required to raise avocados and citrus, but that the lowest water duty, which is 4.2, is that which would be applied to irrigated acres.  We don't say that each acre is entitled to 4.2, if they are raising citrus and they can get by on 1.8.

MR. SACHSE:  That's right.

MR. LITTLEWORTH:  I have this problem, your Honor.  I

think this is irrelevant now, and if the Court were to decide
it were not, then I would want to put in evidence, because
I think that is not a correct figure in our area.

THE COURT:  It would be a small matter to put it on.

MR. LITTLEWORTH:  Yes.

THE COURT:  And the discrepancy between you and the
Government probably is a fraction.

MR. LITTLEWORTH:  No, it runs five to seven acre-feet
on alfalfa in that area.

MR. STAHLMAN:  I would like to discuss this further.  I
don't think we have sufficient time now.  I think there are
elements we are overlooking here to get the full benefit out
of this lawsuit.

THE COURT:  You will have plenty of time to talk about
it.

MR. VEEDER:  Your Honor, should I file in the record
Mr. Oviatt's letter to me of November 19th?

THE COURT:  Yes, file it.

Let's take a recess until 2 o'clock.

(Noon recess.)

San Diego, California, Tuesday, November 24, 1959.   2:00 P.M.

THE COURT:  All right, proceed in the Fallbrook case.

THE CLERK:  Nine, 1247-SD-C, United States vs. Fallbrook, et al.

MR. VEEDER:  The pre-trial order is in process of being typed at the moment.  It will be available this afternoon, your Honor.

THE COURT:  All right.

Are you going to call Col. Bowen to start with?

MR. VEEDER:  No.  I thought, in accordance with the pre-trial order, Mr. Littleworth would call his clients, and then we would call Col. Bowen.

THE COURT:  All right.

MR. LITTLEWORTH:  I will call Mr. Barnett.


RALPH O. BARNETT,

a defendant herein, called as a witness on his own behalf, being first duly sworn, on his oath was examined and testified as follows:

THE CLERK:  Please take the stand and give your name.

THE WITNESS:  Ralph Barnett.

DIRECT EXAMINATION

BY MR. LITTLEWORTH:

Q   Ralph O. Barnett?

A   That is correct.

Q   Is your name spelled without an "e" on the end, although you are named that way in the complaint?

A   Yes, sir.

Q   What is your address?

A   Murrieta Hot Springs, Murrieta, California.

Q   Are you the owner of the parcel of land which is shown as Parcel No. 30 on Roripaugh's Exhibit B?

A   Yes, sir.

Q   You are not married?

A   Yes.

Q   This property is in your own name?

A   That is correct.
                                      is
Q   And this land/described in your answer and also in the soil survey report prepared by the United States?

A   It is.

THE COURT:  How many acres in that piece?

THE WITNESS:  Approximately 200.

BY MR. LITTLEWORTH:

Q   Mr. Barnett, I show you the engineering report prepared by the United States, No. 440, and ask you if you have examined this report?

THE COURT:  Let's give it a number for identification.

THE CLERK:  Government's Exhibit 166, your Honor.

THE COURT:  Government's Exhibit 166 for identification.

(Engineering Report marked Plaintiff's Exhibit No. 166 for Identification.)

BY MR. LITTLEWORTH:

Q  Have you examined this report?

A  Yes, I have.

Q  The report indicates that there are 204 acres in your parcel, of which 106.79 are irrigable; is that correct?

A  Yes, it is.

Q  Would you describe briefly what improvements are on the property?

A  Nothing but the home ranch place at the present time.

Q  That is a home?

A  A home, that is correct, where my mother lives.

Q  And does Murrieta Creek run through and across the middle of this property?

A  Yes, it does.

Q  At the present time is the acreage on this land irrigated?

A  No, not at the present time.

Q  Do you have one well on the property?

A  Yes.

Q  And is the data about this well which is set forth

on page 3 of the report, which is Exhibit 166 for Identifica-
tion, correct?

A   Yes, it is.

Q   That is, it is one domestic well, is it?

A   One domestic well; that is right.

Q   Now, Mr. Barnett, there are also some springs on this
land?

A   Yes, there are.

Q   Will you tell us approximately where they are lo-
cated?

A   Right on the Wildomar fault.

Q   Do you impound any of this spring water?

A   Yes.

Q   Would you describe the structure which impounds it?

A   It is a dirt reservoir holding approximately three
acre feet of water.

Q   When was this reservoir constructed?

A   About 1912.

Q   Do you know who constructed it?

A   Yes, my father had it constructed at that time.

Q   Were you born and raised on this ranch?

A   Yes, I was.

Q   Has the spring water been impounded in that reservoir
since that time?

A   Yes.

Q   Have you ever sought or received the permission of any downstream user in order to impound this water?

A   No, sir.

Q   Does the flow of this line of springs vary during the season of the year?

A   Yes, we found over the period of years that in the middle of the summer or late summer and fall the spring flow is down, and in the winter and early spring the flow of the springs are up.

Q   Except for this seasonal variation, have you noticed any other variation in the flow of the springs over the years?

A   No, sir.

MR. LITTLEWORTH:  Your witness, Mr. Veeder.


CROSS-EXAMINATION

BY MR. VEEDER:

Q   Do you know of your personal knowledge when this reservoir was constructed, Mr. Barnett?

A   Yes, sir.

Q   Were you present in 1912 and observed it built?

A   Yes.

Q   So you know it yourself?

A   That is right.

Q   Now, in regard to the springs, you said they were on the Wildomar fault.  Are you personally acquainted with the

Wildomar Fault?  Have you been able to locate it yourself?

A   No, sir.

Q   Then how do you know it is located on the fault?

A   I have been told that this line of springs are on the Wildomar fault.

Q   But you don't know that personally, do you?

A   That is right.

THE COURT:  Isn't this one of the sets of springs that we visited on our field trip?

MR. LITTLEWORTH:  Yes, it is, your Honor.

MR. VEEDER:  I think it is, your Honor.

Q   Are you using any of the water impounded in the reservoir?

A   Nothing but to use it as a fish pond.

Q   And you only use it for fishing?

A   That is right.

Q   Has that been the historical use of it?

A   It was used for irrigation purposes from the time it was built up to 1938, when the flood of 1938 wiped out the irrigable land below this reservoir.

Q   You are not presently irrigating, then?

A   That is correct.

Q   Do you recall the number of acres you had irrigated there from that impound?

A   Oh, approximately 35 acres, as a guess.

MR. VEEDER:  I move to strike the answer, your Honor.

THE COURT:  By "guess" do you mean an approximation?

THE WITNESS:  That is correct.

THE COURT:  Overruled.

BY MR. VEEDER:

Q  In regard to the well that is used on your property, Mr. Barnett, has that ever been used for purposes of irrigation?

A  No.

Q  And you have no other water use than the fishing use at the present time and the domestic use; is that correct?

A  That is correct.

MR. VEEDER:  I have no further questions.

MR. LITTLEWORTH:  That is all.

THE COURT:  How many acres did you say was irrigable-- 106?

MR. LITTLEWORTH:  167.09.  It contains 204.

THE COURT:  Anyone else care to cross-examine?

MR. VEEDER:  I will call Col. Bowen.

THE COURT:  Were you going to call the Colonel after each witness?

MR. VEEDER:  I thought it would be a neater package to do it that way, your Honor.

THE COURT:  I guess it would, to have it all in one part of the record.

MR. LITTLEWORTH:   I think so, your Honor.

THE COURT:   All right.

Come forward, Col. Bowen.   You have been sworn.

ALLEN C. BOWEN,

recalled as a witness for the plaintiff, having been previously duly sworn, on his oath was examined and testified further as follows:

FURTHER DIRECT EXAMINATION

BY MR. VEEDER:

Q   Col. Bowen, I hand you Exhibit 166 for Identification and ask you to state into the record what is contained in that exhibit?

A   Plaintiff's Exhibit 166 for Identification is a copy of an engineering report prepared on the property of Ralph Barnett.

Q   Under whose direction was that prepared, Col. Bowen?

A   Under mine.

Q   Would you state into the record whether you person-ally know that to be accurate, that exhibit?

A   I do.

Q   And the content of it?

A   Yes, sir.

Q   And would you state in regard to the condition of

the vegetative cover on the land at the present time, have you observed that?

A   Yes, sir.

Q   Would you state what that is?

A   The vegetative cover on this property is primarily native or Mediterranean type cover that has been introduced.

Q   What was the condition of alkali, if any, at the present time, on that land?

A   Some of the sites were found to be saline and alkaline, as indicated on the soil survey map contained with the exhibit for Identification 166.

Q   Is there salt grass present on that at the present time, Col. Bowen?

A   Yes, sir, there is some.

Q   And of what is that evidence-- the presence of salt grass?

A   It is evidence that it is more tolerant of saline and alkali soils than some other types of vegetative cover.

Q   And from the standpoint of depth to ground water in that area, is that indicative of any waterlogging condition?

A   The alkalinity?

Q   That is right.

A   Well, alkali or saline conditions of soils is generally evidence of poor internal drainage, which can arise from a number of conditions.

Q   Do these conditions prevail here?

A   Well, one of the conditions, at least, and perhaps several, prevail here because of the presence of the saline and alkali condition.

THE COURT:  One of the causes of alkaline or saline condition could be nearness of the water below the surface, could it not?

THE WITNESS:  Yes, sir, that could be one of the causes.

BY MR. VEEDER:

Q   Is that one of the causes here?

A   Well, not necessarily, Mr. Veeder.

Q   Why do you say that, Colonel?

A   Well, if I understand your question correctly, you are asking me, is there a first water table which exists under portions of this property for extended periods of time?  That condition may prevail in part.  Again, alkalinity can be caused, as I said, by poor internal drainage.  Water containing soluble solids, soluble salts, can be applied to the surface, and the water cap, say, has evaporated and leaves the dissolved solids behind, it can build up a saline or alkaline condition merely by the fact that it evaporates from the surface.  It may never be in contact with any ground water table or first water table.

MR. VEEDER:  Your Honor, at this time I wish to make reference to a proposal that may be of assistance to your

Honor.  We have here the field sheets prepared by Col. Bowen.
They are the sheets from which the data was taken to prepare
Exhibit 166.  I think it would be helpful.

THE COURT:  Aerial photographs?

MR. VEEDER:  Aerial photographs.  I would like to have
your Honor look at them, and we would like to offer them in
evidence, with the right of withdrawal, because I think from
the standpoint of locating Mr. Barnett's property as it
relates, for example, to the Vail lands and to the other lands
in the vicinity, I think it might be helpful to have it.  We
will need to use them off and on and we would like to have the
privilege of withdrawing them.

