# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al,

Defendants.

No.   1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Wednesday, November 25, 1959

**Pages:**   10,784 to 10,931

FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By

**JOHN SWADER**
Official Reporter
United States District Court
325 West 'F' Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1

2

3

4

5

6

7

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

8

9

10

11

12

13

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
        vs.                    )          No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                Defendants.    )
                               )

14

15

16

17

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Wednesday, November 25, 1959

18

19

20

21

22

APPEARANCES:

        For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                   WILLIAM E. BURBY, ESQ.,
                                   Special Assistants to the
                                   Attorney General,
                                   Department of Justice,
                                   Washington, D. C.

23

24

25

| | |
|---|---|
| For U. S. Navy | LCDR. DONALD W. REDD.<br>LT. CHARLES SALTER. |
| For Defendant Vail<br>Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendants<br>Barnett, et al. | MESSRS. BEST, BEST & KRIEGER,<br>By ARTHUR L. LITTLEWORTH, ESQ. |
| For Defendants<br>Fallbrook Public<br>Utility District,<br>et al. | FRANZ R. SACHSE, ESQ. |
| For Defendant<br>State of California | STANLEY MOSK, ESQ.,<br>Attorney General,<br>By FRED GIRARD, ESQ.,<br>    Deputy Attorney General. |
| For Defendant<br>Murray Schloss<br>Foundation | WALTER GOULD LINCOLN. |

## INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD | RX |
|---|---|---|---|---|
| Allen C. Bowen | 10,815 | | | |
| | 10,852 | 10,853 | | |
| | 10,869 | | | |
| | 10,877 | | | |
| | 10,921 | | | |
| | | | | |
| For the Defendant- | | | | |
| Albert Ceas | 10,794 | 10,807 | | |
| Wesley P. Collins | 10,840 | 10,841 | | |
| Albert Ceas (For Emilie Dixon) | 10,845 | | | |
| Albert Ceas (For Hinkley) | 10,864 | | | |
| Albert Ceas (For Nicholas) | 10,874 | | | |
| Ernest M. Lincoln | 10,882 | 10,894 | | |

1

## INDEX TO EXHIBITS

| Defendant Vail's Exhibit | For Iden. | In Evidence |
|---|---|---|
| AK-1 through 10 | 10,789 | |

Plaintiff's Exhibit:

| | For Iden. | In Evidence |
|---|---|---|
| 172 - ~~Soil Survey~~ *Engineering Report* (Ceas) | 10,795 | 10,819 |
| 173 - Field sheet *Aerial Photographs* | 10,816 | 10,819 |
| 174 - Field sheet *Aerial Photographs* | 10,816 | 10,819 |
| 175 - Field sheet *Aerial Photograph* | 10,816 | 10,819 |
| 176 - Field sheet *Aerial Photographs* | 10,816 | 10,819 |
| 177 - Field sheet *Aerial Photographs* | 10,816 | 10,819 |
| 178 - ~~Soil~~ *Engineering* Report (Dixon) | 10,846 | 10,853 |
| 179 - ~~Soil Survey~~ *Engineering* Report - Hinkley | 10,870 | 10,871 |
| 180 - Engineering Report - Nicholas | 10,877 | 10,878 |
| 181 - Aerial Photo | | 10,879 |
| 182 - Aerial Photo | | 10,879 |
| 183 - Engineering report (Lincoln) | | 10,924 |
| 184 - Aerial Photo | | 10,924 |
| 185 - Aerial Photo | | 10,924 |
| 186 - Aerial Photo | | 10,924 |

10,787

```
 1   San Diego, California, Wednesday, November 25, 1959.   9:30 A.M.
 2
 3         (Other matters.)
 4         THE CLERK:  Four, 1247-SD-C, United States vs. Fallbrook,
 5   et al.
 6         MR. STAHLMAN:  Your Honor, I desire at this time to
 7   lodge, on behalf of Vail, nine letters and documents, all
 8   pertaining to the same subject.  They have reference to the
 9   matter of the letter which Mr. Veeder has previously lodged
10   in regard to withdrawing the protest of the Vail Dam.  I
11   suggest that they be lodged as one exhibit.
12         What is the next Vail exhibit, Mr. Clerk?
13         THE COURT:  Is it satisfactory that the photostats be
14   used in lieu of the original?
15         MR. VEEDER:  Certainly, your Honor.
16         MR. STAHLMAN: I have certification of these, with the
17   exception of two letters, which were taken from the file.  I
18   would like to keep the original photostats.  Most of them were
19   obtained from the Water Rights Board.
20         THE COURT:  Mr. Veeder has no object.  If any counsel
21   want to object to photostats, they may.
22         The next number, as I have it, Mr. Clerk, is Vail's AK.
23         MR. STAHLMAN: May they be marked AK, your Honor?
24         THE COURT:  Do you have an index of the exhibits?
25         MR. STAHLMAN:  Yes, your Honor.
```

1    THE COURT:  Do you know what the next number is?

2    MR. STAHLMAN:  No.  May they be marked AK-1 through 9,

3    your Honor?

4    THE COURT:  Yes.

5    MR. STAHLMAN:  I will submit your Honor copies.

6    It might be interesting to note that the very first

7    letter which initiates the proceedings bears your Honor's

8    signature-- not your signature, but it was written while you

9    were in the office of the United States Attorney.  We make no

10   point of that, however.  It has nothing to do, as I see it,

11   with the substance of the letter with which we are concerned.

12   I hand a copy to Mr. Veeder.

13   THE COURT:  Which letter is that?

14   MR. STAHLMAN:  That is the last one, your Honor.  It is

15   followed with other correspondence in relation to it.  It is

16   necessary to show the entire picture of what was done in

17   connection with the protest.

18   THE COURT:  I didn't know that I had had any connection

19   with this case.  The letter is signed "James M. Carter, United

20   States Attorney, by George F. Hurley."

21   MR. STAHLMAN:  I don't think your Honor even knew the

22   letter was ever written.  I obtained the letter from Mr.

23   Veeder, and it pertains to the subject.

24   THE CLERK:  Counsel, I show AK-1 through 10.

25   MR. STAHLMAN:  (Checking the exhibit.)  That's right.

1    THE COURT:  All right, Vail's Exhibit AK-1 through 10.

2    (Vail's Exhibit AK-1 through 10 was marked for Identi-

3    fication.)

4    MR. STAHLMAN:  Also there is one in there signed by

5    Mr. Sachse, a protest by Fallbrook Public Utility District.

6    It gives the entire picture, however, of the protests and the

7    hearing.

8    THE COURT:  Mr. Sachse has written a letter to Mr.

9    Veeder, dated November 21.  I have a copy of it.  Copies of

10   it went to myself, to Mr. Girard, to Mr. Krieger and to Mr.

11   Stahlman, and to the Office of Ground Water Resources.  It

12   strikes me that it is a very good letter, in which he presents

13   some matters that would be worthy of consideration.  I am

14   going to ask the reporter to include it in the transcript and

15   let counsel and the parties interested have a chance to study

16   it.  Any objection?

17   You haven't read it yet, I take it?

18   MR. VEEDER:  Yes.  I have no objection.

19   (The following four pages contain the letter requested

20   by the Court to be copied into the record:)

21

22

23

24

25

(1)

Law Offices                          1092 South Main Street
SACHSE and PRICE                     Fallbrook, California
    Franz R. Sachse                  Randolph 8-1154
    Curtis K. Price

                                     November 21, 1959

Mr. William H. Veeder

Room 332, 325 West F Street

San Diego 12, California

                Re:  U. S. vs. Fallbrook et al.

Dear Mr. Veeder:

        You recently asked me to give some thought to the form

of judgments affecting riparian owners.  In keeping with the

desire of all of us to shorten the trial and eliminate as

many defedants as possible, I think that we should seriously

consider the question of ultimate Findings and Judgment in the

cases of the following class of defendants:

                Landowners, the location and riparian

                status of whose lands is established

                by proof offered by the United States

                (ownership maps), but in whose cases

                there is no evidence of irrigable acreage.

        Given such a state of proof, I believe that the Findings

and Judgment must recite that the lands are riparian and are

entitled to share correlatively in the waters of the stream.

In such cases, there could be no Finding as to irrigable

1    acreage, nor could there be a Finding that there is no

2    irrigable acreage.  There would be a simple failure of proof

3    on that issue.  If thereafter diversions by such a defendant

4    injured or threatened to injure any other riparian the ques-

5    tion as to the share of each in the waters would be determined

6    at that time, upon conditions then existing.

7         If we could agree on this question, we would solve the

8    vexing problem of the riparian defendant who has filed an

9    answer but offered no proof, since in all cases, the United

10   States has, or will, offer sufficient proof to establish at

11   least the riparian character of the ownership.  Furthermore, I

12   believe many riparian defendants would be perfectly willing to

13   accept a simple Finding and Judgment as to their riparian

14   status, leaving anything further for future determination.

15   Finally, there would be no need for further engineering studies

16   unless the United States itself wished to introduce them into

17   evidence.

18        I realize that you have stated on numerous occasions that

19   you desire a cataloguing of all rights in the stream system,

20   including a determination of the maximum potential demand.

21   But in all sincerity, I do not believe this can be accomp-

22   lished even if irrigable acreage calculations and Findings were

23   made as to the entire watershed.  My reasons are as follows:

24        1.  Any finding as to total present irrigable riparian

25   acreage is subject to adjustment downward in the future as

1  sales of land result in severances.

2      2.  Any such Finding is subject to adjustment upward in

3  the future as improved methods of irrigation make it possible

4  to put more land "under water".  More land is "irrigable" with

5  electric pumps than was ever "irrigable" by gavity.

6      3.  Any Finding as to the present proportion of water

7  available to any riparian is subject to adjustment downward as

8  purely domestic users upstream may increase.  There is no ques-

9  tion as to the right of an upstream riparian to completely dry

10  up a stream as long as his use is purely domestic.

11      4.  Any conclusion as to water duty is subject to

12  adjustment upward of downward as crop patterns change.  Re-

13  gardless of "irrigable acreate", no riparian is entitled to

14  more water than he can reasonably use on the crops then being

15  grown.

16      5.  Finally, of what practical benefit is a Finding of

17  irrigable acreage in any sub-watershed, in the absence of a

18  Finding as to the available water supply in the same sub-

19  watershed?  There are absolutely no records available as to

20  water supply in most sub-watershed of the stream system.

21      I hope we can find time to take this question up with

22  the Court at an early date.

23                              Sincerely,

24                              SACHSE and PRICE

25                              By Franz R. Sachse

1    FRS/e

2    CC Hon. James M. Carter

3        Mr. Fred Girard

4        Mr. James H. Krieger

5        Mr. George Stahlman

6        Office of Ground Water Resources

7

8                           ----------

9            THE COURT:  Let's proceed.

10           MR. LITTLEWORTH:  I would like to call the Court's

11   attention to the fact that Mr. Webb, last night after court

12   closed, colored the additional Borel land which he testified

13   he owned and to which we showed the deeds to Mr. Veeder, and

14   the map as it now appears is correct.

15           THE COURT:  What map is it?

16           MR. LITTLEWORTH: Roripaugh B.

17           THE COURT:  All right, Roripaugh B.

18           MR. LITTLEWORTH:  Roripaugh Parcels No. 25.

19           THE COURT:  All right.

20           MR. LITTLEWORTH:  I will call now Mr. Albert Ceas.

21

22                      ALBERT CEAS,

23   a defendant herein, called as a witness on his own behalf,

24   being first duly sworn by the Clerk, on his oath testified as

25   follows:

1        THE COURT:  What parcel is this now, Mr. Littleworth.

2        THE WITNESS:  I don't know which one he is going to

3    start with, your Honor.

4        MR. LITTLEWORTH:  Ceas Parcel 6, your Honor, on

5    Roripaugh B.

6        THE COURT:  Four different pieces?

7        MR. LITTLEWORTH:  I believe there are more than that,

8    your Honor.

9

10                    DIRECT EXAMINATION

11   BY MR. LITTLEWORTH:

12       Q  Mr. Ceas, where do you live?

13       A  You mean the exact location?

14       Q  What is your address?

15       A  Route 2, Box 34, Murrieta, California.

16       Q  Are you married to Maxine R. Ceas?

17       A  That is right.

18       Q  Is all of the property shown as Parcel 6 on Roripaugh's

19   Exhibit B in your name, with the exception of the Southeast

20   Quarter of the Southeast Quarter of Section 11, Township 7

21   South, Range 3 West?

22       A  Yes.

23       Q  And is that parcel in the name of you and your wife?

24       A  Yes.

25       THE COURT:  I wonder if we could call this 6-A, then,

for ease.

MR. LITTLEWORTH:  This small one, your Honor?

THE COURT:  Yes.

MR. LITTLEWORTH:  Yes.

THE COURT:  Let's number the one at the very bottom of the corner there 6-B, the one in 17 and part of 8, 6-C, and the one up in the 7 as 6-D, the one up in Section 4 as 6-E, and the one in Section 1 as 6-F, all on Roripaugh B.

BY MR. LITTLEWORTH:

Q  Then all of the parcels, with the exception of 6-A, stand in your name alone, and 6-A stands in the name of you and your wife?

A  Yes.

Q  And are these properties all described in your Answer and in the soil survey report prepared by the United States?

A  Yes.

MR. LITTLEWORTH:  I will ask to have the soil survey report marked as 172 for Identification.

(Plaintiff's Exhibit No. 172 was marked for identification.)

THE COURT:  Are they all, you say, covered in that report?

MR. LITTLEWORTH:  Yes, your Honor.

Q  What is your occupation, Mr. Ceas?

A  I am a farmer.

Q How long have you farmed?

A Well, practically all my life.

Q Are you also President of the Riverside County Farm Bureau?

A Yes.

Q Would you just briefly describe what that organization is?

A Well, it is a farmers' organization.

Q Of Riverside County?

A Yes. It is affiliated with the California Farm Bureau Federation and the American Farm Bureau Federation.

Q You have examined the soil survey, Exhibit 172 of the Government?

A Yes, I have.

Q That survey indicates that all of the properties from 6-A through 6-F total about 1,460 acres, of which 1,181.8 are irrigable; is this correct, in your opinion?

A Yes.

Q Is Parcel 6-B down here your main ranch?

A Yes, it is.

Q This is where you live?

A Where I keep all my equipment and where I live-- headquarters.

Q What improvements are on this Parcel 6-B?

A You mean in the line of buildings and so forth?

Q   Yes.

A   My home is there, and my shop, and the grain bin storage and barns and corrals and all the facilities that it takes to operate my ranch.

Q   Are there any surface streams which run through this Parcel 6-B?

A   Tucalota Creek.

Q   What about Santa Gertrudis?

A   It borders it on this other side. · I don't know which direction it would be.

Q   On the southerly side?

A   Yes.

Q   Do you irrigate any land on that parcel?

A   Yes, I do.

Q   How much?

A   Approximately 15 acres at the present time-- 12 to 15 acres.

THE COURT:   This is 6-B?

MR. LITTLEWORTH:   6-B, your Honor, yes.

Q   How many acres, approximately, are there in that parcel?

A   Approximately 240, I believe, 245, something like that.

Q   Do you have a well on that property?

A   Yes, I do.

1    Q  Is that well 24A1, which has been previously referred

2  to in this suit?

3    A  I will have to check the map.

4       Yes, it is.

5    Q  How deep is it?

6    A  Approximately 165 feet.

7    Q  What kind of well is it?

8    A  It is an irrigation well.

9    Q  What is the diameter?

10   A  12 inches.

11   Q  Gravel packed?

12   A  Well, it was drilled with cable tools, I understand,

13  and it had gravel poured down the side of it.  It is not in

14  the sense of the word what we know as a gravel-packed well

15  that is drilled with a rotary rig today, I don't believe.

16   Q  Was this well drilled before you purchased the

17  property?

18   A  Yes, it was.

19   Q  You do not have the log?

20   A  No, I don't.

21   Q  That is the well that irrigates, then, about 15

22  acres now?

23   A  Yes.

24   Q  Where is the irrigated land located with reference to

25  the well?

10,799

1    A   North and south of the well.

2    Q   Immediately adjacent to the well?

3    A   Yes.

4    Q   Do you store any of the water which is produced from
5    that well?

6    A   Only for domestic purposes.   We have an underground
7    cistern that holds probably five or six thousand gallons.

8    Q   And that is for domestic purposes only?

9    A   Yes.

10   Q   How long has that been there?

11   A   Well, since the well was drilled, which was probably
12   in about 1944 or '45.

13   Q   Do you know whether any water was stored for domestic
14   purposes prior to that time?

15   A   Yes.

16   Q   On the same parcel?

17   A   Yes.

18   Q   In the same quantities?

19   A   I don't know.

20   Q   Do you know when water was first stored there for
21   domestic purposes?

22   A   No, I don't.

23   Q   What kind of crops do you grow on the 15 acres?

24   A   I have it in permanent pasture at the present time.
25   That has been in permanent pasture for, oh, ten or eleven years.

Q  By yourself?

A  Yes.

Q  Was that land irrigated prior to your purchasing this ranch?

A  Yes.

Q  Do you know how long that particular acreage has been irrigated?

A  Well, I can remember seeing irrigated crops on that land ever since I was a wee youngster.

Q  How old are you now, Mr. Ceas?

A  Forty-five last Friday.

Q  Have you lived all your life in this area?

A  Yes, except five years that I lived in Inglewood, in my high school years.

Q  You have this land in permanent pasture now?

A  Yes.

Q  Do you know how much water it takes per year to irrigate an acre on that permanent pasture?

A  I would say about five to six acre feet.

Q  What about alfalfa?  Do you know about how much water it takes to irrigate alfalfa in that area?

A  About the same as pasture.

Q  You are talking about the water duty on your own lane?

A  Yes.

1      Q   Is it the same or different in lands in the same

2   vicinity?

3      A   I would think it is about the same.

4      Q   What do you do with the rest of the land which is

5   not irrigated on this Parcel 6-B?

6      A   It is in grain-fallow rotation.

7      Q   That is dry farming?

8      A   Yes.

9   MR. VEEDER:  What did you say-- grain-fallow rotation?

10   THE WITNESS:  Grain-fallow rotation.

11   BY MR. LITTLEWORTH:

12      Q   Let's move on, Mr. Ceas, and let's take Parcel 6-C,

13   which is Section 17 and the Southeast Quarter of Section 8.

14   Are there any surface streams which traverse this parcel?

15      A   Tucalota Creek.

16      Q   What do you do with this land?

17      A   It's grain-fallow rotation--dry land.

18      Q   Do you irrigate any on that parcel?

19      A   No, sir.

20      Q   Is there any water developed on that land?

21      A   Livestock well.

22      Q   Where is that located?

23      A   Approximately right here in Section 17.

24      Q   You are pointing to about the center of the northerly

25   line of Section 17?  What kind of well is that?

A   It is a domestic livestock well.

Q   Do you know how deep it is?

A   65 feet.

Q   Does it have a windmill on it or a pump?

A   It has a windmill on it.

Q   Any pump at all?

A   No, just a windmill.

Q   Is any water stored from that well?

A   Yes, we have a well there for livestock water storage.

Q   How much is stored there?

A   Oh, I would say that that tank holds probably 2,000, 2,500 gallons.

Q   How long has that been done?

MR. VEEDER:   What do you mean, how long has that been done?

