# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

## HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>FALLBROOK PUBLIC UTILITY DISTRICT,<br>et al,<br><br>Defendants. | No. 1247-SD-C |

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Tuesday, December 15, 1959.

Pages:   10,932 to 11081

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211   Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,    )
                             )
                Plaintiff,   )
                             )
        vs.                  )        No.1247-SD-C.
                             )
FALLBROOK PUBLIC UTILITY     )
DISTRICT, et al.,            )
                             )
                Defendants.  )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Tuesday, December 15, 1959

APPEARANCES:

    For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                             WILLIAM E. BURBY, ESQ.,
                             Special Assistants to the
                             Attorney General,
                             Department of Justice,
                             Washington, D. C.

                             LCDR. DONALD W. REDD.

| | |
|---|---|
| For Defendant Vail Company | GEORGE E. STAHLMAN, ESQ. |
| For Defendants Barnett, et al. | MESSRS. BEST, BEST & KRIEGER, By JAMES H. KRIEGER, ESQ. |
| For Defendants Fallbrook Public Utility District, et al. | FRANZ R. SACHSE, ESQ. |

## INDEX TO WITNESSES

For the Defendants:                       D         X        RD       RX

    Frank O. Querry              10,940   10,950

    Frederick H. Guenther      10,970   10,989
                   11,004

    Charles E. Yoder            11,009

    M. J. YODER                 11023    11037

    Leo Roripaugh               11055


For the Plaintiff:

    Allen C. Bowen              10,963   10,966-Krieger
                   10,993   10,995-Krieger
                   11,016
                   11044

## INDEX TO EXHIBITS

|                                                    | IDEN.   | EVID.  |
|----------------------------------------------------|---------|--------|
| **Roripaugh, et al., Exhibit:**                    |         |        |
| E - Well Test                                      | 10,940  | 10,940 |
| F - Well Test                                      | 10,948  | 10,949 |
| G, H, Notices of Water Extraction                  | 11,005  | 11,005 |
| **Plaintiff's Exhibit -**                          |         |        |
| 187 Engineering Report - Querry                    |         | 10,965 |
| 188, 189, 190--Aerial Photos, etc.                 | 10,963  | 10,965 |
| 191 - Soil survey - Guenther                       | 10,971  | 10,995 |
| 192, 193, 194, 195 - Aerial Photos                 | 10,993  | 10,995 |
| 196 - Soil Survey Yoder, C. E.                     | 11,009  | 11,018 |
| 197, 198, 199 - Aerial Photos                      | 11,017  | 11018  |
| 200- Soil Survey, Yoder, M. J.                     | 11,024  | 11,045 |
| 201 - Engineering Report - Leo Roripaugh           | 11056   |        |

San Diego, California, Tuesday, December 15, 1959.   10 A.M.

(Other matters.)

THE CLERK:  Four, 1247-SD-C, United States vs. Fallbrook.

MR. VEEDER:  Is your Honor ready to proceed?

THE COURT:  Yes, sir.

MR. VEEDER:  I make reference to page 10,691, Volume 96, at lines 9, 10, 11 and 12.  During the course of the conversations or discussions respecting the kind and type of relief that, in my view, was required in this litigation, we note that I make the statement there, starting at line 10, "But I didn't want anyone to think that inherent in a decree is a possibility one day of limiting a man to what would be his fair share based on the available supply of water."  There should be a "not" after the word "is," in line 11-- there is not a possibility.

THE COURT:  The correction will be made.

MR. VEEDER:  In other words, I want it clear that there is a real possibility that there will be regulation on the basis of irrigable acreage and a real possibility that these matters will be enforced by injunctive decree.

Now, we have talked somewhat about this matter of irrigable acreage and Mr. Sachse's letter of November 21, 1959, appears in the transcript at page 10,790.  I don't know whether your Honor desires us to go into that matter now, or

1   whether you would prefer that we wait until Mr. Girard of the

2   State is here, or what would be your preferences in that

3   respect.

4        THE COURT:  Let's pass that up.  Then when Mr. Girard is

5   here have some comment on it later.

6        MR. STAHLMAN:  What is the situation in regard to the

7   motion to admit the Hall testimony?  That hasn't been heard

8   yet.

9        MR. VEEDER:  You have two matters there, George, that

10  are one problem.  The Bruner testimony--

11       MR. STAHLMAN:  The Bruner testimony is admitted.

12       MR. VEEDER:  Bruner is admitted, subject to further

13  review by me.

14       I have time, as I understand it, in regard to the Hall

15  matter.

16       THE COURT:  I haven't ruled on the Hall motion.  Is there

17  objection to the motion of the Vail Company?

18       MR. VEEDER:  I didn't hear your Honor.

19       THE COURT:  I haven't ruled on the Hall motion.

20       MR. VEEDER:  That's right.  I am going to respond to that,

21  however.

22       I think that in regard to both the Bruner and the Hall

23  testimony there will be further developments which will stem

24  largely from my review of the records from which the Bruner

25  testimony has been taken.  I have had a chance to go through

1    that and I believe there are matters there that will call for

2    clarification, and I believe it will be necessary-- based upon

3    those investigations I would like to talk to Mr. Stahlman

4    further about them-- perhaps to call Dr. Coit again, because I

5    believe there is a serious error in the record.

6         THE COURT:  That may well be.  And there may be factual

7    questions presented that will have to be determined one way

8    or the other.  But the principle of law that Mr. Stahlman

9    relied upon is the fact that in a prior litigation between the

10    same parties the testimony is received in a subsequent trial.

11    If it is unavailable, that testimony can come into this trial.

12    The fact that it comes into the record doesn't mean that the

13    Court has to accept it all.  You may rebut it, you may explain

14    it, you may call Coit or anybody else.  But as a matter of

15    law the testimony comes in, does it not?

16         MR. VEEDER:  It does if the elements required are present.

17    I believe that Mr. Stahlman at the moment is saying that the

18    facts are different between this case and the original case,

19    and by his own actions I think that he may have ruled himself

20    out, from the standpoint of the Bruner and the Hall testimony.

21    Those are elements, though, that I think I should cover in a

22    written statement.

23         THE COURT:  When do you want to take up the Hall matter

24    and further discussion of the Bruner matter?  Later on?

25         MR. VEEDER:  Yes, I would be glad to take it up later on.

1    As I understand, Mr. Stahlman is going to proceed this week

2    in regard to testimony and his attack upon the stipulated

3    judgment.

4         THE COURT:   Are you ready to proceed this week when Mr.

5    Krieger finishes?

6         MR. STAHLMAN:   After these other men are through, yes,

7    your Honor.

8         THE COURT:   After Mr. Krieger and Mr. Littleworth get

9    through?

10        MR. STAHLMAN:   Yes, your Honor.   Then the Henderson

11   case also, we will put that on first.

12        I have turned over to Mr. Veeder the remainder of the

13   Bruner testimony.   There are other matters in there besides

14   what I have indicated that I would like to have before the

15   Court.   However, it is quite extensive and it goes into matters

16   that I am not particularly concerned with.   But any other

17   matter in the record that Mr. Veeder wants in there, I think

18   that testimony is competent also.

19        THE COURT:   Let's proceed, Mr. Krieger.

20        MR. KRIEGER:   First, may I offer in evidence the well

21   test that was asked for at the conclusion of Mr. Lincoln's

22   testimony.   I think the record speaks for itself in that re-

23   gard.

24        You asked for it, Mr. Veeder.

25        MR. VEEDER:   Yes, I did.

10,939

1    MR. KRIEGER:   Will you take this for the State of

2  California, Mr. Illingworth.

3    MR. ILLINGWORTH:   Yes.

4    THE COURT:   Will this be part of the Roripaugh, et al.,

5  series?

6    MR. KRIEGER:   No, I think it should come in under Mr.

7  Lincoln's own exhibit in that order.

8    MR. STAHLMAN:   In connection with this letter, Mr.

9  Krieger, these wells are to be reported under State law, as

10  I understand.  Do you have the copy of that report furnished

11  to the State regarding extractions from the wells?

12    MR. KRIEGER:   I don't know what you are referring to,

13  Mr. Stahlman.

14    MR. STAHLMAN:   Mr. Wilkinson informs me that Mr.

15  Littleworth said he could have those.

16    MR. KRIEGER:   No, we do not have those reports from the

17  State Water Rights Board.

18    THE COURT:   What number we assign to exhibits is not

19  important, and as I understood you were using for your clients

20  the series we called Roripaugh, et al., A, B, C, D so far.

21  So this would be E in that series.

22    MR. KRIEGER:   All right, let's put it in on that.   I

23  thought we had a series of exhibits, but we do not have, for

24  Mr. Lincoln.  The only thing that goes in is the soil survey

25  for him.

1      THE COURT:  That was a Government exhibit.

2      MR. KRIEGER:  Yes, your Honor.

3      THE COURT:  E is the next in order?

4      THE CLERK:  Yes, your Honor.

5      THE COURT:  What is this document you tender?

6      MR. KRIEGER:  This is a well test made in 1959 on the

7  Lincoln well.

8      THE COURT:  It will be marked Exhibit E, and unless there

9  is objection it will be received in evidence.

10     (Well Test marked Roripaugh, et al., Exhibit E was

11  marked for identification and received in evidence.)

12     MR. KRIEGER:  Mr. Frank Querry, will you take the stand,

13  please.

14     While he is doing that, your Honor, may I state, we do

15  not have the records of the State Water Rights Board application

16  and reports.  We looked for them and we do not have them.

17     Mr. Querry, will you come around, please.

18

19              FRANK O. QUERRY,

20  called as a witnes on his own behalf, being first duly sworn

21  on his oath was examined and testified as follows:

22     THE CLERK:  State your name, please.

23     THE WITNESS:  Frank O. Querry.

24     MR. KRIEGER:  May I have the Querry report for

25  identification, Mr. Veeder.

10,941

1      My I have the engineering report of Frank O. Querry

2  marked for identification, please.

3      THE CLERK:  Roripaugh --

4      MR. KRIEGER:  This is not Roripaugh--

5      MR. VEEDER:  Those have been going in as the exhibits

6  of the United States of America.  Mine shows 172.

7      THE COURT:  The Government's next exhibit in order

8  will be 187.

9      Is that right, Mr. Clerk?

10      THE CLERK:  Yes, your Honor.

11      MR. VEEDER:  You are right.

12

13                  DIRECT EXAMINATION

14  BY MR. KRIEGER:

15      Q  Where do you live, Mr. Querry?

16      A  On Pala Road, approximately three miles from Temecula.

17      THE COURT:  Which parcel does this concern on Roripaugh's

18  Exhibit?

19      MR. KRIEGER:  Parcel 43, your Honor.

20      THE COURT:  What is this Roripaugh exhibit number?

21      MR. KRIEGER :  This is the one that is down here in the

22  Wolfe Valley.

23      THE COURT:  What is the exhibit number?

24      MR. KRIEGER:  Roripaugh's Exhibit B, your Honor.

25      THE COURT:  And what parcel?

10,942

1  MR. KRIEGER:  Parcel 43, the one down in the most

2  southeasterly corner there.

3  THE COURT:  All right.

4  BY MR. KRIEGER:

5  Q  You are married, Mr. Querry, to Odessa D. Querry, are

6  you?

7  A  That is correct.

8  Q  And you and your wife own the parcel shown as 43 on

9  Roripaugh's Exhibit B; is that right?

10  A  That is right.

11  Q  And that land is located in the Wolfe Valley?

12  A  Yes.

13  Q  I show you for identification Government's 187, being

14  the engineer's report on your property, and ask you if you

15  have seen that before.

16  A  Yes.

17  Q  And the land which you own, Mr. Querry, is the land

18  which is described in both your Answer and in the Government's

19  report 187 for Identification; is that right?

20  A  Yes.

21  Q  And this report shows that you own 385 acres, of

22  which 225 acres are irrigable; is that approximately correct?

23  A  Yes.

24  Q  By the way, when did you purchase this ranch?

25  A  In 1956.

10,943

Q   Through it runs Pechanga Creek; is that correct?

A   That is correct.

Q   And have you any wells on that property?

A   Yes, there are two wells.

Q   Did you drill those wells or were they drilled before you bought the ranch?

A   They were drilled before I bought the ranch.

Q   Do you have any idea when they were drilled?

A   I was told they were drilled in 1955.

Q   That is, the former owner told you that; is that right?

A   Well, someone did.  I don't know exactly when it was drilled.

Q   Now, the wells you are talking about, I wonder if you would come down here for a minute, Mr. Querry, and just locate them on Exhibit B Roripaugh.  Can you point out where they are located?

A   (Witness stepping down.)  The one well is right in the corner.

MR. KRIEGER:  And by the corner, your Honor, he is talking about the most northerly tip of Parcel 43.

THE COURT:  Shown on Exhibit 15-A as the Querry Well J2; is that right?

MR. KRIEGER:  Shown as the Querry well.

Q   I wonder if you would look here for a minute at

1   Government's Exhibit 15-A, Mr. Querry, and ask you if that is

2   the well you are talking about?

3       A   Well, I am not familiar with that.

4       Q   You can't tell it from that map?

5       A   No.  No, I couldn't tell it from that map.

6       MR. KRIEGER:  That is bench mark 1030, and it is also

7   bench mark 1030 at the same place on Exhibit 15-A, so it is

8   the same well by correlation.

9       THE COURT:  All right.

10      How many acres do you have altogether there?

11      THE WITNESS:  380.  To be exact, I don't know exactly.

12  Approximately 380.

13      MR. KRIEGER:  He testified 385, your Honor, and that is

14  what the Government report shows.

15      THE COURT:  How much does the report show is irrigable?

16      MR. KRIEGER:  225, your Honor.

17      Q   By the way, where is the other well located, Mr.

18  Querry?

19      A   It's approximately--  What is this?

20      Q   Well, this is no more than an outline on the map

21  showing the fault line and one of the edges of the basin.

22      A   Very close to this line.

23      Q   Very close to the most southeasterly line of your

24  property; is that correct?

25      A   That is right.  It is approximately, oh, 500 feet from

1     the road.

2          Q  Is that in Section 29, do you know?

3          A  I don't know.

4          Q  Do you use both wells for irrigating purposes?

5          A  No.

6          Q  Which well do you use?

7          THE COURT:  Point out the second well again.  I couldn't

8     see it because you were in front of it.

9          MR. KRIEGER:  The second well he pointed out as being in

10    the most easterly tip of his property, your Honor.

11          THE COURT:  On 15-A there is a well shown in Section 29

12    as C-1.  It is probably that well.

13          MR. KRIEGER:  That would be it, your Honor.

14          Q  Do you use that well at all for irrigation purposes?

15          A  No, I don't.

16          Q  The only well you use, then, is the one that is

17    located up in Section 20; is that right?

18          A  That is right.

19          Q  Not 20.  It is really in Section 19.  It is known in

20    the State as 19-J-2.

21          Now, Mr. Querry, from this irrigating well how many

22    acres have you been irrigating?

23          A  Approximately 150.

24          Q  Have you been doing that each year?

25          A  No.

1    Q   Or is that just this current year?

2    A   I have been irrigating approximately 105 until, oh,

3    approximately three months ago, it was increased to 150.

4    Q   What crops have you planted?

5    A   Permanent pasture and alfalfa.

6    Q   Do you have any opinion as to how many acre-feet of

7    water you apply on that land each year?

8    A   A year?

9    Q   Yes.

10   A   No, I haven't.  I haven't been irrigating 150.  I

11   have just been irrigating 105.

12   Q   Yes.  I think you misunderstood my question.  Do you

13   know how many acre-feet of water you apply to that acreage

14   each year?  Have you any way of measuring it?

15   A   Acreage?

16   Q   Yes.

17   A   105.

18   Q   Three acre-feet, five acre-feet, seven acre-feet?

19   A   No, only from the power consumption, from the power

20   company.

21   Q   I see.  That is your guide, then, as to the amount

22   of water you apply?

23   A   That is correct.

24   Q   And from that information do you have an opinion as to

25   how many acre feet of water you do apply?

10,947

1          A   No, I don't.

2          MR. VEEDER:   I am going to object.

3          THE COURT:   The objection is overruled.   He said he

4    doesn't know.

5          MR. VEEDER:   I just bit it right off.

6    BY MR. KRIEGER:

7          Q   You have drilled no wells since you have purchased

8    the property, have you?

9          A   No, I haven't.

10         Q   What kind of irrigation system have you got?

11         A   Sprinkling system, with a pressure sprinkling system.

12   The well is the pressure system directly into an underground

13   pipe.

14         Q   No reservoir?

15         A   No reservoir, no.

16         Q   What size pipe do you use?

17         A   Well, it is approximately-- it starts at approximately

18   13-inch and down to 6-inch.

19         Q   And some of those pieces of pipe are, of course,

20   movable, are they not?

21         A   I am speaking of the underground now.   The surface pipe

22   is movable, yes.

23         Q   I see.   What size?

24         A   That is all 3-inch.

25         Q   You do not, under this system of irrigation, then,

1   require any reservoiring of water at all?

2       A   No.

3       Q   Does this type of irrigation, in your opinion, require

4   more or less water than flood type irrigation?

5       A   It would be less water.

6       Q   Do you have a log of your well, Mr. Querry? By a well

7   log I mean showing the history of when it was dug and--

8       A   No, I don't.

9       Q   You don't have that?

10      A   No, I don't.

11      Q   Do you know how deep the well is?

12      A   No.

13      Q   And you do have a well test, though, from the

14  California Electric Power Company, do you not?

15      A   Yes.

16      Q   I show you well test of California Electric Power

17  Company, dated November 12, 1959, and indicating that a test

18  was made November 11, 1959.  Is that the well test that was

19  made on your well?

20      A   Yes, that is right.  This is the one.

21      THE COURT:   It will be marked Roripaugh's F for Iden-

22  tification.

23      MR. KRIEGER:   Thank you, your Honor.

24      (The document was marked Roripaugh's Exhibit F for

25  Identification.)

1    BY MR. KRIEGER:

2        Q  And this well test shows that there is a static water

3    level of 32 feet, does it not, and a pumping water level of

4    44 feet?

5        A  That is right.

6        MR. STAHLMAN:  Your Honor, if I am not mistaken, we may

7    be incorrect in these exhibit markings.  I understood this

8    was put in as Roripaugh's E, and it is the same document I

9    have marked as E when it was previously introduced.

10        MR. KRIEGER:  This is not the same.

11        THE COURT:  It is not the same.  Roripaugh's E was the

12    Lincoln well.

13        MR. KRIEGER:  That is correct.

14    While you are here, George, let me give you one of

15    these.

16    And will you give this one to California, please.

17        Q  I think we were just going over this to get some of

18    the basic data from it, and it shows that the well pumped

19    1252 gallons per minute, with approximately a 12-foot drawdown;

20    is that correct?

21        A  That is right.

22        MR. KRIEGER:  I offer that well test in evidence, your

23    Honor.

24        THE COURT:  Received in evidence as Roripaugh's F.

25        (Well test received in evidence and marked Defendant

1   Roripaugh Exhibit F.)

2   BY MR. KRIEGER:

3       Q   Now, the well you have referred to a moment ago, Mr.

4   Querry, being at the most easterly end of this property, is that

5   well used for domestic purposes?

6       A   No.

7       Q   Do you have a well that is used for domestic purposes?

8       A   Yes.  You asked me, did you, how many wells was on the

9   property?  I have a domestic well.

10      Q   In addition to the other two that you mentioned, is

11  that right?

12      A   That is right.

13      Q   Fine.

14      THE COURT:  Do you have another copy of Exhibit F for

15  me?

16      MR. KRIEGER:  I am sorry.  I am one short on both these

17  exhibits.

