# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                             Plaintiff,

vs.

                                          No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                             Defendants.

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      Wednesday, December 16, 1959.

           Pages:  11082 to 11234

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>FALLBROOK PUBLIC UTILITY )<br>DISTRICT, et al., )<br>)<br>Defendants. ) | No. 1247-SD-C. |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Tuesday, December 15, 1959

APPEARANCES:

For the Plaintiff           WILLIAM H. VEEDER, ESQ.,
                            WILLIAM E. BURBY, ESQ.,
                            Special Assistants to the
                            Attorney General,
                            Department of Justice,
                            Washington, D. C.

                            LCDR. DONALD W. REDD.

For Defendant Vail                    GEORGE E. STAHLMAN, ESQ.
Company

For Defendants                        MESSRS. BEST, BEST & KRIEGER,
Barnett, et al.                       By JAMES H. KRIEGER, ESQ.

For Defendants
Fallbrook Public
Utility District,                     FRANZ R. SACHSE, ESQ.
et al.

For Defendant                         STANLEY MOSK, ESQ.,
State of California                    Attorney General,
                                      By Fred Girard, Esq.,
                                      Deputy Attorney General.

## INDEX TO WITNESSES

| For the Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| Leo Roripaugh | 11086 | 11102 | | |
| Jack Roripaugh | 11150 | 11169 | | |
| (Max M. Henderson)<br>ALLEN C. BOWEN | 11198 | 11218 | | |
| Max M. Henderson | 11223 | | | |

| For the Plaintiff: | | | | |
|---|---|---|---|---|
| Allen C. Bowen | 11089 | | | |

1

## INDEX TO EXHIBITS

Plaintiff's Exhibit -                                    Iden.        In Evidence

   201 - Engineering Report-Leo Roripaugh                              11097

   202 - Field Sheet                              11089               11097

   203 - Riverside County Subdivision 11091                           11097

   204 - Subdivision maps (location map) 11093                        11097
                                  for 203

Defendant's Exhibit -

   I - Roripaugh                                                      11124

   J - Roripaugh                          11176          11177

   C - Henderson                                                      11209

<u>San Diego, California, Wednesday, December 16, 1959.   10 A.M.</u>

THE CLERK:  One, 1247-SD-C, United States vs. Fallbrook. Further court trial.

MR. KRIEGER:  With your permission, your Honor, may I ask Mr. Roripaugh just one or two other questions?

THE COURT:  You may.

MR. KRIEGER:  In the first place, we found, in this Roripaugh's Exhibit I, that Well No. 3 had not been located in the right place, and you will recall that there was some testimony that indicated that it was above Mr. Roripaugh's house.  Now, in the meantime Mr. Webb and Col. Bowen have chatted together and can correct that exhibit to show truly where those wells are, with your permission.

THE COURT:  That may be done.

LEO RORIPAUGH,

one of the defendants, having been prevously duly sworn on his oath was examined and testified further as follows:

FURTHER DIRECT EXAMINATION

BY MR. KRIEGER:

Q  Now, Mr. Roripaugh, yesterday I don't believe I asked you if there were any other wells in the area that you knew of which had been drilled.  Are there any?

1    A  Well, there was an oil well drilled in the valley

2    there.

3    Q  And where was that?  Located on Roripaugh's I?

4    A  It was right here.

5    Q  Why don't you circle that and mark to the left of it

6    "Oil," with the Court's permission?

7         Now, that is on your property, and it shows it to be

8    just northeasterly of the Murrieta Creek; is that right?

9    A  That is right.

10   Q  And on the most westerly part of your property?

11   A  That is right.

12   Q  Do you know when that well was drilled?

13   A  About five years ago.

14   Q  Do you know how deep they went?

15   A  Over 4,000 feet.

16   Q  Did you get any water out of that well?

17   A  Yes, the driller said that there was water and gravel

18   clay all the way and they never did hit rock at the bottom of

19   it.

20   Q  Is there a log on that well, do you know?

21   A  Yes, there is.

22   Q  You don't have it, though?

23   A  Well, we thought we had it, but we couldn't put our

24   hands on it.  But it could be available, I think.  The State

25   of California would have it.

1    THE COURT:   Over 4,000 feet deep?

2    THE WITNESS:   Yes.

3    THE COURT:   And never hit bedrock?

4    THE WITNESS:   No, they never hit bedrock.

5    THE COURT:   Did the Navy know about this when they dug

6    the Pauba Well?

7    MR. VEEDER:   I would have to ask the Navy, your Honor.

8    Col. Bowen says this well was dug after the Pauba Well was

9    drilled.

10   BY MR. KRIEGER:

11       Q  Is that well equipped with any pump of any kind now,

12   or is it capped?

13       A  No, the State required that they cap it, which they

14   did; they put a concrete plug in it.

15       MR. KRIEGER:   That's all.

16       MR. VEEDER:   Your Honor, from the standpoint of cross-

17   examination I think it might be more helpful if we were to

18   get the Roripaugh report into evidence by calling Col. Bowen,

19   and then recalling Mr. Roripaugh for Cross-Examination, if

20   that will be all right.

21       THE COURT:   That is satisfactory.

22       Step down, Mr. Roripaugh.

23

24

25

ALLEN C. BOWEN,

recalled as a witness in behalf of the plaintiff, having been previously duly sworn, testified further as follows:

THE CLERK:  Your Honor, Government's Exhibit 202 has been marked for identification.

(Government's Exhibit No. 202 was marked for Identification.)


DIRECT EXAMINATION

BY MR. VEEDER:

Q  Col. Bowen, I hand you plaintiff's exhibit marked for identification 201 and ask you to state into the record the content of that identification.

A  Exhibit 201 for Identification is a copy of the engineering report on the property of Leo Roripaugh.

THE COURT:  Exhibit 201 has already been identified as Leo Roripaugh's engineering report.

MR. VEEDER:  It has not been admitted.

THE COURT:  But it has been marked 201.

THE CLERK:  That is correct.  202 was just marked, you Honor.

THE COURT:  What is 202?

MR. VEEDER:  Plaintiff's Exhibit 202 for Identification is one of the field sheets, your Honor.

THE COURT:  Pardon me.

MR. VEEDER: While we are talking about the field sheets, in accordance with your Honor's original approval of using prints and then substitutions of these field sheets, Col. Bowen has made the substitution and has taken out the exhibits which we had lodged temporarily until we had the prints available.

THE COURT: Exhibits may be substituted. Just substituting another photo copy?

MR. VEEDER: That is exactly right, your Honor.

THE COURT: All right.

BY MR. VEEDER:

Q Under whose direction was the exhibit marked for identification 201 prepared?

A Under my direction.

Q And, Col. Bowen, is the content of that identification correct, to your personal knowledge?

A Yes, sir.

Q I hand you, Col. Bowen, the aerial photograph marked for identification 202 and ask you to state into the record what appears on that aerial?

A Plaintiff's Exhibit 202 for Identification is a photographic reproduction of a field survey sheet made on aerial photo No. 3-0034.

Q Colonel, are there other exhibits presently in the record from aerials which you utilized in the preparation of

1    this soil survey and engineering report for the Roripaughs?

2        A  Yes, sir, there are.

3        Q  Would you state into the record which of those exhibits

4    which have already been admitted were utilized by you in that

5    connection?

6        A  Yes, sir.  They were Plaintiff's Exhibits 194, 167,

7    168, 181, 174 (also numbered 193), 177 and 182.

8        THE CLERK:  Your Honor, Government's Exhibit 203 has been

9    marked for identification.

10       (Plaintiff's Exhibit No. 203 was marked for Identifica-

11   tion.)

12   BY MR. VEEDER:

13       Q  Col. Bowen, I hand you the identification marked 203

14   and ask you to state into the record the content of that

15   exhibit.

16       A  Plaintiff's Exhibit 203 for Identification has a

17   cover sheet upon which is typed "Riverside County Subdivision,"

18   it being understood that these subdivisions are in the Santa

19   Margarita watershed.  The exhibit is an assemblage of River-

20   side County Assessor's Plats upon which have been entered

21   parcel numbers encircled as designated by the Office of Ground

22   Water Resources.  There are also entered in pencil where

23   appropriate on each plat the crest of the watershed of the

24   Santa Margarita River.  For example, Assessor's Plat No. 19-30

25   has a penciled line in the lower right-hand corner which

indicates the crest of the watershed.  There also have been added connecting marks to indicate where pencil numbers apply to portions of blocks or blocks which are delineated on the Assessor's Plats.

Q  Colonel, would you correlate this identification 203 with the Exhibit 201, which is your engineering report?

A  Yes, sir.  Referring to page No. 1 on Plaintiff's Exhibit No. 201, under "Legal Description," it starts out that the following parcels were taken from the Temecula Land & Water Company Assessor's Map 20-8.  We turn to Assessor's Map 20-8 contained in Plaintiff's Exhibit 203.  We note that the next paragraph has a number in parentheses 480-- that is our parcel number-- and the description, such as the Northwest Half of Block 158 refers to the Assessor's block number.  158 appears at the bottom of the plat number 20-8 above the word "Land" in "Temecula Land & Water Company," and the Parcel No. 480 indicates what portions of Block 158 are described on page 1 of Plaintiff's Exhibit 201.

Q  I observe these numbers here, Colonel-- 480.

THE COURT:  These numbers here, in the soil report Exhibit 201.

MR. VEEDER:  Yes.

THE WITNESS:  That is the parcel number assigned to that particular piece of land described in the paragraph following.

THE COURT:  The parcel number assigned by your office?

THE WITNESS:  Yes, sir.

MR. VEEDER:  The Office of Ground Water Resources.

Q  Now, Colonel, I hand to you the map marked for iden-
tification 204 and I ask you to read the title block into the
record, if you would, please.

A  Plaintiff's Exhibit 204 for Identification is entitled
"Temecula - Murrieta - Wildomar Area Subdivisions, Riverside
County within  the Santa Margarita watershed."

Q  Would you relate that to 203?

A  Plaintiff's Exhibit 204 for Identification is a loca-
tion map which is compiled from the Assessor's plats.

Q  Who compiled it?

A  It was compiled in my office under my direction.

Q  Would you point out on 204 at least some of the
Roripaughs' properties, to assist us a little more?

MR. KRIEGER:  Excuse me.  May I ask a question for
clarification?

MR. VEEDER:  Yes.

MR. KRIEGER:  I take it that 204 is a compilation of all
the sheets in 203; is that correct?

THE WITNESS:  Yes, sir.  But because of the reduced scale
on 204 it doesn't show all of the subdivisions of the blocks
which are shown in 203.

THE COURT:  Wait just a minute.  This exhibit from the
Assessor's Office is what number-- 203?

MR. VEEDER:   203, your Honor.

THE COURT:   It has been my experience that the Assessor's Office will make up plats and arbitrarily assign numbers and parcel numbers, et cetera, but that doesn't necessarily have anything to do with the recorded subdivisions that may appear in the county recorder's office.   I understand that Exhibit 204 is a compilation of the recorded tracts in the County Recorder's Office; is that right?

THE WITNESS:   No, sir; 204 is a compilation from 203, using the Assessor's plats.

THE COURT:   Using the Assessor's plats?

THE WITNESS:   Yes, sir.

THE COURT:   I notice in your Exhibit 201 the legal description says "The North Half of Block 158 of Temecula Land & Water Company Subdivision."   That would mean to me that in the County Recorder's Office there is recorded a Temecula Land & Water Company subdivision with a legal description of Block 158.   Is that true?

THE WITNESS:   Yes, sir, and that is shown on Plate 20-8 of Plaintiff's Exhibit 203.

THE COURT:   Then the Assessor's Office in this instance used the same block numbers, for example, 158, that came off of the subdivision map?

LCDR REDD:   That is right.   They have in all of these Riverside County subdivisions in this area.

THE COURT:  Well, you are not sworn.

LCDR REDD:  No, sir.

THE WITNESS:  Yes, sir; that is correct.

THE COURT: Go ahead.  That clears that up for me.

MR. VEEDER:  If you want an explanation why we are going into this, your Honor, our problem is much the same as the one we encountered with Mr. Sachse in regard to some of these interlocutory judgments.  It is almost impossible to handle these descriptions with any facility at all.

THE COURT:  Let me warn you again, as I did informally, that you can't draw descriptions that are worth a cent off of the assessor's descriptions.

MR. VEEDER:  I understand that.

THE COURT:  You have to tie the descriptions in to the recordings in the County Recorder's Office.  If it is true that the county recorder has used the same block numbers and tract numbers, et cetera, all right.  But if you tie into an assessor's description, you are in trouble.

THE WITNESS:  Your Honor, all of our work has been tied into the descriptions in the Recorder's Office.  People from my office have gone to the Recorder's Office in both Riverside and San Diego and have extracted the descriptions from those records.

THE COURT:  All right.

MR. VEEDER:  We will do this additional thing.  When we

1   challenge a tract as being riparian we will put in evidence to

2   that effect.  This is largely for location, your Honor.

3         THE COURT:  All right.

4         THE WITNESS:  Also on 204 the principal streams that

5   traverse the area depicted on the map are shown, and the

6   principal roads and streets are also shown, with the crest of

7   the watershed appearing on the extreme left-hand margin of 204.

8         THE COURT:  I understand that Exhibit 204, then, will

9   contain at least for location purposes all of the subdivisions

10  that have been recorded in the County Recorder's Office in this

11  Temecula-Murrieta Valley.

12        THE WITNESS:  Down to the blocks, your Honor.

13        THE COURT:  But not broken down below blocks?

14        THE WITNESS:  No.  They are broken down below blocks in

15  203.

16        THE COURT:  And the actual recorded maps not only break

17  them down into blocks, but break them down further into lots,

18  I take it.

19        THE WITNESS:  Yes, sir.

20        THE COURT:  All right.

21        MR. VEEDER:  We offer in evidence Plaintiff's Exhibits

22  for Identification 201, 202, 203 and 204.

23        THE COURT:  Plaintiff's Exhibit 201 (the soil report),

24  203 (the Assessor's compilation), and 204 (the map) are all

25  received in evidence.  Plaintiff's Exhibit 202, also one field

1   sheet, if it is not already in, will be received in evidence.

2   (Plaintiff's Exhibits No. 201, 202, 203 and 204 were

3   received in evidence.)

4   MR. STAHLMAN:  Your Honor, I wonder if as we proceed in

5   this evidence we can have just a little discussion as to what

6   the ultimate effect would be in certain situations.  Is it the

7   contention of the Government that the fact that there has been

8   filed a subdivision map in itself severs it, or is it only

9   after such subdivision parts were sold that it would be

10  severed as riparian land?

11  MR. VEEDER:  Well, I can't answer that right off.  It is

12  my view--

13  THE COURT:  I don't think that is any problem.  Suppose I

14  owned a hundred acres that was riparian, and if I filed a

15  subdivision map and cut it up into a hundred lots, if I never

16  sold a single lot the property would still all be riparian.

17  MR. STAHLMAN:  That's all I want to know.

18  THE COURT:  Isn't it just that simple?

19  MR. STAHLMAN:  Yes, I think so.

20  THE COURT:  But if I sold off a lot in the upper corner

21  two miles from the stream, I probably severed the riparian

22  rights on that property, and even if I bought it back later

23  I probably would have no riparian rights in that lot that I

24  had previously sold.

25  MR. VEEDER:  With that I am a hundred percent in agreement.

1    THE COURT:  You are going to reserve opinion as to whether

2 the mere filing of a map would sever riparian rights?

3    MR. VEEDER:  Your Honor, I am the careful kind.

4    MR. STAHLMAN:  I didn't hear that.

5    THE COURT:  He says that he is the careful kind, Mr.

6 Stahlman.

7    MR. VEEDER:  Maybe somebody has noticed that.

8    MR. STAHLMAN:  There are a number of different adjectives

9 that could describe it.

10    MR. VEEDER:  He hurt my feelings again, your Honor.

11    I have no further questions of Mr. Roripaugh.

12    THE COURT:  You are not prepared at this time to go into

13 this chain of title to determine how much of this land is

14 riparian?

15    MR. VEEDER:  No, your Honor.  I think from the standpoint

16 of time it is better to select the larger parcels that we think

17 are involved and go ahead and on rebuttal put that in.  Is

18 that all right?

19    THE COURT:  That is satisfactory, with the understanding

20 that you have voluntarily taken the position that if you don't

21 make a showing the Court will find those all to be riparian.

22    MR. VEEDER:  Your Honor, I have no desire to put these

23 people to that extra cost.

24    THE COURT:  You have the records, you have made the

25 searches of title.  Let's have it understood.

1    MR. KRIEGER:  Your Honor, let me ask Col. Bowen one

2    question about Section 21, which is Roripaugh's 12-B on

3    Roripaugh B.

4

5                    CROSS-EXAMINATION

6    BY MR. KRIEGER:

7        Q  Have you found any water up in this section, Col.

8    Bowen?

9        A  No, sir.

10       Q  Have you found any water up in the North Half of the

11   North Half of Section 20 adjoining it?

12       A  No, sir.

13       MR. VEEDER:  Wouldn't it be well to indicate the map?

14       MR. KRIEGER:  I said Roripaugh's B.

15       MR. VEEDER:  Would your Honor want a copy of Exhibit 204

16   up there?

17       THE COURT:  Yes.

18       (Mr. Veeder hands the Court a document.)

19   BY MR. KRIEGER:

20       Q  You know of no wells up there other than the windmill

21   that Leo Roripaugh talked about; is that right?

22       A  I know of no other except that one.

23       Q  You have no opinion, do you, whether any wells could

24   be drilled up there which would be productive?

25       MR. VEEDER:  I object to that question as being far too

1    vague.  How could he possibly know?

2        THE COURT:  He just said he didn't know of any other

3    wells than those he already testified to.

4        MR. KRIEGER: I asked him if he had an opinion whether a

5    well could be produced up in that area.  That was the import

6    of the second question.

7        THE COURT:  Overruled.

8        THE WITNESS:  Inasmuch as that-- Parcel 12-B?

9        MR. KRIEGER:  Yes.

10       THE WITNESS:  As shown on Roripaugh's Exhibit B it is

11   underlain largely by Recent and older alluvium, and it might

12   be possible to drill a well in there and find some water.  But

13   I do not know--

14   BY MR. KRIEGER:

15       Q  Whether or not it would be worth pumping you can't

16   determine from your knowledge of the area, can you?

17       A  No, sir.

18       MR. KRIEGER:  That's all.

19       THE COURT:  Colonel, let me ask you, on Exhibit 204 these

20   blocks are apparently parts of more than one subdivision, are

21   they not?

22       THE WITNESS:  Yes, sir.

23       THE COURT:  Wouldn't it be well to have marked on here the

24   general outlines of the subdivisions, plus also the fact that--

25   take the area immediately north of Temecula, I notice various

1    blocks with the same number, so that there must be other

2    subdivisions.  Here is a 4, here is a 4, here is a 4.  There

3    must be some other subdivision in there which would be

4    necessary for a proper identification.

5        MR. VEEDER:  We will have those marked in, your Honor.

6        THE WITNESS:  Yes, sir.

7        THE COURT:  All right.

8        MR. KRIEGER:  Your Honor, may I ask the Colonel a few

9    more questions?

10       MR. VEEDER:  May we withdraw Exhibit 204 for that purpose,

11   your Honor?

12       THE COURT:  Yes.  I hand you back my copy, too.

13       MR. KRIEGER:  While this map is still there, Mr. Veeder,

14   would you leave it for just a moment and let me ask a question

15   about it.

16       Q  What scale is that on, Colonel?

17       A  That is one inch equals 1000 feet.

18       Q  And how did you superimpose the watercourses on that

19   map?

20       A  We used U.S.G.S. 7½-minute quadrangle as the control

21   for the watercourses.

22       Q  And did you do the same thing for the boundaries of

23   the watershed?

24       A  Yes, sir.

25       MR. KRIEGER:  That's all.

1    MR. VEEDER:   I have no further questions.

2    THE COURT:   Step down, Colonel.

3

4                        LEO RORIPAUGH,

5    one of the defendants herein, recalled as a witness in his

6    own behalf, having been previously duly sworn, testified

7    further as follows:

8

9                        CROSS-EXAMINATION

10   BY MR. VEEDER:

11       Q  Mr. Roripaugh, referring to the Roripaugh Exhibit B

12   and the areas marked Parcel 12 in a pink color, it is observed

13   that in the midst of the exterior boundary of your property

14   there appear to be islands of uncolored land.  Would you

15   explain that, please?

