# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.   1247-SD-C

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Thursday, December 17, 1959.

Pages:   11235 to 11379

# FILED

SEP 24 1963

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By

DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

11235

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA,      ) | |
| )                              | |
| Plaintiff,       ) | |
| )                              | |
| vs.       ) | No. 1247-SD-C. |
| )                              | |
| FALLBROOK PUBLIC UTILITY       ) | |
| DISTRICT, et al.,       ) | |
| )                              | |
| Defendants.       ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Thursday, December 17, 1959

APPEARANCES:

    For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                            WILLIAM E. BURBY, ESQ.,
                            Special Assistants to the
                            Attorney General,
                            Department of Justice,
                            Washington, D. C.

                            LCDR. DONALD W. REDD.

APPEARANCES (Continued):

    For Defendant Vail        GEORGE E. STAHLMAN, ESQ.
    Company

    For Defendant          STANLEY MOSK, ESQ.,
    State of California      Attorney General,
                          By FRED GIRARD, ESQ.,
                            Deputy Attorney General.

    For Defendants
    Fallbrook Public
    Utility District,      FRANZ R. SACHSE, ESQ.
    et al.

    For Defendant
    Murray Schloss       WALTER GOULD LINCOLN, ESQ.
    Foundation

## INDEX TO WITNESSES

| For the Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| Max M. Henderson | 11239 | 11241 | | |
| James V. Wilkinson | 11250 | | | |
| | 11292 | 11367 | | |

1

## INDEX TO EXHIBITS

2

| Defendant's Exhibits: | Iden. | In Evidence |
|---|---|---|
| AH-1 and AH-2 | | 11252 |
| AI-1 and AI-2 | | 11253 |
| AJ | 11253 | |
| AN | | 11296 |
| AO | 11302 | 11304 |
| AP | | 11329 |
| AQ | 11334 | 11355 |

| Plaintiff's Exhibits: | | |
|---|---|---|
| 161 | | 11358 |
| 162 | | 11358 |

San Diego, California, Thursday, December 17, 1959.  10 A.M.


        (Another matter.)

        THE COURT: Fallbrook.

        THE CLERK:  1247-SD-C, United States vs. Fallbrook.
Further court trial.

        MR. STAHLMAN:  Dr. Henderson, will you take the stand,
please.


                    MAX M. HENDERSON,
one of the defendants herein, recalled as a witness in his
own behalf, having been previously duly sworn, testified
further as follows:


                DIRECT EXAMINATION (Resumed)
BY MR. STAHLMAN:

        Q  Doctor, in addition to the lands which you have in
cultivation in the vicinity of your home, are there other
lands, in your opinion, on the property that either presently
or at sometime in the future could be devoted to some pro-
ductive agriculture to an extent?

        A  There might be slight amounts on that upper forty.

        Q  That would be up in this area here?

        A  Yes.  Very small acreage, not any present use
commercially available.

1      Q  In other words, you don't feel that at this time it

2  would be economically beneficial to put  that under cultiva-

3  tion?

4      A  I feel that if the Court would just keep jurisdiction

5  in this case, as is contemplated, I think that could be taken

6  care of at sometime in the future, if necessary.  At the

7  present time I don't see it.

8      Q  Are there any cabin sites or home sites in this area?

9      A  Yes, there are some very desirable home sites in the

10 oak trees both along the river and along the north fork of

11 Stone Creek.

12     Q  Are there home sites in other areas around that

13 country that, in your opinion, at sometime could be put into

14 production, even though it were in small acreage?

15     A  Small amounts for personal gardens.

16     Q  This source of water you had previously used from

17 Stone Creek, is there any facility there at the present time

18 for extraction of any amount of water?

19     A  No, not at the present time.

20     Q  You did have a pump there at one time?

21     A  At one time we had a gasoline-driven pump there and

22 pumped water for some nursery stock.

23     Q  What were the circumstances under which it was

24 removed?

25     A  In the first place, we removed the gasoline engine

1  because it failed and did not replace it, and later on the

2  pump was abstracted by some hunters or some person looking

3  for an extra pump.

4      MR. STAHLMAN:  Probably needed a pump for his gun.

5      That's all I have.  You may cross-examine.

6

7                    CROSS-EXAMINATION

8  BY MR. VEEDER:

9      Q  Dr. Henderson, I hand you the map, the soil survey

10  prepared by Col. Bowen, and I ask you to observe the areas--

11  there are three in number-- which are directly south of what

12  used to be your cultivated and irrigated area.  Can you see

13  those?

14      MR. STAHLMAN:  May I ask for the record what you are

15  showing him?

16      MR. VEEDER:  I am showing him the map and the soil survey.

17      MR. STAHLMAN:  It's not marked.

18      MR. VEEDER:  No.  It is a copy, however.  Let's get the

19  exhibit.

20      MR. STAHLMAN:  I don't know.  Just so we know, for the

21  record, what you are talking about.

22      THE COURT:  The soil map report was Henderson's Exhibit

23  C.

24      MR. STAHLMAN:  No objection to using a copy of it, Mr.

25  Veeder.  I just wanted the record to show what you were

1    showing him.

2    BY MR. VEEDER:

3        Q  You will observe from Henderson's Exhibit C three

4    areas which are delineated as being irrigable in character,

5    which are orange in color, and I ask you whether you have

6    developed or utilized those lands for any purpose?

7        A  These are lands-- You said to the south.  These are

8    to the east.

9        Q  I beg your pardon.

10       A  And those have not been developed at all, except this

11   one.  That was deep brush at one time.

12       Q  You are pointing to the one closest to your cultivated

13   and irrigated area?

14       A  That is right.

15       Q  But you are presently not using any of those lands?

16       A  They are not in use.

17       Q  Have you any present plans for the utilization of

18   those lands?

19       A  Definitely.  Ultimately they will be used.

20       Q  What do you think will be the source of water?

21       A  The pipe line we already have across here.

22       Q  The pipe line that goes across there now?

23       A  Yes, sir.

24   THE COURT:  The pipe line indicated to Stone Creek?

25   THE WITNESS:  That is correct.

BY MR. VEEDER:

Q  Is it from Stone Creek?

A  It is continuous from Stone Creek to the intake of the river.

Q  You stated there was another area in which you thought there might be some lands which could be developed.  Referring again to Exhibit C, where do you believe those are located?

A  In this area.

Q  Those are not designated as irrigable in character in the soil survey, are they?

A  I believe not.

Q  Now, in regard to the title to your lands, Dr. Henderson, did you have a title search or a title certificate for those properties?

A  Definitely.

Q  And do you have deeds for each parcel of land?

A  There was one deed.

Q  You have a single deed describing all the lands?

A  Yes, sir.

Q  Could you make available to us-- it might save us some money-- the certificate of title and the deed for examination?

A  I could, but it would take some time because they are in Orange County in a safety deposit box.

Q  At your convenience would you make those available to us?

1      A   Yes.   You wish the certificate of title and the deed?

2      Q   Yes, I would.

3      MR. STAHLMAN:   If you will get them, Doctor, and turn them

4  over to me, I will see that Mr. Veeder sees them.

5      MR. VEEDER:   And we will return them just as soon as we

6  can.

7      I have no further questions.

8      MR. SACHSE:   I have just one or two, your Honor.

9

10                         CROSS-EXAMINATION

11  BY MR. SACHSE:

12      Q   Mr. Henderson-- I am really just checking my notes

13  here-- you say at the time you moved into the property in '41

14  the pump had been removed before you went in there, the river

15  pump?

16      A   That is correct.

17      Q   And then in 1949 you started pumping a little water

18  yourself at that time with a Diesel?

19      A   Yes, I think there was some pumped as early as '47.

20      Q   And Stone Creek was not pumped by you since when?

21      A   Stone Creek has not been pumped by me since '48, I

22  think.

23      Q   When were you served with the summons in this case,

24  do you know?

25      A   '51.

1    MR. SACHSE:  I have nothing further.

2    MR. STAHLMAN:  That's all I have.

3    I would merely indicate that your Honor might desire to

4    look at this property.  If you do, it might be well to see it.

5    THE COURT:  What good would that do?

6    MR. STAHLMAN:  Well, to show you that it is, I think, a

7    very superior piece of property compared to a great deal of

8    the property in the general area that is used for this same

9    purpose.

10   THE COURT:  The only problem in the case is the problem

11   of the effect of the judgment in the Santa Margarita-Vail case,

12   and I would comment, when we are through with this case, as

13   follows:  That first my present intention is to take continu-

14   ing jurisdiction in this case, regardless of what kind of

15   decree is entered.  That is one thing.

16   Secondly, if the Vail Company succeeds in setting aside

17   the stipulated judgment, then I don't think the Government

18   would have much opposition to setting aside the previous decree

19   as to Playtor and Schloss.  It would seem to be only common

20   fairness that if the major decree went out that these two minor

21   areas ought to go out, too.  I would think that that would be

22   the Government's position.

23   MR. VEEDER:  No comment.

24   MR. STAHLMAN:  That's all, Doctor.

25   THE COURT:  No comment?

1          MR. VEEDER:  Well, yes, I was being a little facetious

2     with your Honor.  If your Honor will bear with me, I don't

3     see how we can do anything until the pleadings are closed and

4     the grounds upon which that judgment is going to be attacked.

5          THE COURT:  That's right.  I don't ask you to comment.

6     But it seems to me that the major problem in the case is the

7     stipulated judgment, and that if it went out I would feel

8     that there should go out with it all the provisions of the

9     other judgment that was not appealed from.  Now, how that

10     wuld be done I don't know.  But as to this man's property ,

11     if that happened I would find that the amount of irrigable

12     acres, as shown by Col. Bowen's report; was the amount, and

13     that he was a riparian user, and apparently according to the

14     irrigable land that he has the amount of water he would be

15     entitled to would be probably closer to two and a half miner's

16     inches than one miner's inch.  I think something like that.

17          In the Colonel's report isn't 2.35 miner's inches about

18     what it would amount to?

19          COL. BOWEN:  Yes, sir, that was continuous diversion, your

20     Honor.

21          MR. STAHLMAN:  Your Honor, here is something that might

22     give us a view of this judgment that I think to be of an un-

23     conscionable nature.  That one miner's inch, as allotted to this

24     property under the previous case, is on a continuous flow

25     basis.  That means that the miner's inch would be taken over

1   the period of the entire year.  Now, in the summertime there

2   would be, of course, not sufficient water to irrigate but about

3   one acre of land, according to the rough calculations, and one

4   miner's inch continuous flow for a year is about 14 acre-feet

5   of water, and that would have to be taken over a 12-months

6   period.  Whereas we show here that here is land that has been

7   developed and capable of utilizing for productive and beneficial

8   use about 54 to 57 acre-feet of water a year.  Under Col.

9   Bowen's theory that would be supplemented by normal rainfall.

10  So it certainly would seem to be an unconscionable situation if

11  a man had subjected his property rights to an American court

12  of justice and then found out by reason of that judgment

13  within a very few years people who had no part in the case and

14  who were not in litigation at that time, who have comparable

15  properties, would have a reasonable proportion of water of the

16  river.  It certainly would be a sad day for our American courts

17  if we would have a judgment that in future litigation that is

18  instituted by the very people who started the first litigation

19  and to which this man, as I say, thought he would go in and

20  have his property rights determined, would wind up by being put

21  in the position that this property is in today.

22      MR. VEEDER:  We are not even at issue on this matter.

23      THE COURT:  That is right.  More than that, these broad

24  generalities about what happens in an American court of justice

25  don't take us anywhere.  In the Vail case we have some legal

1    issues to frame.  It is true that they are of an equitable
2    nature and that equity appeals to conscience and all that sort
3    of thing.  But hard cases make bad law.  I needn't tell you
4    where my sympathies lie, but we don't decide these cases on
5    sympathy.

6        MR. STAHLMAN:  I appreciate that, your Honor.  But when
7    we talk about a judgment being unconscionable we have to use
8    some standard.  I think the cases indicate that is a matter
9    that rests within the sound discretion of the Court, and
10   therefore the Court in weighing and determining these matters,
11   here is one approach you could make to it.  You could say if
12   your Honor entered a judgment at this time on the evidence
13   before this Court of the same kind and character that is
14   entered in the early case, would your judgment at this time  .
15   so entered be conscionable, if you had to enter these other
16   judgments?  Therefore, if your judgment would be as the previous
17   court's had been, I think you couldn't do it in good conscience.
18   Therefore, I think it attests to the fact that the court in the
19   previous case rendered an unconscionable judgment.

20       THE COURT:  Certainly, had I tried the first case, I will
21   tell you right now from what I have seen of it, I wouldn't
22   have entered the kind of judgment that was entered in the first
23   case.

24       MR. VEEDER:  This is extremely important to me.  From
25   George's standpoint, George has a very competent sort of

1   approach here.  He is fighting the stipulated judgment for

2   this little operator here, which is allright.  I understand

3   what he is doing.  But I still say, your Honor-- and I think

4   this is extremely important right now-- that we get this thing

5   squared away.  If it is an unconscionable judgment, he should

6   be in the Superior Court of San Diego County saying that it

7   is unconscionable.

8       MR. STAHLMAN:  Oh, no.

9       THE COURT:  We will argue that out later.

10      MR. STAHLMAN:  All right.

11      THE COURT:  Anything further in the Henderson matter?

12      MR. STAHLMAN:  That's all, your Honor.

13      THE COURT:  Mr. Henderson, I am not deciding these matters

14  now.  You don't even have your pleadings in shape.  I have

15  commented how I feel about it.  If the Vail interests succeed

16  in their proposition, then I am going to try to find some way

17  to relieve you also.  I don't know.

18      THE WITNESS:  Thank you, your Honor.

19      THE COURT:  If the Vail interest don't succeed, you are

20  stuck with this judgment.  The only ray of hope I see for you

21  is that inconsistency between the findings and the judgment,

22  and the judgment probably controls.  The judgment says that

23  you are not limited to domestic use.  The judgment says that

24  you can use this water anywhere on that ground.  So that might

25  be come solace to you, if that is the interpretation I finally

1    put upon it.  It's pretty hard to unring a bell.  Did you

2    ever hear that expression?  If somebody tolls a bell, it's

3    kind of hard to unring it.

4         All right, proceed, Mr. Stahlman.

5         MR. STAHLMAN:  Is Mr. Kunkel available, Mr. Veeder?

6         MR. VEEDER:  No.

7         MR. STAHLMAN:  He has been here and I anticipated call-

8    ing him.  When will he be back?

9         I will call Mr. Wilkinson.

10        THE CLERK:  Mr. Wilkinson has been sworn before, your

11   Honor.

12

13                    JAMES V. WILKINSON,

14   recalled as a witness in behalf of the defendant Vail Company,

15   having been previously duly sworn, was examined and testified

16   as follows:

17        MR. STAHLMAN:  Your Honor, I think we ought to settle

18   this question regarding the Hall testimony.  That was a motion

19   that was made here some time ago.  It has been hanging fire.

20   We have been in court on a number of occasions.  I think we

21   ought to have a ruling on it.  The motion was made in writing.

22   The grounds were set out and exhibits were introduced-- not

23   in evidence, but marked for identification.

24        THE COURT:  Why shouldn't the motion be granted, Mr.

25   Veeder?

1    MR. VEEDER:  Well, from my standpoint, your Honor, I

2  think Mr. Hall is entirely available to be called, and why

3  shouldn't he be called?

4    MR. STAHLMAN:  I think that our brief settles that

5  completely.  It says that even though the witness were

6  available the evidence is admissible.

7    MR. VEEDER:  I have no objection to it.

8    THE COURT:  The motion is granted.  The Hall testimony

9  will be received in evidence in this case.

10    MR. STAHLMAN:  There is an exhibit in connection with

11  Bruner's testimony, first--  Your Honor has already granted

12  that motion -- which is AH-1 and AH-2.  They were the maps

13  which are explanatory of the evidence.  We will offer those in

14  evidence.

15    THE COURT:  You say AH-1 and AH-2?

16    MR. STAHLMAN:  Vail's AH-1 and AH-2.  They are maps of the

17  Santa Margarita Ranch which are explanatory of the method that

18  Bruner used in making a determination of the acreage and the

19  lots.

20    THE COURT:  You had an Exhibit AH already, didn't you?

21    THE CLERK:  That is still for identification.  It is a

22  soil survey map.

23    MR. STAHLMAN:  That is the one I have here.  They are

24  two maps, which are of the same exhibit.

25    THE CLERK:  I believe there are three exhibits:  AH is

1    the soil survey map; AH-1 is the west portion, and AH-2 is the

2    east portion of AH.

3        MR. STAHLMAN:  Here they are.

4        THE COURT:  All right, AH-1 is the west portion, and AH-2

5    is the east portion of the Santa Margarita Ranch.

6        MR. STAHLMAN:  Then Exhibit AI-1 and AI-2 are the two

7    maps which are the soil survey maps in the first case of the

8    Vail Ranch.  We will offer those in evidence at this time.

9        THE COURT:  Vail's AH-1 and AH-2 are received in evidence;

10   and AH, according to my records, is not yet in evidence.

11       MR. STAHLMAN:  AH and AH-1 and 2 are the same.

12       THE CLERK:  AH were the two together, your Honor, and

13   then they were numbered 1 and 2.

14       MR. STAHLMAN:  The same situation applies to AI-1 and 2,

15   which are maps of the Vail property.  We offer those in

16   evidence.

17       THE COURT:  Which part is AI-1?

18       MR. STAHLMAN:  AI-1 is the west, and AI-2 is the east.

19       MR. GIRARD:  Mr. Stahlman-- maybe this is a little late--

20   I didn't receive a copy of this transcript of Hall's which was

21   admitted in evidence.  Did that pertain only to the prior

22   testimony as to the soil survey problem and irrigable acreage?

23       MR. STAHLMAN:  Yes, that portion of the evidence.  Didn't

24   you get a copy of that?

25       MR. GIRARD:  I got a copy of your pleading but it did not

1   include a copy of the actual transcript pages that were being

2   included.

3        MR. STAHLMAN:   No.

4        MR. GIRARD:   But as long as his prior testimony, which

5   is admitted concerns only the irrigable acreage problem.

6        THE COURT:   As I understand it, the testimony is offered

7   and received only on the irrigable acreage problem.

8        MR. STAHLMAN:   Yes, your Honor.

9        THE COURT:   And the extent of irrigable and irrigated

10  land.

11       MR. STAHLMAN:   That is right.

12       THE COURT:   It doesn't involve geology or anything else.

13       MR. STAHLMAN:   No, your Honor.

14       MR. VEEDER:   It has been strictly limited to the point

15  George talked about.

16       THE COURT:   That is right.   That is what it is received

17  for.

18       MR. STAHLMAN:   And to the evidence we have designated in

19  our motion by page and line number.

20       THE COURT:   All right, AI-1 and AI-2 are received in

21  evidence.

22       You are going to mark this transcript of his testimony

23  also?

24       MR. STAHLMAN:   Yes, your Honor, Exhibit AJ.

25       I think the exhibit of the transcript of the Bruner

1    testimony is in evidence.   It was copied into the record.

2    MR. VEEDER: There is a proposition that I want to bring

3    up here now that George is squared away on this.

4    MR. STAHLMAN:  I have another motion, Mr. Veeder.

5    MR. VEEDER:  I think we had better take a look at what

6    has transpired.  In your motion, Mr. Stahlman, in regard to

7    the Bruner testimony, I simply say that Bruner's testimony is

8    incompetent, irrelevant and immaterial because the man was

9    not qualified.  There is no proper foundation for the proof

10   of how this soil survey was accomplished.  I want that clear.

11   And I am going to move to strike this whole matter.  I told

12   your Honor earlier that I was going to summarize these things

13   in writing to you, because I think it is extremely important.

14   However, if you will observe on the exhibit attached to the

15   Bruner motion there is page 13686-- this becomes extremely

16   important, because the man whose testimony appears on page

17   13686 is not Bruner.

18   MR. STAHLMAN:  That's true.

19   MR. VEEDER:  And the point that I am trying to make is

20   that-- and it is very essential that it be made-- that we have

21   a motion relating to one witness and really the probative

22   aspect of the exhibit relates to the testimony of another

23   witness.

24   THE COURT:  I don't understand what you are talking about.

25   MR. STAHLMAN:  May I explain this, your Honor?

1    THE COURT:  Let me see it.

2    MR. STAHLMAN:  He is correct, except--

3    THE COURT:  He is correct?  I don't understand what you

4  are talking about.

