# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.  1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**    Friday, December 18, 1959.

**Pages:** 11380 to 11470

# FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA, )
            Plaintiff, )
      vs. )      No. 1247-SD-C.
FALLBROOK PUBLIC UTILITY )
DISTRICT, et al., )
            Defendants. )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Friday, December 18, 1959

APPEARANCES:

     For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                              WILLIAM E. BURBY, ESQ.,
                              Special Assistants to the
                              Attorney General,
                              Department of Justice,
                              Washington, D. C.

                              LCDR. DONALD W. REDD.

APPEARANCES (Continued):

        For Defendant Vail          GEORGE E. STAHLMAN, ESQ.
        Company

        For Defendant            STANLEY MOSK, ESQ.,
        State of California     Attorney General,
                             By FRED GIRARD, ESQ.,
                                Deputy Attorney General.

        For Defendants
        Fallbrook Public
        Utility District,      FRANZ R. SACHSE, ESQ.
        et al.

        For Defendant
        Murray Schloss        WALTER GOULD LINCOLN, ESQ.
        Foundation

# INDEX TO EXHIBITS

| Defendant's Exhibits - | Iden. | In Evid. |
|---|---|---|
| AQ    Vail | 11391 | 11391 |
| AQ-1 Vail | 11391 | 11392 |

11382

INDEX TO WITNESSES

| For Defendant Vail: | D | X | RD | RX |
|---|---|---|---|---|
| James V. Wilkinson | 11389 | | | |
| Allen C. Bowen | 11393 | 11396 | | |
| Fred Kunkel | 11414 | 11445 | | |

1    San Diego, California, Friday, December 18, 1959.   10 A. M.

2

3         (Other matters.)

4         THE CLERK:   One, 1247-SD-C, United States vs. Fallbrook.

5    Further court trial.

6         THE COURT:   Mr. Lincoln has been present during these

7    proceedings involving the Vail judgment this week.   And I

8    have heard from Mr. Girard, Mr. Sachse and various other people.

9    I would like to let the record show what Mr. Lincoln's position

10   is as to the stipulated judgment and the prior judgment.

11        I understand that you represent the Schoss Estate, Mr.

12   Lincoln?

13        MR. LINCOLN:   Yes, your Honor.

14        THE COURT:   The Schloss Estate, Intervenors.

15        MR. LINCOLN:   The Schloss Estate, and also Mr. Playtor.

16        THE COURT:   Does Mr. Playtor still have an interest?

17        MR. LINCOLN:   No, Mr. Playtor sold his property to Mr.

18   Henderson, who was here in your Honor's court yesterday.

19        THE COURT:   Then you are not concerned with Playtor?

20        MR. LINCOLN:   No, your Honor.

21        THE COURT:   As I recall, the Schloss Estate, using the

22   term broadly, was one of the intervenors the same as Playtor?

23        MR. LINCOLN:   Yes, your Honor.

24        THE COURT:   And the award that was made in the first

25   judgment was not appealed from?

1    MR. LINCOLN:  That is correct, your Honor.

2    THE COURT:  The proposition was advanced here yesterday

3  that the old judgment is in force and effect as to the inter-

4  venors-- there is not much dispute about that, and that also

5  it is still in effect except as to those matters in which a new

6  trial was ordered.

7    What is the position of your client with reference to

8  this judgment and this stipulated judgment?  Are you going to

9  urge that the stipulated judgment be held to be inequitable in

10 its enforcement?  Or are you going to urge that it is a proper

11 judgment, and that your client is bound by the prior judgment

12 before the appeal?

13   MR. LINCOLN:  In so far as either my clients or Mr.

14 Playtor, who was my client at that time, had any notice or any

15 knowledge of the stipulated judgment until, I think, several

16 years after it was filed, your Honor, we have felt that we are

17 not bound by it, and that, of necessity, since we were not

18 bound by it we must be bound by the original judgment.  We feel

19 that the stipulated judgment, since it was approved by very

20 excellent attorneys on both sides, has no reason to be set

21 aside.  Consequently, we shall respectfully do what we can to

22 oppose it.

23   THE COURT:  You heard the Court's statement yesterday

24 that if it developed that the Court decided that the stipulated

25 judgment should not stand, the Court would attempt to find

1   some way to get rid of the effect of the judgment as to the

2   intervenors, and the appeal made by the Court to the intelli-

3   gence and generosity of the Government's attorney to cooperate

4   in that respect.

5       Now, what would be your position if the stipulated

6   judgment should be held ineffective?  Do you still think you

7   want to be bound by the prior judgment?

8       MR. LINCOLN:  Well, we feel that in so far as the desire

9   to set aside the stipulation is concerned, the parties who

10  object to it, and I also think perhaps your Honor, too, should

11  know what is going to be the position of the Vail Company in

12  the future.

13      Your Honor will remember two situations which are before

14  us.  The first one is that the present Vail Company, the

15  corporation, was not in existence until 1958, and consequently

16  it had no personal knowledge of the stipulated judgment or of

17  any effect that the stipulated judgment might have or might

18  not have between the years 1940 and the year 1958.  Your Honor

19  should also know, as will probably be presented to the Court--

20  and I trust I am not out of order by calling it to your Honor's

21  attention before it is so presented-- that also in 1958, as of,

22  I believe, December 31st of that year, the old Vail trust went

23  completely out of existence by reason of a very elaborate

24  and complicated document which was filed in the Riverside

25  court, by which two things were done, the first being that all

1   of the Vail properties then in existence were transferred to the

2   new Vail Company, the corporation.

3       MR. STAHLMAN:  Pardon me.  I don't like to interrupt

4   counsel when he is talking.  But I think I would like to have

5   Mr. Lincoln under oath.

6       THE COURT:  Well, this isn't evidence.  I am merely ask-

7   ing for his position.

8       Go ahead, Mr. Lincoln.

9       Well, two things were done.  You named one of them:

10  The property was transferred to the Vail Corporation.

11      What was the second thing?

12      MR. LINCOLN:  The second thing, your Honor, was that the

13  Vail Corporation attempted, in that particular document, to

14  assume many, or perhaps all, of the liabilities of the old Vail

15  trust.  But whether or not, under that very elaborate document,

16  the Vail Corporation is in position to stand in the shoes of

17  the Vail Trust, which is now dead in law, I very seriously

18  question and shall question when I present the situation to

19  your Honor, unless the United States itself does.

20      And we are also very intently interested in knowing what

21  the position of the Vail Company is going to be if this

22  stipulated judgment is set aside, and we agree to having it

23  set aside, whether or not a few years from now the Vail Company,

24  the present corporation, is going to be dissatisfied with the

25  conditions which it finds after the stipulated judgment might

1  be set aside and ask again that the new judgment be in turn set

2  aside, because it would possibly have exactly the same

3  criticism of the new judgment which your Honor might make in

4  that respect as it has of the judgment which was made by his

5  Honor, Judge Thompson, I think it was, in 1940.

6        THE COURT:  Thank you very much, Mr. Lincoln.

7        Mr. Stahlman, do you want to proceed with Mr. Kunkel?

8        MR. STAHLMAN:  No, your Honor.

9        Evidently Mr. Veeder is laboring under some miscon-

10  ception regarding--

11        THE COURT:  Well, let me ask Mr. Lincoln.

12        I might want to swear you as a witness.  Could you

13  testify of your own knowledge whether that exhibit on the board,

14  Plaintiff's Exhibit 10, was one of the exhibits in the original

15  trial between Santa Margarita and Vail?

16        MR. LINCOLN:  I cannot, your Honor.

17        THE COURT: You cannot?

18        MR. LINCOLN:  No, your Honor, because my understanding

19  is that after a case is finished the procedure usually would

20  be for the respective parties to be allowed to take their

21  respective exhibits.

22        THE COURT:  I thought you might have seen the exhibit

23  during the prior trial.

24        MR. LINCOLN:  I may have, your Honor, but I don't remember

25  it.

1          THE COURT:  All right.

2          Mr. Stahlman.

3          MR. STAHLMAN:  Call Mr. Wilkinson.

4          MR. VEEDER:  Your Honor, there was one thing that George

5    was going to make reference to.  This is not an original ex-

6    hibit.  This is a photograph of an exhibit.  That is a thing

7    that was not clear in my mind last evening.

8          MR. STAHLMAN:  I think I can clear that up, your Honor.

9          MR. VEEDER:  And I think your Honor thought.

10         MR. STAHLMAN:  Will you take the stand, Mr. Wilkinson?

11         THE COURT:  By this, you mean Vail's Exhibit AQ.

12         MR. VEEDER:  I pointed to AQ, your Honor.

13

14                    JAMES V. WILKINSON,

15   called as a witness in behalf of the defendant Vail Company,

16   having been previously duly sworn, testified further as follows

17

18                    DIRECT EXAMINATION

19   BY MR. STAHLMAN:

20         Q  Mr. Wilkinson, on arriving in San Diego this morning,

21   where did you go?

22         A  I went to the County Clerk's Office.

23         Q  To the County Clerk of the County of San Diego?

24         A  Of San Diego.

25         Q  And at the County Clerk's office did you obtain the

1  following map, which I will show you?

2      A   I did.

3      Q   Were you present when this document, a letter on the

4  stationery of the County Clerk of San Diego County, was

5  presented to me?

6      A   I was.

7      Q   And it was presented by a Mary L. Sackett, who is a

8  Deputy County Clerk?

9      A   That is right.

10      Q   At that time did she then turn over this map to us?

11  MR. VEEDER:  Is that going in evidence?

12  THE WITNESS:  She did.

13  MR. STAHLMAN:  If you are objecting--

14      I might state this to the Court.  I talked to Mr. James

15  this morning and I explained to him that we may have some

16  technical reasons, and he said he would send a deputy over

17  here, if necessary, to attest to the fact that this came out

18  of the County Clerk's office.

19  THE COURT:  I understand what you are doing.  And if

20  Mr. Veeder wants to insist on it, we will have to have the

21  deputy over here.  Otherwise, it looks now as if we have the

22  original map.

23  MR. VEEDER:  As I understand it, that would be sig-

24  nificant.  I thought George was going to have it marked and

25  put in.

1          MR. STAHLMAN:  Yes, I would like to.

2          MR. VEEDER:  That is satisfactory.

3          THE COURT:  This is in lieu of calling the County Clerk?

4          MR. VEEDER:  Yes, that is right

5          MR. STAHLMAN:  May we mark the original as AQ, your

6   Honor?

7          THE COURT:  The original will be marked as AQ and the--

8   I don't think it will gum up our record in any way.

9          MR. VEEDER:  I want to be sure I understand.  The

10  document here--

11         THE COURT:  came from the County Clerk's office.

12         MR. VEEDER:  --came from the County Clerk's office, and

13  it is the exhibit; is that right?

14         THE COURT:  It will be marked AQ, and it will be the

15  exhibit, and the one previously marked will be returned to

16  Mr. Wilkinson.

17         MR. VEEDER:  If they are identical--

18         MR. STAHLMAN:  Look at them.  You can see.  It is quite

19  obvious that they are identical.

20         MR. VEEDER:  I have no objection.

21         THE COURT:  That will be the order.

22         And this letter will be AQ-1.

23         Received in evidence.

24         (Defendant Vail's Exhibit AQ and AQ-1 were marked for

25  identifcation and received in evidence.)

1    MR. STAHLMAN:  You are not making a point of bringing the
2  County Clerk over here, Mr. Veeder?
3    MR. VEEDER:  No.  I had no idea where that other one came
4  from.
5    THE COURT:  I understand, Mr. Veeder, that the letter
6  from the County Clerk will be the equivalent of calling the
7  deputy clerk to identify Exhibit AQ.
8    MR. VEEDER:  That is correct, your Honor.
9  BY MR. STAHLMAN:
10    Q  And this map has been in your possession continuously
11  from the time it was delivered to you by the County Clerk until
12  you brought it here into court; is that right?
13    A  That is right.
14    Q  And it is the same condition now that it was in when
15  you obtained it from the County Clerk?
16    A  That is right.
17    THE COURT:  All right.
18    MR. STAHLMAN:  That's all for Mr. Wilkinson, your Honor.
19    THE COURT:  Any questions?
20    MR. VEEDER:  No, your Honor.
21    THE COURT:  Step down, Mr. Wilkinson.
22    MR. STAHLMAN:  Call Col. Bowen.
23
24
25

1                   ALLEN C. BOWEN,

2  called as a witness in behalf of defendant Vail, having been

3  previously duly sworn, testified as follows:

4

5                 DIRECT EXAMINATION

6  BY MR. STAHLMAN:

7     Q  Col. Bowen, are you generally familiar with the soil

8  conditions in the Pauba Valley in the vicinity of the area

9  that is under irrigation by the Vail Company, as shown in

10  Exhibit Vail J?

11     A  Yes, sir.

12     Q  And do you have an opinion as to the factor of return

13  flow of irrigation by the type of irrigation that is employed

14  there when it is furrow irrigated or flooded?

15     A  Yes, sir.

16     Q  Are there differences in the porosity of the soil

17  from one end of the valley to the other, that is, from the

18  outfall down to the terminus at the fault line near Temecula?

