# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.   1247-SD-C

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   February 3, 1960.

**Pages:**   11498 to 11636.

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 -- Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| )  Plaintiff,  ) | |
| )  vs.  ) | No. 1247-SD-C. |
| )  FALLBROOK PUBLIC UTILITY  ) | |
| DISTRICT, et al.,  ) | |
| )  Defendants.  ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Wednesday, February 3, 1960

APPEARANCES:

    For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                                   WILLIAM E. BURBY, ESQ.,
                                   Special Assistants to the
                                   Attorney General,
                                   Department of Justice,
                                   Washington, D. C.

                                   LCDR. DONALD W. REDD.

APPEARANCES (Continued):

For Defendant                   STANLEY MOSK, ESQ.,
State of California             Attorney General,
                                By FRED GIRARD, ESQ.,
                                    Deputy Attorney General.

For Defendant
Fallbrook Public
Utility District,               FRANZ R. SACHSE, ESQ.
et al.

For Defendant Vail              GEORGE E. STAHLMAN, ESQ.
Company                         EARL K. STANTON, ESQ.

Pl. Ex. 158        p. 11508
       159         p. 11506

11499

San Diego, California, Wednesday, February 3, 1960.   10:00 A.M.


(Another matter.)

THE COURT:  Mr. Veeder, what is your estimate of our program here this week?  How long will it be?

MR. VEEDER:  From our standpoint, your Honor, the arguments here today will be all that can be accomplished.

I am prepared, and we are prepared, to go into the matters of the stipulated judgment in these arguments.  How long they will take I can't estimate.  For myself, I think if I go more than half an hour I am probably wasting your Honor"s time.  When we get through with these arguments, I think that will be it for the week.

THE COURT: Nothing further we can do this week?

MR. VEEDER: No, your Honor.  So far as the United States of America is concerned, we don't plan to go ahead until Mr. Stahlman has rested in regard to the Vail case.  So that is the circumstance.

In regard to next week, if you are interested, I can tell you that I talked to Mr. O'Malley in Los Angeles.

THE COURT:  What is the situation there?

MR. VEEDER:  He tells me he will be prepared to go on the 9th; that he will run, he thinks, three to four days.

I brought that matter to Mr. Littleworth's attention. He said in view of his vagueness of the period of time for the

Oviatt case, he asked me to state to you that he would rather wait until March when they reconvene, so he can bring down all his clients. There are about twenty of them. I said that that was amenable to us, because I understand there are problems of bringing the farmers in.

THE COURT: These matters that are going to take four or five days sometimes take only two. What else can we do next week if Mr. O'Malley runs out of gas?

MR. VEEDER: If George would bring down Mr. Vail, I think that would terminate the Vail Company matter.

THE COURT: Do you think Mr. Vail will be available next week?

MR. STAHLMAN: I can't state at this time, your Honor. I think so. I wouldn't want to say. On a previous appearance here in court it was stated that these other matters would be on first and Mr. Kunkel would give his evidence in relation to certain well tests-- your Honor outlined that in the record, and then after that Mr. Vail would be available. That would be after the 16th.

THE COURT: I didn't understand that there was any provision that we had to wait on Mr. Vail's testimony until after we got these well tests.

MR. VEEDER: No.

MR. STAHLMAN: That is the way you outlined it.

THE COURT: There is no particular relationship.

1    MR. STAHLMAN:  I know he did plan a trip to Arizona on

2  some business over there.  I will find out this evening or

3  maybe this noon.

4    THE COURT:  I would be concerned if it were a problem

5  about his health, but I am not particularly concerned about

6  trips to Arizona.

7    MR. STAHLMAN:  No, I don't want to indicate that.  As

8  I indicated to your Honor, we first wanted to go to the office

9  of O'Melveny & Myers and check some records.

10    THE COURT:  Maybe you will have some time this week.

11    MR. STAHLMAN:  Yes, we will do it this week.

12    THE COURT: But I think you should be ready next week,

13  the latter part of the week, to fill in if we run out of things

14  we can do.

15    MR. STAHLMAN:  The latter part of next week.  Very well.

16    THE COURT:  Mr. Sachse, do you have any other matters

17  you can go forward on?

18    MR. SACHSE:  No matters that call for evidence, your

19  Honor.

20    I sent this lengthy letter to Mr. Veeder, and I believe

21  a copy to your Honor.  There are certain questions that, as

22  far as I am concerned, cannot be disposed of until Mr. Veeder

23  argues or until you request a brief:  The question of these

24  attempted reservations of riparian rights in deeds, the question

25  of how we are going to handle soil conservation dams, and some

1   of those things.

2   But evidencewise I will be ready to go the first of

3   March with Occidental College, if it is to be tried here--

4   I don't care whether it is here or before the Master-- and

5   probably try to go with Searl Brothers and Diamond and

6   Domenigoni Valleys.  And as to Seivers and Stardust Ranch, I

7   will not have a positive answer until Sunday.  I have a motion

8   pending to be relieved as counsel, but they called me up and

9   maybe I am still in it.

10   I have given to Mr. Veeder a complete outline of what I

11   can do as far as getting to trial.

12   (Continuation of another matter.)

13   THE CLERK:  Two, 1247-SD-C, United States vs. Fallbrook,

14   et al.  Further trial.

15   THE COURT:  You had some housekeeping matters, Mr.

16   Veeder?

17   MR. VEEDER:  Yes, your Honor.

18   I have already reported to you in regard to my conver-

19   sation with Mr. O'Malley and Mr. Littleworth.  I would like

20   to have that in the record, because I said I would do that.

21   There is another matter involving the installation on the

22   Leo Roripaugh property of the water level recorder.  Due to

23   some fiscal difficulties, we have not placed that recorder on

24   Well 23K1.  However, I have been assured by Col. Bowen that

25   that will be done in the immediate future.

11503

I talked to Mr. Littleworth about his clients' property and the installation of the recorders.  He told me on the phone, and said that I could relate to you, that an extension of 90 days would be amenable to him, subject, of course, to the fact that if Mr. Roripaugh needs the well the recorder would be taken off and he would be permitted to utilize it in his farming operation.

THE COURT:  You submit an order drawn on Leo Roripaugh's property for an additional 90 days.

Any objection?

I will sign the order.

MR. VEEDER:  Mr. Stahlman lodged with the Court, and your Honor directed us to prepare copies of, Vail's Exhibits AR-1 through AR-10.

Have you made copies, George?

MR. STAHLMAN:  Yes, I gave you a copy this morning.

MR. VEEDER:  I have made three copies, your Honor, if anybody needs them.

THE COURT:  How are these to be numbered?  You list them as AR-1 through AR-10.

MR. STAHLMAN:  They are in the same order that I presented them to the Clerk, in sequence.

THE COURT:  The Clerk has them numbered?

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  I will let him number mine.

MR. VEEDER:  We have no objection to Vail's Exhibits AR-1 through AR-10, your Honor.

MR. STAHLMAN:  I might indicate, your Honor, that the documents, taken as a whole, fairly indicate, from our view-point, that the drilling of the Pauba Well was under the control of the Navy.  It was drilled as a result of a permit which was requested of the Vails for the purpose of drilling it. The evidence in relation to the circumstances preceding the drilling, and the reason for the drilling, is the evidence which will be introduced on behalf of Mr. Vail.

MR. VEEDER:  May I inquire, George, these haven't been admitted yet?

MR. STAHLMAN:  No.

MR. VEEDER:  Does your Honor admit them?

MR. STAHLMAN:  I merely explained the reason for the exhibits, your Honor, that individually they don't mean much themselves, but there is a sequence of events that occurred in connection with the drilling, together with other evidence that is in the record of the case, and the testimony of Mr. Vail will indicate that the Navy came to Vails and asked to have this well drilled.  These matters of great secrecy sur-rounding the drilling of the well at that time was because of negotiations between the Navy and the Vail Company for con-demnation of the Vail Ranch and the purchase of the ranch for military purposes, and the well was drilled in connection with

1   that.  And then there are other features which the evidence

2   in the case will clearly indicate, I think, that what was in

3   the minds of the Navy in addition to the matter of the purchase

4   is reflected in documents already in court here.

5        In other words, the permit that they were urging that

6   Vail sign for the drilling of the well was signed prior to

7   the serving of the complaint in the Santa Margarita suit on

8   Vail, and I think the evidence is reasonably susceptible of

9   the deduction that it was drilled in contemplation of the

10  lawsuit-- they knew of the lawsuit at the time.

11       THE COURT:  Vail's Exhibits AR-1 through AR-10 will be

12  received in evidence, there being no objection.

13       (Vail's Exhibits AR-1 through AR-10 for Identification

14  were received in evidence.)

15       MR. VEEDER:  I refer your Honor to Exhibits marked for

16  Identification 158 and 159.  Those have not been offered, but

17  I make the offer now.

18       I had anticipated that when Mr. Vail was called we

19  would examine him in regard to those documents.

20       Now, Exhibit 159 for Identification is the revocable

21  permit from the Vail Company to which Mr. Stahlman just alluded.

22  For the purposes of the argument, I would think it would be

23  desirable to have this exhibit admitted in evidence.  If there

24  is objection, of course, I can have it certified.

25       MR. STAHLMAN:  The revocable permit?

1    MR. VEEDER:  Yes, Exhibit 159 for Identification.

2    There is no objection, as I understand it, to the ad-

3  mission of that document, your Honor.

4    THE COURT:  The revocable permit has attached to it in

5  the copy that I have the letter of August 2nd, 1951, to Oliver

6  P. Smith from O'Melveny & Myers.  That is part of the exhibit.

7    MR. STAHLMAN:  That letter, your Honor, and some other

8  correspondence that was held about that time is the matter that

9  I want to go with Mr. Vail to O'Melveny & Myers' office to

10  refresh his recollection as to the events that occurred.

11    THE COURT:  But there is no objection to Exhibit 159

12  going in evidence?

13    MR. STAHLMAN:  No, your Honor.

14    THE COURT:  All right, Exhibit 159 will be received in

15  evidence.

16    (Plaintiff's Exhibit No. 159 for Identification was

17  received in evidence.)

18    THE COURT:  And Exhibit 158 is the stipulation?

19    MR. VEEDER:  That, your Honor, is the stipulation be-

20  tween O'Melveny & Myers and the United States of America.  It

21  is a matter of record in this Court at the present time, and I

22  offer that now.

23    THE COURT:  What do you mean, it is a matter of record

24  in this court?  Part of the file?

25    MR. VEEDER:  Yes, your Honor, it was a stipulation

1   between O'Melveny & Myers and the United States of America

2   resolving all differences with the Vail Company.

3          THE COURT:  I don't have a copy of it.  Do you have an

4   extra copy?

5          MR. VEEDER:  I can give you a copy.

6          MR. STAHLMAN:  Let me see what this is, first, Mr.

7   Veeder.

8          THE COURT:  Do you have a copy for me?

9          MR. VEEDER:  Yes, your Honor.

10         MR. STAHLMAN:  This is a stipulation which we have

11   previously stipulated would be stricken from the record?

12         MR. VEEDER:  No, we didn't stipulate that it would be

13   stricken from the record.  George, I said that you are no

14   longer bound by it.

15         MR. STAHLMAN:  No longer bound by it?

16         MR. VEEDER:  Yes.

17         MR. STAHLMAN:  Well, that is a matter that is already

18   in the record in the case.

19         MR. VEEDER:  I would like to have it as an exhibit.

20         THE COURT:  It is part of the file, but it is not in

21   the evidentiary record of the case.

22         MR. STAHLMAN:  You are not going back on the other

23   stipulation that we are relieved from the stipulation, are you?

24         MR. VEEDER:  George, you are the only one who is going

25   back on stipulations.

1          MR. STAHLMAN:  Well, I just asked the question.  I think

2     it would expedite matters here.

3          MR. VEEDER:  George, no, I am offering this as showing

4     a course of relationship with the Vail Company until you came

5     along.

6          THE COURT:  I agree that the stipulation was set aside.

7          MR. STAHLMAN:  Yes.

8          THE COURT:  And it is offered now for a limited purpose,

9     as Mr. Veeder has stated, without any attempt to again bind

10    anybody by the stipulation, but the conduct of the parties may

11    be shown.

12         I don't know that I have read this.  Let me look at it.

13         MR. VEEDER:  It is very interesting.

14         (A pause.)

15         THE COURT:  Exhibit 158 is received in evidence for the

16    limited purpose described by Mr. Veeder.

17         MR. STAHLMAN:  I understand that the limited purpose

18    is to show the relationship of the parties; is that correct?

19         MR. VEEDER:  That is correct.

20         THE COURT:  Well, it would be admissions against inter-

21    est and various things, but not for the purpose of breathing

22    life again into the stipulation, which has been set aside by

23    agreement of the parties.

24         (Plaintiff's Exhibit No. 158 for Identification was

25    received in evidence.)

THE COURT:  Incidentally, just looking at my notes--
and I don't have the transcript-- it seems to me that when I
discussed setting aside this week of February 2nd, I have notes
here that Stardust Ranch, Mr. Sachse's situation, the Oviatt
problem, the well measurements above Vail Dam, ownership maps
on Wilson Creek and upper Temecula, a cleanup of the other small
parcels on the Murrieta--

MR. VEEDER:  That is Mr. Krieger and Mr. Littleworth.

THE COURT:  --and probably the Domenigoni Valley.  But
no use crying over spilt milk.

MR. VEEDER:  Your Honor, in regard to the ownership maps,
what I am doing on that-- I have those in my office-- I have
talked to counsel about a proposal.  If it is all right with
you, I will outline it now.  I would like to have time set
aside to call Col. Bowen for the purpose of introducing evidence
in regard to lands in the Murrieta Valley and in other parts of
the watershed of the Santa Margarita River where there have been
answers filed and claims made or where there have been no
answers filed at all.  We would put Col. Bowen on the stand
for the purpose of proving the evidence which we have of the
ownership of the properties.

THE COURT:  This is Wilson Creek?

MR. VEEDER:  No, I am speaking of Murrieta, and then I
will move around to those two creeks.

We would put on whatever evidence we have to the end

that your Honor could make findings in regard to the individual

parcels, the objective being to avoid default in that area.

We would do the same thing in the area above Vail Dam,

which includes Temecula Creek and Wilson Creek.

Now, Mr. Sachse has been advised, Mr. Girard has been

advised, Mr. Stahlman has been advised of this proposal that

we were going to make.  They indicate that they have no objec-

tion.  We are pointing to a March date for that purpose.

Is that agreeable with you, Col. Bowen?

COL. BOWEN:  You could be cutting out too big a job.

MR. VEEDER:  Well, we will go ahead on Murrieta Creek

in March, and go as far as we can along that line.

I am greatly concerned that people are not coming in

to make their claims, your Honor, particularly in the area

of Storage Unit No. 4, and I don't see how a decree can be

written absent some evidence in regard to those areas.

Now, I will lodge with the Court the ownership maps

and names in regard to Wilson Creek and the others this week,

and if there is no objection -- I don't see why there would be

objection, it is just a matter of routine-- those matters

where we have delineated the boundaries of the individual

parcels.

In regard to the well investigation above Vail Dam, I

don't recall, and the record doesn't show, that we had any

responsibility to put in that evidence the week of February

2nd, your Honor.

THE COURT:  Well, let's quit talking about February 2nd.

MR. VEEDER:  It is my understanding that Mr. Stahlman is the movant in this matter.  I assume that he has the opening.

MR. SACHSE:  Are you through, Mr. Veeder?

MR. VEEDER:  Yes.

MR. SACHSE:  I have one very brief question, your Honor. We have made quite a few orders and have done a lot of work on well measurements in the Upper Murrieta.  I think we ought to have some steps to have the well measurements on the military reservation brought up to date.  The last exhibits we have in this court show water storage in the basins of Chappo, Ysidora, et cetera, as of 1957.  We have had two winters now since. I think if your Honor is going to have current data on the status of the Murrieta and the Pauba we ought to have current data on the military reservation as well.  We can't ask your Honor for an order to enter upon the reservation, but the United States has always had that data, I think they keep it, and I would simply request that they bring Exhibits 50 and 51 up to date and supply us as soon as possible with well measurements from the reservation.

MR. VEEDER:  We of course will bring them up to date, and they are kept currently.  So there is no problem.

MR. SACHSE:  I think we should have them.

11512

THE COURT:   Those are Exhibits 50 and 51?

MR. SACHSE:   Those are just two that I called off at random.   There are a number of them.   What I would like, speaking for myself, would be to let the United States bring up to date any exhibits it desires, but I would like to know how the well measurements have fluctuated since 1957 after the last two wet seasons.

THE COURT:   Will you undertake that next week, Mr. Veeder?

MR. VEEDER:   Yes, we will, your Honor.

We will also go ahead with Mr. Hoffman's data in regard to runoff and precipitation.   Those are being worked up now. We will keep those current as time goes by.

THE COURT:   Also runoff and precipitation?

MR. VEEDER:   That is correct, your Honor.

MR. SACHSE:   That's all I have.   Thank you.

THE COURT:   We have been numbering our interlocutory judgments with successive numbers.   It seems to me-- a very minor matter-- but the first interlocutory judgment entered was the one involving Mr. Swing's clients, and I don't think it has a number.

MR. SACHSE:   It was not written on it, your Honor.

THE COURT:   So the Clerk will make a minute order calling that Interlocutory Judgment No. 1.   We will have a number for each of these interlocutory judgments.   The Clerk will insert

1    that number on the original judgment in the file,   Inter-

2    locutory Judgment No. 1.

3            MR. VEEDER:  I have from Mr. Willett an agreement in

4    regard to some of his clients, and I will have that in chambers

5    for your Honor to sign sometime today.

6            THE COURT:  All right.

7            Now as to the stipulated judgment, it is a question of

8    whom to hear first.

9            As I read the brief prepared by the State of California,

10   they advance the theories of law that certain types of judicial

11   holdings concerning water and water rights can be res adjudicata

12   or can come within the doctrine of estoppel, collateral

13   estoppel by judgment-- a minor distinction between the two

14   principles-- and that a finding that certain land is non-

15   riparian would be res adjudicata forever, barring maybe an

16   earthquake or a landslide or some physical phenomena.  Land

17   once found to be non-riparian thereafter continues to be non-

18   riparian.  Land found to be riparian might, by changed

19   conditions, become non-riparian because of severance of the

20   land from the ownership that was at one time riparian.  That

21   land that was riparian, therefore, might or might not be res

22   adjudicata.  That findings and judgment thereon as to the

23   extent of the basins-- physical phenomena, et cetera-- would

24   not be a situation which would be affected by change in con-

25   ditions.  And then, finally, that any allocation of water

1    between persons entitled to use it would never be res adjudicata

2    or thereafter binding and would be subject to re-analysis at

3    any time, depending upon the correlative uses made by persons

4    entitled thereto.  And respectable California authorities

5    cited for those propositions.

6        The conclusion reached by Mr. Girard was that the

7    stipulated judgment-- I don't know whether he referred to the

8    old judgment, but it seems to me that you did, as still having

9    some life-- but as to its findings and the judgment thereon

10   as to the extent of basins you might well argue that that was

11   a finding and judgment that would be binding on this Court and

12   that the character of riparian lands would be binding, but

13   that the allocation of water would not.

14        I also understand Mr. Girard's argument to be that

15   because of these facts and the fact of the conclusion drawn

16   that the Court is not bound by the allegation of one-third,

17   two-thirds, but might be bound by the very limited basin found

18   in the old judgment; that the better practice would be, on the

19   basis of changed conditions, to set aside the whole thing.

20   And finally, on the point as to drafting a judgment and trying

21   to incorporate this judgment, the State of California threw

22   up their hands and said, "It's an impossibility-- it just

23   couldn't be done."

24        Now the position of Fallbrook is somewhat similar in

25   some respects and different in others.

1        So rather than re-argue in detail these matters, we

2   have the general issues set forth here.  There are certain

3   things that I would like to discuss with you.  This first one

4   may be just my confused thinking, but here it is.

