# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

—————

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

—————

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Tuesday, February 9, 1960

**Pages:** 11637 to 11786

FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By_____
DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

1           IN THE UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF CALIFORNIA

3               SOUTHERN DIVISION

4                 - - -

5

6      HONORABLE JAMES M. CARTER, JUDGE PRESIDING

7                 - - -

8  UNITED STATES OF AMERICA,    )

9           Plaintiff,    )

10      vs.              )      No.1247-SD-C.

11  FALLBROOK PUBLIC UTILITY    )
     DISTRICT, et al.,       )

12            Defendants.   )

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17            San Diego, California
             Tuesday, February 9, 1960

18

19  APPEARANCES:

20     For the Plaintiff        WILLIAM H. VEEDER, ESQ.,
                          WILLIAM E. BURBY, ESQ.,

21                          Special Assistants to the
                          Attorney General,

22                          Department of Justice,
                          Washington, D. C.

23

24                          LCDR. DONALD W. REDD.

25

APPEARANCES (Continued):

    For Defendant Fallbrook
    Public Utility District,    FRANZ R. SACHSE, ESQ.
    et al.

    For Defendant Vail        GEORGE E. STAHLMAN, ESQ.
    Company

    For Defendant Murray     WALTER GOULD LINCOLN, ESQ.,
    Schloss Foundation      and MRS. ROSALIND BATES.

    For Defendant Oviatt     MESSRS. MUSICK, PEELER & GARRETT,
                          by JESSE R. O'MALLEY.

    For Defendants Gibbon    GEORGE GROVER, ESQ.
    and Cottle

INDEX TO WITNESSES

For the Plaintiff:                          D        X       RD      RX

    Allen C. Bowen                     11657    11663

For the Defendants:

   James Oviatt                          11673
   Harold Kimbell Brinkerhoff          11701    11731
   Fred Bass                                  11737    11741
   Dave Welch                                 11746    11750
   Chalma Bailey                              11761    11774

# INDEX TO EXHIBITS

| Plaintiff's Exhibits - | Iden. | In Evidence |
|---|---|---|
| ~~206~~, 206-A, 206-B, 206-C | 11652 | 11655 |
| 207-A | | 11655 |
| 207-B-1, 2 and 3 | | 11655 |
| 207-C-1, 2 | | 11655 |
| 208-A, B, and C | | 11655 |
| 209-A, B and C | | 11655 |
| 211-A, B and C | | 11655 |
| 212-A, B and C | | 11655 |
| 213-A, B and C | | 11655 |
| 214-A, B and C | | 11655 |
| 215-A, B and C | | 11655 |
| 216-A, B and C | | 11655 |

| Defendant's Exhibits - | | |
|---|---|---|
| Oviatt Exhibit A - Engineering Report | 11657 | 11663 |
| Oviatt Exhibits B through V | | 11663 |
| Oviatt Exhibits W and X | 11668 | |
| Oviatt Exhibit Y-1 through Y-4 | 11675 | 11680 |
| Oviatt Exhibit Y-5 through Y-7 | 11676 | 11680 |
| Oviatt Exhibit Z | 11681 | |
| Oviatt Exhibit AA | 11769 | 11773 |
| Oviatt Exhibit AB | 11770 | 11773 |
| Oviatt Exhibit AC | 11772 | 11773 |

1  San Diego, California, Tuesday, February 9, 1960.  10:00 A. M.

2

3      (Other matters.)

4      THE CLERK:  No. 1247-SD-C, United States of America,

5  plaintiff, vs. Fallbrook Public Utility District, et al.,

6  defendants.

7      Further court trial.

8      Your Honor, I believe there are some new appearances this

9  morning.  May I get those?

10     THE COURT:  Yes.

11     MR. O'MALLEY:  Mr. J. R. O'Malley, of the law firm of

12  Musick, Peeler & Garrett, and I am appearing for the defendant

13  James Oviatt.

14     THE COURT:  Who else is appearing here?  We know most of

15  you.  Mr. Grover is here, and Mrs. Bates is here.

16     Are any land owners appearing here this morning who have

17  any interest?

18     Mr. Swing is here.  I don't think you have any clients,

19  do you, Mr. Swing?

20     MR. SWING:  Your Honor, yes.  I have been discharged for

21  disability from this case, but I still have an indirect inter-

22  est in it, and I want to keep in touch with those who are

23  actively participating.  I recall after the Civil War the sur-

24  vivors started having reunions, and I anticipate when this

25  "Civil War" is over that there will be occasion to have

1    reunions to celebrate the victory.  I would like to be among

2    those present.

3         THE COURT:  We are glad to have you here, Mr. Swing.

4    What matters shall we proceed with?

5    Mr. Sachse, you had a motion?

6         MR. SACHSE:  I have a motion to be relieved as counsel.

7    That may go off calendar until everything is straightened out

8    to my satisfaction.

9         THE COURT:  Your motion may be withdrawn?

10        MR. SACHSE:  It may be withdrawn.

11        THE COURT:  Mrs. Bates, you have a motion?

12        MRS. BATES:  Yes, your Honor, I have a motion in behalf

13   of the Trustees of the Murray Schloss Foundation, as set out

14   in the motion, who have discharged Mr. Lincoln and have retained

15   me in the matter.

16        I received just a few moments ago from Mr. Lincoln an

17   answer and what purport to be two demurrers.  I may be in

18   error, but I thought under Rule 7 we didn't have demurrers in

19   the Federal Court any more.  This is what these are called.

20        On page 2 Mr. Lincoln states that we did not comply with

21   Rule 3, which is true, your Honor.  The reference to Section

22   1654, Title 28 of the United States Code, did not go through

23   on to the one that Mr. Lincoln was served with, or onto one of

24   the originals.  That much is correct, your Honor.

25        As to the rest of it, the demurrer section, Mr. Lincoln

1  has been informed by registered mail by the Trustees that he is

2  no longer employed, and he sees fit to attempt to continue in

3  this matter, your Honor.  We feel that it is very irritable

4  that we be placed in a position where we may amend the answer,

5  as under the present circumstances harm could be done to the

6  Schloss property if they were left with not even a request for

7  water, your Honor.

8      THE COURT:  First of all, it is not urgent, and I am not

9  going to take up a lot of time today settling a dispute between

10  you and Mr. Lincoln.  It is not urgent, because we have a lot

11  of things to try in this case, and I can't see that there is

12  any prejudice to the rights of the Schloss Estate to put this

13  over to some future time.

14      Secondly, there is no such thing as a special demurrer,

15  or even a general demurrer, in the Federal Court, and all this

16  matter set forth in the fourth separate defense will be

17  stricken.  This is typical state practice.  The subdivisions A

18  through R are matters of special demurrer.  We don't know what

19  a special demurrer is in this court.

20      As far as the complaint is concerned, there is a motion to

21  dismiss for failure to state a cause.  But this is not a com-

22  plaint.  It is a simple matter of substitution of counsel.

23      If this matter can't be disposed of amicably between you,

24  I suppose the Court at sometime in the future will set a hearing

25  on it.  But I am not going to be excited about it.  I have too

1    many important matters to try, to worry about that.  The Schloss

2    Estate will not be prejudiced by delay in ruling on this matter.

3         MRS. BATES:  I am going to have to amend the answer, your

4    Honor.  I would have to ask for permission to amend at such

5    time as I am substituted in.

6         I also have learned this morning that Col. Bowen hasn't

7    even finished the maps and that they will not be finished until

8    sometime toward the end of March.  So you are quite right on

9    that.  But I would like to have him cite some termination, or

10   whatever the Court wishes me to do, so that I can report both

11   to the State Court in Riverside and to the Trustees as to whether

12   I am or am not an attorney of record in this matter.  This

13   isn't between me and Mr. Lincoln.  I am here representing the

14   Trustees, your Honor.

15        THE COURT:  What is in issue in this dispute between you

16   and Mrs. Bates, Mr. Lincoln?

17        MR. LINCOLN:  Your Honor, the fundamental issue is a very

18   simple question, although a very much complicated one, as to

19   who of various individuals are now or have been for some month

20   or two the real actual bona fide trustees of the Estate of

21   Murray Schloss, and that requires a review of all the proceed-

22   ings which have occurred in the Riverside Court, together with

23   the proceedings which are now pending before the District Court

24   of Appeal of the State of California on petition for writ of

25   mandate filed by myself a few days ago.

1   We take the position in that, if your Honor desires me

2   to go into it any further--

3   THE COURT:  I understand that the Riverside Superior

4   Court made some determination?

5   MR. LINCOLN:  Based upon a petition by one trustee, the

6   Riverside court removed two other trustees.  We respectfully

7   contend, in the first place, that the Riverside court, being

8   a probate court, had no jurisdiction to remove a trustee

9   anyway; and secondly, that one trustee has no right to file a

10  petition to remove another trustee of the same trust

11  THE COURT:  But if the judgment of the Superior Court

12  of Riverside County stands, then that judgment determines who

13  the trustees of the Murray Schloss Estate are; is that right?

14  MR. LINCOLN:  To some extent only, your Honor.  Your

15  Honor is right to that extent.  Only partially, however.

16  THE COURT:  How partially?

17  MR. LINCOLN:  Well--

18  THE COURT:  The Superior Court of Riverside County re-

19  moved two trustees?

20  MR. LINCOLN:  Yes, your Honor.

21  THE COURT:  How many trustees are there altogether?

22  MR. LINCOLN:  Ten.  There were two vacancies at the time.

23  Consequently, that left four vacancies.

24  The next problem comes as to what were the circumstances

25  of the making of the four trustees who were supposed to have

taken their place, and as to what we respectfully contend that

the one trustee who filed the case originally is seeking to

get his friends and relatives into the position of trustees

of the estate so that they then may do things which are ab-

solutely against the will of the decedent and against the

decree of distribution which was filed in the estate in 1931.

MRS. BATES:  May I be heard, your Honor?

THE COURT:  I am not going to try this out.

MRS. BATES:  No, I don't expect you to.

May I say, I am just hearing about the writ of mandate

right now.  I have never been served.  But then I have never

been served by anything in these matters that Mr. Lincoln files

in various courts.  Eventually I will probably pick it up in the

District Court.

May I add that I do represent the majority of the trustees.

All of these matters have not only been handled by the Riverside

Court, but no friends or relatives of anybody except Mr.

Lincoln's two sons, Mr. Lincoln's wife and Mr. Lincoln's

secretary are involved in the deal.  But all we are interested

in here is, as soon as we are able to, to try to protect the

Schloss property, which we feel hasn't been done here.

I have no knowledge, as I say, about this writ of mandate

at all.  This is something that must have occurred within the

last 24 hours.

THE COURT:  I may require you to fight this all out in

1    Superior Court before you bother me with it.  I am certainly

2    not going to review the proceedings in the Superior Court.  I

3    have no appellate jurisdiction over a Superior Court.  It seems

4    to me that if you have matters pending in that court, we will

5    have to wait until they become final and find out exactly what

6    the Riverside Superior Court has determined.

7         I am going to continue this motion.  I suppose it should

8    be put over to a date to which we would adjourn the Fallbrook

9    case again, although I doubt if anybody else in the litigation

10   is interested in the quarrel between the trustees in the Schloss

11   Estate.

12        Is anybody here interested in that controversy?

13        I will continue it until Tuesday, March 22nd, 1960, at

14   10 o'clock A.M.

15        MRS. BATES:  Your Honor, I will have been two days in

16   trial on a personal injury case in Los Angeles on March 22nd.

17   Could it be before then?

18        THE COURT:  It could be before then.  I don't know

19   whether it can be then or not.  We have a very heavy criminal

20   calendar down here.

21        I will say this.  If you take on representation in this

22   case you are accepting a hazardous assignment for the reason

23   that we have to try our criminal cases and we do the best we

24   can to accommodate counsel in these civil matters, and some-

25   times we have a lot of problems.  And so if you are tied up

1    in a lot of State court matters, you may have problems from

2    time to time.  This is catch as catch can trying to get to

3    work on the Fallbrook case.

4         MRS. BATES:  It was not my idea that I should have to

5    be here on every occasion that this case was called, your

6    Honor, but only when the matters in regard to the Schloss

7    Estate came up.

8         THE COURT:  What about the 29th?

9         MRS. BATES:  I have a matter, but I will continue it,

10   on the 29th.

11        THE COURT:  When I say the 29th, I have no assurance

12   that we will hear your matter on Tuesday. We might hear it

13   sometime during the week.  We set matters on Tuesday here, as

14   they do in Los Angeles.  We try to let you know at the end of

15   the week preceding what our schedule is going to be.  We can't

16   call it any closer than that.

17        Do you prefer the 22nd or the 29th?

18        MRS. BATES:  The 29th, your Honor.  I don't assume that

19   the motion to substitute attorneys is going to take up very

20   much of your time?

21        THE COURT:  I have indicated that I am going to let the

22   Riverside Superior Court decide this matter.  If this writ of

23   mandate is denied, we will see what kind of judgment you have

24   and how far that takes us around to a solution.  You have the

25   controversy in the Superior Court.  I don't think I should take

1    it on.

2         March 29th at 10 o'clock.

3         MRS. BATES:  Thank you.

4         MR. VEEDER:  May we proceed, your Honor?

5         THE COURT:  Yes.

6         MR. VEEDER:  I have talked with your Honor, Mr. Sachse,

7    Mr. Stahlman, and generally Mr. Swing, outlining the proposal

8    that was outlined to your Honor in some detail that the United

9    States of America would undertake to put into the record an

10   alphabetical list of defendants, a description of the boundaries

11   of the properties of these defendants, and file a map showing

12   the location of each of the properties.

13        I have prepared, your Honor, a tabulation of the exhibits,

14   and I hand it to your Honor.

15        THE COURT:  This tabulation will concern the entire

16   watershed?

17        MR. VEEDER:  It will concern the entire watershed, your

18   Honor, starting, however, with the Murrieta area, because in

19   accordance with our discussions with your Honor we will notice

20   for April 4, 1960, a calling of cases involving parties who

21   either have not answered or have filed pro per and are not

22   represented by counsel.  .

23        THE COURT:  From the Murrieta?

24        MR. VEEDER:  In the Murrieta area, your Honor.

25        MR. SACHSE:  You mean April 5th or 4th? What is Monday?

MR. VEEDER:  We have noticed it for the 4th.  Do you want it on the 5th, your Honor?  It doesn't matter to us.

THE COURT:  It had better be on a Tuesday rather than on a Monday.

MR. VEEDER:  All right, we will put it on April 5th, then.

THE COURT:  You don't anticipate this will take very much time?

MR. VEEDER:  I don't think it will take very much time. We will call Col. Bowen to put in evidence in regard to the riparian overlying and irrigable acreage, and it depends a great deal as to whether these individuals-- and I am sincerely hopeful they will appear-- will testify in regard to their water uses and in regard to their sources of water.

Now, I have asked Mr. Luddy (the Clerk) to reserve for us, for the purpose of these exhibits which have been marked by us, for the Lower Murrieta and Santa Gertrudis watershed, it would be Plaintiff United States of America Exhibit 206-A, B and C, and they will run on through with each of the exhibits which we have here and which I will deliver to the clerk for marking.  I don't think we need to take the Court's time.

THE COURT:  The document you handed me will be No. 205.

MR. VEEDER:  I hadn't thought I would put that in as an exhibit, your Honor.  It is simply a--

THE COURT:  A tabulation.

MR. VEEDER:   Well, I would designate it as 206½, and then it will be 206-A, B, and C.   We can put that document in.

THE COURT:   What is No. 205?

MR. VEEDER:   It is the Pemberton Report in the Vail case.

I would deliver these to Mr. Luddy and let him at his convenience mark them, if that is all right, because they are voluminous and there are a great number of them and I didn't think we needed to take the Court's time doing that.

MR. STAHLMAN:   In connection with the conversation we had this morning, Mr. Veeder, does this list contain the Vail properties in the town of Temecula?

MR. VEEDER:   Yes.   There is a point, Mr. Stahlman, that I think is of importance.   Mr. Sachse and I have been working on a stipulation in regard to the town properties in Temecula, Murrieta and Wildomar.   I think those should be treated separately from the farm properties, and I think that can be worked out.

But we haven't yet come to complete agreement as to the kind and type of interlocutory judgment that will be entered.

THE COURT:   The tabulation you handed me starts with references to 206-A, B and C.   Why don't we mark this document 206?

MR. VEEDER:   Your Honor, I have already marked it 206.

THE COURT:   Yes. Everything inside starts with 206-A. Why can't this be called 206?

1    MR. VEEDER:  Fine.

2    THE COURT:  Do you have an extra copy?

3    MR. VEEDER:  Yes (handing document to the Court.)

4    THE COURT:  Does anybody object to this procedure that

5    has been outlined?

6    MR. VEEDER:  These will be lodged with the Court.  Any-

7    body can examine them.  If there is objection, they can raise

8    it.

9    (Plaintiff's Exhibits 206, 206-A, 206-B and 206-C were

10   marked for identification.)

11   THE COURT:  I think it is also the plan of the Govern-

12   ment, at least from what I have heard, that from time to time

13   they will thereafter bring on some of these other areas for

14   hearing in like manner of people who have not filed answers

15   or who have answered in pro per and not come into court.  Letters

16   will be sent out in an attempt to bring them in from time to

17   time throughout the watershed.

18   Isn't that your purpose?

19   MR. VEEDER:  That is the purpose, your Honor, and I think

20   if we put in their titles and put in the exterior boundaries

21   of their properties, your Honor will have the point of beginning

22   in making findings.  There are a great many of these people

23   who are now using water but who have not indicated any desire

24   or interest in appearing.

25   THE COURT:  I doubt if the other counsel in the case will

1653

1   be interested in these proceedings.  However, I suppose we

2   will have to set up dates so that counsel can be present if

3   they want to.

4       MR. VEEDER:  We intend to serve these people.

5       THE COURT:  Have you, Mr. Sachse, any interest in these

6   matters?

7       MR. SACHSE:  I have some clients who are affected,

8   and Mr. Veeder and I hope to draw an interlocutory judgment

9   form or something to work it out.  But I have an interest.

10      THE COURT:  Will any other counsel be interested in

11  these?

12      MR. STAHLMAN:  I will be interested in the Vail townsite

13  lots in Temecula, your Honor.

14      THE COURT:  But you wouldn't be interested in other

15  people?

16      MR. STAHLMAN:  No, your Honor.

17      MR. VEEDER:  Your Honor's letter would be distributed

18  to each counsel.

19      THE COURT:  So they would know.

20      MR. VEEDER:  Yes.  That is what I think they would

21  require.  And we would send the same letter to each individual

22  defendant.

23      THE COURT:  All right, that ought to do it.

24      MR. VEEDER:  If it is amenable to your Honor, I will

25  avoid the time now with these.

THE COURT:  By "these" you mean Exhibit 206?

MR. VEEDER:  These exhibits which are tabulated on your Honor's desk.

As I understand, there are no objections.

THE COURT:  You are offering them in evidence?

MR. VEEDER:  That is right, your Honor.

MR. STAHLMAN:  What are you offering in evidence?

MR. VEEDER:  Exhibits 206-A, B, and C on through.

MR. STAHLMAN:  Are some of those Vail properties?

MR. VEEDER:  Yes.

MR. STAHLMAN:  I would like to see them first.

MR. VEEDER:  Yes.

THE COURT:  Can't we put them in evidence?  I think you are going to find them to be just assessor's charts and lay-outs, et cetera.

MR. VEEDER:  The fact is that I would appreciate it if anybody finds anything that is not exactly correct.

MR. STAHLMAN:  May I ask this question, Mr. Veeder:  Do these comport with the maps which we put in on the Temecula townsite?

MR. VEEDER:  Yes, they do.

MR. STAHLMAN:  Very well.

MR. VEEDER:  George, I would suggest that you take a look at them, because you and I have to work out these town lots.

THE COURT:  Do you want me to hold up ruling on his

1    offer?

