# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| | Plaintiff, | |
| vs. | | No. 1247-SD-C |
| FALLBROOK PUBLIC UTILITY DISTRICT, et al. | | |
| | Defendants. | |

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Wednesday, February 10, 1960

**Pages:**   11787 to 11931

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) | |
|      ) | |
|      Plaintiff,   ) | |
|      ) | |
|     vs.   ) | No. 1247-SD-C. |
|      ) | |
| FALLBROOK PUBLIC UTILITY   ) | |
| DISTRICT, et al.,   ) | |
|      ) | |
|      Defendants.   ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Wednesday, February 10, 1960

APPEARANCES:

| | |
|---|---|
| For the Plaintiff | WILLIAM H. VEEDER, ESQ., |
| | WILLIAM E. BURBY, ESQ., |
| | Special Assistants to the |
| | Attorney General, |
| | Department of Justice, |
| | Washington, D. C. |
| | |
| | LCDR. DONALD W. REDD. |

APPEARANCES (Continued):

    For Defendant Fallbrook
    Public Utility District,    FRANZ R. SACHSE, ESQ.
    et al.

    For Defendant Vail         GEORGE E. STAHLMAN, ESQ.
    Company

    For Defendant Oviatt     MESSRS. MUSICK, PEELER &
                            GARRETT,
                            By JESSE R. O'MALLEY, ESQ.

## INDEX TO WITNESSES

| For the Plaintiff: | D | X | RD | RX |
|---|---|---|---|---|

**For the Defendant Oviatt:**

| | D | X | RD | RX |
|---|---|---|---|---|
| James Oviatt | 11794 | | | |
| Max Bookman | 11841 | 11887 | | |

**For the Defendant Vail:**

| | D | X | RD | RX |
|---|---|---|---|---|
| Mahlon Vail | 11807 | 11818 | | |
| William H. Veeder | 11836 | | | |

11790

## INDEX TO EXHIBITS

| Defendants' Exhibits - | Iden. | In Evid. |
|---|---|---|
| Oviatt's AD | 11791 | |
| Oviatt's W and X | 11794 | |
| Oviatts AE and AF | 11802 | |
| Vail's AS | 11837 | 11839 |
| Oviatt's AI | 11859 | 11902 |
| Oviatt's AG | 11845 | 11902 |
| Oviatt's AH | 11854 | 11855 |
| Oviatt's Z | | 11880 |

| Plaintiff's Exhibit - | | |
|---|---|---|
| 205 | | 11821 |
| 217 | 11822 | 11825 |

1    San Diego, California, Wednesday, February 10, 1960   10:00 A.M.

2

3         (Other matters.)

4         THE CLERK:  Two, 1247-SD-C, United States of America,

5    vs. Fallbrook Public Utility District, et al.  Further court

6    trial.

7         MR. O'MALLEY:  Your Honor please, I have here a summary

8    of measurements of diversions from Temecula Creek both by

9    Oviatt and his predecessor Weaver, which has been made by

10   Mr. F. E. Green.  At this time I would like to have it marked

11   for identification and offer it in evidence.  It is my under-

12   standing that counsel will stipulate that it may be received

13   subject to the right of any party to check the figures.

14        MR. STAHLMAN:  No, we haven't said that at all, Mr.

15   O'Malley.  We want to check it before it goes in.  We are

16   reserving any objection we may have to it.  You were going

17   to have Mr. Green here.

18        MR. O'MALLEY:  Do you object to it?  Mr. Green is not here.

19        MR. STAHLMAN:  You are not offering at this time?

20        MR. O'MALLEY:  I would like to offer it at this time.

21        MR. STAHLMAN:  It is premature to offer it at this time,

22   your Honor.  There is no proper foundation laid.  We certainly

23   want to check it.

24        THE COURT:  It is marked for identification as Oviatt's

25   Exhibit AD.

(Defendant Oviatt's Exhibit AD was marked for Identi-
fication.)

MR. O'MALLEY:  I understand, Mr. Veeder, in so far as
you are concerned it may be received as against the Government;
is that right?

THE COURT:  I am not going to receive it piecemeal.  It
goes in as to everybody or it doesn't go in.

MR. STAHLMAN:  Did you make copies of this?

MR. O'MALLEY:  That is one of the documents that I will
get for everybody along with my other exhibits.

MR. VEEDER:  I advised Mr.O'Malley that we would
simply check it out; that we have no objection to it, if it is
correct.

MR. STAHLMAN:  That is my position.  I would like to
check it before it goes in evidence, your Honor.

THE COURT:  Then check it out during the day.

MR. STAHLMAN:  If we have the information and Mr.
Green is available to check it, I will check it today.  If
not, I would like to check it later.

THE COURT:  Let me see it.

You do not have copies?

MR. STAHLMAN:  May I see it?

MR. O'MALLEY:  In any event, we will reserve the offer
at this time, your Honor please, and possibly we can get
together during the recess.

1     MR. STAHLMAN:  We will check it, your Honor.

2     THE COURT:  Do you have a copy?

3     MR. STAHLMAN:  Yes, I have a copy of his, I think.

4     MR. O'MALLEY:  Yes.

5     THE COURT: A copy of Exhibit AD?

6     MR. STAHLMAN:  It is not a copy.  Looking at it, it's

7 an entirely different typewriter.

8     MR. O'MALLEY:  Why don't you check it during the recess.

9     MR. STAHLMAN:  Yes.

10     THE COURT:  Mr. Clerk, make a photostatic copy for

11 Mr. Stahlman.

12     Anyone else want a copy at this time?

13     All right.

14     MR. O'MALLEY:  Your Honor please, there were three

15 exhibits which have not been received in evidence.  Exhibits

16 W and X have already had a foundation laid for them, and I

17 would like to offer them at this time, Exhibit W for Identi-

18 fication being the exhibit which is the map of Rancho Ramona

19 and Exhibit X being the comparable exhibit for the Oak Grove

20 Ranch of Mr. Oviatt.

21     There is another exhibit, Exhibit Z, showing both

22 properties, but I will offer that at the conclusion of the

23 testimony of Mr. Oviatt.

24     So at this time I offer in evidence Exhibits W and X.

25     THE COURT:  Oviatt's Exhibits W and X are received in

1  evidence.

2      (Defendant Oviatt's Exhibits W and X were received in

3  evidence.)

4      MR. O'MALLEY:   Will you resume the stand, Mr. Oviatt?

5

6              JAMES OVIATT,

7  one of the defendants herein, having been previously duly

8  sworn, on his oath was examined and testified further as

9  follows:

10

11           DIRECT EXAMINATION (Resumed)

12  BY MR. O'MALLEY:

13      Q  Mr. Oviatt, I am not sure whether on yesterday's

14  date you testified to the total acreage owned by you, that is,

15  the total of the two ranches, the Oak Grove Ranch and the

16  ranch which is Rancho Ramona.   Will you state that figure for

17  the record?

18      A  Rancho Ramona is 1,171.63.   Oak Grove is 6,729.07.

19      Q  What is the total, sir?

20      A  The total is 7,900.70.

21      Q  Can you state the acreage, starting first with Rancho

22  Ramona and then proceeding to the Oak Grove Ranch, can you

23  state the total acreage which was irrigated by you during each

24  year in which you owned those properties?

25      A  Yes.  Starting--

11795

MR. STAHLMAN:  Pardon me just a moment.

MR. O'MALLEY:  Is there an objection?

MR. STAHLMAN: May I address the Court, please?

MR. O'MALLEY:  Surely.

MR. STAHLMAN: Whether or not he is making reference to some notes, and if so what the notes are.

MR. O'MALLEY:  Yes, the witness is referring to a compilation which he is using to testify from.

MR. STAHLMAN:  That answers the first part.  Is it his own figures?  Is it from observation or what?

MR. O'MALLEY:  They were compiled from records of the ranch.

MR. STAHLMAN:  May I ask him a few questions on voir dire, your Honor.

THE COURT:  All right.


VOIR DIRE EXAMINATION

BY MR. STAHLMAN:

Q  You are referring to some figures that you have there, Mr. Oviatt?

A  Yes.

Q  Where did you get the information from which you compiled the figures?

A  I got it from different sources:  The foreman of the ranch, and from my own and notes that we took.

Q   When were these notes compiled that you are referring to?

A   Well, I started out in '44.

Q   In other words, this is a year-to-year, as the acres were put in you put down the figures and kept a record of it during that period of time?

A   That is right.

Q   And that is what you are referring to?

A   There is '44, '45, '46.

Q   This particular document from which you are testifying here, the typewritten document, was this taken from some handbook or from some book or something?

A   It was taken from notes and from a book we kept on the grain that we bought each year; if we were going to put in a hundred acres of grain, we were going to put 60 pounds to the acre, then we knew how much.

Q   You took this information from the original record book and put it on this typewritten sheet; is that correct?

A   Some of them were slips of paper we put down on various documents, and some was given me by the foreman of the ranch that measured them, that ran the drill.

Q   When did you compile this list?

A   Just for my information.

Q   When?

A   Just the past month or so.

1    MR. STAHLMAN:  That is all I have.

2    THE COURT:  What difference does it make?  What is the

3 emphasis on the number of acres that have been irrigated, in

4 so far as riparian use is concerned?

5    MR. STAHLMAN:  I don't think there is any.  But he is

6 claiming something in addition to riparian use, as I under-

7 stand it.

8    MR. O'MALLEY:  To answer the first part of your Honor's

9 question in exactly the same way your Honor stated it, I

10 think counsel is quite right.  In so far as our riparian

11 rights are concerned, it makes no difference whatsoever.

12    THE COURT:  This is directed to your claimed prescriptive

13 right?

14    MR. O'MALLEY:  That is correct, your Honor.  For whatever

15 it is worth, we want to show our usage over the period of years.

16    THE COURT:  Go ahead.

17    THE WITNESS:  In '44 we watered a hundred acres.

18    MR. STAHLMAN:  Go slowly, if you will, please.

19    MR. O'MALLEY:  Will you take it slowly so counsel can

20 make notations.

21    THE WITNESS:  In '45, 145.

22 BY MR. O'MALLEY:

23    Q  Are these the figures for Rancho Ramona now?

24    A  Yes.

25    In '46 it was the same.

1     '47 when we put in the overhead sprinkling system we

2  run the water over a half mile up in the fingers and different

3  other places, we watered 205.

4     '48 it was down to 180, and stayed at that figure to

5  '53, inclusive.

6     '54 it was 150 acres.

7     '55 it was 120.

8     '56 it was 100.

9     '57 it was 80.

10    '58 it was 80.

11    '59 it was 65.

12  Do you want the crops that we watered with this?

13  Q   Yes, will you state the crops that have been irrigated

14  during those years, Mr. Oviatt?

15  A   Kaffircorn, alfalfa, permanent pasture, Sudan grass,

16  wheat, oats and barley.

17  Q   I notice that the amount of acreage has been declining

18  in recent years in the figures related by you.  Will you state

19  the reason for that, sir?

20  A   There was a lack of water.

21  Q   Would you irrigate additional acreag during that

22  period if the water had been available?

23  A   Certainly.

24  Q   During that period did you also irrigate during the

25  winter months?

11799

1    A  We irrigated during the winter months every year.

2   We had to do it when we didn't get rains even on our dry farm

3   land.

4    Q  You testified on yesterday's date that you diverted

5   all of the waters of Wilson Creek during the period since

6   Rancho Ramona has been owned by you.  Since your purchase

7   of the Ranch has ther been an interruption of the practice

8   of taking all of the water of the stream and irrigating?

9    MR. STAHLMAN:  I object.

10   MR. VEEDER:  I object to the question because it is not

11   in line with the record, because repeatedly yesterday they

12   said they didn't take it when there was flood time.

13   MR. O'MALLEY:  I was going to say except during the

14   flood period.

15   MR. STAHLMAN:  I object to the question as calling for a

16   conclusion, no proper foundation laid; he is not qualified.

17   THE COURT:  Overruled.

18   You may answer it.

19   THE WITNESS:  We took all of the water out of this

20   stream from the time I was first on the ranch up until the

21   date, excepting flood waters, and we built a dike purposely

22   so when the flood water came we could turn it out of our

23   diversion box-- we built a dike probably 40 or 50 feet long

24   out of rock, a rock wall, it was three feet wide, and went

25   into the ground about five feet, and it was five feet high.

BY MR. O'MALLEY:

Q   You testified to the acreage irrigated by you each year, Mr. Oviatt.   Were your crops rotated during that period so that on various occasions a particular piece might be under crops in rrigation and the following year there might be a different practice?

A   Oh, yes, we rotated, and sometimes we would get a crop of oat hay out and later on in the season we would put in another crop, sometimes Sudan grass.

Q   You have given the figures of the acreage which was irrigated by you each year on the property which is described as Rancho Ramona.   Will you state the same figures for the Oak Grove property?

A   Well, we watered--

THE COURT:   Give the year first, and then the acreage.

THE WITNESS:   Well, on that lower piece that Mr. Bailey testified to where we took the diversion out of Temecula Creek--

MR. VEEDER:   That is the 14-acre parcel?

THE WITNESS:   Yes.   We watered that every year and had different crops in there; sometimes permanent pasture, and sometimes corn, and sometimes alfalfa, and sometimes grain. And by the reservoir we watered ten acres mostly, to begin with, from Kohler Canyon.   And then after we started pumping the well up in the center of the valley about two years ago we

started watering 20 acres there, and put down another well

about three years ago, if I remember right, and we watered

40 acres from Well No. 19, making a total of 80 acres.

THE COURT:  I have 70.  You said the 10-acre piece by

the reservoir mostly from Kohler and later--

THE WITNESS:  10 acres below the bridge.  That is 20.

THE COURT:  The 10 acres below the bridge youdidn't

mention.

THE WITNESS:  Yes, I said that was from onthe Bailey

piece that he called 14 acres. We were diverting the water

from Temecula Creek.

THE COURT: You are using the 14 acres to make up the

total of 80?

THE WITNESS:  No, I called it 10 acres.

THE COURT:  But you are using the 10 acres out of that

14-acre piece to make up your 80?

THE WITNESS:  Yes, that's right.

THE COURT:  All right.

THE WITNESS:  Two tens, one twenty, and a forty.

THE COURT:  All right, I see where the other tenis.

BY MR.O'MALLEY:

Q  Now, Mr. Oviatt, have you prepared a summary of the

wells which were on each of the properties, the Oak Grove

property and Rancho Ramona, as well as the production from

the various diversion facilities on eachof your properties?

11802

A    I have.

MR. O'MALLEY:   At this time, if your Honor please, I would like these summaries to be marked for identification, and I will lay the foundation for them with the witness; the first being defendant's exhibit next in order, being the summary which is pertinent to Rancho Ramona, and the second being the summary which is pertinent to the Oak Grove property.

MR. STAHLMAN:   Do you have any copies of those?

THE COURT:   Oviatt's Exhibit AE is a summary re Ramona, and Oviatt's Exhibit AF is a summary re Oak Grove property.

(Defendant Oviatt's Exhibits AE and AF were marked for identification.)

THE COURT:   These are summaries of what?   Of water pumped from wells and from diversions?

MR. O'MALLEY:   There were two types of data on each of them; one is a summary of the wells and the various diversion facilities, and two, the products from those facilities during the period of ownership by Mr. Oviatt.

THE COURT:   Do you have any copies of them?

MR. O'MALLEY:   No, but I think all of counsel have seen them yesterday.

MR. STAHLMAN:   We just looked at them.   That means nothing.

MR. O'MALLEY:   I hope to enlighten you further through the witness now.

11803

MR. STAHLMAN:  It would be convenient if we had a copy of them.

THE COURT:  Do you have further exhibits you are going to put in?

MR. O'MALLEY:  Not too many.  I have some two or three exhibits which I am going to offer through Mr. Oviatt, and then I am going to offer a couple of use permits.

MR. VEEDER:  He can have them reproduced in my office, if he wants to.

MR. O'MALLEY:  Those are, in effect, extensions of the use permits which are already in evidence.  And that is about it in so far as what we plan to offer by way of exhibits, your Honor.

THE COURT:  How long will it take you to have copies of these made?

MR. VEEDER:  I don't know, but it will take only a minute, I am sure.  I am going to ask Mrs. Tooker if she can get it done, because frankly I haven't seen those myself.

MR. STAHLMAN:  You will have to cut it, then paste it back.

The Clerk says he can do it without cutting it.

THE COURT:  What other exhibits do you have?

MR. O'MALLEY:  Let me state what I have, your Honor please.

THE COURT:  Just hand them up.  Let me look at them.

I can see them a lot quicker than you can tell me about them.

MR. O'MALLEY:   I have two use permits which are extensions of permits.   This is a summary of diversions, and then I have this map that Mr. Bookman will testify to, and this sketch of the mechanical facilities on the Rancho Ramona which Mr. Bookman will testify to.   And that is it by way of exhibits.

THE COURT:   The map, I take it, is from Bulletin No. 57, it looks like.

MR. BOOKMAN:   Yes.   It is in evidence now.

THE COURT:   We will not worry about it.

MR. O'MALLEY:   I am sure nobody has seen this sketch of the diversion facilities that Mr. Bookman will testify to.

THE COURT:   Is anybody particularly interested in copies of these special use permits?

MR. STAHLMAN:   No, but I think we should have a copy of the filing they made in San Diego County.

THE COURT:   That old filing?

MR. STAHLMAN:   Yes, your Honor.

MR. O'MALLEY:   I thought I had direction from your Honor yesterday to get counsel copies when I got back to my office of everything, but I haven't been back.

THE COURT:   You are talking about Exhibit AA.

MR. STAHLMAN:   Yes.

THE COURT:   There were some copies around.

MR. STAHLMAN:  Yes, he had some copies yesterday, but we didn't take them.  Mr. Oviatt had some copies.

MR. O'MALLEY:  I may have another copy that I can dig up.

THE COURT:  I will hand these back to you.

Can't you go out at the noon hour and have copies made of this summary, Table 25?  Is that from Bulletin No. 57?

MR. BOOKMAN:  Yes, sir.

THE COURT:  That is from Bulletin 57.

MR. O'MALLEY:  Yes.

THE COURT:  Then this map of facilities, can't you go up to a blueprint company and have half a dozen copies made?

MR. O'MALLEY:  I would hope so.

MR. SACHSE:  I can't very well make an objection before something is offered, but I am going to object to any well data because on the face of it it is an improper riparian use. He is a riparian owner.  The use, as I take it, from his wells isn't going to establish any prescriptive right.  I think it is irrelevant and immaterial.

MR. O'MALLEY:  We are not even to that point.

THE COURT:  Let's cross that when we get to it.

Mr. O'Malley, have you got something to go into before you go into Exhibits AE and AF?

MR. O'MALLEY:  I have, but this is rather vital to our presentation.  It is the guts of what I want to prove through

1  this witness:

2      THE COURT:  Are you ready to go ahead with Mr. Vail at

3  this time?

4      MR. STAHLMAN:  Yes, your Honor.

5      THE COURT:  Mr. Clerk, take these down.  Where would it

6  be easier to make them, in your office or in the Clerk's office?

7      MR. VEEDER: It would be very simple to go right in my

8  office, your Honor.

9      THE COURT:  We will need the Clerk here with exhibits

10  concerning Mr. Vail's testimony.  Mr. Redd can take them

11  down.

