# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al,

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Thursday, February 11, 1960

**Pages:** 11932 to 12089

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
Deputy

JOHN SWADER
Official Reporter
United States District Court
325 West F Street,
San Diego 1, California
BElmont 4-6211   Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -


UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
     vs.                       )      No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
            Defendants.        )


REPORTER'S TRANSCRIPT OF PROCEEDINGS


San Diego, California
Thursday, February 11, 1960


APPEARANCES:

        For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                   Special Assistant to the
                                   Attorney General,
                                   Department of Justice,
                                   Washington, D. C.

                                   LCDR. DONALD W. REDD.

1 | APPEARANCES (Continued):

2        For Defendant Fallbrook
       Public Utility District,    FRANZ R. SACHSE, ESQ.
3        et al.

4        For Defendant Vail       GEORGE E. STAHLMAN, ESQ.
       Company

5        For Defendant Oviatt     MESSRS. MUSICK, PEELER &
                                         GARRETT,
6                                           By JESSE R. O'MALLEY, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

# INDEX TO WITNESSES

2

For the Plaintiff:                         D        X       RD       RX

3

4

5

6

7  For Defendant Oviatt:

8      James Oviatt                    11937    12008

9      Amos Welch (Deposition)    12032

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX TO EXHIBITS

| Defendant Oviatt Exhibit-- | Iden. | In Evid. |
|---|---|---|
| AD-1 | 11990 | |
| AE and AF | | 12003 |
| AJ and AK | 12003 | 12005 |
| AL | 12056 | 12069 |

1    San Diego, California, Thursday, February 11, 1960. 10 A. M.

2

3         (Other matters.)

4         THE CLERK:  Two, 1247-SD-C, United States vs. Fallbrook,
et cetera, et al.   Further court trial.

5

6         MR. SACHSE:  Your Honor, before Mr. O'Malley proceeds I
have two minor transcript corrections.

7

8         THE COURT:  All right.  Which volume?

9         MR. SACHSE:  The most recent one, Volume 105, page 11891,
line 5.  The question reads:  "And for the full year, 1552

10   acre feet?"  It should read "And for the next year 115 acre

11   feet."  I have checked this with Mr. Bookman, who was on cross-

12   examination at the time.

13        THE COURT:  The correction will be made, if there is no

14   objection.

15        MR. SACHSE:  And the second one is at page 11903 on line
3, the word "light" should be "like."

16

17        That's all.

17        THE COURT:  The correction will be made.

18        MR. VEEDER:  I have a point here.  On page 11824, lines

19   11 and 12, relating to United States of America, Plaintiff's

20   Exhibit 217, Mr. Stahlman says, "These are taken from the

      records of the company."  I think what George said was, "These

21   are taken from the records of the court."

22        MR. STAHLMAN:  I said that, yes.

23        THE COURT:  What document were you referring to?

24        MR. VEEDER:  The resolutions adopted by the Vail Company.

25        MR. STAHLMAN:  That's correct.

1    THE COURT:  Change "company" to "court."

2    MR. VEEDER:  Your Honor asked me to direct your attention

3  to the parts of Mr. Vail's testimony that--

4    MR. STAHLMAN:  Pardon me for interrupting.  In connection

5  with that, may that go over until a later date, for this reason.

6  On our way back last evening we had a discussion in relation

7  to the parties who were up there at the ranch, et cetera, and

8  he says he thought he had some photographs up there and by

9  looking at those there is a possibility that he would know who

   it was that made the statement.

10   MR. VEEDER:  The time and place and parties present is an

11  essential part of the foundation for this kind of testimony,

12  to begin with.

13   MR. STAHLMAN:  I understand there are some photographs

14  and he thinks he probably dated them, and they have a picture

15  of the parties who were there, and I would like before we go

   into this--

16   THE COURT:  All right, put it over.

17   Come forward, Mr. Oviatt.

18   MR. O'MALLEY:  Take the stand, Mr. Oviatt, please.

19

20              JAMES OVIATT,

21  having been previously duly sworn, was on his oath examined

   and testified further as follows:

22

23              DIRECT EXAMINATION (Resumed)

24  BY MR. O'MALLEY:

25   Q  Mr. Oviatt, with reference to Oviatt AE for Identification

1  which has been marked for identification before, is that a

2  summary of the wells on Rancho Ramona?

      A  Yes.

4      Q  And does it also reflect a certain stream flow and

5  diversion data with respect to Rancho Ramona?

      A  It does.

6      Q  And the same is true with respect to Oviatt AF, except

7  that it relates to your Oak Grove property; is that correct?

8      A  That is correct.

9      Q  With respect to Oviatt AE, Mr. Oviatt, your Oak Grove

10  property or your Rancho Ramona property, will you state the

11  number of wells on Rancho Ramona and state whether or not those

12  wells were on the property when the property was purchased by

    you or if they were subsequently put in by you after your

13  purchase of the property?  And I am wondering when you do so

14  if you may locate the particular wells on the map of Rancho

15  Ramona, which is Oviatt W.

16      A  Well, this is Well No. 21, which was drilled last

17  year to replace the old well that was on the ranch when I

18  purchased it.

19      Q  And is that the well near the surface diversion--

20      A  It is.

21      Q  --in the area which has been marked as 7J; is that

22  right, sir?

23      A  7J, yes.

24      Q  Very well.

25      A  The next one is the well that was drilled in 1944.

1    THE COURT:  What is the number of it?

2    THE WITNESS:  That is our No. 1, in 7Q here.

3    MR. O'MALLEY:  Is that in 7Q?

4    THE WITNESS:  That would be this well.  That was 81 feet

5    deep, with a 12-inch casing, and it is now inactive for the

6    reason that the water got down and we got about six miner's

7    inches and it was not --

8    THE COURT:  Keep your voice up.

9    THE WITNESS:  I say, the water got down to about six

10   miner's inches and we had a 25-horsepower pump in there used

11   for overhead irrigation, so that we thought it was not worth

12   pumping for that quantity of water.

13   BY MR. O'MALLEY:

14   Q  Will you find out the next well, then, and state the

15   history of that well, Mr. Oviatt?

16   A  The next well we call No. 2, which is in 18B.  It is

17   located--

18   Q  Is that in the upper left-hand corner of 18B?

19   A  No.

20   Q  Excuse me.

21   A  It's right here.

22   Q  Approximately at the center of 18B at the top of the

23   line; is that right?

24   A  Yes.  That was 261 feet, with a 12-inch casing, and

25   there was not enough water at that time to pump it.

The next one is what we call No. 5.  That is in 7N.  It was what we call the Oil Test Well in the center of the valley.

Q   When was that--

A   In the spring of 1945.  That is 365 feet, with a 12-inch casing bullnosed at 107.  It used to pump a hundred-- well, we don't go into that.  It is inactive at the present time.

Q   Will you point out where that is on Exhibit W, Mr. Oviatt.

A   That is about--

THE COURT:  In 7P?

THE WITNESS:  7P; that's right.

THE COURT:  On map Exhibit Oviatt W.

MR. STAHLMAN:  Which well are you pointing to?

THE COURT:  What do you mean by "bullnosed"?

THE WITNESS:  Well, we put the casing in and bullnosed it so it wouldn't sand up.

THE COURT:  What do you mean by "bullnosed"?

THE WITNESS:  Well, it is a closed-in casing.

THE COURT:  From 107 feet down, then, it is closed off?

THE WITNESS:  The well driller told us there was not any water in the well.  He drilled it with a rotary rig, and evidently sealed it off with the mud he used in there, and we put a test pump on it, got a man from Riverside to come over and test pump it, and we had over 1300 gallons a minute, and the

1  water level was at 37 feet and the drawdown was to 46 feet,

2  and this man that came over used a compressor in there and

3  blew the sand out of the perforations and that let the water

4  in.

5      MR. STAHLMAN:  I think we are confused here.

6      MR. O'MALLEY:  Do you have an objection?

7      MR. STAHLMAN:  It is not an objection.  It is just to

8  clarify our thinking.

9      THE WITNESS:  It is in 7N.

10      MR. STAHLMAN:  You said 7P.

11      THE WITNESS:  It is in 7N.

12      MR. STAHLMAN:  No. 5.

13      THE WITNESS:  It is No. 5, yes.

14  BY MR. O'MALLEY:

15      Q   And is that the well in the lower right-hand corner

16  of 7N?

17      A   That is right.

18      Q   What is the next well on your list, and when was it

19  installed?

20      A   It was installed in 1946.  It is a jet pump.  It is

21  in 7Q.  That is on the north side of the stream, Wilson Creek

22      THE COURT:  It is still being used?

23      THE WITNESS:  Yes, sir.  That is 80 feet deep, with an

24  eight-inch casing exactly.

25      THE COURT:  Going back a minute to the Oil Test Well,

1   so-called, the chart Exhibit Oviatt AE indicates that it was

2   not pumped after 1956.

3        THE WITNESS:  That is correct.

4        THE COURT:  Did it run out of water?

5        THE WITNESS: Yes, sir.

6        THE COURT:  Or was the water just not worth pumping?

7   Which?

8        THE WITNESS:  Well, it got down, we had a 25-horsepower

9   pump in there, and we got down to about six or eight miner's

10  inches, so we didn't use it any more because it was not

11  practical to use it any more.  We pumped 150 miner's inches

12  out of it up to about 1949, and then it dropped down to 100

13  inches in 1950, and then a hundred--

14       THE COURT:  Well, the chart shows that.

15       THE WITNESS:  O.K.

16       MR. O'MALLEY:  Very well.

17       Q   Now, the next well?

18       A   The next well, we drilled another dry hole in 7Q, 75

19  west of the jet.  We got no water.

20       MR. STAHLMAN:  Wait a minute.

21       THE WITNESS:  It was drilled in 1946.

22       MR. STAHLMAN:  You said 7Q?

23       THE WITNESS:  In 7Q, adjoining the jet.

24       MR. STAHLMAN:  Is this 6 on your Exhibit F the well we

25  are talking about?

THE WITNESS:  We have two in 7Q.

THE COURT:  It has no number on it.

THE WITNESS:  That was a dry hole, so we filled it up at 110 feet.

The next we call No. 6, a hundred yards west of the owner's house.  That was drilled in 1948, 130 feet deep, 14-inch casing.  The same as I stated before, we had a 25-horse-power motor and it was not worthwhile pumping six miner's inches.

Then No. 7 is in 12K in the lower alfalfa field.  That was drilled in 1949, that was 67 feet, with a 14-inch casing, and the same with that.  We stopped pumping because it was not feasible to pump it.

The next is No. 12 i  7Q in the canyon above the residence.  It was drilled in 1950 to 70 feet and it was a dry hole, so we stopped and filled it up.

The next is in 7M on the north just below Reservoir No. 3. It was drilled in 1950 to 260 feet.  That turned out to be a dry hole and we filled it up.

No. 13 is in 7Q  It is marked "Buddha Corral."  That was drilled in 1950 to 130 feet, with an eight-inch casing, and that is active.

The next is in 7N, 600 feet below the Oil Test Well.  It was drilled in 1950 to 150 feet.  A dry hole.

The next is 7P, No. 15, near the pear tree.  It was

drilled in 1954, drilled it to 150 feet, 12-inch casing, and that is inactive for the same reasons I have stated.

BY MR. O'MALLEY:

Q   Could you point out where that is near the pear tree?

A   Yes.

Q   In what section?

A   That is here-- 15.   It is right near that box in 7P.

The next would be No. 16 by the turkey pens.   It was drilled in 1956 to 186 feet, with a 12-inch casing, and that is inactive.

Q   Can you locate that on this section of the map?   In the right-hand corner of 12-R, approximately?

A   No, in the center.

Q   The right center of 12-R?

A   Right center.

The next was No. 20, in 18C, near the No. 2 Reservoir. It was drilled in 1957 to 566 feet, with a 12-inch casing, and that is active.

No. 21, I think, we have called that one, haven't we?

Q   I am not sure.

A   Well, No. 21 is 7J.   That is by the intake, drilled in 1959, to a depth of 450 feet, with an eight-inch casing, and that is active.

Q   Is that the well that replaced the older well that you testified to earlier?

1       A   Yes, that is the well I testified to that replaced

2   the old well.

3       THE COURT:   We have one other column on this chart AE,

4   and you show tributary to Wilson Creek.   I take it this is

5   Cottonwood?   Or what do you call it?

6       THE WITNESS:   On Rancho Ramona?

7       THE COURT:   Yes.

8       THE WITNESS:   Wilson Creek.

9       MR. O'MALLEY:   It is also called Lancaster, Cottonwood

10  or Wilson Creek.

11      THE COURT:   You have a series of miner's inches.   Is

12  this an estimate of miner's inches taken then from the surface

13  of the stream?

14      THE WITNESS:   From Wilson Creek.

15      THE COURT:   Yes.

16      THE WITNESS:   Yes, sir.   I have a record of all those.

17  It was put in evidence.

18      THE COURT:   So that I understand this, when you listed the

19  wells you listed the number of inches they could pump, and I

20  take it that was a sustained pumping over a period of time to

21  produce that much water; is that right?

22      THE WITNESS:   Well, when the well was drilled the well

23  driller gives the number of miner's inches it would produce in

24  order to put the proper size of pump in.

25      THE COURT:   So that is the figure you used?

THE WITNESS:  That is the figure we used at that time, and then as the water level dropped we quit pumping.

THE COURT:  How did you arrive at the figure of miner's inches?  For instance, in 1944 you show 87 miner's inches taken from Wilson Creek.  Would that be the most that you ever took in any one day-- 87 inches?

THE WITNESS:  Well, we took that from Mr. Green's measurement that we are going to put in as evidence.

THE COURT:  What I am trying to get at is, is it an average figure or the maximum figure or--

THE WITNESS:  Well, I would say it was an average.  To my knowledge, it would be an average figure.

THE COURT:  You mean on the average 365 days of the year the amount of water you took from the creek averaged 87 miner's inches a day?

THE WITNESS:  Yes,sir.

MR. O'MALLEY:  For that year.

MR. STAHLMAN:  I would like to ask him some questions.

MR. SACHSE:  So would I.  And your Honor has opened up something that might make this whole thing objectionable.  I have understood, from the caption of this exhibit, that this is annual extractions.  Well, this isn't extractions, if I understood what he said.

MR. O'MALLEY:  I am going to go through this in detail.

MR. SACHSE:  This is capacity, not extractions, and it

1    is a very different kettle of fish.

2        MR. STAHLMAN:  I have a query the same as your Honor on

3    this situation.  May I ask one question?

4        The Green figures that you referred to, are those the

5    figures you have been asking us to check over?

6        THE WITNESS:  Yes.

7        MR. STAHLMAN:  Your Honor, those are periodic figures.

8    They are dated on dates over periods of time.  You couldn't

9    get an average out of them.

10       MR. O'MALLEY:  I will attempt to lay the foundation with

11   respect to those figures when I get into this, your Honor please,

12   unless your Honor wishes to ask more questions with respect to

13   this particular subject matter.

14       MR. STAHLMAN:  I am also informed that they are not even

15   periodic.  They were at random.

16       THE COURT:  Go ahead.

17   BY MR. O'MALLEY:

18       Q  Now, Mr. Oviatt, you have testified with respect to the

19   well production data on Rancho Ramona, and does Oviatt AF

20   reflect the well history of the property which you know as the

21   Oak Grove property?

22       A  It does.

23       Q  This may be somewhat cumbersome to work with, but

24   beginning--

25       MR. STAHLMAN:  I am just wondering if I may make a

1    suggestion, counsel.  If you would put that on the board here.

2        MR. O'MALLEY:  I certainly think that might be helpful.

3        THE COURT:  All right.

4        MR. O'MALLEY:  If we can have some thumb tacks and the

5    witness could step up to it.  I will stand back here, Mr.

6    Oviatt, and if you would stand back approximately in the

7    position that Mr. Stahlman is in, and if you could point out,

8    and keep your voice up.

9        THE WITNESS:  I can see all right.  Go ahead.  I will

10   come down, if necessary.

11       MR. O'MALLEY:  Why don't you step over to this side,

12   then.

13       THE WITNESS:  I have to get close enough to see it.

14       THE COURT:  Stand where you want, Mr. Oviatt.

15   BY MR.O'MALLEY:

16       Q  Will you point out the first well you have listed on

17   AF, Mr. Oviatt, and state the history of that well and point

18   out where it is located on Oviatt X?

19       A  Let's see, this is what we want here.  That is a dry

20   hole there.  What we call No. 3 was a windmill we put down in

21   1946.  It was 96 feet deep, 12-inch casing, and it is a dry

22   hole at the present time.

23       THE COURT:  What is the symbol here 9P?

24       THE WITNESS:  9P isn't on this.  Yes, it is.  That is

25   the location on this map.  The No.3 is a windmill located in

Section 9 South, 2 East.

THE COURT: And designated as 9P in that area on the map Exhibit X.   Go ahead.

THE WITNESS:  The next is No. 4, a windmill, designated 22J above the air strip, drilled in 1946 to 153 feet, 12-inch casing, active.

Do you want me to list all this series of dry holes?

The next is a dry hole in 9 South, 2 East, 16N.

THE COURT:  Go ahead.  It is a dry hole.  The chart shows how deep and when it was drilled.

THE WITNESS:  O.K.

THE COURT:  16P just to the right of it on the map.

THE WITNESS:  It was drilled in 1948.  It was a dry hole.  Where is 16P again?  9 South, 2 East, 16P.

THE COURT:  There are two red dots on there, both marked 16P.

THE WITNESS:  That is correct.  It was drilled in 1948. It was a dry hole.

The next is 9 South, Range 2 East, 21D, drilled in 1948. It was a dry hole.

The next one here is 9 South, 2 East, 16F in the center of the valley, drilled in 1950 to 480 feet, with a 12-inch casing, and it is active.  There it is.

The next is 9 South, 2 East, 16P, 100 feet east of the Bailey house, drilled in 1950 to 196 feet.  It is a dry hole.

1   THE COURT:  That would be one of these dots around the

2 area of 16P.

3   THE WITNESS: Yes, probably that one.

4   The next one is No. 9, a windmill halfway from Highway

5 79 to the cowboy's house.  It was drilled in 1950, 145 feet

6 deep, eight-inch casing, active.

7   The next is No. 10, the windmill in the canyon, 1950, 65

8 feet, eight-inch, active, 15R.  No, it's a dry hold.

9   THE COURT:  Well, there are two; there is 15R1 and 15R2.

10 So it must be in the same area.  The reference is the same.

11   This R signifies a certain location in the section, does

12 it not?

13   MR. O'MALLEY:  That is correct.

14   THE COURT:  So that the active windmill and the dry hole

15 are near together there.

16   THE WITNESS:  The next one is a windmill in 8 South, 2

17 East.

18   THE COURT:  No, 9 South, 2 East, 16N.

19   THE WITNESS:  Didn't we call that one?

20   THE COURT:  16N over here.

21   THE WITNESS:  16N.  That is a dry hole, drilled in 1950.

22   The next is the windmill up in Culp Valley in 8 South,

23 2 East.

24   THE COURT:  33C1 and also C2.

25   THE WITNESS:  That is inactive.

1          The next one to it is C2, a dry hole.

2          MR. STAHLMAN:  Is that on Government land?

3          THE WITNESS:  I thought it was on our land.  I think it

4  is over here.

5  BY MR. O'MALLEY:

6          Q  Pointing to the enclosed area which is marked P.

7          A  Culp Valley.

8          Q  Yes.

9          A  It is right near this road.  I guess somebody put

10  that on there wrong.

11          Q  Do you want me to make a correction on that exhibit?

12          A  No, I don't think it makes any difference.

13          MR. VEEDER:  I really think it does make a difference.

14  BY MR. O'MALLEY:

15          Q  If the map is not correct in the present form, could

16  you spot its approximate location?

17          A  It is right below this road.

18          THE COURT:  This series of lettering crosswise, A, B, C--

19  I have that in the front of my notebook-- Who assigned this

20  number to it?

21          THE WITNESS:  I think my secretary did.

22          THE COURT:  No, it's the other way around-- A, B, C, D.

23  You say your secretary did?

24          THE WITNESS:  Max, did you?

25          THE COURT:  This is A, B, C, D.  It is marked in here as

11952

1      within C.

2          THE WITNESS:  Culp Valley is marked 8 South, Range 2 East,

3      33C2.

4          THE COURT:  If it is properly located, it is properly

5      marked C-1 and C-2.  But if it is over here, it should be B.

6          THE WITNESS:  It is just below this road in here, but it

7      is on our property.

