# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

—  —  —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

—  —  —

UNITED STATES OF AMERICA,

Plaintiff,

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.

Defendants.

—  —  —

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         Tuesday, March 22, 1960

Pages:        12090 to 12266

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By
DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 — Ext. 370

VOLUME 105

12090

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

-- --

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
        .vs.                   )          No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, ET AL.,              )
                               )
                Defendants.    )


REPORTER'S TRANSCRIPT OF PROCEEDINGS


San Diego, California
Tuesday, March 22, 1960


APPEARANCES:

        For the Plaintiff            WILLIAM H. VEEDER, ESQ.,
                                     Special Assistant to the
                                     Attorney General,
                                     Department of Justice,
                                     Washington, D. C.

                                     LCDR. DONALD W. REDD.

APPEARANCES (Continued)

| | |
|---|---|
| For Defendant Fallbrook<br>Public Utility District,<br>Et Al. | FRANZ R. SACHSE, ESQ. |
| For Defendant Vail<br>Company | GEORGE STAHLMAN, ESQ.<br>EARL K. STANTON, ESQ. |
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney General,<br>By FRED GIRARD, ESQ.,<br>    Deputy Attorney General. |
| For Defendant Murray<br>Schloss Foundation | WALTER GOULD LINCOLN, ESQ. |
| For Defendants<br>Barnett, et al. | MESSRS. BEST, BEST & KRIEGER,<br>By JAMES H. KRIEGER, ESQ. |

# INDEX TO WITNESSES

| For the Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| Jennings B. Shamel | 12111 | 12123 | | |
| **Malcolm M. Waddell** | **12139** | 12147 | | |
| Roland E. Pearl | 12153 | 12161 | | |
| A. F. Howell | 12166 | 12178 | | |
| Walter Nielsen | 12197 | | | |
| Kate Louise Gwinn | 12202 | 12205 B | | |
| **Albert H. Small** | **12206** | | | |
| **Ralph Bates** | **12207** | 12212 | | |
| **Edward Bryant** | **12213** | | | |
| Thomas E. Wilks | 12217 | 12231 | | |
| Thomas H. Wilks | 12236 | | | |
| David A. Brown | 12247 | | | |

12093

INDEX TO EXHIBITS

| Plaintiff's Exhibit - | Iden. | In Evidence |
|---|---|---|
| 218 - Shamel | 12113 | 12138 |
| 219 - Waddell | 12140 | 12150 |
| 220 - Pearl | | 12161 |
| 221 - Howell | | 12185 |
| 222 - Nielson | | 12201 |
| 225 - Bates | 12207 | 12213 |
| 226 - Bryant | 12214 | 12217 |
| 227 - Thomas E Willes | | 12247 |
| 227-A - Thomas H. Willes | | 12247 |
| 228 - David Brown | | 12258 |
| 223 - Given | | φ 12205-D |
| 224 - Small - Eugene | | |

Roripaugh's Exhibit -

| K | 12121 | 12122 |
| L | | 12125 |
| Well Log - Gonzales well | | 12144 |
| Roripaugh Et D - part of also | | 12156 |
| Well Driller's Report - no. 13647 | | |

1   San Diego, California, Tuesday, March 22, 1960.   10:00 A. M.

2

3        THE CLERK:  Number eleven, 1247-SD-C, United States vs.

4   Fallbrook.

5        THE COURT:  Do you have the appearances of counsel, Mr.

6   Clerk?

7        THE CLERK:  Yes, your Honor.

8        Are there any persons appearing in the Fallbrook matter

9   who are not represented by an attorney?

10       THE COURT:  No one here is appearing who does not have an

11  attorney?

12       MR. TARWATER:  Does that mean people from Murrieta?

13       THE COURT:  Yes.

14       MR. TARWATER:  There are two or three of us here from

15  Murrieta who don't have attorneys.

16       THE COURT:  Let's have the names one by one.

17       MR. TARWATER:  Irvin Tarwater.

18       THE COURT:  And you own land in Murrieta?

19       MR. TARWATER:  Yes, sir.

20       THE COURT:  How much?

21       MR. TARWATER:  My own interests would be approximately

22  120 acres.

23       THE COURT:  Do you also have some relatives there?

24       MR. TARWATER:  Yes, sir.  My wife, Rose C. Tarwater, my

25  boy, Benjamin W. Tarwater, and his wife, Clara Irene Tarwater.

1    THE COURT:  Is that all the Tarwaters now?

2    MR. TARWATER:  Yes, sir.

3    THE COURT:  What other persons are appearing here pro per

4    this morning?

5    MR. MANCE:  Mike Mance.

6    THE COURT:  How many acres do you have there?

7    MR. MANCE:  I sold them last year, but there is 345 acres.

8    THE COURT:  That you now have?

9    MR. MANCE:  Well, I sold them last year, so I don't know.

10   I was notified to appear here on the 5th of April.

11   THE COURT:  Do you have any further interest in the

12   property?

13   MR. MANCE:  I still have the trust deed for it.

14   THE COURT:  What other party is here?

15   MR. MAYS:  Fred Mays.

16   THE COURT:  How many acres do you have?

17   MR. MAYS:  80 acres.

18   THE COURT:  Were letters sent out to a number of these

19   people for today?

20   MR. VEEDER:  Your Honor, the letters that went out for

21   this date pertain to Interlocutory Order No. 12, and we have

22   received only one letter back from Harry Windsor, stating that

23   they have sold their property as of January, 1960.  I don't

24   know whether anyone in the courtroom now from the Fallbrook

25   area has appeared to object to the interlocutory order.  I think

1    THE COURT:  Let's see the order.  What area does this

2  cover?

3    MR. VEEDER:  In the Fallbrook Creek area, your Honor;

4  not in the Murrieta Creek area.  The Murrieta Creek area is

5  set for April 5th and 6th.

6    THE COURT:  Did you gentlemen think you were called in

7  here today, or did you just come in because of this being

8  tried?

9    MR. TARWATER:  We just came down.  We were interested in

10  the trial.

11    THE COURT:  All right.

12    MR. VEEDER:  I think we have subpoenaed Mr. Tarwater and

13  others.

14    Isn't that correct, Mr. Tarwater?  You have a letter from

15  us for April 5?

16    MR. TARWATER:  Yes, we are supposed to come in on the 5th,

17  and some of the others on the 6th.

18    THE COURT:  All right.

19    MR. VEEDER:  I think that clears it up.

20    THE COURT:  This proposed judgment in the Fallbrook Creek

21  area is one of these judgments that if you got any water under

22  the ground you are lucky to have it; it belongs to you?

23    MR. VEEDER:  That is correct.

24    THE COURT:  Is there anyone here from the Fallbrook

25  area in connection with Interlocutory Judgment No. 12?

1     All right, submit it, then.

2     MR. VEEDER:  I will bring it to your chambers, your Honor.

3     I have some other matters that I would like to bring to

4 your Honor's attention, if I may, prior to Mr. Krieger's

5 proceeding.

6     I had a call yesterday from Mr. Yackey.  There has been

7 some question as to whether he should introduce evidence in

8 regard to his claims this week.  He indicated to me, your Honor,

9 that he would much prefer to put it off, if he could, until

10 sometime next week, and asked me to call him -- Mr. Sachse is

11 here-- in regard to it this afternoon, if I would.  There is

12 pending at the present moment, to be heard on March 29, 1960,

13 the application to appropriate rights to the use of water by

14 Mr. Yackey and an associate.

15     THE COURT:  Before the State Water Board?

16     MR. VEEDER:  That is correct, your Honor.  Mr. Sachse and

17 I have discussed this matter.  Mr. Sachse has filed protests

18 to Mr. Yackey's application.  It occurs to me that the disposi-

19 tion of that application might be relevant here.  Under those

20 circumstances it occurs to me it might be desirable to let the

21 Yackey matter go over until after the 29th.

22     Could we hear from Mr. Sachse?

23     MR. SACHSE:  I concur.  I request the Court to put the

24 thing over until the Water Rights Board hearing.  I am pro-

25 testing and I am going to ask them for an early ruling.  I

1  think it is the kind of case they can give a prompt opinion on.

2  THE COURT:  Do you anticipate that they might rule right

3  at the hearing?

4  MR. SACHSE:  I question that, because I don't know whether

5  it will be a full board or only one man.

6  THE COURT:  There is no firm date fixed for Mr. Yackey?

7  MR. VEEDER:  No, your Honor.

8  THE COURT:  So it is entirely satisfactory to hear his

9  matter later on.  I wouldn't think you would get a ruling

10  from the Water Rights Board next week.  We will put it over

11  until some later date.

12  MR. VEEDER:  We were figuring on the date of April 26th

13  for some more Murrieta people.  Would that be satisfactory to

14  your Honor?

15  MR. SACHSE:  We are coming back, I presume, on the 30th

16  of this month, which would be the day after the Water Rights

17  Board hearing.  We might have it at that time.  We might be

18  able to tell the Court when we expect a ruling from the Water

19  Rights Board.

20  THE COURT:  All right, let's put it on the agenda for the

21  morning of March 30th, when we will later hear it.

22  MR. VEEDER:  We will call them and tell Mr. Yackey that,

23  your Honor.

24  THE COURT:  Yes.

25  MR. VEEDER:  I have a call also from Mr. Grover.  He has

1    the Gibbon-Cottle matter, which is scheduled for sometime

2    this week.  I advised him that, if agreeable to your Honor,

3    I would call him sometime this afternoon and tell him the

4    progress that is being made here in regard to claims of Mr.

5    Krieger.

6         Another call came in from Mr. Swing, and he asked to be

7    notified in regard to some of his clients up in the Temecula

8    area, and I advised him that we wouldn't be getting to those

9    for sometime, unless your Honor had orders in regard to them.

10   I know of no reason why we should progress into that area at

11   this time.

12        THE COURT:  All right.

13        MR. VEEDER:  I have, your Honor, orders in connection with

14   the continuance of the well survey which is presently in

15   progress, and also an order extending time for the convenience

16   of operation of water level recorders on the Vail properties.

17   I have spoken to Mr. Krieger and Mr. Stahlman about these

18   matters.  They have no objection to the entry of this order.

19        Is that correct?

20        MR. STAHLMAN:  I have no objection to the order, your

21   Honor, but I do think that very shortly we should have some

22   indication here as to what has been demonstrated by these

23   tests and what direction we are going.  I think we ought to

24   put Mr. Kunkel on the stand.

25        MR. VEEDER:  I would like that.

1    MR. STAHLMAN:  Put Mr. Kunkel on the stand and find out,

2  so that when we get through with these things we don't have to

3  revamp a lot of them.

4    THE COURT:  When did you start these well tests?  Last

5  fall sometime?

6    MR. VEEDER:  It was in June, your Honor.

7    THE COURT:  In June.

8    MR. VEEDER:  That's right.  This continuance which we

9  have here will just about make it one year.

10    MR. KRIEGER:  Is this the second continuance?

11    MR. VEEDER:  No, it is the third continuance.

12    MR. KRIEGER:  I share the same view, your Honor.  I have

13  no objection to it, except that I would like to know where we

14  are going and what is being accomplished by them.

15    THE COURT:  You have had a go this summer, fall, winter

16  and spring.  It seems to me that you can clip this off at any

17  time.  Unless you get rain in the next couple of weeks, you

18  are not going to get any more water from now until June.  You

19  will be getting less water.  I will sign the order, but I

20  agree with counsel, let's wind this up and summarize the

21  results and see what we have.

22    MR. VEEDER:  We have exhibits prepared, your Honor, and

23  we will put them in on rebuttal, based on these investigations.

24    THE COURT:  Are you going to wait until the running out

25  of this year period before you prepare them?

1    MR. VEEDER:   No, your Honor, we are going on schedule.

2    MR. GIRARD:   When does the order expire that the Judge

3  is signing?

4    MR. VEEDER:   It is 90 days from the 22nd of March.

5    THE COURT:   June 23rd the first order was made.

6    MR. VEEDER:   That is correct.

7    THE COURT:   This makes it practically a full year, then.

8    MR. VEEDER:   That is correct.  That is what we asked for,

9  your Honor.

10    THE COURT:   No, you asked for 90 days, and you kept

11  extending it.

12    MR. VEEDER:   I will say I had one year in mind.  Every-

13  body has been reading my mind.  I thought it was very clear.

14    THE COURT:   Tell me some more about this matter.  You say

15  you are going to have the results of these tests in on schedule?

16  What does that mean?

17    MR. VEEDER:   We intend to put in rebuttal, your Honor,

18  and this material which we have, which has been distributed to

19  all counsel, has been sent out in accordance with your Honor's

20  orders, it has been compiled, it has been analyzed, and ex-

21  hibits have been prepared in connection with it to show the

22  result.

23    MR. STAHLMAN:   That is exactly the point I would like to

24  have.  What is the analysis that your people have made as a

25  result of these exhibits?  We get them from time to time.  And

1   what is the theory or basis upon which they are to be laced

2   together?  I think we should know that at the earliest possible

3   date.

4        MR. VEEDER:  We will proceed in accordance with your

5   Honor's direction.

6        THE COURT:  Have you seen the results of the tests from

7   time to time, too, counsel?

8        MR. STAHLMAN:  The measurements, yes.

9        THE COURT:  But you haven't sent them any of your con-

10   clusions or summaries?

11       MR. VEEDER:  No, your Honor.

12       MR. KRIEGER:  Or even what is being aimed at.  We have

13   received the data, but that's all.

14       THE COURT:  When will you begin to have some conclusions

15   and summaries as to what is shown by this testing?

16       MR. VEEDER:  May I confer for a moment, your Honor?

17       THE COURT:  Yes.

18       MR. VEEDER:  Mr. Kunkel tells me that he has met with Mr.

19   Webb and members of the State in regard to the outcome of these

20   investigations and they have had discussions in connection with

21   them.  I don't think there is anything secretive about it at

22   all.

23       MR. STAHLMAN:  It is not that.  I think we should have

24   in the record here what we are doing, too.  What direction are

25   we going? What is the object?  We haven't had that.  I think

1    we ought to have it.  And what conclusions have been reached

2    up to the present time.

3        THE COURT:  It is all directed toward the extent of a

4    water basin in the Murrieta Valley, I take it, is it not?

5        MR. VEEDER: That is correct, your Honor.

6        Your Honor will recall also that pursuant to your Honor's

7    direction a canvass is being made above Vail Dam. That is

8    primarily what this order relates to now, the maintenance of

9    recorders on the Vail property and on the Roripaugh property.

10    We are going ahead on this matter, and as I say, it would be

11    premature to put in a complete analysis now.

12        MR. KRIEGER:  May I ask Mr. Veeder if this information

13    is aiming at a transmissibility test?

14        MR. VEEDER:  No.

15        MR. KRIEGER:  Is that where we are getting?

16        MR. VEEDER:  No.

17        MR. STAHLMAN:  We don't know.

18        THE COURT:  Isn't it aimed, isn't it all directed toward

19    this issue which we have not resolved as to the extent of

20    these ground water basins?

21        MR. VEEDER:  That is right.

22        THE COURT:  Is there any mystery about that?

23        MR. STAHLMAN:  And that only?

24        MR. VEEDER:  And in regard to the present water levels

25    throughout the water-bearing strata, particularly in Storage

Unit 4.

THE COURT:  It might be used for comparison to show higher and lower water levels some years preceding.

MR. VEEDER:  That is correct.

THE COURT:  But it is essentially directed at the extent of the basin.

MR. VEEDER:  It is essentially directed at the extent of the water-bearing strata related to the runoff of the Santa Margarita River.  That is what it is directed to.

THE COURT:  Well, let's not speculate as to the conclusions.  We will have ample time to see what they are and to analyze the data on which they are based.  But I take it that you intend to do this before the end of June.  Or do you want to wait until this whole year runs out?

MR. VEEDER:  I would like to have the balance of this continuance that we have here, because it would more than show where the pumps have stopped in the valley and when they have been started again on a new irrigation season.

THE COURT:  It will be understood that this year is all you want.  There will be no further extension.

MR. VEEDER:  Unless your Honor directs to the contrary.

THE COURT:  And that you will promptly start in after the 22nd of June to compile your final conclusions and results.

MR. VEEDER:  That is right, your Honor.  That is what we

1    will do.

2        THE COURT:  May I inquire also, has there been any

3    resolution of the differences between counsel in reference

4    to the Schloss Estate?  I see one of the attorneys here this

5    morning.

6        MR. LINCOLN:  No, your Honor, we have had no conference

7    with any of the attorneys with reference to that.

8        THE COURT:  Am I going to have to try that out?  Were

9    there any further orders made by any of the State courts in

10   the matter?

11       MR. LINCOLN:  I hope not, your Honor.  Unless my worthy

12   opponent on the 24th of this month insists on going ahead

13   with something, which, under the circumstances which have

14   developed, I think your Honor will not do that.

15       THE COURT:  Is there any change in the status?

16       MR. LINCOLN:  Yes, your Honor, there was a change.  Your

17   Honor will remember that I suggested at the time I was here

18   before that there was a matter pending before the Fourth

19   District.  That matter has been resolved against me.  In the

20   meantime, however, I have filed an appeal from the orders

21   of the Probate Court of Riverside County, and that appeal is

22   in process of perfection.  It has not yet gone to the reviewing

23   court.

24       THE COURT:  I am inclined to think that I am not going

25   to try this issue between you and your opponent on the matter,

1   and just wait until it is decided by some State court.  Why

2   should I spend a couple weeks hearing this row about the

3   trustees of the Schloss Estate?

4        MR. LINCOLN:  Your Honor is very wise, and while I would

5   be very glad indeed to have that decided by this Court, I see

6   no reason why it should be, because it must of necessity be

7   tried at sometime or other and the Superior Court of the

8   State of California would be the wiser court to try it in

9   because all of the pleadings are there and the witnesses are

10  in that vicinity.

11       THE COURT:  That is not a firm decision, but that is my

12  present inclination.

13       Any other matters, Mr. Veeder?

14       Any other attorneys?

15       MR. VEEDER:  We have nothing at this time, your Honor.

16       THE COURT:  All right, we will start, Mr. Krieger, with

17  some of your clients.

18       MR. KRIEGER:  Yes, your Honor.

19       I wonder if at this time we could ask leave of the Court

20  to withdraw as counsel for four parties that we have repre-

21  sented.

22       The first one is Mr. C. L. Cain, who is shown as Parcel

23  No. 46 on Roripaugh's Exhibit B.  Mr. Cain has withdrawn from

24  the group of people in the Murrieta Valley whom we represent.

25       The same is true of W. A. Thompson, shown as the owner

of Parcel 41 on Roripaugh B.

The third is Mr. B. O. Williams, as Parcel 34 on Roripaugh's B, who recently passed away.

The fourth one is H. L. Wilks, shown as Parcel 50 on Roripaugh's B, who no longer lives in the Murrieta Valley and we have not been able even to contact him.

So we would ask leave to be substituted out for those four parties.

THE COURT: How can you be substituted out without notice to these people?

MR. KRIEGER: We will give them the best notice we are able to give them that we are withdrawing. We have reason to believe that the latter party has just moved away from the Valley and we probably can reach him. So far we have not been able to contact him.

THE COURT: You have no substitutions substituting these people in pro per.

MR. KRIEGER: No, we do not, your Honor. The first two, though, we would like, and we have no objection from them, that they be substituted in pro per-- Mr. Thompson and Mr. Cain.

THE COURT: Are they here today?

MR. KRIEGER: I don't believe so. No.

THE COURT: I don't propose to substitute you out of the case without either a motion or a substitution of attorneys prepared in the regular course.

12108

MR. KRIEGER:  I intend to do that, your Honor.  I was just wondering if there was any objection from other counsel or from the Court if we should file the normal motion to be substituted.  If not, we will go ahead with that right away.

MR. VEEDER:  This raises a problem for us, then, your Honor.

THE COURT:  Yes.  I will pass on your motion, if it comes up by motion, when it gets here.  If it is submitted, of course, as a substitution, that is something else.  We can probably do that in routine order.  But there has been work done, you know the facts of these matters, we can proceed a lot faster with counsel, and I will think about relieving you like this.

MR. KRIEGER:  We understand what the Court's view would be and we have asked the people that we represent, some hundred people in that valley, who have been working together as a group, and from time to time we have had very few people that have had to withdraw from this suit, and they have not been footing their share of the bill with others, and the group has asked that we be relieved.  That is the reason for it, your Honor.

THE COURT:  All right.

MR. KRIEGER:  I might also state that I think there are soil surveys on all of these parties.

I think, Col. Bowen, you have soil surveys on practically

1    all of them?

2        THE COURT:  On all of them, Colonel?

3        COL. BOWEN:  Yes, sir.

4        MR. KRIEGER:  Except those who have not permitted the

5    Marines to come on.

6        THE COURT:  These four that are mentioned, there are

7    soil surveys?

8        COL. BOWEN:  Yes, sir.

9        MR. VEEDER:  Should those then be included in our April

10   5th and 6th hearing, your Honor?  We are trying to take care

11   of these areas as completely as we possibly can.

12       MR. KRIEGER:  May I point them out to you over here.

13   I will point them out to you. Cain is Parcel 46 (indicating).

14   He is purely a riparian owner by our own admission.

15       Thompson is Parcel 41, which is right here.

16       THE COURT:  There would be no problem on either one of

17   those.  They are both overlying owners.

18       MR. KRIEGER:  That is correct.  And the third one is

19   Williams, Parcel 34.

20       THE COURT:  I find it, down south of 41.

21       MR. KRIEGER:  Right here.  Still no problem.

22       THE COURT:  There is a small portion across the fault line,

23   but there is no problem there.  He is an overlying owner.

24       MR. KRIEGER:  That is right.  And H. L. Wilks, Parcel 50,

25   is right up here also, right astraddle the fault line on the

1  northeast side of the valley.

2  THE COURT:  Parcel 50 might cause a little more trouble,

3  depending on where that basin goes.  I can't see by my map.

4  Does he lie on both sides of that fault line?

5  MR. KRIEGER:  He does, and I think we have introduced

6  some evidence here that there is very little water up in this

7  area which is to the northeast of the fault line, although it

8  does come in the compass of the Kunkel line.

9  THE COURT:  That is the only one that will probably give

10  us any concern, isn't it?

11  MR. VEEDER:  It would give me no concern, your Honor.

12  THE COURT:  Shall we send letters to these people and ask

13  them to be here on the 5th?

14  MR. VEEDER:  I would like to have your Honor direct them

15  to do that, with the agreement of counsel.

16  MR. KRIEGER:  Fine.

17  THE COURT:  Or as to Mr. Wilks, see if we can serve a

18  subpoena on him-- that is Parcel 50.  That is the only one that

19  will present any problem.  The others fit right into the

20  category of what we have been doing-- overlying owners.

21  MR. VEEDER:  Could I ask him voluntarily to appear before

22  serving the subpoena?

23  THE COURT:  All right, you may use your own judgment.

24  MR. KRIEGER:  We are going to have two of the Wilks family

25  testifying today.  Maybe we can check with them right now

1    whether they have any knowledge as to where H. L. Wilks is.

