# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

## HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

                Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

                Defendants.

No.   1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:      Wednesday, March 23, 1960

Pages:   12267 to 12434

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,          )
                Plaintiff,          )
       vs.          )          No.1247-SD-C.
FALLBROOK PUBLIC UTILITY          )
DISTRICT, et al.,          )
                Defendants.          )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Wednesday, March 23, 1960

APPEARANCES:

      For the Plaintiff              WILLIAM H. VEEDER, ESQ.,
                                 Special Assistant to the
                                 Attorney General,
                                 Department of Justice,
                                 Washington, D. C.

                                 LCDR. DONALD W. REDD.

1 | APPEARANCES (Continued)

2 |     For Defendant Fallbrook
    Public Utility District,     FRANZ R. SACHSE, ESQ.
3 |     et al.

4 |     For Defendant Vail         GEORGE STAHLMAN, ESQ.
    Company

5 |

6 |     For Defendant State       STANLEY MOSK, ESQ.,
    of California           Attorney General,
7 |                                 By FRED GIRARD, ESQ.,
                                  Deputy Attorney General.

8 |     For Defendants          GEORGE GROVER, ESQ.
    Gibbon and Cottle       OWEN STRANGE, ESQ.
9 |

12269

## INDEX TO WITNESSES

| For the Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| Joseph A. Rowe | 12276 | | | |
| | 12361 | 12366 | 12378 | |
| Louis Johannsen | 12330 | 12337 | 12353 | |
| John F. Mann, Jr. | 12405 | 12425 | | |

# INDEX TO EXHIBITS

| Plaintiff's Exhibit - | Iden. | In Evidence. |
|---|---|---|
| 229 – Cottle | 12276 | |
| 230 – Gibbon | 12276 | |

## Defendant Gibbon & Cottle Exhibits

| | Iden. | In Evidence |
|---|---|---|
| S-1, S-2, S-3, S-4, S-5, S-6 | | 12302 |
| T | 12302 | |
| T-1, T-2 | | 12303 |
| T-3, T-4, T-5, T-6, T-7, T-8 | | 12304 |
| Q and R | | 12306 |
| F, G, H, I, J, K, L, M, N | | 12317 |
| O, P | | 12318 |

12271

San Diego, California, Wednesday, March 23, 1960.   10:00 A. M.

(Other matters.)

THE CLERK:  Two, 1247-SD-C, United States vs. Fallbrook. Counsel, state your name for the record.

MR. STRANGE:  Owen Strange for Gibbon and Cottle.

MR. GROVER:  Mr. Strange appears of record, but this may be his first appearance in court.

THE COURT:  For whom does he appear?

MR. GROVER:  For defendants Gibbon and Cottle.

MR. STRANGE:  Your Honor, my last appearance here was, I think, two years ago at one hearing.  Mr. Grover has complete responsibility in this case.

THE COURT:  What are we going to proceed with?

MR. GROVER:  With both Gibbon and Cottle, your Honor.

I would like to make a brief opening statement to explain two or three things.

Your Honor will recall that earlier this week I spoke to you on the telephone about the possibility of deferring the appearance of one of the witnesses who lives in the northern part of the State, who is an elderly gentleman and who finds it inconvenient to be here now, and I will follow your Honor's suggestion and discuss with counsel the best method of arranging for his appearance or a stipulation regarding what he would testify to.

1        Another witness, the brother of this person, has recently

2   had a heart attack.

3        THE COURT:  Is this cumulative evidence?

4        MR. GROVER:  Not entirely, your Honor.  As your Honor

5   knows, to go back to the early days of water use requires

6   testimony regarding each period, and I believe that in the case

7   of both these gentlemen they would be able to testify to par-

8   ticular years that the other witnesses will not have any

9   knowledge of.

10       I might say that one of them is Mr. L. J. Tripp, the son

11  of the original claimant, and who was a boy when the first

12  water filing was made 75 years ago, and he helped build the

13  ditch.  His brother was younger and was not born then, but

14  himself owned the property at a later time and will be able to

15  fill in during the period of the '10's and '20's.

16       Secondly, I want to call your attention to the fact that

17  there are two owners here.  The ranch was purchased by the

18  father of the present owner, Dr. Cottle, in 1936, but in 1941

19  it came to Mrs. Gibbon, who is a daughter of Dr. Cottle, and

20  Mr. William Cottle, who is a son of Dr. C. C. Cottle, and there

21  is now separate ownership.

22       THE COURT:  Separate ownerships of an undivided interest?

23       MR. GROVER:  As far as the land is concerned.  And then

24  there is an undivided one-half interest in each one so far as

25  the original water right is concerned, that 1885 right.

1   THE COURT:  What is the land, an undivided interest?

2   MR. GROVER:  No, it is divided, your Honor.

3   THE COURT:  Each has his own parcel of land?

4   MR. GROVER:  That is right.  And we will have a map show-

5   ing the two ownerships.  It has some interest here because there

6   is a disagreement between Mr. Cottle and Mrs. Gibbon regarding

7   the exact location of the dividing line, and while it is a

8   disagreement and there is a lawsuit pending in the Superior

9   Court of Riverside County to determine that, there is no

10  bitterness here.  They just want to find out where the line

11  between their properties is.  And we are representing both

12  of them so far as the water right is concerned.

13  THE COURT:  I am not going to decide where the line is.

14  MR. GROVER:  I understand that, your Honor.  But in view

15  of some of the comments made about similar cases in the past,

16  I wanted your Honor to know about it and wanted you to know that

17  we are not going into it here.  One of the wells, I guess two

18  of them, are located in the disputed area, but the water rights

19  will not be affected.

20  Another point I should mention is that, in effect, we are

21  retained by the Security Title Insurance Company, who are

22  defending the case by reason of policies of title insurance

23  they have issued, and I mention that because some of the

24  documents and certificates we will introduce will be title company

25  certificates which in the normal course would not require comment,

1  but your Honor might wish to double check and counsel might

2  wish to know that they are from an interested party.

3    Finally, your Honor, Mr. Cottle is employed in Los Angeles,

4  and we were uncertain just when we would go on, whether today

5  or tomorrow, and I told him we would be more certain of going

6  on tomorrow, and I suggested that since he could only be here

7  one day that he come tomorrow.  So that even if we finish

8  with the other witnesses he will be here briefly the first

9  ting tomorrow morning.  I understand you are devoting the entire

10  week in any event.

11    There are three types of water right involved here:  The

12  riparian right, of course; and the prescriptive rights based

13  on water use; and also this ancient appropriative right-- I

14  say ancient; it's 75 years old-- and because I haven't been

15  here continuously through the trial I might state a little bit

16  about the nature of these rights, as I understand them, even

17  though it may be repetitive for your Honor.

18    The appropriative right stems from a diversion made on

19  Government land in 1885 and carried to the land of Mr. Sam

20  Tripp, the original claimant, so that it does come under the

21  statutes of 1886 and following that, in effect, give the

22  acquiescence of the Government to the establishment of rights

23  on a public domain and which bind to that extent the later

24  patentees from the public domain.  And therefore, we are

25  interested in carrying our water right back to that date and

1   showing that it was on Government land.

2       Then of course with regard to downstream owners, at least,

3   the water use will be traced as accurately as we can for the

4   purpose of establishing prescriptive rights. And your Honor

5   will recall, no doubt, that you ruled that use of water on

6   riparian land, since it is presumed to be a riparian use, does

7   not give rise to a prescriptive right, and at that time in

8   your pretrial opinion, since there is a little uncertainty--

9   certainly we feel there is on that-- you said that in the

10   absence of a showing of stronger authority, we plan to present

11   this point by brief for reconsideration by your Honor. The

12   theory, briefly, is that if you are using all the water on the

13   stream and the man down below you has a right to use it, it is

14   obvious that you are taking water that he has a right to use.

15   The fact that he puts the seed in so that he has immediate need

16   for it in that sense, would not be the important thing. The

17   important thing is that he has a cause of action to get his

18   share whenever he wants it.

19       THE COURT: Wasn't that stated that it is presumed that

20   the use is a riparian use?

21       MR. GROVER: I haven't reviewed the authorities recently,

22   I don't like to represent, except that some of the statements

23   are based on that. You recall the State Attorney General,

24   through Mr. Moskovitz, filed a brief.

25       THE COURT: I recall.

1      MR. GROVER:  Mr. Veeder, I believe, has agreed to intro-

2  duce for identification the reports.

3      THE COURT:  Where is this land located?

4      MR. GROVER:  Our first witness is an engineer, who will

5  place that location.  Mr. Veeder is just going to get the

6  numbers of these reports.

7      MR. VEEDER:  The engineering report for William W. Cottle,

8  I believe you said, would be Exhibit 229, Mr. Clerk.

9      THE CLERK:  Yes.

10     MR. VEEDER:  And Exhibit 230 would be the engineering

11 report of Kathryn C. Gibbon.

12     THE COURT:  Marked for identification.

13     (Plaintiff's Exhibits 229 and 230 were marked for Iden-

14 tification.)

15     THE COURT:  Proceed.

16     MR. GROVER:  I would like to call Mr. Joseph A. Rowe.

17

18              JOSEPH A. ROWE,

19 called as a witness on behalf of defendants Gibbon and Cottle,

20 being first duly sworn, testified as follows:

21     THE CLERK:  State your name, please.

22     THE WITNESS:  Joseph A. Rowe.

23

24

25

DIRECT EXAMINATION

BY MR. GROVER:

Q   Mr. Rowe, what is your occupation?

A   Civil Engineer.

Q   Where id your office located?

A   1179 E Street, San Bernardino, California.

Q   Are you associated with any other engineers there?

A   Yes; with my father.

Q   And what is the name of thefirm?

A   The firm's name is W. P. Rowe & Son, Consulting Engineers.

Q   Are you a licensed engineer of the State of California?

A   I am.

Q   What is your license number?

A   RE7386.

MR. GROVER:   Your Honor, I am not sure how extensively the qualifications of licensed engineers have been gone into here, so I will cover it briefly and leave it to the other attorneys, I believe, to go into detail.

Q   What is your education in engineering, Mr. Rowe?

A   I graduated from Stanford University in 1941 in the School of Engineering.

Q   What degree did you receive?

A   I received a B.A. degree from Stanford at that time. At this time the same courses they would give a B.S. degree.

But it is a very peculiar thing at Stanford.  If you want a B.S. degree, if you are graduated before a certain date, you can write to the Registrar of the University and he will tell you you have a B.S. degree, even though you have a B.A. degree in engineering.

Q   But it is a degree in engineering?

A   Yes.

Q   In civil engineering?

A   Yes, in civil engineering.

Q   After graduation what experience in civil engineering did you have?

A   After my graduation from Stanford I worked a short time for the Corps of Engineers.  At the time Pearl Harbor was bombed I tried to join the Navy and was successful in getting into the Navy in about the middle of 1942.  During the entire war I was not associated with any part of civil engineering. I was at sea most of the time.

After my naval career I came back and was a member or partner in the firm of Rowe & Webb.  The firm had been formed shortly after the end of the war.  I was a member of that firm for about two years when the firm was dissolved.

Then I became a member in the firm of W. P. Rowe & Son, which was around 1948-49 that the firm of W. P. Rowe & Son was formed.

Q   In your practice as a civil engineer have you specialized

12279

1  in any particular type of engineering?

2      A   Yes, the work of W. P. Rowe & Son is primarily

3  hydraulic engineering.   I would say that almost all of our

4  business is hydraulic engineering.

5      Q   And what type of projects?   Will you describe briefly

6  some of the projects you have worked on in connection with

7  that practice?

8      A   Well, it is a rather broad field, Mr. Grover.   I can

9  cover it generally:   Sources of supply, water distribution,

10 studies of water basins, matters pertaining to litigation.

11     THE COURT:   All concerning water?

12     THE WITNESS:   All concerning water; yes, sir.

13 BY MR. GROVER:

14     Q   Who were some of the principal clients you have worked

15 for in these water matters?

16     A   There are a considerable number of water companies and

17 some industry.   I could name some of the water companies, if

18 you desire, and name some of the industries.   At present my

19 father is a member of the State Water Rights Board, but he has

20 an agreement whereby he represents the United States in the

21 Whittier Narrows case, the case involving waters and construction

22 of Whittier Narrows Dam.

23     Q   Would you concentrate on the projects that you person-

24 ally work on?   If you assist your father--

25     A   Yes, I offered some assistance to him in this particular

1    case in the early stages.  I don't know how to answer the

2    question without going into all the clients we represent.

3        Q  Some of the larger, more representative ones that

4    involve work similar to that you did in this case?

5        A  Recently I can point to the San Luis Rey Water Conserva-

6    tion District.  We represent the San Bernardino County Water

7    District, in which our services are very similar to what we

8    are engaged in this matter.  We have made studies in the

9    Beaumont area for the Beaumont Irrigation District, and in

10   the Banning area for the Banning Water Company.  We have done

11   work on the Mohave River, all three basins-- that is, the Upper,

12   the Middle and the Lower.  We have done hydrology work in

13   Bunker Hill Basin.

14       Q  Where is that?

15       A  Bunker Hill Basin is the San Bernardino Basin.  It is

16   located in the City of San Bernardino.

17       The Chino Basin, which is west of that.

18       Prado Basin, which is at Prado Dam.

19       Temescal Basin, which is south of Prado Dam.

20       Q  These most recent ones are on the Santa Ana River,

21   are they?

22       A  Yes.

23       Q  How about the San Jacinto River?  Have you done any

24   work on the San Jacinto River?

25       A  Yes, I have completed a study on the San Jacinto River,

1    on a tributary to the San Jacinto River.

2         Q  In the few years when it gets that far?

3         A  Yes, that is right.

4         Q  In connection with these projects, during this work,

5    you have worked on these ones you have mentioned?

6         A  Yes.

7         Q  Has it involved the making of maps of surface features

8    and irrigation works?

9         A  It has.

10        Q  Has it involved the design of irrigation facilities?

11        A  It has.

12        Q  Has it involved a study of underground water and

13   movement of underground water and sources of underground water?

14        A  Yes.

15        Q  Has it involved a study of wells and the logs of wells?

16        A  Yes.

17        Q  Has it involved a study of surface hydrology, river

18   systems and related matters?

19        A  Yes.

20        Q  And you have been working on these since the war?

21        A  Since after the war, yes.

22        Q  Right after the war.  About what year was that?

23        A  I believe the war ended in 1945, and I came back in the

24   early part of '46.

25        Q  For the past thirteen or fourteen years you have been

12282

continuously employed in this type of hydraulic engineering?

A   That is correct.

MR. GROVER:   Your Honor, that is essentially all I have by way of qualifications, except for the particular study of this area.   This would be a good time for voir dire, if anybody desires it.

MR. VEEDER:   I will wait until you ask a question.

BY MR. GROVER:

Q   For the preparation of your testimony here, Mr. Rowe, did you make a study of the Gibbon and Cottle properties near Radec along the Temecula River?

A   I did.

MR. GROVER:   For purposes of location, your Honor, I am not sure of the exact number of this map.   This is the Vail Lake quadrangle of the U.S.G.S., which, I understand is the Exhibit 29 series, and I didn't find the exact number in the file.

THE COURT:   You can find it at the recess.

MR. GROVER:   All right.

THE COURT:   I understand you are referring to U. S. Geological Survey quadrant.

MR. GROVER:   Vail Lake quadrant.

Q   I hand you the map which purports to be the Vail Lake quadrant of the U.S.G.S., one of the Exhibit 29 series, and would you point out for the Court on that exhibit the location

1  of the junction of State Highways 71 and 79 there?

2      MR. VEEDER:  May I interrupt for just a moment?

3      MR. GROVER:  Yes.

4      MR. VEEDER:  Do I understand that this quad is not in the

5  file?

6      MR. GROVER:  No, in going through the file I did not find

7  it this morning, and I didn't have time to make a thorough

8  search.

9      THE COURT:  It is probably in there.

10      MR. GROVER:  Yes.

11      THE CLERK:  29R, your Honor.

12      MR. GROVER:  I went through it hurriedly.  I thought I

13  would check it later rather than take the time now.

14      Q  On Exhibit 29R, then, Mr. Rowe, would you point out the

15  intersection of State Highways 79 and 71?

16      A  Yes.  It is in Section 19, Township 8 South, Range 1

17  East.  The intersection is near the east-west center line of

18  Section 19 and about halfway between the center of section 19

19  and the east quarter corner of said Section 19.

20      Q  From that Exhibit 29R, did you prepare some maps of the

21  properties of the defendants Gibbon and Cottle?

22      A  Yes.

23      MR. GROVER:  I have here, your Honor, a map, which has been

24  identified as Gibbon and Cottle Exhibit B for Identification,

25  lodged with and marked by the Clerk.

1 Q Mr. Rowe, did you prepare Exhibit Gibbon and Cottle B?

2 A I did.

3 Q And would you state briefly how you prepared the map?

4 A Yes. You are referring to the base map, Mr. Grover?

5 Q Yes. Well, the entire thing.

6 A The entire map. The base map for Cottle and Gibbon

7 Exhibit B was made from a blown-up copy of Exhibit 29R, Exhibit

8 29R being on a scale of one inch equals 2,000 feet and Gibbon

9 and Cottle B being on a scale of one inch equals 500 feet.

10 Q When you say "blown up" you mean it was photostated and

11 reproduced at a different scale?

12 A That is correct. The reason we did that is so that

13 we could show on a larger scale the ownerships and the land

14 studies that we conducted on the properties.

15 Q Then after you got this blown up, what did you do to

16 make Exhibit B?

17 A There are certain other things which were added to the

18 base map.

19 Q First of all, if I may interrupt, did you delete

20 anything from the blown-up copy of Exhibit 29R?

21 A Yes. From 29R all we used was mainly the location of

22 the major highways, the location of section corners as shown on

23 29R, the location of Temecula Creek and some minor tributaries

24 to Temecula Creek.

25 Q How did you get those off the blown-up map onto Exhibit

12285

1    Gibbon and Cottle B?

2         A   They were traced off the blown-up copy of 29R.

3         Q   Then what did you add?

4         A   To the items that were taken off 29R we have shown a

5    subdivision of some of the sections, that is, we have shown

6    lines connecting quarter corners and even dividing it up into

7    smaller acreage than that.  The reason for doing that was so

8    that we could plot some descriptions furnished as to the land

9    ownerships of Mr. Cottle and Mrs. Gibbon.

10        Q   Did you add anything else to the map?

11        A   Yes.  I show also some well locations on the map.

12        Q   Does Exhibit Gibbon and Cottle B show the outline of

13   the land ownerships of those two defendants?

14        A   That is correct.

15        Q   Where did you get the descriptions for those outlines?

16        A   I got the descriptions from you, Mr. Grover.

17        Q   I notice a legend here that shows a long line with two

18   dots and a long line-- in other words, a dash-dot-dot line.

19   Does that show the property lines of those two defendants?

20        A   Yes.

21        Q   And for clarity I call your attention to a National

22   Forest boundary, which is a long line with a short dash, and

23   ask you where you got the National Forest boundary?

24        A   The National Forest boundary line also appears on

25   Exhibit 29R.

12286

MR. GROVER:  I mention that, your Honor, because it might appear confusing.  Some of the lines are similar in character.

Q  Does the red on Exhibit Gibbon and Cottle B show the property description for defendant Kathryn C. Gibbon as furnished by me?

A  That is correct.

Q  And does the green outline on Exhibit Gibbon and Cottle B show the property boundary for William W. Cottle as furnished by me?

A  That is correct.

MR. GROVER:  Your Honor, I think it might be convenient if we put the map up on the board for future reference.

Q  I have here, Mr. Rowe, a map which has been lodged with the Clerk and marked by him Gibbon and Cottle Exhibit A for Identification and ask you if you prepared that map.

A  I did.

Q  And did you prepare it in the same way that you prepared Gibbon and Cottle B?

A  Yes.  It is the same base map as Gibbon and Cottle B.

Q  How does it differ from Gibbon and Cottle B?

A  Upon Gibbon and Cottle A, I have shown locations of various fields that are planted, as well as other facilties, such as well locations, reservoir locations, ditch lines, as well as structures.

Q  Now, these again are features which you added to the

1    original blow-up of Exhibit 29R?

2         A  With the exception of some of the structures which

3    appeared on 29R when it was blown up.

4         Q  But I notice that you did not show those structures on

5    Exhibit Gibbon and Cottle B.

6         A  That is correct.

7         Q  So that the takeoff from Exhibit 29R was slightly

8    different in each case?

9         A  Yes, except for the structures.

10        Q  And the property line shown on Exhibit Gibbon and

11   Cottle A is the same as that on Exhibit Gibbon and Cottle B,

12   except that it is not colored; is that correct?

13        A  That is correct.

14        Q  Do you have any additions to make to this map of

15   irrigation fields, before we get into a discussion of the fields

16   themselves?

17        A  Yes.

18        Q  Is there a field you would like to add there?

19        A  Yes, there is a field which is located--

20        MR. GROVER:  Perhaps we had better put this on the board,

21   your Honor, and you could see it as he draws it in a little

22   easier.

23        THE WITNESS:  Would you care to have me delineate on the

24   exhibit?

25        MR. GROVER:  Yes, please.

THE WITNESS: I am drawing now on Gibbon and Cottle A.  I am on land owned by William W. Cottle.  On the east there is the word "Radec Valley."  Right near the word "Radec" and near the name "William" in the "William W. Cottle," I am drawing a red line which roughly outlines the field that should have been shown as "Pasture part time."

Q  Would that then be colored green to coincide with the legend on the map?

A  That would be colored green; yes, sir.

Q  As I understand, that was left off by inadvertence when the map was prepared?

A  That is correct.

Q  Would you explain the monument down in the lower right-hand corner of Exhibit Gibbon and Cottle A, described as "Intake upper ditch"?  Tell us what that represents, and first of all how you know about that monument.

A  Yes.  I located the intake of the upper ditch from a field trip to the intake.  I walked up the ditch and located it from a field examination and located it on Temecula Creek down near the lower right-hand corner of Gibbon and Cottle A.

Q  Would you describe that intake?

A  Yes.  The intake structure is a small rock and earth dam approximately three feet high at the highest part of it and about 40 feet long, from which there are two 12-inch pipes that divert water into the ditch.  There is also an

1   overflow line 12 inches in diameter which acts as an overflow

2   and allows water to continue down Temecula Creek.

3       Q   Is the dam a permanent structure?

4       A   No, it is rock and filled in with earth.

5       Q   What do you mean, it is not permanent?

6       A   By not permanent I mean a major flood or a capital

7   flood could wash the structure out.

8       Q   But would it in the average year there survive the

9   flows that come down Temecula Creek at that point?

10      A   In an average year, yes.

11      Q   It would only be an exceptional flood that would

12  destroy it?

13      A   That is correct.

14      Q   After the water is diverted from the river, would you

15  describe its passage along the line you have marked "Ditch"?

