# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No. 1247-SD-C

---

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Thursday, March 24, 1960

**Pages:**   12435 to #12589

## FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

**JOHN SWADER**
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211   Ext. 370

1

2

IN THE UNITED STATES DISTRICT COURT

3

SOUTHERN DISTRICT OF CALIFORNIA

4

SOUTHERN DISTRICT

5

6
UNITED STATES OF AMERICA,           )
                                    )
7
                    Plaintiff,      )
                                    )
8
        vs.                         )            No. 1247-SD-C.
                                    )
9
FALLBROOK PUBLIC UTILITY            )
DISTRICT, et al.,                   )
10                                  )
                    Defendants.     )
11

12

13
REPORTER'S TRANSCRIPT OF PROCEEDINGS

14

15
San Diego, California
Thursday, March 24, 1960

16

17  APPEARANCES:

18        For the Plaintiff            WILLIAM H. VEEDER, ESQ.,
                                       Special Assistant to the
19                                     Attorney General,
                                       Department of Justice,
20                                     Washington, D. C.

21                                     LCDR. DONALD W. REDD.

22

23

24

25

12436

APPEARANCES (Continued)

For Defendant Fallbrook
Public Utility District,                FRANZ R. SACHSE, ESQ.
et al.

For Defendant Vail                      GEORGE STAHLMAN, ESQ.
Company

For Defendant State of                  STANLEY MOSK, ESQ.,
California                              Attorney General,
                                        By FRED GIRARD, ESQ.,
                                            Deputy Attorney General.

For Defendants                          GEORGE GROVER, ESQ.
Gibbon and Cottle

## INDEX TO WITNESSES

| For Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| William Cottle | 12439 | 12466 | 12481 | 12483 |
| Katharine Gibbon | 12487 | 12513 | 12515 | |
| Gustav A. Spaniol | 12517 | 12543 | 12555 | |

For Plaintiff:

| | D | X | RD | RX |
|---|---|---|---|---|
| Allen C. Bowen | | 12471 | | |

1                          INDEX TO EXHIBITS

2    **Plaintiff's Exhibit -**              Iden.        In Evidence

3                229                                        12570

4                230                                        12570

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    San Diego, California, Thursday, March 24, 1960.  10:00 A.M.

2

3         THE CLERK:  Two, 1247-SD-C, United States vs. Fallbrook.

4    Case on trial.

5         THE COURT:  Proceed.

6         MR. GROVER:  Mr. William Cottle.

7

8                        WILLIAM COTTLE,

9    one of the defendants herein, being first duly sworn, testified

10   as follows:

11        THE CLERK:  State your name, please.

12        THE WITNESS:  William Cottle.

13

14                     DIRECT EXAMINATION

15   BY MR. GROVER:

16        Q  Mr. Cottle, are you the William W. Cottle who is a

17   defendant in this case?

18        A  I am.

19        Q  And have you read the answer which has been filed on

20   your behalf in this case?

21        A  Yes.

22        Q  And are you familiar with the description of the

23   property which the answer alleges that you own?

24        A  Yes.  That is the legal description, you mean?

25        Q  Yes.

1    A   Yes.

2    Q   And do you own that property?

3    A   Yes.

4    Q   I call your attention now to an exhibit which has

5  been given the number Gibbon and Cottle B.

6    THE COURT:  You own this property yourself; not you and

7  your wife?

8    THE WITNESS:  No, it is in both our names.  But it was a

9  gift to me, but it is legally in both our names.

10    THE COURT:  And your wife's name?

11    THE WITNESS:  Gertrude.

12    THE COURT:  Is that set forth in the answer?

13    MR. GROVER:  I don't recall.  I will double check it.

14    THE COURT:  Get it for the record.

15    MR. GROVER:  Yes, your Honor.

16    Q Calling your attention to Gibbon and Cottle Exhibit B,

17  is the property which you own and described in your answer the

18  property outlined in green on that exhibit?

19    A   With that one exception of the disputed part.

20    Q   Yes, that has already been called to the attention of

21  the Court.

22    A   All right.

23    Q   When did you acquire this property?

24    A   In 1941.

25    Q And from whom?

1    A   From my father.  It was a gift; one-half from my

2  father, the other half was purchased from my aunt.

3    Q   Who was that?

4    A   Anna J. Marcy.

5    Q   Have you seen the property and been familiar with it

6  since the time you acquired it?

7    A   Yes, almost every week.  Is that what you mean?

8    Q   Yes.

9    A   Yes.

10   Q   How about before the time you acquired it?  Were you

11 familiar with the property?

12   A   Yes.

13   Q   And what is the earliest knowledge you have from

14 direct observation of the property?

15   A   Well, driving by on the highway, it would be back in

16 the late '20's.  That was while visiting a friend's ranch

17 down below.  But my father bought it in 1936.  That was my

18 first knowledge really of all the property.

19   Q   And have you been familiar with the conduct of the

20 property, with the management of the property, the cultivation

21 of it since 1936?

22   A   Yes.

23   Q   Calling your attention to Exhibit Gibbon and Cottle A,

24 which is this one over here, are you familiar with the various

25 fields which have been shown on there and which have been

1   given letter designations?

2       A   Yes.

3       Q   Could you, field by field, give us your recollection

4   of the use which has been made of each field, with particular

5   attention to the irrigation practices?  And it might be helpful

6   if you step down here.

7       A   What period of time do you want to start?

8       Q   Well, just start with your earliest knowledge.

9       A   That would be 1936.  To the best of my recollection,

10  in '36 when my father purchased the property this field F and

11  C and E and B and J and I were all in either native grass

12  and alfalfa-- some of them were in alfalfa, and the balance

13  was in native grass, and they were all irrigated.

14      MR. SACHSE:  Would you please review those letter desig-

15  nations again, Mr. Cottle?

16      THE WITNESS:  Yes.  F and C and E-- that is up by the

17  house.  Part of that was grass and part of that was in orchard.

18  Those are the two small fields right around the house.  And

19  then below the improvements there, field B and Field J and

20  field I.  And then there was some overflow in this other field

21  H.  Down here was a green patch of maybe a fourth--

22  BY MR. GROVER:

23      Q   When you say "down here"--

24      A   This field H.  There was some green, more or less

25  from overflow water, probably about one-fourth, not over half

1    of that.  But it was later enlarged.

2        Q  Was that irrigated?

3        A  It was overflow water, yes.

4        Q  By overflow water you mean overflow from what?

5        A  From the upper fields, from the fields above.  Then

6    this field D was first in gardening and more recent years in

7    alfalfa.  That has been watered with sprinklers more recently.

8        THE COURT:  When was it first in gardening?

9        THE WITNESS:  I would say about 1945.  About half of it.

10       THE COURT:  And was it irrigated at that time?

11       A  Yes, by an engine pump out of the reservoir.

12       THE COURT:  And when was it completely cultivated?

13       THE WITNESS:  Enlarged and put in alfalfa in about 1941-

14   42, I would say.

15       MR. VEEDER:  I am going to object to any more evidence

16   from this witness on the ground that it is incompetent,

17   irrelevant and immaterial and not proving any issue in the

18   case.

19       If I understand the present status of the record, your

20   Honor, these defendants are seeking to prove appropriative

21   rights, as nearly as I can tell.  We have the filing that

22   was made, or at least the notice that was allegedly posted

23   and the filing of that notice back in 1885.  It is absolutely

24   impossible for me to tie up any of this irrigated acreage with

25   the pleadings that have been filed or with that claim that

1    has been made.

2         I want to interpose these objections and then put in a

3    motion to strike.

4         If I understand the California law, he has to tie it up

5    sometime, your Honor.  He has to tie it back to some kind

6    of appropriative claim, if I understand his pleadings.

7         I am objecting on the grounds that there is absolutely

8    no basis at this juncture to claim any right under the laws

9    of California, if I understand the course he is pursuing.

10   He has made no filing with the State.  We can't tell whether

11   the water was originally used in 1885.

12        THE COURT:  Mr. Veeder, we are all familiar with this.

13   Your objection is overruled.  If it turns out that the answer

14   doesn't properly set forth the claims, the answer can be

15   amended in conformity with the proof.  But you can't prove

16   any case by one witness or one iota of evidence.  Certainly

17   the evidence that the garden was irrigated from a well doesn't

18   prove an appropriative right from the ditch, but it does go

19   to show that there was irrigable ground and that use was made

20   of the water.  I don't see any reason at this time for any

21   objection.

22        MR. VEEDER:  If you would let me finish, your Honor.

23        Then unless he ties this back to some witness who can

24   show when the water was first applied the intention to

25   appropriate and to bring it down to the acreage that is

1  presently shown here, I will move to strike all of the evidence

2  that is presently going in.  I want to preserve that right.

3      THE COURT:  You always have a right to move to strike.

4  I am not going to limit you there.  But I think Mr. Grover

5  knows something about water law and is competent to present

6  his case.  The objection is overruled.

7  BY MR. GROVER:

8      Q  Mr. Cottle, to correct a misimpression at this time,

9  I believe, the reservoir you referred to--

10      THE COURT:  Reservoir?

11      THE WITNESS:  It was a reservoir that we were pumping out

12  of to the garden, and not a well.

13      MR. GROVER:  We will get to the methods of delivering

14  the water later, your Honor.

15      THE COURT:  Then this garden that was irrigated beginning

16  in 1941 was irrigated from a reservoir?

17      THE WITNESS:  That is correct.

18      THE COURT:  Is that the one shown in Parcel B?

19      THE WITNESS:  Yes.

20      THE COURT:  And when it was put into alfalfa it was then

21  also irrigated from the reservoir?

22      THE WITNESS:  From the reservoir.  And you will note at

23  the top of B there is a ditch that runs along the top of B.

24  Some of the water comes from there by gravity.  This was

25  irrigated from that ditch.

BY MR. GROVER:

Q   Would you continue, then, Mr. Cottle, the description of water used.  Have you discussed field J?

A   Field J, as I remember, was in alfalfa in 1936 or soon after that.  My father put it in.  It was in Alfalfa when I had the ranch in 1941.

Field H was enlarged in the late '40's.  I am sorry I don't have the date.  Field H was enlarged some.  I told you before that the lower corner was enlarged, and then it was bulldozed out-- some cottonwood trees in the creek bottom.

THE COURT:  In what year?

THE WITNESS:  It was in the late '40's, to the best of my recollection.

THE COURT:  Then was water used on any of that?

THE WITNESS:  When we had it.  Starting in the late '40's when we started having a water shortage.

THE COURT:  Would that be on all of H, or on just part of it?

THE WITNESS:  I would say on most of it.

BY MR. GROVER:

Q   When you refer to water troubles, what do you mean?

A   I mean this, that when we first had the ranch and before when my father had it, using surface irrigation, we could pretty well cover it; but as the water went down and people started pumping up above we had less water and then

1 couldn't sprinkle, because I wasn't using well water.  I was

2 depending upon the ditch water and I had to spread it the

3 best I could with the amount of head I had, and some of these

4 farther fields I couldn't reach.

5     Q  How about field G?

6     A Field G has always been in grain.  I have never

7 irrigated it myself.

8     Q  Are you familiar with the irrigation of that field?

9     A  G?

10 MR. VEEDER:  It has never been irrigated, he said.

11 MR. GROVER:  He said he had never irrigated it himself.

12     Q Was it ever irrigated?

13     A  That I don't know.

14     Q  You just don't know?

15     A  I don't know.

16     Q  How about field A?

17     A Field A I continued the ditch that runs along the

18 highway there and built a flume across, and if I had any

19 water it would be just a little excess water, and that was

20 many years ago.  It hasn't been irrigated for years because

21 of lack of water.

22 THE COURT:  How much of it did you ever irrigate?

23 THE WITNESS:  Oh, I would say half at the best.

24 BY MR. GROVER:

25     Q  Fields F, C, E, B, J and I, then, you say, have been

1    irrigated since 1936?

2        A   Say that once more, please.

3        Q   Fields F, C, E, B, J and I have been irrigated since

4    1936?

5        A   That is right.

6        Q   And are they being irrigated now?

7        A   To the extent that we have water.  But for instance

8    field J, which has a lower ditch, there is water in the early

9    spring, but after that in the summer I can't irrigate it the

10   last several years.

11       Q   How about field I?

12       A   That would be the same.  It has been irrigated this

13   year, but it will not be this summer, probably, unless there

14   is better water than we have now.

15       Q   Field D, you say, went into alfalfa in 1942.  Has it

16   been continuously in alfalfa since that time?

17       A   Yes.

18       Q   And has it been irrigated?

19       A   Yes.  That is irrigated out of the reservoir, as it

20   was before.

21       Q   How is this irrigation carried on, Mr. Cottle, and

22   what is the source of the water for it?

23       A   Well, I am dependent entirely upon the ditch.

24       Q   Upon which ditch?

25       A   The main ditch that runs along here, what we call the

1    main ditch.

2        Q  Is that sometimes referred to as the upper ditch?

3        A  The upper ditch, yes.  I am dependent upon that.  It

4    flows into a reservoir.  From that reservoir I pump into this

5    alfalfa field which is above the ditch.  The balance of it

6    has to be by surface irrigation either out of this reservoir

7    or out of this ditch that runs along the top, or this lower

8    field out of this lower ditch.

9        MR. VEEDER:  Where did you point to the reservoir when

10   you started?

11       THE WITNESS:  Up here.

12   BY MR. GROVER:

13       Q  At the most northerly part of your property?

14       A  Yes.  It is fairly close to the highway, you can see,

15   and the grade is such that the water from there runs right

16   around there like that.

17       Q  Do you take water out of the upper ditch continuously?

18       A  Well, except as my sister and I divide it.  I usually

19   take it three and a half days and she takes it three days and

20   a half.

21       Q  You say usually?

22       A  We have changed that over the years.  We have taken it

23   different number of days over the years.  Always divide it.

24   One time I remember back many years ago we each took it a week

25   at a time.  Then later when we had less water we started down

1   to three and a half days each.  So we have each used it

2   continuously, yes.

3       Q  Have the arrangements been on the basis of a one-half

4   interest in each of you?

5       A  Always.  By written agreement and by use.

6       Q  Has the water from the ditch been used every year since

7   1936?

8       A  Yes.

9       Q  And has the ditch ever been damaged or washed out or

10  any of the facilities from time to time?

11      A  Yes.

12      Q  And what has happened when that has occurred?

13      A  Well, I think in 1936 or '37-- I have forgotten the

14  year when my father had been washed out-- usually fixed it

15  in a few days.  It was dirt and rock dam.

16      Q  Have you or has anyone allowed it to remain washed

17  out and unused for any substantial length of time?

18      A  No, it has been fixed immediately in every case.  We

19  had to replace about 500 feet of steel pipe a few years ago,

20  but it was only while the pipe was being installed that the

21  ditch was not used.

22      THE COURT:  When a flood would come in the wintertime and

23  wash out this dam fill out across the Temecula Creek, you

24  would wait until the storms were over before you would put it

25  back in, wouldn't you?

THE WITNESS:  Yes, but that was only a few days, as a rule.  It is a low dam, so there was not much damage that would be done.

THE COURT:  You say a few days.  Ordinarily you get heavy rains around here in December and January,  Suppose your little dam went out with a heavy rain early in December.  You wouldn't be irrigating then, would you?

THE WITNESS:  Sometimes in dry years.

THE COURT:  You mean you would put the dam back again, and maybe it would be washed out again in January?

THE WITNESS:  Oh, yes, it could.  But this washout is not that important.

MR. VEEDER:  I object to this "it could."  Has it?

THE COURT:  I suggest that more likely when the dam would go out with the first flood in winter you would probably wait until the heavy rains were over before you put the dam back in.

THE WITNESS:  Maybe I haven't made myself clear.  The dam, which is only a little farther than from here to the wall and only about that high, wouldn't completely wash out.  It would wash a hole about that wide and about that deep, to my recollection.  It was not difficult to fix it as soon as the water went down.  So I would say, for all intents and purposes, it was in continuous use.  The other times it usually takes you two or three weeks to clean the ditch.  At that time

1    there is not water in there.  That is usually in February.

2    BY MR. GROVER:

3        Q   How often is it cleaned?

4        A   Well, once a year in more recent years, to that ex-

5    tent.  And then you would clean it-- Mr. Spaniol will know

6    more than I do about that-- using a rake to clean the grass

7    out.  There is water in the ditch in this case.

8        Q   Is the dam now constructed with an overflow to assist

9    in preventing washouts?

10       A   Yes. We haven't had any trouble with it washing out in

11   some years, to my recollection.  I am talking about many years

12   ago when I talk about it being washed out.

13       Q   Would you describe the lower ditch?  Do you see where

14   it is indicated on the map Exhibit A?

15       A   Yes.  This lower ditch in 1936 when my father bought

16   the place, I think it was open then, as I remember.  If it was

17   not, it was open in succeeding years.  Water was taken out

18   and flowed along this lower ditch and was used in what we call

19   Field H, part of Field H, and over here on J and I.

20       MR. VEEDER:  Your Honor, I want to interpose a further

21   objection in regard to the course that is being pursued here.

22   Here is obviously a change of point of diversion and, I believe,

23   a change of place of use of this water, certainly as to the

24   point of diversion, from the claim of 1885.  There is no

25   evidence of compliance with State law in regard to that change

1  of point of diversion and place of use.

2       THE COURT:  You can argue that later.  It wouldn't be a

3  valid objection to the evidence coming in as to what was done.

4       MR. VEEDER:  I want the record to show that I am object-

5  ing, because there is no basis at this point for what he is

6  attempting to prove, your Honor.

7       THE COURT:  Overruled.

8       You say the ditch was opened up shortly after your

9  father got the property, that lower ditch?

10      THE WITNESS:  Yes.

11      THE COURT:  You mean by that that that is the first time

12 that ditch was constructed, or had that ditch been there be-

13 fore?

14      THE WITNESS:  I understand--

15      MR. VEEDER:  I object to this, your Honor.  He says he

16 understands.  He doesn't know.

17      THE WITNESS:  To my knowledge, I can't say prior to my

18 father, I don't know whether it was used or not.

19 BY MR. GROVER:

20      Q  Did your father construct the ditch?

21      A  No.

22      THE COURT:  In other words, that lower ditch was there

23 when you first became familiar with the property?

24      THE WITNESS:  Yes.

25      THE COURT:  What did your father do then, put a dam down

1  at the lower intake?

2  THE WITNESS:  Yes, a little low rock dam to turn the water

3  off.

4  THE COURT:  Not a permanent dam, but rock and fill?

5  THE WITNESS: That is right.

6  THE COURT:  To divert water into this lower ditch?

7  THE WITNESS:  That is right.

8  BY MR. GROVER:

9  Q  Have you continuously used the lower ditch diversion

10  since 1936, you or your father?

11  A  No.  I have used it in those years prior to 1950, I

12  would say.  The last time it was open, as I remember, was

13  1953, at which time you couldn't get water, there was not

14  sufficient water, and there has not been since.

15  Q  And what is the reason you haven't used it since then?

16  A  Because there was not sufficient water in the creek

17  to take out.

18  Q  Since 1936 has the ditch diversion been made whenever

19  there was sufficient water?

20  A  Yes.

21  THE COURT:  Specifically, between 1936 and 1953, how many

22  of those years did you use the lower ditch, do you know?

23  THE WITNESS:  No, I couldn't answer that as to each year.

24  It has been used numerous years, but I couldn't answer that.

25  THE COURT:  If there was water you used it, and if there

1 was not you didn't; is that it?

2 THE WITNESS:  Some years we would, and some years we

3 wouldn't.

4 BY MR. GROVER:

5 Q  But you did use it whenever there was water?

6 A  When we could get water up, yes.  In fact, we opened

7 it one or two years when we couldn't get water out and were

8 trying to get water out.

9 Q  Has water come to the lower ditch from any other source

10 than the intake at the creek?

11 A  Yes, I understand-- I will not say I understand-- the

12 upper intake is above the intersection of what I call Long

13 Canyon.  I think that is the proper name.

14 THE COURT:  Yes, we have it marked.

15 THE WITNESS:  You are familiar with it, are you?

16 THE COURT:  We have it marked.

17 THE WITNESS:  You see the upper intake is above, so

18 some of this water that comes down here comes down and can be

19 picked up in the lower ditch.

20 THE COURT:  Now, there is a pipe line across from that

21 reservoir shown between parcels 2 and 3 on your sister's

22 property, across from that reservoir connecting the two ditches.

23 MR. GROVER:  I don't believe that is a pipe line, your

24 Honor.  It is just a division between fields, I think.

25 THE COURT:  There is no ditch across there or connection

between those two ditches?

