# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.  1247-SD-C

---

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**    San Diego, California

**Date:**    Wednesday, March 30, 1960

**Pages:**    12604 to

**FILED**

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
By_____ Deputy

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DISTRICT

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1247-SD-C. |
| ) | |
| FALLBROOK PUBLIC UTILITY ) | |
| DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Wednesday, March 30, 1960

APPEARANCES:

    For the Plaintiff          WILLIAM H. VEEDER, ESQ.,
                                Special Assistant to the
                                Attorney General,
                                Department of Justice,
                                Washington, D. C.

                                LCDR. DONALD W. REDD.

1   APPEARANCES (Continued)

2       For Defendant Fallbrook
        Public Utility District,      FRANZ R. SACHSE, ESQ.
3       et al.

4       For Defendant Vail            GEORGE STAHLMAN, ESQ.
        Company
5

6       For Defendant State           STANLEY MOSK, ESQ.,
        of California                 Attorney General,
                                      By Fred Girard, Esq.,
7                                         Deputy Attorney General.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

<u>INDEX TO WITNESSES:</u>

2  <u>For Defendants Searl Bros.:</u>          D          X         RD         RX

3        Joseph Rowe                      12612
                                          12645
4        Fred Kunkel                                 112620

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## INDEX TO EXHIBITS

| Defendant Searl Brothers Exhibit - | For Iden. | In Evid. |
|---|---|---|
| A | | 12619 |
| K | | 12632 |
| L | 12638 | 12640 |
| B | 12648 | |
| D | 12653 | 12659 |

1  San Diego, California, Wednesday, March 30, 1960.   10:00 A. M.

2

3       (Other matters.)

4       THE CLERK:  Four, 1247-SD-C, United States vs. Fallbrook.

5  Further court trial.

6       THE COURT:  Proceed.

7       MR. VEEDER:  Your Honor, I have delivered copies of my

8  memorandum in regard to findings of fact and conclusions of

9  law on the attack on the stipulated judgment.  As I under-

10 stand it, you had these sealed by the Clerk, and I suggest

11 that they be distributed now, if that is all right.

12      THE COURT:  Well, they started coming in and so I told

13 the Clerk to start distributing them already.  They have been

14 passed out.  Those who haven't got them, the Clerk will give

15 them to them.

16      MR. VEEDER:  There is nothing to be done in regard to

17 those findings today, is there, your Honor?

18      THE COURT:  No.

19      MR. SACHSE:  Your Honor, before I proceed with the Searl

20 Brothers and the Garboni case, there are two matters that were

21 left hanging at our last week's session.

22      I have arranged with the land owner and a witness who

23 will represent Stardust Ranch to be here Friday morning, and

24 we will proceed with that, which, I think, will be a very short

25 hearing.

THE COURT:   That is the Stardust?

MR. SACHSE:   Yes, your Honor.

THE COURT:   How long do you think it will take?

MR. SACHSE:   Frankly, I don't think over an hour, your Honor.   It is going to be purely routine.   There will be the introduction of the engineering report.   There are two old appropriations which will be introduced.   My testimony on them will be very limited.

THE COURT:   I have the Grocers Antitrust case on for pretrial again, as well as the Campus Theatre case, it looks like.   But what we will do is to get you started either at 9:30 or 10 and get through with you and then go ahead.

MR. SACHSE:   They are from a long distance out of town, your Honor, and I told them to try to be here at 9:30 to have a few words with them myself.   But I can't guarantee it.

THE COURT:   Well, we will work it out.

MR. SACHSE:   The second question I left hanging in the air was to contact the State Water Rights Board on the Yackey matter.   I did so at the close of the Yackey hearing.   Mr. Veeder was absent at the time.   He attended only the morning session.   I am very much afraid there is no use of asking your Honor to delay hearing the rest of the Yackey case.   I don't think we can possibly get an opinion in less than three months and perhaps more.   So I would suggest that all your Honor can do under the circumstances is to find that he has an inchoate

1   right, as evidenced by his filing, and maybe before the findings

2   are formally written we would have a judgment on it and either

3   throw it out or not, as the case may be then.

4         THE COURT:  When would you go ahead with Yackey?

5         MR. SACHSE:  He is not my client, your Honor.  I opposed

6   him at the Water Rights Board.  But I don't think his case should

7   take over a few minutes.

8         Should it, Bill?

9         MR. VEEDER:  After hearing you and Mr. Yackey, I couldn't

10   let it go for less than a couple of hours, half a day.

11         THE COURT:  What was that?

12         MR. VEEDER:  You should have seen it, your Honor.   Mr.

13   Yackey and Mr. Sachse were really going at each other.

14         Frankly, all joking aside, I think Mr. Yackey should be

15   here.  I would like to examine him the way Mr. Sachse did.

16         MR. SACHSE:  Seriously, I don't think, aside from Mr.

17   Yackey's claimed appropriative right, I think Mr. Veeder will

18   agree, there is very little evidence to be taken on the Yackey

19   case.

20         THE COURT:  Well, we will cross that bridge when we get

21   to it.

22         MR. SACHSE:  Is Mr. Kunkel here, Mr. Veeder?

23         MR. VEEDER:  Mr. Kunkel has been directed to be here,

24   Franz.  I don't know where he is.

25         MR. SACHSE:  I am going to need him definitely.

MR. VEEDER:   He is going to be here.

MR. SACHSE:   Then, your Honor, I would like the record to show that I am going to proceed with the case of Searl Brothers and Fred Garboni, covering generally the area of Diamond Valley and Domenigoni Valley and the upper corner of the watershed.

THE COURT:   Searl Brothers first?

MR. SACHSE:   Yes, your Honor.

The only additional evidence for Garboni will be specific maps on his particular land and some evidence of his particular use.   The general geologic testimony given in behalf of Searl Brothers is intended in behalf of Garboni also.

THE COURT:   Which map are you putting up now?

MR. SACHSE:   United States Exhibit 15, your Honor.   I am going to use it with Mr. Kunkel later, but I might as well put it up now.   We can hang the others on top.

Your Honor recalls the general area of the watershed that is involved, the extreme northern portion of the watershed.

I will call Mr. Joseph Rowe.

THE CLERK:   Your Honor, Mr. Rowe was sworn on March 23rd, 1960.

JOSEPH A. ROWE,

called as a witness in behalf of defendants Searl Brothers,

having been previously duly sworn, testified as follows:


DIRECT EXAMINATION

BY MR. SACHSE:

    Q  Will you state your name and address, Mr. Rowe?

    A  Joseph A. Rowe.

    Q  Are you the same Mr. Rowe who testified here last

week in behalf of the Gibbon and Cottle properties?

    A  I am.

    Q  What is your occupation?

    A  Consulting engineer.

    Q  Mr. Rowe, I don't want to review again your entire

educational and experience background, but I would like you

to review briefly for the Court specific investigations that

you have made where you have considered the direction of

movement of ground waters.

    A  Yes.  When I testified last week I believe I mentioned

a number of basins, and I can go through those again.

    In the Santa Ana River watershed, the Bunker Hill or

San Bernardino Basin, which underlies mainly the City of San

Bernardino and properties to the east; the Chino Basin in the

Santa Ana River watershed, which is on the north side of the

Santa Ana River in both Riverside and San Bernardino Counties;

the Temescal Basin, which is on the south side of the Santa

Ana River in the vicinity of Prado Dam; the Prado Basin itself,

which is a basin that occupies the bottomlands of Prado Dam;

the Beaumont Basin, which occupies an area around the City

of Beaumont and Banning, extending both east and west from

Beaumont.

In the San Luis Rey River, Mission Basin, which is

upstream from the City of Oceanside.

On the Mojave River, the three basins, being the Upper

Basin, the Middle Basin and the Lower Basin, the Upper Basin

extending above the narrows at Victorville, the middle basin

between the Barstow Gorge and the lower narrows at Victorville,

and the lower basin extending practically above the forks of

the road fault.

Q  In all of those investigations have you been concerned

with the location of ground water and its movement?

A  Yes, sir.

MR. SACHSE:  I am placing on the easel, your Honor,

Searl Brothers Exhibit A for Identification.  Copies of all

these exhibits have been distributed to counsel in advance of

the hearing.

Q  Mr. Rowe, let me direct your attention to the Exhibit

Searl A which is now on the easel.  Who prepared that exhibit?

A  I did.

Q  And will you tell us where you obtained the base map

12614

1   on which you have done your own inking and work?

2   A  Yes.  Mr. Sachse, the base maps were taken from U. S.

3   Geological Survey quad sheets.  I don't recall the quadrangle

4   names at the present time.  I can give them to you in just a

5   moment.  I believe they are an exhibit in this case-- that is,

6   the quad sheets.

7   Q  All the quads for the watershed are in evidence, Mr.

8   Rowe.

9   A  I might not be familiar with the exhibit numbers,

10  but it is a portion of the Hemet quadrangle, a portion of the

11  Winchester quadrangle and a portion of the Romoland quadrangle.

12  Q  How did you transfer those quadrangles to the map

13  Exhibit A?  How did you create this base map?

14  A  Those were transferred by direct tracing from the

15  quadrangle sheets.

16  Q  And you have not attempted, obviously, to include on

17  Exhibit A all of the information that appears on the quadrangle?

18  A  That is correct.

19  Q  I observe a yellow line marked "San Jacinto Watershed,

20  Santa Margarita Watershed" on the exhibit.  Where did you

21  obtain that delineation of the watershed?

22  A  Mr. Sachse, that is an approximate location, as is

23  designated on Exhibit A.  It was taken from the quadrangle

24  sheets themselves.  It was also taken in part from Bulletin

25  57, Exhibit 15, and on the east end in part from Col. Bowen's

12615

1    study of the Searl Brothers property.

2        Q   Just in order that we can be quite clear on what this

3    exhibit intends to prove, you are not contending, as I under-

4    stand it, that this watershed line is technically accurate to

5    the foot; is that right?

6        A   That is correct.

7        Q   Now, the area indicated in pink represents what?

8        A   That represents Searl Brothers' property in the

9    Diamond and Domenigoni Valley areas.   There is also an insert

10   near the lower right-hand corner of the map which shows on a

11   smaller scale Searl Brothers properties as they relate to

12   sections that cannot be shown to the same scale on the base

13   map.   Those sections are located considerably south of

14   Domenigoni Valley in rather hilly country.

15       Q   And from what source did you obtain the information as

16   to Searl Brothers' land ownership?

17       A   That was obtained from two sources, Mr. Sachse; one

18   is from the descriptions in the answer of Searl Brothers in

19   this particular case, and also from certain information on file

20   at Searl Brothers' ranch, copies of which were furnished me.

21       Q   I observe small green symbols which in the legend are

22   indicated to be Searl Brothers' wells.   Where did you obtain

23   the data as to the location of those wells?

24       A   Those wells were located by me personally in the field.

25       Q   And each of these wells appears to have a numerical

1   designation.  Do those numerical designations have any specific

2   significance?

3        A   Yes.  On each well you will actually find two numbers.

4   One number, which has the letter in front of it, is a State

5   well designation; that is by 40-acre plots within the section.

6   The number below is a designation used by Searl Brothers them-

7   selves on their ranch.

8        Q   In other words, let me direct your attention to the

9   extreme right of the pink area in Section 34 as Well P-1 and

10  underneath it is the number 8.  Do I understand then that this

11  well would be designated by the State system as 5 South 1 West

12  34P1?

13       A   That is correct.

14       Q   And the number 8 that appears beneath it is simply

15  the Searl Brothers' designation for that well?

16       A   That is correct.

17       Q   Directing your attention to Section 1 and Sections 11

18  and 12 near the center of the map, there are wells without the

19  Searl Brothers' designation, simply marked "Windmill."  What is

20  the explanation of that?

21       A   To my knowledge they have no Searl Brothers numbers.

22  They are merely windmills that the Searl Brothers have.

23       Q   Is this  Exhibit Searl A accurate to the best of your

24  knowledge?

25       A   It is.

MR. SACHSE:  I am going to offer in evidence Searl

Brothers A, your Honor.

MR. VEEDER:  I would like to ask a couple of questions,

if I may.


CROSS-EXAMINATION

BY MR. VEEDER:

Q  I observe some broken lines, Mr. Rowe, used for your

approximation of the watershed line.  Can you see it?

A  Yes.

Q  State into the record what that broken line consti-

tutes.

A  Yes.  I believe, Mr. Veeder, on the next exhibit it

will have a legend showing what those lines are.  But those

lines represent the toe of the slope of the hills as it meets

the valley floor.

THE COURT:  Actually, that represents the demarcation

between the younger alluvium and the basement complex as taken

off Exhibit 15, does it not?

THE WITNESS:  No, not entirely.  I have designated them

as "Toe of slope."

THE COURT:  Where did you get them?

THE WITNESS:  I got them from the U.S.G.S. topographic

maps.

MR. SACHSE:  I think your Honor's observation  and the

1  facts may coincide.  But Mr. Rowe's determination of these

2  lines is taken wholly from the U.S.G.S. topo.

3      MR. VEEDER:  I am not making an objection to your exhibit,

4  Mr. Sachse, but there are some things that were not explained,

5  and this is for location purposes entirely.  That is all I am

6  interested in.

7      MR. SACHSE:  Go ahead.

8      THE WITNESS:  That is right.

9  BY MR. VEEDER:

10      Q  Could you show us where the thread of Warm Springs

11  Creek wouldappear?  It starts down here, I see.

12      A  Yes.  The thread of Warm Springs Creek as it exists,

13  as shown on the topographic maps, is also shown on Exhibit A,

14  and it is shown with a dashed line with three dots running--

15  Did you want me to run through each of the sections?

16      Q  No.

17      A  It goes generally up through the middle of Domenigoni

18  Valley and Diamond Valley.

19      Q  Is it not lost, though, some place?  I can't see it,

20  in other words.

21      Q  As you go east along Newport Road the stream itself

22  is very hard to define and from my observation it is a channel

23  or a ditch alongside of Newport Road and along the south side

24  of Sections 31 and 32 and in 33, township 5 South, Range 1

25  West appears to be a man-made ditch where the actual spread

12619

1   of Warm Springs Creek would run.

2       Q   May I inquire, is there conflict between your location

3   of the thread of Warm Springs Creek and the general location

4   that appears on United States Exhibit 15?

5       A   No major conflict, no.

6       MR. VEEDER:   I have no objection.   Just for location

7   purposes, is that right?

8       MR. SACHSE:   That is all.   That is for the land location

9   only.

10      MR. VEEDER:   I have no objection.

11      THE COURT:   Do Pixley Canyon and Goodhart Canyon feed

12  into Warm Springs Creek, down in the right-hand corner?

13      THE WITNESS:   Yes.   Now, I have shown it exactly as

14  shown on the U.S.G.S. topographic map.

15      THE COURT:   Do they actually feed into Warm Springs

16  Creek?

17      THE WITNESS:   Yes, the way the hydrographic divide is

18  drawn here they would feed Warm Springs Creek, your Honor.

19      THE COURT:   All right, Searl Brothers Exhibit A received

20  in evidence.

21      (Defendant Searl Brothers Exhibit A for Identification

22  was received in evidence.)

23      MR. SACHSE:   This is a good stopping point, your Honor,

24  and I would like to use Mr. Kunkel first, if I could.   It

25  would make my examination more orderly.   May I interrupt Mr.

1    Rowe's examination and call Mr. Kunkel?

2            THE COURT:  Yes.

3            THE CLERK:  Your Honor, Mr. Kunkel was sworn on October

4    1, 1958.

5

6                          FRED KUNKEL,

7    called as a witness in behalf of the defendant Searl Brothers,

8    having been previously duly sworn, testified further as

9    follows:

10           THE CLERK:  Would you state your name, please?

11           THE WITNESS: Fred Kunkel.

12

13                       CROSS-EXAMINATION

14   BY MR. SACHSE:

15       Q  You are the same Fred Kunkel who testified as a

16   geologist for the United States and who was largely instru-

17   mental in the preparation of United States Exhibit 15; is that

18   not correct?

19       A  That is correct.

20       Q  I want to review briefly as foundation some of the

21   observations that I believe you made with relation to Exhibit

22   15.

23       I believe that you testified generally that ground waters

24   moved down the hydraulic gradient from the point of higher

25   head to the point of lower head; is that correct?

1      A   That is correct.

2      Q   And I also recall your testimony to be that when

3  ground waters moved in such manner through highly permeable

4  material such as younger alluvium and came up against areas

5  of much lesser permeability we frequently find the phenomenon

6  of rising water; is that correct?

7      A   When there is a large difference in permeability that

8  commonly occurs.

9      Q   And that phenomenon, for example, explains, or in

10  part explains, the spring line on the Wildomar fault?

11      A   That is correct.

12      Q   That the fault is less permeable than the material

13  through which the water has been moving to the east of the

14  fault?

15      A   That is correct.

16      Q   With particular reference, for example-- if you want

17  to step down here-- the point of rising water you located in

18  Section 35, Township 7 South, Range 1 East, do you observe the

19  one to which I am pointing?

20      A   I do.

21      Q   It would appear that that rising water is at the lower

22  end of a very small part of younger alluvium surrounded by

23  basement complex; is that correct?

24      A   That is correct.

25      THE COURT:   This is not on the Searl property?

MR. SACHSE:  This is a very brief preliminary, your Honor. I am coming to Searl in a moment.

Q  Does this condition we discussed a moment ago of ground water moving through permeable material and coming up against less permeable account for that kind of rising water?

A  In the case indicated, yes.

Q  Yes. Similarly, I believe you explained that the rising water which we discovered in Radec Valley and again on the Oviatt property, the phenomenon in that case might be caused by the fact that the alluvium is pinched into a smaller area between boundary rocks of much less permeability.  Might that also account for rising water?

A  Yes, a quantity of water is moving through the deposits, and when the cross-sectional area is reduced the hydraulic gradient is increased.  Therefore, the water table in given cases rises to land surface, which is what occurred in these two cases that you referred to.

Q  With similar reference to the many points of rising water you indicated at the lower end of Coahuilla valley, does that same phenomenon account for that rising water?

A  Yes, the same phenomenon accounts for that rising water.

Q  You may resume your seat, if you will.

Now, I want to invite your attention specifically to those portions of Exhibit 15 dealing with Diamond and

1    Domenigoni Valleys.   I observe that on Exhibit 15 you have

2    indicated ground water contours only at the extreme northern

3    and eastern end of Diamond Valley; is that correct?

4        A   That is correct.

5        Q   Why did you not extend the ground water contours on

6    the full length of Diamond and Domenigoni Valleys?

7        A   To the best of my recollection, I did not have a

8    sufficient number of well logs and water level measurements

9    at the time I prepared the map.

10       MR. VEEDER:   He can have an opportunity to refresh his

11    memory, is that not correct?

12       MR. SACHSE:   Certainly.

13       I want to review the status of Exhibit 15, that is all,

14    Mr. Kunkel.

15        Q   Have you made any further studies since you prepared

16    Exhibit 15 of these water level measurements?

17        A   In that area, no; not in Diamond or Domenigoni Valley.

18        Q   So you don't at this time want to make any changes in

19    Exhibit 15 as you have presently delineated it?

20        A   At the moment, no.

21        Q   Still directing your attention to Exhibit 15, I

22    observe that at several points along the watershed boundary--

23    I am indicating with a pointer this part of younger alluvium

24    extending right through the watershed boundary; is that correct?

25        A   That is correct.

12624

1    Q   You do not mean to imply that the younger alluvium

2  ends abruptly at that point, do you?

3    A   No.

4    Q   Actually, isn't it a fact that that is a very flat

5  valley floor and that the delineation of the suface watershed

6  is pretty tough without instruments or actual plane table work

7  in many cases?

8    A   That is correct.

9    Q   Do you know the name of the watershed immediately

10 to the east there?  San Jacinto watershed, is that correct?

11   A   Menifee, I believe.  I believe it is Menifee Valley,

12 which is part of San Jacinto.

13   THE COURT:  East?

14   MR. SACHSE:  I beg your pardon.  Immediately west of

15 the Diamond and Domenigoni Valleys is the San Jacinto water-

16 shed and Menifee Valley.

17   Q   Is that correct?

18   A   That is correct

19   Q   Did you obtain any figures as to the depth of the

20 alluvium along the watershed line between Domenigoni Valley

21 and Menifee Valley?

22   A   No.

23   Q   Now, still continuing down the surface drainage of

24 Domenigoni Valley, the thread of Warm Springs Creek you have

25 indicated by arrows showing direction of water movement; is

1  that right?

