# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

---

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

---

UNITED STATES OF AMERICA,

Plaintiff,

vs.

No. 1247-SD-C

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

<br>

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

**Place:**   San Diego, California

**Date:**   Thursday, March 31, 1960

**Pages:**   12754 to 12882

**FILED**

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,      )
                               )
                 Plaintiff,    )
                               )
        vs.                    )          No. 1247-SD-C.
                               )
FALLBROOK PUBLIC UTILITY       )
DISTRICT, et al.,              )
                               )
                 Defendants.   )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Thursday, March 31, 1960

APPEARANCES:

| | |
|---|---|
| For the Plaintiff | WILLIAM H. VEEDER, ESQ., Special Assitant to the Attorney General, Department of Justice, Washington, D. C. |
| | LCDR. DONALD W. REDD. |

1   APPEARANCES (Continued)

2       For Defendant Fallbrook
        Public Utility District,    FRANZ R. SACHSE, ESQ.
3       Searl Brothers, and
        Garbani Brothers

4       For Defendant Vail          GEORGE STAHLMAN, ESQ.
5       Company

6       For Defendant State         STANLEY MOSK, ESQ.,
        of California               Attorney General,
7                                   By FRED GIRARD, ESQ.,
                                        Deputy Attorney General.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# INDEX TO WITNESSES

For Defendant Searl Brothers:

| | D | X | RD | RX |
|---|---|---|---|---|
| Leonard E. Searl | 12758 | 12764 | | |
| Sherman G. Babcock | 12783 | | | |
| Joseph A. Rowe | 12792 | 12794 | 12813 | |
| John F. Mann | 12817 | 12850 | | |

For Defendant Garbani:

| | D | X | RD | RX |
|---|---|---|---|---|
| Fred Garbani | 12862 | 12868 | | |

INDEX TO EXHIBITS

| Defendant Searl Brothers' Exhibit - | Iden. | In Evid. |
|---|---|---|
| N | 12759 | 12762 |
| O | 12785 | 12786 |
| P | | 12789 |
| C-1 | 12794 | 12812 |
| Q | | 12794 |
| R | 12818 | |

Plaintiff's Exhibit -

| | | |
|---|---|---|
| 231 Searl Bros. Engineering Report | | 12861 |

1    San Diego, California, Thursday, March 31, 1960.   10 A. M.

2

3        THE CLERK:   One, 1247-SD-C, United States vs. Fallbrook.

4   Further court trial.

5        MR. SACHSE:   Will you resume the stand, Mr. Searl.

6

7                    LEONARD E. SEARL,

8   a defendant herein, recalled as a witness in behalf of

9   Defendant Searl Brothers, having been previously duly sworn,

10   testified further as follows:

11

12                DIRECT EXAMINATION (Resumed)

13   BY MR. SACHSE:

14        Q   Mr. Searl, when we adjourned yesterday you were

15   testifying regarding your method of determining the total water

16   extractions of the Searl Brothers and I recall your testimony

17   is to the effect that the only information you had on such

18   extractions was not by exact metering but by calculations

19   arrived at by using pumping capacity and kilowatt hours,

20   applying formulas given by the power company; is that correct?

21        A   That is true.

22        Q   And I asked you if you had such figures, and you

23   stated yes, and about that time we adjourned.   Will you tell

24   us again where you obtained those figures?

25        A   Yes.   In our operation it is the bookkeeper's duty

1    to read these meters each day.  Now we realize, of course, that

2    this is not an accurate determination of the volume of water

3    that we use, but it is the best thing we have available.

4        Q   Before you came here did the bookkeeper give you a

5    list of the readings that he had made over the years 1954 to

6    1959?

7        A   Yes, he did.

8        MR. SACHSE:  May we see the original, please?

9        Your Honor please, you can see it is a pencil draft and

10   Mr. Veeder was kind enough to let us use his secretary and

11   we have reproduced it in typed form, but the original is here,

12   if anybody wants to examine it.

13       Would you please mark as Searl Exhibit N a sheet

14   entitled "Water Recordation Report to State of California."

15       (The document was marked Defendant Searl Brothers'

16   Exhibit N for Identification.)

17   BY MR. SACHSE:

18       Q   What is the significance of this language at the

19   top "To State of California"?

20       A   We were required to report to the State of California

21   our estimated water usage.

22       Q   Ground water extractions?

23       A   Ground water extractions.

24       Q   You have your original in front of you?

25       A   Yes, I do.

12760

1     Q   So for the year 1954, according to the calculations

2  made by your bookkeeper, your wells pumped 1192 acre feet and

3  you purchased 749 acre feet; is that right?

4     A   That is correct.

5     Q   And the next two figures are simply the percentage

6  of total use represented by wells and by Metropolitan water?

7     A   That is correct.

8     Q   And that same rule applies down throughout each of the

9  years indicated?

10    A   That is right.

11    MR. SACHSE:   I will offer in evidence Searl's Exhibit N.

12    MR. VEEDER:   May I ask a few questions?

13    MR. SACHSE:   All right.

14

15               VOIR DIRE EXAMINATION

16  BY MR. VEEDER:

17    Q   You said, as I recall your term, that you didn't think

18  these were accurate figures?

19    A   No.

20    Q   Why would you think they were inaccurate?

21    A   Well, for example, our procedure involves the test-

22  ing of the wells by the California Electric Power Company,

23  and possibly they would test, say, the first of April.   We

24  would use the same kilowatt  hour consumption on each well

25  for three months.   Quite possibly the wells would decrease in

1    capacity.  Consequently, we would be getting a wrong correla-

2    tion between output and kilowatt hours.  Or somebody would

3    forget to open a valve and the well would be pumped for 24

4    hours without producing any water.

5        Q  But these are figures that you keep in the course

6    of your business, is that right?

7        A  That is true.

8        Q  And they weren't prepared for this litigation?

9        A  They were not.

10       Q  Do they relate to wells that are both inside and

11   outside the watershed of the Santa Margarita River?

12       A  Yes, they relate to all of our wells, with one ex-

13   ception.  Our Well No. 1 is used primarily for domestic

14   purposes and for servicing our cattle feed lot, and those

15   kilowatt hours are not read as it doesn't enter into the

16   economy of the crop production.

17       Q  And you put all the water that you have into a closed

18   distribution system; is that right?  Is it a pipe line or--

19       A  Yes, sir, it is the standard underground concrete

20   lines.

21       Q  Do these figures reflect the Garbani uses?

22       A  They could, yes.  They could.

23   THE COURT:  How would they reflect Garbani uses?

24   THE WITNESS:  For example, Mr. Garbani would request or

25   say to us that he plans to use water on Wednesday morning.  We

1   have to make arrangements with Metropolitan to pick up the

2   increased usage.   But he wants the water 24 hours earlier than

3   we can make arrangements for it.   We quite possibly would

4   service him directly from our No. 2 reservoir, which had been

5   filled by these wells, and consequently they would show the

6   output of the well.

7       MR. SACHSE:   But you would replace that water with

8   Metropolitan water?

9       A  Yes, in our computations we would deduct the water

10  usage, we would take the meter reading of Garbani and sub-

11  tract it from our total use.   So we come back to the--

12      MR. VEEDER:   I have no objection.

13      THE COURT:   N received in evidence.

14      (Searl Exhibit N for Identification was received in

15  evidence.)

16

17                  DIRECT EXAMINATION (Resumed)

18  BY MR. SACHSE:

19      Q  Mr. Searl, I hand you United States Exhibit 231,

20  which is an engineering report on your property.   A copy has

21  already been supplied to you.   Would you quickly glance at

22  this and see if it conforms to the one you have already looked

23  at.   This is the same report you have already examined at

24  your leisure.

25      A  Yes.

Q  Now, I will direct your attention specifically to the sections of the report dealing with land use capabilities. I cannot refer to a single page because, as you know, the report is broken down into sections of the ranch.  Are you familiar with those sections?

A  Yes.

Q  And generally speaking are you in agreement or disagreement with the findings of the Marine Corps as to the land use capabilities of the Searl Ranch?

A  I would say that we are generally in agreement, yes.

Q  There is a calculation in this report on the last page, page 9, indicating maximum developed irrigated acres for row crop as 1882.6 acres and irrigated pasture as 365.1 acres. Now that doesn't mean your presently irrigated acres, does it?

A  No, sir.

Q  It means the maximum potential development?

A  In their estimation, yes.

Q  Do you generally agree with those figures?

A  I think, generally speaking, yes, we do.

Q  And on the same page the report makes a calculation of the maximum future potential water use on your land, assuming ample water were available for your development, the total amount being 8,928.7 acre feet.  Do you generally agree with that figure?

A  I believe that we do, yes.  Yes, we do.

Q   Is there any specific thing in this report with which you are in disagreement?

A   There are a few minor errors that we have run across. In our Section 30, they have included 40 acres too many.

Q   You pointed out that the report did not have completely accurate information as to your reservoirs; is that correct?

A   That is correct.

Q   But there is nothing which in any way affects your water rights to which you want to object in this report?

A   No.

THE COURT:   What was the maximum potential acre feet?

THE WITNESS:   8928.

MR. SACHSE:   8928.7.

You may cross-examine, Mr. Veeder.


CROSS-EXAMINATION

BY MR. VEEDER:

Q   You have no way of determining whether Santa Margarita River water goes north and easterly of the watershed line as depicted on Exhibit Searl Brothers A, have you?

A   That is correct; I have no information.

Q   In other words, it is quite possible that you are, in fact, exporting water out of the Santa Margarita River Valley into the area north of the watershed line?

1      A   I would say that would be possible, yes.

2      THE COURT:  By the same token, you might be using water

3  from the wells outside the watershed within this watershed?

4      THE WITNESS:  That is correct; wells 6,7 and 8.

5  BY MR. VEEDER:

6      Q   How long have you been commingling the waters in that

7  manner?

8      A   Since we started irrigating.

9      THE COURT:  How long is that?

10      THE WITNESS:  Since about 1941, '40, '41.

11  BY MR. VEEDER:

12      Q   And that was when you put in this system that you are

13  presently using; is that right?

14      A   That is when we started to construct the system, that

15  is right.

16      Q   Is there any way you can tell, from viewing your

17  property, as to where the watershed line is located, just

18  from a visual inspection?

19      MR. SACHSE:  You mean the surface?

20      MR. VEEDER:  That is right.

21      THE WITNESS:  Do I understand you to mean if we were on

22  the property could we pretty well distinguish the dividing line?

23  BY MR. VEEDER:

24      Q   That's right.

25      A   I think, generally speaking, you could, yes.

Q   You can?

A   Yes, I think so.

Q   And you agree with the watershed line as located on Searl Brothers Exhibit A?

A   I would say it would be difficult to agree with it, not being able to correlate the physical aspects with this line, but in general I would suspect that it is correct.

Q   Do you have any present plans of increasing your irrigated acreage?

A   Yes, we do.

Q   Where will that increase be?  Could I ask you to come down here so that I will be with you?

A   Section 11.

Q   I will give you a pen and ask you just generally to demark the areas.  Not that this is reflective of the fields or anything, but just mark as nearly as you can, locate the legal subdivisions by quarter sections, if you can, where you intend to increase your irrigated acreage.

A   This would have to be a general thing.

Q   I understand.

THE COURT:  He suggested by quarter sections.  It can be very rough.

THE WITNESS:  May I explain what our intentions are, your Honor?

THE COURT:  Yes.

THE WITNESS:  It might be self-explanatory.  The new aqueduct crosses in Section 11 at this point.

MR. SACHSE:  Just a moment.  By "new aqueduct" do you mean the aqueduct presently under construction from the San Jacinto Reservoir down to San Diego?

THE WITNESS:  Yes; the canal.

BY MR. VEEDER:

Q  And that is Colorado River water?

A  Yes.  We hope to be able to install a pipe line on our Section 11, which would eventually serve approximately the north two-thirds of Section 11.

THE COURT:  Down to the toe of the hills there?

THE WITNESS:  Yes.  Not--

BY MR. VEEDER:

Q  Could you just draw a line along there for us and put your initials there, please?

A  All right.

THE COURT:  And that you propose to irrigate from the aqueduct water and not from any wells?

THE WITNESS:  That is correct.  And also a portion of our Section 1 running generally along the toe of the hill.

THE COURT:  And up how far?

THE WITNESS:  To the toe of the hill on the north slope.

THE COURT:  Beyond the road there?

THE WITNESS:  Yes.

1    THE COURT: That you propose to irrigate by aqueduct

2    water?

3    THE WITNESS:  Yes.

4  BY MR. VEEDER:

5    Q  Do you propose an additional irrigation system, or

6    will you use your present system with your means of commingling

7    the waters?

8    A  It would take an entirely separate irrigation system.

9    Q  It would?

10   A  Yes.

11   THE COURT:  There is a little section in Section 12 to

12   the west of the toe of the hill.  Would you propose to irrigate

13   that also?

14   THE WITNESS:  Yes, sir.  That is relatively flat and

15   is irrigable.

16   THE COURT:  Where else?

17   THE WITNESS:  As of present, well,--

18   THE COURT:  Let me ask you this.  You are not irrigating

19   any part of Section 12 now, or Section 7?

20   THE WITNESS:  Section 12, only this westerly--

21   THE COURT:  Presently you are not irrigating any part of

22   it?

23   THE WITNESS:  No.

24   THE COURT:  Or 7?

25   THE WITNESS:  No.

12769

1    THE COURT:  And dropping down below to 13, those little

2  pieces below?

3    THE WITNESS:  No, sir.

4    THE COURT:  That is just pasture now?

5    THE WITNESS:  Yes, sir.

6    THE COURT:  And likewise the part shown in the insert

7  below in Sections 30, 32 and 35; that is just pasture?

8    THE WITNESS:  That is true.

9    THE COURT:  Going over the rest of the map, look up at

10  Section 21.  Do you see Section 21?

11    THE WITNESS:  Yes.

12    THE COURT:  That part south of the toe of the hill, are

13  you presently irrigating that?

14    THE WITNESS:  Yes, sir, as of the spring of this year.

15    THE COURT:  That is 31.

16    THE WITNESS:  Yes, in 31.  We have constructed an earthen

17  dam by an earthen reservoir in 31.

18  BY MR. VEEDER:

19    Q  You are pointing to the southeast of the southeast

20  of 31; is that correct?

21    THE WITNESS:  Yes, sir, almost on the line dividing 31

22  and 32.

23    Q  Could I ask you to mark that reservoir on there, if

24  you would, please.

25    A  Yes, sir.

Q  You are impounding in that this commingled water from Santa Margarita and the Colorado; is that right?

A  Yes, sir.  May I explain the procedure?

Q  Yes.

A  The valley generally slopes in this direction.

Q  When you say "in this direction"--

A  From right to left or to the west.

Q  In other words, downstream?

A  Right.

Q  On Warm Springs Creek as depicted on Exhibit A?

A  That is true.  Our more intensive irrigation is in Section 33, portions of 5, of 6--

THE COURT:  Not 6.

THE WITNESS:  Not 6.  33, 34, in this general vicinity of 33-34.  The runoff waters from our potato crop, which has been irrigated in the row, follows the low part of the valley headed west and we can re-use and plan to re-use the runoff from crops in the upper end of the valley on this Section 31.

MR. VEEDER:  I am sorry to interrupt you, but you were pointing-- you had your finger about where the "v-a-l" is in Section 39, which is north of the watershed line, and you were bringing it downstream on Warm Springs Creek.  Did you mean to point out that the water was running off of those fields down into Domenigoni Valley?

THE WITNESS:  Yes, they normally would.

1      MR. VEEDER:  I think we will have to change the water-

2  shed line.

3      THE COURT:  The part you pointed to is east of the

4  watershed as shown on this map.

5      THE WITNESS:  I see.

6      THE COURT:  Do you think the watershed line is wrong?

7      MR. VEEDER:  I think counsel will stipulate that we can

8  change it.

9      THE WITNESS:  May I further explain?  We have another

10  waste water reservoir at the toe of these hills.

11  BY MR. VEEDER:

12      Q  You are still pointing to the Southwest Quarter of

13  Section 33?

14      A  Yes.

15      Q  I beg your pardon.  You are now pointing to the

16  Southwest Quarter, not still.

17      A  The runoff from a portion of 33 will be entrapped in

18  this earthen reservoir and by gravity will come around the toe

19  of the hill and deposit it into the reservoir at this point,

20  which in turn is distributed westerly in 33 an used over and

21  over and over as to the amount of runoff.  It can be supple-

22  mented also.

23      THE COURT:  Let me ask you now.  You say you can see

24  this what would be the watershed line in most of the fields,

25  you can generally tell which way the water runs?

1        THE WITNESS:  Yes, sir.

2        THE COURT:  You don't have water that runs from east

3   of the watershed line into this watershed, do you?

4        MR. VEEDER:  That is what he testified to, your Honor.

5        THE WITNESS:  Yes, sir, we have a waste water ditch

6   running from our easterly line.

7        THE COURT:  Between 33 and 34?

8        THE WITNESS:  Yes.  This ditch extends from our easterly

9   line due west across 33 and ties in with this reservoir.

10       MR. VEEDER:  I ask you to draw that line in there, if

11  you would.

12       This could happen to anybody.

13       MR. SACHSE:  I guess we are importing more and more water

14  into the Santa Margarita.

