# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al.

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:     San Diego, California

Date:      Friday, April 1, 1960

Pages:     12883 to 12954

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211   Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - -

UNITED STATES OF AMERICA,　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　)
　　　vs.　　　　　　　　　　　 )　　　　　No. 1247-SD-C.
　　　　　　　　　　　　　　　　)
FALLBROOK PUBLIC UTILITY　　　 )
DISTRICT, et al.,　　　　　　　 )
　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　 )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Friday, April 1, 1960

APPEARANCES:

　　　For the Plaintiff　　　　　　WILLIAM H. VEEDER, ESQ.,
　　　　　　　　　　　　　　　　　Special Assistant to the
　　　　　　　　　　　　　　　　　Attorney General,
　　　　　　　　　　　　　　　　　Department of Justice,
　　　　　　　　　　　　　　　　　Washington, D. C.

　　　　　　　　　　　　　　　　　LCDR. DONALD W. REDD.

APPEARANCES (Continued)

|  |  |
|---|---|
| For Defendant State<br>of California | STANLEY MOSK, ESQ.,<br>Attorney General,<br>By FRED GIRARD, ESQ.,<br>    Deputy Attorney General. |
| For Defendant Vail<br>Company | GEORGE STAHLMAN, ESQ. |
| For Defendant Fallbrook<br>Public Utility District,<br>Stardust Ranch, et al. | FRANZ R. SACHSE, ESQ. |

# INDEX TO WITNESSES

| For Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| Willard H. Allen | 12886 | 12890 | | |
| | 12893 | 12894 | | |
| Dee McGaugh | 12895 | 12922 | | |

INDEX TO EXHIBITS

| Plaintiff's Exhibit - | Iden. | In Evid. |
|---|---|---|
| 232 | 12885 | 12948 |
| 233 |  | 12893 |
| 234 |  | 12893 |

1      San Diego, California, Friday, April 1, 1960.   10 A.M.

2

3         (Other matters.)

4      THE CLERK:  One, 1247-SD-C, United States vs. Fallbrook.

5  Further court trial.

6      THE COURT:  Do we have another series of exhibits?

7      MR. SACHSE:  I am perfectly willing to put them all in

8  under the United States' number, if you want.

9      THE COURT:  All right, put them all in under the

10  United States' number.

11      MR. SACHSE:  Because the only other exhibit is the

12  engineering report itself.

13      THE CLERK:  The next number will be 232.

14      (Plaintiff's Exhibit No. 232 was marked for identifica-

15  tion.)

16      MR. VEEDER:  Your Honor, I will call this party Nettie

17  M. Lloyd, if it is satisfactory, to dispose of this letter

18  that you just tendered me.

19      THE COURT:  Yes, I think you can do that, in view of

20  the letter, and file the letter in the proceedings.

21      MR. VEEDER:  Yes, if it is agreeable.

22      THE COURT:  Yes.

23      MR. SACHSE:  May I proceed?

24      THE COURT:  Yes.

25      MR. SACHSE:  A brief opening statement.

1    MR. VEEDER:  That is in the record.

2    MR. SACHSE:  Yes.  I say this specific map is not an

3  exhibit, but it is United States Exhibit--

4    MR. VEEDER:  205,6,7 series, but I would have to check

5  that.

6    MR. SACHSE:  This is the United States's ownership map

7  and I have simply taken the liberty of coloring in some

8  visual indication to the Court for the location of the

9  Stardust properties.  This is Vail Lake.  These are the Oviatt

10  properties upon which we heard testimony two weeks ago.  That

11  is the Oviatt Ramona Ranch.  And here is the Vail boundary.

12  That is to give us our general orientation.

13    I will call Mr. Allen.

14

15          WILLARD H. ALLEN,

16  one of the defendants herein, being first duly sworn, on his

17  oath was examined and testified as follows:

18    THE CLERK:  State your name, please.

19    THE WITNESS:  Willard H. Allen.

20

21          DIRECT EXAMINATION

22  BY MR. SACHSE:

23    Q  Where do you live, Mr. Allen?

24    A  Pasadena.

25    Q  What is your occupation?

1    A   Well, I am in the music business, and I am ex-

2    sanitarium operator.

3    Q   How long have you owned the Stardust Ranch?

4    A   Since July, 1959.

5    Q   And the Stardust Ranch is the property which I have

6    delineated in red on the xhibit on the board?

7    A   That looks like it.

8    Q   From whom did you acquire Stardust Ranch?

9    A   Mr. W. C. Seavers.

10   Q   So obviously I presume you have no knowledge of

11   the operations of the ranch prior to July, 1959?

12   A   That is right.

13   MR. VEEDER:  May I interrupt for just a second.

14   The Court asked me the exhibit number that you have

15   placed on the board.  That would be Wilson Creek watershed

16   Exhibit 211-C, ownership map, and I have put up the Oviatt

17   exhibit for the purpose of correlation, your Honor.  That is

18   Oviatt Exhibit Z.

19   THE COURT:  The map of both properties is Oviatt Z.

20   MR. SACHSE:  I am going to ask the Court to give the

21   engineering report on the Stardust Ranch the next United

22   States number.

23   THE COURT:  232.

24   BY MR. SACHSE:

25   Q   Mr. Allen, have you received from the Office of

Ground Water Resources, Marine Corps Base, Camp Pendleton,

a copy of an engineering report on your property?

A   Yes.

Q   I will hand you Government's Exhibit 232 and ask you

if that is the report you received.

A   Yes, it is, sir.

Q   Have you had an opportunity to examine that report?

A   Yes, I have.

Q   With particular reference to the conclusions contained

in United States Exhibit 232 relating to irrigable acreage on

Stardust Ranch, do you have any disagreement with those con-

clusions?

A   No, I don't.  It looks very fair.

Q   Again with particular reference to the conclusions

expressed on page 16 of the report dealing with maximum future

potential water use, assuming that sufficient water were avail-

able, do you have any disagreement with those conclusions?

A   No, sir.  That is all right.

Q   You have, I believe, however, located at least one

error in this report that you believe should be brought to

the attention of the Court; is that right?

A   I believe the artesian well that was drilled in 1957

was inadvertently omitted from it.

MR. SACHSE:  My next witness knows more about that well

and there is no point in cluttering the record with Mr. Allen's

1    testimony on it.

2         MR. VEEDER:  He's just the owner.

3    BY MR. SACHSE:

4         Q   What present use, Mr. Allen, are you making of the

5    water on the property, regardless of the source from which the

6    water is available?

7         A   We have alfalfa and permanent pasture.

8         Q   Do you know how many acres you have in those crops?

9         A   No, I don't.

10        Q   Are you presently running any stock on the ranch?

11        A   Just some horses.

12        Q   Since your acquisition of the property in the summer

13   of 1959 you have raised no commercial crop other than alfalfa;

14   is that correct?

15        A   That is right.

16        Q   What are your general plans for the future?

17        A   Well, my plans for the ranch are to make a health

18   ranch of it and to grow organic truck gardening, as well as

19   alfalfa and permanent pasture.  We want to expand that phase

20   of the ranch.

21        Q   In other words, you expect to continue with rather

22   extensive irrigation on the ranch?

23        A   That is right.  We want to use the maximum available.

24        MR. SACHSE:  I have no further questions of Mr. Allen.

25   I may suggest to Mr. Veeder that I think we might go

1  faster if you want to skip the whole thing and wait for Mr.

2  McGaugh, who has a detailed familiarity with this property.

3       MR. VEEDER:  I am interested in skipping sometimes, but

4  not now.

5       MR. SACHSE:  Suit yourself.

6

7                        CROSS-EXAMINATION

8  BY MR. VEEDER:

9       Q  What do you mean by your future plans for water use,

10  Mr. Allen, about raising these vegetables?

11      A  Well, my plan is to expand the organic gardening

12  phase of the ranch.

13      Q  What do you mean by organic gardening?

14      A  That is raising vegetables with compost; no com-

15  mercial fertilizer, sprays or any of the things we are seeing

16  so much in the papers, magazines and scientific reports these

17  days.

18      Q  You will use water, however?

19      A  Oh, yes.

20      Q  Would you name the kind and type of vegetables you

21  would grow?

22      A  Row crops mainly-- carrots, turnips, peas, beans,

23  radishes.  I don't know whether we can raise celery there or

24  not.  Raise lettuce.

25      Q  You are not going to raise any rice up there, are

yo..

1  you?  It takes about 9 acre-feet per acre.

2      A  No, I think we will have to try to find an organic

3  gardener up around Sacramento for that.

4      Q  Have you given any thought as to the number of crops

5  of these vegetables a year you would raise?  Have you gone into

6  that question?

7      A  Not having had the experience of the climate there,

8  et cetera.  We want to grow them the year round.  We will

9  plant carrots, and the same with other vegetables, that will

10 grow the year around.  I imagine in the cold part of the year

11 some of them will slow down to just about a standstill.

12     Q  Is that a frost-free area?

13     A  Not too far from it.  I see palm trees.

14     Q  But you don't know?

15     A  No, I am really going to have to learn some of those

16 things by trial and error.

17     Q  Do you propose to subject additional land to the

18 growing of these vegetables in addition to that which is

19 presently irrigated?

20     A  No, I think the amount that is irrigable now is going

21 to be-- if we can get enough  water to take care of that we

22 will be doing fine.

23     Q  In other words, you would propose to utilize some

24 of the lands which are presently being devoted to the raising

25 of permanent pasture, you would put that into row crops, would

1   you?

