# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al,

Defendants.

No.   1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       Wednesday, April 6, 1960

Pages: 13,094 to 13,234

## FILED

SEP 2 4 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____ DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 · Ext. 370

VOLUME 115                                                              13,094

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - - - - - - -

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

- - - - - - - -

UNITED STATES OF AMERICA,            )
                                     )
               Plaintiff,            )
                                     )
          vs.                        )        No. 1247-SD-C
                                     )
FALLBROOK PUBLIC UTILITY             )
DISTRICT, et al.,                    )
                                     )
               Defendants.

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Wedensday, April 6, 1960

APPEARANCES:

     FOR THE PLAINTIFF:                    WILLIAM. N, VEEDER, ESQ.,
                                           Special Assistant to the
                                           Attorney General
                                           Department of Justice,
                                           Washington, D.C.

                                           LCDR DONALD W. REDD

13,095

1  APPEARANCES: (continued)

2        FOR THE DEFENDANTS:

3        For Defendant Fallbrook          FRANZ R. SACHSE, ESQ.
         Public Utility District,
4        et al.

5        For Defendant Vail               GEORGE STAHLMAN, ESQ.
         Company                          EARL K. STANTON, ESQ.
6

7        For Defendant State of           STANLEY MOSK, ESQ.,
         California                       Attorney General,
                                          By FRED GIRARD, ESQ.,
8                                           Deputy Attorney General

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

13,095-a

## INDEX TO WITNESSES

| For the Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| Edith G. Horstman | 13,111 | | | |
| Frank A. Burnham | 13,114 | | | |
| Jerry Young | 13,117 | | | |
| Clayton S. Erdel | 13,123 | | | |
| Mabel L. Crews | 13,124 | | | |
| Van E. Clark | 13,127 | | | |
| Jessie M. Vail | 13,128 | | | |
| Mary Deering | 13,130 | | | |
| Vernon Le Fevre | 13,134 | | | |
| Phronia P. Wickard | 13,135 | | | |
| Bessie M. Wickard Bastian | 13,137 | | | |
| Lewis J. Munoa | 13,138 | | | |
| Irvin R. Rasch | 13,144 | | | |
| Sam Termine | 13,145 | | | |
| Fred Lloyd | 13,146 | | | |
| Paul H. Anderson | 13,147 | | | |
| Alda Zimarik | 13,148 | | | |
| William J. Higlee | 13,149 | | | |
| Nora Bryant | 13,151 | | | |
| Miles W. Thompson | 13,153 | | | |
| Howard Morrow | 13,155 | | | |
| Victor A. Garrison | 13,156 | | | |
| George E. Blake | 13,157 | | | |

13,095-b

## INDEX TO WITNESSES (continued)

**For the Defendants:**      D    X    RD    RX

Marvin Duane Curran    13,158

Louis Baggenstos    13,159

Ray Verner Mize    13,160

Jim Kean    13,168

Willis A. Thompson, Sr.    13,169

Marry C. Winter    13,175

Sidney J. Winter    13,180

Willis A. Thompson, Sr. (resumed)    13,181

Knott - alfred - see no appearance    P. 13,183

## INDEX TO EXHIBITS

**For the Plaintiff:**    **For Identification**    **In Evidence**

255 Eng Report - Willis A. Thompson   13,169    13,171

P 14

1    <u>San Diego, California, Wednesday, April 6, 1960, 10:00 A.M.</u>

2        THE CLERK:  2-1247-SD-C United States vs Fallbrook.

3    Further court trial.

4        MR. SACHSE:  Your Honor, before Mr. Veeder proceeds,

5    Mr. Krieger asked me to invite the court's attention to the

6    fact that the additional parcels that he spoke to your Honor

     about at the close of the day have been inserted on Roripaugh's

7    Exhibit C.

8        MR. VEEDER:  Your Honor, there are quite a number of

9    people from Murietta who are in the courtroom today, and there

10   are some in my room.  I have asked them all to come in to the

11   end that they might give their names and take the oath, as

12   you directed the parties who were here yesterday.

13       There are, some other matters that I would like to bring

     to your Honor's attention which are in the nature of house-

14   keeping, but I think we ought to keep ahead of them.

15       Interlocutory Judgement No. 13 was called for yesterday.

16   There were no people in the courtroom, based upon your Honor's

17   request for statements by all parties, and I ask that that

18   interlocutory judgement be entered.

19       THE COURT:  What area does it concern?

20       MR. VEEDER:  That is in the Fallbrook area, your Honor.

21       THE COURT:  And the judgement provides that any water

22   under the ground owned by these parties in Interlocutory

     Judgement No. 13 is local, vagrant, percolating and not part

23   of the stream system?

24       MR. VEEDER:  That is right.  And it is also a judgement

25   that there be no claims against the United States.

P 15

1    THE COURT:  All right, submit the judgement and I will
2  sign it.
3    MR. VEEDER:  All right.

     Your Honor, I talked to Mr. Grover in regard to the hear=
4  ing which is set for the Gibbon and Cottle matter.  That pro-
5  ceeding, he advises me, would take about a half day.
6    THE COURT:  This is to hear this man Tripp.
7    MR. VEEDER:  That is right.  He said that he wanted to be
8  sure that he had adequate time, and I told him that I would
9  bring it to your Honor's attention.  You have that, my notes
10  show, set for May 27th at ten o'clock.
     THE COURT:  What day of the week is that?
11
     MR. SACHSE:  Friday, your Honor.
12
     MR. VEEDER:  I would like to be sure that the 27th date
13  is firm.  My records show that.
14    THE COURT:  Well, it is firm, the only problem we have
15  is the other work we have around this court.  I will try to
16  work my calendar out so that we can have that full day avail-
17  able.
     MR. VEEDER:  Here is what I would like to do in that
18  connection, your Honor.  We have set for April 26th additional
19  parties from the Murietta area which we called the La Laguna
20  area.  That is set for April 26th at 10 o'clock.  It would be
21  a hearing similar in nature to the one yesterday and today.
22  We are going to bring in on April 26th the La Laguna people
23  up to 100 names.  We found that yesterday was a pretty full
24  day really, and we are going to limit it to 100 names, if that
25  is all right, on April 26th.  I don't believe that we can

P 16

1  handle any more than that, because there are necessarily

2  interruptions, and I think it is only fair to the people that

3  they have an opportunity to express themselves fully.

4      THE COURT:  The only problem is that in sharing this

5  Los Angeles calendar with Judge Kunzel I have had to agree

6  to take certain weeks in Los Angeles, and when I was up there

   Monday I agreed to take the week of April 25th in Los Angeles.

7  I should have seen that Fallbrook entry.  I think probably

8  what I had better do is to try to switch that week with the

9  19th.

10     MR. VEEDER:  It will be most helpful, your Honor.  We

11 have the last hearing before the Special Master on the 25th at

12 Reche School.

13     MR. GIRARD:  As I understand, these people have already

   received notice for the 26th?

14     MR. VEEDER:  No.

15     MR. GIRARD:  I was going to suggest, if it is going to

16 be here, why can't Mr. Cranston just hear it here?

17     MR. VEEDER:  I think his notices relate to Reche School.

18     MR. GIRARD:  He will be at Reche School on the  25th, is

19 that correct?

20     MR. VEEDER:  Yes.

21     MR. GIRARD:  And the 26th it is scheduled before Judge

   Carter.

22     MR. VEEDER:  Yes.

23     MR. GIRARD:  And he can't be here, apparently.  I don't

24 know why Mr. Cranston couldn't hear the same thing we did

25 yesterday.

P. 17

1    THE COURT: The only thing is this. I have had before

2    me all the evidence on geology and Mr. Cranston has not. It

3    is true that the Master could report to me the matters such

4    as occurred yesterday, I could accept his findings on acreage

5    and irrigable acreage etc., and can then apply that to what

6    I have heard on geology. It would work, I have no doubt about

     it. I think I will leave the date April 26th stand and I will

7    try first to switch my calendar with Judge Kunzel so I will be

8    here that week and be in Los Angeles the week before, and then

9    alternatively if we get into trouble I don't see why the

10   Master couldn't hear the cases of these people. Is that agree-

11   able?

12   MR. VEEDER: Whatever you say, your Honor. My own view

13   is --and I am afraid that George will make some comment when

     I say this--your Honor's full and complete knowledge of the

14   geology is most helpful to us.

15   THE COURT: I will tell the Master exactly what I want

16   him to hear and try, and he will not be trying any questions

17   on geology, if it works out that way.

18   MR. VEEDER: The date will be firm.

19   THE COURT: All right.

20   MR. VEEDER: I have one more worry that I would like to

     unload, if I may. That half day on the 27th of May, would it

21   be possible to schedule for the 28th of May?

22   THE COURT: Saturday?

23   MR. VEEDER: I didn't realize it was a Saturday, your

24   Honor. Is there another day we could use? Could we have the

25   26th?

P 18

1    THE COURT:  For pro pers?

2    MR. VEEDER:  Yes, your Honor.  I am worried about time.

3 I hate to have people have to make another trip in, that's all.

4    THE COURT:  It is agreeable to make it the 26th and the

5 27th.  I can plan my calendar ahead.

6    MR. VEEDER:  All right, we will then schedule it for 10

 o'clock on the 26th and 10 o'clock on May 27th.

7    THE COURT:  But we will plan to hear Mr. Grover on the

8 27th.

9    MR. VEEDER:  Yes, your Honor.

10    MR. SACHSE:  Your Honor, a thought occurs to me.  I

11 haven't had a chance to mention it to Mr. Veeder, so he isn't

12 prepared for this.  Maybe we could run in at one of these

13 hearings, and save a lot of time, one or another of these

14 Masters' findings.  Those are cases where I feel certain that

 we can say there would be no appearances.  Counsel have been

15 all through them.  They have been heard before the Special

16 Master.  The public have been notified and had there chance

17 to appear.  I know your Honor is interested in getting rid of

18 large blocks of these people.  We would have available prob-

19 ably everything west of the gorge and Panchanga creek by that

20 time, which are some pretty substantial chunks.

21    THE COURT:  Those Masters' findings have to be served on

 everybody in the case--some 6000 defendants.

22    MR. VEEDER:  Your Honor, I don't mind switches of signals,

23 but this is a brand new one on me.

24    MR. SACHSE:  It is your Honor.

25    MR. VEEDER:  And frankly, I don't like it.

P   19

1      THE COURT:   That would be almost an impossible task to do

2  for that date, wouldn't it?

3      MR. SACHSE:   I realize that your Honor.

4      MR. VEEDER:   That is right.   We're trying to do this

5  methodically.

6      MR. SACHSE:   I sympathize with Mr. Veeder's problems.   But

7  as soon as the Master's hearings are over I think we ought to

   give thought to getting the Master's findings set for hearing,

8  because there is the largest single block of findings that are

9  complete and ready for action.

10     THE COURT:   The Master has had his hearing and heard

11  objections to his findings?

12     MR. SACHSE:   Yes, your Honor.

13     THE COURT:   And he has tendered them to the court, and as

14  I recall, to get around the provision the Rules, they have been

   lodged.   They are not filed.

15     MR. SACHSE:   Yes, your Honor.

16     THE COURT:   So the final thing at the present time on the

17  Master's findings is to serve everybody in the watershed with

18  copies and say "now is your chance to object".

19     MR. SACHSE:   And your Honor can adopt them or modify them

20  as the case may be.

21     THE COURT:   I doubt very much if there will be objection

   by anybody.

22     MR. SACHSE:   I don't think so, your Honor.

23     THE COURT:   But the mechanical test of getting those find-

24  ings out and serve everybody is a colossal test.   You have now

25  12 or 13 interlocutory judgements, plus the Master's findings,

P 20

1    all of which could be served in one bundle.

2        MR. VEEDER:  Your Honor, I don't need to tell you that
3    my great concern is due process of law, and that is why we
4    adopted this procedure we are now following to have a letter
5    from you to these people.

6        The hearings before the Master, I'll say this, simply
7    broke down.  People were not appearing and weren't being heard.
8    I feel that we have a mechanical means now that is very satis-
     factory.  It would not supersede what has been done, but it
9    would certainly be most helpful to the end that there would
10   not be what I believe can occur in years to come.

11       MR. SACHSE:  You have pointed out the mechanical problem,
12   and I happen to have the Master's findings laying on my desk,
13   and I am not exaggerating, the stack is a foot high.  So far
14   the papers are more than a foot high.  I think we are going
15   to have to devise a means of doing something other than serving
16   that entire bundle on everyone of these people.  I haven't done
17   any research in the matter.  Maybe we can serve it by reference.
     Maybe we can tell them that the findings are lodged.  They have
18   had their own findings.  We will break down the United States
19   mails if we send out a pile that high.  The findings, descript-
20   ions and everything else he has done so far are literally over
21   12 inches high.  The findings are brief, but it is the de-
22   scriptions that take up all the space.

23       THE COURT:  It has to be done some day, but it doesn't
     have to be done by May 27th.

24       MR. SACHSE:  Except that I see the end of this, your
25   Honor, and I hope that we can all keep working on this.

P 21

1   MR. VEEDER:  That's the kind of help you've been getting,

2   a little gravel in the gears, your Honor.

3   THE COURT:  Can we go ahead?

4   MR. VEEDER:  That is the extent of the housekeeping this

5   morning, your Honor.

6   If we could follow the procedure you followed yesterday

7   in regard to the swearing of the parties, that would save us

8   some time.  We have gone ahead with some of the people who

9   have arrived and in my office we have discussed the problems

    with them in regard to their claims.

10   THE COURT:  All right.

11   MR. VEEDER:  After the swearing Cdr. Redd will go ahead

12   with the parties who have'nt yet discussed their problems.

13   THE COURT:  Ladies and gentlemen, if you will stand up

14   one at a time and give your names to the Clerk.  Starting in

15   the jury box here, any persons who have come in today in re-

16   sponse to letters from the court involving land in the Murietta

17   Valley, stand up and give your names.

     MRS. DEERING:  Mary Deering.

18   THE COURT:  The next one.

19   A VOICE:  Disinterested.

20   MR. VAIL:  Jesse M. Vail.

21   THE COURT:  The next one.

22   MR. PAGGENSTOS:  Louis Paggenstos.

     THE COURT:  The next one.

23   MR. MUNOA:  Louis J. Munoa.

24   THE COURT:  The next gentleman.

25   MR. KNOTT:  Alfred Knott.

P22

1    THE COURT:  The next one.

2    MR. MIZE:  Ray Mize.

3    THE COURT:  The next one.

4    MR. WINTER:  Harry C. Winter.

5    THE COURT:  The next one.

6    MR. LLOYD:  Frank Lloyd.

     MR. GARRISON:  Victor A. Garrison.

7    THE COURT:  The next row.

8    MRS. WICKARD:  Phonria Wickard.

9    THE COURT:  The next one.

10   MRS. BRYANT:  Nora Bryant.

11   THE COURT:  The next one.

12   MRS. BASTIAN:  Bessie Wickard Bastian.

13   THE COURT:  The next one.

     MR. CLARK:  Van E. Clark.

14   THE COURT:  The next row.

15   MR. BURNHAM:  Frank A. Burnham.

16   MRS. HORSTMAN:  Edith Horstman.

17   MR. YOUNG:  Jerry Young.

18   MR. ERDEL:  Clayton Erdel.

19   MR. THOMPSON: Louis Thompson, land also appearing for

20   Sarah E. Thompson.

     MR. THOMPSON, JR.:  Willis Thompson, Jr.

21   MR. THOMPSON:  Miles W. Thompson.

22   MR. THOMPSON:  Curtis T. Thompson.

23   MRS. CREWS:  Mabel Crews.

24   THE COURT:  The first row over here.

25   MR. LE FEVRE:  Vernon Le Fevre.

1    MR. ANDERSON:  Paul H. Anderson.

2    MR. CURRAN:  Marvin Curran.

3    MR. THOMPSON:  Raymond I. Thompson.

4    MR. TERMINE:  Sam Termine.

5    MR. WINTER:  Sidney J. Winter.

6    MR. SHELD:  Thomas Sheld.

7    MR. MORROW:  Howard Morrow.

8    MR. JENNINGS:  W. H. Jennings.

9    MR. HIGLEE:  William J. Higlee.

10    THE COURT:  Does that take care of everybody?

11    In a moment or two I will ask those of you who have not

12 been down to the Government's office on this floor at the other

13 end of the hall --

14    Is there a name on the door?

15    MR. VEEDER:  It is number 303.  I think they know where

16 it is, your Honor.

17    THE COURT:    -- to go down there and talk with Lt. Cdr.

18 Redd, who is an attorney and one of the Government's attorneys

19 in this case.

20    Commander Redd, will you stand up so they will see you

21 and know who you are.  Thank you.

22    Tell us briefly what you do down there, Commander.

23    COMMANDER REDD:  Your Honor, I show them a description of

24 their property. Then if there is any question we check it on the

25 Assessor's maps,which we have in evidence,and then we show them

the tabulations we have,what we computed their total acreage to

be and what we computed their irrigable acreage to be.

JOHN SWADER, OFFICIAL REPORTER

P 24

1   If there is any disagreement on it, we try to find out
2   where the discrepancy is. If there is agreement, we write
3   "Agreement" on their folder and their folder is sent in to
    Mr. Veeder.

4   THE COURT: Thank you Commander Redd.

5   This matter of tabulating your total acreage and those
6   acres that are irrigable is important in the sense that the
    government has wanted to have a tally of how many irrigable
7   acres are involved in this watershed. But actually it is
8   not a matter of too great moment. We all know that there
9   is not enough water in this watershed to irrigate all the
10  irrigable acres of the watershed. The time may come when there
11  will have to be some apportionment of water. There is no con-
12  templation at this time in this case, while this trial is going
13  on of making a quantitative apportionment. But all you have to
14  do is look at the figures of ground that could be irrigated
15  in this watershed to know it would be a physical impossibility
    ever to irrigate it all.

16  At any rate, we want that information.

17  Most of you, probably all of you, own land in the Murietta
18  section, which overlies a basin of water. Underground there
19  is a basin of water which is part of the stream system. This
20  is not true in other parts of the watershed. And if you are
21  overlying owners, then your rights are correlative--that is
22  you have no absolute right alone. Your right has to be gauged
23  in comparison with the rights of your neighbors and the rights
24  of other people who also have rights on this stream system.
25  That is what we mean by a correlative right. No one person
    could take all of the water to the exclusion of anyone else.

P 25

1    Those persons who own land outside this basin area are
2    going to be in a different position.  There is probably very
3    little water in the areas, but what water there is, may in
4    substance, belong to them, subject only to some claim by some
5    adjoining neighbor who might complain.
6        The court has taken evidence on the geology of this district.
7    I would just like to take a moment to show you this map which
8    happens to be Exhibit 15-E.  We have a whole series of exhibit
9    15.  To orientate you on the map, here is where the Santa
10   Margarita river breaks through the basement complex and runs
11   on down to the coast.  Temecula is in here, Murietta, Wildomar,
12   and this is just part of the immense watershed that feeds the
     stream that narrows.
13       Then there was considerable testimony taken on the geo-
14   olgy in this district.  To orient you on this map, the blue
15   areas are areas of what are called basement complex.  That is
16   almost solid rock, and the court has been uniformly finding
17   that any water found in this blue area is what is spoken of
18   as vagrant, local, percolating water and not part of the stream
19   system, and those people who have land in those areas, unless
20   there is some exceptional circumstances, get a decree that
21   any water they find they are just lucky to have and they are
     not a part of the stream system and they are out of the lawsuit.
22       The grey area shown here was originally basement complex
23   or rock, but it has weathered a little bit.  It is called the
24   old weathered area, and that is in the same category as the
25   basement complex.  The testimony shows that any water found in
     these areas exists in only in fractures or fissures or rock

P  26

1  faults.  There is no basin involved of any kind.  They are in

2  the same category as the people in the blue area.

3  The area shown in yellow, plus some little strips that

4  run up here, are what is spoken of as alluvium.  That is what

5  has been washed down into a depression in years past.  It is

6  the type of material that water can collect in and water will

7  move through it.  The real yellow area, as shown along the

8  Murietta Valley, is the younger alluvium, which is very ex-

9  cellent for bearing and holding water.  The darker yellow is

10  the older alluvium, which is not as good, being a little more

11  solidly packed material than the lighter yellow.

12  The testimony has shown that along the south side of

13  the Murietta Valley there is a fault line here.  Along in this

14  area of the Murietta Valley is another fault line where in

15  years past there has been a slippage.

16  There is no dispute, and all counsel have agreed, that

17  the Murietta Valley, as such, is a basin, Pauba Valley is a

18  basin, Wolf Valley is a basin.  There is dispute as to how far

19  back that basin goes into the older alluvium.  We know that it

20  goes past the fault line.

21  Various lines have been suggested and names have been

22  given to them based upon the names of some of the engineers

23  who have testified, for instance, what is called the

24  "Kunkel Line".  The Kunkel Line comes in here and swings a-

25  round like this.  There is the "Webb Line".  It doesn't go

quite as far up as the Kunkel Line, but proceeds up into this

area.

The evidence also shows that in years past the rock

13,109

P 27

1   underneath the ground tilted, so that when the government

2   drilled the Pauba well down near the junction of the Murietta

3   and Temecula they went 2600 feet and didn't hit rock--2600 feet

4   through this type of sediment, older and younger alluvium,

5   2600 feet of water-bearing formations.  And of course that well

6   is down near this fault line.  From that area nobody knows how

7   deep the alluvium is.  The thing tapers up to where when you

8   get up to basement complex there is no alluvium at all.  From

9   what we know of it, in general terms, there is a large basin

10  there where the rock is tilted down to an unknown depth down

11  near the Santa Rosa mountains and to no depth at all at this

12  end.  One of the major questions in the case, not yet decided,

    is how far up this basis extends.

13       As far as the people who own land in the Murrieta are

14  concerned, no expert has testified to anything except that you

15  overlie a basin of water and you are, therefore, overlying

16  owners, and an overlying owner has the same rights as riparian

17  owner.  A riparian owner is one who owns land boardering on a

18  stream.  Whether you border on a stream or not doesn't make any

19  difference, as long as you overly the basin you have a reason-

20  able right to the use of that water, and you have a right that

21  has to be used in conjunction with everyone else in the water-

22  shed who has a right in the stream system.

23       Is that a fair statement of what the evidence has shown?

24       MR. STAHLMAN:  I think that your Honor has made a very

25  excellent and clear exposition of what has occurred here.

