# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

### HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT, et al,

Defendants.

No. 1247-SD-C

— — —

## REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:      San Diego, California

Date:       April 26, 1960

Pages: 13,235 to 13,331

# FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By _____
DEPUTY

J O H N   S W A D E R
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

– – – – – – – –

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

– – – – – – – –

UNITED STATES OF AMERICA, )
                       )
        Plaintiff, )
                       )
    vs.             )      No. 1247-SD-C
                       )
FALLBROOK PUBLIC UTILITY )
DISTRICT, et al., )
                       )
        Defendants. )

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Tuesday, April 26, 1960

APPEARANCES:

    FOR THE PLAINTIFF:          WILLIAM. H. VEEDER, ESQ.,
                                Special Assistant to the
                                Attorney General,
                                Department of Justice,
                                Washington, D. C.

                                LCDR DONALD W. REDD

    FOR THE DEFENDANTS:

    For Defendant Fallbrook      FRANZ R. SACHSE, ESQ.
    Public Utility District, et al.

1  APPEARANCES (continued)

2      FOR THE DEFENDANTS (continued):

3      For Defendant Vail                 GEORGE STAHLMAN, ESQ.
       Company                            EARL K. STANTON, ESQ.
4
       For Defendant State of             STANLEY MOSK, ESQ.,
5      California                         Attorney General,
                                          By FRED GIRARD, ESQ.,
6                                            Deputy Attorney
                                             General.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

13,237

## INDEX TO WITNESSES

| For the Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| letter Andrew W. Bauer | 13,239 | | | |
| letter Arthur Mejia | 13,242 | | | |
| Alexander John Phillian | 13,247 | | | |
| urban (Irvin) Tarwater | 13,258 | | | |
| Mabel L. Crews | 13,287 | | | |
| George Yackey | 13,292 | | | |

## INDEX TO EXHIBITS

| For the Plaintiff: | For Identification | In Evidence |
|---|---|---|
| 207-E | | 13,241 |
| 256 | | |
| 257 | 13,277 | 13,278 |
| 258   Tarwater-Treaty records | 13,278 | 13,278 |
| 259 | 13,278 | 13,278 |
| 260 | 13,281 | 13,281 |
| 261   Douglas E. Owen | 13,290 | 13,290 |

| For the Defendants: | | |
|---|---|---|
| Yackey's A | 13,300 | 13,317 |
| Yackey's B | 13,317 | 13,317 |
| Yackey's C | 13,318 | 13,318 |
| Yackey's D | 13,322 | 13,322 |

1    San Diego, California, Tuesday, April 26, 1960, 10 A.M. o'clock.

2                              (Other matters)

3         THE COURT:  How many people are here in the Fallbrook

4    matter in response to letters from the Court?  Let's see their

5    hands.  Just one?

6         MR. SACHSE:  I think there are some more, you Honor.  I'll

7    check with Mr. Veeder's office.

8         THE COURT:  See if you can get the Clerk to get a list of

9    them during a short recess.

10                             (short recess)

11        THE CLERK:  18 - 1247-SD-C, United States v. Fallbrook,

12   further Court trial.

13        MR. VEEDER:  Your Honor, there are several of the defen-

14   dants in the courtroom.  I don't know just exactly how your

15   Honor desires to proceed.  I understand that the Clerk has the

16   names.  You may desire to direct your attention to them first.

17        THE COURT:  How many names do you have?

18        THE CLERK:  Your Honor, I have Urban Tarwater, Rose C.

19   Tarwater, George Yackey, Alma Yackey, Arthur Mejia, and Alexander

20   Phillian.

21        THE COURT:  Anyone else present?

22        MR. VEEDER:  I think Mr. Bauer is present.  Mr. Bauer is

23   a defendant.  I think he is in agreement with us.

24        THE COURT:  Is Mr. Bauer here?

25        MR. BAUER:  Yes, your Honor.

1    THE COURT:  Let the Clerk have your name.

2    MR. BAUER:  Andrew W. Bauer.

3    THE COURT:  Will all the persons whose names were called

4  stand, raise your rights hands and be sworn by the Clerk.

5    (Whereupon the persons whose names have been mentioned

6  heretofore by the Clerk, were duly sworn by the Clerk.)

7    THE COURT:  Are these people all from the Murietta area?

8    MR. VEEDER:  Mr. Yackey is not, of course.  He is present

9  on his own individual matter which is on Sandia Creek.

10    The other ladies and gentlemen are from Murrieta.

11    And Mr. Tarwater has some matters in regard to the Treaty

12  of Guadalupe Hidalgo.  His individual parcel has been taken care

13  of.

14    I can report to your Honor, however, if you desire me to

15  do so, that out of the letters that were sent out we have received

16  15 replies.  We sent out a total of 68 letters.  15 replies have

17  come, in which they have accepted the acreages which we set

18  forth.  There are nine where problems have been raised, which

19  involves responses from us to those individuals.  I have written

20  letters on them.  They will go out.  I have prepared them for

21  your signature, your Honor, and they will be delivered to you

22  for review.  However, they are just matters raising points as to

23  the meaning of this letter, corrections in acreages and things

24  like that, which have been taken care of in my office and letters

25  have all been written.

1         Now, in regard to where they have had agreement, your

2   Honor, I would propose to deliver to the Clerk copies of them,

3   and if it is agreeable to your Honor, have the agreements

4   marked as exhibits.  They can then be cross-referenced into the

5   title and map exhibits which are now part of the record, and I

6   think that would be the most expeditious way of handling it.

7   Treat them, in effect, like stipulations for settlement.

8         THE COURT:  Can't you take the documents upon which they

9   have indicated approval and make your cross-referencing by

10  exhibit numbers on some part of the document before you give

11  them to the Clerk, and then the document will speak for itself

12  and you will have to cross-reference to the tract or the parcel,

13  etc.

14        MR. VEEDER:  That has already been done, your Honor.  The

15  cross-references are in the letters themselves.  We set out

16  the exhibits to which they refer and the parcels to which they

17  refer.

18        THE COURT:  Did you give a separate exhibit number to

19  each one of these?

20        MR. VEEDER:  Your Honor, we have this exhibit 207 series,

21  and I think the last one of that was 207-D.  If it would be

22  agreeable, we could make these 15 --

23        THE COURT:  207-E?

24        MR. VEEDER:  That would be all right, your Honor.  That

25  would be the 15.

1          THE CLERK:   207-E would be the next in the 207 series,

2    your Honor.

3          THE COURT:   Any objection to that procedure?

4          MR. VEEDER:   Mr. Sachse?

5          MR. GIRARD:   No objection.

6          MR. VEEDER:   Then I will hand these letters to the Clerk,

7    your Honor.

8          THE COURT:   Exhibit 207-E, a series of letters, received

9    in evidence.

10          MR. VEEDER:   May I inquire now as to how you want me to

11    proceed in regard to the exhibits?   You have asked that copies

12    of the exhibits be made available to you.   I have the 207 series,

13    which relates to these parcels of land.   It was not clear to me

14    whether all other counsel wanted a full set or not.   They are

15    very bulky.   If they want them, I will make them available.

16          MR. GIRARD:   I don't want a copy of them. Mr. Veeder.

17          MR. VEEDER:   If you don't, it would just save us having to

18    bring them into my office and taking up space.

19          THE COURT:   Let's start taking these people up as we did

20    before.

21          Mr. Bauer.

22          MR. VEEDER:   Mr. Bauer has agreed, your Honor.

23          MR. BAUER:   I agree.   I have agreed to the stipulations on

24    that.

25          THE COURT:   You have a document of any kind here?

1      MR. VEEDER:  Yes, it is one of the 207-E series.

2      THE COURT:  You have signed your consent on it?

3      MR. BAUER:  Yes, your Honor.

4      THE COURT:  We are through with you, sir.

5      MR. BAUER:  Yes, I signed my consent.

6      THE COURT:  The Court would propose to find that this land
7  is over the Murietta Basin.

8      MR. VEEDER:  That is correct, your Honor.

9      THE COURT:  Col. Bowen has bees sworn heretofore.  This
10  man owns property and is an overlying owner?

11     COL. BOWEN:  Yes sir.

12     THE COURT:  The Court would propose to find that you have
13  correlative rights with other persons who have rights in the
14  stream system.

15     All right.

16     MR. VEEDER:  Mr. Mejia is the next defendant, your Honor.
17  I think he is in agreement with the acreage, 31.9, which we now
18  show.  But he had some questions, and I think if your Honor would
19  call him to the stand you can explain to him the situation.

20     THE COURT:  Come forward, Mr. Mejia.

21                    ARTHUR MEJIA,

22  one of the defendants herein, having been duly sworn on his oath
23  was examined and testified as follows:

24     THE CLERK:  State your name please.

25     THE WITNESS:  Arthur Mejia.

1      MR. VEEDER:  I have handed to Mr. Mejia the form, and he

2 was wondering about the extent of the water rights that he would

3 receive under this, and what the meaning of this is, your Honor,

4 if you will explain it to him.

5      THE COURT:  It is 31.9 acres; is that right?

6      THE WITNESS:  Yes.

7      THE COURT:  And all of it is irrigable?  That is the

8 testimony already in the record.

9      MR. VEEDER:  That is correct, your Honor.

10      THE COURT:  Col. Bowen, this land overlies the Murrieta

11 Basin?

12      COL. BOWEN:  Yes, your Honor.

13      THE COURT:  The Court would propose to find that you have

14 land that overlies the Basin and that you have, therefore,

15 correlative rights with other persons who have rights in the

16 stream system, rights particularly in the Basin and therefore

17 in the stream system.

18      Do you know what I mean by that?

19      THE WITNESS:  Yes sir.  What I wanted to find out was if

20 I could get a hundred percent water rights on my well.

21      THE COURT:  In ones sense, you have a hundred percent water

22 rights in that all of the acres you own have water rights because

23 they ovelie this Basin, but the term "100%" might mean something

24 to you.  It doesn't mean the same thing to me.

25      Let me tell you how this works.  Imagine that there is a

1  a basin underground.  We can't see it, but we will assume that

2  there is a basin.  Let's assume that there are 10 people who own

3  land over that basin.  The law says that it would be unfair for

4  that one man to pump all the water out of that basin.

5  THE WITNESS:  That is right.

6  THE COURT:  The law says that persons who have this land

7  that overlies that basin have correlative rights.  Each man must

8  exercise his right having in mind that other people have rights.

9  That is as far as we can go.  There is no attempt going to be

10  made in this case presently to tell you that you can pump only

11  this much or that much.

12  THE WITNESS:  That is what I wanted to know.

13  THE COURT:  That situation may come up.

14  What are you presently doing?  What are you irrigating?

15  What kind of crops?

16  THE WITNESS:  I have alfalfa.

17  THE COURT:  Do you use sprinklers?

18  THE WITNESS:  Yes.  I don't have alfalfa on all of it now,

19  but my intentions are of planting alfalfa on the whole part.

20  THE COURT:  There is no other kind of order I can make in

21  your case except the one I have indicated.  What do you have in

22  mind when you say you want a hundered percent water rights?

23  THE WITNESS:  I mean like you said before, you know, if I

24  have my alfalfa planted, you see, then they cut me down on my

25  amount of water I'm supposed to be getting.

13,245

1    THE COURT:  We can't forsee what will happen.  But let's

2  assume that you have a continual series of dry years, let's

3  assume that the water gets so scarce up there that everybody

4  has problems.  Everybody is going to have to be treated alike.

5    THE WITNESS:  That is right.

6    THE COURT:  When you say you treat them alike, that means

7  that you take into account how many irrigable acres of land

8  they have.  I would think presently that if one man had 1,000

9  acres and another man had 30 acres that it would be on some

10  proportional basis.

11    THE WITNESS:  That is right.

12    THE COURT:  In other words, you have to share what water

13  there is with other people.

14    Also, you are a part of the stream system and will be

15  forever, in that other people, upstream and downstream, have

16  rights on the stream.  In that sense you are in this lawsuit

17  in the future, if there are further proceedings.  You have a

18  right to be heard on it.

19    THE WITNESS:  If I am getting, you know, an equal share,

20  like everybody else, that is all I want, because I don't want to

21  be getting anything better than my neighbor.  I think he is

22  entitled to the water himself.

23    THE COURT:  That is as near as we can do it.  This is sort

24  of like the Golden Rule.  We try to make fair and équitable

25  distribution when the time comes as to what water you can use.

1   No one would ever be able to keep you completely from having

2   water, no matter how scarce the water would get, as long as

3   there was a little to go around.  You would be entitled to some.

4   You are in an ideal position.  Your land is over the basin.

5          THE WITNESS:  That is the kind of protection I wanted.  I

6   guess I was misunderstanding that.

7          THE COURT:  Is there any criticism of what I have told the

8   witness.

9          MR. VEEDER:  I think that is precisely the situation, your

10  Honor.  There may be regulation, but he will share the same as

11  everyone else.  That is what I understood you to say to him.

12         THE COURT:  In other words, no one can ever come in and

13  say, "Mr. Mejia, you shut down your well completely.  You can't

14  pump at all.  We'er going to let so-and-so and so-and-so pump."

15  It would be hard to conceive of a situation where you wouldn't

16  be entitled to your reasonable share of what water there was,

17  along with everybody else.

18         THE WITNESS:  That's all right.

19         THE COURT:  All right.

20         MR. VEEDER:  May I add to Exhibit 207-E the letter from

21  Mr. Mejia?

22         THE COURT:  Add it to Exhibit 207-E.  Who is the next

23  witness?

24         MR. VEEDER:  Mr. Phillian, I think, is the next one.

25         THE COURT:  Come forward, Mr. Phillian.

ALEXANDER JOHN PHILLIAN,

one of the defendants herein, having been duly sworn, on his

oath was examined and testified as follows:

THE CLERK:  State your name please.

THE WITNESS:  Alexander John Phillian.

MR. VEEDER:  It might help to clarify somewhat here.  The

witness is also representing Myrtle A. Provolt.

Is that correct?

THE WITNESS:  That is right.

MR. VEEDER:  He has deposited with us a signed statement

pursuant to which Myrtle A. Provolt has authorized him to

represent her in this matter.  I have accepted it, your Honor,

for the United States, and if it is agreeable with you I would

have it made a part of the record.

THE COURT:  All right, it may be made part of the record.

THE CLERK:  The next exhibit will be 256, your Honor.

THE COURT:  Why not make it part of 207-E?

MR. VEEDER:  207-E would suit me, your Honor.

THE COURT:  Make it part of 207-E.

How many acres of land does the evidence show this man has?

Is there any dispute about that?

MR. VEEDER:  We have 181.1 acres total, with 36.6 --

THE WITNESS:  In another parcel.

MR. VEEDER:  In another parcel of land, that is correct.

