# IN THE UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

— — —

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

— — —

UNITED STATES OF AMERICA,

Plaintiff,

vs.

FALLBROOK PUBLIC UTILITY DISTRICT,
et al.

Defendants.

No. 1247-SD-C

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Place:        San Diego, California

Date:         May 26, 1960

Pages:        13,332 to 13,400

FILED

SEP 24 1963

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

By_____
                    DEPUTY

JOHN SWADER
Official Reporter
United States District Court
325 West F Street
San Diego 1, California
BElmont 4-6211 - Ext. 370

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

– – – – – – – –

HONORABLE JAMES M. CARTER, JUDGE PRESIDING

– – – – – – – –

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1247-SD-C |
| | ) | |
| FALLBROOK PUBLIC UTILITY | ) | |
| DISTRICT, et al., | ) | |
| | ) | |
| Defendants. | | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

San Diego, California
Thursday, May 26, 1960

APPEARANCES:

    FOR THE PLAINTIFF:        WILLIAM H. VEEDER, ESQ.,
                                  Special Assistant to the
                                  Attorney General,
                                  Department of Justice,
                                  Washington, D.C.

                                  LCDR DONALD W. REDD

1    APPEARANCES (continued):

2          FOR THE DEFENDANTS:

3    For Defendant Fallbrook              FRANZ R. SACHSE, ESQ.
     Public Utility District,
4    et al.

5    For Defendant Vail                   GEORGE STAHLMAN, ESQ.
     Company

6    For Defendant State of               STANLEY MOSK, ESQ,
7    California                           Attorney General,
                                          By FRED GIRARD, ESQ,
8                                             Deputy Attorney
                                              General and
9                                          ERNEST SANCHEZ, ESQ.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## INDEX TO WITNESSES

| For the Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| Kenneth L. Howell | 13,360 | | | |
| Penn W. Pickering | 13,390 | | | |
| Wayne K. Whitney | 13,394 | | | |

## INDEX TO EXHIBITS

| For the Plaintiff: | For Identification | In Evidence |
|---|---|---|
| Additions to 207-E | | 13,338 |
| | | 13,389 |
| | | 13,392 |
| 29-AC | | 13,389 |
| 29-AD | | 13,389 |
| 262 Eng Report- Whitney | 13,393 | 13,394 |

## INDEX TO WITNESSES

| For the Defendants: | D | X | RD | RX |
|---|---|---|---|---|
| Kenneth L. Howell | 13,360 13,375 | | | |
| Penn W. Pickering | 13,390 | | | |
| Wayne K. Whitney | 13,394 | | | |
| Harry M. Davis | 13,374 | | | |

## INDEX TO EXHIBITS

| For the Plaintiff: | For Identification | In Evidence |
|---|---|---|
| Additions to 207-E | | 13,338 13,389 13,392 |
| 29-AC | | 13,389 |
| 29-AD | | 13,389 |
| 262 - Eng Report - WK Whitney | 13,393 | 13,394 |

1    San Diego, California, Thursday, May 26, 1960, 10 A. M.

2        THE CLERK:  1-1247-SD-C, United States v. Fallbrook Public

3    Utility District and others.  Further court trial.

4        THE COURT:  We don't have a very big crowd, Mr. Veeder.

5    Maybe our correspondence has been fairly effective.

6        MR. VEEDER:  I think your Honor should be complemented on

7    it.

8        THE COURT:  Have these people been interviewed?

9        MR. VEEDER:  To the extent that we have had time.  We have

10   talked with most of them.

11       There are some points that I would like to bring up, how-

12   ever, if I could, before proceeding with them.  There were four

13   counsel involved.  They have been notified and I was wondering

14   if your Honor would care to call for appearances at this time

15   to see whether any of these lawyers, who were notified to

16   appear, have appeared, to the end that there will be no confusion

17   on that point.

18       The first is Mr. Trent C. Anderson of Los Angeles, who

19   represented Ernest Bennett.  And I haven't seen Mr. Anderson

20   here.

21       THE COURT:  I had a letter from Mr. Anderson.  Did I pass

22   it on to you?

23       MR. VEEDER:  My records don't show that we have received

24   it, your Honor.

25       THE COURT:  Stating that he could not be here at tihs time,

1   for some reason, and I ought to contact Mr. Bennett.  We will

2   have to dig that up at the recess and see what we can do about

3   that.

4      MR. VEEDER:  The next firm is Weyl, Dunaway and Weyl of

5   Los Angeles, representing Matilde Moizant.  That firm was

6   notified on May 12th.

7      THE COURT:  I had a letter from Mr. Weyl.  I have it on

8   my desk somewhere.  As I recall, he stated that he was content

9   with what we proposed to do.  I will find that at the recess

10   also.

11      MR. VEEDER:  Next is Earl Malrose, attorney-at-law, repre-

12   resenting Nathanial A. Davis and Creela Davis.

13      THE COURT:  I don't think I received any letter from him.

14   No appearence here today.

15      MR. VEEDER:  The next is Raymond Choate, of Wilmington,

16   California, representing (Lewis) V. Molle.

17      THE COURT:  I don't think I have heard from him.

18      MR. VEEDER:  I will check with your office, then, your

19   Honor, for the other two.

20      Now, there are defendants who have appeared here, your

21   Honor.  In the past we have had them sworn.  Do you desire to

22   do that now?  Then I can outline the procedure I desire to

23   follow in connection with them.

24      THE COURT:  Are there any other matters of a preliminary

25   nature that we have to take up?

1    MR. VEEDER:  We have received a great number of responses

2    to our letters in which there has been agreement with the

3    proposed total acreage and irrigable acreage.  I had thought,

4    your Honor, that we would simply proceed as we have in the

5    past and have those letters marked as part of the evidence in

6    the case, and the exhibit which we have been using is U.S.A

7    Exhibit 207-E.

8        THE COURT:  In other words, we have been using Exhibit

9    207-E to tie in with the platbook 207-D.

10       MR. VEEDER:  And the rest of them, yes, your Honor, which

11   are the data relating to titles, location, parcel numbers, and

12   we have added 207-E for this Murrieta area, and the letters

13   accepting your Honor's letter have been made part of the record

14   in the case.

15       THE COURT:  The ones you are going to put in are those in

16   which there are no qualifications, in which no further corres-

17   pondence is required?

18       MR. VEEDER:  That is correct, your Honor, and only those.

19       THE COURT:  All right, they may be received in evidence as

20   part of Exhibit 207-E.

21       MR. SACHSE:  For curiosity's sake, how many are there?

22       MR. VEEDER:  We got some more this morning.  There are

23   about 75.  I counted them last night.  There were 69 acceptances.

24   And we have received several from his Honor this morning.

25       THE COURT:  I had a count of more than that, but some of

1    them may have had loose ends.  I had 74 as of the other day.

2        MR. VEEDER:  In my count I am limiting it strictly to the

3    ones where there were no qualifications.

4        MR. STAHLMAN:  How many letters were sent out?

5        MR. VEEDER:  Right at 200, and as a matter of fact we are

6    getting responses right at 100, so I think that is pretty

7    good.

8        THE COURT:  Many of them have moved and there have been

9    many transfers of property.  There are all sorts of problems in

10   connection with it.  Many of them indicate people who do not

11   understand the nature of this law suit.  And I will go into that

12   in a minute.

13       So file the letters you have received where there have

14   been no qualifications as part of Exhibit 207-E, and they will

15   be received in evidence.

16       (Certain letters received as part of plaintiff's Exhibit

17   207-E.)

18       MR. VEEDER:  I would also like the record to show that

19   there are some of the letters which are responses to your

20   letter relating to the hearing of April 26th.  There are no

21   qualifications.  They are simply acceptances.  I would like to

22   have them included in 207-E.

23       THE COURT:  You are seeing to it that all of these letters

24   concern the property shown on the plats in Exhibit 207-D?

25       MR. VEEDER:  Every time we get any response we check it

1    back against that, your Honor.

2        THE COURT:  All right, they may be filed.

3        MR. VEEDER:  Let the record show, then, that we have placed

4    these into evidence.

5        THE COURT:  That is right.  They are in evidence as part of

6    207-E, and may be so marked by the Clerk.

7        MR. VEEDER:  I did not know whether your Honor desired me

8    to raise other points now, but we have several letters which

9    are qualified acceptances of the total acreage and the irrigable

10   acreage contained in your letter relating to the hearing as of

11   now, in which they have raised the point in regard to the Treaty

12   of Guadalupe-Hidalgo.  I am simply going to summarize my

13   analysis of what I think they are saying.  They say that they

14   are willing to participate, apparently, upon a correlative

15   basis, unless they have rights under the Treaty; and if they

16   have rights under the Treaty, which is a question of law, they

17   want your Honor to recognize those.

18       THE COURT:  I don't see Mr. Tarwater here today.  I have

19   the brief of the government on that subject, and since we are

20   going to meet tomorrow let's ask him to be present and I will

21   probably rule on this Treaty matter and put it to rest once and

22   for all.

23       MR. VEEDER:  You want us to notify Mr. Tarwater?

24       THE COURT:  Notify him and request him to be here tomorrow

25   morning.  He seems to be carrying the flag on this Guadalupe-

13,340

1   Hidalgo Treaty.  He asked to be served a copy of your brief.  I

2   guess you served him.

3       MR. GIRARD:  No, I haven't, your Honor.  I didn't have his

4   address.  I will mail it today.  I just filed it this morning.

5   Bill (the Clerk) is going to give me his address now.

6       THE COURT:  It is not a long brief and when he comes in

7   tomorrow he can read it, and after he has looked it over we

8   will hear what he has to say.

9       MR. VEEDER:  I'm going to have my secretary call him now

10  because I think he should have as much time as possible.

11      MR. GIRARD:  Is he in San Diego?

12      MR. VEEDER:  No, he is in Murrietta.  Isn't he?

13      COL.  BOWEN:  Murrieta, California.

14      THE COURT:  Mailing it to him today would not reach him

15  by tomorrow.

16      MR. VEEDER:  I think he ought to hold on to it then.

17      THE COURT:  Has your messenger gone already?

18      MR. VEEDER:  He has gone now.

19      THE COURT:  If he wanted to come in he could pick up a

20  copy today or he can see it when he gets here tomorrow.

21      MR. STAHLMAN:  We go by there this evening.  We could take

22  a copy by.

23      THE COURT:  Fine.  Thank you, Mr. Stahlman.

24      MR. GIRARD:  Thank you, Mr. Stahlman.

25      THE COURT:  Pass those over until tomorrow morning.

1     MR. VEEDER:   I will deliver them to the Clerk.  Can they

2     have a 207-E mark on them?

3     THE COURT:   Let's hold them until tomorrow. Do it all at

4     one time.

5     MR. VEEDER:   I have some more problems which have arisen,

6     and they are matters that are becoming cumulative in nature.

7     We have received four statements for the hearing today that

8     the people either are no longer owners or that they own a

9     divided interest with someone who is deceased -- in other words

10    it has gone into an estate.  We try and follow through on these.