THE COURT:  The diagram shown on this map you have handed
me is the same that has been carried over in to the soil survey.

MR. VEEDER:  That is correct, your Honor, and also the
symbols.

THE COURT:  Is this just for ease of orientation?

MR. VEEDER:  For orientation.

THE COURT:  You are not going to make them exhibits in
the case?

MR. VEEDER:  I thought we would make them exhibits in
the case, your Honor, and they would be available for use by
Mr. Littleworth or anybody else.  They are going to be help-
ful to us.

THE COURT:  What is this talk about withdrawing them?

MR. VEEDER:  We will only withdraw them when we need to use them momentarily, your Honor.

THE COURT:  Can this first one be marked an exhibit next in order?

MR. VEEDER:  That is correct.

THE COURT:  Are we going to have one map?

MR. VEEDER:  There will be three maps that will be involved.

Am I right on that?

THE WITNESS:  Yes, sir.  I perhaps should explain the use of these to his Honor, so that he understands just what the situation is.

MR. VEEDER:  I think that would be a good idea.

THE COURT:  Let me see them before you mark them.

Yes.

THE WITNESS:  The two aerial photographs, your Honor, which are on double-weight paper, numbered 3-52 and 3-53, both enlarged copies of our 1955 aerial photograph coverage of the Santa Margarita Valley, are actual field sheets.  That is the areas which it was determined would be mapped on those particular photographs are delineated by a green line, which we call the "match line."  That line matches the same green line on photographs north and south and east and west of each particular figure.  Now, in this area, particularly in the old land grant area, such as this Ralph Barnett property, the

property lines do not run east and west and north and south,
as they do generally in areas that have been surveyed in
township, range and section.  So we found in this area
particularly that the match lines would intersect property
boundaries.  So that actually the field sheets for Mr.
Barnett's property-- I should say we required three separate
field sheets for Mr. Barnett's property in order to survey
the entire property.  Now, two of those are present before
your Honor.  The third has just a small portion in the
southwest corner.  It is not present in the courtroom.  But
from those three field sheets the entire property as shown on
the single-weight enlargement of an aerial photograph No.
3-0053 was delineated and the soil sites and symbols were
marked on that for ease of reproduction.

It is our intent, of course, to continue using the field
sheets for other surveys, as may be required.

THE COURT:  In other words, these heavy backed ones may
be used for other properties?

THE WITNESS:  Yes, sir.

MR. VEEDER:  That is correct, your Honor.

THE COURT:  That answers my question.  I was going to
determine whether or not we could key each of these maps into
the soil survey, such as in this case the survey of Exhibit
166, whether we could make the map 166-A.  The one on thin
paper could be, because you are through with that, aren't you?

THE WITNESS:  Yes, sir, we are.

MR. VEEDER:  I think that would be perfectly proper.

THE COURT:  All right, let the exhibit on thin paper, which has on it the soil survey identically with that shown in Exhibit 166, be marked 166-A.

MR. VEEDER:  Then the other two would be marked--

THE COURT:  Next in order.

MR. VEEDER:  167 and 168, respectively.

THE COURT:  Give numbers to them, Colonel, so that we can identify the ones you talk about.

THE WITNESS:  The two field sheets presently before his Honor are No. 3-0053 and 3-0052.  Those numbers appear in white in the lower left-hand corner of each photograph.

THE COURT:  Where do you see the 3?

THE WITNESS:  The 3, sir, is the flight number which follows U.S.N.  It indicates the number of the flight.  Those numbers, your Honor, have been depicted on a number of maps which are in evidence as an exhibit, reproductions of $7\frac{1}{2}$-minute series.

THE COURT:  All right, the map with the number 3-0052 will be Exhibit 167, and the map 3-0053 will be Exhibit 168.

MR. VEEDER:  We offer in evidence Plaintiff's Exhibits 166, 166-A, 167 and 168.

MR. LITTLEWORTH:  No objection.

THE COURT:  Plaintiff's Exhibits 166, 166-A, 167 and 168

(Plaintiff's Exhibits 166, 166-A, 167, and 168 were marked for identification and received in evidence.)

MR. VEEDER:  I have no further questions at this time from Col. Bowen.

MR. LITTLEWORTH:  I have one or two questions, your Honor.

THE COURT:  All right.


CROSS-EXAMINATION

BY MR. LITTLEWORTH:

Q  Col. Bowen, you have heard Mr. Barnett testify to a line of springs.  Are they, in fact, located along the Wildomar Fault line?

A  Yes, sir.

Q  Would you look at your report on page 2, the paragraph just below the middle of the page?  It startes out "Ground Water Storage is present."

A  Yes, sir.

Q  The last sentence of that reads, "The fault acting as a barrier forces the water to rise to the surface along this line."  Do you have any opinion as to what kind of barrier the fault is at that point?

MR. VEEDER:  I am going to object to that as being too broad in scope.

Also, I am going to object on the ground that there is

1    no proper foundation for that question from Col. Bowen.  I

2    don't believe Col. Bowen investigated the fault for the

3    purpose of determining the tightness or its exact location.

4         MR. GIRARD:  He did testify that everything in there

5    was correct.

6         MR. VEEDER:  That is not included in this question.

7         MR. LITTLEWORTH:  Let me simplify the question.

8         Q  Col. Bowen, do you have any opinion as to how effective

9    a barrier to ground water the fault is at that location?

10        MR. VEEDER:  Again I object on the ground that there is

11   no foundation that the Colonel has investigated that particular

12   phase of it, from the standpoint of the degree of tightness.

13        THE COURT:  Let's find out.  The objection is overruled.

14        Answer yes or no.

15        THE WITNESS:  Yes, sir, I have an opinion.

16   BY MR. LITTLEWORTH:

17        Q  Would you state it, please?

18        A  Well, it is effective enough to obstruct the lateral

19   movement of ground water through that particular fault line,

20   as evidenced by the springs.

21        Q  Do you think any water passes through the fault at

22   that point?

23        MR. VEEDER:  That is objected to on the grounds that

24   there is no foundation.

25        THE COURT:  Sustained.  I don't think you have qualified

the Colonel as a geologist.  There are plenty of geologists

around here without making an expert geologist out of the

Colonel.

MR. LITTLEWORTH:  All right, Colonel.

THE COURT:  Anything further?

MR. VEEDER:  I have no further questions, your Honor.

THE COURT:  Let me inquire, while we are right on the

Barnett property, is Mr. Barnett going to contend that he has

a prescriptive right to a reservoir and to impound the flow

of the springs?

MR. LITTLEWORTH:  Yes, your Honor.  I should make one

qualification, your Honor.  I think sometime we will have to

have some law on whether or not certain temporary impoundment

may not be proper as a riparian use.  If it is not proper

as a riparian use, as a matter of law, then, we would maintain

that we have a prescriptive right.

THE COURT:  What is the Government's position going to

be?  Are you going to take away the man's duck pond?

MR. VEEDER:  No, I am sort of partial to Mr. Barnett.

I have no desire to take it away from him, if I can help it.

But the point is that from-- 1938 did you say?

MR. LITTLEWORTH:  Since 1938 it has not been used for

irrigation purposes.

THE COURT:  Was it used as a duck pond also between

1912 and 1938?

MR. BARNETT: Yes, sir.

THE COURT: Was it used also as a fish pond during that time?

MR. BARNETT: Yes.

THE COURT: Is it still used as a fish pond?

MR. BARNETT: Yes.

MR. VEEDER: I wonder how the fish got along without water during the irrigation season.

THE COURT: That is an academic inquiry.

MR. VEEDER: I am not objecting.

THE COURT: I am just thinking about the record. The witness was asked just one question: Did anyone ever object to his impounding the water.

MR. LITTLEWORTH: I asked whether he had ever sought or received consent from any downstream user.

THE COURT: Yes. The question is whether that would be sufficient to find a prescriptive use. I have just an offhand opinion that in a dry area like this where water is at such a premium, that that probably would be enough.

Has anybody ever threatened to sue you unless you broke that reservoir down?

MR. BARNETT: No.

THE COURT: Nobody except the Government?

MR. BARNETT: That is the only one.

THE COURT: When were you first contacted by any

Government representative?

MR. BARNETT:  I don't remember.  When they first started sending out these packages of paper.

THE COURT:  Did they ever make any threats or demands on you other than the suit they filed?

MR. BARNETT:  No, sir.

MR. VEEDER:  I might say, in that regard, your Honor, if the prescriptive time had not expired by the time the National Government acquired the rights, he could not acquire against the United States a prescriptive right.

THE COURT:  But if a prescriptive right was acquired, it was acquired long before the Government ever took this property.

MR. VEEDER:  I am not quite sure whether I agree with your Honor, in some of those regards.  As to the quanity of water, whether this was a refill, a single fill, a refill, how much water was used-- there are a great many things.  I am not being critical of the case that went in, but if your Honor is searching me, giving me a psychoanalysis, as some- times you do--

THE COURT:  I am trying to find out right now what your position is going to be.

MR. VEEDER:  My position is that I think there might be one filling of a reservoir.  But I don't think there is enough proof that he had water to irrigate 35 acres of land in two

acre-feet.

MR. LITTLEWORTH:  Three acre-feet.

MR. VEEDER:  You would have to fill and refill that
quite often, and I think there has to be proof in that re-
gard.  Now, I have no desire to interfere with Mr. Barnett's
use of water, but I do say--

THE COURT:  Let's just be practical a minute.  Is the
defendant going to be content, and is the Government going
to be content, with a finding that the right to this reservoir
is limited to keeping it filled with water?

MR. VEEDER:  To one filling.

THE COURT:  Without worrying about the irrigation of 35
acres.

MR. LITTLEWORTH:  Yes, your Honor.  We are not claiming
a prescriptive right for irrigation.  If we wanted to irri-
gate the property now, we would probably sink a well under a
riparian right.

THE COURT:  So that what you are really claiming, as
far as the pond is concerned, is the right to keep the pond
filled from the springs.

MR. LITTLEWORTH:  That is right, which has been con-
tinuously done since 1912.

MR. VEEDER:  I think that is an entirely different
situation.

THE COURT:  Will the Government stand still for that?

1      MR. VEEDER:  I will say yes, from my own standpoint, if

2  it is one filling and the water runs through, I will have

3  no objection.  I think the proof will support it.

4      THE COURT:  The point is, as I understand the testimony,

5  what the claim now is is a right to keep the reservoir

6  reasonably full from the springs.