BY MR. LITTLEWORTH:

Q   How long has water been stored from this windmill?

A   From this particular windmill, about ten years.

Q   Was there another well there before this one?

A   Yes, there has been.

Q   Is this a replacement well, then?

A   Yes.

Q   Then how long has water been stored from either this well or the replacement well?

1      A   Well, for 40 years that I can recall personally.

2      Q   The same quantity, approximately?

3      A   Approximately, yes.

4      Q   Is there any other water, then, on Section 17 that

5   has been developed?

6      A   No, sir.

7      Q   Now, let's take 6-D, which is this portion.

8      THE COURT:   How many acres in 6-C?  160 plus 40, 200

9   acres?

10     MR. LITTLEWORTH:   That is a whole section, your Honor.

11     THE WITNESS:   800.

12     MR. LITTLEWORTH:   Plus 160.

13     THE COURT:   800 acres.

14     MR. LITTLEWORTH:   Yes.

15     THE COURT:   Now you are taking up 6-D.

16     MR. LITTLEWORTH:   Yes, your Honor.

17     Q   This is the portion in the Southwest Quarter of

18   Section 7, Mr. Ceas.  Are there any surface streams which

19   traverse this particular parcel?

20     A   No, there isn't.

21     Q   Is there any water developed on this land?

22     A   No.

23     Q   Do you farm this land?

24     A   Yes.

25     Q   Is it dry farmed?

10,884

A  Yes; grain-fallow rotation.

Q  Now, 6-E is located in the Southwest Quarter of Section 4.  Are there any surface streams which traverse this particular parcel?

A  No.

Q  Is there a tributary of Tucalota which crosses it? It appears so from the map.

A  Well, there is a little creek that goes up from Tucalota Creek and goes through the property.

Q  And that is a little creek which runs into Tucalota?

A  Yes.

Q  And the little creek crosses this Southwest Quarter of Section 4?

A  Yes.  In other words, the water off of that portion of ground, if there were any water on it, would drain into Tucalota Creek.

Q  Do you do any irrigating on that land?

A  No.

Q  Is there any water developed at all?

A  No.

Q  Is that all dry farmed?

A  Yes.

Q  Now, 6-F is a strip in the northerly half of Section 1, 7 South, 3 West.  Is this riparian to any stream?

A  Warm Springs Creek.

10,805

Q  Warm Springs traverses it in a north-south direction?

A  Yes.

Q  Do you irrigate any land there?

A  No.

Q  Do you dry farm what is irrigable there?

A  Yes.

Q  Is there any water developed on that property?

A  A spring for livestock use.  We use it for livestock watering purposes.

Q  Do you store any of the water from the spring?

A  Only a hole that we dug with a bulldozer below the spring to hold enough water so that cattle can drink out of the hole.

Q  How long has that been done?

A  They have been watering cattle out of that spring for years and years that I can recall, although --

Q  Do you know approximately how many years?

A  Well, thirty years that I know of.

THE COURT:  How long has the water been running down into a hole?

THE WITNESS:  Well, we dug that hole with a bulldozer in '51 below the spring for storage for livestock water.

BY MR. LITTLEWORTH:

Q  How were the cattle watered previous to that?

A  There used to be a little pipe stuck in the ground

1    and it ran into a little redwood water trough.

2        Q   And that was the way it was done for at least thirty

3    years , to your memory?

4        A   Yes, that I know of.

5        Q   And now you have simply dug a hole in the ground and

6    instead of using the redwood trough the water is retained in

7    the hole in the ground?

8        A   Yes.

9        MR. LITTLEWORTH:  I think that's all, Mr. Veeder.

10       THE WITNESS:  Mr. Littleworth, we have that other 40

11   acres, if you want to cover it now.

12       MR. LITTLEWORTH:  Yes.  I am sorry.

13       Q   In Section 11 now, the parcel denominated 6-A on

14   Roripaugh B, are there any surface streams which cross this

15   particular parcel?

16       A   No.

17       Q   Do you irrigate this?

18       A   No, sir.

19       Q   Is it all dry farmed?

20       A   Yes.

21       Q   Is there any water developed on this land?

22       A   No.

23       MR. LITTLEWORTH:  That's all.

24

25

CROSS-EXAMINATION

BY MR. VEEDER:

Q   Mr. Ceas, have you measured the water that you have
used for irrigation on your property designated on Roripaugh
B as 6-B?  Did you ever measure the water?

A   You mean the quantity of water I am pumping?

Q   That is right.

A   No, I haven't.

Q   So when you state that five or six acre feet per
acre is required for your permanent pasture, that is purely
an estimate, isn't it?

A   Yes, it's a farmer's guess.

Q   I didn't hear that.

A   It's a farmer's guess or an estimate.

Q   How many months of the year do you irrigate that
land?

A   Generally we expect to start irrigating pasture in
that country, in that area, about the 1st of March up until
the fall rains start raining about the first of November.
But permanent pasture being property that is utilized the year
around, if the good Lord isn't good to us, we have to irrigate,
you might say, practically the year around.

Q   In other words, when you estimate five to six acre-
feet a year per acre, your calculation is on a 12-months
irrigation period?

70.808

1    A  Yes.

2    Q  And if you irrigate only nine months, then you would

3  reduce it proportionately; is that right?

4    A  Probably not proportionately, Mr. Veeder, because

5  generally our rainy season comes in the wintertime when the

6  days are short and the nights are long and your grass doesn't

7  grow as much as it does in the summertime.  So naturally your

8  requirements during your summer months, for the same given

9  number of days or period, there will be a heavier water

10  requirement in the summertime than there would be in the winter

11  months.

12    Q  Would you say your five to six acre-feet per acre

13  was what you were relying upon for the 12-months period?

14    A  Yes.

15    Q  Have you ever changed the area in that parcel from

16  the standpoint of the lands that were irrigated?  Was it always

17  the same fifteen acres?

18    A  No, not necessarily.

19    Q  In other words, it is quite possible that your

20  irrigated acreage might embrace different lands; is that right?

21    A  Yes.

22    Q  Where would that lane be where you made the changes?

23    A  It could go further south from--

24    Q  It could go further south?

25    A  It could go further south, yes, in a southerly

1    direction.

2        Q  And have you, in fact, done that?

3        A  Yes, I have.  Having aluminum portable sprinkler

4    system and at times during the spring of the year in the years

5    that we have grain planted there and it is a little dry in the

6    spring, we move our sprinkler system on down the valley and

7    utilize our water to irrigate the grain.

8        Q  In other words, your irrigated acreage might be sub-

9    stantially more than fifteen acres; is that right?

10       A  I wouldn't say I have used it on substantially more

11   acres.  I have used it on a few more acres.

12       Q  What would you say-- ten acres?

13       A  I have used it on ten acres more.

14       Q  In other words, you might run as high as 25 acres?

15       A  Yes.

16       Q  How frequently do you irrigate your grain that way?

17   Every year?

18       A  No.

19       Q  What would be the years?  The years when it is ex-

20   tremely dry; is that right?

21       A  That's right.  Actually, we only plant a crop every

22   two years, and sometimes we are fortunate enough that we have

23   sufficient rainfall that we don't have to irrigate that grain

24   and supplement the rainfall.

25       Q  Have you any information as to the quantity of water

1   you require when you have to supplement the natural precipita-

2   tion for the irrigation of your grain?

3        A  No, I haven't.

4        Q  Do you use your portable sprinklers on the fifteen

5   acres?

6        A  Yes, I do.

7        Q  Now, are you telling us that you need five to six

8   acre-feet per acre when you use a sprinkler system?

9        A  Yes.

10       Q  Isn't that pretty high?

11       A  I don't think so.

12       Q  Have you measured the depth to water in your well

13  which is located in Section 17, which is marked 6-C on

14  Roripaugh B?  How far is it to water there?

15       A  About ten feet.

16       Q  And your well is 65 feet deep?

17       A  Yes.

18       Q  And what kind of pump do you have on it?

19       A  Windmill; just a plunger type pump.

20       Q  Did you drill the other wells that are situated on your

21  property, for example, on 6-B did you drill those yourself or--

22       A  Which one is that?

23       Q  6-B.  I am back to the home place again for just a

24  moment.

25       A  No, I didn't.

10.811

1    Q  Do you know the depth to water there on those?

2    A  Approxiately 70 feet.

3    Q  To water?

4    A  Yes.

5    MR. LITTLEWORTH:  You are asking for the static level

6  now, Mr. Veeder?

7    MR. VEEDER:  Yes, static level.

8    THE WITNESS:  I think when Mr. Kunkel and the State

9  fellows were out there doing some checking on those wells, it

10  was approximately 70-72 feet, right in that neighborhood.

11  BY MR. VEEDER:

12    Q  Now, referring to the properties again in your 6-B,

13  is there a live stream running down to those lands any time

14  of the year?

15    A  Yes, to this extent, that when there is enough

16  rainfall for water to run off those lands that are upland from

17  my ranch, there is water down through that creek.

18    Q  For about how long a period of the year does that

19  run?

20    A  It could vary a lot; it depends on how much rainfall

21  we have had.

22    Q  Have you had any runoff in that creek during the last

23  fifteen months?

24    A  Not to my knowledge.

25    Q  And there is no water running down there at all?

1    A  Not this past spring, I don't believe.

2    Q  Would you have been in a position to observe it, if

3 there was?

4    A  If it comes down far enough where I can see it.

5    Q  Are you so located that you could see it?

6    A  Oh, yes.

7    Q  Now, in regard to the properties in Section 4-- that

8 is the land just north and east, is it not, of the Borel

9 property?

10    A  Yes.

11    Q  Are you acquainted with that?

12    A  Yes.

13    Q  That is your 6-E.  And is that a tributary of Tucalota

14 Creek?

15    A  Only to the degree, Mr. Veeder, that the small creeks

16 that come out of that property would eventually, if there

17 were any water running through them, would run into the

18 Tucalota Creek.

19    Q  And you have seen them carry water, have you not?

20    A  A very small amount, yes.

21    Q  Does that occur usually in the spring of the year,

22 or when does it occur?

23    A  When we have had what we consider pretty good rains,

24 which we haven't had for so long that I am not sure what one

25 of them looks like.

Q   And you also have a tributary to Tucalota Creek in the Southeast Quarter of Section 8, which is part of 6-G, have you not?

A   The main channel of Tucalota Creek goes through there.

Q   And that is the water that runs on down through Mr. Borel's property; isn't that right?

A   I believe so.

Q   In regard to the spring that is up here in Section 1, which is marked 6-F, does that spring run the year round?

A   Yes, it does.

Q   And you use it the year round; is that correct?

A   Whenever we have livestock on those properties up there we use it.

Q   And during the spring there is a creek that runs across your property, too, isn't there?

A   Yes.

Q   How long does that run in the year?

A   Depending again on the amount of rainfall we have in the winter.

Q   Does it run every year?

A   No, it doesn't.

Q   And if you didn't interfere with the spring would it run on down across these other properties, I mean the properties below you?  Have you ever seen the water from the spring run

1   off your land?

2        A   Oh, no.

3        Q   You use it all; is that right?

4        A   No, there isn't enough water to come out of that

5   spring.  It all seeps into the ground before it gets down

6   across that property.

7        Q   You use all of it yourself; is that it?

8        A   Well, it stays on the property, yes.

9        MR. VEEDER:   I have no further questions.

10

11                          CROSS-EXAMINATION

12   BY MR. STAHLMAN:

13        Q   This 6-B, the well that you have on there that you

14   state would irrigate about 15 acres, in your opinion could

15   you irrigate more than 15 acres with the production from that

16   well?

17        A   I believe so.

18        Q   What is your best judgment as to the maximum amount

19   of acres you could irrigate with that well?

20        A   Do you mean, Mr. Stahlman, to irrigate something that

21   you would keep in irrigation like alfalfa, pasture, or some-

22   thing like that?

23        Q   Extended irrigation.

24        A   Probably 20 acres, maybe 25 would be stretching it,

25   I would say.

10,815

1    Q This spring you have indicated that you have a dam in
2 which you replaced the redwood tank, have you noticed any
3 variation in the flow of that spring during the seasons?
4    A  No.
5    Q  And how about during the lifetime of the spring as you
6 have observed it today, as compared with 30 years ago?
7    A  Since I have observed that spring, Mr. Stahlman, I
8 don't believe it has changed at all.
9    Q  You don't think it has changed at all?
10    A  It hasn't changed at all.
11    MR. STAHLMAN:  That's all I have.
12    MR. LITTLEWORTH:  I have no redirect examination, your
13 Honor.
14    Step down.
15    THE COURT:  All right.
16    MR. VEEDER:  Call Col. Bowen.
17

18              ALLEN C. BOWEN,
19 recalled as a witnes in behalf of the plaintiff, having been
20 previously duly sworn, was examined and testified as follows:
21

22              DIRECT EXAMINATION
23 BY MR. VEEDER:
24    Q  Col. Bowen, I hand you exhibit marked for Identifica-
25 tion 172 and ask you to state into the record the content of

1    that exhibit.

2         A  Plaintiff's Exhibit 172 for Identification is a copy

3    of an engineering report prepared for the property of Albert

4    Ceas.

5         Q  Under whose direction was that prepared?

6         A  It was prepared under my direction.

7         Q  Would you state into the record whether, in your

8    opinion, the conclusions and data set forth are correct?

9         A  They are correct.

10        MR. VEEDER:  Your Honor, I am going to have marked

11   five separate aerials, which would be 173, 174, 175, 176, and

12   177.

13        (The Aerial Photographs referred to were marked

14   Plaintiff's Exhibits 173, 174, 175, 176 and 177 for Identi-

15   fication.)

16   BY MR. VEEDER:

17        Q  I hand you, Col. Bowen, the aerial photograph marked

18   for Identification 173 and ask you to identify into the record

19   and state what is set forth upon it.

20        A  Plaintiff's Exhibit 173 for Identification is the

21   field sheet consisting of an enlargement of Aerial Photograph

22   3-0049.  Upon this field sheet a portion of the property

23   of Albert Ceas was mapped.

24        Q  May I ask you also to identify that with the aerial

25   in your Identification 172.

1    A  In each instance, Mr. Veeder, the aerial photo copies

2    in 172 for Identification contain the aerial photo number.

3    For example, the first aerial photo contained in the report

4    172 contains at the bottom "Aerial Photo No. 3-0049." That

5    is the same number that appears on Plaintiff's Exhibit No.

6    173 for Identification.

7        THE COURT:  Before we pass that, Exhibit 173 must show

8    what you would call 6-F, this narrow strip in here; is that

9    right?

10       THE WITNESS:  That is right, sir.  It shows a portion

11   of 6-F.  The remainder of it will appear on Aerial Photo

12   3-0070, which joins it on the east.

13       THE COURT:  I see.  All right.

14   BY MR. VEEDER:

15       Q  I hand you Plaintiff's Exhibit marked for Identifica-

16   tion 174, which is an aerial photo, and ask you to state into

17   the record what appears on that identification.

18       A  Plaintiff's Exhibit 174 for Identification is the

19   aerial photo used as a field sheet to survey a portion of

20   Albert Ceas' property, and it is an enlargement of aerial

21   photo No. 3-0068.

22       Q  And would you relate that to the aerial photo copies

23   that appear in 172?

24       A  Two sheets in the series of aerial photo copies

25   appearing in 172, namely, aerial photo sheets 3 and 4, are

10,818

1   reprints from 174.

2       Q  I hand you plaintiff's exhibit marked 175 for Iden-

3   tification, which is an aerial photo, and I ask you to state

4   into the record what is set forth on that aerial?

5       A  Plaintiff's Exhibit 175 for Identification is the

6   field sheet which was used to survey a portion of the Albert

7   Ceas property, and that is an enlargement of Aerial Photo

8   3-0070.

9       Q  Would you identify that as it relates to 172?

10      A  The sixth aerial photo appearing in 172 is a print

11  of a portion of 175.

12      Q  I hand you Plaintiff's Exhibit marked for Identifica-

13  tion 176, which is an aerial photo, and ask you to state into

14  the record what is set forth on that aerial?

15      A  Plaintiff's Exhibit 172 for Identification is the

16  field sheet used to survey a portion of Albert Ceas' property

17  and it is an enlargement of Aerial Photo No. 3-0082.

18      Q  And will you relate that to Identification 172?

19      A  The eighth aerial photo appearing in 172 is printed

20  from 176.

21      Q  I hand you Plaintiff's Exhibit marked for Identifica-

22  tion 177 and ask you to state what is set forth in that

23  aerial?

24      A  Plaintiff's Exhibit 177 is the field sheet that was

25  used to survey a portion of Albert Ceas' property, and it is

1    an enlargement of Aerial Photo 3-0083. The ninth and last

2    aerial photo which is bound in 172 is a reprint of a portion

3    of 177.

4        MR. VEEDER:  We offer in evidence the exhibits marked

5    for identification 172 through 177, your Honor.

6        THE COURT:  Plaintiff's Exhibits 172 through 177, in-

7    clusive received in evidence.

8        (Plaintiff's Exhibits No. 172, 173, 174, 175, 176 and

9    177 were received in evidence.)

10       THE WITNESS:  For your Honor's information, there is an

11   aerial photograph index also contained in Plaintiff's Exhibit

12   172 which has the aerial photo numbers printed on it and gives

13   the general location of each of those photos.

14   BY MR. VEEDER:

15       Q  Colonle, have you observed the irrigated lands which

16   are irrigated on the property of Mr. Ceas which has been

17   identified on Roripaugh B as 6-B?

18       A  I have seen the irrigated pasture described by Mr.

19   Ceas.

20       Q  Have you considered or have you investigated and

21   viewed the sprinkler system that he utilizes for the irrigation

22   of that property?

23       A  No, sir, I have not inspected his sprinker system.

24       Q  Based upon your experience, Col. Bowen, in regard

25   to the irrigation of such pasture for a nine-months period,

10,820

1  what would you say would be a reasonable diversion duty

2  utilizing a sprinkler system?

3      MR. LITTLEWORTH:  I object to that, your Honor, on the

4  grounds that there is no proper foundation laid, at least not

5  in my presence.  I have not heard the Colonel qualified on

6  farming matters.

7      Secondly, I think Mr. Veeder on cross-examination of

8  Mr. Ceas developed the fact that it varies greatly with the

9  weather and other matters, and I don't think that question can

10 be answered.

11     THE COURT:  Read the question.

12     (The reporter read the pending question.)

13     THE COURT:  Overruled.

14     THE WITNESS:  May I see Plaintiff's Exhibit 172, please?

15     MR. VEEDER:  I handed you a copy of 172, Colonel.

16     And I will hand to the Court the exhibit that has been

17 admitted in evidence.

18     THE WITNESS:  I believe, Mr. Veeder, that the water duty

19 as contained in Plaintiff's Exhibit 172 for irrigated pasture,

20 namely, 3.83 acre feet per year is a reasonable duty of water

21 for this particular area.

22 BY MR. VEEDER:

23     Q  And you are speaking of diversion duty or field duty?

24     A  That was field duty, Mr. Veeder.  The diversion duty

25 would be approximately 4.2, which allows 10% for losses which

are variously known as administrative losses or project

losses.

THE COURT:   Where does this appear?   At what page in

Exhibit 172?

THE WITNESS:   Just before the photo index, your Honor,

is the tabulation "Water Duty for Agricultural crops."