18      That's all.

19

20                      CROSS-EXAMINATION

21  BY MR. VEEDER:

22      Q   You stated, Mr. Querry, that Pechanga Creek crossed

23  your property, close to it?

24      A   It runs through the property, yes.

25      Q   The creek itself goes through your land?

A   That is right.

Q   Could you show me where?  Will you locate it for us on Roripaugh's B, please?

A   Is this all mine?  That isn't all my land, is it?

Q   Your counsel says it is.

A   This coloring in this shape?

Q   Yes, that's right.

Isn't that correct?

A   I asked you.  I don't know.

Q   You better ask Mr. Krieger.

A   Do you want me to tell you where this goes?

Q   Yes.

A   If this is all mine, then I can tell by this. Approximately, the black line is very close to it.

MR. STAHLMAN:  May the record show that he is pointing to the line which delineates the southern boundary line of the fault.

MR. VEEDER:  The Elsinore fault line.

THE WITNESS:  Well, it is very close to that.

MR. KRIEGER:  Running parallel to the Elsinore fault line, you are indicating?

THE WITNESS:  That is right.

BY MR. VEEDER:

Q   Is it north or south of your property?

A   Just like that.

Q   Right straight across?

A   It is a little irregular, but it generally follows that line.  It makes a double turn here, a slight turn, but it runs fairly straight.

THE COURT:  It runs, apparently, then, from the south-east to the northwest?

THE WITNESS:  That is correct.

BY MR. VEEDER:

Q   When did you say you went on to that property?

A   In 1956.

Q   Do you recall how many acres of land were in cultiva-tion there at that time when you went on the property?

A   Pardon?

Q   How many acres of land were in cultivation when you went onto the property?

A   In cultivation?  What do you mean, dry farming or irrigation?

Q   In cultivation-- dry farming and irrigation.

A   Oh, it was approximately 200 acres, all dry farming.

Q   It was dry farmed at that time?

A   All dry farmed.

Q   In other words, you have, then, brought under irriga-tion, if my notes are correct here, approximately 225 acres; is that right?

A   That is what could be irrigated.  I have 150 I am

1    irrigating now.

2         Q   In other words, when you say 225, the 225 acres of

3    irrigable land are not all subjected at the present time to

4    irrigation; is that right?

5         A   That is true.

6         Q   And when did you bring in your additional 45 acres?

7    Was that this year?

8         A   This year.

9         Q   So you have a total of 150?

10        A   Yes.

11        Q   I observe in your pleadings, your Answer declares

12   that your water duty is 1400 acre-feet per year, which would

13   run upwards to 7 acre-feet per acre.  Have you ever applied

14   that quantity of water to the land?

15        A   I haven't measured it out.  I don't know exactly.

16   I would have to go by the power.

17        Q   In other words, you have no personal information--

18        A   No.

19        Q   --on the matter?

20        A   No.

21        Q   And you have never, of course, measured the quantity

22   of water applied?

23        A   No.

24        Q   Now, do you know how deep your domestic well is?

25        A   108 feet.

Q   Did you drill that yourself?

A   I drilled that.

Q   What is the static water level on that, do you know?

A   I don't know exactly.  It is around 25 feet, though, the last I checked it.

Q   Could I ask you to locate your domestic well again on Roripaugh's B for us, so that we will have the location of it?  We have a well on the eastern and southeastern corner of your property.  Would you locate it, and you can write on that, if you would.

A   It's right by the river bank.  That river goes through there.  It is just on this side of the bank.

Q   Is it near your house?

A   Yes, it is.

Q   Where is your house, then?

A   Well, approximately in here.  It is hard to tell from this.  Approximately this point right in here.

THE COURT:  Roripaugh's B shows a roadway coming up through there.  Is that your roadway into your property?

THE WITNESS:  That is right.

THE COURT:  Where is the well compared to that roadway?

THE WITNESS:  You have a different map than this.

THE COURT:  No, I have that.

MR. KRIEGER:  His Honor is looking at this.

Here is the roadway he is talking about.

1    THE WITNESS:  Right here.  The house is right on that.

2  That is the old roadway, which isn't there now, but the house

3  is right on that roadway there.

4  BY MR. VEEDER:

5    Q  Could I ask you to mark with this pencil where it is

6  located, and also mark where the well is located.

7    MR. KRIEGER:  The map shows an X mark approximately in

8  the middle of the property.

9    THE COURT:  Where with reference to the fault line?  Right

10  near the fault line?

11    MR. KRIEGER:  On the fault line, your Honor.

12    MR. VEEDER:  Do you see the first line running northwest-

13  erly?  It is right at the end of that line on the fault line.

14    THE COURT:  All right.

15  BY MR. VEEDER:

16    Q  Is all of your land in pasture at the present time?

17    A  No.

18    Q  What are the crops you are raising?

19    A  Alfalfa and pasture.

20    Q  How many cuttings of alfalfa do you get down there?

21    A  That varies.  It depends on the season.  Approximately

22  six cuttings.

23    Q  You get six cuttings.  And when do you start irrigating

24  down there?

25    A  That varies.  One year might be two or three months

10,956

1    ahead of the other.  If the rains keep coming we don't irri-

2    gate.  But some years there will be two or three months

3    difference in the rainfall.  We irrigate when the plant needs

4    it, when the rains stop.

5    Q  Are you irrigating at the present time?

6    A  No.

7    Q  When did you stop irrigating?

8    A  This last rain.

9    THE COURT:  In case you don't know, we just had a rain.

10   It was a spotty one, but in certain areas there was up to two

11   inches or more.  But it was pretty spotty.

12   MR. VEEDER:  I want that in the record.

13   Q  Now, do you irrigate the year around if you don't get

14   rain?

15   A  No.

16   Q  You don't?

17   A  Well, what do you mean the year round?  Keep running

18   all of the time, you mean, constantly?

19   Q  No.  Are any crops being raised at the present time

20   on your property?

21   A  There is crops that need water.  If it hadn't rained

22   I would be watering now.

23   THE COURT:  You were irrigating alfalfa and permanent

24   pasture up to the time of this last rain?

25   THE WITNESS:  Yes.

1      THE COURT:  Then this rain came along, so you haven't

2  irrigated since?

3      THE WITNESS:  We got about an inch of rain up there, and

4  we don't irrigate now.

5      THE COURT:  And if we don't get rain between now and the

6  first of the year you will be irrigating again?

7      THE WITNESS:  I will start in again.  Not very heavy in

8  the winter.  You don't irrigate like you do in the summer.

9      MR. VEEDER:  I have no further questions.

10      THE COURT:  With reference to Exhibit 187, are you

11  generally content with the soil survey, Mr. Krieger?

12      MR. KRIEGER:  Yes, your Honor.

13      THE COURT:  What is the water duty shown in the soil

14  survey?

15      MR. KRIEGER:  4.2 and 3.83, the same as on the other

16  reports.

17      THE COURT:  4.2?

18      MR. KRIEGER:  I beg your pardon.  It is 4 or 3.83, the

19  way it shows on the report.

20      THE COURT:  Depending on the loss?

21      MR. KRIEGER:  Yes, your Honor.

22      THE COURT:  Are you content with that estimate of water

23  duty?

24      MR. KRIEGER:  We will agree with that water duty.

25      THE COURT:  All right.

MR. VEEDER:  I have one more question, your Honor.

Q   What is your pumping schedulle, Mr. Querry.  Do you turn your pump on in the morning and shut it off at night?  Is that how you operate?

A   No.

Q   How do you operate?

A   There are certain weather conditions that vary use of water.  If there is a high wind, I don't water.  It blows it off and I would be wasting water.

Q   In other words, you have no pumping schedule?

A   I pump when the wind is down, generally, at night.

Q   Oh, at night?

A   At night.

Q   Do you keep track of when you irrigate?  Have you got a diary or anything that indicates when you turned on your pump?

A   You don't use it the same amount of time each time.

Q   I know that from what you have said.  Have you a record as to when you irrigate?

A   When I turn that pump off?

Q   Yes.

A   No.

Q   You don't?

A   No.

MR. VEEDER:  I have no further questions.

10,959

1      THE COURT:  Do you offer in evidence Exhibit 187?

2      MR. VEEDER:  I am going to wait until we call Col. Bowen

3   for that, your Honor.

4      THE COURT:  All right.

5

6                      CROSS-EXAMINATION

7   BY MR. STAHLMAN:

8      Q  When did you say you acquired the property, Mr.

9   Querry?

10     A  1956.

11     Q  And in 1957 and years thereafter you have filed with

12   the State a report of the amount of water which you used, have

13   you not?

14     A  Yes, I filed it.

15     Q  Where did you get the information for the quantity

16   of water that you filed in your State reports?

17     A  I took that from the power, monthly power.

18     Q  Did you figure it out yourself?

19     A  Yes.

20     Q  You figured it out?

21     A  Yes.

22     Q  What method did you use?  How did you arrive at the

23   quantity by the use of the power?

24     A  Well, I don't know how accurate it is.  From what I

25   read, you had to turn in something, so I turned it in.

10,960

1    Q  When you turned it in did you try the best you could

2 at the time to get the correct figure?

3    A  Well, I wouldn't say that it is anywhere near correct,

4 because I don't know all the phases of how to figure that out.

5    Q  How did you figure it out?

6    A  I tried to find out if you should file that, and I

7 understood it was compulsory, so I just figured it out the

8 best I could, from the amount of hours that was run on that

9 power.

10    Q  You took the amount of hours, and what else?

11    A  Depending on the pressure on the pump, it would give

12 you how much water you are using.  The higher the pressure,

13 the less the water.

14    Q  How did you determine your pressure at the pump?

15    A  Well, I have one of these Rainbird books which tells

16 how much acre-feet, how many gallons there is in it, and I

17 tried to figure it out.

18    Q  In 1957 how many acres did you have under irrigation?

19    A  1957?

20    Q  Yes.

21    A  Around 100.

22    Q  Around 100 acres.  Do you recall the amount that you

23 turned in to the State as used in that year?

24    A  Yes.

25    Q  How much?

10,961

1      A   I don't know how much it was.  I don't have the

2   figure.

3      Q   For the purpose of refreshing your memory, how about

4   924 acre feet?  Did you use that much?

5      A   I would have to go back to the figures again.  I don't

6   know how much.

7      Q   Let's assume that the report in the State files,

8   being State Report 2300333, Well No. 8S2W 19J1, indicated that

9   you had filed the use of 924 acre-feet that year.  Would that

10   be about right?

11      A   I wouldn't know--

12      MR. VEEDER:  I object to that; there is no foundation,

13   your Honor.

14      THE COURT:  The objection is overruled.

15      Do you have the State report here?

16      MR. STAHLMAN:  I don't have the report.  I have excerpts

17   from it, and I have a number on it.  We are going to ask-- in

18   fact, we have asked Mr. Illingworth to see if he can procure

19   some of these reports for us.  We called him, but he hasn't

20   been able to get them yet.

21      MR. VEEDER:  In view of what he said, why don't we get

22   the reports?  He says he doesn't know whether they are right

23   or not.  He says he doesn't think they are right.

24      MR. KRIEGER:  Mr. Illingworth doesn't have them.

25      We certainly have no objection.

1        THE COURT:  He didn't state quite that.

2        Let's go ahead.

3    BY MR. STAHLMAN:

4        Q  Your property borders on certain parts of the Vail

5    properties, does it not?

6        A  That is right.

7        Q  And in which direction is the Vail Ranch from the

8    property shown on Roripaugh's B?

9        A  Well, that would be north, northeast.

10       Q  It would be along--

11       A  That's it.  It would be northeast.

12       Q  And how about--

13       A  On that side.

14       Q  On this side also?

15       THE COURT:  Northwest.

16       MR. STAHLMAN:  Northwest.

17       THE WITNESS:  Northeast and northwest.

18   BY MR. STAHLMAN:

19       Q  In other words, it would be across the road as shown

20   as being the most northerly boundary of your property here?

21       A  That is right.

22       Q  And then west of the line shown at the road?

23       A  Yes, clear through.

24       Q  It would be across there?

25       A  That is right.

1    MR. STAHLMAN:  That is all.

2    MR. KRIEGER:  That's all, Mr. Querry.  You may step down.

3    MR. VEEDER:  Call Col. Bowen.

4

5                     ALLEN C. BOWEN,

6    called as a witness in behalf of the plaintiff, having been

7    previously duly sworn, testified further as follows:

8

9                     DIRECT EXAMINATION

10   BY MR. VEEDER:

11       Q Col. Bowen, I hand you Plaintiff's Exhibit marked 187

12   for Identification and ask you to read into the record the

13   title that is set forth on the cover of that identification.

14       A  The title on the cover of 187 for Identification is

15   "Engineering Report on the Property of Frank O. Querry,

16   Office of Ground Water Resources, Marine Corps Base, Camp

17   Pendleton, California."

18       Q  Under whose direction was that prepared?

19       A  Under my direction.

20       Q  And are the contents of that identification correct,

21   to your personal knowledge?

22       A  Yes, sir.

23       THE CLERK:  Your Honor, Government's Exhibits 188,189 and

24   190 have been marked for identification.

25       THE COURT:  So marked.

1       (Plaintiff's Exhibits 188, 189 and 190 were marked

2   for identification.)

3   BY MR. VEEDER:

4       Q  Col. Bowen, I hand you Plaintiff's Exhibit marked 188

5   for Identification  and ask you to state into the record what

6   at aerial is?

7       A  Plaintiff's Exhibit 188 for Identification is a

8   photographic copy of a field survey sheet used to prepare a

9   portion of the soil survey report on the Querry property.  This

10  is Aerial Photo No. 3-0064.

11      Q  I hand to you Identification marked 189 and ask you

12  to state into the record what is set forth in that aerial.

13      A  Plaintiff's Exhibit 189 for Identification is a

14  photographic enlargement of Aerial Photo 3-0088, upon which the

15  soil survey for the entire Querry property appears.  This

16  property was mapped in the field on two field sheets, one of

17  which was the original Plaintiff's Exhibit 188 for Identifica-

18  tion, and the other of which is the original field sheet 189

19  for Identification.

20      Q  I hand you Plaintiff's Exhibit marked for Identificaion

21  190 and ask you to state into the record what appears on that.

22      A  Plaintiff's Exhibit 190 for Identification is a

23  photographic copy of the soil survey field sheet upon which a

24  portion of the Frank Querry property was surveyed, and that

25  survey was made on aerial photo enlargement 3-0088.  That is the

10,985

1   same aerial photo upon which the compilation was made as it

2   appears on Plaintiff's Exhibit 189 for Identification.

3        Q   I hand you the Identification 187 and ask you to cor-

4   relate the identification 188, 189 and 190 with the contents

5   of that Identification 187.

6        A   The photographic copy of the soil survey of the

7   Querry property which appears in 187 for Identification is

8   a photographic reproduction of a portion of 189 for Identi-

9   fication, and contains part of the work appearing on 188 and

10  190 for Identification.   The work done on 188 and 190 was

11  combined on 189 and photographed and reproduced and enclosed

12  with 187.

13       MR. VEEDER:   We offer in evidence exhibits marked for

14  identification 187, 188, 189 and 190.

15       THE COURT:   Received in evidence.

16       (The documents referred to were received in evidence

17  and marked Plaintiff's Exhibits No. 187, 188, 189 and 190,

18  respectively.)

19       MR. VEEDER:   I have no further questions

20       THE COURT:   Any cross-examination?

21       MR. KRIEGER:   Yes, may I ask just one or two questions

22  of Col. Bowen.

23

24

25

CROSS-EXAMINATION

BY MR. KRIEGER:

Q  Col. Bowen, referring to Exhibit 187, page 3 of the report indicates, the third paragraph from the bottom, that the well that we have been talking about has a capacity of 2100 gallons per minute.  How did you arrive at that, so you know?

A  Following the drilling of the well and the testing of it-- the well was drilled when the property was owned, I believe, by Billy McGee, and the test following the drilling of the well reported about 200 miner's inches.

Q  So this information comes from a well test in connection with a well log prior to the ownership of Querry; is that right?

A  Yes, sir.

Q  And then looking at the same page, I notice that you state that there are presently about 160 acres under irrigation.  Do you know when you completed this report?

A  Well, the field work was done in March, Mr. Krieger, and the finished report here was completed sometime this summer.

Q  I see.  So it reflects the most recent operations of Mr. Querry?

A  Yes, sir.

MR. KRIEGER:  Your Honor, may I reply in answer to your

1    question earlier-- I think I gave an improper answer-- this

2    report indicates that the irrigation requirements are four acre

3    feet per acre for row crops and 3.83 for pasture, plus a 10%

4    loss.

5         THE COURT:  And you are content?

6         MR. KRIEGER:  Yes.

7         Thank you.

8         THE COURT:  May Col. Bowen step down?

9         Any other questions?

10        MR. VEEDER:  No.

11        MR. STAHLMAN:  I have a matter in connection with this.

12        I wonder if Mr. Krieger intends to put in any evidence

13   relative to the type of property, whether or not it is riparian

14   and whether there has previously been any severance.

15        MR. VEEDER: We have undertaken, your Honor will recall,

16   early in the trial the responsibility of stating whether we

17   were in accord with the claim of riparian acres.  In each instance

18   we are going to have to check it out, and if it is a matter of

19   rebuttal, if we find there is something that indicates that

20   the lands are not riparian, Mr. Krieger will be advised.  This

21   is the same arrangement I made with Mr. Littleworth.

22        THE COURT:  In the absence of that showing, the Court

23   will assume that all of his land is riparian.

24        MR. STAHLMAN:  In the event that no showing is made, if

25   there is some question of recalling, we may recall Mr. Querry.

1    THE COURT:  You may.  You have the same opportunity that

2  the Government would have, if you are not content with the

3  understanding.  We will proceed on the basis that all of this

4  land is riparian unless some affirmative showing is made that

5  there has been a severance.

6    MR. VEEDER:  As I understand it, when it comes time for

7  rebuttal, if we have a question, we will be permitted to put it

8  in.

9    THE COURT:  Yes.

10    On this matter the Court would propose to find, and make

11  a note of it in the record right now, that in the absence of

12  some rebuttal showing the land is riparian, that the 225 acres

13  are irrigable; that the northerly portion of the land-- in

14  fact, according to 15-A, a large portion of it overlies the

15  basin of the Pechanga, and that he would be an overlying owner

16  as well as a riparian owner.

17    The Court would also find that, in the absence of other

18  testimony, that as to that portion of his property lying in the

19  basement complex any water developed on that would not be part

20  of the stream system.

21    MR. KRIEGER:  Very good.

22    Shall we go ahead, or take a recess, your Honor?  I am

23  ready to go.

24    THE COURT:  Well, I have some other things to do.  We

25  will take a short recess.

1        (Recess.)

2        THE COURT:  Is this a new map, a new exhibit?

3        MR. KRIEGER:  No, I have posted on that board Roripaugh's

4    A so as to correlate it with Roripaugh's B.  This next parcel,

5    your Honor, is known as Parcel 42 on Roripaugh B.

6        THE COURT:  Whereabouts is it?

7        MR. KRIEGER:  This is Murrieta Hot Springs.  It is shown

8    in orange about the middle of the map, and the reason we are

9    correlating it is so that the so-called Kunkel line runs

10   through this parcel and through two wells south of the Kunkel

11   line and one northof it.

12        I will call Mr. Guenther, please.

13        MR. VEEDER:  May I tender a thought at this point, Mr.

14   Krieger.  We have had difficulty in understanding the designa-

15   tion of the Security First National Bank as trustees in regard

16   to the Guenther properties.