16       A  Well, there are parcels in the center area there that

17   we do not own.

18       Q  Now, I observe on Roripaugh's Exhibit I, however, that

19   there are no designations which comport with those islands which

20   appear uncolored on Roripaugh's B.  Do you see what I am say-

21   ing?  Are you irrigating or utilizing those islands?

22       A  We dry farm it.

23       Q  You dry farm it.  But you make no claim to those lands

24   or claim no water in connection with them; is that correct?

25       A  That is correct.

Q   Now, do you apply any water to them at all?

A   No.

THE COURT:   Now, this presents the same situation we had in the case of M. J. Yoder.   It seems to me that a check ought to be made as to whether the people that own those islands within Mr. Roripaugh's exterior areas have appeared, and if they haven't we ought to clean those up shortly while we are proceedings.

MR. VEEDER:   I think there are some unusual circumstances about some of those ownerships.

Q   Would you state into the record, Mr. Roripaugh, your knowledge in regard to the people who, you believe, are the owners of those islands?

A   Well, it is a difficult problem because a lot of the people that own the islands have died and they are scattered all over the country.   A lot of them are Canadians, and it is very hard to trace them down.   Even if we could find out who they are, the records are rather indefinite and pretty much mixed up on those particular small pieces.

THE COURT:   What has the Government done?   Published against whom they thought were the record owners?

MR. VEEDER:   Yes, that has been done, your Honor.   But it is a problem.   If we can find those, to the extent that we can find them I think we should do as your Honor has suggested. However, I am anxious to get what evidence we can from Mr.

11104

1   Roripaugh in regard to those properties to the end that we

2   can show whether they are irrigable or not, whether he is

3   farming them, and similar data for the record, if that is per-

4   missible.

5   　　THE COURT:  Well, of course, on the problem whether

6   they are riparian or not, that would be quite a problem.  You

7   would have to take a contour map and see if gulches or dry

8   beds crossed them.  But on the other hand, isolated as they

9   are, unless they lie over a dry bed, they may not be riparian.

10   However, that becomes, in a way, immaterial if the Court finds

11   that the basin runs up to the Kunkel line.  Then they would

12   all be overlying owners in any event.  They would all be over-

13   lying owners in that event, and their rights would be the

14   equivalent of riparian rights.

15   　　MR. VEEDER:  Your Honor can see on Section 26 is a good

16   example.  It looks like the Northwest Quarter of the Northeast

17   Quarter of 26.

18   　　THE COURT:  Well, that larger island there-- it's hard

19   for me to see on this map-- it looks like there is a --

20   　　MR. VEEDER:  It has younger alluvium there, I believe.

21   　　THE COURT:  Yes.

22   　　MR. VEEDER:  It is just one of the problems we are going

23   to run into, I believe.

24   　　THE COURT:  Along this same line, I notice on Roripaugh's

25   B there are four other little parcels lying westerly of your

1  major holdings, lying on either side, one on the west side

2  of 395 and three on the east side of 395, and the one on the

3  west side being in Section 22 and the other three being in

4  Section 23, and they are not shown on Roripaugh's I, either,

5  Roripaugh's I being only to show wells.

6      THE WITNESS:  That is right.

7      THE COURT:  Anything of any particular importance about

8  those four other little parcels that are part of 12?

9      THE WITNESS:  No, they are just pieces that we have picked

10 up at tax sales and that sort of thing.  We don't even farm

11 them.  Other people farm them.  They have never been surveyed.

12 As far as putting our fingers on them, we don't even know where

13. they are.  We know we have them but we couldn't go out and walk

14 around them because we don't know where they are.

15     THE COURT:  No wells that you know of on them?

16     THE WITNESS:  No, sir.

17     THE COURT:  That would be a nice question as to whether

18 they are riparian, too.

19     MR. VEEDER:  We have problems.

20     THE COURT:  Again, if there is a basin there, then they

21 overlie a basin.  Their rights as an overlying owner would be

22 equivalent to a riparian owner, except that you would have to

23 develop water on the particular parcel.

24     MR. VEEDER:  I think that is one of the problems here.

25     THE COURT:  If you develop water on the particular parcel,

1   and not transport from one to another.

2       MR. VEEDER:  I think it becomes very important here, as

3   to where the Roripaugh water is being used.

4       THE COURT:  All right, we have a lot of loose ends on

5   that.

6       MR. VEEDER:  We are trying to snip them of, your Honor.

7       Q  Now, Mr. Roripaugh, I recall some testimony in the

8   record-- Is your father Jack Roripaugh?

9       A  That is right.

10      Q  He is in court?

11      A  Yes, sir.

12      Q  I observe that in Volume 84 at page 9645 his testimony

13  to the effect that when you drilled one of your wells that a

14  flowing well on his property dried up; do you recall that

15  situation?

16      A  I believe he did testify to that.

17      Q  It did occur?

18      A  That is true.  Well, he testified to it.  It must have

19  occurred.  Yes.

20      Q  It did occur?

21      THE COURT:  Where is the Jack Roripaugh property you are

22  talking about?

23      MR. VEEDER:  I was going to ask Mr. Roripaugh if he would

24  identify that property as it relates to, I think, Roripaugh B,

25  which would probably be as good as any to indicate the land.

1    Can you orient yourself there?

2    A  Yes.

3    Q  Why don't you draw the exterior boundaries, if you know,

4  of your father's property?

5    A  This is the property he presently owns, and he did own

6  this sliver in here.

7    Q  What is that sliver?

8    A  It is owned by my sister.

9    THE COURT:  You said "this property," Are you referring

10  to Parcel 31 on Roripaugh's B?

11    MR. VEEDER:  It is the triangular piece where the number

12  35 appears, your Honor.

13    THE COURT:  Lying entirely west of 395?

14    THE WITNESS:  That is correct.  That is my sister's

15  property.

16    THE COURT:  Did he own other property there?  Or is that

17  the only piece?

18    THE WITNESS:  This is the only piece my dad owned.

19    THE COURT:  The part lying west of 395?

20    THE WITNESS:  Well, he just owns this piece presently.

21    THE COURT:  That is the part east of 395?

22    THE WITNESS:  That is correct.  That is the part he owns

23  now.

24  BY MR. VEEDER:

25    Q  Would you mark where the well was situated that no longer

flowed after you brought in your well?

A  It is right in the corner of the property.

Q  Would you make an X right there?

A  There is a mark on the map which, I believe, represents the well.

THE COURT:  The corner where it says "Reservoir"?

THE WITNESS:  Yes.  It is right at the site of the reservoir.

MR. VEEDER:  Put a circle there, so that I will know that you have been here.

Q  Now, how long ago was that that you brought that well into production that caused your father's well no longer to pump?

A  I believe that well is about eight years old or ten years old, in that neighborhood.

Q  Could you locate that well for us now, referring to Roripaugh's I, the one that caused your father's well to cease to flow?

A  Yes, it is the Well No. 1.

Q  It is Well No. 1 on Roripaugh's I.  Now, could I ask you to mark on Roripaugh's B where that well is situated?

A  Right here.

Q  We can put a circle there.  In other words, the well that ceased to flow is approximately a quarter up to a half-mile to the east; is that correct?

A   Yes.   No, it would be to the west, really.

Q   Your dad's well is to the east of where your well is situated; isn't that right?   Is it west of there?   I am concerned, frankly, about where the fault is in regard to your No. 1 well.

A   If I read this map right, my well is west from my dad's well, I mean roughly.

Q   And yours is east from his?

A   Yes.

THE COURT:   So as I read the map, the No. 1 well is east of the fault line shown on Roripaugh's B.

THE WITNESS:   That is correct.

MR. VEEDER:   That appears that way, yes.

THE WITNESS:   That is correct.

BY MR. VEEDER:

Q   Are you sure it is Well No. 1 rather than Well No. 4?

A   Yes, it is Well 1.

Q   It is Well 1 and not Well 4?

A   No.   This Well 1 that we are talking about is south of the old highway or the freeway, I should say.

THE COURT:   And also south of the old highway, is it not? Well No. 1?

THE WITNESS:   No, it is north of the old highway, the so-called 71.

THE COURT:   Here is old 71, and here is Well No. 1.   It

1    shows it to be south.

2         THE WITNESS:  Yes, it is Well No. 4.  I am looking at the

3    wrong road.  It is Well No. 4 that we are talking about.

4         THE COURT:  Well No. 4 is the one that caused your father's

5    well to cease to flow?

6         THE WITNESS:  That is correct.

7    BY MR. VEEDER:

8         Q  In the utilization of your water from Well No. 4, do

9    you have any particular lands that are irrigated by that source

10   of water?

11        A  There is a small piece of land irrigated by it here.

12   Then all this land above the dike is irrigated, except 12 to--

13        Q  Just a minute.  From Well No. 4 you irrigate across

14   the fault line and onto an area east of the stream bed; is that

15   right?

16        A  East of the Murrieta Creek stream bed.

17        Q  And how many acres of land do you irrigate from that

18   source?

19        A  Oh, there is roughly about 115 acres, I guess.

20        Q  115?

21        A  In that area, roughly.

22        Q  Do you have any other source of water for that 115

23   acres of land which is situated between the stream bed and the

24   fault line?

25        A  Well, that is our major source.  We do get a little bit

1  from the reservoir below my house, which is fed by a spring.

2     Q  In other words, you use two sources of water, then, on

3  that property?

4     A  Yes.

5     Q  But the primary source is from Well No. 4?

6     A  That is correct.

7     Q  What is the yield of that well, do you recall?

8     A  It is around 100 inches, 90 to 100 inches; about 100

9  inches.

10     Q  You figure that, then, about two second-feet?

11     A  Yes, I guess that's right.

12     Q  About how long do you run that each year?  Do you run

13  it the full year long for irrigation, or how long?

14     A  No, we don't.  It just depends a hundred percent almost

15  on weather conditions.  Normally we wouldn't be running it at

16  all now, but we are using it part time now.

17     Q  You are running it now?

18     A  Part time.

19     Q  For what are you using it?

20     A  Irrigating permanent pasture and alfalfa with it.

21     Q  In regard to that water, do you impound it?  Do you

22  store it better to utilize it, or how do you handle it?

23     A  We run it through a reservoir.  In fact, that well

24  is hooked up to two reservoirs.

25     Q  Which are those reservoirs now?

1      A  One is No. 10, and one is No. 1.

2      Q  No. 10 and No. 1.  No. 10 is quite a sizeable reservoir,

3 isn't it?

4      A  Yes.

5      Q  And how long do you figure it takes to fill that when

6 you pump into it?

7      A  Oh, it takes two or three days to fill it if we had

8 it completely empty.

9     THE COURT: Actually, that reservoir generally has water

10 in it all of the time, doesn't it?

11     THE WITNESS:  Yes, there is some water in it.

12     THE COURT:  It is fed by springs?

13     THE WITNESS:  No.

14     THE COURT:  In part?

15     THE WITNESS:  No.  Just the one blow the highway is fed

16 by a spring.

17     THE COURT:  Which is the one you see with the trees around

18 it as you drive by?

19     THE WITNESS:  If you are on the freeway you would see the

20 upper one, the larger one.

21     MR. VEEDER:  That is the one to the right.

22     THE COURT:  Both have trees around them, do they?

23     THE WITNESS:  Yes, they do.

24 BY MR. VEEDER:

25      Q  So you would impound your water in Reservoir No. 10

1   for several days; is that correct?

2      A  Well, it might or might not be true.  If we were in the

3   middle of the summer and we were irrigating and had a couple

4   of irrigators working below the reservoir, we would frequently

5   take it all out each day, but we would be pumping 24 hours

6   every day.

7      Q  How is it now?  Is it full now?

8      A  Yes, there is water in it now.

9      Q  In other words, during the winter months you fill it

10   up and store water in it?

11      A  We are using it now and pumping it because it is so

12   dry.

13      Q  But several days impoundment is the customary practice,

14   is that right, in regard to that reservoir?

15      A  I wouldn't exactly say that.  If we had an irrigator

16   that doesn't show up on Monday morning, he has had a hard

17   weekend, it might stay over there an extra day or so.  But

18   normally we use it each day when we are pumping in there and

19   when it is in the summertime.

20      Q  In regard to Reservoir No. 1, you say that is fed by

21   springs?

22      A  Yes.

23      Q  How long does it take that to fill?

24      A  Well, the springs keep it pretty much filled up.  But

25   if we want additional water it is hooked into Well No. 4 and

1   we put additional water in there and use it in that manner.

2      Q  You pump it down enough so that you fill it with No.

3   4?

4      A  Yes, we supplement the springs with pumped water from

5   No. 4.

6      Q  With regard to Reservoir No. 2 and Reservoir No. 6,

7   to which you made reference, how long do you hold the water in

8   those?  Do those have outlets?  As I recall, you said those

9   were stock watering reservoirs?

10     A  I am trying to locate them.

11     Q  Here you are.

12     THE COURT:  In the foothills.

13     THE WITNESS:  Oh, inthe foothills there?

14     MR. VEEDER:  Yes.

15     THE WITNESS:  Oh, yes, I see.  Well, No. 2 we do use for

16  irrigation.

17  BY MR. VEEDER:

18     Q  You use that, and you impound water there for the

19  purpose of irrigation; is that correct?

20     A  Yes.  We have a line running into it and a line running

21  out.

22     Q  You store water there and from that you irrigate; is

23  that right?

24     A  Yes.

25     Q  How many acres of land do you irrigate from that source?

A   You are speaking of Well No. 2?

Q   I am referring to Well No. 2.

A   We have roughly 115 acres over there.

Q   And what did you say the yield of that well was?

A   It is around a hundred inches, too.

Q   That is also, you figure, a couple of second feet from that?

A   Yes.

Q   And are you using it at the present time?

A   No, sir, it is not running right now.

Q   How many cuttings of alfalfa do you usually get?

A   Depending on the season, five or six.

Q   And how many tons to the acre do you figure?

A   Well--

Q   Or did you ever figure?

A   I never figured it.

Q   Do you irrigate any of the lands, Mr. Roripaugh, which appear in your Section 26 in Roripaugh's I?

A   From these wells we have been talking about?

Q   No, just in a general question now.  Are any of those lands in Section 26 irrigable?

A   Now you are talking about north of the freeway?

Q   That is correct.

A   Yes, we irrigate those, part of it.

Q   Excuse me?

11116

A   We irrigate some of that land.

Q   How many acres do you irrigate up there?

A   About 225-30.

Q   About 225 to 230.  What is the source of water for that acreage?

A   From Wells No. 6 and No. 7.

Q   And do you impound water for the utilization for the irrigation of those lands?

A   Yes, we use Reservoir No. 7 and Reservoir No. 8 in operating those wells.

Q   Could you step down here and mark on your Roripaugh's B where those lands which are irrigated in Section 26 are situated?

A   Very roughly.

Q   Well, just locate it generally.  The wells are here, if it helps you any.

THE COURT:  One well is to the west of the section line between 26 and 25, and the other is to the east, and roughly they are about the middle.

MR. VEEDER:  I am speaking of this section right here, and the lands which are irrigated in Section 26.

THE WITNESS:  Well, the lands, roughly, from the reservoir site-- I don't know exactly where the well would be here.

MR. KRIEGER:  See if you can locate it before you mark the map.  Both these are on the same quad sheet.

1 THE WITNESS:  The old well is marked on the map here.
2 This is No. 6.  It is marked right there on the map now.  And
3 No. 7 is, yes, roughly in that relation.

4 MR. STAHLMAN:  Could we, in order to clarify the map,
5 put the number on them where he has now indicated the wells?

6 MR. VEEDER:  Well, make a 6 and a 7, then.  That's what
7 they are.

8 Q  Where are the lands irrigated from those sources?
9 Just be very rough, just for location.

10 A  Well, Santa Gertrudis Creek comes down between these
11 two wells, and the lands lay each side of the river there, and
12 it is a long, slender piece of land lying on both sides of the
13 Santa Gertrudis Creek.

14 Q  You couldn't locate them any more specifically than
15 that; is that right?

16 A  No, I couldn't, not on that map.

17 THE COURT:  The contours show flat land in there.

18 THE WITNESS:  It is the flat land.  We don't go up on the
19 hills at all with the water, just in the flat bottom.

20 BY MR. VEEDER:

21 Q  When did you bring that land under irrigation?

22 A  That land was under irrigation when we bought the
23 ranch, the major part of it.  We have added a few acres or a
24 couple of pieces there by doing a little leveling and grading.

25 Q  And when did you bring Well No. 7 in?

A   I think that has been there about three or four years.

Q   Is that the 1500 gallons a minute well?

A   Well, that is the so-called big well.   It pumped, I believe, in the test 190 inches or thereabouts.

Q   190?

A   Yes.

Q   And when you are utilizing it what is the general-- how much do you get from it?

A   Well, that was a recent test that the people made, and when they made the test they operated under the same condition as when we are irrigating, so I assume it pumps about the same.

Q   It would run close to about four second feet, wouldn't it?

A   In that neighborhood.

Q   How many days a year have you run that?   Do you have any way of knowing?

A   No, I wouldn't.

Q   Do you have any pattern for turning that well on and off?

A   No, only as we need the water.

Q   And you pump that water then up into a reservoir and you hold it there and release it?

A   Well, it wouldn't necessarily all be pumped into the reservoir.   Lots of times we use it directly into the field from that pump.

Q  Are there any other lands that are irrigated from Wells No. 6 and 7?

A  No, just the lands in the valley there.

Q  Would you state if you have any other irrigated lands than those to which I have made reference?  You have testified in regard to the lands which are situated in Sections 34 and 35 and Section 26.  Are there any other lands?

A  No, that is all we irrigate.

Q  From your description I note that you said you irrigate on both sides of the Santa Gertrudis River.  Is there any irrigation in Section 25?

A  Is that where you have your finger?

Q  Yes, here is 25, here is your Well No. 6.

A  No, we don't put any water across the highway.  That is hilly lands there.

THE COURT:  He is not talking about across the highway. Section 25 includes the land both east and west.

MR. VEEDER:  It would be your northwest corner up there.

THE WITNESS:  We irrigate portions of it.

BY MR. VEEDER:

Q  You irrigate both Sections 25 and 26?

A  Portions, as I remember the map.

Q  Do you make any use of your water other than for purposes of irrigation?  Stock water?

A  Well, no, we don't.  I mean, stock might water at those

reservoirs if they happen to be in those fields.   That's all.

Q  How many head of stock do you usually run?

A  Well, from three to five hundred head.

Q  And do you carry them the year around, three to five hundred?

A  Yes, we do.  It fluctuates.

Q  Have you observed any springs in this area, Mr. Roripaugh, that have dried up in the last several years?

A  Which area?

Q  In the area that would be immediately east of the fault line.  You are acquainted with the Wildomar fault line on Roripaugh's B?

A  Yes.  East-- that is towards my dad's property?

Q  Yes.

A  No.

Q  During your experience in this area, have you observed any springs dry up at all in the last 25 years?

A  Yes, there was a spring originally that fed this.  Now, I am getting down in the valley.

Q  When you say "in the valley"--

A  Reservoir No. 2, to be exact.

Q  There was a spring there; is that right?

A  Yes, there was.

Q  Could I ask you to mark on Roripaugh's I where that spring was situated?

A   (Marking map.)

Q   Could you make just a little bigger circle there.

When did that dry up, Mr. Roripaugh?

A   I guess about, as near as I can recollect, three or four years ago.

Q   Now, how does that relate to the drilling of your wells, your most recent wells? Was that about the same time?

A   I don't exactly remember.  I just don't remember the exact time that it dried up.

THE COURT:  He has marked that spring.  Apparently it is very close to the fault line there.

THE WITNESS:  Yes.

MR. VEEDER:  It would be, your Honor.

THE COURT:  The spring that used to feed Reservoir No. 2.

MR. VEEDER:  I am going to ask him to come down again and mark it on Roripaugh's B, so that it will show on both Roripaugh's I and B.

THE WITNESS:  This may be the spring.  The spring is right behind the reservoir.

MR. VEEDER:  Right behind the reservoir?

THE WITNESS:  Which is there now.

MR. STAHLMAN:  It shows on Roripaugh's B.

THE WITNESS:  Yes.

BY MR. VEEDER:

Q   Have you, in your operation of your wells, measured the

1   static water level in them?

2      A   No.   They have been tested, I mean, after we entered

3   this lawsuit, the static water levels have been tested many

4   times.