5    MR. STAHLMAN:  I can explain it.  The only value of that

6  page there is the Clerk's statement-- it merely straightens

7  out the exhibit-- that the exhibit LZ--

8    THE WITNESS:  I believe is O-9-B.

9    MR. STAHLMAN:  That the Exhibit O-9-B, whatever exhibit

10  it is in that case, was changed so that it shows that the

11  exhibit we put into evidence here, which was stamped by the

12  Clerk's admission in the case, is that exhibit and the one

13  which Mr. Bruner was testifying to.

14    THE COURT:  Then these questions and answers that

15  preceded the colloquy with the Clerk and the attorney are

16  not part of it.

17    MR. STAHLMAN:  They are not part of the Bruner testimony.

18    THE COURT:  May I draw a line through them?

19    MR. STAHLMAN:  Certainly, your Honor.

20    MR. VEEDER:  Your Honor, in that regard we are making

21  and exception to the hearsay rule, and a very serious one,

22  in my view.  We have stood still quite patiently for a lot

23  of these things.  But we are now down to the proposition

24  that the mere announcement into the record for whatever

25  exhibit it was, and I don't know who did it, that this exhibit

1   is the same exhibit we have been talking about throughout the

2   trial in1926, and that is what it is, and we now say that this

3   exhibit is the same one concerning which all this testimony

4   went in and they give it another mark, and George should in

5   some manner offer additional evidence or in some manner tie

6   it up.  I don't believe that a mere pronouncement into the

7   transcript of the record identifying the exhibit will suffice.

8         THE COURT:  We can talk about that later.  I think it

9   does.

10         MR. VEEDER:  Just so I have my objection, your Honor.

11         THE COURT:  As I understand the matter, this testimony

12   of Mr. Bruner, which began on page 9655, with some inter-

13   ruptions in pages, continued on through page 13274.  That

14   was Bruner's testimony.

15         MR. STAHLMAN:  Yes.

16         THE COURT:  Then this last page 13686 is in for the

17   purpose only of showing the change in identification.

18         MR. STAHLMAN:  That is right.

19         MR. VEEDER:  You will find that there are several pages

20   that have nothing to do with Mr. Bruner's testimony.

21         THE COURT:  We will run a line through page 13686,

22   except the colloquy between the Clerk and the attorneys at

23   the bottom, and that part will not be part of the record.

24         Are there other pages in here which are not Mr. Bruner's

25   testimony?

1    MR. VEEDER:  Yes, your Honor.

2    THE COURT:  Where are they?

3    MR. VEEDER: There is testimony in here by H. M. Hall.

4    MR. STAHLMAN:  Let me see it.

5    MR. VEEDER:  Right here.  If I sound confused, I am.

6    I haven't the slightest idea what that scrambled egg is

7    supposed to be.

8    MR. STAHLMAN:  The only pertinent part of the testimony

9    is that of Mr. Bruner.  We took a photograph of the page.  I

10   think it is just a question of what evidence the Court will

11   consider.  All we have offered is the testimony of Mr. Bruner.

12   The fact that there are some remarks by Mr. Hall, a very short

13   statement there in the transcript, I don't think would destroy

14   the effect of the testimony.

15   THE COURT:  The motion is granted as to Mr. Hall, too.

16   MR. VEEDER:  No, your Honor.  The motion in regard to

17   Mr. Hall doesn't relate to the 1926 trial.

18   MR. STAHLMAN:  He is right in that respect, your Honor.

19   As far as Mr. Hall's testimony in that case is concerned, Mr.

20   Hall, I believe, merely made a statement that he put the

21   numbers on these.

22   THE COURT:  All right, on page 12370, the one-line

23   statement attributed at line 6 to H. M. Hall, will not be

24   part of the record.

25   MR. VEEDER:  You will find that there are others, too.

1    MR. STAHLMAN:  Anything that Mr. Hall testified in that

2    case is not included in our motion.

3    THE COURT:  Point out what else you don't want in here.

4    MR. VEEDER:  Well, it goes on indefinitely.

5    MR. STAHLMAN:  Your Honor, our motion does not ask for

6    Mr. Hall's testimony in that instance to be admitted.  We have

7    designated the Bruner testimony, we have photographed the

8    transcript, I have turned them over to Mr. Veeder, he has had

9    an opportunity to see the transcript, and simply because, as

10   your Honor has done in this case, somebody would come up on

11   a page of a transcript and make a remark, what are you going

12   to do-- block it out?  The motion is only to admit the testi-

13   mony of Mr. Bruner in this particular.

14   MR. VEEDER:  All that I know is that on appeal this could

15   look very odd having the references.

16   THE COURT:  Let's run a line through the part, if it is

17   not Bruner's testimony.

18   MR. STAHLMAN:  I have no objection to that, your Honor.

19   MR. VEEDER:  Well, I would just as soon, if your Honor

20   wants to take these pages out, let's not take your time now.

21   THE COURT:  All right.  And since this entire transcript,

22   I understand, was typed up in our record, we will have to go

23   and find the pages of our record.

24   MR. STAHLMAN:  If Mr. Veeder will make a list, we will

25   delete those from our record.

1    THE COURT:  All right.

2    We were down to Mr. Hall's testimony, Exhibit AJ.

3    MR. VEEDER:  Your Honor, may I be very sure that my

4  objections as to the competency of the evidence by Mr. Bruner

5  be clear and that it be applicable to this whole record.

6    THE COURT:  I previously ruled on this.  Now you are

7  making some other objection other than the motion to strike

8  you are going to make later?

9    MR. VEEDER:  No.

10    THE COURT:  What is it?

11    MR. VEEDER:  As I understand, your Honor has stated, and

12  I want the record to be very clear that we say, first, that

13  Mr. Bruner was not competent, nor was any proper foundation

14  laid for the purpose of establishing what Mr. Stahlman seeks

15  to establish by the record from the previous case.  It is

16  incompetent, irrelevant and immaterial, and doesn't tend to

17  prove any issue.  Mr. Bruner was simply a man who worked in an

18  office and he simply took directions and did nothing more nor

19  less than to perform the work of a draftsman.  He didn't make

20  any determinations.

21    THE COURT:  Is that what he testified to?

22    MR. VEEDER:  That is correct.

23    MR. STAHLMAN:  No, your Honor.

24    MR. VEEDER:  I am just analyzing it, George.

25    MR. STAHLMAN:  In that record which we have submitted

1   here before your Honor in this exhibit which we are just dis-

2   cussing, we included in there the qualifications of Mr. Bruner

3   when he was on the stand, and it showed that he had tremendous

4   experience in working in  subdivisions and other places where

5   he had done the same type of work he did in this case and much

6   more extensive engineering activities.  He was well qualified.

7   And then you remember we have the testimony of the surveyor

8   under whom he worked that he was a competent and qualified man.

9   We have that before this Court.  We have his qualifications

10   there.  That is a matter that your Honor can redetermine whe-

11   ther he is qualified or not from the record in this case.

12   But he testified to a great extent.

13       THE COURT:  I thought we had been all through this before.

14   The objection is again overruled.  And I understand that you

15   intend to make some motion, which I have given you permission

16   to do, pointing up in writing just exactly what you want to

17   object to and why and all about it.

18       MR. VEEDER:  In that regard, your Honor, I have gone

19   through three volumes of this testimony from which these ex-

20   cerpts have been culled.  It would seem to me that it would

21   be totally impossible for your Honor to make any rulings or

22   findings-- and I don't want to interfere any more than I have

23   in regard to this course that is being adopted, but I believe

24   that if your Honor were to view the whole record in this case

25   of the previous 1926 case-- I would object to it, of course,

1    but it strikes me that that is about the only way your Honor

2    can get the picture of this matter.

3         For example, I have gone through the record on appeal

4    where Vail Company and Rancho Santa Margarita stipulated as

5    to the issues that would be on appeal.  Repeatedly these

6    very points that George has brought up are reviewed.  For

7    example, the trial judge said, "Well, I have taken into con-

8    sideration the fact that there are other parties.  I have

9    taken into consideration --"

10        MR. STAHLMAN:  Are we arguing the Bruner testimony now?

11        MR. VEEDER:  I don't believe you can reach in and take

12   out 15 pages of Bruner and wind up--

13        MR. STAHLMAN:  Put it all in, if you want to.

14        THE COURT: That is another problem, if you want in more

15   of Bruner.  A motion was made to admit Bruner's testimony on

16   the ground that he had testified in a previous action involving

17   the same issues, and that was the reason the testimony was

18   admitted.  Now, if somebody wants later on to talk about

19   putting in the whole Santa Margarita-Vail transcript, we will

20   talk about that when the time comes.

21        Now, let's go on to the next item, Hall's testimony,

22   Exhibit AJ for Identification.

23        MR. STAHLMAN:  In connection with the Hall testimony, if

24   I follow Mr. Veeder's reasoning, I would ask that all of Mr.

25   Hall's testimony go into the record.  I don't think that is

11262

1    necessary.

2         THE COURT:  Have you in your motion marked out the pages?

3         MR. STAHLMAN:  In my motion I have marked the pages by

4    line and page number of the testimony that pertains to the

5    particular subject.

6         MR. VEEDER:  That was before Judge Yankwich.

7         MR. STAHLMAN:  Yes, that was before Judge Yankwich in

8    this same case.

9         THE COURT:  All right, Hall's testimony,  Exhibit AJ, is

10   received in evidence, it being understood that the portion

11   in evidence is that portion specified in Mr. Stahlman's motion.

12        MR. VEEDER:  That's right.

13        THE COURT:  Not the whole volume, but that portion

14   specified in the motion.

15        MR. STAHLMAN:  Does your Honor desire that copied into the

16   record?

17        THE COURT:  How much is it?

18        MR. STAHLMAN:  It would about to probably five or six

19   pages.

20        THE COURT:  Then I think the best thing to do would be to

21   have it typed into the transcript here.  Otherwise, we will

22   have to go back to Mr. Stahlman's motion to find out what is

23   in and what is out.

24        MR. VEEDER:  I think that is the only proper way to handle

25   it.

1      THE COURT:  Can you gentlemen, then, mark out for the

2  reporter the pages and parts of pages that are being copied

3  into the record?

4      MR. STAHLMAN:  Yes, your Honor.

5      THE COURT:  Mr. Veeder, will you check it before it is

6  done?

7      MR. VEEDER:  Yes.

8      THE COURT:  But the exhibit as such is received in evidence,

9  with the understanding, however, that it is superseded-- as

10  a matter of fact, if we are going to do that, I don't see any

11  reason to have the transcript here in evidence.  So Exhibit AJ

12  will not be received in evidence except as a volume, but the

13  portions contained in the motion will be copied into the record.

14      (The portions of the record designated by Mr. Stahlman's

15  motion above referred to are as follow:)

16

17

18

19

20

21

22

23

24

25

(Volume I, page 66, line 10, to page 69, line 15:)

"BY MR. SHRYOCK:

"Q  Mr. Hall, will you state your residence address?

"A  460 Plymouth Road, San Marino, California.

"Q  Do you have a business address in Los Angeles?

"A  Yes; 406 South Main Street, Los Angeles.

"Q  What is your business or profession, Mr. Hall?

"A  I am a civil engineer.

"Q  Did you have the usual grade school and high school education?

"A  Yes.

"Q  And following that did you attend any institution of higher learning?

"A  Yes; the University of California at Berkeley.

"Q  Were you graduated from that institution?

"A  Yes, sir; in 1907 with a degree of B.S. in electrical engineering and with a submajor in civil.

"Q  And have you pursued either electrical or civil engineering as your occupation during your life?

"A  I have, both of them.

"Q  Well, would you say that you are primarily civil or electrical?

"A  Civil.  I have a state license for civil engineering but not for electrical.

"Q  And is that with respect to any particular aspect of civil engineering that you have pursued your profession?

"A  Yes, in connection with underground water, the development and use of it and irrigation of ranches.

"Q  Are you known as a water engineer?

"A  Yes.

"Q  Have you had any experience in hydrological matters?

"A  Yes, I have.

"Q  Have you been employed in any particular projects calling for your professional skill as a water engineer and/or hydrologist?

"A  Yes, I have.

"Q  Would you relate some of those items of employment?

"A  Some of the earliest were with the General Electric Company handling their irrigation, pumping work and then as--

"Q   In what locality?

"A   Southern California and then as chief engineer for the California Irrigated Farms Company and the surveys and adaptations of their lands for irrigable crops in the San Joaquin Valley and in the Mono Basin above Bishop, and then with the Vail Company since the early 1920's.

"I have had complete charge of their irrigation work on their ranches, both here in Southern California and in the Imperial Valley and on the Santa Rosa Island off of Santa Barbara and other ranches which they have.

"And then I have had some hydrological work around Palm Springs in connection with lawsuits there and with the Metropolitan Aqueduct in connection with their Cajalco reservoir and several other smaller jobs.

"Some in the upper Temecula and some around Puente, all involving the development of underground water and its use.

"Q   And is the Vail Company to which you refer the Vail ranch which is in the Santa Margarita watershed?

"A   Yes.

"Q   Have you ever had occasion to testify in a

court as an expert witness?

"A  Yes, I have, many times, the major one

being in the Vail-Santa Margarita suit where the

Santa Margarita Ranch was the predecessor in int-

erest of the United States Government at Camp

Pendleton.

"Q  And was that in the Superior Court of the

State of California?

"A  Yes, it was.

"Q  Was that a more or less protracted

litigation?

"A  Yes; that was a long time of steady work.

"Q  Were you accepted by the Superior Court

of California as an expert witness in that case?

"A  Yes.

"Q  And have there been other occasions on which

you have been accepted as an expert witness by

courts?

"A  Yes, especially in the Caljalco case for

the Metropolitan Aqueduct and the work at Palm

Springs of McManus vs. Smoke Tree Ranch and others--

smaller ones.

"Q  Have there ever been any occasions on

which your qualifications as an expert have been

disputed or in which you have not been accepted

5

1    by a court as an expert?

2        "A  No occasions of that kind, no.

3

4  (Volume I, page 84, line 24, to page 85, line 2:)

5        "Q  Now, Mr. Hall, turning now to the Vail

6    properties.  Do we understand that you have been

7    the Vail water engineer since the early 1920's?

8        "A  Yes, that is true.

9

10  (Volume I, page 85, lines 6 to 20:)

11        "Q  Now, could you give us a description,

12    a general description of the Vail properties

13    within the Santa Margarita watershed?

14        "A  The Vail properties are an aggregation

15    of several original land grants, the Pauba,

16    from which the ranch takes its name, being

17    the largest one and the little Temecula being

18    another one.

19        "The southern half of the Temecula grant

20    is another one and the Santa Rosa grant

21    to the west being another.

22        "The total acreage in all of these grants

23    is about 85,000 but it is not all riparian to

24    the Temecula stream.  It doesn't all lie in the

25    watershed.  It all lies in the watershed with

the exception of the westerly part of the

Santa Rosa grant but all the rest of the

grants are within the watershed of the Temecula

stream.

(Volume I, Page 87, lines 4 to 13:)

"Q    BY MR. SHRYOCK:  Mr. Hall, I show you

a map entitled 'Map of land classification in the

drainage area of the Temecula-Santa Margarita

watershed" and ask you to state what that is.

"A   That is a map prepared either by myself

or under my direction in about 1927, and it

includes a survey of the complete watershed

of the Santa Margarita system.

"I divided it into blocks and made a personal

survey of the classification of the lands

within those blocks.

(Volume I, page 89, lines 21 to 22:)

"(The map above referred to marked

Plaintiff's Exhibit No. 36, was received

in evidence.)

(Volume 2, page 100, line 14 to page 101, line 12:)

"Q  Mr. Hall, when we concluded yesterday I

believe we were at the point where you had

identified Plaintiff's Exhibit 35, a map of

the upper part of the Santa Margarita watershed

and including the Vail properties and that you

were about to launch into a general description

of that exhibit -- how it was compiled and of

the Vail properties.

"Before going into that, though, may I

ask you to describe to the court with a little

more particularity the exact nature of your

personal investigation of the areas in question

during the years that you have covered?

"A   The work was done in connection with a

suit in the Superior Court pending at that time,

done under my direction and more than half was

done with my personal presence in the field at

the time the work was done, but of course we

required many assistants, surveyors and sur-

veyors for measuring areas and locating our-

selves upon the maps.

"We also had soil experts and helpers to do

the immense amount of leg work that was neces-

sary.  We used our own feet, sometimes horses,

sometimes model T Fords to cover the area but

we did not definitely investigate every square

8

1      foot of all of the area under consideration.

2          "We did make a definite investigation of those

3      parts which we have classified here as in the

4      watershed and profitably irrigable but that

5      is by no means the total in the watershed.

6

7  (Volume 2, page 105, lines 7 to 23:)

8          "Q  Could those lands be described as

9      water-bearing in themselves?

10          "A  Yes.  The next item going downstream

11      is the Pauba ranch itself, by which I include

12      all of the three grants, Pauba, Little

13      Temecula, and Temecula.

14          "Q  And we are now arriving at the Vail

15      property?

16          "A  That is the Vail property, yes.

17              "May I speak then of Exhibit 33 --

18      "MR. SHRYOCK:  May I have Exhibit 33?

19      "(The document was handed to counsel.)

20      "THE WITNESS:  --which breaks this property

21      down in detail, with the final results-- I have a copy.

22      "MR. SHRYOCK:  Oh, you have a copy.

23      "THE WITNESS:  Yes.  --with the final results

24      of 33,128 acres classified out of the total.  But

25      out of this classification we found 3,718 waste,

9

1    and a net irrigable acreate of 29,400 acres."

2    "Q BY MR. SHRYOCK:  Now, that figure of

3    29,400 is a net irrigable acreage of the Vail

4    properties, is it, Mr. Hall?

5    "A  Of the Vail properties, excluding the

6    Santa Rosa grant.

7    "Q  What is the total acreage in which that

8    29,400 resides?

9    "A  The total acreage within the grant lines

10   of the Pauba grant is 27,662; the Temecula

11   grant, 11,186; the Little Temecula grant,

12   1,727; making a total of 40,575.

13   "There were certain islands sold out of

14   this property, like the Town of Temecula,

15   which exclude 784 acres, leaving Vail

16   ownership net of 39,791 acres.

17   "MR. DENNIS:  That last figure, Mr. Hall, again?

18   "THE WITNESS:  39,791.

19   "Q BY MR. SHRYOCK:  That does not diminish

20   the 29,400?

21   "A  The 29,400 is a part of that."

22

23   (Volume 2, Page 106, lines 13 to 24:)

24   "Q BY MR. SHRYOCK:  That does not diminish

25   the 29,400?

"A   The 29,400 is a part of that.

"This total figure of 39,791, for convenience
of our agricultural work has added to it 460
acres riparian to the Pechanga stream only,
but well irrigated in its full proportion,
making a total of 40,251 acres, 39,791 of
which lies in continuous grants through
which the main stream flows.

"Now, in investigating the total of 40,251
acres owned by the Vails, we eliiinated 7,123,
mostly in blocks 1 and 3, as not even worth
investigation.  They were high hills, and we
just called it all a waste, leaving a total
for the soil survey of 33,128 acres.

(Volume 2, page 106, line 25, to page 107, line 5:)

"Then to go back on the previous testimony,
the 33,128 acres was decreased by 3,718 acres
of waste, leaving net irrigable lands of 29,410
on the three grants of the Vail Company.

"This does not include the Santa Rosa
Grant, which is not riparian to the main stream.

(Volume 2, page 107, lines 5 to 11:)

"Q  Mr. Hall, during your 45 years as a
water engineer have you had frequent occasion

to determine the question of whether lands
upon which you were doing work are riparian
or not riparian?

"A  Yes, it is one of the principal
considerations that an engineer faces in his
investigation work.

"Q  Are you prepared to state what your con-
cept of riparian land is?

"A  Yes.  My basis for judgment on
riparian lands is that the lands must first
be within the watershed of the stream con-
sidered, and drain into that stream.  They
must also have access to the stream, and they
must be one continuous piece, no part of which
has ever been severed from its riparian rights.

(Volume 2, page 110, lines 6 to 16:)

"Q  Now, Mr. Hall, to recapitulate, do we
understand correctly that in general the total
Vail holdings in the area involved in this
litigation are contained in four grants?

"A  That is correct.

"Q  Three of which, Temecula, Little
Temecula and Pauba are riparian to the main
stream?

"A  Yes.

"Q  And the fourth of which, Santa Rosa, is not riparian to the main stream, but is to the Murrieta?

"A  That is right, and the Sandia and De Luz.

(Volume 2, Page 110, line 16, to Page 111, line 11:)

"Q  Yes, sir.  What is the total acreage of the four grants?