19     A  Yes, sir.

20     Q  Do you have an opinion as to what would be the per-

21  centage of return flow in that area where irrigation is con-

22  ducted by row irrigation or flood irrigation?

23     A  Throughout the valley, Mr. Stahlman?

24     Q  Yes.

25     A  Yes, sir.

11394

Q   What would that percentage be?

A   Well, the percentage will vary.  You have named two of the factors, Mr. Stahlman.

Q   What other factors would you take into consideration in relation to the determination?

A   The type of crop that is grown is one of the factors, the slope of the land, the width of the border checks, the depth of the furrow, the permeability of the subsoil as well as the permeability of the topsoil, the rate of application of water to the soil, and possibly other factors which I haven't named.

Q   When you gave the percentage relative to the return flow on the Lincoln property, you took into consideration those factors, too?

A   Yes, sir, I took into consideration length of run, the use of the border type irrigation, width of border, slope, soil texture.

Q   What would be your opinion as to the rate of return in the Pauba Basin?

THE COURT:  General average throughout the basin, if you can make one.

MR. STAHLMAN:  General average, yes.

THE WITNESS:  I would say it would range from 30 to 50 percent, Mr. Stahlman.  The average throughout the basin would probably be somewhere in the neighborhood of 35 to 40%, since

1   the very absorptive areas are confined largely to the upper

2   portion of the Pauba Basin.

3        THE COURT:  In other words, your rate of return in this

4   spreading ground below Nigger Canyon would be much higher than

5   further down the valley?

6        THE WITNESS:  Yes, sir.

7        THE COURT:  So you try to make some estimate based upon

8   the factors you have enumerated and your knowledge of how

9   irrigation is carried on there in the Pauba Valley?

10       THE WITNESS:  Yes, sir.

11  BY MR. STAHLMAN:

12       Q  And when we speak of "return flow," how does that

13  water go?

14       A  Well, return flow, Mr. Stahlman, is considered to be

15  that water applied to an irrigated field which returns to the

16  stream system either as surface runoff from the tail lands or

17  as deep percolation into the ground water basin.  Now, the sur-

18  face runoff in the Pauba Valley is rather limited.  There is

19  some, but actual surface contribution to the stream itself is

20  negligible.  The bulk of the return in the Pauba Valley is

21  that water which goes below the root zone and percolates down

22  through the alluvium to the ground water body.

23       MR. STAHLMAN:  That's all.

24       THE COURT:  Cross-examine.

25

CROSS-EXAMINATION

BY MR. VEEDER:

Q   Col. Bowen, the diversion duty is the combined duty of field plus project losses; isn't that right?

A   Yes, sir.  The losses between the point of diversion and the place of use, plus the water applied to the field.

Q   That is correct.  Now, in making your calculations in regard to return flow, the return flow, as you have been using it, is simply the difference between the quantity of water applied to the field and the consumptive use of the plants; is that correct?  Or is there another element?

A   Consumptive use, Mr. Veeder, is not only the water used by the plant, but it is also water that is lost in evaporation.

Q   That's correct.

A   Consumptive use deducts water available.  That is gone.  It is either tied up in the plant tissues or is evaporated into the air.

Q   That is correct.  In other words, the 30 to 50% to which you are making reference is water that was not consumptively used; isn't that right?

A   Yes, sir.

Q   Now, that water would go into-- I am speaking now of the Outwash Area of Nigger Canyon?

A   Yes, sir.

1      Q   The water which was return flow there would go into the

2   ground water basin, would it not?

3      A   Yes, sir.

4      Q   And it would go down to the JK area, some of it might

5   go down to the JK area and be again used; isn't that correct?

6      A   Yes, sir.

7      Q   So as a matter of fact, then, your 30% would be your

8   return flow, there would be an increase in consumptive use of

9   that return flow; isn't that right?

10     MR. STAHLMAN:   Just a minute.   That would then show up

11  in other consumptive uses.   It is as broad as it is long.

12     MR. VEEDER:   If you are making an objection, counsel,

13  fine.

14     MR. STAHLMAN:   Yes.

15     MR. VEEDER:   What is your objection?

16     MR. STAHLMAN:   Immaterial.

17     THE COURT:   Overruled.

18  BY MR. VEEDER:

19     Q   Would you proceed on down the valley.   Take an acre-

20  foot of water that has been utilized, 30% of which or 50% of

21  which, in your opinion, has gone into the ground water basin.

22  Would you state whether you have an opinion as to the effect

23  of use and re-use of that return flow?

24     A   Yes, sir, I have an opinion.

25     Q   Would you state what your opinion is?

1    A  Well, let's assume a 50% return flow in the Outwash

2  Area.  A portion of that would be available for re-use by the

3  Vail Company, inasmuch as they operate the entire irrigation

4  system in the Pauba Valley.  So that for each hundred acre-

5  feet of water applied to the outwash area, the 50 acre-feet

6  that returns to the ground water basin is re-used, in whole

7  or in part, as it follows the hydraulic gradient down the

8  valley, and not all of that 50 acre-feet of the hundred applied

9  would show up as surface stream flow at Temecula Gorge.

10    Q  So as a matter of fact, when you view Vail's AP, when

11  you show 2,204 acre-feet as the return flow for the year 1942,

12  that would not be reflective of actuality from the standpoint

13  of number of acre-feet actually diverted and applied?

14    MR. STAHLMAN:  I object to that.  It is not return flow.

15  It is net use.  The question is compound, and it is unin-

16  telligible.

17    THE COURT:  I don't understand the question.  And I am

18  having trouble understanding the theory of this business.

19  Certainly you don't have to put on proof that if there is

20  return flow that return flow itself, in part or in toto, may

21  be used later in later pumping, or if it is not used it may

22  make other water available, push other water up that is used,

23  or take the place of other water that is used.  But I don't

24  know where that gets us.

25    MR. VEEDER:  We haven't contended that it increases the

1    flow in the stream, necessarily.  It might or might not.

2         THE COURT:  Let me finish.  I don't know where that gets

3    us.  A certain amount of water is applied to land in the Pauba

4    Valley, and there is a certain amount of that water that goes

5    back into the underground as return flow.  Now, the Government

6    is trying to show that this return flow is again pumped out and

7    used, some part of it.  I don't know where that gets us.  There

8    would be no way mathematically to figure this out.  Certainly

9    from the gross amount of water applied on the ground in Pauba

10   Valley there could be estimated a gross amount of return flow,

11   and the fact that some return flow cropped up and was used in

12   later pumping.  Logically, I don't know where it gets us.  It

13   is just a dog chasing its tail.  You put so much water on the

14   ground.  The Colonel said that 35 to 40% on the average is

15   return flow.  Now you are engaged in some metaphysical con-

16   tention here that I am having trouble following.

17        MR. VEEDER:  I am not engaged in it.  It is their exhibit,

18   your Honor, and I don't believe that column 15 has one-- has

19   any sense.  It doesn't mean a thing.

20        THE COURT: Maybe you can handle these metaphysical problems

21   better than I can.  You understand what Mr. Veeder is getting

22   at, Colonel, I take it.

23        MR. VEEDER:  Maybe he doesn't.

24        I will ask another question.  I will withdraw the question

25   and start again.

1        Q   From the standpoint of the availability of water to

2   the United States, does Column 15 showing return flow have any

3   significance?

4        MR. STAHLMAN:   Just a moment.   I object to that as

5   invading the province of the Court and calling for a conclusion

6   on the part of the witness.

7        MR. VEEDER:   Your Honor, what then is the purpose?   There

8   is only one issue here that is involved-- and I am glad the

9   matter has come up the way it has-- there is only one issue:

10  Is return flow important in your calculation as to the

11  correlative share of water of the United States of America?

12  In every other lawsuit I have been engaged in, return flow has

13  been important.   Why?   Because it will reduce the burden, to

14  a degree, upon some of the users upstream.   But here, if I

15  understand correctly, what has transpired is that the water is

16  used and re-used, and used and re-used.   So the column showing

17  return flow is meaningless, because it doesn't present any more

18  water for use, and the water resources are not better used

19  under the circumstances.

20       THE COURT:   Well, now, let's start out from where we are.

21  Here is a big rancho upstream.   It uses water, and there is a

22  return flow.   Here is the Government downstream, the last user

23  on the stream-- it uses water, and there is undoubtedly a

24  return flow downstream.   However, the return flow downstream

25  doesn't benefit anybody upstream, but the return flow downstream

1    would make more water available for the last user.

2         MR. VEEDER:  Your Honor, I would like to have that

3    statement read back, because I didn't follow it.

4         THE COURT:  Read it.

5         (The reporter read the last statement by the Court.)

6         MR. VEEDER:  The point that I make is this, though.  It

7    is entirely possible to have a situation where people living

8    off of return flow wouldn't create a burden on the stream with

9    which we would be in competition.  It is entirely possible

10   that there would be a dry area in the stream, and the kind

11   and type of regulation would be very different than where you

12   have a--

13        THE COURT:  You lose me.  I just fall right off the

14   wagon.  Maybe I am not very smart.

15        MR. VEEDER:  Your Honor is very smart.  The point I am

16   trying to make is, why are we talking about return flow on the

17   Pauba Valley if it doesn't, in some manner, increase the

18   quantity of water going through?

19        THE COURT:  Because there are too many other factors,

20   Mr. Veeder.  If there was nobody else who used in the upper

21   watershed, except Vail and the Pauba Valley-- no one else used,

22   then you might argue that this return flow would show up at

23   the Narrows.  But this isn't the situation.  So how can you

24   say that you are going to draw an immediate comparison with

25   what runs out at the Narrows with the return flow?  I don't see

1   any particular relationship.

2        MR. VEEDER:  Then your Honor, I am going to ask your

3   Honor to direct me as to the significance of Column 15.

4        THE COURT:  I want to inquire now.

5        Now, you studied Vail's Exhibit AP, I take it, or looked

6   it over?

7        THE WITNESS:  Yes, sir.

8        THE COURT:  As I understand, what Vail is trying to

9   prove by Exhibit AP is this:  They are trying to show, among

10  other things, that the Government at Pendleton averaged in

11  use about 8,095 acre-feet, in column 6?

12       THE WITNESS: Yes, sir.

13       THE COURT:  And they show that the Vail Company used in

14  column 14 about 4,800 acre-feet.

15       THE WITNESS: Yes, sir.

16       THE COURT:  And then by their last column they call

17  attention to the fact that there is a return flow, so that

18  the net amount that Vail was using, in round numbers, was

19  around 3,500 acre-feet.

20       THE WITNESS:  Yes, sir.

21       THE COURT:  Is that a logical deduction?  Or is there

22  something wrong in the logic of that?

23       MR. VEEDER:  I think that is a matter for briefing,

24  your Honor.

25       MR. STAHLMAN:  The Court just asked the witness a question,

1    Mr. Veeder.

2         THE WITNESS:  It is a logical deduction, your Honor.

3    Part of this water that Vail is using, the fact of the matter

4    is a large part comes from the dam.  Part of that water from

5    the dam returns to the basin.

6         THE COURT:  Now, of course, Exhibit AP does not purport

7    to show return flow downstream, nor does it purport to show

8    sewage return into the system.

9         THE WITNESS:  It does not, your Honor.

10        MR. VEEDER:  That is correct.

11        THE COURT:  So that if you are going to make a strictly

12   comparable chart, you would have to take in those factors

13   downstream, too.

14        THE WITNESS:  Yes, sir; show the net use downstream,

15   as well as the net use upstream.

16        THE COURT:  But the chart, in your opinion, logically

17   reflects the effective return flow in the Pauba Valley?

18        THE WITNESS: Yes, sir.

19        THE COURT:  I think I understand it now, unless you

20   get me mixed up again.  I think if you want to talk about net

21   use downstream you are entitled to take into account sewage

22   that you return into that system.

23        MR. VEEDER:  That is right.

24        THE COURT:  I think you are entitled to take into account

25   return flow downstream, because if you use-- of course, you

11464

are not using a lot if irrigation in the alluvium downstream,
you are using it up on those mesas where return flow is rather
questionable, although there may be some; but if you were,
we will say, extensively cultivating the alluvium in the
canyon, there would be a very large return flow back into the
system downstream.

MR. VEEDER:  It is a matter of use and re-use, yes,
your Honor.  There is only one thing that I want to be sure
of.  I want to be sure that the import of this exhibit is clear,
and that from the standpoint of the Vail Company that they are
trying to avoid the impact of the stipulated judgment that
was entered into.  All I want to be sure of is that your Honor
has clearly before him the fact that certainly when they use
and re-use the water they can't complain very much about it
being an unconscionable or a harsh or difficult situation
for them.

MR. STAHLMAN:  Can we save our arguments on the stipulated
judgment until later on?

THE COURT:  Yes.

Any further questions?

MR. VEEDER:  Yes, your Honor.

Q   Now, Col. Bowen, you have been interrogated in regard
to the Pauba Valley and the use of water there.  Have you an
opinion as to whether it is to the benefit or to the detriment
of the Vail Company to have proved the geology showing lateral

1    confinement as distinguished from the geology introduced by

2    the United States of America showing no lateral confinement?