5        The Government is contending that this stipulated

6   judgment is binding on the Vail Company and settled all of

7   Vail Company's rights; that there was no continuing juris-

8   diction reserved by the Superior Court; that the State litiga-

9   tion has been very expensive. Query:  Could the Government,

10  and should the Government, have come into the Superior Court

11  to enforce their rights under this State judgment, instead of

12  bringing Vail Company into a lawsuit with, it turns out, 6,000

13  defendants and another expensive go-around on questions which

14  the Government says have already been adjudicated?  It seems

15  to me that the United States, as successor in interest to the

16  rights of Santa Margarita, would have a right to go into the

17  Superior Court, and even though the Court didn't take con-

18  tinuing jurisdiction, that court would have had a right to

19  have enforced this judgment.

20       Now, on the other side of the coin, what could have

21  been accomplished if the Government could have done that and

22  if the Government should have done that?  Because the Govern-

23  ment's desire was to secure an adjudication of who had rights

24  to this river.  My inquiry is directed to whether or not the

25  Government, by its conduct, has imposed an unconscionable

1    burden on Vail by making them a party to this lawsuit.  It

2    may be that there is some real quick, simple answer to this

3    inquiry.

4           MR. VEEDER:  Do you want it from me, your Honor?

5           THE COURT:  I would like to hear you first on that,

6    to start with.

7           MR. VEEDER:  The obvious answer, so far as we are

8    concerned, your Honor, is that there was fixed a right in real

9    property when the Superior Court entered its decree apportion-

10    ing the water two-thirds to the Rancho Santa Margarita and

11    one-third to the Vail Company.  When we purchased the rights

12    there was no question about the enforceability of the judgment,

13    and they proceeded to live by the judgment and, indeed,

14    stipulated that the matter would not be litigated here.  I

15    don't believe that this Court or any other court with concurrent

16    jurisdiction would be deprived of jurisdiction simply because

17    two parties on a stream had litigated the matter previously

18    and had concluded their differences previously.

19           There is no unconscionable burden, in our view, in

20    regard to the bringing of this litigation.  Fallbrook was

21    desirous of appropriating rights to the use of water.  We said

22    there was no water.  Sawday and many others were between Vail

23    Company and the United States of America and were diverting

24    water, the Roripaughs were beginning, Quarry was beginning,

25    there were a great number of users who were coming into the

1   valley and who were claiming rights to the use of water.

2   Certainly we would not be precluded from having the matter

3   adjudicated before your Honor in a basinwide litigation.

4        But there is one all-important factor which, I think,

5   cannot be ignored here.  We cannot, in my view, nor should we,

6   look to the relationship between Vails and Santa Margarita as

7   of 1941.  We must look at the relationship between the National

8   Government and Vail Company as of 1948 and 1949 when arrange-

9   ments were made and, indeed, later than that, in 1951.  What-

10   ever was in the minds of the parties, in our view, in 1941 is

11   immaterial now by reason of the course of conduct by the Vail

12   Company, and we say that it was binding then, and it is

13   binding now.  But if your Honor should decide that it was not

14   binding then by reason of some unconscionable thing, concerning

15   which I have no knowledge and certainly the record doesn't show

16   it, we say that by a course of conduct by Vail's representa-

17   tions, by Vail's agreements, we don't have to roll history back.

18   We accept it as of now.

19        THE COURT:  You are off of the track.  Let's stick to

20   this little inquiry that I made.  And I suggest to you one

21   matter which may be a pretty direct answer to this, which

22   grows out of the stipulation, Exhibit 158.  This stipulation

23   was attached to the complaint, and so at the time that the

24   complaint was filed there had been an agreement between the

25   Vails and the United States that this judgment was binding.

1    And therefore, query:  Does this answer the inquiry that

2    there would have been no additional burden put on Vail?  Now,

3    looking at it again--

4         MR. VEEDER:  May I interrupt, your Honor.  I am sorry,

5    sir.  In regard to Exhibit 158, if you are referring to the

6    original complaint, I don't believe that that was attached to

7    it.  That agreement was entered into in October, 1951, and

8    the cause was initiated in January, 1951.

9         THE COURT:  It was attached, then, to the amended

10   complaint.

11        MR. VEEDER:  It was antecedent to the amended complaint.

12        MR. STAHLMAN:  No.

13        MR. VEEDER:  I said it was antecedent.  It was not at-

14   tached.

15        THE COURT:  At least, by October, 1951, the stipulation

16   was entered into. But even then, what about this:  Vail having

17   been made a party, even though it conceded at that time that

18   its rights were fixed by the stipulated judgment, as to other

19   parties who had not been brought into the original suit, Vail

20   would have to come into this court and participate.

21        MR. VEEDER:  Necessarily.

22        THE COURT:  Or they had no right.  They would have to

23   come in and participate and protect themselves against claims

24   of other users.

25        MR. VEEDER:  There is one thing that is very important

1    here, your Honor.  If you will check the names of the parties,

2    who, as I remember, are the first twenty or so in the original

3    complaint that we filed in San Diego in 1951, you will note

4    that they are the parties litigant in the Superior Court of

5    San Diego County in the case of Barbee vs. Oviatt.  When I

6    brought this lawsuit-- when I say, "I", I mean when the United

7    States brought this lawsuit-- originally one of the factors

8    that concerned us the most and concerned the Navy the most was

9    that although we had a stipulated arrangement with the Vail

10   Company, there was then pending in the Superior Court of San

11   Diego County a suit to adjudicate the rights above Vails on the

12   Temecula and necessarily we were concerned by it.

          THE COURT:  Was Vail a party to that suit?

          MR. VEEDER:  Yes, it was.  It intervened, your Honor,

15   and it did participate and it did introduce evidence, as I

16   remember.  I know it cost them $15,000.

          MR. SACHSE:  Fallbrook was not a party.

          MR. STAHLMAN:  Neither was Santa Margarita.

          MR. VEEDER:  I didn't say that at all, Mr. Sachse.

          THE COURT:  Does anyone else want to be heard directly

21   on this inquiry I made?  Is there anything to it?  Or can I

22   toss it out as not being a matter that will have any bearing

23   on this decision?  I don't attach a lot of weight to it.  It

24   is a little loose end that has kind of bothered me.

          MR. VEEDER:  There is one thing as to which I would

1      like to ask leave now.  Mr. Stahlman served on me a copy of

2      his brief yesterday and then a copy of an answer apparently

3      to mine.  I would like to have leave to file a response to

4      his brief.

5          MR. STAHLMAN:  It is not really in response to yours,

6      Mr. Veeder.

7          THE COURT:  If you are going to file a response, you

8      had better file one to the brief of the State of California.

9          MR. VEEDER:  I intend to answer that.

10         THE COURT:  As well as the brief of Mr. Stahlman.

11         MR. VEEDER:  Yes.

12         THE COURT:  But one answer in which you answer all of

13     these matters, because that is a very excellent brief.

14         MR. VEEDER:  I disagree with your Honor, but I will

15     answer it.  I think he is completely wrong.

16         THE COURT:  Does anyone want to be heard on this limited

17     inquiry that I made?

18         MR. STAHLMAN:  Your Honor, in connection with your

19     analysis of the brief filed by the State, I think there is one

20     other thing we can have in mind.

21         THE COURT:  Are you talking about the inquiry I made now,

22     or are you on something else?

23         MR. STAHLMAN:  I am no something else, your Honor.

24     However, I think it is a matter--

25         THE COURT:  Well, does anybody want to be heard on this

1   other little inquiry?

2        MR. GIRARD:  Your Honor, I would just make a brief

3   comment on your question as to why the United States of

4   America didn't enforce the stipulated judgment in the State

5   court.  I think a pretty obvious answer why neither Vail nor

6   the United States would go into the State court to enforce the

7   stipulated judgment is that both of them were taking a lot

8   more water than is provided for in the stipulated judgment

9   measure.  In other words, the amount of acre-feet to which they

10  were entitled on the gaging measurements at gaging station 3

11  and 6 does not correspond at all to the acre-feet they were

12  pumping out of the basins.

13       MR. VEEDER:  May I respond to that, your Honor.

14       Mr. Girard's thought to try to analyze why is completely

15  in error.  The stipulated judgment was being lived by and was

16  being enforced between the parties at the time, and I think if

17  you check the records in this court you will find that down

18  through 1953 there was absolutely no question about the relation

19  and there was no need for enforcement against the Vail Company.

20  They were living with it then.

21       THE COURT:  Is there now in the record proof of this

22  factual contention that you made, Mr. Girard?  Or is this the

23  matter that you said you might submit by--

24       MR. GIRARD:  There is probably enough in the record

25  from which that could be inferred and certainly supported.  It

11522

1    is not tied down in a single exhibit.

2         THE COURT:  Could it be pulled together?

3         MR. GIRARD:  Very easily.

4         MR. STAHLMAN:  Yes, your Honor.

5         THE COURT:  Will you take the responsibility of pulling

6    the matter together and seeing if the record will support

7    an exhibit that shows that fact?

8         MR. GIRARD:  Yes, your Honor, we will.

9         MR. STAHLMAN:  We will also assist in it, your Honor.

10   I think it can be clearly demonstrated, as Mr. Girard indi-

11   cated yesterday to your Honor, that the stipulated judgment

12   never was lived up to by either party.

13        MR. GIRARD:  We cited it in the third point in our

14   brief, I think a couple of months in 1954, I believe, which

15   showed the difference between the amount of water used by Vail

16   and the United States and the amount of water which the measuring

17   flow would have entitled them to.

18        MR. VEEDER:  Mr. Girard's error is obvious, because we

19   started the lawsuit in 1951 and there was not a violation at

20   that time.  What he is talking about is three years subsequent.

21        MR. STAHLMAN:  I think the entire history of the stream

22   flow will show, first, that the stipulated judgment couldn't

23   be and was not lived up to.

24        Going back to the situation of putting Vail in the

25   position of being a party defendant.  Yes, Vail was in the

1   Oviatt suit.   They came in as intervenors.   It was a suit in

2   which there were certain claims made of diversions of water

3   upstream from Vail, and Vail then intervened.   It would have

4   been a very easy matter for the Government to have intervened

5   in the case.   However, Vail having been made a party to the

6   previous case, I think the background of the litigation of the

7   case is very interesting as related to practical aspects of

8   what litigation of this river has accomplished.   And I think

9   this lawsuit here is of the same character-- we are not

10   accomplishing anything.

11         THE COURT:   Well, let's just get away from generalities.

12   We are going to talk about specific problems.

13         MR. STAHLMAN:   Your Honor, in the first lawsuit the

14   Vails filed, and there is an exhibit in this case in their

15   answer, showing that they requested these other parties to be

16   made a party to the lawsuit.   That was opposed by the prede-

17   cessors in interest of the Government.   The Government then

18   taking over their interest files a lawsuit, includes Vail as a

19   defendant, makes all the allegations in both the original com-

20   plaint and in the amended and supplemental complaint, putting

21   Vails against all the other people on the river, putting them

22   into this tremendously expensive lawsuit and putting them in

23   the position where Vails would ultimately be bankrupt of water

24   on this river, and I submit that the acts on the part of the

25   Government in bringing this action and making Vail a party

defendant as they did, with no distinction between the Vail

Company and any other party defendant, putting them in the

position where they were obligated to defend themselves in this

lawsuit again and then contending that their rights had already

been established, I submit doesn't comport with equity, reason

and common sense.

MR. GIRARD:  One other point that ought to be con-

sidered while we are talking about the type of lawsuit that

was brought in the Federal Court, as I recall, in reading the

Government's complaint and supplemental and amended complaint,

there were allegations in there that all rights claimed by

the United States as against all defendants, including the

parties to the judgment and the stipulated judgment, all the

United States's rights were paramount rights-- and I think

that particular word was used in the complaint.  Query:  When

they bring a lawsuit in the Federal Court claiming that their

rights are paramount to all other rights, can they, in good

conscience, claim that Vail is bound by a judgment or that the

other parties are bound by a judgment which, in effect, treated

them as equal riparians?

MR. VEEDER:  I will respond to that very simply.  We

pled the Vail Company judgment and we pled the legal effect of

it and we incorporated by reference the stipulated judgment

and set up our rights based upon it with the Vail Company, and

very competent lawyers representing the Vail Company agreed

1    with our complaint and settled the matter with us.

2         From our standpoint, the allegation of prior and

3    paramount rights is nothing more nor less -- and I sincerely

4    hope that my friend Mr. Girard is not going to introduce the

5    point of paramount ownership in this thing-- we were simply

6    pleading the terminology used always in the State of California

7    when you plead prior and paramount rights to set up the issue.

8         THE COURT:  Let's just stop a minute.  Yes and no,

9    subject to that interpretation, and that is what your superiors

10   said when you went before Congress.  But you came into this

11   courtroom and advanced three or four theories.  They were

12   nothing but paramount right theories, that the Government

13   had rights apart and different and above the rights of a

14   riparian owner on a river.  Now, you can't talk out of both

15   sides of your mouth.

16        MR. VEEDER:  But your Honor, I think, has forgotten--

17        THE COURT:  Well, let's not rehash that.  I have

18   covered it all in the pretrial opinion, even your bucket at

19   the end of the stream theory.

20        MR. VEEDER:  My metaphysical thought, your Honor?

21        THE COURT:  Your thought on the national forest, your

22   theory of incorporeal hereditaments-- that some severance

23   occurred, that by some metaphysical process the Government

24   had the right to all the water apart from the land.  How can

25   you stand there and tell me you have not urged the paramount

1   right in the United States?

2       MR. VEEDER:  Your Honor, the only thing I urged, and I

3   think it is constitutional law and will certainly be reviewed

4   by the Ninth Circuit, is simply this, that the question of

5   the National Government's use of water, under the theory that

6   was advanced to your Honor, is quite entirely different from

7   urging in regard to prior and paramount rights as a riparian.

8   We certainly have always said, and we are bound by, in our

9   view, the stipulated judgment which fixed our rights with the

10  Vail Company, and we pleaded accordingly in our pleading.  Now

11  to inject this other element into it is unfortunate, although

12  I don't mind a good row about it.  I simply say that the four

13  corners of the matter as set up here should be on the basis

14  of the pleadings as we pleaded the Vail Company stipulated

15  judgment and proceed on the basis that we are entitled to

16  one-third-two-thirds, rather than getting into an entirely

17  foreign element in regard to Vail Company.

18      THE COURT:  Well, let's go to another point.  I don't

19  know that Mr. Girard's suggestion takes us very far, except

20  that the Court is of the opinion that there has been a con-

21  tention at various times by the Government that it was pressing

22  some sort of superior right.  And query:  If it was pressing

23  some kind of superior right, what use is the stipulated judg-

24  ment?

25      Let's go to another question.  Suppose this had not

been a stipulated judgment, but a judgment on the merits whereby
the Superior Court had said that Vail may have one-third and
Santa Margarita may have two-thirds. Under the law as cited
in the brief, particularly Mr. Girard's, Mr. Sachse's and Mr.
Stahlman's brief, those rights are correlative and they would
be subject to modification at some later time. My inquiry is
this: Because of the fact that this was a stipulated judgment,
does it have any different character than a judgment after a
trial on the merits? Or, to make the point more specific, can
it be argued that this was a contract between Santa Margarita
and Vail? And I will give you my tentative thinking on that.

Suppose that instead of entering a stipulated judgment
Vail and Santa Margarita had said, "Look, we have had a belly
full of this lawsuit. Let's just sign a contract between our-
selves and not worry the court any more about it. We don't have
to have a new trial unless we want one. Let's just sign a
contract." So they sign a contract, and in the contract it is
agreed that Vail gets one-third and Sant Margarita gets two-
thirds, and there had been no judgment entered on this contract.
Query: That contract might have had a lot more binding effect
than a judgment. If the parties could do this by contract,
what was the reason or the use of submitting a stipulated
judgment to the Court? And since it did go to the Court, and
since this understanding that they had was put into a stipulated
judgment, then instead of being a contract which you could

1    argue couldn't be modified except by the consent of the parties,

2    having become a judgment it now comes under the rule of

3    California law that the amount of use is subject to readjust-

4    ment at any time.   That is my particular inquiry.

5        MR. VEEDER:   May I call your Honor's attention to our

6    brief starting on page 14.   I am not referring to the present

7    brief, but the brief which I filed in response to Vail Company's

8    memorandum attacking the stipulated judgment.

9        THE COURT:   I don't have that in front of me.   What page

10   is that?

11       MR. VEEDER:   I will give your Honor a copy of it.

12       THE COURT:   It is the brief filed on September 21, 1959, at

13   page 14.

14       MR. VEEDER:   That is correct, your Honor, and starting

15   from there on through.

16       Your Honor has raised some extremely interesting

17   propositions by his comment.   But antecedent to that let me

18   again interpose the statement that the Government has acted

19   and the Vail Company have both acted under the stipulated

20   judgment many, many times, and we have spent a great deal

21   of money pursuant to the representations of the Vail Company.

22   Everything I say has to be on that background.

23       And then there is the other side of the coin that this

24   is not a normal or ordinary judgment declaring riparian rights.

25   This is an arrangement pursuant to which-- and we spend

1   millions of dollars based upon it-- pursuant to which each party

2   was permitted, by reason of agreement between them, to do things

3   which normal riparian owners could not do.  The enforceability

4   of such an arrangement is recognized in California law as

5   between those two riparians, and certainly we have not at-

6   tempted to make it applicable to anyone else.  So it is

7   without the purview of the principles cited-- well, I cite them

8   as non-riparians.  A changing condition can result in a change

9   in regard to riparian acreage, if there is a sale and a

10  severance.  But that is true in regard to any decree involving

11  the adjudication of rights to the use of water.  We have it

12  frequently where a piece of land has soured by reason of too

13  much water or has become alkaline.  You go in on a motion to

14  show cause, and that piece of land is no longer allowed to get

15  any water.  In effect, there is a re-allocation, which is

16  entirely possible in a river of short supply.  Each one gets a

17  little bit more because no one ever gets all that he could use.

18  So there is nothing new or unusual on the proposition of

19  adjusting decrees to the moment.  Indeed, I think a decree is

20  usually out of date the moment it is signed, as long as people

21  are continuing to use their land.

22          Now, to get to the proposition that you brought up.  A

23  stipulated judgment, your Honor, as the case is cited in our

24  brief--

25          THE COURT:  Which brief?

MR. VEEDER:  In the brief I just handed to your Honor, whatever the date of it is, the brief in opposition to the Vail Company's attack on the stipulated judgment.

If your Honor will read from page 14 on in particular, but I would like to have you read the whole thing--

THE COURT:  I read it once.  From page 14 on to the end?

MR. VEEDER:  Yes, because there we began outlining the basis.  Let's go from page 1 all the way through, your Honor.

In any event, the point that I am trying to advance here is that a stipulated judgment between parties is by the courts held to be of greater dignity and more binding effect than one entered on the merits.  Why?  Because the parties have sat down and they have agreed in a contractual arrangement to conclude their matters in that way.

THE COURT: I might go along with that on general matters of litigation.  But what about a stipulated judgment on the use of two riparians on a river?  Are there any cases on that?

MR. VEEDER:  I haven't found a situation where someone has come in and said, "We want a change, although we stipulated that this was the riparian acreage."  I haven't found a case like that.

But that is not this case at all, because this is not a stipulation in regard to riparian owners.  This is a stipulation pursuant to which it was agreed between the parties that flood waters could be impounded, that water could be used in

and outside the watershed.  Now, those two elements changed

materially, as I point out in my brief to your Honor.  While

your questions are of extreme importance and indeed very

interesting, they relate only to the parties who have not

entered into such an arrangement.  We have made an arrangement

which is contrary to the riparian rights.  But that has been

sustained by the highest court in California as being perfectly

proper.  If two riparian parties desire to say, "Well, O.K.,

we are not going to be limited in this way.  We are going to

let each one of us use his water on non-riparian land," that

is perfectly valid.  It can't be enforced against Roripaugh,

it can't be enforced against Oviatt, for example, nor do we

undertake to do that.  We say that as between the Vail Company

and the United States, and fortunately for us in this matter

the Vails are astride of the river all the way down to the

Temecula Gorge so we can work it out physically-- there is no

question on that-- we are in the position where whatever rights

your Honor decrees correlatively between all other parties in

the litigation, we are in a position so that we can work out

a one-third-two-thirds allocation with the Vail Company.  I

don't believe there is any difficulty there at all.  If the

Roripaughs were attacking that or something like that, I think

we should have that issue resolved with the Roripaughs.  That

suits me very well.  But in regard to our using water outside

the watershed, we have an arrangement with the Vail Company

1    that permits it.  We have an arrangement with the Vail Company

2    that lets them store the water under the stipulated judgment.