2        MR. STAHLMAN:  I don't think so, your Honor.

3        THE COURT:  All right.  Plaintiff's Exhibits 206-A, B,

4    and C, 207-A, 207-B-1, 2 and 3, 207-C-1, 207-C-2, 208, A, B,

5    and C, 209, A, B, and C, 210-A, B and C, 211-A, B and C, 212-A,

6    B and C, 213-A,B, and C, 214-A, B, and C, 215-A, B, and C,

7    216-A, B, and C are received in evidence.

8        MR. SACHSE:  May I have one more question, Mr. Veeder.

9    Some of these have previously been introduced before the

10   Master?

11       MR. VEEDER:  Yes.

12       MR. SACHSE:  There has been no change in them?

13       MR. VEEDER:  No, there has been no change, and those

14   have the Master's designation, so that there can be no mixup

15   on them.

16       THE COURT:  Which ones are you referring to, like No.

17   213?

18       MR. SACHSE:  No. 213 has been introduced.  Starting

19   from the back, De Luz has been introduced, Fallbrook has been

20   introduced.

21       THE COURT:  Those exhibits will have the Master's exhibit

22   number on them?

23       MR. VEEDER:  Yes.

24       THE COURT:  All right.

25       MR. VEEDER:  And it is very important, because we are

1   sending out our interlocutories on the basis of that.

2      MR. STAHLMAN:  In connection with De Luz and Sandia, those

3   matters have not been heard, as far as the Vail property is

4   concerned?

5      MR. VEEDER:  That is right.

6      MR. STAHLMAN:  You will have a date for that, I presume.

7      MR. VEEDER:  Yes.  This relates solely to title, Mr.

8   Stahlman.  It has nothing whatever to do with rights.  Just

9   simply land ownerships.

10      MR. STAHLMAN:  All right.

11      MR. VEEDER:  Your Honor, it may be that we will substi-

12   tute some of these.  We are using work copies here.  But I

13   will let your Honor know which ones those are that we sub-

14   stitute copies for at a later date.

15      THE COURT:  Are you ready to go, Mr. O'Malley?

16      MR. O'MALLEY:  Yes, your Honor, although it is my

17   understanding-- and I conferred with Mr. Veeder yesterday

18   afternoon-- that he desires to put on Col. Bowen somewhat

19   out of his usual order, and that is entirely agreeable with me,

20   if that is still his desire.

21      MR. VEEDER:  Yes.  I think what we would do is put in

22   Mr. Oviatt's engineering report at this time, if Mr. O'Malley

23   is ready to proceed with his case.

24      THE COURT:  Come forward, Col. Bowen.

25

ALLEN C. BOWEN,

called as a witness for the plaintiff, having been previously
duly sworn, testified further as follows:

DIRECT EXAMINATION

MR. VEEDER: I think this will be Plaintiff's 217, Mr. Luddy.
I ask to have it marked for identification.

I think this will be an Oviatt exhibit. The next number
will be 217, your Honor.

THE COURT: Do you want to give it a Government number or
an Oviatt number?

MR. VEEDER: It is entirely up to your Honor.

THE COURT: Mr. O'Malley, do you have some exhibits?

MR. O'MALLEY: Yes, indeed, your Honor.

THE COURT: Do you have an Oviatt series?

MR. O'MALLEY: Yes, sir.

THE COURT: All right, Oviatt's Exhibit A.

MR. O'MALLEY: However, I understand this is now being
offered as the Government's exhibit, although I may say that
subject to the fact that we may went to interpolate and modify
some very minor things in the report we have no objection to
its receipt in evidence.

MR. VEEDER: It is prepared by the Government, if you
want it that way.

THE COURT: Oviatt's Exhibit A marked for identification.

1        (Defendant Oviatt's Exhibit A was marked for identi-

2   fication.)

3   BY MR. VEEDER:

4        Q   Col. Bowen, I hand you Oviatt's Exhibit marked for

5   Identification A and ask you to read into the record the title

6   block on that and state under whose direction it was prepared.

7        A   "Engineering Report on the Property of James Oviatt

8   prepared by the Office of Ground Water Resources, Marine Corps

9   Base, Camp Pendleton, California," prepared under my direction

10  and supervision.

11       Q   Col. Bowen, is that data contained in that Oviatt's A

12  correct, to your own personal knowledge?

13       A   Yes, sir.

14       THE COURT:   Do you offer it in evidence?

15       MR. VEEDER:   I offer it now, your Honor.

16       THE COURT:   It is received in evidence.

17       (Defendant Oviatt's Exhibit A was received in evidence.)

18       MR. O'MALLEY:   There is no objection, however, as I

19  pointed out to your honor, we may wish to add some additional

20  data that is not reflected in this report.

21       THE COURT:   Does this upset your numbering series?

22       MR. VEEDER:   No, your Honor.

23  BY MR. VEEDER:

24       Q   Col. Bowen, I hand you an aerial photo marked Oviatt's

25  B and ask you to state into the record what appears on that

1  aerial and to identify it with the content of Oviatt's A, if

2  you would, please.

3          A  Oviatt's Exhibit B for Identification--

4          MR. STAHLMAN:  Could you give me the number of it?

5          THE WITNESS:  Oviatt's B for Identification.

6          MR. STAHLMAN:  And the area?

7          THE WITNESS:  I will, if you will give me time.

8          Oviatt's B for Identification is a photographic repro-

9  duction of a soil survey field sheet.  The vertical aerial

10  photo reproduced in Oviatt's B is 3-0185.  Referring to

11  Oviatt's A, there is a photo index showing the photos which

12  were used in surveying the Oviatt property.  This photo index

13  appears just above the glossy reproductions of the aerial

14  photo and Oviatt's B appear in the upper left-hand corner of

15  the photo index with the number 3-0185 inside the match lines

16  of that photo.  Similarly, each of these other photos, the match

17  lines of each of the photos are depicted on the photo index

18  included with Oviatt's A.

19          MR. VEEDER:  We offer in evidence the identification

20  marked Oviatt's B.

21          THE COURT:  It will be received in evidence.

22          (Defendant Oviatt's Exhibit B was received in evidence.)

23  BY MR. VEEDER:

24          Q  Col. Bowen, I hand you Oviatt's C and ask you to state

25  into the record what appears on that aerial?

11660

A   Oviatt's C for Identification is a photographic reproduction of the soil survey field sheet used to map a portion of the Oviatt property.   This is a reproduction of vertical aerial photo 3-0184.   It shows a portion of the Ramona Ranch.

MR. VEEDER:   I offer in evidence Oviatt's C, your Honor.

Your Honor, we are in this position.   We have these large aerials of the same data contained in Oviatt's A.   Col. Bowen has now testified in regard to Oviatt's B and C.   I see no objection to going through each one of these--

MR. O'MALLEY:   I will stipulate that they may be received in evidence.

MR. VEEDER:   They go from D to V.

THE COURT:   They are all identified.

MR. SACHSE:   The numbers are out of order.   The first two were reversed from the way they were in the book.   Could you just read them off?

MR. VEEDER:   I would like to make the offer.

THE COURT:   Can the exhibit numbers be put in on the page in the Exhibit A that we are talking about?

MR. STAHLMAN:   Read them off and we can mark ours.

MR. VEEDER:   I would have them marked, and we would have Col. Bowen during the recess mark them.   I am moving fast because of time.   I think we could have him go through during recess and mark it into Oviatt's A, each one of these aerials,

1    to the end that they would be in proper order.

2        MR. STAHLMAN:  Don't you want to show by this record the

3    number of the photos and what exhibit number it is?

4        MR. VEEDER:  That is what I think we can do.  I think he

5    can do it during the recess.

6        THE COURT:  What do you want done? The exhibit number

7    read and the aerial numbers?

8        MR. STAHLMAN:  Give us the number and what exhibit it is

9    and we can mark it.

10       THE COURT:  Just read them in, Mr. Veeder.

11       MR. VEEDER:  Go ahead and read them in.

12       THE WITNESS:  Oviatt's D for Identification is a

13   reproduction of aerial photo 5-0104.

14       Oviatt's E for Identification is a photo reproduction of

15   Photo No. 5-0151.

16       Oviatt's F for Identification is a photo reproduction of

17   Aerial Photo 6-0016.

18       Oviatt's G for Identification is a reproduction of the

19   aerial photo 6-0017.

20       Oviatt's H for Identification is a photo reproduction

21   of aerial photo 6-0018.

22       Oviatt's I for Identification is a reproduction of

23   aerial photo 6-0019.

24       Oviatt's J for Identification is a photographic repro-

25   duction of aerial Photo 6-0020.

1          Oviatt's K for Identification is a photo reproduction

2   of Aerial Photo 5-0164.

3          Oviatt's L for Identification is a photo reproduction

4   of Aerial Photo 5-0163.

5          Oviatt's M for Identification is a photo reproduction

6   of Aerial Photo 5-0162.

7          Oviatt's N for Identification is a photo reproduction

8   of 5-0161.

9          Oviatt's O for Identification is a photo reproduction

10  of 5-0160.

11         Oviatt's P for Identification is a photo reproduction of

12  5-0123.

13         Oviatt's Q for Identification is a photo reproduction of

14  5-0122.

15         Oviatt's R for Identification is a photo reproduction of

16  5-0121.

17         Oviatt's S for Identification is a photo reproduction

18  of 5-0120.

19         Oviatt's T for Identification is a photo reproduction

20  of 5-0074.

21         Oviatt's U for Identification is a reproduction of

22  6-0045.

23         And Oviatt's V for Identification is a photo reproduc-

24  tion of 6-0046.

25         On each of these reproductions the portion of the

1    property that appears on the photo within the match lines

2    owned by Oviatt is delineated in red.

3        MR. VEEDER:  We offer in evidence Oviatt's Exhibits for

4    Identification D through V.

5        THE COURT:  I don't think I acted on your request for

6    Oviatt's Exhibits B and C.  At any rate, Oviatt's Exhibits B

7    and C, and then D through V are received in evidence, so that

8    all the photos A through V are now in evidence.

9        (Defendant Oviatt's Exhibits A through V for Identi-

10   fication were received in evidence.)

11       MR. VEEDER:  I have no further questions of Col. Bowen.

12

13                    CROSS-EXAMINATION

14   BY MR. O'MALLEY:

15       Q  Col. Bowen, what is the date on which those photo-

16   graphs were made?

17       A  1955.

18       Q  Can you give me the approximate range of the time,

19   Colonel, without going into the detail for each one of them?

20       A  Yes, sir.  The date, Mr. O'Malley, appears on each

21   of the photos.  April, 1955, I believe, generally.  It appears

22   that most of these were made in April of 1955, sir.

23       Q  When was the foundation work done which is summarized

24   in the report, which is, I believe, Oviatt's A in Evidence?

25       A  The field work, Mr. O'Malley, was done in the spring

of 1959.

Q And is the report itself dated? I didn't see a date on our copy of it.

A The date which I just gave, the season of 1959, appears on page 1 of Oviatt's A under the introduction.

Q In any event, the field work was done during that period; is that correct, sir?

A Yes, sir.

Q Now, directing your attention to the location of Rancho Ramona, which is reflected in these exhibits, will you state whether or not there is an impervious barrier or dike between Rancho Ramona and the lands of plaintiff which are the subject of this action?

MR. STAHLMAN: May I have the exhibit number of Rancho Ramona?

THE COURT: Are you referring to all of Mr. Oviatt's property as the Rancho Ramona?

BY MR. O'MALLEY:

Q Will you state the exhibit number, Colonel, on which Rancho Ramona is reflected?

A It appears on Oviatt's Exhibit A on page 58, 59 and 60.

Q Now, with reference to Rancho Ramona -- I will again rephrase the question. Will you state whether or not there is an impervious barrier or dike between that property and the

1    properties of plaintiff?

2        MR. VEEDER:  Mr.O'Malley, without making objection, I

3    would like to point out that the United States owns Bureau of

4    Land Management lands scattered throughout the Oviatt

5    properties.  We own the Coahuilla Indian Reservation.  Are

6    you referring the naval enclave?

7        MR. O'MALLEY:  I am merely referring to the naval lands

8    which are the subject of this action.

9        THE COURT:  Leave out "subject of this action." The

10   naval lands, as Mr. Veeder points out, the Government has land

11   all over this watershed.  Your question is, is there an

12   impervious dike between what is called the naval enclave or

13   the old Rancho Santa Margarita--

14       MR. O'MALLEY:  That is correct.

15       THE COURT:  --and the land known as Rancho Ramona?

16       MR. O'MALLEY:  That is correct.

17   Q  Do you understand the question, Colonel?

18   A  Yes, sir.

19   Q  Will you answer it, sir?

20   A  Yes, sir, there is an impervious dike.

21   Q  Where is that located?

22   A  It is located at the head of Nigger Canyon on the

23   Vail property.

24   Q  What does that consist of?

25   A  It consists of a concrete dam tied into the foundation

to bedrock at foundation, and at the abutment.  It cuts off any underground flow that might have existed in the past there and limits the flow, since it was constructed to releases by the Vail Company.

MR. O'MALLEY:  Very well.

May these exhibits be marked defendant's exhibits next in order, your Honor?

THE CLERK:  Oviatt's W.

MR. SACHSE:  Your Honor, I don't want to make any difficulties for Mr. O'Malley, but apparently he is not familiar with your Honor's ruling on lodging and copies for counsel.  Are we going to be able to get copies of these?

MR. O'MALLEY:  Frankly, I didn't learn until yesterday the procedure by which I was obliged to produce a large number of copies.  I don't have but copies that I propose to offer in evidence.  I can arrange to get them at some suitable time.

MR. SACHSE:  I have no objection to the admission, but I have clients who are concerned with Oviatt's claims and I would like to have copies of the exhibits.

THE COURT:  You may withdraw the exhibits for the purpose of having copies made, if necessary, and will you send copies for counsel?

MR. O'MALLEY:  How many, your Honor?

MR. SACHSE:  I want a full set.

MR. STAHLMAN:  I want a full set.  However, this concerns

11667

1    me, that the very purpose of lodging the exhibits was that we

2    may, prior to the time a witness is called, have some informa-

3    tion as to what they are. Here we have no idea what these

4    exhibits are.

5         THE COURT: I realize that the purpose of lodging them

6    was to see whether there would be objections to them, and if

7    there were no objections we could go ahead. But Mr. O'Malley

8    is here. Let's not throw rocks in the way of progress.

9         MR. STAHLMAN: I have no objection to his progressing.

10        MR. O'MALLEY: I wonder, if anybody wants them, can they

11   give me their name and address and telephone number?

12        THE COURT: We will agree right now: Mr. Sachse, Mr.

13   Grover, Mr. Stahlman, the United States, the State of California,

14   and the Court.

15        MR. O'MALLEY: All right.

16        MR. SWING: Put my name down. I have some clients in

17   that area.

18        MR. O'MALLEY: Very well.

19        LCDR. REDD: Could you make that two for the United

20   States, so that the Navy can have a set?

21        THE COURT: And a set for the Court.

22        MR. O'MALLEY: Do you want a duplicate set for your

23   Honor?

24        THE COURT: I have been given a duplicate set.

25        MR. O'MALLEY: Very well. I am not prepared to furnish

1      that many copies now.  I hope I may go forward.

2              THE COURT:  Yes.

3              MR. O'MALLEY:  May this be marked Defendant's Exhibit

4      next in order?

5              THE CLERK:  Oviatt's Exhibit W.

6              MR. STAHLMAN:  Tell us just what Oviatt's W is.

7              MR. O'MALLEY:  Yes, as soon as it has been marked.

8              Oviatt's Exhibit W is a map which purports to show the

9      boundaries of Rancho Ramon.

10             May this be marked as Oviatt's Exhibit X?

11             THE CLERK:  Oviatt's X.

12             MR. O'MALLEY:  Oviatt's Exhibit X is the map which

13     purports to show the boundaries of the Oak Grove property of

14     Mr. Oviatt.

15             (Defendant Oviatt's Exhibits W and X were marked for

16     identification.)

17             MR. O'MALLEY:  Is there anybody here who wants to examine

18     these in detail before I show them to the witness?

19             MR. STAHLMAN:  I would like to look at them.

20             MR. O'MALLEY:  Very well.

21             THE COURT:  We will take a short recess.

22             Do you have other exhibits, Mr.O'Malley, that you could

23     mark at this time and let counsel look at them?

24             MR. O'MALLEY:  Yes, your Honor.

25             THE COURT:  Let them be looked at without being marked.

1      MR. STAHLMAN:  Is this for the purpose of showing owner-

2  ship?

3      MR. O'MALLEY:  I am going to explain some of the details.

4      (Recess.)

5      MR. VEEDER:  Your Honor, may I ask to have the Clerk

6  mark two exhibits we have put on the board which are numbered

7  211-C?

8      THE COURT:  From the series you offered this morning?

9      MR. VEEDER:  From the series I offered this morning.

10     THE COURT:  And the second one is what?

11     MR. VEEDER:  210-C.

12     THE COURT:  These show the properties we are talking

13  about?

14     MR. VEEDER:  These are the exterior boundaries marked

15  on the title maps.

16     MR. STAHLMAN:  Are these the maps you put into the

17  Master's hearing previously?

18     LCDR. REDD:  Yes-- that is, Temecula was, but Wilson

19  Creek has not been.

20     MR. VEEDER:  Wilson Creek has not been entered.  But we

21  are offering that now.  Well, it's already in evidence here.

22     MR. O'MALLEY:  May I proceed, your Honor?

23     THE COURT:  Yes.

24  BY MR. O'MALLEY:

25     Q  Col. Bowen, I show you this document which as been

1   marked as Oviatt's Exhibit W for Identification, which reflects

2   the boundaries of the property of Mr. James Oviatt known as

3   Rancho Ramona, and I ask you to state whether or not the

4   properties within the yellow lines are the properties of Mr.

5   Oviatt as determined by your survey?

6       A  Yes, sir.  The yellow line corresponds with the

7   description which we have evolved of this particular property

8   of Mr. Oviatt's property.

9       THE COURT:  What is the significance of the one section

10  with the yellow line around it?

11      THE WITNESS:  That is approximately 40 acres that is out,

12  your Honor.  That is the Northeast Quarter of the Southwest

13  Quarter of Section 7, Township 8 South, Range 1 East.

14      THE COURT:  That does not belong to Mr. Oviatt?

15      THE WITNESS:  That is correct, sir.

16      MR. VEEDER:  Title is in the United States of America,

17  from the record, your Honor.

18      MR. O'MALLEY:  I am going to offer this through this

19  witness, but in as much as our witness is going to testify to

20  it I desire to have him authenticate the document.

21      THE COURT:  What is the significance of the numbers?

22      MR. O'MALLEY:  Your Honor, they are merely for the

23  purpose of identification so that when our subsequent witnesses

24  refer to a particular parcel which is irrigated he can point

25  to a parcel bearing a given number and identify it in that

manner.   That is the only significance it has.   They are

merely mechanical enumerations that we have evolved for that

purpose.

Q   Col. Bowen, I show you this document which has been

marked as Defendant's Exhibit X for Identification and ask you

whether or not that exhibit accurately depicts the Oak Grove

properties of Mr. Oviatt as determined by your survey?

THE COURT:   Which part?

MR. O'MALLEY:   Being the properties which are represented

here, the properties within the yellow lines.

THE WITNESS:   Yes, sir.   The delineations in yellow on

Oviatt's X for Identification correspond with our description

of those properties, with the exception of this one parcel,

which is not closed, Mr. O'Malley.

BY MR. O'MALLEY:

Q   I wonder if you would be good enough to indicate on the

exhibit the enclosure of it, if you would, please.   Would you

like to draw it in with a pencil?

A   Our records, Mr. O'Malley, show that the North Half

of the Northwest Quarter of Section 7, Township 9 South, Range

3 East, is owned by the Oviatts, and I will with a black pencil

indicate closure of that 80 acres which is partly enclosed

already with yellow pencil.

MR. O'MALLEY:   Very well.