12      Mr. Redd, will you go down and have some copies made of

13  Oviatt's Exhibits AE and AF, and have some copies made of

14  Exhibits AA and AD.

15      MR. O'MALLEY:  We have the copies of these.

16      THE COURT:  All right, step down, Mr. Oviatt.

17      Mr. Vail.

18      Mr. Vail has been sworn in this case, hasn't he?

19      MR. STAHLMAN:  Have you been on the stand before, Mr.

20  Vail?

21      MR. VAIL:  Not on the stand.  I think I have been sworn

22  once in the case.

23      THE COURT:  Well, we will swear you again.

24

25

MAHLON VAIL,

called as a witness on behalf of defendant Vail Company,

being first duly sworn, on his oath was examined and testified

as follows.

THE COURT:  What exhibits are you going to use?

MR. STAHLMAN:  Exhibit 159.

MR. VEEDER:  This switch caught me a little short on

some of my exhibits.  May I have just a moment, your Honor?

THE COURT:  Vail's AR-1 to AR-10?

MR. STAHLMAN:  Yes.

THE COURT:  What is the other exhibit-- Government's

159?

MR. STAHLMAN:  Government's 159.

May I proceed?

THE COURT:  Wait until Mr. Veeder is ready.

MR. VEEDER:  I just don't have my copies here.  I thought

this was going on at 2 o'clock.

THE COURT:  Have you sent for your exhibits?

MR. VEEDER:  Yes, your Honor.

THE COURT:  We will wait just a minute.

MR. VEEDER:  Go ahead, George.


DIRECT EXAMINATION

BY MR. STAHLMAN:

Q  Mr. Vail, directing your attention to Government's

Exhibit 159, which is represented here as a copy of a revocable permit between the Vail Company and the United States and relates to permission by Vail Company for the Government to enter upon the Vail property to drill a well, which was thereafter known as the Pauba Well or Navy Well, do you recall the occasion of executing that document?

A   I believe so.

Q   In other words, you did sign such a document?

A   That is correct.

Q   Now, directing your attention to the fact that the document bears the date of March 8, 1951, Vail Company, by Mahlon Vail, is it your recollection that that is about the time on which you signed it?  You signed it on the date which the document bears?

A   George, I believe it.  I don't remember the exact date.

Q   That is your best recollection?

A   Yes.

Q   That it would be the date on which it bears, and you signed at about that time anyway; is that right?

A   I believe so.

Q   Prior to the time this document was signed, do you have any recollection of any correspondence between the Navy and the Vail Company in connection with the leading up to the signing of this revocable permit?

11809

A   Yes, it had been discussed.

Q   Well, discussed.  But were there any letters between the Government and Vail Company that you recall?

A   Not that I recall.

Q   When you had discussions in relation to the drilling of this well, with whom did you have those discussions?

A   Well, I don't remember, George.  I talked to different people of the Navy.

Q   Were these representatives of the Navy, the people you talked to?

A   That is correct.

Q   Can you tell us your best recollection as to about how long prior to the signing of the revocable permit that you started having discussions with the Navy regarding the drilling of this well?

A   I believe it was a matter of months.

Q   And where were these discussions held?  There was more than one of them, were there?

A   Yes, I believe there were probably a couple of discussions.  I was not present at all of the discussions.

Q   Those that you were present at, where did they occur?

A   Well, at my camp up there at the ranch.

Q   Do you recall representatives of the Navy being there on more than one occasion in connection with this particular matter?

A   I believe so.

Q   At this time, can you recall any of the--

MR. VEEDER:   May I interrupt just a moment.

When Mr. Vail says, "I believe so," is he saying "I know" or "I don't know"?

BY MR. STAHLMAN:

Q   Is that your best recollection, Mr. Vail, when you say "I believe so"?

A   Well, my best recollection is that we had at least one conversation regarding the well at my camp.

Q   Do you recall any conversation at any other place prior to the time of the signing of this?

A   Not with the Navy.

Q   Do you recall any of the parties who were present at this discussion that you had at your camp?

A   You mean Navy personnel?

Q   Yes, Navy or Government representatives?

A   Well, I hate to admit it, but I can't identify them. There have been so many Navy and Marine men up there that I don't remember on this occasion who was there as far as the Navy was concerned.  There was a lot of the top brass there.

Q   A number of them?

A   Yes.

Q   In your discussions with them was it ever discussed as to what the reason was for wanting to drill a well on

11811

the Vail property?

MR. VEEDER:  I object to the question, your Honor.  I think the document speaks for itself.  I don't believe this has any relevancy or materiality whatever in regard to the issues that are before your Honor.

THE COURT:  The Court is entitled to hear the surrounding circumstances.  Obviously, a written agreement can't be varied by oral conversations, except in certain exceptional cases.  But this is the position of the parties, their problems concerning it, and all.

MR. VEEDER:  But, your Honor, there is no challenge as to whether this document is ambiguous or not.  There is no challenge at all in that regard.  I don't believe, your Honor, that it is appropriate at any time to introduce evidence, unless there is some charge that this document is unclear.  I don't believe you can go behind a document simply because--

THE COURT:  Now, wait.  Is there any attempt to go behind the document?

MR. STAHLMAN:  No, your Honor.  The only purpose of this question is this.  The document indicates that this well was for exploratory purposes, and I think that the conversation will indicate what they had said in relation to what would be interpreted as the exploratory purpose, the purpose for exploring.

MR. VEEDER:  I renew my objection, your Honor, and state

1   that it is completely irrelevant and immaterial.  And he

2   certainly cannot--

3      THE COURT:  Just a minute.  We have a law professor

4   here and of course he knows all of these answers.

5      MR. STAHLMAN:  Yes, he has written books on them.

6      THE COURT:  But as I understand the law, it is this.

7   Although the rule is that you can't vary the terms of a

8   written instrument by the conversations that preceded, unless

9   the document is ambiguous, it is nevertheless permissible in

10  all cases to take testimony of the surrounding circumstances,

11  the position of the parties, the incidents that may have

12  led up to the document-- sort of background information.

13     MR. VEEDER:  But, your Honor, the point that I am making

14  on this is that there is no challenge here as to the meaning

15  of the document, as to what it relates to.  I submit, your

16  Honor-- perhaps I was not clear as to the basis of my objec-

17  tion-- my objection is that there is no attack on the document.

18  Its validity is admitted.  He says he signed it.  Now what

19  conceivable purpose would there be for him to go on and tell

20  us what some Navy brass said, perhaps with a little yellowstone.

21  And I submit--

22     MR. STAHLMAN:  Maybe a lot of yellowstone.

23     MR. VEEDER:  The more yellowstone, the more irrelevant.

24     That is my view, your Honor.  I want to repeat, I think

25  this is totally immaterial and irrelevant.

THE COURT:  I am going to hear it and you can move to strike it.

MR. VEEDER:  I will, your Honor.

MR. O'MALLEY:  Obviously, in so far as the parties not present at the conversation are concerned, it would not be admissible.  I assume it is going in only as against the Government, Mr. Stahlman.

MR. VEEDER:  I think it goes as to everybody.

MR. O'MALLEY:  I object to it as being a conversation not within our presence.

THE COURT:  It will be limited as between the Government and Vail Company.

MR. STAHLMAN:  Do you have the question in mind, Mr. Vail?

THE WITNESS:  No, I don't, George.

MR. STAHLMAN:  Read it, please.

MR. VEEDER:  I renew the objection on the additional grounds that it would be entirely hearsay.  We have no way of checking who was there.  He says he doesn't know.

THE COURT:  You mean that a witness who had conversation with a certain man in uniform would be prevented from testifying to that conversation merely because he had forgotten the man's name?

MR. VEEDER:  Your Honor, particularly when he has forgotten the man's name.  What kind of rebuttal can we have?

THE COURT:  Suppose there was a conversation between two parties and the witness forgets the man's name.  Does that mean that he can't testify to the conversation if he remembers it?  It is a matter of cross-examination.  It goes to the weight of his testimony.

MR. VEEDER:  I have made my objection, your Honor.  Have you overruled it, your Honor?

THE COURT:  Yes.

MR. STAHLMAN:  Mr. Veeder said the other day that he didn't know even the reason for drilling this well.

Would you read the question, please?

(The reporter read the pending question as follows:  "Q  In your discussions with them was it ever discussed as to what the reason was for wanting to drill a well on the Vail property?")

THE WITNESS:  They were interested in the underground formation and the possibility of getting a lot of water, I suppose.

BY MR. STAHLMAN:

Q  Do you recall anything they said to you about why they wanted to get a lot of water?

MR. VEEDER:  I object to that, your Honor.

All right.  Let all my objection go to this whole line of testimony.  It's the worst thing I ever heard of.

THE COURT:  All right, on the grounds you have heretofore

1    stated.  If you have any specific objection to a particular

2    question, all right.

3         MR. VEEDER:  Yes.

4         THE COURT:  But the objection I am allowing to go to the

5    entire line of testimony-- let's have this clear-- is the

6    objection that you make that because there is a written

7    document no witness can testify to any of the preliminary

8    matters or any of the surrounding circumstances.

9         MR. VEEDER:  Certainly there has been no attack on it at

10   all.

11        MR. STAHLMAN:  You raised the question of unjust enrich-

12   ment in this case.  That is the only point this goes to.

13        MR. VEEDER:  Is that what this is going to, unjust

14   enrichment now?

15        MR. STAHLMAN:  Yes.

16        MR. VEEDER:  All right, that suits me.

17        MR. STAHLMAN:  My next witness, I think, will throw a

18   great deal of light on this.

19        MR. VEEDER:  Are you going to have another witness?

20        MR. STAHLMAN:  Yes.

21        THE COURT:  Go ahead..

22        THE WITNESS:  I understood--

23        THE COURT:  Just tell us what was said, not your under-

24   standing.  I know a person is apt to say, "I understood" and

25   "It was my impression", but those are your conclusions.  What

1     was said to you, the best you recall?  What words were used?

2          THE WITNESS:  Well, that would be a hard question to

3     answer, your Honor, because there was an awful lot of conver-

4     sation and a lot of--

5          MR. VEEDER:  And a lot of yellowstone.

6          THE WITNESS:  And a lot of ideas.

7          THE COURT:  Tell us the best you can.

8          MR. VEEDER:  We are priming this guy.  We are pumping

9     it out of him.  Let's take a blackjack and beat it out of him.

10    He doesn't know.  He doesn't remember.

11    BY MR. STAHLMAN:

12         Q  The point is, Mr. Vail, was anything said there about

13    why they wanted to find out whether there was a large amount

14    of water there, why the Navy was interested in finding that

15    out?

16         A  Yes, there was.

17         Q  What was that?

18         A  Well, they wanted-- it was told to me that they were

19    curious to know whether there was a large quantity of water

20    there that would be available in case of an emergency.

21         Q  Now, then, at the time you signed this revocable

22    permit you had not been served with a copy of the complaint

23    in the case of United States vs. Fallbrook, had you?

24         A  No, I don't believe so.

25         MR. STAHLMAN:  In fact, I might indicate, your Honor,

1    the records show that it was some couple of weeks or so after-

2    ward.

3            THE COURT:  When was the suit filed?

4            MR. STAHLMAN:  The suit was filed, however.

5            MR. VEEDER:  January 28, 1951, your Honor.

6            And I object to this as being incompetent, irrelevant and

7    immaterial, and as having no bearing on the case.

8            MR. STAHLMAN:  It does in connection with the unjust

9    enrichment, your Honor.

10           THE COURT:  It is agreed that the present lawsuit was

11   filed on January 28, 1951?

12           MR. VEEDER:  I would want to check it.

13           THE COURT:  Subject to being checked.

14           MR. STAHLMAN:  I think that is the date.  And I think

15   the records will show that the Vail Company was not served

16   with a complaint until later in March.

17           THE COURT:  Read the question.

18           MR. STAHLMAN:  The question is already answered your

19   Honor.

20           I just indicated to your Honor what the record shows.

21           THE COURT:  What was the question and answer?  That he

22   didn't know about the suit when it was filed?

23           MR. STAHLMAN:  That he had not been served with a suit.

24           THE COURT:  Did you know about the complaint having been

25   filed?

THE WITNESS:  I can't say that I did, your Honor.

THE COURT:  You don't know?

THE WITNESS:  That is right.

MR. VEEDER:  He doesn't know whether he knew or not. Isn't that it?

THE COURT:  That is what he said.

MR. VEEDER:  I just wanted to be sure.

THE COURT:  Go ahead.

MR. STAHLMAN:  I believe Vail's Exhibits AR-1 to AR-10 are in evidence.

THE CLERK:  Yes; admitted on the 3rd.

MR. STAHLMAN:  You may cross-examine.


CROSS-EXAMINATION

BY MR. VEEDER:

Q  I hand you the exhibit marked for identification No. 205 and ask you whether you knew or know a man named J. R. Pemberton?

A  I do.

Q  And was J. R. Pemberton ever in your employ-- I beg your pardon-- in the employ of the Vail Estate or the Vail Company?

A  No, I don't believe actually he was in our employ. I would have to look to the records.  But I believe that Bill, in any work that he did--

1     Q   You say "Bill"?

2     A   Pemberton.

3     Q   Mr. Pemberton?

4     A   Yes-- did it without pay.

5     Q   You sort of "conned"him into it?

6     A   Yes.

7     MR. STAHLMAN:   Wait a minute.  Just for the record here,

8   I presume that is a facetious remark.

9     THE COURT:   It may go out.

10    MR. STAHLMAN:   They are old friends and have been for

11   many years.

12    I would even give you a drink of Four Roses sometime.

13    THE COURT:   At any rate, Mr. Pemberton was an old

14   friend of yours?

15    THE WITNESS:   That is right.

16   BY MR. VEEDER:

17    Q   And you are the Mahlon Vail to whom this letter

18   marked October 21, 1950, was sent?

19    A   That is correct.

20    Q   Do you recall receiving that letter in 1950?

21    A   No, I don't.

22    Q   You just read it.

23    A   But I will read it and see.

24    MR. VEEDER:   While he is reading it, your Honor, I sent

25   down to your office the resolutions of the Vail Company.  Do

you have those, your Honor?

THE COURT:  I have them here.  I have the ones you sent to me.

MR. VEEDER:  I would like to have those marked for identification.

MR. STAHLMAN:  May I know what this is?

MR. VEEDER:  Yes.  They are the resolutions antecedent to the stipulated judgment.

MR. STAHLMAN:  Yes, I understand.

MR. VEEDER:  And I would like to offer those, if I may, now.

MR. STAHLMAN:  That isn't part of this particular examination.

MR. VEEDER:  No.  While Mr. Vail is reading his own correspondence, I thought we could get a little work done here.

Q  Are you acquainted with the Pemberton report, Mr. Vail?

THE COURT:  Is that Exhibit 205?

THE WITNESS:  I remember having received it and having read it.

BY MR. VEEDER:

Q  And Mr. Pemberton has worked in regard to the ground water and the availability of ground water on the Vail Company property in the past; isn't that correct?

1    A   He is familiar with the geology and he has discussed

2  the geology in the past.  Even when we built the dam I talked

3  to Bill about several features.  He has just been interested

4  in the geology, that's all.

5    Q   Do you recall the circumstances under which he under-

6  took this report dated October 23, 1950, for you in regard to

7  the availability of ground water on the Vail properties?

8    A   Well, anyone would be interested in anything pertinent

9  to their property.

10    Q   Well, when did you first discuss this matter with

11  Mr. Pemberton which gave rise to the Pemberton report?

12    A   I think it was probably after one of these discussions

13  with the Navy.

14    MR. VEEDER:   I offer in evidence Plaintiff's Exhibit

15  marked 205 for Identification, your Honor.

16    MR. STAHLMAN:  No objection.

17    THE COURT:  Received in evidence.

18    (Plaintiff's Exhibit No. 205 for Identification was

19  received in evidence.)

20  BY MR. VEEDER:

21    Q   In other words, you and the Navy were interested in

22  the amount and availability of ground water under the Pauba

23  Ranch; isn't that right?

24    A   Well, yes.

25    Q   And you called in your friend Mr. Pemberton sometime

1   prior to October 23, 1950, and you brought your interest in

2   that ground water to his attention; isn't that right?

3          A   That is right.

4          Q   So do you recall when he first began his investigation,

5   Mr. Vail, for the purpose of preparing the Pemberton report,

6   Exhibit 205?

7          THE CLERK:   Government's Exhibit 217 for Identification

8   has been marked, your Honor.

9          (Plaintiff's Exhibit No. 217 was marked for Identifica-

10  tion.)

11  BY MR. VEEDER:

12         Q   Did you respond to that?

13         A   No, I did not.

14         MR. STAHLMAN:   Do you recall the question?

15         THE WITNESS:   No, I don't.

16         MR. VEEDER:   Would you please read it?

17         (The Reporter read the pending question as follows:

18  "Q   So do you recall when he first began his investigation,

19  Mr. Vail, for the purpose of preparing the Pemberton report,

20  Exhibit 205?")

21         THE WITNESS:   I don't remember the date, but it was--

22  it took probably a month or two in preparation.

23  BY MR. VEEDER:

24         Q   So your best estimate would be that probably in

25  August, 1950, would be the latest date that you would have

consulted with him in regard to the preparation of the
Pemberton report?

A   Well, now, I don't recall when the report was pre-
pared.  If you will give me that date.

Q   The date is October 23, 1950, and you said a couple
of months, and I just said August.  Would that be about right?

MR. STAHLMAN:  Do you understand the question, Mr. Vail?

THE WITNESS:  Yes, I do.

It might have taken him less time than that to prepare
it.  I am not sure.

BY MR. VEEDER:

Q   Mr. Pemberton is available himself, is he not, so that
he could testify?

A   That is right.

Q   Could I ask you, Mr. Vail, to look at the records of
your company and obtain for us any correspondence you had with
Mr. Pemberton in regard to the initiation of this investiga-
tion?  Would you do that for us?

A   I wouldn't have any correspondence with him regarding
it, I am sure.  I feel sure that none of it was ever written,
because I don't write Bill.

Q   But Bill writes you?

A   Yes, at times.

Q   I hand to you the exhibit marked for Identification
217 and ask you--

1    THE COURT:  Has that just been marked?

2    MR. VEEDER:  Yes, your Honor.

3    MR. STAHLMAN:  This is not proper cross-examination,

4  your Honor.

5    MR. VEEDER:  Then I will make him my witness.

6    MR. STAHLMAN:  O.K.

7    THE COURT:  Is there any need to have any oral testimony

8  in connection with the documents and resolutions by the Vail

9  Company?

10    MR. VEEDER:  George, will you concede them?

11    MR. STAHLMAN:  Oh, yes.  These are taken from the records

12  of the company?

13    MR. VEEDER:  Yes.

14    MR. STAHLMAN:  Yes, I have seen them.  You have them

15  both there, of Santa Margarita and the Vail Company?

16    MR. VEEDER:  There you are, George.

17    THE COURT:  I don't see the Santa Margarita there, just

18  the Vail Company.

19    MR. VEEDER:  I think the Santa Margarita is there.

20    MR. STAHLMAN:  We have no objection to those going in

21  evidence.  They are part of the record in the early case.

22    THE COURT:  Anybody have any objection to them?  Here is

23  a man whose name appears on them.  Does anyone want to examine

24  him about them?

25    MR. O'MALLEY:  I assume that they are not being offered

11825

as against the other defendants.

MR. VEEDER:  We will offer them for all purposes.  I don't know whether they would be significant to anybody else or not.

THE COURT:  They concern the question of the stipulated judgment.  Mr. O'Malley, you can take this position, if you want to, on this matter.  So far the pack has ganged up on Mr. Veeder.