8          MR. ILLINGWORTH:  Those were designated in our report,

9      so I probably did that myself, your Honor.

10         MR. O'MALLEY:  Very well.  The record should show that

11     the Court has noted the correction.

12         THE COURT:  I put a circle around the two wells in

13     Section 33, and they are marked C-1 and C-2 with an arrow and

14     shown that they belong in the area that would be called B

15     and if properly numbered they would be 33B1 and 33B2.  Leave

16     them with the arrow there.

17         MR. O'MALLEY:  Very well.

18         Q   What is the next location?

19         A   The next location is in 21E, it is 9 South, 2 East,

20     21E, near Palomar Mountain, near Highway 79, drilled in 1950

21     to 140 feet, eight-inch, inactive.

22         THE COURT:  Why is it called Palomar Mountain?

23         THE WITNESS:  Palomar Mountain--

24         THE COURT:  I suppose it is nearest the Palomar Mountain.

25         THE WITNESS:  Yes, it is the furthest one away from the

Highway 79. We just did that for location on here.

The next is 9 South, 2 East, 10K near the cattlemen's house. It was drilled in 1956, a dry hole. It's near the cowboys' house. That was a dry hole.

The next is in 9 South, 2 East, 10L near the cowboys' house.

THE COURT: It's a windmill.

THE WITNESS: It is a windmill, drilled in 1957, to 226 feet, with an 8-inch casing. It is active.

The next is 9 South, 2 East, 16N, drilled in 1957, 163 feet, 8-inch casing. That is active.

Then the other two are the windmills that were on the property when I purchased it, and they are located in 9 South, 2 East, 8Q designation. They join one another. They were drilled in 1880.

THE COURT: I will write 8Q on here.

THE WITNESS: That is correct.

BY MR. O'MALLEY:

Q Is that the last of the well locations on Exhibit X, Mr. Oviatt?

A Yes.

Q While we are up here, can you also point out the spring locations? There are a number of spring locations upon Oviatt X that you have utilized since your ownership of the property?

1      A There are between twenty and thirty.

2      Q  Can you point them out generally on the property and

3  state what they are used for?

4      A  Well, they are used for watering cattle that roam over

5  the large range there.

6      THE COURT:  They are listed on the map which is up here

7  in Section 34-- Sheep Spring up here, Chalma Spring in Section

8  26, is that right?

9      THE WITNESS:  I think we have them all lined out.

10      Max, could we have your map for just a second?

11      Do you want me to line them all out?

12      MR. O'MALLEY:  Can you point to them?

13      THE WITNESS:  I pointed them all out on your map this

14  morning.  Could you bring that up?

15      MR. BOOKMAN:  Do you want the other exhibit?

16      THE WITNESS:  No, this map.  It will only take a second.

17  You did this for me.  Would you mind marking them?

18      MR. O'MALLEY:  I think, if it is permissible with your

19  Honor--

20      THE WITNESS:  All he is going to do is located them.

21      MR. O'MALLEY:  May we circle the springs on this exhibit

22  to which he has just testified?

23      THE COURT:  Do we have a green pencil?

24      MR. STAHLMAN:  Here is a green pen, your Honor.

25      THE WITNESS:  They are all named right here on the map,

if you want to circle them.

THE COURT:  Can that be done at the recess?

MR. O'MALLEY:  Very well, if it is agreeable.

THE COURT:  They are all named on Exhibit X, and Mr. Bookman will just circle them so that we can check them out a little easier.  Is that agreeable?

MR. O'MALLEY:  Very well.

MR. VEEDER:  Yes, your Honor.

BY MR. O'MALLEY:

Q  Now, Mr. Oviatt, do you have an exact knowledge of the amount of water which was produced on your separate properties since your ownership of those properties?

A  I don't understand the question.

Q  You do have some knowledge of the amount of water which was produced on your property since your ownership of the properties, do you not?

A  You mean what we used?

Q  Yes.

A  Well, we used the amount of water that we needed to water the acreage  hat I have testified to.

Q  That you testified to under direct examination on yesterday's date; is that right?

A  That is correct.

Q  On Exhibits AF and I believe Mr. Veeder has AE, there is some data showing the production or showing a figure of

11956

1   miner's inches both from wells and from the Wilson Creek

2   diversion point.  Now, with respect to the wells in the course

3   of water development work on the ranch, was well production

4   data reported to you by the well drillers?

5       A  Yes.

6       Q  And is that one of the sources of information with

7   respect to well productions which is reflected on Exhibits AE

8   and AF for Identification, Mr. Oviatt?

9       A  Yes.

10      Q  Now, in addition have you made some actual water

11  measurements yourself in miner's inches?

12      A  I have.

13      Q  Will you state how you did it, Mr. Oviatt?

14      A  We did it mostly with the smaller wells with buckets

15  with a stop watch-- five, ten and twenty-gallon containers.

16      Q  And have you made some stream measurements yourself,

17  Mr. Oviatt?

18      A  Yes.

19      Q  And how was that done?

20      A  We ran the water, all the water that we diverted from

21  Wilson Creek into the Reservoir No. 2, and from there we ran

22  it down to the large box at the booster pump, and when the

23  water engineer that put the overhead system in in 1945-- we

24  had a large box there about eight feet high, about six feet

25  sqare, and sort of on one side of it it is about 24 inches

1   wide where it overflows from that box into a pipe, it has a

2   large 16-inch concrete pipe, and from there it goes on down

3   to flood irrigate, and he made a gadget that we put on the

4   side of the overflow and marked it 50 miner's inches, 100

5   miner's inches and 150, so that when it came up to that level

6   in the overflow we could estimate approximately what the miner's

7   inches registered.

8       THE COURT:  Any head above it?

9       THE WITNESS:  No.

10      THE COURT:  Just flowed over?

11      THE WITNESS:  Just flows over.  And the water came in at

12   the top to fill up the box, and then it just flowed over the

13   top of the box into this pipe to go down to the flood

14   irrigation system.

15      THE COURT:  Did you store it in the reservoir first?

16      THE WITNESS:  No, we filled the reservoir and the box

17   in the reservoir overflowed into the pipe line that ran from

18   the reservoir to this box near the booster pump, and we gauged

19   when we pumped the booster pump where it was pumping 150

20   miner's inches-- the reason he did this was because we couldn't

21   measure that with our 20-gallon bucket, so he made this

22   device to go on the side of it-- and when we pumped water in

23   this well adjoining the booster pump that would likewise over-

24   flow and go in here and we could tell approximately what the

25   well was producing.

MR. SACHSE:  May I go back for a minute to this reservoir measurement, because this measurement by the reservoir, unless I completely misunderstood Mr. Oviatt, he is measuring how fast the water goes out of the reservoir, not how fast it goes into the reservoir.

THE COURT:  No.  I thought so, too.  But he said they filled the reservoir up, and then as they pumped it was overflow from the reservoir after they filled it, then it was taken in another pipe down to this other box where again it was the overflow that was measured.

MR. O'MALLEY:  That's correct.

MR. STAHLMAN:  Does your Honor think it would be advisable if we saw this system up there before we conclude our examination of this witness?

THE COURT:  Are the marks still on this box?

THE WITNESS:  No, we haven't measured it that way for five or six years, I guess.

THE COURT:  I say, are the marks still on the box?

THE WITNESS:  No, it was a device that he put on and that had marks on this device that we had sort of an aluminum piece of metal--

THE COURT:  What is the method of measuring miner's inches by a Weir? Are any of you gentlemen familiar with it?

MR. STAHLMAN:  Col. Bowen is.

MR. ILLINGWORTH:  Normally we don't measure directly

miner's inches.   This is an old device that the miners used.
The miner's inch box was a one-inch square opening under a
head of four inches, depending on what part of the State you
were in, or six inches-- it varied throughout the West.   But
since it varied with the head, it is actually an inaccurate
method of determining water flow.   So we always measured in
gallons per minute or cubic feet per second, and oftentimes
convert it back to miner's inches because that is a familiar
term.   But a weir is a good way of measuring water, measuring
the head on the weir and various other methods.

THE COURT:  Without a head just as the water flows over?

MR. ILLINGWORTH:  Yes.  Or you measure the depth of the
water that goes over the weir.

MR. VEEDER:  You are speaking of a cippolleti weir?

MR. ILLINGWORTH:  That is a special type of weir.  Most
of the time we use a rectangular weir.  A cippolleti weir has
only sloping sides.

THE COURT:  I can remember as a boy watching my dad
measuring water with a weir.  There would be a flat piece on the
bottom.  As I recall, it was 12 inches across.  Then they
would have a paddle they would put down on the opening until
they would get a head, I suppose, of three, four to six inches.

MR. ILLINGWORTH:  Yes.

THE COURT:  That must have been the head.

MR. ILLINGWORTH:  In some places it was four inches.

1    THE COURT:  Then when they finally got the water flowing

2  at a rate so that that head would stay static, that amount

3  of pressure at the head, then the measurement of the distance

4  between the lip and the paddle enabled you to get your miner's

5  inches.

6    MR. ILLINGWORTH:  That is a reasonably good way of measur-

7  ing a small quantity of water.  But if you had 150 gallons a

8  minute or something, you would have to have a large number of

9  those boxes, and it is not accurate when you get into larger

10  boxes.

11    THE COURT:  You can measure by flow over a weir.

12    MR. ILLINGWORTH:  Yes.

13    THE COURT:  Even flow over a weir.

14    MR. ILLINGWORTH:  Yes.  It is usually a sharp-crested

15  metal weir to get standard results, and you simply measure the

16  head, provided you get back far enough from the edge of the

17  flow so that it doesn't start to draw down, and you get a true

18  measurement of the head on the weir and then you can look it

19  up in the table.

20    MR. VEEDER:  But you have to have a conversion table.

21    MR. ILLINGWORTH:  This is for an accurate method.

22    MR. VEEDER:  Your Honor, we are coming down here not to

23  argue with Mr. Illingworth.  But here is my concern about these

24  figures.  I don't care what type of weir you have.  There are

25  a great number of factors that go into an accurate measurement,

1    and we must have a method of conversion, you must have a con-

2    version table that will take into consideration the elements

3    that are involved before you can apply them.

4        THE COURT:  Some of these figures were obtained by this

5    man Green.  There is no doubt about his competence, is there?

6        THE WITNESS:  That is checked with Mr. Green's measurements.

7        MR. VEEDER:  Then Mr. Green should be the one to testify,

8    I think.

9        MR. SACHSE:  There is going to be some cross-examination

10   on that question.

11       MR. O'MALLEY:  Let me proceed and let's see what addi-

12   tional foundation we can lay.  I was not through with my exam-

13   ination.

14       Q  You have testified with respect to the manner in

15   which you made those particular measurements.  Or do you wish to

16   add anything to that testimony, Mr. Oviatt?

17       A  The only thing I could add is that when that water

18   ran through an opening like that it had a space about that

19   wide that it ran through, this pipe was a half-round pipe like

20   that and it flowed over the top of this, and when it would

21   rise to a certain height we also had a steel ruler we could

22   put in the center of it and we could tell it.  We had this on

23   the side and we just used that gadget on the side and when it

24   got up to there it registered so many miner's inches going

25   over here.

1    Q   Was it calibrated by the engineer?

2    A   Yes, it was.

3    THE COURT:   You are talking so far about the measurements

4    you made on the diversions from Wilson Creek at Ramona Ranch,

5    aren't you?

6    THE WITNESS:   That is right.   And all the other measure-

7    ments were taken running the water into a five-gallon bucket

8    or a ten-gallon bucket or a 20-gallon drum or a 40-gallon

9    drum, as the case may be.   And we did that with the stock water--

10   so many gallons a second.

11   BY MR. O'MALLEY:

12   Q   In the course of water development work on the ranch,

13   have you observed water measurements in miner's inches as made

14   and reported to you by well drillers?

15   A   I have many of them.

16   Q   In that connection have you gained some proficiency

17   in estimating the rate of flow in miner's inches by visual

18   observation?

19   A   Yes, I think I am capable of registering it pretty

20   close.

21   Q   Now, the figures that are reflected in terms of

22   miner's inches on both AE and AF for Identification, were those

23   figures compiled by the several methods of-- were those figures

24   of miner's inches estimated by you by the several methods which

25   have been the subject of your testimony?

A   They have.

MR. SACHSE:   Exactly which figures in that column were you pointing to, Mr. O'Malley?

MR. O'MALLEY:   I am referring to the columns of figures of extractions specifically on AE, the second page, counsel, and on AF, which are at the bottom of the exhibit just under the location of the several wells.

MR. SACHSE:   Thank you.

BY MR. O'MALLEY:

Q   Now, in addition, Mr. Oviatt, certain data was also reported to you by Mr. F. E. Green; is that correct?

A   That is correct.   Do you mean Finkle?

MR. SACHSE:   I can't hear.

BY MR. O'MALLEY:

Q   Did Mr. F. E. Green, the engineer, also report certain diversion data to you respecting Wilson Creek?

A   Yes, he mailed us a copy--

Q   He did?

A   He did, yes.

Q   With respect to the irrigation system of Rancho Ramona which you described in your testimony on yesterday's date and which has also been described by Mr. Bookman, do you know the cost of that irrigation system?

MR. SACHSE:   That is objected to on the grounds of immateriality, your Honor.

1    THE COURT:   What is the materiality?

2    MR. O'MALLEY:   I just want to describe the irrigation

works generally.   He can state it in round figures.

4    MR. SACHSE:   We have fought this out with the United

States and your Honor has already ruled that whether the United

States has a few hundred million dollars invested at Camp

Pendleton or ten dollars is of no materiality.   If it is not

material as to the United States, I don't think it is material

as to anyone else.

10   MR. STAHLMAN:   With all these dry holes, I think he is

the answer to the well driller's prayer, whatever that cost.

12   THE COURT:   The objection is sustained.   You don't

increase your rights by the expenditures you make.

14   MR. O'MALLEY:   Very well.

15   THE COURT:   Take the morning recess.

16   (Recess.)

17   MR. O'MALLEY:   Will you resume the stand, Mr. Oviatt.

18   Q   Mr. Oviatt, when you purchased the Oak Grove property

were there any unpaid taxes on that property?

20   A   No.

21   MR. SACHSE:   Objected to as being immaterial, your Honor.

22   MR. O'MALLEY:   This is pertinent, your Honor please, to

the subject of prescription.   I think we do have to make a very

brief showing with respect to the tax situation.   It will be

very short.   It is material in that respect.

1    MR. SACHSE:  If it's for that purpose, I have no objec-
2    tion, your Honor.

3        THE COURT: Overruled.

4        MR. O'MALLEY:  Do you have the question in mind, Mr.
5    Oviatt?  I will repeat it, Mr. Oviatt.

6        Q  When you purchased Oak Grove property, were there any
7    unpaid taxes on the ranch?

8        A  No.

9        Q  And have you paid all the taxes on the ranch which
10   were assessed against it since your ownership of the property?

11       A  Yes.

12       Q  And were the water rights assessed separately in any
13   way from the other valuation which was placed upon the property?

14       A  No.

15       Q  With respect to the Rancho Ramona were there any
16   unpaid taxes on the property when you purchased that property?

17       A  No.

18       Q  And have you paid all the taxes on your property since
19   your ownership of the property with respect to the Rancho
20   Ramona?

21       A  Yes.

22       Q  Have the water rights been assessed separately from
23   the other valuation placed upon theproperty?

24       A  No.

25       Q  There has been testimony here by you with respect to

1   the acquisition of the Oak Grove property, which was known

2   as the Bailey Ranch.  When did you first observe the irriga-

3   tion of this property?

4       A  In 1944.

5       Q  Have you been familiar with the irrigation of the

6   property since its ownership by you?

7       A  Yes.

8       Q  How is it irrigated, Mr. Oviatt?

9       A  There was a diversion from Temecula Creek, from a

10   little dam in Temecula Creek.

11       THE COURT:  Are you talking about Oak Grove or Ramona?

12       MR. O'MALLEY:  Oak Grove, your Honor.

13       I think it might be helpful, since these diversion

14   facilities are set forth on Exhibit Z, if the witness could

15   testify with respect to this exhibit.

16       Q  Mr. Oviatt, can you point out on the map which is

17   Exhibit Z where the head gate of the ditch is located which

18   irrigates the Bailey Ranch from the Oak Grove property?

19       A  It is taken out of Temecula Creek on the Wentworth

20   property, crosses the old Brinkerhoff property onto about 14

21   acres and runs into a reservoir for watering this land right

22   in here.

23       Q  And by this land, are you referring to the 14-acre

24   piece which you have testified to?

25       A  Just below the bridge on Highway 79.

Q   And what crops were grown on that property?

A   Alfalfa, corn, permanent pasture and grain.

Q   How much of the water of the stream was diverted by the use of that head gate?

A   We ran approximately 20 miner's inches out of the Temecula Creek into a small reservoir and back into Chihuahua Creek, which ran back into Temecula, and we use the reservoir for watering anywhere from 500 to 800 head of cattle, as the cattle were in the meadow.  Lots of times we couldn't get any water out of the windmill.  That was one of the reasons why we put in the reservoir.  The other was so that we could get a bigger head to run it through the property.

Q   How much of the water of the stream did that consist of that was diverted at that head gate?

A   In the summertime most of the time it took all of the stream, except in flood or rainy season.

Q   Has that practice continued since your ownership of the ranch?

A   It has.

Q   Has that property you have just described been under irrigation continuously since your ownership of the property?

A   Yes.

Q   In addition, have you diverted water from Kohler and Rattlesnake Canyons?  First, point out the Kohler Canyon diversion.

A  Kohler Canyon is in this location.

Q  In Kohler Canyon?

A  In Kohler Canyon, and run approximately two miles down to the Oak Grove reservoir.

Q  Then that water runs into the reservoir.  And is any other water added to the reservoir?

A  Yes, the water from this well is pumped into the reservoir to mix with the Kohler Canyon water, and we take that water out for irrigation purposes with a booster pump.

Q  Is there any domestic use made of that water?

A  And it is used for watering cattle and horses and the assistant foreman's house.

Q  On the ranch?

A  And truck gardening.

Q  Then, Mr. Oviatt, with respect to the Rattlesnake Canyon diversion, can you identify that on the map?

A  It is up on the sidehill of the place near Rattlesnake Canyon, and that runs down to the old Bailey house, with a small pipe.  I have forgotten the size of it.  But it is dry at the present time.

Q  There has been some testimony on yesterday's date with respect to the Oviatt-Cummings diversion.  Can you point that out to the Court?

A  Well, that is taken out of Temecula Creek here at this point, and there is a box in the Temecula Creek, a cement box,

11969

with a wood cover, and it goes on around the mountain here down

this way to this Cummings property, and then it is used for

domestic use on the Cummings property-- this is leased land--

and runs from there under the road over to the Oak Grove

property and it is used for domestic use and gardening.

    Q   Can you state the history of that Oviatt-Cummings

diversion, Mr. Oviatt?

    A   It was homesteaded by the father of Mrs. Cummings and

Mrs. Homer and we have it under long-term lease under an option

to purchase, and they have the water there.

    THE COURT:   What do you have under an option to purchase?

    THE WITNESS:   We lease it on a 15-year lease.

    THE COURT:   What do you lease?

    THE WITNESS:   We lease 40 acres here.

    THE COURT:   Shown as the Cummings lease?

    THE WITNESS:   That is right.

    MR. O'MALLEY:   Mr. Oviatt, I think you have explained

those three diversion points, unless there are some questions

that the Court has.

    THE COURT:   What do you call the Snavely lease?

    THE WITNESS:   That is the Herd lease, and the Snavely

lease is this.

    THE COURT:   Belongs to Snavely?

    THE WITNESS:   Belongs to Snavely, and we have it on lease.

    THE COURT:   You have it on a long-term lease?

THE WITNESS:   That is right.

THE COURT:   Do you have any right of way across the Snavely property or across for the Kohler Canyon diversion?

THE WITNESS:   Yes, we have a right of way from the Forest Reservation-- it was taken out in 1913 or '14-- and across this property.

THE COURT:   Did Snavely's property in 1913 or '14 belong to the Federal Government?

THE WITNESS:   I wouldn't know that.   He has only owned it since 1933.   He just recently sold it.   The patents were issued in 1914.

THE COURT:   What about the diversion called the Oviatt-Cummings diversion?   Do you have a right of way across the Cummings lease to put that in?

THE WITNESS:   Yes.

THE COURT:   Is it written?

THE WITNESS:   No, it is oral.   We just use the water that went to their house.   They come out and live in the house and use it for domestic use on weekends.

THE COURT:   When you go down to the Temecula diversion, the one downstream, whose property does this ditch run across?