2    Do you know?

3    MR. THOMAS WILKS:  I don't recall his address right off.

4    MR. KRIEGER:  In what area does he live?

5    MR. WILKS:  He is in Los Angeles.

6    MR. KRIEGER:  He still owns the property?

7    MR. WILKS:  Yes, sir.

8    THE COURT:  Is he a businessman or is he employed?

9    MR. WILKS:  He works for the Domingues Water Company.

10    MR. KRIEGER:  That helps us.  We ought to be able to

11  reach him.

12    THE COURT:  He ought to be interested enough to come down

13  if we send him a letter that we are going to hear his parcel

14  someday.  Try to get him here by letter, and if not, see if

15  you can get a subpoena served on him.

16    All right, what is next?

17    MR. KRIEGER:  Mr. J. B. Shamel.

18    This testimony, your Honor, will be directed to Parcel 31,

19  on Roripaugh's D.

20

21               JENNINGS B. SHAMEL,

22  one of the defendants herein, being first duly sworn, on his

23  oath was examined and testified as follows:

24    THE CLERK:  State your name, please.

25    THE WITNESS:  Jennings B. Shamel.

12112

1    MR. KRIEGER:  This parcel joins the Roripaugh piece,

2  your Honor.

3

4                    DIRECT EXAMINATION

5  BY MR. KRIEGER:

6        Q  And your address?

7        A  301 North Bay Front, Balboa Island, Newport Beach.

8        Q  Your wife is Ruth T. Shamel?

9        A  Yes.

10       Q  And you and she together own the parcel shown as

11 Parcel 31 on Roripaugh's Exhibit B?

12       A  That is correct.

13       THE COURT:  How many acres?

14       THE WITNESS:  Approximately 160 acres.

15 BY MR. KRIEGER:

16       Q  That property is described in your answer is it not?

17       A  Yes.

18       MR. KRIEGER:  There is a slight discrepancy between the

19 answer and the Government's soil survey, but I believe the

20 difficulty has been resolved and the Government is amending

21 their soil survey, or has amended it, so that the answer and

22 the soil survey are the same.

23       I ask that the soil survey for Jennings B. Shamel be

24 marked for identification.  Or has it been?

25       THE COURT:  Have we been using Government numbers on these

1    soil surveys?  Is that the practice?  Have we been using

2    United States exhibit numbers on the soil surveys?

3        MR. VEEDER:  I think we have been, your Honor.

4        THE COURT:  Yes.  I have 207.  Is that about right, Mr.

5    Clerk?

6        THE CLERK:  The next Government exhibit will be 218, your

7    Honor.

8        THE COURT:  What has happened in between?

9        MR. VEEDER:  That involves the Vail properties and the

10   matters of the stipulated judgment, your Honor.

11       THE COURT:  Let's see your list of exhibits, 206 through

12   218, Mr. Clerk.

13       (Plaintiff's Exhibit No. 218 was marked for identification.)

14       THE COURT:  Proceed.

15   BY MR. KRIEGER:

16       Q  Mr. Shamel, you have had a chance to review this soil

17   survey, Exhibit 218 for Identification?

18       A  Yes, I have.

19       Q  Now that report shows that there are 165 acres in this

20   parcel of land; is that right?

21       A  Approximately, yes, sir.

22       Q  And it also shows that 158.6 acres are irrigable.  Do

23   you agree with that conclusion?

24       A  Yes, I do.

25       Q  Do you irrigate this land at the present time?

1    A   Yes.

2    Q   About how much of it?

3    A   Well, all of the 158 acres or thereabouts.

4    Q   What kind of crops do you raise there?

5    A   There is permanent pasture.

6    Q   And what sort of irrigation practice do you use?

7    A   On the hilly portion we sprinkle, and on the level

8  we run.

9    Q   You have two irrigation wells on this land, do you not?

10   A   That is correct.

11   Q   The first one of these is shown, is it not, on

12  Roripaugh's A as Well, 25M2; is that right?

13   A   Yes, that is correct.

14   Q   And that well would be located on the upper part of

15  your property and near the road; is that right?

16   A   That is right.

17  MR. KRIEGER:   The log of that Well 25M2 has already been

18  introduced as part of Exhibit B, your Honor, and is in evidence.

19   Q   When was that well 25M2 drilled?

20   A   From all the information I have and the date marked on

21  the concrete base of the old pump, it was 1912.

22   Q   Have you taken any recent measurements of the well?

23   A   Sometime in January I think we checked the water level.

24  MR. VEEDER:   Is that 1960?

25  THE WITNESS:   Yes.

BY MR. KRIEGER:

Q  What was the static water level at the time you measured it in January, 1960?

A  To be accurate I think I would have to refer to a letter that I mailed after the measurement.  It was standing around 20 or 21 feet.

Q  Could it have been 24 feet 3 inches, as set forth in your letter?

A  Approximately.

MR. VEEDER:  I have no objection to counsel testifying.

MR. KRIEGER:  We can get it all out, but it will waste time.

Q  Now, was it measured last year about this time that you know of?

A  Not that I can recall, no.

Q  Do you know whether in the last year the water table has risen or fallen?

A  It seems to have been approximately the same at the same seasons of the year.

Q  Is there anything unique about this ater in so far as its taste or temperature is concerned?

A  It seems to be considerably warmer than the water from either the domestic or the other irrigation well. There seems to be more mineral content and taste.

THE COURT:  How deep a well is it, do you know?

1    THE WITNESS:  Approximately 500 feet or maybe a little

2  better.

3    THE COURT:  How big a casing?

4    THE WITNESS:  As I recall, it is a 12-inch casing.

5    THE COURT:  Do you know how many miner's inches or gallons

6  per minute it will pump?

7    THE WITNESS:  I think the last check the power company

8  made was somewhere between 900 and 1,000 gallons, that I

9  recall.

10 BY MR. KRIEGER:

11    Q  You have another well on this property, I think you

12  mentioned, and is that not also shown over here on Roripaugh's

13  Exhibit A as 26R2?

14    A  Yes.

15    Q  And where is that in relation to the previous well you

16  testified to?

17    A  It is a little further away from Winchester Road.

18    Q  How far south is it?

19    A  I would say probably a thousand yards from the other

20  well, approximately.

21    Q  A thousand yards?

22    A  Yes.

23    Q  There is a well log on that well, also?

24    A  Yes, sir.

25    MR. KRIEGER:  And here again, to refresh the Court's

1   recollection, that has been submitted as part of Exhibit B.

2      MR. VEEDER:  Is that Roripaugh's D?

3      MR. KRIEGER:  Roripaugh's D is a collection of all those

4   well logs, Mr. Veeder.

5      Q  Have you recently measured the static level of this

6   well?

7      A  At the same time I measured the other well, and I am

8   going to have to probably give the same answer; I would have

9   to refer to a letter to give you the exact footage, but it

10   was something around 20 or more feet

11      Q  20 or 21 feet?

12      A  Yes.

13      MR. VEEDER:  Are we going to have that letter, or how

14   are we going to handle this?  I think it is speculation now

15   entirely, and I don't believe this is evidentiary in character.

16   He says he doesn't remember and he has to refresh his memory

17   from something, apparently.  I am not making an objection,

18   but I do think the record will look a little odd the way it is

19   going in.

20      THE COURT:  Maybe Mr. Krieger can find the letter.

21      MR. KRIEGER:  Just a moment, Mr. Veeder.

22      Q  I will show you a letter dated February 4, 1960,

23   written by yourself to our law firm, Mr. Shamel, and with that

24   letter ask you if that refreshes your recollection on the well

25   levels that I have been asking you about, first on the north

1   well, which is 25M2?

2      A   24 feet 3 inches measured on January 30, 1960.

3      Q   And does that then also tell you about 26R2, the well

4   to the south?

5      A   That measured 21 feet and 1 inch, measured on January

6   30, 1960.

7      MR. KRIEGER:  Very well.

8      If you wish, your Honor, I can introduce this as part

9   of Exhibit D.

10      THE COURT:  Since your recollection has been refreshed,

11   these are the measurements that were made?

12      THE WITNESS: These are exactly it.

13      THE COURT:  All right.  It will not be necessary, unless

14   you want it.

15      Do you have a reservoir on this property, too?

16      THE WITNESS:  Yes.

17      THE COURT:  How big is this reservoir?  Is that shown on

18   the soil survey?

19      MR. KRIEGER:  I was going to come to that next, your

20   Honor.

21      THE COURT:  Go ahead.

22   BY MR. KRIEGER:

23      Q   I was going to ask you if you have any domestic wells

24   on this property, first?

25      A   I have two.

Q   Where are they located with respect to the existing 25M2 well?

A   The last well you referred to, the domestic well, is probably 200 feet toward Winchester Road from that well.

Q   And where is the other well located?

A   It is at the upper end of the ranch, probably six or eight hundred or a thousand feet from the first well that you referred to. I don't have the number.

Q   Those are used purely for domestic purposes; is that correct?

A   That is correct.

THE COURT:  Are the domestic wells listed on Roripaugh's A?

MR. KRIEGER: No, they are not.  Let me make sure.  No, they are not.

Q   Now, you also have a reservoir on your property; is that right?

A   Yes, sir.

Q   What is its capacity?

A   I would estimate somewhere between six and seven acre-feet.

Q   And about when was it built, do you know?

A   I don't know.  It was there when I bought the ranch in 1954.

Q   Do you operate this reservoir at all, use it at all?

A   Yes, we do.

Q   How do you use it?

A   We pump into it at night and sprinkle out of it during the day.

Q   Used only for temporary purposes;  is that right?

A   That is right.

Q   How long would it take you under normal operations to fill that reservoir completely?

A   To fill it?  About two days.

Q   In 1959 did you purchase an additional parcel of land from L. Judd Morse and Janet K. Morse?

A   I did; yes, sir.

Q   Where is that located with respect to your existing property?  Will you come down here and show it?  I will get you the description first.  Here it is.

I will show you while you are standing here for convenience a grant deed from the Morses to yourself, a married man, dated April 18, 1959, and ask you if that is a description of the property which you acquired?

A   That is, yes.

Q   Is that property then located in the easterly portion of Section 13, Range 7 South, 3 West, to the east of Winchester Road?

A   It is.

THE COURT:  Is this property adjoining what is shown as

Parcel 25?

MR. KRIEGER:  Yes, it does adjoin parcel 25 and comes all the way down and adjoins Parcel 6 and also parcel 42.

THE COURT:  Does it take in that northeast corner of Section 24?

MR. KRIEGER:  Yes, it does.

I would like to introduce this deed in evidence and then ask Mr. Webb, with your permission, to draw this parcel on Exhibit D.

THE COURT:  Yes.  Do you have a photostat of the deed?

MR. KRIEGER:  Yes, I do.  We will offer that.

THE COURT:  Do we have a series on Mr. Krieger yet?

THE CLERK: Roripaugh, et al., your Honor.  The next one will be K.

(The document above referred to was marked Roripaugh's Exhibit K for Identification.)

BY MR. KRIEGER:

Q  How many acres in that parcel that you acquired, Mr. Shamel?

A  92 acres.

Q  Do you irrigate any of it?

A  We irrigate approximately 40 acres.

Q  To what crops?

A  Alfalfa.

Q  Does the Santa Gertrudis Creek run through this

property?

    A   It does; yes, sir.

    Q   Do you know how much of that whole 92 acres is irrigable?

    A   I would estimate approximately 70 acres.

    Q   Is there a well on this property?

    A   There is, yes, sir.

    Q   Is the well on this property shown on Roripaugh's A as Well 24 A 2, which would be in the most northeasterly corner of Section 24?

    A   Yes, sir.

    Q   That is the well that is located on your property?

    A   Yes, sir.

    MR. KRIEGER:   I might also say that there is a well log as part of Roripaugh's D already in evidence on that well, your Honor.

    Q   Have you made any recent well measurements on this well?

    A   No, I haven't.

    MR. KRIEGER:   I think that is all.

    THE COURT:   Was it Morse you got this property from?

    THE WITNESS:   Morse-- M-o-r-s-e.

    MR. KRIEGER:   I believe I made an offer of that grant deed, your Honor.

    THE COURT:   It is now received in evidence as Exhibit K.

    (Roripaugh's Exhibit K for Identification was received in

Evidence.)

## CROSS-EXAMINATION

BY MR. VEEDER:

Q  Mr. Shamel, would you tell us the period of each irrigation season that you utilize your wells for purposes of irrigation?

A  Well, that of course would depend on your weather.  We are starting to irrigate now, and that would be a pretty good date to use.

Q  When did you start your pumps, and would you state which ones?

A  We started both pumps as of this week.

Q  Could you give us a day on which you started them?

A  It wouldn't be accurate, but around the 15th of the month.

Q  About the 15th of March?

A  Yes.

Q  And is that the customary time, would you say, to start your pumps?

A  Well, some seasons it would be later, depending on the rain and the weather.  I don't think you could establish an accurate date when you start them or stop them.

Q  Your irrigation season, though, would generally start in March; is that correct?

A   The latter part of March.

Q   How long a period do you usually irrigate?  Do you irrigate the year around?

A   No.  We have irrigated as late as November.

Q   Could you tell us how late you irrigated in 1959?

A   It would have to be a guess.  I wouldn't know.

Q   I wouldn't want you to guess.  But would it be November?

A   Anything I would give you would be a guess.

Q   In connection with your farming operations, what are the principal crops that you raise?

A   Permanent pasture.

Q   How many acres of permanent pasture would you state you have?

A   Approximately 158 acres.

Q   And you use that simply for grazing your stock?

A   Yes, sir.

Q   Do you harvest any hay at all off of it?

A   In the spring sometimes we have to cut the hay off of the first crop to get the foxtail out of it; not for the purpose of hay, but to get rid of it.

Q   Did you do that this year?

A   It is too early for that, but we will have to.

Q   But you are now irrigating it?

A   Yes.

Q   Are you going to irrigate the full 150 acres?

A   Yes, sir, we are.

Q   And do you keep your pumps going continuously for this purpose, for your irrigation purposes?

A   During the season, yes, sir.   Not continuously; not at night.   We use one pump at night to fill the reservoir, and the other pump we don't pump at night.

Q   But during the daytime you have both pumps operating; is that right?

A   Yes.

Q   In other words, you would have this kind and type of operation:   During the daytime you would irrigate and run your sprinklers from the reservoir, and also you would be running your sprinklers from the well, or would your well pump into the reservoir?

A   The well that pumps into the reservoir is used during the day for part of the flooding operation, and at night to fill the reservoir for the sprinkling operation.

Q   In other words, you flood and sprinkle, both?

A   Both, yes.

Q   How many head of stock do you run in this area there on the average?

A   We have now approximately 150 head of cattle and about 35 head of horses.

Q   Would you say that is your average operation?

A   That is pretty close to average, yes.

Q   When did you come into this property to begin your operation?  In 1953 did you say?

A   It was in 1954, if I remember correctly.  I am not sure.  It's 1953 or '54.

Q   Would it be in the spring or fall?  When did you go in there?

A   I don't remember.

Q   Did you have occasion at that time to measure the static level of your well?

A   When I purchased the ranch there was given to me a log and the water level of the well made by the power company, but what it was I can't recall.

Q   And has your operation been about the same since you began in 1953 or '54?

A   It has, yes.

Q   In other words, your acreage is the same-- 156, 158 acres; is that right?

A   That is correct.

Q   And you are using about the same quantity of water as you did at that time?

A   Yes.

Q   Do you recall what was the static level of the wells at the time that you went on the property?

A   I do not, no, sir.

Q   What do you mean by the static level, Mr. Shamel?

A   The level of the water that you measure from the ground to the water.

Q   And for how long a period was your pumps shut down when you had made your last static water level measurement?

A   Approximately two months, I would say.

Q   In other words, you would say that the last irrigation was in December; is that correct?

A   In the period from January to December wouldn't be two months.  The measurement was made in January.  I would say we probably quit irrigating maybe in October.

Q   Have you measured your wells at any time since January, 1960?

A   No, sir.

Q   And your last previous measurement was in January, 1959?

A   January, 1960.

Q   Had you previously measured the well?

A   No, sir, I had not.

Q   In regard to your operation in the property recently acquired, which appears to be in Sections 24 and 13, are you using about the same acreage that was irrigated when you bought the property, or have you increased it?

A As far as I know, there was none of it irrigated when I bought the property.

Q   In other words, you broke out that land since you

1   have acquired it?

2       A  Yes.

3       Q  Do you know the static level of that well on that

4   property?  Have you measured that?

5       A  No, sir, I haven't.

6       THE COURT:  When was that well drilled?

7       THE WITNESS:  It was drilled approximately a year ago,

8   your Honor.

9       THE COURT:  You drilled the well?

10      THE WITNESS:  Yes, I did.

11      THE COURT:  How deep is it?

12      THE WITNESS:  It is a little less than 300 feet, as I

13   recall.

14   BY MR. VEEDER:

15      Q  Do you know the static water level of that well?

16      A  I don't know it now.  There is a record of it.

17      Q  Where would we find that record, Mr. Shamel?

18      A  That has been submitted to the Court.  It was given to

19   me by the man who drilled the well.  I don't have it here.

20      Q  Would you provide it to the Court?

21      A  Yes, I will be glad to.

22      Q  When can we expect that?

23      A  As soon as I get hold of the driller, which I would

24   say would be in about a week.

25      Q  We would like to have that if we could.

12129

1    THE COURT:  Mr. Krieger, will you take the responsibility

2  to secure the well log?

3    MR. KRIEGER:  Yes, your Honor.

4  BY MR. VEEDER:

5    Q  What are the crops you are raising in your newly-

6  acquired Sections 24 and 13?

7    A  Approximately 40 acres of Alfalfa.

8    Q  How long have you been raising the alfalfa on that

9  land?

10   A  Approximately a year.

11   Q  How many cuttings did you get off that last year?

12   A  I think we got five cuttings last year.

13   Q  Have you started irrigating that property this year?

14   A  No, sir, not yet.

15   Q  And you haven't started to pump on that property this

16  year yet?

17   A  No.  I am sorry.  We started the pump.  There was a few

18  patches in there that didn't grow last year and we reseeded

19  and we were germinating those few late patches.  The alfalfa

20  didn't take last year.

21   Q  When did you start that?

22   A  About a week ago.

23   Q  You would say you started all your pumps about a week

24  ago, including on this newly-acquired land?

25   A  Yes, sir.

1    Q   Have you found any relationship in your operations

2   between the depth to water in your wells and the operations

3   of any of your neighbors, Mr. Shamel?

4    A   I have no knowledge of any of the other neighbors'

5   wells.

6    Q   Would you answer the question?  Have you observed any

7   relationship in the depth to water in your well by reason

8   of the operations of any other wells?

9    A   I wouldn't know what caused it.  Naturally, as the

10   season progresses our water drops a little bit, but I don't know

11   what causes it, other than taking the water out of the well.

12    Q  Could you estimate for us the drop in water level during

13   the irrigation season?

14    THE COURT:  Which well are you talking about?

15    MR. VEEDER:  Any of the wells.

16    THE COURT:  The new property or the old property?

17    MR. VEEDER:  Let's start with the old property.

18    THE WITNESS:  I wouldn't be able to give you an accurate

19   answer to that, because I didn't measure it.

20    MR. VEEDER:  In other words, you don't know?

21    THE WITNESS:  I don't know.

22    MR. VEEDER:  I have no further questions.

23    THE COURT:  Will you have your engineer put the line in

24   on the outline of this property?

25    MR. KRIEGER:  Yes, your Honor.

1   I wonder if I could clarify a point right now.

2   THE COURT:  Yes.

3   Take a short recess now.

4   (Recess.)

5   MR. VEEDER:  There are one or two points that I want to

6   cover.

7   You go ahead, Mr. Krieger.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MR. KRIEGER:  First of all, I am sorry that we got in that request for another exhibit, your Honor, because that information is all in evidence, as I had already stated and Roripaugh's Exhibit 2 is the well log of 24 A2 shown on Roripaugh's A.  So there is no need to produce any additional evidence.

THE COURT:  All right.

MR. STAHLMAN:  It is 26 R2, is it?

MR. KRIEGER:  24 A2, is the well about which Mr. Veeder was asking the questions, and there is a log in evidence.

THE COURT:  That is the new well drilled about a year ago.

MR. STAHLMAN:  You have also stated 25 M2.  Is 26 R2 in?

MR. KRIEGER:  26 R2 is in, yes.

THE COURT:  Are you finished with this?

MR. KRIEGER:  Yes, your Honor.  One question:

Q  Do you know whether the water table or the static water level has gone up and down in your well shown as 25 M2?

MR. VEEDER:  For what period?

BY MR. KRIEGER:

Q  That is the first well you testified concerning, and for this last year.

A  If I can use the record on the map, I would say that the water has risen in the well from approximately 39 feet as of a year ago to a little over 24 feet as of this year.

MR. VEEDER:  I move to strike the answer because he is not testifying of his own personal knowledge on that, your Honor.

2

1  THE COURT:  Which well are you talking about now?  The

2 new well?

3  THE WITNESS:  No, the old well.  I am referring to the map,

4 assuming that that is proper information.

5  MR. KRIEGER:  He is talking about the first well he testi-

6 fied to.  25 M2 is the well on the northern part of his property,

7 your Honor.

8  THE COURT:  And you say that a year ago the water was at

9 39 feet?

10  THE WITNESS:  Your Honor, I am referring to the map, which

11 indicates that the water last year at approximately this time

12 stood at 39 feet.

13  THE COURT:  The map is in evidence.

14  MR. KRIEGER:  Yes, your Honor.

15  THE WITNESS:  That is not a messurement that I made.  That

16 is a measurement that someone else made.

17  THE COURT:  Motion denied.  The statement adds nothing

18 that is not already in the record.

19  Anything further?

20  MR. KRIEGER:  Nothing further.

21  Cross-examination resumed.

22 BY MR. VEEDER:   CROSS-EXAMINATION

23  Q  Mr. Shamel, did you turn on your well at the end of

24 February, 1960 -- anyone of your wells?

25  A  Not that I have any record of; no, sir.

3

1    Q  You would know whether you turned on your well?

2    A  No, I wouldn't.  I operate from remote control.  It could

3  have been turned on for tests or for some other reason, but not

4  for irrigation.

5    Q  Do you have someone who operates those wells for you?

6    A  Yes, I do.

7    Q  In other words, he might be able to state if he turned

8  on the wells toward the end of February, 1960?

9    A  If anyone turned them on, I have no knowledge of it.

10  There would be no reason to turn them on.

11    Q  So far as you know?

12    A  So far as I know.

13    Q  And you do not live on the property yourself; is that

14  correct?

15    A  No, sir.

16  MR. VEEDER:  I have no further questions.

17  THE COURT:  Have you indicated your satisfaction with the

18  soil survey, Exhibit 218?

19  MR. KRIEGER:  The witness has indicated his satisfaction

20  with that, I think, and he has also used basically the same test-

21  imony as to the new parcel he acquired, as to which there is no

22  soil survey.