16      A   Yes.  I have shown the location of the ditch.  It

17  might be hard to distinguish, but I have shown it with a blue

18  pencil on Exhibit Gibbon  and Cottle A, and it generally follows

19  along the right bank of the river from the intake down to

20  where it crosses-- near where it crosses the south line of

21  Section 19 in Township 8 South, Range 1 East.

22      Q   Excuse me.  That is near the center of the map there?

23      A   Near the center of the map; yes, sir.

24      Q   Directing your attention to Exhibit 29R, could you

25  point out to the Court the terrain at that point which shows

1   on 29R because of the contour lines?

2       A   Did you want me to make a mark on 29R?

3       Q   As a matter of fact, that is my copy of 29R.  No, I

4   don't think it is necessary to mark.  Just point out to the

5   Court where that is.

6       A   It shows at that location that the land becomes rather

7   uniform, the land flattens out.

8       Q   At what location?

9       A   At the location where the ditch leaves the right bank

10  of the river.

11      Q   Up to that point what kind of terrain is it, between

12  that point and the intake?

13      A   The terrain is rather precipitous except for one small

14  area that I noted, and that area is about halfway between the

15  east quarter corner of Section 30 and the northeast quarter

16  of Section 30-- those are all Township 8 South, Range 1 East.

17  There is an area in there which has been cleared and the land

18  is rather uniform.  But other than that, the topography is

19  rather steep.

20      Q   You would say that the ditch up to the point where it

21  comes out as you mentioned is in a canyon?

22      A   It is in a canyon, yes.

23      Q   Go ahead with your destription of the ditch, if you

24  will.

25      A   After the ditch leaves the bank of the river, it then

1    runs across in a rather flat lands.

2        Q   Goes in what direction?

3        A   Runs in a northerly direction, almost following the

4    line halfway between the south quarter corner of 19 and the

5    southeast corner of 19.   There is a newly-constructed reservoir

6    where water can be discharged from the ditch into this

7    reservoir or it can continue on in a northerly course to a

8    reservoir which has been used for a considerable number of

9    years to my knowledge, and also at that point there is a

10   division of the water between those used by Mrs. Gibbon and Mr.

11   Cottle.   Mr. Cottle's water continues in the same ditch in a

12   northerly fashion and circles around to the northwest to a

13   reservoir on Mr. Cottle's property located near the center

14   of Section 19 and is designated on the map as a reservoir.

15       Q   Is there a location designation for that ditch, a

16   local name for it?   Is that the upper ditch, Mr. Rowe?

17       A   Yes, that is the upper ditch.

18       Q   Would you describe then the lower ditch?

19       THE COURT:   What is this business about the division of

20   water?   I don't see anything on the map showing --

21       MR. GROVER:   It is three and a half days to each one, and

22   Mr. Rowe really isn't the witness to describe it.

23       THE COURT:   I don't see the physical ditch where it is

24   divided.

25   BY MR. GROVER:

         Q   Mr. Rowe, would you show the point where the water is

JOHN SWADER, OFFICIAL REPORTER

1  stopped when Mrs. Gibbon is taking it and released when Mr.

2  Cottle takes it?

3      A  When Mrs. Gibbon is taking water from the ditch she

4  can discharge the water either into a reservoir which is right

5  below 19Q2, where there is the word "Reservoir" with an arrow

6  pointing to a green patch.

7      THE COURT:  That is the big reservoir.

8      THE WITNESS:  That is the big reservoir.  Mrs. Gibbon can

9  discharge water into that reservoir--

10     MR. VEEDER:  Isn't that a blue patch?

11     THE WITNESS:  A blue patch, yes.

12     --into another reservoir which Mrs. Gibbon owns, where there

13 is the word "reservoir" written above 19Q1 and an arrow point-

14 ing to a blue patch designating a reservoir.

15     Mr. Cottle does not take water from either one of these

16 reservoirs.  When Mr. Cottle is taking water, all the water

17 is allowed to flow in the ditch uninterrupted around to the

18 north and west into Mr. Cottle's reservoir.  Mr. Cottle's

19 reservoir is located right near the center of Section 19.

20 BY MR. GROVER:

21     Q  Would it be fair to say that when Mrs. Gibbon takes the

22 water during her agreed half of the week it just doesn't get to

23 Mr. Cottle?

24     A  That is correct.

25     Q  She takes it into her reservoir or by direction into the

1    fields?

2        A   That is correct.

3        Q   And when she is not entitled to the water the other

4    half of the week it goes on to Mr. Cottle?

5        A   Yes.

6        MR. VEEDER:   I thought you said you were going to call a

7    witness for that purpose.

8        MR. GROVER:   For the purpose of discussing the legal

9    arrangements between them.  But I am discussing the physical

10   means of getting it to Mr. Cottle.

11       MR. VEEDER:   Does this witness know that himself?   Counsel

12   has done a good job of testifying.

13       THE COURT:   Go ahead.  We will have other witnesses on

14   this.

15       MR. VEEDER:   That is what I want.

16       THE COURT:   The case isn't going to hinge on the division

17   of water between these two people.

18       MR. VEEDER:   The point I am trying to make, your Honor,

19   is that if he is going to call a witness I would rather have

20   him call the witness rather than testify himself.

21       THE COURT:   Go ahead.

22   BY MR. GROVER:

23       Q   Would you describe, Mr. Rowe, the lower ditch?

24       A   Yes.  The lower ditch is also shown on Gibbon and

25   Cottle Exhibit A.  On the exhibit there is the designation

"Intake lower ditch," and that is located in Section 19 South

and west of the large reservoir.  That lower ditch follows

generally along the bank of the river and flows in a northerly

direction, and then it turns in a westerly direction up near

Cottle Well No. 1 and continues around and empties into an

area designated "Pond" on Exhibit Gibbon and Cottle A and

shown as blue.

Q   At the extreme west of the Cottle property?

A   At the extreme west of the Cottle property.

Q   Did you see water in the upper ditch when you were

there, Mr. Rowe?

A   Yes.

Q   Did you see water in the lower ditch?

A   No.

Q   Beg your pardon?

A   Yes, I have seen water in the upper ditch.  I have

seen no water in the lower ditch.

Q   So far as you know is water being currently taken through

the lower ditch?

A   Not to my knowledge.  From the instake to the lower

ditch there is no water being taken.  There is-- and it is not

shown on Exhibit Gibbon and Cottle A-- an 8-inch concrete

pipe line which runs from the Cottle Reservoir in the center

of Section 19 to a point in the lower ditch immediately

easterly of Well 19K1.  From Cottle reservoir water can run

1  through the pipe line and water can then get into the lower

2  ditch.  I have never seen water in the lower ditch even at

3  that point.

4      Q  So far as you know, then, although upper ditch water

5  gets into the lower ditch, there is no additional diversion

6  from the river by means of the lower ditch?

7      A  I have never seen a diversion to the lower ditch from

8  the river directly.

9      Q  All right, Mr. Rowe.  Would you describe the wells that

10  are shown on the map?  The wells are shown on Gibbon and Cottle

11  Exhibit A as well as B, are they not?

12      A  Yes, but I don't believe they are designated on B.

13      Q  Would you show them on Exhibit A, then?

14      A  Yes.  What I meant by designated on Exhibit B, it

15  does not show a number or a name for the well.

16      Yes, I have prepared some sheets or tabulations showing

17  pertinent data on Gibbon wells and on Cottle wells.

18      Q  Mr. Rowe, I have here two exhibits marked by the Clerk

19  for identification Exhibit Gibbon and Cottle Q and Exhibit

20  Gibbon and Cottle R.  Are those the two sheets of data to which

21  you have referred?

22      A  Yes.

23      Q  Did you prepare those exhibits?

24      A  I did.

25      Q  And would you by reference to the wells as designated

12296

1    on Exhibit Gibbon and Cottle A and by reference to the data in

2    Exhibit Gibbon and Cottle Q and R describe the wells and

3    indicate what data is applicable to each one?

4          MR. GIRARD:   Which is Q and which is R?

5          THE WITNESS:   Q is the one that pertains to the Cottle

6    wells.  I will take Q first.

7          On sheet 1 on Gibbon and Cottle Q I show two wells.

8    Cottle Windmill is the same as the well 19K1 shown on Exhibit

9    Gibbon and Cottle A. That is a State well designation.  Now

10   the information I have on Exhibit Q was obtained from inter-

11   views with Mr. Cottle, and also I was able to obtain a log

12   of one of the wells from Mrs. Gibbon.

13         Do you want me to read into the record what appears on

14   these as far as the wells are concerned?

15         Q   No, I don't think that will be necessary.

16         A   I believe the Cottle Windmill, 19K1, the data appears

17   in State Bulletin 57.

18         MR. VEEDER:   It is not in the record.

19   BY MR. GROVER:

20         Q   Would you go ahead and describe each well.

21         A   Yes.

22         Q   That is the Cottle Windmill.

23         A   That is the Cottle Windmill, yes.  That well, according

24   to Mr. Cottle, was drilled in 1936 to a depth of 19 feet, with

25   a 12-inch casing.  He is using it for domestic purposes, and

12297

1   when I was there on May 2nd I noted a one-cylinder gasoline

2   engine which was used to pump water for his domestic use.  The

3   static level at the time I was there on May 2, 1959, was 10.8

4   feet to water from the reference point.

5        Q  Go on to Cottle No. 1.

6        A  Cottle No. 1 was drilled in the fall of 1958.

7      MR. SACHSE:  What is the well number?

8      THE WITNESS:  It has no State well number.  It was

9   drilled to a depth between 117 and 130 feet, with a 10-inch

10   casing.  It is not used at the present time.  The static level

11   May 2, 1959, was 17.2 feet from the top of the casing.

12   BY MR. GROVER:

13        Q  That again is your measurement?

14        A  That is my measurement.

15        Q  What is this test pump data?

16        A  Mr. Cottle reported to me that the well pumped one

17   miner's inch.  That was all the well would pump.

18        Q  Would you go to Cottle No. 2?

19        A  Cottle No. 2-- I have a water well driller's report on

20   Cottle No. 2.

21        Q  Does that have a State number?

22        A  No.

23        Q  Is it the same well that is shown in Exhibit Gibbon and

24   Cottle A as Cottle No. 2?

25        A  That is correct.

12298

1    Q   Near the boundary between the two properties?

2    A   Yes, it is actually sown on Gibbon's land, that is, on

3  the Gibbon side of the boundary line between Cottle and

4  Gibbon on Exhibit Gibbon and Cottle A.

5    Q   And is the information given on the sheet 2 of Exhibit

6  Gibbon and Cottle Q, the information from that log which you

7  have?

8    A   Yes.  I would like to make one correction.  On the

9  water well driller's report it shows the yield to be 100

10  gallons per minute, with a 130-foot drawdown and not a 137-foot

11  drawdown as I have shown it.

12    Q   Is that 137 then just a clerical error?  It should be

13  130?

14    A   It should be 130; yes, sir.

15  THE COURT:  Correct it.

16  MR. VEEDER:  What are you correcting now?

17  THE COURT:  Exhibit Q.

18  MR. GROVER:  The last line on page 2 of Exhibit Q should

19  read 130 feet instead of 137 feet, then; is that right?

20  THE WITNESS:  That is correct.  I have changed the exhibit

21  handed me with a blue pen showing 130 instead of 137.

22  BY MR. GROVER:

23    Q   Would you go to Exhibit Gibbon and Cottle R now?

24    A   I have some well measurements on Cottle No. 2 which

25  do not show on this sheet, and before going to R, if it is all

12299

1    right, I would like to read my measurement into the record.

2        Q  All right.

3        A  I found the water level in Cottle No. 2 on May 2, 1959

4    at 11.5 feet below the top of the casing.  The casing being

5    approximately five feet above ground surface, the top of the

6    casing being approximately five feet above ground surface.

7        MR. VEEDER:  You say you are offering that as a static

8    level?

9        THE WITNESS:  Yes, at that time.  That is not the static

10   level at the time the test pump was made.  It is a measurement

11   that I made on the well on May 2, 1959.

12   BY MR. GROVER:

13       Q  Would you go on then to Exhibit Gibbon and Cottle R?

14       A  Yes.  On Gibbon and Cottle R I have shown pertinent

15   data on Gibbon wells in Radec Valley, California.  The informa-

16   tion shown on eachone of these six sheets was from information

17   in the ranch files, from which I had obtained or was given

18   photostatic copies.

19       Q  Go ahead on each well and locate it.

20       A  Gibbon No. 1 I have no information on the driller.  It

21   was drilled in March, 1942, to a depth of 85 feet, with a

22   12-inch casing.  That well does have a State number and on

23   Gibbon and Cottle A it is designated 19Q1.  The actual designa-

24   tion would be 8 South, 1 East, 19Q1.

25       Q  Is that a windmill well?

A   Yes, sir.

Q Does it have a pump in it other than a windmill pump?

A  I don't recall. I don't believe it does.

Q  But the windmill is still there?

A   The windmill is still there.

Gibbon No. 2 was drilled by VanWinkle of Hemet, California, in March, 1952.  There is a log available on that well, and I have shown the log on Exhibit Gibbon and Cottle R.  It also has a State well nujber, and it is designated on Gibbon and Cottle A as Well 19Q2.

Q  And the information given there on sheet 2 on Exhibit Gibbon and Cottle R is the information from that log; is that correct?

A   The information on the log is from the log, yes.  There is some test pump data, a copy of which was furnished to me, the test being made by the California Electric Power Company in 1959.

MR. VEEDER:  May I inquire, counsel, are you going to put into the record these reports from the California Power Company and the well log?

MR. GROVER:  I hadn't planned to do it.  But we have them.  It is merely a matter of what counsel desires.

MR. VEEDER:  That has been the practice, your Honor. There is data left off these Exhibits Q and R that appear in the other.

1          THE COURT:  Let's put the well logs in.  What file will
2    they go into?

3          MR. VEEDER:  What are your numbers?

4          MR. GROVER:  Do you mean the exhibit numbers?

5          MR. VEEDER:  Yes.

6          THE COURT:  How far have you numbered?

7          MR. GROVER:  We are down to R, your Honor.

8          THE COURT:  S then would be well log data.  Do you have
9    these well logs?

10         MR. GROVER:  Yes, I have copies.  I don't have copies for
11   all counsel.

12         MR. GIRARD:  I don't want copies.

13         THE COURT:  Do you waive copies?

14         MR. VEEDER:  If they are here, we can make copies very
15   easily.

16         THE COURT:  Let's start in and pick up the ones we have
17   so far.  Which ones do you have?  We will give them subnumbers.
18   Go back to Cottle Exhibit B.

19         THE WITNESS:  The first log I have is on Cottle No. 2.

20         THE COURT:  That will be S-1 in evidence.

21    What else do you have?

22         THE WITNESS:  On Exhibit R I have Gibbon No. 2.

23         THE COURT:  That well log will be S-2 in Evidence.

24    What else do you have?

25         THE WITNESS:  There is a log on the Gibbon Creek Well.

1     THE COURT:  That will be S-3 in Evidence.

2     THE WITNESS:  There is a log on the Gibbon Corral Well.

3     THE COURT:  That will be S-4 in Evidence.

4     THE WITNESS:  There is a log available on the Gibbon field

5  well.

6     THE COURT:  That will be S-5 in Evidence.

7     THE WITNESS:  And on the Gibbon valley well.

8     THE COURT:  That will be S-6 in evidence.

9     (The documents were marked Defendant Gibbon and Cottle

10  Exhibits S-1, S-2, S-3, S-4, S-5, and S-6 in Evidence.)

11     MR. VEEDER:  Are those for all the wells?

12     THE COURT:  He doesn't have logs for all the wells.

13     THE WITNESS:  That covers all the logs I have.

14     MR. GROVER:  May I suggest that we use Exhibit T for the

15  test pump data.

16     THE COURT:  All right.

17     (The document was marked Defendant Gibbon and Cottle

18  Exhibit T For Identification.)

19  BY MR. GROVER:

20     Q  What is the first one, Mr. Rowe, for which you have

21  a document for test pump data?

22     A  Well, of course, on Cottle No. 2 the test pump data

23  appears on the log.  That is in Exhibit Gibbon and Cottle Q.

24  Cottle Well N . 2, the test pump data shown at the bottom

25  appears on the log itself, which is Exhibit S-1.

1       THE COURT: Do you have any separate test well data?

2       THE WITNESS:  Yes.

3       THECOURT:  I don't understand, though, how that test data

4  appears on the log.  Oh, you are talking about Cottle No. 2.

5       THE WITNESS:  Yes, sir, Cottle No. 2 in Exhibit Gibbon

6  and Cottle Q.

7       THE COURT:  All right.  That is on S-1.

8       What do you have on Gibbon?

9       THE WITNESS:  On Gibbon and Cottle Exhibit R, Gibbon No.

10  2, there is a test by the California Electric Power Company,

11  July 23, 1959.

12      THE COURT:  That will be T-1 in Evidence.
                                        Gibbon
13      (The document was marked Defendant Exhibit/and Cottle

14  T-1 in Evidence.)

15      THE COURT:  Part of that you copied on your Exhibit; is

16  that right?

17      THE WITNESS:  Yes,sir.

18      THE COURT:  What other well test data do you have?

19      THE WITNESS:  There is a test on the Creek Well.

20      THE COURT:  That will be marked T-2 in Evidence.

21      (The document was marked Defendant Gibbon and Cottle

22  Exhibit T-2 in Evidence.)

23      MR. VEEDER:  What is the date on that T-2?

24      THE WITNESS:  The date of test is June 23 and 24,1959.  It

25  was made by Townsend's Electric Motor Service of Escondido.

12304

1      MR. STAHLMAN:  Incidentally, that consists of several

2  sheets.

3      THE WITNESS:  Well, there is some correspondence that

4  appears with this, although the test appears on one sheet.

5      THE COURT:  Do you have any more well data?

6      THE WITNESS:  Yes, sir; on the Gibbon corral well.

7      THE COURT:  That will be T-3 in evidence-- well test.

8      (The document was marked Defendant Gibbon and Cottle

9  Exhibit T-3 in Evidence.)

10      THE WITNESS:  There is also one on the Gibbon-- a number

11  of them on the Gibbon field well.

12      MR. VEEDER:  What is the date on the corral well?

13      THE WITNESS:  The corral well, the date of test is July

14  14, 1959, Townsend's Electric Motor Service, Escondido.

15      THE COURT:  How many tests do you have on the Gibbon

16  field well?

17      THE WITNESS:  I show tests on August 14, 17, 21, and 31

18  of 1959.

19      THE COURT:  That will be T-4, T-5, T-6 and T-7 in

20  Evidence.

21      (The documents were marked Defendant Gibbon and Cottle

22  Exhibits T-4, T-5, T-6 and T-7 in Evidence.)

23      THE WITNESS:  There is also a test, your Honor, on

24  October, 1959.

25      THE COURT:  That will be T-8.

12305

1      (The document was marked Defendant Gibbon and Cottle

2  Exhibit T-8 in Evidence.)

3      THE COURT:  Is there a test on the Gibbon valley well

4  on September 3, 1959?

5      THE WITNESS:  Yes.

6      THE COURT:  That will be T-8 in Evidence.

7      (The document was marked Defendant Gibbon and Cottle

8  Exhibit T-9 in Evidence.)

9      THE COURT:  We will take our recess and the Clerk can

10  mark these and put them in order.

11      (Recess.)

12      THE COURT:  Change T-9 to T-5.  In other words, T-4

13  will be the well logs on the Gibbon field well, four of them.

14      MR. GROVER: Pump Test data.

15      THE COURT:  The pump test.  And T-5 will be the well log

16  on the Gibbon Valley Well.

17      THE WITNESS:  There is one test that shows at the bottom

18  of the Gibbon field well, which is the fifth test on that,

19  which should be given the designation T-5.  It doesn't appear

20  with all the other tests.

21      MR. GROVER:  That would be the fifth or the sixth test?

22      THE COURT:  The test of October, 1959, you mean, or the

23  static level of 1960?

24      THE WITNESS:  The test of October, 1959, by Don Trineri.

25      THE COURT:  All right, that will be T-5, then.

1    THE WITNESS:  Yes.

2    THE COURT:  Then the test on the Gibbon Valley well will

3  be T-6.

4    THE WITNESS:  Yes, sir.

5    THE COURT:  All in evidence.

6    MR. GROVER:  At this time, your Honor, I would like to

7  offer Exhibits Gibbon and Cottle Q and R in Evidence.

8    THE COURT:  Received in evidence, Gibbon and Cottle Q and

9  R.

10    (Defendants Gibbon and Cottle Exhibits Q and R for

11  Identification were received in evidence.)

12  BY MR. GROVER:

13    Q  I have here, Mr. Rowe, and exhibit marked by the Clerk

14  Gibbon and Cottle C and Exhibit Gibbon and Cottle D and

15  Exhibit Gibbon and Cottle E.  Exhibit Gibbon and Cottle C

16  is the one headed "Tabulation showing surface water diversion

17  reported by Kathryn C. Gibbon," Exhibit Gibbon and Cottle D

18  is the one headed "Tabulation showing ground water extractions

19  of Kathryn C. Gibbon," and Exhibit Gibbon and Cottle E is

20  headed "Tabulation showing total ground water pumped and

21  portion of the surface water diversions, Kathryn C. Gibbon,"

22  all for identification.  Did you prepare those exhibits, Mr.

23  Rowe?

24    A  I did.

25    Q  And what was the source of the information shown

1    thereon?

2        A  The source of the information was from photostatic

3    copies of records in the ranch files.

4        Q  Will you take each of the Exhibits C, D and E in-

5    dividually and explain?

6        A  Yes, sir.

7        MR. VEEDER:  Your Honor, I am going to object to these

8    as being purely hearsay.  The party who kept these records is

9    the only one who can properly testify to them.  This man is

10   not an officer of the company, nor did he keep the records

11   himself.  I think they should call a witness.  It looks to

12   me like a simple type of tabulation.  I see no reason for this

13   witness testifying in regard to it.

14       MR. GIRARD:  It is not offered in evidence yet, Mr.

15   Veeder.

16       MR. VEEDER:  He is going to explain what the man asked

17   him to do, and I assume he is going to read from the record.

18       MR. GROVER:  That is right.  The source of these exhibits

19   is the information on the reports to the State Water Rights

20   board.  If counsel prefers that we get certified copies of those,

21   we can.  But this just seemed the easier way to do it.  Mr.

22   Gibbon, who kept the records, died last year, and these are

23   from the ranch records, of which of course Mrs. Gibbon has

24   custody, and we can present them in that way.

25       THE COURT:  What we have done before at times during your

12308

1    absence, Mr. Grover, when we had problems like this was to

2    have the data brought in from which the compilations were

3    made, put the data here where counsel can inspect it, and

4    then go ahead and use the summary subject to correction.