12456

1  THE WITNESS: There is a wooden flume.

2  THE COURT: I understood--

3  MR. VEEDER: I think we are talking about different things

4 now.

5  THE COURT: Directing your attention to the small

6 reservoir directly between parcels 2 and 3, I understood that

7 there was some passageway, a ditch, pipe or flume to divert

8 water from the upper ditch across to the lower ditch.  I

9 thought we heard some testimony on that.  Is there such a

10 flume?

11  THE WITNESS: There is a flume, your Honor, but that is

12 simply where the main ditch comes along, it gets just above

13 this small reservoir and has to be carried across on the flume.

14  THE COURT: Then there is no connection way between the

15 two ditches?

16  THE WITNESS:  The overflow water could run from this

17 reservoir down through the lower ditch.

18  THE COURT:  I am not talking about the overflow.  There

19 is no ditch, pipe or flume connecting the upper ditch and the

20 lower ditch in that area?

21  THE WITNESS:  No.

22  MR. VEEDER:  I think the witness Rowe testified that there

23 was a connection.

24  MR. GROVER:  I can't recall his exact language, but I

25 understood him to say that east of that little reservoir there

1    was a little bit of pipe.

2         THE COURT:  I understood that there was a definite connec-

3    tion way between the upper ditch and the lower ditch.  But

4    you say there is not.

5         THE WITNESS:  Not by pipe.  By gravity flow, but not by

6    pipe.

7         THE COURT:  Is the gravity flow in a ditch or just a

8    flooding?

9         THE WITNESS:  The reason I am thinking, your Honor, is

10   because it made a wash which I guess you would call a ditch.

11   It was not hand dug.

12        MR. GROVER:  I believe, and I will check the record, that

13   Mr. Rowe was referring to a pipe just east of the little

14   reservoir, and you remember that something was said about

15   whether it was an open ditch all the way and he said that it

16   was except for a little pipe east.

17        THE COURT:  He may have been referring to between the

18   upper ditch and the reservoir, the means to put the water from

19   the upper ditch into that reservoir.

20        MR. GROVER:  I believe that is it.  And then later on,

21   you remember, I called his attention to the piece of flume.

22        THE COURT:  Apparently I misunderstood.  Mr. Veeder may

23   have, too.

24        MR. VEEDER:  I certainly did.  There is a question whether

25   they are claiming a storage right for these reservoirs.  Now

1    it becomes very important.

2         THE COURT:  My notes show this on Mr. Rowe's testimony:

3    No water being connected by lower ditch.  Pipe line from

4    reservoir fed by upper ditch to lower ditch.

5         MR. GROVER:  I will check the record, your Honor.

6         THE WITNESS:  Maybe he means over on my property.  There

7    is a pipe line from my reservoir across field B down to the

8    lower ditch.

9         THE COURT:  That may be it, then.  There is a pipe line

10   from your reservoir across field B down to the lower ditch?

11        THE WITNESS:  Yes.  The water in the upper ditch going

12   to the reservoir comes down to this, across field B to my

13   lower ditch, through which water can pass on to field J.

14   BY MR. GROVER:

15        Q   When you say your reservoir, Mr. Cottle, you mean the

16   one in field B?

17        A   Yes, in field B.

18        THE COURT:  How big a pipe is that?

19        THE WITNESS:  8-inch concrete pipe.

20        MR. VEEDER:  There is a variance between his testimony

21   and the pleading.  It is obvious that they now use the

22   reservoir.  The pleadings make no reference, as I recall, to

23   a claimed storage right from Temecula Creek.  I object that

24   there is this variance, your Honor.

25        THE COURT:  Did you ever see a lawsuit where there was

12459

1    not some variance or some discrepancies in testimony?

2    MR. VEEDER:  I never saw quite so many, your Honor.

3    That's my problem.

4    THE COURT:  Overruled.

5    MR. VEEDER:  Just so the record shows.

6    BY MR. GROVER:

7    Q  Mr. Cottle, would you describe the pond shown in

8    field I?  Just describe what it is and how it relates to the

9    irrigation system.

10   A  Years ago when there was more water that was sort

11   of a low sump, you would call it.  I had it bulldozed out to

12   fill the pond, and the overflow water from gravity irrigation

13   on fields J and I would flow into that, and then it overflows

14   from there into the creek, and except like this time of the

15   year in the winter it has been dried-- in the summer it has

16   been dry for some years.

17   THE COURT:  Then what useful purpose does it serve?

18   THE WITNESS:  It would be that if I had water in it I

19   suppose I could pump out of that to irrigate these lower

20   fields.  But I haven't done that.  There has not been a pump

21   on it.

22   MR. VEEDER:  Nor is there a claim being made to use it

23   that way.

24   THE WITNESS:  No.

25   MR. GROVER:  If that were a proper riparian use,

12460

1    certainly it could be done.  I believe it would be.

2         MR. VEEDER:  The witness responded.

3         MR. GROVER:  What was the answer?

4         MR. VEEDER:  No.

5         MR. GROVER:  I move to strike the answer.

6         THE COURT:  It wouldn't prevent him from making a claim

7    later to use a pond temporarily to store water to irrigate

8    land.  The answer will stand, but the mere fact that he

9    doesn't make a proper riparian use now doesn't keep him from

10   making it tomorrow.

11        MR. GROVER:  I think we understand each other, your

12   Honor.

13        MR. VEEDER:  I hope so.

14        MR. GROVER: We have claimed a riparian right, and what-

15   ever right that gives us.

16        Q  Mr. Cottle, would you describe the reservoir in

17   Field B?

18        A  Well, that was on the property when my father bought

19   it in 1936.

20        Q  And has it been used continuously since then?

21        A  Continuously since that time.

22        Q  What is the size of the reservoir?  What is the capacity

23   of the reservoir?

24        A  It is approximately 80 by 60, and it is about 9 feet

25   deep.

12461

Q   Do you know the acre feet capacity of the reservoir?

A   No.

Q   How is the reservoir used in the irrigation of the fields?

A   Well, number one, there is an electric motor right by the reservoir from which I can pump water out to this alfalfa field which is above the ditch.  At times I have also pumped out on to field F with the same motor.  Otherwise, the water flows into the reservoir and comes out of the reservoir to this pipe line down to field G, or some of that we use to irrigate on field B, on the lower part of field B, that part of the field that is below the reservoir.  The rest of it is irrigated from the ditch up along the road.

Q   Is the reservoir ever empty?

A   Only to clean it in the winter.  It is a mud bottom.

Q   Are you taking as much water from Temecula Creek now as you have in years past?

MR. VEEDER:  At what time of the year, what month, what period?

THE COURT: Let's reframe it.  "No" might mean in the wintertime or it might mean in 1960.

BY MR. GROVER:

Q   Are you taking, or have you taken, as much water in the last year as you have in previous years?

A   Well, we are taking all the water that is available,

1    which is less than it has been in previous years.

2        Q   Then you used to take more water?

3        A   When there was more water.  We have always taken all

4    of the water that is in the creek that would fill a 12-inch

5    pipe under a foot and a half head.

6        Q   When you say "we" do you mean you and your sister?

7        A   Me and my sister.

8        Q  And your father before you?

9        A   And our father before us.  And we do the same now

10   and take all there is in the creek that we can take out, but

11   it is not as much as it has been in previous years.

12       Q   And have you put that water to use on the two ranches?

13       A   Yes.

14       Q   All of it?

15       A   Yes.

16   THE COURT:  May I ask some questions?

17   MR. GROVER:  Certainly, your Honor.

18   THE COURT:  When your father took this property over in

19   1936, what did he have?  The property that is now owned by

20   you and your sister, or just the part owned by you?

21       THE WITNESS:  No, he had both.

22       THE COURT:  Both parcels?

23       THE WITNESS:  Yes.

24       THE COURT:  The same part shown in red on Exhibit A and

25   the part shown in green on Exhibit A?

1    THE WITNESS:  With one little exception.

2    MR. GROVER:  That is Exhibit B (handing document to the

3  witness).

4    THE WITNESS:  The original ranch that he purchased in-

5  cluded a small acreage above there, which has since been

6  disposed of.  Otherwise, it is identical.

7    THE COURT: So when your father acquired it he had both

8  the parcels that you and your sister now own?

9    THE WITNESS:  Yes.

10    THE COURT:  And of course when he was operating it he

11  was not splitting the water half between one part and half

12  between the other; is that right?

13    THE WITNESS:  I don't know how he divided it.  He was

14  irrigating both fields.

15    THE COURT:  When did this split start between you and your

16  sister?

17    THE WITNESS:  In 1941.

18    THE COURT:  Your sister acquired her property at the same

19  time you did?

20    THE WITNESS:  That is right.

21    THE COURT:  All right.

22  BY MR. GROVER:

23    Q  What was the interest of Anna Marcy?  You mentioned

24  getting part of the property or some interest from her.

25    A  When my father bought it he put up--

1    MR. VEEDER:  I object to this as being incompetent,

2  irrelevant and immaterial and not tending to prove anything.

3  If you have a document you put it in the record.  What differ-

4  ence does it make?

5    MR. GROVER:  The witness at one time testified that he

6  got part of the property from Anna Marcy.

7    THE COURT:  Was it an undivided interest that she had?

8  She didn't own specific property.  Did she own just an interest

9  in all of it?

10    THE WITNESS:  I am trying to remember the records.  One

11  deed came from my aunt, and one came from my father.  My aunt

12  was given a trust deed for her interest in payment.

13  BY MR. GROVER:

14    Q  So actually you got it from both your father and from

15  your aunt, Anna Marcy?

16    A  Yes.

17    Q  In addition to taking the water out of the upper ditch

18  as you have just described, did you also take water out of the

19  lower ditch?

20    A  Yes.

21    Q  And as I understood your testimony, whenever it was

22  available?

23    A  Whenever it was available.

24    Q  And you used it for irrigation on the ranch; is that

25  right?

12495

A   That is right.

THE COURT:   When you say you did you are talking about after 1941 when you had the property?

THE WITNESS:   That is when I had it.   My father used it before that.

THE COURT:   How did this work?   If you got half of the water from the upper ditch by division with your sister, you occasionally got in addition water from the lower ditch?

THE WITNESS:   That is correct.

THE COURT:   So you really had more water than she had; is that right?

THE WITNESS:   No, because she had wells.

THE COURT:   What is that?

THE WITNESS:   She had wells.

THE COURT:   What about those two wells there listed as Cottle 1 and 19K1?

THE WITNESS:   These?

THE COURT:   Yes.

THE WITNESS:   19K1 is a 20-foot well with a windmill on it used for domestic water.   Very little water.

THE COURT:   What about Cottle No. 1?

THE WITNESS:   That turned out to be almost a dry hole. It has never been developed.   I think it is a one-inch well. The other one is the one that is in dispute, and that has not been developed.

1      THE COURT:  Cottle No. 2?

2      THE WITNESS:  That is correct.  Neither one of them pumps.

3      MR. GROVER:  That's all I have, your Honor.

4      THE COURT:  Can the witness come back to the witness

5  stand?

6      MR. VEEDER:  I think we can start with him on the stand.

7      THE COURT: Come back to the witness stand, Mr. Cottle.

8

9                          CROSS-EXAMINATION

10 BY MR. VEEDER:

11     Q  You stated that there has been pumping upstream from

12 your property and has reduced the quantity of water reaching

13 your diversion point.  Do you know who is doing that pumping?

14     A  Mr. Trunell is the first ranch above us.  That is one.

15     Q  And how long has that pumping plant or whatever it is,

16 the diversion of Mr. Trunell, been in operation?  Have you

17 knowledge?

18     A  No, I don't.  It has been a number of years.

19     Q  And who else?

20     A  Well, up around -- if you are acquainted there-- around

21 Emory's store.  They call it Paradise Valley.  That is clear

22 at the top of the headwaters.  They put in there one or two

23 acres of alfalfa.

24     Q  Do you know who owns that property?

25     A  No.

1  Q  Were you a party to the suit of Barbee vs. Oviatt, do

2  you recall?

3  A  We were named, I think, on a cross-filing by the Vail

4  Ranch.

5  Q  Did you appear in that proceeding?

6  A  No.

7  MR. GROVER:  What was the answer?

8  THE WITNESS:  The answer was no.  I guess we did answer.

9  THE COURT:  Well, "appear" is a legal term.  If you filed

10  an answer, you appeared.

11  THE WITNESS:  Well, we filed an answer.  I took you

12  literally.  I am sorry.

13  BY MR. VEEDER:

14  Q  Are you acquainted with whether water passes under

15  the diversion structure which is designated here as "Upper

16  ditch"?  Does the water go through the sand under that

17  structure?

18  A  I would say not to the extent that we can stop it.  If

19  there is any, it is not obvious.

20  Q  You haven't dug down in the bottom of the ditch to

21  bedrock and attempted to seal off the diversion, have you?

22  A  Yes.

23  Q  You have?

24  A  I can't talk about bedrock.  We have made this dam

25  as much as--

1    Q   You have gone down as deep as you could?

2    A   Yes.

3    Q   When did you make that?

4    A   That has been on several occasions.  It has been
5    repaired and made deeper.  I don't have a record.  My brother-
6    in-law attended to it and he can tell you.

7    Q   But it has been repaired and made deeper?

8    A   Since we have had it, yes.

9    Q   As a matter of fact, you are exercising more control
10   over Temecula Creek now than you did, say, in 1936; is that
11   right?

12   A   Well, I would say it is a tighter dam than it was
13   originally, yes.  We think it is, yes.

14   Q   And to that extent it takes more water; is that right?

15   A   No, it takes less water because there is less in the
16   creek.

17   Q   Proportionately, though, it takes more water, does it
18   not?  In other words, it doesn't let water go through?

19   A   That I don't know because I don't know what goes
20   under the sand.  I can't tell.

21   Q   In other words, you attempted to get all the water
22   you could?

23   A   We tried to get our 12-inch pipe full.

24   Q   And you have changed the structure that was originally
25   there; is that right?

1  A Yes, we put some rock in.

2  Q You stated that at one time the pipe line washed out,

3 did you say?

4  A Yes.

5  Q What year was that, do you recall?

6  A I think it was in '37, soon after my father bought the

7 place.

8  Q Washed out the ditch and everything else?

9  A No, it washed out mostly the pipe line.

10  Q Where would that be?

11  A Right where that stream intersects just below the

12 intake.  That is Long Canyon, I guess.  That was the water

13 that washed it out.

14  Q Washed out a considerable length of it?

15  A I don't know-- two or three hundred feet maybe of the

16 pipe, not the ditch.

17  Q It didn't wash out the ditch?

18  A No, sir.  That is pipe along there.

19  Q Is there any other open ditch that has been washed out

20 to your knowledge?

21  A No; the rest of it, as far as I know, has been all

22 right.

23  Q How high is that located above the stream bed, do you

24 recall?

25  THE COURT:  The ditch or the pipe?

1        MR. VEEDER:  The ditch and/or the pipe.

2        THE WITNESS:  Well, the pipe itself at that particular

3  point is, oh, eight or ten feet, I would say, above the floor

4  of the creek.

5  BY MR. VEEDER:

6        Q   And is the open ditch from the point of diversion about

7  that same distance?

8        A   No, it is practically stream level.

9        Q   Practically stream level?

10       A   Yes.  You see, where Long Canyon hits that other

11  stream at right angles, that is what causes the trouble.

12  When the water rushes down Long Canyon it has a 90-degree

13  turn to make.  From the point of diversion down to where

14  the pipe line starts the ditch is not very high above the bed

15  of the creek.  Then where the pipe line carries over it gets

16  as much as eight or nine feet, I would say.

17       Q   The ditch is along that area?

18       A   The ditch picks up again at the end of the pipe line.

19  Then there is about 500 feet of 12-inch pipe on a trestle

20  about eight feet high, I guess.  Then the ditch picks up again.

21       Q   Where would that ditch pick up again?  Why don't you

22  come down here and show me?

23       A   You see, this pipe starts about here and ends about

24  there.  That is about 500 feet.

25       Q   Will you put "500 feet of pipe" right there.

1    You said youhave 550 feet of open ditch and then 550 feet

2  of pipe; is that right?

3    A  I don't know exactly the figures.

4    Q  Mr. Rowe put it in.

5    A  He should know.

6    Q  And then there is a pipe line here?

7    A  Yes.  And then there is a ditch comes in.

8    Q  I would like to have you mark "Pipe Line" on there,

9  if you would.  Let's use a red pencil.  And then let's have

10 you mark an arrow toward it.

11   A  (Marking the exhibit.)

12   Q  From that point, which is a red line across Temecula

13 Creek and across the ditch and across the pipe line, there is

14 an open ditch on further along there; is that right?

15   A  That is right.  This is all open ditch.

16   Q  All the way down?

17   A  Except for one other spot.  I think it is here-- a

18 wooden flume.

19   Q  Would you mark "Wooden flume" with a red pencil there?

20     How long do you figure that wooden flume would be?

21   A  40 feet.  I am guessing now.

22   Q  With the exception of what you said, 500 feet of pipe

23 and 40 feet of flume, the rest of it is open ditch?

24   A  It is all open ditch except one short flume here.

25   THE COURT:  "Here", meaning by the reservoir between

1    Parcels 2 and 3 on the Gibbon property.

2         THE WITNESS:  Maybe 20 feet.

3    BY MR. VEEDER:

4         Q  And your ditch, you would say, is within close

5    proximity the full length of Temecula Creek as it goes up and

6    down the valley; is that right?

7         A  Yes.

8         Q  And it is through earth fill?

9         A  Yes.

10        Q  Have you observed the point of rising water in

11   Temecula Creek below the point of diversion?

12        MR. GROVER:  Which point of diversion?

13        MR. VEEDER:  The upper point of diversion.

14        Q  Where does Temecula Creek rise again when it rises?

15        A  Well, at what time of the year?

16        Q  Well, unless I designate to the contrary it would be

17   after the irrigation season down to the termination of the

18   irrigation season, say in the month of June, where would the

19   point of rising water be?

20        A  I don't believe I could tell you.  I don't believe I

21   know.  There is often a little pond standing in here, and

22   there is another one over in here.  But I couldn't tell you

23   where it rises.

24        Q  During the period when you are using your lower ditch

25   where would the water rise?

1      A   I would say it would have been continuous flow down

2   probably from this Long Canyon.

3      Q   It would be a continuous flow?

4      A   I would think so, yes.

5      Q   Do you know?

6      A   No.

7      Q   You don't know?

8      A   Because I would go up here and open it up and I

9   didn't go up here to see.

10      Q   In other words, you did know during the period when

11   you were using the lower intake that there was a flume which

12   shows at the intake of the lower ditch?

13      A   Yes.

14      Q   Then after you put in your more or less sealed dam

15   up here at the upper intake there was no longer any water

16   down in the lower ditch; is that correct?

17      A   No, I wouldn't say that was correct, because water

18   can come down from Long Canyon that has no relationship to the

19   upper ditch.

20      Q   Well, what has transpired then that has defeated the

21   flow of that stream or has prevented the flow of that stream?

22      A   There is nothing about this upper dam that would have

23   anything to do with the water flowing down Long Canyon.

24   Long Canyon comes in below the upper dam.

25      Q   Yes.  Do you recall the number of years that you used

1  the intake at the lower ditch?

2        A   No, I can't.

3        MR. GROVER:  May I have the question, please?

4        (The reporter read the pending question.)

5        THE WITNESS:  I couldn't tell you.

6  BY MR. VEEDER:

7        Q   Would you say it was one year?

8        A   Yes, it was more than one year, but I can't tell you

9  how many.  We haven't used it for over seven years, and that

10 is the reason it is kind of hard to remember what year.

11       Q   You haven't used it for over seven years?

12       A   We haven't been able to get any water out for over

13 seven years.

14       Q   Have you any recollection as to how long water would

15 be available in that intake in the lower ditch during the

16 irrigation season when you used it?

17       A   Well, my recollection in the early days when we used

18 it, it was good in the summer.

19       Q   In the early days, you mean--

20       A   Back in the '30's and early '40's.

21       Q   There was some runoff there?

22       A   Yes.

23       Q   But you don't know how much?

24       A   No.

25       Q   Nor do you know how long you used it?

1    A  You mean how late in the year?

2    Q  Well, yes.  Whether you had water there all through

3  the irrigation season?

4    A  My recollection was that it stayed during the summer

5  in years that we used it.  But the trouble was that there would

6  not be enough to open up.  This is a fairly long ditch and if

7  you couldn't get it flowing with any head, we would give it

8  up.

9    Q  And you had pretty high losses in a ditch like that,

10  didn't you?