2      A   That is correct.

3      Q   Do you have any measurements indicating the depth of

4  the alluvium you have shown on Exhibit 15 in Section 19,

5  Township 6 South, Range 2 West?  Check me on my sections,

6  please.

7      A   I have no well data that I recall.

8      Q   And no borings of depth of alluvium?

9      A   No, no borings that I recall.

10      Q   Now, at the lower end of the section just mentioned,

11  Section 19, the downstream end of Section 19, I observe that

12  you have indicated an area of weathered basement complex,

13  which extends entirely across the thread of Warm Springs Creek;

14  is that right?

15      A   That is correct.

16      MR. VEEDER:  We have been referring to that as "residuum",

17  is that right?

18      MR. SACHSE:  Not on this exhibit.  I want to be accurate.

19  This exhibit says "Weathered basement complex."

20      Q   It is indicated on the exhibit as--

21      A   Weathered basement complex.

22      Q   Now, Mr. Kunkel, would you expect to find the

23  phenomenon of rising water in a geologic situation such as we

24  find at the lower end of Section 19, bearing in mind your

25  previous testimony regarding Coahuilla Valley and other areas

1    we just spoke of?

2         A   Yes.

3         Q   In your investigation of Warm Springs Creek, did you

4    find any areas of rising water?

5         A   Differentiating between rising water and the symbol

6    indicated as spring and extent of the stream flow on Govern-

7    ment's Exhibit 15, I did find evidence of rising ground water

8    in the lower end of Domenigoni Valley.

9         MR. VEEDER:   Was that Section 19?  You were correlating

10   an area there.

11   BY MR. SACHSE:

12        Q   Take this overlay, please, and tell us where you

13   found the evidence of rising water.

14        A   I would like the opportunity to refresh my memory on

15   this by checking my notes at the recess.  However, to the best

16   of my recollection, I believe-- to the best of my recollection,

17   there is evapo-transpiration occurring inthe southwest part

18   of Section 19, Township 6 South, Range 2 West.  I do not

19   recall actually observing stream flow in the period of October

20   to December, 1957.  And I also observed areas of rising water,

21   to the best of my recollection, in Section 17.  The exact

22   location I am not certain of.

23        Q   Will you check those later at your convenience?

24        A   I will do that.

25        Q   You stated you observed rising water and also evidence

12687

1    of evapo-transpiration. I notice that you don't have any

2    rising water symbol on Exhibit 15.

3        A  I do not have a spring and flowing water indicated,

4    which is the symbol that is shown on Exhibit 15. Rising water

5    may be moist ground from which there is evaporation. There

6    may be no one point that could be called a spring, but there

7    is an area from which ground water is discharging.

8        Q  In other words, when you speak of an area of evapo-

9    transpiration in Section 19 you mean an area where the soil is

10   wet and where vegetation can grow easily, but not necessarily

11   where you find ponds or running surface water; is that cor-

12   rect?

13       A  That is correct.

14       Q  Now, in your investigation of this Warm Springs Creek

15   drainage, the upper end of the Warm Springs Creek drainage,

16   did you review findings made by hydrologists or geologists in

17   earlier historic periods?

18       A  As I have testified earlier, in the course of prepara-

19   tion of Government's Exhibit 15 and other exhibits I consulted

20   existing literature and the records in the files of the State

21   of California. At the moment I cannot specifically recall

22   which references related to the lower end of Domenigoni Valley.

23       Q  Did you ever have occasion in that investigation to

24   refer to Department of Interior United States Geological Survey

25   Water Supply Paper No. 429, entitled "Ground Water in the San

12628

1   Jacinto and Temecula Basins, California, by Gerald Waring,"

2   printed in 1919?

3       A   I am aware of the report, and I have consulted it.

4   I consulted it, I am sure, prior to the work I did on Exhibit

5   15.

6       Q   Do you have any recollection what Mr. Waring's findings

7   were as to surface flow or rising water in the area to which we

8   have just referred?

9       MR. VEEDER:   When you use the term "findings"-- this is

10  not an objection, I am inquiring-- are you meaning comments

11  and observations?

12      MR. SACHSE:   I will rephrase the question.   It is a

13  good objection.

14      Q   Mr. Kunkel, do you recall what is stated in the

15  publication of the U. S. Geological Survey to which I just

16  referred as to running water and rising water in the area we

17  are talking about?

18      A   I do not.

19      Q   Do you recall the general geologic findings contained

20  in that publication?

21      MR. VEEDER:   Again, it is a conclusion you are referring

22  to.

23  BY MR. SACHSE:

24      Q   The material contained in the publication relating to

25  geology.

1    A  Specifically, I don't recall.

2    MR. SACHSE:  I think this had better be marked for iden-

3  tification, because I am going to refer to it a lot, but I hope

4  we can avoid putting it into evidence.

5    MR. VEEDER:  When you say "this," what is it?

6    MR. SACHSE:  Will you please mark for identification

7  Plate 3 of U.S. Geological Water Supply Paper No. 429, dated

8  1919, entitled "Map of San Jacinto and Temecula Basins,

9  California," showing geologic formations, artesian basins,

10  depth to water and wells, as Searl Brothers Exhibit K.

11    I have Exhibits A through J already numbered.

12    I will hand Searl Exhibit K for Identification to the

13  witness, and first, for the purpose of orientation, check me

14  if I am correct, Mr. Kunkel.

15    Q  I find Warm Springs Creek entering the Murrieta Valley

16  marked "Warm Springs Creek on the map and shown with an inter-

17  mittent stream symbol.  I am tracing it with my pencil to a

18  symbol, below a symbol red 58 next to the printed language

19  "Leon Mine abandoned."  Do you agree that I have traced the

20  approximate course of the stream as shown on that map?

21    A  That is correct.

22    Q  Will you locate on the map Diamond and Domenigoni

23  Valleys and indicate it to the Court?

24    A  Diamond Valley and Domenigoni Valley in general are

25  located in the northeast part of Township 6 South, Range 2

1    West, specifically Sections 1, 2, 3, 9, 10, 11 and part of 12.

2        Q   Will you please observe the geologic symbols that are

3    indicated on this map on the left-hand side and state into the

4    record what this map indicates to be the material in Domenigoni

5    Valley proper?

6        A   Domenigoni Valley proper, the central valley part,

7    is underlain by--

8        MR. VEEDER:  I am going to object to that question on the

9    grounds that I believe the exhibit must be self-explanatory,

10   your Honor.

11       THE COURT:  Overruled.  It may be some help to me to

12   understand it.  I am not quite as smart as some of the lawyers.

13       THE WITNESS:  --and underlain by a material by the areas

14   colored a light yellowish tan, and in the explanation that is

15   indicated as younger valley fill, chiefly alluvial gravel,

16   sand and clay, but includes the residual materials of the

17   smaller basins, principal water-bearing formations, chiefly

18   Pleistocene.  In this regard, I would like to indicate that

19   Pleistocene is Quartenary in age.

20       MR. VEEDER:  He is adding the amendment to the exhibit.

21       MR. SACHSE:  I will accept his statement as to what it

22   indicates.

23       Q   Will you likewise identify this more or less pink

24   colored material that I find immediately south of the

25   Domenigoni Valley on the map and tell us how that is classified?

A   The area surrounding Domenigoni Valley is indicated as being a pink color, and in the legend it is indicated as igneous and metamorphic rocks not water bearing.

THE COURT:   Would that be the equivalent of what we call the basement complex?

THE WITNESS:   In general, it would be the same.

BY MR. SACHSE:

Q   Directing your attention again to Domenigoni Valley, am I not correct in stating that the exhibit indicates an extensive belt of alluvium running from the town of Hemet down through Diamond Valley, Domenigoni Valley, Menifee, down the drainage of Salt Creek and then terminating, and that Salt Creek and Menifee Valley are within the San Jacinto watershed; is that correct?

A   What you have stated is correct.

Q   Now, I will ask you again what I asked earlier.  Now that you have seen this map, Mr Kunkel, do you recall whether or not you had occasion to refer to this in connection with your work in this area?

A   Yes, I did.  It is the same map.

Q   The same map you drew?

A   Well, I was acquainted with it and I was aware of it during the time of my preparation of Exhibit 15.

MR. SACHSE:   I would like to offer in evidence this exhibit.  However, this is a very difficult document to get

1    hold of, your Honor, and I am going to ask the Court's

2    permission to try to have it reproduced-- I am not much of an

3    expert on photography-- and ultimately to withdraw it again.

4    May I offer it inevidence at this time?

5         THE COURT:  To whom does it belong?

6         MR. SACHSE:  It is Mr. Rowe's map, but Mr. Rowe borrowed

7    it.  I think the United States can probably get it from the

8    U.S.G.S.  This is a 1916 publication.

9         MR. VEEDER:  I will try to get it, if I can.  Will you

10   leave it in the record for us?

11        MR. SACHSE:  We will leave it in the record now.

12        THECOURT:  It is received in evidence.  Permission is

13   given to duplicate it in some way and to withdraw it from

14   evidence.

15        (The document was received in evidence and marked

16   Searl Brothers Exhibit K.)

17        MR. SACHSE:  If you could find one for me, Mr. Kunkel,

18   I would be most grateful.

19        THE WITNESS:  This document is very difficult to obtain

20   even from official sources.  Libraries are about the only

21   places that have them any more.

22        THE COURT:  What are you going to prove?

23        MR. SACHSE:  Your Honor, perhaps you have given me a

24   lesson.  Maybe I should have made a short statement on what

25   my proof is going to be or what I intend to prove.

1        MR. VEEDER:   Is this your opening statement?

2        MR. SACHSE:   I say, maybe I should have done it, and

3   with your Honor's permission I will interrupt my proceedings

4   and do so.

5        THE COURT:   All right.

6        MR. SACHSE:   Our position, stated very simply, your

7   Honor, is-- I will refer to Exhibit 15 to indicate it-- that

8   the ground waters of Diamond Valley and Domenigoni Valley do

9   not drain into or support the Santa Margarita River Basin;

10  that they are a part of the San Jacinto River Basin.   Now that

11  is the essence of it.   While on the surface, the surface

12  flow, when there is surface flow, flows to the southwest, the

13  ground waters do not.   They flow to the northeast.   I am well

14  aware that this fact, even if proved, if your Honor should

15  find in accordance with our contention, poses some very

16  difficult and complex legal questions as to whether ground

17  water extractions in Domenigoni Valley should be controlled

18  in this watershed, whether they should be controlled in the San

19  Jacinto watershed, or whether they should be controlled as

20  wholly separate and independent basin.   Those legal questions

21  we are going to have to argue later.   But the thing with which

22  I am principally concerned with this proof, which is going to

23  continue the rest of this day, is what we hope will be con-

24  clusive evidence as to the direction of ground water movement

25  into an entirely different watershed than that which is the

subject of this litigation.

THE COURT:  I can immediately see one terrific problem. Let's assume that you prove that a certain amount of ground water moved into this other watershed.  When the basin of the Domenigoni Valley alluvium is full and has not been pulled down, there is far more chance in the event of rainfall for the rain water running over the surface to continue to run on.

MR. SACHSE:  That is correct.

THE COURT:  If the basins were pulled down, the water would tend to go into the alluvial soil and become part of the ground water which runs into the other valley.

MR. SACHSE:  Which runs into the San Jacinto.

THE COURT:  So you have a situation, then, where even if ground water did go into the other watershed, you have the problem that if excessive pumping occurs in the Domenigoni Valley then less of the surface water that would ordinarily flow into our watershed goes into the watershed and more of it goes into the ground.  On the other hand, if pumping is controlled in the Domenigoni Valley and water levels are up, then we get more water into our basin.

MR. SACHSE:  Your Honor is a hundred percent correct. You are ahead of us on the legal argument.  We are aware of it. We are going to expect to meet it.

I would like to state briefly what at least one of the counter-problems to that is.  This litigation, is in its essence

1   a lawsuit which someday, even if we don't here, will regulate
2   the use of water in the watershed as we are suing.  That is
3   the purpose.  It would give the United States or any downstream
4   owner the right to interfere with upstream uses that affect
5   their water supply.  That is the purpose of this lawsuit.

6        This lawsuit is also being conducted under the water
7   laws of California and the Constitution of California, and if,
8   to use an extreme example again, the only circumstance under
9   which Domenigoni Valley could help the United States or any
10   downstream user would be to be chockfull, brimfull, then I
11   submit that under the laws of this State your Honor could
12   not order any restriction of the pumping.  Because a brimfull
13   basin of swamp, of phreatophytes, which is useless in farming,
14   is not a reasonable and is not a beneficial use of water in
15   this arid country, and no downstream owner would have any right
16   to insist that any upstream basin always remain full.

17        And I might go just a step further.  My only client is
18   Diamond and Domenigoni Valley, but I am trying to truly be
19   helpful to the Court in the rest of this litigation, and that
20   is why I very carefully picked out this funny little example
21   in the middle to ask one of the questions of Mr. Kunkel.  Be-
22   cause I think that the legal principle for which I contend in
23   Diamond and Domenigoni Valleys will have to also be applied to
24   whoever appears to own this little pocket-- and I don't know
25   who he is-- which is a different situation.  That is a bathtub,

so to speak, which fills up, and only when it is full does it spill over the rim and go downstream. Has the United States, or has Vail Company, or has anyone below that point the right to insist that that bathtub stay full?

I throw that in at this point so that your Honor gets a more clear picture of our arguments. This is not a simple matter. I can state that from the legal standpoint it is one of the most complex questions that I have ever tried to brief. I haven't finished, and honestly I don't know what the law is going to be.

THE COURT: There is another factor that will have a bearing. If you establish that there is some underground flow and that the Santa Margarita watershed profited only when the basins were full, and that is the point, that there is no-- this isn't a conclusion-- there is no dam downstream on the Murrieta or the Santa Margarita, so that conceivably floods and high waters sweeping out of that valley could flow clear on to the ocean and be lost. If there was a dam, you would have a tighter picture.

MR. SACHSE: You mean a man-made dam or an artificial dam, your Honor?

THE COURT: Yes. If you had a dam you could say that no water would be lost. If water comes down we will catch it. We have no dam. We have basins down in Pendleton.

MR. SACHSE: The corollary to that, if instead of the

1    word dam you use the word "vacant" or "empty storate" whether

2    it is above or below ground, you have the same situation.  There

3    is less water lost.

4        I honestly don't want to argue the case now.  This is

5    a very complex question.  I know Mr. Veeder is going to have a

6    lot to say about it.  But I am glad that your Honor interrupted

7    me and it has been worthwhile to know where we are going.

8        THE COURT:  We know what we are shooting at.

9    BY MR. SACHSE:

10       Q  In connection with your studies, Mr. Kunkel, did you

11   have occasion to review any of the older United States Geological

12   Survey quads, not the new ones but the old ones that were done

13   by plane table survey before photographs?

14       A  I looked at them.  I didn't use them in great detail.

15   But I am aware of them and I have seen them.

16       Q  You didn't, for instance, use the old historical quads

17   in tracing the thread of Warm Springs Creek?

18       A  As I testified earlier, the base map as indicated is

19   the base map prepared by the Office of Ground Water Resources,

20   to the best of my knowledge, from 1 to 62,500 scale maps.

21       Q  I am asking what you did in your work.  Did you

22   attempt to determine what old maps might have shown to be the

23   course and location of Warm Springs Creek?

24       A  I did not.

25       MR. SACHSE:  Will you please mark next in order as Searl

1  Brothers Exhibit L, U.S. Geological Survey Elsinore Quadrangle

2  1 to 125,000 scale, surveyed in 1897-1898, published in

3  February, 1901.

4  THE COURT:  I suppose this is going to show that Warm

5  Springs Creek ran down into Lake Elsinore?

6  MR. SACHSE:  It is going to show that there was not any

7  Warm Springs Creek at the upper end.

8  (Searl Brothers Exhibit L was marked for Identification.)

9  BY MR. SACHSE:

10  Q  Now, will you again, for the benefit of the Court,

11  try to pick up Warm Springs Creek, running right through the

12  letter C in the word "Temecula" at the lower end of the map

13  and proceeding up with an intermittent stream symbol to -- I

14  can't remember my symbol.  Is this little tiny thing a mine

15  symbol or something?  I am too far away from it to see.

16  A  I will describe it, if you wish.

17  Q  Trace it.

18  A  Warm Springs Creek on the Elsinore quadrangle at a

19  scale of 1 to 125,000, the edition of February, 1901, the

20  lowest end of the stream where it joins Murrieta Creek is at a

21  point called Line Rosa, a town name, presumably.  The stream

22  course is generally north-northeasterly to approximately the

23  junction point between Townships 6 and 7 South and Ranges 2 and

24  3 West, and from that point the stream channel as shown by

25  the Elsinore quadrangle extends for approximately two and a

1    half miles, at which point the stream course is no longer

2    indicated.

3        Q    Where does that Warm Springs Creek terminate or

4    originate, let me say, as far as any symbols on this exhibit

5    are concerned?  Paloma Valley, is that correct?

6        A    As indicated by the Elsinore quadrangle, the origin

7    of the stream as indicated is Paloma Valley.

8        Q    Are you familiar with the fact that Paloma Valley

9    is within the San Jacinto River watershed?  If you are not

10   familiar, will you please check it yourself later?

11       A    I am checking.  I am looking at the Searl Brothers

12   Exhibit K, which is the same identical base map as the

13   Elsinore Quadrangle to which we were referring, with the

14   geology superimposed.  However, it cannot be exactly the same

15   edition because this is a 1919 edition and the Warm Springs

16   Creek on this edition indicates that Warm Springs Creek extends

17   northeasterly to the place called Leon.

18       Q    Leon Mine, is that not correct?

19       A    Well, there is a Leon Mine to the north of the place

20   called Leon.

21       Q    Would you look at the other exhibit L and see where

22   that Leon Mine is with relation to where Exhibit L shows the

23   headwaters of Warm Springs Creek to be?

24       A    The 1901 edition of the Elsinore quadrangle does not

25   show the Warm Springs Creek in the vicinity of Leon or the Leon

1640

1   Mine.

2      Q  How many sections between the headwaters of Warm

3   Springs Creek as shown on Exhibit L and the Leon Mine?

4      A  Approximately one mile.

5      MR. SACHSE:  May I at this point offer the exhibit, your

6   Honor.

7      Do you have any objection to the U.S. quad?

8      MR. VEEDER:  May I check it.

9      THE COURT:  It will be received in evidence. You may

10   check it later.

11      (Searl Brothers Exhibit L for Identification was received

12   in evidence.)

13      (Another matter.)

14      (Recess.)

15      MR. SACHSE:  Your Honor, was Exhibit L admitted?

16      THE COURT:  Yes.

17  BY MR. SACHSE:

18      Q  Now, Mr. Kunkel, when a geologic condition exists

19   such as is indicated on Searl Exhibit K where a continuous

20   stretch of alluvium extends across a watershed line, is it

21   possible, in your opinion, that ground waters might move in

22   either direction across that surface watershed line?

23      A  It is possible.

24      Q  And I presume you would agree that pumping on one or

25   the other side of the watershed line would have some effect on

1     which way the ground waters move; is that right?

2          A   Yes.

3          MR. VEEDER:   I object.   I think it is far too vague,

4     your Honor.

5          THE COURT:   It has already been answered.   The objection

6     is overruled.

7     BY MR. SACHSE:

8          Q   The answer is that pumping would have some effect on

9     which way the ground waters move across the watershed line?

10         A   If I can have your original question read back,

11    was it "could" or "did"?

12         Q   Could.

13         MR. VEEDER:   I think he said it was possible.

14         MR. SACHSE:   It was possible, yes.   It was possible that

15    they move across.

          Q   Now, let's go back again to the pumping-- and you

     may object, if you want to, Mr. Veeder.

          Assume heavy pumping on the San Jacinto side of the

     watershed line in such an area of continuous alluvium, as is

     indicated on Searl's K.   What effect would that have on the

     movement of ground water on the Santa Margarita side?

          MR. VEEDER:   I am going to object to that.   I think the

     question is too vague.   I think there is no basis whatever on

     which a conclusion could be predicated.   The distance from

     the watershed-- there are a great many factors which would be

1   involved upon which a conclusion would have to be predicated.

2   It is objected to as being too vague.

3        THE COURT:  Overruled.

4        THE WITNESS:  Could the reporter read the question?

5        (The Reporter read the pending question.)

6        MR. VEEDER:  I think, your Honor, that could open up this

7   lawsuit into a whole new area.  I think under the Salton Sea

8   cases, your Honor will recall, that your jurisdiction would be

9   such that you could control the activities of individuals in

10  the San Jacinto area, and it might be necessary to do so,

11  and I don't believe that there is any basis at this time for

12  the question.  I renew the objection.