15       MR. VEEDER:  We just want to be sure we get our share

16  of it.

17       THE COURT:  Put your arrows there.

18       MR. VEEDER:  I am thinking of Fallbrook, under this

19  circumstance.

20       THE COURT:  And right above it "Waste water ditch."

21       Now, you mean that water picked up in this ditch which

22  starts at the boundary between Section 33-34, midsection there,

23  will run by gravity in a westerly direction?

24       THE WITNESS:  Yes, sir.

25       THE COURT:  And will be picked up in a reservoir which

now shows to be near the watershed line, and then will run

by gravity to what is marked as Reservoir No. 1 on this map?

THE WITNESS:  Yes, sir.

THE COURT:  And then can be used in 32 or 31?

THE WITNESS:  Yes, sir.

MR. VEEDER:  If he doesn't stop, we will have to serve

everybody in Chicago, your Honor.

THE COURT:  Let me ask you something else.  Now let's

take Section 32.  You see the toe of the hills here.  These

are outcroppings of basement complex.  Are you presently

irrigating most of the apparently level part in 32 there?

THE WITNESS:  We will start this spring.

THE COURT:  You are not now irrigating it?

THE WITNESS:  No, sir.  It is planted as of right now,

sir.

THE COURT:  Last year you were not irrigating that?

THE WITNESS:  On occasions we have irrigated grain with

the use of runoff water with the sprinkler system.

MR. VEEDER:  Let's look at 33, the part that shows within

the watershed.

THE COURT:  First, 33 south of the watershed line and

excluding these areas apparently of basement complex, have

you been irrigating that part of 33?

THE WITNESS:  Yes, sir.

THE COURT:  And the northeastern part above the watershed

1    line, have you been irrigating that part?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  What about Section 2 here, a little over half

4    of it that lies within the section?  Are you irrigating that?

5          THE WITNESS:  Yes.

6          MR. SACHSE:  That is 3, isn't it?

7          THE WITNESS: Yes, that is 3.

8          THE COURT:  No, it's 4.

9          THE WITNESS:  3 and a portion of 4.

10         THE COURT:  Here is 3 over here.  Here is 4 as I mark it

11   out.

12         And a portion of 5, you have been irrigating that?

13         THE WITNESS:  Yes, sir.

14         THE COURT:  This portion in the Northwest Quarter of 3,

15   you have been irrigating that?

16         THE WITNESS:  Yes, we have irrigated it.

17         THE COURT: Now, I see the other land supposedly outside

18   the watershed up here in Section 32--

19         THE WITNESS:  28.

20         THE COURT:  --28.  About three-quarters of that section,

21   have you been irrigating that?

22         THE WITNESS:  We have never irrigated up toward the toe

23   of the hill.  We have irrigated this portion.

24         THE COURT:  The southeast quarter you have irrigated?

25         THE WITNESS:  Yes.

1    THE COURT:  You have not irrigated, then, the Northeast

2  Quarter of Section 29?

3    THE WITNESS:  It is irrigated, however.  We leased the

4  land to Page Brothers and they installed a system of their

5  own over here.

6    THE COURT:  From outside the watershed?

7    THE WITNESS:  Yes.

8    THE COURT:  Where is your most extensive farming?  You

9  have given us figures of your use of water and in 1954 to 1959

10  when you used this water would it be fair to say that most of

11  that water has been used in, say, an area from the ditch you

12  have drawn in 34 and 33 southerly of the ditch, something like

13  that?

14    THE WITNESS:  Yes, sir.

15    THE COURT:  Is that your most extensively irrigated

16  area?

17    THE WITNESS:  Yes.

18    MR. VEEDER:  May I have that marked, your Honor?

19    THE COURT:  Let's take a colored pencil and sort of draw

20  a rough outline around the area where most of this water has

21  been used that you have been testifying to.

22    THE WITNESS:  I would have to start at the northerly

23  boundary of 32-33.

24    THE COURT:  Just draw a very rough line.  Start over

25  again with this blue pencil.  Stay away a little bit from the

1   black line so you can see it.

2   MR. SACHSE:  Col. Bowen just pointed out that the fields

3   show quite clearly on this exhibit, if you will refer to it.

4   But just so we know it is rough.

5   THE COURT:  It is rough.

6   (The witness drawing on the exhibit.)

7   THE COURT:  The line came down here over like that,

8   didn't it?

9   THE WITNESS:  Yes.

10   THE COURT:  I think we can see it.

11   MR. VEEDER:  That is a blue line that you have now put

12   in enclosing the principal acreage that the Searl Brothers

13   farm?

14   THE WITNESS:  Yes.

15   THE COURT:  For the record, it includes the westerly

16   half of Section 34, the easterly half of Section 33, about

17   30 or 40 acres in the Southeasterly Quarter of Section 28, and

18   it includes probably about 30 acres in the Southeast Quarter

19   of Section 32, and it includes all of that first part shown

20   on Exhibit A lying in Section 5, probably about 10 acres in

21   the Northwest Quarter of Section 3.

22   MR. VEEDER:  Could you agree on the ten acres?

23   THE WITNESS:  About 30.

24   THE COURT:  This would be 40 acres over here.  Oh, that's

25   160.  That is right, 40 acres.

1          And my reference to 30 acres in Section 28 would be

2   closer to--

3          THE WITNESS:  To an 80.

4          THE COURT:  To an 80 or more?

5          THE WITNESS:  Yes.

6          THE COURT:  All right.

7          MR. VEEDER:  May I ask a question, your Honor?

8          THE COURT:  Yes.

9   BY MR. VEEDER:

10         Q  Referring to Exhibit N, which is a compilation that

11   you have made of acre feet per year from 1954, does that

12   reflect water measured and remeasured at any point in your

13   irrigation system?  Do you understand what I am saying now?

14         MR. SACHSE:  I don't understand you either, Mr. Veeder.

15         THE WITNESS:  No, we do not remeasure the runoff that we

16   trap.

17   BY MR. VEEDER:

18         Q  In other words, you referred to your waste ditch

19   which goes across the center line of 33.  You don't remeasure

20   any water that is waste water?

21         A  No, sir.

22         Q  Have you ever made any calculations as to what you

23   would expect to be the return flow on what you have used as

24   waste water?

25         A  Yes, sir.  Yearly we try to estimate the amount of

1    runoff that we can expect.

2         Q   When you use the term "runoff" you are not talking of

3    natural precipitation, are you?

4         A   No, sir; crop waste water, tail waste water.  We

5    attempt to calculate this so that we may plan our crop to

6    utilize on the lower end of the valley this waste water and

7    try to maintain maximum efficiency as to total water available.

8         Q   What have those calculations evinced from the stand-

9    point of return flow and availability of waste water?

10        A   It varies from year to year.  We have no record of it.

11   We plan a 40 or an 80 or something like that to accommodate

12   this waste water.

13        Q   You wouldn't know percentagewise how much water from

14   an acre foot you could expect to be available for re-use?

15        A   It varies drastically from crop to crop.

16        Q   And from season to season?

17        A   And season to season.

18        Q   And temperature to temperature?

19        A   That is correct.

20        Q   You mentioned that there was a disparity in the

21   figures in regard to Section 30.  Will you tell us which

22   Section 30 was involved?

23        A   That would be in Section 30, Township 5 South, --

24   6 South, 1 West.

25        Q   6 South, 1 West?

1    A   Yes, sir.  The total acreage reported in the report

2  is correct, except they have added one more 40, and it is

3  also different than as outlined on this exhibit.

4    Q   You are saying this exhibit, which is Exhibit A of

5  Searl Brothers?

6    A   Yes, sir.

7    MR. VEEDER:  I have no further questions.

8    MR. SACHSE:  Nothing further, your Honor.

9

10                    CROSS-EXAMINATION

11    MR. STAHLMAN:  May I ask one question just as a matter

12  of information.

13    Q   Where you have indicated that this water from outside

14  of watershed is ditched across the watershed line in the

15  Santa Margarita system, is that low land in through there?

16    A   Is this low land?

17    Q   Yes.

18    MR. VEEDER:  Let's see where you are pointing.  That is

19  not within any field, however.

20  BY MR. STAHLMAN:

21    Q   Is that ditch within a field?

22    A   It separates the fields.

23    Q   How deep a ditch is that?

24    A   Not over three feet deep.

25    Q   Does the land rise from the place where the ditch is

12780

located on the watershed line to the north and to the south?

A  Yes.

Q  In other words, there is a constriction in there?

A  The aerial photos, I think, show.

Q  Directing your attention to this aerial photo--

MR. VEEDER:  Let him show it.

MR. STAHLMAN: Go ahead.

THE WITNESS:  The natural drainage of this area passes through this range of small hills here, thusly.

BY MR. STAHLMAN:

Q  And directing your attention to this photo here, being Exhibit 231 and being the photo which is a composite showing the lands and also showing the watershed line--

MR. VEEDER:  Let's put that down so that all of us can take a look.

BY MR. STAHLMAN:

Q  First, I will ask you with reference to this photograph about where would that ditch be in the photograph?

MR. VEEDER:  You are referring to Exhibit 231 and the big composite aerial?

MR. STAHLMAN:  Yes.

THE WITNESS:  Let me get my distances correlated.

THE COURT:  Almost off of the map?

THE WITNESS:  It is off of the map, yes.

THE COURT:  Draw it in there .

12781

1 (The witness drawing on the exhibit.)

2 MR. VEEDER:  That is the center line to 33 now; is that

3 right?

4 THE WITNESS:  Approximately, yes.

5 MR. VEEDER:  May I ask him to extend it, George?

6 MR. STAHLMAN:  Yes, it would be well if he did.

7 THE WITNESS:  The ditch terminates at this reservoir

8 approximately at the toe of, I believe it is this-- I didn't

9 get to the reservoir-- it is the toe of this here, almost

10 on the watershed line.

11 THE COURT:  Move it.

12 (The witness marking the exhibit.)

13 THE COURT:  The reservoir is right at the toe there?

14 THE WITNESS: Approximately.

15 BY MR. STAHLMAN:

16 Q  Then is it also conveyed in a ditch across the water-

17 shed line or the position where the watershed line is drawn

18 here on this composite picture, Exhibit 231?

19 A  Is it transported by ditch, did you ask?

20 Q  Yes.

21 A  At one time it was both by ditch and by concrete pipe

22 line.

23 Q  How do you do it now?

24 A  By both.

25 MR. VEEDER:  You mean, does it go by gravity?

12782

MR. STAHLMAN:  That is the point, yes.

Q  In other words, there is a ditch, is there, from this reservoir to the other reservoir to the west that you testified to?

A  The natural drainage is from the toe of this hill to approximately the center of this field.  You can almost see the-- in other words, this ditch would run this direction to this point.

MR. VEEDER:  Why don't you draw that on, Mr. Searl.

(The witness drawing on the exhibit.)

MR. STAHLMAN:  Continue that line.

THE WITNESS:  Draw everything that is ditch, sir?

BY MR. STAHLMAN:

Q  There is a ditch in the vicinity of where you have placed the line on this photograph?

A  Yes, sir.

Q  Now, then, from your observation of the land in the area would you say that where the water crosses the watershed line is the low point in the contour of the land in that vicinity?

A  Yes, sir.

Q  In other words, these are hills that come down through here on both sides?

A  Yes.

MR. STAHLMAN:  That is all I have.

1        MR. VEEDER:  May I ask you to put your initials on

2   Exhibit 231 there.

3        (The witness marking the exhibit.)

4        THE COURT:  And I take it that this R for Reservoir--

5        THE WITNESS:  Is misplaced.

6        THE COURT:  --is over here?

7        THE WITNESS:  That is correct.  This is a comparatively

8   new reservoir.

9        MR. STAHLMAN:  That's all I have.

10       MR. SACHSE:  Thank you, Mr. Searl.

11       MR. VEEDER:  He is a good witness.

12       MR. SACHSE:  I will call Mr. Sherman Babcock.

13       Mr. Veeder, this is the gentleman who had the water

14   analyses.

15

16                    SHERMAN G. BABCOCK,

17   called as a witness on behalf of the Defendants Searl Brothers,

18   being first duly sworn, testified as follows:

19       THE CLERK:  State your name, please.

20       THE WITNESS:  Sherman G. Babcock.

21

22                    DIRECT EXAMINATION

23   BY MR. SACHSE:

24       Q   Where do you live, Mr. Babcock?

25       A   In Riverside, California.

1    Q  What is your occupation?

2    A  Analytical chemist.

3    Q By whom are you employed?

4    A  By myself.  I am a partner in a family business.

5    Q  And are you on a retainer for any public agencies in

6 Riverside County?

7    A  Yes, sir.

8    Q  For whom?

9    A  The City of Riverside, the Riverside County Flood

10 Contro District, and several small municipalities.

11    MR. SACHSE:  Mr. Veeder, I don't contemplate going through

12 the qualifications of the gentleman, I will tell you now.

13 That is all I am going to do.  If you want voir dire, go ahead.

14    MR. VEEDER:  That's all right with me.  Go ahead.

15 BY MR. SACHSE:

16    Q  Mr. Babcock, you have made, at the request of Mr.

17 Joseph Rowe, certain analyses of ground waters obtained from

18 wells in Domenigoni Valley, have you not?

19    A  Yes, sir.

20    Q  As I understand it, the first such analyses you ever

21 made were samples brought to you by Mr. Rowe that you did

22 not take; is that correct?

23    A  That is correct.

24    MR. SACHSE:  Do you want these marked?

25    MR. VEEDER:  I think they should be marked.

1        MR. SACHSE:  Would you mark these two as a single ex-

2  hibit, then?  Staple them together, please.

3        THE CLERK:  Searl O for Identification.

4  BY MR. SACHSE:

5        Q  I am handing you two sheets stapled together marked

6  Searl O for Identification.  I will ask you if these are the

7  analyses you made of the samples which were brought to you

8  by Mr. Rowe.

9        A  Yes, sir.

10        Q  Now, those analyses indicate the entire chemical

11  composition of the water, do they not?

12        A  The major elements, yes, sir.

13        Q  And then at the lower half of the sheet I see a

14  figure "Conductivity."  What is that figure?

15        A  That is a measurement of the electrical conductivity

16  of the water, and it is an indication of the total dissolved

17  salts in the water.

18        Q  Are these analyses correct, to the best of your

19  knowledge?

20        A  They are.

21        Q  On each of these is written in red letters a number

22  6S2W 10D2 and 6S2W 16D2.  Are those State well numbers?

23        A  I presume they are, yes.

24        MR. SACHSE:  I will have to ask Mr. Rowe.  They are.

25        I will offer in evidence Searl Exhibit O, your Honor.

1        THE COURT:  O received in evidence.

2        (Defendant Searl Brothers Exhibit O for Identification

3   was received in evidence.)

4        THE CLERK:  Your Honor, Exhibit Searl P has been marked

5   for identification.

6        THE COURT:  How many of these do you have?

7        MR. SACHSE:  I am going to have P, which is a group of

8   eight analyses.

9        THE COURT:  Exhibit O is the first one?

10       MR. SACHSE:  The first ones that were delivered to Mr.

11  Babcock.  The next ones were the ones Mr. Babcock took him-

12  self.

13       THE COURT:  All right.

14  BY MR. SACHSE:

15       Q  After making the analyses of the samples delivered to

16  you by Mr. Rowe, did you accompany Mr. Rowe into the field and

17  make certain well analyses?

18       A  Yes.

19       Q  Do you believe that by stepping down here to the

20  exhibit you could orient yourself and confirm that the locations

21  of wells marked with numbers in red and green boxes are the

22  wells from which you took the samples?

23       MR. VEEDER:  I object on the grounds that this is

24  incompetent, irrelevant and immaterial, and not tending to

25  prove any issue in the case.  The witness Rowe, concerning

1    whom this is foundational materal, has stated he had no

2    opinion as to whether the waters which are in the Menifee

3    Valley are waters from the Domenigoni Valley.   Therefore, this

4    could not prove a single issue in the lawsuit.

5         THE COURT:  Overruled.

6         MR. SACHSE: Great.  I don't want the witness if you

7    don't want this.

8         THE COURT:  Overruled.

9         MR. VEEDER:  I move to strike.

10   BY MR. SACHSE:

11        Q   Are the wells indicated in the colored boxes the

12   wells from which you took the samples?

13        A   Yes.

14        MR. SACHSE:  You may resume the stand.

15        Q   I will hand you an exhibit marked P, which has four

16   sheets.  Who took the sample on this occasion to which you have

17   just referred?

18        A   I did.

19        Q   I observe notations on this sheet as to "Well was

20   running", et cetera.  Whose notations are those?

21        A   They are mine.

22        Q   Those are your own notations?

23        A   Yes.

24        Q   And these are your own?

25        A   Not on your sheets.

Q  You took notes, I presume, on something else?

A  Yes.

Q  And typed this later in your office?

A  Yes.

Q  But this is the original draft of your conclusions on each of the wells listed as to the samples you took?

A  Yes, sir.

MR. SACHSE:  Your Honor, there should be one more sheet added to it, I see.  I will have it stapled on the back.

To correct the record, your Honor, this is five sheets, not four, as I originally stated.

MR. VEEDER:  Will the witness identify that last one?

BY MR. SACHSE:

Q  I would like you to look at the last one and state, Mr. Babcock, for the record, whether all of those five sheets represent the analyses prepared by your office at the request of Mr. Rowe.