2      A   If we don't have enough water to keep both going.

3   The row crop is really the thing we are interested in.

4      Q   And any time that you would find that your vegetables

5   were in competition with your pasture for the available supply,

6   you would put in the vegetables?

7      A   Yes, because the demand for that type of thing is

8   increasing as the knowledge of it becomes available to people

9   through health food stores.

10      Q   In regard to alfalfa, would you do the same thing?

11      A   Yes.

12      Q   Would you take out the alfalfa?

13      A   Yes, if it would become an obstacle to the row crops

14   for water.

15      Q   In substance, then, you would be planning to put in

16   what would amount to a truck gardening culture up there; is

17   that correct?

18      A   As far as we can, yes.

19      Q   You don't know how many acres you have in alfalfa now?

20      A   I think there are about 14 of good alfalfa, and then

21   there is some old alfalfa that we are not cropping.

22   MR. VEEDER:   I will ask no further questions at this

23   time.

24   You will be around, will you not?

25   THE WITNESS:   Yes, I will be.

1    MR. SACHSE:   There is one thing I overlooked, your Honor.

2    MR. VEEDER:   Are those your applications to appropriate

3  water?

4    MR. SACHSE:   These are the two old Civil Code applica-

5  tions, certified copies of the record.

6    MR. VEEDER:   I will look at them during the recess.

7

8            FURTHER DIRECT EXAMINATION

9  BY MR. SACHSE:

10   Q  Mr. Allen, I am going to hand you two photostatic

11 copies, one marked United States Exhibit 233 and the other

12 United States Exhibit 234, being copies of Notice to

13 Appropriate Water, certified copies of originals on file in

14 the office of the County Recorder of San Diego County, Exhibit

15 233 being filed in Book 1 at Page 76 of Water Claims, and No.

16 234 being filed in Book 2 at Page 97 of Water Claims.  Do you

17 know where these instruments came from?  I don't mean the

18 certified copies.

19   A  They are copies of the originals that Mr. Seavers

20 turned over at the time of the ranch sale.

21   Q  As part of the title documents and history of your

22 ranch?

23   A  That is right.

24   MR. SACHSE:   I will offer these in evidence.

25   THE COURT:   Plaintiff's 233 and 234 received in evidence.

1      (Plaintiff's Exhibits No. 233 and 234 were received in

2   evidence.)

3      MR. SACHSE:  I have nothing further at this time.

4      MR. STAHLMAN:  I would like to ask a couple questions.

5

6                       CROSS-EXAMINATION

7   BY MR. STAHLMAN:

8      Q  How many acres do you have under irrigation at the

9   present time or have been irrigated in the recent past,

10  whether the alfalfa is good or bad?

11     MR. VEEDER:  I thought he said he didn't know.

12     THE WITNESS:  I am really not sure.  Mr. McGaugh will

13  be able to tell you the permanent pasture and the amount that

14  was watered before the rains started.

15  BY MR. STAHLMAN:

16     Q  In connection with the temperature up there, do you

17  know what sumac is?

18     A  Yes, they grow a lot of that down around Indio,

19  don't they?

20     THE COURT:  No, it's a wild plant.

21     MR. STAHLMAN: It gives a rough idea as to the temperature.

22     Q  You don't know whether you have any of that on your

23  lane?

24     A  No, sir, I do not.

25     MR. STAHLMAN:  That is all.

MR. SACHSE:  Step down.

I will call Mr. Dee McGaugh.


DEE McGAUGH,

called as a witness on behalf of defendant Allen, being first

duly sworn, on his oath was examined and testified as follows:

THE CLERK:  State your name, please.

THE WITNESS:  Dee McGaugh.


DIRECT EXAMINATION

BY MR. SACHSE:

Q   Where do you live, Mr. McGaugh?

A   About 25 miles south of Hemet.

Q   What is your address?

A   Box 126, Star Route, Hemet.

Q   Are you acquainted with the property known as the

Stardust Ranch and which is indicated on a copy of U. S.

Exhibit 211-C on the easel in red?

A   Yes.

Q   For how long a time have you been familiar with that

ranch?

A   About 29 years now.

Q   Were you acquainted with Mr. W. C. Seavers, who was

the former owner of the ranch and from whom Mr. Allen pur-

chased it?

1    A   Yes, I was working for him at the time Mr. Allen

2    purchased the place.

3    Q   And when did you cease being employed on the Stardust

4    Ranch?

5    A   January of this year, 1960.

6    Q   I wish you would start with the termination of your

7    employment at Stardust and work backward and review for the

8    Court your acquaintance with it-- whether you were employed

9    there, whether you lived there, et cetera; give us a history

10   of your knowledge of Stardust Ranch.

11   A   Well, I lived there better than three years and

12   managed it for Mr. Seavers.

13   Q   At that time you were the manager and operator of the

14   ranch?

15   A   Yes.

16   Q   As an employee of the then owner Mr. Seavers?

17   A   Yes.

18   Q   And before that what was your connection with it?

19   A   Well, there was a few years there that I was in the

20   service.  I managed the place for Ralph Singer from 1937, I

21   guess, to the time I was inducted into the service, which

22   would be January, 1942.

23   Q   And Mr. Singer was the then owner of the ranch?

24   A   He was the owner of the ranch.

25   Q   You were the manager of it for him?

A   Yes.

Q   Prior to 1937 did you have any connection with it?

A   Yes.   Prior to that my brother-in-law owned the property.

Q   What was his name?

A   Fred Bass.

Q   Go ahead.

A   And that dates back to about 1931, making the 29 years that I have been on and off that property.

Q   Are you familiar with the irrigation system and source of water for the ranch?

A   Yes.

Q   When was the last time you had occasion to examine the irrigation system?

A   Well, just prior to the time I left Mr. Allen. However, I have been back there since then, but just to give advice to the fellow he has on there now that wanted to know different things.   So I go there and talk about them.

Q   This ranch has a surface diversion by which it takes water from Wilson Creek, doesn't it?

A   Yes.

Q   Are you familiar with that diversion?

A   Yes.

Q   When was the last time you saw that diversion?

A   Oh, possibly a month ago.

1      Q   And when was the first time you became acquainted

2   with the ranch's diversion from Wilson Creek?

3      A   In 1931.

4      Q   Will you describe in your own words the diversion as

5   it exists at present?

6      A   Well, the diversion is a combination rock and cement

7   diversion dam with a series of sand traps to catch the sand

8   at high water time, and it has, oh, possibly half a mile of

9   10-inch steel pipe coming out of it.

10     Q   Where does that steel pipe go?

11     A   It goes to the reservoir which we irrigate from.

12     Q   Is that diversion today in the same condition as it

13  was when you first became acquainted with it in 1930 or '31?

14     A   No, it is all steel now.  It serves the same purpose.

15  But in the early days it was mostly redwood fluming and

16  galvanized pipe.  But that has been replaced with a steel pipe

17  which still serves the same purpose.

18     THE COURT:   What about the dam?   Is it the same as it

19  was?

20     THE WITNESS:   The diversion dam, yes, except for the

21  improvement of sand traps to catch the sand to keep it from

22  sanding your lines up.

23     THE COURT:   Is this a permanent dam across there?

24     THE WITNESS:   Yes, it is rock and cement.   It is about,

25  oh, I would say 30 inches high.

1    THE COURT:  Does it wash out in wintertime?

2    THE WITNESS:  No.  We have to clean the sand out of it.

3    It backs up and holds the sand.

4    THE COURT:  In 29 years you have never known it to wash

5    out?

6    THE WITNESS:  No, sir.  This whole canyon is just a

7    series of huge boulders and we more or less just mortared

8    the smaller rocks in with cement.  A storm couldn't take it

9    out.

10   THE COURT:  Does this dam go down to bedrock'

11   THE WITNESS:  I don't know whether it would be bedrock

12   or not, but it is rock; probably the top of other big boulders.

13   THE COURT:  It is anchored to these rocks below?

14   THE WITNESS:  Yes.

15   THE COURT:  Go ahead.

16   BY MR. SACHSE:

17   Q  How high did you say the dam was?

18   A  About 30 inches.

19   Q  It is less than three feet high?

20   A  Yes.

21   Q  And when there is high water the water just runs over

22   the top, doesn't it?

23   A  Yes, it goes right over, and we have this 10-inch

24   pipe that goes off to the side and goes through the sand trap

25   and then through a weir and into your line.  That is to keep

12900

the sand from going into your line and sanding your lines up.

Q   You say it goes to your reservoir.   What kind of reservoir is that?

A   Irrigation reservoir.

Q   How is it built?

A   It is an earth pond.

Q   It is an earth pond with embankments around it?

A   Yes, and then an outlet.

Q   Do you know how many acre feet of water it can hold if full?

A   There are two that we serve from there.

Q   There are two reservoirs?

A   Yes, and they are divided by a fill between them.

Q   In other words, they are immediately side by side, are they not?

A   Yes.

Q   With just a small fill between them?

A   Yes.   The larger one holds 20 acre feet of water-- that is not 20 acres in surface, that is 20 acre-feet, and the other holds 16, and they are side by each.

Q   Are these reservoirs interconnected by pipes or channels?

A   Yes.

Q   So if you put water into one reservoir you can shut it off and keep it in one, if you want to, or permit it to

1   run directly from one into the other?

2       A   Yes.

3       Q   You can operate them separately or as a single

4   reservoir with a wall across the middle; is that correct?

5       A   Yes.

6       Q   And from that reservoir where does the water go?

7       A   It irrigates.  We have a butane booster plant.  As

8   we were employing sprinklers and the particular type we were

9   using were the Rainbird 40, so you had to have 40 pounds

10  pressure; so we pump from the reservoirs with the booster.