13,110

1    MR. VEEDER:  For the first time, Mr. Stahlman and I are

2 in accord.

3    THE COURT:  We will not worry about these lawyers, ladies

4 and gentlemen.  We would go crazy in this case if we didn't have

5 a little fun once in awhile.  This breaks out occasionaly here.

6 Today Mr. Veeder and Mr. Stahlman are in agreement.  In thirty

7 minutes they will be in violent disagreement.

8    All of you who have given your names stand, raise your

9 right hands and the Clerk will swear you.

10    (Whereupon the Clerk administered the witnesses oath to

11 the persons who heretofore gave their names for the record.)

12    THE COURT:  Those of you have not been down to Commander

13 Redd's office, if you will go down there now and we will pro-

14 cede with some of those who have already been down there, and

15 then return to this courtroom.

16    MR. VEEDER:  Your Honor, we would like to have put on the

17 board Exhibit 207-C-1, I think it was a helpful exhibit.

18    THE COURT:  All right, put it up.

19    MR. VEEDER:  We would also like to have Exhibit 207-B-2.

20 And your Honor was working with Exhibit 207-D.

21    THE COURT:  I have my copy.

22    I have some letters here, Mr. Veeder (handing documents

23 to Mr. Veeder.)  I suppose you could write them a letter, and

24 say, "Here is what we propose to find and if this is satisfactory

25 indicate on the copy of the letter and return it."

1          MR. VEEDER:  We're going to do that with those of yester-

2     day, too, your Honor.

3          I would like to have it shown in the record to the end

4     that there be no question about it, that this is Cecilia

5     Katzner, Box 21, Murrieta, California, who has wired that she

*PAT* (above line 5, over "Katzner")

6     was unable to attend.  We will write her and tell her what our

7     findings are and ask for an agreement from her.

8          And the same as to Mrs. Agnes Matz.

9          THE COURT:  You note that in one of those letters someone

10    has passed away.

11         MR. VEEDER:  That is correct.

12         THE COURT:  Are you ready to proceed?

13         MR. VEEDER:  Yes, your Honor.

14         The first party is Mrs. Edith G. Horstman.

15                    EDITH G. HORSTMAN,

16    one of the defendants herein, having been duly sworn, on her

17    oath testified as follows:

18         THE CLERK:  State your name please.

19         THE WITNESS:  Edith Grace Horstman.

20         I also represent my husband, Jarrit Horstman.

21                    DIRECT EXAMINATION

22    BY MR. VEEDER:

23         Q  Are you the Mrs. Edith G. Horstman who, together with

24    Jarrit Horstman, filed an answer in this proceeding?

25         A  Yes.

1    MR. VEEDER:  For your reference, your Honor, 207-D -- it

2  is Parcel 141.  For the record we refer to it in 207-B-2 as 20-

3  3-141.

4    Q  Our records show, Mrs. Norstman, that you own .3 of an

5  acre and that .3 of an acre of that property is irrigable.  Do

6  you agree with that?

7    A  That is correct.

8    THE COURT:  All of it is irrigable?

9    MR. VEEDER:  That is correct, your Honor.

10    Q  You are using that primarily for domestic purposes; is

11  that right.

12    A  Yes.

13    Q  While you were talking with me in there, you raised some

14  questions which I suggested you talk to his Honor, Judge Carter,

15  about.

16    A  There seems to be quite a little confusion, and I

17  imagine some propoganda.  There are a lot of people who feel it

18  is of no value to come down.  A lot of people in Murrieta feel

19  it is of no value to come down because it is a lost case before

20  you come down, and there are a lot of them that have asked me

21  to find out, if I could, if there would be another hearing for

22  those who haven't been able to come, so that they cam come down

23  if you think it is worth while.  I thought it was worth while to

24  come down.

25    THE COURT:  Of course, it is no lost cause.  If you own a

1  piece of ground over a basin you would always be entitled to
2  some water, and if you are using water for domestic purposes I
3  think you have no problem in the world.

4      THE WITNESS:  I wanted a verification of it.

5      THE COURT:  The persons who are using water for irrigation,
6  in the future, may have more of a problem than a person using it
7  for domestic purposes.

8      Secondly, we don't want to default anybody.  We have let
9  these answers be filed in pro per.  We are trying to get you in
10 here to complete our record; and we are trying to tell you, as
11 best we can, what is going on.  For example, my attempted
12 explaination of what the geology was.  But I would certainly
13 urge a person to come down, because if we can't get them down
14 voluntarily we may put out subpoenas and bring them in.  It is
15 important that everyone in this water shed have a chance to show
16 what land they have and where it is located.

17     We know where your land is located because of the maps
18 we have.  We know you overlie a basin.  No matter how short the
19 water would ever become in this valley, it would be hard for me
20 to imagine a situation where people couldn't at least get dom-
21 estic water.  There might be problems on curtailment in the
22 sense of irrigation.  I hope that we will have wet years again.
23 Maybe we will have artesian wells again.  That's something we
24 can't foresee.

25     MR. VEEDER:  Col. Bowen, is this property overlying?

13,114

1    COL. BOWEN:  Yes sir.

2    MR. VEEDER:  I have nothing more, Mrs. Worstman.  Thank

3    you for bringing that matter to the attention of the Court.

4        Mr. Burnham.

5                        FRANK A. BURNHAM,

6    one of the defendants herein, having been duly sworn, on his

7    oath was examined and testified as follows:

8        THE CLERK:  State your name please.

9        THE WITNESS:  Frank A. Burnham.

10                      DIRECT EXAMINATION

11   BY MR. VEEDER:

12       Q Are you the Mr. F. A. Burnham who, together with Vera E.

13   Burnham, filed an answer in this proceeding?

14       A  That is right.

15       Q How long have you been a resident in the Murrieta area?

16       A  I was born in that area.

17       Q  And you have been operating in that area?

18       A  I have been right in Murrieta itself since 1922.

19   MR. VEEDER:  Your Honor, the reference will be 166 in 207-D.

20       Q  Our records show that presently you have lands totaling

21   .6 of an acre, of which .6 of an acre are irrigable.

22       A  That is right.

23       THE COURT:  All of which are irrigable?

24       MR. VEEDER:  Of which all is irrigable.

25       THE COURT:  All right.

1   BY MR. VEEDER:

2       Q  Do you agree with that, Mr. Burnham?

3       A  I think it is very fair.

4       Q  Mr. Burnham, have you observed in the Murrieta area

5   flowing wells and springs?

6       A  Yes, there have been a number of them come up, but they

7   are gradually drying up.  I had one many years ago that I think

8   I have a pump on it now.  I have sold the property some six years

9   ago.

10      Q  Where is that located?

11      A  That is between Temecula and Murrieta, just half way

12  between the two towns.  It is on 395 and Date Street.

13      Q  And have you observed springs in the area in the past?

14      A  Yes.

15      MR. SACHSE:  I object to that as being too vague and in-

16  definite.

17      Will you spell out where it is, whose wells and springs

18  he saw?

19      I resent this performance that is going on here of pure

20  baldfaced hearsay.  I want to hear everything these people have

21  to say, but I want to know where it is and what he knows.

22      THE COURT:  Mr. Veeder, is there any need to prove that?

23  In times past there was a lot more water in this valley than

24  there is now.  We know that in times past there were artesian

25  wells and springs in the Murrieta Valley.

13,116

1      MR. VEEDER:  Well, your Honor, from my standpoint, I think

2  it is extremely important that you have before you any data that

3  you can have.  The State of California and Mr. Sachse, I under-

4  stand their problems, but I think it is important.

5      THE COURT:  If it is going to add anything.  If it is

6  cumulative --

7      MR. VEEDER:  If there agreement that the water table is

8  sharply dropping and that it is becoming extremely critical in

9  the area, if they stipulate to that, I agree.

10     MR. SACHSE:  Your Honor, Mr. Krieger has asked me to watch

11  out for his interests.  As your Honor knows, Mr. Krieger has a

12  couple of hundred clients in this water shed.  If Mr. Veeder is

13  going into this line of testimony as part of the United States'

14  case, I am going to make a request on behalf of Mr. Krieger that

15  the thing be postponed until he can be here.

16     I have no client affected in the Murrieta Valley.

17     THE COURT:  If you want this witness to prove anything

18  about springs and artesian wells, put him back on at some later

19  date for that purpose.

20     MR. VEEDER:  I don't want to impose upon him, your Honor.

21     THE COURT:  If he has something on his own property pres-

22  ently that you want to bring out, on Parcel 167 in Exhibit 207-D,

23  all right.

24     MR. VEEDER:  Col. Bowen, is this property overlying.

25     COL. BOWEN:  Yes sir.

1    MR. VEEDER:   I have nothing further.

2        THE COURT:   The Court would propose to find in your case,

3    and in the case of Mrs. Horstman, that you are overlying owners,

4    overlying a basin; that you have a correlative right to use

5    water in conjunction with all other persons who have a right to

6    use water out of this stream system.

7        That is all we need from you, sir.

8    MR. VEEDER:   Thank you, Mr. Burnham.

9    THE COURT:   Call the next witness.

10   MR. VEEDER:   Jerry Young.

11       THE COURT:   There is a practical problem also, Mr. Veeder.

12   I let somebody twist my arm to go down this noon and talk to

13   some retired officers club in La Jolla.  So I will have to get

14   out of here a few minutes before 12, and I will race to get

15   back, and I would limit this testimony to what was the original

16   purpose of the hearing.

17       MR. VEEDER:   Our search for the truth will continue, though,

18   your Honor.

19                         JERRY YOUNG,

20   one of the defendants herein, having been duly sworn, on his oath

21   was examined and testified as follows:

22       THE CLERK:   State your name please.

23       THE WITNESS:   Jerry Young.

24                    DIRECT EXAMINATION

25   BY MR. VEEDER:

1        Q  Mr. Young, are you the Jerry Young who, with Alice

2   Young, filed an answer in the proceeding.

3        A  I am.

4        MR. VEEDER:  At this time I would like to make a statement

5   into the record in regard to Mr. Young.

6        THE COURT:  What parcels?

7        MR. VEEDER:  There are several parcels:  650, 657, 680,

8   701, 712 and 716.

9        Mr. Young advises me that he has transferred to John

10  Robertson 10 acres of land.  In his answer he originally claimed

11  30 acres of property.  Our records show only that this 10 acres

12  apparently in his name, but I have told him that in my view it

13  would be proper for him to testify in regard to it, if that is

14  agreeable to your Honor.  John Robertson has not been named a

15  defendant, but I think this man can testify in regard to it.

16       THE COURT:  Robertson acquired after the lis pendens was

17  filed?

18       THE WITNESS:  Yes sir.

19       THE COURT:  This man knows the ground and it apparently

20  is all overlying.

21       THE WITNESS:  Yes sir, it is.

22  BY MR. VEEDER:

23       Q  Is it not true, Mr. Young, that the 10 acres to which

24  reference was made was completely irrigated by you?

25       A  For 20 years I have irrigated it; yes sir.

1    MR. VEEDER:  With leave of Court, we will check out the

2  10 acres, your Honor, and I will file a statement, if that is

3  agreeable with your Honor, in regard to the property, sending a

4  copy of it to Mr. Young and to Mr. Robertson.  I don't want to

5  have to call Mr. Young back again.

6    THE COURT:  All right.  That is agreeable.

7    All of this property, Col. Bowen, is overlying the Murrieta

8  Basin?

9    COL. BOWEN:  Yes, your Honor.

10    MR. VEEDER:  I wanted to interrogate him a little bit

11  further about his other properties.

12    A  Our records disclose, Mr. Young, that in your name,

13  under the parcels to which I have referred -- that is, 650, 657,

14  680, 701, 702 and 716 -- that there is a total of 17.3 acres, of

15  which 13.2 acres are irrigable with the 4.1 acres which are non-

16  irrigable.

17    A  That is right.

18    Q  That 4.1 acres is in creek bottom; is that right?

19    A  That is right.

20    Q  Are you in agreement in regard to the figures I just

21  stated in regard to total acreage and irrigable acreage, other

22  than the Robertson property?

23    A  Yes.

24    Q  You also made a statement to me in regard to public

25  relations in the Murrieta Valley.  If you would like to say

1  something to the Court about that, I'm sure he will be glad to

2  hear it.

3  A  I would like to mention to you, Mr. Veeder, that I have

4  three domestic wells in the Town of Murrieta, too, that I didn't

5  speak to you about, on individual lots there.  You didn't

   speak to me about that.

6  MR. VEEDER:  I might as well make a showing on that.  We

7  are going to treat Murrieta, Temecula and the townsites

8  separately from this.  If their claims are limited to domestic,

9  I think we can handle those separately, your Honor, if that is

10  agreeable.

11  THE COURT:  And by domestic do you include household use,

   garden and lawn?

12

13  MR. VEEDER:  Yes, your Honor.  We sould have the statutory

   definition of what constitutes a domestic use in the State of

14  California which is a half acre and household uses and garden and

15  similar uses.

16  Are you in agreement on that, Mr. Girard?

17  MR. GIRARD:  Yes, under California law the upper domestic

18  user has, as a matter of right, priority over downstream users.

19  MR. VEEDER:  But it would within that statute.

   THE COURT:  I understand that what you propose to do in

20  these three little towns, then, is probably to get an inter-

21  locutory decree, which would be submitted to the people that

22  own lands in these towns?

23  MR. VEEDER:  Yes, your Honor.  The way we are doing it in

24  Fallbrook.

25  THE COURT:  Which would provide that they had their rights

1    to domestic use of water, as defined by California water law?

2         MR. VEEDER: That is correct, your Honor. Is that suit-

3    able?

4         MR. SACHSE: I have one client whom that might not suit.

5    He happens to have his well, and uses it for industrial purposes.

6    I think it is an entirely proper use. I concede that it could

7    be outranked by domestic use, but I think his present use is

8    proper.

9         THE COURT: We may have some exceptions, but the general

10   pattern will be that we treat these towns as a group, providing

11   in the decrees that each person with a town lot was entitled to

12   domestic use as defined by the California water law. If someone

13   else has another right, we can take that up specially. Is that

14   agreeable to you?

15        MR. SACHSE: Satisfactory, your Honor.

16        MR. VEEDER: I think that is the only way we can handle it.

17        THE COURT: What about this 10 acres that you sold to

18   Robertson? Is that all overlying?

19        THE WITNESS: Yes, all along the river.

20        THE COURT: Is that all irrigable?

21        THE WITNESS: Yes, I have irrigated it for 20 years in

22   alfalfa.

23        MR. VEEDER: Our records simply don't show that 10 acres.

24        THE COURT: It is shown as part of this other land. Is

25   that it?

1        THE WITNESS:  Yes.

2        MR. VEEDER:  It doesn't show as part of the other land,

3   your Honor.  That is why I have to handle it separately.

4        THE COURT:  You say you have 17 acres?

5        THE WITNESS:  Yes.

6        THE COURT:  This 10 acres is not part of the 17 acres?

7        THE WITNESS:  No sir.

8        THE COURT:  You had 27 acres?

9        THE WITNESS:  Yes.

10       THE COURT:  You sold 10 acres?

11       THE WITNESS:  That is right.

12       THE COURT:  And you haven't found the other 10?

13       THE WITNESS:  No.

14       MR. VEEDER:  No, your Honor.  I wanted him to testify to

15  it, so he wouldn't have to come back.

16       THE WITNESS:  In my answer to you I said I was moving

17  down on this 17 acres and I was putting down a domestic well,

18  and I am in the process of installing a jet pump for domestic

19  work on the irrigating well.  So I claim water for that domestic

20  purpose for this 17 acres.

21       THE COURT:  These people who have a domestic well have a

22  right with it.  If they haven't got a well, they have a right to

23  drill one.  I don't think there is any sense incumbering the

24  decree that X has a domestic well.

25       THE WITNESS:  It is just the idea that if there was going

1   to be a lot of water we would like to add the water for domestic
2   purpose in our case.

3       MR. VEEDER:  I think it is implicit where they live on
4   the land they have a right to domestic water.

5       THE COURT:  I see no problem.  Whether they have a well
6   or might get one in the future, they have a domestic right.

7       MR. VEEDER:  Clayton S. Erdel.

8       The reference will be 155.

9                       CLAYTON S. ERDEL,
10  one of the defendants herein, having been duly sworn, on his
11  oath was examined and testified as follows:

12      THE CLERK:  State your name, please.

13      THE WITNESS:  Clayton S. Erdel.

14                      DIRECT EXAMINATION
15  BY MR. VEEDER:

16      Q  Are you the Clayton S. Erdel who filed in this proceeding
17  an answer with Nadine Erdel?

18      A  Yes sir.

19      Q  Our records show, Mr. Erdel, that you have .7 of an
20  acre and that all of that property is irrigated.  Do you agree
21  with that?

22      A  Yes sir.

23      MR. VEEDER: Col. Bowen, is Mr. Erdel's land overlying?

24      COL. BOWEN:  Yes sir.

25      MR. VEEDER:  We have nothing further, your Honor.

1    THE COURT:  The Court would propose to find that you are
2  an overlying owner on the basin and that you have correlative
3  rights with all other persons interested in the stream.
4    Thank you.
5    MR. VEEDER:  Donald C. Crews and Mabel L. Crews.
6    THE COURT:  What parcel number?
7    MR. VEEDER:  It will be 140 and 143.
8                    MABEL L. CREWS,
9  one of the defendants herein, having been duly sworn, on her
10  oath was examinied and testified as follows:
11    THE CLERK:  State your name please.
12    THE WITNESS:  Mabel L. Crews.
13                    DIRECT EXAMINATION
14    MR. VEEDER:  Your Honor, at this time I would like to make
15  a statement on this case.  Our records show that Mrs. Crews has
16  1.8 acres.  She advises me that the claim is 2.5 acres.  There
17  is only one thing I can saw, and that is that we will have to
18  check this out.
19    Q  Mrs. Crews, do you live in the town of San Diego?
20    A  Yes.
21    Q  In other words, it would be easy to contact you in
22  reagrd to this matter?
23    A  Yes.
24    THE COURT:  Is this two separate pieces that you have?
25    THE WITNESS:  Well, they are all in one -- they are all

1   connected.  They may be in different additions.

2        THE COURT:  But they are adjacent, one to the other?

3        THE WITNESS:  Yes.

4  BY MR. VEEDER:

5        Q  There are eleven lots?

6        A   Yes, there are eleven lots.

7        Q  And we have tried to run this down and there is that

8  disparity of about .7 of an acre.  However, we do show that 1.8

9  is entirely irrigable.  Is that in agreement with you?

10        A  All eleven lots are irrigable.

11        THE COURT:  All the property she has?

12        THE WITNESS:  Yes.

13        MR. VEEDER:  All the property is irrigable, your Honor.

14  I will check it out, your Honor, from the standpoint of this .7

15  of an acre.

16        THE COURT:  Write her a letter and ask her if she approves

17  of what you propose to submit as findings and have her approve

18  or disapprove it.

19        MR. VEEDER:  And if we can't straighten out this .7 of an

20  acre we will have to contact her again and perhaps she will have

21  to come in.

22        THE COURT:  Yes.

23        MR. VEEDER:  Have you anything further to say?

24        THE WITNESS:  Only that I do look after my brother, John

25  M. Walters, at the same time.  He has 24 lots.  At present he is

13,126

1   in Indiana.  But he has filed.

2        MR. VEEDER:  Is that John M. Walter?

3        THE WITNESS:  Yes.

4        MR. VEEDER:  It will be Parcel 149, your Honor.  That is

5   20-3-149.

6        THE COURT:  It shows 3.3 acres here.

7        MR. VEEDER:  The claim, however, speaking of the claim in

8   the answer, is for five acres. Our records, however, show that

9   there are 3.3 acres, of which all are irrigable.

10       Now, again, Mrs. Crews, we will have to check this out, if

11   there is a difference.

12       THE WITNESS:  There are 24 lots.  You found that?
                                    Yes.
13       MR. VEEDER:/ What we will do is check out both the property

14   to John M. Walter and your property and we will contact you on

15   behalf of John M. Walter to the end that we can make a correct

16   determination of his total acreage.

17       THE WITNESS:  All right.

18       THE COURT:  Col. Bowen, regardless of the exact acreage of

19   these lots, they are all overlying the Murrieta basin?

20       COL. BOWEN:  Yes, your Honor.

21       THE COURT:  All right.

22       The Court proposes to find that you overlie a basin and

23   that as an ovelying owner you have correlative rights to the

24   water in the stream.  You heard what we had to say, didn't you,

25   about domestic water? We will probably have a separate inter-

13,127

1    locutory decree providing that persons either with wells or who,

2    in the future, would drill domestic wells are entitled to dom-

3    estic water.

4         That is all we need from you.

5         MR. VEEDER:  Thank you, Mrs. Crews, and we will be in

6    touch with you.

7         THE WITNESS:  Okay.

8         MR. VEEDER:  Next is Mr. Van Elmo Clark.

9         The Parcel number on this will be 189 in your Exhibit 207-

10   D, your Honor.

11                          VAN E. CLARK,

12   one of the defendants herein, having been duly sworn, on his

13   oath was examined and testified as follows:

14        THE CLERK:  State your name please.

15        THE WITNESS:  Van E. Clark.

16                       DIRECT EXAMINATION

17   BY MR. VEEDER:

18        Q  Are you the Van Elmo Clark who, with Regina W. Clark,

19   filed an answer in this proceeding?

20        A  I am.

21        Q  Our records show, Mr. Clark, that you own 5 acres of

22   land, and that the five acres are irrigable.  Do you agree with

23   that?

24        A  Yes.

25        MR. VEEDER:  Col. Bowen, are these 5 acres of land overlying

13, 128

1  property?

2      COL. BOWEN:  Yes sir.

3      MR. VEEDER:  That is all we have.

4      THE COURT:  The Court would propose to find that you are

5  an owner of land overlying a basin, and that you have correlative

6  rights with other people on the stream system.

7      That is all we need from you, sir.

8      MR. VEEDER:  The next is Jesse M. Vail.

9                      JESSE M. VAIL,

10  one of the defendants herein, having been duly sworn, on his

11  oath was examined and testified as follows:

12      THE CLERK:  State your name please.

13      THE WITNESS:  Jesse M. Vail.

14                    DIRECT EXAMINATION

15  BY MR. VEEDER:

16      Q  Mr. Vail, are you the Jesse M. Vail who filed an answer

17  with Harriet M. Vail in this proceeding?