THE COURT:  I understand there is 181 and 36, or 181, of

1   which 36.6 --

2   THE WITNESS:  We have 181.1.  That is one piece of land.

3   We have nine pieces, actually, legally.  And there is another

4   square of another quarter setion which had been reduced to 36-

5   something here because of a county road which has been put

6   through.

7   MR. VEEDER:  For your reference, your Honor, it would be

8   in your Exhibit 207-D; you would find one parcel of land which

9   is 19-44-3, 173 acres, and there is 19-48-256, which is 8.1

10  acres, for a total of 181 acres.

11  THE WITNESS:  In two different grants, your Honor.  The

12  major portion of 173 acres is in Rancho Santa Rosa, and the 8.1

13  acres is in Rancho La Laguna.

14  MR. VEEDER:  Are you in agreement with these figures, Mr.

15  Phillian?

16  THE WITNESS:  Yes.

17  THE COURT:  How much of this land is irrigable?

18  THE WITNESS:  It is hilly.  It all depends upon where you

19  start.  It has been adjudged all of it irrigable.

20  MR. VEEDER:  That is correct, your Honor.

21  You raised a point, Mr. Phillian, and I want to be sure I

22  understand it correctly, as to the 36.3 acres.  Are you now

23  in agreement with that, or are you not?

24  THE WITNESS:  According to my recollection, that was

25  supposed to have been 38.8, but I am told because of the amount

1  of land taken for the road, that has reduced it to 36.3 acres as

2  irrigable acreage.

3       MR. VEEDER:  And that is acceptable to you then?

4       THE WITNESS:  Yes.

5       THE COURT:  Have you filed an answer in this case?

6       THE WITNESS:  I have not been served personally and I have

7  not answered, but I have arranged with the Clerk there and I

8  have a letter.

9       THE COURT:  You are willing to sign the letter and approve

10 the figures as shown?

11      THE WITNESS:  The figures, yes.  But the matter of correl-

12 ative rights is something I want to understand further, and I

13 would like to argue it in court to reach something equitable.

14      THE COURT:  Did you hear what I told the other witness

15 here?

16      THE WITNESS:  Yes, your Honor.

17      THE COURT:  Col. Bowen, you are familiar with where this

18 land lies?

19      COL.BOWEN:  Yes, your Honor.

20      THE COURT:  Does it all overlie the Murrieta Basin?

21      COL. BOWEN:  Yes, your Honor.

22      THE COURT:  The same thing I told him would apply to you.

23 What would you argue for any different?

24      THE WITNESS:  Your Honor, first of all, I might have some

25 differences as to the actual existence of a basin there.  The

1   theory is something I don't agree with, and I do not feel that

2   it can establish any evidence in a way that a court can really

3   base a judgment on.

4       THE COURT:  Does this property lie between the fault lines?

5       MR. VEEDER:  Yes, it does, your Honor.

6       THE COURT:  We have taken a lot of evidence here in this

7   area, and I refer here to Exhibit 15-A, for example.  The

8   evidence shows that this broken line, along here, to the north-

9   west side of Murrieta Basin, is a fault line; and there is no

10  doubt that a basin exists between that line and the toe of the

11  Santa Rosa Mountains where the rock comes down.  That basin

12  also goes further to the north and west.  The Court has not yet

13  decided how far it goes.  But as far as this land that lies in

14  the Murrieta Valley is concerned, there is just no argument

15  about that;  it is an underground basin of water.  There is no

16  argument about it.  No attorney who has appeared in here has

17  disputed that proposition.

18      Now, there is a dispute as to how far to the north and east

19  that basin goes.

20      But as I understand the testimony , you own land right over

21  that Murrieta Basin.

22      THE WITNESS:  I do, and although it may seem there would

23  be no argument about the Basin existing there, I too have

24  studied some sciences and it is just as true that that water

25  could actually be pushed upstream from some other source as

1   well as come from the hills, either because of any precipitation

2   of any kind, and the water there actually its channels could not

3   be measured, its amount could not be measured, and it would be

4   difficult to make any kind of a just distribution of such

5   water.

6       THE COURT:  Do you think I should make a decree that you

7   are entitled to all the water you find underneath your ground

8   without reference to the people who own land right next to you?

9   Do you think that would be fair?

10      THE WITNESS:  I am ready to share with the people next to

11  me in agreement with them, that I could come to an agreement

12  with.  But I want to say very frankly that although we recognize

13  that the government has the authority to see that we do all get

14  justice, that once we surrender these rights of coming to agree-

15  ment with our neighbors to share something, we may find there

16  that it is going to be very difficult to hold any rights there.

17      THE COURT:  We are not asking you to come to any agreement

18  as to sharing water.  The only purpose of this letter was to

19  point out to you what the acreage and how much was irrigable and

20  that the Court would inform you that the Court proposes to find

21  that this land you own was land overlying a basin and that, as

22  a matter of California water law, you therefore had correlative

23  rights.

24

25

1        THE WITNESS:  I understand that there were rights in

2   the original grants that superceded any of the state laws.  I

3   think in the original answer that we made to this particular

4   complaint we argued that these Treaty rights were inherent in

5   these grants and these treaties were to be respected, particu-

6   larly by the Federal Government, and if we do have rights in

7   those grants we share them with the people who occupy those

8   individual grants with us, and we have come to agreement with

9   them on that basis.  Because these individual grants were made

10  with definite rights written into them, and the treaties were

11  to respect these.  Now we would like to preserve those.

12        And if it were to come to either giving them to the

13  Government on patriotic bases or others voluntarily, we would

14  be very happy to show our own patriotic spirit.  But we would

15  like to have that as our own right to do voluntarily.  We do

16  not want to have these rights taken away from us.

17        That is the crux of the argument that I want to present

18  on behalf of myself and Mrs. Provolt.

19        THE COURT:  Mr. Tarwater has raised this point and has

20  gone into it to some extent and wants to go into it further,

21  and any decision made with reference to Treaty rights would

22  inure to everybody in the same situation whether they raise

23  the point or not.  If the Court should find that you have any

24  Treaty rights, everybody else concerned will get them in the

25  decree.  Personally, I don't think there is any merit to this

1   contention.  But we'll see later.  However, Mr. Tarwater has

2   gone into it in far more detail than you have, I think.

3         THE WITNESS:  I am willing to accept any decision that

4   you make in the matter that Mr. Tarwater had.  I would go

5   along with him and that would dispose of this.

6         THE COURT:  The point is that if I should decide that

7   somebody had rights under the Treaty, everybody else who has

8   rights under that Treaty will get the same treatment.  I am

9   not going to say that because you or Mr. Tarwater raised the

10  point, you get the rights, if any, under the Treaty and nobody

11  else does.  If i go for any Treaty rights, everybody else who

12  has a chain of title to an old grant gets the same thing.  Do

13  you understand?

14        THE WITNESS:  If we all submit to the arguments in the

15  complaint and no one raises this particular issue, you, your-

16  self, probably would not have reason to investigate the

17  Treaty rights.  I do not know.  However, we do want these

18  investigated, and we are not going to sign away any rights

19  until we have ascertained whether we do or do not have Treaty

20  rights.

21        And I might state to the Court, even if it were found

22  that we had these rights and it was good for the general

23  country to surrender some of them for the good of all, we

24  would be just as ready to do it as any of our neighbors.

25        THE COURT:  No one is asking anybody to sign away any

1   rights.  We have a lawsuit to determine what rights you have.

2   Of course, you gentlemen have raised these Treaty problems

3   and none of you has hired a lawyer.  With all respect to you,

4   it is an old legal saying that a little knowledge is a

5   dangerous thing.  It is very difficult for a layman to present

6   a legal argument or to present his legal points.  We will do

7   the best we can with it, but you haven't given the Court much

8   help.

9        In substance, you have said, "We have Treaty rights."

10  How have you got them?  Well, you have the documents.  Mr.

11  Tarwater has dug up a number of documents.  But it comes far

12  short of giving the Court any help on this problem.

13       THE WITNESS:  Your Honor, this is a complicated problem,

14  to be sure, and we laymen, individual property owners, are not

15  in a position to hire high calibre attorneys to investigate

16  things.  That would be difficult for us to do.

17       THE COURT:  Let me give you an example.  Do you have any

18  doubt that the Vail Estate owns a lot of property that came

19  down from a Mexican grant the same way?

20       THE WITNESS:  No.  It seems that they have considerable

21  properties, and they have them by virtue of these grants.  Or

22  at least their title is based on these grants.

23       THE COURT:  Don't you think that the Vail Company, if

24  they thought there was any merit to Treaty rights secured by

25  the Treaty of Guadalupe Hidalgo, have sufficient financial

1  means that they could have had so me lawyer right a good legal

2  brief on that problem?

3      THE WITNESS:  Frankly, from what I know of the extensive

4  territory that they own, they could hardly use up the rights

5  or the portions of water that they may get.  I think it extends

6  into several thousand acre feet.  We individual property

7  owners who want to do something --

8      THE COURT:  That doesn't follow.  The Pauba Valley basin,

9  part of the Vail property, as a water-producing area, is far

10  superior even to the Murrieta basin, and if they had Treaty

11  rights in it bythe Treaty of Guadalupe Hidalgo don't you think

12  that in the lawsuit that took three and a half years when they

13  were fighting the big ranch downstream and in this lawsuit the

14  Vail Company would have thoroughly investigated and filed a

15  legal brief about their Treaty rights in the Pauba Valley?

16  That is probably the greatest water-producing area in this

17  whole watershed.

18      THE WITNESS:  It is quite probable that it didn't occur

19  to them.  Or it might not have occurred even to an attorney.

20  I, myself, was quite surprised.  Had it not been for some

21  people who had made investigations on it, I would not have

22  known.

23      THE COURT:  Can we leave it that we have your point in

24  mind and that you want to have any rights that the Court may

25  find are available to you under the treaties?

13,256

1          THE WITNESS:  Yes.

2          THE COURT:  And if I find that you haven't got any, then

3    you will have to either appeal or you will have to do without

4    them.

5          THE WITNESS:  We are agreed to that.

6          THE COURT:  All right.

7          THE WITNESS:  Thank you, your Honor.

8          THE COURT:  Thank you for coming in.

9          By the way, is this property that you have been enumerat-

10   ing owned jointly by Mr. Phillian and Mrs. Provolt, or does she

11   have a separate piece of property?

12         MR. VEEDER:  As I understand it, you have a part interest

13   in the 36.6 acres to which we have referred with Mrs. Provolt.

14         THE WITNESS:  One-half equal interest for each of us,

15   Mrs. Provolt and myself.

16         MR. VEEDER:  In addition, your Honor, there is another

17   parcel of land which appears on page 5 of Exhibit 207-D, and

18   that would be Parcel 57.  Our records show that there is a

19   total of 40 acres, 39.6 acres of which are irrigable and .4 of

20   an acre of which is not irrigable.

21         Are you in agreement with that, Mr. Phillian?

22         THE WITNESS:  That is Mrs. Provolt's individual property

23   in Murrieta.

24         MR. VEEDER:  That is right.

25         THE WITNESS:  That is Temecula Rancho, I believe.

1    MR. VEEDER:  Are you in agreement with that?

2    THE WITNESS:  Yes.

3    MR. VEEDER:  I have nothing further, your Honor.

4    MR. STAHLMAN:  I have just one remark to make, in

5    connection with your explanation -- not in regard to the Treaty,

6    but in regard to the other questions that the defendant raised.

7    The Court undoubtedly will have continuing jurisdiction of

8    the case, and if there are some geologic or hydrologic matters

9    that at some time in the future appear to be different than

10   they are, I presume the Court could correct those.

11   THE COURT:  I don't know what you're talking about, Mr.

12   Stahlman.

13   MR. STAHLMAN:  Well, I had better keep still then.

14   THE COURT:  All right.

15   MR. STAHLMAN:  As far as your remarks on the Treaty are

16   concerned, that may be like this character in Los Angeles who

17   knocked out the vagrancy law on intoxication.  I don't know

18   his name, but they call him the "Guzzler's Giesler."  Maybe we

19   overlooked something.

20   THE COURT:  Thank you for coming in.

21   MR. VEEDER:  Before he leaves, the United States is

22   willing to agree to the acreages to which reference has been

23   made.

24   As I understand it, there is agreement as to the

25   acreages at least; is that correct?

13,258

1      THE WITNESS:  Yes.

2      THE COURT:  The Court will find the acreages and the

3  irrigable acreages in accordance with the record made here

4  today.

5      MR. VEEDER:  Even though the letters are not signed.

6      THE COURT:  That is right.

7      And the Court proposes to find, unless I am persuaded to

8  the contrary, that you have correlative rights with other

9  persons overlying the same basin.

10      The Court also proposes tentatively to find, unless

11  persuaded otherwise, that you have no special rights that

12  accrue to you under the Treaty of Guadalupe Hidalgo or the old

13  Mexican grants.  I am just telling you what is in my mind

14  presently.  Someone might persuade me later.  But I haven't

15  been persuaded yet.

16      Thank you for coming.

17      MR. VEEDER:  That is the extent of the people who have

18  appeared based upon our letters in the Murrieta area for this

19  hearing of April 26, your Honor.

20      Mr. Tarwater is here.  He said that he had some exhibits

21  that he desired to bring to your attention.

22      THE COURT:  Do you have some additional exhibits, Mr.

23  Tarwater?

24      MR. TARWATER:  I have.

25      THE COURT:  Will you produce them?

1    How did we mark the series of exhibits that Mr. Tarwater

2    presented previously?

3          MR. VEEDER:  I'll have to check that.

4          THE COURT:  Do you recall, Mr. Tarwater?

5          THE WITNESS: I don't know.  I put in two sets of them.

6          THE COURT:  I see them here.

7    Exhibit 235 is the ratification of the Treaty of

8    Guadalupe Hidalgo.

9          THE WITNESS:  That is the last ones that I put in.

10         THE COURT:  Exhibits 235, 236 and 237 all pertain to the

11   Treaty of Guadalupe Hidalgo.  There were three the last time,

12   weren't there?

13         THE WITNESS:  Yes.

14         THE COURT:  You put in some earlier?

15         THE WITNESS:  Two years ago, two sets, showing the

16   Treaty, the Protocol to the Treaty, and an Act of Congress

17   relative to the grants.

18         THE COURT:  Does anyone know what numbers those were

19   marked?

20         MR. VEEDER:  I don't believe they were marked, your

21   Honor.

22         As I remember, Mr. Tarwater, you told me that they were

23   delivered in chambers to Judge Carter.  Isn't that right?

24         THE WITNESS:  That is right.

25         MR. VEEDER:  I wish you would make your statement, Mr.

Tarwater.

1       THE WITNESS:  I delivered them to Judge Carter in his

2  office one morning, and he said, if I remember right, that he

3  would file them for me.