11    THE COURT:   On that I want to talk to you.  I suggest that

12    we formulate a letter.  We will probably wind up with a series

13    of form letters here.  If we have that kind of situation, we

14    have a certain type of letter that we mail them, advising them

15    what the situation is.

16    MR. VEEDER:   And I will talk to your Honor later about

17    where we get returns.  We have received 11 returns.

18    THE COURT:   Pass that over until tomorrow.

19    MR. VEEDER:   We have the interlocutory judgments in the

20    Fallbrook area numbered 16 and 17 that were noticed for today.

21    I have received no objections to either of the proposed inter-

22    locutory judgments, and I don't know that anyone is in the court-

23    room who is objecting to that proposal in the Fallbrook area.

24    THE COURT:   Is there anyone present who objects to the

25    interlocutory judgments that have been mailed out in connection

1    Mr. Veeder in the next batch of letters that go out when we are

2    trying to clean up some of these small parcels in other areas

3    of the watershed that we will probably send out a copy of this

4    letter, again trying to tell people what this lawsuit is about.

5        As you probably know, we have held meetings at Fallbrook

6    where I spoke to people in that area at the beginning of this

7    lawsuit.  I appeared at Murrieta and spoke to people there.  I

8    tried to give them some idea of what this suit was about.

9        At any rate, so that you may better understand the matter,

10   this letter reads as follows -- and it pretty well summarizes

11   what the lawsuit is about:

12       "So you may understand the nature of the action pending,

13   let me state as follows:-  The government is not condemning or

14   seeking to acquire the land or the water in the Santa Margarita

15   watershed. . . ."

16       The word "condemn" there is a legal term where the govern-

17   ment condemns property for public use.  The government is not

18   doing that.

19       ". . . As the last owner on eht stream, the United States

20   has brought a quiet title action to determine the rights of

21   parties in the watershed to the use of the water.  The final

22   decree will specify who does and who does not have rights to

23   the use of water from the stream system.

24       "When the evidence is all in, there will be found as to

25   your parcel one of two things:

1    with certain property in the Fallbrook area?

2        It is understood, of course, that there will be a later

3    time when anyone in the watershed may object to these inter-

4    locutory judgments before they become part of the final judgment.

5        The Court hears no objections.

6        MR. VEEDER:   Then I will tneder to your Honor copies for

7    signature.

8        THE COURT:   Are you ready to proceed with these people

9    who are present?

10       MR. VEEDER:   I could outline briefly to your Honor, based

11   upon notes received from you.   There is in the courtroom Mr.

12   Kenneth Howell, who wrote a letter to you in regard to his

13   properties, who asked me to be prepared to discuss his letter.

14       THE COURT:   Mr. Howell is present.

15       MR. VEEDER:   Mr. Whitney is present.

16       Mr. Pickering is present.

17       There are two people that I haven't had the opportunity to

18   talk to.   Your Honor asked for their names.

19       THE COURT:   Who else is present who has land in this water-

20   shed?   Stand up and let us have your name.

21       What is your name, sir?

22       MR. DAVIS:   H. M. Davis.

23       MR. VEEDER:   We will check on Mr. Davis, your Honor.

24       THE COURT:   Who else?   Is that all?

25       MR. DAVIS:   And Mrs. Davis.

1    MR. VEEDER:  I would like to refer to the fact that there

2  are present in the courtroom John H. Richie and Marie L.Richie,

3  who own property on Temecula Creek immediately downstream from

4  the Gibbon and Cottle property.  This is out of the area, of

5  course, which is before your Honor as of today.  However, I

6  said to them that from the standpoint of the United States, if

7  Mr. Richie would care to testify in regard to his properties I

8  would petition your Honor to let them testify in regard to it.

9    THE COURT:  You are ready to proceed on that?

10    MR. VEEDER:  Yes, we are, your Honor.

11    THE COURT:  All right.  Anyone present who has an interest

12  in this property besides Mr. Howell, Mr. Whitney, Mr. Pickering,

13  Mr. Davis and Mr. Richie?

14    Will you all stand up and be sworn by the Clerk?

15    (Whereupon, the Clerk duly administered the witness's

16  oath to the above-named persons.)

17    THE COURT:  If you will come forward and take seats in the

18  jury box, I think it will be a little easier.

19    Ladies and gentlemen, this suit has been a trial to all of

20  you and to us.  The Circuit Court of the United States, on the

21  prior appeal, ruled that everyone who had an interest in the

22  land in the watershed had to be made defendants.  This is no

23  doing of this Court, nor is it the doing of the attorneys for

24  the Government or anyone else.  It was a decision of the Circuit

25  Court that, since the Government owned land as the last user on

13,344

1   the stream, everyone who had an interest in the land or the use

2   of the water in the watershed had to be made defendants.   That

3   meant that 6,000 of you had to be made defendants.

4       The Court has tried to work out procedures so that there

5   might be due process in this proceeding.  Many of you have not

6   appeared by laywers, and we have attempted to do what we can to

7   solve your problems.  We have attempted to se that anyone's

8   rights would not be prejudiced even though they had no lawyer,

9   or would not be prejudiced even if they had a lawyer -- put it

10  that way also.

11      There is a lot of mis-information, though, about what the

12  suit was about, and this has become apparent when certain of

13  these letters were sent out showing you what evidence we had in

14  the record as to some of your small parcels and I received

15  certain letters that disturbed me very much.  A person would

16  write in saying, "I have only a couple of acres, and if the

17  government wants my water they can have my water.  I don't want

18  to fight the government."  Or another man wrote in that he had

19  20 acres of ground and he had a well on it and he intended to

20  retire on it, but he had given up hope since the government was

21  going to take his water.

22      Because of those letters, I have formulated a letter here,

23  which I have called "Form Letter #1."  Whenever anyone writes

24  in with that kind of statement I will try to straighten them out

25  as to just what this suit is about,and I'm going to instruct

1   Mr. Veeder in the next batch of letters that go out when we are

2   trying to clean up some of these small parcels in other areas

3   of the watershed that we will probably send out a copy of this

4   letter, again trying to tell people what this lawsuit is about.

5        As you probably know, we have held meetings at Fallbrook

6   where I spoke to people in that area at the beginning of this

7   lawsuit.  I appeared at Murrieta and spoke to people there.  I

8   tried to give them some idea of what this suit was about.

9        At any rate, so that you may better understand the matter,

10  this letter reads as follows -- and it pretty well summarizes

11  what the lawsuit is about:

12       "So you may understand the nature of the action pending,

13  let me state as follows:-  The government is not condemning or

14  seeking to acquire the land or the water in the Santa Margarita

15  watershed. . . ."

16       The word "condemn" there is a legal term where the govern-

17  ment condemns property for public use.  The government is not

18  doing that.

19       ". . . As the last owner on the stream, the United States

20  has brought a quiet title action to determine the rights of

21  parties in the watershed to the use of the water.  The final

22  decree will specify who does and who does not have rights to

23  the use of water from the stream system.

24       "When the evidence is all in, there will be found as to

25  your parcel one of two things:

1      "1.  That the water under your land is part of the Santa

2  Margarita stream system, in which event you have correlative

3  rights with all other persons who similarly are entitled to

4  water from the stream -- that is, that all persons with such

5  rights on the stream must share equitably the water, <u>or</u>

6      "2.  That the water under your land is vagrant, local

7  percolating water and is not part of the stream system, in

8  which event under California law you would be entitled to all

9  the water you can produce, except in so far as your use impinged

10  upon that of your immediate neighbors.

11      "In either event, the government only claims its fair share

12  to the use of the water in the stream, and chances are that you

13  would never have any problem insofar as securing reasonable

14  amounts of water from the land which you own, if there exists

15  any water.

16      "The evidence as to the character of the ground water

17  varies.  In some locations it is clearly local and vagrant --

18  not a part of the stream system.  In other locations the water

19  line is in underground basins or is otherwise clearly part of

20  the stream system.  Finally, there are other locations where

21  the answer is difficult to find."  In-between situations.

22      "Trusting this gives you a little better view of the problem,

23  and thanking you for your co-operation, I am  Sincerely."

24      Does counsel feel that that is a fair summary of this

25  suit?

13,347

1    MR. GIRARD:  Yes, your Honor.

2    MR. VEEDER:  May I interrupt, your Honor?  My secretary is

3 talking to Mr. Tarwater.  He is ill and he cannot be here

4 tomorrow.  She is still on the line.

5    MR. STAHLMAN:  We will deliver this to him tonight.

6    THE COURT:  If he cannot come in, we can do that at the

7 next session a month later.

8    MR. VEEDER:  Yes.

9    THE COURT:  Tell him so.

10    MR. VEEDER:  I'm sorry to have interrupted.

11    THE COURT:  Do we have Exhibit 15?

12    MR. VEEDER:  Exhibit 15 is on the board, your Honor.

13    THE COURT:  That is good enough, I guess.

14    MR. STAHLMAN:  What will be the next date to notify Mr.

15 Tarwater?

16    MR. VEEDER:  I have asked for June 23rd and 24th.

17    THE COURT:  June 23rd and 24th.

18    Since you have taken the trouble to come in here, I would

19 like to tell you a little bit about what has gone on in this

20 law suit.  We have taken over 14,000 pages of testimony.

21    This line here is the ocean.  This dark line is the water-

22 shed line.  This is the location of the gorge at Temecula.  The

23 Murrieta lies here.  Generally, we are concerned with all this

24 land in this watershed.  The colors on the board indicate the

25 character of the ground and the material under the ground.

1        Starting with the blue, this is what we call "basement

2   complex," or, in ordinary language, almost solid rock.  There

3   may be on the surface a foot or six inches or three feet of

4   some soil, but down below you are right down to solid rock.

5        The evidence has shown, and the Court is prepared to find,

6   that in the areas of the blue any water that exists is water

7   that comes out of joints or cracks or fissures in this rock and

8   is not part of the stream system--that it is vagrant, local

9   percolating water; and as to people who own property in the

10   blue area, unless something should happen to change it, we

11   propose in the final decree to find that any water they have

12   they are just lucky to have.  You can tell this is that desert

13   area, and some of it is fairly mountainous, where the water is

14   not part of the stream system.  It is local, vagrant percolating

15   water.  As to those people, the final decree will sever them

16   finally from the river.  It will sever them finally from any

17   litigation on the river because the water they have is so small

18   or minute and is not part of the stream system and therefore

19   we shouldn't be burdened with them further in the lawsuit.

20        The area marked in gray is also a basement complex, but

21   it is weathered -- in other words, it has broken up some. There

22   is some soil on top of the rock.  But likewise, in most of the

23   area -- and there is only one big portion of it up here in

24   French Valley and Ould Valley -- the finding will probably be

25

1  that any water found there is local, vagrant, percolating

2  water and not part of the stream system, and that those people

3  will be severed by the final decree from any connection with

4  the river.