7      MR. VEEDER:  That is right.  And as I understand it,

8  after it is full, the water flows over and on out.

9      THE COURT:  That's right.

10     MR. VEEDER:  That circumstance is one thing.  I am

11 satisfied.

12     THE COURT:  Good.  We have settled a part of a lawsuit

13 right there.

14     MR. LITTLEWORTH:  We will call Alex Borel

15

16              ALEXANDER F. BOREL,

17 a defendant herein, called as a witness on his own behalf,

18 being first duly sworn, on his oath was examined and testified

19 as follows:

20     THE CLERK:  Please take the stand and give your name.

21     THE WITNESS:  Alexander F. Borel.

22

23              DIRECT EXAMINATION

24 BY MR. LITTLEWORTH:

25     Q  Mr. Borel, will you state your address, please?

BY MR. LITTLEWORTH:

Q   That report, Mr. Borel, covers, does it, the South-
west Quarter of Section 8, 7 South, 2 West?

A   Yes.

Q   And the Northwest Quarter of Section 18, 7 South, 2
West?

A   That is correct.

Q   Do you own both those parcels?

A   My wife and I do, yes.

Q   And they are shown as Parcels No. 25 on Roripaugh's
Exhibit B?

A   That is right.

Q   You also own several other parcels indicated by the
same number on Roripaugh's B?

A   Yes.

Q   And they are not included in this soil survey; is that
right?

A   That is right.

Q   Let's take the two that are included in the survey.
They show a total acreage of 320 acres, of which 254.2 are
said to be irrigable; is that right?

A   Yes.

Q   Do both those parcels touch upon a surface stream?

A   Yes, I would say.

Q   Pardon?

1    A  Let's see, it would be Murrieta, Route 2, Box 36.

2    Q  Are you married to Louise Borel?

3    A  Yes, sir.

4    Q  Will you state your occupation?

5    A  Dry farming mostly.

6    Q  And you irrigate some lands?

7    A  A little.

8    Q  How long have you been a farmer?

9    A  About 32-3 years.

10    MR. LITTLEWORTH:  May we have the soil survey on his

11  property marked for identification.

12    THE CLERK:  169.

13    THE COURT:  169 marked.

14    (Soil survey marked Plaintiff's Exhibit No. 169 for

15  Identification.)

16  BY MR. LITTLEWORTH:

17    Q  Mr. Borel, have you reviewed the engineering report

18  marked for identification as Exhibit 169?

19    A  Yes, sir.

20    THE COURT:  Are you satisfied with it?

21    THE WITNESS:  Yes, sir.

22    MR. LITTLEWORTH:  Your Honor, that, however, covers

23  only part of his land, so I think we will have to go into it a

24  little more in detail.

25    THE COURT:  All right.

A  Yes.

Q  That is Tucalota Creek?

A  Tucalota Creek.  But there is no surface stream.

Q  Tucalota Creek cuts across both pieces of property?

A  Yes.

Q  Is your home place located in the Southwest Quarter of Section 8?

A  Yes.

Q  Do you have any wells on that parcel?

A  One, yes.

Q  What kind of well is it?

A  Domestic well.

Q  Has that well been designated 8M2 on the various State reports?

A  It must be, yes.

Q  What kind of well is it?

A  It's a 12-inch casing well, I think 366 feet deep.

Q  What kind of pump?

A  A windmill and, I think, a horse and a half jet on it.

Q  Do you store any of the water or impound any of the water from that well?

A  Yes, possibly about 600 gallons in tanks, and then we have a cement tank that holds possibly a thousand gallons or more.

Q  You have two steel tanks?

A  Yes.

Q  So you have 1200 gallons, then in two steel tanks, and then another concrete reservoir?

A  Yes.

Q  How long has that water been impounded?

A  Since 1927.

Q  Are there any springs located on that same parcel?

A  Yes.

Q  Can you tell approximately where it is located?

A  I can show it to you on the map.

Q  Is it about the center of the quarter-section?

A  Just about.

MR. VEEDER:  Why don't we have him located it, then, on 15-A?  It would be helpful.

BY MR. LITTLEWORTH:

Q  On Roripaugh's B there is a designation "Res."  Is it located at that point?

A  It is about 400 feet east of that, I would say-- southeast.

Q  Do you impound any water from that spring?

A  Yes.

Q  In what kind of structure?

A  Earth fill.

Q  Do you know the capacity of the reservoir?

A  No.  I would say three or four acre-feet.

Q  How long has that reservoir been there?

A  I imagine around-- my dad built it about the time I was born.  I think about 1910.

MR. VEEDER:  I object on the grounds that it is hearsay.

THE COURT:  Well, when you were first old enough to look around you saw this reservoir there?

THE WITNESS:  Yes, when I was a little boy I know Dad was working on it.

BY MR. LITTLEWORTH:

Q  How old are you now, Mr. Borel?

A  Forty-nine.

THE COURT:  You were born in 1910, then?

THE WITNESS:  Yes, sir.

BY MR. LITTLEWORTH:

Q  Has the water from that reservoir been used to irrigate any land?

A  Yes.

Q  Do you irrigate with it now?

A  We have every year up to this year.

Q  How much land has been irrigated?

A  Oh, between eight and ten acres, along in there.

Q  Where is the land located with reference to the spring?

A  It would be west.

Q   How far away from the spring?

A   Well, it would be two, three hundred yards -- I don't know-- something on that order.

Q   How long has this land been irrigated?

A   Ever since I can remember.

THE COURT:   You said this earth fill holds, you think, two to three acre-feet of water?

MR. LITTLEWORTH:   Three to four, I believe he said.

THE WITNESS:   Three to four, I think.

BY MR. LITTLEWORTH:

Q   This is filled by the spring water and then you use the water to irrigate with?

A   That is right.

Q   What kind of irrigation system do you have at the present time?

A   Sprinkling at the present.

Q   Previously did you irrigate by flooding?

A   Yes.

Q   Is the rest of that parcel of land dry farmed?

A   Yes.

Q   What kind of crops do you grow on the irrigated land?

A   We grew alfalfa.

Q   Do you know how much water it takes per year to irrigate an acre of that alfalfa?

A   It takes a good four acre-feet or better.

Q   Four or better?  Have you ever sought anyone's permission downstream in order to store the water which you impounded from both your domestic well and from the spring?

A   No.

Q   Have you ever had anyone object to that?

A   No.

Q   That has been continuously done, though, since you were a boy?

A   That is right.

Q   Let's take a look at this Northwest Quarter of Section 18, which is also in the report.  Is there any irrigation done on that land?

A   No.

Q   Dry farm it all?

A   All.

Q   Is there any water developed on that parcel at all?

A   No.

Q   Now, Mr. Borel, let's look at the Northeast Quarter of Section 8, Township 7 South, Range 2 West.  This is not included in the report, but you own this quarter section also?

A   Yes.

Q   Is there any surface stream which runs through this parcel of property?

A   No.

Q   There is no surface watercourse which runs across

1    this land or touches it?

2         A  No.

3         Q  Are there 160 acres there?

4         A  Yes.

5         Q  Do you farm it now?

6         A  Yes.

7         Q  Dry farm it now?

8         A  Yes.

9         Q  Can you tell us approximately how many acres are

10   irrigable?

11        A  Well, I would say--

12        MR. VEEDER:  I am going to object.  I don't believe that

13   the witness is qualified to testify in regard to what is or

14   what is not irrigable acreage in this instance.  I think he

15   can make a determination from the standpoint of a farmer

16   whether it is arable, but I don't believe he can say whether

17   it is irrigable without going into the question of engineering,

18   the delivery of water and quite a number of other things.

19        MR. LITTLEWORTH:  I can't think of anyone who is better

20   qualified to make an answer to that question than a man who

21   has has 27 years farming experience and has grown crops on the

22   land.

23        THE COURT:  I don't think so either.  The objection is

24   overruled.  But what is the use of going into the question

25   whether it is irrigable?  He is not riparian to the stream,

1   apparently he doesn't overlie any basin.  Where will he ever

2   get water?

3        MR. LITTLEWORTH:  This raises a good point, your Honor.

4        THE COURT:  The map, however, shows a reservoir on it.

5        MR. LITTLEWORTH:  Yes.  I don't know precisely why

6   the United States restricted its survey.  It may be that it

7   feels that some of this land will be going out.  If that

8   were the case, we would be happy to bypass it.  However, we

9   have never been fully apprised of what ground waters the

10  Government was going to try to claim are part of the stream

11  system, and unless some of this area is excluded I felt we

12  would have to go ahead and put on testimony on it.

13        THE COURT:  Let's suppose that he says it is all

14  irrigable. Where would he get any water?  Is it riparian?

15        MR. LITTLEWORTH:  It does not touch the surface stream

16  of any tributary, no, sir.

17        THE COURT:  Maybe it doesn't touch any marked tributary,

18  but water that runs off of it must run into a ditch or

19  depression, which in turn runs into a creek.

20        MR. LITTLEWORTH:  Yes, the drainage probably goes to

21  Tucalota.

22        THE COURT:  Roripaugh's B that I have in front of me

23  shows a drainage tributary of some sort running down through

24  the easterly side of it and hitting Tucalota Creek.

25        MR. LITTLEWORTH:  Yes.

THE COURT:  That is one of those elusive rights where you might have a little water in the winter, but in the wintertime you wouldn't need it.

MR. LITTLEWORTH:  I think, your Honor, this parcel is not riparian to any surface stream in the legal sense of the word, and I think the ground waters are not part of the stream, and in our view this land should be dismissed from the lawsuit.  But until that happens we are left with the question of putting on general proof.

THE COURT:  Let's find out.

Mr. Littleworth is willing to concede that it is not riparian.  In other words, he is willing to concede that he makes no claim to any use of surface waters on this parcel, and he would like a holding that any water that was found on that particular 160 acres Mr. Borel is just awful lucky to have it and it belongs to Mr. Borel and is not part of the stream system.

MR. VEEDER:  Your Honor, I have looked at the U.S.G.S. map in regard to that property and I believe that there is a surface stream there going across the property, and I think it is entirely possible that Mr. Borel being a good farmer one of these days he might put in a check dam and impound the water that is there.  I don't believe that the water to be found there is of the kind and character that your Honor would to be surface water in the sense that that term is used

legally-- in other words, water that just dissipated out over the top of the ground, which does not enter into any surface stream. We were sure this problem would come up and it is here.  We find that on the U.S.G.S. quadrangle which is 29-N there is a stream-- an intermittent stream, but these are all intermittent.

THE COURT:  29-N?