BY MR. VEEDER:

Q   And for the record, to the end that your statement

with regard to field duty will be more explicit, will you state

what field duty means to you?

A   Field duty is the amount of water delivered and

applied to the field being irrigated.

Q   That is, to the crop itself?

A   To the crop; yes, sir.

THE COURT:   What water duty do you contend for, Mr.

Littleworth?

MR. LITTLEWORTH:   Your Honor, all of our people have

told us that (1) The water duty varies.   Col. Bowen has used

a chart the same on every single survey, 3.83, and it appar-

ently comes out of the Escondido office of the United States

Department of Agriculture.   I don't know whether that means

that it is designed for conditions closer to the sea.   At any

rate, all of our people tell us that water duty varies.   It

is not always the same.

(2)   That this seems to be consistently low for alfalfa

or irrigated permanent pasture. I have also talked to the
County Farm Advisor and he indicates the same general belief,
that 3.83 is not sufficiently high for this area.

MR. VEEDER: I move to strike that statement, your
Honor. This is purest hearsay from counsel.

MR. LITTLEWORTH: This is just a statement of position
at this point.

MR. VEEDER: Just so it is not in the record as anything
more than that.

MR. LITTLEWORTH: I have not intended to make any great
issue of it, because, as I said yesterday, I don't think it
is truly relevant at this point. But I did want to indicate
our position that we do not believe that 3.83 is correct
for every parcel in this area.

MR. VEEDER: I have no further questions.


CROSS-EXAMINATION

BY MR. LITTLEWORTH:

Q   Col. Bowen, talking about water duty for a minute,
what factors do you think would affect the water duty for a
particular crop on a particular piece of land?

A   The factors that would affect the requirements are
the temperature, the number of hours of sunlight during the
year, the character of the soil, namely, the texture of the
surface soil, the permeability of the subsurface soil, the

1     presence or absence of ground water either as a first water table

2     or a permanent water table.

3         Q   And how much rain you would have during the year?

4         A   Certainly.

5         Q   Would you say, then, that the water duty in any

6     particular year on a particular crop on a particular piece of

7     land is probably going to vary?

8         A   Oh, yes, sir; there is no question about that.

9         Q   You have used one figure on all of the soil surveys

10    which youhave prepared for the clients that we have so far

11    introduced testimony on, have you not?

12        A   That is correct.

13        Q   And in fact, would it not be fair to say that the

14    water duty for any given crop on these various parcels of

15    land would really differ?

16        A   Yes, there would be differences, depending on the

17    soil site.

18        Q   Do you happen to know whether this 3.83 figure which

19    comes out of the Escondido office was prepared for irrigation

20    in an area close to the sea?

21        A   Well, I know that it was prepared as a guide for the

22    soil conservation work throughout the San Diego County.

23        Q   Do you know whether it is applicable to an area as

24    far inland as this Murrieta area?

25        A   There is some of San Diego area much further inland

10,824

than Murrieta.

Q  Have you ever talked to Mr. M. L. MacFarland of the Riverside County Farm Advisory Office, or to any other persons in the Riverside County Farm Advisor's office, with regard to water duty in this area?

MR. VEEDER:  That is objected to as being incompetent, irrelevant and immaterial, your Honor, and not tending to prove any issue in this cause.

THE COURT:  It tends to test his opinion.  Overruled.

THE WITNESS:  I have known Mr. MacFarland for many years, Mr. Littleworth.  The field of engineering and drainage irrigation is my particular speciality, and I have worked in Imperial County and eastern Riverside County for a number of years, and in this work I became acquainted with Mr. MacFarland. However, I personally have not talked with him about this particular matter.  However, a representative from my office has talked many times with a representative of his office and with representatives of the Riverside Citrus Experiment Station, and I have, in fact, in my office schecules of water application or water duty prepared by the Riverside County Farm Advisor's office, and there is nothing in those that is inconsistent with this schedule that we insert as a guide in these reports.

BY MR. LITTLEWORTH:

Q  This is inserted, though, as a general guide and may

10,825

1   not be correct for a particular parcel of land?

2       A   Absolutely right, and I have so previously testified

3   on many occasions.

4       Q   Tucalota Creek traverses several of Mr. Ceas's

5   parcels.   How would you describe the flow of that creek?

6       A   Tucalota is an intermittent stream.

7       Q   Does it flow only immediately after and following

8   periods of precipitation?

9       A   Well, I believe there is some spring flow in

10  Tucalota Creek which continues long after periods of rainfall

11  and runoff.

12      Q   Do you think there is some permanent flow there?

13      A   Well, what reach of the stream are you talking about,

14  Mr. Littleworth?   Tucalota Creek is a rather long stream.

15      Q   What about the reaches that go through Mr. Ceas's

16  property?  Apparently that would affect the Southeast Quarter

17  of Section 4, the Southeast Quarter of Section 8, further

18  down.

19      A   I beg your pardon, Mr. Littleworth, but Tucalota

20  Creek does not flow throughout the Southeast Quarter of

21  Section 4, Township 7 South, Range 2 West.

22      Q   A tributary to Tucalota flows through the Southwest

23  Quarter of Section 4, does it not?

24      A   Yes, sir.

25      Q   How would you describe the flow of that tributary?

1    A  It is an intermittent stream.

2    Q  Does it have any permanent flow?

3    A  No, sir, none that I have observed.

4    Q  Just flow immediately after rain?

5    A  Well, during and immediately after periods of high

6    rainfall and runoff.

7    Q  Colonel, on page 4 of Exhibit 172, in the middle of

8    the page there, there is a paragraph which reads:  "Ground

9    water in storage is confined primarily to the alluvium south

10   of the fault at Murrieta Hot Springs."  Can you tell us which

11   of these Ceas parcels would lie north of this fault at Murrieta

12   Hot Springs that you referred to?

13   A  Yes, sir. That fault is shown, in part, on Plaintiff's

14   Exhibit 15-A as running through Murrieta Hot Springs.  That

15   is Sections 13 and 14, 7 South, 3 West, and Sections 17 and

16   18, 7 South, 2 West.  So, referring back to Defendant's

17   Exhibit Roripaugh B, that fault would lie northerly of Ceas

18   Parcel 6-B, it would intersect the southerly portion of Ceas'

19   Parcel 6-C, and the remaining parcels, namely, 6-A, 6-D, 6-E

20   and 6 F would lie north of the Murrieta fault.

21   Q  Col. Bowen, do you have an opinion as to whether the

22   ground waters on those parcels lying northerly of that fault

23   line form part of the Santa Margarita River or its tributaries?

24   A  Yes, sir, I do.

25   Q  Would you state that opinion, please?

1    A  My opinion is that, with the exception of the Recent

2  alluvium which borders Tucalota Creek as it flows through the

3  Southeast Quarter of Section 8, 7 South, 2 West, and the

4  alluvium over which Warm Springs Creek flows in Section 1, 7

5  South, 3 West, and of course the Recent and Older alluvium

6  which is shown south of the Murrieta fault, with those ex-

7  ceptions, the water found in the basement complex and residuum

8  is local, vagrant, percolating and not part of the stream

9  system.

10    Q Then would you say that all of the ground water under

11  Parcel 6-A on Roripaugh B would be considered local, percol-

12  ating, vagrant ground water and not part of the stream

13  system?

14    A  Yes, sir.

15    Q  And this would be true also of all the ground water

16  under 6-E in the Southwest Quarter of Section 4?

17    A  Yes, sir.

18    Q  And all of the ground water under Parcel 6-D in the

19  Southwest Quarter of Section 7?

20    A  Yes, sir.

21    Q  And then all of the ground waters under the other

22  portions you have mentioned, except those lying in the Recent

23  alluvium and lying southerly of the fault line on Section 17?

24    A  In Section 17, 7 South, 2 West; yes, sir.

25    THE COURT:  Well, would you say there in Section 17 that

1    it is south of the fault line or south of the edge of the

2    older alluvium?  The fault line on my map only seems to extend

3    a portion of the way across there.

4          THE WITNESS:  Yes, sir.  The older alluvium is feather-

5    ing out north of there.  The contact between the older alluvium

6    and the basement complex or residuum is actually the more

7    logical boundary to draw, inasmuch as the alluvium is water-

8    bearing and if there was any water in it, it would be in

9    hydraulic continuity with the water contained in the remainder

10   of the older continental deposits.

11         Q   Col. Bowen, would the alluvium in Section 17 as it

12   joins the basement complex be thin in that area?

13         A   It would be north of the Murrieta fault line.

14         Q   What I am getting at is, is there enough ground

15   water in storage in any of Section 17 to be really concerned

16   about, or can you say that the ground water storage lying

17   in the Recent alluvium in Section 17 would be, in fact,

18   negligible in amount?

19         MR. VEEDER:  I object to that on the grounds that "a

20   negligible amount" or "to be concerned about" or matters

21   like that are so vague and uncertain that certainly the

22   Colonel couldn't be expected to comment on them.

23         THE COURT:  We have to use the best evidence we can in a

24   situation of this sort.  It is all opinion testimony.

25         THE WITNESS:  Your question, I believe, said "Recent

10,629

1    alluvium."  Do you mean the older alluvium?

2            MR. LITTLEWORTH:  Older alluvium, yes.

3            THE WITNESS:  I have no opinion there, because I don't

4    know the depths south of the Murrieta fault.

5            MR. LITTLEWORTH:  That's all I have.

6            MR. VEEDER:  I have no questions, your Honor.

7            MR. LITTLEWORTH:  I am going to use Mr. Ceas to prove

8    up three others who are relatives, so I will put him back

9    on the stand.

10           Emilie Ceas Dixon is next.

11           THE COURT:  Well, before we pass Ceas, in the absence

12   of other evidence by the Government, tentatively the Court

13   would propose to find that any water under 6-A, 6-D, 6-E are

14   not a part of the stream system; that any water in 6-F could

15   not be a part of the stream system, except in the younger

16   alluvium shown on 15-A; and that as to 17, any water would

17   not be part of the stream system, except in the younger

18   alluvium shown in the Southeast Quarter of Section 8; and

19   probably that any ground water found in the bottom part

20   of Section 17 would be so negligible that the easiest thing

21   to do would be to say it was not part of the stream system.

22           As to 6-B, of course, there is no doubt but that

23   probably the Court is going to find that that is land over-

24   lying the basin.  In other words, 6-B was the only section

25   you are really concerned with here.

10,830

Now, what would counsel think about that kind of finding, tentatively?

MR. LITTLEWORTH:  When Mr. Webb testified for us earlier, your Honor, he felt that the basin, while there certainly is a basin in Santa Gertrudis, did not reach up quite as high as the 6-B parcel.  So there would be that conflict in the evidence.

THE COURT:  Well, leaving that open.

MR. LITTLEWORTH:  Yes, I would agree with all of the other findings, your Honor.

THE COURT:  Would you agree, leaving that open, tentatively, in the absence of other evidence?

MR. VEEDER:  Your Honor, on that score I have some question as to what is meant by the term, as now being used, "vagrant, local, percolating water and not part of the stream system," for this reason.  I am not taking issue at this moment, or probably issue at all, with Col. Bowen.  My view on the subject is this, that we may be getting in to the position where we would deny that there is any water in the residuum which is actually part of the stream system.  I believe there are instances where it would be a physical impossibility to have such a circumstance exist.

This is my own.  I may be in error on it.  I view this circumstance here-- and I am pointing to Sections 7 and 8, Township 7, Range 2, where we have shown on 15-A points of

1   rising water.  We have situated there an area concerning which

2   Col. Bowen testified yesterday that if the younger alluvium

3   there designated were dewatered it would have the effect of an

4   appreciable impact upon the surface runoff.  I think he is

5   absolutely right there.  The point that I think that your

6   Honor would be desirous of considering before arriving at a

7   conclusion that there was no water in the residuum-- and I

8   have to confess that I am drawing on experience in other

9   litigation when I am saying these things-- that it would be

10  physically impossible, to my view, not to have some ground

11  water in the residuum, for the younger alluvium, as I under-

12  stand it, overlies residuum, and if I understand correctly

13  and strictly speaking as a non-scientist I understand that

14  there can be no surface stream absent a ground water table

15  sufficiently near the surface to maintain the surface stream.

16  So it is conceivable, it would seem to me--

17      THE COURT:  That's an absurdity.  If you have a stream

18  of water that runs over solid rock, you have a stream of water,

19  and you certainly have no ground water table underneath it.

20      MR. VEEDER:  We are talking about a particular situation.

21      THE COURT:  You made a general statement which I couldn't

22  let go unchallenged.

23      MR. VEEDER:  I am talking about water running over

24  alluvium.  We will restrict it to water running over alluvium.

25      THE COURT:  I will agree.

1    MR. VEEDER:  So under those circumstances, unless the

2  alluvium is actually underlaid entirely by basement complex,

3  I think it would follow necessarily that there would have to

4  be some ground water in the residuum, and it would be the

5  ground water in the residuum that would maintain the surface

6  stream.

7    Thus, I would say that it would be necessary to object

8  to your Honor's tentative finding, because I truly believe

9  that there must be some ground water in the residuum.  Now,

10  I don't know how much, but I believe truly that if a well

11  were put down in the residuum bordering upon the younger

12  alluvium, and if that well were pumped, it would have the

13  effect of dewatering the residuum and in the process dewater-

14  ing the alluvium.

15    THE COURT:  I have your thought in mi d, and it cor-

16  responded with something I was going to mention next.

17    On your general hypothesis that if there is any water

18  in the residuum, generally speaking it might be part of the

19  stream system, I am probably going to find against you.

20  We have enough to fight about in this case without subjecting

21  all of this area of the residuum to litigation on the stream.

22    MR. VEEDER:  I didn't suggest that, your Honor.

23    THE COURT:  But we can pass this up.  I am only giving

24  you some tentative views.

25    Now the other thought-- and you have touched upon that--

1   is this.  Let's take Ceas Parcel 6-F, where the younger

2   residuum runs across it.  It seems to me that in fashioning

3   a decree we ought to be able in some way to make it possible

4   for Ceas to do business and eventually sell all or part of

5   that property. And what I am going to tentatively throw out

6   is this, that you would have to pick some arbitrary distance

7   from the edge of that younger alluvium, and just out of my hat

8   suppose we said a hundred feet to either side of the younger

9   alluvium.  Any well drilled in this forbidden area, this

10  arbitrary area, would be subject to possible litigation on

11  the stream system.  Any well drilled in that area beyond this

12  little zone that we arbitrarily set would not be part of the

13  stream system.

14       Now this is a very tentative idea.  What I am thinking

15  about is this.  There is no doubt that if a well were put down

16  in the younger alluvium it would dewater whatever supply

17  existed in the younger alluvium.  Now this boundary between

18  the younger and the older is only approximate, and there is

19  no exact way to know where it lies.  It would seem to me that

20  it might be fair to all parties to fix some arbitrary zone on

21  either side of the younger alluvium, as shown on the surface.

22  In other words, establish an area there and if a defendant

23  put a well in that area he would be told by the terms of the

24  decree that he might be later on subject to some further

25  litigation on the stream system.  If, on the other hand, he

moved outside this forbidden zone and put wells in, that any water he got there, as I have said many times, he would be just lucky to have it.

Now this would make it possible-- people are going to be interested later in disposing of this property-- and it would make it possible for a man to pass title to property so that the buyer would know what he got.  If the buyer were buying a lawsyit and he wanted to buy the entire east half of that 6-F and take his chances on a well, and obviously that is where he would put a well if he were going to put one up in there, he would take a chance that sometime some of his neighbors on the stream system or some downstream owner would contend that he was taking more than his share.

Do you think something like that is workable?

MR. VEEDER:  I think that is highly desirable, your Honor, because if there is one thing that has come out of all this busnes it is this.  I believe we have to have a criterion to guide us on some of these physical features, and there is always a point in a lawsuit where you simply say, "Well, based upon the data we have, we are going to make this arbitrary determination."  I think that is the proper approach.

THE COURT:  What do you think?

MR. SACHSE:  There is this one thought-- I am sure that Mr. Veeder is thoroughly aware of it-- just as an example, this                situation on De Luz Creek where a fully detailed

1   set of findings had been made and where the Master repeatedly

2   found as to parcel after parcel after parcel that the ground

3   water within the alluvium delineated on exhibit so and so

4   were part of the stream system and that the ground waters up on

5   the hill were not part of the stream system.  The trouble is

6   we don't know where the alluvium is.  That is the line that

7   we have difficulty in drawing.  In fact, the United States

8   themselves objected to the Master's findings.  They didn't

9   object-- I shouldn't put it that way.  Mr. Veeder himself

10  requested that we be permitted to try to figure out a way

11  more accurately to delineate this, and finally he threw up

12  his hands.

13     MR. VEEDER:  We never throw up our hands.

14     THE COURT:  Try this for size.  We would provide that

15  as a prima facie showing the younger alluvium and older

16  alluvium as shown upon some map-- and there is not too much

17  general disagreement-- would be controling; that in case of a

18  real controversy as to where this younger alluvium exists,

19  which would undoubtedly concern only one parcel, the matter

20  would be open for further demarcation of the area of the younger

21  alluvium.

22     MR. SACHSE:  In other words, you would refer to an

23  actual map in your findings.

24     THE COURT:  Refer to a map in our findings.

25     MR. SACHSE:  That would be fine.

1    THE COURT:  And make it a prima facie proposition.  But

2 subject to being reopened, because these lines are approx-

3 imate.

4    In other words, if a controversy arose, say, as to Mr.

5 Ceas's Parcel 6-F, he has a very small area there, he can send

6 an engineer in there and with some test holes he could tell you

7 in short order where your younger alluvium was and where it

8 was not; and in the case of a real controversy it seems to me

9 that it would be only fair to let the parties explore if they

10 wanted to spend the money on it.

11    Do you think something like that would work?

12    MR. SACHSE:  That sounds reasonable, your Honor.

13    MR. VEEDER: That is the only way.  And the fact is that

14 the procedure that Mr. Sachse and I have followed in regard

15 to his clients is just about that.  He will say, "Here is my

16 client's property.  We will look on the maps we have involving

17 the geology, and if it appears they are removed from the

18 stream we cay, "O.K., out she goes."  I don't mean out it

19 goes.  We can get your interlocutory order and that is it.

20    There is only one thing that I worry about, your Honor,

21 and that is great generalizations, because there is such a

22 variant up and down the valley in regard to each individual

23 parcel.

24    I think what your Honor has outlined is very sensible

25 and about the only approach to take.

1      THE COURT:  Why I suggest this business of some little

2  area near this alluvium is that it would be obviously unfair,

3  it would seem to me, for a person to take the map and spot

4  where the map shows the younger alluvium stopped and then go

5  on the ground and move his hole over three feet  where the

6  younger alluvium stopped and put down a well and say, "I am

7  in the residuum and any water I get here doesn't come out of

8  the younger alluvium."   We know how these pockets are filled

9  up in the younger alluvium, and by luck he might have a well

10  right down in the younger alluvium and draining out the water,

11  which wouldn't be cricket as far as his neighbors are con-

12  cerned who might not have that same right.

13      MR. SACHSE:  I think it would work.  I like it.

14      THE COURT:  Well, we can try this for size and see how

15  it would work as we go along with some of these things.

16      But I didn't ask you your view, did I?

17      MR. LITTLEWORTH:  Yes, I think that has possibilities,

18  your Honor.