17        MR. KRIEGER:  We will explain it.

18        MR. VEEDER:  I wish you would.

19        MR. KRIEGER:  All right.

20

21                    FREDERICK H. GUENTHER,

22   one of the defendants herein,called as a witness in his own

23   behalf, being first duly sworn, on his oath was examined and

24   testified as follows:

25        THE COURT:  State your full name.

10,970

DIRECT EXAMINATION

BY MR. KRIEGER:

Q   What is your address, Mr. Guenther?

A   Murrieta Hot Springs, Murrieta, California.

Q   And you are the manager of the Guenther's Murrieta Hot Springs, are you not?

A   Yes, sir.

Q   And it is true that that property is shown as Parcel 42 on Roripaugh's Exhibit B; is that right?

A   That is right.

Q   Mr. Guenther, the title to the property that we are talking about is in the Security First National Bank; is that right?

A   That is right.

Q   Do they hold that property as Trustee?

A   That is right.

Q   And they hold it for the members of the Guenther family, including yourself?

A   That is right.

Q   And are you authorized to speak for the other members of the Guenther family here today?

A   I am.

MR. VEEDER:   Is he authorized to speak for the Security First National Bank, too?

MR. KRIEGER:   I don't know if anyone can speak for the

1    Security First National Bank.  But he is speaking for the

2    beneficiaries of the trust estate.

3          THE COURT:  Does the record show who these beneficiaries

4    are?

5    BY MR. KRIEGER:

6          Q  Can you name who the beneficiaries of the trust are?

7          A  There is Mr. Hugo Guenther.

8          Q  That is your father?

9          A  That is my father.  The Estate of Mr. Rudolph

10   Guenther, Mrs. Annie Bergey, and each of those trustees has

11   two children:  Frederick H. Guenther-- that is myself, Evelyn

12   Keith Reekie, Murrieta Carolyn Lohr, Dorothy Ann Heydenfeldt,

13   Murrieta Maher, Jack Leroy Bergey.  That is nine people.  That

14   is right.

15         Q  Will you keep your voice up, Mr. Guenther?

16         A  Yes.

17         MR. KRIEGER:  May I ask that the Government soil survey

18   on Guenther's Murrieta Hot Springs be identified as an exhibit?

19         THE CLERK:  No. 191.

20         THE COURT:  Exhibit 191 for Identification.

21         (Soil Survey marked Plaintiff's Exhibit No. 191 for

22   Identification.)

23   BY MR. KRIEGER:

24         Q  Mr. Guenther, you have had a chance to review this

25   Exhibit 191 for Identification, have you not?

1     A  I have.

2     Q  Will you tell me whether the legal description of

3  your property as Parcel 42, as found in your Answer and as

4  found in 191 for Identification, is correct?

5     A  It is correct.

6     Q  When did the Guenther family acquire the Murrieta Hot

7  Springs property?

8     A  In 1902.

9     Q  Is that your grandfather that first purchased it?

10    A  That is right.

11    Q  How long have you lived there?

12    A  I was born there in 1911.

13    Q  Have you lived there all your life?

14    A  I have lived there most of my life.

15    Q  How long have you managed the Hot Springs?

16    A  For about twenty years.

17    Q  Mr. Guenther, the report that I just showed you and

18  which you said you reviewed, 191 for Identification, shows

19  that there are approximately 514 acres of land in Parcel 42,

20  of which 441.9 are irrigable.  Is this a correct statement?

21    A  It is.

22    Q  Are there any surface streams that course through

23  Parcel 42?

24    A  Warm Springs Creek forms partially the western boundary

25  of the properties.

Q   The western boundary?

A That is right.

THE COURT:   I am trying to correlate Roripaugh's B with 15-A.  Does your land go to the east edge of that creek or to the west edge or to the center of that creek?

THE WITNESS:  To the center of the creek.

THE COURT:  It goes to the center of the creek?

THE WITNESS:  Yes, sir.

THE COURT:  It is a sandy creek bed?

THE WITNESS:  Yes.

THE COURT:  And you go to the center of it?

THE WITNESS:  Yes.  It starts at the center in the northerly part, and then as it gets down toward the southerly part the property line crosses the creek, and then we are on both sides of the creek.

THE COURT:  Yes, I understand that, at the bottom part. But up in the northerly part of that curved line where the line starts at the far north and runs southerly, your line runs to the center of that creek?

THE WITNESS:  To the center of the creek.

THE COURT:  That is important, because that puts the edge of the property in that younger alluvium.  That is why I asked the question.

Go ahead.

MR. KRIEGER:  Mr. Sachse pointed out that that shows

very well on the map in Exhibit 191 for Identification.  It is
the last page of the report, showing that it courses right
along that stream in the middle of the stream.

THE COURT:  The map shows that the line runs--

MR. VEEDER:  Which map is your Honor referring to?

THE COURT:  Exhibit 191.  The map would seem to indicate
that it takes in the stream bed there.

MR. VEEDER:  That is what I inquired about.  That is
Roripaugh's B to which you are now referring?

THE COURT:  I am looking at 191.

MR. KRIEGER:  That's right.

His Honor was talking about the map attached to the
report.

THE COURT:  The one you just called my attention to is
191.

MR. KRIEGER:  Yes.

THE COURT:  The witness said, however, that his property
line goes to the center of that creek in the northern portion.
It wouldn't make much difference as long as the line took in
some of that creek bed.

MR. KRIEGER:  Yes.

Q   I wonder, Mr. Guenther, if you would explain in a few
words what the operation of the Murrieta Hot Springs is.  What
does it do?  What kind of trade does it cater to and so forth?

A  Well, it is a resort catering to people that come up

1    there for mineral baths, offering them accommodations and

2    meals.

3         Q   People come there for health purposes, do they?

4         A   For health purposes.

5         Q   And this resort has been in operation continuously

6    for how many years?

7         A   Well, since 1902 in the Guenther family.

8         Q   Is any part of the property irrigated?

9         A   No, not irrigated.

10        Q   I see.  What is your source of domestic water for the

11   resort?

12        A   We have two cold water wells.

13        Q   I wonder if you would come down and locate them here,

14   would you?

15        A   I think it is shown right here on the map, this one

16   here, and this one here.

17        Q   I wonder if you would just put a circle and put a D

18   next to it, would you, on each one separately-- just put a D.

19        A   By both of them?

20        Q   Yes, that's right.

21        THE COURT:  It would seem to be in the northwest corner

22   of Section 23.  .

23        MR. KRIEGER:  That is exactly right, and just above the

24   Kunkel line.

25        Q   Where is your main well on the property?

1    A  The main well is the one just north of the second well.

2    Q  Just north of the second domestic well; is that right?

3    A  Just north of the domestic well.

4    Q  Mr. Guenther, while you are there, is that well

5  described on Roripaugh's A as Well No. 23A1 or 23A2?

6    Come over here will you, please?  Is it either of the

7  wells shown on Roripaugh's A?

8    A  That would be A-1.

9    Q  All right.  The well you have just described is 23A1

10  on Exhibit Roripaugh A; is that right?

11    A  That is right.

12    Q  That is the main well.  Is there another well nearby?

13    A  There is.

14    Q  And how far away is it from the first well you have

15  just mentioned?

16    A  The distance is within 75 to 100 feet.

17    Q  Which way?

18    A  A-1 is south-- it is north of A-2.

19    Q  A-1 is north of A-2 about 75 feet; is that right?

20    A  That is right.

21    THE COURT:  The map would indicate that it was west ,

22  would it not?

23    MR. KRIEGER:  Here again, I don't think there was any

24  occasion to really survey the exact position of these wells,

25  your Honor.

THE COURT:  I see.

BY MR. KRIEGER:

Q On Roripaugh's Exhibit A there is another well shown on your property right up around the hot springs, and it is 14J1. Do you see it here?

A Yes, sir.

Q What is that well?

A That is the hot water well.

MR. KRIEGER:  You may resume the stand.

I would like to say that the log to the well that we have been talking about, 23-A-1, is included in Roripaugh's Exhibit B, which has all the supporting data in support of these various wells, your Honor.

THE COURT:  It includes A-1, but not A-2.

MR. KRIEGER:  A-1 is what I am talking about, which is the principal well.

THE COURT:  Allright.

BY MR. KRIEGER:

Q What is the diameter of that well, do you know?

A It is a 16-inch casing.

Q Do you know how deep it is?

A About 494.

Q And what kind of motor is it equipped with?

A It has a Byron Jackson submersible.

Q Do you know how much water that well produces?

1          A   In the neighborhood of 15 inches.

2          Q   I am going to correlate that for a minute with the

3     information shown on the map to which Mr. Webb testified.

4          MR. VEEDER:   What are you doing now? Correlating this

5     gentleman's testimony with Mr. Webb's?

6     BY MR. KRIEGER:

7          Q   You said 130 gallons per minute, did you, or 150?

8     I didn't hear you.

9          A   No; I said 15 inches.

10          Q   I see.   When was that well drilled-- 23-A-1?

11          A   1939.

12          Q   And is this well the primary source of water for the

13     resort?

14          A   That is the primary source.

15          THE COURT:   For domestic purposes?

16          THE WITNESS:   For domestic purposes.

17          THE COURT:   And for irrigation, too, or just for

18     domestic purposes?

19          THE WITNESS:   We don't irrigate, your Honor.

20     BY MR. KRIEGER:

21          Q   How much of all the water would you say it produces

22     for domestic purposes?

23          A   About 90% of domestic.

24          Q   The well that is on Roripaugh's A as 23-A-2 is also

25     a producing well?

A  It is also a producing well.

Q  Do you know its diameter?

A  It is also a 16-inch.

Q  How deep is it?

A  477, I believe.  I am sure it is 477.

Q  Do you use that well in connection with 23-A-1?

A  We do in peak periods when we have large house counts. It produces, actually, more water than the smaller well, the submersible.

Q  When was 23-A-2 drilled?

A  In 1933.

Q  What kind of motor does it have on it?

A  It has a turbine, deep well turbine.

THE COURT:  Why do you use A-1 if A-2 produces more water?

THE WITNESS:  A-2 caved on us.  Well, it was, I am sure, in the '30's.  It was not gravel packed, and the stratas, according to the well driller, were very fine.  Consequently, when they put this large 30-horse motor on it, it pulled the sand stratas, and we had a cave.  It was rehabilitated later on, theoretically gravel packed, another hole sunk along the side and gravel put in the well--the well was surged to bring the gravel around this caved-in portion, theoretically, and we have used it just in a limited way since then.

Q  Since that episode?

10,980

1    A   Since that episode.

2    Q   So you use it only as a standby, really, is that

3    right, or to supplement the supply from the other well?

4    A   That is right.

5    MR. KRIEGER:   Your Honor, the log of that well also is

6    found in Roripaugh's Exhibit B.

7    Q   Is there a third well in this general area?

8    A   There is.

9    Q   And where is it located with relation to--

10    A   Shall I?

11    Q   Yes, let's look at Roripaugh's A for a minute and

12    ask what its relation is to 23-A-1 and 2.

13    A   It would be east of A-1-- east and south about 250

14    feet.

15    Q   About 250 feet, is that right?

16    A   250 feet.

17    Q   How deep is that well, do you know?

18    A   The same as A-2.  It is about 470-475.

19    Q   Is this well used?

20    A   No.

21    Q   Why not?

22    A   Shall I get up there?

23    Q   Yes.

24    A   (Resuming the stand.)  This well never gave us too

25    much quantity.  I believe we pumped about seven inches and

1  then it would never clear up.  After it was drilled it was

2  put on a test run and it pumped a fine mica formation, which

3  we didn't put into or domestic system because of the danger

4  that it might clog up the domestic system.

5       Q  It pumped sand and you were never able to clear it

6  up; is that right?

7       A  We were never able to clear it up.

8       Q  Do you have any storage in connection with this

9  operation?

10      A  We do.  We have two reservoirs on hills behind the

11 springs that the capacity is about three-quarters of a million

12 gallons of water.

13      Q  Both of them together?

14      A  Both of them together.

15      Q  Do you know when these reservoirs were constructed?

16      A  They were constructed in the early '20's.

17      Q  And have they been used for storage continuously

18 since that time?

19      A  They have.

20      Q  You spoke a few moments ago about having a hot water

21 system, which is actually the heart and soul, I suppose, of the

22 resort business for these baths that people come up and take.

23 Is this separate entirely from the fresh water system?

24      A  It is.

25      Q  Is it a pipe distribution system?

A   It is.  It is composed of two hot water reservoirs,
in capacity around about 10,000 gallons each.  They are in
the spring area and they are-- at least one of them is a
bottomless tank.  The springs come up underneath and are
held there and the piping goes by gravity down to a pressure
tank and we pump into the baths, the hot springs baths.

Q   How many springs are there?

A   About seven.

Q   I wonder if you would show us generally on Roripaugh's
Exhibit B where they are located in relation to the hot springs
itself-- that is, the building?

A   The main buildings are in this area here, and the
springs area is just below this top.  I believe that represents
my father's house on the hill.  Just below that is the springs
area.

Q   So it is directly to the north, a little bit to the
west of the buildings constituting the resort; is that right?

A   That is right.

Q   And those reservoirs, then, are below the springs
themselves, except those that they pull into directly; is that
right?

A   That is right.

THE COURT:  I notice that Exhibit 191 states that one
of these wells is 424 feet deep, another one is 200 feet deep,
and one is 174 feet deep.  Are you certain about the depths of

these wells?

THE WITNESS:  I believe that that mistake was made by the Government engineers who were taking the well records.  I know those figures I gave are true.

BY MR. KRIEGER:

Q  In other words, you stick with the testimony you have given as to the depth of these wells, to the best of your knowledge; is that right?

A  Yes, sir.

I didn't give you the well depth on the hot water well.

Q  No.  Tell us what the depth of the hot water well is.

A  I believe that's 170.  Now, I could be mistaken on that.  That was drilled long before my time.

MR. VEEDER:  I move to strike that testimony, your Honor.

MR. KRIEGER:  That is 14-J-1, your Honor.

THE WITNESS:  However, we have a log on it.

MR. VEEDER:  I move to strike it.  He says he doesn't know whether it is right or not and has no information on it.

THE COURT:  He didn't say that he had no information on it.  He said it was drilled before his time.

THE WITNESS:  We have a log on it.

THE COURT:  Is that your best judgment as to its depth?

1   What difference does it make?

2   MR. VEEDER:  I am not sure what it might make.  We are

3 fighting about how much water and the source of these waters,

4 and I am just being careful.

5 BY MR. KRIEGER:

6   Q  What is the temperature of this mineral water?

7   A  It is various temperatures.  Our hottest spring at

8 its source was 170 degrees.  The water as it goes into the

9 bath house from the pressure tank, which is an accumulation

10 of the various springs, is 140 degrees.

11   Q  So that would be a mean average temperature of all

12 the seven springs and the well water, too, that is, the

13 mineral well water, too; is that right?

14   A  That is right.

15   Q  Is this water high in sulphur content?

16   A  It is.

17   Q  I think you explained very sketchily how this water

18 was used, but I wonder if you would explain a little bit

19 further how the sulphur water is used for baths?

20   A  Well, it is pumped into Roman style tubs in the

21 bath house, cold water is added because of the temperature

22 of the hot water to around 100 degrees, and then the guests

23 at the springs that they are taking the baths walk into the

24 tub and take usually a 12 to 15-minute tub bath.  This of

25 course tends to increase their body temperature and causes

1    perspiring and results in a sweating, which reduces toxic

2    poisons.

3         Q   This is the health aspect of the resort business, is

4    that right?

5         A   Yes, that's right.

6         Q   That has been going on since 1902; is that right?

7         A   Since 1902.

8         Q   To your knowledge has there been any decline in the

9    amount of water produced by those hot water springs through

10   the years?

11        A   No decline.

12        Q   Has there been any increase in the amount of water?

13        A   No, no increase.

14        Q   And have the owners of any property around you,

15   below you, ever objected to any of the water that you were

16   using for that purpose?

17        A   No.

18        Q   Have they ever objected to any of the storage of water

19   which you were making on the property?

20        A   No.

21        Q   Mr. Guenther, have you ever made any effort to find

22   other water-producing wells on the property?

23        A   Yes, we have.

24        Q   I wonder if you would come down and show us where that

25   was attempted and describe what fortune you had.

A   This was in looking for cold water.  One well was drilled down in the vicinity-- Well, it doesn't show the road-- just north of the road and east of Temecula Hot Springs, as it is shown here on the map.

Q   In the vicinity of Warm Springs Creek?

A   Right.

Q   In the middle of it?

A   No, not in the middle of the creek.  It was to the right of the creek.

Q   He is pointing, your Honor, so that we can locate it for the record, to a point just north and west of the road as it leaves the south section line of Section 14.

THE COURT:  It is right near the figure 1087 shown on the elevation.

MR. KRIEGER:  Yes, that is exactly-- almost exactly where he was pointing.

Q   What luck did you have with that well?

A   It was a dry hole.

Q   How deep did you go?

A   That I couldn't say.

Q   Did you make any other efforts to get water in the area?

A   Yes, we did.  This again was in my grandfather's time. There was a dry hole.

MR. VEEDER:  I object to it, then, as being hearsay.

BY MR. KRIEGER:

Q   Did this happen before you were born?

A   No.

Q   It happened when you were a young boy?

A   Right.

Q   All right, testify to it.

MR. VEEDER:  No, I have an objection, unless he knows to his personal knowledge.

THE COURT:  Let's find out later.  Overruled.  He was alive and around at the time.

MR. VEEDER:  As long as my objection is in the record.

THE COURT:  Overruled.

Do you know?  Where was this well drilled?

THE WITNESS:  This was drilled, it would be north and slightly east of the two wells that we operate now, cold water wells, and just south of the landing field on a knoll opposite what used to be our dairy.

BY MR. KRIEGER:

Q   How far north would you say it would be of 23-A-1 and 23-A-2, your now producing cold water wells?

A   I would say a quarter of a mile.

Q   What luck did you have with that well?

A   That was also a dry hole.

Q   And when, to the best of your knowledge, was that dug?

A   That was dug before the '20's.

1    MR. VEEDER:  That's a long, long time ago.

2    THE WITNESS:  1915 or '16.  My father happens to know

3  that and told me about it.

4    MR. VEEDER:  I am almost afraid to move to strike, but

5  I am going to, as being hearsay.

6    THE COURT:  Did you see the well being dug?

7    THE WITNESS:  No, sir.

8    MR. VEEDER:  I move to strike the whole thing.

9    THE COURT:  It may go out.

10    THE WITNESS:  My father said-- Well, that's hearsay.

11    MR. KRIEGER:  Your witness.

12    THE COURT:  Let me ask, before you cross-examine.

13    You also have a swimming pool up there, do you not?

14    THE WITNESS:  Yes, sir.

15    THE COURT:  The report in Exhibit 191 shows that it

16  stores about 10,000 gallons?

17    THE WITNESS: Yes, sir.

18    THE COURT:  That comes off the cold water domestic

19  system?

20    THE WITNESS:  That comes off the cold water.  But we do

21  add a little warm water when the outside temperatures are cold.

22  We can add hot water from the springs to that.

23    THE COURT:  What do you do with the water from the baths

24  and from the swimming pool after it has served its purpose?

25    THE WITNESS:  That goes down into the Warm Springs Creek,

1   eventually goes down into Warm Springs Creek.

2        THE COURT:   Proceed.

3

4                            CROSS-EXAMINATION

5   BY MR. VEEDER:

6        Q   Would you come down to Exhibit 15-A, please, and

7   orient yourself, if you can, as to where your properties are

8   situated?

9        A   Right in here.

10        Q   Now, can you state, in regard to the dry wells

11   concerning which you testified, their location as they relate

12   to the straight line that I am making reference to, the

13   straight line that runs across close to the bottom of the

14   lower boundary of Section 13?  Can you see where I am point-

15   ing?