5      Q   Have you observed whether the static water level of

6   the ground water body over which your lands lie, has that been

7   declining, to your knowledge?

8      A   Well, it has stayed fairly stable.   You are talking

9   about the water level out under the lands where we irrigate?

10      Q   No, I am talking about actually whether the depth to

11   water is greater now in the wells than it was several years ago.

12      A   Yes, it has gone down some.

13      Q   Could you tell me about how far, to your personal

14   knowledge, if you know, how much of a decline there has been?

15      A   No, I don't know.

16      MR. KRIEGER:   Are you talking about a particular well?

17      MR. VEEDER:   I am just being general now.

18      MR. KRIEGER:   It is pretty difficult, it seems to me, to

19   answer a question for all of his ten, eleven or twelve wells.

20      MR. VEEDER:   It's a good idea.   I will be specific.

21      Q   Will you tell me whether the level in Well No. 2 has

22   dropped?

23      A   It has come down some.

24      Q   Do you know how much?

25      A   No.

Q  Do you recall the depth to water when you first began operating that well?

A  No, I don't.

Q  Do you know the depth to water of any of your wells when you began operating them?

A  Yes.

Q  Which ones?

A  Well No. 4 was an artesian well when it was drilled.

Q  No. 4 was artesian?  And it is no longer artesian; is that correct?

A  Yes.

Q  When did that cease to be a flowing well, do you recall?

A  Well, we pumped it several years before it ceased to flow, and when I say it isn't an artesian well now, when we have wet winters it is right up to the top, I mean it flows a little bit.

Q  Could you correlate the dates when it ceased to flow with the drilling of any of your other wells in that area?

A  No.

Q  Have you at any time checked the static water level of the well you have designated as Well No. 8, which is 23-K-1? Do you see where I am talking about?  It is up in Section 23. Do you know the depth to water?

A  Where is it?

Q  Right there.

THE COURT:   The windmill well.

THE WITNESS:   It is an oil well.  No, the only thing I know about that well is that for a good many years we have had a windmill on it for pumping cattle water.  Apparently it has stayed pretty stable, because we have never added or detracted any pipe from that section.  If it had gone down, I suppose we would have had to add more pipe to our pump, and it was never added.

MR. VEEDER:   I have no further questions.

MR. STAHLMAN:   I have a few.  Do you want to take a recess now?  It's ten after eleven, your Honor.

THE COURT:   How many questions?  Just one or two?

MR. STAHLMAN:   Four or five.

THE COURT:   Take our recess now.

(Recess.)

THE COURT:   Mr. Clerk, do you show Roripaugh's Exhibit I in evidence?

THE CLERK:   No, your Honor.

MR. KRIEGER:   May I offer it?

THE COURT:   Roripaugh's Exhibit I will be received in evidence.

(Roripaugh's Exhibit I for Identification was received in evidence.)

THE COURT:   All right, Mr. Stahlman.

REDIRECT EXAMINATION

BY MR. STAHLMAN:

Q   This well of your father's that you referred to as being affected by the pumping of Well No. 4, how far is that well, what is the distance between those two wells?

A   I would say it is something over a quarter of a mile.

Q   And from the time that you first placed No. 4 in operation how long was it before you noticed an effect on the well on your father's property?

A   I don't know.  He could maybe testify better to that particular point than I could.

Q   In other words, you have no recollection of that your-self?

A   I don't know exactly the time, no.

Q   Are you familiar with the well on the property of Vail Company referred to as the Hutch?  Do you know where that property is located just generally?

A   Yes, I do.

Q   Do you know of some wells on that property?

A   Yes, I do.

Q   How far are they from the boundary line, we will say, of the property that you and Mr. Cass own?

A   Well, there is a 200-acre strip of land lying between the two properties.  I guess it is possibly half a mile. The Ralph Barnett property lies between us.

Q  Are you talking about this strip here?

A  That is right.

Q  Which is indicated upon Roripaugh's Exhibit B as 30. That strip, you say, is about 200 feet?

A  No, it's more than that.

THE COURT:  He said it was 200 acres.

THE WITNESS:  It is 200 acres.

BY MR. STAHLMAN:

Q  How far is the width of that?

A  Well, it would be between a quarter and a half mile across it, I should judge.

Q  And the wells on the Hutch property are just over the boundary line of that strip of property designated as 30-- speaking now about the southerly boundary line?

A  Yes, they are just over the line.

THE COURT:  Talking about the southeasterly boundary line.

MR. STAHLMAN:  Southeasterly, yes.

Q  Now, then, you have approximately 450 acres under irrigation, Mr. Roripaugh?

A  Yes, roughly that.

Q  And roughly you are producing about 450 miner's inches of water from the combined source of your wells for irrigation purposes, are you not?

A  Yes, roughly that is true.

THE COURT:   How many inches did you say?

MR. STAHLMAN:   Roughly 450.

THE WITNESS:   I believe it is a little less than that, but approximately that.

BY MR. STAHLMAN:

Q   There is a sort of rough rule of thumb by farmers about one miner's inch for one acre; isn't that about it?

A   Yes, I believe that is kind of a rule of thumb.

MR. VEEDER:   That's a sore thumb with us.   We are not going to have a miner's inch to the acre around here, your Honor.

BY MR. STAHLMAN:

Q   That is what the farmers for years kind of figured up in that area, haven't they?

A   Yes, that has been kind of the general rule.

Q   Now, this property that you acquired, you and Mr. Cass, when you acquired that did you acquire the entire piece that is shown as No. 12 on Roripaugh's B?

A   The first land we acquired was this block in the valley here, and there was part of it went above the new highway 395, somewhere in this area here, roughly, and then we acquired this piece.

Q   When you said "this area here roughly," you indicated a position about at the southwest corner of Parcel 31 on Roripaugh's B and continuing--

1        A   It went pretty much straight across here.

2        THE COURT:   Is this cross-examination directed to the

3    riparian nature of this property?   If it is, you might as

4    well stop and wait until the Government comes in with their

5    proof.   They will undoubtedly have a map showing the date of

6    acquisition.

7        MR. STAHLMAN:   I just want to familiarize myself with the

8    situation, your Honor, because we may want to do some checking

9    too.   I don't know.

10        Q   How many different parcels did you acquire at differ-

11    ent times to make up the entire piece?

12        A   Well, our major land that we acquired was this block

13    here first, and then this block.

14        THE COURT:   The second block he indicated was 12-B on

15    Roripaugh's B.

16        THE WITNESS:   We bought this block here and this block

17    at the same time, and then later we acquired this block here,

18    excepting small pieces lying in the hills.

19    BY MR. STAHLMAN:

20        Q   In other words, the principal area as designated as

21    the Roripaugh property on Roripaugh's B was in three large

22    parcels and some smaller ones?

23        A   Yes.   There was two large parcels bought at two differ-

24    ent times.   Well, there was about a two-year lapse between the

25    two purchases.

Q  Do you have available any place the static level of Well No. 4 when you drilled it and Well No. 7?

A  As I said before, Well No. 4 flowed when it was first drilled for quite some time.

Q  When you say flowed, you mean it was of an artesian nature?

A  That is right.

MR. STAHLMAN:  That is all I have.

BY MR. KRIEGER:

Q  Mr. Roripaugh, Mr. Veeder asked you several times with reference to Well No. 4 whether that was the well that caused your dad's well to dry up.  Did your dad's well dry up?

A  No, that isn't true at all.  It just merely took the cream off from it you might say.  It took the flow out of the well, but probably the actual dropping of the water level in my dad's well might have been five or six feet.  He pumps it yet today and it is a very fine well.

Q  He has pumped it continuously from the time you drilled Well No. 4, too, isn't that right?

A  Yes, that is right.

MR. KRIEGER:  That is all.

# RECROSS-EXAMINATION

**BY MR. VEEDER:**

Q Do you feed the alfalfa and the crops you grow there to your own stock?  Is that what you do, Mr. Roripaugh?

A We do both.  We sell part of it and feed part of it, again depending on the season.

Q About what percentage would that be?  50-50?

A That is very hard to answer.  This year we had to hold back a lot of hay because of the dry weather and we are having to feed a lot more than we would with normal rainfall.

Q You couldn't give us an estimate as to how much you feed and how much you sell?

A No, I really couldn't.

Q When you say as a rule of thumb you use a miner's inch to the acre, did you ever calculate how much water that was for an irrigation season?

A No, I have not.

Q How many days do you figure you irrigate a year?  You must have some estimation of the number of days.

THE COURT:  Well, if you are going to make any sense out of it, let's take one piece of property, one check.

MR. VEEDER:  All right.

THE COURT:  You are probably irrigating the entire season around somewhere.  But on one particular check how many days a year would you irrigate?

THE WITNESS:  That is a mighty hard question to answer.  I mean, the season and everything just affects that a hundred percent.  In a dry year you just irrigate a lot more than you do in a wet one.  A couple of years ago we had a lot of rainfall and we had our pumps shut down for a long time.  This year it has been the opposite.  We have been running and running to keep the stuff going.

BY MR. VEEDER:

Q  This miner's inch to the acre, this thumb riddle you brought in, does that contemplate a continuous flow of a miner's inch to the acre?

A  No, it wouldn't be continuous flow.  You never do irrigate continuous flow.  It always rains a little bit.  In the winter-- this is a dry year, but we wouldn't continually irrigate those pastures.  We would only try to keep them alive, because it's cold and they don't produce anything.  We just try to keep them going.

Q  You have 115 acres in one field; is that right?

A  Roughly, yes.

Q  Are you taking into account that you require 115 inches continuous flow for that field?

A  Not continuous flow, no.

Q  Would you give us then an estimation under your rule of thumb how many days out of 365 what you would irrigate that?

A  I just couldn't do it accurately at all.  I have never

1 had any occasion to.  We only use it as we have to have it,

2 and I just haven't had anyoccasion to try to figure it out.

3 I probablymight not know how to go at it, even.

4  Q  Have you ever tried to apply your rule of thumb to

5 your actual land, Mr. Roripaugh?

6  MR. KRIEGER:  I am inclined to think we are confusing

7 a couple of things here, and the witness is being pushed a

8 little bit on that.  A miner's inch is simply a rate of flow,

9 and you have to convert that into quantity by converting it

10 into inch days, and the witness has said that he has made

11 no record of the inch days that he has let that water go on

12 his land.  It seems to me that Mr. Veeder's question has been

13 answered.

14  THE COURT:  It is going to be very difficult to get any

15 help on it.

16  But you have one field up there of 115 acres, and you

17 have a well up there that will pump 115 miner's inches.  When

18 you are growing alfalfa on that field you don't cut the

19 whole field at the same time, do you?

20  THE WITNESS:  No, it is cut in blocks.

21  THE COURT:  How many acres to a block, would you say?

22 How would you divide it up, into four different parcels or five?

23  THE WITNESS:  That would be possible.  In four you would

24 cut a block, and as you are baling and raking and so forth

25 you would cut another block.

THE COURT:  You would have maybe 25 acres to a block, roughly?

THE WITNESS:  Yes, that could be the case.

THE COURT:  So then you would stagger these cuttings of the four different blocks at different periods?

THE WITNESS:  That is right.

THE COURT:  Then as soon as you would cut a certain block you would then put the water to it?

THE WITNESS: Right behind it, yes.

THE COURT:  And you have a check system there, haven't you, for flooding?

THE WITNESS:  Yes.

THE COURT:  How many hours would you flood ordinarily? Just take an average.

THE WITNESS:  Well, the borders on our particular ranch are 27 feet wide, and normally we would run the water from an hour to two hours to get through the check, depending on whether we are running on land that is pretty solid and water travels over it fast, or on loam land.

THE COURT:  So you would put your whole flow into one check until you would practically flood it, and then you would move it into another check?

THE WITNESS:  That is right.

THE COURT:  So a 25-acre piece might take you three or four days to irrigate after a cutting?

THE WITNESS:  That would probably be the case.

THE COURT:  After you have given it the first irrigation, after a cutting, do you irrigate again before the next cutting?

THE WITNESS:  Again, that depends on the weather.  If the weather is cool and not too hot, we plan to irrigate about once every 30 days, once per cutting.

THE COURT:  But if it got hot you might have to put the water to it again before the next cutting?

THE WITNESS:  Yes.

THE COURT:  Normally you would irrigate once per cutting?

THE WITNESS:  Yes.

THE COURT:  You irrigate, the alfalfa grows up, you cut it, and then you irrigate again?

THE WITNESS:  That is correct.

THE COURT:  So in that manner of spreading your work of irrigating, cutting, baling, et cetera, you cover your whole 115 acres?

THE WITNESS:  That is correct.

THE COURT:  If you would let your well of 195 miner's inches run continuously, and if you had the help to employ and the land to put it on day and night, you could irrigate a lot more than 115 acres?

THE WITNESS:  Yes, that is right.

THE COURT:  I don't know how you would figure this out, but this is the way it is actually done.

MR. VEEDER: Your Honor, I am quite aware how it is actually done. I worry, though, about these generalities, because if memory serves me right a miner's inch to the acre for a 180-day irrigation season, I think, runs something like 6.6 acre-feet, and we can't live with that.

THE COURT: The only way you could get accurate information would probably be from the electricity used, showing how long the well operated or how much juice was used on the well. But I don't know how you are going to get it any other way to give you any figures. The average farmer figures an inch to the acre because he doesn't intend to run his water 24 hours a day. He intends to use it on this piece a while and then he will do some other work and use it on another piece, and stagger his cuttings, and how many actual hours during the month he ran his water would be pretty hard to estimate, unless you did it by computing the electricity or the time the pump ran.

BY MR. VEEDER:

Q  This thing works out about this way, if my figures are right. I calculate that you have about 450 acres under irrigation; is that right?

A  Roughly, that is true.

Q  And you have about 450 miner's inches of water from wells; isn't that right?

A  Yes.

Q  So that would run about 9 second feet?

A  Yes, that is true.

MR. SACHSE:  You say they could run about 9 second feet, Mr. Veeder.  They don't run 9 second feet.

MR. VEEDER:  I am going to ask the next question.

Q  Can you tell us how many days a week you run your pumps?

A  No, that is just impossible, because there are times when those pumps are shut off and there are times when they might run a week day and night and never be turned off, and then there would be other times when they would be turned off two or three days at a time.

Q  Do you ever shut off all your pumps at the same time?

A  That could be.

Q  Have you ever done it?

A  Yes, that could be sometimes on Sunday when the boys are not working, they might be all shut off.

MR. VEEDER:  I have no further questions.

MR. STAHLMAN:  I have just one or two more.


FURTHER REDIRECT EXAMINATION

BY MR. STAHLMAN:

Q  Mr. Roripaugh, with the quantity of water that you are able to produce, would you, in your opinion, be able to irrigate additional land than that which is now under irrigation?

A   Yes, I possibly could.

Q   And by means of additional storage where you could store over night, et cetera, you could irrigate probably considerably more acreage, could you not?

A   Yes, with additional storage where we leave the pumps running at night, that might be possible.

Q   Do you have land in the area that is designated as No. 12 on Roripaugh's B that is susceptible of the same type of irrigation that you are doing -- in other words, pasture land and alfalfa?

A   Well, if we developed further water on our ranch it would have to be used on some of the rolling hills part of it. We are only irrigating in the flat part of the valley.  The economics of irrigating the hills is another problem.  It costs money to do that.  We probably could do it on a small scale, but up to this point we haven't.

Q   You haven't done it, but that land is land upon which vegetative growth can be created?

A   Yes.  Some of our neighbors are doing it, right next door to us, and they are growing permanent pasture on hills.

Q   If you would expand it, how many additional acres would there be, in your best judgment, that you could put under irrigation?

A   That is a hard question.  But as an example, we have this piece of ground lying right here below the freeway, between

the freeway and the old highway, and that is not too steep
at all-- it is rolling, and we could conceivably easily put
that under sprinkler irrigation and grow permanent pasture
on it.  It is good land and it is not too steep.  They are
irrigating steeper land down there with sprinklers right
around there.  But the overall I would hate to say, because I
don't know how much of it would be economically feasible to do.

Q  Do you agree with the report that the Government put
in that the maximum land that you could develop for irrigation
would be 2,659.8 acres?

A  Well, they have experts and they say that to be the
case, and I guess I go along with it.

Q  Of course, that includes also 12-B on the map?

A  That is right.

MR. STAHLMAN:  That is all.

MR. KRIEGER:  That is all.

MR. VEEDER:  I have no further questions.

THE COURT:  Here again you have a question of how much
could reasonably be irrigated.  The figure in the report,
Exhibit 201, is 2,659.8 acres irrigable.  I take it that that
means that the land lies in such a position and is of such
character that if there were water available-- I am not talking
about the economics of getting the water there, but it could
be irrigated.

Is that right, Colonel?

COL. BOWEN:  Yes, sir.

THE COURT:  As a practical matter, that is not a realistic figure, because unless we are all wrong about this you are never going to get the kind of water up in Parcel 12-B on Roripaugh's B that you got down below at Sandia Creek.

What have you got, 720 acres up there?

THE WITNESS:  800.

THE COURT:  800 acres up there.  As far as being irrigable is concerned, that is not a realistic figure, if you are going to catalog this properly.

Likewise, in Parcel 12-A on the Santa Gertrudis there is a lot of that, as a practical matter, that will not be subject to irrigation.

Let me call that to your attention.  In trying to make some cataloging here, you haven't got anything in the record which really indicates how much of this ground is really susceptible of irrigation, unless we want to take the figure of 450 acres that has been irrigated.  Here is a man with one of the best wells in the valley, and I assume a fairly efficient operation, and he is irrigating 450 acres.  You could expand that figure some, but the chances are that the 450 acres that is being irrigated is a much more realistic figure than the 2,600 that could potentially be irrigated.

MR. VEEDER:  I would take issue, to a degree, with your Honor on that, for this reason.  In what seems to me to be not

too long a lifetime, I see that they have bettered the pumps, when electricity is available.  All those factors, your Honor, are extremely important in regard to the matter of bringing lands into irrigation.  All you have to do is to go into areas where rural electrification has come in.

THE COURT:  There is electricity in this area.

MR. VEEDER:  That is what I am saying.  So it would be impossible-- I don't know why the hysterics-- a few years ago it wouldn't have been possible, and I daresay that if your Honor were sitting in 1912 he wouldn't have given any thought to this land being irrigated.  But now your Honor observes.  I am quite certain that there are going to be more efficient means of irrigation as the years go by and a greater demand. I daresay that Mr. Roripaugh himself would desire and thinks that he could increase it.

THE COURT:  All that you say is true.  But I am merely calling your attention to the fact that you ought to have something more realistic than 2600 acres of irrigable ground. Somebody told me one time, and I suppose it's another one of these rules of thumb, that the amount of water used in urban development is practically the equivalent of the water duty for farming.

MR. VEEDER:  I think I told you that, your Honor.

THE COURT:  Did you tell me that?

MR. SACHSE:  I agree that it is just about the same.

THE COURT:  Of course, if that is true, with the development going on in this valley, the Roripaugh property, with the water that is available, would be suited for that type of development.  And how much the water duty would be on an urban development, I suppose, would depend on how it was cut up.  Small homesites, probably five or ten acres, would seem to be what would come first.

I am just suggesting to you.  You are going to get a figure somewhere someday about how many irrigable acres there are in this watershed, and it is not going to mean a thing unless you are a lot more realistic than to take a figure like this 2659 acres as being irrigable.

MR. VEEDER:  I think we have to look at the 2659 acres in the background of the soil survey.

THE COURT:  A couple of other comments.  We have come up probably for the first time to the problem of the little storage reservoir built by cooperation of the Soil Conservation Service, and I hope we don't have a lot of problems with these.  It seems to me that those soil conservation reservoirs do two things:  They put water back into the ground, and secondly, they probably expose water to evaporation.

MR. VEEDER:  Could I add a third to that?  Ultimately they kill a surface stream, if you get enough of them.

THE COURT:  I don't know how they could kill a surface stream in this dry country.  In rainy weather you are not

1  concerned about the stream flow.   There is water goes into the

2  ocean out of this river almost every year.

3  　　　MR. VEEDER:  The only surveys with which I am familiar

4  indicate that it would reduce the runoff about 25% in certain

5  areas.

6  　　　THE COURT:  Were these surveys made in a dry area?

7  　　　MR. VEEDER:  Yes, they weremade in an area not too similar

8  to this in the Cheyenne River area in Wyoming and over in

9  South Dakota, and it was found that the soil conservation dams

10  took about 25% of what would have been the runoff in a state

11  of nature under a given precipitation.