"A  The total acreage of the four grants would be 86,591.  That is made up of the 40,251 acres mentioned above, and 46,340 in the Santa Rosa ranch.  Of this 46,340 in the Santa Rosa ranch, 6,904 are not in the watershed but lie westerly of the watershed.  The drainage from them goes into the San Onofre and San Mateo Creeks.

"In the watershed, then, of the Santa Rosa there is 39,646 acres, of which 19,581 lies in the Murrieta watershed, 10,270 in the Sandia, and 9,589 in the De Luz.

"Q  Now, will you state, Mr. Hall, whether the 29,400 net irrigable acres you spoke of, out of a total of some forty-odd

13

1    thousand acres, applies only to the three

2    grants other than Santa Rosa?

3        "A   That is correct.

4        "Q  And, consequently, they refer only to

5    lands which are riparian to the main stream;

6    is that correct?

7        "A   That is right.

8        "MR. DENNIS:  I wonder if you would explain

9    what you mean by 'the main stream.'"

10

11   VOLUME 2, page 112, lines 1 to 10:)

12       "MR. SHRYOCK:  By the 'main stream' I

13   shall ask Mr. Hall to confirm this, we mean

14   the Santa Margarita-Temecula river system

15   but not including a tributary such as the

16   Murrieta.  In other words, the Santa Margarita

17   is the Santa Margarita up to the confluence

18   of the Murrieta and Temecula and as I

19   understand it the continuation of the main

20   stream is what is known as the 'Temecula

21   River.'  Is that right?

22       "THE WITNESS:  That is right, yes.  And

23   these three grants are all crossed by the

24   main definite channel of that main stream.

25

14

(Volume 2, page 112, lines 11 to 22:)

"Q  BY MR. SHRYOCK:  Now, Mr. Hall, have you determined the riparian nature or not of the 40,000 acres in which the 29,400 acres was computed to lie?

"A  Yes.  It is all riparian because it is a continuous ownership and has never been separated and it is all within the watershed.

"Q  Have you made any personal title graphs of the lands of the Vail estate yourself?

"A  Yes, I have.

"Q  Is there any question in your mind as to the riparian character of the 29,400 acres?

"A  No, there is not."

(Volume 2, Page 114, lines 5 to 22:)

"Q  BY MR. SHRYOCK:  Have you computed or applied a duty of water to the lands which you have ascertained as being irrigable?

"A  Yes, I have.  For our own needs we have classified that 29,410 acres into our groups which are more definitely set out in Exhibit 33, and to the Class A lands of Exhibit 33 I have applied a general average overall duty of 2.35 acre-feet per acre or area-feet, as a shorter term.

15

1     "This makes a need for that Class 'A' land of

2     25,830 acre-feet per annum, if we could get it.

3     "Class 'B' land has the same duty and

4     requires 16,944 acre-feet, if we could get it.

5     "Class 'C' land we applied a duty of 2.5

6     so it requires 13,484 acre-feet with the same

7     proviso and class "d" land has a higher duty

8     because it is adapted to row crops and alfalfa

9     in the river bottoms, an average duty of four

10    acre-feet per acre requiring 23,000-plus acre-

11    feet or a total of 79,514 acre-feet which could

12    be profitably applied to the irrigable land on

13    the ranch if that much water were available."

14              - - - - - - -

15    THE COURT:  Now, another matter between you gentlemen.

16    I made some conflicting orders here.  I asked Mr. Stahlman to

17    prepare some material as to what he had proved on the Coit

18    survey and whatnot, and he replied that he had searched the

19    record and found out that I had ordered you to do it previously.

20    Apparently, therefore, he did nothing and relied upon the

21    former order.  As a result, neither of you has done anything

22    on this matter.

23    MR. STAHLMAN:  Yes, your Honor, I did.

24    MR. VEEDER:  Yes, he did.  He put in some material.

25    MR. STAHLMAN:  Yes, I put it in.

1    THE COURT:  In a written document?

2    MR. STAHLMAN:  Yes, your Honor.

3    MR. SACHSE:  Yes, I have it before me.  We have all had

4  copies.

5    THE COURT:  I don't know that I ever saw a copy of that.

6    MR. STAHLMAN:  I filed it with the Clerk, your Honor.

7    THE COURT:  With a duplicate copy for me?

8    MR. STAHLMAN:  Yes, your Honor.

9    THE COURT:  Let me see what the thing looks like.

10    Then Mr. Veeder is the only man in default.

11    MR. VEEDER:  No, your Honor.  Begging your pardon, your

12  Honor.  I explained to your Honor that I was not about to help

13  the Vail Company.  If they want outlined what they did, in a

14  motion to strike I intend to do that.  But you said to me,

15  "Will you now go through and find out what George has proved?"

16  Your Honor, at that time I very respectfully stated--

17    THE COURT:  Well, let's knock it off.  Mr. Stahlman has

18  filed something.

19    MR. STAHLMAN:  Your Honor, here is a document I filed

20  entitled "Memorandum of Testimony on Soil Survey of Coit."

21    THE COURT:  What was the date it was filed?

22    MR. STAHLMAN:  There is an affidavit of mailing to Mr.

23  Veeder on there.

24    MR. GIRARD:  I received a copy of it in Sacramento on

25  November 19th.

1    MR. SACHSE:  That is my copy.

2    MR. GIRARD:  It must have been filed shortly before that

3  date.

4    MR. STAHLMAN:  It was filed on the same day, your Honor.

5  I got it from the stenographer and came right down to San

6  Diego and filed it.

7    MR. GIRARD:  It is dated in October.

8    THE COURT:  I will look for it and see if I have it.

9  If not, you will have to get me an extra copy.

10    The motion to admit Mr. Halls testimony is a separate

11  document, isn't it?

12    MR. STAHLMAN:  Yes, your Honor.

13    If you wish, I will make another copy.

14    THE COURT:  Let me find out if I have it.  I will look

15  at the recess.

16    MR. VEEDER:  Your Honor, I would like to make myself

17  clear on this proposition.  As I understood your original

18  direction, it was superseded by the one that went to George.

19    THE COURT:  I had forgot that I directed you to do it,

20  or I wouldn't have directed him to do it.

21    Go ahead.

22    MR. VEEDER:  Then as we progressed along George continued

23  putting in these motions in regard to Mr. Hall's and Mr.

24  Bruner's testimony.  I reserved the right and your Honor

25  granted me a right to file a motion, together with supporting

1   points and authorities, to strike all this evidence, including,

2   as I interpret it-- I have already moved to strike the Coit

3   testimony, and I renew that motion to strike now, and I will

4   file with your Honor not what I think George has offered in

5   evidence in support, but where I think he fell down, and I

6   will also refer to the fact that there is a great deal of

7   material which is in conflict, and I will assist your Honor as

8   much as I can by pointing out those factors.

9       THE COURT:  Well, the situation is just this simple.  If

10   in going over this matter I conclude that Vail has made a

11   prima facie case on their proof of the amount of ground and

12   irrigable acreage and irrigated acres, then the burden shifts

13   to you.  You either stand on that record or put some proof

14   in yourself as to how many irrigable and irrigated acres they

15   have.  You are as familiar as I am with the rule that it

16   doesn't have to be proof beyond a reasonable doubt.  If any

17   reasonable showing is made, then the burden is on you to show

18   why it is not correct; and if you don't do it, I would probably

19   propose to find in accordance with the evidence submitted by

20   Mr. Stahlman.  That is how simple the problem is.

21       MR. VEEDER:  I appreciate that, your Honor.

22       MR. STAHLMAN:  Your Honor will find in this document I

23   have excerpted from the transcript the statement Mr. Veeder

24   made to the Court.  I think he kind of forgets some of these

25   things he says spontaneously at times.  But he had stated there

1   that he is going to have a soil survey made of his own.

2        MR. VEEDER:  Oh, no.

3        MR. STAHLMAN:  That's the transcript.  Not only that,

4   but they have been flying planes over there taking pictures

5   of the ranch for that purpose.

6        Haven't you?  Haven't you recently made a series of

7   photographs of that property?

8        MR. VEEDER:  Not under my direction, no.

9        MR. STAHLMAN:  You know nothing about it, Mr. Veeder?

10       MR. VEEDER:  Airplanes flying over Vail?  No.

11       MR. STAHLMAN:  And taking photographs?

12       MR. VEEDER:  Not a thing.

13       THE COURT:  I urged you gentlemen sometime back to see

14   if you couldn't get together first on irrigated acreage,

15   which I thought should be a very simple problem.  Have you

16   done anything on that?  I asked you to renumber the parcels

17   on the irrigated pieces down in the Pauba Valley.

18       MR. STAHLMAN:  That was done, your Honor.

19       THE COURT:  Has that been done?

20       MR. STAHLMAN:  Yes, Col. Bowen and Mr. Wilkinson got

21   together on that.

22       THE COURT:  Has any record been made that that has been

23   done?

24       MR. STAHLMAN:  No, we are coming to that in his testimony,

25   your Honor.

1   THE COURT:  Did you come to some agreement as to how many

2   acres in the Pauba Valley had at any time been irrigated?

3   MR. VEEDER:  I believe that we have already gone into the

4   record on that.  I believe Col. Bowen stated that he and Mr.

5   Wilkinson had agreed .  Isn't that right?

6   THE COURT:  I don't recall that there is anything in the

7   record.

8   MR. VEEDER:  I am certain that on the acreage in the Pauba

9   Valley--

10   THE COURT:  Irrigated acreage.

11   MR. VEEDER:  Irrigated.  I am quite sure, your Honor,

12   that you will find in the record a statement to that effect.

13   MR. GIRARD:  I think Mr. Wilkinson testified to it, your

14   Honor.

15   THE COURT:  I would like to have somebody call my atten-

16   tion to it in the transcript.  You don't have to do it right

17   now.

18   Now, the next issue.  Of course, there is no issue as to

19   the gross number of acres owned by Vail?

20   MR. VEEDER:  We haven't contested that.

21   THE COURT:  That is agreed.

22   So, the remaining issue is twofold:  How many acres are

23   there that are irrigable, and generally where are they?  Now,

24   where they are isn't really too important, because no decree

25   is going to spell out the legal description of where these

1   irrigable acres are in this Vail Estate.   I don't think it is,

2   with the irregularities that would be involved.

3       MR. VEEDER:  Your Honor, with all respect to your Honor,

4   I believe one of the things that has concerned me greatly is

5   that this Exhibit D of the Vail Company, which is a tabulation

6   of the irrigable acreage and the location of the irrigable

7   acreage down to a tenth of an acre, has been offered in evidence

8   and admitted.   I have objected to it, and I intend when the

9   motion is made to move to strike it.

10      MR. STAHLMAN:  Yes, it is already in.   That is the

11   compilation made by Mr. Coit and brought up to date.

12      THE COURT:  It is a compilation, but it is not a legal

13   description of where each parcel is.

14      MR. STAHLMAN:  No, your Honor.

15      THE COURT:  But within certain general areas it shows

16   where they are.

17      MR. VEEDER:  When it is read, though, your Honor, with

18   Exhibit C, it is a location, with all respect to your Honor.

19      MR. STAHLMAN:  Suppose it is a location.

20      MR. VEEDER:  And it does become important.

21      THE COURT:  Well, the major issue between you is how many

22   irrigable acres are there?

23      MR. VEEDER:  That is right.

24      THE COURT:  What is the gross acreage of the Vail Ranch?

25   118,000 acres?

1    MR. STAHLMAN:  97,000 -- in excess of 97,000.

2    MR. VEEDER:  Including the Santa Rosa?

3    THE COURT:  97,000 including the Santa Rosa?

4    MR. STAHLMAN:  Yes.

5    MR. VEEDER:  Is that wrong, Mr. Wilkinson?

6    THE WITNESS:  I believe that is a little strong.  It

7    is more like eighty-seven, not ninety-seven.

8    MR. STAHLMAN:  Did I say ninety-seven?

9    THE WITNESS:  You said ninety-seven.

10   MR. STAHLMAN:  87,000.

11   THE COURT:  There is going to be no issue about the Santa

12   Rosa?

13   MR. STAHLMAN:  No, your Honor, Col. Bowen has made a

14   survey of those creeks up there.  The only effect we believe

15   that evidence will have will be in relation to the matter

16   affecting the stipulated judgment in relation to the runoff

17   of Sandia and De Luz Creeks.

18   THE COURT:  We go north of the Narrows, and the problem

19   is north of the Narrows?

20   MR. STAHLMAN:  Yes

21   MR. VEEDER:  Isn't it true that Coit's survey does ex-

22   tend up to part of the Santa Rosa Ranch?

23   MR. STAHLMAN:  A small portion on the--

24   MR. VEEDER:  Murrieta side?

25   MR. STAHLMAN:  Yes, just a small portion on the Murrieta

11286

1   side.  That is on Murrieta Creek.

2       THE COURT:  How far apart are you in your estimates of

3   the irrigable acreage?

4       MR. STAHLMAN:  According to the evidence they put in

5   before Judge Yankwich, we are right on the nose.

6       MR. VEEDER:  Those were in happier days.  I am not about

7   to be bound by that.

8       MR. STAHLMAN:  Are these unhappy days?

9       THE COURT:  I understand that when the matter was tried

10   before Judge Yankwich the figures of Vail and the Government

11   were the same?

12       MR. STAHLMAN:  Yes.

13       MR. VEEDER:  Your Honor, in that regard, O'Melveny &

14   Myers stipulated with us that there was no conflict, and that

15   is how that went in.

16       THE COURT:  What were those figures?

17       MR. VEEDER:  I haven't checked them.

18       MR. STAHLMAN:  Roughly, your Honor, there was around

19   33,000 acres.

20       THE COURT:  33,000 irrigable acres?

21       MR. STAHLMAN:  Yes, your Honor.

22       MR. VEEDER: I want to check that, because I think that

23   is very high.

24       THE COURT:  What is the Government's contention presently

25   as to how many irrigable acres there are?

1    MR. VEEDER:  I am not contending, your Honor.  I am

2    simply saying that George hasn't proved irrigable acres at

3    this juncture.

4        THE COURT:  What is Vail's present contention, based upon

5    the proof offered?

6        MR. STAHLMAN:  We have proved that there are--

7        Is that Exhibit C?

8        MR. VEEDER:  Exhibit D will show.

9        MR. STAHLMAN:  The exact number of acres-- 33,100.

10       THE COURT:  What page does that compilation appear on?

11       THE WITNESS:  Page F.

12       MR. STAHLMAN:  Page F, your Honor.

13       It shows the total as 33,128.1.

14       THE WITNESS:  That is the total acreage.  The irrigable

15   acreage is 30,377.

16       MR. STAHLMAN:  '30,377.  The entire acreage involved was

17   33,128.

18       THE COURT:  I don't see that 30,000 figure on page F.

19       MR. STAHLMAN:  Mr. Wilkinson, will you show his Honor

20   right here on that exhibit?

21       THE COURT:  Oh, I see.  I see the column.  It starts

22   33,677.5, and then it lists Class A, Class B, Class C, Class D,

23   and then it lists 3,290.5 as waste.  Is that right?

24       THE WITNESS:  That is right.

25       MR. STAHLMAN:  That is correct.

1       THE COURT:   So we take 33,667.5 and subtract 3,290.5,

2   and you get 30,377.   Is that right?

3       THE WITNESS:   That is right, your Honor.

4       THE COURT:   I recall testimony of Col. Bowen in  this

5   matter where he was interrogated as to some spot checks that

6   he had made, and my offhand recollection of his testimony

7   was that on the areas he had spot checked this Exhibit D was

8   fairly accurate.   Do you remember that?

9       MR. SACHSE:   That's my recollection, your Honor.

10       MR. VEEDER:   That happened one day when I was in Denver,

11   the only day I was not in court.

12       THE COURT:   You mean you were not here?

13       MR. STAHLMAN:   You were here the next day and found out

14   about it.

15       MR. VEEDER:   I was very bitter.

16       MR. STAHLMAN:   If you were here, the facts would have

17   been changed?

18       MR. SACHSE:   Your Honor, this isn't really my bowl of

19   soup, but we just listened a minute ago to Dr. Henderson, a

20   retired dentist, testify what he thinks there is as irrigable

21   acreage and it is admissible.   My client Gus Shaver, who

22   drives a truck, a former fullback at U.S.C., testified to

23   irrigable acres.   And right down the line in Master's hearings

24   we have permitted this.   I think this is the most terrific

25   time waster I have ever seen.   Mr. Veeder's objection is to

1    weight.   I think he can ask Sandy how many irrigable acres

2    are there on the Vail Ranch?  If he says 50,000, all right,

3    period.   From there on Mr. Veeder can try to show that Sandy

4    doesn't know what he is talking about.   I think all of this

5    is absolutely unnecessary.

6           And of course, as your Honor knows, I think irrigable

7    acreage isn't admissible anyway.

8           THE COURT:   "Judge" Sachse, I think you are probably

9    correct.

10           MR. STAHLMAN:   I think he is.

11           THE COURT:   I think it is a great waste of time.

12           I have understood you to say somewhere privately or in

13    the courtroom that at the very worst the Vail figures were

14    only 10% off, but that the Government was so interested in

15    accuracy that they wanted to find out about this other 3,000

16    acres.   10% of that figure would be 3,000 acres.

17           MR. VEEDER:   That is a lot of land, your Honor.

18           THE COURT:   We are not talking about irrigated land.   We

19    are talking about irrigable land.

20           MR. VEEDER:   That is right.

21           THE COURT:   3,000 acres doesn't amount to a grain of rice.

22           MR. VEEDER:   I am glad to hear Mr. Sachse bleed a little

23    bit.   He has been so quiet for a while.   I am glad he is finally

24    alive.

25           But the point I am trying to make, your Honor, is that

1   from my position I am making a record as carefully as I know

2   how, because if your Honor upsets the stipulated judgment I

3   want the record exactly-- well, I want to be able to point

4   out to the Ninth Circuit some of these things that worry me so

5   much.

6        Further, I don't believe that the evidence that has gone

7   in from Dr. Coit, Exhibits D and C, can be sustained on any

8   theory.  I am preparing a memorandum now.  I will hand it

9   to your Honor.

10       If somebody wants to go ahead, let's go ahead and get

11  something done.  I have been waiting a long while.  I told

12  your Honor a long time ago I was going to file a motion to

13  strike and that I was going to put in my memo of points and

14  authorities.

15       MR. STAHLMAN:  Get it done and let us know your position,

16  as soon as possible.

17       THE COURT:  All right, it's time for a recess.  We have

18  Mr. Wilkinson on the stand here and as soon as we return from

19  the recess we will start taking some testimony.

20       MR. VEEDER:  Attacking the judgment?  That is the next

21  thing.

22       MR. STAHLMAN:  Oh, it's testimony.

23       (Recess.)

24       THE COURT:  I found your summary, Mr. Stahlman.

25       MR. STAHLMAN:  Thank you, your Honor.

1        Before we get into this matter, I wonder if we might ask

2   some of the attorneys here about what the program will be.   I

3   don't know whether we will finish with this witness by

4   tomorrow night or not.   Mr. Veeder will undoubtedly have some

5   cross-examination.   Let's assume that we do not.   Can we de-

6   termine when we will return to court?

7        THE COURT:   We will fix some date after the first of the

8   year.

9        MR. STAHLMAN:   Very well.

10       THE COURT:   And give Mr. Veeder a chance to get in these

11  motions that he wants to make.

12       Then you are going to talk about trying the rest of these

13  parcels in Murrieta Valley.

14       MR. VEEDER:   That is correct.

15       THE COURT:   Let's go ahead.


17                    JAMES V. WILKINSON,

18  called as a witness in behalf of the defendant Vail Company,

19  having been previously duly sworn, testified as follows:

20       MR. STAHLMAN:   If there is no objection, there has been

21  lodged by the Government Exhibit 144.   It is not in evidence.

22  It is the entire judgment of the original Santa Margarita

23  case, and I would like the privilege of withdrawing this for a

24  few days, if I may, to make copies of it.

25       Do you have any objection, Mr. Veeder?

1    THE COURT:  That may be withdrawn for that purpose.

2    MR. STAHLMAN:  I will make copies for all counsel, your

3  Honor.

4    MR. VEEDER:  The Christmas spirit has taken over.

5    THE COURT:  Proceed.

6    MR. STAHLMAN:  I get my Christmas spirit from a different

7  source.