3          MR. STAHLMAN:  I object to the question as being in-

4    competent, irrelevant and immaterial.  It assumes facts not in

5    evidence.  It invades the province of the Court, and there is

6    no proper foundation laid.

7          MR. GIRARD:  And it is beyond the scope of the direct

8    examination.

9          MR. VEEDER:  Your Honor, in regard to these matters they

10   have called in Col. Bowen to talk about use and re-use of

11   water, they have undertaken to introduce some geology here,

12   and they have called Col. Bowen to talk about water use in the

13   Pauba Valley.  And what would it mean?  We have here California's

14   Exhibit AC, prepared by Mr. Illingworth, as I recall, showing

15   that there is a very sharp decline in the water table in the

16   Pauba Valley.  I have asked a question directly relating to

17   availability of water to the Vail Company, precisely the

18   questions that were directed to Col. Bowen-- supply of water

19   for the Vail Company.  It is our position that it is manifest

20   that the geology that we are offering here as compared to the

21   findings in the old case is much to the betterment of the Vail

22   Company than that which they are attempting now to show was

23   a mistake.  It is obvious that you couldn't set aside the

24   stipulated judgment unless they showed detriment, and it is

25   our view that it is greatly to the benefit of the Vail Company

1   to have a large basin of 35 square miles from which to draw

2   and much better than this narrow little yellow strip that appears

3   on Exhibit AQ.

4           THE COURT:  I will sustain the objection on various

5   grounds.  This is not what the Vail Company is trying to

6   prove.  This thing you are talking about is such a non sequitur

7   that it is hard for me to put it in position.

8           Vail Company is complaining about the stipulated judg-

9   ment which tells them how much water they can use and which

10  tells them that they have to pump water for you, if necessary,

11  and things of that sort.  They are not complaining about what

12  the map showed.  They are not complaining at all about what

13  the map showed.  They have offered Exhibit AQ as part of their

14  showing to show that at the time the stipulated judgment was

15  entered into and the previous case was tried there was,

16  apparently, a mistaken view as to the facts on which the

17  judgment was based.  We are not here to decide the import

18  of the thing you are trying to go into.

19          MR. VEEDER:  But, your Honor, here we are talking about

20  return flow, we are talking about the availability of water,

21  we are talking about the whole hydrological situation when you

22  get into use and re-use, and I submit, your Honor, that with

23  this witness I would prove that the Vail Company's situation

24  is not reflected only by use and re-use.  We have right now

25  in the record evidence which shows that it is entirely possible

1   to the contrary that it is unquestionably the situation, that

2   where the Vail Company pumps down water as it has-- your Honor

3   is acquainted with California's Exhibit AC. Observe they

4   knock the bottom out of their own basin. They show that when

5   they put the dam in the water table dropped very greatly. Now

6   they are saying that all the water they use and re-use in the

7   valley should be on a statistical basis reflected on their

8   Exhibit AP, I think it is.

9       My view is this. I believe that when they open up the

10  question of use and re-use, they open up the question of what

11  occurs when they drop the water table in the valley, and where

12  does additional water come from to them, in addition to the

13  resources that would appear below Vail Dam.

14      Now, when Mr. Hall was testifying he put these arrows on

15  AC, showing that when this situation which appears on AC,

16  proved by the State-- I owe them so much-- right here the water

17  table drops. Where does the water come from? The water comes

18  in from the sides and older alluvium, with the net effect that

19  certainly the pumping down and the pulling down of the water

20  table is not a matter of use and re-use, and return flow and

21  return flow. It might be under this concept of the old case,

22  but here they benefit very, very materially by dewatering

23  their basin. The whole concept here of their AP and column

24  15 is completely erroneous and completely not reflective of

25  fact.

1   THE COURT:  Let me ask you.  Are you trying to convince

2   me-- This is not evidence, this is argument-- Are you trying

3   to convince me or are you trying to confuse me?  I am just

4   completely lost in what you are going on.  There is no use of

5   making long arguments if they are not persuasive to the Court.

6   MR. VEEDER:  Your Honor, if it's not persuasive, I am

7   wasting your time and mine.

8   THE COURT:  Let's keep our eye on the ball.  Vail Company

9   has come in and has said that the stipulated judgment is

10  inequitable in its enforcement-- that's one point-- because

11  of the fact that they are under an obligation to pump water

12  to keep a flow at the narrows, and that as additional de-

13  velopment goes on in the valley the time may come when all

14  Vail Company will be able to do will be to run pumps for the

15  benefit of keeping flow at the Narrows.

16  The Vail Company also contends that the judgment was

17  entered under various mistakes of fact and law.  That iw as

18  entered under the mistake that the Vail Company was entitled

19  to all the water out of the Murrieta, and that it was entered

20  under a mistake as to this geological setup we see on these

21  maps.

22  MR. VEEDER:  And in the findings, your Honor.

23  THE COURT:  Now, I don't see how, in the argument you are

24  making, namely, that if there is a big basin there is more

25  water available in Pauba Valley than if there is not the basin--

1    in other words, I don't see how that enters into this.

2        MR. VEEDER:  Well, your Honor, the point that I am trying

3    to make to you-- and it is extremely important-- is that unless

4    Vails can show a detriment by this alleged mistake in geology,

5    it is meaningless.  It is like any other appeal in a case.  If

6    a court makes an error on an insignificant finding which is

7    not detrimental to the party appellant, then on appeal the

8    appellate court simply ignores it.  Now, I think precisely

9    the same rule--

10        THE COURT:  Tell me, in simple language, what your

11    point is.

12        MR. VEEDER:  Well, here, your Honor, as the Pemberton

13    report shows, which is part of our brief--

14        MR. STAHLMAN:  It is not in evidence yet, and he is

15    arguing his case, your Honor.  He had an objection here--

16        THE COURT:  Well, now, wait.  I am trying to find out

17    what he is talking about.  Give me a little time.

18        MR. VEEDER:  Let's start over.  Where is your first

19    difficulty, your Honor?

20        THE COURT:  Look, if you are trying to do what I think

21    you are doing, I know what you are talking about.  But I don't

22    know what flows from it.  Let's compare AQ and Government's 15.

23    According to AQ there was a water basin in the Pauba Valley

24    and the Murrieta.  The land surrounding was Mesa Silt, and

25    the findings indicate-- talking about the prior judgment-- that

1  there was an interchange of water between this Mesa Silt and

2  the alluvial basins in the Pauba and the Murrieta; that the

3  younger alluvium in the Pauba and the Murrieta were the basin;

4  that the Mesa Silt was a confining area.  That seems to be

5  the thesis on which the trial court proceeded and on which

6  the judgment was entered.

7      Now you are pointing out that according to the Govern-

8  ment's testimony any even California's position this area called

9  Mesa Silt and which we called older alluvium bordering the

10  Pauba Basin and bordering the Murrieta Basin is water-bearing

11  and is not completely confining.

12      The position of California is that they concede there is

13  water in there.  They claim they don't have enough information

14  to state whether or not this should be characterized as a

15  basin to the extent that the United States contends.  The

16  United States contends that it goes up to the Kunkel line, and

17  there is some intimation that you want to extend it even

18  further than the Kunkel line.

19      Now, I am familiar with this record and this apparent

20  conflict.

21      MR. VEEDER:  That is right.

22      THE COURT:  Now, what more do you want, what do you

23  want to do?  What conclusion do you want me to draw from that?

24      MR. VEEDER:  First, the conclusion that I think impelling

25  here is that if there was a mistake in geology, the geology

1  which we have proved is beneficial to the Vail Company rather

2  than detrimental to them, because the geology that we have

3  proved shows them having access to a tremendous quantity of

4  water as distinguished from the quantity of water which would

5  be available in the much more restricted area as shown on

6  Vail's AQ.

7      THE COURT:  I get your point there, and I would be in-

8  clined to go along with that.  If that were all that was

9  concerned in the Vail case, we could end it right now.

10      MR. VEEDER: Well, there is one bite at a time in this

11  business, your Honor.

12      MR. STAHLMAN:  Well, you are sure taking a lot of them.

13      THE COURT:  Just a moment.

14      If that is what you are trying to prove, that under the

15  geology as we understand it there is more water for pumping

16  by Vail than there would have been under the geology as it was

17  understood at the time the prior case was tried, I concede

18  generally that that is true.

19      MR. VEEDER:  Yes.

20      THE COURT:  But I don't know where that takes us.

21      MR. VEEDER:  That takes me a long way and the morning

22  hasn't been wasted.

23      THE COURT: Mr. Girard.

24      MR. GIRARD:  My only comment is, your Honor, that this

25  is all very interesting, and Mr. Veeder, if he desires, certainly

11412

 1    should be allowed to produce evidence on it.  But Col. Bowen

 2    didn't testify on direct examination about anything like that.

 3         THE COURT: That's right.  I sustained the objection

 4    already. I am just trying to find out what Mr. Veeder was

 5    getting at.

 6         MR. VEEDER:  Now let me take the additional step on this.

 7         MR. STAHLMAN:  If he is going to start arguing this

 8    case, your Honor, I don't think this is the time.

 9         THE COURT:  No, this is not the time for argument.

10         MR. STAHLMAN:  I would certainly have an opportunity to

11    respond.  He is proposing a great many situations here that

12    can be answered, and it's merely going to be a harangue.

13         THE COURT:  We will have plenty of time to argue later.

14         MR. VEEDER:  The point that I am trying to make, your

15    Honor, in regard to the pumping down of the basin, the point

16    that I am trying to make in regard to the measurement of the

17    return flow and all these other elements that are involved,

18    you cannot conceivably separate them from the fact to which I

19    have made reference.

20         THE COURT:  Well, let's stop that right now.  Whether

21    the basin is as shown in AQ or as shown in 15-A, the return

22    flow situation is exactly the same.  If water is used in the

23    Pauba Valley there is a return flow to the Pauba Valley

24    regardless of its source.  So there is a non sequitur there.

25         MR. VEEDER:  Oh, no.  Then the whole thing is irrelevant,

1  this whole composite of Mr. Wilkinson's is totally irrelevant,

2  if you don't take into consideration your sources of water and

3  your calculated sources of water and all the resources before

4  it.

5      THE COURT:  All that Mr. Wilkinson's exhibit attempted

6  to show was that when there was irrigation in Pauba Valley

7  there was return flow in Pauba Valley.  Now that is true

8  whether the basin is as shown in AQ or as shown in 15--

9  exactly the same.

10      MR. VEEDER:  As long as I got the point across, your

11  Honor.

12      THE COURT:  All right.

13      MR. STAHLMAN:  I hope you didn't get all those other

14  points across, because I would like to respond to them.

15      THE COURT:  Anything further from the Colonel?

16      MR. GIRARD:  No, your Honor.

17      THE COURT:  All right, step down for a moment.

18      Are you going to interrogate Mr. Kunkel this morning?

19      MR. STAHLMAN:  Yes.  It's after 11, your Honor.

20      THE COURT:  Are you going to be able to finish by noon?

21      MR. STAHLMAN:  I am hoping to.

22      THE COURT:  Take a short recess.

23      MR. STAHLMAN:  If we don't get into another one of these

24  Veeder stratospheric gyrations.

25      (Recess.)

1      MR. STAHLMAN:  Call Mr. Kunkel.

2

3                    FRED KUNKEL,

4   called as a witness in behalf of Defendant Vail, having been

5   previously duly sworn, testified as follows:

6          THE COURT:  You have been sworn.

7          THE WITNESS:  Yes, sir.

8          THE COURT:  What is your first name, again?

9          THE WITNESS:  Fred.

10         THE COURT:  Fred Kunkel.

11

12                 DIRECT EXAMINATION

13  BY MR. STAHLMAN:

14        Q  Mr. Kunkel, directing your attention to Government's

15  Exhibit 15-A, this map which you previously testified was

16  prepared by yourself--

17        A  That is right.

18        Q  And the yellow coloring in all instances is the younger

19  alluvium; is that correct?

20        A  That is correct.

21        Q  Now, directing your attention to this gaging station

22  which has previously been referred to as the Murrieta Station,

23  there is younger alluvium in that area, is there not?

24        A  There is.

25        Q  Do you have an opinion as to whether or not there is

1    subsurface flow in that area?

2        A   In my opinion, there is subsurface flow in that area.

3        Q   And have you made any determination as to the depth

4    of the younger alluvium in that area?

5        THE COURT:   What area, now?

6        MR. STAHLMAN:   The area of the gaging station, the

7    Murrieta gaging station.   That is shown in Section 13, 3 West,

8    8 South.

9        THE WITNESS:   I have examined the area geologically in

10   the field, I have examined the well logs, water level data,

11   and on the basis of those facts I have determined-- say formed

12   an opinion concerning the thickness of the alluvial deposits

13   in that area.

14       Q   And what is the opinion you have?

15       A   Southwest of the Elsinore Fault the alluvial deposits

16   in Section 13, Township 8 South, 3 West are relatively thin.

17       Q   Relatively thin.   What do you mean by relatively thin?

18       A   I haven't completed my statement.

19       Q   Pardon me.

20       A   Northeast of the Elsinore fault the deposits are

21   relatively thin.

22       Q   Do you have an opinion as to about how thick they are

23   north?