3         THE COURT:  You are getting into another subject and

4    I don't want to get off what I talked about that you just

5    raised at this point.  I don't contemplate that your agreement

6    about using water outside the watershed is worth a red cent.

7         MR. VEEDER:  With the Vail Company?

8         THE COURT:  With the Vail Company.  It wouldn't make any

9    difference.  Suppose the Court could fashion some kind of

10   decree that would give effect to this stipulated judgment

11   which says that you can use some water outside the watershed,

12   and suppose the Court established the correlative rights of

13   the other people-- I don't know how you would do it, but

14   through some way-- but in any event as to the correlative

15   rights of the United States and the Vail Company, whatever they

16   may be, the Vail Company gets one-third and the United States

17   gets two-thirds of that bundle of rights, and then the United

18   States or the Vail Company said, "We are going to use some of

19   our water outside the watershed."  Every other water user on

20   that stream could complain about using the water outside the

21   watershed.

22        This is an additional point that we can talk about later

23   But I don't think that agreement means a thing.  If you can

24   use any water outside the watershed, it has to be either on

25   the theory that you have prescriptive rights or on the theory

1    that once water gets to you and has passed down the stream no

2    one else can complain about what you do with it.  But you can't

3    compel them to let water come down the stream in order that you

4    may use it outside the watershed.

5        MR. VEEDER:  I am not speaking of that, and I think the

6    physical situation will indicate precisely what I am saying.

7        The physical situation is such-- I want to start again.

8    I am not agreeing with what your Honor said in any sense of

9    the word.  I want it clear that I believe that it can be worked

10   out.  But as between the Vail Company and the United States

11   of America, under the physical conditions that exist, we can

12   have an arrangement to use water outside the watershed.

13       THE COURT:  We will talk about it later-- that you cannot

14   compel any water to come down that stream to be used outside

15   the watershed as to other riparian owners in that watershed.

16       MR. VEEDER:  I think the matter is academic, as we will

17   demonstrate later.

18       MR. STAHLMAN:  But not so far as Vail is concerned, your

19   Honor. We are actually putting water on land outside the water-

20   shed.  We will have to quit as soon as this decree is entered.

21       THE COURT:  Do you want to say anything more about what

22   would have happened had they just signed a contract instead of

23   going into court with the judgment?  That is the particular

24   inquiry.

25       MR. VEEDER:  I say, in that regard, your Honor, that I

agree with you.  I think that the parties could contract, and I believe a fortiori, it having been approved by the Court after 400 days of trial, it cannot be set aside, certainly by this Court.  You might enjoin it if it is unconscionable. I am not saying that I am in agreement with you.  But I am saying this, that from the standpoint of this judgment as agreed to it has the dignity of a contract plus the sanction of the highest trial court in California. And I certainly don't believe that the mere fact that-- I will put the converse on it.  I think the fact that the contract has been approved by a court lends greater dignity to it.

THE COURT:  Here are cases tried and a division is made one-fourth and three-fourths, and then the parties by stipulation come into court and say, "We don't want to litigate this. We submit a judgment to you one-third and two-thirds."  Actually, isn't what we have a judgment allocating the water percentage-wise between two parties, and isn't it, therefore, subject to modification at any time upon change of conditions?

MR. VEEDER:  I don't think so, your Honor, for the reason that the parties have acted upon it to their irreparable damage based upon representations.

THE COURT:  That's another point.  Let's leave that out.

MR. VEEDER:  I can never leave that out.

THE COURT:  There might or might not be some estoppel of some sort.  But absent estoppel, why should this judgment

1    be any different than any other judgment that allocated water

2    between riparian users?

3       MR. VEEDER:  Well, all I can say is that it is true

4    that any decree can be modified upon a proper showing.  There

5    are the barriers to which I have referred that would preclude

6    it here.

7       THE COURT:  Take a short recess and we will start again

8    in about eight or ten minutes.

9       (Recess.)

10       THE COURT:  Who else wants to be heard on this question

11    about contract-stipulated judgment, is it any different from

12    any other kind of judgment?

13       MR. STAHLMAN:  I think it is quite obvious that the

14    stipulation having been a proceeding in court, the Court would

15    have control of it and therefore California law would apply,

16    your Honor.

17       THE COURT:  By the way, do we have in the record just

18    exactly what that stipulation was that was submitted to the

19    Court?  Was it merely an approval of a form of judgment?

20       MR. VEEDER:  I delivered those to your Honor.  We had

21    photographs made of them.  I don't believe they have been

22    marked.  However, the resolution of the Vail Company, the Vail

23    Company's exhibit and the others, have been prepared and were

24    delivered to your Honor.

25       MR. STAHLMAN:  His Honor wants to know how it happened.

1  As I reconstruct it from the examination of the records,

2  when this matter had been talked over between Santa Margarita

3  and Vail, the Board of Directors of the Santa Margarita

4  Corporation called a meeting and approved this form of judg-

5  ment, and then the trustees met and then they went into court

6  and Mr. Lincoln appeared representing the intervenors. That

7  is how the intervenors got into the stipulated judgment. He

8  was present. I think it recites on the face of the decree.

9  MR. GIRARD: I went through the record over there, and

10  I think this is correct. There was never a signed stipulation

11  filed in court. They just went in with a judgment, with the

12  judge's signature to be inserted, and apparently on a motion

13  calendar or something they submitted it to the judge, counsel

14  advised that this was the agreement reached, and it was signed

15  by the judge.

16  MR. VEEDER: In that regard-- May I interrupt just a

17  moment-- all you have to do is to go across the street and run

18  back the record that is in the Superior Court, and I am sure

19  I prepared for your Honor copies of those resolutions as you

20  requested me to do sometime ago.

21  THE COURT: There may well have been resolutions by

22  both sides.

23  MR. GIRARD: Yes.

24  THE COURT: And Mr. Girard's statement may also be

25  correct that the attorneys appeared, advised the court that

1  both sides were satisfied with this judgment, and the judge

2  signed it.  I think our record along here somewhere along the

3  line should show just exactly what happened.  If you delivered

4  those to me, I probably have them in the file here.  Whatever

5  we need to do could be done to have a record on exactly what

6  happened.

7      MR. VEEDER:  What did occur was this, that the resolu-

8  tions incorporated by reference the stipulated judgment as

9  prepared, they were tendered to the Court, the resolutions and

10  the stipulated judgment.

11      MR. STAHLMAN: And they were filed.

12      MR. VEEDER:  They were filed.

13      MR. GIRARD:  I am not sure whether they were incorporated.

14      MR. VEEDER:  Yes.

15      MR. GIRARD: But there was no executed stipulation.

16      THE COURT:  In the sense of one document?

17      MR. GIRARD:  In the sense of one document; that is cor-

18  rect.

19      THE COURT:  It was more the approval by both sides of

20  a judgment that was to be submitted to the Court?

21      MR. GIRARD:  That is correct, your Honor.

22      THE COURT:  Let's make a note now of a loose end here

23  that will have to be cleaned up.  Let's have the record made,

24  by exhibit or otherwise, of exactly what happened at that time.

25      MR. VEEDER:  If your Honor's secretary will check on that.

11538

1   If you don't have it, I will get the resolutions and the

2   stipulated judgment from the Superior Court of San Diego.

3       MR. STAHLMAN:  If your Honor is ready to go into the

4   next subject-- your Honor undoubtedly has some other points---

5   I would like to just call your Honor's attention briefly to

6   this situation.  We talked about the one feature of the judg-

7   ment, that is, the putting of water on the land that is non-

8   riparian, and I think we might have in mind another feature of

9   this judgment as we are considering some of those factors.

10   And that is this requirement under the judgment of three-second-

11   foot flow is a question in mind, and I have raised it in the

12   brief, that this is not a reasonable and beneficia use.

13       THE COURT:  George, this is an entirely different

14   question.

15       MR. STAHLMAN:  Surely.

16       THE COURT:  I want to go into this three-second-foot

17   flow later on.  Let's take one thing at a time.

18       MR. STAHLMAN:  Very well, your Honor.

19       THE COURT:  Mr. Girard.

20       MR. GIRARD:  I might just comment briefly.  I think Mr.

21   Sachse's brief sets forth the best position I have read on the

22   idea that this should be treated somewhat as a contract, if it

23   is going to be given any effect at all.  And of course it is

24   the State's position-- I think we have pointed it out in our

25   brief-- that this is, in effect, a judgment, period.  It is

not a contract.  It is signed by a judge and it should be treated identically as if it were any other judgment issued after a trial on the merits.  There is no distinction, I don't think, in California law between a stipulated judgment and a judgment.  Both of them are judgments, and have the scope, force and effect of that type of legal proceeding.

THE COURT:  Does anybody else want to be heard on this point?

Let's hear a little discussion on what is the ffect of the so-called living with the judgment and complying with it.

Now, to position that problem, let's assume that a judgment is made after trial apportioning some water on the stream.  As I think Mr. Veeder said, the moment one of these judgments is made it is immediately out of date, and changes occur.  And for twenty years people on this stream live with that judgment and comply with it.  Meanwhile, more and more changes occur, other uses occur.  Some land that is riparian ceases to be riparian.  New demands are made.  But the parties have lived with it.  They have steadfastly complied with it. And based upon the judgment and the fact that a certain amount was allocated to one party-- a percentage, we will say, was allocated to one party-- he built water systems and he extended water lines to parts of the district, and he relied upon the fact that other people on the stream were complying with the judgment.  But someday somebody gets tired of this and comes

1    into court and says, "Look, this is clear out of date. The

2    correlative rights are not entirely different."  And the man

3    who ran one mile of pipe to irrigate a bunch of ground dis-

4    covers that on the new correlative arrangement he hasn't got

5    any water for those pipes.

6         Is there any legal significance that attaches to the

7    fact that parties have lived with one of these things and

8    have complied with it?

9         MR. SACHSE:  I would like to express an opinion on that

10   question, your Honor.

11        I don't think there is any significance to the fact that

12   they have lived with it.  That is California water law. Every

13   appropriator, for example, takes subject.  Fallbrook has idle

14   pipes that have been sitting idle for a long time because

15   circumstances change.  George knows all about them.  In the San

16   Luis Rey River.  Similarly, as the draft gets heavier your

17   Honor might be forced, or your Honor's successor some years from

18   now might be forced to cut back Vail's use.  It is conceivable

19   that if the draft gets heavier some of Vail's land might have

20   to dry up or some of the United States's reservation might have

21   to dry up, solely on the basis of the draft between the ripar-

22   ians.  The mere fact that the judgment may have been acted upon

23   for twenty years without that condition arising doesnt mean

24   that it won't arise tomorrow.

25        THE COURT:  Or the fact that the condition has arisen

in the twenty-year period and nobody did anything about it--

MR. SACHSE: --doesn't stop you from doing it when the need arises.

THE COURT: Mr. Girard.

MR. GIRARD: I think there are quite a few cases that in so far as a riparian right is concerned that merely because someone goes ahead and develops and uses their riparian land and incurs expenditures, that the riparian that let his land set idle is not estopped to assert his right to demand for water.

THE COURT: Which would be persuasive of the principle.

MR. GIRARD: Yes. In other words, disuse and failure to assert a right which is based upon a riparian status is not an estoppel in the sense when he decides to use it.

THE COURT: Therefore, actually utilizing a riparian right and making expenditures and relying upon an amount of use that later on turns out to be excessive would not be any estoppel against anybody else.

MR. GIRARD: That is our view. And in this case particularly, where this suit involves so many other people who were never concerned with that prior judgment, even though Vail and the United States, let us assume, have complied with it regularly and have lived up to its terms for twenty years, it would certainly not estop them from asking this Court to make a water allocation which of course would substantially affect

11542

the prior right.  I think the prior stipulated judgment is

really nothing but an allocation of water, and inaction by

one riparian who was a party to it cannot estop it.

THE COURT:  Mr. Veeder.

MR. VEEDER:  Your Honor, the point that your Honor

raised is, in my view, something above and beyond that which

has been touched upon before.  In other words, you say, "Well,

assuming that someone built up an economy predicated upon the

stipulated judgment--

THE COURT:  I was trying to state a situation where

there is a definite reliance on a certain allocation of water.

MR. VEEDER:  That's right.

THE COURT:  Which would be a stronger case than merely

living with a judgment and making a division as provided by

the judgment.

MR. VEEDER:  That is right. We are in this position--

and I take no issue at all with the State when they bring up

propositions involving people who are not bound by the stip-

ulated judgment.  We recognize that entirely.  But we say this

is removed from that principle.

The point that I would like to make, though, your

Honor, and it is one that I believe is most important in other

litigation in the Ninth Circuit at the very moment, is that

a rule of property was established here.  Now we haven't

touched on that factor before, but your Honor never raised this

1   point before, either.  That there is a very, very important

2   rule of law that where a man has acted, as we have acted here,

3   in reliance upon the stipulated judgment with the Vail Company,

4   that a rule of property has been established which courts

5   will not ignore.  It is a phase of the principles of stare

6   decisis.  But it is a matter where, as here, we have gone ahead

7   and built an entire military enclave largely outside the water-

8   shed dependent upon Vail's continued reliance and continued

9   being bound by the stipulated judgment.

10        The Supreme Court in a case in Southern California,

11   United States vs. Title Insurance Company (265 U.S. 472), at

12   page 486, lays down what I think is a very important rule and

13   which, I think, is particularly applicable here, in view of

14   what your Honor has just stated.

15        THE COURT:  Is this a water case?

16        MR. VEEDER: No, it is a land case, but I think it is

17   certainly applicable.  It says:

18            "A decision was given 23 years ago

19            (a decision upon which these people were

20            relying) that affected many tracts of land

21            in California, particularly in the southern

22            part of the State.  In the meantime there

23            has been a continuous growth and development

24            in that section.  Land values have been en-

25            hanced and there have been many transfers.

Naturally, there has been reliance on the
decision.  (In other words, we have relied
on the decision.)  The defendants in this
case purchased fifteen years ago after it
was made (after the decision upon which we
are relying here was made).  It has become
a rule of property and to disturb it now
would be fraught with many injurious re-
sults . ."

THE COURT:  Well, there is no doubt as to the general
rule.  But the real question is, does that sort of thing apply
to a water situation and an allocation of water?

I can remember in law school when I went to "Bull"
Warren's class in law, and "Bull" said, "Gentlemen, if you
want to know what the law was, harken to Professor Williston.
If you want to know what the law ought to be, listen to
Professor B.  If you want to know what the law will be, listen
to Professor Hudson.  But if you want to know what the law
is, pull up your chairs."

Property law, sure.  But this is not the rule on alloca-
tion of water because of the very nature of the correlative
rights of the parties.

MR. VEEDER:  I don't want to incur your Honor's wrath,
but I want to go back to the proposition that we are not deal-
ing here in any way with the Vail Company, and that is the

1    sole matter, as riparian.  They are using water on what they

2    call their government lands outside the watershed, they are

3    impounding water, and we have removed from this case, in my

4    view, the factual situation which would make applicable the

5    principles of the Hobart case and the other cases.  I cited

6    those cases to your Honor and I am in full accord with them

7    as between Riparians.

8         THE COURT:  You cited them in about two or three lines.

9         MR. VEEDER:  Because they were inapplicable.  I knew that

10   rule very well.  The fact is we have had some very bad times

11   with it.

12        But the point I am trying to make is that we cannot

13   possibly here regard that rule, in my view, as binding.

14        As I said in regard to the Murray Schloss Estate, in

15   regard to Dr. Henderson, I think that there is reason to review

16   their present uses.  I think there is.  And I said so.

17        THE COURT:  Why are they in any different position than

18   Vail?

19        MR. VEEDER:  Because of the fact that Vail Company

20   entered into an arrangement permitting the use of water out-

21   side the watershed, permitting the storage of water.  Then

22   Vail later on ten years after we bought the property asked us

23   to refrain from objecting to the building of the dam.  We did.

24   Then as George's Exhibit AR-1 shows-- I am not sure whether

25   AR-1 is the one or not; yes, it is AR-1-- we spent $51,610 in

digging the Pauba Well upon the representation that the Vail

Company was actually going to live with the stipulated judg-

ment.

MR. STAHLMAN:  That was a factual matter which is not

before the Court yet, your Honor.

MR. VEEDER:  Why is it not?  The evidence has been

admitted into the record.

MR. STAHLMAN:  He is going off the track again, your

Honor.

THE COURT:  Vail's Exhibit AR-1 is in evidence already.

MR. STAHLMAN:  Yes.

THE COURT:  Let's go ahead.

MR. VEEDER:  The point I make here is, your Honor-- and

I was sincere when I said about wasting your Honor's time if

I went more than half an hour-- I simply say that in regard

to the Roripaughs, in regard to any other riparian upstream,

we would share correlatively with them, and that it would be

perfectly proper if a changed condition transpired to have a

motion to show cause why they should either be restrained from

using the additional water they propose or that they might be

permitted to use some more water.  But the Vail Company's

situation is an entirely different situation.  And your Honor,

I would like, if I could, to refer to the 29 series here.

THE COURT:  I know.

MR. VEEDER:  And I think it is extremely important.

1   Your Honor is worried whether he can write a practical decree,

2   and I believe that the physical circumstances are such and I

3   believe the physical circumstances prevailed when the trial

4   court, the Superior Court of San Diego, came down with its

5   original decision, and I believe entirely that when that court

6   made its determination for allocation of water between the

7   parties it took into consideration the very factors that had

8   to be taken into consideration to make a fair apportionment

9   between the parties.

10   Now, I don't know whether your Honor considered the

11   brief that we wrote carefully or not, but we did run all the

12   way through, taking paragraph by paragraph as it related to the

13   1930 decree that was entered, and no one can say that the

14   stipulated judgment was just a mad hatter's dream.  The

15   stipulated judgment goes paragraph for paragraph almost word

16   for word with the decree that was entered by Judge Jennings

17   in the Superior Court.  There is only one difference they made.

18   When they took into consideration this picture that appears on

19   Exhibit 290, they took into consideration the fact that Vails

20   are so situated that they could be regulated in the manner

21   that was set forth in Judge Jennings' decree.  The fact that

22   there was 75-25 makes no difference at all.  It was found

23   that a percentage allocation was the best way to handle it.

24   THE COURT:  Let's go back now.  The particular thing

25   we are discussing is this:  Does living with a judgment,

1    complying with it and various other conduct engaged in make

2    the judgment any more binding?  And you talk about the Vail

3    Dam, and you talk about the Pauba Well, with which you are

4    familiar.  Let's leave those out of consideration.

5        But you make a further point that I want to explore.

6    You say that this is a different kind of judgment, in that it

7    provided that we could use water outside the watershed, and we

8    then built an installation outside the watershed relying on

9    the terms of that stipulated judgment.

10       MR. VEEDER:  That is a rule of property.

11       THE COURT:  Now if water is in short supply in this

12   watershed, and if other riparians were therefore entitled to

13   object to your use of water outside the watershed and par-

14   ticularly to object to your demand that water come down into

15   the enclave so that it could be used outside the watershed,

16   doesn't that contention blow up completely?  Because as against

17   any other riparian, isn't it true that you would have no right--

18   leaving out prescriptive rights-- as against any other riparian

19   who complained, you would have no right to require that water

20   to come into the enclave so that you could use it outside the

21   watershed?

22       MR. VEEDER:  I believe, your Honor, that would be

23   correct in regard to the correlative rights of the Roripaughs,

24   assuming they are riparian rights.  I believe that would be

25   the rule of law.  In other words, we have a legal right to

1   the use of water riparian in nature which would be enforceable

2   by all parties and recognized by all parties.  Now that is

3   why the physical circumstance becomes so important.