The enclosure here, if your Honor please, that the witness

has just made is merely an extension of the yellow lines which
I am indicating and which are now enclosed in a black pencil
by the witness.

THE COURT:  The Government's records show that you own
an additional what?

MR. O'MALLEY:  80 acres.

THE WITNESS:  Approximately 40 acres, your Honor.

MR. O'MALLEY:  40 acres.

THE COURT:  40 acres?

THE WITNESS:  Yes, sir.

MR. O'MALLEY:  Since these documents will be testified
to by our witnesses, I thought it would be helpful to authenticate
through this witness.

With that I have no further cross-examination of Col.
Bowen.

MR. VEEDER:  Were those offered?

MR. O'MALLEY:  I will offer them through our witnesses, if
your Honor please.

MR. VEEDER:  I have no questions.

THE COURT:  Does anybody else have any questions?

MR. SACHSE:  No questions.


CROSS-EXAMINATION

BY MR. STAHLMAN:

Q  How did you determine the diversions that exist on

the Oviatt properties as a whole?  By visual inspection or did you take that from a map?

A  I determined it by visual inspection.

Q  On the date you made the inspection, did you list all of the diversions you observed on the property at that time?

A  Yes, sir.  This survey, of course, took a number of days, not concurrent days, but was extended over the entire spring season, with some checks going into the summer.

MR. STAHLMAN:  I guess that's all I have on these exhibits.

MR. O'MALLEY:  I have no further questions, your Honor. May I proceed, your Honor please?

THE COURT:  You may.

MR. O'MALLEY:  I desire to call Mr. Oviatt to the stand. Would you be sworn, Mr. Oviatt?


JAMES OVIATT,

being a defendant herein, called as a witness on his own behalf and being first duly sworn, on his oath was examined and testified as follows:

THE CLERK: State your name, please.

THE WITNESS:  James Oviatt.


DIRECT EXAMINATION

MR. O'MALLEY:  Before examining this witness, I should

1   like to make this request of your Honor.  We are not proceed-

2   ing as rapidly as I had hoped that we might, and I do have

3   some witnesses who will be coming after lunch from some

4   distances, and some of them are elderly people, and if I am

5   not through with this witness on either direct or cross, as it

6   appears I will not be, I wonder if I may take them out of

7   order after lunch.

8        THE COURT:  You may.

9        MR. STAHLMAN:  Along that line, I have more testimony

10  by Mr. Vail, if we can get to that sometime during the day.

11  It will accommodate us.

12       MR. O'MALLEY:  Beg your pardon?

13       MR. STAHLMAN:  Short testimony by Mr. Vail.  I don't

14  think it would take over fifteen minutes or so.

15       THE COURT:  If this the balance of your testimony in-

16  volving the correspondence on the dam, et cetera?

17       MR. STAHLMAN:  Yes-- for the Pauba well, your Honor.

18       THE COURT: This will be all you will need from Mr.

19  Vail, then?

20       MR. STAHLMAN:  That is right, your Honor.

21  BY MR. O'MALLEY:

22       Q  Where do you live, Mr. Oviatt?

23       A  In Los Angeles.

24       Q  Are you the owner of the property in San Diego and

25  Riverside Counties known as Rancho Ramona?

A   I am.

Q   Do you also own a ranch in the Oak Grove area which you refer to as the Oak Grove Ranch?

A   I do.

MR. O'MALLEY:   May these exhibits, which are the deeds to these properties, be marked for identification as Defendant's exhibits next in order?   And these have all been seen by counsel and I understand they don't want copies of these documents.

MR. STAHLMAN:   We don't need copies.   These are just the deeds?

MR. O'MALLEY:   These are the deeds to the properties. That is correct.

MR. STAHLMAN:   Not the other photostats that you have shown?

MR. O'MALLEY:   That is correct.

Possibly they might be received as one exhibit.   They are all of the deeds.

THE COURT:   How many of them are there?

MR. O'MALLEY:   There are four documents here, your Honor.

THE COURT:   Let's mark them Oviatt's Y-1 through Y-4.

MR. O'MALLEY:   Very well.

(Defendant Oviatt's Exhibits Y-1, through Y-4 were marked for identification.)

THE COURT:  How many acres are there in this Rancho Ramona altogether?

THE WITNESS:  I have forgotten.

THE COURT:  You don't remember how much land you own?

THE WITNESS:  If you want it in detail, it is 1,171.63 acres.

THE COURT:  How much in Oak Grove?

THE WITNESS:  6,729.07.  Do you want the Taylor Grazing, too, Judge?

THE COURT:  By that you mean you have some rights to graze on Federal land?

THE WITNESS:  Yes, we have ten-year leases on those. And then we have some rented properties, too.

THE COURT:  We will let your counsel decide about those.

MR. VEEDER:  We had a sort of pretrial conference with Mr. O'Malley yesterday and I pointed out to him that we made no objection to his title, reserving, however, the right to check out what he asserts to be the riparian acreage on these properties, so that at a later date we may find it necessary to introduce some rebuttal evidence on that score in regard to his titles.

MR. O'MALLEY:  In which event, of course, we may desire to adduce additional testimony on that subject.

THE CLERK:  Exhibits Y-1 through Y-7, inclusive, your Honor.

1          (Defendant Oviatt Exhibits Y-1 through Y-7 were marked

2    for identification.)

3          MR. VEEDER:  In regard to the use of the word "pretrial

4    conference," I was being facetious, your Honor.  He came to my

5    office.

6          THE COURT:  Allright.

7          MR. O'MALLEY:  I think we had a pretty good pretrial,

8    your Honor.

9          Q   I show you this document, Mr. Oviatt, which has been

10   marked Oviatt's Y-1 for Identification, and ask you what that

11   document is.

12         A   It is a conveyance of the property from Weaver to

13   Downtown Properties, which I own, and then on to me personally.

14         Q   By the property, are you referring to Rancho Ramona?

15         A   Yes.

16         Q   I show you the document marked Oviatt's Exhibit Y-2

17   for Identification and ask you what that document is.

18         A   That is an additional 40 acres that was purchased from

19   a man by name of Bass.

20         Q   And is that adjacent to Rancho Ramona?

21         A   Yes.

22         Q   I show you the document marked Oviatt's Exhibit Y-3

23   for Identification and ask you what that purports to be.

24         A   That is a grant deed to the Oak Grove Ranch from Mr.

25   Bailey.

Q  And the document Oviatt's Exhibit Y-4 for Identifica-
tion, what does that purport to be?

A  This is a section purchased from the Southern Pacific.

MR. SACHSE:  Is that part of Oak Grove still?

THE WITNESS:  Yes.

BY MR. O'MALLEY:

Q  This document which has been marked Oviatt's Exhibit
Y-5 for Identification, what does that purport to be?

A  That is another piece purchased from Drew Bailey.

Q  And the document which has been marked Oviatt's
Exhibit Y-6 for Identification, what does that purport to be?
Is that another property purchased from the Southern Pacific?

A  Yes, that is right-- another section.

THE COURT:  Part of Oak Grove?

THE WITNESS:  Part of Oak Grove, yes.

BY MR. O'MALLEY:

Q  And the document marked Oviatt's Exhibit Y-7 for
Identification, what does that purport to be?

A  That is another piece purchased from two other Baileys.
No relation to the other.

Q  In what area is that property?

A  That is Oak Grove.

MR. O'MALLEY:  At this time, if the Court please, I offer
in evidence Defendant Oviatt's Exhibits Y-1 through Y-7, in-
clusive.

11679

MR. STAHLMAN:   May I ask a question in connection with one of these deeds before you do that?

Q  Mr. Oviatt, referring to Oviatt's Exhibit Y-2 for Identification, can you indicate to us where that property is located on any of your maps that you have here?

A  Yes.  It adjoins right on the road.  The road runs right through it.  Wait a minute.  No.  This is not Oak Grove. This is Rancho Ramona.  That is this piece right here where there was a spring, where we took the water out from under the culvert there.

Q  Is there more than one deed that conveys to you the Rancho Ramona?

A  This is the second deed.

Q  When you say "the second deed"--

A  This is from another party.  This is all purchased from Weaver.  This is purchased from Bass.

Q  Can you indicate on this map?

THE COURT:  This map is Exhibit W.

MR. STAHLMAN:  Exhibit W.

THE WITNESS:  Well, everything under the yellow there is what we purchased originally from Weaver, and this is the 40 acres in here that was purchased from Bass.

BY MR. STAHLMAN:

Q  When you say this is the 40 acres, are you referring to this by the number 1636?

1    A   Yes.   That was the piece that had the spring on it

2  running into Wilson Creek.

3    THE COURT:   Referring to the spring indicated on Exhibit

4  W immediately to the left of No. 1636, shown on the right-hand

5  side of the map a little below center.

6  BY MR. STAHLMAN:

7    Q   Is that spring flowing at the present time?

8    A   No; it is dry.

9    Q   I notice, according to the deed, that all water

10  rights conveyed by this deed were reserved to William J. Walsh.

11  Who was William J. Walsh, do you know?

12    A   No, I don't.

13    Q   I am referring to the deed marked Y-2.

14    A   There is something wrong about that, because this

15  ranch has been using that water since 1881.

16    Q   What I am getting at is, do you at this time-- you

17  say this is the first time you had noticed this reservation of

18  a water right.   You are not familiar with the circumstances--

19    MR. O'MALLEY:   I think that may be proper cross-

20  examination, but I don't think it would be proper voir dire

21  at this time, your Honor.

22    THE COURT:   No.

23    Oviatt's Exhibits Y-1 through Y-7 are received in evidence.

24    (Defendant's Exhibits Y-1 through Y-7 for Identification

25  were received in evidence.)

1    MR. O'MALLEY:   I desire next, if the Court please, to

2   offer and mark a map which has been inspected by counsel,

3   which shows each of the properties of Mr. Oviatt, both the

4   Oak Grove and the Rancho Ramona properties, which will be

5   Defendant's Exhibit Oviatt's next in order, being Defendant

6   Oviatt's Z.

7        (Defendant Oviatt's Exhibit Z was marked for identi-

8   fication.)

9   BY MR. O'MALLEY:

10       Q   Mr. Oviatt, I show you this document which has been

11   marked as Defendant Oviatt's Exhibit Z for Identification and

12   ask you what is depicted upon that document.

13       A   This is Rancho Ramona property in the red, and this

14   is Oak Grove property.

15       Q   By the Rancho Ramona property are you referring to the

16   property in the upper left-hand corner of the property?

17       A   Yes, just above Vail Lake there, you see. This is

18   Temecula Creek.

19       Q   Are the balance of these properties on the right of the

20   exhibit, the lands which you have heretofore referred to as

21   the Oak Grove properties?

22       A   That is right.   The ones with the stripes in here

23   are the Taylor Grazing--

24       Q   In addition, are there some areas which are under

25   lease by you?   Will you point those out?

A   They are identified as this cross stripe here.   This
is the Taylor grazing, and the red there is this lot and lease.

THE COURT:   Is this part of it?

A   Yes, that is another leased property.

BY MR. O'MALLEY:

Q   Does this legend on the lower lefthand corner of the
property indicate the properties which are leased by you, Mr.
Oviatt?

A   Yes, that is right.

MR. VEEDER:   May it be understood that the legend will
control if there is a variance between what the witness
testifies and what appears in the legend, because it is hard
for me at least to distinguish between those two colors?

THE WITNESS:   It is leased land.

THE COURT:   Let's cross-hatch one of them.

THE WITNESS:   You can call this one-- what's this called?
It is lot and lease.   You can call this the Herd lease.

MR. VEEDER:   Then your legend is correct, isn't it?

THE WITNESS:   Yes, it is correct.

THE COURT:   This one at the bottom with the cross-hatching
in the red is the Herd lease?

THE WITNESS:   That is right.

THE COURT:   Change your symbol and double cross-hatch it
and we will have no dispute.

MR. O'MALLEY:   Mr. Bookman, would you make this change?

11683

1        THE WITNESS:  He wants us to change this Herd lease.

2        THE COURT:  Put the cross-hatches in the opposite direc-

3   tion and put it in the legend so we will not mix it up.

4        MR. O'MALLEY:  To avoid some confusion.

5        (Mr. Bookman marking the exhibit.)

6        MR. O'MALLEY:  With that, if your Honor please, Defendant

7   Oviatt's Exhibit Z for Identification is offered in evidence.

8        MR. VEEDER:  Mr.O'Malley, we did not have an opportunity

9   to check this.  I don't object to it, but I would like to have

10  Col. Bowen review it and tell me whether it is correct, and

11  then we may have objection later.

12       MR. O'MALLEY:  Very well.  This, Mr. Veeder, is the

13  identical properties which Col. Bowen has already reviewed,

14  except that it is superimposed on one large map.

15       THE COURT:  Check it and call it to the Court's attention

16  later.

17       MR. VEEDER:  Mr. O'Malley, didn't I also observe

18  diversions on that map?  This yellow, is that diversions, or

19  what is that?

20       MR. O'MALLEY:  I can have Mr. Bookman, who will be our

21  next witness, clarify the diversion and stream detail, if that

22  is satisfactory to you.

23       MR. VEEDER:  I didn't intend to complicate it, except

24  that it is going in.

25       MR.O'MALLEY:  Principally, I would like at this time

to offer this through this witness for the purpose of showing the entire ownership as it relates to the stream system.

THE COURT:  Just postpone your offer in evidence until you have identified everything on the map.

MR. O'MALLEY:  Very well, I will reserve offering this until I have also had Mr. Bookman testify to this detail.

Q  Mr. Oviatt, with respect to Rancho Ramona, when did you first observe the irrigation of this property?

A  The first time I went over it thoroughly was in the summer of 1943.

Q  How did you happen to be familiar with the irrigation of the property at that time?

A  Well, I was anticipating buying it and I wanted to see what they had in the way of water and irrigation system.

Q  Who was the owner of the property at that time?

A  Mr. Weaver.

Q  Was the ranch irrigated at that time?

A  Yes.

Q  Where was the water obtained?

A  It was obtained from Wilson Creek.

Q  Was there a diversion box?

A  Plus a spring across the road on the Bass property.

Q  Was there a diversion box or weir on the stream known as Wilson Creek?

A  There was, yes.

Q   Or Lancaster Creek.  By the way, that creek, as known to you, has that been known variously by the names Wilson, Lancaster and Cottonwood creek?

A   Yes.

Q   It is all the same stream when any of those names are used; is that right, sir?

A   Yes, sir.

Q   With reference to Oviatt's Exhibit W for Identification, will you state and point out to the Court and counsel where that diversion box or weir was located?

A   Here is the State Highway 79.  It is down maybe 300 yards from there.

THE COURT:  Marked "Surface diversion" on the map?

THE WITNESS:  "Surface diversion."

MR. O'MALLEY: That is right.  Very well.

THE WITNESS:  And this spring ran under the road here and went into the surface diversion.

BY MR. O'MALLEY:

Q   Is that diversion box still there on the stream?

A   It is.

Q   At that time how much of the water of the stream -- you use the term "Wilson" or "Lancaster" Creek?

A   Wilson.

Q   --known as Wilson Creek did it divert?

MR. VEEDER:  May I hear the question, please?

(The Reporter read the pending question.)

MR. VEEDER:  Your Honor, I object on the grounds that there is nothing to show that this witness--

MR. O'MALLEY:  Very well, I will lay a little more foundation for that.  In view of counsel's objection, I will withdraw the question at this time.

Q  Did you observe at that time that you said you made a complete study of the ranch, did you observe how much of the water of the stream was being diverted in that diversion box?

A  I did.

Q  What did you observe in that connection?

A  Approximately a hundred miner's inches.

Q  How much of the total of the surface water of the stream did that consist of?

A  All of it.

THE COURT:  When was this observation made? What time of the year?  You say 1943.  When?

BY MR. O'MALLEY:

Q  Will you give us a little better foundation?  I think you have already indicated it was in the summer?

A  Sometime around September or October, 1943.

Q  Will you describe the irrigation system on the ranch as it existed at that time?

A  Well, the water ran from the diversion box--

Q  Would it help you, Mr. Oviatt, if you had Oviatt's

1    Exhibit W in front of you?

2        A   Well, I can remember it.  But I can show it better

3    here, maybe, so that the Judge will understand it.

4        (Mr. O'Malley placing exhibit before the witness.)

5        THE WITNESS:  If you will hang onto the top of that.

6        MR. VEEDER:  All right, sir.

7        THE WITNESS:  The surface diversion after it left this

8    box came on around this hill--

9        THE COURT:  Following the line of arrows.

10       THE WITNESS:  --following the line of arrows over to

11   No. 2 Reservoir.  That was out of a box here by my house, and

12   there was another pipe line from there came over to No. 1

13   Reservoir, went through No. 1 Reservoir on down clear to the

14   Vail's property line here, which watered all of this property.

15       THE COURT:  The southern part of the rancho?

16       THE WITNESS:  Yes, that's right.  Then the other pipe line

17   out of this No. 2 Reservoir came through here over to what we

18   call "Pear Tree Box."

19       MR. VEEDER:  That is where 15 is located.

20       THE WITNESS:  Yes.  Then it went from there over to

21   here.

22       THE COURT:  No. 5.

23       THE WITNESS:  And then it went on down here.  Well, this

24   line didn't go to the Vails.  This is the one that went around

25   the other side of the hill.  But this went on down to the Vail

1    property.   Then the one coming this way followed the hills

2    around this curvature here and went on down to this point here

3    and stopped.

4         THE COURT:   The center of 12-R area.

5         THE WITNESS:   Yes.

6         THE COURT:   Shown on the map.

7         THE WITNESS:   Then after we put this well down in 1945

8    we put a booster pump in there--

9         THE COURT:   I 7N.

10   BY MR. O'MALLEY:

11        Q   What I would like you to do, Mr. Oviatt, is to testify

12   only with respect to the system as it was when you purchased

13   it in 1943, and I will ask you about any additions you have

14   made to it.   Confine your answer at this time, if you will,

15   Mr. Oviatt, to the system as it existed when you purchased it.

16        A   That was the two lines that followed this side of the

17   slopes of the mountains, and this here went down to the Vail

18   property, and this one went down and stopped here at 12R.

19        THE COURT:   You have shown 3.   Are you referring to this

20   one at the uppermost line, too, or just the two between the

21   lines?

22        THE WITNESS:   This is the third line that came on down

23   here and stopped over here close to the--

24        MR. VEEDER:   The terminal being 12-H; is that right?

25        THE COURT:   In 1943 there were three lines?

THE WITNESS:  Yes, sir.

BY MR. O'MALLEY:

Q  In addition to the diversion box or weir which was testified to, was there also an infiltration pipe line in the stream, Mr. Oviatt?

A  Up at the surface diversion?

Q  Yes.

A  Yes, there was about four lines went this way, about four feet under the ground, and four lines came this way, and they took the underground water too and put it into this box here, and that came out of that box with a 16-inch concrete line.  All of these lines were from 16 inches down to 10 or 12 inches.

THE COURT:  So that we will have a record, the witness has just indicated that on Exhibit W between the area marked "Surface diversion" and the place to the left thereof called the box of underground pipe lines to pick up water out of the underground stream, and that there also were lines running in a northwesterly direction to the area shown as 21, meaning an active well to take water out of the underground.

THE WITNESS:  And the other toward the road, the highway.

BY MR. O'MALLEY:

Q  Mr. Oviatt, at that time-- and again my question is with respect to the year 1943-- did you observe at any time during that prior summer as to what, if any, crops had been irrigated?

A   Yes.   They were irrigating from these two reservoirs.

THE COURT:   Indicating Reservoir No. 1 and Reservoir No. 2, as shown on the map.

THE WITNESS:   They were taking water out of there and flood irrigating this area.

THE COURT:   This area indicated as 7P on the map, part of that area.

THE WITNESS:   And they were watering this area here below the booster pump.

THE COURT:   In 7-N.

THE WITNESS:   They were watering practically all of this-- this area in here.