MR. VEEDER:  I will stipulate to that, your Honor.

MR. O'MALLEY:  I will withdraw any objection to that.

THE COURT:  All right, Plaintiff's Exhibit 217 received in evidence.

(Plaintiff's Exhibit No. 217 for Identification was received in evidence.)

MR. VEEDER:  Your Honor, this does go beyond the scope of the direct examination, so for the purpose of the next few questions I am going to ask Mr. Vail-- I will make him my witness, if that is agreeable.

THE COURT:  All right.

Let me see Exhibit 217, Mr. Clerk.

BY MR. VEEDER:

Q  Mr. Vail, do you recall the proceedings before the Department of Public Works, the Division of Water Resources in the State of California, in regard to the hearing on your application for a permit to appropriate water at the Vail Dam?

A   Well, undoubtedly there was such a hearing, but I was not present at those hearings.  That was handled by our attorneys.

Q   Do you recall who your attorneys were at that time?

A   O'Melveny & Myers.

Q   Do you recall an attorney by name of Mr. Whyte-- W-h-y-t-e?

A   No, I don't.

Q   But it was the firm of O'Melveny & Myers who represented you in that matter?

A   That is correct.

MR. VEEDER:  Now the next questions, your Honor, that I desire to allude to-- and I am making this explanation because of statements that I made into the record on February 3rd in regard to an interpretation of the stipulated judgment.

Q   Mr. Vail, for a great many years you purchased water from Jack Roripaugh, did you not, to irrigate the property referred to as the Piece by Jack?

A   Well, I don't think we ever purchased any water from Jack.

Q   What was your arrangement?

A   He rented land and put his water on the land that he rented.

Q   He put the water there himself?

A   Yes.

Q   Didn't you ever buy any water from him?

A   I don't believe so-- although he might have charged it up to the crop.  I am not sure.

Q   Did you ever use any of the water yourself from that well, do you recall?

A   I don't believe so.

Q   Is that property now being cropped by the Vail Company? I don't mean now, I mean this last irrigation season.

A   I would have to ask my nephew.

MR. STAHLMAN:   I think that is your best witness on this situation, Mr. Veeder.  I don't think Mr. Vail is familar with that situation.

MR. VEEDER:   I am going back a little beyond Mr. Wilkinson's operation.

Q   Now, when was the last time that you irrigated the land served by the Hutch well? Can you remember that?

A   No, I can't.

Q   Well, was it in the last 25 years?

A   Yes.

Q   Well, when was it, do you remember?

A   Well, if I knew I would most certainly tell you, but it is several years ago.

Q   And you removed the pump from that well, did you not, and put it on the Naval Well?

A   That is right.

11828

1    Q   So at least you haven't been using that well for

2    approximately ten years; would that be right?

3    A   Well, if that is the age of the Pen Well.

4    Q   The Pen Well?

5    A   Or I mean the Navy Well.

6    Q   You don't remember, though, whether it was ten or

7    twelve years before that when you ceased using the Hutch Well?

8    A   I don't remember the exact year we ceased using that

9    well.

10   Q   You don't?

11   A   No.  I am not operating the ranch.  There are two

12   other people who are paid to do that.

13   Q   You were aware, though, were you not, for example,

14   that Ernest Lincoln was pumping water north of your property

15   to irrigate his land; isn't that right?  Do you know Ernest

16   Lincoln?

17   A   I have met him for I believe the first time only a

18   month or so ago.

19   Q   Do you know where his property is located?

20   A   Approximately.

21   Q   Have you seen that land in there cropped down through

22   the years?

23   A   Well, I am not sure that I have, because I don't know

24   the exact location of his ranch, and I have had no occasion

25   to just go up and visit.

Q You are acquainted, are you not, with the--

He's a difficult witness.

MR. STAHLMAN:  You are a difficulty attorney.

THE COURT:  Go ahead.

BY MR. VEEDER:

Q  You are acquainted with the Cass-Roripaugh operation, are you not?

A  Yes.

Q  And you have seen that land cropped, have you not, down through the years?

A  Yes.

Q  How many years have you seen that land cropped, if you can recall?

A  I have seen it cropped ever since I went to the country.

Q  And how long ago is that?

A  Probably in 1910.

Q And have you seen them use water from the Murrieta Basin to crop that land, to irrigate that land?

A  Yes.

Q  You have?

A  Yes.

THE COURT:  Of course, that doesn't mean anything.  That could mean any year from 1910 to 1960.

MR. VEEDER:  I am going to cover that, your Honor.

Q   And you have seen that land cropped every year; is that not correct?

A   I am not sure that it was even irrigated when I first went down there.

Q   How long ago do you recall first seeing it irrigated, Mr. Vail?

A   Well, there was a small portion of it irrigated in probably about 1915.

Q   And they have since that time increased the acreage and increased the use of water up in there; is that right?

A   That is correct.

Q   And that would be the lands which would be actually abutting and bordering upon Murrieta Creek; isn't that right?

MR. STAHLMAN:   If you know.

THE WITNESS:   Not all of it.

BY MR. VEEDER:

Q   Well, but some of it?

A   That is right.

Q   And there are other operators in there that you know are using water from the Murrieta Creek and the basin underlying it-- the Barnett property?  Are you acquainted with the Barnett property?

A   Which Barnett property?

Q   Well, it is the Barnett property lying immediately north of your north line in the Temecula Grant.

1      A   Well, if you refer to a small piece of land, some 40

2   acres, that belong to Ben Barnet, that's one thing.  But I

3   have been talking about the Barnett property all of the time.

4   The Roripaugh land is the major Barnett property, as we old-

5   timers remember it.

6      Q   Do you recall the amount of water, the maximum

7   quantity that you could pump from the Hutch well? What is the

8   most you could ever take out of that?

9      A   I don't really know what the maximum was.  We have

10   those records.  We have some records, I believe.

11      Q   And you would be glad to produce those, wouldn't you?

12      A   Yes, I would be glad to produce anything that we have.

13      Q   Then would you make those available to us, that is,

14   your pumping records from the Hutch well?

15      MR. STAHLMAN:  Whatever you want.  I would think we would

16   do it as we have in the past; let Mr. Wilkinson, who has the

17   records, bring them, or you can come up and look at them.

18      MR. VEEDER:  I'd be afraid to go up there.

19      THE COURT:  Are you about through?

20      MR. VEEDER:  No, I am not.  Do you want to take a recess

21   now?

22      THE COURT:  Are you going to some other subject?

23      MR. VEEDER:  I am going to follow this a little further.

24      MR. SACHSE:  Is this the stipulated judgment?  I hate

25   to admit it, but I am a little lost.

MR. VEEDER:  This is the stipulated judgment.

THE COURT:  I want to ask a question.  I know what he is getting at.  You may object to the question.

MR. VEEDER:  I will, your Honor.

THE COURT:  Mr. Vail, do you know whether or not -- there was a pipe line from that Hutch well, was there not, that went down?

THE WITNESS:  That is correct.

THE COURT:  What kind of a line was that?

THE WITNESS:  Concrete, and partially steel.

THE COURT: Did that fall into disrepair at sometime?

THE WITNESS:  Yes.

THE COURT:  Do you know when?

THE WITNESS:  Well, after the floods, whenever they were.

THE COURT:  What floods were those?  There were floods in various years, weren't there?

THE WITNESS:  Your Honor, I will have to admit that I am very poor at remembering dates.

THE COURT:  Do you know of your own knowledge why you quit pumping the Hutch well?  Did you quit pumping it because the pipe line got washed out, or did you quit pumping it because the stipulated judgment was signed?

This is what you are getting at, isn't it?

MR. VEEDER:  Yes.  If I asked such a leading question, there would have been an objection.  It suits me.

THE COURT:  Well, let's get right down to it.

THE WITNESS:  We have used the water there spasmodically because there was some good land under that pipe line.  But our principal reason for not-- for my not wanting to use that water, as I saw it, we were apt to use more than our share of water to take care of the land.  We had--

MR. VEEDER:  I am going to object to this at this time.

MR. STAHLMAN:  In other words, when he gets an answer he doesn't like he objects.

THE COURT: Sustained.

Take a short recess.

MR. STAHLMAN:  I ask that it be stricken, then.

(Recess.)

MR. VEEDER:  Your Honor, I will withdraw my objection to your Honor's question.  I am very anxious to have him go ahead.

THE COURT:  Sometimes I sit up here and am baffled.  I can't find out what side the lawyer is on.  It sounded to me like this was just what you wanted, Mr. Veeder.

You may withdraw your objection.

Read the last part of Mr. Vail's answer, Mr. Reporter.

(The Reporter read the last part of the witness's answer as follows:  "But our principal reason for not-- for my notwanting to use that water, as I saw it, we were apt to use more than our share of water to take care of the land.

11834

1   We had--")

2       MR. VEEDER:  May I withdraw the objection, your Honor.

3   Go ahead and spin out the rest of it.

4       MR. STAHLMAN:  That is it, isn't it?

5       MR. VEEDER:  I want the witness to say whether that is

6   it.  He didn't want to be caught stealing water.

7       Will you please go ahead.

8       MR. STAHLMAN:  In other words, he was trying to comply

9   with the stipulated judgment.

10      THE COURT:  That statement may go out.

11      Any further part of your answer, Mr. Vail?

12      THE WITNESS:  I don't remember where I stopped in the

13  answer.

14      THE COURT:  Read it again, Mr. Reporter.

15      (The Reporter again read the last answer as follows:

16  "A  We have used the water there spasmodically because there

17  was some good land under that pipe line.  But our principal

18  reason for not-- for my not wanting to use that water, as I

19  saw it, we were apt to use more than our share of water to

20  take care of the land.  We had--")

21      THE WITNESS:  On the balance of the ranch.

22  BY MR. VEEDER:

23      Q   In your recollection, was the Hutch well of such

24  dimension that it could pump three second feet?

25      A   Three second feet?

11835

Q   Yes.

A   Yes, I believe a little in excess of three second feet.

Q   Did you ever pump that much water with it?

You are going to show up with the records, aren't you?  So I will strike that question.

A   Yes, we will turn over any records that we have.

Q   Have you a well in the Pechanga area near the Querry property that you are using now?

MR. STAHLMAN:  What do you mean by "near"?

THE WITNESS:  No.

MR. STAHLMAN:  He says no.  That's all right.

MR. VEEDER:  I have no further questions.

MR. STAHLMAN:  That's all.

I would like to finish up one other phase that attaches right on this.  It will be very short, your Honor.

MR. O'MALLEY:  I would like to go forward, your Honor.

MR. STAHLMAN:  They are not here yet.

MR. O'MALLEY:  But I have another witness.

THE COURT:  Just relax, Mr. O'Malley.

Proceed, Mr. Stahlman.

Is everybody through with Mr. Vail?  Are there any further questions?

MR. STAHLMAN:  I want to call Mr. Veeder.

MR. VEEDER:  I knew it.

11836

I think I have been sworn at, and sworn several times, but I will swear again, if you want me to.

WILLIAM H. VEEDER,

called as a witness on behalf of defendant Vail, being first duly sworn on his oath was examined and testified as follows:

DIRECT EXAMINATION

BY MR. STAHLMAN:

Q  Mr. Veeder, you recall that in connection with the matter of the Pauba Well you indicated in court here that you would turn over certain records to me and that we might have those records and present them to Court; is that correct?

A  Well, Mr. Stahlman, my recollection is that any records that we have have been, and are now, available and if you haven't got them--

Q  Well, you did make arrangements for me to look at the files of the Eleventh Naval District in connection with the Pauba Well, and also the files at Camp Pendleton in the Public Works Office, did you not?

A  Yes, I am sure I did.

Q  And directing your attention to the files in the Public Works Office, you had yourself checked those files and seen them prior to the time that you made the arrangements so that I may look at them; is that correct?

A   Mr. Stahlman, I have to say, in keeping with Mr. Vail's testimony, that I don't remember ever checking the Public Works files.

Q   Well, you did have them checked, and you brought some of those letters from the Public Works files here and presented them to Court, did you not?

A   Now, in that regard, Mr. Stahlman, I believe, the fact is I am certain, that the revocable license signed by Mr. Vail came from the Public Works records.  I am not being evasive.  I don't truly remember whether I ever saw the Public Works records or not.

Q   You made a statement in court the other day that you did not know why the navy well was drilled, did you not?

A   I repeat I don't know now.

Q   Directing to your attention a document bearing the date July 19, 1951--

THE COURT:  This will be given a number now.

MR. STAHLMAN: Yes, your Honor, I would like to have it marked.

THE COURT:  Next in order.

THE WITNESS:  Did I write this?

MR. STAHLMAN:  No.

THE CLERK:  Vail's Exhibit AS.

(Defendant Vail's Exhibit AS for Identification was marked.)

1      MR. STAHLMAN:  AS, if I may put it on here.

2         Q  The summary of the conference held at San Diego,

3   Eleventh Naval District Public Works Office in 1325 on 18

4   July, 1951, to discuss any further recommendations on the

5   Pauba Well.  You have seen that document, haven't you?

6         A  I have not.  I didn't know it existed, and from my

7   own standpoint, if you found it in those records, I must

8   tell you you are luckier than I am, because I didn't look at

9   it.

10      MR. STAHLMAN:  I will offer it in evidence, your Honor,

11   and make particular reference to the paragraph which states

12   the reason for drilling the Pauba Well.

13      THE COURT:  Let me look at this.

14   Where did this come from?  The records at Pendleton?

15      MR. STAHLMAN:  It came out of either the records at

16   Pendleton or the records of the Eleventh Naval District.

17      MR. VEEDER:  Can I quit being a witness for a minute

18   and become a lawyer, or try to?

19   I think he has to identify where that came from, because

20   I never saw that thing before.

21      MR. STAHLMAN:  You just bring your man in charge of

22   records from the Elevanth Naval District up here, will you?

23      MR. VEEDER:  Yes.

24      THE COURT:  Wait a minute.  Let me read it.

25   You are interested in this paragraph, who wants the

tests and why?

MR. STAHLMAN:  Yes, your Honor.

THE COURT:  Have you seen this?

MR. VEEDER:  No, your Honor, I haven't.

(The Court hands document to Mr. Veeder.)

MR. VEEDER:  But if it is from the records, I don't care.

MR. STAHLMAN:  And also the previous paragraph where it states-- Yes, that's right.

MR. VEEDER:  Do you want the whole thing?

MR. STAHLMAN:  Yes, the whole thing, and this in here.

THE COURT:  Any objection to its going into evidence?

MR. VEEDER:  I have no objection.

THE COURT:  Vail's Exhibit AS received in evidence.

(Defendant Vail's Exhibit AS for Identification was received in evidence.)

THE COURT:  Are you through with this witness?

MR. STAHLMAN:  Yes, that's all.

THE COURT:  Anybody like to cross-examine him?

MR. STAHLMAN:  I would like to do a few other things with him.

THE COURT:  Step down.

MR. STAHLMAN:  Do you want a copy of that?

MR. VEEDER:  Yes.

MR. STAHLMAN:  We have some other evidence in relation

to this subject.

THE COURT:  Now, the only thing remaining with Mr. Vail is the fact that there was objection to his testimony.  There is only one part of it that would seem to me to have any bearing-- I am talking about the part to which Mr. Veeder objected, and that is his statement that the Navy wanted to find out if a lot of water could be produced from the under-ground in case of an emergency.

MR. VEEDER:  And I have a motion to strike that.

THE COURT:  You moved to strike it.

MR. VEEDER:  Yes, I moved to strike it.  Your Honor said, " You can have a motion to strike," when you said that it could go in.

THE COURT:  Do you recall anything else you want to strike?

MR. VEEDER:  All of his testimony.  I think it is completely incompetent, irrelevant and immaterial.

THE COURT:  All of his testimony?  Including the part when you examined him?

MR. VEEDER:  No.

THE COURT:  Be specific.

MR. VEEDER:  I want to move to strike all of his testimony in regard to the revocable permit.

THE COURT:  Then wait until you get the transcript and tell me what you want to strike.

MR. VEEDER:  All right.

THE COURT:  I will postpone it, and it is your responsibility to bring the question up.

Mr. O'Malley, have you got the papers?

MR. O'MALLEY:  No, I haven't, your Honor.

I can go forward with Mr. Bookman, if that is all right, and if I may interrupt Mr. Oviatt's testimony for the second time and go forward with Mr. Bookman.

THE COURT:  What is the delay in getting those papers?

MR. O'MALLEY:  I don't know.  The papers have not been returned to me.  I guess he is working on them down in the Clerk's office.

THE COURT:  All right, Mr. Bookman.

THE CLERK:  I believe Mr. Bookman was sworn before the Master, but not down here, your Honor.

THE COURT:  Swear him again.


MAX BOOKMAN,

called as a witness on behalf of defendant Oviatt, being first duly sworn, on his oath was examined and testified as follows:

THE CLERK:  State your name, please.

THE WITNESS:  Max Bookman.

DIRECT EXAMINATION

BY MR. O'MALLEY:

Q   What is your profession, Mr. Bookman?

A   I am a consulting civil engineer.

Q   And have you had any experience in the field of hydrology?

A   Yes, I have.

Q   Will you briefly review that experience?

A   My education, first, includes graduation from the University of California in 1952, and a Bachelor of Science in Civil Engineering, with a major in Irrigation and Water Supply.

In the field of Hydrology, my experience included in the early years with the U. S. Geological Survey, starting in 1933, with work on the Kern River with the Conservation Branch of the U. S. Geological Survey.  I worked with the U.S. Bureau of Reclamation in Imperial Valley on the All-American Canal.

I started with the State of California, Division of Water Resources, in 1938, and stayed with them until the war. During that time I was working on flood control and water projects, studies of the Division of Water Resources out of Sacramento.

I worked with the U. S. Corps of Engineers, Sacramento Division, on the comprehensive studies of the Sacramento and

San Joaquin Valleys in 1942 to 1944.

In 1945 I became Chief Engineer of the Riverside County Flood Control and Water Conservation District and stayed until 1950.

In October, 1950, I became engineer in charge for the Division of Water Resources of all the activities of Southern California, water resources investigations and water master's service, the work for the courts as referee, work in connection with the statewide water plans and ground water studies.

In 1956 I became District Engineer when the Department of Water Resources was born, which enlarged the activities of the Department of Water Resources of the State of California, having a staff of about 200 engineers under my supervision at that time.  During my work as District Engineer, one of the studies which was made, one of the activities included the work for the Superior Court as Referee in the Temecula reference in Barbee vs. Oviatt, and also the Sacramento River investigation which was requested by the Legislature in the Budget Act of 1952.

In 1959 (October) I left the State to go into private consulting practice.

1     Q   And while you were on the Temecula River investigation

2   and the Santa Margarita investigations did you become familiar

3   with the stream system which is the subject of this litigation?

4     A   Yes.

5     Q   Or at any other time?

6     A   I knew the streams before that time.  I first became

7   acquainted with this area starting in around 1925, but in more

8   detail as I became Chief Engineer of the Riverside County Flood

9   Control and Water Conservation District, which included the area

10  along the Temecula Creek and Murrieta Creek in Riverside County,

11  and that was starting in 1946.

12     In 1950 I became familiar again with the Temecula Creek

13  area in line with the work as Referee for the Court on Barbee

14  versus Oviatt, and that investigation continued from that date

15  October 1950 until about May 1954, when we completed the Santa

16  Margarita River investigation.

17     I may add that I have recently also gone over the area,

18  in January of this year.