THE WITNESS:   It is taken out of the old Wentworth, and then it runs to the Brinkerhoff property, and they use it for irrigation, and then we take it from there into this reservoir and we use it to water this piece here.

1    THE COURT:  Has anybody checked to see whether the

2  Winthrops or Brinkerhoffs have filed an answer in here or set

3  up any interest inthis problem?

4    MR. SACHSE:  Winthrop is represented by Mr. Swing.  I am

5  watching it for him.

6    THE COURT:  Who represents Snavely and Cummings?

7    THE WITNESS:  Snavely sold his property, but we still

8  have it under lease.

9    THE COURT:  This is Cummonis.

10    THE WITNESS:  Cummings is the name.  It's spelled wrong

11  there.

12  BY MR. O'MALLEY:

13    Q  While we are here with this map, would you point out

14  all of the locations on your Oak Grove property which have

15  been the subject of irrigation by you?

16    THE COURT:  You have covered this on a map where you

17  could describe it by parcels.  That was Ramona, wasn't it?

18    MR.O'MALLEY:  That was Ramona.  I am not sure whether we

19  have covered this ground with respect to Oak Grove.

20    THE WITNESS:  We went through the list.

21    THE COURT:  Let's cover it by section numbers, then.

22    THE WITNESS:  I think we can cover it better on this

23  map.

24    MR.O'MALLEY:  Very well, if you would rather use Exhibit

25  X.

1       THE WITNESS:  I can read this better.

2       Here is the reservoir that takes the water from Kohler

3  Canyon.  Then we have an underground pipe line going over to

4  this active well-- that is the active well-- it goes over to

5  this active well, and that well pumps back into the reservoir.

6  We water this, and we have a booster pump right there on the

7  side of that hill.  The water comes out of the reservoir

8  through the booster pump and waters about ten acres here,

9  40 acres in this 76P district, and then we have another well--

10  What is that legend?  That's a live well, isn't it-- Yes,

11  right there in that corner we have another pump.  That was

12  that deep well 450 feet deep.  We got it cased down to about

13  150 feet, and we have no electricity for that, so we pumped

14  it with a Leroy engine with butane and watered 20 acres on

15  the top of this field right here.

16       THE COURT:  That is 10, 40 and 20, which makes 70.

17       THE WITNESS: Well, 10 more over here, your Honor.

18       THE COURT:  Where?

19       MR. O'MALLEY:  On the Bailey Ranch.

20       THE WITNESS:  Right here.

21       THE COURT:  I suggest now, with the help of Mr. Bookman,

22  that you take colored pencils and during the noon hour mark

23  off these areas in different colors where they are watered.

24  Because there is no record here when the witness says take the

25  water here and take it there.  Just mark them off.

1    MR. O'MALLEY:  We can do it during the lunch hour, your

2 Honor.

3    THE COURT:  I would suggest that you use different colors

4 for these ten acres at the bottom and the two other pieces

5 here.

6    MR. VEEDER: Is your Honor going to write in "irrigated

7 acres"?

8    THE COURT:  Carry off with lines to the side at the

9 bottom of the map and put the acreage in with arrows pointing

10 up.

11 BY MR. O'MALLEY:

12    Q  Mr. Oviatt, there was some testimony on yesterday's

13 date with respect to a purported agreement between you and

14 Mr. Barbee at some stage or other with respect to sharing the

15 water of the Oviatt diversion on Temecula Creek.  Did you have

16 such an agreement, oral, written or otherwise, with Mr. Barbee?

17    A  Well, when Mr. Swing filed that suit called the

18 Oviatt-Barbee or Barbee-Oviatt suit, in order to avert a law-

19 suit on it I said theproperty--

20    Q  Did you have a conversation with Mr. Barbee?

21    A  I did.

22    Q  Did you make an offer of an agreement with him with

23 respect to--

24    MR. VEEDER:  I object to this; there is no proper founda-

25 tion for these conversations.

MR. STAHLMAN:  Objected to as calling for a conclusion on the part of the witness.

BY MR. O'MALLEY:

Q  Did you have a conversation with Mr. Barbee about a proposed form of agreement?

A  I did.

Q  Where did the conversation take place?

A  It took place over at my house one time, and over at his house two or three times.

Q  In other words, there were two or three separate conversations on the subject; is that right?

A  That is right.

Q  Will you state the conversation briefly, what you said and what he said, with respect to the subject matter?

A  I offered to settle this--

MR. VEEDER:  I object; there is no proper foundation for this.  We are entitled to have the dates, we are entitled to have who was present.

THE COURT:  There is law to the effect that you can get that on cross-examination.  But go ahead.

MR. O'MALLEY:  I will be glad to lay what additional foundation I can, your Honor.

Q  What is the best date you can now give us, Mr. Oviatt, for this conversation?

A  Well, it was within I would say a month to two months

1  after the suit was filed in 1949.  I don't remember what month

2  it was.

3      Q  In these conversations was anybody present other than

4  you and Mr. Barbee?

5      A  Yes, one of my nephews was present.

6      Q  Will you state his name, sir?

7      A  Louis Oviatt.

8      Q  Was anybody else other than your nephew Louis present?

9      A  Just Mr. Barbee and his wife at one time.

10     THE COURT:  Who represents Barbee here?

11     MR. O'MALLEY:  Barbee is deceased, your Honor, but on

12  yesterday's date I believe it was your Honor made inquiry, I

13  believe of Mr. Bookman, with respect to a purported agreement.

14     THE COURT:  I know, but who represents the Barbee

15  property now?

16     THE WITNESS: It is sold.

17     MR. VEEDER:  Mr. Swing originally filed the answer in

18  this case on behalf of Barbee.

19     MR. SACHSE:  I have no direct connection with it.  Phil

20  has asked me to watch it, because frankly he doesn't know his

21  own status-- it is one of these estates that has been divided

22  up.  But since I have other clients who are interested anyway,

23  I am watching the testimony.

24     THE COURT:  All right.

25

BY MR. O'MALLEY:

Q   State the conversation.

A   In order to avoid a lawsuit--

Q   Just tell us briefly what you said and what he said, in substance.

A   I told him that I would agree to take the water three days a week, and Brinkerhoff would take it one day a week, and he could have it the balance of the week, and we would take it during the water season exactly as I proposed.  He agreed to it at first.  Then he took it up with Mr. Swing, and Mr. Swing wrote me a letter stating that his client didn't want to go through with it-- that they were going to continue the lawsuit.

Q   Did that end the transaction so far as you were concerned?

A   That did.

MR. VEEDER:  I move to strike all this as being incompetent, irrelevant and immaterial, your Honor.  It has not a thing to do with the case, if the agreement was not gone through with.

MR. O'MALLEY:  I don't think it has either.

THE COURT:  Overruled presently.

MR. O'MALLEY:  My only purpose for bringing it up was--

THE COURT:  Was there any time in which the water was divided between you and Barbee three and a half days to Barbee

and three and a half days to you?

THE WITNESS:  No, sir.

THE COURT:  Where did this come from?

MR. SACHSE:  It came from an Oviatt exhibit wherein it says that specifically.

MR. VEEDER:  I think it is on AH.

MR. O'MALLEY:  There was a vague reference to it in one of the exhibits.

MR. SACHSE:  It's on page 123 of Oviatt AH.

THE COURT:  The lawsuit was filed in 1949?

MR. O'MALLEY:  I believe August, 1949.

MR. SACHSE:  August, 1949.

THE COURT:  This note we are referring to on page 123 in AH states this:  "Nine of the ten irrigated acres in 1953 belonged to James Oviatt."  I am going to inquire now, did the tenth acre belong to Brinkerhoff?

THE WITNESS:  That is a misstatement, your Honor, because that means that Brinkerhoff was only watering one acre and we were taking the balance for our ten acres.

THE COURT:  The next statement is this--

You say that is what it means?

THE WITNESS:  Well, substantially that is what it means.

THE COURT:  How much acreage did Brinkerhoff irrigate there?

THE WITNESS:  He just watered one acre of fruit trees.

11978

1    THE COURT:   This tenth acre that they don't mention
2   who it belonged to was Brinkerhoff?

3    THE WITNESS:   That is right.

4    THE COURT:   The next statement says, "During 1951 and
5   1952. ." That is after the Barbee-Oviatt lawsuit was filed?

6    THE WITNESS:   Yes.

7    THE COURT:   ". . water was diverted for approximately
8   three and a half days a week.   During the remainder of the
9   week Temecula Creek was allowed to flow downstream to diversions
10  9 South, 1 East, 12H."   I take it that must be the Barbee
11  diversion.

12    MR. SACHSE:   That is Barbee.

13    THE WITNESS:   What happened there is, I agreed with Mr.
14  Barbee, as I so stated.   We then did it for a certain length
15  of time, and Mr. Swing influenced Mr. Barbee not go go ahead
16  with it.   He wanted a lawsuit, I guess.

17    THE COURT:   Then there was a part of the time after the
18  lawsuit was filed in which you did deliberately take the water
19  certain days of the week and did not take it other days of the
20  week?

21    THE WITNESS:   That is correct.

22  BY MR. O'MALLEY:

23    Q   How long was that period of time, approximately?

24    A   That wouldn't be more than 30 days at the most.

25    MR. SACHSE:   That is in contradiction of his own exhibit,

1   and I think we ought to get this straight.

2       MR. O'MALLEY:  It is straight.

3       THE COURT:  This comes out of Bulletin No. 57.

4       MR. SACHSE:  It was introduced by Mr. Oviatt.

5       THE COURT:  Let's let Mr. Illingworth take the responsi-

6   bility for finding the source of this footnote on page 123

7   of AH.

8       MR. SACHSE:  He did it.  He was the man.

9       THE COURT:  Is this your text that you wrote?

10      MR. ILLINGWORTH: Yes, your Honor.

11      THE COURT:  We will call you as a witness later to

12  find out where you got this information.

13      MR. O'MALLEY:  Inasmuch as we are on this particular

14  subject, the procedure may be a little informal, but I would

15  have no objection to your Honor interrogating him, or I would

16  be glad to do so at this time.

17      THE COURT: Mr. Illingworth, where did you get this in-

18  formation?

19      MR. ILLINGWORTH:  From being there in the field at the

20  time, and to the best of my knowledge this is what happened.

21  It is certainly my view that it happened for longer than

22  thirty days.  This is my understanding.  And we were making

23  measurements on diversions, and to my knowledge I do know that

24  it was for a period of time operated in this way and the water

25  was diverted into the ditch at Oak Grove for approximately half

of the week and then subsequently the gates were closed there

and the water was allowed to go downstream.

THE COURT:  For the time being, that will be enough.

MR. O'MALLEY:  Very well.

MR. VEEDER:  He said it was his understanding.

Did you manipulate the gates yourself?

MR. ILLINGWORTH: No, I didn't turn the gates on and off,

but I observed the water both ways.  I can't say I was there

every day of the week, but I was there a sufficient number

of times that I saw it on and I saw it off, and when the

gentlemen told me this is the way they operated-- I talked to

the foremen of the two places, and that is the way they said it

was being operated.

MR. VEEDER:  I don't think it is important anyway, so

I will just skip it.

MR. O'MALLEY:  Anyway, I thought we should make such

clarification as we could with respect to that subject matter.

THE COURT: All right.

MR. O'MALLEY:  And I think Mr. Illingworth's comments

have been a help in that respect.

Q Mr. Oviatt, you have testified under direct examination

heretofore with respect to the crops which you grew on both

Rancho Ramona  and the Oak Grove ranch.  Did you also raise

cattle and turkeys since your ownership of those two ranches?

A   We did.

Q  Did you use water for that purpose?

A  We did.

Q  You have figures showing the number of cattle and turkeys raised each year since your ownership of those two ranches.  Will you state them for the record?

A  In 1944 we started out with 3500 turkeys, 500 hogs, a thousand head of cattle and ten horses.  In 1945 the President of the United States asked all the ranchers to raise all the turkeys they possibly could for our Armed Services overseas. So to begin with in the fall of 1944 we ran 6,000 eggs through our turkey houses and hatched them and from then on we ran from 15,000 to 18,000 turkeys each year up until it started to drop down to 6,000 turkeys in 1950, and we sold out and quit on the turkeys.

MR. SACHSE:  When was that?

THE WITNESS:  In 1950.  But we ran four and five hundred head of hogs all of the time up until 1953, when we reduced it to about 300.  And we increased our cattle from a hundred in 1948 up to 500, and we ran about 500 from then on up to this present date.  We also had quite a number of horses.

These turkeys, I might state, when you run 18,000 head of turkeys you have to have a lot of water for them, because 75% of their intake is water, and we used that the year around.

BY MR. O'MALLEY:

Q  Have you completed the summary, Mr. Oviatt, with

respect to the cattle and turkeys raised by you?

A  Well, we raised from 1945 about 5,000 head over at the Oak Grove Ranch under the large oak grove and we used the water for them, and anywhere from 100 to 500 head of cattle was watered there at various times.

Q  With respect to Mr. Welch, who testified earlier in this trial, can you tell us briefly what his duties were when he was employed by you?

A  He was a mechanic who took care of all our farm machinery and trucks and did the welding and putting in the pipe lines for both ranches.

Q  Did he maintain the water system in connection with those duties you have described?

A  Yes.

Q  Did his duties include any work which would give him detailed in contrast to a general knowledge of your acreage which was under irrigation?

A  No, he was not a farmer, as he stated.

MR. STAHLMAN:  That is objected to as calling for a conclusion of the witness, your Honor.

THE COURT:  Overruled.

You are trying to limit or impeach your own witness?

MR. O'MALLEY:  No, I am not, your Honor.

THE COURT:  All right, overruled.

THE WITNESS:  He certainly wouldn't know anything about

1  irrigating, because he didn't have anything to do with it,

2  except--

3      MR. STAHLMAN:  I ask that that be stricken, your Honor.

4      THE COURT:  Overruled.

5  BY MR. O'MALLEY:

6      Q  He did, however, have charge of the maintenance of

7  the irrigation system; is that right?

8      A  That is right.

9      Q  Mr. Oviatt, do you know a Mr. Mahlon Vail?

10     A  I do.

11     Q  Directing your attention to the spring of 1945, did

12  you have a conversation with Mr. Vail concerning your use of

13  the water of Temecula Creek?

14     A  I did.

15     Q  Where did the conversation take place?

16     A  At my house.

17     Q  Other than yourself and of course Mr. Vail, was any-

18  body else present?

19     A  Yes, my wife was present.

20     Q  Can you state the substance of what was said by you

21  and what was said by Mr. Vail?

22     A  Well, it was about the time we put in a lot more

23  sprinkler heads because our water started to go down--

24     Q  Just state briefly what was said.

25     A  Well, he just come out west of the house and he said,

11984

"You are certainly using a lot of my water."  And I said to him, "Well, this ranch, the records show, was using this water long before you were born."

Q  Is that the substance of the conversation with Mr. Vail on that occasion?

A  Yes.

MR. O'MALLEY:  If your Honor please, I may say, in connection with our evidence with respect to the usage of waters of the pertinent river system on both the Oak Grove properties and the Rancho Ramona, as testified to by Mr. Oviatt, we rely principally upon the acreage irrigated, together with the figures which are in evidence showing the amount of water reasonably required for beneficial use in irrigation.  However, we have marked for identification on AE and AF for Identification certain data respecting stream flow as distinguished from actual water usage, we have laid the best foundation that we are able to lay at this time through this particular witness for such data, and I believe it will be of some assistance to the Court, and at this time AE for Identification and AF for Identification are offered in evidence for that purpose.

MR. VEEDER:  I would like to ask some questions on voir dire, your Honor, if I may.

MR. O'MALLEY:  Certainly.

1989

## VOIR DIRE EXAMINATION

BY MR. VEEDER:

Q   I observe that on the second sheet of AE you have dry holes marked in the columns under 1944.

A   That is correct.

Q   Were those wells actually dusters, were they completely dry, or did you get any water out of them?

A   We got no water out of them.  In fact, we went across the river below the No. 3 Reservoir and I think we went down two hundred and some-odd feet, it might have been 260 feet, and there was not a drop of water in the hole.

THE COURT:  Which one is that you are talking about?

THE WITNESS:  It is the one below No. 3 Reservoir.

THE COURT:  I see, it is the one following No. 12 on Exhibit Oviatt AE.

But in connection with the No. 2 well, which you said was a dry hole and you went down 261 feet, I thought you testified that there was water but not enough to pump?

THE WITNESS:  That is correct.

THE COURT:  Counsel just got through asking you, were these completely dry holes or was there some water?

THE WITNESS:  They are marked whether they were dry. If they are marked "Dry," they were dry.  If we put a casing in them and water is still in there, we marked them "Inactive," thinking that when the water level comes back again we would

1  pump.

2      THE COURT:  As to No. 2 on AE, the 261-foot one--

3      MR. VEEDER:  It was not a dry hole.

4      THE WITNESS:  Near the blacksmith shop?

5      THE COURT:  Oh, I see, you have it listed "Inactive" on

6  one sheet, and you have it listed as "Dry" on the second sheet.

7      THE WITNESS:  Yes.  That should be changed.  Do you want

8  to change it?

9      MR. O'MALLEY:  With your Honor's permission--

10     THE COURT:  Change the word "Dry hole" on the second

11 sheet of Exhibit AE following No. 2 to "Inactive."

12     MR. O'MALLEY:  Would you make that change now, Mr.

13 Oviatt.

14     The record should show that the deletion and change has

15 been made by the witness.

16     THE COURT:  All right, go ahead.

17 BY MR. VEEDER:

18     Q  On this annual extractions, I observe at the bottom of

19 each column across from the words "Tributary to Wilson Creek"

20 it refers to 87 miner's inches.  I assume that that is what

21 that designation amounts to.

22     A  That is correct.

23     Q  Are you by this identification, by this exhibit

24 purporting to state that there were 87 inches diverted con-

25 tinuously through the year 1944?

1    A   Yes.

2    Q   Every day of 1944 you took 87 inches through that

3 diversion structure?

4    A   Yes, and we used it for watering our alfalfa and

5 oat hay.  We put in oats early in the fall, and if we didn't

6 have enough rain to bring it up we would put water on it, and

7 if it got up six inches high and we didn't have enough rain we

8 would use this to water it.

9    Q   Did you measure that yourself?

10    A   No, I did not.

11    Q   Who measured it?

12    A   A man by name of Finkle and a man by name of Green.

13    THE COURT:  Is Mr. Finkle the well-known engineer?

14    THE WITNESS:  He was an engineer I had come up to my

15 ranch.

16    THE COURT:  What was his first name?

17    THE WITNESS:  E. F. I think.

18    MR. O'MALLEY:  I have a Finkle report, incidentally,

19 that I wanted to offer.  It is M. C. Finkle, your Honor.

20    THE COURT:  Is there more than one Finkle?

21    THE WITNESS:  This is the Finkle that was on the stand

22 for 121 days for Santa Margarita.  He was the man that put the

23 water system in in 1919.

24    THE COURT:  Speak up so everybody can hear, Mr. Oviatt.

25    THE WITNESS:  He is the man that engineered the water

11988

1   system for a man by name of Kuhneritz that owned the ranch

2   in 1919.  Later on Mr. Finkle was Santa Margarita's water

3   engineer.

4        THE COURT:  That is enough about Finkle.

5   BY MR. VEEDER:

6        Q  Can you tell us which of the figures came from Mr.

7   Green and which came from Mr. Finkle?

8        A  Well, Mr. Finkle, as I said, was down there with me,

9   I engaged him as an engineer, and he spent three days in 1943

10  before I bought Rancho Ramona, and then he spent three days in

11  1945, and he measured this water while he was there through a

12  weir in the box as described by Mr. Bookman.

13       Q  I observe from Oviatt AD that the Green report shows

14  one observation.  The name is Weaver on there.  That was prior

15  to your purchase, wasn't it?

16       A  No, it was not.  In my report on that he called it

17  Oviatt-Weaver.  I purchased it.

18       THE COURT:  Counsel is pointing out that 1943 was before

19  you bought the ranch.  Is that right?

20       THE WITNESS:  I paid a deposit on it in 1943, and early

21  in '44 I took possession.

22  BY MR. VEEDER:

23       Q  I observe further that the report shows one reading

24  apparently on the 9th day of August, 1944.

25       THE COURT:  Where is that?

MR. VEEDER:  Do you have AD, your Honor.

THE COURT:  Wilson Creek.

MR. VEEDER:  Wilson Creek.

Q  300 feet below Sage Road and 100 feet above-- is that "diversion" or "division" pipe?