23  THE COURT:  All right.

24  The court would propose to find -- this isn't a final find-

25  ing, but following my practice of indicating what I think about

4

1  these matters as we go along -- that the first parcel 31 over-

2  lies a basin and the defendant is an overlying owner and has

3  correlative rights with other persons pumping from that basin,

4  and that the reservoir is proper and the use made of it doesn't

5  conflict with California water law.

6      Is that sufficient on the first parcel, Mr. Veeder? and Mr.

7  Krieger?

8      MR. KRIEGER:  Yes.

9      THE COURT:  As to the second parcel, lying in Sections 24

10  and 13, by reference to Exhibit 15 A the well 24 A2 is obviously

11  in the area of younger alluvium and that well would be a part of

12  the stream system and overlies a basin and he would have

13  correlative rights as far as that is concerned, and by again

14  referring to 15 A the property lying north of the fault line that

15  runs through the Murrieta Hot Springs shows the ground to be

16  either in basement complex north of that fault line or in -- what

17  is this category of grey on 15 A?

18      MR. SACHSE:  Weathered basement complex.

19      MR. KRIEGER:  Weathered.

20      THE COURT:  -- weathered complex, and that any water that

21  refinds in that area he is lucky to have and belongs to him with-

22  out reference to the stream.

23      MR. VEEDER:  That raises a point, your Honor, as to where

24  the water is being used, then, in Section 13 Township 7, 3 West--

25  in other words, is it water being exported across the fault?

5

1    THE COURT:  Suppose it were.  If there is one parcel and

2  he has a well in Section 24, doesn't he have a right to use that

3  water on all the parcel?

4    MR. VEEDER:  Well, there is a question which comes to my

5  mind at once.  If this land is not overlying a ground water

6  body in Section 13, there would arise a question as to whether

7  he has a right to export water onto that particular piece of

8  land.  I think it is a question of law, your Honor.

9    THE COURT:  Let's look at this.  This is 15 A, my copy.

10    MR. VEEDER:  Could we put up 15 A, then, your Honor?

11    THE COURT:  All right, put it up.

12    The area of your new property takes in this corner in

13  Section 24 and then extends up between the road and this section

14  line.  Are you familiar on your property where certain outcrop-

15  pings of rock appear or what is called basement complex? This

16  blue indicates basement complex -- solid rock.

17    THE WITNESS:  That is now in sagebrush, and there is rock

18  there, yes, sir.

19    THE COURT:  And between that rock and the road --

20    THE WITNESS:  I am irrigating here.(indicating)

21    THE COURT:  Below the rock, south of the rock?

22    THE WITNESS:  Yes.

23    THE COURT:  The witness has indicated that he is irrigating

24  in Section 24 and a small bit above Section 24, all below the

25  fault line.

1    MR. KRIEGER:  It is right in the middle of Tucalota Creek,

2  apparently, with his well.

3    THE COURT:  Yes, his well is in the younger alluvium and

4  in Tucalota Creek.  We can postpone that problem for discussion.

5  That would raise an interesting question of law.  In other words,

6  if the northern part o f that property is not overlying a basin

7  and water is taken up out of the basin, it can be argued that

8  any return is lost to the basin because of the fault line.

9    MR. SACHSE:  I don't think it poses a problem, your Honor.

10  I think if that is Tucalota Creek and the land is riparian to

11  Tucalota Creek and the whole parcel is riparian, whether it is

12  ground water or surface water, he can use it anywhere on the

13  procel, whether it is basement complex or not.

14    MR. KRIEGER:  I think that is right.  As long as that parcel

15  is riparian, that question doesn't arise.  It is in the same

16  watershed of the old Santa Gertrudis Creek.

17    THE COURT:  Doesn't that follow, Mr. Veeder?

18    MR. VEEDER:  Perhaps.

19    THE COURT:  Well, tentatively, I would take that position,

20  unless something comes along to change my mind.

21    MR. VEEDER:  It is a matter to be resolved, as I said.  It

22  is a question of law.

23    MR. SACHSE:  I had a question.  I just didn't understand.

24    In your first statement in regard to Parcel 31 I believe

25  you used the word "basin" or "ground water body."  May I ask if

7

1   you were referring to the basin of the Santa Gertrudis Creek -

2   as shown on 15 A or to the basin as contended for by the United

3   States?

4        THE COURT:   I am not passing on the basin contended for

5   by the United States at this time, but it is obvious that in any

6   event this portion is over a basin.   It is largly younger allu-

7   vium, with the exception of a small portion of the north end.

8   But I'll tell you now I think the basin is going to go back that

9   far anyway.

10       MR. SACHSE:   I don't quarrel with that, your Honor.   I

11   agree that it is in a basin.   It is in the Santa Gertrudis beyond

12   question.

13       THE COURT:   All right.   You may step down, Mr. Chamel.

14       MR. KRIEGER:   Mr. Waddell.

15       THE COURT:   Exhibit 218, the soil survey is received in

16   evidence.

17       (Plaintiff's 218 received. )

18       MR. VEEDER:   Normally we call Col. Bowen to put it in.

19   But if we took a short cut, it suits me.

20       THE COURT:   Is there any objection to putting it in without

21   calling Coll Bowen?

22       MR. VEEDER:   I have no objection. I just wanted to call your

23   Honor's attention to the normal process.

24       MR. KRIEGER:   I assume that you would say it is accurate and

25   complete.

8

1      THE COURT:  I will ask him.

2      Exhibit 218 is accurate to the best of your knowledge and

3  information?

4      COL. BOWEN:  Yes, your Honor.

5      THE COURT:  All right.

6

7                    MALCOLM M. WADDELL,

8  one of the defendants being first duly sworn, testified as

9  follows:

10      THE CLERK:  State your name please?

11      THE WITNESS:  Malcolm M. Waddell.

12                    DIRECT EXAMINATION

13      MR. KRIEGER:  We are now talking about Parcel 4 on Rori-

14  paugh's B.  That is right here, your Honor. (Indicating.)

15  BY MR. KRIEGER:

16      Q  Where do you live?

17      A  Redondo Beach, California.

18      Q  What is your occupation?

19      A  General contractor.

20      Q  What is your street address at Redondo Beach?

21      A  211 South Irena Avenue.

22      Q  You are married to Margarita M. Waddell and you and your

23  wife own property shown as Parcel 4 on Roripaugh's B; is that

24  right?

25      A  Yes.

12140

9

1    Q  And that property is described in your answer in this

2    lawsuit?

3    A  Yes, sir.

4    Q  And that lies, just to locate it, just northeasterly of

5    the main creek of Murrieta main channel; is that right?

6    A  Yes, sir.

7    MR. KRIEGER:   I would like to have the soil survey report

8    marked as Exhibit 219 for Identification.

9    (Plaintiffs' 219 marked for Identification.)

10   BY MR. KRIEGER:

11   Q  Let me show you the soil survey report marked for

12   Identification Exhibit 219 and ask you whether you have reviewed

13   this report?

14   A  Yes, sir.

15   Q  Now, this report shows that you have approximately 60

16   acresoof land, of which 54 acres are irrigable.  Do you agree at

17   that figure?

18   A  Yes, sir.

19   Q  When did you buy this property?

20   A  In 1944.

21   Q  Are there any irrigation wells on the property?

22   A  Yes, sir, there is one.

23   Q  Where is it located approximately?

24   A  I would say the northwesterly corner.

25   Q  The northwesterly corner?

10

1    A  Yes, sir.

2    Q  Do you know how deep that well is?

3    A  No, only by the log.  I had never measured it or had

4  anything to do with it.  Only by the log that was given as evi-

5  dence.

6    Q  You have a copy of that log and you have handed it to us,

7  have you not?

8    A  Yes, sir.

9    THE COURT:  You say the northwest corner?

10    THE WITNESS:  I believe the northwest corner, yes.

11    THE COURT:  Is that the well that is shown as P-1?

12    MR. KRIEGER:  I don't believe it is shown on Rotipaugh's

13  A, your Honor.  This is 35 B1.

14    THE COURT:  Exhibit 15 A shows a P-1.

15    MR. KRIEGER:  Does it?

16    THE COURT:  It would be very close to that corner.

17    MR. KRIEGER:  May I look at your map, your Honor.  I have

18  a B-1, but not a P-1.

19    THE COURT:  I just sketched it in there.  There is a P-1

20  shown.  It may be outside or in,  I can't tell.

21    MR. KRIEGER:  We don't show that, your Honor.  That is the

22  old Gonzales well, but it doesn't show on our exhibit, I believe.

23  It does show on 15 A.

24    MR. VEEDER:  Isn't that what your Honor is referring to?

25    THE COURT:  Yes.

11

1    Q  Is the well called the Gonzales well, Mr. Waddell?

2    THE WITNESS:  I presume so, because Mr. Gonzales, as near

3    as I know, drilled the well and owned the property.

4    THE COURT:  That you now own?

5    THE WITNESS:  Yes, sir.

6    BY MR. KRIEGER:

7    Q  I have a photostatic copy all written in longhand of

8    what appears to be a well log, Mr. Waddell.  Have you ever seen

9    this before?

10   A  Yes, sir; it is my handwriting.

11   Q  It is your handwriting, and it says "Log of well on

12   Gonzales place"?

13   A  Yes, known as the Gonzales place.

14   Q  You say this is in your handwriting.  Where did you get

15   the information?

16   A  From Mrs. Bessie Barnett.

17   Q  Did she give you that information from memory or --

18   A  No, she has the handwritten log of her brother, who

19   drilled the well, and I made a copy of it.

20   MR. KRIEGER:  This has written on it, interestingly enough,

21   your Honor, 1848 Pio Pico Granite --

22   MR. VEEDER:  This is all hearsay.  I have no objection to

23   it.

24   MR. KRIEGER:  But I just thought it would be interesting to

25   know what the source of this information was, if you want it

12143

12

1  in evidence.

2       THE WITNESS:  She is still alive and she can produce the

3  log of her brother.

4       THE COURT:  Was her brother this Gonzales?

5       THE WITNESS:  Yes, sir.

6       THE COURT:  Let see what you have there.

7       If you don't object, then what is the use of worrying about

8  it?  Let's put it in.

9       MR. VEEDER:  I would like to examine it, your Honor.

10      MR. KRIEGER:  I think it says "Drilled in 1914," does it

11  not, in the upper left-hand corner?

12      THE COURT:  14 or 15.  I don't know what difference it is

13  going to make.  I'm not going to make any findings about the

14  well logs.

15      MR. VEEDER:  I have no objection.

16      THE COURT:  Except to say that it is a producing well.

17      MR. VEEDER:  That's for sure.

18      MR. KRIEGER:  I will offer it in evidence, your Honor.

19      THE COURT:  Roripaugh's L.

20      MR. KRIEGER:  Wouldn't this be under our well log informa-

21  tion on Exhibit D?  We have all this well log information.  We

22  would like to include it there.

23      THE COURT:  All right, it will be given a subnumber.

24      THE CLERK:  None of the others have a subnumber, your Honor.

25      THE COURT:  All right, it will be incorporated as part of

1  Roripaugh's D.

2  　　　Do you offer it in evidence?

3  　　　MR. KRIEGER:  I offer it in evidence.

4  　　　THE COURT:  It is received.

5  　　　(Well log of Gonzales well received in evidence as part of

6  Roripaugh's Exhibit D.)

7  　　　MR. KRIEGER:  It indicates that the well is 103 feet deep.

8  　　　THE COURT:  How many inches of water do you pump out of it?

9  　　　THE WITNESS:  I don't pump it.

10  　　　THE COURT:  You don't pump it.  Do you know when it was

11  pumped last?

12  　　　THE WITNESS:  No, sir.

13  BY MR. KRIEGER:

14  　　　Q  Do you irrigate your property at all?

15  　　　A  No, sir.

16  　　　Q  Grow anything on it at all?

17  　　　A  No, sir.

18  　　　Q  Do you have any domestic wells on your property?

19  　　　A  Yes, sir.

20  　　　Q  Where is that located?

21  　　　A  I have one right beside the house within about I would

22  say 15 feet of the house in a northerly direction.

23  　　　Q  When was that drilled, do you know?

24  　　　A  No, I don't remember the date; 1946, somewhere in that

25  general vicinity.

12145

Q  Any logs on that well?

A  No, sir.

Q  The soil survey that I have shown to you as Exhibit 219 for Identification and it shows that this well is about 60 feet deep, with an eight inch casing, and powered by a three-quarter horse motor.  Do you know if that is correct?

A  Yes, sir.

THE COURT:  You're talking about the domestic well now?

THE WITNESS:  Yes, sir.

BY MR. KRIEGER:

Q  Do you have any ground water storage reservoir on your property?

A  Yes.

MR. VEEDER:  Don't you mean surface reservoir?

MR. KRIEGER:  That's right.

Q  Where is that located, Mr. Waddell?

A  I would say it was southerly.  It is in a southerly direction of the house.

Q  How is that filled?

A  By springs.

Q  Do you know what its capacity is?

A  No, sir.

Q  Are there some other natural bodies of water like ponds on your land?

A  Yes, sir.

Q   How many?

A   Two.

Q   And what is the nature of those ponds?  How large are they?  How much water in them?   Have you any estimate?

A   I don't have any way of measuring them and I don't know. They fill them normally with just natural spring-fed ponds.

Q   They are filled with spring water and then I take it the ponds run and go into Murrieta Creek; is that right?

A   They flow down from my property onto the Vail property. I don't know.  I suppose they eventually find Murrieta Creek.

Q   You make no use of that water; is that right?

A   No, not at the present time.

Q   Do you notice any decline in the amount of water on the surface over the years you have lived there?

A   Well, the ponds remain constant throughout the summer-time, I would say, but the run-off increases through the hot months due to evaporation probably and other circumstances.

Q   To what run-off are you referring?

A   That goes down onto the Vail property.

Q   That which comes out of the springs and ponds and rolls on down?

A   Yes.

Q   But the amount in the ponds remains constant, you say?

A   Yes.

Q   What about the domestic well?  Do you have any trouble

1   getting water out of that?

2       A   No, sir.

3       MR. KRIEGER:   I think that is all.

4

5                       CROSS-EXAMINATION

6   BY MR. VEEDER:

7       Q   Did you construct the reservoir yourself?

8       A   No, sir.

9       Q   That was on the property when you bought it; is that

10  correct?

11      A   We have done some deepening of them, but they were there

12  when we bought the property, yes, sir.

13      Q   Are you in a position so you can observe the stream

14  flow of Murrieta Creek?

15      A   Well, it is all on the Vail Company.   I have no flow

16  on my land from the creek.

17      Q   And you do not border upon any creek or any tributary

18  of the Murrieta Creek?

19      A   I don't know what the tributary would be.   There is

20  some waste water flows through our land at times at flood condi-

21  tions.

22      Q   During the flood period?

23      A   Yes.

24      Q   Is there any water that flows across your property dur-

25  ing the irrigation season from the Roripaugh lands or from any

1    other lands in that area?

2        A  Not from the Roripaugh land, no.

3        Q  From any other land?

4        A  There has been in the past season from the Vail lands

5    above us.

6        Q  Have you observed whether the well levels in your domes-

7    tic wells remain relatively constant throughout the whole year?

8        A  Well, the pump sets down tight to the casing and I have

9    had no reason to lift the pump.  Otherwise you can't get a

10   measuring device in there.

11       Q  Do you live there all the year round?

12       A  No, sir.

13       Q  Does somebody occupy the property at the present time?

14       A  No, sir.

15   MR. VEEDER:  I have no questions.

16

17                      CROSS-EXAMINATION

18   BY MR. STAHLMAN:

19       Q  How many acres in your piece?

20       A  Approximately 60 acres.

21   MR. STAHLMAN:  That is all.

22

23

24

25

13149

Z1

THE COURT:  The Court proposes to find that the entire property overlies the younger alluvium in the Murrieta Basin and that it overlies a basin of water, and that the defendant therefore has correlative rights with the other persons in the basin and the river.  I think the reservoir is properly used and is not in conflict with California water law.

Does that take care of it?

MR. VEEDER: When your Honor says that it doesn't conflict with California water law, do I understand you correctly to mean that it is a riparian use?

THE COURT:  Yes.  Presently it is being filled by springs, not even being pumped, which I think would be proper.  I don't know how you could close off a spring. Certainly it could be pumped and filled periodically for irrigation.  It is apparently filled by a spring.

Thank you, Mr. Waddell.  You are in the lawsuit for the rest of your life.

THE WITNESS:  I presume.

MR. VEEDER:  Has Mr. Waddell's engineering report been offered in evidence?  I don't have a note that it has.

THE COURT:  It has not been offered in evidence yet.

Is it correct, Col. Bowen?

COL. BOWEN:  Yes, sir.

MR. KRIEGER:  No objection.

THE COURT:  Is it offered in evidence?

Z2

1    MR. VEEDER:  Yes.

2    THE COURT:  Exhibit 219 received in evidence.

3    (Plaintiff's Exhibit No. 219 for Identification was

4    received in evidence.)

5    MR. VEEDER:  If we are going to have me put them in, it

6    suits me very well.  If counsel is going to put them in, fine.

7    MR. KRIEGER:  I think you have been putting them in,

8    haven't you?

9    MR. VEEDER:  The last time in regard to Mr. Shamel I

10   think it just sort of slithered in.  I don't know who put it in.

11   I am willing to do whatever your Honor directs.

12   MR. KRIEGER:  I am certainly willing to stipulate that

13   from here on out, as far as these clients today are concerned,

14   because these soil surveys have been carefully reviewed, we

15   will stipulate that as far as we are concerned they are correct

16   and we will stipulate to their admission in evidence.

17   THE COURT:  The Colonel sits here.  He has already been

18   sworn.  All he has to answer is, is this correct?  We can work

19   it out.

20   MR. VEEDER:  I just wanted it done is all, your Honor.

21   MR. KRIEGER:  Mr. Pearl.

22

23                    ROLAND E. PEARL,

24   one of the defendants herein being first duly sworn, called

25   as a witness in his own behalf, testified as follows:

Z3

1      THE CLERK:  State your name, please.

2      THE WITNESS:  Roland E. Pearl.

3      MR. KRIEGER:  Would there be any possibility of adjourning

4  five minutes early, your Honor?

5      THE COURT:  Yes, we will accommodate you.  Can you come

6  back at 1:30?

7      MR. KRIEGER:  Fine.

8      THE COURT:  1:30.

9      (Noon recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Z4

San Diego, California, Tuesday, March 22, 1960.   2:00 P.M.

MR. SACHSE:  Before Mr. Krieger continues, could I ask your assistance in getting myself squared away for my clients, who are due to come in here pretty quickly?  Mr. Krieger tells me that he hopes to finish today.  Mr. Grover is scheduled for tomorrow, and when I was in touch with him last week--- we had thesame engineer-- he told me thought it would be about two days, which would run us into Friday.  I am ready to go Friday, but I would much prefer, since we are not meeting either Monday or Tuesday, if I could set my Diamond Valley and Domenigonia Valley people to start from scratch on Wednesday morning.

THE COURT:  That is agreeable.  I have too much to do Friday anyway.  I set a case for trial at 9 o'clock, and I have a pretrial set at 9:30, and there is a non-jury case that I want to try Friday afternoon.

MR. SACHSE:  Then I will call my clients and tell them to be here Wednesday the 30th and be prepared to go ahead on Diamond and Domenigoni Valleys.

And will you have Mr. Kunkel here?

MR. VEEDER:  Yes.

MR. GIRARD:  Do I understand that we are not meeting on Friday of this week?

THE COURT:  I understood that Mr. Grover will probably

Z5

1  go into Friday.

2      MR. SACHSE:  I think not.  I think he will be finished

3  on Thursday.

4      THE COURT:  Well, I have too much to do.  It's unfortunate,

5  but the criminals have to come ahead of the good people.  You

6  have to try your criminal cases before you try your civil

7  litigation.  You can find things to do, can't you, Mr. Veeder?

8      MR. VEEDER:  Yes.  I have no objection.  But Mr. Grover

9  asked me to call as soon as I found out.

10      THE COURT:  Tell him to come in tomorrow morning.

11

12                 ROLAND E. PEARL,

13  one of the defendants herein, having been previously duly

14  sworn, testified as follows:

15

16                 DIRECT EXAMINATION

17  BY MR. KRIEGER:

18      Q  Your name is Roland E. Pearl?  Is that right?

19      A  Yes.

20      Q  What is your address?

21      A  Murrieta, Post Office Box 71.

22      THE COURT:  What parcel does this concern?

23      MR. KRIEGER:  Parcel 35, your Honor, right here on

24  Roripaugh's B.  And it is interesting to note that the parcel

25  directly to the northwest of Parcel 35 is also Pearl property.

6

1  That was corrected sometime ago.  It was formerly marked

2  Lincoln.

3      THE COURT: There are two 40's in there.

4      MR. KRIEGER:  That is correct.

5      Q  Is that correct?

6      A  That is right.

7      MR. KRIEGER:  They are right in the middle of Murrieta

8  Creek.

9      Q  Your wife is Patricia Pearl; is that right?

10     A  That is right.

11     Q  You and your wife and William C. Custer and his wife

12  Marilyn Moyer Custer own properties shown as Parcel 35 on

13  Exhibit B; is that right?

14     A  That is right.

15     Q  You have had an opportunity, have you, to look at the

16  soil survey report of the United States, marked for identifica-

17  tion 220?

18     A  Yes.

19     Q  Does the legal description in your answer and in the

20  soil survey fit the parcels that are shown as Parcel 35 on

21  Exhibit B?

22     A  They do.

23     Q  Murrieta Creek runs right through your land; is that

24  right?

25     A  That is right.

7

1        THE COURT:  Before we get away from it, are you satisfied

2   with that soil survey?

3        THE WITNESS: Yes.

4        MR. KRIEGER:  You are always just a jump ahead of me,

5   your Honor.

6        THE COURT:  You went into Murrieta Creek.  I thought you

7   had forgotten about it.

8        MR. KRIEGER:  No, I haven't.  In fact, I would like to

9   go back and cover that to this extent.

10        Q   The soil survey shows the property consists of 80

11   acres, of which 69.1 are irrigable.  You agree with that

12   figure, do you?

13        A   That is right.

14        Q   Do you irrigate any part of this property?

15        A   Yes.

16        Q   What type of irrigation do you use?

17        A   Sprinklers.

18        Q   What crops do you grow?

19        A   Permanent pasture and Sudan grass.

20        Q   Have you any wells on your property?

21        A   Yes.

22        Q   How many?

23        A   Two.

24        Q   One is an irrigation well; is that right?

25        A   That is right.

8

1    Q  When was that drilled?

2    A  March, 1959.

3    Q  What is the depth and size of that well?

4    A  It's a 12-inch casing, and it's 405 feet deep.

5    Q  It is a gravel-packed well?

6    A  Yes.

7    Q  What kind of pump do you have on it?

8    A  15-horse.

9    Q  Do you have a well log of the well?

10    A  Yes.

11    Q  This is shown, is it not, on Water Well Driller's

12 Report No. 13674?  Is that the log that goes with that well?

13    A  That is right.

14    MR. KRIEGER:  I will introduce that as one of Roripaugh's

15 Exhibit D.

16    THE COURT:  The well log will be included with the

17 exhibits in Roripaugh's D, in Evidence.