5         Would that satisfy you?

6         MR. VEEDER:  We are getting right into the heart of this

7    litigation at the present time.  It would seem to me like there

8    would have to be some evidence as to how these quantities

9    which are depicted in total diversion were derived.  Now, they

10   purport to be in acre-feet.  I don't know whether there was a

11   wier there, I don't know whether they had a gaging station,

12   I have not the slightest conception as to how they arrived at

13   a diversion in 1951 as 653-- I assume that is acre-feet--

14   total diversion for that year.  It goes beyond the normal

15   situation where, if a man shows up with a photostatic copy of

16   a deed, we accept it.  But I can't accept, your Honor, the idea

17   that we are coming in here with total acre feet, without some

18   evidence as to how the measurements were taken, how they were

19   kept, who did it, and matters of extremely technical aspects

20   which I believe only one trained is capable of taking, and

21   certainly in the totals it is essential that we have some

22   proof as to the credibility of these things.

23        MR. GROVER:  May I ask if counsel would accept a certified

24   copy of the record on file at the State Water Rights Board.

25        MR. VEEDER:  No.

1    MR. SACHSE:  It looks like the Court is going to have to

2    accept it.  That is a record called for by statute, and if

3    you don't like it, you can rebut, Mr. Veeder.  The objection

4    then is one of weight.  That is what I did for Fallbrook. I

5    put in certified copies of the records, they were accepted,

6    and I brought you two boxes of original data and set them in

7    this courtroom for you to examine, and you never said a word.

8        MR. VEEDER:  Is this Sachse's C.J. ruling on the objec-

9    tion?

10       MR. SACHSE:  This is Sachse making an argument to his

11   Honor.

12       THE COURT:  Address yourself to the problem.

13       MR. VEEDER:  I will be glad to.  I addressed myself to the

14   problem here.  The longer I work with State reports, the

15   more I become disenchanted.

16       The point I am trying to make is that these are factors

17   of great importance.  The mere fact that they are reported to

18   the State of California lends nothing to me in regard to their

19   accuracy or how they were taken.  Now, here we have a situation

20   where a stream is dried up by these diversions, and I think

21   it highly important that we determine in regard to the quantity

22   of the water actually diverted as they relate to the acreage

23   purportedly irrigated, and I don't believe under the circum-

24   stances there is a proper foundation for this material.

25       MR. GROVER:  I will concede that, your Honor, except that

12310

they are public records, and so far as the objection as to

hearsay goes I believe certified copies would do and I will

produce them.  We have the ranch records, we have the daily

wier readings by Mr. Gibbon, who made the arithmetic computa-

tions.  Unfortunately he is not here and it would take days

to reconstruct these figures from his records.  But it can be

done.  But as far as the objection as to hearsay goes, I will

introduce the certified copies of the public record.

MR. GIRARD:  Mr. Veeder doesn't feel that the public

record is entitled to be admitted in evidence, but I think

the Federal Rules specifically provide that any evidence which

is admissible in a State court in the District of this Court

is admissible in this Court and the rules are to be liberally

construed to admit the evidence. And California has an express

statute which is applicable in this area of the State which

says that public records and documents are admissible in evi-

dence.  So I think under those specific Federal Rules of

Procedure it is admissible, regardless of hearsay.  It goes

to the weight, certainly, and that is it.  The statute says so.

MR. VEEDER:  I think we are all familiar with this

elementary statement that he just made.

The point I am trying to get to is that I am going to

object to the foundation on the ground that there is absolutely

no way of determining, on the state of the record as here

presented, as to how they arrived at these tabulations.  If

1   there were records kept in the course of business, that is

2   one thing.   I think they could bring in the basic data and

3   let us examine it.

4       THE COURT:   Of course, any objection to Exhibits C, D and

5   E is good as they stand.   But can't we obviate this in some

6   way?   First of all, Mr. Girard properly states the rule.   We

7   have a rule of multiple admissibility.   If it is admissible

8   under State law or Federal law, it goes in.   And California

9   has a statute that public records go in.   If the public

10  records go in, which would be certified copies of what has

11  been filed with the State Water Rights Board, that doesn't

12  give you any check on the data.

13      MR. VEEDER: That is right.

14      THE COURT:   But Mr. Grover has offered to produce the

15  original records made by Mr. Gibbon so that you could have

16  them spot checked and see how accurately he reported to the

17  State Water Rights Board, as well as the readings.

18      MR. VEEDER:   We are in complete accord, your Honor.   That

19  is just what I asked him to do.

20      THE COURT:   Then we have the problem solved.

21      MR. GROVER:   I will be happy to do that, your Honor.

22      THE COURT:   Is there a monthly report made to the State

23  Water Rights Board?

24      MR. GROVER:   An annual report.   There was a few years ago

25  a ten-year report when it started.   An annual report is made

1   since then.

2      THE COURT:  Do we have annual reports for each of these

3   years 1947 to 1948?

4      MR. GROVER:  The first ten years are a single report but

5   listing them year by year.  Then there is a supplemental report

6   since then.

7      THE COURT:  What are these records from which these

8   reports were made up?

9      MR. GROVER:  They will be records of the wier readings

10   and the records based on these pump tests of the well, which

11   show, I believe, that the upper intake is read exactly the same

12   time each week and from this the flow in the ditch is computed.

13   And we have the original field books.  They are not artistic,

14   your Honor, but they have been kept regularly and legibly,

15   and Mr. Spaniel is here, who has taken many of the readings.

16   Miss Gibbon has had custody of the records since Mr. Gibbon

17   died.

18      THE COURT:  Who is Mr. Spaniel?

19      MR. GROVER:  He is the gentleman here who has worked on the

20   ranch from time to time.

21      THE COURT:  And he has taken some of the readings that

22   Mr. Gibbon, Sr., recorded in the books?

23      MR. GROVER:  Yes, your Honor.

24      THE COURT:  Or did Mr. Spaniel record them?

25      MR. GROVER:  Mr. Gibbon made the computations and filings

1   with the State based partly on his weir readings and partly

2   on Mr. Spaniel's and partly on other employees of the ranch

3   who in the regular course made these readings.

4       THE COURT:  And after you have produced these records

5   Mr. Spaniel will be available for cross-examination?

6       MR. GROVER:  Yes, he can be, your Honor.  Mrs. Gibbon

7   is actually custodian of the records.  She will be here, too.

8       MR. STAHLMAN:  Are they measured separately?

9       MR. GROVER:  As far as the upper ditch, the water right

10  in which they have an undivided half interest, no.  It is half

11  a week to one and half a week to the other.

12      MR. STAHLMAN:  But the figures you show here--

13      MR. GROVER:  Are the total diversions.

14      MR. VEEDER:  Which cannot be related to the individual

15  acreage that is irrigated.

16      MR. STAHLMAN: You merely split it down and assumed that

17  each got the same quantity of water?

18      MR. GROVER:  Yes.

19      THE COURT:  One would take three days and the other three

20  days?

21      MR. GROVER:  One is three days and four nights and the

22  other is four days and three nights, your Honor.  Mrs. Gibbon

23  will testify to that.

24      There is no question the objection is good to this exhibit

25  as presented.

12313

1    THE COURT: What about D?

2    MR. GROVER: The same thing goes for D. And E is a total

3    of parts of C and D.

4    THE COURT: Let's pass C, D, and E until you can get this

5    information that Mr. Veeder insists on.

6    MR. GROVER: May I ask if our arrangements here call for

7    the certified copy from the Board, or could Mrs. Gibbon's

8    ranch copy of what was filed suffice?

9    MR. VEEDER: I am perfectly willing to have the ranch

10   copies. And it might help you to bring the data in. If I

11   understand, what you have said is that you measure the water

12   the beginning of the week. Is that what you did?

13   MR. GROVER: It was a certain time each week. Formerly

14   it was Fridays. Now it is Mondays.

15   MR. VEEDER: Then it is measured seven days later?

16   MR. GROVER: Yes.

17   MR. VEEDER: And on a following stream you are going to

18   take the measurementas of the Friday previous. In other words,

19   it will not reflect the true flow of the stream if your stream

20   is declining; is that right?

21   MR. GROVER: There is a weekly measurement. To the extent

22   that that is not as good as a daily measurement, it is not as

23   good as a daily measurement.

24   MR. VEEDER: I just wanted to be sure.

25

BY MR. GROVER:

Q  Mr. Rowe, directing your attention to Gibbon and Cottle Exhibit A--

MR. VEEDER:  You haven't offered A, have you, counsel?

MR. GROVER:  No, I haven't.

Q  Would you describe, Mr. Rowe, the various fields which you outlined on the exhibit and some of the other structures beside the wells for the purpose of identifying them on the map?

MR. VEEDER:  I am going to interpose this objection. Until we know whether the year in which these fields were in crop or whether those are offered in evidence of the '59 crops or the historical crops, we will have to make objection.

MR. GROVER:  I had in mind that Mr. Rowe would bring that out.  The header on the map is February, 1960; in fact, that s all it purports to show.

MR. VEEDER:  Those are the crops as of 1960.

MR. GROVER:  Yes.  And, Mr. Rowe, although he has been there in times past, is not the person really to testify about the historical irrigation.

MR. VEEDER:  Or about the crops.

MR. GROVER:  Well, he can testify about the crops as of now, yes.

THE COURT:  Proceed.

THE WITNESS:  On Exhibit Gibbon and Cottle A there is shown

1   by using different colors various crops.  The orange color

2   shows crops that are alfalfa, the red marks with the hash mark

3   on it are areas that are devoted to fruit trees, the brown-

4   ish colored is area that is planted to grain, the green area

5   are areas that are planted to pasture.  We also show on

6   Exhibit Gibbon and Cottle A reservoir areas shaded blue.

7   BY MR. GROVER:

8       Q   Would you take each field, Mr. Rowe, and just describe

9   what it is and give us approximate acreage as computed by you.

10      A   I do not have the fields numbered myself.  Perhaps if

11  you have a numbering system for me to follow I will be happy

12  to follow it.  Or I can just write in the acreages on each

13  field as I have computed them.

14      Q   Why don't you do it later?

15      THE COURT:  Let's number the fields.  We had this same

16  problem with the Vails.

17      MR. GROVER:  All right, your Honor.

18      THE COURT:  Can you do something else and do that during

19  the recess at noon?

20      MR. GROVER:  I could just have him put on the local numbers

21  right now and refer to them as that.

22      THE COURT:  All right.

23  BY MR. GROVER:

24      Q   Would you mark on the pasture there in the southeast

25  Quarter of the Southeast Quarter of Section 19, number one--

1  that is, Field No. 1, just with a pencil.

2  A   I am marking with black pencil on Gibbon and Cottle

3  Exhibit A the number 1 for the pasture east of the large

4  reservoir.

5  THE COURT:  You can conform your copies over the noon

6  hour.  Just put the numbers on the original there.

7  THE WITNESS:  I am showing the field around the large

8  reservoir, that is, the green pasture area around the large

9  reservoir, as Field No. 2.

10  THE COURT:  How far up does that proceed?  To the pipe

11  line from the smaller reservoir or--

12  THE WITNESS:  It goes up to just-- it covers the entire

13  green area around the reservoir up to a dashed line that

14  appears north of Well 9Q1.

15  THE COURT:  Go ahead.

16  THE WITNESS:  I am designating Field No. 3 as the pasture

17  north of the last described line between the lower ditch and

18  the upper ditch inside the Gibbon property.

19  I am showing field No. 4 as the green pasture area that

20  is east of the ditch line adjacent to Field No. 3 and--

21  MR. GROVER:  Mr. Rowe, I believe the local designation is

22  that Field 4 is west of that line, but farther north.

23  Perhaps we had better do this at noon.

24  THE COURT:  Do you have numbers?

25  MR. GROVER:  There are numbers that Mrs. Gibbon and Mr.

1    Spaniel could give us.

2         THE COURT:  That would be better.  Let's not make it any

3    more confusing than necessary.

4         MR. GROVER:  That's right.

5         THE COURT:  What about these exhibits on the chain of

6    title?  Any objection to those?

7         MR. VEEDER:  We have no objection your Honor.  We are

8    going to run them out from the standpoint of riparian acres

9    as we are doing on others.  I have no objection to that.

10        THE COURT:  They may be some help to you.

11        MR. VEEDER:  That is correct.

12        MR. GROVER:  I have the certificate from the title

13   company that it was prepared by them.

14        MR. VEEDER:  You don't purport to show what is riparian

15   and what is not?

16        MR. GROVER:  In the chain of title?

17        MR. VEEDER:  That is right.

18        MR. GROVER:  No, it is just a chain of the record title.

19        MR. VEEDER:  That is the point I am making.

20        THE COURT:  Then Exhibits F through N can be received

21   in evidence?

22        MR. GROVER:  Yes, your Honor, F through N.

23        THE COURT:  F through N received in evidence.

24        (Defendant Exhibits Gibbon and Cottle F through N were

25   received in evidence.)

1    MR. GROVER:  And while we are at it, Exhibit P, the

2  Miller affidavit, which is one of the documents referred to

3  in the chain of title, recorded 1936, I would like to offer

4  that.  I find now that my photostatic copy of it is not

5  certified.

6    MR. VEEDER:  We will check these matters out.  I have no

7  objection to its going in as it is.

8    THE COURT:  All right, P will be received in evidence,

9  then.

10    (Defendant Gibbon and Cottle Exhibit P for Identification

11  was received in evidence.)

12    MR. GROVER:  And Exhibit O is the original water claim,

13  and I have a certified copy of that which shows the place

14  where it is recorded, which I would like to substitute.

15    MR. STAHLMAN:  Did you send us a copy?

16    MR. GROVER:  Yes, I sent a little blue ditto copy of it.

17    But I have here the certified copy from the County

18  Recorder's Office in San Diego.  If I may substitute it, your

19  Honor, for the uncertified copy.

20    THE COURT:  You may change O and it will be received in

21  evidence.

22    (Defendant Gibbon and Cottle's Exhibit O for Identification

23  was received in evidence.)

24    THE COURT:  I take it that your Exhibits A and B--

25    MR. GROVER:  Well, your Honor, I have to tie the property

1    description into the answers.  I started to speak to Mr.

2    Veeder and didn't have sufficient time at recess.  I think we

3    can work out a stipulation on that, because it was merely a

4    copy of the answer that I gave Mr. Rowe and it will have to

5    be tied into the pleading itself.

6         May I ask while we are on these documents, your Honor,

7    if it has been the practice to introduce deeds.  I didn't

8    submit them because the owners will be here in each case.

9    But I have copies of the deeds, if it would be helpful.

10        THE COURT:  We haven't considered it necessary where there

11   was not any real dispute.  The Government has had the title

12   checked up in order to make you parties to this suit.

13        Would you want copies of deeds?

14        MR. VEEDER:  No, we have never asked for them, your Honor.

15        THE COURT:  You have given us the chain of title to assist

16   in determining what is riparian.

17        MR. GROVER:  Could I just then submit uncertified copies

18   of the deeds simply as exhibits to the Court, without copies

19   to counsel?

20        MR. VEEDER:  It's all right with us.

21        THE COURT:  You don't need to do that.  You can ask your

22   witnesses if they own this property shown on this map, and

23   that is good right there.

24        MR. VEEDER: That is prima facie title.

25        MR. GROVER: That would be easier, your Honor.

1    Q  Mr. Rowe, would you describe the method of measuring

2  water in the upper ditch as observed by you?

3    A  In the upper ditch below the intake there is a

4  rectangular weir, and that weir has a reference point about

5  six feet upstream from the crest of the weir where the measure-

6  ments are taken as far as depth of water over the weir.

7    MR. VEEDER:  That is a gage, or what is it?

8    THE WITNESS:  It is a reference point.  It is a 2 by 6

9  driven into the ground and it is set at the same elevation as

10  the crest of the weir, and upon that they make their measure-

11  ment of head or the amount of water passing over the weir.

12  BY MR. GROVER:

13    Q  What is the purpose of establishing a reference point

14  behind the weir itself?

15    A  Well, if you get too close to the crest of the weir

16  you are apt to find inaccurate measurement because the water

17  surface will drop as it approaches the weir.  The water

18  surface in the channel as it approaches the weir will have a

19  drop to it as it is trying to get through the restriction in

20  the weir itself.

21    Q  Is it standard engineering practice, then, to locate

22  a reference point approximately this distance behind the weir?

23    A  Yes, it is generally located some place behind the

24  weir where the water is still and undisturbed during its motion

25  through the channel and over the crest of the weir.

12321

1  Q  Would you mark on Gibbon and Cottle's Exhibit A the

2  approximate location of the weir?

3  A  I am referring to my notes now.  I believe it is

4  approximately 300 feet downstream from the intake, as shown

5  on Exhibit A.

6  MR. VEEDER:  What are you placing on there on Exhibit A?

7  THE WITNESS:  On Exhibit A, to locate the weir, I am

8  scaling off from the point designated "Intake upper ditch" a

9  distance of approximately 300 feet to show the location of

10  the weir that measures the water that passes through the ditch,

11  and I have made a black mark across the ditch section.  If

12  you want to designate it "weir," I will write the word "Weir"

13  or let it go as it is designated.

14  BY MR. GROVER:

15  Q  Write the word "Weir," please.

16  A  I have written the word "Weir" with black pencil and

17  have shown an arrow to the mark I have across the ditch

18  approximately 300 feet downstream from the intake.

19  Q  Is there another weir on the ditch?

20  A  Yes, sir, there is.

21  Q  Would you locate that in a similar way?

22  A  There is another weir located adjacent to the smaller

23  reservoir on the Gibbon property designated "Reservoir" on the

24  map, and I am marking right now with a black pencil, which is

25  rather difficult to see--

1      MR. VEEDER:  I will get you a red one.

2      THE WITNESS:  That will be better.  I am using a red

3  pencil now and showing near the southeast corner of a small

4  reservoir on the Gibbon property a line across the ditch and

5  it is designated as "Weir."

6  BY MR. GROVER:

7      Q  What kind of weir is that?

8      A  It is a rectangular weir.

9      Q  What size?

10     A  24-inch.  Both of them are 24-inch weirs.

11     MR. VEEDER:  Where is your reference point, if I may

12  interrupt for just a moment?  Do you have a reference point?

13     THE WITNESS:  At which weir?

14     MR. VEEDER:  At the upper weir.

15     THE WITNESS:  At the upper weir the reference point is

16  six feet upstream from the weir itself, that is, from where the

17  measurements are actually taken.  There is also a reference

18  point upstream from the weir at the small reservoir from which

19  measurements are taken.

20  BY MR. GROVER:

21     Q  To clarify this point, Mr. Rowe, are there any special

22  design features that go into the construction of a weir with

23  relation to such reference point?

24     A  Yes, there is a standard design for a weir in a weir

25  box.  We have a case here where we are not spilling the water

1  in a box.  We are trying to still the water in the channel

2  itself.  By stilling the water--

3      Q  Stilling?

4      A  Stilling-- s-t-i-l-l-i-n-g, to slow down the velocity

5  of the water so that you do not get what is termed "velocity

6  of approach."  Velocity of approach will affect the amount

7  of water passing over a weir.  If you place a weir in a very

8  rapid-moving stream and try to measure the water that passes

9  over the weir, you are not going to get an accurate measurement.

10  If the stream is slowed down to a point where it is settled

11  and still and then spills over the weir, you are going to get

12  a much more accurate measurement on that weir.

13      To reduce this chance of velocity of approach, the

14  reference point is generally moved upstream.  It is common

15  practice with almost every weir to move the reference point

16  upstream from which the measurements are made.

17      Q  And is the reference point in this still area?

18      A  Yes, it is within the channel bottom.  It just

19  happens to be upstream so that the water will be in a still

20  state as it is being measured.

21      Q  And is it sufficiently upstream to be at a different

22  elevation as the ditch flows down the mountain?

23      A  No.  I would have a level with me to measure it to see

24  if the level of the weir and the reference point were the same

25  level.  But I did make a measurement on the reference point and

12324

on the weir crest itself. I found that the reference point,
in my opinion, is accurate-- that is, that measurements from
the reference point give accurate readings as to the quantity
passing over the weir.

Q  And was that true of both weirs?

A  Yes.

Q  Are there any measuring devices on the lower ditch?

A  No, sir.

Q  Are there any measuring devices other than the two you
have mentioned on the upper ditch?

A  Not that I could find.

Q  Are there any on the properties through which the
stream flows?  Are there any measuring devices on the stream
itself?

A  Not as far as I could see.

MR. GROVER:  May I ask if any of the measurements that
have been taken and are reported in Bulletin 57 in that
vicinity are in evidence?

MR. VEEDER:  I think some of the data that was gathered
in connection with Barbee vs. Oviatt is in, isn't it, as I
recall, Mr. Girard?

MR. GIRARD:  I don't know.

THE COURT:  I couldn't tell you without going through the
exhibits.

MR. GROVER:  As far as the stream measurements go, could

1    I confer with counsel and consult the record?

2        THE COURT:  I don't think we had any problem on stream

3    measurements.

4        MR. GIRARD:  No, I think those were taken, and I think

5    the Radec measuring given us is the nearest one, but that is

6    downstream from this property, as I understand it.

7        MR. SACHSE:  To the best of my recollection, your Honor,

8    Mr. Illingworth testified that the State for short periods of

9    time did maintain a number of other measuring places.  Whether

10   their figures are in I don't recall.  I don't recall that he

11   put any figures in.  But I do recall that he definitely

12   testified.  It may be that one of them is one to which counsel

13   refers.

14       MR. VEEDER:  I do recall that there was some of those that

15   went in, and if they are in we will accept them.

16       MR. GROVER:  What I had in mind was that I would endeavor

17   to collect this data and offer it, if it was not already in.

18   As long as the record will be open after we finish, I will

19   contact Mr. Illingworth.

20       THE COURT:  Does this dam at the upper diversion area

21   stretch clear across the creek and take all the water?

22       THE WITNESS:  Yes.

23       THE COURT:  Shuts the water off completely?

24       THE WITNESS:  Yes, sir.

25       THE COURT:  Diverts it into pipes and into this ditch?

1      THE WITNESS:  It diverts it into two 12-inch pipes about

2  40 feet long and the pipes discharge into the ditch proper and

3  the ditch runs down about 200 feet more or so and the water

4  is measured in the weir at that location.

5  BY MR. GROVER:

6      Q  Might there be flowed in the river which would be

7  greater than could be diverted by this ditch?  Are there any

8  evidences of greater flows than the ditch would carry?

9      A  I think yes.  You are talking about a flood coming down.

10     Q  Yes.

11     A  Yes.

12     Q  In connection with your last answer I thought I would

13  point out that it was not an answer directed to flood flows.

14  When you answered that the dam would take all the water you

15  didn't mean flood flows?

16     A  No, I didn't mean flood flows, your Honor.  I meant just

17  the normal flow of the stream.

18     THE COURT:  How long have you been familiar with this

19  property?

20     THE WITNESS:  With the intake, about a year, your Honor.

21     THE COURT:  I understood that there was another 12-inch

22  pipe that is an overflow pipe.