11    A  Yes.

12    Q  In regard to the lands irrigated by that ditch, would

13  you state into the record the fields which received water from

14  the structure in question?

15    A  I would say part of field H.

16    Q  When you say part of field H, could you give us an

17  estimate as to the acreage?

18    THE COURT:  Field H has a total acreage, we heard here,

19  of 7.8.  How many acres in field H would you say was irrigated

20  from the lower ditch?

21    THE WITNESS:  Two-thirds of it.

22  BY MR. VEEDER:

23    Q  And in regard to field J?

24    A  All of it.

25    Q  And in regard to field I?

1    A   I would say three-fourths of it.

2    Q   Then what were the crops that you raised on field H?

3    A   Native grass.

4    Q   Just native grass?

5    A   Yes, and Bermuda-- that is native down there.

6    Q   And you pastured it?

7    A   That is right.

8    Q   How did you irrigate that-- flood it?

9    A   Just flood it.

10   Q   And when the water is available you just turn it in?

11   A   Yes.

12   Q   In regard to pasture J, what kind of crops did you

13   raise there?

14   A   Alfalfa and later Bermuda.

15   Q   We are still talking about the water from the lower

16   ditch, you understand.

17   A   Yes.

18   Q   And how many cuttings of alfalfa would you get from

19   that field J, do you recall?

20   A   No, but I would estimate probably six.

21   Q   Six?

22   A   Yes.  You are talking over a period of twenty years,

23   aren't you?  You are not talking about recent years.

24   Q   I am talking about during those few years in which you

25   used the lower ditch.

A   O.K.   That's all right.

Q   There was sufficient water then to get six cuttings; is that right?

A   That is right.

Q   Is there any seepage or ground water table that would help support that alfalfa?

A   I don't know.   It probably would when there was that much water, because in here the water is--   pointing to I now-- because that isn't too much of a drop-off and there is water on part of I that stands some part of the year in the wet seasons.

Q So you would say then that there was probably some natural seepage and underflow that would support your alfalfa crop?

A   In wet years, yes.

Q   And that is in I and J?

A   In wet years, yes.

Q   Could you tell us the proportion of I and J lands which would be supported by this natural seepage and under-flow?

MR. GROVER:   If you know.

MR. VEEDER:   Well, if he doesn't, I hope he doesn't answer.

THE WITNESS:   I wouldn't know.   I would say more of I than of J.

BY MR. VEEDER:

Q   And you would say approximately half of I would be supported by underflow?

A   Yes.

Q   What were you raising down there on I?

A   Just grass, native grass pasture.

Q   How many head of stock would you run in there at that time?   Would you just graze it off?

A   Just graze it off.

Q   How many total acres of alfalfa do you figure you irrigated down there at that time?

A   Well, I never had I in alfalfa.   I only had J.

Q   How many acres of alfalfa do you figure were raised on J?

A   What was field J in acres?

MR. STAHLMAN:   6.4.

BY MR. VEEDER:

Q   In regard to the operation of your reservoir which is in field No. 2, do you have water in that at the present time?

A   That is not mine.   That is on my sister's place.

Q   You don't store any water at all, then, is that right, for your operation?

A   No, except what I have in this reservoir, and that is for the purpose of irrigating these fields I had mentioned

1   before.

2        Q   How do you fill that reservoir?

3        A   From the main ditch.

4        Q   The water is then conducted from this upper point of

5   diversion and brought all the way down and put into that

6   reservoir?

7        A   That is correct.

8        Q   How long does it take to fill this reservoir?

9        A   It depends on the year, whether we have half a pipe

10  or a full pipe.

11       Q   Do you ever have a full pipe down there?

12       A   We did have originally, yes.

13       Q   When was the last time you had a full pipe?

14       A   Several years ago, I would say.

15       Q   You would say back probably in 1950?

16       A   I would think so.

17       Q   Not more recently than that?

18       A   Your rainfall charts could probably tell you closer

19  than I can tell you.

20       Q   But the only way you can irrigate that field with any

21  success is that you have to bring water down there and build

22  up--

23       MR. SACHSE:   What field are you talking about?

24       MR. VEEDER:   We are talking about B.   He and I have an

25  understanding.

1    Q  You have to bring it down there, impound the water,

2  and then pump from it; is that right?

3    A  We do it two ways.  I take out of the reservoir by

4  gravity and then pump onto this alfalfa field above the ditch.

5  We would have to pump up there above the ditch.

6    Q  Are you using that today?

7    A  Yes.

8    THE COURT:  Are you about through?

9    MR. VEEDER:  I will go through my notes.  If we had a

10  recess I might save a little time, your Honor.

11    THE COURT:  I wondered why you were examining Mr. Cottle

12  so extensively.  Mr. Johannsen yesterday testified on this

13  matter.  I don't recall that there was any particular cross-

14  examination.  Mr. Johannsen said that there were 20 acres

15  down on the Cottle lands that were used from the lower ditch

16  entirely and occasionally let upper ditch water, if there was

17  some over, run onto the Cottle lands.  Do you remember that?

18    MR. VEEDER:  When I got through listening to Mr. Johannsen

19  I don't think he said very much and I was not greatly impressed.

20    THE COURT:  Well, he said that.

21    MR. VEEDER:  He didn't talk quantity of period, so it

22  wasn't bothering me.

23    THE COURT:  It was  in the period 1928 to '36.

24    MR. VEEDER:  I thought he only irrigated in '29 and '30.

25    MR. GROVER:  That was the potatoes, Mr. Veeder.

1      MR. VEEDER:  I am not going to review what I think the man

2  said.

3      THE COURT:  Take a short recess.

4      (Recess.)

5  BY MR. VEEDER:

6      Q  Have you any estimations or record as to the quantities

7  of water actually delivered to your lands at the present time

8  from the upper ditch, Mr. Cottle?

9      A  By the present time you mean right now?

10      Q  Yes, say in 1959.

11      A  No.  Just near the reservoir there is a 12-inch wide

12  flume that I put in the ditch, and that would vary anything

13  from, I would say, 7½ up to 4 inches.

14      Q  In depth?

15      A  No, the water would vary.  It varies in the daytime.

16  It goes down in the afternoon, for example.  So I can't give

17  you a range.

18      THE COURT:  This flume is by your reservoir down in

19  Parcel B?

20      THE WITNESS:  Yes.  It is hardly called a flume,  It is

21  four feet long and a foot wide, and I had it just roughly

22  marked every inch.  As near as I could tell from looking at

23  that, it would vary.  I couldn't tell you exactly, no.

24  BY MR. VEEDER:

25      Q  As a matter of fact, you couldn't tell in the aggregate

1  the number of acre feet a year that you have used, could you?

2  A  No.

3  MR. VEEDER:  I have no further questions.

4  MR. SACHSE:  I have no questions.

5  MR. STAHLMAN:  I have no questions.

6

7  REDIRECT EXAMINATION

8  BY MR. GROVER:

9  Q  When you say inches marked on that flume, do you mean

10  inches in depth or miner's inches?

11  A  No, inches of depth, just a very rough measurement.

12  Q  And have measurements been made by other persons of

13  the amount of water diverted into the upper ditch?

14  A  Yes, I think they have.

15  Q  And have those measurements been reported to the State

16  Water Rights Board?

17  A  Yes, I understand they have.  My sister--

18  MR. VEEDER:  I object to both these statements because

19  he says "I think" and "I understand," and he doesn't know

20  himself.

21  THE COURT:  Overruled.  He is merely helping us to find

22  out where we can get it.

23  BY MR. GROVER:

24  Q  Do you know that Mrs. Gibbon has filed with the State

25  Water Rights Board a report each of the required years for

1    the total diversion into the upper ditch?

2        A   You gave me a copy of a report.   That is all I know.

3        Q   Is that your only knowledge?

4        A   That is my only knowledge.

5        Q   You have referred to grass that was supported in part,

6    that is, from the standpoint of water supply, by seepage from

7    the creek there along the lower edge of fields I, J and H.

8    Did you use that grass?   Did you put cattle down there to

9    feed on that grass that was subirrigated that way?

10       A   Yes.

11       Q   Going up the ditch to Long Canyon, would you describe

12   what you know of the flows in Long Canyon?   Are they regular

13   throughout the year or intermittent, or what?

14       A   I would say it is regular through the winter, and in

15   the summer it would vary with different years.   But often in

16   the summer it dries up, as far as a continuous flow is concerned.

17   There would be pools, but there would not be a continuous flow

18   of water on the surface.

19       Q   In the period after the dam at the upper ditch was

20   arranged into the underground area as you have described,

21   that is, put down into the underground, in that period were

22   there flows from Long Canyon into Temecula Creek?

23       A   Oh, yes.   Each year, is that what you mean?

24       Q   Yes.   And were those flows responsible for some of the

25   water picked up in the lower ditch that flows out of Long

12483

1  Canyon?

2  MR. VEEDER:  Do you mean were they the source?

3  BY MR. GROVER:

4  Q  Were they the source of some of the diversions in the

5  lower ditch?

6  A  I would say yes.

7  MR. GROVER:  That's all I have.

8

9  RECROSS-EXAMINATION

10  BY MR. VEEDER:

11  Q  Mr. Cottle, did you ever observe the water from Long

12  Canyon flowing down to the lower diversion during the irriga-

13  tion season?

14  A  Yes, I would say I have.  If I can answer your

15  question, the water flows from Long Canyon into the same creek

16  bed that comes down from the upper intake, and that water would

17  flow on down and be taken out at the lower intake.

18  Q  May I inquire, have you seen it the full length?

19  A  Yes, I walked up the creek and it was continuous flow.

20  Q  What time of year was that?

A  It would be at various times of the year, when we go

up to the upper intake.

Q  Would it be July?

A  It could have been some years ago, yes.

25  Q  Well, was it?

1    A  I can't say July of any year, no.

2    Q And you have walked during the irrigation season from

3  the lower diversion all the way up to Long Canyon and through-

4  out the entire length you have seen water?

5    A  Yes.

6    Q  During the irrigation season?

7    A  Yes.

8    Q  Do you recall the quantity of water, just roughly, an

9  estimate?

10    A  No, I wouldn't be a good judge of that.

11    Q  It would be a very small amount, wouldn't it?

12    A  Well, in the summer, yes.

13    Q  In July it would be pretty low?

14    A  Yes, it would be low then.

15    Q  It might not be there at all in most years; is that

16  right?

17    A  In recent years, yes, you are correct.

18    MR. VEEDER:  I have no further questions.

19    THE COURT:  You may step down.

20    This country has changed since I first started to come

21  into San Diego County.  I can remember back in '40-'41 we had

22  to ford the San Luis Rey River when you would come from Pala

23  to go to Valley Center.  There would be an actual stream of

24  water running down the San Luis Rey River across a cement ford

25  in that road from Pala to Valley Center.  It has been years

1   since I have seen any water running there.  The little creek

2   that runs through my property was big enough in the summer

3   that we could have a little swimming pool -- dam it up and

4   have a real nice pond.  There is not enough water now to wet

5   the bottom of your feet.

6       MR. STAHLMAN:  I believe it was '49-'50 and '51 there was

7   a stream surface flow under the bridge at Bonsall.  Since

8   that time I have never noticed it, and I go over that bridge

9   practically every day.

10      THE COURT:  Call your next witness, Mr. Grover.

11      MR. GROVER:  Your Honor, I would like first to move to

12  amend the answer of Mrs. Gibbon to correct an error in

13  property description.  On page 7 of the original answer, at

14  line 8, the Northwest Quarter of the Southeast Quarter of

15  Section 20 should be the Northwest Quarter of the Southwest

16  Quarter of Section 20.  That correction was made before Mr.

17  Rowe plotted the outline of the properties on Exhibits A and

18  B, but the amendment has not heretofore been made.

19      Then the supplemental answer or the answer that was filed

20  to the supplemental or amended complaint, since it incorporates

21  the first answer as far as property description is concerned,

22  would also be amended.

23      THE COURT:  How should it read now?

24      MR. GROVER:  The Northwest Quarter of the Southwest

25  Quarter.

1    THE COURT: The amendment may be made.

2    Call your next witness.

3    MR. GROVER: And I notice a typographical error also in

4  one of the other exhibits that we introduced before. Would

5  this be the best time to call attention to it?

6    THE COURT: Yes, it would be all right.

7    MR. GROVER: It is in one of the chains of title, Chain

8  No. 1 on page 3, entry No. 9, the reference to the affidavit

9  of Lula Miller, which is an exhibit, the last line of that

10  description of the affidavit says, "1885 to 1926." The affi-

11  davit itself will show that it was 1936. It is just an

12  erroneous description of the affidavit, and I believe it appears

13  elsewhere in the chain of title.

14    THE COURT: Change it to '36.

15    THE CLERK: Shall I make the correction, your Honor?

16    THE COURT: Yes, if you will. Here is my copy.

17    THE CLERK: I believe I have it. Exhibit F, your Honor?

18    THE COURT: Exhibit F, that is right.

19    THE CLERK: Page 3?

20    THE COURT: Page 3.

21    MR. GROGER: Mrs. Katharine Gibbon.

22

23                KATHARINE GIBBON,

24  one of the defendants herein, being first duly sworn, testified

25  as follows:

THE CLERK:  State your name, please.

THE WITNESS:  Katharine Gibbon (Mrs. William Gibbon).

THE COURT:  Also known as Katharine Gibbon?

THE WITNESS:  Yes.

THE COURT:  Have you been a witness before?

THE WITNESS:  No.

THE COURT:  Just sit back and relax and speak up so we can hear.


DIRECT EXAMINATION

BY MR. GROVER:

Q  How do you spell your first name, Mrs. Gibbon?

A  K-a-t-h-a-r-i-n-e.

Q  And your last name has no "s" on the end of it?

A  None.

Q  Are you the Katharine C. Gibbon who was sued here as Katharine C. Gibbon with the "Katharine" spelled with a "e-r-i-n-e"?

A  Yes, they misspelled my name.

Q  Are you familiar with Exhibits Gibbon and Cottle A and B which are on the board?

A  Yes, I think so.

Q  And are you the owner of the land outlined in red on Exhibit B, the one on the left?

A  Yes, I am.

12488

1    Q   Are you the sole owner?

2    A   Yes, I am.

3    Q   How long have you been the owner of the property,

4  Mrs Gibbon?

5    A   Since 1941.

6    Q   And who owned it before then?

7    A   My father.

8    Q   And when did he acquire it?

9    A   In 1936.

10   Q   And have you been familiar with the property since

11 1936?

12   A   Yes, I have.

13   Q   How familiar?

14   A   Every other weekend.  I mean while my father owned it

15 we were there every other weekend and sometimes through the

16 week.  We spent our summers there each year.

17   Q   That is each year?

18   A   Each year.

19   Q   And after you owned it did you continue to visit the

20 property regularly?

21   A   We lived there.  We were there every weekend for

22 several days and I spent every summer on it until the girls

23 were grown.

24   Q   Are you familiar with the fields that are depicted on

25 Exhibit A or have been depicted by Mr. Rowe?

A   I know the fields.  I haven't seen all the new numbering, but I know the fields.

Q   Would you perhaps step down--

THE COURT:  She can look at mine.

MR. GROVER:  I have one here.  She can look at this one, your Honor.

Q   Now, you understand that the numbers of the fields on your property have been put on there just for convenience in description in this case.

A   Yes.

Q   Are you familiar with the irrigation practices on that property since 1936?

A   Pretty well, yes.

Q   And could you tell us, field by field, what years they have been cultivated and what crops have been in them whenthey were cultivated, and to what extent they have been irrigated, to the best of your knowledge?

MR. VEEDER:  That is about a seventeen times compounded sentence, counsel.  Let's start over and ask one question at a time.

MR. GROVER:  All right.

Q   With respect to field No. 1, could you tell us what crops have been grown there since 1936?

A   When my father took over the ranch there was alfalfa in one, and he had alfalfa down at 2, 3 and 4.

1    Q   And how long did that continue?

2    A   Well, that has always been done in 4, 3 and 2.

3    Q   How about field No. 1?

4    A   Well, it went for a long time out there.  There was

5 an engine up in the upper corner, an engine house, and there

6 is a path, a ditch that goes all the way down around and on

7 down by the old road where water used to flow.

8    Q   Where would that ditch be?  Would it be east of

9 fields 1, 7, 6 and 5?  Is that where you meant?

10   A   You mean here?

11   Q   Well, east of those fields.

12   A   There is another ditch that used to go down here by

13 the road.  There is the big ditch that goes up to the intake,

14 and there is an old ditch that went down to the road.

15   Q   The big ditch is the one marked there as the--

16   A   Upper ditch.

17   Q   --upper ditch?

18   A   Yes.

19   Q   But this other ditch you are referring to was a ditch

20 that was east or west of the upper ditch-- east being to the

21 right of the map?

22   A   East.

23   Q   In terms of the fields as they are numbered there,

24 about where was the location of that other ditch?

25   A   It came up in here where the big oak tree is.  There

1   is a big oak tree up in here.

2       THE COURT:  Indicating south of the big reservoir.

3       THE WITNESS:  And went on around.  Here was the pump

4   station and it went around down through here.  This map

5   doesn't show the old road.  It went into the old road and just

6   went down.

7       MR. VEEDER:  You just irrigated field 11.

8       MR. GROVER:  I don't believe she said that.

9       MR. VEEDER:  I am not being critical in the slightest.

10  But that long brush worries me.

11      THE COURT:  Do you know accurately enough where this old

12  ditch was that you could draw it on the map with reasonable

13  accuracy?

14      THE WITNESS:  You have a picture where the old road is.

15  It just went to the left of the old road.  And there is still

16  some old pipe up there and clay.  Not that we used it, but it

17  had been used before.

18      THE COURT:  This is the Geodedic Survey map.  Whether

19  this is the old road or not I don't know, but you will notice

20  there is a dotted line running up.

21      THE WITNESS:  That would be the old road, I imagine.

22      THE COURT:  And it ran clear up almost to the Temecula?

23      THE WITNESS:  Back up in here.

24      THE COURT:  This runs even farther than that.  It ran

25  up almost to the Temecula.

12492

1          MR. VEEDER:  That is 29R?

2          THE COURT:  29R.

3          Is that right?

4          THE WITNESS:  There is some of it still up in there.

5          THE COURT:  You notice here there is also a road shown,

6   a better road, coming in from the highway east of Radec and

7   coming down to what looks like a house, a little dot.

8          THE WITNESS:  Isn't that the new house of the tenant there?

9          THE COURT:  Then there is a house shown by this letter V?

10         THE WITNESS:  This is the old road.  It went right along

11  there, right to the right.  There is a map some place that

12  has the old road on it.

13         THE COURT:  The present road comes in to the east, does

14  it?

15         THE WITNESS:  Yes, it comes in differently.

16         THE COURT:  Comes in from further east on the highway?

17         THE WITNESS: That is right.  They changed it later.

18         THE COURT:  This could be the new road and the dotted

19  line could be the old one?

20         THE WITNESS:  This is the old one, I think.

21         THE COURT:  As I would read this map, this old road would

22  be almost where the so-called upper ditch is.

23         THE WITNESS:  No.

24         MR. GROVER:  No, I believe not, your Honor.  There may

25  be a hint here, if I may be permitted to point out.

1     MR. VEEDER:  Are you going to testify, counsel?

2     MR. GROVER:  No, but I would like to point out something

3 on this exhibit.

4     MR. VEEDER:  That is testifying, but go ahead.

5     MR. GROVER:  Your Honor can see the faint line to the

6 east of the field 8 there coming down to a structure.  Mr.

7 Rowe originally had that new road in there.  You remember

8 this is a blow-up of 29R.

9     THE COURT:  So that would be the new road?

10     MR. GROVER:  That would be the new road.  Then by judging

11 where the junction of the two highways is, the T formation

12 of the two highways, I think.

13     MR. VEEDER:  Why don't we have a witness do this, your

14 Honor.  I don't think it is proper for counsel to tell what

15 Mr. Rowe did or didn't do or thought or didn't think.

16     THE COURT:  Just a moment.  Let's look at your property

17 there at those three squares that appear there.  What are

18 those black squares?  Are those houses?

19     THE WITNESS:  This is our house and the barns, I think.

20     THE COURT:  This house is the most southerly one.

21     THE WITNESS:  This is our house, and the barn, and the

22 tenant house, and this is the water tank.

23     THE COURT:  And the new road comes to the tenant house?

24     THE WITNESS:  To the tenant house, its some place up in

25 here and comes down and around.  But the old road went out

12494

1    where the corrals are sort of and then went down like this and

2    down to the road, you know.  There must be a map that shows

3    where it came.