13       MR. SACHSE:  Your Honor, may I be heard.  This is exactly

14  what I want to hear and exactly what I am trying to prove.

15       THE COURT:  Mr. Veeder, you say in one breath that I

16  would have jurisdiction to do something in the San Jacinto, and

17  in the next breath you object to the question.  The question

18  is pretty broad, but the expert can give his opinion and his

19  view.

20       I can conceive of a situation-- I don't know whether this

21  might exist or not-- of an area of younger alluvium extending

22  across the surface line of the watershed, and I can conceive

23  of a situation where, when this alluvium was full of water, the

24  basin was full, overflow might run one way.  I can conceive of

25  a situation where pumping on one side or the other of the

1   watershed line might change the water gradient in this water

2   basin so that water would cease to run where it might have

3   run previously underground and run a different direction.  You

4   could have any kind of situation possible, unless somebody could

5   explore the underground and tell us exactly what the story was.

6          MR. VEEDER:  Your Honor, there are several reasons why

7   I have been concerned about the vagaries of the question that

8   was presented to the witness.  Your Honor will observe that

9   in Dodge Valley we have a situation where obviously younger

10  alluvium extends across the watershed line.

11         THE COURT:  We have Chihuahua Valley.

12         MR. SACHSE: We have Rainbow Valley.

13         MR. VEEDER:  We have Terwilliger Valley, we have Rainbow

14  Valley.  We have quite a number of people in this litigation

15  as it is.

16         The point that I make is that if he wants to tie it down

17  and say that there are five wells here within a quarter of a

18  mile, in your opinion do you think they are stealing water

19  from the United States of America, and if he doesn't say yes--

20  I assume he would say yes.  The point that I make, your Honor,

21  is that Fallbrook would be bleeding about the situation.  It

22  seems to me that that is true in regard to everyone down there.

23  And I can see a situation where it might be relevant if they

24  are pumping in such an area where your Honor might conclude

25  that they are taking our water.

But as the situation now is presented I think it is too vague. I renew my objection.

THE COURT: Overruled. It goes to the weight.

BY MR. SACHSE:

Q  Are you acquainted with the question now, Mr. Kunkel, and are you ready to answer it without regard to Mr. Veeder's testimony?

A  Assuming that we have-- let's not start with an assumption. Starting with the situation that we have, where younger alluvium extends across a watershed divide, and assuming that ground water is also continuous across the divide and continued in the younger alluvial deposits, then assuming a well reasonably closely spaced to either side of the divide, pumping from the assumed ground water body would affect water levels on the other side of the divide.

Q  I don't think there is any question but that you agree that extractions of ground water from Domenigoni Valley by wells located in Domenigoni Valley would lower the water table of the ground water in the Domenigoni Valley; is that correct?

A  That is correct.

Q  And as his Honor pointed out earlier in his question to me, that would leave more room for surface waters to percolate when flood waters come, wouldn't it?

A  It would allow more storage space, yes.

1     Q   Now, then, would not exactly the same result flow if

2  ground waters were pumped across the divide from a well located

3  across the surface divide?  And I want your answer and not

4  Mr. Veeder's, so don't look at Mr. Veeder.

5     MR. VEEDER:  Did he look at me?

6     THE COURT:  Go ahead.

7     THE WITNESS:  Assuming the hydraulic continuity, it

8  would make little difference on which side the well were

9  located.

10     THE COURT:  Let' see this exhibit.

11     MR. SACHSE:  I have no further questions of Mr. Kunkel.

12     MR. VEEDER:  I have no questions.

13     MR. SACHSE: Mr. Rowe, would you resume the stand?

14

15                     JOSEPH A. ROWE,

16  recalled as a witness in behalf of defendant Searl Brothers,

17  having been previously duly sworn, testified further as follows:

18

19                DIRECT EXAMINATION (Resumed)

20  BY MR. SACHSE:

21     Q   I am putting on the easel Exhibit Searl Brothers B

22  for Identification.  Mr. Rowe, who prepared that exhibit?

23     A   I did.

24     Q   With reference to the base map on which your work is

25  superimposed, is that the same base map that was used in Searl

12646

1 Exhibit A to which you have already testified?

2      A   It is.

3      Q   And is the watershed line as delineated on Searl's

4 Exhibit B determined in the same way that it was determined in

5 Exhibit A?

6      A   Yes, that is the watershed line between San Jacinto

7 and Santa Margarita.

8      Q   I want to go over some of the symbols on Searl B

9 rather carefully.  The broken line symbol to which Mr. Veeder

10 referred in his earlier cross-examination of you, is that also

11 on Searl's B, the toe of the slope as shown on the U.S.G.S.

12 quads?

13      A   Yes in the legend shown on Searl's B it has the symbol

14 dashed line with a "toe of slope" written after it.

15      Q   And the wells that appear on Searl B, are they identi-

16 fied by the same State well code that you used on Searl A?

17      A   They are.

18      Q   I observe that there are a great many additional

19 wells on Searl B.  Is that correct?

20      A   That is correct.

21      Q   I observe also that Searl B does not contain the Searl

22 Brothers well number.

23      A   Not the designation of the Searl Brothers themselves.

24      Q   I will direct your attention to the red lines, one

25 wavy red line running from point A to point A to point A prime

and the other straight red line running from point A to point A double prime.  Do you see the two lines to which I refer?

A  Yes, sir.

Q  Now, directing your attention to the red line from A to A to A prime, what does that red line indicate, and how is it located?

A  That line indicates a profile line.  It is located more or less along the axis of the valley, following generally along the course of the stream.  It has been shifted from the axis in some cases to pass through wells where there is data available to assist in drawing a profile line without making too many extensions to that particular line.

Q  In other words, you located it to suit yourself?

A  That is correct.

Q  And also the line A-A double prime likewise was located by you to suit yourself?

A  That is correct.

Q  I observe starting over at the extreme right near point A the well H-2 has a very short dashed line extending from it to the red line.  What is the significance of that dashed line?

A  The wells located adjacent to the red line shown with dashes indicate that the information on the well, that is, the depth of the well or the elevation of the water table, was projected to that line.

Q  Actually, Searl B is simply a surface delineation of

1  the location of a profile which you have shown on a subsequent

2  exhibit.  Is that not right?

3      A  That is correct.

4      MR. SACHSE:  I will offer in evidence Searl's ExhibitB,

5  your Honor.

6      THE COURT:  Searl's Exhibit B received in evidence.

7      (Defendant Searl Brothers Exhibit for Identification B

8  was received in evidence.)

9      MR. SACHSE:  I am now placing on the easel Exhibit Searl

10  C for Identification.

11      Q  Who prepared Searl C, Mr. Rowe?

12      A  I did, Mr. Sachse.

13      Q  Before we go further I believe there is a very minor

14  typographical error on Searl C that we want to correct;

15  is that correct?

16      A  That is correct.  Where you are pointing now on the

17  lower profile the solid line designated, I believe, April,

18  1953, should be April, 1959.

19      MR. SACHSE:  In other words, if your Honor will observe

20  the line--

21      THE COURT:  I see it.

22      MR. SACHSE:  It is correctly designated in one place.  It

23  is incorrectly designated in another.  It should be April,

24  '59.  May I correct it?

25      THE COURT:  You may.

1    THE WITNESS:  I might add, Mr. Sachse, that the line on

2 the profile above is the same line and is properly designated.

3 BY MR.SACHSE:

4    Q  You are referring to the upper profile.  It is cor-

5 rectly designated April, 1959.

6    A  That is correct.

7    Q  Now, will you please explain to the Court the exhibit

8 Searl C and its relationship to Exhibit Searl B.  If you

9 would step down to the easel and use a pointer, please do.

10    A (Stepping down to the exhibit.)  Yes.  Searl C is

11 drawn to the same horizontal scale as Searl B.  Shown on the

12 exhibit the approximate ground surface is shown as a brown

13 line in both profile A-A-A prime and profile A-A-A double prime.

14 We have shown, for simplicity sake, we have repeated on both

15 profiles all the information appearing to the right of the point

16 A which is near Well 6 South, 2 West 9K1.

17    Q  Just a moment.  May we stop just a minute to be sure

18 that I follow you.  Do I understand then that on both the

19 upper and the lower profile all the material to the right of

20 the letter A reflects findings in the wells along the curve

21 line in Exhibit B between the two letters A?

22    A  That is correct.

23    THE COURT: And there are two profiles that are identical

24 to the right of the axis A-A?

25    THE WITNESS:  Yes, your Honor, with the exception that

in the lower profile we have shown depth of well with the solid lines. The depth of the well does not appear in the upper profile to the right of A-A -- to the right of the letter A.

BY MR. SACHSE:

Q  Go ahead, please, with the rest of the explanation.

A  We have shown on the profile in both the upper and lower profile water surface elevations as of the winter of 1953.

Q  Stop there, please. Where did you obtain that information?

A  That information was obtained from Bulletin No. 57.

MR. VEEDER:  Your Honor, I am going to object to the further references to Bulletin No. 57. There are appendices that have been taken and marked and are in evidence. Bulletin No. 57 is not in evidence. There are a great many things to which we have previously objected. Your Honor sustained our objection to the narrative on much of it. I think we should identify what these are from. The appendices to which we agreed, we had no objection if they went in. If you took them from the water level measurements--

MR. SACHSE:  Don't argue about it, Mr. Veeder. We will tell you where they came from.

MR. VEEDER:  I would like to know. If they came from the narrative, we are going to be very bitter about it.

12651

THE COURT:  Let's find out.

THE WITNESS:  No, sir, they are not from the narrative.
They are from the appendix, the chapter that pertains to water
level measurements.

BY MR. SACHSE:

Q  Where did you get the figures for the red line
April, 1959?

A  Those figures were obtained from my own measurements.

Q  You say from your own measurements.  Do you mean by
that that you personally went into the field and measured each
of these wells indicated in April, 1959?

A  I did.

Q  Now, on the lower profile A-A-A double prime, the
left-hand portion of it, I see a great many faint ink lines,
one of them dated 1-23-53, another one 1-15-41, another 4-13-22.
What do those lines indicate?

A  I might add that in the lower profile the lines you
have referred to were taken from State Bulletin No. 39J.

Q  What is that bulletin?

A  I believe it is Precipitation and Ground Water
Measurements in Southern California.

Q  In other words, you didn't personally measure these
water depths in 1922?

A  No, sir.

Q  Both these exhibits are also to a vertical scale,
are they?

12652

1      A   Yes.  Both these exhibits are to a vertical scale.  The

2  scale is marked on the exhibit as on inch equals 50 feet.

3      Q   Directing your attention to that portion of the two

4  profiles to the left of the letters A, now there they are

5  different; am I right?

6      A   That is correct.

7      Q   The upper of the two profiles, namely, the profile

8  A-A-A prime represents the red line on Exhibit B-- A-A-A prime;

9  is that correct?

10     A   Yes.

11     Q   And the lower profile, A-A-A-double prime would

12  represent a line on B from A to A to A double prime; is that

13  correct?

14     A   That is correct.

15     Q   Is the Exhibit Searl C accurate, to the best of your

16  knowledge, Mr. Rowe?

17     A   It is.

18     Q   And does it accurately depict the water level profiles

19  indicated thereon for the dates indicated thereon, to the best of

20  your knowledge?

21     A   It does.

22     MR. SACHSE:  I will offer in evidence Searl's C, your

23  Honor.

24     MR. VEEDER:  Just one question before that.

CROSS-EXAMINATION

BY MR. VEEDER:

Q   Have you Bulletin 39 in your possession where we could examine it?

A   Yes, I have a copy of Bulletin No. 39J.   There are series after the J series.   The J Series has most of the earlier measurements in what we call the Menifee.

Q   Do you have that in your possession?

A   I have.

MR. VEEDER:   Subject to review of that, I have no objection to this exhibit going in.   But I would like to take a look at it.

THE COURT:   Do you want to take a look at it before I admit this?

MR. VEEDER:   No, that's all right.

THE COURT:   Searl Exhibit C received in evidence.

(Defendant Searl Brothers Exhibit C for Identification was received in evidence.)

MR. SACHSE:   Now you may resume your seat for awhile, Mr. Rowe.

Q   I am now going to hand you an exhibit which has been marked Searl D for Identification.   Use the Court's exhibit for the time being.   His Honor has one.   Who prepared that tabulation Searl D?

A   I did.

MR. SACHSE: May I have it for just a moment. For the record, that is a tabulation entitled "Tabulation Showing Elevation of Water Surface in Various Wells, Diamond, Domenigoni Valley and Menifee Valley for the years 1953 and 1959, " and it consists of two sheets.

Q   Let's take the columns on Searl D one at a time, Mr. Rowe, and explain what they are. Start with the left-hand column headed "Well."

A   Yes, in the column headed "Well," on the left on Searl D is the number assigned to the well, using the State numbering system. I might add here, Mr. Sachse, that when I originally went in the field I found wells that had not previously been assigned a State number. I then sent the information to the State and they assigned numbers to that particular well. Those numbers are all shown on Exhibit D.

Q   So the first block of figures in column 1 indicates that the well beneath it are in 6 South, 1 West, the first one would be Section 5H1; is that correct?

A   That is right.

Q   And so on down the line. Now the next column "Depth," what is that? Depth of the well or depth to water, or what?

A   Yes, that is the depth of the well.

Q   And from what source did you obtain the figures you use in column 1 as to depth of the well?

A   You will notice after the word in the column "Depth"

1   that after, for example, the 1-12 in the top line there is a

2   symbol "O".  If you refer to sheet 2, below the numbers on

3   that sheet you will find that "O" refers to "Owner."  In that

4   particular case the depth was obtained from the owner.

5       Q  Similarly, I see the letter "L".  That would mean that

6   the depth was obtained from a log?

7       A   That is correct.

8       Q   And the symbol "57" would mean in that case that

9   you obtained the depth from the well tables in Bulletin No.

10  57?

11      A   That is correct.

12      Q   Go to the next column.  "Elevation RP."  What does

13  that mean?

14      A   "Elevation RP" is the elevation of the reference

15  point from which observations that I made on a particular well

16  were made.

17      Q   And similarly you have a code following that.  Is that

18  the same code that appears after column 2?  In other words,

19  "'57" means Bulletin 57?

20      A   Yes.

21          "T" refers to a topographic sheet.

22          "R" refers to direct level measurements made by myself

23  and an assistant on each of the wells so designated.

24      Q   Now then there is a date that appears after that

25  figure.

1    A   Yes.

2    Q   What does that date indicate?

3    A   That date might be a little bit misleading.  It goes

with the column "Water Levels 1953," and it refers to the date of

the measurement shown in 1953.  For example, on Well 6 South,

1 West, 5H1 at the top of the tabulation, distance to water

52.3 refers to November 20, 1953.

8    Q   And that is your own measurement in every case?

9    A   No, not in '53.

10   Q   How did you get that figure?

11   A   The depth to water and the date?

12   Q   Yes.

13   A   That was taken from water well measurements in

Bulletin No. 57 or from Bulletin No. 39.

15   Q   I see down near the bottom of the page, under the

"Elevation RP," Bulletin 39.  Would that be the source of your

water level measurements also at that time?

18   A   That is correct.

19   Q   The next column, "Elevation Water Table," what is the

relation of that column to the one preceding?

21   A   That is the elevation above sea level of the water

table.  It is the difference in elevation of the reference

point and the depth to water.

24   Q   In other words, 1529.7, taking the first line, sub-

tracted from 1582 would give you 52.3; is that right?

1     A   That is right.

2     Q   Then we find "1959 distance to water," and again

3 dates.  Are those dates related to the column "Distance to

4 Water"?

5     A   That is correct.

6     Q   Those are all your own measurements, are they not?

7     A   Yes, sir, they are all my own measurements.

8     Q   I see in the first column, for instance, the word

9 "Pumping."  That means that you didn't measure the well because

10 it was pumping?

11     A   That is correct.

12     Q   And where there are no indications of pumping do you

13 have any way of knowing, or can you tell us, how long any of

14 those wells may have been idle?

15     A   It is a little difficult sometimes, Mr. Sachse, but

16 generally when we arrive at a well or when I arrive at a well

17 to measure it I look for possible leak around the well where

18 the water might have been dripping, I look for possible

19 irrigation in the area, and I always feel the motor to see if

20 the motor is warm, cool or cold.  If the motor is hot it is

21 a good indication that the well has been pumped recently.  If

22 it is cold, it is an indication that the well has not been

23 pumped for a considerable period of time.

24     Q   To the best of your knowledge, except as indicated

25 by the symbol "pumping" do all of these distances to water

1   indicate static levels?

2      A  They do.

3      Q  The last column "Elevation Water Table."  Explain

4   that, please.

5      A  Yes, that is obtained in the same way that we obtained

6   the elevation water table under the year 1953.  There is one

7   exception, Mr. Sachse, and that is on Well 6 South, 2 West

8   16C1, which appears down near the middle of the tabulation.

9   It has the letter A after the elevation of the water table.

10   That elevation was obtained by direct level.

11      Q  What is the relation, if any, between the wells that

12   appear on Searl D and the wells that are shown on Searl C?

13      A  They are the same.

14      Q  In other words, the data that is contained graphically

15   on Searl C is reproduced in tabular form on Searl D; is that

16   right?

17      A  That is correct.

18      Q  Is the tabulation Sear D accurate, to the best of your

19   knowledge?

20      A  It is.

21      MR. SACHSE:  I offer in evidence the tabulation Searl D,

22   your Honor.

23      MR. VEEDER:  Just one or two questions, your Honor.

24

25

1                          CROSS-EXAMINATION

2    BY MR. VEEDER:

3         Q   I observe your references here to Bulletin No. 57.

4    That relates to the appendices, does it not?

5         A   That is correct.

6         Q   And the only material you were utilizing from Bulletin

7    No. 57 was the tabular data taken from the records; is that

8    right?

9         A   Yes.

10        Q   From the records maintained by the State?

11        A   Yes.

12        Q   And there is no reference, you adopted none of the

13   conclusions that were expressed in the narrative of that

14   bulletin; is that right?

15        A   That is right.

16        MR. VEEDER:  I have no objection to Exhibit D.

17   And your Searl E is part of D; is that right?

18        MR. SACHSE:  No, Searl E is a little different.

19        MR. VEEDER:  Are you going to offer those separately?

20        MR. SACHSE:  I am going to offer E separately.  Some of

21   those are stapled together.  You will have to break them apart.

22        MR. VEEDER:  That is how I got it.

23        THE COURT:  Searl D is admitted in evidence.

24        (Defendant Searl Brothers Exhibit D for Identification

25   was received in evidence.)

12660

1    THE COURT:  You don't show all of the wells that you have

2  on Searl D on Searl C, do you?

3    THE WITNESS:  Yes, I believe they all show, your Honor.

4    THE COURT:  I was looking in particular now in 6 South,

5  2 West, the well marked 17N1.

6    MR. SACHSE:  It is the last well on the top profile--

7  the first well on the left-hand side.

8    THE COURT:  All right.

9    MR. SACHSE:  I hope we didn't leave any off.  That was

10  the intention.

11    Q  Now, Mr. Rowe, I will now hand you exhibit marked

12  Searl E for Identification, being a table showing "Elevation

13  of Water Table Various Wells Lower Domenigoni Valley."  Now

14  who prepared that exhibit?

15    A  I did.

16    Q  First, will you tell us which of your previous map

17  exhibits is the easiest to refer to in connection with this

18  tabulation?

19    A  Searl B.

20    Q  And what is the relation of the tabulation shown on

21  Searl E to the map Searl B?

22    A  It shows measurements on various dates for the dates

23  shown on the wells designated on Searl E.

24    Q  When you say "it", you mean Searl E shows?

25    A  Searl E shows measurements made on various wells on

1  Searl B on the dates shown.

2      Q  Who made the measurements?

3      A  I did.

4      Q  Is this a tabulation of all the measurements you

5  have made in that area?

6      A  No, sir.

7      Q  How did you, or why did you delineate or select these

8  particular wells for tabulation?

9      A  The lower Domenigoni Valley is what the tabulation

10  states, and that is all they were--

11      Q  When you say "Lower," could you tell us by reference

12  to Searl B what general area you are talking about?

13      A  Yes.  Generally within Township 6 South, 2 West,

14  Sections 16, 17, 9 and 10.  There is one measurement in

15  Section 2 shown on Searl E.

16      Q  That is the well N1?

17      A  2N1, yes.

18      Q  In other words, the wells that are tabulated on

19  Searl E are wells that appear down gradient from the well

20  6 South, 2 West, 2N1?