A  Yes, sir.

Q  And all of those samples were actually taken by you, were they not?

A  Yes, sir.

MR. SACHSE:  I will offer in evidence Exhibit O.

MR. VEEDER:  I would like to have my objection, your Honor, applicable to all of Mr. Babcock's testimony and to all of these exhibits.  I would just make a running objection,

1   so to speak, your Honor.

2          THE COURT:  All right.  I don't know what the objection

3   was, but it was not good.  It will be overruled.

4          MR. VEEDER:  I want to renew it, then, your Honor.

5          THE COURT:  It will go to Exhibits O and P and all of

6   Mr. Babcock's testimony.

7          MR. VEEDER:  The objection, for the record, was that

8   Mr. Rowe had arrived at a conclusion, then he backed away

9   from it and he said he had no conclusion, on cross-examination.

10  So this is incompetent, irrelevant and immaterial, and--

11         THE COURT:  Then it becomes a question of fact.  The

12  witness could say he had an opinion.  Then he could say on

13  cross-examination he did not have an opinion.  It is still a

14  question for the Court to decide.  Overruled.

15         MR. SACHSE:  You may cross-examine, Mr. Veeder.

16         THE COURT:  Exhibit P is received in evidence.

17         (Defendant Searl Brothers Exhibit P for Identification

18  was received in evidence.)

19  BY MR. VEEDER:

20         Q  I observe, Mr. Babcock, that you say that your samples

21  were taken-- I am now referring to 590501 E-- the sample was

22  taken at a weir discharge?

23         A  In this particular case, yes, sir.

24         Q  How far was that from the well?  That is the well

25  6S2W, 10D2.  How far was that from the well?

1     A  I can't say at this time.  It is not part of the

2  record and I do not remember.  I would presume that it was--

3     Q  I don't want you to presume.

4     A  All right.

5     Q  Would you recall whether the water ran through an

6  earthen ditch to where the weir was situated?

7     A  I am sure it did not.

8     Q  You don't remember, though?

9     A  I don't remember how far it was from the well.

10    Q  How then was the water conducted to the point where

11 the sample was taken?

12    A  In each case there was either a pipe or a closed

13 conduit from the well to the point of sampling.  We took no

14 samples where the water was exposed to the air or ran in an

15 earthen ditch.

16    Q  In your experience has it made any difference

17 whether the well was pumped at the time you took your samples

18 or not?

19    MR. SACHSE:  Has it made any difference for what?

20    MR. VEEDER:  From the standpoint of the test he is

21 making as to the chemical content of the water.

22    THE WITNESS:  Often the analysis will change slightly

23 if the well has been running over what it might have been had

24 it not been running at the time.

25

BY MR. VEEDER:

    Q  In other words, if the water is pulled down in the well it might have a different chemical content than if it were taken at a static level?

    A  A small difference is possible, yes, sir.

    MR. VEEDER:  I have no further questions.

    MR. SACHSE:  Thank you, Mr. Babcock.

    May Mr. Babcock be excused, your Honor?

    THE COURT:  He may be excused.

    MR. SACHSE:  Mr. Veeder, we have the exhibit, you know, that your office prepared for Mr. Rowe.

    MR. VEEDER:  At least we typed it for Mr. Sachse.

    MR. SACHSE:  We are ready to put Mr. Rowe back on now, if you have it.

    MR. VEEDER:  Yes.

    MR. SACHSE:  My only reason to put him on is to introduce this exhibit.  If you don't want to cross-examine--

    MR. VEEDER:  Oh, I desire to cross-examine.

    MR. SACHSE:  Take the stand, Mr. Rowe.


               JOSEPH A. ROWE,

recalled as a witness in behalf of Defendant Searl Brothers, having been previously duly sworn, testified further as follows:

12792

1          THE CLERK:  Your Honor, Searl Q has been marked for

2     identification.

3

4                    FURTHER DIRECT EXAMINATION

5     BY MR. SACHSE:

6          Q  Mr. Rowe, I will hand you an exhibit that has been

7     marked Searl Q.  Will you tell us who prepared it?

8          A  Yes.  I prepared the base information for it, Mr.

9     Sachse.

10          Q  From what source or in what condition was this base

11     information?

12          A  The base information on the wells shown in the

13     Menifee area were from logs of the wells; the Domenigoni

14     area, the same, from logs of wells; Sections 16 and 17 area,

15     Well 6 South, 2 West, 16D2, was from information that I had

16     taken myself as to the quantity and drawdown of that particular

17     well.

18          Q  And you have all of this information in your notes

19     with you here at trial?

20          A  I have.

21          Q  And you prepared this exhibit in draft form with a

22     pencil last night and Mr. Veeder's office was kind enough to

23     type it this morning; is that the history of it?

24          A  That is correct.

25          MR. SACHSE:  I will offer in evidence Exhibit Searl Q.

1    MR. VEEDER:  May I inquire just a moment here?

2

3                    VOIR DIRE EXAMINATION

4    BY MR. VEEDER:

5        Q  This April 3 based on a static level of 10.3, would

6    you show me where that has application?

7        A  Yes.  You will note that in the area where it says

8    Sections 16 and 17 area, in the drawdown of feet there is a

9    little A and B opposite 13.3 and 7.8 figures, and the explan-

10   ation of A and B is shown in the footnotes.

11       MR. VEEDER:  Have you made your offer, Franz?

12       MR. SACHSE:  Yes, I made the offer.

13       MR. VEEDER:  I am going to object onthe ground that

14   Exhibit Searl Q for Identification is incompetent, irrelevant

15   and immaterial, not tending to prove any issue in this case,

16   because the witness has stated that he had no opinion as to

17   whether the Santa Margarita River water from the Domenigoni

18   Valley was entering and had entered the Menifee Valley, as

19   depicted on Defendant's Exhibit B.

20       THE COURT:  Overruled.  It wouldn't even be necessary

21   for a witness to give an opinion.  If certain facts were

22   presented, the Court might draw a conclusion.

23       MR. VEEDER:  That is what I am afraid of, your Honor.

24       THE COURT:  The Court has a right to draw a conclusion.

25   I don't sit up here as an automaton.  I have a few ideas of

1    my own once in awhile.   Overruled.

2         I take it that this Exhibit Q is limited to such wells

3    as you could find tests on; is that right?

4         THE WITNESS:  Yes, sir.

5         THE COURT:  You couldn't find any other tests on any of

6    these other wells?

7         THE WITNESS:  That is correct.  That is tests where I

8    had my own actual observations or from logs.

9         MR. SACHSE:  Was it admitted, your Honor?

10        THE COURT:  Admitted in evidence.

11        (Defendant Searl Brothers Exhibit Q for Identification

12   was received in evidence.)

13

14                     CROSS-EXAMINATION

15        MR. VEEDER:  Would you mark this as C-1.  This is the

16   cross-section.  I don't want him to have to mess up his own

17   exhibit.

18        MR. SACHSE:  Why don't you give it a United States

19   number?

20        MR. VEEDER:  Let's keep this in the Searl family.

21        THE COURT:  Mark this C-1, a duplicate of C.

22        (Defendant Searl Brothers Exhibit C-1 was marked for

23   Identification.)

24   BY MR. VEEDER:

25        Q  Now, Mr. Rowe, I am going to ask you to come down

1   to the easel and view the exhibit marked Searl C-1 for Iden-

2   tification, and I refer to the well that you have marked on

3   here as GS2W, 10E1, and you made that measurement yourself?

4       A   Yes.  That is a 6, Mr. Veeder-- 6 South.

5       Q   I guess that is a 6.  What was the date that you made

6   that measurement?  Do you recall?

7       A   Yes.  I have made several measurements of that par-

8   ticular well, Mr. Veeder.

9       Q   What is the depth to water there, as you show it?

10      THE COURT:  Which one are you talking about?

11      MR. VEEDER:  That is 6S2W, 10E1.

12      THE WITNESS:  Yes.  I believe on Searl D or E it shows

13   the elevation of the water table in that particular well.  I

14   can refer to the exhibit or refer to my notes.

15      Q   Would you tell us what the level is on that, if you

16   would?

17      A   6S2W, 10E1, on April 4, 1959, elevation of water

18   table was 1440.3.  Distance to water was 16.8 feet.

19      Q   As I view your exhibit C-1, the water level is

20   materially higher than 6S2W, 9J1; is that not correct?

21      A   That is correct.

22      Q   And similarly it is considerably higher than 6S2W

23   10D1; isn't that correct?

24      A   Yes, it is higher.

25      Q   Now, would you draw a line connecting the points

12796

between 6S2W, 10E1 and 6S2W, 10D1 and 9J1?

A  Yes, sir.  (Drawing.)

Q  As depicted on Searl Brothers Exhibit C-1 for Identification, you have what would amount to a ground water mound there, would you not?

THE COURT:  Put that line in red, so we know what you are talking about.  It is the only line in there that didn't appear on the original C-1

(Witness marking exhibit.)

BY MR. VEEDER:

Q  Is it not true then that as shown on C-1 you have what amounts to a ground water mound between those two wells?

A  Yes.

Q  It is a ground water mound, is it, as shown on the map?

A  As shown on the map?

Q  The exhibit?

A  As shown on the exhibit it would appear to be a ground water mound.  However, there is some explanation about this particular well that would not make it a ground water mound.

THE COURT:  What is that explanation?

THE WITNESS:  Your Honor, you will notice in the profile A-A double prime on Searl Exhibit C-1 that the depth of this well is approximately 18 or 19 feet below the surface of the

1   ground.  It is a very shallow well.  The well is located on

2   the end of a field.  I am pointing to it now in Section 10E1

3   near Winchester Road.  It is my understanding from Mr.--

4       MR. VEEDER:  I object to his understanding, your Honor.

5       MR. SACHSE:  You asked for it.  Let him give his explana-

6   tion.

7       THE COURT:  Let him go ahead.

8       THE WITNESS:  Mr. Francis Domenigoni, when he irrigates

9   in the field to the east in the general area of E1, that he

10  can actually fill that well with waste irrigation water--

11  that is, the water in the well will stand almost at the surface

12  of the ground.  On numerous occasions when I have measured

13  this well I believe I have found it as high as 5.8 feet from

14  the surface of the ground.  The last time I was out I believe

15  it was down a little bit lower than that.  The fluctuation of

16  this well is due primarily to irrigation water, waste irriga-

17  tion water settling in the vicinity of this particular well.

18      THE COURT:  What is meant by the broken line on that well

19  as contrasted to the solid line?

20      THE WITNESS:  The broken line, your Honor, indicates that

21  the well was projected to the profile line.  It is not located

22  on the profile line.  It is located away from the profile line.

23      MR. SACHSE:  Why don't you indicate on Exhibit B?  If

24  there is any question you can use B to indicate it.

25      THE WITNESS:  I have.  It shows a dashed line running

1   from E-1.   It is rather hard to see because it goes through

2   the letters E-1, but it does project to the profile line.

3        MR. VEEDER:   I object to the hearsay testimony from Mr.

4   Domenigoni and move to strike that phase of it from this man's

5   testimony, because it is the purest hearsay, your Honor.   And

6   this is important.

7        THE COURT:   An expert in this field is much like an

8   expert in the field of condemnation, where he gathers his

9   information.   I don't think you can apply a technical objec-

10  tion to this sort of thing.   If those objections were good,

11  you couldn't make any survey within the lifetime of a man in

12  connection with one of these problems.

13       MR. VEEDER: Your Honor--

14       THE COURT:   Overruled.

15       MR. VEEDER:   That puts an end to that.

16       Q   The two red lines that you have drawn do evidence a

17  ground water mound, be it artificially created or otherwise--

18  in other words, the water level in the gound water table is

19  higher at 6S2W, 10E1 than in the two wells to which you have

20  drawn the line?

21       A   Mr. Veeder, I would like to point out, in my opinion--

22       Q   Would you answer the question yes or no.

23       THE COURT:   Just a minute.

24       THE WITNESS:   You referred to ground water level.   In

25  my opinion this is not a true ground water level at this point.

1    I am pointing now to well 6 South, 2 West, 10E1.

2         THE COURT:  Let me ask you a question.  These wells as

3    to depth are projected on the bottom; is that right?

4         THE WITNESS:  Yes, sir; where you see the dashed lines

5    they are projected to the profile line.

6         THE COURT:  But I mean the depth is shown by these

7    heavy lines on the bottom profile?

8         THE WITNESS:  Yes.

9         THE COURT:  Which you have not put on the top profile.

10        THE WITNESS: That is correct.

11        THE COURT:  So the depth of this well we have been

12   talking about, Well 10E1, is the point shown at the very

13   bottom of it; is that right?

14        THE WITNESS:  It is very close to the bottom, yes, sir.

15        THE COURT:  Then is your water level right at the bottom,

16   too?

17        THE WITNESS:  Yes, sir.  It shows on Exhibit Searl D

18   that the depth of the well is 19 feet.  That is the total

19   depth of the well.  That is in accordance with the log.  I

20   found the water level at 16.8 feet below the top of the casing,

21   my reference point on April 4, 1959.

22        THE COURT:  Go ahead.

23        Are these circles on Exhibit C-1 at the end of the lines

24   supposed to mean the depth of the well or ground water level?

25        THE WITNESS:  No, sir, that is the ground water level.

1   The circles in the profiles indicate the ground water eleva-

2   tion in April, 1959.  The X marks indicate measurements taken

3   from Bulletin No. 57 as of the winter of 1953.

4        THE COURT:  Answering Mr. Stahlman's suggestion, the

5   bottom profile shows the depth of the well a few feet lower

6   than the water level.

7        THE WITNESS:  That is correct.

8        THE COURT:  I think this is a good time for a recess.

9        (Recess.)

10       THE COURT:  Proceed.

11  BY MR. VEEDER:

12       Q  Now, Mr. Rowe, will you join me again at Searl

13  Exhibit C-1 and using your red pencil-- Do you have that red

14  pencil, sir?

15       A  I have.

16       Q  --connect the points between 6S2W, 3R3, 4 and 6 with

17  6S2W, 1GC1, using the ruler.

18       MR. SACHSE:  Which water level did you ask for?

19       THE WITNESS:  I believe you mean here, 6S2W, 16C1.

20       MR. VEEDER:  That is right.

21       THE WITNESS:  What was the upper one, Mr. Veeder?

22       MR. VEEDER:  It is 6S2W, 3R3, 4 and 6 as you have marked

23  it on here.

24       THE WITNESS:  Yes.

25       MR. VEEDER:  Could you make it a little heavier than that?

1    I like to be able to see it.

2         THE COURT:  The Court has to see it, too.

3         MR. VEEDER:  Yes.  It's useless for me to see it if

4    your Honor does not.

5         Q  Now, in viewing the Searl Exhibit Q, do you have

6    the rating or do you have the size of the motor for the well

7    6S2W 9J1?  What is the horsepower on that?

8         A  I believe it is 15 horsepower, Mr. Veeder.

9         Q  Would you take your red pencil and mark "15 horse-

10   power"?

11        MR. SACHSE:  Are you sure, Mr. Rowe?

12        THE WITNESS:  I would like to refresh my memory by

13   looking at my notes.

14        MR. SACHSE:  Take your time.

15        THE WITNESS:  Yes, the well pump is a 15 horsepower on

16   9J1.

17   BY MR. VEEDER:

18        Q  All right.  Would you mark that on there, please,

19   with your red pencil.  Put it up on the well number, so that

20   we can see it.

21        A  Here?

22        Q  That's right.

23        A  (Marking exhibit.)

24        Q  Now, would you show us the horsepower on your Well

25   6S2W, 10D1 and 2?  You can show both those, if you will.

12302

1      A   Yes.   It will take me a little while to find those

2   horsepowers, Mr. Veeder.   I believe 10D1 is a submersible

3   pump and I don't think I have the horsepower on it.   It is

4   a small domestic pump for the residence.

5      Q   Well, referring to California's Exhibit F, that shows

6   that the horsepower on 10D2 was 20.   Does that sound right to

7   you?

8      A   It sounds reasonable, yes.

9      Q   Why don't you put it up there where you put it on J

10   at the same level?

11      A   I will put it in and make it with a 57 after it.

12      Q   What is the 57?

13      A   Referring to Bulletin No. 57.

14      MR. STAHLMAN:   That's what you asked for, wasn't it,

15   Bill?

16      MR. VEEDER:   No.

17      THE COURT:   That is where you got the information, Mr.

18   Veeder.

19      MR. VEEDER:   No, I don't believe Bulletin 57 is in the

20   record, your Honor.

21      THE COURT:   Appendix F is.

22      MR. VEEDER:   Appendix F is not Bulletin 57.

23      THE COURT:   It is part of it.   It is a distinction without

24   a difference.

25      MR. VEEDER:   I think I should show the exhibit on that,

1  your Honor.  I think it is Appendix F rather than 57.

2      Would you do that?  Put "57" and "Appendix F" after that.

3      THE COURT:  A-p-p F.

4  BY MR. VEEDER:

5      Q  Now, referring again to California's compilations

6  here--

7      MR. STAHLMAN:  Bulletin 57.

8      MR. VEEDER:  No, Bulletin 57 is not in the record.  I

9  refer to California's Appendix G, page 5.