11      Q   You could actually gravity from the reservoir to

12  the fields on the ranch, could you not?

13      A   Oh, yes.

14      Q   And in the past that has been done by prior owners?

15      A   Yes, until sprinklers came into use.  In years past

16  it was all flood irrigated.

17      Q   About when did you start sprinkler irrigation, if

18  you know?

19      A   The first sprinklers that came on there was the old

20  galvanized type.  Ralph Singer put them there in possibly '41.

21  But we discontinued those because we couldn't get help to move

22  them.  That was before they started to make them in the

23  aluminum.  So then John Tyler put the aluminum sprinklers in,

24  and during the war years--

25      THE COURT:  That is portable?

1    THE WITNESS: Yes, it is portable.

2    THE COURT: You can move it around.

3    THE WITNESS: Yes. Approximately three miles of under-

4    ground main lines, and then we have stands or risers, some

5    call them, that come off those lines into the individual lines

6    wherever you are irrigating.

7    BY MR. SACHSE:

8    Q    And you have irrigated wholly from sprinklers for

9    the last few years?

10   A    Yes.

11   Q    Or do you still do some flooding?

12   A    I will take that back. I raised some corn, and any

13   row crop I flood. I don't use sprinklers.

14   Q    But you use sprinklers entirely on your permanent

15   pasture and alfalfa?

16   A    Yes-- and grain.

17   Q    How is this reservoir used in connection with your

18   system? Do you store water in it for long periods of time?

19   Or do you use it as a conduit?

20   A    Oh, no, it is strictly for irrigation. What is done

21   there, I usually irrigate at night because we have quite a

22   brisk breeze through there and I was losing so much from

23   evaporation, so I changed and irrigated at night. Then I

24   store my water in the daytime both from the well and from the

25   stream and pump it out into the booster.

Q   And the reservoir also gives you a larger capacity from which you can boost?

A   Yes.  If I did not have a place to pond it my booster would be of no value to me, because it would put out so much more water than what would be the normal flow.

Q   During your acquaintance with  the ranch have you used water for domestic purposes also?

A   Yes, we used to use this same pipe line to get our domestic water from there.

Q   Have you used this same water for stock water?

A   Yes.

Q   And for irrigation purposes?

A   That is right.

Q   Incidentally, you have fish in that reservoir, do you not?

A   Yes, there are fish in there.

Q   What crops do you of your own knowledge know have been raised on the ranch?  Start again, if you will, please, with the most recent time and go back.

A   Well, for Mr. Seavers there was cattle, hay, alfalfa, barley, oats, rye.

Q   It was pretty much a grain and stock operation for Mr. Seavers?

A   That is what the place has always been.

Q   Prior to that was there ever an orchard on it?

1290¢

1    A  Oh, yes, there used to be, I would judge, about 20

2  acres of English walnuts there at one time.

3    Q  And have there from time to time been row crops

4  raised?

5    A  Oh, yes, most every year.

6    Q  Have you ever measured at any time the amount of

7  water diverted from Wilson Creek by your surface diversion?

8    A  Yes, I have measured it-- it is fairly accurate--

9  by the barrel measurement. Set a 50-gallon barrel under your

10  stream and time it to see how long it fills and then you can

11  divide that by gallons per minute. 9 gallons a minute is a

12  miner's inch. So the last measurement that I had was a

13  fraction over 13 miner's inches coming through the weir.

14    Q  And when was that?

15    A  That was either in August or September. That is

16  the very lowest time that water is --

17    Q  Last year, August or September?

18    A  Yes, of 1959.

19    Q  How would that flow compare with the flow in pre-

20  ceding years at the same season? Was that about normal for

21  the dry season?

22    A  Yes, I would say fairly.

23    Q  But the flow would be greater in the early spring?

24    A  Yes. You can take this time of year right now,

25  possibly if you went by the weir and measured it, normally it

12905

1     is flowing about 20 to 24 inches at this time of year.

2         Q  You have seen these documents that are in evidence

3     as Government's Exhibits 233 and 234, haven't you?

4         A  Yes.

5         Q  What do you know about them?

6         MR. VEEDER:  He knows they are black.

7         MR. SACHSE:  I will lead you, Mr. McGaugh.  I don't

8     think Mr. Veeder is going to object.

9         Q  As far as you know, these are just pieces of paper

10    that your brother-in-law had also?

11        A  That is right, and each owner down the line.

12        Q  You testified that the surface line from the diversion

13    was changed in part from a redwood weir to a steel pipe?

14        A  That is right.

15        Q  Was that done while you were on the ranch?

16        A  Yes, I was manager for Ralph Sanger.

17        Q  Did that change in the system of moving the water

18    from a weir to a pipe increase or decrease the amount of water

19    you were taking at that time?

20        A  No, I would say it served the same purpose.  It is

21    just that the old one was needing repair and they replaced it

22    with a steel line.

23        Q  You are generally familiar with Wilson Creek as it

24    flows through the valley floor of the Stardust Ranch, aren't

25    you?

1       A   Yes.

2       Q   And the floor of the valley proper around the ranch

3   is quite flat?

4       A   Yes.

5       Q   And presently, am I not correct, there are dikes or

6   levees constructed along the creek?

7       A   Yes.

8       Q   Who built those?

9       A   Ralph Sanger.  I was manager there at that time.

10      Q   What was the reason for doing that?

11      A   Well, in 1937 when we had the big rain it flooded

12  the whole area and we lost about 20 acres of alfalfa, plus

13  washing about three feet of sand in on some of our better

14  fields.  That was about the time the Government Soil Conserva-

15  tion come into being, and the encouraged the ranchers and

16  farmers to do that sort of thing and gave part of the money

17  toward building such things.

18      THE COURT:  Is this a good time to take a recess?

19      MR. SACHSE:  Yes, your Honor.

20      (Recess.)

21      MR. SACHSE:  Your Honor, during the recess I received

22  a telephone call from Mr. Krieger-- and I have just told Mr.

23  Veeder-- and Mr. Krieger will be here Tuesday and Wednesday

24  and expects to be able very quickly to put in the evidence

25  on all the rest of his clients, with the possible exception of

12907

the Diamond and Domenigoni Valleys, and Mr. Swader (Reporter)
is special delivering the transcript of that to him, and
depending on what he reads in the transcript he will be able
to advise us on Tuesday or Wednesday whether he is going to
want any further time from then or not.   So we may get a very
happy break in getting rid of a lot of people of Mr Krieger.

THE COURT:   Good.

BY MR. SACHSE:

Q   Mr. McGaugh, will you describe the kind of stream
that Wilson Creek is in the dry season after it reaches your
point of diversion or, let's say, starting at your point of
diversion?   Do you take basically all of the water in the dry
season?

A   Yes.

Q   Then in the dry season it is a dry stream bed down
between these dikes until it reaches somewhere near the Oviatt
property; is that correct?

A   Yes, right after it goes on to the Oviatt Property,
just across the highway there.

Q   And at that point it becomes surface water?

A   Yes.

Q   Are you familiar with the Oviatt diversion?

A   Yes.

Q   And it flows then as surface water to the point of
the Oviatt diversion?

1      A   Yes.

2      Q   In the past did that point of rising water where it
3  came to the surface, was that further upstream?

4      A   Yes, that used to be up on-- the water came up on the
5  Stardust property.   In these dry years I guess it just receded
6  until it--

7      Q   It now comes up on the Oviatt property?

8      A   Yes.

9      Q   In the wintertime when there is surface flow in
10  Wilson Creek, such as after heavy rains, is it now entirely
11  confined between the two dikes, or does it spread out over the
12  valley?

13      A   No, it is confined between the two dikes and shoots
14  it right straight on down the canyon to Oviatts and then on to
15  Vail Lake.

16      Q   When was the last time those dikes washed out?

17      A   They have never washed out.   I maintain them each year.
18  They will cut in like banks will, but each year I take a dozer
19  and--

20      Q   So they have never actually broken and flooded the
21  valley since 1936 or '37?

22      A   Yes-- '37.

23      THE COURT:   This is to prevent flooding on your property;
24  is that the reason?

25      THE WITNESS:   Yes, to more or less centralize the flow.

1    It is right in the bottom of a wash bed, but it is just to

2    keep it from flooding out over its banks.

3            THE COURT:   This is on Wilson Creek?

4            THE WITNESS:   Yes. Well, I think the maps, your Honor,

5    show that as Lancaster.

6            MR. SACHSE:   The U.S.G.S. quad even shows them.

7            THE COURT:   Your maps will probably show that as

8    Lancaster.

9            MR. VEEDER:   Your quads are the 29 series.

10           THE COURT:   Wilson Creek and Coahuilla Creek come

11   together on the Stardust property, don't they?

12           THE WITNESS:   Yes.

13           THE COURT:   Then these dikes are downstream from where

14   they come together?

15           THE WITNESS:   Yes.

16           THE COURT:   Are these dikes down through Wilson Valley

17   and what they call Lancaster Vlley?

18           THE WITNESS:   Yes.

19           MR. SACHSE:   It is very clearly shown on United States

20   Exhibit 29R, your Honor.

21       Q   Mr. McGaugh, would you look over his Honor's shoulder

22   here?  The dikes to which you referred are shown in a cross-

23   hatched line running down--

24       A   Yes, here they are.

25       Q   It says "Levee"?

1      A  Yes.

2      Q  And the little black building symbols which I see

3  immediately above the word "Valley" in Lancaster Valley, those

4  are the buildings on the Stardust Ranch?