18      A  That is right.

19      MR. VEEDER:  This is Parcel 158 in 207-D, your Honor.

20      Q  Our records show that you claim one lot of land in the

21  area in question, and that there are .2 of an acre in that

22  property, all of which are irrigable.  Is that agreeable with

23  you?

24      A  Yes sir.

25      MR. VEEDER:  Col. Bowen, is this land overlying?

1      COL. BOWEN:  Yes sir.

2      MR. VEEDER:  We have nothing further.

3      THE COURT:  The Court would propose to find that you own

4 land overlying a basin and have correlative rights with other

5 persons on the stream system.

6      MR. VEEDER:  Next is Thomas L.  Sheld.

7      The reference number is 187 and 191, your Honor.

8                        THOMAS L. SHELD,

9 one of the defendants herein, having been duly sworn, on his oath

10 was examined and testified as follows:

11      THE CLERK:  State your name please.

12      THE WITNESS:  Thomas L. Sheld.

13                      DIRECT EXAMINATION

14 BY MR. VEEDER:

15      Q  Are you the Thomas L. Sheld, who with Jacqueline

16 Sheld, filed an answer in this proceeding?

17      A  That is correct.

18      Q  Our records show, Mr. Sheld, that you have two parcels of

19 land, and for the purposes of our record I will allude to them

20 by our numbers.  Parcel 20-3-187 shows .5 of an acre, all of

21 which is irrigable, and 20-3-191 shows .5 of an acre, all of

22 which are irrigable, for a total of one acre of land, all of which

23 is irribable.  Do you agree with that?

24      A  Yes.

25      MR. VEEDER:  Is that land overlying, Col. Bowen.

1        COL. BOWEN:  Yes sir.

2        THE COURT:  The Court proposes to find, as I have in the

3   other cases, that you are an overlying owner and have correla-

4   tive rights with the other people who have rights in the system

5   of the Santa Margarita River.

6        That is all we need from you.

7        MR. VEEDER:  Thank you, Mr. Sheld.

8        THE WITNESS:  Thank you.

9        MR. VEEDER:  The next one we have here is Joe Matz and

10  Mary Derring.

11                      MRS. MARY DEERING,

12  one of the defendants herein, having been duly sworn, on her

13  oath was examined and testified as follows:

14        THE CLERK:  State your name please.

15        THE WITNESS:  Mrs. Mary Deering.

16        MR. VEEDER:  There are two reference numbers, your Honor,

17  117 and 127.

18                      DIRECT EXAMINATION

19        THE COURT:  Is this the matter in which we had a letter

20  this morning?

21        THE WITNESS:  Well, my sister-in-law wrote to me.  My

22  brother passed away.

23        THE COURT:  This is the letter we have?

24        MR. VEEDER:  Yes, your Honor.

25        THE WITNESS:  And the property is in probate.

1    the Court can make a decision.

2        MR. VEEDER:  If it is agreeable, then, I will attempt to

3    follow through and serve on the parties the points just raised

4    by Mr. Sachse.

5        MR. STAHLMAN:  I don't wish to prolong this, but Mr. Veeder

6    has indicated certain portions of the findings.  It is clearly

7    set out what was said, and I think we have submitted it in our

8    brief.

9        THE COURT:  I'm not going to decide it now.  It is too

10   major a problem in the case to decide it hurriedly.

11       MR. STAHLMAN:  Very well, your Honor.  Just for the record,

12   in case your Honor reads the case, if your Honor will start at

13   page 54 of the findings, finding 24 at line 15, and continuing

14   to finding 23, you will see the great conflict that existed in

15   the first case and the map that was submitted here in the old

16   case and made part of the findings.

17       MR. VEEDER:  Your Honor, before we go, there are two wells

18   as to which we would like to readjust the location on Exhibit

19   207-C-2.

20       THE COURT:  They may be withdrawn for that purpose, and

21   see that it is called to counsel's attention what you have done

22   to the Exhibit.

23       MR. SACHSE:  I had half a dozen transcript corrections,

24   one of them at least which is very important.

25       THE COURT:  Can you list them and give them to the reporter?

1      THE COURT:   This is the letter?

2      MR. VEEDER:   I had better check out that Joe  Matz.

3      THE COURT:   Your sister-in-law has a separate piece of

4  property?

5      THE WITNESS:   No; the 70 acres were left to my brother.

6      THE COURT:   So you have a half interest in the 70 acres?

7      THE WITNESS:   Yes, and she has the other half.

8      THE COURT:   We can take care of these two at the same time,

9  Mr. Veeder.

10      MR. VEEDER:   Yes, your Honor.   We might as well have the

11  letter in the record.

12      THE COURT:   Yes.

13      MR. VEEDER:   I would like to have copied into the record

14  the letter from Mrs. Agnes Matz, dated April 5, 1960, and the

15  address is Downey, California.   I hand that to the Clerk.

16

17                                        Downey Calif.
                                          April 5 - 1960

18  United States District Court
    San Diego 1, California
19  Judge, James M. Carter

20  Dear Sir:

21      I am sending my regrets, that I cant be in Court on April

22  6, 1960.

23  To protect my water rights, because of illness.

24      Mr. Joe Matz is deceased of last June 9 - 1959.

25      Mrs. Mary Wilder and I own 70 acres in the Temecula rancho,

    in Murrieta California.

1    in Murrieta California.

2        I request that you protect my water rights for me, and I

3    wish to express my deepest gratitude and thanks to you and the,

4    United States of America.  For protecting our water rights.

5                                    Very truly yours,

6                                    /s/  Mrs. Agnes Matz
                                          9325 Downey Ave.
7                                         Downey, California

8    BY MR. VEEDER:

9        Q  You are the Mary Deering who, with Joe Matz, filed an

10   answer in this proceeding?

11       A  Yes.

12       MR. VEEDER:  Your Honor, for reference purposes, the first

13   tract is 20-5-117, which our records show consists of 30 acres,

14   28.6 acres of which are irrigable, and 1.4 acres of which are

15   non-irrigable; and the other parcel is 20-5-127, a total of 40

16   acres, 25.7 acres of which are irrigable and 14.3 acres of which

17   are non-irrigable.

18       Q  Your answer shows a claim of 70 acres, so there is

19   agreement on that ?

20       A  Yes.

21       Q  Are you in agreement with the irrigable and total

22   acreages as they appear here?

23       A  Yes.

24       MR. VEEDER:  Col. Bowen, are these lands overlying?

25       COL. BOWEN:  Yes sir.

1    THE COURT:  Was this answer filed by Joe Matz alone?

2    THE WITNESS:  No.  He has passed away.

3    THE COURT:  He and his wife both filed an answer?

4    MR. VEEDER:  No, your Honor, Joe Matz and Mary Deering

5  are the only two who answered.

6    THE COURT:  Matz's wife did not answer?

7    THE WITNESS:  Yes, she did, that was her letter.

8    MR. VEEDER:  But she didn't sign the answer.

9    THE COURT:  There is no problem.

10    THE WITNESS:  Joe Matz has passed away.

11    THE COURT:  We have the letter in the file that Joe Matz

12  has passed away.  Can we shortcut this and provide that the

13  decree will refer to Mrs. Matz's interest?

14    THE WITNESS:  Yes.

15    THE COURT:  As being subject to the probate proceedings.

16    MR. VEEDER:  Yes.  We would like to have the evidence

17  applicable to the estate or the successors.

18    THE COURT:  All right.

19    You each have an undivided one-half interest in this 70

20  acres?

21    THE WITNESS:  Yes sir.

22    THE COURT:  All right.  The Court would propose to find

23  that the 70 acres overlies the basin, and that the owners there-

24  of have correlative rights in the use of the water of the Santa

25  Margarita stream system.

1          THE WITNESS:   There is no well on that property now.

2          THE COURT:   That doesn't meant that you couldn't have a

3    well later.

4          MR. VEEDER:   Vernon LeFevre.

5                         VERNON LE FEVRE,

6    one of the defendants herein, having been duly sworn, on his

7    oath was examined and testified as follows;

8          THE CLERK:   State your name please.

9          THE WITNESS:   Vernon Le Fever.

10                       DIRECT EXAMINATION

11   BY MR. VEEDER:

12         MR. VEEDER:   The reference is 108, your Honor.

13         Q   Are you the Vernon Le Fevre who, with Melissa M. Le

14   Fevre, filed an answer in this proceeding, sir.

15         A   Yes sir.

16         Q   I observe that from our records the total acreage is 2.7

17   acres, all of which are irrigable.   Do you agree with that?

18         A   I do.

19         Q   I note that in your answer you referred to 3 acres.   Is

20   the 2.7 acceptable?

21         A   I said approximately.   According to my tax bill it is

22   2.65.

23         MR. VEEDER:   Col. Bowen, are these lands overlying?

24         COL. BOWEN:   Yes sir.

25         THE COURT: The Court would propose to find that you own

1    land overlying a basin and have correlative rights with all

2    other persons who have rights in the Santa Margarita stream

3    system.

4            That is all we need from you, sir.

5            THE WITNESS:  Thank you.

6            MR. VEEDER:  Thank you sir.

7            Harold R. and Phronia P. Wickard.

8            The reference number is 186.  I also observe that she has

9    a parcel of property at Wildomar.  You don'y have the records on

10   that, your Honor, but I would like to handle that, if I can.

11   It is just a small parcel.

12           THE COURT:  All right.

13                      PHRONIA P. WICKARD,

14   one of the defendants herein, having been sworn, on her oath

15   was examined and testified as follows:

16           THE CLERK: State your name please.

17           THE WITNESS:  Phronia Wickard.

18                      DIRECT EXAMINATION:

19   BY MR. VEEDER:

20           Q  Are you the Phronia Wickard who, with Harold R. Wickard,

21   filed an answer in this proceeding?

22           A  I am.

23           Q  Our records show, Mrs. Wickard, that you own 9 acres of

24   land, all of which are irrigable.  Is that agreeable with you?

25           A  Yes.

1      Q   Are those figures correct?

2      A   Yes.

3      Q   The records also show that you have a parcel of land in

4   Wildomar.

5      A   Yes.

6      Q   And the records disclose that you have .3 of an acre

7   there, all of which are irrigable;  is that correct?

8      A   Yes.

9      MR. VEEDER:  Your Honor, it is true that that Wildomar

10   land is not part of this proceeding, but it would save them a

11   trip if we take care of it now.

12      THE COURT:  You mean it is not part of the hearing today?

13      MR. VEEDER:  That is correct.

14      THE COURT:  It is involved in the lawsuit.

15      MR. VEEDER:  It is involved in the law suit.

16      THE COURT:  That takes care of that.

17      Col. Bowen, this land, the 9 acres and the lot in Wildomar,

18   overlie the basin?

19      COL. BOWEN:  Yes, your Honor.

20      THE COURT:  The court would propose to find that you own

21   land overlying a basin which is a part of the Santa Margarita

22   stream system and therefore have correlative rights with all

23   other persons who have rights in the stream system.

24      That is all we need from you.

25      MR. VEEDER:  Thank you very much.

1    THE WITNESS:  Thank you.

2    MR. VEEDER:  Bessie M. Wickard.

3    The reference is 188, your Honor.

4                    BESSIE M. WICKARD, BASTIAN,

5    one of the defendants herein, having been duly sworn, on her

6    oath was examined and testified as follows:

7    THE CLERK:  State your name please.

8    THE WITNESS:  Bessie M. Wickard Bastian.

9                    DIRECT EXAMINATION

10   BY MR. VEEDER:

11       Q  Are you the Bessie M. Wickard who filed an answer in

12   this proceeding?

13       A  I am.

14       Q  Our records show that you own 10 acres, all of which

15   are irrigable.  Do you agree with that?

16       A  That is right; yes.

17   MR. VEEDER:  Col. Bowen, are those lands overlying?

18   COL. BOWEN:  Yes sir.

19   THE COURT:  The Court would propose to find that you are

20   the owner of the 10 acres overlying a basin and therefore have

21   correlative rights with all other persons who have rights in the

22   stream system of the Santa Margarita.

23       That is all we need from you.

24   MR. VEEDER:  This would be time for a recess because we

25   have caught up on the processing for the moment, your Honor.

1    THE COURT:  Do you think we can get these people run through
2  this morning?
3    MR. VEEDER:  I would have to go down to my office and see.
4    THE COURT:  Take a short recess.
5                     (Recess)
6    THE COURT:  Call your next witness.
7    MR. VEEDER:  Lewis J. Munoa, will you take the stand.
8                    LEWIS J. MUNOA,
9  being one of the defendants herein, having been duly sworn, on
10  his oath was examined and testified as follows:
11    THE CLERK:  State your name please.
12    THE WITNESS:  Lewis J. Munoa.
13                 DIRECT EXAMINATION
14    MR. VEEDER:  There are three reference numbers: 729, 96
15  and 112.
16    Q  Are you the Lewis J. Munoa and Wanda J. Munoa who filed
17  an answer in this proceeding?
18    A  Yes sir.
19    MR. VEEDER:  This is with reference to 729, your Honor.
20    Q  Our records show that you have one parcel of land, the
21  total of which is 2.3 acres, .2 of an acre of which is irrig-
22  able, and 2.1 acres of which is non-irrigable.  Are you in
23  agreement with that?
24    A  Yes sir.
25    Q  On your parcel 96 we observe that you have .6 of an
acre

1   acre, all of which is irrigable.  Are you in agreement on that?

2       A  Yes sir.

3       THE COURT:  The record shows that there is 1 acre, on page

4   7.  Is this in the Temecula Land and Water Company?

5       MR. VEEDER:  That is correct.

6       Col. Bowen, would you check that?

7       COL. BOWEN:  Page 46, Parcel 96, Townsite of Temecula.

8       MR. VEEDER:  20-14, your Honor.

9       THE COURT:  I have the wrong page then.

10      All right.

11      MR. VEEDER:  The next parcel is in 20-15 and it is 112,

12  your Honor.

13      Q  Our records show that there is 1.6 acres, all of which

14  are irrigable.  Are you in agreement?

15      A  Yes.

16      Q  In other words, you are in agreement with all of the

17  figures as to both total acreage and irrigable acreage?

18      A  Yes sir.

19      MR. VEEDER:  Col. Bowen, are those lands overlying?

20      COL. BOWEN:  Yes sir.

21      THE COURT:  The Court would propose to find that you are

22  an owner overlying a basin and have correlative rights with

23  everyone else in the stream system.

24      Call your next witness.

25      MR. VEEDER:  I will call Raymond Thompson.

13,140

RAYMOND I. THOMPSON,

1

2 one of the defendants herein, having been duly sworn, on his

3 oath was examined and testified as follows:

4       THE CLERK:  State your name please.

5       THE WITNESS:  Raymond I. Thompson.

6       MR. VEEDER:  Before proceeding with the evidence in regard

7 to this claim, I want the record to show that Mr. Thompson is also

8 appearing for Inez Hunt and Murrieta Valley Town Hall Association.

9 That latter reference is 20-3-136.

10       THE COURT:  That is Murrieta Town Hall?

11       MR. VEEDER:  That is correct.

12       THE COURT:  What is the Hunt reference?

13       THE WITNESS:  She was a former owner.  Her name is still

14 on it.

15       MR. VEEDER:  In discussing this matter with Mr. Thompson,

16 it appears that he has acquired property from Walter Cooper.

17 Our records also show that Mr. Cooper is a client of Mr.

18 Krieger.  I have advised Mr. Thompson that (see next page)

19

20

21

22

23

24

25

P 1                                                                    13,141

present hearing as of today we would omit the Cooper property.
I will correspond and talk with Mr. Krieger in regard to this
and see what disposition he desires to make of it.

THE COURT:  All right.

MR. VEEDER:  The references to the property to be handled
as of today are 20-3 and your number 179, and the other parcel
is 20-4-47 and 20-5-123.

Q  Are you the Raymond Ingram Thompson who, with Octavia
Thompson, filed an answer in this proceeding.

A  Yes.

Q  Our records show that the properties designated as
Tract 20-3-179 has an aggregate acreage of 3.3 acres, all of
which are irrigable, are you in agreement on that?

A  Yes.

Q  On Parcel 20-4-47 is your interest that of a Trust Deed
Beneficiary, or do you have the legal title to that property?

A  Yes, I hold the first mortgage on it.

Q  That acreage shows that there is a total of 52.7 acres,
50.5 acres of which are irrigable and 2.2 acres of which are
non-irrigable.  Are you in accord with that?

A  Yes.

THE COURT:  That is the property that Margolis testified
to yesterday.  Margolis owns it.

THE WITNESS:  Yes, your Honor, he is the one that owns it.
BY MR. VEEDER:

Q  In regard to the property designated as 20-5-123, there
is a total of 20.6 acres, all of which are irrigable, are you
in accord with that?

P  2   1    A  Which one is that now?

2    Q  Our designation is 20-5-123.

3    A  That doesn't mean much to me.

4    THE COURT:  It is the 20.6 acre parcel.

5    THE WITNESS:  I have two of them, your Honor.  I don't

6    know which one he means.  I sold one and I have still have the other.

7    MR. VEEDER:  Mr. Clerk, could you get me Exhibit 207B2.

8    Q  A portion of Block 25.  That make sense to you?

9    A  Yes.

10    Q  And we find that is 20.6 acres, all of which are irri-

11    gable.

12    A  Yes.

13    THE COURT:  Is this the reference to 123?

14    MR. VEEDER:  That is correct your Honor.

15    Are those lands overlying, Col. Bowen?

16    COL. BOWEN:  I haven't checked them out yet, Mr. Veeder.

17    MR. VEEDER:  I will proceed and ask in regard to Inez Hunt and Murietta Valley Town Hall.

18    Q  Our records show that to be 20-3-136, 4.7 acres, all of

19    which are irrigable; is that correct?

20    A  Yes.

21    THE COURT:  What is the situation there?  Inez Hunt deeded to Murietta Town Hall?

22    THE WITNESS:  Yes, sir.  She deeded that to Murietta Town

23    Hall Association, with the right of survivorship.  She has

24    since died.

25    THE COURT:  What is your connection?  Are you connected

P   1    with the Murietta Town?

2        THE WITNESS:  Yes, sir.

3        THE COURT:  Did Inez Hunt file an answer?

4        MR. VEEDER:  There is an answer here, yes, your Honor.
It is signed by Inez Hunt and the Murietta Town Hall Association,
5    so it is a combined answer.

6        THE COURT:  She has since died.

7        THE WITNESS:  Yes.

8        THE COURT:  So that Murietta Town Hall now owns the com-
9    plete fee?

10        THE WITNESS:  Yes.

11        MR. VEEDER:  The Hunt property, Col. Bowen?

12        COL. BOWEN:  Parcel 136, on Assessors page 20-3, is
13   overlying.

14        MR. VEEDER:  In regard to the Thompson property, Col.
15   Bowen is checking that as to whether it is all overlying, or
     not.  But I would like to proceed, if we could.  Could we call
16   another witness and then have Col. Bowen testify in regard to
17   this separately?

18        THE WITNESS:  It will be overlying.

19        THE COURT:  Murietta Town Hall is in the town of Murietta?
     THE WITNESS:  Yes.
20
21        MR. VEEDER:  There is no question about that.

22        THE COURT:  There is no question about that.

23        MR. VEEDER:  Col. Bowen has testified to that.  Are
     problem is this other tract of land.

24        THE COURT:  Step down.  We will call another witness.

25        THE WITNESS:  That 20 acres is close to the other.

13,144

P 4 1  MR. VEEDER:  Irvin R. Rasch.

2      IRVIN R. RASCH,

3 one of the defendants herein, having been duly sworn, on his

4 oath was examined and testified as follows:

    THE CLERK:  State your name please.

5

    THE WITNESS:  William H. Jennings.

6

7    MR. VEEDER:  That has been sold to William H. Jennings.

 I would like to have this in the record, though.

8      DIRECT EXAMINATION

9 BY MR. VEEDER:

10   Q  And you acquired the property from Irvin R. Rasch?

11   A  Yes.

12   MR. VEEDER:  The record shows that Irvin R. Rasch and Mary

13 L. Rasch filed their answer in this proceeding claiming 1 acre

of land, your Honor.  The reference is 20-5 and the reference

14 you have is 102.

15   Q  The record shows that there is 1.1 acres, all of which

16 are irrigable.  Do you agree with that?

17   A  Yes sir, I do.

18   MR. VEEDER:  Col. Bowen, is that property overlying?

19   COL. BOWEN:  Yes, sir.

20   THE COURT:  The court proposes to find that you own land

21 overlying a basin and you have correlative rights to all other

persons who have rights in the Santa Margarita stream system.

22   THE WITNESS:  Yes.

23   THE COURT:  That is all we need.

24   MR. VEEDER:  I would like to interrogate Col. Bowen on

25 this Thompson property in question.

P 5   1      Will state, Col. Bowen, whether the lands of Raymond

2   Ingram Thompson are overlying?

3        COL. BOWEN:  Yes, sir, they are.

4        THE COURT:  I propose to make the same findings as to

5   your  land, Mr. Thompson.  Your land is overlying the basin

6   and you have correlative rights with all other persons who

7   have rights in the stream system of the Santa Margarita river.

         MR. THOMPSON:  I agree.

8        THE COURT:  All right.

9        MR. VEEDER:  Sam Termine.

10       The reference number is 116, your Honor.

11               SAM TERMINE,

12   one of the defendants herein, having been duly sworn, on his

13   oath was examined and testified as follows:

14        THE CLERK:  State your name please.

         THE WITNESS:  Sam Termine.

15             DIRECT EXAMINATION

16   BY MR. VEEDER:

17       Q  Are you the Sam Termine who filed an answer with Sarah

18   Termine?

19       A  Yes.

20       Q  For the record it is 20-5-116.  It discloses that you

21   are the owner of 38.8 acres, all of which are irrigable.  Is

        that agreeable to you?

22       A  Yes.

23       MR. VEEDER:  Col. Bowen, is that land overlying?

24       COL. BOWEN:  Yes, sir.

25       THE COURT:  The court proposes to find  that as an owner

P 6

of land overlying a basis you have correlative rights with all other persons who have rights in the stream system.

THE WITNESS: Yes, sir.

THE COURT: That's all.

MR. VEEDER: Frank Lloyd.

FRED LLOYD,

one of the defendants herein, having been duly sworn, on his oath was examined and testified as follows:

THE CLERK: State your name please.

THE WITNESS: Fred Lloyd.

DIRECT EXAMINATION

BY MR. VEEDER:

Q  Are you the Frank Lloyd who filed an answer in this proceeding?

A  I am.