4       MR. GIRARD:  Your Honor, I would like to bring out a

5  point on some of these exhibits that Mr. Tarwater is intro-

6  ducing.

7       In the first place, all these exhibits are Acts of

8  Congress and they are reported in official volumes of statutes

9  of the United States Government.  I haven't had a chance to

10 look through all these things, and I haven't objected to them

11 on that basis.  But as far as what the official statutes

12 provide, and official ratifications of Congress etc., they are

13 all in official publications, and I would much prefer to use

14 those than to have these individual photostatic copies of

15 some document for which no foundation has been laid.

16      THE WITNESS:  I have the originals here.

17      MR. GIRARD:  I presume that the originals are in

18 Congress.

19      THE WITNESS:  I have them right here.

20      MR. GIRARD:  Do you have the original Treaty?

21      THE WITNESS:  I have the original copies.

22      MR. GIRARD:  You have a copy of what purports to be the

23 Treaty.

24      THE WITNESS:  Signed by the Library of Congress.

25      MR. GIRARD:  But that is published in the official

1  statutes, your Honor, and those can be cited.  I don't have

2  the statutes with me, but I am sure Mr. Veeder knows that

3  there are official publications of these treaties.  As a

4  lawyer I would prefer to rely on those documents than on these

5  exhibits that Mr. Tarwater is introducing.

6  THE COURT:  I think Mr. Girard is right.  You see, the

7  Treaty of Guadalupe Hidalgo is available in print, which is

8  easier to read than a copy.

9  THE WITNESS:  You don't believe that the Treaty of

10  Guadalupe Hidalgo exists?

11  THE COURT:  We know that it exists.

12  THE WITNESS:  Are these documents that I put in the

13  other day proof that it exists?

14  THE COURT:  Nobody disputes that it exists.  But the

15  point that Mr. Girard makes is that the thing is printed in

16  books where you can read it without having to struggle through

17  these copies.

18  THE WITNESS:  When my property is founded on that, how

19  else can I protect it but by getting it from the legal places

20  in the Government to get them?

21  THE COURT:  You can refer to the official volumes.

22  THE WITNESS:  Isn't a certified copy from the Library of

23  Congress official?

24  THE COURT:  There might be some question about it.

25  What do you have there?

1        THE WITNESS:  I have the original or certified copys

2   from the Archives of the original Mexican title to the grant

3   written in Mexican.

4        THE COURT:  That's going to be a big help to us, you know.

5   Do you have a translation of it?

6        THE WITNESS:  I turned in two translations earlier two

7   years ago, two different sets of translations of it.

8        THE COURT:  What else do you have there?

9        THE WITNESS:  I have a copy of the Protocol, which I

10  would like to read to you a portion of.

11       THE COURT:  No, let me see what you have there.

12       THE WITNESS:  Here is the Protocol.  That is an Act of

13  Congress, I think.  That is an Act of Congress relative to

14  settling the claims of the grants.

15       THE COURT:  I don't know what this document is.  Take a

16  look at this, Mr. Girard.

17       THE WITNESS:  This is the Protocol.

18       MR. VEEDER:  Your Honor, in view of the fact that those

19  have already been deposited with your Honor, why don't we just

20  check them out and if they are here make them part of the

21  record?

22       THE WITNESS:  There is an Act of Congress relative to

23  these grants.

24       MR. GIRARD:  Your Honor, frankly Mr. Tarwater would have

25  been a lot better off if he had spent his money to hire a

1    lawyer than spending his money getting these transcripts.

2         THE WITNESS:  Your Honor, I would like to point out to

3    you in the Treaty that the Treaty says that the grantees may

4    cause their legitimate titles to be acknowledged before the

5    court.

6         THE COURT:  These four documents that you have brought
     are
7    in/all the documents that you have today; is that right?

8         THE WITNESS:  Here is the big part of the Treaty, the

9    main part of it.

10        THE COURT:  Of course, this is just taken from a book,

11   you see.  We have in the court here the actual Statutes at

12   Large themselves.

13        THE WITNESS:  Why don't you bring them in?  Let's find

14   out what they say.  I'll trust your copy.

15        THE COURT:  Mr. Girard, I'm going to appoint you a

16   Committee of One to look over some of this material during the

17   noon hour and we will talk about marking it.  I will also find

18   out what I have in my file.  He says that he left certain

19   documents with me.  We'll do that right now.

20        MR. VEEDER:  I haven't had a chance to check out our

21   files.  I don't believe we have them.

22        THE COURT:  Take a short recess.

23        (MOMENTARY RECESS)

24        THE COURT:  Here is apparently what Mr. Tarwater is

25   talking about.  But my recollection is that he just handed them

13,264

1    to me.  He didn't ask me to file them or anything else.  He

2    probably figured that if he handed them to the Judge they were

3    filed.  But that doesn't necessarily follow.

4         Here is one document.  I don't know what it is.

5         THE WITNESS:  That is the English translation of the

6    title to the grant.

7         THE COURT:  Here is another document.

8         THE WITNESS:  That is the Protocol, I believe.

9         THE COURT:  Yes, that seems to be very similar to the

10   one you have here today.  Isn't it?

11        THE WITNESS:  Yes.

12        THE COURT:  What is this supposed to be?

13        THE WITNESS:  That is a judgment in the San Diego Court

14   in the trial between Vail and O'Neill, I think.

15        THE COURT:  No, this is 1850.  It is a report of some

16   commissioners appointed to investigate and settle private

17   land claims in the State of California, petition of Louis

18   Vigness.

19        THE WITNESS:  That was the Mexican owner of the Temecula

20   Ranch.

21        THE COURT:  Here is a document, Temecula Land & Water

22   Company vs.

23        THE WITNESS:  That is a copy of my deed from the

24        Brothers, bringing a good succession of title down to

25   me.

1    THE COURT:  And Temecula Land & Water Company to M. L.

2  Wicks,  another old deed, apparently.

3    THE WITNESS:  They were directors in the Temecula Land &

4  Water Company, deed from them to some of my land.

5    THE COURT:  That is all you gave me, isn't it?

6    THE WITNESS:  I think so, sir.

7    THE COURT:  That is all I have.

8    Mr. Girard, the Court is going to appoint you a Committee

9  of One, with full authority to call upon other Counsel for

10  assistance, to look over this matter and see which of these

11  matters are contained in statutes -- we have them in the

12  Grand Jury room -- and we will make some decision after we

13  hear from you as to which of these will go into evidence and

14  which are already covered by matters appearing in the books.

15  If they appear in the books -- there will be no harm done --

16  we can put a statutory reference on it, if Mr. Tarwater feels

17  better about getting these historic documents in evidence.

18  He has done quite a job here.

19    Then seco ndly, I would like to have you, Mr. Tarwater,

20  sit down with the representative of the State of California

21  and tell him your theory.

22    Mr. Girard, can you sit down with Mr. Tarwater and try

23  to find out what his theory is?

24    THE WITNESS:  I would like to do that, because I would

25  like to get at the truth of this thing.

13,266

THE COURT: That any rights accrue by virtue of these grants. So that we can at least get on the record what his contention is.

MR. STAHLMAN: You have the question at Fresno, don't you, Mr. Veeder?

MR. VEEDER: That is the kind of help I've been getting from Mr. Stahlman for years, your Honor.

MR. GIRARD: I want you to know that I didn't prompt that, Mr. Veeder.

THE COURT: Is the Government making some such contention in the case of Rank v Krug?

MR. STAHLMAN: In the City of Fresno vs. State Water Rights Board.

THE COURT: Is the Government making some contention about old grants?

THE WITNESS: I believe it is the same claim.

MR. VEEDER: I would like to have Mr. Girard's report as to what he thinks the proposition advanced by Mr. Tarwater is before I make any observations at all, your Honor.

Of course, what we are simply claiming in that instance that with the Mexican grant under the Treaty of Guadalupe algo there would pass to the National Government -- which t be in conflict with Mr. Tarwater's statement -- the ropriated waters in the stream. Now that is the general ltion.

JOHN SWADER, OFFICIA...

1    I would like to be off the record on this. I would rather

2    try the Fresno case in Fresno, if it is all the same to your

3    Honor.

4         MR. STAHLMAN:  If you have anything to enlighten us on

5    the Treaty --

6         MR. VEEDER:  There is no desire on my part to go into an

7    extensive statement on Rank v Krug.

8         THE COURT:  This is another theory as to the Government's

9    rights to unappropriated water.  This is another theory, other

10   than those you have advanced at pre-trial.

11        MR. VEEDER:  With all respect to your Honor, I would

12   like to withhold any comment with regard to the Fresno case.

13   Not that I am afraid, but --

14        THE COURT:  I think we can withhold comment on the

15   Fresno case.  But you advanced some plain and fancy theories

16   on pre-trial.

17        MR. VEEDER:  And very sound, your Honor.

18        THE COURT:  This is one, as I recall, that I have never

19   heard before.

20        MR. VEEDER:  It's nothing new.

21        THE COURT:  It was not advanced before me.

22        MR. VEEDER:  Truly I don't know whether it is involved

23   in this case.  But I will advance it now, if you want me to,

24   sir.

25        THE COURT:  The Government claims the unappropriated

1    waters of the State of California by virtue of the Treaty of

2    Guadalupe Hidalgo.  Is that it?

3         MR. TARWATER:  That is right.

4         MR. VEEDER:  Are we off the record?

5         THE COURT:  We're on the record.

6         MR. VEEDER:  I'll be very glad to -- in fact, it seems

7    imperative now -- to explain the theory of the ownership of

8    the unappropriated rights to the use of water, whether it was

9    under the Louisiana Purchase, under the Treaty with Texas,

10   under the Treaty of 1848 with  Great Britain, there passed to

11   the United States of America, as succeeding sovereign, all of

12   the right, title and interest of its predecessor sovereign,

13   whether it was France, whether it was Texas, whether it was

14   Mexico, whether it was Great Britain.   And I might add --

15   there is nothing new in this theory -- that it is a fundamental

16   precept of international law that that takes place.  That there

17   resides in the successor in interest, the National Government

18   of the United States of America those rights to the use of

19   water until such time as they have been conveyed away.  There

20   has been no conveyance away of the ownership of the unappropri-

21   ated rights to the use of water.  They still reside in the

22   National Government.  And therefore --

23        MR. GIRARD:  May we show strong objection to that

24   statement?

25        MR. VEEDER:  I have a half-finished statement.  May I

1    have the reporter read that sentence back?

2         (Whereupon, the reporter read back the last statement

3    by Mr. Veeder.)

4         MR. VEEDER:  And therefore, in any instance where there

5    are unappropriated rights to the use of water, the National

6    Government asserts them.

7         Now in bringing that into the Fresno case, again you

8    have to explain how this thing transpired.

9         THE COURT:  I don't care how it got into the Fresno

10   case.

11        MR. VEEDER:  But your Honor, that is why I was reluctant

12   to bring it in.

13        THE COURT:  You can tell me later.

14        MR. VEEDER:  John (the reporter) will have to join us

15   in chambers.

16        THE COURT:  Of course, ordinarily sovereignty over land

17   is a different thing from ownership of land.  There is a

18   fundamental distinction between sovereignty and ownership.

19   Sovereignty, of course, is the control of the sovereign,

20   ordinarily, in the exercise of civil and criminal jurisdiction

21   over the area.  But when sovereignty passes it is not ipso

22   facto true that ownership passes.

23        I can see right to start with that we have a lot of

24   things to discuss on that kind of theory.

25        MR. VEEDER:  Your Honor, there are two aspects to which

13,270

1   your Honor made reference.  There is the aspect of sovereignty,

2   which is the power to enact laws.  And in addition there is

3   the passage of the ownership of the properties title to which

4   resided in their predecessor sovereign.  I agree with you

5   completely.  There are two aspects to sovereignty.  But one of

6   them, the aspect which is most important here, is that, as a

7   succeeding sovereign, title passed to the National Government

8   with the Treaty of Guadalupe Hidalgo and all these other

9   treaties.  All of the right, title and interest resided in the

10  grantor.

11          THE COURT:  And then when the State of California was

12  created none of this passed to the State of California?

13          MR. VEEDER:  That is correct, your Honor.

14          THE COURT:  In other words, the National Government

15  passed to California title to certain lands.

16          MR. VEEDER:  Sectio ns 16 and 36, I believe.  And there

17  were, of course, other grants -- I think the swamp and overflow

18  and many other instances -- in which the United States of

19  America did transfer outright and conveyed to the Stateof

20  California.

21          However, if your Honor will consider the Enabling Act

22  of California, and all other enablingacts, you will observe

23  the statement that the admission of the State of California

24  into the Union in no way affected the titles of the National

25  Government to the properties residing in it at that time.

1    So the comment that your Honor made in regard to

2  sovereignty, with all respect to your Honor, covers only half

3  the question.  I certainly wouldn't say that it is only half-

4  right.  But the point is that we are strictly discussing

5  titles --

6    THE COURT:  All right.

7    Did I let Mr. Veeder say enough, Mr. Girard, for you to

8  know what he is thinking about?

9    MR. GIRARD:  Yes, I know what Bill is thinking about,

10  your Honor.  I have read the briefs in the City of Fresno case.

11  But I would like to know whether he is planning on relying on

12  that contention in this suit.  Aside from the factual differ-

13  ence and aside from the fact that other people have the same

14  grantees here that he has, it seems to me that a claim like

15  that would be outside the stipulation the the Government

16  entered into originally in the trial of this suit.

17    THE COURT:  Are you going to inject that issue into this

18  lawsuit?

19    MR. GIRARD:  I don't know whether Mr. Veeder is intending

20  to do that, or whether he was just commenting generally to

21  your Honor's question.

22    MR. VEEDER:  I was commenting only generally.

23    THE COURT:  But it is not your present intention to

24  inject that issue into this lawsuit?  Do you want to answer

25  the question yes or no?

1    MR. VEEDER:  Frankly, I hadn't thought about it, your

2    Honor.

3         THE COURT:  It is being injected indirectly by these

4    individual owners.

5         MR. VEEDER:  It is.  And I think it is unnecessary.

6         THE COURT:  Not the same question, but a phase of it.

7         MR. VEEDER:  I would have to get more information from

8    Mr. Tarwater on that proposition.

9         The matter of the ownership of the unappropriated rights

10   to the use of water, as I said before, is not new.  It is in

11   no sense new at all, your Honor.  It has been advanced many

12   times.

13        And George has helped us once more in bringing this

14   matter up.  I believe it is extraneous to the issue.

15        THE COURT:  What do we have to take care of this after-

16   noon?  Mr. Yackey?