5      Now it is true that in these blue and gray areas the rain-

6  fall that falls, that runs down the gullies,the streams and the

7  canyons is part of the stream system and must be permitted to

8  flow on down the stream system.  The only way that people

9  could legally dam up or impound water in this area would be

10  through application made to the State of California to secure

11  the right to build a dam.  That would be very difficult to do.

12      Since most of you are concerned with the area in here,

13  you are interested in seeing that the rainfall that falls up

14  here flows down and feeds these underground basins and feeds

15  the stream system.

16      As to the two yellow colors, these are areas of alluvium,

17  which has broken away and disintegrated.  It has been deposited

18  over long periods of time in these areas.  The yellow is the

19  so-called younger alluvium,and the orange is the older

20  alluvium.  Both of this type of material is water bearing.

21  There is water in it.

22      As to the younger alluvium, we are all agreed that this

23  is the very best type of material in which to find water and

24  to hold water, and the yellow areas are very definitely basins,

25  leaving out, for example, some of the small stringy stretches

1  of alluvium where they may or may not be very important in

2  connection with the stream system.  Certainly in the areas

3  we are concerned with here, these yellow areas are basins and

4  are material that very readily collects water, through which

5  water moves very easily.

6      In the orange area the material is tighter. It is all

7  agreed that water does go through it.  There is some question

8  as to how fast and how much.  There is some question as to

9  what extent these constitute basins.  But they are the second

10  most important part of the material in the area.

11      Now, our evidence has also shown that along here on the

12  southeast side of the Murrieta Valley, of course, the Santa

13  Rosa Mountains move up, there are faults as shown here by

14  dotted lines, the Elsinore fault and there is another fault

15  on the other side of the valley called the Wildomar fault.

16  Faults are places where this rock, the basement complex, has

17  split.  You have seen them as you ride along in automobiles.

18  Sometimes the slip is only a few feet, sometimes it is thousands

19  of feet.  The rock has broken and the slip has occurred.  They

20  have a very definite impact on the problem of water.  So for

21  example, the evidence has shown that if you could look under-

22  neath the ground you would find that from along in here where

23  the basement complex is toward the surface of this solid rock,

24  this basement complex, slopes downward in a southwesterly dir-

25  ection, so that for example right down near the gorge on the

1   Vail property the Navy dug the Pauba well in an attempt to

2   find just what kind of basin was here.  They went 2400 feet

3   and never hit solid rock.  They still weren't into the bottom

4   of this basin of alluvium fill or loose material that filled

5   in there.  We don't know how deep that solid rock is in this

6   area.  We know that up here the solid rock is at the surface.

7        As a result, there has been a basin created here just

8   north and east of this gorge and running along here up the

9   Pauba Valley.  There is some question not yet decided as to

10  how far up this basin may run.  The Government has put on

11  proof that it runs up something in that area.  There are other

12  contentions that it should be in different places.  That is

13  one of the things the Court is going to have to decide.  But

14  even the map gives you sort of a picture of this alluvial fill.

15  At one time, for instance, this stream that now runs down the

16  Murrietta ran out the other way into Elsinore and there may

17  have been a good sized lake in here which later on, many years

18  past, broke through the mountains and created this stream that

19  runs down here.

20       Most of you have property in which we call the Murrietta

21  basin.  There is no argument, the evidence is without dispute,

22  all are agreed that certainly between these two fault lines

23  stretching the length of the Murrietta Valley is a basin of

24  water.  It is part of the stream system.  The same is true of

25  the Pauba basin and the Wolf basin here, and also some other

1    areas which we have discussed.

2        Now, water rights that pertain to your land are judged

3    by California Law, and California Law is the same as most law

4    on water rights in the western states, and it is a very

5    reasonable rule and that is, it is the rule that the riparian

6    owner, the person who owns the land bordering a stream or the

7    person who has land overlying a basin where there is water

8    underneath has correlative rights with everybody else on the

9    stream system.

10        What do we mean by correlative rights?  It means that if

11    you own ten acres here and you have a big neighbor all around

12    you, he couldn't put wells all around your property and take

13    all the water to the extent that you couldn't get any.  In

14    other words, it would be a fair right to use water.  This is

15    just common sense.  In other words, if you and a hundred other

16    people have property on a little stream that is running through

17    the property, the hundred of you would have to share that water

18    equitably.  The man at the top couldn't take all of it and

19    leave none for the man at the bottom.  The same is true for a

20    basin.  No one is going to be permitted to take all the water

21    and leave the rest none.  That is what we mean when we talk

22    about the doctrine of correlative rights.

23        In the case of owners in Murrieta, the Court has ind-

24    icated in the letters sent out that we propose to find that

25    their property overlies a basin which is part of the stream

13,353

1   system; that they have correlative rights with everybody else

2   who has rights in the stream system, and that those rights

3   must be shared equitably and fairly.  This is where the

4   Government comes in.  The Government says, "we own land on

5   this stream system and we want our fair use of the water as

6   well as people above who have water bearing land."  The Court

7   as yet does not contemplate making any quantitative decision,

8   saying that you may take only this much and somebody else can

9   take only that amount.  The final decree will specify who

10  those people are who are part of the stream system.  In the

11  lower reaches in the Fallbrook area we have already made that

12  finding, with the exception of a few people.

13      Most of this land that has any water has water that is

14  vagrant, local percolating and not part of the stream system.

15  That is not true up above here.

16      Does that give you a little picture of what our problem

17  is?  Have any of you any questions that I can answer for you?

18      Do Counsel have any statements to supplement what the

19  Court has said?

20      MR. VEEDER:  I think your Honor's statement is very

21  excellent.

22      Perhaps you have made the reference, but some of these

23  people who are in the basement complex do have riparian rights

24  when there is water in the stream.  I don't believe your Honor

25  made reference to that.

1     THE COURT:   You see, you have two kinds of water rights.

2  One is the riparian right where you have land that borders on

3  a stream, and the other is where you have land that overlies

4  a basin.  There is no water running but there is water in the

5  basin underneath.  Those rights are similar.  Each person who

6  has the right has a correlative right in connection with other

7  people with similar rights.  In the basement complex, of course,

8  there are streams that run, and even a man up in the blue area,

9  if there were a stream of water that ran through his property,

10  would have a riparian right and also would be part of the

11  stream system.  Of course, up in that basement complex this

12  is, in most cases, a rather illusory right.  It is a right

13  that exists on paper, but it is a right that the man can't

14  use because the only time the stream runs is in the rainy

15  season and that is the time he doesn't want to use the water.

16  He certainly would have a right when the stream is running to

17  take his fair use of it.  He can't store it and keep it from

18  running down into the basins below.  But he has a riparian

19  right.  I have referred to it as a rather illusory right.  If

20  a man had a hundred acres up in the basin complex and the only

21  time the stream ran through his ranch was when there was a

22  storm and heavy rains, he has a beautiful right on paper but

23  as a practical matter it is not worth a cent to him unless he

24  can get permission from the State of California to build a dam

25  and store water over a period of months to use it later.  That

1    is expensive and is also very questionable whether he can get

2    that right because to the extent that he stored the water he

3    would be keeping the water from running down into the stream

4    system and into the basins.

5         Is that what you have in mind?

6         MR. VEEDER:  Yes, that is precisely what I had in mind,

7    your Honor.

8         THE COURT:  Mr. Sachse or Mr. Girard do you want to add

9    anything?

10        MR. SACHSE:  No, your Honor, I agree.  Mr. Veeder pointed

11   out the only question I had, and that was the matter of surface

12   rights that may exist even when ground water is not a part of

13   the stream.

14        THE COURT:  I have tried to simplify this.  There are

15   many other kinds of rights.  There are people who claim to

16   have prescriptive rights.  They have used something for so

17   long that nobody else can take it away from them.  There are

18   people who claim that they have appropriative rights; that

19   they have appropriated water out of some of these streams and

20   therefore they may use the amount that they have appropriated

21   without reference to other people on the stream.  We have

22   several of those situations involving ranches up the stream

23   where their land is on either side of some of the streams,

24   like the Temecula.  Those are separate matters that have to

25   be passed upon.  There are a lot of fringe problems.  I just

1    tried to give you a broad outline, particularly as it concerns

2    you people in the Murrieta.

3        MR. STAHLMAN:   There is only one other thing that I would

4    suggest, your Honor. We have situations like in the Murrieta

5    where they have strictly domestic use, the difference is the

6    priority of the right.

7        THE COURT:   Yes, that should be mentioned.   It is also

8    California water law that domestic use is first in right, and

9    domestic use includes water for a house and garden --

10       What does the statute say, one half acre?

11       MR. VEEDER:   A half acre, your Honor.

12       MR. FIRARD:   Domestic animals.

13       THE COURT:   Yes, domestic animals, etc.  So that at a

14   time of exstreme scarcity of water the domestic users on the

15   stream would have priority and this first category would be

16   protected.   So that in these cases where people have small

17   holdings and they are only concerned with domestic water, you

18   have the best right probably on the stream system.

19       Lets take up these people in Murrieta.

20       MR. VEEDER:   Your Honor, it had occurred to me, Mr. Richie

21   is here and his property might very well fall into the cate-

22   gory that you were talking about.  I am not sure that his

23   right is riparian.  It may not be.  But he is immediately down

24   below Gibbon and Cottle.

25       THE COURT:  All right, lets take up the Richie matter.

1    MR. VEEDER:  Your Honor, the Exhibit would be 210-C and

2    his property would be Parcel 36.

3        THE COURT:  I don't have a copy of those plats.  Exhibit

4    216-C is a plat, is it not?

5        MR. VEEDER:  Mr. Clerk, you might be helpful to the Court

6    to locate that.  This Gibbon and Cottle situation should be up

7    tomorrow, but as long as the Richie's are here it occurred to

8    me that your Honor might hear them as to anything they want to

9    testify to.

10       Checking the records on this matter, it appears that an

11   Engineering Report was prepared for the Richie's.  It went into

12   the record at the Reche's School, and of course Mr. Cranston

13   still has those records, but there may be some points that Mr.

14   Richie would like to testify to in regard to present avail-

15   ability of water in the stream and the effect on upstream diver-

16   sions.

17       MR. SACHSE:  Your Honor, certainly I am not protecting Mr.

18   Grover.  Mr. Grover is going to put on his case.  I don't rep-

19   resent his client.  But it doesn't seem fair to me, Mr. Veeder,

20   to offer the proof which is going to affect all upstream diver-

21   sions.  These people are immediately downstream.  I think it is

22   only fair that counsel for Gibbon and Cottle be here and have a

23   chance to do something about it.  I would feel very badly if

24   that were done to me.

25       THE COURT: Where do you live, Mr. Richie? Up in the valley?

13-358

1          MR. RICHIE: I live up there near Radec Junction along

2     Temecula Creek.

3          THE COURT:  Can you be here tomorrow?

4          MR. RICHIE: I can be here tomorrow, yes.

5          THE COURT:  At the recess, Mr. Veeder, will you try to

6     get hold of Mr. Grover and see whether he can be here tomorrow?