MR. VEEDER:  That is the one that I have, your Honor, if you care to see it.

MR. LITTLEWORTH:  Is this a named stream?

MR. VEEDER:  Yes, I think it is a tributary of Tucalota.

THE COURT:  I don't understand that a stream has to have a name.

MR. LITTLEWORTH:  No.  I just wondered whether it was.

MR. VEEDER:  I have no desire to enter into a stipulation which would deprive Mr. Borel of the right to use water if he wanted to, or to limit us to object if it interfered, in our view, with this stream.

THE COURT:  Well, then, on the showing on Exhibit 29-N-- Mr. Veeder has been fair about this-- the Court would be prepared to make a finding that this land was riparian to a tributary of Tucalota Creek.

Now, whether you would ever make anything out of this would be a serious question, how much water you could impound, and when you could get permission to do it, and all that, and

other bridges that you would have to cross.  But that puts
you in a situation where, if that finding is made, you are
then part of the litigation on the stream.

What about water underneath this property?  Do you
contend that the water is part of the stream system, Mr.
Veeder?

MR. VEEDER:  I will give you my view on that, your Honor.
I think it is quite possible, if I view this correctly, that
the two wells that Mr. Borel has in the Northeast Quarter
of Section 8-- I want to be sure we are all together.  Our
records show that there are two wells there right in the bed
of the creek, and it would seem to me that it is entirely
possible that his pumping could create a cone of depression
which would reduce the surface runoff.

THE COURT:  He hasn't testified to any wells in--

MR. LITTLEWORTH:  Your Honor, there are two small wells
there, and perhaps I should bring this evidence out right
now, then.

THE COURT:  All right.

BY MR. LITTLEWORTH:

Q  Do you have any wells in this Northeast Quarter of
Section 8, Mr. Borel?

A  Yes.

Q  Can you describe them?

A  The type of wells?

Q   Yes, and how deep they are, what kind they are?

A   One of them is an old stock well we had there, about 22 to 24 feet deep, with a 16-inch casing.

Q   Does it have a pump on it?

A   No.  It has a welded lid on it.

Q   It is not used at all?

A   It is not used at all.  And the other one is probably south a hundred yards, 72 feet deep.

Q   Does it have a pump?

A   That has a pump on it.

Q   What kind?

A   It has an old turbine pump in it that we use to pump water in the reservoir up on the hill there.  I think it is a five-horse motor on it.

Q   Do you have a larger horsepower in order to lift the water in that instance?

A   That is right.

Q   Do you know how much water that well produces?

A   Well, the last test we gave it, I think it was about five inches.

Q   Is that water, you say, lifted up to the hill?

A   Yes.

Q   Is it stored there?

A   Yes.

Q   How much is stored?

A   Oh, I don't suppose over an acre foot.

Q   And how is it used?

A   Well, when we did use it we used a booster pump and sprinkled.

Q   You did some irrigating up there?

A   Yes.

Q   How many acres?

A   Well, possibly 40 acres, just sprinkling barley, the dry-land barley-- in other words, just to give it a shot in the arm, hoping it will rain next month.

Q   Are you doing that now?

A   No.

Q   How long has it been since you used the water in that way?

A   I think we used a little last year.

THE COURT:  How long have you been following that method, though?

THE WITNESS:  About ten years now.

BY MR. LITTLEWORTH:

Q   Do you remember when this well was drilled?

A   About ten years ago.

THE COURT:  What is there, a steel casing in that well?

THE WITNESS:  12-inch casing, yes.  But I have always felt it was not-- the reason we don't use it very much, because it is not a paying proposition.

It is not good enough to monkey with.

BY MR. LITTLEWORTH:

Q   How much of that quarter section do you think is irrigable?

A   Oh, I would say 99 percent of it would be.

THE COURT:   Where does this appear on this 15?

MR. SACHSE:   It is up in the residuum, your Honor, up in the gray.

THE WITNESS: Away up above here.

MR. VEEDER:   It will be noted on that, your Honor, that the stream course which appears on your 29-N does not show through on that tracing that you have.

THE COURT:   I am still trying to see where Mr. Little-worth had his finger.  Oh, I see.

None of the alluvium shown in Section 8 is in this Northeast Quarter?

MR. LITTLEWORTH:   I think not, your Honor.

THE COURT:   The alluvium shown in Section 8, a part of Tucalota, Section 8 shown on Exhibit 15-A-- 15-A shows no alluvium in the northeast quarter; is that right?

MR. VEEDER:   That is correct, your Honor.

THE COURT:   What is going to be the position of the parties on this parcel?  Mr. Veeder?

MR. VEEDER:   My own view on it, your Honor, is that I would feel that Mr. Borel is so situated as a riparian there

1   that even though the rights that he has are not of immense

2   value, that they do have some value, and I am not trying--

3   you have asked me a difficult question, your Honor, and I

4   don't want to be attempting to represent Mr. Borel while he

5   has completely competent counsel.  But at the same time I

6   would be reluctant myself to stipulate that that water is

7   not part of the stream system, where I truly think it is.

8        MR. LITTLEWORTH:  This parcel, then, your Honor,

9   apparently does have a tributary to Tucalota, and I think

10   would be legally riparian.  Mr. Borel is going to be in

11   this lawsuit for other parcels, and so it doesn't really

12   help him a great deal to get one piece of his land out.  If

13   this were the only piece of land he owned, there might be some

14   advantage to him to get out and be done with it by a waiver.

15   But he is going to be in here anyway.

16        THE COURT:  All right, then, I would propose to find

17   that the 160 acres is riparian to a tributary to Tucalota

18   Creek, and that the water on the land is part of the stream

19   system.

20        MR. LITTLEWORTH:  Not necessarily the ground water,

21   your Honor.

22        MR. SACHSE:  Before your Honor proposes to make such

23   finding, I would like to have some cross-examination of Col.

24   Bowen on this same parcel.

25        MR. LITTLEWORTH:  Your Honor, I am only referring to

surface water.  This is riparian surfacewise, apparently.
But I don't believe that the ground waters form part of the
stream system.  Actually, there are some elements in the
soil survey which indicate that ground water storage is
negligible on the Borel property.

THE COURT:  Well, there is no objection to a finding
of riparian in character of the soil?

MR. LITTLEWORTH:  No, sir.

THE COURT:  I am not making findings, but just trying
to solve these disputes as we go along.

How much of this would you say was irrigable?  About
all of it?

THE WITNESS:  I would say 99 percent.

MR. VEEDER:  There are some lands, I think, your Honor,
that Mr. Littlworth and I can agree on that will go out.

THE COURT:  All right.

BY MR. LITTLEWORTH:

Q  Let's move on, then, Mr. Borel, to the next parcel
shown on Roripaugh's B.  I am referring now to Section 13,
the Southeast quarter of Section 12, and all of Section 14,
except for the Northwest Quarter, all of these located in
7 South, 2 West.  This land also is not shown in the United
States Soil Survey Report?

A  That is right.

THE COURT:  Now which one are you talking about?

1    MR. LITTLEWORTH:  This one here, your Honor, away over.

2    THE COURT:  In 12, 13 and 14.

3    MR. LITTLEWORTH:  Yes.

4    Q  Now, this land, Mr. Borel, is located north of Buck

5    Mesa, is it?

6    A  Yes.

7    Q  You have 1280 acres there, approximately?

8    A  That is right.

9    Q  What do you do with it now?

10   A  Dry farm it.

11   Q  How much of that 1280 acres is irrigable?

12   A  Oh, I don't know, a thousand acres, maybe.

13   Q  How does the water drain from that land?

14   A  It drains two ways.  It drains to Tucalota, and

15   it also drains to the Santa Gertrudis.

16   Q  Do either of those two streams run across any of

17   that land?

18   A  Well, at the beginning of the Santa Gertrudis, I

19   would say-- I don't know, in that area.

20   Q  One of the tributaries to the Santa Gertrudis.  Do

21   you have any wells on that property?

22   A  Two windmill wells-- domestic and cattle-stock.

23   Q  Are they indicated one in the middle of Section 14

24   down near-- or two of them?

25   A  No, one there.

1   Q   One on Section 14 down near the bottom?

2   A   Yes.

3   Q   Where is the other one?

4   A   On Section 13 in the Southeast corner.

5   Q   They are used for stock purposes now?

6   A   Stock purposes and one domestic.

7   THE COURT:  How many on 13?

8   THE WITNESS:  One.

9   MR. LITTLEWORTH:  One in the far southeast corner of

10  13, and one about in the middle of 14 at the bottom.  It is

11  marked on the map.

12  THE COURT:  Col. Bowen, you are 15-A.  Where is that--

13  up in the residuum?

14  COL. BOWEN:  Yes, sir.  Take Section 13, three-quarters

15  of Section 14, and the southeast of 12, all in the residuum

16  or basement complex, as shown on 15-A.

17  MR. LITTLEWORTH:  That apparently also is riparian,

18  then, your Honor, at least as far as surface water is con-

19  cerned.

20  Q   Mr. Borel, let's look at this other section on

21  Roripaugh's B, which is found in Section 6, 7 South, 2 West.

22  Do you own all of the Southwest Quarter of that section?

23  A   I do.

24  Q   The map indicates that there is a little corner

25  section which is not owned by you; is that incorrect?

A   That is incorrect.

MR. LITTLEWORTH:  Your Honor, we have the deed to that property, which indicates that the full quarter section is owned, but there is a mistake on the map, and I wonder if we might show the deed to the United States and then make the correction at some later time.

THE COURT:  Show the deed to the United States and make the correction later.

MR. VEEDER:  That will be satisfactory, your Honor.

THE COURT:  You also own the Southeast Quarter of the Northwest quarter; is that right?

THE WITNESS:  Yes, sir.

BY MR. LITTLEWORTH:

Q   How many acres in that parcel?

A   Approximately 200.

Q   What do you do with that land now?

A   We dry farm about a hundred acres of it, and the rest is pasture land.

Q   That is, grazing land?

A   Yes.

Q   You don't irrigate any of it?

A   No.

Q   How many acres of that parcel are irrigable?

A   Oh, I would say a hundred, a hundred and twenty-five acres.

1    Q   Does the east fork of Warm Springs Creek run through

2   that property?

3    A   Yes.

4    Q   Are there any wells on it?

5    A   No.

6    Q   Incidentally, is that east fork of Warm Springs

7   known locally as French Creek?

8    A   That is right.

9    Q   Did you at one time, Mr. Borel, file an application

10  with the State to make a surface diversion of 200 acre-feet

11  from that land?