19      I would think personally that there are certain areas

20  where the younger alluvium is so thin and so small that,

21  again, the ground water storage is negligible and youcould,

22  in fact, take out all ground waters even though they might be

23  in the younger alluvium because there would be such a small

24  amount of them.  But this becomes a factual matter on individual

25  parcels as to where there would be any appreciable quantity.

THE COURT:  Well, of course, that's true, if we knew.
For instance, take a tributary and the engineers look it over
and they say that the alluvium here is not more than five or
six feet deep.  We don't know the geology of this thing.
Suppose that below the surface there is some large size
pocket that has been filled up with younger alluvium.  If a
man put a well down in there he could drain out every bit of
water that ever got into this thin layer of younger alluvium
above him.  It would all run down into this pocket and he would
get the benefit of it.  Actually, it is stream water.  I
wouldn't be surprised that in some of these upper reaches this
younger alluvium is again an illusory thing.

MR. LITTLEWORTH:  That is my thought, your Honor.  It
would be a factual matter in each case.

THE COURT:  However, it would conduct water in the season
when water was running.

MR. VEEDER:  And each dewatering of it reduces the
quantity of runoff.

THE COURT:  And I think the landowner also has to make
up his mind, as I told you and Mr. Krieger, whether, when you
have one of these illusory rights, you want to encumber your
property with a decree that you are part of the stream system
as far as that property is concerned, or whether you want to
say that we abandon any claim to the stream system and proceed
on the basis that we are out of any future litigation.

1    MR. LITTLEWORTH:  I think, on that point, when we have

2    finished with our people and have completed Col. Bowen's

3    testimony on ground water on these various parcels, there may

4    be, indeed, a fair share of this land, after we have conferred

5    with the owners, that we will want to get out of the suit

6    completely on something like this judgment No. 2.

7         THE COURT: By the way, of course, we can't finish today.

8    We will be back here next Tuesday?

9         MR. LITTLEWORTH:  I will not be able to pick up next

10   Tuesday, your Honor.  I have to be in San Francisco.  But I

11   have Roripaugh still to do, and so I am going to have to

12   come back on another day anyway.

13        THE COURT:  Who is going to work next week?

14        MR. STAHLMAN:  I can take Dr. Henderson.  I don't know

15   how long that will take.

16        THE COURT:  I would like to have you talk at the recess,

17   because if you are not going to take up the four days next

18   week-- or was that the week we agreed to go to the irrigation

19   convention?

20        MR. SACHSE:  No; that's gone.

21        THE COURT:  If you are not going to work next week, then

22   I want to schedule some other cases around here.  Talk it over

23   and let me know when I come back.

24        (Recess.)

25        MR. LITTLEWORTH:  Your Honor, we are going to proceed,

1    just very briefly, with Mr. Collins, who is one of the

2    persons on whom we did not have a survey, but he is away up

3    inthe upper part of the country and he has some turkeys he

4    has to get back to.

5         THE COURT:  All right.

6

7                        WESLEY P. COLLINS,

8    a defendant herein, called as a witness on his own behalf,

9    being first duly sworn, on his oath was examined and testified

10   as follows:

11        THE CLERK:  Please state your name.

12        THE WITNESS:  Wesley P. Collins.

13

14                        DIRECT EXAMINATION

15   BY MR. LITTLEWORTH:

16        Q   What is your address, Mr. Collins?

17        A   Route 2, Box 38, Murrieta.

18        THE COURT:  You didn't list him yesterday.

19        MR. LITTLEWORTH:  He is in your order, your Honor, but

20   we don't have the soil survey on him.  But he heard about the

21   trial and he is down here and so I thought we would try to

22   take care of him while he is here.

23        THE COURT:  What number?

24        MR. LITTLEWORTH:  He is No. 8, your Honor.

25

BY MR. LITTLEWORTH:

    Q  Mr. Collins, are you the owner of the property described as Parcel No. 8 in Section 31, Township 6 South, Range 2 West, on Roripaugh Exhibit B?

    A  I am.

    Q  How many acres are there there?

    A  40.

    Q  Do you live there?

    A  I do.

    Q  What do you do with that land?

    A  Raise turkeys on it.

    Q  Do you have any water developed there?

    A  I have one dug well.

    Q  A hand-dug well?

    A  That is right.

    Q  Do you have any kind of pump on it?

    A  It has a horse and a half jet pump.

    Q  How do you use the water?

    A  I use the water to water turkeys.

    Q  And for domestic purposes?

    A  And for domestic.

MR. LITTLEWORTH:  I have no other questions.

CROSS-EXAMINATION

BY MR. VEEDER:

Q  Have you an orchard up there on your land?

A  There is olive trees on the place.

Q  And you have no irrigation up there at all, do you?

A  No.

MR. VEEDER:  I have no further questions.

MR. LITTLEWORTH:  Thank you, Mr. Collins.  That's all.
You will not be able to call Col. Bowen on him right now.

MR. VEEDER:  No.

MR. LITTLEWORTH:  You will take care of that later.

THE COURT:  Is this owned by you alone or you and your wife?

THE WITNESS:  My wife and I.

THE COURT:  What is your wife's name?

THE WITNESS:  Betty Jane.

THE COURT:  All right.
The Court would propose to find from the location of that property on the map that any water that you have on it you are just lucky to have.
Is the property riparian?  Is there any creek or stream?

MR. LITTLEWORTH:  I should have asked  him that one other question, your Honor.

THE COURT:  That carries water off?

BY MR. LITTLEWORTH:

Q   Mr. Collins, are there any surface streams which run across that property?

A   I don't know.

Q   Are there any surface watercourses?

A   I guess you would call that surface water.

Q   I don't think you understand what I mean. Are there any creeks on your property?

A   No.

MR. LITTLEWORTH:   That's all.

MR. VEEDER: Your Honor, we have been talking about interlocutory judgment No. 2 on that case, your Honor.

THE COURT:   Yes.

Will it be satisfactory to you if judgment were entered that any water under that ground was not part of the stream system and that you were forever out of this lawsuit?

THE WITNESS:   It would.

THE COURT:   That any water you got you could use, subject only to what your neighbors might say about it?

THE WITNESS:   That I would like.

THE COURT:   All right, that is what we will try to do.

MR. LITTLEWORTH:   All right, you are excused, then, Mr. Collins.

MR. VEEDER:   That takes care of due process, if we ever had it.

THE COURT:  One other question.  You say this is completely covered with olive trees?

THE WITNESS:  Not completely, no.

THE COURT:  Does it lay pretty flat?

THE WITNESS:  No.

THE COURT:  According to the map, it looks like it only slopes gently.

THE WITNESS:  That describes it very well.

THE COURT:  Well, it is apparently irrigable if you had water, isn't it?

THE WITNESS:  That is right; it is.

THE COURT:  This brings to mind another suggestion that I think you ought to make.  I want to talk to you sometime at length about this latter of cattaloging this ground.

It seems to me that if you are going to catalog irrigable acres, we ought to catalog them into two or three arbitrary columns.  We ought to catalog them in one column where they are irrigable where there is no reasonable possibility that they ever would be irrigated.

MR. VEEDER:  From the Santa Margarita River, yes.

THE COURT:  From the stream system.  If they got aqueduct water in there or something else, that would be different. But where you would not include them in any computation as irrigable acres which would be made up to be of any use to anybody in computing the ground reasonably irrigable.

1  Then you ought to have another column where the land

2  that clearly could at any time be irrigated from the stream

3  system would be included.

4      You might want a third column where you would put some

5  doubtful cases.

6      But it seems to me that if we are going to pursue your

7  theory of tabulating irrigable acres, it ought to be done

8  realistically.

9      MR. VEEDER:  I think you are right, and I think we have

10  tentatively worked out this procedure.  We can take the areas

11  in particular sections and in particular townships and ranges

12  and put them in the category-- your Honor used the term

13  "doubtful"-- we could arrive at language that is appropriate

14  and segregate them in that way.  I think that can be done.

15      THE COURT:  Let's think about that.

16      MR. VEEDER:  Your Honor made reference to a map when

17  you were addressing Mr. Collins.  That was one of the 29 series,

18  was it not?

19      THE COURT:  The map I was looking at was Roripaugh B,

20  which had some contours on it.  I also had before me 15-A.

21      MR. VEEDER:  And the U.S.G.S. quads, the 29 series, would

22  be helpful from the standpoint of slope and land contour, if

23  you wanted to identify it that way.  I was not sure what map

24  your Honor made reference to.

25      THE COURT:  The 29 series contours are in the record,

10,845

and without specifying the particular on it can be considered, if necessary.

MR. VEEDER:  I thought that was what you were having reference to.

THE COURT:  Yes.

MR. LITTLEWORTH:  We will now proceed with Dixon, then, your Honor.  This is No. 26 on Roripaugh B.

THE COURT:  Point it out.

MR. LITTLEWORTH: Two parcels, one in Section 1 and one in Section 7.


ALBERT CEAS,

one of the defendants herein, recalled as witness in behalf of defendant Dixon, having been previously duly sworn, testified further as follows:


DIRECT EXAMINATION

BY MR. LITTLEWORTH:

Q  Mr. Ceas, is Emilie Dixon your sister?

A  Yes.

Q  What is her name at the present time?

A  Emilie Crawford.

Q  What is her address?

A  I can't tell you offhand.  She lives down on Balboa Island.

10,846

1    Q  Have you farmed her land?

2    A  Yes, I have.

3    Q  Is she the owner in her own name of the two parcels

4  shown as No. 26 on Roripaugh Exhibit B?

5    A  Yes.

6    THE CLERK:  Government's Exhibit 178.

7    THE COURT:  Exhibit 178 marked for Identification.

8  BY MR. LITTLEWORTH:

9    Q  I show you Exhibit 178 marked for identification.

10  Have you examined that report, Mr. Ceas?

11    A  Yes, I have.

12    Q  Are the descriptions contained therein of your

13  sister's land correct?

14    A  Yes.

15    Q  That report indicates that there are a total in both

16  parcels of 198 acres, of which 134.9 are irrigable; is that

17  correct?

18    A  Yes.

19    THE COURT:  You are authorized to speak for your sister?

20    THE WITNESS:  Yes.

21    THE COURT:  And you are familiar with this land?

22    THE WITNESS:  Yes.

23    THE COURT:  You have farmed it?

24    THE WITNESS:  Yes.

25    THE COURT:  All right.

BY MR. LITTLEWORTH:

Q  Now, look at the land, Mr. Ceas, in Section 1, 7 South, 3 West.  Does Warm Springs Creek traverse that property?

A  Yes, it does.

Q  Is there any water developed on that land?

A  No.

Q  You dry farm it all?

A  Yes.

Q  Now, look at Parcel 2, which is in the southerly half of Section 7, Township 7 South, Range 2 West.  Are there any surface streams across that property?

A  No.

Q  Are there any tributaries to Tucalota?

A  No, I don't believe so.

Q  Tucalota runs--

A  Well, there might be a very small one.  Actually, there is kind of a knoll and part of the runoff water would run to Warm Springs Creek and part of it would run to Tucalota.

Q  Are there any creek beds on there which do carry water which runs into those two streams?

A  Well, yes, very small tributaries.

Q  Is there any water developed on this land at the present time?

A  No.

10,848

1       Q  You dry farm all of that?

2       A  Yes.

3       THE COURT:  You are speaking of both properties now.

4  No water on either one?

5       THE WITNESS:  That is right.

6       MR. VEEDER:  That is, no water developed.

7       THE COURT:  Yes.

8       THE WITNESS:  That is right.

9       MR. LITTLEWORTH:  Those are the only questions we have,

10  your Honor.

11       THE COURT:  Which contour map of the 29 series would

12  be involved here?

13       MR. LITTLEWORTH:  It would be J or M.  The line runs

14  down the middle.

15       THE COURT:  Let me look at them.

16       MR. VEEDER:  I think it is both of them.

17       MR. LITTLEWORTH:  This is Section 1 land here, and here

18  is the other one, which is the southerly quarter of Section 7,

19  your Honor.

20       THE WITNESS:  Part of that runoff water in Section 1

21  would actually go into Murrieta creek, I believe, too.

22       THE COURT:  We are looking at the wrong 7.  We want the

23  Murrieta.

24       MR. LITTLEWORTH:  Here is the Murrieta quad sheet.  The

25  one we are looking for is 29-N.

1   MR. VEEDER:  I think you have that.

2   THE COURT:  I have it.  29-N and 29-J show it.

3   Now, Mr. Ceas, will you look at this map, which is

4   Roripaugh's B, and Parcel 26.  Now, part of that parcel 26 is

5   the Southwest Quarter of the Southeast Quarter of Section 7,

6   Township 7 South, 2 West.  Now, if you will look at it, also

7   where I have sketched in very roughly on Government's

8   Exhibit 15-A, the Southwest Quarter of the Southeast Quarter

9   and the most southerly and easterly corner of Parcel 26

10   seems to extend into an area of younger alluvium.  Have you

11   ever investigated that corner down there?

12   THE WITNESS:  Actually, the surveyors haven't been

13   able to find that corner.  I never realized it went clear down

14   into that younger alluvium.

15   THE COURT:  That is what I am trying to determine.

16   Does it or does it not?

17   THE WITNESS:  It is awful close.  I don't know, actually,

18   whether it does or doesn't.

19   MR. VEEDER:  15-A shows that, your Honor.

20   THE COURT:  As a matter of fact, this isn't sketched out

21   here correctly.  The line probably comes in like this and more

22   over that way.  But you see what I am getting at.

23   THE WITNESS:  Yes, I see what you are getting at.

24   THE COURT:  You never explored that corner?

25   THE WITNESS:  No, I haven't.  The reason we haven't is

1  because there is a road goes down into the Judge's place over

2  here and actually it is fenced out of the part of the land that

3  we farm.

4      THE COURT:  It is pretty hard to tell from the section

5  maps, because they are split up here.  Do you want to check

6  into that later and come back and tell us what you found?

7      A  I could, yes, sir.

8      THE COURT:  Col. Bowen, have you looked into that

9  question?

10     COL. BOWEN:  No, sir.

11     MR. VEEDER:  We might save Mr. Ceas a trip back.  I know

12 he doesn't want to come back any oftener than he has to.  If

13 you want us to, we will have somebody check it, your Honor.

14     MR. LITTLEWORTH:  Does it show on the aerial?

15     THE WITNESS:  Yes, it does.  I don't believe it goes

16 down into that younger alluvium.  Here is a road that goes

17 in to Judge Hilliard's place, here is the creek bed below

18 these eucalyptus trees.

19     MR. LITTLEWORTH:  You are now referring to Photo

20 3-0069 in Exhibit 17-A.

21     THE WITNESS:  Yes.  I don't believe it goes into that

22 younger alluvium.

23     THE COURT:  In fact, that southeast corner, according

24 to 29-N in evidence, would extend almost down to a reservoir

25 shown there and right down to a roadway.  Look over here.  There

10,851

1    seems to be a roadway that comes in.

2          THE WITNESS:  Yes.

3          THE COURT:  And then one roadway passes northerly of the

4    upper reservoir, and a trail comes down along and passes right

5    across the north end of the southerly reservoir.  Do you see

6    what I mean?

7          THE WITNESS:  Yes.

8          THE COURT:  Are you familiar with that reservoir

9    southerly of the two reservoirs there?

10         THE WITNESS:  Yes, sir.  Those were some small earth

11   fill reservoirs that were pushed in there for little fish

12   ponds, I believe; but when the stream came up one winter the

13   temporary reservoirs went out.

14         THE COURT:  You don't know how far your corner is from

15   that reservoir.

16         THE WITNESS:  I don't believe it goes down to that

17   reservoir.  There is actually no corner marked there, if you

18   know what I mean.  There is no cornerstone or post or

19   surveyor's corner there.

20         THE COURT:  All right.

21         MR. LITTLEWORTH:  That's all the questions I have

22         MR. VEEDER:  I have none.

23         MR. LITTLEWORTH:  Step down, Mr. Ceas.

24         MR. VEEDER:  Call Col. Bowen, please.

852

ALLEN C. BOWEN,

recalled as a witness in behalf of the plaintiff, having
been previously duly sworn, testified as follows:


FURTHER DIRECT EXAMINATION

BY MR. VEEDER:

Q Col. Bowen, I hand you Plaintiff's Exhibit marked
178 for Identification and ask you to read into the record
the content of that identification.

A Plaintiff's Exhibit 178 for Identification is a
copy of the engineering report prepared for the property of
Emilie Dixon.

Q Under whose direction was that prepared, Col. Bowen?

A Under my direction.

Q Would you state whether or not there is in the
record at the present time your field notes from which you
prepared that engineering report?

A The field sheets from which the aerial photo copies
included within 178 were made are included in the record
already. They are aerial Photos No. 3-0049, -70 and -69.

Q 49 and 69?

A Yes, sir; 49, 69 and 70.

Q And I hand to you those aerials and ask you to state
into the record how they are designated from the standpoint
of exhibits.

10,853

1    THE COURT:  Did you mark them for identification yet?

2    MR. VEEDER:  They are already in.  I just want to tie

3 them in.

4    THE WITNESS:  They are plaintiff's exhibits 170 and 173.

5 And there is one other, Mr. Veeder.

6    MR. VEEDER:  I will ask you to look at those exhibits,

7 if you would, Colonel, to be sure you get them.

8    THE WITNESS:  And Plaintiff's Exhibit 175.  Those three

9 field sheets form the basis for the soil survey report in 178.

10   MR. VEEDER:  Is the engineering report correct to your

11 personal knowledge, Col. Bowen?

12   THE WITNESS:  Yes, sir.

13   MR. VEEDER:  We offer in evidence Plaintiff's Exhibit

14 marked 178 for Identification.

15   THE COURT:  Plaintiff's 178 received in evidence.

16   (Plaintiff's Exhibit No. 178 was received in evidence.)

17   MR. VEEDER:  I have no further questions.

18

19                    CROSS-EXAMINATION

20 BY MR. LITTLEWORTH:

21   Q  Col. Bowen, do you have an opinion as to whether the

22 ground waters underlying those two parcels form a part of the

23 Santa Margarita River or its tributaries?

24   A  Yes, sir, I do.

25   Q  Would you state that opinion, please?

A Referring to Parcel No. 26, shown in Section 1, 7 South, 3 West, on Defendant's Exhibit Roripaugh B, it is my opinion that the ground water contained in the alluvium over which Warm Springs Creek flows is a part of the stream system.

THE COURT: Let's call that 26-A.

THE WITNESS: Parcel 26-A.

It is further my opinion that ground water, if any, found in the basement complex and residuum underlying Parcel 26-A is local, vagrant, percolating, and not part of the stream system.

MR. LITTLEWORTH: Shall we designate the other parcel as 26-B, your Honor?

THE COURT: That's right.

BY MR. LITTLEWORTH:

Q What about that one?

A It is my opinion that the ground water, if any, underlying Parcel 26-B, as shown on Defendant's Exhibit Roripaugh B, is local, vagrant, percolating, and not part of the stream system, because that parcel as shown in Plaintiff's Exhibit 15-A is underlain completely by basement complex and residuum.

MR. LITTLEWORTH: That's all.

REDIRECT EXAMINATION

BY MR. VEEDER:

Q Colonel, would your opinion be any different if it were found that 26-B actually extended down into the bed of Tucalota Creek?