16        MR. KRIEGER:   What is that line?

17        MR. VEEDER:   That is the fault line.

18        MR. KRIEGER:   That is known as the Murrieta fault line,

19   is it?

20        MR. VEEDER:   I am not under oath, but I will be glad to

21   testify.

22        MR. KRIEGER:   I am just trying to identify it.

23        THE COURT:   It will be identified as the Murrieta fault

24   line running south of the springs.

25        MR. VEEDER:   It is the Murrieta fault line.

1    THE WITNESS:  The three wells that were drilled for cold

2  water, one was-- Is that supposed to be the creek?

3    MR. VEEDER:  May I orient the witness on that?

4    Yellow will show the Warm Springs Creek.

5    THE WITNESS:  Well, it was right in-- there is a road on

6  there-- it was right in that area.

7    MR. KRIEGER:  Before the witness gets mixed up, point out

8  to him that Roripaugh's B shows the Guenther property runs to

9  the south of the line between Section 13 and 24 and 14 and 23--

10  you see the section line there-- and the Guenther property

11  runs south of that section line, and point out to him where the

12  wells A-1 and A-2 are in the northeast corner of Section 23.

13    MR. VEEDER:  If it would help him, he could put A-1 and

14  A-2 there with pencil and then he could orient himself better,

15  perhaps.

16    THE WITNESS:  Is this A-1 and A-2?

17    MR. KRIEGER:  If we are going to correlate that, let's see

18  if we can do it with a ruler and get it somewhere near.

19    MR. VEEDER: At best it is only relative, Mr. Krieger.  I

20  am only trying to identify these wells with relation to the

21  Murrieta fault.

22    THE COURT:  I think we can stop, if that's all you want.

23  They are all south of the Murrieta fault line, the wells you

24  talk about, except the hot water well.  I followed very closely

25  where you marked them on Roripaugh's B.  They are all south of

10,991

1  the fault line.

2  BY MR. VEEDER:

3      Q  Where are those wells as they relate to the Murrieta

4  fault line?

5      A  One well was drilled right about there, another one

6  was drilled about -- well, to pinpoint it, I couldn't.  Shall

7  I make it the general area?

8      MR. KRIEGER:  There has been some help offered here

9  that is very good.  Mr. Kunkel has suggested that very possibly

10  those are marked on this map.

11      Can you see those?

12      THE WITNESS:  These?

13      MR. KRIEGER:  Yes, those little marks that are right

14  in the corner of Section 14.

15      THE WITNESS:  That could be.  This looks like the dairy

16  barn.  They are actually south of those buildings.

17      THE COURT:  According to your testimony, you spotted the

18  other dry hole over in here, here was the roadway, Webster

19  Avenue coming up, this is in the creek bed, and you spotted

20  the dry hole down in here.

21      THE WITNESS:  That is about right.

22      And the other one is in this area here.

23      Now, this is apparently the other-- another well, and

24  this may be the well, I don't know.  It is pretty close.  There

25  is one well we abandoned because of the small percentage of

1  water we were getting out of it.  We abandoned this after we

2  drilled No. A-2.

THE COURT:  I don't think that demonstrates a well, that
little dot you pointed to.  I think that is just part of the
fault line.

THE WITNESS:  I see.

THE COURT:  These are little circles that seem to in-
dicate wells.

THE WITNESS:  Actually, the other well, if this is the
canyon, was more in this area right in here.

THE COURT:  Indicating immediately north of the fault
line and right under the word "Hot."

MR. VEEDER:  Under the letter "O" of "Hot."

THE COURT:  Yes.

THE WITNESS:  Maybe I had better look at this to make sure
if that is right.

MR. VEEDER:  You can relate it to the landing field.

THE WITNESS:  Well, my landing field is right in here,
and the well is right in this area.  Well, it is probably
right over the "O" there in "Hot," which apparently is the same
on both maps.

MR. VEEDER:  I have no further questions.

THE COURT:  Any further questions?

MR. STAHLMAN:  Just one question.

CROSS-EXAMINATION

BY MR. STAHLMAN:

Q   Has that property ever been subdivided, to your knowledge?

A   Not to my knowledge.  You mean since the family has had it?

Q   At any time.

A   I don't think so.  I think originally years ago there was-- Mr. Roripaugh would know more about that-- the San Diego Land & Water Company had the property south of us set up for a real estate subdivision.

THE COURT:  You may step down.

MR. VEEDER:  Call Col. Bowen.


ALLEN C. BOWEN,

Recalled as a witness in behalf of the plaintiff, having been previously duly sworn, testified further as follows:


DIRECT EXAMINATION

THE CLERK:  Your Honor, Government's Exhibits 192 through 195 are marked for identification.

(Plaintiff's Exhibits 192, 193, 194, and 195 were marked for identification.)

BY MR. VEEDER:

Q   Col. Bowen, I hand you the exhibit marked 191 for

Identification and ask you to state into the record the content
of that exhibit.

A   Plaintiff's Exhibit 191 for Identification is entitled
"Engineering Report on the property of Guenther's Murrieta
Hot Springs."

Q   And under whose direction was that report prepared?

A   Under my direction.

Q   Is it accurate, to your personal knowledge, Col.
Bowen?

A   Yes, sir.

Q   I hand you the aerial photographs which have been
marked 192, 193, 194 and 195, and ask you to relate those to
the identification marked 191.

A   Plaintiff's Exhibit 192 for Identification is an
enlargment of Aerial Photo No. 3-0051, and on this exhibit
appears the entire Murrieta Hot Springs property delineated
in red.   It is made up of the actual field survey prepared
on the originals of 193, 194 and 195, each of which are
photographic copies of soil survey sheets, and portions of
the Guenther property appear on each of those last three.   The
photograph in 191 is a photographic reproduction of the
property as it appears on Plaintiff's 192 for Identification.

Q   In regard to the photo in 191, Col. Bowen, would you
correlate the boundary line which comes down Hot Springs Creek
as it is shown there with the boundary line of the property as

1     disclosed on Roripaugh's Exhibit B?

2        A   The irregular line which appears on both the photo

3   in 191 and on Roripaugh's Exhibit B as forming a portion of the

4   westerly boundary of the Murrieta Hot Springs property are

5   both following the meander of Warm Springs Creek. The irregular

6   red line on the photo in 191 is on the center line of the

7   creek, your Honor.

8        Q   Is there any variance between the two boundary lines

9   as shown on the maps?

10        A   Basically, no variance between the two.

11        MR. VEEDER:   We offer in evidence Plaintiff's Exhibits

12   marked for identification 191, 192, 193, 194 and 195.

13        THE COURT:   Plaintiff's Exhibits 191, 192, 193, 194 and

14   195 all received in evidence.

15        (Plaintiff's Exhibits 191, 192, 193, 194 and 195 were

16   received in evidence.)

17        MR. VEEDER:   I have no further questions.

18        THE COURT:   Any questions?

19

20                   CROSS-EXAMINATION

21   BY MR. KRIEGER:

22        Q   Col. Bowen, may I call your attention to page 4 of

23   Exhibit 191 and inquire where you obtained the information as

24   to the depth of the 1911 well?

25        A   Wherever possible we obtained the depth of wells by

10,996

1　plumbing the wells with a tape, either by actually plumbing the

2　well or taking it from well logs which are in our possession.

3　I am not exactly certain how we got the depth of that par-

4　ticular well at the moment.

5　　　Q  You wouldn't have a work sheet on that?  Because there

6　is apparently some confusion here, and we thought we would

7　clear it up.

8　　　A  I can get that information, Mr. Krieger.

9　　　MR. VEEDER:  I really think we ought to have it, because

10　there apparently is a variance.

11　　　THE COURT:  We had some previous testimony on A-1 and

12　A-2, because in my notes on Exhibit Roripaugh's Exhibit A-1

13　I have a note that A-1 and A-2, as well as another well clear

14　over to the right, all hit bedrock, and I am sure we had proof

15　as to how deep that was.  But I don't know where it is in the

16　record.

17　　　Anything further?

18　　　MR. KRIEGER:  Nothing further.

19　　　THE COURT:  Look into this further, if you can.

20　　　THE WITNESS:  Yes, sir.

21　　　THE COURT:  As to this property, in the absence of other

22　proof, I would propose to find, in accordance with the testimony,

23　that 441.9 acres is irrigable, but that because of the highest

24　and best use to which this property could be put that the

25　likelihood of it being irrigated would be slight.

19,997

1    I would further propose to find that as to that portion

2  of the property lying north of the fault line, that this hot

3  water obviously comes from some fissure or crack that runs

4  very deep into the ground, and although you might argue that

5  it could be part of the stream system it would be better off

6  if it were not part of the stream system.  This hot sulphur

7  water couldn't do anything but contaminate, and probably does

8  contaminate, water further downstream.  I therefore would

9  propose to find that that sulphur water was not part of the

10  stream system.

11    Any objection to that?

12    MR. VEEDER:  I would have to consult with my "Brains"

13  for awhile.

14    THE COURT:  I would also propose to find that the use

15  of these reservoirs was a proper use of water-- storing water

16  for domestic purposes for baths as a health resort, including

17  a swimming pool.  In other words, I don't think we have any

18  problem on this piece of property, except as to the domestic

19  wells below A-1 and A-2, and that is going to hinge somewhat

20  upon where the Court fixes this basin line; and if the Court

21  fixes the basin line to include those wells, then he becomes an

22  overlying owner as to those wells and his correlative rights

23  with other parties are part of the stream and basin system.

24    No one questioned the Colonel as to his views on these

25  two wells A-1 and A-2.  They apparently are drilled in the

1    older alluvium.

2         Is that right, Colonel?

3         THE WITNESS:  Yes, sir.

4         THE COURT:  And in your opinion, are they taking water

5    that is part of the stream system of the Santa Margarita?

6         THE WITNESS:  Yes, sir.

7         THE COURT:  In your opinion there is a basin up that

8    far?

9         THE WITNESS:  In my opinion, the Murrieta fault line

10   forms the boundary of the basin in that vicinity, your Honor.

11        THE COURT:  I would also find that the property is all

12   riparian, in the absence of further testimony.  But this

13   emphasizes again the necessity of cataloging the ground.  As a

14   practical matter it should be listed in the irrigable column,

15   and I would think, absent the drying up of these hot springs

16   and the hot water well, that the use of this property would be

17   for resort purposes and I have serious doubt whether any of that

18   upper portion would ever be irrigated, from that bottom portion

19   in the older alluvium.

20        MR. VEEDER:  When your Honor says "the upper portion"--

21        THE COURT:  North of the fault line.  The contour shows

22   that it is pretty rugged.  Obviously, the best use of that

23   is for a resort.  So that area north of the fault line would

24   seem to me to be, although irrigable, put in a column where it

25   never would be irrigated.

Have you any estimate how many acres there are north of that fault line?

MR. VEEDER:   Col. Bowen?

THE WITNESS:   No, we have not made that determination, your Honor, but we could do so.

THE COURT:   It is shown by the map Exhibit 15-A to be spotted with outcroppings of basement complex.

MR. VEEDER:   Wouldn't it be possible to make that determination from the soil survey?

THE COURT:   If you can make an approximate determination, let us know, will you?

THE WITNESS:   Yes, sir.

THE COURT:   Adjourn until 2 o'clock.  I have to go to a luncheon for Judge Shell today and I can't start at 1:30.

(Noon recess.)

<u>San Diego, California, Tuesday, December 15, 1959.  2 P.M.</u>

MR. VEEDER:  Your Honor, we have a matter here, if I could interrupt for just a moment.

Mr. Teasdall has four clients in the case that are in precisely the same situation as Mr. Sachse's clients in interlocutory judgment No. 3.  We have gone over these parcels, and I thought if I stated them into the record we might then prepare the order for your Honor's signature and not bother Mr. Teasdall to come down again, if Mr. Teasdall agrees to that.

MR. TEASDALL:  I agree.  We are prepared to disclaim any right in the Santa Margarita or any of its tributaries.

THE COURT:  All right.

MR. VEEDER:  And the parties, for the record, would be James Duncan, Fallbrook Women's Club, Martha Fleckenstein, Milton Harvey and Irving Reeder.

We will prepare the order, submit it to your Honor, and serve a copy on Mr. Teasdall, if that is amenable to all.

THE COURT:  Is this property in the Fallbrook area?

MR. VEEDER:  That is correct, your Honor, it is in the same area in which Mr. Sachse's clients are located.

THE COURT:  And there is enough evidence in the record, apart even from the Master's reports, to make the findings proposed?

1        MR. VEEDER:  That is our view, your Honor.

2        THE COURT:  And I think we had testimony on the geology

3  of that entire region.

4        MR. VEEDER:  We did, your Honor.

5        THE COURT:  All right, that's satisfactory.

6        MR. VEEDER:  Thank you, Mr. Teasdall.

7        MR. TEASDALL:  Thank you.

8        THE COURT:  Prepare it, and on the document I want your

9  approval as to form, et cetera.

10       MR. VEEDER:  He has approved the Interlocutory No. 3

11  as to form.

12       THE COURT:  On the particular document the practice is

13  to have counsel for both sides; one side present it and the

14  other side approve it as to form and sign it.

15       MR. TEASDALL:  I will sign that, your Honor.

16       THE COURT:  All right.

17       MR. TESDALL:  Thank you.

18       THE COURT:  It will be number four, will it not?

19       MR. VEEDER:  That is correct.

20       MR. TEASDALL:  That is what I understand.

21       THE COURT:  He has the form?

22       MR. VEEDER:  He has viewed the form and we just went

23  into it at lunch time.

24       THE COURT:  It will be Interlocutory Judgment No. 4.

25       MR. VEEDER:  No. 4.

1          MR. TEASDALL:  That is the way I understand it, your

2     Honor.

3          You will prepare that?

4          MR. VEEDER:  Yes.

5          MR. KRIEGER:  Your Honor, when we recessed you spoke

6     last about cataloging of these lands, and I had read in the

7     testimony where you had done that on the previous two days

8     of trial, and so that I may be very clear in what your Honor

9     said, I understand that while all of the land in the Murrieta

10    Hot Springs area is, in your tentative finding, said to be

11    riparian.  Still you pointed out that the great portion of

12    that land which lies above the Murrieta fault would probably

13    never be used for irrigable purposes, and while that has

14    no effect from a legal point of view, from the practical

15    point of view it has considerable effect, and the point of

16    cataloging those rights, as I understand it, is to point out

17    those lands which may really use this water to which they are

18    entitled as against those which will not.  Is that correct?

19         THE COURT:  That is right.

20         MR. KRIEGER:  Fine.

21         THE COURT:  In other words, Mr. Veeder has been asking

22    that there eventually be made a cataloging of all the irrigable

23    acres in this watershed, and I took some pains awhile back to

24    point out to him that that isn't going to mean anything unless

25    you can break it down into a couple of columns:  Irrigable land

1    which has some reasonable expectation of being irrigated, and

2    other irrigable lands which probably never will be irrigated

3    or never could be irrigated by water out of this watershed.

4    The situations previously involved land much of it up in the

5    dry area where there is no water except in winter in the creeks,

6    and the only way they could ever irrigate the land would be

7    to get a permit to build a dam, and there would be a serious

8    question as to how much water they could ever impound in the

9    creek.  The land is irrigable.  If there is ever water, it

10   could be irrigated.  But I suggested that it would be silly

11   to include the land like that in the same cataloging as land

12   which could reasonably be irrigated, and I suggested that there

13   be thought given to breaking this cataloging down into two

14   or three categories:  Those that probably will be irrigated,

15   those that reasonably could be irrigated, and those which

16   probably never would be irrigated and couldn't be irrigated.

17        Do you follow me?

18        MR. KRIEGER:  Even though technically they are riparian

19   lands.

20        THE COURT:  They would be listed as being riparian.

21        And there is testimony in this case that certain land

22   is irrigable.  This is in a little different category than the

23   others.  First of all, it is on a creek where there probably

24   would not be too much water that could be impounded.  It is

25   true that there are some wells which could be used for

irrigation purposes, but the higest and best use of this property

is as a resort and chances are that it never will be irrigated

land, except possibly that area south of the fault line which

lies rather level.  Northof the fault line, according to the

contours, that is pretty rough country.

MR. KRIEGER:  Fine.

I would like, if I may, to recall Mr. Guenther for just

a moment for the purpose of introducing what quantities of

water have been used on that land through the years.  That

might be i portant because it has gone on for such a great

period of time as to create a prescriptive right against

certain people.

THE COURT:  Mr. Guenther.


FREDERICK H. GUENTHER,

one of the defendants herein, recalled as a witness in his

own behalf, having been previously duly sworn, testified

further as follows:


FURTHER DIRECT EXAMINATION

BY MR. KRIEGER:

Q . Mr. Guenther, in compliance with the law of

California, the Water Recordation Act, did you prepare notices

of ground water extractions reporting on the two wells shown

on Roripaugh's A, namely, 23-A-1 and 23-A-2?

A   I did.

MR. KRIEGER:   These are the only two copies I have of that.   Perhaps I had better mark them for identification.

THE COURT:   They will be Roripaugh's next in order. Make them one exhibit.   What will it be?

THE CLERK:   Roripaugh's G.

MR. KRIEGER:   This one I am referring to talks about Well No. 2, and it is related, as we will point out, to 23-A-1.

The second refers to Well No. 1, and that is 23-A-2.

THE COURT:   Do you want them under the same exhibit number?

MR. KRIEGER:   Anything you like.

THE COURT:   Two exhibits, then, Roripaugh's G and H; Well No. 2, 23-A-1, would be G, and Well No. 1, 23-A-2, would be H.

MR. VEEDER:   No objection.

MR. KRIEGER:   I think if there is no objection we might just introduce them in evidence, with the understanding that I have the right to withdraw them and make photostatic copies.

THE COURT:   Roripaugh's Exhibits G and H received in evidence.

MR. KRIEGER:   Fine.

(Roripaugh's Exhibits G and H were marked for identification and received in evidence.)

BY MR. KRIEGER:

Q   Now, from these records can you tell us how much water has been pumped from Well 23-A-2, which, I understand, Mr. Guenther, is your main well but is used the least because of the condition you recited-- How much water has been used from 1947 to 1956 each year?

A   Well, the annual extractions in acre-feet are 7.85 from 1947 to 1956 each year.

Q   That is annual extraction?

A   Annually.

THE COURT:   That is from one well?

THE WITNESS:   From one well.

MR. KRIEGER:   That is from 23-A-2, your Honor.

Q   Now, Mr. Guenther, referring to Exhibit G, which is a report of Well 23-A-1, tell us how much water has been produced annually from 1947 to 1956.

A   116.4 acre-feet.

Q   And in both these cases can you recite how this computation was made?

A   Well, I computed this with the help of a man from the Farm Bureau at Riverside.

Q   And is the record based on actual hours of operating those wells?

A   It is.   Our maintenance man, when he puts a well on, he puts the time that he puts the well on, and when he turns

it off he marks the hour down, so that we can tell from the

amount of pumping the amount of water that the well produces.

That is the way we compute these figures.

MR. VEEDER:  I wonder if it would be possible for us to

obtain those and duplicate them, Mr. Krieger?

MR. KRIEGER:  I don't know.

THE COURT:  I think that is satisfactory.

MR. KRIEGER:  May I produce those.

Will you duplicate them, Mr. Veeder?

MR. VEEDER:  That is correct.

MR. KRIEGER:  Fine.

Do you have the supporting data?

THE WITNESS:  They are still at home at the Springs.

MR. KRIEGER:  That information, your Honor, would, I

think, be additive to Exhibit B, which is the data that is in

support of all of our well test showings-- Roripaugh's B.

Q  Now, Mr. Guenther, going back beyond 1947, prior

to that time these wells had been operating for many years,

have they not?