12  　　　THE COURT:  Let's assume that in Southern California check

13  dams would take 25% of the runoff.  When does this runoff

14  occur?  The check dam interferes with the runoff at the very

15  time of the year when water is a dime a dozen when nobody needs

16  the water and a lot of it runs into the ocean.   These check

17  dams don't fill up during the summer.  They don't fill up

18  during the time of the year when you need to use the water,

19  when water is short.  They fill up in the wintertime, and

20  thereafter they retain some of the water and use some by

21  evaporation.   There must be some that goes back into the system.

22  　　　MR. VEEDER:  Your Honor, frequently what occurs is that

23  when your younger alluvium in these areas here has completely

24  dried out during the summertime, the first part of the runoff

25  enters that and it has to be accumulated in ground water to

the end that there will be sufficient to support a surface
stream.  So each time you reduce the quantity of water by 25%
you are going to have an effect on your surface runoff, even
if your water comes as your Honor has stated.

THE COURT:  Mr. Veeder, I have a little trouble following
you.  You have some younger alluvium that needs to be filled
up, and here comes a heavy rain in the wintertime.  If you
could show me one of these dry gulches where after a big rain
water was not running down completely over the younger
alluvium, and if you could show me a dry gulch where with a
good winter rain the water never ran clear across the younger
alluvium because check dams had filled it up, I would agree
with you.  But what happens is that you have one of these
rains and the water comes sweeping over the younger alluvium,
the younger alluvium takes all it can take in the limited
time the water is running, and the rest of the water is wasted.
So your check dams are getting the water at the very time
when it doesn't hurt anybody.

MR. KRIEGER:  In fact, it saves water, because that water
otherwise might very well run off to the ocean, and thereby it
is checked.

THE COURT:  It is pretty hard for me to conceive of a check
dam that would hurt this stream system.  As you drive from
San Diego to Escondido there are some of these soil conservation
dams, some on the right and some on the left before you get

to Escondido, and I have watched them during the years as I drive back and forth, and when you are getting a good-sized rain these things start to fill up. Now, these check dams are usually in a different type of material. They are up higher than the system. I can't say that I have ever seen any of those overflow in the last year or so. In other words, the little draws that they were in they probably collected most of the surplus water that flowed in these little draws.

MR. VEEDER: For what it is worth, Mr. Sachse and I are at the present time trying to work out language to take care of the problem you are talking about. He has some check dams. I suppose it would be Interlocutory Order No. 5.

MR. SACHSE: It doesn't matter about the number. But the theory is very simple, your Honor. If the man asserts the right to interfere with the surface flow, I believe as his attorney I have to accept the fact that he stays in this lawsuit and you can't let him out. So it is just a matter of drawing a finding, a conclusion and a judgment that reserves to you the right at a future time, if damage is proved, to restrain, to control, to regulate, to prohibit, et cetera, any of this interference with surface flow.

MR. VEEDER: We are on the way, your Honor.

THE COURT: Now, the second matter is this matter of the reservoir for temporary storage, and I hope that counsel can take a liberal view of this. The storage of water without

permits, of course, is contrary to the California water law.
But this business of a temporary reservoir to build up a head,
with the idea maybe of pumping at night and irrigating the
next day, doesn't seem to me that that is the kind of storage
of water about which you should get all excited. And it ranges
from the domestic situation where the man has a tank and
pumps water up into his tank to give himself some pressure at
his house to the farmer who has a reservoir where he can
pump some water overnight and maybe irrigate the next day and
maybe hold water for a day or so during the time he is
irrigating. I have never seen any of these reservoirs around
here that seem to me to be used other than in that manner.

MR. STAHLMAN: Your Honor, I think under California law
you can store it. It is cyclical storage that isn't allowed.
But to use it as an adjunct to a system is permissible.

THE COURT: Then you don't think there is any problem
on that?

Is that your view, Mr. Girard?

MR. GIRARD: Yes, I think as long as the storage is used
in the manner it is used as Roripaugh and Vail testified, it
is a perfectly proper riparian use.

MR. VEEDER: What about the United States? We were given
quite a currying, if you remember, when this matter came up
about how we had to operate our system.

MR. SACHSE: It was probably me. But I see no objection

1   to the operation of the United States tanks.  I have always

2   objected to the lake.  But the impoundment as a part of the

3   operation of the system I think is entirely proper.

4         MR. VEEDER:  I think we can probably work something out.

5         THE COURT:  If that is the situation, we may be in agree-

6   ment as far as your tanks at Pendleton are concerned, leaving

7   out other problems such as the use of water outside the

8   watershed.  As far as your use of tanks are concerned, it is

9   just a system no different than that of the farmer.

10        MR. VEEDER:  I am happy that we have made some progress.

11        MR. STAHLMAN:  I didn't think there was any question

12   about that.

13        THE COURT:  Maybe counsel will change his mind as the

14   case has progressed.

15        MR. VEEDER:  I am going to work real hard on that, your

16   Honor.

17        THE COURT:  Mr. Roripaugh, you may step down.

18        MR. KRIEGER:  Your Honor, may I make comment about this

19   question of ownership while we are here.

20        Apparently Mr. Veeder is getting ready to study these

21   ownerships rather carefully, and that's all right with us.

22   On the other hand, I think there are at least two answers to the

23   question that he might raise concerning the ownershps in the

24   strict riparian sense.

25        In the first place it occurs to me that anyone who is not

strictly riparian, but who is near the stream and pumps water from that part of the stream system that supports a stream is as much riparian as though his land bordered on the stream itself.   In support of that we have a series of California cases.   The leading case, of course, is Hudson vs. Daley, and I think Peabody vs. Vallejo is also along that line.  The authorities have gone further and further to show that there is no clear-cut distincition between the fellow who borders on the stream and the fellow who is in the alluvium next to it or quite a ways from it, so long as it supports that stream. So I can visualize that even if you do not have a continuous ownership, if you have a man who is over that area supporting that stream and pumping from that stream, he can be treated nonetheless as a riparian.

MR. VEEDER:  What are your view, Mr. Krieger, if I may inquire, in regard to the extent of the acreage that an over-lying user may apply the water?

MR. KRIEGER:  That is the second point.

MR. VEEDER:  Can he take it to another tract?

MR. KRIEGER:  That is the second point.

The first point I was talking about that category of user is just like a riparian user.

But the second aspect of this thing, and it reaches this same point, is to treat these people as overlying owners. Then an overlying owner, I think, is treated correlatively with

the other overlying owners when he puts his water to use, and
I think he has the same right-- as shown by the series of
cases, Pasadena vs. Alhambra in particular, and Riverside vs.
San Bernardino-- he has a right so long as he takes water out
of a common basin to use water on various parcels of his
land.  They do not have to be contiguous so long as the source
of supply is the same.

THE COURT:  And so long as the other parcels are also
over the basin.

MR. KRIEGER:  That is correct.  And those other parcels
overlying the same basin, of course, can object.  But the
only thing that they can object to is that this fellow is
taking more water than he is entitled to, and then you get
into an adjudication of the ground water basin.

So if you take either the ground water approach or the
Hudson vs. Daley approach to this problem, it seems to me that
the question of ownership is not a significant one in this
lawsuit.

THE COURT:  Do I apprehend correctly that you are now
going to contend that all of your client Roripaugh's land
overlies an underground basin?

MR. KRIEGER:  I think in all the testimony we have, with
the exception of 21, which was Roripaugh's 12-B, which I hope
can go out of this lawsuit, all of that which remains in, I
think, we will take that view, your Honor, because it

MR. VEEDER:  We are certainly amenable and desirous of having that done, if that can be done.  I don't want to interrupt.

MR. STAHLMAN:  Yes, surely.

THE COURT:  Did he have a soil survey?

MR. VEEDER:  No, he didn't have a soil survey.  Now, I am certainly not representing him.  I am just presenting it to your Honor's attention.

THE COURT:  All right, come forward, Mr. Jack Roripaugh.

I will be your lawyer, and if we lose don't be mad at me.

THE CLERK:  Your Honor, Jack Roripaugh has been sworn previously.


JACK RORIPAUGH,

one of the defendants herein, called as a witnes in his own behalf, having been previously duly sworn, testified further as follows:

THE COURT:  Your name is Jack Roripaugh?

THE WITNESS:  It is John Roripaugh, really-- John E.

BY THE COURT:

Q  Where do you live;  what is your address?

A  My address is Murrieta, Route 2, Box 43.

Q  And you filed an answer in pro per in this case?

A  Yes.

1  comes down the Santa Gertrudis.  We admit that the wells are

2  good, they pump fine water, and it would be folly for us

3  to contend otherwise.

4      THE COURT:  You see, this is one of these strange things.

5  His property runs right up to the Kunkel line there.

6      MR. VEEDER:  Just a little over it.

7      THE COURT:  I am talking about 12-A.

8      MR. KRIEGER:  12-A, yes.

9      THE COURT:  It runs right up to the Kunkel line.

10     MR. KRIEGER:  Yes.

11     THE COURT:  And then of course the parcel 12-B is part

12  in and part out of the Kunkel line.

13     MR. KRIEGER:  It is part in and part out, but there is

14  no water in that section.

15     THE COURT:  Your position, then, generally, is that as

16  far as Parcel 12-A is concerned it is all overlying a basin?

17     MR. KRIEGER:  Yes.  For that reason, I don't think we

18  have any problem on Roripaugh.  He is riparian.  We have an

19  estimate of his irrigable acreage, and we have a basis upon

20  which to assume two categories;  His legal entitlement, and

21  his practical entitlement.

22     MR. VEEDER:  Your Honor, before we adjourn, Mr. Jack

23  Roripaugh is here.  He would like to put in his evidence

24  before your Honor.  He is appearing pro per.

25     THE COURT:  Good.

Q  You don't have a lawyer?

A  No.

Q  How many acres of ground did you own at the time this suit was started?

A  Approximately 66.  Pardon me, your Honor.  I don't know.  After that Highway 395 was put through there I deeded the lower part, and whether you mean-- I don't know just when this suit began.  That's what I am trying to get at.

Q  You deeded it to your daughter?

A  Yes.  That's right.

THE COURT:  Does anybody know whether this deed to her was before or after the suit?

MR. VEEDER:  I wouldn't know, your Honor.  The suit started on January 25, 1951, if that is any help.

THE COURT:  When was the lis pendens filed?

MR. VEEDER:  I don't know when you were served.

Let me check that out, your Honor.

THE COURT:  Look over here, Mr. Roripaugh.  I have before me what we call Roripaugh's Exhibit B, and I show you a piece of ground that lies northeasterly of the old road and it lies southeasterly of Banana Avenue, and it runs up to what is called Parcel 31, which is owned by--

MR. STAHLMAN: J. B. Shamel.

THE COURT:  And then there seems to be an older road.

Q  Now, is this the parcel that I have just described that

you are talking about?

A   This is Winchester Road here?

Q   This is 395 here.

A   Oh, that's 395.

Q   Here is Banana Avenue, and it becomes Winchester Road.

A   That's correct.

Q   This is the 66 acres you originally owned?

A   Yes.   That is the 56, and then there is a portion--

Q   56 or 66?

A   There is 56 in this lot, and 10 acres approximately in the lot below that that I own.   I cut the lot in two and I kept the portion my side.

MR. KRIEGER:   Could I bring Roripaugh's B over here?

MR. STAHLMAN:   Your Honor, this is going to take some time.   He has problems of putting water on other land and so forth.   I happen to be familiar with it.   I don't think we can finish before noon.

MR. VEEDER:   And that Piece by Jack's is involved.

MR. STAHLMAN:   Yes.   I don't like to suggest it, because you are his lawyer, but you could read his answer.

MR. VEEDER:   We could throw the pleadings out.

THE COURT:   I thought that this was the parcel--

Let me inquire off the record.

(Discussion off the record.)

1   THE COURT: All right, you can come back this afternoon,

2 can't you?

3   THE WITNESS: Yes.

4   THE COURT: All right, be back at 2 o'clock.

5   Adjourn until 2 o'clock.

6   (Noon recess.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

San Diego, California, Wednesday, December 16, 1959.  2 P.M.


JOHN E. RORIPAUGH,

heretofore called and sworn, recalled as a witness in his own

behalf, testified further as follows:


DIRECT EXAMINATION (Resumed)

BY THE COURT:

Q   In Exhibit 203 you have located the parcels that you

are interested in, and they are Lots 115 and 116 of the

Murrieta portion of the Temecula Rancho, as per map in Book

8, page 359 of Maps and Recors of San Diego County.

Allow me a little time on my client here.

MR. VEEDER:  May we sort of watch here?

THE COURT:  Yes.

Q   To get you oriented, this is the new highway, and

here is Garfield, the old highway?

A   That is right.

Q   Here is Banana Avenue.  Originally you owned all of

Lots 115 and 116?

A   That is right.

Q   Your wife's name is Pearl Roripaugh?

A   Yes.

Q   And your name is John E?

A   That is right.

1      Q  And you and your wife owned this together?

2      A   That is right.

3      Q   And then you deeded to your daughter that portion

4  of Lot 116 that lies south of the new highway?

5      A   That is right.

6      Q   And the daughter's name is Mrs. Margaret Roripaugh

7  Ramsey?

8      A   Yes.

9      Q   You deeded this property to her in her own name?

10     A   Yes.

11     Q   Is that about 23 acres, that piece?

12     A   22 and a fraction.  I don't know just exactly.

13     Q   You deeded this to her about 1951?

14     A   That would be about the time.  I am not sure just

15  exactly.  I think it was a little later than that.

16     Q   Well, your Answer says 1951.

17     A   Is that right?  Well, that is probably correct, then.

18     Q   Before you deeded it to her, her land was irrigated

19  from your well?

20     A   That is right.

21     Q   Up in Lot 115?

22     A   115, that's right.

23     Q   And you say in your Answer that that property you

24  deeded to her had been irrigated from your well continuously

25  since about 1931?

1    A That is right.

2         There is one thing I would like to say, your Honor.

3    They have drilled a well on that property and I should

4    probably withdraw any right to put water on it.

5         Q Well, let's see what we have got.  Since 1931 that

6    22 acres has been planted to alfalfa, pasture grass and other

7    crops?

8         A  That is right.

9         Q  Nobody ever complained about your supplying her

10   water after you deeded her the property?

11        A  No.

12        Q  And you supplied her water after you deeded it to

13   her from about 1951 down to the present?

14        A  Yes.

15        Q  This well that you say she has drilled is the one

16   we saw out there being drilled, was it not?

17        A  Yes.

18        Q  When we made our field trip?

19        A  That is right.

20        Q  Did they get a good water well there?

21        A  They did, very good.

22        Q  That well is drilled on a portion of Lot 116 south

23   of the new highway?

24        A  That is right.

25        Q  Up in the northern corner?

1    A   Yes.

2    Q   How deep is that well?

3    A   A little over 200 feet.  I think about 206.

4    Q   How big a casing?

5    A   Eight-inch casing.

6    Q   How far to water from the surface?

7    A   You mean the static level?  It is a few feet.  I think

8    about maybe 12 to 18.

9    Q   How big a pump do they have on it?

10   A   I just don't really know.  The pump just about fills

11   that casing.  It is a sort of combination jet pump.

12   MR. VEEDER:  Mr. Leo Roripaugh says he thinks it is about

13   five horse.

14   MR. LEO RORIPAUGH:  Isn't the motor a five-horse, Dad?

15   THE WITNESS:  I believe it is.  I am not sure.

16   MR. LEO RORIPAUGH:  I think it is five horse, your Honor.

17   BY THE COURT:

18   Q   How many inches does it pump?

19   A   It pumps around, I am quite sure, between 35 and 40.

20   Q   Miner's inches?

21   A   That's right.

22   Q   All of Lot 115 and all of Lot 116 is suitable for

23   irrigated crops?

24   A   That is right.

25   Q   It lays level, doesn't it?

A  All of it.

Q  No waste land at all?

A  No.

Q  In the part that you and your wife own, first of all Lot 115, there is about 56 acres in there?

A  That is right.

Q  And then you have another about ten acres in Lot 116 north of the new highway?

A  That is right.  Pardon me.  That is southwest of the new highway, this portion here.  No, it's north.  The lot is southwest.  But you are right about that.  That small portion is north, northeast.

Q  Northeasterly of the new highway?

A  Yes.

Q  Let me ask you another question.  Did your daughter ever file an answer herself in this case?

A  I think she did.

THE COURT:  Because all of this matter about her property is in his answer, too.

MR. LEO RORIPAUGH:  They filed an answer, your Honor.

THE WITNESS:  I am quite sure they did.

MR. VEEDER:  We have answers up here, your Honor. Would that be under the name Ramsey?

MR. LEO RORIPAUGH:  Yes, Ramsey.

MR. STAHLMAN:  Do you represent the daughter, too?

1     THE COURT:  We have most of the evidence we need right

2  now.

3     Q  When did you purchase your property there?

4     A  I moved on there in 1910, but I bought it from my

5  father-in-law, and I think it was the next year before the

6  deed was made out-- we were busy plowing, I guess.

7     Q  You bought it from your father-in-law?

8     A  Yes.

9     Q  What was his name?

10    A  Barnett.

11    THE COURT:  What about this being riparian?  It is

12  obvious that it overlies the basin.

13    MR. LEO RORIPAUGH:  It is right on a creek, too, I think.

14  BY THE COURT:

15    Q  Do you border a creek?

16    A  Yes, I am right close to the creek, within a few

17  yards of it.

18    Q  Where is the creek?

19    A  The Santa Gertrudis.

20    Q  Is the creek entirely on Leo's property?

21    A  Yes, it is there.  My land doesn't extend over into

22  the creek bottom, just a few yards or some two or three

23  hundred feet.

24    MR. STAHLMAN:  I happened to look at the map, your Honor,

25  and it shows that it is overlying that portion of the younger

1    alluvium of Santa Gertrudis Creek on Exhibit 15-A.

2    THE COURT:  Yes, Exhibit 15-A shows that both John

3    Roripaugh's property and Mrs. Ramsey's property lie entirely

4    over the new alluvium as shown on 15-A.

5    MR. STAHLMAN:  I think that would make it riparian.

6    MR. VEEDER:  He would probably be riparian at high water,

7    but I don't believe he would be at the lower flow.

8    THE COURT:  It doesn't make any difference if he is an

9    overlying owner.

10   MR. VEEDER:  I thought your Honor asked whether he was

11   riparian.

12   THE COURT:  Yes.  I doubt that he is riparian, except

13   possibly at flood time.

14   MR. VEEDER:  That's right.

15   MR. STAHLMAN:  I think he is riparian to the underground

16   water as well as on the stream.  Wouldn't he be riparian?

17   THE COURT:  That is true, too.  It doesn't have to be a

18   stream on the surface.

19   MR. VEEDER:  But I am talking about the surface runoff.

20   THE COURT:  We are going to mark on Roripaugh's B, out-

21   line his property there, and call it for identification Parcel

22   53.  I think that is the next parcel.

23   MR. VEEDER:  That is correct.

24   MR. KRIEGER:  Why don't we color that in?

25   THE COURT:  Yes, just color it in, and then the part

1    south of the road mark as 54, Mrs. Ramsey's parcel, and show

2    his property as coming clear down to the new highway.

3        (Mr. Krieger marking the map.)

4        MR. VEEDER:  Let's also put the 53 and 54 in the title

5    block down here.

6    BY THE COURT:

7        Q  Do you have a reservoir up in the corner of your

8    property up there?

9        A  I have two reservoirs, one on each corner.

10       Q  One on the most northerly corner, and one on the most

11   northeasterly corner?

12       A  Yes.

13       Q  How long has this reservoir up to the most northerly

14   corner been in there?

15       A  That has been in ever since I put the well in.  That

16   was put in in 1930 or '31.

17       Q  How many acre-feet will it hold?

18        Leo, do you know?

19       MR. LEO RORIPAUGH:  I would say about two, two and a half.

20   BY THE COURT:

21       Q  When did the reservoir in the easterly corner go in?

22       A  That went in in about '35, I believe.

23       Q  How many acre-feet will that hold?

24       A  That one holds considerably more.  I should say probably

25   two acre-feet.  I didn't hear what Leo estimated the other.

1    MR. LEO RORIPAUGH:  I thought the one at the house would

2  hold roughly three, and the other one two.

3    THE WITNESS:  I don't think so, Leo.  I don't think either

4  one would hold quite that much.