8    THE COURT:  You have been sworn, Mr. Wilkinson.

9    THE WITNESS:  I have, your Honor.

10

11              DIRECT EXAMINATION

12  BY MR. STAHLMAN:

13    Q  In connection with the matter his Honor brought up,

14  Mr. Wilkinson, you and Col: Bowen did meet and confer with

15  relation to the acres irrigated on the Vail Ranch as shown

16  upon Vail's Exhibit J?

17    A  Yes, we did.

18    Q  And did make some designations upon the map to desig-

19  nate the particular areas?

20    A  Yes, we did.

21    THE COURT:  What did you do, assign parcel numbers?

22    THE WITNESS:  That is right; parcels 1 through 19.

23  BY MR. STAHLMAN:

24    Q  Do you have a list that works in connection with it

25  designating the parcels and the acreage?

1          A  I do.

2          THE COURT: Do you have copies of it?

3          MR. STAHLMAN: I believe, your Honor, Col. Bowen previously

4    testified in connection with this matter, and there was some

5    17 acres difference.

6          Isn't that right?

7          THE WITNESS: I believe it is around four acres difference.

8          MR. STAHLMAN: Oh, four acres difference.

9          THE WITNESS: In the total.

10         MR. STAHLMAN: Is that correct, Col. Bowen?

11         COL. BOWEN: At the time I testified there were 17 acres

12   difference, but since then Mr. Wilkinson has recomputed and

13   now there are only four acres difference.

14         THE COURT: The figure shown on the list handed me is

15   3,299.

16         COL. BOWEN: Yes, sir.

17         THE COURT: What was the other figure that the Government

18   had-- four more or less?

19         COL. BOWEN: Four more, your Honor, 3,303.

20         THE COURT: And that is already in the record?

21         COL. BOWEN: I don't believe I gave that figure in the

22   record. I simply stated the difference, your Honor.

23         THE COURT: You are under oath, and your statements made

24   here, according to your computation, it is 3,303?

25         COL. BOWEN: Yes, sir.

1    MR. VEEDER:  There is agreement on that, your Honor.

2    THE COURT:  All right.

3    MR. STAHLMAN:  Would your Honor like the list of the

4  irrigated acres according to parcels on the map?

5    THE COURT:  That is what has been handed to me, and it

6  will be received in evidence as an exhibit.

7    MR. STAHLMAN:  That could be Vail's J-1?

8    THE WITNESS:  No, it could replace the original.

9    MR. VEEDER:  I am going to move to strike Vail's K, be-

10  cause it supersedes it.

11    THE WITNESS:  That is right.

12    THE COURT:  Just a moment.  This Vail's J-1 now has each

13  of the parcels which were previously referred to by name numbered,

14  and Vail's K was the old compilation, and I suppose Vail's K

15  should now go out of the record.  Is that agreeable?

16    MR. STAHLMAN:  Yes, your Honor.  Shall we supplement it

17  by this new list and call this Vail's K?

18    MR. VEEDER: If you want to substitute it, I am agreeable.

19  Why don't you make it Vail's K and withdraw the other.

20    THE COURT:  We will substitute it.

21    MR. VEEDER: Very well.

22    THE COURT:  This one sheet will be called Vail's K and will

23  be in evidence in lieu of the previous Vail's K.  This is the

24  second substitution.  I see we have two previous Vail's K's.

25  The Clerk will mark this new K in evidence as of this date.

1    THE CLERK:  Yes,  your Honor.

2    THE COURT:  All right.

3    (Vail's Exhibit New K was received in evidence.)

4  BY MR. STAHLMAN:

5    Q  Mr. Wilkinson, have you made an investigation or

6  search to determine the drilling of any wells since the entry

7  of the stipulated judgment?

8    MR. VEEDER:  Where, George?

9    MR. STAHLMAN:  I will come to that.

10   THE WITNESS:  I have made a search.

11  BY MR. STAHLMAN:

12   Q  Did you compile a list of the wells that you discovered

13  in that search?

14   A  A partial compilation.

15   MR. STAHLMAN:  I might indicate, for the benefit of

16  counsel, that that list is contained as Exhibit 2 in the

17  memorandum which I have filed in connection with the testimony

18  to be adduced in the Vail case regarding the stipulated

19  judgment.

20   THE COURT:  I saw it.  Now, do you have an exhibit here

21  with this list on it?

22   MR. STAHLMAN:  Yes, your Honor.

23   THE COURT:  What is the next Vail number?

24   THE CLERK:  The Vail number will be AN, your Honor.

25   THE COURT:  What about AL?  I don't seem to find what

1  that is.

2      THE CLERK:  Geological map showing portions of the Vail

3  Ranch, your Honor.

4      MR. STAHLMAN:  Oh, yes.

5      THE CLERK:  And Vail's AM is Answers of Defendants in

6  Case No. 42850, Superior Court of the State of California.

7      MR. STAHLMAN:  Yes.

8      THE COURT:  Are Vail's L and M in evidence?

9      MR. STAHLMAN:  No, your Honor.

10      THE COURT:  Just marked.

11      MR. STAHLMAN:  We will touch upon them as proceed with

12  his testimony.

13      THE COURT:  All right, now you are marking Vail's AN, a

14  list of wells drilled in various parts of the valley since

15  the entry of the stipulated judgment.  Is that right?

16      MR. STAHLMAN:  Yes, that is right, your Honor.  And it is

17  further designated in the exhibit as Hydrographic Unit No. 1

18  of the State Bulletin No. 57, merely for location.

19      THE COURT:  You offer in evidence Vail's AN?

20          MR. STAHLMAN:  Yes, your Honor.

21      THE COURT:  AN received in evidence.

22      (Defendant Vail's Exhibit AN was received in evidence.)

23  BY MR. STAHLMAN:

24      Q  Now, directing your attention to Exhibit AN, consisting

25  of two pages--

1    THE COURT:   Do you have a copy for me?

2    MR. STAHLMAN: There was one in the memorandum, your

3  Honor.

4    THE COURT:   All right, I will look at the one in the

5  memorandum.

6    MR. STAHLMAN:   It is marked as Exhibit 2 in the memorandum,

7  your Honor.

8    Q  Will you explain to the Court the source of information

9  and what is depicted on Vail's Exhibit AN in connection with

10  the wells of which you made a check?

11    A  Vail's Exhibit AN is a resume and a partial compilation

12  of wells listed as being irrigation wells in the various

13  hydrographic units 1, 2 and 3 of State Bulletin 57.   These

14  wells were drilled after January 1, 1941 and go through the

15  period 1953 and '54, at which time the State ceased their

16  efforts in the area.

17  BY MR. STAHLMAN:

18    Q  In other words, after the year '53 or '54 any wells

19  that were drilled for irrigation purposes are not contained

20  within this exhibit?

21    A  That is right.

22    Q  Do you know that there were other wells in addition

23  to the wells contained on this list drilled after the dates

24  of '53 and '54?

25    A  Oh, yes, from my own knowledge of the area I know there

1   are wells, and it has also come out in the testimony by the

2   defendants represented by Mr. Krieger.

3       Q For instance, the Roripaugh well that was brought in,

4   as he testified, I believe, about four years ago, that well

5   is not included in this list?

6       A   He has wells not included in this list.

7       Q   And that is true of other persons in the areas?

8       A   That is true.

9       Q   What is the general area in which Hydrographic Unit

10  No. 1 of Bulletin 57 pertains to?

11      A   That is the area best depicted on the map contained in

12  Bulletin No. 57, but it is the area in Murrieta Valley.

13      Q And the area that is contained in Hydrographic Unit No.

14  2, where is that area?

15      A   That is an area above Vail Dam on, I believe it is,

16  Wilson Creek.

17      Q   And Hydrographic Unit No. 3, generally speaking, where

18  is that?

19      A   That is also an area above Vail Dam.

20      MR. VEEDER:   Your Honor, isn't this material entirely

21  cumulative?   I am not trying to argue with George, and I am

22  not even making an objection; but I believe this is all in the

23  record today.

24      THE COURT:   That is right.   But this pulls it together

25
    so that we can look at it a little more clearly.

1          MR. STAHLMAN:  That's right, your Honor.

2          THE COURT:  Don't you want me to consider these things?

3          MR. VEEDER:  I don't particularly care, your Honor, but

4    I am sure it is all in the record-- every bit of it.

5          MR. STAHLMAN:  Yes.  It differentiates, however, the

6    wells that were included within certain dates.

7          THE COURT:  Go ahead.

8          MR. STAHLMAN: We have lodged Vail's Exhibit AM, which is

9    the original answer filed in the suit Santa Margarita vs.

10   Vail, Action No. 48250 of the Superior Court of San Diego

11   County.  We will offer a certified copy of that answer in

12   evidence.

13         MR. GIRARD:  Vail's answer, George?

14         MR. STAHLMAN:  Yes.  It is an amended answer.

15         THE COURT:  It is received in evidence.

16         Do you have an extra copy of that?

17         MR. STAHLMAN:  Your Honor, I have.  It is contained in

18   the memorandum which I prepared.  The material about the

19   answer that I am concerned with at this time is in Exhibit No.

20   3.  If your Honor desires copies I can have them made.

21         THE COURT:  No, let me look at it, if you haven't got it.

22         What significance do you attach to this?

23         MR. STAHLMAN:  The significance is that in the answer

24   the Vail Company had alleged that there were other water users

25   in the area of the Vail Ranch that should be parties defendant

1    in that case; that findings show that the Court considered that

2    matter and did not make them parties defendant; that many of

3    the properties are properties that are in this case.   In other

4    words, here was Vail Company in 1926 or when this answer was

5    filed doing the very thing that the Government said has to be

6    done at this time, and they made a motion, which was opposed

7    by the plaintiff in that case, the predecessors in interest, and

8    they opposed the bringing into the lawsuit at that time other

9    persons in the case.

10   THE COURT:  All right.

11   MR. STAHLMAN:  Now, the significance of it is that here

12   we are now, they are claiming that these parties belong in the

13   case, and they are in the case, and it shows that Vail Company

14   at that time wanted them in the case.

15   THE COURT:  All right, I have your point.

16   MR. VEEDER:  Your Honor admitted it a little fast for me.

17   I want to object on the grounds that it is incompetent, irrele-

18   vant and immaterial, not tending to prove any issue in this

19   case.

20   I renew the additional objection that this is a collateral

21   attack upon a judgment entered in the State court, and that

22   it is no proper place here thus to attack collaterally the

23   judgment entered by the Superior Court of the State of

24   California.

25   This is an entirely different issue, your Honor, that is

1 being raised now.  He is saying here that there was a non-

2 joinder of parties, apparently, an entirely different aspect.

3 His pleadings relate in no way to it.

4     THE COURT:  It will not be considered by the Court on any

5 technical ground of now ruling upon whether there should have

6 been a joinder at that time or not.  But I understand it is

7 offered to help portray the general picture of what went on in

8 connection with the Vail Company's contentions to set aside

9 the stipulated judgment, if I make myself clear.  In other

10 words, the technical objection of non-joinder, standing by

11 itself, is a matter that should have been ruled upon, and

12 apparently was, by the Superior Court.

13     MR. VEEDER:  That is right.

14     THE COURT:  In that isolated position I am not going now

15 to rule that there should have been a joinder.  But I do in-

16 tend to look at all of this evidence from the standpoint of

17 determining whether or not the Vail judgment, the stipulated

18 judgment, should stand or fall, or relief be given in connec-

19 tion with it.

20     MR. VEEDER:  I wanted to express my position in regard to

21 the objection that I made.

22     THE COURT:  Objection overruled.

23     What is your next exhibit?

24 BY MR. STAHLMAN:

25     Q  I will show you here what is marked as Exhibit No. 3

1   in the memorandum, which was submitted to the Court and counsel--

2       THE COURT:  That will be marked Vai's Exhibit AO for

3   Identification.

4       (Vail's Exhibit AO was marked for identification.)

5       THE COURT:  What does it purport to be, Mr. Wilkinson?

6       THE WITNESS:  This is a comparison of owners as defend-

7   ants in the present action as compared to some of the owners

8   that were requested by Vail Company to be included in the

9   original action.

10   BY MR. STAHLMAN:

11       Q  You have two columns:  Present owners and Old owners.

12   Does this list, Exhibit AO, contain all of the names that

13   were listed in the answer in the previous case?

14       A  No, it does not.

15       Q  What was the method by which you determined the present

16   owners in relation to the old owners as contained in the

17   answer and contained on Exhibit AO?

18       A  First of all, in many instances, a simple comparison

19   of names.

20       Q  They are still the present owners?

21       A  They are still the present owners.  And then also from

22   my knowledge of the area and the old owners and the present

23   owners it was a simple progression of ownership to the present

24   one.  For instance, the first owner Barnett.  We have heard

25   his name mentioned in court many times.  We find now that there

1    are other owners Barnett.  The old owners Barnett, I should

2    say, follow down to one owner Barnett, and that Barnett

3    property now has been broken down to various Roripaugh, Cass

4    and others.

5         Q And the names that are contained in the answer that

6    are not on this Exhibit AO, are those properties that you are

7    unable to determine who the present owners are?

8         A   That is right.

9         Q   Or didn't know?

10        A   Or didn't know.

11        MR. VEEDER:  Your Honor, I think, first, that Mr.

12   Wilkinson is not qualified to undertake this research.

13        Secondly, and more important, however, I think that this

14   evidence would be incompetent, irrelevand and immaterial, and

15   not tending to prove any issue in the case.

16        I will shorten it by saying that this is part of the

17   collateral attack upon the judgment entered in another court

18   and not proper under the circumstances.

19        THE COURT:  Overruled .  I am going to receive all of

20   this, and I am going to determine later whether or not this

21   is a proper collateral attack.

22        In certain instances I suppose that property has descended

23   from one person to another; like in lines 13 on down:  A. L.

24   Wilks was the previous owner, and now there are H. L., Richard,

25   Charles, and T. H., all having parts of the Wilks property.

1    MR. STAHLMAN:  I offer in evidence Vail's Exhibit AO.

2    THE COURT:  Received in evidence.

3    (Vail's Exhibit AO for Identification was received in

4    evidence.)

5    BY MR. STAHLMAN:

6    Q  I will show you here a document which was marked as

7    Exhibit 5 and included as a part of the memorandum which was

8    submitted to the Court in connection with the issues of the

9    stipulated judgment, and ask you if you prepared the material

10   which is upon this sheet Exhibit 5, as contained in the mem-

11   orandum.

12   A  Yes, I have.

13   THE COURT:  Let's give it an identification number.

14   THE CLERK:  AP, your Honor.

15   THE COURT:  Vail's AP for Identification.

16   (Vail's Exhibit AP was marked for identification.)

17   THE COURT:  Did you prepare it?

18   THE WITNESS:  Yes, I did.

19   THE COURT:  What does it purport to be?

20   MR. STAHLMAN:  Explain it and the source of your informa-

21   tion.

22   THE WITNESS:  The source of information is, as noted on

23   the compilation-- it is at the bottom portion of it-- each

24   column stating from what source the information came.  It is

25   demonstrative of the situation which exists and has existed on

1    the Santa Margarita River.   The compilation is broken into

2    three portions.

3        MR.STAHLMAN:   First, may I ask, the time here is between

4    1942 and '57, that is, when the stipulated judgment went into

5    existence?

6        A   That is right.

7        These three portions are headed by the names Camp

8    Pendleton, Intervenors, and Vail Company.

9        THE COURT:   These are in acre-feet?

10       THE WITNESS:   These are in acre-feet, your Honor.

11       THE COURT:   And I see under each column you have put the

12   source of your information, and as to Pendleton you show in

13   Column 1 the military purposes, in column 2 irrigation purposes,

14   in column 3 you add them together, incolumn 4 pumped, from

15   Bulletin 57.   What is the significance of that?

16       THE WITNESS:   That is in order to gather the figures,

17   as noted in Footnote B, of 1942 and '43 from column 4.   These

18   items were not given in the United States Government's exhibit,

19   Exhibit 150.   The information was, apparently, lacking in their

20   records.   The State Bulletin No. 57 had these figures, so I

21   inserted the column in order to get a complete rundown of the

22   period concerned.

23       THE COURT:   What did you mean by "pumped"?   Do you mean

24   pumped out of wells on Camp Pendleton?

25       THE WITNESS:   That is right, your Honor.

1    THE COURT:  Where did you get these figures?

2    THE WITNESS:  In column 4, your Honor?

3    THE COURT: Yes.

4    THE WITNESS:  From State Bulletin 57.

5    THE COURT:  Except for the last three items?

6    THE WITNESS:  Except for the last three items, which are

7 from Vail Company's records.

8    THE COURT:  How did Vail Company have records of what was

9 pumped at Camp Pendleton?

10    THE WITNESS: There is a joint measuring situation where

11 all our pumpage is measured as well as theirs by the same man.

12    MR. VEEDER:  That is pursuant to the stipulated judgment.

13    THE COURT:  And he sends you a copy of the report?

14    THE WITNESS:  They have copies of our pumpage, and we

15 have copies of theirs.

16    MR. STAHLMAN:  That is the Mr. Green who has been here-

17 tofore referred to.

18    THE COURT:  Column 5 is diversions through the O'Neill

19 Ditch.

20    THE WITNESS:  That is right, your Honor.

21    THE COURT:  And you have added that to 3?

22    THE WITNESS:  Yes, I have added that to column 3.  In

23 other words, column 6 contains what is pumped and what is

24 diverted into the lake.

25    THE COURT:  In other words, Column 6 says 3 plus 5.

1    THE WITNESS:  That is right.

2    THE COURT:  But actually you say it was what was pumped

3  and what was diverted.  What was pumped was 4.

4    THE WITNESS:  You will note that columns 3 and 4 contain

5  the same information.  The breakdown into military purposes

6  and irrigation purposes is from United States exhibits.  They

7  are combined and should be the same as column 4.  However,

8  there are small variances in the combination of 1 and 2, as

9  compared to column 4.  For all intents and purposes, they

10  should be the same figure.

11    THE COURT:  So you actually use, when you made this

12  Column 6, you used 5, the O'Neill Ditch, and you used Column

13  3, which was the total of 1 and 2?

14    THE WITNESS:  That is right, your Honor.

15    THE COURT:  Instead of using the pumpage from Bulletin 57.

16    THE WITNESS:  That is right.

17    MR. SACHSE:  I think I understand this, but to keep from

18  having to go back, your Honor, 3 is a total of 1 and 2, and

19  3 and 4 should be the same.

20    Is that right?

21    THE WITNESS:  Yes.

22    MR. SACHSE:  Except that, apparently, the figures as

23  introduced in Exhibits 150 and 151 are not quite the same as

24  the figures in Bulletin No. 57.

25    THE WITNESS:  That is right.

1      THE COURT:   Now, 7, you took the flow to the ocean.   I

2   understand that.

3      Then your last column is the actual use shown in column

4   6 plus the flow to the ocean.

5      THE WITNESS:   That is right, your Honor.

6      THE COURT:   Then Column 9 and Column 10 involve inter-

7   venors by area grouped Fallbrook and Naval Depot?

8      THE WITNESS:   That is right, your Honor.

9      THE COURT:   These both draw water out of the river?

10      THE WITNESS:   That is right, your Honor.

11      THE COURT:   Where did you get column 9?   From State

12   Bulletin 57?

13      THE WITNESS:   Column 9 is from State Bulletin 57.

14      THE COURT:   Column 10?

15      THE WITNESS:   Column 10 is from State Bulletin 57 and

16   Vail Company's records.

17      THE COURT:   How would you have records of what was

18   diverted at the United States Navy Depot?

19      THE WITNESS:   The same man, Mr. Green, supplies us

20   information, as well as, I think, we have other sources of

21   information on that.

22      THE COURT:   Then you took the Vail Company for columns

23   11 through 15, and you showed in column 11 what was pumped,

24   your own records, and in column 12 water you got from the lake

25   for irrigation purposes from your own records?

1    THE WITNESS:  That is right.

2    THE COURT:  13 is evaporation loss?

3    THE WITNESS:  Not that, your Honor.  Evaporation less

4  consumptive use.

5  BY MR. STAHLMAN:

6    Q  Explain what you mean by evaporation less consumptive

7  use and how you arrived at those figures there.

8    A  Well, the evaporation, of course, is a straight figure--

9  evaporation from the surface of the lake itself.  However,

10  there would be transpiration if the lake were not in existence.

11  In other words, without the lake there are certain losses

12  which will occur naturally from the phreatophytes.

13    Q  May I ask you a couple of questions along this line.

14  There was, prior to the building of Vail Dam, a study made

15  as to what those losses would be by reason of the evapo-

16  transpiration losses?