24       MR. VEEDER:   North and east, now, George.

25       MR. STAHLMAN:   Yes, north and east.

1    THE COURT:   The Elsinore fault now, to refresh my

2 recollection, is that the fault nearest the Santa Rosa

3 Mountains?

4    THE WITNESS:  Yes, your Honor.

5    North of the fault the deposits are more than a thousand

6 feet in thickness.

7 BY MR. STAHLMAN:

8    Q  And what is your opinion as to what they are southeast

9 of the fault?

10    A They are on the order of a hundred feet.

11    Q  A hundred feet?

12    A More or less.

13    Q  Then whenever youwould have surface flow at that point

14 you would anticipate that there would be subsurface flow, would

15 you not?

16    A  Yes.

17    Q  Now, then, you also have seen that the same character

18 of material extends down to where the gaging station No. 3

19 is, that is, the Temecula Gorge station?

20    A  Yes.

21    Q  And that is also an alluvium, is it not?

22    A  That is in younger alluvium.

23    Q  And when there is a surface flow at that point there

24 is also a subsurface flow, is there not?

25    A  There is some.

Q   There is some.  Do you have any opinion as to the amount or quantity or quality-- Express yourself in any way-- as to what the subsurface flow would be at that point?

A   Compared to the low water flow, the subsurface flow would be a very minor quantity in addition to that.

Q   What do you mean by minor?  What are the limitations of your judgment in relation to minor?

A   I have not arrived at a quantiative figure, but the value would be the cross-sectional area of the alluvial deposits times the transmissibility of the alluvial deposits, times the hydraulic gradient.

Q   Are you familiar with any other factors?

A   I have not determined any of those factors in the Narrows, except that the younger alluvial deposits are very thin.  Therefore, the transmissibility will be very low.  Also, the cross-sectional area is very low.

THE COURT:  From my recollection of our inspection there at the Narrows, there is this underlying rock on both sides and apparently across the bottom, and a very thin and not very wide area of younger alluvium  there where flow would occur.

BY MR. STAHLMAN:

Q   However, you would anticipate that there would be some subsurface flow when there is surface flow, would you not?

A   I would anticipate a very minor quantity.

11418

1    Q   Now, you are familiar also with the character of the

2    alluvium at Gaging Station No. 6 on Camp Pendleton, are you

3    not?

4    A   I am not acquainted--  Which?

5    THE COURT:  Ysidora.

6    MR. STAHLMAN:  Ysidora Gaging Station.

7    THE COURT:  The one downstream.

8    THE WITNESS:  Yes.

9    BY MR. STAHLMAN:

10   Q   And what is the character and type of alluvium in

11   that area?

12   A   There is younger alluvium in that area.

13   Q   And what would you say as to its depth?

14   A   It is on the order of 200 feet.

15   Q   And how about the lateral area at the Ysidora Gaging

16   Station?

17   A   It is considerably wider than at the Temecula Gaging

18   Station.

19   Q   And when you have surface flow at the Ysidora Gaging

20   Station, in your opinion, there would be a subsurface flow at

21   Ysidora Gaging Station?

22   MR. VEEDER: May I have that question, please?

23   (The reporter read the pending question.)

24   MR. VEEDER:  I think you should designate which way the

25   surface flow is.  We have an influx from the ocean coming in.

1    That might be a factor.

2         MR. STAHLMAN:  Let's reframe the question so that Mr.

3    Veeder can't get confused.

4         Q  When you have a flow out of the Santa Margarita into

5    the ocean and it is flowing on the surface at Ysidora, in your

6    opinion would there be a subsurface flow at that time?

7         A  Under natural conditions?  Do you mean under natural

8    conditions?

9         Q  Yes, let's say under natural conditions.

10        A  Under natural conditions, there would be a ground water

11   discharge and flow out of the lower basin.

12        THE COURT:  Would the same formula be used -- the depth

13   of the alluvium, the gradient, the various factors you gave

14   before?

15        THE WITNESS:  The same factors would be applied.

16   BY MR. STAHLMAN:

17        Q  When you made your geological study in the Pauba

18   Valley and the Murrieta Valley, you have previously testified

19   that you took into consideration other studies in the area

20   that had been made, have you not?  You recall?  I am refreshing

21   your memory as to the testimony you previously gave.

22        A  I don't recall making that statement.

23        Q  You recall Mr. Mann?

24        A  Certainly.

25        Q  You took into consideration Mr. Mann's studies?

A   Yes.

Q   You named Mr. Mann and some other geologists who had made studies in that area?

A   Yes, that I referred to.

Q   And did you take into consideration the studies that Professor Tollman had made in that area?

A   No, sir, I had not.

Q   Did you know that Professor Tollman had made geologic studies in that area for the Santa Margarita Rancho predecessors in interest at Camp Pendleton?

A   No, I was not aware of that.

Q   Were you aware of the fact that there had been a lawsuit the Santa Margarita vs. Vail, and that there were matters of geology in that lawsuit?

A   I knew that there had been a lawsuit, and I presumed that matters of geology had been involved.

Q   Did you do anything in relation to determining what geological factors had been developed in connection with the evidence in that case?

A   To the extent that I inspected original notes of Mr. Finkel, who was, I believe, an expert for the Rancho Santa Margarita.

Q   Did those notes indicate to you that Professor Tollman had made some geological studies in that area?

A   No, they didn't.

1    MR. VEEDER:  He has already answered that question.

2  BY MR. STAHLMAN:

3    Q  Do you know who Professor Tollman is, or was?

4    A  I know who Professor Tollman was.

5    Q  Who was he?

6    A  He was a ground water geologist, a Stanford professor,

7  author of the book "Ground Water."

8    Q  And when you made this study, then, you didn't know

9  that Professor Tollman had made a study of the same area that

10  you were geologizing in Pauba Valley?

11    A  I was not aware of Professor Tollman's study.  As far

12  as I know, it is not in the published literature.

13    Q  Well, you didn't know about it?

14    THE COURT:  He has answered that.  Go ahead.

15  BY MR. STAHLMAN:

16    Q  And Mr. Veeder didn't tell you about it?

17    MR. VEEDER:  Mr. Veeder didn't, no.

18    MR. STAHLMAN:  I am asking the witness a question.

19    THE COURT: Go ahead.  If he didn't know about it, then

20  nobody told him about it.  Let's go ahead.

21  BY MR. STAHLMAN:

22    Q  By the way, what factors did you take into consider-

23  ation by any of the other geologists that you adopted as part

24  of your geology in the Pauba area?

25    A  In the Pauba area the geology and conclusions are my

1    own, based on the available data.

2    Q And by the available data, do you have reference to

3    some reports that were made by other geologists in the area?

4    A  By data I refer to original data which I, to the

5    best of my ability, in all cases searched out.

6    Q  You mean by that that the geological survey that

7    you have made here and the conclusions that you have come to

8    in relation to that are completely your own and not the

9    adaptation from any other study that was made in this area;

10   is that right?

11   A  Not an adaptation.  Perhaps I had better correct that.

12   I did refer to the Pauba Valley report by George F. Wertz,

13   who was my superior, and I was aware of that, I was aware of

14   the studies, and in that case I also went back to the original

15   data again.

16   Q  When you talk about the study of Mr. Wertz, you are

17   speaking now about the study he made in connection with the

18   drilling of the Navy well?

19   A  That is correct; yes, sir.

20   Q  And in his study in connection with the Navy well

21   you knew that he had stated that the area of the Pauba Basin

22   was confined; that is, the water sources of the basin were

23   confined to the Pauba basin itself and a small artesian area

24   in the vicinity of the rim of the basin.  You knew that, didn't

25   you?

11423

A   Those were not Mr. Wertz's conclusions.

Q   What were his conclusions that you knew at the time you made the study?

MR. VEEDER:   I object to the question. Mr. Wertz's report is in the evidence.   That is the best evidence.   I don't believe it is proper for counsel now to try and entrap the witness.   Let the exhibit stand.

THE COURT:   The exhibit still stands.   Overruled.   He may ask the witness.

MR. STAHLMAN:   Read the question.

Do you understand the question?

THE WITNESS:   I will do my best.

(The reporter read the pending question as follows: "Q   What were his conclusions that you knew at the time you made the study?")

THE WITNESS:   The area which I believe you are referring to was the area outlined by--

BY MR. STAHLMAN:

Q   You state the area you had in mind when you worked.

A   All right.   The area I had in mind when I was working on the Pauba Valley under the supervision of Mr. Wertz at the time, referring to his original data plus having his report and Mr. Wertz personally present to discuss the area, the area I was referring to is the area known as the area of artesian flow or an artesian area.   It is also referred to by

1    Waring in Water Supply Paper-- and I never can remember the

2    number.

3         MR. STAHLMAN:   Pardon me just a minute.

4         Will you read the question again, because you are not

5    answering the question.

6         THE WITNESS:   I am doing my best.

7         MR. STAHLMAN:   Now listen to the question, please.

8         (The reporter again read the pending question as follows:

9    "Q   What were his conclusions that you knew at the time you

10   made the study?")

11        MR. STAHLMAN:   I am talking about Mr. Wertz.

12        THE COURT:   Is it Mr. Wertz's conclusions now as to the

13   Pauba Valley generally, or the artesian area in Pauba Valley?

14        MR. STAHLMAN:   Whatever conclusions he took into con-

15   sideration, your Honor.   I don't care what it is.   Just what

16   conclusions that Mr. Wertz made that he took into consideration.

17        THE COURT:   Concerning Pauba Valley?

18        MR. STAHLMAN:   For Pauba Valley, yes, your Honor.

19        THE WITNESS:   You are asking me--   May I have the question

20   again, please?

21        MR. STAHLMAN:   Read it, please.

22        (The reporter again read the pending question as follows:

23   "Q   What were his conclusions that you knew at the time you

24   made the study?")

25        MR. VEEDER:   As expressed in the report.

1       MR. STAHLMAN:  He can tell where he gets them.

2       THE COURT:  All right, you have had it read.  Now go

3 ahead.

4       THE WITNESS:  The conclusions of Mr. Wertz were that an

5 area of artesian flow existed in the lower end of Pauba Valley.

6 BY MR. STAHLMAN:

7       Q  When did you first, in  the course of this study or

8 otherwise, reach the conclusion that you have previously

9 expressed that this is one large storage unit; that is, Unit

10 No. 4 and Unit No. 1 and Unit No. 3, as you showed on your

11 Storage Unit Map No. 18 (I believe it is)?

12       A  I believe it is 17.

13       Q  17.

14       A  I would have to check my notes to see exactly when I

15 first visited the valley.  That is in evidence.

16       Q  Well, did you reach the conclusion that it was one

17 storage unit when you first visited the valley?

18       MR. VEEDER:  May I have the question, please?

19       THE COURT:  Read it.

20       (The reporter read the pending question.)

21       THE WITNESS:  I would say, on the basis of my past

22 experience, when I started working in the valley I was of

23 the opinion that it probably was, and an examination of the

24 data--

25       MR. STAHLMAN:  Is that when you first--

1          MR. VEEDER:  Let him finish.

2          THE COURT:  Yes, let him finish.

3          THE WITNESS:  An examination and analysis of the data

4    and preparation of the geologic maps and cross-sections, as

5    far as I am concerned, made any other conclusion impossible.

6    BY MR. STAHLMAN:

7          Q  Well, then, whenyou first started your study, you

8    started with the idea that these storage units 1, 3 and 4 were

9    one storage unit, did you?

10         A  No.  I started the study knowing by having been in

11   the area that there was a large area of alluvial deposits.

12   There was no evidence that these deposits were broken up by

13   any impermeable barriers or formations.  Visiting an area for

14   the first time, a hydrologist more or less just thinks in

15   terms that the water moves from high head, the points of

16   recharge, toward the points of discharge.  The Canyon of

17   Temecula is obviously the point of discharge.  The surrounding

18   high lands are the areas of recharge.

19         MR. STAHLMAN:  The question is a simple one.

20         Will you read it again, please?

21         THE COURT:  What are you trying to get at now?  I don't

22   want to break into your cross-examination.  But do you want

23   to go ahead with it, or do you want to tell me-- you can take

24   your choice-- what you are getting at?

25         MR. STAHLMAN:  Well, I am getting at several things, your

1   Honor.   Evidently there have been different conclusions as to

2   the geology in the area, and I think it is to test the sub-

3   stance of his testimony as to whether he goes in there with an

4   idea that this was a unit and starts to prove it, or whether

5   as the result of an examination that he made he proved some-

6   thing.

7        MR. VEEDER:  Then I object to the question as being

8   completely irrelevant and immaterial.   What difference does it

9   make what a scientist had in mind when he went in there?

10       MR. STAHLMAN:  It goes to the weight of his testimony.

11       THE COURT:  Are you objecting to the proof that the

12   Government has offered that there are larger basins than the

13   Pauba Valley?

14       MR. STAHLMAN:  No, your Honor.  And I would like to

15   say that we have taken no position, in spite of what Mr. Veeder

16   has said in argument many times, as to what the geology is.

17   All we want to know is what is the geology in this area?  What

18   are the facts?  Is it a storage unit or is it not?  Or is it

19   as it was found in the findings of fact in the first case?