4   THE COURT:  Well, do you contemplate that there would

5   be any possibility that there is sufficient water in this

6   watershed that if you tried to put in a decree a contention

7   that you be entitled because of a stipulated judgement with

8   Vail to have water come down into the enclave so that you might

9   use it outside the watershed, leaving out prescriptive rights

10  and appropriative rights, do you think there is any possibility

11  that with the short supply of water in this watershed that

12  other riparians would stand still for that?

13  MR. VEEDER:  I think this, your Honor-- and this is why

14  I have put these exhibits on the wall-- here we have the

15  people who are likely to object:  Ernest Lincoln, Roripaugh,

16  and the rest of them.  They are not riparian through a good

17  deal of the year because their creeks are dry, so they would

18  have no objection and no basis for objection to our pumping

19  out of our basin, because we haven't demanded from them that

20  water be released down on that day for us to use.  They could

21  only object if they themselves were being shorted by our non-

22  riparian use.

23  THE COURT:  Let's put it this way.  If they object,

24  isn't it clear that you couldn't get a right like that?

25  MR. VEEDER:  Not during the irrigation season, because,

your Honor, they couldn't show that there would be any benefit to them if we used the water outside the watershed. We wouldn't be competing with them in aslightest for a supply of water.

And in addition, if I amy point to another factor why, in my view, the average individual above us will not and cannot complain, it is that the water that we are using outside of the watershed during the irrigation season does not exceed the quantity of water that is delivered to us by the Vail Company. The three second feet that comes down to us is not important on a day-to-day basis. We are living on the water that goes into the basin during the period during the winter period that recharges our basin. The three second feet would not be in the stream at all, if it were not for the stipulated judgment. They would have dried the stream up entirely with their very, very extensive riparian land.

So we are actually talking about a physically academic problem when we are talking about objection by the small or the other riparian users upstream, because, as I said-- and I will repeat it once more-- I don't believe that, with the exception of the riparians in the reach of the river from the gorge down to the enclave, speaking about the Temecula Gorge now, with the exception of those people I don't believe that an objection could be made by riparian users because of the physical situation which I have described. The people who use water for irrigation above us are pumpers in every instance.

1   They are not parties who are using water from surface diversions--

2   I'll revise the statement-- they are the minimal users. That's

3   the situation.  There may be some above Vail Dam, but I don't

4   believe there are any in the Murrieta.  I am concerned about

5   the Murrieta now.

6        So we have the situation where the parties who could

7   object are those between the gorge and the enclave.

8        Now, in the stipulated judgment it is provided that out

9   of our share of 66-2/3% those riparians in that reach of the

10  river will be taken care of, and certainly they are entitled

11  to it.

12       MR. STAHLMAN:  That is not what it says.

13       MR. SACHSE:  That is not what it says.  It says the

14  two intervenors will be taken care of out of your share.

15       MR. VEEDER:  Thank you very much.  We will limit it,

16  then, to those two.  But the other riparians who can apply

17  water beneficially are entitled to their correlative shares.

18  But I don't know of a single riparian of any dimension at all

19  in that area.  But assuming that that was the case, they could

20  only object up to the point of their right to beneficial use.

21  They couldn't object simply because they don't like the theory

22  or the idea.

23       So from our standpoint we are confronted with the problem

24  of the reach of the river between Temecula Gorge and the

25  enclave.  For I think that the evidence that we put in so very

carefully in regard to each tributary all the way up the stream-- Col. Bowen testified, if you remember, days on end, putting in each one of these aerial photographs-- your Honor will be able to find from the exhibits that are in the record to date that there is not a riparian during the irrigation season who would be injured by our diversion outside the watershed.

MR. STAHLMAN: May I respond?

THE COURT: Wait just a moment.

MR. VEEDER: So from our standpoint, the stipulated judgment does no violence whatever to the small users. We respect their rights. But the principal part of our recharge comes during the wintertime when they are not using water and the water runs down to us naturally if it is not interfered with.

THE COURT: Now, of course, you get into a problem that concerns the Fallbrook Public Utility District.

MR. VEEDER: And I believe that that is very true. But that is an appropriator, your Honor, and up to this point-- and I think it was very proper-- we have set aside the appropriators, we have set aside and haven't even discussed in this matter the appropriators, and I think we fight on many fronts in this lawsuit. That is another matter.

THE COURT: It is true that when this water gets down into your basins, after it gets there, I don't know if there

1    is anything anybody can do about where you use it.  But when

2    you get to the problem about what water you compel to come down

3    to recharge those basins, then other people are interested.

4         MR. SACHSE:  That is the issue.

5         THE COURT: So, for instance, you pump your basins down

6    by pumping out of the watershed, and then you insist that you

7    have a right to a winter flow to recharge your basins.  You

8    then come into conflict with the claims of the appropriator

9    Fallbrook.

10        MR. VEEDER: That is right.

11        THE COURT:  Who says, "We are within the watershed.

12   We want to appropriate water.  Here is a person who wants to

13   use it outside the watershed."  So you have a conflict there.

14        You also may, if you are not already up against it,

15   be up against the problem of upstream users who will be able

16   to complain about the amount of water that you want to come

17   down and flow into this basin that you pump out of.

18        MR. VEEDER: My response to that, your Honor, is that I

19   know of no area where there would be a possibility of surface

20   storage.  So the matter is then limited to those who have rights

21   to pump out of the basins above us.  And I think that sufficient

22   to the day is the evil thereof.  If it is shown that by their

23   dewatering of basins above us they must have water to recharge

24   their basins, for which we are also taking claim to recharge

25   our basin, I think we would have a motion to show cause to see

1  whether we were injuring them by taking the water out of the

2  watershed.  But I don't believe that issue is present here

3  today.  I think it quite possible with the increased population

4  going on in the Murrieta, they could pump the river down to the

5  point that there wouldn't be any surface flow for most of the

6  years.  Then there might be a conflict between basins, and then

7  the issue might arise as to whether we could properly as against

8  them ask for water to recharge our basin. But as I say, I

9  don't believe that issue is here today, and I don't think that

10  we should anticipate that issue until such time as it arises.

11      We are going to recommend to your Honor a decree that

12  would have key wells, the level of which would be extremely

13  important to us and I think to the Vails.  Now it might be that

14  when they pump their water down to the point where, as I say,

15  they need everything to recharge it and we are using it outside

16  the watershed, you might have a problem there.  But we would

17  still fall back on our appropriative right at Lake O'Neill

18  to use that water out of the watershed.  But I don't think we

19  have that issue here today.

20      MR. STAHLMAN:  Mr. Veeder has pointed up the fact that

21  all these matters concerning the stipulated judgment are going

22  to cause us nothing but trouble.  I would like to comment,

23  before we leave this question, on one situation, in so far as

24  he pointed out that in the Murrieta Valley they are not

25  concerned because Roripaughs and Lincoln and those people pump

1    water in the summertime from the underground basin. All right,

2    they pump from the underground basin. However, Vail, under

3    the stipulated judgment, was compelled to cause a three second-

4    foot flow, but there is nothing in that judgment that says

5    where Vail has to pump that water from. Let's assume that

6    Vail is logical and reasonable in its application.

7        MR. VEEDER: May I interrupt just a moment. May I

8    have the reporter read back a couple of sentences.

9        THE COURT: Yes.

10        (The Reporter read the last part of Mr. Stahlman's

11    remarks.)

12        MR. STAHLMAN: And Vail is husbanding water in order

13    to get the greatest benefit from the water they are entitled

14    to, and the stipulated judgment is in effect. What prevents

15    Vail, under this stipulated judgment, from going up, we will

16    say, to the Hutch and pumping that three second feet out of

17    the Hutch, which would have a direct bearing on Lincoln and

18    Roripaugh at that that time of the year?

19        THE COURT: Where is the Hutch?

20        MR. STAHLMAN: Up in Murrieta Valley. Vail has wells there,

21    if you recall. There are two wells that have not been used

22    up there in the Hutch. They are right close. Any water

23    pumped out of them would run down a short distance into the

24    divide at the gap. It could come right through the Murrieta

25    gaging station and consequently into Station No. 3 at

Temecula.

Or what would be wrong if we went over next to Quarry and started pumping a well over there and pumped the three second feet out of there?  It would certainly have a tremendous effect on these other people up there and they would be up in arms.  Under the stipulated judgment we would be privileged to do that.  There is nothing that says where that water has to come from.  We have to maintain a three second foot flow. And the minute you do that you are right into the pockets of the other water users.

This stipulated judgment will be nothing but a source of trouble to everybody else on the stream, and will only result in a multiplicity of hearings if the stipulated judgment remains in effect.

Another thing, to progress a little further on that, is the three second foot flow a reasonable and beneficial use?

THE COURT:  I want to talk about that later.

MR. STAHLMAN:  Well, it ties into what Mr. Veeder has been talking about, affecting other people.

MR. VEEDER:  The point I would like to make, your Honor, is twofold.  George says he is about to go up here and take some water from his neighbors.  He is not permitted, under the stipulated judgment, to pump from the Hutch well.  That's one thing.

MR. STAHLMAN:  Why not?

1          MR. VEEDER:  Because if you will read the stipulated

2     judgment and the lands to which it applies, the northwest

3     portion of the Temecula Grant cannot use water.

4          Secondly, the PV line of wells is going to be the most

5     important thing in the next few days to your Honor.  In other

6     words, under the stipulated judgment, the Vail Company during

7     the irrigation season are not permitted to pump from Cantarini,

8     they are not permitted to pump from Navy, they are not per-

9     mitted to pump from, as I recall, their KK Well.

10          THE COURT:  What do you mean by PV?

11          MR. VEEDER:  That is the PV line that is referred to,

12     your Honor, I think it is in 13 and I think it is in 10.

13          THE COURT:  What do the initials PV stand for?

14          MR. VEEDER:  I don't know, your Honor.

15          MR. STAHLMAN:  If your Honor desires to know that, and

16     Mr. Veeder doesn't, I will --

17          MR. VEEDER:  It is a line of wells, your Honor, that we

18     will show you.

19          THE COURT:  All right.

20          MR. VEEDER:  I have it here in an exhibit which is be-

21     fore your Honor.

22          MR. STAHLMAN:  Those are surface diversions he is

23     referring to in connection with the PV wells.  There was a

24     map introduced in the previous case. That shows you again that

25     we have to go back into the exhibits and the findings of the

/ious case and the interpretation of this stipulated judg-

t.

MR. VEEDER:   The PV line of wells are referred to on

e 48 of the stipulated judgment.

But again we are confronted with the situation where

rence is made to surface diversions.   They say that there

e no surface diversions.   But if your Honor will look

onsider the provisos in the tenth paragraph of the

lated judgment--

MR. SACHSE:   Section Tenth, you mean?

MR. VEEDER:   Yes, some of which was superseded by the

lding of the Vail Dam, but the balance of it is not

cted.

Do you have the stipulated judgment there, your Honor?

THE COURT:   Yes.

MR. VEEDER:   By turning to the tenth proviso, a full

paragraph above eleven, you will find this statement, and it

is extremely important from the standpoint of the original

judgment and also the stipulated judgment.

MR. STAHLMAN:   On what page?

MR. VEEDER:   It is on page 49, George.   I am using the

one that was attached.

MR. STAHLMAN:   The tenth section?

MR. VEEDER:   Yes.

"For the purpose of determining

defendant's total diversions of water from the
Temecula-Santa Margarita River and its
tributaries, meaning thereby to include
both allotments of 33-1/3% of the water of the
river as defined in Section Third and the
additional storage waters as defined in
Section Tenth, any water abstracted or
diverted by defendants from the underground
waters of said river by use of wells or pumps
or other means of diversion, whether now
existing or hereafter established, except as
hereinafter in this section provided, shall
be added to any surface diversion by the
defendants from the waters of said river.
Such abstractions by the defendants of the
underground waters of the Temecula-Santa
Margarita River are, and for all purposes
of the judgment shall be considered, diversions
of waters of said river--"

MR. STAHLMAN:  Except as hereinafter provided.

MR. VEEDER:  Yes.

". . except as hereinafter provided, considered
as diversions of water of said river, and are
now and shall be chargeable against the
fractional part of the surface flow of said

1  stream."

2      In other words, your Honor, and this is extremely

3  important why we must go back each time to the original judg-

4  ment that was entered, the original judgment that was entered

5  had the proviso that the surface diversions and the subsurface

6  diversions would be identically the same.

7      There is also a provision in the stipulated judgment

8  that during the irrigation season there would be no pumping

9  below the PV line.

10      Now, that PV line of wells, your Honor, can be located

11  and they are referred to by numbers PV on the exhibit attached

12  to the revocable permit signed by Vail.  If you will look

13  up toward the outwash area-- Do you have a copy of that map?

14      THE COURT:  I know about where they are.

15      MR. VEEDER:  You will find that there is a line and a

16  delineation of where the diversions of the pumping from the

17  subterranean basins will no longer be conducted.

18      So when Mr. Stahlman says that suppose that the Vails

19  pump down near Quarry or suppose that the Vails pump up near

20  the Hutch Well, I simply say that they are precluded from

21  that by the express language of the stipulated judgment, and

22  we would naturally prohibit it because of the terms of that

23  judgment, and I think your Honor would prohibit it by reason

24  of the fact that there would be obvious and complete detriment

25  to people such as Ernest Lincoln and the Roripaughs.

THE COURT:  I have a hard time even understanding you.

MR. STAHLMAN:  He has misread it, your Honor.

MR. SACHSE:  It's absolutely not true.

MR. STAHLMAN:  He has misread the whole thing, your Honor.  He has misquoted.  He either doesn't understand the stipulated judgment--

MR. SACHSE:  Mr. Veeder left out, if you will look at the last sentence of that Section Tenth, the last paragraph, "Waters abstracted or diverted from said underground waters which shall not be subject to the provisions of this section are as follows: (3) Water which defendants may pump directly into the surface flow of the stream pursuant to section 11. . " And Section Eleventh is your three second foot section.  Mr. Veeder has talked for fifteen minutes on something that is absolutely untrue.

MR. VEEDER:  Mr. Sachse simply didn't comprehend what is going on.  Here is what we have.  George says there is a possibility of their pumping up near the Hutch.  I hope he listens to me now.  Do you know where the Hutch well is?

MR. SACHSE:  Yes.

MR. VEEDER:  And that they might pump up out of the Pechanga.  The point I make is that they are not permitted to pump down in those areas, and the only purposes for which they can--

THE COURT:  Where does it say that they are not

1    permitted?

2         MR. SACHSE:  Show me where it says that they are not

3    permitted.

4         THE COURT:  You can't find it.  So if you want to

5    look it up, tell me after lunch.

6         MR. VEEDER:  I can find it.

7         THE COURT:  Did you find it?

8         MR. VEEDER:  Yes.

9         MR. STAHLMAN:  What page is it on?

10        THE COURT:  What section?

11        MR. VEEDER:  13th.  The attempts of these gentlemen to

12   say that I was misreading it is a little absurd.

13        MR. SACHSE:  What section?

14        MR. VEEDER:  13th.  "Defendants shall not make, during

15   any"--

16        MR. STAHLMAN:  You are reading the second paragraph

17   of 13?

18        MR. VEEDER:  I will read the first part:

19             "Each of the parties hereto shall have

20             the right to construct dams or reservoirs

21             on its or their respective lands or else-

22             where for the purpose of intercepting or

23             impounding or conserving such water,

24             provided, however, that in the event such

25             dam or reservoir is hereafter constructed

1          by defendants for such purposes the right

2          of defendants to abstract and divert stor-

3          age waters pursuant to Section Tenth hereof

4          shall cease and terminate . ."

5      Now that is--

6      MR. STAHLMAN:  Now, go ahead.

7      MR. VEEDER:  That is extremely important, your Honor,

8  because--

9      MR. STAHLMAN:  You started to read the other section.

10  Go ahead and read it and see if it says what you say.

11      MR. VEEDER:  I want your Honor to read both these

12  paragraphs in the light of Section Tenth that I read.

13          "Defendant shall not make, during any

14          irrigation season, any surface diversion"--

15      MR. STAHLMAN:  Any surface diversion.

16      MR. VEEDER:  And the interpretation of "surface

17  diversion" is that when you are pumping out of the basin it

18  is comparable to surface diversion.

19      MR. STAHLMAN:  No.

20      MR. SACHSE:  No.

21      MR. VEEDER:  ". .any surface diversion of water of

22          said river at Reche pumping plant, Cantarini

23          pumping plant, Tule pumping plant referred

24          to or any other point in said Temecula

25          River below the point of rising water as shown

on Exhibit 265 . ."

And when your Honor considers the limitation upon the pumping, and when your Honor considers the language used in regard to the pumping from the basin as the same as surface diversions, you will see that the Vail Company, by their pumping as of now, are violating the terms of the stipulated judgment.

Now, the additional factor in regard to where and how they could pump the Hutch well. If your Honor will read the provisions in regard to the lands to which the stipulated judgment has application, if you will go back to paragraph -- Mr. Wilkinson testified to this, I am glad-- you will find references to the lands.

MR. STAHLMAN:  What paragraph?

MR. SACHSE:  Section, you mean.

MR. VEEDER:  It would be Section Third.

"The lands of the defendant herein
referred to consist of those certain
lands in Riverside County known as Pauba
Grant, Lots A, B, C, and D, and the Little
Temecula Rancho or Rancho as shown on the
Wolf Partition Map of Little Temecula Grant,
et cetera . ."

I will skip on down. I don't know what your Honor is looking at. Then it says:

"The southeasterly approximately one-half of the

Temecula Grant."

Are you there?

In other words, it is the area presently irrigated,

the southeasterly part is presently irrigated.

THE COURT:  But even if that is true, this Section Third

says:  "Defendants are entitled to take and use upon the whole

or any part of their lands," and the lands are described.

MR. VEEDER:  That's right.

THE COURT:  "33-1/3% of the water."  But this doesn't

say that they are not entitled, in order to keep this three

second foot flow, that they are not entitled to take from

somewhere else for that purpose.  This talks about where they

are entitled to take their use on their lands.

MR. VEEDER:  Precisely.  But if you gentlemen will look

at the Temecula Grant you will see that the northwestern part

of it is excluded from this.

THE COURT: That's right.  They can't use water, under

this stipulated judgment, on that part excluded.

MR. VEEDER:  That's right.

THE COURT:  But it doesn't say that they can't take water

out of their land that might be there in the Murrieta  to keep

this three second foot flow.  This Section Third starts:

"Defendants are entitled to take and use, upon the whole or

any part of their lands hereinafter mentioned," and then comes

1    this limitation.

2         MR. VEEDER: That's right.

3         THE COURT:  But this pertains to where they might use

4    water, not the question of the water they supply to somebody

5    else.

6         MR. VEEDER:  When you view, as we do, the proviso that

7    the southeasterly portion of the Temecula Grant eliminates

8    the northwesterly portion of any affect of this stipulated

9    judgment, it is manifest what the parties had in mind.  They

10   did prohibit the very thing that Mr. Stahlman says they might

11   do; they prohibited the pumping at a point which would destroy

12   Murrieta.

13        MR. STAHLMAN:  No.

14        THE COURT:  They prohibited surface diversions, and as

15   a matter of fact they weren't concerned about destroying the

16   Murrieta Creek.  As I read this judgment, they proceeded on

17   the premise that Vail had all the waters of Murrieta Creek.

18        MR. STAHLMAN:  That's right.

19        MR. VEEDER:  No, they didn't, your Honor.

20        THE COURT:  That is the way I read it.  I read it upon

21   a premise that this is a sort of premise on which they proceeded,

22   that Vail had all the waters of Murrieta Creek.

23        MR. VEEDER:  That was one of the things that was

24   abandoned, and that is one of the primary differences which I

25   pointed out in my brief.  Under the decree of Jennings, the

1    entire Murrieta Creek was adjudicated to the Vail Company.

2    It was spelled out in precise terms that by that adjudication

3    all of Murrieta Creek went to the Vail Company.