MR. VEEDER:   12-Q.

THE WITNESS:   And this piece in here, these two pieces.

MR. O'MALLEY:   The witness has referred to 12-Q and 12-K.

THE WITNESS:   Yes.

BY MR. O'MALLEY:

Q   Any other parcels or sections that were irrigated at that time?

A   They were watering around the-- this line that went over here, they were watering this property in here.

THE COURT:   The northeast corner of 18-B.

THE WITNESS:   And this property in here.

THE COURT:   The southwest corner of 7-Q.

THE WITNESS:   And this property in here.

THE COURT:   Part of 7-P previously referred to.

THE WITNESS:  There was 20 acres being watered, or 30 acres, below this booster pump in here-- did we mention that? --in 7-N.

MR. O'MALLEY:  I believe we did.

THE WITNESS:  I believe we mentioned that.

MR. STAHLMAN:  You mentioned the area but not the acreage.

MR. VEEDER:  What was the amount of the acreage?

THE WITNESS:  20 or 30 acres in that.

BY MR. O'MALLEY:

Q  Have you completed your resume of the acreage which was being irrigated during the summer prior to your purchase of the property, Mr. Oviatt?

A  Well, from this box here--

MR. O'MALLEY:  The witness is referring to the box on--

THE WITNESS:  --12-R, they were watering some property in here.  I don't know just how much.  Maybe 10 to 20 acres in there.

THE COURT:  In 12-R.

MR. O'MALLEY:  Very well.

Q  Now, Mr. Oviatt, since your ownership of the property-- will you point to the various parcels-- have you irrigated, yourself, all of the parcels which you have heretofore testified to were under irrigation during its ownership by Mr. Weaver?

A  Yes, we did.

1      Q  Have there been any additional parcels that have been

2  irrigated by you?

3      A  Yes.  When we put in-- when the water in the creek,

4  Wilson Creek, started to get a little lower, then we put in a

5  well right here.

6      THE COURT:  In 7-N, marked No. 5.

7      THE WITNESS:  And another well-- the first one we put

8  in was right in this location right near a house.

9      MR. O'MALLEY:  The witness is pointing to an area in 7-Q.

10      THE COURT:  Almost in the center.

11      MR. O'MALLEY:  Almost dead center.

12      THE COURT:  Is this the well here?  Well 13, is that the

13  well you are referring to, with the arrow over it?

14      MR. VEEDER:  That is an active well, your Honor?

15      THE WITNESS:  No, that is an active well.  Right here is

16  the well.

17      THE COURT:  Is that a figure 1 beside it?

18      THE WITNESS:  Yes.  That is the first well.

19      THE COURT:  Towards the center of 7-Q, with a red dot,

20  with a red 1 beside it.

21      THE WITNESS:  That is right.

22  BY MR. O'MALLEY:

23      Q  Can you point out any parcels or pieces in this

24  overall parcel that you have not heretofore testified to, Mr.

25  Oviatt, that have been under irrigation by you since its purchase

1    by you from Weaver?

2         THE COURT:  By that you mean parcels that Weaver did not

3    irrigate?

4         MR. O'MALLEY:  That is correct.

5         THE COURT:  That he irrigated?

6         THE WITNESS:  When we put this booster pump in at this

7    big well that we call the Oil Test Well--

8         THE COURT:  No. 5 in 7-N.

9         THE WITNESS:  We then ran an underground 6-inch pipe

10   up to about the center of 7-Q.  Then we ran one--

11        MR. O'MALLEY:  Was that parcel then irrigated?

12        THE WITNESS:  Yes, then we irrigated that with an overhead

13   system.  Then we went from the booster pump here--

14        THE COURT:  In 7-N.

15        THE WITNESS:  --up to several fingers up in here.

16        MR. O'MALLEY:  In 18-E.

17        THE WITNESS:  In 18-E.

18        THE COURT:  18-F.

19        MR. O'MALLEY:  18-E as well as 18-F.

20        THE WITNESS: That is right.  There is another finger in

21   there, and then there was another finger over this way, you

22   see.

23        THE COURT:  Another finger into 18-D.

24        THE WITNESS:  Then we put a reservoir down in here, which

25   we call the NO. 3 Reservoir in the southeast corner of 7-N,

1   and we ran a line from the booster pump over to there, so that

2   we could use this pipe that was put in in 1919, this under-

3   ground pipe here, to water this piece.

4          MR. O'MALLEY:  Referring to 7-M.

5          THE WITNESS:  7-M.

6          THE COURT:  You say that pipe was put in in 1919?

7          THE WITNESS:  Yes.

8          THE COURT:  And that is the pipe running across 7-M and

9   12-J and down into 12-H?

10         THE WITNESS: That is right.

11         I guess that is about all we put in at that time.

12         MR. VEEDER:  When he says "at that time," what time was

13  that?

14         THE WITNESS:  That would be 1945.

15  BY MR. O'MALLEY:

16         Q  Have you identified all of these subparcels within

17  this overall single parcel, Mr. Oviatt, that you have irrigated

18  since the purchase of the property by you?

19         MR. STAHLMAN:  He didn't indicate parcels; he indicated

20  areas.

21         MR. O'MALLEY: Area.  I am referring to them merely by

22  way of identification as subparcels.  It may be understood

23  that this is all one parcel, but so that we can designate these

24  areas for the record.

25         THE WITNESS:  We watered part of 7-J, 7-Q, 7-P, 7-N,

7-M, all this here below the road in 7-Q, and all this flat land in 18-C, and the major part of 7-N, 12-Q and 12-K.

BY MR. O'MALLEY:

Q   Have you now testified, Mr. Oviatt, to all of the areas within this parcel which comprises Oviatt's Exhibit W in Evidence?

A   That is about all I can remember, yes.

THE COURT:  We will recess at this time.  I have a board luncheon today.  It will be 2 o'clock before I get back.  We will adjourn until 2 o'clock.

(Noon recess.)

San Diego, California, Tuesday, February 9, 1960.  2:00 P.M.


3      (Other matters.)

4      THE CLERK:  No. 1247-SD-C, United States vs. Fallbrook,

5  et al.  Further court trial.

6      MR. O'MALLEY:  May I proceed, your Honor?

7      THE COURT:  Yes.

8      MR. O'MALLEY:  Mr. Brinkerhoff, will you take the stand?

9      MR. STAHLMAN:  Just a moment.  Is Mr. Oviatt finished?

10     THE COURT:  He withdrew him.  He will put him back on.

11     MR. STAHLMAN:  I am a little perplexed by our proceedings

12  here.  In view of the testimony we had up to this point, I

13  would like to get straightened out in my own mind.  We who

14  attended pretrial proceedings know a little something about

15  what somebody was shooting at.

16     THE COURT:  Do you want Mr. O'Malley to make an opening

17  statement?

18     MR. STAHLMAN:  I think he should make an opening statement,

19  your Honor.  I understand there have not been additional

20  pleadings filed.

21     THE COURT: All right, tell us what your case is.

22     MR. O'MALLEY:  I would rather not argue it in detail.

23     THE COURT:  Oh, no, in summary.

24     MR. O'MALLEY:  Briefly, with respect to the properties

25  that counsel for Vail is concerned with, namely, Rancho Ramona,

we claim riparian rights upon that property.  We claim that all

of that property is riparian to the stream which is known

variously by the terms -- some of these witnesses will call it

Lancaster, some will call it Wilson, others will call it

Cottonwood creek, but I think everybody understands what we

are talking about.

In addition, with respect to that particular property,

although I fully recognize the burden which we are carrying,

there are some circumstances under which, despite the fact

that the water is being diverted upon riparian property and

despite the very strong presumption that that is being put to

a proper riparian use, we believe that under all the facts of

this case, particularly the long history of the diversions

here and the long history of the litigation which has been

pending in connection with the water of the stream, we will

urge upon the Court that in addition to unquestioned riparian

rights we have them, as far as Rancho Ramona is concerned,

particularly that counsel for Vail is concerned with, we will

urge to the Court that we have a prescriptive right to divert

the waters of that stream.

The situation with respect to the Oak Grove property is

substantially the same.  It is a somewhat more complicated

situation, but substantially it is the same picture.  We have

the situation where the properties are riparian to the stream

system, we have water rights incident to that riparian use,

11698

1   we have a long period of historical usage, as in the case of

2   the Rancho Ramona.  We will urge to the Court that there is a

3   prescriptive right.

4       There are some further diversions that are pertinent to

5   the Oak Grove property that do not in any way concern the

6   Rancho Ramona.  We will show three separate diversions from

7   sources off of that property onto that property which is known

8   as the Oak Grove property and which has gone back over a number

9   of years.

10      I am not going to argue the law at this time, but

11   suffice it to say that we are shooting primarily at establish-

12   ment of our riparian right.  But we believe that from all the

13   facts and circumstances, despite the rather heavy burden we

14   are cheerfully assuming, that we will be in a position to,

15   and we will urge to the Court, that in addition to the rights

16   which we have as a riparian owner there are prescriptive rights

17   which, in the event that our water rights are determined in a

18   decree, should be recognized in the decree of this Court.

19      MR. STAHLMAN:  Confining myself first to the Ramona

20   property, we may have an entirely different situation there.

21   As the evidence up to the present indicates, this is one hold-

22   ing that the water diverted was used entirely upon this

23   particular piece, and that aroused my curiosity to the point

24   that at the recess I asked counsel what his objective was in

25   connection with the proof in relation to the diversion of

1   riparian water to be used upon the parcel which, as the

2   evidence at this point indicates, is riparian to the stream

3   from which the water is diverted, and he told me that when he

4   argued the case he would present some legal cases which would

5   substantiate the theory upon which he is proceeding.

6       I would suggest that counsel submit those cases at this

7   time so that we may have an opportunity to study them.  He

8   has not explained what his particular theory is in connection

9   with the acquiring of this prescriptive right, and I think we

10  ought to have a little more detail in connection with that,

11  and we should be apprised of the cases upon which he relies in

12  order to substantiate that legal theory.

13      I don't know how other counsel feel.

14      THE COURT:  Do you have it at hand?

15      MR. O'MALLEY:  I have a memorandum which I would be

16  perfectly happy to file at this time, your Honor.  I thought

17  I was called upon primarily to present our evidence, and I did

18  not understand that it would be appropriate at this time to

19  file points and authorities.  But I certainly have no objection

20  to so doing at this time, if your Honor would like to receive

21  them, and if they are of any help to counsel at this time I

22  certainly have no objection to filing them now.

23      THE COURT:  Do you have them ready?

24      MR. O'MALLEY:  Yes, your Honor.

25      THE COURT:  Do you have copies?

1    MR. O'MALLEY:  Yes.  I hope I have enough.  Frankly, I

2  didn't quite understand that we had such a battery down here.

3    THE COURT:  We had an extensive pre-trial in this case

4  and the Court wrote an opinion that decided a lot of legal

5  issues generally as to the parties who appeared.  Mr. Stahlman's

6  request is in order.  If you have it ready to file, we will

7  have it.

8    MR. O'MALLEY:  Frankly, if your Honor please, I didn't

9  quite understand we would have the battery that we have.  I

10  expected to serve these.  I now have a total of six copies.

11  Of course, I have to file two.

12    MR. VEEDER:  You may forget about us.

13    THE COURT:  How many pages is it?

14    MR. O'MALLEY:  Three pages, your Honor.

15    THE COURT:  We will have the Clerk make some extra

16  copies.

17    MR. O'MALLEY:  I will file two copies with your Honor.

18    I hope I don't have to determine the priorities in

19  distributing these copies.

20

21

22

23

24

25

5
1b

1      THE COURT:  Give one to Mr. Stahlman.  He is particularly

2   interested.

3      MR. O'MALLEY:  And I will file two copies with your Honor's

4   Clerk at this time.

5      THE COURT:  The Court will have some more copies.

6      MR. O'MALLEY:  Your Honor has two copies.

7      THE COURT:  I have a copy.  That will suffice for the

8   present.

9      MR. O'MALLEY:  That will state roughly my position.

10      THE COURT:  How many more copies did you want?  The State

11   has a copy, Mr. Stahlman has a copy, Mr. Sachse has a copy.

12      MR. VEEDER:  I would like to have two copies, Your Honor.

13      THE COURT:  Two copies for the Government.

14      MR. SACHSE:  I am quite sure Mr. Grover will want a copy,

15   although he is not here this afternoon.

16      THE COURT:  Make about five copies and then you will have

17   a couple extra down there.

18      MR. O'MALLEY:  Your Honor, I started to call a witness.

19   Would your Honor like me to proceed at this time.

20      THE COURT:  Yes.

21      MR. O'MALLEY:  Mr. Brinkerhoff, will you take the stand,

22   please.

23              HAROLD KIMBELL BRINKERHOFF,

24   called as a witness for Defendant Oviatt, being first duly sworn

25   on his oath was examined, testified as follows:

1          THE CLERK:   State your name please, sir?

2          THE WITNESS:   Harold Kimbell Brinkerhoff.

3

4                         DIRECT EXAMINATION

5    BY MR. O'MALLEY:

6          Q   Where do you live, Mr. Brinkerhoff?

7          A   I am now residing in Riverside.

8          Q   What business are you in?

9          A   I am in the real estate business.

10         Q   Have you ever been familiar with or known a ranch in

11   San Diego and Riverside Counties known as Rancho Ramona?

12         A   Yes.

13         Q   When did you first see this ranch?

14         A   My father owned that ranch at one time, and that would

15   have been -- oh, it has been a long time ago.   It was about the

16   last of '24 or the first of '25 is when I first went there.

17         Q   Is that at the time your father was owner of the ranch?

18         A   Yes, he owned the ranch at that time.

19         Q   What was his name?

20         A   Hiram J. Brinkerhoff.

21         Q   How long did he remain owner of the ranch, to the best

22   of your recollection?

23         A   I think until about '31, last of '31, something like

24   that -- '31, '32.

25         Q   And how long did you live on the ranch, Mr. Brinkerhoff?

1      A Well, let's see, I left there in the fall of 1931, which

2 would have been about close to six years.

3      Q At that time you were living upon the ranch, was there

4 a creek going through the ranch which was known variously by

5 the names Wilson, Cottonwood or Lancaster Creek?

6      A It never did flow past the intake except in flood time.

7      Q The creekbed went through the ranch; is that right?

8      A Yes, the bed itself, yes.

9      Q And it approached the ranch at the intake; is that

10 right?

11      A Right.

12      Q What did you call it, Wilson or Lancaster?

13      A It was called various names; Lancaster or Wilson Creek

14 or Cottonwood Creek.

15      Q Did the ranch have an irrigation system when you first

16 saw the ranch?

17      A Yes, it had a very good irrigation system.

18      Q Where was the water obtained which was used to irrigate

19 the ranch?

20      A I don't know just exactly. The Hemet Road goes north

21 and south there. The intake was about, oh, I would say possibly

22 three-eighths of a mile southwest from the Hemet Road.

23      Q Was there a diversion box or wier or intake at that

24 point?

25      A Yes, there was. There was a cement intake there

4b

1   measuring approximately, oh, possibly nine feet wide and about

2   15 feet long.

3      Q  How much, if any, of the water of the creek was diverted

4   by that intake?

5      A  All of the water was diverted in that.

6      THE COURT:  All the water?

7      MR. VEEDER:  At what time?

8      THE COURT:  At what time?

9      THE WITNESS:  Oh, at what time?

10 BY MR. O'MALLEY:

11      Q  When you first went onto the ranch at about the time

12 you have testfied to, how much of the water of the stream was

13 diverted through that intake?

14      A  It all went into the intake.

15      THE COURT:  Just a moment.  We asked a question.  At what

16 time of the year are you talking about?  All the year around or

17 the dry seasons or when?

18      THE WITNESS:  It was a continuous withdrawal from the

19 creek.  There was no time that it didn't run into the intake.

20      THE COURT:  You mean the flood waters?

21      THE WITNESS:  Not flood waters.

22      MR. O'MALLEY:  Except for the --

23      THE WITNESS:  Except for flood waters, it was all diverted

24 into the intake.

25

5b

BY MR. O'MALLEY:

Q  Did that go on continuously all during the period that you were on the ranch?

A  That is correct.

Q  What was the water used for?

A  Well, for crops of various kinds.

Q  Do you remember the crops on the ranch that were irrigated, generally?

A  Well, at vvarious times we had milo maize, we had oats, we had alfalfa.  Of course, primarily it was taken for alfalfa, which is a year round crop more or less.  But we had diversified crops -- potatoes, a little of everything.

Q  Can you estimate the number of miner's inches of water which were taken from the creek --

MR. SACHSE:  Just a moment.  That is objected to as having no foundation.

BY MR. O'MALLEY:

Q  Are you familiar with the amount of water that was taken from the creek during that period?

A  We always used to speak of it as a hundred inches.  I don't know.  At various times --

MR. VEEDER:  Objected to as being not responsive.

MR. STAHLMAN:  I object to it as being not responsive, your Honor.

THE COURT:  It may go out.

BY MR. O'MALLEY:

Q  Are you familiar generally with water measurements? You don't purport to --

A  Yes, I do know about water measurements.  There is a wier in the intake.

Q  As a result of your observations of the amount of intake into the system, are you able to make an estimate of the approximate amount of the water which was diverted from the creek onto your property when you first went on it?

A  Yes; it was a hundred inches.

MR. STAHLMAN:  Just a minute.  May we have a yes or no answer.

THE COURT:  Answer it yes or no.  The answer "Yes" may stand.  All the rest may go out.

BY MR. O'MALLEY:

Q  How much was it, to the best of your knowledge?

MR. VEEDER:  That is objected to --

THE WITNESS:  100 inches at least.

THE COURT:  It may go out.

Mr. Brinkerhoff, an objection was made.  Wait until the objection is ruled upon.

I will sustain the objection.

You say there was a wier in that intake?

THE WITNESS:  That is correct.

THE COURT:  Did you ever see how this wier was operated?

1    THE WITNESS:  Yes, sir.

2    THE COURT:  How was it operated?

3    THE WITNESS:  In the diversion there is a guage that you

4  can drop down to back the water up, and then there is a cali-

5  brated measurement across there, it is 24 inches wide, and by

6  meauring the amount of water that flows over this intake 24

7  inches wide you have your calibration.

8    THE COURT:  How much of a head was backed up?

9    THE WITNESS:  As I remember, it was 20 feet.

10    THE COURT:  20 feet.  By "head" I mean the depth of the

11  water above the top of the outlet.

12    THE WITNESS:  Well, the wier would take all the water, so --

13    MR. VEEDER:  You are asking the depth of water above the

14  wier blade, aren't you?

15    THE COURT:  No, I am not.  At least my recollection as a

16  small boy of seeing them measure miner's inches doesn't comply

17  with that.

18    You mean there was a wier 24 inches wide?

19    THE WITNESS:  That is correct.

20    THE COURT:  And the water poured through this wier?

21    THE WITNESS:  Over the top of it.

22    THE COURT:  Over the top of the bottom of the wier?

23    THE WITNESS:  Well, I can draw you a --

24    THE COURT:  I take it that by a "wier" you mean something

25  like that?

1    THE WITNESS:  That is correct.

2    THE COURT:  And the water flowed across through this

3  opening?

4    THE WITNESS:  That is correct.

5    THE COURT:  And there were calibrations on the side?

6    THE WITNESS:  That is correct.

7    THE COURT:  This wier was 24 inches wide?

8    THE WITNESS:  Yes.

9    THE COURT:  How high were the sides of this wier?

10    THE WITNESS:  They were about -- let's see, about two feet,

11  something like that.

12    THE COURT:  About two feet from the blade across which

13  the water flowed to the top of it?

14    THE WITNESS:  It could have been a little deeper than that.

15  I don't know exactly.

16    THE COURT:  Was there any paddle or stop place in the wier

17  from above to build a head of water above the level of the water

18  that flowed out?  Do you follow me?