19     Q   In what connection?

20     A   In connection with my appointment for Mr. Oviatt.

21     Q   Are you familiar with the properties of Mr. Oviatt known

22  as Rancho Ramona and the Oak Grove properties of Mr. Oviatt?

23     A   Yes, I am.  I first became familiar with the Rancho

24  Ramona and the Oak Grove properties in October, 1950.

25     Q   Are you familiar with the diversion facilities of Mr.

1    Oviatt on the Lancaster Creek area?

2        A   Yes.

3        Q   And have you prepared an engineering exhibit of such

4    facilities?

5        A   Yes, I have.

6        MR. O'MALLEY:   These are some copies, counsel.

7        At this time, if your Honor please, I would like to mark

8    for Identification the document which the witness has just

9    referred to, being Defendant's Exhibit next in order.

10       THE CLERK:   Oviatt's AG.

11       THE COURT:   Oviatt's AG.

12       (Oviatt's AG marked for Identification.)

13   BY MR. O'MALLEY:

14       Q   Is Oviatt's AG the sketch which you have prepared of those

15   diversions facilities?

16       A   Yes, I prepared this sketch after my visit to Mr.

17   Oviatt's property in January, 1960.

18       THE COURT:   Do you have a copy for me?

19       THE WITNESS:   I have another copy.

20       THE COURT:   Which is the Court's Exhibit?

21       MR. O'MALLEY:   I think the witness has AG as marked by the

22   Clerk.

23       THE WITNESS:   I gave it to the Judge.   I have my own copy

24   here.

25       THE COURT:   Do you have another copy?

1       MR. O'MALLEY:  I distributed some to counsel here.

2       THE COURT:  All right.  You see, I have a set of maps

3   here of most of these things.  It's a lot easier to refer to my

4   own.

5       THE WITNESS:  Mr. O'Malley, I have another copy beside the

6   Exhibit copy, do you want to give that to the Judge here?  That

7   is what I was looking at.

8       MR. O'MALLEY:  All right, if the witness could work from

9   the Exhibit.

10      THE WITNESS:  Can we exchange, your Honor.

11      MR. O'MALLEY:  And the copy he has may be considered the

12  Court's copy.

13      Q  Will you describe the diversion facilities of Mr.

14  Oviatt on the Lancaster Creek with reference to that Exhibit for

15  Identification and state the capacity of the diversion facilities?

16      A  Yes.  The diversion facilities which I found to be on

17  the ground shown on this exhibit were as they existed January

18  13, 1960 of this year.

19      First, we went down the State Highway which is shown on the

20  plan map and inspected the spring which is marked "spring" next

21  to the road.  This spring was dry at the time we visited the

22  site, and the topography was such that there was a natural

23  channel following the road down to where a ten inch culvert is

24  shown on the map crossing the road into a box.  There was a pipe

25  going into this box, 12 inches in diameter, concrete pipe which

1    extended along the foot of the hill, and when there was water

2    it was discharged over the top of the box.   But at the present

3    time, the spring being dry, there was no connection between

4    the pipe and the top of what is marked "junction box," which is

5    shown at the top of the map.

6        MR. SACHSE:   You said, "at the present time."  When was

7    this?

8        THE WITNESS:   At the time I made iy inspection.

9        MR. SACHSE:   When?

10       THE WITNESS:   January 13, 1960.

11       The surface diversion from Lancaster Creek is shown to be

12   about 600 feet northwest of the road.   Actually, on the road

13   crossing itself there is a dip in the road -- there is no

14   bridge at this point, and underneath the dip there is a 16

15   inch culvert pipe to take the low flows under the road, and also

16   further upstream to the north there is an 18 inch culvert pipe

17   under the road.

18       The main diversion dam, which is marked on the map shown

19   "masonry diversion dam. See Detail A," and I measured it to be

20   30 feet in length by four feet thick, and it had a 12 inch pipe

21   at the intake which went through the dam and into a concrete

22   flume, which is shown in the upper right-hand corner of the map.

23   The concrete flume was 16 inches wide and 17 inches deep, made

24   of concrete blocks with a concrete bottom, and this flume ex-

25   tended from the diversion dam for a distance of about 400 feet

1   to the junction box, and it went into the junction box out of

2   the flume through a 16 inch diameter pipe which is called "upper

3   pipe 16 diameter."

4        I also found that there was a second pipe coming into the

5   box which is called the "lower pipe 14 inch diameter infiltra-

6   tion pipe."  This lower pipe was immediately below the 16 inch

7   diameter pipe coming from the flume in the box.  This lower pipe

8   was the collection of five 18 inch infiltration lines, which are

9   shown on the map crossing the creek at two points, coming into

10  a box right above the old dam and then going through the 14

11  inch diameter pipe into the junction box.

12       In the junction box you will note that there two partitions;

13  one is 12 feet, and the other is eight feet.  The water comes

14  into the eight foot wide partition box and then through the par-

15  tition there is a 16 inch diameter pipe which allows the water

16  to go from the upper partition of the box into the 12 foot by

17  six foot section.  Also, through this center wall, which is

18  about two feet high, water could pass over the top if there was

19  more water than the 16 inch pipe through the wall could carry.

20       Coming out of the six foot by 20 feet by 10 foot deep

21  junction box there was this 16 inch pipe which went along the

22  canyon wall and parts of it were buried to protect it against

23  the erosion  of the floods, to a box which is shown to the right

24  of the designation "old well."  From this box the pipeline

25  changed to a 12 inch pipe, which came down along the foot of the

1  hill to the junction of the road going into Mr. Oviatt's ranch

2  and then followed along the service road south into Reservoir

3  No. 1.

4  MR. VEEDER:  Isn't this purely cumulative?  I thought

5  this was all gone into yesterday.  I'm not being critical of

6  Mr. O'Malley, but we are being pressed for time, and I think

7  this is all in, isn't it?

8  MR. O'MALLEY:  I want to show, if your Honor please, the

9  system, the capacity of the system, because it relates to the

10  amount of water which was actually diverted.

11  THE COURT:  It's not taking long.  Go ahead.

12  THE WITNESS:  To make it brief, Mr. O'Malley, I will not

13  go into other details showing how this system operates.  But I

14  want to point out that the domestic well called "Jet Domestic

15  well" is shown on this map to the north of Lancaster Creek,

16  which pumps into a line and serves the house and the swimming

17  pool and at other times is lifted when there is sufficient water

18  in the Jet well up to the domestic reservoir which rides on the

19  system through a three inch pipe.  And that is the second part

20  of the system.  One is the irrigation system, and the other is

21  the domestic water system.

22  THE COURT:  This Jet well crosses this 16 inch pipeline?

23  THE WITNESS:  Yes.

24  THE COURT:  It is not hooked in with it?

25  THE WITNESS:  That's right.

1    THE COURT:  This domestic reservoir is not hooked in with

2  the 16 inch line either?  In other words, that is a domestic

3  reservoir entirely up there?

4    THE WITNESS:  Yes, sir.  But, if there is overflow from

5  the house system, it would go into reservoir No. 2, as shown

6  coming from the swimming pool into the system.  So that any

7  water, any surplus at any time, would not be wasted.

8    THE COURT:  I see.

9    THE WITNESS:  I computed, first, the flow that the intake

10  at the masonry diversion dam was able to carry by two methods;

11  one the amount of the flow that could go through the 12 inch

12  pipe, the maximum amount; and second, the capacity of the flume

13  itself, the concrete flume; and I found that the pipe through

14  the dam itself, the 12 inch pipe, was controlling and the

15  maximum that it could take would be six cubic feet per second,

16  according to the computed inflow, under a two foot head.

17    THE COURT:  Under a two foot head?

18    THE WITNESS:  Yes, sir.

19    THE COURT:  What would that be in miner's inches?

20    THE WITNESS:  That would be about 300 miner's inches.

21    THE COURT:  You don't know how often there would be a

22  two foot head, though, do you?

23    THE WITNESS:  No, sir.

24    THE COURT:  As a matter of fact, there is no dam above

25  there to raise water.

1    THE WITNESS:  No, there is no dam to raise the water, and

2  the records which we have of measurements of water at this point

3  is something that I wish to testify to.

4    THE COURT:  Assuming that water is flowing through that

5  12 inch pipe with no head, just water enough to come up to the

6  top of the 12 inch pipe, just flowing through the 12 inch pipe

7  without any head, how many cubic second feet and how many miner's

8  inches could flow through it?

9    THE WITNESS:  I haven't computed it in that manner.

10    The 12 inch pipe would have a --

11    THE COURT:  Do you want to do it later?

12    THE WITNESS:  I haven't got the area of it here.

13    THE COURT:  Do you want to do it later?

14    THE WITNESS:  Yes.

15    THE COURT:  Do it over the noon hour.

16    THE WITNESS:  All right.

17    MR. O'MALLEY:  Very well.

18    THE WITNESS:  I wish to add one more thing, before I get

19  off this chart, sir. During the time that we started to measure

20  diversions in 1951 --

21    MR. VEEDER:  I object to this, your Honor.  I think there

22  has to be question and answer.

23    THE WITNESS:  Excuse me.

24    MR. O'MALLEY:   He merely said that he made some studies

25  in 1951.  He wanted to add something.

1          THE WITNESS:   I want to point out the point on the map

2     where these installations were made.

3          THE COURT:   Go ahead Mr. Bookman.

4          THE WITNESS:   There was a measuring device installed --

5          THE COURT:   What time are you talking about now?

6          THE WITNESS:   Well, it was installed in December, 1950.

7     A measuring device was installed in what is called the "junction

8     box."   This device consisted of a 90 degree notch wier installed

9     in the 16 inch pipe I described going through the center wall --

10    the notch wier was made out of metal with a wood frame, and

11    attached firmly to the 16 inch pipe so that all the water coming

12    through the 16 inch pipe had to pass over the notch wier, and

13    there was a scale attached to it to measure the head on the

14    notch wier, and periodic measurements, daily measurements, were

15    made at that time, in addition to the installation of a continu-

16    ous recorder, which was installed for a period of ten days in

17    order to give us a confirmation of any fluctuations.

18          MR. VEEDER:   What time of year was this?

19          THE WITNESS:   The recorder was installed in January.

20          MR. VEEDER:   Not in the irrigation season?

21          THE WITNESS:   Not during the irrigation season.

22          THE COURT:   Go ahead.

23          THE WITNESS:   However, the periodic measurements were made

24    starting in February, 1951 until May of 1954, and I have those

25    measurements.

BY MR. O'MALLEY:

Q  Have you testified now fully as to the manner in which those measurements were made?

A  yes.

Q  And was a record of such diversions kept at that time?

A  Yes.  The measurements were recorded by an engineer that we have in the area assigned to measuring all the surface diversions along Temecula Creek and in accumulating information on wells.  He recorded these in a field book, which was then transferred to our permanent record in Los Angeles, and the computations of the flow were made in the permanent records and the results are shown on Table 25 of the Santa Margarita Inves-tigation.

Q  And was that document prepared generally under your supervision and control in connection with the duties you have heretofore described?

A  Yes, sir.

MR. VEEDER:  Was that one of the State's Exhibits that he making reference to now, that is in this case?

THE WITNESS:  Yes.

THE COURT:  Has it been received in evidence?  Have you checked?

THE WITNESS:  I understand that Bulletin 57 is --

MR. VEEDER:  It is not in evidence.

THE WITNESS:  -- is State's Exhibit L, I believe.

1      MR. VEEDER:  Bulletin 57 is not in the record yet.

2      THE COURT:  Parts of it are in.

3      MR. VEEDER:  Parts of it are in, and that is the reason

4  I am bringing up this point now.

5      THE COURT:  It may be surplusage.  It may be already in.

6  What objection do you have to its admission?

7      MR. O'MALLEY:  I merely want to show the record in so far

8  as they are pertinent to these Lancaster Creek diversions, which

9  I will have the witness testify to.

10      At this time I would like to have the Table 25 marked for

11  Identification as Defendant Oviatt's next in order.

12      THE CLERK:  Oviatt's AH.

13      (Defendant Oviatt's Exhibit AH marked for Identification.)

14      THE COURT:  Do you have a copy?

15      THE CLERK:  Is this copy for the Court?

16      MR. O'MALLEY:  Yes.

17      THE WITNESS:  Mr. O'Malley, I want to point out that

18  attached to this Exhibit, which is a copy of Table 25, is also

19  the part of the Table 24 which is a description of the surface

20  diversions which include Mr. Oviatt's diversions.

21  BY MR. O'MALLEY:

22      Q  I show you the document, Mr. Bookman, which has been

23  marked as Oviatt's AH for Identification.  Is that the document

24  you have just referred to?

25      A  Yes, it is.

Q  Does that document reflect the diversions by Mr. Oviatt from the Lancaster Creek for the period you have described?

A  Yes, sir.  The Lancaster Creek diversion is No. 8S1E-7R marked "Oviatt" and is described on page 123 of this exhibit under "James Oviatt 8S1E-7R".

MR. O'MALLEY:  At this time, if your Honor please, I ask that the Exhibit for Identification be received in evidence.

THE COURT:  Is is received in evidence.

(Defendant Oviatt's Exhibit AH received in evidence.)

BY MR. O'MALLEY:

Q  With reference to that Exhibit, would you just state for the record what it shows with reference to the Lancaster Creek diversions of Mr. Oviatt?

A  This Exhibit shows that the total diversion at that point was 140 acre feet in 1951, 160 acre feet in 1952 and 165 acre feet in 1953.

MR. STAHLMAN:  May I ask a question at this point.

Is this a calendar year?

THE WITNESS:  Yes, sir.

MR. O'MALLEY:  It is not the irrigation year.

Q  Have you made any survey of the irrigable lands of Mr. Oviatt -- the Oak Grove properties and the Rancho Ramona?

A  In connection with our studies, we had a survey made of the irrigable land irrigated lands throughout the Santa Margarita River investigation.

13

1          Q  Did that include both the Oak Grove property and also

2   Rancho Ramona?

3          A  Yes, it did.

4          Q  Can you state the irrigable acreage of Mr. Oviatt on

5   those two properties?

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MR. VEEDER:  I object on the grounds that there is no proper foundation for the soil survey to which he makes reference.  The investigations that appear in the State publication are clearly without any proper foundation, from the standpoint of investigations, and I don't believe that Mr. Bookman would testify that they are accurate or that they are representative of the actual irrigable acreage.  I submit that there is an engineering report in now.

MR. O'MALLEY:  He was about to confirm it, if you don't object, Mr. Veeder.

MR. VEEDER:  I strenuously--

THE COURT:  Well, if we can save time.  First of all, we have had this problem about foundation these things before, and probably you could lay one.  But the objection would probably be good.  Why don't you shorten it up some?

MR. O'MALLEY:  Let me withdraw the question and start over again.

THE COURT: All right.

BY MR. O'MALLEY:

Q  Have you reviewed the summary of the irrigable acreage which is now in evidence as Oviatt's Exhibit A?

A  Yes, I have.  I made a comparison of Oviatt's A--

MR. STAHLMAN:  What is A?

THE COURT:  Soil report.

THE WITNESS:  The engineering report by the U. S.

11858

1    Marines signed by Col. Bowen, I compared the aerial maps as

2    best I could with the survey work that was done by the State,

3    and I am satisfied with the work done by the Marines.

4    BY MR. O'MALLEY:

5        Q   Did you also make a review of the amount of water

6    required to irrigate the properties of Mr. Oviatt?

7        A   I inspected the quantities shown in the report, and

8    I am satisfied with the quantities in the report.  I might

9    quote those figures, if you will hand me the report.

10       MR. VEEDER:  They are already in evidence.

11       MR. O'MALLEY:  They are already in.

12       THE COURT:  4 acre feet for a portion of the land, and

13   3.93 acre feet for the rest.

14       THE WITNESS:  Yes, sir.

15       THE COURT:  I keep forgetting.  Does this figure take

16   into account evaporation?

17       MR. VEEDER:  4.2 includes the 10% project losses.

18       THE COURT:  I think this is just 4.0.

19       THE WITNESS:  4.0 for row crops, and 3.83.

20       THE COURT:  That includes evaporation loss.

21       MR. VEEDER:  That includes the 10% that we have figured.

22       MR. O'MALLEY:  That is my understanding.

23       THE COURT:  All right.

24   BY MR. O'MALLEY:

25       Q   Mr. Bookman, have you also made a study of the

physiography of the area in which the properties of Mr. Oviatt
are located?

A   Yes, I have.

Q   Are they reflected on an exhibit prepared under
your direction and control?

A   Yes.

MR. O'MALLEY:  May this document be marked for iden-
tification as Defendant's exhibit next in order?

MR. STAHLMAN:  That is Plate 6 from the Bulletin, is it?

MR. O'MALLEY:  Yes.

MR. STAHLMAN:  We have that.

MR. VEEDER:  That is already in.

MR. O'MALLEY:  It is already in.  But I believe he has
superimposed some additional data on it.

THE COURT:  Oviatt's AI for Identification.

(Defendant Oviatt's Exhibit AI was marked for Identifi-
cation.)

THE COURT:  It is a plate?

THE WITNESS:  Plate 6 entitled "Hydrographic Map."  I
understand it is Exhibit AB of the State of California.

THE COURT: California's AB?

THE WITNESS: Yes, sir.

THE COURT:  For cross-reference.

BY MR. O'MALLEY:

Q   Now, with reference to Oviatt AI for Identification,

will you describe the physiography of the area in which the properties of Mr. Oviatt are located?

A   The only purpose for including this map was to show the stream system where Mr. Oviatt's property is located.  Mr. Oviatt's property lies in what is shown as Hydrographic Units No. 2 and 3.  Immediately upstream from Vail Reservoir, shown on the map, I have shown the Rancho Ramona, which is located along Lancaster Creek, and Lancaster Creek drains the area shown as Hydrographic Unit No. 2 and discharges into Vail Reservoir and jóns Temecula Creek in and about the location of the dam.

The Oak Grove property is shown in Hydrographic Unit No. 3 and is along the Temecula Creek and tributaries of Temecula Creek, including Chihuahua Creek and Cooper Creek and Culp Valley, which are all tributary to the Temecula Creek Hydrographic Unit No. 3.

Q   Is Rancho Ramona within the watershed of Wilson Creek or Lancaster Creek?

A   Yes, sir.  I examined the land and the maps, and the Rancho Ramona is.  Lancaster Creek flows through Rancho Ramona, and the lands are within the watershed of Lancaster Creek.

Q   You say it flows through Rancho Ramona.  Therefore, it necessarily touches or abuts the creek; is that right?

A   Yes, sir.

Q   It flows approximately through the center of the

property; isn't that correct?

A   That is correct.

Q   You indicated that you were also familiar with the Oak Grove property of Mr. Oviatt.   Are all of such properties within the Temecula Creek watershed?

A   All but a small portion of the two sections shown on the right which overlap the watershed boundary.   Those are in the mountainous areas.   Those two parts do not contribute to the Temecula Creek runoff.

THE COURT:   The portions shown out of the watershed?

THE WITNESS:   Yes, sir.

THE COURT:   The portions shown as in the watershed--

THE WITNESS:   Are all within Temecula Creek drainage area.

BY MR. O'MALLEY:

Q   Can you indicate that on that map which you have here?

A   The two sections I refer to are in Township 8 South, Range 3 West, and overlie the drainage boundary shown on the map.

Q   Are they the portions which lie easterly of the drainage coundary?