A  Diversion pipe.

Q  Diversion pipe?

A  "Diversion pipe line flume at the lower end of the flume"-- read it on.  It states here that he has "yearly" at the heading-- "yearly diversion observation."  And what does he say here, "1.72 cubic feet," and half of that is in the neighborhood of 87.

Q  It is based upon one reading, however, is it not, from Oviatt AD?

A  In August.

Q  I am trying to --

A  Yes, it is on one reading.

Q  In 1944?

A  In August.

THE COURT:  I can't understand this.  The only entries in 1944 on Exhibit AD are under the date August 9th, but there are three of them:  One is Wilson Creek 300 feet, et cetera, one is Wilson creek a hundred feet, and the other is at the flume and three figures are given, and then appears on the side "One observation," which might refer to the one day, "Mean 1.72."

1    How can 1.72 be the mean of the three figures set forth there?

2        MR. SACHSE:  The mean is after 5-18-45.  I have the same

3    question you have, your Honor.

4        MR. O'MALLEY:  I am perfectly frank to state to your

5    Honor that our foundation with respect to this--

6        MR. VEEDER:  Your Honor, counsel is speaking and so is

7    the witness.

8        THE COURT:  This is off the record.

9        (Off the record.)

10       THE WITNESS:  There are others there that were missing.

11       MR. VEEDER:  Are you examining notes from the witness,

12   your Honor?

13       THE COURT:  The witness has handed me a package of

14   observations which he said were mailed to him by Mr. Green.

15   These are original documents that apparently Mr. Green sent him.

16   I hope, thumbing through here, to see if I could find something

17   about 1944.  Here is the August map.

18       THE WITNESS:  I could explain that to you.

19       THE COURT:  Well, here is the particular document.  We

20   will mark it AD-1 for Identification.

21       (Defendant Oviatt Exhibit AD-1 was marked for Identi-

22   fication.)

23       THE COURT:  This is a sheet sent to you by Mr. Green?

24       THE WITNESS:  It is, sir.

25       THE COURT:  Observations were made on August 9, 1944 on

Wilson Creek.

THE WITNESS:  That is right.

THE COURT:  This concerns now Ramona Ranch.

THE WITNESS:  Into that box 300 feet below Sage Road, you have a hundred feet above Weaver Dam, Wilson Creek below Weaver diversion dry 3, total Weaver-Oviatt diversion is 1.72 acre feet as it appears on here.

THE COURT:  No.

THE WITNESS:  Well, 1.72 cubic feet, I mean, and miner's inches is 87, and that is what I put down in my report.

THE COURT:  From what you understand of this letter, is Mr. Green reporting on two different diversions which he has added together?

THE WITNESS:  Well, they all go into the box, and he is reporting all the water in the diversion and none is left below the Weaver diversion-- it is dry.  He is taking it all.

MR. VEEDER:  The .29 of a second foot, is that after the water has been diverted through the flume?

THE COURT:  It looks apparent that there has been added the .29 to the 1.43 to make 1.72.

MR. SACHSE:  If you strike the 1-- you can say a typographical error-- .72 would be pretty close.

THE COURT:  I haven't figured it.

MR. SACHSE:  If you say it is a typographical error, .72 is right on the nose.

THE COURT:   More than that, the AD talks about "mean."
Of course, if there is only one observation, I guess the one
observation would be the mean.

MR. STAHLMAN:   But it wouldn't mean much.

THE COURT:   Here are these documents.   You gentlemen can
study them over during the noon hour and when I come back try
to tell me what they mean.

Adjourn until 2 o'clock.

(Noon recess.)

1    San Diego, California, Thursday, February 11, 1960.  2:00 P.M.

2

3        (Other matters.)

4        THE COURT:  Where are we, gentlemen?

5        MR. VEEDER:  On the Fallbrook case?  That's hard to say,

6    your Honor.

7        THE COURT:  Come forward, Mr. Oviatt.

8        MR. O'MALLEY:  Would you like to resume the stand, Mr.

9    Oviatt.

10

11                        JAMES OVIATT,

12    recalled as a witness in his own behalf, having been previously

13    duly sworn, testified further as follows:

14        MR. O'MALLEY:  May I say, with respect to exhibits for

15    Identification AE and AF, in so far as the data with respect

16    to extractions is concerned, as I stated to your Honor before

17    the noon recess, we are quite free to concede that the founda-

18    tion for that data is not entirely adequate.  We are offering

19    it to the Court in case there is no objection to it.  I should

20    say, however, if there is objection to it on the grounds of

21    insufficiency of foundation, so far as the extraction data

22    is concerned in miner's inches we would be free to concede

23    that we have done all we can by way of authenticating that

24    data.  We do have the well data in the record as of now, and

25    I would say to your Honor that so far as our usage is concerned

1  we are relying upon our acreage which will be multiplied by

2  the figures in the record showing the amount reasonably

3  required for such acreage, showing our usage during the

4  pertinent period.  With that, we are content to rest, but we

5  are willing to offer this exhibit in his present form, if

6  there is no objection to it.  If there is objection, we will

7  be free to concede that the foundation for it is not entirely

8  adequate.  It is the best data we had.

9      THE COURT:  I shouldn't wisecrack, but you take a long

10  time to say very little.  You are an old friend of mine.  I

11  sat here listening to this explanation.

12      Mr. O'Malley, on your Oak Grove Exhibit AF, as I under-

13  stood the testimony, Kohler Springs you measured with cans;

14  is that right?

15      THE WITNESS:  Yes; buckets.

16      THE COURT:  Buckets.  And Rattlesnake Springs you

17  measured with buckets?  No, that's dry.

18      THE WITNESS:  Rattlesnake is dry now.  We measured

19  practically all wells--

20      THE COURT:  I am talking about these diversions.  Kohler

21  Springs diversion--

22      THE WITNESS:  We measured that as it came out of the

23  pipe line with a bucket.

24      THE COURT:  And this Oviatt-Cummings diversion?

25      THE WITNESS:  The same way.

THE COURT:  With a bucket.  Rattlesnake Springs is now dry.

THE WITNESS:  That is right.

THE COURT:  So that as far as your Exhibit AF is concerned, with Kohler and Oviatt-Cummings I think you have a foundation, subject to cross-examination.  And Rattlesnake Springs, how do you arrive at this one miner's inch exhibit?  Did you have any measurements when it did run?

THE WITNESS: When it was running into the water trough at the barn we measured it.  That was some years ago.

THE COURT:  That would leave the Temecula diversion as the loose end in AF.

And on AE, as I understand the testimony, these figures of the miner's inches were capacity figures.  They were taken from the drillers at the time the wells were completed?

THE WITNESS:  The wells, you mean?

THE COURT:  Yes.

THE WITNESS:  Yes.

THE COURT:  So they are capacity figures.  And the foundation is probably lacking on this column of miner's inches that runs across the page at the bottom.  Is that your position?

MR. O'MALLEY:  Because they include a tabulation for which the foundation is incomplete.  I think that would be correct, if your Honor please.

THE COURT:  Then I would suggest that as to AE there be stricken out of the title "Annual Extractions" and put "Initial Capacity of Wells."  That is what the testimony shows.

MR. O'MALLEY:  That is correct.

THE COURT: So if you will take a pencil on the original of AE--

MR. O'MALLEY:  It is in front of the witness.

THE COURT:  --and strike out "Annual Extractions" and put "Initial Capacity of Wells."

MR. VEEDER:  We are going to have well logs produced for al of this, are we not?  And also the history in regard to those drillings?

MR. O'MALLEY:  The well logs were turned over to the State of California in connection with its Santa Margarita investigation.

MR. VEEDER: Some of those wells were drilled--

MR. O'MALLEY:  That is, up to that point.  We have one or two since that period, which we would be glad to provide you, if you desire them.

MR. VEEDER:  And we do.

THE COURT:  Then the words at the top, this "Surface Diversion" should be stricken out on AE; is that right?

MR. O'MALLEY:  What was the terminology suggested by the Court?

THE COURT:  "Initial Capacity of Wells."  Is that

1   agreeable?

2         MR. VEEDER:  Not with me, your Honor.

3         THE COURT:  Put it in anyhow.

4         Why isn't it agreeable with you, Mr. Veeder?

5         MR. VEEDER:  Because I don't believe the exhibit is

6   reflective of anything.  I think that he can say, if it is

7   the truth and he knows himself, that the initial capacity of

8   the Oil Well was 150 miner's inches.  But certainly it is not

9   150 miner's inches for 1946, '47, '48, '49, et cetera.  The

10   point that I make is that we have a tabulation purporting to

11   show water uses coupled with acreages.  I assume it is the

12   heart and soul of their lawsuit.

13         MR. O'MALLEY:  That is not correct.

14         MR. VEEDER:  Maybe it doesn't have a heart and soul.

15   The only point I make--

16         THE COURT:  You may cross-examine.  I understand his

17   testimony to mean that-- maybe it shouldn't be "Initial

18   Capacity."  I understand that these were the capacities of

19   these wells and they do not represent a total amount of water

20   pumped and as the wells dropped down in capacity they were

21   abandoned and other wells were drilled.

22         Let me ask you now:  Take the Oil Test Well, you show it

23   in 1945 as 150 miner's inches.

24         THE WITNESS:  That is what the well produced at that

25   time by test.

1    THE COURT:  How do you know what it produced in 1946?

2  Did you have tests in 1946?

3    THE WITNESS:  No, but we ran it through the top of the

4  large box by the booster house.  The well is only 10 feet from

5  that big box that ran underneath into the big box and then

6  flowed over the top, and we measured just like you would in

7  a weir.

8    THE COURT:  From your observation did the Oil Test Well

9  produce as much water from 1945 through 1949 as when it was

10  initially drilled?

11    THE WITNESS:  Practically as much, your Honor.

12    THE COURT:  And then it began to drop off?

13    THE WITNESS:  Then it began to drop off and it got down

14  to where it was not worthwhile pumping for six inches of water.

15    MR. VEEDER:  But, your Honor--

16    THE COURT:  Let's take another one, Well No. 13, near

17  Buddha's Corral.  You start out showing in 1950 18 miner's

18  inches.

19    THE WITNESS:  That is correct.

20    THE COURT:  That is what the well driller tested it after

21  it was brought in?

22    THE WITNESS:  That is correct.

23    THE COURT:  Then it continued at about the same amount

24  of production through 1957?

25    THE WITNESS:  That is correct.

THE COURT:  Now you have 1958 listed as 12 miner's inches, and 1959 as 8 miner's inches.  How do you know the drop in miner's inches?

THE WITNESS:  I measured the miner's inches purposely and I had taken the 15 horsepower pump out and put in a 5-horsepower and we are pumping 6 miner's inches from it now.

MR. VEEDER:  Perhaps I haven't made myself clear, your Honor.  The way this is set up, it is set up on a continuous flow basis.

THE COURT:  Oh, no, we understand that.

MR. VEEDER:  I can say this thing, two years from now when we are looking at it and there is nothing to show that the 18 inches there was not diverted 365 days-- why not say on one test or something like that?  The reason why I am concerned about it is that we have, if your Honor will observe, we have this tied to acreages.

THE COURT:  What is "this"?

MR. VEEDER:  It says, "Acreage Watered."  You have 100, 200, 180, 180.  Now he is trying a prescriptive case here, your Honor, and it is manifest that when you have a total of miner's inches and the acreages, he is over the fence, unless there is something shown that will depict the actuality in regard to these measurements.

THE COURT:  The record can show that.  I said "Initial Capacity."  In view of what the witness has said, strike the

word "Intial."  This chart, as far as it is drawn, will be limited to capacity of these wells, and then by cross-examination we can bring out what the facts are.  I doubt that anyone of these wells was ever pumped 365 days, certainly not at the miner's inches figure shown.

(Another matter.)

THE CLERK:  The case on trial, No. 1247-SD-C, United States vs. Fallbrook.

THE COURT:  Then in this Exhibit Oviatt AE the line "Tributary to Wilson" should be stricken out, shouldn't it, Mr. O'Malley?

MR. O'MALLEY:  I think that is correct, your Honor.

THE COURT:  Run a line through it on the original.

Then the total miner's inches, does that have any significance?  It is not the total miner's inches in use.  It was the capacity.

MR. O'MALLEY:  I think that column may well be deleted.

THE COURT:  All right, it goes out, too.

MR. O'MALLEY:  And the record should show that I am also at this time putting a line in pencil through such column.

THE COURT:  All right.

Now you have listed, Mr. Oviatt, on this exhibit the number of acres that you irrigated each of these years.  Are these figures correct from 1944 on through '59?

THE WITNESS:  They are.

THE COURT: That may remain in there.

Now on Exhibit AF, in view of your testimony as to Kohler, Rattlesnake and Oviatt-Cummings, those figures may remain in, and draw a line through the Temecula Creek diversion? That is the first item.

MR. O'MALLEY: Very well.

THE COURT: Is that agreeable?

MR. O'MALLEY: Yes, your Honor.

THE COURT: Run a line through it, then.

All right.

MR. SACHSE: Your Honor, may I inquire, is the effect of this then that these conclusions as indicated on the two exhibits are stricken from the record? They are stricken from the exhibit. May also the references--

THE COURT: Yes, any testimony-- well, that is a pretty broad statement. I don't know of any testimony where he added together the miner's inches supposedly from the wells and from Wilson Creek and came up with these figures shown here.

MR. SACHSE: Frankly, I don't recall any either, but I had a lot of cross-examination here.

THE COURT: If there was any testimony directed to the two lines which have been stricken, that testimony will be stricken also.

MR. SACHSE: Thank you.

MR. VEEDER: May I inquire if I understand what you have

done--

THE COURT:  Wait a minute.  If there was any testimony of this witness concerning the figures shown in these two columns, that testimony may go out.

MR. O'MALLEY:  It may be stricken.

THE COURT:  That will be stricken.  That leaves in the record some testimony about these diversions, and we had some estimates and that sort of thing.  The same is true with the Temecula diversion shown on AF, which has been stricken.  If this witness has testified to any amounts in connection with that diversion that relates to this line that has been stricken, that may go out of the record.

MR. VEEDER:  I would like to inquire in regard to the line the Wilson Creek diversion, did you intend to have each number, for example, 87 inches--

THE COURT:  It all goes out.

MR. VEEDER:  We should have a line running through it.

THE COURT:  Clear across that.  Just run your pencil clear across.

MR. O'MALLEY:  I am taking the figures separately, if that is agreeable.

Very well.

With that correction, is it your Honor's ruling that the exhibit is received in evidence?

THE COURT:  Do you now offer AF and AE?

MR. O'MALLEY:  Yes, your Honor, as corrected.

MR. SACHSE:  No objection.

THE COURT:  AE and AF received in evidence.

(Defendant Oviatt's Exhibits AE and AF were received in evidence.)

MR. O'MALLEY:  Our remaining exhibits are merely two use permits, your Honor.

THE COURT:  Well, you have AD, on which we ran into trouble.

MR. O'MALLEY:  Yes, we are not pressing that, your Honor.

THE COURT:  You are not offering it?

MR. O'MALLEY:  I am going to check with the Clerk.  I think all of our other exhibits are in evidence.

THE COURT:  My record shows they are, except AD.  But check with the Clerk.

MR. O'MALLEY:  The last of our exhibits are two use permits for Kohler Canyon and Rattlesnake Canyon, respectively, which I desire to be marked Defendants' Exhibits next in order.

THE COURT:  You had some use permits in previously.

MR.O'MALLEY:  Yes, your Honor, and these are follow-ups by Mr. Oviatt of those same diversions.

THE COURT:  AJ and AK.

MR. O'MALLEY:  AJ being the Kohler Canyon diversion, and

AK being the Rattlesnake Canyon diversion.

(Defendant Oviatt's Exhibits AJ and AK were marked for Identification.)

BY MR. O'MALLEY:

Q   Mr. Oviatt, I show you the document marked for identification as Oviatt's AJ.  Is that the Kohler Canyon use permit which was granted to you?

A   It is.

Q   And I show you Oviatt's AK for Identification.   Is that the Rattlesnake Canyon use permit which was granted to you?

A   It is.

MR. O'MALLEY:   At this time, if your Honor please, these exhibits are offered in evidence.

THE COURT:   These use permits run for a certain fixed period of time and then you have to renew them, is that it?

THE WITNESS:   Yes.   Well, I think it was because they were transferred from the former owners to me.

THE COURT:   I see.

MR. SACHSE:   They never need renewal, as I understand, unless they are transferred or unless the Government chooses to revoke them.

THE COURT:   Apparently there was a transfer of ownership.

MR. O'MALLEY:   That is correct.

THE COURT:   And I take it that is the reason this was

1    done.

2         AJ and AK received in evidence.

3         (Defendant Oviatt's Exhibits AJ and AK for Identifica-

4    tion were received in evidence.)

5         MR. VEEDER:  There are legal questions involved in both

6    those, your Honor.

7         MR. O'MALLEY:  We so understand.

8         MR. VEEDER:  But I make no --

9         MR. O'MALLEY:  I am not through with this witness, but I

10   should point out to your Honor that the suggestions made by

11   the Court prior to the noon recess that Mr. Bookman place on

12   Exhibit X a sketch, was done by Mr. Bookman, and if your Honor

13   desires he can explain it at this time or not, as the Court

14   wishes.

15        Mr. Bookman has been sworn.

16        Would you like to point those out to the Court?

17        MR. BOOKMAN:  These were put on with Mr. Oviatt.

18        THE COURT:  On Exhibit X different colors were used.

19   The blue area down in the vicinity where they talk about the

20   14 and the 10 acres has been cross-hatched in blue.  There has

21   been written "To irrigate the reservoir 10 acres 2-10-60."

22   Today is the 11th, but I take it this indicates the day you

23   put it on.

24        Then there is another red double cross-hatch; it says,

25   "Irrigated from Well 19 Reservoir 40 acres alfalfa," which

1   appears immediately above the blue.

2      Further up directly north but separated by other land

3   is a different color of red, "Irrigated from Well 8, 20 acres

4   of alfalfa."

5      And then finally in orange over to the west side of the

6   map is "Irrigated Oviatt-Brinkerhoff Diversion 10 acres alfalfa."

7      I think that is all pretty clear now.

8      MR. O'MALLEY:  You may cross-examine.

9      THE COURT:  I want to ask a question before you cross-

10  examine.

11     In connection with this Oak Grove Ranch, as I understand

12  it, you have two diversions.  You have the bigger diversion

13  downstream, where you say, during the irrigation season, you

14  took all the water out of it.

15     THE WITNESS:  Yes, and put it back in through Chihuahua

16  Creek.

17     THE COURT:  Any that you didn't use?

18     THE WITNESS:  That is correct.  But we water cattle there

19  and so we have to keep the reservoir full.  We water about 250

20  head of cattle out of that reservoir.

21     THE COURT:  Further upstream there is this diversion

22  called the Oviatt-Cummings diversion.

23     THE WITNESS:  That is correct.

24     THECOURT:  We have had no description of what kind of

25  diversion that is.  What is it like?

1   THE WITNESS:  I think Mr. Bookman explained it.  It is a

2   diversion box right in the center of Temecula Creek, a weir

3   box about three by three with a wooden top on it and a two-

4   inch pipe line comes out of that box around the hill and over

5   to the Cummings residence, and from there it goes under the

6   road over to near that reservoir, and it is then used by the

7   Cummings for over fifty years they told me.

8       THE COURT:  That is a two-inch pipe?

9       THE WITNESS:  A two-inch pipe, and we use it for water-

10  ing cattle on both sides of the road.

11      THE COURT:  So there is no attempt at that upper diver-

12  sion to take all the water?

13      THE WITNESS:  No.

14      THE COURT:  I take it that the water flows over the

15  top of this box and keeps the pipe full?

16      THE WITNESS:  That is correct.

17      THE COURT:  That is the reason this upper diversion

18  apparently is listed on your check as being from two to three

19  miner's inches; is that correct?

20      THE WITNESS:  Yes, sir.

21      THE COURT:  All right.  You may cross-examine.

22      MR. SACHSE:  I have a few questions, your Honor.

23

24

25

CROSS-EXAMINATION

BY MR. SACHSE:

    Q  Mr. Oviatt, the case of Barbee vs.Oviatt was filed on August 2, 1949; is that correct?  Do you recall the date? Or perhaps your counsel will so stipulate.

    MR. O'MALLEY:  I think that date is correct.

    THE WITNESS:  I will stipulate to that.

    MR. O'MALLEY:  Whatever the record shows.

BY MR. SACHSE:

    Q  What is the date that you acquired your first land in the Oak Grove area?