18    (Well Driller's Report No. 13647 was received in evidence

19 as part of Roripaugh's Exhibit D.)

20    MR. KRIEGER:  Your Honor, I think if I may have the

21 original for just a moment, because it is quite a bit clearer

22 than the photostatic copies I have just handed around.  It

23 indicates that there is a yield of 900 gallons per minute, with

24 a 61-foot drawdown, shown in the lower left-hand corner under

25 item 10, well tests.

12157

9

1    THE COURT:  That well is up in the northwest corner?

2    THE WITNESS:  Yes.

3    THE COURT:  Rather, the most northerly corner.

4    THE WITNESS:  It is in the center of the property on

5    the northern end.

6    THE COURT:  Is that M-1 shown on the map?

7    MR. KRIEGER:  This is a brand new well, I believe.

8    Is it not?

9    THE WITNESS: Yes.

10    MR. KRIEGER:  Just in March of last year.  I don't think

11    it shows on any map.

12    Q  Would you come over here for a moment to Exhibit B

13    and point out where on your land it is located?

14    A  (Witness stepping down and indicating.)

15    MR. KRIEGER:  Do you see that, your Honor?

16    THE COURT:  Yes.

17    MR. KRIEGER:  There is a crossmark in pencil on

18    Roripaugh's Exhibit B.

19    Q  Do you know what the static water level is in that

20    well?

21    A  Right now?

22    Q  Yes.  Have you measured it recently?

23    A  About 33 feet.

24    Q  About what date?

25    A  About two weeks ago.

1    Q   Do you know what it was say a year ago?

2    A   About 32 or 33 feet.

3    Q   Has a test been made of that well by the California

4    Electric Power Company?

5    A   Yes, it has.

6    Q   I will show you a letter dated April 27, 1959, from

7    California Electric Power Company to yourself and ask you if

8    that is the report.

9    A   Yes.

10   MR. KRIEGER:  I will introduce this in evidence as one

11   of Roripaugh's D exhibits.

12   THE COURT:  Part of Roripaugh's D.

13   (The document above referred to was received in evidence

14   as part of Roripaugh's Exhibit D.)

15   MR. KRIEGER: That shows a static water level of 36.5

16   and a pumping level of 61 feet and 606 gallons per minute.

17   Q   Now, this well that you have been discussing, was that

18   in replacement of an old well?

19   A   Yes.

20   Q   What happened to the old well?

21   A   We don't know.  It just went dried up.

22   Q   Was there any drop in the water table when the old

23   well no longer produced?

24   A   No, the static water level stayed the same.

25   Q   But the pump just didn't pump any water?

A  No.

MR. VEEDER:  He said dried up, didn't he?

MR. KRIEGER:  No, I don't think he said that.

THE WITNESS:  No, I misworded that.  There is some water there, but not sufficient water.

BY MR. KRIEGER:

Q  How would you then compare the static water level in the old well with the one in the new well?

A  Identical.

THE COURT:  How far distant was the old well from the new well?

THE WITNESS:  Approximately 150 feet.

BY MR. KRIEGER:

Q  Mr. Pearl, do you also have a domestic well on this property?

A  Yes.

Q  Come over and locate it, will you, please?

A  Well, it would be westerly about 200 feet from the irrigation well.

Q  And very close to the boundary of your property?

A  Yes, on the same boundary as the irrigation well, about 15 or 20 feet from the road, from Elm Street.

Q  Do you know how deep it is?

A  180 feet.

Q  What is its diameter?

1    A  Eight-inch casing, and gravel packed.

2    Q  What is the water level of that well?

3    A  15 feet.

4    Q  Have you noticed any change in the water level of that

5 well since it was pumped in 1958, did you say that was drilled?

6    A  Yes.

7    Q  Have you noticed any change in the water level?

8    A  No.

9    Q  Have you any well logs or well tests on that domestic

10 well?

11   A  No, I don't believe I do have.

12   Q  Do you have a reservoir on your property?

13   A  Yes.

14   Q  Where is it located, if you will come down once more?

15   A  Northwestern corner.  That is right in this corner.

16   Q  Right in the corner there.  What is its capacity?

17   A  Three acre-feet.

18   Q  What do you use it for?

19   A  Irrigation--storage.

20   Q  How do you operate with it?

21   A  I pump into it and then irrigate at night with sprinklers.

22   Q  So it's an in-and-out proposition; is that right?

23   A  There is a turnover in the water constantly.

24   Q  So there is a complete turnover every 24 hours or so;

25 is that correct?

1     A  Yes.

2     MR. KRIEGER:  No further questions.

3     MR. VEEDER:  Do you have the engineering report?

4     MR. KRIEGER:  Yes.

5     MR. VEEDER:  Do you want to offer that now?

6     MR. KRIEGER:  I will offer it in evidence.

7     THE COURT:  Col. Bowen, is it correct?

8     COL. BOWEN:  Yes, sir.

9     THE COURT:  Received in evidence.

10     (Plaintiff's Exhibit No. 220 for Identification was

11 received in evidence.)

12

13                   CROSS-EXAMINATION

14 BY MR. VEEDER:

15     Q  How long have you farmed the place, Mr. Pearl?

16     A  Three years.

17     Q  And is the acreage that you have now under cultivation

18 the same as it was when you bought the place?

19     A  No.

20     Q  What would you say was the irrigated acreage when you

21 bought the place?

22     A  12 acres-- 15 acres.

23     Q  And how much have you increased since that time?

24 What increase in acreage, if that is more clear?

25     A  I have irrigated all of the acreage since then.

1    Q   In other words, you have increased your acreage from

2   12 acres to approximately 80?

3    A   Yes-- 69.

4    Q   69 acres.  Have you started irrigating your land for

5   this irrigation season?

6    A   Yes.

7    Q   When was that?

8    A   Three days ago.

9    Q   And was that when you measured the static water level

10   of your well?

11    A   No.

12    Q   When was that, then?

13    A   Two weeks ago.

14    Q   Do you run your pump continuously when you start

15   irrigating?  Does it run every day of the irrigation season?

16    A   No.

17    Q   What is your regimen of irrigation?

18    A   The weather conditions.

19    Q   Generally during the dry period, then, from the 1st

20   of April on through October?

21    A   Approximately every other day I will run 24 hours on

22   the well.

23    Q   And then you will sprinkle out of the reservoir?

24    A   Yes.

25    Q   Do you raise any hay?

1        A   Yes.

2        Q   Or do you feed it all?

3        A   I feed it all.

4        Q   I asked two questions.   You raise some hay; is that

5   right?

6        A   I feed all the feed I raise.

7        Q   Do you cut some hay?

8        A   For my own use, yes.

9        Q   Could you tell me how many acres of hay you raise?

10       THE COURT:   By "Hay" do you mean alfalfa?

11       MR. VEEDER:   I mean whatever he cuts for hay, as

12   distinguished from that which he feeds.

13       THE WITNESS:   30 acres, 35 acres, approximately.

14   BY MR. VEEDER:

15       Q   And how many cuttings do you get?

16       A   Last year on my Sudan I got three cuttings.   I put in

17   Sudan and got three cuttings.

18       Q   During the irrigation season have you had occasion to

19   measure the static water level of your well say along in July?

20       A   Yes.

21       Q   What did you find that to be?

22       A   Lower.

23       Q   About how much?

24       A   I wouldn't be able to say without the report.

25       MR. VEEDER:   We we have the report here, counsel?

1    MR. KRIEGER:  The two reports show it.

2    MR. VEEDER:  Show the static water level as of July, 1959?

3    MR. KRIEGER:  Yes.  I don't think it is July, 1959, but

4  it is earlier in that year.

5    MR. STAHLMAN:  April on our copy.

6    MR. KRIEGER:  It is April, 1959.

7  BY MR. VEEDER:

8    Q  When did you turn off your pumps for 1959?

9    A  I don't know.

10    Q  Could you give us an estimate as to the month?

11    A  Late fall.

12    Q  October and November?

13    A  I wouldn't say for sure.  I really don't know.  It

14  could be any one of those three months.

15    Q  Don't you have power bills?

16    A  I could verify it, yes, through the power bills.

17    Q  Did you turn your pumps on at any time prior to three

18  days ago, during January or February?

19    A  Yes.

20    Q  What was the occasion for that?

21    A  California Resources Board was there, in checking the

22  water.

23    Q  And they turned your pump on?

24    A  Yes.

25    Q  Do you remember the date that that took place?

1          A   No, but we could check with them.   They will send me

2    a report of it.

3          Q   Could you get that for us?

4          A   I sure can.

5          Q   How long did they run your pump?

6          A   Ten to fifteen minutes.

7          Q   Is that all?

8          A   Yes.

9          MR. VEEDER:   I have no further questions.

10         THE COURT:   Anything further?

11         MR. KRIEGER:   Nothing further.

12         THE COURT:   I would propose to find, on the basis of

13   Exhibit 12-A, that those two Parcels 35 lie over and in the

14   younger alluvium, and that apparently the Murrieta stream

15   bisects parts of it.   Does it not?

16         MR. KRIEGER: That is right.

17         MR. VEEDER:   Both parcels abut upon it, your Honor.

18         THE COURT:   Abut upon it, or does it bisect it?

19         MR. VEEDER:   I can't tell.

20         THE COURT:   It doesn't make any difference.   The land is

21   therefore not only riparian but also over an overlying basin,

22   and that the rights of the Pearls are correlative with those

23   of the other persons of the water system.   That the reservoir

24   is a proper riparian use.

25         MR. KRIEGER:   All right.

I will call A. F. Howell.


GEORGE A. F. HOWELL,

one of the defendants herein, being first duly sworn, testified

as follows:

THE CLERK:  State your full name.

THE WITNESS:  George A. F. Howell.


DIRECT EXAMINATION

BY MR. KRIEGER:

Q  Where do you live?

A  1720 Ellencourt Drive, South Pasadena.

Q  Are you married to Ada S. Howell?

A  I am.

Q  Are you both together the owners of the property shown

as Parcel 29 on Roripaugh Exhibit B?

A  I am.

MR. KRIEGER:  Your Honor, if I may point it out-- we

are going north on all of these hearings, we are going north-

west up the Murrieta Creek-- there are three parcels.

Q  Is that correct?

A  That is correct.

THE COURT:  I find them.

BY MR. KRIEGER:

Q  Which of these three parcels is the main ranch?

1   THE COURT:  Let's mark them 29-A, B, and C.

2   MR. KRIEGER:  All right.

3   THE COURT:  The big one that you have your pencil on

will be 29-A, the one immediately north of it 29-B, and the

one to the east 29-C.

6   MR. KRIEGER:  All right.

7   Q   And 29-A is the main ranch; is that correct?

8   A   That is correct, yes.

9   Q   Where does Murrieta Creek run in relation to these

three parcels of property?

11   A   Between 29-B-- No.  Where is B?  Over there?

12   Q   Yes.

13   A   And parted there, and runs through that part, Part B.

14   Q   Runs through this part?

15   A   That is right.

16   Q   And its relation to 29-C?

17   A   It doesn't run through it.  It doesn't run near it.

I would say it is a hundred yards from it.

19   Q   To the north of it?

20   A   Yes, that is correct.

21   Q   And then goes down the northeast side of it; is that

correct?

23   A   No, sir, it doesn't come through there at all.

24   MR. VEEDER:  Your Honor may be interested in looking at an

aerial photograph, because I think it is going to be in conflict

with the witness's testimony.

THE COURT:  It looks like a creek bed hits the corner of 29-C.

THE WITNESS:  Yes, that is right, it does.

BY MR. KRIEGER:

Q   Just hits the northernmost tip; is that right?

A   That is right.

Q   Let me show you the soil survey of your property, which is Exhibit 221 for Identification, and ask you if you have examined this report.

A   Yes, sir.

Q   This report shows, as you know, that there are approximately 202 acres in all three parcels, of which 174.4 are irrigable acres.  Do you agree with this figure?

A   Yes, sir.

Q   Taking the main ranch, 29-A, are there any wells located on that parcel?

A   Yes, sir.

Q   How many?

A   There are three altogether.

Q   On this one Parcel 29-A; is that right?

A   Yes, sir.

Q   Are they irrigation or domestic wells?

A   One is an irrigation and one is a domestic well.

Q   Will you come and locate that on the map Roripaugh's B?

MR. VEEDER:   Could you give us the number of those?  Is that J-2 and J-1?

BY MR. KRIEGER:

Q   Mr. Howell, if you would come over here to Roripaugh's A for a moment.  Can you tell me whether this well marked 20K2 is the well that you are talking about?

A   No, I was not talking about that one at all.

Q   You were not?

A   No.  That well there is here.

Q   That is on Parcel 29-C?

A   No, it is on 29-B.

Q   There is no relation here at least on 29-A.

Now the irrigation well that you are talking about on 29-A is located where?  Can you describe it?

A   It is in the northeasterly part, right down in there.

Q   Right in this area?

A   That is right.

Q   When was that well drilled?

A   I don't know.

Q   When did you buy the property?

A   1953?

Q   Was it there at that time?

A   Yes, sir.

Q   You recall that the soil survey report, which is Exhibit 221 for Identification, recites that that well is

1    about 98 feet deep and has a 12-inch casing with a 10-horse-

2    power motor.  So far as you know, is that correct?

3       A   That is correct.

4       Q   How much land do you irrigate from this well?

5       A   About 20 acres, approximately.

6       Q   What kind of crops?

7       A   Permanent pasture.

8       Q   Is the well tied in with any reservoirs?

9       A   Yes, sir.

10       Q   Would you describe them?

11       A   There is a reservoir right in front of the well and

12    we pump into that and then irrigate out of that.

13       Q   The practice is to pump into the reservoir and then

14    immediately or within 24 hours or so release water for

15    irrigation purposes; is that correct?

16       A   That is correct.

17       Q   On 29-A on Roripaugh's B is shown a reservoir.  Is

18    that the reservoir you are talking about?

19       A   Yes, sir.  That also acts as a domestic well, too.

20       Q   It also acts as a domestic well.  Do you have any

21    storage tank?

22       A   Yes, we have a large storage tank near the house.

23       Q   The soil survey shows that that has a capacity of

24    2,200 gallons.  Is that correct?

25       A   I imagine somewhere around that.

Q   Were the reservoir and the tank located on the property when you purchased it?

A   Yes, sir.

Q   Would you say in connection with the irrigation practice you have just described and water goes in and out of that reservoir on a 24-hour basis?

A   Yes, sir.

Q   How much water in gallons per minute or inches, any way you want to describe it, does this well produce?

A   About 20 inches, 24 inches.

Q   20 to 24 inches?

A   Yes.

Q   Do you have any other wells on this same Parcel 29 A?

A   Yes, sir.   There is a windmill right in the corner,
in the northeasterly corner.

Q   Up here?

A   That's right, somewhere in there.

Q   Is there one or two?

A   There is one there.   And then there is one up behind
the house, behind the tank that we have up there, farther back
up in the field.

Q   So you have two windmills on the property?

A   That is correct.

Q   Do you use these at all?

A   No, sir.

Q   Now, for convenience, let's look at Parcel 29 B, which
is immediately to the north.   Do you have any wells on that
property?

A   Yes, sir.

Q   How many?

A   One.

Q   What kind?

A   It is a domestic well.

Q   Where is it located?

A   I would say in the north -- it would be about the center
of the field there on the north side of the riverbed.

Q   On the north side of the river?

1      A   Yes, sir.

2      Q   When was this well drilled?

3      A   I believe it was in 1955.

4      Q   Is this well which is located in Section 20 shown on

5   Roripaugh's Exhibit A as 20 L2?

6      A   I believe it is.  I believe that is the one when I was

7   over there.

8      Q   That well, for your information so that you can identify

9   it, is shown on Exhibit A as having been drilled in 1956.

10     A   That is right; it was '56.

11     Q   It has a pull-down of 174 feet and a specific capacity

12   of .41.  Does that refresh your recollection as being the well

13   we are talking about?

14     A   That is the well all right.  I drilled that for an irri-

15   gation well.

16     Q   That irrigation well that we have just identified as

17   20 L2 is shown in the soil survey, I believe, as well No. 4.

18   How deep is it, do you know?

19     A   I believe it is 320.

20     MR. STAHLMAN:   460 feet according to this.

21     THE WITNESS:   That is wrong.

22   BY MR. KRIEGER:

23     Q   That is a mistake?

24     A   That is a mistake.

25     Q   You would say the distance is what?

1       A  I think it is 320 feet.  It is around 300.  I would say

2  it is 280 to 320 feet. - It cost $3,200.00 is what I paid for

3  the drilling of it.

4       Q  You didn't do that for a domestic well, I take it?

5       A  No.

6       Q  You tried to get an irrigation well?

7       A  That is correct.

8       Q  And you wound up having a domestic well?

9       A  Yes.

10      Q  That is all you have used it for since?

11      A  That is all it can be used for.

12      Q  Do you have any wells on Parcel 29 C?

13      A  I have two wells.

14      Q  What are they?

15      A  One irrigates 73 acres.  That is the total amount of

16  acreage, approximately 73 acres.  That is in the far corner.

17      Q  Locate that, if you will.

18      A  Yes.  That is right in here. (Indicating)

19      Q  That is in the most northerly part of the property; is

20  that right?

21      A  Yes.  Well, let's see.  That is right in here.  That is

22  in the center right down in here.

23      THE COURT:  The well is shown as D-1.  There is a well

24  shown as 28 D-1.

25      MR. KRIEGER:  But that doesn't appear on Roripaugh's A.

1       THE COURT:  Place your pencil again, Mr. Howell.

2       THE WITNESS:  Right about in here.

3       MR. KRIEGER:  It shows just below the section line of

4   Section 28.

5       THE COURT:  That is just about where 28 D-1 appears on

6   15 A.

7   BY MR. KRIEGER:

8       Q  Mr. Howell, when was that well drilled?

9       A  1956.  That was drilled right after the other one.

10       MR. KRIEGER:  Your Honor, does that appear to be super-

11   imposed on that map 15 A, or is that one of the marked wells on

12   that exhibit?

13       THE COURT:  No, it is one of the wells marked on this map,

14   but I don't know whether -- my copy of 15 A shows location of

15   wells by Fred Kunkel, 1958.  So it probably would be the Well

16   28 D-1.

17       MR. KRIEGER:  I think there is another way of identifying

18   that.

19       MR. STAHLMAN:  What number well is it on Exhibit 221?

20   BY MR. KRIEGER:

21       Q  Who drilled that well?

22       A  Johnny Lynch.

23       Q  How deep is it?

24       A  Approximately 500 feet.

25       Q  How much water does it produce?

1    A  About 70 inches.

2    Q  In that connection, you have a California Electric Power

3  Company test on that well?

4    A  Yes, sir.

5    Q  Let me show you a letter dated September 9, 1957, signed

6  by F. E. Locking, addressed to you, and ask you if that is the

7  original report you got from the power company?

8    A  Yes, sir, it is.

9    MR. KRIEGER:  I will offer that as one of Roripaugh's

10  D Exhibits.

11    THE COURT:  It may be part of Roripaugh's D in evidence.

12    Is that a well log or a well test?

13    MR. KRIEGER:  A well test.  That original exhibit, in case

14  your Honor has any difficulty as I have had with my photostatic

15  copy, shows 611 gallons per minute.

16    (The document above referred to was received in evidence

17  as part of Roripaugh's Exhibit D.)

18  BY MR. KRIEGER:

19    Q  How much land do you irrigate with that well?

20    A  73 acres approximately.

21    Q  All in Parcel 29 C; is that right?

22    A  That is correct.

23    Q  You said you had another well on that property; is that

24  right?

25    A  Yes, sir.

1      Q  What sort of well is that?

2      A   That is 150 feet deep and it pumps around 40 to 41

3  inches, I believe.

4      Q  What is it powered with?

5      A  A one and a half horse power.  I just wanted a domestic

6  well and I wanted to just water the hogs that I had there.

7      Q  It seems that everytime you go down for irrigation wells

8  you get domestic wells, and vice-versa.

9      A  That is what happened.

10     Q  You say this has a one and a half horse power pump and

11  pumps about 41 inches?

12     A  It will pump about 41 inches.  It pumped 41 inches on

13  a test when they tested it.

14     Q  What is the static water level?

15     A  I don't know.  I believe it is around 15 feet.

16     Q  You also have a soil conservation check dam on this

17  Parcel 29 C, don't you?

18     A  No; on 29 A.

19     Q  That is on 29 A?

20     A  Yes.

21     Q  I think that is shown as Reservoir No. 1 in the soil

22  survey report.  Do you store any water in that?

23     A  No, sir.

24     Q  Do you know how much capacity it has?

25     A  I believe it is something like 17 acre feet.

1    Q  What is it used for?

2    A  Just to prevent the water from washing the roads out

3  down below.

4    Q  Did you contribute anything to the cost of constructing

5  that check dam?

6    A  I contributed some, and the Government contributed some.

7    Q  You contributed along with the Government for the build-

8  ing of that?

9    A  Yes, sir.

10    Q  I don't know that I asked you a minute ago whether the

11  domestic well with the high production was drilled last year?

12    A  Yes, it was drilled in 1959.

13    Q  Who drilled that?

14    A  Johnny Lynch.

15    Q  Are there any other wells that you have on your parcels

16  of property that you have not described this afternoon?

17    A  No, sir.

18    Q  Any other reservoirs?

19    A  No, sir.

20    MR. KRIEGER:   That's all.

21

22              CROSS-EXAMINATION

23  BY MR. VEEDER:

24    Q  What is the total acreage that you are irrigating as

25  of today, Mr. Howell?

1     A  Approximately 93 acres.

2     Q  And how many acres were there being irrigated when you

3     went on the property?

4     A  Approximately 20, because this 29 C was not part of the

5     first ranch that I bought -- it has no connection.

6     Q  Could you break it down from the standpoint, then, of

7     parcels?  You have Parcel 29 A --

8     A  A and B.

9     Q  How many acres were irrigated when you went on there on

10    29 A?  Do you remember?

11    A  On 29 A there is none.

12    Q  There is none now?

13    A  That is right.  And there was none then.

14    Q  29 B?

15    A  Approximately 20 acres there was then, and there is

16    now.

17    Q  In other words, on 29 A and B you have made no increased

18    acreage; is that right?

19    A  Well, maybe three or four acres, but that would be the

20    most.

21    Q  Respecting 29 C, what year did you say you acquired that?

22    A  I believe it was 1956.

23    Q  What was the acreage when you purchased that property

24    which was under irrigation?

25    A  None.  There was none under irrigation.

Q  In 29 C?

A  29 C.

Q  How many acres do you have there now?

A  Approximately 73.

Q  What are the crops that you raise on those properties, Mr. Howell?

A  On the 73 acres?  29 C?

Q  Let's start in on 29 B.  What are the crops you raise there?

A  On 29 B?

Q  Yes, sir.

A  Permanent pasture.