23     THE WITNESS:  That is correct.

24     THE COURT:  You have never seen water flowing out of it?

25     THE WITNESS: Yes, when I was there last year they were

apparently just putting the ditch into operation and at that time part of the stream was being diverted into the ditch and the remainder of the flow in Temecula Creek was being discharged through the 12-inch overflow pipe.

THE COURT:  What time of year was that?

A   That was about two weeks ago.  I can get the exact date.  On March 15, 1960.

THE COURT:  Take our recess until 1:30.  See if you can get your field marked.

MR. SACHSE:  Your Honor, I know Mr. Grover will want to check, but I see that Appendix E of Bulletin 57 is in evidence, and that is the previously unpublished records of stream and spring discharge, which includes readings in Temecula near Radec (1950, 1951, 1952, 1953), Temecula Creek near Oak Grove, Aguanga, et cetera.  That portion of Bulletin 57 is in evidence.

THE COURT:  Take our recess.

(Noon recess.)

San Diego, California, Wednesday, March 23, 1960.   1:30 P.M.

THE COURT:  The Clerk is tied up.  We will get along without him, if we can, for a little while.

Proceed.

MR. VEEDER:  There are three housekeeping items I would like to get out of the way, if I could.  It will take only a moment.

We had an employee, a Mr. Moran, if you remember, who was in charge of the office maintained by the United States Marines in the town of Temecula.  He has resigned to take another position.  We believe that the mission has been accomplished for which we hired him.  If you remember, your Honor, it was a public relations matter to calm down the concern of many people.

THE COURT:  The Rebellion Fallbrook.

MR. VEEDER:  Yes.

MR. SACHSE:  They were afraid to put him in Fallbrook. They put him in  Temecula.

MR. VEEDER:  Well, we infiltrated a little down there.

At any rate, I would like to ask your Honor to be relieved of the responsibility of replacing Mr. Moran and from continuing the office at Temecula.

THE COURT:  I think it can be closed up.

What about the school?

1    MR. VEEDER:  That was the next item of housekeeping.
2  The Reche School, if it is amenable to your Honor, I will
3  tell the GSA that they can terminate that after our next
4  hearing, which is scheduled for April 25th.

5    THE COURT:  All right.

6    MR. VEEDER:  Thank you, your Honor.  That is all right
7  all the way across the board, then?

8    THE COURT:  That is correct.

9    MR. GROVER:  Your Honor, we have started putting numbers
10  for the Gibbon fields, and up to 5 they correspond with
11  present local designations, and beyond that we just numbered
12  them arbitrarily.  They go up to 11.  On the Cottle side we
13  have used letters and we tried to make them correspond with a
14  list that we had, but if they don't quite Mr. Rowe will
15  complete that, using arbitrary letters which we will refer to
16  in the future.

17    I would like to call, if I may, a witness out of order.
18  Mr. Johannsen's father formerly owned part of this property
19  and he has come here from Hemet as an accommodation and at some
20  inconvenience.

21    THE COURT:  We always try to accommodate people from
22  Hemet.

23    MR. GROVER:  If we can take him right now.

24    THE COURT:  Yes.

25    MR. GROVER:  Mr. Louis Johannsen.

12330

1           LOUIS J. JOHANNSEN,

2  called as a witness on behalf of defendants Gibbon and Cottle,

3  being first duly sworn, testified as follows:

4           THE COURT:  State your full name.

5           THE WITNESS:  Louis J. Johannsen.

6

7                   DIRECT EXAMINATION

8  BY MR. GROVER:

9       Q   Mr. Johannsen, where do you live?

10      A   I live in Hemet, just on the edge of the town of Hemet.

11      Q   Have you ever lived in Radec?

12      A   I did not live there, no.

13      Q   Are you familiar with the farm down there at the

14  intersection of Highways 71 and 79?

15      A   Yes, I am.

16      Q   And have you had an opportunity to look at Exhibit

17  Gibbon and Cottle A, which is this map here?

18      A   Yes.

19      Q   Could you tell us when you first saw the properties

20  depicted here and what your association with them has been?

21      A   Well, my father owned that property from the years

22  1928 to 1936, and at that time he resided on that place inter-

23  mittently, that is, his chief home was in Los Angeles but he

24  was up there a great part of the time, and during that

25  period I farmed a portion of this ranch to potatoes, and we

1   also had pasture for sheep.

2       Q  How familiar were you with the farm in that period

3   1928 to 1936?

4       A  I was there pretty nearly every weekend or so.  I had

5   a man working for me who did the work on the potato crop and

6   took care of the sheep.

7       Q  Do you want to come down here and look at the map?

8   Would it be more convenient?

9       Are you familiar with the point on the lower right-hand

10  portion of the map marked "Intake upper ditch"?

11      A  Yes, that is where the water was taken into the ditch.

12      Q  And at the time you were familiar with it from 1928 to

13  1936 was there water taken from the creek through that ditch?

14      A  Yes.  Occasionally it would vary a hundred feet or

15  two hundred feet, depending on the amount of water that there

16  was in the creek.

17      Q  You mean the point of diversion?

18      A  The point of diversion, yes.

19      Q  But it was always in that general vicinity?

20      A  Yes, within a hundred or two hundred feet at the out-

21  side.

22      Q  What was done with the water when it was taken through

23  the ditch?

24      A  It was brought on through and brought over to this land.

25  This is what was known as the upper ditch, and this pasture

1   was all irrigated,

2         Q   Excuse me.  Could you describe the fields by these

3   numbers?

4         A   That is No. 2, 3 and 4.  Those are the three fields

5   that were irrigated from this ditch which we called the upper

6   ditch, and the potato land I had to put a pump in the ditch

7   right about in here.

8         Q   That is at the lower left-hand corner of Field 1?

9         A   Yes.  And we had to raise the water somewhat in order

10  to get it on these fields in here where the potatoes were.

11        Q   The fields you have just pointed to are 1, 7, 6 and

12  how far?

13        A   And a portion of 5.

14        Q   And a portion of 5.

15        A   About half of 5.

16        THE COURT:  Do I understand that all of 1, all of 6, and

17  all of 7 were put into potatoes?

18        THE WITNESS:  About how many acres would that comprise?

19        MR. GROVER:  Mr. Rowe has those computations.  They

20  will be put in later.

21        THE WITNESS:  I can remember the acreage better than I

22  can the size of the field.

23        MR. GROVER:  One is eight and a half--

24        MR. VEEDER:  Your Honor, I think until that evidence is

25  in in regard to acreages--

THE COURT:  Let's go at it the other way.  Do you remember how many acres?

THE WITNESS:  Approximately 20 acres was in potatoes.

THE COURT:  20 acres altogether?

THE WITNESS:  Yes.

MR. VEEDER:  That was the fields 1, 7, 6, and half of 5?

THE WITNESS:  Yes.  Probably closest to wherever you could get the water on at that time.

THE COURT:  And how many acres were irrigated in Fields 2, 3 and 4?

THE WITNESS:  Approximately 20 acres was all pasture for the sheep.

BY MR. GROVER:

Q   Let me ask, Mr. Johannsen, if these fields 2, 3 and 4 appear to be the same way they were then-- that is, the area between the upper and lower ditches?

A   Yes, they are, because this road came in right along on the edge, right straight from where the highway met here, came right straight to the house up in here.

Q   To the west of field 5, then?

A   That is right.  And the lower ditch was in here where it irrigated this property.

Q   Where it is now shown on the exhibit?

A   Yes.  So the pasture was between the road and this upper ditch and this lower ditch.

12334

1  Q   And how far up did the irrigated pasture go in those

2  days?

3  A   Well, it went just about to this property line right

4  here.

5  Q   The line between the present Cottle and Gibbon

6  property?

7  A   As to this line I cannot tell you how far it went

8  this way, because I can't quite orient myself.

9  MR. VEEDER:  You are now pointing to No. 2; is that

10  correct?

11  THE WITNESS:  Yes. But I do know that approximately 20

12  acres would be between these two ditches.

13  THE COURT:  That would just about check out if you drew

14  a line about the north end of the big reservoir-- about 20

15  acres in there.

16  BY MR. GROVER:

17  Q   That reservoir was not there at that time, was it?

18  A   I can't recall.  If it was we did not use it.  It might

19  have been a reservoir that we didn't use.

20  Q   Did you have any familiarity with the property over

21  west of this property line that is the Cottle property now?

22  A   Yes.

23  Q   Was that part of the land that your father owned?

24  A   No.

25  Q   But you observed the amount of irrigation there?

1      A   They had some pasture over on that ranch also for

2   cattle.

3      Q   Do you remember how many acres were in pasture over

4   there?

5      A   No, it would just be a guess.  I would say 25, 28.

6      MR. VEEDER:  I move to strike it if it is just a guess.

7      THE COURT:  You can't give us a guess, but you can give

8   us a reasonable estimate, if you can make one.

9      THE WITNESS:  Yes.  Judging from what we had, I would say

10  there would be another 20 acres also over on that other ranch,

11  perhaps more.

12     THE COURT:  That was irrigated?

13     THE WITNESS:  Yes, sir.

14  BY MR. GROVER:

15     Q   And at that time did they use the lower ditch?

16     A   They used the lower ditch entirely.  Not the upper

17  ditch.  The upper ditch was on our property.

18     Q   Was water from the upper ditch used on property?

19     A   Occasionally, I think when we were using this and

20  we didn't need it we let the water run over on the other.

21  But we had to maintain this ditch.

22     MR. VEEDER:  And you are pointing to the upper ditch.

23     THE WITNESS:  The upper ditch; yes, sir.

24  BY MR. GROVER:

25     Q   Is the lower ditch as shown there substantially the

1   way it was at that time?

2       A   I really can't say.  I think that is approximately the

3   way it was.

4       MR. VEEDER:  I object, your Honor.  He says he doesn't

5   remember it, so I think that is the end of it.

6       THE COURT:  Yes, that will be the end of it, if he doesn't

7   remember.

8   BY MR. GROVER:

9       Q   There was, however, a lower ditch?

10      A   There was definitely, yes, and they irrigated from

11  that ditch.

12      Q   Was the intake to the lower ditch on your father's land

13  or--

14      MR. VEEDER:  He says he doesn't remember.

15      MR. GROVER:  He might remember that much.

16      MR. VEEDER:  But he doesn't remember where the ditch was.

17      THE COURT:  Overruled.  Let's see if he knows where the

18  intake was.

19      Whose land was it on?  If you know.  If you don't know, say

20  so.

21      THE WITNESS:  I really couldn't say.  It is too far back.

22      THE COURT:  All right.

23      MR. GROVER:  That is all I have, your Honor.

24

25

CROSS-EXAMINATION

BY MR. VEEDER:

Q   Did you raise potatoes for the years 1928 to 1936?

A   No.

Q   What were the years in which you did raise those potatoes?

A   I know we raised them in 1929 and '30.  But what we done after that I don't know.

Q   Then you had the depression, didn't you?

A   Yes.

Q   So you don't recall other than--

A   No, just those two years definitely.

Q   You raised them two years.  What kind of potatoes did you raise, early or late?

A   White Rose and spring crop potatoes.

Q   When would you start irrigating?

A   We would start irrigating usually in the last of April or first of May.

Q   And when would you take off the crop?

A   In the middle of July.

Q   When was the last time you would irrigate before you would harvest?  Do you remember how many weeks or how many days?

A   Well, some years-- and I believe it was the case at that time-- it gets pretty warm.  We irrigate right close to the

harvest, just a couple of weeks before we harvest.

Q   How long?

A   About two weeks.

Q   About two weeks, you would say, 14 or 15 days?

A   Yes.

Q   And how many times would you irrigate to make your crop?

A   Between five and six times.

Q   Between April and the middle of June?

A   That is correct.

THE COURT:   The middle of June.   The crop would go off about the first of July?

THE WITNESS:   Between the 1st and 15th of July, depending on the year.

MR. VEEDER:   I thought he said the 1st of July, your Honor.

I have no further questions.

MR. SACHSE:   I have a question, your Honor.


CROSS-EXAMINATION

BY MR. SACHSE:

Q   Mr. Johannsen, do I understand you to say that the upper ditch never served the Cottle property during the period 1928 to 1936?

A   No, the water went through the ditch when we didn't use

1   it on our property.  It went on through down to the other
2   property, which was the old Miller property at that time.

3       Q   I want to be sure we are talking about the same ditch.
4   The upper ditch-- you see the one to which I refer?

5       A   Yes.

6       Q   What happened to the water when it left your property
7   during the time you were on it?

8       A   Well, if we had any surplus and if it was convenient
9   for them to use the water at that end of the ranch, they took
10  it through that upper ditch; but if it was not, then they
11  diverted it above and put it into their lower ditch and took
12  it out.

13      THE COURT:  Diverted it down about where that small--

14      THE WITNESS:  About in there, yes.

15      THE COURT:  From the stream?

16      THE WITNESS:  From the ditch.  I think there is just one
17  line clear up the canyon, I think, up to that point.

18      MR. VEEDER:  The witness is saying "I think."  Does he
19  know?

20      MR. SACHSE:  Let me try again.

21      Q   You ran water down the upper ditch to irrigate potatoes?

22      A   No, sir.

23      Q   To irrigate pasture?

24      A   That is correct.

25      Q   And fields 3 and 4?

A   That is correct.

Q   There would be excess water in the ditch after you finished?

A   That is right.

Q   What happened to it?

A   It went down where that line is down to the ranch, right across.

Q   Come down and show us, please.

THE COURT:  It followed down the ditch, then, I take it.

THE WITNESS:  It followed down here and followed onto this ranch and irrigated in here somewhere.

MR. SACHSE: Perhaps I misunderstood you.

THE COURT:  But for the irrigation done on theCottle place they took water out of another intake in the stream further down?

THE WITNESS:  I don't know whether there was another intake or whether they took it right out of our ditch and used just this one intake for the whole thing.

THE COURT:  Who was operating the Cottle place at that time?

THE WITNESS:  Miller was the people's name that owned the ranch at that time, and they had different tenants on the place, I think, at that time.

THE COURT:  What irrigating was done on the pasture?  Was it flooding?

12341

THE WITNESS:  Just flood irrigated-- panels or borders.

THE COURT:  It was level enough that the 20 acres there could be irrigated?

THE WITNESS:  Yes, that had always been irrigated long before we came on the ranch, too.

THE COURT:  Was that irrigated each of the years that you knew it from 1928 to 1936?

THE WITNESS:  Yes, it had to be in order to maintain the pasture.  It was a permanent pasture.

MR. VEEDER:  I would like to move to strike the statement that it was irrigated years before they came on the property. I think that is hearsay, your Honor.

THE COURT:  That may go out, unless you know.

Were you ever around there before 1928?

THE WITNESS:  Well, I have been in and out of there a good many times.

THE COURT:  Before 1928?

THE WITNESS:  I passed it right on the highway, yes,sir. I had seen them irrigating it.  I knew the previous owner, Clint Tripp, very well and used to visit there.

THE COURT:  What was the earliest date that you ever saw the pasture being irrigated on what is now the Gibbon place?

THE WITNESS:  Well, at least five years before we owned the place, I know I used to be in and out of that ranch.

THE COURT:  So by 1923 you saw the pasture being irrigated?

12342

THE WITNESS:  In there, yes.

THE COURT:  Let's go back to 1923.  Did you see them doing any irrigating at that time in the area where you were growing potatoes later?

THE WITNESS:  Yes, I did.  Mr. Tripp had sheep also pastured in there.

THE COURT:  How was that irrigated? By checks, too?

THE WITNESS: That was irrigated in borders.

THE COURT:  The land you later put into potatoes was irrigated by check and borders?

THE WITNESS:  That had never been bordered.  It had never been in pasture.

THE COURT:  Never been irrigated?

THE WITNESS:  That had been irrigated when I put the potatoes in.

THE COURT:  Never had been irrigated?

THE WITNESS:  Never had been before that I know of.

THE COURT:  When you refer to the sheep, you are talking about the 20 acres that was in pasture?

THE WITNESS:  That is in here, yes, sir, between the ditches.

THE COURT:  3 and 4 and part of 2.

THE WITNESS:  Yes, sir.

THE COURT:  All right.

BY MR. SACHSE:

Q  Mr. Johannsen, I may have a wrong note on your

1    testimony, but my note reads that you stated that the Cottle

2    property was not irrigated from the upper ditch during the

3    period 1928 to 1936.  That is what I want to get straight.

4        A  Very little of the water went through the upper ditch

5    to go here, because they had a very small amount of land that

6    would benefit from this ditch.  They had a lower ditch that

7    irrigated that property.

8        MR. SACHSE:  That is all.

9        THE COURT:  But the witness doesn't remember whether the

10   water came in the upper intake and was cut across to the lower

11   ditch, or was taken out of the lower intake.

12       MR. SACHSE:  I understood that.

13       MR. VEEDER:  No further questions.

14       MR. GROVER:  I believe the record will show that at the

15   time he said there was no irrigation from the upper ditch to

16   what is now the Cottle property he qualified by saying except

17   when we had water we didn't use.

18       MR. VEEDER:  He said when there was a surplus it ran on

19   down there.

20       MR. GROVER:  Something like that.

21       THE COURT:  There is no dispute about that.

22

23                    CROSS-EXAMINATION

24   BY MR. STAHLMAN:

25       Q  Mr. Johannsen, I presume that while you were in

1    possession there operating you observed this ditch that went

2    up to the intake?

3         A   Yes.

4         Q   Is that in the stream bed?

5         A   Along the side of the wall mostly, right up alongside

6    the wall mostly.

7         Q   There is a wall there, is there?

8         A   There is a canyon and the pipe is strung along.   Some

9    places it was on a trellis, some places it was maybe in the

10   bottom, some places higher up on the bank.

11        Q   In other words, the course that it took was away from

12   its normal flow in the stream bed, that is, the normal stream

13   bed?

14        A   Well, the stream was running just the same as the ditch

15   is.

16        Q   Parallel to it?

17        A   Parallel to it; that is correct.

18        Q   However, if the diversion were not in existence the

19   water would have flowed in a slightly different course?

20        A   In the bottom.

21        Q   In the bottom.

22        A   But in just the same line.   It is a steep canyon both

23   ways and the natural flow would be right down the canyon.

24   The pipe line was taken and gradually brought up to get the

25   water on the higher land.

1    Q  From the point where the water was diverted down to

2    the place of usage, was that all pipe line or was that ditch?

3    A  There was some ditch in some places and some pipe line.

4    Q  Did you ever during the time you were there see that

5    the diversion had been flooded out?

6    A  It had been flooded out at times.

7    Q  Do you recall what year it was flooded out?

8    A  No, I don't.

9    Q  You know it has been, though?

10    A  I know it has, and this had to be rebuilt.

11    Q  Now, then, did you ever observe to the west of where

12    the ditch entered upon the land which you were irrigating

13    that there was some rising water that flowed down through the

14    stream to the south?

15    A  Well, the creek sometimes would be very heavy through

16    here and would rise and spread.

17    Q  How about in the summer months?  There was flow in

18    that creek downstream from the diversion, was there not?

19    A  Yes, there was.

20    Q  Do you recall where the point of rising water was at

21    the time you were there?

22    A  No, I don't.  But in some places it would be running

23    on the surface, and in other places it would go underground

24    and then it would rise again, depending on the formation

25    underground.

MR. VEEDER:  May I interrupt?  You are talking about the point of rising water below the point of diversion?

MR. STAHLMAN:  Yes.

THE COURT:  Below the upper point of diversion?

MR. STAHLMAN:  Yes.

Q  During that period of time you did see where it would come to the surface in some places and go underground and come to the surface again?

A  That is right.

Q  Have you seen that diversion recently?

A  No.

Q  When was the last time you saw it?

A  I wouldn't know.  A good many years ago.

Q  Was that while you were operating the property?

A  Yes, sir.

Q  What type of diversions did they have at that time?  How was it constructed?  About what size was it?

A  I think we just put in an earth fill at the time and brought it to an open ditch and then the open ditch run and entered a pipe line.

Q  How high was the earth fill?

A  Oh, about six or seven feet dike.

Q  And how long was it?

A  Not clear across the stream; didn't have to, because the stream was on one side, as I remember.  Probably a 30-foot

12367

1    dike in there.

2        Q   That was the diversion that you say was washed out?

3        A   Yes.

4        Q   And when it would wash out the water of course would

5    go back to its normal course down the streambed?

6        A   Down the channel.

7        Q   Do you know at any time how long that dike was out at

8    any time?

9        A   Well, during the wintertime it probably was out maybe

10   as much as 30 days before they would get to it and fix it, but

11   in the summertime of course we had it fixed immediately.

12       THE COURT:  As a matter of fact, that dirt dike would

13   wash out each winter when the rains came?

14       THE WITNESS:  Yes, sir, it did.  Except that where we took

15   it out  was on one side of the canyon and there was still a

16   larger creek bottom along the side there where the water could--

17   this natural flow would have come into the main canyon, but

18   there was kind of a little side canyon there where the water

19   could be easily corraled and put into the pipe line.

20       THE COURT:  But after the winter rains would you put this

21   dirt fill in?  You wouldn't start irrigating in January or

22   February?

23       THE WITNESS:  No, we did't.  It was not too much to

24   rebuild.  It was simply a matter of rebuilding it each time.

25       THE COURT:  What time of the year would you rebuild it?

1    THE WITNESS:  Whenever we needed the water.

2  BY MR. STAHLMAN:

3    Q  Do you have a recollection as to about when that would

4  be?

5    A  No, I don't.  I couldn't remember what those years

6  were.  Some of them were dry years; some of them were wet

7  years.

8    MR. STAHLMAN:  I think that is all.

9    THE COURT:  Mr. Sachse?

10    MR. SACHSE:  Nothing further from me, your Honor.

11    THE COURT:  Mr. Veeder.

12

13                        CROSS-EXAMINATION

14  BY MR. VEEDER:

15    Q  Could you state approximately and mark where you

16  remember seeing the point of rising water below the point of

17  diversion for the upper ditch?  I am referring now to Gibbon

18  and Cottle'sExhibit A.  Could youdo that?

19    A  I don't think I could.

20    Q  You don't remember?

21    A  If I was on the ground maybe I could, but I couldn't

22  here.

23    Q  Could you estimate for us then the distance downstream

24  from the point of diversion where you observed the rising

25  water?

12349

A   No, except that it was somewhere between here and where it entered the land.

Q   Would you straighten me out on that, sir?  Some place between the point of diversion--

THE COURT:  Upper diversion.

THE WITNESS:  Upper diversion.

BY MR. VEEDER:

Q   --the upper diversion and where the ditch went onto what has been designated as field No. 2; is that right?

A   Yes, sir.

Q   In other words, you have observed the recovery, the creek rising in an area between those two points?

A   Somewhere in there it would rise and then be flowing on the surface more than it would back toward the diversion.

Q   Would you compare the stream flow at the point of diversion with the point where you saw the water rise?

A   Compare it as to amount of water?

Q   As to quantities, yes.