4         THE COURT:  Where was this ditch with reference to the

5    old road?

6         THE WITNESS:  On this side of it, on the right-hand side.

7         THE COURT:  Right?

8         THE WITNESS:  Come in to the ranch.

9         THE COURT:  Coming in to the ranch?

10        THE WITNESS:  Yes.

11        THE COURT:  So as you now face going out from the ranch

12   it would be on the left-hand side?

13        THE WITNESS:  Yes, on the low side.

14        THE COURT:  The old ditch was on the low side of that

15   ridge?

16        THE WITNESS:  Yes.

17        MR. VEEDER:  It sounds like the upper ditch.

18        THE WITNESS:  No, it is entirely different.  This is the

19   upper ditch over here.

20        MR. VEEDER:  When was the upper ditch reconstructed?

21        MR. GROVER:  Wait a minute.

22        THE WITNESS:  The upper ditch has always been there.

23        THE COURT:  You call this the old ditch.  You mean it was

24   there when you first saw the property in 1936?

25        THE WITNESS:  Yes.

1    THE COURT:  Was it used then?

2    THE WITNESS:  Whether my father used it, you see, I

3  really can't tell.

4    MR. GROVER:  Which ditch is this?

5    THE WITNESS:  The little ditch.

6    THE COURT:  By the old road.

7    THE WITNESS:  But it used to be away up there and we

8  would fall of.

9    THE COURT:  You were just a little bit of a girl in 1936?

10   THE WITNESS:  No, I was not.  I was married.

11   MR. VEEDER:  Your Honor will sway the jury here.

12   THE COURT:  Do we have any record of this old road?

13   MR. GROVER:  On 29R, I believe, that is the road there.

14   MR. VEEDER:  There is nothing to show that that is the

15  old road.

16   THE COURT:  What date is 29R?  Can we tell when this was

17  made up?

18   MR. GROVER:  On my copy it shows the date of the aerial.

19   MR. STAHLMAN:  1953.

20   THE COURT:  It says "Aerial Photos Taken 1949.  Field

21  check 1953."

22   MR. VEEDER:  The witness said that 1953 would be too

23  late for that old road.

24   THE COURT:  Let's see what we can do here.  It is listed

25  on the map before you with the red dot.

1    THE WITNESS:  I would have to look on the bills that we

2 paid.

3    THE COURT:  Let me get the map in front of you.  The place

4 that you list as your house and the barn, were they there at

5 the time the old road was there?

6    THE WITNESS:  Yes.

7    THE COURT:  Or were they built since?

8    THE WITNESS:  No, they were there.

9    THE COURT:  Which side did the old road run with refer-

10 ence to this house and barn?

11    THE WITNESS:  The old road ran in to our house and the

12 barn would be on the right-hand side.

13    THE COURT:  Facing which way?  As you are facing now?

14    THE WITNESS:  Yes.

15    THE COURT:  The barn would be on your right?

16    THE WITNESS:  Yes.

17    THE COURT:  And the road ran right to your house?

18    THE WITNESS:  Yes.  Also the same old road is still

19 there that went way up in here to the creek.

20    THE COURT:  Just listen to me a minute.  You notice on

21 the map something shown as "Corral well."  Was that well

22 there when the old road was there?

23    THE WITNESS:  No.

24    THE COURT:  It has been built since?

25    THE WITNESS:  Yes.

1    THE COURT:  Can you tell by using that as a key the place

2  where the old road ran?

3    THE WITNESS:  To the right of it.

4    THE COURT:  As you go out?

5    THE WITNESS:  Yes.

6    MR. STAHLMAN:  In traversing the old road it wouldn't

7  cross the ditch?

8    THE WITNESS:  No.

9    MR. GROVER:  Which ditch?

10    THE WITNESS:  The big ditch.  It came out at Davidson's.

11    THE COURT:  Well, now, with those marks in mind, do you

12  think you could step up to the board to Exhibit A and with a

13  pencil put in where that old road ran?

14    THE WITNESS:  No, because it was very crooked.  I know

15  where it started and where it ended.

16  BY MR. GROVER:  Could you put in where that old ditch ran,

17  that smaller ditch?

18    A  Well, it was on the left of that road.

19    Q  It was also crooked, then?

20    A  It was crooked.

21    THE COURT:  Tell us about this old ditch.  How big was it?

22    MR. VEEDER:  Your Honor, I am going to object to that

23  on the grounds that it is irrelevant in this phase of the

24  litigation because she said she had never seen any water in

25  it.  May I inquire, with all respect to your Honor, what

12498

1      importance does it have?

2          THE COURT:  Well, Mr. Veeder, I don't have to lead you

3      by the hand.  But let's assume for argument that there was an

4      appropriative right secured, or a prescriptive right secured,

5      and it concerned this old ditch.  If the right was secured,

6      the mere fact that the line of the ditch was changed after it

7      got on to the property wouldn't lose the right.

8          I don't know.  Maybe this old ditch is the ditch that

9      goes back to 1885.  What is your view, Mr. Grover?  Have you

10     investigated it?

11         MR. GROVER:  Well, your Honor, a prescriptive right or an

12     appropriative right does not have to be used in exactly the

13     same place every time.

14         THE COURT:  What is your investigation about this old

15     ditch?  Is there any significance to it?  Or can we forget

16     about it?

17         MR. GROVER:  No, it indicates that at the time Dr. Cottle

18     bought the ranch there was irrigation of this area east of the

19     upper ditch by means of an engine house to which Mrs. Gibbon

20     has referred which pumped from the upper ditch to this old

21     ditch and permitted irrigation toward the upper ditch from

22     above.

23         THE COURT:  Where was this old engine house you are

24     talking about?

25         THE WITNESS:  Right up in there, right up sort of in the

1  corner.

2      MR. VEEDER:  Why don't we put that on Exhibit A so we

3  will have at least a starting place?

4      THE COURT:  She has her pencil on it.

5      THE WITNESS:  This is the main ditch now, isn't it, right

6  here?

7      THE COURT:  Yes.

8      THE WITNESS:  Well, it was real close to it, because

9  there was a little ditch that went over to the engine house

10  and picked up the water.

11     THE COURT:  Mark it on the map 3 where the pencil is.

12     THE WITNESS:  It was close to the main ditch.

13     THE COURT:  Mr. Grover, mark it with an X and draw a line

14  to one side and say "Engine House" and put parentheses

15  "Gibbon" underneath.

16     MR. VEEDER:  By the size and weight of that writing, it's

17  an awful big engine house.

18     THE COURT:  Go ahead.

19     MR. GROVER:  Let me ask this:

20  Q  Where did this little ditch that youhave described

21  above the upper ditch, where did it run from the engine house?

22  A  It went down here and kind of curved around.

23  Q  Did it come out near your house in the southeast

24  corner of field 7?

25  A  It came over this way a little bit.

1      Q   East of your house?

2      A   A little bit, and came on down by the road.

3      Q   You are indicating that it came east of your house and

4  then in between the house and the barn.

5      MR. VEEDER: Counsel--

6      MR. GROVER:  That is where she put it.

7      THE WITNESS:  That is where I put my pencil.  Anyhow, it

8  came here, and went there-- I couldn't draw it, but it curved

9  out, and I couldn't tell you exactly.  It didn't hit the house.

10  I think it must have gone more around the back of the barn.

11      MR. VEEDER:  It went east of the barn, didn't it?

12      THE WITNESS:  Most likely.

13      MR. VEEDER:  Not between the house and the barn?

14      THE WITNESS:  No, because we had that barn there.

15      THE COURT:  As a matter of fact, 29R shows it doing just

16  exactly that, coming up toward the house and then going east

17  of the barn.

18      MR. VEEDER:  That is right.

19      THE WITNESS: And then went up to the creek, too.

20  BY MR. GROVER:

21      Q   How far north toward the highway did it go?

22      A   It went clear down to where Davidsons lived to the

23  gate of the old road.

24      Q   And where was that?

25      A   Well, it was almost opposited Barton's Store, you know,

12501

1    that Davidson house, and our gate was there.

2        Q   And is that very near the intersection of Highway 79?

3        A   Yes, it is, to the right.

4        Q   Going back to field No. 1, was that irrigated in 1936?

5        A   Yes, my father raised alfalfa on that.

6        Q   He did?

7        A   Yes.

8        Q   And has it been irrigated ever since then?

9        A   We have it in pasture now.  The water went down at

10   one time.  I am not sure.  I couldn't say every year. But when

11   the water left us, then you know you can't pump, you have to

12   do a little less.  When you have the water you can do more.

13       Q   By that you mean that you irrigated largely with

14   reference to when water was available?

15       A   Yes.

16       Q   How about field No. 7?  Does that have another name

17   that you used?

18       A   We called it the "Small alfalfa" now, and it used to

19   be an orchard-- it used to be a victory garden.

20       Q   Was that irrigated in 1936?

21       A   Doubt it.  That I am not sure of.

22       Q   When was the victory garden put in?

23       A   We started a victory garden in 1941, it was wartime,

24   and then we put in a big orchard.

25       Q   Did you put in the orchard immediately after the Victory

1    garden went out?

2        A  No, the orchard was there immediately.  We watered

3    it with buckets from the spring.

4        THE COURT:  Are you talking about 7 now?

5        THE WITNESS:  7.

6    BY MR. GROVER:

7        Q  When the victory garden was there, there was no

8    orchard?

9        A  Yes. The orchard came first.

10       Q  And what year was that?

11       A  Well, it would be in '42.  We got the ranch in 1941

12   at the end and we put in the orchard and the trees immediately,

13   and then it was wartime and I put in the victory garden and

14   we kept that in until the end of the war.  Then we moved the

15   victory garden over to the side of the house and put a lot of

16   lemon trees in where the victory garden was.

17       MR. VEEDER:  You have two victory gardens at two places.

18       THE WITNESS:  I do.  I moved it.

19       THE COURT:  How did you water the victory garden?

20       THE WITNESS:  We had a well and the water went up to a

21   tank and came back and then there was an engine, and I don't

22   remember-- it seems to me that toward the end we used that

23   engine out of the ditch.  We inherited some iron pipe or

24   corrugated pipe that we used to use before we started buying.

25   They had some big pipe that they used when they irrigated these

1    pastures.   They used pipe for the water.

2         THE COURT:   Take our adjournment until 1:45.

3         (Noon recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

12504

San Diego, California, Thursday, March 24, 1960.   1:45 P. M.

THE COURT:   Proceed.

BY MR. GROVER:

Q   Mrs. Gibbon, before the recess we were discussing field No. 7.  Now you mentioned some fruit trees going in in 1941, as I recall.  Was that throughout the field marked there as 7, or was it in only a portion of the field?

A   It was about half of the field, and then I put my garden up on this top piece-- it was not quite over to the half, and then we put the garden down through here and put the almond trees up there.  So it was not all cultivated.

Q   Then it went into alfalfa later?

A   Yes.

Q   When was that?

A   I think it was around 1951.

Q   But whether it was in fruit trees, victory garden or almonds or alfalfa, it was irrigated?

A   To the best I remember, yes.

Q   From 1941.  Was the alfalfa in the entire field?

A   When we put it in, yes.

Q   Yes.

A   Well, there is a little strip of trees going up here. It goes right up to where the trees are.

Q   Is there a wash to the east of the reservoir on your

1    property?

2        A  Yes, it goes into this reservoir.

3        Q  A gully?

4        A  That is right.

5        Q  That lies between fields 6 and 7?

6        A  That is right.  And here is our road.

7        Q  Now, going to field No. 2, has it been irrigated in

8    the past, to your knowledge?

9        A  Yes, it is irrigated ever since my father.  I know

10   that.  It was flooding all three.

11       Q  That is, from 1936 on?

12       A  Yes.

13       Q  How about field No. 3?

14       A  The same.

15       Q  Field No. 4?

16       A  The same.  Everything below the ditch.

17       Q  That is, all of your property below the ditch was

18   irrigated from 1936 to the present?

19       A  Yes.

20       Q  In what crops?

21       A  He had alfalfa, and when we took over we put pasture

22   in.

23       Q  Is it in pasture now?

24       A  It is in pasture.

25       Q  This large reservoir in the bottom of Field No. 2,

1   before that was built was that irrigated land?

2       A   That is pasture.

3       Q   When was it built?

4       A   Just finished.

5       Q   Just finished?

6       A   Yes.

7       Q   So that until very recently that was also irrigated

8   land?

9       A   Yes, about February.

10      MR. VEEDER:  I might save a little time on cross-

11  examination, counsel.  Do I understand that this large

12  reservoir was just finished?

13      THE WITNESS:  Yes.

14  BY MR. GROVER:

15      Q  Field No. 5, field No. 6, field No. 8 and field No. 9,

16  would you tell us what crops have been in there?

17      A   It used to be oats, and then we started this six

18  acres of alfalfa and these oats.

19      Q  Where were the six acres of alfalfa-- in which field?

20      A   Here in No. 6.  We call that the "Old alfalfa."  That

21  was the first one.  And then this was oats and we irrigated

22  them.

23      Q   That is 5, 8 and 9?

24      A   Yes.  They are irrigated oats now.  And this year we

25  put in another eight of alfalfa and turned this oat field

1   into five acres of pasture or thereabouts.

2        THE COURT:  Which is "this oat field"?

3        THE WITNESS:  This (indicating).

4        MR. VEEDER:  No. 5 she was pointing to, I believe.

5        THE WITNESS:  5, 6, 8 and 9 used to be oats, and then

6   we put what is 6 into alfalfa.

7        THE COURT:  When did you do that?

8        THE WITNESS:  It must have been around '51, I think, the

9   end of '50-51, some place in there.

10       THE COURT:  And then what else did you put into alfalfa?

11       THE WITNESS:  And then the oats went on, but they were

12  irrigated oats.

13  BY MR. GROVER:

14       Q  In what fields?

15       A  5, 9 and 8.

16       THE COURT:  And then you put some other alfalfa in?

17       THE WITNESS:  And this year we put No. 8 into alfalfa

18  and No. 5 into pasture and No. 9 is still irrigated grain.

19  BY MR. GROVER:

20       Q  Have you cleared some additional land very recently

21  in the easterly edge of field No. 9?

22       A  Yes.

23       Q  And field No. 10, too?

24       A  And No. 10.  We have broken up two or three fingers

25  of land and we enlarged No. 11 so it goes up further.

1    Q  That is the most southerly part?

2    A  Yes.

3    Q  What about field No. 10, except for those enlargements

4 of this past year?

5    A  That has been there quite a long while.  Most of this

6 No. 11 and all of No. 10 were cleared in the late '40's, around

7 '49, by one of the local people up there.

8    Q  But for you?

9    A For us, yes.

10    Q  And what crops were put in there?

11    A  Oats.

12    Q  And were they irrigated?

13    A  No, I don't think so.  I don't actually know.

14    Q  And since then have they remained in oats?

15    A  Yes, they are always planted every year.

16    Q  And have you irrigated them all?

17    A  This might have had a little bit.  I am not sure

18 about the irrigation.

19    MR. VEEDER:  Counsel, she says she doesn't know.

20    THE WITNESS:  No, I don't, really.  I don't think so.

21 There is this piece up in here that may have been irrigated,

22 the piece that goes across the road, the small piece.

23    Q  The easterly finger of No. 9?

24    A  Yes.

25    THE COURT:  Irrigated from a well?

1       THE WITNESS:  The ditch comes down and goes in the

2  reservoir, and then we have another pump that boosts it up.

3  But we do have a new well down in there, field well that we

4  made that we are planning to irrigate it from.  It depends on

5  the weather how much water you have.

6       MR. VEEDER:  Are all the wells on that Exhibit A that

7  have been drilled-- A or B?

8       THE WITNESS:  We have two wells down here which have

9  been there a long time, and the wells up here have just been

10  drilled in the last year.

11  BY MR. GROVER:

12       Q  Are there any wells that are not shown that you own,

13  that are not shown on Exhibit A?  Are they all shown?

14       A  Yes.  I didn't look at it, but there are four on this

15  side and two on this side.

16       Q  Exhibit A is this exhibit.  Are they all shown?

17       A  Oh, I see.  Yes, they are.

18       MR. VEEDER:  6?

19       THE COURT:  7.

20       THE WITNESS:  6.

21       THE COURT:  7.

22       MR. GROVER:  The Cottle No. 2 is the one that Mr. Cottle

23  drilled.

24       THE COURT:  Counting it, it is 7.

25       MR. GROVER:  Counting it, it would be 7.

1    THE WITNESS:  Yes.

2    MR. GROVER:  But that is in the disputed area.

3    Q  Now, Mrs. Gibbon, are you familiar with the diversion

upstream marked on this exhibit as "Intake upper ditch"?

5    A  I haven't been up there for two or three years.  We

used to ride up the creek and all over the place, yes, and

up to the intake, but not for the last -- it has been a year

since I have been there.

9    Q  Is that the source of water for the upper ditch?

10   A  Yes.

11   THE COURT:  Is this cumulative?

12   MR. GROVER:  Essentially, your Honor.

13   THE COURT:  Unless you have something new--

14   MR. GROVER:  I was leading up to one point, your Honor.

15   I would like to get Mrs. Gibbon to testify that she is the

16   owner of the water right.  I know that Mr. Veeder is going to

17   object.

18   MR. VEEDER:  I was going to say it is a legal conclusion

19   and why get into it.

20   MR. GROVER: To the extent that the owner of the water

21   right depends upon a chain of title, I believe it is compe-

22   tent for her to say that she owns it.

23   THE COURT:  Without this being binding on what she owns

24   or if she owns it, I have no objection to her testifying.

25

1    BY MR. GROVER:

2        Q  Are you and your brother, Mr. Cottle, owners each one

3    of an undivided one-half interest, or are you successors in

4    interest of the water right which was recorded by Sam Tripp

5    in 1885?

6        MR. VEEDER:  There are three different questions in that.

7    I object on behalf of the good lady.  If you break them down

8    it will be easier to follow.

9    BY MR. GROVER:

10       Q  Are you familiar with the water right claim filed by

11   Sam Tripp in 1885 in the records of San Diego County?

12       A  Yes, and we own them.

13       MR. VEEDER:  You can't win, your Honor.

14   BY MR. GROVER:

15       Q  And are you and your brother successors in interest

16   to that water claim?

17       A  Yes.

18       MR. VEEDER:  I object on the grounds that it is a legal

19   conclusion.  She doesn't know whether she is a successor in

20   interest or not.  She is claiming a right.  That is all she

21   can testify to.

22       THE COURT:  Overruled.

23       You claim to own whatever rights are claimed by the

24   filing?

25       THE WITNESS:  Yes.

1      THE COURT:  You claim the title?

2      THE WITNESS:  Yes.

3      THE COURT:  One-half each?

4      THE WITNESS:  Yes.

5      MR. VEEDER:  That's all there was to it.

6  BY MR. GROVER:

7      Q  Do you run any cattle on your land?

8      A  Yes.

9      Q  How many head at the present time?

10     A  We have 139.

11     Q  And how many head have you run in the past?  Has it

12  varied?  Has the number varied somewhat?

13     A  Oh, yes.  It depends on how much cattle are when you

14  buy them.  We have run up to 150 and more and less.

15     Q  What is the smallest herd you have had?

16     A  I think about 75.

17     Q  And the pasture and alfalfa which are raised on your

18  land, are they used to feed the cattle in large part?

19     A  Entirely.

20     Q  And is the size of this herd dependent in part on the

21  amount of water for the pasture and alfalfa?

22     A  It has to.  You keep as many cattle as you have feed.

23     MR. GROVER:  I believe that is all I have.

24

25

CROSS-EXAMINATION

BY MR. VEEDER:

Q  Since you went on the property in 1936, Mrs. Gibbon, you have increased the number of irrigated acres quite materially, haven't you?

A  Yes.

Q  In other words, the acreage that was irrigated when you went on the property, you are still irrigating that, and you have, for example, pointed out that you irrigated parcel No. 9?

A  You see, not that we have more water, but we do it by sprinkling and not by wild flooding.  So we make the same amount of water do more work.

Q  You have done it by taking the water over to 9, 10 and 11, which was not irrigated originally; is that right?

A  When we had wild flooding we didn't irrigate that.

Q  Are you storing water in this reservoir today?  I am pointing to No. 2.

A  We intend to.

Q  You are going to store water there?

A  No, not store.  It is management, to put it in and take it out right away, something about building up a head.

Q  You have really talked to counsel.

A  No, I talked to the man who built the thing.

MR. VEEDER:  I would say that I am not getting anywhere.

12514

1      THE COURT:  How many acre feet will that big reservoir

2  hold?