21      A  That is correct.

22      Q  The well numbers in the first column are in accordance

23  with the State numbering system?

24      A  That is correct.

25      Q  What about Reference point?

A   Reference point elevation are for my own direct levels.

Q   And the measurements were all taken by you?

A   That is correct.

Q   And this tabulation accurately reflects the water levels for the wells indicated at the dates indicated?

A   Yes. There is one correction I would like to make on this tabulation.

Q   Go ahead.

A   December 12, 1959, in the extreme right-hand column, the second well from the bottom, 6 South, 2 West, 10E1, that measurement should be 5.8 and not 6.8 as shown.

MR. SACHSE:   May I make the change, your Honor?

THE COURT:   Yes, make it.

THE WITNESS:   It also affects the elevation of the ground water table under it to 1451.3.

BY MR. SACHSE:

Q   With the exception of that correction, is the exhibit correct, to the best of your knowledge?

A   It is.

MR. SACHSE:   I will offer it, your Honor.

THE COURT:   On the first item, the second column, you show figures 13.9 and 1416.3.  I take it 13.9 to water, and water stands at the elevation 1416.3?

THE WITNESS:   That is correct.  The measurements on the distance to water are shown in the upper portion of the columns

1  as you go the right of the well designation.   The lower figure

2  is the elevation of the water table.

3       THE COURT:   When you got down to this one where you have

4  44, did you omit to make the elevation check, or what is the

5  reason?

6       THE WITNESS:   In that particular case, on January 3, 1959,

7  I had a little difficulty determining accurately the distance

8  to water in Well 6 South, 2 West, 9K2.   There was some water

9  leaking back into the casing, or the casing was wet, and I

10  could not obtain an accurate measurement.   I do know it was

11  around 44 feet.   I was unable to check my measurements.

12       THE COURT:   Is E offered in evidence?

13       MR. SACHSE:   Yes, your Honor.

14       THE COURT:   It will be received in evidence.

15       (Defendant Searl Brothers Exhibit E for Identification

16  was received in evidence.)

17       THE COURT:   1:30 or 2?

18       MR. SACHSE:   1:30 is all right with me, your Honor.

19       THE COURT:   Adjourn until 1:30.

20       (Noon recess.)

21

22

23

24

25

San Diego, California Wednesday, March 30, 1960,  1:30 P. M.

BY MR. SACHSE:

Q  Mr. Rowe, I will invite your attention to Exhibit

Searl Brothers F for Identification, which is entitled "Tabula-

tion showing elevation of water table in Domenigoni Well No.

2, Section 16, Township 6 South, Range 2 West."  Would you

please locate Well No. 2 on Exhibit B for the Court's informa-

tion?

A  Yes.  It is shown as Domenigoni Well No. 2.  Also

below that it says "Well No. 6 South, 2 West 16D2."

Q  Who prepared that exhibit?

A  I did.  I am pointing to it on Exhibit Searl B.  It

is located in Section 16, Township 6 South, Range 2 West.

Q  Now, will you look over to Searl Exhibit C and locate

it also on Searl C, please.  I believe it is on the upper

profile.

A  Yes.  It also shows on profile A-A-A prime, and it is

designated 6 South, 2 West, 16D2.

Q  Thank you.  You may resume your seat, if you will.

Now, these measurements that are indicated on Searl Exhibit

F were taken by whom?

A  By me.

Q  On the first day, January 3, 1959, you show "Discharge

Gallons per minute zero."  That is a static measurement, is it?

A   That is correct.

Q   What was the condition of the well actually at that time??

A   Well, there was no pump installed in the well at that time.  As a matter of fact, there appeared to be additional casing laying on the ground like they had not been--

MR. VEEDER:   I object to this as conjecture, your Honor.

THE COURT:   Sustained.

BY MR. SACHSE:

Q   You don't have to draw any conclusion.

A   There was some casing laying on the ground.

Q   On April 3, the next date on the exhibit, the well was pumping; is that correct?

A   That is correct.

Q   How did you calculate the amount of discharge that is shown in the next column?

A   That was calculated by using a can where we measured the volume of the can and using a stop watch to determine how long it took to fill the particular container.

Q   You calculate the discharge on April 3 at 11 A.M. was 20.3 gallons per minute.

THE COURT:   This is not on Searl's property.

THE WITNESS:   No, sir.

BY MR. SACHSE:

Q   How did you get your depth to water?

1    A   Those were made by measurements with a tape.

2    Q   And the elevation to water table was made how?

3    A   By subtracting the depth to water from the elevation

4  on the reference point, which is shown at the heading of the

5  table as 1422.1.

6    Q   Were all the subsequent measurements given-- April 3,

7  April 3, April 4, May 1, et cetera-- made in the same way?

8    A   They were.

9    Q   Was it the same pump and the same size pump on May 13

10  that was in operation on January 3?

11    A   It appeared to be the same pump and the same engine,

12  yes.

13    Q   I observe then that on April 3 there was a 20-gallon

14  per minute discharge and on December 12 only a 5.9 gallon per

15  minute discharge.

16    A   That is correct.

17    Q   But that the drawdown between April 3 and December 12

18  remained practically the same; varied only from 23.9 to 22

19  feet, is that correct?

20    A   Well, not the word "drawdown" in its strictest sense.

21  It shows the depth to water.  You see, I show the static as

22  10.56 on January 3.  I do not show any other static levels on

23  this tabulation.  I was unable to obtain a static level while

24  the pump is operating.

25    Q   The depth to water then remained almost the same?

1     A   That is right.

2     Q   But the discharge declined drastically?

3     A   That is correct.   The elevation of the water table

4  stayed practically the same.

5     Q   As a hydrologist do you have any opinion as to what

6  type of subsurface condition might result in this phenomenon

7  of a drastically declining volume of production while the depth

8  to water remains the same and yet the same size pump pumping?

9     MR. VEEDER:  I object to the question.  I don't under-

10  stand it.  I don't see how the witness could understand it.

11    MR. SACHSE:  I will try to rephrase it.

12    THE COURT:  I understand it.  What we are going to get

13  is only opinion testimony.  But here is a chart showing the

14  water level remaining about the same, and it shows the drop-

15  off in discharge.

16    MR. VEEDER:  He is asking, though, the kind and type of

17  geologic formation that would create the condition.

18    MR. SACHSE:  No, I didn't ask him that.  I asked for an

19  estimate as a hydrologist, any opinion as to the type of

20  conditions that might create this condition.

21    MR. VEEDER:  I object to it as being conjectural.

22    THE COURT:  Overruled.

23  BY MR. SACHSE:

24    Q   Answer the question, please.

25    A   Yes, it shows that the material from which the water

1  is obtained in this well is a rather tight material.

2      Q  Is the date on Exhibit F accurate, to the best of

3  your knowledge?

4      A  It is.

5      MR. SACHSE:  I will offer in evidence Searl's Exhibit

6  F.

7      THE COURT:  Received in evidence.

8      (Defendant Searl Brothers' Exhibit F for Identification

9  was received in evidence.)

10     THE COURT:  I don't know that I follow you.  The material

11 is tight.  Poor permeability, is that what you mean?

12     THE WITNESS:  It has a low permeability, yes, sir.

13     THE COURT:  How would that square with a water level that

14 was about the same while the pump was operating but less

15 water being pumped?

16     THE WITNESS:  It would mean that the ability of the

17 water to reach the well is restricted.

18     THE COURT:  But the water is reaching the well because the

19 water level is the same.  Ordinarily, where you are pumping

20 out of material and if you pump excessively you would get a

21 cone of depression, you would get an area where the water

22 level would drop because of one reason-- poor permeability,

23 tight material-- the water level would drop and you would get

24 less production.  But here is a water level that is staying

25 about the same in the well, and yet you are getting less water

1  discharged.

2      THE WITNESS:  Yes, it means that less water is arriving at

3  the well, your Honor.  The cone of depletion, as far as the

4  bottom of the cone at the well is concerned, has stayed at

5  practically the same level.

6      THE COURT:  You would think, would you not, that if the water

7  level remained the same and the pump was operating at the same

8  efficiency, it would cause the water level in the well to drop

9  and then thereafter the production of the well might become

10  less?  Isn't that what you would reasonably expect?

11      THE WITNESS:  Well, yes, except that what has happened

12  here, your Honor, is that they were unable to obtain the 20

13  gallon a minute from the same pumping level.  Therefore, they

14  had to reduce discharge.  The discharge quantity was the way

15  they regulated the performance of this particular well.

16      THE COURT:  They cut down on the pump some way?

17      THE WITNESS:  They cut down on the discharge; yes, sir.

18      MR. VEEDER:  On this there is not a scintilla of evidence,

19  this part that he just said.

20      THE COURT:  He is giving what he thinks might be reasons.

21  How would they cut down on the pump?

22      THE WITNESS:  It is a gasoline engine and they throttle

23  the engine to run any speed.  There are also valves on the

24  discharge.

25      THE COURT:  Do you know that anything like that was done?

1          THE WITNESS:  Yes, sir, the engine was slowed down.

2          THE COURT:  Did you make some tests as to what speed

3    the engine was operating on these other dates?

4          THE WITNESS:  No, sir.  This tabulation, your Honor, is

5    not a tabulation showing the efficiency of the pump or what

6    the pump will produce.  It merely shows that for certain

7    discharges we have a certain depth to water in a well.

8    Actually, it has nothing to do with the pump at all.  It has

9    to do with the performance of the well.

10         MR. VEEDER:  I object again.  This is far too conjectural,

11   your Honor.

12         THE COURT:  Overruled.

13         How do you know that there was not something wrong with

14   the pump?

15         THE WITNESS:  There might have been, your Honor, but

16   nevertheless we still find, with five gallon a minute, a depth

17   to water of 22 feet, and that was on December 12.  On April 3

18   we find it from almost the same depth at 23.9, we find 20.3

19   gallons a minute coming out of the well.  I think, if I can

20   explain it this way, that the relationship between the pumping

21   level or the distance to water and the quantity has changed.

22         THE COURT:  I might understand this if there was proof

23   that you had taken revolutions per minute of the engine or

24   something like that and knew that this pump was throttled down

25   to where it was running a lot slower and with less efficiency

1  on this last date. But I don't know that you made any tests

2  on that pump engine.

3      THE WITNESS: No, your Honor. We are not making a test

4  of the pump or the engine. It could have been a different pump,

5  as far as that is concerned. It could have been an electric

6  pump. It could have been a gasoline engine . They could have

7  taken the original pump out and put a new pump in the well.

8  We are finding a relationship here regardless of the type of

9  pump in the well between a quantity discharged and elevation

10  of the water table in that particular well.

11      THE COURT: Maybe I am thick-headed. Go ahead.

12      MR. VEEDER: I am going to object on the grounds that

13  this is all incompetent, irrelevant and immaterial and not

14  tending to prove a single issue in this case. I see no reason

15  for it. He was not there. He didn't run the pump. He didn't

16  know what happened.

17      MR. SACHSE: He took every one of these himself while the

18  pump was running. He just so testified.

19      MR. VEEDER: The point I am making, though, is that if he

20  went and turned on the pump and ran it for ten minutes or

21  however long he ran it, then measured the depth to water, what

22  has that to do with this case?

23      THE COURT: I don't know yet. I don't know yet whether

24  he turned the pump on each time, or whether it had been running

25  when he got there, how long it had been running, what revolutions

1   per minute the engine was running.

2       MR. STAHLMAN:  I am wondering whether the phenomenon as

3   explained here that he believes occurred in this well, whether

4   it could be demonstrated on the blackboard as to what he

5   believed occurred.

6       MR. SACHSE:  If Mr. Rowe thinks he can make a better

7   exposition I don't care.

8       THE COURT:  How deep was this well?  Do you know?

9       THE WITNESS:  Yes, sir.  It is shown on Searl D as being

10  43 feet deep.

11      THE COURT: Go ahead.  The objection is overruled.

12      MR. SACHSE:  I am going to offer in evidence Searl's

13  Exhibit F.

14      THE COURT:  It has already been received in evidence, I

15  think.  If not, it will be received in evidence.

16  BY MR. SACHSE:

17      Q  Now, Searl G for Identification is an exhibit con-

18  sisting of five sheets, the heading being "Information

19  From Driller's Logs and Francis Domenigoni on various

20  Domenigoni wells in Sections 16 and 17, Township 6 South,

21  Range 2 West."  Are you familiar with that exhibit?

22      A  I am.

23      Q  Who prepared it?

24      A  I did.

25      Q  So that we clearly understand how this was obtained,

1   the data that is set forth on Searl Exhibit G represents en-

2   tirely information you obtained from other sources, does it

3   not?

4          A   That is correct.

5          Q   And taking the first sheet of the exhibit, "Owner

6   Francis Domenigoni" at the bottom next to the last line,

7   "Information from Lynch," does that mean that you obtained the

8   data contained on this sheet from Mr. Lynch?

9          A   That is correct.

10          MR. VEEDER:   I object on the grounds that all this

11   material is purely hearsay, your Honor.

12          MR. SACHSE:   I think this is helpful to the United

13   States of America.   If they want to know what has happened

14   on these wells, we are trying to help them.   If they don't

15   want it--

16          THE COURT:   Well, equivalent well logs with this

17   type of information we have received wherever we could get it.

18   People have dug up old well logs that they couldn't possibly

19   have identified.   Some predecessor in interest, when he sold

20   them the ranch, said, "This is the well log."

21          Overruled.

22   BY MR. SACHSE:

23          Q   Does that indicate, that statement, "Information

24   from Lynch," that all of the data on that sheet covering

25   Well 16D1 is obtained from Mr. Lynch?

1      A   That is correct.

2      Q   Go over to the next page, please.  Here I see we

3   have some more information, but there is no statement exactly

4   from whom this information is obtained.  Can you tell us where

5   you got the information on Sheet 2?

6      A   Yes.   The log was obtained from a Mr. Marvin Walker

7   in Elsinore.

8      Q   And is the data that is indicated on this sheet a

9   recapitulation of what you obtained from Mr. Walker?

10      A   On the log, yes.  I believe the date drilled, without

11   referring to my notes, was obtained from Francis Domenigoni.

12      Q   And so on through the exhibit, do each of these

13   sheets represent the best information you were able to obtain

14   on each of these wells?

15      A   That is correct.

16      MR. SACHSE:  I will offer it in evidence.

17      MR. VEEDER:  I have had my objection.

18      THE COURT:  Received in evidence.

19      (Defendant Searl Brothers Exhibit G for Identification

20   was received in evidence.)

21   BY MR. SACHSE:

22      Q   I will now call your attention to the exhibit Searl

23   H, being a single sheet entitled "Tabulation Showing Pertinent

24   Data on Searl Brothers Wells Diamond Valley information from

25   Searl Brothers records."  Who prepared that exhibit?

1     A   I did.

2     Q   Directing your attention for a moment to the Exhibit

3  Searl A, are the wells covered in H the same wells that

4  appear on Searl A?

5     A   They are.

6     Q   And does Exhibit H again represent the best informa-

7  tion you were able to obtain in tabular form concerning each

8  of those wells?

9     A   It is.

10    Q   Is it accurate, to the best of your knowledge?

11    A   It is.

12    MR. SACHSE:  I will offer in evidence Searl H.

13    THE COURT:  What are the numbers in parentheses, taking

14  the first column, where it says "Size casing in inches 12(3)"?

15  What is that?

16    THE WITNESS:  At the bottom of the tabulation, the next

17  to the last sentence, in more or less the notes at the bottom,

18  it days, "Information in parentheses from Appendix S DWR

19  Bulletin 57, Santa Margarita Investigation."  It is a com-

20  parison of the information shown on Appendix F of Bulletin

21  57 with the records of Searl Brothers.

22    THE COURT:  In other words, you mean that Bulletin No.

23  57 and Appendix F would show that as a three-inch casing?

24    THE WITNESS:  Yes.

25    THE COURT:  And the next one, Well No. 2, which you show

1   as 14, Bulletin 57 would show as 16?

2        THE WITNESS:  Yes, sir.

3        MR. SACHSE:  That is correct, your Honor, right through

4   you will find many such discrepancies.

5        THE COURT:  And on depth where well No. 6 you show as

6   130 feet, the Bulletin shows as 90 feet?

7        THE WITNESS:  That is correct.

8        THE COURT: All right, Searl H received in evidence.

9        (Defendant Searl Brothers Exhibit H for Identification

10  was received in evidence.)

11  BY MR. SACHSE:

12       Q  I will now invite your attention to Searl Brothers

13  Exhibit I, a single sheet tabulation entitled "Tabulation

14  Showing Eastern Municipal Water District Deliveries to Searl

15  Brothers in Diamond Valley, 1954 to '59 annual acre feet."

16  Who prepared that exhibit?

17       A  I did.

18       Q  When you say "Annual" does that figure mean that these

19  are calendar years rather than water years?

20       A  That is correct.

21       Q  From what source did you obtain the information as

22  to the amount of Eastern Municipal Water District deliveries

23  to Searl Brothers?

24       A The information was received from Eastern Municipal

25  Water District records.

Q  In order that I may be sure that I read these cor-
rectly, the first figure 54, does that indicate that 748 and
972 thousands of acre feet were delivered in the calendar year
1954 of Metropolitan Water District water to Searl Brothers?

A  That is correct.

MR. SACHSE:  I will offer it in evidence.

THE COURT:  These are importations into the District?

THE WITNESS:  Yes, sir.

THE COURT:  And this Eastern Municipal Water District,
if you know, gets its water from the Metropolitan Water
District?

THE WITNESS:  That is correct.

THE COURT:  In toto?

THE WITNESS:  That is correct.

THE COURT:  So these are importations into the water-
shed?

THE WITNESS:  Not in its strictest sense, your Honor.
I mean all of this water did not necessarily arrive within the
Santa Margarita watershed.

MR. SACHSE:  Your Honor will observe--

MR. VEEDER:  No, he was saying, was this importation of
what was Colorado River water?

THE COURT:  All imported water?

MR. VEEDER:  That was the question.

THE COURT:  No, I see the point now.  It is all imported

1 water, but only some part of it was used within this watershed

2 and some part was used within another watershed.

3  THE WITNESS:  That is correct, your Honor.

4  MR. VEEDER:  That was the question I was going to ask on

5 voir dire.

6  You have no breakdown as to where this water is used,

7 do you?

8  THE WITNESS:  No, sir, other than on the Searl Brothers'

9 ranch.

10  MR. VEEDER:  And that could have been within or without

11 the watershed, as the Court pointed out?

12  THE WITNESS:  Referring to the Santa Margarita watershed?

13  MR. VEEDER:  Yes.

14  THE WITNESS:  That is correct.

15  MR. SACHSE:  I offer in evidence Searl Brothers I.

16  THE COURT:  Received in evidence.

17  (Defendant Searl Brothers Exhibit I for Identification

18 was received in evidence.)

19  THE COURT:  Is there any way to get any kind of

20 breakdown?

21  MR. SACHSE:  Your Honor, in the light -- my answer to it

22 is no, I wouldn't know how to go about it, in the light

23 particularly of questions I asked Mr Kunkel.  You can observe

24 the watershed line.  There are wells on both sides.  It is as

25 flat as a billiard table.  Where the water goes once it is

1   pumped onto the ground is anybody's guess.  That is one of

2   the problems we are attempting to develop with this whole line

3   of examination.

4           THE COURT:  All right.

5   BY MR. SACHSE:

6           Q  Now, Mr. Rowe, I invite your attention to Searl

7   Brothers Exhibit J, being a map entitled "Conductivity and

8   Chloride Content of Water from Various Wells Menifee and

9   Diamond Valley, Results of May 6, 1959, Analyses from Samples

10  Taken May 1, 1959."  Who prepared the exhibit?

11          A  I prepared the exhibit.

12          Q  Now, will you tell us briefly the background of this

13  exhibit, how it happened that you made this study?

14          A  Yes, Mr. Sachse.

15          MR. VEEDER:  You asked him who.

16          MR. SACHSE:  Go ahead and tell us.

17          THE WITNESS:  Yes.  One of the ways to determine movement

18  of waters is through a chemical analysis.  Now while Well

19  6 South, 2 West, 16D2 was being pumped, I had occasion to

20  test that water and I noticed some dissimilarity in the taste

21  of the water with waters I had tasted in Section 10 or in

22  other areas other than Section 16 or 17.  I took a sample of

23  water from Well 6 South, 2 West, 16D2 and a sample from Well

24  6 South, 2 West, 10D2, and had them analyzed, took them to

25  Babcock & Sons, Chemists, in Riverside, and had a complete

1   mineral analysis run on those waters to determine if the

2   quality of the water was the same from each well.  I found--

3   BY MR. SACHSE:

4        Q  Don't tell us what you found, please, for a moment,

5   except as a generality.  Did what you found cause you to go

6   further with your investigation?