10     THE COURT:  Of Bulletin 57.  We have to identify it.

11  Go ahead.

12  BY MR. VEEDER:

13     Q  And I observe and ask you to check it, Mr. Rowe,

14  that the water level as shown there in 1953 was 22.  So would

15  you mark on 6S2W, 9J1, Searl Exhibit C-1, right at the point

16  of intersection of your line going between 1GC1 and 3R3, write

17  22, would you, please?

18     THE COURT:  Well, write where 22 would come on your

19  chart.

20     MR. VEEDER:  Yes.  I think that is where it comes, you

21  will find.

22     MR. SACHSE:  May I see that reading for a minute.

23     MR. VEEDER:  Yes.

24     MR. SACHSE:  Is this the one?

25     MR. VEEDER:  This is known as selective pruning by the

1    witness.

2        MR. SACHSE:  I just want to be sure we understand.  This

3    is information obtained from the owner.  Do you agree that is

4    what that language means, Mr. Veeder?

5        MR. VEEDER: Yes, because--

6        MR. SACHSE:  Fine.  I want it in.

7        MR. VEEDER:  Because this atrocity is in, at least in

8    part.

9        Would you mark 22 down, please?

10        THE WITNESS: On 9J1 I am marking a distance down of 22

11    feet.

12        THE COURT:  Draw a line out to the side here so we can

13    see it.

14        THE WITNESS:  22 feet--57.

15        MR. VEEDER:  Appendix G.

16        THE COURT:  Appendix G5.

17        MR. VEEDER:  Yes, G5.

18        THE WITNESS:  G5.

19        THE COURT:  Put after that "From owner."

20    BY MR. VEEDER:

21        Q  Now, referring to 9K1, would you also refer to

22    Appendix G, page 5.  State 22, which is shown there, and mark

23    it on the exhibit-- referring again to Exhibit G1.

24        A  May I see the notes again, Mr. Veeder.

25        It is the same thing.  Is it all right if I arrow

1        this to that?

2              THE WITNESS:  All right.

3              THE COURT:  Put the date down, too-- '53.  Are they

4        both '53?

5              THE WITNESS:  Yes, your Honor.

6              THE COURT:  They are both 10-53.

7              THE WITNESS:  All right, sir.

8        BY MR. VEEDER:

9              Q   Now, as a matter of fact, Mr. Rowe, isn't it true

10       that the wells 10D1 and 9J1 are pumping wells?  Isn't that

11       true-- for irrigation purposes?

12             A   9J1?

13             Q   This one right here.

14             A   Yes, and 10D2.

15             Q   Yes.  Would you mark that 10D2, so we will be sure the

16       reference is correct?

17             A   Yes, those are both irrigation pumps.

18             Q   And is it not true that those irrigation wells

19       would create a drawdown or a cone of depression in the area

20       in which they are used?

21             A   I have no information as to a cone of depression

22       or the influence of the cone of depression from any of those

23       wells, Mr. Veeder.

24             Q   Are you telling the Court that there would not be

25       a cone of depression if you had a pumping well of that dimension

1   have shown on my Searl C as the measurements in 1959.

2   BY MR. VEEDER:

3   Q   Would you state whether, in your opinion, the Santa

4   Margarita River water out of Domenigoni Valley is flowing

5   into Menifee Valley and is used there at the present time.

6   Express your opinion.

7   A   Mr. Veeder, we went through this yesterday.

8   Q   That's right.

9   A   I am referring now to Searl Exhibit C.  On that

10  particular profile I show, in the lower profile, a difference

11  in ground water elevation between the point A, located in

12  Section 9, and water in the Menifee Valley area or in the

13  Menifee area shown to the left of point A.  There is a

14  difference in the water table, in the elevation of water.

15      MR. VEEDER:  Let me interrupt the witness once more.

16      THE COURT:  Let him finish.

17      MR. VEEDER:  He will not answer the question, your

18  Honor.

19      THE COURT:  Maybe he will.

20      MR. VEEDER:  He's afraid to.

21      THE COURT:  Go ahead.

22      MR. SACHSE:  May that go out?

23      MR. VEEDER:  No, I want it in there.

24      THE COURT:  It may go out.

25      THE WITNESS:  Referring to the upper profile, we find

1    and it was used?

2         A  First, Mr. Veeder, let me go back and explain further

3    on these wells.

4         Q  Would you answer the question.  I asked you whether

5    you are stating to the Court that the pump on 9J1, 15 horse-

6    power size, would not create a cone of depression if it was

7    used for irrigation purposes?

8         A  Yes, it would create a cone of depression.

9         Q  Is it not also true that a pump of the size of 20

10   horsepower would do the same thing?

11        A  That is correct.

12        Q  And would that not contribute to the ground water

13   mound which is shown on 10E1?

14        A  Not necessarily, Mr. Veeder, no, sir.

15        THE COURT:  Why?

16        THE WITNESS:  Let me explain this, your Honor.  Well

17   No. 10E1 is the only well on which I have measurements in

18   the Northwest Quarter of Section 10 and the East Half of

19   Section 9, in which I have found the phenomenon of a shallow

20   distance to water.  I have also measured wells 9A2 and 9A1,

21   and on occasion, on December 12, 1959, I found the depth

22   of water in those wells to be in excess of 30 feet below

23   the reference point.  9E1 is the only well in an area of six

24   wells in which that condition exists.  North, west and south

25   of it we find a water table which corresponds to the one I

1   at point A in Section 9 that the water table is below the

2   elevation of the water table in Section 16 to the left of

3   point A.  The water could not rise and flow out through

4   Section 16 in accordance with profile A-A-A prime.  Therefore,

5   my opinion is that if any escape or underground flow from

6   Domenigoni Valley area exists it would be toward the Menifee

7   area.

8   BY MR. VEEDER:

9       Q  Now, will you answer this question yes or no:  Have

10  you an opinion that Santa Margarita River water is flowing

11  out of Domenigoni Valley or is being pumped out of Domenigoni

12  Valley and into Menifee Valley?

13      THE COURT:  Pumped out?

14      MR. SACHSE:  That is objected to; it has been asked

15  and answered.

16      MR. VEEDER:  No, it has not.

17      MR. SACHSE:  He has stated that the water can run no

18  place except there or else stay, Mr. Veeder.

19      THE COURT:  But he has not stated.  He may answer the

20  question, but reframe it.  You say "pumped" out of what?

21      MR. VEEDER:  I will make it two questions, your Honor.

22      THE COURT:  All right, separate them.

23      MR. VEEDER:  Now, this is yes or no.  Time is short.

24      Q  Do you have an opinion whether Santa Margarita River

25  water--

12809

1      MR. SACHSE:  I object to the words Santa Margarita.

2 It doesn't prove anything.  Let's state it right, if you are

3 going to state it.  That is an ambiguous statement-- Santa

4 Margarita River water.

5      THE COURT:  Domenigoni Valley.

6      MR. VEEDER:  Well, now, your Honor--

7      THE COURT:  Limit it to something in the area that we

8 are talking about.  "Santa Margarita River water" covers a

9 lot of ground.

10     MR. VEEDER:  Is there any question but that Domenigoni

11 Valley is part of the Santa Margarita River watershed?

12     MR. SACHSE:  That's the whole issue.

13     THE COURT:  You can ask the same question as to Domenigoni

14 Valley.  That is the way you have been asking it.  Break it

15 into two parts.

16     MR. VEEDER:  All right, your Honor.

17     Q  Have you an opinion as to whether water is flowing

18 out of Domenigoni Valley--

19     THE COURT:  Underground.

20 BY MR. VEEDER:

21     Q  --ground water is flowing out of Domenigoni Valley

22 into Menifee Valley?  Do you have an opinion?

23     A  Yes.

24     Q  What is your opinion?

25     A  My opinion is that if there is any escape from the

1    water of Domenigoni Valley they are to Menifee.

2         THE COURT:  You told us that before.  If they flow out,

3    they flow that way.  But the question now is, do you have an

4    opinion as to whether there is actually a flow underground

5    from Domenigoni Valley to Menifee Valley?

6         THE WITNESS:  No, sir, I have no opinion as to quantity.

7         THE COURT:  Do you have an opinion as to any under-

8    ground water that leaves Domenigoni Valley and goes into

9    Menifee Valley?

10        THE WITNESS:  No, sir.

11   BY MR. VEEDER:

12        Q  You don't have an opinion?

13        A  No, sir.

14        MR. VEEDER:  I move to strike it again, your Honor.

15        THE COURT:  Denied.

16        MR. VEEDER:  Let me be specific.  I move to strike the

17   Exhibit C, the Exhibit J, showing the conductivity et cetera,

18   and the Exhibit B, all of the statements made by this witness

19   and all related exhibits that have been introduced in connec-

20   tion with the alleged phenomenon of water leaving the Domenigoni

21   Valley and going into Menifee Valley.

22        MR. GIRARD:  Does that include Exhibit 15 also, Mr.

23   Veeder?

24        MR. VEEDER:  That is the only statement this gentleman

25   from California has made in three months.

1   THE COURT:  But it is a very pertinent one, and

2   obviously your motion is too broad, even limited to exhibits

3   other than 15.  You are too good a lawyer to know there is

4   any merit in it.  It's overruled.

5   BY MR. VEEDER:

6       Q  Now, have you an opinion as to whether pumping in

7   Menifee Valley causes water to leave Domenigoni Valley and

8   to enter Menifee Valley?

9       A  Mr. Veeder, we have--

10   MR. VEEDER:  Would you tell him to answer the question?

11   MR. SACHSE:  Answer it yes or no, if you have an opinion.

12   THE WITNESS:  I have no opinion.

13   THE COURT:  All right, that ends that.

14   MR. VEEDER:  Your Honor, I renew my motion to strike

15   on the basis on which it was originally made in regard to the

16   first question.

17   THE COURT:  Denied.

18   Again I repeat, he wouldn't have to give any opinion.

19   He could present to this Court charts, he could present to

20   this Court the water chemical analysis, he could present to

21   this Court the geology of the area, and he would not have to

22   give any opinion.  He could say, "I don't have an opinion."

23   That wouldn't mean that we would strike the material.

24   MR. VEEDER:  Your Honor, if I may respectfully bring

25   to your Honor's attention that every single exhibit that is

1    placed on here is opinion testimony-- all of it.

2         MR. SACHSE:   Those are well measurements.   They have

3    been admitted in evidence as a depiction.

4         MR. VEEDER:   Just a minute.   I would like to make this

5    clear.   I believe there are California cases that indicate

6    that when an exhibit is prepared drawing lines to connect up

7    wells or to make contours or to do as he has done here,

8    speculated entirely irrelevantly, those are opinions, the

9    whole thing, and I want that clear.

10        THE COURT:   Some opinions, some factual matters.   It's

11   a mixture.   It has nothing to do with the objection you made.

12        MR. VEEDER:   Your Honor, I offer in evidence Searl's

13   Exhibit C-1.

14        MR. SACHSE:   I have no objection.

15        THE COURT:   Received in evidence.   Without abandoning

16   your objection, of course.

17        MR. VEEDER:   Oh, no, the motion to strike, your Honor.

18        THE COURT:   Without abandoning your motion to strike,

19   C-1 may go into evidence.

20        Are you through with this witness?

21        MR. SACHSE:   I have just one question, your Honor.

22        (Defendant Searl Brothers Exhibit C-1 for Identifica-

23   tion was received in evidence.)

24

25

REDIRECT EXAMINATION

BY MR. SACHSE:

Q   Mr. Rowe, is the gentleman Connell referred to in that State tabulation covering well J-1 still the owner of the property?

MR. VEEDER:   How would he know?   That is a legal conclusion.   I object to it.

BY MR. SACHSE:

Q   If you know.

A   He still lives on the property.   He is not the owner of the property.

Q   He lives on it?

A   He lives on it, yes.

Q   Did you discuss that express California well measurement with Mr. Connell?

A   Yes, I have on two different occasions discussed--

MR. VEEDER:   I object--

THE COURT:   Overruled.

MR. SACHSE:   Mr. Veeder introduced the hearsay, your Honor

THE WITNESS:   I have discussed the water levels in his wells.

MR. VEEDER:   I object to this purest hearsay, your Honor.

THE COURT:   Overruled.

THE WITNESS:   Since they were drilled in 1953.   He has

1    stated to me that the level has never been 22 feet, to his

2    knowledge; that it has been closer to 42 feet.  On one occa-

3    sion I had Mr. Mann with me as a witness when I asked the very

4    question again a second time.

5        MR. SACHSE:  I have no further questions.

6        THE COURT:  If you want Mr. Connell brought in, the

7    Court will issue a subpoena for him.

8        MR. SACHSE:  He is a party, your Honor.  We can call him

9    for an admission against interest.

10       MR. VEEDER:  I think this man has destroyed his testimony

11   anyway.

12       THE COURT:  Anything further?

13       MR. STAHLMAN:  I have one question, your Honor.

14

15                     CROSS-EXAMINATION

16   BY MR. STAHLMAN:

17       Q  In connection with this well, you testified yesterday

18   regarding the drawdown and that the motor was shut down and

19   the production was less than it had formerly been.  Do you

20   recall which well I am talking about?

21       A  Yes, I do.

22       Q  What well was that?

23       A  That was Well 6 South, 2 West, 16D2.

24       Q  Can you explain, either by illustration or drawing

25   on the blackboard what in your opinion the phenomenon is that

1   causes that?

2          A.  I think first Searl Q has reference to the very well

3   you are talking about, and it shows by converting quantity--

4          THE COURT:  You have my copy.

5          THE WITNESS:  I am sorry

6          THE COURT:  Do you have another copy?

7          THE WITNESS:  Yes, I do.

8          THE COURT:  Which one is it?

9          THE WITNESS:  It is 16D2, your Honor.  It is down near

10  the bottom of the exhibit.

11         We have shown in the column called "Quantity Gallons

12  Per Minute, 20.3," we have shown opposite that the drawdown

13  in feet or 13.3, with a footnote A.  The ratio of the quantity

14  pumped to the drawdown in the well-- this is pure relation-

15  ship-- is shown in the fourth column and is the specific

16  capacity of the well.  In other words, for every one and a

17  half gallons pumped the drawdown was 1.5 feet.  That is based

18  on a static level as of January 3, 1959.  Now the well had

19  been pumping, from information I have received from Mr.

20  Domenigoni, almost continuously, except for oil and servicing

21  it, from prior to April 3 to after December 12, 1959.  After

22  December 12, 1959, about a week or so, the well was shut off.

23  The first opportunity I had to make a static level on the well

24  again was on March 25, 1960.  The static level then had

25  dropped around three and a half feet during the time that this

pump was being operated.  Now this decrease in the specific capacity is due partly to the lowering of the static water table and partly because the cone of depletion had reached out during all those four months it had pumped, thereby not permitting as free a flow of water to the well as was experienced during the early stages of the pumping.

MR. STAHLMAN:  That is all I have.

MR. SACHSE:  I have nothing further.

THE COURT:  Anything further?

MR. VEEDER: No.

THE COURT:  All right, Mr. Rowe.

All right, adjourn until a quarter of 2.

(Noon recess.)

San Diego, California, Thursday, March 31, 1960.   1:45 P.M.

THE COURT:   Proceed.

MR. SACHSE:   I will call Dr. Mann.

THE CLERK:   Dr. Mann was previously sworn on March 23rd, your Honor.


JOHN F. MANN,

recalled as a witness for Defendant Searl Brothers, having been previously duly sworn, testified further as follows:


DIRECT EXAMINATION

BY MR. SACHSE:

Q   You are the same Dr. Mann who testified previously in this cause in connection with the lands of Gibbon and Cottle in Radec Valley?

A   Yes, I am.

MR. SACHSE:   Your Honor, before we proceed I would like to offer in evidence-- Mr. Veeder tells me he has no objection-- for future use as we need it, a larger scale aerial photograph which represents the same general area, in part at least as is on 78Q5.

THE COURT:   What would be the number on it?

MR. SACHSE:   It will be Searl next in order.

THE CLERK:   R.

1          (Defendant Searl Brothers Exhibit R was marked for

2      Identification.)

3          MR. VEEDER:  In the general area.  It is not exact.

4          MR. SACHSE:  It has much the same area on it, but not

5      all of it.

6          THE COURT:  Before we go any further, I have been

7      thinking about this ditch running out of the watershed.  It

8      doesn't disturb me.  I think I can demonstrate how water can

9      run out of a watershed into another watershed.

10         Take this cardboard I hold in my hand and assume the

11     corners are numbered A, B, C and D.  Draw a ditch from D over

12     to the center, which I have called A prime.  If the cardboard

13     is held at that angle, natural water flow of rain would flow

14     from the watershed line AB across to CD.  But a ditch drawn

15     from D to A prime could actually run that water back into

16     the other watershed.

17         Is there any doubt about that?

18         MR. VEEDER:  Is that an order?

19         THE COURT:  No, but is there any doubt about it?

20         MR. VEEDER:  I would want to consider it.

21         THE COURT:  Let's try it out.

22         In other words, a ditch angling across toward the low

23     place on the watershed could artificially actually carry

24     water back into the Santa Margarita watershed where the natural

25     flow would be the other way.

12819

MR. SACHSE:  Depending on the angle and direction of the ditch.

THE COURT:  Depending on the angle and direction of the ditch and where it would cross the watershed line.  I think you can try it out on a plane surface.  You will see exactly what I mean.