5      A  Yes, that is the headquarters.

6      Q  And the reservoir shown on 29R is your reservoir, is

7  it not?

8      A  Yes.

9      Q  And that reservoir is shown on 29R as a single body

10  of water, but as you explained it is actually divided into

11  two parts by a sort of levee in the middle?

12      A  Probably when this map was made the other reservoir

13  was not made, because I just built that in 1956.

14      Q  But presently it is operated?

15      A  Yes.  It joins this one on the south.

16      THE COURT:  Where is this diversion point?  Off of the

17  map?

18      THE WITNESS:  You see, here is our levees.  This is the

19  lower end of your canyon.  It comes out of this rocky canyon,

20  and the pipe line comes around and it hangs on rock bluffs

21  until it gets out of the canyon and then it is buried from that

22  point.

23      THE COURT:  Over to the reservoir.

24      THE WITNESS:  Yes.

25      THE COURT:  The diversion point is--

1          THE WITNESS:  It is in this canyon.

2          THE COURT:  East of the north of the levee, beginning

3     of the levee?

4          THE WITNESS:  Yes.

5          THE COURT:  I notice that 29R shows an intermittent

6     stream running down into your reservoir.

7          THE WITNESS:  That is a dry wash.  I also have dikes

8     that control and shoots it into this one right here.  I have

9     taken a dozer and carryall and opened the channel so that it

10     will not run down across and flood your buildings out.  There

11     are several big hay barns up in this area.  It would just come

12     down there and spread out and run through your barns and

13     buildings.  So I have also put it into that other channel.

14     Just a kind of flood measure is what it is.

15          THE COURT:  Government's Exhibit 15 shows Coahuilla

16     and Wilson Creek.

17          THE WITNESS:  Coahuilla and Wilson Creek come together

18     and that forms Lancaster.  Lancaster actually comes through

19     the ranch.

20          THE COURT:  The joinder of Coahuilla and Wilson Creeks

21     is near the intersection of Sections 3 and 10 and they are

22     not shown on this map 29R.

23          MR. SACHSE:  The joinder of the two streams, your Honor?

24     I don't know what you are getting at, but the joinder of the

25     two streams, as shown on the ownership map, is on the Stardust

1    property, the extreme upper end of it.

2         THE COURT:  Yes, that is what he testified to.  From
3    Government's Exhibit 15 it would appear they join in Section
4    10 in the northeast quarter of Section 10.

5         THE WITNESS:  That is right.  That is where they join.
6    BY MR. SACHSE:

7         Q  You also have wells from which you irrigate your
8    property, don't you, Mr. McGaugh?

9         A  Yes.

10        Q  How many, and will you tell us what you know about
11   each well?

12        A  We have one well there that we have for irrigation.
13   It is an artesian well.

14        Q  How deep is it?

15        A  474 feet by the log book.

16        Q  And is that the most recent well you have put in?

17        A  Yes.

18        Q  And it is a flowing artesian at present?

19        A  Yes.  The artesian is about 50 gallon a minute.

20        Q  50?

21        A  Yes.

22        Q  What is your next well?

23        A  And then the one we use for the domestic water.

24        Q  How deep is that?

25        A  137 feet.

Q   Does that also flow?

A   No, it is not a flowing well.

Q   Was it ever a flowing well?

A   No.

Q   Then you have another well, do you not?

A   Domestic.

Q   How deep is that?

A   94, I believe.  I couldn't be sure of that one.

Q   And that is also for domestic purposes only?

A   Yes, it is a standby.  It is just a shallow well.

Q   So your irrigation water is derived wholly from the stream diversion or from the new deep artesian well?

A   That is right.

THE COURT:  Where is the new deep well constructed?

THE WITNESS:  In Section 8.

THE COURT:  The part of Section 8 you own is the part the Southeast Quarter of Section 8?

THE WITNESS:  Yes.  It is right near the road that comes to what we call the Welch place.  That property was acquired.

MR. VEEDER:  Could I have that located on the Oviatt map, Oviatt Z?

MR. SACHSE:  Step to the board, if you can, and locate it, Mr. McGaugh.

THE WITNESS:  This comes in from the back side of the property.  We have the ranch buildings here.  The well sets

1    just about right here.

2         MR. VEEDER:  Why don't you mark it on there?  I will

3    give you a red pencil.

4         THE COURT:  Does that have the sections there?

5         MR. VEEDER:  Yes, it has, your Honor.

6         THE COURT:  Is it the Southeast Quarter of Section 8?

7         MR. VEEDER:  There is 8 there.  Would you take your red

8    pencil--

9         THE WITNESS:  It is right about there, in that area

10   right there.

11        THE COURT:  Where is that, in Section 8?

12        MR. VEEDER:  It looks like the Southeast of the North-

13   west.

14        MR. STAHLMAN:  That would be in the older alluvium.

15        MR. VEEDER:  Is it in the Southeast of the Northwest?

16        THE WITNESS:  The only thing I can go by is this road

17   coming in to the house.

18        THE COURT:  You are not talking about this road over

19   here?

20        THE WITNESS:  Is this the channel?

21        THE COURT:  That is your levee, yes.  Here is your

22   reservoir, and here is a little road that comes from the

23   reservoir across here and runs across there and shows a couple

24   of houses in there.

25        THE WITNESS:  These are the houses, then.

1      THE COURT:  Is that the Welsh place?

2      THE WITNESS:  This is the old Welsh property.

3      THE COURT:  Where is the well?

4      THE WITNESS:  This is your highway, and there is a road

5  comes in from that side and I thought that was it.  This here

6  is wrong.  I have the well setting on Coffer's property there.

7      MR. VEEDER:  Here is an eraser.

8      THE WITNESS:  So that would be closer down to the build-

9  ings in here.

10      THE COURT:  Here is your reservoir, here is the road

11  running directly north from the reservoir.

12      THE WITNESS:  Yes.

13      MR. VEEDER:  Let the record show we are referring to

14  Oviatt Z now.

15      THE COURT:  Yes.

16      THE WITNESS:  Well, this road continues on and goes out

17  that way.  There is a white house and barn sits here, and the

18  well is just out from them.

19      THE COURT:  Is this the house and barn?

20      THE WITNESS:  This must be.

21      THE COURT:  As you go across on the left-hand side?

22      THE WITNESS:  Yes.  So the well would be right in this

23  vicinity here.  I had it up on the neighbor's property, the

24  Coffers' property.

25      THE COURT:  There is a little creek bed that runs down

1 through there?

2     THE WITNESS:  Yes.

3     THE COURT:  Which side of the creek bed is it on?

4     THE WITNESS:  It would be on the--

5     THE COURT:  Northwest?

6     THE WITNESS:  Yes.

7     THE COURT:  And the house and barns on the southeast

8 side?

9     THE WITNESS:  Yes.

10     THE COURT:  So it is across the creek bed.

11     THE WITNESS:  So we have it just about located right

12 there.

13     MR. VEEDER:  That little red spot is a little too small.

14     THE WITNESS:  Well, I thought perhaps I might have to

15 erase it again.

16     THE COURT:  From 29R it would appear that it is right

17 at the edge of the valley floor.

18     THE WITNESS:  Yes, it is just up from the valley floor.

19     THE COURT:  On a peak?

20     THE WITNESS:  A ridge.

21     THE COURT:  The artesian well?

22     THE WITNESS:  Yes.

23     THE COURT:  How did you locate it on a ridge?

24     THE WITNESS:  We had two fellows come and locate it

25 there, a geologist and another fellow.  I told them it seemed

to me like they were crazy, but that is where they got their
well.

MR. VEEDER:  Did they use a water witch to locate it?

THE WITNESS:  Yes, they used a water witch, and then
a geologist from Los Angeles.

MR. SACHSE:  I am getting confused on these wells.

Q  Do you have another flowing well?

A  Just the one.  Just the one flowing well.

Q  Then let's be sure we get this straight.

A  O.K.

Q  Will you take a good look at the well described in
the engineering report as No. 4?

A  This well is located 100 feet northwest of the ranch
house.  This well here is the one we use for the domestic
use for all the buildings.

Q  But that doesn't flow?

A  No; it is pumped.

Q  Then Col. Bowen's observation that the well was
flowing into a small ground storage reservoir, you think,
is in error?

A  Maybe I didn't read far enough up here.

MR. VEEDER:  We will call Col. Bowen.

THE WITNESS:  No, he has it correct.  It so states here.
It is in Section 8.

BY MR. SACHSE:

Q  Is this the big well, then?

1    A   Yes, this would be the big well.  And the other one

2  is-- I don't see it mentioned.  This would be the--

3    Q   The one you have just pointed out?

4    A   Yes, the one I just pointed out there is that well

5  there.

6    THE COURT:  This well is on the Stardust property?

7    THE WITNESS:  Yes, sir.  Coffer owns a part of Section

8  8 there.

9    MR. VEEDER:  Now we have added to Oviatt Z?

10    THE COURT:  I am just trying to find out.  It is

11  questionable whether it is in the Southeast Quarter or in the

12  Southwest Quarter.  It is very close to the line.

13  BY MR. SACHSE:

14    Q   Mr. McGaugh, you wanted then to correct what you said

15  earlier that there appeared to be an error in the engineering

16  report, and you are now of the opinion that the well described

17  by Col. Bowen in the engineering report United States Exhibit

18  232 as Well No. 4 is, in fact, this new artesian well that

19  you have just placed on Oviatt Exhibit Z?

20    A   That is right.

21    THE COURT:  How many gallons a minute would you say

22  that flowed?