Q  The reference number on this is 20-3-142.  Our records, Mr. Lloyd, disclose that you own .6 of an acre, all of which are irrigable, and that you have a domestic well; is that correct?

A  That is correct.

MR. VEEDER:  Col. Bowen, are those lands overlying?

COL. BOWEN:  Yes, sir.

THE COURT:  The court proposes to make the same finding as to you, that you own land overlying a basin and have the correlative rights to the use of water of the Santa Margarita stream system along with all other persons who have similar rights.

THE WITNESS:  Thank you.

P 7 1    MR. VEEDER:  Thank you very much sir.

2    The next is Paul H. Anderson.

3    The reference number is 104--20-5-104.

4             PAUL H. ANDERSON,

5 one of the defendants herein, having been duly sworn, on his

6 oath was examined and testified as follows:

    THE CLERK:  State your name please.

7    THE WITNESS:  Paul H. Anderson.

8           DIRECT EXAMINATION

9 BY MR. VEEDER:

10    Q  Are you the Paul H. Anderson who, with Helen I.

11 Anderson, filed an answer in this proceeding?

12    A  Yes, sir.  I am.

13    Q  The records that we have show that you have a total of

14 4.3 acres, all of which are irrigable.  Are you in agreement
with that?

15    A  Yes I am.

16    MR. VEEDER:  Does that land overlie, Col. Bowen?

17    COL. BOWEN:  Yes, sir.

18    THE COURT:  I propose to make the same finding as to you:

19 that you own land overlying a basin and you have correlative

20 rights with all other persons who have rights in the stream
system.

21    MR. VEEDER:  Emil Zimarik.

22          ALDA ZIMARIK,

23 one of the defendants herein, having been duly sworn, on her

24 oath was examined and testified as follows:

25    THE COURT:  Have you been sworn?

P 8 1    THE WITNESS:  Yes.

2    THE CLERK:  Were you in here when everyone was sworn?

3    THE WITNESS:  No.

     (The clerk swears the witness.)

4    THE CLERK:  Would you state your name again please.

5    THE WITNESS:  Alda Zimarick.

6                    DIRECT EXAMINATION

7  BY MR. VEEDER:

8       Q  The number is 20-2-727.

9       Q  Are you the Alda Zimarick who filed, with Emil Zimarick,

10  an answer in this proceeding?

11      A  I am.

12      Q  Our records show that you have .6 of an acre, all of

13  which is irrigable; is that correct?

     A  That is right.

14   MR. VEEDER:  Col. Bowen, does that property overlie?

15   COL. BOWEN:  Yes, sir.

16   THE COURT:  The court would propose to find that you own

17  land overlying  a basin and therefore have correlative rights

18  with all other persons who have rights in the stream system.

19   THE WITNESS:  Plus the Treaty Rights?

20   THE COURT:  The Treaty Right issue has not been decided.

21   MR. VEEDER:  That is the same one that Mr. Tarwater, brought
    up, however.

22   THE COURT:  She raises this in her answer, does she?  It

23  doesn't make any difference.  If the court found there were

24  any treaty rights it would apply to everybody, whether they

25  raise them in their answer or not.  But to be very frank with

P 9

1   you, the court has looked over some of this matter about treaty

2   rights and takes a rather dim view of the laws urged by Mr.

3   Tarwater.  I will look over it further before I finally sign

4   the decree.

5        MR. VEEDER:  Mr. Tarwater, I experience that almost every

6   day.

7        THE COURT:  You may step down.  Thank you.

8        MR. VEEDER:  I didn't want you to break his spirit, your

    Honor.

9        THE COURT:  Break his spirit like I have broken yours

10  you mean?

11       MR. VEEDER:  Yes, your Honor.

12       William J. Higlee.

13                      WILLIAM J. HIGLEE,

14  one of the defendants herein, having been duly sworn on his

    oath was examined and testified as follows:

15                      DIRECT EXAMINATION

16  MR. VEEDER:

17       The reference is 20-5-132, your Honor.

18       THE CLERK:  State your name please.

19       THE WITNESS:  William J. Higlee.

20       THE COURT:  Have you been sworn?

21       THE WITNESS:  No, sir, I haven't.

        THE COURT:  Raise your right hand.

22       THE CLERK:  I believe Mr. Higlee was sworn when everyone

23  raised their hand.  I have his name.

24       (The witness was again by the clerk duly sworn.)

25  BY MR. VEEDER:

P  10  1    Q  Are you the William J. Higlee who, with Marlene S.

2  Higlee, filed an answer in this proceeding?

3    A  Yes, sir.

4    Q  Our records show that you have a total of 18.8 acres,

5  all of which are irrigable; is that agreeable with you?

6    A  That is agreeable.  Only one thing I don't know about.
The question here of the Nutmeg property.  That has been

7  abandoned, as I understand.  I could be wrong.  If this is true,

8  that reverted back.  Then that would be 30 feet, as I understand

9  it, in addition to this.  Otherwise that would be all right.

10    MR. VEEDER:  He has a question of law, your Honor.  If this

11  Nutmeg street has been abandoned, then he will have an additional

12  30 feet added to his property, if the law is to that effect.

13    THE WITNESS:  Thirty by 660.

14    THE COURT:  I am not going to decide if you have that

15  property or not, but if it turns out that you have it, it is
overlying.

16    I take it this is all overlying, Col. Bowen?

17    COL. BOWEN:  Yes, sir.

18    THE COURT:  It is overlying and you have correlative rights

19  in the stream system along with all other persons who have sim-

20  ilar rights.

21    THE WITNESS:  Yes, sir.

22    THE COURT:  You have the area of this street surface, do
you, Mr. Veeder?  He gave you that, did he not?

23    MR. VEEDER:  Yes, he did, your Honor, and I would ask him

24  to state it again.

25    Q  It was 30 by 660, is that not right?

P 11

1      A   It is to my knowledge--if it is a 60 foot street, which

2  I am not sure, then it would be 30 by 660. There would be a

3  little cut off there, depending upon the width of Washington

4  street.

5      Q   I understand it is 660 then?

    A   That is right.

6      MR. VEEDER:  And it is overlying?

7      THE COURT: Yes, he so testified.

8      Thank you.

9      MR. VEEDER:  Thank you sir.

10     Nora Bryant.

11     The reference is 20-6-211, your Honor.

12                 NORA BRYANT,

13 one of the defendants herein, being duly sworn, on her oath

14 was examined and testified as follows:

15     THE CLERK:  State your name please.

16     THE WITNESS:  Nora Bryant.

17               DIRECT EXAMINATION

BY MR. VEEDER:

18     Q   Are you the Nora Bryant who filed an answer in this

19 proceeding?

20     A   Yes, I think so, yes.

    THE COURT:  Who is the E. Bryant?

21     THE WITNESS:  That is my son.  He was here a couple of

22 weeks ago.

23     THE COURT:  We proved up on this a couple of weeks ago?

24     MR. VEEDER:  I think that is correct, your Honor.

25     THE COURT:  At least it is shown in this tabulation.  It

13,152

P 12

is crossed out with the word "E. Bryant".

MR. VEEDER:  I think that is correct.  And here again I am going to have to check this out with Mr. Krieger.  I believe Nora Bryant at one time was represented by Mr. Krieger, although I am not sure.

THE COURT:  Is Mr. Krieger your attorney?

THE WITNESS:  I just don't know.  I haven't an attorney myself.  My son has one, but I don't know his name.

THE COURT:  You and your son own this, or do you own it?

THE WITNESS:  I own it.

THE COURT:  Let's take the proof.

MR. VEEDER:  I would like to do that.

THE COURT:  Go ahead.

BY MR. VEEDER:

A  Our records show, Mrs. Bryant, that you have 10 acres of land, all of which are irrigable.  Is that agreeable to you?

A  It could be irrigable, but I don't irrigate it.

THE COURT:  Are you talking about 20-6-211?

MR. VEEDER:  20-6-211.

THE COURT:  It shows that she has 20 acres here. Did you have 20 acres at one time?

THE WITNESS:  No, I have always had the 10.

THE COURT:  Is this in the Temecula Land and Water Company subdivision or in some other subdivision?

MR. VEEDER:  Your Honor, this is one of those problems we have in regard to this land.

Q  Did you ever own 20 acres?

A  No, not there, no.

P 13

1    MR. VEEDER:  She claims only 10 acres in her answer.  All

2  I can say is that we will check this out for Mrs. Bryant and

3  let her know on it, because I don't know how the difference

4  on this acreage appeared.

5    Q  You have a son, do you not, who testifed here?

    A  Yes.

6

7    MR. VEEDER:  I will have to run this through, because

  Mr. Krieger has an interest in this matter.  That is all I

8  can do, your Honor.

9    THE COURT:  All right.

10    Is the land shown overlying the basin, Col. Bowen?

11    COL. BOWEN:  Yes, your Honor.

12    THE COURT:  Mr. Veeder will check this out so we will have

13  the judgement correct, since you own only 10 acres.

    THE WITNESS:  I only own 10.

14

15    THE COURT:  The court will find that your land is overlying

  the basin and you have correlative rights with other persons

16  who have an interest in this stream system.

17    Thank you Mrs. Bryant.

18    THE WITNESS:  Yes, sir.

19    THE COURT:  Do you have her address there, Mr. Veeder?

20    MR. VEEDER:  Yes.

    Curtis T. Thompson.

21

    This is an instance in which no answer was filed, your

22  Honor.  The reference number is 20-3-185.

23    THE COURT:  Have you been sworn as a witness?

24    THE WITNESS:  Yes I have.

25                MILES W. THOMPSON,

13,154

P  14

1   one of the defendants herein, having been duly sworn, on his

2   oath was examined and testified as follows:

3          THE CLERK:  State your name please.

4          THE WITNESS:  Miles W. Thompson.

5          MR. VEEDER:  We don't have an answer in the record, your

    Honor, for this gentleman, but our records show that he does

6   own property.

7          THE COURT:  You called him Curtis Thompson.

8          What is your name?

9          THE WITNESS:  Miles.  We both own the land together.

10         THE COURT:  Who is Curtis?

11         THE WITNESS:  He is my brother.

12         MR. VEEDER:  Maybe we have the wrong Curtis.  All I can

    say is that this is the record I have.

13         THE COURT:  You each have an undivided interest in this

14  land?

15         THE WITNESS:  Yes, we do.

16         THE COURT:  How many acres do you have?

17         THE WITNESS:  Ten.

18         THE COURT:  Did you file an answer?

19         THE WITNESS:  No I didn't.

20         THE COURT:  Each of them has an undivided interest, accord-

    ing to Miles Thompson.

21         MR. VEEDER:  And have they both been sworn?

22         MR. MILES THOMPSON:  Yes.

23         MR. CURTIS THOMPSON:  Yes.

24         THE CLERK:  State your name please.

25         THE WITNESS:  Curtis Thompson.

P 15

1   MR. VEEDER:  The record shows that there are 10 acres,

2   all of which are irrigable, are you in agreement with that?

3   MILES THOMPSON:  Yes.

4   CURTIS THOMPSON:  Yes.

5   THE COURT:  Have you checked out the description so that

6   you have the description for the decree?

7   MR. VEEDER:  Yes, your Honor.

8   THE COURT:  Is this overlying a basin, Col. Bowen?

9   COL. BOWEN:  Yes, your Honor.

10  THE COURT:  The court proposes to find that you own land

11  over a basin and have correlative rights with all other persons

12  who have an interest in the stream system.

13  That is all we need from you.

14  MR. MILES THOMPSON.  Thank you.

15  MR. VEEDER:  Howard Morrow.

16  The reference is 128, your Honor.

17                    HOWARD MORROW,

18  a defendant herein, having been duly sworn, on his oath was

19  examined and testified as follows:

20  THE CLERK:  State your name please.

21  THE WITNESS:  Howard Morrow.

22                  DIRECT EXAMINATION

23  BY MR. VEEDER:

24  Q  Are you the Howard Morrow and Betty Morrow who filed

25  an answer in this proceeding?

    A  That is right.

    Q  Our records, show, Mr. Morrow, that you have a total

    of 20 acres, all of which are irrigable.  Are you in agreement

P 16

1  with that?

2      A That is correct.

3      MR. VEEDER:  Col. Bowen, are those lands overlying?

4      COL. BOWEN:  Yes, sir.

5      THE COURT:  The court proposes to make the same finding
in your case:  That you own land overlying a basin and therefore

6  have correlative rights to the use of water with all other

7  persons who have rights in the stream system of the Santa

8  Margarita river.

9      Thank you.

10      MR. VEEDER:  Victor A. Garrison.

11      The reference numbers are 20-3-148 and 20-3-160, your

12  Honor.

13                    VICTOR A. GARRISON,

14  a defendant herein, having been duly sworn, on his oath was

15  examined and testified as follows:

16      THE CLERK:  State your name please.

16      THE WITNESS:  Victor A. Garrison.

17      THE CLERK:  You have been sworn?

18      THE WITNESS:  Yes, sir.

19                    DIRECT EXAMINATION

20  BY MR. VEEDER:

21      Q Are you the Victor A. Garrison who, with Arlene D.
Garrison, answered in this proceeding?

22      A Yes, sir.

23      Q Our records show that the parcel marked 148 for our

24  records contains 1.2 acres, all of which are irrigable, and

25  the parcel designated 160 contains 1.8 acres, all of which are

13,157

P  17

1    irrigable.  Are you in agreement with those figures?

2        A  Yes, sir.

3        MR. VEEDER:  Are those lands overlying, Col. Bowen?

4        COL. BOWEN:  Yes, sir.

5        THE COURT:  The court proposes to find that you own land

6    overlying a basin and that you have correlative rights with

7    all other persons who have rights in the stream system.

     That is all we need.

8        MR. VEEDER:  George and Fern Blake, again, this is a case

9    where there has been no answer filed, your Honor.  The reference

10   is 20-3-144.

11                        GEORGE E. BLAKE,

12   a defendant herein, having been duly sworn, on his oath was

13   examined and testified as follows:

14       THE CLERK:  State your name please.

15       THE WITNESS:  George E. Blake.

16       THE CLERK:  Were you sworn?

17       THE WITNESS:  I haven't been sworn.

     (Whereupon the witness was duly sworn by the clerk.)

18       MR. VEEDER:  We are able to ascertain his land, your

19   Honor, although an answer has not been filed.

20       THE COURT:  All right.

21                      DIRECT EXAMINATION

     BY MR. VEEDER:

22       Q  The records show, Mr. Blake, that you own one lot of

23   land, .2 of an acre and that all of it is irrigable.

24       A  That is right.

25       MR. VEEDER:  That is all we have, your Honor.

P 18

1    Is that land overlying, Col. Bowen?

2    COL. BOWEN:  Yes, sir.

3    THE COURT:  The court proposes to find that you have land

4    overlying a basin and that you have correlative rights with

5    all other persons who have rights in the stream system.

6    THE WITNESS:  I understand.

     THE COURT:  All right.

7    MR. VEEDER:  Marvin Duane Curran.

8               MARVIN DUANE CURRAN,

9    a defendant herein, having been duly sworn, on his oath was

10   examined and testified as follows:

11                  DIRECT EXAMINATION

12   MR. VEEDER:  The reference is 20-2-711.

13   Q  Are the Marvin Duane Curran who, with Kay Louise Curran,

14   filed an answer in this proceeding?

15   A  Yes.

16   Q  Our records show that your properties consist of .9

     of an acre, all of which are irrigable; is that correct?

17   A  Yes.

18   MR. VEEDER:  Col. Bowen, are those lands overlying?

19   COL. BOWEN:  Yes, sir.

20   THE COURT:  The court proposes to make the same finding

21   as to you:  That you have land overlying a basin and that you

22   have correlative rights with all other persons who have rights

     in the stream system.

23   Thank you.

24   Mr. Curran, I have a note here that yesterday we were

25   considering our Parcel 710, .2 of an acre, and there was some

P 19  1  testimony that it had been sold to Marvin Curran.

2  THE WITNESS:  That is right.

3  THE COURT:  So you have another piece besides this .9 of
4  an acre?

5  THE WITNESS:  Yes.

5  THE COURT:  It is .2 of an acre?

6  THE WITNESS:  Yes.

7  THE COURT:  And the record shows that it is all irrigable.

8  THE WITNESS:  Yes.

9  THE COURT:  Is it adjacent to the other piece?

10  THE WITNESS:  No, it is on the other corner.

11  THE COURT:  In the town of Murietta?

12  THE WITNESS:  That is right.  It is on the same block.

13  THE COURT:  The court proposes to find that both pieces
overlie the basin.

14  I suppose  you will check that up from the record.  It is
15  710.

16  MR. VEEDER:  That is right.

17  THE COURT:  Thank you.

18  Call the next witness.

19  MR. VEEDER:  Louis Baggenstos.

20  LOUIS BAGGENSTOS,
one of the defendants herein, having been duly sworn, on his
21  oath was examined and testified as follows:

22  THE CLERK:  State your name please.

23  THE WITNESS:  Louis Baggenstos.

24  DIRECT EXAMINATION
25  BY MR. VEEDER:

13,160

P 20

1   Q   You filed an answer in this proceeding?

2   A   Yes.

3   Q   The reference number is 20-3-151.

4   The record also shows that the land you own is .1 of an

5   acre, all of which is irrigable; is that correct?

6   A   Yes, sir.

   MR. VEEDER:   Col. Bowen, is that land overlying?

7   COL. BOWEN:   Yes, sir.

8   THE COURT:   The court proposes to find that you own land

9   overlying a basin and have correlative rights with all other

10  persons who have rights in the stream.

11  That is all.

12  MR. VEEDER:   The next is Ray Mize.

13                  RAY VERNER MIZE,

14  one of the defendants herein, having been duly sworn, on his

   oath was examined and testified as follows:

15  THE CLERK:   State your name please.

16  THE WITNESS:   Ray Verner Mize.

17  THE COURT:   You were previously sworn?

18  THE WITNESS:   Yes, sir.

19  MR. VEEDER:   There several reference numbers, your Honor,

20  and it is necessary that we refer to the fact that there is a

21  question as to the total irrigable acreage.

22  Q   Is that not correct?

23  A   That is correct.

   MR. VEEDER:   We have agreed to check it out, but I would

24  like to get into the record what we have concerning which there

25  is agreement, if that is all right with your Honor.

P 21

1    THE COURT:  Do you have the reference numbers?

2    MR. VEEDER:  Yes, your Honor.  The first reference number

3    is 20-5-120, 20-5-125, 20-5-124, 20-7-246 and 20-7-247.

4    I am going to take each parcel to the extent that there

5    is agreement, your Honor.

6    Q  Now, in regard to parcel 120, there 28 acres, of which

7    28 acres are found to be irrigable.  Are you in agreement with

     that?

8    A  The difficulty there is that there is a discrepancy

9    in the total acreage.  Where it is I am not able to say.

10   Q  Can you straighten those out, Mr. Mize, if we were to

11   refer to your legal subdivision?  Do you have your records that

12   would do that?

13   A  According to the tax records, I think those figures

14   are approximately right, but there is a railroad right of way

15   which goes through there, and also an abandoned street and we

16   have always considered the total of those three items 120 acres,

     and that does not show much.

17   Q  The aggregate of the parcels which we have, and I will

18   put in the aggregate to the end that we can see where the dis-

19   parities are, there is a total of a 193.1 acres, which our

20   records show.

21   A  No.

22   THE COURT:  119.3

     THE WITNESS:  The first three items there--

23   MR. VEEDER:  As he said, he didn't know how to straighten

24   this out.  I was going to give you the total.

25   THE WITNESS:  The other two are entirely separate.

P 22

1   THE COURT:  Did you say 193 acres?

2   MR. VEEDER:  All of his lands, in our records, total 193.8

3   acres, 188.4 acres of which are irrigable, and 4.7 acres of

4   which are non-irrigable.

5   THE WITNESS:  There is another thing there I want to point

    out to you.  The last two items are now owned by us anymore,

6   except for a trust deed, so that they have to be separated.

7   MR. VEEDER:  All that I can do then, your Honor, is refer

8   to the legal descriptions and see if we can work it out with

9   him.  It was impossible to work it out in my office.

10  THE COURT:  See if you can work it out.  Write him a

11  letter and file the letter.  I think it makes a great deal of

12  difference.  The man owns the land.  I don't think it is so

    important to have the exact acreage.  I can't effect his title

13  in the land.

14  MR. VEEDER:  It does have an effect on his irrigable acreage.

15  However, I will write you a letter, sir, and we will sum-

16  marize these, and if there is disagreement you can advise us and

17  we will check it out.

18  THE WITNESS:  I would like to ask another question, if I

19  may.

20  MR. VEEDER:  Fine.

    THE COURT:  Yes sir.

21  THE WITNESS:  These water rights, seem to be, as I understand

22  it, this official notice now that we are affected equally with

23  everyone else.  What was the word you used?

24  THE COURT:  Correlative.

25  THE WITNESS:  Correlative rights.  I thought  there are

P 23

1   patent rights and various other things involved.  Does that
2   affect them in any way?  We had a patent from the government
3   for this land, which stated certain things.  Is that going to
4   invalidate some of those rights?
5   THE COURT:  Well, Mr. Mize, all the land in the State of
6   California which is now held by other people came in various
7   ways into their ownership, if you trace the chain of title.
8   Some of it came from the old Spanish grants which were in ex-
9   istence when the state was formed, some of them came from
10  government land which was patented by the government to indi-
11  viduals, who later on transferred it on down.  I suppose there
12  are other lands owned outside the Spanish grant.  But I suppose
13  those would be the two main sources of the land.  I am of the
14  view that it doesn't make any difference how your title is
15  derived; that the California law of water rights applies to
16  all the land in the State.  As a matter of fact, if there was
17  any merit to Mr. Tarwater's point about Mexican law, the Mexican
18  law of water rights is very similar to California water law.
19  In other words, this law that one person couldn't hog all
20  the water just because he got some water out of his ground is
21  common sense, and that is supposed to be the basis of law.  Laws
22  are passed to carry out the common desires of the community.
23  It is my understanding of Mexican water law that it is very sim-
24  ilar to California water law.  I don't think the fact that you
25  traced your title back to a patent from the United States makes
    any difference.
    THE WITNESS:  One reason for my question, and it has not
    been entirely answered yet, I didn't quite understand the

P 24

1   implications of your findings, what it means, and I was trying

2   to see what the finding meant to us.

3       THE COURT:  I will try to explain it to you in laymen's

4   language.