17        MR. VEEDER:  Yes, Mr. Yackey.

18        But before we adopt some of these things, we have two

19   more interlocutory judgments, No. 14 and No. 15.  I don't

20   believe there is anybody in the courtroom who has responded to

21   these.  If it is agreeable, I will tender them to your Honor

22   for signature.

23        THE COURT:  These are judgments in the Fallbrook area

24   which involve vagrant, local, percolating waters not a part

25   of the stream system.

13,273

1      MR. VEEDER:  That is right.

2      MR. GIRARD:  Apparently, roughly twenty of the sixty

3  people responded today, Mr. Veeder.

4      MR. VEEDER:  There were more people than that, Mr.

5  Girard.  I think there were sixty parcels.

6      MR. GIRARD:  And I take it, your Honor, that upon a

7  showing that these letters went out your Honor will find

8  according to the evidence in this case, and that is, in effect,

9  their notice to be here if they objected, even though they

10  didn't return their letter.

11      THE COURT:  All right.

12      MR. VEEDER:  That is what I was hoping for.  And I think

13  I would like to cover the point as to the hearings on the 5th

14  and 6th, too, along that same line.  I am worried about due

15  process, and that is why I have been extremely anxious to get

16  these letters to go out, and if they have been notified it

17  should constitute a request from you for their appearance.

18      THE COURT:  We are entitled, under the evidence now in

19  the record, to find in accordance with what we have already

20  and what was stated in the letters that went out to them.

21      MR. VEEDER:  That is the best we can do.  I don't think

22  we can do any more.

23      THE COURT:  Unless we can bring them into court by

24  subpoena.

25      I have a sentence calendar at two o'clock, so you will

1    have to wait.

2        MR. VEEDER:  Mr. Yackey's matter is the only one, I

3    believe.

4        THE COURT:  I will give you some time to look over this

5    material -- you, Mr. Girard and Mr. Tarwater.  You will have a

6    little time to work on this.

7        Adjourn until two o'clock.

8        (NOON RECESS)

9                                - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  SAN DIEGO, CALIFORNIA, TUESDAY, APRIL 26, 1960, 2:00 P. M.

2                          - - -

3        (Other matters.)

4                          - - -

5        THE COURT:  Mr. Girard.

6        MR. GIRARD:  I don't know, your Honor -- I have all

7  these exhibits with a brief definition of each one that I

8  prepared -- maybe we ought to have them just marked at this

9  time.

10        THE COURT:  All right, let's mark them.  We know the

11  three that are in Exhibit 235.

12        MR. GIRARD:  Yes, I have those here also.

13        I think Exhibit 239-A is the last one, isn't it?

14        THE CLERK:  238, 239 and 239-A.

15        THE COURT:  Do you mean the last Government exhibit?

16        MR. GIRARD:  The last exhibit concerning this Treaty.

17  Is that the last Government exhibit?

18        THE COURT:  Yes, 239-A.

19        The only ones that I know anything about in evidence are

20  235, 236, 237, 238, 239 and 239-A.

21        MR. VEEDER:  Mr. Tarwater, do you want your own copies

22  marked and go into evidence?

23        MR. TARWATER:  I would like to keep them, because they

24  are the originals; the only protection I have, I feel.

25        MR. VEEDER:  He told me that he didn't want them in the

record.

1    THE COURT: Maybe the Court can find the material

2  elsewhere.

3    MR. GIRARD: I found the Treaty and the Proclamation,

4  which are two of those.

5    THE COURT: Two of those that are already marked.

6    MR. GIRARD: Two of those which are not marked, which

7  Mr. Tarwater submitted here in court today. Certainly there

8  is no need --

9    THE COURT: There is no need for those.

10    MR. GIRARD: I wouldn't think so.

11    The Treaty itself, which is the large one here, I might

12  add, your Honor, is codified in United States Statutes at

13  Large, 43rd Congress 1873 to 1875, at page 492 -- commencing

14  at page 492. It is in the first volume.

15    THE COURT: What is it called, Volume I?

16    MR. GIRARD: No, there is no volume number on it. It is

17  the first volume of the United States Statutes at Large, which

18  I found in your Grand Jury room.

19    THE COURT: Yes. It is apparently a compilation.

20    MR. GIRARD: It is a compilation of all the treaties

21  executed and ratified prior to 1873 with every country, and

22  the Treaty of Guadalupe Hidalgo and the Proclamation are set

23  forth on page 492.

24    I will put this volume back in the Grand Jury room.

25    THE COURT: You may hand him back the Treaty and the

1    Proclamation.  We are not concerned with those.

2        MR. GIRARD:  There is one little problem in regard to

3    the Treaty.  These are just photostatic copies of the Statutes

4    at Large.  I don't know if Mr. Tarwater wants them marked and

5    introduced in evidence.   I have no objection.

6        THE COURT:  They needn't be in evidence.  They are in

7    the Statutes at Large.  The Court can take judicial notice of

8    them.

9        MR. GIRARD:  I would think so.

10       This is part of the same thing, I believe.  All of these

11   are in the United States Statutes at Large.

12       This is in that volume, Mr. Tarwater (handing document

13   to Mr. Tarwater).

14       Mr. Tarwater has presented here a Protocol.

15       This Brotocol, too, Mr. Tarwater, is in that volume

16   (handing document to Mr. Tarwater).

17       There is a document here which this Court does not have.

18   At least I could not find a copy of the Congressio nal Digest.

19   But this would be in the Congressional Digest.  It is a

20   message from the President to the House, transmitting a report

21   of a Captain Halleck which relates to the laws and lands and

22   Mission properties in California.  This is just a compilation

23   of letters from Captain Halleck to various superiors.

24       THE COURT:  Let's mark it 256 and put it in evidence.

25       MR. GIRARD:  I have no objection.

1    THE COURT:  Exhibit 256 in evidence.  It may be withdrawn

2  later with substitution of a copy or other procedure.

3    MR. GIRARD:  Here are some Temecula Land & Water Company

4  resolutions which pertain to Temecula land.

5    THE COURT:  Mark it Exhibit 257 in evidence.

6    MR. GIRARD:  This is some affidavits of various indivi-

7  duals which were submitted to the commissioners who were set up

8  after the Treaty of Guadalupe Hidalgo to determine title to

9  land pertaining to the Temecula land.  They are more or less

10  affidavits or statements of various individuals which were

11  presented to the commissioners who were appointed under the

12  Treaty to determine the validity of Mexican land grants. That

13  is generally it, I believe.

14    MR. TARWATER:  It also includes the title to the

15  Temecula Ranch as granted by the authorities in California.

16    THE COURT:  Mark it Exhibit 258 in evidence.

17    MR. GIRARD:  This document is the Mexican records which

18  apparently have been transcribed.

19    MR. TARWATER:  Part of the same.

20    MR. GIRARD:  They are statements in English concerning

21  the title to this Temecula Grant prior to the Treaty.

22    MR. TARWATER:  That is right.

23    MR. GIRARD:  Whether or not they convey title, I think

24  they would have to be examined more closely.

25    THE COURT:  Exhibit 259 in evidence.

1    MR. GIRARD:  That consists of the documents that Mr. Tar-

2  water, I believe, forwarded to you and presented today.

3    THE COURT:  The previous documents.

4    MR. GIRARD:  I have those here and can identify them, if

5  you want me to.

6    THE COURT:  Let's se which one of those might be material.

7  Some of those are duplications, aren't they?

8    MR. GIRARD:  I don't know, your Honor.

9    THE COURT:  Exhibit 235.

10    THE CLERK:  Exhibit 235 is the Mexican ratification, your

11  Honor.

12    THE COURT:  Is it a ratification by Mexico?

13    THE CLERK:  Yes, your Honor.

14    THE COURT:  What is Exhibit 236?

15    THE CLERK:  Senate resolution re ratification of the

16  Treaty.

17    THE COURT:  A resolution of the United States Senate?

18    THE CLERK:  Yes, your Honor, that's what I have it listed.

19    MR. GIRARD:  That is correct.

20    THE COURT:  Exhibit 237 I have listed as a ratification

21  document of some sort.

22    MR. GIRARD:  As ammended by the Senate, signed by the

23  President on March 16, 1848.  It has to do with the ratification

24  of the Treaty.  It is signed by President Buchanan.

25    THE COURT:  Exhibit 238 is a map of the grant of Temecula.

1    MR. GIRARD: Exhibit 238 is a plat of the Temecula Rancho.

2    Exhibit 239 is a copy of the patent from the United States

3    following the hearings before the commissioners and the decision

4    of the District Court of the United States which reversed that

5    decision.

6    Exhibit 239-A is probably a little better exhibit of that

7    than Exhibit 239. I think it is an identical exhibit. Exhibit

8    239-A is legible while Exhibit 239 is very difficult to read.

9    THE COURT: Some of those documents that he had today had

10   a recording reference to deeds in the County Recorder's Office.

11   Which ones were those?

12   MR. GIRARD: That would be the Temecula Water Company.

13   THE COURT: Look at the certification on the back. It

14   shows where it appears.

15   MR. GIRARD: Yes, that is the County Recorder of San Diego

16   County. It appears in volumes 72 and Book 113. The first one

17   appears in Book 113 in the County Recorder's Office. That will

18   show on the face of them. And the other one appears in Book

19   72.

20   THE COURT: Are those Exhibit 257 or 258?

21   MR. GIRARD: Exhibit 257. They are two separate deeds

22   from the Temecula Land and Water Company to the predecessor of

23   Mr. Tarwater.

24   THE COURT: All right.

25   Does that complete your evidence?

1       MR. TARWATER:  I think this should be included also, your

2   Honor (handing document to the Court), as it is an Act of

3   Congress which explains the intent of Congress in settling the

4   land claims, how they should be settled.

5       THE COURT:  Isn't this found in the statutes?

6       MR. GIRARD:  It would be found in the statutes, yes, your

7   Honor; but I don't think the Court has this volume -- at least

8   I couldn't find it in there.

9       THE COURT:  Let's mark it Exhibit 260.  How would you

10  characterize it?

11      MR. GIRARD:  It is a photostat of the Statutes at Large

12  and Treaties of the United States of America from December 1,

13  1945, to March 3rd, 1951, edited by George Minot, Esq.  It is

14  volume 9 and includes pages 631 through 634 of that volume.

15      THE COURT:  All right, that will be Exhibit 260 in evidence.

16      MR. GIRARD:  Frankly, I think this probably appears in this

17  volume, too.

18      THE COURT:  I will wager that we can find that in there,

19  because that is supposed to be a compliation.

20      MR. GIRARD:  I don't have it, though.

21      THE COURT:  One final matter.  Do you have any idea what

22  Mr. Tarwater's theory is on this?  How do you spell out this

23  theory that he is pressing?

24      MR. GIRARD:  I know what he is claiming, your Honor.  He

25  is claiming that he has rights under the Mexican grant.  But I

1   don't see any legal basis to the claim, and frankly, I can't

2   understand his argument.

3        THE COURT: Caliming that he and all other persons who

4   derived title from these Mexican grants have title to certain

5   rights to water which would have existed under Mexican law

6   prior to the Treaty?

7        MR. GIRARD:  That is correct.

8        MR. VEEDER:  Until confirmed by the laws of the United

9   States of America, and therefore, he is successor in interest

10  to those rights that passed to the original grantor from Mexico.

11       MR. GIRARD:  That is probably his theory.

12       MR. VEEDER:  I think that is the theory.

13       THE COURT:  All right.  Does anybody know what the Mexican

14  law was prior to the time of Guadalupe Hidalgo?

15       MR. GIRARD:  I don't know, your Honor.  I don't think it is

16  necessary to look there.  I think if you look at the Treaty of

17  Guadalupe Hidalgo, in sections 8 and 9 there are provisions

18  which, in effect, state that land which is now part of the

19  United States shall be treated just as if it were on a parity

20  with any other land.  Mr. Tarwater doesn't agree.  He refers to

21  a statement in the Protocol which would indicate somewhat

22  different.  But at least, I cannot find any provision in the

23  Treaty itself which even touches on this subject.

24       THE COURT:  You don't claim, Mr. Tarwater, that you have

25  any greater rights than anyone else whose titles derive from

1   a Mexican grant, do you?

2       MR. TARWATER:  As long as those people have rights within

3   this grant, they have the same rights I have.

4       THE COURT:  And your rights are correlative?

5       MR. TARWATER:  Correlative within the grant; not within

6   the stream.

7       THE COURT:  What is your position with reference to people

8   who have rights in other grants?

9       MR. TARWATER:  They have the same right.  I have a letter

10  from the Law Department of the Library of Congress which says

11  that each one of these grants is a law unto itself.

12      THE COURT:  More specifically, here is the Little Temecula,

13  and you claim title down through the Little Temecula?

14      MR. TARWATER:  The Little Temecula, yes.

15      THE COURT:  The Vail Company claims a right down through

16  the Pauba.

17      MR. TARWATER:  That is right.

18      THE COURT:  As between you and the Vail Company, are your

19  rights correlative with Vail's?

20      MR. TARWATER:  My rights are correlative with anybody that

21  owns land within Temecula Rancho, but I'm not correlative with

22  people outside that grant -- I can't be correlative.

23      MR. VEEDER:  When you use the term "correlative" --

24      THE WITNESS:  Parallel.

25      MR. VEEDER:  "similar to" is what you mean, not "correla-

1    tive" as we use it here, do you?

2         MR. GIRARD:  I think he means "correlative."

3         MR. VEEDER:  I'm not trying to argue.  "Correlative" is a

4    word of art, and I wanted him to be sure.

5         THE COURT:  You mean that you and all the other people who

6    have rights in the Little Temecula grant could pump all the

7    water you wanted to and the people who had rights under the

8    Pauba grant could do nothing about it?

9         MR. TARWATER:  No, I didn't say that.  They have equal

10   rights with me to pump water within their own boundry lines.

11   They can dip out of the stream like I can.

12        THE COURT:  You are talking about your rights contrasted

13   with those that come from the Pauba grant.

14        MR. TARWATER: That is right.  They can pump out of the

15   stream on their own land.

16        THE COURT:  Let me give you an example to see what your

17   position is.  Suppose that Vail Company went down to the edge

18   of the Pauba grant and they put in a well 10 feet from the

19   boundry every 50 feet up across the basin and they pumped those

20   wells as hard as they could and they took the water that they

21   didn't use and used all the water they wanted to and even sold

22   water outside the watershed.  Would you complain about that?

23        MR. TARWATER:  What I want to preserve then, is the right

24   to go deeper.

25        THE COURT:  First, could you complain about that, under

1  your theory, if they did that?

2      MR. TARWATER:  I just want the right to be free to go

3  deeper with my wells, so I could dip deeper also when the well

4  goes dry we are all out all at once.

5      THE COURT:  You do not feel that you could restrain them,

6  but you could dig as deep as you wanted 10 feet on your side of

7  the line.