7          MR. VEEDER:  He is definitely going to be here tomorrow,

8     your Honor.

                              some
9          THE COURT:  We scheduled/additional witnesses.

10         MR. VEEDER:  Yes, he is going to call Mr. Tripp in regard

11    to this matter that Mr. Sachse raised.

12         THE COURT:  Mr. Sachse raised a point as to which I think

13    he is correct.  Immediately upstream from you is the Gibbon

14    and Cottle property, and they made claims of certain rights

15    to this water and to the extent that their claims are valid

16    it has an effect on you.  I don't see how this man's showing

17    downstream could have any effect on the Gibbon and Cottle, but

18    Gibbon and Cottle"s showing upstream could surely have an

19    effect on him.

20         MR. SACHSE:  That is very true, your Honor.  I hope that

21    I was not misunderstood.  He stated that the testimony was

22    going to be as to the effect on upstream diversions.  In other

23    words, that he was going to testify what effect Gibbon and

24    Cottle's diversions have on him.  I think Gibbon and Cottle

25    have a chance to cross-examine.

1          MR. VEEDER:   I am extremely anxious to clarify my sit-

2     uation, your Honor.  Mr. Richie came into my office.  I didn't

3     know that he was coming in.

4          THE COURT:   I understand.

5          Mr. Richie, I think we had better hear your matter tomorrow.

6     That will mean another trip down here but I think it is only

7     fair that the two of you be here at the same time.  Is that

8     agreeable?

9          MR. RICHIE:  Yes your Honor.

10         THE COURT:   All right.

11         MR. VEEDER:   Your Honor, I have here a letter from Mr.

12    Kenneth L. Howell, who owns property in the area concerning

13    which your Honor has directed his statement this morning.  Mr.

14    Howell has written a very informative letter.  You have asked

15    me to be prepared to respond to his inquiry.  I submitted to

16    your Honor a memorandum yesterday and a copy of Mr. Howell's

17    letter.

18         THE COURT:   Yes.  I couldn't read the copy.  Let me see

19    the original.  It was a poor reproducing job, Mr. Veeder.

20         MR. VEEDER:   Let the record show that I didn't reproduce

21    it.

22         THE COURT:   I will pass up the question of the total

23    amount of land.

24         Which is Mr. Howell?  We will take up the question as to

25    the total amount of land you have in a minute.  But you have

1  certain questions.  The first question was, what inalienable

2  water right does the property owner carry?  You heard my

3  explanation of California Water Law.  Has that answered your

4  question?  Or do you want further explanation?

5      MR. HOWELL:  I am afraid it does in a rather negative way,

6  your Honor.

7      THE COURT:  Well, there is no absolute ownership to all

8  the water that you find under your ground, if you are part

9  of the stream system, and it is just a matter of common fair-

10  ness -- it works both ways.  If you owned all the water you

11  could get under your ground and the man next door owned all

12  the water he could get, the first thing you would be in a

13  pumping race to see who's going to get this water.

14      MR. HOWELL:  I am not referring to water underground or

15  water that flows from someone else.  I am only asking about

16  water that falls within the boundaries of my own property.

17      THE COURT:  The answer is that under California Water

18  Law that water must be allowed to follow its natural inclinations

19  down the gullies and streams and canyons into the basins, etc.

20  All that water that can fall on your ground and seep into it,'

21  of course, helps you, and there is no law that says that you

22  cannot keep your ground soft and plowed up and permeable so

23  that the rain will seep into it.  I don't know of any law

24  that says that you can't contour plow in order to get a better

25  penetration of water.  But the matter of building dams to save

1   that water is a matter that only the State may authorize.

2       The second question that you ask concerns the location of

3   this property, and I suppose that we had better get a plat of

4   it.

5       Have you shown Mr. Howell a plat?

6       MR. VEEDER:  Yes, your Honor, I have, and it appears to

7   me that Mr. Howell could probably best delineate it on, I

8   think it would be Exhibit 208-C.  I put that on the memorandum

9   there, your Honor.

10      THE COURT:  208-C.  Do you have that map available?

11      MR. VEEDER:  He delineated for me, in the office, the loca-

12  tion of his property.  I know he could show it to you.  We

13  can check it out.  I would rather have him testify rather than

14  try and state what the circumstances are.  I think Mr. Howell

15  could probably outline on Exhibit 208-C the location of his

16  property.

17      THE COURT:  State your full name for the Clerk, Mr. Howell.

18      MR. HOWELL:  My name is Kenneth Lambert Howell.

19      I own one mile of frontage on Baxter Road.  That would

20  be the easterly half mile in Section 25.  Baxter Road is one

21  mile long.  It begins in the middle of Section 26, extends

22  easterly one mile to the middle of Section 25.  I own all the

23  frontage on Baxter Road.  Recently, in the last three years,

24  I acquired 20 acres of olives at the west end of Baxter Road.

25  So now I own the full mile frontage on Baxter Road.

1    THE COURT:  You said that Baxter Road started at the

2  center?

3    THE WITNESS:  That is right.

4    THE COURT:  You mean the center of the southerly line

5  of the Section?

6    THE WITNESS:  That is correct.

7    THE COURT:  Does it run along the Section Line?

8    THE WITNESS:  It runs along the Section Line, your Honor.

9    THE COURT:  To the center of the southerly line of Section

10  25?

11    THE WITNESS:  That is correct, yes.

12    THE COURT:  How far back do you go?

13    THE WITNESS:  In Section 25 I go back three quarters of

14  a mile.  240 acres in Section 25.

15    THE COURT:  Draw it on there, and put "KLH".

16    THE WITNESS:  In Section 26 I own all of the southerly

17  quarter mile -- I am sorry, I do not mean all -- I mean of the

18  easterly half I own the southerly quarter mile.

19    THE COURT:  Then you own the southerly half of the south

20  east quarter of Section 26?

21    THE WITNESS:  Yes.

22    THE COURT:  And that would be 80 acres?

23    THE WITNESS:  That is correct.  Now of that 80, as I have

24  told you, the westerly 20 acres is a recent purchase.

25    Above that in Section 26 I own 28 acres -- 28.55 to be

1    exact.   That would be the northeast quearter of the southeast

2    quarter of Section 26, less 380 feet -- there is a 380 foot

3    strip there that I do not own.   Now this land, I believe, is

4    100.4 acres.

5            THE COURT:   That is another piece?

6            THE WITNESS:   That is a part of this piece.   Actually

7    this land is what you mentioned as largely basement complex.

8    The actual agricultural land would be only about this area in

9    here, something like this.   It is the foot of the hills and

10   is therefore irregular, and if you run a plenimeter over that

11   it is something like this.   It is irregular.   That estimate of

12   100 acres wouldn't be too far from right.   It would actually

13   be, if it were the quarter mile wide, 120 acres.   But it is

14   not all cultivated, you can see.

15           THE COURT:   You have indicated that all this land would

16   be what you consider irrigable?

17           THE WITNESS:   I have farmed it in grain for many years,

18   yes.

19           THE COURT:   It would be irrigable?

20           THE WITNESS:   Yes, that is correct. Up here in the

21   mountains it is thin.

22           THE COURT:   I have checked that in with blue.

23           MR. SACHE:   We have a larger scale one in evidence, your

24   Honor.

25           MR. VEEDER:   It doesn't make any difference to me.

1           May I for the record make a statement so that you can be

2    sure and to clarify this.  The reference is Exhibit 107B-1,

3    Parcel 19-21-170.  Your Honor, we have Exhibit 15E that will

4    show it a little better I think.

5           Our only concern is that our records do not correspond

6    with what was said.  We can only check it out, and that is

7    what we will do.

8           THE COURT:  In what respect?

9           MR. VEEDER:  In regard to this Parcel 19-21-170.

10          THE WITNESS:  I believe, your Honor, that he has only

11   talked about Section 25.  That would be about right for Section

12   25, but would not include the land in Section 26.

13          MR. VEEDER:  The important thing is that these are

14   Exhibits in the Court, so we have to have them straightened

15   out.

16          THE WITNESS:  From your letter I couldn't understand

17   where that applies.  That is about right.  If you run a pleni-

18   meter over the photograph, you will be able to check it.

19          MR. VEEDER:  And from San Diego I can't do anything about

20   it.  So we have to have somebody make one more check on this,

21   and I think we will come out in complete accord.  The only

22   thing is that these are Exhibits in the Record and if there is

23   a disparity I want it clarified.

24          THE COURT:  Do you have wells on this property?

25          THE WITNESS:  Yes, I have one well and one spring; right

13,365

1    here by the house, and at the house I have a domestic well.

2        THE COURT:   He is indicating that --

3        THE WITNESS:   Right near the spring.

4        THE COURT:   He is indicating a place just north of

5    Baxter Road and near its beginning in the center of the Section

6    Line, running east and west between Section 26 and Section 25,

7    shown as Q1 on Government's Exhibit 15E for identification.

8        THE WITNESS:   It might be described, your Honor, as the

9    end of Central Avenue where Central joins Baxter.

10       THE COURT:   How deep a well is it?

11       THE WITNESS:   I think it is 104 feet.

12       THE COURT:   How big?

13       THE WITNESS:   That was on the property I purchased rec-

14   ently.   I think it is an 18" well.   I have not checked it.

15       THE COURT:   How big a pump do you have on it?

16       THE WITNESS:   Only a small gasoline pump.   It is only a

17   domestic well.

18       THE COURT:   A domestic well?

19       THE WITNESS:   It is a domestic well, so far.   I do not

20   know much could be obtained from it by pumping with a larger

21   pump.

22        THE COURT:   Then your spring is nearby also?

23       THE WITNESS:   The spring is nearby, yes.   That is, as

24   I told you in the letter, an old spring that was used way back

25   in the other century to water cattle.   It is rocked in nine

1    feet deep, and it is about 6 x 8.

2         MR. VEEDER:  While you are looking at Exhibit 15E, could

3    you mark that spring on there?

4         THE WITNESS:  Yes.

5         MR. VEEDER:  Use a grease pencil if you will.

6         THE WITNESS:  The spring and the well are very close

7    together.  The spring is right there.

8         MR. VEEDER:  Make it big enough so that we can see it.

9         THE WITNESS:  And the well is right there.

10        THE COURT:  The well is at Q1?

11        THE WITNESS:  That is correct.

12        THE COURT:  The spring is right here?

13        THE WITNESS:  Yes.

14        THE COURT:  I will draw a line accross there.

15        MR. VEEDER:  Would you have him put his initials there,

16   your Honor.

17        THE COURT:  KLH, and run an arrow down to the location of

18   the spring.

19        Can we do anything further on this matter now?  What

20   about this other land that he owns?