12   A   Yes.

13   Q   Was that filed in 1950?

14   A   Somewhere along there.

15   Q   Application No. 13577?

16   A   Yes.

17   Q   Was there a hearing held on it?

18   A   I believe there was.

19   Q   Did you ever receive a permit to make any diversion?

20   A   No.

21   Q   And have you made any surface diversion?

22   A   No.

23  THE COURT:  Your application was turned down?

24  THE WITNESS:  Yes.  Well, it was turned down by the

25  Vail Company and Pendleton.  That is where the buck come from.

THE COURT:  It was turned down by the State WaterBoard?

THE WITNESS:  I don't know.

MR. LITTLEWORTH:  Yes, Mr. Borel.

MR. VEEDER:  What did counsel say?  Yes, the State Water Rights Board turned down Mr. Borel?

MR. LITLEWORTH:  I understand it was denied.

THE COURT:  On the objection of Vail and the Government.

BY MR. LITTLEWORTH:

Q  Is there a spring on that land?

A  Yes.

Q  Do you use that now?

A  For stock water.

Q  Do you impound any of it in a reservoir?

A  There is a little reservoir there that the spring is in about 30 feet square and about four feet deep.

Q  How long has that been there?

A  Ever since I can remember.

Q  At least since 1920, we will say?

A  Oh, yes.

Q  And has the water been impounded continuously since that time?

A  Yes.

Q  And used continuously for watering stock?

A  Yes, and a little domestic at one time.

Q  Now, looking again at Roripaugh's B, Mr. Borel, do

you also own the northerly half or portion of the northerly

half of Section 7?

A  Yes.

Q  This is not colored on the map?

A  That is right.

MR. LITTLEWORTH: Again, your Honor, this is an acquisi-

tion which has been made.  I have the deed, and I would like

to have permission to plot it on the map at a later time.

THE COURT:  All right.  Tell me now how much of that.

MR. LITTLEWORTH:  It is the northeast quarter of the

section, your Honor, and then there is the portion of the

northwest quarter lying easterly of the road, except where the

road bends the line continuously straight on up to the

northerly line of the section.

MR. VEEDER:  Counsel, are you amending your pleadings

to embrace these tracts?

MR. LITTLEWORTH:  No, sir.  This particular section is

included in the Answer.  It is on page 2 of the Answer to

the Amendatory and Supplemental Complaint, Mr. Veeder.

However, it was not indicated on this map through an inad-

vertence.

MR. VEEDER:  In regard to the other parcel of land,

concerning which you just showed me a deed, in the first

instance was that included in the pleading?  I haven't had an

opportunity to check it.

1    MR. LITTLEWORTH:  Yes, that is included in the pleadings,

2   but for some reason the pleading includes an exception, which

3   was therefore plotted by cutting out this corner.  Mr. Borel

4   told me this was not correct.  We got the deed out and I don't

5   know why the Answer showed an exception.  He has title to

6   the whole land.  It was an old answer filed by previous

7   counsel.

8        THE COURT:  Tell me again, what portion of the North-

9   west Quarter does he own?

10       MR. LITTLEWORTH:  He owns the portion lying easterly

11  of the road, Winchester Road, except that as the road makes

12  a sharp bend in a northeasterly direction his property line

13  follows straight on up along the line of the road.

14       THE COURT:  How many acres in that Northwest Quarter

15  of Section 7?

16       THE WITNESS:  Approximately 280-- I beg your pardon.

17       THE COURT:  Altogether?

18       THE WITNESS:  Altogether there is about 280, according

19  to the deed, somewhere along there.

20  BY MR. LITTLEWORTH:

21       Q  How much of that land is irrigable?

22       A  Oh, 95% of it, I suppose.

23       Q  Do you dry farm that land now?

24       A  Yes.

25       Q  Is there any water developed on that parcel?

A   No.

Q   Are there any surface water streams that you can see on that parcel?

A   No.  It drains two ways.

Q   How does the water drain?

A   It drains two ways.  It drains toward the WarmSprings Creek, and it drains toward Tucalota Creek.

MR. LITTLEWORTH:  29-A, your Honor, apparently indicates that there are, again, some of the small tributaries to some of the other streams on this property.

MR. VEEDER:  Counsel, I think it would be better to check that citation of yours once more, just to be sure.  You said 29-A, didn't you?

MR. LITTLEWORTH:  I thought that was what you said.

MR. VEEDER:  I thought it was 29-N, but I would rather verify it.

MR. LITTLEWORTH:  Yes.

THE COURT:  I have 29-N in front of me.

MR. VEEDER:  I think that is not far enough up, your Honor.

MR. LITTLEWORTH:  This would be inthe north half of Section 7.

MR. VEEDER:  Right here.

THE COURT:  Is this Section 7 down here?

THE WITNESS:  Yes, this would be it.

15,749

THE COURT:  It is this part here?

THE WITNESS:  This part in here.

THE COURT:  It looks like it is in the Murrieta Quadrangle.

Take a short recess.  I think you can look it up.

(Recess.)

MR. VEEDER:  Your Honor, I have the pre-trial order prepared for your signature.  May I hand them up to you?

THE COURT:  Yes.

Did you look this over, Mr. Littleworth?

MR. LITTLEWORTH:  Yes, I have, your Honor.

MR. VEEDER:  We have made some slight revisions of the original draft, and they have been incorporated in this re-write.

MR. STAHLMAN:  May I have a copy?

THE COURT:  File it, Mr. Clerk.

MR. LITTLEWORTH:  The quad sheet I was referring to, your Honor, is 29-J, and it indicates that there is one of the small tributaries to, I believe, Warm Springs Creek which goes through that upper portion of Section 7.

THE COURT:  Where is Section 7 on this quad you handed me?  On the right-hand side?

THE WITNESS:  Right here (indicating).

THE COURT:  In other words, to look at this Section 7, we have to look at both maps, don't we?

1        THE WITNESS:  Yes.

2        MR. VEEDER:  When your Honor says both maps--

3        THE COURT:  29-J and 29-M.

4        It is going to be your contention that the property

5   owned in Section 7 by Mr. Borel and his wife is riparian?

6        MR. LITTLEWORTH:  I think the surface waters are, your

7   Honor.  Now this is the thing Mr. Veeder and I just discussed

8   a moment ago, and maybe we can discuss it a little more care-

9   fully.

10       It is our opinion that the ground waters in much of the

11  Borel property do not form part of the stream system, and that

12  in the surface rights the riparian surface rights are of very

13  little value there-- these illusory rights where water only

14  flows at a certain time, and you can't really use the water

15  unless you impound it-- and I would hope that we could elimin-

16  ate some of this Borel acreage.

17       THE COURT:  You discuss it after court tonight.

18       Mr. Borel, all this property you have been describing

19  is owned by you and your wife?

20       THE WITNESS:  That is right.

21  BY MR. LITTLEWORTH:

22       Q  There is no water developed on this parcel we are

23  talking about, the North Half of Section 7?

24       A  No.

25       Q  Do you also own some town lots in the Townsite of

1    Murrieta?

2         A   Temecula.

3         Q   Six of them are described in your Answer, are they?

4         A   Five or six.  I don't know just what it is.

5    MR. LITTLEWORTH:  I should correct that.  There are five.

6    THE COURT:  That is owned by you and your wife?

7    THE WITNESS:  Yes, sir.

8    BY MR. LITTLEWORTH:

9         Q   Those are Lots 12, 13, 14, 15 and 16, in Block 29

10   of the Townsite of Temecula?

11        A   That is right.

12        Q   What is located on that land?

13        A   A store building, a well.

14        Q   You have one well?

15        A   One little well, yes.

16        Q   Is it a domestic well?

17        A   Domestic well.

18        Q   Do you know how deep it is?

19        A   140, I believe, approximately.

20        Q   What kind of pump?

21        A   One-horse jet pump-- or a half-horse jet pump, I

22   believe it is.

23        Q   When was that well drilled, approximately?

24        A   Oh, about 1955, along in there.

25        Q   Was there any source of water for this property prior

1    to that time?

2        A  Yes.

3        Q  Was this well a replacement well then?

4        A  Yes.

5        Q  When was the first well drilled?

6        A  I wouldn't know that.  It had been there quite some

7    time before.

         MR. LITTLEWORTH:  I think those are the only questions

9    we have right now, your Honor.


                        CROSS-EXAMINATION

12   BY MR. VEEDER:

         Q  How many tons of alfalfa do you get up in that area

14   where you say you have eight to ten acres of irrigated land?

15       A  We used to try to get two cuttings of alfalfa and

16   one crop of seed and then some pasture off of it.

         Q  What would be your irrigation season?  When would

18   you start irrigating?

19       A  When did we start irrigating?

20       Q  Yes.

21       A  In the spring of the year, whenever it was necessary.

22       THE COURT:  These eight to ten acres were located in--

23       THE WITNESS: Section 8, Southwest Quarter.

24   BY MR. VEEDER:

25       Q  What month would you start irrigating?

1     A  Well, sometimes we started in February, maybe January;

2  depends upon the season.

3     Q  In other words, it is quite possible you would

4  irrigate the year around; is that right?

5     A  Sir?

6     Q  Did you ever irrigate the year around?

7     A  No.

8     Q  What would be the months that you didn't irrigate,

9  then?

10    A  Well, it would be from generally the month of

11  November, December, January, maybe February; depends on the

12  weather.

13    Q  How long did it take your crop of seed to mature?

14    A  I think approximately three months.

15    Q  In other words, you would get two cuttings, and then

16  you would let the alfalfa grow and go to seed?

17    A  That is right.

18    Q  And that has been your standard practice?

19    A  That has been one of the practices, yes, unless there

20  is a little shortage of water and couldn't keep it irrigated

21  properly to let it go to seed.

22    Q  Did you measure the quantity of water that was

23  applied to your land at any time?

24    A  No.

25    Q  What were your means of irrigation-- rill or sprinklers

or what did you use?

A   Well, prior to 1946 it was all flood irrigated, and after 1946 when they put in power in there we startes sprinkling.

Q   You impound the water and build up a head and then irrigate that way; is that what you do?

A   That is right.

Q   And that is actually the only irrigation that you have up in that area?

A   That is right.

Q   Throughout all the lands that you own?

A   Excepting that we have irrigated a littleup in that northeast quarter of Section 8.

Q   Northeast Quarter of Section 8?

A   Yes.

Q   And what was the source of the water for that?

A   That was that well.

Q   It was from a well?

A   From a well, yes.

Q   In this adobe spring from which you made an application to appropriate water that was denied you, the permit was denied, did you ever undertake to irrigate from that source?