A My opinion is that any water in the alluvium border-ing Tucalota Creek in Section 7, 7 South, 2 West, is a part of the stream system, and if it were found in fact that that 26-B overlay in part that alluvium I would believe the water contained inthe alluvium was part of the stream system.

MR. VEEDER: I have no further questions.

MR. SACHSE: I have a few questions, your Honor.


CROSS-EXAMINATION

BY MR. SACHSE:

Q Col. Bowen, I am going to ask you to do some scaling, because I don't trust my own. Could you scale the length north to south of Tucalota Creek through Parcel 49, the Hinkley parcel?

A Are you speaking of Warm Springs Creek?

Q Pardon me. Warm Springs.

A The length of the reach of Warm Springs Creek through Parcel 49, as shown on Defendant's Exhibit Roripaugh B, is approximately eight-twentieths of an inch.

Q And this is the same scale?

1    MR. VEEDER:  Is that scale sufficiently accurate,

2  Colonel?

3    THE WITNESS:  The scale that Mr. Sachse has given me

4  is an engineering scale manufactured by Kibble & Esser Company,

5  and I believe it is sufficiently accurate.

6    MR. VEEDER:  I was worried whether it was a proper scale

7  that could be used on this map.

8  MR. SACHSE:  That is 2,000 feet to the inch scale.  About

9  how many feet?

10    A  About 800 feet.

11    THE COURT:  From the looks of the map Roripaugh B, it

12  looks like those three strips across there, Parcels 26, 6 and

13  49, take up the whole half-section.

14    MR. VEEDER:  It would be a half mile.

15    MR. SACHSE:  It would work out just about right.

16    THE COURT:  In other words, 320, 110 acres in each one

17  of them, and if they take up the whole half-section, if they

18  are described in some way to indicate that each of them has a

19  third of that half-section, then it would be 880 feet.

20    MR. SACHSE:  Pretty close.

21    Q  Now, will you check, if you please, also with the

22  scale, the width of the alluvium as shown on Government's 15-A,

23  the same area?

24    MR. VEEDER:  I am going to object to that on the grounds

25  that the exhibit to which he is making reference, 15-A, is

1  diagrammatic as distinguished from being drawn in on a

2  specific survey, so that the conclusions that might be reached,

3  whatever Mr. Sachse is searching for, might not be at all

4  reflective of any reality.

5      MR. SACHSE:  If the Court please, these are preliminary,

6  and I submit the objection would go to the weight and not to

7  the admissibility.

8      THE COURT:  Overruled.  The foundation laid for 15-A

9  was not that it was only diagrammatic; that it was done

10 as accurately as possible, but that there were of course,

11 discrepancies here and there.  It was not a schematic diagram.

12 It was an attempt to show us where the younger alluvium was,

13 in the best judgment of the men who prepared it.

14 BY MR. SACHSE:

15     Q  About 200 feet, Colonel?

16     A  Approximately 300, according to the scale, as shown

17 on Plaintiff's Exhibit 15-A.

18     Q  Now, I am going to ask you to do a little arithmetic,

19 if you will.  Here is a clean piece of white paper.  Will you

20 take 880 feet and multiply it by 300?

21     A  I scaled it at 800, Mr. Sachse.

22     Q  That's correct.

23     A  Do you wish me to use 880?

24     Q  Use the 800.

25     A  800 times 3, 240,000 square feet.

Q  I want you to assume the depth of the alluvium of 20 feet and multiply it by that.

MR. VEEDER:  I object on the grounds that there is no basis for such an assumption and for such hypothesis.

MR. SACHSE:  I am asking him as an expert witness to assume a fact, Mr. Veeder.

THE COURT:  Overruled.

THE WITNESS:  4,800,000 cubic feet.

BY MR. SACHSE:

Q  Col. Bowen, are you generally familiar with how that alluvium would compare, for example, with alluvium in Pauba Valley?

MR. VEEDER:  Compare in what respect, Mr. Sachse?

MR. SACHSE:  As to its specific yield, the amount of water it would carry.

MR. VEEDER:  I object; there is no foundation whatever for this.

BY MR. SACHSE:

Q  Then I will ask you to assume, Colonel.  Colonel, I will direct your attention to Government's Exhibit 18--

THE COURT:  He has embarked upon a proof of the principle of de minimis, I think.

MR. SACHSE:  Exactly, your Honor.

THE COURT:  Generally I can anticipate what counsel are at long before they get to the mark.

THE WITNESS:  What was the assumption, Mr. Sachse?

BY MR. SACHSE:

Q  I am looking at Government's Exhibit 18, in which Mr.
Kunkel calculated ground water storage capacity of a number
of basins, and there is no calculation, of course, for this
end of Warm Springs Creek.  But let's take a high one.  We
will take the highest.  The estimated specific yield for Pauba
Valley, as calculated by Mr. Kunkel, is 16.  Now, applying
that specific yield figure to your cubic feet, what result
do you get?

A  You want 16% of the cube?

Q  Of the cubic feet, yes.

MR. VEEDER:  I think he might write a brief on it, but
I don't see how he can get into the matter from the standpoint
of evidence.  He can argue it if he wants to.

THE WITNESS:  That would be 768,000 cubic feet.

BY MR. SACHSE:

Q  Now, there are how many cubic feet of water in an
acre-foot?  43,560, are there not?

A  Cubic feet in an acre-foot, yes, sir, 43,560 cubic
feet in an acre-foot.

Q  Now, will you please determine how many acre-feet of
water, assuming those figures I have given you, would be in this
strip of land on the Hinkley parcel?

MR. VEEDER:  Assuming it is full?  Assuming what?

1     MR. SACHSE:  Assuming the figures I have given him,

2 a 16% specific yield, which is your yield for Pauba Valley.

3     THE COURT:  Assuming all the alluvium is full of water.

4     THE WITNESS:  It would be approximately 18 acre-feet.

5 BY MR. SACHSE:

6     Q  So if the Hinkley parcel were completely dewatered

7 by putting a well into it, under the assumptions I have given

8 you, the stream system would be short 18 acre-feet of water;

9 is that right?

10     THE COURT:  Well, now, wait.  There is where your whole

11 train breaks down.  If this was just a little basin that had

12 no supply of water running into it and you pumped it out,

13 then of course you have lost 18 acre feet. But this is a

14 piece of alluvium lying in a stream bed, and as you pump water

15 out of it more water comes in.  If you want to limit your

16 question to the fact that if you had it blocked at both ends

17 and pumped it dry, there would be 18 acre-feet.

18     MR. SACHSE:  Your Honor has suggested a couple more

19 questions on the de minimus.

20     Q  Col. Bowen, how do you describe that stretch of Warm

21 Springs Creek, as far as its runoff characteristics are

22 concerned?  Is it an intermittent stream?

23     A  Yes, sir.

24     Q  And is it a stream that flows only during and

25 immediately after periods of heavy precipitation and runoff?

1        A  Yes, sir.

2        MR. SACHSE:  I have nothing further.

3

4                    REDIRECT EXAMINATION

5    BY MR. VEEDER:

6        Q  Col. Bowen, have you gone onto that piece of property

7    yourself?

8        A  Yes, sir.

9        Q  During what time of the year?

10       A  In the dry period of the year.

11       Q  Have you observed the spring just above that property?

12       A  You mean on the Ceas property?

13       Q  That's right.

14       MR. SACHSE:  The Ceas property isn't above it, Mr.

15    Veeder.  I have been using 49.

16    BY MR. VEEDER:

17       Q  You have been using 49?

18       A  Yes, sir.

19       MR. SACHSE:  I think Ceas is immediately below.

20    BY MR. VEEDER:

21       Q  You have seen the spring on the Ceas property?

22       A  On the Ceas property below it you mean?

23       Q  That is right.  But you have seen it?

24       A  No, I have not.

25       MR. VEEDER:  I have no further questions.

San Diego, California, Wednesday, November 25, 1959. 1:30 P.M.

MR. VEEDER:  Your Honor, I have referred to Inter-
locutory Judgment No. 3, prepared by Mr. Sachse and by me,
and you have seen a copy in the rough.  It is now ready for
your Honor's signature and I ask the Clerk to hand it to you.

THE COURT:  It is the opinion of both counsel that
there is sufficient evidence in the record to support the
findings and conclusions suggested?

MR. SACHSE:  Yes, your Honor.

MR. VEEDER:  Yes.

That is about a hundred of the brave lads, your Honor.

MR. SACHSE:  There are 34 in this one.

THE COURT:  What descriptions are you using?

MR. VEEDER:  We are using reference to the exhibits
before the Special Master and incorporating the descriptions
by reference.  Mr. Sachse and I have checked the descriptions
back with the references that are in Exhibit A and we have
found them to be correct.

Am I correct?

MR. SACHSE:  That is right.  We are under the impression
that ultimately we will have to supply, at the final hearing,
a description which other people can identify.  Your Honor
will recall that we discussed this with you that this would
save paper.

1    THE COURT:  Has anybody checked with the title companies

2  as to those descriptions on the maps?

3    MR. VEEDER:  I haven't yet, your Honor.  Was I directed

4  to?  I don't recall.

5    MR. SACHSE:  I don't know that you were, Bill.  We both

6  were directed to.

7    THE COURT:  I am not so sure but that in the final

8  judgment, if the descriptions on the map are sufficient to

9  allow someone to go to the map and see what the description

10  was, you couldn't still use map descriptions.

11    MR. VEEDER:  I truly think it would be all right.  I

12  don't see why it wouldn't be just as effective as referring

13  to a plat being filed by means of reference to identify city

14  property.

15    MR. SACHSE:  I will check into it.

16    THE COURT:  You will check into that later.

17    All right, I will look this over and sign it.

18    MR. LITTLEWORTH:  Will you take the stand, Mr. Ceas.

19    This is Hinkley No. 49, your Honor.

20

21           ALBERT CEAS,

22  recalled as a witness in behalf of the defendant Hinkley,

23  having been previously duly sworn, testified as follows:

24

25

1  Hinkley.  Apparently there was confusion in the name between

2  the grandfather and the granddaughter here.  And I believe

3  Commander Redd would like permission to withdraw this and

4  substitute a couple of pages to get the name straightened out.

5  But this report marked 179 for Identification is the report

6  on this land, and the name can be straightened out.

7       THE COURT:  All right.  It may be withdrawn for the

8  purpose of correction, and counsel can look over it later and

9  see that it is satisfactory.

10 BY MR. LITTLEWORTH:

11      Q  Now, Mr. Ceas, have you looked at Exhibit No. 179

12 for Identification?

13      A  Yes, sir, I have.

14      Q  That report shows that there is a total of 186 acres

15 between these two parcels, of which 135.8 are irrigable; is

16 that correct?

17      A  Yes, it is.

18      Q  Looking at the strip here in Section 1--

19      THE COURT:  We will call that 49-A, and the other 49-B.

20      MR. LITTLEWORTH:  All right.

21      Q  Looking at 49-A, now, on Roripaugh B, is there any

22 surface stream which traverses that property?

23      A  Yes, there is.

24      Q  Is that Warm Springs Creek?

25      A  Yes.

1    Q  Do you farm that land?

2    A  Yes, I do.

3    Q  Dry farm it?

4    A  Yes, I do.

5    Q  Is there any water developed on that land at all?

6    A  No.

7    Q  Now, looking at 49-B in the southerly have of

8  Section 7, do you also farm that land?

9    A  Yes, I do.

10    Q  Is there any surface stream which you can see

11  running across that parcel?

12    A  No surface stream.  There is a small tributary

13  of Tucalota Creek that runs up through that property.

14    Q  Do you dry farm that land also?

15    A  Yes, I do.

16    Q  Any irrigation at all?

17    A  No.

18    Q  Is there a well on that property?

19    A  Yes, there is.

20    Q  What kind is it?

21    A  We have a small windmill well there.  It is a dug

22  well.  It is about 65 feet deep.

23    Q  Does it have a motor or pump of any kind?

24    A  It has a windmill.

25    Q  A windmill only?

1    THE COURT:  Are you through with this parcel now?

2    MR. LITTLEWORTH:  Yes.

3    MR. SACHSE:  I have nothing further.

4    THE COURT:  My comments would be the same as to Ceas.

5    We will adjourn until 1:30.  Is that agreeable?

6        (Noon recess.)

DIRECT EXAMINATION

BY MR. LITTLEWORTH:

Q   Mr. Ceas, is Sherilan Hinkley your daughter?

A   Yes, she is.

Q   And are you authorized to represent her on the stand here today on this particular piece of property?

A   Yes, I am.

THE COURT:   Where is 49 located?

MR. LITTLEWORTH:   One parcel again in Section 1, and another parcel in the South Half of Section 7, your Honor.

THE COURT:   I see.

BY MR. LITTLEWORTH:

Q   Mr. Ceas, is your daughter the owner of the two parcels marked No. 49 appearing on Roripaugh Exhibit B?

A   Yes.

Q   Was that land which was distributed to her from the estate of your father Etienne Ceas?

A.   That is right.

Q   He was named as a defendant in this suit, was he?

A   Yes.

Q   But he is now deceased and his estate has been probated?

A   Yes.

MR. LITTLEWORTH:   Your Honor, I would call attention on the soil survey report that the name on it is Etienne

A  Yes.

Q  Do you store any water coming out of that windmill well?

A  We have a small tank for stock water purposes, probably about a thousand gallons, I guess.

Q  Do you know how long water has been stored from that well?

A  Water has been stored on that place since approximately 1928.

Q  In the same quantity?  About a thousand gallons?

A  Yes.

Q  Always been used for stock?

A  Yes.

Q  Do you know of any other attempts to find water on that property?

A  Yes, I do.

Q  What was it?

A  I might show you on  the map the location of another well that exists that is capped over at the present time.

Q  All right.

A  Right down in this corner.

Q  You are now referring to the Southeast corner of Parcel 49-B?

A  Yes.  That well is on the easement which the Navy acquired for the first San Diego aqueduct.

1      Q   Is it used?

2      A   No, it is not.

3      Q   When was it drilled?

4      A   I believe a year prior to when the first aqueduct

5  was put in, which would have been 1945.

6      Q   About 1945?

7      A   Yes.

8      Q   Do you know how deep it was?

9      A   Over 300 feet.

10     Q   Do you know whether they found water in that well?

11     A   They put a pump on the well and attempted to pump it

12  and there was no water in the well.

13     MR. LITTLEWORTH:   That is all.

14     MR. VEEDER: I have no questions.

15     THE COURT:   Anyone else?

16     All right, step down.

17     MR. VEEDER:   Call Col. Bowen.

18

19                     ALLEN C. BOWEN,

20  recalled as a witness in behalf of the plaintiff, having been

21  previously duly sworn, testified further as follows:

22

23                  FURTHER DIRECT EXAMINATION

24  BY MR. VEEDER:

25     Q   Col. Bowen, I hand you the exhibit marked 179 for

1      Identification and ask you to read the title block into the

2      record.

3           A   Plaintiff's Exhibit 179 for Identification is the

4      Engineering Report on the property of Etienne Hinkley, as

5      shown on the face of the exhibit.

6           Q   Will you state, Colonel, whether the field sheets

7      from which this exhibit, this identification, was prepared are

8      now a matter of record?

9           A   Yes, sir, they are.

10          Q   And do you have a reference there so that we can

11     identify the field sheet?

12          THE COURT:   By "matter of record," you mean in evidence

13     as exhibits.

14          MR. VEEDER:   In this case, yes, your Honor.

15          THE WITNESS:   Well, they would be numbers 49, 69 and

16     70.

17          THE COURT:   Exhibit numbers?

18          THE WITNESS:   No, sir; those are the photographic

19     numbers.

20     BY MR. VEEDER:

21          Q   Did you say 69 and 70?

22          A   And 49; yes, sir.

23          Q   (Mr. Veeder handing documents to the witness.)

24          A   Those are the exhibit numbers, your Honor-- Plaintiff's

25     Exhibit 173, 170 and 175.

THE COURT:  And the material in exhibit 179 in the nature of the maps are taken from these field sheets?

THE WITNESS:  Yes, sir.

MR. VEEDER:  Was exhibit marked 179 for Identification prepared under your direction, Colonel?

A  Yes, sir.

Q  And are the statements and statistics contained in it accurate, to your personal knowledge?

A  Yes, sir.

MR. VEEDER:  We offer in evidence Exhibit 179.

MR. LITTLEWORTH:  No objection.

THE COURT:  Received in evidence.

(Plaintiff's Exhibit No. 179 was received in evidence.)

MR. VEEDER:  I have no questions, your Honor.


CROSS-EXAMINATION

BY MR. LITTLEWORTH:

Q  Col. Bowen, do you have an opinion as to whether the ground waters on these two parcels form part of the Santa Margarita River or its tributaries?

A  Yes, sir, I do.

Q  Would you give that opinion, please?

A  Referring to Defendant's Exhibit Roripaugh B and Parcel No. 49-A as shown thereon, it is my opinion that the ground water contained in the alluvium over which Warm Springs

1   Creek flows is a part of the stream system, and it is my

2   further opinion that the remainder of the property being

3   underlain by basement complex and residuum, as shown on

4   Plaitiff's Exhibit 15-A, that any ground water found in that

5   basement complex or residuum is vagrant, local, percolating

6   water and not a part of the stream system.

7        Now, with regard to Parcel 49-B, as shown on Defendant's

8   Exhibit Roripaugh B and with reference to Plaintiff's Exhibit

9   15-A, it is noted that a portion of the alluvium in contact

10  with Tucalota Creek extends into 49-B and the waters contained

11  in that Recent alluvium, in my opinion, are part of the stream

12  system.  The remainder of 49-B is underlain by residuum and

13  basement complex, and it is my opinion that if any water is

14  found in that residuum or basement complex it is local,

15  vagrant, percolating, and not part of the stream system.

16       Q  Col. Bowen, this 49-A parcel is the one that Mr.

17  Sachse asked you some questions on before lunch, and I think

18  he asked you to assume in that hypothetical that the alluvium

19  was 20 feet deep.  Do you happen to know how deep the alluvium

20  is there?

21       A  No, sir, I don't.

22       Q  Do you think 20 feet is a fair assumption?

23       A  That is probably somewhere close to the actual depth.

24  MR. LITTLEWORTH:  That is all.

25  MR. VEEDER:  I have no questions.

26,873

1    THE COURT:  Any other questions?

2    Did you make any check on the well that Ceas testified

3 to down in the southeast corner of 49-B?

4    Do you have a well log on it?

5    MR. VEEDER:  No, we do not.

6    THE WITNESS:  Is that the well that is capped?

7    THE COURT:  Yes.

8    THE WITNESS:  No, I made no check on that well.

9    THE COURT:  It went 300 feet deep.  Obviously it

10 penetrated into the residuum.  It was drilled in the younger

11 alluvium.  It undoubtedly penetrated into the residuum for

12 several hundred feet. And the testimony that there was no

13 water found, of course, confirms what we thought and know

14 about most of the residuum in this area.

15    THE WITNESS:  It would be my opinion, your Honor, that

16 the greatest depth pierced the unweathered basement complex

17 rather than residuum.

18    THE COURT:  In other words, it went through the younger

19 alluvium , the residuum and then into the basement complex?

20    THE WITNESS:  Yes, sir.

21    THE COURT:  Anything further from this witness?

22    MR. LITTLEWORTH:  No, sir, your Honor.

23    THE COURT:  Thank you.

24    MR. LITTLEWORTH:  Mr. Ceas, one more.

25    THE COURT:  Are you related to all these people up there,

Mr. Ceas?