A  They had.  1933 was in this Report No. 1 well, and

1939 was No. 2 well.

Q  Which is 23-A-2?

A  That is right.  Excuse me.  The reports don't go back

that far.  We only started this pumping report since the time--

we started these reports prior to the time the State Water

Resources Board designated us to do that.

Q Both these wells we are talking about have been operating at least since 1933, have they not?

A  Yes, one in 1933 and one in '39.

Q  I see.

A  At the time they were drilled.

Q  As far as you know, since 1939 has the quantities of water produced by these wells and used in the resort varied a great deal?

A  No, it has not.

MR. KRIEGER:  I think that's all.

MR. VEEDER:  I have no questions.

THE COURT:  You may step down.

MR. KRIEGER:  Charles Yoder.

This parcel about which testimony will now be given, your Honor, refers to Parcel 19, shown on Exhibit B.

THE COURT:  There is a 17 there of the same color and it is split by the highway.

MR. KRIEGER:  Parcel 17 will be the next one.  That is the M. J. Yoder piece.

THE COURT:  Parcel 19 is the smaller square?

MR. KRIEGER:  That is correct.

THE COURT:  All right, I see it.

CHARLES E. YODER,

a defendant herein, being first duly sworn, on his oath was

examined and testified as follows:

    THE CLERK:  State your name, please.

    THE WITNESS:  Charles E. Yoder.


DIRECT EXAMINATION

BY MR. KRIEGER:

    Q  And your address?

    A  4851 Los Alamos Road, Murrieta.

    MR. KRIEGER:  I ask that the soil survey of the United

States be marked for identification on the Charles E. Yoder

parcel.

    THE COURT:  It will be the Government's next in order,

No. 196.

    MR. VEEDER:  Your Honor, before we mark any more ex-

hibits-- I wish I had stopped you on this one-- we find that

exhhibit 174 is a duplicate of 193 tht went in this morning.

    THE COURT:  Is any harm done?

    MR. VEEDER:  Well, I just wanted to point out that there

is this duplication, and if you want to leave the numbers as

they are, all right.

    THE COURT:  It would be more difficult to undo it than

just to make a note that Exhibit 174 is a duplicate of Exhibit

193.

BY MR. KRIEGER:

Q  Are you married to Marjory B. Yoder?

A  Yes, I am.

Q  And do you and your wife together own the parcel shown as No. 19 on Exhibit B?

A  We do.

Q  I show you for identification 196 and ask you if the property described in 196 for Identification and in your Answer is the property which you and your wife own?

A  Yes, it is.

Q  And this exhibit, as you recall, shows that there are 413 acres in Parcel 19, of which 394 are irrigable; is that approximately correct?

A  Yes, it is.

Q  Now, Mr. Yoder, are there any watercourses that run through Parcel 19?

A  Yes.

Q  What are they?  Have they names?

A  I am not aware of the names.

Q  They are just watercourses without names?

A  Just watercourses.

Q  And those watercourses, so far as you know, enter into the Murrieta Creek; is that correct?

A  That is correct.

Q  Do you have any wells on your property?

1      A   Three; two drilled wells and one dug well.

2      Q   Would you come down here for just a moment, please,

3   and show me the two drilled wells?

4      Put a larger circle there.

5      Where is the other one?

6      THE COURT:  Can we identify that for the record in some

7   way?

8      MR. KRIEGER: I would like to identify these with the

9   State numbers, if I might.  Mr. Yoder has indicated one well

10  that lies near the 1200 mark, it has a 1200 elevation mark

11  in the Northwest Qarter of Section 16.  I think the State

12  refers to that as 16-C-1, and with your permission we will

13  so mark it.

14     THE COURT:  All right, 16-C-1.

15     MR. KRIEGER:  And the other well, which is more to the

16  east and near the center of Section 16, I think, is referred

17  to by the State as 16-G-1.

18     THE COURT:  It shows the well as H-1 on 15-A right on a

19  level with the No. 16 and off toward the center of the property.

20     MR. KRIEGER:  This is, I believe, a different well than

21  the one Mr. Yoder is referring to.

22     THE COURT:  All right.  16 what?

23     MR. KRIEGER:  G-1.  For the purposes of his testimony,

24  we may call it that.

25     Q   Now, referring first to 16-C-1, when was the first

1     well, 16-C-1, drilled?

2        A  16-C-1 was drilled in 1954.

3        Q  How deep is it?

4        A  210 feet.

5        Q  What kind of pump does it have?

6        A  A one-horse submersible.

7        Q  And how much water does it produce?

8        A  Less than a miner's inch.

9        Q  Now, referring to the second well, 16-G-1, when was

10     that well drilled, do you know?

11        A  It was on the place when my father started farming it

12     in the fall of 1932.

13        Q  Do you know how deep that well is?

14        A  168 feet.

15        Q  And do you know how much water it produces?

16        A  Less than a miner's inch.

17        Q  Have you ever tried to get any more water out of either

18     of these wells than you have just testified to?

19        A  Yes, we have.

20        Q  Did you have any luck?

21        A  No.

22        Q  What happens when you pump them harder?

23        A  They pump dry.

24        Q  How have you used the water that you have obtained

25     from these wells?

11013

1    A   Just domestic.

2    Q   How many houses have you on the property?

3    A   Two.

4    Q   You also spoke earlier about a dug well.  Where is

5   that well?

6    A   It is about a hundred yards east of 16-G-1 here.

7    Q   I will put an arrow on that and just call it "Dug,"

8   if we may.

9        Is there a storage tank in connection with the dug

10  well?

11   A   There is a 4,000-gallon storage tank in connection

12  with either the dug well or 16-G-1.

13   Q   Do you use the dug well at all?

14   A   I haven't in the last five or six years.

15   Q   Why not?

16   A   Its water is harder than the other water, and since

17  I have put in a submersible pump and not depending on a

18  windmill I don't need it.

19   Q   Do you irrigate any of the ranch?

20   A   No.

21   Q   All dry farming?

22   A   All dry farming.

23  THE COURT:  How much water do you get out of the dug

24  well?

25       THE WITNESS:  I have never measured it.  I think, though,

1 that it is less than an inch.  I don't think I would get any

2 more out of it than out of either of the others.

3 BY MR. KRIEGER:

4   Q The storage, Mr. Yoder, you spoke of in that tank

5 next to the two wells, how long have you been storing water

6 in that tank?

7   A Since about 1942 or '43.

8   MR. KRIEGER:  That's all.

9   THE COURT:  I thought you said you had three drilled

10 wells and one dug well.

11   THE WITNESS:  No; two drilled, and one dug.

12   MR. VEEDER:  I have no questions.

13   THE COURT:  What is the well shown on Government's

14 Exhibit 15-A as 16-M-1, or is that H-1?  It's hard to read here.

15 Is that an abandoned well?  No, it's an open circle.

16   MR. STAHLMAN:  The identical spot that he has marked.

17   THE COURT:  16-G-1, isn't it?

18   MR. VEEDER:  It is the same as G-1.  H-1 is identically

19 the same.

20   THE WITNESS:  It is located with the dug well.  It is

21 on the wrong side of the road for the drilled well.

22   THE COURT:  I am trying to take Roripaugh's B and

23 superimpose it on 15-A.  It would appear that K-1 is within

24 this piece of ground.

25   MR. KRIEGER:  Yes.

Q  These are all in your section now, Mr. Yoder.  Is H-1 in your property?  Is that the same as G-1?

A  I don't believe it is the same as 16-G-1.  16-G-1 is over here on this side of the road.

Q  Do you know anything about 16-H-1?

A  No, I don't.

MR. KRIEGER:  Can you give us just a minute, your Honor.

I think we are correct, your Honor.  The State Bulletin 57 shows that G-1 and H-1 are two different wells.

MR. VEEDER:  I move to strike that.

THE COURT:  Motion denied.

MR. VEEDER:  I think we are going to have to put in some evidence on that.

THE COURT:  As I understand your testimony, what is shown on 15-A as K-1 is not on your property?

THE WITNESS:  Yes.

THE COURT:  It is across the line on the other fellow's property?

THE WITNESS:  Yes.

THE COURT:  Whose is that K-1?

THE WITNESS:  O. R. Rail's.

THE COURT:  Anything further from this witness?

MR. KRIEGER:  No, your Honor.  That's all.

MR. M. J. Yoder.

THE CLERK:  Mr. Yoder was sworn before, your Honor.

1    MR. KRIEGER:  Mr. Veeder was going to put in both the

2    Government soil surveys together, but I think in order to keep

3    the presentation as it has been, if he would call Col. Bowen

4    now we can introduce the last exhibit for identification.

5       MR. VEEDER:  That is satisfactory with me.

6       MR. KRIEGER:  I will withdraw Mr. Yoder.

7       THE COURT:  All right, Mr. Yoder, step down.  The lawyers

8    have changed their minds.  You will find that this is quite a

9    common experience in a lawsuit.

10

11                    ALLEN C. BOWEN,

12   recalled as a witness in behalf of the plaintiff, having been

13   previously duly sworn, testified further as follows:

14

15                    DIRECT EXAMINATION

16   BY MR. VEEDER:

17       Q  Col. Bowen, do you have the exhibit there?

18       A  No, sir.

19       Q  Col. Bowen, I hand you Plaintiff's Exhibit marked

20   196 for Identification and ask you to state into the record

21   the content of that exhibit.

22       A  Plaintiff's Exhibit 196 for Identification is a copy

23   of the engineering report on the property of Charles E. Yoder.

24       Q  Under whose direction was that prepared?

25       A  Under my direction.

Q   Is it correct, to your personal knowledge?

A   Yes, sir.

THE CLERK:   Government's Exhibits 197, 198 and 199 have been marked for identification, your Honor.

THE COURT:   Government's Exhibits 197, 198 and 199 marked for Identification.

(Aerial Photos marked Plaintiff's Exhibits 197, 198 and 199 for Identification.)

BY MR. VEEDER:

Q   I hand you, Col. Bowen, the aerial marked for identification 197 and ask you to state into the record what appears in that aerial photograph.

A   Plaintiff's Exhibit 197 for Identification is an enlargement of aerial photo No. 3-0036, and there appears upon it the property of Charles E. Yoder delineated in red near the top of the exhibit.   That is compiled from field survey sheets, which are on aerial photos No. 3-0036 of Plaintiff's Exhibit 198 for Identification and aerial photo 3-0037, Plaintiff's Exhibit 199 for Identification.

Q   I ask you to correlate the identification 197, 198 and 199 with Plaintiff's Exhibit for Identification 196, if you will, please.

A   The portions of the Charles E. Yoder property which were surveyed on Plaintiff's Exhibit 199 for Identification and Plaintiff's Exhibit 198 for Identification were combined on

1    Plaintiffs' Exhibit 197, and the photographic copy of the

2    property as appears on 197 is included with Plaintiff's

3    Exhibit 196 for Identification.

4         MR. VEEDER:  We offer in evidence Identifications 196,

5    197, 198 and 199.

6         THE COURT:  Received in evidence.

7         (Plaintiff's Exhibits No. 196, 197, 198 and 199 were

8    received in evidence.)

9         MR. VEEDER:  I have no further questions.

10        THE COURT:  Col. Bowen, you are familiar with where this

11   property is located?

12        THE WITNESS:  Yes, sir.

13        THE COURT:  And you are familiar with the fact that it

14   is largely older alluvium, except for the younger alluvium

15   shown on 15-A running down through the middle?

16        THE WITNESS:  Yes, your Honor.

17        THE COURT:  You heard testimony about the amount of water

18   the owner, Charles Yoder, got out of these wells?

19        THE WITNESS:  Yes, sir.

20        THE COURT:  Do you have an opinion as to whether or not

21   this water is part of the Santa Margarita water system, or is

22   vagrant, percolating water?

23        MR. VEEDER:  I object to your Honor's question.  There

24   is no proper foundation for it.  There is nothing to show the

25   size of the pump, the motor, whether the well is perforated.

1  There is nothing in the record to show that the extraction

2  of one miner's inch of water is in any way relevant or proof

3  in regard to the availability of ground water.

4      THE COURT:  I don't know what the witness would base his

5  opinion on, but the objection is overruled.

6      Do you have some opinion, regardless of what you base it

7  on?  If you have, say so.

8      THE WITNESS:  I have an opinion, your Honor.

9      THE COURT:  What is your opinion?

10     THE WITNESS:  My opinion is that the older alluvium

11 and younger alluvium underlying this property are water-

12 bearing materials, and any water that is extracted from them

13 is a part of the stream system.

14     THE COURT:  Do you want to move to strike that?

15     MR. VEEDER:  I like that very much.  You never know,

16 your Honor.

17     THE COURT:  Anything further?

18     MR. KRIEGER:  Let me ask him a question on top of that,

19 if I may.

20     THE COURT:  I don't know what you have to worry about.

21 If that is all the water he can develop on it, outside of being

22 tied up in this litigation from her on out, he hasn't much

23 to worry about.  I don't think they could ever contend that

24 he was using more than his share.

25     MR. VEEDER:  If he keeps it that way, we never will.

1   MR. STAHLMAN:  His share is only 1501 acre feet.

2   MR. KRIEGER:  What we do by going after that line of

3   questioning is to develop the old hassle we have had as to

4   whether or not, no matter how much water you can get out of a

5   well, that land is in the younger or the older alluvium, and

6   therefore it is within the stream system.

7   THE COURT:  I am going to decide this eventually.  You

8   may ask him some questions, if you want to.  But I am not

9   saying I am going to decide it on the basis of Col. Bowen's

10  testimony.  I think he would be the first one to admit that

11  he is not quite as good a hydrologist as possibly some of the

12  engineers.  He has never claimed to be an expert on geology,

13  but he has had a lot of practical experience looking over this

14  watershed.  Eventually I am going to decide where this basin

15  runs, and any help I can get I want it.

16  MR. KRIEGER:  I think we all have a lot of respect for

17  Col. Bowen's opinion.  You opened up an avenue of inquiry.

18  Let me ask him one question, your Honor.

19  THE COURT:  Two or three.

20

21          CROSS-EXAMINATION

22  BY MR. KRIEGER:

23  Q  Col. Bowen, would you say that the productivity of

24  a well sunk in Parcel 19 would have some bearing on your

25  opinion as to how much that water-bearing land contributed to

11021

the waters of the stream system?

MR. VEEDER:  I object to that.  There is nothing in the record, there is not a thing in the world in the record upon which the good Colonel could predicate an opinion, under the circumstances.  What kind of well is it?  How deep is it?  There are any number of questions.  I submit, your Honor, that there is no foundation whatever for this.  I don't know what kind of luck I will have on this.

MR. KRIEGER:  The Colonel can make it as broad as he wants.

THE COURT:  If I sustain your objection, I am going to strike the other answer.  So takeyour choice.

MR. VEEDER:  Your Honor, that is cruel and inhuman treatment.

THE COURT:  Overruled.

You may answer, if you have an opinion.

THE WITNESS:  May I have the question read?

(The reporter read the pending question.)

THE WITNESS:  Yes, sir, I have an opinion in that regard.  If it is a properly constructed and developed well, the yield of the well would have a great bearing on the productivity of the clastics.

BY MR. KRIEGER:

Q  It would indicate to you just how much water was contributed to the stream system in that area, would it not?

11022

1    A  Yes, sir, that would be included.

2    Q  Would there be any other factors than well productivity

3  that you would take into account?

4    A  Of course, we have to idealize this.  I am speaking

5  of a well that is properly constructed and properly developed.

6  Its yield would be excellent evidence on the productivity of

7  these water-bearing materials.

8    Q  You were here, were you not, during the testimony of

9  Mr. Webb given with regard to Exhibit A Roripaugh and all of

10  those wells that border on the Murrieta Creek?

11    A  Yes, sir.

12    Q  And didn't his testimony regarding the specific

13  capacity of those wells have some influence on you, in your

14  opinion, that the joining lands contribute water to the stream

15  system?

16    MR. VEEDER:  I would like to have the question read back.

17    (The reporter read the pending question.)

18    MR. VEEDER:  Go ahead and answer it.

19    THE WITNESS:  I don't believe that that influenced me

20  very much, Mr. Krieger.

21  BY MR. KRIEGER:

22    Q  Is there a difference between having land as shown

23  on Government's Exhibit 15-A that has older and younger

24  alluvium in it and a demonstration through wells as to whether

25  you can get water out of that very same area?

1        A  Well, actually the only way you can demonstrate the

2   productivity of any specific geologic formation is by drilling

3   a well in it, developing it, and then pumping it.

4        Q  And determining what its specific capacity is?

5        A  Yes, sir.

6        Q  Then specific capacity of a well drilled anywhere in

7   this land which technically has younger and older alluvium

8   in it is a very important item, in your estimation, in

9   determining how much water-bearing land there is there?

10        A  Extremely important, because that is the great un-

11   known in this whole area at the present time.

12        Q  I see.  Then you, in your position, I take it, are

13   not able to state how much water can be gotten out of this

14   very land we are talking about on Exhibit 15-A?

15        A  No, sir, I am not.

16   MR. KRIEGER:  That's fine.  Thank you.

17   MR. VEEDER:  I have no questions.

18   THE COURT:  Step down.

19   MR. KRIEGER:  Mr. M. J. Yoder.

20

21                    M. J. YODER,

22   a defendant herein, called as a witness in his own behalf,

23   being first duly sworn, on his oath was examined and testified

24   as follows:

25        THE COURT:  This is Parcel 17?

1    MR. KRIEGER:   This is Parcel 17, shown just outside the

2 previous parcel on Exhibit B.

3

4                          DIRECT EXAMINATION

5    MR. KRIEGER:   May I have the Government report on Parcel

6 17, M. J. Yoder, marked for identification, please?

7    THE CLERK:   No. 200.

8    THE COURT:   Exhibit 200, for Identification.

9    (Soil Survey marked Plaintiff's Exhibit No. 200 for

10 Identification.)

11 BY MR. KRIEGER:

12    Q   Mr. Yoder, where do you live?

13    A   My address?

14    Q   Yes.

15    A   39-680 Highway 395, Murrieta.

16    Q   And you are married to Anita S. Yoder, are you?

17    A   That's right.

18    Q   What is your occupation?

19    A   Farmer.

20    Q   You and your wife own the property shown as Parcel

21 17 on Exhibit B?

22    A   That's right.

23    Q   And you have looked at Exhibit 200 for Identification,

24 being the soil survey on your property?

25    A   Yes, I think that is what I seen.

11025

1    Q   And do you and your wife together own the property

2   describedin your Answer and in this Exhibit 200 for Iden-

3   tification?

4    A   That is right.

5    Q   You recall this soil survey shows that there are

6   approximately 1,725 acres in Parcel 17, of which 1,651.3 are

7   irrigable?

8    A   That is right.

9    Q   Do you agree with that statement?

10    A   I think that is right.

11    Q   Are there any surface streams across Parcel 17?

12    A   Well, Warm Springs Creek goes along the east part of

13   it a little ways.

14    Q   Where I am pointing?

15    A   That is right.

16    Q   Any other creeks?

17    A   No.

18    Q   That is the only one?

19    THE COURT:   There are dry watercourses running down

20   through it, are there not?

21    THE WITNESS:   Yes.

22    THE COURT:   Run water in winter?

23    THE WITNESS:   Yes.

24    THE COURT:   Shown on 15-A. There is some younger alluvium

25   there?

1      THE WITNESS:  They would run when there was actual

2  rainfall, while it was raining.

3      MR. KRIEGER:  Looking at 15-A for a moment, your Honor,

4  that distance, I can outline briefly what we are talking about.