5    THE COURT:  Is that pretty close?

6    MR. LEO RORIPAUGH:  It is somewhat near, your Honor.

7    THE WITNESS:  That would be pretty close, yes.

8  BY THE COURT:

9    Q  How have you used these reservoirs?  Pump water into

10  them to get a head; is that what you use them for?

11    A  Yes.  I used to use them to take care of the flow.  I

12  used to fill it with the flow.

13    Q  When your well was flowing as an artesian well?

14    A  That is right.

15    Q  When did it stop flowing as an artesian well?

16    A  I am not sure of the date.  Leo could probably tell.

17  He drilled a well below it, and from then on it gradually

18  went down and in the course of two or three months the flow

19  was gone.

20    MR. VEEDER:  Your Honor, I have been told that I said

21  that it dried up Jack Roripaugh's well.  I didn't intend to

22  say "dried up."

23  BY THE COURT:

24    Q  When was the well drilled?

25    A  It was drilled in 1930.

11163

1    Q  And since the well has ceased to be an artesian well,
2  you pump into one or both reservoirs and use those to build
3  up a head to irrigate with?

4    A  That is right.

5    THE COURT:  Col. Bowen, you can sit right there.  You
6  have been sworn.

7    What is this ground suitable for, what kind of crops--
8  alfalfa, permanent pasture?

9    COL. BOWEN:  No, sir; it is suited to row crops and--

10    THE COURT:  As well as alfalfa?

11    COL. BOWEN:  As well as alfalfa; yes, sir.  We have given
12  it the field duty of 4 acre-feet per acre per year for row
13  crops.  Of course, if you want to figure the project duty,
14  we added 10% for project losses.

15    THE COURT:  Your 4 acre-feet includes the 10%?

16    COL. BOWEN:  No, sir, that is exclusive of the 10%.  The
17  field duty is 4 acre-feet.  The project duty would be 4.4
18  acre-feet per acre per year?

19    THE COURT:  Are you satisfied with that estimate of acre-
20  feet of water, Mr. Roripaugh?

21    A  No, I am not, to be frank about it.

22    Q  How many acre-feet do you think you ought to have for
23  that piece of ground?

24    A  I think there ought to be at least five.  I don't
25  think four acre-feet will double crop it at all.

Q  By double crop it you mean growing two crops in the same year?

A  That is right, which could be done there.

THE COURT:  All right, gentlemen, you may cross-examine my client.

MR. STAHLMAN:  Do you want a new lawyer, Mr. Roripaugh?

THE WITNESS:  No, I am very well satisfied.

MR. STAHLMAN:  I happen to know that he is also claiming a right.  He has used some water off of the land for a good many years on leased land.

MR. VEEDER:  George, I am going to cross-examine.

THE COURT:  That can be brought out.  I am not going to expose my client's position.  Maybe I should inquire into this.

Q  Have you pumped out of this well on your property and used it on other land?

A  Yes, I have.

Q  What other land did you use it on?

A  Land adjoining on Vail Company.

Q  That belongs to Vail Company?

A  Yes.

Q  Is that what is called the Piece by Jack's?

A  I guess that would be it.

THE COURT:  What exhibit number is that, Mr. Veeder?

MR. VEEDER:  I think that is Vail's J.

1          THE COURT:  Point out on Vail's J where the Piece by

2     Jack's is..

3          That piece is immediately adjacent and adjoins Mr.

4     Roripaugh's property which lies to the north and west.

5          MR. VEEDER:  That is my understanding.

6     BY THE COURT:

7          Q  How much water have you used over there on the Piece

8     by Jack's?

9          A  A great deal.  I started to put water on there in

10     1932.  I lease that land from Vail Company and it has been

11     going on there ever since.

12          Q  Do you still lease it?

13          A  How much I couldn't say.  Considerable.

14          Q  Do you still lease it from Vail?

15          A  No.  Three years ago I turned it back to Vail.  But

16     they are still putting water on it.

17          MR. VEEDER:  Are they using your water?

18          MR. STAHLMAN:  Just a moment.  It's not time for cross-

19     examination.

20       BY THE COURT:

21          Q  What kind of crops did you grow from 1932 to about

22     three years ago?

23          A  Alfalfa mostly.  But that year they took it back for

24     one year to grow that crop of spuds.

25          THE COURT:  Well, that was during the time that you were

1   using it.  Then after they grew these spuds one year you went

2   back and used it again?

3       A  Yes.

4       Q  What year was it that you grew the crop of spuds?

5       A  I couldn't say.  It must have been along about-- well,

6   I should think around '37 or '8.

7       Q  You didn't grow them; the Vails grew them?

8       A  That is right; the Vails grew them.

9       Q  Did anybody ever complain about your using water over

10  on the Vail property?

11      A  Never that I ever knew of.

12      Q  Are the Vails, since you gave the property up, still

13  using your water on the Piece by Jack's?

14      A  Yes, sir.

15      Q  Do they pay you for that water?

16      A  Yes, sir.

17      Q  You are dependent on that income I take it, to get

18  along?

19      A  I am.  I will have to admit that.

20      MR. STAHLMAN:  To pay his attorney fee.

21      THE WITNESS:  The business of farming being as it is,

22  I appreciate that.

23      THE COURT:  You understand, this is a very important

24  point of evidence now.

25      Q  What do you get for the use of that water a year?

1    A  Well, I really have to admit I make Vail Company kind

2  of a rate on it-- 7½ an acre-foot.

3    Q  And how many acre-feet a year do you estimate they

4  use?

5    A  Well, I think that they use about pretty close to two

6  acre-feet this year.  I could figure that exactly.

7    MR. VEEDER:  Two acre-feet a year?

8    THE WITNESS:  I would like to say that they put in a

9  spring crop there one year of spuds and one year of corn,

10  which of course didn't take a great amount of water.

11  BY THE COURT:

12    Q  They use about two acre-feet per acre?

13    A  That is right.

14    Q  And how many acres are on that piece by Jack's?

15    A  Approximately 60 acres.  I think Mr. Wilkinson could

16  probably tell us just what the exact amount is.

17    MR. STAHLMAN:  I might make this suggestion, your Honor,

18  if we can bring the billing down and show what it was.

19    THE COURT:  You don't have to do that if we can find out.

20  I can figure it myself.  He get seven and a half per acre-foot,

21  and they use two acre feet per acre on 60 acres, which would

22  be 120 times seven-fifty, wouldn't it?

23    MR. VEEDER:  That gives you $900.

24    THE COURT:  Is that what it is?

25    MR. VEEDER:  That is the way I figure it.

BY THE COURT:

    Q  What does this run, about $900 a year to you?

    A  It's more than that.

    Q  It runs more than that?

    A  Yes.

THE COURT:  This is very important.

THE WITNESS:  I should say it's generally twice that.

THE COURT:  Do you have the amounts?

MR. STAHLMAN:  I asked Mr. Wilkinson.  He doesn't know offhand, but they have the bills up there and we can check it and inform your Honor in the morning.

THE WITNESS:  I could figure that out.  I could figure it out from my records at home and send it down to you.

MR. VEEDER:  Is it relevant?

MR. STAHLMAN:  Yes.

MR. VEEDER:  I think it is only relevant as to the quantity of water that he uses, not how much money he gets for it.  I am for him.

THE COURT:  Let's bring it down and complete the record anyhow.

    Q  And you claim a right to continue to do this?

    A  That is right.

THE COURT:  All right, you may cross-examine now, and I will object if I don't think the questions are proper.

MR. VEEDER:  I have exercised that privilege myself,

1    your Honor.

2

3                        CROSS-EXAMINATION

4    BY MR. VEEDER:

5        Q  Now, you say that the water duty, when you lease this

6    land, you calculate two acre-feet to the acre for the full

7    season?

8        A  Pardon me?

9        Q  You say your water duty for the full season was two

10   acre-feet per acre; is that right?

11       A  That is right, this season.  But that depends on what

12   kind of crop they are growing.

13       Q  And the crops they were growing were corn?

14       A  Potatoes was one of them, both spring crops, and then

15   corn next spring.

16       Q  Did you double crop it that year?

17       A  No, that was not double crop.  That was two successive

18   years.

19       Q  What time did you harvest your potatoes?

20       A  In July sometime.

21       Q  And how many irrigations?

22       A  Well, that was almost a continuous proposition there.

23   They were running water there slowly.  I can't tell just when

24   the pump was running, of course, but it was most of the time.

25   At that time they had spuds on theirs and on my own place too.

Q  But that cropping pattern you figure that two acre-feet per acre was an adequate water duty?

A  Well, that is about what they used.

Q  And they made a crop?

A  Yes, they did.

Q  In regard to alfalfa, isn't that what you used it for? That property is used for alfalfa, too, isn't it?

A  Yes.

Q  Did you calculate the water duty for the alfalfa?

A  Well, it would be--

Q  Did you calculate it?

A  Well, yes, I have given it a great deal of thought, but I don't know what it was because, frankly, I had no meter on the well when I was raising alfalfa.

Q  How many cuttings did you figure?

A  Sometimes five and sometimes six.

Q  You must have made a charge for that.  If it was on a year when you had two acre-feet per acre, you say you ran something like--  well, I figured it at $900.  You said that that is about half as much?

A  Yes, it was considerably more than that, but I wouldn't want to give a figure unless I would look it up.  I could figure it up down to the dollar.

Q  The duty of water is important and I am trying to figure if there is some way that we can arrive at it.

1      MR. STAHLMAN:  Your Honor, he is arguing with your client.

2      THE COURT:  Yes, just ask your questions.

3      MR. VEEDER:  Well, I picked out a hard way to make a

4  living.

5      THE WITNESS:  It is, I will agree with you.  You have

6  kept me so busy that I didn't do too much record keeping.

7  BY MR. VEEDER:

8      Q  Now, in irrigating the Piece by Jack's, how did you do

9  that?  Did you impound the water in a reservoir and take it

10  across?

11      A  Yes, part of the time I pumped it directly from my

12  well, but recently we have been using a booster pump to fill

13  the reservoir there and pump out of my well and the reservoir,

14  too.

15      Q  In other words, you store the water?

16      A  That is right.

17      Q  And then release it?

18      A  That is right.

19      MR. STAHLMAN:  Just a moment.  That isn't what he said.

20      MR. VEEDER:  He said yes, George.

21      MR. STAHLMAN:  He said that he had a booster pump and

22  pumped directly as well as out of the reservoir.

23  BY MR. VEEDER:

24      Q  Would you clarify that?  How do you operate today?

25  Do you put all the water into the reservoir and then take it

1  out?

2      A  No, I put the water in this reservoir-- speaking of

3  Vail's land.

4      Q  I am speaking right now of the Piece by Jack's to

5  start with.

6      A  That is right.  I fill the reservoir full of water

7  and then the booster pump pumped more than my well would

8  furnish, so I pumped from my well and turned the water in

9  from the reservoir, too, and used this booster pump.  The

10 booster pump pumps considerablymore than my well can furnish.

11     Q  You see this west of the highway here?

12     A  That is right.

13     Q  Is that also part of the property that is the Piece by

14 Jack's, do you figure?

15     A  The highway--

16     Q  This parcel that is severed by the highway here, is

17 that also part of the Piece by Jack's?

18     THE COURT:  The little piece that lies west of 395 there.

19     THE WITNESS:  The piece below 395?

20     MR. VEEDER:  West.

21     THE WITNESS:  No, that is adjoining my daughter's.  I

22 don't have anything to do with that any more.

23     THE COURT:  Is it part of what is called the Piece by

24 Jack's?

25     THE WITNESS:  I suppose it is.  That phrase "Piece by

1  Jack's is a new one on me, so I wouldn't know just what that

2  covers.

3  BY MR. VEEDER:

4      Q  I observe that it is tied to the Piece by Jack's,

5  and that is why I am inquiring.

6      A  That water used to go through there before the

7  highway was put in .  I used to irrigate right through to

8  the old road Garfield.

9      Q  But it is not irrigated from your well any longer?

10     A  Not now.  It has been up until this year when they

11 drilled the other well.

12     Q  I see.  In other words, you had been using it.  How

13 are you farming your own land, your 56 acres, concerning

14 which you testified?  What are you raising on that?

15     A  I am raising, due to a rotation program, I have been

16 raising barley on it since I took it out of alfalfa three

17 years ago.

18     Q  What do you figure your water duty for barley?

19     A  Well, that could be anywhere from nothing up to a

20 couple of acre-feet.

21     Q  As a matter of fact, in the irrigation of your barley

22 you just irrigate it to get it started and then you don't

23 irrigate any more, do you?

24     A  Well, yes, sometimes.  But ordinarily I don't like to

25 irrigate it at all.  I would like to have it rain on it.  If

it rained good, I wouldn't need to irrigate.

11174

1    Q  You are not stating, then, that to raise a crop of

2  barley you use two acre-feet per acre, are you?

3    A  No, not-- if you use two feet per acre you would

4  just have to go without any rain.  If you didn't have any

5  rain at all, you could possibly use that much.  But that

6  would be pretty high, I'll say that.  I wouldn't expect to

7  use hardly that much.

8    Q  In raising your alfalfa would you figure that you

9  irrigated it five times  a year?

10    A  More than that.

11    Q  Let's take a year of five cuttings.  How many irri-

12  gations would there be?

13    A  There could be as many as, when the country is dry

14  like it is now, there could be as many as eight or nine.

15    Q  Usually isn't it true that you irrigate right after

16  your hay is off and get in one good soaking and you don't

17  irrigate it any more, isn't that right, until the next cutting?

18    A  That depends on the man cutting the alfalfa and the

19  kind of season he has.

20    Q  Generally, isn't that the way you operate, though?

21    A  When we have normal rainfall that is the usual way

22  of operating.

23    Q  Well, take a dry year like this year.  How many times

24  would you irrigate?  Would you irrigate ten times?

25    A  I found out it worked pretty good to irrigate it

1    twice, every other time.  Irrigate it once, cut it, irrigate

2    it immediately again, and then irrigate it again probably a

3    week before it is ready to cut.

4         Q  But your second irrigating would be pretty light,

5    wouldn't it?

6         A  No, it wouldn't be light.  It would be heavy or

7    heavier because you have the growth holding back the water.

8         Q  Would you say, then, that on an average year -- I

9    am speaking of what an average year would be-- a year when

10   you get some rainfall, you would figure then that you would

11   irrigate six or seven times; is that right?

12        A  Well, that's a hard question to answer.  When the

13   winters are as dry as they have been for most of the time for

14   a good many years, you had better put a little water on it

15   during the wintertime to get a little moisture down in the

16   subsoil.

17        MR. VEEDER:  Your Honor has a really good client here.

18        THE COURT:  I am really proud of him.

19        MR. VEEDER:  I am working real hard on this matter and

20   not getting any place.

21        Well, I have no further questions.

22        THE WITNESS:  Would I be allowed to make a remark here?

23        MR. VEEDER:  You have the Court for counsel.  You can't

24   do better than that.

25        THE WITNESS:  Our Farm Advisor says that for alfalfa and

1   pasture grass it takes from four to six acre-feet.  Would you

2   like to see his report on it?

3       MR. STAHLMAN:  Do you have it here in some document?

4       THE WITNESS:  Yes.  Would you like to see it?

5       MR. STAHLMAN:  Sure, I would like to see it.

6       THE WITNESS:  (Producing document and handing it to Mr.

7   Stahlman.)  I have no briefcase, Mr. Stahlman.

8       MR. STAHLMAN:  Maybe your lawyer will lend you his.

9       Is this an official publication by the Agricultural

10  Extension Service at Riverside?

11      THE WITNESS:  Yes.  Mr. Harvey-- in passing I might tell

12  you that Mr. Harvey says that if anyone disagrees with that,

13  he would be very glad to come in and talk about it and explain

14  it.

15      MR. STAHLMAN:  This is quite an interesting little

16  document.  I will offer it in evidence.

17      MR. VEEDER:  I would like to look at it, if I may.

18      THE COURT:  You may look at it.

19      MR. VEEDER:  You realize what Mr. Stahlman did to you,

20  don't you?  He took it away from you.

21      THE COURT:  Mark it for identification as Roripaugh's

22  Exhibit J.

23      MR. VEEDER:  May I have just a moment to look at it, your

24  Honor?

25

        THE COURT:  It is probably as trustworthy as the various

1   compilations the Government sets forth in its soil studies

2   of the estimates of the amount of acre-feet.

3       MR. VEEDER:  We have the best man in the country doing

4   it, your Honor.  I don't know this other fellow.

5       Some use less than the low figure, and some use more--

6   I see.

7       MR. STAHLMAN:  You are entirely wrong.  There have been

8   estimates as a result of studies in various crops.

9       MR. VEEDER: George, you are not under oath.

10      MR. STAHLMAN:  We are going to put somebody under oath

11  on the matter.

12      THE COURT:  Well, there is no doubt but that it comes

13  from a farm advisor of Riverside County, and it is just another

14  table such as the Government has used in its soil surveys to

15  make some estimates.

16      MR. VEEDER:  I have no objection to it.

17      MR. STAHLMAN:  In addition to that, your Honor, Mr.

18  Roripaugh has been a practical farmer for many years, and he

19  says it takes about five acre-feet.

20      THE COURT:  Roripaugh's Exhibit J received in evidence.

21      (Roripaugh's Exhibit J for Identification was received

22  in evidence.)

23      THE COURT:  The amount of water that is used for alfalfa

24  is going to depend, to a large extent, on the type of soil

25  you have, isn't it?

1    THE WITNESS:  Yes.

2    THE COURT:  If you have sandy soil you can pour all kinds

3  of water on it?

4    THE WITNESS:  That is right.

5    THE COURT:  If you have a tighter soil, you use a lot

6  less; isn't that right?

7    THE WITNESS:  Yes.  This soil varies considerably.

8  BY MR. VEEDER:

9    Q  You never did measure the quantity of water applied

10  to any of your crops, did you?

11    A  No.  I have recently, that is, I have metered it.

12    Q  Do you have your meter readings?

13    A  Yes.  I haven't them with me.

14    Q  Could you make those available to us?

15    A  Yes.

16    THE COURT:  You say you don't have them with you?

17    THE WITNESS:  No, I do not.

18    MR. VEEDER:  I have no further questions.

19    THE WITNESS:  But I would like to emphasize that a spring

20  crop, such as I have grown since the water has been metered,

21  doesn't take anything like the water that I very probably

22  would like to use on it.

23    THE COURT:  I want to show you how fair my client is.

24  Did you hear his statement?

25    Read it back, Mr. Reporter.

1    (The reporter read the last statement of the witness.)

2    THE WITNESS:  For instance, if you dig a field of

3    potatoes in July the chances are that you can probably quit

4    irrigating a considerable time before that, because it would

5    be sometime before you could get on there with a digger.

6    BY MR. VEEDER:

7    Q  As a matter of fact, the four to six acre-feet per

8    year for alfalfa would include normal precipitation, wouldn't

9    it?

10   A  Well, it would.  If it was dry the year round, it

11   really takes a lot of water, because to raise any kind of

12   crop you must irrigate in winter if you don't get a reasonable

13   amount of rainfall.

14   THE COURT:  Let the record show that Mrs. Ramsey's property,

15   which has been marked Parcel 54 on Roripaugh's B, is described

16   in her answer as being bounded on the north by Banana, on the

17   east by Freeway 395, on the south by Apricot Street, and on

18   the west by Garfield Avenue.

19   Anything further?

20   Thank you, sir.

21   MR. KRIEGER:  Is George through with Mr. Roripaugh?

22   THE COURT:  Yes.

23   MR. KRIEGER:  There is just one question, Mr. Roripaugh.

24

25

CROSS-EXAMINATION

BY MR. KRIEGER:

Q   I think you said something about checking the static
level of your well recently; is that right?

A   Yes, I did.

Q   How long ago did you do that?

A   I think it was just about a week ago.

Q   What was it?

A   It was 20 feet and 9 inches.

Q   It had come up considerably since the last time it
was measured; is that right?

A   Yes, it had come up considerably since I stopped
pumping.

Q   Does it do this every year?

A   Well, yes.   I couldn't say about the rise, how much
it would be, but it comes up every year.

MR. KRIEGER:   Thank you.


FURTHER CROSS-EXAMINATION

BY MR. VEEDER:

Q   When did you stop irrigating this year?

A   It must have been about the first of August, I think.

Q   About the first of August?

A   Yes.

MR. STAHLMAN:   May I ask a question, not strictly in

1  connection with the property, but I think it might be of some

2  significance.