17    A  Yes.  That study is shown on page 133 of Bulletin 57.

18    MR. VEEDER:  Your Honor, I have refrained from objecting

19  to these references to Bulletin 57 up to now.  Bulletin 57 was

20  excluded based upon an objection.

21    THE COURT:  No.

22    MR. SACHSE:  Bulletin 57 is in evidence.

23    THE COURT:  Parts of it.

24    MR. SACHSE:  Yes, parts of it.

25    MR. VEEDER:  No, Bulletin 57 isn't in evidence.

1    THE COURT: Parts of it are.

2    MR. SACHSE: Parts of it.

3    MR. VEEDER: Your Honor, the data that was admitted in

4  Bulletin 57, some of it, the statistics I agree to.  And the

5  only part that is in there is Mr. James's testimony and, to

6  some degree, Mr. Illingworth's testimony--

7    MR. STAHLMAN: Bill, you can make this speech if you want

8  to, but I can overcome it.

9    MR. VEEDER: I am not making any speech.  When we are

10  talking about Bulletin 57, we have to go back and see the

11  circumstances that relate to it and whether these pages are,

12  in fact, in evidence.

13    MR. STAHLMAN: May I ask a couple more questions, your

14  Honor?

15    THE COURT: Yes.

16    MR. STAHLMAN: The minute you mention 57 Mr. Veeder just

17  hurts.

18    THE COURT: Go ahead.

19  BY MR. STAHLMAN:

20    Q  This study that was made previous to the construction

21  of the dam, do you have those figures as to the evapo-transpira-

22  tion loss in the files of the Vail Company?

23    A  In the files of the Vail Company this study is in

24  existence, yes.

25    Q  Do you know whether or not those figures are the same

1  figures that appear in Bulletin 57?

2      A  Yes, they are the same figures that appear in Bulletin

3  57.

4      Q  In other words, Vail gave them to the State and the

5  State put them in Bulletin 57?

6      A  Yes.

7  THE COURT:  Who made the study?

8  THE WITNESS: Mr. A. L. Sonderegger.

9  THE COURT:  Who is he?

10  THE WITNESS:  He is a consulting hydrologist.  I would

11  say he held a high position for many years in Southern

12  California.

13  THE COURT:  Who was he working for when he made these

14  figures?

15  THE WITNESS:  Vail Company.

16  THE COURT:  This was prior to the building of the Vail

17  Dam?

18  THE WITNESS:  That is right.  I believe the report is

19  dated July of 1948.

20  THE COURT:  And these are some of the figures relied upon

21  when the Vail Company expended money for the dam?

22  THE WITNESS:  That is right.

23  MR. VEEDER:  I object to this on the grounds that this

24  phase is all hearsay, your Honor.

25  THE COURT:  Obviously, it could be a business record.

1   if the Vail Company spent money based upon the figures.

2         MR. VEEDER:   I don't believe the rule to which you are

3   referring would have application.   This is purely hearsay.

4   If Mr. Sonderegger is the one who prepared it, I think he

5   should appear.

6         THE COURT:   Are these figures prepared by this engineer

7   part of the business records of your company?

8         THE WITNESS:   Of course.

9         THE COURT:   And upon receipt of this report from the

10  engineer you kept them as part of your records?

11        THE WITNESS:   Of course.

12        THE COURT:   And has the company relied upon them and

13  the Vail interests relied upon them in expending money for

14  the Vail Dam?

15        THE WITNESS:   Mr. Sonderegger was one of the consulting

16  engineers in the original studies made for the dam itself.

17        THE COURT:   And you relied upon his advice and statistical

18  data that he prepared?

19        THE WITNESS:   Yes, your Honor.

20        THE COURT:   The objection is overruled.

21        The purpose of this column 13, I suppose, is to show just

22  how much more water would be lost because Vail Dam is in ex-

23  istence than would have been lost if Vail Dam was not in ex-

24  istence; is that it?

25        MR. STAHLMAN:   Yes, your Honor.

1    MR. VEEDER:   That is the real reason for my objection.

2  This is an extremely important matter and it is clearly hear-

3  say.

4    THE COURT:   712 acre-feet.

5    MR. VEEDER:   Yes, your Honor, it's a lot of water.

6    MR. STAHLMAN:   You may also recall that Mr. Hoffman

7  testified here in relation to the evaporation of the dam,

8  and I don't think these were taken into account.   This evi-

9  dence is admissible for several reasons.

10    THE COURT: I would hazard a guess that when you get

11  through checking the figures you will not find there is too

12  much discrepancy in the figures that have been supplied.

13    Now, your column 14 is your column 11, the amount you

14  pumped, plus your irrigation from the lake in 12, and

15  evaporation loss out of Vail Lake, less what would have been

16  lost, which gives you 14, and then in 15 you list-- What is 15?

17    THE WITNESS:   15 is a net use figure, your Honor, as

18  compared to a use figure.   It is called 14 less 30% for returned

19  irrigation water.

20    THE COURT:   Where do you get the 30% figure?   From

21  testimony in this record?

22    THE WITNESS:   The testimony is in the record already,

23  I believe, your Honor.   Col. Bowen said it could run as high

24  as 35 to 40%, I believe.

25    THE COURT:   And that 30% would be the average of water

1    returned to a river system because of irrigation?

2         THE WITNESS:  That is right.

3         MR. STAHLMAN:  You notice that we have taken the lowest

4    figure there.  I think it will run actually higher.

5         THE COURT:  So then you wind up by showing that the use

6    at Pendleton has averaged a little over 8,000 acre-feet,

7    and the use by Vail has averaged a little less than 3,500

8    acre-feet; is that right?

9         THE WITNESS:  That is right, your Honor.

10         MR. VEEDER:  May I ask some questions on voir dire, your

11   Honor?

12         THE COURT:  Is that the purpose?

13         THE WITNESS:  That is not the entire purpose, your Honor.

14         THE COURT:  What other purpose?

15         THE WITNESS:  I think one should not help but note the

16   last five figures in column 15 as compared to the figures

17   preceding those will show Vail Company's efforts and results

18   of Vail Dam and water had the Vail Dam not been built would

19   jump from column 15 all the way back to column 7 and flow

20   to the ocean.

21         MR. STAHLMAN:  In other words, by that you mean that this

22   study shows one thing, it shows that there would have been

23   water lost into the ocean had not Vail Dam been constructed?

24         THE WITNESS:  That is right.

25         MR. VEEDER:  May I ask some questions on voir dire, your

## VOIR DIRE EXAMINATION

BY MR. VEEDER:

Q   Now, in referring to column 15, would you state the sources of the data upon which you relied in obtaining that data?

A   Well, the numbers in column 15 are from our records.

Q   They are your records?

A   That is right.

Q   Now, when you made your calculations in regard to the return flow-- You did make calculations, didn't you, in regard to return flow?

A   Yes, I did.

Q   Did you take into consideration the disparity between return flow when you irrigated by the rill method and when you irrigated by sprinklers?

A   I took it into consideration only to the extent that Col. Bowen made the statement as to return waters, and our irrigation is practically in its entirety by, as you call it,-- what was that?

Q   Rill.

A   --rill irrigation.

Q   What do you call it?

A   I would call it flood type or furrow irrigation.

Q   Isn't there a difference between flood type and furrow irrigation?

1    A   Well, it is water that is run across the ground as

2   compared to sprinkler irrigation, which is in the form of

3   sprinklers through the air and onto the ground.

4    Q   You are using sprinklers, aren't you, now?

5    A   We are, and we have used sprinklers mainly for

6   germination of our crops.   Our operation as far as the Vail

7   Company is concerned is almost in entirety a flood type

8   irrigation.

9    Q   But you would state that the basis of your data in

10   regard to return flow was largely the statements made by

11   Col. Bowen; is that right?

12    A   That and other sources which I wouldn't identify as

13   one particular thing.   It is common knowledge that there is

14   a return flow.

15    Q   Depending, though, a great deal upon a vast variety of

16   circumstances; isn't that right?

17    A   Well, it is as vast a variety as you find in any

18   irrigation.

19   THE COURT:  Let me ask one question.  Vail Dam gates

20   were closed when?

21   MR. STAHLMAN:  1949.

22   THE COURT:  What part?

23   THE WITNESS:  I think it was October, 1948.

24   MR. STAHLMAN:  October, '48.

25   THE COURT:  1948.  So the water year 1949 shown in this

11317

1    chart is the first one that reflects the real operation of

2    Vail Dam; is that right?

3        THE WITNESS:  That is right.

4        MR. SACHSE:  Your Honor used the term "water year."

5        Are these years water years, Mr. Wilkinson, or are they

6    calendar years?

7        THE WITNESS:  Water years.

8        THE COURT:  Well, it's noontime.

9        MR. STAHLMAN:  Yes.

10       May we offer in evidence Vail's Exhibit AP.

11       MR. VEEDER:  I want to make objection, your Honor, on

12   the grounds that it is hearsay.

13       THE COURT:  I am afraid we wouldn't have time now to

14   hear the long objection.  You will make it after lunch.

15       MR. VEEDER:  I will be succinct.

16       THE COURT:  Make it right after lunch.

17       MR. VEEDER:  All right.

18       THE COURT:  Be here about a quarter of 2-- 1:45.

19       (Noon recess.)

20

21

22

23

24

25

1    San Diego, California, Thursday, December 17, 1959.  1:45 P.M.

2

3                          JAMES V. WILKINSON,

4    recalled as a witness in behalf of the defendant Vail Company,

5    having been previously duly sworn, testified further as

6    follows:

7         THE COURT:  Does anybody know where in Bulletin 57 these

8    figures came from which Mr. Wilkinson says he relied upon?

9    Did anybody check to see where they appear?

10        MR. GIRARD:  I haven't checked to find out in the

11   bulletin.  They came from the original exhibit which was

12   introduced by the United States in the first suit.  I think

13   Col. Bowen can give you the explanation better than I can.

14        THE COURT:  You mean that exhibit in the first suit--

15        MR. GIRARD:  Was used as the basis for the figures in

16   the Bulletin.

17        THE COURT: --was the source of the figures in the Bulletin?

18        MR. GIRARD:  Yes.

19        MR. STAHLMAN:  The first suit they are talking about is

20   the Yankwich trial.

21        MR. GIRARD:  The Yankwich trial.  The United States'

22   exhibit in that suit.

23        MR. VEEDER:  The exhibit there was simply adopted by the

24   State and written into their bulletin.  The reason why there

25   is a variance is that simply figures were taken at different

1  times of the year.

2  THE COURT:  In other words, if I understand this right,

3  the United States introduced an exhibit at the first trial

4  before Judge Yankwich.

5  MR. GIRARD:  Yes, your Honor.

6  THE COURT:  That dealt with this business of evaporation

7  loss and use, et cetera, and when the State compiled Bulletin

8  57 they picked up this material prepared by the Government and

9  used the figures?

10  MR. GIRARD:  That is correct, your Honor.

11  MR. VEEDER:  I want to be sure you and I are talking about

12  the same thing, your Honor.

13  MR. GIRARD:  I think Column 4 is the one we are talking

14  about.

15  MR. VEEDER:  Are you talking about column 10 or 4?

16  THE COURT:  Talking about 4, first.  This is what happened

17  to 4.

18  MR. GIRARD:  Yes, your Honor.  Then the United States in

19  this trial used a different approach in figuring it, although

20  I think the concluding total is practically identical.

21  THE COURT:  Then I take it there can't be any objection

22  to column 4.

23  MR. VEEDER:  Here is what we are doing, your Honor.  I

24  have called for the Green records, which will show, as I under-

25  stand, will comport fully with the records that we have been

1   using in this trial, and that the figures shown in Column 4

2   from Bulletin 57 would be then corrected to be in accordance

3   with those which are here and in this record.

4       THE COURT:  If you find any discrepancies in the Green

5   records, you may call it to the Court's attention.  But as

6   Exhibit 18 now stands, it is conceded that these figures from

7   Bulletin 57 originally came from an exhibit offered by the

8   Government in the first trial before Judge Yankwich.

9       MR. GIRARD:  I would like Col. Bowen to explain what

10  happened, the difference.

11      THE COURT:  And the Government can't very well object.

12      MR. VEEDER:  Your Honor, the Government can't very well

13  object-- I don't quite follow it.  If these columns are

14  correct--

15      THE COURT:  Here is the State trying to compile data to

16  get up a bulletin, and this is customary practice in matters

17  of this sort, and so the State finds that the United States,

18  in all its majesty, has prepared an exhibit and represented

19  to the Court that it was correct or it wouldn't have offered

20  it, and it was received by the court in a trial in the United

21  States District Court.  So the State of California, maybe in

22  your view mistakenly, felt that this was sufficient indicia

23  of correctness for this set of figures and picked them up and

24  put them in the Bulletin.  Isn't that what it amounts to?

25      MR. VEEDER:  Yes.  There is no denial of that.  But if

1   anyone is laboring under the impression that the fact that they

2   picked up a tabulation from the United States of America and

3   put it in the Bulletin, it gives any blessing to the geology,

4   the hydrology and the thinking generally in the Bulletin,

5   I hope your Honor doesn't.

6   THE COURT:  We are talking only about these figures.

7   Col. Bowen, do you have anything to say about these

8   column 4 figures?  Do you know anything about this?

9   COL. BOWEN:  Yes, your Honor.  As noted, the totals of

10   columns 3 and 4 are essentially the same.  There is very

11   minor difference.  The total of column 3 is 96,420, and

12   column 4 is 96,122.  Where the differences arise, in some

13   instances, significant differences-- for example, in 53,

14   column 3 shows 6,850 acre-feet, column 4 shows 6,038 acre-

15   feet, which is a little better than 800 acre-feet difference--

16   where those differences arise, the reason therefor is that

17   different data was used to compile the two columns.  Column

18   4 was taken from an exhibit which was introduced before Judge

19   Yankwich, and we used Base maintenance records to compile that

20   exhibit and the measurements were made at different times than

21   Mr. Green measured and we relied on Mr. Green's measurements

22   to arrive at the exhibits in this case.  But the total amount

23   of water for the period is essentially the same.

24   THE COURT:  All right.  And the exhibit that was used at

25   the first trial was a Government exhibit prepared under your

1   direction at the Base?

2        COL. BOWEN:  Yes, sir.

3        THE COURT:  All right.

4        COL. BOWEN:  But based on measurements made at different

5   periods, which accounts for differences from year to year.

6        THE COURT:  What about column 9?  It was also taken from

7   State Bulletin 57-- Fallbrook extractions.

8        MR. STAHLMAN:  I think we can clear that up, your Honor.

9        Either Mr. Wilkinson or Col. Bowen, if Mr. Green makes

10  measurements at the Fallbrook Station, he turns them in to

11  Pendleton as well as Vail.  Isn't that it?  What is the situa-

12  tion?

13       COL. BOWEN:  Mr. Green used to measure that diversion,

14  but these figures showing the Fallbrook's diversion in

15  Bulletin 57, I am sure, came from the Fallbrook Public Utility

16  District.  Mr. Green measured that for a number of years and

17  then discontinued it.

18       MR. SACHSE:  I can state this-- I don't know where they

19  came from in Bulletin 57, but I know since our first diversion

20  started we have been required by law to report to the State,

21  so that the State would not have had to go to Judge Yankwich's

22  exhibit to find that data.  It would have been in the State's

23  own files.

24       THE COURT:  Do you have a page?

25       THE WITNESS:  I think I can probably find it.

THE COURT:   Then as to that column, if anyone finds any discrepancies, they can call it to our attention later.   Check that.

MR. VEEDER:   I am proceeding on the basis that we will check all these statements and their sources, your Honor.

THE COURT:   No. 10, the Naval Depot column, the source of which was Bulletin 57 and the Vail Company, and those in part were Green measurements.   Where did they come from?

MR. STAHLMAN:   I think we can clear that up.   Those were taken, your Honor, from records in the Vail Company's file, which were from a list that Col. Bowen had supplied to Mr. Hall at one time.

THE COURT:   Is that correct, Col. Bowen?

COL. BOWEN:   Yes, sir.

THE COURT:   Now, the next reference to Bulletin 57 is column 13, and that is the evaporation, et cetera.   There the notation is United States Exhibit 129 and Bulletin 57.   Are the same figures shown in both sources?

THE WITNESS:   No, sir, they are not, your Honor.

THE COURT:   What part of these figures comes from Exhibit 129 an what from Bulletin 57?

THE WITNESS:   Exhibit 129 pertains to a yield study, I believe, made by Mr. Hoffman of Vail Lake.   I am not sure.

MR. STAHLMAN:   Here is Exhibit 129 (handing to the witness).   I recall that now.

1    THE WITNESS:  The exhibit is entitled "Yield of Vail Lake

2  prepared by Walter Hoffman."  It is United States Exhibit 129.

3    MR. STAHLMAN:  In this case.

4    THE COURT:  It shows the evaporation, the acre-feet of

5  evaporation from Vail Lake.

6    THE WITNESS:  That is right, your Honor.

7    THE COURT:  And then from those figures you subtracted

8  some figures on what would have been lost, consumed, had Vail

9  Dam not been built?

10    THE WITNESS:  That is right.

11    THE COURT:  Where did you get those figures?  From the

12  engineer?

13    THE WITNESS:  From Mr. Sonderegger's report "Salvage of

14  Evapo-transpiration Loss."  The report is quoted, I believe,

15  on page 133 of Bulletin 57.

16    THE COURT:  In Bulletin 57 at page 133 appears Table 26

17  titled "Consumptive Use By Former Swamp Lands at Vail Reservoir,"

18  and preceding the chart appears "This allowance was based on

19  data presented in the foregoing table which were taken from

20  the report 'Vail Reservoir Report on Salvage of Evapo-trans-

21  piration Losses, by A. L. Sonderegger, dated July, 1948.'"

22  This is the same A.L. Sonderegger who was employed by the Vail

23  Company?

24    THE WITNESS:  That is right, your Honor.

25    THE COURT:  Anything further?

MR. STAHLMAN:  Yes, your Honor.

Q  Are there other matters indicated by this Exhibit AP?

A  Well, it might be of interest to note column 8, and in looking at that figure also consider Section 12th of the stipulated judgment.  In Section 12th-- I cannot quote exactly, but it refers to the entitlement of the Santa Margarita Ranch, and it also refers to the entitlement of the Vail Company.  Santa Margarita Ranch is entitled to divert this amount of water.  Now, this Column 8 certainly is representative of what they are entitled to, even though they don't use it.

Q  You mean, assuming the judgment to be in existence?

A  Assuming a judgment to be in existence.

MR. STAHLMAN:  I think that is a matter that we will have some discussion and argument on.

THE COURT:  We can take that up later.  The judgment is in evidence, and the chart will be.  Have you offered this chart yet?

MR. STAHLMAN:  Yes, I offer it, your Honor.

THE COURT:  And you wanted, at the recess, to make objection to it, I think.

MR. VEEDER:  Yes, your Honor.  I object that there is no proper foundation for it.

I object on the grounds that this witness is not qualified to prepare such an analysis as this; that there is no foundation

1   whatever for it.

2       It is true that there are columns here concerning which

3   we have no objection, concerning which we would offer Mr.

4   Green's records, and I think the data that is already in the

5   record.   But certainly in regard to the references to Bulletin

6   57 I am going to go back and check the whole area out, the

7   whole Bulletin out, and the exhibits out entirely for the

8   purpose of determining whether there are references cross-

9   referenced into the Bulletin, which would, in effect, admit

10   into evidence certain parts of the Bulletin as to which I have

11   had objection sustained.

12       I think this, I have never seen such an exhibit in my

13   life.

14       THE COURT:   Any objection you had sustained to the

15   Bulletin was to the Bulletin in toto.   There were not objec-

16   tions to a particular chart or to compilations.   It involved

17   conclusions, et cetera, contained in the Bulletin.

18       MR. VEEDER:   That's right.

19       THE COURT:   We have all agreed all along that in making

20   these studies, anybody making a study is entitled to rely upon

21   the available literature.   That is common practice.   There

22   isn't any merit to that.

23       Any other objection?

24       MR. VEEDER:   Hearsay; certain references to the Sonderegger

25   report.

11327

1    THE COURT: Do you have that report available?

2    THE WITNESS: I do, your Honor.

3    THE COURT: Will you let Mr. Veeder see it, if he wants

4  to see it?

5    THE WITNESS: Yes, your Honor.
     MR. VEEDER:

6    It doesn't make any difference.  I think Mr. Sonderegger

7  is the man who has to testify.  I don't think this could

8  conceivably be a record kept in the course of business.  So

9  I renew my objection on that ground.

10    So these references which are made here, it is a tre-

11  mendous task.