20   What is the true situation?

21       THE COURT: Well, let's not spend all day on this.  Go

22   ahead.  Ask him the pointed question.

23       Did you go in there, Mr. Kunkel, from the previous in-

24   vestigation you had made of the literature and Mr. Wertz's

25   report and Mr. Mann's, did you go in there with a preconceived

```
1    idea that there was one big basin?

2         THE WITNESS:  If I had a preconceived idea, which I do

3    not believe I had, it would have been to the contrary, that the

4    Wildomar Fault zone was a much more impermeable barrier than I

5    now of am the opinion.  I have changed my opinion.

6    BY MR. STAHLMAN:

7         Q  You are continuing at the present time with these

8    tests that you are making under court order?

9         A  Yes, we are.

10        Q  Do you have any opinion at this time when the tests

11   will be concluded?

12        A  The physical tests, such as actually pumping, testing

13   and determining drawdown effects in adjacent wells, unless

14   the Court desires additional information, are concluded, as

15   far as I am concerned.  However, in my opinion, a series of

16   water level measurements in selected wells will have to con-

17   tinue for a considerable time.  However, I can draw con-

18   clusions before those measurements are concluded.

19        Q  Are you in position to draw the conclusions now?

20        A  I have formed certain opinions which, on further

21   analysis, I may or may not change.

22        MR. STAHLMAN:  I don't want to take your time to go into

23   it, and I was going to ask Mr. Veeder--

24        THE COURT:  Wait until it's brought out by Mr. Veeder,

25   and then you may cross-examine at some later date.
```

1   MR. STAHLMAN: What is the date on which that order ex-

2   pires?

3   MR. VEEDER:  It is expiring very soon.

4   THE COURT:  When do you expect, Mr. Veeder, to be able

5   to put the proof on that you find from this testing?

6   MR. VEEDER:  My own view is that (1) When I have rested

7   myself and (2) When all of the defendants have concluded, I

8   will put in rebuttal in the normal order of business.

9   THE COURT:  When all the defendants have concluded.  Do

10   you mean when we have finished trying all the parcels on this

11   watershed?

12   MR. VEEDER:  Well, your Honor, I will do whatever your

13   Honor directs.  We are moving along on our exhibits now; we

14   are moving along on our well tests.  It never occurred to me

15   that I would put in rebuttal until after all of the defendants

16   had rested.

17   MR. STAHLMAN:  In connection with that, your Honor, we

18   are receiving periodically different charts and maps, and

19   without some explanation as to the party who is conducting it

20   and what he is driving at they are meaningless, and I think

21   that as these tests are going to continue that there should

22   be sometime in the near future when we have some concept and

23   explanation as to what these tests are for and what they are

24   directed at and what partial results have been accomplished

25   and how much longer it has to go and matters of that kind.

11430

THE COURT:  I think you should set some target date and put this proof on before we have cleaned up all this out-lying area.  You can wait until we have finished some of this what might be called the Vail case and matters in the Murrieta Basin and all that.  But I think this material from your testing should come in before we finish up all the tag ends of this valley.

MR. STAHLMAN:  Your Honor, especially in view of the fact that Mr. Veeder hasn't even rested yet, and then he says that this will be rebuttal after he has rested and everybody else has rested.  We have been giving and trading in this case.

THE COURT:  All right, what do you think of my suggestion?

MR. VEEDER:  I would be very pleased to do that, your Honor.  I had anticipated a different schedule, but we will try to meet what your Honor has directed, and I will meet what your Honor has directed.

THE COURT:  Well, I don't think you really meant until we have heard every other parcel.  A lot of this other area my take the Master an myself a long time to clean up some of these parcels.  But we are getting toward the end of talking about the Temecula and Murrieta Valleys, and I would think that would be about the time that that ought to come in.

MR. VEEDER:  We have been working on these exhibits, your Honor.  I have looked at the rough drafts of the exhibits that are being prepared for what I have called our rebuttal.

1   I haven't asked Mr. Kunkel when he thought he would be through.

2   My own target date on it was along in February or March. But

3   if you tell me to accelerate that pace, we will try to do it.

4       MR. STAHLMAN:  We ought to know ahead soon, the next time

5   we come back into court, about what they are doing, your

6   Honor.  We may want to make some tests, too.  If we wait until

7   the tag end, that may extend this case.  The State may want

8   to make some tests.

9       MR. VEEDER: I want to inquire now for the record.  I

10  believe that data is being supplied to you daily or whenever

11  Mr. Kunkel acquires it, and I am sure that you have all the

12  data.

13      MR. GIRARD:  We have voluminous amounts of well tests,

14  and I presume it's all the data, and I presume that-- at least

15  I understand also that Mr. Thomas has gone out or at least

16  discussed some of this with Mr. Kunkel.  He can advise us

17  better.  But I am sure we are getting all the material.

18      MR. VEEDER:  I know that that is the direction that your

19  Honor gave, and I am sure that there is full and complete

20  exchange of data with all parties of the data that you are collecting.

21  Is that not correct?

22      THE WITNESS:  About every two weeks Mr. Veeder distributes
    FRED KUNKEL

23  to all counsel, and I also send copies directly to the State

24  of all data that have been collected in that approximately

25  two-weeks period.  Every month they get a copy of every recorder

1    chart.

2    THE COURT:  Do you want this well testing in before you

3    argue the problem onthe Vail judgment?

4    MR. VEEDER:  On the basis of material that has come to

5    me and the exhibits that are being prepared, it might be

6    helpful to your Honor when we argue the proposition.

7    THE COURT:  Then I think you ought to shoot for some

8    date, say, sometime in February to pull together your con-

9    clusions and present it through Mr. Kunkel, and I think if

10   the State wants to pull together any conclusions out of it

11   they ought to do it about the same time.

12   MR. VEEDER:  I think that is a good idea, your Honor.

13   I will talk to Mr. Kunkel at lunch time and report to you after

14   lunch.

15   THE COURT:  All right.

16   MR. STAHLMAN:  That's all I have.

17   MR. GIRARD:  So that there will be no confusion, your

18   Honor, as faras the conclusions are concerned, it may be that

19   we may agree with Mr. Kunkel and it may be that we may not,

20   but we want to see their exhibits, from which I think our

21   people can gather their conclusions before we start making our

22   own.

23   MR. VEEDER:  We will lodge our exhibits as your Honor

24   has required us to do.

25   THE COURT:  All right.

*attorney for State of California* (handwritten margin note)

11433

1    Anything further from Mr. Kunkel at this time?

2    MR. STAHLMAN:  Not now, your Honor.

3    THE COURT:  Before you step down--

4    Mr. Stahlman, I want to try to understand, as we go

5    along, what you are getting at, and I assume you were trying

6    to point up the fact that there is some flow at the Narrows

7    in addition to the surface flow.

8    MR. STAHLMAN:  Yes, your Honor.

9    THE COURT:  And you also were interested in what the

10   underground flow is at Ysidora in addition to the surface flow?

11   MR. STAHLMAN:  Yes.  If Mr. Kunkel can work out those

12   factors, I would be glad to have them.

13   THE COURT:  Have you ever made any computations based

14   upon the factors you gave us of what the flow would be at the

15   Narrows and what the flow would be at Ysidora?

16   THE WITNESS:  At the upper Narrows I have made no such

17   studies, but at Ysidora I would again have to check the reports

18   to refresh my memory.  Mr. Wertz may or may not have made

19   those studies.  I personally did not make studies at Ysidor.

20   MR. STAHLMAN:  If they have them made, will you make

21   the available?

22   MR. VEEDER:  I believe they are in evidence.

23   MR. GIRARD:  They are in one of the exhibits.

24   MR. VEEDER:  They are already in evidence, I am sure of

25   that.

*attorney for Vail*

*G.F.W. Jr.*
*Please note*

1    MR. STAHLMAN:  I will go into that during the recess,

2  your Honor.

3    THE WITNESS:  It would be better to consult Mr. Wertz on

4  Ysidora.

5    MR. STAHLMAN:  We will check further into that.

6    THE COURT: Anything further from this witness?

7    MR. STAHLMAN:  No, your Honor.

8    MR. VEEDER:  Are we going to reconvene after 2 o'clock?

9  There are some questions I am going to have to ask him.

10    THE COURT:  I didn't think we were when we finished

11  up this morning.

12    MR. STAHLMAN:  I was hoping we wouldn't.

13    MR. SACHSE:  I would like to reconvene briefly, or

14  do it now-- I don't want to interrupt this-- and have a little

15  discussion on what is immediately ahead of us.

16    THE COURT:  I have that in mind.  What do you want to

17  do this afternoon?

18    MR. VEEDER:  My own view on it was simply this, your

19  Honor, that I want to check out my notes and see exactly what

20  has been covered and perhaps cross-examine to a degree.

21    THE COURT:  Cross-examine whom?

22    MR. VEEDER:  Fred Kunkel, who is on the stand.

23    MR. STAHLMAN:  Can we do it now and maybe work a little

24  later and then have the afternoon off?

25    MR. VEEDER:  I have to report to your Honor in regard to

1  when I am going to have this target date anyway.  I see no

2  reason why we can't come back.

3      MR. STAHLMAN:  It doesn't make any difference to me.

4      MR. SACHSE:  I would just as soon come back after lunch

5  for an hour.  Suit yourself.

6      MR. VEEDER:  Mr. Sachse and I have problems that we are

7  working on, anyway.  We couldn't get this matter done anyway.

8  I could limit my cross-examination if I were sure of the

9  extent and breadth of George's examination this morning.  I

10  will try to do that.

11      THE COURT:  There are some things I want you to do before

12  we convene again, and we will have to set some date when you

13  will come back.

14      How much more does the Vail Company have to present,

15  other than those couple of exhibits which rest upon other

16  evidence in the case?

17      MR. STAHLMAN:  Your Honor, I anticipate calling Mr. Vail

18  sometime, and I would like during this time-- I presume that

19  we are not coming back until after the first of the year?

20      THE COURT:  That's right.

21      MR. STAHLMAN:  It may be that I will want to call some

22  other witnesses in relation to occurrences in the years past.

23  I am not too certain on that.

24      And then, of course, the matters which I have raised in

25  my memorandum relating to evidence that we will discover in

1 relation to the area east of Vail and further development there
2 in the Murrieta Valley.  Probably have to revise some of these
3 lists that we have.  I think there are other wells in addition
4 to those that have been indicated.  To what extent they affect
5 and influence the flows, I don't know.

6     THE COURT:  Then I will tell you what I have in mind
7 that I want you to do, and then we can adjourn for the noon
8 hour and be back here and discuss between yourselves what date
9 you want to come back and then I'll try to adjust my calendar
10 to it.

11     I have had briefs from Vail Company and from the United
12 States on this stipulated judgment-- several briefs on that.
13 I don't know that presently I want any more briefs of law from
14 them.

15     However, I do want to know the position of the State
16 of California and Fallbrook on the stipulated judgment, and I
17 have in mind a series of things which probably all parties
18 should respond to.

19     1.  The point raised the other day:  Is part of the old
20 judgment in Santa Margarita vs. Vail, which was not affected
21 by the granting of the new trial, still effective as to the
22 Government, the successor of Santa Margarita, and the Vail
23 Company?

24     MR. VEEDER:  Effective as against the United States, as
25 successor in interest.

1    THE COURT:  That is right, and the Vail Company.

2    Or did the stipulated judgment supersede entirely the

3  old judgment?  And I would like to hear from all four of you:

4  The United States, Vail Company, California and Fallbrook, on

5  that.

6    MR. SACHSE:  Your Honor, may I respectfully suggest, Mr.

7  Krieger called me this morning and asked me to keep him advised

8  on this, and that express question is deeply involved in Krieger,

9  and I am going to take the liberty of ordering this transcript

10  sent to him.

11    THE COURT:  All right, I want something from Mr. Krieger

12  on that, too.

13    2. I would like to have you set your hand at trying to

14  tell me, in simple language, just what this stipulated judgment

15  means.  I have read it and I have tried to summarize it.  Let's

16  see what you come up with.  I don't want you to quote sections

17  in this, that and the other thing.  In simple language, what

18  does this stipulated judgment mean, (1, 2, 3, 4, 5, right down

19  the line)?  A summarization of it in lay language.

20    MR. VEEDER:  In addition to what we have already given

21  your Honor?

22    THE COURT:  Yes.

23    3.  I want you to try your hand at a simple draft of a

24  decree that would affect this valley.  Assuming that the

25  stipulated judgment stands and/or that part of the old judgment

1 stands, how would you draft a decree that would take care of

2 rights in this valley, with one or the other of those assump-

3 tions, either that there is still some life in the old judg-

4 ment that affects the Government and Vail and/or that the

5 stipulated judgment stands. I don't mean a lengthy decree.

6 I am just thinking of this particular area now. What could the

7 Court say on it?

8     4. Can any judgment of a state court involving riparian

9 rights ever be res adjudicata? I think the State of California

10 is particularly interested in this point. You are pro patria

11 and I think this is something that Mr. Girard could be of some

12 help on. In other words, is a judgment such as the stipulated

13 judgment res adjudicata? Or isn't any judgment involving

14 riparian rights subject to modification, depending upon the

15 uses, the amount of irrigable land being irrigated, the use

16 or non-use of water by persons entitled thereto, the increased

17 use at one time or another, et cetera? Can you have such a

18 thing as a final judgment apportioning riparian rights?