4    Now that was eliminated from the stipulated judgment.

5    It was eliminated for a very obvious reason, in my view.  It

6    was eliminated to the end that there would be at least some

7    contribution to the Rancho Santa Margarita from the Murrieta

8    Creek.

9    Now, in addition, your Honor, the original judgment

10   said that the Santa Margarita Rancho is entitled to 75% of the

11   waters, less Murrieta Creek, in every instance, and it said

12   the Temecula Rancho, the Temecula Grant was entitled to all

13   of the waters of the Murrieta Creek, and that the Santa Rosa

14   was entitled to all of the waters of Cottonwood Creek.  So

15   when they changed those provisos of Judge Jennings' decree,

16   they permitted the Rancho Santa Margarita to enjoy and to

17   participate in part in the Murrieta Creek.  That is exactly why

18   they dried up the Brown Hutch Field, I think they call it.

19   MR. STAHLMAN:  You are reading something that is not in

20   the decree at all.

21   MR. VEEDER:  The thing I would do after lunch, because

22   I was very careful in cross-examining Mr. Wilkinson on this

23   proposition-- I asked him to point out on his map, whatever it

24   is, showing the Spanish grants-- I will put it on the wall

25   for you, and I asked him to point out what was the southeasterly

1    part of the grant, and he showed us, and the northwesterly

2    part of it is the field that was dried up, the Hutch Well

3    field has been dried up.

4         MR. STAHLMAN:  That is not so at all.  It is a line

5    between there and the other owners upstream.

6         MR. VEEDER:  After lunch I will be very glad to put the

7    exhibit on the wall.

8         MR. STAHLMAN:  If he wants to go to the testimony, the

9    testimony was that the Vails went back after this suit and

10   started pumping Hutch and the irrigation lines had deterior-

11   ated so they discontinued pumping at that time.

12        MR. GIRARD:  This is pretty far afield from the legal

13   arguments.

14        MR. VEEDER:  I will show you exactly the lands that are

15   involved.

16        THE COURT:  However, I have other problems.  Reading

17   this part of this Section Tenth that remains, I can't even

18   understand it.  It starts out, "For the purpose of determining

19   defendant's total diversions of the waters . ." and then they

20   describe what they mean by "total diversions," --"meaning to

21   include both the allotment of 33-1/3% and the additional

22   storage waters . ."

23        MR. VEEDER:  Which is no longer important because of

24   the Vail Dam.

25        MR. SACHSE:  That's out, yes.

1        MR. VEEDER:  That's right.

2        THE COURT:  Well, you are going to show me something

3  after lunch.

4        Let me ask you another question, and this problem I

5  pose about living with the judgment and the things you say the

6  Government had done and other parties had done, including the

7  building of Vail Dam.  Is there any dispute that in a new

8  decree entered by this Court the operation of Vail Dam could

9  not be controlled?

10       MR. STAHLMAN:  $N_ot$ a bit, your Honor, just like you

11  could a dam on any stream.

12       MR. VEEDER:  I will say this, that I would assume that

13  your Honor, in chrnicling and cataloging the respective

14  priorities, would award to Vail Company I think a 1946 priority

15  for that appropriative right.

16       THE COURT:  You miss my point.  You are raising a con-

17  tention that one reason why this stipulated judgment should not

18  be set aside is that the Government sat still and let Vail

19  build the Vail Dam.

20       MR. VEEDER:  That's right.

21       THE COURT:  What does that mean?  That means that you

22  are contending that Vail has certain rights flowing out of this

23  dam which they would not have had if the Government hadn't sat

24  still.  The money to build Vail Dam was spent by the Vails.

25       MR. VEEDER:  That's right.

THE COURT:  Is there any argument but that in a final decree in this case, if the stipulated judgment is not here, this Court can determine how Vail Dam shall operate, so that the Government may not be prejudiced by the dam having been built there?

MR. VEEDER:  Your Honor, if we set aside the stipulated judgment, then the matter becomes, what are the riparian rights of the United States? And it is obvious that the Vail Company would have no right to impound water, as it now does, and thus interfere with our riparian runoff.

THE COURT:  Isn't that a matter of controlling how Vail Dam operates?

As a matter of fact, I can see where the operation of Vail Dam would be of great value to the United States.  You have basins that you want built up.  Here is a dam that controls the flow of water.  It is possible, therefore, to regulate the flow of water coming in above Vail Dam for the benefit of the basins below.

MR. VEEDER: Vail Dam is already regulated under the stipulated judgment, as far as we are concerned, your Honor.

THE COURT:  I am saying if the stipulated judgment is set aside.  You have made your point that one reason that I should not set aside the stipulated judgment is that you sat by and let Vail build the dam.

MR. VEEDER:  That's right.

1    THE COURT:  Is there any merit to that objection at all?

2  You may have other objections.  I don't see any merit to that

3  at all.  Because I think you spent no money.  Vail spent the

4  money.  So any prejudice was not yours, but Vail's.  And I

5  think the Vail Dam could be regulated by a decree of this

6  Court.  So how are you prejudiced by the fact that the Vail

7  Dam is up there?

8    MR. VEEDER:  There is no question in my mind that the

9  Vail Company are taking water that would naturally flow down

10 to us, and as riparian owners we are entitled to it.  And as

11 the waters are being diverted increasingly by other parties

12 we could object, and I think we most certainly should object

13 to any interference by them with those rights.  Now we are in

14 a position, and it is one that we are going to begin to enforce,

15 we are in a position to tell the Vails, "You stored some flood

16 waters up there and we are entitled to 66-2/3% of that, and we

17 can use it beneficially.  You release it to us under the

18 stipulated judgment."

19    THE COURT:  Mr. Girard, can you give me any help on

20 this problem?

21    MR. GIRARD:  I think you are a hundred percent right,

22 your Honor.  Vail's license that they got from the State simply

23 says "subject to all vested rights."  The United States is

24 riparian rights are vested.  This Court could curtail the

25 operation of Vail Dam as it sees fit in the event the operation

11572

1    of that dam impairs any of the United States's rights which

2    are prior.  There isn't any question about it.  They could

3    close it down--

4         MR. VEEDER:  Open it up, you mean.

5         MR. GIRARD:  Open it up.  You could do anything you

6    want.

7         MR. STAHLMAN:  Are you going to have this run on a

8    different basis than any other dam in California simply on the

9    basis of the stipulated judgment?

10        MR. VEEDER:  You agreed to it.

11        THE COURT:  My only inquiry is-- and Mr. Sachse and Mr.

12   Girard back me up in this-- and that is, I apprehend that if

13   this stipulated judgment is set aside you have no merit on this

14   point that you sat by and let them build the dam, because in

15   the final decree that is entered I could provide how Vail Dam

16   should be operated.

17        MR. VEEDER:  I am going to say this.  We have a property

18   interest and a property right, and if it is all the same to

19   your Honor we don't want it tampered with.  We think we are

20   doing very well under the stipulated judgment.  I think we are

21   entitled to come up there and say, "We want 66-2/3% of the

22   waters."

23        MR. STAHLMAN:  How about the waters that they let run

24   into the ocean?  We want one-third of that.

25        THE COURT:  Well, we will adjourn shortly until 2 o'clock

1    I will tell you what my next inquiry is going to be.  You can

2    be thinking about it.

3         One very pertinent inquiry is this question of the

4    required three second feet of flow.  It doesn't take very much

5    imagination, looking into the future development of this valley

6    and the increased use of water, to foresee a situation where

7    Vail would be required to maintain that flow to such an extent

8    that they would have very little water available to use upon

9    their land, and my inquiry is:  Isn't that an unconscionable

10   provision?  And wasn't it made under a mistake of fact? The

11   mistake of fact being that there were not any particular large

12   users upstream of Vail.  Vail had plenty of water available.

13   Therefore, it supplied three second feet.  We haven't got the

14   testimony in, but there is going to be testimony on pumping

15   above.  There is going to be testimony of the wells in these

16   other basins up above.  It doesn't take very much imagination

17   to foresee a situation where Vail's Rancho would be utterly

18   useless except for dry farming by being required, from here

19   to eternity, to put three second feet of water in that stream.

20   Query:  Isn't that a mistake of fact where the parties assumed

21   that this would not be an unconscionable burden and assume

22   that this could be done without difficulty, when as a matter of

23   fact they were all wrong?  Isn't that a mistake of fact that

24   would be a basis for setting aside the decree?

25        It is true that the first judgment, and it may still

1    have some effect, talked as if the Vails were entitled to all

2    the flow of the Murrieta, and I am not so sure but that the

3    stipulated judgment doesn't carry some of that into effect.

4    I want to explore that.  That is the first inquiry.

5         Is that assumption still here or is some of it carried

6    into the stipulated judgment, or did some of it survive from

7    the original judgment?  If any of it survives or is existent,

8    either in the stipulated judgment or in the original judgment

9    that may still remain, wasn't there a mistake of fact that

10   Vails were entitled to all of the waters out of the Murrieta,

11   which in itself would be grounds for setting aside the stip-

12   ulated judgment?  In other words, an assumption that Vail had

13   this water, when we know now that it doesn't all belong to

14   Vail.  We know that there are wonderful wells up there in the

15   Santa Gertrudis pumping large amounts of water.  Isn't this a

16   mistake of fact which the parties proceeded upon the theory that

17   this water was available to Vail and it would be such a mistake

18   of fact that would justify setting aside the stipulated judg-

19   ment?

20        I may have some others, but those two are very pertinent.

21   We will start on them at 2 o'clock this afternoon.

22        (Noon recess.)

23

24

25

1    San Diego, California, Wednesday, February 3, 1960.   2:00 P.M.

2

3        THE COURT:   Who wants to be heard first on the three

4    second feet?

5        MR. VEEDER:   George, if you want to, go ahead.

6        MR. STAHLMAN:   There is a lot that can be said about

7    the three second feet, your Honor.

8        THE COURT:   I cut you off before.   You have been wanting

9    to talk about the three second feet.   Now here is your chance

10   to tell me what you want to tell me about this three second

11   feet.

12       MR. STAHLMAN:   As I indicated to your Honor, it poses a

13   number of questions that complicate the entire lawsuit and,

14   I think, affect the rights of other people.

15       In the first place, as I have indicated, your Honor,

16   the question in my mind is as to whether the Vails in applying

17   the three second feet under the stipulated judgment is a

18   reasonable and beneficial use of riparian water.   It would seem

19   to me that the other riparians on the river would certainly be

20   affected and they would certainly have objection to taking

21   that quantity of water out of the upper watershed.

22       THE COURT:   Of course, the other riparians could limit

23   Vails use.   As between the other riparians and Vail, there is

24   nothing res adjudicata, and when the time came that the three

25   second feet impinged on other riparians they would say to Vails

1    "You can't deliver three second feet.  You can deliver only

2    two."  And then Vail would be required to pump, I suppose,

3    from their basins, and over a period of time you would have

4    no water in the basin.

5         MR. STAHLMAN:  You would be destroying your river

6    system.

7         THE COURT:  The point you are making is, why isn't it a

8    proper riparian use?

9         MR. STAHLMAN:  There are several reasons why it may or

10   may not be a proper riparian use, or could not be.  For instance,

11   if you are required to pump that water down to Pendleton, they

12   can use it any place they want to down there and put it to any

13   use they desire to put it to.

14        In addition to that, we have the feature, as I indicated

15   to your Honor this morning, that we were into some considerable

16   argument on, and that is that there is no provision in that

17   judgment or no limitation as to where Vail can pump that water

18   from.  And if Vail should, as I have indicated, pump that water

19   up in the Murrieta Basin, it would have the effect of diminish-

20   ing the supply of water to all of the people in that area up

21   there.  Mr Veeder has already indicated that pumping up there

22   has had a serious effect upon that basin.  As I have indicated,

23   up here in the Hutch--  this map over here shows it, if your

24   Honor please-- this is the area that was referred to as the

25   Hutch.  That was the area that was formerly under irrigation

1    and the Vails had to have two pumps up there in that area

2    there.  They were shut down during the period of time when the

3    injunction was in process and the case was on appeal, and after

4    the appeal Vails went in there to pump that and found that

5    the irrigation lines were insuch condition that it was not

6    practical to pump it and one pump was moved down on the Navy

7    Well.  They were drilling that well about that time. But

8    there is nothing in the stipulated judgment to prevent the

9    pumping up in the Hutch, and that would be a logical place to

10   pump it.

11        THE COURT:  The difficulty with that argument is this.

12   You have to argue this case from Vail's standpoint as to your

13   relations with the United States.  There is no argument that

14   as to other riparians uses by Vail which took more than their

15   correlative share could be restrained.  So that your argument

16   that pumping from the Hutch would hurt other people is no

17   problem, because the Court holds that there is a correlative

18   right and if Vail's pumping impinges on their right to the

19   use of water, Vail has got to quit pumping.  You have to argue

20   this from the standpoint of Vail and not rely upon the fact

21   that what Vail did do woud hurt other riparians.

22        If this stipulated judgment between Vail and the

23   Government sticks and Vail is obligated to deliver that amount

24   of water, the time might well come when there was not that

25   amount of water that Vail could deliver without impinging on

the rights of other riparians.  But that is simple then.  The

Government and Vail, bound only by the new judgment, are

restricted as to the gross amount of water the two of them can

have and Vail is still obligated to supply the water.

MR. STAHLMAN:  Wouldn't this matter be important as to

the stipulated judgment as to whether or not the pumping of

water in that area was a reasonable beneficial use?

MR. VEEDER:  Could you say that again, George?

MR. STAHLMAN:  As to whether or not the extraction of

waters for the purpose of merely sending the waters downstream,

as we are obligated to do under the stipulated judgment, is a

reasonable beneficial use of riparian water.

In other words, a riparian has a right to extract water

for certain purposes.  Now is that one of the purposes for

which a riparian may, under the law of the State of California,

extract water and put it to the use which the stipulated judg-

ment intends it shall be put to, to wit, send it downstream?

THE COURT:  This argument is limited to waters you

supply by pumping.

MR. STAHLMAN:  Yes.

THE COURT:  Obviously, the natural flow of the stream,

for the benefit of downstream riparians, is a reasonable

riparian use.

MR. STAHLMAN:  Yes.

THE COURT:  So you are limiting the argument to extractions

1    by pumping.

2         MR. STAHLMAN:  Yes.

3         THE COURT:  To supply the three second feet.

4         MR. STAHLMAN:  To supply that.

5         When the first case was on trial, and this evidences

6    itself  in the findings of fact, that was a cattle ranch down

7    there and the benefit of the three second feet in the summertime

8    was to give surface flow of water to Pendleton for the watering

9    of their cattle down there, and I presume that was the reason

10   that gave rise to this three second feet.  Because in that

11   case, according to the findings as disclosed there, the judge

12   took the view at that time that the cattle had the right, as

13   they were wont to do from time immemorial, to drink the flow

14   of the surface water.  I think it was a ridiculous approach to

15   it.  I don't think the Court at that time had the proper con-

16   cept of California's application of riparian rights in relation-

17   ship to this type and character of stream where you do not

18   have a dependable flow of water but an intermittent flow.  It

19   is quite obvious that that is the reason that the court said

20   they could have surface water to water their cattle.

21        The character of the place has changed and Pendleton is

22   supplying their water for the base entirely from underground

23   wells.  Even the watering of cattle is not done on the surface.

24   It is done the same as we do up at Vail's.

25        So the occasion that gave rise to the creation of the

necessity of this three second feet is another one of those conditions which through the process of time and the lack of vision and the lack of understanding and the mistaken idea that the people who were trying the case at that time had as to what changes of time would present, and it again shows and demonstrates the incompetency of this stipulated judgment to solve the problems on the river.

Then we have as a practical situation, as we have demonstrated here, notwithstanding the fact that over a period of years that water has been pumped down there that water has been captured and considered surplus water and taken before it ever reaches Camp Pendleton, they have done nothing about that situation.

So here we have been operating under a stipulated judgment with an obligation to supply a three second foot flow down there when none of the conditions that gave rise to that have ever been complied with even on the part of the Government. They didn't get that water down there. The stream was completely dried up from the Fallbrook pumping plant on down.

So the obligation to pump the three second foot flow, I think, in the first place, is contrary to law, and in the second place, looking at it from a practical point of view to the efficiency of the stream system, it doesn't accomplish any purpose of any benefit to anyone.

THE COURT:  Do you attach any significance to the argument that this obligation on you might be someday so unconscionable as to render the Vail Estate a dry-farming property?

MR. STAHLMAN:  Yes, I think that is exactly what the ultimate effect of this will be.  Not only that, but by being compelled to carry out the obligation of the stipulated judgment in relation to the three second feet Vail will in periods of drouth, such as we have now, if this continues, eventually dry up and make inefficient the operation of that basin.  I think it can destroy the entire basin which nature has provided as one of the great attributes of this river.

MR. VEEDER:  Are you through, George?

MR. STAHLMAN:  Just a minute.

And then, your Honor, we have this situation.  When we get into Section 12, where if the water is not pumped in future years Vail can make this thing up in the following season, et cetera. We would be taking water from one season to the next.

Go ahead.

MR. VEEDER:  Your Honor, the imporant factor that I would like to bring to your Honor's attention in regard to this three second feet are the findings which it is stated are applicable to the United States of America.  Now in Vail Company's Exhibit AB, Finding 18--

1582

1          MR. SACHSE:  On what page is that?

2          MR. VEEDER:  It is Finding 18.  I am using the exhibit.

3   I think the page numbers are different.

4          MR. SACHSE:  I think it is on page 39.

5          MR. VEEDER:  It is stated there as a finding.  Does

6   your Honor have a copy?

7          THE COURT:  No, I don't have a copy in front of me.

8   This is the original judgment?

9          MR. VEEDER:  This is the original judgment.

10          THE COURT:  You rely in part onthe original judgment,

11   then?

12          MR. VEEDER:  I am saying if the findings are applicable,

13   we had better take a look at the whole thing.

14          THE COURT:  Go ahead.

15          MR. VEEDER:  "The normal and usual surface flow of said

16   stream (that's Temecula Creek) are not artificially diverted,

17   amounts during the dry or irrigation season of every year, to

18   approximately 50 inches of water--

19          MR. SACHSE:  500.

20          MR. VEEDER:  Beg your pardon.

21               ". .500 inches of water at the head of Temecula

22               canyon and above the confluence of the Murrieta

23               Creek."

24          Now that 500 inches of water would be converted into

25   ten second feet.  So if we are talking about a state of nature,

1  and when we are talking about riparian rights, we necessarily

2  are talking about a state of nature, and the basis upon which

3  we could participate with the 38,000 acres of riparian land

4  which we have, 18,000 of which can be irrigated, and also in

5  regard to our numerous uses as a military camp down there,

6  it is manifest that the three second feet to be delivered at

7  the head of the gorge is, in my view, a very reasonable demand

8  based upon the allocate share or the correlative share to which

9  the parties would be entitled , assuming the vitiation of

10  the stipulated judgment.  In other words, I think that the

11  three second feet delivery is a reasonable arrangement-- I'll

12  start again-- I think that there is certainly a sharp reduction

13  from what would have been the normal flow of the stream had

14  there been no diversion.  So we have to look at this in a

15  state of nature of determine whether it is unconscionable.

16      THE COURT:  How near the facts as you know them today

17  is this finding?

18      MR. STAHLMAN:  Completely different, your Honor.

19      THE COURT:  That the normal and usual flow--

20  And I take it this is of the Temecula?

21      MR. VEEDER:  That is of the Temecula.

22      THE COURT:  Not the Murrieta?

23      MR. VEEDER:  Above the confluence with the Murrieta.

24      THE COURT:  --is 500 inches.  Now, not only the normal

25  and usual flow when not artificially diverted during the dry

1  and irrigated season-- do they define that, or do we have to

2  guess at that?

3      MR. VEEDER:  I think Section 11, which provides for the

4  three second feet, describes the dry irrigation season there,

5  and I believe it is from the 1st of May through the 31st of

6  October or to the first of November.

7      THE COURT:  How close is this finding to the facts as

8  we know them today?

9      MR. VEEDER:  I will say this, that today, your Honor,

10 with the Vail Dam in there as it is, we would have to go above

11 that to reconstruct the flow.  Certainly it is entirely differ-

12 ent, because the crest of high water is completely controlled

13 at Vail Dam.