19    THE WITNESS:  I don't quite follow you, your Honor.

20    THE COURT:  Let's see if I can draw a diagram.  Here, we

21  will say, is the blade.  The water flows across like this.  Was

22  there any kind of stop or blade place down in the water so that

23  the water would back up like that, leaving a volume of water

24  flowing out this way with a head of water above it?

25    THE WITNESS:  As I remember at least, there was a groove

1   down in the inside of this wier where boards could be put in.

2   I don't recall whether they put any in there or not.  But there

3   was a groove on either side of this wier in which boards could

4   be slipped in.

5        THE COURT:  How would you know how many inches flowed

6   across the wier?

7        THE WITNESS:  I don't propose to say.  I am just going

8   on what we -- I was a young man of 21 and my father was the

9   owner of the ranch and we used to always call it a hundred

10  miner's inches.  I don't propose to be a --

11       MR. STAHLMAN:  Your Honor, I ask that that be stricken.

12       THE COURT:  It may go out.

13       MR. STAHLMAN:  May I ask a question, your Honor.

14       THE COURT:  Yes.

15  BY MR. STAHLMAN:

16       Q  What were the calibrations on the side of the wier?

17       A  One inch calibrations.

18       Q  And how many inches high was that?

19       A  I don't recall.  24, I believe.

20       MR. STAHLMAN:  That's all.

21       THE COURT:  How high was the water as it flowed across

22  the bottom of the wier?

23       THE WITNESS:  It was at least two feet deep, I would say,

24  something like that.  I don't just recall.

25       THE COURT:  Two feet deep and two feet wide?

THE WITNESS:  Yes, something like that.

BY MR. O'MALLEY:

Q  Mr. Brinkerhoff, have you stated everything you can with respect to the quantity of water which flowed across that diversion point?

MR. STAHLMAN:  That calls for a conclusion of the witness, your Honor.

THE COURT:  Overruled.

THE WITNESS:  I don't just know what you mean by your question there.  Is there any more?

BY MR. O'MALLEY:

Q  Yes.  Did you take any additional measurements of the quantity of water that passed through that diversion box?

A  I, personally, took no measurements.

Q  Very well.  Will you describe how the water was carried from that diversion point to the various sections of the ranch which were irrigated?

And, at this time I think it might be helpful if the witness had in front of him Exhibit W(handing exhibit to the witness.)

Are you familiar with the location of Rancho Ramona as it is reflected on Exhibit W for Identification?

A  No, I have had nothing to do with your identification map at all.

Q  Is this map or is this area which is set forth on this

1    map generally familiar to you, Mr. Brinkerhoff?

2         A  Well, I would have to study it a little bit.  I can't

3    just sit right down and -- this has been 30 years ago.

4         Q  Very well.  From the diversion point where did the

5    various pipelines go which carried water to the various sections

6    of the ranch?

7         A  Coming out of the diversion box was a 16 inch line.

8    Have these gentlemen been up to the ranch?

9         Q  Well, you just state it in your own words for the

10   record.

11        A  Coming out of the diversion box there is a 16 inch

12   line that runs along above the bottom of the wash there, and

13   it is kind of up on the side of the hill.

14        THE COURT:  North or south of the wash?

15        THE WITNESS:  It would be on the south of the wash, and

16   it runs around and down where Mr. Oviatt's existing home is now

17   was the diversion box that took the water onto the different

18   locations on the ranch.  Now, from this diversion box the lines

19   was split up into different circumfrences of pipe.  Now, there

20   was a main line of 12 inch pipe took off -- I would like some-

21   body to orientate me on this map here.

22        THE COURT:  Of course, these may or may not be the lines

23   that were there when you were there.

24        THE WITNESS:  They are the existing lines now.

25        THE COURT:  I say, they may or may not be.  You don't know?

1      THE WITNESS:  I say that they are.  I mean I know that

2   they are.  Let's put it that way.

3      From the diversion box there was a 16 inch line ran down

4   here to approximately where Mr. Oviatt's residence is now.

5   Then there was a 12 inch line.

6      Would somebody please orientate me on this map here?

7      MR. O'MALLEY:  You state, if you will.

8      (Mr. Veeder handing Exhibit to the witness.)

9      THE WITNESS:  This is the creek here, coming down here.

10     MR.O'MALLEY:  The record should show that the witness

11   has in front of him page 58 of Oviatt's Exhibit A.

12     THE WITNESS:  As near as I can locate things here, I

13   would say that the diversion box is right in approximately here.

14   This evidently is the --

15     THE COURT:  If you want to study that, that may be all

16   right, but it is not going to help us to say, "here" on a photo-

17   graph.

18     If you look at this map, Exhibit W -- hand it over here --

19   I take it that this is to the north, the top, and the bottom is

20   to the south?

21     THE WITNESS:  Yes.

22     THE COURT:  To the right is east, and to the left is west?

23     THE WITNESS:  Yes.

24     THE COURT:  And the valley of Wilson Creek runs across-wise

25   from the east to west across the property?

13

1      THE WITNESS:  Almost.

2      THE COURT:  There is shown on the map a place designated

3  "domestic reservoir."  I take it that that is the place where

4  the present existing domestic reservoir is located?

5      THE WITNESS:  The domestic is the one on top of the hill.

6  Yes, it is about down to the hill.

7      THE COURT:  The contour showing a little hill here shows

8  a line.  What is the blue line supposed to be?  Is that Wilson

9  Creek?

10      THE WITNESS:  Is that the creek?

11      MR. O'MALLEY:  That is the creek.

12      THE WITNESS:  All right, the water ran into a 16 inch

13  pipe here at the diversion.

14      THE COURT:  Indicating where the present box is now.

15      THE WITNESS:  Yes, it is the same box that was there when

16  I was there.

17      THE COURT:  In 7-R.

18      THE WITNESS:  Yes.  And it came down to approximately this

19  point right here.

20      THE COURT:  Just west of this little hill that kind of

21  sticks out?

22      THE WITNESS:  That is correct.

23      THE COURT:  In 7-Q.

24      THE WITNESS:  Then here it split and went into a 12 inch

25  line.  This is a 12 inch line.

1      THE COURT:   Indicating the most northerly line of arrows
2  running northwesterly across the map.

3      THE WITNESS:   Yes.  If I am interpreting the map correctly,
4  this should be a 12 inch line here.  Here there is a ten inch
5  line went back over here to -- is this supposed to be the
6  reservoir here?

7      THE COURT:   These are present reservoirs, reservoirs 1,
8  2 and 3.

9      THE WITNESS:   All right.  This is the one I am interested
10  in over here.

11      THE COURT:   The most northerly reservoir?

12      THE WITNESS:   Well, yes.  It is up near the house.   The
13  ten inch line come around here and into the reservoir.   There
14  was -- I don't know whether it is indicated or not here --
15  there was a ten inch line -- wait a minute -- if this is the
16  existing reservoir -- oh, this is the other line.  This must be
17  the 12 inch line going down here, then, because if this is going
18  into the reservoir, this is a ten inch line.

19      THE COURT:   There are two reservoirs shown down here.
20  Which one are you talking about?  I take it the houses are shown
21  by these dots?  Do these indicate structures?

22      MR. OVIATT:   Right by the box on the hill, he is talking
23  about.

24      THE COURT:   Which reservoir are you talking about -- 1 and
25  2, or 3?

THE WITNESS:  No, this one over here.  No. 3 is the one up by the house, I believe.

THE COURT:  Where is the house?

MR. OVIATT:  No. 3 reservoir is across the river on the north side.  That was not built in your time.  This is the first time he has seen the map.  If somebody would explain to him.

THE WITNESS:  I asked to have orientation on the map before I got myself confused with your map.  I can draw my own map and show you exactly where it is, but to come in fresh with a --

THE COURT:  Can we agree?  Do you know where the houses are presently?

THE WITNESS:  I would say that the houses are --

THE COURT:  Have you seen them recently?

THE WITNESS:  Yes, I have seen them.

THE COURT:  Are the three dots supposed to be the houses?

THE WITNESS:  Those are the houses.

THE COURT:  Here is the foot of the hill that sticks out, and here are three houses.

THE WITNESS:  These are the two reservoirs here we are talking about.

THE COURT:  1 and 2.

THE WITNESS:  Yes.

MR. OVIATT:  Those are the two he built.

THE WITNESS:  These are the two I built.  This is a 12 inch

1 line. This is a ten inch line coming across.

2     THE COURT: The 12 inch line you indicate is the most

3 northerly line running northwesterly up near where reservoir

4 No. 3 is now?

5     THE WITNESS: Yes.

6     THE COURT: And the ten inch line came down to the foot

7 of the hill and ran down to reservoirs 1 and 2?

8     THE WITNESS: Yes. The line continues on down around

9 that north side, which is the ten inch line, clear down to where

10 the hog barns used to be when I was there.

11     THE COURT: Where were the hog barns?

12     THE WITNESS: In this area down here.

13     MR. O'MALLEY: Indicating generally the area of 12-R.

14     THE COURT: Did that ten inch line at that time run to

15 the boundary of the Vail Estate?

16     THE WITNESS: Not this line here. This 12 inch line con-

17 tinued on down to what we call the 80 acres down there and then

18 down to the Vail line.

19     THE COURT: You mean by that the 12 inch line went clear

20 to the Vail line?

21     THE WITNESS: No, the 12 inch line went down to this

22 diversion box approximately. Well, it went down -- I guess this

23 reservoir is on the north side -- it went approximately here,

24 and the ten inch line went across to this field. There is a

25 field over in here, below this reservoir.

1      THE COURT:   In 7-M.

2      THE WITNESS:   Then right here, this became a ten inch

3   line, there is a line there that continued on down here from

4   this diversion box right along the edge of the river, right

5   about this point.

6      MR. O'MALLEY:   Indicating the northwest corner of 7-P.

7      MR. STAHLMAN:   Put your finger on reservoir 3.

8      THE WITNESS:   It was opposite reservoir 3, over here on

9   the south side of the creek bottom, and there was a ten inch

10   line run across, and now they dump it into this creek but it

11   went right along here.   This 12 inch line from this point went

12   on down here and when it got down to this 80 acres it became a

13   ten inch line and it continued on clear down to the Vail

14   property.

15      THE COURT:   He is indicating generally, east to west,

16   starting from the northwest portion of 7-P in a westerly direc-

17   tion down to the edge of the Vail property.

18   BY MR. O'MALLEY:

19      Q   Now, Mr. Brinkerhoff, will you describe the various

20   sections within this one parcel which constitutes Rancho Ramona

21   which were irrigated during that period that you have testified

22   to?

23      A   Well, all of the main part of the valley was irrigated,

24   all in below what is Mr. Oviatt's home now was irrigated, and

25   then this piece back over here which you have been referring to

1   as 7-M was irrigated, and then on down below what we call the

2   80 acres was irrigated.

3          THE COURT:  Where is that?

4          THE WITNESS:  The 80 acres would be down in this portion

5   here.

6          THE COURT:  12-K and 12-Q.

7          THE WITNESS:  Probably be the better part of it in both

8   of them, because this pipeline is running along the south side

9   of what we call the 80 acres.

10  BY MR. O'MALLEY:

11         Q  Were there any other sections of this parcel which were

12  irrigated at the time you testified about?

13         A  We did irrigate a piece up here right opposite the

14  intake --

15         THE COURT:  7-J.

16         THE WITNESS:  Yes.  But we irrigated that from a different

17  source.  We had a pump in there.

18  BY MR. O'MALLEY:

19         Q  You testified now to all of the parcels that were

20  irrigated during that period you just testified to, Mr. Brinker-

21  hoff?

22         A  You mean the amount of the land irrigated?

23         Q  Yes, the various sections of this overall parcel which

24  constitues the ranch, have you testified to the various sections

25  that you now recall that were irrigated during that period?

1       A   I believe so.   Starting here, and all this area here,

2   the main part of the valley, this section in here, and the

3   80 acres.   I believe that would cover it.

4       THE COURT:   That doesn't make much of a record.   He

5   indicated, starting at the point marked "Surface diversion"

6   on Oviatt's Exhibit W.   He said that below that in the valley

7   and put his hand on 7-Q, 7-P, 7-N, 18-B and 18-C.

8       Go on from there.

9       THE WITNESS:   With the exception of the wash, all of the

10  valley bottom wss irrigated.

11      THE COURT:   Clear to the Vail line?

12      THE WITNESS:   Clear to the Vail line, with the exception

13  of right over in here.   There was a little piece right in there.

14      THE COURT:   Indicating the section north of the creek and

15  under the words "Wilson" as it appears on Exhibit W.

16  BY MR. O'MALLEY:

17      Q   Now, in addition to this irrigation system you have

18  described, were there any wells upon the property?

19      A   Yes, we drilled two wells.

20      Q   Where are they located, if you recall?

21      A   A little north and east of the intake, about a hundred

22  yards north and east of the intake.   That would be about over in

23  there somewhere.

24      THE COURT:   Two wells are shown on Exhibit W, one red and

25  one green, about in this area.

1          THE WITNESS:  Yes.

2          THE COURT:  The green one marked 21 in the area marked

3    7-J.

4    BY MR. O'MALLEY:

5          Q  What were those crops?

6          A  We had a crop of potatoes in this area here.

7          THE COURT:  Indicating 7-J.

8          MR. O'MALLEY:  Yes.

9          THE COURT:  Where was the other well?

10         THE WITNESS:  They were side by side.

11   BY MR. O'MALLEY:

12         Q  Were those the only two wells upon the property at

13   that time?

14         A  That was all the wells that were on the property, with

15   the exception of a domestic well up near the house.

16         Q  There was an additional well near the home which you

17   used for domestic purposes?

18         A  Yes.

19         Q  Were there any additions to the irrigation system con-

20   structed during that period you have testified to?

21         A  Not the actual irrigation system.  I did build what is

22   indicated there as 1 and 2 reservoirs, or 2 and 3 -- which is it?

23   1 and 2.

24         Q  Do you remember the connections of the reservoir,

25   approximately?

A  Oh, just guessing at it, I would say probably three acres.  Covered an area of possibly two to three acres, something like that.

Q  Are you now referring to both reservoirs?

A  At the time I built these reservoirs they were not two; they were one.

Q  They constituted one?

A  They constituted one reservoir; that is correct.

Q  Of the dimensions you just described?

A  Approximately that.

Q  Do you remember how much water was contained in those reservoirs?

MR. STAHLMAN:  Your Honor, the capacity of the reservoir, or how much was in it at any one time?

THE WITNESS:  I have seen the reservoir up to within very close to the top of it.  I wouldn't know just how far or how many acre feet.  If there are some of you who can figure that sort of thing, you could probably get at it.  But I don't know exactly how many acre feet.

THE COURT:  How deep was the water in the reservoir?

THE WITNESS:  Well, I put up about a 12 foot bank there, I would say.

THE COURT:  Wouldyyou say there would be as much as ten feet of water?

THE WITNESS:  Yes, I have seen that much water in it.

1   BY MR. O'MALLEY:

2        Q   Except during the period that you have referred to as

3   flood stage, was there ever any time during this period you have

4   testified to in which your father was the owner of the ranch

5   when all of the water on Lancaster Creek was not diverted into

6   this irrigation system which you testified to?

7        A   No, it was always diverted, with the exception of flood

8   time.

9        MR. O'MALLEY:  You may cross-examine.

10

11                        CROSS-EXAMINATION

12  BY MR. STAHLMAN:

13       Q   What were the years that you lived on the ranch and

14  were familiar with it?

15       A   As I told you, I didn't go there exactly when my father

16  bought the ranch.  As far as I can remember, it was the latter

17  part of '24 or into '25.

18       Q   Then you said about six years prior to the fall of

19  1931; is that right?

20       A   I left there in 1931.

21       Q   You were on there about six years?

22       A   Something like that.

23       Q   Have you returned to the ranch since then?

24       A   I have.

25       Q   When?

22

11723

A   I was foreman for Mr. Oviatt from about the middle of 1947 to March of 1949.

Q   Have there been any expansion in the areas under irrigation during that time over what had been irrigated when you were there?

A   Are you referring to the amount of ground covered?

Q   Yes.

A   Yes, I believe there would be about 20 acres possibly.

Q   In other words, when you were there as a foreman they were irrigating about 20 acres more than when you were there previously?

A   Yes, I would say somewhere in the neighborhood possibly of -- as near as I can remember we were irrigating somewhere in the neighborhood of 250 up to 300, close to that.

MR. VEEDER:   250 acres?

THE WITNESS:   Something like that.   I don't recall just exactly.

THE COURT:   When you say "we were irrigating" --

THE WITNESS:   My father and I.

THE COURT:   250 to 300?

THE WITNESS:   Something in that neighborhood.   When I was foreman for Mr. Oviatt we added a little finger up in there that had about 20 acres to it, something like that.

BY MR. STAHLMAN:

Q   When you were irrigating it during that period of six

years, what did you during each of these six years that you
irrigated have ample and sufficient water during the irrigation
season to apply water to all of that?

A  Yes.  The reason we had two diversions, of course, in
some cases, is because you can cover a lot more territory on
row crops than you can on --

Q  That isn't my question.  My question is, did you
irrigate during that six years the same amount of acreage on the
ranch?

A  Naturally it is going to vary, but on the whole, yes.

Q  Did it vary some during the six years?

A  Are you speaking about the amount of land?

Q  Yes, the amount of land that you actually irrigated?

A  I don't think so.

Q  In other words, you had ample water during the six
years that you irrigated to irrigate what land was under irri-
gation at that time?

A  I don't know about the ample part of it, but we used
it all.

Q  Did you ever have to curtail production of any crops
during that six years because you didn't have sufficient water?

A  No, the water was very certainly -- for the six years
that I was there, the water flow was very consistent.

Q  And you worked for Mr. Oviatt as foreman.  What was the
last time you were on the ranch during that period of time that

24

11725

1    you were foreman?

2        A   I left there in March, '49.

3        Q   And have you been back to the ranch since that time?

4        A   Oh, just on occasion is all.

5        Q   Are you familiar with what the irrigatable acreage is

6    on the ranch at this time?and has been the last few years?

7        A   No, I have not been there only just to visit.  Since I

8    left there I have been there probably three or four times.  I

9    have been down through the ranch, yes, but I wouldn't know

10   exactly all the --

11       Q   Well, did you make any observations as to what is being

12   irrigated now compared with what was irrigated when you were

13   foreman on the ranch?

14       A   Well, I would say about the same.

15       Q   About the same?

16       A   Yes.

17       Q   Were you irrigating during the period of time you were

18   on the ranch that six year period all of the acreage on the

19   ranch that, in your opinion, was capable of being planted at

20   that time?

21       A   Well, all that was under pipeline.

22       Q   But there was other land not under pipeline that, if you

23   had pipelines, you could have irrigated?

24       A   Oh, yes.

25       Q   In fact, do you know whether or not there has been any

1  addition of pipeline replaced on the ranch since the time you

2  spent your six years there?

3      A  No, no cement lines of any kind have been added.

4      Q  You are familiar generally with the Ramona Ranch and

5  what its exterior boundaries are, are you not?

6      A  Right.

7      Q  And these pipelines that you have described as being

8  on the ranch when you were down there during the six year period,

9  those pipelines were within the confines of the outer boundaries

10  of the ranch, weren't they?

11      A  That is correct.

12      Q  Now, was there any water flowing in the stream during

13  the summer months during the six years you were there?

14      A  At what point?

15      Q  Well, at any point?

16      A  Yes, there was water flowing at the intake.

17      Q  What do you mean by "intake"?

18      A  Where the water was diverted from the creek into the

19  pipelines.

20      Q  You are talking about the diversion?

21      A  That is correct.

22      Q  You describe that diversion as being what size?

23      A  Approximately nine by 20, something like that.

24      Q  When you say nine by 20, which direction?

25      A  Nine feet width, 20 feet long.

Q   Nine feet high?

A   Wide.

Q   And 20 feet long?

A   Right.

Q   What was the form of that diversion?

A   What do you mean-- construction?

Q   Yes, the construction.