A   The portions which lie easterly of the drainage boundary are not within the Temecula Creek watershed.

Q   And except for those two properties, the remainder of the Oak Grove properties are within the watershed; is that

1    correct?

2        A   Yes, sir.

3        Q   How much, if any, of the Oak Grove properties of Mr.

4    Oviatt abut the stream system?

5        A   Well, all of the properties owned abut either Temecula

6    Creek or tributaries of Temecula Creek.  The majority of the

7    property, as shown on the map, which is located in Township

8    19 South, Range 2 East, is along and abuts and is contiguous

9    with Chihuahua Creek, which is a principal tributary of

10   Temecula Creek.

11       Q   Now, Mr. Bookman, have you also made a study with

12   respect to the occurrence and availability of water within

13   this stream system which is the subject of this action, and

14   have you studied the well data, the ground water data and the

15   surface diversion data respecting the properties of Mr.

16   Oviatt to which you have just testified?

17       A   Yes, I have.

18       MR. STAHLMAN:  Before you go into that, is your Honor

19   going to have a recess?

20       THE COURT:  Yes.  That is new subject matter?

21       MR. O'MALLEY:  Yes, it is.

22       THE COURT:  Before we leave the matter of the Oak Grove

23   Ranch, does the understanding we have had still apply that we

24   may assume that the ground is all riparian unless the Government

25   proves to the contrary?

1     MR. VEEDER:  That is why I haven't objected to it.  I

2 think there have been consolidated tracts all the way through

3 and we will undertake an investigation, and I have agreed with

4 Mr. O'Malley on that.

5     THE COURT:  In other words, unless the Government produces

6 evidence of the consolidation of tracts, et cetera, it will be

7 assumed that the property is all riparian.

8     MR. VEEDER:  We will go ahead on that basis, your Honor.

9     THE COURT:  Of course, much of it up in the dryer areas

10 the riparian right is again an illusory right.

11     MR. O'MALLEY: We are quite aware of that, your Honor.

12     THE COURT:  The only time water runs is when you can't

13 use it.  I am talking about not properties along Chihuahua

14 Creek.

15     Take our recess until 2 o'clock.

16     (Noon recess.)

17

18

19

20

21

22

23

24

25

San Diego, California, Wednesday, February 10, 1960.   2:00 P.M.

(Other matters.)

THE CLERK:   Two, 1247-SD-C, United States vs. Fallbrook Public Utility District, et al.

MR. VEEDER:   Your Honor, there is one thing.   Mr. Hoffman is going to be down here Friday for the purpose of assisting in bringing up to date the exhibits.   We would like to be able to remove the exhibits to work on them and to bring them down to date, if there is no objection to that.

THE COURT:   The exhibits may be withdrawn for that purpose.

MR. STAHLMAN:   For what purpose?

MR. VEEDER:   Stream flow, hydrographs, et cetera.

(The witness Bookman resumes the stand.)

MR. VEEDER:   Before we start, may I ask just one question.

We have in Oviatt's A a statement that reservoirs 2 and 3 are filled from wells on the Rancho Ramona, and I desire to inquire as to whether the claim is being made that the waters pumped from those wells and into the reservoirs are part of the Santa Margarita River and its tributaries?

MR. O'MALLEY:   It is my understanding-- it is an engineering question, but it is my understanding that that is part of the ground water that is part of the Temecula or Wilson Creek system.

1    MR. VEEDER:  And that is the claim that is being made

2  here?

3    MR. O'MALLEY:  Well, let me reserve my comment on that

4  at this time, counsel.

5    MR. VEEDER:  It will make a great deal of difference on

6  whether we have two questions on cross-examination or fifty.

7    MR. STAHLMAN:  Or two hundred.

8    MR. VEEDER:  That is right.

9    THE COURT:  Well, the gist of your question is whether

10  there is any claim that this water that is pumped out of wells

11  is vagrant percolating water.

12    MR. VEEDER:  Well, if that is the assertion that is being

13  made, it is one approach; and if it is claimed that it is

14  water from a ground water body which is partof the Santa

15  Margarita River, it is another situation.

16    THE COURT:  Is there any dispute about this?  These

17  wells lie at the bottom of the canyon.

18    MR. O'MALLEY:  They all lie within that general basin,

19  and it is my understanding from the geology and the hydrology

20  involved here that that is the case.

21    THE COURT:  They lie in areas of younger alluvium, don't

22  they, as shown on Exhibit 15?

23    MR. VEEDER:  I think that they all start in the younger

24  alluvium.

25    THE COURT:  And probably enter older alluvium.

1          MR. VEEDER:  That is right, because it is just a thin

2     mantle there.

3          But if that is the basis upon which we are proceeding,

4     fine as far as I am concerned.

5          MR. O'MALLEY:  It is my understanding that they are all

6     within that general basin.  I would rather interrogate the

7     witness upon that, but I understand all of the proof that has

8     gone in in this case has been in conformance with the question

9     posed by counsel.

10          THE COURT:  Do you want to ask the witness if he has an

11     opinion?

12          MR. VEEDER:  I don't believe the witness is qualified,

13     your Honor.

14          MR. O'MALLEY:  I don't suppose anybody is qualified

15     except the Government's witnesses.

16          MR. VEEDER:  Well, no, I don't believe that Mr. Bookman

17     purports to be a geologist, or that he made any ground water

18     studies.

19          THE COURT:  I thought I heard him say that he made ground

20     water studies for various people.

21          MR. VEEDER:  I don't want to open up anything.  I just

22     want to know if that is the claim he is making.

23          THE COURT:  I will ask the question, and anybody can

24     object if they want to.

25          You are familiar with the various wells that Mr. Oviatt

1    has on his property?

2         THE WITNESS:  Yes, I am.

3         THE COURT:  You are familiar with the wells from which

4    he pumps into two reservoirs?

5         THE WITNESS:  Yes, I am.

6         THE COURT:  From the study you made, both after you

7    were employed by Mr. Oviatt and the work you had done in

8    connection with the State survey, do you have an opinion as

9    whether that water that comes out of those wells is what we

10   called here vagrant, percolating water which isn't part of the

11   stream system or that it is water that comes out of either an

12   underground flow of the Temecula or a water basin underlying

13   it?

14        THE WITNESS:  It is my opinion that the water that comes

15   out of these wells are part of the underflow of the Temecula

16   and Lancaster Creeks-- that is, in the case of Rancho Ramona

17   it is Lancaster Creek; that it is not percolating water, that

18   it is underflow from the river itself.

19        THE COURT:  That answers it, doesn't it?

20        MR. STAHLMAN:  I wonder, do we have well logs on these

21   wells-- as long as we are talking about these wells?

22        THE COURT:  We are talking generally about wells.

23        Tell us what wells we are talking about.  On the Exhibit

24   W, which is the Ramona Ranch, what wells?

25        MR. O'MALLEY:  We have a list of wells.

MR. STAHLMAN:  Are you going into your list of wells?

MR. O'MALLEY:  Yes, I am.

MR. STAHLMAN:  Well, if you are going into them--

MR. O'MALLEY:  I was going to introduce them with Mr. Oviatt when we got interrupted.

I would like to conclude with this witness, if I may, and then we will go back to Mr. Oviatt.

THE COURT:  All right.  Proceed.

BY MR. O'MALLEY:

Q  Mr. Bookman, prior to the adjournment for the noon recess you were asked by the Court, what is the flow through the Ramona diversion without a head on a 12-inch pipe line? Have you made now a computation of that flow?

A  Yes, I have.

Q  Will you state what that computation indicates?

A  Well, I had computed the flow that I originally stated under the $2\frac{1}{2}$ head using the discharge, if Q equals a constant times an area times the square of the 2GH, that is the flow through an orifice, and under the two-foot head above the pipe I testified that it was 6 cubic feet per second and/ or 300 miner's inches.  Using that same formula, I gave the answer, without a head on the pipe, of 2.7 cubic feet per second, or 135 miner's inches.

MR. O'MALLEY:  Mr. Reporter, may I have the last question and answer before the recess read, please.

(The reporter read the record as follows:  "Q  Now, Mr.
Bookman, have you also made a study with respect to the
occurrence and availability of water within this stream system
which is the subject of this action, and have you studied the
well data, the ground water data and the surface diversion
data respecting the properties of Mr. Oviatt to which you have
just testified?  A  Yes, I have.")

BY MR. O'MALLEY:

Q  In connection with the investigations of studies which
you testified you made on the Santa Margarita River System,
did these studies concern the occurrence and availability of
the quantities of water supplied throughout the watershed
of the Santa Margarita Water system?

A  Yes.

Q  And based upon this study have you formed an opinion
as to the occurrence and availability of water in the Temecula
area?

MR. SACHSE:  Would you repeat the question, please?

(The reporter read the pending question.)

THE WITNESS:  Yes.

BY MR. O'MALLEY:

Q  Did you make any studies which related to the effect
in the Temecula area upstream from the Vail Reservoir as it
may affect the availability of water below the Vail Reservoir?

MR. SACHSE:  I object on the grounds that it is

1   incomprehensible.  I don't follow it.

2       MR. O'MALLEY:  Do you understand the question, Mr.

3   Bookman?

4       THE WITNESS:  Yes, I do.

5       THE COURT:  Read it back.

6       (The reporter read the pending question.)

7       MR. SACHSE:  The effect of what upstream?

8       MR. O'MALLEY:  Let me withdraw it.  I think his objec-

9   tion may be well taken, and in the light of your objection

10  I think I will withdraw the question.

11      Q  Have you made any studies which related to the effect

12  of the use of water in the Temecula area upstream from the

13  Vail Reservoir upon the availability of water downstream from

14  the Vail Reservoir?

15      MR. STAHLMAN:  I object to it.  I can't understand the

16  question.

17      MR. VEEDER:  This calls for a yes or no answer.

18  BY MR. O'MALLEY:

19      Q  Did you make such a study, Mr. Bookman?

20      MR. STAHLMAN:  Maybe he doesn't understand it.  It is

21  unintelligible.

22      THE WITNESS:  Yes.

23      THE COURT:  Well, your objection is overruled.

24      MR. VEEDER:  The answer is yes.

25      THE WITNESS:  Yes, I have made a study.

BY MR. O'MALLEY:

Q   Have you formed, then, an opinion as to whether the diversion of water by Mr. Oviatt has any appreciable effect on the water available to riparian owners downstream from the Vail Reservoir?

MR. STAHLMAN:   That is objected to as being incompetent, irrelevant and immaterial, indefinite and uncertain, and invading the province of the Court.

THE COURT:   He is asked does he have an opinion.   The man has made a study.   The objection would go to the weight of his testimony.   He has told what various positions he has had.   On cross-examination you can find out what this study is.   Or, of course, you could require him to detail the study that he made as the basis of his opinion.   But the question now is, does he have an opinion?   Isn't that the pending question?

MR. O'MALLEY:   That is the pending question, your Honor.

THE WITNESS:   Yes, I have an opinion.

THE COURT:   The objection is overruled.   He says that he has an opinion.

BY MR. O'MALLEY:

Q   Will you state the opinion, and state the basis for it?

MR. STAHLMAN:   I object to the opinion as being incompetent, irrelevant and immaterial, calling for a conclusion on

1  the part of the witness, and invading the province of the

2  Court.

3      This is the very question, as to whether there is water

4  in that river or not.

5      MR. VEEDER:  Also, it is partly a legal question, and I

6  don't believe the witness is at all qualified.

7      MR. O'MALLEY:  Your Honor, when you have an expert

8  witness you are always in the area where you partly invade the

9  province of the Court.  That is the very purpose of the expert.

10     THE COURT:  The objection is overruled.

11     MR. VEEDER:  I want to object further, and I adopt Mr.

12  Stahlman's objection, and make the additional objection that

13  when a question is asked as to the availability of water it

14  entails, in part at least, a conclusion of law in regard to

15  the riparian rights and the other rights upstream, some of

16  which are inchoate and some of which are being presently

17  exercised.

18     THE COURT:  Let's rephrase the question, then, to leave

19  out that part of it and phrase the question this way:  Have

20  you made a study as to what effect the use of water by Mr.

21  Oviatt on his property, as referred to in the testimony here,

22  would have on the presence of water downstream from the

23  Oviatt property?

24     MR. O'MALLEY:  I will adopt your Honor's question.

25     THE COURT:  Of course, we understand that the Vail

11872

1    Reservoir stops everything that comes down.  So I don't know

2    that you get anything if you say "downstream from the Vail

3    Reservoir."

4        MR. O'MALLEY:  In the light of your Honor's observation,

5    I will reframe it.

6        THE COURT:  Why don't you limit it between the edge of

7    the Oviatt property and the beginning of the water in the

8    Vail Reservoir?

9        MR. O'MALLEY:  I will adopt the phraseology "downstream

10   from the Oviatt properties."

11       THE WITNESS:  Yes, I have made such a study and have an

12   opinion.

13   BY MR. O'MALLEY:

14       Q  What is that opinion, Mr. Bookman?  Will you state

15   the basis for it?

16       A  Yes.  My opinion is that the use by Mr. Oviatt on

17   his properties in the Rancho Ramona and in the Oak Grove

18   area have a minor effect on the availability or the occurrence

19   of water to those downstream from his property.  And the reason

20   for that is as follows:

21       First, it came to my attention in our studies that prior

22   to the construction of the Vail Dam there had existed swamp

23   and brush area within Nigger Canyon Valley which used water,

24   and that the uses that might occur, that would occur by Mr.

25   Oviatt would merely decrease the amount of losses by

1   evapotranspiration on tules, brush and other vegetation in

2   Nigger Valley.

3          Second, I observed that in the making of our studies in

4   connection with the regimen of the river as it took place due

5   to rainfall over the watershed, that there was a number of

6   large ground water basins below Mr. Oviatt's property between

7   him and the ocean, and that any depletion of the stream that he

8   could have caused would in turn be filled up as it has in

9   previous, because the records show that the winter floods

10  filled these reservoirs up again and merely decreased any

11  waste to the ocean.

12         I also found in our studies of Vail Reservoir constructed

13  and effect of a possible construction of dams downstream in

14  the Fallbrook area that these reservoirs which we considered

15  the Vail Reservoir filled and spilled in almost every major

16  flood that had occurred historically, including 1916, 1917,

17  1922, 1924, 1927, 1938, and that at the time that the Vail

18  Reservoir spilled there was also spill from the large

19  reservoirs we were considering for conservation at Fallbrook,

20  indicating that any use by Mr. Oviatt would merely decrease

21  the spill over the reservoir and would be then replenished

22  with flood waters under such conditions.

23

24

25

1    On the basis of these considerations, I drew the opinion

2  that the uses upstream, not only by Mr. Oviatt but by those

3  upstream from Vail reservoir, were of minor consequence to the

4  availability or the amount of water that would occur below the

5  point.

6    THE COURT:  By "minor" you mean infinitesimal?

7    THE WITNESS:  Yes, sir.

8    THE COURT:  In the law we would say "de minimis," so small

9  as not to be worthy of consideration.

10    THE WITNESS:  Yes, sir.

11    MR. STAHLMAN:  I wonder, in view of this, whether counsel

12  is going to abandon his claim of prescriptive right.

13    THE COURT:  That is the thought I had in mind.  I was

14  smiling up here.

15    MR. O'MALLEY:  I realize exactly what your Honor has in

16  mind.  But if you will notice, the memoranda which I filed with

17  your Honor yesterday when we were in court, I made this state-

18  ment, exactly what this witness has testified to, only in about

19  one line.  But if the Court makes a contrary determination, then

20  I think your Honor must necessarily, and if your Honor makes any

21  determination that our usages of water does in any way impair

22  the water rights of the downstream users, then your Honor must

23  necessarily find that we have a prescriptive right to continue

24  the diversions which we have made in the past.  And that is

25  exactly our position, if your Honor please.  The two are

See P 11918 - 11,919

1  inconsistent, and it is our opinion that in this case what we

2  do is of such a minor nature that there is no basis for any

3  decree which would in any way limit us as an upstream user.

4  But, if your Honor comes to any contrary conclusion, then we

5  are necessarily in the position where we can and will assert

6  a prescriptive right.  That is exactly our position, your

7  Honor.

8      THE COURT:  I know your position.  Of course, sometimes

9  things aren't all A and all B or, as the adage goes, no woman

10  is as white as she's powdered or as black as she's painted.

11  And sometimes it is not a case of saying it's either this or

12  that.

13      MR. O'MALLEY:  I recognize that the facts of this case,

14  if your Honor please, impose a very considerable burden upon your

15  Honor.  But that is our position, and we believe that it is in

16  this case just that simple, although I recognize that this is

17  a case that is full of complexities and that your Honor does

18  have a very grave problem in passing upon all the issues of this

19  case.

20      I think I would like to proceed to a couple bagatelles

21  with this witness, and then I assume there will be one or two

22  short questions on cross-examination.

23      MR. VEEDER:  I think we can start with that.

24      THE COURT:  He has a few more questions.

25      MR. O'MALLEY:  I have just a couple more questions.

1      Q  Mr. Bookman, have you made a review of the Bowen

2  report, which I believe is Oviatt's A?

3      A  Yes, sir, I have.

4      Q  Did you observe some minor discrepencies within that

5  report?

6      A  Yes, I have.

7      Q  Would you point them out to the Court?

8      A  May I have the Exhibit please.

9      Q  Yes.

10     MR. STAHLMAN:  As I understand, these are discrepencies

11  in the report itself?

12     Mr. O'MALLEY:  Yes, there are some very minor bagatelles,

13  but we felt we would like to correct them.

14     MR. VEEDER:  What is a "bagatelle"?

15     MR. O'MALLEY:  A minor point.  These discrepencies are

16  not very important, but I thought we would like to clear them

17  up.

18     THE WITNESS:  It is true that these are very minor, and

19  merely for the purpose of the Exhibit being correct that I am

20  bringing these up.

21     As testified this morning, we are in agreement with this

22  report and this work.

23     Starting with page 52 of the Engineering portion of the

24  report, which is marked Exhibit Oviatt A, I found on checking

25  the information on the wells which is listed for the Lancaster

Valley area that there were minor differences in connection with the depth of a well. Realizing that this may not be too important, I am not going to mention all of the minor differences, because I don't think they are too important, except one which is rather a major difference, and that is Well No. 8 on page 52 states that this well which is located 700 feet southwest of the Ramona Ranch house and that the well is pumped by a 15-horsepower electric motor driven turbine, has a 12 inch casing and is 130 feet deep, and water from this well is used for irrigation. That well is what Mr. Oviatt calls his Well No. 20 and his records that he has indicated that the well is 566 feet deep when first drilled instead of 130.

MR. VEEDER: Do you have the well log on that?

THE WITNESS: No, sir.

MR. STAHLMAN: Mr. Oviatt said he has well logs that he can produce.

THE WITNESS: I want also to note that in addition to the eight wells of Mr. Oviatt, when he presents his list of wells that there will be additional wells that he has which he considers inactive or dry holes which he is reporting, and that also he has an active well which he calls No. 21, which is not listed in the Exhibit Oviatt A, which was drilled in 1959 to replace the original well that he testified existed near the intake, and that this well is now active.

MR. O'MALLEY: Is that the summary of the minor

1    discrepencies?

2             THE WITNESS:   No, sir.   I have some more.

3             MR. O'MALLEY:   Proceed.

4             THE WITNESS:   In regard to the Oak Creek area, page 54,

5    surface diversions are listed .  No. 1 is listed Kohler Canyon.