    A  1945.

    Q  When in 1945, do you know?

    A  I have it some place.  The deeds are of record.

    Q  There are a number of deeds at different times.  Was the first one the purchase from Bailey, do you recall?  Is it correct that you purchased the Bailey property in November-- November 19, 1945?

    A  Yes.

    Q  And then you made a purchase from the Southern Pacific Land Company on December 12, 1945?

    A  Yes.

    Q  And then you made another purchase from Drury Bailey on April 8, 1946?

    A  That is correct.

1      Q  Then you made another purchase from the Southern

2  Pacific on August 7, 1947?

3      A  Yes.

4      Q  And another purchase from George and Virginia Bailey

5  on February 27, 1950?

6      A  Right.

7      Q  And those are the lands that comprise the Oak Grove

8  Ranch, so-called?

9      A  Yes.

10      Q  Now, Mr. Oviatt, I want to direct your attention

11  to the calculations of "Acreage watered," the last line across

12  the page on Oviatt AE on the second page.  Do I understand

13  from that that in 1951 you irrigated 180 acres; is that correct?

14      A  That is correct.

15      Q  You received a copy of the Referee's report on which

16  the costs of reference were calculated in Barbee vs. Oviatt,

17  did you not?

18      A  I did.

19      Q  Do you recall that that report showed 134 acres

20  irrigated by you in that year?

21      A  I do.

22      Q  Did you make any objection or protest to that figure

23  being used by the Referee?

24      A  In the--

25      Q  In the Barbee vs. Oviatt Referee's Report.

1  A No, because I thought it was just a record of our

2 prorata of what we had to pay and I was so glad to pay it and

3 get out of the suit that I didn't take time to object to it.

4  Q Of course, if you had had more acres you would have

5 paid more money in the reference, would you not?

6  A Sure, I would.

7  Q In 1952 it is your testimony that you irrigated 180

8 acres, and also in 1953; is that right?

9  A That is right.

10  Q And are you aware that the referee's report shows

11 that you irrigated only 95 acres in 1952 and 97 acres in 1953?

12  A Yes.

13  Q And you made no objection to those figures, either?

14  A No.

15  Q Still on this same sheet on Exhibit AE, the very

16 last line on the whole page says "Acreage reported herein is

17 less than that reported to the State Water Rights Board."

18  A Yes, we put that on there to call your attention to

19 the fact that we knew it and we were going to give an amended

20 document.

21  Q I may be opening the door up to prove something very

22 fine for you, I don't know, but why would the two acreages

23 reported be different?

24  A The one we reported and the one they did?

25  Q No, you report on this sheet, let's say, 180 for '49,

1   and your asterisk says that you reported more than that to the

2   State of California.

3        A   That was because my secretary perhaps not putting the

4   right acreage down.  We didn't discover it until we started

5   checking the acreage.

6        Q   In other words, any greater figures than these that

7   may appear in any state report should be disregarded, and we

8   should use these as correct; is that right?

9        A   You should use mine as correct.

10       Q   The ones that appear on AE?

11       A   That is right.

12       MR. SACHSE:  We struck the data on the Temecula Creek

13   diversion on AF, your Honor?

14       MR. O'MALLEY:  Yes.

15  BY MR. SACHSE:

16       Q   Have you made any filings of any kind with the State

17   of California Water Rights Board or any other agency to

18   appropriate any of the water you are presently taking from

19   any diversion on Temecula Creek?

20       A   No, I think we went on the fact that it has been used

21   for a period of time.

22       Q   Now, your use of the Kohler Spring diversion, the

23   Rattlesnake Spring diversion, the Oviatt-Cummings diversion,

24   and the Temecula Creek-Oak Grove diversion all date since 1945;

25   is that right?

1          MR. O'MALLEY:  Objected to as being compound, your Honor.

2          MR. SACHSE:  I will take them one at a time.

3          Q  You have made no use of water from Kohler Canyon prior

4    to 1945, did you?

5          A  No, it was the Bailey Ranch at that time.

6          MR. SACHSE:  I move that go out.  That is hearsay and

7    not responsive.

8          THE WITNESS:  I bought it from them.

9          THE COURT:  Overruled.

10          MR. SACHSE:  The witness is testifying to what somebody

11    else did, your Honor.

12          THE COURT:  All he said is that it was the Bailey Ranch

13    at that time.

14    BY MR. SACHSE:

15          Q  Did you make any use of the diversion that is called

16    Oviatt-Brinkerhoff prior to 1945?

17          A  Certainly not.  I didn't own the property.

18          Q  And did you make any use of the Oviatt-Cummings and

19    Harmer diversion prior to 1945?

20          A  The same answer.

21          Q  And the same answer for Rattlesnake Canyon; is that

22    right?

23          A  That is right

24          MR. SACHSE:  I have nothing further.

25          MR. STAHLMAN:  May I move to strike the testimony which

1   he gave in response to, I think it was near the end of

2   counsel's question, where he said somebody told him that the

3   water had been diverted there for fifty years, as being purely

4   hearsay, your Honor.

5        MR. O'MALLEY:  That was received without objection.

6        MR. STAHLMAN:  I am moving to strike it.

7        MR. VEEDER:  It was in colloquy with the Court.  I have

8   a note on the same thing.

9        THE COURT:  If you want me to strike it, I will.  But is

10  there any doubt about it?

11       MR. VEEDER:  I don't know.

12       MR. STAHLMAN:  We didn't know it.

13       THE COURT:  Is there any doubt about it?

14       MR. STAHLMAN:  That it had been diverted for fifty years?

15       THE COURT:  That this water went across and was used

16  by Cummings and then was carried on to the property?

17       MR. STAHLMAN:  I don't know.

18       THE COURT:  All right, it may go out.

19

20                 CROSS-EXAMINATION

21  BY MR. VEEDER:

22       Q  Mr. Oviatt, would you tell us the percentage of the

23  whole or the actual acreage that you had in alfalfa in 1945?

24       A  100 acres.

25       Q  You had a hundred acres in there?

1    A   Alfalfa and pasture.

2    Q   How many cuttings a year do you get?

3    A   Depending on the amount of water.  If we have sufficient

4    water we will get eight to nine cuttings a year.  But we

5    haven't had sufficient water lately and we will get down to

6    about seven.  We have cut every month in the year except from

7    the middle of November to about the middle of March, depending

8    on the weather-- sometimes earlier and sometimes later, depend-

9    ing on how the climate is.

10    Q   Do you irrigate that from your wells, or how do you

11    irrigate that?  What was the source of water for that 100

12    acres?

13    A   It came out of the Wilson Creek, and if we didn't

14    have enough to do it we pumped it from our own wells.

15    Q   Did you have enough each summer month starting with

16    June to irrigate your alfalfa out of Wilson Creek?

17    MR. O'MALLEY:  June of what year?

18    MR. VEEDER:  1945.

19    Well, I will put that generally:

20    Q   For each of the years you have operated your farm up

21    there, has Wilson Creek produced enough water to irrigate your

22    alfalfa acreage?

23    A   Well, I couldn't tell you that.  If we didn't have

24    enough water from Wilson Creek, we pumped from our wells, and

25    we had enough water to irrigate the land I testified that we

1  irrigated, and sometimes we irrigated grain after we seeded

2  our dry-farmed land in the fall and the water was not sufficient

3  to bring the seed up we would water it, and if it got up two

4  inches and we didn't have a rain storm we would water it again

5  and we would water it every two or three weeks as long as it

6  needed it-- if we had the water to do it with.

7      Q  As a matter of fact, you don't know the sources of

8  water that you used on any of the acreages which are set forth

9  on Exhibit AE; is that right?

10     MR. O'MALLEY:  You mean separate sources?

11     MR. VEEDER:  That's right.

12     MR. O'MALLEY:  How much went on each crop?

13     THE WITNESS:  Certainly not.  I couldn't remember back

14  in 1945 where the water came from, except two places; it had

15  to come from Wilson Creek or it had to come from wells.

16  BY MR. VEEDER:

17     Q  And you mixed the two each season?

18     A  We did when it was necessary to do it.  If it was

19  raining we didn't pump our wells, but if it was raining we still

20  ran it from Wilson Creek and put it on the alfalfa, because

21  Alfalfa has deep roots and we try to keep them wet all the

22  year around.

23     Q  How many acres of grain do you usually put in for your

24  farming?  I see you have wheat, barley and oats.

25     A  Anywhere from 150 to 250 acres.

Q   But you don't irrigate all of it, do you?

A   We irrigate it if we have a sufficient amount of water to do so, if it needs to be irrigated.

Q   In the year 1959 did you have enough water to irrigate your grain?

A   No, certainly not.

Q   So you didn't irrigate your grain in 1959?

A   No.  I got tired putting it in and letting it die. I put very little in.

Q   So as a matter of fact your Exhibit A, which shows your tabulation of acreages and crops, is not reflective of yearly practice in regard to the application of water to the acreages set forth; is that right?

A   Well, in 1959 we state we irrigated 65 acres, because that's all the water we had to do it with.

Q   What percentage of that was in Alfalfa in 1959?

A   That was all alfalfa in permanent pasture.

Q   You didn't irrigate anything but your permanent pasture then and alfalfa in 1959?

A   Well, if you are just talking about irrigation, I think that's all we did.

Q   And you have no knowledge, do you, Mr. Oviatt, as to the quantity of water you have applied annually to your alfalfa; is that correct?

A   I have knowledge that we put on all the water that

1    we had.  We certainly wouldn't let it die if we had water to

2    water it.

3        Q  But you don't know how much?

4        A  No.

5        Q  You participated in the lawsuit of Barbee vs. Oviatt

6    and the Vail Company was brought into that case; is that not

7    correct?

8        A  Yes, they filed a cross-complaint.

9        Q  Did you make any claim against the Vail Company in

10   the case of Barbee vs. Oviatt, do you remember?

11       A  I don't remember, but I hardly think we did.

12       Q  You made no claim against the Vail Company?

13       A  I don't remember.  Mr. Cosgrove handled that for me.

14   He is deceased.

15       Q  Who handled that?

16       A  Terry Cosgrove.

17   MR. VEEDER:  You were the Referee in it, were you not,

18   Mr. Bookman?

19       MR. O'MALLEY:  I was counsel of record at one time, if

20   your Honor please, but I must confess the details are very

21   vague in my mind, when I was an associate of that firm.

22       MR. VEEDER:  You don't know whether there was a claim

23   made against them or not?

24       MR. O'MALLEY:  As I recall, counsel-- of course, such

25   recollection as I have is subject to what the record will show--

I believe the Vails did file a cross-complaint against every-
body upstream, and in defendant's answer, the answer of Mr.
Oviatt, a prescriptive right was asserted against everybody
downstream, including the Vails, in their answer to that cross-
complaint. That is my recollection of it. I think I might
have some pleadings that I could offer in evidence, if you are
concerned with it.

MR. VEEDER: I am certainly concerned with it, because
Mr. Bookman says that no one downstream has anything to worry
about in regard to the uses of water by Oviatt. So if you
made a claim against Vail Company, I think it is extremely
important here. I think Mr. Bookman must know whether they
did or not. He was Referee. Can somebody produce that in-
formation for us?

MR. O'MALLEY: Counsel, I think I could find the plead-
ings that were filed. I think probably Mr. Oviatt has a copy
of the pleadings.

THE WITNESS: I don't think I preserved them, because I
thought it was a dead duck.

MR. O'MALLEY: But the pleadings are on file in the
Superior Court of San Diego and there is no problem about it.

MR. STAHLMAN: Just so this is not testimony. It is
colloquy between counsel. I will check the pleadings.

MR. VEEDER: I want to see whether a claim was made of
that nature.

I have no further questions.


CROSS-EXAMINATION

BY MR. STAHLMAN:

Q  Mr. Oviatt, you have all the well logs from the year 1953 to the present time, those wells which were drilled in that period?

A  I think Mr. O'Malley told you that those well logs were put into the State, except any well that has been drilled since the date they were put in.

Q  I am not asking you what Mr. O'Malley told me. I am asking you. Since 1953, since the State has well logs, as Mr. Illingworth has indicated, up to 1953.

A  I promised you I would get them for you, and last night Mr. O'Malley called my attention-- no, Mr. Bookman called my attention and he said, "You haven't got those. You can't give them to him. He can get them from the State."

Q  Will you authorize the State to permit us to view those well logs?

A  I don't see any reason why, if my counsel doesn't object.

MR. O'MALLEY:  We certainly have no objection, counsel. Although I am not sure that I have any control over the sovereign State of California.

MR. STAHLMAN:  You can obtain a copy from the State.

The owners can, under the law.  So will you obtain a copy for us and present it here in court of the wells drilled after 1953?

THE WITNESS:  I will, if I can.

MR. STAHLMAN:  You will do that and produce them at some later time, or have your counsel send them in?

THE WITNESS: O.K.

MR. STAHLMAN:  Very well.

Q  Now, then, Mr. Oviatt, you said you had a conversation with Mr. Vail about your stealing his water, something to that effect.  Do you recall that conversation?

A  Yes, I had several conversations.  Pretty near every time he came up there he went out and looked at the water and came back and took a drink of whiskey.

Q  Came back and got his drink of whiskey?

A  Yes.

Q  How long have you known Mr. Vail?

A  He didn't want to waste the water.

Q  How long have you known Mr. Vail?

A  Too many years, I guess.

Q  He would probably say the same thing.  But in fact--

A  We have been friends for a good many years.

Q  And you kid back and forth a great deal, don't you?

A  That is right.  And he comes over and eats my food and drinks my liquor, and I do the same to him if somebody

1  brings down a good bottle and I find out about it.

2      Q  In fact, during this period of time you say you have

3  had these conversations he was coming over to your place quite

4  frequently and you were going down to his place quite frequently,

5  were you not?

6      A  That is right.

7      Q  Having dinners together.  And this occasion you

8  referred to this morning, you said you had just put some new

9  sprinklers on your place; is that right?

10     A  That is right.

11     Q  Where were those sprinklers you put on your place?

12     A  They were right below my house.  There was some of

13  them weighed 60 pounds, and they were the first sprinklers

14  that were made, and then we kept adding to them.

15     Q  What were they-- Rainbirds?

16     A  Well, they were iron pipe weighing 65 pounds to a

17  20-foot length instead of about eight pounds now.

18     Q  Were they running when he was over there?

19     A  Yes, and the sun was behind them and they looked

20  like a beautiful sight and a lot of water and he frothed at

21  the mouth.

22     Q  What did he say, "You are stealing my water"?

23     A  That is right.

24     Q  Said it in jest, didn't he?

25     A  No, he didn't say it in jest.  He says, "I don't know

1    what you are doing with all this water you are using."

2        Q   "I don't know what you are doing with all this water

3    you are using," is that what he said?

4        A   Yes.  He said, "You are stealing it from me."

5        Q   "You are stealing it from me"?

6        A   So I said, "It will go right back in the ground and

7    I hope it reaches you."

8        Q   And then you went in the house and had a few drinks?

9        A   That is right.

10       Q   And that is all that was said about it?

11       A   Well, I showed him some papers where in the former

12   trial--

13       Q   I am asking you was anything more said about it?

14   THE COURT:  Let him finish his answer.

15   THE WITNESS:  Yes, while we were discussing this I

16   showed him these papers where Mr. Haas, his attorney in the

17   Santa Margarita-Vail controversy, they put witnesses on to

18   prove that we needed 350 acres-- water for 350 acres.  I had

19   five documents there to show him.

20   BY MR. STAHLMAN:

21       Q   That Mr. Haas had said that you could have water for

22   350 acres?

23       A   Mr. Haas had testified in the trial, put a man by name

24   of John Barton, a man by name of Tripp and a man by name of

25   Brinkerhoff, who was the father of the Brinkerhoff who testified

12023

here, and they put him on the stand and he testified that the

Rancho Ramona needed water for 350 acres of ground that was

under a water system and could be watered if they had that

amount of water.

Q   That is what you told him?

A   I didn't.  I showed him some of the documents that I

had copied from Terry Cosgrove's library on the Santa Margarita

controversy.  He said, "Oh, they don't mean a damn."

MR. STAHLMAN:  Just a moment, please.

THE COURT:  Let him finish his answer.

MR. STAHLMAN:  All right, go ahead.

THE WITNESS:  He just says, "They don't mean a damn."

He said, "Let's play gin rummy."

BY MR. STAHLMAN:

Q   And you played gin rummy?

A   That is right.

Q   Did you win or lose?

A   Well, he's too good for me.

MR. STAHLMAN:  I ask that everything be stricken in

connection with the documents except that he showed him some

documents.

MR. O'MALLEY:  He asked for the conversation, I submit,

and the witness stated it.

MR. STAHLMAN:  That isn't conversation.

THE COURT:  Overruled.  It may remain in.

BY MR. STAHLMAN:

Q   You went down to Mr. Vail shortly after that and you brought down a case of beer and said, "I am not going to drink your water. We will drink some beer," didn't you?

A   That is right.

Q   By the way, when you irrigated up there your alfalfa, that is on a very loose, porous soil, is it not?

A   Yes.

Q   It uses a great deal of water?

A   It uses about three times the amount of water that Vail would use down on his more compact soil.

Q   And a large portion or some portion of that water at least is return flow into the underground soils, is it not?

A   I hope so.  I don't know.  It goes into the ground, and we want to keep it wet down three feet to get down to the bottom of the alfalfa roots.  That is the reason we water all winter.

Q   Now, this diversion that you talked of on the Ramona Ranch and these lateral pipes that you put out into the stream to assist extraction of an additional amount of water from the stream, what year did you put those in?

A   I didn't put them in.  The man we have a deposition--

Q   Do you know when they went in?

A   No, I don't.

Q   They were in when you bought the place?

1    A  They were in when I bought the place.  As a matter

2  of fact, I do know that we had to take some of them out and

3  replace them because they got filled up with sand and wouldn't

4  absorb the water.

5    MR. STAHLMAN:  Your Honor, I am wondering, if we can

6  make arrangements, does the Court care to go up to see this

7  property-- we would like you to, I would, and I think some of

8  the other counsel would also-- to see what this irrigation

9  system looks like?  And then I would want to reserve the right

10  to finish the cross-examination after we have had a chance to

11  see it.

12    MR. O'MALLEY:  I would like to conclude the cross-exam-

13  ination at this time, if your Honor please.  Certainly, if

14  your Honor would like to see the property--

15    THE COURT:  You conclude the cross-examination, and if

16  we go to see it and if it is necessary we will let Mr. Oviatt

17  come back in.

18    First of all, I don't think the irrigation system means

19  one thing one way or the other.

20    Secondly, there are a series of problems involved about

21  these diversions.  But they are not going to be cured by an

22  inspection, because if there are rights that have accrued they

23  accrued a long time ago.  It is not any present use that could

24  create any rights.  So that a visual look at this isn't going

25  to help very much.

MR. O'MALLEY:  It is very pretty country up there, however.

THE COURT:  Yes, I have been through there.  It is pretty country.

THE WITNESS:  You had better bring some donkeys if you want to go look at it.

THE COURT:  Any further cross-examination, Mr. Stahlman?

I will not rule definitely against looking at it, but when we get through we will sort of summarize to see what our problems are.

MR. STAHLMAN:  I would just ask Mr. Oviatt, in the event we desire to go up and look at the property, may we do so?

THE WITNESS:  We would be happy to have you.

MR. STAHLMAN:  Thank you.  Shall I bring my own drink?

THE WITNESS:  Not if I can get out of it.

MR. VEEDER:  Your Honor inquired in regard to Oviatt AO whether the 10% project loss was included in the four-foot per acre and the 3.83, and I find that it was not included. You add to that 10%.

THE COURT:  You are talking about Oviatt's Exhibit A?

MR. VEEDER:  That is correct; the engineering report.

MR. O'MALLEY:  That is correct.

THE COURT:  Most of these reports have been the other way, have they not?

1    MR. VEEDER:  The difficulty arose in my mind when you

2    asked the question, you said four acre feet per acre.  I have

3    always gone on the basis of 4.2, which includes 10%, and which

4    we have been quoting for permanent pasture, which was what you

5    were referring to.

6        THE COURT:  It has always been the practice in these

7    soil reports to include or not to include the loss?

8        MR. VEEDER:  I would like to have Col. Bowen state it,

9    your Honor.

10       THE COURT:  Colonel, you are still under oath.

11       COL. BOWEN:  The tabulation in the reports that shows

12   the duty of water for various crops is field duty and does not

13   include the 10% which is added for project duty.

14       THE COURT:  This is uniform then throughout the reports

15   you have filed?