Q  How do you irrigate that land?  By sprinkler or --

A  Sprinklers.

Q  When does your irrigation season start generally?

A  In March sometime, and into the first part of November.

Q  Have you started irrigating for the year 1960?

A  Yes, sir.

Q  And when was that?

A  About a week ago.

Q  Would you say March 15th?

A  Somewhere in there; yes, sir.

Q  Do you raise any hay at all?

A  Not there.

Q  You don't raise any hay on your Parcel 29 B?

A   I don't raise any hay now.

Q   Period?

A   Yes.

Q   In regard to the 73 acres that you brought into cultivation, you raise permanent pasture on that?

A   No, sir.

Q   What do you raise?

A   Alfalfa hay.

Q   In other words, you do raise some hay?

A   You said 29 B, and I said --

Q   I thought you were speaking generally?

A   No, I am speaking of 29.  That is why I said nothing on 29 A, 29 B.  29 C I raise alfalfa hay on 29 C.

Q   You raised 73 acres?

A   Yes, sir, approximately.

Q   And when did you start that?  Was that in 1956?

A   Yes, sir.

Q   How many cuttings did you get off that?

A   Approximately seven.  Sometimes it's six and sometimes it's seven.

Q   Have you calculated the quantity of water you apply to your alfalfa down there?

A   No, sir.

Q   Once you start irrigating that 73 acres, do you run your pumps continuously throughout the irrigation season?

1      A   Pretty much, yes, sir.

2      Q   And would that be true in regard to 29 B?

3      A   No, it wouldn't be as consistent as 29 C.   29 B would

4   be less.

5      Q   You turn it on, let it run for awhile, and then

6   shut it down?

7      A   Shut it down, yes, sir.

8      Q   Have you observed the water levels in your wells during

9   the irrigation season?

10      A   No, sir, I have never tested them.

11      Q   Have you ever had any problem getting water?

12      A   No, sir.

13      Q   On which well do you have your 50 horsepower pump?

14      A   29 C.

15      Q   29 C?

16      A   Yes, sir.

17      Q   Is it 29 C2, do you know?

18      A   Our records show it is 29 C2.

19      Q   I beg your pardon.   28 C2.

20      A   I haven't seen any 28 yet.

21      Q   You're not familiar with that?

22      A   No, sir.

23      Q   How many head of stock do you run out there?

24      A   I have approximately 50 head, I think.

25      Q   And would you say that that is what you usually run

1    there?

2      A   I have run that and to 75 head.

3      Q   Do you feed what you raise to your stock?

4      A   I have fed and sold both.

5      Q   Have you observed the surface run-off in Murrieta Creek

6    past your place since you bought it?

7      A   Have I observed the river running?

8      Q   Yes.

9      A   Yes, sir.

10      Q   Does it run every year?

11      A   No, I don't believe it has run every year.

12      Q   Did you see it run during the year 1959-1960?

13      A   I believe it ran. I haven't seen it in 1960, but I

14    believe it ran in 1959. I saw it run in 1959.

15      MR. VEEDER:   I have no further questions.

16      MR. KRIEGER:   If I can find the soil survey report Exhibit

17    221 --

18      THE COURT:   I have it.

19      Is it correct, Col. Bowen?

20      COL. BOWEN:   There is apparently a conflict on the depth

21    of that well No. 4. I would like to check my basic data. As

22    far as the rest of it is concerned, it is correct, your Honor.

23      MR. KRIEGER:   I think he said there was a storage tank of

24    2200 gallons rather than 22,000; is that right?

25      COL. BOWEN:   That is right. Mr. Krieger asked Mr. Howell

1  about the capacity of that tank.

2      MR. KRIEGER:  May that stand corrected at 22,000, Mr.

3  Howell?

4      THE WITNESS:(Mr. Howell.)  I wouldn't have any idea.

5      MR. KRIEGER:  That was my error.

6      THE COURT:  All right, 22,000.

7      Can the Colonel check his basic data and later on, if he

8  finds some correction has to be made on his information as to

9  the depth of the well, the exhibit can then be corrected?

10     MR. VEEDER:  Yes, and we will let counsel know the changes.

11     MR. KRIEGER:  Good.

12     THE COURT:  The exhibit may be corrected.

13     Do you offer Exhibit 221 in evidence?

14     MR.KRIEGER:  Yes, your Honor.

15     THE COURT:  Exhibit 221 received in evidence.

16     (Exhibit 221 received in evidence.)

17     THE COURT:  As to tentative findings, may I inquire of

18  Mr. Krieger where you got the fault line that you put on

19  Roripaugh's B as to the Elsinore fault, that is, the fault line

20  to the east?  What base map did you get that off of?  One of

21  our exhibits?

22     MR. KRIEGER:  Did you say the one to the east, that is,

23  the Wildomar?

24     THE COURT:  The one to the west I mean, the Elsinore fault.

25     MR. KRIEGER:  Where did we get this, Mr. Webb?

30

1    MR. WEBB:  That came from one of the Government's Exhibits

2  scaled off at the bottom of this map.

3    THE COURT:  Let's make these tentative and subject to

4  correction, but my recollection is that the fault line runs

5  across, according to Roripaugh's B, 29 A, and probably the water

6  basin is the area to the east thereof and not the west.  Can

7  you see it on here?

8    MR. VEEDER:  Yes.  I think 15 A is the source of your line

9  for the Elsinore fault.

10    THE COURT:  No.

11    MR. VEEDER:  Then what was the source of it?

12    THE COURT:  I have 15 A in front of me.  It doesn't show

13  an extension of the fault line down that far.

14    MR. KRIEGER:  May we look at it, just to check it?  It

15  might be worth doing.

16    THE COURT:  Mr. Clerk, do you have Exhibit 15 handy?

17    MR. VEEDER:  There is a sdifferent scale between 15 and 15 A.

18    THE COURT:  They are a different scale, all right.  I

19  think that is probably where you got that fault line.  It may be

20  a different scale, but it shows on 15 as about the same position

21  as on Roripaugh's A.

22    MR. KRIEGER:  I think the witness did testify, didn't he,

23  that all the well production was to the east of this fault line

24  on 29 A?

25    THE COURT:  Yes.  But my tentative findings would be that

b

1  any water that would get to the west of the fault line would be

2  not part of the stream system and they would be just lucky to

3  have it.

4      As to the portion on 29 A east of the fault line, the Court

5  would find that it is overlying the Murrieta Basin and the

6  rights of the owners are correlative with other owners in that

7  area.

8      The Court would find that 29 B and C are both riparian and

9  also overlie the Murrieta Basin, and that the rights of the

10  owners are correlative with other owners interested in the

11  water system.

12      The Court would find that the reservoirs are proper ripar-

13  ian uses.

14      Did we come to any general agreement about check dams?

15  Mr. Sachse and Mr. Veeder have been discussing that.

16      MR. VEEDER:  We have not, your Honor.  There are matters

17  that Mr. Sachse and I are continuing to discuss.

18      As I understood, this structure was for flood control.

19      THE COURT:  That is right.

20      At least as to the record on this parcel and the Court finds

21  no improper riparian use through the check dam.

22      MR. VEEDER:  May I tender the thought, nor is there any

23  evidence they claimed right to the use of water in connection

24  with it.

25      THE COURT:  I don't know whether they go that far.  It has

1   been built to stop erosion of roads and apparently has served

2   that purpose, but apparently doesn't hold or retain any appreci-

3   able amount of water.  So that I would find no fault with the

4   check dam.

5       MR. VEEDER:  The point I was making is this.  Nor is there

6   any claimed right to the uses of water in connection with it.

7       THE COURT:  There is no proof of a right that would be

8   prescriptive in character, if that is what you are getting at.

9       MR. VEEDER:  My own view is that when he puts a dam in

10  and applies water to beneficial use, he should come in good

11  conscience, be entitled to it.

12      THE COURT:  What is your point?

13      MR. VEEDER:  My point is that if he is appropriating water

14  by putting it in a dam and has constructed a dam, if he is

15  claiming a right, there should be some evidence of the claimed

16  right.  If he is not claiming a right, that is his business.

17  Maybe it is not even mine.  But if he is going to claim a

18  right and we are writing findings, it will become important.

19      THE COURT:  I merely find that the use of the dam, as shown

20  by this testimony, was not improper.  Wouldn't that do it?

21      MR. VEEDER:  It is a negative way of saying that he has no

22  right.

23      THE COURT:  It is an affirmative way of saying that he has

24  a right to use the dam to keep his roads from being washed out.

25  I think it's a small matter.

1      MR. VEEDER:  17 acre feet.

2          THE COURT:  There is no proof that it ever had 17 acre

3  feet of water in it.  As I understood the testimony, there has

4  been very little water in it.  Isn't that the testimony?

5          MR. KRIEGER:  Very little indeed, and that check dam is

6  not being used for the purpose of appropriating water, if that

7  is what Mr. Veeder is worrying about, because he specifically

8  said that it was not.

9          MR. VEEDER:  I am trying to help the man out.

10         THE COURT:  I am not so sure you are.  Maybe we are both

11 trying to do the same thing.  Let's let the record show that

12 we are both trying to help him out, and when the findings are

13 drawn see what we can do about it.

14         MR. VEEDER:  Fine.

15         MR. KRIEGER:  We have Mr. Webb here and we might as well

16 find out where he got the fault line for Exhibits Roripaugh A

17 and B both.  They are the same.

18     Where did you get them from, Mr. Webb?

19         MR. WEBB:  I took them from this map, which I believe is

20 Exhibit 17.

21         THE COURT:  I think it is the same base as Exhibit 15

22 also.

23         MR. VEEDER:  Is that correct?

24         MR. KUNKEL:  15 and 17.  The same base.

25         THE COURT:  The Court will tentatively find that all the

34

1   property to the west of that Elsinore fault line is not part of

2   the basin, and if there is water there it is not part of the

3   stream system.

4       MR. VEEDER:   Your Honor, has been using the terminology,

5   if I may refer to it, as the Murrieta Basin.   You mean, as I

6   understand it, the ground water body, both east and west of the

7   fault.   Or are you restricting your statement only to the

8   area between the two faults?

9       THE COURT:   When I have been talking about the basin

10   generally, I have been talking about the area between the two

11   fault lines.   This portion I am talking about now lies west

12   of the Elsinore fault and is not their flow within the basin?

13   The basin extends further than the Wildomar fault on the east.

14   There is no doubt about that.   I have been using the Murrieta

15   Basin to refer generally to the ground between the two fault

16   lines.   There is no doubt that the basins go further east.

1       (Another matter.)

1       (Recess.)

1       MR. KRIEGER:   Your Honor, may I ask a question of Mr.

2   Howell while he stands here?

21       THE COURT:   Yes.

22       MR. KRIEGER:   In that soil conservation check dam, is

2   there a pipe outlet at the bottom of the dam?

2       THE WITNESS:   Yes.

2       MR. KRIEGER:   And it drains through that then gradually

35

1    instead of running off all at once; is that right?

2        MR. HOWELL:  Yes.

3        MR. VEEDER:  Is there a control of that pipe?

4        THE COURT:  By that you mean a valve or cut-off?

5        MR. VEEDER:  A valve.

6        MR. HOWELL:  There is a vale, yes.

7        MR. VEEDER:  Do you open that valve?

8        MR. HOWELL:  I have never opened it.  It has never been

9    opened.

10       MR. VEEDER:  In other words, all the water that goes in is

11    impounded and retained for --

12       MR. HOWELL:  There has never been any water in there that

13    lasted any length of time.

14       MR. KRIEGER:  If there were water in it, how would it be

15    released?

16       MR. HOWELL:  Through that valve.

17       MR. KRIEGER:  Who would open the valve?  Is it open all

18    the time?

19       MR. HOWELL:  No; it is closed.

20       MR. KRIEGER:  Who would open it, do you know?

21       MR. HOWELL:  No.

22       MR. KRIEGER:  Would you?

23       MR. HOWELL:  I could.  There would be no occasion that I

24    know of.

25       MR. VEEDER:  To open it.

1      MR. HOWELL:  Pardon?

2      MR. VEEDER:  I finished his sentence.

3      THE COURT:  Let's go ahead.

4      MR. KRIEGER:  That's all the questions I have of Mr.

5   Howell.

6      MR. VEEDER:  Your Honor, may I bring up this point, because

7   it is one on which Mr. Sachse and I have been laboring a long

8   while.  I realize that you folks are in a hurry and I will be

9   quiet soon here.

10      Our concern is your Honor's jurisdiction to regulate the

11   valve on Mr. Howell's structure.  What occurs if he doesn't

12   open the valve?  Is there a right so to impound that water?

13   And if the impounded water goes into the underground, as we have

14   been told, it did, is it vagrant percolating water or is it part

15   of the stream system?  I'm not trying to complicate the law-

16   suit.

17      THE COURT:  I understand that you are not concerned with

18   one check dam.  You are concerned with a couple of thousand in

19   that watershed.

20      MR. VEEDER:  Yes, particularly during the short water sea-

21   son.  When you have a flood that is one thing.

22

23

24

25

Z1
8

1    But when you block off what little water there is in

2    these arroyos, that is a problem.

3    THE COURT:  Ultimately the only thing we can do with

4    check dams is to provide that the Court will have continuing

5    jurisdiction over them.

6    MR. SACHSE:  That is the substance of it.  That we

7    reserve to your Honor jurisdiction regarding opening it or

8    closing it or tearing it out in the future.

9    THE COURT:  Let's see how they work and if the problem

10   gets too critical something might be done.  Otherwise, many

11   of these check dams are used for watering stock on dry ranges

12   and things of that sort.  Some of the property might be

13   valueless if they couldn't store a little water for stock.

14   MR. KRIEGER:  What about the dams that are not yet built

15   but will be built in the future?  Would the Court retain

16   jurisdiction over those?

17   THE COURT:  I would think so.

18   MR. KRIEGER:  That means that the Court would retain

19   jurisdiction over all the surface waters in the watershed.

20   THE COURT:  Yes.

21   MR. VEEDER:  That is the objective of the lawsuit.

22   MR. SACHSE:  We have never quarreled with the Court's

23   continuing jurisdiction even in this basement complex.  It

24   has been strictly as to the ground water.  As to surface water,

25   you always retain jurisdiction.

THE COURT:  The surface water is supposed to flow over the basement complex and feed the stream.  But the ground water in the complex and in the older weathered areas we have found is not part of the stream system.

MR. KRIEGER:  This check dam has an automatic outlet in it, and I understand some of them do-- they have an open pipe at the bottom so that the water moves out gradually.  There would be nothing improper about such a check dam.

THE COURT:  The easiest thing to do is to let Mr. Sachse and Mr. Veeder continue to work on this problem, and probably wind up by taking continuing jurisdiction over all of the surface waters of this watershed, including check dams.  If we have particular problems we will meet them when we come to them.

MR. STAHLMAN:  We are also interested, your Honor.  We have some of the stock water dams your Honor spoke of that we have been using up there for fifty years.

THE COURT:  That wouldn't make any difference.  It would be difficult for you to prove a prescriptive right to one, because you can't show that you have maintained it over somebody else's objection.  So you haven't got any prescriptive right, I would guess.

MR. KRIEGER:  On the other hand, your Honor, wouldn't it possibly be so where you have a check dam that is not used for any beneficial use of water but simply for the purpose of

controling the runoff and the dam has been used only for the

purpose of temporarily storing water, that it is not an

improper use as a check dam.

THE COURT:  There wouldn't be one of these dams in fifty

that would come within that category.  Most of these dams have

only a spillway over the side, and the majority of them are used

for stock purposes, as I have observed.  They get some water

in the winter and use it for stock as long as you can until

the grass is gone.

MR. KRIEGER:  I agree with that.  And yet we have talked

about that check dam being an improper use.  On the other

hand, the controling check dam is a proper use.  He is not

using that for any beneficial use.

THE COURT:  There is nothing to get excited about.  I

have no doubt that we could say that as long as Mr. Howell

will have a valve open partway, depending on how big the

outlet is, there might be one result.  But this bites into the

whole problem, which we haven't fully considered, and I don't

think there is anything contemplated presently about even the

present checkdams.  It is just the thought of the future.  The

fact that they are impediments to the flow of the surface water

and would therefore be within the Court's jurisdiction.

MR. GIRARD:  Also important to remember on these check

dams is that they may be a proper use, but they may not be

based upon a proper right.  You can obtain a right to store

water in one of three ways, by prescription, by appropriation, or by riparian use.

THE COURT:  We are not going to decide it right now. Let's go ahead.

MR. KRIEGER:  May I ask Col. Bowen one question in clarification of the last witness's testimony-- Mr. Howell.

Col. Bowen, showing you Exhibit 221, which is the Howell soil conservation report, do you show in your report anything concerning the fault line and its relationship to this Parcel 29-A?

COL. BOWEN:  Yes, sir.  On pages 1 and 2 of Exhibit 221 appears a section entitled "Geology," which indicates that basement complex rocks outcrop along the southwestern boundary of the southern parcel, which is Parcel No. 29-A on Roripaugh's Exhibit B.  At the top of page 2 it goes on to report that structurally the southern parcel is traversed by the Elsinore fault zone.  The southern parcel again being 29-A as appears on Roripaugh's B.  The actual trace of the fault is concealed by the older alluvium, but its existence is evidenced by the presence of the Santa Rosa Horst to the southwest.  And referring again to the aerial photo in Exhibit 221 of the southerly parcel, which is labeled Block 203, it indicates the steep land in the southwest portion of that block, which is a part of the Santa Rosa Horst, and would indicate although concealed the Elsinore fault traverses Block 203 somewhere

5

1   about midway between the northeasterly boundary and the

2   southwesterly boundary of the Block 203.

3       MR. KRIEGER:  Using the information in your soild survey

4   221, could you superimpose on Exhibit B where you believe the

5   fault line would be on Parcel 29-A?

6       COL. BOWEN:  Now, sir.  As indicated in the report, I

7   don't have enough information on that particular parcel,

8   because the fault is concealed.

9       THE COURT:  What are you trying to prove?  Are you dis-

10  satisfied with my tentative findings?

11      MR. KRIEGER:  No.  Here is what I am trying to show.

12      THE COURT:  Presently the map Roripaugh's A shows the

13  fault line to place more than half of 29-A to the southwest

14  of the fault line.  Now you have just asked the Colonel if

15  he couldn't put the fault line about the middle of 29-A.

16      MR. KRIEGER:  No, I didn't ask him that.  I asked him if

17  he could put it on 29-A. And in reading the soil conservation

18  report it would be my observation that this fault line would

19  go further to the southwest.

20      THE COURT:  Do you want to put it further to the south-

21  west?

22      MR. KRIEGER:  No, I don't think it makes any difference

23  as far as the decree is concerned.  But you asked the question

24  about the accuracy of this line and I was just wondering if it

25  could be established through the soil conservation report.

6

1    That is the whole purpose of my question.

2        THE COURT:  I see.

3        MR. KRIEGER:  It can't be done.  So that is it.

4        THE COURT:  Would you say that any water found west of

5    the Elsinore fault line was probably vagrant, percolating

6    water and not part of the stream system?

7        COL. BOWEN:  Yes, sir.

8        MR. KRIEGER:  All right.

9        Mr. Nielsen.

10

11                    WALTER R. NIELSEN,

12   one of the defendants herein, being first duly sworn, testified

13   as follows:

14        THE CLERK:  State your name.

15        THE WITNESS:  Walter R. Nielsen.

16

17                    DIRECT EXAMINATION

18   BY MR. KRIEGER:

19        Q   What is your address?

20        A   837 Craig Avenue, La Canada.

21        THE COURT:  What is this parcel number?

22        MR. KRIEGER:  28, right here.

23        Q   That is one parcel of property; is that right?

24        A   Yes, sir.

25        Q   I show you the soil survey report, Exhibit 222 for

7

1    Identification and ask you if you have examined this report?

2         A  Yes, sir.

3         Q  And is it true that the description in the soil

4    conservation report, Exhibit 222 for Identification, and the

5    answer that you have filed in this lawsuit describes the

6    parcel of land referred to as Parcel 28 on Exhibit B?

7         A  Yes, sir.

8         Q  And do you agree with the conclusion inthe soil survey

9    report Exhibit 222 that you own 60 acres of land, all of

10   which is irrigable?

11        A  Yes, sir.

12        Q  How many wells do you have on the property?

13        A  Two wells.

14   MR. VEEDER:  I don't believe that is a proper question.

15   From the standpoint of the engineering report, I don't believe

16   Col. Bowen indicated it.

17        Do you recall your question, Mr. Krieger?

18   MR. KRIEGER:  I asked the question if he agreed with the

19   conclusion in the soil survey report that there was 60 acres

20   in the parcel, all of which was irrigable, and he answered

21   "Yes."

22   MR. VEEDER: I have no objection to that question.

23   BY MR. KRIEGER:

24        Q  Your answer to that question is yes?

25        A  Yes.

8

1   Q  How many wells do you have on that parcel?

2   A  Two wells.

3   Q  One domestic and one irrigation?

4   A  Yes.

5   Q  How deep is this domestic well?

6   A  About 56 feet.

7   Q  Do you know what the water level is?

8   A  No, sir, I don't.

9   Q  Do you know when that well was dug?

10   A  No, sir, I don't.

11   Q  Was it on the property when you purchased it?

12   A  Yes, sir.

13   Q  When was that?

14   A  1952.

15   Q  You have been using it continuously?

16   A  Yes, sir.

17   Q  You also have an irrigation well?

18   A  Yes, sir.

19   Q  How deep is it?

20   A  Approximately 192 feet.

21   Q  And how much is the diameter?

22   A  12-inch casing.

23   Q  And what horsepower motor?

24   A  30-horsepower motor.

25   Q  How many inches do you pump with this, do you know?

1    A  Well, the capacity of the pump is approximately 60

2  inches.

3    Q  How much of this 60 acres do you irrigate?

4    A  I don't know exactly.  I would say around 10 or 15.

5    Q  Do you use a sprinkler system to irrigate?

6    A  Yes.

7    Q  Do you do any storing of water in connection with

8  that irrigation?

9    A  No, sir.

10    Q  What kind of crops are you growing?

11    A  Permanent pasture and about two and a half acres of

12  alfalfa and dry farm the rest of it.

13    Q  Did you obtain last year a report on your well, a

14  test report?

15    A  Yes, sir.

16    Q  I show you a report entitled "Water Well Service Well

17  Report of Walter Nielsen property, November 7, 1959, Murrieta,

18  California," and ask you if that is a copy of the report which

19  you received.

20    A  Yes, sir.

21    Q  Reciting that the pump was installed at 153 feet,

22  static level is 55 feet, pumped 540 gallons per minute, and

23  a hundred feet with 45-foot drawdown on a 48-hour test; is

24  that correct?

25    A  Yes.

10

1    MR. KRIEGER:  I offer that as part of Roripaugh's Exhibit

2    D.

3    THE COURT:  It will be received in evidence as part of

4    Roripaugh's Exhibit D.

5    (The document above referred to was received in evidence

6    as part of Roripaugh's Exhibit D.)