A   The pipe line would only hold a certain amount of water, and whenever we had a pipe line full the rest of it would all go down also.

Q   I didn't make myself clear.  When the ditch was taking all of Temecula Creek out, would the flow in Temecula at the point of diversion relate to the quantity of water rising down below the point of diversion?

1    A  I can't answer.

2    Q  You can't recall?

3    A  At different times of the year it varied.

4    Q  It varied?

5    A  Yes, sir.

6    Q  Would it vary on the basis of your irrigation?

7    A  It is just something I can't remember.  I am sorry.

8    Q  If you can't remember, that's fine.

9    A  I am sorry.

10    Q  About how far was it an open ditch before the water

11  went into the pipe line which constituted this upper ditch,

12  do you remember?

13    THE COURT:  There is no evidence that a pipe line

14  constituted the upper ditch.

15    MR. VEEDER:  I understood that there was an open ditch,

16  your Honor.  I may be in error.

17    THE COURT:  I misunderstood the question.  You talked

18  about until it entered your pipe line.

19    MR. VEEDER:  Yes.  As I understood what he said in his

20  testimony-- and he can correct me if I am in error-- I under-

21  stood there was a diversion of water that went into the ditch

22  and then into the pipe line.

23    THE WITNESS:  Pipe line, or it was a wood flume, part of

24  it was wood flume, too, I believe.

25

1 BY MR. VEEDER:

2     Q From point of takeoff it was either in flume or pipe

3 line?

4     A Or in an open ditch.

5     Q Where would the open ditch be?

6     A I know we had some open ditch at the diversion.  I

7 can't remember how far.

8     Q You don't remember whether it was a hundred yards or

9 half a mile?

10     A I am sure it was not half a mile.  It could have been

11 a hundred yards.

12     Q The ditch would be the sand in it and gravel?  What

13 was the ditch?

14     A No, it was brought pretty well up against the hill.

15 There was pretty good soil there.

16     Q But it was an earth ditch?

17     A Yes, an earth ditch.

18     THE COURT: How much pipe line was there between the

19 upper point of diversion and where the upper ditch entered

20 what is now marked as pasture 2 on Exhibit A?

21     THE WITNESS: This is all open ditch, all of this.

22     MR. VEEDER:  You are pointing to open ditch from what

23 point?

24     THE WITNESS: Right about where it first came into the

25 ranch, where it irrigated land, right about here.

1     THE COURT:  Pointing to the line between Sections 19 and

2  30?

3     THE WITNESS:  Yes, sir, right about there, that was all

4  open ditch.

5     THE COURT:  From there on north?

6     THE WITNESS:  Yes, sir.

7  BY MR. VEEDER:

8     Q  And then was it pipe line?

9     A  This was either some flume line and some wood flume

10  line and then some open ditch and up here this was open ditch

11  also.

12     Q  When you said that this was open ditch also, you

13  were pointing from the point of diversion?

14     A  Yes, sir.

15     Q  And you don't recall the distance?

16     A  I don't remember.

17     MR. VEEDER:  I have no further questions.

18

19             CROSS-EXAMINATION

20  BY MR. STAHLMAN:

21     Q  Directing your attention again to the statement made

22  regarding the water rising and then going underground in

23  places, as you go to the west off of the property in this

24  area down through here there is a canyon, is there not?

25     A  Yes, sir.

12353

Q   There was always water running through that canyon, wasn't there, surface flow?

A   Pretty well, yes.  I used to own that ranch below.

Q   In the summertime as well as in the winter you would find water would flow through that canyon?

A   Yes.

MR. STAHLMAN:  That is all.


REDIRECT EXAMINATION

BY MR. GROVER:

Q   On that last question, was that all of the time that there was water running in that canyon west of the Miller property?

A   Of course, it was right on the surface.  Sometimes it would be a little dry, there would not be any water flowing right on the surface, but it was running through the sand.

MR. VEEDER:  Could he mark where that canyon is?

MR. STAHLMAN:  I was orienting myself with Exhibit 29R.

To orient you, here are the two highways into Radec, and then down through here would be the narrow canyon, would it not?

THE WITNESS:  Yes.

MR. STAHLMAN:  Will you mark it where the point was that you have indicated that the water would flow on the surface?

THE COURT:  Get a colored pencil so it will show up.

THE WITNESS:  Right where the steepest part of the canyon

12384

1    was, and that was right down in here.

2        MR. GROVER:  About on the San Bernardino Meridian?

3        THE WITNESS:  Just about right in there.

4        MR. STAHLMAN:  This narrow part through here?

5        THE WITNESS:  Right in here.

6        MR. STAHLMAN:  It would run through that narrow part from

7    about where it floods out, about through there; is that right?

8        THE WITNESS:  I don't know if it would rise to that

9    complete distance.

10        MR. STAHLMAN:  But in that area where I have made the

11    mark?

12        THE WITNESS:  Yes.

13        MR. GROVER:  May the record show that the mark is in the

14    vicinity of where the San Bernardino Meridian crosses the

15    creek.

16        MR. VEEDER:  Let the witness initial it.

17        THE COURT:  Yes, the red mark on 29R.

18        MR. VEEDER:  May he initial it, your Honor?

19        THE COURT:  Put your initials on there.

20        THE WITNESS:  That is to the best of my knowledge.

21        MR. STAHLMAN:  That is your best recollection anyway?

22        THE WITNESS:  Yes.

23        THE COURT:  Let me see the map.

24        Are you through?

25        MR. STAHLMAN:  Yes.

12335

BY MR. GROVER:

    Q   Mr. Johannsen, the rising water to which you have just testified down in the-- I am sorry, I thought it was marked. Would you point out again the rising water, Mr. Johannsen, that Mr. Veeder directed your attention to?

    A   Some place between the intake and here.

    MR. STAHLMAN:   May the record show that he has indicated between the upper intake on Exhibit A and he pointed then to the --

    MR. VEEDER:   South line of Field 2.

    MR. STAHLMAN:   --to the south line of Field 2.

    THE COURT:   All right.

BY MR. GROVER:

    Q   Are you familiar with a tributary known as Smith Creek or Smith Mountain Creek or Long Canyon?

    A   I did know that, but just where it comes in-- I know it came in somewhere up in here, it seems to me.

    Q   Is this tributary coming in from the west shown in Section 29 coming in below the place marked "Intake upper ditch," is that the approximate location of Smith Canyon or Long Canyon?

    A   I think so.

    MR. VEEDER:   Do you know?

    THE WITNESS:   Well, it is a little confusing to me there on account of having owned this other ranch, and that was

1  also a similar diversion below and sometimes I am not quite

2  sure.  But I am pretty sure that that was where it came in.

3      MR. VEEDER:  I move to strike his testimony because he

4  doesn't know as to where the creek comes in.

5      THE COURT:  Well, Long Canyon is shown on Exhibit 29R as

6  coming in right there, and that is obviously one of the

7  canyons shown on the map.  What difference does it make?

8      MR. VEEDER:  It makes all the difference in the world,

9  as I see it.

10     THE COURT:  The witness has testified that that is where

11 he thinks Long Canyon came in.  It is shown on 29R.  It's

12 already in evidence.

13     It may go out.  Let's go ahead.

14 BY MR. GROVER:

15     Q  Is there any tributary to Temecula Creek downstream

16 from the place marked on Exhibit A as "Intake upper ditch"?

17 Do you recall any other tributary coming in in that vicinity?

18     A  No, I do not.

19     Q  Was this rising water that you have referred to

20 upstream from the point marked "Intake lower ditch"?

21     MR. VEEDER:  He said he didn't know where "Intake lower

22 ditch" was.

23     MR. GROVER:  The point where he did say is even upstream

24 from that, this field 2, so it doesn't matter.

25     Q  Was the rising water that you have referred to down

1    here constant?  I mean, was it always the same amount?

2       A  Oh, no.

3       Q  Was the creek sometimes dry upstream of the rising

4    point?

5       A  Oh, yes.  The only time it would rise was when the

6    canyon would narrow, where the canyon would narrow naturally

7    the water came up because it was a rocky bottom, but where it

8    spread out and had a large basin to run it would go under-

9    ground and when it would hit the rocky canyon it would rise

10   and come to the surface.

11      Q  You have spoken of the floods washing out the dam

12   shown here as "Intake upper ditch."  Was there ever any year

13   when you didn't replace that dam when it was washed out?

14      A  Not while I was farming on the ranch.  Those two

15   potato years I know that definitely.

16      Q  How about the period of 1928 to 1936?  You testified

17   that your father owned it.  Was the water used ever year?

18      A  He always used it on the pasture, yes.

19      Q  Were there any other crops grown in this field 1, 7,

20   6, 5 area beside the potatoes?

21      MR. VEEDER:  During what period?

22      MR. GROVER:  At any time.

23      THE WITNESS:  Grain was farmed very often also.

24   BY MR. GROVER:

25      Q  In what period was that?

12558

1        A   Between 1928 and '36.

2        Q   Was the grain irrigated?

3        A   No.

4        Q   When you came to put the potatoes in there you took

5    the water from the upper ditch by a pump?

6        A   Gas engine, yes.

7        Q   Gas engine pump.  After the year 1930 do you know

8    of any irrigation above the ditch there in fields 1, 7, 6 and

9    5?

10       A   No, I do not.

11       Q   Might there have been?

12       MR. VEEDER:  That is objected to as being purely specula-

13   tion, your Honor.

14       THE COURT:  Sustained.

15       MR. GROVER:  I was trying to bring out whether he didn't

16   know or whether he knew definitely that there was not.

17       MR. VEEDER:  He said he didn't know.

18       THE COURT:  He said he didn't know.

19       THE WITNESS:  No, I don't.

20       MR. GROVER:  If that is true I am satisfied, but I

21   didn't want the impression to be left that he did know that it

22   was not irrigated.

23       MR. VEEDER:  I didn't have that impression.

24       MR. GROVER:  May I bring out that distinction, your

25   Honor?

1          THE COURT:  Yes.

2   BY MR. GROVER:

3          Q. Do you know that those fields were not irrigated

4   after 1930?

5          A  No, I don't.

6          THE COURT:  You said that grain was grown in those fields?

7          THE WITNESS:  Grain was grown, but they weren't irrigated.

8          THE COURT:  How many years was grain grown?

9          THE WITNESS:  I don't remember.  I didn't farm it, ex-

10   cept those two years of potatoes myself.

11          THE COURT:  You saw grain grown later?

12          THE WITNESS:  Grain was grown later on those fields;

13   yes, sir.

14   BY MR. GROVER:

15          Q  Might the grain have been irrigated?

16          MR. VEEDER:  Objected to as being conjectural.

17          THE COURT:  Sustained.

18          MR. GROVER:  I may have another witness that can--

19          THE COURT:  We will wait until we hear all the witnesses.

20          MR. GROVER:  I didn't want him to leave the impression

21   of contradicting the other witnesses if it is just a case of

22   not knowing.

23          THE COURT:  I think he has been trying to tell us all he

24   remembers honestly.

25          MR. GROVER:  That is true.  But if he remembers it

12380

1     definitely was not irrigated, it is different from not remember-

2     ing.

3          THE COURT:  He says that when there was grain it was not

4     irrigated.  He saw grain there one or more years after he

5     grew potatoes, although he didn't farm it.

6          Isn't that what you said?

7          THE WITNESS:  Yes, sir.

8          MR. GROVER:  All right, your Honor.

9          Q   In any period are you familiar with cattle or

10    sheep being run on either of these ranches?

11         A   In what period?

12         Q   In any period.

13         A   Well, during the period that we had the ranch definitely

14    the sheep were run in this pasture in here.

15         Q   In the pasture between the ditches?

16         A   Yes, sir.

17         Q   And how many head of sheep?

18         A   It varied.  I don't remember how many.  I didn't own

19    them myself.  My father owned the sheep.

20         Q   Were there any cattle?

21         A   Occasionally a few cattle they would pick up and

22    fatten.

23         Q   How about the Miller Ranch?

24         A   As to their operation I can't tell you very much.

25         MR. GROVER:  That's all.

THE COURT:  Anything further from this witness?

MR. VEEDER:  Nothing from us, your Honor.

THE COURT:  Thank you, Mr. Johannsen.  You are excused.

MR. GROVER:  Mr. Rowe, will you take the stand again, please?


JOSEPH A. ROWE,

having been previously duly sworn, recalled as a witness

in behalf of defendants Gibbon and Cottle, testified further

as follows:


DIRECT EXAMINATION (Resumed)

BY MR. GROVER:

Q  Pursuant to the arrangements made before the noon

recess, have you marked numbers on these fields on Exhibit

Gibbon and Cottle A?

A  Yes, I have marked numbers on Gibbon's fields and I

have started to letter the fields on the Cottle parcels but

was not able to finish before the recess to letter all of the

fields.

Q  Would you finish that right now?

A  Yes.  Yes, I have finished lettering the fields on the

Cottle parcels.

Q  In drawing the outlines of these fields did you survey

the boundaries?

12382

1      A  No, sir.

2      Q  How did you draw the boundaries?

3      A  Those were drawn from field observation, using the

4   enlarged copy of the Exhibit 29R, I believe it is, and by

5   walking in the field outlined, by walking over the land

6   outlining the boundary of the fields.

7      Q  So that these are not an outline of the accuracy of

8   a survey, but are based on personal observation?

9      A  That is correct.

10      THE COURT:  Are they reasonably accurate?

11      THE WITNESS:  Yes, sir.

12      THE COURT:  You have done this before?

13      THE WITNESS:  Yes, sir.

14   BY MR. GROVER:

15      Q  Have you computed the acreage of the various fields?

16      A  I have.

17      Q  How did you do that?

18      A  By using the fields as delineated on Gibbon and

19   Cottle's Exhibit A, I used the planimeter and planimetered

20   the area.

21      Q  And what results did you reach for the various fields?

22      A  I have them here, which I can read.  Concerning

23   Gibbon's acreage, field No. 1, 8.5 acres; field No. 2, 8.0

24   acres, I have combined fields 3 and 4 and have a total of 15.7

25   acres.

1      MR. VEEDER:  15.7?

2      THE WITNESS:  15.7.  Field No. 5 is 12.0 acres, I have

3  also combined 6 and 7 and have a total of 7.2 acres; field

4  No. 8 is 4.7 acres; field 9 is 8.3 acres; field 10 is 8.9

5  acres, field 11 is 11.0 acres, for a total of 84.3 acres.

6  BY MR. GROVER:

7      Q  How about the Cottle fields?

8      A  On the Cottle fields, Field A, 9.7 acres; Field B,

9  8.4 acres; I have combined fields C and E for a total of 2½,

10  field D, 2.2 acres, field F, 3.7; field G, 3.8; field H, 7.8,

11  I, 9.9; J, 6.4; for a total of 53.9 acres.

12      Q  Does this purport to show the acres that had been

13  irrigated in the past?

14      MR. VEEDER:  I object to that.  There is no foundation.

15  This witness doesn't know whether the lands were irrigated in

16  the past.  There is nothing to show whether he was ever on that

17  place.

18      MR. GROVER:  The answer would be no.

19      MR. VEEDER:  Why did he ask it, then?

20      MR. GROVER:  To make it clear to the Court that this is

21  what it is.

22      THE COURT:  Overruled on the grounds that the witness

23  will say no.

24      Is that correct?

25      THE WITNESS:  That is correct.  The answer is no.

BY MR. GROVER:

Q  Does it purport to show what is being irrigated at this particular time?

A  No.

Q  It does purport to indicate the reasonably accurate exterior boundaries of the fields as they have been described?

A  That is correct.

Q  And the acreages.  Mr. Rowe, does the map Gibbon and Cottle's Exhibit A correctly show the location of Temecula Creek and its tributaries in the vicinity of the Gibbon and Cottle properties?

A  I made another field survey of the location of Temecula Creek.  It was taken directly from the enlarged copy of 29R.

THE COURT:  Let me interrupt.

(Another matter.)

THE CLERK:  Two, 1247-SD-C, United States vs. Fallbrook.

THE COURT:  Proceed with the case on trial.

BY MR. GROVER:

Q  Mr. Rowe, is all of the property shown on Exhibits Gibbon and Cottle A and B as belonging to Mr. Cottle and Mrs. Gibbon within the watershed of the Temecula River?

A  Yes.

Q  And have you made an examination of Exhibit 29R with respect to the answer to the last question?

A  Yes

1       Q  And does that examination confirm your answer?

2       A  Yes.

3       THE COURT:  You are speaking not only of the numbered

4  fields, but the other mountainous ground shown on A and B; is

5  that right?

6       THE WITNESS:  No, your Honor.  I was referring to the

7  irrigated area.  Are you talking about the entire property?

8       MR. GROVER: The entire property.

9       THE WITNESS:  No, there is some portion in the south end

10  which might be questionable, in the south end of Mrs. Gibbon's

11  property that might be questionable whether it is in Temecula

12  or another stream tributary to Temecula which would join

13  Temecula down below where it passes through the property.

14       THE COURT:  It would be within the watershed of the

15  Temecula?

16       THE WITNESS:  It is within the watershed of the Temecula,

17  yes, or Santa Margarita.

18       MR. VEEDER:  There is a difference.

19       THE COURT:  What?

20       MR. VEEDER:  Temecula is a subwatershed, as I understood

21  the term to be used.  Is that right?

22       MR. GROVER:  Yes, I said the Temecula.

23       MR. VEEDER:  He said Santa Margarita.

24       THE COURT:  Let's hold ourselves to the Temecula.

25       THE WITNESS:  Temecula.

12366

THE COURT:  Is it all within the watershed of the Temecula?

THE WITNESS:  Yes.

THE COURT:  29R will speak for itself.

MR. GROVER:  Yes.  That is all.


CROSS-EXAMINATION

BY MR. VEEDER:

Q  Have you ever been on this property during the irrigation season?

A  Yes, sir.

Q  What year was that?

A  1959.

Q  And for how many days?

A  My first appearance was on April 19, 1959.

Q  That was the first day you ever were on the property?

A  Yes, sir.  I was on the property proper?

Q  Yes.

THE COURT:  Give us the other dates.

THE WITNESS:  May 2, 1959, June 19, 1959, February 18, 1960, March 15, 1960.

BY MR. VEEDER:

Q  When did you make your investigation to determine the areal extent of those fields?

A  I made that investigation on, I believe it was, the

1    May 2nd trip.

2         Q   You made that all in one day; is that right?

3         A   I did all of Cottle's in one day, yes, sir.  I did

4    part of Gibbon's that day and part of Gibbon's the following

5    time I was down there.

6         Q   In June?

7         A   Yes.

8         Q   In other words, you split your work up on the Cottle

9    investigation, is that right?

10        A   That is correct.

11        Q   Did you walk out the areas or how did you do it?

12        A   I walked generally around the area.

13        Q   When you say generally around the area, around each

14   field?

15        A   No, I did not walk completely around each field.

16        Q   Did you walk around the entire area that you have

17   designated as fields?

18        A   I was on each area that I designated field and a spot

19   that I can't visually see where the field was located.  I

20   did not actually pass or measure distances around each

21   field.

22        Q   What kind of notes did you take when you made that

23   investigation?

24        A   I kept them on the copy of the --

25        Q   Do you have those with you?

1      A   Yes.   I believe it is 29R.   This is one of the sheets

2   I used, which covers part of Gibbon's land.   This is the sheet

3   that I used that covers Cottle's land.

4      Q   On this sheet that covers the Gibbon land, I don't

5   see any mark or any indication which would lead you to draw

6   a field in the shape of field No. 11.

7      A   Yes, sir.

8      Q   Did you walk that out or how did you do it?

9      A   No.   I also have another sheet that I used afterward.

10     Q   You have another sheet?

11     A   Yes, sir.

12     Q   And you wrote that in from memory; is that right?

13     A   No, sir.

14     Q   How did you arrive at it?

15     A   I can show you on the map.   Are you referring to

16  field 11?

17     Q   Yes.

18     A   I have walked along field 11 I would say two or three

19  different times, on two or three different occasions.

20     Q   I thought you said it was only on May 2nd did you

21  make your investigation for the purpose of outlining that

22  field.

23     A   No, I said on Cottle's property on May 2nd.

24     Q   And on the Gibbon property you did the rest of it, as

25  my records show, on June 19th.

1    A  I have done some on May 2nd and some on June 19th, and

2  I have done some this year.

3    Q  You have done some more work than you originally said?

4    A  Yes.

5    Q  Was this field in grain when you were there in 1959?

6    A  Part of it was in grain.

7    Q  Which part was that?

8    A  It was about like it is shown, except it was not quite

9  as large in the southern end.  That is around Section 30, if

10  I recall.

11    Q  How many acres would you estimate was in that field

12  when you looked at it?

13    A  I said there was 11.0.

14    Q  You have that in grain now.  How come it is all in

15  grain at the present time?  Did they put in some more crop?

16    A  No, it is still in grain.

17    Q  You show the whole field in grain is the point I am

18  making.  You said that when you investigated it part of it

19  was not in grain.

20    A  I said at the very southern portion or the portion

21  touching at Section 30 there was a portion that I don't recall

22  being in grain in 1959.

23    Q  Is it in grain now?

24    A  Yes.

25    Q  In other words, they brought in the whole field; is

1    that right?

2        A   Yes.

3        Q   Is there any means for irrigating that land?

4        A   Any means?

5        Q   Yes, is there any system?

6        A   Well, you could run portable pipe in there.

7        Q   Is there now, though?  You have a system down there.

8    Have they got a means to irrigate it down there now?  Do

9    they have pipe down there?

10       A   They irrigate with portable sprinklers and pipe.  They

11   could run pipe down there.

12       Q   But there is no pipe there now?

13       A   I don't know.

14       Q   You have never seen any?

15       A   I have never observed any.

16       Q   In regard to field 10, which is in grain, have you

17   found any means for irrigating that field?

18       A   Not other than running portable pipe and irrigating.

19       Q   And there is no means for irrigating that now that

20   you know of?

21       A   None that I know of.

22       Q   And that would be true in regard to your grain field

23   No. 9?

24       A   Grain field 9 I have seen that irrigated myself.

25       Q   When was that?

1    A  That was in 1959.

2    Q  And they were irrigating grain?

3    A  They were irrigating grain this year in Field 9.

4    Q  What date?

5    A  I believe it was on my--

6    Q  March 16th?

7    A  No, the one prior to that.

8    Q  Were they irrigating the grain on February 18th?

9    A  I have no note of the fields that were irrigated.

10   There was some recollection that they were irrigating in that

11   area.

12   Q  In 1960?

13   A  In 1960, yes, sir.  That would have been in March,

14   1960-- March 15th.

15   Q  That is just a few days ago?

16   A  Yes, sir.

17   Q  In regard to the grain up in here on A on the Cottle

18   land, have you seen that irrigated?

19   A  No.

20   Q  Would that be also true of G?

21   A  In G I would say it has not been irrigated this year.

22   I have not seen it irrigated this year.

23   Q  You have never seen it irrigated any time?

24   A  No, sir.

25   Q  Did you measure the smallest area of the ditch or

1    pipe line which was used to carry water down to the properties?