3      THE WITNESS:  They tell me 10.  I don't know, you see.

4  I don't know how to figure it.

5      MR. VEEDER:  Few people do.

6      THE WITNESS:  This one I don't know how many.

7  BY MR. VEEDER:

8      Q  You brought in new land into alfalfa in 6; is that

9  right?

10     A  Yes..

11     Q  And is that also true in regard to 7?

12     A  No, 7 ever since 1941 we have bought we have always

13  had something going.

14     Q  You began in 1941 irrigating that land?

15     A  Yes.  And always something in here.

16     THE COURT:  "Here" is what?

17     THE WITNESS:  1.

18     THE VEEDER:  I have no further questions.

19     THE COURT:  Mr. Sachse?

20     MR. SACHSE:  No questions, your Honor.

21     THE COURT:  Mr. Stahlman?

22     MR. STAHLMAN:  Mr. Veeder asked mine, your Honor.

23     THE COURT:  Mr. Girard?

24     MR. GIRARD:  No, your Honor.

25

REDIRECT EXAMINATION

BY MR. GROVER:

1

2

3      Q  Mrs. Gibbon, have you irrigated these fields in part

4  from wells?

5      A  Yes, we have used the Wisconsin well.

6      Q  Which one is that?

7      A  I don't know-- I think you have it called 2.

8      THE COURT:  Put your finger on it.

9      THE WITNESS:  We used the windmill well, which is No. 1,

10  in the early days.  That is our first well right there.

11  And then we use water of this second well to irrigate.

12  BY MR. GROVER:

13      Q  And has the water from those wells been the source of

14  some of the additional irrigated area that you have put in

15  since you got the ranch?

16      A  Well, I suppose so.

17      MR. VEEDER:  You don't know?

18      THE WITNESS:  Well, we irrigated with it.  We put some

19  of this water into this reservoir and then pumped it up.

20      MR. VEEDER:  When you say "this water into this reservoir"

21  you are pointing--

22      THE COURT:  "This" doesn't mean anything.  She is

23  referring to Well No. 2.

24      THE WITNESS:  Yes.

25      THE COURT:  And the reservoir between parcels 2 and 3.

1    THE WITNESS:  Yes.  And then pumped it along with the

2    stream water.  There was not too much water out of here.  It

3    is mostly stream that we used.

4    BY MR. GROVER:

5       Q  And by reason of having that well water you could put

6    more land under irrigation?

7       A  Yes, particularly because we haven't had so much water

8    down the stream.

9       Q  Have you put as much land under irrigation from the

10   upper ditch as was possible in view of the amount of water

11   you could take through the upper ditch every year since you

12   have had the property?

13      A  Yes, we have.  We expand just as much as we have water

14   for.

15      Q  And you have taken just as much through the upper ditch

16   as was available in the creek?

17      A  We take all of the upper ditch, and since that went

18   a little bit low we take some of our water from well 2.  But

19   that costs money.  We never used it when we didn't have to.

20      Q  On field No. 6, when did you put that under irrigation?

21      A  I think about 1951.

22   MR. GROVER:  That's all.

23   MR. VEEDER:  I have no questions.

24      THE COURT:  All right, Mrs. Gibbon, thank you very much.

25   You have distinguished yourself, you are a good witness.

1    MR. STAHLMAN:  Especially on cross-examination.

2    THE COURT:  You know the distinction between storing

3 water and using the reservoir to build up a head.  That is

4 something that a lot of water lawyers have to learn about.

5    MR. GROVER:  Mr. Spaniol.

6

7               GUSTAV A. SPANIOL,

8 called as a witness on behalf of defendants Gibbon and Cottle,

9 being first duly sworn, testified as follows:

10    THE CLERK:  State your name, please.

11    THE WITNESS:  Gustav A. Spaniol.

12

13              DIRECT EXAMINATION

14 BY MR. GROVER:

15    Q  Mr. Spaniol, where do you live?

16    A  Just across the road from the entrance to the Gibbon

17 Ranch.

18    Q  And how long have you lived there?

19    A  Since March 19, 1939.

20    Q  Are you familiar with the Gibbon Ranch as shown on

21 the Exhibit A?

22    A  Yes.  After 1939, yes.

23    Q  Have you worked on the ranch?

24    A  Lots of times-- most of the time.

25    Q  Are you familiar with the operation and conduct of

1    the ranch ever since 1939?

2        A  Part of the time of '42 I was employed in the ship-

3    yards, so I was there only Saturdays and Sundays.

4        Q  But you were there continuously through that year even?

5        A  Yes.

6        Q  From week to week?

7        A  Yes.

8        Q  And all the other times from 1939 on you have had a

9    continuous familiarity with the ranch?

10       A  Yes.

11       Q  What have your duties on the ranch consisted of?

12       A  Well, when I started we was doing a little bit of

13   everything from building to irrigating.

14       Q  And have you from time to time had charge of activities

15   relating to the irrigation of portions of the ranch?

16       A  Yes.

17       Q  Are you familiar with the various fields which have

18   been outlined on Exhibit Gibbon and Cottle A?

19       A  Cottle's?

20       Q  Well, on the Gibbon portion of the exhibit?

21       A  Yes.

22       Q  And could you tell us what you know about the

23   irrigation history of field No. 1 from 1939?

24       A  At the time I got over there this field was irrigated

25   by a pump that stood up in here, but I didn't have nothing

1    to do with that pump. But I knew where the water went, but

2    I didn't have nothing to do with that part of it at that early

3    time.

4         Q   Where did the water go?

5         A   Well, of course, it went down this ditch. But for

6    No. 1 they had a little pump stuck over here and had an

7    offshoot from this ditch.

8         Q   When you say "this ditch" you mean the upper ditch?

9         A   The upper ditch. And they pumped that up onto a bank

10   that run all the way around here and away back over in here

11   somewhere. But I didn't run that pump. I said it was there.

12        THE COURT: Well, did you see it run while you were

13   there?

14        THE WITNESS: I can't say that I did see it run because

15   I--

16        THE COURT: Your conclusion is that the pump and the

17   ditch were there and somebody before you--

18        THE WITNESS: Somebody before me run it.

19        THE COURT: When you say they ran it in a ditch around

20   there, you are referring to pasture No. 1, then?

21        THE WITNESS: Pasture No. 1. They pumped it out of the

22   main irrigation ditch up onto a bank and then that thing run.

23        MR. VEEDER: I object to this as being conjectural. He

24   didn't see it. There might have been a ditch there.

25        THE COURT: Overruled. I will understand that all the

1  record will show is that there was a ditch and a pump and you

2  could see it on the ground where the ditch had run around

3  pasture 1.

4      Is that satisfactory?

5      MR. VEEDER:  That is a good finding.

6  BY MR. GROVER:

7      Q  Did it also go on north by fields 7, 6 and 5?

8      A  This is the house and barn.  It went off over in here

9  somewhere and missed that, but crossed here and crossed--

10  the old road used to come up through here.

11      THE COURT:  Indicating No. 5.

12      THE WITNESS:  Yes.  That went up around in there and

13  crossed under that road at some point, because I plowed up

14  a section of irrigation pipe.

15      MR. VEEDER:  But you didn't see it?

16      THE WITNESS:  I seen the irrigation pipe.  I plowed it up.

17      MR. VEEDER:  The ditch.

18      THE WITNESS:  I plowed that pipe up.

19      THE COURT:  Could you see the remnants of the ditch on the

20  ground?

21      THE WITNESS:  I couldn't see it.  It had all been plowed

22  up and everything else.  At the time this pipe was still in

23  the road and I plowed it up with the Ford tractor.

24      THE COURT:  At the place where the road was?

25      THE WITNESS:  They discontinued the road.

1    THE COURT:  And this pipe was laying under the road?

2    THE WITNESS:  This pipe was laying under the road.  And

3  that is when they put the road in away over here somewhere.

4    THE COURT:  Maybe if the witness stood by the map we

5  would have better luck.

6    MR. GROVER:  Do you want to stand over here, Mr. Spaniol.

7    THE COURT: Go ahead.

8  BY MR. GROVER:

9    Q   What is your first knowledge of irrigation of field

10  No. 1?

11    A   My first knowledge of field No. 1 irrigation, if we

12  needed it was, in 1951.

13    Q   Had there been any crops grown there before, to your

14  knowledge?

15    A   Yes.  Banana squash I seen.

16    Q   When was that?

17    A   That was somewhere in '39-40, I am not sure which,

18  and that was irrigated from this place here.  That is the

19  only place they got any water.

20    Q   Indicating a point marked "Engine house," I guess.

21  And that was in 1939 or '40?

22    A   '39 or '40.

23    Q   When Dr. Cottle owned it?

24    A   When Dr. Cottle owned it.

25    Q   How much banana squash was there?

12522

1    A   At least five acres, maybe more.

2    Q   In field No. 1?

3    A   In field No. 1.

4    Q   How about after '39 or '40 until the period of

5    irrigation you mention as '50 or '51?

6    A   Oats.

7    Q   It was in oats?

8    A   Yes.

9    Q   Were they irrigated?

10   A   Couldn't irrigate it.  Never tried to irrigate it

11   out of this because--

12   MR. VEEDER:  He pointed to the pump house.  Isn't that

13   right?

14   MR. GROVER:  That is right.

15   Q   That engine house was not used after that banana

16   squash period?

17   A   Not that I know of.  After that I don't think they

18   ever used it.  I wouldn't swear to that because I never seen it

19   work.

20   Q   But in '50 or '51--

21   A   In '51 I irrigated with the sprinkler system.

22   Q   Field No. 1?

23   A   Field No. 1.

24   THE COURT:  All of it?

25   THE WITNESS:  All of it.

12523

BY MR. GROVER:

Q  And since '51?

A  It has been irrigated all of the time.  It is in pasture now.  After we got finished with the dry land farming, then we put it in pasture.

Q  That was what year?

A  '51.

Q  And since '51?

A  Pasture all of the time.

Q  Irrigated?

A  Irrigated.

Q  How about field No. 7?  If it will help, you can divide that up into portions.

A  Well, No. 7 had about a hundred fruit trees in it.

Q  When was this?

A  Oh, '41 to it might have been '52 or '3 when they were taken out.

Q  And were they irrigated?

A  They were irrigated by this windmill well.

Q  Wait a minute.  Which windmill well, the Cottle windmill or the Gibbon?

A  Wait a minute.  Windmill No. 1.  We had a gas engine on that.  We would pump water into this tank that was up here. There was a water tank up in here.

Q  The one marked "Tank" just above "Katharine E. Gibbon?"

1    A   That is up a little bit further than it was then. We

2  pumped the water up there and then irrigated the orchard out

3  of that tank.

4    Q   Since 1953 what crop has been in that area where the

5  trees were?

6    A   While the trees were in there we had a small section

7  of oats in there.  That only amounted to about a quarter acre,

8  I should judge.  It was not very big.

9    Q   And any other crops during that time from '41 to '53?

10   A   Nothing that I can remember.

11   Q   Was there a garden in there at one time?

12   A   Not that I know of.  We had test plots in there for

13  the Government.  They planted different kinds of grains to see

14  what they would do.

15   Q   Were there almonds in there at any time?

16   A   We had almonds all over this orchard.  We had almonds,

17  peaches, pears, nuts of all kinds, wild nuts, everything else.

18   Q   Were those trees irrigated?

19   A   Sure, from this tank and that well.

20   Q   From 1941 to '53?

21   A   Yes.

22   Q   And after 1953 what has been done with that field?

23   A   We tore them out and put in alfalfa.

24   Q   Has it bean in alfalfa ever since?

25   A   Yes.

1       Q   Has it been irrigated ever since?

2       A   Yes.  By that time we had the sprinkler system and

3   we could irrigate like a section.

4       THE COURT:  Where does the water come from since 1953?

5       THE WITNESS:  It was coming out of the ditch then because

6   we had a pump on our Ford tractor.

7   BY MR. GROVER:

8       Q   You mean out of the upper ditch?

9       A   Out of the upper ditch, yes.  I don't refer to the

10   lower ditch at all.

11       Q   Fields 2, 3 and 4, could you tell us what you know of

12   the irrigation history of those?

13       A   From '39 we flooded it out of the irrigation ditch.

14   We filled the ditch, we would block it off somewhere and cut

15   some slots in the bank, put a pipe in it and lead them all

16   over as we wanted them.

17       Q   How long did that practice go on?

18       A   Until we got the sprinkler system.

19       Q   About when was that?

20       A   '51.

21       Q   And since '51 how have you irrigated?

22       A   All sprinkler.

23       Q   So that from 1939 to the present time, fields 2, 3 and

24   4 have been continuously irrigated?

25       A   Yes, all of the time.

1    Q  How about fields 5, 6, 8 and 9?

2    A  Well, after we got this into alfalfa--

3    Q  When you say "this" you mean field 7?

4    A Field 7.  After we had 7 in alfalfa-- of course, this

5 was all oats sprinkled.

6    Q  That is 5 and 6?

7    A  5, 6, 8 and 9 was oats, and that was sprinkled when

8 we needed it.  As it got dry we would sprinkle.  That was

9 under irrigation.

10    THE COURT:  When?  That was after 1951?

11    THE WITNESS:  After '51, yes.  But we put the alfalfa in

12 here it must have been about '54.

13 BY MR. GROVER:

14    Q  In what field?

15    A  In 6.  Roughly about '54.  I may be off a little bit.

16    Q  Has it been in alfalfa ever since?

17    A Yes.

18    Q  Irrigated?

19    A  Irrigated.

20    Q  How about field 5?

21    A  5 was dry farming, but we irrigated that; if we didn't

22 get much rain in the winter we irrigated it.  If we got a lot

23 of rain we didn't.  We didn't have to.

24    Q  When did it go into pasture?

25    A  Just went in last fall.

Q   And is it irrigated pasture?

A   It is irrigated pasture.   There is water on it right now.

Q   How about field 8?   Did it go into alfalfa?

A   That went into alfalfa last fall.

Q   And before that it was--

A   Dry farming.

Q   Did you do any irrigation of it?

A   We irrigated it as it was needed.

Q   For what crop?

A   Oats.

Q   And since when?

A   That has been in there in oats for I don't know how many years, but we irrigated it since we got the sprinklers in '51.   Before that, dry farming.

Q   And field No. 9, which is marked "Grain"?

A   This oats the same; irrigated when it was necessary.

Q   When was the earliest irrigation of it?

A   Sometimes we irrigated in December.

Q   No, I meant what year?

A   Oh, that would come in about '51.

Q   Before that it was dry farmed?

A   Dry farming, yes.

Q   And it has been irrigated on that basis since '51?

A   Whenever it was needed.   If we had plenty of rain we

1  didn't irrigate.  If we had no rain, then we irrigated.

2  THE COURT:  Would it be a fair statement to say that you

3  didn't use any sprinklers on 5, 6, 8 and 9 until after 1951?

4  THE WITNESS:  Yes.

5  BY MR. GROVER:

6  Q  Is that true of 6 as well?

7  A  6 the same thing.  It was all in oats at that time,

8  until we put it in alfalfa.  Then we really irrigated it.

9  Q  How about field No. 10?

10  A  That is just dry farming, in oats; we never irrigated

11  it.

12  Q  Do you irrigate it now?

13  A  We haven't had a chance yet, but it will be.

14  Q  You mean you can irrigate it this year?

15  A  Yes, we can irrigate it this year.

16  Q  Could you last year?

17  A  No.

18  Q  How about field No.11?

19  A  The same thing; no irrigation.

20  Q  The most northerly part of field 11, do you have any

21  local designation for that?

22  A  No, we never--

23  Q  Is that the corral area?

24  A  The corral-- the pasture is right down along in

25  through here.  That is a wire fence and the cow corrals where

1    we have been feeding them.  That is our cattle yard.

2    Q  Have you irrigated that part of field 11 at any time

3    in the past?

4    A  No.

5    Q  Field No. G up on Mr. Cottle's property, have you

6    working for Mrs. Gibbon irrigated any portion of that up there?

7    A  This is this corner here?

8    Q  Yes.

9    A  Yes, we have irrigated that since we had the sprinklers.

10   Q  And when was that?

11   A  Ever since 1951.  Up until this year.  We didn't

12   sprinkle there this year.

13   Q  Are you familiar with the intake of the upper ditch?

14   A  Yes.

15   Q  Has that ditch been in continuous operation since 1939?

16   A  Except when we had to clean it.

17   Q  And how often do you clean it?

18   A  Once a year.

19   Q  And have you had, in connection with your duties, any

20   responsibility for operating the ditch?

21   A  Sort of a boss.

22   Q  Beg your pardon?

23   A  Sort of a boss.

24   Q  So that you know how much water has been taken through

25   the ditch in a general way?

A   Yes.

Q   Have you taken all the water that was available in
the creek except at flood times?

A   At flood times it went over the top of the dam or
washed it out.  But as a rule all we could get was a 12-inch
pipe full-- that is all would go down is one 12-inch pipe full,
and anything over that would bypass us.  You see, that flume
being 12 inches down here, although we do have a double pipe
up here, there is only so much can get by this other one.

Q   Have you taken the maximum that could go through there
whenever it was available?

A   Yes.

Q   And have you used on the Gibbon or the Cottle ranches
all of that water for irrigation?

A   Yes.

Q   And that is ever since 1939?

A   Yes.

Q   Are you familiar with the lower ditch?

A   I have seen it, but I have never done nothing on it,
except one year.  You see, we had these fellows cleaning this
ditch--

Q   Which ditch are you referring to?

A   The main ditch.  And when they got through with this
they got on this lower ditch and done some cleaning on that,
and that was-- it could be six or seven years ago.  I am not

1    absolutely certain as to that.

2        Q   But you have never had any responsibility for main-

3    taining the lower ditch or operating it?

4        A   No.

5        THE COURT: Did you ever see water run in the lower ditch?

6        A   Yes, I have seen water in it.

7    BY MR. GROVER:

8        Q   When was that?

9        A   Back in about '52-53, in there.  You see, it was not

10   always plugged up, so that ordinarily if you plugged off this

11   lower dam down here the water would go through.

12       Q   You are pointing down to the intake to the lower ditch?

13       A   The intake to the lower ditch right here, and the

14   water would shoot by there.

15       Q   In making measurements of flow in the ditch, have you

16   personally made any of the weir measurements that would be

17   shown in the ranch records?

18       A   It does; it shows there.  I have made oodles of them.

19   I made a lot of them.

20       THE COURT:  Can the witness come back to the stand?

21       MR. GROVER:  Yes, your Honor.

22       THE COURT:  Come back to the stand.

23   BY MR. GROVER:

24       Q   How often are those measurements made?

25       A   Once a week.

12532

Q   Are they made at the same time each week?

A   Same time each week day; Fridays before, and Mondays now.

Q   You mean for a certain number of years it was on Fridays, and now it is changed to Mondays?

A   Yes.

Q   Is the flow of the stream and the ditch up at the head sufficiently regular through the week that the weekly reading gives a substantially accurate picture of the flow for the week?

MR. VEEDER:  I object to that as being purely con-jectural, your Honor.

THE COURT:  Sustained.

Did I understand you to say that you take the readings at the same time each day?

THE WITNESS:  Approximately 1 o'clock each Monday.

THE COURT:  In the afternoon?

THE WITNESS:  In the afternoon.  And then we come back down to the lower weir and take it there as nearly as possible at about 1:15, 1:20.

THE COURT:  You take your readings then?

THE WITNESS:  Yes, one at the upper and one at the lower.

THE COURT:  The upper at 1 p.m., and the lower at about 1:30?

THE WITNESS:  Yes; on Mondays.

1      THE COURT: And when you were taking the readings on

2  Friday, were you also taking two readings?

3      THE WITNESS:  Two readings.

4      THE COURT:  Upper and lower at the same time of the day?

5      THE WITNESS:  Yes.

6      THE COURT:  Did you make notes in the records of the

7  company of these readings?

8      THE WITNESS:  In the book we had in the garage.

9      THE COURT:  All right.

10  BY MR. GROVER:

11      Q  Have you made all the readings, or did other people?

12      A  Other people made them, too.

13      Q  Sometimes you made them, and sometimes other people

14  on the ranch made them?

15      A  Yes.

16      Q  How regular is the flow of the river at the point of

17  the upper intake?

18      MR. VEEDER:  I object to that:  How regular is the flow

19  of the river.  I object to it.  It is incomprehensible to

20  begin with.  What does it mean?  He hasn't been there every

21  Monday when the river has flowed.

22      THE COURT:  It's obviously not good.  You are asking

23  about flow of the river.  He didn't measure the river.  He

24  measured the weirs.