7        A  It did.

8        Q  What did you do after that?

9        A  After that I felt that other samples should be taken,

10   and I felt that to properly take the samples that I shouldn't

11   be the one to take the samples.  I then asked Mr. Sherman

12   Babcock of Babcock & Sons to accompany me into Menifee

13   Valley and Domenigoni Valley and take some other samples,

14   additional samples.

15        Q  Did he do so?

16        A  He did.

17        Q  On this Exhibit start at the first well, if you

18   will, on which Mr. Babcock took a sample.  Just give us the

19   chronological order.  Don't tell us anything about the findings,

20   but tell us where you went and what samples you took with Mr.

21   Babcock.

22        A  In the company of Mr. Babcock we took a sample--

23   Do you want the exact chronological order?  I can check my

24   notes and give us the time.

25        Q  No.

12681

Q  We generally started in the Menifee Valley area, which was 5 South, 3 West, Well 36Q1.  We then obtained a sample from Well 6 South, 2 West, 6P1.  We also obtained a sample from Well 6 South, 2 West, 5N.

Q.  To summarize and then continue onward, didyou obtain samples from all of the wells that have numbers in the red and green boxes connected with them on Exhibit J?

A  That is correct.

Q  And were all those samples taken on this same trip?

A  They were.

Q  And taken by Mr. Babcock?

A  That is correct.

Q  And the analyses were made by Babcock?

A  That is correct.

MR. SACHSE:  I might interject here, your Honor, that we are going to have Mr. Babcock present tomorrow for any cross-examination of his original notes, et cetera, but I would like to continue at this time, although it is concededly hearsay, for orderly procedure.

THE COURT:  You may.

BY MR. SACHSE:

Q  Will you tell us what the figures that are enclosed in the red lines mean?

A  Within the red lines, as shown in the legend, it shows the conductivity of the water.

1     Q   What does the word "conductivity" mean in layman's

2   language?

3     A   I am sure Mr. Babcock can explain conductivity better

4   than I.   It is just the rate at which the water will conduct

5   a current.

6     Q   Is it in any way reflective of the amount of dissolved

7   solids that are in the water?

8     A   It is an indication of the total dissolved solids in

9   water, yes.

10     Q   In other words, am I correct in stating that,

11   generally speaking, the lower the conductivity figure the

12   lower the dissolved solids, and the higher the conductivity

13   figure the higher the dissolved solids?

14     A   That is correct.

15     Q   What do the figures in green represent?

16     A   The figures in green represent the chloride content

17   of the water in parts per million.

18   MR. VEEDER:   May I interrupt, your Honor.   As I under-

19   stand, the conclusions that this witness expressed are going

20   to be Babcock conclusions?

21   MR. SACHSE:   He has not expressed any conclusions.

22   MR. VEEDER:   Well, he expressed a conclusion as to

23   conductivity.   I don't want to continue to interrupt, if you

24   are going to back this up.

25   MR. SACHSE:   Mr. Babcock is going to be here with his

1  original sheets.  You may cross-examine to your heart's

2  content.  But I am quite sure that Mr. Babcock will agree that

3  the conductivity bears a direct relationship to the dissolved

4  solids.

5      (An interruption while the Court handles another matter.)

6      THE COURT:  Go ahead.

7  BY MR. SACHSE:

8      Q  Do I understand then that the figures that you have

9  enclosed in the red boxes and the green boxes you obtained from

10  Babcock?

11     A  That is correct.

12     Q  And Babcock gave you the chloride contents in parts

13  per million and you simply wrote them down on this exhibit?

14     A  That is correct.

15     Q  Babcock gave you the conductivity figure and you

16  inserted that on the exhibit?

17     A  That is correct.

18     THE COURT:  So then you prepared Exhibit J-1 as a

19  compilation of these figures and then you prepared J and put

20  the figures on the map?

21     THE WITNESS:  That is correct.

22     MR. SACHSE:  I was just going to refer to J-1, but the

23  Court has asked the question.

24     Q  So that the record may be clear, with specific

25  reference to J-1 for Identification, being a tabulation

1   showing conductivity, et cetera, and chlorides, samples taken

2   May 1, 1959, is that in tabular form the same data that appears

3   on J?

4         A   It is.

5         MR. SACHSE:   If the Court please, I will offer Searl

6   Brothers Exhibits J and J-1 in Evidence, reserving of course

7   to Mr. Veeder a motion to strike if on cross-examination he

8   finds any inadequate foundation.

9         MR. VEEDER: Subject to that, your Honor, I have no

10  objection.  He is going to produce Mr. Babcock and also the

11  records.

12        THE COURT:   All right.

13  BY MR. SACHSE:

14        Q   Just so that we understand each other, I think we

15  have the original records here.  Mr. Veeder wants to go over

16  those tonight.

17        A   Yes, sir, I have the original copies of the original

18  analyses.

19        Q   Will you then during the recess get out the original

20  Babcock analyses and give them to Mr. Veeder so that he can

21  go over them tonight?

22        A   Yes.

23        THE COURT:   J-1 and J received in evidence.

24        (Defendant Searl Brothers Exhibits J and J-1 for

25  Identification were received in evidence.)

THE COURT:  Somewhere along the line are you going to tell me what conclusions you draw from this?

MR. SACHSE:  We are almost ready to ask the $64 question, your Honor.

MR. VEEDER:  Who is going to draw the conclusion?  That is the $64 question.

MR. SACHSE:  The engineer is going to draw the conclusion on the assumption that the conductivity and the chloride figures are correct.

THE COURT:  Let's wait and find out.

MR. VEEDER:  I am breathless, your Honor.

THE COURT:  We are too impatient, Mr. Veeder.

MR. SACHSE:  You may resume your seat, if you will, Mr. Rowe.

Q  In making a determination as to the direction of ground water movements, what are some of the factors which you as a hydraulic engineer consider?

A  Of course, one of the first things we consider, Mr. Sachse, is the elevation of the water table.  That can be obtained by well measurements, it can be obtained by observations of standing water level, the water table standing on the surface of the ground or near the surface of the ground, we also use chemical analysis in determining movement of ground water.

Q  By chemical analysis do you mean that type of data

1    that is indicated on the Searl J?

2        A   That is correct.

3        Q   What other factors, if any?

4        A   On the surface of the ground the existence of any

5    restriction or rock outcrop.

6        Q   In other words, you mean geologic factors in general?

7        A   They would be geologic factors, but it would be a

8    rock outcrop, whether there is rock on the surface, whether

9    there is not rock on the surface.

10       Q   Now, directing your attention specifically to Searl

11   Exhibit C, considering first the upper of the two profiles,

12   that is profile A-A-A prime, will you indicate to the Court

13   what that profile shows as far as direction of ground water

14   movement is concerned on the dates of the various measurements?

15       A   Yes.  It shows both for the winter of 1953 and April,

16   1959, a movement of the ground water from the right of the

17   diagram to the left.

18       Q   I see that you designate from the right to the left

19   along the green and red lines and you stopped at point A.

20       A   That is correct.

21       Q   What about movement to point A from the other direction?

22   What would that profile alone indicate?

23       A   A movement from-- I believe you are referring to

24   16C1 toward A.

25       Q   I am asking you what that profile, considered solely

12687

1    alone, might indicate as to movement in any other direction

2    than from right to left?

3         A  It would indicate that there is no ground water

4    movement from the point A on the east toward Well 16C1.

5         Q  Why?

6         MR. VEEDER:  Just a moment.  Before we go any further,

7    could we have this exhibit so that we can find our A?

8         MR. SACHSE:  Yes, here it is.

9         Q  Why do you say that there is no movement indicated on

10   that profile from the location of the well 6 South, 2 West,

11   16C1 toward point A?

12        THE COURT:  No movement?

13        MR. SACHSE:  No water movement from the well toward

14   point A.

15        THE COURT:  It is just the reverse of what he said.

16        MR. SACHSE:  Pardon me.  From point A toward the well.

17        THE WITNESS:  From point A toward Well 16C1 there is no

18   movement.

19   BY MR. SACHSE:

20        Q  Why not?

21        A  Because the elevation of the water table in 16C1 is

22   higher than at point A or Wells 9K1 and 9K2.

23        Q  In other words, water is not going to run uphill

24   between the two points; is that correct?

25        A  That is correct.

1         MR. VEEDER:  We will stipulate to that.

2   BY MR. SACHSE:

3         Q   You have already testified that the lower profile is

4   identical between points A and A with the upper profile?

5         A   That is correct.

6         Q   Starting at point A on the lower profile, what does

7   that profile indicate as to the direction of ground water

8   movement after ground levels point A?

9         A   On the lower profile, Mr. Sachse, you will note that

10  we have short dashed lines extending from point A over to the

11  left on to Well No. 6 South, 2 West, 6R1.

12        Q   Would you please step to Searl B and locate that

13  same well that you have just mentioned on Searl B for the

14  Court?

15        A   Yes.  Point A that I am pointing to now is in Section

16  9 near Well 9K1.  6R1 is in the Menifee area approximately a

17  mile beyond the watershed divide.

18        Q   Now then, continue along this line of the profile

19  and continue to trace the direction of ground water movement.

20        A   This profile shows a difference in water table between

21  Well 6-- we are talking about 6 South, 2 West now-- 6R1 and

22  9K1 and 9K2.  As you go--

23        Q   Just a moment while we are there.  In other words,

24  the direction of the movement as indicated by that profile is

25  from 9K1 and 9K2 toward 5N1; is that right?

A    That is correct.

Q    And from 5N1 toward 6R1; is that correct?

A    That is correct.

Q    And so on down the slope of the red and green line; is that correct?  Is it or is it not?

A    Well, it shows-- this particular profile shows that on 12-20-53 (December 20, 1953) that there is a slope in the water table from Well 6 South, 3 West, 2F1, toward Well 6 South, 3 West, A-1.

Q    In other words, you have again then a reverse slope such as you find in the upper profile; is that correct?

A    That is correct.

Q    Now moving up vertically from the green line to your 1953 well measurements on the same profile A-A-A double prime, what was the relation of the water table between N1 and F1 in January, 1953?

A    In January, 1953, it shows that the water table was rather flat.  It was almost flat.  You can tell from the line that is not colored on Exhibit C and it is designated 1-23-53.

Q    Move up the water table as of January, 1941.  What does that water table show?

A    It shows also that that water table is rather flat from Well 5N1 to 5 South, 3 West, 36N1 and a slight drop into 6 South, 3 West, 2F1.

Q    Again, those wells of that profile represent the same

1  wells that appear on the surface profile indicated on Searl

2  B; is that right?

3       A  That is correct.

4       Q  Now, directing your attention, Mr. Rowe, to the upper

5  profile again, particularly the low point shown in A, what

6  type of subsurface condition might cause or influence such a

7  ground water profile?  Do you understand my question?

8       A  No, not exactly, Mr. Sachse.

9       Q  I am directing your attention to point A on the

10  upper profile on Searl C, and we see one ground water profile

11  sloping from right to left to point A and another profile

12  sloping from left to right to point A.  What type of subsurface

13  conditions might cause such a phenomenon?

14       MR. VEEDER:  I object to that.  That is becoming too

15  conjectural, your Honor.  He hasn't laid any foundation for

16  that by this witness.  Nor is there anything in evidence

17  upon which such a hypothesis could be predicated.

18       THE COURT:  Overruled.

19       THE WITNESS:  It shows at point A a free movement of

20  water toward Point A.

21  BY MR. SACHSE:

22       Q  What about on beyond point A?  What type of subsurface

23  conditions might exist beyond point A to cause that reversal

24  of direction of the ground water movement?

25       MR. VEEDER:  I renew my objection.  This witness hasn't

1   been qualified as a geologist.  He hasn't been qualified to

2   have any knowledge of what is underground or to have any

3   knowledge of what underlies this alluvium concerning which he

4   testified.

5      MR. SACHSE:  I took some pains to have him testify to

6   extensive work in underground water basins and direction of

7   ground water movements.  I thought he was qualified.

8      THE COURT:  I think he is qualified.  It is a matter of

9   weight.  Overruled.

10      MR. VEEDER:  I object on the ground that there is no

11   foundation to show that he has sufficient knowledge of the

12   conditions underlying this area to reach such a conclusion.

13      THE COURT:  Overruled.

14      THE WITNESS:  It shows here.  I think it has been

15   stipulated before that water will not run uphill.

16      MR. VEEDER:  I will agree to that.

17      THE WITNESS:  And it shows that to have water at the

18   elevation as shown in Well 16C1, that there cannot be a free

19   movement of water from A towards C1 because of the rise.  Now

20   that free movement would be caused either by rock underground--

21   BY MR. SACHSE:

22      Q  You mean a restriction would be caused?

23      A  A restriction, a tight soil condition or a small

24   narrow cross-sectional area through which the water would pass

25   trying to flow from point A to well 16C1.

Q   Now, Mr. Rowe, with particular reference to your tabulation, the exhibit that shows these same wells, Searl Exhibit D, what can you tell us about the depth of those wells to the left of point A as compared with the wells 9K1 and 9K2 at point A?

A   To the left of point A, as shown on Searl D, it is also depicted on the upper profile of Searl C, Mr. Sachse, Well 6 South, 2 West, 16C2, has a depth of 23 feet, and moving to the left 16D1 has a depth of 40 feet, 16D2 has a depth of 43 feet, 17N1 has a depth of 16 feet.  In the vicinity of point A, Well 9K1 has a depth of 87 feet, 9K2 has a depth of 102 feet.

Q   Do those well depths offer any indication of sub-surface conditions that might account for this low spot at point A?

A   Yes.

Q   What is it?

A   Well, it shows in every case where we could find the depth that to the left of point A wells were shallow and where logs were available it shows that they ended at rock.

Q   If you will drop down to the lower profile, take for example the first well to the left of point A, 6 South, 2 West, 5N1, what is the depth of that well?

A   It is around 227 feet.

Q   Do you have any information from the log as to the

1    type of material through which that well was drilled?

2         A  No, I don't believe I have-- Just one moment.  Yes,

3    I have the log of well 6 South, 2 West, 5N.

4         Q  What does it say about the type of material in which

5    it bottomed?

6         A  Fine brown sand and clay at 312 feet.

7         THE COURT:  That is 5N1?

8         THE WITNESS:  That is 5N, your Honor.

9         THE COURT:  5N1?

10        THE WITNESS:  No, 5N.  The two were very close together.

11        THE COURT:  It is not shown on the map.

12        MR. SACHSE:  5N?

13        MR. VEEDER:  What number are you using?  5N?

14        MR. SACHSE:  I am not sure I heard the witness correctly.

15        MR. STAHLMAN:  Two hundred and some feet deep.

16        THE WITNESS:  I think I can explain it this way, Mr.

17   Sachse.  I do not have the log of 5N1.  I have a log of 5N.

18   BY MR. SACHSE:

19        Q  Which is very close to 5N1?

20        A  That is correct.

21        Q  And that showed a depth of 300 feet?

22        A  That is correct.

23        Q  Now, Mr. Rowe, basing your answer solely for a moment

24   on the evidence contained in Searl Exhibits B and C and the

25   tabulations in connection with them, have you any conclusion

1  as to the direction of ground water movement in or out of

2  Domenigoni Valley?  And please demonstrate your answer by

3  reference to Searl B.

4       THE COURT:  You are having him base his opinion--

5       MR. SACHSE:  Just on this one thing alone first, your

6  Honor.

7       THE WITNESS:  Yes.  The profiles in Searl C show move-

8  ment of water from point A in Section 9 on Searl B toward

9  Menifee Valley along the line A-A-A double prime.

10       THE COURT:  Well, they show movement of water partway

11  along that line, and they show also a water gradient from

12  A-prime back toward A, don't they?

13       MR. SACHSE:  No, your Honor.

14       THE COURT:  A-A double prime.

15       MR. VEEDER:  That is right.

16       THE WITNESS:  Yes, at times of the year, yes, the green

17  line will show a movement back toward point A west of the

18  watershed divide.

19  BY MR. SACHSE:

20       Q  You say west of the watershed divide?

21       A  Yes.

22       Q  In other words, back toward the point within the San

23  Jacinto watershed?

24       A  That is correct.

25       Q  Looking at still only the profile, is there any

1    evidence on the profile to indicate movement from the San

2    Jacinto watershed into the Santa Margarita watershed?

3        A  No.

4        Q For the same obvious reason that it can't run uphill?

5        A  That is correct.

6        Q  The profiles show the watershed boundary, do they

7    not?

8        A  That is correct.

9        Q  Show it to us.

10       A  On profile A-A double prime it is designated "San

11   Jacinto watershed."  It should be "Santa Margarita Watershed,"

12   approximate location.  I am pointing to it now approximately

13   4,000 feet or so westerly of point A.

14       Q  I want to jump over now to Searl J.

15       Mr. Rowe, you may resume the stand.

16       I want to direct your attention to the well shown as

17   D-2 in Section 10.  It has a little red dot on it.  Do you

18   see the one to which I refer?

19       A  I do.

20       Q  And it has a conductivity figure of 968 and a

21   chloride figure of 99.

22       A  That is correct.

23       Q  I will direct your attention to the well D-2 in

24   Section 16.  Do you locate that one?

25       A  I do.

1      Q It has a conductivity figure of about four times as

2   great as the previous well, and a chloride content of about

3   four times as great.  Do you see that?

4      A  I observe that.

5      Q  Are those similar waters?

6      A  They are not the same water.

7      Q  Similar?

8      A  No, they are not similar.

9   MR. VEEDER:  May I interrupt and save some time?

10   MR. SACHSE:  Yes.

11   MR. VEEDER:  You say they are not the same water?

12   THE WITNESS:  They are not similar waters.

13   BY MR. SACHSE:

14      Q  Again referring first to the well D2 in Section 10,

15   would you compare the waters as characterized by their

16   conductivity and chloride content of the Well D2 in Section

17   10 with the well N2 inSection 17?

18   THE COURT:  It is not N2; it is N.

19   MR. SACHSE:  No, in Section 17.  You are looking at the

20   wrong one, your Honor.  Section 17 away down at the foot.

21   THE COURT: All right.

22   BY MR. SACHSE:

23      Q  Am I correct that the chloride content of the latter

24   is twenty times as great, and the conductivity is eight times

25   as great or better?

1        A   Yes, approximately.

2        Q   Are those similar waters?

3        A   No.

4        Q   Now, please compare D2 in Section 10 with N in Section

5    6.   I observe that the conductivity of the first well mentioned

6    is 968 and the second is 1188.   Is that a reasonably close

7    conductivity?

8        A   Yes.

9        Q   And how about the comparison of the chloride content

10   of the two wells?

11       A   Yes, that is similar.

12       THE COURT:   That is not in 6.   That is in 15, isn't?

13       MR. SACHSE:   It's my glasses, your Honor.   I stated it

14   wrong.   It is in 5.

15       Q   Now, basing your answer, Mr. Rowe, solely on the

16   evidence contained in Searl J and in the tabulation which shows

17   Searl J in tabular form, have you any opinion as to the

18   direction of ground water movement in and out of Diamond and

19   Domenigoni Valleys?

20       A   Yes.   From the similarities of the waters in

21   Domenigoni Valley north of the north line of Section 16, 6

22   South, 2 West, and the similarity of the waters in Menifee

23   Valley, it shows a movement of water-- it shows that the water

24   in Section 10, that is D2, Section 10, K1 and K2, Section 9,

25   and in Menifee Valley are similar waters, and it shows that

1     if there were the movement the movement would be--

2          MR. VEEDER:  Did you say "If"?

3          THE WITNESS:  I am looking now at a plan.  I have no

4     profile when I am considering this.  That the movement could

5     either be from Menifee Valley to Domenigoni Valley or from

6     Domenigoni back to Menifee.  They are similar waters.

7     BY MR. SACHSE:

8          Q  In other words, I was asking you now to give your

9     opinion solely on the data contained in Exhibit Searl J.

10         A  Searl J.

11         Q  Do I understand you that based on this exhibit alone

12    you would conclude that the waters might move either way

13    across the divide between Domenigoni Valley and Menifee Valley?