MR. SACHSE:  In fact, if you had an absolutely level ditch going around the contour which divided the watershed--

THE COURT:  If you had an absolutely level ditch and a very small drop, of course the depth of this ditch might run it through.  But let's assume a plane surface, as I hold this in my hand, the line AB is higher than CD.  The natural rainfall would run to the right.  But if you had a ditch across there it would run the other direction.

MR. VEEDER:  Depending on the gradient, contour, et cetera.

THE COURT:  It would depend on a lot of factors.  But the point is that it is entirely possible to have water run artificially by gravity from one watershed to another.

So much for that.

BY MR. SACHSE:

Q   Dr. Mann, have you at my request made a study as a geologist of the direction of ground water movement in lower Domenigoni Valley?

A   Yes, I have.

Q   What field investigations have you made in connection with that study?

A   I visited the area on May 13, 1959 and again on March 25, 1960.

Q   And as a result of your field investigations and your other work, have you formed an opinion as to the direction of ground water movement in the lower Domenigoni Valley?

A   Yes.

Q   What is your opinion?

A   My opinion is--

MR. VEEDER:  Just a moment.

MR. SACHSE:  Just a minute.  Mr. Veeder wants to object.

MR. VEEDER:  At this juncture, your Honor, I certainly don't believe there is any proper foundation for it.

MR. SACHSE:  Do you want me to review all of his qualifications again, Mr. Veeder?

MR. VEEDER:  I am not worried about his qualifications.

THE COURT:  He made a study of this watershed years ago. He has gone back to a particular part of it and looked it over again.  It would seem to me that it is largely a matter of cross-examination.

MR. VEEDER:  That is what I was afraid of.  I would like to have a little more foundation.  We have gone into his qualifications and your Honor said they are O.K.

MR. SACHSE:  I intend to ask a lot more questions about

12821

1   how he arrived at this.  This is just a case of flipping the

2   cart before the horse, if you want to put it that way.

3        MR. VEEDER:  Whenever I see the cart before the horse

4   I am worried.

5        THE COURT:  Let's have the opinion and the reasons for

6   it.

7   BY MR. SACHSE:

8        Q   What is your opinion?

9        A   In my opinion, essentially all of the underflow from

10  Domenigoni Valley flows westerly into Menifee Valley.  Only

11  a very small amount of ground water moves southerly into the

12  Santa Margarita system.

13       Q   Will you please review for the Court the geologic

14  evidence that influenced that opinion that you have relied

15  upon?

16       A   The geologic evidence is based upon the following:

17  In my opinion, the materials from which the production in

18  the topographically low end of Domenigoni Valley produced water

19  are coarse sands and gravels, as indicated on the available

20  well logs.  The production of these wells and the specific

21  capacity of these wells are high.  In my opinion these high

22  specific capacities indicate materials of fairly high

23  permeability.  I have plotted the elevations of the base of

24  the sands and gravels that appear on the wells for which logs

25  are available in lower Domenigoni Valley and find that the

12822

1    elevations range from 1315 to 1366 feet above sea level.

2    From field examinations and from available well logs, it is

3    my opinion that there is a bedrock lip near the south line of

4    Section 9.

5       Q   Would you point that general area out?  Is that the

6    area, referring to Exhibit Searl B, in which we see the wells

7    marked C-1, C-2, D-1, et cetera?

8       A   A short distance north of wells 16C1 and C2.

9       Q   Go ahead.  You say in your opinion there is a granite

10   lip?

11      A   A bedrock lip at that position.

12      THE COURT:  Does it run in an easterly or westerly

13   direction?

14      THE WITNESS:  Your Honor, it stays near the south line

15   of Section 9 and extends for at least half a mile to the

16   south.  I have not traced this any further south than that.

17      THE COURT:  It runs to the south?

18      THE WITNESS:  Yes, sir, to the south.

19   BY MR. SACHSE:

20      Q   Still referring to Searl B, I see an area enclosed

21   in an irregular dotted line right at the common corner of

22   Sections 8, 9, 17 and 16.  Do you see the one to which I

23   refer?

24      A   Yes.

25      Q   That is a high spot.  Where does the lip run with

1    relation to that?

2         A  That is an outcrop of basement.  The lip itself forms

3    an east-west barrier to the movement of water.

4         Q  And that spot at the corner sections of 18, 19, 17

5    and 16 to which you have just referred is what?

6         A  It is an outcrop of basement rock.

7         THE COURT:  Does that lip that you indicate there run

8    down somewhere near the section line between 16 and 17, or

9    further east of it?

10        THE WITNESS:  I don't believe I am making myself as

11   clear as I might here, your Honor.  This lip is an east-west

12   lip which water must clear if it is to move to the south.

13        THE COURT:  I thought you said it ran to the south.

14        THE WITNESS:  I traced the granitic materials to the

15   south.

16   BY MR. SACHSE:

17        Q  The southerly extent, how far south it goes, that's

18   the point.

19        A  I have not traced that far.

20        THE COURT:  Could you take a pencil and draw on that

21   map about where you think it is?

22        THE WITNESS:  Yes, sir.

23        MR. SACHSE:  That is the next question I wanted to ask.

24        THE COURT:  Pardon me if I represent your client.

25        MR. SACHSE:  That's all right.  We are very happy, your

1  Honor.

2       THE COURT:  Here is a red grease pencil.

3       THE WITNESS:  If water is to move from Domenigoni Valley

4  southward, it must rise above the outcrop of granitic materials

5  which I am marking on Exhibit B, an east-west line approximately

6  one-quarter of a mile north of the south lines of Sections 8

7  and 9.

8       THE COURT:  I see you have to draw the line from the

9  toe of the hill on the right to the toe of the hill on the left.

10       THE WITNESS:  Yes.

11       THE COURT:  Not quite to it.  Does it go all the way?

12  BY MR. SACHSE:

13       Q   Would you write your name or initials above that

14  with the black pencil, please?

15       A   The important thing here is that if the water is to

16  rise from the gravels which occur in the lower portion of

17  Domenigoni Valley, it must rise above the bedrock lip which,

18  from well logs and my personal observations, I would estimate

19  at an elevation of 1400 feet.

20       THE COURT:  To bedrock?

21       THE WITNESS:  To bedrock in this position.

22  BY MR. SACHSE:

23       Q   Will you please refer back to your testimony a moment

24  ago where you testified to the base of the water-bearing

25  aquifers in lower Domenigoni Valley in elevation above sea

1    level?

2         A.  The base of the water-bearing aquifers in lower

3    Domenigoni Valley, from well logs available, north of the lip

4    ranges from elevation 1315 to 1366.

5         Q  And would have to rise again to what elevation?

6         A  We would have a minimum of 34 by this calculation

7    that the water in the base of the gravels would have to

8    rise to get over this lip.

9         Q  While you are still standing there, Doctor, referring

10   to the area marked "Toe of slope" to the west of the red line

11   you drew, what material do you find that to be?

12        A  That is basement rock.

13        Q  And the outcrop shown in the center of the sections

14   immediately below your red line, what do you find that to be?

15        A  It is basement rock.

16        Q  And the area at the easterly end of the line you

17   have just drawn is what material?

18        A  It is basement rock.

19        Q  You may resume your seat.

20        Have you an opinion geologically as to how this valley

21   was formed in geologic times past?

22        A  Yes.  In my opinion, we have a simple system here

23   of Recent alluvium being backfilled in an old erosional valley

24   cut into basement rock.  The high permeability of these

25   materials indicates to me that they must have been deposited

1    by a through-flowing stream; a stream which had substantial

2    velocity and co ld not have stopped anywhere in this vicinity

3    but must have continued out of the area of lower Domenigoni

4    Valley.

5        MR. VEEDER:  I fell off the sled.  Are you speaking about

6    the stream going down to Warm Springs Creek?

7        THE WITNESS:  If we may imagine, Mr. Veeder, Domenigoni

8    Valley with all of the Recent alluvium removed-- we will

9    start with this condition-- the stream flowing and depositing

10   these basal gravels in Domenigoni Valley could not have

11   flowed southerly to the Santa Margarita system because it

12   would have had to rise above what was then a topographic

13   divide of bedrock.  There is only one direction that these

14   alluvial gravels could have continued, and that is westerly

15   into Menifee Valley.

16   BY MR. SACHSE:

17       Q    May I again make sure that I understand you.  It is

18   your opinion that geologically, directing your attention to

19   Searl B, a rapidly flowing stream moved generally from east

20   to west through Diamond and Domenigoni Valleys could not

21   climb the topographic or go through the topographic barrier

22   of the basement complex you have just described and there-

23   fore was compelled to proceed in a westerly direction out

24   through Menifee Valley; is that correct?

25       A    That is correct.

THE COURT:  Of course, that opinion presupposes that there has been no earth movement that raised this basement lip up to 1400 feet?

THE WITNESS:  Yes.

MR. SACHSE:  Would you answer his Honor's question?

THE WITNESS:  Yes.

THE COURT:  Or that the area where the gravel was deposited  has not dropped through earth movement?

THE WITNESS:  Yes, sir.

BY MR. SACHSE:

Q  Can you tell us what evidence, if any, you find by your own studies or by reference to other studies of slippages or earth movements?

A  There is no evidence that I was able to detect of faulting which has affected the Recent alluvium, and this goes not only here but for much of the surrounding area.

Q  In other words, you have found no evidence--

A  No evidence of fault.

Q  Of the type suggested by his Honor that would contradict your basic assumption?

A  And in my opinion, in the recency of the time with which we are dealing here, there would have not been sufficient offset by faulting or sufficient tilting to have changed this through-flowing stream from its westerly movement into Menifee Valley.

1      Q  Now, you have described the material at the lip as

2  granitic.  Have you made any examination of surface outcrops

3  on the Menifee Valley side near the topographic divide, near

4  the watershed divide?

5      A  Yes, I have.

6      Q  If it would help, incidentally, anywhere here to use

7  an aerial, please ask for it.

8      A  I can tell you what I did.

9      Q  All right.

10      A  I have examined the area of the topographic divide,

11  especially including this 8J well right on the divide, which

12  was drilled in 1951 using a rotarh bucket.  I have examined the

13  materials which were the debris from this bucket hole.  In

14  these materials are water-worn cobbles of various rock types.

15  I cannot say from what depth within the hole these came, but

16  they indicated that alluvial materials occur under the hill

17  on which 8J has been drilled.

18      Q  Well 8J is on a rise itself, isn't it?

19      A  It is on a small rise along the topographic divide.

20  I have examined also the hill upon which the old homestead in

21  the Northeast Quarter of Section 8 and I found there of water-

22  worn materials of different rock types.  I was able to trace

23  these water-worn materials almost to the rock outcrops-- I

24  have to put a line.

25      THE COURT:  Yes, put some lines in there to show us,

1  first, the watershed line as near as you can.

2      THE WITNESS:  Yes, sir.  The watershed line would be

3  approximately at this position.

4      MR. VEEDER:  May I ask that he extend it the full length.

5      THE WITNESS:  I would have to transfer that, Mr. Veeder,

6  from--

7      MR. VEEDER:  This is just an approximation, is it not,

8  your Honor?

9      THE COURT:  If he is going to show it, let him do it

10  at a recess.

11      THE WITNESS:  This gets to be a matter in this flat area

12  of just topographic elevation.

13      THE COURT:  It looks like you have drawn it right through

14  the corner section there.

15      THE WITNESS:  Very close, yes, in that position.

16      THE COURT:  What are these areas, 40's or 160's?

17      THE WITNESS:  They would be 160's.

18      MR. VEEDER:  It is a mile, isn't it, across there where

19  you see the white line?

20      THE COURT:  Would this line up here by the section line--

21  Yes, here is the toe of the basement complex, section line

22  between 4 and 5 and 8 and 9, would it not?

23      THE WITNESS:  Yes.  This is the east quarter corner of

24  Section 8.  I examined materials approximately to this position

25  and found water-worn materials.

MR. SACHSE:  The Doctor has drawn a red line indicating how far south he went and examined materials.

THE COURT:  Label the line you have just drawn as B, and the line you first drew as A, A being the watershed line and B being the line how far south you went examining materials.

THE WITNESS: Yes.

MR. SACHSE:  May I suggest that the Doctor put a little circle around the two hills he referred to, one at the well J-1 and one at the homestead, the upper of the two being well J-1 and the lower the homestead.

Is that right?

THE WITNESS:  That is correct.  I did not actually traverse on the ground to the rock outcrops.  I could see them from this hill and I could draw in here from the aerial photograph the position of the edge of what I would consider to be alluvial materials approximately in here.

THE COURT:  That is line C?

THE WITNESS:  C.

BY MR. SACHSE:

Q  So that we can understand each other, when you described a moment ago this swift-flowing stream which, in your opinion, reached the barrier lip and turned westerly, did that stream, in your opinion, proceed westerly between the lines drawn on the photos B and C?

A  Yes, it did, between those two.

12831

1    Q   Now, Doctor, I would like particularly to invite your

2    attention to the profile Searl C.  You were present this

3    morning and heard the cross-examination of Mr. Rowe concerning

4    the fact that a higher water table exists at Well 6 South, 2

5    West, 10E1?

6    A   Yes.

7    Q   You personally were aware of the fact that that is

8    a higher water table than the surrounding wells, were you not?

9    A   Yes, I measured this in the company of Mr. Rowe on

10   March 25th.

11   Q   Have you an explanation?

12   A   Yes, I do.

13   Q   --of the fact that the water table in 10E1 is sub-

14   stantially higher than the table in the surrounding wells?

15   A   Yes, I do.

16   Q   Will you give us that explanation?

17   A   If I may use the board, your Honor.

18   MR. SACHSE:  Yes.

19   THE COURT:  What is this directed to?

20   MR. SACHSE:  This is the water mound that Mr. Veeder

21   was questioning about, your Honor.

22   MR. VEEDER:  May I inquire before he starts, is this

23   C-1?  Is that what he is going to talk about?

24   MR. SACHSE:  He is going to talk about the physical

25   condition.  I will ask him to look at C.  It is the same well

number.

THE COURT:  Where is C-1?  It is not on the board.

MR. SACHSE:  I didn't take it off.

THE COURT:  This water mound was put on in red.

MR. VEEDER:  This is the point that he drew.

MR. SACHSE:  He drew it on the upper one.  Here it is.

MR. VEEDER:  This is the one he is going to testify about.

MR. SACHSE:  Yes.

THE COURT:  He is going to talk about this water mound?

MR. SACHSE:  Yes.

THE WITNESS:  (At the blackboard.)  In my opinion, this high water table in well 10E1 is the result of perching, a well-known ground water phenomenon.  If this represents the ground surface, there is a shallow water table and a saturated zone resting upon relatively tight materials.  The zone of saturation in this position.  Below this is another water table, the main water table, somewhere in here.

BY MR. SACHSE:

Q   And below that what?

A   Saturation.

Q   Below the main water table?

A   Basement at the very bottom.

Now, in my opinion, the well 10E1, which is only 19 feet deep, has a high water table because it penetrates only the perched zone.

Q   Is a synonym for "perched" water a suspended water plane?   Is that the same?

A   It would be essentially the same.

Q   Have you any physical evidence that you have obtained from well logs or other sources that substantiated this conclusion?

A   Yes.   I have examined the soils in the southern portion of Section 9 and I find that they consist primarily of clays and silts.   The soils themselves are relatively tight. I have examined the well logs in the lower part of Domenigoni Valley and find that there is a zone which will vary from well to well but which occurs down to a depth of approximately 30 feet, which is designated on the well logs as sandy clay. This in my opinion is a relatively tight material which suspended the water close to the surface and produced the perched water table.

Q   Just for further clarification, when you use the words "suspends the water close to the surface," you don't mean that there is no movement between those waters?

A   No.   There will be opportunity in places for this water to move down to the main water table.

Q   But the fact that the zone you have marked "tight" is substantially less permeable than either the zone above it or below it?

A   Yes.

12834

Q   What is the source of recharge of such perched water?

A   It would be primarily water which is applied on the surface.  In many areas that I have investigated and found perched water it has been the result of irrigation return.

Q   Does this fact that irrigation return is a source of recharge have any effect on the quality of perched water?

A   Yes, it does.  Perched waters typically in arid or semi-arid climates are of poor quality.

Q   Let's go back to the map immediately beneath the aerial photo, Searl Exhibit B, on which you indicated by a red line your opinion as to the location of the barrier of granitic lip.  Have you had an opportunity to examine the materials in that area, both surface and beneath the surface?

A   Yes, I have.

Q   Tell us how you did it.

A   I examined the materials north of the lip on the surface.  As I mentioned previously, these materials are soils consisting almost entirely of clay and silt, almost no sand, and this I interpret to mean a temporary dam of the surface flows in this vicinity in the not-too-distant geologic past.  This would be one of the latest events in this region, the deposition near this bedrock lip of materials which I attribute to quiet water deposition.  Perhaps the sort of situation which occurred in Temecula Gorge in 1916 where the water was temporarily dammed.

Q  Now, moving on southwest across the lip, have you had opportunity to examine the type of material that you find in the area immediately below the lip or immediately southwest of the lip?

A  Fortunately, surrounding Well 16C1 is a pit 14 feet deep.  I examined the materials in this pit and made notes on the distance of capillary rise, which I found to be five to six feet.  There was at this time on March 25, 1960, water standing in the bottom of this pit.

Q  In geologic terms, what do you call the material you found in the vicinity of this pit or in this pit?