23    THE WITNESS:  Approximately 50 gallons a minute the

24  last time I gauged it.

25

BY MR. SACHSE:

Q   Now, in addition you have developed, or there have been developed while you have been on the ranch, some springs, have there not?

A   Yes.

Q   How many?

A   Oh, I have developed one, two, three springs.

Q   Would you find it easiest to locate the springs with reference to the geologic map, do you think-- 29R?

A   Yes, I think so.

Q   Don't make any marks on it yet.  Can you tell us where these springs are located, approximately?

A   There is one right here.

Q   Put your pencil at them first and then we will locate them.

A   Where Wilson and Coahuilla Creeks come together.

THE COURT:  This doesn't show that.

THE WITNESS:  It doesn't?  Well, I developed one for stock water there.

BY MR. SACHSE:

Q   You developed a spring for stock water purposes right at the junction of Wilson and Coahuilla Creeks?

A   Yes.

Q   What is the next one you developed?

A   Just up from this flowing well I dug a little pond

1      and spring out and that would be up above where I located the

2      flowing well.  That would be in Section 8.   This white here

3      evidently is the cleared ground, and it would be roughly

4      right in this area here.

5          Q  It would be in the Southeast Quarter of Section 8?

6          A  Yes.

7          Q  How big is that spring?

8          A  It is just a small spring for stock water.

9          Q  When you say you developed it, what do you mean you

10     did?

11         A  Took a dozer and dug it out and cleaned it out and

12     put redwood in.

13         Q  In other words, it is simply a box in which you

14     accumulate the seepage from the spring for stock water pur-

15     poses?

16         A  Yes.

17         Q  You don't take that water anywhere?

18         A  No, it just stays right there for stock water.

19         Q  Is there any other spring?

20         A  Yes, there is one right over from the well the other

21     way just above.

22         Q  The same well?

23         A  Yes.

24         MR. VEEDER:  Before we go on I would like to have him

25     mark those springs on Section 8.

THE WITNESS:  I can give it approximately here.  It would be right about in this area here.

MR. VEEDER:  Will you put a red mark there?

THE WITNESS:  All right.  And then of course the other one I can't mark because it is not on this one.  That is where the two creeks come together up above.  Then this would be the well.  Right in here would be the other spring in this area just down from the well a ways.

THE COURT:  Two springs and a well in that section?

THE WITNESS:  Yes.  Well, this whole area here is more or less springs.  The neighbor up there has one or two springs, and we have two in there.

THE COURT:  Let me mark these.  The red dot I put on there, you saw that, for the well?

THE WITNESS:  Yes.

THE COURT:  I will mark that "Well."  And the first spring you showed there I will mark 1, and the second spring is No. 2, and off to the side I will write "McGaugh."

BY MR. SACHSE:

Q  Are any of these springs used for any purpose except stock water?

A  No, that is all, for stock water.

MR. SACHSE:  You may cross-examine.

(Another matter.)

CROSS-EXAMINATION

BY MR. VEEDER:

Q   Now, in regard to the flow of the Wilson Creek in the last ten years, from your personal observation would you compare it with the previous ten years as long as you have been acquainted up there for thirty years?  Is there more or less water in there?

A   I would say there is less, from my observation.

Q   And are there people upstream there diverting and using water from your--

A   No.  There was a ranch up there, but theirs is completely dried up and they have abandoned and moved out-- what we knew as the old Surray Ranch.  And then further up-stream --

Q   Upstream on what?

A   On Wilson Creek, there is a trout fishing concession up there.

Q   Somebody has impounded the water up there?

A   No, the water continues to flow, but he has put little checks in the creek and stocked it with trout.  It has been there a number of years.  Link's Rocky Lodge is what it is known as.

Q   How far is that above the Stardust?

A   Right up the creek, I would judge two and a half to three miles.

1    THE COURT:  Is that in the east side of the area called

2  Coahuilla Valley?

3    THE WITNESS:  Yes, it is.  Well, it is more commonly

4  known as Reed Valley.

5  BY MR. VEEDER:

6    Q  Now, would you step to Oviatt Z.  This is the Ramona

7  Ranch?

8    A  Yes.

9    Q  Are you acquainted with that?

10    A  I see that.

11    Q  You are familiar with the Ramona Ranch?

12    A  Yes.

13    Q  During the irrigation season, during the drier season,

14  say during the month of July, where was the first rising water

15  that you would observe in the stream above the Oviatt property?

16    MR. SACHSE:  In what year?  On direct examination he

17  testified that it moved.  So tell him when you want.

18    MR. VEEDER:  I would like to have him talk about the

19  month of July on years as he has observed it.

20    THE WITNESS:  During the whole entire time?

21    MR. VEEDER:  Yes.  Can you sort of take an average?

22    A  Yes.  I would say that roughly the area would be--

23  This is the dike coming through there-- the area would probably

24  be right in this vicinity here.

25    Q  To the end that we can keep this straight, would

12924

1    you just print an A right there as to where you usually

2    observed rising water back twenty years ago?

3        A   That would be right there.  And then in this area

4    here.  You see, this used to lie in the Stardust Ranch, but

5    Oviatt has this now.  There used to be an area right in here.

6        Q   Did you sell some of that land?

7        A   My brother-in-law .  When he first sold this property

8    he reserved 40 acres along the road there, and later sold that

9    to Oviatt, and that would be this portion right here.

10       Q   Was your brother-in-law named Fred Bass?

11       A   Yes.

12       MR. VEEDER:  Your Honor, in that connection I refer

13   to Oviatt Exhibit Y2, I think it is, in which there is a

14   reservation by Fred Bass, if I properly read this instrument,

15   for rights to the use of water in connection with the lands

16   to which the witness has just made reference.

17       Q   Now, what has been the place of rising water, for

18   example, in the last ten years?

19       A   You are talking about Oviatts now?

20       Q   No, I am talking about the area within the levee here.

21   Has it moved on down?

22       A   Yes, it is below there.  This is Highway 79 here.

23   There is no water that comes up on the east side of this

24   highway any more at all.

25       Q   When you say "this highway" you are alluding to--

1    A   Highway 79.

2    Q   And at the present time the rising water is--

3    A   There has not been any for the last ten years, I

4  would say.

5    Q   There has not been for the last ten years?

6    A   No.

7    Q   Any water where you put the A?

8    A   You asked me twenty years ago.

9    Q   Yes.  And there used to be a live stream there?

10   A   Yes.

11   Q   Throughout the whole irrigation season; is that

12  right?

13   A   Yes, it came up there the year round.

14   Q   And you would say it would be downstream from

15  Highway 79 on the Oviatt property about how far at the

16  present time?

17   A   Well, I haven't been over there recently, but --

18   MR. SACHSE:  If you don't know on these things, be

19  frank to tell Mr. Veeder you are not sure.

20   I don't want to use my witness to stab for Mr. Oviatt.

21   MR. VEEDER:  I don't want anyone stabbing for Uncle

22  Sam.

23   THE COURT:  What other witnesses do you have?

24   MR. SACHSE:  I have no more, except to ask Col. Bowen

25  about the engineering report.

12926

1        MR. VEEDER:  Ten minutes is enough for me, your Honor.

2        THE COURT:  I can't give you ten minutes.  I have a

3   luncheon engagement and I have to go some distance to keep it

4   and it's a rather important one.  I have to go right now.

5        MR. VEEDER:  I think your Honor can appreciate the

6   importance of this witness in view of the circumstances.

7        THE COURT:  Adjourn until 2 o'clock.

8        (Noon recess.)

1    San Diego, California, Friday, April 1, 1960.   2:00 P. M.

2

3        MR. VEEDER:  Your Honor asked me to bring to your

4    attention the setting for April 4th.  I suggest that it be

5    continued to the 5th.

6        THE COURT:  Yes.  Heretofore we have suggested continu-

7    ing this case to April 4th.  Because of a judge's meeting it

8    will be continued to 10 o'clock A.M. on April 5th, and we

9    expect to go on April 5th and 6th.

10       MR. SACHSE:  There will be no appearance then on the 4th?

11       THE COURT:  No appearance on the 4th.

12       MR. STAHLMAN:  And not on the 7th?

13       THE COURT:  No.  Then we figure that if this matter

14   shortens up on Tuesday, the 6th, we can argue these proposed

15   decrees on the 7th.

16       MR. SACHSE:  I will be prepared to argue.

17       MR. VEEDER:  I thought we were going to recess on the

18   6th, your Honor.

19       THE COURT:  I thought that in our conversation in

20   chambers we said that if we found we had time on the 6th we

21   would argue the decree.

22       MR. VEEDER:  I am for that.

23       THE COURT:  This depends on what happens on Tuesday.

24   If we clean up on Tuesday and have the 6th available, we might

25   as well use it for that purpose.

1    MR. VEEDER:  I am for that.  But you mentioned using

2    the 7th.

3    THE COURT:  I misspoke myself about the 7th.

4    MR. STAHLMAN:  Your Honor, in going over Mr. Veeder's

5    arguments and proposed findings, I find there may be a short

6    amount of testimony that I may want to put on.  Otherwise,

7    we can argue then.

8    THE COURT:  We will cross that bridge when we get to it.

9    The plan is this.  We have set aside the 5th and 6th.

10   Depending on how many people show up on the 5th and how far

11   Mr. Krieger gets, whether we get cleaned up or not, we may

12   have time on the 6th to argue the decrees.

13   MR. STAHLMAN:  Yes.  But you haven't set anything for the

14   7th?

15   THE COURT:  No.  I am going to try that narcotics case

16   on the 7th.