5       Let's take a stream, because most water law concerns rights

6   on a stream.  Suppose you and ten other people own property on

7   the stream, and the man up at the head of the stream, as the

8   water came through his property, said, "I own everything on my

9   property."  So he took all the water and used it on his ground

10  and maybe even took some out of the watershed.  Common sense

11  says that the people below would complain, wouldn't they?

12      THE WITNESS:  Yes.

13      THE COURT:  What would they say?  They would say, "You

14  have no more right to all of that water than we have.  Each of

15  us has a right correlatively to use the water on that stream.

16  If there is lots of water, we will use lots of water.  If there

17  is little water, we will use little water."

18      The same holds true through all the basin.  You and 10

19  other people hold land on a basin.  The law says that you can't

20  put a well down in that basin and use water to such an extent

21  that you hurt the use of other people who pump out of the basin.

22  For instance, you might put down a well in your basin and none

23  of the 10 other people have a well at that time.  You get a

24  fine well.  The ten other people decide later they want to put

25  down a well.  So when they do that, you say, "Wait a minute.

    I dug this well.  I have used the water out of this basin for

    50 years.  Now you want a well in the basin."  The law says

    that it doesn't make any difference.  If they are an overlying

13,165

P 25

1   owner, they have the right to that well whether you dug a well
2   in the past or not and they can't lose that right by not digging
3   that well.  You and the other people share correlatively the
4   water in that basin.  If there is lots of water, you all get
5   lots of water.  If there is a small amount of water, you all
6   get a small amount of water.

7       That is as well as I can explain correlative rights to
8   you.  With the exception of the further thought that this isn't
9   as simple as one little basin of 10 owners.  This is a stream
10  system on which the government is at the bottom of the stream
11  and  Vail rancho is upstream and various big and little people
12  all have rights on this stream.  We don't contemplate in this
13  case presently making an allocation and saying you get so many
14  inches and so many gallons.  The time may come when that might
15  have to be done at some time in the future.  Take the Vail
16  rancho.  It consists of thousands of acres.  Let your mind
17  wander into the future when that is cut up into small home
18  sites and an attempt is made to use riparian water on that land.
19  This could have a terrific impact on the amount of water avail-
20  able in this stream.  There is acreage up there that presently
21  is not irrigated, some of which may be riparian and may overlie
22  basins.  So that if Joe Doakes comes along five years from now
23  and puts a 1000 acres under cultivation, this is going to cut
24  down on the amount of water available to other people.

        That is all we mean by correlative rights.  Does that help
    you any?

        THE WITNESS:  I think so.  I was just trying to get at the
    point how this was different from any other situation where the

P 26

1   court's finding has not been made.  That is really what the
2   gist of the problem was.

3       THE COURT:  This is true all over the western states.
4   In the western states water law is all very similar.  There
5   are a lot of other ramifications that you can go into, such
6   as appropriations, prescription, etc.  But as far as the rights
7   of riparian and overlying owners are concerned, that is as well
    as I can explain it.
8
        Have I made a fair layman's statement of this matter to
9   Mr. Mize, Mr. Sachse and Mr. Girard?

10      MR. GIRARD:  I don't know how you could do any better
11  without writing a book, your Honor.

12      THE COURT: All right.

13      MR. STAHLMAN:  This question of domestic and irrigation
14  water, the paramount right there is the domestic.

15      THE COURT: And Mr. Stahlman suggests also that the laws of
    California gives first priority to domestic use, and in a show-
16  down between irrigation use and domestic use domestic use has
17  a higher priority.

18      MR. STAHLMAN:  Then as far as surface flow is concerned
19  on a stream, the upper domestic user has a right to use the
20  water in preference to the downstream user.  In other words,
21  as long as the upper owner uses the water for strictly domestic
    purposes, the downstream owner can't complain.
22
        THE COURT:  I wouldn't be disturbed about this.  My own
23  view is that eventually when this case is laid to rest they
24  will build a dam downstream and catch some of the flood waters
25  that may otherwise go to the ocean and that may serve to satisfy

P 27

1    the needs of the Marine Base from that dam.  If the government

2    gets into a situation where it does not have enough water on

3    the Marine Base, of course it always has the right of eminent

4    domain.  It can condemn land upstream and the water rights that

5    pertain to it.

6        We can't forsee the future here.  We have presently em-

7    barked upon a program to demark those people who have rights

8    in the stream system and to define what the stream system is.

     That is about all we are going to accomplish by this case.

9        THE WITNESS:  Thank you.

10       THE COURT:  All right.

11       Leaving out the question of discrepancies, all of Mr. Mize

12   land appears to be overlying, does it, Col. Bowen?

13       COL. BOWEN:  Yes, your Honor.

14       THE COURT:  Subject to straightening out exactly this

15   acreage, the court will make the same finding as to you as it

     has made as to these other defendants.

16       MR. VEEDER:  Your Honor Mr. Mize asked about the Thompson

17   property.  I would have to identify that further.

18       Paul Thompson.

19       THE WITNESS:  He was here yesterday.

20       MR. VEEDER:  Paul Thompson testified yesterday and I would

21   have to check the record to see exactly what transpired there.

         THE WITNESS:  We own the Trust Deed on that property.

22       MR. VEEDER:  I am sure the record will show it, but I

23   couldn't tell you now exactly what occurred on that, your Honor.

24       THE WITNESS:  I know approximately what occurred, so I am

25   satisfied on that.  But you don't require me here any further?

13,168

P 28

1     MR. VEEDER:  No, sir.

2     Elmo Dunham.

3     THE COURT:  Have you been sworn?

4     MR. KEAN:  No, I am his son-in-law.

5     MR. VEEDER:  This is Mr. Kean, your Honor.

6     THE COURT:  Have you been sworn?

7     MR. KEAN:  No.

                    JIM KEAN,

8   being first duly sworn, on his oath was examined and testified

9   as follows:

10                  DIRECT EXAMINATION

11    MR. VEEDER:  Your Honor, the reference is 20-3-150.

12    I want the record to show that there has been no answer

13  filed in this case, and the return discloses that the summons

    was served on Elmo A. and Ethel Marie Dunham.

14    Q  Are you acquainted with those parties?

15    A  Yes I am.

16    Q  You are a son-inlaw; is that correct?

17    A  That is correct.

18    THE COURT:  Son-inlaw of Elmo A. Dunham?

19    THE WITNESS:  Yes.

20    THE COURT:  And Mrs. Dunham is your mother?

      THE WITNESS:  Mother-inlaw.

21    THE COURT:  Son-inlaw of both of them.

22  BY MR. VEEDER:

23    Q  Are you authorized, sir, to testify on the behalf of

24  the parties mentioned in connection with this proceeding--the

25  Dunhams?

P 29

1      A  That is right.

2      Q  Do you have anything in writing?

3      A  No I don't.

4      THE COURT:  Are you familiar with this property?

5      THE WITNESS:  Yes I am.

6      MR. VEEDER:  The parcel reference is 20-3150, your Honor.

7      Q  The record shows in this case there a total of .6 of
an acre, all of which is irrigable.  Are you in accord with that?

8      A  That is right.

9      MR. VEEDER:  Are those properties overlying, Col. Bowen?

10     COL. BOWEN:  Yes, sir.

11     THE COURT:  The court would propose to find that Mr. and
12  Mrs. Dunham are the owners of this property and that whether
13  or not they filed an answer won't make any difference; they own
14  land over the basin and have the correlative rights with other
    owners in the stream system.

15     That completes it.  Call the next one.

16     MR. VEEDER:  Willis A. Thompson.

17     This is an instance in which there has been an engineering
18  report.  I would like to have the engineering report marked the
19  next United States Exhibit number.

20     THE CLERK:  255.

21     (The engineering report above referred to was marked for
22  identification as Plaintiff's Exhibit 255.)

23                    WILLIS A. THOMPSON, SR.,
    one of the defendants herein, having been duly sworn, on his
24  oath was examined and testified as follows:

25                    DIRECT EXAMINATION

'13,170

P 30

1     THE CLERK:  State your name please.

2     THE WITNESS:  Willis A. Thompson, Sr.   There are two of us

interested--Willis A. Thompson junior and senior.

4     THE COURT:  Is this report, Col. Bowen, correct, according

to your best information and belief?

6     COL. BOWEN:  Yes, your Honor.

7     THE WITNESS:  There is too much acreage in here on this

map and we can't find out where it is.

8     MR. VEEDER:  Before we go any further on this, this is

9     an instance where Mr. Krieger had filed an answer.  As I under-

10    stand, he has withdrawn as counsel for Willis A. Thompson, Sr.--

11    THE WITNESS:  That is right.

12    MR. VEEDER:  And in fact in connection with this entire

proceeding.

13    THE COURT:  What is the reference number?

14    MR. VEEDER:  The reference number as we have it is

15    20-3-177 and 182.

16    THE COURT:  Have you been sworn?

17    THE WITNESS:  Yes, sir.

18  BY MR. VEEDER:

19    Q   Are you the Willis A. Thompson, Sr., who, with Nellie

20    Thorne Thompson, Willis A. Thompson, Jr., and Frances F.

Thompson, filed through Mr. Krieger an answer in this proceeding?

21    A   That is right.

22    MR. VEEDER:  Did your Honor say that Plaintiff's Exhibit

23    255 had been admitted?  You asked Col. Bowen if it was right

24    or not.

25    THE COURT:  It will be received in evidence--Plaintiff's

P 31  1  Exhibit 255.

2  (Plaintiff's 255 received.)

3  BY MR. VEEDER:

4  Q  Have you, Mr. Thompson, viewed the Exhibit marked 255,

5  which is the engineering report?

6  A  Is it the same as this one I have?

6  Q  Yes.  Better take a look and see.

7  A  It is the same lot numbers.  I presume it is all the

8  same.

9  Q  Would you state into the record whether you are satis-

10  fied with that report as it appears?

11  A  There is too much acreage on it.

12  Q  Would you state in what regard there is a disparity in

13  the acreage?

14  A  There is about 20 acres too much listed here than is

14  supposed be there.  I don't know where the mistake is.

15  THE COURT:  How many acres do you claim to own?

16  THE WITNESS:  About 420 in the ranch, and 13.80 is also

17  included.

18  THE COURT: 13.80?

19  THE WITNESS:  They have 12.80.

20  THE COURT:  They have it 12.80 and 1 acre piece; that makes

20  13.80.

21  THE WITNESS:  That is correct.  And on the ranch property

22  the four of us own--

23  THE COURT:  Parcel 177, according to Exhibit 207-D, shows

24  1 acre and irrigable.  Is that correct for that piece?

25  THE WITNESS:  Who is that under?

P 32

1    THE COURT:  It doesn't show who owns it.

2    MR. VEEDER:  Sarah E. Thompson.

3    THE WITNESS:  Sarah E. Thompson?

4    MR. VEEDER:  That is right.

5    THE WITNESS:  No, she doesn't own the 1 acre piece.  I

own that now.  For some reason they have the legal description

mixed up.  It was excepted in the old deeds and then it was

put back in.  I own it.

8    THE COURT:  The 12.8 acre piece is No. 182 and is shown

9 as being all irrigable, is that right?

10    THE WITNESS:  That is right.

11    THE COURT:  Who owns that piece?

12    THE WITNESS:  My wife and I--Nellie Thorne Thompson and

Willis A. Thompson, Sr.

14    THE COURT:  That takes care of that.

15    Those are both overlying, are they, Col. Bowen?

    COL. BOWEN:  Yes, sir.

16    THE COURT:  There is no reference in here then to this

17 large ranch parcel?

18    MR. VEEDER:  That is correct.

19    THE COURT:  How many acres do you say you own in this

20 ranch property?

21    THE WITNESS:  What we figured up we thought we owned--

    MR. WILLIS, JR.:  413 instead of 443, I believe.

22    THE WITNESS:  They listed them by blocks and they presumed

23 they were 40 acres, and they came up with different acreage in

24 these blocks and the lots even.

25    THE COURT:  Of course, that can happen.

Case 3:51-cv-01247-JO-SBC  Document 4617  Filed 09/24/63  PageID.34083  Page 84 of 145.

13,173

P 33

1    MR. WILLIS, JR.:  It should be 421 instead of 441.  But

2  there is a split in Block 61 which we can't find the error in.

3    THE WITNESS:  Block 61 consisted of 120 acres and someplace

4  they have made a  mistake.

5    MR. VEEDER:  Col. Bowen says it is right as far as he

6  knows and the report is as he views it, and I would like to

7  check out the description and correspond with the witness for

   the purpose of rectifying the excess acreage, if that can be done.

8    THE COURT:  All right.

9    Is this land all overlying, too, Col. Bowen?

10    COL. BOWEN:  Yes, sir.

11    THE COURT:  Where does it lie?

12    COL. BOWEN:  It lies astride Murietta creek, your Honor,--

13  that is largest portion of it does.  Or are you speaking of

   these two smaller parcels?

14    THE COURT:  I am talking about the larger property.

15    COL. BOWEN:  The larger property all overlies the basin,

16  your Honor.

17    THE COURT:  The court would propose to find that you are

18  an overlying owner and have correlative rights to the use of

19  the stream system along with other owners.

20    Who owns this larger piece of ground?

21    THE WITNESS:  My son and myself own it, your Honor.

22    THE COURT:  Willis A. Thompson, Sr., and Willis A. Thompson,

   Jr.?

23    THE WITNESS:  That is right.

24    THE COURT:  Half and half?

25    THE WITNESS:  Yes, sir.

P 34

1   THE COURT:  Each an undivided interest?

2   THE WITNESS:  Yes.

3   THE COURT:  Then check out the matter of total acreage.

4   Other than that we need no further evidence in the matter.

5   MR. VEEDER:  We will do that your Honor.

6   THE COURT:  Sometimes these sections and quarter-sections

7   and so-called forty-acre parcels have more or less land than

    the amount described.

8   THE WITNESS:  The one piece we have sold part of off, they

9   have measured off wrong.

10  THE COURT:  See if you can straighten it out.

11  THE WITNESS:  Just one more thing.  There is 1 acre in

12  there, that acre that was excepted, has never been--I haven't

13  filed an answer on it or anything.

14  THE COURT:  That is that acre you have told us about?

15  THE WITNESS:  Yes, where my mother's home is in the middle

    of that ten acres.

16  THE COURT:  That is the one acre which, with the 12.8 acres,

17  makes 13.8 acres?

18  THE WITNESS:  Yes.

19  THE COURT:  We have your answer on it.  That is the pur-

20  pose of having your testimony in court.

21  THE WITNESS:  I didn't know it was answered until I came

    here.

22  THE COURT:  We have the finding that you are the apparent

23  owner of that acre and that it has these overlying rights.

24  Doesn't that take care of it?

25  THE WITNESS:  Yes.

P  35

1    Then I wanted to appear for my mother, Sarah E. Thompson.
2    She has a half interest in 13.8 acres.
3        MR. VEEDER:  We have that reference here, your Honor.
4    That would be in Parcel 20-3-177.
5        That is part of the 13.8, is it not?
     A  No, sir.
6    Q  Is that an additional parcel?
7    A  That is an additional parcel.  The other half of the
8    two pieces were not cut up.
9        THE COURT:  We don't find it here then.
10        THE WITNESS:  I have a notice.
11        THE COURT:  Do you have the file on Sarah Thompson?
12        MR. VEEDER:  I am having that checked out now, your Honor.
13    If he can wait.
14        THE COURT:  All right, step down and wait a while.
       Do you have another witness here?
15        MR. VEEDER:  Harry C. Winter.
16        There are quite a number of parcels of land.  There is
17    disagreement as to acreage, but we had better get this into
18    the record, your Honor.
19        THE COURT:  Let me have the references.  How many of them
20    are there?
21        MR. VEEDER:  Twelve, your Honor.
                        HARRY C. WINTER,
22    a defendant herein, having been duly sworn, on his oath was
23    examined and testified as follows:
24        THE CLERK:  State your name please.
25        THE WITNESS:  Harry C. Winter.

P 35

1  Then I wanted to appear for my mother, Sarah E. Thompson.

2  She has a half interest in 13.8 acres.

3  MR. VEEDER:  We have that reference here, your Honor.

4  That would be in Parcel 20-3-177.

5  That is part of the 13.8, is it not?

6  A  No, sir.

7  Q  Is that an additional parcel?

8  A  That is an additional parcel.  The other half of the

   two pieces were not cut up.

9  THE COURT:  We don't find it here then.

10  THE WITNESS:  I have a notice.

11  THE COURT:  Do you have the file on Sarah Thompson?

12  MR. VEEDER:  I am having that checked out now, your Honor.

13  If he can wait.

14  THE COURT:  All right, step down and wait a while.

   Do you have another witness here?

15  MR. VEEDER:  Harry C. Winter.

16  There are quite a number of parcels of land.  There is

17  disagreement as to acreage, but we had better get this into

18  the record, your Honor.

19  THE COURT:  Let me have the references.  How many of them

20  are there?

21  MR. VEEDER:  Twelve, your Honor.

                    HARRY C. WINTER,

22  a defendant herein, having been duly sworn, on his oath was

23  examined and testified as follows:

24  THE CLERK:  State your name please.

25  THE WITNESS:  Harry C. Winter.

1                 DIRECT EXAMINATION

2        MR. VEEDER:  The references, your Honor, are 2-3-146,

3 2-3-161, 20-3-163 (a T.D. beneficiary), 20-7-299 (T.D. benefici-

4 ary), 20-7-315 (T.D. beneficiary).  Those will be the ones we

5 will deal with.  There is another one, 20-4-68, in which there

6 is a question in regard to acreage.

7       Q  Are you the Harry C. Winter and Florence Warren Winter

8 who answered in this proceeding?

9       A  Yes.

10       Q  I will refer to these parcels of land concerning which

11 there has been some agreement.  It appears that based upon our

12 records you have a total of 44.64 acres of land, 41.24 acres of

13 which are irrigated, and that is exclusive of the parcel 20-4-68.

14 Is that in accord with your understanding?

15       A  Yes.

16       Q  In regard to the property designated 20-4-68, our records

17 show that there are 7.2 acres which are non-irrigable and 42 acres

18 which are irrigable.  Do you find a disagreement on that?

19       A  Yes, I do.

20       Q  Would you state into the record the nature of that dis-

21 agreement?

22       A  I feel that Lot 123 is all irrigable.  And then I believe

23 you said there --

24       Q  7.2 acres non-irrigable.

25       A  That is right.

1      MR. VEEDER:  I think all we can do on this parcel 68,

2  your Honor, is to have Col. Bowen check it out with this wit-

3  ness and see if we can't come to agreement on it and handle

4  the matter by letter or by some kind of stipulation.

5      THE COURT:  All right.

6      Now, the other parcels there is agreement on are number

7  146, a half acre parcel, all irrigable?

8      THE WITNESS:  Yes.

9      THE COURT:  Are you going over the others?

10     MR. VEEDER:  I think we have covered them.

11     THE COURT: Parcel 161, .2 of an acre.

12     MR. VEEDER:  I took the total concerning which he has

13  entered into agreement, which was 44.64 acres in the aggregate,

14  41.24 acres of which we found to be irrigable.  He says he is

15  in agreement with that.

16     THE WITNESS:  I am afraid you have that wrong.  I have 49

17  and some tenths acres.  We went over that awhile ago.  And then

18  I own a deed of trust on 123 and half of 108, the original one

19  that I owned.  It's quite confusing.

20     MR. VEEDER:  Here is my thought about this, your Honor.

21  Because there are so many parcels of land, I think we had

22  better have Col. Bowen check this with the witness and see if

23  we can't work an arrangement with him to which he will be

24  agreeable.  We have gone all over this before with him this

25  morning and apparently his records show that he has trust deeds,

1    he has prior ownerships in fee, which we simply cannot work out

2    on the basis of the record before us.

3         THE COURT:  All right.

4         MR. VEEDER:  Are those lands overlying, Colonel?

5         COL. BOWEN:  Not entirely.

6         MR. VEEDER:  So it is necessary that we check them out.

7         Our parcel number 68 is partly overlying the basin com-

8    plex, your Honor, in the Santa Rosa escarpment.  That is the

9    portion that Mr. Winter thinks is irrigable, I guess.  The rest

10   of it, however, is overlying.

11        THE COURT:  Let's put the matter over.  You may step down.

12   If you can work something out, all right.  If not, you will have

13   to come back.

14        THE WITNESS:  I'll be glad to come back, because I think

15   that is exactly right.

16        THE COURT:  We can't go any further on it now.

17        THE WITNESS:  There has only been this matter on 123 that

18   I disagree with them from what I find.

19        THE COURT:  123 is the number of a lot?

20        THE WITNESS:  I have a deed of trust.  It belonged to my

21   son.  And it can all be irrigated, and they are about 7 acres.

22   That is the only disagreement we have.

23        MR. VEEDER:  I have this thought, that if he can come back

24   after lunch we might be able to work this out.

25        THE COURT:  All right, come back after lunch.  We will see

1     if we can work it out.

2            MR. VEEDER:  There are two more, Mr. Knott and Mr. Sidney

3     Winter, and I would like to have them after lunch, your Honor.

4            THE COURT:  Mr. Winter is coming back here.  What about

5     these other people?  Can we take care of them this morning?

6            MR. VEEDER:  There are only two left, your Honor.

7            THE COURT:  Can we take them now?

8            MR. VEEDER:  No, your Honor, I don't have the record on

9     them at this time.

10           THE COURT:  All right, 1:30.

11                        (Noon recess)

12           San Diego, California, Wedensday, April 6, 1960, at 1:30

13     P.M.

14           MR. VEEDER:  In regard to the property of Harry C. Winter

15     and Florence Winter, your Honor, concerning which there was a

16     disagreement, seemingly, we have a rrived at the point where

17     it has been decided that there can only be a checkout in regard

18     to the irrigable acreage, and we have agreed with Mr. Winter to

19     do that and we will go on his property for that purpose, and

20     that will conclude the Harry C. Winter case that check has been

21     made, your Honor.

22           THE COURT:  All right, call the next witness.

23           MR. VEEDER:  Alfred Knott.

24           (no response)

25           THE COURT:  He may be here later.

1      MR. VEEDER: Sidney J. Winter.

2                        Sidney J. Winter,

3  one of the defendants herein, having been duly sworn, on his

4  oath was examined and testified as follows:

5          THE CLERK:  State your name, please.

6          THE WITNESS:  Sidney J. Winter.

7                      DIRECT EXAMINATION

8          MR. VEEDER:  The number on that, your Honor, is 20-3-176a.

9          THE COURT:  176a?

10          MR. VEEDER:  That is the number I have.

11          THE COURT:  You have 176-1, 176-2 and 176-3.

12          MR. VEEDER:  I'll change that to 2 then.

13          THE COURT:  All right.

14  BY MR. VEEDER:

15          Q  Mr. Winter, are you the Sidney J. Winter who filed in

16  this proceeding with Velma B. Winter, in answer to the govern-

17  ment's complaint?