8      MR. TARWATER:  They have the same right I do.

9      THE COURT:  Then we would have a pumping contest to see

10  which of you could get the most water out of the basin, with

11  which you could do as you pleased because you found it on your

12  ground.

13      MR. TARWATER:  I did not say it is right.  It is the law

14  under the Treaty, as I understand it.  That would be the law.

15      THE COURT:  At the time, what was the Little Temecula and

16  what was the Pauba were part of Mexico.  Have you looked into

17  what the law was in Mexico?  Merely because these grants were

18  carved out of Mexican land wouldn't seem to put any extra rights

19  in them.

20      MR. TARWATER:  The rights are written into the titles.  For

21  instance, in the Temecula grant it says that heo may use hiar

22  land freely and exclusively for cultivation and other purposes

23  as suits him.

24      THE COURT:  It doesn't say expressly that you can do the

25  pumping you are talking about.  You read that in by implication;

1  is that right?

2  MR. TARWATER:  The pumping?  No, there is an express right

3  in the title to the Temecula grant which gives the owners of the

4  land the right to irrigate and to cultivate the land.  It is

5  expressed in the title there.

6  MR. GIRARD:  Your Honor, this is a copy of the patent

7  which was issued by the United States following the hearing

8  before the commissioners.  On page 9 of Exhibit 239-A it says

9  "Conformation of said claim and this patent shall not affect

10  the interests of third persons."

11  MR. TARWATER:  The interests of third persons.  At that

12  time they were mostly Indians who had servitudes and crops on

13  the land.  I think that is what it refers to.

14  THE COURT:  You have completed your evidence on this?

15  You have no other evidence?

16  MR. TARWATER:  Not that I know of at the present time.

17  THE COURT:  All right.  You may step down.

18  I think, Mr. Girard, in order to dispose of this issue, I

19  had better impose upon you to write a short memorandum for the

20  Court.  We have all the evidence on it now.  Justify the State

21  of California paying you this tremendous salary.

22  MR. GIRARD:  All right, your Honor.

23  MR. TARWATER:  Your Honor, in the argument we had in the

24  ante-room, he brought up the question that the Protocol was not

25  part of the Treaty, and I thought that the Protocol, having

1   substituted some provisions for provisions which were stricken

2   in the original Treaty, would constitute part of the Treaty if

3   it was ratified along with the Treaty.

4       THE COURT:  Will you look into that?

5       MR. GIRARD:  Yes, I will.

6       THE COURT:  And serve a copy on Mr. Tarwater and on the

7   other counsel here who have appeared.

8       Are you interested in this legal problem, Mr. Veeder?

9       MR. VEEDER:  I wanted to bring to your Honor's attention

10  that Mrs. Crews is here and she also makes a similar claim to

11  that of Mr. Tarwater.  She asked me to bring it to your Honor's

12  attention.

13      THE COURT:  This ruling will affect everybody, whether they

14  make a claim or not, who has property in the Temecula grant, the

15  Pauba grant or the other grants.

16      MR. VEEDER:  Did you have anything to say, Mrs. Crews?

17      MRS. CREWS:  I was not sure that I did.  My brother and

18  I both filed Treaty rights we felt we had, and I was not sure

19  that those files were read.

20      THE COURT:  We know that many answers have raised the

21  Treaty right question.  Many other people have copied those

22  paragraphs and I have seen them in various answers.

23      But the point is this, if I should sustain the contention

24  of Mr. Tarwater that he has some kind of right which he calls a

25  "Treaty Right," this will inure to the benefit of everybody who

1    derives title from the Little Pauba and from the Temecula and

2    from the various other grants.  If I decide that that is the

3    law, everybody entitled to it gets the benefit of it.  So

4    whether you artfully put it in your answer or not, you would

5    ride along with the others.

6         MRS. CREWS:  I am sure that Mr. Tarwater is better able to

7    state these things than I stated in my little file.  But I

8    certainly still claim it and I just wanted to have that brought

9    out.

10        THE COURT:  All right.  I can tell you in about one minute

11   what I think about it.  I think that when you research Mexican

12   law prior to the time of Guadalupe Hidalgo you will find that

13   Mexican law recognized a right of reasonable use.  In fact,

14   our western water law has a Continnental basis and is based on

15   Mexican law.  The water law of the western states, most of which

16   were under Mexican dominion at one time, I think, is dated

17   back to Mexican law or Spanish law; and that was the law of

18   reasonable use.  And at the time these pieces of ground which

19   later on became the grants, were under Spanish and Mexican

20   domination, here was the land that later became the Little

21   Temecula, here was the land that later became the Pauba, here

22   is some land inbetween, and all of the people of these basins

23   had a right to reasonable use of this water, which was the same

24   as a correlative use.  And therefore, when there was carved out

25   the Rancho Little Temecula under Mexican law, this didn't change

1   the fact that this was a right of reasonable use that belonged

2   to the persons that owned the Rancho, but the other people

3   adjoining on the stream system or basin also had the same right

4   of reasonable use.  The same thing is true when the Little

5   Pauba was carved out.  And when we ratified the Treaty of Guada-

6   lupe Hidalgo and passed title to these ranches we didn't change

7   the law one whit.  Here were still pieces of ground that were

8   the Ranchos, here was ground inbetween that weren't the Ranchos,

9   here was ground elsewhere on the stream in the basins, and there

10  was a right of reasonable use, which is exactly what we talk

11  about when we say that correlative rights.  Therefore, I don't

12  think you have any greater rights from treaties than a person

13  who got land that was not part of a Rancho that at one time

14  had belonged to Mexico and had passed to the United States and

15  came on down.

16      I don't know whether Mr. Girard agrees with that general

17  theisis or not, but that is my tentative view on it.

18      MR. GIRARD:  Yes, I agree with it, too.  I also think there

19  are some federal statutes which provide that California law

20  shall apply.

21      THE COURT:  I'm not passing on it finally.  I have asked

22  Mr. Girard, whom I consider a competent lawyer, to do a little

23  briefing job on it, which has not been done by any of you

24  people.  We will see what he turns up.  You will get a copy of

25  it.

1    Any other counsel, upon receipt of Mr. Girard's brief, may

2    feel free to file a memorandum.  Also, any of the litigants may

3    file a memorandum.

4    MR. STAHLMAN:  We all attended the discussion in the room,

5    and I think we understand the situation now.  We have read the

6    Treaty and have heard the opinions of these people who make

7    these claims.

8    MR. GIRARD:  I was going to say that the brief will be con-

9    cerned only with the issue of Mr. Tarwater.  There are separate

10   problems involving situations which I don't think we ought to

11   go into.

12   MR. STAHLMAN:  You're not going to try the Fresno case here.

13   MR. GIRARD:  No, I don't want to.

14   MR. VEEDER:  Your Honor, if I may proceed, Ray Eberhard,

15   an attorney from Los Angeles, called me in regard to the property

16   of Owen E. Douglas.  Mr. Douglas was notified in connection

17   with this hearing today.  Col. Bowen had written a letter dated

18   March 31st, 1960, to Mr. Eberhard, setting out the irrigable

19   acreage and the total acreage.  Mr. Eberhard told me by tele-

20   phone that he was satisfied with this report.  I told him that

21   I would put Col. Bowen's letter into the record for him and

22   would advise him that that was acceptable to you, if it is

23   acceptable to you, your Honor.

24   THE COURT:  It is acceptable.  Have you got a copy of the

25   letter?

1    MR. VEEDER:  I will get copies.  I will hand you a copy of

2  it.  It is just a summarization.

3    THE COURT:  Where does this land lie, Col. Bowen?  In the

4  Murrieta Basin?

5    COL. BOWEN:  Yes, your Honor, it overlies the Murrieta

6  Basin.

7    THE COURT:  The Court would propose to make findings in

8  line with the letter of March 31, 1960, which will be government's

9  Exhibit 261, in evidence, and would find that the land is land

10  overlying a Basin and the owner has correlative rights with

11  other persons in the Basin and on the stream system.

12    MR. VEEDER:  Your Honor, you have extended your orders for

13  the purpose of making well measurements down to June 22nd, 1960.

14  In regard to the Roripaugh recorders, there will be an expira-

15  tion of that order on May 3rd.  I have talked to Mr. Krieger

16  about it.  He said he would notify me as to the acceptability

17  of an extension down to June 22nd.  May Mrs. Tooker present

18  this to you, if he agrees to it?

19    THE COURT:  Yes, it may be presented.

20    MR. VEEDER:  I think Mr. Yackey is the next one in order.

21    THE COURT:  Mr. Yackey.

22    Tell me what this is about.  This is a little different.

23    MR. VEEDER:  I think Mr. Yackey had better tell your Honor.

24    MR. GIRARD:  Your Honor, may I be excused?  I have to

25  catch a plane at 5 0'clock.

1    THE COURT:  Yes.

2    MR. GIRARD:  I understand that the next meeting is on May

3  26th.

4    THE COURT:  When is the next hearing?

5    MR. VEEDER:  May 26th, your Honor.

6    THE COURT:  May 26th is a Thursday; is that right?

7    MR GIRARD:  Yes, I think May 26th and 27th were set aside.

8    THE COURT:  Yes, May 26th and 27th.

9    MR. GIRARD:  I will have that memorandum in by then, your

10  Honor.

11    THE COURT:  All right.

12    Have you been sworn, Mr. Yackey?

13    MR. YACKEY:  Yes, I have been sworn this morning.

14                    GEORGE YACKEY,

15  one of the defendants herein, having been duly sworn, on his

16  oath was examined and testified as follows:

17    THE COURT:  Are you appearing as your own attorney?

18    THE WITNESS:  Yes sir.

19    THE COURT:  All right.

20    THE WITNESS:  To straighten it out, Judge Carter, my wife

21  and I, first, have certain property at Fallbrook that are in

22  the Utility District, practically in the town of Fallbrook,

23  that I see no reason why would not be covered by the findings

24  of fact or the interlocutory decree that was recently made.

25  Those properties consist of our former home on Quail Hill,

13,293

1   which is our answer, dated May 20, 1958, listed as the Santa

2   Margarita Drive property.  It was about 8 acres and since the

3   time we made this answer we sold 1.17 acres to Lieutenant

4   General G. F. Good, of the Marine Corps, retired.  The rest of

5   that land we own.

6       We have a piece of piece of property on Doherty Street,

7   listed as Doherty Street property that goes in that same cat-

8   agory.

9       And also we have an interest in a piece of property that

10  was on Kalmia Street that consisted of 3 city lots with some

11  improvements.  And in September, 1958, that property was sold

12  to the Teakell's.

13      All of those properties are not on riparian water and have

14  no wells or other sources except the Fallbrook Public Utility

15  District.

16      THE COURT:  You said something about it being included in

17  some interlocutory decree.  Have they been included?

18      MR. VEEDER:  Two of them are included, and there is one

19  with a spring on it and water rising on it and I don't believe

20  it comes within the purview of the interlocutory order your

21  Honor has been submitting to these people.

22      THE COURT:  You say that two of them are included in an

23  interlocutory order heretofore made?

24      MR. VEEDER:  That is right.

25      THE COURT:  Which two?

1    MR. VEEDER:   I would have to check them out.   I talked to

2 Mr. Yackey about it, and it is suitable to us in regard to those

3 two.

4    THE WITNESS:   I would say that these three could all be in

5 that interlocutory decree.

6    THE COURT:   Mr. Veeder said that two are already in a

7 decree.

8    MR. VEEDER:   We have already sent those to you, if our

9 records are right on that.

10    THE WITNESS:   That is agreeable to me.

11    MR. VEEDER:   That is what the records show.   I will have

12 it checked again.

13    But, in any event, we will handle those Fallbrook lots in

14 the same manner we are handling all the others, if it's all

15 right with your Honor.

16    THE COURT:   That is all right Mr. Veeder.

17    None of these three pieces you have listed is the piece

18 that has this spring on it.

19    THE WITNESS:   No.

20    THE COURT:   Tell me about it.

21    THE WITNESS:   It is a piece of property known as the De

22 Luz Road property that we sold to a man by the name of Patton.

23    THE COURT:   You sold it to Mr. Patton?   You have no interest

24 in it?

25    THE WITNESS:   We have just the financial interest in it,

1     covered by a deed of trust, your Honor.

2          THE COURT:  You have a deed of trust on it?

3          THE WITNESS:  Yes, and that  has a well supported by a

4     stream flowing through it.  And that is our only interest in

5     that property.

6          THE COURT:  The well is in the De Luz Creek, then?

7          THE WITNESS:  No, it is an un-named creek along the De Luz

8     Road from Fallbrook down to the Santa Margarita River.  It is

9     the creek where the water used to be derived for supporting the

10    railroad down at the bottom of the canyon in the old days.

11         THE COURT:  This property abuts on this creek or straddles

12    it?

13         THE WITNESS:  Straddles it.

14         THE COURT:  Has this property been located on any map?

15    ⸱   MR. VEEDER:  That is a point I tried to bring to Mr. Yackey's

16    attention in my office this afternoon.  We have several pleadings

17    filed by Mr. Swing.  Mr. Yackey himself has not filed an

18    answer in regard to that property that is involved.  I didn't

19    really realize that until he told me that he had not himself

20    answered it.

21         Now, there are a great many complex factors involved in

22    Mr. Yackey's claim.  He has reservoirs, he has wells, he has

23    alluvial areas, he has severences, it appears to me.

24         What is the Leisner place?

25         THE WITNESS:  You have gotten away from me, because the

1   information I'm talking about was in an answer I made on May 20,

2   1958, to you, and I am quoting verbatum from that.

3       MR. VEEDER:  If you are, it would be the same piece of land

4   that I am talking about.

5       THE WITNESS:  I don't know what you are talking about, but

6   I am quoting from a copy of the materials supplied to you.

7       MR. VEEDER:  Go ahead.

8       THE COURT:  Have you pulled out the answer?

9       MR. VEEDER:  Yes, I have the answer here, your Honor.

10      The point I was going to make to your Honor is that I

11  think we could save time by having Col. Bowen check out these

12  installations that are involved and the areas that are involved,

13  because, as I explained to Mr. Yackey, I don't want to go into

14  extended cross-examination in regard to these matters.  I know

15  generally his properties.

16      THE COURT:  Why don't we have a survey made?

17      THE WITNESS:  I don't think it would be necessary on all

18  of these.  I was trying to clear them up.  I came in yesterday

19  to Mr. Veeder's government office here to find out whether I

20  couldn't get this straightened out, as per the invitation I

21  received.  I called the Base last week and talked to Commander

22  Redd about it.  I came in yesterday and they were gone.  I came

23  back again today and at noon time, by appointment with Mr.

24  Veeder, I talked to him about this, and it was decided at that

25  time that I would go ahead just like I'm going ahead now.