21        MR. VEEDER:  He does own some land.

22        THE COURT:  Does it show here?

23        THE WITNESS:  Yes.

24        MR. VEEDER:  It is south and west of the Wildomar fault.

25        THE WITNESS:  At the other end of Central Avenue.  This is

1  Grand Avenue. Above Grand Avenue you see the old Rancho Line

2  which is the line between the former Laguna Rancho and the

3  old Santa Rosa Rancho. I have the remains of that portion of

4  the Santa Rosa Rancho that was sold by Parker Deere in 1887

5  to Graham Collier, the one who developed this Wildomar and

6  Elsinore area, and I have the remains of that Rancho, and it

7  is approximately this area.

8      MR. VEEDER: For identification -- let me help on that --

9  that would appear on Exhibit 207B1, Parcel 19-44-10.

10     THE WITNESS: We show 820.6 acres, total 823. I took it

11  off the tax records and the old maps that I have.

12     THE COURT: That is close enough. Tax records aren't

13  accurate.

14     MR. VEEDER: I want to be sure that we identify this

15  property.

16     THE WITNESS: That is correct, yes. It is this area in

17  here.

18     THE COURT: You have drawn a line. Finish the line.

19     THE WITNESS: I am trying to get it as exact as I can.

20  This is roughly it right in here. Now I do not own several

21  of the lots. Some of this yellow area, in fact all the yellow

22  area here, has been cut up into lots. I do not own this, I

23  only own a small portion of the valley here at the end of

24  Central Avenue. There is about 47 acres, and of that 47 only

25  about 30 acres is actually tilled.

1    THE COURT:  This is the old Rancho Line?

2    THE WITNESS:  This is the old Rancho Line.

3    THE COURT:  You only go to the old Rancho Line?

4    THE WITNESS:  Yes.

5    THE COURT:  You come here?

6    THE WITNESS:  Here, and here, and then I do spread.

7    MR. VEEDER:  I would like to call Col. Bowen as a witness

8    concerning this Parcel 19-44-10.

9    THE WITNESS:  This as you have marked it is very nearly

10   correct.

11   MR. VEEDER:  To which Exhibit is he referring now, your

12   Honor?

13   THE WITNESS:  What is the number ofthis?

14   COLONEL BOWEN:  Mr. Howell is referring to my copy of

15   Plaintiff's Exhibit 15El, upon which I have delineated in red

16   the approximate perimeter of his Santa Rosa property.

17   THE WITNESS:  There is a slight difference here.  I do

18   own straight through here.  I don't know where you got this

19   triangular cut-off here.  This that you see here, this square,

20   is land that was sold out to a man by the name of Lord, and  I

21   do not own inside of this square.  I do own the rest here,

22   coming down to the Grant Line.  I believe you have indicated

23   too much here.  This is the Grant Line, isn't it?  I do not

24   own down to Grand Avenue.  I only own accross there.

25   THE COURT:  What you are showing is not the Exhibit in

1    evidence.

2         COLONEL BOWEN:  No sir.  But this is in evidence in the

3    Assessors' Plats, the property owned by Mr. Howell as delineated

4    in those plats.

5         THE WITNESS:  I have the old official map on that, if

6    you would care to see it.  You can copy it exactly any time

7    you want.

8         THE COURT:  Could you look at the map that he has and

9    check again and then place the diagram of his land on Exhibit

10   15E for identification at your liesure at recess or at the

11   noon hour?

12        COLONEL BOWEN:  Yes sir.

13        MR. VEEDER:  There are some questions I would like to

14   ask Colonel Bowen about the irrigable and non-irrigable acreage

15   to the end that a disparity may be corrected at this time.  I

16   am speaking again of Parcel 19-44-10.

17        THE COURT:  Santa Rosa?

18        MR. VEEDER:  That is right, to which Mr. Howell has been

19   testifying.

20        THE WITNESS:  (Mr. Howell):  I am not talking about

21   Santa Rosa addition to Wildomar.

22        MR. VEEDER:  Colonel Bowen, would state into the record,

23   based on your investigations, the total acreage, and then the

24   acreage which your investigation discloses to be irrigable

25   in character?

1    COL. BOWEN:  In Parcel 19-44-10 there is a total of 820.6

2  acres.  Of that amount 74.8 acres are irrigable and the remainder

3  is non-irrigable.

4    THE COURT:  The remainder is 745.8.

5    COL. BOWEN:  Yes sir.

6    THE COURT:  Does that agree with your computation, Mr.

7  Howell?

8    MR. HOWELL:  Yes.  I believe I had 823 total, and the

9  reason is I included the abandoned streets between lots.

10    THE COURT:  What about irrigable?

11    MR. HOWELL:  I am farming only about 30 acres of it.

12    THE COURT:  The question is, how much of it do you think

13  is irrigable?  Is 74.8 acres a reasonable estimate of the

14  irrigable land?

15    MR. HOWELL:  As I told you in the letter I sent ahead, it

16  was my plan to try to develop that up-land area.  My personal

17  feeling is that there is a little more than that.  But that is

18  not too bad an estimate.

19    THE COURT:  This finding that we make, if we find that you

20  have approximately 75 acres of irrigable land, that doesn't

21  mean that you couldn't use water in the watershed elsewhere if

22  you could do it.  This is not a conclusive finding.

23    Is that right?

24    MR. VEEDER:  Yes, your Honor, and you are touching on a

25  point that I believe would be of interest to Mr. Whitney.  He

1   asked me what you meant by irrigable land, and if you would

2   state now to Mr. Whitney it might save a moment, if you are

3   aggreeable to do so.

4        THE COURT:  I understand that it is that ground which is

5   reasonably susceptible of irrigation.

6        MR. VEEDER:  Which is not presently irrigated.

7        THE COURT:  Whether it is now irrigated or not doesn't make

8   any difference.  Is it reasonably susceptible of being irrig-

9   ated?

10        MR. VEEDER:  Under present methods of irrigation.

11        MR. GIRARD:  Without regard to whether there is water or

12   not.

13        THE COURT:  Yes.

14        On this Santa Rosa ground, do you have wells or springs?

15        THE WITNESS:  I have two groups of springs.  One is right

16   about here in this canyon directly up from Central Avenue.

17        THE COURT:  What do you call that canyon?

18        THE WITNESS:  Locally we call it Rainbow Canyon.  And over

19   here in the next canyon, which has been called Wilson Creek, in

20   the south portion of Wilson Creek Canyon I have another spring.

21        THE OCURT:  Are those springs which appear by Exhibit 15-E

22   for identification to be in the basement complex? Do you have an

23   opinion whether that water is part of the stream system or is

24   vagrant, local percolating water and not part of the stream

25   system?

1    COL. BOWEN:  Yes, I have an opinion, your Honor, and my

2    opinion is that they are local, vagrant percolating waters, not

3    part of the Santa Margarita stream system.

4    MR. HOWELL:  I agree with that, your Honor.  I believe that

5    it is associated with the old former Elsinore Fault.

6    THE COURT:  I'm going to so find, and that means then that

7    any water you get out of those streams you are just going to

8    be lucky to get.

9    MR. VEEDER:  May I ask one question, your Honor.

10    THE COURT:  Yes.

11    MR VEEDER:  Does the water from any of those springs flow

12    to a distance during any time of the year so that it might flow

13    into the Murrieta Creek or Murrieta Basin, based upon your

14    observation.

15    MR. HOWELL:  I don't think so.  Now the springs are

16    connected with two pipelines to a reservoir on the property.

17    They have been connected since the late 80s.  That installation

18    was put in originally for people in the Wildomar townsite.  In

19    fact, that Santa Rosa addition was purchased from Parker Deere

20    to give another additional source of water for Wildomar.  When

21    I purchased in 1933 I bought all of the remaining owners down

22    at Wildomar townsite, and I now own all of the water rights.

23    Those springs were even used by the Indians because we have dug

24    up Indian relics around those springs.

25    THE COURT:  Would water from the springs flow into and feed

19,373

1    the Murrieta?  We are not talking about flood water.

2        MR. HOWELL:  I don't see how it could get that far.  It is

3    less than an inch of water.  An inch of water wouldn't run a

4    half a mile down to the basement comples in the valley.

5        THE COURT:  I will still so find as I indicated.  Any

6    objection Mr. Veeder?

7        MR. VEEDER:  No, your Honor.  I would like to clarify my

8    position.  I have asked these questions before.  If the springs

9    are such that they do flow to a point where they enter the

10   alluvium or enter the surface stream, then I say they are part

11   of the Snata Margarita River.  If they are so small that they

12   do not do that, then I would say that they could be classified

13   along the lines your Honor has stated.  But I cannot always

14   accept the idea that all springs in the basement complex do

15   not contribute to the Santa Margarita system.

16       THE COURT:  At the recess or at the noon hour, we will see

17   if the Colonel and you can work out a diagram of that on Exhibit

18   15-E for identification.

19       MR. HOWELL:  May I answer Mr. Veeder?  I think I have an

20   observation that will clarify it.  There was, at one time when

21   the springs were disconnected for about two weeks -- the pipe-

22   lines broke -- the water went down the canyon not over a quarter

23   of a mile at the most, and it is half a mile to the sediments.

24   So I don't believe they could ever contribute to the basin at

25   Wildomar.

1    THE COURT:  All right.  Take the morning recess at this

2  time.

3    MR. VEEDER:  Just a moment.  Mrs. Davis, I would like to

4  talk to you in the office.  I think she will be the next one

5  up, your Honor.

6    THE COURT:  All right.  Take a recess.

7                    (Morning Recess)

8    MR. VEEDER:  Your Honor, I would like to call Col. Bowen

9  in regard to the Harry M. Davis property.

10    THE COURT:  All right.

11    MR. VEEDER:  He has been sworn.

12    THE COURT:  Yes.

13    MR. VEEDER:  Col. Bowen, are you acquainted with the

14  properties owned by Harry M. Davis which have been designated

15  Parcel 19-32-181?

16    COL. BOWEN:  Yes sir.

17    MR. VEEDER:  And have you made an investigation in regard

18  to whether those properties are situated within or without the

19  watershed of the Santa Margarita River?

20    COL. BOWEN:  I have.

21    THE COURT:  Would you state whether you have an opinion as

22  to whether they are within or without the watershed?

23    COL. BOWEN:  Based upon my investigations last week with

24  Mr. Pickering, who was here in the courtroom, it is my opinion

25  that that parcel, purportedly owned by the Davises is outside

19,375

1    the watershed of the Santa Margarita River.

2        MR. VEEDER:  We move to have dismissed from this case

3    Harry M. Davis and Fleda V. Davis, their properties not being

4    within the watershed of the Santa Margarita River.

5        THE COURT:  Motion granted.  Do you want a formal order?

6        MR. VEEDER:  I will prepare a formal order for their dis-

7    missal and will mail a copy to the Davises so that that will be

8    a matter of record.  We have nothing further, your Honor.

9        THE COURT:  That takes care of your problem, Mr. Davis.

10       MR. DAVIS:  Thank you.

11       MR. VEEDER:  We have this situation in regard to the

12   Pickering and in regard to the Whitney properties.  Col. Bowen

13   has made investigations in regard to them.  The data will be

14   available by 2 o'clock.  Unless there is someone in the court-

15   room, I don't think there is anything further at this time.