A   No.

MR. VEEDER:   I have no further questions.

MR. LITTLEWORTH:   That is all, Mr. Borel.

THE COURT:   You may step down, Mr. Borel.

MR. VEEDER:  Call Col. Bowen.


ALLEN C. BOWEN,

recalled as a witness in behalf of the plaintiff, having been

previously duly sworn, testified further as follows:


FURTHER DIRECT EXAMINATION

MR. VEEDER:  The next number, Mr. Clerk.

THE CLERK:  The next number in order is 170.

THE COURT:  Exhibit 170 marked for Identification.

THE WITNESS:  We already have it marked 169, your Honor.

MR. VEEDER:  Where was that?

THE WITNESS:  Here on the witness stand, Mr. Veeder.

BY MR. VEEDER:

Q  Could you state into the record whether this engineer-

ing report that you prepared for Alexander F. Borel was

prepared under your direction?

A  It was.

Q  And in your opinion is it correct from the standpoint

of the technical investigation that has been made?

A  Yes, sir.

MR. VEEDER:  I will ask to have marked for identification

the Exhibit 170.

THE COURT:  No, 169-A.  Is this the map?

MR. VEEDER:  Your Honor, this is the one that we are

going to ask to have withdrawn, and we have marked the ones we

are going to withdraw.

THE COURT:  You don't have a separate map for this piece?

MR. VEEDER:  That is correct.

THE COURT:  All right, then, 170.

(Map marked Plaintiff's Exhibit No. 170 for Identifica-

tion.)

BY MR. VEEDER:

Q   Col. Bowen, I hand you Plaintiff's Exhibit marked

170 for Identification and ask you to state into the record

what is shown on that identification.

A   Plaintiff's Exhibit 170 for Identification is an

enlargement of vertical aerial photograph 3-0069.  It was

made in March, 1955.  Within the green lines drawn on the

face of that photographic enlargment are soil sites and

property boundaries.  The sites are symbolized with the

fractional symbols, and the township, range and section

numbers appear, and the numbers of adjoining photographs

appear around the margin of the green line.

Q   Would you correlate that with Plaintiff's Exhibit

marked for Identification 169?

A   Yes, sir.  Plaintiff's Exhibit 170 for Identification

is the field sheet upon which the survey was made, copies of

which appear in 169 for Identification.  There are two

photographic prints in 169, one of which shows the Southwest

Quarter of Section 8, Township 7 South, Range 2 West, and the other shows the Northwest Quarter of Section 18, Township 7 South, Range 2 West.   These copies that appear in 169 are photographic copies of those properties as they appear in 170.

THE COURT:  Which is Section 18-- Here?

THE WITNESS:  Yes, sir.

THE COURT:  And 8 is--

THE WITNESS:  The section corner, your Honor, the southwest corner of Section 8 appears on the face of the photograph, and the Southwest Quarter of Section 8 appears with the blue symbol for reservoir approximately in the center on 170.

THE COURT:  All right.

MR. VEEDER:  We offer 170 and 169 in evidence.

THE COURT:  Received in evidence.

(Plaintiff's Exhibits 169 and 170 were received in evidence.)

MR. VEEDER:  I have no further questions.


CROSS-EXAMINATION

BY MR. LITTLEWORTH:

Q  Col. Bowen, looking at page 2 of your report, Exhibit 169, the first paragraph reads, in part:  "The basement complex, owing to its crystaline nature, precludes ground water

storage, although water may occur locally coursing along

joints or fractures." You are referring there to the South-

west Quarter of Section 8 and the Northwest Quarter of Section

18, both in 7 South, 2 West; is that correct?

THE COURT:  It would be the Northwest Quarter of 18.

MR. LITTLEWORTH:  Northwest Quarter of 18 and the

Southwest of 8.

THE WITNESS:  7 South, 2 West; that is correct, sir.

BY MR. LITTLEWORTH:

Q  Are the ground waters that you refer to as locally

coursing along joints or fractures, in your opinion, part of

the waters of the Santa Margarita River or its tributaries?

A  In my opinion, the water, if any, in those cracks

and fractures in the basement complex are not a part of the

Santa Margarita River stream system.

Q  Would you  say that such ground water as is found

on those two parcels would be local vagrant percolating

ground water?

A  With the exception of the ground water found in the

alluvium bordering Tucalota Creek.

Q  You also state in that same paragraph that the

alluvium which is present along Tucalota Creek is unimportant

as regards storage.  How thick is the alluvium there?

MR. VEEDER:  I object.  That goes beyond the point of

the soil survey report.  There is nothing to indicate that

there is a general thickness.  It can vary from the center of the stream to the upper edges of the stream.  So I don't see how there could possibly be a response to that question.

MR. LITTLEWORTH:  Your Honor, I think he can indicate generally whether this is just a thin mantle of alluvium, or whether there is some younger alluvium up there of any consequence.

THE COURT:  Yes, he may.  Overruled.

THE WITNESS:  We didn't actually drill the alluvium to determine the thickness, but there is every evidence up there that it is thin.

BY MR. LITTLEWORTH:

Q  Can you give me any estimate of what you mean by "thin"?

A  10 to 20 feet.

Q  Do you have an opinion, Col. Bowen, as to whether a well, if it were drilled squarely in the center of that alluvium, would have any material effect on the flow of the Santa Margarita River, say, at the Gorge?

MR. VEEDER:  I object to that question on several grounds.  There is no proper foundation.  It is vague.  It is, in my view, virtually incoherent.  I think you can have a high variety and different kinds of wells.  Perforation would make a great deal of difference.  Others are dug or drilled wells.  There are so many points involved that I

1    would think the question could not be answered.

2         I also raise the additional point that there is no

3    foundation for the question.  This witness has not been

4    qualified on that particular point.

5         The whole proposition is utterly vague as to what would

6    occur at the head of the gorge.  It might be that on this

7    particular single individual well it would be reflected, but

8    in the aggregate of several wells being drilled I think it

9    becomes extremely important.

10        MR. LITTLEWORTH:  I think that if that is the case,

11   Col. Bowen can say so.  But your Honor, now we are touching

12   on what has been one of the real knotty problems in this case.

13   Now, the Colonel has testified that for the most part the

14   ground waters under that section are not part of the stream

15   system, but are local ground waters.

16        MR. VEEDER:  Just a moment, Mr. Littleworth.  I don't

17   believe that the witness testified.  Didn't you ask about

18   cracks and fractures, as to whether that was part of the stream

19   system?

20        MR. LITTLEWORTH:  And I asked him a question as to

21   whether all of the ground waters under both those parcels--

22        MR. VEEDER:  I was unaware that you asked about all of

23   the ground waters.

24        MR. LITTLEWORTH:  And his reply was yes, except for the

25   ground waters in the alluvium.  And then we went on  to find

out that the alluvium is very thin in that area.

Now this raises the question as to whether a well anywhere in that area, even if you put it right in the alluvium, would have any effect, and that is what I am trying to ask the Colonel.

MR. VEEDER:  I still say it is the kind of well you would drill.  There are a thousand different things.

MR. LITTLEWORTH:  I think the Colonel can answer that, if that is the case.  But the report says that the alluvium is relatively unimportant as far as storage is concerned, and he says it is very thin.  What I am trying to find out is whether there is anything that a land owner can do up there which would really have any material effect then on the stream flow, so we might come to the conclusion that all of the ground waters anywhere under those two sections could be found to be not part of the stream system.

MR. VEEDER:  I think it goes beyond the scope of the direct examination.  I will put in another objection.

THE COURT:  What does it say in the report?

MR. LITTLEWORTH:  It says the alluvium is locally present along Tucalota Creek, but confined to the stream channel and unimportant as regards storage.

THE COURT:  The objection is overruled.  Let's get the question formulated again.  What particular parts are you talking about?

MR. LITTLEWORTH:  I am referring now to both these parcels which are included in the report, that is, the Southwest Quarter of 8 and the Northwest Quarter of 18.  The same conclusions are drawn as to both of them in the report.

THE COURT:  It is not the Southwest, is it?

MR. LITTLEWORTH:  Yes, the Southwest of Section 8 and the Northwest of 18 are the two parcels which are included in this report.  Tucalota Creek traverses both of them.

Q  What I want to know is whether a well drilled into the younger alluvium in either of those parcels would have an effect on the stream system, Col. Bowen.

A  Yes, sir, it would have a significant effect on low flow.

Q  Can you tell us what you mean by "significant"?

A  Yes, sir.  It could be so significant that in a low enough stage of the stream flow the alluvium might absorb the entire flow, if the alluvium had been dewatered by a well.

Q  You think this would be true of a single well, if it were drilled into the alluvium?

A  Well, a single well would dewater a portion of the alluvium.  The alluvium is more absorptive than the basement complex that contains it.  Consequently, when it is dewatered and water runs over the surface it tends to percolate into the alluvium fill and fill up these voids from which the water was removed by the pump.

1      Q   How can you say it would have a significant effect when

2   you say, however, that the storage in that area is unimportant?

3      A   I said it would be significant for low flow.

4      Q   Well, there is not very much ground water stored in

5   that alluvium, is there?

6      A   No, sir, the volume of the alluvium is relatively

7   small.

8      Q   Then if you take the ground water out of that

9   alluvium, can you really have a significant effect then upon the

10   stream flow?

11      MR. VEEDER:   I object to that as being argumentative,

12   your Honor.

13      THE COURT: Sustained.

14   BY MR. LITTLEWORTH:

15      Q   Col. Bowen, do you have any opinion as to whether

16   the ground waters under any other of the parcels of the Borel

17   land shown on Roripaugh's B are a part of the Santa Margarita

18   River and its tributaries?

19      MR. VEEDER:   I am going to ask that reference be made to

20   the specific parcels to which the inquiry is directed.   They

21   are scattered throughout the entire watershed.

22      MR. LITTLEWORTH:   That is why I asked him whether he had

23   an opinion on any of them, because they are not included in his

24   report. If he hasn't an opinion on any of them, we will not

25   go any further.

THE COURT:  Do you know where the other parcels are that are marked 25 on the map?

THE WITNESS:  Yes, your Honor.

THE COURT:  Including the addition of a 40 to the Southwest Quarter of Section 6, which was omitted, we are told by error, and including the property in the Northeast Quarter of Section 7 and a portion of the Northwest Quarter of 7, which we were told about today?

THE WITNESS: Yes, sir.

THE COURT:  Can you answer the question?

THE WITNESS: Yes, sir.

THE COURT:  What is it?

THE WITNESS:  I have an opinion.