    MR. CEAS:  I guess.


                ALBERT CEAS,

recalled as a witness in behalf of defendant Nicholas, having

been previously duly sworn, testified as follows:

    THE COURT:  Which parcel is this?

    MR. LITTLEWORTH:  No. 27, your Honor.  This is the

Nicholas land, which is the triangular-shaped here and purple.

    THE COURT:  Yes.


                DIRECT EXAMINATION

BY MR. LITTLEWORTH:

    Q  Mr. Ceas, is Seraphina Nicholas your aunt?

    A  Yes, she is.

    Q  Did she also raise you?

    A  Yes.

    Q  And are you authorized to speak for her on this

Parcel 27?

    A  Yes, I am.

    Q  Also land which you farm?

    A  Yes.

    Q  Is Seraphina Nicholas the owner of the land shown as

Parcel 27 on Roripaugh B?

    A  Yes, she is.

10 875

Q   That land is described in her answer and also in the soil survey marked Exhibit 180 for Identification?

A   Yes.

Q   Those descriptions are correct?

A   Yes, they are.

Q   That report shows that there are 1135 acres in that parcel, of which 960 acres are irrigable; is that correct, in your opinion?

A   I believe so.

THE COURT:   Before I forget it and we pass the Hinkley matter, I would propose to make the finding, in the absence of other evidence, as to 49-A in the same manner as I would find as to 6 and 26-A; and as to 49-B, I find it is in accord with the testimony of Col. Bowen.   There is not enough evidence to know when this well was drilled, whether it was drilled in the dry season or not, to know whether there is actually water in that younger alluvium shown in the southeast corner or whether it is such a thin layer that actually it amounts to nothing.

MR. VEEDER:   Nothing to show the perforations in the well either.

THE COURT:   No.   We will have to pass that now, I think.

MR. LITTLEWORTH:   Yes.

Q   Mr. Ceas, is this Parcel 27 traversed by any surface stream?

A  Yes, it is.

Q  Which one?

A  Santa Gertrudis.

Q  Is there any well on that property?

A  Yes, there is.

Q  Can you tell approximately where it is located?  You are indicating a point in the southwest quarter of Section 20; is that correct?

A  Yes, that is.

Q  What kind of well is it?

A  It is a domestic well.

Q  Do you know how deep it is?

A  Approximately 100 feet.

Q  What kind of pump?

A  Windmill, and pump jack.

Q  How long has it been there?

A  Well, prior to 1920, I know.

Q  Is there any water stored in connection with this well?

A  Yes, there is.  There is a water storage tank for domestic purposes, approximately 5,000 gallons.

Q  How long has that been there?

A  Well, ever since I can remember.  I was brought up on this ranch and ever since I was a youngster there has always been a storage tank of approximately that capacity.

Q  And water has been stored there continuously, then, for domestic purposes from that well?

A  Yes.

THE COURT:  You say prior to 1920?

THE WITNESS:  Yes.

BY MR. LITTLEWORTH:

Q  Is there any irrigation on that land?

A  No, there isn't.

Q  You dry farm all of it?

A  Yes.

MR. LITTLEWORTH:  That's all.

MR. VEEDER:  I have no questions.

THE COURT:  All right, step down.

MR. VEEDER:  Call Col. Bowen, please.


ALLEN C. BOWEN,

recalled as a witness in behalf of the plaintiff, having been previously duly sworn, testified as follows:


FURTHER DIRECT EXAMINATION

BY MR. VEEDER:

Q  I hand you, Col. Bowen, the exhibit marked for identification 180 and ask you to state into the record what is represented by that exhibit.

A  Plaintiff's Exhibit 180 for Identification is an

10,878

engineering report on the property of Seraphina Nicholas.

Q   And under whose direction was that prepared?

A   Under my direction.

Q   I also hand you the aerial photo marked 181 and ask you to state into the record what appears on that aerial photo?

A   Plaintiff's Exhibit 181 for Identification is a field sheet upon which a portion of the Seraphina Nicholas property was mapped, and it is an enlargement of Aerial Photo No. 3-0067.

Q   Would you correlate that field sheet with the aerial photographs that appear in identification 180?

A   The last photographic copy in 180 shows an area circumscribed by a red triangle, and that is copied from Plaintiff's Exhibit 181.

Q   I hand you, Col. Bowen, an aerial photo marked 182 for Identification and ask you to state into the record what appears on that aerial photo.

A   Plaintiff's Exhibit 182 for Identification is the field sheet used to map a portion of the Seraphina Nicholas property, and it is an enlargement of the vertical aerial photo 3-0084.

Q   Will you correlate 182 with 180, showing where the corresponding aerials appear in 180?

A   The next to the last photographic print in 180 is a

reduced print of 182.

Q  And is the data contained in Plaintiff's Exhibit marked 180 for identification accurate, to your personal knowledge?

A  Yes, sir.

MR. VEEDER:  We offer in evidence the exhibits marked 180, 181 and 182.

THE COURT: Received in evidence.

(Plaintiff's Exhibits 180, 181 and 182 were received in evidence.)

MR. VEEDER:  I have no further questions.

MR. STAHLMAN:  I just wondered if it would be well to show in evidence at this point whether or not this property is contained in Storage Unit No. 4, as shown on Plaintiff's Exhibit 17.

MR. VEEDER:  I will ask Col. Bowen to step to Roripaugh's B and state whether the property to which reference has now been made and concerning which Exhibit 180 pertains is located in Storage Unit No. 4, which is delineated on Roripaugh's Exhibit B.

THE WITNESS:  I don't believe, Mr. Veeder, that the ground water storage unit 4 is delineated on Defendant's Exhibit Roripaugh B.

THE COURT:  The Kunkel line, I think.

MR. VEEDER:  The Kunkel line is the exterior boundary.

MR. STAHLMAN:  It takes Exhibit 17 to show it, I think.

THE COURT:  It is not necessarily the storage unit, is it?

MR. VEEDER:  I think the scale of the map is different, your Honor, but I believe that is the outer boundary.

MR. STAHLMAN:  Here is Exhibit 17.

MR. VEEDER:  If you put Exhibit 17 up there, I believe you will find that they correspond.  There is a difference in scale.

(Mr. Stahlman putting up the exhibit on the board.)

MR. VEEDER:  May I inquire from Mr. Littleworth, was it the intention to show on Roripaugh's B substantially the same line as appears on the outer extremity of storage area No. 4, as depicted on Plaintiff's Exhibit 17?

MR. LITTLEWORTH:  Yes, it was, and I think Mr. Webb has already testified that he made allowances for change in scale and did transcribe that storage unit line on our Roripaugh B.

MR. VEEDER:  Does that answer the question, Mr. Stahlman?

MR. STAHLMAN:  Yes.

MR. VEEDER:  Then I withdraw the question presented to Col. Bowen.

MR. STAHLMAN:  What question was that?

MR. VEEDER:  I asked him for a response--

10,881

1    MR. STAHLMAN: No, I would like to have it in the record.

2    I want the evidence in the record, not just the statement of

3    counsel.

4        MR. VEEDER:  Why don't you answer the question, then,

5    as originally asked?

6        THE WITNESS:  I am wondering who asked the question at

7    this point.  Is this your question, Mr. Stahlman?

8        THE COURT:  Yes.

9        MR. STAHLMAN:  I will ask the question whether or not

10   the property you testified to as shown on Roripaugh's Exhibit

11   and designated as Parcel 27 is within or without the Storage

12   Unit No. 4 depicted on Government's Exhibit 17, referred to

13   as the boundaries of the Kunkel line?

14       THE WITNESS:  Partly within and partly without, Mr.

15   Stahlman.

16       MR. STAHLMAN:  And could you tell us to what extent it

17   is in?

18       THE WITNESS:  Well, the greatest portion of it is within.

19       MR. STAHLMAN:  And the place in which this well is

20   located that you observed on the property, that is within, is

21   it?

22       THE WITNESS:  Did you say the well was marked on

23   Roripaugh's Exhibit B?

24       MR. STAHLMAN:  No, the well that you have testified to

25   in relation to--

THE COURT:   He didn't testify to the well.

MR. VEEDER:   Mr. Ceas did.

THE COURT:   You had your finger right on it.

The record will show that the well referred to is within the Kunkel line.  As I read the map, all of 27 is within the Kunkel line, except approximately the north half of the Northeast Quarter of Section 19-- what is the range and township?

THE WITNESS:   7 South, 2 West.

MR. VEEDER:   I have no further questions.

MR. LITTLEWORTH:   I have no questions of Col. Bowen on this.

THE COURT:   Any decision as to this parcel will have to await some decision on the extent of the basins.  It is obvious that the land is riparian.

MR. LITTLEWORTH:   Yes, your Honor.

THE COURT:   And the land lies over old alluvium, plus the younger alluvium of the Santa Gertrudis.

All right, call your next witness.

MR. LITTLEWORTH:   Mr. Ernest Lincoln.


ERNEST M. LINCOLN,

a defendant herein, being first duly sworn, on his oath was examined and testified as follows:

THE CLERK:   Please take the stand and give your name.

1    THE WITNESS:  Ernest M. Lincoln.

2

3                    DIRECT EXAMINATION

4    THE COURT:  What number, counsel?

5    MR. LITTLEWORTH:  No. 15, your Honor.

6    Q  Mr. Lincoln, your name is Ernest M. Lincoln?

7    A  That is right.

8    Q  And what is your address, please?

9    A  Box 13, Murrieta, California.

10   Q  Are you married to Julia K. Lincoln, who is also

11 known as Julia Wieke?

12   A  That is correct.

13   Q  Does your Answer on file in this suit also include a

14 joint answer with Reina Hamilton?

15   A  That is correct.

16   Q  Who is she?

17   A  She is my sister-in-law.

18   Q  And part of this property is jointly owned with her?

19   A  That's right.

20   Q  What is your occupation, Mr. Lincoln?

21   A  Rancher at present.

22   Q  How long have you been in the ranching or farming

23 business?

24   A  Oh, about 1937, more or less.

25   Q  Since 1937?

10,884

A Practically.

Q Mr. Lincoln, I now show you Exhibit 183 for Iden-tification, which is the soil survey on your property, and ask you if you have examined that?

A I have to an extent.

Q Now, is it correct that the survey does not include a small parcel in Section 22, Range 7 South, 3 West?

A That is correct.

THE COURT: Let's number these so that we can refer to them.

MR. LITTLEWORTH: All right, shall we call that 15-A, then?

THE COURT: The one you just referred to will be 15-A, the one lying partly in Sections 28 and 33 will be 15-B. Is the other piece all one section or is that divided up?

MR. LITTLEWORTH: That is all one parcel, your Honor.

THE COURT: That will be 15-C, then.

MR. LITTLEWORTH: And he has one other one up in Section 3 up here.

THE COURT: Where is that?

THE WITNESS: In Section 3.

THE COURT: That is shown on my map.

All of Section 3 except that southwest corner?

MR. LITTLEWORTH: Yes. That would be 15-D.

Now, there are also two town lots, your Honor, in the

1    town of Murrieta, which I think could be 15-E.

2         THE COURT:  Where is that located?

3         MR. LITTLEWORTH:  Right in the--

4         THE COURT:  I see.  That is 15-E.

5         MR. VEEDER:  That is two parcels, is that correct?

6         MR. LITTLEWORTH:  Yes.

7         Q  Mr. Lincoln, does the report No. 183 also include

8    what we have described as 15-E, that is, the town lots in

9    Murrieta?

10        A  What?

11        Q  The report does not include those town lots?

12        A  Not in this report.

13        Q  Now, are the town lots 15-E and 15-A, Parcel and

14   Section 22, all owned by Reina Hamilton in her own name?

15        A  That is correct.

16        Q  The report shows a total acreage of 1,152 acres,

17   which would include all of the land shown on Roripaugh B

18   except Parcel 15-A and Parcel 15-E?

19        A  That is correct.

20        Q  And of that amount the report states that 785.7 acres

21   are irrigable.  Is that correct?

22        A  As near as I can--

23        THE COURT:  How much?

24        MR. LITTLEWORTH:  785.7.

25        Q  Is that correct?

A   That is correct.

Q   Looking at 15-A, how many acres are there in that parcel?

A   There are 33 acres.

Q   Do you farm that land?

A   No, I don't.  That is leased out.

Q   Are you familiar with the land?

A   Not to a great extent.

Q   Do you know how much is irrigable?

A   I presume there is probably 20 acres of it could be, maybe a little more.

Q   About 20 acres?

A   About that, I would say.

Q   Is there any surface stream which touches this Parcel 15-A?

A   Hot Springs Creek cuts right across the edge of it.

Q   Is that the same as Warm Springs Creek?

A   That is correct.

Q   It cuts across the easterly side of it?

A   That is right.

Q   Let's look down here at 15-B and 15-C.  Is this your main ranch?

A   That is correct.

Q   And is there an error on this map as to the land which you own?

10,887

A  That is right.

Q  Should this section which is uncolored in the middle of 15-C be colored to indicate that you own it?

A  That is right.

THE COURT:  By "section" you don't refer to--

MR. LITTLEWORTH:  I should say a parcel.  I do not mean a whole section.

THE COURT:  Lying immediately south and west of the parcel marked 35.

MR. LITTLEWORTH:  Yes.

Q  Now, immediately above this uncolored square there is a parcel here with both the numbers 35 and 15 in it.  You do not own that land?

A  I do not.

Q  Did you exchange those two parcels?

A  That is correct.

Q  So that now you own the parcel which is uncolored?

A  That is right.

Q  And do not own the one immediately above it?

A  That is right.

Q  Is that part of the Pearl property?

A  That is right.

MR. VEEDER:  Could we make that change on the exhibit?

MR. LITTLEWORTH:  Yes.

MR. VEEDER:  And then put 15 in the uncolored portion

1    and strike the 15 in the other portio.

2        THE COURT:  Yes.

3        MR. LITTLEWORTH:  I will ask Mr. Webb to make the color

4    change after court, then.

5        THE COURT:  Is 35 another parcel?

6        MR. LITTLEWORTH:  Yes, that is the Pearl property, and

7    they own 80 acres there now.

8        THE COURT:  Strike that 15 and leave the 35 in.

9        MR. LITTLEWORTH:  Yes, your Honor, we will.

10        Q  Mr. Lincoln, are all these properties correctly

11    described in the soil survey report No. 183?

12        A  That is right.

13        Q  Is your main ranch owned an undivided one-half by

14    you and your wife and the other undivided one-half interest

15    by Reina Hamilton?

16        A  That is correct.

17        Q  That would apply then to Parcels 15-B and 15-C?

18        A  That is right.

19        Q  Do you irrigate any part of those two parcels?

20        A  Yes, sir.

21        Q  How many acres do you now irrigate?

22        A  Approximately 90 acres.

23        Q  Can you indicate here on the map what part you

24    irrigate?  Can you step down here and just show us?  You are

25    indicating--

1    A  40 here, and 40 here, and partly --

2    Q  You are indicating, then, the portion of Parcel 15-C

3  which falls in Section 27, and then the northeasterly portion

4  of 15-C, which is in Section 34; is that correct?

5    A  That is right.

6    Q  What is your source of water for that irrigation?

7    A  Out of three wells. I have three wells.

8    MR. LITTLEWORTH:  You may resume the stand.

9    Q  And are they located in the area you have just

10 indicated that you irrigated?

11    A  That is correct.

12    Q  What kind of crops are you now growing?

13    A  I have 30 acres of permanent pasture, and at the

14 present time there is approximately 30 acres in alfalfa,

15 and the rest of it I am preparing to put into permanent pasture

16 and alfalfa as soon as we get it prepared.

17    Q  What is the water duty, Mr. Lincoln, on permanent

18 pasture on your land?

19    A  I figure around between 5-6 acre feet, depending on

20 the season.

21    Q  Do you think it is the same for alfalfa?

22    A  Yes.

23    Q  Would you describe briefly the three wells which

24 you have on this main ranch?

25    A  There is one over there bordering Hot Springs Creek,

1    with a 14-inch casing, 235 feet deep, gravel packed.

2        Q  What kind of pump?

3        A  Lane and Bowler 15-horsepower motor.

4        THE COURT: Bordering Hot Springs Creek?

5        THE WITNESS:  Warm Springs Creek.

6        THE COURT:  Warm Springs Creek.  You are talking about

7    another piece of ground, aren't you?

8        MR. LITTLEWORTH:  Warm Springs, I think, probably

9    cuts down through into the main channel here, your Honor.

10       THE COURT:  Which piece does he mean?

11       MR. LITTLEWORTH:  Mr. Kunkel is agreeing that he is

12   right.

13       Mr. Lincoln, perhaps you can come and just briefly

14   indicate on this map where your three wells are.  Maybe you

15   should number them 1, 2 and 3.

16       THE WITNESS:  Here is one of them right in here-- I

17   beg your pardon-- here, one here, and there is another one

18   in here.

19       MR. LITTLEWORTH:  Let me mark these 1, 2 and 3.

20       MR. STAHLMAN:  All three of them are shown.

21       MR. LITTLEWORTH:  I will mark them, your Honor, perhaps

22   1, 2 and 3, so Mr. Lincoln--

23       THE COURT:  Yes.

24       MR. LITTLEWORTH:  I will mark the lowest one here No.

25   1-- that is what he put down, and then the one above it, the

1   highest one as 2, and the most easterly one, 3.

2       Q   Mr. Lincoln, let's talk for a minute about this

3   well you have marked No. 1.   Would you describe it?

4       A   That is a 14-inch casing, 116 feet deep, gravel

5   packed, 7½-horsepower motor, Peerless pump on it.

6       Q   What about the well which you marked No. 2, which

7   is your most northerly well here?

8       A   That is a 14-inch casing, 235 feet deep, gravel

9   packed, Lane & Bowler Pump, 15-horsepower motor.

10      Q   What about the one over here marked No. 3?

11      A   That is also a 14-inch casing, gravel packed, 365

12   feet deep, 20 horsepower Lane & Bowler Pump.

13      Q   Do you have any reservoir which you use in connection

14   with those wells?

15      A   Yes, I have a reservoir adjoining that No. 1 pump.

16      Q   What is the capacity of it?

17      A   About two acre-feet.   I use it as a buffer.   When

18   we shut off a valve in irrigating it won't throw all of that

19   pressure on the pipe line.   It takes it into the reservoir.

20      Q   Do you have a sprinkler system for your irrigation?

21      A   About 12 acres I use a sprinkler system on.

22      Q   Would you tell me how you utilize this reservoir in

23   connection with your irrigation?

24      A   At times when we are irrigating, most of the land

25   is flood irrigated, and instead of shutting the pump off--

1   every time you shut a valve off you build that pressure up in

2   the cement lines-- the reservoir takes your water and

3   relieves the pressure on the pipe lines.  When we make the

4   change on the valves, then it goes on and we use the water

5   out, we get a little larger head, when we can go and open

6   up the valve and use it.

7       Q  Is the reservoir then used just for temporary im-

8   poundment of water in connection with the irrigation system?

9       A  That is right.

10      Q  How long has that been your practice?

11      A  Oh, since we put the reservoir in, around 1940, I

12  think it was.

13      Q  Was any water used in that fashion prior to that

14  time?