5      THE COURT:  I have it sketched out in front of me here.

6      MR. KRIEGER:  Good.  You are way ahead of me.

7      Q  How much of this property do you irrigate, Mr. Yoder?

8      A  At present about 20 acres.

9      Q  Where would that 20 acres be located on this map?

10     A  Well, it would be south and east of the junction of

11  Murrieta Hot Springs Road and Highway 395.

12     Q  In the general area that I am referring to here?

13     MR. VEEDER:  I wish you would state where you are

14  referring to.

15     THE WITNESS:  That is 395 you are pointing to.

16     MR. KRIEGER:  This is Highway 395, yes.

17     THE WITNESS:  Yes.  Murrieta Hot Springs Road crosses

18  that.

19     THE COURT:  Is that the same as Webster?

20     THE WITNESS:  Yes.

21  BY MR. KRIEGER:

22     Q  You say south and east?

23     A  That is right.

24     Q  Which would put it in the most southeasterly portion

25  of your land, being in Section 15 and the upper part of Section

22; is that right?

A  Most of it there would be in Lot 130, 131.

THE COURT:  We don't have those lots.

THE WITNESS:  You don't have the lots.

THE COURT:  This part you irrigate is east of 395?

THE WITNESS:  That is right.

THE COURT:  And south of Webster Avenue?

THE WITNESS:  That is right.

THE COURT:  We can have that marked.

MR. KRIEGER:  That is fine.

Q  Is the rest of the land dry farmed?

A  Yes, with the exception of a little waste land.

Q  What crops do you grow on the irrigated part?

A  Oats and permanent pasture.  I have had it in alfalfa.

Q  How long have you been irrigating that 20 acres?

A  I irrigated that 20 acres, along with another 40, in 1954 was the first irrigating I did.

Q  And do you irrigate by sprinklers or by flooding?

A  By sprinklers.

Q  You have some wells on your property, do you?

A  That is right.

Q  How many?

A  Three.

Q  Are they all drilled wells?

A  That is right, they are all drilled wells.

Q   What is your main irrigation well?

A   I think that is identified as 15-Q-2.

Q   That is on Exhibit A, Roripaugh, is that right?

A   I believe that is right.

Q   15-Q-2.  Can you see it from there?

A   Yes, I can see it.

MR. KRIEGER:  Can your Honor see it, too?

THE COURT:  Yes, I have both maps here.

MR. KRIEGER:  Fine.

I might say again, your Honor, that the log on that well is part of Roripaugh's Exhibit B and is on file.

Q   How deep is that well, Mr. Yoder?

A   I think it is about 318 feet.

Q   What kind of motor has it got?

A   It has a 15-horse electric motor.

Q   Do you know how much the well produces?

A   About 24 miner's inches.

Q   Do you have another irrigation well?

A   Yes.

Q   And where is that in reference to the previous one you just testified to?

A   Well, it is south about 131 feet.

Q   Could that be shown as 15-Q-3 on Roripaugh's Exhibit A?

A   That is right.

11029

THE COURT:  How deep is it?

THE WITNESS:  Oh, it is about 1120 feet.

BY MR. KRIEGER:

Q  Was it drilled as a water well?

A  Drilled as an oil well, as I understand, a wildcat oil well.

Q  It is equipped with what kind of pump?

A  It has a little one-horse submersible.

Q  Do you know where that well is perforated?

A  No, I don't.

Q  Do you know how much water it produces?

A  Well, we pump less than a miner's inch.

Q  Did you say those two wells are less than 130 feet apart?

A  About 131 feet apart.

Q  Is the ground between the two wells level?

A  Well, the surface of the ground at the 15-Q-3 is about five inches lower than the surface of the ground at Q-2.

Q  I see.

A  It's the barnyard there.  It's practically level.

Q  I see.  Have you recently measured the static water level of these wells?

A  Yes, I have.

Q  When?

A  That was early in the month of November, between the

5th and the 9th, November of this year.

Q   This year?

A   That's right.

Q   What did you find the difference in elevations to be, if any?

A   Static level, you mean, of the water?

Q   Yes.

A   About 105 feet.

THE COURT:   What was your static level on Q-2?

THE WITNESS:   Q-2 static level was 128 feet.

THE COURT:   What was the static level on Q-3?

THE WITNESS:   I got 23 feet 7 inches.

THE COURT:   Actually, that Q-3 is a hot water well, isn't it?

THE WITNESS:   That is right.

THE COURT:   What degree of temperature?

THE WITNESS:   138 degrees at the discharge of the pump.

THE COURT:   And your Q-2 runs about 90 degrees?

THE WITNESS:   97 degrees, your Honor.

BY MR. KRIEGER:

Q   Are there any durther differences in these two wells, for example, in the chemical content?

A   Well, Q-2 is high in sodium and boron, for that matter, whereas Q-3 is high in sulphur.

Q   Can you use any of those waters from either well on

1    your land, or do you blend them?

2         A  Yes, run them together and then through the

3    sprinkler system.

4         Q  This is done on the recommendation of the County

5    Farm Advisor?

6         A  That's right.

7         Q  Have you ever pumped one well and observed what

8    effect it had on the other?

9         A  Yes.  That was what I was doing early in November

10   when I made the static tests.

11        Q  Of this year, at the same time?

12        A  Yes.

13        Q  And which well did you pump?

14        A  Well, I pumped Q-2.

15        Q  How long did you pump it?

16        A  Well, in making these tests I run it for 12-hour

17   periods before I would make my test.

18        Q  And was 15-Q-3 operating at that time?

19        A  Well, I made tests in which Q-3 was running and in

20   which Q-3 was shut off.

21        Q  During the time Q-3 was off and you were running Q-2,

22   did you observe any change in the static water level of Q-3?

23        A  No, sir, I didn't.

24        Q  Did you reverse that process at any time and pump

25   Q-3 and stop Q-2?

11032

A  Yes, that is right.

Q  And how long did you pump Q-3?

A  I didn't go back and make measurement until it had run that way for 12 hours.

Q  And what difference did it make in the static water level of Q-2?

A  I couldn't detect any difference.

Q  Prior to this time had the Government representatives come in and pumped these same wells, Q-2 and Q-3?

A  They came in while I was pumping; yes, sir.

Q  While you were pumping, you say?  Not while you were conducting these test pumps?

A  No, I had the pumps running at the time that they came to make tests.

Q  Did they conduct a series of tests on these same wells?

A  I think that is right.  I think that is what they were doing.

Q  And when they conducted these tests did they disconnect one pump while the other pump was pumping?

A  Well, they stopped one pump while the other pumped.

Q  Did they disconnect the discharge pipe?

A  No.

Q  You observed that if you leave both pumps connected, even though you are pumping only one pump, the fact that it is

1    tied to another pump makes some difference?

2        A  Well, it makes a difference in the head pressure;

3    yes, sir.

4        Q  I see.  When the Government representatives were

5    there, did you tell them this?

6        A  Yes, I did.

7        Q  They did not disconnect the discharge pump, but they

8    asked you to do what?

9        A  Well, I have some gates in my discharge pipes and

10   some pressure gages, and so I throttled the discharge of the

11   one that was pumping in an effort to simulate the pressure

12   that was there when both pumps were running.

13       Q  And you cooperated with them in order to carry out

14   this experiment; is that right?

15       A  That is right.  That is a little hard to do, because

16   in irrigating, changing from one lateral to another, or rather

17   maybe two or three laterals, those laterals are different

18   lengths and there are different numbers of sprinklers on each

19   lateral, so the pressure varies a little from time to time,

20   depending on how many sprinklers are being pumped.  So my

21   undertaking to simulate this pressure was, well, I knew about

22   how that gage stood, but it varies, depending on how many

23   sprinklers are running.  So I could have missed it a little

24   bit.

25       Q  Is it for this reason that you went back later by

1   yourself and disconnected the discharge pump and made these

2   tests you have spoken of independently?

3       A   That is right.  I felt as though we needed something

4   a little more accurate on that.

5       Q   Have you got a domestic well on the property?

6       A   That is right.

7       Q   Where is that located?

8       A   Well, that is west of Q-3 about 630 feet, and it is

9   about four hundred and, oh, maybe 450 feet from Highway 395.

10  It is east of 395.

11      THE COURT:  Is it about where there appears a water

12  tank marked on Roripaugh's A?'

13      A   That is right.  The water tank used to stand there at

14  the well, your Honor, and I moved it over-- well, it stands

15  within 20 feet of Q-3 at present.

16      THE COURT:  I see.  But at the time this map was made

17  it would seem to be about equidistant between Q-3 and the

18  highway, maybe closer to the highway.

19      THE WITNESS:  Closer to the highway.  It is about 425

20  feet from the highway and 630, we will say, from Q-3.

21      THE COURT:  But presently the water tank has been moved

22  over by Q-3?

23      A   That is right.

24  BY MR. KRIEGER:

25      Q   How deep is that well?

A   Oh, it is in the neighborhood of 180 feet.  It seems
to me I have measured it at 182.

Q   How is it equipped?

A   It has a 2-horsepower electric jet pump.

Q   How much water does it produce?

A   Oh, at present, you know, it runs intermittently
there.  I suppose about an inch of water, I imagine.

Q   And the temperature of that water?

A   The temperature is 76 degrees.

Q   Do you store the water from that well?

A   We have two storage tanks.  They are not at the
well.  They are over near the other wells.

Q   Over near Q-2 and Q-3?

A   That is right.

Q   Further to the east?

A   That is right.

Q   How large are those tanks?

A   They are something over 6,000 gallons-- 6,200, I
believe, something like that.

THE COURT:  You mean 6,200 is the total for both tanks,
or each is 6,200?

THE WITNESS:  No, your Honor, that is each one.

BY MR. KRIEGER:

Q   And how long have you been storing water?

A   Well, I have been storing water in there since I

1    got the property.  They were there on the property when I

2    got it and they were used for water at that time.

3            THE COURT:  When did you get the property?

4        A   Well, this particular part of the property, that is,

5    what is south of Webster there where these wells are located,

6    I got that in 1943.  However, this whole block here that is

7    colored that way, I got part of that back in 1937.  That is

8    the bulk of the acreage.  There have been little pieces added to

9    it along between '37 and '43.

10   BY MR. KRIEGER:

11       Q   And did you actually farm that land before you bought

12   it?

13       A   I farmed most of it before I bought it.

14       Q   Since when?

15       A   That is the most of this that is marked Area 15.

16           I began farming that in, I believe it was the spring

17   of '33.

18           THE COURT:  You say marked Area 15.

19           THE WITNESS:  Yes, sir.

20           THE COURT:  There is nothing marked here 15.  Do you

21   mean in Section 15?

22           MR. KRIEGER:  Better come down here and explain that.

23   I am sure he is referring to Section 15.

24           THE WITNESS:  No.

25           THE COURT:  Are you talking about the ground east of

11037

1    395 and South of Webster?

2         THE WITNESS:  Oh, it's 17.  I beg your pardon.  I saw

3    this 15.  It is the area marked 17, your Honor.

4         THE COURT:  17 is your entire parcel.

5         THE WITNESS:  That is right.

6         You see, the part that I bought of that in 1937 didn't

7    have any well suitable for irrigation on it and it was not

8    until I got this land in 1943 that there were wells that I

9    undertook to irrigate with.

10        THE COURT:  When you bought this ground in '37, did you

11   buy the piece that ran clear across to Warm Springs Creek?

12        THE WITNESS:  Yes, sir.

13        THE COURT:  But you didn't get that part south of

14   Webster Avenue until '43?

15        THE WITNESS:  That is right.

16        MR. KRIEGER:  Did I ask you, Mr. Yoder, if you

17   irrigated this land with sprinklers?

18        THE COURT:  You did.

19        MR. KRIEGER:  Then I withdraw the question.

20        I have no further questions.

21

22                    CROSS-EXAMINATION

23   BY MR. VEEDER:

24        Q  Mr. Yoder, which were the wells upon which you made

25   the tests?  Q-2 and Q-3, was it not?

1    A That is right.

2    Q Are you acquainted with the fact that there was 20

3 sacks of cement dumped into Q-3 in 1935?

4    A No, I don't know what was done to that well previous

5 to the time I got it.

6    Q And you didn't know that there was a wooden plug

7 driven down into that?

8    A No, I wouldn't know that.

9    Q That might make a little difference in your static

10 tests, if you had that kind of conglomerate down in that well,

11 wouldn't it?

12    A Well, I wouldn't know whether that would make any

13 difference.

14    THE COURT:  That doesn't get us anywhere.  It would

15 depend where the 20 sacks went.  It is a 1020-foot well.  If

16 they went down to the bottom 20 feet, that would be one thing.

17 If they stopped 150 feet below the surface, it might mean

18 something else.

19    MR. VEEDER:  The fact remains that that is a matter that

20 is now in evidence.

21    MR. SACHSE:  It is in evidence, you say?

22    MR. VEEDER:  It is on the well log, yes.

23    THE COURT:  If it is, refresh my recollection.  What

24 does the well log show?  That 20 sacks of cement were dumped

25 in the well?

1    MR. VEEDER:  Here is what it shows.  On July 30, 1925,

2  they dumped 20 sacks of Riverside cement on top of a wooden

3  plug driven in the stub of a $12\frac{1}{2}$-inch case.

4    MR. SACHSE:  You have the wrong well.

5    MR. VEEDER:  No, I am reading from the well log, which

6  is marked here 15-Q-3.

7    THE COURT:  Is this what is called the old oil well that

8  we talked about?

9    MR. VEEDER:  No, your Honor.

10    THE COURT:  There are two old wells.  Is this one of

11  the old oil wells?

12    MR. VEEDER:  It was his understanding, if my notes are

13  correct, that this was originally 1120 feet deep, and it was

14  drilled as an oil well.  Isn't that what he testified to?

15    THE COURT:  Yes.

16    MR. VEEDER:  These notes that are on this well log-- the

17  well logs are in evidence, and that is a notation which appears

18  on the well log.

19    THE COURT:  Somebody must have been getting too much

20  hot water out of it and hoped to get a little cooler water.

21    MR. VEEDER:  The only point I am trying to make, I

22  don't believe it is the best kind of test for interrelation-

23  ship.

24    THE COURT:  I can see that they would grow some mighty

25  fine crops with 138-degree hot sulphur water.

1    MR. SACHSE:  I don't want to argue with Mr. Veeder.  I

2  don't know.  I don't think this is in evidence.  I think this

3  is by reason of supporting data that we brought around that

4  people had a right to look at, and I don't think anybody has

5  introduced this bundle of well logs.

6    MR. VEEDER:  I think they are in.  I will check it back.

7    THE COURT:  We had an entire exhibit of well logs, to

8  which we added from time to time.

9  BY MR. VEEDER:

10    Q  Do you store any of the water you are using for

11  purposes of irrigation?

12    A  No.

13    Q  Pumped out of the well and then you use your pressure

14  from the pump to run the sprinkler; is that right?

15    A  That is right.  It goes direct from the pump.

16    Q  What is the maximum acreage you have ever had under

17  irrigation?

18    A  In the spring of 1954 we irrigated 60 acres.

19    Q  What was your crop?

20    A  That was oats.

21    Q  What are you raising at the present time during the

22  1959 season?

23    A  Oats and permanent pasture.

24    Q  How many acres of oats in 1959?

25    A  Oh, about 14 acres.

Q   And about six acres of permanent pasture; is that right?

A   I think that is about right; yes, sir.

THE COURT:   Does all this land that you irrigated at one time, the 50 or 60 acres, lie south of Webster and east of 395?

THE WITNESS:   Yes, your Honor, that is right.   That is that area there.

THE COURT:   Acquired in 1943?

THE WITNESS:   That is right.

THE COURT:   How much area of this would you say lies south of Webster and east of 395?

THE WITNESS:   I have always considered it about 60 acres.

MR. VEEDER:   I have no further questions.

THE COURT:   Any other questions?

MR. KRIEGER:   No further questions.


CROSS-EXAMINATION

BY MR. STAHLMAN:

Q   Mr. Yoder, what are these little islands here?

A   That is parcels of land that belong to other people.

Q   Was this entire area subdivided at one time?

A   I think that is right; yes, sir.   That is previous to my knowledge.

1    THE COURT:  Are those six little islands owned by one

2  person or by various persons?

3    THE WITNESS:  By several persons, your Honor.

4    MR. STAHLMAN:  That's all I have.

5    THE COURT:  Any further questions?

6    MR. VEEDER:  No, your Honor.

7    THE COURT:  We ought to dispose of those six parcels

8  while we are on this subject.  Does anybody know the record

9  owners of them?  Have they appeared?

10    MR. VEEDER:  We would have to run that down, your

11  Honor.

12    THE COURT:  Let's do that in the next day or so while

13  we are in this area.  We will eventually have to get some

14  proof on it.  I take it that these six little islands in

15  there are about similar to your ground in that area, are they

16  not?

17    THE WITNESS:  Yes.  Some of them have eucalyptus trees

18  on them.

19    THE COURT:  I mean, they lie about the same as your

20  ground?

21    THE WITNESS: Yes, sir.

22    MR. VEEDER:  Are those irrigated at the present time,

23  to your personal knowledge?

24    THE WITNESS:  Not that I know of.

25    MR. STAHLMAN:  Are there any wells on them, to your

11043

1   knowledge, on any of the islands?

2        THE WITNESS:  I don't know of any wells on them.

3        MR. STAHLMAN:  No one living on them?

4        MR. KRIEGER:  As Col. Bowen, I think, will testify,

5   some of that land gets up into the basement complex, as shown

6   on 15-A.

7        THE COURT:  No.

8        MR. KRIEGER:  Doesn't it?

9        THE COURT:  The very most northerly tip on Mr. M. J.

10  Yoder's property just reaches into the basement complex.  At

11  the recess you look and see.  I have them scaled off here.

12       MR. STAHLMAN:  Does anyone live on any of those parcels?

13       THE WITNESS:  I don't know.  There is someone put some-

14  thing on one of those parcels recently.  Whether he lives

15  there or just has some beehives there.

16       MR. STAHLMAN:  Any building on it, to your knowledge?

17       THE WITNESS:  I haven't seen it.  Whatever is there has

18  been put there in just the last month or two and I don't know

19  what is there now.

20       MR. KRIEGER:  I was wrong, your Honor.

21       MR. STAHLMAN:  That is in regard to the location as

22  related to the basement complex and residuum, as shown on 15-A.

23       THE COURT:  Anything further from this witness?

24       MR. KRIEGER:  Nothing further.

25       THE COURT:  Step down, Mr. Yoder.

1          Come back, Colonel.

2

3                    ALLEN C. BOWEN,

4    recalled as a witness in behalf of the plaintiff, having been

5    previously duly sworn, testified further as follows:

6          MR. VEEDER:  Your Honor, I think we have now located

7    the well log for 15-Q-3.  That is marked in evidence as Exhibit

8    16-A17.

9

10                   DIRECT EXAMINATION

11   BY MR. VEEDER:

12         Q  Colonel, I hand you the exhibit marked 200 for

13   Identification and ask you to state into the record the con-

14   tent of that exhibit.

15         A  Plaintiff's Exhibit 200 for Identification is a copy

16   of the engineering report prepared on the property of M. J.

17   Yoder by the Office of Ground Water Resources, Marine Corps

18   Base, Camp Pendleton, California.

19         Q  Under whose direction was that prepared?

20         A  Under my direction.

21         Q  Colonel, will you state into the record whether the

22   field sheets which have been marked as Exhibits 197, 198 and

23   199 are the field sheets from which you prepared part of this

24   exhibit?

25         A  Well, they are in part the base for the preparation

1  of the soil survey included in this exhibit.  It would

2  perhaps be easier if I would go through these and refer to

3  the exhibit numbers.  I have them before me, Mr. Veeder.