3

4                          CROSS-EXAMINATION

5  BY MR. STAHLMAN:

6      Q  You have lived there for many years, Mr. Roripaugh,

7  in that area?

8      A  Since January, 1910.

9      Q  And during that period of time have you seen wells

10  drilled around in your vicinity there?

11     A  Yes, I have.

12     Q  Did you make observation of the drilling at times of

13  some wells?

14     A  I have sometimes.

15     Q  Did you ever see them drill a dry hole in that area?

16     A  Yes, I have seen them drill some holes that didn't

17  furnish any water.

18     Q  Do you recall any particular well about where it is

19  located?

20     A  Yes, there is a well up above my place about a mile,

21  a mile and a half, mile and a quarter, something like that,

22  that my brother-in-law drilled.  I was there two or three

23  different days when he was drilling.

24     Q  When you say about a mile up, was that up Banana Road?

25     A  Yes, that is right.

MR. VEEDER: I believe this is already in the record.

MR. STAHLMAN: Is it?

MR. VEEDER: Yes. If I recollect, I think Mr. Roripaugh testified.

BY MR. STAHLMAN:

Q Anyway, the neighbor to your north, what is his name?

A Ceas.

Q And where was this well, how far away from his property?

A Oh, it is a very short distance, probably less than a quarter of a mile from his lower line.

Q Less than a quarter of a mile from his lower line?

A Yes.

Q That would be the line that joins your property?

A Yes, that joins Leo's property.

THE COURT: The Ceas property is up there, Parcel 6, away up.

MR. STAHLMAN: I see.

MR. VEEDER: Is that 24-Q-2?

MR. STAHLMAN: Yes, 24 is the section.

THE WITNESS: Your Honor, there is one thing I didn't mention, which I don't know has any bearing on the case. I had a half-interest in a well half a mile above my place for many years and irrigated from that. That was drilled in 1911 and I used it up until I drilled this other well. That is one of the Shamel wells now.

1      MR. VEEDER:  May I have that read?

2      THE COURT:  Read it.

3      (The reporter read the last statement of the witness.)

4      THE WITNESS:  I said I had a half-interest.  I sold it

5  to Mr. Shamel.

6      THE COURT:  You used it from about 1911 to about 1930,

7  something like that?

8      THE WITNESS:  That is right.

9      THE COURT:  You have so many claimed water rights that--

10      THE WITNESS:  Well, I thought I would put it up for

11  your consideration.

12      THE COURT:  Where did you use that water, on this parcel

13  that you told us about?

14      THE WITNESS:  That is right.

15      THE COURT:  That we marked Parcel 53 and your daughter's

16  54?

17      THE WITNESS:  That is right.

18      MR. VEEDER:  The matter concerning which Mr. Stahlman

19  has been interrogating now appears at page 9616 in Volume 84,

20  your Honor.

21      MR. STAHLMAN:  May I see it?

22      MR. VEEDER:  Yes.

23      THE COURT:  How did you transport the water down from

24  the Shamel well?  By pipe?

25      THE WITNESS:  In an open ditch.

THE COURT: This was across Shamel's property?

THE WITNESS: Yes.

THE COURT: And with his consent?

THE WITNESS: Yes. We had an easement on a right of way there for ditch purposes.

THE COURT: I would advise you that you would probably have enough water rights in connection with your land and where it lies that I don't think I would press any claim to water from Shamel's well. You no longer have an interest in the well?

THE WITNESS: As I said, I think I said "had." The reporter used the word "have."

MR. STAHLMAN: So that we know what we are talking about on the well that he said was a dry well, it is a well that is indicated here right by the No. 1087 in Section 24.

MR. VEEDER: Did he say it was a dry well?

MR. STAHLMAN: Yes. It was 314 feet deep, according to your transcript.

MR. VEEDER: I don't think he said it was dry.

MR. KRIEGER: He said he hit a rock and quit.

BY MR. STAHLMAN:

Q Is that the well that you meant was the dry well?

A I think so. I could check it out on the map, if I may.

MR. STAHLMAN: Let's be sure.

1      MR. VEEDER:  He says there is plenty of water in it, but

2   I think it pumps out quick.

3      THE WITNESS:  This is the road (indicating)?

4      MR. STAHLMAN:  Yes.

5      Evidently everybody agrees, including Mr. Kunkel and

6   the witness.

7      MR. VEEDER:  Agrees to what?

8      THE COURT:  Any further questions from Mr. Jack Roripaugh?

9      MR. STAHLMAN:  I have no questions.

10      THE COURT:  You may step down, thank you.

11      Is there going to be an issue in this case whereby the

12   Vail Company claims the right to secure water from Mr. Jack

13   Roripaugh to water the Piece by Jack's?

14      MR. STAHLMAN:  Jack is claiming the right, and we have a

15   right to buy the water from him for that piece.

16      THE COURT:  He is going to claim the right to sell it to

17   you and get money for it?

18      MR. VEEDER:  Do you say the Piece by Jack's is an over-

19   lying piece?

20      THE COURT:  I think it is clearly overlying.  According

21   to Exhibit 15-A, it is almost entirely in the younger alluvium.

22      MR. VEEDER:  If your Honor makes such a finding, I think

23   it will shorten the case a lot.

24      THE COURT:  I see by Exhibit 15-A that the land adjoin-

25   ing Parcel 53 on Roripaugh's B and Parcel 54 on Roripaugh's B,

1  the two parcels we were talking about, is entirely yellow in

2  the younger alluvium-- you can spot it there, Mr. Veeder--

3  and I would propose to find that that piece by Jack's as it

4  is called, and Parcels 53 and 54 were all overlying a basin

5  of water which was part of the Santa Margarita Stream Sytem,

6  and that probably-- if it is a basin that does it.  You don'

7  have to worry about a stream.  Therefore, there would be

8  nothing wrong with using water from one piece on an adjoining

9  piece overlying the same basin.

10      MR. VEEDER:  My only concern is that the Vail Company

11  I understood, took the position that it was not all basin

12  throughout that area.

13      MR. STAHLMAN:  We haven't taken any position as to wha

14  is or isn't.  That is something that awaits the finding.

15      THE COURT:  All right, I don't think we have any prob

16  then, on this matter of my client's income from the Vail

17  Company.  I think that is pretty well established that th

18  proper.

19      Before we go ahead, though, I had a note here this m

20  that I meant to talk about.  Mr. Leo Roripaugh testified

21  he was asked by his counsel whether he had ever asked any

22  permission to store water, whether anyone had ever asked

23  to quit storing.  As far as proving a prescriptive right

24  doubt very much if that goes far enough to prove a prescr

25  right.  But in view of the position of counsel as to te

1   storage for irrigation purposes or other purposes, you probably

2   have no problem.

3       MR. KRIEGER:  I agree with you.  In view of your comments

4   from the bench, I think that is only temporary storage that

5   we have any right to claim there, and that is all we wish

6   to claim.

7       THE COURT:  We will come up against prescriptive rights

8   in here, and I don't think a use becomes prescriptive merely

9   because no one has objected.  It seems to me that for a use

10  to become a prescriptive right there must be adversity, and

11  that must mean that somebody is going to object.

12      Mr. Girard.

13      MR. GIRARD:  Following your Honor's comments, if Mr.

14  Krieger is going to contend that temporary storage is a proper

15  riparian use, you can't very well contend it is a prescriptive

16  use because no one could complain of it.

17      THE COURT:  That is right.  But this may be premature,

18  because we don't need to reach it in your case, in view of the

19  position of counsel.  But when we get into these claims of

20  prescriptive rights, I don't think that kind of proof is

21  going to go far enough to prove a prescriptive right.  If I

22  used the water upstream and we took it out of the watershed

23  and people below didn't need it and made no complaint, I don't

24  think that use could ever ripen into a prescriptive right.

25      MR. VEEDER:  I think your Honor added one element in

1    there, though, that I hadn't heard in your previous comments--

2    they didn't need it.   But in this area I believe it would be

3    presumed that the impounding and diversion of water out of

4    the watershed would be an invasion of somebody's rights

5    downstream.

6    THE COURT:  The first time we hit a prescriptive right

7    here that bothers me we will go into it in more detail.   We

8    don't need to do it now.

9    MR. KRIEGER:   I agree with you.

10   I wonder, before we pass on to other things, this con-

11   cludes our witnesses for the time being.   We have some twenty

12   or so more soil reports and witnesses who will presumably

13   go on before the Master, but inasmuch as we have treated this

14   whole case before your Honor I see no reason why, if it is

15   agreeable with you, we can't bring in at a later date the

16   rest of our clients.   And I could conceive that we would try

17   to get together now with Mr. Veeder on these soil reports.

18   Having been over so many of them and having agreed with

19   Col. Bowen's study on almost all of them, we might by

20   stipulation get rid of most of these parcels after identifying

21   them on this map.

22   MR. VEEDER:   The Government is most agreeable to that

23   approach, your Honor.

24   THE COURT:   These other parcels you are talking about

25   now, are these smaller ones?

1    MR. KRIEGER:  They are all named on Roripaugh's B, and

2    most of them are found right here in the middle of Murrieta

3    Creek.  A few of them are out in the outlying lands, which I

4    think we also might be very well able to arrive at a stipula-

5    tion, now that we have gone this far.  There is one that

6    will be heard along with the Searl Brothers, and that is the

7    Domenigoni interests, who are up in Diamond Valley.

8    MR. VEEDER:  I think we count 24.

9    MR. KRIEGER:  And if you would set a date for that

10   sometime next year when we have a chance to go over all these

11   reports, we would be glad to make a day of it that way.

12   THE COURT:  What about Parcel 25?  Have we had proof on

13   it?  That is a big parcel up there.

14   MR. VEEDER:  Borel?  Parcel 25 is Borel.

15   THE COURT:  Yes.

16   MR. KRIEGER:  Yes, we have had that.

17   THE COURT:  We have had proof on that.

18   We have had proof, according to my rough notes here,

19   on most of these larger parcels outside the Murrieta Basin

20   proper.

21   MR. KRIEGER:  That is right.

22   THE COURT:  Except 22.  I don't think we had anything on

23   22, away up at the top end of the map.

24   MR. VEEDER:  We have been dealing on that.  I believe

25   that is the Frick property, isn't it?

1    MR. KRIEGER:  Yes.

2    MR. VEEDER:  I have been talking with Mr. Arthur

3  Littleworth in the hope that we can work out a settlement on

4  that, your Honor.  I am going to get a little data.  I think

5  there is every reason to assume we can settle that.

6    THE COURT: Also, I see two parcels not in the Murrieta

7  basin, Parcels 52 and 9 in Section 32.

8    MR. KRIEGER:  Yes.

9    The same thing, Mr. Veeder.

10   MR. VEEDER:  I think 9 owns two parcels, though.  Isn't

11  that true?

12   MR. STAHLMAN:  Does your Honor think it might be a good

13  idea to designate in some way those already heard, to keep it

14  straight, by circling the number on Exhibit Roripaugh B?

15   MR. KRIEGER:  It is simple to do.  I have them right

16  here.

17   THE COURT:  Check them off if you want to.

18   What is the situation on Parcels 52 and 9?

19   MR. KRIEGER:  I think that Parcel 9 would be in the same

20  category as Parcel 22.  It is away out in the complex.

21   MR. VEEDER:  I think we have already undertaken conver-

22  sations with Mr. Arthur Littleworth on that.

23   THE COURT:  On Parcels 9 and 52?

24   MR. VEEDER:  Yes, your Honor.

25   Isn't that right, Mr. Sachse?

11191

1    MR. SACHSE:  I recall the conversations, but I have no

2    recollection of the number, Mr. Veeder.

3    THE COURT:  The only remaining parcels, outside of the

4    ones we have mentioned, that lie outside this Murrieta basin

5    is this Shamel property at 31.  Did we hear anything on that?

6    MR. VEEDER:  No, and we are extremely anxious to have

7    that tract heard here, because if your Honor will observe that

8    is among the 24 that we have thought it would be desirable to

9    include.  The Shamel property is of interest because it has

10   some hot water wells, as I remember-- warm water anyway.  It

11   being so closely related to Jack Roripaugh's property and the

12   other Roripaugh interests, we thought it would be good to have

13   that heard here.

14   MR. KRIEGER: We are agreeable to that.  It was not in

15   your order.

16   THE COURT:  No.

17   What is the Master going to hear, the matters in the

18   basin or--

19   MR. KRIEGER:  It seems to me there is very little reason

20   to have him hear any of this, if it is agreeable to you to

21   hear them, with the understanding that we have tried to arrive

22   at most of these by stipulation on these reports before that

23   day.

24   THE COURT:  It seems to me that the remaining parcels

25   outside of the ones we have been talking about are clearly in

1    that Murrieta basin.

2    MR. KRIEGER:  They are.

3    THE COURT:  We shouldn't have very much of a problem on

4    that.

5    MR. KRIEGER:  I think no problem at all.  And rather

6    than go to another Master's hearing and acclimate ourselves

7    to a new atmosphere, we would rather wind up.

8    THE COURT:  There are two others.  There are 23 and 14

9    that join Leo Roripaugh's property.  One is Cantarini, and

10   another is Hall.

11   MR. KRIEGER:  I think you have the soil reports on both

12   of those now.

13   If I may, on Exhibit B I will check off the ones that

14   are completed.

15   THE COURT:  You can do that at your leisure.

16   Have you finished the witnesses you have?

17   MR. KRIEGER:  Yes your Honor.

18   MR. VEEDER:  There is one point that came up.  There

19   was a disagreement in regard to the depth of the well on the

20   Guenther Murrieta Hot Springs.  If you recall, Col. Bowen's

21   report was at variance with some of the testimony, as I recall.

22   Col. Bowen's report coincides with Exhibit 16-A-16.

23   As I understand, that was the source of your data?

24   Col. BOWEN:  Yes, sir.

25   MR. VEEDER:  If there is a dispute on it, I think they

1  ought to put in some additional testimony or some additional

2  evidence on it.

3      MR. KRIEGER:  I think there is simply a conflict in

4  testimony.  The well log to which Mr. Veeder is referring is

5  1911 and very likely sometime since that time, as a basis

6  for Mr. Guenther's testimony, that well was rejuvinated.  It

7  must have been sunk a little deeper.

8      THE COURT:  What is that exhibit number, Mr. Veeder?

9      MR. VEEDER:  Exhibit 191 is the engineering report.  The

10 well log is Exhibit 16-A-16.

11     THE COURT:  And which one of the wells is that well log

12 of?

13     MR. VEEDER:  That is 14-J-1.

14     THE COURT:  That is the hot water well?

15     MR. VEEDER: Yes, your Honor.  If you care to look at it,

16 Exhibit 16-A-16 will show it.

17     THE COURT:  All right.

18     When do you think you will be ready to proceed on these

19 many parcels in the Murrieta Valley?

20     MR. VEEDER:  We are due back for a hearing with the

21 Master, if I recall correctly, on January 11.

22     MR. SACHSE:  I think we are supposed to be cleaning up

23 some Rainbow and what else.

24     MR. VEEDER:  I am going to talk to Mr. Cranston.

25     MR. SACHSE:  We are not going into a new watershed, as

1    I understood it.

2         MR. VEEDER:   No.  I am going to talk to Mr. Cranston

3    about exactly what he wants to cover.  But that is our schedule.

4         MR. SACHSE:   As I understood it, if we don't go into a

5    new watershed, I informed Mr. Cranston on this very subject

6    because I was not clear what the 11th hearing would be.  The

7    11th hearing should be very brief, unless we jump over into

8    Wilson Creek or something like that.

9         THE COURT:   Mr. Veeder, have you found out when your

10   reservations are to return to Washington?

11        MR. VEEDER:   I can get onto an airplane on Tuesday, and

12   that is about as good as I can do.

13        THE COURT:   Next Tuesday?

14        MR. VEEDER:   That is right.  I was pondering what would

15   happen if I didn't get home for Christmas.

16        MR. STAHLMAN:   I have an argument in the Appellate Court

17   on Tuesday of next week, your Honor.

18        THE COURT:   What do you have to do the rest of this week?

19        MR. VEEDER:   It is entirely up to Mr. Stahlman.

20        MR. STAHLMAN:   We can proceed with the Henderson case,

21   your Honor.

22        THE COURT:   Are you ready to proceed this afternoon or

23   tomorrow morning or what?

24        MR. STAHLMAN:   This afternoon or tomorrow morning,

25   whichever meets the convenience of the Court.

1      THE COURT:  You say the Henderson case?

2      MR. STAHLMAN:  Yes.  That is one of the intervenors who

3  wound up in the stipulated judgment.  I will represent Dr.

4  Henderson.

5      MR. VEEDER: He is in the courtroom, isn't he?

6      THE COURT:  Let's see if I understand this.  Playtor

7  is a party to the stipulated judgment.

8      MR. STAHLMAN:  Yes.

9      THE COURT:  And Henderson has since acquired his interest.

10      MR. STAHLMAN:  Yes.

11      THE COURT:  And you represent Henderson?

12      MR. STAHLMAN:  Yes, your Honor.

13      THE COURT:  And you want to put some proof on in connec-

14  tion with his case.

15      MR. STAHLMAN:  That is correct.

16      THE COURT:  He is here and available today?

17      MR. STAHLMAN:  Yes.

18      THE COURT:  Then tomorrow morning are you prepared to

19  start on your case?

20      MR. STAHLMAN:  Yes.  We can do it tomorrow morning or,

21  if your Honor wants it at a later date, it's all right.

22  However, we are ready to go tomorrow morning.

23      I have this situation.  I anticipated presenting Mr.

24  Vail as a witness, but he is unable to testify at this time.

25  He has undergone an operation.  He is just recuperating.  He

1    had one setback, and I don't think he is in condition to

2    testify until probably after the first of the year sometime

3         THE COURT:   Tomorrow is Thursday.   You have witnesses

4    that you can put on Thursday and Friday?

5         MR. STAHLMAN:   Yes.

6         MR. GIRARD:   You will go Friday, too, George?

7         MR. STAHLMAN:   I think we will finish tomorrow, your

8    Honor, unless we get into some of these long discussions in

9    relation to matters pertaining to the stipulated judgment,

10   and then it may be somewhat protracted.   However, we can let

11   the legal arguments go to some other date if you want to.

12        THE COURT:   Let's take a recess and then hear the

13   Henderson testimony, and tomorrow morning you start in.

14        MR. STAHLMAN:   Very well.

15        (Recess.)

16        (Another matter.)

17        THE CLERK:   The case on trial, 1247-SD-C, United States

18   vs. Fallbrook.

19        MR. STAHLMAN:   Your Honor, let the record show that I

20   am representing Dr. Henderson, who is present in court.   He

21   has appeared previously.   He had an Answer filed by some

22   attorneys, I think from Santa Ana, and then he appeared in

23   propria persona on some pleadings that were filed after the

24   amended and supplemental complaint.

25        THE COURT:   Was there a substitution substituting him

1   in pro per in place of these other attorneys?

2       MR. STAHLMAN:  No, there never was a substitution, your

3   Honor.

4       THE COURT:  Will you prepare a substitution?

5       MR. STAHLMAN:  I will.  I thought that he being here in

6   court can himself state.  In the State Court we did it that

7   way.

8       THE COURT:  All right.

9       MR. STAHLMAN:  If you want a written substitution, I can

10   prepare it.

11       THE COURT:  Call him up here.

12       MR. STAHLMAN:  Come up here, Dr. Henderson.

13       Do you want him under oath at this time?  I am going to

14   call another witness first in his case.

15       THE COURT:  Well, you previously have appeared through

16   some other attorney; is that right?

17       DR. HENDERSON:  That is right.  That was five years ago

18   that we started that, your Honor.

19       THE COURT:  And then you filed some pleadings in your

20   own name.

21       THE WITNESS: Yes.

22       THE COURT:  Now you want to employ Mr. Stahlman as your

23   attorney?

24       DR. HENDERSON:  That is right.

25       MR. STAHLMAN:  And you have notified the other attorneys

1      and they have communicated with me at one time.

2          DR. HENDERSON:  They have communicated with you fully,

3      I believe.

4          THE COURT:  Let the record show that Mr. Stahlman is your

5      attorney.

6          What is your full name?

7          DR. HENDERSON:  Max M. Henderson.

8          MR. STAHLMAN:  Sit over there, Doctor, where I can talk

9      to you.