12    THE COURT: Which particular columns do you find fault

13  with?

14    MR. VEEDER: I certainly find fault with column 15, your

15  Honor.

16    I find fault with the-- I have no idea where this Fallbrook

17  No. 9 came from.

18    THE COURT: Fallbrook No. 9?

19    MR. VEEDER: Column No. 9.

20    THE COURT: We have just had that explained.

21    MR. VEEDER: I was just talking to Mr. Sachse, and he

22  says he doesn't know where they came from.  He says they are

23  not in comport with his.  They do not comport, your Honor.

24    MR. SACHSE: I am just stating this as a fact-- I have

25  no particular objection to the exhibit, but they don't comport

1    with Fallbrook's Exhibit L, which is in evidence and which

2    purports to show our diversions.  Sometimes they are higher,

3    sometimes they are lower.  Maybe it is on a water year as

4    distinguished from a calendar year.

5        THE COURT:  Where did you get column 9?

6        THE WITNESS:  I am not sure, your Honor.  I would have

7    to spend some time.

8        MR. SACHSE:  It could well be.  Yes, Fallbrook's L is

9    on a calendar year basis.  I haven't taken the time to run

10   these things over to see if they are on a water year or if

11   they jibe. Let me check them.  These are by months, so it

12   will be easy to do.

13       MR. STAHLMAN:  Is that the same exhibit you had in the

14   other case?

15       MR. SACHSE:  I think so.

16       Let me check this out very quickly.  They are by months.

17       THE COURT:  On page 135 of the Bulletin is a table

18   entitled "Seasonal Surplus Diversions by Water Service Organiza-

19   tions," and it only runs down through 1949; but beginning with

20   the year 1942 appears the figure 170, 203, 155.

21       MR. SACHSE:  That's it.

22       THE COURT:  And down to 113 of the year '48-49.  Now,

23   where the figures appear for the period-- Oh, it's contained

24   on the next page and carries it down through the figure 1233

25   in 1955.

1    MR. SACHSE:  We have it, your Honor.  It is down on

2    page 135 of Volume 1.

3    THE COURT:  Yes.

4    MR. SACHSE: And it does jibe with Fallbrook's L, if you

5    switch it from calendar year to water year.  At least, I

6    have run one of them through and it does.

7    THE COURT:  We will assume that it does, unless somebody

8    else wants to check it and finds objection.

9    All right, your objection is overruled, Mr. Veeder.

10   Vail's Exhibit AP is received in evidence.

11   (Defendant Vail's Exhibit AP was received in evidence.)

12   MR. VEEDER:  Your Honor, mention was made about Mr. Kunkel.

13   I have now called Mr. Kunkel and he will be in the courtroom

14   at 10 o'clock tomorrow.

15   MR. STAHLMAN:  Good.

16   Q  Now, Mr. Wilkinson, as the manager of the Vail Ranch

17   do you have an opinion as to the irrigable acres contained on

18   the property owned by Vail on the Pauba, Temecula and Little

19   Temecula holdings?

20   MR. VEEDER:  I object to that.  It is not an opinion

21   question at all.  It can't be an opinion question-- how many

22   irrigable acres.  If he is going to come up with a declaration

23   of the irrigable acreage, we have got to have some foundation.

24   Did he go out and look at it?  Did he go out and test it?  Did

25   he go out and make a survey of any kind?  What did he do?

1      MR. STAHLMAN:  That is cross-examination.

2      THE COURT:  It is true that this is a big ranch.  Suppose

3  you were one of the owners of a ranch that you were operating

4  and it was just a hundred-acre ranch.  Do you think that any

5  judge would not permit you to state how many acres you had

6  that were, in your opinion, irrigable, as a practical farmer?

7      MR. VEEDER:  Well, certainly, with a hundred acres a man

8  could conceivably go out and do it.  But Mr. Wilkinson has

9  never purported to me or to anyone else that I know of a

10 statement as to whether he is a soil scientist or not.

11     THE COURT:  I think the record already shows that he has

12 been all over this ranch; he has lived on it; he now lives

13 on it.

14     What is your capacity up there?

15     THE WITNESS:  I am foreman, your Honor.

16     THE COURT:  Do you have an interest in the ranch?  Or

17 your mother does?

18     THE WITNESS:  I have an interest in the ranch.

19     THE COURT:  You are one of the owners?

20     THE WITNESS:  Yes, I am one of the owners.

21     THE COURT:  As foreman, are you all over this ranch?

22     THE WITNESS:  I have been to almost every part of it,

23 your Honor.  I haven't been on every square foot of it.  That

24 would be impossible.

25     THE COURT:  How long have you lived on it up there?

1    THE WITNESS:  I have lived on it since about 1950 or '51.

2  I have been on it previous to that many times.

3    THE COURT:  Your duties as foreman take you out day by

4  day to various parts of the ranch?

5    THE WITNESS:  Yes, your Honor.

6    THE COURT:  I think it goes to the weight.  The objec-

7  tion is overruled.

8    The question now concerns irrigable acres where?

9    MR. STAHLMAN:  On the Pauba, Temecula, and Little Temecula

10  holdings owned by the Vail Company.

11    THE COURT:  You are now talking about these lands?

12    MR. STAHLMAN:  Yes.

13    THE COURT:  Pauba, Temecula and Little Temecula.

14    MR. VEEDER:  Does that include the whole ranch with the

15  exception of the Santa Rosa?

16    MR. STAHLMAN:  No, it doesn't what we term the whole ranch,

17  because there had been some other properties acquired after

18  that.  But the three original grants I have referred to, and

19  those portions of the grants which are owned by Vail Company.

20  Some of Little Temecula is not owned by Vail Company.

21    THE COURT:  Do you have such opinion?

22    THE WITNESS:  I have an opinion, your Honor, that the

23  figure 29,000 acres, as determined by the Coit Survey, is

24  an accurate one, from my knowledge of the ranch and the terrain

25  and activities that have been carried on by neighboring ranchers

1    and people in the general area, that that figure is to me the

2    most accurate that could be determined at present.

3        MR. VEEDER:  Then I move to strike his answer, your

4    Honor.

5        THE COURT:  Have you compared this conclusion with the

6    Coit survey and the maps and records pertaining thereto?

7        THE WITNESS:  I have been out on the ranch with the Coit

8    maps and records and examined various parcels and find the

9    situation to be as he depicted it.

10       THE COURT:  What is your motion, Mr. Veeder?

11       MR. VEEDER:  Well, I move to strike on the grounds that

12   he didn't answer the question as presented.  He said, do you

13   agree with the Coit survey?"

14       THE COURT:  No, I didn't say Do you agree with it.  I said

15   "Have you checked your opinion against the Coit Survey and the

16   maps, et cetera?" And he said he had, he had been out on the

17   ranch, taken the Coit maps and survey with him and checked

18   various parcels.

19       MR. VEEDER:  Well, I move to strike on the grounds that

20   it is not his determination, but rather he simply adopted the

21   Coit survey, and on the grounds that he has no foundation and

22   no background as a soil scientist.

23       THE COURT:  Motion denied.

24   BY MR. STAHLMAN:

25       Q  Have you also made a determination of the irrigable

1  acreage in the Santa Rosa Ranch in the vicinity of Slaughter-

2  house Canyon and the Murrieta area?

3  　A  I am familiar with it.  I have not made a determination

4  　Q  You have been over the land?

5  　A  But I have been over the land, and I think that Dr.

6  Coit's estimate of somewhere in the vicinity of about 1300

7  acres is probably quite conservative.  I feel there is more

8  land there that is irrigable than he has surveyed.

9  　Q  You feel that there may be more land in that area that

10  is irrigable land than what is contained in the Coit Survey?

11  　A  Yes.

12  　Q  And that land you have been over?

13  　A  Yes, I have.

14  　Q  You are familiar with its characteristics, topography,

15  contours, soil conditions?

16  　A  I am.

17  　MR. STAHLMAN:  May the record show that we are placing

18  upon the easel a map which bears the designation "Geological

19  Map Showing Portions of Vail Ranch, Riverside County,

20  California," with legends thereon.  It is marked as Plaintiff's

21  Exhibit 10.

22  　THE COURT:  From some former action?

23  　MR. STAHLMAN:  From some former action, the action of

24  Santa Margarita vs. Vail.

25  　THE COURT:  It will be marked AQ for Identification here.

1    (The map was marked Defendant Vail's Exhibit AQ for

2  Identification.)

3    MR. STAHLMAN:  And this is the map from which the photo-

4  static copies that were supplied in connection with the memo-

5  randum which I have submitted previously to the Court, and with

6  Mr. Veeder's kind permission I would like to put a photograph

7  of that map in as an exhibit rather than the map itself, be-

8  cause it is a permanent record of the Vail Ranch.

9    MR. VEEDER:  I have no objection.  Begging your pardon,

10  if it gets in.

11    MR. STAHLMAN:  Yes, I understand.

12    MR. SACHSE:  You mean you have no objection to its

13  admission?

14    MR. VEEDER:  No, Franz, I have no objection to the

15  substitution, if and when it gets in.

16    MR. STAHLMAN:  May the photostatic copy which I here

17  hold be marked Exhibit next for Identification.

18    THE CLERK:  Vail's AQ.

19    THE COURT:  AQ for Identification, in view of Mr. Veeder's

20  stipulation that a photograph may be used in place of the

21  original map.

22  BY MR. STAHLMAN:

23    Q  Directing your attention to the map on the board--

24  You may refer to that as AQ for Identification-- you have seen

25  this map before, have you?

1    A  Yes, I have.

2    Q  Is that map a permanent record of the Vail Company?

3    A  It is.

4    Q  And where did you see the map at Vail Company?

5    A  In the ranch records.

6    Q  And are those records records in relation to the

7    previous litigation of Santa Margarita vs. Vail?

8    A  That is right.

9    Q  And the map as it exists here on the board, together

10   with the statement Plaintiff's Exhibit 10 and the stamp which

11   appears in the lower left-hand corner "Plaintiff's Exhibit 10,

12   Santa Margarita vs. Margaret R. Vail, et al., 42850, November

13   16, 1926, J. B. McLees, Clerk, by J. L. Squire," were those

14   designations on the map at the time when you first saw the

15   map as part of the records?

16   A  Yes, this is part of the ranch records.

17   THE COURT:  This is an exhibit from the Santa Margarita

18   vs. Vail case?

19   THE WITNESS:  That is right.

20   THE COURT:  I suppose you have a number of them with

21   this clerk's stamp on them?

22   THE WITNESS:  Yes, we do, your Honor.  In front of you

23   is a copy of it.

24   THE COURT:  I mean, you have other exhibits with a similar

25   stamp on them?

THE WITNESS:  That is right.

THE COURT:  And the signature of the clerk?

THE WITNESS:  That is right.  All bound.  This has been taken out of the binder, as you note.

THE COURT:  And the signatures on all these exhibits are similar?

THE WITNESS:  They are, your Honor.

BY MR. STAHLMAN:

Q  Have you also made comparisons between the map and the transcript of the record of the case and know that it is the map?

A  I did, Mr. Stahlman.

MR. STAHLMAN: We will offer in evidence the map, your Honor.

MR. VEEDER:  Is this kept in the course of business, too, your Honor?  Is that what it is being offered as-- a record in the course of business?  I am just trying to get informed.

THE COURT:  No.  As I understand it, although Mr. Stahlman hasn't said it, he doesn't offer the map for the truth of what is depicted upon it, but he offers the map as part of the evidence which the court had before it in the case of Vail vs. Santa Margarita at the time the prior decree was entered.

That is the purpose isn't it?

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  In other words, from your theory of the case

it could have been completely wrong, but this is the map which

the Court had before it?

MR. STAHLMAN:  This is the map which was used, your

Honor.

MR. SACHSE:  That is not enough, your Honor.  I want this

admitted as much as Mr. Stahlman does.  But it so happens

that, one, this is a plaintiff's exhibit in the first case,

that is, the exhibit of the predecessory in interest of the

United States, not the exhibit of the Vail Company.  I want

this in evidence.

And the second thing is, the stipulated judgment, the

actual findings and the actual conclusions of law make many

references which can only be understood by looking at this

exhibit.

THE COURT:  Are there references made to Exhibit 10?

MR. SACHSE: Not to Exhibit 10 as such.  But there are

references made, for example, to mesa silt, there are refer-

ences made to the ground water basin of the Murrieta and

Temecula Valley being bounded by mesa silt; there are many

references, and this is the key exhibit and it is an exhibit

of the predecessor in interest to the United States, with whom

the United States is in privity and I think the United States

is bound by it.

THE COURT:  But you would want it admitted for a broader

1    purpose than I indicated?

2        MR. SACHSE:  Yes, your Honor.

3        THE COURT:  Well, considered now in its broader aspect,

4    what objection do you have to having it go in evidence as an

5    exhibit, offered in evidence by your predecessor in interest

6    and one upon which the decree upon which you rely and the

7    decision upon which you rely was founded and rests in part?

8        MR. VEEDER:  I object to its competency, to begin with.

9    If he wants to get something like this in, he had better call

10   the clerk of the court.  Certainly he is not going to put it

11   in under the basis he has proceeded on.

12       Secondly, I object on the grounds that--

13       THE COURT:  Let's take that one objection.  We probably

14   could not find Mr. McLees, the clerk.  He is probably no longer

15   clerk.  He is probably dead.  And Mr. Squires probably isn't

16   here.  We probably could cast around in the Clerk's Office and

17   might find someone who would recognize their signatures.  But

18   you are not going to raise that technical objection, are you,

19   have them bring over someone to identify the signatures of

20   these people?

21       MR. VEEDER:  I have not the slightest concept, your Honor,

22   I have not the slightest knowledge of how in the world this

23   record here-- I don't know who signed it, I have no idea as

24   to the authenticity of it.  It could have come from anywhere.

25   And I do object to the competency of it.

1   Moreover, I object on the grounds that it is irrelevant

2   and immaterial; that is a collateral attack upon a judgment

3   now in force and effect.

4   If these people want to attack it, they should go across

5   the street and attack all these matters in the Superior

6   Court of San Diego County.  They can't attack them here.

7   Secondly, there is not a scintilla of evidence which

8   would support-- there is nothing in the record that would

9   support this proposition as set forth on this identification

10   Vail's AQ.

11   THE COURT:  If the law is that former testimony that was

12   taken orally in a prior action involving similar issues is

13   admissible, why shouldn't the exhibits be admissible in the

14   same way?

15   MR. VEEDER:  Of course, I object to your Honor's ruling

16   on the approach that you can put that evidence in the record.

17   I let it just go in on part of it.  But here, absent all of

18   the record from the geologist who testified in this regard,

19   it is utterly meaningless to hang this map on the wall.  It

20   has nothing whatever to do with the proposition before your

21   Honor, because there is no evidence to support it.

22   MR. SACHSE:  My interest in this, your Honor, because I

23   don't want to act mysterious here-- let them argue about

24   whether it goes in-- If this judgment is upheld, if the United

25   States convinces your Honor that the stipulated judgment sticks,

1   then I think it sticks in its entirety, in all of its entirety,

2   and the stipulated judgment very carefully refers back to the

3   findings in the preceding case, and the findings say this:

4            "It is not true that the waters coming

5            into the area of said ancient Mesa Silt

6            formation. . are spread out or are ab-

7            sorbed by the soils and saturate a wide

8            mass of subterranean material. . or of

9            any greater extent than the eroded channels

10           and the modern fills of the valleys of

11           the Temecula, the Murrieta, the Pechanga,

12           the Santa Gertrudis, and other and lesser

13           streams. . It is not true that either or

14           both of said underground water planes

15           in said area constitute an underground or

16           submerged lake. . It is true that the

17           only underground water plane lying beneath

18           any portion of the lands of the defendants,

19           which water plane is in contact or which

20           is part of or which contributes to or

21           supports or to which there are contributions

22           from the surface flow of the Temecula River

23           or Creek is the underground water plane of

24           the Temecula alluvial basin."

25   Now, Mr. Veeder wants the advantages of the judgment of

1    the old Santa Margarita vs. Vail case, which gave him, to take

2    one thing, two-thirds of the water of the stream.   Then I say

3    he is also stuck with the disadvantages of what is the stream,

4    and the old Santa Margarita vs. Vail case absolutely clearly

5    spells out that all of Mr. Kunkel's Zone 4, all of the rest

6    of it is no part of the Santa Margarita River system.

7        That is my interest.

8        THE COURT:  Does the stipulated judgment make reference

9    to those findings?

10       MR. SACHSE:  It does, your Honor.

11       THE COURT:  You see, we have that odd situation where

12   findings were made and it went up on appeal, and then it came

13   back.  There weren't very many references in this stipulated

14   judgment to the prior findings.

15       MR. GIRARD:  Let's not concern ourselves only with the

16   stipulated judgment, your Honor.  As I read the judgment in

17   the Santa Margarita suit, which was reversed by the Supreme

18   Court, it was reversed only in part, and the only part on

19   which it was reversed was riparian land of Vail.  All other

20   aspects of that judgment were affirmed.  So regardless of the

21   stipulated judgment, there is a final Supreme Court judgment in

22   effect which specifically affirmed all other parts of the trial

23   court's judgment, except the amount of riparian acreage on

24   Vail's property.

25       THE COURT:  Then to follow this along, just to get how

1  this is going or to understand it, it is the contention of

2  the State and of Fallbrook that if the United States stands

3  on the stipulated judgment they must also stand upon that part

4  of the prior judgment which was not reversed.  They must,

5  therefore, be bound by the findings and conclusions of law

6  and that therefore the only part of this Vail Ranch that is

7  part of the stream system are these yellow areas shown on

8  Exhibit AG.

9      MR. SACHSE:  Exactly correct, your Honor.

10     THE COURT:  And that therefore any water that underlies

11  any of this Mesa Silt is not part of the stream water, and

12  that Vail Company could pump that until Kingdom come.

13     MR. GIRARD:  If you are going to rely on a judgment, you

14  have got to rely on the parts that are adverse as well as the

15  parts that are favorable.

16     MR. STAHLMAN:  In the reversal in the Supreme Court case,

17  they make reference to the fact that the other findings still

18  stand.

19     THE COURT:  Yes, I remember that.

20     MR. STAHLMAN:  Undisturbed.

21     THE COURT:  I know.

22     MR. GIRARD:  They sent it back for a new trial on that

23  limited issue.

24     THE COURT:  Yes.

25     What do you say to this, Mr. Veeder?

1      MR. VEEDER:  I am never perturbed.  I am quite convinced--

2      THE COURT:  I am not asking you your mental state of mind.

3  What do you say to this legal problem?

4      MR. VEEDER:  What they are stating here is completeley

5  irrelevant, because if Mr. Stahlman thinks that he can upset

6  a stipulated judgment on the basis of these findings he is

7  wrong.  He is wrong for this reason.  You have to show that

8  some kind and type of detriment emanated from this.

9      THE COURT:  This is not what I am asking you to comment

10  on.  I am asking you to comment on this:  Suppose you are

11  right that the stipulated judgment is in effect.  What is

12  your answer to what Mr. Girard and Mr. Sachse have just

13  stated as to where you find yourself?

14      MR. VEEDER:  I don't think that where facts in a sub-

15  sequent case show clearly that there is no confinement in a

16  geological area, that you would be bound by it, if you thought

17  to the contrary.  In other words--

18      THE COURT:  In other words, you are just going to pick

19  out those parts of the judgment that favor your case, and you

20  want to ignore anything else that doesn't favor your present

21  theory.

22      MR. VEEDER:  Your Honor, may I make an additional statement.

23  I haven't said at all that it would be contrary to our interest

24  to have your Honor enter a finding which I would know would be

25  completely in error.  It might be to our advantage.  Simply to

1    say that the stream system is a narrow strip of land between

2    the Wildomar fault and the Elsinore fault and another narrow

3    strip of land between what we have called the younger and

4    older alluvium-- I am not sure that that wouldn't be to our

5    advantage.  But I believe that it would be completely in

6    error, and I believe that the evidence that went in yesterday

7    would indicate that your Honor couldn't possibly make such

8    a finding.

9        Now, the fact that there is a variance between the

10   geology as we now know it and the geology as depicted in these

11   findings dating back to 1926 doesn't mean anything from the

12   standpoint of the validity or the enforcibility of it.  I don't

13   want to see your Honor make that mistake.  I truly don't.  But

14   I believe it would be a most grievous error to say that the

15   geology as found by the State court was right.  I don't believe

16   it was right.  But that doesn't upset the judgment in any way,

17   which was a stipulated arrangement to terminate litigation.