19     MR. VEEDER: I wish your Honor would define what you mean

20 by "apportioning".

21     THE COURT: Well, I suppose you could have a final

22 judgment that said that A and B have correlative rights on the

23 stream. That probably would be final. But can you have ever

24 a final judgment as between two riparians, saying that A may

25 use so much water and that B may use so much water, if there

1    are other persons involved in the watershed?  Because isn't

2    this, relying upon the philosophers, isn't this what Heraclitus

3    meant when he said that there is nothing permanent but change,

4    and change is always changing?  How can you ever fix, by a

5    final judgment, riparian rights?  Now you can fix a prescriptive

6    right, you can fix an appropriative right.  But how can you

7    ever fix a riparian right, except in so far as you take into

8    account other riparians and other users, and when is it being

9    used and not used, et cetera.  Now, I want that looked into.

10          MR. VEEDER:  In other words, the word "apportionment"

11   doesn't mean, in your Honor's view, that there is adjudicated

12   ten second feet day in and day out to the Southwest Quarter

13   of the Southwest Quarter of Section 13, Township 8, Range 3.

14          THE COURT:  So you won't be in doubt, here is what I am

15   thinking about.  If the Vail judgment had said that the Vail

16   Company had a prescriptive right to use X amount of water on a

17   certain piece of ground, and then anybody who had been in that

18   litigation would be bound by that-- and that is not a variable

19   right, that is a right that can be used regardless of what

20   other people do-- then I would say that that is a final

21   judgment.  But when a judgment says that as between two

22   riparians one may use a third and the other may use two-thirds--

23   this is riparian use that's being talked about in the Vail

24   judgment-- how can it be a final judgment?  Because isn't it

25   always subject to further consideration as conditions change or

1   as other users come in and things of that sort?  That's the

2   problem.

3        MR. GIRARD:  In other words, isn't it the same thing as

4   an alimony judgment?

5        THE COURT:  Well, apply it to alimony or child support.

6   No matter what a judge might say as to child support, as being

7   final, it is always subject to review during the minority of

8   the child.  Or, in certain cases, alimony; with changed con-

9   ditions, you can change it.  But unless there are changed

10  conditions, it continues on.

11       I am just interested in this alleged finality to a

12  judgment between riparians.

13       MR. VEEDER:  I have been worried about the word

14  "apportionment" used, because I don't  think it is applicable.

15  That is the reason why I brought the word up.

16       THE COURT:  You can put your pen to work on this.

17       Those are the four things I am interested in and would

18  like to hear from you on.

19       Also in considering what date we shall meet again, there

20  are two things that we want to clear up:

21       One, the rest of the parcels in the Murrieta Basin, the

22  smaller units.

23       Two, we want to have Mr. Veeder's motion to strike the

24  testimony about the irrigable land on Vail's property, if he

25  is so advised.  I understood that there is only a 10% differential

1  in the Government's contention on Vail.  Maybe he will decide

2  not to worry about that.  I would propose right now that if

3  there is only a 10% spread between you, that the Court go down

4  the middle and then you will have a 5% spread.

5      MR. STAHLMAN:  There is no evidence, though, as to what

6  their contention is.

7      THE COURT:  I don't know whether it is in the record or

8  not, but I think that it is about a 10% spread.

9      MR. STAHLMAN:  I don't think it is.  You are talking

10  about the Coit survey.

11      THE COURT:  I am talking about the irrigable acreage.

12      MR. STAHLMAN:  No, I think Col. Bowen's testimony was

13  that he found Coit's substantially the same.  I don't think

14  there was any variance of 10%.

15      MR. VEEDER:  I don't believe he said that it was sub-

16  stantially the same.

17      THE COURT:  At any rate, if it turns out to be a 10%

18  spread, which would be 3,000 irrigable acres somewhere in this

19  vast rancho, the Court could easily split it down the middle

20  and take a figure of 5% less than what Vail Company has pro-

21  posed and get rid of this thing.  What is 1,500 irrigable

22  acres?  That is land that might possibly be irrigated, if there

23  is enough water, in this whole watershed.

24      So that we want Mr. Veeder to get busy with his motion,

25  if he is going to do this, or come to some terms on this

1   irrigable acreage business.

2       MR. VEEDER:  Your Honor's ruling on the stipulated

3   judgment would relieve me of all concern one way or the other.

4       MR. STAHLMAN:  What difference would it make how much

5   land is up there whether the stipulated judgment is in or out?

6       THE COURT:  He means that if I should rule against him

7   on the stipulated judgment he is going to be tough.  As to

8   every drop of water that might fall anywhere, he is going to

9   be asserting the interest of the Government.

10       MR. STAHLMAN:  Well, he is supposed to do that, anyway,

11   to carry out his oath of office.

12       THE COURT:  Well, those are the things that I think you

13   should talk about.

14       Then the major things in addition to those, when both

15   sides think they have put in enough evidence so that we can

16   start arguing the question of the stipulated judgment, get

17   busy and have the argument and get that behind us.  It is the

18   Government's desire and Vail Company's desire to have some

19   ruling on this stipulated judgment.  We have most of Vail's

20   record.  I don't know what else the Government wants to make

21   in the way of a record.  And talk about when we are going to

22   argue this.

23       MR. VEEDER:  That brings us to the question of when you

24   wanted our analysis of the data we have been obtaining from

25   wells.

1    THE COURT:   That is another item.

2    MR. VEEDER:   It might be helpful to have that ahead of

3    the argument.

4    THE COURT: .Yes.   Pick some day to get your charts and

5    conclusions in on the basis of this well testing, and serve it

6    on the other parties so that they may either be content and

7    agree or want to disagree and draw some conclusions or charts

8    of their own.

9    These are the present loose ends that I see that we

10   should be looking toward solving.   You can think about it and

11   tell me when you come back from lunch.

12   MR. VEEDER:   You mean timewise?

13   THE COURT:   Timewise.   I would suggest that we not meet

14   again before at least the middle of January or maybe toward the

15   end of January.

16   MR. VEEDER:   We have a hearing before the Special Master

17   on the 11th, your Honor.

18   THE COURT:   You have soil surveys in progress, being

19   prepared and all that.

20   So I would appreciate it if you would talk a few minutes

21   either before you go to lunch or after you go to lunch between

22   yourselves and then let me hear from you later.

23   All right, recess until 2 o'clock.

24   (Noon recess.)

25

1    San Diego, California, Friday, December 18, 1959  2:00 P.M.

2

3         THE CLERK:  One, 1247-SD-C, United States vs. Fallbrook.

4         MR. VEEDER:  I don't know what order of business you

5    want to proceed on, your Honor, but there are some orders

6    needing extension of time for taking of well measurements and

7    for proceeding on the Vail property for the purpose of well

8    recorders.

9         MR. STAHLMAN:  Vail and the others?

10        MR. VEEDER:  Both.

11        MR. STAHLMAN:  We have no objection to this.  But I do

12   think we should have a progress report on this thing, so that

13   we have an opportunity to question Mr. Kunkel in relation to

14   what matters we have now.

15        THE COURT:  Yes.  This 90 days takes us through March.

16   It will take us almost through the end of the rainy season.

17        MR. VEEDER:  That's right.

18        THE COURT:  I think this ought to be about the end of it.

19        MR. STAHLMAN:  May it be understood, then, Mr. Veeder,

20   that the next time we appear in court, at the next continued

21   date, that we might have Mr. Kunkel available?

22        THE COURT:  Let's not worry about a progress report,

23   because I think the next time this comes up in court we ought

24   to have the charts and summaries and conclusions of the

25   Government ready.

1        MR. STAHLMAN:  The point I had in mind is that there may

2  be some matters here that we would want to make some tests in

3  connection with it.  I don't think it would take much time.

4        THE COURT:  Well, let's not do it piecemeal.  Let's see

5  what the Government comes up with.  Maybe you will be content.

6        What else is there in the way of housekeeping here?

7        MR. SACHSE:  Your Honor, I have no housekeeping matters.

8        MR. VEEDER:  I have a couple of questions of Mr. Kunkel,

9  if he would get back on the stand, your Honor.

10       THE COURT:  All right, let's finish that up.

11

12                      FRED KUNKEL,

13  recalled as a witness in behalf of the defendant Vail Company,

14  having been previously duly sworn, testified further as follows:

15

16                    CROSS-EXAMINATION

17  BY MR. VEEDER:

18       Q  Mr. Kunkel, have you viewed the area concerning which

19  you testified this morning on direct examination at the head

20  of Temecula Gorge and observed that there has been any recent

21  change in the general geology of that area?

22       A  Recent within what time interval?

23       Q  A thousand years?

24       MR. STAHLMAN:  Oh, I object to that as calling for a

25  conclusion.

1    THE COURT:  Overruled.

2    MR. VEEDER:  Well, from 1926?

3    THE WITNESS:  Which question do you want answered?

4    MR. VEEDER:  Well, from 1926 have you observed anything

5    that would indicate change of the geological situation from

6    1926 to date?

7    MR. SACHSE:  Is the question, has he observed geologic

8    change since 1926?

9    MR. VEEDER:  I asked whether he has observed anything

10   that would indicate geologic change since 1926.

11   MR. SACHSE:  A change in the geology since 1926?

12   MR. VEEDER:  That's right.

13   THE COURT:  Have you?

14   THE WITNESS:  From my own personal observation, no.  There

15   has been some evidence perhaps that there have been very minor

16   movements along the Wildomar fault zone, but that is largely

17   a matter of inference rather than direct observation.

18   BY MR. VEEDER:

19   Q  You have seen no change that would indicate a change

20   in the older or younger alluvium during that period, have you?

21   A  No.  The geology as mapped is virtually the same.

22   Q  And would that be true in regard to the area at Ysidora

23   Basin?  Have there been any changes since 1926 that you could

24   observe, as a geologist?

25   A  Geologically, no appreciable changes.

1     MR. VEEDER:  That's all.

2     MR. STAHLMAN:  Did you see the area in 1926?

3     THE WITNESS:  No.

4     THE COURT:  We are wasting time.  What difference would

5  it make?  There has been no major geologic change since 1926.

6     Step down, Mr. Kunkel.

7     MR. STAHLMAN:  Is that all?

8     MR. VEEDER:  Well, he is going to testify at length in

9  rebuttal, or whatever you want to call it.  But I am not going

10  to take any more time on what you asked.

11     THE COURT:  All right, what do you think is the time

12  schedule?

13     MR. SACHSE:  May I make an observation before we speak

14  of the exact time schedule.

15     I think we are a lot closer to a conclusion of testimony

16  in this case than some of us realize.  I have discussed most

17  of this with Mr. Veeder, although we have not arrived at any

18  agreement or conclusion.  But it seems to me that if the

19  United States could, as soon as possible, put into evidence

20  as part of its case in chief, because it is still of record

21  that the United States has not rested, the remainder of its

22  ownership maps for the entire watershed and any local additional

23  geological maps that they may have prepared, I think the

24  taking of evidence on defendants' cases would finish very,

25  very fast.

11448

1    In the first place, there are very few counsel left.

2 If one checks the list of defendants represented by attorneys,

3 there are very few.

4    In the second place, speaking for myself, I will not

5 introduce any evidence of irrigable acreage, unless the United

6 States itself introduces a soil survey.

7    And in the third place, we could all of us eliminate in

8 our minds at least very large areas of basement complex and

9 residuum as far as ground water is concerned.

10    Now, I honestly believe that with those ownership maps

11 and supplemental geological maps in, if any, that we could

12 see this thing wound up as far as defendants' cases are

13 concerned in a couple of weeks.  And I have in mind that Mr.

14 Grover represents clients, and that I represent some clients.

15 Nevertheless, I think it would wind up in a couple of weeks and

16 would be ready for the United States's rebuttal.

17    But there is a second aspect to this thing of special

18 problems that I think we could discuss and perhaps will not

19 require the attendance of all counsel, and they are problems

20 that involve little or no taking of evidence.

21    There is, of course, the stipulated judgment.

22    There is the fact that the Master's findings have been

23 completed and approved by the Master on two different water-

24 sheds, and that a third is now set for hearing on objections

25 before the Special Master.

That could be disposed of.

There is a question which will have to be ruled on by your Honor of at least ten clients of mine who purported to reserve riparian rights in their grants to the Fallbrook Public Utility District.  That is a purely legal question.  Their deeds are in evidence now, and I don't think it would take fifteen minutes argument and a page or two of briefing by Mr. Veeder and myself to get a ruling from your Honor on whether these reservations are any good.

There is the matter of this form of decree that you brought up yesterday as to soil conservation dams.

And the biggest problem that I think we ought to be thinking about, if we are as close as I think we are to the end of evidence, is what we are going to do with what you might call the defaulting defendant.  To put it another way, the defendant who hasn't done anything.

I believe that a lot of these things can and should be disposed of very rapidly, and I think we are closer to a con-clusion of this case than some of us really realize-- I mean getting finished so that your Honor would say, "Let's go to work and prepare some findings."