14     MR. STAHLMAN:  Your Honor, in that respect, if I may--

15 Bill, pardon me-- the operation of the Vail Dam with the water

16 that is released there causes a greater flow at Temecula

17 Gorge than would happen in a state of nature, because it is

18 holding that water back-- a greater flow in the summer months

19 because it is held back.  It is then fed back and some forced

20 underground.  We have figures to demonstrate that.

21     THE COURT:  Do we have figures in the record?

22     MR. VEEDER:  We have the figures upon which a recon-

23 structed flow could be made, I believe, your Honor.

24     But I want to make a point right here, and I am not

25 being captious with George or anything else.  I think the

1 points we are on right now are evidentiary in character and

2 not proper argument.  In other words, here is the way I look

3 at it.  When the statement is being made that the three second

4 feet is an unconscionable requirement to release down to us

5 with our large riparian acreage, I think that is not a matter

6 of legal argument, I think it is a matter of proof, and I think

7 the stipulated judgment which is being attacked on the grounds

8 that it is unconscionable, it would behoove-- and I am not

9 telling George how to try his lawsuit, because he does very

10 well, I obeserve-- the question of unconscionableness of the

11 three second feet turns on a matter of evidence that your

12 Honor would have to weigh.

MR. STAHLMAN:  I think the evidence will show that that

14 is already in the record here.  That is not a realistic figure.

15 It may have been at that time. The years they took in determ-

16 ining the stream flow during the trial of the first case is

17 entirely different.

MR. VEEDER:  I held my fire while you were talking,

19 George.

MR. STAHLMAN:  I am sorry.

THE COURT:  This first judgment entered in 1930, did it

22 provide for three second feet?

MR. VEEDER:  No, it did not, your Honor.  It provided

24 for 25% of the flow at Temecula Gorge throughout the dry or

25 irrigation season.  That was what the decree provided.

11586

1        THE COURT:   25% of the flow at the gorge?

2        MR. VEEDER:   That is correct.

3        THE COURT:   Which would include the Murrieta as well as

4    the--

5        MR. VEEDER:   That is correct.  I want that checked

6    again, if somebody will take a look at the judgment.  But it

7    is the last paragraph, George.

8        THE COURT:   75%, not 25%.

9        MR. VEEDER:   It says that the Vails could use 25% of

10    the flow at the gorge.

11        MR. STAHLMAN:   Here is what it says, your Honor.

12        MR. VEEDER:   It is the last paragraph of the judgment.

13        MR. STAHLMAN:   Here is the original judgment, which is

14    Exhibit 144 in the present case:

15                "The defendants, and each of them, their

16            agents, employees, representatives, tenants,

17            lessees, or any person, firm or corporation

18            acting for or on behalf of or claiming through

19            or under said defendants, or any of them, are

20            hereby, and each of them is hereby, enjoined

21            from diverting or abstracting, and is hereby

22            directed immediately to discontinue and to

23            refrain from diverting or abstracting, from

24            either or both the surface flow of the

25            Temecula-Santa Margarita River (the Murrieta Creek

flow excepted) and the underground waters

of the Temecula alluvial basin during the

dry or irrigation season of the year, to

wit, from the 1st day of May until the 31st

day of October of the same calendar year,

in excess of 25% of the total flow of said

Temecula-Santa Margarita River measured at

Temecula Gorge, Gaging Station No. 3."

MR. VEEDER:   It's in my brief, your Honor, if you want
it.

THE COURT:   And then measure it at the gorge?

MR. VEEDER:   Your Honor, that was not what was done.

THE COURT:   That is what the judgment says.

MR. VEEDER:   There was awarded to the lands north of the
crest line in the Temecula Grant all of the flow of the
Murrieta .   In other words, that land was entitled to dry up
Murrieta Creek and leave in the stream 25% of the flow of the
Santa Margarita-Temecula.

THE COURT:   Yes, but the judgment that you just read
provides that Vail gets 25% and there is allowed to pass 75%
of the water of what they call the Santa Margarita, which is
the Temecula.

MR. VEEDER:   That's right.

THE COURT:   Measured at the gorge.

MR. VEEDER:   That's right.

1    THE COURT:  So by the time it gets to the gorge it is

2  water of the Murrieta and Temecula.

3    MR. VEEDER:  But they are taking this kind of pitch

4  on that, that they are declaring the rights of the Temecula

5  Grant so that it could dry up the entire Murrieta, your Honor,

6  which I think was contemplated by Judge Jennings' decree.

7  Then there would be 25% of the flow of the Santa Margarita

8  less the Murrieta.

9    THE COURT:  You handed me a stipulated judgment a

10  minute ago.  Do you have a copy there?

11    MR. VEEDER:  Yes, your Honor.

12    THE COURT:  You had another one.  Did you take it, Mr.

13  Stahlman?

14    MR. STAHLMAN:  Yes, your Honor (handing document to

15  the Court).

16    THE COURT:  In what section of the stipulated judgment

17  does that appear?

18    MR. VEEDER:  Section Eleventh, your Honor.  Do you

19  have a copy of the original judgment there, your Honor?

20    THE COURT:  Yes.

21    MR. VEEDER:  We have written a comparison of those in

22  the first part of our brief, your Honor, setting out verbatim

23  the language you are looking at.

24    THE COURT:  Isn't it true that the stipulated judgment

25  also proceeded upon the premise that the defendant Vail could

1      get the entire flow of the Murrieta?

2              MR. VEEDER:  No, sir.

3              MR. STAHLMAN:  It certainly does.

4              THE COURT: Section Twelfth starts:  "Defendants at

5      all times shall be entitled to divert from the Temecula-Santa

6      Margarita river and its tributaries. . "

7              MR. VEEDER:  That's right.

8              THE COURT:  They generally refer to the Temecula-Santa

9      Margarita River as the river excluding the Murrieta.

10             MR. VEEDER:  Not in the stipulated judgment, your Honor.

11             THE COURT:  Is there any definition in here?

12             MR. VEEDER:  No, sir.

13             MR. STAHLMAN:  There is no definition.

14             MR. VEEDER:  It is the Temecula-Santa Margarita River

15     and its tributaries to which the stipulated judgment applies.

16     There is no differentiation.

17             THE COURT:  But they didn't mean the Murrieta.

18             MR. VEEDER:  When we go through the provisos of the

19     judgment of 1930, your Honor, there was great care to separate

20     in every instance, by findings of fact, conclusions of law in

21     the judgment itself, in which it said that the Rancho Santa

22     Margarita had no right, title or interest in or to any of the

23     waters of the Murrieta.  That proviso is one of the provisos

24     that was eliminated.

25             THE COURT:  That was not appealed from?

MR. VEEDER:  Yes, it was, your Honor.

MR. STAHLMAN:  No, it was not.

THE COURT:  It is not involved in the remand.

MR. VEEDER:  Your Honor, may I go on to that point now.  The fine point of the appeal to the Supreme Court of the State of California was on the basis that the court below erred in declaring that the crest of the watershed between the Temecula and Murrieta made it so that, as a matter of law, the Pauba Grant and the Temecula Grant south of that crest were not entitled to water from the Murrieta.  Similarly, that the area of the Temecula north of the crest was not entitled to water from the Santa Margarita.  The net result of the stipulated judgment was to conform to the determination by the Supreme Court that those lands were all riparian.

THE COURT:  It doesn't say so in the stipulated judgment.

MR. VEEDER:  But, your Honor, it refers to the entire stream and it does not segregate the Murrieta at all.  So it necessarily follows that they had reference -- the fact is the language of the stipulated judgment is in no way limited to anything but the total runoff, which necessarily includes Santa Gertrudis and the Murrieta.  It says, "The waters of said stream and its tributaries herein apportioned to the intervenors throughout. . "  It goes on and talks about-- if you turn to the sixth and the seventh there-- all of those

provisos refer to the stream and its tributaries. Now, I find no basis whatever for Mr. Stahlman's conclusion that the Murrieta would be eliminated from the total runoff of the stream.

MR. STAHLMAN: Your Honor, going through the Supreme Court's directive to the Superior Court as to what would be the issues on the new trial, it says:

"From what has been heretofore stated in this opinion, it is obvious that reversal of the judgment is necessary. However, the new trial need not be a protracted one. Appellants have not challenged many of the findings. There is no need for a new trial of these issues. It would appear that on a new trial it will be necessary (1) To ascertain the extent of appellants' riparian and irrigable acreage as set forth in the body of this opinion."

That was in relation to discussing the legal effect of the riparian land over the crest line and in the watershed of the main stream.

"(2) To ascertain the extent of respondent's riparian and irrigable acreage only in so far as it involves the table land discussed in the body of the opinion; (3) To ascertain whether an injunction should be granted under the

1      rules set forth."

2           MR. VEEDER:  But when you read that in its entirety, it

3      said that the error was declarant that the land owners

4      situated below the confluence of a tributary stream could

5      object from the standpoint of the riparian character of the

6      land that you couldn't take water across the crest of the

7      watershed.

8           Now here is the point that I think we will be into

9      before we are through.  The question was this.  The Supreme

10     Court of California declared that the Temecula Grant was

11     riparian to the Murrieta, that the land north of the crest of

12     those two streams was riparian to the Temecula Creek.  Now

13     what they said was that you have to look to the entire stream

14     Murrieta, and it was a point directly on appeal, that was the

15     whole question on appeal, and when they referred it back they

16     said, when you make your allocation, when you make your de-

17     termination, you make your determination on the basis that the

18     lands in the Murrieta Valley are riparian to the main stream.

19          Now on that point I don't believe that there can be any

20     doubt at all that when these people sat down to allocate among

21     themselves, it was on the basis of the remand and the direction

22     that they had to consider the entire area above the confluence

23     of the two streams as being riparian to the stream as a whole.

24     Therefore, it would have been violative of the remand, in my

25     view, clearly violative for them to say that the Murrieta was

1   not covered by the stipulated judgment.

2      THE COURT:  Let's see what views other people have on

3   this.  Mr. Girard or Mr. Sachse, have you analyzed this

4   problem?

5      MR. GIRARD:  I have some notes here, your Honor.

6   Whether or not they are on this specific problem I don't know.

7      First of all, I think we have to recognize and remember

8   that the requirement of three cubic feet per second is, in

9   effect, an allocation of water to a riparian.  In other words,

10  it is a method or standard or measuring device that they use

11  in assuring that the downstream riparian, the Rancho Santa

12  Margarita, got its 66-2/3% of the water.  It is nothing more

13  than an allocation, this three second feet.  And under the

14  points and authorities which we filed, and which we submit are

15  correct, an allocation of water is not final and can be subject

16  to change upon a change in conditions.

17      Now, at the time this allocation was made in the

18  stipulated judgment there were several things, I think, that

19  are a little different than they are now:  (1) (This may be

20  disputed.)  There was an assumption by the parties that the

21  two parties were the only ones, in effect, that had rights on

22  the stream. But there certainly can't be any dispute that there

23  was a limited amount of pumping then as compared to now.  There

24  certainly has been a change in conditions since then.

25      Also, I might emphasize-- this is pointed out in my

brief-- the operation of Rancho Santa Margarita then was
primarily a cattle operation.  Three second feet had a great
deal of importance possibly to the type of activity that was
going on at the time that the stipulated judgment was entered
into.  Now, of course, it is not that type of operation.  Mr.
Veeder in his comments this morning in effect conceded that
when he stated, I believe, that the Camp Pendleton or the
Federal use is primarily from ground water and that ground
water recharge is primarily from flood waters.  So actually
the three second feet does little to benefit the primary use
of the United States.  The primary use is from ground waters,
which is recharged not by the three second feet but by the
flood waters. Consequently, the United States does make some
use of the surface flow during the summer.  I believe the
Ammunition Depot has some use with it, and I believe also some
of it goes into Lake O'Neill.  But the extent of the three
second feet requirement is not of the importance today that
it was then as far as the users of the Rancho Santa Margarita
are concerned.

It should also be emphasized that-- I don't recall what
particular finding it was you were discussing here, where at
the time this judgment was entered, I think it was on page 39,
Finding 18-- it was stated that approximately 500 inches of
water is on the surface in the Temecula Creek above Murrieta
Creek.  As I understand it, 500 inches of water is 10 second

1  feet, 10 cubic feet per second.  Certainly that condition has

2  changed.  Frankly, in going over the exhibit here, it appears

3  that that figure of 500 second feet was grossly wrong when it

4  was entered.  From the measurements that we have in this

5  exhibit--

6       THE COURT:  What number?

7       MR. GIRARD:  Government's Exhibit 21.  This is in second

8  feet of the flow at Temecula Creek at Railroad Canyon.  Is

9  that correct?

10      MR. SACHSE:  Yes.  In other words, this is the total.

11  This would be Murrieta and Temecula together.  It would be a

12  larger amount than that referred to in the finding.

13      MR. GIRARD:  If you will just glance through them,

14  both before and after Vail Dam, going back to the year 1923,

15  just glancing at it, it shows that 10 cubic feet per second

16  figure is ridiculous.  There has certainly been a change in the--

17      MR. VEEDER:  Wait a minute.  We are being bound by some

18  findings and not by others, dependent upon the whim, apparently.

19      THE COURT:  This is Santa Margarita River near Temecula.

20      MR. SACHSE:  Yes.  That is the gage that is maintained

21  below the confluence of the two streams.

22      MR. STAHLMAN:  Station 3, which is the one that is

23  designated in the stipulated judgment.

24      THE COURT:  What are the figures?

25      MR. STAHLMAN:  They are cubic feet per second.  At the

1    bottom they are accumulated into acre feet.

2         THE COURT:  So, starting in May, which is part of your

3    dry season, you are talking about the figures 6, 5, 4, 4, 5,

4    4, 5, 4.

5         MR. STAHLMAN:  If you start at the very back, you will

6    see the ones you have just referred to back to 1923 before the

7    judgment was even entered.

8         MR. VEEDER:  I think, again, this is a proposition

9    evidentiary in character.  I can have Col. Bowen make an

10   analysis of it in regard to the runoff records.  We have a

11   situation where Vail Dam is in effect.  We have a great many

12   propositions.

13        THE COURT:  These figures go back beyond--

14        MR. VEEDER:  They go back to 1923, I believe, your

15   Honor.

16        MR. STAHLMAN:  Away before Vail Dam.

17        MR. VEEDER:  The point I am trying to make, though,

18   your Honor, from our standpoint it is an evidentiary matter

19   which should be on the basis of a review by an expert on this

20   point to the end that we would not have injected in here the

21   elements which I believe are now being raised.

22        The only reason I brought up the 500 miner's inches

23   to your Honor's attention is the fact that the State is insist-

24   ing, Mr. Sachse is insisting and others are insisting that we

25   are bound by these findings whether they are right or wrong.

1   We are going to be bound by Mr. Girard on the findings that he

2   likes, and by ones that he doesn't like we are going to be

3   relieved of, because it has got to work both ways.

4   MR. GIRARD: No, it doesn't. The three second feet is

5   nothing but an allocation of water, and it has been our con-

6   sistent position that neither you nor anyone else is bound by

7   that if there is a change of conditions.

8   MR. VEEDER: Are you rewriting Bulletin No. 57?

9   MR. GIRARD: I didn't have anything to do with Bulletin

10  No. 57, Mr. Veeder.

11  But this is just evidence, if anything, of what I think

12  everyone must concede, the existence of a change of conditions

13  since 1930 when the stipulated judgment was entered.

14  MR. VEEDER: The stipulated judgment was entered in

15  1941.

16  MR. GIRARD: 1941.

17  MR. VEEDER: 1940.

18  MR. GIRARD: 1940, all right, roughly.

19  MR. VEEDER: Your Honor, there are several points that--

20  THE COURT: Let's see if Mr. Girard is finished.

21  You called my attention to Exhibit 21.

22  MR. VEEDER: He didn't answer your Honor's question.

23  He didn't even refer to it.

24  MR. GIRARD: What was the question, your Honor?

25  I don't want to be evasive.

1          THE COURT:  No.  The particular thing that I was trying

2     to get was your view as to this problem.  The original judgment

3     in 1930 without question as much as said to Vails, "You can

4     have all the Murrieta."  The stipulated judgment came along,

5     there was no definition of the Santa Margarita-Temecula River

6     in it, and they made this division of one-third-two-thirds.

7     Do you have any view as to whether, under the stipulated

8     judgment, the Temecula was also to belong to the Vails?

9          MR. VEEDER:  May I interrupt for just one second on

10    that, your Honor?

11         THE COURT:  A second?

12         MR. VEEDER:  I am sorry.

13         THE COURT:  All right.

14         MR. VEEDER:  "The plaintiff is entitled to take and

15    use, upon the whole or part of the land, 66-2/3% . ."  I am

16    now reading from Section 2, because I think your premise was

17    in error, with all respect to your Honor.  "The plaintiff may

18    take 66-2/3% of said Temecula-Santa Margarita River and all

19    its tributaries."  So when that was written it is all-inclusive.

20         THE COURT:  Of course, it states "Temecula-Santa

21    Margarita."

22         MR. VEEDER:  "And all its tributaries."

23         I am sorry I interrupted, but your premise, I think,

24    might be changed a little bit by that statement.

25         MR. GIRARD:  The only answer I can give, your Honor, is

certainly not one of certainty.  Now there is no question that in the first judgment the court treated the Murrieta and the Temecula-Santa Margarita River as two separate things.  There are numerous provisions, commencing with the third, fourth, seventh, fifth, twelfth, stating a specific gaging station on the Murrieta River, which they referred to in there as the Murrieta River.  There is no doubt that in the original judgment they considered the Temecula-Santa Margarita and the Murrieta as being two separate streams.  In the stipulated judgment they refer only to the Temecula-Santa Margarita River and they use the identical term "Temecula-Santa Margarita River" that they used in the first judgment, which distinguished between the two.  There is no reference at all in the stipulated judgment to the term "Murrieta."  The only thing I can state is that if they had wanted to reach a conclusion so different from the prior judgment, it would seem to me that they would have said so specifically that they used the term "Temecula-Santa Margarita River" in exactly the same way as they used it in the prior judgment, and they made no mention at all of the Murrieta.

THE COURT:  Wouldn't the facts be correct that the allocation to Vail of 25% of the Temecula plus all of the Murrieta would have been far more than one-third of the combined streams?

MR. VEEDER: That will require evidence, your Honor.

1    THE COURT:  It will probably require evidence, but

2  isn't that pretty apparent even before we look into it?

3    MR. VEEDER:  I think that it depends somewhat on the

4  runoff and somewhat on the years, but I would like to have an

5  analysis made of that.

6    But I submit that when the response was made to your

7  Honor now that the State of California did not refer to the

8  fact that it says "Temecula-Santa Margarita River and all its

9  tributaries."  Now it couldn't include the Murrieta.

10    THE COURT:  Unless there is life in the first part of

11  this judgment, which there undoubtedly is, this stipulated

12  judgment isn't supported by any findings.  These are largely

13  conclusions, they are really judgment provisions, and in the

14  first judgment they talk about the "Santa Margarita-Temecula

15  River," as being distinct from the Murrieta.  Now, if there is

16  life in this first judgment, then it may well have been the

17  intention of the parties and the Court that when the stipulated

18  judgment was signed Vail still had all the Murrieta and this

19  was a new division of the waters of the Santa Margarita-

20  Temecula and all its tributaries, meaning the tributaries

21  above the gorge.

22    MR. VEEDER:  I will be very, very pleased to rest a

23  good share of our case upon the fact that they wrote in "all

24  tributaries" after the earlier judgment had been changed.

25    THE COURT:  Where is the working part of the first

1    judgment that made the allocation of 25%?

2          MR. VEEDER:  That is Exhibit 144, your Honor.

3          THE COURT:  It is in the conclusions of law also,

4    isn't it?

5          MR. VEEDER:  I don't believe it is.

6          MR. STAHLMAN:  No.

7          MR. VEEDER:  The one we worked with in writing our

8    brief was a separate and distinct exhibit apart from the

9    findings of fact and conclusions of law.

10         MR. SACHSE:  The judgment does not say three-quarters.

11   The way you get your three-quarters and one-quarter is by

12   adding up a lot of fractions for Vail.  In other words, it

13   says they get 3.9% of a certain one, and another part of another

14   one, and so on.  You have to add them all up.