A   Cement.

Q   That is the material.  But what was its form?  Was it just a diversion directly across the stream bed?

A   Well, it was in the form of a cement box with the inlet at the upper end, with a wing running out to the side to stop any flow around it.

Q   And during the period of time you were there, had you seen water flowing beside this diversion point at any time of the year?

A   Only at flood.

Q   Only at flood, you mean during the winter months?

A   Whenever there happened to be a flood.  There have been floods in the summertime.

Q   You have seen it flow past there in the summertime, have you?

A   Just on a flash flood, which are unusual.

Q   Did you have any meter outside this Weir that you have previously described, did you have any measuring device

11728

Z2

1    anywhere on the ranch to determine the quantity of water--

2        A   What time are you speaking of?

3        Q   Let me finish the question.

4        A   Excuse me.

5        Q   At any time did you have any measuring device in any

6    of these pipe lines to measure the quantity of water that was

7    flowing through the pipe lines?

8        A   No.  We did have a measure on the outlet after I had

9    built the reservoir.

10       Q   The reservoir that you built?  Did you build one

11   reservoir?

12       A   One reservoir.

13       Q   And there are now two reservoirs, are there?

14       A   Actually there are three.

15       Q   Well, there are two in close proximity to each other,

16   No. 1 and 2, as shown on this map?

17       A   That is correct.

18       Q   You are familiar with their location?

19       A   Right.

20       Q   Do you know when the No. 2 Reservoir was built?

21       A   Well, it was evidently built sometime during Mr

22   Oviatt's time.  Actually, it is the original reservoir that I

23   built.  The only thing is that they put a dam across it, making

24   it into two.

25       Q   In other words, the reservoir as it exists today, the

total area in the reservoir is the same as it was when you
were on the ranch?

A   Yes.

Q   But it has now been divided; is that correct?

A   That is correct.

Q   You don't know what the capacity of that reservoir
is?

A   Not exactly.  As I said before, I would say it was
two or three acres.  It would cover an area of two or three
acres.

Q   If it is determined that the capacity of the combined
reservoirs would be 6 acre feet, would that about comport
with your--

A   I don't profess to be any expert on it.

Q   In other words, you don't know what it is?

A   I would say, just as my observation, it would cover
two or three level acres.  After you fill it up with water,
that is another problem.

THE COURT:  Well, let's save time.

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  What is Vail's and the Government's conten-
tion as to the acre feet that these two reservoirs contain?

MR. STAHLMAN:  6 acre feet.

MR. VEEDER:  The engineering report by Col. Bowen shows
their combined capacity as about 6 acre feet, your Honor.

THE COURT:  Is that a satisfactory estimate, Mr. Oviatt?

MR. OVIATT:  Yes.

THE COURT:  That is all settled.  Reservoirs 1 and 2 together are 6 acre feet.

MR. VEEDER:  Let me start again on this, because I want to be sure it is right and I have been having some difficulty following them on it.  No. 1 is the one on the north side, is that right?  That is 2 acre feet.

THE COURT:  No, $N_o$. 3 is shown here on the north side. The numbers here may be different from the numbers in the soil survey.  Are they?

MR. VEEDER:  That is what is concerning me, your Honor.

MR. STAHLMAN:  I think we have a difference in numbering.

MR. VEEDER:  I think we had better check them.  That is the point I wanted to be careful of.  Numbers 2 and 3 on page 53 of the report are 1 and 2 on their map.

MR. O'MALLEY:  That is correct.

THE COURT:  That is correct.  The soil survey lists them as 2 and 3.  The exhibit lists them as 1 and 2.  That is the one we are now talking about.

MR. VEEDER:  That is 6 acre feet.

THE COURT:  You are agreed that 6 acre feet is a fair estimate?

MR. O'MALLEY:  Substantially correct.

THE COURT:  What does the report show?

MR. STAHLMAN:  It calls it 1, which is really No. 3 on Exhibit W.

THE COURT:  And the report says it is about two acre feet.  Is that a fair estimate?

MR. O'MALLEY:  Yes, we will accept that, your Honor.

MR. VEEDER:  That is all I have at present.

Do you want to go ahead, Mr. Sachse?


CROSS-EXAMINATION

BY MR. SACHSE:

Q  Mr. Brinkerhoff, did your father build the weir?

A  No, that was already there.

Q  And your entire irrigation that you have described during your father's occupancy of the ranch, it was all by gravity downstream?

A  That is correct.

Q  Did that condition still exist in the Oviatt operations when you were foreman?

A  That is correct.

MR. SACHSE:  That is all.

MR. VEEDER:  I have a few questions here.


CROSS-EXAMINATION

BY MR. VEEDER:

Q  In regard to the reservoirs, during that period did

you use the well to fill your Reservoirs 1 and 2?

A   No.

Q   It was just surface diversion?

A   The reservoirs were filled from surface diversions.

Q   And you would impound the water and hold it there and then release it for us; is that correct?

A   Yes, to give us a bigger head.

Q   Did all of the water that you utilized go through those reservoirs?

A   Not always.

Q   How would you get it around the reservoirs?

A   Right above Mr. Oviatt's house there is a diversion there that goes down through the 12-inch line.

Q   You have no way of knowing the ratio between the direct diversion and direct application of the water to the quantities of water that were stored?

A   Please?

Q   Do you know how much water was stored and then utilized for purposes of irrigation?

A   Well, here is the thing, the reservoir naturally was used to store the water at night when we wouldn't be using it to give us a bigger head.  Then we would combine it with the surface flow and give us still a bigger head.

Q   You stated that you irrigated 300 acres, between 250 and 300 acres; is that correct?

A   I would say something like that.   I don't know exactly.

Q   What percentage of that was in alfalfa, do you remember?

A   Let's see, we had two pieces of alfalfa; we had a piece down on what we called the 80 acres.

Q   What size was that?

A   I would say possibly about-- I don't know exactly-- I would say about possibly a third of it was in alfalfa, something like that.

Q   A third of the 80?

A   Something like that, yes.   I am just guessing at it. I don't know exactly.   I would say about a third.

Q   Did you rotate your crops?

A   I have stated before, yes, that we did have rotated crops.

Q   In regard to 250 acres, it would make a great deal of difference as to what crops you were irrigating as to the quantity of water that would be required in a regular season; isn't that right?

A   Yes.

Q   And alfalfa would use a great deal more water than, for example, beans?

A   That is right.

Q   You have no way of knowing?

A   Knowing what?

Q   The quantities of water that were actually applied to beneficial use?

A   It was all applied to beneficial use.

Q   I am trying to say, you don't know how many acre feet a year were applied to a beneficial use?

A   I am no hydraulic engineer.

Q   You don't know?

A   I am not a hydraulic engineer.

THE COURT:  If you don't know, say so.

THE WITNESS: All right.

THE COURT:  No man ever hurt himself by saying he didn't know.  Do you know how many acres you would have each year in alfalfa?

THE WITNESS:  That was quite consistent.  I mean, we had, I would say, as I told him before, about a third of the 80, and we had about, oh, I would say 25 up in the main heart of the valley into alfalfa.

THE COURT:  Well, would you say 52 or 53 acres of alfalfa each year?

THE WITNESS:  Something like that.

MR. VEEDER:  I have no further questions.

MR. STAHLMAN:  I have one other question on another point here, your Honor.

8

Z9

### FURTHER CROSS-EXAMINATION

BY MR. STAHLMAN:

Q Directing your attention to this Oviatt's Exhibit W, at the time that you were on the ranch during that six-year period there was a line that came down to the Vail properties?

A That is right. It is still there.

Q And during that period of time you were irrigating down in the area as shown here as 12-Q, 12-K, 12-J, the flat land down in there, were you not?

A Well, right in here there was a little piece right in here that was inclined to be alkaline, right across here.

THE COURT: In 12-Q.

MR. STAHLMAN: Yes.

Q Did you irrigate that land-- the alkaline land?

A Not the alkaline.

Q How about the other lands in 12-Q, K and J, the flat lands?

A As we called it, the 80 acres there, it was prac-tically all irrigated, with the exception of this little piece in here.

Q What were the types of crops you planted in that area?

A Right up here close to the --

Q The hill?

A Well, there is a hill.

Q Would that be about in here?

A   That would be probably this here.

Q   The hill is indicated in 12-R?

A   Yes.  This hill in here, you come around this hill and into the 80 acres.  This area up in here was into alfalfa.

Q   And when you irrigated that you used a flood type irrigation, did you not?

A   That is correct.

Q   In other words, the water you had in the pipe, you flooded onto the field to raise your crop?

A   That is right.  Sprinkling was not known at that time.

Q   Did your fields come down close to the line of--

A   They went clear to the Vail line.

Q   They went clear to the Vail line.  And that area in there was being irrigated?

A   That is correct.

THE COURT:  How many acres would you say in that area were irrigated?  80?

THE WITNESS:  In the lower portion there?

THE COURT:  Or more than that?

THE WITNESS:  No, there was not quite that much, because, as I say, there is a little portion out there.  It had all been irrigated with the exception of maybe four acres in there.

THE COURT:  Are you through?

MR. SACHSE:  I have nothing further, your Honor.

MR. O'MALLEY:  I have no redirect, your Honor.  May this

11737

8

Z11

1    witness be excused?

2            THE COURT:  Mr. Brinkerhoff, we are through with you.

3        THE WITNESS:  Thank you.

4        MR. O'MALLEY:  Mr. Fred Bass.

5

6                    FRED BASS,

7    called as a witness on behalf of defendant Oviatt, being first

8    duly sworn, on his oath was examined and testified as follows:

9        THE CLERK:  State your name, please.

10       THE WITNESS:  Fred Bass.

11

12                   DIRECT EXAMINATION

13   BY MR. O'MALLEY:

14       Q   Where do you live, Mr. Bass?

15       A   I live at Parris.

16       Q   Did you ever own a ranch in San Diego County known

17   as the Stardust Ranch?

18       A   Yes, sir, I owned the Stardust.

19       Q   What period did you own that, Mr. Bass?

20       MR. STAHLMAN:  Is that in San Diego County?

21       MR. O'MALLEY:  That is in San Diego and Riverside Counties.

22       MR. OVIATT:  No.

23       MR. O'MALLEY:  Excuse me.  I accept the correction from

24   an expert.

25       Q   That ranch is in--

11738

A  Riverside County.

Q  --Riverside County, is it not?

A  Yes, sir.

Q  What period of time did you own that, Mr. Bass?

A  Well, let's see, I owned it -- I think I bought it
in '34 and sold it in about '39.

Q  Where is the Stardust Ranch located in relation to a
ranch of Mr. Oviatt known as Rancho Ramona?

A  It is right due east.

Q  When did you first see the Rancho Ramona?

A  Well, a few years prior to that.  I don't remember
exactly.  I was in there and I rode all over this.

Q  When did you say prior to that?

A  But I was definitely from, oh, I would say from '34,
'35 and along in there, I had cattle in there, and I was
quite frequently by there and rode all over the country.

Q  Did you ever observe in some fashion the irrigation
system of Rancho Ramona?

A  Yes, sir, I did.

Q  Did you observe the diversion box?

A  Well the intake; yes, sir.

Q  Yes.  And do you remember approximately in relation
to the date you have testified to when you first saw it?

A  How is that?

Q  When did you first see that diversion box?

7

Zx#13

A   Well, as I told you, about I would say '34.

Q   And do you recall who the owner of the ranch was at that time?

A   Mr. Weaver.

Q   Did you observe how much, if any, of the water of Wilson Creek was being diverted by the diversion box?

A   Well, right at this intake they were taking all of it.

MR. VEEDER:  Specify the time of the year when it occurred.  It would help.

THE WITNESS:  I heard the testimony here.  There was a period--

BY MR. O'MALLEY:

Q   Just your own observations.

A   The period when the creek-- of course, when there is floods and overflowing, but just during the ordinary run during the dry period they took it all.

MR. STAHLMAN:  Just a moment.  I am losing something here.  Are we talking about surface diversion?  That is all he observed, I presume.

MR. O'MALLEY:  That is correct.

THE COURT:  That is what he is testifying to.

BY MR. O'MALLEY:

Q   Did you notice or observe what was done with the water that was diverted?

A   Well, it went into this pipe line and on down through

1    the ranch; yes, sir.

2        Q  Did you notice whether or not they were irrigating

3    crops with the water?

4        A  Well, sure, they had different kinds of crops they

5    used it for.  But I didn't, you know,--

6        Q  You were not familiar with the details?

7        A  No.

8        Q  After that period of time when you first observed

9    the irrigation system, did you observe it again from time to

10   time during the time you owned the Stardust?

11       A  Yes, sir.

12       Q  Was there any time when you observed it when all of

13   the water of the creek was not being diverted into the

14   irrigation system?

15       MR. STAHLMAN:  I don't think that question means any-

16   thing.

17       MR. O'MALLEY:  I think it is quite meaningful, your

18   Honor.

19       THE COURT:  You mean by that all of the surface?

20       MR. O'MALLEY:  All of the surface water of the stream.

21       THE WITNESS:  That was coming down, yes, sir, from

22   this creek that would run into this weir box.

23   BY MR. O'MALLEY:

24       Q  That was during the period that you owned the Stardust,

25   which would be from approximately '34 to '39; is that correct,

sir?

A   Yes, sir.

MR. O'MALLEY:   You may cross-examine.

MR. VEEDER:   I have no questions, your Honor.


CROSS-EXAMINATION

BY MR. SACHSE:

Q   Mr. Bass, during your occupancy and ownership of the

Stardust Ranch, was there summer flow in the stream above the

Oviatt Weir on Stardust?

A   Yes, sir, there were two.

Q   Where?

A   They come into the old Wilson Creek channel, and

then there was another channel running in right where this

Hemet Road crosses that hit the main channel, which would be

Wilson Creek.

MR. SACHSE:   Perhaps Mr. O'Malley will help me to be sure

that his witness is oriented here.

Q   I will show you an aerial photograph, Mr. Bass.

What is this, C?

MR. VEEDER:   That is Oviatt's C.

BY MR. SACHSE:

Q   To get you oriented, this would be Stardust Ranch--

correct me if I am wrong, please.  This would be the levee of

the creek going down through the middle of Stardust.

A  Yes, sir.

Q  And this is a little comb-shaped area--

A  But this is on the Ramona property.

Q  That is right; this is on the Ramona property.

A  Yes, sir.

THE COURT:  The Ramona property is the red line?

MR. SACHSE:  Yes, enclosed in red.

Q  On that portion of Wilson Creek that is shown on this photograph upstream from the Ramona weir, was there surface flow during your occupancy of Stardust in the summertime?

A  I will tell you, I had this intake, we called it the Cottonwood--

Q  You are misunderstanding me.

MR. O'MALLEY:  He is trying to answer in his own way.

THE WITNESS:  I forget just what Mr. Vail there knows. My intake didn't take it all of the time, see, and like he said, I cut it back into Wilson Creek when I was not using it and it went on down and sunk and then rose again before it got to the Ramona.

BY MR. SACHSE:

Q  That is the point I want to bring out.  Look at the aerial photograph, please.

A  Yes.

Q  This aerial photo doesn't show your Stardust intake?

1    A    If it is that levee that is between there, Mr. Singer

2    built it right after I sold him the property on the Stardust.

3    Q    But your Stardust intake is further upstream than the

4    levee?

5    A    Yes.

6    Q    I am talking only about this portion of Wilson Creek

7    that is on the flat lands lying immediately upstream from

8    Oviatt.

9    A    Yes, sir.

10    Q    As shown on Oviatt's Exhibit C.  What surface flow

11    existed on that portion?

12    A    This water, as I told you, of course, when it was

13    raining and so forth, the creek would run, but it would sink

14    where Amos Welch was and where this other place went in, let's

15    see, I would say this little corner here, and about right here

16    the creek rose again, and then--

17    MR. O'MALLEY:  Indicating immediately to the east.

18    THE WITNESS:  Going right back to Wilson Creek.

19    BY MR. SACHSE:

20    Q    Immediately to the east of the Oviatt boundary; is that

21    right?

22    A    Yes, sir.

23    Q    Let me try to rephrase this and you tell me if I am

24    right.  Can you observe, Mr. Bass, that these are hills?  You

25    see how the hills pinch together there?

A   Yes.

Q   Up here there is a valley?

A   Yes.

Q   In other words, Wilson Creek would begin to rise to the surface on your property, the Stardust, when it got down into the hills and out of the flat valley; is that right?

A   You mean the water from the creek?

Q   The water would come up to the surface as it pinched it between the hills; is that right?

A   Yes, sir.

THE COURT:   Are you representing Stardust, Mr. Sachse?

MR. SACHSE:   Yes, your Honor.

I have no further questions.

THE COURT:   Any further questions?


CROSS-EXAMINATION

BY MR. STAHLMAN:

Q   You just rode down there and observed there was a weir and there were some pipes there and water was going into it; is that right?

A   Yes, sir.

Q   You never measured it?

A   No.   No, I don't know a thing about measurements of water.

MR. STAHLMAN:   That's all.

11745

1          THE COURT:   Any further questions?

2          MR. VEEDER:   I have none, your Honor.

3          THE COURT:   Thank you, Mr. Bass.

4          We will take a short recess pretty soon.   Is this a good

5     time?

6          MR. O'MALLEY:   I am about to call another witness, your

7     Honor.

8          THE COURT:   We will take a short recess.

9          (Recess.)

1      MR. VEEDER:  One minor problem that I would like to bring

2  to your Honor's attention and ask your Honor's authorization.

3  We have completed a good share in the Murrieta Valley of this

4  well canvass.  With your Honor's authorization -- I have agreed

5  with Mr. Sachse and Mr. Stahlman -- we would like to locate on

6  these ownership maps the wells to the end that we would have

7  one place where we could look for sources of water, if your Honor

8  will permit withdrawal of the maps for the purpose of entering

9  those wells.

10     THE COURT:  Those are the maps in the 206 series?

11     MR. VEEDER:  Yes, it is the same series.  It would be 206-C,

12  the first one we would like to work on.

13     THE COURT:  That may be withdrawn for the purpose of putting

14  on the wells.  Are you going to use some numbering system with

15  the wells?

16     MR. VEEDER:  We will use the same numbering system that

17  has been used by the State.

18     THE COURT:  All right.

19     Call your next witness.

20     MR. O'MALLEY:  David Welch, please.

21

22                    DAVID WELCH,

23  called as a witness on behalf of Defendant Oviatt, being first

24  duly sworn on his oath testified as follows:

25     THE CLERK:  State your name please.

THE WITNESS:  Dave Welch.


DIRECT EXAMINATION

BY MR. O'MALLEY:

Q Where do you live, Mr. Welch?

A  Radec Junction.

Q  Where is that located?

A  It is on Highway 79, the junction with 71.

Q  Where is it with relation to Temecula?

A  It is about 14 miles east.

Q  Are you familiar with the property known as Rancho Ramona?

A  Yes, fairly.

Q  Going back to the 30's, were you employed upon the property at that time?

A  Yes, during the early 30's.

Q  Do you remember the approximate time that you were employed?

A  Well, shortly after Mr. Brinkerhoff sold it. I worked for Mr. Weaver.

Q  Immediately following the acquisition of the property by Mr. Weaver from Mr. Brinkerhoff; is that right?

A  Yes.

Q  How long were you on the property at that time?

A  Well, I worked on and off for a year possibly, a little

1   more.

2        Q   For Mr. Weaver?

3        A   Yes.

4        Q   What work did you do?

5        A   General ranch work mostly.

6        Q   Was the ranch irrigated at that time?

7        A   Yes.

8        Q   Where was the water obtained?

9        A   From the Cottonwood Creek.

10       Q   Was there a diversion box on the creek?

11       A   Yes, that's right.

12       Q   Do you remember approximately where it was located?

13       A   Oh, approximately a hundred yards or so west of Highway

14   79.   That was the boundary of the property.

15       Q   Did you observe that during the course of your duties

16   on the ranch?