6    On page 2 there is listed Temecula Creek, which is the diver-

7    sion located in Section 21 Township 19 South Range 2 East,

8    consists of a masonry diversion box at the creek bottom with

9    a pipe line leading up the Oak Grove Ranch house area.   The

10   diversion is not used at present because of breaks in the pipe-

11   line.   This is all that is listed in regard to surface diver-

12   sions, and Mr. Oviatt has additional surface diversions which

13   have been evidently omitted from this report.

14            First, there is the Oviatt-Brinkerhoff diversion which

15   Mr. Bailey testified about yesterday.

16            THE COURT:   That was taking water out of Temecula Creek?

17            THE WITNESS:   That was taking water out of Temecula Creek.

18            THE COURT:   Originally off the Levy property, and then

19   off the Wentworth property.

20            THE WITNESS:   Yes, and that was located in the Southeast

21   Quarter of the Northwest quarter of Section 17 Township 9 South

22   Range 2 East.   It is shown on Exhibits that have been placed in

23   yesterday.

24            MR. O'MALLEY:   I think it is on Exhibit Z which shows

25   both properties of Mr. Oviatt.  I want to be sure this is the

1      right exhibit.  Yes, it is.

2           I wonder if the witness may testify with Exhibit Z for

3      Identification before him.

4           (Placing Exhibit before the witness.)

5           THE WITNESS:  Yes, the first one that was omitted was

6      what we call the Oviatt-Brinkerhoff diversion, which is located

7      in Section 17, in the Northwest Quarter of Township 9 South

8      Range 2 East.

9           THE COURT:  In the Northwest Quarter?

10          THE WITNESS:  The Southeast Quarter of the West Quarter.

11          THE COURT:  Where is that shown?

12          THE WITNESS:  About a quarter mile west of the No.

13     Section 17 on the map.

14          THE COURT:  Oviatt's Z.

15          MR. STAHLMAN:  Is that one he moved?

16          THE WITNESS:  That is the one that washed out and had to

17     move upstream in order to make the diversion; yes.

18          The second diversion which is not shown is called Kohler

19     Canyon, and that is located on Oviatt's Z, shown in Section 28

20     Southeast Quarter of the Southeast Quarter Section 28 Township

21     9 South Range 2 East, and that is the one that Mr. Bailey tes-

22     tified to that was filed on in the San Diego County Courthouse,

23     which was presented.

24          MR. O'MALLEY:  Is that indicated on the yellow line on the

25     map which begins in Kohler Canyon?

1          THE WITNESS:  Yes, sir.

2          MR. O'MALLEY:  Very well.

3          THE WITNESS:  The third one that was omitted is called

4    Rattlesnake Spring, and it is located in Section 20 and is in

5    the Southeast Quarter of the Southeast Quarter of Section 20

6    Township 9 South Range 2 East, and that is domestic well which

7    also Mr. Bailey testified to yesterday.

8          MR. O'MALLEY:  Very well.  Are those the principal dis-

9    crepencies which you found in the Exhibit A?

10          THE WITNESS:  Yes.

11          MR. O'MALLEY:  In view of the fact that these diversions

12    have now been referred to by this witness, if your Honor please,

13    I would offer Oviatt's Exhibit Z for Identification in evidence

14    at this time.

15          MR. STAHLMAN:  The report does show Kohler Canyon diversion.

16          THE COURT:  Is there anything else that is objectionable

17    on the map?  It is merely a listing of the property we had

18    identified.

19          Oviatt's Z will be received in evidence.

20          (Defendant Oviatt's Exhibit Z was received in evidence.)

21          MR. VEEDER:  It is for location only; isn't that right?

22          MR. O'MALLEY: Yes;  It shows the location of the diversion

23    points, and it also shows the property listed.

24          THE COURT:  Mr. Bookman, before I get mixed up here, on

25    Exhibit Oviatt's AH, which you identified this morning as showing

1 diversions, the first one you have underlined is the Lancaster

2 Creek diversion, which you have diagramed in the map Oviatt's

3 AG.

4     THE WITNESS:  Yes, sir.

5     THE COURT:  Now, the next diversion shown on this list

6 is in Section 17 9 South 2 East, and that is the Temecula Creek

7 diversion we have been talking about.

8     THE WITNESS:  That is right.

9     THE COURT:  The next one listed is shown on Exhibit Oviatt's

10 AH as 9 South 2 East Section 21.  Is that the Rattlesnake

11 diversion but with a different section number?

12     THE WITNESS:  No, sir, that is the Oviatt-Cummings diver-

13 sion, which is the one that takes out of Temecula Creek and

14 serves the domestic and stock water to the Oak Grove property.

15 It is the one that -- let's see -- yes, I believe, that Mr.

16 Bailey testified to this one, too, yesterday.  It is called the

17 Oviatt-Cummings-Harmer diversion.

18     THE COURT:  We didn't hear anything about that, that I

19 know of.

20     MR. STAHLMAN:  No.

21     THE COURT:  It is not Kohler Canyon and it is not Rattle-

22 snake.

23     THE WITNESS:  No.

24     THE COURT:  And it is not Temecula Creek.

25     THE WITNESS:  I actually didn't complete my testimony in

1  regard to these other diversion points.

2      MR. O'MALLEY:  Very well, sir.

3      THE COURT:  Before you do, going ahead on Oviatt's AH,

4  the next diversion shown is in Section 28, and that is Kohler

5  Canyon.

6      THE WITNESS:  Yes, sir.

7      THE COURT:  And actually Rattlesnake isn't shown.

8      THE WITNESS:  That is correct, your Honor.  Rattlesnake

9  Canyon diversion is one which we didn't find at the time we

10  made our investigation.  It is one that we did not come across.

11  So Rattlesnake Canyon Spring diversion is not shown on that

12  exhibit.

13      THE COURT: But this exhibit does show another diversion

14  shown at the very bottom of the first page on Exhibit AH, which

15  I don't recall that we heard any testimony on.  Is this diver-

16  sion in Section 21 referred to in Exhibit A of the Soil Report?

17      THE WITNESS:  May I see that again, please?

18      THE COURT:  Show him Exhibit A Mr. Clerk.

19      This is in connection with what -- Oak Grove?

20      MR. O'MALLEY:  That is the Oak Grove, the Oviatt-Cummings

21  diversion, as I will point out to your Honor in Exhibit Z is

22  a diversion onto the Oak Grove property.

23      THE WITNESS:  Yes, sir.  Your Honor, diversion No. 2 in

24  Exhibit Oviatt's A is the one that we referred to as the Oviatt-

25  Cummings-Harmer diversion in Section 21.

11885

23

1    THE COURT:  Is it called diversion No. 2 in Exhibit A?

2    THE WITNESS:  Yes, sir.

3    MR. STAHLMAN:  On what page is that, your Honor?

4    THE COURT:  Page 55.

5    Where is it shown on the map?

6    THE WITNESS:  It is shown on Oviatt's Z in Section 21 on

7    Temecula Creek itself, almost in the center of Section 21, about

8    a quarter mile below the No. 21 on the Exhibit.

9    THE COURT:  And this was one we called the Temecula

10   diversion way downstream?

11   THE WITNESS:  Yes, sir, this is called the Oviatt-Brinkerhoff

12   diversion.  This is called the Oviatt-Cummings-Harmer diversion.

13   THE COURT:  All right.  We have had no proof about it,

14   when it occurred or anything about it.

15   BY MR. O'MALLEY:

16   Q  You have testified this morning with respect to the

17   measurements of water diversions onto Rancho Ramona during the

18   period that you were with the State.  Have you also compiled

19   similar records of diversions onto the Oak Grove properties of

20   Mr. Oviatt?

21   A  At the same time that the measurements were made at

22   the Rancho Ramona, there were measurements of three other diver-

23   sions made by Mr. Oviatt in the Oak Grove Ranch, which are called

24   Oviatt-Brinkerhoff, Oviatt-Cummings-Harmer, and Kohler Canyon.

25   Q  Will you state what the record of the diversions has

1   reflected during the period of time it was made by you or under

2   your supervision and control?

3       A   On the Oviatt-Brinkerhoff diversions on Temecula Creek,

4   which consisted of an earth dam with a diversion ditch two feet

5   deep and about two and a half feet wide at the top and about

6   1250 long until it discharged into a reservoir, we installed a

7   wier which was a steel sharp-crested wier in the ditch, with a

8   measuring scale alongside the wier so that the head could be

9   measured on the wier itself, and took measurements on this wier

10  periodically during the time of our investigations on February,

11  1951 until May, 1954.   The length of the wier itself was 18

12  inches wide.   We also recorded, as we did on the Rancho Oviatt,

13  set in a continuous recorder in order to verify our periodic

14  measurements to make sure that there was no significant change

15  in between the time when we made periodic measurements.   So for

16  a period of two weeks we had a continuous recorder on this wier

17  which recorded the water levels at all times.   The data was

18  recorded in field books and transferred as I described this

19  morning to our permanent records and computed and summarized,

20  and the results are shown on the Exhibit which I introduced this

21  morning.   I don't recall the number of it.

22      MR. SACHSE:   AH.

23      THE WITNESS:   And on Exhibit AH, page 128, diversion No.

24  9S2E17F Oviatt-Brinkerhoff shows that the diversion of 80 acre

25  feet in 1951 from July through December, part of the year, 115

1    acre feet for 1952, and 235 acre feet for 1953.

2        The second diversion which we measured on the Oak Grove

3    property was known as the Oviatt-Cummings-Harmer diversion,

4    which I have identified on Exhibit Oviatt's Z, this last one

5    that I looked at.  The diversion itself, consists of a concrete

6    box set in the stream about five feet square and has a wood

7    cover over it to keep out the trash, and as I mentioned it is

8    directly in the creek bed, and from the box itself there is

9    about 4700 feet of two inch pipe, and this diversion served the

10   cabin property of Cummings and Harmer and then went on to the

11   Oak Grove Ranch.  There was no storage on the system.  This

12   diversion was formerly designated in older records that we came

13   across as the Mapes diversion.  We made measurements on this

14   diversion by quantitative volumetric measurements -- that is,

15   we use a stop watch and a five gallon can.  I found in a measure-

16   ment we made in 1951 on January 17, that we meausred 6.6 gallons

17   a minute, and on February 17 a year later, in 1952, the measure-

18   ment recorded was 10.8 gallons a minute.  For the entire time

19   that we observed this diversion, we summarized the flow as be-

20   ing shown on this Exhibit AH as being one acre foot for 1951,

21   one acre foot for 1952, and one acre foot for 1953.

22       The third diversion we measured was known as the Kohler

23   Canyon diversion and is located 9S2E28R.  This surface diversion

24   from Kohler Canyon is made by diverting the water by a small

25   earth dam through a ditch which was about two feet wide on top

1  and about a foot and a half in depth for a distance of about

2  60 feet to a small collecting pond -- it was not more than about

3  ten feet in diameter, which led into a steel pipe, ten inches

4  in diameter for a distance of about 25 feet and then went into

5  an eight inch pipe for a distance of 60 feet and then for 1.9

6  miles it was about a six inch pipe, where it discharged into a

7  reservoir on Mr. Oviatt's Oak Grove property.  The surface

8  reservoir is shown, I believe, on the U.S. Marine's list.  May

9  I look at that again?  I am quite sure they have that reservoir

10  listed, although they didn't have the diversion.

11         THE COURT:  Here it is.

12         By the U.S. Marines list, you mean Exhibit A?

13         THE WITNESS:  Exhibit Oviatt's A.

14         Yes, sir, Exhibit Oviatt's A lists on page 54 "Ground

15  storage reservoir.  A storage reservoir located about one and

16  one fourth miles east of Oak Grove Ranch house.  The reservoir

17  is formed on three sides by earth dikes and on the fourth side

18  by a natural ground contour.  The capacity of this reservoir is

19  about six acre feet.  The reservoir is filled from Kohler Canyon

20  diversion."

21         In order to measure Kohler Canyon diversion we insert a

22  24 inch sharp-crested metal wier in the earthen ditch diverting

23  from the creek and made periodic measurements starting in Febru-

24  ary, 1951 through September, 1954, and the sum total of the

25  diversions made are shown on Exhibit Oviatt AH and are shown to

1  be 115 acre feet in 1951, 120 acre feet in 1952 and 80 acre feet

2  in 1953.

3       I believe that is all I have to say.

4  BY MR. O'MALLEY:

5       Q  Have you summarized the diversions at Oak Grove now,

6  Mr. Bookman?

7       A  Yes.  The diversions to which I have testified at Oak

8  Grove Ranch include Oviatt-Brinkerhoff, which is located 9 South

9  2 East 17 F, the Oviatt-Cummings-Harmer diversion 21 L, the

10  Kohler Canyon diversion known as 9 South 2 East 28 R, and I have

11  not testified to Rattlesnake Springs diversion.

12       Q  Did you make some comparison of the Rattlesnake diver-

13  sion at that time?

14       A  No.

15       MR. O'MALLEY:  Very well.  I think I have concluded with

16  this witness, but if I may check my notes.

17       You may cross-examine.

18       MR. SACHSE:  I have a few questions, your Honor.

19

20                    CROSS-EXAMINATION

21  BY MR. SACHSE:

22       Q  Mr. Bookman, first, respecting your testimony as to

23  the diversion works at Ramona Ranch -- you have an exhibit in

24  evidence, when you testified to the amount of water that could

25  flow you are testifying to capacity, youre not implying that

1   that amount of water did flow through?

2       A   No, sir.   No, I didn't testify to the amount of water

3   that did flow through it.

4       Q   You were merely talking about capacity?

5       A   Yes, capacity.

6       Q   Do you have Exhibit AH before you?

7       A   No, sir.

8       MR. SACHEE:   Would you give it to him, Mr. Clerk.

9       THE WITNESS:   Yes, I have it.

10  BY MR. SACHSE:

11      Q   Directing your attention, first, to the Oviatt Ramona

12  Ranch diversion, your studies indicated that in 1951 that diver-

13  sion totaled 140 acre feet?

14      A   Yes.

15      Q   I will ask you to make a quick calculation of how much

16  water a hundred miner's inches of continuous flow for a year

17  would be, and tell me if I am not right that it would be about

18  1448 acre feet?

19      A   Well --

20      Q   Well, a hundred miner's inches is three second feet,

21  and a second foot continuous flow for a year is --

22      MR. O'MALLEY:   May the witness complete the answer to the

23  first question and then go on to another question?

24      THE WITNESS:   Yes, I would like to.

25      THE COURT:   All right, take your time.

1          THE WITNESS:   That is correct; 1448 acre feet for a hundred

2   miner's inches flowing continuously throughout the year.

7

Z1

1      Q  So then in your opinion the conclusion drawn by Mr.

2  Oviatt and Mr. Brinkerhoff that this diversion carried a

3  hundred miner's inches continuous flow at least certainly was

4  not true for the calendar years 1951, '52 and '53?

5      A  Well, I don't know what his-- I can't testify for

6  him.  All I can testify to is what we measured, and whether

7  his diversion is what he observed or what times he observed

8  the hundred inches I can't testify to.

9      Q  If you will drop down, please, to the Oviatt-

10  Brinkerhoff diversion, you calculate what 30 miner's inches

11  would be in a year.  I get 442 acre feet.

12      THE COURT:  Is there any testimony that there was 30

13  miner's inches?

14      MR. SACHSE:  Yes, your Honor, that is what Mr. Bailey

15  testified that he got through the diversion.  I have a page

16  reference, if your Honor wants it, in the transcript.

17      THE COURT:  What page?

18      MR. SACHSE:  Page 11765.

19      THE WITNESS:  What amount did you say it was?

20      MR. SACHSE:  My rough arithmetic is 442.  Is that right?

21      THE WITNESS:  That is 434.

22      MR. SACHSE:  All right, I will settle for that.

23      Q  So a 30-inch flow for a full year would have produced

24  434 acre feet; is that right?

25      A  Yes.

Q   And the actual production of that diversion, accord-
ing to your measurements, was 80 acre feet in 1951?

A   That 80 acre feet, may I say, is July through
December, part of the year.

Q   And for the full year, 1552 acre feet?

A   Yes.

Q   And for 1953, 235 acre feet; is that right?

A   Yes.

Q   Go to the next page, please, the Kohler Canyon
diversion.  Do I read it correctly that in 1951 you found
that there was diverted from that diversion 115 acre feet
for the calendar year?

A   That is correct.

Q   Am I right that there are 325,900 gallons in an
acre foot?

A   325,900.

Q   Would you consider a use of 115 acre feet a year a
reasonable domestic use?

A   He didn't use that all for domestic use.

Q   Just answer my question.

A   No.

Q   You would not consider a reasonable domestic use
115 acre feet a year, would you?

A   No.

THE COURT: As I understand, in that particular diversion

does that water, after it goes to the domestic supply, then

turn into one of the irrigating reservoirs, or where does the

balance of it go?

THE WITNESS:   The water goes first into the reservoir

which is mentioned in Oviatt Exhibit A I pointed to, which is

about 6 acre feet, and then it is used for irrigation of

crops adjacent to the west of the reservoir, mainly alfalfa

pasture.

BY MR. SACHSE:

Q   Are you familiar with Oviatt's Exhibit AA?

A   I have seen it, yes.

Q   That purports to be an old Civil Code filing for

water; is that right, Mr. Bookman?

MR. VEEDER:   He can't read it, he says.

THE WITNESS:   Have you got a better copy?

MR. SACHSE:   That is not the original.   The original

is quite legible.

THE COURT:   Where is the original, Mr. Clerk?

THE WITNESS:   This Exhibit AA purports to be certified

to by the County Recorder of San Diego County to be a copy of

the original record of water location notice.

BY MR. SACHSE:

Q   Do you recall Mr. Bailey's testimony?

I will refresh your recollection that he said he

filed this.   You observe his signature on it-- Chalma Bailey,

Locator.

A  Yes, I recall that.

Q  And that this was the Kohler Canyon diversion, do you recall that?

A  Yes.

Q  Do you observe the title of his attempted appropriation, "Water Location Notice for Domestic Purposes"?

MR. O'MALLEY:  I submit that the document speaks for itself, if your Honor please.

THE WITNESS:  I observe it.

THE COURT:  Your objection is overruled.

BY MR. SACHSE:

Q  State whether on AH, Mr. Bookman-- would you look over to the third page of AH, which is some test material and tabulations?

A  What page number?

Q  It is page 123, and with reference to the last diversion appearing on the page, under your "Remarks" column-- first, where did you get the information on which those remarks in that column are based?

A  We got this information by being right on the ground at the time they were irrigating and talking to both Mr. Barbee and Mr. Oviatt's foremen in regard to their arrangement on use of the water out of the creek.

Q  So during the years 1951 and '52 the maximum diversion

per week on the Oviatt property was for three and a half days; is that correct?

A  For 1951 and '52; that is correct.

Q  If I read this correctly.

THE COURT:  This diversion downstream, 9S, 1E, 12H, is listed under the name of Ward, shown on page 128 of Exhibit AH.  Did I understand you to say something about Barbee?

THE WITNESS:  Barbee, yes.

THE COURT:  Is Barbee the man who operated that downstream diversion?

THE WITNESS: Barbee was located downstream.  That was one of the problems which we were brought into originally in that Temecula reference.

THE COURT:  Barbee, though, was not a diverter; he was just using water out of the stream; is that right?

THE WITNESS:  Barbee was using water out of the stream, yes.