16       COL. BOWEN:  Throughout the reports, yes, sir.  The last

17   paragraph does state, your Honor, the 4.2 figure, which is

18   simply the field duty of 3.83 for permanent pasture plus .38,

19   being 10%, equaling 4.2.

20       THE COURT:  And the project water duty of 4 acre feet

21   would then be 4.4.

22       COL. BOWEN:  Yes, your Honor.

23       MR. VEEDER:  For row crops.

24       THE COURT:  For row crops.

25       COL. BOWEN:  Yes.

1    THE COURT:  That is cleared up.  Our transcript is in

2  error in the past, but it can be cross-referenced to the

3  present transcript.

4    MR. STAHLMAN:  I think it is in the record, but I want to

5  be sure.

6    Q Mr. Oviatt, this conversation you had with Mr. Vail,

7  about what year was that?

8    A  1945.  Well, I had so many after that, but I guess

9  that is--

10    THE COURT:  The first piece you bought up at Oak Grove

11  was the Bailey Ranch?

12    THE WITNESS:  That is right.

13    THE COURT:  Can you show me on that map just about what

14  the Bailey ranch consisted of?

15    THE WITNESS:  It consisted of everything in the red

16  over there, except those two what we call "Railroad Sections"

17  in the right-hand corner.

18    THE COURT:  All the rest of it was the Bailey Ranch?

19    THE WITNESS:  All the rest of it was the Bailey Ranch,

20  yes. Well, I bought a piece (stepping down to the map)-- Mr.

21  Drew Bailey bought in his name and then transferred it to me.

22  Where is the road?  Well, it's on the left-hand side of the --

23  there is no road on this map, is there?

24    THE COURT:  The road runs just north of the river.  If

25  you will follow it, you will find it.  Here is a road here

1   coming down.

2       THE WITNESS:  That is the State highway, your Honor.

3   The road goes into the ranch there, follows around here.  This

4   location right in here, I think that would be the piece--

5   either that piece or that piece.  There happened to be a spring

6   on there and I wanted the 40 acres.  So it would be right in

7   there.

8       THE COURT:  The rest of this was all the Bailey Ranch

9   when you first bought it?

10       THE WITNESS:  No, there was another piece I bought right

11   in here from a man and his wife named Bailey, but no relation.

12       THE COURT:  What about this?  Is this part of the Bailey

13   Ranch?

14       THE WITNESS:  Yes.

15       MR. O'MALLEY:  He also mentioned these Railroad lands.

16       THE COURT:  All right.  I take it the Government is

17   going to chart this out to see what part of this is riparian

18   and what is not.

19       MR. VEEDER:  We are.  I hope that just a bare certificate

20   will suffice on it.  I don't want to spend a lot of money.

21   But I think we can get the exterior boundaries checked out.

22       THE COURT:  It may be possible to do it with a map.

23   Take a map of the ground and show what was the original grant

24   and what was added to it.

25       MR. VEEDER:  I am going down to the title company.

1    MR. O'MALLEY:  We had ordered that ourselves and they

2  apparently misunderstood what we were seeking and we didn't

3  get it in time for this hearing, your Honor.

4    THE WITNESS:  We will produce it, if you want it, if we

5  can get them back.

6    MR. VEEDER:  I would just as soon save the taxpayers some

7  money.

8    THE COURT:  Take the Railroad grants.  Of course, that

9  land would be riparian to the tributaries it lays over, but

10  its riparian character is an illusory one.  There is no water

11  up there in streams that would be of any account.  However, it

12  is riparian if it overlies a tributary to a river.  But it

13  can't be added to other land to take water from other land and

14  add to it, because it is too far away to do it anyhow.  I don't

15  know that you have any problem.

16    MR. VEEDER:  The United States has interests, of course,

17  through this whole area, parcels of land that, I believe,

18  might be well in competition with the Oviatt claim, and we

19  have to do it, and I am just going to check the whole matter.

20  One of the last exhibits we have is of Bureau of Land Manage-

21  ment properties, and we are preparing to rest, and we want

22  to bring all of these things together.

23    THE WITNESS:  I will have to take that back.  We didn't

24  get it on that ranch.  We got it on Rancho Ramona.

25    THE COURT:  Got what?

12031

THE WITNESS:  We put a title search in.

THE COURT:  You bought the ranch.

THE WITNESS:  We traced it back to the time the Government owned it or the time it was homesteaded.

THE COURT:  But you bought the Rancho Ramona in one piece?

THE WITNESS:  That is right, except one addition of 40 acres.

MR. O'MALLEY:  That was the Bass piece that he testified to, your Honor.

THE COURT:  Any further questions from Mr. Oviatt?

MR. VEEDER:  I have none, your Honor.

MR. O'MALLEY:  I have one deposition, your Honor, please, and I have no redirect examination.

THE COURT:  Step down, Mr. Oviatt.

MR. O'MALLEY:  I hope I may get that in today, because I am in a bind and I would like to get out of here, if I may.

THE COURT:  How long a deposition is it?

MR. O'MALLEY:  It's 26 pages, your Honor.

MR. STAHLMAN:  I have never seen it.

MR. O'MALLEY:  You had notice of it, and it is here and you can make any objection as we go along.

MR. STAHLMAN:  I don't think we have had sufficient notice to see what it is.

MR. O'MALLEY:  But to save time I would like to move

1   along as fast as we can.

2       THE COURT:  Can we read the deposition into the record?

3       MR. O'MALLEY:  That is what I hope to do.

4       THE COURT:  Who is a good reader here?  Do you have a

5   copy of it?

6       MR. O'MALLEY:  Yes, I have the original and a copy.

7       MR. STAHLMAN:  I am a good reader but I don't have a

8   good heart-- I don't know what's in it.

9       THE COURT:  Somebody who is a good reader get up here

10  and read it.  Let me have the copy.

11      MR. STAHLMAN:  Do you have an extra copy?

12      MR. O'MALLEY:  Could we sit down together here?

13      THE COURT:  Does it concern only the Rancho Ramona?

14      MR. O'MALLEY:  This relates to the history of the Rancho

15  Ramona, if the Court please.

16      Do you want to sit over here beside me?

17      MR. STAHLMAN:  Oh, no, I am sure you are not going to

18  read something that is not in there.

19      MR. SACHSE:  This is only Rancho Ramona?

20      MR. O'MALLEY:  Yes.

21      MR. STAHLMAN:  May it be read subject to a motion to

22  strike?

23      MR. O'MALLEY:  This deposition is dated February 1, 1960.

24          "Questions by Mr. Day:

25          "MR. DAY:  This is a deposition taken in

the United States District for the Southern

District of California, Southern Division,

Civil No. 1247-SD-C, in which the United

States of America is the plaintiff, and

Fallbrook Public Utility Company, et al., are

defendants.  It is pursuant to a notice dated

January 25th, 1960, and a notice dated January

26th, 1960, by Musick, Peeler & Garrett,

Attorneys for James Oviatt, one of the defend-

ants."

THE COURT:  Since we have the deposition, can we relieve

the reporter from having to write what you are reading, and

as we get to discussions of certain pages let him take that

down?

MR. O'MALLEY:  That is quite agreeable, your Honor.

"Q  Will you state your name?

"A  Amos Welch.

"Q  Where do you live, Mr. Welch?

"A  At 795 Tolman Creek Road, Ashland,

Oregon.

"Q  Mr. Welch, will you waive the reading

and signing of this deposition?

"A  I will."

The record should show that it was not backread and

signed by the witness.

"Q  Where did you live in 1919?

"A  In 1919 I was living in Hemet, California.

"Q  Are you familiar with a ranch in San Diego and Riverside Counties in California known as the Rancho Ramona?

"A  I am.

"Q  Do you know who owned that ranch in 1919?

"A  Max Kuhnrich.

"Q  When did you first see this ranch?

"A  It was the late spring or summer of 1919.

"Q  What connection did you have with Rancho Ramona in 1919?

"A  I was foreman for E. P. Barnhum of Hemet, California, who was a cement contractor of concrete pipe, and I carried the papers-- that is, the blueprint-- of that line, and saw to it that the line was put in where the survey was put in.

"Q  What line-- what line do you mean by that?

"A  The concrete pipe line.

"Q  What was the purpose of the concrete pipe line?

"A  To convey water all over the ranch.

"Q   This was on Rancho Ramona?

"A   Rancho Ramona.

"Q   What was your responsibility in the installation of this irrigation system?

"A   I was the foreman.

"Q   Was there a creek flowing through Rancho Ramona?

"A   There was a creek that flowed into Rancho Ramona, but not through it, only under flood conditions.

"Q   What was the name of this creek?

"A   It went by Lancaster Creek and Wilson Creek.

"Q   Will you describe the irrigation system which you installed or helped install?   And start with the diversion point-- the sources of the water and carry this description on through.

"A   Well, the  water came in-- came up at the road on the east portion of the ranch from Lancaster Creek, and it was diverted-- about halfway down there was a hill-- the water was diverted into a box, approximately four by eight and about four and one-half feet deep. From there it was run into a 16-inch pipe line

that followed around the hill to a point at the

old blacksmith shop.

"Q May I stop you just a moment, Mr. Welch?
You said halfway down.  Halfway from where to
where?

"A Well, the box is about 350 to 400 feet
from the road.

"Q O.K.  Go ahead and tell me-- was there
any division points in this system?

"A Division-- you mean changing where
you could run the water in different direc-
tions?

"Q Yes.

"A Yes.

"Q All right.  Now, will you take the line
from the box to the first division point?

"A The 16-inch line continued on to the
blacksmith shop-- the old blacksmith shop at
the pepper tree.

"Q On which side of the ranch was that?

"A Well, it was on the east portion.

"Q Well, maybe to make this record more
clear I will ask you to describe the ranch
in so far as hills and fields and flat areas
are concerned, and the general location of it

and what parts of it was irrigated, so that

the record will have a basis to go on.

"A  One-third of it could be farmed, the

rest of it was hills.

"Q  Where was this one-third?

"A  Right practically through the center

of the valley.

"Q  And was that more or less level?

"A  It was more or less level.  It had a

fall to it toward the west.

"Q  Now this farm land, generally which

direction did it run-- this level area or

flat area?

"A  It sloped to the west mostly.  That's

the way the water run.

"Q  All right.  Now, then, if we said the

farm land ran from the east side of the place

to the place, would that be correct?

"A  Approximately, as near as I could

get at it.

"Q  Then, speaking in general terms, this

pipe line-- 16-inch pipe line-- it ran from

the diversion box to a pepper tree, where

there was a division point.  What side of the

farm land was that on?

"A  It's on the upper side as you go

into the place.

"Q  What direction?

"A  Well, it would be on the east and south.

"Q  East and south.  All right, now from

the pepper tree where did it go?

"A  The old original line-- there was a

division box there where it could be ran around

where the buildings are in a 12-inch line, or

it could be taken across and to the middle of

the farm land.

"Q  And what size was that line?

"A  That was 16."

MR. VEEDER:  May I interrupt a moment?

MR. O'MALLEY:  Surely.

MR. VEEDER:  I fell completely off the sled.  I would

like to get your map-- I think it is Exhibit W.

MR. O'MALLEY:  Incidentally, for your information,

counsel, there is a map.  I have a copy of it here, and the

Court has the original, if you would like to follow it, because

he does relate the description of it to a map which is an

exhibit to this deposition.

MR. VEEDER:  This is all right as long as--

THE COURT:  Except that the witness apparently has made

numbers on this little map.

1     MR. O'MALLEY:  Why don't you take this and share it

2   with Mr. Stahlman?

3     MR. VEEDER:  All right.  We have been sharing things

4   for a long while.

5     MR. O'MALLEY:  "Q  All right.  Now, were there

6   any more division points?

7     "A  Yes, there was another division point

8   down at the-- just east of the alfalfa

9   field that I put in-- well, it was there in

10   1944.  I don't know when it was put in.

11   "Q  This was the original division point

12   that was put in in 1919?

13   "A  That was the original point.  It has

14   since been changed.

15   "Q  Now at that time, in 1919, what lines

16   came out of that division point?

17   "A  There was a line that cut across the

18   valley to the south and followed the hills

19   to the end of the place.  Cut across from

20   here and went right around to the lower end

21   of the place.

22   "Q  Is that south?  Would that be south

23   or north?

24   "A  South.

25   "Q  Mr. Welch, did you say this line went

from the division box to the south side?

"A  To the north side.

"Q  And then where did it go?

"A  From there on to the Vail's line.

"Q  How close to the hills did it come?

"A  Right close to the hills.  It followed
level land.

"Q  All right.  Now where did the other line
from that division box go?

"A  There was a division box then that too,
out and went straight west around the point
of the hills.

"Q  And where did it end?

"A  It ended at the property line of Vail's.

"Q  Now going back to the first division
box, you said that there were two lines coming
from there and we have described one.  Now
where did the other line go?

"A  The other line went south around the
buildings and emptied into a dirt reservoir.

"Q  Was there a line from the dirt
reservoir?

"A  There was.  There was a line from the
dirt reservoir that was 10 inch.  It continued
on around the hills to a point opposite

the old frame barn that was there in '44.

"Q What side of the fields was this line on that we were just describing?

"A It would be on the south side of the fields.

"Q How close to the edge of the hills was this line?

"A Right where the hills started in from the level land-- the level land below that could be irrigated from it.

"Q Now, Mr. Welch, have you described the entire system that was installed at that time?

"A As near as I can recollect, that was the total that was put in that time. There has since been pipe laid there and changes made.

"Q Was there any farm land in the Rancho Ramona that could not be irrigated from this irrigation system, that you put in in 1919?

"A For lack of water, yes.

"Q Well, I meant from a physical standpoint.

"A No. Water could be taken and run in any line on the place in 1919 when we left it.

"Q And from those lines would it cover all of the farm land or would there be some

farm land left out?

"A  There possibly would be some of it that
would be-- you would have to use a lot of
grading to have gotten water on it.

"Q  At the time that you installed this
irrigation system was there any evidence
present of any former irrigation system?

"A  Yes.

"Q  Will you describe this?

"A  Someone had taken the water out in a
dirt ditch and had run it down to this old
frame barn, or in the vicinity of this old
frame barn, before 1919, before I saw it.
Because the ditches and flumes and stuff--
in putting in the new lines we had to cut
through ditch banks and kick wooden flume
out of the road in order to get our ditches
dug, to bury the pipe.

"Q  Was there any reservoir present when
you put in the pipe line?

"A  As I recollect, there was no reservoir
when I put in the pipe line.  Everything was
in dirt ditches.  There was an old orchard
down there by the barn-- scattering trees.
A previous flood before that had washed out

the most of them, but there was an occasional

tree there scattered around over the valley.

"Q  Will you describe the flow of water in

Lancaster Creek, or Wilson Creek?

"A  I saw it measured several times and

it run from --

"Q  Well, I mean where did it start and where

did it end?

"A  The most of it came up on Rancho

Ramona.  And I never saw any time when it

wasn't utilized and used on Rancho Ramona,

while I was on the place.

"Q  If Rancho Ramona had not used the

water, what would have happened?

"A  It would have went into the ground.

"Q  Before it left Rancho Ramona?

"A  Yes.

"Q  Did the diversion box, which you

constructed, take all of the water from the

creek?

"A  It did-- only when it was in flood

stage.

"Q  Do you know what crops were irrigated

in 1919?

"A  If I recollect, in 1919 there was

nothing there but a few little acres of
alfalfa and some old trees and a garden
spot up around the house.   That's all I
recollect.

"Q   Did they use water from the new irri-
gation system in 1919, while you were there?

"A   Well, they couldn't use it while I
was there, because it wasn't completed--
until it was completed.

"Q   Did you see it used before you left?

"A   No,  I saw it tested.  It was all
tested.  We run water in it to see if there
was any leaks, but I never saw water run
in it.  In fact, it was sometime in the
Fall.  If I recollect right, it was sometime
in the Fall and it was too late to plant
anything.

"Q   Who was the owner of Rancho Ramona
when you installed this system?

"A   Max Kuhnrich.

"Q   Did you visit Rancho Ramona after
you completed the installation of that
irrigation system?

"A   Yes, I was up there-- I believe it
was in 1920.  E. P. Barnum, the contractor

who installed the pipe, had a little trouble
collecting his money, and he took me up there
when he saw Max Kuhnrich.  I believe it was
either in the winter or the spring of 1920.

"Q  Were they using the irrigation system
at that time?

"A  There was some activity of grading ground
and showed some signs of farming.

Q "Were they taking the water?

"A  They were taking the water and running
it on the ground.  Yes.

"Q  How much of the water were they taking?

"A  All of it when I saw it.  They were
scattering it over this ranch out here in order
to grade it.

"Q  Did you make more than one visit up
there while Kuhnrich owned it?

"A  No.  I was up there just once.

"Q  When did you next see Rancho Ramona?

"A  Possibly in 1926.

"Q  Who owned the ranch at that time?

"A  Brenkenhof.  A fellow by the name
of Brenkenhof.  Hiram Brenkenhof.

"Q  And what was the occasion of your visit
to see it at that time?

1     "A   At that time it was spuds.  He got

2   caught on a bunch of spuds and I went over

3   to help him harvest them.

4     "Q   Where did you live then?

5     "A   I lived right east of Ramona Ranch.

6   I owned 200 acres there bordering Ramona.

7     "Q   Were these spuds raised with the

8   irrigation?

9     "A   Certainly.

10    "Q   How long had you owned that property

11  next to Rancho Ramona, or how long had you

12  lived there?

13    "A   I had bought it in '25 and moved up

14  in '27.

15    "Q   From the date that you moved up there

16  how often did you visit Rancho Ramona?

17    "A   Oh, I couldn't say exactly, but I

18  was there several times.

19    "Q   On these visits did you have occasion

20  to see whether or not they were using all the

21  waters of Lancaster or Wilson Creek?

22    "A   They was using all the water any time

23  That I was over there and hollering for more--

24  trying to distribute more.  That's why I was

25  over there.

"Q   Did you have any occasion to see what
use was being made of the water?

"A  He had the alfalfa and the year that
I helped him with the spuds he had several
hundred sacks of spuds, that I saw.

"Q   Did Mr. Brenkenhof sell the place?

"A  I don't know who he sold it to.  I
don't know who Brenkenhof sold it to.  I
never heard whether Brenkenhof sold to E. L.
Weaver or not, or whether there was a middle-
man in between there.

"Q   Well, to your knowledge-- who was
the next person that you knew owned the
place?

"A   E. L. Weaver.

"Q   Do you know when he came up there to
operate it?

"A   It was in 1930 approximately.

"Q   Were you acquainted with the ranch
during the time that Mr. Weaver owned and
operated it?

"A   Yes.  I worked for Weaver several times.

"Q   Do you know whether or not there were
any changes made in the irrigation system
between the time it was installed in 1919

and the time that Mr. Weaver bought it?

"A. No, only the dirt reservoir.  I believe
Brenkenhof did build the first dirt reservoir.
I'm not positive of it, but I'm pretty sure
that he did.

"Q  You said that you worked for Mr. Weaver
several times.  Would you explain that?

"A  Well, I worked for Mr. Weaver building
a three-car garage and living quarters out
of cement blocks.  And then I took over the
ranch and run the ranch for some time.  I
don't know just how long.  And then there was
a Mr. Winchester came up there and he ran the
ranch for approximately a year.  Then Weaver
came back after me to go back again.  I went
back again and I was with him then a couple
of years.  And then there was a White-- a
Mr. White, that was on there for a year or so.
And all the time that these different ones was
on there more or less I was going back and
forth all the time to help them with the
water.

"Q  Well, did you have good knowledge of
the use of the water all during the time
that Mr. Weaver owned the place?

"A  Yes.  During the time that Mr. Weaver owned the place I had a good knowledge of the water and what it was used for and what was raised.  I couldn't designate exactly what was raised at what time, but I knew what the main crops was.

"Q  During this period were there any changes made in the irrigation system?  Now by 'this period' I mean the time that Mr. Weaver owned it.

"A  Yes.

"Q  Describe what changes were made.

"A  Well, at the old dirt reservoir we built a big reservoir there of sand and oil.  They used two truck and two trailer loads of hot oil and built a reservoir-- I think it was 240 feet long and 175 feet wide and 9 feet deep at the outlet.

"Q  That was the dimensions as you remember them?

"A  As I remember them.  As close as I can remember them.  That was quite a while ago."

THE COURT:  It's time for a recess.

MR. O'MALLEY:  We are on page 14, your Honor.

1   THE COURT:  Yes, about six lines from the top.

2   MR. O'MALLEY:  Yes.  I hope we can finish this today.

3   THE COURT:  We can finish it.

4   (Recess.)