7    BY MR. KRIEGER:

8    Q  Has the level of that well changed any over recent

9    months since it was--

10    A  Not to my knowledge, no, sir.

11    MR. KRIEGER:  That is all.

12    MR. VEEDER:  I have no questions.

13    THE COURT:  You are satisfied with this report Exhibit

14    222?

15    THE WITNESS:  Yes, sir.

16    THE COURT:  Col. Bowen, is it correct?

17    COL. BOWEN:  Yes, sir.

18    THE COURT:  Anybody want to offer it in evidence?

19    MR. KRIEGER:  I offer it in evidence.

20    THE COURT:  Received.

21    (Plaintiff's Exhibit No. 222 for Identification was

22    received in evidence.)

23    THE COURT:  As to this parcel 15-A shows it to lay over

24    some older alluvium and partly younger alluvium, but it is

25    obviously between the Wildomar fault and the Elsinore fault

11

1   line.  The Court finds that it overlies the basin and that the

2   rights of the owner are correlative with other persons having

3   rights in the basin stream system.

4       Anything further needed?

5       Thank you.

6       Do you contemplate an interlocutory judgment in this

7   Murrieta area one of these days?

8       MR. VEEDER:  Yes, I am hopeful that when we have finished

9   the work we have now scheduled for April 5th and 6th we can

10  go generally the same line we have followed in the Fallbrook

11  area.  That is one reason why I have been very concerned about

12  what we have been doing in regard to these check dams, because

13  I know there are check dams directly involved.

14      THE COURT:  So far we have only had one.

15      MR. VEEDER:  That is correct.  But when we move further

16  up the valley.

17      THE COURT:  Call the next witness.

18      MR. KRIEGER:  Miss Louise Gwinn.


20              KATE LOUISE GWINN,

21  one of the defendants herein, being first duly sworn, testified

22  as follows:

23      THE CLERK:  State your name, please.

24      THE WITNESS:  Kate Louise Gwinn.

25      THE COURT:  What parcel is this?

1        MR. KRIEGER:   45, right here, your Honor.

2    BY MR. KRIEGER:

3        Q   What is your address?

4        A   Post Office Box 924, Murrieta.

5        Q   And you are married to W. A. Gwinn; is that right?

6        A   Yes, sir.

7        Q   And together you own the property shown as Parcel

8    45 on Roripaugh's Exhibit B; is that right?

9        A   Yes, sir.

10       Q   I show you the Government Soil Conservation Survey

11   on this property marked for identification 223 and ask you

12   if you have had an opportunity to review this report.

13       A   This is the one I looked at.

14       Q   And the land described in the soil survey report 223

15   as well as the answer on file in this case describes the

16   property which you own and which has been identified as Parcel

17   45 on B Roripaugh; is that right?

18       A   Yes, sir.

19       Q   Now this report indicates that your property consists

20   of approximately 34 acres, of which 23.2 are irrigable.  Do

21   you agree with that conclusion?

22       A   Yes, sir.

23       Q   Do you irrigate any part of your land?

24       A   Yes, sir.

25       Q   Have you an irrigation well on the property?

1    A   Yes, sir, we do.

2    Q   When was it drilled?

3    A   About 1956.

4    Q   Did you buy the property before or after that time?

5    A   Just before that time.

6    Q   Do you have a copy of the well log on that well?

7    A   That was presented to you.

8    Q   To Mr. Littleworth or our office, was it?

9    A   Yes, on both wells.

10   Q   We will get to the other well later.  But as to the

11   one that was drilled in 1956, I will show you a water well

12   driller's report showing July, 1956, and ask you if that is the

13   log of that well.

14   A   Yes that is.

15   THE COURT:  Do you offer it as part of Roripaugh's Exhibit

16   D?

17   MR. KRIEGER:  I offer it in evidence as part of Roripaugh's

18   Exhibit D.

19   THE COURT:  It will be received as part of Roripaugh's

20   Exhibit D.

21   (The document above referred to was receive in evidence

22   and marked as part of Roripaugh's Exhibit D.)

23   BY MR. KRIEGER:

24   Q   Is there another well on that property?

25   A   Yes, sir, there is.

1      Q   What is it used for?

2      A   It is a domestic well.

3      Q   Is it close to the irrigation well?

4      A   A short distance from the irrigation well.

5      Q   Is that the well that is equipped with a 7½-horsepower

6   motor?

7      A   No, sir.

8      Q   That is the irrigation well; is that right?

9      A   That is the irrigation well.

10      Q   And that irrigation well also has a 12-inch casing,

11   does it not?

12      A   Yes, it does.

13      Q   Coming to the domestic well, when was that drilled,

14   do you know?

15      A   According to the well log, in 1950.

16      Q   You have a well log on that well, do you not?

17      A   Yes, sir.  It was presented to us.

18      Q   I will show you what is referred to as an official

19   well record showing the date of the report as 11-15-50 and

20   ask yo if that is the log of that well.

21      A   That is the log that was presented to us when we

22   purchased the ranch.

23

24

25

12205-A

MR. KRIEGER:   I will introduce that as part of Exhibit D.

THE COURT:   It will be received as part of Exhibit Roripaugh's D.

BY MR. KRIEGER:

Q   Do you know the static water level of this well?

A   The domestic well?

Q   The domestic well.

A   I don't know.

Q   Do you know the static water level of the irrigation well?

A   It was approximately 18 feet.

Q   When was that?

A   That was soon after it was drilled, before they put the pump in.

Q   And you have not measured it since 1956; is that right?

A   No, sir.

Q   Do you store any water on your property?

A   No, we don't.

Q   What do you use the land for?

A   Permanent pasture, and the boy has part of it into oats now.

Q   About how many acres do you actually cultivate there now?

A   Approximately nine acres into permanent pasture, and I would say perhaps 11 acres into oats this year.

Q  Have you ever tested the irrigation well to find out how much it will really produce?

A  Yes, sir.

Q  How many inches will it produce?

A  It was tested by the power company at 145 inches.

Q  How long ago was that?

A  That was in 1956 when it was drilled by Johnny Lynch.

MR. KRIEGER:  That is all.  Thank you.


CROSS-EXAMINATION

BY MR. VEEDER:

Q  How long do you irrigate your permanent pasture each year.  What is the month in which you usually start?

A  It depends on the rainfall.  We haven't started to irrigate yet, but if the hot winds continue we will soon.

Q  And generally you start irrigating in March?

A  Well, usually in March or April.

Q  And you run through to when?

A  Until we have a heavy frost.

Q  That would be October or November?

A  It was October this past year.

Q  Do you have real heavy frosts in that area down there?

A  Yes, we do.

Q  Now, in regard to your grain crop oats, is it your customary practice to raise small grains on your property?

1    A   No, sir.  It is the first year we have raised any.

2  My son has it as a Future Farmer project.

3    Q   Then how many acres have you increased your irrigated

4  acres since you acquired the property?

5    A   We have not increased any irrigated acres.

6    Q   You are not irrigating any of the grain, the oats?

7    A   No, sir, we haven't.

8  MR. VEEDER:  I have no further questions.

9

10                  REDIRECT EXAMINATION

11  BY MR. KRIEGER:

12    Q   Murrieta Creek runs right through the middle of your

13  property, does it?

14    A   Yes, sir, lengthwise.

15  THE COURT:  Do you have a soil report on this?

16  MR. KRIEGER:  It has been identified as Exhibit 223.

17  THE COURT:  Are you satisfied with the soil report?

18  THE WITNESS:  Yes, sir.

19  THE COURT:  The soil survey and engineering report?

20  THE WITNESS:  Yes, sir.

21  THE COURT: Col. Bowen, is it correct?

22  COL. BOWEN:  Yes, sir.

23  THE COURT:  Anybody offer it in evidence?

24  MR. KRIEGER:  I offer it in evidence.

25  I would like to get my copy back.  It got lost in the

1   confusion, I think.  I didn't hand you one earlier, did I,

2   your Honor?

3        THE COURT:  No.

4        MR. VEEDER:  We have three here.  You may have one of

5   them.

6        THE COURT:  Exhibit 223 received in evidence.

7        (Plaintiff's Exhibit No. 223 was received in evidence.)

8        THE COURT:  Are all these soil reports in up to date?

9        THE CLERK:  Yes, your Honor.

10       THE COURT:  Anything further from this witness?

11       The Court will find that the property overlies the basin

12  of the Murrieta between the two fault lines and is also

13  riparian to the Murrieta.  The owner's rights are correlative

14  to other owners interested in the water system.

15       You may step down.

16       MR. KRIEGER:  Thank you.

17       Mr. Small.

18

19

20

21

22

23

24

25

1           ALBERT H. SMALL,

2   one of the defendants, having been previously sworn on his

3   oath was examined further and testified as follows:

4

5       THE COURT: Is this marked by parcel number?

6       MR. KRIEGER:  No, this gentleman is not one of the people

7   we represent. He is representing himself, your Honor.

8       THE WITNESS:  No, there are two other brothers and a sister,

9   and the property is described as the Southwest one-half of the

10  Southeast one-half of Lot 71, Temecula Grant and Water Company

11  as shown by Map on File Book 8, page 359 Maps of San Diego

12  County Records.

13      THE COURT:  It is going to take us a little time to find

14  that. We have the maps in evidence. Maybe we can find it.

15      How many acres do you own up there?

16      THE WITNESS:  An undivided one-fourth interest in ten

17  acres.

18      THE COURT:  You and your brothers and sister together

19  have ten acres?

20      THE WITNESS:  Yes.

21      THE COURT:  Can we locate it later?

22      MR. VEEDER:  Yes, and if it is agreeable, rather than

23  take the time now, in the morning I would attempt to identify

24  it in the exhibits presently in the record.

25      THE COURT:  I think we can do it. He will not be needed

1   here again today.

2       How many more witnesses do you have today?

3       MR. KRIEGER:   I have five, and I would like to finish.

4   They will not be long.

5       THE COURT:   Wait around.  We might be able to take care of

6   you tonight.

7       MR. KRIEGER:   Mr. Bates.

8

9                    RALPH BATES,

10  one of the defendants, being first duly sworn, testified as

11  follows:

12      THE CLERK:   State your name please?

13      THE WITNESS:   Ralph Bates.

14

15                  DIRECT EXAMINATION

16  BY MR. KRIEGER:

17      Q  Where do you live?

18      A  Murrieta, Post office box 70.

19      Q  Are you married to Effie Louise Bates?

20      A  I am.

21      Q  Have you reviewed the soil conservation report of the

22  United States Government in this report marked for Identification

23  225?

24      A  I think I have.

25      Q  Do you own the land described?

1          MR. VEEDER:   He says he thinks he has.   He is now looking

2     at the exhibits.

3          THE COURT:   What parcel is involved?

4          MR. KRIEGER:   Parcel No. 7.

5          THE WITNESS:   Yes, I have looked at that.

6     BY MR. KRIEGER:

7          Q  You say that the land described in this report as well

8     as in your answer on file in this case describes Parcel 7 as

9     shown on Exhibit B?

10         A  That is right.

11         THE COURT:   Right astride the Wildomar fault line?

12         MR. KRIEGER:   Yes, right here, Parcel No. 7.

13         Q  This report 225 shows that you own 20 acres with your

14    wife, all of which is irrigable.

15         A  That is right.

16         Q  Do you agree with that conclusion?

17         A  That is right.

18         Q  Is any of this land irrigated?

19         A  No, sir.

20         Q  Is it dry farmed at present?

21         A  Yes, sir.

22         Q  All of it?

23         A  There are four houses on the place, and of course, that

24    isn't farmed.

25         Q  Have you ever irrigated any part of it?

1      A  No, sir.

2      Q  Did you ever make any use of the property for commercial

3 purposes?

4      A  No.

5      Q  Did you ever raise turkeys there?

6      A  You mean for like that?

7      Q  Yes.

8      A  Yes, we raised turkeys on there, and dry farming.

9      Q  You stopped raising turkeys, though, about 1956, did

10 you?

11      A  Yes, that was the last that there was any turkeys raised

12 on it.

13      Q  Do you have any wells on this property at all?

14      A  Yes; four.

15      Q  Are they all located southerly of the Wildomar fault

16 as shown on Exhibit B?

17      A  Yes.

18      Q  They are to the southwest of the fault line; isn't that

19 correct?

20      A  That is correct.

21      Q  You have one domestic well, do you?

22      A  They are all domestic wells.

23      Q  When were they drilled -- the first one?

24      A  The first one was drilled about 1935.

25      Q  And how deep is it, do you know?

1     A   100 feet approximately.

2     Q   Are you still using it?

3     A   Yes.

4     Q   When was the next one drilled?

5     A   The next one was drilled about ten or 11 years ago.

6     Q   Are you still using it?

7     A   No, sir.

8     Q   Why not?

9     A   It was a drilled well and was not rock packed and didn't

10   give sufficient water for domestic use at the house.

11    Q   The third one, when was it drilled?

12    A   In 1957.

13    Q   In 1957.  And how deep is it?

14    A   120 feet.

15    Q   Who drilled it, do you know?  Was that Don Trineri?

16    A   Don Trineri, yes.

17    Q   Are you still using that third well?

18    A   Yes.

19    Q   Is it an adequately producing well for your purposes?

20    A   Yes.

21    Q   Then you say you had a fourth one?

22    A   That is right.

23    Q   When was that drilled?

24    A   1958.

25    Q   How deep is it?

1    A   Approximately 100 feet.

2    Q   Does it produce water too?

3    A   Yes.

4    Q   So I take it you have wells 1, 3 and 4 that you are
5    still using; is that right?

6    A   1, 3 and 4.

7    Q   What have you observed about the water levels in those
8    wells?   Has it been going down?

9    A   It has dropped down some.

10   Q   How much would you say they have dropped down since
11   1957?

12   A   Since 1957?   The one is all I know about, and that is
13   my own well, and it has dropped possibly 45 to along in the
14   50's -- 45 feet to along in the 50 feet.

15   Q   Dropped five feet; is that right?

16   A   Yes, or a little more.

17   Q   In how long a time?

18   A   Since it was drilled in 1957.

19   Q   How long have you lived on that place?

20   A   You mean on the 20 acres?

21   Q   Yes.

22   A   I have lived there since 1935.

23   Q   Have you noticed any great change in the water level
24   since 1935?

25   A   Yes; it has dropped quite a little bit.

1    Q  How much would you say?

2    A  Well, the one well stood -- the first well that was

3    drilled stood at 17 feet when it was drilled.  Now, it is down

4    around 50, the last time.  I haven't checked them for a long

5    time.

6    Q  Is this the lowest it has ever been?

7    A  Yes.

8    MR. KRIEGER:  That's all.

9

10                    CROSS-EXAMINATINN

11   BY MR. VEEDER:

12    Q  I didn't hear when you measured the depth to water the

13   last time.

14    A  I haven't measured for a long time.  I don't know.

15   The State measured it, but I don't remember.  Well, in fact,

16   I told them just to help themselves and go ahead and measure it.

17   I didn't care what they did.

18    Q  You said in 1935 it was 17 feet to water, then you said

19   it was 50 feet to water, and I didn't hear the date.

20    A  That was, I suppose, a couple of years ago.

21    Q  You would say 1957?

22    A  Around there.

23    Q  Or 1958?

24    A  I couldn't say which it was.  I don't remember.

25    MR. VEEDER:  I have no further questions.

1    THE COURT:   Is the engineering report satisfactory to

2 you?

3    THE WITNESS:   Yes.

4    THE COURT:   And is it correct, Col. Bowen?

5    COL. BOWEN:   Yes, sir.

6    THE COURT:   Offer it in evidence?

7    MR. KRIEGER:   It is offered.

8    THE COURT:   Plaintiffs' Exhibit 225 received in evidence.

9    (Plaintiffs' Exhibit 225 received in evidence.)

10    THE COURT:   The Court proposes to find that this ten

11 acre parcel is located over a largely younger alluvium, part

12 the older alluvium, but all of it over a basin on both sides,

13 extends on both sides of the Wildomar fault in this particular

14 area.  The rights of the owner are correlative with other

15 overlying and riparian owners.

16    MR. KRIEGER:   That's all Mr. Bates.  Thank you.

17    THE COURT:   Step down.

18    MR. KRIEGER:   Edward Bryant.

19

20            EDWARD BRYANT

21 one of the defendants being first duly sworn, testified as

22 follows:

23    THE CLERK:   State your name please?

24    THE WITNESS:   Edward Bryant.

25

## DIRECT EXAMINATION

THE COURT: What parcel counsel?

MR. KRIEGER: We are dealing here with Parcel 36, your Honor.

THE COURT: I see. And it is up just north and west of Bates's property.

MR. KRIEGER: Thank you. It is also across the fault line.

Q What is your occupation, incidentally, Mr. Bryant?

A Bathhouse attendant, Murrieta Hot Springs.

Q You are the owner of this parcel shown on Roripaugh's B as Parcel 36, are you not?

A Yes, sir.

Q I show you Exhibit 226 for Identification, being the soil report prepared by the United States for this parcel, and ask you if you have reviewed this report?

A Yes. Mr. Littleworth sent it to me.

Q That's right. Ths report 226 shows that you own approximately 20 acres of land, it being the same 20 acres described in your answer in this case.

A Yes.

Q And it also states that all of that 20 acres is irrigable. Do you agree with that conclusion?

A Well, just about, I guess.

Q Do you irrigate any of that land?

A No, sir.

1    Q  Is it all dry farmed?

2    A  All dry farmed, yes.

3    Q  You rent it out, do you?

4    A  Yes.

5    Q  Do you have any wells on the property?

6    A  One domestic well.

7    Q  When was it drilled?

8    A  I think about three or four years ago.  I have forgotten

9 for sure.

10    Q  Do you agree with the soil report that says it is 129

11 feet deep and pumped by one horse motor?

12    A  No, that statement is wrong.  It is a three-quarter inch

13 submersible.

14    Q  Three-quarter horse?

15    A  Three-quarter horse submersible pump.

16    Q  The well is 129 feet deep?

17    A  Yes.

18    Q  And has a 16 inch casing; is that right?

19    A  No; eight inch.  Somebody got that wrong.

20    Q  Eight inch casing?

21    A  Yes.

22    Q  Do you have any pump tests or well logs?

23    A  No, sir, I haven't.

24    Q  Can you tell me whether the one domestic well you have

25 is on the southwest or the northeast side of the Wildomar fault?

1   A   I don't know where the fault is.  I can't tell you.

2   Q   You have no opinion about it; is that right?

3   A   No, I don't know where the fault is.

4   MR. KRIEGER:   I have no further questions.

5   THE COURT:   Did you mark the report?

6   MR. KRIEGER:   Yes, it has been marked 226.

7   THE COURT:   May it be stipulated that the Colonel may

8   check his notes further and, if necessary, correct his report?

9   MR. KRIEGER:   Yes, your Honor.

10   THE COURT:   The map shows that the area that Bates testified

11   to has ten acres and that Bryant testified to has 20 acres are

12   drawn to the same size.

13   Have you got 20 acres there?

14   THE WITNESS:   Yes.

15   THE COURT:   Mr. Bates, you have just ten?

16   MR. BATES:   No; I have 20.

17   THE COURT:   My mistake.  That corrects that.

18   Where is this domestic well, just as a matter of curiosity --

19   which end of the property?

20   THE WITNESS:   It would be the north corner, I guess you

21   would call it.

22   THE COURT:   In the north corner of it?

23   THE WITNESS:   Yes.

24   THE COURT:   Anything further with this witness?

25   MR. VEEDER:   We have nothing.

48

1      THE COURT:  Somebody offer the soil report in evidence?

2      MR. KRIEGER:  It is offered.

3      THE COURT:  Plaintiffs' Exhibit 226, subject to being

4  corrected.

5      (Plaintiffs' 226 received in evidence.)

6      THE COURT:  The Court finds that the 20 acre parcel lies

7  astride the Wildomar fault and partly over younger and older

8  alluvium, and I would be inclined to find it is all within the

9  basin, it all overlies the basin.  Any objection to that finding?

10      It doesn't make a lot of difference.  As long as he has

11  any part of it, overlying the basin, he could use it, I take it,

12  on all his ground.  Couldn't he?

13      MR. VEEDER:  I want to check that, your Honor.

14      MR. SACHSE:  I will say yes.

15      THE COURT:  Step down Mr. Bryant.

16      MR. KRIEGER:  Thomas E. Wilks.

17      THE COURT:  What parcel, Mr. Krieger?

18      MR. KRIEGER:  We are now talking about Parcel 2, your

19  Honor.

20

21              THOMAS E. WILKS,

22  one of the defendants, being first duly sworn, testified as

23  follows:

24      THE COURT:  What parcel, Mr. Krieger?

25      MR. KRIEGER:  We are now talking about Parcel 2 your Honor.

1  **THE CLERK:** State your name, please?

2  **THE WITNESS:** Thomas E. Wilks.

3

4       **DIRECT EXAMINATION**

5 BY MR. KRIEGER:

6  Q Mr. Wilks, what is your address?

7  A Post office box 57, Wildomar.

8  Q And you are married to Luella M. Wilks?

9  A That is correct.

10  Q And you own the property shown as Parcel 2 on Roripaugh's

11 B; is that correct?

12  A Yes, sir, with some additions that I have gained since

13 that map has been drawn.

14  Q I would like to have you come down here and tell us

15 what the additions are, and with the Court's permission put

16 2 in those places as soon as you have identified them.

17  A All right. What parcels I have since purchased, I

18 purchased the property from my father, here listed as 16 on

19 this same report, and covered also by the --

20  **THE COURT:** Which 16? They lie on three sides of what is

21 marked as 2.

22  **THE WITNESS:** They would be the northeast and the southwest.

23 BY MR. KRIEGER:

24  Q The northwest and the southeast; is that correct?

25  A Yes.

1    Q  Are those 20 acre parcels?

2    A  Yes, roughly.

3    Q  And your own parcel?

4    A  It is 20.

5    Q  So that is 60 acres; is that right?

6    A  Yes.

7    Q  Have you since acquired any other land?

8    A  None that isn't marked.

9    Q  And you also own the parcel marked 2 which is directly

10   to the northeast of Parcel No. 2 to the southwest; is that

11   right?

12   A  That is correct.

13   MR. VEEDER:  Which is bound by Parcel 16 to the north

14   and 21 to the south?

15   THE WITNESS:  That is correct.

16   THE COURT:  How many acres in that parcel?

17   THE WITNESS:  There are 15.

18   THE COURT:  Then you have 75 acres?

19   THE WITNESS:  That is correct.

20

21

22

23

24

25

BY MR. KRIEGER:

Q   The answer that you have placed on file in this lawsuit describes how much of that land, Mr. Wilks?

A   I believe only 30.

Q   Only the original two parcels that are marked 2 on that map; is that right?

A   That is right.

Q   It does not take in the other two parcels you have just described?

A   That is correct.

MR. KRIEGER:  With the Court's permission, might I strike 16 and put 2?

THE COURT:  In those two areas.

MR. KRIEGER: All right.

THE COURT:  The other 16 will remain up above.  Will you amend your answer or now will you take care of this description problem?  Do you have it set forth in the soil report?