2        A  Which ditch are you referring to?

3        Q  I am talking about the upper ditch.

4        A  The upper ditch.  Yes, I did.

5        Q  Where was that located?

6        A  In my opinion, the smallest--

7        Q  Where is it located?

8        A  The ditch?

9        Q  The smallest point, the most constricted area through

10   which water is carried to irrigate the land?

11       A  We did not make a survey of the entire ditch to

12   determine its capacity for its full length.

13       Q  In other words, you don't know?

14       A  As far as the ditch itself is concerned, I don't know.

15       Q  Do you know what area or reach of this so-called upper

16   ditch is in pipe and what length is in open ditch?

17       A  I am not certain of the entire length of a ditch that

18   is open.  I do have a measurement on a pipe that exists near

19   the confluence of Smith Creek and Temecula Creek.

20       Q  You have a measurement you mean as to the size of it?

21       A  As to the size and the length.

22       Q  And how long is that?

23       A  I believe it is 579 feet.  Total length of the pipe

24   as I have it is 579 feet.

25       Q  579 feet.  And that would be, you would say, would be

12373

how long?  About a mile?  I mean the ditch, the pipe and the whole thing?

A  I have never scaled the distance.

Q  You can look at it.  You are an engineer.  How long do you think it is?

A  If I had a scale I could scale it.

Q  Don't bother.  Can't you see from here?  You can scale it if you want to.  In other words, you know at least 500 feet of it carries water; is that right?

A  I know the whole ditch and the pipe carry water.

Q  But you never walked out the ditch?

A  Yes, I have walked the entire ditch.  I have never paced the distance of the ditch and I have never scaled the distance on the map.

Q  The ditch after it enters the Gibbon property is an open ditch; isn't that correct?

A  Yes, sir.

Q  And what kind of soil does it traverse?

MR. GROVER:  May I ask what is meant by "Gibbon property"?

MR. VEEDER:  From here down.

THE WITNESS:  No, the Gibbon property is down below that, Mr. Veeder.  Clear down.  Move down more yet.  Clear down.

THE COURT:  No, the National Forest.

MR. GROVER:  Look at Exhibit B.

THE COURT:  Clear down.

1        MR. VEEDER:   I have no problem.   I am talking about the

2   area where--

3        MR. GROVER:   This is the Gibbon property right here.

4        MR. VEEDER:   I beg your pardon.

5   BY MR. VEEDER:

6        Q   How far is the ditch open, then, after it reaches the

7   field area?

8        A   After it reaches the field area, you are referring now

9   to field No. 2?

10        Q   Yes, that is right.

11        A   It is open for the entire distance except for a

12   pipe line across a little draw that is east of the small

13   reservoir on Gibbon property, which is also east of Well No.

14   19Q1.

15        Q   And have you followed the ditch the balance of the way

16   through the field?

17        A   I have.

18        Q   And it is open ditch in soil throughout the whole

19   length; is that right?

20        A   Yes.   There might be small places where they run

21   tractors over it and there is pipe to conduct the water or

22   irrigation roads.

23        Q   In regard to the lower ditch did I understand you to

24   say you have never seen water carried in that ditch?

25        A   That is correct.

12375

Q   So you have never seen any of the land irrigated then on the property, is that right, and your fields H, I, and J?

A   No.  I have seen on H in March of this year.

Q   What in March of this year?

A   Field H and part of field I, I have seen the water very close to the surface of the ground or on the surface of the ground in that general area.

Q   But you don't know the source of that water?

A   It was not from irrigation.

Q   You don't know the source of the water.  You saw it standing on the field?

A   That is correct.

Q   Did you at any time in connection with the wells on these properties take more than one measurement, and if so what wells did you measure?

A   I believe by measurement you mean distance to water?

Q   That is right.

A   Do you want all my measurements, Mr. Veeder?

Q   I would like to know when you took them.  For example, you have on what you call the Windmill Well a static level of 10.8.

A   I took measurements on May 2, 1959, or I believe that was the first day I made any measurements on wells.

Q   When you took the static level do you know the last time that well had been pumped?

A   I will go through them well by well.

Q   Can you answer the last question?

MR. SACHSE:   He is trying.   Let him answer the last question.

MR. VEEDER:   I asked another question, Mr. Sachse.

MR. SACHSE:   He would like to answer the one you just asked him.

MR. VEEDER:   He will get it.

THE COURT:   Read the question.

(The reporter read the pending question.)

MR. SACHSE:   I would like an answer to that.

MR. VEEDER:   That is what I am asking.

THE COURT:   Proceed, Mr. Witness.

THE WITNESS:   Yes.

BY MR. VEEDER:

Q   When was that, when was the last time the well had been pumped since you--

A   Which well are you referring to?

Q   The windmill well.

A   Whose?

Q   I have a note here that well 19K1, a windmill well, you said the static level was 10.8.

A   I am sorry.   I thought you were referring to the other wells.   No, I don't know when that was last pumped.

Q   In other words, you simply took a measurement and that

1    is the only measurement you took on that well; is that right?

2        A  That is correct.   That is the only measurement I have

3    on Cottle's windmill.

4        Q  What are the other measurements that you made on this

5    land?

6        A  I measured Cottle Well No. 2 on May 2, 1959, and I

7    don't believe there are any other measurements until March

8    15, 1960.

9        Q  Do you know when those wells had been used prior to

10   taking those measurements?

11       A  To my knowledge, Mr. Veeder, they were not used --

12   they have not been used at all, except for test pumping

13   purposes just after they were drilled.

14       Q  In other words, the static level is reflective of a

15   long period of recovery; is that right?

16       A  Yes, there is no evidence of use between May 2, 1959,

17   and March 15, 1960.

18       MR. VEEDER:  I have no further questions.

19       MR. SACHSE:  I have no questions.

20

21                    CROSS-EXAMINATION

22   BY MR. STAHLMAN:

23       Q  Was there any difference in that water level measure-

24   ment between March 2nd and May 2nd?

25       A  On Cottle No. 2?

12378

1    Q  Yes.

2    A  Yes, sir.  I believe, without looking, it rose around

3  three feet.  I could check it in a minute.  It was 11.5 feet

4  to water on May 2, 1959.  I have it at 7.7 feet, Cottle No. 2,

5  on March 15, 1960.  That elevation is from the same reference

6  point, which is about five feet above ground surface.

7    Q  On this measurement you took in March, 1960, was

8  the stream flowing on the surface at that time?

9    A  Yes.

10    MR. STAHLMAN:  That is all I have.

11

12                    REDIRECT EXAMINATION

13  BY MR. GROVER:

14    Q  Are there two windmill wells?

15    A  Yes.

16    Q  There is one on the Cottle property and one on the

17  Gibbon property?

18    A  That is correct.

19    Q  You have stated in answer to one of the questions on

20  cross-examination that you had walked the upper ditch all the

21  way around from Mrs. Gibbon's reservoir through the Cottle

22  property and that it was a ditch.  Will you check your memory

23  on that, Mr. Rowe?  Is it open ditch all the way?

24    A  There is a short piece of pipe where it crosses east

25  of Mrs. Gibbon's small reservoir, and I believe there is--

1    there might be a small piece of pipe--

2        MR. VEEDER:  I object to the "might be."

3        THE WITNESS:  I recall seeing a piece of pipe at that

4    ditch around where the caretaker's house is or approximately

5    200 feet east of Cottle's reservoir.

6    BY MR. GROVER:

7        Q   Is it a flume in there?

8        THE COURT:  Are you gentlemen talking about the same

9    area?  He is talking about the area from the big reservoir

10   on down to the end of the ditch.

11       THE WITNESS:  That is correct.

12       THE COURT:  And I thought you were talking about from

13   the big reservoir up to the point of intake.

14       MR. GROVER:  No.  Let me show you on the map.  I think

15   Mr. Rowe has forgotten the flume you can see from the road.

16       MR. VEEDER:  Twist his arm.

17       THE COURT:  Find out what you are asking him.

18   BY MR. GROVER:

19       Q   In the area from Mrs. Gibbon's small reservoir around

20   through the Cottle property is there any flume there?

21       A   Yes, there is a short reach of flume.

22       Q   And is that the area where you were testifying to

23   when Mr. Veeder asked you a question?

24       A   Yes.

25       Q   There is a short piece of flume?

```
 1        A  Yes.

 2        Q  So it is not strictly correct that it is open ditch

 3   all the way?

 4        A  That is correct.

 5        MR. GROVER:  It's unimportant.

 6        THE COURT:  Where is this 579 feet of pipe you are

 7   talking about?

 8        THE WITNESS:  That pipe, your Honor, is located approx-

 9   imately 300 feet downstream from the weir below the upper

10   intake on the upper ditch.

11        THE COURT:  What size pipe is it?

12        THE WITNESS:  That is a 12-inch pipe, 12-inch welded

13   steel pipe.

14        THE COURT: Do you know what the grade of that pipe is?

15        THE WITNESS:  Yes, sir.  I have a plan or survey prepared

16   by Mr. J. F. Davidson.

17        MR. VEEDER:  I object to that as being purely hearsay.

18        THE COURT:  Did you make any calculation yourself as to

19   the fall of that pipeline?

20        THE WITNESS:  No, sir, not myself.

21        THE COURT:  The pipe starts about 300 feet downstream

22   from the weir?

23        THE WITNESS: Down from the weir, yes, sir.

24        THE COURT:  All right, go ahead.

25
```

12381

BY MR. GROVER:

Q   The measurements that you have given on wells are depth to water from a reference point; is that right?

A   On wells?

Q   Yes.

A   Yes.

Q   They are not measurements from sea level?

A   No.

MR. GROVER:   I wonder if I could touch on this Smith Canyon rising water?

THE COURT:   Yes.   Identify Smith Canyon on the map.

MR. GROVER:   Yes.

Q   You were present, were you not, when Mr. Johannsen testified regarding the rising water down stream from the intake of the upper ditch?

A   Yes.

MR. VEEDER:   I thought we were going to have it identified as to where that canyon is.

MR. GROVER:   I thought the Court said we would know where it was.

MR. VEEDER:   I thought you said you wanted it identified on Exhibit A.

THE COURT:   I know where it is.   If you want the record to show, it is obviously the stream that runs in from the south and comes into Temecula Creek just north of the upper

1  diversion point. That is Smith Creek, isn't it?

2      MR. GROVER:  Yes.

3      THE WITNESS:  That is correct.  I think on 29R it is

4  called Long Canyon.

5      MR. GROVER:  And I believe, your Honor, sometimes it is

6  called Smith Mountain Creek.

7      MR. VEEDER: Why can't we mark it on the map?

8      THE COURT:  Put "Smith Canyon" on the map.

9      THE WITNESS:  That is the reason I left the name off,

10  because there are so many names.  I will mark it in green

11  pencil on Gibbon and Cottle's Exhibit A.  What is the name of

12  the stream?

13      MR. GROVER:  It is Long Canyon on 29R.

14      THE COURT:  Put "Long" and then put "Smith" in

15  parentheses around it.

16      Does that other tributary have a name that comes in

17  downstream of the diversion point?

18      THE WITNESS:  To my knowledge it has no name.  It might

19  have a local designation, but I am not familiar with it, your

20  Honor.

21  BY MR. GROVER:

22      Q  Is water contributed to the Temecula Creek from Smith

23  Canyon, to your knowledge?

24      MR. VEEDER:  When?

25      MR. GROVER:  At any time.

1          THE WITNESS:   Yes.

2     BY MR. GROVER:

3          Q  Have you seen water coming out of Smith Canyon into

4     the Temecula Creek?

5          A  Yes, on March 15th I noted water coming from Smith

6     Canyon into Temecula Creek.

7          Q  Of this year?

8          A  Of this year.

9          Q  Did you make any estimates or measurements of the flow

10    of Temecula Creek or Smith Canyon at that time?

11         A  It is very difficult to make an estimate of the flow

12    of a stream, but I would estimate that about three second-

13    feet was flowing in Smith Canyon at that time.

14         Q  Did you at any time observe rising water below the

15    confluence of Smith Canyon and Temecula Creek?

16         A  I did observe a flow on May 2, 1959.

17         Q  And would you locate on Gibbon and Cottle's Exhibit A

18    approximately where that point was?

19         A  It was a rock outcrop in the stream bed, I would

20    estimate approximately a thousand feet upstream from Cottle's

21    west line where it crosses Temecula Creek.

22         Q  Would you put a mark on Exhibit A there?

23         A  I will make a mark of an X, which is approximately

24    where I observed water flowing over rock in the bed of

25    Temecula Creek.

1    Q   And will you initial that X, please?

2        That is a red X, initialed in black pencil.

3        Would you repeat the date of that observation, please?

4    A   I believe it was May 2, 1959.   I can check my notes.

5   May 2, 1959.

6    Q   By rising water what do you mean?

7    A   I observed that water was flowing over the rock at

8   that point.   The stream at that point passes over a rock

9   ledge.   On each side of the stream bed there is solid rock.

10  It is the lowest part of the stream bed itself.

11       THE COURT:   Upstream from that was water flowing?   You

12  mean no water was flowing upstream and when the canyon got to

13  this rocky place water was flowing over the rocks?   Is that

14  right?

15       THE WITNESS:   Yes, above this point where I noted water

16  flowing over the rocks there were very slight flows which

17  were almost impossible to measure appearing in the sands of

18  Temecula Creek and then disappearing.

19  BY MR. GROVER:

20       Q   So that there was negligible flow above this point,

21  but there was greater flow at the point of rising water?

22       A   Yes.

23       Q   Did you estimate the amount of the flow of rising

24  water?

25       A   I estimated a flow there of around 25 miner's inches.

12385

1    MR. GROVER:  That is all I have, your Honor.

2    THE COURT:  How many inches is three second feet?

3    MR. VEEDER:  150.

4    THE WITNESS:  50 inches is one second foot, so there is

5    150 miner's inches.

6    MR. STAHLMAN:  for what period?

7    THE WITNESS:  For what period?

8    THE COURT:  He said March 2nd, 3 second feet.  1 second

9    foot is 50 inches.

10    MR. STAHLMAN:  What was the figure as to the miner's

11    inches he said?

12    THE COURT: When?

13    MR. GIRARD:  25.

14    THE COURT:  We are talking about two different places,

15    Mr. Stahlman.  Where the X is he says 25 inches of flow.

16    THE WITNESS:  That was on May 2, 1959.  Then I saw three

17    second feet flowing in Smith Canyon in 1960.

18    MR. GROVER:  Three second feet?

19    THE WITNESS:  Yes.

20    MR. STAHLMAN:  At that time did you observe what was

21    flowing here at the point you marked X?

22    THE WITNESS:  Yes.

23    MR. STAHLMAN:  What was flowing at that time?

24    THE WITNESS:  It would be very difficult to estimate the

25    quantity flowing at that point.  I would say it was in excess

12386

1    of the amount coming out of Smith Canyon.

2        MR. STAHLMAN:  That's all.

3

4                    RECROSS-EXAMINATION

5    BY MR. VEEDER:

6        Q  You stated, if I understood you correctly, that there

7    are 300 feet of open ditch before the pipe line after the

8    point of diversion.  Is that what you said?

9        A  No.  Starting at the point of diversion there is

10   approximately 300 feet of open ditch.

11       Q  That is what I said.

12       A  To a weir.  Then from the weir it continues another

13   250 to 300 feet to a pipe line.  Back up, Mr. Veeder.  We are

14   right now opposite Smith Canyon.

15       Q  Why don't you come around here and mark for us the

16   300 feet down to the weir and then the 200 feet beyond that,

17   if that is what you have been saying, and put "200" and "300"

18   where they belong.

19       A  Now you want me to mark on Exhibit A?

20       Q  Where the open ditch is from the point of diversion.

21       A  The open ditch from the point of diversion runs from

22   the point of diversion to the weir, as shown on Exhibit A.

23       Q  What distance do you think that will be?

24       A  That is approximately 300 feet.

25       Q  Mark 300 feet there.

12387

MR. GROVER:  May I interrupt before we get the map marked up.  I believe by point of diversion Mr. Rowe is including in the diversion structure a double length of pipe.

THE WITNESS:  Yes.

MR. VEEDER:  I will be glad to have him testify to that.

MR. GROVER:  He did earlier.

BY MR. VEEDER:

Q  Now, below the Weir, how many feet of open ditch are there?

A  Open ditch to where?

Q  Where it goes into the pipe line.

A  Approximately 250 to 300 feet.

Q  How far is the open ditch from Temecula Creek-- put the two hundred or three hundred, whatever you are going to use.

A  I used 250 feet.  It is an approximation.

Q  How far is the ditch removed from Temecula Creek than that approximately 550 feet?

A  What part of Temecula Creek are you referring to?

Q  Well, it flows right alongside of it.

A  That is right.

Q  Right parallel to it, isn't it?

A  Yes, that is correct.

Q  What kind of dirt or earth is the water flowing through after the diversion?

12388

A  The bottom of the ditch appears to be fairly solid. I have touched it and sounded it-- not sounded it, but have touched it, and it feels to be fairly solid material.  It is clayey material.

Q  And the course is right alongside the Temecula Creek for that distance?

A  Yes.

THE COURT:  Right alongside it, but some distance above?

THE WITNESS:  It is not in the stream bed.  It is always on the side of the wall.

BY MR. VEEDER:

Q  Just so it is clear that the water seeps back into the creek.

MR. GROVER:  Let the witness testify.

MR. VEEDER:  The conclusion is unavoidable, counsel.

THE COURT:  I will draw the conclusions to be drawn. My observation of these old ditches that have existed for a good many years is that they carry a good bit of water without loss.  They are different from other ditches.

MR. VEEDER:  It might be.  But as I understand, this area is subject to flood and of course the flood would take out any silt deposit that would normally be brought in by diversion.

THE COURT:  There is no evidence that the flood gets up high enough to wash out this ditch up on the side of the bank.

1  BY MR. VEEDER:

2      Q  Did you observe the topography of that field which is

3  marked 11 on the Gibbon property?

4      A  Yes.

5      Q  Would you describe it to the Court?

6      A  The topography rises rather gently up to, I am guessing,

7  around the section line-- I think you are pointing to it now--

8  the section quarter, then it drops into the unnamed tributary

9  to the Temecula Creek.

10     Q  And that area which is included in your No. 11 is

11  pretty broken and rocky;  isn't that right?

12     A  No, not where they have cleared off.  There is one

13  little rock outcrop in the middle of that field which I don't

14  show.  It is of small size and I did not separate that from

15  any other part of the field.

16     Q  You didn't take into consideration, actually, the

17  quality of the soil or any other aspects of the characteristics

18  of the soil; is that right?

19     A  No, sir.

20     MR. VEEDER:  I have no further questions.

21     THE COURT:  Have you looked at these engineering and

22  soil reports on the Gibbon and Cottle property?

23     THE WITNESS:  By Col. Bowen?

24     THE COURT:  Yes.

25     THE WITNESS:  Yes, sir.

1      THE COURT:  Exhibits 229 and 230. What is your view of

2  them after your inspection of the property?

3      THE WITNESS:  I am not a soil chemist, your Honor, but

4  I would say that where Col. Bowen shows lands classified as

5  II, III and IV, that they generally agree with the areas that

6  are presently being utilized on both Gibbon and Cottle.  However,

7  there are other portions of particularly Gibbon's land that

8  are not being used which Col. Bowen shows as Class either II,

9  III or IV.

THE COURT:  I got lost.

THE WITNESS:  In other words, every place where I have shown a utilization that is the land use as to some farming activity.  I believe that generally the soils are classified II, III or IV in Colonel Bowen's report.

THE COURT:  Take the Gibbon property, Exhibit B, the parts you have colored.  Is that the amount that, in your opinion, is irrigable land?

THE WITNESS:  On Gibbon?  I didn't understand the question.

THE COURT:  Have you shown by the colored areas on Exhibit Gibbon and Cottle's B the areas that, in your opinion, are irrigable land?

THE WITNESS:  Yes, sir.

THE COURT:  Do you realize that the total you have shown is 84 acres while Colonel Bowen has shown that there is a possibility of irrigating 107?

THE WITNESS:  That is correct.

THE COURT:  In other words, then, Colonel Bowen's survey has been a very fair one.

THE WITNESS:  Yes.  Although, your Honor, there are other areas on Gibbon's land which I do not show on my map which Colonel Bowen shows as Class II, III or IV, and taking those into consideration I would say that Colonel Bowen is fair in his estimate as to the lands that are irrigable on the Gibbon parcels.

THE COURT: You have shown on Cottle's parcel by color which you think are the irrigable acres?

THE WITNESS: Yes, sir.

THE COURT: To reach a total of 53.9.

THE WITNESS: Yes, sir.

THE COURT: Are you familiar with how many acres the Colonel found were irrigable?

THE WITNESS: I don't recall.

THE COURT: Sixty-two. That is possible irrigable acreage.

THE WITNESS: Yes.

MR. GIRARD: Maybe I am confused, but isn't this Exhibit A to show what is irrigated?

THE WITNESS: It is not showing what is irrigated.

MR. GIRARD: It is not showing land which might be irrigated.

MR. VEEDER: It is not showing irrigated land. It is cultivated land. But it is not, I think, land on which crops might be grown.

THE WITNESS: That is correct.

THE COURT: Wait a minute. You have all kinds of crops. Tell me, have you colored in on Cottle's property the areas that, in your opinion, are tillable ground?

MR. GROVER: May I interrupt? All the areas. I don't think he understands that that is what you mean.

THE WITNESS: I have shown on Exhibit A those lands

1    which are presently being farmed on both the Cottle and the

2    Gibbon properties.

3        THE COURT:  Take Cottle's property.  Is there any ground

4    on Cottle's property, in addition to what you have put in

5    there in color, that could possibly be irrigated?

6        THE WITNESS:  Yes, sir.

7        THE COURT:  Where?

8        MR. GROVER:  Could you describe it in terms of Colonel

9    Bowen's report, to save time?

10       THE WITNESS:  I think I can describe it or point to it on

11   the map.  There may be a small amount of land adjacent to

12   Temecula Creek opposite Cottle No. 2 Well.  There is also an

13   area that is not colored between Field H, B, F and the Gibbon

14   property line I do not show as being --

15       THE COURT:  It is a very small area.

16       THE WITNESS:  It is a very small area.

17       THE COURT:  But other than that, you have listed in

18   color the possible irrigable land.

19       THE WITNESS:  That is correct.

20       THE COURT:  Would you say that the estimate that the

21   Colonel has made of 62 acres of irrigable land was a very fair

22   estimate?

23       THE WITNESS:  Yes, sir.

24       THE COURT:  Now go back to the Gibbon property.  Wouldn't

25   you say that the estimate the Colonel made on Exhibit 230 of

4

1    102.2 acres of row crops and 5.5 acres of irrigated pasture,

2    making 107.6 acres, would you say that that is a very fair

3    figure for irrigable land?