25      MR. GROVER:  He has observed the flow, your Honor.  Here

1    is the point, your Honor.  If we have a steadily moving stream,

2    a weekly measurement would be more reliable than if we had one

3    that varies a great deal.

4         MR. VEEDER:  What varies a great deal?

5         MR. GROVER:  The flow in quantity.

6         He can tell us whether it is a pretty steady stream or

7    a stream that flows differently every day.  Naturally, there

8    are going to be changes during the week, but I would like to

9    get in his words, without leading him, what he thinks about

10   the regularity of the flow of the river.

11        MR. VEEDER:  Your Honor, I object.  I don't believe this

12   witness can testify to the regularity of the flow of the river.

13   I think we all know that these intermittent streams, in time

14   and place, are given to violent fluctuation, dependent upon

15   evaporation, rainfall, time of the year-- a hundred different

16   factors are entailed.

17        THE COURT:  There is no doubt about that.  Without any

18   testimony on it, you could make a fast guess that there would

19   be a lot of water in this stream in the wintertime after the

20   rains, and in the spring it might run some water, and in the

21   summer you might be lucky to find enough to wet your feet.

22        MR. GROVER:  But that is an annual record.  And a weekly

23   reading, if there were an annual cycle, would give you a good

24   picture of how the water was coming down in the winter and in

25   the summer.

1   THE COURT:  Your question is not going to add anything.

2   Obviously, a measurement every ten minutes would be more

3   accurate than one every day, and one every day would be more

4   accurate than one every week, and one every week would be more

5   accurate than one every month.  You have a weekly reading.

6   Why not rest on that?

7       MR. GROVER:  I wanted your Honor to have the benefit of

8   his description of the regularity of the flow.

9       MR. VEEDER:  In that regard also, they are going to

10  produce these weekly measurements, as I understand it, from

11  which one of their exhibits was prepared.  If that takes in

12  all the water it should be reflective of what he is trying

13  to get out of this witness.

14      MR. GROVER:  That is the purpose.

15      MR. VEEDER:  It is pure speculation, what he is asking

16  him, though, and I renew my objection.

17      THE COURT:  I wouldn't object to a general description

18  of the stream, but that is not going to add anything.  But

19  if you go any further than that--

20      MR. GROVER:  I think it might have a particular reason,

21  which I will ask Mr. Spaniol to tell about, if I may.

22      MR. VEEDER:  I have an objection to this.

23      THE COURT:  He is withdrawing the question.

24      MR. GROVER:  I withdraw the question that I asked.

25      THE COURT:  He is asking another question.

BY MR. GROVER:

Q   What is the source of the water in the stream immediately upstream from the intake to the upper ditch?

A   It comes out of a bunch of springs about a mile up from the dam.

THE COURT:  You mean it is rising water in the bottom of the creek?

THE WITNESS:  Yes, about a mile up, comes out of the side of the hill and out of the bottom of the creek about a mile up from the dam.

MR. GROVER:  Now we are getting onto the dangerous ground again, but in the light of that I will ask him again.

Q   Is this flow of rising water from the springs at the side and bottom of the creek, is it a relatively even flow?

MR. VEEDER:  I object to that, your Honor.  I don't know what "relatively" even means.  I don't believe the witness knows.

THE COURT:  Don't you have a gaging station down at Aguanga?

MR. VEEDER:  The highest one up there is Radec, I believe.

THE COURT:  No, there is a gaging station at Aguanga which is within this same section, within Section 19.

MR. GROVER:  Is that the same section 19?

THE COURT:  According to my map here, it shows in Section 19 beyond the area of the Cottle property.

1      MR. GROVER: That is right. There is one.

2      MR. VEEDER: It is downstream, though.

3      MR. GROVER: Downstream.

4      MR. VEEDER: And what he is trying to elicit, as I under-

5 stand it, is the flow of the stream above the point of diver-

6 sion.

7      THE COURT: The objection is overruled.

8      You may tell me, in general words, how you observed the

9 stream flow.

10      THE WITNESS: It is fairly average, but it gradually

11 goes down toward the end of the summer. In the spring now

12 it is pretty even right now.

13      THE COURT: By "even" you mean it would flow about the

14 same each day?

15      THE WITNESS: Yes, steady. But toward the end of the

16 summer and middle of the summer it is gradually going down.

17      THE COURT: When you get along towards the summer, did

you ever notice that there was a lot more flowing in the morning

than in the evening?

      THE WITNESS: No, I don't think so.

      THE COURT: You didn't notice that?

      THE WITNESS: No.

23      THE COURT: Go ahead.

24 BY MR. GROVER:

25      Q  Did you have anything to do with the construction of

1    the dam at the intake of the upper ditch?

2        A   Rebuilt it a lot of times.

3        Q   And could you tell us how it is constructed, with

4    particular reference to the part that is below the ground?

5        A   Yes.  We had three men up there one day, with myself,

6    and we dug the lower part of the dam all out for about six

7    or seven feet, took everything out down to rock and hauled up

8    a whole lot of clay, that is, as good clay as we could get,

9    dumped it in there and covered the whole mess up with rock and

10   put a new pipe under it for an outlet.

11       THE COURT:  Do you want to move to strike this?

12       MR. VEEDER:  No, your Honor.

13       THE COURT:  Was this the first time, to your knowledge,

14   that they had ever dug down to the rock, when they put this

15   dam in?

16       THE WITNESS:  That deep, yes.

17       THE COURT:  You didn't find any other old clay when you

18   dug down?

19       THE WITNESS:  No, just rock.

20       THE COURT:  Just rock and gravel?

21       THE WITNESS:  Yes.

22   BY MR. GROVER:

23       Q   When was this done?

24       A   About five years ago, roughly.

25       THE COURT:  Did you get more water after you did that?

1     THE WITNESS:  Yes.

2     MR. VEEDER:  I didn't hear it.

3     THE WITNESS:  Yes.

4  BY MR. GROVER:

5     Q   This pipe that you referred to, what pipe is that that

6  you put--

7     A   Piece of 12-inch 10-gauge tarred pipe.

8     Q   What was the purpose of it?

9     A   So we could have an underground passage underneath

10  the dam when we wanted to let the water go down.

11     Q   You say underground, you mean--

12     A   Under the dam.

13     Q   Above the surface of the ground but below the surface

14  of the ground underneath the dam?

15     A   Just at the creek bed level.

16     Q   Would water coming through this pipe be on top of the

17  ground or underneath the ground?

18     A   Just at the level of the ground or creek bed.

19     Q   But would it flow above the ground?

20     A   Yes.  Not above the ground.

21     Q   What was the purpose of the putting that pipe there?

22     A   It is the only way we had of letting the water out

23  from behind the dam.  You see, when we would go to clean the

24  ditch we had to let the water bypass us.  Otherwise, we

25  couldn't shut the water out of the ditch.

1    Q   When you say it was the only way to let the water

2    through the dam, you mean except for the diversion pipes?

3    A   Yes.   The diversion was really above the creek bed.

4    That is what the dam was in there for, to raise the water up.

5    Q   So when you would open this other pipe up the water

6    would go down the creek instead of into the diversion?

7    A   Yes.

8    THE COURT:   What was the purpose of putting the clay down

9    there?   To get more water?

10   THE WITNESS:   To get more water.   It was all constructed

11   of sand before.

12   MR. VEEDER:   Simply sealed it off and took more water?

13   THE WITNESS:   Yes, we stopped all the seepage, then.

14   THE COURT:   It's the old story of just ask one more

15   question.

16   MR. VEEDER:   That is right.   We couldn't have gotten that

17   with a pistol.

18   THE COURT:   Obviously, this was not the kind of dam that

19   had been constructed before.

20   MR. GROVER:   But it is what the facts are, your Honor.

21   THE COURT:   Yes.

22   MR. GROVER:   There was some uncertainty about it before.

23   MR. VEEDER:   There is not now.

24   THE WITNESS:   The dam will hold now.

25   MR. VEEDER:   He says that the dam will hold now.

1    Q   Does water go through this outflow pipe into the creek

2  at all times or when you allow it to go through?

3    A   Only when we allow it to go through.

4    Q   You are the one who does the measuring of this?

5    A   No.  The regular foreman of the place now, he does it.

6    Q   But you have kept the records?

7    A   Well, with all these different men they had on the

8  place, yes.

9    MR. GROVER:  I had another question.  I am sorry.

10    MR. VEEDER:  Go ahead.

11  BY MR. GROVER:

12    Q   In the five years since this change was made in the

13  construction of the dam, have you gotten more water than in the

14  '39 period, or less?

15    MR. VEEDER:  I object to that unless we have a comparison

16  as to the quantity of water in the stream.  That is the most

17  important single aspect.

18    You have gotten more water, depending on the runoff;

19  isn't that correct?

20    MR. GROVER:  I am just asking him about the water in the

21  ditch.

22    Q   Is there more water coming through the ditch in the

23  last five years than there was in the period--

24    MR. VEEDER:  I object on the grounds that is cumulative,

25  your Honor.

1   MR. STAHLMAN: He said that it produced more water.

2   MR. GROVER: That is not quite the point. Here is the

3   point. When the water became very scarce, as in the last few

4   years, they made greater efforts to get even less quantity of

5   water. They are not taking more water. They got more water

6   before. But they had to be a little more ingenious to get it.

7   MR. VEEDER: That word "ingenious" is a hard word around

8   here.

9   MR. GROVER: This is the way you do it, if you are

10  protecting a water right and making the most out of your

11  situation.

12  THE COURT: Try it again. Ask your question.

13  MR. GROVER: I want to distinguish between the statement

14  he made earlier, which was that he got more water, and the

15  point is that immediately of course he did, but did he get more

16  water than he had prior thereto?

17  THE COURT: What you want to ask is this:

18  Is it a fact that notwithstanding the improvements you

19  made in the dam-- putting the clay in and all-- that during the

20  last five-year period when we have had dry years you actually

21  wound up with less water in your ditch than ran in the ditch

22  at earlier times when we did not have the dry years?

23  THE WITNESS: May I say this. We do not have a 12-inch

24  pipe full of water now, nohow. Can't get it.

25

1    BY MR. GROVER:

2       Q   But you had in those earlier years?

3       A   Yes, we had water coming out of our ears.

4       MR. GROVER:   That is all I have, your Honor.

5       THE COURT:   All right, Mr. Veeder.

6

7                  CROSS-EXAMINATION

8   BY MR. VEEDER:

9       Q   You have taken these measurements for how many years?

10       A   Oh, I guess it's ten years or more; at least that

11 much.

12       Q   And you took them once a week?

13       A   Between me and the different men that was working

14 there.

15       Q   What did you do with those measurements afterward?

16       A   Put them down in a book in the garage. We kept a

17 record of them.

18       Q   You made the record and then you wrote it in?

19       A   Made the measurements.

20       Q   You made the measurements, put it in the book and

21 then kept track. You were talking about the upper and lower

22 weir. Is it correct that the weir-- could you come here?

23       (Witness stepping down to the exhibit.)

24       You took a measurement at the weir-- let the Court see

25 this-- you took a measurement at the weir just below the

1  heading; is that right?

2       A   It is down there about three or four hundred feet,

3  something like that, 300 feet, down at the bottom.

4       Q   And then where is the other weir that you mentioned?

5       A   Right down there.

6       THE COURT:  Let the record show where he is pointing.

7  BY MR. VEEDER:

8       Q   And that was at the small reservoir in Field No. 2?

9       THE COURT:  Between 2 and 3.

10 BY MR. VEEDER:

11      Q   And the water then is presently diverted, is it not,

12 between that point and the second point of delivery; isn't

13 that right?  Isn't there some water diverted --

14      A   Where?  Into what?

15      Q   For your field No. 1?  Is there any water taken out

16 of there?

17      A   Cows drink out of a little spot there that we dug

18 out.

19      Q   Don't you pump out of there?

20      A   No, we don't pump out of there.

21      Q   And where does this water go?

22      A   Into the reservoir, just about right here.

23      Q   The water goes into the reservoir?

24      A   If we let it go.  But --

25      THE COURT:  You are talking about the big reservoir?

THE WITNESS:  Yes.

THE COURT:  Have you pumped out of the big reservoir yet?

THE WITNESS:  No.

THE COURT:  Then the pumping and the sprinkling you have done has been out of the smaller reservoir between fields 2 and 3?

THE WITNESS:  Yes.

THE COURT:  And your weir is down there before the water goes into the small reservoir?

THE WITNESS:  Yes.

THE COURT:  Your second weir.

BY MR. VEEDER:

Q   And each day you took those measurements?

A   No, not each day; once a week.

Q   Once a week you took the measurements at both places?

A   Yes.  That was not me taking them each week, but somebody took them.

Q   Yes.  When you flood field No. 2-- isn't that how you used to do it, with your flood irrigation?

A   Yes, we used to flood.  That was before '51.

Q   How did you do that?

A   We cut a ditch in the bank--

Q   You cut a --

A   A ditch in the bank.  We cut the small ditch, stuck a piece of pipe in there, covered the pipe so the water would

1  go down through the pipe, then we had 10-foot pipe lengths

2  of 6-inch pipe that we fed the water with.  We cut those,

3  ever 25 feet wide we had one of those openings.

4      Q  Did this field No. 2 slant down toward the creek?

5      A  It slanted down toward the creek.

6      Q  And what kind of soil is that?  Is that sandy soil?

7      A  Pretty good soil as far as I could tell; not sandy,

8  sandy loam.

9      Q  Field No. 2 is a pretty good field.  But you irrigated

10  the whole field, didn't you?

11      A  Yes.

12      Q  So the water would flow down toward the creek; isn't

13  that right?

14      A  Yes.

15      Q  And when you were irrigating that field No. 2 there

16  would be water running on down into the creek?

17      A  Not if we could help it.

18      Q  But there was some return, wasn't there?

19      A  There might have been a little, but we watched it

20  so it didn't run down there.

21      Q  And how much water would you put on there?

22      A  I couldn't tell you.

23      Q  Would you put the whole ditch on that field No. 2?

24      A  It would run six 6-inch pipes full on one field.  That

25  would take all the ditch would carry-- six 6-inch pipes full.

Q   So you would divert the whole thing on field No. 2?

A   Then when we got that water in we would move down to
another field.

Q   Then you would move down to Field No. 3?

A   At that time 3 and 4 were one field.

Q   And the gradient from 3 and 4 was down to the creek?

A   All downhill.

Q   So that the water you put on there would be used to
irrigate, and any tail water or any waste water would find
its way back to the creek?

A   No, it would fall into the lower ditch.

Q   It would flow on down?

A   In this lower ditch.

Q   It would flow down the creek first, would it not?

A   No.

Q   And it would go--

A   In the lower ditch all the way around, if there was
enough of it coming over.

Q   And the water you put on here--

A   If we put too much on there, it would go in the lower
ditch.

Q   How many cuttings of alfalfa would you get on that?

A   It was pasture.  There was alfalfa up here at one time,
but that is quite awhile ago.

Q   So you would in effect on fields 2, 3 and 4 reapply

1   all of the water of the ditch?

2       A   All the water.

3       Q   So that any return flow that there might be would

4   either go into the lower ditch or into the creek; is that

5   right?

6       A   Couldn't pass the lower ditch.

7       Q   It couldn't?

8       A   No.

9       Q   And if it went into the lower ditch then it would flow

10  on down?

11      A   It would flow on down.

12      Q   Down to H, J and I?

13      A   Go all the way down.

14      Q   The gradient of those fields is down to Temecula

15  Creek, is it not?

16      A   Yes.

17      Q   So that the water that was taken out of the upper

18  ditch was in an area all slanting down to Temecula Creek?

19      A   That is before '51.

20      Q   Yes.

21  MR. GROVER:   I don't believe that is the testimony.

22  MR. VEEDER:   The man said yes.

23  MR. GROVER:   Obviously he doesn't understand.

24  THE WITNESS:   It was flowing down to the lower ditch.

25  MR. GROVER:   That is the answer.

1    THE COURT:  He is talking about the drainage of the

2  ground.  The ground falls away in the direction of the creek

3  and overflow water was picked up by the lower ditch.  I under-

4  stand.

5    MR. VEEDER:  Counsel, the witness said that.

6    Q  So as a matter of fact now you have a situation--

7    THE COURT: Before you do that, let me ask another

8  question.

9    Were you familiar with that pond over there on Cottle's

10  property?

11    THE WITNESS:  No.  I have seen it, but that is all.

12    THE COURT:  When you were doing this flooding of fields

13  2, 3 and 4, were there ever situations where the lower ditch

14  was full of water and carried it around?

15    THE WITNESS:  Not from our fields.  We never let that much

16  get away from us.

17    MR. STAHLMAN:  No irrigator will ever admit that he loses

18  any water.

19    THE COURT: Go ahead.

20  BY MR. VEEDER:

21    Q  Do you maintain these pastures pretty green and nice

22  during the irrigation season, don't you, by putting plenty

23  of water on them?

24    A  We put plenty of water on them.

25    Q  Now, since you have put in your sprinkler system you

1   find it a lot more efficient, don't you?

2       A   A lot more work.

3       Q   Well, a lot more work, but it is also more efficient,

4   is it not?

5       A   You use less water.

6       Q   In other words, you can put it on an area that was

7   not previously irrigated; isn't that right?

8       A   Control area, yes.

9       Q   So as a matter of fact, there would not be-- as an

10  old irrigator you can answer this-- as a matter of fact, by

11  your sprinkler system you are actually consuming all of the

12  water that you divert, aren't you?

13      A   Yes.

14      Q   So there would be no return flow where you use the

15  sprinklers; isn't that correct?

16      A   That is correct.

17      THE COURT:  Have you finished with the map so we can get

18  the witness back on the stand?

19      MR. VEEDER:  Yes, he can go back.

20      Q   When you raise your oats, what time of the year do

21  you plant oats?

22      A   Generally before Thanksgiving.  It had to be in the

23  ground before Thanksgiving.

24      Q   And your oats get the benefit of the fall and winter

25  rains?

1    A    Winter rains.

2    Q    And do you harvest it as grain or cut it as hay?

3    A    We cut it as hay.

4    Q    And when do you cut it?

5    A    The early part of June on the average.

6    Q    And how many times would you irrigate your oats to make

7    your hay crop?

8    A    That depended on the rain that we got during the

9    winter.

10   Q    How many times did you irrigate last year?

11   A    Last year I think we irrigated -- that is the '58-59

12   season?

13   Q    Well, I believe I am speaking about--

14   THE COURT:  The crop that matured before July 1st, 1959.

15   MR. VEEDER:    That's right.

16   THE WITNESS:  I think we irrigated them once last year.

17   BY MR. VEEDER:

18   Q    Once?

19   A    Yes.

20   Q    And you irrigated with the sprinklers at that time?

21   A    Oh, yes.

22   THE COURT:  When was that irrigation last year?  What

23   month was that irrigation in-- February, March?

24   THE WITNESS:  No, I am almost certain it was in February.

25   THE COURT:  But you don't irrigate along in May or June?

THE WITNESS:  No.

THE COURT:  After your oats gets up four or five inches tall, or what?

THE WITNESS:  No, after it gets up about a foot you don't bother it.

BY MR. VEEDER:

Q  So you would figure one irrigation would be about right in a year like '58-59?

A  Yes.

Q  One irrigation?

A  Yes.  If your rains are spread out, you are all right.

Q  In regard to this year, how many times have you irrigated your oats?

A  We ain't through yet.  We are just starting.

Q  I mean up to now.

A  We are just irrigating right now.

Q  This is the first irrigation?

A  Yes.

Q  And if you don't get any more rains how many more irrigations do you figure?

A  Possibly one or two.

Q  At the outside?

A  One anyway, maybe two.

Q  Have you calculated the quantity of water you would utilize --

1    A  No.

2    Q  Thank you.  That's the kind of witness I like.

3       Do you use any of the water out of the wells for

4  irrigation at the present time?

5    A  Except the lawn, the house lawn.

6    Q  And in the past did you use the wells for irrigation

7  of any of the pasture?

8    A  Very little.  The well don't produce enough water

9  to do much irrigating.

10    MR. VEEDER:  I have no further questions.

11

12                    CROSS-EXAMINATION

13  BY MR. STAHLMAN:

14    Q  When you say you are familiar with this place, you

15  are familiar with this new reservoir that was built?

16    A  Yes.

17    Q  What type of construction is it?

18    A  Just bulldozed a hole in the ground and put up a bank.

19    Q  Anything put on the bottom to seal it off?

20    A  Not yet, no seal.

21    Q  Do you expect to seal it?

22    A  Yes.

23    THE COURT:  With what?

24    THE WITNESS:  That is a question.  I don't know.

25    THE COURT:  Are you going to try to use a clay seal, or

1    are you going to put concrete on it?