14         A  That is correct.

15         Q  Let me ask you if it is common or usual to find

16    waters that vary as much as the waters of D2, Section 10 and

17    let's say N2, Section 17 in such a relatively short surface

18    distance?

19         A  That is quite a variation, Mr. Sachse.  It is not

20    uncommon to find waters as dissimilar as that in a shorter

21    distance.

22         Q  In other words, the surface distance really has

23    nothing to do with it, does it?

24         A  No.

25         Q  What factors subsurface then influence or would cause

1   the wide variation in chloride content and conductivity?

2      A  It would show that there was very little or no

3   movement of water, say, from Well 10D2 and K1 and K2 into the

4   area occupied by wells 16C1 16D2 and 17N2.

5      Q  And vice-versa?

6      A  And vice-versa.

7      Q  Now, Mr. Rowe, in connection with this work, have

8   you also had occasion to consider factors other than those

9   that are delineated upon the exhibits we have placed in

10   evidence?

11      MR. VEEDER:  In connection with the conclusions he

12   expressed?

13   BY MR. SACHSE:

14      Q  In connection with your basic conclusions of water

15   movement?

16      A  Yes.  For example, we find productivity of wells--

17   we have from the well log, for example, the specific

18   capacity of well, I believe it is, 9K1 or 9K2-- I can check

19   it in my notes-- and also 9J1 as related to the only well we

20   could find pumping on, say, the Temecula side of the

21   Domenigoni Valley, which was 10D2.  We can make a comparison

22   of the pumping from those two areas, that is, the drawdown

23   versus the quantity, which is a measure of the permeability

24   of the materials.  We find, for example, that Well 9J1 will

25   pump, from memory, around 900 gallons a minute with, I believe,

1   a 17-foot drawdown.  We find that 9K1 will pump, from memory

2   again, five and som-odd gallons a minute from a similar

3   drawdown of 17 feet.  We find that in Well 16D2 we have a draw-

4   down of some--

5        THE COURT:  What exhibit are you taking these figures

6   from?  They are not in evidence?

7        THE WITNESS:  No, sir.

8        MR. SACHSE:  I was asking if he has any other data other

9   than is in his exhibits that he has considered in his ultimate

10  conclusions.

11       Q  You have the basic data on all of this, if anybody

12  wants it, do you not?

13       A  I have.

14       MR. VEEDER:  What is the source of the basic data?

15       THE WITNESS:  Part of it was from the Division of Water

16  Resources, copies of water well drillers' reports, part of

17  it from logs furnished by Mr. Van Winkle, part of it from logs

18  furnished by a Marvin Walker.

19  BY MR. SACHSE:

20       Q  Now, Mr. Rowe, based on all your investigations in

21  Diamond and Domenigoni Valleys and the adjoining area of

22  Menifee Valley, do you have any conclusion, considering all the

23  evidence available to you, as to the direction of ground

24  water movement out of Domenigoni Valley?

25       A  Yes.

1       MR. VEEDER:  Answer yes or no.

2   BY MR. SACHSE:

3     Q  Answer yes or no:  Do you have an opinion?

4       A  Yes.

5       Q  What is that opinion?

6       A  It is my opinion that the ground water moves to the

7   northwest into the Menifee area.

8       MR. SACHSE:  You may cross-examine.

9


10                      CROSS-EXAMINATION

11  BY MR. VEEDER:

12      Q  I observe, Mr. Rowe, that there are no wells within

13  approximately one mile from the Menifee Valley to the water-

14  shed line as disclosed on Searl B; is that correct?

15      A  There are no wells from which a water level could be

16  obtained.

17      THE COURT:  Are there actually wells in that area?

18      THE WITNESS:  Yes, sir.  There is a well located--

19  BY MR. VEEDER:

20      Q  I am referring now only to your Exhibit B.

21      A  Yes, sir, your Honor, there is a well located--

22      Q  Why don't you mark it as you go along.  Indicate it

23  and give it an approximate letter A, B, C, et cetera, if you

24  will.

25      A  Near the east quarter section of Section 8, Township

1   6 South, Range 2 West, and I believe it is J, without referring

2   to my notes.  It is in the northeast corner of the south half

3   of Section 8.

4       THE COURT:  You place it just beyond the watershed lines.

5       THE WITNESS:  It is very close to the watershed line,

6   your Honor.

7   BY MR. VEEDER:

8       Q  You have that in the northeast corner, do you not,

9   of the south half?

10      A  Of the south half, yes, sir.

11      MR. SACHSE:  May I ask that he write the letter J there,

12  too, your Honor.

13      THE COURT: Yes, write the letter J.

14      Were you able to explore that well?

15      THE WITNESS:  Yes, sir.

16      MR. VEEDER:  Could I ask you, before you leave, to put

17  your initials on it, so that we can keep track.

18      THE COURT:  Did you get a water level or a well log

19  on that?

20      THE WITNESS:  No, your Honor, I was able to sound the

21  depth of the well.  I was able to obtain from a person who

22  had the well drilled certain information on the well.

23  BY MR. VEEDER:

24      Q  Did you find the depth to bedrock?

25      MR. SACHSE:  Did he find the depth of that well to

1  bedrock?

2      THE WITNESS:  No.

3  BY MR. VEEDER:

4      Q  You did not.

5      THE COURT:  What information did you get about it?

6      THE WITNESS:  From my own soundings, your Honor, I

7  found the depth to be--

8  BY MR. VEEDER:

9      Q  The depth of the well?

10      THE WITNESS:  I found the depth of the well to be roughly

11  55 feet from the top of a casing which was about a foot and

12  a half above the ground surface, which makes the depth some-

13  where around 53 feet deep.

14      THE COURT:  What was the water level?

15      THE WITNESS:  I sounded the well to the bottom .  There

16  was no water in the well.  It was dry.  I obtained information

17  from a man named Clyde Christensen, who had the well drilled--

18  his father had it drilled in 1951, and there is certain

19  information in this letter concerning that particular well.

20      MR. SACHSE:  Go ahead and give it to the Court.

21      MR. VEEDER:  I think we should have it.  Why don't we

22  put it into evidence as long as he is testifying?

23      MR. SACHSE:  It's all right with me.  I am delighted.

24      THE COURT:  Is this letter from the driller?

25      THE WITNESS:  No, sir, it was a letter from Clyde C.

1    Christensen, who is with Christensen Farms Company.  Christensen

2    leased the land and drilled a well in that location-- this is

3    his story that I received-- to water stock in that area

4    and used the well for a couple of years.  He has no records

5    between 1953 as to depth of water.  He shows that at the time

6    the well was drilled the water level stood at 30 feet in 1951.

7    I can read the letter.

8         MR. SACHSE:  You can put the whole thing in, Mr. Veeder.

9    I had no idea you wanted this kind of hearsay.  I will be

10   delighted to have it.

11        MR. VEEDER:  All I want is the facts.  As long as we

12   are going to have all of this evidence, I want to be sure we

13   know what we are doing.

14        MR. SACHSE:  I am anxious to have the letter in.

15        THE COURT:  If there is no objection, let's put it in.

16        Do you have the letter there?

17        THE WITNESS:  Yes, sir, I have it right here.

18        THE COURT:  Show it to Mr. Veeder.

19        Mark it M for Identification.

20        MR. VEEDER:  I have no objection to this, your Honor.

21        THE COURT:  M received in evidence.

22        (Defendant Searl Brothers Exhibit M was received in

23   evidence.)

24        THE COURT:  Wouldn't you expect, if water moved in the

25   direction you have indicated, that you would not find a dry

1    hole there where you have marked J?

2        MR. SACHSE:  How deep is the well again?

3        THE WITNESS:  Your Honor, at the present time, in order

4    to determine the elevation of the bottom of the hole, that is,

5    the elevation above sea level, I ran direct levels to that

6    particular well.  I have an elevation of the reference point,

7    that is, the top of the casing, and I have the length of the

8    casing at the hole.  I could plot that on the profile.  It is

9    the lower profile on Searl's C.

10        MR. VEEDER:  May I interrupt the witness so that we can

11   mark this M now.

12        THE COURT:  I have already directed it to be marked in

13   and received it in evidence.

14        You could plot it on C?

15        THE WITNESS:  Yes, sir, and it would plot somewhere

16   above the green line that shows passing from the point A

17   toward the wells in the Menifee area.

18        THE COURT:  You mean if plotted out the depth of it

19   would not reach down to where the water level now is?

20        THE WITNESS:  That is correct.

21        MR. VEEDER:  Would you just do that.

22        THE COURT:  We will take a recess while you do it.

23        (Recess.)

24        THE COURT:  Mr. Veeder, here is a letter from a woman

25   who has 2.7 acres in Murrieta.  You can locate it on the map

1       and we know what our finding would be.  Probably no problem

2       at all.  Overlying land.  Maybe you could submit something to

3       me as to what findings we can propose and excuse her.

4            MR. VEEDER:  I will undertake that.

5            I am glad that your Honor brought it up.  Mr. Ray

6       Eberthardt represents a client by name of Owens in the Murrieta

7       area.  I called him in Sacramento today and told him of the

8       hearing on the 5th and 6th, and he said that if Col. Bowen

9       would submit to him the results of his findings, if he agreed

10      with it, Mr. Eberhardt would not appear in this matter.  If

11      it is agreeable with your Honor, I will continue to contact

12      lawyers on that basis.  It may save them some problems.

13           THE COURT:  All right.

14           Proceed.  Did you draw that in?

15           THE WITNESS:  Yes, sir, your Honor, I have located and

16      initialed-- I have shown on Searl B the location of Well 8J,

17      with my initials; and I have also shown on Searl's C by dashed

18      lines, because it is projected to lines A-A double prime,

19      Well 8J, the depth being as I sounded it on my last measurement.

20           THE COURT:  Drilled in '53, you say?

21           THE WITNESS:  The letter says it was drilled in 1951.

22      BY MR. VEEDER:

23           Q  It was dry when you sounded it?

24           A  It was dry when I sounded it, yes.  I have sounded

25      it twice.

Q   And when was the last time?

A   March 25 this year.

THE COURT:   Is that the only other well in that area?

A   No, sir.   There is another well in this area.   It is a windmill located just south of it.   I would have to check my notes for the exact location.   I am pointing now near the northeast corner of Section 8.   I sounded the depth of that windmill.   It is rather a shallow well.   I do not know whether there is any history.   I have no log on it at all.   The only thing I have is the depth of the well.   It was dry when I sounded it.

BY MR. VEEDER:

Q   The date on that?

A   It was, I believe, October, 1958, Mr. Veeder.   I can check my notes.

THE COURT:   Before you look at that, let me ask you another question.

THE WITNESS:   Yes, sir.

THE COURT:   The toe of the basement complex has not been extended around there.   Was it down at what we call the younger alluvium below the fill of the hill?   The windmill well?

THE WITNESS:   It was off the hill, yes, sir.

THE COURT:   Off the foot of the hill?

THE WITNESS:   Yes, sir.

Yes, I found that windmill on January 3, 1959, my second

1   visit, was 41.7 feet deep from the top of a 22-inch casing.

2   The casing is about one foot above average ground.  No water

3   in the well.  I have it located 300 feet south of the road

4   that runs along the north line of Section 8.  I have a mileage.

5   I could convert how far it is east.  It is eight-tenths of a

6   mile east of Leon Road.

7       MR. VEEDER:  As shown on your Exhibit B?

8       THE WITNESS:  Yes.  I have shown it on Exhibit B as an

9   approximate location, Mr. Veeder.  I could probably scale it

10  a little closer for you, if you desire.

11      THE COURT:  How deep was it?

12      THE WITNESS:  It was 41.7 feet deep from the top of a

13  22-inch casing, the top of the casing being about a foot above

14  average ground.  There was no water in the well at my visit

15  either on January 3rd or on October 22, 1958.

16  BY MR. VEEDER:

17      Q  Are there any other wells that you have located in

18  that area?

19      A  There is one more well located in Section 8.

20      Q  Before we leave the Windmill Well to which you alluded

21  in your last testimony, which appears to be, did you say,

22  eight-tenths of a mile--

23      A  East of Leon Road.

24      Q  Could I ask you to put your initials on that.  I would

25  like to have you put the same kind of designation on that that

1    you did on your J well, if you will, Mr. Rowe.

2         A   Yes, sir .  I believe you will find that to be 8A.

3         Q   Will you indicate that?

4         THE COURT:  Where did you place that well now?  Let me see

5    again.

6         THE WITNESS:  I am pointing to it now, your Honor, near

7    the northeast corner of Section 8, Township 6 South, Range--

8         THE COURT:  That is the windmill well?

9         THE WITNESS:  That is the windmill well.

10        THE COURT:  Where is this other one you were talking

11   about?

12        THE WITNESS:  The other well is located southwesterly

13   of 8J at an abandoned residence.  It is a very old well.  It

14   appears to be a dug well.

15        THE COURT:  Put your finger on it there so that I can

16   see.

17        THE WITNESS:  I do not have an exact location.  I can

18   approximate a location.  I am locating it now.

19        THE COURT:  That is where we have J right there.

20        THE WITNESS:  I am locating it with reference to J.

21   There is a second well, your Honor, southwest of J.

22        THE COURT:  All right.

23        (The witness marking the exhibit.)

24        THE COURT:  Slightly below it and slightly to the west?

25        THE WITNESS:  Yes, sir.

1    THE COURT:  And across the watershed?

2    THE WITNESS:  It is very difficult to tell on which side

3  of the watershed the well is located.

4    THE COURT:  It is an abandoned well, dry?

5    THE WITNESS:  It is a dry well.  It is an abandoned well.

6  I sounded the depth of it.  I called it on May 13, 1959 an

7  old windmill at stone house.  I sounded it to be 23.2 feet

8  deep.  The reference point was at ground.  It was a dug well,

9  Approximately 2,000 feet north of the south line of Section 8

10  and 450 feet west of the east line of Section 8.  I have no

11  other data on that well.

12    THE COURT:  How deep would you say J was that you put

13  on the map?

14    MR. VEEDER:  The letter says 53; isn't that right?

15    THE WITNESS:  I sounded it to be 54.7 from the top of

16  the casing, Mr. Veeder, the casing being 1.8 feet above ground.

17    THE COURT:  About 53 feet.

18    One more question.  On your profile C, I guess it is

19  there, where you have drawn J in, how deep would that well

20  have to be extended to meet what you claim to be the water

21  table presently?

22    THE WITNESS:  Your Honor, first I would like to say that

23  I do not claim this to be the water table.

24    THE COURT:  That is a dotted line.

25    THE WITNESS:  It is just a projection from point A across

1    into the Menifee area.  Above the dotted line that I have

2    shown in 54 I can scale that distance for you.  It is merely

3    a projection, your Honor.

4         THE COURT:  All right, if you would.

5         THE WITNESS:  From the bottom of that well to the green

6    line as shown on Exhibit Sear C, it is approximately 15 feet.

7    To the red line it is about 28 feet.

8    BY MR. VEEDER:

9         Q  You have no knowledge, then, as I understand it, as

10   to whether there is a barrier that would separate the Menifee

11   Valley from the Santa Margarita Valley in an area southward

12   and eastward of where you have marked your 8 J; is that right?

13        A  May I have the question read, please?

14        (The reporter read the pending question.)

15        MR. SACHSE:  Would you amend the question, if I might

16   suggest, that it does separate them?  The word "would" is

17   kind of ambiguous.

18        MR. VEEDER:  Thank you, Mr. Sachse.  If it will make

19   you happy we will change the word.

20        THE WITNESS:  Mr. Veeder, when you say Santa Margarita

21   Valley, would you mean Domenigoni Valley?

22        MR. VEEDER:  Yes, it is part of the Santa Margarita.

23        THE COURT:  It is not the Santa Margarita Valley.  It

24   is the Santa Margarita watershed.

25        MR. VEEDER:  I will stand corrected, your Honor.  Santa

Margarita watershed.

THE WITNESS:  In a southeasterly direction?

MR. VEEDER:  That is right.

THE WITNESS:  To my knowledge, there is no barrier.

BY MR. VEEDER:

Q   Then how do you explain the fact that you have a well
which is dry, your Well J is dry, drilled to a considerable
depth?  Are you stating that the Searl Brothers have pumped
to the point where they have dewatered the area that was
previously water bearing?  Have they taken the water away from
J; is that what you are saying?

MR. VEEDER:  Are you aware of the location of Searl
Brothers' land?

THE WITNESS:  Searl Brothers' land is located clear on the
extremely easterly end of Diamond Valley, Mr. Veeder.

BY MR. VEEDER:

Q   What would have caused that fall of water, then, Mr.
Rowe?  What could cause that to occur?

A   The fall of the level in Well 8J I think you are
referring to?

Q   Yes.

A   It could be very well pumping from Menifee Valley
that could cause it to drop.

Q   In other words, it might be a phenomenon entirely
over which there had been no control at this time; is that

1  right?  The people just pumping and taking water out of the

2  Santa Margarita River Watershed; is that right?

3      A  I don't know what you mean by no control.  They have

4  been pumping in the Menifee Valley for almost 60 years, Mr.

5  Veeder.

6      Q  Then we will go back.  You are stating that it is

7  your conclusion then that these people are pumping water that

8  is depleting the waters in the Santa Margarita watershed;

9  is that right?

10     A  No, I didn't say that.

11     Q  What is the objective of all this testimony that you

12 have been giving, then?

13     A  I am saying that pumping in the area of Section 6

14 South, 2 West or in the Menifee Valley can have an effect on

15 water levels in, say, Section 9, 6 South, 2 West.

16     Q  Do you believe that that is the case?

17     A  I have no opinion on that.

18     Q  You have no opinion?

19     A  No, sir.

20     Q  And it would be purely a guess on your part then to

21 say that this pumping would affect the water of Domenigoni

22 Valley?

23     A  I would expect it to have an effect, yes.

24     Q  In other words, it is your opinion then that the

25 pumping in Menifee Valley is taking Santa Margarita River

1    watershed water?

2         MR. SACHSE:  I object, if the Court please.  That is the

3    whole question, whether this is water of the watershed.  If

4    Mr. Veeder wants to say they are taking ground water and make

5    this clear so that the witness knows what he is talking about,

6    I have no objection.  These are booby trap questions.

7         THE COURT:  Rephrase your question.

8         It is your opinion that the pumping in the Menifee

9    Valley is pumping in part ground waters which have flowed down

10   from the Domenigoni Valley and off into the Menifee under-

11   ground?

12        THE WITNESS:  It is my opinion, your Honor, that pumping

13   in the area of Section 6 or Menifee Valley area can extend

14   and influence water in the lower Domenigoni Valley, yes.

15        MR. VEEDER:  I object to the response.  He says it can.

16   I have inquired as to whether it does, in his opinion.

17        THE COURT:  Ask the question.

18        By "can" do you mean that it does?

19        THE WITNESS:  I have made no definite study, your Honor,

20   to determine the effect of pumping in Section 6 as it relates

21   to the Domenigoni Valley area.

22        THE COURT:  You had some figures on the capacity of the

23   wells in Sections 10 and 9 as compared with the capacity of

24   the wells down in 16 and 17.  But you didn't have an exhibit

25   prepared on that.  They were the result of some well logs that

1   you had.  Could you prepare from those well logs some summary

2   of that information?

3        THE WITNESS:  Yes, sir, I could furnish the log, if

4   you so desire.

5        THE COURT:  Could you overnight get us some little

6   exhibit that would show the pumping capacity of those wells

7   in 9 and 10 as compared with the wells in 16 and 17?

8        THE WITNESS:  Yes, sir.  I can read right now from notes

9   I have taken what the capacity of wells in Section 9 is, with

10  a drawdown, and I can also prepare an exhibit tonight, your

11  Honor.

12       THE COURT:  You prepare it and we will look at it in the

13  morning and we may put your well logs in, too.

14       THE WITNESS:  Yes, sir.

15       THE COURT:  Go ahead, Mr. Veeder.

16  BY MR. VEEDER:

17       Q   I realize the danger of repetition on this matter.

18  But when you said the word "can" have an effect upon the ground

19  waters of Domenigoni Valley, did you intend to say that, in

20  your opinion, the pumping in Menifee Valley does have an effect

21  on the ground waters in Domenigoni Valley?

22       A   Mr. Veeder, I said I did not have an opinion.

23       Q   You do not have an opinion?

24       A   No, sir.

25       MR. VEEDER:  I move to strike all of the testimony of

1    this witness in regard to the phases of Exhibit B in regard to

2    A double prime and A and all other features and aspects of

3    his conclusions, including the elements involved in the

4    chemistry of those waters, by reason of the fact that he

5    says he has no opinion.  He is simply saying that it is a

6    possibility.