A  This material is sandy clay and I believe it is a well-weathered residuum from the basement rock.

Q  By any stretch would you call it alluvium?

A  No, sir.

Q  Are you familiar with the geologic study made by Mr. Waring in the Department of Interior, U.S.G.S., 1919 ground water paper?

A  Yes, I am.

Q  Searl K is a plate taken from that publication. Would you locate for the Court the general area about which you are talking now, with the well C-1, D-1, et cetera?

A  This would be Section 9, and I agree with this interpretation showing the alluvium continuing to the west into Menifee Valley, but not continuing into the Santa

1  Margarita.

2      THE COURT:  This, you say, would be 9.

3      Is there any harm putting a red pencil on that?

4      MR. SACHSE:  A red pencil is pretty coarse.  Why not use

5  a small black one?

6      MR. GIRARD:  Isn't that the one you want to retain in-

7  tact?

8      MR. SACHSE:  That is why I say I would rather use a

9  black pencil.

10     THE COURT:  Let's identify this without marking it, then.

11     It is immediately left of the circles showing water

12  levels--

13     THE WITNESS:  Depth to water.

14     THE COURT:  --depth to water, 1080.  How can we identify

15  this?

16     MR. SACHSE:  I would say it is immediately above the

17  letter "o" in the word Domenigoni in Domenigoni Valley.

18     THE COURT:  That will do it.

19  BY MR. SACHSE:

20     Q  You say you agree with this study.  Do you also agree

21  with the location of the pinkish material as shown on Exhibit

22  K?

23     A  Yes, I do.

24     THE COURT:  The pinkish material is--

25     MR. SACHSE:  Igneous and metamorphic rocks not water

1    bearing.

2        THE WITNESS:  Basement rock.

3    BY MR. SACHSE:

4        Q   In your terminology you would group that in basement

5    complex?

6        A   Basement complex, yes.

7        Q   May I invite your attention, Doctor, to California's

8    Exhibit L, Plate 13-B in this proceeding.  This is a plate

9    taken from Department of Water Resources Bulletin No. 57

10   covering the geology of the inland area of the Santa Margarita

11   River.  Are you familiar with that plate?

12       A   Yes, I am.

13       Q   Will you please indicate to the Court the general

14   area of the Domenigoni Valley on that plate?

15       THE COURT:  The witness has put a section 9 in the

16   younger alluvium at the southwesterly end of it.

17   BY MR. SACHSE:

18       Q   Do you agree with the delineation of the younger

19   alluvium as shown on Exhibit California's L, Plate 13-B?

20       A   Yes, I do.  And I might add here also that I believe

21   the interpretation given on Plate 13-B is somewhat more

22   correct than in the Plate 3 of Water Supply Paper 429.

23       THE COURT:  Which is K.

24       THE WITNESS:  Because they designate this as an area of

25   residuum.

1    MR. SACHSE:  Which is in accord with your specific

2    finding, whereas K calls it just basement complex.

3    THE WITNESS:  Just basement rock.

4    THE COURT:  When you say "this" you mean the area

5    immediately to the south of the younger alluvium?

6    THE WITNESS:  Immediately to the south through which the

7    present surface drainage runs to Domenigoni Valley.

8    MR. SACHSE:  Your Honor, instead of marking the whole

9    book I am going to offer this plate.

10    Mr. Veeder, do you want to look at it?  This is from

11    Bulletin 15, Santa Margarita River Investigation, dated April,

12    1959, Department of Water Resources, and covers this same area—

13    in other words, it covers the area outside the San Jacinto

14    watershed topographically.  Here you can observe Domenigoni

15    Valley, Diamond Valley, the watershed line.  This is a public

16    document.  I would be willing to tear it out.  This is an

17    extra copy.  But can we tear it out and get it marked, Mr.

18    Veeder?

19    THE CLERK:  Searl S, your Honor.

20    THE COURT:  Searl S.

21    MR. VEEDER:  Before you hand it to the witness may I

22    take a look at it?

23    MR. SACHSE:  Yes.  If you want one to work with, without

24    taking it out, you may use this.

25    MR. VEEDER:  Yes, I would like one of my own.  I want to

12839

1   orient myself.

2        This is the watershed line, may I inquire, of the Santa

3   Margarita Valley?

4        MR. SACHSE:  This is the upper part of the San Jacinto.

5   This would be the Santa Margarita.

6        MR. VEEDER:  And the force of the surface runoff is down

7   this way?

8        MR. SACHSE:  Yes.

9        MR. VEEDER: May I inquire, is this just cumulative, Mr.

10  Sachse?

11       MR. SACHSE:  It is not exactly cumulative.  They are

12  not exactly the same.

13       MR. VEEDER:  I was hoping to keep this lawsuit within

14  the Santa Margarita River Valley.  But go ahead.  I have no

15  objection.

16       THE COURT:  You don't want to bring in six thousand more

17  defendants, do you?

18       MR. VEEDER:  No, I don't.  But I may have to ask your

19  Honor for an order.

20  BY MR. SACHSE:

21       Q   I hand you an exhibit marked Searl S for Identifica-

22  tion, being entitled "State of California, Department of Water

23  Resources Plate, the Santa Ana investigation, San Jacinto-

24  Elsinore area, aerial geology."  Will you first for the

25  Court, please, locate on that exhibit the boundary between

12840

the San Jacinto and the Santa Margarita watershed topographic-
ally?

A  It is indicated on this plate by a heavy black
dashed line.

Q  The area to the south being in the topographic Santa
Margarita River watershed?

A  That is correct.

Q  Will you please indicate to the Court the area of
Domenigoni Valley on that plate?

A  The area of the Domenigoni Valley is shown as an
east-west strip of QAL (Quarternary Alluvium) south of the
topographic divide.

Q  How far south does this exhibit carry this younger
alluvium of Domenigoni Valley?  I don't mean in distance, but
how does it terminate it?

A  It carries it to the same position approximately as
appears in Plate 3 of Water Supply Paper 429.

Q  That is Searl K?

A  Plate 13-B of Bulletin 57.

THE COURT:  Which is California Exhibit L.

THE WITNESS:  Yes.

BY MR. SACHSE:

Q  And what type of material does this exhibit show to
comprise that boundary?

A  It shows a type of rock part of the basement complex.

1    Q   Do you agree again generally with the delineation

2    of the younger alluvium as shown on Searl S?

3    A   Yes, I do.

4    Q   And do you agree that there exists a barrier in

5    approximately the area shown on Searl S as BCT?

6    A   Yes, I do.

7    MR. SACHSE:   I offer in evidence Searl S.

8    THE COURT:   Searl S received in evidence.

9    How about R?

10    MR. SACHSE:   Yes, may we offer the blown-up photograph

11    R?

12    THE COURT:   R received in evidence also.

13    (Defendant Searl Brothers Exhibits S and R were received

14    in evidence.)

15    BY MR. SACHSE:

16    Q   Now, Dr. Mann, will you examine Exhibit 15-- and

17    we have an overlay here to locate our sections-- and will

18    you tell me whether or not you agree with the delineation on

19    Exhibit 15 of younger alluvium in Section 19?

20    A   I have not examined Section 19.

21    Q   How about the younger alluvium shown in Sections 17

22    and 18?

23    A   In 18 I have not examined.  I have examined Sections

24    17 and 16.

25    Q   In fact, Sections 16 and 17 are the two sections you

1    referred to when you were speaking of being fortunate enough

2    to find a pit where you could see the material; is that

3    correct?

4         A    That is correct.

5         Q    You testified, I believe, that in your judgment that

6    was residuum?

7         A    That is correct.

8         Q    Is it, in your judgment, younger alluvium in that

9    area?

10        A    It is not younger alluvium.

11        THE COURT:   By "that area" you mean Sections 16 and 17?

12        THE WITNESS:   16 and 17.

13   BY MR. SACHSE:

14        Q    However, the outcrops in 17, what in your judgment

15   are those outcrops?

16        A    They are basement rocks.

17        Q    Now, Dr. Mann, you testified a moment ago that in

18   your judgment some water-- I believe your exact language was

19   that only a very minor quantity going southwest from Domenigoni

20   Valley to the Santa Margarita River watershed; is that cor-

21   rect?

22        A    That is correct.

23        Q    Have you attempted to calculate the quantity of water

24   movement through the residual materials southwest into the

25   Santa Margarita watershed?

A  Yes, I have.

Q  First, will you tell us, by reference to whichever exhibit best suits your purpose, where you made this calculation?

A  Referring to Exhibit Searl B, I made this underflow calculation in the vicinity of Well 16D1 where the horizontal distance between the basement outcrop becomes a minimum.

Q  You say becomes a minimum.  Did you calculate the horizontal distance between the basement outcrops at that spot?

A  I paced the horizontal distance.

Q  What did you find it to be?

A  270 feet.

Q  Will you please describe, step by step, how you made this calculation?

A  I think if I may use the blackboard again.

Q  Surely.

A  This is what is known as the "slope-area method".

MR. SACHSE:  Do you want this first water picture on here any more?

THE COURT:  No.

MR. SACHSE:  I will take it off.

THE WITNESS:  There is not much flow, Mr. Sachse.  I will not need much space.

Utilizing the formula Q equals PIA where Q is the flow

in gallons per day, P is the permeability coefficient in
gallons per day per square foot, I is the slope in feet per
foot, and A is the saturated cross-sectional area in square
feet.  In determining a value for P, since it was not possible
to measure this directly, to make an estimate based on judg-
ment, and in my opinion these materials which I observed in
this pit are sandy clays and of low permeability, I have
utilized Searl Exhibit Q, which indicates the specific
capacity of Well 16D2.  This specific capacity is 1.6.  In
my judgment this indicates materials of low permeability.
I have examined the height of the capillary fringe in the pit
I previously mentioned which surrounds Well 16C1, which
was 14 feet deep.  I have also examined another pit near the
east-west center line of Section 17, this pit being 9 feet
deep.

THE COURT:  It has no number?

THE WITNESS:  No.  I spoke to Mr. Rowe about this.  This
is the first time he had found this in his studies.  So no
number appears on this exhibit.  It was just last Friday.

In each of these pits I found the capillary rise to be
five to six feet, which, in my opinion, is indicative of
low permeability.  From these lines of evidence I have assigned
to P the value of 100 gallons per day per square foot.  In
determining I, I have utilized static levels available for
Wells 16C2 and 16D2 which were upstream and downstream

1   respectively from Well 16D1, where I made this pace measure-

2   ment.  The slope turns out to be 7.6 feet in 1400 feet, or

3   0.00543.  The cross-sectional area saturated was based upon an

4   assumption from water level measurements and the available

5   log of Well 16D1, a saturated thickness of 18 feet, an

6   effective saturated width of 200 feet.  My calculations con-

7   verted to an annual basis how an underflow of 2.2 acre feet

8   per year through this residuum.

9   BY MR. SACHSE:

10      Q  In order that I clearly understand what the 2.2 means,

11   Dr. Mann, does that mean that at this particular point where

12   your calculation was made the calculation indicates that in

13   a year's time 2.2 acre feet would pass between the granitic

14   outcrops, the granitic rim that was 270 feet apart?

15      A  Underneath the present surfaces drainage, yes.

16      Q  2.2 acre feet in a year?

17      A  In a year.

18      THE COURT:  This is based upon the premise that the

19   basement lip was not there.  If the basement lip was there,

20   nothing would pass through it?

21      THE WITNESS:  It is based upon the premise, your Honor,

22   that the basement lip is there, but underneath this channel

23   of residuum.

24   BY MR. SACHSE:

25      Q  That there is how much?

1        A   28 feet to granite in Well 16D1.

2        Q   As you testified earlier, you located the basement

3   lip at 1400 feet?

4        A   Approximately 1400.

5        Q   Which is 28 feet below the ground surface of that

6   particular well?

7        A   That is correct.

8        MR. SACHSE:   Have we made ourselves clear, your Honor?

9        THE COURT:   28 feet below there.   Then down a little

10  further south where you took your measurement across it was

11  18 feet?

12       THE WITNESS:   No, your Honor, the 28-foot figure comes

13  from the position where I took the underflow measurement.

14  Of the 28 feet, only the bottom 18 feet is saturated.

15       THE COURT:   I see.

16  BY MR. SACHSE:

17       Q   Obviously, if you have made this calculation, you

18  assume there is some water in this 18 feet.   Where does that

19  water come from, in your judgment?

20       A   In my opinion, the water that escapes through this

21  residuum falling beneath the present surface drainage of the

22  Santa Margarita River is derived from the perched waters in

23  Domenigoni Valley.

24       Q   May I again make sure I understand you.   You feel

25  there is a water table perched at lower Domenigoni Valley and

1    more or less sealed off, although there is some movement, from

2    the main water table below it, and that that perched water

3    moves southwestward and constitutes the water which you find

4    in the residual materials at and beyond the granite lip?

5        A   That is correct.

6        THE COURT:  Now this check that you made there between

7    that piece of basement complex that stands out right at the

8    joinder of Sections 8 and 9 and 16 and 17 was made from there

9    in an easterly direction to the toe of the basement on the

10   other side?

11       THE WITNESS:  Yes, sir.

12       THE COURT: From the map it would look like the distance

13   across in the westerly direction was about the same or maybe a

14   little wider.

15       MR. VEEDER:  May I be sure?  We are talking about the

16   red line; is that right?

17       THE COURT:  We are talking about the area of the red

18   line.

19       MR. VEEDER:  And you are now speaking of the area lying

20   westward of the outcrop?

21       THE COURT:  That is right.

22       You made an examination on the east of the outcrop?

23       THE WITNESS:  Yes.

24       THE COURT:  Would you estimate that about the same

25   situation exists westerly from the outcrop to the basement

1  complex?

2      THE WITNESS:  No, your Honor, I don't believe that any

3  water moves through there.

4      THE COURT:  Why?

5      THE WITNESS:  Because the basement rock is too shallow

6  in this position, because there is-- I will have to check my

7  notes on this-- there is a windmill well at the toe of the dam

8  used by Francis Domenigoni for a duck pond and a short

9  distance downstream from this windmill well there is no

10  residuum, only basement rock, and I don't believe that any

11  underflow is getting by that point.

12      MR. STAHLMAN:  You mean on this side, that is in this

13  area between the outcrop and the toe?

14      THE WITNESS:  That would be in Well 17G1.

15  BY MR. SACHSE:

16      Q  When you say that you mean 17G1--

17      A  Is the windmill.

18      Q  Domenigoni's duck pond?

19      A  At the toe of the dam for Domenigoni's duck pond.

20      Q  At that point or a short distance southwest of it

21  there is not even residuum; there is just basement rock?

22      A  There is no residuum.

23      Q  In the light of your conclusion as to perched water

24  in the lower Domenigoni Valley, what is your opinion regarding

25  the recharging effect of surface runoff on the main body of

1  ground waters in that area?

2      MR. VEEDER:  There has been no foundation for that from

3  this witness, your Honor.  He hasn't made any comment

4  throughout this trial in regard to natural precipitation or

5  anything else in regard to the area.

6      MR. SACHSE:  Are you objecting?

7      MR. VEEDER:  Yes.

8      MR. SACHSE:  What is the objection?

9      MR. VEEDER:  That there is no foundation, as I said.

10     THE COURT:  Overruled.

11     MR. SACHSE:  Do I make my question clear, Doctor?

12     THE WITNESS:  Yes.  In my opinion, the presence of the

13 perched water table close to the surface of the ground and

14 the small amount of available ground water storage above

15 this point would indicate that the surface flows when they

16 pass the basin will not completely fill the available ground

17 water storage but only that underground storage which is

18 above the perched water table.

19     Q  By "above" you mean vertically above?

20     A  Vertically above.

21     Q  Between the ground surface--

22     A  Between ground surface and the perched water table.

23     MR. SACHSE:  You may cross-examine.

24

25

CROSS-EXAMINATION

BY MR. VEEDER:

Q   Doctor, you say that the perched water table is, in your opinion, created by irrigation; is that right?

A   Primarily irrigation return.

Q   Primarily return.  You mean it seeps into the ground?

A   The excess water beyond that which is used consumptively by the crop.

Q   And where does the water, in your opinion, come from that is pumped out of the ground and used to irrigate the surface?

THE COURT:   Pumped where?  Lower Domenigoni Valley?

MR. VEEDER:   Yes.  I am limiting myself to this area.

Q   I will be more exact.  Let's take the water from Well J-1.  Have you oriented yourself now?

A   9J1, yes.

Q   Do you think the water that is used there is from the perched water table or is it from greater depth?

A   It is from greater depth.

Q   Do you believe that the water that is pumped from 9K2 is from greater depth or from the perched water table?

A   From greater depth.

Q   And would you say that the pumping from the upper reaches of Diamond Valley and Domenigoni Valley, as shown on the Exhibit 15, came from the deeper--

1   MR. SACHSE:  Just a minute.  What is "Upper reaches,"

2   because I want it strictly understood that Dr. Mann has made

3   only the investigation I asked him to, as far as I know, and

4   I think this is beyond the scope of the direct examination.

5   I had him limit it to Domenigoni Valley.

6   MR. VEEDER:  I refer to where the Searl Brothers'

7   properties are.

8   MR. SACHSE:  I object.  It is not within the scope of

9   the direct examination.  I am sure that Dr. Mann will tell

10  you that I didn't have any investigation made.  Maybe he has

11  independent knowledge.