17   MR. VEEDER:  We might clean up another point in the

18   record.  I think this witness misunderstood what occurred this

19   morning.  I said that ten minutes is not enough.  I think he

20   understood you to say that he had opportunity to be through

21   in ten minutes, and that certainly couldn't be the case.

22   Isn't that correct, Mr. Sachse?

23   MR. SACHSE:  Go ahead.

24   BY MR. VEEDER:

25   Q  Mr. McGaugh, I show you the aerial photograph which

1  is in the back of Exhibit 232 of the Stardust Ranch, and the

2  number of that aerial is 5-0105.  Have you viewed that aerial?

A   I have seen several of them.

Q   And that does depict pretty well the properties where

your principal farming operation is located; is that right?

A   Yes.

Q   Where is that artesian well in relation to your

farming operation?

A   Here is the wash.  This is the buildings right here.

This little road runs right around here.  You see this little

knoll.  You can even see the dozed-off spot right in here.

This isn't the boundary line here, this red.

Q   That red is not the boundary line?

A   No, because this is the field.  We have an airstrip

here on this field, and there is a white house here and a barn

and on this ridge you can see our reservoir, and the well is

just above the reservoir in that area.

THE COURT:  Let me look at that.

I would say that he is pretty accurate when he measured

it on 29R.

THE WITNESS:  I can also show those springs.

MR. VEEDER:  I think this picture 5-0104 will locate it

a little more accurately.  I wanted to tie it to the home

place, though, your Honor.

Q   Can you find it on that?

1        A   Right there is the well at that point, and this is

2   the reservoir right here.

3        MR. VEEDER:  I am going to hand you this grease pencil.

4        Col. Bowen, this grease pencil will show up on this,

5   will it not?

6        MR. SACHSE:  A plain black pencil will show up, won't it?

7   BY MR. VEEDER:

8        Q   You just mark it with the red pencil.  Make an X right

9   there.

10       THE COURT:  The well?

11       MR. VEEDER:  Yes.

12       THE WITNESS:  Right where that dot is.

13  BY MR. VEEDER:

14       Q   Are you utilizing that well for the purposes of

15  irrigation?

16       A   Yes, that is strictly irrigation.

17       Q   And where are you using that water?

18       A   Well, there is a pipe line.  The water goes directly

19  into the reservoir.  We have a booster there away over at

20  these reservoirs.  It is all tied together with an underground

21  system.  I can use that water any place on there, as well as

22  the waters from these reservoirs.  It is all an interconnected

23  system.  Wherever I need the water for this whole valley

24  here it is under pipe line and it is all under, which my

25  system there was, I would oppose my pumps--

12931

1    Q   You would what?

2    A   I would oppose my pumps and figure my gallonage.
3  This booster puts out 500 gallons a minute, this one puts
4  out 750.  Figuratively speaking, I could run about 103
5  Rainbird 40's by opposing my pumps.

6    Q   As a matter of fact, then, you have a new source of
7  water there by that well that you didn't have prior to the
8  time it was drilled; is that right?

9    A   That is right.

10   Q   And what was the date of the drilling of that well?

11   A   It was in 1957, I think they started, in the late
12  fall there, and we finished and had it in operation by the
13  following May, as I remember it.

14   Q   Do you have any other irrigation wells from which
15  you are pumping?

16   A   No.

17  THE COURT:  You said that one of these wells pumps 750
18  gallons a minute?

19  THE WITNESS:  That is my booster.

20  THE COURT:  Your booster out of the reservoir?

21  THE WITNESS:  Yes.

22  THE COURT:  What would be the purpose of opposing the
23  pumps?  Couldn't you pump more out of the reservoir without
24  pumping the other well?

25  THE WITNESS:  Well, if I use one, like in my long sets,

1   I wouldn't get enough water out to get all over it in a hurry.

2       THE COURT:  Two of them gives you more than one?

3       THE WITNESS:  Yes.

4       MR. SACHSE:  Equalize your pressure?

5       THE WITNESS:  Yes.  One of the boosters is 750 gallons

6   a minute, and the other is 500, and putting the two together I

7   get roughly 1300 gallons a minute where I can get all over one

8   particular--

9       THE COURT:  I thought it was 50 gallons a minute.

10      THE WITNESS:  That is the artesian.

11      THE COURT:  Isn't that the well you were talking about

12  pumping?

13      THE WITNESS:  The artesian is into the reservoir.

14      THE COURT:  I see.

15      THE WITNESS:  Then my booster plants take it from the

16  reservoir.  That is the principal reason we designed it that

17  way.

18      THE COURT:  You have a pump on that well?

19      THE WITNESS:  Yes.

20      THE COURT:  And when you pumped it you get 500 gallons

21  a minute; is that right?

22      THE WITNESS:  It is about 380, I think was the last.  I

23  can't say exactly to that.  I can check it.

24      THE COURT:  All right.

25

BY MR. VEEDER:

Q  Have you observed a falling in the ground water table in your other well?  Has there been a decline in the depth to water in your wells?

A  Not noticeably, I would say.  I haven't noticed it.

Q  From the standpoint of surface supply-- we are still on Exhibit 232-- where is your point of diversion that you take the water down to this well? I am now on photograph 5-0105, the last one.

A  You can't see it on this map.  You can see the canyon. This is your canyon going up here.  Like I say, it is very steep, but it is just about half a mile from that point up this canyon here where the diversion dam is, and your pipe line comes down out of this canyon on kind of rock bluffs and then after it reaches out here in the open it is a buried pipe line to your reservoir.  But it comes out of this canyon right here.

Q  You have been taking the entire stream there, have you?

A  Yes.

Q  During the irrigation season?

A  Yes.

Q  And you have been bringing that over and storing it in your reservoir?

A  And then pumping it.  The only reason we do that, like I explained before, because the amount isn't there that

1    you can employ and be justified; so we impound it and then we

2    employ this butane booster that pumps 750 gallons a minute.

3        Q   And you are using that for long-range storage, though?

4        A   No.

5        Q   How do you keep fish in there?  Those fish don't have

6    to go down to the well every night while you are pumping it?

7        A   That is the way you design, or the Soil Conservation

8    boys design those.  They have what you call a three-foot dead

9    storage.  In other words, you can't pump that last three

10   feet out of there.

11       Q   In other words, you do have some permanent storage

12   in there?

13       A   About three feet.  That is to keep your pipe line

14   clean.  It is more like a settling basin to keep your debris

15   and sand and stuff from getting in your pipe line system.

16       Q   When we were interrupted for lunch you were going to

17   show on Oviatt's Z the point of rising water during the

18   irrigation season as it now occurs, as distinguished from where

19   it occurred twenty years ago.  Could you step down here and

20   mark that for us?

21       A   Well, I would say this must be their diversion right

22   there, and I would say it is right in that area.

23       Q   You say the point of rising water is about where

24   Oviatt has his dam?

25       A   Yes.  Possibly maybe just a few feet ahead of there.

1    I couldn't be absolute on that, because I don't keep check on

2    it.

3         Q   Why don't you just take this yellow pencil and draw a

4    line down to here and put a B up there?  That will show where

5    the point of rising water is, from the standpoint of your

6    testimony.

7         A   I would say approximately-- this is the highway--

8    right in this area here.

9         Q   Draw a line down.  Now just write a B right there.

10   Put it in red so we will know you did it.

11        Now, since you went on the place, the Stardust Ranch,

12   how many acres have you been irrigating for alfalfa?

13        A   You mean all at one time, or over the period of years?

14        Q   Have you increased your alfalfa acreage since you

15   went on there?

16        A   Yes.

17   THE COURT:  In 29 years you mean?

18   MR. VEEDER:  Yes.

19   THE WITNESS:  Yes, considerably.

20        Q   What would you say was your acreage when you went on

21   there in 1929, say, in Alfalfa in 1929?

22        A   Alfalfa and feed I would judge probably 150 or 160

23   acres.

24        Q   When you went on there?

25        A   Yes, sir.

1          Q   What do you figure the acres to be now?  I am

2     speaking of when you quit.  You left there in '59.

3          A   I had 18 and 14.  I had two different parcels there.

4     One was 18 acres, and another was 14 acres.

5          THE COURT:  32 acres.  That's all the alfalfa?

6          THE WITNESS:  Yes.

7          MR. SACHSE:  This is in the fall of '59.

8          THE WITNESS:  Yes.

9          THE COURT:  How much permanent pasture that you irrigated?

10         THE WITNESS:  I had 56 acres when Mr. Allen bought it.

11    BY MR. VEEDER:

12         Q   Do I understand that you have reduced your irrigated

13    acreage from about 150 down to 88?  Is that what you said?

14         A   That is probably how much the water has fallen off.

15         Q   In other words, you have been forced to reduce, by

16    reason of the falling off of the water supply?

17         A   Yes.

18         Q   And now you have had to supply yourself with water

19    there and maintain this 88 acres or whatever it is, you have

20    had to put in a well?

21         A   Yes.

22         Q   And increase your quantity of water.  Now, has that

23    been your situation, for example-- '58 was a pretty good year,

24    wasn't it?

25         A   Yes.

1    Q   Were you short of water in '58?

2    A   I would say it was just about the same, other than the

3  dry farming crops.  We had a better crop due to the rain that

4  year.  But as far as your water level table and that, it didn't

5  help much.

6    Q   In other words, you are finding increasingly that

7  you are short of water in that area?

8    A   That is right, in my opinion.

9    Q   How many times do you irrigate your alfalfa a year

10 in that area, do you figure?