18          A  Yes sir.

19          Q  We find that you have a total of 3.4 acres, all of

20  which is irrigable.  Is that agreeable to you?

21          A  That is right sir.

22          MR. VEEDER:  Col. Bowen, is that 3.4 acres overlying?

23          COL. BOWEN:  Yes sir.

24          MR. VEEDER:  We have nothing further.

25          THE COURT:  I propose to find that you are an overlying

1    owner, overlying the basin, and have correlative rights with

2    other persons in the water system of the Santa Margarita River.

3         THE WITNESS:  Yes sir.

4         THE COURT:  That is all.

5         MR. VEEDER:  Is Mr. Willis A. Thompson in the courtroom?

6         Would you take the stand and I will ask you some questions

7    on this.

8                        WILLIS A. THOMPSON, SR.,

9    one of the defendants herein, having been previously duly sworn,

10   on his oath was examined and testified further as follows:

11                        DIRECT EXAMINATION

12   BY MR. VEEDER:

13        Q  Mr. Thompson, with reference to plaintiff's Exhibit

14   255, an engineering report, are you not now in agreement with

15   the acreage that is shown in that report?

16        A  441.

17        Q  Are you in agreement with the figure that is shown

18   there?

19        A  If that is what it is.  I think we are now.  I don't

20   think it comes out quite right yet.  That would be this acreage

21   here?

22        THE COURT:  Hand it to me and I will show you the page

23   where it appears.

24        MR. VEEDER:  The total acreage is 457.  It appears on page

25   1.

13,182

1        THE COURT:  It appears as 456.7 on page 3.  Is that the

2   agreage that you have?

3        THE WITNESS:  It is still too much.

4        THE COURT:  We are not going to worry ourselves about

5   that.  We are not passing on your title.

6        THE WITNESS:  I just want you to know that it doesn't

7   quite agree with the deed.

8        THE COURT:  Say more-or-less.

9        THE WITNESS:  Yes, it comes close.  If you are satisfied,

10  we are satisfied.

11       MR. VEEDER:  We will write it, "more-or-less," your Honor.

12       THE COURT:  Did we cover the area where this land is

13  located?  This 456 and a half acres is overlying the Murrieta

14  basin, Col. Bowen?

15       COL. BOWEN:  Yes sir.

16       THE COURT:  I have already passed on that.

17       THE WITNESS:  Thank you.

18       MR. VEEDER:  Alfred Knott is the last one, your Honor.  I

19  don't find him.

20       THE COURT:  Any other persons present who haven't been

21  heard in this matter?

22       THE WITNESS:  Was that Sara E. Thompson property settled?

23       MR. VEEDER:  We had to check that out, your Honor.  I

24  don't have the record on Sara E. Thompson.

25       THE COURT:  If you are talking about that 1 acre piece --

1       THE WITNESS:  No, it's 13.33.

2       THE COURT:  We have listed here two parcels, one of 1 acre

3   and one of 12.80, which together make 13.80.

4       THE WITNESS:  That is what it amounts to, but it isn't

5   those two pieces of property.

6       THE COURT:  Then you will have to check out this Sara

7   Thompson matter, Mr. Veeder.

8       MR. VEEDER:  We will check that out, your Honor.

9       THE COURT:  Check it out later.

10      MR. VEEDER:  That is all we can do, your Honor.

11      I would like to dispose of this Alfred Knott matter, if I

12  could, your Honor.  He is not here.  He appeared and was under

13  oath and I was hopeful we could have him here.

14      THE COURT:  What is the reference number?

15      THE WITNESS:  The reference numbers are 20-13-39, 20-13-45,

16  and 20-14-54.  There are three parcels.

17      THE COURT:  Do you know where they appear in here?

18      COL. BOWEN:  Pages 43 and 44, your Honor.

19      MR. VEEDER:  Parcel 39 is .5 of an acre, all irrigable;

20  Parcel 45 is .5 of an acre, all irrigable; Parcel 54 shows .7

21  of an acre, all irrigable; for a total of 1.7 acres.  There is

22  no disagreement, but I would like to have Mr. Knott say that.

23      THE COURT:  The Court will find that that is the acreage

24  that he has and that it is all irrigable.

25      Does this land overlie the basin?

1       COL. BOWEN:  Yes sir.

2       THE COURT:  He is an overlying owner and has correative

3  rights over the basin with other persons in the water system of

4  the Santa Margarita River.  Write him a letter and tell him that

5  is what court proposes to find  Unless we hear from him to the

6  contrary, that will be it.

7       MR. VEEDER:  All right, your Honor.

8       That concludes the Murrieta matter for today.

9       THE COURT:  All right.

10      What is your desire as to how we proceed on discussing

11  this Vail-Santa Margarita problem?

12      MR. VEEDER:  Are you addressing me, your Honor.

13      THE COURT:  I am addressing everyone.  You may speak up

14  first.

15      MR. VEEDER:  They are the movants.  I would just as soon

16  have them start, your Honor.

17      MR. STAHLMAN:  Your Honor, I feel that there has been a

18  great deal of this matter that has been agrued in out briefs.

19  If your Honor desires, I will proceed with the argument.  How-

20  ever, when I argued it on the previous occasion your Honor had

21  certain points in mind which you desired to hear us on.  I am

22  willing to proceed under either method.

23      THE COURT:  Give me a minute or two here.

24      As I read the proposed findings and judgment by the State

25  of California -- Mr. Girard, check me as to whether I am right --

1    you predicate the proposed decree upon the basis that we are

2    dealing with riparian water and that there can be no binding

3    division of riparian water that is subject to changes from time

4    to time.

5         MR. GIRARD:  That is correct, your Honor.

6         THE COURT:  That is really the essence of your findings.

7    Plus the additional fact that you propose a finding that the

8    United States and the Vail Company have both overused their

9    allotment under the decree, during the life of the decree.

10        MR. GIRARD:  That is correct.

11        The basic reasoning behind the findings is that the former

12   stipulated judgment allocated rights to water, there has been a

13   change in conditions, and the findings basically set forth the

14   change in conditions.

15        THE COURT:  California's Exhibit AX, which was marked for

16   identification, I suppose, is a compliation showing your conten-

17   tion that both Vail and Santa Margarita overused their allotment.

18        MR. GIRARD:  Yes, your Honor.   Basically, your Honor --

19   and you pointed the problem the other day on that -- the

20   stipulated judgment allocated two-thirds - one-third of the

21   total water of the Santa Margarita River to the two interests.

22   Then in the stipulated judgment it provides that the total water

23   shall be determined by the two-thirds - one-third allocation.

24        THE COURT:  Take a short recess.

25                          (recess)

1      THE COURT:  All right, Mr. Girard.

2      MR. GIRARD:  Specifically referring to the stipulated

3  judgment, on page 4 of the stipulated judgment (page 2 of Exhibit

4  A to the Complaint), the total waters of the Santa Margarita

5  River and all its tributaries are allocated on a two-thirds -

6  one-third basis.  Then going to Section 8 of the stipulated

7  judgment it says: "Whenever the total normal flow of said total

8  Temecula Santa Margarita River (when not artifically diverted

9  or abstracted) measured at Gaging Station No. 3 exceeds the

10 total normal flow measured at Gaging Station Nuo. 6, then and

11 in that instance the flow of said stream at said gaging station

12 No. 3 shall be considered as the total flow of said stream, and

13 at such time the apportionments and allotments herein provided

14 for shall be predicated upon the flow of said stream at said

15 Gaging Station No. 3."  In a prior section they say that the

16 total flow of said stream shall be considered as the normal

17 flow that goes through at Station 6 at Ysidora.  Nowhere in

18 the stipulated judgment is the term""Santa Margarita River and

19 its tributaries" defined.  So in determining what the total

20 waters of the Santa Margarita River are, for purposes of alloca-

21 tion, the stipulated judgment finds that by saying that the

22 total waters which are allocated shall be considered the waters

23 that go through Gaging Station 6 or Gaging Station 3.

24     THE COURT:  Gaging Station 6 being Ysidora, and Gaging

25 Station 3 being Temecula?

1      MR. GIRARD:  The Narrows.

2           MR. VEEDER:  Your Honor, may I interpose an objection to

3   California's position?  I would like to have it in the record.

4           THE COURT:  Can't we hear Mr. Girard out?

5           MR. VEEDER:  I would rather have it over my objection.

6           MR. GIRARD:  I want to make a statement first.

7           MR. VEEDER:  He is attacking the stipulated judgment.

8           MR. GIRARD:  I want to make a statement before Mr. Veeder

9   makes his.

10          THE COURT:  I will hear Mr. Girard and then I will hear you,

11  Mr. Veeder.

12          MR. GIRARD:  Your Honor, we are not attacking the stipu-

13  lated judgment.  These proposed findings of fact were prepared

14  at the request of the Court, and we filed them on the basis of

15  the facts that we think are in the record.  The decision whether

16  or not the stipulated judgment should or should not be set

17  aside is your Honor's.  I want to make it clear that in our

18  Points and Authorities and in our Proposed Findings of Fact it

19  is our opinion that the Court can only do this by applying

20  California law.  In other words, if a California court could not

21  do this, then your Honor can't do it.  Our position is that a

22  California court, under California law, could do it; and there-

23  fore, your Honor, who is limited to an application of California

24  law in this case, can also do it.

25          THE COURT:  And you are appearing for the State of Calif-

1   ornia.

2           MR. GIRARD:  Yes, your Honor.

3           THE COURT:  In pro patria, as it were, having the interest

4   of the people of the State and not appearing for or on behalf of

5   any party.

6           MR. GIRARD:  That is correct, your Honor.

7           THE COURT:  And you have merely proposed this set of

8   findings and this proposed judgment at my request when I asked

9   other counsel to have a crack at drawing some proposed findings

10  and judgments.

11          MR. GIRARD:  That is correct, your Honor.

12          THE COURT:  Now, Mr. Veeder, before he proceeds make your

13  objection.

14          MR. VEEDER:  Your Honor, I interpose my objection on the

15  grounds that the State of California is, in truth and in fact,

16  attacking the stipulated judgment.  They have in their original

17  pleadings admitted paragraph 6 of the Complaint of the United

18  States of America, in which we alleged that we succeeded to the

19  interests of the Rancho Santa Margarita under the stipulated

20  judgment and that we are entitled to all the benefits of it.

21  In their original answer to that, they agreed -- they said that

22  it was in force and effect.  Secondly, in their answer to the

23  Ammendatory and Supplemental Complaint they admitted that same

24  allegation.  So twice California has said that the stipulated

25  judgment was in force and effect.

1    Moreover, on November 29, 1951, when I stipulated with the
2  State of California as to the conduct of this trial, in the
3  light of an agreement with the Vail Company that the stipulated
4  judgment would be binding and in force and effect, they knew
5  well, and we knew, and the entire basis óf our position then, as
6  now, is that the stipulated judgment permitted use of water on
7  non-riparian land, which is perfectly proper under California
8  law.  Now, they are changing their position.

9    It is our position that the Attorney General of the State
10  of California should specifically authorize this attack.  How-,
11  ever, if he should specifically authorize this attack, we are of
12  the view that they are estopped from changing their position
13  because it is much to our detriment.

14    I will say that their original memorandum was an attack
15  upon the stipulated judgment; and I will further state that Mr.
16  Girard orally attacked the stipulated judgment here.

17    I object, moreover, to the exhibit which is marked -- I
18  beg your pardon, I don't know whether it is an exhibit or what
19  it is -- it is marked California's AX.

20    THE COURT:  That has been lodged.

21    MR. VEEDER:  That is known as "AX", and it apparently
22  swings now.  The thing that I would suggest, if he wants to get
23  that into evidence, he should call a witness.

24    THE COURT:  He hasn't offered it in evidence yet.  It has
25  only been lodged.  He will probably call a witness.  Let's not

1    anticipate.

2        MR. VEEDER:   If he makes any reference to it I'll be very

3    bitter.

4        MR. GIRARD:   Your Honor made reference to it.

5        MR. VEEDER:   I am very bitter about your Honor making

6    reference to it because I think it is entirely improper.

7        I make my objection to California's --

8        THE COURT:   Are you through?

9        MR. VEEDER:   Well, I will cease, your Honor.   I will let

10    him go ahead.   I know your Honor will overrule it.

11        THE COURT:   Your objection is overruled in toto.   First

12    of all, Mr. Girard is an officer of this court and I can request

13    any officer of this court to assist the Court on problems that

14    come along.

15        Secondly, the State of California, although appearing

16    generally in pro patria, are also landowners of small portions of

17    land in this watershed.

18        Thirdly, even if a pleading sets forth a certain position,

19    pleadings can always be ammended.   Pleadings are filed before

20    the case is tried, and it is a common practice to ammend pleadings

21    to conform to the proof.   Furthermore, we don't even need an

22    ammendment of California's pleadings.   We have ample pleadings

23    on the side of the Vail Estate to do whatever we do in this

24    matter.

25        MR. VEEDER:   I apprehend that California's answer is being

1  ammended as of now?

2      MR. GIRARD:  No.

3      THE COURT:  No.  I am just saying that I can't find any

4  merit to any of your objections.

5                    (Other matters)

6      THE CLERK:  2 - 1247-SD-C, United States vs. Fallbrook.

7      THE COURT:  Mr. Girard.

8      MR. GIRARD:  I want to make is crystal clear, in the light

9  of Mr. Veeder's last arguments, that he is correct when he said

10  that in our answer we admitted the stipulated judgment was in

11  full force and effect, your Honor.  We admit that now.  We do

12  not desire to change it.  We admit that it is in full force and

13  effect.  Our sole position in this is advising your Honor, pur-

14  suant to your Honor's request, that under California law your

15  Honor has a right to change it if the facts are sufficient to

16  justify that course of action as determined by your Honor.  We

17  do not move for the stipulated judgment to be set aside.  Vail

18  Company did that.  We only seek, pursuant to the Court's request,

19  to give you our opinion as to the law.  We are not in any

20  manner seeking or requesting or desiring to change our pleadings

21  in this case.

22      THE COURT:  In other words, the stipulated judgment,

23  according to your pleadings and as the fact remains, is now in

24  force and effect until such time as the Court might decide to

25  make some alteration.

1    MR. GIRARD:  That is right.  We admit that without any

2  doubt whatsoever.

3    THE COURT:  What is your view on the government's position?

4  One of the many positions of the government is this:  that after

5  the stipulated judgment and all the things that preceeded it,

6  the government did two or three things:  (1) it drilled the

7  Pauba Well and spent some money;  (2) apparently, according to

8  the government's position, it withdrew its protest as Vail Dam;

9  and (3) the government says that everybody concerned has lived

10  with, and complied with, the old decree.

11    MR. VEEDER:  May I interpose one thing there, your Honor?

12  We also spent about a hundred million dollars outside the water-

13  shed with their full knowledge, with the understanding that we

14  could use the water outside the watershed based upon the stipu-

15  lated judgment.  I think that is a very important factor in our

16  relationship with California.

17    THE COURT:  I have heard no proof that that is why you

18  spent it outside the watershed.  I have assumed all along that

19  this was an error of some general in the Pentagon who assumed

20  you could take California water and use it anywhere.

21    MR. VEEDER:  There is not a scintilla of evidence on that,

22  your Honor.

23    THE COURT:  How could you come into this court and make

24  any showing that you relied upon a judgment with one party in a

25  big basin that you could take water outside the watershed and

1  at the same moment you would have to realize that every other

2  person in that watershed could restrain you or object to your

3  taking the water outside the watershed?

4      MR. VEEDER:  But as against the Vail Company.

5      THE COURT:  But what good would it do?  What is it but an

6  illusory right?  You have a judgment with the Vail Company that

7  says that as to the Vail Company they will stand still while you

8  take water out of the watershed.  What value is it when it is

9  obvious that, under California law, any other person who had

10  riparian or overlying land in the valley could object to your

11  taking the water out of the watershed?

12      MR. VEEDER:  The point that I make is this, that during

13  the whole period from April to October no one is riparian  on

14  the stream, there being no water in the Murrieta Creek above the

15  Vail Company land, and usually no water in Temecula Creek above

16  Vail Company land during that period.  Those people are not

17  riparian during the greatest share of the year.  Vail Company

18  alone, for the greater part of the year, is the only riparian

19  owner who could object to the use of that water outside the

20  watershed.  It is very fundamental that when there is no water

21  in the stream, a man who is otherwise riparian has no objection,

22  and he is not riparian during the dry period of the year.  That

23  is our whole point.

24      THE COURT:  This is one I have heard now for the first

25  time.

1        MR. VEEDER:  No, I have brought this up repeatedly, your

2   Honor.

3        THE COURT:  I have heard this for the first time.  However,

4   it is true that once the water gets down in the enclave nobody

5   can object to what you do with it.  But that doesn't mean that

6   you have a right to insist that that water come to your enclave

7   in order that when it gets there you may do as you please with

8   it.

9        MR. VEEDER:  As against the Vail Company, when they are

10   the only ones who are riparian, we have a right against them

11   under the stipulated judgment, and that is the point.

12        THE COURT:  To me this is a new point.  Maybe it is inher-

13   ent in the case.  I have never heard it expressed before.

14        MR. VEEDER:  It is inherent, certainly in what I extend to

15   your Honor for review today, and I have brought it up many times

16   before.

17        MR. GIRARD:  Directing myself to your inquery as to the

18   Pauba Well, and without going into whether or not the United

19   States' allegations are correct or are supported by the facts or

20   not, I don't think it makes any difference on the basic legal

21   question of your jurisdiction to set aside, modify or change

22   an allocation among riparians.  If you find those facts to be

23   sufficient or to be true, as the United States said, you cer-

24   tainly have the power and the authority to take corrective

25   measures any way you want to do it.  You can require Vail to

1   give the United States back their $50,000 that they paid toward

2   the dam, if they want to push their request, or you can require

3   releases, or you can --

4   THE COURT:  Generally, your theory would be that since

5   there would, ipso facto, have to be a continuing right to

6   apportion riparian waters, nobody could, in good conscience,

7   rely upon any allocation to the extent of thereafter trying to

8   estop a court from later re-allocating water.  Is that about it?

9   MR. GIRARD:  That is about it, yes.  And if there are

10  unconscienable results of this, you certainly have the juris-

11  diction to make whatever order, entry or decision you feel the

12  facts warrent.

13  THE COURT:  What do you think about that new point that

14  Mr. Veeder made?? It sounds new to me.  Has that been raised

15  before?  He makes some contention that since streams above

16  Vail dry up in the summer, there is, therefore, no flow of water

17  and, therefore, there is no riparian owner who can complain

18  about the importations of water outside the watershed down-

19  stream.

20  MR. GIRARD:  I don't quite follow it.  Certainly there

21  are riparian owners between the Gorge and Camp Pendelton.

22  MR. VEEDER:  We take care of those.

23  MR. GIRARD:  There are only two of them taken care of in

24  the stipulated judgment -- Schloss and Henderson.  I think even

25  Fallbrook has some riparian rights down stream from the Gorge.

1        MR. SACHSE:  And I represent a few private individuals.

2        MR. GIRARD:  I'm certain there are many other riparians

3   on Murrieta Creek who could use the water, if they so felt.

4        MR. VEEDER:  It is not there.

5        MR. STAHLMAN:  It has been there, and it shows that it

6   flows there at Murrieta.  Not only that, there is water flowing

7   under the ground in many of those places besides that which is

8   flowing on the surface.  I don't think Mr. Veeder can segregate

9   the fact that during the summer months these streams do become,

10  to some extent, depleted and that from year to year they change,

11  and he has shown by his own exhibits they are farther upstream.

12  Here, he contends that they move downstream, but he has considered

13  here only the surface flow.

14       MR. GIRARD:  I have a little difficulty understanding Mr.

15  Veeder's position.  Apparently, his position is that during the

16  summer months these people cannot possibly use any water of the

17  stream.  If that is true, why are we waisting so much time in

18  getting them into the law suit?

19       MR. VEEDER:  Do you want me to explain?

20       MR. GIRARD:  They all have substantial groundwater rights,

21  and the stipulated judgment is not limited solely to surface

22  rights.

23       MR. VEEDER:  I'll be glad to explain it.

24       THE COURT:  Let's hear your explain it a little.  It sounds

25  new to me.  I have heard a lot of theories.

1   MR. VEEDER: Your Honor, if you will observe, I placed a

2   map worth 10,000 words at the beginning of our proposed findings.

3   Your Honor will also view Exhibit 15-E or the 15 series that your

4   Honor has. It will be noted that the rising water in Murrieta

5   Creek is right at the northern boundry of Vail Company where it

6   traverses Murrieta Creek. It flows entirely on Vail Company

7   property down to the confluence of Vail Company land with

8   Temecula Creek, with minor exceptions in the Town of Temecula,

9   and there is not a thing to show that those people are claiming,

10  or have any means of utilizing, the flow of Murrieta Creek.

11       Turning again to Pauba Valley and alluding to our map, you

12  will observe that Temecula Creek in its entire course below Vail

13  Dam, is entirely upon the properties of Vail Company. So it is

14  manifest that in regard to people above the Gorge, there are no

15  claimants during the period, we shall say roughly from April 1

16  throught the month of October, who are in a position to object

17  to the transportation of water outside the watershed by reason

18  of the fact that they do not have surface water by their land.

19  There is not a scintilla of evidence to show that pumping above

20  that point would interfer, during the summertime, with the surface

21  flow, and certainly there is nothing in Pauba Valley that would

22  demonstrate that there would be interference.

23       Now, in regard to the area below Temecula Gorge, if there

24  was ever an illusory right it is in Temecula Gorge in regard to

25  riparian land. I will say now that the United States of America

1   would recognize, to the fullest extent, and has recognized to
2   the fullest extent, those riparian lands; and when those riparian
3   lands have had their adequate share of water, they certainly are
4   not in a position to object to the United States using its share
5   of water under the stipulated judgment with the Vail Company.
6   But I have no knowledge that the Fallbrook Public Utility Dis-
7   trict, which has acquired some land following its illusory
8   reservation, is in a position to object in regard to that trans-
9   portation.  Even so, it could be only to the extent that they
10  were exercising their riparian right upon their riparian lands.
11  But this is injecting a new and foreign element in here.  There
12  is only one question:  Can we, under the law, as against the
13  Vail Company, transport water outside the watershed under the
14  circumstances that prevail?  And we say necessarily so, and I
15  believe Mr. Girard will agree, that the California law recognizes
16  that two riparians can agree to use water upon non-riparian
17  lands if they do not injure other riparians.  And in view of
18  the fact that whatever riparians exist are between the enclave
19  and Vail Company, if they have objection, they can have their
20  rights taken care of and they can be taken care of.  There is
21  not a scintilla of evidence in the record to the contrary.