1    I mentioned that there are three of these parcels that we

2  don't have any interference or question about whatever, this

3  De Luz Road property, I believe, deserves an answer, and the ot

4  other property I'm going to talk about afterward are entirely

5  different problems.

6    THE COURT:  How many acres are there in this De Luz Road

7  property?

8    THE WITNESS:  Approximately 40.

9    THE COURT:  And is the legal description set forth in your

10  answer?

11    THE WITNESS:  It is, sir.

12    THE COURT:  Let me see the answer.

13    THE WITNESS:  The last item (handing document to the Court).

14    MR. VEEDER:  I want to be sure that you and I are looking

15  at the same thing, Mr. Yackey.  Is this the De Luz property to

16  which you are referring here?

17    THE WITNESS:  This piece here.

18    THE COURT:  The last description on Exhibit A attached to

19  that answer.  Do you show the date of the filing of that answer?

20    MR. VEEDER:  Yes, your Honor.  It doesn't have the filing

21  date on this matter.  May 20th, 1958, your Honor.

22    THE COURT:  That is close enough.

23    Now, this boarders a stream?

24    THE WITNESS:  Yes sir.

25    THE COURT:  I mean it straddles a stream, un-named?

1    THE WITNESS:  Yes.

2    THE COURT:  Did you acquire it all at one time, the 40

3    acres all in one piece?

4    THE WITNESS:  I did.

5    THE COURT:  You will run down the title on it, I take it?

6    MR. VEEDER:  Yes, your Honor.

7    THE COURT:  Does this stream flow in the summer or only in

8    the wintertime on the surface?

9    THE WITNESS:  To the best of my knowledge, during the years

10   that I observed it, it was flowing constantly.

11   THE COURT:  All the year around?

12   THE WITNESS:  Yes sir.

13   THE COURT:  When was the last year that you observed it?

14   THE WITNESS:  About a year ago.

15   THE COURT:  How many acres are you presently irrigating?

16   THE WITNESS:  I have nothing to do with this except the

17   owning of the property interest, and as far as I know he is

18   not irrigating any of it since he bought it.

19   THE COURT:  How much is irrigable of the 40 acres?

20   THE WITNESS:  Oh, most of it would be house sites.  You

21   asked me a question, and I answered you correctly, Judge Carter.

22   I bought it in one piece.  However, I believe there was a prior

23   severence of 2 acres astraddle the old creek and the rest was

24   back of it.  That was many years ago.  So if there is any right

25   to it, it would be a prescriptive right, because the former

1    owner had bees and some other activities on the property.

2       THE COURT: You think there was a 2 acre piece straddling

3 the stream, which was severed from the other 30 acres at one

4 time?

5       THE WITNESS: I wouldn't be suprised it had been at one

6 time. He has acquired a prescriptive right to use the water

7 back of it.

8       THE COURT: How would you say he has acquired a prescrip-

9 tive right to use water on 2 acres?

10       THE WITNESS: By carrying it back. He had a pump in there

11 and diversion works.

12       THE COURT: Where did he carry it? Over the whole 38 acres?

13       THE WITNESS: I don't know. I know he had bees and a bee

14 house on the property before I bought it.

15       THE COURT: Do you know which side of the stream he carried

16 it on?

17       THE WITNESS: He worked it on both sides of the stream,

18 but to the west is where the majority of the use would have to

19 be.

20       THE COURT: If he had bees, what was the use for the water?

21       THE WITNESS: In the buildings that he used, in the apiary

22 that he had, where he worked his honey over. I don't know what

23 else he did, whether he planted plants for the bees or not. I

24 don't know.

25       THE COURT: That is all you know about that?

1        THE WITNESS:  Yes.  And all my interest in that is financial.

2        THE COURT:  What is the next parcel you want to talk about?

3        THE WITNESS:  The next properties are considerably north

4  of the Santa Margarita River over on Sandia Creek, and they

5  involve the old Marchant Ranch.

6        MR. SACHSE:  I suggest that you put your exhibit up there

7  so his Honor will see what you are talking about, Mr. Yackey.

8        MR. VEEDER:  I wish we could identify these in some way.

9  This is my concern, your Honor.  Each one presents a legal

10  problem.  He does have a map that we gave him.

11        May I have a copy of that map, Mr. Yackey, so that I can

12  follow along?

13        THE WITNESS:  Yes.

14        MR. SACHSE:  Why don't you put it on the board?

15        THE WITNESS:  This is the government's former Exhibit 69,

16  and it was suggested that I use it in order to simplify the

17  work, and I did.

18        THE COURT:  You took the base of Exhibit 69 and you then h

19  have added some things to it.

20        THE WITNESS:  Yes sir, that is right.

21        THE COURT:  What number shall we give this exhibit?

22        MR. VEEDER:  I don't think we had better have a government

23  number on it.

24        MR. SACHSE:  Give it a Yackey number.

25        THE COURT:  Call it Yackey's Exhibit A.

1    MR. VEEDER:  To the end that I may stay on the sled, I

2  want to be sure I follow along on this.  Is this the one as to

3  which you are claiming an appropriative right?

4    THE WITNESS:  No, I haven't got to that one yet.

5    THE COURT:  It will be marked for identification, Yackey's

6  Exhibit A.

7    You have drawn in in blue the area of Section 36, except

8  a portion boardering on the stream and the two branches thereof;

9  is that correct?

10    THE WITNESS:  Yes.  I would like to start with the piece
            Section
11  above/36, which is Section 25.  It is a triangular shaped piece.

12    THE COURT:  Can we talk about this piece while we're at it?

13    THE WITNESS:  If you wish, sir.

14    THE COURT:  What is the name of these streams?

15    THE WITNESS:  The one on the right is the un-named tributary

16  to Sandia Creek.  The one on the left is Sandia Creek, formerly

17  called Bear Creek.  Section 36 I do not own.  It is owned by

18  my sister, and I act for her under a power of attorney.

19    THE COURT:  What is her name?

20    THE WITNESS: Millicent Y. Taylor.  I have "Taylor" written

21  across the middle of Section 36.

22    THE COURT:  She owns this as her separate property?  Her

23  husband has no interest in it?

24    THE WITNESS:  She is a widow, sir.

25    THE COURT:  Has she filed an answer?

1        THE WITNESS:  She has, sir.

2        THE COURT:  Has she set up this description?

3        THE WITNESS:  Pardon me.  I filed an answer in her behalf.

4   It was filed on the same date as the other.

5        THE COURT:  The copy shown me by the witness has at the

6   bottom "May 20, 1958."  It was probably filed about the same

7   time as the other.  It is the answer of Millicent Y. Taylor,

8   and it has an appendix and Exhibit A that list all of Section

9   36 except a portion described by metes and bounds.

10       Is that a correct description?

11       THE WITNESS:  Approximately 24 acres that was deeded to

12   the Fallbrook Public Utility District.

13       THE COURT:  And this section is the area astraddle the un-

14   named creek and Sandia Creek?

15       THE WITNESS:  Yes sir, the "Y" shaped portion in the

16   southern part of Section 36.

17       MR. VEEDER:  That was exactly the question I asked you,

18   Mr. Yackey, so that I could follow through.

19       You are now back on the one Millicent Taylor signed by you?

20       THE COURT:  That is right.

21       MR. VEEDER:  That is 616 acres; is that right?

22       THE WITNESS:  Approximately, yes sir.

23       THE COURT:  616 acres?

24       THE WITNESS:  Yes sir.

25       THE COURT:  How much of that is irrigable?

1   THE WITNESS:  I figure approximately 492 acres, sir.

2   THE COURT:  And does water run in this un-named creek in

3   the summer?

4   THE WITNESS:  It has run in the upper end, as far as I

5   know, as long as I have been around.  At the southern end,

6   however, it goes into the ground and disappears in most years.

7   THE COURT:  What about Sandia Creek?

8   THE WITNESS:  That is Sandia Creek.  The un-named creek is

9   only a dry ravine except when there is run-off from rains.

10  Sandia Creek comes into Section 36 as a surface stream practically

11  always, and to the best of my knowledge it has always done it,

12  and at the south end it has disappeared into the ground in the

13  driest parts of the summer.  Some years it runs all summer.

14  Some years it surfaces in the afternoon or night time and in

15  the day time dries up again.

16  THE COURT:  Tell me about this land in Section 25.

17  THE WITNESS:  The land in Section 25 is the old Marchant

18  Ranch.  It is owned by my wife and me, and it is the property

19  on which we live.  It grosses 224 acres, of which I estimate

20  193 acres is irrigable.  To the right of it is 100 acres in

21  Riverside County, which was a part of this property at the time

22  the lis pendens was filed and so we treated it as one piece.

23  However, we sold it.

24  MR. VEEDER:  Mr. Yackey, may I interrupt just a minute,

25  because I want to be sure I know where you are going.  Are you

1   speaking now of the Lisner property?

2       THE WITNESS:  Yes.  We sold it.

3       MR. VEEDER:  And that is in Section 31?

4       THE WITNESS:  Yes.

5       THE COURT:  You said there was something in Riverside

6   County.

7       THE WITNESS:  Yes.  The Riverside County line (indicating),

8   it cuts those 2 pieces.  All the part in Section 25 is owned

9   by my wife and me now, and the other portion is owned by the

10  Leisners.

11      THE COURT:  Who are they?  Are they related to you?

12      THE WITNESS:  No, no relation.

13      THE COURT:  Do you have any security interest in that

14  property?

15      THE WITNESS:  No sir, but I have a power of attorney to

16  act for them in water matters.

17      MR. VEEDER:  Are you going to file those?

18      THE WITNESS:  I am going to file those today.

19      MR. VEEDER:  Your powers of attorney in both instances?

20      THE COURT:  Have the Leisners filed an answer?

21      THE WITNESS:  No sir, because at the time I filed, I

22  filed on the whole thing.

23      THE COURT:  This Leisner property doesn't abut on any

24  stream, does it?

25      THE WITNESS:  No sir,  I am not certain of the riparian

13,304

1  rights.  Any right I could see it would have would be a pre-

2  scriptive right due to the fact that for years it was coupled

3  to, and used by, the Marchants as part of the Marchant property.

4  MR. VEEDER:  Your Honor, I object to this because I think

5  this is hearsay in  regard to these claimed prescriptive rights.

6  I don't believe he knows these things personally.

7  THE COURT:  Just a minute.  We will start all over again.

8  A hundred acres in that last piece of property?

9  THE WITNESS:  Yes.

10 THE COURT:  How many are irrigable?

11 THE WITNESS:  I figure 80 acres.

12 THE COURT:  It does not abut on any stream?

13 THE WITNESS:  Only what I would call the dry stream beds,

14 but which cut through it and which are tributaries of Sandia

15 Creek.

16 THE COURT:  Do you know, of your own knowledge, of any use

17 of water on the Leisner property?

18 THE WITNESS:  No sir, I don't; but my knowledge is rather

19 scant over a 2 year period.

20 THE COURT:  Has any of that property been cultivated or

21 irrigated, to your knowledge?

22 THE WITNESS:  Yes sir; a considerable amount of the land

23 has been cleared and cultivated at different times.

24 THE COURT:  How much of the 100 acres?

25 THE WITNESS:  I wouldn't know.  Not over 75.

13,305

1    MR. VEEDER:  In this regard, I regret to have to interrupt, but

2    I submit that this witness doesn't know these things of his

3    own personal knowledge, your Honor.

4    THE COURT:  He knew how much had been cleared, and obviously

5    at some time or another had been cultivated.  That's all he

6    says.  That's all I'm asking about now.

7    MR. VEEDER:  Is he observing it from broken ground or

8    brush cleared, or what is it?

9    THE WITNESS:  That is right; brush cleared and broken

10   ground.

11   THE COURT:  But you don't know, of your own knowledge, of

12   any use of water on that land?

13   THE WITNESS:  No sir.

14   THE COURT:  What about the piece of ground in Section 25?

15   What do you know about that?

16   THE WITNESS:  That piece is highly developed.  It has been

17   all cleared, preactically at one time, and it has a maze of

18   pipelines over it; it has wells and one spring and a number of

19   dams and reservoirs.  It is quite highly developed.  It has two

20   houses and a number of other buildings.

21   THE COURT:  Is it astraddle any stream or tributary?

22   THE WITNESS:  Yes sir, it straddles a tributary that comes

23   from the east across to the west and enters Sandia Creek.  There

24   is a spring, as shown on the map, on the right-hand portion --

25   "Spring and dam" it says, and that spring was a developed spring

1    and there is a dam below it 8 feet high and it supplies enough

2    water, normally, to take care of the domestic plantings and

3    orchards.

4        THE COURT:  Do you know when the dam was built, of your

5    own knowledge?

6        THE WITNESS:  No, I can't give you the exact date.  The

7    former owner bought the property in 1933.

8        MR. VEEDER:  Again, this is a hearsay, your Honor.

9        THE WITNESS:  I could find that because it was a United

10   STates soil conservation project.  They designed it and financed

11   the building of it.  And from that spring water flows down to

12   right below the figure 25 where there is a larg dam that im-

13   pounds water, and below that dam a ways is a well that re-

14   captures the water that seeps through from the spring and from

15   the reservoir described in back of the dam, and that is called

16   a domestic well and that supplies the domestic water for the

17   house.  Then downstream below that is another soil conservation

18   dam that is larger than the one above, and in the wet years it

19   impounds quite a little water, but in the dry years we don't

20   use it as a holding reservoir, as a rule.

21       THE COURT:  When is it a holding reservoir?

22       THE WITNESS:  It catches run-off water that comes down the

23   stream during rains and during run-off periods.

24       THE COURT:  And retains it?

25       THE WITNESS:  Yes sir.  And right below that dam is what

1  we call the east irrigation well, which currently is the main

2  irrigation well for the property, and that is just east of

3  Sandia Creek and it is drilled considerably below Sandia Creek.

4       THE COURT:  How deep is it?

5       THE WITNESS:  I think it is in the neighborhood of 40 feet.

6  I would have to check that to be sure, your Honor.

7       THE COURT:  How big a well is it?

8       THE WITNESS :  About 5 feet in diameter.  It has a five

9  horsepower motor on it.

10      THE COURT:  Then there is a west irrigation well, west

11  of Sandia Creek?

12      THE WITNESS:  Yes sir.  I might add that that east irriga-

13  tion well is currently operating at 90 gallons per minute with-

14  out any draindown.

15      THE COURT:  What do you mean by "currently?"  In the

16  month of April?

17      THE WITNESS:  No sir, since I have been there, in about a

18  two year period, it supplies water and keeps a pressure tank

19  full at the rate of at least 90 gallons a minute.