16       Mr. Kenneth Howell, who is a witness here, has expressed

17   some concern about your informal ruling as to the utilization

18   of water on that tract of land concerning which he last testified,

19   and it may be that he would like to present some further state-

20   ment on that.  From the standpoint of the United States, I

21   think what your Honor has said is probably right.

22       THE COURT:  There is an old rule, Mr. Howell, that when the

23   Court is going to rule in your favor you quit talking.  If you

24   keep talking about it, we may find a situation where I have to

25   change my mind.  The ruling I made about those springs is the

1   most favorable ruling you could get, and I am announcing in-

2   formally what I propose to find as to various groups of these

3   parcels when they are submitted to me for interlocutory judg-

4   ments so that I will have in the record what I have in mind.

5   I don't think I'm going to change my mind on it.

6       Are you content?

7       MR. HOWELL:  I was talking to Mr. Veeder, your Honor, in

8   the interim, and I said to him that it seems like 74 acres is

9   not quite as much as there is available of the 823 acres.  I did

10  say that.

11      THE COURT:  That is a different problem.  The question of

12  how much irrigable land you have is another problem.  The

13  government wants an estimate of this irrigable land.  Actually,

14  I don't think it is too important.  It is only an estimate to

15  know how much irrigable land there is in this watershed.  The

16  fact that I would say that you had 50 acres wouldn't keep you

17  from irrigating 75 acres if you had the water and could get the

18  water on the land.  Or if I said you had 75 acres irrigable and

19  it might turn out that there was only 25 that you could irrigate,

20  this is only an estimate of the irrigable land based on our

21  best judgment on the evidence.

22      Have you concluded talking with Col. Bowen about the area

23  of this property?

24      MR. HOWELL:  Col. Bowen and I are, you might say, are in

25  exact agreement as to total acreage; yes sir.

13,377

1    THE COURT:  But you are in disagreement as to the irrigable

2    land?

3    MR. HOWELL:  Just before the intermission I believe you

4    mentioned that 70 acres had been allotted.

5    THE COURT:  74.8 acres.

6    MR. HOWELL:  74.8 acres had been allotted.  We are now

7    actually farming 80 acres, and one of the reasons that I told

8    you for having that up-land area is that in that area, in that

9    region, any ground that can be used that is up on a hillside

10    has what we call air drainage so the trees can be grown there

11    that cannot be grown down on the valley floor.

12    THE COURT:  Is it your testimony that you think 80 acres

13    of it is irrigable?  Or how much do you think is irrigable?

14    MR. HOWELL:  In my own mind I believe about a hundred acres

15    can be actually profitably contoured and used.  I have built

16    two miles of roads in there with that idea in mind.  I did that

17    before the war.  And after returning from the war and knowing

18    of this, I did no more.  Had this not happened, I would have

19    developed approximately a hundred acres of that property.  That

20    was my intention, your Honor.

21    THE COURT:  Any objection if I find that 100 acres of the

22    ground is irrigable?

23    MR. HOWELL:  I would appreciate it very much if you would,

24    sir.

25    THE COURT:  Mr. Girard?

1      MR. VEEDER:  Mr. Girard is always in the happy state of

2  not having any problems.

3      THE COURT:  How important is it?

4      MR. GIRARD:  It is not important at all, your Honor.

5      MR. SACHSE:  I have objected consistently to any evidence

6  of irrigable acreage because I think the whole thing is subject

7  to change day after tomorrow.  I don't care what you find.

8      THE COURT:  That is right.  I will say very frankly that

9  I have found Col. Bowen to be most reliable and most fair in

10  his estimates, but it is of such small moment that if you feel

11  better, if your peace of mind would be better to say that I

12  think you have an hundred acres that could be irrigated.  This

13  doesn't mean that you can irrigate them.  You have to get the

14  water.  And it is only an estimate.  The only purpose, I under-

15  stand, that the government is insisting upon estimates of

16  irrigable acreage is to be able to catalogue eventually how

17  many acres might be irrigated someday in this watershed.  Isn't

18  that the only reason?

19      MR. VEEDER:  Basically, your Honor, I do think it is a

20  measuring stick.  You must have some kind of device to determine

21  the demands upon the stream for dear old Fallbrook Public

22  Utility District, and my own view is that it is not an unimport-

23  ant matter.  It is a matter to me of great importance.  And that

24  is the reason why I asked Mr. Howell to come in here again.  I

25  certainly think that we should have a criterion for the cataloguing

1  of these rights.

2      THE COURT:  Mr. Veeder, are you going to follow my sugges-

3  tion and break your total irrigable ground down between that

4  where there is a reasonable probability of irrigation and that

5  where it is entirely illusory?

6      MR. VEEDER:  I don't believe, your Honor, we could ever

7  say, nor do I want to undertake to say, that as to any irrigable

8  land the right was entirely illusory.

9      THE COURT:  Let's take up in the basement complex.  We have

10  a man who is riparian to a stream, and he has a hundred acres of

11  nice level ground up there in the desert.  I would have to find

12  that he had a hundred acres that was irrigable.  But I would,

13  at the same time, have to say that the prospect of his ever

14  irrigating it out of the stream was entirely illusory.  So

15  unless you are willing to be realistic and catalogue the

16  ground as maybe in three catagories:  that which is clearly

17  illusory, that which is clearly within the realm of possibility,

18  and maybe some middle ground where you say maybe yes and maybe

19  no, this compliation won't mean a thing.  If you go back to
        and tell them
20  Congress that you have a hundred thousand acres up there that

21  is irrigable, it will not mean a thing.  And I will put it in

22  the record right now so that in reading some of this record

23  they will know about it.  There are thousands of acres of land

24  that come within the category of being irrigable that never

25  can be irrigated out of this stream system.

13,380

1    MR. VEEDER:  I am quite in accord with your Honor on all

2    these things that you are saying.  But I am also saying that

3    from the standpoint of apportionment of water, for example, on

4    the Vail Company as they relate to us, it becomes extremely

5    important.  So I can't sit here and have your Honor say that it

6    is meaningless or that we can flip a coin and say it is a

7    hundred or 80.  I couldn't do that, nor do I intend to.  I just

8    want the record to show that when the chips are down I'm going

9    to insist that we have criteria for the determination of the

10   respective rights of the parties.

11   THE COURT:  If you think this is a criterion without some

12   logical segregation of the irrigable lands within the categories

13   where they clearly would be irrigable and those where they

14   clearly would not be irrigable as a practical matter, then I

15   am not going to pay any attention to any talk you give me about

16   allocating water on the basis of these estimates.

17   MR. VEEDER:  There is only one thing I can say to your

18   Honor in that regard, and that is that there are areas through-

19   out the valley where it is quite obvious that a dry arroyo is

20   not going to irrigate lands which are irrigable.  But there are

21   also innumerable instances, all you have to do is point to the

22   Pauba Valley and see that when your Honor paints with the

23   broad brush that he was painting with in regard to Mr. Howell,

24   I have to object to it because I can't accept the broad criteria,

25   without being critical in the slightest.  I simply say that I'm

1    not going to buy it right off because there are going to be

2    instances in which I'm going to ask for findings.

3        MR. GIRARD:   Your Honor, I agree, and I have stated to

4    Mr. Sachse, I think many times, that I don't think this irrigable

5    acreage means anything now.  But being as the Court is inclined

6    to take evidence on it, I think it is imperative that we take

7    the best evidence on that particular point.  Col. Bowen and his

8    staff have made estimates and surveys which I think every

9    attorney who has been in the case, any time at all, has a lot

10   of respect and valuation for.  And I think in order to reach a

11   conclusion contrary to Col. Bowen's estimate, it should be

12   based on something other than whether or not a particular land-

13   owner would be satisfied.  I think 75 of these landowners sent

14   in notices that they were satisfied with Col. Bowen's figure.

15   If somebody is going to be able to come in here and say, "I

16   think I have 100 acres instead of 75" and your Honor will go

17   along and say, "OK, we will go along if that will make you

18   happy," we are going to have everybody coming in and asking for

19   more on the basis that they think they can use it.

20       THE COURT:   That is how unimportant I consider it.

21       MR. GIRARD:   I agree that it is unimportant.  But if we

22   are going to take evidence on this particular point, I think

23   that Col. Bowen's evidence is pretty good evidence, and unless

24   there is contrary evidence I would feel that his figures should

25   be used.

1    THE COURT:  I'm going to find, somewhere along the line,

2    that these estimates are subject to revision on the basis of

3    changed conditions in the future.

4    MR. GIRARD:  I think you should.

5    MR. VEEDER:  I think that is the law of the State of

6    California.

7    THE COURT:  In view of Mr. Girard's spirited objection, he

8    having come all the way from Sacramento to attend this hearing,

9    I will find in accord with Col. Bowen that 74.8 acres are

10   reasonably susceptible of irrigation.

11   It is understood, Mr. Howell, that this does not limit you.

12   You can irrigate as much ground as you can get water on, if you

13   have the water and if you are using a correlative fair right of

14   water.

15   MR. VEEDER:  Then may I write a sequel to what your Honor

16   has just said?  If on the basis of Col. Bowen's testimony, and he

17   tells me that that land is classification VII or VIII, and my

18   friend Mr. Howell starts squirting water on that land and we

19   think it is coming from the Santa Margarita River, we will say

20   the land is non-irrigable and that it is a waste of water to

21   apply water to it and we will be back where we started.

22   THE COURT:  We will have to have a further hearing.

23   MR. VEEDER:  That is right.

24   THE COURT:  We will cross that bridge when we get to it.

25   MR. VEEDER:  But I do think that these soil surveys are

1   extremely important, and if Col. Bowen says that this land

2   classification is VII or VIII,I am not going to agree that he

3   could take water and put it on that land.

4          THE COURT:  I think I have more confidence in his testimony

5   sometimes than you do, Mr. Veeder.

6          MR. VEEDER:  Are you making a finding on that, your Honor?

7          MR. SACHSE:  Your Honor, it seems to me that we are kind

8   of going in circles.  So that there is no mis-understanding,

9   may I state that I am in absolute disagreement with Mr. Veeder's

10  statement as to the law.  I believe the law is as your Honor

11  stated it.  The case of Cowell v. Half Moon Bay Water Company

12  settles it that the irrigable acreage can be used as a yard-

13  stick, assuming an apportionment determining how much water a

14  man is entitled to.  But once an apportionment has been made,

15  he can use the water anywhere on his riparian land.  If he wants

16  to spread it on rocks -- that would be perhaps an unreasonable

17  use.  But if he can grow something, the mere fact that Col.

18  Bowen, let us say, thinks the land is not irrigable, he has a

19  right to do it.  I don't want to be construed as agreeing with

20  Mr. Veeder at all.  I think your Honor is right.

21         THE COURT:  We are wasting time.  So far the ground as to

22  which we have made tentative findings has been ground where there

23  was not much argument about it in the Murrieta Basin.  We have

24  a few other areas outside.  But I'm going to insist that in

25  this cataloguing there be designated, as we come to them, some

1   of these places where there is riparian ground that is irrigable

2   and where it is clearly illusory.