THE COURT:  What is your opinion?

MR. LITTLEWORTH:  What is your opinion?

THE WITNESS:  If I may approach this exhibit, your Honor.

THE COURT:  Yes, sir.

THE WITNESS:  I will do so.

Referring to Plaintiff's Exhibit 15-A, it is noted that the remainder of the Borel property, as depicted on Plaintiff's Exhibit Roripaugh B, with the additions made by your Honor, that those properties are thoroughly underlain by residuum or basement complex, with the minor exception of an area in the Southwest corner of Section 14, Township 7 South, Range

2 West, and that on 15-A shows contact between older alluvium and residuum.

It is my opinion that the ground waters in the residuum and basement complex are present only in the cracks and fissures which exist in that crystaline rock are local, vagrant percolating and not part of the stream system.

As regards that small portion of older alluvium in the southwest corner of Section 14, it is very thin in that area. However, any water that would be present in that, in my opinion, would be in hydraulic continuity with any water throughout the older alluvium.

BY MR. LITTLEWORTH:

Q  Now, Col. Bowen, your testimony now is relating to all of the Borel lands shown on Roripaugh's B, with the exception of the Southwest Quarter of Section 8 and the Northwest Quarter of 18, to which you have earlier testified?

A  That is correct.

Q  And it is your conclusion, then, with the exception of this small bit of alluvium in Section 14, that all of the ground waters under those lands are local incharacter and do not form part of the stream system?

A  That is my opinion.

MR. LITTLEWORTH:  I think that is all, your Honor.

MR. VEEDER:  I have no questions.

THE COURT:  Will you show me on the map where the

1  property is?

2      THE WITNESS:  It is all in Section 13, your Honor, the

3  Southeast quarter of 12.

4      THE COURT:  Southeast?

5      THE WITNESS:  Yes.

6      THE COURT:  Southeast Half?

7      THE WITNESS: Southeast Quarter, sir.

8      THE COURT:  All right.

9      THE WITNESS:  The South Half of 14 and the Northeast

10  Quarter of 14.

11      MR. LITTLEWORTH:  Did you have any questions?

12      MR. GIRARD:  No.

13      MR. VEEDER:  No one else has any questions.

14      MR. LITTLEWORTH:  Your Honor, I would like to proceed

15  next with Mr. Reyes' property.  He is not here, but we have in

16  our office talked with him, and he is in agreement with the

17  findings of the soil survey, and actually his land has been

18  farmed for some twenty years by Mr. Borel.  I think Mr. Borel

19  can probably tell us about the character of the land better

20  than Mr. Reyes can.

21      THE COURT:  All right.

22      Now, before you leave Borel, Mr. Veeder, are you going

23  to object to a finding in line with Col. Bowen's testimony

24  concerning ground water on the Borel property?

25      MR. VEEDER:  I look at it this way, your Honor.  We

are conducting, and Col. Bowen has proceeded in conducting,

further investigation in regard to ground waters, particularly

directed to the matter of rebuttal.  I would be reluctant at

this moment to respond yes or no to your Honor's question

until I go into it further.  I don't believe it will delay

the matter at all in anyway.

THE COURT:  When will this rebuttal come in, if at all?

MR. VEEDER:  It will come, I assume, when everyone has

rested and the United States puts in the investigations that

are going on today.

MR. STAHLMAN:  The United States hasn't rested yet.

MR. VEEDER:  I say when all parties have rested.  I

have particularly in mind the Vail Company, your Honor.  These

are important factors, and as I say, I would prefer not to

make a response at this time.

THE COURT:  Well, in the absence of further testimony,

I would be inclined to find in accordance with Col. Bowen's

testimony, first, as to the two parcels, the 160 acres in

Section 18 and 160 acres in Section 8, that the only portions

of those sections that have any water as part of the stream

is this thin layer of alluvium.  The rest of the property is

only vagrant, percolating water or water in cracks and fissures

which are not part of the stream system.  That as to all of

the remaining portions of the Borel property, except the very

southernmost strip along the bottom of the Southwest Quarter

of Section 14, they are all in the residuum, and that there
is nothing but vagrant, percolating water-- well there probably
isn't any water, except in the cracks and fissures, and that
that is not part of the stream system, with the exception that
one portion of the bottom part of Southwest Quarter of Section
14, which is almost a matter of de minimis because it is at the
joinder of the residuum and the older alluvium.

MR. VEEDER:  All I am worried about at this juncture,
your Honor, is the precedent that might come out of a com-
mitment made by me at this time.  I think that Mr. Littleworth
and I will be able to enter into a stipulation in regard to
these parcels which would, I think, be satisfactory to all
parties.  You asked me a very important question, which could
have far-reaching effects on other lands in the litigation.

THE COURT:  I would like, as far as we can, to come to
an understanding as we go along.  If we leave the record as it
is, in the absence of further testimony, I take it you would
have no objection to the finding I would propose to make.

MR. VEEDER:  That is correct; in the absence of other
testimony.

THE COURT:  Let me make this suggestion, while we are
going through these individual pieces-- we have had two of
them today, and we may have another-- it seems to me that you
ought to rather promptly, while the facts are fresh in your
mind, draw up what you would propose to have found as to these,

1    and even if we can't do it formally, get some accord with

2    counsel as we go along on the state of the record as it now

3    stands.

4         MR. LITTLEWORTH:  I think that would be wise.

5         THE COURT:  Would that be asking too much?  Or would you

6    rather go over the typewritten record and do it later?

7         MR. VEEDER:  My experience is that it is easier to go

8    over the full record.  But if counsel will submit to me what

9    he considers a good set of findings, it would probably be

10   helpful.

11        MR. LITTLEWORTH:  Ithink we would prefer to make some

12   tentative findings at the conclusion of this testimony-- I

13   mean, draw them up.

14        THE COURT:  Draw up a document and say that in the

15   absence of further evidence to the contrary this is about what

16   the Court expects to find, and we would sort of heal these

17   matters up as we went along, subject of course to what the

18   Government's position might be in the event the Court's ruling

19   might be favorable to Vail, in which event, I take it, the

20   Government would pull out all stops.

21        MR. VEEDER:  Any stops that are in, your Honor, would be

22   pulled out.

23        You have raised a point, and I was going to wait until

24   the morning to bring it up.  But here is the situation we have

25   in the Office of the Ground Water Resources.  In working out

1  the titles for these maps of land ownership, we have gone

2  through and found that in quite a number of instances, in

3  the case of the Ceas property-- I don't believe that the

4  Borel property is necessarily involved in this situation--

5  but in the case of the Roripaugh property, most assuredly,

6  we will offer in evidence these plates that have been prepared

7  in the Office of Ground Water Resources for title purposes.

8  I think it might be helpful to Mr. Littleworth to go through

9  these with us, because I believe that some of the land you

10  are asserting to be riparian will be shown by these plates

11  to be non-riparian, and we would put this into evidence and

12  you would have them to check it out.  I think the evidence will

13  show that some of your land is not riparian.  I am not

14  switching you off the subject.  I think I am on the subject,

15  because you might want to look at it this evening.  I can have

16  it marked for identification now, if that would be helpful

17  to you.

18      MR. LITTLEWORTH:  I think, Mr. Veeder, I would rather

19  wait and let you put this in as part of your rebuttal case,

20  as we discussed earlier.

21      MR. VEEDER:  I just wanted to notify you of the course

22  we are going to adopt on these matters.

23      MR. LITTLEWORTH:  That will give us a little time to

24  check these out.  I wouldn't be able to do it tonight very

25  well.

1          I think, also, on the question of what lands are

2   riparian, we are faced with defining, first, where some of

3   these basins are.  I think the law is pretty clear that land

4   which may not abut on a surface stream but which overlies an

5   underground basin which the Court finds to be part of the

6   stream system is, indeed, riparian as fully as though it

7   touches on the surface.

8          THE COURT:  That doesn't concern Borel.

9          MR. LITTLEWORTH:  No.  This is the problem that Mr.

10  Veeder is now raising about some of our people.  And whether

11  or not land is riparian also depends to a certain extent on

12  what the Court finally finds are waters which support the

13  stream flow and are part of the stream.

14         THE COURT:  Go ahead with Ceas.

15         MR. LITTLEWORTH:  I think we are going on with Reyes,

16  your Honor.  He will be very brief.

17

18                 ALEXANDER F. BOREL,

19  having been previously duly sworn, recalled, on his oath was

20  examined and testified further as follows:

21         THE COURT:  What is Reyes' full name?

22         MR. LITTLEWORTH:  Antonio N. Reyes, your Honor.

23         THE COURT:  Does this man Reyes have a wife who is

24  involved also?

25         MR. LITTLEWORTH:  No, your Honor, the Answer is in his

1   name alone.

2   THE COURT:  And that is Parcel 48 on Roripaugh's B?

3   MR. VEEDER:  The engineering report should be identified,

4   Mr. Littleworth.

5   MR. LITTLEWORTH:  Yes.

6   Would you mark the report.

7   THE CLERK:  171.

8   THE COURT:  171 for Identification.

9   (Engineering Report marked Plaintiff's Exhibit No. 171

10  for Identification.)

11

12                    DIRECT EXAMINATION

13  BY MR. LITTLEWORTH:

14  Q  Mr. Borel, is Mr. Reyes the owner of the property

15  which appears as Parcel No. 48 on Roripaugh's B, located in the

16  Northwest Quarter of Section 8, Township 7 South, 2 West?

17  A  Yes.

18  Q  Have you farmed that land?

19  A  Yes.

20  Q  For how long?

21  A  Oh, approximately thirty years.

22  Q  Have you examined the United States' report,

23  Exhibit 171 for Identification?

24  A  Yes.

25  Q  This report shows that there are 160 acres there,

1      of which 143.9 are irrigable; is that correct?

2          A   That sounds approximately right.

3          Q   Is that land all dry farmed?

4          A   Yes.

5          Q   Is there any water on the property at all?

6          A   One dug well there, approximately 40 feet deep.

7          Q   When was it dug?

8          A   It was there as far back as I can remember.

9          Q   Is it used now?

10         A   For stock water only.

11         Q   Does it have a pump of any kind on it?

12         A   It had a windmill on it.  The windmill blew over.  I

13     think there is just a pump jack on it now.

14         THE COURT:  How much did you say was irrigable?

15         MR. LITTLEWORTH:  143.9 is in the report, your Honor.

16         Q   Is this well used only, then, for stock purposes now?

17         A   That is right.

18         Q   Do you know of any surface stream that runs through

19     that property?