15      A  Sir?

16      Q  Was any water used that way before 1940?

17      A  I never used it, and I don't believe there was.

18      Q  Do you do any irrigating on Parcel 15-B?

19      A  No.

20      Q  You don't have any wells on that parcel?

21      A  No.  There is an old well on there, it has been there

22  for years, but there is no water in it.  It has never been

23  used, as long as I have had the property.

24      Q  Let's take a look at the parcel up here in Section

25  13, 15-D.  Is this land owned one-half by your wife alone and

BY MR. LITTLEWORTH:

Q  Mr. Lincoln, what about the town lots indicated in Murrieta as Parcel 15-B?  How are they used?

A  Two lots are used for a residence, and another one is used for the Murrieta Post Office.

Q  Are there any wells on either of those?

A  There is a well in use on the lot where the Post Office is.  That takes care of the water for both places. There is a well.

Q  Tell us what kind of well it is.

A  Drilled well, about 120 to 130 feet deep, my recollection.  I am not sure.

Q  What kind of pump?

A  They have a gear head pump.

Q  Used for domestic purposes only?

A  That's all.

MR. LITTLEWORTH:  That's all.


CROSS-EXAMINATION

BY MR. VEEDER:

Q  When you say they have a geared pump on the lot where the Post Office is located, to whom were you making reference?  The United States?  Does the Government rent the property from you?

A  That is correct.

1   one-half by Reine Hamilton?

2       A   That is correct?

3       Q   You have no interest personally in this?

4       A   No interest myself.

5       Q   Is there any surface stream which crosses that

6   property?

7       A   No.

8       Q   None you can see?

9   MR. LITTLEWORTH:   May I have the quad sheet on that,

10  your Honor.

11      The quad sheet, your Honor, appears to show one of the

12  small tributaries.

13  MR. VEEDER:   Are you now referring to 29-J?

14  MR. LITTLEWORTH:   Yes.

15  THE COURT:   Section 3?

16  MR. LITTLEWORTH:   Section 3.

17      Q   Is there any water developed up on that property?

18      A   No, there isn't.

19      Q   Is it dry farmed?

20      A   That is correct.

21  THE COURT:   The quad sheet shows several intermittent

22  streams in Section 3.

23  MR. LITTLEWORTH:   Yes, your Honor.

24  THE COURT:   Two at the bottom part, one in the northern

25  part.

Q  And who runs that well, the United States or you?

A  My sister-in-law takes care of it.

Q  In other words, it is her property?

A  Yes, sir.

Q  Now, regarding pumping that you do on Well No. 1-- which is, as I recall, a 1¼-inch casing, 7½-horsepower, 116 feet deep-- do you maintain any records of the period when you irrigate?

A  No, I haven't.

Q  What are the crops that you have been irrigating from that well?

A  Mostly alfalfa and permanent pasture.

Q  Alfalfa and permanent pasture.  Would you differentiate for us, by a statement as to acreages, that which you have in alfalfa which is irrigated by your Well No. 1.

A  It does not produce enough water for me to take care of the amount of alfalfa I have planted.

Q  In other words, your Well No. 2 or 3 you use to--

A  That is correct.

Q  Is there any way you could estimate for us the quantity of water you are taking from Well No. 1 for your alfalfa production?

A  It would be pretty hard.

Q  You couldn't divide it up?

A  I couldn't divide it up.

Q  How many acres in the total do you irrigate from Well No. 1, combining your pasture and your alfalfa?

A  I don't use that well very much because I don't put on enough water, and sometimes I just kick it on temporarily to handle the sprinklers when I have sufficient water in the reservoir.

Q  Then perhaps we should take this approach to it. Do you take the water from Wells 1, 2 and 3 and put it into a single unit system; is that the way you handle it?

A  I can do that.

Q  Do you do it?

A  I have done it, yes.

Q  And is that your regular practice?

A  More or less.

Q  In other words, is it correct to say that you are now irrigating 90 acres of land using wells 1, 2 and 3 as your sole source of supply?

A  That is right.

Q  Would you state the number of acres you have in alfalfa out of the 90?

A  At the present time?

Q  Yes.

A  At the present time I have--

Q  My notes show 60; is that right?

A  30-some acres.

Q  I thought you said you were bringing in another 30 acres.

A  I am preparing some more ground.  It will be in in the spring.

Q  And that will make a total of 60 acres of alfalfa?

A  Approximately 60 acres of alfalfa.  There will be some of it in permanent pasture.

Q  Could you give us an estimate of the number of acres of permanent pasture?

A  At the present time I have 30 acres in permanent pasture.

Q  And you calculate?

A  About 15 acres more.

Q  I may be wrong.  I am hitting 105 acres rather than 90.

A  It wouldn't be that much.  Probably won't be that much.  It will be close to 90 acres.

Q  How many cuttings of alfalfa do you get?

A  It all depends on the season.

Q  Let's say last year.

A  Last year?  I got six cuttings.

Q  And how do you handle your irrigation?

A  Flood control most of it.

Q  How many days a year can you calculate for us that you are actually applying water to these 90 acres of land?

Have you any idea?

A  Well, this year I started in along in March, and I am still irrigating.

Q  In other words, it is quite possible you might irrigate the year around?

A  That is correct.

Q  And have you ever done that?

A  I have done that here several years before when we had a dry season like this.

Q  And you were then pumping every day, in other words, from your Wells 1, 2 and 3?

A  Not all, not every well, no.

Q  But you were pumping from one or the other of the wells constantly?

A  That is more or less correct.

Q  Have you calculated the number of gallons per minute that any one of these wells would yield, or has anyone calculated it for you?

A  Well, it has been, yes.

Q  Do you have those records?

A  I don't have them with me, no.

Q  Would you mind supplying those records for us?

A  I believe you have had them.  I think your people made a test on those wells.

MR. VEEDER:  May I inquire of Mr. Kunkel for just a

minute.

Our records show that we don't.

Our records show, Mr. Lincoln, that we don't have any evidence, any data in regard to tests. I was wondering if you could make those available.

Counsel, would you provide us with those?

THE WITNESS: I can give you a copy of the power company test.

MR. LITTLEWORTH: I think the only ones that have ever been made are the ones which the California Electric Power Company routinely makes on most of the land in this area from time to time. I think there have been some past tests made by the power company on these wells.

MR. VEEDER: I wonder if we could have those.

MR. LITTLEWORTH: Yes, we can get that information together, such as has been done.

BY MR. VEEDER:

Q Based upon those tests, have you calculated the number of acre feet a year that you have used on these lands of yours?

A I have turned it in to the State Resources last year. I couldn't tell you.

Q You don't remember?

A I don't remember just what it was. California State Water Resources have a report on it from last year and the year before.

10,900

Q   You turned that in?

A   Every year.

Q   By the way, do you have a permit to store water in your reservoir?  Did you file an application and get a permit, or how are you using that water?  Is there any State authorization?

A   No.

Q   Have you kept track, Mr. Lincoln, first, of the static water level in any of these wells?  Do you know what I mean by "static water level"?

A   Yes.  Around 37-38, I guess it would be, around 14 to 15 feet.

Q   In 1937 and '38 the static level in those wells--

A   I didn't have all those wells.  The one well I had was around 13 to 14 feet.

Q   And was that Well No. 1?

A   That is correct.

Q   No. 1, the static water level was 13 to 14 feet.  Did you ever calculate the draw-down on those wells when you had them in operation?

A   I don't remember what the draw-down is, and I can't give you the report.  It was made by the man who installed the pump at that time and I neverpaid any attention to it until recently, and we made a check of the draw-down a few months ago and it was around 60-some feet-- 64 feet, I think

10,901

it was.

Q  May I inquire, sir, was that well No. 1 where your draw-down was 60 feet?

A  That is right.

Q  And what was the static level?

A  Around 48 feet.

Q  Is that still applicable to Well No. 1?

A  I think it is.

Q  And would that be true in regard to Wells No. 2 and 3?

A  All those wells, the static level stands around 48 to 49 feet.

Q  Have you observed when you pumped Well No. 2 any reaction on Well No. 1?

A  I have not.

Q  Have you seen any?  Have you found any?

THE COURT:  You mean you have not observed at all, or you have not observed a reaction?

THE WITNESS:  I do not see any difference in the draw-down of either one of them.

BY MR. VEEDER:

Q  You say you fire up pump No. 1 and you don't observe any interaction with wells 2 and 3?

A  That is right.

Q  Have you found any interaction among wells in the

1    vicinity, that is, any of your neighbors pumping?

2        A   I do not recall of hearing anything about that.

3        Q   You haven't observed any yourself?

4        A   No, sir.

5        Q   Now, has the fall in the static level of those

6    wells from 13 to 48 feet, has that been a drop in water

7    levels that was a constant factor, or did you have any measure-

8    ments in between at all?

9        A   About four years ago it stood around 18 feet.

10       Q   When did you bring in your wells 2 and 3?

11       A   3 and 3-- one of them was brought in in 1945,

12   and the other in 1952; No. 3 in '52, I think it was.

13       Q   And what was your No. 2, please?

14       A   I think that was around 1947 or '48, somewhere around

15   in there.

16       Q   Have there been any other irrigation wells in the

17   vicinity of this well brought in during this period, to your

18   knowledge?

19       A   There is one up above me.

20       Q   What would be the one above you?

21       A   That is on the Pearl property.

22       Q   That would be what is referred to here, am I right,

23   on that 36 and 15?

24       A   It is up on the white section, on that green section,

25   right up there.

Q   Yes.   And that would be what would be in the
Southwest Quarter of 27 and the Southeast Quarter of 28; is
that correct?

A   It is one right in here, and--

Q   Could I ask you to mark that for us, please?

A   And one in here.

MR. VEEDER:   May I have the record show that Mr. Lincoln
has marked an X in the Southeast Quarter of Section 28 where
he says a well has been drilled.

Q   Is that an irrigation well?

A   That is correct.

Q   And can you tell us the owner of that well?

A   Mr. Pearl.

Q   Can you tell us when that well was dug or drilled
or however it was constructed?

A   One well went in about seven years ago, and just
renewed one there-- renewed it because the other one went
dry on him.   He just put one in a year or year and a half ago.

Q   And would that be in the same general location?

A   That is correct.

Q   And you would say about one year ago?

A   About that.

Q   Have you any personal knowledge as to the yield of
that well?

A   I have not.

10,904

Q   Is he irrigating from that well during this irrigation season?

A   That is right.

Q   Generally, do you know where his property is located as being irrigated from that source?

A   It is the 40 here.

Q   Is it the 40, then, that is marked on Roripaugh's B with a 36 and 15, to which you recently relinquished title? Isn't that right?

A   Yes.

Q   How many acres do you figure are being irrigated on that premises?

A   I wouldn't want to say.  I don't know just how many.

Q   You don't know.  What other crops is he raising there? Do they compare with yours?

A   Mostly permanent pasture.

Q   You are also indicating on Roripaugh B another well which, to your knowledge, was recently drilled.  Could you mark an X where that is located, please?

A   Right in here.

Q   Make a good-sized X there, if you will.  Now, you have marked another well, which would be in the Southwest of the Southeast of the Southwest of 28, Township 7 South, Range 3 West.  Now, do you know who owns that well?

A   I believe a party by name of Campbell owns it now.

Q   Campbell.   That is an irrigation well?

A   They use it for that.

Q   Have you any idea of the number of acres he has in irrigation?

A   I have not.

Q   What is he raising, do you know?

A   I believe it is mostly pasture now.   He is using it for that.

Q   Do you recall when that well went in?   I am going to call that the Campbell well.

A   That has been about five or six years ago.

Q   You would say that went in about 1954 or '55?

A   Somewhere around that.

Q   Are there any other wells with which you are acquainted?

A   I don't know of any.

Q   Are you acquainted with any wells on the Roripaugh place, which would be south of your premises?

A   He has one adjacent.

Q   Could you sort of locate that one?

A   Right in here.

MR. LITTLEWORTH:   Mr. Roripaugh is going to be coming along.   I think we can get a whole lot more accurate testimony from Mr. Roripaugh.

MR. VEEDER:   All right, I will move on.

Q   Have you calculated, Mr. Lincoln, the number of days
irrigation between each cutting of alfalfa?

A   At certain times of the season you will have to
irrigate an average of about every two weeks.

Q   Let's take this year.  How would you compare this
year with other years from the standpoint of --

A   It is pretty dry.

Q   Would you say it is dryer than average, in your
experience?

A   I think so.

Q   How many days a year do you figure that you irrigate
your alfalfa between cuttings during this year?

A   Oh, from ten to twelve days.

Q   Do you let any of your alfalfa go to seed, or do
you--

A   No, I cut it off.  I cut it off.

Q   After you get six cuttings, do you pasture after
the last cutting, or how do you do that?

A   Sometimes I do, and sometimes I don't.  It all depends
on how my feed holds out.

Q   Would you repeat for us what you have calculated your
water duty to be?

A   I don't know just what you mean.

Q   You testified in regard to the duty of water per acre,
I wonder if you could repeat that for us.

1     A  Well, five to six acre-feet.

2     Q  How did you arrive at that five to six acre-feet,

3  Mr. Lincoln?

4     A  Because some of the property uses a heck of a lot of

5  water.

6     Q  That may not be precise, but it is succinct.  Do you

7  use sprinklers?

8     A  I have about twelve acres I use sprinklers on.

9     Q  How many nozzles on your sprinklers? How do you

10  calculate the discharge from them?

11     A  Sometimes they run 30, sometimes 40.

12     Q  30 or 40.  What size pump do you have on the

13  sprinklers?

14     A  10 horsepower.

15     Q Did you ever have those sprinklers rated?

16     A  No, I never figured it up.  I just put the water on

17  as it needs it, that's all.  I don't try to waste any.  I

18  try to be as economical as I can with it, because I want to

19  hold that power bill down-- it's pretty high.

20     Q  Are you stating for the record that in your opinion

21  on the areas where you use your sprinklers it runs five to

22  six acre-feet?

23     A  No, I don't believe it will run quite as much as

24  where I flood, because the places you sprinkle it takes more

25  water, it would be taking more water than you are putting on

1    with your sprinklers, if you are flooding.

2        Q   And you flood the balance of your area?

3        A   That is correct.

4        Q   How do you do that?

5        A   Just border it.

6        Q   Border it and irrigate a particular plot and then you

7    go on?

8        A   That is right.

9        Q   How long do you impound your water that you pump into

10   your reservoir?

11       A   Some days it is in there a couple of days or a week,

12   and sometimes it is pretty well filled one day and it is empty

13   the next.

14       Q   Let's take in the spring of the year, from March,

15   the cooler period in there, from March to May.  Do you hold

16   it for two to three days; is that right?

17       A   Sometimes, yes.

18       Q   So what would your average be?  Would you say it

19   would be two days that you would fill your reservoir and hold

20   it?

21       A   It would be approximately two or three days.

22       Q   How in the management of the water do you irrigate

23   your fields?  Do you pump your reservoir full and then you

24   let it run on down and flood a particular area and then shut

25   it off?  How do you get it down there?

A   You turn the pumps on.  We don't want it to run too
fast in the border, we check the valves, and it backs up in
the reservoir, and then later on if the border is toward night,
if a border hasn't completely finished and the reservoir is
pretty well filled up, we cut off the pump and run from the
reservoir until the border is finished.

Q   How many head of stock do you run down there now?

A   Around 85 head.  They are also watered from this
reservoir.

Q   Now, in regard to the area in which you are situated,
are there any springs?

A   No springs any more.

Q   You say "any more."  Were there ever springs there?

A   There was a couple of years ago.

Q   Where were those located, can you tell us?  Do you
remember?

A   They were up along the old railroad right of way.

Q   How about coming down here and marking where those
springs used to be.  I am referring now to Roripaugh B.

A   One of them was right along in here.

Q   Why don't you put a box there, make it so it is square,
because we have about everything else on there not.

I want you to observe whether I am right on this or not.
You have marked two boxes in Tract 15-C, which would be in the
Northwest Quarter of Section 34, Township 7 South, Range 3 West;

1   is that correct?

2       A   That is right.

3       Q   Can you tell us how long ago it was that those springs

4   dried up?

5       A   About seven or eight years ago, I should say.

6       Q   Can you correlate that with the period when these

7   wells were drilled to which you testified in regard to both

8   your own property and other property?

9       A   What is that?

10       Q   Can you correlate the drying up of those springs

11   with the drilling of the wells not only by others but by your-

12   self?

13       A   The wells, I don't believe, had anything to do with

14   the springs, because the springs were fairly strong sulphur

15   and they were shallow springs-- they only went down about

16   12 feet.

17       MR. VEEDER:   I move to strike the answer.  I don't

18   believe it is responsive.

19       MR. LITTLEWORTH:   No, your Honor, he asked the question.

20       THE COURT:   Motion denied.

21   BY MR. VEEDER:

22       Q   From the standpoint of time, would you correlate the

23   dates when those springs went dry with your drilling of the

24   well?

25       A   No, I can't.

10,911

1        MR. VEEDER: Your Honor, I observe that it is about a

2   quarter to 3. I might save some time if I continue this

3   cross-examination after a short recess.

4        THE COURT: All right.

5        MR. LITTLEWORTH: Your Honor, what is our program going

6   to be for the rest of the afternoon? Can we decide that now?

7        THE COURT: We can't finish with all your people.

8        MR. LITTLEWORTH: No, we cannot.

9        THE COURT: Whom do you have left?

10        MR. LITTLEWORTH: I have next in order Mr. Quarry, and

11   I suspect he would take longer than the rest of the day. It

12   might be that Mr. Lincoln is a proper place to stop.

13        THE COURT: You have the two Yoders, Gunther and Quarry

14        MR. LITTLEWORTH: Yes.

15        THE COURT: That would mean when we would reconvene

16   next Tuesday you would not be ready?

17        MR. LITTLEWORTH: I am ready to go, but unfortunately

18   I have to be in San Francisco, and I do not know now that

19   Mr. Krieger could come down. I am going to be gone all next

20   week in San Francisco.

21        THE COURT: Have you discussed at the recess or some-

22   time what we would do next week?

23        MR. LITTLEWORTH: We did discuss it.

24        MR. VEEDER: We discussed it, but that is about as

25   far as we got.

1    MR. LITTLEWORTH:  Without too much success.

2        Mr. Stahlman suggested that there were one or two short

3    people who could go on.

4        MR. STAHLMAN:  It wouldn't take a whole day.  I have

5    this deadline to meet.  If we are not going to have court,

6    I can keep myself busy.

7        THE COURT:  Truer words were never spoken, Mr. Stahlman.

8        I would think, therefore, that we would not meet next

9    week.  You can't be here, Mr. Littleworth.  Mr. Stahlman has

10   only one witness.

11       Is there anyone else who would have any matter that

12   they could put on next week?

13       MR. VEEDER:  Could we take a look at the calendar in

14   regard to further time, then, your Honor?  What would be the

15   next week?  I don't have a calendar with me.

16       THE COURT:  This week we are talking about starts

17   November 30th, Monday, and then the week of Tuesday,

18   December 1st.  If that week were out, we would meet again on

19   the 8th of December.

20       When were you supposed to be ready to go, Mr. Stahlman?

21       MR. STAHLMAN:  The 15th of December.  The 10th was the

22   time to get in the papers.

23       THE COURT:  Could we adjourn, then, to the 8th?

24       MR. LITTLEWORTH:  Yes, your Honor, as far as we are

25   concerned.