4  　　　　THE COURT:  What exhibit numbers?

5  　　　　THE WITNESS:  The aerial photos contained in Exhibit 200

6  for Identification are numbered at the bottom with the aerial

7  photo number from which they were copied.  The first sheet,

8  Aerial Photo 3-0036, was copied in part from Plaintiff's

9  Exhibit 198, the second photo, 3-0037 is a part of Plaintiff's

10  Exhibit 199, the third photo No. 3-0038 is a photographic

11  copy of a portion of Plaintiff's Exhibit 186, the fourth

12  aerial photo No. 3-0050 is a photographic reproduction of a

13  portion of Plaintiff's Exhibit 195, and the fifth and last

14  photo, No. 3-0051 is a photographic reproduction of a portion

15  of Plaintiff's Exhibit 194.

16  　　　BY MR. VEEDER:

17  　　　　Q  Is the content of this identification 200 correct,

18  to your personal knowledge?

19  　　　　A  Yes, sir.

20  　　　　MR. VEEDER:  We offer in evidence Identification marked

21  No. 200.

22  　　　　THE COURT:  Exhibit 200 received in evidence.

23  　　　　(Plaintiff's Exhibit No. 200 for Identification was

24  received in evidence.)

25  　　　　The aerials relied upon are in evidence already.

11046

1      MR. VEEDER:  That is correct, your Honor.

2      I have no further questions.

3

4                    CROSS-EXAMINATION

5  BY MR. KRIEGER:

6      Q  Col. Bowen, do you have any opinion whether a well

7  could be sunk in the upper portion of Parcel 17 that would

8  produce water in such a way that it would be economically

9  feasible to drill such a well and equip it with a pump?

10     MR. VEEDER:  Wait a minute.  I am going to object to

11  that question on the ground that there is no foundation; it

12  is too vague and too speculative.  It couldn't possibly be

13  answered, based upon the data in the record.

14     THE COURT:  We will see if the Colonel has any opinion

15  and what he bases it on.  Overruled.

16     THE WITNESS:  Would you define more specifically, please,

17  Mr. Krieger, what you mean by the upper portion of the parcel?

18  BY MR. KRIEGER:

19     Q  In your opinion, would it be economically feasible

20  to sink a well in the upper portion of Parcel 17 and irrigate

21  land with it?

22     MR. VEEDER:  I renew my objection to this line of

23  questioning.

24     THE COURT:  The objection is overruled.  Go ahead.

25     THE WITNESS:  Referring to Plaintiff's Exhibit 200, your

Honor, there are enclosed with two of the photographs overlays on clear acetate, one overlay appearing with aerial photo 3-0037 and the other appearing with aerial photo 3-0050. These overlays show the approximate position of a fault striking through the M. J. Yoder property and described on page 3 of the report as striking about north 60 degrees west from the Southwest Quarter of the Southwest Quarter of Section 11 (projected), 7 South, 3 West, and northeast of that fault, which does not appear on any other exhibit here. It is my opinion that the geologic formation is essentially non-water-bearing, being primarily crystalline basement complex material, and that any water found northeast of the fault described in Plaintiff's Exhibit 200 would be local, vagrant, percolating and not part of the stream system.

MR. KRIEGER:  I am glad to have that answer.

Q  In addition to that, Col. Bowen, even below that fault line, and that would be to the southwest, do you have any way of knowing how productive a well would be?

A  No, sir.

Q  No wells up there that you know anything about, are there, other than those which Mr. Yoder has testified to, which are in the lower section of his property?

A  I know of no others on that parcel, Mr. Krieger.

Q  So you have no way of judging how much water can be produced, whether it would be economically prudent to dig a

11048

1   well or anything else up there?

2       A  No, sir.

3       MR. KRIEGER:  That's all.

5                       CROSS-EXAMINATION

6   BY MR. STAHLMAN:

7       Q  I wonder if I might ask a question that might be

8   off the base here, but he raised the question about the

9   well log here that says that they dumped 20 sacks of cement

10   in this well.

11       Do you have an opinion, Colonel, as to why cement

12   would be dumped into a well?

13       MR. VEEDER:  I object to that as being too vague.  He

14   is not going to psychoanalyze somebody who did something in

15   1935.

16       THE COURT:  Sustained.

17       MR. STAHLMAN:  That's all.

18       MR. SACHSE:  I would like to ask the Colonel a question

19   about this fault.  I am not quite clear on it.

21                       CROSS-EXAMINATION

22   BY MR. SACHSE:

23       Q  Colonel, would you look at your acetate.  Are these

24   two photographs 3-0037 and 3-0050-- this is the same fault,

25   isn't it, extending from one to the other?

1      A   Yes, sir, the easterly boundary on photo 3-0037 is

2   common, in part, to the westerly boundary of the parcel

3   delineated on photo 3-0050.

4      Q   So the fault line shown on both those photos is the

5   same fault?

6      A   Yes, sir.

7      Q   On page 3 of this same Exhibit 200, you refer to a

8   second fault, the third paragraph, under the heading "Geology"

9   on page 3.

10      A   That is the Murrieta fault, which has already been

11   described and appears on Plaintiff's Exhibit 15.

12      Q   But it does not appear on this one?

13      A   No, sir, it does not appear on Plaintiff's Exhibit

14   200.

15      MR. SACHSE:   That's all.

16      MR. VEEDER:   I have no questions.

17      THE COURT:   All right, Colonel, step down.

18      Colonel, I will ask you one question, and you can

19   answer it right there.   You heard the testimony of Mr. Yoder

20   that this well 15-Q-3 has water of 138-140 degrees temperatur.

21   Is it your opinion that that water comes from an underground

22   basin or from some crack or fissure?

23      THE WITNESS:   I don't have an opinion on that.

24      THE COURT:   I want to ask Mr. Yoder a question.   You

25   may answer it right there.

1    In the very southerly part of your property you own

2  land on both sides of 395 and south of Webster Avenue, is that

3  right?

4    MR. M. J. YODER:  Yes.

5    THE COURT:  What about that land south of Webster and

6  west of 395-- have you ever irrigated it?

7    MR. YODER:  No, your Honor.

8    THE COURT:  According to my scaling, there is a well

9  15-N-1 that appears to be within your property.

10    MR. YODER:  That is a neighbor's property, I believe,

11  your Honor.

12    THE COURT:  That is right south of Webster Road.

13    MR. YODER:  It is not far from Webster; that's right.

14    THE COURT:  Whose well is that?

15    THE WITNESS:  I don't know the name of the party there.

16  There are several owners.  I have been told there were

17  several owners.

18    THE COURT:  The map shows a windmill there.  Is there a

19  windmill in connection with that well?

20    THE WITNESS:  I think there is a windmill there now,

21  yes, your Honor.

22    THE COURT:  I see.

23    I will indicate what I think I would find, unless I

24  have some more evidence in here.  Somebody is going to have a

25  big job of convincing me that any basin runs north of the

Murrieta fault line or its extension.

MR. VEEDER: Your Honor, extension, did you say?

THE COURT: Its extension westward. The mere fact that
the fault line is not shown on 15-A is not conclusive. The
Colonel in his report has mentioned that the Murrieta fault
line runs on across it, although he hasn't shown it in the
acetate. I am talking about the southerly fault line, the
Murrieta fault line.

MR. KRIEGER: This one, your Honor, shown on 15-A?

THE COURT: That is right.

In the absence of other evidence, I would be inclined
to find, without much doubt, that the property of M. J. Yoder
north of that fault line was not part of any basin, and that
probably any water in that northerly portion was vagrant,
percolating water.

As to where the basin may be is still open for other
testimony, and I will not make even any tentative conclusions
on that. According to Mr. Yoder's testimony, the property that
he bought bordered Warm Springs Creek and his property line
runs to the middle, which would mean that unless this was
split up and riparian rights lost, all this land would be
riparian.

MR. VEEDER: Your Honor, it was subdivided, if I may
interrupt.

THE COURT: Well, that might not answer it. Property

1   probably could be subdivided and still riparian rights might

2   or might not be lost.

3       MR. VEEDER:  This is one of the parcels that we intend

4   to run out further.

5       THE COURT:  That is right.  However, if the property is

6   riparian, it is an illusory right.  Any water that might be

7   obtained from Warm Springs would certainly not go very far

8   to irrigate that acreage.  This is the type of property, if

9   it is riparian, that ought to be cataloged as property in

10  which there is no reasonable possibility that it will be

11  irrigated, with the exception of this land lying south of

12  Webster Road, and maybe some land adjacent to it-- that

13  northerly part.

14      I haven't commented on Charles Yoder's Parcel 19.  His

15  land is riparian to these dry washes that run through it.  It

16  would probably be riparian.  I notice the Kunkel line runs

17  through it.  I am not going to make any comments as to whether

18  he may be in or outside of a basin.

19      As to this water, though, that has been developed in

20  Q-2 and Q-3, that presents a very interesting problem.

21  Certainly this hot water is not water that would ordinarily

22  be used for irrigation without cooling and mixing.  From the

23  very temperature and the chemical content, I don't think this

24  water comes from any basin underneath.  I think I should

25  have enough right there to find that this water came out of

1  some deep fissure or crack, got heated and picked up chemicals.

2  I don't think it comes out of any basin. I have serious

3  doubt if it is part of the stream system, except when it is

4  pulled out of the ground and spread on the ground. But without

5  the effect of the wells in pumping water onto the ground, I

6  don't think that water is part of any basin, with that

7  temperature and that difference in chemical content in two

8  wells that close together.

9      MR. VEEDER:  We disagree with that, your Honor.

10      THE COURT:  Doesn't that sound logical?

11      MR. SACHSE:  It does to me.

12      MR. KRIEGER:  It does to me, your Honor. And inci-

13  dentally, your Honor, going back for just a moment to Parcel

14  19, I presume you would go further and put that in your

15  cagetory of illusory rights, too.

16      THE COURT:  Yes.  If the property in Parcel 19 is

17  riparian, as it appears to be, I think that clearly is one

18  of these illusory rights where the cataloging should be put

19  in an area where there is not much reasonable possibility

20  that it would ever be very much of it irrigated from what I

21  have heard.  Certainly there is no surface flow that he can

22  reach.  The wells so far give him about a miner's inch.

23  If he has hit a basin, it is not much of a basin.  I think

24  his rights are pretty illusory.  His irrigable ground should

25  be put in that questionable category.

1    I am only making these suggestions while these things are

2    fresh in my mind.   These aren't findings by any means.

3        MR. VEEDER:   What occurs is that this water runs from

4    the basin into these deep cracks and fissures and is heated

5    and comes back up.

6        THE COURT:   That could happen.

7        MR. VEEDER:   It does.

8        THE COURT:   Take a short recess and then proceed with

9    the next one.

10       (Recess.)

11       MR. KRIEGER:   Your Honor, we can clarify one point so

12   that the record will be clear on Parcel 19, Charles Yoder.

13   The dug well to which he refers is shown in Bulletin 57 as

14   16-H-1.

15       Is that right?

16       MR. VEEDER:   There is agreement on that.

17       THE COURT:   As shown on Government's 15-A and--

18       MR. KRIEGER:   And on Roripaugh's B.   It is shown already

19   on 15-A as H-1, and I have marked it.   With your permission

20   I will erase the word "Dug" and put "16-H-1."

21       THE COURT:   Just put 16-H-1 underneath "Dug."

22       What is the next party?

23

24

25

1

1       MR. KRIEGER:  Leo Roripaugh.

2       I think Mr. Roripaugh has been sworn already.

3       THE COURT:  All right.  What parcels are these?

4       MR. KRIEGER:  This is Parcel 12, your Honor.

5

6                      LEO RORIPAUGH,

7  a defendant herein, having been previously duly sworn, on his

8  oath was examined and testified further as follows:

9       MR. KRIEGER:  You have been sworn, Mr. Roripaugh.

10      THE WITNESS:  Yes, I believe so.

11

12                   DIRECT EXAMINATION

13 BY MR. KRIEGER:

14      Q   State your full name, please.

15      A   Leo Roripaugh.

16      Q   Where do you live?

17      A   North of Temecula two miles.

18      Q   How long have you lived in the Murrieta area?

19      A   All my life.

20      Q   How long is that?

21      A   Fifty years.

22      Q   And have you been a farmer most of your life?

23      A   Yes.

24      MR. KRIEGER:  I will ask that Government's Exhibit on

25 the Leo Roripaugh property be marked for identification as 201.

2

1    (The document was marked Government's Exhibit No. 201

2   for Identification.)

3   BY MR. KRIEGER:

4        Q   I will show you Exhibit 201 for Identification and

5   ask you if you have studied the soil survey report of the United

6   States.

7        A   Yes.

8        Q   Now, do you and your wife, Mr. Roripaugh, own the

9   land along with Louis Cass and his wife, shown on Roripaugh's

10   B as all those parcels marked 12?

11        A   Yes, that is right.

12        Q   How do you own that property?

13        A   It is a one-fourth undivided interest to each of us.

14        THE COURT:  That is, Louis Cass has an undivided one-

15   fourth, his wife a fourth, you a fourth, and your wife a

16   fourth?

17        THE WITNESS:  That is right.

18        THE COURT:  What is your wife's name?

19        THE WITNESS:  Marian.

20        THE COURT:  What is Louis Cass's wife's name?

21        THE WITNESS:  Virginia.

22   BY MR. KRIEGER:

23        Q   And you have been in charge of that ranch for how

24   many years?

25        A   About fifteen years.

11957

Q  And you represent Mr. Cass's interests, do you not?

A  Yes, I do.

Q  And you are authorized to speak for him today?

A  Yes, I am.

Q  Now, will you tell me if, after looking at Exhibit
201 for Identification, all of the land described in that
exhibit for identification is land owned in undivided one-
quarter interest by the four people you have just recited?

A  Yes, that is right.

Q  And do you agree with the conclusion in that report
that there are approximately 2,984 acres, of which 2,659.8
are irrigable?

A  Yes, that's right.

MR. KRIEGER:  For convenience sake, your Honor, we have
had prepared a quad map which has designated on it the
Roripaugh sections, which, I think, will afford us a much
better opportunity to show the various wells and reservoirs
and property holdings.

THE COURT:  All right.

MR. KRIEGER:  I can put Mr. Webb back on the stand to
identify this, he having made it, Mr. Veeder, and if satis-
factory with you we will introduce it for the purpose of
showing the locations of the wells and reservoirs which are
designated in a very broad way on Roripaugh's B.

MR. VEEDER:  I see no reason why we can't stipulate to

11058

this just from the standpoint of locations.

MR. KRIEGER: Locations, that's right. That is all. Actually, the soil survey is the one that speaks as far as property is concerned.

THE COURT: Mark the quad exhibit Roripaugh I.

(The Quad was marked Defendant Roripaugh's Exhibit I for Identification.)

MR. KRIEGER: You have one there?

THE WITNESS: Yes.

MR. KRIEGER: Roripaugh's I, which has been admitted by stipulation, your Honor, does not have on it Parcel 12 as shown on Roripaugh B, which is Section 21, 7 South, 2 West. It was not big enough to get on the same quad. But that will not be material, in any event, for the purposes of our examination, I think, for the moment.

THE COURT: All right. We have previously agreed to call that Section 21 -- or did we? Let's call that 12-B.

MR. KRIEGER: 12-B.

THE COURT: Are you going to split this other up into pieces and tell us about it?

MR. KRIEGER: I don't believe there is any real need to split it up. If it appears as we go along, may we do it then?

THE COURT: Do it then, all right.

Section 21 will be Parcel 12-B

MR. KRIEGER: All right.

5

1          THE COURT:  So Roripaugh's Exhibit I will concern

2     Parcel 12-A.

3          MR. KRIEGER:  All right.

4          Q  Mr. Roripaugh, what streams run through your property?

5          A  Murrieta Creek and Santa Gertrudis Creek both.  They

6     intersect on our property.  Santa Gertrudis meets Murrieta

7     Creek.

8          Q  And also Santa Gertrudis Creek runs through your

9     Parcel 12-B; is that right?

10          A  That is right.

11          Q  Starting at the lower part of your property, that

12     is, that which is down in the Murrieta Valley, I would like to

13     go over this well by well and reservoir by reservoir and

14     describe it.  The first one appearing is Well No. 2, which

15     appears just southwest of the Murrieta Creek.  When was that

16     well drilled?

17          A  It is about six years old.

18          Q  Did you drill it?

19          A  Yes.

20          Q  How deep is it?

21          A  A little over 300 feet.

22          Q  How is it equipped?

23          A  Well, it has a 30-horsepower motor on it and a deep

24     well turbine pump.

25          Q  How much water does it pump?

6

1    A   About 100 inches, 90 to 100.

2    Q   And what do you do with the water from that well?

3    A   We irrigate alfalfa and permanent pasture.

4    Q   What number of acres do you irrigate with it?

5    A   Approximately 115.

6    Q   Are those acres located to the southwest of Murrieta

7  Creek?

8    A   Yes, they are between the main channel and the

9  mountain there.  That would be south of the well, south and

10  southwest.

11    Q   And you have been pumping that well continuously

12  since 1954, is that right?

13    A   Yes, since it has been drilled.

14    Q   What type of irrigation do you use on that land?

15    A   Flood irrigation.

16    Q   Do you use a reservoir in connection with the irriga-

17  tion?

18    A   Yes, we do.

19    Q   And what reservoir is that?

20    A Well, the map shows a reservoir over southwest of the

21  well, and we have a concrete pipe line running to the reservoir.

22    THE COURT:  Is that Reservoir No. 2 shown on the map?

23    THE WITNESS:  Yes, that is right, your Honor.

24  BY MR. KRIEGER:

25    Q   What is the capacity of that reservoir?

A  Oh, I imagine it is a couple of acre-feet, in that neighborhood.

Q  How long has that reservoir been there, do you know?

A  Well, the reservoir has been there for years.  Before we drilled the well there was a spring there.  The reservoir was there when I was a small boy.

Q  So you would say that, to your knowledge, it has been there since as long as you can remember-- twenty?

A  Yes, since I can remember it has been there.

Q  Is it any longer filled with spring water?

A  No, it is not.

Q  The only water that goes into it then is from Well No. 2; is that right?

A  Yes, that is right.

Q  Do you have any other storage in that area right next to the mountains?

A  Well, there is a reservoir marked No. 6 here, which is a reservoir that has been there for a long time.  Spring water feeds into it.  We don't pump into it.  It is marked No. 6 on the map here.

Q  What is the capacity of that reservoir?

A  It is very small.  I don't know.  About a quarter of an acre-foot, something like that-- very small reservoir.

Q  And spring water feeds into it, does it?

A  Yes.

8

1      Q  You notice, while we are over on that side of the

2  river, in Exhibit 201 for Identification, Reservoirs 203, 4 and

3  5 are mentioned as part of your reservoir system.  Do you know

4  what reservoirs the Government is referring to?

5      A  I believe they are Soil Conservation Dams built under

6  the Supervision of the Soil Conservation and built to their

7  specifications.

8      Q  You did not build them?

9      A  Well, we built them under their supervision.

10      Q  But you only constructed them for the purpose of

11  controlling runoff; is that right?

12      A  That is right.

13      Q  You do not use them as reservoirs?

14      A  No, we don't irrigate out of them or pump into them.

15      THE COURT:  Are they all west of the river?

16      THE WITNESS:  They are, yes, southwest; they are in the

17  foothills.

18      THE COURT:  In the foothills there?

19      THE WITNESS:  Yes, that's right.

20  BY MR. KRIEGER:

21      Q  Are there outlets on all of these dams?

22      A  Yes, they have steel pipe line.

23      Q  And I take it all they do is just check the runoff

24  temporarily and the water goes on through; is that right?

25      A  That is right.

9

1    Q   And the water that goes through those dams goes

2    directly into Murrieta Creek?