10          I will call Col. Bowen.

11

12                      ALLEN C. BOWEN,

13      heretofore called and sworn, called as a witness on behalf

14      of the defendant Max M. Henderson, testified as follows:

15

16                    DIRECT EXAMINATION

17      BY MR. STAHLMAN:

18          Q  Col. Bowen, are you acquainted with the defendant

19      Dr. Henderson?

20          MR. VEEDER:  Your Honor, at this point I want to inter-

21      pose an objection on the grounds that there has been no

22      proof of title of Max M. Henderson.  However, I am informed,

23      and believe, that he is successor in interest from intervenor

24      Phillip Playtor, whose name appears in Section Fourth of the

25      stipulated judgment.  I understand, moreover, that the Playtor

1   properties were involved in the case of Rancho Santa Margarita

2   vs.  Vail in the Superior Court of San Diego County in Case

3   No. 42850; that a judgment was duly entered in that case, and

4   that no appeal was taken by Playtor or by the successors in

5   interest of Playtor.  The result being that the United States

6   having succeeded to the interest of the Rancho Santa Margarita,

7   the result being, in my view, that this is res adjudicata,

8   that the matter has been settled, and that as successor in

9   interest to the Rancho Santa Margarita the matter is completely

10  concluded, that all evidence would be irrelevant and immaterial

11  and not tending to prove any fact in this case or any issue

12  that is involved.

13      MR. SACHSE:  Let the record show that Fallbrook joins in

14  the objection, your Honor.

15      MR. VEEDER: I would like the record to show that that is

16  the first time the United States and Fallbrook have agreed on

17  anything.

18      MR. STAHLMAN:  I don't think for the same reason, however.

19      THE COURT:  It is true that there have been no pleadings

20  filed with reference to Henderson's claim to be relieved from

21  this judgment.

22      MR. SACHSE:  Yes, he has, your Honor.

23      MR. STAHLMAN:  There is an amendment to the Answer.

24      THE COURT:  Then the same issues are generally involved

25  as in the Vail case?

1      MR. SACHSE:  Yes, your Honor.

2      THE COURT: But if the Court should grant the relief

3  asked by Vail, it will automatically grant it of its own

4  volition as to all other parties who might be affected by

5  those prior judgments and decrees.

6      MR. VEEDER:  Perhaps I didn't make myself clear, your

7  Honor.  I believe the Playtor properties-- and I am conderned

8  about the dearth of facts in regard to some of these matters--

9  I believe that the properties of Max M. Henderson are in a

10  somewhat different category.  True, there is reference made

11  to them in the stipulated judgment.  And of course my

12  objections have already been made that the stipulated judgment

13  is binding and enforcible in all of its terms.  But I believe

14  there is an additional element here, that no appeal having

15  been taken and the Superior Court judgment having become final,

16  I believe that the effect of that judgment is entirely different

17  than the stipulated arrangement which we have with Vail.

18      THE COURT:  Do the pleadings by Henderson attempt to set

19  aside the first judgment entered in the Vail case?

20      MR. STAHLMAN:  I will ask that they be amended to set

21  aside both judgments, the original judgment and the stip-

22  ulated judgment.

23      MR. VEEDER:  Well, they don't now.

24      THE COURT:  He was not a party to the stipulated judgment,

25  was he?

1    MR. VEEDER:  He is only referred to.

2    MR. STAHLMAN:  He is designated in the stipulated judg-

3 ment.

4    THE COURT:  But he didn't stipulate to anything at the

5 time the judgment was entered.  On page 69 of the findings--

6 I have a summary of them-- he is mentioned on page 69.

7    MR. SACHSE:  He is mentioned at the very beginning in the

8 preamble, your Honor.  The preamble of the stipulated judgment

9 states, "Said intervenors (Playtor being one of them) didnot

10 appeal from said  judgement."  That is the original trial

11 judgment.  But now they haveincluded him in the stipulated

12 judgment, and the pleadings at this moment-- I certainly have

13 no objection to Mr. Stahlman's request to amend, but at this

14 moment the pleadings only move to set aside the stipulated

15 judgment, not the original judgment, which would of course pose

16 a very different problem.

17    THE COURT:  In the findings and conclusions in the Vail

18 decree that went up on appeal, Playtor, the intervenor and

19 successor in interest to Henderson, is mentioned on page 69,

20 and as I understand Playtor did not appeal and that judgment

21 became final.

22    MR. STAHLMAN:  That is right.

23    THE COURT:  And that subsequently there is reference to

24 Playtor in the stipulated judgment, but so far there has been

25 no proof in this court that the intervenors ever stipulated.

1    MR. VEEDER:  That is right.

2    THE COURT:  Therefore, in the present state of the record

3    this man appears to be bound by the original judgment which

4    was appealed from only by Vail and was not appealed from by

5    the intervenors, and if the pleadings on file by Henderson

6    do not make an attack upon the original judgment entered

7    permission will be granted to file the necessary amendment

8    and the objection of the Government is overruled without

9    prejudice to what may develop.

10    I don't see any difference in legal effect in setting

11    aside a stipulated judgment and setting aside the original

12    judgment that bound the intervenors.

13    MR. STAHLMAN:  I don't think there is.

14    THE COURT:  If there is grounds to do so.

15    MR. VEEDER:  Your Honor, I truly don't believe that this

16    Court could conceivably set aside a judgment of a state court.

17    I believe you might restrain its enforcement.

18    MR. STAHLMAN:  That is right.  That is the method by

19    which it is done.  That is in our brief.  We will cover that

20    completely, your Honor.

21    THE COURT:  Aside from the relief that the Court might

22    grant, do you think there is a difference in the binding

23    effect of the so-called stipulated judgment and the earlier

24    judgment?

25    MR. VEEDER:  Well, your Honor, you are asking me an

1    extremely difficult question.  There is a difference, yes,

2    I will say that.  But this matter is compounded by somany

3    pleadings.  I was trying to get them together today to find

4    out exactly what the issues are.  I don't know myself.  But I

5    do know that there is a difference.

6    $^H$ere is a decree from which no appeal was taken, no

7    effort to set it aside in the Superior Court of San Diego

8    County, a decree that has been in force and effect for thirty

9    years.

10    THE COURT:  I know all that.  What is the difference in

11    effect between the judgment entered by the Superior Court of

12    San Diego County on the stipulation between Vail and Santa

13    Margarita and the judgment previously entered against the

14    intervenors, from which they did not appeal?

15    MR. VEEDER:  I would say that the stipulated judgment

16    would have far more binding effect than just the ordinary

17    judgment, your Honor.

18    THE COURT:  In other words, you mean it would be harder

19    for this Court to grant relief to Vail than it would be to

20    Playtor's successor, Henderson.  Is that it?

21    MR. VEEDER: Well, I wouldn't go that far, your Honor.

22    MR. SACHSE:  I disagree, your Honor.

23    MR. VEEDER:  I think they are both equally binding.  I

24    think they are res adjudicata.  I think they are long gone

25    from the standpoint of being the subject of attack.

1    THE COURT:  Your objection is overruled, without prejudice

2  to your motion later to strike the evidence or to urge the

3  Court to find in line with your objection.

4    MR. SACHSE:  One objection, for the record only-- and I

5  will state right now that I consent to the amendment-- I have

6  read these pleadings very hastily, but I don't think there is

7  any possibility that as presently written they claim a

8  prescriptive right.  I agree that Dr. Henderson may have a

9  prescriptive right, but it isn't pleaded.

10    MR. STAHLMAN:  That may be,

11    THE COURT:  Well, Mr. Stahlman is always very happy to

12  have the Court and counsel to advise him on what to put in

13  his pleadings.  He will be duly advised to look into that.

14    How much time will you want to get this amended pleading

15  in?

16    MR. STAHLMAN:  I think by the time we get back to court

17  after the first of the year I can have it in.

18    THE COURT: Say January 11th?

19    MR. STAHLMAN:  Very well..

20    THE COURT: This is a date to have them filed.

21    MR. VEEDER:  Wait a minute.  Have we fouled this thing

22  up again so that we are not going to do anything this after-

23  noon?  I should have been quiet.

24    THE COURT:  No, we are going ahead, with permission later

25  on, in substance, to amend to conform to the proof or whatever

1   documents Mr. Stahlman wants to file.

2        MR. STAHLMAN:   I can always file a better pleading after

3   I have heard the evidence.

4        MR. VEEDER:   I was going to say that I hope there is

5   conformity between your pleadings and the evidence.

6   BY MR. STAHLMAN:

7        Q  Are you acquainted with Dr. Henderson?

8        A Yes, sir.

9        Q  Do you know where his property is located?

10       A  Yes.

11       Q  Have you been on the property?

12       A  Yes.

13       Q  And have you made a survey of the property?

14       A  Yes, sir.

15       Q  Directing your attention to this map which we have

16   marked as Henderson's B, do you recognize the general location

17   of that property as confined within the red lines shown on the

18   exhibit?

19       A  Yes, sir.

20       Q  Have you been on the property yourself?

21       A  Yes, sir.

22       Q  And made a survey of the property?

23       A  Yes, sir.

24       Q  Do you have the survey with you?

25       A  I might say that we have made two surveys of this

1   property, Mr. Stahlman.  The first one was made in November,

2   1951, at which time I met Dr. Henderson on his property and

3   we didn't have the aerial photos to serve as a base for our

4   soil survey at that time, so we used the plane table method.

5   In this rough country it is extremely difficult to make

6   accurate plane table surveys.  However, we did prepare a map

7   and submitted a report to Dr. Henderson.  And subsequently he

8   asked us to review our findings on that first report, which

9   we did in 1958, at which time we did have adequate aerial

10  photo coverage to supply a base for additional reports, and

11  we submitted to Dr. Henderson under cover of a letter signed

12  by me a portion of a photo reproduction of a vertial aerial

13  photo.  However, we have not submitted to him one of these

14  complete blue bound reports.

15      Q  You did, however, make a survey as to the acreage of

16  the property and the present condition of the property?

17      A  Yes, sir, we made a soil survey of the property.

18      THE COURT:  Do you have sufficient notes thatyou can

19  testify to the acreage, the irrigable acreage, et cetera?

20      THE WITNESS: Yes, sir, I do.

21  BY MR. STAHLMAN:

22      Q  Will you tell us what you found in connection with

23  your investigation of the Henderson property?

24      MR. VEEDER:  Mr. Stahlman, have you offered Henderson's

25  Exhibit B?

1    MR. STAHLMAN:  I will offer it at this time.

2    MR. VEEDER:  I don't know myself.  Where did that come

3  from, George?

4    MR. STAHLMAN:  From Dr. Henderson.

5    MR. VEEDER:  It is all right with me.  I didn't know

6  where it came from.

7    THE COURT: All right, Henderson's Exhibit B is received

8  in evidence, and also Henderson's Exhibit A, excerpts from the

9  judgment, and also without prejudice to the Government and

10  to Fallbrook's position in the matter.  That is, you may later

11  move to strike the exhibit, and go ahead and take all of the

12  exhibits in evidence subject to your continuing objection.

13    MR. VEEDER:  That's all right.

14    THE WITNESS:  Our latest survey of the property of Dr.

15  Henderson showed 22½ acres of irrigable land, all of which,

16  in my opinion, are suited to the culture of avocados.

17  BY MR. STAHLMAN:

18    Q  What is the total acreage of the Henderson piece?

19    A  I believe it to be 280 acres.  It consists of the

20  South Half of the South Half and the Northwest Quarter of the

21  Southeast Quarter of Section 33, and the Southwest Quarter

22  of the Southwest Quarter of Section 34, Township 8 South,

23  Range 3 West, San Bernardino Base and Meridian.  That would

24  be 240 acres rather than 280, which I had previously mentioned.

25    THE COURT:  The prior findings refer to 240 acres.  There

1  has been no change, I take it, since then?

2       THE WITNESS:  No, sir; 240 acres is the correct figure,

3  your Honor.

4       THE COURT: All right.

5  BY MR. STAHLMAN:

6       Q  Directing your attention to an aerial photo map and

7  several pieces of paper attached thereto--

8       THE COURT:  Why don't you leave them together as one

9  exhibit?

10       MR. STAHLMAN:  There is a field study by Dr. Coit in

11  here.

12       MR. VEEDER:  Oh, no.

13       MR. STAHLMAN:  Oh, yes.

14       Q  Well, these documents which I am showing you here,

15  are those documents which you prepared and submitted to Dr.

16  Henderson?

17       A  The aerial photo reproduction, with the land capability

18  classes in color, was prepared in my office under my direction.

19       THE COURT:  Is this the 1958 report you are talking about?

20       THE WITNESS:  Yes, sir, this report was submitted to Dr.

21  Henderson in 1958, with a copy of the photo reproduction which

22  I hold.

23       MR. VEEDER:  Is this an exhibit?

24       MR. STAHLMAN:  Not yet.  I am just identifying it for

25  the purpose of marking it.  I thought he had a copy and I was

1    going to use yours, as we did in other cases.  But now that we

2    don't, we are using this one.

3        THE WITNESS:  The letter which transmitted the soil survey

4    on the aerial photo base is contained here with my signature

5    thereon dated 29 January, 1958, and addressed to Dr. Max

6    Henderson.  The sheet entitled "Map Symbols" is the legend

7    which is customarily inclosed with our engineering reports

8    to explain the soil symbols contained on the map.  The water

9    duty for agricultural crops is a form which is enclosed with

10   our engineering reports, and the final document dated 27

11   November, 1951, entitled "Engineering Report M. M. Henderson

12   property" is the one which followed my investigation of that

13   property on 5 November, 1951.

14       THE COURT:  All right, the entire group will be marked

15   Henderson's Exhibit C for Identification.

16       Any objection to the receipt in evidence of Exhibit C?

17       MR. SACHSE:  No objection.

18       MR. VEEDER:  Under the same circumstances.

19       THE COURT:  Exhibit C received in evidence, subject to

20   the continuing objection of Fallbrook and the United States.

21       (Henderson's Exhibit C was received in evidence.)

22   BY MR. STAHLMAN:

23       Q  Will you describe to the Court what you observed in

24   connection with the cultivation of the acreage on the Henderson

25   place which you found to be susceptible of reasonable and

1   profitable irrigation?

2       A  Dr. Henderson had a portion of that planted in avocados,

3   which he irrigates with water from the Santa Margarita River.

4       THE COURT:  How many acres in avocados?

5       THE WITNESS:  In 1951, your Honor, there were 14 acres,

6   and I believe Dr. Henderson has increased that since then, but

7   I don't know the area of the increase.

8       MR. SACHSE:  That was in 1951 there were how many?

9       THE WITNESS:  14.

10  BY MR. STAHLMAN:

11      Q  What did you determine the water duty for this land

12  to be?

13      MR. VEEDER: For what crops?

14      THE WITNESS:  I consider the land suited to avocados,

15  and considering that crop I came up with a water duty of 2.35

16  acre-feet per acre per year.

17      THE COURT:  2.35?

18      THE WITNESS:  Yes, sir.  That is the field duty water

19  applied to the land, your Honor.

20      I might add, your Honor, that that is exclusive of

21  rainfall.

22      THE COURT:  Exclusive?

23      THE WITNESS:  Exclusive of rainfall, which I don't

24  believe was taken into consideration by the Farm Advisor

25  of Riverside County.

1    THE COURT:  You are using the word "exclusive."  Do you

2 mean that the total water duty is 2.35 acre-feet and if there

3 is rainfall then the water duty is decreased?

4    THE WITNESS:  No, sir.  That under periods of normal

5 precipitation this amount of water, 2.35 acre-feet of water,

6 would have to be applied.

7    THE COURT:  In other words, it assumes a normal rainfall?

8    THE WITNESS:  Yes, sir.

9    THE COURT:  Which would be in addition to the 2.35?

10   THE WITNESS:  That is correct, your Honor.

11 BY MR. STAHLMAN:

12   Q  In connection with the document that you transmitted

13 to Dr. Henderson on January 29, 1958, you indicated therein

14 a total irrigable acreage of 22.5, with an annual water duty

15 of 52.9 acre-feet; is that correct?

16   A  Yes, sir.  The 52.9 is arrived at by multiplying 22½

17 acres by 2.35 acre-feet.

18   Q  That is your opinion at this time that that is the

19 water duty?

20   A  Yes, sir.

21   THE COURT:  This property lies astraddle of the Santa

22 Margarita below the Narrows?

23   THE WITNESS:  Yes, sir, it is right astraddle of the

24 canyon or narrows section of the Santa Margarita River, bounded

25 on the south by the Riverside County line.

BY MR. STAHLMAN:

Q  And you also observed that there is a home place on the ranch?

A  Yes, sir.

THE COURT:  Does this property have any wells on it?

THE WITNESS:  The primary diversion, your Honor, is from direct stream flow in the Santa Margarita River.  The diversions as they were in 1951 are described in the engineering report of 27 November, 1951.

BY MR. STAHLMAN:

Q  Did you in any of your investigations ever learn the historical diversion to this property, some parts of this property, from an older filing?  Are you familiar with that, Colonel?

A  No, I never went into the matter of filing, Mr. Stahlman.

MR. STAHLMAN:  That's all.

THE WITNESS:  I do know that there was an additional well described in our report here, namely, the well located on the North Fork of Stone Creek, which is described in the 1951 report.

BY MR. STAHLMAN:

Q  Where would that be on this aerial map, Henderson Exhibit B?

A  Stone creek is the drainage which enters from the

1    right on Henderson's B and has its confluence with the

2    Santa Margarita River immediately south, about 1200 feet

3    south of the southern property line of Max Henderson; and the

4    north fork of Stone Creek, which is described in our 1951

5    report, is the drainage which runs diagonally from the

6    northeast corner of the property down through the property

7    to its confluence with the other fork of Stone Creek, the

8    south fork.

9       THE COURT:  Where is this well with reference to Stone

10   Creek?

11      THE WITNESS:  The well is described as being on the north

12   bank, your Honor.  There is a red dot on Henderson's B which,

13   I believe, is approximately at the position of the well.  That

14   description, your Honor, is the last paragraph of the first

15   page of our engineering report of 1951, described as near the

16   southwest corner of the Southwest Quarter of Section 34,

17   Township 8 South, Range 3 West, San Bernardino Base and

18   Meridian.

19   BY MR. STAHLMAN:

20      Q  These documents that are contained in Henderson's C,

21   are those all of the documents which you prepared in connection

22   with your study of the Henderson property?

23      A  No, sir.  I have mentioned, Mr. Stahlman, that we did

24   make a map to accompany this 1951 report, which was on a plane

25   table base, and that map is not included with Henderson's

Exhibit C.

Q  However, this map that is a part of Henderson's C
you believe to be the correct map as of the time on which the
map was made, sometime in 1958?

A  Yes, sir.  The field work was actually done in
December, 1957, in preparation of this aerial photo which
accompanies Henderson's C, and that is the more accurate of
the two, as I have previously testified.

THE COURT:  The report in 1951 also mentions a third
diversion point, a non-flowing spring.  Where is that spring
located?

THE WITNESS:  That spring your Honor, as I recall, is
in one of these little draws which drains into the Santa
Margarita River from the west to the east.  I am not sure
just which one of those draws the spring was located in at the
time.  It is described here as near the center of the
Southeast quarter of the Southwest Quarter of Section 33,
Township 8 South, Range 3 West, San Bernardino Base and
Meridian.

THE COURT:  What kind of material is the soil in that
area?

THE WITNESS:  Basement complex, your Honor, very steep,
precipitous land, with an extremely thin mantle of soil.

THE COURT:  What would you say would be the source of the
spring?  Would it be part of the Santa Margarita stream system,

1   or would it be vagrant, percolating water or water found in

2   cracks and crevices?

3        THE WITNESS:  No, sir.  Undoubtedly emanating from cracks

4   and fissures in the basement complex there, and in my opinion

5   not part of the stream system.

6   BY MR. STAHLMAN:

7        Q  That would be true, Colonel, of any springs in that

8   general area, that character of terrain?

9        A  Yes, sir, I would say any springs outside the river

10  itself would be local water, in my opinion.

11       Q  The area that is planted to avocados of approximately

12  22.5 acres is land which gently slopes toward the river, does

13  it not?

14       A  Part of it is rather gently sloping.  I note in the

15  aerial photo which forms a part of Henderson's C that it ranges

16  from about 4% to 16% in the vicinity of the house.  The Class

17  IV land that is colored blue on Henderson's C is in the range

18  of 16% slope, and the yellow land, Class II, colored yellow

19  on Henderson's C, ranges about 4%.