18   And it has nothing whatever to do with this litigation.  We

19   are talking in regard to the Vail Company, in regard to

20   measured surface runoff, and that is what the stipulated

21   judgment relates to-- the surface runoff as measured.

22       Now, it is true that the ground waters are extremely

23   important from the standpoint of uses by the Vails, but the

24   two-thirds-one-third is not measured ground water.  It is

25   measured surface runoff.

1        MR. SACHSE:  Excuse me, Mr. Veeder.  I want to make one

2    point, at the risk of being considered discourteous.

3        The stipulated judgment gives the United States two-

4    thirds of something, and if that judgment is upheld by your

5    Honor the question is, what does it give them two-thirds of?

6    That is my concern.  And I contend that it must give them two-

7    thirds of what the judgment was about, namely, the yellow

8    areas, as you point out, not this large expanse, and that

9    any possibility of the United States then on the strength

10    of that judgment asking your Honor to step back into the

11    older alluvium and to control pumping or diversion therefrom

12    is out.

13        THE COURT:  Let me interject also.  If a court in its

14    judgment made a mistake as to fact-- found that black was

15    white, and then rendered a judgment, you ordinarily wouldn't

16    upset the judgment because the court had incorrectly decided

17    the facts.  But if the court had decided something, you would

18    look at what they decided without being too concerned about

19    whether the court was wrong.

20        Now, Mr. Sachse says that the court decided something

21    here.  They might have said in so many words that they were

22    deciding what was the stream system of the Santa Margarita,

23    but they probably did it, at least inferentially, because they

24    gave the Rancho Santa Margarita two-thirds of the surface flow,

25    and in addition to that they keep the Vail Company to pumping

underground water if the flow did not measure up to that

certain amount.   So they were undoubtedly talking both about

surface flow and, at least to that extent, about underground

waters.   And where is this water that they talk about?   We

go back and examine the findings and see what the stream

system is.

MR. VEEDER:   Your Honor, the points that are important

in regard to the relationship between the Vails and the United

States of America are the key measuring points which relate

to surface runoff, and we as bona fide purchasers without ·

notice went in and bought land concerning which there was a

stipulated judgment, we bought without knowledge of any error--

if there was one we don't know.   We don't believe the errors

to which they are making reference have any significance·

whatever, for this reason:   The Vail Company said, "We want

to settle the litigation."   Rancho Santa Margarita said, "We

want to settle the litigation."   Neither of the parties who

entered into the agreement is extant today.   The organization

of the Vail Company that was in existence is gone.   Similarly,

the Rancho Santa Margarita is gone.   We bought the property

with the stipulated judgment in effect, and the only thing

that were important in that stipulated judgment was the matter

of the apportionment of the water.   What water?   The water of

the Santa Margarita River, measured, if you please, at the head

of Temecula Gorge, or alternatively at the end of the river,

1   depending upon the circumstances of runoff.  And I submit, and

2   I believe the law sustains us completely in this matter, that

3   where the situation prevails as it does here, namely, an

4   apportionment of water on the basis of surface runoff,

5   assuming there was an error, I don't believe it makes one bit

6   of difference.

7       I think the important thing is this, your Honor.  This

8   collateral attack upon a judgment will turn upon what I think

9   to be a very crucial proposition of law, namely, was it ex-

10  trinsic mistake, or was it intrinsic mistake that was involved,

11  if the question of mistake can be raised at all.  If it was

12  extrinsic mistake, conceivably, your Honor could consider it.

13  Manifestly, though, it was an intrinsic mistake.  It was a

14  mistake arrived at after the facts had been reviewed.

15      THE COURT:  Are you using the words "intrinsic mistake"

16  and "extrinsic mistake" in the same manner in which the words

17  "intrinsic" and "extrinsic" fraud are used in the California

18  cases?

19      MR. VEEDER:  That is right, your Honor.

20      THE COURT:  People vs. Colona, et cetera.

21      MR. VEEDER:  That is right.  And I think you will find

22  that the similar principles prevail.  In other words, if you

23  find a situation that couldn't have been before the Court,

24  conceivably it could be considered by that court, not by your

25  Honor.

1   THE COURT:  I am not going to have this whole matter

2   argued now.  I just wanted you to briefly state your position.

3   I ask Mr. Girard and Mr. Sachse if they are going to take

4   a position on the validity of the stipulated judgment.

5   MR. SACHSE:  No, I am not, your Honor.  All I want is

6   that if the stipulated judgment sticks, I want it to stick in

7   its entirety.

8   THE COURT:  Mr. Girard, is the State of California going

9   to take a position?

10   MR. GIRARD:  Not a position, no, your Honor.  If your

11   Honor requests, there are some points, I think, that I at

12   least consider important on the issue.  I might address some

13   letter or brief to the Court.  But I don't think it is of

14   statewide importance one way or the other whether the stipulated

15   judgment as between Vail and the United States is set aside.

16   THE COURT:  Don't you think the stipulated judgment has

17   an impact upon the general water rights in the Temecula-

18   Murrieta Valley?

19   MR. GIRARD:  Yes, it does have an impact-- I think it has

20   an impact on how the stream will be administered, if the

21   allocation were ever to be made.  However, as I have under-

22   stood the position of my predecessor in the case, our principal

23   function was to be concerned primarily with the state law in

24   the general aspect as distinguished from who gets certain

25   pieces of water.  My comments, if I were to make any, I think

1    would be primarily directed to that aspect, as to the law in

2    California on the power of your Honor to set aside, and quite

3    possibly on certain factual problems which might or might not

4    affect the validity of the judgment.

5        THE COURT:  Well, let's go back to Exhibit AQ for

6    Identification.

7        MR. STAHLMAN:  Yes, your Honor.

8        THE COURT:  Now, do you want to take the time out to

9    look up some clerk over there who can identify this original?

10   Do you want to stay around this country over Christmas while

11   we find out whether Mr. McLees is dead and where Squires is

12   and all that sort of thing?  Can't you look at that ancient

13   document and the testimony of Mr. Wilkinson as to what it is

14   and be content with that and rest your objection upon other

15   grounds?

16       MR. VEEDER:  Your Honor, I am going to object on every

17   ground conceivable to this, and I am going to fight very hard

18   about this.  The point is this--

19       MR. STAHLMAN:  Pardon me, before you start another long

20   speech, I am not going to respond at this time.  I feel there

21   will come a time when we will fully thresh out the merits of

22   the setting aside or the abrogating of this stipulated judg-

23   ment.  I am glad to have Mr. Veeder's arguments at this time

24   and to know what they are.  However, I don't think this is

25   the time to go into those matters.

1        Now, in relation to the particular exhibit, I would like

2   to call your Honor's attention to the findings of fact which

3   are now in evidence as Vail's Exhibit AB, and on page 22 at

4   line 3 there is a reference to this particular exhibit.   It

5   says:

6               "The exterior boundaries of said

7          Temecula alluvial basin or valley lying

8          between the Mesa Silt formation on either

9          side thereof, and extending from the mouth

10         of Nigger Canyon along the course of said

11         Temecula Creek to the vicinity of the head

12         to Temecula Canyon, are approximately out-

13         lined on Plaintiff's Exhibit No. 10 and

14         said basin is shown or marked thereon as

15         Recent alluvium; that all of said area

16         between said points shown or marked on

17         said exhibit No. 10 as Recent alluvium,

18         excepting Lots C, D, E, and F of the Little

19         Temecula Grant or Rancho (and excepting

20         the modern alluvium area of the Murrieta

21         Valley to the northwesterly of said

22         Temecula alluvial valley or basin), lies

23         within, and forms a part of, said Temecula

24         alluvial basin or valley, but that said

25         Temecula alluvial basin at certain places

1          along its northerly and southerly sides ex-

2          tends beyond said limits as shown on said

3          Exhibit No. 10. ."

4     It goes on and on, and it clarifies what the finding is

5  in relation to the map and makes further reference to Exhibit

6  10.

7     THE COURT:  These were the findings of fact and conclusions

8  of law at the time the case went up on appeal?

9     MR. STAHLMAN:  Yes, your Honor.

10     THE COURT:  And they went in, I take it, as I recall,

11  without objection.

12     MR. VEEDER:  What's this?

13     THE COURT:  They went into evidence without objection.

14     MR. STAHLMAN:  Yes, your Honor.

15     MR. VEEDER:  These?  No, I objected to them.  They went

16  in-- and your Honor recently stated the basis on which they

17  went in-- they went in solely and only for the purpose of

18  saying that such findings had been entered.  Under no stretch

19  of the imagination did we say that those findings would be

20  permitted, in our view.

21     THE COURT:  The only thing I am concerned with from your

22  objection to this exhibit, Mr. Veeder, is solely the matter of

23  identification whether this exhibit, the original of which is

24  on the board and the photographic copy of which you have

25  stipulated may be used in lieu of the original, is actually

1   Exhibit 10 that was used inthe prior trial.  That's all I am

2   concerned with.

3       MR. VEEDER:  I don't know whether it was or not.  I have

4   been in the business so long that I know this--

5       THE COURT:  All right.

6       Mr. Wilkinson, these bound exhibits that you have there

7   at the ranch are bound up in volumes?

8       THE WITNESS:  That is right, your Honor.

9       THE COURT:  What do they run, from 1 on?

10       THE WITNESS:  They contain both plaintiff's and defend-

11   ant's exhibits in Case No. 42850.  They runfrom No. 1 on for

12   the plaintiff, and the lettered series for the defendant,

13   such as our Z-9 and O-9.

14       THE COURT: Are you personally familiar with how they

15   happened to be delivered to the Vail Company?

16       THE WITNESS:  They were not delivered to me, but they

17   are part of the records.  That was quite some time ago.  I

18   was not taking care of such records at the time.

19       THE COURT:  I think it is admissible.  The objection is

20   overruled.  However, out of an abundance of caution, I am only

21   concerned with one thing, Mr. Veeder's objection on the ground

22   that it has not been identified as the exhibit in the case,

23   and I would suggest that you bring someone in at some time

24   who can say that this is an exhibit that was used in Santa

25   Margarita vs. Vail.

1    MR. STAHLMAN:  Very well.  That I will do, your Honor.

2    THE COURT:  The objection is overruled.  Vail's AQ is

3    received in evidence.

4    MR. VEEDER:  May I inquire, your Honor; because your

5    ruling was so very important, are you permitting this to go

6    in on the basis the same as if the witness who prepared this

7    exhibit had testified here?

8    THE COURT:  I am permitting it to go in because it is

9    referred to in the findings of fact in the previous trial,

10   because it was an exhibit offered in evidence by your

11   predecessor in interest, and regardless of what the foundation

12   testimony was this is part of the record in that case, and

13   the fact alone that it was referred to in the findings of

14   fact and conclusions of law would make it necessary for an

15   understanding of those findings of fact and conclusions of law.

16   MR. VEEDER:  Is it going in as the testimony of the

17   witness who prepared the exhibit?  That is what I am inquiring

18   about.

19   THE COURT:  It is going in for what it shows on its face,

20   and as it is referred to in the findings.

21   MR. VEEDER:  In other words, for the testimony of the

22   witness; is that correct?

23   MR. STAHLMAN:  That isn't what his Honor said.

24   THE COURT:  I don't know what the testimony of the witness

25   is about it.  There is no doubt about it.  You and I have no

1   doubt. It is the Vail Rancho. You can tell by looking at

2   it, with the exception of the Santa Rosa. We can tell by

3   looking at it that it is the Pauba Valley. There are all

4   sorts of identifying marks on it to indicate that it is the

5   same basic map with which we have been working. And it has

6   a very clear legend on it. The Recent alluvium is yellow,

7   the Mesa Silt is the darker color, the Nigger Valley forma-

8   tion is shown-- we know where Nigger Valley is-- basalt,

9   granite, metamorphics.

10      MR. VEEDER: If that is the basis upon which it is

11   going in, I just wanted to be sure.

12      THE COURT: Proceed.

13      MR. STAHLMAN: Now, this other matter that I am going

14   into, your Honor, will recall that Mr. Veeder lodged as an

15   exhibit-- however, there is no evidence before the Court as

16   yet in connection with the matter-- pertaining to the

17   proposition of the Navy withdrawing objection to the permit

18   to build Vail Dam.

19      THE COURT: Let me interrupt.

20      What was your objection to having this original

21   exhibit in evidence in this case?

22      THE WITNESS: It is a matter of our records, your

23   Honor. We want to keep the things intact as a matter of

24   record. If the photostat is satisfactory, we wish to return

25   this to our file.

1    THE COURT:   Is it important to the Vail Ranch to have

2  this exhibit in evidence?   Do you know of any time when it

3  would be more important than now?

4    THE WITNESS:   No, your Honor.

5    MR. STAHLMAN:   We are perfectly willing to put it in,

6  your Honor.

7    THE COURT:   Why I suggest that the original be used is

8  this.   This photo copy that I have at least doesn't dis-

9  tinguish between the green and the blue, and the brown and

10  the basalt, and the original does.   From the original you can

11  see where the granite is, where the basalt appears, and your

12  photo does not distinguish between these dark colors, and I

13  think I would rather have the original exhibit itself.   You

14  can use one of the photographs for your files.   When this case

15  someday is finally concluded you may get this exhibit back.

16    So the Clerk will mark the original map as Exhibit AQ

17  instead of the photostat.

18    MR. STAHLMAN:   Very well, your Honor.

19    (Defendant Vail's Exhibit AQ for Identification was

20  received in evidence.)

21    THE COURT:   Now, Mr. Stahlman, you are going into what?

22    MR. STAHLMAN:   I think Mr. Veeder has sort of put us in

23  a position of defending ourselves before he has submitted proof

24  on some matters in this case.   This brief which he filed made

25  many references to factual matter, none of which has been

1  testified to, one of them being the proposition of the Navy

2  withdrawing a permit to the Vail Dam.

3  MR. VEEDER:  George, I have withdrawn--  May I interrupt

4  just a moment?

5  MR. STAHLMAN:  Yes.

6  MR. VEEDER:  I think that is Exhibit 161 and 162 to which

7  you refer.  I lodged those many weeks or months ago.  It may

8  be that this will be the proper time to have them go into

9  evidence.

10  MR. STAHLMAN:  I don't know whether your exhibit is such,

11  without some witness, as to be competent.  But do you want

12  to proceed on that proposition?  We are ready to meet it.  I

13  would like to have the record complete on it, however.

14  MR. VEEDER:  George, the only thing I am going to say in

15  that regard is that we have raised the proposition, and we did

16  lodge those exhibits, and if you are denying their correctness

17  of it, I think the time has run out on you.

18  MR. STAHLMAN:  They are not in evidence, are they?

19  MR. VEEDER:  No; they are marked.

20  MR. STAHLMAN:  You try to introduce them and then I will

21  give you my objection to the introduction of them.  However, I

22  am ready to take the matter up at this time.

23  THE COURT:  Do you have them here?

24  MR. VEEDER:  Yes.  They are Exhibits 161 and 162, as I

25  remember.

1    THE COURT:  Do you waive any objection as to foundation
2    or authenticity on them?

3    MR. STAHLMAN:  I don't know.  We have been unable to
4    find a copy of the letter which Mr. Veeder has.  That is why
5    I say I think I would like to know where this letter came from,
6    whether it was out of the official Navy files.  I am not
7    making any great point of it.  I am ready to meet the situation.

8    THE COURT:  Well, you either make a point of it or you
9    don't.

10   MR. STAHLMAN:  Is this a signed copy of the letter?

11   MR. VEEDER:  This is a copy that came from the files.
12   I am now speaking of Exhibit 162.  That is a letter from the
13   files of the Eleventh Naval District, as I remember.

14   MR. STAHLMAN:  What is the other one?

15   MR. VEEDER:  That is also one from the Eleventh Naval
16   District.  I think I lodged those.

17   MR. STAHLMAN:  They have been lodged.  I am not making
18   a point of that, that my time has run out, et cetera.

19   MR. VEEDER:  Now, George, in regard similarly to Exhibit
20   161, which is a transcript of the record of the hearing before
21   the State Water Rights Board, or Division of Water Resources
22   at that time, in regard to the Vail application to appropriate
23   water, may I inquire, you say this is or is not a correct copy?

24   MR. STAHLMAN:  I am not making an objection to it.  I
25   think I would like to compare it with my copy.

1      MR. VEEDER:  You may.

2      MR. STAHLMAN:  It doesn't look like an official copy to

3  me.

4      MR. VEEDER:  We obtained the copies from the State Water

5  Rights Board, or Division of Water Resources in those days,

6  and we have had it copied.  If there is objection to it, we

7  can send it back and have it certified.

8      MR. STAHLMAN:  If you are introducing it, may it be

9  subject to my being able to check it against the official

10  record, of which I have a copy.

11      MR. VEEDER:  By all means.  If it would facilitate things,

12  I now offer in evidence Exhibits marked for identification

13  Plaintiff United States of America's 161 and Plaintiff United

14  States of America's 162.

15      MR. STAHLMAN: And this is upon the representation that you

16  have such a letter containing that language in the files of

17  the Eleventh Naval District?

18      MR. VEEDER:  Yes.

19      THE COURT:  All right, Exhibits 161 and 162 received

20  in evidence.

21      (Plaintiff's Exhibits No. 161 and 162 for Identification

22  were received in evidence.)

23      MR. STAHLMAN:  I offer in evidence, your Honor, Vail's

24  Exhibit AK-1 to AK-10, which have heretofore been lodged and

25  of which I have submitted copies to all parties.  I might say

1    these are photostats which were made from originals which we

2    have-- not originals which we have, but certified copies which

3    we have from the State Water Resources office.

4        THE COURT:  All right, Vail's AK-1 to 10 received in

5    evidence.

6        (Defendant Vail's Exhibits AK-1 to AK-10 for Identifica-

7    tion were received in evidence.)

8        MR. STAHLMAN:  That is another matter on which I presume

9    we will await argument.

10       THE COURT:  We will argue about it later.  They are

11   numbered, are they, Mr. Clerk, AK-1 to 10?

12       THE CLERK:  Yes, your Honor.

13       MR. STAHLMAN:  Mr. Veeder raised another issue in

14   connection with the drilling of the Pauba Well.  I spent some

15   considerable time trying to find the records that pertain to

16   the situation and the issues which he raised, and it was only

17   last week that I received copies which were made at the Camp

18   Pendleton office in connection with it.  I have not had an

19   opportunity to segregate them and determine which would be

20   competent and which wouldn't and which would pertain to the

21   situation.  They were kind enough to make copies of such matters

22   in the file that I thought on a hasty reading pertained to the

23   case and I have not had an opportunity carefully to go over

24   them, so that I can bring those matters into court which would

25   be of some evidentiary effect.

1    THE COURT:  You may do that later.

2    MR. VEEDER:  I don't want the impression to be conveyed,

3  your Honor, that the United States didn't make that available

4  to Mr. Stahlman.

5    We didn't delay on that, George.  They were available to

6  you.

7    MR. STAHLMAN:  Wait a minute, let's just go into that.

8  You said you would have the files down here, and I came down

9  and spent a whole day and there was not a thing in those files.

10  Then we found out they were at Pendleton, and I went up there

11  later.

12    THE COURT:  Let's not worry about it.  You have them now.

13    MR. STAHLMAN:  Yes, your Honor.

14    I wonder if we could have a recess now and then I think

15  I could finish very shortly.

16    THE COURT:  Take a short recess.

17    (Recess.)

18    MR. STAHLMAN:  Your Honor, as an explanation of the

19  memorandum which I submitted in connection with the stipulated

20  judgment, there is contained in there an Exhibit No. 4, and I

21  believe that that Exhibit N is premature.  It is in relation

22  to diversions that exist of Vail Dam.  There has been no

23  evidence taken on them and there really is no basis at this time

24  for this exhibit, and I think that that is one of the things

25  that should await until after the testimony is heard.

1    THE COURT: All right.

2    MR. STAHLMAN:  Then there is a matter that entered into

3    the factors affecting the stipulated judgment in relation to

4    riparian land which Vail owns on the Santa Rosa, on De Luz

5    Creek, and on Sandia Creek, and Col. Bowen has made a survey

6    of that which, I am informed, is not quite ready but almost

7    finished, and that will have to await until, I presume, our

8    next hearing in court.

9    Then there is in the memorandum on page 13 a tabulation

10   that tabulates the combined storage units and differentiates

11   between the testimony as given by the State of California and

12   that as given by the Government.  I don't have extra copies

13   of those.  I will, however, lodge them.  It is merely a

14   comparison, and I would like to present those at a later time.