MR. VEEDER:  I am in complete accord with that.

THE COURT:  Yes, I am, too.  I think you have done a nice job gathering up some loose ends here and cataloging them.

On these defaulting defendants, it would seem to me that

1   when we take care of this basement complex area we will have

2   no trouble taking care of those who have not appeared or who

3   have appeared pro per in most of those areas.  Then there may

4   be isolated cases where we are either going to have to try to

5   coax the persons to come in or send the Colonel or somebody

6   out to take a particular look.  I am not going to default

7   anybody in this proceeding without taking reasonable measures

8   to find out just what they have and what the decree should

9   provide.

10   MR. SACHSE:  Well, what concerns me, your Honor, is not

11   so much that you will default anybody, because, frankly, I am

12   thinking about the riparian defendant who doesn't appear, the

13   defendant covered in that letter that I wrote which you had

14   inserted into the record.  I think an ownership map introduced

15   by the United States in evidence showing that John Smith

16   overlies the basin or is riparian to Tule Creek is absolutely

17   all the evidence that has to be in this case, and that he can't

18   be defaulted.  The evidence is then in and we can then enter the

19   finding and we have then, with one fell swoop, disposed of all

20   the back country riparians, unless they want to come in and

21   prove something additional.

22   MR. VEEDER: I can point up the problem, though, your

23   Honor, by a rough map that will go into evidence ultimately

24   of the tremendous number of wells that are in the Murrieta

25   Valley, domestic and irrigation both.  This is the result of

1   our investigation down to date, that is, under these court

2   orders where Mr. Kunkel and his staff have located wells and

3   measured the water levels, et cetera.

4        The concern that I talked about to Mr. Sachse and to your

5   Honor is that we have something upwards to 54 defendants

6   represented by Mr. Krieger.  They are broadly scattered.  But

7   intervening in between those scattered defendants are defend-

8   ants who have appeared pro per, defendants who have filed

9   answers, and then there are some who haven't shown up at all.

10       Now, I think the effectiveness of your Honor's decree is

11   tied up directly and immediately with the problem that I am

12   pointing up.  I think that we are going to have to work out a

13   procedure where these people are notified again to show up.

14       THE COURT:  All right, we can work on that.

15       What are your suggestions for our next session?

16       MR. STAHLMAN:  I think, as your Honor suggested this

17   morning, the middle or latter part of January would be satis-

18   factory.

19       Of course, I think some of this other evidence ought to

20   go in now.  We are practically through, with the exception of

21   what has to come in generally with other evidence and Mr. Vail.

22   And as far as I am concerned, it can be either way.

23       THE COURT:  Let's talk about Vail.  Hon the Vail side, I

24   understand that those couple of exhibits that you had attached

25   to your memorandum, your are going to hold up on those until

1    you get further evidence.

2         MR. STAHLMAN:  Yes.  One of them in particular I noticed

3    was premature.

4         THE COURT:  And then outside of the testmony of Mahlon

5    Vail you are through with the evidence?

6         MR. STAHLMAN:  With the evidence, yes, except that which

7    I say will come in naturally.

8         THE COURT:  What proof will the Government want to put

9    in, if any, on rebuttal?

10         MR. STAHLMAN:  We have the matter that we discussed, Mr.

11    Veeder, regarding the Pauba well, that I think I have indicated

12    to your Honor.  And of course Mr. Vail will have testimony in

13    connection with that.

14         THE COURT:  What about the Pauba well?

15         MR. STAHLMAN:  There is considerable correspondence.

16    Mr. Veeder has taken the position that we have been unjustly

17    enriched by the drilling of the Pauba well, and the circum-

18    stances surrounding the well, I think, are very interesting.

19         THE COURT:  You will cover that by Mahlon Vail's

20    testimony?

21         MR. STAHLMAN:  Yes.

22         THE COURT:  And by correspondence?

23         MR. STAHLMAN:  Yes.  The documents I will be ready for

24    the next time that we come back to court.

25         THE COURT:  Mr. Veeder.

1    MR. VEEDER:  Here is my view about this matter, your

2    Honor.  Outside the questions of law presented by the Vail

3    Company's challenge to the stipulated judgment, I believe

4    that our rebuttal evidence would be the same for the Vails as

5    it is for Mr. Krieger's clients or for the State of California. I

6    can't separate in my mind the hydrology and the geology and

7    the ground water phenomena that relates to the Vails as they

8    relate to Querry and the rest of them.  My purpose would be

9    to put in our rebuttal and say, "This is applicable to all

10   hands," and let it stand that way.  Unless George comes up

11   with a letter that I have never seen before.

12       MR. STAHLMAN:  Mr. Veeder, in this discussion we had

13   at noon you intimated that you would rather not argue the

14   matter until after your tests are completed.  That is true, is

15   it not?

16       MR. VEEDER:  I think Mr. Kunkel's work that he is doing

17   now, I have understood that your Honor ordered us to get these

18   things all done and pulled together that Mr. Kunkel is doing

19   now on our rebuttal and get these things in and not wait

20   until the end of the trial.  Is that not correct?

21       THE COURT:  That is right.

22       MR. VEEDER:  And you expect us to get that done on a

23   February or March date.

24       THE COURT:  If you want to postpone the decision on what

25   we are going to do about the Vail judgment until after that is

11454

1  in, then I say get that in at the earliest moment-- get it in

2  at the end of January or the first of February.

3      MR. VEEDER:  Well, I don't think it would be impossible--

4  and I don't want to delay this any further, but it occurs to

5  me that the more data we get in the better.

6      MR. GIRARD:  Just briefly on delaying the decision on

7  the Vail stipulated judgment, it would seem to me that probably

8  the major aspect of this would be a legal question and the

9  discussion of that and possibly a ruling by your Honor would

10  not have to be postponed until the end of the pump test evi-

11  dence, would it?

12      MR. VEEDER:  I will be guided by what your Honor says

13  on it.

14      MR. GIRARD:  I don't have any real preference one way

15  or the other, your Honor.

16      THE COURT:  Do you think the pump tests have any impact

17  at all on the questins raised by Vail in regard to the judgment?

18      MR. VEEDER:  I will tell you what our evidence is be-

19  ginning to show.  That you are getting a reverse gradient in

20  Murrieta.  In other words, they are pumping the water down.

21  You are getting pumping holes all the way through the Murrieta

22  Valley.

23      THE COURT: You mean the gradient runs upstream?

24      MR. VEEDER: That is right.  Pumping holes have indicated

25  that the ground water has been reduced to the point where the

1   gradient is upstream.

2        MR. STAHLMAN:   Are you talking about cones of depression?

3        MR. VEEDER:   Pumping holes, yes, there are cones of

4   depression.   That is what is coming out of it.

5        And our position in regard to the Vail matter is this.

6   They contracted, or they stipulated, or whatever your Honor

7   desires to call it, to deliver a minimum of three second-feet

8   at their gorge-- that's our view, it's very simple-- and if

9   Murrieta contributed to the three second-feet, it made no

10  difference to use, within reason.

11       But I think that it is extremely important that the

12  view be taken that in meeting our riparian rights downstream

13  that all parties who are claiming correlative shares have an

14  obligation, not as specific as the Vails, perhaps, but never-

15  theless they have an obligation just like anyone else, and I

16  think that Querry and Roripaugh and the rest of them have to

17  contribute something to the runoff, the discharge going down

18  the Temecula Canyon.

19       Now, how important our pumping tests are, how important

20  the more refined geology is that we have, in regard to your

21  ultimate decision on the proposition, I don't know.   You have

22  indicated repeatedly, though, how is this going to work?   How

23  can the Vail Company's stipulated judgment with the National

24  Government be correlated and made operative in regard to other

25  riparians?   I think that is one of your principal concerns.

1    I don't know how important this more finalized, more
2    refined data would be to your Honor in that decision.  You
3    have asked us, how is it going to work?  I think we have to
4    come up with a plan that shows how it can be accomplished.

5    Above all, I don't want to delay any longer the ruling
6    on the stipulated judgment, because I am worried about the
7    Coit survey, I am worried about other things until that
8    decision is made.

9    THE COURT:  Now there is the further problem of some
10   of these bigger ranches on the Temecula.  Do you want those
11   heard before we go into the decision on the Vail judgment?

12   MR. STAHLMAN:  I think they are important.

13   MR. SACHSE:  Your Honor listed three clients represented
14   by me upstream from Vail Dam-- Tule Land & Cattle and Bergman.
15   I am prepared to submit it the minute the ownership map of the
16   United States is in.  I will simply accept the United States's
17   ownership map.  I am prepared to submit both of them right then
18   on the geology and ownership map.  Neither of them has any use
19   of any kind, and I am going to rest their case, except domestic
20   use on Bergman.

21   The third one, Sievers (Stardust Ranch), I still have
22   had no communication of any kind with the new owners.  I have
23   written letters trying to get squared away, and when this
24   Court reconvenes if he has not gotten in touch with me there
25   is going to be a motion to relieve me of counsel, because I

1    can't get a word from him and, frankly, if he acts that way I

2    don't want to represent him.

3         THE COURT:   Well, we have the Oviatt problem.

4         MR. SACHSE:   Oviatt has his own counsel.   Mr. Krieger

5    advised me yesterday that they thought they would be ready in

6    February.

7         MR. STAHLMAN:   I think we should start taking testimony

8    on some of those larger users east of Vail.   We know of some

9    substantial diversions that are being made up there.   I think

10   it is important to know the legality of those things-- in

11   addition to large extractions by pumping.

12        MR. VEEDER:   Your Honor, in regard to our position, we

13   will do whatever you direct us to do.   But I wanted to point out

14   what our findings are indicating now in the Murrieta, and I

15   think it may have some bearing on your decision.

16        MR. STAHLMAN:   There is another thing on these well tests.

17   I don't know but that we may not want to make some well tests,

18   and maybe some problems will arise by reason of the evidence

19   on some of those ranches east of Vail, because we have questions

20   there, for instance, of reversing the gradient, impounding area,

21   and things of that sort.   Then we have the same thing that

22   Mr. Veeder is concerned about down in the Murrieta.   We may

23   have those situations on the other side.   So I think those

24   areas where there are large extractions, which is the most

25   important, I think the evidence in those matters should be one

1    of the first things we take up when we get back here.

2          THE COURT:   When will the Government have these ownership

3    maps in the area in the upper part of the Temecula?

4          MR. VEEDER:  By the end of January, your Honor.

5          MR. STAHLMAN:  You will go along with me that we should

6    take evidence on the larger areas, will you not?

7          MR. VEEDER: I really think that there are matters that

8    evidence has to be taken on.

9          I will add this additional factor.  I personally would

10   like to have this evidence come in before you rather than

11   before the Master.  As I pointed out to your Honor one day,--

12   and I hope without disreppect-- that we are riding two horses

13   and it is extremely difficult.  As long as we have to prepare

14   for the Special Master and go ahead on that, the work of

15   Commander Redd and Col. Bowen is consumed on that.  We can

16   do a lot better down here.  We have proved this week how

17   rapidly we can move before your Honor-- except when George and

18   I are hassling.  When Mr. Krieger got down here we went to work

19   and cross-examined and were through expeditiously.

20         MR. SACHSE:   I surely concur, your Honor.  We started

21   before the Master-- and believe me, this is no criticism of

22   Judge Cranston; he has done an outstanding job, in my opinion--

23   in De Luz Creek I think we haxe 90% of the defendants done.

24   They are complete.  He has a good set of findings.  Fallbrook

25   is done.

1    But now we are getting nowhere.  The last hearing we

2  had--

3    MR. VEEDER:  The last four hearings.

4    MR. SACHSE:  The one particularly on the Vail Dam, on

5  the Upper Temecula, there was one person asked a question,

6  and that was me for one of my clients.  It was foolishness.

7  All we had was the ownership map and a small supplemental

8  geologic map prepared by Col. Bowen on part of the property.

9  The same thing on the Pechanga.  We can put it in here before

10  you and it's done.

11    THE COURT:  Will you have the ownership maps on the

12  Temecula above Vail and on Pechanga by the 1st of February?

13    MR. VEEDER:  Those are done, your Honor.

14    MR. SACHSE:  They are done.

15    MR. REDD:  Vail is in evidence.

16    MR. VEEDER:  Pechanga is in evidence.

17    LCDR REDD:  We are on Wilson Creek now.

18    THE COURT:  That was before the Master.

19    MR. SACHSE:  It would be Wilson Creek, it would be the

20  Murrieta Valley, and it would be these upper drainages such

21  as Tucalota and upper fringes.  Now Domenigoni Valley poses

22  a minor problem, but it wouldn't take over two or three days

23  to try it.  We could do that separately.

24    THE COURT:  I think that the testimony should be taken

25  concerning most of these bigger ranches upstream from the

1   Vails before we finally conclude the problem on the Vail

2   judgment, and I would think that we should set a date around

3   the first part of February, and at that time Mr. Sachse will

4   try to find out whether he can proceed with the Stardust

5   Ranch.

6        MR. SACHSE:  I will either proceed then or be relieved.

7        THE COURT:  Have the Government get after Oviatt.  Does

8   anybody know his attorney's name yet?