15         MR. VEEDER:  And thank you, Mr. Sachse, for one of the

16   things that has come out of this; it shows that where they

17   tried to apportion it to the Pauba, I think the Pauba got

18   12½%, I think there was 8% went to the Temecula, 2½% or some-

19   thing like that-- I am just giving it from memory now-- 2½%

20   went to the Little Temecula.

21         MR. STAHLMAN:  That was the allocation of water to lands.

22         MR. VEEDER:  That is correct, and that is the point that

23   I am making.  They said that all of the lands were riparian

24   to the Santa Margarita and all its tributaries above, and

25   that is the ruling of the Supreme Court of California.

MR. STAHLMAN:  Your Honor asked another question and Mr. Veeder again got away.  You asked about the conclusions of law on the first trial. That is also part of Exhibit AB. The conclusions of law followed the findings of fact.

MR. VEEDER:  If your Honor has the Government's brief before him, you will find on page 8 a summary of those allocations and they are set out in tabular form.

MR. STAHLMAN:  Under Section 5, if I may read it to your Honor:

> "The plaintiff owns and is entitled to take and
> use on its said lands in said Santa Margarita
> Ranch riparian to said stream .75 part of the waters
> of said Temecula-Santa Margarita River. . "

MR. VEEDER:  Do you want to say "less the Murrieta"?

MR. SACHSE:  Yes, it says "the entire flow of the Murrieta having been first deducted."

MR. VEEDER:  That's right.

MR. STAHLMAN:  Yes.

THE COURT:  Of course, it can be well argued that since they say-- I am looking at pages 64, 65 and 66-- on page 64 of the Findings and Conclusions, Exhibit AB, it says:

> ". . is entitled to take and use on its
> lands .75 part of the waters of the Temecula-
> Santa Margarita River . .  The entire flow
> of the Murrieta Creek . . being deducted

therefrom."

On page 66 they say:

"Defendants are entitled to take and use
.25 part of the entire water supply of the
Temecula-Santa Margarita River (minus Murrieta
Creek or River)."

In that sense they used "Temecula-Santa Margarita River"
as the entire river system and then deducted the Murrieta.

MR. GIRARD:  As I recall, your Honor-- Maybe this is
in support of Mr. Veeder's position--   didn't that exhibit
which Mr. Stahlman introduced that delineated the stream in
the old Santa Margarita suit include part of the Murrieta?

MR. VEEDER:  Yes, it did.  I have a copy of that here.

MR. STAHLMAN:  Exhibit AQ.

MR. GIRARD:  Yes.  That would refer to the first trial
where they used the Santa Margarita and the Temecula and the
Murrieta as different type streams.

MR. VEEDER:  There is just enough.  I was looking at
that exhibit.  There is just enough of it shown.

MR. GIRARD:  I don't recall offhand, but I thought it
did show some of it.

MR. STAHLMAN: There is the very crux of this thing,
your Honor, the greatest mistake they made in the entire thing
is defining and delineating what the stream system was at that
time.  It is completely different now.

1    MR. VEEDER:  This is the Murrieta, and the basis of--

2  if your Honor cares to see it.

3    MR. STAHLMAN:  This map was for a certain purpose.  It

4  was a geologic map.

5    THE COURT:  Yes, I see that it shows the stub end of

6  the Murrieta there.

7    MR. VEEDER:  It shows the extent of the Murrieta that

8  runs through the Vail property.

9    MR. STAHLMAN:  Only in so far as it goes to the Vail

10 property.

11    THE COURT:  Yes.

12    MR. STAHLMAN:  That is as far as they determined the

13 gedogy.

14    THE COURT:  Mr. Girard, have you finished?

15    MR. GIRARD:  Yes, your Honor.

16    THE COURT:  Do you have anything that you want to add,

17 Mr. Sachse?

18    MR. SACHSE:  I will be very brief, your Honor.

19    This is just a question of how we interpret it.  I

20 don't want to repeat what your Honor said, but I think I

21 interpret it a little differently than you do.  The original

22 judgment divided something 75-25.  Now what did it divide?

23 It divided all of the waters of the Temecula-Santa Margarita

24 less Murrieta Creek.

25    MR. VEEDER:  Which it awarded to Vail.

MR. SACHSE:  First, that was the division.  The United
States got three-fourths of all the waters, less Murrieta
Creek.  Then right down the line for different parcels of
Vail land Vail was allowed--

THE COURT:  Various amounts for various parts of the
Murrieta.

MR. SACHSE:  Yes, always deducting the Murrieta Creek
right straight through.

When you add up these percentages it works perfectly
with the United States's 75.  Vail was granted 12.3, 3.9, 8.8.
When you add them up that makes 25.  The United States got
75% of the waters, less Murrieta.  Vail got 25% of the waters
less Murrieta.  Who gets Murrieta?

THE COURT:  Vail.

MR. SACHSE;  It's vacant.  Vail gets it.  That is my
analysis.  And I think the stipulated judgment doesn't
contradict it in the least.

I want to say one word, because Mr. Veeder is either
misinterpreting my position in this or I haven't made it
clear.  I do not believe that some findings should stay in
effect and some not.  My position is very simple:  That if this
stipulated judgment sticks at all, then any part of the original
judgment which was not reversed or which is not changed by the
stipulated judgment must also stick.  I do not think that
Mr. Veeder can have his cake of the stipulated judgment and

1 lose the bitter tea of the size of the watershed. He has to

2 have them both. If he wants the stipulated judgment he is

3 going to be stuck with the stream system and the original

4 judgment. If he wants that, if that is the ultimate outcome--

5 I can't conceive of his wanting it, and I think I come to a

6 conclusion which probably doesn't help your Honor much. I

7 think if we could wave a magic wand and get rid of the

8 stipulated judgment we would be miles ahead.

9     MR. GIRARD: It should be pointed out that in Section

10 7 of the judgment the entire flow of Murrieta Creek is given

11 to the defendants.

12     THE COURT: Of course, as a practical matter, it strikes

13 me that Vail having won the appeal in the first case was not,

14 by the stipulated judgment, taking less than they have in the

15 original judgment. We may have to have some record to base this

16 on, but it would seem to me that when Vail said, "We are under

17 the first judgment" when they had one-fourth of the Temecula

18 and all of the Murrieta, it's sort of silly to say now that

19 they entered a stipulated judgment where they took one-third

20 of both streams.

21     MR. VEEDER: I think that we are incorrect in going

22 beyond the four corners of the judgment, because I think that

23 is what we are bound by.

24     But I went to point out to your Honor one very important

25 phase, that when Vails wound up with their conclusions as

1    they did they went ahead with competent counsel to make their

2    determination, and I don't believe that having made the repre-

3    sentations to the Government that they have made that we can

4    go into what might have been in their minds.  The language of

5    the stipulated judgment is all-inclusive and all-clear,--

6    Temecula-Santa Margarita and all its tributaries.  Now, your

7    Honor has to read something completely and entirely and wholly

8    different than the language of the stipulated judgment to

9    come up with the conclusion which you have just expressed.

10       THE COURT:  I think any lawyer reading this stipulated

11   judgment, his first reaction would be to throw up his hands

12   and say, "What have we got here?  What kind of animal is this

13   in the legal menagerie?"  Then you try to read it with the

14   original judgment and you find yourself in worse position.

15       MR. VEEDER:  I think the law inthe matter, at least in

16   my view, is quite clear.  I think that every single aspect of

17   the original judgment is merged into the stipulated judgment,

18   and I believe--

19       MR. SACHSE:  You are bound by the stream system?

20       THE COURT:  Merged into it.  You mean you go back to the

21   original judgment?

22       MR. VEEDER:  I don't believe there is any part of the

23   original judgment extant today, because paragraph by paragraph--

24   now, Franz, don't have a stroke; I am not talking about

25   findings now, but I am talking about the judgment itself--

they went through paragraph by paragraph, using identically
the same words as in the original judgment in many instances,
and I believe it was entirely superseded.  The boys got
together and they said, "We'll terminate it this way," and they
did.

    MR. GIRARD:  May I ask Mr. Veeder a question, your
Honor?

    THE COURT:  Yes.

    MR. GIRARD:  Would you say that would apply to people
who are parties to the judgment who were not to the stipulated
judgment?

    MR. VEEDER:  I don't believe-- and I will tell you,
you are asking a question that Mrs. Bates is going to raise
herself, because she talked to me about it, and I certainly
don't want to be in the position of having the good lady think
I am arguing the case against her-- she says that in her view
the stipulated judgment, if it goes out, takes out the inter-
venors.  She will speak for herself on that.

    MR. GIRARD:  I am glad to hear that

    MR. VEEDER:  My own view is this, that the intervenors
could not have been bound by the stipulated judgment.  They
didn't sign it.  More important--

    MR. STAHLMAN:  They signed the stipulated judgment.
They went in court with their lawyer.

    MR. VEEDER:  I will bring the resolutions over.

1    THE COURT:  All right.

2    MR. VEEDER:  The point that I am trying to make is that

3 the stipulated judgment recites in precise and exact terms in

4 regard to the intervenors that which was declared in Judge

5 Jennings' decree.

6    So we have the situation where I think the proposition

7 stands where only in so far as the intervenors the final

8 judgment of Judge Jennings stands.  But in regard to the

9 United States and Vail it doesn't.  Now, there is nothing wrong

10 in that.

11    THE COURT:  You mean that that part of the first judg-

12 ment which was not appealed from and which the Supreme Court

13 did not direct a new trial upon is now of no effect?

14    MR. VEEDER:  No, that isn't.

15    THE COURT:  That is what you are saying?

16    MR. VEEDER:  No, I said that in so far as the inter-

17 venors are concerned it is still in effect.

18    THE COURT:  Let's forget about the intervenors.  As

19 between the United States and Vail.

20    MR. VEEDER:  I think that the stipulated judgment

21 supersedes in its entirety the judgment itself.

22    MR. SACHSE:  May I ask a question, then-- very specific:

23 The stipulated judgment just uses the words "Temecula-Santa

24 Margarita River and all its tributaries."

25    MR. VEEDER:  Yes.

1      MR. SACHSE:   The original judgment uses the language

2  "Temecula-Santa Margarita River as delineated and defined in

3  the findings herein."

4      Now, does the stipulated judgment include implicitly

5  the language as defined in the findings here, or don't you

6  have any definition of the Temecula-Santa Margarita River?

7  You either have no definition--

8      MR. VEEDER:   You have it spelled out in entirety and

9  clearly that the waters that were apportioned between the

10  parties litigant there is the Santa Margarita River and all

11  its tributaries.

12      MR. SACHSE:   As defined where?  In other words, Mr.

13  Veeder-- my question is very simple-- the original judgment

14  tells us in case two small land owners-- forget Vail and the

15  United States-- got into an argument with one of you and they

16  wanted to know what is the extent of this stream system, the

17  original judgment tells you, it says, "Go look at the findings

18  herein." The stipulated judgment doesn't say that.  It just

19  says "Temecula-Santa Margarita River."  So it seems to me that

20  you are in a--

21      MR. VEEDER:  No, I am not.

22      THE COURT:  On the horns of a dilemma.

23      MR. SACHSE:   --on the horns of a dilemma.

24      MR. VEEDER: No.

25      MR. SACHSE:   Either you have no definition whatsoever

of the stream system, you either have none in your stipulated

judgment, or else you have to jump back to your findings to

find out what your stream system is.

MR. VEEDER:  It is impossible to comprehend what he has

just said.  It says in explicit terms, "The Santa Margarita

River and all its tributaries."

MR. SACHSE:  What are they?

MR. STAHLMAN:  What are they?

MR. SACHSE:  Does that include Domenigoni and Diamond

Valleys?

MR. VEEDER:  I don't know.  It might include all of

the runoff.

THE COURT:  If your position is correct, what did you

take the time of this Court for in putting on proof on the

river and its tributaries.  If all you have to do in a judgment

is just to say Santa Margarita River and its tributaries, why

do we spend all of the time we did?

MR. VEEDER:  Because of the very simple fact that in

addition to Vail there is a great number of parties litigant

who are not bound by this stipulated judgment. That is exactly

why I did it.

THE COURT:  That's a good enough answer.  We will stop

right now.

Mr. Veeder or Mr. Girard, assume that there is still

some life in the original judgment other than the parts which

1   the Supreme Court ordered a new trial on, and assume that the

2   stipulated judgment is only an allocation of water, what do

3   you have to say about the fact that this first judgment found

4   a very small basin in comparison with the testimony we have

5   heard here and contrary to your present contention?

6          MR. VEEDER:  Are you asking me, your Honor?

7          THE COURT: You.

8          MR. VEEDER:  I think that from the standpoint of Vails,

9   and it is an extremely important point from our standpoint,

10  the geology as determined by the Court, and I might add adopted

11  by the State of California in the Bulletin-- and I almost

12  cost myself some money-- shows a delineated and a delimited

13  area.  Now, I have disagreed with that.  I think it is an

14  error.  I don't see how, in the words of the State of California--

15  I want Mr. Girard to hear this because I want him to talk to

16  his boys-- it would be a physical impossibility to have a

17  stream eroded into the older alluvium and create such a thing

18  as this.

19         THE COURT:  Let's get down to the point.  I asked you

20  to make two assumptions:  First, that those findings made in that

21  first judgment of the limited extent of those basins-- well,

22  we know they are in there.

23         MR. VEEDER:  I was just giving you some background, your

24  Honor.

25         THE COURT:  Secondly, assume that the allocation of

1   water is subject to change at any time.  What are you going

2   to do if I hold that the allocation of water is subject to

3   change at any time upon changed conditions?  Do you want to

4   be stuck with that limited basin in the old findings?

5        MR. VEEDER:  No, the immense value of our geology to

6   the Vail Company is incalculable.  Here they were originally

7   saying that they could only pump out of this limited strip

8   of land.  We say that when they pump they pump from the entire

9   area which is Storage Unit No. 4.  So that greately enhanced

10   the source of water from which they are today pumping, in my

11   view.  And if there is one proposition of law that is elementary

12   in this matter, it is that they could only do violence and

13   have vitiated the stipulated judgment if they showed that the

14   mistake which was made was detrimental to them.  And it is

15   certainly not a detriment to them to find that they are now

16   drawing, in the words of Mr. Pemberton-- and he is the Vail

17   Company's hydrologist-- that they are drawing from 35 square

18   miles of storage when they originally thought they were

19   drawing from this very, very narrow area.

20        THE COURT:  Do you see the position you are in yet?

21   I don't know whether you understand yet what I am talking about.

22   Assume that the allocation made by the stipulated judgment--

23   you don't want to assume this, but please do-- is an assignment

24   of correlative rights of riparians, and that it is subject to

25   change.  The law is clear that if a prior judgment determines

physical facts such as non-riparian extent of land or limits

of a basin that that could be binding, unless it is set aside.

If I hold that one-third-two-thirds was merely an allocation

and I don't do something to this old judgment, then you have a

situation where if you hold Vail to the other provisions of

the stipulated judgment or the other old judgment Vail could

put wells down outside this basin area marked in the light

yellow on this Exhibit AQ and their wells would not affect

the stream system.  In other words, this would be vagrant,

percolating water under the old findings.  Vail could put

wells down, line your narrow basin from one end to the other,

and then they could pump it.  It is not part of the stream

system.

MR. VEEDER:  As far as I am concerned, they can put

all the pumps up here they choose-- I would love to see them

do it-- as long as they maintain our three second feet here.

You would never hear a peep from us in that regard.  And I

assure you they will never do it.

MR. SACHSE:  Does that go for every other owner who is

not committed to this three second feet?

MR. VEEDER:  No, because the stipulated judgment relates

only to two people.

MR. SACHSE: No, the doctrine of collateral estoppel

by judgment, that his Honor mentioned, as I understand it,

binds the parties to it even as against people who were not

1   parties to the judgment.

2      MR. VEEDER:  Your Honor, you frighten me not at all from

3   the standpoint of having them dig wells all along the

4   continental alluvium, if that is what your Honor wanted to hear.

5      THE COURT:  Under the stipulated judgment they would be

6   only obligated to supply you three second feet from the stream

7   system.

8      MR. VEEDER:  That's right.

9      THE COURT:  They wouldn't be obligated to supply you

10  any water from something that was not part of the stream

11  system.  So you get to a situation where they can't supply you

12  three second feet; they can supply you only two second feet.  Then

13  what do you do?  You come in and restrain them and say, "It's

14  true you can only give us two second feet, but you are getting

15  water out of part of the older alluvium which, although the

16  old judgment said was not part of the stream system, we now

17  contend is, and therefore we are going to restrain you from

18  pumping those wells."  You would be attacking the old judgment.

19     MR. VEEDER:  No.  If they are pumping up here, and they

20  never will--

21     THE COURT:  I wouldn't think they would put the wells

22  where your hand is.  I would suggest they would put them about

23  ten feet away from the younger alluvium there on the map.

24     MR. VEEDER:  If they wanted to try that, they would

25  buy themselves a good lawsuit.

1   But the point I am trying to make to your Honor is

2   that if they want to say that these lands up here through

3   this area can be irrigated in that manner, let them go ahead

4   and do it, if they want to overdraw their supply of water and

5   still supply us with the three second feet.  It suits me very

6   well.  I don't care.

7   THE COURT:  I would anticipate that if that land up

8   there and the water under it is not part of the stream system

9   that probably nobody could complain if they pumped from that

10  and irrigated the land shown in light yellow.  I don't think

11  anybody could complain if you took water that was not part

12  of the stream system and put it into the stream system.

13  MR. VEEDER:  There is also the additional fact that

14  when they start doing that they are pumping water from under

15  Shamel, they are pumping water from under Roripaugh, they are

16  pumping water from under a great number of people, in my view,

17  and those people are entitled to restrain them whether we are

18  or not, because the decree I am going to ask your Honor to

19  enter, and I know in justice will be entered, what we are

20  seeking is to have an adjudication among all these other people

21  and that the judgment to which we succeeded when we bought the

22  Rancho Santa Margarita, the representation pursuant to which

23  we let them build the dam, the $51,000 we spent for the Pauba

24  Well, I say they are bound and they can't at this time vitiate

25  it because of the unjust enrichment.

1    But there is one point that your Honor did make that

2  I think we should get into.

3    MR. STAHLMAN:  Why not stick to the point?

4    MR. VEEDER:  We are running out of time.  That's my

5  problem.

6    THE COURT:  Do you have some observation on this point,

7  Mr. Girard?

8    MR. GIRARD:  Yes, your Honor.

9    As I understand it, your factual situation was that you

10  found that the stipulated judgment was an allocation of

11  water and could be and would be modified.  But then what do

12  we do about this old part of the judgment?

13    THE COURT:  That's right.

14    MR. GIRARD:  As far as the State of California is

15  concerned, we would probably get Mr. Veeder off the hook by

16  the State insisting that we want a finding based on the evidence

17  and not on the old judgment.  We were not a party to it.  We

18  are entitled to a judgment on the evidence here.  And if you

19  do that and if we have a right to insist on that, which I

20  submit we do, you are in the position of what do you do, make

21  two separate findings on the same issue in the same case, some

22  of them binding some people and some not?  I don't think it

23  is physically possible for you to do it.  So I think, frankly,

24  you would just about have to set aside the whole thing as a

25  matter of equity.  And as I understand just from Mr. Veeder's

1   comments previously, the other parties to that suit would not

2   object to your setting aside that finding also, if you set

3   aside the stipulated judgment.  I certainly don't think Mr.

4   Stahlman would.

5       MR. STAHLMAN:  I will not.

6       MR. GIRARD:  What are you going to do?  If we insist

7   on a finding on the evidence and somebody else insists on a

8   finding on the res adjudicata issue, you can't possibly issue

9   two findings on the same thing.

10      MR. VEEDER:  I think he is creating a problem that

11  isn't present, for this very reason.  We have a stipulated

12  judgment under which we have operated for twenty years, in

13  which Vail Companyhave agreed to deliver three second feet.

14  It partakes of a contractual obligation with the blessing of

15  the highest trial court of California, and I don't believe they

16  can wiggle out of the three second feet at this juncture.

17  Everybody would like to ignore the fact that based on their

18  representations we acted, and acted to our irreparable damage

19  if it is set aside.