17       A   How much of the water was diverted?

18       Q   Yes.

19       A   Well, all of it, to the best of my knowledge.

20       Q   During this period of a year that you were on the

21   ranch --

22       MR. STAHLMAN:   You are talking about surface diversion?

23       THE WITNESS:   Yes.

24   BY MR. O'MALLEY:

25       Q   Were any crops irrigated?

1    A   Yes.

2    Q   Do you recall what those crops were?

3    A   Mainly alfalfa, some corn, and a small vegetable garden.

4    Q   Did that irrigation process that you have just testi-

5   fied to go on continuously during this year that you were on

6   the ranch?

7    THE COURT:  Ask your questions more artfully.  Do you

8   mean continuously for 365 days of the year, in winter, during

9   the rainy season?  You don't mean that obviously, do you?

10   BY MR. O'MALLEY:

11    Q   How much of this period did this irrigation go on that

12   you were familiar with during the year?

13    A   Well, all of the time that I was worked on the ranch,

14   which was not continuously, but it was the better part of a

15   year, possibly a little more.

16    THE COURT:  Did they irrigate in January or December?

17    THE WITNESS:  No, I say I was on the ranch, but the

18   alfalfa would be irrigated furing the winter unless there was

19   especially heavy rains.

20   BY MR. O'MALLEY:

21    Q   Do you recall approximately how many acres were irri-

22   gated during that period, Mr. Welch?

23    A   I would just have to approximate it.  I really don't

24   know.  But between 30 and 40 acres, I would say, as a guess.

25    THE COURT:  Altogether, or in alfalfa?

1          THE WITNESS:   In alfalfa.

2   BY MR. O'MALLEY:

3        Q   What other crops were irrigated?

4        A   "hile I was there only calfer corn or milo maize and

5   a small vegetable garden.

6        Q   Do you recall approximately how many acres that was?

7        A   Not over four or five.

8        MR. SACHSE:   Which?   Vegetables or --

9        THE WITNESS:   In calfer corn or milo maize.

10   BY MR. O'MALLEY:

11        Q   How many other acres were irrigated in addition to

12   calfer corn?

13        A   Well, the alfalfa and that was about all at that time.

14        Q   You mentioned a vegetable garden.   Give the approximate

15   size of that?

16        A   It was just small.   They didn't sell vegetables commer-

17   cially.   It was just for their home use.

18        MR. O'MALLEY:   You may cross-examine.

19        MR. VEEDER:   I have no questions.

20

21                CROSS-EXAMINATION

22   BY MR. STAHLMAN:

23        Q   What year was this that you were there?

24        A   I think about 1932.   I am not positive about the date.

25        THE COURT:   According to the testimony of Mr. Brinkerhoff,

1    he left there in 1931, and this man went to work for Mr. Weaver.

2          Did you come on as soon as Mr. Weaver took over or shortly

3    thereafter?

4          THE WITNESS:  No.

5          THE COURT:  Shortly after?

6          THE WITNESS:  A matter of a few months, I would say.

7          MR. O'MALLEY:  May I have this witness again, if the

8    Court please, for a couple of brief questions on redirect?

9    There is a matter I would like to cover that I did not and

10   probably should have.

11         THE COURT:  Do you want to do it now?

12         MR. O'MALLEY:  If that is agreeable with your Honor and

13   counsel?

14         THE COURT:  Go ahead.

15   BY MR. O'MALLEY:

16         Q  Mr. Welch, directing your attention to the year 1945,

17   did you again become familiar with the irrigation system on

18   Rancho Ramona?

19         A  Yes, I went to work for Mr. Oviatt.

20         Q  And how long did you work for him beginning in 1945?

21         A  Until 1951.

22         Q  At that time was this same irrigation system in opera-

23   tion that you have heretofore testified to?

24         A  Well, the original lines were still in.  However, there

25   was not as much flood irrigation going on.  It was more and more

1    overhead or sprinkling system used.

2        Q During this period did the diversion box also divert all

3    the water of the stream?

4        A  Yes.

5        Q  Was it used for irrigation on the ranch during this

6    entire period?

7        A  Yes.

8        Q  '45 to '51?

9        A  Yes.

10    MR. O'MALLEY:   Those are the additional questions, if your

11    Honor please.

12    MR. VEEDER:   I have a question now.

13

14                    CROSS-EXAMINATION

15    BY MR. VEEDER:

16        Q  Was the acreage the same in '45 as in 1931 or '32,

17    whenever you were there -- the irrigated acreage?

18        A  Just roughly, approximately.

19        Q  About the same?

20        A  Yes.  But as I say, there had been a small piece put

21    into over head sprinklers that hadn't been flood irrigated prior

22    to that.

23        Q  About how big was that acreage, could you estimate?

24        A  Possibly 20 acres, 15 to 20 acres.

25    MR. VEEDER:   I have no further questions.

11753

1    MR. STAHLMAN:  I have no questions.

2

3                    REDIRECT EXAMINATION

4    BY MR. O'MALLEY:

5        Q  Mr. Welch, was there an additional finger extended

6    into the property of Mr. Oviatt which was developed during the

7    time you were on that ranch from '45 to '51?

8        A  I believe that is the 20 acres I mentioned.  Is that

9    the --

10       Q  Well, there was an additional finger that was developed?

11       A  Yes, that is right.

12       Q  And that was irrigated with this overhead system that

13   you have just described?

14       A  Yes.

15       MR. O'MALLEY:  That is all.

16       THE COURT:  I have a question.  Mr. Brinkerhoff testified

17   that he was foreman for Mr. Oviatt in '47 to '49, and he said

18   there was 250 to 300 acres being irrigated at that time.

19       THE WITNESS:  I was not asked that question, was I?

20       THE COURT:  You were asked and you said you were there

21   from '45 to '51 and that there was about the same acreage as

22   was irrigated in '32, plus maybe 15 acres.  You said that in

23   '32 there were 30 to 40 acres of alfalfa and four or five acres

24   of calfer corn.  Now, who is right here?

25       THE WITNESS:  Well, it all depends.  There is probably a

1   lot of ground that was dry farmed there that was not irrigated

2   at all.

3        THE COURT:  We are talking about irrigated acreage.

4        MR. STAHLMAN:  I have one question.

5        THE COURT:  Just a minute.

6        Then your testimony is that in 1932, 30 or 40 acres of

7   alfalfa, and in '45 to '51 about the same acreage in alfalfa

8   and the same acreage, four or five acres, in calfer corn, but

9   there was an additional 15 to 20 acres developed.

10        THE WITNESS:  Yes, and in addition to that there was

11   a large maybe 30 acres or so put into alfalfa for permanent

12   pasture that I didn't mention.

13        THE COURT:  In addition to the other alfalfa?

14        THE WITNESS:  Which had been irrigated originally, then

15   it had been flooded out, and then Mr. Oviatt reclaimed that

16   part and put it under sprinklers.

17        MR. VEEDER:  I couldn't hear that last part your Honor.

18        THE COURT:  Read it Mr. Reporter.

19        (The reporter read the witness's last answer.)

20        MR. STAHLMAN:  I have a question.

21

22                  CROSS-EXAMINATION

23   BY MR. STAHLMAN:

24        Q  Mr. Welch, when you worked on the ranch did you irrigate?

25   Was that part of your job, too?

1    A   No, I was not irrigating.

2    Q   But you were all over the ranch and saw it?

3    A   That is right.

4    Q   What was the year when this land was flooded out, you

5  say?

6    A   Well, it was before my time -- that is, my time on the

7  ranch.

8    Q   What kind of work did you do on the ranch?

9    A   Mostly maintenance work.

10    Q   What is that?

11    A   Keep the machinery, pipelines and the electrical equip-

12  ment operating.

13    Q   You were all over the ranch from time to time?

14    A   Yes, that is right.

15    Q   You knew what was going on?

16    A   Yes.

17    MR. STAHLMAN:   That is all.

18

19                    FURTHER REDIRECT

20  BY MR. O'MALLEY:

21    Q   This additional piece you referred to as being re-

22  claimed, that was the part that was redeveloped after you put

23  in this overhead sprinkling that you just testified to?

24    A   That is right, directly west of Mr. Oviatt's house.

25

FURTHER EXAMINATION

BY MR. STAHLMAN:

Q  What year was that, may I ask?

A  That was during that period between '45 and the time I left in '51.

Q  Was it near the end of the period you left or the early part?

A  No, the early part. I helped put in the pipeline for that project.

MR. STAHLMAN:  That's all I have.

THE COURT:  Any further questions?


FURTHER REDIRECT

BY MR. O'MALLEY:

Q  Was an underground system installed during that period by the booster pump?

A  Yes.

Q  What acreage was watered with that additional equipment?

A  Well, this finger that I mentioned, and also --

Q  Where was that located?

A  Well, it was south and west of the main buildings, that is, the --

Q  And any aother part?

A  Well, all the --

Q  Was there a piece next to the Vail's that was also

1   watered by flood irrigation?

2       A   Yes, after a well was put down.   There was a well put

3   down there that was flooded.

4       Q   What was the approximate size of that piece, as you

5   recall?

6       A   That is the original alfalfa field that has been

7   mentioned.   That was flood irrigated originally.

8       MR. O'MALLEY:   Very well.   That will be all.

9

10                       FURTHER EXAMINATION

11  BY MR. STAHLMAN:

12      Q   When you said after the well was put down, when was

13  that well put down that you have referred to?

14      A   Oh, possibly '46 or so, along there, '47.

15      MR. O'MALLEY:   We will have a complete record of that

16  through our subsequent witness, counsel.

17  BY MR. STAHLMAN:

18      Q   When you talk about under ground system, what was that

19  that you installed?

20      A   I didn't mention it.

21      Q   He mentioned it and you answered it.   What did you mean

22  by it?

23      A   I don't believe I answered that particular part.   What

24  was it?

25      MR. O'MALLEY:   What was the additional part of the system

1    that you personally installed?

2        THE WITNESS:  Well, the booster pump and the lines from

3    the booster pump to the land that was to be irrigated by over-

4    head system.

5        MR. O'MALLEY:  And that land consisted of what portions of

6    the ranch now, for the record?

7        THE WITNESS:  Well, the central portions that had been

8    flooded at one time, and the finger that has been mentioned.

9        MR. O'MALLEY:  Very well.

10        MR. SACHSE:  I would like to get my acreages straight,

11    your Honor.

12

13                        FURTHER CROSS

14    BY MR. SACHSE:

15        Q  Mr. Welch, you testified that when you first worked

16    for Mr. Weaver there was between 30 and 40 acres in alfalfa;

17    is that right?

18        A  Yes.

19        Q  And four or five acres in calfer corn?

20        A  Yes.

21        Q  And the small home vegetable garden?

22        A  Yes.

23        Q  Then during your employment by Mr. Oviatt an additional

24    20 acres, which you refer to as a finger, was put under irriga-

25    tion; is that right?

1    A  Yes.

2    Q  And then you referred to an additional 30 acres re-

3 claimed in alfalfa.  Is that still an additional 30?

4    A  Yes.

5    Q  Then you finally referred to a field which you said

6 was the old alfalfa field but was put into overhead.  Is that

7 same 30 acres of alfalfa that was irrigated by you under Mr.

8 Weaver?

9    A  Yes, but it was flood irrigated.

10    Q  Then?

11    A  Yes, and later, too.

12    Q  You switched then later on during your employment by

13 Mr. Oviatt from flood to overhead?

14    A  No, we just supplimented the free water with the well

15 water.

16    Q  So summarizing the maximum acreage that you know of

17 being irrigated that any one time would be 30 or 40 acres of

18 alfalfa, four or five acres of calfer corn, a 20 acres finger

19 and a 30 acre so-called reclaimed plot; is that right?

20    A  Roughly.  I am not an authority on acreage.  That is

21 just a guess.

22    MR. SACHSE:  That is all.

23

24                    **FURTHER CROSS**

25 BY MR. STAHLMAN:

1    Q   As a farmer, that is your best judgement of the acreage?

2    A   Yes, that is a guess.

3    THE COURT:   There is no proof that he is a farmer.

4    Are you a farmer?

5    THE WITNESS:   Heaven help me, no.

6    THE COURT:   He is a maintenance man.

7    THE WITNESS:   That should be clear by now.

8    MR. STAHLMAN:   That's like me.   My lawyer friends think

9    I'm a farmer, and my farmer friends think I'm a lawyer.

10   THE COURT:   Anything else from Mr. Welch?

11   MR. STAHLMAN:   No.

12   THE COURT:   Thank you Mr. Welch.

13   MR. O'MALLEY:   We have one more witness, your Honor,

14   an elderly man who came from some distance.

15   THE COURT:   We are not ready to quit yet.   Let's keep

16   going.

17   MR. O'MALLEY:   I hope not.

18   THE COURT:   Maybe we can hear from Mr. Vail.

19   MR. VEEDER:   I hope we don't.

20

21                    CHALMA BAILEY,

22   called as a witness on behalf of the Defendant Oviatt, being

23   first duly sworn, on his oath was examined, testified as follows:

24   THE CLERK:   State your name, please?

25   THE WITNESS:   Chalma Bailey.

1        DIRECT EXAMINATION

2    BY MR. O'MALLEY:

3        Q   Where do you live, Mr. Bailey?

4        A   Well, at the present time I live on 79 and Barton

5    Score about 24 miles southeast of Hemet.

6        Q   Have you ever been familiar with that portion of what

7    is now the James Oviatt Ranch in the Oak Grove area, which was

8    formerally known as the Bailey Ranch?

9        A   Well, I was one of them, and I was first familiar

10   with it when it belonged to a man by the name of Mike Levy

11   back in 1887.

12       Q   Then at that time was the property under irrigation,

13   Mr. Bailey?

14       A   There was about 14 acres under irrigation.

15       MR. STAHLMAN:   Are you talking about one particular parcel

16   of this Oak Grove Ranch?

17       MR. O'MALLEY:   Yes, counsel, and this witness can't see

18   very well -- we're talking about a rather small portion.   I

19   wonder if we could just have a stipulation that we are identify-

20   ing --

21       MR. STAHLMAN:   Tell me what you are referring to.

22       MR. O'MALLEY:   Yes.   We are talking about this little piece

23   right fdown here, identified as 21-E.

24       MR. STAHLMAN:   What size piece?

25       MR. O'MALLEY:   It is about a 14 acre piece.

1   THE COURT: 21-E on Oviatt's Exhibit X.

2   MR. O'MALLEY:  Very well.

3   Q  You have stated, Mr. Bailey, that back in about 1887

4  when the property was owned by Mr. Levy you first observed

5  the property.  At that time was the property being irrigated?

6   A  Yes, I believe I had alfalfa pasture and then an apple

7  orchard; alfalfa planted around the apple trees.

8   Q  Where was the water obtained which was used to irri-

9  gate that parcel?

10   A  That came out of the Temecula Creek.

11   Q  Can you tell us where the headgate of the stream was,

12  Mr. Bailey, please?

13   A  At that time that Michael Levy owned it, it was up

14  about a quarter of a mile above the property.  It was being

15  irrigated right out of the creek, and they first took it out

16  with a pipeline partway and a ditch the rest of the way.

17   Q  From that diversion point how did the water get to that

18  property which became the Bailey Ranch?

19   A  Came right down the creek.

20   MR. STAHLMAN:  Talk louder, please.

21   MR. O'MALLEY:  I'll go back over it.  This is an elderly

22  man and we will have to take it slowly.

23   Q  Describe the course of the ditch from the diversion

24  point when it got to your ranch, Mr. Bailey?

25   A  Well, it took off and across the ground clear down

1    until it got on Mr. Oviatt's ground.

2         Q  Was there a ditch between that diversion point?

3         A  Yes, a ditch all the way.

4         Q  Can you give us the approximate dimensions of the ditch?

5         A  Well, the first ditch I put in, I intended to use the

6    reservoir.

7         Q  I would like now to stay on the way the property was

8    when you saw it back in 1887.

9         A  I am talking now about when we owned the property.

10        Q  Can we just describe the system as it was in 1887

11   when you first saw it?

12        A  It was a four inch pipeline the biggest part of the

13   way.

14        Q  Where did the pipeline start?

15        A  It started about a quarter mile up the creek.

16        Q  On whose property was it?

17        A  That was on Art Levy's property at that time.

18        Q  That pipeline came down to what is now the Bailey

19   Ranch; is that right?

20        A  Yes.

21        Q  Did you start to farm the property at any time, Mr.

22   Bailey?  Did you own the property yourself subsequently?

23        A  After 1928 we owned the property.

24        Q  Between the time when you first saw it in 1887 down

25   to 1928 did you see the property from time to time?

1    A  I was there most of the time, lived right close to it.

2    Q  Did you observe whether or not it was being irrigated?

3    A  Irrigated all the time.

4    Q  Did you observe, was that diversion that you testified

5  to in existence all during that period?

6    A  That is right.

7    Q  You testified that you purchased the property in 1928;

8  is that correct?

9    THE COURT:  No, he said '8 to '28, your family had it,

10  is that right?

11    MR. O'MALLEY:  No, it was '28, I believe, your Honor.

12    Q  When did you purchase the property, Mr. Bailey?

13    A  That would be the latter part of '27 or '28.  I am

14  pretty sure it was in '28 that we took the property over.

15    Q  Did you irrigate the property then, Mr. Bailey?

16    A  Well, when we first got it the ditch had washed out

17  and had to put in a new ditch.

18    Q  You put in the new ditch in '28?

19    A  I put in the new ditch myself.

20    Q  Where was the headgate of the ditch?

21    A  It was up the creek about half a mile.

22    Q  And on whose property was that headgate?

23    A  That was on John Wentworth's property at that time.

24    Q  And then the ditch traversed from the Wentworth property

25  down to your property, which is the Bailey Ranch; is that right?

1        A   Yes.

2        Q   And at that point was the ranch irrigated?

3        A   Yes.

4        THE COURT:   Are you talking about these 14 acres?

5   BY MR. O'MALLEY:

6        Q   You are now referring to this 14 acre piece which has

7   been the subject of your testimony; is that right, sir?

8        A   Yes.

9        Q   How long did you own the property?

10        A   Well, I think that we owned the property clear up to

11   about '45, when we sold it to Mr. Oviatt.  I think it was

12   about 1945.

13        Q   During that period was there ever any interruption of

14   your practice of irrigating from the stream?  In other words,

15   did you irrigate from the stream during that entire period?

16        A   I irrigated all the time.

17        Q   How much of the water of the stream was diverted from

18   the Wentworth property?

19        A   When I first started in, what I was going to say, that

20   I made a real small ditch so as to use the reservoir on Mr.

21   Wentworth's side of the fence, but there were so many gopher

22   holes washing the land all away, so I made the ditch 18 inches

23   across the bottom, two feet deep and two feet wide at the top,

24   so I could turn all the water at the head of the creek and

25   irrigated right from the ditch.  I figured I had about 30 miner's

1    inches.

2         Q  You stated that you ran all of the water from the

3    headgate of the stream into the ditch; is that right?

4         A  Yes.

5         THE COURT:  After he made the ditch bigger.

6    BY MR. O'MALLEY:

7         Q  That was following the time that you enlarged the ditch;

8    is that right?

9         A  Yes.

10         Q  Do you remember when that was that you enlarged the

11    ditch, approximately, Mr. Bailey?

12         A  Yes.   That was along about 1930.

13

14

15

16

17

18

19

20

21

22

23

24

25

9

Z1

1    Q   Up until the time you sold it to Mr. Oviatt, all of

2    the water of the stream was diverted in to the ditch?

3    A   Used it all, yes.

4    Q   After the ditch went to your property, this 14-acre

5    piece, where did it go from there?  Did it go back into the

6    stream at any point?

7    A   Yes, if we had an overflow of the ditch it would go

8    into Chihuahua Creek and then from Chihuahua Creek back into

9    Temecula Creek.

10    Q   What crops were irrigated during this period?

11    A   The crops I kept on it was alfalfa, Sudan and family

12    garden.