THE COURT:  I am trying to find out, I am trying to check this diversion referred to as 9S, 1E, 12H.  According to your first page 128 of Exhibit Oviatt AH, that appears to be under the name of an owner by name of Ward.

THE WITNESS:  Barbee sold out during the time of our investigation, after our investigation started, and I am not sure but that Mr. Ward might be the new owner.

THE COURT:  You don't know, though?

THE WITNESS:  No.  But that was the diversion that we were concerned with, what was previously known as the Barbee diversion.

THE COURT:  When you talked to Mr. Ward and Mr. Oviatt was there some agreement between them establishing that three and a half days?

THE WITNESS:  There is disagreement between them.  That is what caused the problem.

THE COURT:  Yes, but was there some agreement between them in 1951 and 1952 with reference to this three and a half days diversion by Oviatt and three and a half days that it was not diverted then?  Did you ascertain any facts about that?

THE WITNESS:  All we could ascertain at that time was that that was claimed to be the understanding over how they would operate, and the contention of Oviatt or Barbee or Ward, his successor, was that it was being violated.

MR. VEEDER:  I move to strike all of this evidence because it is purely hearsay, your Honor.

MR. O'MALLEY:  We will present some direct testimony on that through Mr. Oviatt when he is back on the stand.

THE COURT: It may go out.

Did you talk to Mr. Oviatt about this?  Do you have any recollection of what he had to say about it?

THE WITNESS:  I didn't personally talk to him, your Honor.

THE COURT:  That is all.

BY MR. SACHSE:

Q  However, the operation as you observed it was three and a half days to Oviatt for those two years, whatever the reason may have been; is that right?

A  Yes, sir.

MR. VEEDER:  May I inquire right there:  Did this witness observe it himself?

THE WITNESS:  Not personally observed it for three and a half days through that point.

MR. Veeder:  You personally observed it for three and a half days?

THE WITNESS:  No, sir.  It was the people under my direction who were in the field that have made the observation reported it to me.

BY MR. SACHSE:

Q  Now, Mr. Bookman, I observe on pages 123 and 124 of Oviatt AH, first on 123, three Oviatt diversions, and then a third column "Appropriations on file with the State," and in each case the words Non, None, None.  In other words, you found no record of any filing in accordance with the Water Code for any of those appropriations?

A  That is correct.  We had a check made of the records.

Q  And found none.  And the same would apply then to the Oviatt filing on page 124, Oviatt-Cummings-Harmer; you found

no filing of record for that diversion?

A   That is correct.

Q   You were the referee in the Barbee-Oviatt reference
in the Superior Court, were you not?

A   I was in charge of the work for the reference.

Q   And in connection with that reference you were
required to make a calculation of irrigated acres of land
owned by the various parties involved in order to apportion
the costs of the reference; isn't that correct?

A   We were not required to do that, sir.  Under the
Water Code the referee makes recommendations to the court
on the apportionment of costs, and we chose to do it on our
estimate of irrigated acres.

Q   In other words, whether you were required or not,
you calculated the irrigated acres for the years 1951, '52
and '53 for all of the parties involved in that reference,
didn't you?

A   That is the way we--

Q   And you used that figure as the basis of apportioning
the costs?

A   Yes.

Q   How did you calculate the irrigable acreage of each
of those people?  By studies with your reference staff?

A   It was what our staff observed in the field as to
the irrigated acres.

Q   It was your best conclusion, then, as to the number of irrigated acres owned by these various parties?

A   That is right.

Q   I find that your conclusion was that for the year 1951 James Oviatt had 134 irrigated acres, for the year 1952 he had 95 irrigated acres, and for the year '53 he had 97 irrigated acres.  Does that include both ranches, Oak Grove and Ramona?

A   That included in that table all of Mr. Oviatt's land.

Q   So your staff's best conclusion at the time of the reference was that the maximum irrigated acreage on both ranches was 134 acres in 1951?

A   That is correct.

MR. SACHSE:  I have nothing further, your Honor.

MR. VEEDER:  I wish to call your Honor's attention to Exhibit marked for Identification Oviatt AI.  Has that been offered?

THE CLERK: No.

MR. O'MALLEY:  I thought I had offered that exhibit. May I have leave to offer that at this time?

MR. VEEDER:  I most certainly am going to object to the exhibit.  When it was originally offered as part of California's case I observe that it was stricken, and there is so very much on it that was objectionable when it was offered at that time because of obvious errors on it and obviously a

1   misrepresentation of the true stream flow.   In other words, it

2   was after one of the rare wet years, and it purports to show

3   a great deal more water running in the river than historically

4   would be possible.   It will be noted that, for example, it has

5   the Vail Company as a water service organization, it has the

6   Navy enclave as a water service organization.   I don't believe

7   that is true in regard to either of them.   If they want to

8   take the scissors and cut it down the middle and put in that

9   green part, I have no objection to it, because it is simply

10   for location.

11          MR. SACHSE:   Is there a motion?   Mr. Veeder, I am not

12   trying to interrupt you.

13          MR. VEEDER:   This is an objection.

14          MR. SACHSE:   I left out one question.   I was going to

15   ask permission to come back in when you are through on those.

16

17

18

19

20

21

22

23

24

25

1      MR. VEEDER:  I don't want to cause Mr. O'Malley any

2  difficulty, other than I say if you want to take the scissors

3  and cut that off.

4      THE COURT:  Let me see Exhibit Z, Mr. Clerk.

5      MR. VEEDER:  I think Exhibit Z has everything on it, your

6  Honor.

7      THE COURT:  Except that Exhibit AI shows the stream system

8  a little more clearly.

9      Can we take Exhibit AI -- and Mr. O'Malley will probably

10  agree -- and just x off the portion to the left?

11      MR. SACHSE:  Your Honor, Mr. Veeder's AB is in evidence.

12  The little one is nothing but a reproduction of this.  The one

13  in Bulletin 57 is an exact reproduction of this, the exact

14  same thing.

15      THE COURT:  Except that it has been changed around.

16      MR. SACHSE:  The legend has been changed.

17      I don't know what the objection is.  I don't care about

18  this objection.  I want to be quite sure that we understand that

19  this map is in evidence.

20      THE COURT: Is that California's AB?

21      MR. SACHSE:  This is California's AB.  I don't care what

22  you do with this, but California's AB is in evidence.  It is

23  not for Identification only.

24      THE COURT:  But the one in evidence is different.

25      MR. VEEDER:  It is not this, for sure.

1      THE COURT:  Except the legends are different.

2      MR. VEEDER:  The point I want to make, your Honor, is

3  that we have objected to this, and we renew our objection.

4      THE COURT:  You want to be consistent.

5      Let me see the Exhibit.  Will you withdraw your objection

6  if we take and run an x through this?

7      MR. VEEDER:  Why not just cut it off?

8      THE WITNESS:  All right.

9      THE COURT:  Can we leave, say, Vail Dam in?

10      MR. VEEDER:  Surely.

11      THE COURT: And strike out the words about "water service

12  organization"?

13      MR. O'MALLEY:  I will stipulate to that. That is agreeable

14  with Mr. Oviatt.

15      MR. SACHSE:  Is that all you had?

16      MR. VEEDER:  I have a lot more questions.

17      MR. SACHSE:  May I interrupt you?

18      MR. VEEDER:  Yes.

19      MR. SACHSE:  If your Honor will permit, I did leave out

20  one very important question of Mr. Bookman.

21      MR. O'MALLEY:  I wonder if I might offer the various

22  exhibits I have not offered yet and that I have identified

23  through this witness.

24      THE COURT: Wait just a minute.

25      How about cutting this right there and x'ing out some of

1   this material?

2         MR. VEEDER:  Cut it off.

3         THE COURT:  Oviatt's Exhibit AI received in evidence as

4   mutilated.

5         (Oviatt's Exhibit AI received in evidence.)

6         MR. O'MALLEY:  May I offer at this time Exhibits AD, AE,

7   AF and AG?

8         MR. STAHLMAN:  What are those?

9         MR. SACHSE:  They haven't been testified to yet.

10        THE COURT:  We haven't heard any talk about AE and AF.

11        MR. O'MALLEY:  That's right.  Excuse me.

12        THE COURT:  What is AD?

13        THE CLERK:  AD is a list of Oviatt diversions, your Honor.

14        THE COURT:  We haven't had testimony on it either.  That

15   is one of the things we had sent down to be photostated.

16        MR. O'MALLEY:  Yes.

17        THE COURT:  And AG you have identified, and it is that

18   sketch of the diversions.

19        MR. O'MALLEY: Yes, and that has not been offered, and I

20   would like to offer it at this time, your Honor.

21        THE COURT:  All right, AG received in evidence.

22        (Oviatt's Exhibit AG received in evidence.)

23        MR. SACHSE:  Your Honor, I overlooked a rather important

24   question, if I may go back to Mr. Bookman for a moment.

25        THE COURT:  Yes.  He's still back here.

1                    FURTHER CROSS-EXAMINATION

2    BY MR. SACHSE:

3         Q  Mr. Bookman, you made light calculations of irrigable

4    acreage for all of the parties to the reference, did you not?

5         A  Yes.

6         Q  And they were made in the same manner that you made

7    the Oviatt one?

8         A  Yes.

9         Q  And for the year 1951 you found that the John C. Tyler

10   Ranch had 150 acres irrigated?

11        A  I don't recall.  I don't have that in front of me.

12        Q  Page B - 18 of the Reference (handing document to the

13   witness.) for the year 1951 did you find that John C. Tyler

14   Ranch had 150 acres irrigated?

15        A  That is right.

16        Q  For the year 1952 that it had 246 acres irrigated?

17        A  That is right.

18        Q  And for the year 1953 246 acres irrigated?

19        A  That is right.

20   MR. SACHSE:  That's all.

21        John C. Tyler is Stardust.

22                    CROSS-EXAMINATION

23   BY MR. VEEDER:

24        Q  I observed that on your Oviatt AH you have enlisted a

25   great number of diversions in the reach of the Temecula River,

1    which, I believe, was before the Referee in Barbee versus

2    Oviatt; isn't that right?

3        A  Yes.  Not all of those diversions were located at the

4    time of Barbee versus Oviatt.  This table, Oviatt AH, is from

5    the Santa Margarita River investigation, Bulletin 57, and we

6    supplemented, we just continued and supplemented all other

7    diversions we could find included in that table.

8        Q  For example, I observed that the Gibbon and Cottle

9    diversion, that there are diversions by Bergman, there are

10    quite a number of diversions.  Do you say that those diversions

11    in the aggragate, with the Oviatt diversions, would be de minimis

12    in regard to the runoff of the Temecula-Santa Margarita River?

13        A  Yes, I think so.

14        Q  You think that none of those diversions, none of those

15    water uses above Vail dam would have any affect on the water

16    supply reaching the Pauba Valley?

17        A  I believe they will have some effect.  I said that it

18    was minor.

19        Q  Did you say they are de minimis, as the Court used the

20    term?

21        A  I don't recall the definition.

22        Q  You say that they are so small that it would make no

23    difference to the Vail Company, for example?

24        MR. STAHLMAN:  I think that is invading the provence of

25    the Court.

1      MR. VEEDER:  I am going down the stream.  I will say in

2  regard to any users below Vail Dam.

3      THE WITNESS:  I believe they would have a minor effect.

4  It would be a small effect at times to those downstream owners.

5  It is not entirely no effect at all.

6  BY MR. VEEDER:

7      Q  You are saying that this aggragate would be a little

8  bigger than just --

9      A  It wouldn't be zero.

10      Q  It wouldn't be zero?

11      A  No.

12      Q  And isn't it true that the Temecula Creek, Wilson Creek

13  and Coahuila Creek combined flow, above Vail Dam contribute quite

14  a substantial share of the total runoff of the Santa Margarita

15  River?

16      MR. SACHSE:  I object on the ground that it is too vague,

17  your Honor -- substantial share.  I would like it a little more

18  specific.

19  BY MR. VEEDER:

20      Q  Would you state then the major tributaries of the

21  Santa Margarita River, Mr. Bookman?

22      A  Murrieta Creek, Temecula Creek and going downstream there

23  is the Santa Margarita River itself, there is DeLuz Creek.

24      Q  So as a matter of fact, you included Temecula Creek as

25  one of the major tributaries and one of the major sources of

1  water for the Santa Margarita River?

2      A  Yes, I do.

3      Q  And isn't it true that during the irrigation season there

4  are demands for water far in excess of the available supply from

5  Temecula Creek?

6      MR. O'MALLEY:  Are you talking about the entire stream?

7      MR. VEEDER:  I am talking about Temecula Creek above

8  Vail Dam.

9      THE WITNESS:  Yes, there are demands for more water than

10  there is available in the summer flow.

11  BY MR. VEEDER:

12      Q  Isn't it true that the diversions that are made are

13  such that for the greater share of the irrigation season

14  Temecula Creek is dry at the present time?

15      A  At certain points; not all along.

16      MR. O'MALLEY:  I object to this in its form, your Honor.

17  He is placing it in two different time periods, one at the

18  pesent time and one during the irrigation season.

19      MR. VEEDER:  Thank you.

20      Q  We will say during the irrigation season of 1959, was

21  it not true that the diversions dried up the entire Temecula

22  Creek?

23      MR. SACHSE:  I object unless you clarify whether you are

24  talking about surface or subsurface flow.  You made quite a

25  point of that.

1      MR. VEEDER:  I will limit it then to surface flow.

2      MR. SACHSE:  I have a further objection to the form of

3   the question when he says, isn't it true that the surface

4   diversions dried up the surface flow?  Does that question mean

5   that the surface diversions alone did it, or that the weather

6   did it?

7      MR. VEEDER:  I will rephrase it.

8      Q  Is it not true that the surface diversions on the

9   Ramona Rancho itself takes all of the surface flow plus some of

10   the subsurface flow at the Rancho Ramona?

11      A  Yes.

12      Q  Under those circumstances isn't it true that the water

13   during this period, speaking of the irrigation season, which

14   would naturally reach the Vail Company line are prevented from

15   doing so by reason of this diversion, the Ramona Diversion?

16      A  The Ramona diversions, whatever is used, yes, would

17   not reach the Vail at that particular time.  That isn't the

18   point I made, though.

19      MR. VEEDER:  Mr. Stahlman asked me when I'm ready to

20   pause for a moment, to ask for a recess.

21      THE COURT:  Take a short recess.

22      (Recess.)

23   BY MR. VEEDER:

24      Q  In arriving at your conclusion that the aggragate of

25   all the irrigation uses above Temecula Dam would have no effect

1  below the dam, Mr. Bookman, what was the quantity of water

2  that you utilized in making your calculations, that you calculated,

3  rather, was being used by the Ramona Ranch?  Did you figure it

4  a hundred miner's inches?

5      A  I didn't base that opinion on the amount used at

6  Ramona Ranch itself.  I based the opinion on the study, as I

7  testified, on the river system as a hole, as far as the effect

8  downstream.

9      Q  And do you place that on the basis of the stream system

10  as it is at the present time?

11      A  Yes.

12      Q  Did you take into consideration spills from Vail Dam

13  in making that calculation?

14      A  Yes, I did.

15      Q  In other words, you didn't take into consideration as

16  it is at the present time.  Vail Dam never spilled; did you know

17  that?

18      A  You are playing on  semantics.  I didn't testify

19  to that point.  I testified that we made a study of historical

20  floods, and I testified that the floods of 1916 and 1917 and

21  1918 -- those are historic floods -- that Vail reservoir would

22  have spilled.

23      Q  In other words, you are not testifying to actuality.

24  You are testifying as to what might have been when you say that

25  the total diversions upstream above Vail Dam would not effect

1   downstream present day users?

2       MR. O'MALLEY:  That is objected to as being incompetent,

3   irrelevant and immaterial, and I object to the form of the

4   question, your Honor.

5       THE COURT: Overruled.

6       THE WITNESS:  The answer to your question is yes.  It is

7   based on a prediction of historic weather conditions being

8   repeated under the present situation.

9   BY MR. VEEDER:

10      Q  What was the last year of this study, what was the

11  last water year of your study which gave rise to this conclu-

12  sion which you expressed?

13      A  1953.

14      Q  In other words, you did not include the period of the

15  last five or six years; is that right?

16      A  That is correct.

17      Q  Now, in reaching the conclusion that you expressed did

18  you take into consideration a dam constructed by Fallbrook?

19  Was that part of your study?

20      A  Not constructed by Fallbrook.  A dam that could be

21  constructed at the De Luz site.

22      Q  And what size dam would that have been?

23      A  I believe it was 144,000 acre feet.

24      Q  In other words, unless we have 144,000 acre feet of

25  storage De Luz Creek or at Fallbrook, your testimony would be

different than that which you expressed as an expert opinion?

A   No, it wouldn't, because I expressed other points in my opinion that it was based on.

Q   What were the other points?

A   I expressed the point that there were ground water basins existing and that had been refilled historically and that operate in a similar manner as the proposed or the contemplated surface reservoir at DeLuz.

Q   Are you saying that the ground water storage, for example, at Camp "Pendleton would be exactly the same as a 144,000 acre foot storage reservoir?

A   No, I'm not saying that.

Q   Are you saying that in your studies you calculated that there would be spills ∨from Vail Dam?

A   That there would be?  Yes, sir.

Q   Would you change your opinion if, in fact, there had not been any spills from Vail Dam since it was closed in 1948?

A   No.   I said that the other part of my opinion was that there was regulatory storage in the ground water basins themselves besides the Vail Dam or any proposed dam that could be build in the canyon below Fallbrook, and that they too would act in the same way in minimizing the effective uses up above the Vail reservoir.

Q   Have you taken into consideration what has actually transpired in regard to the lowering of the water table in the

1    Lancaster Basin?  Did you take that into consideration?

2         A  Certainly.

3         Q  And what effect would that have on --

4         A  It has very little effect in Lancaster Valley itself,

5    as a very minor amount of storage, as indicated by the well logs

6    and the availibility of water they have been able to get from the

7    wells in Lancaster Valley.

8         Q  It is true, however, is it not, that you must maintain

9    a quantity of water during the irrigation season to support the

10   surface runoff of Temecula Creek; isn't that right?

11        A  To support the surface runoff?

12        Q  Yes.  You would not have surface runoff without a ground

13   water table to support it, would you?

14        A  That is correct.

15        Q  And when your ground water table is down, as it is at

16   the present time, there has to be a recharge of those basiss

17   above Vail Dam before you would have a surface supply; isn't

18   that right?

19        A  That is correct.

20        Q  In that connection then -- I am speaking of the present

21   moment -- you would change your opinion as expressed, would

22   you not, that those diversions would have no effect upon the

23   runoff?

24        A  I said they had a minor effect.  I didn't say they

25   had no effect.

1    Q   Now, in regard to your calculations respecting the

2    phreatophytes in Nigger Canyon, how many acres of phreatophytes

3    did you consider were located in that area?

4    A   Well, as I recall, within the dam itself -- and the

5    figures are published in Bulletin 57 -- it was about 1400 acre

6    feet of water were used for the complete area covered by the

7    reservoir.

8    Q   In other words, all your calculations, then, are

9    predicated upon water being maintained in Vail Dam at the high

10   water mark; is that correct?

11   A   No, they are not predicated on that.  I expressed the

12   opinion on the effect downstream based on these particular points

13   which I enumerated.  One was the losses of the phreatophytes,

14   another was the ground water storage, and the other was the

15   surface storage.  On the basis of all these, I drew the opinion

16   that the effect of use upstream above the Vail reservoir had

17   little effect on the availability of water to the area below.