5   MR. VEEDER:  Before we start again on this deposition,

6   I have just one item.  I would like to notice the next set

7   of interlocutory judgments for March 8, 1960.  Is that all

8   right?

9   THE COURT:  Is that a Monday?

10   MR. VEEDER:  That is a Tuesday, your Honor.

11   THE COURT:  I will be here.  That is agreeable.

12   MR. SACHSE:  Which set is that?

13   MR. VEEDER:  I think that will be No. 9 or maybe 10.

14   THE COURT:  What area-- Murrieta?

15   MR. VEEDER:  No; Fallbrook.

16   MR. SACHSE:  Still Fallbrook.

17   MR. VEEDER:  Still Fallbrook.

18   THE COURT:  All right.  Mr. O'Malley, let's keep going.

19   MR. O'MALLEY:  "Q  Any other changes made in the

20       irrigation system?

21       "A  Yes.  In building the new reservoir

22       we discarded the old line from the bkack-

23       smith shop to the middle of the valley and

24       run it from the new reservoir to this

25       diversion box, and discarded this line

JOHN SWADER, OFFICIAL REPORTER

that ran from the point of the hill at the

blacksmith shop.

"Q  Any other changes?

"A  Well, there was a building built by the

old adobe house as a blacksmith's shop on this

carrying line to the reservoir.  And we pumped

water out of that into an 8 by 20 by 8 feet

deep tank on top of the hill and used it

for domestic water.

"Q  Will you describe every use, if you can,

that was made of the waters of Lancaster

Creek while Mr. Weaver had it?

"A  Well, it was domestic water for one

thing, stock water, irrigation, to raise

alfalfa, garden, orchard, grapes, sugar

beets-- or stock beets, corn-- I believe

they had a crop of milo in there one year.

And the overflow when we didn't use the

water on this alfalfa land we let it run

through the alfalfa and irrigated what dry

farming barley land we could get it over,

so there was no water went to waste while

I was with Weaver.

"Q  During the time you were with Weaver

was there any water flowing on past in

12052

the diversion box?

"A None, only in flood stage.

"Q Did you ever try to do anything to increase the amount of water that was diverted into the irrigation system?

"A Yes, I did.

"Q Would you describe what you did?

"A I went to the diversion box and started with a 4 foot ditch-- 4 feet wide and about 4 to 5 feet deep-- and ran diagonally above the-- to about a point-- what was that-- I believe it was 150 feet. We used 300 feet of 14-inch pipe and laid them 3 to 4 feet deep in the sane, and diverted the water into the box through this underground system.

"Q How many lines was that?

"A That was two 14-inch lines laid side by side and laid loose. The joints was not cemented. That was the theory that the water would seep through the joints and get away and be utilized through the sand.

"Q What effect did this have?

"A It increased the water about one-third.

"Q Did you use this increased supply

of water on the ranch?

"A   Yes.   The water had dropped down
to about 85 inches before I put this in and
we were looking for more water.

"Q   You say '85 inches'.   What do you mean?

"A   85 miner inches-- approximately that.

"Q   Can you remember how many acres you actually
irrigated on the place?

"A   Well, not knowing the lines or where
they were-- and I never measured any of it--
we called the alfalfa field 40 acres.   And
then there was five or six acres around the
point of the hill on the low end of the place.

"Q   What crop was in that?

"A   Alfalfa.   Then there was about five
or six acres up next to the houses that was
in alfalfa.   So that would make a total of
40-- 46-- possibly 56 acres of alfalfa, as
near as I can guess at it.

"Q   What other crops were irrigated at
the same time?

"A   Well, the orchard at the house, the
garden.

"Q   How many acres in that?

"A   Oh, there was possibly five, maybe

six.  Any waste water we'd run it off on the

barley fields.

"Q  How many acres were covered in the

barley fields?

"A  Well, that's hard to guess at it.

It wasn't graded ground and it was wherever

the water would run.  It's hard to guess at

it.  It could have been anywheres from ten

to twenty acres.

"Q  Did you always run the waste water

on the same 10 or 20 acres?

"A  We run it all below the alfalfa.  Yes.

They would always plant that piece of grain

first, because we could get water on it.

"Q  When you described the pipe line,

you spoke of the pipe line which was on the

south side as going around the point of a

hill.  Did you irrigate any land west of that

point?

"A  That is where the six acres of alfalfa

was at.  The water ran through that and run

out into the grain fields below, towards

Vail's fence.

"Q  Is that the same grain field that you were

just speaking of?

"A  Yes.

"Q  Were there any grain fields-- let me get my
directions straight-- east of that point?

"A  No.  The alfalfa field was in here and
ran up to a point about 200 feet from this
hill.  Between this big patch of alfalfa
and that other patch was about 250 feet, I'd
say.  And this was all cottonwood trees in
here and a river bed.

"Q  What was directly north of that point?

"A  Vacant land.  Flat, level land that
I had graded.

"Q  North of that point of hill where the
pipe line went around?

"A  This was river bed.  We had it in
grain and dry farmed it.

"Q  Can you recall any other crops or
any other irrigation other than what you have
told me?

"A  No, I can't recall any more.

"MR. DAY: Mr. Reporter, will you please
mark this Defendant James Oviatt's Deposition
Exhibit A?  (Mr. Day hands copy of map to
Reporter.)

"Defendant James Oviatt's Deposition

Exhibit A-- copy of topography map of part of

Riverside County, California, with area in

center colored yellow to denote Rancho Ramona--

was marked for identification."

MR. O'MALLEY:  At this time, if the Court please, if I

may interrupt this, may I have the original of the map marked,

which I believe your Honor has, as Defendant's Exhibit for

Identification next in order.

THE COURT:  That will be AL.

MR. O'MALLEY:  Which is referred to as A in this deposi-

tion.

THE COURT:  All right.

(Defendant Oviatt's Exhibit AL was marked for identifica-

tion.)

MR. O'MALLEY:  "Q  Mr. Welch, I hand you a map marked

defendant James Oviatt's Deposition Exhibit A.  Are you

familiar with the country shown by this map?

"A  I am.

"Q  Will you take this pen and mark north on

the north side, whatever would be the north

part of the map?

"A  (Witness marks indicating north at top

of map.)

"Q  Does this map show Rancho Ramona?

"A  It does.

"Q   Will you describe that part of the
map which is Rancho Ramona?

"A   The yellow.

"Q   Will you take this pen and make a
mark and label it 'A' at or near the point
where the water was diverted from Lancaster
Creek?   I don't expect you to be precise on
this, but as close as you can tell from looking
at the map and your memory.   Just make a mark
there and put an 'A'-- a capital A alongside
of it.   Will you put a line right across the
creek at that point?"

MR. STAHLMAN:   This map you showed me doesn't have
that on it, does it?

MR. O'MALLEY:   This is a copy.   I presume the original
has it.

THE COURT:   Yes, it has it, but it doesn't show up very
well.   It is right here, as I get it.

Do you want to sit up here by me on this witness stand
and look at it?

MR. STAHLMAN:   Fine.

THE COURT: Go ahead.

MR. O'MALLEY:   "A   (Witness marks on map.)   That's
where the box was at.

"Q   All right.   Now does this map, marked

Defendant James Oviatt's Deposition Exhibit

A, show the section lines and 40 lines?

"A  It does.

"Q  May I have the pen?  I'm going to take

the pen and I'm going to mark in what is a

40 line the letter 1. and ask you:  was

there irrigation done in that 40?

"A  There was.

"Q  Im going to mark another 40 division

number 2.  Was there irrigation done in

that 40?

"A  There was.

"Q  What part of the 40 marked 1. was

irrigated?

"A  Nothing was irrigated below the

reservoirs.  It all lays where you've

got 1. and 2.

"Q  You say the reservoirs.  Do the

reservoirs show on the map?

"A  They do.

"Q  How are they shown?

"A  Side by side.

"Q  Are they any color or any distinguishing

mark?

"A  They are blue, I believe.  Blue or

black.

"Q. Now then I'm going to mark another 40 3. Was there irrigation in that 40?

"A That is the part that I don't know exactly where this alfalfa is. There was some orchard trees in here that had been irrigated, because I pulled them out when I started to grade this 40 in here for alfalfa and I think, as near as I can remember, that this 40 is the one with the big field.

"Q Now wait a minute. This 40-- we are making a written record here and we can only refer to them by the ones we have numbered. All right. Now I'll number this next 40 4. Was there irrigation in 4 to your knowledge?

"A Not to my knowledge.

"Q I'll number this one 5. Was there irrigation in 5?

"A There could be. These alfalfa beds could have run over into that. The old barn set right in here, right about on the division line. At the end of the alfalfa there was a barn set here and there was a road run through here.

"Q   I'm going to mark this next one 6.
Now what division line did you mean?

"A   6 is the one that had the big alfalfa
field on it, as near as I can recollect.

"Q   I'll mark this 40 7.   Was there
irrigation on 7?

"A   None that I recollect.   No.

"Q   I'll mark this 40--8.   Was there
irrigation there?

"A   Waste water from the alfalfa was
run there on the grain fields-- had  been
run there.

"Q   I'll mark this one 9.

"A   That's the same as 8.   There had
been some water run on it in the grain fields.

"Q   I'll mark this one 10.   Was there
irrigation on the 40 that is marked 10?

"A   Yes.

"Q   And I'll mark this one 11.   Was there
irrigation on the one marked 11?

"A   Yes.

"Q   Now where is the alfalfa field that
was down around the point?

"A   It was part on 11 and possibly 10.
It's below this point of the hill.   It lays

right in through here.  We had the alfalfa

field laid right in here, just like this.

"Q  Would you take the pen and just sort

of outline the alfalfa field as you remember

it?

"A  As I remember it, there was a road

around here and the alfalfa field come in

here something like this.  (Witness marks on

map.)

"Q  All right.  Mark that 'B', will you?

Did you mark that a B or D?

"A  D.

"MR. DAY:  Mr. Reporter, that was marked

with a D.

"Q  And that was the alfalfa field that

was around the--

"A  Yes.  The waste water from this was

run onto 11 and 10.

"Q  Will you tel me how the reservoir,

that was constructed for Mr. Weaver, was

used?

"A  It was used to hold water over the

night, so that we could get a bigger head

of water, so that we could do away with the

night irrigation, and we could get a bigger

head of water at a time.

"Q   Did you ever shut the water off at the diversionbox?

"A   Never.

"Q   If you weren't actually irrigating at any time, where did  the water go?

"A   Into the reservoir.  The dirt reservoir and the new reservoir were side by side and it run from one into the other.  We could use it and divert it either way.

"Q   Did Mr. Weaver sell the ranch while you were still there?

"A   He did.

"Q   To whom did he sell it?

"A   James Oviatt.

"Q   Did you work for James Oviatt?

"A   I worked for James Oviatt approximately two or three months.

"Q   During the time that you worked for James Oviatt did he use the irrigation system, taking water from Lancaster or Wilson Creek?

"A   He did.

"Q   How much of the water did he take?

"A   All of it.

"Q   During all of the time of your

acquaintance with Rancho R mona, do you
know of any time when they did not take
and use all of the water of Lancaster or
Wilson Creek?

"A  I couldn't say that any time I was
on Rancho Ramona that the water wasn't all
used and they were looking for more.  I was
there several times trying to increase the
flow.

"Q  Do you know approximately how much
water was used by Rancho Ramona during the
time that you were familir with its use?

"A  All of it.

"Q  How much was this?  Was there any
measurement?

"A  Anywheres from 85 to 105 inches.

"Q  How did you know this?

"A  It was measured over a weir with a
4-inch backup in it.

"Q  Did you measure it?

"A  No.

"Q  Who measured it?

"A  I measured it several times, but--
but nothing official.  It was measured by
different ones.  I never knew who measured it.

I always imagined that it was Vail Brothers

that measured it, or it could have been the

State, or it could have been the Forest

Service.  I don't know, but I saw it measured

several different times by different men."

MR. STAHLMAN:  I ask that the imagination be stricken, your Honor.

THE COURT:  It doesn't make any difference.

MR. STAHLMAN:  I don't think it does, either.

THE COURT:  Go ahead.

MR. O'MALLEY:  "Q  Did you go with these men and watch them measure it?

"A  Several times I did.

"Q  Were there any times, while you were familiar with Rancho Ramona, that there was a severe water shortage?

"A  We had several times when the water dropped.  Yes.

"Q  And did you continue to take the water?

"A  We continued to take the water.

"Q  Do you know of any complaints made by lower riparian users concerning the water that Rancho Ramona was taking?

"A  I heard of some, but I never knew

anhthing about them personally.

"Q  Did you ever know of a man by the
name of F. C. Finkle?

"A  I recollect an old gentleman up there
when we put the pipe line in and I'v long
since forgot his name, but he could have been
an engineer.  I don't know who he was.  I saw
him around there when we installed the pipe
line.

"Q  You don't know that his name was Finkle?

"A  I couldn't swear that his name was Finkle.
No.

"Q  During the time that you were on Rancho
Ramona were there livestock being raised there?

"A  They always had more or less livestock.

"Q  Tell us how many head of livestock and
what type were raised.

"A  When I left, when Weaver sold to Oviatt,
there was over 100 head of hogs and I don't know
how many turkeys.  That was the young Weaver's
project.  He had a good many turkeys on the
place.  I installed some of the water dripping
fountains and one thing and another that he
used up there.  We used a lot of water on those

turkeys. Ther was a stallion and three brood

mares, over 100 head of hogs, there was a

couple or three milk cows, and there was some

beef cattle.

"Q How many beef cattle?

"A I don't know exactly. I never knew

whether Weaver bought those-- it was just about

the time of the sale-- and I never knew whether

Weaver bought them or whether Oviatt bought

them. There was about 30 head, as I remember.

"Q All of the time you were on the ranch

there were livestock there?

"A Yes, there was livestock and we used

horses along with the tractor on a lot of work.

"Q How were these livestock watered?

"A By the water from the creek.

"Q By the creek you mean Lancaster Creek?

"A Lancaster Creek-- the same water.

There was no domestic water there. The windmill

was up above, but the well caved in and then we

used the water from the creek.

"Q Do you have any other knowledge about

the use of water on Rancho Ramona?

"A All I know is, there was a lot more pipe

line laid on the place in 1919 than there was

water to put in it.  We was always short of
water.   There was a lot more ground could have
been put in there-- could have been put under
cultivation and irrigated, if we'd had the
water, but we never had the water.

"Q  These fields that you irrigated-- how
far back towards the hills did you irrigate?

"A  Well, the pipe line was at the edge
of the hills and we irrigated toward the valley.
And the ground had never been leveled to run
water on.  And we just turned it loose out
these pipe lines and we just let it flood over
what it would cover.  That's the way the
barley fields was irrigated.

"Q  And the Alfalfa Fields were--

"A  They were levled and bedded to save
water.  If they hadn't been you'd never have
got them wet.

"Q  Why do you say that?

"A  Because those beds have all got to be
bedded and floated and graded before you can
run water.  It's a sandy soil.

"Q  When did you leave Rancho Ramona?

"A  February, 1944.

"MR. DAY: That is all."

1          It contains the usual signature line, et cetera.

2          THE COURT:  He said he deletes the word "No" at the

3    beginning of line 6 on page 8.

4          MR. O'Malley:  Yes.  Would you like me to read that?

5    Would yourHonor like me to read the two or three lines with

6    the deletion?

7          THE COURT:  Yes.

8          MR. O'MALLEY:  I will read from the top of the page

9    so that it will make a little sense and context:

10              "Q  Was there any farm land in the

11              Rancho Ramona that could not be irrigated

12              from this irrigation system, that you

13              put in in 1919?

14                 "A  For lack of water, yes.

15                 "Q  Well, I meant from a physical

16              standpoint?"

17    He deletes the word "No," and it now reads:

18                 "A  Water could be taken and run in any

19              line on the place in 1919 when we left it."

20    The word "No" was deleted.

21          THE COURT:  Incidentally, this man Day, who knew about

22    this case only what counsel told him, took a pretty good

23    deposition, I think.

24          MR. O'MALLEY:  I think he did a good job, your Honor.

25          THE COURT:  At least the deposition is intelligible,

1    which is more than you can say for a lot of them.

2         MR. O'MALLEY:  I should say that this man is very elderly

3    and was in very poor health and was very difficult to interro-

4    gate.  I feel he did a good job, too.

5         THE COURT:  Do you offer the deposition in evidence?

6         MR. O'MALLEY:  It is offered in evidence, your Honor.

7         THE COURT:  Anybody see anything objectionable?

8         MR. O'MALLEY:  I also offer, of course, the attached

9    Identification AL.

10        THE COURT:  The deposition as read will be received in

11   evidence.  Do you want the deposition marked as an exhibit

12   also?

13        MR. VEEDER:  Why not run it in the record?

14        THE COURT:  It has been run in the record.

15        The map referred to in the deposition as Exhibit A

16   will be received in evidence as Exhibit AL.

17        (Defendant Oviatt's Exhibit AL for Identification was

18   received in evidence.)

19        MR. STAHLMAN:  Will there be copies made of that?

20   I don't think we need them.

21        MR. O'MALLEY:  Your Honor, I just want to check to be

22   sure that there are no exhibits that have not been offered

23   and received.

24        With that, I believe the defendant Oviatt rests.

25        I have filed points and authorities.  I can discuss our

1    position more completely at this time, if your Honor wishes.

2        Suffice it to say, I would like leave to file an

3    additional memorandum after I have received a transcript,

4    including today's transcript, and file it with your Honor as

5    soon as I can get it together and state our position more

6    fully.

7        I will state generally, however, at this time that it

8    is our position that the diversions of the waters of Wilson

9    Creek by the defendant James Oviatt are of such nature that

10   they do not significantly affect the water available to the

11   downstream owners, and therefore I base that upon the testimony

12   of our expert witness Mr. Bookman and also upon the testimony

13   elicited under cross-examination from Col. Bowen, who indi-

14   cated that there as an impervious barrier at the point of the

15   Vail Dam.

16       However, our position with respect to this matter is

17   this.  Our rights are riparian in character and we are entitled

18   to all of the rights of a riparian owner to that quantity of

19   water which a riparian owner is entitled to for beneficial

20   use upon our respective properties.

21       That brings us to the point of prescriptive rights,

22   which we are urging, and I am thoroughly familiar with the

23   usual doctrine in California that when water is utilized

24   upon riparian land we start out with a presumption that such

25   waters were used in the exercise of the riparian right.  We

1   start with that presumption.  So that a person in the position

2   of our riparian owner does, indeed, undertake a very heavy

3   burden when he attempts to prove a prescriptive claim.

4          THE COURT:  Let's not argue the law now on this.

5          MR. O'MALLEY:  Very well.  I will submit a memorandum

6   arguing both the factual and legal aspects of our case.

7          THE COURT:  Let me sort of sum up what we have here.

8   I have done the same thing as to some of these other ranches.

9   These aren't findings, but they are tentative suggested

10  findings as to what we have, and maybe we can pinpoint some

11  things that aren't in dispute and some things that are in

12  dispute.

13         First, as to the riparian character of the land, subject

14  to what check the Government makes of the title and the

15  situation that exists there, we can start in with the premise

16  that all the land is riparian, unless the Government shows to

17  the contrary.  Now, of course, if there was an isolated piece

18  of land at the ranch-- an extreme case would be the Railroad

19  Sections-- they would be riparian as to the little tributaries

20  over which they lay.  But that riparian right would be an

21  illusory one because there would be no water up in there except

22  at a time of rain, and therefore the riparian right doesn't

23  mean anything.

24         But take a case closer to the stream.  Assuming that

25  certain lands were riparian along the stream, the purchase of

1  another piece of land and adding it to what the owner already

2  had would not permit the owner to use water out of the stream

3  for that additional land.  The land obviously had been

4  severed, and by being joined again with land that joins the

5  stream would not make it riparian so that it might use water

6  out of the stream.

7      MR. O'MALLEY:  Unless the piece which is joined to it was

8  in itself riparian in character.

9      THE COURT:  Well, it would be riparian as to any

10  tributaries over which it lay.

11      MR. O'MALLEY:  That is right.

12      THE COURT:  But by being attached to land which ran

13  down to a piece of running water, it couldn't use water out

14  of that creek.

15      MR. O'MALLEY:  That is correct.

16      THE COURT:  I don't think we will have any problem on

17  this.  This is a matter of some study to be made.  It may be

18  best to do it very simply or illustrate it by some map showing

19  by colors the date of acquisition, et cetera.