MR. VEEDER:  What is the father's name?

THE WITNESS:  Thomas H. Wilks.

MR. VEEDER:  We have a report here on Thomas H. Wilks.

MR. KRIEGER:  The soil report, your Honor, only refers to the two original parcels which the witness owned.

MR. VEEDER:  Here is Thomas H.

THE COURT:  That will be marked 228.  Thomas E. Wilks is

11 2

227, and the Thomas H. Report is 228.

MR. VEEDER:  We are going to have a split personality on the Thomas H.

THE COURT:  We will take care of it.  We will just mark it.

MR. VEEDER:  Fine.

THE COURT:  Or do you want to call it 227-A?

MR. VEEDER:  I would like to have it so that the Colonel can separate them in his testimony, because I think we will have to call him on it.

THE COURT:  Call the Thomas H. Wilks report 227-A, and the Thomas E. Wilks report 227.

MR. KRIEGER:  We are going to have some trouble here, your Honor, unless I try to explain that these two ownerships are distinct.  The only thing is that in the Thomas H. Wilks report which you have ordered identified as 227-A --

THE COURT:  There will be property in there that belongs to Thomas H.  We can separate it.  All I am concerned with now is getting the log in.  You can file an amended answer or file an exhibit with the proper log.

MR. KRIEGER:  I will file an amended answer incorporating the right parcels, and I will also file an amended answer for T. H. Wilks.

THE COURT:  Is that agreeable, Mr. Veeder?

MR. VEEDER:  Fine.

11  3

THE COURT:  All right.

MR. KRIEGER:  Very well.

Q  Mr. Wilks, you have had an opportunity, have you not, to review both 227 and 227-A, yours and your father's soil conservation reports; is that right?

A  Yes, I have.

Q  In 227, which sets out the original acreage which you have owned, being 15 and 20-acre parcels, the Government's report recites that this consists of 31 acres, all of which are irrigable.  Do you agree with that report?

A  Yes, I do.

Q  Do you presently farm all of these four parcels we are talking about?

A  Yes, I do.

Q  How long have you been farming the acres which you own, the two original parcels?

A  I started farming, taking over my father's farm, so to speak, upon my completion of World War II duty and have done so ever since, except for a period of recall duty in the Korean conflict.

Q  And you have been doing that continuously then ever since?

A  Yes.

Q  Do you also farm your father's other parcel that he still retains?

11  4

1    A  No, I do not.

2    Q  Are you irrigating any of these five parcels now?

3    A  Yes, I do.

4    Q  What crops do you grow?

5    A  Alfalfa hay predominantly, and I do irrigate my grain

6  hay when I need to.

7    Q  What type of irrigation system do you have?

8    A  Sprinkler system.

9    Q  Do you have any irrigating wells?

10    A  Yes; I have two.

11    Q  Where are they located?

12    A  One is located in the first parcel.  That would be the

13  227, that would be Parcel 2 in the -- That would be the

14  westerly corner.

15    Q  The westerly corner of the 20-acre parcel, or the 15?

16    A  The 20-acre parcel.

17    THE COURT:  The one you originally had before you

18  acquired the property from your father?

19    THE WITNESS:  Yes.

20    THE COURT:  The center one of the three 20's?

21    THE WITNESS:  Yes, that is right.

22  BY MR. KRIEGER:

23    Q  When was this well drilled?

24    A  In 1956, I believe-- 1955 or 1956.  I believe it was

25  through the winter.

1   Q   How deep is it, do you know?

2   A   150 feet.

3   Q   Casing size?

4   A   12-inch, gravel packed.

5   Q   Do you have a log on this well?

6   A   Yes, I believe there is one that has been filed with

7   your office.

8   Q   Here is a water well driller's report showing the

9   well drilled 1-4-56, No. 28380.  Is that the well we are

10   talking about?

11   A   That is correct.

12   THE COURT:  Is it offered as part of Roripaugh's Exhibit

13   D?

14   MR. KRIEGER:  Yes.

15   THE COURT:  It is received.

16   BY MR. KRIEGER:

17   Q   And have you had a well test made of that same well?

18   A   Yes, I have.

19   Q   And that was done in April, 1956?

20   A   That is correct.

21   Q   There is a letter to Thomas E. Wilks dated April 16,

22   1956, from California Power Company, which purports to be a

23   well test.  Is that the test you received?

24   A   At that time, yes, that is correct.

25   MR. KRIEGER:  I offer this also in connection with

11   6

1    Roripaugh's Exhibit D.

2         THE COURT:   It will be received as part of Roripaugh's

3    Exhibit D.

4         (The document was received in evidence and marked as

5    part of Roripaugh Exhibit D.)

6         MR. KRIEGER:   Showing gallons per minute, 178.9, if you

7    have difficulty reading that on your copy, your Honor.

8         Q   What kind of pump do you have on this well?

9         A   15-horsepower electric motor.

10        Q   Do you know how much water this well will now produce

11   today?

12        A   Since the time of that well report, well test, pump

13   test, I have increased the number of bowls on that pump and

14   now produces approximately 28 inches, I presume.   I have not

15   had it tested.

16        Q   In 1956 it produced about 20 inches?

17        A   Yes.

18        Q   You changed the bowls on the pump; is that correct?

19        A   That is correct.

20        Q   Have you made any recent well measurements?

21        A   Yes, in January of this year.

22        Q   When did you make it?

23        A   January 29th.

24        Q   What was the level of that well?

25        A   38 feet.

11  7

Q   Did you also measure it at any earlier time?

A   Yes, I measured it in the summer months when I am
pumping heavily on it to compare my drawdown.

Q   Did you measure it in the summer of 1958?

A   Yes, I did.  I believe at that time the well stood at
95 feet.

Q   And in 1959 in the summer?

A   Yes; at that time it was 88 feet.

Q   So the well rose between those two years; is that
right?

A   That is correct.  That was with the same amount of
pump running time prior to the measurement.

Q   You measured the well at approximately the same time
in each year and after the same amount of pumping had been
going on; is that right?

A   That is correct.

Q   That level you just testified to, was that the pumping
level?

A   That was the pumping level, with the pump on it
running.

Q   So the 95 feet and the 88 feet were respective pumping
levels in 1958 and 1959?

A   That is correct.

THE COURT:  Was the 35 or 38 feet in January of this year
a pumping level?

11 8

1        THE WITNESS:  No, sir; that is a static level.

2   BY MR. KRIEGER:

3        Q  Was there any pumping level you took in January of

4   this year?

5        A  I didn't pump in January.

6        Q  You also have a domestic well; is that right?

7        A  That is correct.  It serves also as a commercial well.

8        Q  The other well you are speaking of?

9        A  Yes.

10        Q  Where is it located?

11        A  It is right at the corner of my house, which is in the

12   center of the other property listed as 2 there.

13        MR. KRIEGER:  I wonder, with the Court's permission,

14   if I can give these letters again, and if I can refer to the

15   parcel you have been testifying to, which is the southwest

16   parcel, as 2-A of the original holdings of Mr. Wilks.

17        THE COURT:  You mean before he got something from his

18   father?

19        MR. KRIEGER:  That is correct.

20        THE COURT:  All right, that is 2-A.

21        MR. KRIEGER:  And the one immediately to the northeast

22   as 2-B, and the one to the south of 2-A as 2-C, and the one

23   to the north of 2-A as 2-D.

24        THE COURT:  All right.

25

11   9   1    BY MR. KRIEGER:

2       Q  In which of those parcels that we have marked is your

3    home located?

4       A  2-B.

5       Q  And when was that domestic well drilled, do you know?

6       A  1952.

7       Q  Walter Robinson was the driller?

8       A  That is correct.

9       Q  How deep is that well?

10      A  80 feet.

11      Q  Do you have a log of it?

12      A  I do not, no.

13      Q  What is the size of the casing?

14      A  That is a 10-inch gravel packed.

15      Q  And the pump?

16      A  It is a $7\frac{1}{2}$-horsepower electric motor.

17      Q  Do you know how much water that well will produce?

18      A  Approximately 10 inches.

19      Q  When did you purchase Parcel 2-B?

20      A  It would be approximately in 1948, I believe.

21      Q  Is that the same time you purchased 2-A?

22      A  No, I purchased 2-A, it would have been in 1952, I

23   believe.

24      Q  Talking about the Parcel 2-B and the domestic well

25   on it, have you observed the static water level from 1948 to

the present time over the years?

    A  Yes, I have.

    Q  Has it fluctuated?

    A  Yes, it fluctuates a great deal.  At the time we drilled it, it was a flowing well, and as I stopped pumping the water level in that well continually rises until it flows again.  However, it has not flowed this year, nor last winter.

    Q  Is the average static level about the same, or has it increased, or has it decreased over the years?

    A  I would say it would have to have decreased, due to the fact that it has not flowed.  But in 1959 it stood at approximately two feet from the top.

    THE COURT:  Did it flow in 1957?

    THE WITNESS:  Yes, sir.

    THE COURT:  In 1956?

    THE WITNESS:  Yes, sir.

    THE COURT:  In 1955?

    THE WITNESS:  Yes, sir.

BY MR. KRIEGER:

    Q  Has it ever been an artesian well?

    A  Yes, sir, it was when it was drilled.

    Q  When did the artesian flow stop, or has it?

    A  Well, it has stopped in the last two years, 1958 and 1959.

    Q  Were there any wells on parcel--

THE COURT:  Let me inquire.  You say this domestic well is up in what is now called 2-B?

THE WITNESS:  That is correct, sir.

THE COURT:  Is it up toward the northern part of 2-B or the southern part of 2-B?

THE WITNESS:  It would be about between 300 and 400 feet from the highway.

THE COURT:  How many feet would that be from the north end of that 2-B?

THE WITNESS:  It would be approximately a thousand feet.

THE COURT:  Down nearer the highway than it is at the north end of that parcel?

THE WITNESS:  Yes, sir, it is a third of the way up, I would say.

THE COURT:  Do we have a soil report on that?

MR. KRIEGER:  Yes.  That is a double soil report, 227 and 227-A.

THE COURT:  I understand.

BY MR. KRIEGER:

Q  Are there any other wells on Parcels 2-C and 2-D which you acquired from your father?

A  None.

MR. KRIEGER:  That is all.

12   12

CROSS-EXAMINATION

BY MR. VEEDER:

    Q  In regard to your well on Parcel 2-B, which was artesian, could you locate that well for us, Mr. Wilks, as it relates to the Wildomar fault as depicted on Roripaugh's B?

    A  It is to the south and west.

    Q  It is south of the fault as depicted there?

    A  About right in there.

    Q  There are no other wells westerly of that point?

    A  This well on 2-C.

    Q  I beg your pardon. Easterly-- you are right.

    A  No.

    Q  Do you have any other flowing wells in that area?

    A  Not of mine.

    Q  Are you acquainted with any other flowing wells?

    A  My father had one.

    Q  Where would that be?

    A  That would be approximately the same distance away from the street line in 16.

    Q  And how would it be in line with the well that flowed on Exhibit 2-B?

    A  It would be directly to the north.

    Q  Are there springs located in the area of those two artesian wells?

12    13

1    A   There were.

2    Q   You say there were?

3    A   Yes.

4    Q   How long ago were there?

5    A   Upon my pumping my well I dried them out.

6    Q   You did.  And where were those springs situated as
related to the wel on 2-B and the well on your father's property
that you found to flow?

9    A   They were on my father's property on 16, about 200--
well, approximately 50 to 60 feet away from the highway.

11    THE COURT:  You have a half-dozen of those 16's, Mr.
Krieger.  Let's number them now.

13    MR. KRIEGER:  Fine.

14    THE COURT:  The Parcel 16 lying immediately northwesterly
of 2-B will be 16-A.

16    There is a pie-shaped parcel to the right.  We will call
that 16-B.

18    And there is a small parcel to the very northwest of the
map.  We will call that 16-C.

20    Are there any more 16's?

21    MR. KRIEGER:  This 16 is no longer --

22    THE WITNESS:  It is an error, actually.

23    MR. KRIEGER:  Let's point out, while we are at it, that
this 16 parcel just to the southwest of Parcel 21 is under
the ownership of Richard Wilks, and it has been corrected on

12253

1    your map to show Parcel 51 instead of 16.

2        THE COURT:  All right.  I think we have already had some-

3    thing on it, haven't we?  I see my map is already corrected.

4        MR. KRIEGER:  It has been corrected, but I just wanted

5    to clarify it now.

6        MR. VEEDER:  I had asked the witness if he would mark the

7    areas in which the springs used to flow prior to the time that

8    he and his father drilled a well.

9        THE WITNESS:  In 16-A.

10   BY MR. VEEDER:

11       Q   And where would that be from the wells?  Easterly

12   from the well?

13       A   Easterly and southerly, easterly from my well on 2-B,

14   and southerly from my father's windmill domestic well.

15       Q   Were there any other springs situate on your property?

16   I am now referring to your place on 2-B.

17       A   No, no other springs on my personal property.

18       Q   Are you aware of the location of any other springs

19   in that area?

20       A   There are springs through this area that lie to the

21   east of it.

22       Q   And south?

23       A   Yes.

24       THE COURT:  He was indicating with his finger the line

25   of the Wildomar fault.

MR. VEEDER:  That is correct.

THE COURT:  Are you familiar with that fault line?

THE WITNESS:  Other than the spring, sir.  That gives a fair--

THE COURT:  A row of springs running from the northwest to the southeast.

THE WITNESS:  That is correct.

BY MR. VEEDER:

Q  Have you observed any other springs along that area that have been dried up in recent years, not on your property?

A  I don't really know whether they have dried up or not. I don't believe they all have.

Q  Have you observed any that have been dried up?

A  Well, there was one that was adjacent to my property in '21 that was tiled, and since it has taken care of that problem.  I don't know whether the tile is still flowing or not.

Q  What period of each year do you irrigate your land and utilize your wells for that purpose?

A  Like everyone else, it varies with the seasons. Approximately March to November.

Q  How many cuttings of alfalfa do you get?

A  Six to seven.

Q  In regard to your permanent pasture, how do you utilize your water on that?

A    I don't have permanent pasture.

MR. VEEDER:  I have no further questions.

THE COURT:  Anything further?

MR. KRIEGER:  Nothing further.

THE COURT:  Does anyone want to offer the two exhibits in evidence?

MR. KRIEGER:  Yes.  We haven't heard the other one yet. I wonder if we should wait.

THE COURT:  All right.

I propose to find that this domestic well which originally was a flowing well and which even today is two feet from the surface is actually northeast of the Wildomar fault line.  I don't think there is any other conclusion you can draw.  The witness's testimony that the row of springs running from the northwest to the southeast would indicate that there is rising water along that fault line the same as further to the southeast.  The only other cause for rising water would be water originating to the northwest in the Murrieta Basin coming downstream.  But the significance of the rising water near where we know the fault line is, is too obvious to me to be disregarded.

Don't you think it logically follows that those flowing wells had to be to the northeast of that fault line, regardless of what the map may show?  These fault lines aren't as exact as a razor blade.

1    MR. VEEDER:  That is right.

2    THE COURT:  They slip.

3        By the way, Murrieta Creek runs through three of your

4    parcels, A, B, and C, does it not?

5    THE WITNESS:  Yes.

6    THE COURT:  I find that Parcels 2-A and 2-D are riparian;

7    that Parcel 2-B is not, but that all four parcels overlie a

8    basin, and that the rights of the defendant are correlative

9    with other overlying owners and other riparian owners.

10       Is that satisfactory?

11   MR. VEEDER:  I think it is fine, your Honor-- excellent.

12   MR. KRIEGER:  I will call the next witness, if I may.

13   THE COURT:  Yes.

14   MR. KRIEGER:  Thomas H. Wilks.

15

16               THOMAS H. WILKS,

17   one of the defendants herein, being first duly sworn, testified

18   as follows:

19   THE CLERK:  State your name, please.

20   THE WITNESS:  Thomas H. Wilks.

21   MR. KRIEGER:  We are glad to have Mr. Wilks here with us.

22   He has just gotten out of the hospital, your Honor.

23

24

25

DIRECT EXAMINATION

BY MR. KRIEGER:

Q   Where do you reside, Mr. Wilks?

A   Wildomar.

Q   And your wife is Teresa Wilks; is that right?

A   That is right.

Q   Mr. Wilks, you have just heard your son testify to
these parcels of land, haven't you?

A   I have.

Q   He testified that you sold him two 20-acre parcels
on either side of his original parcel?

A   That is right.

Q   That means, does it not, that you still retain this
parcel marked 16-A, do you not?

A   That would be approximately 30 acres in that block
now.  There was formerly a hundred acres in the block.

Q   Then there is a pie-shaped piece down here marked 16-B?

A   That is right.

Q   You still own that?

A   Yes.

THE COURT:  About how many acres?

THE WITNESS:  84 or 85, somewhere around that.

BY MR. KRIEGER:

Q   Then there is one up here to the northwest marked 16-C.
You don't any longer own that one, do you?  Wasn't that sold

1    to the school district?

2         THE COURT:  Up near the town of Wildomar.

3         THE WITNESS:  That was in the town of Wildomar.  That

4    was approximately five acres-- just a block of rocks.

5    BY MR. KRIEGER:

6         Q  You don't own that any more?

7         A  Wildomar School bought that.

8         Q  So you really own these two parcels you have spoken of,

9    the one with about 30 acres and the one with about 84 acres,

10   is that right, Mr. Wilks?

11        A  That is right.

12        Q  I will show you the U.S. Soil Conservation report 227-A

13   for Identification.

14        MR. VEEDER:  Col. Bowen and I would like to have them

15   referred to as the Ground Water Resources Engineering Report.

16   It is just a personal whimsy, your Honor.

17        MR. KRIEGER:  May we just stipulate that if we use one

18   term it means the other.

19        THE COURT:  Let's not worry about it.

20   BY MR. KRIEGER:

21        Q  You have been over this report, haven't you, Mr. Wilks?

22        A  That is right.

23        Q  And this report concludes with all of the parcels of

24   land that are referred to.  That refers to the parcels which

25   you now own which you sold to your son?

A   That is right.

Q   And which includes the school five acres, too?

A   I believe so.

Q   And I think it indicates that there are approximately 149 acres, of which 145.1 are irrigable.  Do you agree with that conclusion?

A   I would presume so.

Q   You have no reason to disagree with that conclusion; is that right?

A   No.

Q   Now, you also own some property with Mr. Tarwater; is that right?

A   That is correct.

Q   That is not included in any of this property we have been talking about?

A   No, sir.

Q   Or that your son has been talking about; is that right?

A   That is right.

MR. VEEDER:  Is that Tarwater property included in the answer which is filed?  It becomes important because Mr. Tarwater is appearing pro per and he will be here on the 5th and 6th.

THE WITNESS:  I believe half of that Tarwater property now is in escrow.  It was formerly 80 acres.  Now it is 40 acres.

BY MR. KRIEGER:

Q Did you own an undivided one-half interest in that?

A That is right.

MR. VEEDER: It is not included in 227-A, is that right,
Mr. Krieger?

MR. KRIEGER: It is not included in 227-A, that is right.
The reason for that is that there has been no soil survey, if
you will let me use that term, on that parcel.

MR. VEEDER: I have no objection. I just want to be sure
when Mr. Tarwater is here we will know what to do.

MR. KRIEGER: Furthermore, let the record show that Mr.
Wilks' undivided half interest in the Tarwater parcel, if we
can call it that, is Parcel 4 in the answer, so it may be
segregated.

Q It is now in escrow being sold; is that right?

A 40 acres of it.

Q How many acres were there in that parcel?

A There were approximately 80 acres, and the new 395
cut off two or three acres, something like that. I am not
just positive.

Q The answer states that it is about 77.54 acres.

A I think that is right, yes.

Q And 40 acres of that is in the process of being sold?

A There is 37 acres in escrow right now.

Q You are retaining 40 acres?

1          A  That is right.

2          Q  We are not testifying as to that parcel of land

3     right now.

4          MR. VEEDER:  I think the "we" is proper.

5     BY MR. KRIEGER:

6          Q  Is any of your land presently irrigated?

7          A  Only what my son is taking care of.

8          Q  How much of that is there?  About 30 acres?

9          A  I think he is probably cultivating more than that now.

10    I don't know what he testified to, but he is gradually in-

11    creasing that.

12         Q  Is he irrigating part of 16-A, this main parcel of

13    land?

14         A  Yes.  Yes, I believe so.

15         Q  Is he irrigating any of 16-B, the triangular 84 acres

16    shown over here?

17         A  No, none of that.

18         Q  So it would be all up in this main parcel 16-A; is

19    that correct?

20         A  Yes.

21         Q  Are there any wells on that Parcel 16-A?

22         A  Yes, the well that furnishes my home.

23         Q  Just a domestic well?

24         A  Yes, that is right

25         Q  There is no irrigation well there; is that right?

A   No.

Q   When was that well brought in?

A   Before I came to the country.

Q   You mean the Murrieta country; is that right?

A   Yes.

Q   When did you come there?

A   Somewhere around 1893, I think somewhere in there.

Q   When did you acquire this property?

A   In 1910.

Q   Do you know how deep that domestic well is?

A   200, to my knowledge.

Q   And what size casing?

A   7-inch.

Q   Do you know where the static water level now stands?

A   About 13 feet, I believe.

Q   Was that well ever artesian?

A   Yes, sometime ago.

Q   Was there ever a time when that well didn't flow at all?

A   Not for the last four, five or six years, I guess.

Q   Was there any time before that that it ever stopped
flowing that you remember?

A   Not to my knowledge, no.

Q   Do you know how the static water level has risen
or fallen over the years?

A   Well, it has gradually gone from a flowing well down

1    to you might say 13 feet now.

2        Q   13 feet?

3        A   Yes.

4        Q   And what did it use to be, say, in 1950?

5        A   Well, it used to be practically all subirrigated

6    there.   I used to grow alfalfa without irrigation there.

7        Q   Has there ever been a time before when the water

8    level has been down this far that you can remember?

9        A   No, it has gradually receded as our rainfall quit

10   coming.

11       Q   Have you any other wells over here on 16-B?

12       A   Oh, when my father dug some, but I don't know

13   whether-- they were dug wells, and I don't know whether they

14   exist now or not.   I haven't been on the place for years.

15       Q  And they are not used any more?

16       A   No.

17       Q   Is there any farming done on 16-B?

18       A   Well, I have rented and I think the fellow is using

19   it for cattle purposes, I believe-- stocking it.   I rent it

20   for cash rent.   It's rather hilly.   You have pretty near

21   got to use a cleat tractor to get over it.   I used to farm

22   it with a wheel tractor when I was younger, but not any more.

23       Q   Mr. Wilks, just one word about this parcel you own

24   with Mr. Tarwater.   Where is it located on this map?

25       A   Well, the Hot Springs Creek goes through on 122.

1   Where is 395?  Does it show Hot Springs Creek on there?

2       THE COURT:  Hot Springs Creek is over here back of

3   Murrieta Springs.

4       THE WITNESS:  395 just cuts one corner off of it.  This

5   must be it.  Yes, I think so.