4         THE WITNESS:  Yes, sir.

5         THE COURT:  What are we fighting about?

6         MR. GROVER:  Mr. Rowe didn't understand you to mean all

7    the irrigable.  He was not trying to show all the irrigable.

8    He had examined the report and agreed substantially with it

9    as to irrigable.

10        THE COURT:  All right.

11        MR. GROVER:  And the two maps don't purport to show the

12   same thing.

13        THE COURT:  I realize that.  But they do show -- and I

14   figured you made an inspection -- of the two exhibits, the

15   colored areas shown, most would be the possible irrigable

16   land in these two pieces.

17        MR. GROVER:  Yes.  I think it might be helpful, in that

18   connection, if we had Mr. Rowe indicate by some kind of mark

19   the field down here upstream from this unnamed tributary which

20   he said was cleared.  If he could just mark that.  I believe

21   that is one of the areas shown on the Colonel's report.

22        THE COURT:  It doesn't make any difference.  There is a

23   very small area in there.  You can put it in, if you want.

24        THE WITNESS:  It is a small area.  I couldn't spot it

25   exactly.  I would say it is some place midway between the

south line of Section 30 and the north line of Section 30 and

west of the east section line of Section 30.

THE COURT:  How many acres would there be in it?

THE WITNESS:  I would estimate around 4 or 5 acres.

THE COURT:  According to the aerial photo in the Gibbon

report, the only area in there -- there are two small areas

shown with symbols 2 and one shown with symbol 3, and they

are not contiguous -- they are separated by the channel in the

creek.

MR. GROVER:  One last question on that point of irriga-

bility, your Honor.

Q    Is there any land in the Gibbon or Cottle ranch

which, although not irrigable, could be the subject of

reasonable beneficial use of water from Temecula Creek?

MR. VEEDER:  May I have the question?

THE COURT:  That stumps me.  It is not irrigable, but it

could beneficially use water.

Take the afternoon recess.

(RECESS)

THE COURT:  Read the last question.

(Whereupon, the Reporter read the pending question as

reflected above.)

THE WITNESS:  Yes.

BY MR. GROVER:

Q    What type of land would that be?

1      A    The type of land would be, I would say, the low

2 rolling hills, areas that are not precipitous or extra steep.

3 Those lands could be used.

4      Q   For what purpose?

5      A   For residence, domestic use, estate purposes, such

6 as that.

7      Q   Do these lands include some of those listed in

8 Colonel Bowen's reports as not irrigable?

9      A   Yes.

10    MR. GROVER:  I believe that is all I have, your Honor.

11    MR. SACHSE:  I have one question, your Honor.  I probably

12 should have asked it before this redirect.

13               FURTHER CROSS EXAMINATION

14 BY MR. SACHSE:

15      Q   Mr. Rowe, can you estimate for us the stream distance

16 between the intake of the upper ditch and the intake of the

17 lower ditch?

18      A   Approximately six thousand feet.  That is stream

19 distance.

20    MR. SACHSE:  That is all.

21    MR. VEEDER:  I have no questions.

22    THE COURT:  Step down.

23    MR. GROVER:  At this time I offer Exhibits Gibbon and

24 Cottle A and Gibbon and Cottle B.

25    THE COURT:  Gibbon and Cottle A and B received in evidence.

1    MR. SACHSE:  Before Mr. Grover calls his next witness,

2  Exhibit O is in evidence, is it not?

3    THE COURT:  Yes.

4    MR. SACHSE:  I don't know whether this is a valid

5  objection and calls for a motion to strike Exhibit O or

6  whether it simply calls for an explanation perhaps from Mr.

7  Grover.  I don't think Exhibit O -- in fact, I am certain

8  that it does not -- complies with the provisions of the Civil

9  Code of California that were in effect regarding appropriations

10  at the time this appropriation was filed.  It does not comply

11  with the Civil Code in the following specifics:  It does not

12  recite the number of inches under the pressure that is called

13  for by the Civil Code, it does not recite the point of

14  diversion -- this is much more important, and it doesn't

15  recite the place of use.

16    THE COURT:  Are you referring to the Code in effect in

17  1885?

18    MR. SACHSE:  Yes, your Honor.  I am certain that it is

19  defective in those three respects.  However, the point is,

20  that doesn't mean that this isn't a valid appropriation under

21  the so-called non-statutory appropriations.

22    THE COURT:  Self-help.

23    MR. SACHSE:  Under the self-help appropriations that

24  were then in effect.

25    But I think the proof under the two is going to be very

1   different, and the self-help theory is going to require a

2   little more specific proof.  And I would like to ask Mr.

3   Grover if this document is purported to be a step in his

4   foundation for an appropriative right; because if that is so,

5   I don't think it is going to hold any water, except possibly

6   to establish a date.

7       MR. GROVER:  The document obviously does not with precision

8   set forth all of these points.  I think it is arguable, how-

9   ever, and when the case is completed we will argue that it

10  substantially complies with the requirements at that time.  But

11  it is admissible in any event because --

12      THE COURT:  It is admissible.  There is no argument about

13  that.

14      MR. GROVER:  Yes.  And we will have a witness who was

15  alive at that time and acquainted with it who can, even if it

16  doesn't comply with the Civil Code, relate sufficient facts

17  that this document will be helpful in nailing down the date

18  of the appropriation, the non-statutory appropriation, and for

19  that reason it is evidentiary even if it doesn't constitute an

20  appropriation under the Civil Code.

21      In addition that, as I understand the law relating to the

22  statute of 1872 and the others associated with it, the

23  statutory requirements apply only as between people who do,

24  or they benefit only a person who does comply with the statute,

25  and as against other persons who did not post or record such

12399

9

1    notice the requirements of the Civil Code are not important.

2       MR. VEEDER:  On the basis of the doctrine of relation back.

3       MR. GROVER:  That is right.  That as against someone who

4    does comply, the failure to comply might deprive the appro-

5    priator of the doctrine of relation back.

6       THE COURT:  No one else has made a filing here?

7       MR. GROVER:  Not that I know of.

8       But in any event, we will argue, to the extent that we

9    can, that it does comply.  But if it doesn't comply, it isa

10   at least helpful on the non-statutory.

11      THE COURT:  At the time of this alleged appropriation was

12   this property now owned by Gibbon in one ownership?

13      MR. GROVER:  No.

14      THE COURT:  What property was owned?

15      MR. GROVER:  Part of it was.  I just don't recall exactly

16   now.  I couldn't delineate it on the map from memory.

17      THE COURT:  Was it part of both the parcels, or was it all

18   within one?

19      MR. GROVER:  It is part of both parcels.

20      THE COURT:  And what is your proof going to show as to

21   the extent of this appropriative use -- how many acres?

22      MR. GROVER:  From memory I can't give the exact ones.

23   But it was gradually increased with reasonable diligence, and

24   this witness is the man who was the son of the man who made

25   the filing.  He worked on the ditch when he was 19.  His

12400

10 1 father died and he carried on himself.  So he will give, as

2 well as he can, year by year, the acres that were in use.

3   THE COURT:  But to what maximum?

4   MR. GROVER:  He is familiar with the property today, and

5 it has been increasing right along.  Just from memory I don't --

6   THE COURT:  We can't prejudge from what we heard today, but

7 from what I heard today it looked to me like about your

8 maximum proof on the Gibbon property would be about 20 acres.

9   MR. GROVER:  Well, for certain purposes it would be con-

10 siderably more than that, your Honor.

11   THE COURT:  For grazing and watering stock, yes.  But for

12 irrigation it would look to me like about 20 acres.

13   MR. GROVER:  For what purpose, your Honor?

14   THE COURT:  For irrigating land.

15   MR. GROVER:  Well, you see, since Mr. Johannsen's time

16 it has been considerably expanded.

17   THE COURT:  But if I understand the law rightly, you don't

18 just appropriate an unlimited amount of water.  You appropriate

19 water for a certain use and for a certain acreage, and the

20 fact that you later on might find that you could use the

21 water in a dozen other places isn't going to expand your

22 right.

23   I will be very much surprised if your proof goes beyond

24 20 acres of irrigable land plus water for sheep and cattle

25 and things of that sort.  I am raising the question now that

10

1   there may not be an important dispute about that.  If that is

2   what your proof is going to show, maybe we can huddle a little

3   bit and shorten it up.  Maybe everybody is going to stand

4   still for a right of that sort.  I don't know.

5       MR. GROVER:  The evidence would come in as a prescriptive

6   right in any event, even if it were not an expansion of the

7   original appropriation.  But the original amount appropriated

8   isn't the limit, of course, as long as it is expanded with

9   reasonable diligence.

10      THE COURT:  Yes, but there comes an end to how far this

11  expansion goes.  I would imagine -- this is a rank guess --

12  that in 1885 he ran this water down here and he probably

13  irrigated three or four acres to start with and he thought

14  he was doing pretty well, and I would suppose that over a

15  reasonable period of time it was expanded out, and I am going

16  to guess that your proof is going to show that there was

17  about 20 acres there that was subject to this water taken

18  from this ditch.

19      MR. GROVER:  I believe it will be more than that, your

20  Honor.

21      THE COURT:  I am just inquiring.  I thought you might

22  want to state what you thought your proof would show.  You

23  are not certain.

24      MR. GROVER:  One witness has said that in a period before

25  Mr. Johannsen's time 40 acres on the Gibbon part of the

11

1   property --

2       THE COURT:  Let's put it this way.  Suppose they started

3   taking water and that there had been at least a self-help

4   appropriation and over some recent time after 1885, say within

5   ten or twelve years, they worked it up to 15 or 20 acres.  Do

6   you think that then in 1930 a further expansion of it could be

7   made to 30 or 40 acres?

8       MR. SACHSE:  I don't think it would be done after 1914,

9   your Honor.  I think that prior to 1914 any claimant had a

10  right to proceed either under the Civil Code or by self-help.

11  But once the Water Commission Act came in, in 1914, his right

12  froze as to anything he did before.  Future ones he has to

13  appropriate under state law as it then existed.

14      THE COURT:  That is probably correct, too.  But between

15  1885 and 1914 I don't think there is no limit to what expansion

16  could be made.  I think the conduct of the parties during that

17  period of time is going pretty well to demark what appropria-

18  tive right, if any, they secured.  Suppose that a man had

19  irrigated, appropriated and made a self-help approrpriation

20  and irrigated three acres in 1885 and then he didn't irrigate

21  any more until 1912.  In 1912 he decides that he is going to

22  take water to irrigate 35 acres.

23      MR. SACHSE:  He started a new statutory appropriation.

24      THE COURT:  The gap there is so broad that you would say

25  "No."

1    If, on the other hand -- trying to put ourselves back in

2    the position of the pioneers -- a man started taking water

3    for two or three acres, the next spring he takes for four

4    acres, the following year he adds five more, and with reason-

5    able diligence over a period of five or ten years he expands

6    it to where he has 25 acres, I think you could probably say

7    that this was all part of the first appropriation.  This is

8    certainly no firm opinion.  But I would contrast that situa-

9    tion with the situation where the man took three acres and

10   then thirty years later he is going to make it 33 acres.

11        Do you follow me?

12        MR. GROVER:  Yes, your Honor.  The general proposition

13   that your Honor pointed out is true, that you have to use

14   diligence, and it has to be within the intent of the original

15   filing.  That is one point of this filing.  It says "All of

16   the water of the Creek."  This witness who was there will

17   tell a story, a pioneer story of developing that land.

18        THE COURT: Obviously it couldn't be an appropriation of

19   all the water of the creek in the most favorable position,

20   because it was a dirt or rock fill, it didn't stop any

21   underground flow, it was subject to being washed out by

22   flood.  So at very best it is some part of the flow of the

23   stream.  It couldn't be all of it.

24        MR. GROVER:  But simply on the question of the intent to

25   expand, to go ahead and take as much as he could, it is a

point.

1    THE COURT:  What these people did after 1885 is going to

2  throw a lot of light on what their intent was.

3    MR. GROVER:  That is right.  And what I am trying to say

4  is, I don't believe there is any alternative to having this

5  witness here.

6    MR. VEEDER:  You have asked for a deposition and also a

7  continuance to bring in this man from wherever it is.

8    MR. GROVER:  From Dinuba.

9    Let me say who the two witnesses are.  Clinton Tripp, who

10  formerly owned it in the period before Mr. Johannsen and who

11  was the son of the original claimant, has had a heart attack

12  and doesn't want to appear in court at all and for a couple

13  of weeks I wouldn't be able to even have his deposition.  I

14  would like to have a deposition of his testimony.

15    L. J. Tripp, his older brother, who remembers the beginning

16  of the ditch, can come down.  It simply was not convenient

17  this week.

18    THE COURT:  Where does he live?

19    MR. GROVER:  In Dinuba, near Fresno.

20    THE COURT:  All right, call your next witness.

21    MR. GROVER:  Dr. Mann, please.

22    JOHIT.

23

24

25

1                    JOHN F. MANN, JR.,

2    called as a witness on behalf of defendants Gibbon and Cottle,

3    being first duly sworn, testified as follows:

4         THE CLERK:  State your name, please.

5         THE WITNESS:  John F. Mann, Jr.

6

7                    DIRECT EXAMINATION

8         THE COURT:  Are you the Dr. Mann who made some studies

9    of geology up around the Temecula area?

10         THE WITNESS:  I am the culprit, sir.

11         THE COURT:  I have been hearing about you for a long

12   time.

13         THE WITNESS:  Yes, I have heard many stories, your Honor.

14         THE COURT:  I am glad to see you here in the flesh.

15         Proceed.

16   BY MR. GROVER:

17         Q  Dr. Mann, would you give a brief summary of your

18   education in the field of geology?

19         A  I was graduated from the Colorado School of Mines

20   with a degree of geological engineer in 1943.  I received a

21   Master of Science and a Ph.D. in Geology from the University

22   of Southern California.

23         Q  What date?

24         A  The M.S. in 1947; the PhD. in 1951.

25         Q  And prior to 1951 did you engage in any practice

1 of geology?

2     A  Yes.  In 1943-44 I was an exploration geologist for

3 the Frontier Refining Company in the Rocky Mountains.

4     After that I entered the United States Navy.  Only a part

5 of that time was spent in strictly technical work.  I spent

6 several months at Bikini in preparation for the bomb tests

7 there.

8     Q  Was that geological work?

9     A  Yes, it was.

10     In 1946 I entered the University of Southern California,

11 graduate school, and was a part-time research assistant for the

12 U. S. Geological Survey.

13     In the summer of 1947 I was a field geologist for the

14 Amorado Petroleum Corporation.

15     In the summer of 1948 I was ground water geologist for

16 the U. S. Geological Survey at Long Beach.

17     From 1947 to 1949 I was a teaching assistant at the

18 University of Southern California, Geology Department.

19     It was during the 1948-49 year that I spent mapping in the

20 area of this lawsuit, the results of which have been published,

21 and I understand that some of that material has already been

22 received in evidence here.

23     MR. VEEDER:  You say the results of the lawsuit?

24     THE WITNESS:  The results of the lawsuit are in evidence?

25 No, sir, I don't believe.  I say the results-- I understand

1   that some of my results have already been received in this

2   lawsuit.

3           In 1949 to 1951 I was ground water geologist with the

4   Illinois State Geological Survey at Urbana, Illinois.

5           I returned to California in 1951 and became a Professor

6   at the University of Southern California, until February of

7   1958, at which time I resigned from full-time teaching to

8   enter the field of ground water geology as a consultant.   And

9   I have continued since that time teaching a course in ground

10  water geology at night at the University of Southern California.

11          Q  Is that course in geology at the University the only

12  course offered by the university in ground water geology?

13          A  Yes, it is.

14          Q  And what level?

15          A  It is a graduate course.

16          Q  For your Ph.D. degree did you write a thesis or a

17  dissertation?

18          A  Yes, I did.  It is California Division of Mines

19  Special Report No. 43. That is a summary of my dissertation,

20  and that is the report which covers the area of this lawsuit.

21          Q  Of what area, specifically?

22          A  Well, I mapped primarily the valley sedimentary rocks

23  extending from Wildomar to Aguanga.

24          Q  And what was the subject of the dissertation?  What

25  type of geology?

1    A   It was primarily a study of general geology, the

2   nature of the sedimentary materials in the valley, with

3   particular attention to faulting and other things like the

4   physiography and the contained fossils, what few there were.

5   But in general the overall geology.  It was not a special

6   report on ground water as such.

7    Q   Did it include matters, though, that relate to ground

8   water?

9    A   Oh, yes.  In the process of this I studied many of

10   the exhibits in the old Vail-Santa Margarita case that were

11   in the possession of Mr. Hall, who, I understand, has testified

12   here.

13    Q   Do you specialize in any particular branch of geology?

14    A   Yes, at the present time and for the last twelve years

15   I have specialized in water, and particularly so in the last

16   nine.

17    Q   Does that include underground water?

18    A   Primarily underground water.

19    Q   And when you say ground water, you mean underground

20   water?

21    A   Yes.  They are synonymous, essentially.

22    Q   Where is your office located?

23    A   My office is in La Habra, California.

24    Q   Could you give us a brief summary of some of the

25   activities, projects and clients you have been associated with

12409

1  in this practice of ground water geology?

2       A   Since 1952, I have been a consultant to the United

3  Water Conservation District in Ventura County.

4       Since 1952 I have been a consultant to the County of Los

5  Angeles, Division of Waterworks and Utilities.

6       Since 1954 I have been a consultant to the Pacific Coast

7  Borax Company.

8       These of course not fulltime work, but various projects

9  from time to time.

10      I have spent quite a good deal of time in the last three

11 years as a member of the Engineering Advisory Committee on the

12 San Fernando Reference-- the Los Angeles vs. San Fernando

13 suit.

14      And then more recently I was retained to represent the

15 Upper San Gabriel group in the Long Beach vs. San Gabriel

16 controversy.

17      Q   In the San Fernando Reference did you represent one

18 particular party?

19      A   I represent the City of Los Angeles Department of

20 Water and Power.

21      Q   And have you done any work on the Colorado River?

22      A   Yes, I testified for the State of California in the

23 Arizona vs. California suit in the summer of 1958, I believe.

24      Q   Have you made a particular study for your testimony

25 in this case of the area shown on Exhibits A and B and the

1    surrounding area?

2         A  Yes, in my original mapping in the spring of 1949 I

3    covered the entire area of the Gibbon and Cottle ranches.

4    I was called in to locate a well for Mr. Gibbon.  I believe

5    that was in 1954.  And then on March 15th, last week, I again

6    visited the property.

7         Q  Could you give us a general picture of the geology

8    of the Gibbon and Cottle property, with particular reference

9    to underground water supplies?

10        A  There are really only two formations beneath these

11   properties that are of much significance as regards water.

12   Underlying both these is the basement complex, which is rather

13   highly faulted.  There is a complex of faults running

14   through this property generally with a northwesterly trend.

15   The Temecula arkose, which is of Pleistocene Age, Ice Age

16   deposit, has shared in this faulting, and much of the

17   northerly and northeasterly portions of the property are

18   underlain by Temecula arkose.  The latest material deposited

19   here has been the Recent alluvium along Temecula Creek, and

20   that from the available well logs is on the order of 40 feet

21   thick.  The Temecula arkose beneath the property, from

22   existing well logs, is as much as 365 feet, although the

23   depth through the Temecula arkose and to the top of the

24   basement rock is dependent to a large extent upon which fault

25   block the well is located in.

12411

Q   Are there any underground water basins beneath the property of Gibbon or Cottle or both properties?

A   I believe the entire area of the ranch there could be considered part of an individual basin which has been recognized previously as Radec Basin.

THE COURT:   Now you say the entire area of the ranch. Are you referring to the colored portion on the map or the part up in the mountains?

THE WITNESS:   It is generally, your Honor, the area of low topography which surrounds the irrigated acreage.  It is in a regular basin with a bedrock canyon on the upper or southeasterly end, a bedrock canyon on the lower or northwesterly end, and the boundaries on the northeast side are somewhat less distinct because the Temecula Arkose is present there.  The bedrock is not at the surface.  But bedrock surrounds this basin on the southeast, the southwest, a good deal of the northwest, and the topography would limit-- would form the boundary on the northeast.

BY MR. GROVER:

Q   With reference to Exhibit 29R, would you with a pencil outline approximately the boundary of the basin that you have referred to?

A   (The witness marking the exhibit.)

MR. GROVER:   May the record show that the witness has outlined with black pencil an area encircling the intersection

12412

1    of Highways 71 and 79 on Exhibit 29R.

2        THE COURT:  I can't see it from here.

3        MR. GROVER:  Let's take it down.

4        THE COURT:  Let him make it in red pencil.

5        THE WITNESS:  (Marking the exhibit.)  Now, I would like

6    to explain.  I think merely drawing a line on a map in an area

7    that is this complexly faulted would be not presenting the

8    picture in the proper light.  In essence, we have here two

9    layers of geology.  The lower layer, the water-bearing layer,

10   consisting of the Temecula arkose, is highly faulted.  I

11   mapped on the southeastern portion of the Gibbon Ranch three

12   faults trending northwesterly which, although I have not

13   shown it, continues beneath the flat irrigated area-- the

14   effects of the faulting have been obliterated by cropping

15   practices there.

16       Q   By "effects" you mean the surface of the ground?

17       A   The surface of the ground, yes.  The faults are some-

18   what easy to follow where the topography is more rugged.  But

19   to the northwest beneath the main part of the basin the fault

20   lines cannot be traced.  However, I would be quite surprised to

21   see that those faults did not continue.  In my opinion, they

22   do continue underneath this basin and compartmentalize the

23   Temecula arkose beneath this area.

24       Q   What are the water-bearing materials in the basin?

25       A   Water has been found in the shallow Recent alluvium

1    which is on the southwestern edge of the basin, and also in

2    the Temecula arkose elsewhere in the basin.  The Recent alluvium

3    is confined to a rather narrow strip following the edge of the

4    steep topography on the southwest side.

5        THE COURT:  The basin as drawn by the witness on 29R lies

6    entirely within Section 19.

7        THE WITNESS:  Yes, sir, entirely within Section 19.  And

8    the strip of Recent alluvium which is recognized on the

9    surface by a rather sharp topographic break is present along

10   the southerly and southeasterly-- well, I guess it would be

11   southwesterly portionsof the basin.  It is only in that portion

12   of the basin that the loose Recent alluvium occurs.

13   BY MR. GROVER:

14       Q  Is the Temecula arkose water-bearing, though?

15       A  The Temecula arkose is water-bearing, as has been

16   demonstrated by all the wells on both these ranches, except

17   those that are drilled through the Recent alluvium.  However,

18   the water which is present in the Temecula arkose is replenished

19   with considerable difficulty from the flowing stream or from

20   the saturated Recent alluvium.