2        THE WITNESS:  No, it is too big for that.

3    BY MR. STAHLMAN:

4        Q   A chemical seal?

5        THE WITNESS:  No.  My idea is Mojave clay.

6        Q   Do you know the capacity of the reservoir?

7        A   Roughly 10 feet, the Soil Conservation told me.  I

8    don't know exactly.  I never measured it.

9        Q   Was this reservoir built by the Soil Conservation

10   people, too?

11       A   Yes.

12       Q   This stream that you indicated flowed the same in

13   the morning as in the evening upstream-- do you recall your

14   answer that upstream from the diversion the stream flowed the

15   same in the morning as in the evening?

16       A   Well, so far as I know, yes, because we don't measure

17   it in the early morning or in the afternoon.

18       THE COURT:  You don't measure the stream at all; you

19   measure the weir.  He is talking about the stream.

20   BY MR. STAHLMAN:

21       Q   I am talking about the stream.  When you were asked

22   by his Honor as to the source of the water upstream as to whether

23   it flowed the same in the morning and in the evening, you said

24   yes.  Do you recall that answer?

25       THE COURT:  He is asking you now if you recall that answer

1    that you gave.

2         THE WITNESS:  Yes, I do.  But I am just doing a little

3    thinking on that.

4         THE COURT:  Do you or do you not recall the answer?

5    Don't anticipate the next question.  Do you recall that you

6    so answered?

7         THE WITNESS:  Yes.  But I never measured that.

8    BY MR. STAHLMAN:

9         Q  But did you ever go up there in the morning and then

10   go up the same evening and check it?

11        A  No.

12        Q  Observe it?

13        A  No.

14        Q  That is just a guess on your part, then?

15        A  I can see it flowing and that is all I look at.

16   MR. STAHLMAN:  That's all.

17   THE COURT:  Mr. Sachse?

18   MR. SACHSE:  I have no questions, yourHonor.

19

20                     REDIRECT EXAMINATION

21   BY MR. GROVER:

22        Q  Have you observed the flow of the creek at other places

23   in the morning and in the evening?

24        A  No.

25        THE COURT:  I will be very surprised if this stream is

an exception to the general rule for small mountain streams

in this area.

THE WITNESS: It all comes out of springs.

BY MR. GROVER:

Q  Have you ever irrigated your oats more than twice?

MR. VEEDER:  You mean the Gibbon oats?

MR. GROVER:  Yes.

THE WITNESS:  Several years back we did.

BY MR. GROVER:

Q  How many was the most you ever did?

A  As a rule it was three times.

Q  Is any of the well water for irrigation by the

reservoir, put into the reservoir and then used for irrigation?

A  Yes, No. 2 well we would pump into the reservoir

and then pump it out of there through the pipe line.

THE COURT:  No. 2 well.  You are not talking about Cottle

No. 2?

THE WITNESS:  No; Gibbon.

THE COURT:  You are talking about the No. 2 well in area

2.

THE WITNESS:  In area 2.  There are two wells there close

together.

MR. GROVER:  That is all I have.

THE COURT:  Mr. Veeder?

MR. VEEDER:  Nothing more.

1    THE COURT:  Step down.  Thank you.

2    MR. GROVER:  These are all the witnesses I have today.

3  I think it might be a good time to make arrangements, or we can

4  make them later, for the continuance until we can bring Mr.

5  Tripp here.

6    MR. VEEDER:  Are you going to bring him?

7    MR. GROVER:  Yes.

8    THE COURT:  There are two Mr. Tripps.

9    MR. GROVER:  Mr.L. J. Tripp.  He is the man who has the

10  knowledge back to 1885.

11    I would be happy to have his deposition, since we will

12  have to go north on the Clinton Tripp to Modesto anyway.

13  We could catch L. J. Tripp in Dinuba on the way, I guess.

14    MR. VEEDER:  I like his Honor's cross-examination.  We

15  couldn't have that if we had a deposition.

16    MR. GROVER:  Naturally, I don't want to go to any un-

17  necessary work for anybody, but I think your Honor should be

18  present when L. J. Tripp is testifying.  I think it should

19  be before your Honor.

20    THE COURT:  Are you talking about the man whose deposition

21  you are going to take?

22    MR. GROVER:  No, because of his illness he doesn't feel

23  that he could testify in court.

24    THE COURT:  I think this man Tripp is a very necessary

25  witness, if you are going to claim any appropriative or

1  prescriptive right, and I think certainly if he can come here

2  he should come here.

3      MR. GROVER:  That is what I say, your Honor.

4      THE COURT:  You have completed with all your witnesses?

5      MR. GROVER:  Yes, except for those.

6      THE COURT:  And you have completed your case with the

7  exception of the reports to the State Water Rights Department?

8      MR. GROVER:  Yes, we are going to work that out with

9  counsel.

10      THE COURT:  And these two Tripp witnesses?

11      MR. GROVER:  Yes, your Honor.  The way the testimony

12  has come out, it may be that we might want to present at the

13  same time of Mr. Tripp one or two other witnesses who are

14  familiar with little periods to fill in the gap that I had

15  not thought would be necessary, but the way it has come in

16  we might have to fill in a year or two there.  We want to make

17  a complete 75-year record, if we can.

18      Also, I would like to submit copies of the deeds and

19  perhaps a few of the other documents that show in the chain

20  of title, merely as a technical matter of proof.

21      THE COURT:  I don't think you need to go to that trouble

22  and expense.  You have the chain of title.  The Government is

23  going to check all these.  If they need further information,

24  they will call for it.

25      MR. GROVER:  I have copies of a few of them, and if there

1    is no objection I would like to--

2          THE COURT:  Do you want the deeds?

3          MR. VEEDER:  No, but if he wants to give them to me I

4    will look at them.  My own view is that we have to go through

5    and check everyone else's.  But if he has them, we will take

6    them.  It might save some money.

7          MR. GROVER: The only point being that they haven't been

8    lodged ten days in advance, and I would submit them subject

9    to objection.

10         MR. VEEDER: We have no objection.

11         THE COURT:  The Government has no objection.  If you have

12   copies of the deeds, you can put those in right now.  How

13   many do you have?

14         MR. GROVER:  I have the deeds to Cottle 1 and the deed

15   to Gibbon 2 and a deed to Johannsen 1.

16         THE COURT:  You don't have a complete chain of them?

17         MR. GROVER:  No.

18         THE COURT:  Then why encumber the record with them?  Why

19   don't you let Mr. Veeder see what you have available and give

20   him copies, and if we have any problem we will call upon you.

21   You certainly will not lose any rights by not putting in your

22   chain of title.  You have exhibits showing your chain of title

23   and you have a prima facie case of ownership.

24         MR. GROVER:  Then, your Honor, I will not bother with it.

25         THE COURT:  Mr. Sachse, do you expect next week to occupy

1    Wednesday, Thursday and Friday?

2        MR. SACHSE:  I want to inquire, your Honor.  I feel

3    certain that the Searl Brothers case will take Wednesday and

4    probably Thursday.  There are some good geological questions.

5    I imagine that Mr. Veeder will have some fairly lengthy

6    cross-examination.

7        THE COURT:  Where are they located?

8        MR. SACHSE:  That is Diamond and Domenigoni Valleys.

9        The only other client I have with whom I can proceed to

10   put on a case will be relatively brief, and that is Stardust

11   Ranch.  That is down by Oviatt.  We are jumping into two

12   different parts of the river.  I could have them here Friday,

13   or we could put them aside to another time.  I have made no

14   arrangements for them.  Whatever your Honor prefers.

15       THE COURT:  How long will it take?

16       MR. SACHSE:  I don't think their case will be very long,

17   because frankly we have a small amount of evidence.  We are

18   going to rely largely on the U. S. engineering report and I

19   don't think they would take more than an hour or two.

20       THE COURT:  I have set aside this next week, except

21   Tuesday when I will be gone.  Why don't you have them ready

22   Thursday noon on call, and if not, on Friday morning?

23       MR. SACHSE:  I will have them for Friday morning.

24       THE COURT:  Suppose that you wind up with the Searl

25   Brothers' case by Thursday noon.  Why not have them on tap

1  presently for Thursday noon, or if not, call them and tell

2  them to come in Friday morning.

3      MR. SACHSE:  They are coming a long way, your Honor.  The

4  owner is a doctor and I just hate to ask them.  I think we

5  could find things to do to take up that half day.  I don't

6  believe Mr. Veeder is going to let my engineer witnesses get

7  through so easily.

8      THE COURT:  Do you think you can do this Stardust case

9  in half a day?

10     MR. SACHSE:  Yes, your Honor.

11     THE COURT:  Then Friday morning will be satisfactory.

12     MR. SACHSE:  That will leave me one further client whom

13 you directed to present his case before you, namely, Occi-

14 dental College.  Col. Bowen has just told me informally that

15 he hopes the engineering report will be ready in two weeks.

16 I would like the latter part of next week to set that for an

17 exact hearing day also.

18     THE COURT:  Isn't that Occidental College property all

19 up in the basement complex?

20     MR. SACHSE:  They are all riparian.  Mr. Veeder requested

21 the hearing to be here.

22     MR. VEEDER:  They have a dam, don't they?

23     MR. SACHSE:  They have two ponds.  They assert no

24 appropriative rights of any kind.  They have never used the

25 water from the dam.  It is one of these wide places in the

1   stream that they let run out the other end.   It's just a beauty

2   spot for fish pond.

3        That is the only other one I have.

4        Your Honor also directed me to have Harry Bergman and

5   Tule Land & Cattle put their case on here.   I want to state

6   for the record at this time that there will be no case on

7   behalf of either of those defendants.   We will rest our case

8   at this time on the United States' geological evidence and

9   the United States' ownership evidence, which shows the status

10  of both those properties as to riparian rights and geological

11  evidence.

12       We have no further problem.   We have enough in the record

13  already.

14       MR. SACHSE:   That is my position, your Honor.

15       MR. STAHLMAN:   I want to see those reports.

16       MR. VEEDER:   They are not reports.

17       MR. SACHSE:   I am resting their case on Exhibit 15,

18  et cetera.

19       THE COURT:   They are basement complex holdings.

20       MR. SACHSE:   And riparian.   As far as I am concerned, I

21  couldn't offer anything in addition.

22       THE COURT:   There is no substantial irrigable ground?

23       MR. SACHSE:   There is no use by either one of them.

24  They are just large owners.

25       THE COURT:   Cattle ranches?

1    MR. SACHSE:  No ranch.  It is just land ownership of

2    riparian land that has never been used.

3    THE COURT:  You are not concerned with how much land might

4    be irrigable?

5    MR. SACHSE:  I am not concerned, your Honor.  I think

6    your Honor recalls my position.  If they ever start to use

7    it, I will come in and assert the right to prove up our

8    irrigable acres whenever they want it.

9    MR. STAHLMAN:  There is no diversion?

10   MR. SACHSE:  On neither of them.

11   THE COURT:  Is there any possibility that we could get

12   this Tripp witness down next week?

13   MR. GROVER:  I think we could, your Honor.  He wanted to

14   come in May, if he could.  I didn't know when I talked to him

15   what your schedule would be.  He wanted to visit relatives

16   here at the end of May.  He is 84 and really isn't very mobile,

17   and I would like to accommodate him.

18   MR. VEEDER:  I told Mr. Grover that we would accommodate

19   ourselves to the difficulty in regard to the age of these

20   witnesses.

21   THE COURT:  You will not be here next week, will you?

22   MR. GROVER:  Not except for more on this case.

23   MR. VEEDER:  I would ask Mr. Grover to give me some time

24   in advance, though, because I don't know where I will be

25   during May.

1    MR. GROVER:  Fine.

2    MR. VEEDER:  I think we will probably have a situation

3  where we are going to put in testimony on the 5th or 6th.  I

4  would like to arrange it for that time when this Tripp man

5  will be available.

6    MR. GROVER:  Memorial Day is the day that he hopes to be

7  down here.

8    THE COURT:  We probably should fix a continued date now

9  for this Tripp matter, and then if we don't reach it, continue

10 it again.  In other words, we have a jurisdictional problem

11 in that this case should be continued each time to a date

12 certain.

13   He wants to come down around Memorial Day?

14   MR. GROVER:  Yes, your Honor.

15   THE COURT:  Do you think we can finish with him in a day?

16   MR. GROVER:  Yes, I believe so.

17   THE COURT:  What about the Friday after Memorial Day,

18 which would be June 3rd?  The Friday before would be the 27th

19 of May.

20   MR. GROVER:  I believe May 27th would probably be better,

21 because that would give him the weekend and Memorial Day here

22 without interruption of several days.  After the 30th he

23 probably would want to go home.

24   THE COURT:  Shall we say the 27th, then?

25   MR. GROVER:  Yes, your Honor.

1   MR. VEEDER:  May we have that, then, the 27th, as the

2   date to notify people to be in?

3   THE COURT:  Yes.

4   May 27th at 10 o'clock.  Tripp will be the main matter

5   of business, plus letters to other people to come in.

6   MR. VEEDER: That is right.  We will put them at the 10

7   o'clock hour, though.

8   THE COURT:  All right.

9   The only comment I want to make on this Cottle-Gibbon

10  matter, because I haven't heard all the evidence, but I would

11  merely suggest that Mrs. Gibbon not spend any more money to

12  put any bottom on this big reservoir until we have some

13  determination on this matter.  I have serious doubt as to

14  whether the ten-acre-foot reservoir will be of any particular

15  use to you.  I am certainly making no decision, but it seems

16  to me that you have built an awful big reservoir for any

17  reasonable use that you may have from this stream.  I would

18  keep my money in my pocket awhile.

19  Anything further today?

20  MR. SACHSE:  Yes, your Honor.  Before we recess and

21  while we are planning this, do I understand then that we will

22  proceed through next week with Searl Brothers and Stardust.

23  And then on Tuesday the 5th, Mr. Veeder, you have sent out

24  your notices for people from Murrieta?

25  MR. VEEDER:  April 5th and 6th, and also April 26th.

12566

1    MR. SACHSE:  You plan also then to have a hearing here the

2  6th?

3    MR. VEEDER:  Yes.

4    THE COURT:  On April 6th?

5    MR. VEEDER:  Yes, sir.

6    THE COURT:  On what?

7    MR. GIRARD:  It is on individual people from Murrieta.

8    MR. VEEDER:  That is right.  We don't know how many

9  people will be in on the 5th.  We have sent two sets of notices

10  dated the 5th and 6th.

11    THE COURT:  We don't know how long this type of thing is

12  going to take us, either.

13    MR. VEEDER:  This is the first time around.

14    THE COURT:  This is an experiment.

15    MR. VEEDER:  Yes, your Honor.

16    THE COURT:  The 5th and 6th?

17    MR. VEEDER:  And also the 26th of April.  And now May

18  27th on the Tripp matter.

19    THE COURT:  Yes.

20    MR. SACHSE:  The other thought I had, your Honor, I am

21  the only counsel who thus far has complied with your Honor's

22  direction-- and I am not particularly proud of my compliance,

23  it's a matter of legal work-- but I would like to check on

24  what some of these other lawyers think about this stipulated

25  judgment, and I would like to know if we are going to argue

1    it before you and when.

2         MR. VEEDER:   I mentioned to your Honor this morning that

3    I hadn't received from the State or from Mr. Stahlman their

4    proposed findings or conclusions of law.

5         MR. SACHSE:   I haven't seen yours either, Bill.

6         MR. VEEDER:   I am hanging onto them.

7         THE COURT:   Apparently some of this work has been done, but

8    both sides are reluctant to serve their work until the other

9    is done.

10        Yours is ready?

11        MR. VEEDER:   Yes.

12        THE COURT:   Yours is ready?

13        MR. GIRARD:   I dictated mine just before I came down.   I

14   received it at the hotel yesterday.   I want to change it.

15   There are two provisions in the findings of fact that I want

16   to delete.   I will do that Friday and have it in the mail

17   Friday night.

18        THE COURT:   Yours is ready?

19        MR. STAHLMAN:   I have mine all in rough form.   It is

20   just a question of editing it.

21        MR. GIRARD:   Mine is not in rough form.   Mine is ready

22   for filing.

23        THE COURT:   You can go ahead and file what you have

24   as soon as they are ready with the Clerk and the Clerk will

25   hold the copies for service until they are all in.   Is that

1    agreeable?

2         MR. GIRARD:  I don't mind Mr. Veeder seeing mine before

3    he files his.  I will send them down directly to everybody.

4         MR. VEEDER:  I haven't looked at Franz's.  I put it in the

5    file.

6         THE COURT:  Send down the originals and the copies and

7    the Clerk will hold them sealed and serve them all at one time.

8         MR. STAHLMAN:  That is satisfactory.

9         THE COURT:  Is that satisfactory?

10        MR. VEEDER:  Fine, your Honor.

11        THE COURT:  Then you can all file as soon as you are

12   ready.

13        You want until about Tuesday or Wednesday of next week,

14   Mr Girard?

15        MR. GIRARD:  I will have mine in the mail tomorrow night,

16   your Honor.

17        THE COURT:  Mr. Stahlman, how long do you want?

18        MR. STAHLMAN:  When will yours come in?

19        MR. VEEDER:  I am going to put mine in there this after-

20   noon or in the morning.

21        MR. STAHLMAN:  It is just a matter of getting over to the

22   office and editing them.

23        THE COURT:  Do you think you can get them in by next week?

24        MR. STAHLMAN:  Yes, I think so.

25        THE COURT:  I would think it would be a pretty important

1   matter to the Vail Estate.  Get busy on it.

2       MR. STAHLMAN:  It is very important.  I want to get at

3   it.  We have been doing a lot of work on it.

4       THE COURT:  This Fallbrook matter is on the calendar on

5   the 29th and you gentlemen are going to be excused and I will

6   continue the matter to the 30th.  But Mrs. Rosalind Bates

7   will be here, without doubt, and Mr. Lincoln, next Tuesday.

8       MR. SACHSE:  You set that day for the Schloss Estate

9   argument.

10      THE COURT:  That is right.  I may hear it, and I may not.

11  Do you have any interest in that matter?

12      MR. SACHSE:  Curiosity is all.

13      THE COURT:  That is the argument as to who is going to

14  represent the Schloss Estate.

15      MR. SACHSE:  I will not be here.

16      MR. GIRARD:  I will not be here.

17      THE COURT:  I don't know what I will do with it.  I am

18  inclined to think I am not going to decide who is going to

19  represent that estate.

20      MR. GIRARD:  As I understand it from just talking, wasn't

21  it the District Court of Appeal that upheld the removal?

22      THE COURT:  Yes.

23      MR. GIRARD:  The time is going to run probably for the

24  Supreme Court to grant a hearing.

25      THE COURT:  Further proceedings have been taken.  You

1  heard Mr. Lincoln.

2      MR. STAHLMAN:  I will probably be here.

3      MR. GROVER:  I had thought that Col. Bowen would be here

4  to put in the Government report.  I don't care whether that is

5  done now or in May.

6      MR. VEEDER:  That is correct, your Honor.  I believe the

7  engineering reports have been identified but have not been

8  admitted.

9      MR. GROVER:  I would like to examine him briefly, but we

10  can do that on May 27th.

11      THE COURT:  You were not here when we were doing this.

12  He has been sworn and the exhibit numbers are 229 and 230,

13  and I have just asked him one question:  Are thos correct,

14  Col. Bowen, to the best of your information and belief?

15      COL. BOWEN:  Yes, sir.

16      MR. GROVER:  I have no objection to the reports, your

17  Honor.  It is just that on a couple of points I wanted to

18  cross-examine.

      THE COURT:  Do you offer them in evidence?

      MR. VEEDER:  Yes.

      THE COURT:  Exhibits 229 and 230 are received in
evidence.

      (Plaintiff's Exhibits No. 229 and 230 for Identification
were received in evidence.)

      THE COURT:  Do you want to examine the Colonel?

1        MR. GROVER:  Yes, I want to examine Col. Bowen briefly,

2   your Honor.  We can do it now or we can do it on May 27th.

3        MR. VEEDER:  Before we forget about these findings of

4   fact and conclusions of law, if I can interpose for a moment,

5   is there going to be any argument on those, or review, from

6   your Honor?

7        THE COURT:  I think before I sign something I am going

8   to have a discussion.  Let's put that over until I see them

9   next week and we will fix some time to argue it.

10       MR. VEEDER:  In other words, I didn't want that to be

11  fore closed.

12       THE COURT:  How long will your examination of Col. Bowen

13  be?