7         THE COURT:  Overruled.  He has stated that he has an

8    opinion as to what might be possible.  He says that to say

9    whether this actually happens he would want to check, I take

10   it, the capacity of wells and performance of wells in the

11   Menifee Valley as compared with wells in the Santa Margarita

12   watershed, and to arrive at the conclusion whether there is

13   actually an effect of the pumping of wells in one area on the

14   water level of wells in the other.

15        MR. VEEDER:  I renew my objection and motion to strike

16   and I would like to have it pending until such time as he

17   comes up with the basis on which he can arrive at a conclusion.

18        THE COURT: Denied.  You may make your motion at the

19   proper time.

20        MR. STAHLMAN:  May I suggest a question, Mr. Veeder?

21        MR. VEEDER:  No, I object, your Honor.

22        MR. STAHLMAN:  I am going to suggest it anyway.  If you

23   did have an opinion, what would it be?

24        MR. VEEDER:  You see what I mean?

25        Q   I hand you Plaintiff's Exhibit 78 Q 5 and I would

1   like to have you use a red pencil and mark on that aerial

2   photograph 78 Q 5 the line A double prime and A.

3       Your Honor, during the recess the witness located these

4   and I think it would be a pious idea to have it marked now.

5       MR. SACHSE:  May the record show that the witness and

6   Col. Bowen together located these.

7       MR. VEEDER:  Yes, Mr. Sachse, I don't believe there is

8   any disagreement as to its location.

9       MR. SACHSE:  I don't want you teaching Col. Bowen.

10      THE COURT:  Are you marking both A prime and A double

11  prime?

12      THE WITNESS:  No, I am marking point A.

13      MR. VEEDER:  A and A double prime.

14      THE WITNESS:  The photograph does not extend to point A

15  double prime.

16      MR. VEEDER:  Well, you go just as far as you can toward

17  that, will you?

18      THE WITNESS:  Yes.

19      MR. VEEDER:  I will get the straightedge.

20      THE COURT:  Here is a ruler.

21      (The witness marking the exhibit.)

22  BY MR. VEEDER:

23      Q   Now, is it correct to conclude then that as of the

24  present time the area through which the water has possibly or

25  can flow out of the watershed of the Santa Margarita and into

the San Jacinto watershed or the Menifee Valley is not over
half a mile wide; is that correct?

MR. SACHSE:  At that particular point or everywhere?

MR. VEEDER:  At the particular point where well 8-A and
well J are located as depicted by you on Exhibit B.

THE WITNESS:  As far as the distance, Mr. Veeder, I
have not measured the distance.

BY MR. VEEDER:

Q   Well, can't you observe it on your own Exhibit B?
What would be the distance measured?

A   I don't quite understand your question, Mr. Veeder.

Q   For example, Mr. Rowe, what is the distance between
J and the line A to A double prime?

A   Shows it to be approximately 800 feet.

Q   And what is the distance between A and A double prime
from 8A?

MR. SACHSE:  From the windmill 8A?

MR. VEEDER:  Yes.

THE WITNESS:  Normal to the direction of line A-A double
prime it is about a thousand feet.

BY MR. VEEDER:

Q   So you would say that the area through which that
water would be passing at least at the present time would be
not over 1800 feet?

A   No.

1    Q   What did you say?

2       THE COURT:  He said no.

3       THE WITNESS:  No.

4       THE COURT:  It could pass also through the southwest

5    corner of 8 and north of the place where the toe of the

6    basement complex comes down, could it not?

7       THE WITNESS:  Yes, sir.

8    BY MR. VEEDER:

9       Q But it would be purely conjectural, would it not,

10   whether it does pass in that area?

11      A   Mr. Veeder, I am not a geologist to determine the ac-

12   tual cross-section of the area through which this water flows.

13      Q   You are not a geologist?

14      A   No, sir.

15      Q   So you have no knowledge then and no opinion then as

16   to the area through which the water might pass, if it passed

17   at all; is that right?

18      A   Yes, it could pass-- Would you read the question,

19   please?

20      (The Reporter read the pending question.)

21   BY MR. VEEDER:

22      Q   Would you answer the question, please?

23      A   The type of material, no, sir.

24      Q The type of material, no, sir.  What do you mean by

25   "Type of material, no, sir"?

1    A  You asked me about the area through which the water

2  flows.

3    Q  You have no idea as to the area through which it

4  flows, if it flows at all?

5    A  I have some idea, yes.

6    Q  What is your idea?

7    A  Judging on the surface of rock outcrops which appear--

8  they do not show on my exhibit; it is merely from memory in the

9  field-- that there is some distance between rock outcrops

10  on the north of the line A-A double prime and south of the

11  line A-A double prime.

12    Q  And there is the possibility, in your opinion, in

13  your view, that that water does go through there?

14    A  Yes.

15    Q  But you don't personally know, do you?

16    A  I have a measurement in Well No. J of 30 feet in

17  1951.

18    THE COURT:  30 feet?

19    THE WITNESS:  30 feet to water, yes, sir, in 1951.

20  BY MR. VEEDER:

21    Q  And that is right at the watershed line?

22    A  That is very close to the watershed line.

23    MR. SACHSE:  That is in this hearsay letter that Mr.

24  Veeder put in evidence, your Honor.

25    THE COURT:  All right.

BY MR. VEEDER:

Q   And as a result the gradient would be into the watershed of the Santa Margarita River with a 30-foot water level at that point; is that right?

A   No, sir.

Q   Well, wouldn't it be as reasonable to have the water go into the watershed as out?

A   Mr. Veeder, referring to Searl C, scaling down a distance of 30 feet where I have shown Well 8J, it shows that the elevation of the water table is considerably above water levels even as far back as 1941 in the Menifee area.

Q   Now, in regard to the quantities of water that you think can or possibly pass through there, have you made any estimation?

A   No, sir.

Q   So you don't know whether it is large or great, do you?

A   No, sir.

Q   Now, in your calculations did you take into consideration the areal extent of Domenigoni Valley as it relates to the entire areal extent of the lands within the Santa Margarite River watershed?

MR. SACHSE:   Just a moment.  Read it, please.

(The Reporter read the pending question.)

MR. SACHSE:   I object on the grounds that it is not

1    proper cross-examination, and it is irrelevant and immaterial

2    what relationship the area of Domenigoni Valley bears to the

3    entire area of the Santa Margarita River watershed.  It is

4    not proper cross-examination.  This witness hasn't even

5    testified to any part of the Santa Margarita River watershed,

6    except Diamond and Domenigoni Valleys.

7         THE COURT:  Overruled.

8         THE WITNESS:  No.

9    BY MR. VEEDER:

10        Q  You don't know?

11        A  No.

12        Q  Have you taken into consideration the effect of

13   present irrigation practices in the Santa Margarita River

14   Valley upon the ground water table?

15        MR. SACHSE:  I object, if the Court please, the Santa

16   Margarita River Valley can be anywhere from Oak Grove to the

17   ocean.

18        THE COURT:  Sustained.  Rephrase it.

19        MR. VEEDER:  You may resume the stand.

20        I will strike the question, Mr. Sachse, and withdraw the

21   last question and I will rephrase the question.

22        Q  Have you observed irrigation in the Domenigoni Valley

23   in the vicinity of where you have marked on Plaintiff's

24   Exhibit 78-Q-5, during this irrigation season-- that is, in

25   1960?

1    A  You mean in the entire area?

2    Q  No, I said where A is right in the middle where that

3 field is.

4    A  Yes, March 25th, 1960 I noticed some irrigation.   I

5 noticed some irrigation of a new field in the vicinity of

6 point A on 78Q5.

7    Q  And what direction did that lie from A?

8    A  In all directions.

9    Q  In other words, they were irrigating that entire field,

10 is that right, where A is located?

11    A  Portions of it, yes.   They weren't irrigating the

12 entire field at one time.

13    Q  Where was the source of water for that?

14    A  At the time I was there they were pumping Well 9J1.

15    Q  9J1, as shown on Exhibit Searl Brothers Exhibit B;

16 is that right?

17    A  That is correct.   That is 6 South, 2 West, 9J1.

18    Q  And that would be southeasterly from the thread of

19 Warm Springs Creek as depicted on Searl Brothers B?

20    A  It is very close to the thread of Warm Springs Creek.

21 I would say within 50 to 100 feet.

22    Q  And you would say that the source of the ground

23 water that was being utilized to irrigate that land on 78Q5

24 would be part of the water resources of the Santa Margarita

25 River watershed, would you not?

1    A   They were from within the Santa Margarita River

2  watershed, yes.

3    Q   And it was ground water within the watershed; isn't

4  that right?

5    A   It was ground water within the watershed.

6    Q   Would you think that that well would be drawing

7  from the same source as the well in A-1 in Section 17 in

8  Township--

9    MR. SACHSE:  A-1 in 17?

10    MR. VEEDER:  Isn't this A-1?

11    THE WITNESS:  Yes, I can see it from here, Mr. Veeder.

12  BY MR. VEEDER:

13    Q   Would you say they are pumping from the same ground

14  water basin?

15    A   Mr. Veeder, Well A-1, to my knowledge, is a dry well

16  at this present time.

17    Q   Is it in the same ground water strata, then, in your

18  view?

19    A   I don't know what you mean by the words "Ground water

20  strata."

21    Q   Would you point out to me on Menifee Valley a well

22  that you knowhas water in it at the present time?

23    A   Yes, I am pointing now to well 6 South, 2 West, 6R1.

24    Q   Would you walk over there and mark that on your

25  Exhibit B?

1    A    It is on Exhibit B shown in the southeast corner

2    of Section 6, Township 6 South, 2 West.

3    Q    Are you stating to the Court that, in your opinion,

4    the well J-1 in Section 9 and the well A-1 in Section 6 in

5    the Menifee Valley are both tapping the same water bearing

6    strata?

7    A    I have no opinion whether they are drawing from the

8    same water-bearing strata.

9    MR. SACHSE:   Mr. Veeder, if I may offer a suggestion,

10   "Strata" is a word you have started using.   I don't know what

11   it means myself.

12   MR. VEEDER:   The same water-bearing body.   Would that

13   help you?   I would just as soon have the semantics agreed

14   upon right now before you answer the question.

15   Q    When I ask a question on the ground water body I mean

16   it is hydrologically interconnected between the same source

17   of water as J-1 was tapping when you saw it on March 25th and

18   the well A-1 to which you referred in Menifee Valley, the

19   same ground water body hydrologically interconnected.   Now if

20   there is agreement on that, will you answer the question as

21   to whether in your opinion they are both tapping the same ground

22   water body?

23   A    Mr. Veeder, again I have no opinion.

24   Q    You have no opinion at all on that point?

25   A    No, sir.

1    MR. VEEDER:   I renew my motion to strike all of this

2    witness's testimony in regard to the interconnection between

3    ground waters of Domenigoni Valley and Menifee Valley, your

4    Honor.

5        THE COURT:   Denied.   Just because the witness has an

6    opinion on one thing doesn't mean that he has to have an

7    opinion on everything.   The conservative witness will give

8    you a limited opinion, and if you push him further he will

9    say, "I don't want to go that far."   But that is no ground to

10   strike the opinion he has already given.

11       MR. VEEDER:   If I understand what he has said, he is

12   saying that there are some elements that are interesting

13   scientifically, but he is not testifying that the Domenigoni

14   Valley ground water body extends into the Menifee Valley.   I

15   will ask him that question.

16       Q   Based upon your investigations and upon your analysis

17   of these matters, are you of the opinion that the ground water

18   body in Domenigoni Valley extends into the Menifee Valley

19   as depicted on Exhibit Searl B?

20       A   Yes.

21       Q   In other words, you would say that water which is

22   being pumped out of Well Jl in Section 9 would be tapping a

23   ground water body which extends into Menifee Valley?

24       A   Not necessarily.

25       Q   Have you any opinion as to whether there is a break,

1    a separation between the ground water body in J-1 and the

2    ground water body in Menifee Valley?

3        A   I have no opinion as to a break, Mr. Veeder.  I merely

4    show between point A on profile A-A double prime and point

5    of well 6 South, 2 West, 6R1 a projection across an area

6    which includes the Santa Margarita-San Jacinto watershed.   I

7    show that the water level on the Menifee side is much lower

8    than on the Domenigoni side.

9        Q   But you do not want anyone to assume that you have

10   an opinion as to an interrelationship between the ground

11   waters in the two valleys?

12       A   Mr. Veeder, I testified previously that I have no

13   opinion as to how much water is flowing from the Domenigoni

14   to Menifee.

15       Q   But you are stating that you do know, and it is your

16   opinion, that there is some water passing from the Santa

17   Margarita watershed into the Menifee Valley?

18       A   No, sir.  I say this.  In essence it amounts to

19   observing the quality of the water in the two areas.   The

20   waters are similar.  The subsurface flow of water from point

21   A can only be in one direction, in my opnon and that is if

22   there is a flow, to well 6R1.

23       Q   If there is a flow?

24       A   Yes.

25       Q   Have you made any studies in regard to the

1   interrelationship between surface runoff and the ground water

2   table in the Domenigoni Valley?

3       A   I don't know what you mean by the words "surface

4   runoff."

5       Q   Just the discharge in Warm Springs Creek when it is

6   carrying water.

7       A   No, I have no records of discharge in Warm Springs

8   Creek.

9       Q   And you have made no observations and you have made

10  no studies of the matter at all?

11      A   No, sir.

12      Q   Is it your opinion that normally the ground water in

13  an area supports the surface runoff, such as there is in that

14  area?

15      A   That the ground water supports surface runoff?

16      THE COURT:   What counsel means-- he is using a short-

17  hand--where the ground water basins are full you are going

18  to get more surface runoff.   Where the ground water basins

19  are pulled down, the runoff is going to fill the upper first

20  before you have runoff on the surface.   I think that is what

21  he is talking about.

22      MR. VEEDER:   That is correct, your Honor.

23      THE WITNESS:   I have made no observations of the surface

24  flows in tne entire area.

25

BY MR. VEEDER:

Q   And you are going to make these studies that the
Court asked you to in regard to yields; is that right?

A   Yes, I am going to show information I have on logs
of wells in Sections 9, I believe I have one in 10, the
drawdown vs. quantity for the wells as related to drawdown
on Searl Exhibit F, which shows quantities and pumping levels.

Q   Would you state, based upon the investigations that
you have made, that there is a general downward trend of
ground water levels throughout the area in which you have
made your studies?

A   A general downward trend?

Q   You have your 1953 through 1959--

THE COURT:   The areas, are you talking about the Menifee
Valley?

MR. VEEDER:   I am talking about Domenigoni Valley and
Menifee Valley, your Honor.

THE WITNESS:   Yes, I was going to take the entire area,
Mr. Veeder.   I think Exhibit C shows that.

Q   Shows the general downward trend?

A   No, sir, it does not.

THE COURT:   Wait a minute.   What do you mean by "down-
ward trend"?   Do you mean year by year there is less water,
or do you mean the gradient of the water runs down?

MR. VEEDER:   That is right, that there is a generally

1   lowering of the ground water table in this area.

2        THE COURT:  Year by year?

3        MR. VEEDER:  Well, since he started his studies.

4        THE COURT:  I understand the question.

5        Go ahead.

6        THE WITNESS:  That is what I was referring to, a lowering

7   of the water table.  We have profile A-A-A double prime,

8   which shows for the two measurements comparisons I can make

9   of 5-4-53 and 11-6-53 in Well 17N1, very little change in the

10  elevation of the water table between that time and April, 1959.

11  That is in the area now between wells 16C2 and 17N1.

12  BY MR. VEEDER:

13       Q  You have on here, as I see it, 5H2 and 5H1 and 5 and

14  17N2.  Have you made any studies throughout that area?  I

15  am speaking of the entire range.

16       A  Yes, this shows a lowering, as shown on Exhibit C,

17  of the water table extending roughly from Well 6 South, 2 West,

18  10D2 up the valley, that is, up Domenigoni and Diamond Valleys.

19       MR. SACHSE:  To the right on the chart?

20       THE WITNESS:  To the right on the chart, yes.  It shows

21  downward trend in the water table between the winter of 1953

22  and April, 1959.

23  BY MR. VEEDER:

24       Q  1958 was a pretty good year, wasn't it?

25       A  For what?

Q   A pretty good water year?

A   Well, it depends upon where you were.

Q   I was in the State of Virginia, but I am not bothered about that.  I am talking about the Santa Margarita River watershed.  Wasn't it a pretty good year?  The fact is that it was an excellent year, wasn't it?

A   I am not familiar with the rainfall data in the Santa Margarita River watershed in 1958.

Q   Wouldn't that be somewhat significant in responding to the question I asked you in regard to the general downward trend?

A   I don't believe so.  I am showing measurements in 1953 and April, 1959.  Mr. Veeder, I do not know what has happened between the years 1953 and 1959 as to the water table.  I have no history in the area to the right-- well, to the entire area shown on Exhibit Searl C, with the exception of some measurements I have in the Menifee Valley area, that is, measurements from the State.

Q   Just for the record, could you turn to Exhibit 15 and using my pen mark the area generally on 15 where your line A-A double prime is situated?

MR. SACHSE:  Here is an overlay.

MR. VEEDER:  Do you want a ruler on that?

THE WITNESS:  I would like to have a pen.

MR. VEEDER:  That will work.

1        May we borrow a ruler for a moment, your Honor.

2        THE COURT:  Yes.

3        THE WITNESS:  Did you want me to take it clear to the

4    point A double prime, or just show the trend of the line?

5        MR. VEEDER:  That is right.

6        THE WITNESS:  I am drawing on Exhibit 15 a line with a

7    pen from point-- showing the approximate location of the line

8    A-A double prime, point A being located in Section 9, 6 South,

9    2 West.

10   BY MR. VEEDER:

11       Q   Why not just write A and have it?  And then go over

12   to your A double prime.

13       A   I am marking A double prime, but it is not necessarily

14   the location of A double prime on Exhibit B.  It is in the

15   same direction as A double prime.

16       Q   Where are the Searl Brothers' lands from that point?

17   Could you just generally locate those on exhibit 15 for us,

18   please?

19       A   Searl Brothers' lands are in Sections 11, 6 South,

20   2 West, the entire section--

21       MR. SACHSE:  No; 1 West.

22       MR. VEEDER:  Mr. Sachse just corrected the witness.

23       MR. SACHSE:  He has the wrong range, that is all.

24       THE COURT:  We can find where they are.  You don't

25   want to mark them on Exhibit 15, do you, Mr. Veeder?

1    MR. VEEDER: I would just like to have them marked on

2    Exhibit 15 so I could start working on him from there.

3    THE COURT:  That can be done.  It is just a matter of

4    transferring it from one map to the other.  You can do that

5    after court.

6    MR. VEEDER:  All right.

7    Q  Now, it is observed that the Searl Brothers lands,

8    as depicted on Exhibit A, are traversed by the watershed line

9    as you have set forth, is that correct, on Exhibit A?

10    A  The watershed line, yes, goes through a portion

11    of the Searl Brothers' property.

12    Q  Have you made any investigations in regard to the

13    interrelationship between waters lying north and generally

14    easterly of the watershed line on the Searl Brothers' property

15    and wells within the watershed line lying generally south and

16    westerly of that line?

17    A  No, sir, other than to locate wells.

18    Q  Now, in regard to Exhibit 15, could you just point

19    to me generally where those lands are located and then during

20    the recess mark the Searl Brothers location on Exhibit 15 for

21    me?

22    A  Locations of what, Mr. Veeder?

23    Q  Searl Brothers land.

24    A  All of Searl Brothers land?

25    MR. SACHSE:  Are you trying to test the witness's ability?

1        MR. VEEDER:  I said during the recess, Mr. Sachse.

2        Q  Generally, where would you find them?  Where are they

3   located on Exhibit 15?

4        A  On Exhibit 15 they are located in Sections 4, 3, a

5   portion of Section 3, a small portion of Section 5-- that is

6   all 6 South, 1 West.  They are located in a portion of Section

7   28, 29, 30, 31, 32, 33, and 34, 5 South, 1 West.

8        Q  Now, Mr. Rowe, you have testified in regard  to the

9   phenomena of at least, you say, the possibility of water

10  passing from Domenigoni Valley into Menifee Valley.  Would

11  you say, in view of the fact that the Searl Brothers' lands

12  are similarly located in the new alluvium, are you saying that

13  the water would pass through the Searl Brothers' lands in the

14  same way?