12  THE COURT:  It is beyond the scope of the direct exam-

13  ination, but if the Doctor has an opinion he may answer.

14  MR. VEEDER:  I withdraw the question.

15  THE COURT:  I ruled in your favor.  But go ahead.

16  MR. VEEDER:  I would just as soon have the man limit it.

17  These one-acre, one-section men I like.  If they don't go

18  beyond that, I don't worry much.

19  Q Where would be the source of the recharge for this

20  water pumped by J-1 and K-2?  Have you any idea?

21  A Yes.

22  Q  Well, what is it?

23  THE COURT:  You asked him about K-1.  Now you mean K-2?

24  MR. VEEDER:  That is right.

25  THE COURT:  In Section 9?

1     MR. VEEDER:  That is right.

2     THE WITNESS:  They are essentially the same, your Honor.

3     It would be derived from rainfall penetration within the

4     area.

5     Q   From where?

6     A   Upstream beyond this area where the perching effect is

7     so important.

8     Q   In other words, it would be surface runoff that would

9     recharge?

10    A   There would be some surface runoff further east in

11    the valley which, I am sure, would get into the underground and

12    feed this deep water which is being pumped, yes.

13    Q   Indeed, if there was not recharge from the surface

14    area of this upper area one couldn't continue to pump from J-1;

15    isn't that correct?

16    A   Not exactly, because now we do have the return from

17    imported water.

18    Q   Let's go back before we had return from imported water.

19    They have been pumping there for quite awhile, haven't they?

20    A   Yes.

21    Q   When did you go into the valley the first time?

22    A   To do any detailed work, May 13, 1959.

23    Q   I thought you wrote your thesis on something up in

24    this whole valley?

25    A   No, sir, this is not within my thesis area.

Q   That's too bad.  Your first familiarity was in 1959?

A   That is correct.

Q   And the deficit pumping that would transpire if there
was not surface recharge would soon deplete that area; isn't
that right?

MR. SACHSE:  Are you asking the witness to assume a
fact?  There is no testimony of a deficit up there yet.  But
I have no objection to your asking him to assume something.

MR. VEEDER:  We went into that yesterday.  We asked Mr.
Rowe if it didn't appear that there had been a general down-
ward trend in this whole area in regard to pumping, and I
think while he equivocated, he agreed after a time.

MR. GIRARD:  He said the water level.

MR. VEEDER:  It is the same thing, Mr. Girard.

THE WITNESS:  If you are posing the question whether
or not there is overdraft in this basin, Mr. Veeder--

BY MR. VEEDER:

Q   I am not.  I am saying, in view of the fact that there
is a pulldown the way it is, is it not true that you would
have to have a source of recharge and that recharge would have
had to be there before your importation of Colorado River
water?

A   Oh, there is recharge, yes.

Q   And that recharge does come from the surface runoff,
does it not?

1      A  In part.

2      Q  Have you observed the kind and type of alluvium which

3 constitutes the surface of this general area?  Now I am

4 pointing to Domenigoni Valley.  Is it permeable, in your view,

5 or would it be receptive to natural precipitation?

6      A  In the lower part of Domenigoni Valley, no.

7      Q  I was pointing here.  Do you consider that in the

8 lower part?

9      MR. SACHSE:  You have waved that across four sections.

10 Why don't you give him the section?

11      MR. VEEDER:  No, I am pointing to Domenigoni.

12      THE COURT:  On Exhibit 15.

13      MR. VEEDER:  That is right, and he can read that word.

14      THE COURT:  On Exhibit 15 the word "Domenigoni" starts

15 in Section 8, runs across Section 9 and into Section 10.

16 BY MR. VEEDER:

17      Q  Would you say that area is receptive to surface water

18 when it flows across it?

19      A  No, it would be of relatively low permeability.

20      Q  Then in your opinion the recharge for Well J-1 would

21 necessarily have to come from further up the valley; is that

22 right?

23      A  That is correct, as underflow.

24      Q  But you haven't studied that area, so you don't know

25 really where the water comes from, do you?

12855

1    A   I have studied the area to which you have referred--

2  Sections 8, 9 and 10.

3    Q   Have you studied the area of Diamond Valley where we

4  show the contours up here?

5    A   My opinion was based upon the westerly slope of the

6  main water table in this area, which I am familiar with.

7    Q   You are in effect saying, nevertheless, that there is

8  recharge from the surface area above 9J1; isn't that right?

9    A   I would expect there would be, yes.

10   Q   And indeed, except for this recent importation, it

11 would be the only source of recharge; isn't that right?

12   A   Unless there is a resolution of the problem about

13 whether there is underflow from the San Jacinto drainage up

14 into the upper part of Diamond Valley.  I don't know.

15   Q   You don't know?

16   A  But with that qualification I would agree.

17   Q   Now, I am going to show you the quadrangle, the

18 Winchester quadrangle 29M.  Are you generally in accord with

19 the location of the surface stream in that-- Warm Springs

20 Creek?

21   A   I agree that the present surface drainage passes

22 across the top line of Section 9 and goes southwesterly.

23   Q   And you are familiar, are you not, with the fact

24 that that is one of the tributaries to Murrieta Creek?

25   A   Yes, I am.

1    Q   And that the water coming down Diamond Valley and

2    Domenigoni Valley, the surface runoff, is part of the Santa

3    Margarita River?

4    A   I understand that to be correct.

5    MR. SACHSE:   You are referring to surface water again?

6    MR. VEEDER:   That is what I said.

7    THE WITNESS:   Surface water is tributary to Murrieta

8    Creek and the Santa Margarita River, yes.

9    BY MR. VEEDER:

10    Q   Have you at any time given consideration to the

11    precipitation and runoff records in the Murrieta Valley?

12    MR. SACHSE:   Which one?   That is an awful broad question.

13    MR. VEEDER:   Any of the records.

14    THE WITNESS:   Well, to all of them, no.

15    BY MR. VEEDER:

16    Q   Based upon your investigations, do you believe that

17    those who are pumping water in the Menifee Valley are pumping

18    water from the same ground water body that Well J-1 in

19    Section 9 was pumping?

20    A   The same continuous layers of aquifer materials, yes,

21    sir.

22    Q   And they are, in effect, in competition one with

23    the other?

24    MR. SACHSE:   By "they" you mean who, the pumpers?

25    MR. VEEDER:   Yes, those who are extracting water in the

42857

1  Menifee Valley are in competition, in other words, with the

2  supply of water pumped out by Well J-1 in Section 9?

3      THE WITNESS:  Domenigoni Valley is tributary, from a

4  ground water standpoint, to Menifee Valley.  I don't believe

5  that it is possible to say, under these circumstances, that

6  it is all one ground water basin.

7  BY MR. VEEDER:

8      Q  You don't know, in other words, whether they are

9  hydrologically interconnected; is that right?

10     A  It is my firm opinion that they are hydrologically

11 interconnected.

12     Q  And then the pumping in 9J1 would reduce the quantity

13 of water to the extent that it was consumptively used, which,

14 in your opinion, would have gone into Menifee Valley?

15     A  That is correct, the pumping of 9J1 would intercept

16 underflow which would, except for that pumping get into

17 Menifee Valley.

18     THE COURT:  May I interrupt your chain of thought.

19     When we took this trip-- and I think it is on 29M where

20 we have the numbers marked-- we came down Winchester Road

21 here, as I recall we were driving south and this Domenigoni

22 ranch house was over to the right.  Is that about it?

23     THE WITNESS:  That is about it.

24     THE COURT:  Where it says "Road."  Then we stopped and

25 drove aways and walked in a westerly direction over to a

1  little hill-- that must be point 31-32 -- where you could

2  look across and see this outcropping of basement complex

3  which lay generally between 9 and 16 and 17.  That is where

4  we walked, wasn't it, where we could look across and see that

5  outcropping?

6      MR. SACHSE:  That's right.

7      THE COURT:  At that time the suggestion was made that

8  there was a contention that the underground flow flowed

9  westerly.

10     MR. SACHSE:  Yes, and the man who made that contention

11 was the then counsel for Searl Brothers-- Mr. Dougherty, my

12 predecessor.

13     THE COURT:  I thought that was the area, and I have a

14 vivid recollection of that area from the surface standpoint.

15     MR. VEEDER:  Yes, we were down there.  I think we walked

16 down and looked down in that area.

17     THE COURT:  Go ahead.

18     MR. SACHSE:  I remember this gentleman up here walked

19 down with us-- Mr. Garbani.

20     MR. VEEDER:  It shows that we all have a recollection.

21     THE COURT:  Go ahead.

22 BY MR. VEEDER:

23     Q  Now, turning to Searl R, the area lying west of your

24 line marked A here, in your opinion, then, when water is

25 used in Menifee Valley, it would, to some degree at least,

1  reduce the quantity of water available for pumping in
2  Domenigoni Valley; is that right?

3      A   That is correct.

4      Q   Now, you made very careful calculations in regard
5  to the passage of ground water across the granitic lip flowing
6  down to Murrieta.  Did you make any calculations as to the
7  quantity of water passing into Menifee Valley?

8      A   I did not have the information available for making
9  a detailed calculation, but I could give you an estimate of
10 what the ratio might be or a general estimate, if that would
11 help.

12     Q   Could you state it in acre feet?

13     A   I would say 100 acre feet or more.

14     Q   100 acre feet or more?

15     A   Or more, yes.

16     MR. SACHSE:  Passed what?

17     THE WITNESS:  Westerly from Domenigoni Valley into
18 Menifee Valley.

19     MR. SACHSE:  Per year?

20     THE WITNESS:  Per year, yes.  Approximately 50 times as
21 much as goes southerly into Santa Margarita.

22 BY MR. VEEDER:

23     Q   When you say 100 acre feet or more, you might have
24 gone to a million.  Would you be friendly about this thing and--

25     A   I think if we started getting up around 200 we

12860

1    would be parting company.  As I say, I have no data on which

2    to base this calculation such as I did, but in analyzing the

3    comparison of the probable saturated areas, the existing

4    slopes and the permeabilities that are indicated by wells

5    9J1 and 9K1, I would say a 50-to-1 ratio would be reasonable.

6        Q   And you are saying then that the waters, by and large,

7    that is part of the Santa Margarita River Watershed is not

8    passing out of the valley but rather is used in the Domenigoni

9    Valley; is that right?

10       A   That is completely incorrect.

11       Q   Well, we are observing an area in here in the Santa

12   Margarita River Valley.  This field here to which I am now

13   pointing, if I am correctly oriented, is irrigated by 9J1,

14   and that well certainly is pumping more than 100 acre feet a

15   year, is it not, to irrigate that size field?

16       A   Oh, I would say so, yes, more than 100 acre feet.

17       Q   Perhaps I didn't ask a proper question, then.  I am

18   saying that there is more water used in Domenigoni Valley

19   than runs out into Menifee Valley; isn't that right?

20       A   Yes, I would say that would be true.

21       Q   And your testimony hasn't related in any degree to

22   surface runoff?

23       A   No, I have studied no records.  I have observed none.

24   I know nothing of the surface runoff, except that it does go

25   down through the Santa Margarita.

1    MR. VEEDER:  I am not going to ask you any more questions,

2   if it is just a hundred acre feet that is involved.  I have

3   no further questions.

4    MR. SACHSE:  I have nothing further.

5    THE COURT:  Let's take a recess.

6    You may step down.

7    (Recess.)

8    MR. SACHSE:  I will call Fred Garbani, please.

9    MR. VEEDER:  May I interrupt, your Honor.  We would

10   like to offer in evidence Exhibit 231.

11    THE COURT:  Is it correct, to the best of your knowledge

12   and belief, Col. Bowen, with the exception that you don't

13   have up-to-date data on the reservoirs?

14    COL. BOWEN:  With the exception, your Honor, of the

15   portion in Section 30, Township 6 South, Range 1 West, which

16   we show in Exhibit 231 incorrectly.

17    THE COURT:  Is it offered in evidence?

18    MR. SACHSE:  No objection.

19    THE COURT:  Received in evidence.

20    (Plaintiff's Exhibit 231 for Identification was received

21   in evidence.)

22

23

24

25

FRED GARBANI,

One of the defendants herein, being duly sworn, testified

as follows:

 THE CLERK:  State your name, please.

 THE WITNESS:  Fred Garbani.


DIRECT EXAMINATION

BY MR. SACHSE:

 Q  Will you state your name, Mr. Garbani?

 A  Fred Garbani.

 Q  Where do you live?

 A  Hemet, California.

 Q  Are you the owner and operator of the ranching

property that is shown on the exhibit Garbani A, which I am

putting on the blackboard and which was prepared by Mr.

Joseph Rowe?

 A  Yes, I am part owner.

 Q  Who is the other owner?

 A  My brother.

 Q  What is your occupation?

 A  Manager and workman both.

 Q  On the farm?

 A  On the farm.

 THE COURT:  Does your brother have an undivided half

interest?

1          THE WITNESS:  Well, there are three of us; undivided

2     third interest.

3          THE COURT:  Do we have the names of the owners in the

4     answer?

5          THE WITNESS:  James, Joe and Fred.

6          THE COURT:  Each a third.  All right.

7     BY MR. SACHSE:

8          Q   Garbani Exhibit A shows certain wells as green dots--

9     if you want to step down here to be sure you can see more

10    clearly-- which have State numbers on them and also have

11    beneath then numbers 1, 2, 3, 4.  Are those wells correctly

12    located?

13         A   Yes, sir.

14         Q   And are all those productive wells?

15         A   Well No. 4 we quit pumping.

16         Q   When did you quit pumping?

17         A   About '48.

18         Q   For what reason did you stop pumping?

19         A   Well, we had that on Diesel and it was costing us too

20    much for what water we were getting off it.

21         Q   In other words, there was still water, but the yield

22    was not sufficient to justify the expense?

23         A   No.

24         Q   You may sit down.

25             Will you tell the Court what kind of farming operation

1  you operate?

2      A  We do grain farming and alfalfa.  We have around 400

3  acres of grain, about 150 acres of alfalfa.

4      Q  The alfalfa is irrigated, is it not?

5      A  Yes, it is irrigated.

6      Q  How do you irrigate?  By sprinkler or by row?

7      A  Most of it now is by sprinkler system.

8      Q  How about the grain?  Is that irrigated at all?

9      A  Part of it.  Where we can get at it with the sprinklers,

10  we sprinkle.

11     Q  To start a crop, or do you sprinkle it to develop it?

12     A  This year we preirrigated, and now we are spinkling

13  right now.

14     Q  You show a reservoir on this map?

15     A  Yes.

16     Q  What kind of reservoir is that?

17     A  Well, that is a three-acre-foot reservoir.  We pump

18  our wells in there and if we get EMWD water through Searl

19  Brothers we run it all in there and then take it from there.

20     Q  But that reservoir does not trap any surface runoff,

21  does it?

22     A  No, it does not trap any surface runoff.

23     Q  So the only use of the reservoir is to put well water

24  in for the purpose of creating volume or head and then irrigat-

25  ing from that?

1   A   Yes, that is what we do.

2   Q   Did you hear Mr. Searl's explanation how the MWD

3   water is delivered from him to you?

4   A   Yes.

5   Q   You agree with that?

6   A   Yes, I agree with that.

7   Q   In other words, you have no direct connection to the

8   MWD at the present, do you?

9   A   No, only through that line.

10   Q   However, the MWD proposed line is going to come pretty

11   close to your line, isn't it, the one that is going in now?

12   A mile or two away?

13   A   Yes, it will be a couple of miles.

14   Q   Are you going to have any connection to that?

15   A   I don't know.

16   Q   You have no knowledge such as Mr. Searl discussed

17   that he might soon be using it?

18   A   No.

19   MR. SACHSE:  In this case, your Honor, Col. Bowen's

20   office has not yet completed fully assembling an engineering

21   report, so I cannot ask Mr. Garbani at this time if one is

22   satisfactory.  He hasn't had a chance to examine it.

23   THE COURT:  It will be ready later?

24   MR. SACHSE:  Yes.  But our experience is such that I

25   don't think there is going to be any quarrel, and I would like

the understanding that we can either bring him back, if there
is objection, or otherwise I will just appear and by stipula-
tion say that it is acceptable and not have to bring him back
again.

MR. VEEDER:  If it will be amenable, your Honor, when
we get into the area of taking care of the proppers we will
put that evidence in.

THE COURT:  Yes.

MR. VEEDER:  We would want to mark it as an exhibit.

MR. SACHSE:  Yes, I would want it as an exhibit.  But
I don't want to bring Mr. Garbani back here for a few minutes
on that.

THE COURT:  How many acres do you have altogether, you
and your two brothers?

THE WITNESS:  We own 770 acres in Diamond Valley.

THE COURT:  And how many of those acres do you think are
irrigable?

THE WITNESS:  Well, it would be close to 500 irrigatable—
could be irrigated.

BY MR. SACHSE:

Q  How much have you got under water now, or are you
ittigating now?

A  Well, of our own we have about 350.

Q  You say of your own?  Are you leasing some also?

A  We are leasing some adjoining.

1     Q  But of the land shown on Exhibit Garbani A about 250

2  is irrigated at present?

3     A  Yes.

4     THE COURT:  That piece of ground that lies westerly,

5  separated from the larger piece, only a small part of that?