11   A   Well, I usually irrigate twice to the cutting.

12   Q   How many cuttings do you get?

13   A   Six would be a--

14   Q   Did you ever figure the tons per acre that you got?

15   A   Yes, I have figured, along with my pasturing.  I used

16 to do a lot of pasturing on that.

17   Q   What would you get a ton to the acre?

18   A   Oh about a ton and a quarter.

19   MR. SACHSE:  Do you mean cut hay a ton and a quarter, or

20 is that an estimate of the pasture hay, too?

21   THE WITNESS:  That would be overall.

22 BY MR. VEEDER:

23   Q   In the operation then that you have had, you have

24 actually in your experience cut your acreage in half; is that

25 right?

A   That would be about--

Q   Now, in addition, as I understand it, you have changed your process of irrigation from flooding to sprinkler irrigation; isn't that right?

A   That is right.

Q   Why did you do that?

A   Well, you get more use out of your water from your application in that particular kind of farming, because your land is not level-- it's rolling and generally slopes.

Q   In other words, actually you could irrigate a larger acreage with less water; isn't that right?

A   No; I wouldn't say that, because my experience is that when you flood or sprinkle-- speaking of alfalfa or legumes, you can use that for a yardstick-- one miner's inch of water will give you one acre of alfalfa.  So if you have 20 miner's inches of water you can readily assume you can raise 20 acres of alfalfa and take care of it, whichever way you put it on. You don't have the runoff condition sprinkling as you do with flooding.

Q   In other words, your tail water or your waste water is reduced; is that not right?

A   That is right.

Q   So the water that used to return to the stream when you were flooding doesn't return to the stream now; is that right?

1    A   Not necessarily, because you set your whole operation

2  up where if you are irrigating a field here and lower down

3  you utilize that runoff water for another pasture down below.

4    Q   You catch it and put it into the sprinklers again?

5    A   Not with the sprinklers.   I was speaking of flooding

6  irrigation.

7    Q   In other words, there is not the return flow when you

8  are using the sprinklers?

9    A   No.

10   MR. SACHSE:   The witness didn't say that, Mr. Veeder.

11   MR. VEEDER:   He just agreed with me, Mr. Sachse.

12   THE COURT:   I am confident he didn't mean what you meant

13  by return flow.   By return flow I take it you mean water that

14  would run off the ground into a ditch that might be picked up

15  again and used.

16   MR. VEEDER:   I make no bones about it.   I think when

17  they are using sprinklers upstream there is less water that

18  gets back into the stream than there was previously.

19   THE COURT:   What do you mean by "return flow"?

20   THE WITNESS:   I don't know that I mentioned any return

21  flow.

22   THE COURT:   That was his question.

23   MR. VEEDER:   Let me rephrase the question and straighten

24  this out, because it is important, your Honor.

25   Q   In other words, let's take our Exhibit 232 and you

1    locate your alfalfa.  Right here immediately north of the

2    reservoir, is that an alfalfa field?

3        A  Yes.

4        Q  And you sprinkle that?

5        A  Well, you see this picture was taken--

6        MR. SACHSE:  In '55.

7        THE WITNESS:  I would say it is prior to four years

8    ago, because I have this in alfalfa in this area, which doesn't

9    show up on your map.

10       THE COURT:  Which area?

11       THE WITNESS:  This area right in here.

12       THE COURT:  To the left.

13   BY MR. VEEDER:

14       Q  You have increased the alfalfa acreage?

15       A  Yes, right here.

16       Q  You are sprinkling that area; isn't that right?

17       A  Yes.

18       Q  And the reason why you sprinkle it is that you can

19   utilize more efficiently the quantity of water that you have;

20   isn't that right?

21       A  You can just distribute it better.

22       Q  And as the result there is less waste water from your

23   sprinkler system than there is under the flooding system;

24   isn't that right?

25       A  Now, on your flooding, you see, to get the proper

1    amount for a crop you have this runoff that is spoken of, and

2    in this particular case knowing the terrain and all here is a

3    little area that is often put in-- that is, in the days when

4    we flood irrigated several years ago. Well, your runoff from

5    your alfalfa would run off down, there is a swill through here,

6    and irrigate cow feed down here on the lower which was not

7    cropped. It was just a way of utilizing your runoff water.

8         Q   When it got down to that loose area down there it was

9    pretty close to the stream bed, wasn't it?

10        A   No. In fact, this is one of the largest fields down

11   there. This is a huge field down in here. This is the school

12   house here. This is all farm land.

13        Q   Now you are sprinkling that whole area?

14        A   I would if I had water to irrigate. But the part

15   that we are irrigating we are using sprinklers on.

16        Q   Did you ever calculate the return flow in using your

17   flood system?

18        MR. SACHSE:  Return flow to what?

19        MR. VEEDER:  To the creek, Mr. Sachse.

20        MR. SACHSE: Tell the witness.

21        THE COURT:  Mr. Witness, by the term "return flow," as

22   we use it here, it doesn't necessarily mean water on the

23   surface of the ground in the creek. It would also include

24   water that seeped into the ground.

25        THE WITNESS:  I would say it would be possibly the same

1  from flood irrigating as it would be from sprinklers in that

2  respect, because I have studied into that and in either case

3  10% of your water goes to your deep depth.  Your plant life,

4  different crops, assume different percentages.  Regardless

5  whether you are flooding or sprinkling, you have a certain

6  amount that is going through evaporation and that sort of thing.

7      Q  You would say then that on your place you would figure

8  a return flow of 10% of the water?

9      A  In either case.  Your United States Government

10  statistics will show you that.  That is where I got that

11  information.

12      THE COURT:  That ought to be pretty good authority.

13      THE WITNESS:  That should be.

14      THE COURT:  You can't keep these farmers from reading,

15  you know.

16      MR. VEEDER:  I am glad that we have in the record that

17  it is usually 40%.

18      Q  Now, as I understand it, there are some springs on the

19  Stardust Ranch; is that correct?

20      A  Yes.

21      Q  Could you step up here to Oviatt's Z-- it's a little

22  bit odd to be using Oviatt's exhibits, but would you stand

23  up here and use this purple pencile to show where those springs

24  are located?

25      A  This is the Cottonwood School.

12945

1      Q   You see one near Cottonwood School?

2      A   No, there is not one next to it.  The school should

3  be about here.  There is a spring there.  The springs are all

4  over in this area.

5      Q   Would you mark where the springs are, using that

6  purple pencil?

7      A   We established this as the house this morning, didn't

8  we?

9      Q   His Honor did, and I am accepting it.

10     A   There is a clump of eucalyptus trees about in this

11 area.  There would be one right in here.  Then there would be

12 one-- we established this as the well, didn't we?  There would

13 be one right there.  And then there would be one about right

14 here.

15     Q   Was there a spring on your brother-in-law's place,

16 the old place?

17     A   There is not now.

18     Q   Where would that be located?

19     A   Right in this area here.  Here is the school here.

20 There is a little slough here.  It used to be a quicksand area.

21     Q   That is dried up now?

22     A   Yes.

23     Q   Let's take the yellow pencil again and draw a line

24 down there and put with your red pencil an "S."

25     A   (Marking exhibit.)

1    Q  And that is the spring that is now dried up, eastward

2    from the point of the presently rising water; is that right?

3    A  Yes.  In fact, your State Highway Department has

4    almost filled that up with rocks and stuff they have hauled

5    off the highway.  They have used that area to dispose of so

6    many rocks, it is almost completely filled up by the Highway

7    Department now.

8        MR. VEEDER:  Do you have a well log for your artesian

9    well, the 474-foot well?

10       MR. SACHSE: I neglected to bring it, Mr. Veeder.  I will

11   obtain it and get it to you here as fast as he can mail it to

12   me.  I understood from Mr. McGaugh and Mr. Allen this morning

13   that they have one, but they don't have it with them.

14       Is that right?

15       THE WITNESS:  That is right.  It is also registered with

16   the State.

17       MR. SACHSE:  It's registered with the State.  I think it

18   may be in our present file.

19       MR. VEEDER:  I have no further questions.

20       MR. STAHLMAN:  I have just a few.

21

22                     CROSS-EXAMINATION

23   BY MR. STAHLMAN:

24       Q  Mr. McGaugh, what would you say the distance was

25   between the place where you now observe rising water on the

1  Oviatt property to the place where you saw it when it was

2  furthest upstream from that point?

3      MR. VEEDER:  At what time of the year, George?

4      MR. STAHLMAN:  In the summertime.

5      MR. VEEDER:  July is the month I have been using.

6      MR. STAHLMAN:  I will take July.

7      THE WITNESS:  Roughly speaking, I would say about a

8  quarter of a mile, approximately.

9  BY MR. STAHLMAN:

10     Q   What size pipe do you have for your distributing

11  lines?

12     A   Our main lines are all eight-inch steel lines.  The

13  lines coming from the canyon into the reservoir is 16-inch.

14     Q   Out of the reservoir is eight-inch?

15     A   Yes.

16     Q   And that is connecting your system whereby the water

17  is supplied from the artesian well, that is eight-inch also?

18     A   It is all interconnected, yes.

19     Q   How about the suction line on your pump, on the booster,

20  what size is that?  That goes into the eight-inch line?

21     A   Yes.  It comes out of the reservoir with an eight-

22  inch line on one booster, and then I have a pump on that--

23  it is a 500-gallon-a-minute pump, it is 2.7 by 4, and then the

24  one on my butane booster is a bigger pump, it is a 750-gallon-

25  a-minute pump and it is a 6 by 5 pump.

1    Q  You referred to the Welch properties.  What do you

2  mean by the Welch properties?