22       Now, on that proposition, we take the position that as
23  between Vail Company and the United States of America, there is
24  a right in real property, a right protected under California
25  law, which says that we can use the particles of water on non-

13,199

1   riparian land, and that is what is contemplated in the stipulated

2   judgment.   I believe that California has failed to meet the

3   true import of the stipulated judgment, because they have

4   limited it to riparian users.   I will not contest the fact that

5   they are a changing arrangement, whenever riparians are involved.

6   But the enforcability of an arrangement to use water on non-

7   riparian lands certainly exists and certainly is an entirely

8   different catagory than the normal situation of an adjudication

9   decree where riparians are using water in different quantities

10  under different circumstances.

11      THE COURT:   What are you going to say to this?   You are

12  going to ask me to make findings that your basins in the lower

13  part are down, you are going to ask me to make findings that

14  saltwater has intruded as far back as inside the gorge at

15  Ysidora; and you are going toaask me to make some kind of pro-

16  vision, probably, that if you have water going down to re-charge

17  your basin, you have a right to keep your basins full.   Do you

18  have any right to pump water out of your basins outside the

19  watershed and then insist that other water come down to fill it

20  up?

21      MR. VEEDER:   As against the Vail Company, yes.   And the

22  thing that worries me is that your Honor says that this is the

23  first time I have brought it up.   I have repeatedly stated, in

24  all my arguments, in the briefs that I have filed, that as

25  against other owners --

1    THE COURT:  You have stated that as against other owners,

2 this decree did not bind them.  But this is the first time you

3 have spelled out this argument that in the summertime the only

4 running water is on the Vail property.

5    MR. VEEDER:  Your Honor, I thought I had spelled it out,

6 but if I didn't, I have some excellent findings, if your Honor

7 would care to adopt them, that will be right in point on that

8 proposition.

9    But during the period when there is water running in the

10 Santa Gertrudas Creek, Warm Springs Creek, or any place else,

11 we could not make demands against those riparians for the pur-

12 pose of exportation of water.  However, as against Vail Company,

13 within the limits of our prescribed rights under the stipulated

14 judgment, we are entitled to do so.

15    Now, we concede -- I never concede anything -- We admit

16 that there are some technicalities in regard to the period

17 from November to the end of March when, as distinguished from

18 1959-60, there is some water.  We couldn't say to Mr. Roripaugh,

19 "Knock off your pumping, we want to export some water from the

20 basin."  We couldn't do that because he has a legal right as

21 against us, as an overlying and riparian owner.  But, except

22 during those periods when water is in Santa Gertrudas Creek,

23 except at that time, he has no basis for objecting to our ex-

24 portation of water.  And I would say this, in addition, we are

25 injucting a foreign issue in here when we talk about third

1 parties. There is only one issue. As against the Vail Company,

2 during the time they have riparian water and we have riparian

3 water, is the judgment enforcable?

4 THE COURT: Haven't you built up another straw man by

5 putting on your map Exhibit 5-E, which is not is in evidence, but

6 I have no objection to talking about it. By putting on that

7 map the fact that there is water running on the surface of the

8 Vail property, don't you, therefore, ignore entirely water

9 which is running under the surface?

10 MR. VEEDER: In that regard, the alluvium from the Murrieta

11 Valley on down to the confluence of the Temecula is extremely

12 shallow. There is rock outcropping there right at the surface.

13 It is so shallow that is is not a matter of competing with any-

14 one, if I understand what you are saying, in regard to that

15 surface water. And may I hasten to add further that, as your

16 Honor well knows, in his fine statement on geology today, we

17 have a grenidic lip right here which brings to the surface all

18 of the water of the Murrieta and the Temecula. So it is not

19 an instance where our pumping 10 miles downstream could be

20 tapping groundwater off the Vail property.

21 MR. GIRARD: May I have that again?

22 MR. VEEDER: So it is not an instance where our pumping

23 10 or 11 miles downstream could be tapping ground water off the

24 Vail property. We certainly can't be pumping water and depleting,

25 during the low water period, any water in any basin above the

1   Temecula Gorge, this lip here.  That is an impossibility because
2   there is a grenidic underlay for a distance of almost 7 miles.
3   There is a very thin mantle of alluvium in that area.  So when
4   we are using water for the period to which I have alluded, it
5   is absolutely impossible for us to be competing with anybody
6   but the Vail Company.

7        The quantity of water to which we are entitled is depend-
8   ent, to a degree, upon the vageries of the weather, but by and
9   large the quantity of water that is entering the Gorge, as our
10  finding will show, is controlled almost entirely by the Vail
11  Company pumping; and indeed, since they have put in their
12  concrete up there and made their fine dam, their control is
13  complete of the Temecula.

14       THE COURT:  Do you have any doubt at all that continued
15  development of property and continued pumping upstream in
16  Murrieta from the place of rising water could have the effect
17  of completely drying up the flow of water from that point down
18  to the Gorge?

19       MR. VEEDER:  It is conceivable, your Honor, that the
20  pumping that is going on there today could dry up the flow.
21  But in regard to the legal issue that is before us today, that
22  is a nightmare some years away.  But it has nothing to do with
23  the question.

24       THE COURT:  Let's take the other side.  Let's take Pauba
25  Valley.  We have two or three of the users upstream.  Isn't it

1    entirely possible that, in order to comply with this judgment,

2    the Vail Company might have to pump deeper and deeper into the

3    basin of the Pauba Valley?

4         MR. VEEDER:  Your Honor, in regard to what Vail might

5    someday have to do, I'm going to say, "Sufficient to the day,

6    is the evil thereof."  But I think we can take this proposition

7    as a point of beginning in regard to the Vail Company.  When

8    the stipulated judgment was entered into they were fully aware

9    of the physical facts that existed there, and they fully com-

10   prehended, beyond doubt, that they had to deliver some water,

11   whether it was three second feet or five, a very important

12   factor in this case.  But in any event, the fact remains that

13   they have not pumped water to meet their obligation.  I don't

14   know what would occur if they ever had to pump water to meet

15   their obligation.  But there is not a scintilla of evidence in

16   the record as of now that they have had to deplete their basin

17   to meet their obligation.

18        Further, let's never forget that the National government

19   has a riparian right that must be met by Vail Company irrespective

20   of the stipulated judgment.  And let us also remember, a thing

21   overlooked by California, that we have Lake O'Neil, which has

22   been recognized, I believe, by the Vail Company for years, which

23   is entitled, in our view, to upward of 3,000 acre feet of water.

24        I have always wanted to thank Mr. Sachse for what he did

25   for us.  He proved, when we were putting in the evidence, that

1    that was a low water flow right, the appropriative right.  So

2    after the high water is gone, we can knock on the door of Vail,

3    I believe, and say, "You release sufficient water to fill our

4    appropriative right for Lake O'Neil," and we believe that runs

5    around 3,000 acre feet a year.

6        So, from out standpoint, your Honor, we believe that Vail

7    Company has an obligation to meet our claims, whether it is

8    under the stipulated judgment or not.

9        I have searched the record where they have suffered

10   irreparable damage by reason of the stipulated judgment.  There

11   is nothing to show, although they allege it, there is nothing

12   to show in the record that it is inequitable, that it is un-

13   conscionable, and if I may respectfully bring to your Honor's

14   attention, it is the record as of this moment that must be

15   considered, not what could happen five years from now or to-

16   morrow.  You will observe that the proposed judgment which we

17   have tendered to your Honor for consideration says that the

18   stipulated judgment today is in full force and effect.  Vail

19   Company is seeking to have it set aside.  We are simply saying

20   that under the California law and the basis of the evidence

21   which has been introduced, the stipulated judgment is in force

22   and effect and there is no grounds for seting it aside.

23   Conceivably, in your Honor's power in equity, you could say

24   that is is unconscionable to require Vail Company to pump water

25   to you.  But that is not in the evidence to date.  And our

1    whole proposition right now, and this is why it is extremely

2    important to us, is that we have one kind and type of lawsuit

3    with the Vail Company and another kind and type of lawsuit with

4    everyone else. We are insistent, with all respect to your

5    Honor, that the real issue is whether, during the competitive

6    period of the season, there are other riparians who could object

7    to our transportation of water out of the watershed. We submit

8    that the evidence shows that there are not.

9         THE COURT: You have covered a lot of ground, Mr. Veeder,

10   and finally you have got back to the thing we were talking

11   about. I find it a little difficult to follow all of your

12   arguments. I would like to try to stick to one at a time; but

13   you ended up on the same note that you started with.

14        MR. VEEDER: That's right.

15        THE COURT: But in the meanwhile we took part in an ex-

16   cursion across Lake O'Neil and around the watershed.

17        The particular thing we are talking about now is this.

18   During the dry season, assuming no surface run in the stream

19   above the Vail property, ins't it true that there is no riparian

20   who could be heard to complain about your exportation of water

21   outside the watershed?

22        MR. VEEDER: I believe that is true, your Honor. I have

23   put that map together for your Honor to view, based on the

24   location of rising water of Murrieta. I don't believe there is

25   any question --

1        THE COURT:  Well, let's hear from some of the other people.

2        MR. SACHSE;  May I make just a few comments on your point

3   about the complaints from people upstream.

4        Mr. Veeder is again succeeding in creating a scarecrow, or

5   strawman, that doesn't exist.  The fact is that no riparian up-

6   stream can complain against the United States' diversions out of

7   the watershed at anytime.  I don't care how much water is in

8   the river, and I don't care if it is the United States.  They

9   couldn't have complained to the Santa Margarita diversions out-

10  side the watershed, if they did it, because it didn't hurt them.

11  Once it got there, they could do anything they want with it.

12       Mr. Veeder has ducked the real issue.  The real question

13  is:  Can the United States go upstream and say to these people,

14  in the dry season of the year, "Restrict your pumping so that

15  more water comes down to us"?  It doesn't matter whether there

16  is surface stream flowing at that time or not.  We have spent

17  two and one-half/with Mr. Veeder and his geologists insisting

18  that the United States can control pumping in the whole water-

19  shed, and finally, as your Honor explained this morning -- Mr.

20  Veeder said it is a very fine explanation -- the whole purpose

21  of this law suit is that the United States can, someday, if the

22  problem arises in the future, go in and say, "You must pump

23  less out of that well, you must pump less out of that one."  It

24  doesn't depend upon whether there is surface flow.  Surface

25  flow has nothing whatsoever to do in the case before us.

1    I am expressing no opinion on the stipulated judgment

2    at all.  But I don't like to see us go skyrocketing into a

3    corner that has nothing to do with it.

4         MR. GIRARD:  If ever there was in evidence an exhibit

5    which would support a change in conditions to set aside a

6    stipulated judgment, it is exhibit 15-E itself.  I think this

7    was one year later than the last series 15 exhibit, which is

8    October, 1948.  This exhibit, as I read it, shows that there

9    has been a complete change in the movement of ground water.

10   Where formerly it used to go down into Temecula, now, because of

11   all the pumping in Murrieta, the water is flowing this way; and

12   they, in effect, showed a reverse gradient, and the people in

13   Murrieta who are pumping have changed the actual movement of

14   considerable ground water.  They are pumping that water now

15   because of these many, many activities.  You have, at this time,

16   a change in conditions caused by people, other than the parties,

17   who didn't exist at the time of the stipulated judgment.

18        Maybe I have misread this exhibit, Mr. Kunkel.  Is that

19   what is shows?

20        MR. KUNKEL:  That is what it shows.

21        MR. VEEDER:  I think you have the exhibit.

22        MR. GIRARD:  I think I have.

23        It shows a change in conditions resulting from acts of

24   others which were not in effect at the time of the stipulated

25   judgment.  Maybe a dozen.

1      MR. VEEDER:   I would like to explain it.

2      MR. GIRARD:   I would rather have Mr. Kunkel explain it.

3      MR. STAHLMAN:   That is why I have been insisting all

4  along that we should have had some evidence in this case showing

5  where the Government is going in relation to these pump tests

6  from which they have drawn these exhibits.  Now they have created

7  the impossible position of not only the government demanding that

8  water come down, --

9      THE COURT:   Only one of you talk at a time, if you want to

10  be heard.

11      MR. VEEDER:   The point of rising water is exactly the same.

12      MR. STAHLMAN:   Now you have arrows going the other way.

13      THE COURT:   We haven't got Exhibit 15-E in evidence yet.

14      MR. VEEDER:   No.  I think there has been a mis-interpreta-

15  tion.

16      MR. STAHLMAN:   That is why I felt that before we argued

17  the question on the stipulated judgment, I have on several

18  occasions thought we ought to have Mr. Kunkel put on some

19  evidence here as to what direction we are going.  He has at

20  least got to the point where he has produced a map here, and the

21  map does show that there has been a reverse gradient, if the

22  symbols are the same as they have been on the other maps.  How-

23  ever, I don't think that is the only answer to the argument Mr.

24  Veeder has propounded to your Honor today.

25      THE COURT:   Talk about his argument about surface flow

1    existing only in the dry season on the Vail property and there-

2    fore there is no riparian except Vail who is hurt.

3         MR. STAHLMAN:   They also must tie it into the question as

4    to the putting of the water on the land outside the watershed.

5         Is that right?

6         MR. VEEDER:   It is a stipulated judgment.

7         MR. STAHLMAN:   One factor that I think shows the uncon-

8    scionable nature of this judgment is that that was a bilateral

9    agreement between parties, that the Vail Company would be

10   privileged in putting water on land --

11        MR. VEEDER:   I didn't hear that.

12        MR. STAHLMAN:   Would be willing to put water on land which

13   was non-riparian, and Vail Company has land which is non-rip-

14   arian and is putting water on that land, and I thoroughly

15   expect that your Honor is going to curtail from doing that

16   because other riparians are not going to stand for it.   Simply

17   because the Navy is in the favorable position of being at the

18   down end of the stream to argue that Vail should supply water

19   to them so that they may put it outside the watershed when Vail

20   itself, we know, is not going to use riparian, I think that, in

21   and of itself, shows the unconscionable nature of the judgment

22   and the mistake of fact that the two parties.

23        THE COURT:   I am having trouble getting you gentlemen to

24   direct your attention to this particular argument that Mr.

25   Veeder has made.   I keep trying to analysis it and you get me off

1    on other matters.  I want some help on that argument.

2         MR. STAHLMAN:  The surface water is supported by the water

3    underground.  It is a part of the stream system.  It is part of

4    the water in the watershed.  If you deplete it, whether you

5    deplete it from pumping underground or divert it from the surface

6    above, I don't think it makes any difference.  The fact that

7    there is water rising at this point now, it is probably rising

8    back that far by reason of the fact that the Vails, in an attempt

9    to carry out the terms of the stipulated judgment -- and I would

10   like to state, your Honor, that I think it shows that they did

11   try to carry out the terms of the stipulated judgment, and the

12   Vails are not pumping in areas in which they could pump, which

13   has been the reason this water is at the surface at this point

14   at this time.  During these dry years I assume that would have

15   gone down further if the pumping had occurred at other places.

16   So the fact that there appears to be rising water at that place

17   and that the water flows over the lip, I don't think that is the

18   answer to the question.  It is whether this obligation to put this

19   water down there would eventually destroy Vail Ranch, if the

20   drought continues -- and it well might, as we have had evidence

21   from the government that at one time it continued for forty

22   years.  And furthermore, it has never reached Camp Pendleton in

23   10 years or so.  The water, under the State permit, has been

24   determined to be surplus water and it is pumped out of the

25   stream at Fallbrook.  It has not reached Camp Pendleton.  And

Reel
11

1    secondly, the amount of water that goes down certainly bears no

2    relationship to the large quantity of water they are using out-

3    side the watershed.

4         THE COURT:  I'll hear you later.  But you are off the

5    subject again, so let's terminate it until I ask for argument

6    on this particular topic.

7         Mr. Girard.

8         MR. GIRARD:  Let us assume that Mr. Veeder is correct that

9    all of the surface runoff is on Vail property.  That still is

10   no particular reason for  or against setting aside the stipu-

11   lated judgment.  Merely because all the surface water is on

12   Vail property and they control it does not mean, ipso facto,

13   that the stipulated judgment is still a fair apportionment

14   between the two riparians.

15        The question is not whether other riparians could complain.

16   The question is whether or not the stipulated judgment now is

17   based upon equitable principles in the light of present condi-

18   tions.  I think it must be admitted that the United States'

19   use of water has changed considerably from what it was in 1940.

20   They are using ground water now, almost exclusively, for their

21   military purposes.  I think it must be admitted that summer

22   flows of surface water are relatively immaterial to re-charging

23   their ground water basins.  The only evidence that was ever

24   introduced in this case on that point was by California in their

25   Exhibits A, B and C, which showed that if you cut off all of the

1    surface flow at the gorge, the United States' basins would fill
2    up satisfactorily to accomplish their uses.  There has been some
3    evidence introduced on that point in this case.  So even if the
4    only surface flow is on the Vail property lands, if that surface
5    flow has a relatively minimal importance to the United States
6    because of their changed type of use, where they now rely on
7    ground water exclusively, which is recharged from winter flows,
8    I don't think in equity they can demand that the flow reach
9    them.

10          THE COURT:  Actually, isn't this surface flow in the
11   summer that they seek to export out of the watershed?  Isn't
12   that true?

13          MR. GIRARD:  No, your Honor, they export the ground water
14   out of the watershed.  That is what they use.

15          I don't think the export out of the watershed is important
16   at all until someone says, "You riparian or your overlying owners
17   cut down a particular use," because the United States is privi-
18   leged to export all they want out of the watershed until they
19   seek to restrain someone else from using water so that that
20   water can reach them.  That is the only time that export becomes
21   important.

22          THE COURT:  Are you back on the track now, Mr. Stahlman?

23          MR. STAHLMAN:  I think so, your Honor.  I thought I was
24   before, at least on the track that Mr. Veeder took.

25          THE COURT:  Yes, your argument and his were similar.  I'm

13,213

1    trying to get down to one point.

2         MR. STAHLMAN:   The water that he is talking about comes

3    from a basin in which there are many other people who have a

4    right and interest.   Now under the stipulated judgment, we will

5    assume that he has said that there have been times when the

6    flow was less than three second feet.   Then there would be an

7    obligation upon Vail to pump.   The question then arises, Vail

8    could pump out of this watershed or out of this watershed.   It

9    makes no difference which it is.   It may be more economical, it

10   may be more sound and more in accord with the proper husbanding

11   of water to pump it out of the Murrieta watershed, and to do so

12   raises a question as to whether or not, considering the rights

13   of these other riparians and overlying owners, if that is a

14   reasonable and beneficial use of water to take it out of the

15   watershed and transport it down to Camp Pendleton.   I don't

16   think it is a reasonable and beneficial riparian use.   And that

17   is what Vail would be doing and that is why it affects every-

18   body in this watershed.   The flow sheets at Temecula show that

19   there were times when the natural flow of the stream was less

20   than three cubic second feet in the summer.   It certainly can

21   occur again, and when it does occur, Vail, under the stipulated

22   judgment, being obligated to pump water out of here or here --

23   the stipulated judgment doesn't say which, as long as it comes

24   off Vail land down to Camp Pendleton -- you are affecting every-

25   body in the watershed.   Because it doesn't make any difference

1  where you are taking this water out, you are depriving every

2  water user in the Santa Margarita to the right to use the water.

3  And, in effect, we would be taking the water, in which there is

4  a correlative right with all the other persons, and, under a

5  stipulated judgment that was made twenty-some years ago, pump

6  that water down.

7        THE COURT:  Make a note to answer this when we get to it.

8        MR. VEEDER:  I have a note, your Honor, I was hoping you

9  would let me do it now.

10        THE COURT:  All right.

11        MR. VEEDER:  There is one thing that is coming out of this

12  argument.  It is the failure of the Vail Company to sustain its

13  burden of proving the grounds for setting aside the stipulated

14  judgment.  The point that I am making, your Honor, is that to

15  induce a court of equity to exercise the harsh remedy of injunc-

16  tion, there has to be a showing, by the party, that it has been

17  irreparably damaged or that there has been some reason for you

18  to invoke that high power.  Now, as of the moment -- and I

19  think Mr. Sachse will agree with me -- there is nothing to show

20  that there is injury to anyone by reason of the stipulated judg-

21  ment.  I think that is enough reason for denying Vail's demand

22  and request and motion and pleading to set aside or to enjoin the

23  operation of the stipulated judgment.

24        THE COURT:  I take it that the decree of this Court has

25  some prospective operation.  I can't make a decree in which I

1    say, I will not look further ahead than April 6th, 1960.   I

2    think I can take into account the increased usage that has

3    occurred in the Murrieta Valley and upstream from the Vail

4    Ranch, and it seems to me that it would not be a proper and

5    equitable decree unless I weighed what might happen prospectively,

6    what might happen should the Vail Company be required to pump out

7    of these basins to fulfill a provision of the stipulated judg-

8    ment.  And Mr. Stahlman made a pretty strong argument.  It

9    doesn't take much imagination to see a situation where the Vail

10   Company could be diligently performing its obligation under the

11   stipulated judgment and where the people in Murrieta Valley

12   would feel the pinch because the water levels would go down and

13   the water would be going down the drain to fulfill a term of

14   the stipulated judgment.

15        MR. VEEDER:  Let me answer that, your Honor.  In regard

16   to the situation that exists -- and I think this is extremely

17   important --Vail Company, as of the moment, has no means of

18   pumping Murrieta water.

19        THE COURT:  You mean they have no well.

20        MR. VEEDER:  They have no pump, they have no system.

21        MR. STAHLMAN:  We have two wells right up there.

22        MR. VEEDER:  I said you have no pump.  There is no pump

23   on those wells.

24        MR. STAHLMAN: You can put them in there is 24 hours.

25        MR. VEEDER:  But the point I make is that your Honor would

1    be passing on a moot question, and I submit that you can't have

2    jurisdiction.