20      THE COURT:  For how long a time?

21      THE WITNESS:  All year around.

22      THE COURT:  It pumps 90 gallons a minute and you pump a

23  pressure tank full, but when the tank gets full it cuts off?

24      THE WITNESS:  Yes sir, except during irrigation the well

25  pumps at approximately 90 gallons a minute and keeps on going.

1      THE COURT:  Two or three days at a time?

2      THE WITNESS:  We use it, generally, not over three days a

3  week.  It has been used, however,  probably a lot more than we

4  have used it.  I have only been back about two months and

5  haven't had very many summer months that I have been there,

6  although I had caretakers take care of it.

7      The west irrigation well is another well about 4 feet in

8  diameter and I think about 80 feet deep and it was tested for

9  150 gallons a minute.

10      THE COURT:  When was it tested for 150 gallons per minute?

11      THE WITNESS:  At the time of the construction.

12      THE COURT:  When was that?

13      THE WITNESS:  I am not certain when it was, but I think

14  it was 1951, because all the electrical equipment was put in

15  and the company, Weeb Brothers, delivered the pump to install

16  it, and within a matter of several days around there Mr.

17  Marchant had received his first summons in this suit and so he

18  abandoned it -- he refused to put the pump in.

19      MR. VEEDER:  That is objected to as being hearsay, your

20  Honor.

21      THE COURT:  Overruled.

22      It has no pump in it?

23      THE WITNESS:  It has no pump in it at this time; no sir.

24      THE COURT:  It never has been pumped?

25      THE WITNESS:  Except for test pumping.

1    THE COURT:  When it was drilled?

2    THE WITNESS:  Yes sir.

3    THE COURT:  It is below the creek bed?

4    THE WITNESS:  It is below the creek bed considerably.  Mr.

5    Marchant had cleared it out, and it is still cleared and still

6    used as a planted grain field, the area surrounding it, approx-

7    imately 15 acres.

8    THE COURT:  But he had never irrigated it?

9    THE WITNESS:  He had never irrigated it.  He had the pipe

10   and the material and everything, but as far as I know he never

11   irrigated it, and I have never irrigated it.

12   THE COURT:  The fact that he had never irrigated it would

13   not keep him from exercising the right.

14   THE WITNESS:  That is right.  He intended to use it as a

15   permanent springs.  He has the layouts, but I haven't gone into

16   it.

17   There is one other small dam that doesn't ammount to much.

18   It is between the domestic well and the reservoir at the house.

19   That is a concrete dam.

20   THE COURT:  You don't show it on the map here?

21   THE WITNESS:  No sir.  It's right in there.

22   THE COURT:  You do or you do not show it?

23   THE WITNESS:  I do not show it, your Honor, on your map.

24   MR. VEEDER:  It is not on Yackey's Exhibit A.

25   THE WITNESS:  No sir.  It is a very small dam about 6 feet

1      high and about 30 feet long.

2          THE COURT:  6 feet high and 30 feet long?

3          THE WITNESS:  Yes.

4          THE COURT:  How much water is impounded behind it?

5          THE WITNESS:  I would say not over 300,000 gallons, which

6      is about a third of an acre foot.

7          THE COURT:  It fills it up?

8          THE WITNESS:  The same creek that comes from the spring to

9      the impounding reservoir and the seepage comes down.  There is

10     a running stream in that canyon to the west from the spring and

11     from this other reservoir.

12         THE COURT:  What do you use that reservoir for?

13         THE WITNESS:  That reservoir is currently filled with silt

14     from a flood a few years ago.  But it was formerly used for a

15     swimming pool.  It has a 6 inch pipe out of the bottom and a 4

16     inch pipeline leading away from it, and they used it everyday

17     for irrigation down below at one time.

18         THE COURT:  Now, you have something else drawn on Section

19     36, a dam and some diversion works.  What is that?

20         THE WITNESS:  In Section 36 the former owner, Mr. Alex

21     Hanson, who died in 1950, in about 1934 had filed an application

22     and had secured a permit from the State of California, the

23     predecessor of the Board of Water Resources, for a dam and

24     diversion, and he had two diversion points and two supply dams.

25         MR. VEEDER:  May I interrupt?  I don't know how to handle

1      this thing.  Is it all right if I inquire?

2          THE COURT:  I don't either.  Do you have a copy of this

3      application that he made?

4          THE WITNESS:  No sir, I don't, because I was coming to the

5      point that the permit was revoked after he died and before his

6      estate was settled.  It was revoked during the time that we

7      were negotiating, my sister and I, for the purchase of the

8      property for her, and unbeknownst us it was revoked; and when

9      I found out about it it was too late to do anything about it.

10     That diversion, however, is mentioned in Bullitin 57 of the

11     State's Santa Margarita Report, on the last page in volume 2,

12     I think, and it called for 2½ cubic feet per second diversion.

13         MR. SACHSE:  It is one of the appendicises to Bullitin 57

14     and it is listed as the Hanson Deversion.

15         MR. VEEDER:  It is not a reservoir.

16         MR SACHSE:  No, it is a stream diversion.

17         I think, to clear the record, though, Mr. Yackey would

18     stipulate, to make this clear to your Honor, that that permit,

19     as Mr. Yackey says, has been revoked by the State Water Rights

20     Board and that it is now the subject of a new application.

21         THE WITNESS:  I'm getting to that.

22         MR. SACHSE:  In other words, the permit that he has just

23     mentioned is not going to be before this court, if I conceive

24     the law correctly.  It will be a new application in Mr.

25     Yackey's name.

1    THE COURT:  What appendix is this in Bullitin 57?

2    MR. SACHSE:  Can you show it to his Honor?

3    THE COURT:  Applications to appropriate water?

4    MR. SACHSE:  Yes, it is a list of diversions and applica-

5    tions.

6    MR. VEEDER:  The reason the matter has some significance

7    to us is that it is a part of the answer --

8    THE COURT:  The application to appropriate water that he

9    refers to is shown in Appendix K.

10    MR. VEEDER:  Of State's Exhibit L.

11    THE COURT:  State's Exhibit L, Appendix K-2.  We can read

12    it right in: Application #8007, date filed --

13    MR. VEEDER:  I object on the grounds that it is incompetent,

14    irrelevant and immaterial, your Honor.  The permit has been

15    cancelled.  It has not a breath of life in it.

16    THE COURT:  At least it gives us some description and

17    information.  Let's put it in.  It has been revoked.  I don't

18    think it has any present bearing.

19    THE WITNESS:  May I have a statement on that?

20    THE COURT:  Let's put this in: Date filed, 7-3-34, Estate

21    of Alexander F. Hanson, diversion #8S4W36D Sandia Creek,

22    location of point of diversion northwest quarter of the north-

23    west quarter of Section 36, Township 8 South 4 West SBM;

24    amount applied for, 2.5 cubic feet for irrigation and domestic

25    use; status of permit.

THE WITNESS

1      THE WITNESS:  What I would like to comment, if I may

2  without interruption.

3      MR. VEEDER:  I'm going to interrupt you if you go too far.

4      THE WITNESS:  That this permit was issued and it was shown

5  in the State records as being a valid permit for a number of

6  years after this particular suit that we are in today was filed,

7  and it is possible that your Honor may take a look at certain

8  things from an attitude of what happened prior to the develop-

9  ments in this case, and we have some later developments that

10  apply to this, and I just want to bring out that until 1957 or

11  1958 this particular permit was valid.  On that particular permit,

12  the permittee had erected the dam and the diversion works,

13  they still exist, and had put in pipelines and had cleared land

14  to use this water on and was in the process of continuing the

15  development.  He was going right on along with it in a noble

16  fashion when, in 1950, he died and his estate, as I said, was

17  very slow in being settled and the trustee or executrix of the

18  estate did not dispose of the land until we bought it, and

19  during that time they took no interest in the property and that

20  is why the permit was revoked, because it was not put to

21  beneficial use.

22      THE COURT:  The permit has been revoked.

23      THE WITNESS:  That is right.

24      To go ahead with that piece of property, we have filed an

25  application, my sister owning Section 36 and our owning part of

1    Section 25, combining the two pieces probably for the first

2    time in history, and we filed an application with the state,

3    #18393, after the Fallbrook Public Utility District received its

4    permit from the State on the Santa Margarita, Rainbow Creek and

5    Sandia Creek, and we filed an application to take 1800 acre-

6    feet of water out of this Creek during the winter run-off

7    months.

8    　　MR. SACHSE:  If you have a copy of that application, I

9    think you ought to file that with the Court.  That is just a

10   suggestion.

11   　　THE WITNESS:  I have a copy that was made especially here

12   (handing document to the Court).  This has been processed

13   through advertizements, map-making and everything about it,

14   and the hearing was held on March 23rd, I believe, at Los

15   Angeles, by the State Water Rights Board.  I recognize, Judge

16   Carter, that you can decide what you wish and we will abide by

17   it on water rights, but at this time I know you are leaving it

18   up to the Water Rights to make their determination, and the

19   determination of this is now before the State Water Rights

20   Board and I know after they are through with it you will act

21   as you see fit.

22   　　THE COURT:  All I would propose to do would be to find

23   that you have filed an application on such and such a date,

24   number so-and-so, to appropriate 1800 acre-feet of water per

25   year for domestic, irrigation, stock water, recreation and

1   incidental uses, etc; that the matter has not yet been deter-

2   mined, or meanwhile, if it is determined by the State Water

3   Rights Board, find what the Board determined.

4        THE WITNESS:  That is what I thought, and I thought there

5   would be no argument about it.  There is the map that accom-

6   panied it.  I have marked out the names of the properties, and

7   there is a dam that shows and the development as it would be.

8        THE COURT:  Do you propose to build a dam up there?

9        THE WITNESS:   Yes, sir, we propose to build a dam -- in

10  fact, if we get the permit we will proceed to build a dam as

11  quick as we can.

12       THE COURT:  How big a dam do you propose to build?

13       THE WITNESS:  It will hold approximately two thousand

14  acre feet of water.  We are asking for 1800 acre feet a year,

15  but we realize that we will not get it by cyclic collections.

16  And we probably will not drain the reservoir every year,  so

17  that we probably will not take anywhere near 1800 acre feet a

18  year, even if it is available.

19       MR. SACHSE:  For the record, the application is being

20  protested by the Fallbrook Public Utility District.

21       THE WITNESS:  It was heard at a public hearing.

22       THE COURT:  Did the Government also protest it?

23       THE WITNESS:  They appeared, but didn't protest.

24       MR. SACHSE:  They protested, but didn't appear.

25       MR. VEEDER:  I filed the protest and appeared specially

1   on the matter.

2       My own view on this is -- it's extremely important, I

3   believe, in the litigation -- certainly the map to which you

4   are now referring is a highly technical document.  There is no

5   evidence that Mr. Yackey is trained from the standpoint of

6   hydrology and similar matters.

7       MR. SACHSE:  Mr. Veeder, let's not make it more difficult.

8   He qualified as an expert for Fallbrook.  I'm opposing him on

9   the application.

10      MR. VEEDER:  The point I am trying to make is that from

11  the map you will observe that there is a great deal of material

12  there.

13      THE COURT:  I have indicated what I am going to find

14  about it.  I am not going to retry the State Water Rights

15  Board's activities.  I propose that we mark this application

16  and the copy of the application and the copy of the map in

17  evidence as part of his claim here.  Is there any objection to

18  that?

19      MR. VEEDER:  I am going to object to the whole thing,

20  because I think there is no proper foundation for it.  If I

21  understand it, the only thing you are saying is, "Here is a

22  man who appeared before the State Water Rights Board and made

23  an application on such and such a date."

24      THE COURT:  That is all I propose to find now, unless

25  somebody convinces me to the contrary.

13.317

1      You have no objection to his copy of his application?

2      MR. VEEDER:  No, I certainly do not.

3      THE COURT:  All right, a copy of his application will go

4  in as Exhibit B.

5      (The document above referred to was marked and received

6  in evidence as Yackey's Exhibit B.)

7      MR. VEEDER:  Simply evidencing that he filed an applica-

8  tion.

9      THE COURT:  That is all it does.

10      And Exhibit A, his map, will be received in evidence --

11  the first map that we have been talking about.

12      THE WITNESS:  Would you like to make that map I just gave

13  you a part of the exhibit?

14      THE COURT:  Is this attached?

15      THE WITNESS:  It is a part of it.  Normally, it followed

16  it.  Normally, it would be submitted together.

17      THE COURT:  If it is part of the application --

18      MR. VEEDER:  But it was not filed as part of the

19  application.

20      THE WITNESS:  Make a separate one out of it, then.

21      MR. SACHSE:  It is not part of the application.

22      THE COURT:  You drew this map, did you?

23      THE WITNESS:  Yes, sir.

24      THE COURT:  You are an engineer?

25      THE WITNESS:  Yes, sir.

1       THE COURT:  You were, for many years, some official with

2   the Fallbrook Public Utility District?

3       THE WITNESS:  Yes, sir.

4       THE COURT:  What were you?

5       THE WITNESS:  Chief Engineer and General Manager.  And

6   as a registered engineer I prepared and signed that.  I am

7   registered in California and Hawaii.

8       THE COURT:  Exhibit C.  Do you offer it in evidence?

9       THE WITNESS:  Yes, sir.

10      THE COURT:  Exhibit C received in evidence.

11      (Copy of Yackey's application to the State Water Rights

12  Board was marked and received in evidence as Yackey's Exhibit

13  B.

14      (Defendant Yackey's map was marked and received in evidence

15  as Yackey's Exhibit C.)

16      THE COURT:  But I will tell you now, Mr. Yackey, what I

17  propose to find is that you have an application pending, and

18  whatever the status of that application is, whenever we get

19  ready to draw our conclusion.

20      THE WITNESS:  I realize that a hundred percent.

21      I would like to add one other thing.  During the time

22  that Section 36 was owned by the Hanson Estate and the

23  partial Section 25 was owned by Mr. Marchant, answers in this

24  suit were filed by Mr. Swing for those defendants.

25      THE COURT:  Did you file any answer?

1    THE WITNESS:  No, sir, because I didn't think it was in

2  order.

3    MR. VEEDER:  The answer is "No."  I don't think "because"

4  is important.

5    THE WITNESS:  The filing of these papers by Mr. Swing was

6  synchronized with just about the date I bought it.  In fact,

7  you will notice that the date of Mr. Swing's filing shows

8  after the date that I filed on the other properties that we

9  owned.

10    MR. VEEDER:  In that connection, your Honor, you will

11  observe that there are references throughout the pleadings to

12  structures, wells,acreages, locations.  The evidence that has

13  gone in doesn't support any of the averments in those plead-

14  ings.  I have no desire to make it more difficult for Mr.

15  Yackey.  I have tried to be very lenient on it.  We would like

16  to have access to check out these various structures.

17    THE COURT:  May the Government have access to go on and

18  make a survey?