3        MR. VEEDER:  And that is exactly why I am keeping my foot

4   in the door on this, even if it gets pinched a little bit.  I

5   am insisting, your Honor, that there are instances where we

6   can't deal with these matters with a broad brush, and when we

7   ask for findings in a particular area I don't want to be ham-

8   strung by what your Honor said this morning.

9        THE COURT:  I am going to insist, if you catalogue irrigable

10  ground, that you do it in about three catagories: (1) that

11  kind of ground where it is reasonably certain that there would

12  be water to irrigate it,(2) those areas which are riparian and

13  are irrigable on which there is no possibility that there would

14  be water in the stream which could be used to irrigate it, --

15       MR. VEEDER:  I think it is going to hurt a lot of people.

16       THE COURT:  How will it hurt them?

17       MR. VEEDER:  I have in mind when Mr. Grover was here.  I

18  think his situation is one precisely in point, your Honor.  His

19  client has gone up into an area and has applied water to lands

20  which, if my recollection is correct, are non-irrigable.  I

21  don't believe that it is proper to take water and apply it to

22  land that Col. Bowen has said that, in his view, having viewed

23  the land, is non-irrigable.  I think it is a waste of water to

24  apply it on that land, and I believe the law is such that it

25  is/proper for a man, to take Mr. Sachse's example of applying
       im

1   water to a gravel pit or a gravel bed, to say, "Well, I have

2   my allocation.  I don't care what you say about it.  I am a

3   little nuts.  I am going to apply the water to the gravel bed.

4   It will not do any good, but it is my water and I can do with

5   it what I want."  I say that that is not the law and we certainly

6   are going to be adamant if anyone undertakes such a thing.  And

7   I think/Gibbon and Cottle situation may be the point for
                this

8   decision on that thing, and I would like to have your Honor

9   rule on it, because if they can take this precious water and

10  apply it to a gravel pit I'm going to be there.

11       THE COURT:  You understand Mr. Sachse's position?  That

12  is not the position he took.  He started to give an example of

13  putting it on rocks and admitted that was not a beneficial use.

14       MR. SACHSE:  I admit very clearly that it was a poor

15  example.  It would be an unreasonable use of water.  But so

16  that there is no mis-understanding between us, I will cite

17  Cowell v. Half Moon Bay Water Company.

18       MR. VEEDER:  I have read it many times.

19       MR. SACHSE:  It is right on the nose.  It had this exact

20  problem.  It concerned lands that were extremely high, extremely

21  rough, and also fertile lands on this creek.  It was purely a

22  riparian question.  The court made an allocation to each land-

23  owner of the surface flow of the stream, and one of them chose

24  to go in for a kind of agriculture that the rest did not and to

25  pump the water to the high mesa which the court had not considered

1  irrigable and raise a type of crop and go in for a type of

2  agriculture that no one had contemplated at the time that they

3  had calculated the irrigable land.  And the court said that it

4  makes no difference whatsoever;  that he was entitled to such-

5  and-such quantity of water as long as he uses it beneficialy to

6  grow a crop.

7       MR. VEEDER:  He and I are in agreement.

8       MR. SACHSE:  Cottle is growing a crop.  Perhaps it is not

9  on as good soil.  Perhaps he uses more water to do it.  But if

10  we are going to go off on the tangent that you are suggesting,

11  the next step will be that the finest field lands can't have

12  any water bacause the water percolates through them too fast.

13       MR. VEEDER:  No.

14       MR. SACHSE:  I don't think this Court has any business, or

15  ever will have any business, telling the individual how he is

16  going to farm, under any circumstances in the future.

17       MR. VEEDER:  I like your 180 that you just did.  As long

18  as the water can be applied beneficially, I have no objection

19  to it.  My objection is where Col. Bowen comes along and says

20  that it is class VII or class VIII land, lands that are non-

21  irrigable, and a man is wasting water by applying it to them,

22  I say they have no legal right, and that is it.

23       MR. SACHSE:  May I ask a question of Col. Bowen, your

24  Honor?

25       THE COURT:  Yes.

1       MR. SACHSE:  I think I can settle this in one minute.

2       Col. Bowen, in your experience and based on your VII and

3  VIII clasifications of land, is it possible to apply water

4  beneficially to such land with proper cultural practices, proper

5  terracing and so on in some cases?

6       MR. VEEDER:  I object to that.  That is wide open.  There

7  is no basis for the hypothesis.

8       MR. SACHSE:  Mr. Veeder has said that all class VII and

9  class VIII ground is no good.

10      MR. VEEDER:  But it is a triple-barrel question.  He says

11  with proper cultural practices and with proper changes, with

12  proper this and proper that.  Then it is no longer non-irrigable.

13      THE COURT:  Overruled.

14      COL. BOWEN:  We have a good example in this case, I think,

15  Mr. Sachse.  One of your clients, Mr. Matthews, has subjected

16  some Class VII land to avocado culture by virtue of terracing.

17      MR. SACHSE:  And you consider the use of water to be a

18  beneficial use?

19      COL. BOWEN:  Yes sir.

20      MR. SACHSE:  Thank you.

21      MR. VEEDER:  Wasn't it necessary, didn't he have to make a

22  great many changes in regard to the property before he could

23  make it irrigable?

24      COL. BOWEN:  Indeed he did.  Yes sir, he had to bench-

25  terrace it.

1      MR. VEEDER:   Thereafter, when he made these changes, it

2  became irrigable land; is that right?

3      COL. BOWEN:   Yes sir; it became irrigable land.

4      MR. VEEDER:   I have no further questions.

5      THE COURT:   How long will you be this afternoon on these

6  two people?

7      MR. VEEDER:   I think it will be very, very short.

8      THE COURT:   I have an argument to hear on a case that I

9  tried yesterday, and as soon as we get through I'll go into

10 that.   Then we will adjourn until tomorrow morning.   Do you

11 expect some more people?

12     MR. VEEDER:   The letters for tomorrow, yes, your Honor,

13 and also Mr. Grover will be here.

14     THE COURT:   All right.

15     MR. VEEDER:   May I inquire, is Mr. Illingworth going to

16 be here tomorrow?

17     MR. GIRARD:   Yes, he will be here tomorrow.

18     MR. VEEDER:   Thank you.

19     THE COURT:   Mr. Veeder, here are the two letters from Mr.

20 Anderson and Mr. Weyl.   I was right in my summary of them.

21     Adjourn until 2:00 P.M.

22                    (Noon Recess)

23 San Diego, California, Thursday, May 26, 1960, 2:00 P. M.

24     MR. VEEDER:   Your Honor, I would like to add to Exhibit

25 207-E additional responses that we have received and have them

1   made part of that Exhibit.

2        THE COURT:   Received in evidence as part of Exhibit 207-E.

3        (Additional responses received in evidence as part of

4   plaintiff's Exhibit 207-E.)

5        MR. VEEDER:   In regard to defendant Moizant, her lawyer

6   wrote in and said that they were amenable to accepting the pro-

7   posal.  I am going to file both the lawyer's letter and a copy

8   of the letter originally sent to Moizant.

9        THE COURT:   That will be satisfactory.

10        MR. VEEDER:  Your Honor, we have some new U.S.G.S. quad-

11   rangles which cover areas in the Santa Margarita River water-

12   shed.  I would like to offer them.  They are just blue copies.

13   However, I think they will be useful to your Honor and to

14   counsel.  They will be substitute Exhibit 29-AC and Exhibit 29-

15   AD.  I will get additional copies for your Honor.  They are new.

16   They have just been put out.

17        MR. SACHSE:  Are they available in your office, Mr. Veeder?

18        MR. VEEDER:  Yes.

19        THE COURT:   29-AC and 29-AD received in evidence.

20        (U.S.G.S. quadrangles received in evidence as substitute

21   Exhibits 29-AC and 29-AD.)

22        MR. VEEDER:  In regard to Mr. Pickering, who is in the

23   courtroom, your Honor, there is now agreement in regard to his

24   acreage.  Mr. Pickering is here if your Honor would interrogate

25   him on the subject.

1    MR. STAHLMAN:  May I ask a question about these maps?

2    MR. VEEDER:  Yes.

3    MR. STAHLMAN:  You may know this.  One of them is an

4    edited map, and the other is unedited.

5    MR. VEEDER:  Would Mr. Kunkel explain that.

6    MR. KUNKEL:  These are advance blueline prints of the

7    topographic maps which are in preparation at the present time

8    by the Topographic Branch of the Geological Survey in Sacramento,

9    and they will be checked out further and eventually published

10    in the regular series.  These are advance prints.

11    MR. STAHLMAN:  This first one here, Exhibit 29-AD, says

12    that it is unedited, but Exhibit 29-AC says "edited."  So there

13    is a difference evidently,y in the two.

14    MR. KUNKEL:  They are both advance sheets subject to

15    correction, and the degree of editing may be somewhat different.

16    MR. VEEDER:  They are simply in for whatever they are worth.

17    They are new.  They will be of assistance in the long run.

18    THE COURT:  All right, let's proceed.

19    MR. VEEDER:  Mr. Pickering is here, your Honor.  He has

20    signed your Honor's letter.

21    THE COURT:  Let me see the letter.

22    (Mr. Veeder hands document to the Court.)

23    THE COURT:  The letter indicates that you have a total of

24    41.9 acres, Mr. Pickering, of which 17.4 acres is irrigable;

25    is that correct.

1      MR. PICKERING:  That is right.

2      THE COURT:  No, all are irrigable; 17.4 acres outside the
3  watershed.

4      MR. PICKERING:  I stand corrected; that is right.

5      THE COURT:  It is not plain to me yet.  Does the 41.9 acres
6  include the 17.4 acres outside the watershed or not.

7      COL. BOWEN:  Yes, it does, your Honor.

8      THE COURT:  Then when you say "All are irrigable" you mean
9  that the 17.4 acres outside the watershed are also irrigable?

10     COL. BOWEN:  Yes, your Honor.

11     THE COURT:  But not from our watershed?

12     COL. BOWEN:  Yes, your Honor.

13     THE COURT:  As explained, then, I have no problem with it.

14     Col. Bowen, where does this land lie?  Over the Murrieta
15  Basin?

16     COL. BOWEN:  Right up on the contact, your Honor, between
17  the basement complex and the older alluvium.  It is in that
18  area where there has been no definition of ground water basins.

19     THE COURT:  Then actually, within the watershed, there are
20  24.5 acres irrigable?

21     COL. BOWEN:  Yes sir.

22     THE COURT:  The Court has not yet decided yet, Mr. Pickering,
23  the full extent of the basin up in that area, and the Court will
24  decide either that you have land over the Basin in which you have
25  correlative rights and you therefore have land where there is

1   water that is part of the stream system, or that you have

2   vagrant, local percolating water not part of the stream system.