20         A   No; only a very small stream that comes into Tucalota

21         Q   You say one of the tributaries of Tucalota is there?

22         A   That is right; very small.  I believe it originates

23     on it.

24         MR. LITTLEWORTH:  That's all.

25         MR. VEEDER:  I believe your Honor has the U.S.G.S. map

1       on that.

2               THE COURT:  Yes, it is Exhibit 29-N, Northwest Quarter

3       of Section 8, Township 7 South, Range 2 West.

4               MR. LITTLEWORTH:  That's all, Mr. Borel.

5               MR. VEEDER:  I have no questions.

6               I will call Col. Bowen.

7

8                           ALLEN C. BOWEN,

9       having been previously duly sworn, recalled as a witness

10      on behalf of the Plaintiff, testified further as follows:

11

12                      FURTHER DIRECT EXAMINATION

13      BY MR. VEEDER:

14              Q  Col. Bowen, I hand you Plaintiff's Exhibit marked

15      171 for Identification and ask you to state into the record

16      of what that identification is composed.

17              A  Exhibit 171 for Identification is a copy of an

18      engineering report prepared for the property of Anthony M.

19      Reyes.

20              Q  Under whose direction was that prepared?

21              A  Under my direction.

22              Q  Are the statements contained in that report correct

23      to your personal knowledge?

24              A  Yes, sir.

25              MR. VEEDER:  We offer in evidence the Identification

marked 171.

MR. LITTLEWORTH:  No objection.

THE COURT:  Exhibit 171 received in evidence.

(Plaintiff's Exhibit No. 171 was received in evidence.)

MR. VEEDER:  I have no further questions.


CROSS-EXAMINATION

BY MR. LITTLEWORTH:

Q  Col. Bowen, page 1 of the report states, "Ground water storage is negligible on the property because the residuum deposits are thin.  The crystaline nature of the underlying granodiorite precludes ground water storage." Do you have an opinion as to whether the ground water under that land is part of the Santa Margarita River and its tributaries?

A  Yes, I do.

Q  What is that opinion?

A  Referring to Plaintiff's Exhibit 15-A, it is noted that the Northwest Quarter of Section 8, Township 7 South, Range 2 West, is underlain by basement complex, symbolized as residuum and basement complex, and water, if any, found in that formation, in my opinion, would only be in the cracks and fissures of the crystaline rock and is local, vagrant, percolating and not part of the stream system.

Q  Would that opinion apply to all ground waters under

that parcel of land?

A   Yes, sir, if there is any there, it would apply to all.

MR. LITTLEWORTH:   That is all.


REDIRECT EXAMINATION

BY MR. VEEDER:

Q   Do you have knowledge, Colonel, as to the depth of the residuum in that area?

A   I have general knowledge of the depth of the residuum throughout that area, Mr. Veeder, as observed in the cut when the aqueduct went through.

THE COURT:   What was that depth of the residuum?

A   About 20 feet, your Honor.

BY MR. VEEDER:

Q   And would you say that would be applicable in this particular tract?

A   I would say it would be no more than that because of the evidence of relatively unweathered basement complex thrusting up through the residuum.

MR. VEEDER:   I have no further questions.

THE COURT:   You see, this illustrates now how long any computation could be of irrigable land.  Here we have had a series of 160-acre pieces which are clearly many of them irrigable.  But there is no possibility of any appreciable

1    amount of water ever being saved or stored to irrigate them.

2    So suppose the Government is interested in adding up how

3    much irrigable land there is in the watershed.  If you are

4    going to make any accurate presentation, pieces like this

5    would have to be eliminated entirely.  Here is a piece that,

6    if Reyes gets any amount of water on his property, he is just

7    lucky, and even on the surface water if he ever got permission

8    to store the amount he could store would be so negligible it

9    wouldn't amount to anything.  So in any calculation this has

10   to go in, under the testimony, as riparian ground, it has to

11   go in as having 143.9 acres as being irrigable.  But as a

12   practical matter, in any sensible computation both ought to

13   be crossed off as having any effect on the water system.

14        Is that agreed?

15        This is how erroneous a compilation could be.  You

16   multiply this by 100 and you have got 16,000 acres, just

17   taking a rough figure, that would be listed as riparian and

18   irrigable, and yet in any honest computation to be considered

19   by the Government or some congressional committee in connec-

20   tion with the demands made upon the stream, this ought to go

21   out.  It just doesn't figure in the stream system.

22        MR. VEEDER:  I believe, your Honor, in that regard,

23   that there will be areas such as these where the quantity

24   of water available is negligible.  I also believe that in

25   other areas a chronicling of irrigable acreage is absolutely

1   essential.

2        I am speaking now actually for all water users in the

3   area.  It may be that there will be no possibility of any

4   impoundment of water there at a future date.  I don't know.

5   I do know that my experience has been on several occasions

6   where people have failed to appear, failed to prove up, failed

7   to claim right-- I am thinking of the Walker River case right

8   now.  The water, it is true, is negligible.  But at the same

9   time if a man wanted to utilize it for a place to spend a

10  few days on a weekend or something like that, it would be

11  important for him to be able to put in an impounding structure

12  and impound some water.  You say he would be forced to go

13  to the State Engineer's Office.  I am not going to argue that.

14  I am saying that my feeling is that to simply arbitrarily

15  eliminate these people could be very prejudicial to them.

16        THE COURT:  You and I are not talking about the same

17  thing.

18        MR. VEEDER:  I thought that was what your Honor was

19  leading up to.

20        THE COURT:  No, I am just directing my attention to what

21  I think is your intention to have cataloged as part of the

22  stream system the amount of riparian land, the irrigable

23  acres and the water duty, and if you are going to catalog

24  stuff like that you ought to put a big Roman "I" after that,

25  meaning illusory, because it would show as 160 acres riparian

1   land and it would show as 144 acres of irrigable land and in

2   any sensible calculation it ought to go out. ·

3       MR. VEEDER:  You can put "H.W."--hog wash.  It might

4   be negligible, I agree with you.  But in regard to other lands--

5       THE COURT:  No, I am not talking about other lands.  I

6   am talking about some of Borel's and Reyes' lands that we

7   heard about today.

8       MR. VEEDER:  I think in regard to some of those Mr.

9   Littleworth and I are going to stipulate on.

10      MR. LITTLEWORTH:  We are waiting.

11      THE COURT:  You can stipulate in the sense that you

12  are going to stand still for a court's finding, but because

13  everybody is adverse, every finding this Court makes must be

14  supported by evidence.  We understand each other on that.

15      MR. VEEDER:  Completely.

16      THE COURT:  All right.  In other words, you can say that

17  you are in agreement on a certain finding, but I make the

18  finding on the basis of what is in the record, and insubstance

19  the Government and Mr. Littleworth stand still while I make

20  the finding.  We understand each other.

21      MR. VEEDER:  This standing still is difficult for me

22  sometimes, your Honor, but I will do my best.

23      THE COURT:  Are we through with Reyes' piece?

24      MR. LITTLEWORTH:  Yes.

25      We are ready, then, I presume, to go on to the next.

1    That is Mr. Ceas.

2         THE COURT:  I am getting tired.

3         MR. LITTLEWORTH:  He is going to be longer than some

4    of the others.

5         MR. SACHSE:  Before you recess, I wanted to state for the

6    record that Mr. Veeder has drafted and I have checked and

7    approved and Mr. Veeder will be presenting to you Inter-

8    locutory Judgment No. 3, I guess, this afternoon or tomorrow

9    morning.

10        MR. VEEDER:  Tomorrow morning.

11        MR. SACHSE:  I just wanted to state for the record that

12   that is entirely satisfactory.  I represent all of the de-

13   fendants involved.  And this is another one of those

14   identical to the last one, with the exception that our method

15   of identifying the parcels is different.  The judgment itself

16   is the same as Judgment No. 2.

17        THE COURT:  Good.  You are making progress.

18        MR. LITTLEWORTH:  We pick up with Ceas then tomorrow?

19        THE COURT:  Yes.

20        MR. STAHLMAN:  I have a matter that we can take up in

21   the morning, your Honor.

22        THE COURT:  There was a motion to substitute parties

23   on the calendar.

24        MR. LITTLEWORTH:  Yes, that was ours.

25        THE COURT:  Any objection to granting that motion?

MR. VEEDER:  Who is going to be substituted?

MR. LITTLEWORTH:  The Rawson Ranch was formerly in an estate.  It is located up in the basement complex area primarily, below Diamond Valley.  It has not been distributed and we represent the purchasers of part of it, and our motion was to be substituted as to the lands which the new purchaser now owns.  Part of the lands have gone to another person.

THE COURT:  This is to substitute the new owners who have come in since the lis pendens was filed?

MR. LITTLEWORTH:  Yes, your Honor.

THE COURT:  And now own portions of this property.  I think they should come in as parties defendant.

MR. VEEDER:  That is correct.

THE COURT:  If there is no objection, the motion of Shipman will be granted.

The motion of Vail Company concerning Hall will go over, then, on the calendar.

MR. STAHLMAN:  Yes.

There is one other matter in relation to the drilling of the Pauba Well.  Mr. Veeder made arrangements for me to see a certain file.  I came down and spent three hours going through a big file in which there was not anything on the Pauba Well.

Doesn't the Eleventh Naval District have a file on the

1  drilling of the Pauba Well?  You gave me certain papers.  They

2  must have come out of a certain file.  I spent practically a

3  whole day on that file.

4      MR. VEEDER:  George, I told you I would make available

5  to you the files that we have, and there we have them.

6      MR. STAHLMAN:  Where did you get the information?

7      MR. VEEDER:  I think the other data you have came

8  from the Cannon files.

9      MR. STAHLMAN:  Doesn't the Eleventh Naval District have

10  a file?

11      MR. VEEDER:  I think you have seen everything there is.

12      MR. STAHLMAN:  It is not in those files you submitted to

13  me.

14      THE COURT:  Let's cooperate a little after court and

15  see if you can find what file Mr. Stahlman is looking for.

16      Mr. Stahlman, are you getting ready to present your

17  case?  Have you been working?

18      MR. STAHLMAN:  I should say so, your Honor; as a matter

19  of fact, I think they kind of cinched me a little on time.  It

20  is a big job we are doing.

21      THE COURT:  I told you two or three months ago to keep

22  working.

23      MR. STAHLMAN:  That was on one phase, on which I met the

24  deadline.  Now we have another one on the 10th.

25      THE COURT:  Adjourn until 9:30 tomorrow morning.

10,783

1          (Adjournment until Wednesday, November 25, 1959, at

2     9:30 A. M.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25