10,913

1        MR. STAHLMAN:  The 8th or 9th.

2        MR. LITTLEWORTH:  I think we could pick up again on the

3    8th, and if need be go over to the 9th.

4        MR. STAHLMAN:  We would have Dr. Henderson at that

5    time.  That will take a little while, because you gave him

6    some questions on Mr. Veeder's favorite subject-- stipulated

7    judgment.

8        THE COURT:  Is that agreeable?

9        We will take a recess and then we will finish up with

10   Mr. Lincoln, if we can, and then adjourn to December 8th.

11       MR. VEEDER:  What would that mean?  Probably on the 8th,

12   9th and 10th and then reconvene on the 15th; is that right?

13       THE COURT:  I don't know.

14       MR. LITTLEWORTH:  You will not run on the 8th, 9th and

15   10th with my people.  You might with some others.

16       THE COURT:  Would you rather put it over to the 15th?

17       MR. VEEDER:  Your Honor, it would make more sense to me.

18       MR. LITTLEWORTH:  That would be satisfactory.

19       THE COURT:  All right, the 15th.

20       MR. VEEDER:  In other words, we will run on the 15th

21   and so far into the next week as is necessary.

22       MR. SACHSE:  Mr. Littleworth would continue and clean

23   up on the 15th, and then you would pick up with the stipulated

24   judgment.

25       THE COURT:  All right, take a short recess, and then

1    finish up with Mr. Lincoln.

2         (Recess.)

3         MR. VEEDER:  We would like to have you, if you could,

4    Mr. Littleworth, to produce for us the reports or copies of the

5    reports that you have with the State.  I see that Mr. Girard

6    is not here.  You have been making reports to the State on

7    these pumps, as I understand it.  Is that right?

8         MR. LITTLEWORTH:  I think every well user is supposed

9    to.  Mr. Lincoln says that he has.  I have not seen them.

10   But we will try to get them.

11        . You want any California Electric Power tests which have

12   been made also?

13        MR. VEEDER:  That is correct.

14        MR. LITTLEWORTH:  We will try to get them together.

15        MR. STAHLMAN:  Can we get those before we come to court

16   next time?

17        MR. LITTLEWORTH:  I will try.

18   BY MR. VEEDER:

19        Q  What was the date of your last cutting of alfalfa

20   down there?  Can you tell us that?

21        A  About four weeks ago.

22        Q  About four weeks ago?

23        A  That is correct.

24        Q  And you are presently irrigating; is that correct?

25        A  I have water running on permanent pasture at the

1   present time.

2        Q   And you are pumping?

3        A   That is right.

4        Q   Can you tell me which wells are presently running?

5        A   No. 2.

6        Q   The No. 2 well is now running?

7        A   That is correct.

8        Q   Was there a period that your wells have been shut

9   off entirely during this irrigation season?

10       A   There is probably at different times four or five

11  days that there is none of them in operation.

12       Q   Could you tell us when those dates would be?

13       A   No, I couldn't tell you.  Sometimes our work inter-

14  feres with them.  We haven't the labor to put on them at the

15  time that we should be running water.  We can't get to it.  We

16  don't do it.

17       Q   Would you have any diary that would show when you

18  shut off those wells?

19       A   I have not.

20       Q   And you have no means of determining, say, from the

21  first of June to date when those wells would be cut off?

22       A   I have not.

23       Q   Could you tell us the schedule that you follow in

24  regard to your pumping?  Do you turn your pumps on in the

25  morning and shut them off at night?

Q Are you acquainted with the operation of neighbors closeby?

A I am not.

Q You are not acquainted at all with how they operate this Pearl pump?

A I am not.

Q What is the size of the pumps through which you pump your water now?

A You mean my distribution lines?

Q That's right?

A I have about 3,000 feet of 12-inch, and I guess in the neighborhood of close to a mile and a quarter of 14.

Q 14-inch pipe?

A That is right.

Q Those are the pipes for your main distribution system?

A That is correct.

Q And do you tap those same pipes for your sprinklers and for your flooding?

A I use them for the sprinklers, pump out of them with a booster pump for the sprinklers.

Q Did you test the water from those springs that you said were sulphur?

A Yes.

Q What kind of vegetation was there around the springs, do you recall?

A   That is correct.

Q   About what time do you turn them on in the morning?

A   It varies; sometimes 6 o'clock, sometimes 5 o'clock, sometimes later.

Q   But generally you would say that you throw the switch on those at about 5 or 6; is that right?

A   That is right.

Q   And they would run throughout the balance of the day; is that right?

A   That is right.

Q   And you would cut them--

A   About 6, 7.

Q   6 or 7 in the evening.  Would it be safe to say that you never pump after 6 or 7 in the evening?

A   I very seldom do.

Q   And when you turn on your pumps, is it generally your practice to turn on two pumps or one pump?  Or how do you do that?

A   We generally use two, if we are watering alfalfa and the permanent pasture both, we use two pumps.

Q   Would you say that is your general practice?

A   That is right.

Q   Would it be proper to say that you have done that day in and day out since June of 1959?

A   Yes.

A   Oh, just ordinary grass grew around them more or less. Cattle used to keep it down.  That is where I used to water my cattle from those springs.

Q   Cattle went down and drank from the sulphur spring?

A   Yes, sir.

Q   How did you know it was sulphur?  Did you smell it? How did you tell?

A   Smelled and tasted it.  At one time I sent it in for a test on it and it came back.

Q   Do you have copies of that test?

A   No, I haven't. That is years ago.

Q   To whom did you send that?

A   To a laboratory in Los Angeles.

Q   Did you send that to the State of California for testing?

A   No; a private company in Los Angeles.

Q   Do you recall the name of the company?

A   No.  They are away out of business now.

Q   You said you thought they were shallow springs.  How would you--

A   Well, before I bought the place there was a pipe in the ground, about an 8-inch casing in the ground, that was down 10 feet, and that water come from that for years.

Q   That was how you determined -- that is why you conclude that it was shallow?

1    A   That is right.

2    Q   There is no evidence of that?

3    A   I took it from the other spring above that one, and
4  that was only one-inch pipe drilled back into the bank, it
5  went back about 50 feet, and that flowed water out from that,
6  and that was the same type of water.  So I thought it was from
7  the same source.

8    Q   Tell me, have you observed any springs on your
9  neighbors' property that have been dried up?

10   A   No, I have not.

11   Q   Have you observed any springs along what are known
12  as the fault lines?  Are you acquainted with the fault line?

13   A   I hear about it.  I can't say where it is.

14       There are springs over at the Barnett place.  That
15  is the only ones I know about.

16   Q   Did the springs at the Barnett place dry up?

17   A   No, sir; they are running.

18   Q   They are running now?

19   A   That is right.

20   Q   Do you know whether those are sulphur or not?

21   A   I don't know.  I don't think so.

22   Q   Do you ever pump on the weekends?  Do you irrigate
23  on the weekends?

24   A   Yes.

25   Q   Saturday and Sunday?

1    A  Yes, sir.

2    Q  On Sunday, too?

3    A  I work every day.

4    Q  So do I.  It's foolish.  What is the length and width

5  of the border on your flood irrigation system?

6    A  At present I have them in there 26 feet.

7    Q  26 feet?

8    A  That is right.

9    Q  In length?

10   A  Well, in the neighborhood of around 1100 feet, most

11  of them.  Some of them, shorter.

12   MR. VEEDER:  That is all.

13   THE COURT:  Any further questions?

14   MR. LITTLEWORTH:  No redirect, your Honor.

15   THE COURT:  Step down, Mr. Lincoln.

16   Does that conclude it?

17   MR. LITTLEWORTH:  I think we have Col. Bowen on Mr.

18  Lincoln, and then that will conclude it, your Honor.

19   THE COURT:  Col. Bowen.


21               ALLEN C. BOWEN,

22  recalled as a witness in behalf of the plaintiff, having been

23  previously duly sworn, testified further as follows:

24

25

FURTHER DIRECT EXAMINATION

BY MR. VEEDER:

Q   Col. Bowen, I hand you Plaintiff's Exhibit marked 183 for Identification and ask you to read into the record the title block of that identification.

A   Plaintiff's 183 for Identification is a copy of the engineering report prepared on the property of Ernest N. Lincoln.

MR. VEEDER:  Your Honor, before I proceed any further, I would like to inquire from Mr. Littleworth, before I forget it--

Mr. Littleworth, when you produce those documents that we have asked for, can you tell us when you think they will be available?

MR. LITTLEWORTH:  I don't know.  I have never talked to Mr. Lincoln about them.  I don't know whether he has copies or not.

THE COURT:  See what you can find out.

MR. LITTLEWORTH:  We will get them as soon as we can.

MR. VEEDER:  It might be that we would want to ask Mr. Lincoln a couple more questions.  I don't want to impose on his time any more than necessary.

MR. LITTLEWORTH:  We haven't got them now.  So I will get them to you as soon as I can.

MR. VEEDER:  And I can contact you and have him come

1   back; is that right?

2       MR. LITTLEWORTH:  Yes.

3   BY MR. VEEDER:

4       Q   Was Exhibit 183 prepared under your direction, Col.

5   Bowen?

6       A   Yes, sir.

7       Q   I hand you Plaintiff's Exhibit marked 184 for

8   Identification, an aerial, and I ask you to state into the

9   record what appears on that aerial.

10      A   Plaintiff's 184 for Identification is a single weight

11  print of a field sheet, on which a portion of the Lincoln

12  property was surveyed.  The photo number of this print is

13  3-0035, and because this particular portion of Mr. Lincoln's

14  property fell within the match lines of about three different

15  field sheets--

16      THE COURT:  Let's identify the other field sheets.  You

17  used about three of them?

18      THE WITNESS:  Yes, sir.

19  BY MR. VEEDER:

20      Q   I hand you plaintiff's Exhibit marked 185 for

21  Identification, it is an aerial, and I ask you to read into

22  the record what appears on that aerial.

23      A   Plaintiff's 185 for Identification is a field sheet

24  upon which a portion of Mr. Lincoln's property was surveyed,

25  and it is an enlargement of aerial photograph 3-0035.

1      Q   I hand you Exhibit marked 186 for Identification

2  an aerial, and I ask you to state into the record what appears

3  on that.

4      A   Plaintiff's 186 for Identification is a field sheet

5  used to survey a portion of Mr. Lincoln's property, and it

6  is an enlargement of aerial photo No. 3-0038.

7      Q   Now, would you correlate those three aerials, which

8  are 184, 185 and 186, with the aerial which was contained in

9  identification 183?

10     A   184 is compiled from 185 and an adjoining photograph

11 3-0052 and another adjoining photograph 3-0034.   The surveys

12 from those three photographs were all plotted on a copy of

13 3-0035, which is Plaintiff's Exhibit 184 for Identification.

14 A print of 184 for Identification is included with 183 and is

15 the first aerial photo print which appears in 183.   186 for

16 Identification is reproduced, in part, on the second aerial

17 photo contained in 183 for Identification, and the third

18 aerial photo contained in 183 for Identification is copied from

19 a field sheet already in evidence.

20     Q   Could you tell me what that number is, so we can

21 compare it?

22     A   The photo number is 49.

23     Q   Will you refer to photo No. 49 and state what the

24 exhibit is that is marked on it?

25     A   Plaintiff's 173 is reproduced, in part, and contained

as the last aerial photo reproduction in 183.

Q  Is the data contained in the engineering report,
plaintiff's exhibit marked for identification 183, accurate,
to your personal knowledge, Col. Bowen?

A  Yes, sir.

MR. VEEDER:  We offer in evidence the exhibits which
have been marked for identification 183, 184, 185 and 186.

THE COURT:  Received in evidence.

(Plaintiff's Exhibits No. 183, 184, 185 and 186 were
received in evidence.)

BY MR. VEEDER:

Q  Col. Bowen, you have heard the testimony of Mr.
Lincoln and you have viewed the properties that he occupies
and which he ranches.  Based upon your experience in the
area and your knowledge as an expert in soils and use of
water, would you state what, in your opinion, a reasonable
water duty would be for production of permanent pasture on the
lands in question?

A  These lands in question, as shown on the first
aerial photo contained in 183, in the upper right-hand corner,
are light-textured surface primarily, with moderately rapid
permeable subsurface.  However, on these, I believe that with
an efficient irrigation system the quantity of water contained
in the table, namely, 3.83 feet per acre of irrigated pasture
for applied duty or 4.2 for project duty, is reasonable.

1    Q  You have used "applied duty."  Could you state

2  whether that is the same as "field duty," as used in other

3  instances, Col. Bowen?

4    A  Yes, sir, it is the same.

5  THE COURT:  What did you say--3.8?

6  THE WITNESS:  3.83, your Honor.

7  THE COURT:  What would be a reasonable duty for alfalfa,

8  based on the same premise as the previous question?  The same

9  figure?

10  THE WITNESS:  3 feet, your Honor, applied duty and field

11  duty.

12  BY MR. VEEDER:

13    Q  Then what would you say would be the diversion duty

14  for alfalfa in that area?

15    A  Well, again, based on the efficiency of the irrigation

16  system, it would vary to some extent; but a 10% project loss

17  is reasonable, so 3.3 would be a reasonable project duty for

18  alfalfa.

19    Q  Would you state whether, in your opinion, those

20  criteria should be applied in the operation as described by Mr.

21  Lincoln?

22    A  In the operation as described by Mr. Lincoln, I

23  would say, with  the exception of the area that he irrigates

24  with sprinklers, he would probably have to use more water than

25  that in order completely to irrigate his border irrigated

area.

Q  In regard to the areas which are sprinkled, would you state what, in your opinion, would be the proper diversion duty?

A  It would be the same as I have already testified.

Q  Would that be the same, also, as to the applied or field duty?

A  Yes, sir.

MR. VEEDER:  I have no further questions.


CROSS-EXAMINATION

BY MR. LITTLEWORTH:

Q  Col. Bowen, if I understand your testimony, then, 3.83 is your water duty for a man who has a sprinkler system; is that correct?

A  Well, it would be correct for a man who had a sprinkler system.

Q  And if Mr. Lincoln does not have a sprinkler system, as he has testified, on all of his land and operates part of it under flood irrigation, then you say he would require more water?

A  We are talking about a lot of variables, Mr. Little-worth-- length of run, width of border, slope, and those things all vary the amount of water that it is necessary to apply to completely wet it.  I would say that with an efficient

1  border irrigation system he could, undoubtedly, approach the

2  same figure as for sprinklers.  Sprinklers are not absolutely

3  the most efficient method of applying water.  There are con-

4  siderable losses in evaporation, for example, in sprinklers,

5  which are not incurred in border or furrow type irrigation.

6      Q  What is the length of irrigation season you have

7  assumed in this 3.83 calculation?

8      A  About six or seven months.

9      Q  So if, in fact, the farmer had to irrigate eight,

10  nine or ten months during the year, they would use more then

11  than 3.83 per acre-foot?

12      A  Yes, sir, that is certainly one of the variables in

13  our country, since no two irrigation seasons appear to be the

14  same length.

15      Q  Now, Col. Bowen, looking at the report on Mr.

16  Lincoln's property on page 2, refer to the last sentence in

17  the third paragraph from the bottom-- it reads:  "The alluvium

18  is therefore considered to have been deposited as a thin

19  veneer immediately underlain by basement complex and is of

20  no significance."  Are you referring there to the property in

21  Section 3, which is indicated as 15-D on Roripaugh B?

22      A  Section 3, Township 7 South, Range 3 West, yes, sir.

23      Q  Bearing that in mind, then, do you have an opinion

24  as to whether the ground water beneath that parcel 15-D are

25  part of the waters of the Santa Margarita River or its

1   tributaries?

2       MR. VEEDER:  Would you like to look at 25-J, Col. Bowen

3   (handing document to the witness)?

4       THE WITNESS:  Referring to Parcel 15-D, as depicted on

5   Defendant's Exhibit Roripaugh Exhibit B, and comparing that

6   with the same area as shown on Plaintiff's 15-A, which is

7   Section 3, Township 7 South, Range 3 West, it is noted that

8   a portion of that parcel is underlain by basement complex

9   and a portion is underlain by the older alluvium.  It is my

10  opinion that the ground water, if any, in the basement complex

11  underlying 15-D is local, vagrant and percolating and not

12  a part of the stream system, and that the ground water

13  contained within the alluvium is a part of the stream system.

14      Q  Is the ground water in the alluvium what you are

15  referring to when you say, on page 2, that that alluvium is

16  a thin veneer and of no significance?

17      A  Yes, sir.

18      Q  Would you say, then, that the amount of ground water

19  in the older alluvium which appears in that parcel is

20  negligible?

21      A  Inasmuch as it appears to be rather thin in there,

22  Mr. Littleworth, I would say that it would be negligible.

23  But that older alluvium is a better water-bearing material

24  than the  asement complex.

25      MR. LITTLEWORTH:  That is all the questions I have.

1          MR. STAHLMAN:   I have a couple questions, your Honor.

2

3                          CROSS-EXAMINATION

4   BY MR. STAHLMAN:

5          Q   Col. Bowen, in an area such as this of the Lincoln

6   properties, which have been described as being under irriga-

7   tion, which overlie a basin such as we have indicated on

8   Roripaugh's Exhibit B, have you an opinion as to whether or

9   not, when irrigation is conducted by flooding, there is any

10  return of the flood waters to the ground water source?

11         A   Yes, sir, I have an opinion.

12         Q   And have you a familiarity with the type and character

13  of the soils of the Lincoln property there over which the

14  flood water irrigation is conducted?

15         A   Yes, sir; only I think it would be more correct to

16  call it border irrigation rather than flood water, because

17  it is controlled and the irrigator oftentimes thinks of

18  flooding as an uncontrolled type of irrigation.

19         Q   It is, however, water which is flooded over the

20  surface and confined within border lines of dirt thrown up to

21  form the borders?

22         A   Yes, sir.

23         Q   With that type of irrigation over this type of soil,

24  do you have an opinion as to the flow of water that would be

25  returned to the underground source?

1        MR. VEEDER:  I object to the question.

2        THE COURT:  Amount of water.

3        MR. STAHLMAN:  Amount of water, yes.

4        THE WITNESS:  Yes, I have an opinion.

5    BY MR. STAHLMAN:

6        Q  How is that expressed?  In a percentage of water

7    utilized in irrigation?

8        A  Yes, sir.

9        Q  In an area with the type and character of soil such

10   as there is on the Lincoln property, what would your opinion

11   be that the return percentage would occur?

12       THE WITNESS:  Referring to the first aerial photograph

13   contained in Plaintiff's Exhibit 183, the soils occupying the

14   area that Mr. Lincoln irrigates are shown to be light-

15   textured at the surface, with in some instances gravely

16   loam, verylight textured, and the heaviest textured soil

17   surface would be a silt loam, the soil depth is very great,

18   and the permeability of the subsoil is moderate to moderately

19   rapid, as I have already testified, and under those soil

20   profile conditions I would say that return flow from the

21   border type irrigation practiced by Mr. Lincoln would run

22   from 30 to 40% of the water applied.

23       MR. STAHLMAN: That is all.

24       THE COURT:  Are you through with the Colonel?

25       MR. VEEDER:  I might have some questions later on,

10,931

1   depending somewhat on what Mr. Lincoln does.

2          THE COURT:   Continued to December 15th.

3          MR. LITTLEWORTH:   Thank you, your Honor.

4          (Adjournment until Tuesday, December 15, 1959, at 10

5   A. M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25