3    A   Yes.

4    Q   Do you know when those were built?

5    A   Well, they were built two different years.  I guess

6    they have been in there about four years, I think.  The older

7    one may be four years old, and the last one, I believe, is three

8    years old.

9    Q   And you said you did not use them at any time to

10   pump water into for storage purposes; is that right?  .

11   A   No.

12   Q   Do you use Reservoir No. 6 in that general area for

13   watering cattle, too?

14   A ' Yes.   That particular field, when we have cattle in

15   there, that is the only place they can get water.   That is

16   from Reservoir 6.

17   Q   And has water been stored there also as long as you

18   can remember?

19   A   There has been a spring there always.

20   Q   You also irrigate land lying northerly or north-

21   easterly of Murrieta Creek, do you not?

22   A   Yes.

23   Q   About how many acres of land do you irrigate there?

24   A   Well, there is approximately 115 on that side.

25   Q   What do you grow there?

10

1      A   That has alfalfa and permanent pasture.

2      Q   Is that the same as that you have across the stream?

3      A   Well, approximately the same crops, but it is a

4  different well.

5      Q   Yes.  You feed this, now, from which numbered well

6  shown on Exhibit I?

7      MR. VEEDER:  Feed?  I didn't hear the question.

8      THE COURT:  You use the word "feed."  You mean you

9  water this alfalfa and permanent pasture from what well?

10  Is that what you mean?

11      MR. KRIEGER:  Yes, your Honor.

12      THE WITNESS:  That is furnished from Well No. 4.

13  BY MR. KRIEGER:

14      Q   Well No. 4 was drilled when?

15      A   I believe it is about nine years old.

16      Q   How deep is it?

17      A   A little over 500.

18      Q   How is it equipped?

19      A   It has a 10 horsepower electric motor on it.

20      Q   How much water does it pump?

21      A   Approximately a hundred inches.

22      Q   You have been doing that continuously since it was

23  drilled; is that right?

24      A   Yes.

25      Q   And do you use that for pasture irrigation that you

11

1  just referred to on the northeasterly side of the river?

2  A  Yes, we use it there, and then we use it between the

3  new highway and Highway 71.  Right where the well is located

4  we irrigate a piece of land there.

5  Q  How do you irrigate from that well, with sprinklers

6  or flooding?

7  A  No, it is flood.

8  Q  I want to see if that is one of the wells marked on

9  Roripaugh's A, and I think it is.

10  Is the well you have just been talking about, Well

11  No. 4 on Roripaugh's I the same as 35-C-1, Mr. Roripaugh?

12  A  Yes, sir, that is right.

13  Q  Do you use any reservoirs in connection with Well

14  No. 4?

15  A  Yes, there are two reservoirs.

16  Q  Which ones are they?

17  A  Well, one of them is Reservoir No. 10, and the other

18  one is Reservoir No. 1.

19  Q  One is on one side of the highway, and the other on

20  the other?

21  A  That is right.

22  Q  Do any other wells pump into those reservoirs?

23  A  No.

24  Q  Just Well No. 4?

25  A  That is right.

12

1    Q  What about the capacity of Reservoir No. 10?

2    A  We have never had any exact measurement on it, but

3  it is quite a large reservoir and maybe holds, I don't know,

4  from eight to ten acre-feet, in that neighborhood.

5    Q  What about Reservoir No. 1?

6    A  Well, it is considerably smaller and maybe holds, I

7  don't know, three or four acre-feet, possibly.

8    Q  How long have those reservoirs been in existence?

9    A  No. 1 has been there ever since I can remember, and

10  No. 10 we built since we have had the ranch.

11    Q  When does that mean?

12    A  Well, it was built when we drilled the well, which

13  is approximately nine years ago.

14    Q  How do you use Reservoir No. 10 in connection with

15  your farming operations?

16    A  Well, we have a concrete pipe line going out the

17  lower side of it under the highway, and then that line

18  spreads over the valley there and we pump in there during the

19  night and use two heads of water in the daytime down below;

20  gives us more pressure and more water.

21    Q  So the water that stays in there only stays in there

22  for a short while, really; is that right?

23    A  That is right.  It fluctuates.

24    Q  Is the same true of Reservoir No. 1?

25    A  Well, Reservoir No. 1 has always got water in it

13

1   because it is spring-fed from underneath, and there is always

2   water in it, and when we need supplemental water we pump it

3   in there and take it out again.

4       Q   Is it filled exclusively by springs?

5       A   It is spring-fed, but we add to the springwater when

6   we are using it more.

7       Q   Do you know who built Reservoir No. 1?

8       A   No, I really don't.  It has been there since I can

9   remember.

10      Q   I think Government's Exhibit 201 for Identification

11  indicates the capacity of Reservoir No. 1 is 5 acre-feet.

12  Is that correct, to the best of your knowledge?

13      A   Well, it could be.  I have never measured it or had

14  any reason to.

15      Q   Then you don't know?

16      A   I don't know the exact acreage feet, no.

17      Q   That is the reservoir that is right next to your

18  house; is that right?

19      A   That is right.

20      Q   Do you have a domestic well located near your home

21  place, too?

22      A   Yes, just below my house about 150 feet there is

23  a domestic well.

24      Q   How is that shown on our Exhibit I?

25      A   It is well No. 1, as near as I can tell.

14

1    Q And is there another well also near your house?

2    A Well, there is on this map, this Well No. 3. I don't

3    know about that.

4    Q Is there a well there?

5    A There is a well at the Cass residence, but it is

6    across that Santa Gertrudis Creek there, and this Well No. 3

7    shows right across the road from my house. We don't have a

8    well there.

9    Q That could be the only well they are referring to,

10   could it not, Mr. Roripaugh?

11   A You mean the Cass well?

12   Q Yes.

13   A The domestic well? That could be.

14   Q Let's talk about Well No. 1 for a minute. When was

15   that drilled?

16   A Well, that has been there many, many years. It was

17   drilled before my time.

18   Q Do you know how deep it is?

19   A It is a couple hundred feet at least, maybe deeper.

20   Q How is it equipped?

21   A It has a one-horsepower electric motor on it.

22   Q How much water does it produce?

23   A I really don't know. We use it for two houses, and

24   I don't know just what it produces.

25   Q How about well No. 3-- when was that drilled?

15

1    A   Oh, that has been there about five years, I guess,

2    when that residence was built.

3    Q   The Cass residence has only been there for five years?

4    A   Five or six years.

5    Q   How deep is that well?

6    A   It is only 80 feet, for the Cass residence.

7    Q   How is it equipped?

8    A   It has a one-horsepower pressure pump in it.

9    Q   Do you know how much water it produces?

10   A   No.

11   Q   In any event, Wells No. 1 and 3 are used purely for

12   domestic purposes?

13   A   That is right.

14   Q   Now, let's look at Well No. 5 for just a minute.

15   What sort of well is that?

16   A   Well, that is a well that was drilled before my time,

17   too.  We have a windmill on it at present and we use it for

18   watering stock.  We have a tank there.

19   Q   Do you know how deep it is?

20   A   Oh, again, it is more than 200 feet.  It was drilled

21   as a deep well, I guess, at the time.  It is a 10-inch casing

22   or something like that.

23   Q   And is that water stored in a tank?

24   A   Yes, we do have a tank there.

25   Q   What is the capacity of that tank?

16

1    A   I believe it is about 1,500 gallons.

2    Q   And the water has been stored there continuously

3    for 30 to 40 years that you know of?

4    A   Yes.

5    Q   In that same fashion?

6    A   Yes, at that well.

7    Q   Do you know what the static water level of that well

8    is?

9    A   Well, it was 13 feet when it was measured here about

10   30 days back.

11   MR. VEEDER:   13 feet below the surface?

12   THE WITNESS:   Yes, that is right.

13   BY MR. KRIEGER:

14   Q   Do you know if there has been any change in the water

15   level of that well over the years?

16   A   Well, it has stayed pretty much the same.

17   Q   Now, let's talk about your land in the Santa Gertrudis

18   Valley for just a minute, and I ask you how many acres of land

19   you irrigate there?

20   A   We have approximately 225-30 acres there.

21   Q   How do you irrigate the land?

22   A   Well, we have two wells up there.   One is indicated

23   here as Well No. 7, and Well No. 6.

24   Q   Well No. 7, and that is the same as Well 26-J-1, as

25   shown on Exhibit A, is it not?

17

1    A   That is right.

2    Q   And Well No. 6 is 25-E-1, as shown on Roripaugh's A,

3  is that correct?

4    A   That is right.

5    Q   Well 26-J-1, No. 7, how deep is that well?

6    A   It is about 520 feet, I believe.  It is something

7  over 500.

8    THE COURT:  This is Well 6?

9    THE WITNESS:  Well 7.

10    MR. KRIEGER:  Well 7, your Honor.

11    Q   That is sometimes referred to as the "Big Roripaugh

12  Well."  How is it equipped?

13    A   It has a 50-horsepower electric motor on it.

14    Q   How much water will it produce?

15    A   Well, pumping tests have been made on it.  I believe

16  now it is pumping about 195 inches.

17    Q   That is the latest test that you know about; is that

18  right?

19    A   Yes, since this water thing has started here.

20    Q   And that water is used to irrigate this some 230 acres

21  of land you spoke of.  I didn't ask you what kind of crops you

22  grow there.

23    A   Well, we have grown all kinds of crops there.  We have

24  had alfalfa, and potatoes, and we have had some permanent

25  pasture.  We have had all sorts of crops there throughout the

years.  Lettuce has been grown there.

Q  All of these crops grow well in that area?

A  Yes, it is a good piece of land.

Q  Looking at Well No. 6 for a minute, which is to the
east, slightly to the north of No. 7, how old is that well?

A  Well, that is away, way back.  It is '27 or '28 it
was drilled.

Q  How deep is it?

A  Well, it was originally over 300, I guess near 400.
I don't have the exact dope on that.  We don't have the log
for it.  But it is sanded up now to where it is only about
130 to 140 feet deep.

Q  How is it equipped?

A  It has a 15-horsepower electric motor on it.

Q  And it pumps how much water?

A  Approximately 60 inches.

Q  How do you use the water out of wells 7 and 6 for your
irrigating program?

A  Well, we have a steel pipe line running from 7 up to
6, and then from there we can divert the water in several
different directions.  We take it up to a reservoir here
marked No. 8, and also a reservoir marked No. 7.

Q  You put it in Reservoirs 7 or 8.  You do that pumping
during the nighttime, do you, usually?

A  Well, we might be during the night or day.

19

Q   Then what is the program from there?  How do you use that?  Do you use the head that you gain in those reservoirs?

A   We use the head we gain, and we also have a booster pump at the upper end of No. 8, which shoves the water on up in the field that lies above No. 8, and of course there is gravity pipe lines across all those fields there to shove the water around.

Q   This is a flood irrigation system you have again?

A   Yes.

Q   So I take it the storing of water in Reservoirs No. 7 and 8 is only on a temporary basis, simply to keep your head pumped up at one time, and then let her flow out during the day or whenever you want to irrigate; is that right?

A   That is right.

Q   When was Reservoir No. 7 built, do you know?

A   Reservoir No. 7 has been in there about eight or ten years, I guess.

Q   And you built that?

A   Yes.

Q   What is its capacity?

A   Oh, it's rather small; maybe three acre-feet, or two and a half, something along in there.

Q   How about Reservoir No. 8, when was it built?

A   Well, that has been there ever since -- I suppose it

20

1   was built in 1927 when they drilled the well there.  But it

2   has been there a long, long time.

3        Q   And what is its capacity?

4        A   It is a larger reservoir.  Maybe it holds possibly

5   3½ acre-feet or something in that neighborhood.

6        Q   Do you do any irrigation by sprinkler system on your

7   land?

8        A   Yes, we do some.

9        Q   How much of your land is watered that way?

10       A   Well, we have a portable irrigation system, and when

11  we plant a crop we use that to germinate the seed and we take

12  it around all over the ranch.  It might be used on any portion

13  of it.

14       Q   I notice that you have another well out there in the

15  west.  I think it is Well No. 8.  It is marked "Windmill" on

16  this quad map, too.  When was that well drilled?

17       A   I don't know the exact date.  That is an old oil

18  well drilled in the '20's, around '26, '8, along in there

19  sometime, maybe '25.  It is quite awhile back.

20       Q   Do you know how deep it is?

21       A   Well, it is a deep well.  We tried to measure it one

22  time and we got to 1700 feet and gave up.  It is deeper than

23  that.

24       Q   How much water does it produce?

25       A   We just use it as a stock watering well.  We have a

21

1  windmill on it.

2     Q  Is that used in connection with Reservoir No. 9, as

3  shown on the map?

4     A  Yes, it is.

5     Q  Did you build Reservoir No. 9?

6     A There was always a little puddle in there.  We made it

7  a little larger for watering cattle.

8     Q  How long ago did you do that?

9     A  Oh, when we first got the ranch.  I supposed fifteen

10  years.

11     Q  Do you know how much water that reservoir now holds?

12     A  It is very small.  Maybe a quarter of an acre-foot

13  or something like that.

14     Q  But water has been stored there continuously since

15  that was, as you call it, a puddle?

16     A  Yes, we have had a small amount there to water cattle

17  for a long time.

18     THE COURT:  For how long?

19     THE WITNESS:  Well, since we have had the ranch.  There

20  was a little place there and we made it a little larger to

21  water cattle in.  We have had the ranch fifteen or sixteen

22  years.

23     Q  Now let's go over to well No. 9 on Exhibit I.  That

24  is known as 24Q2.  When was that well drilled, do you know?

25     A  Well, it was drilled in the '20's-- along about '27.

22

1    Q   And what was its purpose?

2    A   Well, they intended to irrigate with it, but they

3    didn't get enough water there.   Just domestic.

4    Q   How deep is it?

5    A   I don't know the exact depth.   It is around 150 or

6    160 feet, in that neighborhood.

7    Q   What is it equipped with?

8    A   I believe there is a half-horse electric motor on it,

9    for domestic use; it furnishes the house.

10   Q   You would have no reason to doubt the Government's

11   report that that well is about 300 to 314 feet deep, would

12   you?

13   A   No. 9?

14   Q   Yes.

15   A   Well, to the best of my knowledge it is not that deep,

16   but maybe I could possibly be wrong.

17   Q   But you have never measured it?

18   A   I think we did measure it away back.   It seems to me

19   that it was around 150 to 160 feet, in that neighborhood.

20   Q   What is that used for now?

21   A   Just domestic water.

22   Q   Let's go over here to No. 10.   That is the last one

23   on this Exhibit I.   How long has that been there?

24   A   It was drilled in--

25   MR. VEEDER:   Well No. 10?

23

1      MR. KRIEGER:  Yes, Well No. 10.

2      THE WITNESS:  That was drilled at approximately the

3  same time.  I mean, they drilled the two there about the same

4  year.

5      Q  And what is its purpose?

6      A  Well, it is a large casing, again.  I believe it is

7  14 or 16-inch casing, and we just use it as a domestic well.

8  It didn't furnish any commercial or irrigating water.

9      Q  Is that the only purpose you have used it for?

10     A  Yes, sir.

11     Q  So you don't know how much water it produces, be-

12  cause it is such a limited demand?

13     A  Well, in days gone by my uncle drilled the well and

14  they put test pumps on them and they just didn't produce

15  anything.

16     Q  Have we mentioned in your testimony all of the wells

17  and reservoirs on Parcel 12-A, as shown on Exhibit I?

18     A  No, there is another domestic well up on the hill

19  just beyond where I live.  There is a house there, and there

20  is a domestic well there.

21     Q  Where would that be?  Would that be north of the

22  highway?

23     A  It is south of the old highway and north of where I

24  live about a half a mile, I guess.

25     Q  Up in the general area that I am pointing to?

24

1      A   No.   (Stepping down to the map.)   It is in this

2   area right here.   That dot may be the well, I don't know.

3      Q   Why don't you just make a circle on that.

4         This isn't an exhibit, unfortunately.   This is just

5   my exhibit.   But we can put it on the original.

6         And that is just another windmill well, is it, did

7   you say?

8      A   Well, it is a domestic--

9      MR. VEEDER:   Just a moment.   This is not an exhibit on

10   which he marked the location?

11      MR. KRIEGER:   Let's get it.   I was going to do it during

12   the recess.

13      THE COURT:   Well, we will just change exhibits.

14      MR. VEEDER:   I have no objection to what is being done,

15   just so it shows up.

16      THE COURT:   Let the exhibit on the board be the Court

17   exhibit, and the Clerk can swap copies with counsel-- Roripaugh

18   I.

19         Go ahead.

20   BY MR. KRIEGER:

21      Q   What is the purpose of this well?

22      A   It is a domestic well.   It has been there for many

23   years, again.   It furnishes a residence there.

24      MR. VEEDER:   What designation did he put on that, Mr.

25   Krieger?   We have our wells down to Well No. 10.

THE COURT:  Call it Well No. 11.

MR. VEEDER:  All right.

MR. KRIEGER:  May I mark it on the map, then?

THE COURT:  Yes.

BY MR. KRIEGER:

Q   When you say many years, Mr. Roripaugh, what does that mean?  You have used that term several times.

A   There, again, that has been there as long as I can remember.

Q   And you have lived there all your life?

A   Yes.

THE COURT:  You can remember back 40 years anyhow, I suppose; is that right?

THE WITNESS:  Yes, I have lived right there.  Yes, it has been there that long.

BY MR. KRIEGER:

Q   Let's for a moment look at Parcel 12-B, which appears on Roripaugh's B, and ask you if there are any wells in that section of land?

A   Well, this particular section isn't right on this map.  We own this 160 that comes out here.

MR. VEEDER:  That would be the North Half of the North Half of 20.

THE WITNESS:  That is right.

MR. KRIEGER:  And I think that appears in the description

26

1    and appears in the soil survey exhibit.  It is improperly
2    marked on the map is all.
3        THE COURT:  Well, get an eraser and change the color
4    of it later on and show that it goes along withSection 21.
5        MR. KRIEGER:  All right.
6        Q   Now, coming back to Section 21, which is Parcel 12-B,
7    and including also the parcel that has just been added, the
8    North Half of the North Half of 20, are there any wells on
9    that property?
10       A   Yes, there is a windmill well marked on there.
11       Q   Is that the only one?
12       A   No, there is an old one there, too.  There was an
13   old one, and it sanded up and we replaced it with this one.
14   This is a more recent well.  But there was one there long,
15   long ago.
16       Q   The present windmill well is how deep?
17       A   115 feet deep.
18       Q   Do you know how much water it produces?
19       A   No; we just use it for stock water.
20       Q   Do you have any reservoirs or tanks in the vicinity?
21       A   We have a tank, yes.
22       Q   How large is it?
23       A   Oh, about 2,000 gallons, I guess.
24       Q   Finally, Mr. Roripaugh, have you ever been requested
25   by anyone to stop any of your storage on any of the lands you

27

1    have been testifying to today?

2        A  No, I haven't.

3        Q  And you have never sought anyone's permission to store

4    water in that area, have you?

5        A  No, I haven't.

6        MR. KRIEGER:  I think that's all, your Honor.

7        THE COURT:  Any questions?

8        MR. VEEDER:  Yes, your Honor.

9        MR. STAHLMAN:  It's almost 4:30, your Honor.  We have

10    a long drive to get home.

11        MR. VEEDER:  Just two minutes.

12        THE COURT:  When do you want to come in?  9:30 in the

13    morning or 10?

14        MR. VEEDER:  Rather have it 10 o'clock, your Honor.

15        THE COURT:  10 o'clock tomorrow morning.

16        (Adjournment until Wednesday, December 16, 1959, at 10

17    o'clock A.M.)

18

19

20

21

22

23

24

25