20       MR. STAHLMAN:  Cross-examine.

21       THE COURT:  Does the Government care to comment on how

22  the Court in the previous case found that Mr. Henderson had

23  60 tillable acres-- and I take it by that that they meant

24  irrigable also-- and very generously allowed him one miner's

25  inch for domestic use only?

1      MR. VEEDER:  Did you inquire?

2      THE COURT:  Yes.  I mean, you are supporting this

3  judgment.  My notes show that the prior finding was that he

4  had a total of 240 acres, 60 acres tillable, and as I remember

5  my notes they allowed one miner's inch for domestic use only.

6      MR. VEEDER:  I think that is in the stipulated judgment,

7  your Honor.

8      MR. SACHSE:  It is in the judgment.

9      THE COURT:  I am reading from the findings.

10     Where is your excerpt, Exhibit A?

11     MR. SACHSE:  What page of the findings, your Honor?

12     THE COURT:  Page 69 my notes show.

13     MR. STAHLMAN:  Your Honor will find that in the original

14  judgment also.

15     THE COURT:  I am talking about the original findings

16  and conclusions, looking at page 69.  They talk first about

17  Prator,  and on page 70 they go to Schloss.

18     MR. VEEDER:  The fact is that it is entirely possible

19  to have areas which are tillable and cultivatable, but it

20  would not be economically feasible to apply water to them,

21  and that was going to be a part of the cross-examination of

22  Col. Bowen that I was going to bring out.

23     THE COURT:  I will hear you.

24     Let me see the findings.

25

       MR. SACHSE:  I think it just an example of why I have

1    consistently objected to evidence of irrigable acreage.  Here

2    was competent court, with competent witnesses, who said that

3    it was not susceptible to practical and profitable irrigation.

4    Here is Dr. Henderson, who is profitably growing avocados on

5    it today.  That is why I don't want evidence of irrigable

6    acreage, et cetera.

7         MR. VEEDER:  You don't want to hear from me in response to

8    Mr. Sachse, I am sure.

9         THE COURT:  Let me just read this a minute.

10        On page 69, line 20, they said:

11             "That said intervenor was not using

12             during the year 1928, but prior thereto

13             for short periods and at irregular intervals

14             had used, water from said river for irrigating

15             portions of said 60-acre parcel, and for

16             this purpose had used amounts of from 2 to

17             3 miner's inches, but not continuously,

18             and had not used a constant flow of water

19             in any amount.  That in 1928 said land was

20             not under irrigation, and at that time crops

21             were not being grown upon it. . "

22        Earlier the court had made the finding, at line 14 to

23   line 19, that 60 acres contiguous and easterly of the surface

24   channel of the river are tillable or susceptible of cultivation,

25   but are not susceptible  of practical or profitable

1    irrigation from the Santa Margarita River.

2         All right.

3         MR. VEEDER:  May I cross-examine, your Honor?

4         THE COURT:  You may.

5

6                        CROSS-EXAMINATION

7    BY MR. VEEDER:

8         Q  Col. Bowen, what is the elevation of the lands which

9    are presently being irrigated by Dr. Henderson as they

10   relate to the Santa Margarita River or Stone Creek?  Do you

11   have that data?

12        A  If I may have the U.S.G.S. topographic map which is

13   in evidence, the Temecula Quadrangle, as I recall, the 29

14   Series, I could answer that question, Mr. Veeder.

15        THE COURT:  Mr. Clerk, in your absence Henderson's

16   Exhibits A, B, and C were received in evidence, Exhibit C

17   being a soil survey.

18        MR. STAHLMAN:  Your Honor, may I make an explanation in

19   connection with Exhibit A?  I asked Dr. Henderson to get a

20   copy of the original judgment, and he brought in just that

21   portion of the judgment that refers to his property.

22        THE COURT:  That is what I asked.  We have the other.

23        MR. STAHLMAN:  Yes.

24        THE WITNESS:  Referring to Plaintiff's Exhibit 29-K, it

25   is noted that the 480-foot contour along the Santa Margarita

1    River at the point where the river departs from Section 33,

2    8 South, 3 West is the lowest spot on the Henderson property,

3    or approximately the lowest spot.

4    BY MR. VEEDER:

5         Q  Is that the river elevation, Colonel?

6         A  Yes, sir, that is the elevation at the stream level.

7    And the area around the house on the Henderson property,

8    which is presently being irrigated, rises to about six to

9    six hundred twenty feet above sea level, which is a difference

10   of around 120 to 140 feet from the stream level to the higher

11   portion of the irrigated ground.  Some of the area increase,

12   of course, is as low as 540 feet above sea level, which is

13   only 60 feet above the lowest point of the stream bed.

14        MR. STAHLMAN: What was that last part?

15        THE WITNESS: I say that the irrigated area on the Henderson

16   property ranges from approximately 60 feet to 160 feet above

17   the lowest point of the stream bed on that property.

18   BY MR. VEEDER:

19        Q  Do you know the source of the waters that are presently

20   used?  Is he using Stone Creek water or Santa Margarita?

21        A  By far the largest supply available to Dr. Henderson

22   is from the Santa Margarita River.  I don't know what proportion

23   of the water that he extracts from Stone Creek is used, but

24   I would say that a limited quantity available from Stone Creek

25   and the bulk of his water for irrigation at least is taken from

the river.

Q   The 140-foot lift, have you considered the cost of such an operation as that?

MR. STAHLMAN:   I object to that as being incompetent, irrelevant and immaterial.

MR. VEEDER:   No, his Honor raised a very important point.

THE COURT:   Overruled.

THE WITNESS:   I considered it in this way, Mr. Veeder, that I compared the physical situation with that of other similar developments in this area and found it to be relatively common practice throughout.   There are some areas lifting water much higher than that for irrigation of avocados.

BY MR. VEEDER:

Q   And the means that are used here, is it an electric pump?

A   Yes, sir.   The reason I hesitated, he has a standby, or did have a standby Diesel-driven pump which he uses when the electricity fails, I guess.

Q   Have you had occasion to consider the cost of irrigating lands at an elevation in this area thirty years ago before the present methods of diversion and application of water to beneficial use had been developed?

A   No, sir.

Q   Have you compared the irrigated areas set forth on Henderson's Exhibit B with your own soil survey?   We have

1   Exhibit B showing the lands that are irrigated.   Are they the

2   same?

3       A  Well, there may be a little difference.   The photo

4   contained as a part of Henderson's B is from aerial photography

5   flown in 1955.

6       MR. STAHLMAN:  You meant C.

7       THE WITNESS:  Henderson's C.  Thank you, Mr. Stahlman.

8   Henderson's C is 1955 photography, and Henderson's B, it appears,

9   was taken in 1953.

10      MR. VEEDER:  All of this can be straightened out by

11   examination of Dr. Henderson.   I will ask no further questions.

12      THE WITNESS:  The area in avocados  which is pictured on

13   Henderson's B appears to be very similar to the area in

14   avocados contained on the photograph which is part of Henderson's

15   C.

16      THE COURT:  What kind of crops are down in this area?

17      THE WITNESS:  That is avocados, your Honor.

18      THE COURT:  What is this in here?

19      THE WITNESS:  That is in avocados, too, with the house

20   and outbuildings-- these dark dots shown north of the culti-

21   vated field on Henderson's property.

22  BY MR. VEEDER:

23      Q  The soil there that is being utilized, is that

24   residuum?

25      A  Yes, in that it is weathered in place.   The soil is

1    derived from the basement complex which underlays it.

2        Q  It is not transported, in other words?

3        A  No, sir, it is not transported.

4    MR. VEEDER:  I have no further questions of Col. Bowen.

5    MR. STAHLMAN:  I have a few on redirect.

6

7                REDIRECT EXAMINATION

8    BY MR. STAHLMAN:

9        Q  This matter, Col. Bowen, of cost of elevating the

10   water, do you know of places on the Santa Margarita where,

11   for irrigation purposes, the water is being raised as much

12   as five and six hundred feet?

13       A  Yes, sir, I do.

14       Q  And in some cases more than that, isn't that true?

15       A  Yes, sir.

16       Q  Now, the riverbed, the point of the riverbed up to

17   where the grove starts on the bank of the river, that is a

18   rather precipitous bank there, is it not?  It raises rapidly

19   and then the ground from there on is of a more gentle sloping

20   nature?

21       A  Yes, sir, that is correct.

22   THE COURT:  May the Colonel step down?

23   MR. STAHLMAN:  Yes, your Honor.

24       I will call Dr. Henderson.

25

1          MAX M. HENDERSON,

2 one of the defendants herein, called as a witness in his

3 own behalf, being first duly sworn, testified as follows:

4          THE CLERK:  State your name, please.

5          THE WITNESS:  Max M. Henderson.

6

7                    DIRECT EXAMINATION

8 BY MR. STAHLMAN:

9          Q  Where do you reside, Dr. Henderson?

10          A  On the Willow Glen Road out of Fallbrook.

11          Q  May we refer to you as Dr. Henderson?  Will you tell

12 us how you come by that title?

13          A  Well, I formerly practiced dentistry for about forty

14 years.

15          Q  Where do you reside?

16          A  Willow Glen Road, Fallbrook.

17          Q  What is the nature of the property at that place?

18 What kind of property is it, generally speaking?

19          A  It is a mountainous area, with spots that are better.

20          Q  When did you acquire the property?

21          A  Acquired the property either in late '41 or early '42.

22          Q  Do you know it to be the property that was in liti-

23 gation in the Santa Margarita vs. Vail lawsuit as the Playtor

24 property?

25          A  I purchased the property from Mr. Phillip Playtor.

1    However, I never heard of that suit until this case was filed

2    in 1951.

3        Q  Did you acquire the entirepiece in one transaction?

4        A  Yes, sir.

5        Q  When was that?

6        A  Late '41 or early '42.  It was negotiated for some-

7    time.  I don't know when the deed was recorded.

8        Q  What was the use to which the property was being put

9    at that time, if any?

10       A  At thattime immediately it was not being put to use.

11   Just prior to that, that is, within a month or so, it had been

12   used as a pasture for Cashmere Goats.

13       Q  How soon after you acquired the property did you start

14   to develop it?

15       A  Well, we started some development immediately, but

16   the water intervened and we could not carry on then for some

17   period of time.

18       Q  What is on the property at the present time in the

19   way or productive vegetation?

20       A  According to Col. Bowen's survey, I believe it is

21   about 16 acres of avocados.

22       Q  Do you grow anything else on that property beside

23   avocados?

24       A  Yes, we grow garden stuff and berries, things we can

25   eat ourseves.

1    Q   Do you have your home on the property?

2    A   Yes.

3    Q   When was the home built?

4    A   When we acquired the property there was a one-room

5 cabin on it.  We have added to that and improved it a little

6 at a time.  Most of it was built-- well, part of it was built

7 in '52, and again a part in '56 or '57.

8    Q   Do you live on the property permanently at the present

9 time?

10    A   Yes, sir.

11    Q   How long have you lived there as your home?

12    A   Approximately five years.

13    Q   Prior to that what use did you make of the property?

14    A   Slowly improving it when we could.

15    Q   Sort of a weekend farmer, were you?

16    A   That is right, mostly weekends.

17    Q   When did you set out your avocado grove?

18    A   They were set out over a considerable period of time.

19 Some were set out in '49, and added to from time to time,

20 mostly '49 and '50, the majority of it.

21    Q   At the time you acquired the property was there any

22 facility for the use of water on the property?

23    A   Not at that time, no.  There had been, but not at that

24 time.

25    Q   Do you know what prior thereto had been the source

1  of supply of what water was used there?

2      A  They had pumped water out of the Santa Margarita River

3  for both the goat ranch and the chicken ranch.

4      Q  Was there a pumping facility on the ranch at the time

5  you acquired it?

6      A  No, they had removed that.

7      Q  When did you first start utilizing water from the

8  river?

9      A  I don't think we started using water from the river

10 until about '48, '49.

11     Q  Prior to that what was the source of supply?

12     A  Spring.

13     Q  Where is the spring located from which you used

14 domestic water?

15     A  May I approach the map?

16     THE COURT:  Yes, sir.

17     THE WITNESS:  About '42 we developed a spring at this

18 point.  It had partly been developed by Mr. Playtor.  We ran

19 a pipe line across here and a cable across the river and ran

20 it up to the house and used that for domestic water supply.

21     THE COURT:  Indicating to the west of the riverbed 700

22 feet or more.

23     THE WITNESS:  That is right.

24     MR. STAHLMAN:  That is on Henderson's B, and there is a

25 little red crossmark at the point where he indicated.

1      THE COURT:  The lowest one of three.

2      MR. STAHLMAN:  Yes.

3      Q  By the way, were there other springs on the ranch

4  at the time?

5      A  There are intermittent springs in this canyon, and

6  this canyon, but they are intermittent.

7      THE COURT:  Marked with red dots also?

8      THE WITNESS:  That is right.

9      THE COURT:  The two being marked being north and above

10  the one he first mentioned, all on the west side of the

11  river.

12  BY MR. STAHLMAN:

13      Q  The spring you first alluded to as being the spring

14  you obtained your domestic water from, was that a spring

15  which flowed?

16      A  For about five years that flowed constantly.  It

17  ceased to flow and we finally took the pipes out.

18      Q  Do you know about what year it ceased to flow?

19      A  About '48, I believe it was.

20      Q  Has there been any flow from that spring since that

21  time?

22      A  Probably just flowed down the canyon, because the oak

23  trees are greener in the canyon.  But we know nothing about

24  that.

25      Q  What is the condition of the other springs?

1  A  They have never been developed, but they flow

2 intermittently.

3  Q  Will you describe to the Court the water system that

4 you utilize on your ranch at the present time?

5  A  May I go to the map again?

6  THE COURT:  Yes, sir.

7  THE WITNESS:  At the present time we have a pit or well

8 at about this point beside the river.

9  THE COURT:  Indicating the right-hand side of the channel

10 of the Santa Margarita River.

11  THE WITNESS:  That is correct, about 200 feet from the

12 south county line.

13  MR. STAHLMAN:  I might say there is a small dot, both

14 a red and blue dot, at the place where the Doctor pointed on

15 Henderson's B.

16  THE WITNESS:  That is a pit or well about 52 feet deep

17 and three feet in diameter.

18 BY MR. STAHLMAN:

19  Q  Was that in the river bottom?

20  A  That is just a little ledge to the side of the river

21 bottom.  It is above the floods.

22  Q  Does the river flow past your place at that point?

23  A  I have never seen it dry.

24  Q  And flowing at the present time?

25  A  Yes, sir.

Q   Continue.

A   The well on the top of the bank at this point is a rise of about 85 feet, and we take out about a three-inch pipe at the well and it goes up this rise in a 5½-inch pipe, and from there it is diverted by a 3-inch pipe, and that 3-inch pipe runs up to the top of the hill.   This is the highest point.   It is 335 feet above the river level.   There is another pipe line that goes across here, which is a 2-inch, and then there are two cross lines here which give it a figure 8 effect to give distribution of water to every part.

MR. STAHLMAN:   The witness pointing to Henderson's B to a certain blue pen mark in the area which clearly shows to be the planted area of the avocados.

THE COURT:   Are those the pipe lines running east and west?

THE WITNESS:   Yes.   There is a continuation of a pipe line, a 2-inch pipe line, which goes to a small well at that point on Stone Creek.

BY MR. STAHLMAN:

Q   Do you obtain any water from the well on Stone Creek?

A   No, sir.   The well there is about 14 feet deep and was used for a short time to raise nursery stock, but is not in use and has not been in use for seven or eight years.

THE COURT:   Is there water in it?

THE WITNESS:   I do not believe there is, your Honor.

1 There was water in it for a number of years.  In fact, that

2 creek flowed for a number of years.  But I do not believe

3 there is water in that well at the present time.

4   THE COURT:  Do you smudge those avocados?

5   THE WITNESS:  No, sir.  It happens, your Honor, that that

6 area is pretty well protected.  The drop into the river and

7 the drop into Stone Canyon gives very good air drainage, and

8 the mountains to the east and west and northeast protect it

9 pretty well from the cold winds.  So it seems to work very

10 well.

11   THE COURT:  As a fellow avocado grower, who is trying to

12 get something started, how do you keep deer away from the

13 trees?

14   (Discussion off the record.)

15 BY MR. STAHLMAN:

16   Q  When did you first become aware of this judgment?

17   A  When this suit was filed by the Navy is the first I

18 had heard of it.  My former owner had told me that we had

19 riparian rights, and naturally I started to develop.  I knew

20 nothing about this suit or any limitation on those rights

21 until this suit was filed.

22   THE COURT:  Well, you have riparian rights.  The question

23 is the extent of them.

24   THE WITNESS:  That is right.

25   THE COURT:  Incidentally, this might be a good place to

1  interject here.  I just noticed some interesting things.  On

2  page 69 of the findings they say that the intervenor Playtor

3  owns and is entitled to take and use for domestic purposes

4  and uses upon said land from said Santa Margarita River,

5  during the entire calendar year, one miner's inch continuous

6  flow.  When they got around to the conclusion, the conclusion

7  said that Playtor owned and was entitled to take and use on

8  his land riparian to the river one miner's inch.  It didn't

9  mention domestic use.  When they got over to the judgment

10  end of it, they said that intervenor Playtor owns and is

11  entitled to take and use on the whole or any part of his lands

12  riparian to the river one miner's inch.

At least, the findings and the judgment, it can be argued,
are in conflict in that respect.

MR. VEEDER: Your Honor, I have been very quiet about this
It seems to me like these matters are entirely incompetent,
irrelevant and immaterial.  But your Honor is reading into
the record so much--

THE COURT:  The exhibits are all in the record.  I am
just calling your attention to it.

MR. VEEDER:  I certainly hope it is not in the record
to prove anything other than that they were entered.  I objected
very strenuously, if you recall, and you said that they are
in simply for the purpose of showing that they had been entered
but not for the proof of anything.

1      THE COURT:  Well, they may be proof of something, and may

2  not.  It depends on what we decide later on.  They are in

3  evidence and they may be considered or not later when we get

4  ready to argue.

5      MR. SACHSE:  If the United States asserts rights under

6  the judgment, they must be in for something more than proof

7  that the judgment was rendered.

8      MR. VEEDER:  We are in this position.  Under a stipulated

9  judgment with the Vail Company--

10     THE COURT:  I understand your position.

11     Let's see if we can get through with this witness.

12     MR. STAHLMAN:  It's 4:30 now.

13     THE COURT:  How long will you take on your cross-

14  examination?

15     MR. STAHLMAN:  I would have a little more on direct,

16  and these nights get dark quick and we have a long ride.

17     THE COURT:  Can you come back tomorrow?

18     THE WITNESS:  Yes.

19     THE COURT:  I don't know what I am going to do about this

20  judgment I want to hear Vail's case and hear the arguments.

21  Every time I read it I get more and more disgusted with it.

22     MR. VEEDER:  But I suffer all of the time, because it is

23  going into the record.

24     THE COURT:  Two big land owners have a fight up there,

25  and here is Playtor who owns a little land down by the river,

1   and these decrees are entered and the big boys get all of the

2   water and they give him one miner's inch, and inone place

3   they tell him he can use it for domestic purposes and in

4   another place they say he can use it anywhere.

5       MR. STAHLMAN:  Here is a party who subjected themselves

6   to an American court of justice and said, "We want our

7   property rights determined," and here is what happened.  And

8   anybody else who sat back and didn't use their land with a

9   comparable area can come in and get four times as much water

10   as Dr. Henderson gets.

11       MR. SACHSE:  Your Honor, I don't want to prolong this--

12       MR. VEEDER:  I am entitled to respond to George.

13       MR. SACHSE:  I think, in all sincerity, before we get

14   into the Vail case, it might not be a bad idea that some of

15   the rest of us express our view on it.  There are some aspects

16   to this judgment that haven't been discussed at all and that

17   concern me, not so much as Fallbrook's attorney, but as

18   attorney for other riparians, and some aspects of it that

19   relate directly to the United States.

20       THE COURT:  All right, I want to hear from all of you.

21   I haven't decided anything.

22       MR. STAHLMAN:  There are some things that will chill some

23   of these other people when they understand that judgment.

24       MR. VEEDER:  I get chilled every time we go into it this

25   way.  This nibbling is killing me.

1          MR. SACHSE:   I get a chill every time I look at the

2    judgment.

3          THE COURT:   All right, 10 o'clock tomorrow morning.

4          (Adjournment until Thursday, December 17, 1959, at 10

5    A.M.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25