15   THE COURT:  All right.

16   BY MR. STAHLMAN:

17   Q  Now, Mr. Wilkinson, will you state whether or not you

18   have an opinion as to whether or not there ever could be a stream

19   flow at Station No. 3, Temecula Gorge, in excess of the stream

20   flow at Station No. 6 at Ysidora?

21   MR. VEEDER:  I object on the grounds that there is no

22   foundation whatever for the question.  There is nothing in

23   the record to support it.

24   That this witness is not qualified.

25   That the question as presented is virtually without

1    meaning, because he says "ever."

2    THE COURT:  What foundation could you lay for that?  This

3    involves a lot of problems.

4    MR. STAHLMAN:  Let me ask the question in another way.

5    MR. VEEDER:  Do you withdraw the question?

6    MR. STAHLMAN:  I withdraw the question.

7    Q  Do you have an opinion as to whether the restored flow

8    at Station No. 3 could ever be greater than at Station No. 6?

9    MR. VEEDER:  I object on the grounds that there is no

10    foundation for this; that this witness is not qualified as a

11    hydrologist to testify in that regard.

12    MR. STAHLMAN:  It is a matter of computation from the

13    records that we have in this case.

14    THE COURT: Then that is a matter of argument, isn't it?

15    It isn't a matter of having some witness declare it.

16    Station 6 is at Ysidora; is that right?

17    THE WITNESS:  That is right.

18    MR. STAHLMAN:  That's right.

19    Let me ask you another question.

20    MR. VEEDER:  Are you going to withdraw the other question?

21    THE COURT:  Yes, he withdraws it.

22    BY MR. STAHLMAN:

23    Q  Have you developed a formula in connection with the

24    restored flow at those two stations by which the quantity of

25    water flowing past each by reason of past performance can be

1    demonstrated?

2         A   I have.

3         THE COURT:   Have you worked this out on a chart?

4         THE WITNESS:   It appears on page 23 of Mr. Stahlman's

5    memorandum, your Honor.

6         THE COURT:   Page 23 is the outline of proof.  Well, the

7    example winds up by saying, "It all seems very confusing,

8    inconsistent, meaningless and impossible."  And I tried

9    studying the formula laid out and I got no sense out of it.

10   It is not going to help the Court any, if that is the one

11   you are going to offer.

12        MR. STAHLMAN:   If he explains the formula, that might

13   help the Court.

14        THE COURT:   Well, do that at some other time.  Get it

15   laid out on a piece of paper and serve copies on counsel and

16   put the explanation in and see if we can understand it then.

17   This higher mathematics is out of my range.  Once you get

18   past A,B,C, I am lost, and you have D in here.

19        MR. STAHLMAN:   I thought if he went to the blackboard he

20   might be able to illustrate it to us.  However, if you would

21   rather do it the other way, I would be happy to.

22        THE COURT:   I would rather have it laid out, and give

23   counsel and all a chance to see it beforehand.

24        Am I wrong?  Is that clear?

25        MR. SACHSE:   I don't understand it, frankly, your Honor.

1    THE COURT:  Thank you, Mr. Sachse.

2    MR. STAHLMAN:  That is why I was going to have it explained.

3    THE COURT:  Explain it in writing when you can do it at

4    your leisure, and mark it as an exhibit later.  We will take

5    it up later.

6    MR. VEEDER:  To be very sure that I see what you are

7    talking about--

8    THE WITNESS: Page 23.

9    THE COURT:  The outline.

10    MR. VEEDER:  I see.

11   BY MR. STAHLMAN:

12    Q  Directing your attention to Exhibit 21, to the

13   corrected copy of the exhibit, which your Honor will recall

14   was inserted by Mr. Hoffman when he was recalled to the witness

15   stand, did you make some calculations in connection with the

16   runoff at Temecula Gorge in relation to the corrected copy of

17   Exhibit 21, which the Government's exhibit in evidence?

18    A  I did.

19    Q  And did you determine the average percentage of error

20   that occurred in connection with the corrections that appeared

21   upon the Exhibit 21, the added page, the corrected page, in

22   relation to the figures that had previously been given as the

23   flow at that point?

24    A  Yes I did.  I--

25    MR. VEEDER:  Will you just say yes, you have?

1    MR. STAHLMAN:  You are telling my witness what to say

2   now?

3    MR. VEEDER:  Because I am going to object to what is

4   going on.

5   BY MR. STAHLMAN:

6    Q  And what was the average percentage of error in

7   relation to those daily figures?

8    MR. VEEDER: I object, your Honor, on the grounds that

9   it is incompetent, irrelevant and immaterial, and doesn't tend

10  to prove any issue in this case.  There is nothing to show

11  that this witness is qualified as a hydrologist.  If that is

12  what he is undertaking to prove--

13    THE COURT:  It is not hydrology.  It is just mathematics.

14    MR. VEEDER:  Is this just arithmetic?

15    THE COURT:  Arithmetic is all it is.

16    MR. VEEDER:  Are you sticking to arithmetic?

17    THE COURT:  Overruled.  Do you want to get home before

18  Christmas?

19    MR. VEEDER:  Not if it will prejudice the case, your

20  Honor.

21    THE COURT:  Go ahead, Mr. Stahlman.

22    THE WITNESS:  For the dates as listed of February 4, 5, 19,

23  March 15, 16, 17, 22, 27, 28, and another one which is probably

24  28, although it is not clear in the trial transcript, also

25  the dates April 1, 2, 3, 4, 7, and another questionable date,

1    the average percent increase is 16.8%.

2    BY MR. STAHLMAN:

3        Q   That is, the later computation was 16.8% greater than

4    the exhibit when it was first introduced in evidence?

5        A   That is right.

6        Q   Did you also determine the percentage of error as to

7    the yearly basis?

8        A   Not the yearly, but the monthly.

9        Q   The monthly?

10       A   The change in the month of February was 4.1%; in

11   March 11.8%; April 11.6%.

12       THE COURT: This was an average of 10.7%?

13       THE WITNESS: For the three months, your Honor.

14       THE COURT:  For the parts of the three months,

15       THE WITNESS:  For the parts of the three months.  The

16   totals for the month are considered there.

17       THE COURT:  Those figures are totals for the month.  You

18   picked up the total figures of the month?

19       THE WITNESS:  That is right.

20       THE COURT:  The other parts were particular days of

21   months?

22       THE WITNESS:  That is right, your Honor.

23       THE COURT:  Were those the only days on which there was

24   runoff, or were they just the days on which corrections were

25   made?

1        THE WITNESS:   Just days on which corrections were made.

2        MR. STAHLMAN:   You may cross-examine.

3

4                         CROSS-EXAMINATION

5   BY MR. VEEDER:

6        Q  Mr. Wilkinson, referring to Vail's Exhibit AP, column

7   15, I ask you to state what is purportedly represented by that

8   column.

9        A  The term "Net Use" means the water actually used in

10  crop production.

11       Q  How did you determine that?

12       A  That was assuming a 30% return of irrigation water.

13       THE COURT:   You took the figure in column 14 and then

14  deducted 30% from it?

15       THE WITNESS:   Not exactly, your Honor, because Column

16  14 also includes evaporation in Vail Lake.  Obviously, there

17  is no return from any evaporation.  So it is just strictly

18  irrigation water.  In other words, 30% is deducted from column

19  11 and column 12, but 30% is not deducted from the evaporation

20  figure as mentioned in column 13.

21       THE COURT:   But your caption says on 15, "Column 14 less

22  30%."

23       THE WITNESS:   That is right, your Honor.  That was an

24  error on my part, because actually--

25       THE COURT:   It should read what?

THE WITNESS:  It should read "Net use," without mentioning column 14, or there should be an explanation of the fact that the items in Column 13 under Evaporation are not considered as giving any return.

MR. VEEDER;  I hand you Vail's AP and ask you to make the correction that you think is necessary on that exhibit to be reflective of what you intended the column to represent.

THE COURT:  Insert it as a note underneath the column. In other words, that you have-- Well, whatever you have done.

THE WITNESS:  I need a rule to get these years straight.

THE COURT:  What has that got to do with making a note under the column?

THE WITNESS:  I was going to quote the years, your Honor.

THE COURT:  Just write under there what you did.  Here is a ruler, if you need one.

THE WITNESS:  It isn't necessary, your Honor.

MR. VEEDER:  Would you read what you have written there?

THE WITNESS:  "Note:  These figures do not give any credit for those mentioned in column 13," with an arrow pointing to column 15.

BY MR. VEEDER:

Q  Do I understand correctly that for each acre-foot of water that is applied in Pauba Valley you purport to represent by Vail's AP, Column 15, that there is a return flow of 30%?

A  Some more, some less, depending on the areas.

Q   In regard to the some less, how much less?

A   The example of seed germination by sprinkling when there are small amounts put on quite frequently in order to germinate the seed and not to establish any great growth, I would say the return is negligible.

Q   And when you say negligible do you mean zero?

A   Zero.

Q   Then is there a gradation between zero and 30% that you think might prevail from the standpoint of return flow?

A   When I say zero, this germination of seed is practiced very seldom at the ranch.  We have to replace alfalfa plantings once in five, maybe once in ten years.

Q   Are you saying, then,-- to cut across a little bit here-- are you saying that 30% of each acre-foot of water that is used on the Pauba Rancho, your ranch, goes into the stream?

A   Into the underground.

Q   In other words, the 30% to which you are making reference is not 30% of each acre-foot that would be available for use by the United States of America?

MR. STAHLMAN:  I object to that.

THE COURT:  I can't understand it.  Sustained.

MR. VEEDER:  May I explain what I mean by it, then?

THE COURT:  I understand what he is saying.  He is saying that he has taken 30% as an average of all the water used by the Vail Rancho; that 30% of it goes back into the underground.

BY MR. VEEDER:

Q   When you say 30% is return flow, are you saying that it goes into the Temecula surface runoff?

A   Only in the sense that the underground must support the surface.

Q   In other words, when we are speaking of the Outwash Area below Nigger Canyon--

MR. STAHLMAN:   May the record show that Mr. Veeder has made reference and pointed to Vail's Exhibit AQ, and that he, indeed, tore it off the board when I made the reference for the record.

THE COURT:   The record will so show.  Apparently, the Court draws the conclusion, he recognized the area on Exhibit AQ.

MR. VEEDER:   I will concede that I recognize it, and I think it is highly humorous that such an irrelevant thing could be put on this Court's easel.

THE COURT:   Go ahead and ask your question.

BY MR. VEEDER:

Q   Referring to the map Exhibit 15-A, I am going to ask you whether you are stating into the record that 30% of each acre-foot of water that is used in the Outwash Area is return flow and available for re-use?

A   Mr. Veeder, I will be glad to answer your question. However, if you would refer to the map on the easel--

1    Q  Vail's J.

2    A  Vail's J, it would be much simpler for me to answer

3  your question.

4    Q  All right, refer to Field 19 and testify as to whether

5  your column 15 purports to show that for each acre-foot of

6  water used in the Outwash Area, 30% of it is return flow?

7    A  Let me qualify my answer by saying that 19 is not all

8  the Outwash Area.

9    Q  All right.  I limit it to 19.

10    A  You limit it to 19?

11    Q  Yes.

12    A  In consideration for 19, the only application on that

13  piece has been sprinkler irrigation, and certainly 30% would

14  not be correct.  However, there has been only one crop grown

15  on that piece of ground.

16    Q  In regard to the sprinkler irrigation, did you plant

17  a crop this year?

18    A  That is the crop I refer to.

19    Q  And you are irrigating now?

20    A  No, we are not.  The crop has been harvested.

21    Q  You did irrigate by sprinkler in that area?

22    A  That is right.

23  THE COURT:  What crop is that?

24  THE WITNESS:  That was the spring crop of potatoes raised

25  this year, your Honor.

BY MR. VEEDER:

Q  Are you stating to the Court that 30% of the water that is applied to Field 19 is return flow?

MR. STAHLMAN:  Just a moment.

THE COURT:  He didn't say that.

MR. VEEDER:  For each acre-foot of water that is applied to that field, was return flow.

MR. STAHLMAN:  The exhibit makes no reference to this year, and he said that that is the only time a crop was grown in that area.

BY MR. VEEDER:

Q  Do you use sprinklers any other place on your ranch?

A  We have, as I said, for germination, and this year this section was sprinkled, and a year previous the section adjoining it, 18, was sprinkled.

Q  And what we have marked as Upper JK in Mesquite?

THE COURT:  It is called now 18 on Exhibit J.

BY MR. VEEDER:

Q  18.  Are you stating that the return flow from sprinkler irrigation in there is 30%?

A  I didn't state that.

Q  Well, is it or is it not?

A  I assume it couldn't approach 30%.

Q  In other words, where you are stating, then, to the Court that for each acre-foot of water that is applied to

1  Field 18 by sprinklers, there is not a return flow of 30%?

2      A  As regards sprinkler irrigation, there is no-- it is

3  my opinion that there is no 30% return.  It is an operation

4  that is not carried out to any great extent on the ranch.

5  However, that same field when furrow-irrigated is a different

6  situation.

7      MR. VEEDER:  I didn't ask that.

8      THE COURT:  I want to hear it.

9      Go ahead.

10     THE WITNESS:  That same field when furrow-irrigated there

11 probably was a 50% return.  In that particular area there is

12 a usage of over 7 acre-feet for one crop of potatoes, which

13 certainly doesn't demand that much water.

14     THE COURT:  The Court has heard all of this evidence.

15 The Court knows that the spreading grounds at the mouth of

16 Nigger Canyon will take a lot more and that a lot more of it

17 will go into the underground and further down.  The Court also

18 heard testimony that the return from sprinkler irrigation is

19 much less than from flooding and irrigating through ditches

20 and rills.  This figure he has given you of 30% is an overall

21 average.

22     MR. VEEDER:  Well, your Honor, I am trying to find out

23 how he arrived at the overall average.

24     THE COURT:  I understood him to say that he based it in

25 part on Col. Bowen's testimony.

1    Go ahead and ask your question.

2  BY MR. VEEDER:

3    Q  Now, in regard to the 30% return, is it not true that

4  you would re-use the return flow, whatever it amounted to?

5  Isn't that frequently the case?

6    A  It possibly is the case, and in other situations, no.

7    Q  What would be the other situations no?

8    A  Where it is impossible, of course, to recapture at the

9  lower end of the valley.

10    Q  In regard, though, to the areas that we have called

11  here your Field 18, that return flow would go into the basin

12  and you can assume that to a degree at least you would re-use

13  it yourself; isn't that right?

14    A  Quite possible.

15    Q  So as a matter of fact,  the percentage would not be

16  30% on any of the re-used water; isn't that right?

17    A  I didn't make any statement to that effect.  I made a

18  statement that there was 30% return water.  As to the re-use

19  and such as that, that is a matter of hydrology.

20    Q  In other words, you don't feel competent to testify in

21  regard to the 30%?

22    A  I feel competent to testify to the 30%, because it is

23  a matter of common knowledge.  From farm practices, there has

24  got to be a return.  Col. Bowen states that the returns are

25  even greater than that.  But as far as the re-usable portion

1  of that water, I can just speak in generalities.

2      Q  From the standpoint of the water that would come down

3  to the United States of America by reason of the water coming

4  down Temecula and entering the Gorge, are you representing to

5  the Court that for each acre-foot of water you use, 30% of

6  it enters the gorge?

7      MR. STAHLMAN:  I object to the question as being compound

8  and argumentative, your Honor.

9      THE COURT:  Overruled.

10     THE WITNESS:  I make no representations as to flows.  In

11  preparing this, I entitled the column "Net Use."

12     THE COURT:  You have answered it.  You didn't make

13  representations as to flow at the gorge.  Somebody else might

14  use the water.

15  BY MR. VEEDER:

16     Q  Indeed, the Vail Company itself might use 30% return

17  flow until you get to the point where you can no longer control

18  it yourself; isn't that right?

19     MR. STAHLMAN:  I object to this as being speculative.

20  It doesn't furnish any evidence.

21     THE COURT:  Sustained.  The Court understands what you

22  are talking about.  How you could compute it, I don't know.

23     MR. VEEDER:  Then, your Honor, may I inquire, what is the

24  significance of Column 15?

25     I don't believe it means anything.

1    MR. STAHLMAN:  I am not concerned with what Mr. Veeder

2  thinks.  If he wants to ask the witness what the significance

3  is, that might be all right.  But he is not testifying in the

4  case.

5  BY MR. VEEDER:

6    Q  In regard to Vail Company's Exhibit N, are you able to

7  state whether you irrigated the barley and oats during the

8  year 1958?

9    MR. SACHSE:  Excuse me.  I am lost.  Are we on AN?

10    MR. STAHLMAN:  No, he is on N now.  He has already cross-

11  examined him on that matter.

12    THE COURT:  AN is a list of wells.

13    MR. VEEDER:  I am not talking about AN.  I am talking about

14  N, your Honor.

15    THE COURT:  I thought you said AN.

16    MR. VEEDER:  No, I am talking about N.

17    THE COURT:  I misunderstood you.

18    MR. STAHLMAN:  What is the question?

19    MR. VEEDER:  I am asking him whether he has personal

20  knowledge whether in 1958 they irrigated the barley, that is,

21  403 acres.

22    THE WITNESS:  I would have to refresh my memory with notes

23  as to the location of the barley.  I assume that that is the

24  situation.

25

BY MR. VEEDER:

Q   Are you representing to the Court that if you irrigated the 403 acres, for each acre-foot of water that was applied to that barley, there is a return to the stream of 30%?

A   I didn't say there was a return to the stream, Mr. Veeder, at any time.   I said there was a return to the underground of water used for irrigation.   I didn't specify that barley crop.

Q   Wouldn't it make a difference in regard to the crops that are being raised whether there is that type of return flow?

A   Not to the crop, but to the procedure in irrigation.

Q   How did you irrigate the barley, then?

A   Barley is flooded when it is necessary.   It is a crop that is generally raised in the spring, and to augment a lack of rainfall it is irrigated, usually just once.

Q   That is right.   And doesn't it make a difference the kind and type of soil that is involved whether your return flow would be 30%?

A   There is no question about that.

Q   So it is impossible, actually, is it not, to take an average of 30% of each acre-foot of water you have applied and say there is going to be that return flow?

A   I don't see the impossibility of it.   I think it has been well explained.   There is a return flow.   I selected a

1   figure of 30% because it was the lowest figure that was

2   mentioned by Col. Bowen.

3        MR. STAHLMAN:  You mean the most conservative figure.

4        THE WITNESS: The most conservative figure.

5   BY MR. VEEDER:

6        Q   In connection with the use of water down in the lower

7   end of the Temecula Valley, have you made any estimation as

8   to the quantity of water which actually enters Temecula Creek

9   as return flow?

10       THE COURT:  You mean enters as surface flow?

11       MR. VEEDER:  That is correct, your Honor.

12       THE WITNESS:  As return flow from what?

13   BY MR. VEEDER:

14       Q  From the fields.

15       A  No, Mr. Veeder.

16       Q  You have no measurements?

17       A  I have made no measurements as to the fields.  I have

18   made measurements of return flow when the river was crossed

19   by the aqueduct.  At that time they dewatered the crossing in

20   order to lay their pipe.

21       Q  And how did you make your calculation?

22       A  From the stream flow measurements.

23       Q  You don't know, though, the sources of the water, from

24   what fields it returned?

25       A  In that particular instance, I would know very well

1    where it came from.

2        MR. STAHLMAN:  Objected to, your Honor.

3        THE WITNESS:  It came from pumps in dewatering the

4    crossing.

5        THE COURT:  The objection is overruled.

6    BY MR. VEEDER:

7        Q  And what did those calculations show?

8        A  I don't remember exactly, but I think at the last

9    crossing there was some 300 acre-feet in excess of normal flow

10   that was due to the pumping activity at the crossing by the

11   Metropolitan Water Aqueduct.

12       MR. VEEDER:  I have no further questions.

13       MR. STAHLMAN:  That is all.

14       MR. GIRARD:  No questions.

15       THE COURT:  How much time do you want tomorrow?

16       MR. STAHLMAN:  I don't need any, unless Mr. Kunkel is

17   going to be here.

18       MR. VEEDER:  Mr. Kunkel will be here.  I called him and he

19   will be here at 10 o'clock.

20       MR. STAHLMAN:  I have a couple of questions of Col. Bowen.

21   They can be asked in the morning.

22       THE COURT:  10 o'clock tomorrow morning.

23       (Adjournment until Friday, December 18, 1959, at 10

24   A. M.)

25