9        MR. VEEDER:  Is Mr. Krieger representing him?

10       MR. SACHSE:  No, but he can tell you.  The name of his

11  attorney slips my mind.

12       THE COURT:  All right, get him in by that time.

13       While we are at it, if you get the ownership maps, take

14  care of Sachse's larger ranches up there.

15       MR. SACHSE:  I will have to get hold of Mr. Grover.

16       THE COURT: Do we have an ownership map of the Murrieta

17  Valley?

18       MR. VEEDER:  Yes.  That went in.

19       THE COURT:  Try to clean up the balance of the Murrieta

20  Valley.

21       And then, assuming that that took us roughly a week,

22  about the same time try to have the charts and findings on

23  these well tests.

24       MR. VEEDER:  I want to be sure of the date you said there.

25       THE COURT:  I haven't fixed it yet.  I am talking about

11461

1    the first part of February.

2        And after we get through some of these ranches upstream,

3    get into Mr. Kunkel's testimony as to his findings on these

4    well measurements and what charts and conclusions he draws and

5    get that out of the way.

6        Will that work?

7        MR. VEEDER:  I think it will, your Honor.

8        As I say, in regard to putting together all this material

9    that we have now gathered, it is quite a task.  But we will

10   undertake to get it as fast as we can.

11       We have the problem-- and I don't think it should delay

12   anyone-- when we run out these titles in regard to whether the

13   land is riparian or not, if I may suggest, I think we should

14   have another hearing in regard to those titles at some time,

15   if there is any conflict.  But I will notify the parties and

16   I will notify your Honor, if that is amenable.

17       THE COURT: That is satisfactory on that.

18       What about your motion in connection with the Coit

19   survey?  Can we put that on also for the early part of February?

20   Or do you want to let that ride until after the ruling on the

21   Vail question?

22       MR. VEEDER:  I would rather let it ride, your Honor.

23   And I think if your Honor were to review the circumstances of

24   the record now, we have Mr. Wilkinson's testimony and we

25   have exhibits C and D.  I have never attempted to correlate

1  what those were reflective of.  It is a very difficult task.

2       THE COURT:  What date shall we fix-- February 2nd,

3  February 9th?

4       MR. VEEDER:  That is, for Oviatt.

5       THE COURT:  For our next hearing, and then see what we

6  can marshal for that time.

7       MR. SACHSE:  I would expect at that time to be able to

8  advise your Honor and Mr. Veeder how close to ready, and I am

9  sure I would be ready with the exhibits on Domenigoni and

10 Diamond.  We would be ready to roll on that.  We could at that

11 time set a date for that, which is, I think, the last big

12 controversial hearing on geology or anything that we have

13 ahead of us.  The second suits me.

14      THE COURT:  Mr. Veeder?

15      MR. VEEDER:  That is satisfactory.

16      THE COURT:  The case is continued to February 2nd.  Now

17 at that time we are going to hear the Stardust Ranch, if

18 Mr. Sachse continues as counsel.

19      MR. SACHSE:  I will be prepared at that time, your Honor,

20 and I will give Mr. Veeder by letter in advance a statement,

21 if he has the ownerships-- Do I understand that you will

22 have the ownerships ready for Wilson Creek and all that are

23 then?

24      MR. VEEDER:  That is correct.

25      MR. SACHSE:  I will give him a list of everybody I

11463

1  will rest with or I will have evidence, and I will have it in

2  his hands fifteen days ahead of time.

3      THE COURT:  All right, the Oviatt property, and Mr.

4  Veeder or some of his assistants will have the responsibility

5  of finding out who that lawyer is and telling him that we will

6  be ready to go on or about February 2nd.

7      MR. VEEDER:  All right.  Do you want me to write the

8  kind of letter that I wrote to Mr. Gardner?

9      THE COURT:  Yes.

10     MR. STAHLMAN:  In that connection, I just asked Mr.

11 Kunkel the last time he made measurements up there, and he said

12 it was over a year.  I think it would be advisable in the

13 hearing of those cases to have measurements of some of those

14 wells that he considered before.  If there are changes down

15 below, there may be changes up there.

16     MR. VEEDER:  There are just so many hours in a day.

17     MR. STAHLMAN:  But he is in a department of the Govern-

18 ment.

19     MR. VEEDER:  The United States will try to get those.

20     MR. SACHSE:  For speed, your Honor, may I make this

21 request of Mr. Veeder--

22     THE COURT:  Well, now, wait a minute.  Some well measure-

23 ments in the Temecula above Vail Dam.

24     MR. VEEDER:  Above Vail Dam.  I don't want to have to

25 get another order on this, if I can avoid it.

*This is a request by Vail for the court to have them do additional work* (margin note)

1    MR. STAHLMAN:  They were able to make those measurements

2    without an order previously.  I don't think it is necessary

3    to have an order.  If you find out there is someone up there

4    who will not permit the measurements--

5         THE COURT:  All right.

6         MR. GIRARD:  Let's leave it up to the engineers to decide

7    which ones they want to measure.

8         MR. STAHLMAN:  That is right.  I would suggest that he

9    consult with the State, and they might want to measure it

10   together.

11        MR. VEEDER:  I think Col. Bowen and Mr. Kunkel and the

12   State could work out a schedule on it.

13        THE COURT:  All right.  What creeks did you say you

14   wanted a map on-- Wilson Creek?

15        MR. SACHSE:  Mr. Veeder, I would like to re-introduce

16   here, if we could, also-- because Tule Land & Cattle is to be

17   tried directly before his Honor-- to reintroduce here the

18   Temecula ownership map, which is already before the master;

19   also, the little supplemental geological map you had, re-

20   introduced here.

21        MR. VEEDER:  We will do that.

22        THE COURT:  What is this, ownership maps on Wilson Creek

23   and the Upper Temecula?

24        MR. SACHSE:  That's right, and anything else they have.

25        MR. VEEDER:  I can outline to your Honor what is

attorney
for State of
Calif

1  transpiring.  Already the Special Master has asked me to

2  introduce into the Master's hearing all the geology and all

3  the hydrology from here.  If there is ever a needless

4  duplication in this veil of tears, it is the situation we are

5  in.  Your Honor is considering exactly the same matters that

6  obviously Mr. Cranston has to consider in coming down with his

7  decision.  That is why I am anxious to get this matter corre-

8  lated and operating under one head.

9       THE COURT:  Why don't we put him on the upper reaches of

10  some of these streams where there is a small amount of

11  alluvium, omitting the basement complex area, and you wouldn't

12  need all this geology downstream.

13      MR. VEEDER:  It is entirely possible.

14      MR. SACHSE:  Your Honor, I honestly think that if Mr.

15  Cranston finishes up Rainbow Creek-- I don't want to foreclose

16  anybody in the upper watershed, certainly, but I think he has

17  gone as far as he is going to get any practical help on it.

18  The experience that Mr. Veeder had and that I had in Pechanga

19  and the Upper Temecula was a farce.  It didn't do any good at

20  all.  We can dispose of it here.

21      THE COURT:  All right, you are going to get some of these

22  ownership maps in.

23      And following these matters here, we will list also the

24  Murrieta Basin-- wind up on that.

25      Domenigoni Valley.  Will you have that other problem

1    solved by that time?

2        MR. SACHSE:  We will certainly be ready to put on what

3    evidence it will take.  I don't think, even assuming that a

4    controversy develops, I don't think it will take over three

5    or four days of evidence.  We can certainly set a date when we

6    come back on the 2nd of February for the Domenigoni Valley.

7        THE COURT:  All right, when we get through with what

8    we can do on these items we have listed, and we will assume

9    that we are going to spend a week or two in here with these

10    odds and ends-- Murrieta Valley itself will take two or three

11    days with those small parcels.

12        MR. SACHSE:  I think so.

13        THE COURT:  Then I would like to have Mr. Kunkel ready,

14    as the next item in order, either to follow on or a short

15    continuance with conclusions and charts from his well-testing

16    data.  I would estimate you would have until about the middle

17    of February to get that done.  Can you do it by that time?

18        MR. KUNKEL:  I think we can do it faster.

19        THE COURT:  We will set tentatively a target date about

20    February 16th for that.  I am not setting a date now, but just

21    giving you a target date when we will probably be ready for

22    that.

23        MR. SACHSE:  Before we leave these ownership maps, may

24    I request that you authorize Commander Redd, Mr. Veeder, to

25    lodge them as early as possible and let me know so I can look

1    at them and then I will give you a letter telling you what I

2    am going to do and not do.

3          MR. STAHLMAN:  Incidentally, if you are going to answer

4    Mr. Gardner's brief, we would like to have a copy, Mr. Veeder.

5          THE COURT:  Yes, if he does it.

6          MR. VEEDER:  How about Mr. Vail's testimony?  Does that

7    come on at that time?

8          THE COURT:  He should be ready by that time.

9          MR. STAHLMAN:  I think so.

10         MR. VEEDER:  I thought he would be the first witness.

11         MR. STAHLMAN:  No.

12         THE COURT:  We will include him in that list and hope

13   to get that in, too.

14         MR. STAHLMAN:  Along in that period of time.

15         THE COURT:  How much time do you gentlemen want to do

16   this other job I gave you, this briefing job or analysis job?

17         MR. VEEDER:  Would it be all right to have that in by

18   the 2nd of February?

19         MR. SACHSE:  No, let's get it quicker than that.  I would

20   like to have time to think about it after it is in.  I don't

21   want to reply to it, necessarily, Mr. Veeder, but I want to

22   know at least what you say before we come into court.

23         THE COURT:  Would it be any help to have somebody sound

24   off first and then somebody reply?

25         MR. SACHSE:  I think just file them against each other

1 and give us a deadline and we will have them all in by a

2 certain date.

3     MR. STAHLMAN:  Then if there is any necessity for

4 reply, we can do it.

5     THE COURT:  Will you brief them under the categories

6 that I gave you?

7     MR. SACHSE:  Yes, your Honor.

8     MR. GIRARD:  We may change the order.

9     MR. SACHSE:  Yes, we may change the order.  We were

10 discussing it at lunch.  I think 1 and 4 are almost the same

11 and have to be considered together.

12     THE COURT:  What order do you suggest, Mr. Girard?

13     MR. GIRARD:  I would suggest 1, 4, 3, 3.

14     THE COURT:  I don't have the numbers.  Tell me what you

15 have.

16     MR. GIRARD:  As I have written them, the first question

17 is the part about the old judgment.

18     THE COURT:  Give me the order in which you want them.

19     MR. GIRARD:  First, I think we should discuss whether

20 part of the old judgment which is not affected by the reversal

21 is still effective as against the parties, or did the stipulated

22 judgment succeed this?

23     THE COURT:  That will be No. 1.

24     MR. GIRARD:  The second one would be, can any judgment

25 of a state court involving riparian rights ever be res

1    adjudicata in the sense of finality?

2        The next one would be 3:  What does the stipulated

3    judgment mean, in simple language-- in lay language?

4        And the last would be the draft of the decree affecting

5    the valley, assuming the judgment and the stipulated judgment

6    remain.  As far as the time is concerned, your Honor, I don't

7    want to do it next week, but if we could have it in-- I am

8    sure I could have whatever I am going to prepare by the 15th

9    of January.

10       THE COURT:  How about January 15th?

11       MR. GIRARD:  What day is that, your Honor?

12       THE COURT:  I will check.

13       MR. GIRARD:  Which would give us a couple of weeks to

14   ponder each other's before we return.

15       THE COURT:  January 15th is a Friday.  How does that

16   sound, Mr. Veeder?

17       MR. VEEDER:  I will go along.  I have a hearing on the

18   7th of January, and I am just trying to figure time.

19       MR. GIRARD:  I will have a week's trial that week, too.

20       THE COURT:  I would like to have them before we come

21   back to study them myself.  Let's say January 15th.  This

22   isn't a big job, with the exception, possibly, of No. 2, which

23   might take a little work.

24       All right.  Can we do anything further?

25       MR. VEEDER:  I don't know how other counsel feel about

1  my talking to your Honor if I have an opportunity to come and

2  outline to you the problems that we are having in regard to

3  these-- there are times, I know, when all counsel aren't here--

4  I am worried about these non-appearing defendants who have

5  land concerning which I think we are going to have to put in

6  some evidence ourselves.

7  THE COURT:  Well, counsel have no objection if we confer

8  about working some of those things out.

9  MR. GIRARD:  I have no objection if you talk to the Judge

10  at any time about anything, Mr. Veeder.

11  MR. VEEDER:  The only thing is, if you wanted to be there

12  I would have to notify you, that's all.  I am never sure what

13  my schedule is going to be.

14  MR. GIRARD:  On behalf of the State, I certainly would

15  oppose anybody's default.

16  MR. VEEDER:  We don't want defaults, and that is my

17  concern today.

18  MR. SACHSE:  Your Honor, I could not get hold of Mr.

19  Teasdall, but I will have Monday-- I am coming back to San

20  Diego-- and I will get the approved judgment No. 4 to the Judge

21  on Monday.

22  THE COURT:  All right, gentlemen, have a merry Christmas.

23  COUNSEL:  The same to you.

24  (Adjournment until February 2, 1959, at 10 A.M.)

25