20      THE COURT:  What damage?

21      MR. VEEDER:  $51,000, to begin with.

22      THE COURT:  Now, wait.  You dug the well to find out

23  what kind of basin there was there.

24      MR. VEEDER:  Yes.

25      THECOURT:  And you found out, didn't you?  And you knew

1    when you dug the well that incidentally it would benefit

2    Vail Company because it was on their property and they could

3    use it.

4         MR. VEEDER:  That's right.

5         THE COURT:  How have you been hurt?  You got what you

6    wanted.  You found you went 2600 feet and never hit bottom.

7         MR. VEEDER:  All on the background that the stipulated

8    judgment was then in existence and would continue in existence.

9    That is the whole basis.  And if your Honor will look--

10        THE COURT:  Wait a minute.  If the stipulated judgment

11   was to continue in existence, you wouldn't have need of this

12   well.  What you needed this well for was to help you use it

13   in proving your case on this larger basin.

14        MR. VEEDER:  Proving what case?

15        THE COURT:  Your case that you are attempting to prove

16   now.

17        MR. VEEDER:  That well had not one iota to do with it,

18   your Honor.

19        MR. STAHLMAN:  That's all we have heard about.

20        THE COURT:  What was the purpose of drilling the well?

21        MR. VEEDER:  You will have to ask the Marines.  I don't

22   recall.

23        THE COURT:  You are asserting that the Government was

24   prejudiced.  What was the purpose of drilling the well?

25        MR. VEEDER:  I have not the slightest idea, your Honor.

1    I think Col. Duber can be called and interrogated.

2         THE COURT:  You have been urging from time to time the

3    great prejudice the Government suffered when they dug the well,

4    if anything happens to the stipulated judgment.  You certainly

5    ought to know what your position is going to be as to what the

6    purpose of the well was.

7         MR. VEEDER:  The purpose of the well, truly it was an

8    exploratory well to see how much water we could expect from

9    Vails under the stipulated judgment.  But I personally don't

10   know.

11        THE COURT:  Mr. Veeder, that broad statement, I

12   challenge you on that.  I challenge you to bring me any proof

13   that that well was dug to see how much water you could get from

14   Vail under the stipulated judgment.

15        MR. VEEDER:  I truly think it was an exploratory well

16   to determine the extent of the yield upon which we could

17   depend, as we are now depending.  I think that is the case.

18        THE COURT:  I suggest that it was a well to explore the

19   depth of the basin and that it had a definite purpose in

20   connection with this lawsuit and the contention the Government

21   makes as to the size and limits of the present basin in the

22   Temecula-Murrieta Valley.

23        MR. VEEDER:  In that regard, your Honor, I wanted to

24   make this statement in the record.  At the time I started the

25   lawsuit, and I started it, and throughout the conduct of the

1  lawsuit I had not the slightest idea of the objective of the

2  Pauba Well.  I had heard about it.  There is not a single question

3  in my mind that the Marines proceeded completely independent

4  of this litigation.  I know I proceeded completely independent

5  of the Pauba Well, the Navy Well.  I know, moreover, that when

6  we put the well in there was an agreement that it would be

7  part of the system under the stipulated judgment.  The words

8  are explicit.

9       MR. STAHLMAN:  Where is the agreement on that?  There

10  is no such agreement on that.

11      MR. VEEDER:  Wait a minute.  We have an exhibit here.

12  Let's check it.

13      MR. STAHLMAN:  You have been talking all day.  Let's

14  let somebody else have a chance here.

15      It's singular that two or three weeks after they obtained

16  permission to drill the well they served Vail with a lawsuit.

17  And Mr. Veeder tells you that he didn't know the purpose of

18  drilling that well, he didn't know it was drilled.  He was

19  preparing a lawsuit.  He didn't prepare it in two days.

20      MR. VEEDER:  I will swear before God Almighty that I

21  didn't know what they were drilling it for, and I didn't care.

22      May I read you paragraph 4 on that?

23      THE COURT:  Of what?

24      MR. VEEDER:  Of the revocable license pursuant to which

25  we entered upon the Vail property for the purpose of digging

1    the well.

2         THE COURT:   What exhibit number?

3         MR. VEEDER:   It is Exhibit No. 159 or 158.

4         MR. STAHLMAN:   Just a minute so I can follow you, Mr.

5    Veeder.

6         MR. VEEDER:   I didn't know you could read.

7         THE COURT:   All right, gentlemen, let's not put me in

8    the position of having to exercise some of my prerogatives

9    as to either one of you.   You are both good lawyers.   Conduct

10   the lawsuit without personalities.

11        MR. VEEDER:   Has your Honor found it?

12        THE COURT:   Paragraph 4.

13        MR. VEEDER:   Paragraph 4.

14             "It is understood and agreed that the

15             exploratory water well when completed shall

16             belong to and be wholly under the control

17             of the permittor and shall be considered a

18             water well under that certain stipulated

19             judgment in adjudication of Rancho Santa

20             Margarita vs. Vail. No. 42850, in the

21             Superior Court--"

22        If there is the slightest idea by anyone that that well

23   was not drilled and was not constructed with the full idea

24   and accepted by the Vail Company with the understanding

25   that the stipulated judgment was then in effect and would remain

1    in effect, I simply say that the words have to be twisted from

2    that express language.

3        THE COURT:  (1) The Vails didn't ask you to drill this

4    well.  The Government wanted to drill it.

5        (2) There was no showing that the Vails needed  another

6    water well at that particular time.

7        (3) If this is a contract of some kind and is binding

8    in effect, there is another solution to this matter.  If the

9    Government insists that some contract has been entered into

10   that is tied into the stipulated judgment and the stipulated

11   judgment goes out, I suppose the Court could decree that the

12   Vail well be capped, if the Government wanted to be a dog in

13   the manger about this.

14       MR. VEEDER:  All we want to do is to have our rights,

15   your Honor.

16       MR. STAHLMAN:  He stated this morning that we couldn't

17   run the well in the summertime anyway.  That well is not a

18   valuable well.

19       MR. VEEDER:  You are running it now, haven't you been,

20   all summer?

21       MR. STAHLMAN:  For what purpose?  Down at the lower

22   end of the stream it does not get into the system.  It waters

23   a few cattle down there.  We could do it with another well.

24   That well isn't essential.  It's of very low specific capacity,

25   too.

MR. VEEDER: Your Honor, I have one or two notes that I would like to cover, if I may, in regard to the queries to Mr. Stahlman.

The point was made that the three second feet was important in regard to the Rancho's cattle operation; that the three second feet is not now important.

MR. STAHLMAN: We are on a different subject now.

MR. VEEDER: I brought the point up because they were things you had asked Mr. Stahlman.

Now, one of the prime reasons for the reversal and the remand in Santa Margarita vs. Vail was the fact that Judge Jennings did not take into consideration the availability of the water in the basins. Now, to me it is impossible to state that the three second feet are not highly important, for several reasons: (1) They do constitute part of our supply of water; (2) Under our appropriative right for Lake O'Neill, which commences after the high water flow on the Santa Margarita River, it is dependent upon the water coming down through the Temecula Gorge. I don't want the impression left that the three second feet is not important to us.

There is an additional proposition that has been advanced in regard to the use of our basin. It is a matter that Mr. Girard has raised. The point from our standpoint is this. Paragraph 12 of the stipulated judgment says that Vails are always entitled to one-half of the quantity of water used

by the United States.  Now, the fact that we are pumping and
to that degree reducing the surface runoff of the Santa
Margarita across our basin, there are still criteria pursuant
to which we can make the determination one-third-two-thirds.

In other words, if we are diverting 9,000 acre-feet
annually, and we have pursuant to the stipulated judgment
Mr. Green measuring wells all of the time, there is a means
of determining Vail's one-half of our full entitlement.
In other words, it is entirely possible without any stream
flow passing the gaging station No. 6 to accord to the Vails
one of the chief benefits under the stipulated judgment, and
undoubtedly one of them that caused them to agree as they did
to the stipulated judgment.  They benefit from and they enjoy
the benefits of the confluence of the Santa Margarita reaching
the United States far below the Temecula Gorge.  In other
words, they benefit now by runoff from De Luz Creek, from
Sandia Creek, from Rainbow Creek, and the other affluents,
which they would not in the state of nature enjoy.

Those propositions, I think, your Honor, all go to the
basis upon which and the reasons for the settlement.

It may be that you will say, "Well, they weren't very
smart."  I don't believe, your Honor, that a matter can be
determined that way.  I think the question is, was there a
valid and a sound basis for a settlement?  And did the court
that entered the stipulated judgment have jurisdiction?  I

believe that when those factors are considered, in the light
of a failure to prove, as in my view they haven't proved,
an inequitable circumstance, I think the stipulated judgment
should be sustained.

MR. STAHLMAN:  If this downstream is of such benefit
to Vail, what are they kicking about?  They are certainly not
in this case to benefit Vails.

Mr. Veeder brought up something that also shows how
inconsistent this judgment is.  There are three different
methods by which the division of water is made, none of which
anyone has clearly defined so that we can understand it.  In
the first place, two-thirds-one-third.  And then what shall
be considered the two-thirds-one-third?  The one-half flow
at Ysidora or at No. 3, whichever is the greatest?  And then
in Section 12 we find another proportion.  Section 12 shows
a different basis upon which the division shall be made.
Section 12 reads:

> "The defendants at all times shall be
> entitled to divert from the Temecula-
> Santa Margarita River and its tributaries
> and apply to beneficial use upon their
> lands an amount of water equal to one-
> half of the amount which the plaintiff is
> entitled to divert from said river and its
> tributaries and apply to beneficial use

1          upon its land."

2          What do they mean by "entitled to divert"?  Do they mean

3 what they are entitled to have under the stipulated judgment?

4 If they do, do they mean the one-half of the flow of the stream

5 or the one-third?  Or do they mean the legal entitlement?

6 We again have an inconsistency.

7          The confusion that exists by reason of the looseness

8 of terms-- is it legal entitlement?  I presume that the

9 stipulated judgment would be interpreted according to general

10 terms and meaning.  Would it be the entitlement of the Santa

11 Margarita to the use of water under California law?  And if

12 they are entitled to use all water under California law, then

13 it puts Vail subject to all of the factors that enter into the

14 determination of what the rights on Camp Pendleton may be.

15 Under the stipulated judgment, we would have a right to rely

16 upon the fact that we would get one-third and two-thirds, and

17 that would include the fact that the water is put outside the

18 watershed.  Your Honor has made a ruling that the water out-

19 side the watershed is the water they are entitled to as

20 riparian on the stream system.  Therefore, you would have Vail

21 subject at all times to being geared to what the entitlement

22 at Camp Pendleton was.  It would add further confusion to the

23 lawsuit and demonstrates further the inequities of this

24 stipulated judgment.

25

THE COURT:  I haven't heard from my old friend here today.  I will not ask him to speak unless he has something to contribute.  Professor Burby.

PROFESSOR BURBY:  I don't believe I can add to the confusion-- I could add to the confusion, and I may not be of any great help.

There are one or two things that concern me a little bit.  In the first place, it is impossible for me to conceive that the judge in the first trial of this case, I mean in the Superior Court of California case, did not know what is meant by a river system and what would be included in the tributaries.

I think the mistake made by the trial court, as pointed out on the appeal, was the question as to the right to take the water from one tributary over the crest line and use it on land that is riparian to another.  I think that was the mistake, rather than the question as to what does or does not constitute a tributary.

The second thing that interests me a little bit is the concern of Mr. Stahlman as to where this water may come from to fulfill the terms of this contract.  Now, I may be wrong on this, but I don't believe there is any impossibility of performance shown here.  In fact, I suppose Colorado River water might even be available for that purpose.  In other words, it does not seem to me to be a defense to say that in order to carry out the terms of this contract we will have to

steal water from somebody else.  There may be such a thing

that the three second feet may not be available in the stream

system, but I believe it would be possible to secure that

water.

There are many other things that have been of great

interest to me.  Frankly, I have not made an extensive study

of this, but I can see that there are some very serious

problems that the Court will have to resolve.

That is all I have to say, your Honor.

MR. VEEDER:  I believe I can agree entirely that there

are some difficult problems.

THE COURT:  We of course don't have all of the record.

We know pretty well what the record is going to be in general

terms.  We have to have the record on this pumping upstream

from Vail. We have to have Mahlon Vail's testimony, and maybe

some well measurements, and our record on this score will be

complete.  Is that right?

MR. VEEDER:  Are you looking at me, your Honor?

THE COURT:  I am looking at you right now.

MR. VEEDER:  That's right.

THE COURT:  I am going to make the suggestion that Mr.

Veeder prepare the draft of an interlocutory judgment, findings

and conclusion, sustaining the stipulated judgment and such

part, if any, of the old judgment as he lays claim to.

And I am going to ask Mr. Girard, since the great State

1  of California is here pro patria and since he has demonstrated

2  a fine ability in writing briefs and presenting issues, to

3  draw a draft of an interlocutory judgment, findings and con-

4  clusions to support it, setting aside the stipulated judgment

5  and any part of the old judgment that remains.

6      That work can be going on and by the time we complete

7  this small amount of evidence that will be needed to complete

8  our factual record on it, I propose to meet this thing head-

9  on and sign one or the other-- maybe not as they are drawn, but

10  an interlocutory judgment on this question.

11      MR. VEEDER:  Do you think that will be a sufficiently

12  final order?

13      THE COURT:  I don't contemplate making it a final order.

14  I contemplate making it an interlocutory judgment in this

15  matter and getting it behind us.

16      MR. VEEDER:  When do you want the proposed--

17      THE COURT:  I will give you as much time as you want on

18  the thing.

19      The more I read the stipulated judgment, the more I

20  read the other judgment, the more I see of this case, the more

21  I become convinced that if there is any legal way to get rid

22  of the stipulated judgment, we ought to get rid of it.

23      I am not making any findings now.  I am not saying that

24  is what I am going to do.  But there is no doubt in my mind

25  that getting rid of the stipulated judgment would facilitate

a decree in this case.

MR. SACHSE:  May I ask a question, your Honor?  As I understand these assignments, you left it possible for Mr. Veeder to write an interlocutory judgment--

THE COURT:  From his position.

MR. SACHSE:  Affirming the stipulated judgment but throwing out the old original trial judgment, if he so desires.

THE COURT:  That is the position he seems to want to take.

MR. SACHSE:  But then you have left the State of California the opportunity of knocking the whole thing out. Isn't there a third alternative?  That the stipulated judgment sticks as a contract-- it is not a contract, but as binding between Vail and the United States, but that everything else in the original judgment sticks to the benefit of all of us other litigants.

THE COURT:  All right, you have that job.

MR. SACHSE:  All right.

MR. VEEDER:  I think we are going shoulder to shoulder here now.

THE COURT:  Don't be too sure until we see what Mr. Sachse comes up with.

MR. VEEDER:  I was attempting humor, your Honor.

MR. SACHSE:  I am quite sure we will not be shoulder to shoulder, Mr. Veeder.

THE COURT:  Parts of these proposed findings you make

will have to be in blank, in that we do not have the figures,

for instance, on upstream pumping as yet. But I think that

generally we have the outlines of the proof on this problem.

Do you see any objection to this kind of procedure?

MR. VEEDER:  No, I think it is in keeping with what we

are doing with the small users.  It may be that I will ask

you to make it final for the purposes of appeal, if you go the

other way, because as far as I am concerned we spent too much

money dependent on this to lose the benefit of it the first

time around.

MR. STAHLMAN:  If you aren't careful you will find your-

self in the same position that Judge Yankwich was in when he

made findings.

MR. VEEDER:  I realize the difficulties.  But, your

Honor, we have a couple hundred million dollars involved in this

thing and we have built our system on the basis of it.

THE COURT:  I don't know.  When I went on the bench

they told me you decided cases not on the basis of how big a

litigant was or how powerful ; that the Federal Judge had a

life appointment, and that it was in line with the independence

of the judiciary.  I don't know that I should be concerned

about that.  I am more concerned about what the law is and

what the facts are.  I can't solve your problems.  If Marine

generals want to build installations outside a watershed,  I

1    think they do it at their peril.

2    MR. VEEDER:  Your Honor, there is probably no more

3    important single question than the one that we have.

4    THE COURT:  I think it is a very important question.

5    Whichever way I go on it, it will not be done without a lot

6    of deliberation and study.

7    Mr. Clerk, here is Exhibit 21 and Exhibit AQ.

8    Someone handed me up a stipulated judgment.

9    MR. STAHLMAN:  That's ours, your Honor.

10    THE COURT:  Mr. Veeder, do you want back your brief

11    of September 21, 1959, or do you have an extra copy?

12    MR. VEEDER:  I have a better copy than that.  I will

13    bring it to you.  I am going to bring in some interlocutory

14    judgments.

15    MR. STAHLMAN:  Your Honor didn't set a time on those

16    proposed judgments.

17    THE COURT:  No.

18    Mr. Stahlman, you were going to find out about Mr.

19    Vail's condition.

20    MR. STAHLMAN:  I was going to call. I neglected to do

21    so.  I will do it right now, if I can get hold of him.

22    I told your Honor I am quite sure I can have him here

23    at the end of the Oviatt testimony, as you indicated.

24    MR. GIRARD:  For what it is worth, I will not be able

25    to be here next week.  But as I understand, Mr. Oviatt's case

1   is going on.  I don't think that concerns the State too much,

2   and I am not going to ask for a continuance.  I have to go to

3   Utah on another matter next week.  But Mr. Illingworth will be

4   here to make any decisions that have to be made in behalf of

5   the State.

6        THE COURT:  Tuesday the 18t is the next session.

7        Do we want to talk some more about these March dates

8   now, or can we put that over until next week?  Let's put that

9   over until next week.

10       I am presently looking at March 22nd and March 29th.

11       MR. SACHSE:  I prefer putting it over to next week,

12   because I can't answer on Stardust Rancho until after Sunday.

13       THE COURT:  Put that over to our next hearing, after

14   next week's sessions.  Tuesday at 10 o'clock.

15       About how much time do you estimate you want to get these

16   proposed findings, conclusions and interlocutory judgments

17   prepared?

18       MR. SACHSE:  It seems to me, if we can ignore true

19   findings of fact-- we don't have to be too choosy about spelling

20   out the findings--

21       THE COURT:  These are subject to correction and change.

22       MR. SACHSE:  If we can boil it down to findings in

23   mere outline and conclusions of law and judgment in form, it

24   shouldn't take too long to do.

25       THE COURT:  I mean in outline form and subject, of

1    course, to filling in or supplying certain facts.  The con-

2    clusions should be done more carefully than the proposed

3    findings, and references to the stipulated judgment and the

4    original judgment can be shorthanded.  I don't think this is

5    something I am going to sign, either one of them, but I want

6    the three positions outlined as to how this thing would work.

7         Let's say now that we wouldn't want them before our

8    session in March and give you probably until the middle of

9    March, the 22nd or 29th of March, before we want them in.

10   Is that all right?

11        MR. SACHSE:  All right.

12        MR. GIRARD:  Any date, your Honor.

13        MR. VEEDER:  I am not sure what the calendar will be,

14   but I will abide by that, and if I get caught I will ask your

15   Honor for your leniency.

16        MR. SACHSE:  The man who brought up the question as to

17   how fast we will do this is the one man who didn't get an

18   assignment-- George Stahlman.

19        THE COURT:  He is pretty close to the picture, and if

20   he wants to put his hand to it--

21        I think I will let you have a crack at what you think it

22   should be, too.  We will have four of them.  So you have a job.

23        MR. STAHLMAN:  I will sit down and write it out right

24   now, your Honor.

25        So that there will be no misunderstanding on this Vail

1   situation, as I indicated to your Honor, I wanted to go with

2   Mr. Vail to talk to some people who were also connected with

3   this drilling of the Pauba well at the time it was being

4   initiated.  It may be that there is some other person who

5   would have evidence, instead of Mr. Vail.  It may be we would

6   use them both.  It may be we will use just one, whichever

7   the circumstances are.

8        THE COURT:  Take a short recess and then I'll take up

9   the Jae Mae matter.

10       (Adjournment in the Fallbrook case until Tuesday,

11   February 9, 1960, at 10 A.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25