13    Q   In addition, during this period, was water obtained

14    from Kohler Canyon?

15    A   That was taken for my mother.  That was my mother's

16    land that it was taken to.

17    Q   Where was that?

18    A   She took up Lot 13 in Section 16, Township 9 South,

19    Range 2 East, as a homestead.

20    Q   Is that what is now part of the Oak Grove Ranch of

21    Mr. Oviatt?

22    A   That belongs to Oviatt now.

23    MR. STAHLMAN:  How far is that?  I would like to know

24    what he is talking about.

25    MR. O'MALLEY:  He gave the legal description.

MR. STAHLMAN: Can you point out to me what he is talking about?

THE COURT: It shows on your map.

MR. O'MALLEY: I don't think this witness can see well enough.

MR. STAHLMAN: Is it this piece here?

MR. O'MALLEY: Yes.

MR. VEEDER: Is that the water from the Forest Service land?

THE WITNESS: You see, I didn't have to file on this water like I did in Kohler Canyon. The Forest Service told me they would give me a free use permit just as good as filing on the water.

THE COURT: I didn't understand you. You said you didn't have to file on this water like you did in Kohler Canyon. Is that what you said?

THE WITNESS: Yes, I didn't have to file on this.

THE COURT: What do you mean by this water?

MR. O'MALLEY: He is talking about Rattlesnake.

MR. STAHLMAN: Let him tell the Court.

THE COURT: We haven't got to Rattlesnake yet.

BY MR. O'MALLEY:

Q We are now talking about Kohler Canyon diversion. Can you tell us when that diversion began?

A I started that along in, oh, along about 1916.

11769

Q  Is your sight good enough so that you can identify these exhibits, Mr. Bailey?

A  I ain't too good at looking at maps.

Q  I have here your original filing in Kohler Canyon. May this be marked Defendant's exhibit next in order?

THE CLERK:  Defendant Oviatt's Exhibit AA, your Honor.

(Defendant Oviatt's Exhibit AA was marked for Identification.)

BY MR. O'MALLEY:

Q  Mr. Bailey, I show you this document which has been marked as Mr. Oviatt's Exhibit AA.  Is this the original filing? I notice your name is on it as Chalma E. Bailey, Locator.

A  Yes.

Q  Is this the original filing that you made on the Kohler Canyon diversion?

A  Well,  I suppose it is, because I had it recorded at San Diego.

Q  Very well.  And the date here of April 8, 1913, is that about in accordance with your recollection?

A  Yes, about the time that I located the water, yes.

Q  What was done with that water, Mr. Bailey?

A  I piped that two miles onto my place.

Q  Where was that taken to?

A  Taken onto Lot 14 in Section 16.

Q  Can you identify it with respect to this--

THE COURT:  Exhibit X shows a Lot 14, and I take it that it can later be identified as being in Section 16.

MR. O'MALLEY:  Very well.

Q  At that point, Mr. O'Malley, did it go into a reservoir?

A  Yes.

Q  And what was done with it?

A  I irrigated alfalfa.

Q  And what piece was irrigated from that diversion?

A  It was a piece of about 12 acres in the South Half-- Out of the South Half of Lot 14, Section 16.

Q  How many acres was that, Mr. Bailey?  Was that about 12 acres?

A  About 12 acres that I was irrigating.

Q  Did that continue all during this period that you owned the ranch?

A  All of the time, yes.

MR. O'MALLEY:  May this document be marked as Defendant's exhibit next in order?

THE CLERK:  Defendant Oviatt's AB.

(Defendant Oviatt's Exhibit AB was marked for Identification.)

BY MR. O'MALLEY:

Q  Mr. Bailey, we have marked for identification here just for the record Defendant's Exhibit AB, which purports to

be a special use permit in your name.  In this Defendant's
Exhibit AB the name is Chalma E. Bailey.  Is that your name,
Mr. Bailey?

    A  Yes.

    Q  Did you also divert water from Rattlesnake Canyon?

    A  Yes.

    Q  Did you obtain a use permit from the Forest Service
for that?

    A  Yes, a free use permit for a ten-foot right of way
across the Forest Service land to patented ground.

    Q  Was there a pipe line leading from that diversion
point to your property?

    A  Yes, that as an inch pipe line.

    Q  Mr. Bailey, what property was irrigated, or what did
you do with that water?

    A  That was for domestic use on my mother's place.  It
was used to irrigate a garden.

    Q  She irrigated a garden, and she also used it for
domestic purposes; is that right?

    A  Yes.

THE COURT:  What was that called, Lot 15?

THE WITNESS:  That was in Lot 13-- her land.  A fellow
named Pinky owned this land before I took it to a homestead
years ago, and it was State land and he could buy it for a
dollar and a quarter an acre years ago, and then he turned it

1  back to the Government.  That meant I had to file on it.  That

2  was the only way I could get it.  That is how I come to file

3  on Lot 6, 11, 12 and 14.  And then the supervisor cut me off

4  on Lot 6 to keep me from taking it.  So I passed it up to

5  Councilman Smith and he took it before Congress and got it for

6  me.  That was when old William Howard Taft was President.

7        THE COURT:  Let's go ahead.

8        THE CLERK:  Defendant Oviatt's Exhibit AC marked for

9  identification, your Honor.

10       (Defendant Oviatt's Exhibit AC was marked for Identifica-

11  tion.)

12  BY MR. O'MALLEY:

13       Q  Did you also obtain a use permit from the Forest

14  Service for the Kohler Canyon?

15       They gave me a right of way.

16       Q  I notice your name on Defendant's Exhibit AC appears.

17  Is that the use permit which you obtained, Mr. Bailey?

18       A  Yes.

19       Q  Is this your signature here?

20       A  Yes.

21       MR. O'MALLEY:  At this time Defendant's Exhibits AB and

22  AC are offered in evidence, your Honor please.

23       MR. SACHSE:  How about Exhibit AA?

24       MR. O'MALLEY:  And Defendant's Exhibit AA is also offered

25  at this time.

1   MR. VEEDER:  I make no objection, if we have the right,

2   of course, to review these exhibits.

3       THE COURT:  Let's let it ride and let counsel have a

4   chance to see them.

5       MR. O'MALLEY:  I thought they saw them at the recess.

6   Very well.  It has been identified by this witness.

7       THE COURT:  How many do you have?

8       MR. O'MALLEY:  AA, AB and AC.  I understand there is no

9   objection.

10      THE COURT:  Does anybody want to look at them further?

11      MR. VEEDER:  Well, let them go.  I intend to check the

12  with the Forest Service to see whether they are effective at

13  this time.

14      THE COURT:  Defendant Oviatt's Exhibits AA, AB and AC

15  are received in evidence.

16      (Defendant Oviatt's Exhibits AA, AB and AC were

17  received in evidence.)

18  BY MR. O'MALLEY:

19      Q  Was this use of the water from Rattlesnake Canyon

20  continuous during the period that you owned the property,

21  up until you sold it?

22      A  It was used on the ranch all of the time.

23      Q  Did you ever measure the amount of the water which

24  came from either Kohler Canyon or Rattlesnake Canyon?

25      A  Yes, I figured by putting on four-inch, three-inch

1   and reducing to 2-inch pipe and taking it down I could force

2   lots of water through the line, but if I had had 2-inch pipe

3   clear through I would have got the same amount.  I measured it

4   and it was three and a half miner's inches.

5        THE COURT:  Out of which?

6        THE WITNESS:  Kohler Canyon.

7   BY MR. O'MALLEY:

8        Q  Did you also measure the amount from Rattlesnake

9   Creek?

10       A  No, I didn't measure that because it didn't quite

11  run an inch pipe full.

12       Q  What was the size of the pipe from Rattlesnake?

13       A  Part of it 500 feet was an inch and a half, and the

14  other 3,000 feet was an inch.

15       Q  How far did you say it was?

16       A  A little over 3,000 feet in length.

17       Q  How full was the pipe?

18       A  That ran about two-thirds full.

19       MR. O'MALLEY:  You may cross-examine.

20

21                    CROSS-EXAMINATION

22  BY MR. VEEDER:

23       Q  Did I understand you to say, Mr. Bailey, that the

24  diversion from Temecula Creek was originally through a four-

25  inch pipe line?  Is that right?

11775

A   That was Kohler Canyon.  You see, I started with a four-inch line of 500 feet, then I reduced it down to three-inch for a thousand feet, then I put on 10,000 of two-inch.

Q   The diversion from Temecula Creek, though, is there not a diversion from Temecula Creek for the 14 acres of land?

A   It is from Kohler Canyon.  No, the one for the 14 acres of land came out of Temecula Creek.

Q   That was originally a four-inch pipe; is that right?

A   No, that was originally a four-inch pipe when Simmons first had it, but that was years ago back before we got the property.

Q   Then you took the water through a 30-inch diversion?

A   Yes.

Q   How much of that 30 inches did you actually use?

A   How much of the water?

Q   Yes.

A   I turned it all in.

Q   What were your losses through there?

A   That is the reason I made my ditch small.  I wouldn't have so much open part of the ditch to lose my water and it would run swift, and I figured I lost about an eighth or a ninth of it getting down that distance of close to half a mile.

Q   Then you said the water was returned, did you not, ultimately to Temecula Creek down below your place of use?

9

Z10

A  Yes, it had an overflow, went back into Chihuahua Creek, and back into Temecula Creek.

Q  Did you ever ascertain and compare the amount of water that was in your return flow ditch with that which you diverted?

A  I turned it all right back down.  So if it did it would be sinking all along anyway and coming up.  So you take in the main channel 50 feet below where I would take out water would start rising all the way down.

MR. VEEDER:  I have no further questions.

THE WITNESS:  What?

MR. VEEDER:  No further questions from me.


CROSS-EXAMINATION

BY MR. SACHSE:

Q  Mr. Bailey, I want to ask you about your Kohler Canyon diversion.  You filed this notice that is Exhibit AA to appropriate the water from Kohler Canyon?

A  Yes, sir.

Q  And you appropriated this water for domestic purposes?

A  Yes.

Q  What did you use it for?

A  Used it to raise alfalfa and stock.

Q  How much alfalfa?

A  12 acres.

Q   How much stock?

A   Anywhere from fifty to a hundred head.

Q   And this was the only application to appropriate water
for that stock and alfalfa that you ever filed?

A   That is right.  That is what I had right there.

MR. SACHSE:  I have nothing further.


CROSS-EXAMINATION

BY MR. STAHLMAN:

Q   You say when you first took it over you put in a
ditch with a shovel?

A   Yes, pick and shovel.

Q   That was for the 14 acres, was it?

A   Yes.

Q   And before that the water was not running in there,
was it?

A   It was running in there all of the time.

Q   How was it running before you dug it with a pick and
shovel?

A   The flood took out the ditch and I had to make a new
one.

Q   How long did you make the ditch after the flow took
it out?

A   I started in within the year, so I wouldn't lose the
right.

Q  How big was the previous ditch?  Or was it a pipe line in there?  What was in there before you used a pick and shovel?

A  They had a pipe line in partway.  They had a four-inch pipeline.

Q  Did the pipe line wash out, too?

A  Yes, that washed out.

Q  The following year you took a pick and shovel and made a small ditch?

A  I put it right into the creek gravity all the way. The put in a pipe line to get the water up in the ditch.

Q  What year was that that you put in the ditch with a pick and shovel?  You are pretty good on dates, I see.

A  That was in 1929.

Q  And then you enlarged it afterward?

A  Yes.

Q  What year did you enlarge the ditch?

A  Right soon after, just a couple or three months.

Q  And when you had the pipe line in there how much water flowed through that pipe line?

A  I didn't use no pipe line.

Q  You never used the pipe line?

A  No, sir.  I used an open ditch.

Q  Prior to the time you owned the property there was a pipe line, wasn't there?

A   Yes.

Q   That was prior to '28?

A   Yes, and that was before Weaver took it over.

Q   Do you know how much water flowed in that pipe line?

A   It was running full and they used it in the reservoir.
They used the reservoir then.

Q   Do you know in what quantity that water ran through?

A   As I figured, it was around six or eight miner's
inches.

Q   Then when you built your little ditch, how much did
you carry in that little ditch?

A   I put in everything at the head of the ditch.  I
figured around 30 miners' inches.

Q   In other words, you went from six inches to thirty
inches in '28?

A   Yes.

Q   You didn't obtain any additional permit to increase
the amount of water you were applying there?

A   The thing is we just used what we wanted to irrigate
our land and irrigate it right, and when we got through we
turned it down for the next party below.

Q   When you put the larger ditch in there, did that carry
more water?

A   It carried all that was running in the stream at the
head.

11780

Q   And how much was that?

A   I would say about 30 inches.

Q   I might have missed the point.  How much did the small ditch carry, did you say?

A   The small ditch only carried about five or six inches.  Then when it washed out the reservoir I made a bigger ditch and irrigated through the ditch.

Q   That was in '28 when you expanded it?

A   Yes.

MR. STAHLMAN:   That is all.

MR. O'MALLEY:   That is all.

THE COURT:   Let me ask you.  You remember when that old four-inch pipe line was up there?  This is the Temecula diversion.  That had a four-inch pipe?

MR. O'MALLEY:   That's right.

THE COURT:   Did you put your ditch in at the same place where they had the diversion for the old four-inch pipe, or did you select a new place?

THE WITNESS:   I went up further with my ditch.  You see, they had a pipe in there, and then in '27 the flood washed it out.

THE COURT:   How far further upstream did you go from the old diversion point?

THE WITNESS:   Almost a quarter of a mile.

THE COURT:   Could you see the remnants of the old

diversion point below?

THE WITNESS: It was all washed out by the flood.

THE COURT: Couldn't see any of it there?

THE WITNESS: Only on the hillsides.

THE COURT: But you knew where it was?

THE WITNESS: Yes.

THE COURT: I don't know whether it makes any difference, but I got the impression that he selected a new diversion point.

MR. O'MALLEY: That is correct, your Honor.

MR. STAHLMAN: On two different pieces of property, the first was of Levy, and the next was what?

THE WITNESS: This property I was talking about where the water was taken out was taken out on the other side of the land that Oviatt doesn't own.

THE COURT: Originally it was taken out on Levy's land?

THE WITNESS: Yes.

THE COURT: When you changed the diversion point and went upstream you went onto somebody else's land?

THE WITNESS: Went onto Mr. Wentworth's land.

MR. VEEDER: But you irrigated the same land?

THE WITNESS: Irrigated the same lane. I went to Wentworth and asked him for a right of way. He said, "Go ahead, put it in wherever you want. I want mine, too." So he said he couldn't work on it, he was old, and at that time

I was full of piss and vinegar and I could do it, and I did do it.

THE COURT:  I was just looking over A and B.  As far as the two use permits are concerned--

MR. O'MALLEY:  They are separate, of course.

THE COURT: At best they are permissive.  You don't claim any rights except permission to use from the Government?

MR. O'MALLEY:  They are a use which has not been denied us to this point.

THE COURT:  I know.  But you start with a permissive use.  Can it ever be anything but a permissive use, unless you defy the whole United States Government and say, "We are going to keep this." I don't think you have anything even then. So we have no problem with the permits AB and AC.  They are permissive rights granted by the Government.  They are still permissive rights.

MR. O'MALLEY:  AA is not the same.

THE COURT:  Do we all agree on that?

MR. O'MALLEY:  That is AB and AC.

THE COURT:  I am talking about the two use permits of 1914.

MR. VEEDER:  Do you agree with that, Mr. Sachse?

MR. SACHSE:  If you are saying these are revocable permits, yes, there is no question about it.

MR. VEEDER:  And they have no rights.

9

Z17

1    MR. SACHSE:  I'll not say that.  You have rights until

2  they are revoked.

3    THE COURT:  Let's not make it complicated.

4    MR. VEEDER:  I am not trying to make it complicated,

5  your Honor.

6    THE COURT:  I don't know why Mr. Sachse gets into this

7  thing anyway.

8    MR. VEEDER: He and I are trying to negotiate a deal on

9  it.

10    THE COURT:  As to AB and AC, here are two special use

11  permits issued by some agency of the government which are

12  obviously a permissive use.  They continue, I take it, from

13  1914 to the present to be a permissive use, and I take it,

14  also, that they have no greater rights today than the day they

15  were issued.

16    MR. SACHSE:  I think that's right, your Honor.

17    THE COURT:  Are you all agreed?

18    MR. SACHSE:  All agreed.

19    THE COURT:  And if they could have been revoked in 1915

20  or '16, they could be revoked today.

21    MR. SACHSE:  That's right.

22    THE COURT:  And I think they probably could be revoked.

23    MR. SACHSE:  I think that's right.

24    THE COURT:  Then we don't have to spend much time on

25  AB and AC.

Now, Exhibit AA, this old location in 1913 in Kohler
Canyon, will present some kind of problem, and the Temecula
diversion will present some kind of problem. I am just try-
ing to sort out the wheat from the chaff and see what we have
been talking about on this.

MR. O'MALLEY: The Temecula diversion and the diversion
reflected in AA are a different breed of cats from AB and AC.

MR. VEEDER: They are of a different magnitude.

THE COURT: They are different, too, because your
diversion shown by AA was apparently a diversion from what
was at that time Government land, wasn't it?

MR. O'MALLEY: I think that is right, but I would rather
not be pinned down as to the status of it at that time.

THE COURT: Anything further from this witness?

THE WITNESS: We always were told that the State had the
say over the water, and as long as we took up the water like I
took it up in Kohler Canyon and used it continually nobody
could take it away from us.

THE COURT: There are lawyers here today who argue
that the State should control the allocation of water, and
there are some who argue the other way.

Any further questions?

MR. O'MALLEY: I have nothing further, your Honor.

THE COURT: Thank you.

MR. O'MALLEY: Thank you, Mr. Bailey.

I am now ready to go back to Mr. Oviatt, and I think this might be an appropriate time to adjourn, if that is agreeable with everybody concerned.

THE COURT:  It's appropriate.  I always am tickled with lawyers who find an appropriate time to adjourn.

MR. O'MALLEY:  I seem to recall that your Honor was in that situation a few years back.

THE COURT:  How is your schedule?  Are you going to finish this week?

MR. O'MALLEY:  I will not only finish this week.  I hope I will finish tomorrow.

THE COURT:  Mr. Vail, are you willing to wait until Thursday or Friday to be heard?

MR. VAIL:  It will be awfully hard.  Tomorrow would be all right.  I do have other appointments for the next day, for early the next day, Thursday.

THE COURT:  When would you like to be heard?  Tomorrow morning or tomorrow afternoon?

MR. VAIL:  Tomorrow morning would suit me fine.

MR. O'MALLEY:  How long will it take?

MR. VAIL:  I don't know.  That is at the mercy of the attorneys here.

MR. O'MALLEY:  Can you estimate your direct examination?

MR. STAHLMAN:  Not over two or three days.

THE COURT:  Seriously, the direct examination willbe very

11786

short?

MR. STAHLMAN:  Yes.

THE COURT:  And the cross-examination might be lengthy?

MR. STAHLMAN:  Yes.

THE COURT:  I don't know.  That's what I gather from the talk I hear.

MR. O'MALLEY:  I think it will be through tomorrow.  I have two witnesses tomorrow.  I am going to finish with Mr. Qviatt, and Mr. Bookman, and of course we have a deposition, But we can put that in later.

THE COURT:  I would like to take care of Mr. Vail tomorrow morning or tomorrow afternoon.

MR. O'MALLEY:  I think we will be done so that he can have the afternoon.  I hope we will.

THE COURT:  Can we agree to start with Mr. Vail at 2 o'clock tomorrow?

MR. STAHLMAN:  Yes.

THE COURT:  Get a good sleep tonight, Mr. Vail, and be ready tomorrow afternoon.

MR. VAIL:  If you don't complete it, is there any way I can get off?

THE COURT:  We will complete it tomorrow afternoon or I will know why.

(Adjournment until Wednesday, February 10, 1960, at 10 A.M.)