18   Q   In making your estimations as to the uses of water on

19   Rancho Ramoma, how many irrigated acres did you calculate?

20   A   I didn't use the Rancho Ramona alone.  I based my

21   opinion on the --

22   Q   Would you answer the question?  How many acres of land

23   did you take into consideration in arriving at your conclusion

24   as being irrigated on Rancho Ramona?

25   A   I didn't use such a figure.

1        Q   How many miner's inches or second feet of water did

2    you calculate were being diverted at Rancho Ramona?

3        A   I didn't calculate it.

4        Q   And you didn't calculate diversions on irrigated acre-

5    age for any of the properties above Vail Dam when you arrived

6    at that conclusion?

7        A   The studies were based on actual measured discharges

8    at Temecula Creek, at Nigger Canyon, and based on that and the

9    computed runoff from the area upstream.

10       Q   Well, if you didn't take into consideration the

11   actual irrigated acreage and the actual water diversions, how

12   could you arrive at such a conclusion?

13       A   Because the discharge figures already included the

14   uses.   They have already been taken out of the river -- the

15   discharges at Temecula Creek and at Nigger Canyon.

16       Q   They have already been taken out?

17       A   They have already been taken out before the measurement

18   is made.

19       Q   You did not use any irrigated acreage at all then above

20   V ail Dam.

21       A   No.

22       Q   So you would have to have tremendous carry over storage

23   to arrive at your conclusion; is that right?   I have asked that

24   question once, and I am going to ask it again because I want to

25   be sure.

1    A  Will you repeat the question?

2    Q  You say you have to have tremendous surface carry over

3  storage before your opinion would have validity; is that correct?

4    A  No.

5    Q  That is it true that in the years 1916 and 1927, for

6  example, the waters that were used in your studies did not go

7  into storage in the coastal and Pauba Basin?  Isn't that right?

8  It went off into the ocean, didn't it?

9    A  As much as percolated into the basin, as much storage

10  as was available in the ground water basins went in.

11    Q  So your statement made earlier that you treated the

12  ground water basins the same as the surface water basins in

13  arriving at your conclusion would not be correct; isn't that

14  right?

15    A  You are wrong.  It is the very opposite of that.

16  When the flood waters filled up the Pauba and the Coastal

17  Basin, it offset the effect of the use upstream to that extent.

18    Q  Offset the--

19    A  Any minor impairment to the supplies downstream.

20  When those basins filled up again, the effects upstream were

21  offset.

22    THE COURT:  Let me ask you a question.  Suppose that

23  back in 1916 when the flood waters came down they filled up

24  all the basins and then went on to the ocean.  But suppose

25  that in 1916 there were only a few users upstream and there

1  had been no pulldown on any of the basins and there had been

2  little water used upstream for irrigation, then it would have

3  taken a lesser amount of water to fill up the basins before

4  it flowed on.  But suppose that in 1916 there had been terrific

5  use upstream and the basins had been pulled down, if you had

6  the same kind of flood as you had in 1916 it would take more

7  water to fill the basins, would it not?

8  THE WITNESS:  That is correct.

9  THE COURT:  Then doesn't the amount of use upstream,

10  to the extent that the water basins have been pulled down,

11  have to be considered, even if you go back and try to look

12  at this historically and say historically over a period of

13  time there have been floods and they have filled the basins

14  and they have run into the ocean, isn't it inaccurate to say

15  that we don't take into account what use has been made up-

16  stream, how badly the basins have been pulled down, because

17  if there is greater use and the basins are pulled further down

18  your figures are out of joint because there is going to be

19  more water taken to fill up the basins before the rest floods

20  into the ocean?

21  THE WITNESS:  You are absolutely correct, your Honor.

22  May I explain why I arrived at that conclusion, even as I

23  agree with your point.

24  THE COURT:  All right.

25

THE WITNESS:  When I became familiar with the Temecula

watershed and went over and found the stream became a surface

stream in the narrow canyon sections and then disappeared

underground where it widened out into the valleys and noted

that wherever water did come to the surface there had been

surface diversions made, so that for many, many years these

were not new developments, that these developments had existed

for those times, I came to the conclusion-- and observing

also, I want to point out, the effect of the wells after the

floods came in the upper Temecula Creek, these small valleys

filled up and the water levels rose rapidly but they were

unable to hold the water in them because of their limited

capacity to hold such water, the water levels dropped again

very quickly, so I came to the conclusion that the development

in the Upper Temecula Creek watershed had reached its maximum

limit, its top limit by nature's process along without any

big surface storage facilities to be built up there and

couldn't be further developed.

Then going back to your point about the increasing uses

in time along the coastal plane, I observed that the coastal

plane had not been drawn down even to recent times to where

it didn't recover.  In other words, the full use of the coastal

basins hadn't even reached with the present development up-

stream in the Temecula reach to where they did not recover.

They actually did recover in the recent time.  So that even

bringing in an increased use to the maximum limit, which it

has already reached the maximum, in my opinion, in the Temecula

area, the coastal basin still recovered and there is still

waste to the ocean.

BY MR. VEEDER:

Q  You say that the Temecula uses have reached the

maximum?

A  In my opinion, they have reached the maximum, to

practical extent, without any further large surface storage,

which is not, in my estimation, economically feasible.

MR. SACHSE:  When you say "Temecula uses", what area

do you mean?

THE WITNESS:  Above Vail Reservoir.

MR. SACHSE:  And you are saying then that Oviatt's

limit is probably reached as far as irrigated acres are

concerned; is that right?

THE WITNESS:  The testimony he gave this morning in-

dicating that his storage is decreasing throughout this drouth

shows that nature itself is controlling him.  No matter how

many wells he has put down, he can get only so much water out

of that underground basin.  He puts a well down, and it goes

dry.  But look at the record he testified to and you will find

that his acreage is decreasing with the decreasing water

supply.  He can't get any more no matter how he has tried.

BY MR. VEEDER:

Q   You observed that there are new wells going in up the Temecula and they are pulling down?

A   Certainly.   Just like Mr. Oviatt has put in new wells, but it hasn't increased his take of water.   One well goes dry, and he tries another spot, and picks up a little water, and it finally goes dry.   They are merely replacements of supplies.   And always, especially during this drouth period, have been on the diminishing side as far as the total water use is concerned.

Q   Isn't it true, though, that there are a great many years in which there are no floods but in which there is a sufficient precipitation which, in the normal course of events and in the state of nature, you would have a surface runoff which cannot exist today by reason of the fact that pumping has pulled down the ground water table to the point that the water simply goes underground rather than forms a stream?   Isn't that true?

A   You would have a lesser runoff during that time which would be later offset, as I said, by the flood waters.

Q   In other words, it is true?

A   Yes.

Q   That we have dewatered those areas, and except in periods of extreme flood, what would be in the normal surface runoff goes into those basins?

A   That is right.

Q   So the only possibility of offsetting is this extra-
ordinary flood nine or ten years apart?

A   That is right.

MR. VEEDER:   I have no further questions.


CROSS-EXAMINATION

BY MR. STAHLMAN:

Q   Mr. Bookman, did you prepare this map?  I am referring
now to Oviatt's W.

A   I marked this system on here together with Mr. Oviatt
when I was out at the ranch.

Q   In other words, between the two of you?

A   After observing it and going over it in the field,
I marked it up.

Q   Does this purport to show all of the wells that are on
the Ramona Ranch?

A   Yes, I think so.

Q   And during the period of time that you made your
study in connection with the Oviatt case, did you measure
static water levels in the wells at that time?

A   Some of them.  We were interrupted right after the
case got started.  In view of the fact that this cas began,
we got orders to quit, and so we just got started on the wells
and were interrupted in the middle of it.  So the records are

not complete.

Q   When you say you got started on this case--

A   We didn't get started.   I mean this case started up.

Q   Did you then start your Bulletin No. 57 after that, the study that culminated in it?

A   Yes.   That was in 1952.

Q   And did you make water level measurements in the area where the Ramona Ranch is located?

A   Yes.   Not on all wells.   Just as many wells as we were able to sample, at least typical areas in each basin where we could find some wells.   We couldn't cover all of them.

Q   And did you also make well measurements during the study of the tests that you made for Mr. Oviatt in connection with your employment for your testimony here?'

A   No, I didn't.

Q   You did not?

A   No.

Q   And you are unable to tell us at this time any differ-ence there is in the static well measurements as they existed in 1951 or '52 and as they relate to today?

A   That is right.

Q   By the way, are all of the wells on the Ramona Ranch that you know anything about placed upon this Exhibit W?

A   Yes.

Q  Have you made any designations to indicate on any document those wells which are dried up or unusable and those which are used for any particular purposes, such as domestic or irrigation?

A  I believe Mr. Oviatt has that information that he is going to submit.

MR. STAHLMAN:  Is that true, counsel?

MR. O'MALLEY:  We are going to, if we can get at it without too much interruption, offer a summary of our well data.

BY MR. STAHLMAN:

Q  Did you also on some form of document attempt to locate all of the wells on the Oak Grove property?

A  Yes.

Q  Which document was that?

A  It is another document that Mr. Oviatt had.

THE COURT:  The map, you mean?

THE WITNESS:  No, he has an exhibit listing the wells and their description, and he has shown them on Exhibit X, I believe.

BY MR. STAHLMAN:

Q  Exhibit X does have the list?

A  Yes, sir.

Q  Then it is the same thing that he has-- a list of the character of the different wells as shown on the map.

A  The dates they were drilled, and depths, et cetera.

9

Z7

Q   By the way, in this matter that you have talked about, your opinion in relation to the effect of pumping on Mr. Oviatt's property would have downstream from the Oviatt property, what is your opinion as to whether or not any upstream pumping upstream from Oviatt would have any effect on Mr. Oviatt's ability to pump?

A   That certainly could affect him, yes.

Q   That is true throughout the entire stream system, is it not?

A   No, there is a difference in the volume of storage in Lancaster Valley.  I mentioned that the storage in these basins above Vail were limited in quantity compared with the ground water storage or the surface storage at Vail Reservoir downstream.

Q   In your study you designated the Lancaster as Upper and Lower, did you not?

A   Yes.

Q   They are, however, two connected water storage units, are they not?

A   Yes.

Q   What was your storage capacity of the two Lancaster basins?

A   I don't recall the figure.  I believe the Lower Basin had a total storage of about estimated to be 38,000 acre feet. However, we noted an qualified that this was not all usable

storage, because of the nature of the formations in the Lancaster Valley, and this is borne out a good deal by the dry wells, the numerous ways in which Mr. Oviatt's wells have decreased historically in production and the fact that it is not a homogenous alluvium-filled valley as you might suppose, and for that reason the usable storage is much less than the computed total storage within that volume.

Q   Have you an opinion at this time as to whether the usable storage in that Lancaster Basin has been depleted or the water in the usable storage area?

A   It is getting mighty low.  I don't know how much more it can go.  You can tell that by the fact that Mr. Oviatt has only a couple of wells that are really active, and some of his best wells have gone dry.

Q   You computed the usable storage in the Lancaster Basin as 8,900 acre feet, did you not?

A   In which basin?

Q   In the Lancaster Upper and Lower?

A   I don't recall that figure.

Q   If that is the figure in the Bulletin, you wouldn't quarrel with it?

A   I wouldn't quarrel with it, if that is what it reports.

Q   Did you make any determination in your study at the present time as to how much water is in that area that you

consider to be the usable storage area?

A   No, it is very problematical, because I think from a practical standpoint the effect that you have gotten from the production of these wells are much more significant to me than you can contemplate or derive from, say, a purely theoretical geological estimate of specific yield and what the formations may contain, and those indicate to me more strongly that the basins are depleted and that the rate at which they became depleted by the evidence of the well production indicates to me that their capacity is very small.

Q   As you go up the valley you run into other storage units that you made computations of; is that right?

A   Yes.

MR. SACHSE:  Temecula, George?

MR. STAHLMAN:  Yes, sticking strictly to the Temecula area, and make reference to the basins you refer to as Anza, Terwilliger--

MR. SACHSE:  That is not Temecula; that's Coahuilla Creek.

THE WITNESS:  Up Temecula Creek there would be Aguanga and Oak Grove above Oviatt's property.

MR. STAHLMAN:  All right, Aguanga.

Q   Do you have an opinion in relation to what the present condition of the Aguanga Basin is in relation to capacity for storage?

A   My opinion of the Aguanga Basin was that it was a somewhat better basin than Lancaster Valley.

Q   The same principle would hold true, would it not, if you made extensive use of the area around Aguanga, that you would then compare the basin just according to the same principles as you did in the Terwilliger?

A   Yes, they have made extensive use of all these basins, as I testified, for many, many years.

Q   And if your Bulletin indicates that the usable storage capacity of that basin is 35,200 acre feet, that would be about it?

A   Again, I apply the same comments I made in regard to Lancaster Basin as to its usability.

Q   And the same thing would hold true of the Oak Grove Basin with a capacity of 11,200 acre feet?

A   The theoretical figure of 200,000 acre feet of storage, as I stated, I merely refer you to the large number of dry holes that have been drilled by Mr. Oviatt in Oak Grove.

Q   So then it would be necessary, in order to keep the amount of water flowing downstream, by just so much water as would be necessary to refill these various basins, would it not?

A   So much water that you could extract from them; that is right.

Q   By the way, with reference to the Well No. 7, as

1   shown on Oviatt's Exhibit W, which is in the subdivision 12K,

2   do you know what purpose that well is used for?

3       A   It is not used.  It is shown as an inactive well.

4       Q   Do you know the depth of the well?

5       A   No.  Mr. Oviatt will testify to that.  He has that

6   information.

7       Q   So you have not made any studies at this time

8   regarding the well levels in any of the area, whether on or

9   off the Oviatt property?

10      A   At the present time, no.

11      MR. STAHLMAN:  I believe that's all I have, your Honor.

12      MR. O'MALLEY:  No further questions.

13      I have a couple of short questions on redirect examination.

14  Is there any more cross-examination?

15      MR. STAHLMAN:  Not from me.

16      MR. O'MALLEY:  Have we made the rounds?

17

18                      REDIRECT EXAMINATION

19  BY MR. O'MALLEY:

20      Q   Mr. Bookman, under cross-examination by Mr. Veeder

21  you were asked as to the extent to which summer flows, the

22  runoff of the Santa Margarita system affected the amount of

23  the storage in the downstream area.  Can you state what

24  percentage of the replenishment of the underground basins in

25  the entire system comes from a summer flow and what percentage

10

212

of the replenishment of the underground basins comes from the winter flows?

MR. VEEDER:  I object on the grounds that there is no foundation for that from this witness.  We haven't gone into the Murrieta Basins, we haven't gone into the coastal basins.

MR. STAHLMAN: Doesn't that bear relationship to when it rains?

MR. VEEDER:  There is nothing at all in the direct examination.

MR.O'MALLEY:  You went into it on cross-examination as to the extent to which the stream system would be replenished by the runoff during the summer period, and with respect to your own question on cross-examination this particular question is directed.

THE COURT:  Has he made any study of this subject matter?

BY MR. O'MALLEY:

Q   Have you made any study as to the extent to which the summer runoff contributes to the recharge of the underground basin as compared with the percentage which the winter runoffs recharge the underground basins of the Santa Margarita River system?

THE COURT :  You have taken the whole system?  Or upstream of Vail Dam?

MR. O'MALLEY:  I am taking the entire system.

MR. VEEDER:  I object to that.  I don't believe I

10

Z13

1     asked that question, your Honor.

2          THE COURT:  Overruled.

3          Have you made such a study?

4          THE WITNESS:  We made a study of the monthly distribution

5     and even the daily distribution typical in this area and

6     reported it in Bulletin No. 57.  I recall that about 80% of

7     the runoff for the year on the average-- we took an average

8     period, a long-time period-- occurs during the winter months.

9     20% during the summer months.

10         MR. O'MALLEY:  That's all.

11         THE COURT:  That is no answer to your question.

12         MR. VEEDER:  20% is enough to kill us.

13         THE COURT:  It is a fact, is it not, that if there was

14    a summer flow down the stream, upstream of Vail Dam, and if

15    the basins were depleted, that the summer flow you have to

16    start from scratch, the summer flow would first start to fill

17    the basins, wouldn't it, and after the basins were filled

18    the summer flow might continue on down?

19         THE WITNESS:  Yes.  But I also made the point, your

20    Honor, that it was the winter flows that would offset these

21    depletions downstream, and those are the times when there

22    surplus waters available.

23         MR. VEEDER:  In the bad years, though, as we have been

24    having, during the bad years when we have no big floods--

25         MR. SACHSE:  Are you testifying or arguing?

MR. VEEDER:  I am going to ask him a question.

Q  In the bad years such as we have been having, you say that those basins are such that they could actually consume most of the runoff, both winter and summer; isn't that right?

MR. SACHSE:  I object to that.  That is not a question. That is a speech.  I ask that it be stricken.

MR. O'MALLEY:  I object to it as being indefinite and uncertain, your Honor.

MR. VEEDER:  Let me start again.  It was a speech, it's true, but it had a questionmark at the end of it.  The question then is this:

Q  During these years, such as up to now, in 1959 and during the period 1954 and 1955, is it not true that with your basins pulled down, virtually your entire runoff goes into the Aguanga Basin, the Lancaster Basin and the other basins that are being dewatered by pumping?

A  Let me understand the year that you mentioned.  1959?

Q  I am taking the years of minimum runoff, which are so much more frequent.

A  During the years of minimum runoff when the flows are low, they would all be utilized in the upstream basin.

MR. VEEDER:  I have no further questions.

THE COURT:  Do you have some further questions, Mr. O'Malley?

10

Z15

1    MR. O'MALLEY:  Not of this witness, your Honor.

2    THE COURT:  Are you through with this witness?

3    MR. O'MALLEY:  That is correct.

4    I can go forward with Mr. Oviatt.  It is obvious that

5    we will not get through.  I will go forward or not, as your

6    Honor wishes.

7    THE COURT:  May this witness be excused?

8    MR. O'MALLEY:  He may be so far as testimony is concerned

9    for me.

10   THE COURT:  How much longer will you be with Mr. Oviatt?

11   MR. O'MALLEY:  I would say on direct possibly an hour,

12   an hour and a half.

13   THE COURT:  Have these exhibits been distributed that

14   you did not have this morning?

15   MR. O'MALLEY:  They are here.  I assume they have been

16   picked up.

17   THE COURT:  I don't have a copy yet.  What happened to

18   all the copies?

19   I now have a copy of AD.  What about AE and AF?

20   MR. STAHLMAN:  Here is a copy of AE, your Honor.

21   THE COURT:  What about AF?

22   MR. STAHLMAN:  Here is a copy of AF.

23   THE COURT:  Thank you, Mr. Stahlman.

24   Do you gentlemen think you will finish tomorrow?

25   MR. O'MALLEY:  I surely hope so.  I have this additional

10-
Z16

1    testimony, about an hour or an hour and a half of Mr. Oviatt,

2    and one deposition.

3        THE COURT:  What other work will we have?  Will we have

4    any work for Friday?

5        MR. VEEDER:  I believe everything that has been scheduled

6    will be done, your Honor.  I am continuing on these other

7    matters that I have been working on.

8        THE COURT:  We will adjourn until 10 o'clock tomorrow

9    morning, then.

10       (Adjournment until Thursday, February 11, 1960, at 10

11   o'clock A.M.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25