20      As to irrigable acres, the defendant Oviatt is satisfied

21  with the calculations made in Government's Exhibit A.  And there

22  is a terrific amount of this land that is irrigable.  I don't

23  know whether it is broken down in this exhibit or not.  Who

24  has the exhibit?

25      MR. VEEDER:  Did you want to look at the copy, your

Honor?

This is my copy (handing document to the Court).

THE COURT::The irrigable land, as shown by the exhibit, is 2,418.1 acres, of which 1,853.2 is suitable for row crops, 564.9 is suitable for pasture.  So there is far more irrigable land than can ever be irrigated out of the water available. And the Court would propose to make findings as to the irrigable land on the basis of Exhibit A.

As to the irrigated land, there is dispute in the testimony, but one thing is apparent, that the amount of irrigated land has decreased as time went on.  Mr. Oviatt himself in his testimony, the figures he gave, as I wrote them down-- I am talking now about Ramona-- don't correspond with his Exhibit AL.  He started out and said a hundred acres in 1944, which corresponds with the chart AL.  He said 145 acres in 1945, and the chart shows 200.  In 1947 he has his top of 205 acres, and the chart shows 200.  In 1948, 180, and the chart shows 180.  The Court would be inclined to think that there had been as much as close to 200 acres at one time under the greatest flow of water irrigated, and that the amount irrigated from time to time has decreased down to where last year probably 65 acres were irrigated.  I don't think this is too important, unless there is merit to this prescriptive right, about which I have considerable doubt.  I think it would be a very simple matter to draw findings on

1    what ground has been irrigated.

2         As to reservoirs, I think the evidence is clear that

3    these are not prohibited reservoirs.  These are reservoirs

4    that have been used to create a head of water and pass the

5    water through and are not storage for those periods of time

6    that would prevent them being a proper use of water.

7         As to the diversions, the Ramona diversion, I think the

8    evidence is clear that there has been a taking of all the

9    water in the stream, except at flood seasons.  However, that

10   pipe through which the water could run was a 12-inch pipe,

11   and running full but with no head Mr. Bookman calculated 130

12   inches.  I haven't made any computations, but I have serious

13   doubt that you could get 130 inches through a 12-inch pipe

14   without some kind of head or pressure.  At any rate, there is

15   no evidence that the water flowing down the creek at any time

16   completely filled the pipe, and there is no evidence that at

17   any time the water was under any head running down there.

18   There is some doubt in my mind about how much water actually

19   went through this 12-inch pipe.  It couldn't have been over

20   130 inches.  Maybe counsel on reviewing the record and from the

21   figures can come up with some closer estimate as to how much

22   water was actually available there at the creek.

23        As to Oak Grove, the evidence shows that there has been

24   about 80 acres irrigated.  There doesn't seem to be much

25   dispute on that.  All of the irrigable ground at various places

1   along the river on that part of the ranch is a very reasonable

2   estimate of what ground has been irrigated.

3       We come to the first of our problems when we get to

4   these matters of diversions.  First, the downstream diversion

5   of Temecula Creek for Oak Grove.  This diversion was originally

6   made on the property of another person by name of Levy.  The

7   property later passed to someone else.  We have title books

8   here-- we can probably find out.  In 1928 the diversion was

9   moved to another person's property, Winthrop's property, and

10  in 1930 the ditch was enlarged to where the condition was that

11  as much as 30 miner's inches was taken off in 1930.  Certainly

12  there was no 30 miner's inches taken originally with a 4-inch

13  pipe.  There is no evidence that water went through it under

14  any head.  What the effect is of a diversion at one place

15  and later moving it to another I am not prepared to say right

16  now.  Also, we run upon a problem of other people's property

17  rights being involved here.  This Winthrop property and Levy

18  property within this watershed, is there an easement over their

19  property for this ditch and pipe line?

20      MR. VEEDER:  The date of patent would be extremely

21  important there.  The patents after 1890 contain provisions

22  for canals and ditches.

23      THE COURT:  Yes.  That may be a matter which we will

24  have to go into further when we find out more about the title

25  problems on these two pieces of property.  Now, going next to

1  upstream diversion, the Cummings-Oviatt diversion, the

2  evidence shows that there was a box in the stream and that the

3  water ran over it and kept a 2-inch line filled with water.

4  The evidence that it had been used for fifty years by

5  Cummings was stricken, but the Court is of the opinion that

6  if inquiry is made that probably would be the fact.  This

7  again involves the rights of other persons.  If persons who

8  owned this piece called the Cummings property, which is

9  shown on Exhibit Z as leased to Oviatt, have a claim to the

10  use of this water, that should be ascertained and established.

11  All Mr. Oviatt's lease would do would be to give him the

12  right to use the property, but it wouldn't affect the right

13  of the owner of the property to this piece of water.  That is

14  going to have to be explored.

15  Who is this party Cummings?  It is Misspelled on the map

16  Exhibit Z.  Is this some relation to this Orville Cummings?

17  MR. OVIATT:  No, your Honor.  It is her father who

18  homesteaded and left the property to Mrs. Cummings and her

19  sister Mrs. Harmon.

20  THE COURT:  What was the father's name-- Cummings?

21  MR. OVIATT:  No, the women are both married.  I have

22  forgotten what his name is-- in fact, I never did know.

23  THE COURT:  In other words, some person-- we don't know

24  his name-- homesteaded this.

25  Is it your information-- this isn't evidence, Mr. Oviatt--

1  is it your information that this water diversion was taken out

2  about the time of the homestead?

3      MR. OVIATT:  Yes, your Honor.

4      THE COURT:  This ought to be explored, because these

5  people Cummings and Harmon would have some substantial right,

6  and Mr. Oviatt as another user on this small line might have

7  a very substantial right.  I think we will have need for more

8  testimony on that Cummings-Oviatt diversion.

9      MR. OVIATT:  The people live in Perris, I think, and in-

10 asmuch as I was leasing it they asked me to protect their

11 rights.

12     THE COURT:  This raises another question.  Maybe some of

13 these things will be simple to you, but they are not immediately

14 simple to me.  Here is water not picked up on a man's property

15 but picked up out of the stream before it reaches his property,

16 and if it is not picked up I think probably some of it would

17 have reached his property.

18     MR. OVIATT:  May I ask the Court a question?

19     THE COURT:  Well, wait just a minute.  I don't know

20 what that situation is.  Is this a riparian use?

21     MR. VEEDER:  He can divert upstream off of his property

22 in exercise of a riparian right, I think.

23     THE COURT:  He has diverted it from a stream that is

24 going to flow through his property.  If he has taken it

25 upstream of his property across other property and onto his

1   property, is this an exercise of a riparian right or an exer-

2   cise of an appropriative right?  It's your question, Mr.

3   Oviatt.

4   　　　　MR. OVIATT:  Well, if we hadn't taken that water and

5   kept the line filled up and put it to beneficial use on that

6   property and on some property over a period of five years,

7   Mrs. Cummings would have lost her right to that water.  Isn't

8   that correct?

9   　　　　THE COURT:  Well, we will enlarge on the matter later.

10  　　　　At any rate, you have some loose ends there.

11  　　　　Now, going to the two diversions out of the canyon--

12  the Rattlesnake Canyon is the simpler of the two-- the only

13  thing shown here is use permits, and the water apparently

14  originates on the Government land.  The permits are revocable.

15  They can't be the basis of any prescriptive right.  I would see

16  no particular problem involved in the Rattlesnake Canyon

17  situation, the permissive use, except the question of whose

18  land this pipe line traverses, and I was trying to ascertain

19  from the map.  Apparently after it leaves the Government land

20  it crosses other land before it gets on to the Oviatt property.

21  What kind of problems that presents I don't know.  That may

22  present some problem in connection with the owner of that land.

23  Although the use from the Government may only be a permissive

24  use, it may be that some prescriptive use has been obtained to

25  take that water across X, Y, or Z's land.

1    MR. VEEDER:  You are speaking of the right of way now

2    THE COURT:  The right of way.

3    MR. VEEDER:  He said that the patent issued in 1933,

4  didn't he, or something like that, long after the pipe line

5  had been put in.

6    MR. OVIATT:  No; 1914.

7    MR. VEEDER:  Yes, 1914.

8    THE COURT:  No start was made on the pipe lines until

9  at least 1913.  Both of the first use permits are dated 1914,

10  both for Kohler and for Rattlesnake Canyons.  As to Kohler

11  there is this filing in 1913, a year and a half before the

12  first use permit.  At any rate, Rattlesnake doesn't seem to

13  be too difficult, except in so far as it may involve some

14  other owners here who may or may not be saddled with some

15  easement for this permissive use.

16    On Kohler Canyon-- I am in doubt about this-- the first

17  permissive application was granted in December, 1914, and in

18  February, 1913, I think it was, this filing was made which

19  stated not that the work had been done but that the work was

20  going to be done over a certain period of time.  What the

21  effect of that is I don't know.  It was followed up subsequently

22  by a permissive application by Chalma Bailey, and the granting

23  of the permissive use under Exhibit AC in December, 1914, from

24  which it might be argued that if he had any right he abandoned

25  it and there is now shown only a permissive use.  However, in

1 1913 I think it was the law that a person could appropriate

2 water by his act, and I don't know that the record is too

3 clear now as to just exactly what Bailey did after he made

4 the filing. Query: Whether the filing was enough? Or did he

5 have to go ahead and actually take some water?

6     MR. VEEDER: That rises on the Forest Service lands,

7 doesn't it?

8     THE COURT: Yes.

9     MR. VEEDER: The Forest Service lands were withdrawn, I

10 believe, in 1908 for the Cleveland National Forest.

11     THE COURT: Well, that I can't tell you about. But if

12 these had not been withdrawn, the water on Government land

13 would be subject to appropriation.

14     MR. VEEDER: That is correct, if it was public domain.

15 But I think our checking the titles of the Cleveland National

16 Forest dated back to 1908.

17     THE COURT: That may solve it.

18     Then the final problem we have is whether or not there

19 is any prescriptive right established. And I will let you

20 brief that, Mr. O'Malley.

21     MR. O'MALLEY: Very well.

22     THE COURT: And after your brief is filed, anyone else

23 who wants to reply to it may have ten days thereafter to reply.

24     How much time do you want to file that brief?

25     MR. O'MALLEY: Frankly, all I can get, your Honor. I am

in kind of a bind.  I would certainly require three weeks, if I can have it.  I am in a rather tight spot.  I will get it out as soon as I can.

THE COURT:  March 7th or March 8th, somewhere along there?

MR. O'MALLEY: Yes, your Honor.

THE COURT:  That is almost a month.

MR. O'MALLEY: That would be fine.  I will try to get it in sooner than that if I can.

THE COURT:  How much of an exhaustive search have you made?  Have you found most of the law?  Maybe you have found what you think you are going to stand on.

MR. O'MALLEY:  Frankly, I think I know what most of the law is, I think I know most of the cases, but I would like to do some further research to be sure that I haven't missed any points.  And further, if your Honor please, I would like to discuss the law in relation to the transcript.

THE COURT:  All right, I will give you until Monday, March 7th.

MR. O'MALLEY:  That will be fine, your Honor.

MR. SACHSE:  Mr. Grover asked me particularly to request in his behalf that if briefs were filed in this that Mr. O'Malley note and send a copy to him, because his clients Gibbon and Cottle are downstream and are very much interested.

MR. O'MALLEY:  I think I have a record of everybody

1  concerned. I will try to serve everybody. And I will try to

2  get this brief in much sooner than that.

3  　　　　THE COURT: All right, get it in if you can on or before

4  March 7th, and other counsel may have ten days thereafter to

5  reply.

6  　　　　Now, are there other legal problems presented here that

7  I haven't seen?

8  　　　　MR. O'MALLEY: I think your Honor stated most of the

9  problems that I saw in this case.

10  　　　　THE COURT: Mr. Stahlman?

11  　　　　MR. STAHLMAN: I think your Honor has mentioned the

12  question in connection with the prescriptive rights and all

13  the elements that would go into that.

14  　　　　THE COURT: Mr. Veeder?

15  　　　　MR. VEEDER: I think there are problems, your Honor. Mr.

16  Stahlman told me that he would obtain the pleadings in

17  Barbee vs. Oviatt. I think your Honor made a very fine

18  summary of it.

19  　　　　THE COURT: You don't see any other problems.

20  　　　　There is one that bothers me. Maybe there is an easy

21  answer to it. The Oviatt-Ramona Ranch runs clear to the Vail

22  property, there is no intervening owner, and of course Vail

23  has a dam across the stream down to bedrock catching every

24  drop of water that comes down that stream below Oviatt. How

25  can I phrase this. As between Vail and Oviatt, had Vail been

1    able to catch all the flood waters, and with Oviatt's use being

2    made upon the ground over the bed of the stream where there

3    would have to be recharge, I have serious doubts how loud

4    the Vail Company can complain about the Oviatt use on the

5    Ramona Ranch.  I don't know whether this has any legal basis

6    or not-- maybe this is just a Sunday school approach to it--

7    but Oviatt can't do anything with flood waters, it passes over

8    his ground, it helps charge the alluvium north of Vail Dam,

9    but by the time it gets to Vail Dam anything in that stream

10   is caught in Vail Dam until the day it floods over, if it

11   ever does.

12               MR. VEEDER:  If ever.

13               THE COURT:  If it ever does.

14               MR. STAHLMAN:  Your Honor overlooked one.

15               THE COURT:  I suppose what you say finally is that Mr.

16   Oviatt is entitled to a reasonable use, a correlative use with

17   his neighbors, and is this one factor that you take into

18   account in determining what his correlative use is?

19               MR. STAHLMAN:  Here is a factor that no one has mentioned,

20   and I have been wondering if they were going to.  We have

21   ground water storage unit No. 5 there, and everybody seems to

22   admit that that water is subterranean water as part of the

23   stream system, and there is this ground water moving down all

24   of the time--

25               THE COURT:  Where is water storage unit No. 5?

MR. VEEDER:  It is the Aguanga-Lancaster.  I think 15 will show it, your Honor.

THE COURT:  15?

MR. VEEDER:  Exhibit 17 will show it.  It also will appear on 15.  There is your ground water storage unit No. 5.

THE COURT:  What significance do you attach to that?

MR. VEEDER:  I attach this significance to it, your Honor, that there seems to be agreement that the ground water is part of the surface runoff of the Santa Margarita River, and obviously when they are participating in the utilization of ground water, as they are, and apparently their wells seem to be one of the best sources of water they have, I think there is a question of correlative rights all the way downstream. The fact that Vails have put a concrete structure across the valley makes no difference in regard to riparians downstream.

MR. STAHLMAN:  Your Honor, there are some other problems that may inter into this situation, and that is we have asked for the well logs, and these are the deep wells that have been drilled since the Bulletin was prepared, and there is that possibility that there will be some evidence in relation to what the characteristics of the Storate Unit No. 5 back of the Vail Dam would be.  In other words, we foresee the possibility that it could be that wells drilled upstream may create a gradient and pull water out of the Vail Dam.

MR. VEEDER:  There is no evidence on that.

12085

1      MR. STAHLMAN:  There is no evidence on that yet.

2      MR. SACHSE:  There is no evidence in the record.

3      MR. STAHLMAN:  None on it as yet.  We can't put evidence

4  in until we get those well logs.

5      MR. SACHSE:  The well log isn't going to show you a cone

6  of depression.

7      MR. STAHLMAN:  It will tell you the character of the

8  soil, so that you can determine -- I don't know, I am not an

9  engineer-- as to what the situation would be in that character

10  of soil under these conditions, the depth of the well, et

11  cetera.  I just mentioned that.  There is no evidence on it

12  as yet.

13      THE COURT: Well, there is another problem, too, that

14  would have to eventually be worked out in these findings.

15  There is not much dispute between the United States and

16  California on the areas of younger and older alluvium, and an

17  application of that to the map of the Oviatt property, and

18  there is certain of Mr. Oviatt's property that is in the

19  basement complex, and the judgment should provide, as it does

20  with other people, that if he finds any water on that part of

21  his property it belongs to him and he is just lucky to have it.

22      Are you familiar with this problem?

23      MR. O'MALLEY:  I am not familiar with it, your Honor.

24      THE COURT:  We are all in agreement on this.

25      MR. O'MALLEY:  It sounds good to me.

THE COURT:  For instance, if you look at Map 15, the

blue area is basement complex, and the Rancho Ramona is up in

here somewhere, most of it probably over the basin.  But the

Oak Grove Ranch scatters all out through here.  Now as to

property which might be in the sections I am pointing to,

that is all basement complex.

MR. O'MALLEY:  Namely, 32.

THE COURT:  I don't know where his ranch runs.  But

the judgment will eventually provide that if he gets any water

in any of those areas, it is his water and that water is not

part of the stream system.  We have agreed that we are not

going to encumber the stream system with water found in the

basement complex.

MR. STAHLMAN:  He will find the drilling up there probably

less productive than he found it in some of the wells down

below.

Your Honor, I think we got away from this other question

a little quickly in relation to Vail.  There are a number of

factors that enter into that situation.

THE COURT:  I didn't hear the first thing you said.

MR. STAHLMAN:  The question that your Honor raised in

relation to whether Vail would have any complaint in relation

to the Oviatt property and the water.  Did you mean the summer

flow or at any time?  You know, we are obligated under our

permit to release certain waters downstream.

THE COURT:  I am not deciding anything.  I just raised this point that the Rancho Ramona goes clear to the Vail property line, and here is the dam.  I don't know.

MR. VEEDER:  Both of them overlie the same ground water unit.  That is the point that I intended to make.

THE COURT:  Well, when do you come back again?  Shall we try for March 22nd?

MR. SACHSE:  To refresh our recollection, your Honor, what was our schedule as to clients?

THE COURT:  Mr. Grover indicated, according to my notes, that he could be ready to go on March 22nd.  But you said you would be ready in March.

MR. SACHSE:  Yes.

THE COURT:  And probably Mr. Krieger could be ready.

MR. SACHSE:  I will try to work it out.

MR. VEEDER:  I believe Mr. Littleworth will be ready. If you set it for the 22nd I will call him in the morning and advise your Honor on that point.

We are shooting for April 5th on this new approach we are taking on the basis of your letter.

THE COURT:  Those are minor matters, aren't they?

MR. VEEDER:  I wouldn't think that this --

THE COURT:  Oh, you mean April 5th I have listed the start of your cleanup on the Murrieta.

MR. VEEDER:  But that could be quite a show, your Honor,

1   because I think people are going to show up on this one.

2   THE COURT:  Let's say March 22nd and see if we can get

3   a week's work in.   That would be Mr. Grover, Mr. Sachse--

4   MR. SACHSE:   I would hope to have available Stardust

5   Ranch, and also if Mr. Veeder is ready to go ahead with

6   Diamond and Domenigoni Valleys, Searl Brothers, and subject to

7   soil report Occidental College.

8   MR. VEEDER:   In addition to those, Mr. Yackey called me--

9   he as a pretty good piece of property up there-- that Mr.

10  Yackey wants to put in his case sometime, and I told him I

11  would call him as soon as you gave us a specific time.  So I

12  am assuming he will be in that period, your Honor.

13  THE COURT:  Mr. Veeder, you will have the responsibility

14  of trying to line up a week's work for that time.  But those

15  are our prospects:  Mr. Grover, Mr. Sachse, Mr. Krieger, Mr.

16  Yackey.

17  I don't think I ever did fix a date that I wanted these

18  proposed findings and conclusions and judgment in from the four

19  of you on this Vail.

20  MR. VEEDER:  You said the latter part of March.

21  MR. STAHLMAN:  You didn't give a date.

22  THE COURT:  Do you want to get them in here by the 22nd?

23  MR. SACHSE:  This doesn't take cross-filing, because we

24  each have a separate job and don't have to serve each other.

25  I can get mine in before the 22nd.

THE COURT:  Mr. Veeder?

MR. VEEDER:  Fine.

THE COURT:  Let's make that the 22nd also.

The case is continued to March 22nd at 10 o'clock in this court.

MR. SACHSE:  There is nothing in connection with Mr. Hoffman's correction of the exhibits that takes any of our attention?

MR. VEEDER:  If he is going to be in here, we will check out the exhibits.  Any additions will be made and we will make copies for counsel.

MR. STAHLMAN:  Now on the 22nd I don't expect you to stand up and say "I expect Mr. Stahlman to proceed this morning," Mr. Veeder.

MR. VEEDER:  I think I will do that.

MR. SACHSE:  May we go off the record for just a minute.

THE COURT: Yes.

(Off the record.)

(Adjournment until Tuesday, March 22, 1960, at 10 o'clock A.m.)