6   BY MR. KRIEGER:

7       Q  Is this parcel you are talking about immediately

8   adjacent to Highway 395?  Is it right on the highway?

9       A  Yes, that is right.

10      MR. VEEDER: Could we have the section and township?

11  BY MR. KRIEGER:

12      Q  And is it located right at the intersection of Sections

13  22, 23, 26 and 27 in 7 South, 3 West?

14      THE COURT:  Show me on the map, counsel.  I can't see it.

15      MR. KRIEGER:  Right here, your Honor.  It is immediately

16  to the northwest of Roripaugh's land and it adjoins the

17  highway.

18      THE WITNESS:  395 just cut off the northwest corner.

19      THE COURT:  How many acres in there?

20      THE WITNESS:  It was 40 acres.  Now I think there is 37

21  left, I believe.

22      THE COURT:  Can your engineer draw it in for us, Mr.

23  Krieger?

24      MR. KRIEGER:  Yes, he can, and we will do that at the

25  recess today, or right now, if we may.

12245

THE COURT:  You can't finish with your witnesses today.

MR. KRIEGER:  We have just one more witness.

MR. SACHSE:  Can't we go over until tomorrow?

MR. GIRARD:  I have no objection to one more witness.

MR. STAHLMAN:  We have wives cooking dinner.

MR. KRIEGER:  I will appreciate putting him on, if it is all right with the Court.

MR. VEEDER:  We are going to have this other work.

THE COURT:  Go ahead.  I will stay all night.  How much more do you want from Mr. Wilks?

BY MR. KRIEGER:

Q  This land that we are just talking about that you own with Mr. Tarwater, is that dry farmed at all?

A  Tarwater is running stock on it.

Q  Are there any irrigation wells on it?

A  No, I think he did irrigate a little on there, on 70 acres, some years ago, I think.  I think he pumped a little out of that Salt Springs Creek, to my knowledge.  Hot Springs Creek, I think they call it.

MR. VEEDER:  Could it be Warm Springs Creek?

THE WITNESS:  Warm Springs Creek.

MR. VEEDER:  I am just trying to get along.

BY MR. KRIEGER:

Q  There is no developed water on that land, is there?

A  No, other than he has developed a little for stock

1   purposes there.

2       Q   How has he developed it?

3       A   He just put in a bulldozer there and dug out.

4       Q   That is a dug well?

5       A   Yes.  I don't think he dug a well.  He just dug out

6   and it just sort of seeps in.

7       MR. VEEDER:   Sort of a sump?

8       THE WITNESS:   That is right.

9       MR. KRIEGER:   That is all I have of him.

10      I would offer these two exhibits, 227 and 227-A in

11   evidence.

12      MR. VEEDER:   227-A is no question.

13      THE COURT:   They are correct, are they, Col. Bowen?

14      COL. BOWEN:   Your Honor, 227, on page 1, under the

15   section entitled "Geology," the word Sothern should be changed

16   to Northern, so that it would read "Younger alluvium underlies

17   the property throughout, with the exception of a small area

18   of older alluvium in the northern;" and similarly the last

19   sentence in the paragraph would read, "The older alluvium

20   where exposed . . "

21      THE COURT:   With that exception they are correct?

22      COL. BOWEN:   Yes.

23      THE COURT:   Except for the change of ownership?

24      COL. BOWEN:   Yes, sir.

25      THE COURT:   Make the corrections.

1    Exhibits 227 and 227-A are received in evidence.

2    (Defendant Roripaugh Exhibits 227 and 227-A for

3    Identification were received in evidence.)

4    THE COURT:  Any questions of this witness?

5    Are you through, Mr. Veeder?

6    MR. VEEDER:  That is correct.

7    THE COURT:  I would propose to find that as to Parcel

8    16-A similar findings as to those as to Thomas E. Wilks.

9    As to 16-B, I am inclined to think that that is within

10    the basin.

11    And as to what we marked 16-C, which no longer belongs

12    to Mr. Wilks, if this school district doesn't show up, can't

13    we take the evidence we have received and dispose of that

14    five-acre piece?

15    All right, call your next witness.

16    MR. KRIEGER:  Mr. Brown.

17

18    DAVID A. BROWN,

19    one of the defendants herein, being first duly sworn,

20    testified as follows:

21    THE CLERK:  State your name, please.

22    THE WITNESS:  David A. Brown.

23    THE COURT:  What parcel, Mr. Krieger?

24    MR. KRIEGER:  This is Parcel 21, shown here on the

25    southwest side of Murrieta valley, astride the Elsinore fault.

1    Would you please mark this.

2

3                    DIRECT EXAMINATION

4    BY MR. KRIEGER:

5        Q   What is your address?

6        A   Box 14, Route 1, Wildomar.

7        Q   Are you married to Nancy Jane Brown?

8        A   Yes.

9        Q   You and your wife together own Parcel 21 as shown

10   on Roripaugh's Exhibit A.   Is that right?

11       A   Yes.

12       Q   By the way, what is your occupation?

13       A   Rancher.

14       Q   How long have you been a rancher?

15       A   All my life-- when I was old enough to farm.   I started

16   farming with my father in about 1940 until I entered the

17   Service, and '45 from then on.

18       Q   I am going to show you Exhibit 228 for Identification

19   entitled "Engineering Report on the Property of David A.

20   Brown, Office of Ground Water Resources, Marine Corps Base,

21   Camp Pendleton," and ask you if you have reviewed that before.

22       A   Yes, sir, in your office.

23       Q   Your land is correctly described in this report, is it?

24       A   Yes, sir.

25       Q   And it also is correctly described in your answer on

file in this case, is it not?

A   Yes.

THE COURT:   Do you own also that 20-acre piece marked 21 on the map between the Wilks property?

THE WITNESS:   Yes, sir.

THE COURT:   We will call that 21-A, the 20-acre piece, and we will call the big piece across the fault as 21-B.

MR. VEEDER:   That is intersected by the fault.

THE COURT:   Well, one lies across one fault, and one lies across the other.

MR. KRIEGER:   That is right.

Q   This soil survey indicates that you and your wife together own approximately 338 acres, of which 233.6 are irrigable.  Do you agree with that conclusion?

A   Yes, sir.

Q   Your land there, as you just testified, is divided into these two parcels on either side of the valley?

A   Yes, sir.

Q   Your main ranch has about 336 acres in it; is that correct?

A   That is correct.

Q   And that is the one that is marked 21-B.  What is the location of that parcel with respect to the channel of the stream?

A   I believe it is slightly west of the main channel that

goes down through the valley, which is called the creek, slightly west of it.

Q   Do you irrigate any part of that land?

A   No, sir.

Q   Why not?

A   No water.

Q   What is your source of water for your home?

A   I have a domestic well.

Q   Is that all?

A   I have another well just off MacVicker Street on Grand, but it is abandoned.

Q   When was the domestic well which you do use drilled?

A   I believe that was in October, 1957.

Q   How deep is it?

A   156, cased to about 136.

Q   Where would you say it was located?  Come over here and locate it.  Take my pencil and put a little zero there.

A   Just northwest of my house on 221-B.

MR. VEEDER:   Could he put his initials there or something, so that we can identify it.

BY MR. KRIEGER:

Q   What is the size of the casing there, Mr. Brown?

A   10-inch.

Q   How much water does that well produce?

A   At the time of drilling it was tested at 10 gallons

a minute.

Q   One inch?

A   One inch; 10 gallons a minute.

Q   That was '57?

A   Yes.

Q   Does it produce the same amount of water now?

A   As near as I know.  In other words, it has a three-quarters submersible, and I have had no reason to have a regular pump test on it, but it has stayed at the same level, varying slightly, as at the time of drilling.

Q   Do you know whether that well when it was drilled hit bedrock?

A   To my knowledge it is in bedrock.  Johnny Lynch, the driller, said it was.

MR. VEEDER:  I move to strike that as being hearsay.

THE COURT:  Overruled.

THE WITNESS:  It is written on my well report.

THE COURT:  It is hearsay, but it is the kind of hearsay we have to get in this kind of case.

THE WITNESS:  I was there at the time it was drilled.

THE COURT:  How deep was the well?

THE WITNESS:  156 feet.

BY MR. KRIEGER:

Q   Have you observed the water level in that well?

A   Yes, I have.

2252

Q   Is there any seasonal variation?

A   Slightly.   At the time of drilling in 1958 the water was approximately at 55-59 feet.   I measured the water two days ago and it is at 55 feet six inches static level.

Q   Have you noticed any change in the water level since?

A   Very little.

Q   You said something about a second well on the property which you are not using.   Where is that in relation to the one you have initialed?

A   About 600 feet in a southerly direction and along Grand Avenue .

Q   And when did you drill that?

A   One month later from the other; that would be November, 1957.

Q   How deep did you go?

A   198 feet.

Q   Do you know whether you hit rock or not?

A   According to the driller, yes.   I was there.

Q   How much did that test when it had a pump test put on it?

A   20 gallons a minute; two inches.

Q   And then--

A   It is capped and abandoned.

THE COURT:   Why?

THE WITNESS:   I drilled it for an irrigation well and

12253

two inches was not sufficient.

BY MR. KRIEGER:

Q  What was the size of the casing?

A  10-inch.

Q  Have you observed the water level in that well?

A  Yes, I have.

Q  Does it also vary with the season?

A  Slightly.  At the time of drilling in 1957 it was
about, if I recall, about 25 feet.  I measured it two days
ago-- that is the 20th, and it was standing at 27 feet.

MR. VEEDER:  Could he locate that on the map?

THE WITNESS:  Yes, sir.  It would be right about here,
just off the--

MR. KRIEGER:  Why don't you put on it your initials No.2.

THE COURT:  It was closer to the road than the other
well?

THE WITNESS:  Yes, slightly.

THE COURT:  By the road I meant Grand Avenue.

THE WITNESS:  That is correct, sir.

BY MR. KRIEGER:

Q  Did you observe the variations of this well pretty
well follow the other one?

A  Yes, sir.

Q  When do these wells start to recover?

A  Generally about September, October, in that area, maybe

November.  It varies a little bit.

MR. KRIEGER:  I realize that was a slightly leading

question.

MR. VEEDER:  I will accept that.

THE COURT:  Let's go ahead.

BY MR. KRIEGER:

Q  Have you got a spring on your land?

A  Yes, I do.

Q  Where is it located?  Will you show us?

A  Yes.  I will not be accurate, but I would say it

is about here.

THE COURT:  Where that roadway seems to go up?

THE WITNESS:  Yes, the roadway goes up to it, but it

continues on up and zigzags around.  It could be further

in a southerly direction.  Without looking at an aerial map,

I don't locate it.

BY MR. KRIEGER:

Q  How much water does it produce?

A  One-half inch.

Q  Do you use this water?

A  No, sir.

Q  What happens to it?

A  It seeps down into the canyon.

Q  Over the years have you noticed any difference in the

yield of the spring?

A   No, sir.   I checked it on wet years and on one of the
very driest years we had, in I believe it was 1951, and it
checked exactly the same.   I had a pipe running out and I
measured it half an inch, five gallons a minute, and it didn't
vary from year to year.

THE COURT:   Have you done anything to develop this spring,
or do you have just a little basin?

THE WITNESS:   Years ago the former owner opened a hole
in the side of the mountain for stock water.   It had not been
used.

BY MR. KRIEGER:

Q   Let's look at the parcel across the valley, 21-A.

MR. SACHSE:   Is that the large one?

THE COURT:   That is the 20-acre piece.

THE WITNESS:   21 acres.

BY MR. KRIEGER:

Q   That lies northerly of the channel of the stream; is
that right?

A   Yes, sir.

Q   Do you irrigate any of this land?

A   No, sir.

Q   Do you dry farm it?

A   Yes, sir.

Q   Do you have any wells on the property?

A   Yes, I do.

12256

Q   How many?

A   One.

Q   When did you drill it?

A   In September, 1958.

Q   And how deep is it?

A   It was 175, cased to about 110 feet.

Q   Did you encounter any rock in the drilling of that well?

A   No, sir, we didn't.

Q   How did the well test?

A   It tests at about three inches.

Q   What did you do with it?

A   Capped it.

Q   Why?

A   I drilled it for irrigation and three inches is not sufficient to irrigate.

THE COURT:   How far northeast of Palomar Street was that drilled?

THE WITNESS:   I would just make a guess at about 250 to 300 feet.

THE COURT:   Do you know where the wells that the Wilks have in the two parcels to the northeast of you there are?

THE WITNESS:   Yes, sir.   It is almost in line in a parallel direction with the highway with the domestic well of the junior Mr. Wilks and it is almost in the center of my

1    property verticalwise.

2         THE COURT:  You have never tried to go back to the

3    northeast corner of your property and drill a water well,

4    have you?

5         THE WITNESS:  No, sir, I didn't.

6         MR. KRIEGER:  I wonder if you want to mark where that

7    well was.

8         THE COURT:  I am not advising you to do so, sir, but I

9    think you would get more than three inches of water.

10        MR. KRIEGER:  And mark it No. 3, would you?

11        (The witness marking the map.)

12   BY MR. KRIEGER:

13        Q  You capped that well; is that right?

14        A  Yes, sir.

15        Q  What is the static water level of that well?

16        A  The water level varies from about two feet from the

17   top of the ground to about six.  Two days ago it was six feet

18   when I measured it.

19        Q  What happens to that well when you pump it?

20        A  You mean when I or my neighbor?

21        Q  Well, whoever pumps it, what happens?

22        A  Well, when we test pumped it, it pulled down naturally

23   on the three inches.  We pulled it down the strata at 40 feet

24   and that is it.  It held at that level.

25        Q  You mean it went down from six feet to forty feet?

1      A   Immediately as soon as you would wind up the pump

2  it would pulldown and then it would hold at three inches of

3  water.

4      THE COURT:  What effect, if any, does the pumping of the

5  wells of the Wilkses to the northwest have on it?

6      THE WITNESS:  None whatsoever that I can see.  When he

7  would start his pump I would check and it would make no

8  difference.

9      THE COURT:  I think you got your well just on the wrong

10 side of the fault.

11     THE WITNESS:  I found that out, sir.

12     MR. KRIEGER:  I think that is all.

13     MR. VEEDER:  I have no questions.

14     THE COURT:  Is there a soil report on this property?

15     MR. KRIEGER:  I just placed it in front of you, your

16 Honor.

17     THE COURT:  I don't think the reporter heard any number

18 on it.

19     MR. KRIEGER:  228.

20     THE COURT:  Exhibit 228.

21     Is it correct, Col. Bowen?

22     COL. BOWEN:  Yes, sir.

23     THE COURT:  Do you offer it in evidence?

24     MR. KRIEGER:  I offer it.

25     THE COURT:  It is received.

(The document was received in evidence as Roripaugh Exhibit No. 228.)

THE COURT:  Col. Bowen, were you able to set out in this report where the Elsinore fault ran through what we speak of as Parcel 21-B?

COL. BOWEN:  Yes, sir.  That is set out in the report at approximately the contact between the alluvium and the crystalline rock or basement complex.

THE COURT:  Is the map Roripaugh's B anywhere accurate, or do the fault lines run--

COL. BOWEN:  I believe the fault probably is a little northerly as it is illustrated on Roripaugh's Exhibit B. A trace of that fault would be indicated in 228.

THE COURT:  Did you explore this spring that lies in 21-B?

COL. BOWEN:  Yes, sir.  That is reported on in there.

THE COURT:  In your report do you indicate that that is vagrant, percolating, local water?

COL. BOWEN:  I believe that inference could be drawn from the report, your Honor, and that is my opinion.

THE COURT:  Does this fault line show on the ground on this property at all?

COL. BOWEN:  It is pretty well concealed by the alluvium, your Honor, but as indicated in 228 it is fairly close to the surface contact of the alluvium and the basement complex.

1    THE COURT:  The Court would propose to find that any

2 water on any part of 21-B lying west and south of the Elsinore

3 fault line is vagrant, local, percolating water, including

4 the spring which the witness testified to.

5    That as to the property lying north and east of the

6 Elsinore fault in 21-B, that the property overlies the Murrieta

7 Basin and that the rights of the defendant are correlative

8 with other riparian and overlying owners.

9    As to 21-A I make similar findings to what were made as

10 to the Wilks property.

11    The Court is inclined to think that the well drilled by

12 the witness Brown lies south and west of the Wildomar fault

13 line and is therefore taking water out of the basin and is

14 not drilled in the area of rising waters north and east of

15 the Wildomar fault line, but that the whole of 21-B overlies

16 a basin which is split by the fault line.

17    MR. VEEDER:  Your Honor, in regard to your statement that

18 the spring was not part of the system, I don't recall whether

19 the witness said that the water did or did not flow down

20 to the valley floor.

21    THE COURT:  No, he said it ran down in the canyon.

22    MR. VEEDER:  That is the point.  But how far does it

23 run?  Does it dry up there, or does it perhaps join Murreita

24 Creek?

25    THE WITNESS:  About ten feet.

1      MR. VEEDER:  And it goes into the ground there?

2      THE WITNESS:  It disappears there; yes, sir.

3      THE COURT:  You are not going to deny this man the use

of this spring, are you?

5      MR. VEEDER:  We are going to send a tank up there, your

Honor.  I move to strike that.

7      THE COURT:  Anything further?

8      MR. KRIEGER:  I think that is all, and I do appreciate

your remaining and letting us put on all of our witnesses,

your Honor.

11      MR. VEEDER:  We still have Mr. Small to deal with, your

Honor.

13      THE COURT:  Maybe we can take care of him.  Have you

found his parcel?

15      MR. VEEDER:  Yes, we have, your Honor.

16      THE COURT:  Is it complicated, or is it simple?

17      MR. VEEDER:  Well, it's a simple matter, your Honor.  I

don't believe we have any problems stemming from it.

19      Is it all right to go ahead?

20      THE COURT:  Yes.

21      MR. VEEDER:  His property is found in the United States

Exhibit 207-B-2.  It is Parcel 20-4-1-81, appearing at page

30 of that exhibit.

24      THE COURT:  How many acres?

25      MR. VEEDER:  Ten acres.  Does he desire to have it

located on Roripaugh's B?  We can put it on, if you want us
to do that.

THE COURT:  Can you put it on Roripaugh's B?

MR. VEEDER:  Do you have it located?  Go ahead and put
it on.

(Mr. Kunkel approaches the map.)

THE COURT:  What is the last parcel number?  Can we
give that a parcel number?

MR. KRIEGER:  56 would be the last one.

MR. VEEDER:  We are jumping the gun a little.  We would
in the normal course of procedure have Col. Bowen identify
it and also identify the irrigable character of it and that
kind of data.  I would like to reserve the right, for the
benefit of Mr. Small, to have that evidence put in on the
5th and 6th.  I don't believe we are ready to do it now.  If
it is agreeable to your Honor, we have identified the property,
and on the 5th or 6th we will put in that evidence, if it is
all right with you.

THE COURT:  Is it all irrigable?

MR. VEEDER:  Yes.

THE COURT:  If it is all irrigable, what difference does
it make?  Have you got any wells on it?

MR. VEEDER:  No.

THE COURT:  No wells.  10 acres irrigable.  None irri-
gated.

1    THE WITNESS:  That is right.

2    THE COURT:  Cleared?

3    THE WITNESS:  Yes.

4    THE COURT:  Dry farmed?

5    THE WITNESS:  That is right.

6    THE COURT:  I don't think you need anything else.  It is

7 within the basin of the Murrieta.

8    MR. VEEDER:  It is certainly overlying.

9    THE COURT:  It is overlying. Your rights are correlative.

10 If you have water, you have to share it with your neighbors.

11    MR. VEEDER:  I have to cross-examine myself now.

12    THE COURT:  Anything else now, gentlemen?

13    MR. KRIEGER:  May I just ask whether I understood you

14 correctly when you said that Mr. Veeder and Mr. Sachse were

15 drawing an interlocutory decree in the Murrieta area?

16    MR. SACHSE:  Not I.

17    THE COURT:  I asked Mr. Veeder if he proposed later on

18 to draw an interlocutory decree in the Murrieta area when we

19 get through the Murrieta Valley.  He said he did so propose.

20 But we have to clean up a lot of pieces of people who have

21 not appeared by lawyers and some who haven't even appeared at

22 all.  They have just defaulted, as a matter of fact.  We have

23 to get some general testimony to cover it.

24    MR. KRIEGER:  When that time comes I would like to have

25 an opportunity to draw such decree, too.

1      MR. VEEDER: We will insist on it.

2      THE COURT: You will be put to work, sir.

3      MR. VEEDER: Mr. Small is the first one in the category

4 that will be coming up on April 5th and 6th. We are trying

5 to cut a pattern for that.

6      THE COURT: I don't think we need anything else from Mr.

7 Small, do we?

8      MR. VEEDER: No.

9      THE COURT: Ten acres of land overlying a basin. That's

10 the end of it.

11      MR. GIRARD: Part of the stream.

12      THE COURT: Yes, his rights are correlative with other

13 people who have rights in the stream and the basin.

14      MR. KRIEGER: I don't presume there is going to be any

15 further reason for us to be here with our clients. We are

16 completed now.

17      THE COURT: What about these others you have listed?

18      MR. KRIEGER: We have indicated a willingness to submit

19 them on the soil reports, as we did these, but Mr. Veeder

20 wanted some particular information on wells.

21      MR. VEEDER: That is right.

22      THE COURT: Here is the list you gave me that you wanted

23 to be relieved on-- 46, 41, 34 and 50.

24      MR. KRIEGER: Yes.

25      THE COURT: What about 44?

1    MR. KRIEGER:  There are a number of others which we said

2  we would submit on the soil reports, and I would like to

3  submit an exhibit of those and a stipulation with Mr. Veeder

4  that those may be submitted on the soil reports.

5    THE COURT:  I see another 16 shown down here that we had

6  no testimony about.  Parcel 16 was the Wilks property.  Right

7  northeast of where Pearl and Custer's property was.

8    MR. VEEDER:  In 27.

9    THE COURT:  Yes.  What about that?

10    MR. VEEDER:  Is that Tarwater's?

11    MR. KRIEGER:  No, this is Tarwater here.

12    I wonder if we could amplify this further.  We have 16-A,

13  B, C, and I wonder if we could make this 16-D.

14    THE COURT:  The one in the center of Section 27.

15    MR. KRIEGER:  Let me recall that.  It can't be done.

16  They are both owned by Mr. Tarwater and Wilks in one piece

17  and has been put on the map and marked 55.  This which is

18  No. 16 should be changed to 55-B.

19    THE COURT:  55-B.

20    MR. KRIEGER:  Yes.

21    THE COURT:  We will have some other proof on it then,

22  will we?

23    MR. KRIEGER:  We will have to have other proof on it,

24  because Mr. Tarwater is involved in it.  There is no soil

25  report on it.  Mr. Tarwater will be putting the evidence in

1    on 55.

2        Should we call the other 55-A?

3        THE COURT:  Yes.

4        10 o'clock tomorrow morning.

5        (Adjournment until Wednesday, March 23, 1960, at 10

6    A. M.)