21       Q  Would you tell us what you mean by "Temecula arkose"?

22       A  The Temecula arkose is a formation consisting largely

23   of sands, some gravels and minor amounts of clays.  An

24   "arkose" is a variety of sand, you might say, which has a

25   particular mineral composition.  It has a great deal of felspar

1    as opposed to the normal sand, which is quartz.  Because of

2    this relatively large amount of Felspar and the ease with

3    which Felspar weathers, the permeability and porosity of the

4    Temecula arkose is far less than it would be in the recently

5    deposited alluvium.

6        Q  Is the Temecula Arkose what has sometimes been

7    described as "older alluvium"?

8        A  I would not consider these terms synonymous.  I

9    recognize two series of Older alluvium:  Younger in age than

10    the Temecula arkose but older than the Recent alluvium.  Now,

11    I don't know whether previously the Temecula arkose has been

12    included in this category.  I myself would not.

13        Q  Is there a specific name like Temecula arkose for the

14    younger alluvium you have referred to?

15        A  The younger alluvium?

16        Q  Yes.

17        A  No.  That is called Recent alluvium or RAL by almost

18    everybody.

19        THE COURT:  We tried to simplify this case and we got

20    about four categories that we have been using.  One is

21    basement complex.  Then next we have the--

22        MR. VEEDER:  Residuum.

23        MR. SACHSE:  Residuum and weathered basement.

24        THE COURT:  And next the older alluvium, and the younger

25    alluvium.

1    THE WITNESS:  If we are forced into this simplification,

2   then we have three in this area.  We have basement rocks.

3   They are lumped, but they are two distinct types here, an

4   older aluvium represented by the Temecula arkose and the

5   Recent alluvium, the uncemented loose material of high

6   porosity and permeability.  These are the three types we have

7   in this area.

8   BY MR. GROVER:

9    Q  Have you noted in your examination where the wells

10   shown on Exhibit Gibbon and Cottle B are in relation to the

11   three types of formations you have described?

12    A  Yes.  The two wells in the Recent alluvium are the

13   so-called Gibbon Creek Well and the Cottle No. 2.  These are the

14   two I understand that are involved now in the boundary

15   controversy.  They are down in the flat sandy area in generally

16   the lowest part of the ranch.  All the other wells on the

17   ranch, I believe, are spudded in, they start in the Temecula

18   arkose.

19    Q  And when you say "start," do you mean they end

20   somewhere else?

21    A  Yes, some of them end in basement rock-- I believe

22   all of them end in basement rock.

23    THE COURT:  Does the basement rock or basement complex

24   underlie the arkose?

25    THE WITNESS:  Yes, sir.

1      THE COURT:  They wouldn't go very far into the basement

2 rock, would they?

3      THE WITNESS:  Normally, one doesn't drill very far into

4 the basement rock, but here for some reason or other they

5 have drilled extra deep into basement rock.  We have, I think,

6 some of the wells 200 feet into basement rock, and I don't

7 feel necessarily that this has been advantageous from the

8 standpoint of water production.

9      Q  The basement rock then is not water-bearing?

10      A  It is where it underlies a Recent alluvium and where

11 it closely underlies the Temecula arkose.  But there would be

12 the problem, if the well were pumped, it may produce for a

13 short while and then the water supply would give out, because

14 it is only from the fractures that the basement rock can

15 produce.

16      Q  Would you describe the sources of water in the various

17 materials-- forget the basement complex-- in the Recent

18 alluvium and the Temecula arkose; would you describe the sources

19 of water for those parts of the basin?

20      A  In the Recent alluvium the primary source of water is

21 the water which comes down Temecula Creek and when ground

22 water storage is available will percolate to the underground,

23 and there would also be a small amount of deep penetration

24 of rainfall on the Recent alluvium.  In the Temecula arkose

25 the sources would be the return of irrigation water which is

1  applied at the surface, deep penetration of rainfall, and to

2  a restricted extent underflow from the saturated Recent

3  alluvium.   I say restricted because there are many faults in

4  here, and I don't believe that the northeasterly flow under-

5  ground beneath this basin from the saturated alluvium, which

6  is the main, the prime source of water in this basin, is

7  going to be at a very great rate.

8      Q   May I have the last part of the answer?  You don't

9  believe the underflow--

10      A   The underflow from the saturated Recent alluvium and

11  the water levels in these wells, in the presence of

12  phreatophytes close to the surface, all demonstrate that at

13  least a large percentage of the time the water is close to the

14  surface.  Now if the Temecula arkose were to be recharged

15  most advantageously, the water would move from the saturated

16  alluvium northerly and easterly beneath the Temecula arkose.

17  But the Temecula arkose itself having a good deal of clay,

18  at least in the pores, and having relatively low permeability

19  and low porosity, and especially because of the extensive

20  faulting in here, would be replenished from this larger

21  source of water at a low or very restricted rate.

22      Q   You mentioned that return irrigation water would be a

23  source of water for the Temecula arkose, but I don't believe

24  you said it would be in the case of the Recent alluvium.  I

25  may have misunderstood you.

A   No, I made that statement on the basis that I have
never seen any, nor have I heard of any agricultural practices
on the Recent alluvium itself.  This is subject to flooding
the entire area of the Recent alluvium.

Q   But if there were irrigation there?

A   If there were irrigation there and there were room
underground, or if one were to consider overflow from the lands
to the northeast, then perhaps some irrigation water might
get back to the Recent alluvium.

Q  Would such overflow occur if flood irrigation were
practiced in the fields above, that is, hydrologically above
the Recent alluvium?

MR. VEEDER:  That is objected to as being too speculative,
your Honor.

THE COURT:  Overruled.

THE WITNESS:  I don't believe I am familiar enough with
the permeability characteristics of these soils to determine
whether this would happen.

BY MR. GROVER:

Q   Might there be any return irrigation water that
percolated into the Temecula arkose that underground would
move to the Recent alluvium?

A   Well, I would feel that the water so applied to the
Temecula arkose would have difficulty in doing that because
of the faulting.

THE COURT:  I don't know whether you understand his ques-
tion.. Suppose that wells were put down in the area of younger
alluvium and they were pumped out, if you can imagine that,
they have taken all the water out of the younger alluvium.
Would there be any draining of water from the arkose into
where there had formerly been water in the younger alluvium?

THE WITNESS:  A very small amount, your Honor.

BY MR. GROVER:

Q. Now, directing your attention to particular wells and
to the source of water which you have described as replenish-
ments from the underground of the stream, could you give us
any quantitative measure of the extent to which the stream might
replenish the areas which are the source of water pumped out
of those respective wells?

MR. VEEDER:  May I have the question?

THE COURT:  Read it.

MR. GROVER:  Perhaps I would do better to start over.

THE COURT:  You might do better, because you have wells
both in the younger and in the arkose.

BY MR. GROVER:

Q  Well by well, could you tell us the extent to which
water pumped from each well as youcome to it would be re-
plenished by the underflow of the stream?  Well, let's just
take one well.

A  I could perhaps answer this better by pointing out a

1    pattern, and this is based upon probability and observations

2    of my own, plus information that has been supplied to me about

3    the production of these wells.

4    MR. VEEDER:  That is precisely my objection.  I don't

5    believe there has been any foundation laid that this man has

6    made an investigation on which to give an answer to the

7    question, your Honor.  I don't believe there is any founda-

8    tion for this line of inquiry.

9    THE COURT:  Have you investigated the production of

10   these wells that are located on the Gibbon and Cottle property?

11   THE WITNESS:  Yes, I have.

12   THE COURT:  Have you seen these well tests?

13   THE WITNESS:  No, I have not seen the well tests.  I

14   have seen only the data that has been supplied to me, the data

15   which Mr. Rowe presented this morning.

16   THE COURT:  That included some drilling logs and some

17   well tests?

18   THE WITNESS:  Yes.

19   MR. GROVER:  Exhibits Q and R.

20   THE WITNESS:  I believe so.  The well tests that were

21   admitted in evidence this morning.

22   THE COURT:  Overruled.

23   THE WITNESS:  This could be answered I think best as the

24   general pattern of recharge, because we do have these northwest

25   trending faults.  The farther the well is from the Recent

alluvium of the stream the less chance it has of getting
appreciable recharge.  I think that is the only way this can
be done-- is generally.  So that the wells close to the
Recent alluvium would have an opportunity for more recharge
than those that are farther away, and the ones that are
farther away, like the field well on the Gibbon property,
which is located on Gibbon and Cottle Exhibit A, the field
well, I believe, would have very poor recharge.

MR. VEEDER:  May I interrupt.  Very poor recharge from
Temecula Creek or from -- you are limiting your statement to
Temecula?

THE WITNESS:  Yes, with respect to that.  And since the
other two items that I mentioned, the return of irrigation
water and the deep penetration of rainfall, are quantitatively
not large, I think the statement would apply generally also.

THE COURT:  If the rate of movement of water through
this arkose is so small as you have indicated by several
answers, why do you characterize this as a basin?  It is
composed largely of the arkose.  The only younger alluvium
is a very thin strip close to the stream.

THE WITNESS:  It was with this in mind that I wished to
qualify my diagram here immediately.  There would be some
question in my mind whether the thing should be called a
basin in the usual sense.

MR. GROVER:  I believe the witness has explained that

1  there is faulting within it.

2  Q  But let me put it this way:  Is all the outline that
3  you put on Exhibit 29R, is that all one continuous under-
4  ground water basin?

5  A  It is continuous, yes, with restricted movement from
6  one place to the other.  This would perhaps qualify more as
7  a topographic basin than it would as a ground water basin.

8  Q  What do you mean by "topographic basin"?

9  A  Well, it is a saucer-shaped affair with holes all
10  around it.

11  THE COURT:  And with the stream down to bedrock northwest
12  and southeast?

13  THE WITNESS:  Yes, sir; bedrock canyons at the upper
14  and the lower ends.

15  BY MR. GROVER:

16  Q  But there is water that can be pumped out of the
17  Temecula arkose from storage, is there not?

18  A  That is correct.

19  MR. VEEDER:  Did you say from storage?

20  MR. GROVER:  Yes.

21  Q  Directing your attention to the field well, what
22  would be the effect upon the Temecula River surface or under-
23  ground of pumping from the field well?

24  A  Essentially none.

25  Q  Directing your attention to the other wells closer

12423

1    to the river, what would be the effect?

2        A  I believe the wells, especially these that are

3    labeled Gibbon 1 and 2, being right next to the block and

4    next to the saturated alluvium, I could visualize that they

5    would be getting more recharge from the river directly, merely

6    on the basis of the proximity.

7        Q  How about the corral well?

8        A  The corral well, there are probably at least two

9    faults that intervene between the corral well and theRecent

10   alluvium in the river, and I would say that the recharge

11   directly from the river would be poor.

12       Q  And the valley well?

13       A  The valley well would be the poorest of all.

14       THE COURT:  The valley well would be outside the basin

15   where you drew it, wouldn't it?

16       THE WITNESS:  Yes, sir, it might be.  I think the

17   production of the well bears it out.  However one wishes to

18   look at this definition of a basin, it is a very poor well;

19   24 feet of overburden and basement.

20   BY MR. GROVER:

21       Q  How about the well that is labeled 19K1 up on the

22   Cottle property?

23       A  It would be in a more favorable position for recharge

24   from the river.

25       Q  Is that the windmill well, let me ask?  It's near the

center of Section 19 just above the "E" in "Radec"?

A  I don't know whether there is a windmill well on this.
I am going merely from a position with respect to the Recent
alluvium.

Q  How about Cottle No. 1?  Would that be about the same?

A  Yes, I would approach that about the same.

MR. GROVER:  That's all I have, your Honor.

THE COURT:  I would say that a comparison of Exhibit 15
and the colored ground on Exhibit B and the basin south of the
roadway as drawn on Exhibit 29K all bear a marked similarity.

Will there be extensive cross-examination of this witness?

MR. VEEDER:  It depends a great deal on the answers to
some of the questions, your Honor.

THE COURT:  If you think you can get through in some
reasonable time I will stay for awhile.

MR. VEEDER:  I don't believe we have much dispute with
the man.

THE COURT:  It seems to fit in with other information we
have already received in evidence.

MR. VEEDER:  I would like to ask him a question, though,
in regard to what he means by "compartmentation" as a result
of faulting.

CROSS-EXAMINATION

1  BY MR. VEEDER:

2      Q  What does that mean in regard to, for example, the

3  field well? Would that be a well which would be subject to

4  compartmentation as you use the term?

5      A  Yes, very definitely so.  If you can imagine a surface

6  of basement rock covered with Temecula arkose, and then a

7  combination of these two faulted so that the arkose is deeper

8  in some places than it is in others, then each of these zones

9  between a pair of faults I would call a compartment.

10     Q  Would it be proper to say that has an effect upon the

11  permeability of the soil?

12     A  Not of the soil, but of the aquifers transmitting the

13  water in the ground, yes.

14     Q  So your conclusion in regard to this Temecula arkose,

15  from the standpoint of its water-bearing quality, is to a

16  degree slanted, so to speak, by reason of the earth movement

17  and faulting, et cetera?

18     A  Very definitely so, yes.

19     Q  So you would not generalize, in other words, in regard

20  to these sedimentary deposits as to their water-bearing

21  qualities?  Do you call those sedimentary deposits?

22     A  Yes, I think it is a very fair generalization to say

23  that the Temecula arkose is nowhere near as good a water-

24  bearing formation as the Recent alluvium.  I think that

25  generalization is proper.

Case 3:51-cv-01247-JO-SBC   Document 4610   Filed 09/24/63   PageID.33319   Page 162 of 426
170

1    THE COURT:  We are all agreed on that.  We have been

2  all through that.

3    MR. VEEDER:  I am trying to bring out, though, the fact

4  that in the Gibbon and Cottle lands this permeability or

5  transmissibility of the formation is affected materially by

6  faulting.

7    THE WITNESS:  Oh, yes.  In fact, the low permeability of

8  the fracture zones may control and prevent movement of water

9  from one compartment to the other.

10    THE COURT:  And conversely there could be better movement

11  in a fracture joint, couldn't there?

12    THE WITNESS:  Your Honor, in the Temecula arkose the

13  nature of the material is such that when it is faulted, as

14  far as I have seen, almost invariably the fault becomes a

15  barrier to the movement of water rather than a channel.  Now

16  this would not be true in the basement rocks, in the brittle

17  rocks.

18    THE COURT:  Are you saying now that you have found such

19  faulting that the field well is in a compartment, or are you

20  merely saying that it could well be in a separate compartment?

21    THE WITNESS:  In extending the Aguanga fault, which I

22  have mapped and which appears on Exhibit 15, the trace of

23  this passage between the field well and the river, and there

24  are also two other faults which I mapped which do not appear

25  on Exhibit 15 which would also appear betwwen the field well,

1    so there are at least three faults between the field well and

2    the river.

3        THE COURT:  Do those faults also lie between the valley

4    well and the river?

5        THE WITNESS:  With reference to the valley well I haven't

6    actually spotted that position with regard to the Aguanga

7    fault, but there would be at least two faults between the

8    valley well and the river.

9        THE COURT:  What about the corral well?

10        THE WITNESS:  The corral well I believe there would also

11    be at least one fault between there, and we are dealing with--

12    I have mapped the faults in here, the ones that are obvious,

13    and there still may be others that I didn't find.  It quite

14    often occurs in a situation like this.

15    BY MR. VEEDER:

16        Q  Are you implying that those faults would be impermeable

17    barriers to the transmission of water from the younger

18    alluvium on up to the field well area?

19        A  They would act certainly as barriers of very low

20    permeability.  Saying "impermeable" may be a little too

21    extreme, but it would restrict or stop movement of water to the

22    northeast.

23        Q  And the recharge then for the area from which the

24    field well has its source would be penetration from rainfall;

25    is that it?

1    A  Yes.

2    Q  Primarily.

3    A  And the irrigation return, such as there would be

4  there.  The water which is in storage there, I believe, has

5  entered extremely slowly over a period of perhaps centuries.

6    Q  So the dewatering of it could take on a permanent

7  aspect, in your opinion?

8    A  Yes, sir, definitely.

9    Q  If water is diverted out of Temecula Creek and

10  conducted down to the area of the field well and used there

11  for irrigation purposes, would you say there would be

12  virtually no return flow once it entered the ground water,

13  once it went into the Temecula arkose?

14    A  There would be virtually no flow from the applied

15  irrigation water?

16    Q  I am pointing to field No. 5 now.

17    A  You said the field well.

18    Q  Well, the field well is right adjacent to it.

19    A  It is quite possible that the water which is in the

20  field well has been derived from the surface, from deep

21  penetration of rainfall, and if there is excess irrigation

22  water applied it would tend to work down there, too.

23    THE COURT:  I didn't get the answer to that.  The question

24  is, would irrigation from the ditch there on Field No. 5 tend

25  to create any return flow to the creek?

1      THE WITNESS:  I don't believe return flow to the creek

2  would be a consideration here.

3  BY MR. VEEDER:

4      Q  Now, respecting the wells which you pointed out are

5  in the younger alluvium-- you said the creek well, can you

6  point that out to me-- you think the use of water from there

7  would be tantamount to a diversion from the stream itself; is

8  that correct?

9      A  To the extent that the creek well is pumped and lowers

10  the water level in here, ground water storage in the Recent

11  alluvium would be made available and would intercept surface

12  flow.

13      Q  And that would be true of the other wells to which

14  you made reference?

15      A  The Cottle No. 2 would produce this sort of inter-

16  ception.  And then to the extent that the other wells close

17  to the bluff, close to the edge of the Recent alluvium were

18  able to get water from the Recent alluvium, they too would

19  intercept water.

20      Q  And in the process of dewatering areas of your pumps

21  in No. 2 here, that would in effect be recharge from the

22  stream itself; is that correct?

23      A  Yes.

24      Q  And would be a burden upon the stream?

25      MR. GROVER:  I object to the word "burden upon the stream."

12430

THE COURT:  All right, reframe it.  Ask it so you don't
get an objection.

BY MR. VEEDER:

Q   It would reduce the surface flow to that extent?

A   To the extent that the well is pumping while the stream
is flowing, it would intercept the flow of the stream, yes.

Q   Wouldn't it also be true that it would dewater the
water-bearing strata even if the surface flow was not present?

A   It would make ground water storage available.  That is
true.

Q   Have you observed the creek from the point of diversion
as shown on the upper ditch down to the boundary line of the
Cottle property to the north?

A   Yes, I have.

Q   And that entire area there is underlain, is it not,
with younger alluvium?

A   That is true.

Q   Have you had an opportunity to consider the depth of
that younger alluvium?

A   Only from the log of the creek well, which shows 40
feet of Recent alluvium, and downstream by the appearance of
the large granite boulders the Recent alluvium must become
thinner.

Q   And to the extent that you dewater that younger
alluvium you reduce the quantity of surface flow of water

1    away from the property; is that true?

2        A  Except for one thing, and this is a matter of the

3    phreatophyte loss within the basin.  I think it is possible

4    to manage this basin by pumping from the alluvium in such a

5    way as to reduce these phreatophyte losses, because they are

6    very bad in the lower end of the property.

7        Q  And that is on the Cottle place?

8        A  That is on the Cottle place, yes.

9        Q  What is the general movement of the ground water?

10   Have you made any study on that?  Is it to the northwest or

11   to the northeast?  In general, have you made any study on that?

12       A  I don't believe I have sufficient well level informa-

13   tion to be sure.

14       Q  You have no opinion on that?

15       A  No.

16       THE COURT:  Well, south of the stream there is no move-

17   ment because that is basement complex, isn't it, on the

18   southern part of the stream?

19       THE WITNESS:  Yes.

20       THE COURT:  So any movement would have to be on the

21   north or the northeast side of the stream?

22       THE WITNESS:  Yes.

23       MR. VEEDER:  I have no further questions.

24

25

12432

CROSS-EXAMINATION

BY MR. STAHLMAN:

Q  Your method of determining faults is by visual observation, is it?

A  Walking along the ground.

Q  And as I understand it, when you are in the more rugged terrain it is more perceptible than on the areas where, for instance, it is overlain with the Temecula deposits-- what do you call that?

A  Arkose.  Yes, it is more evident, generally, the steeper the topography becomes.

Q  As you get down further into the valley you do have further down in the valley greater deposits of Temecula arkose, do you not?

A  Yes, sir.

Q  Larger areas.  And of course in that area the ground is covered with that deposit of Temecula arkose and faults may exist there which are not discernible; is that true?

A  Oh, yes.

Q  And would you say that the area throughout the entire Temecula Valley is quite well faulted?

MR. GROVER:  May I have a definition of "Temecula Valley"?

MR. STAHLMAN:  Well, we will take the area from the Temecula Gorge up to the area that we are speaking of here.

MR. VEEDER:  I object; that goes beyond the scope of the

1   direct examination.

2          THE COURT:  It certainly does.

3          MR. STAHLMAN:  I think it does, too.

4          THE COURT:  We will be here all night if we go into that.

5          MR. STAHLMAN:  Are you objecting to it and the Court

6   sustaining the objection?

7          MR. VEEDER:  Yes.

8          THE COURT:  I am objecting to it, and the objection is

9   sustained.

10         MR. STAHLMAN:  We are not going to be here all night, I

11  can assure you of that.

12         I would like to have found out about it, if I could.

13         MR. VEEDER:  Well, you tried, George.  It is beyond the

14  scope of the direct examination.  If you want to make him

15  your witness, do it tomorrow.

16         THE COURT:  Do you want to excuse the Doctor?

17         MR. STAHLMAN:  I would like to have him back tomorrow,

18  but I am not going to insist on it.

19         THE COURT:  Are you through with him, Mr. Grover?

20         MR. GROVER:  Yes, your Honor.

21         THE COURT:  Thank you, Doctor.  You may be excused.

22         How far did you get today Mr. Grover?  What is your

23  program for tomorrow?

24         MR. GROVER:  The program for tomorrow is to put on

25  witnesses who are familiar with the history of irrigation

1  in the more recent period.

2  THE COURT:  Will you take all day?

3  MR. GROVER:  It could take all day, your Honor. The

4  witnesses are Mrs. Gibbon, Mr. Cottle and Mr. Spaniol.

5  THE COURT:  And then you are through?

6  MR. GROVER:  Yes, your Honor.

7  THE COURT:  So that we can try some other cases on

8  Friday, maybe?

9  MR. GROVER:  I believe we could finish, yes.  I assume

10 that Col. Bowen will be a witness, too.

11 THE COURT:  He will be available.

12 MR. GROVER:  I don't have a great deal to ask him.  But

13 he will not be my witness, of course.

14 THE COURT:  Let's adjourn until 10 o'clock A.M. tomorrow.

15 MR. SACHSE:  Is Mr. Rowe excused?

16 THE COURT:  Do you want to excuse Mr. Rowe, too?

17 MR. GROVER:  I don't believe I need him.

18 THE COURT:  You are excused, too, Mr. Rowe.

19 10 o'clock tomorrow.

20 (Adjournment until Thursday, March 24, 1960, at 10 A.M.)

21

22

23

24

25