14       MR. GROVER:  I would say five or ten minutes, very brief.

15       THE COURT:  Take a short recess, then.

16       (Recess.)

17       THE COURT:  Proceed.  Col. Bowen has been sworn.

18

19                    ALLEN C. BOWEN,

20  recalled as a witness in behalf of the plaintiff, having been

21  previously duly sworn, testified further as follows:

22

23                    CROSS-EXAMINATION

24       MR. GROVER:  Did you want to ask your question first,

25  your Honor?

1        THE COURT:  I have already asked it.  He has been sworn.

2   I asked him if they were correct and he said yes, and I have

3   received Exhibits 229 and 230 in evidence.

4   BY MR. GROVER:

5        Q   Did you do field work for Exhibits 229 and 230?

6        A   I supervised the field work, Mr. Grover.

7        Q   Did you actually yourself get out into the field?

8        A   I didn't do all of the detailed work in connection

9   with this investigation.

10       Q   Did you get to the ranch at all?

11       A   Yes, I have been to the ranch.

12       Q   Directing your attention to page 5 of the Gibbon

13   report--

14       MR. VEEDER:  Do you have a copy of it, Colonel?

15       THE WITNESS:  No, sir, I do not have a copy before me.

16       (Mr. Veeder handing document to the witness.)

17       MR. GROVER:  Is that 230 or 229?

18       THE CLERK:  230.

19   BY MR. GROVER:

20       Q   Exhibit 230, in the first paragraph on page 5 the

21   fourth line says:  "At the time of this survey the discharge

22   of the diversion was about one and a half second feet."  Did

23   you make that measurement?

24       A   I did not personally make that measurement.

25       Q   Do you know the date it was made?

1    A   It was made approximately the midpart of October, 1959.

2    Q   Was that a dry time or a rainy time or relative to

3 other times of the year what were the water conditions then?

4    A  Relatively dry.

5    THE COURT:  One and a half second feet would be about 75

6 inches?

7    THE WITNESS:  Yes, sir.

8 BY MR. GROVER:

9    Q   That is the diversion at the upper intake?

10   A   The intake to the upper ditch, yes, sir.

11   Q   On page 5 again, I just want to clarify this:  "MAXIMUM

12 DEVELOPED ACRES," that column, that means the maximum that

13 could be developed rather than are developed; is that correct?

14   A   That is correct.

15   Q   On the question of water duty there, "IRRIGATION

16 REQUIREMENTS ACRE FEET/YEAR," you may have done this for other

17 defendants, and to that extent I apologize for the repetition,

18 but would you explain what is meant by the 4.00 and the 3.83

19 in that column?  Applied water, consumptive use, or just what?

20   A   That is the field duty, the water required for each

21 acre of crop, the crops being indicated in the left-hand column,

22 for a year's time.

23   Q   When you say water required do you mean water to be

24 applied to the land?

25   A   Yes.

1    Q   Or water used by a crop, or what?

2    A   Water applied to the land.

3    Q   Would that be in addition to rainfall?

4    A   In addition to rainfall.

5    Q   Then this would be an average, and in wetter years it

6    would be less and in drier years more; is that right?

7    A   I would say every year there would be some deviation

8    from this owing to the great diversity of rainfall and the

9    number of days of sunlight that we have during a year down here.

10   Q   Percentagewise what would you say the range would be?

11   Using 4.00 as a hundred, what would the range be from year to

12   year?

13   A   I don't believe I understand your question, Mr. Grover.

14   Q   Would the lowest duty in a wetter year, in that type of

15   year, be 75% of the 4.00, or would it be 80% or what?

16   A   Well, a wetter year is relative.  Would it be a year in

17   which--

18   Q   Well, the optimum year from the standpoint of conditions

19   that would reduce the water duty.  In other words, the lowest

20   your water duty would be, the type of year where your water duty

21   would be the lowest.

22   A   The type of year where your water duty would be the

23   lowest is where you got rainfall every month of the year, I would

24   say.

25   MR. VEEDER: You had better get together on what you mean by

1    high and low duty.

2        MR. GROVER:  Let me start again.

3        Q   "IRRIGATION REQUIREMENTS ACRE FEET PER YEAR," in some

4    years you say that would be more than 4.0 and in other years

5    it would be less than 4.0?

6        A   Yes, sir.

7        Q   In the case of this Gibbon and Cottle property, what

8    would be the highest it would go in a year when it was more than

9    4.0?

10       MR. SACHSE:  You mean when there is no rainfall at all?

11       MR. GROVER:  No, on the Gibbon and Cottle property.

12       MR. VEEDER:  I object.  That is simply too vague for the

13   Colonel to undertake to answer.

14       MR. GROVER:  As an expert he ought to be able to say what

15   the duty will be.

16       MR. VEEDER:  But how can he guess all the climatological

17   aspects?

18       MR. GROVER:  Then how can he say what the duty will be?

19       THE COURT:  This is an average figure that is taken.  It

20   is standard procedure to take an average figure for duty.

21   You could cross-examine and get all kinds of figures as to

22   high or low and when you get all done we would have to be back

23   to an average.

24       MR. GROVER:  I just wanted the range.  So that if there

25   were, for example, a dry year and there was some judgment based

12576
157

1   on this figure, we would have some idea of the Colonel's

2   opinion of how much more than 4 acre feet we could use.  That

3   is all.

4       MR. VEEDER:  I object to that as being incompetent, irrele-

5   vant and immaterial and not tending to prove a single issue

6   in this case, your Honor.

7       THE COURT:  Overruled.

8       If the Colonel can giveyou any range that he has in mind

9   upon which he based this average, he may say so.

10      THE WITNESS:  You have recited only one of the variables

11  in this matter of estimating water requirement, Mr. Grover.

12      MR. GROVER:  That is true.  But to go back to the question--

13      THE COURT:  Let the witness answer the question.  He

14  started to answer it.

15      MR. GROVER:  All right.

16      THE COURT:  The question I asked him.

17      THE WITNESS:  There are a great many variables, one of

18  which you have mentioned being the amount of rain and the

19  regimen of rainfall or the frequency and intensity of rainfall;

20      The air currents that move across the area;

21      The nature or type of irrigation.  For example, as has

22  been mentioned by some of your witnesses here, that some of

23  this area was irrigated in times past by wild flooding, which

24  is the most wasteful type of irrigation known, and that has

25  since been modified, according to your witnesses, by introduction

1    of sprinkler systems, which probably makes the most efficient

2    use of water for irrigation;

3        The type of soil, such as the texture of the surface

4    soil, the permeability of the subsoil, the grade of the land,

5    the length of run for surface irrigation, either furrow or

6    border type.

7        Each of those factors must be taken into consideration

8    in designing an irrigation system for a particular site.   I

9    daresay that each site in the Santa Margarita watershed would

10   vary somewhat from other sites, and they vary certainly from

11   year to year in water requirement.   For planning purposes,

12   therefore, the engineer takes into consideration the figure

13   based, as these figures are, on accepted local usage under

14   average efficiency of application and irrigation and uses

15   those average figures as a point of departure.   They may be

16   modified upward or downward.   And all of these factors I have

17   named must be taken into consideration in determining the

18   upper and lower limits.

19       MR. VEEDER:   Isn't temperature implicit, in the nature

20   of the question that was asked?   If you have a long hot spell

21   of really high temperatures, your figure may vary in regard to

22   the quantity of water required?

23       THE WITNESS:   Very definitely.

24   BY MR. GROVER:

25       Q   What would be the greatest amount that would be required,

1   in your opinion, on the Gibbon and Cottle properties in any

2   year, if you know?

3       MR. VEEDER:  If the temperatures were a hundred every

4   day?

5       MR. GROVER:  Mr. Veeder--

6       THE COURT:  Wait a minute. Again, it depends on what

7   crop you are talking about.  Pick a particular crop.

8       MR. GROVER:  Well, for row crops.  He has given us row

9   crops.

10      THE COURT:  Are you talking about row crops now?

11      MR. GROVER:  That is what the 410 is for, your Honor.

12      THE COURT:  And I suppose you would limit your question

13  to such hot or dry spells and lack of rainfall as we have

14  known in the past in some period with which we are familiar.

15      MR. GROVER:  Exactly, your Honor.  Col. Bowen has made a

16  study of the range.

17      THE COURT:  Do you want to take say an average of the last

18  five years?

19      MR. GROVER:  I would like to know just the range of what

20  would be the worst year and what would be the best year, based

21  on our knowledge of that area.

22      THE COURT:  The Colonel can't rub a mystic ball and tell

23  you what is going to happen at your best or at your worst.  But

24  I imagine if you would ask something based on the experience

25  in the water year of 1959 or based on the experience in the

1   water years of 1955 to 1959, he might give you some answer. I

2   don't know. But the way you ask it, anything could happen.

3       MR. GROVER: Let me tell you my problem, your Honor, and

4   we haven't engaged an expert on this. If this 4.0 acre feet

5   could be a basis for a judgment of this Court as to the amount

6   of water that we could use on a particular acre of land, when

7   it is in fact an average in a range dependent upon many

8   variables, then I don't think it would be a proper limitation

9   upon us. If it is conceded that it is only an approximation,

10  that it could vary a great deal from year to year, then we

11  have no objection to its coming in on that basis.

12      THE COURT: Do you apprehend that there is enough water

13  in this water system to let all the irrigable acres in the

14  water system have 4.0 per acre?

15      MR. GROVER: I suppose not, your Honor.

16      THE COURT: You suppose not. It is absolutely certain

17  that there is not. There is not enough water to take care of

18  all of the irrigable acres in the water system at 4.0 acre feet

19  per acre.

20      MR. GROVER: That is right.

21      THE COURT: Of course, we haven't passed on your

22  appropriative and prescriptive rights, but if what you have is

23  a riparian right there might be serious question whether you

24  could even use 4.0 acre feet.

25      MR. GROVER: That is true, your Honor. But in working

1  out an apportionment, if it should come to that, that would

2  be the measure, I assume, some such figure would be the

3  measure per acre of our theoretical entitlement, to be cut

4  down depending on a number of factors.

5      MR. STAHLMAN:  The same for everybody.

6      MR. GROVER:  It is the same for everyone if you use an

7  arbitrary figure out of a book for everyone.  And I want to

8  know if there are a lot of variables that go into this, as I

9  believe there are, so that we don't really have the basis of

10  this 4.0 for the starting point for an apportionment--

11      MR. VEEDER:  Would you like to have us withdraw Exhibits

12  229 and 230?

13      MR. GROVER:  Not at all.  This is only part of it.

14      MR. VEEDER:  I don't follow what you are doing.

15      MR. GROVER:  I am trying to evaluate Exhibits 229 and

16  230 so that your Honor can know what it is worth.

17      THE COURT:  I have been around in this courtroom in this

18  case a lot longer than you have, Mr. Grover.

19      MR. GROVER:  Indeed you have, and only my absence from

20  those proceedings has prompted me to go into this.

21      THE COURT:  Will you ask a specific question?  He has

22  told you about the variables now.

23  BY MR. GROVER:

24      Q  What would be the most water per acre for irrigation

25  requirements for row crops on the Gibbon and Cottle properties?

1    MR. VEEDER:  I object to that unless he says it is field

2  duty.

3    THE COURT:  Sustained.

4    MR. VEEDER:  We have a very difficult problem already

5  between the difference in diversion duty and field duty in

6  this particular lawsuit, and I think he has to indicate that

7  to the Colonel before he asks a question.

8    THE COURT:  All right, limit yourself to field duty.

9    MR. GROVER:  He had already stated that in his testimony.

10    THE COURT:  What is the greatest amount that he would

11  anticipate might happen in the future?

12    MR. GROVER:  Yes.

13    THE COURT:  Or do you want him to tie them down to some

14  period of time in the past?

15    MR. GROVER:  Your Honor, I may say that I have been

16  through this before when experts have explained how they get

17  these figures.  One of the things is the Blaney-Criddle

18  formula and that sort of ting, and they go year by year, and

19  sometimes the chart is based on the temperature conditions

20  for the particular area for the particular year, and they give

21  year by year the amounts of water duty.  If Col. Bowen has made

22  that kind of study, all I want is to know that.

23    THE COURT:  Why don't you ask him what kind of study he

24  has made?

25    MR. GROVER:  I was trying to approach it a little quicker,

1    your Honor.

2         Q   What kind of study have you made, Col. Bowen, for the

3    use of this figure 4.0 in Exhibit 230?

4         A   I have studied the use of water by local farmers and

5    ranchers in San Diego, Riverside, Imperial Counties.

6         Q   Is that all?

7         A   That took quite awhile, Mr. Grover.

8         Q   I understand.  But did you make laboratory tests, or

9    did you rely upon your expert?  I recall from your earlier

10   testimony that you have done quite a bit of work at farm sites

11   and soil management.

12        A   I always felt that laboratorywork might be useful in

13   knowing where to go to get an understandable solution to a

14   problem.  But I think that relying on laboratory work solely

15   for farm usage of water is poor practice.  I prefer to go

16   to the farm and see what good irrigation practice dictates in

17   the way of use of water.

18        Q   May I ask, was this a particular figure for this

19   particular farm, or is it one that you have used throughout

20   the watershed?

21        A   This figure has been used throughout the watershed,

22   Mr. Grover.

23        THE COURT:  Did you have available the literature on the

24   subject of other studies that have been made as to field duties

25   for various crops in various types of soil?

1        THE WITNESS:  Some of the references, your Honor, are

2  given on this sheet enclosed with each report.  It appears

3  in Exhibit 230 just before the aerial photo.  It is entitled

4  "Water duty for agricultural crops grown in the Santa Margarita

5  watershed," and has three columns, the first of which is

6  "Crop," the second, "Yearly Water Duty Acre Feet Per Acre,"

7  and the third column, "References."

8        Q   And you relied upon those sources, in part, for

9  coming up with the figure 4.0?

10       A   Those sources and my own observations.  By my own

11  observations, I might state that I have irrigated a lot of

12  land and measured water off and on.

13       Q   Where was that; I mean how close to the Gibbon and

14  Cottle property?

15       A   Well, the closest probably is over in Imperial Valley.

16       Q   Is there general agreement among farmers--

17       MR. STAHLMAN:  I have never heard farmers ever agree.

18       MR. VEEDER:  Any more than do lawyers.

19  BY MR. GROVER:

20       Q   Is there general agreement among farmers as to the

21  amount of water that should be applied to a given crop at a

22  given time?

23       MR. VEEDER:  I object to that question.  How would he know?

24  He is not a Gallup Poller.

25       THE COURT:  A given crop at a given time?

1      MR. GROVER:  Yes, among farmers.  These seem such simple

2  things to me.  Farmers do disagree.  One man says, "I want

3  four irrigations for this crop."  Another says, "You can get

4  by on three."  I heard on the radio the other day that the

5  University of California has made laboratory type tests on the

6  amount of water applied to citrus in terms of the number of

7  oranges you get off the tree.  All of these things are not

8  certain by any means, and all I want to do is to make that

9  figure 4.0 uncertain.

10      MR. VEEDER:  We object to that.

11      MR. GROVER:  A generalization, which is what it is.

12      MR. VEEDER: That hurts us.

13      MR. GROVER:  You see, through the medium of this expert

14  there has been an effort to convert something which is very

15  vague and general into something very, very specific, 4.00.

16  And I don't question Col. Bowen's sincerity.

17      THE COURT:  Go ahead and ask your question.  What is the

18  pending question?

19  BY MR. GROVER:

20      Q  Is there general agreement among farmers as to the

21  amount of water that should be applied to a given crop at a

22  given time?

23      MR. VEEDER:  I renew my objection.  I don't believe Col.

24  Bowen should be asked what is the general agreement among

25  farmers.

1          THE COURT:   Overruled, if he knows.

2          THE WITNESS:   There are very real differences, Mr. Grover,

3     between farmers, because of the differences between the land

4     that they farm.

5     BY MR. GROVER:

6          Q   I meant a given crop on a given piece of land.

7          A   And the difference between the type of irrigation they

8     use.

9          Q   Well, on a given piece of land.

10         A   I think if you take the same piece of land and the

11    same crop, that farmers skilled in the culture of that crop

12    would probably agree generally on the amount of water that

13    should be applied to it during the year.

14         Q   Your symbols in the sheet following the one to which

15    you have just referred, the map symbols, just so that I can

16    read it a little better, the bottom figure, the first symbol,

17    that is, the figure below the line, that 5C example, it points

18    over here only to a C.  Do you see what I am referring to?

19         A   Yes, sir.

20         Q   Where does the 5 come from?  What is the 5?

21         A   If you will note in the slope classes-- and incidentally,

22    for the record, the map symbols precedes the water duty for

23    agricultural crops in Plaintiff's Exhibit 230, it does not

24    show it, Mr. Grover, under slope classes.

25         Q   Well, in my copy it follows it.

1          A   Slope classes are given the letters A, B, C, D, E, and

2     F, and there are two columns of figures in percentages, one

3     headed "Moderately erodible soils, and those figures give a

4     range in percentage.  For example, the C under "Moderately

5     erodible soils" gives a spread of 8 to 15%.  So that par-

6     ticular soil site falls in the C slope class and the 5 indicates

7     the dominant percent of slope to the land in that particular

8     instance.

9          Q   On Exhibit 229, the Cottle Report, at page 2 in the

10    paragraph headed "Soils" it says, the third sentence:   "The

11    permeability of the soil varies from moderate with the percola-

12    tion .8 to 2.5 inches per hour to rapid with a percolation

13    rate of 5.0 to 10.0 inches per hour."  Now, I am not trying to

14    be factious at all, but I didn't find any moderate.  Turning

15    to the aerial photo where these symbols appear, are there any

16    lands that you see that have moderate percolation rate, which,

17    as I understand it, it would be an Arabic 4 in the upper right

18    of the symbol?

19         A   I believe you are correct in that observation.

20         Q   And they are all 5 and 6, then, more rapid than moderate?

21         A   Yes, sir.

22         Q   And in the Gibbon one the same statement appears on

23    page 2 under the heading "Soils," it varies from moderate to

24    rapid, and then in the aerial exhibits there, the aerial photos,

25    is it true that there is only one area that has moderate and

1    that part of that is also a 5 as well as a 4, which would be

2    moderately rapid?  That is the area on the first photo about

3    the second or third from the top.

4        A  Yes, sir, that combination of 4-5 as it appears in

5    the symbol underneath the word "Valley" indicates that the

6    subsoil grades from moderate just below the topsoil to

7    moderately rapid as one goes deeper in depth.

8        Q  Are there any other areas there or on the other photo

9    for the Gibbon property that show any moderate percolation?

10       A  No, sir.

11       Q  So it would be true, then, that all of the Cottle

12   property and the great majority of the Gibbon property are

13   actually moderately rapid to rapid in percolation?

14       A  Yes, sir.

15       Q  And is this percolation factor one of the factors that

16   goes into the field duty that you would determine for particular

17   lands?

18       A  Permeability of the subsoil is one of the variables,

19   yes, sir.

20       Q  So that the more permeable, the more water would have

21   to be applied, all other things being equal?

22       A  Yes, sir.

23       Q  You say you use these figures 4.0 for row crops and

24   3.83 for irrigated pastures.  I don't believe you mentioned

25   that, but I will ask:  Those figures are constant throughout

1  the Santa Margarita watershed; is that true?

2      A. As I have already testified, Mr. Grover, they appear in

3  each report I have prepared.

4      Q  And is it not true that the Gibbon and Cottle properties

5  are in a relatively warm area of the watershed?

6      A  Compared to the costal areas, I would say no.  Compared

7  to the higher valleys, such as Anza Valley, yes, they are warmer.

8  They are colder than the coastal areas.

9      Q  How about dryness?  Is that one of the factors you

10 went into, or did that go into this figure?

11     A  Yes, sir-- Humidity.

12     Q  And is this in a relatively dry area of the watershed?

13     A  This is an area of relative low humidity.

14     Q  Would you say that relative to the majority of the

15 watershed the field duty for the Gibbon and Cottle ranches

16 would be greater than the majority of the watershed so far

17 as temperature and humidity are concerned?

18     A  No, sir.

19     Q  What would you say about temperature and humidity?

20     A  I would say it is about an average.

21     Q  It is about an average?

22     A  Yes.

23 MR. GROVER:  That is all I have, your Honor.

24 THE COURT:  Is that all?

25 MR. VEEDER:  That's all, your Honor.

1          THE COURT:   Recess until Tuesday morning for the case,

2    but you gentlemen, I understand, will not be here until

3    Wednesday at 10.

4          (Adjournment until Wednesday, April 6, 1960, at 10 A.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25