15       MR. SACHSE:  I object to this improper cross-examination,

16  and the witness has just answered that he made no determina-

17  tion of water movement across the watershed line on Searl

18  Brothers' land.  It's a waste of time.

19       MR. VEEDER: No, I am not wasting time.

20       Q  You say you have made no opinion?

21       A  I have made no study in that area.

22       Q  How did it occur that you selected the area A-A double

23  prime to go into such detail in regard to this phenomenon?

24  Why did you do that?

25       A  Mr. Veeder, I was not concerned with the source of

1  supply that comes into Domenigoni Valley.  I was concerned

2  with what happens to the water after it arrives there-- that

3  is, the underflow.

4      Q  And as a matter of fact, you say there is a possibility,

5  but you have no opinion as to what does occur; is that right?

6      A  I show that there is a difference in water surface,

7  the surface of the water table.

8      MR. VEEDER:  I have no further questions.

9      MR. SACHSE:  You have no further questions?

10     MR. VEEDER:  The man is going to be back tomorrow with

11 these studies, isn't he?  I will ask them then.


13              REDIRECT EXAMINATION

14 BY MR. SACHSE:

15     Q  If you will resume the stand, Mr. Rowe, we will get

16 these few Garbani exhibits in.

17         I am not going to bother even putting this up on the

18 easel, Mr. Rowe.

19     Q  I will show you the exhibit that has been marked

20 Garbani A for Identification, being a map titled "Map Showing

21 Property and Well Locations of Garbani Brothers in Diamond

22 Valley."  Is that the same base map you used in Searl A?

23     A  It is.

24     Q  Where did you obtain the descriptions from which you

25 located the Garbani property?

A   In the answer.

Q   Did you locate the Garbani wells and identify the Garbani wells shown on Garbani A in the same manner that you located and identified the Searl well shown on Searl A?

A   I did.

Q   And is it accurate, to the best of your knowledge?

A   It is.

MR. SACHSE:   I offer in evidence Garbani's Exhibit A, your Honor.

MR. VEEDER:   We have the same agreement.   I will run out the titles on these, but I have no objection, and you will be notified if we raise any points in regard to the title.

THE COURT:   Garbani Exhibit A, map of the property, received in evidence.

(Defendant Garbani's Exhibit A for Identification was received in evidence.)

BY MR. SACHSE:

Q   I call your attention to Garbani Exhibit B entitled "Map showing pertinent data on Garbani Brothers wells in Diamond Valley."   Are those four wells covered by the tabulation the same wells that are indicated on Garbani A?

A   They are.

Q   And from what source did you obtain that information?

A   Information from Garbani Brothers' records.   It is written right on the tabulation.

1      Q  The exhibit is intended to set forth all the

2  information you obtained from any source as to the Garbani

3  well; is that correct?

4      A  That is correct.

5      MR. SACHSE:  I will offer Garbani's Exhibit B, your

6  Honor.

7      THE COURT:  Garbani's Exhibit B received in evidence.

8      (Defendant Garbani's Exhibit B for Identification was

9  received in evidence.)

10      MR. VEEDER:  Could we put up Garbani A for just a

11  moment, Mr. Sachse, please?

12      MR. SACHSE:  I am not trying to rush this (putting the

13  exhibit on the easel).

14      Did I offer Garbani B?

15      THE COURT: Yes.  Received in evidence.

16  BY MR. SACHSE:

17      Q  I will invite your attention to Garbani Exhibit D.

18      THE COURT:  What about C?

19      MR. SACHSE:  I am not going to offer it by this

20  witness, your Honor.  It is all hearsay and the man who

21  gave him the information is here and if we use it at all we

22  will use it direct by Mr. Garbani.

23      Q  I invite your attention to Garbani D, being a

24  tabulation entitled "Eastern Municipal Water District Deliveries

25  to Garbani Brothers."  From what source did you obtain that

1   information?

2        A   From Eastern Municipal Water District.

3        Q   And is it accurate, to the best of your knowledge?

4        A   It is.

5        Q   Does this also, as in the case of Searl Brothers

6   exhibit, represent Colorado River water imported by the

7   Garbanis onto their lands during the period 1954 to 1959?

8        A   That is a difficult question to answer, Mr. Sachse,

9   in this respect.  My understanding of the operation is that

10  water taken from the EasternMunicipal Water District is taken

11  into Searl's reservoir.  The waters in the reservoir are

12  mixed with waters pumped by various wells on the Searl

13  property.  Water running from Searl Reservoir No. 2, as shown

14  on Searl Brothers Exhibit A, are able to flow to Searl

15  Reservoir No. 1 by means of a pipe line.  Mr. Garbani receives

16  water through a meter on that pipe line.  Some of the water

17  he receives is from the Eastern Municipal, and some is

18  actually Searl Brothers' water.

19       Q   However, the exhibit Garbani D represents-- put it

20  this way, then-- Metropolitan water deliveries for the

21  Garbani account; is that correct?

22       A   That is correct.  It is delivered through Searl

23  Brothers' system to get to Garbani.

24       Q   You obtained this data from Eastern Municipal?

25       A   Eastern Municipal.

1      MR. SACHSE:  I will offer in evidence Garbani's D.

2      THE COURT:  Garbani D received in evidence.

3      (Defendant Garbani's Exhibit D for Identification was

4  received in evidence.)

5      MR. SACHSE:  Do you have any cross-examination on these

6  exhibits, Mr. Veeder?

7      MR. VEEDER:  Yes, I do.

8

9                      CROSS-EXAMINATION

10  BY MR. VEEDER:

11      Q   What kind of system do they have pursuant to which

12  the Garbani and the Searl Brothers' waters are mixed?

13      MR. SACHSE:  If it will save time, I have Mr. Searl

14  here and he is my next witness and he is going to talk at

15  some length on that water system.

16      MR. VEEDER:  All right, I will withdraw it.

17      Is that all for this witness?

18      MR. SACHSE:  That's all for this witness.

19      MR. VEEDER:  Until tomorrow?

20      MR. SACHSE:  Until tomorrow.

21      With his Honor's instructions, Mr. Rowe, be back with

22  the tabulation requested by his Honor.

23      THE COURT:  All right, step down, Mr. Rowe.

24      MR. SACHSE:  I will call Mr. Leonard Searl

25

1           LEONARD E. SEARL,

2   one of the defendants herein, being first duly sworn, on his

3   oath was examined and testified as follows:

4           THE CLERK:  State your name, please.

5           THE WITNESS:  Leonard E. Searl.

6

7                      DIRECT EXAMINATION

8   BY MR. SACHSE:

9           Q   Where do you live, Mr. Searl?

10          A   Hemet, California.

11          Q   What is your occupation?

12          A   Rancher.

13          Q   Mr. Searl, you are appearing in this case as defendant

14   Searl Brothers.  Will you please explain to the Court what

15   Searl Brothers is?

16          A   Well, Searl Brothers is a farming operation, a

17   partnership consisting of four brothers and two of their sons,

18   in Diamond Valley.

19          Q   Are you one of the partners?

20          A   I am.

21          Q   Just familywise-- I don't care about the names--

22   Identify your relationship to the brothers and their sons.

23          A   The four original partners Searl Brothers consisted

24   of the four brothers, one of which is my father.  There are

25   now six partners, myself and another brother's son.

Q   And for how long a time has the Searl family in one branch or another been farming in this area?

A   It is my understanding that my grandparents settled in Diamond Valley sometime in the early '90's.  My father was born in that area.  Since that time they have continued to farm in this area.  They have raised their families, and are still farming there.

Q   Do you have any special title or duties in connection with your partnership?

A   None other than a working partner.

Q   Are you generally familiar with the farming operations of the Searl Brothers in Diamond Valley?

A   Yes, I feel that I am.

Q   Now, directing your attention to the Exhibit Searl A-- that is the map of your property boundaries-- you have had an opportunity to examine that exhibit?

A   Yes.

Q   Now, a number of wells are shown with green symbols on the map.  Do you see them?

A   Yes.

Q   Mr. Rowe testified that each of those wells was identified both with a state number and your number.  As we discuss them I am going to use your well number, Mr. Searl, because I think it might be easier for you.

First, are the well locations, to the best of your

knowledge, correctly shown?

A   May I step over and look at this?

Q   Yes, you may.

A   They are the same exhibits, are they?

Q   That is the same exhibit you have seen, but please go and check.

A   Yes. (Stepping down to the exhibit.)   Yes.

Q   Now, are all of those wells presently in operation?

A   No, sir.

Q   Which one or ones are not in operation?

A   Well, No. 8 was discontinued.   We discontinued using Well No. 8 sometime in the fall of 1958, I believe.

Q   That is well No. 8 in Section 34, and according to the map it is outside the Santa Margarita River watershed; is that right?

A   That is right.

Q   When did you discontinue using it?

A   I believe it was in the fall of 1958.

MR. VEEDER:   He says he believes.   Does he know?

MR. SACHSE:   He believes it was discontinued.

THE COURT:   That is his best recollection, I take it.

Why did you discontinue it?   Because it ceased to produce sufficient amount of water?

THE WITNESS:   Yes, sir, among other reasons.   May I explain?

1    MR. SACHSE:  Yes, go ahead and tell the Court the reasons.

2    THE WITNESS:  We leased some land to the Howard Rose

3    Company of Hemet, and this particular well was right in the

4    middle of their proposed lease.  It was a very poor producing

5    well, I believe six or seven miner's inches, and had very

6    little value to us in our overall irrigation system.  So it

7    was decided to alleviate the problem of consummating the lease

8    that we removed the well.

9    BY MR. SACHSE:

10    Q  I am not sure that the reporter got the description

11    to whom you leased that land.

12    A  I believe they call themselves Howards of Hemet.

13    Q  That is a rose grower?

14    A  A rose growing concern, yes.

15    Q  Who grows not for cut flowers, but for rose bushes?

16    A  Rose bushes, yes.

17    Q  I am going to invite your attention to Exhibit Searl

18    H that has already been placed in evidence, which is a tabula-

19    tion compiled by Mr. Rowe showing data on your wells which

20    Mr. Rowe stated he obtained from your records.  Will you look

21    over that exhibit and tell us if it is correct, to the best

22    of your knowledge, as to each well?

23    A  To the best of my knowledge, it is correct.

24    Q  And the wells are the same wells that are shown on

25    Exhibit A, are they not?

1   A   Yes.

2   Q   I observe that there are some blanks on that exhibit

3   in different places.   For example, under the well No. 1 the

4   driller is blank.   Does that mean you have no knowledge as to

5   who actually drilled that well?

6   A   That is right, because we just didn't keep any record.

7   They weren't important to us at that time.

8   Q   Going on through the wells, wherever these blanks

9   appear, it means that you could locate no information in your

10   files to answer that question?

11   A   That is true.   We had none.

12   Q   Now, Mr. Searl, will you describe briefly to the

13   Court the general nature of your farming operations, the crops

14   you grow, how they are irrigated, and so on?

15   A   As of today, Mr. Sachse?

16   Q   Yes, as of today.

17   A   Well, generally speaking, we consider ourselves

18   cereal grain and cattlemen.   We grow some 5,500 acres of grain--

19   correction-- that would be more like 3,500 acres of grain.

20   We have some 400 or 500 head of cattle.   As of today we grown

21   approximately 400 acres of white rose potatoes each year.   We

22   grow some corn for silage.   We lease land to Howards of Hemet

23   for the production of rosebushes.   I should say that in our

24   crop planning we consider watermelons, onions,

25   Q   When you say you consider, what do you mean?   You do

1  it occasionally or what?

2      A  If the water supply, the land availability all tally

3  and the outlook is reasonable, we do often plant those crops.

4  We have in the past planted carrots and so on.

5      Q  How do you irrigate in general again?

6      A  You mean what type of irrigation we use?

7      Q  Yes.  By gravity, sprinkler, ditch, or--

8      A  Generally speaking, our grain lands are irrigated by

9  sprinklers, our White Rose are about 50-50-- about half under

10  sprinkler irrigation and about half under row irrigation.

11  Most all the other row crops are in the row irrigation.

12      Q  Do you have any reservoirs on your property?

13      A  Yes, sir.

14      Q  How many reservoirs?

15      A  As of today we have six reservoirs.

16      Q  Now you obtained from the United States Marines--

17  Mr. Veeder, we have never marked your Exhibit for

18  identification.

19      MR. VEEDER:  What is the next one?

20      THE CLERK:  231.

21      MR. VEEDER:  231, Searl Brothers Engineering Report.

22  BY MR. SACHSE:

23      Q  You have received from the Marine Corps Office of

24  Ground Water Resources at Camp Pendleton an engineering report

25  on your property, have you not?

1    A   Yes, we have.

2    Q   With regard to your reservoirs, is that report accurate?

3    A   No.  I believe since the report we have added two

4    reservoirs.

5    Q   Taking these reservoirs as a general class, these are

6    all above-surface reservoirs, are they not?

7    A   Yes.

8    Q   Do any of them impound natural surface runoff,

9    natural runoff?

10   A   Are you speaking specifically of rain runoff or of

11   any--

12   Q   I am going to lead you a little.  I don't think Mr.

13   Veeder will object.  I know you have at least one reservoir

14   that tries to recapture waste irrigation water.  Forget that

15   for the moment.  But do you capture the natural runoff from

16   the hills anywhere?

17   A   No.

18   Q   Start out with the way you take your water from

19   whatever source you take it and how you put it into a reservoir

20   and where it goes from there.  Start first with your well

21   water.  Do you pump into a reservoir?

22   A   Yes.  As shown by the exhibit, our better-producing

23   wells are along the south side of our property, which happens

24   to be on the high side of the ranch.  Our pipe line follows

25   the south boundary of the ranch.  The wells pump into the

concrete lines.  By gravity they flow into these earthen

reservoirs.  Periodically along the cement line we have

lateral lines which serve various pieces of ground.  The

reservoirs themselves are interlaced.  By "interlaced" I mean

we can move water from one reservoir to three of the reservoirs,

and we use these reservoirs to redistribute the water to

various crop lands.

Q   You also obtain some water from the Eastern Municipal

Water District, do you not?

A   Yes, sir.

Q   Inviting your attention to Exhibit Searl I-- that is

a tabulation prepared by Mr. Rowe of the Eastern Municipal

Water District deliveries to you for the period 1954 to 1959--

as far as you are aware, is that an accurate exhibit?

A   Yes, I believe it is.

Q   Did you obtain Eastern Municipal Water District water

prior to 1954?

A   No, sir.

Q   Prior to 1954 did you have any source of imported

water?

A   No, sir.

Q   Can you describe briefly for the Court how the

Eastern Municipal Water District water is delivered to you and

used in your system?

A   An improvement district was formed by the growers in

this particular area-- Searl Brothers, Garbani Brothers, McSweeneys, et cetera-- and they as an improvement district built a distribution line running south from Hemet along State Street, State Highway 74.  It terminates at our south boundary, makes a slight jog.

Q  If this would help a little, approach the board, Mr. Searl, and use a pointer and trace this out.

A  The improvement district distribution line comes out State Street and makes a short jog, following our south boundary in here approximately a quarter mile and terminates at our Well 4.  Between Well 4 and this corner we have an earthen reservoir with a capacity of about seven acre feet of water, and that reservoir is connected into the E & W D Distribution line and also connected into our main underground distribution line.  So in effect we have two outlets quite close together servicing us from E & W D.

Q  Let me see if I understand.  In other words, you can either take E & W D. water direct into your system or you can take it into the reservoir and from the reservoir into your system; is that right?

A  That is right.

Q  Does this reservoir to which you have just referred have a number?

A  Yes, we have renumbered our reservoirs since we constructed.  I don't know whether my numbers that I recall

1  offhand correspond with these on the exhibit.

2      Q  What is it on the exhibit?  Is it shown on the

3  exhibit?

4      A  It is not shown on the exhibit.

5      Q  Where is it?  Is it near that Well 4?

6      A  It is approximately halfway between Well No. 4 and

7  this corner of State Street.

8      Q  And what do you call that?

9      A  In our operation this is Reservoir No. 1.

10     Q  Can you also put water into reservoir No. 1 from

11  other sources than Eastern Municipal?

12     A  No, we cannot.

13     THE COURT:  You mean you can't pump into it from Well 4?

14     THE WITNESS:  No, sir.  Well 4 is on the downhill side

15  and actually not even connected into that particular pipe line.

16  BY MR. SACHSE:

17     Q  Does all of the Eastern Municipal Water you receive

18  come through the two connections you have just described?

19     A  Not all of it, no.  We do have two other connections,

20  one approximately one-quarter mile, using this as a starting

21  point, about a quarter mile we have our connection No. 1 on

22  State Street.  These numbers are management designation.  Our

23  connection No. 2 is directly in line with wells 7 and 8; in

24  other words, 7 and 8 lay on a main distribution line connecting

25  into E and W D at this point.

1    Q   Will you describe, Mr. Searl-- and I think you will

2  still want to use the map-- how the Garbani water gets to Mr.

3  Garbani through your system?

4    A   Yes.  In the beginning this group of farmers who

5  financed this distribution line felt it would be prohibitive

6  to construct a steel line from this point to Garbani's.

7    Q   I will get the Garbani exhibit up there for you.

8  Garbani lies right in that area.

9    A   Right in this white line here.  Consequently, we

10  had this cement line constructed.  So we entered into an

11  agreement that we would supply Mr. Garbani from whatever

12  source whatever amount of water he wanted he would get or

13  what he was allocated he would get, and we would replenish

14  our supply from this point.  To try to make that a little

15  clearer, his connection lays right here.

16    Q   Near your Reservoir No. 2?

17    A   On the east, yes, it would be this Reservoir No. 2.

18    Q   So he actually takes delivery of water from you near

19  Reservoir 2?

20    A   That is correct.

21    Q   And the water which he takes may or may not in actual

22  fact be Metropolitan water; is that correct?

23    A   That is correct.

24    Q   It might be your water out of your own wells?

25    A   That is very true.

Q   But you replace the water supplied him with Eastern Municipal water, which is charged to him; is that right?

A   That is right.

Q   Now, in discussing your water use, is there any part of your ranch which you can state is 100% irrigated with imported Eastern Municipal water, or is all your water mixed?

A   I would say that 99% of the time the water is mixed. We do have isolated areas where we could, if the occasion arose, irrigate with E&WD water only.   But generally speaking, it is mixed.

Q   Do you know where the Eastern Water District water comes from?

A   Yes.

Q   Where?

A   Colorado River.

Q   Do you have any figures available, Mr. Searl, from any source as to the total amount of water you use in your farming operations, disregarding rainfall?

A   Yes.

Q   You know, of course, your Metropolitan deliveries. You have an exhibit on that.   How do you know the amount of water you use from wells?

A   May I explain it?

Q   Explain it.

A   We have more or less a cost accounting system, and

1 with the advent of Colorado River water we have been experi-

2 menting with various crops and we want to know how much each

3 crop costs to raise, and since water was an expensive item

4 we set up the system whereby we would make contact with the

5 California Electric Power Company to test our wells at least

6 twice a year, sometimes three times a year, and then their

7 engineers would calibrate each well and give us the figures

8 on how many acre feet of water was produced when you have so

9 many kilowatt hours of power.  Our bookkeeper would make the

10 rounds, in the busy season in the summer he would make the

11 rounds every day reading the electric meter and convert the

12 amount of water or compile the amount of water we would

13 endeavor each day over weirs and sprinkler systems, various

14 means, we in charge of the distribution of water would

15 allocate various crops with so much water for the periods.

16 But we would have a sum total to start with and then we would

17 break it down to various crops.

18     THE COURT:  Let me interrupt.  Are you going to have

19 any kind of written calculation on this?

20     MR. SACHSE:  I will have to ask Mr. Searl.

21     Have you got the bookkeeper's figures?

22     THE WITNESS:  Yes, I do have.

23     MR. SACHSE:  We have a tabulation which I haven't even

24 looked at, your Honor.

25     THE COURT:  I want to adjourn about ten minutes early

1    this evening.  I have to go to San Diego University.

2         MR. SACHSE:  We might save a little time, because I

3    haven't seen the bookkeeper's figures.

4         THE COURT:  What about tomorrow?

5         MR. SACHSE:  Mr. Searl's testimony will be very brief.

6    Mr. Garbani's testimony will be extremely brief.  I have Dr.

7    Mann, who will testify on the general problem of geology and

8    ground water movement.  I think we should figure all day.

9    We may get through early but I doubt it.

10        THE COURT: 10 o'clock tomorrow morning.

11        (Adjournment until Thursday, March 31, 1960, at 10:00

12   A. M.)

13

14

15

16

17

18

19

20

21

22

23

24

25