6     THE WITNESS:  That don't have any water.  That only has

7  a spring water on it.  That is domestic.

8     THE COURT:  What do you use that for-- just pasture?

9     THE WITNESS:  Well, there is a residence on there.  My

10  brother has that and he has it leased out.

11     THE COURT:  You and your two brothers owned it?

12     THE WITNESS:  Just my brother Joe owns that himself.

13     MR. SACHSE:  That's news to me.

14     THE COURT:  Did you set this up in the answer?

15     MR. SACHSE:  I will have to check that.

16     THE COURT:  What is there, about 80 acres there?

17     THE WITNESS:  70.

18     THE COURT:  And that is owned by Joe alone?

19     THE WITNESS:  Yes.

20     THE COURT:  Is any of that ground susceptible to irriga-

21  tion?

22     THE WITNESS:  Well, a very small part of it.

23     THE COURT:  All right.

24  BY MR. SACHSE:

25     Q  How many acres are presently irrigated, Mr. Garbani?

1        A   Around 350.

2        MR. SACHSE:   I have nothing further.

3        THE WITNESS:   That includes the grain land, because we

4    don't irrigate that the year around.

5        MR. SACHSE:   You may cross-examine.

6

7                        CROSS-EXAMINATION

8    BY MR. VEEDER:

9        Q   Do you pump most of your irrigation water; is that

10   right?

11       A   Yes, sir.

12       Q   The larger proportion of it?

13       A   The larger proportion of it.

14       Q   And that is the source of your water for the irriga-

15   tion of both your grain land and your alfalfa land; is that

16   right?

17       A   That is right.

18       Q   And you are using sprinklers?

19       A   Yes, sir.

20       Q   How many cuttings of alfalfa are you getting up there

21   now?

22       A   Well, different in different years.   As a rule, we

23   get six cuttings a year.

24       Q   And how many ton to the acre does that run, do you

25   know?

A   That varies, too.   If you average seven-- young alfalfa might go nine ton to the acre a year, but older cutting if you get seven you are pretty lucky.

Q   Have you calculated the proportion of Colorado River water that you get from the Searl Brothers as that relates to the total water that you use?

A   I didn't--

Q   Did I make myself clear?

A   No.

Q   Have you calculated the number of acre feet of water you use a year up on your property?

A   Well, it varies.   Last year we only used 11 acre feet. We only buy what we can afford.

THE COURT:   You mean you bought 11 acre feet?

THE WITNESS:   Yes, that is what we bought.

BY MR. VEEDER:

Q   And the balance of it for the irrigation year you pumped out of the wells?

A   Out of the three wells.

Q   Could you describe for us the wells that you have? Have you calculated the yield of the wells?

A   They are away down now to what they used to be.   We pump about 80 inches out of the three wells.

Q   And that is about what you have been pumping in the past or not?

1  A No, when we first put them down we had one well that

2 pumped that much by itself.

3  Q When did you first put those wells down?

4  A The first one went in in 1926.

5  Q And the rest of them went in when?

6  A That No. 4 that we quit went in in 1927.  Then the

7 others went in in 1947 and '48.

8  Q Have you noticed any relationship between the levels

9 in your wells and the amount of rainfall you receive up there?

10  A Oh, yes, we have.

11  Q You have noticed that there is a relationship between

12 the two?  When you have a dry season your wells go down; is

13 that right?

14  A Well, they gradually go down.  I don't know why.

15  Q Have you ever noticed that during a wet season whether

16 the water in your well levels are up or down?

17  A Well, they are up until we start pumping a little

18 strong.  We get started and pump a month or two, then they start

19 going down.

20  Q Do you intend to extend your irrigated acreage any,

21 Mr. Garbani?

22  A How do you mean?

23  Q I mean to bring in more acreage and put it under

24 water?

25  A If I had the water or could afford to buy more.

1    Q  But you are not intending to put any more wells down?

2    A  No.

3    Q  Are you pumping up there now?

4    A  Yes, sir.

5    Q  And when did you start pumping up there?

6    A  Let's see, we started about three weeks ago.

7    Q And would you say that that is the normal procedure

8 for your irrigation practices?  Do you usually start--

9    A  It all depends on the rainfall.  We thought we were

10 going to get some rain, so we didn't start irrigating.

11    Q  Were you earlier or later this year in starting

12 your pumping than usual?

13    A  Well, we have taken off a crop of alfalfa without

14 irrigation, and that generally comes in the middle of April.

15 But this year we have had to irrigate to get the first crop.

16    Q So you started a little earlier than usual this time?

17    A  Yes.

18    Q  You figure your irrigation season about April 1st,

19 then; is that right?

20    A  That is right.

21    Q  And it would run on through November, would it?

22    A  Well, I would say our main irrigation quits in

23 October, because we take off our last cutting of hay in

24 November.

25    Q  And you have been running your system up there for

about thirty years yourself; is that right?

A   Since 1926.

MR. VEEDER:   I have no further questions.

MR. SACHSE:   I have nothing further.

THE COURT:   I would propose to find as to Mr. Garbani that the area of younger alluvium, as shown on Exhibit Garbani A, is almost identical to that shown on Government's Exhibit 15, and that that portion of the area in Township 6 South, Range 1 West (70 acres) that belongs to Joe Garbani which is shown to be in the younger alluvium might be subject to being irrigated; that the balance south of the toe line is basement complex.

That as to the property in Sections 5 and 6, belonging to the three brothers, that that portion north of the toe line of the hills is irrigable; that that portion south is basement complex and not irrigable.

That all of the land is riparian and that any water found in the basement complex belongs to whoever finds it and they are just lucky to get it.

That the reservoir is a proper use of riparian water.

I don't think we should be particularly concerned about the mixing of this water from the Municipal District and from the wells, certainly in so far as Mr. Garbani is concerned. There is importation of water into the district which benefits the watershed in the sense that water is being imported, and

1    although there may be an impossibility of ascertaining how

2    much of this water comes in or out of the watershed, I don't

3    think there is any real merit in spending any time on it.  This

4    is a tentative thought about it.

5        As to the Searl Brothers' property, the property in

6    Range 1 West, Township 6 South in Sections 30, 32 and 35, is

7    all in the basement complex and any waters found therein are

8    vagrant, percolating waters and not part of the stream system.

9    The same would be true as to that property in Township 6

10   South, Range 2 West in Section 13.  The two parcels there in

11   Section 13 are in the basement complex.  The same is true in

12   Range 1 West, Township 6 South in Section 7.  That is all in

13   the basement complex.

14       In Range 2 West, 6 South again the toe line of the

15   hills demarks the basement complex and younger alluvium is

16   almost identical in Government's Exhibit 15 and in Garbani's

17   Exhibit A, and in Section 12 that portion lying east and south

18   of the toe line is all basement complex.  The southeast corner

19   of Section 1 is basement complex, and the bottom third of

20   Section 11 is basement complex, plus a portion of Section 1

21   lying northerly of the road shown on the map-- Newport Road, I

22   guess.  The basement complex does not come clear to the road,

23   but as shown on the map the portion there is basement complex.

24       In Section 31, Range 1 West, 5 South again the similarity

25   between Government's Exhibit 15 and Exhibit Garbani A at the

toe line is very similar.  That portion of Section 31 lying south of the toe line is younger alluvium and subject to irrigation.  That portion lying north is basement complex.

The same would be true of Section 32.  Those portions shown in the basement complex would clearly not be irrigable and no water in them would be part of the water system.

That portion there of Section 33, part of it is basement complex-- a few outcroppings.  The rest is younger alluvium and would be subject to irrigation.

Dropping down to Section 4, 6 South, 1 West, all but a very small portion down in the southwest corner and along the southerly border shortly removed to the east of the southwest corner is younger alluvium and subject to irrigation.  There are two little portions in the basement complex.

I take it that all the ground would be riparian, but that the riparian right, both as to Garbani and as to Searl, is an illusory right.  There is no water in these creeks except at times of rain or flood, at which time it wouldn't be usable.

Now as to Searls, I will leave the matter open, but I think also as to Searl we would waste a lot of time if we concerned ourselves too much with this importation of water into the District and the mixing of the Municipal water and the well water.  From the standpoint of the watershed, any water imported benefits the watershed, and on the basis of the

1  diagram drawn on Searl Exhibit A of the present irrigated
2  acres, it is a rough guess that about half are within the
3  watershed and half are out of the watershed.  Wells are being
4  pumped both in and out of the watershed and Municipal water
5  is being brought in.  It would be impossible, under the irriga-
6  tion system, to find out what water went where.  I would merely
7  find that there was this mixing of waters, but that the use
8  of water was presently a proper riparian use, taking into
9  account particularly that water is being imported.

10      Would that be sufficient to base findings on Garbani and
11  Searl, leaving out for the moment the question of this lower
12  Domenigoni Valley?

13      MR. SACHSE:  Yes, your Honor, in my judgment it would,
14  with this qualification, that you commented on the riparian
15  right being illusory.  We would still have a question-- I
16  know Mr. Veeder would agree-- whether they are pumping from
17  the basin.  I think they are.  But whether the basin itself
18  is regulated as a separate basin, as part of the Santa
19  Margarita, or as part of the San Jacinto.

20      THE COURT:  Yes, that is open on the question of what
21  goes on in the lower part of the valley.

22      I would further propose to find that the uses of the
23  reservoirs on the Searl property are proper riparian uses,
24  and that this ditch, if it does bring water from outside the
25  watershed for re-use, is certainly nothing to be enjoined or

1   restrained as far as the watershed is concerned. Re-use of

2   irrigation water is, I take it, a proper riparian use.

3          Now, when you get downstream to the situation in the lower

4   part of the valley, of course, we haven't heard from Mr. Veeder.

5   I thought maybe you would just give up now and quit on that.

6          MR. VEEDER:  Give up and quit why, your Honor?

7          THE COURT:  The very excellent showing made by Mr.

8   Sachse, and your statement that if there is only a hundred

9   acre feet running out into the Menifee Valley you wouldn't be

10  too concerned about it.

11         MR. VEEDER:  No, I think your Honor read something into

12  my comment.

13         THE COURT:  We will leave the matter open.  I thought

14  you might surrender and say, "You've made a very fine showing,

15  Mr. Sachse."

16         MR. VEEDER:  I think Mr. Sachse did very well and that

17  his client ought to be pleased.

18         THE COURT:  Can we base a finding on the showing that

19  he made? If you want to leave that open, I certainly don't want

20  to pass judgment on it until I have heard what you might have

21  to show.

22         MR. VEEDER:  I think that would be a good idea, your

23  Honor.

24         THE COURT:  I will merely repeat the comment we made

25  before that if it should turn out that the ground waters in the

lower Domenigoni Valley on the ratio of 50 to 1, say, feed
the Menifee Valley rather than Warm Springs Creek, then you
have your legal question that Mr. Sachse and I mentioned, and
that is the only possible claim that the rest of the basin
could make, and that would be to have all the basins in the
Domenigoni Valley filled up and not pumped down so that when
flood waters came they would all flow down Warm Springs Creek.
And as Mr. Sachse suggested, it doesn't seem to me that that
would be a proper use of the water sources of this state,
under the present constitutional and statutory law.  Reasonable
uses made in Domenigoni Valley even if they resulted in less
flood water passing down Warm Springs Creek, probably would
be a detriment that the rest of the basin would have to suffer.

I will keep an open mind on this until we see whether
Mr. Sachse has buttoned you up and whether you will want to
rebut this or not.

MR. VEEDER:  Let the record show that the Court laughed.

THE COURT:  I am just laughing at the very quizzical and
disgusted expression on Mr. Veeder's face.

Thank you, Mr. Garbani.

MR. SACHSE:  Before we recess, your Honor, maybe we
ought to take half a minute to decide what we are going to do
on the briefs on the stipulated judgment.  Stardust I will
finish in an hour tomorrow, I trust.  But I haven't even looked
at the briefs, other than California's brief, on the stipulated

1    judgment.  What did your Honor have in mind?  Do you contem-

2    plate having us argue that?

3         THE COURT:  Yes, I think we should discuss it further.

4    But frankly I haven't had time to do any work on it.

5         MR. SACHSE:  I haven't looked at it.

6         THE COURT:  Maybe we can spend some time talking about

7    it tomorrow, if that is agreeable.

8         MR. SACHSE:  It's all right with me.

9         MR. GIRARD:  I understood that you were having some

10    trials tomorrow, your Honor.

11         THE COURT:  I have a pretrial hearing in the Grocers

12    case, but I have gotten so used to running about three cases

13    at a time that I will probably send them all into the Grand

14    Jury room and say, "Proceed with pretrial just as if I were

15    holding a club over your head and I will go ahead and finish

16    this matter and when I am through I will be in and talk to you."

17         MR. GIRARD:  I changed my reservation on the basis that

18    you had these trials tomorrow.  I could probably get it back

19    if I have to.

20         THE COURT:  You don't need to be here tomorrow unless

21    you want to.

22         MR. GIRARD:  I hadn't planned to, if all Mr. Sachse was

23    going to do tomorrow was put on his evidence as to Stardust,

24    because I don't think it involves any issue with which we are

25    concerned.

1    THE COURT:  I don't think we can argue that stipulated

2    judgment tomorrow, because I would want to spend time looking

3    over your findings, which I haven't done.  I thought tomorrow

4    we would fix some date to do that.

5    MR. GIRARD:  That is fine.  I don't have to be here for

6    the date.

7    MR. VEEDER:  I think that is fine, your Honor.  If I

8    have in mind the correct dates, they are April 5th and 6th,

9    and then we skip over to April 26.

10   MR. GIRARD:  In fixing a date, your Honor, any date would

11   be agreeable to me.  But I wanted to be here when it was

12   discussed as far as the merits are concerned.

13   THE COURT:  The 5th of April may be questionable now--

14   we will talk about that tomorrow-- because of the fact that

15   the 4th is a judge's meeting in Los Angeles and that means

16   that the criminal calendar will be put over to the 5th, and I

17   can't tell you from the bench here whether Judge Weinberger

18   has the criminal calendar or whether I have it.

19   THE CLERK:  Judge Weinberger has the criminal calendar

20   on Monday, your Honor.

21   THE COURT:  Then I wouldn't have too many matters carried

22   over to Tuesday.

23   THE CLERK:  No, I think there are about four or five

24   cases.  However, there may be some settings.

25   THE COURT:  Then there is the question of what to do

1   with this criminal calendar for next week, which is always a

2   current problem around here.  I will find out by tomorrow.

3        MR. VEEDER:  I would like to take some time tomorrow,

4   if your Honor has a moment, to try and work out a procedure,

5   assuming that some people will be in on this Murrieta matter.

6        THE COURT:  What time were they asked to come in tomorrow?

7        MR. VEEDER:  I mean on the 5th and 6th.

8        THE COURT:  Yes, we will take care of that.

9        MR. VEEDER:  Because it seems to me like it might be a

10  good idea to be able just to show the people the figures we have

11  arrived at and let them look at the exhibits on an informal

12  basis rather than pursuing the normal course.  I don't know

13  just what your Honor has in mind.

14       MR. STAHLMAN:  There will not be any court in this case

15  on the 7th?

16       THE COURT:  I don't anticipate that there will be.

17       MR. STAHLMAN:  I have another trial.  And on the 12th

18  Mr. Sachse and I have a matter.

19       MR. SACHSE: The tentative plan, as I understand, is

20  April 5 and 6, and then April 26th.

21       MR. STAHLMAN:  That's all right.

22       THE COURT:  Let's check into it and let you know

23  tomorrow on the dates.  Is that agreeable?

24       California has lodged an exhibit.  Sometime later you

25  are going to offer that, I suppose?

1    MR. GIRARD:  Yes, your Honor.  I think it will take
2  about five minutes to qualify the witness.

3    THE COURT:  The purpot of the exhibit is to show that
4  both Vail and the United States have used over their entitle-
5  ment of water; is that right?

6    MR. GIRARD:  That is correct.

7    MR. STAHLMAN:  Under the stipulated judgment.

8    MR. SACHSE:  They are over their entitlement under the
9  stipulated judgment.

10    MR. GIRARD:  Yes.

11    I might add perhaps for information, if they want to
12  check, that the figures as to actual yield were taken from
13  the exhibits in this case, from the file of Vail and the United
14  States, and the exhibits filed by the United States in the case
15  tried by Judge Yankwich.

16    THE COURT:  Since they purport'd by the stipulated judg-
17  ment to divide all the water one-third and two-thirds, how
18  could they both be taking more than they are entitled to?

19    MR. GIRARD:  It is this way, your Honor--

20    MR. VEEDER:  Why don't we have the witness instead of Mr.
21  Girard?

22    MR.GIRARD:  They said they would divide all of the water
23  on a one-third-two-thirds basis, but then they said in
24  determining what all the waters are and what we are entitled
25  to under this allocation the United States is entitled to two-

1  thirds at the gorge or narrows, whichever is less, and Vail

2  is entitled to one-third at the gorge or narrows, whichever

3  is less.  Both pumped two-thirds and one-third of what is

4  available at the gorge.  Whether or not that is a correct

5  interpretation of the stipulated judgment is a question of law,

6  I think.

7       MR. VEEDER:  Why not just knock it off.

8       THE COURT:  10 o'clock tomorrow morning.

9       (Adjournment until Friday, April 1, 1960, at 10:00 A.M.)