3    A  Well, until I think it was Mr. Sanger bought that

4  from the fellow by name of Welch.

5    Q  About when was that?

6    A  I would say it was in the early '40's.

7    Q  And the Welch properties then were previously separate

8  parcels of land?

9    A  Yes.  It was owned by a fellow by name of Welch, and

10  it lies in this same valley, so they bought and we still

11  refer to it as the Welch ranch.

12    Q  And the location at which the artesian well was

13  drilled, that was on what was formerly the Welch property;

14  is that correct?

15    A  That is correct.

16    Q  Now, this channel that you spoke of that you worked,

17  did you follow the natural channel of the stream?

18    A  Yes.

19    Q  You didn't divert the natural flow of the water from

20  the course which it followed?

21    A  No, it is right where the main bed of the old creek

22  is.

23    Q  By the way, what was the acreage in the Welch

24  properties that was acquired as you have testified?

25    A  I couldn't say to be sure.  I don't know just exactly.

1    Q  By the way, this reservoir that you have, has that

2  been treated in any way to prevent leakage?

3    A  No.

4    Q  Right on the surface of the area there, using the same

5  base?

6    A  The same material that was at hand.  They are just

7  earth filled.

8    Q  How was it constructed?

9    A  By carryall and dozer and filled and sheep-footed in.

10    Q  Built it higher than the surface of the earth?

11    A  Yes.

12  MR. STAHLMAN:  That's all I have.

13  MR. SACHSE:  I have nothing further.

14  THE COURT:  I took the liberty to take 29R and put in

15  some of the general outlines of the Stardust Ranch and also

16  from Government's Exhibit 16, which I think is most significant,

17  put in the apparent fault line that runs through there.  You

18  might look at it during the recess.  Part of it is a concealed

19  fault.  The other is apparently on the surface.  It may explain

20  the artesian well.

21  Take a short recess.

22  (Recess.)

23  THE COURT:  Anything further?

24  MR. SACHSE:  I have nothing further on Stardust Ranch,

25  your Honor.

1        MR. VEEDER:  The Government is going to move for judg-

2   ment in regard to these claimed appropriative rights.  There

3   is nothing to tie Exhibits 233 and 234 to any appropriations.

4        THE COURT:  I don't know the dates on them.

5        MR. VEEDER:  1885 and 1890.  And there is nothing to

6   show the use of water back at that time.  So I think we could

7   probably clear out a little debris along that line.

8        MR. SACHSE:  If you are arguing a motion, I have a few

9   things to say about it.

10       THE COURT:  First of all, Exhibit 232, the soil survey,

11  Col. Bowen, with the corrections noted here, is it correct to

12  the best of your knowledge and belief?

13       COL. BOWEN:  Yes.

14       THE COURT:  Exhibit 232 received in evidence.

15       (Plaintiff's Exhibit No. 232 for Identification was

16  received in evidence.)

17       THE COURT: What is your theory, Mr. Sachse, that there

18  is any value in the so-called appropriative rights?

19       MR. SACHSE:  There are two, your Honor.  First, this

20  appropriative right is entirely different from the Oviatt one.

21  As far as draftsmanship is concerned, whoever wrote it, it is

22  technically very carefully drafted.  It specifies the exact

23  point of appropriation, it specifies the exact land on which

24  it is used, et cetera.  It is clearly tied to the water right.

25  Whereas, the Oviatt appropriations to which I objected, I made

the point that in my judgment they were not adequate civil code appropriations under the provisions of the Code and would have to be treated as self-help appropriations.  I think this is a valid Civil Code appropriation.  It is recordded, it's a matter of public record, and there is a presumption that goes with it that a use has been made.

THE COURT:  Does it specify the amount of water?

MR. SACHSE:  Yes, it specifies "All the water" and then it has "to the extent of a thousand miner's inches measured under 4-inch pressure, whether above or below ground, now flowing or herinafter to flow, at the following point," and specifies the point as being so many feet above such and such location, et cetera.

That is point number one.

THE COURT:  That is all I wanted now, just your points.

MR. SACHSE:  Point number two-- which, in my judgment, is a great deal more significant-- your Honor has written a pretrial opinion covering the so-called self-help appropriative claims of the United States.  Now, this is certainly a self-help appropriative claim, even if no document has been filed. There is not the slightest question that there has been a diversion carried on from this point since at least--

THE COURT: Was that point in the public domain at the time of these filings?

MR. SACHSE:  At the time of the filings?  I don't know,

1   your Honor.

2          THE COURT:  Let's pass it now.

3          MR. VEEDER:  Just so the record shows my motions.

4          THE COURT:  You may renew your motion.  I will not enter-

5   tain any now.  I will not pass on it now.

6          MR. VEEDER:  I just want it for the record, your Honor.

7          MR. SACHSE: The third thing is this-- this probably has

8   nothing to do with the appropriation as such-- I want it clearly

9   understood that I don't concede for a moment, even if this

10  appropriation were invalid, assuming that the appropriation

11  were invalid or conceding that it were invalid, that the

12  diversion is still not an entirely proper riparian diversion.

13  That is the second point.

14          In other words, assuming that the Court should rule

15  that this appropriation is a nullity, that this paper means

16  nothing, this is still taken on riparian land and used on the

17  same riparian land, it is all under the one ownership, and it

18  is a proper riparian use of water, either as a riparian use

19  simply diverted from a high point on the stream to a lower

20  point on the stream on the same property, even if it is not a

21  valid appropriation.

22          MR. STAHLMAN:  May I ask a question to clear something in

23  my own mind?  What is your explanation in relation to the

24  artesian well?

25          MR. SACHSE:  I am not going to attempt to give you one,

1   except to draw the obvious conclusion from the fault line that

2   there would be a pressure area northeast of the fault line.

3   I am willing to concede, as I have done many times in this

4   case, that the areas of younger alluvium as delineated on Ex-

5   hibit 15 in this vicinity shall be regarded as part of the

6   stream system, and I am not going to quarrel about the question

7   whether water from that well-- I am not going to urge that that

8   is not stream system water. I concede that the water from

9   the artesian well is stream system water.

MR. VEEDER:  That is what I was pointing at in regard to
appropriation.  The appropriation and the well have nothing to
do with each other.

MR. SACHSE:  That is right.

MR. VEEDER:  So you are simply saying, as I understand it,
that if this appropriation fails, as I think it must, you
will claim a correlative share of the water based upon your
riparian interest; is that right?

MR. SACHSE:  Yes.  And I am saying that as far as
downstream users are concerned I have demonstrated a taking
of the entire flow of this stream.

THE COURT:  Surface flow.

MR. SACHSE:  Surface flow of this stream on our riparian
land for a period of 29 or 30 years.  Those are the facts.
I ask nothing more than that.

THE COURT:  I will not pass on any of these matters,

1  except to say tentatively that as far as the ground is

2  concerned, on the basis of Exhibit 15, there are portions in

3  Sections 8 and 9 which over lie basement complex and which

4  would be subject to the findings that any water that they find

5  there they are just lucky to find-- it's vagrant, percolating

6  water.

7       Tentatively, that the artesian well is apparently caused

8  by that faulting, plus upstream water gradient which causes

9  the water to come to the surface.

10      Parts of the ground in Sections 9, 10, 3 and 2 overlie

11 the younger alluvium in Wilson Valley and would be part of the

12 stream system there.

13      You concede that the artesian well is part of the stream

14 system?

15      MR. SACHSE:  I concede that, your Honor.

16      THE COURT:  We have the open question on which we have

17 never passed as to the extent of this basin that may exist in

18 this area.  As I recall, there was testimony from the Govern-

19 ment's stand point that fro Vail Dam on up between the fault

20 lines clear up to Aguanga Valley and running sort of north of

21 Radec Valley is all one basin of younger and older alluvium.

22 I don't think that is particularly pertinent here, because none

23 of the wells here is in the older alluvium.

24      MR. VEEDER:  Is not the artesian well?

25      THE COURT:  It is in the younger alluvium, according to

1  Exhibit 15.

2      MR. VEEDER:  I would like to check that out.

3      THE COURT:  However, the younger alluvium may be very

4  shallow, It probably goes through the younger alluvium into

5  the older alluvium.  Do we have a well log on it?

6      MR. SACHSE:  I think it is in evidence.  If not, we can

7  supply it.

8      THE COURT:  Check it.

9      MR. VEEDER:  Having drilled on a ridge, it would appear

10  that it would have to be older alluvium.  We don't have

11  younger alluvium on ridges.

12      THE COURT:  It is hard to tell from Exhibit 15.  It is

13  very close between the two.  But if it is in the older, it

14  would certainly have to penetrate the older.  We will leave

15  this question to argue the appropriative right.

16      MR. SACHSE:  Yes.

17      I want to say one thing-- I hope it may not be mis-

18  interpreted by Mr. Veeder-- when I said I concede that the

19  well in this case, that the younger alluvium is part of the

20  stream, I don't want that carried back to yesterday's events

21  on the younger alluvium.

22      MR. VEEDER:  You can't have it both ways.

23      MR. SACHSE:  I can, indeed.  I said some of the younger

24  alluvium areas are not part of the stream system.  This one

25  I concede is.

1      THE COURT:   Different areas and different hydrology and

2  geology involved.

3      MR. VEEDER:   We can't concede that.

4      THE COURT:   I will see you then Tuesday morning at 10

5  o'clock.

6      MR. VEEDER:   And we will argue on the 5th and 6th if we

7  have time.

8      THE COURT:   On the 6th, if we have time.

9      (Adjournment until Tuesday, April 5, 1960, at 10 A.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25