3        The point I make in regard to the stipulated judgment is

4    this, that Vail Company is pumping water out of the Pauba Valley

5    to irrigate all of its land.  Your Honor can go prospectively if

6    he chooses.  But the point that I am making is that as of the

7    record as of this moment there is not a scintilla of evidence

8    that the Vail Company, in meeting their stipulated judgment

9    obligations, are invading the rights of any parties, or that

10   they are damaging anyone or that they are using more than their

11   correlative share.  Indeed, the evidence they have been very

12   careful to put into the record is that they are releasing water

13   they have impounded under their appropriative right for the

14   purpose of utilization in the area.  They have put up their

15   dam.  They had that right under the stipulated judgment.

16       But I am petitioning your Honor to view this matter as it

17   is in existence as of the moment.  I am petitioning your Honor

18   for this reason:  I think there is no basis now for changing

19   this stipulated judgment.  We petition your Honor to have

20   continuing jurisdiction to meet situations which may arise.

21   But as of the moment, if you were to restrain the claims of

22   the United States under the stipulated judgment, I believe that

23   you would be causing irreparable damage without any basis in

24   the record to support it.  Now, that, is the whole issue.  And

25   if you view the proposed findings of California, there is one

1  thing you will observe.  You will observe that as of the moment
2  they cannot say as to themselves that there is justification for
3  setting aside the stipulated judgment.  They say that third
4  parties might be injured, or they say that if we were to put a
                              the system
5  pump at Murrieta and rehabilitate/at the Hutch-Brown Field we
6  might hurt somebody.  Conceivably.  But, your Honor, one thing
7  that concerns me is that they had their day in court, and your
8  Honor ruled that they had the burden of proof to set aside the
9  stipulated judgment and the case was tried in contemplation of
10  that burden of proof.  And I submit that George's argument
11  might be valid under a change in situation, but the record
12  doesn't support it now.  Indeed, when we look at Exhibit 15-E --
13  did you admit this in evidence?

14          THE COURT:  It has not been offered.

15          MR. VEEDER:  I offer it.  I withdraw that.  They'll argue
16  all afternoon about it.  It would be nice to get it in.

17          The point that I am making is that --

18          THE COURT:  Mr. Veeder, let's assume that this problem
19  we are talking about is not of crushing imminence right now, but
20  it is right around the corner.  Wouldn't it be silly for this
21  Court to work on this case and see this approaching problem
22  staring at us from around the corner, and then say, "No, let's
23  put it over.  We will continue jurisdiction in this case.  Maybe
24  next month or six months from now we will have to set aside the
25  stipulated judgment."  Why don't we face the music?  If it has to

1   go out, why not let it go out and be done with it?

2       MR. VEEDER:  I face the music, your Honor, and I face it

3   this way.  I think the evidence produced by Mr. Stahlman in

4   support of his claim has failed.  You say, "Well, there could

5   be damage, and we can't turn our back on it."  But as of the

6   moment, there is not; and my view is that, conceivably, we

7   would have a situation -- I'm just saying conceivably, but then

8   your Honor would be confronted with the additional problem of

9   trying out the question of our correlative rights as riparians

10  and our rights, correlatively, as owners of Lake O'Neil.

11      Now, I submit that we can't do everything in regard to

12  this valley at the same time.  I submit that 10 years from now

13  the situation may be different and your Honor might take a

14  different view in regard to the stipulated judgment.  But as

15  of the moment the stipulated judgment is an invaluable property

16  right of the United States of America.  Its enforcement against

17  the Vail Company has not been shown to have damaged them.  It is

18  a matter of the gravest concern and

19      THE COURT:  Let me interrupt.  Frankly, we have been so

20  busy on these other matters that I haven't had a chance to

21  study this in great detail.  I was particularly interested in

22  what I thought was this new point that you raised and I wanted

23  to get your views on it.  What do you say that we take a short

24  recess and then wind this up at about 3:30?

25      MR. VEEDER:  I would just as soon have it stand submitted

1   now, your Honor.  I have unloaded for all I'm worth.

2   THE COURT:  Let's give the reporter a rest and then come

3   back.  Let's not have any long argument.  Let's just make a

4   few points that should be considered.  I will probably want to

5   discuss this further with you.  I'm sorry I didn't have time to

6   work on this before this hearing.

7   MR. VEEDER:  It is certainly suitable with me to have a

8   recess now, your Honor.

9                    (Recess)

Belt
12

10   THE COURT:  One other thought I have on this matter.  If

11   I understand your argument, Mr. Veeder, you show by a map, not

12   yet in evidence, that the surface flow in 1959 was entirely

13   on the Vail property, and you therefore say that there are no

14   riparians that can complain upstream from where the first flow

15   starts, and, of course, you sweep aside our friends who are

16   bound by the stipulated judgment down at the Gorge.  You do

17   that with a light and nimble touch, that you are going to take

18   care of them, by which, I take it, you mean that you stipulate

19   that they can get out of the stipulated judgment.  So you

20   remove all riparians who could complain about the surface flow.

21   Now, it is a fact in the record that the point of rising

22   water in years prior to 1959 has been upstream.  Let's take the

23   Murrieta, because the Vail Dam changes the situation in the

24   Pauba Valley.  But the point of rising water has been upstream

25   from where you have it now, so that in years past the point of

13,220

1   rising water has flown over other lands where other riparians

2   were concerned.  And the Court could conclude that 1960 or 1961

3   again the rising water would originate in Murrieta Creek above

4   the point you have on the map.

5        MR. VEEDER:  That is not the record, your Honor.

6        THE COURT:  If that is true, then you are basing an

7   agrument built upon a moment in history;  in 1959 there was no

8   rising water above the Vail property, and you would ignore the

9   past, you would ignore the future; and your would say, therefore,

10  because of 1959, no riparian can complain.

11       MR. VEEDER:  May I state this, that the point of rising

12  water, as shown on Exhibit 15-E, is exactly the same place it

13  is on every other map in evidence today.  I think your Honor

14  will also observe --

15       THE COURT:  Let's assume that you are right that the point

16  of rising water is there; but there is no doubt but that water

17  has flown in the Murrieta in an area north and west of the Vail

18  property.

19       MR. VEEDER:  If your Honor will look at Vail Company's

20  Exhibit AB, which is the findings of fact in the old lawsuit,

21  you will find, I believe, that during the summertime the flow

22  has been 20 inches and that that is the extent of the contribu-

23  tion.  I believe, your Honor, if you were to check back on that

24  you would find that there has been really no change of the

25  point of surface runoff during the dry period of the year.

1   THE COURT:   There has been no period when there was water

2   in the Murrieta above that point?

3   MR. VEEDER:   During the dry period of the year.   I think

4   that is what your Honor will find.   And if I am in error, I

5   would like to have it checked out.

6   THE COURT:   You may not be in error as to what the record

7   presently shows.   But I haven't a doubt but that you could go

8   up into the Valley and find a dozen old-timers who would tell

9   you that they saw water running in the Murrieta miles above the

10   Vail boundry in summertime.

11   MR. VEEDER:   Depending upon the year.

12   MR. STAHLMAN:   We had a witness on the stand this morning

13   who told about how, up in that area, the springs have receded.

14   So your Honor must be correct.   He has evidence himself in the

15   record.

16   MR. VEEDER:   I am speaking, your Honor, about the exhibit

17   I attached to our memorandum; I am speaking about the situation

18   as it is in the record today, and I very carefully checked the

19   findings in the original case as to the contributions of the

20   Murrieta during the dry period of the year and I have been

21   generous in regard to the amounts to which I have alluded.

22   The dry period of the year, as shown by the stipulated

23   judgment, is from May 1 to October 30th.   I have reached one

24   month beyond each way, but the stipulated judgment declares the

25   dry period of each year to be from May 1 through the month of

1   October, and I respectfully submit that that point of rising

2   water would be the historical point of rising water during the

3   dry period of the year, and that is the point to which I am

4   directing my argument.   That during the dry period of the year

5   the only riparian user upstream who has water -- that is right

6   here -- would be the Vail Company.   That is why I think the

7   argument is extremely valid, because it would not be an instance

8   where we would be demanding other riparians to let water down

9   to us that we would export out of the watershed, and I can't

10  adopt your Honor's view that we brush off a minimum of three

11  second feet, because when we stop and analyses our water uses

12  and exportations during the dry seasons of the year, I dare say

13  that that would be a very, very important supply to us.

14      THE COURT:   Does any of that three second feet ever get on

15  the surface down to your basins in the summertime?

16      MR. VEEDER:   Yes, except for the interference, today, of

17  Fallbrook.   And we have attempted to maintain the status quo,

18  I'll say, but we would be in deadly peril as of the moment, and

19  the record bears this out, and that is the reason why I objected

20  to the AX Exhibit of California, had we not returned 50% of our

21  exportations in the form of sewage affluent.   We are living on

22  sewage affluent and keeping our basins up.

23      THE COURT:   Well, let's make it short.   Just make a few

24  points, each of you, and then we will be through.

25      MR. SACHSE:   I would like to state very briefly what I

1    think about what your Honor is up against in this case, and I'm

2    not going to argue the merits whether you should set it aside

3    or not.

4            First, I don't question in the least your Honor's authority,

5    if Mr. Veeder should ask you for ancillary relief here, to en-

6    force the judgment against Vail.  I don't think anyone will

7    question that you would have a right to deny it if you found

8    the conditions didn't call for it.

9            I also don't question at all your Honor's right to enjoin

10   its enforcement if you find facts sufficient to warrant such an

11   order.  In other words, I am inclined to agree with the State of

12   California that you can do this.

13           Now, as to whether or not it should be done, what concerns

14   me there, very frankly -- my position here is not that of Fall-

15   brook; it is that of other clients I represent, because I think

16   Fallbrook has very little direct interest in this -- what con-

17   cerns me is this problem.  I don't want this swept under the

18   rug, as Mr. Veeder suggested.  We are going to write an order

19   here sooner or later, which, when the judgment is written, I

20   will be giving opinions to my clients on what they can or cannot

21   do, and I want to be able to tell them.  I don't want to have to

22   say to them, "Well, this judgment is hanging in effect which

23   will vitally affect the activities of Vail, and I can't tell

24   you what effect it is going to have on you because Judge Carter

25   didn't rule on this, Judge Carter didn't decide this, and this

1  thing is still hanging and Judge Carter might tomorrow make a

2  decision in this matter that will vitally concern you as one of

3  the landowners in this area or one of the landowners up here."

4       The reason that it will vitally concern them is this.  I

5  think this could be overlooked.  The stipulated judgment remains

6  in effect, and it is in effect today, I agree.  Also, the trial

7  court judgment remains in effect.  They are one, and they are

8  inseparable.  There are two of them.  So, if it is the only

9  judgment that is in effect, we know now what the trial court

10 judgment says --  we can read it.  But I spent two months trying

11 to write a decree that I got myself into -- your Honor didn't

12 even direct it until I suggested it -- where I tried to write a

13 decree which would, on the one hand, say that the stream system

14 to which the stipulated judgment applies is this stream system,

15 and the stream system to which our new judgment applies is this

16 stream system, and they are not even separate -- they overlap,

17 they are like two circles overlapping each other -- and I spent

18 two months trying to write a decree that would work and that

19 would tell the poor man who is upstream what duties, rights and

20 obligations he has, and I don't think it is possible.

21      If you uphold the stipulated judgment, I think your Honor

22 is, in effect, destroying your own jurisdiction to go beyond the

23 res adjudicata provisions of the trial court judgment on what

24 this stream system consists of, because the stipulated judgment

25 applies to something, it applies to a stream system and if that

1   is not a stream system then this stipulated judgment has not

2   anything to apply to anymore.  And if your Honor's judgment is,

3   at the close of all our arguments, that the stipulated judgment

4   remains in effect, my most vigorous arguments at the conclusion

5   of this case are going to be that your Honor is deleting all of

6   the so-called Pauba formation, as described in the trial judg-

7   ment; your Honor is completely ignoring Tucalota Creek; your

8   Honor is completely ignoring Warm Springs Creek; your Honor is

9   completely ignoring Coahuila Creek; your Honor is ignoring the

10  fact that none of those waters are involved in the area con-

11  trolled by this stipulated judgment.

12          On the other hand, if the stipulated judgment is out, the

13  trial judgment, I think, is out, and your Honor has taken a new

14  res, a new stream system, and has adjudicated the rights on it,

15  and I'm sure we can write a workable judgment.  But I don't know

16  how we can do it with two stream systems that overlap like this

17  and try to work it out for everybody.

18          THE COURT:  Mr. Girard, do you want to sum up in three

19  or four minutes any thoughts you have?

20          MR. GIRARD:  Just breifly as to the legal points, your

21  Honor.  When your Honor does consider this, I would like to

22  specifically refer your Honor to page 15 of our menorandum

23  relating to the judgment and the stipulated judgment.  Commencing

24  on page 15 is a quotation from Mr. Samuel C. Wiel's California

25  Water Law on the very point when a judgment affecting allocation

  
1    among riparians can be set aside, should the Court so determine,

2    I would like you to read that statement and then consider that

3    statement in the light of the changed conditions which are

4    apparent in the record and which are set forth in our findings

5    of fact.

6        I agree, incidentally, with everything that Mr. Sachse

7    has said on the practical approach to a judgment if you don't

8    set it aside.  And I think specific emphasis in this case has

9    got to be directed not only to whether or not others can complain

10   or how it affects Vail, but also to the substantial change in

11   the operation of the Rancho Santa Margarita itself which has

12   come about since 1940.  I think it must be conceded that since

13   1940 Gaging Station number 6 at Ysidora, which is the only

14   measuring station under the stipulated judgment, is of no

15   practical use today.  The ground water basins, which are used

16   by the United States, are taking water which formerly went to

17   Ysidora.  So that particular aspect of the stipulated judgment.

18   is just wiped out.  If and when Fallbrook builds its dam, which

19   it has a permit to do, that again changes the fact of the

20   stipulated judgment.  Water is not going to get down to Ysidora

21   which did in 1940.

22       I will not emphasize all these facts and discuss them, but

23   I think those are apparent in our findings of fact.  And I

24   submit that your Honor should consider those facts in the light

25   of Mr. Wiel's statement, which I think is the best summation of

1    California law.

2         THE COURT:  Mr. Stahlman, can you limit yourself to four

3    or five minutes?

4         MR. STAHLMAN:  Yes, your Honor.  I realize that we have

5    extended ourselves into considerable areas in our brief.  Your

6    Honor will read our arguments there.

7         I certainly think the argument Mr. Sachse made is one of

8    our important arguments.  Your Honor would be confronted with the

9    situation of having to operate the future water conditions of

10   this river with two different types and kinds of stream systems.

11        THE COURT:  Let me interrupt just a minute.  Did you pro-

12   pose any express findings on this stream system, so-called,

13   under this stipulated judgment, Mr. Girard or Mr. Sachse,

14   either one of you?

15        MR. SACHSE:  I drew my proposed findings with the assump-

16   tion at the beginning, and it is expressed in them, that your

17   Honor would find generally a stream system in accordance with

18   the United States Exhibit 15 younger alluvium, which is, of

19   course, very different from the original trial.  Then I tried to

20   write a judgment which would fit them both.

21        THE COURT:  I would like to see a summary of what you

22   think the stream system is as defined in the stipulated judgment.

23        MR. SACHSE:  I have that in my brief in some detail, your

24   Honor.

25        MR. GIRARD:  It is in our memorandum of law too.

1   MR. STAHLMAN:  Your Honor will recall the map which was
2   placed on the board from the old trial was made part of the
3   findings of fact Vail's Exhibit AB, and it outlined what the
4   stream system, and the court in the first trial strictly limited
5   it to the areas of the younger alluvium and eliminated all this
6   area up here.

7   THE COURT:  I understand that the older alluvium was
8   eliminated from any basin of the stream system.  But did they
9   also eliminate the upper reaches of the Warm Springs, Tucolota,
10  Wilson?

11  MR. VEEDER:  They did not, your Honor.

12  MR. SACHSE:  I don't agree.  I have it in front of me.
13  The findings of fact stated that Tucolota Creek extends so many
14  miles up from the Narrows.

15  THE COURT:  Does your brief point out where that point is?

16  MR. SACHSE: My proposed findings have that in them.

17  THE COURT:  All right.

18  MR. VEEDER:  If your Honor will examine, and carefully
19  consider 11 California Second, there is a good summarization of
20  the case which was tried and the error of the arguments that
21  have been presented to your Honor as of the moment.

22  The point that I make, your Honor, is that is your Honor
23  will carefully consider the findings as entered by the Superior
24  Court of the State of California, you will find that that court
25  in its discretion, took into consideration these arguments that

1    were presented in regard to additional parties and other areas

2    in the valley and said, in its discretion, that it could enter

3    an effective decree between the parties.  We submit that it did.

4         THE COURT:  Our Circuit, of course, has said just the

5    reverse.  If we would apply what might be called Ninth Circuit

6    law, that kind of decree couldn't stand.

7         MR. VEEDER:  No, your Honor.  In regard to a general

8    adjudication it said that.  This is a quiet title suit between

9    two parties.  It is true that there may be instances where you

10   would have to have a general adjudication.  But there can

11   always be a suit between two parties for quiet title.  That was

12   done there.

13        But I would like to have your Honor check in regard to

14   Finding number 33, finding number 27, and on page 1 of Vail's

15   AB, and you will find that that court said there could be an

16   effective decree entered.  I submit that it was an effective

17   decree that was entered.  That there are not two stream systems,

18   as Mr. Sachse has stated; that as between the United States of

19   America and Vail Company there was, and is, an effective decree;

20   that there is no reason why, as between Vail Company and the

21   United States, and the nature of the stream system that exists,

22   that they could not agree to use the water inside and outside

23   the watershed, as they did.

24        Now, the State of California has done one thing consis-

25   tently in this lawsuit, and that is to avoid facing up to the

1   fact that this is not an arrangement between a series of rip-

2   arians.  This is an arrangement between two riparians wherein

3   they agreed to use the water outside the watershed.  So I think

4   Mr. Wiel's citation referred to by Mr. Girard is completely

5   inapplicable.

6       I hope your Honor will consider the facts as found by the

7   court in the original instance and on that basis say there is

8   no inconsistency of a nature where he cannot melt these two

9   decrees together.

10      I see that our time is short.  Would it be helpful to

11  your Honor for me to meet these objections by a subsequent

12  memorandum?  I want to be as helpful as I can.

13      THE COURT:  If you have something new to present, including

14  that matter that you have presented this afternoon.  It may be

15  in your brief, but, as I said, I did not have time to work on

16  this as much as I would have liked.

17      MR. VEEDER:  I have a great number of findings to request

18  on that.

19      THE COURT:  If you want to enlarge on that or anything

20  else, you may.  I'm not going to submit it at this time.  The

21  next hearing is set for April 26th.  Either at that date or at

22  the May date I want the foundation to be laid for California's

23  Exhibit AX.  I want any other loose ends that may be involved in

24  this Vail-Santa Margarita problem to be cleaned up so that we

25  will be in a position, finally, to submit this phase of it, and

1    MR. SACHSE:  Do them in writing to the reporter and copies

2  to Court and counsel?

3    THE COURT:  Yes.

4    MR. GIRARD:  Your Honor, may I make a suggestion?  I can't

5  help but notice how effective the last particular witness of Mr.

6  Veeder was today when that witness didn't show up.  In other

7  words, he didn't come here and the evidence went in very

8  quickly as to the irrigable acreage and the extent of his land,

9  and I think, frankly, it might be a good idea to send out letters

10  to these people telling them what the Court is going to find

11  and if they object let them come in rather than putting each

12  one of them on to say that we agree with the government.

13    MR. VEEDER:  I think this is an unmitigated attack and a

14  stupid one.

15    THE COURT:  No, this is no attack.

16    MR. GIRARD:  No.

17    THE COURT:  We could have submitted a letter to most of

18  these people saying that from the evidence we have in the

19  record we propose to find so-and-so.  If necessary I will sign

20  the letter.  In other words, that the Court proposes to find so-

21  and-so.  If you are satisfied with this finding, sign the en-

22  closed copy and return it.

23    MR. VEEDER:  That is exactly the procedure your Honor told

24  me to follow and I have been following it.

25    MR. GIRARD:  I'm not criticising you, Mr. Veeder.

1      THE COURT:  Instead of having these 20 or 30 people come

2  in here on matters where there is really no dispute, if you

3  could have sent them a letter and said, "The evidence is in,

4  in this case, which shows that you have filed an answer, etc.,

5  and you own certain property, and you have 9.1 acres of land,

6  and it is all irrigable, and the evidence shows that it over-

7  lies a basin," and let me sign it, "And theCourt proposes to

8  find that you are an overlying owner.  If you are satisfied with

9  this finding as to your property, sign the enclosed letter and

10  send it back."

11      MR. VEEDER:  Is that what your Honor wants me to do?

12      THE COURT:  I think it should be explored.

13      MR. VEEDER:  The point of it is that I am sending them

14  out for the 26th.

15      THE COURT:  Do you have the materials so you could tell

16  each one of them?

17      MR. VEEDER:  I would have to check them out.

18      MR. STAHLMAN:  Col. Bowen says yes, and Mr. Veeder says no.

19      MR. VEEDER:  I am not sure that we have it all.

20      THE COURT:  Even if the letter goes out a few days late,

21  let's see if we can do that way for the 26th.  "If you are not

22  satisfied, be here on the 26th, and if you are content, sign the

23  letter and send it in."

24      MR. VEEDER:  I'll undertake it, your Honor.

25      THE COURT: Wouldn't that work?

13,234

1        MR. GIRARD:  It wouldn't hurt to try.

2        MR. SACHSE:  That is how we got our first interlocutory

3   judgment, except that it was legally entitled a Request for

4   Admissions and the United States admitted them, and that is

5   how we got them.  I think we ought to keep right on doing it.

6        THE COURT:  Will you be around here?

7        MR. VEEDER:  I'm leaving in half an hour, your Honor.

8   That is why I am a little burned that we get this new idea in

9   the last few minutes.

10        THE COURT:  Let's try it in a different form letter.  We

11   will work it out in your absence and you will be well content

12   with what happens.

13        MR. VEEDER:  I'll bet.

14        THE COURT:  I assure you that there will be no proposed

15   finding on the Vail vs. Santa Margarita.  This will involve these

16   little people who have small acreages.

17        Recess until April 26, 1960, at 10 o'clock A.M.

18        (Adjournment until April 26, 1960, at 10 o'clock A.M.)

19

20

21

22

23

24

25