19    THE WITNESS:  They haven't so far.

20    THE COURT:  May they have?

21    THE WITNESS:  Yes, sir.  In fact, I would welcome Colonel

22  Bowen.

23    MR. VEEDER:  In other words, I will leave the matter in

24  its present status, if that is  agreeable to your Honor.

25    THE COURT:  All right.

1        MR. VEEDER:  And if there is any question, we will bring

2   it to your Honor's attention.  Is that agreeable?

3        THE COURT:  All right.

4        THE WITNESS:  Before we get off this track, I was refer-

5   ring, your Honor, to Mr. Swing's answers, which you might say

6   were good legal jobs that were contracted for and paid for and

7   under which I wish to stand insofar as --

8        THE COURT:  Let me advise you right now that your answer

9   doesn't constitute proof of any kind.

10       THE WITNESS:  No, sir.

11       THE COURT:  In two paragraphs Mr. Swing could have denied

12  the allegations of plaintiff's complaint and alleged that you

13  assert a claim to water, and you would have been in court just

14  as much as you are with twenty pages.  So the allegations in

15  the answer are not proof.

16       THE WITNESS:  No, sir.  But I just wanted to  show on

17  what we stand.

18       MR. VEEDER:  That was the reason that I brought it up.

19  I have no objection if those things are in there.

20       THE COURT:  The allegations in the answer are not proof.

21       MR. VEEDER:  That is right, your Honor.

22       THE COURT:  They are just allegations.

23       THE WITNESS:  I don't think it is necessary, and if your

24  Honor agrees with me I will not go into any long harangue over

25  the points that the Government raised in its claims.  I think

    that has been rehashed a number of times.

1     THE COURT:  What claims?

2     THE WITNESS:  In filing its action, it stated a number of

3  paragraphs about the damage that was being done to the Govern-

4  ment.  I want to deny the responsibility for any damage to the

5  Government.

6     MR. VEEDER:  That is already in the answers.

7     THE WITNESS:  The Government is using the Santa Margarita

8  water out of the watershed for non-riparian uses.  It was poor

9  water management practices.

10     MR. VEEDER:  Your Honor, he has no right to --

11     THE COURT:  I consider this just argument, Mr. Veeder.

12     THE WITNESS:  I say, I don't believe there is necessity

13  of doing this.

14     THE COURT:  I don't believe so either.

15     THE WITNESS:  All right, sir, I will leave it.

16     Would you like to see the copies of the powers of

17  attorney that I have?

18     MR. VEEDER:  I would like to have it marked and made

19  part of the record, Mr. Yackey.

20     THE WITNESS:  I have just the originals.  I have copies,

21  but on the copies the signatures did not come out quite right.

22  But I would like to be able to get back these powers of

23  attorney at some time.  These copies were made on a machine

24  and they are not good copies.

25     THE COURT:  They don't have to be good copies.

1      THE WITNESS:  They are verbatim.

2      THE COURT:  Why don't you just take a pencil or pen and

3 ink and make these copies and use the copies?

4      Is there any objection to that?

5      We will look at the original, and then hand back the

6 original to you.

7      MR. VEEDER:  That is all right.

8      THE WITNESS:  That would be very helpful.

9      THE COURT:  Fill in the copy so that it will correspond

10 with the original.

11      We will make the powers of attorney Exhibit D, both of

12 them, and receive them in evidence.  Dress up a copy for the

13 Clerk so that it looks like the original.

14      THE WITNESS:  All right, sir.

15      THE COURT:  Fill it in with the names so that he can

16 read it.  Print the names.  Don't try to copy the signatures.

17      THE WITNESS:  Yes, sir.

18      (Copies of certain powers of attorney were marked and

19 recieved in evidence as Yackey's Exhibit D.)

20      THE COURT:  Is that all you have to present now?

21      THE WITNESS:  I think so, sir.

22      MR. SACHSE:  I have no cross examination, your Honor.

23      THE COURT:  See if I agree with you.  The only thing you

24 have indicated so far was as to your application for a permit.

25 That is about what I would find.

1    As to your dams, there may be a serious question about

2 those dams, unless they are used merely for overnight storage

3 or something of that sort.  You understand that, don't you?

4    THE WITNESS:  Yes, sir.  The dams that are in there are

5 described by Mr. Swing in his reply as being just holdover

6 operational reservoirs.

7    MR. VEEDER:  That is exactly the objection that I was

8 making.

9    THE COURT:  Again, what Mr. Swing stated in the answer

10 is not evidence.  Your proof indicates that they are not dams

11 that hold water for a short period of time; that they collect

12 water out of the spring and out of the stream and store it

13 there, and then one of the tanks picks up the water below.

14    THE WITNESS:  We pump water into the reservoir.  We can

15 do it from the spring, too.  But we pump water back into those

16 reservoirs for the purposes of water operations on the ranch.

17 They don't hold from winter to summer.  There is not enough

18 water generated in any of those streams to take care of all

19 the reservoirs.

20    THE COURT:  How long do they hold?

21    THE WITNESS:  This year, for example, the only water that

22 we have generated has been out of the spring.  The big

23 reservoir would have been dry if we hadn't been pumping water

24 back into it.  We pump water every few days or every week.

25    THE COURT:  We might as well postpone any further hearing

1   on your matter until after the government report comes in and

2   see what the government's evidence is, and if you want to be

3   heard further, you may be heard further.

4        THE WITNESS:  If there is anything further to be heard at

5   all, I will be heard, will I not?

6        THE COURT:  Yes.

7        MR. STAHLMAN:  May I postpone cross-examination?

8        THE COURT:  You might as well.

9        MR. VEEDER:  We want to be sure that we have authority to

10  go on Mr. Yackey's place.

11       THE COURT:  He has agreed.

12       MR. STAHLMAN:  We will postpone our cross-examination.  I

13  have only one question.

14       THE COURT:  You will probably have to come back in, Mr.

15  Yackey, when we get this government report and see what the

16  government has to say about it.

17       THE WITNESS:  All right sir.

18       THE COURT:  Anything further?

19       MR. SACHSE:  Your Honor, my calandar is wrong, apparently.

20  At least, it does not jibe with that of other counsel.  Are we

21  on for May 26th and 27th?

22       THE COURT:  That is right.

23       MR. SACHSE:  I had it for tomorrow and not for May 27th.

24  We are not on for tomorrow?

25       THE COURT:  No.  You don't have anything to present?

1     MR. VEEDER:  We don't have anything anyway.

2     THE COURT: It sounds to me like you have run out again.

3     The only thing I have in my book was that there were a

4  thousand lawyers or so who filed answers on little bits of

5  ground here and there.  You were going to notify the whole

6  bunch of them to be here?

7     MR. VEEDER:  I have written a memorandum to your Honor in

8  that regard.  We are going to have Mr. Grover, we are going to

9  have people in from the Murrieta area.  If you want me to

10  notify the lawyers, I'll be gald to do it.  I just want to

11  bring it to your attention.

12     THE COURT:  I want two days of work.

13     MR VEEDER:  I will notify the lawyers, if that is what

14  you want, and simply say that they are to be in here to be in-

15  formed by your Honor as to the status of the case.

16     THE COURT:  I thought we were going to notify the lawyers

17  to come in and find out who had matters that might take any

18  lenght of time, and if so, schedule some hearings and we will

19  get through with some of them.

20     MR. VEEDER:  That is the kind of a letter we will write.

21     THE COURT:  Do you advise these lawyers before that time

22  what your evidence shows as to their defenses?

23     MR. VEEDER:  Where ever there is counsel we haven't put in

24  any evidence for them, just a general aoverall approach.  I

25  propose to formulate a letter for your Honor's signature to

1  each of the lawyers.

2      THE COURT:  Mr. Veeder, suppose that a lawyer represents

3  a man who owns land up in the basement complex.  Is it asking

4  too much of the government to go through and pick out those

5  places where you can see there is no problem of any water and

6  formulate a letter for my signature that the record shows that

7  you filed an answer for defendant X, that defendant X owns 40

8  acres, that the evidence is now in the record --  I am signing

9  this -- indicating that this is located over basement complex,

10  the older basement complex, and that any water there exists

11  only in the cracks and fissures and that it is vagrant, per-

12  colating water and not part of the stream system, and if you

13  are content this is the finding we propose to make?

14      MR. VEEDER:  I have no objection to writing that letter,

15  your Honor.  Frankly, I'm worried about writing such things.

16  For example, I talked to the man who represented Lawson, the big

17  holder up in the northwestern part of the watershed.  I talked

18  to him yesterday.  I told him we would check it out and advise

19  him what we thought the status was.  But to do it on a broad

20  basis worries me, because I don't want to be in the position of

21  saying,"You don't have any ground water" and he might have.

22  That's all.  I thought that if they were representing their

23  clients they could come down.  I have no desire to force any-

24  body.

25      THE COURT:  When they come down, what good will they be?

13,327

1   They haven't been in this trial.  They have been sitting in

2   their offices.  They will just be in the way.  And yet to give

3   these people a hearing they should be called in.

4        On the other hand, why can't we tell some of them, at

5   least in general terms?  Can't we tell a man, for instance,

6   that the evidence we have in the record shows that part of

7   your ground is over a basin and part of it is in the basement

8   complex?  You should be prepared to come down, inspect the maps

9   and some of the evidence.

10       MR. VEEDER:  We will undertake that.

11       THE COURT:  Suppose you ask a thousand lawyers to come in

12   and half of them come in unprepared and don't know what it is

13   all about.  This is a job to do.  How else can you do it?

14       MR. VEEDER:  I'll undertake it.  I'm perfectly willing to

15   do it.  I hadn't realized that that is what you wanted done, on

16   the basis of your original statement.  But it suits me.  I do

17   hesitate to tell a man that he does or does not have any, as

18   it appears in the record.

19       THE COURT:  You are not telling him.  You are drafting a

20   letter that I am going to sign.

21       MR. VEEDER:  All right.

22       THE COURT:  And I assume that you are content with the

23   letter or you wouldn't be drafting it for me.

24       MR. VEEDER:  I'm sure I'll be held responsible by you,

25   which is all right, if there is some error in it.  But I'll

1    undertake it.

2        MR. SACHSE:   I have one other question that may put an end

3    to this.   I understand that you had a conference with the

4    Master yesterday, and I would like to know, just for my own

5    planning, how we are going to operate.   Are we going to switch

        Murrieta type
6    these/hearings like the last two we have had before you back to

7    the Master or try to do the rest of the watershed here?   I am

8    done. I haven't any reason to sit in on these things, except

9    for the United States' rebuttal -- I am not getting paid by

10   anybody anymore -- and except for a few individual very small

11   matters, which I am sure can be ironed out by Mr. Veeder.   On

12   the other hand, I am very much interested in this case as a

13   whole.   I intend to stay in as long as anything is going on

14   here that is of any importance to the fundamental issues.   But

15   I would rather see some of this at a place where I can safely

16   stay away, and if I know that some of them are going to be before

17   the Master, where I have no concern, I will not go.

18       THE COURT:   I am willing to terminate the Master's hearings

19   and go ahead myself.   But if I am going to do it I expect a

20   little cooperation.   I did not expect to invite a thousand

21   lawyers in here without a little sorting.   You know, if you

22   went through these answers you would know in a minute into what

23   catagory they fit.   You would write two or three types of

24   letters that would probably cover the group.

25       MR. VEEDER:   Let me do that in regard to the area north of

13,329

1   the Murrieta and to the Murrieta, the Wildomar fault, and

2   Winchester Road.  That is a general area that we could handle.

3      MR. SACHSE:  I know the area.  I have no way of guessing

4   how many parties you have.  I don't know whether it will keep

5   us busy or not.

6      THE COURT:  Why don't we eliminate some of that area that

7   is disputed easterly and northerly of the Basin?  Why don't we

8   work on some other areas and wait until we get this new water

9   level evidence in?  Get down to the basis where we can draw a

10   basin line, if we can;  then when these people come in later,

11   we will know pretty well where we are.

12      MR. VEEDER:  I'll be guided by what your Honor wants.

13      THE COURT:  Can't you pick some areas where we don't have

14   that problem?  That is a loose end which we haven't come to

15   grips with yet.  While in other areas in this basin we don't

16   have that problem.

17      MR. VEEDER:  At the present moment, we have an area which,

18   I'm convinced, overlies ground water.  It is along Warm Springs

19   Creek and on down into the Santa Gertrudis area.  It is an area

20   which certainly overlies groundwater.

21      THE COURT:  When are you leaving?

22      MR. VEEDER:  I was going to leave as soon as I could this

23   evening, but I'll do what your Honor wants me to.

24      MR. SACHSE:  My thought is this.  I think I feel the way

25   you do.  We had, yesterday, a Master's hearing.  A new geologic

1   exhibit was attached to Wilson Creek.  Believe me, there is not

2   a thousand acres of alluvium in all the Wilson Creek watershed

3   on the United States' own geologic map.  Now, we have an owner-

4   ship map.  The United States has completed it for this same

5   area.  I brought out, by a specific examination of Col. Bowen,

6   that there was basement complex and vagrant, local, percolating

7   water not part of the stream system.  Why that couldn't just as

8   easily be done upon a sheet of paper, as to every one of those

9   people, I don't know.  It is not a big water shed as far as

10  ownerships are concerned.  I will gues perhaps 400 or 500 names

11  all told.

12        LCDR. REDD:  300.

13        MR SACHSE:  All right, 300 parcels.  Why, that exact same

14  thing I could do in 2 minutes for each one of those people.

15  Just put Col. Bowen on the stand and ask, "What is your opinion

16  of all the ground water indicated in the blue?" and he says,

17  "Vagrant, local, percolating water."  Your Honor is going to

18  have no contradictory evidence.  And let them out.  Why not

19  get rid of some of these people?

20  /     MR. VEEDER:  I'm willing to do it, and I certainly intend

21  to do it.

22        The question the Court has now is, are we going to termin-

23  ate the Special Master's hearings?

24        THE COURT:  I will terminate the hearings if I get some

25  cooperation in doing this in a reasonable and intellegent manner.

1   If not, I'm going to refer the whole thing back to the Master

2   again and let him worry with you fellows.

3      MR. VEEDER:   I hope you are not implying that you have not

4   got cooperation from me, your Honor, because I think you have.

5      THE COURT:   I'm not implying anything.   I'm tired.   I have

6   worked all I'm going to work today.   If you want to talk to me,

7   call me from Washington and find out where you are going.

8      MR. VEEDER:   All right.   I have written you a memorandum

9   on the point.   I was going to submit it to you.

10      THE COURT:   I'll se you on May 26th and 27th.   Meanwhile

11   we will see what we can figure out.

12      (Adjournment until May 26, 1960, at 10:00 A.M.)