3   In view of where you are located, even though it is up in the

4   upper end of the Valley, it would seem to me that probably

5   your land will be part of the stream system.

6       MR. PICKERING:  These figures, if I understand correctly,

7   don't refer to the basin.

8       THE COURT:  They have nothing to do with where the basin

9   is.

10      MR. PICKERING:  Yes.

11      THE COURT:  It is also true, of course, that you may not

12  use water from this water shed on those 17.4 acres that lie

13  outside the watershed.  You understand that.  That is another

14  principle of law.  You can do a lot of things with water with-

15  in the watershed, but you can't take water out of one water-

16  shed into another.  So your problems on those 17.4 acres are

17  not before us for consideration, unless it should develop that

18  you were trying to use Santa Margarits water in that area.

19      May this be filed, then, as part of Exhibit 207-E in

20  evidence?

21      MR. VEEDER:  Thank you, your Honor.

22      (The Court's letter, signed by Mr. Pickering, received in

23  evidence as part of 207-E.)

24      THE COURT:  Thank you for coming in.  What is your full

25

13,393

1   name, Mr. Pickering?

2        MR. PICKERING:  Penn Wood Pickering

3        MR. VEEDER:  Sometimes Penn W. Pickering?

4        MR. PICKERING:  That is the way it is carried on the

5   record.

6        THE COURT:  Thank you for coming in.

7        MR. VEEDER:  The next matter involves the engineering

8   report on the property of W. K. Whitney, and Mr. Whitney is

9   now in the courtroom, your Honor.

10       THE COURT:  Mr. Whitney and Mr. Pickering were heretofore

11  sworn.

12       MR. VEEDER:  That is correct.

13       I would like to have the engineering report marked U.S.A

14  Exhibit 262.

15       THE COURT:  The engineering report will be marked 262.

16       MR. VEEDER:  I would like to call Col. Bowen.

17       Col. Bowen, I hand you the engineering report marked for

18  identification Exhibit 262 and ask you to state into the record

19  under whose direction that Exhibit was prepared.

20       COL. BOWEN:  Prepared under my direction.

21       MR. VEEDER:  Is it accurate to your personal knowledge?

22       COL. BOWEN:  Yes sir.

23       MR. VEEDER:  Have you discussed this with Mr. Whitney and

24  have you delivered him a copy of that engineering report?

25       COL. BOWEN:  I delivered a copy of this report to Mr.

1   Pickering today, but I haven't discussed it with him.

2       MR. VEEDER:  We offer into evidence the engineering report

3   marked for identification U.S.A. Exhibit 262, your Honor.

4       THE COURT:  Exhibit 262 received in evidence.

5       (Engineering report, U.S.A. Exhibit 262 for identification,

6   received in evidence.)

7       MR. VEEDER:  I have no further questions.

8       THE COURT:  Have you had a chance to look at the report,

9   Mr. Whitney?

10      MR. WHITNEY:  Not yet.  I am satisfied with that letter.

11  I will just sign the letter, if that is satisfactory with

12  everybody.

13      THE COURT:  The report in substance shows -- how many

14  acres does it show Mr. Whitney has?  80 acres?

15      COL. BOWEN:  Approximately 80, your Honor.  It will appear

16  on the first page of the report.

17      THE COURT:  Is that correct, Mr. Whitney?

18      MR. WHITNEY:  No.  It was a full 80, but the road came

19  along through and took off an acre and two-thirds.  That

20  figures out just about right.

21      THE COURT:  It is an 80 less what they took for a road?

22      MR. WHITNEY:  That is right.

23      THE COURT:  How many of those acres do you think are

24  irrigable?

25      MR. WHITNEY:  According to the definitions I received from

13,395

a couple of men this morning, all but a stone patch, about .2 of an acre.

MR. VEEDER:  The letter addressed to Mr. Whitney deducted the road area and showed 78.2 acres, your Honor.  He says that that is acceptable to him.

MR. WHITNEY:  78.

THE COURT:  The letter said that you had 78.2 acres and that all of it was irrigable.  Is that close enough?

MR. WHITNEY:  That is a little too liberal.  There is about two acres of hard stone -- .2 of an acre.

THE COURT:  Then what do you think is irrigable?  77 or 78?

MR. WHITNEY:  I believe I could, by contouring it --

COL. BOWEN:  Your Honor, Exhibit 262 details the irrigable acreage by land classes.

THE COURT:  Will that show at the bottom of page 2?

COL. BOWEN:  Yes sir, the tabulation at the bottom of page 2 in plaintiff's Exhibit 262 shows the area of lands for classes II, III, IV and VIII, and indicates on page 3 at the top that the soils of Classes II and III are susceptible or irrigation -- Classes II, III and IV, your Honor.  The total irrigable acreage as shown in the tabulation on page 3 is 38.

THE COURT:  Then the letter is in error.  There is some error here.  The letter indicated that all of it was irrigable.

MR. WHITNEY:  I don't know.

MR. VEEDER:  All I can say, your Honor, is that I have not

1    looked at the engineering report myself.  It just came in this

2    afternoon.

3        THE COURT:  What does our Exhibit show?

4        MR. VEEDER:  I'll check out Exhibit 207-D.  That is all I'

5    can do.

6        THE COURT:  Do we have it before us?

7        MR. VEEDER:  Would you get Exhibit 207-D, Mr. Clerk?

8        COL. BOWEN:  We prepared this detailed soil survey for Mr.

9    Whitney, your Honor, and the map at the back part of Exhibit

10   262 contains land clasification.  Much of it is shown as steep,

11   shallow soils, with other limiting factors which bar it from

12   being susceptible of profitable and practical irrigation.

13       THE COURT:  The three classes that in your opinion are

14   Classes II, III and IV?

15       COL. BOWEN:  Yes, your honor, on this particular property.

16       THE COURT:  The report further shows that according to the

17   survey, 25 acres of this would be susceptible to row crops with

18   a water duty of 4 acre feet per year per acre, and 12.9 acres

19   would be susceptible for citrus with a water duty of 1.86 acre

20   feet per acre per year.  Do you agree with those two conclusions

21   as to row crops and citrus?

22       MR. WHITNEY:  Very much.  That is a good definition.

23       THE COURT:  And those areas are approximately right,

24   available for row crops or for citrus?

25       MR. WHITNEY:  Very close to what I have figured.

13,397

1    THE COURT:  Have you discovered what the error is, Mr.

2    Veeder?

3        MR. VEEDER:  It shows in Exhibit 207-D that there are 78.2

4    acres total and 78.2 acres irrigable.  It is obviously an error.

5        THE COURT:  Mr. Whitney, on the basis of Col. Bowen's

6    testimony I would propose to find that 38 of your acres are

7    irrigable, and not all the area.  Were you here this morning

8    when we discussed this matter?

9        MR. WHITNEY:  Yes, I was here.

10       THE COURT:  This matter of how many acres are irrigable is

11   a problem on which there is never any final conclusion.  If

12   later on there were use by you of water on other parts of this

13   property, and there were a contention that this was not a proper

14   use, you would be entitled to have a hearing to see whether

15   or not this was a reasonable and beneficial use of water on

16   this other property or was not.  Do you understand?

17       MR. WHITNEY:  Yes sir.

18       THE COURT:  All right, those are the findings that I pro-

19   pose to make.  Where does this land lie with reference to the

20   Murrieta Basin, Col. Bowen?

21       COL. BOWEN:  This land lies largely on the basement complex,

22   your Honor;  as a matter of fact, it borders Mr. Pickering's

23   land, it lies to the east of Mr. Pickering's land, and as the

24   geology of plaintiff's Exhibit 262 shows, the only water, if

25   any, that is likely to be found in this would be in the cracks

1   and fissures in the crystaline rock.

2       THE COURT:  And in your opinion is that part of the stream

3   system?

4       COL. BOWEN:  In my opinion, sir, it is not a part of the

5   stream system.

6       THE COURT:  Do you have a well?

7       MR. WHITNEY:  Nothing exceptional.  I drilled three by hand.

8   I got a tiny little stream about the size of a pencil out of

9   one of them.

10      THE COURT:  The Court would propose to find that any water

11  you found on your ground you would be lucky to have  and that

12  it belonged to you, subject only to such rights as your immedi-

13  ate neighbors might have, and would propose to/final decree
                                          find in the

14  that any water on land you own is not part of the stream system

15  and you will be eternally taken out of this law suit.  If they

16  want to fight it further you will not have to be bothered.  Is

17  that satisfactory?

18      MR. WHITNEY:  Very much so, sir.

19      THE COURT:  All right.

20      MR. WHITNEY:  Thank you very much, sir.

21      THE COURT:  Is your name W. K. Whitney?

22      MR. WHITNEY:  Wayne K. Whitney.

23      THE COURT:  Thank you, Mr. Whitney.

24      MR. WHITNEY:  Thank you very much.

25      MR. VEEDER:  That is it, your Honor.

1    THE COURT:  That is it until tomorrow morning, then,

2    gentlemen, is that right?

3        MR. GIRARD:  That is all right.  I had some discussion that

4    I wanted to enter into in regard to future plans, but we can

5    put that off until tomorrow.  Other counsel are waiting.  As I

6    recall, you did state at out last meeting that you were going

7    to miss your summer vacation to proceed on this case.

8        THE COURT:  No, not necessarily to proceed on this case.

9    I will have something to do around here with out worrying about

10   this case.  If you have vacation problems, Mr. Kunkel here

11   pointed out that he wants to spend a lot of hard earned money

12   and go to Europe in August.

13       MR. GIRARD:  I hope we can get Mr. Kunkel's rebuttal in

14   before August.

15       MR. SACHSE:  We haven't any vacation problems, your Honor.

16   We want to work this summer and get this thing over with.

17       THE COURT:  Maybe you gentlemen can adjourn and discuss

18   future plans and we will talk about them tomorrow.

19       MR. SACHSE:  Thank you.

20       THE COURT:  Will you spend a little time on it?

21       MR. GIRARD:  Be happy to.

22       THE COURT:  Mr. Veeder tells me he thinks he can clean up

23   all the rest of the Murrieta at the next hearing.

24       MR. VEEDER:  That is correct your Honor.

25       THE COURT:  Getting rid of a lot of these small parcels

19,460

1   will be a big help.  The bigger ones shouldn't be as trouble-

2   some as these smaller ones are.

3       Mr. Veeder, have you made any arrangements to mimeograph

4   this form letter that I call "Form Letter #1"?

5       MR. VEEDER:  Yes, it is going to be mimeographed, your

6   Honor.  You will notice on my note to you I have suggested a

7   change in the first sentence to refer to the case.

8       THE COURT:  Will you let me see it before you run it off?

9       MR. VEEDER:  Yes, your Honor.  It is on your desk now, I'm

10  sure.

11      THE COURT:  All right.

12      (Adjournment until Friday, May 27th, 1960, at 10:00 A.M.)

13

14

15

16

17

18

19

20

21

22

23

24

25